**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DON LIPPERT, CARL MICHAELS, | ) | |
| MICHAEL CLARK, WILLIAM EARL | ) | |
| BASSETT, OZELL GRAYER, LEWIS | ) | |
| RICE, and MILAM MARTIN, | ) | |
| | ) | Case No. 10 C 4603 |
| Plaintiffs, | ) | |
| | ) | The Hon. Ruben Castillo |
| v. | ) | The Hon. Mag. Judge Daniel Martin |
| | ) | |
| SALVADOR GODINEZ, LOUIS SHICKER, | ) | |
| PATRICK QUINN, ALPHONSO NORMAN, | ) | |
| MARTHA MALDONADO, | ) | |
| ATHENA ROSSITER, and WEXFORD HEALTH | ) | |
| SOURCES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT WEXFORD HEALTH SOURCES, INC'S ANSWER
AND AFFIRMATIVE DEFENSES TO
PLAINTIFFS' THIRD AMENDED COMPLAINT**

Defendant, WEXFORD HEALTH SOURCES, INC., by its attorneys, Charysh &

Schroeder, Ltd., answers and pleads its affirmative defenses to plaintiffs' third amended

complaint as follows:

**NATURE OF THE CASE**

The Eighth Amendment to the Constitution of the United States prohibits cruel and

unusual punishment. Failure to treat, and unreasonable delay in treating, inmates with serious

medical conditions results in a worsening of their medical problems, and otherwise inflicts

unnecessary pain and suffering on inmates. The United States Supreme Court thus long ago held

that prison officials have a constitutional obligation to provide adequate medical care. As the

Supreme Court recently stated, "Just as a prisoner may starve if not fed, he or she may suffer or

1

die if not provided adequate medical care. A prison that deprives inmates of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in a civilized society." **Brown v. Plata**, 563 U.S. ____. 131 S.Ct. 1910 (2011).

Illinois awarded Wexford Health Sources, Inc. a $4 billion contract to provide medical care to inmates in every prison operated by the Illinois Department of Corrections ("IDOC") (the "Contract"). Wexford's contract with Illinois provides for, in essence, a flat payment based on the inmate population. It thus has an economic incentive to provide minimal care. In an astonishing admission of how this structural contradiction in its mission is resolved in practice, Wexford doctors have told inmates, "We are not here to save lives; we are here to save money."

The State defendants Shicker, Godinez, and Quinn (collectively the "State Defendants"), have put a place contractual and other uniform standards that govern the delivery of health care services by Wexford across the Illinois Prison system, as well as a monitoring system to assess the quality of health care Wexford provides. This monitoring system has identified longstanding, systemic problems in the delivery of healthcare across all Illinois penal institutions. The recognized deficiencies include, among other things, the failure to provide and maintain adequate staffing levels, resulting lengthy and dangerous delays in receiving appropriate treatment (including the failure to refer inmates to necessary and appropriate specialists), the failure to properly manage medications prescribed to inmates, the failure to provide medically prescribed diets, the failure to adequately address issues to physician competence, and the failure to properly create and maintain medical records. Despite the State Defendants' knowledge of the systemic deficiencies in Wexford's performance and the delivery of healthcare services generally, these problems remain uncorrected – IDOC recently renewed the Wexford Contract –

demonstrating the State Defendants' deliberate indifference to the medical needs of Illinois inmates. The result has been, and will continue to be, the provision of health care services which fall below the constitutional standard.

Wexford and the State Defendants' failure to correct these deficiencies ensures that treatment of inmates throughout Illinois' prisons is inevitably delayed for months, and often for years, even in the most severe cases. As a result of Wexford and the State Defendants' policies, inmates throughout Illinois have not received adequate or timely treatment for their medical conditions, their conditions have deteriorated, and they have otherwise been subjected to wholly unnecessary pain and suffering, with no penological justification, in violation of the Eighth Amendment to the Constitution of the United States.

The vast majority of inmates have or will develop medical conditions which require treatment by medical professionals. Wexford and the State Defendants' deliberate indifference to inmates' medical needs thus directly endangers every current and future inmate in Illinois' prisons. In addition, since virtually all inmates will be released to the community, Wexford and the State Defendants' failure to treat serious medical conditions in prison inevitably means that the public at large is needlessly exposed to diseases which breed in prison.

Plaintiffs therefore seek to represent a state-wide class consisting of everyone who is now, or will be, confined in any prison operated by the State of Illinois. The class plaintiffs do not seek damages; they seek only declaratory and injunctive relief.

Lippert's individual claim for deliberate indifference, although indicative of these overarching problems, relates to a specific incident of improper treatment by a nurse and two correctional officers.

**ANSWER:**    Admit that Wexford has a contract to provide specified medical care to inmates within IDOC.  Deny that Wexford has an economic incentive to provide minimal care. Deny that Wexford fails to correct deficiencies.  Deny that medical treatment of inmates is inevitably delayed for months, and often for years.  Deny that as a result of Wexford's policies, inmates throughout Illinois have not received adequate or timely treatment for their medical conditions.  Deny that inmates have been subjected to wholly unnecessary pain and suffering in violation of the Eighth Amendment to the Constitution of the United States.  Deny that Wexford is deliberately indifferent to inmates' medical needs. Deny that the public at large is needlessly exposed to diseases which breed in prison.  Deny any remaining allegations.

## JURISDICTION AND VENUE

1.      Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because the matters in controversy arise under the Constitution and laws of the United States. This civil action seeks declaratory and injunctive relief under 28 U.S.C. §§1343, 2201, and 2202 and 42 U.S.C. § 1983.

**ANSWER**:    Admit jurisdiction.

2.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the Northern District of Illinois.

**ANSWER**:    Admit venue.

3.      One or more of the Class Plaintiffs have exhausted administrative remedies reasonably available to them prior to bringing their 42 U.S.C. § 1983 civil rights claims in accordance with the Prison Litigation Reform Act, 42 U.S.C. § 1997(e)(a).

**ANSWER**:    Deny.

## PARTIES

### Class Plaintiffs

4.    Plaintiff Don Lippert ("Lippert") is an inmate (ID # B74054) at Stateville Correctional Center.  He was first incarcerated on or around February 29, 1996, and remains in custody to this day. Lippert was diagnosed with Type I Diabetes prior to his incarceration. Although Lippert needs, and was prescribed, a medical diet for his diabetes in order to regulate his glucose levels, he has never received said diet. Over the years, Lippert has experienced multiple interruptions in care, including delays in receiving his insulin shots and failures to consistently check his blood sugar levels.

**ANSWER**:    Admit that Lippert is incarcerated at Stateville Correctional Center. Deny that Lippert has experienced multiple interruptions in care. This defendant lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations contained in this paragraph.

5.    Plaintiff Carl Michaels ("Michaels") is an inmate (ID # NO1209) at Dixon Correctional Center. He was first incarcerated on or around April 11, 1980 and remains in custody to this day. Wexford and the State Defendants have failed to provide him with adequate and timely care, causing him harm and permanent injury. Michaels suffers from progressive low tension glaucoma and Hepatitis C. Although Michaels was recommended for surgery to treat his glaucoma in May of 2010, the final approval had still not been provided as of March 2012. Michaels constantly experiences delays in follow up visits and has problems receiving his prescribed medication. As a result of the constant delays and incorrect testing, Michaels has lost

over 50% of his eye sight and will continue to lose the rest at a rapid pace if not provided with adequate treatment. With respect to his Hepatitis C, Michaels, after being diagnosed, waited over a year to gain approval to attend a Hepatitis C clinic. When he experienced negative side effects from the medication he was taking for the Hepatitis C, he was abruptly taken off the medication and as of March 2012, had not received approval for a different medication.

**ANSWER**:    Deny that Wexford failed to provide Michaels with adequate and timely care, causing him harm and permanent injury. This defendant lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations contained this paragraph.

6.    Plaintiff Michael Clark ("Clark") is an inmate (ID # C10666) at Dixon Correctional Center. He was first incarcerated on or around October 11, 1974 and remains in custody to this day. Clark was diagnosed with diabetes while incarcerated at Menard. Although prescribed a medical diet, he only receives a standard prison diet. Clark wrote directly to Defendant Shicker about the inability to control his glucose levels with the foods provided, however, the response he received denied all responsibility and simply stated that "he [Clark] needed to make better commissary choices." Due to Defendants' failure to provide the medical treatment prescribed by his physician, which Wexford is contractually obligated to do, Clark is left with few options to adequately monitor and manage his condition. Clark also suffers from Hepatitis C and began attending the Hepatitis C clinic. Despite this diagnosis, as of March 2012, Clark had not been allowed to see a specialist or begin treatment.

**ANSWER**:    Deny that Wexford failed to provide Clark the medical treatment prescribed by his physician.  Admit only to those duties imposed by law, and deny plaintiffs have properly stated those duties. This defendant lacks sufficient knowledge and information to form a

belief as to the truth of the remaining allegations contained this paragraph.

7.     Plaintiff William Earl Bassett ("Bassett") is an inmate (ID # C01395) at Stateville Correction Center. Bassett was first incarcerated on or around December 11, 1963 and remains in custody to this day. In 2005, a cancerous tumor was discovered in his bladder and as a result his entire bladder was removed. Accordingly, Bassett uses a urostomy pouch, which must be changed every three days. The medical staff have not provided Bassett with an adequate supply of urostomy pouches. Basset has been told to reuse the pouches, despite the fact that they cannot safely be reused. The medical staff does not provide Bassett with gauze to clean himself after changing his urostomy pouch. Instead, Bassett is forced to use paper towels. In 2007, Bassett had a pacemaker surgically implanted. He is supposed to see a doctor every three months in order to test the pacemaker, but as of March 2012, had not seen a doctor for this purpose since August 2011.

**ANSWER**:     Deny that Bassett is not provided with proper medical treatment and supplies. This defendant lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations contained this paragraph.

8.     Plaintiff Ozell Grayer ("Grayer") is an inmate (ID # A15477) at Stateville Correctional Center. He was first incarcerated on or around July 10, 1987 and remains in custody to this day. Grayer suffers from kidney failure and requires dialysis three times a week at regularly-spaced intervals. Wexford and the State Defendants have failed to administer dialysis to Grayer in this manner, putting him at risk of kidney failure. Due to his renal condition, Grayer periodically experiences serious complications. Wexford and the State Defendants' inadequate monitoring of his health, and the resulting delay in medical care that results, has exacerbated

those complications and caused him additional harm. Grayer has two slipped discs in his back, but has not been allowed to undergo necessary corrective surgery. In addition, Grayer does not receive a special diet crucial for patients suffering from kidney failure.

**ANSWER**: Deny that Wexford has failed to provide medical care to Grayer, including proper kidney dialysis  Deny that Wexford inadequately monitors Grayer's health, delays his medical care and causes him harm. This defendant lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations contained this paragraph.

9.     Plaintiff Milam Martin ("Martin") is an inmate (ID # A91437) at Big Muddy Correctional Center. Martin was first incarcerated on or around March 25, 1983 and remains in custody to this day. Martin is confined to a wheelchair due to an injury he received while in prison. On October 27, 2011, Martin fell from his wheelchair suffering injuries to his leg, knee and ribs. After complaining for over two months about his rib injuries, Martin's ribs were finally x-rayed to reveal fractures. Defendants did not provide any wrap, medication or special mattress for the broken ribs; Martin was instructed to take Motrin.

**ANSWER**:     This defendant lacks sufficient knowledge and information to form a belief as to the truth of the allegations contained this paragraph.

10.     Plaintiff Lewis Rice ("Rice") is an inmate (#B20391) at Menard Correctional Center. Rice was first incarcerated on or around April 5, 2010 and remains in custody to this day. On July 27, 2010, Rice collapsed during a cell search and hit his head, and was taken to the health care unit. He complained, at the time of chest pains, but was told he was only being seen for head injury, and he would have to return to have his chest inspected. He was diagnosed with "heat exhaustion," given water, and returned to his cell. On the way back to his cell, he

complained to the escorting officer of his chest pain, which were ignored. Later that evening, he collapsed again. The next day, Rice was given an EKG which showed sinus bradycardia and prolonged QT waves. He was formally admitted and diagnosed with severe abnormal heart beat and, on July 29, 2010, he received a referral to a cardiologist. As of April 2012, Rice had not seen a cardiologist. Since that referral, Rice has collapsed on two separate occasions, and is still housed in an upper gallery.

**ANSWER**:    This defendant lacks sufficient knowledge and information to form a belief as to the truth of the allegations contained this paragraph.

### Defendants

1.    Defendant Patrick Quinn ("Quinn") is the Governor of the State of Illinois. He is sued in his official capacity. The Governor is the Chief Executive Officer of the State of Illinois. He is responsible for ensuring the provision of constitutionally adequate medical care for all inmates in the custody of the IDOC as well as ultimately approving the contract between the State and Wexford to provide health care to Illinois prisoners, and is responsible for establishing monitoring and other procedures to ensure that Wexford in fact provides the contracted services in a manner which complies with Illinois' Constitutional obligation to provide medical care to Illinois' prisoners. In all his actions, Quinn was acting under color of state law and in the course of his employment.

**ANSWER**:    This defendant lacks sufficient knowledge and information to form a belief as to the truth of the allegations contained this paragraph.

2.    Defendant Salvador Godinez ("Godinez") is the Director of the IDOC and is sued in his official capacity. As Director of the IDOC, Godinez is responsible for establishing,

monitoring, and enforcing overall operations, policies, and practices of the Illinois state prison system, which includes the provision of constitutionally adequate medical care for all inmates in the custody of the IDOC. In all his actions, Godinez was acting under color of state law and in the course of his employment.

**ANSWER**:   This defendant lacks sufficient knowledge and information to form a belief as to the truth of the allegations contained this paragraph.

3.      Defendant Louis Shicker ("Shicker") is the Medical Director for the IDOC and is sued in his official capacity. As Medical Director, Shicker is responsible for oversight of the independent contractor, Wexford, hired to provide medical treatment to all inmates in the custody of the state and housed in an Illinois correctional center. Pursuant to the IDOC administrative directives, Shicker is responsible for ensuring that all IDOC established policies and directives are appropriate and properly implemented at all facilities. In addition, Shicker receives and, upon information and belief reviews, the Quality Improvement Minutes for every IDOC facility. In all his actions, Shicker was acting under color of state law and in the course of his employment.

**ANSWER**:   Admit Shicker is the Medical Director for the IDOC.  This defendant lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations contained this paragraph.

4.      Defendant Wexford Health Sources, Inc. ("Wexford") is, and at all times relevant to this lawsuit was, engaged in the business of providing health care professionals and services to all correctional facilities in Illinois pursuant to contract. In this role, Wexford is obligated to properly implement all IDOC written policies and directives to ensure adequate medical treatment is provided at all times.

10

**ANSWER**:    Admit that this defendant provides specified health care professionals and services to correctional facilities in Illinois pursuant to contract.  Admit only to those obligations and duties required under law and pursuant to contract.  Deny plaintiffs have adequately stated those obligations and duties.  Deny any remaining allegations.

5.    Defendant Alphonso Norman ("Norman") is, and at all times relevant to this lawsuit was, a correctional officer at Stateville employed by IDOC. He is and was assigned to F-House. Lippert sues Norman in his individual and official capacity.

**ANSWER**:    This defendant lacks sufficient knowledge and information to form a belief as to the truth of the allegations contained this paragraph.

6.    Defendant Martha Maldonado ("Maldonado") is, and at all times relevant to this lawsuit was, a correctional officer at Stateville employed by IDOC. She is and was assigned to F-House. Lippert sues Maldonado in her individual and official capacity.

**ANSWER:**    This defendant lacks sufficient knowledge and information to form a belief as to the truth of the allegations contained this paragraph.

7.    Defendant Athena Rossiter ("Rossiter") is, and at all relevant times was, a nurse licensed to practice in the state of Illinois. Defendant Rossiter is either an employee of, or a contractor for, Stateville. Lippert sues Rossiter in her individual capacity and official capacity.

**ANSWER:**    Admit Rossiter was at relevant times a nurse licensed to practice in the state of Illinois and worked for Wexford at Stateville.  Deny any remaining allegations.

## THE SYSTEMIC FAILURES AT ISSUE

8.    The population of Illinois' prison system has increased from under 10,000 inmates in 1970, to more than 48,000 inmates today. Illinois' prisons were designed to hold less than

11

34,000 people, and are thus operating at 140% of capacity. As Illinois' prison population has soared, with a corresponding jump in the number of prisoners who are aging or elderly, the number of inmates suffering from serious medical conditions and needing consistent medical treatment has soared as well. Aging populations in prison, just as in society in general, require more constant and comprehensive care to adequately meet the health needs concomitant with the aging process. IDOC and its independent medical contractor, Wexford, have failed miserably to deal with this problem. Further, as the number of inmates needing medical treatment increases, the availability of medical staff, medicine, and resources has decreased.

**ANSWER**:    Deny that this defendant has failed to meet the health needs of inmates. This defendant lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations contained this paragraph.

9.    The Contract governs Wexford's services in all IDOC facilities. The contractual "goal" is "[t]o maintain health status of offenders, establish innovative and cost effective medical and administrative programs, improve the quality of care, provide acceptable, cost effective levels of staffing, and positively impact purchasing of pharmaceutical and/or medical supplies." Wexford is required to "[p]rovide comprehensive medical . . . health services to offenders in a professional manner" and "[o]perate the medical . . . health program in a cost effective manner with full reporting and accountability to Agency."

**ANSWER**:    Admit that the provision of specified medical services is governed by contract.  Admit that Wexford provides specified medical and health services pursuant to the contract.  Deny that the goals of the contract have been completely and fully stated.  This defendant lacks sufficient knowledge and information to form a belief as to the truth of the

remaining allegations contained this paragraph.

10.    Accordingly, the Contract establishes performance standards that must be met by Wexford including, but not limited to, staffing levels and required qualifications for medical personnel at each facility. In addition to standards enumerated in the Contract, IDOC has also issued "Administrative Directives" that govern the provision of services at all IDOC facilities and "Institutional Directives" that govern Wexford's provision of services at individual facilities.

**ANSWER**:    Admit that provisions related to staffing levels and qualifications for medical personnel are established by contract.  Admit that IDOC has administrative and institutional directives that govern the provisions of specified services at IDOC facilities. Deny that the performance standards have been completely and fully stated.  This defendant lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations contained this paragraph.

11.    Wexford's performance under the Contract is centrally monitored in the following ways:

• The Quality Improvement Committee "present[s] an annual report to the IDOC Medical Director that is based on the data it gathers and monitors throughout the year;"

• Wexford and IDOC are required to "monitor performance of medical staff to ensure adequate job performance of medical staff to ensure adequate job performance in accordance with job descriptions;"

• Regular reports of system-wide activities are required when requested;

• A defined peer review process is established; and

• Wexford is obligated to participate in any performance reviews that IDOC

13

conducts.

**ANSWER**:    Admit that Wexford's performance is monitored under the contract. Deny that performance has been completely and fully stated.  This defendant lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations contained this paragraph.

12.    In theory, these standards help establish both a framework for identifying significant deficiencies relating to the provision of medical care and a system for responding to and correcting the identified deficiencies. In practice, both Wexford and the State Defendants have repeatedly failed to take appropriate action in response to identified systemic failures in the medical care delivery. The failure to adequately address these continuing, systemic failures puts all inmates at risk of substantial harm and amounts to a policy or practice of Wexford and the State Defendants.

**ANSWER**:    Admit Wexford identifies, responds to and corrects deficiencies relating to the provision of medical care.   Deny that this defendant has repeatedly failed to take appropriate action in response to identified systemic failures in the delivery of medical care and deny that failures to adequately address continuing, systemic failures puts inmates at risk of substantial harm or amounts to a policy or practice of Wexford.  This defendant lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations contained this paragraph.

13.    Over the past two years, the John Howard Association of Illinois (the "JHA"), a prison monitoring organization, has visited multiple Illinois correctional centers to assess, among other things, the medical and healthcare programs and facilities. In a report entitled "Unasked

14

Questions, Unintended Consequences: Fifteen Findings and Recommendations on Illinois' Prison

Healthcare System," the JHA concluded in its first finding that "there is insufficient external

oversight of IDOC healthcare services, particularly with respect to services provided under

contract by the private vendor, Wexford . . . While administrators in individual IDOC facilities

are charged with performing quality improvement reviews and monitoring the delivery of

healthcare services, they do not have the resources to perform comprehensive quality control

monitoring and financial auditing of services under the Contract. The Office of the Illinois

Auditor General, the entity that typically performs such comprehensive public financial audits,

does not audit the Wexford contract." (See JHA Report, attached as Exhibit A.)

   **ANSWER**:   This defendant lacks sufficient knowledge and information to form a belief

as to the truth of the allegations contained this paragraph.

   14.   On those occasions where IDOC and Wexford have identified serious deficiencies

in the delivery of health care to inmates, the policies and practices employed by IDOC and

Wexford to correct the deficiencies are materially inadequate. For example, investigation to date

has identified longstanding, systemic failures across the Illinois correctional system that result in

the failure to delivery constitutionally required medical care including, but not limited to: (a) the

failure to employ adequate numbers of doctors, nurses, specialists and other medical providers to

ensure the delivery of constitutionally required medical care; (b) the failure to provide

reasonably prompt medical care; (c) the failure to provide timely emergency treatment; (d) the

failure to properly manage medications and medical supplies; (e) the failure to provide medically

prescribed diets; (f) the failure to properly keep adequate medical records; and (g) the failure to

identify and correct incompetent medical treatment.

These longstanding systemic deficiencies, which violate administrative and institutional directives and the terms of the Contract, have not been corrected by either Wexford or the State Defendants, each of which has an independent duty to the inmates.

**ANSWER**:    Deny.

15.    Despite having actual knowledge of these deficiencies and the serious risks they pose, Defendants have been deliberately indifferent to the inhumane conditions to which the inmates are exposed and have failed to make reasonable efforts to remedy those conditions.

**ANSWER**:    Deny.

A.    **The Staffing Levels for Medical Personnel Are Deficient Across the Illinois Prison System**

16.    Wexford is required by the Contract to provide defined staffing levels, but has repeatedly failed to meet those required levels. The understaffing across essentially all facilities have been documented in reports to both Wexford and the State Defendants and has been so pervasive and unresolved that it amounts to a policy and practice of all Defendants.

**ANSWER**:    Admit the contract addresses staffing levels.  Deny the remaining allegations.

17.    Both Wexford and the State Defendants have failed to employ sufficient health care staff to provide adequate treatment across the entire system. Understaffing of nurses, physicians, and other medical personnel is a chronic problem existing in correctional facilities throughout Illinois. Many of these severe deficiencies in the IDOC health system are directly caused by the chronic understaffing.

**ANSWER**:    Deny.

18.    Defendants discontinued necessary positions such as dieticians, podiatrists, and

16

physical therapists. As a result, inmates do not have access to such specialists on a regular basis and are forced to go through the frustrating and often useless process of requesting to see an outside doctor. As a consequence, inmates often simply do not receive the prescribed treatment.

**ANSWER**:    Deny.

19.    Some facilities report shortages of up to essential healthcare personnel at any given time.

**ANSWER**:    Deny.

20.    Wexford and the State Defendants repeatedly have failed to fill critical medical positions throughout the prison system.

**ANSWER**:    Deny.

21.    Moreover, vacant positions, including high level positions such as remain open for excessive periods of time. For example, one particular facility reported a position as vacant for months.

**ANSWER**:    Deny that vacant positions remain open for excessive periods of time. This defendant lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations contained this paragraph.

22.    Such staffing deficiencies lead to facilities inability to meet the contractually required number of hours. For instance, one facility reported that the contractual hours were not met for months straight, falling short by over hours one particular month.

**ANSWER**:    Deny that staffing deficiencies lead to inability to meet the contractually required number of hours.  This defendant lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations contained this paragraph.

23. The JHA has found that the lack of medical staff was a serious and consistent issue in nearly all the Illinois prisons. For example:

• On June 26, 2011, JHA visited Menard Correctional Center in Chester, Illinois. JHA's report after that visit stated, "Menard suffers from chronic understaffing of nurses . . .[which] is a major factor that undermines inmate's access to competent healthcare."

• JHA visited Hill Correctional Center on May 31, 2011 reporting, "a 13-month backlog for dental care and a one year backlog for eye care. . . [several inmates] reported not receiving their medications, and others [reported] being denied medical care for an ongoing condition."

• Similarly, JHA found that Danville Correctional Center "is plagued by staff vacancies" and Pontiac Correctional Center, "[l]ike many Illinois prisons, has a gaping hole in its medical health care staff"

• JHA's visit to Stateville Correctional Facility revealed "significant understaffing problems" in both medical and correctional staff, a problem which "has been normal at Stateville for at least four years."

• More generally, in a recent report, the JHA concluded that "healthcare resources and staffing are inadequate to meet minimum standards of care throughout IDOC. In particular, systemic nursing shortages prevent inmates from timely accessing sick call and necessary healthcare services. However, lack of adequate medical staffing and resources in all areas — medical, mental health, dental, vision —
threaten serious harm by delaying diagnosis and treatment and inviting medical error. Inadequate medical staffing levels also contribute to staff burnout and turnover, which, in turn, help perpetuate chronic understaffing throughout IDOC."

**ANSWER**:     This defendant lacks sufficient knowledge and information to form a belief as to the truth of the allegations contained this paragraph.

> **B.      If Not Outright Denied Treatment, Inmates Consistently Face Lengthy and Dangerous Delays Receiving Medical Care in Illinois Prisons**

24.      Both Wexford and the State Defendants have a practice of failing to implement essential medical policies ensuring that inmates receive timely access to health care they require. Without timely access to necessary treatment, all inmates are at risk of substantial harm.

**ANSWER**: Admit that, without necessary medical treatment, inmates would be at risk of harm. Deny the remaining allegations contained in this paragraph.

25.      To request medical treatment, inmates must submit a request for sick call, whereby they fill out a form describing the needs for medical treatment. The process for submission of a sick call form alone is a significant barrier: often the requests are not collected, collected but not submitted until days later, or "lost" in the process.

**ANSWER**:     Deny.

26.       Once the sick call form is submitted, the inmate is entitled to see a nurse or CMT for assessment and possible recommendation to a physician or physician assistant. Offender sick call requests are required to be reviewed by health care staff within 24 hours of receipt. A nursing evaluation is required to take place within 3 days. When an inmate is referred to a physician, the physician's evaluation is required to occur within 72 hours.

**ANSWER**:     Admit that IDOC administrative directives provide for inmates to see nurses or CMTs within 24 hours of receipt of an offender sick call request slip.  Deny that the process for sick call requests has been completely and fully stated and deny any remaining allegations.

19

27.     These time frames are widely disregarded. Throughout the internal reports, Defendants record their own failures comply with these time frames, reporting 0% compliance in certain facilities for consecutive months.

**ANSWER**:     Deny that time frames for the provision of medical care are widely disregarded. This defendant lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations contained this paragraph.

28.     Such disregard for policies can have serious effects on inmates' health. For example, an inmate at Pontiac was experiencing severe pain in his eye and ear. After visiting sick call, he was told to cease using Q-tips to clean his ears and was not referred to a doctor. After another month of pain and filing a grievance, the inmate was seen again, given an MRI and told he would know the results in three weeks. After over a month, the inmate became concerned and checked his body for lumps. Finding one, he requested sick call and received another MRI. Only after asking was he nonchalantly told that the first MRI revealed a large tumor on his cerebellum. Due to the unreasonable delay in diagnosis and treatment, the inmate lost most of his hearing and vision on the left side of his head and suffered from partial paralysis on the left side of his body. Nearly three years after having the tumor removed from his cerebellum, most of the damage persists.

**ANSWER**: Deny this defendant disregards policies or unreasonably delays diagnosis and treatment. This defendant lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations contained this paragraph.

29.     For one inmate at Dixon suffering from Hodgkin's Lymphoma it took over a month and a half before he was able to finally see the doctor. Others at Dixon report it often

20

takes weeks before inmates are able to see a physician.

**ANSWER**:    This defendant lacks sufficient knowledge and information to form a belief as to the truth of the allegations contained this paragraph.

30.    Delays often occur beyond the sick call process as well. Even where a recommendation for treatment, medication, or a certain procedure is made by a primary care physician, it can be months or even years before an inmate will actually receive the prescribed treatment.

**ANSWER**:    Deny that this defendant often delays medical care. This defendant lacks sufficient knowledge and information to form a belief to the truth of the remaining allegations contained in this paragraph.

31.    Plaintiff Michaels was sent to an outside hospital to see a specialist regarding his glaucoma in November 2008. During the appointment the treating physician told him that he had severe damage to his optic nerve that would continue to deteriorate and he should be scheduled for another appointment in six weeks. As of March 2012, Michaels had still not received his appointment.

**ANSWER**:    This defendant lacks sufficient knowledge and information to form a belief to the truth of the allegations contained in this paragraph.

32.    Plaintiff Clark has been approved for Hepatitis C treatment for over a year, but as of March 2012, had yet to receive any treatment, seen the recommended specialist or received a liver biopsy to determine the severity of the disease.

**ANSWER**:    This defendant lacks sufficient knowledge and information to form a belief to the truth of the allegations contained in this paragraph.

21

33.     Another inmate at Stateville Correctional center was sent to University of Chicago for surgery and was scheduled to come back in two weeks to have the stitches removed. Not only was the inmate never taken back to the outside hospital but despite numerous requests, the prison doctors did not remove the stitches for three months.

**ANSWER**:     This defendant lacks sufficient knowledge and information to form a belief to the truth of the allegations contained in this paragraph.

34.     These lengthy delays in response to sick calls and treatment recommendations cause minor illness and injuries to escalate into emergency situations, where infections develop, diseases progress, and symptoms intensify.

**ANSWER**:     Deny.

35.     Egregious delays are common with respect to dental and vision care as well. A number of prisons report back logs of up to at least 10 months and one facility's non-priority dental list was reported to be three-year wait. Additionally, wait lists sometimes approach 800 inmates long, to receive standard, minimal dental and vision care.

**ANSWER**:     Deny that this defendant engages in egregious delays with respect to dental and vision care.  This defendant lacks sufficient knowledge and information to form a belief to the truth of the remaining allegations contained in this paragraph.

36.     Such lengthy delays may be attributed to Wexford and the State Defendants' failure to properly track requests and recommendations, the lack of staff necessary to effectively implement the directives in place, or several other reasons detailed and outlined in internal Wexford and IDOC reviews.

**ANSWER**:     Deny.

### C. Defendants Do Not Provide Inmates with Timely Emergency Treatment

37.     Timely emergency treatment is not only called for under the contractual and policy guidelines governing the provision of medical care in the State of Illinois, the systematic failure to timely respond to emergency situations constitutes deliberate indifference to the prisoners of the State of Illinois.

**ANSWER**:     Admit that provisions for emergency services are provided for under the contract.   Deny that the provisions for emergency services have been completely and fully stated. Deny the remaining allegations.

38.     Indeed, Defendants further fail to ensure that policies and directives governing emergency medical treatment are properly implemented or that the prisons are properly staffed with enough individuals qualified to respond to a medical emergency results in inmates suffering severe consequences and, in some instances, dying.

**ANSWER**:     Deny.

39.     The Administrative Directives require that each facility have an emergency response team that is prepared and equipped to respond to all medical emergencies in a timely and orderly fashion. The Administrative Directive further requires at least two of the security staff members on duty during any shift be trained in first aid and CPR certified.

**ANSWER**:     Admit that administrative directives provide for emergency response teams prepared and equipped to respond to medical emergencies in a timely and orderly fashion and provide for at least two security staff members per shift to receive training and certification in CPR.  Deny that the provisions for emergency response teams have been completely and fully stated. Deny any remaining allegations.

23

40.     Based upon the delays that continually occur in responding to emergency situations, it is clear that there is a serious breakdown in this system, which can only be remedied by proper staffing and the oversight necessary to fix recurring problems.

**ANSWER**:     Deny.

41.     An inmate at Stateville was diagnosed with kidney stones in January 2010. Although he experienced many bouts of acute pain in the following months, staff continually refused to allow him to see a doctor. In June 2010, he was finally allowed to see a doctor—who found an impacted kidney stone lodged in the inmate's urethra. The doctor accidentally punctured the inmate's urethra during unanesthetized, manual surgery to remove the impacted kidney stone with tweezers, causing intensely sharp, lingering pain in the inmate's penis. Following this operation, the inmate began urinating blood and experienced repeated episodes of extreme pain. He made several requests to see a doctor from June 2010 to August 2010, but his requests were refused until September 2010—at which time the treating physician found a cluster of kidney stones. The inmate, who could no longer urinate, was subsequently admitted to the infirmary and received a catheter.

**ANSWER**:     This defendant lacks sufficient knowledge and information to form a belief as to the truth of the allegations in this paragraph.

**D.     Defendants Do Not Properly Manage Distribution of Medications and Medical Supplies**

42.     Both Wexford and the State Defendants have a policy and practice of failing to prescribe, provide, and properly manage medications and medical supplies.

**ANSWER**:     Deny.

43.     Prescription drugs are ordered in bulk, and then removed from factory packaging

24

(at which time all warnings and directions are also removed), and prepared for delivery to individual inmates.

**ANSWER**:    Deny that inmates do not receive warnings and directions as appropriate. This defendant lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations in this paragraph.

44.    The delivery of medication is not contemporaneously logged according to accepted medical practices; instead, logs are routinely prepared either before the medicines are distributed, or after all medicines are distributed on a shift. This process routinely results in the wrong medicine being given to inmates, and generally calls into question the accuracy of the medication logs. This in turn makes it impossible for physicians to gauge the efficacy of prescribed medications.

**ANSWER**:    Deny.

45.    By removing all directions and warnings supplied by the manufacturer and failing to provide this information another way, defendants deprive inmates of the ability to give meaningful consent to any particular medication regime. Rather, inmates are required either to refuse essential mediation or blindly to take whatever drugs are delivered to them.

**ANSWER**:    Deny.

46.    In addition, Administrative Directive 04.03.110 Section II(E)(9) requires that medications must be provided as prescribed by the physician but medications frequently are not distributed on time. Inmates experience unreasonably long delays and gaps in receiving prescribed medication.

**ANSWER**:    Admit that IDOC administrative directives provide that medications shall

be administered or distributed in a timely manner and according to physician orders. Deny that those provisions have been completely and fully stated and deny any remaining allegations.

47.     The nurses responsible for handling and tracking medication administration consistently fail to appropriately document them in the Medication Administration Record (MAR), which, at the very least, leads to confusion and an interruption in care and can, at most, seriously endanger and damage inmates who, due to this lack of documentation, either get more medication than they should, or do not receive their medication at all.

**ANSWER**:    Deny.

48.     Additionally, multiple prisons report deficiencies in the labeling and storing of medications. Medications are sometimes kept past their expiration date. Medical staff also frequently fail to properly store and separate medications.

**ANSWER**:    Deny that medical staff frequently fail to properly store and separate medications.   This defendant lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations in this paragraph.

49.     Both Wexford and the State Defendants have a policy and practice of refusing to refill prescription on weekends or holidays. If a prescription runs out during one of the blackout times, inmates are forced to suffer without their medication for days.

**ANSWER**:    Deny.

50.     An inmate at Dixon takes medication for Parkinson's disease, but he is frequently unable to receive his medications as prescribed on weekends or holidays. Even if the medical staff is aware that his medications will run out during the weekend or holiday, the staff has refused to take measures to ensure that he receives his medications.

26

**ANSWER**:     Deny that inmates are frequently unable to receive medications as prescribed on weekends or holidays and deny that the medical staff has refused to take measures to ensure that inmates receives medications.  This defendant lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations in this paragraph.

51.     An inmate at Stateville receives medication for degenerative nerve and joint conditions but often goes without medication because the medical staff does not properly monitor and reorder inventory. The inmate either goes without his medication for periods of time or receives medications that were prescribed for other inmates.

**ANSWER**:     Deny that inmates often goes without medication because the medical staff does not properly monitor and reorder inventory.  This defendant lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations in this paragraph.

52.     When inmates need to renew a prescription, they must first endure unreasonable delays caused by the process of seeing a primary physician for the approval (as outlined above, this process often takes weeks). Thus, inmates are forced to go without their prescription medication.

**ANSWER**:     Deny.

53.     Wexford and the State Defendants fail to properly manage the ordering and distribution of medication, resulting in medications running out and inmates receiving improper medication.

**ANSWER**:     Deny.

54.     For example, one inmate at Pontiac had been receiving 20mg of his prescribed medication on every morning for an extended period of time. After visiting the doctor, his

prescription was raised to include an additional 10mg dose in the evening. Defendants incorrectly filled the prescription and, instead of raising the dosage to 30mg per day (20mg in the morning and 10mg at night), provided only the 10mg dose. Defendants have refused to correct, this mistake despite being shown the accurate prescription, leaving the inmate with only one third of his daily dose of prescribed medication.

**ANSWER**:   This defendant lacks sufficient knowledge and information to form a belief as to the truth of the allegations in this paragraph.

55.   Further, where the medication is prescribed by an outside doctor, patients often cannot receive the medication at all because it is non-formulaic or not on the "approved list." Wexford and the State Defendants have a policy and practice of only providing medicine on a limited formulary of approved medicines, and upon information and belief, routinely substitute doctor-approved drug regimens with drugs on the IDOC-approved formulary. As a result, inmates are deprived of medications that are well-established as effective for their health conditions, and receive inferior, ineffective, or obsolete medications. Other times, the inmates receive nothing at all.

**ANSWER**:   Admit that the defendants have a formulary of approved medications and prescribe medications from this formulary.  Deny the remaining allegations.

56.   Wexford and the State Defendants also fail to routinely order essential blood tests to determine whether medication is at a clinically appropriate level. When combined with the failure to maintain adequate medication logs, it becomes impossible for physicians to determine whether a particular medication is working, should be increased, decreased, discontinued, or another medication tried.

28

**ANSWER**:    Deny.

57.    Wexford and the State Defendants have a policy and practice of discontinuing medications abruptly, forcing inmates to go without medications from which they should be weaned or of inappropriately switching to a different medication suddenly. Such practices create serious negative side effects, causing inmates to experience serious pain and suffering.

**ANSWER**:    Deny.

58.    One inmate at Pontiac had been prescribed clomadine for an extended period of time for his high blood pressure. Despite the dangers, this inmate was abruptly removed from the clomadine due to concerns over an adverse reaction suffered by another inmate in the IDOC system. Upon being removed, the inmate's blood pressure spiked to 220/200.

**ANSWER**:    This defendant lacks sufficient knowledge and information to form a belief as to the truth of the allegations contained in this paragraph.

59.    Wexford and the State Defendants also have a policy and practice of failing to provide or properly manage and track the availability of necessary medical supplies. Failure to provide inmates with necessary medical supplies deprives these inmates of basic sanitation and puts them at great risk of infection.

**ANSWER**:    Deny.

60.    For example, Plaintiff Bassett uses a urostomy bag, which must be cleaned and changed regularly. The medical staff has instructed him to reuse his urostomy bag for prolonged periods, instead of providing him with necessary replacements. The medical staff has also unreasonably refused to provide adequate supplies to enable Plaintiff Bassett to properly clean the bag.

29

**ANSWER**:    This defendant lacks sufficient knowledge and information to form a belief as to the truth of the allegations contained in this paragraph.

    **E.**    **The Defendants Have a Policy of Refusing to Provide Medically Prescribed Diets**

61.    The JHA has found that "inmates with special dietary needs, such as diabetics, have limited or, at best, inconsistent access to medical diets depending upon the facility where they reside." For example, plaintiff Lippert needs, and was prescribed, a medical diet for his diabetes in order to regulate his glucose levels, but he has never received said diet.

**ANSWER**:    Deny that Lippert was denied an appropriate diet for his diabetes.  This defendant lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations contained in this paragraph.

62.    Certain medical conditions require medically-prescribed diets, such as heart healthy diets, as part of the treatment plan for those conditions. Certain inmates have in the past and some currently have prescriptions for medical diets. In the past, inmates have received medical diets. However, Wexford and the State Defendants' current policy is to not offer medical diets, but only limited alternative diet options such as soy-based and soft food diets. Instead of providing medical diets, Wexford and the State Defendants insist on inmates fulfilling their medically-prescribed diet needs by making specific choices from the commissary. However, the commissary choices are not a substitute for medically-prescribed diets, and commissary choices are inadequate so as to allow for self-directed medical diet compliance.

**ANSWER**:    Admit that certain medical conditions require healthy diets and admit that certain inmates have had prescriptions for certain medical diets.  Deny the remaining allegations.

63.    Additionally, when inmates bring up their grievances about not receiving

medically prescribed diets, they are told that the diets are not available, and that it is inappropriate to file dietary grievances with medical staff, even though diets are often prescribed by, or have in the past been prescribed by, medical staff. Because no one takes responsibility for getting the inmates the diets they need, the problems associated with their already existing diseases and ailments can be and are compounded.

**ANSWER**:    Admit that certain medical diets have been prescribed by the medical staff. Deny that inmates' medical problems are compounded because no one takes responsibility for getting the inmates the diets they need.  This defendant lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations contained in this paragraph.

64.    Further, Wexford has failed to put in place contractually required dieticians throughout the State.

**ANSWER**:    Deny.

**F.    The Defendants Frequently Fail to Create and Maintain Adequate Medical Records**

65.    Throughout their internal reports, Wexford and the State Defendants note their own failures to maintain complete medical records. From charting medication to charting vitals to having constant backlogs in filing and managing their charts, defendants frequently fail to follow medical standards with respect to the maintenance of medical records.

**ANSWER**:    Deny.

66.    Failure to keep medical records endangers inmates. When medications are not charted on the MAR, there is a great risk that those who rely on the MAR will not be able to catch failures and then administer medications appropriately. There is also the possibility that

31

inmates will receive medications again, in error, if nurses do not chart the first administration. This risk is compounded by the very real possibility that inmates whose medications are not charted will receive multiple medications that will cause adverse drug interactions and put them at risk of severe health complications.

**ANSWER**: Deny.

67. The internal reports also note failures in reviewing and charting with respect to labs. When physicians fail to review and chart lab findings, that failure can delay crucial follow up treatment for inmates whose labs come back with abnormal values indicated.

**ANSWER**: Admit that a failure to review and chart lab results can delay follow up treatment. This defendant lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations in this paragraph.

68. Nurses fail to follow and document treatment protocols and fail to document vitals for patients they are monitoring. These failures create an incomplete picture for physicians who rely on nurses to follow their orders and provide the information necessary to ascertain whether prescribed treatment plans are helping inmates achieve the desired health outcomes.

**ANSWER**: Deny.

69. Failures to maintain complete records have not only an effect on the prisons' ability to monitor their healthcare systems, but also can and do cause serious harm to inmates whose physicians cannot possibly provide the most appropriate treatment when basing their decisions on incomplete medical records.

**ANSWER**: Deny.

**F.    The Defendants Fail to Address Issues of Provider Competence**

32

70.     Wexford and the State Defendants fail to maintain a staff of qualified health care providers to conduct initial assessments. Thus, even when an inmate is able to receive an initial evaluation, it often is conducted by an individual who is not properly trained or licensed to make such an assessment. Such unqualified medical staff may not recognize symptoms a patient displays until the condition has progressed to a more severe stage or the inmate is lucky enough to see a qualified staff member. Such practices further put the class at risk.

**ANSWER**:     Deny.

71.     In the last five years, nearly 3,000 cases have been filed in Illinois alleging inadequate prison conditions, including inadequate medical treatment. These cases illustrate the defendants' longstanding, systemic failure to provide constitutionally adequate medical care, including adequate numbers of qualified health care staff, and to remove incompetent staff. The Honorable Milton Shadur of the Northern District of Illinois commented on the prevalence of inmate cases complaining of inadequate medical treatment in a recent opinion stating: If the random assignment of 42 U.S.C. § 1983 lawsuits by Illinois inmates echoes the totality of such filings in this judicial district (as seems likely), the volume of such actions charging Dr. Parthasarathi Ghosh with constitutional violations under the Estelle v. Gamble rubric would appear to bespeak a litigation cottage industry. And if even a fraction of those actions have merit . . . Dr. Ghosh would seem to be a walking malpractice action.

**ANSWER**:     Deny a longstanding, systemic failure to provide constitutionally adequate medical care, including adequate numbers of qualified health care staff, and to remove incompetent staff.  This defendant lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations contained in this paragraph.

33

## G. The Defendants Have Knowledge of These Systemic Deficiencies

72.     Both the State Defendants and Wexford are aware of the problems described above.

**ANSWER**:     Deny.

73.     Concerns over whether the State Defendants and Wexford appropriately respond to identified violations of the common policies and procedures governing Wexford's provision of health care services is a subject of the resolution (HR 1248) currently pending in the Illinois House.

**ANSWER**:     This defendant lacks sufficient knowledge and information to form a belief as to the truth of the allegations contained in this paragraph.

74.     Wexford's failure to comply with its constitutional obligations goes unchecked. The grievance process that IDOC employs to gather and respond to inmate complaints, for example, is not followed. Rarely are grievances found to have merit, and often, the reasons for "no merit" determinations are inappropriate. For example, there are instances in which grievances have been given "no merit" determinations simply because there is inadequate staff to respond to the subject matter of the grievance. IDOC's failure to implement a grievance process that responds to legitimate grievances, which is one of the only ways inmates can seek improved medical care, is part of a pattern of IDOC's unwillingness to exercise its supervisory responsibilities over Wexford's operations although prison officials know that Wexford is failing to provide adequate medical care to large numbers of prisoners throughout the Illinois prison system.

**ANSWER**:     Deny that this defendant fails to comply with constitutional obligations.

34

This defendant lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations contained in this paragraph.

75.     In addition, there are several organizations that promulgate standards and accredit the quality of the delivery of medical services by penal institutions. These organizations include the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO"), the National Commission on Corrective Health Care ("NCCHC"), and the American Corrections Associations ("ACA"). All of these organizations use objective standards to evaluate the quality of the delivery of health care by correctional systems. Many state and local systems are reviewed by these organizations, and certified when appropriate. Unlike other states and counties, the Illinois system dropped all accreditation in the 1990s. The Illinois system is not currently accredited by any independent organization.

**ANSWER**:    Admit that various entities, including the ACA and NCCHC, promulgate standards and accredit the quality of the delivery of medical services by penal institutions. This defendant lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations contained in this paragraph.

76.     Despite the fact that the State Defendants and Wexford knew or should have known of the systemic failures in their healthcare-delivery system, they have chosen to disregard these problems and the risks they pose to inmates.

**ANSWER**:    Deny.

77.     Despite both Wexford and the State Defendants' systemic failure to provide adequate staffing, and repeated failure to provide the constitutionally required level of medical care to people confined in Illinois' prisons, as detailed in the foregoing paragraphs, in 2011 the

State Defendants all recommended or approved a new multi-billion dollar, multi-year contract between the State of Illinois and Wexford to continue to provide medical care to Illinois' prisoners, without requiring Wexford fix these detailed, and known, problems with its provision of services to the State and its inmates, and without implementing adequate controls to ensure that the care provided complied with minimum constitutional standards.

**ANSWER**:    Deny.

## CLASS CERTIFICATION ALLEGATIONS

78.     All Plaintiffs bring this action on their own behalf and, pursuant to Rules 23(a), 23(b)(1), and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of a class of all inmates who are now, or will in the future be, subjected to the medical care policies and practices of Defendants.

**ANSWER**:    Admit that the plaintiffs purport to bring this matter as a class action pursuant to the Federal Rules of Civil Procedure cited above, but deny that this matter meets the mandates of the Federal Rules.  Deny any remaining allegations.

79.     Numerosity: The class is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). As of October 31, 2012, there currently are approximately 48,000 inmates in the custody of the IDOC, all of whom are entirely dependent on Defendants' provision of medical care. Due to Wexford and the State Defendants' failure to remedy known systemic deficiencies in the provision of medical care, all IDOC inmates receive or are at risk of receiving inadequate medical care while incarcerated.

**ANSWER**:    This defendant lacks sufficient knowledge and information to form a belief as to the number of inmates in the custody of the IDOC.   Deny the remaining allegations.

36

80.     **Commonality**: There are questions of law and fact common to members of the class. Such questions include, but are not limited to:

(a)     Whether Wexford and the State Defendants have failed to operate a health care system providing minimally adequate health care in violation of the cruel and unusual punishment clause of the Eighth Amendment;

(b)     Whether Wexford and the State Defendants are deliberately indifferent to the serious medical needs of class members;

(c)     Whether Wexford and the State Defendants have routinely and systemically failed to employ adequate numbers of doctors, nurses, specialists and other medical providers to ensure the delivery of constitutionally required medical care;

(d)     Whether Wexford and the State Defendants have routinely and systemically failed to provide reasonably prompt medical care;

(e)     Whether Wexford and the State Defendants have routinely and systemically failed to provide timely emergency treatment;

(f)     Whether Wexford and the State Defendants have routinely and systemically failed to properly manage medications and medical supplies;

(g)     Whether Wexford and the State Defendants have routinely and systemically failed to provide medically prescribed diets;

(h)     Whether Wexford and the State Defendants have routinely and systemically failed to properly keep medical records;

(i)     Whether Wexford and the State Defendants have routinely and systemically failed to identify and correct incompetent medical treatment;

(j)     Whether Wexford and the State Defendants have failed to promulgate policies, practices and protocols reasonably necessary to ensure the delivery of constitutionally required medical care; and

(k)     Whether Wexford and the State Defendants have failed to ensure compliance with policies, practices and protocols reasonably necessary to ensure the delivery of constitutionally required medical care.

**ANSWER**:     Deny.

81.     **Typicality**: The claims of the Plaintiffs are typical of those of the Plaintiff Class, as their claims arise from the same policies, practices, or courses of conduct; and their claims are based on the same theory of law as the class's claims.

**ANSWER**:     Deny.

82.     **Adequacy**: Plaintiffs are capable of fairly and adequately protecting the interests of the Plaintiff class because Plaintiffs do not have any interests antagonistic to the class. Plaintiffs, as well as the Plaintiff class members, seek to enjoin the unlawful acts and omissions of Wexford and the State Defendants. Finally, Plaintiffs are represented by counsel experienced in civil rights litigation, inmates' rights litigation, and complex class action litigation.

**ANSWER**:     Deny.

83.     **Rule 23(b)(1)**: This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of inmates is approximately 48,000 and the class also includes future inmates. The prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for the Wexford and the State Defendants. Additionally, the prosecution of separate

38

actions by individual members could result in adjudications with respect to individual members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

**ANSWER**:    Deny.

84.    **Rule 23(b)(2)**: This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Wexford and the State Defendants' policies, practices, actions, and omissions that form the basis of this complaint are common to and apply generally to all members of the class, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the class. All state-wide health care policies are centrally promulgated, disseminated, and enforced from the central headquarters of IDOC, and the failure to address the systemic deficiencies in services and staffing is the result of policies and practices of IDOC, not any particular person. The injunctive and declaratory relief sought is appropriate and will apply to all members of the Plaintiff class.

**ANSWER**:    Deny.

### COUNT I
### Class § 1983 Claim for Deliberate Indifference
### (Alleged against Wexford and State Defendants)

85.    Class Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 84 as if fully restated here.

**ANSWER**: This defendant repeats and re-alleges its responses to the allegations contained in paragraphs 1 through 84 as if fully restated here.

86.    Both Wexford and the State Defendants are aware that inmates require adequate and timely medical treatment, such as access to competent health care providers, medication and

prescribed diets.

**ANSWER**:    Admit this defendant is aware that inmates require adequate and timely medical treatment, access to competent health care providers, appropriate medications and appropriate diets.  Deny any remaining allegations.

87.    Due to the failures described herein, Wexford and the State Defendants have caused class members to suffer countless experiences of untimely and inadequate medical treatment. These failures include, but are not limited to: (a) the failure to employ adequate numbers of doctors, nurses, specialists and other medical providers to ensure the delivery of constitutionally required medical care; (b) the failure to provide reasonably prompt medical care; (c) the failure to provide timely emergency treatment; (d) the failure to properly manage medications and medical supplies; (e) the failure to provide medically prescribed diets; (1) the failure to properly keep medical records; and (g) the failure to identify and correct incompetent medical treatment.

**ANSWER**:    Deny.

88.    Wexford and the State Defendants' ongoing deliberate indifference to the class members' medical needs has deprived them of their right to be free from cruel and unusual punishment as secured to them under the Eighth and Fourteenth Amendments to the United States Constitution, and has resulted in actual physical and medical harm.

**ANSWER**:    Deny.

89.    Class Plaintiffs and the class they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this complaint. Class Plaintiffs and the class they represent have suffered and will continue to suffer irreparable injury as a result of the unlawful

acts, omissions, policies, and practices of the Defendants, as alleged herein, unless Class

Plaintiffs and the class they represent are granted the relief they request. The need for relief is

critical because the rights at issue are paramount under the United States Constitution and the

laws of the United States.

     **ANSWER**: Deny.

**COUNT II**
**Lippert's Individual § 1983 Claim for Deliberate Indifference**
**(Alleged against Individual Defendants Norman, Maldonado, and Rossiter)**

     This defendant provides no answer to the allegations raised in Count II, as no allegations

are directed against this defendant.  To the extent any answer to the allegations are required, the

allegations are denied.

**AFFIRMATIVE DEFENSES**

**First Affirmative Defense**

     1.    This defendant affirmatively states that the plaintiffs' third amended complaint

fails to state a claim upon which relief can be granted pursuant to 42 U.S.C. § 1983 involving

rights secured by the United States Constitution, as the conduct claimed as actionable does not

rise to the standard of seriousness required pursuant to that statute.

     2.    To assert a claim for cruel and unusual punishment under the Eighth Amendment

of the Constitution, a plaintiff must show deliberate indifference to the serious medical needs of

a prisoner.  *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

     3.    In order to properly show a violation of the Eighth Amendment based upon

alleged improper medical care it must be shown that the failure to provide proper medical care

constituted an unnecessary and wanton infliction of pain or was "repugnant to the consciousness

41

of mankind".

4.      To demonstrate that a prison official was deliberately indifferent to an inmate's serious medical need, the prisoner must show "that the official knew of and disregarded an excessive risk to inmate health".

5.      Plaintiffs do not allege facts sufficient to meet the above-mentioned standards, and, as such, have failed to state a cause of action as to this defendant.

### Second Affirmative Defense

6.      Plaintiffs' claims are barred to the extent they failed to properly exhaust their administrative remedies prior to the filing of this litigation, pursuant to *Pavey v. Conley*, 528 F. 3d 494 (7th Cir. 2008).

### Third Affirmative Defense

7.      To the extent that one or more of the named plaintiffs is litigating the claims raised in the third amended complaint in a separate lawsuit, that plaintiff is estopped from being a class representative and/or a member of the putative class.

### Fourth Affirmative Defense

8.      To the extent that one or more of the named plaintiffs failed to comply with the filing fee and cost provision requirements of the Prisoner Litigation Reform Act, 28 U.S.C. § 1915(a)(1), and/or failed to file an affidavit to proceed in forma pauperis, that plaintiff(s) claim(s) should be stricken and/or dismissed.

### Fifth Affirmative Defense

9.      At all times relevant herein, this defendant acted in good faith and in furtherance of lawful objectives without violating plaintiffs' clearly established statutory or constitutional

rights of which a reasonable person would have known. This defendant is therefore protected from suit by the doctrine of qualified immunity.

### Sixth Affirmative Defense

10.     To the extent any plaintiff is raising allegations and/or bringing claims that occurred more than two years prior to that plaintiff being named as a party to this lawsuit, those claims are barred by the applicable two year statute of limitations.

### JURY TRIAL DEMANDED

Respectfully Submitted,

CHARYSH & SCHROEDER, LTD.
/s/ John J. Beribak

Michael J. Charysh, #6187455
John J. Beribak, # 6269405
Charysh & Schroeder, Ltd.
33 North Dearborn St., Suite 1300
Chicago, Illinois 60602
(312) 372-8338

43