37893/01245/MHW/MAE

# UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

DON LIPPERT, et al.,

Plaintiffs,

v.

PARTHA GHOSH, et al.,

Defendants.

Case Number 10 cv 4603

Judge Sara L. Ellis

## 56.1 JOINT STATEMENT OF UNDISPUTED FACTS

The Defendant-Movants, ATHENA ROSSITER, by and through her attorneys, Matthew H. Weller and Matthew A. Eliaser of Cassiday Schade LLP, and MARTHA MALDONADO and ALPHONSO NORMAN, by and through their attorney, Lisa Madigan, Attorney General of Illinois, and the Plaintiff-Respondent, DON LIPPERT, by and through his attorneys, Jason Stiehl, Kristine Argentine and Robyn Marsh of Seyfarth Shaw LLP, for their Joint Statement of Undisputed Facts pursuant to Rule 56.1 of the Federal Rules of Civil Procedure and this Court's standing order, state as follows:

### I. Description of the Parties

1. The plaintiff, Don Lippert ("Lippert"), is an inmate currently housed at Stateville Correctional Center ("Stateville"), a facility within the Illinois Department of Corrections ("IDOC"), which is where the incident at issue took place. *See* deposition transcript of Don Lippert, attached hereto as Exhibit A at 6:4-16; *see also* Third Amended Complaint at Law, Doc. #145 at ¶4.

2. Defendant, Athena Rossiter ("Rossiter"), served as a Licensed Practical Nurse ("LPN") at Stateville, employed by Wexford Health Sources, Inc., in May, 2010. *See* deposition transcript of Athena Rossiter, attached hereto as Exhibit B at 24:10-12.

3. Defendant, Martha Maldonado ("Maldonado"), served as a correctional officer, employed by the IDOC, at Stateville in May, 2010. See deposition transcript of Martha Maldonado, attached hereto as Exhibit C at 10:3-12.

4. Defendant, Alphonso Norman ("Norman"), served as a correctional officer, employed by the IDOC, at Stateville in May, 2010. See deposition transcript of Alphonso Norman, attached hereto as Exhibit D at 14:9-14.

## II. Facts Supporting Venue and Jurisdiction

5. Lippert filed this action pursuant to 42 U.S.C. §1983 for the alleged deprivation of his constitutional rights under the Eighth Amendment to the United States Constitution. *See* Doc. #145, Count II.

6. The subject occurrence took place while Lippert was incarcerated at Stateville, which is located in the Northern District of Illinois. *Id.* at ¶4.

## III. Plaintiff's Allegations of Deliberate Indifference

7. Lippert alleges that he was diagnosed with Type I Diabetes prior to his incarceration in 1996 and was prescribed and requires a medical diet to regulate his glucose levels. Doc. #145, at ¶4. He was also prescribed regular insulin shots to regulate his blood sugar. Exhibit A at 28:1-4; *See* MAR, bates-stamped Lippert 000914, attached as Exhibit E to the affidavit of Liping Zhang, M.D., attached hereto as Exhibit E. Lippert asserts that defendants were deliberately indifferent toward him by failing to appropriately respond to his complaints and requests relating to his diabetes on May 1, 2010. Doc. #145, at ¶¶ 90-104.

8. More specifically, Lippert claims that Rossiter refused to provide him with an insulin shot that was ordered by Dr. Liping Zhang ("Dr. Zhang"), a staff physician at Stateville, and further claims that Rossiter failed to return to see him at his cell later in the day to test his blood sugar and provide him insulin. *Id.* at ¶¶ 97-99; Exhibit E, at ¶ 1.

9. As for Maldonado and Norman, Lippert claims that they refused to help him on May 1, 2010, when he was in need of medical assistance in his cell. Doc. #145 at ¶ 94.

10. Lippert claims that as a result of Maldanado and Norman's alleged deliberate indifference, he suffered hyperglycemic complications on May 1, 2010, requiring treatment in Stateville's health care unit, and that as a result of Rossiter's deliberate indifference later in the day, he suffered further hyperglycemic complications. *Id.* at ¶¶ 94-95, 99, 101.

## IV. Undisputed Material Facts Entitling Defendants to Summary Judgment

### *A. Medical Care at Issue*

11. According to Lippert, back in 2010, he received two rounds of insulin treatment per day, once in the morning and once in the afternoon/evening, provided to him by a nurse or "med. tech." (i.e., Certified Medical Technician or "CMT"). Exhibit A at 29:8-24 - 30:1-18. Defendant Norman confirmed that Lippert sees a doctor or nurse "pretty much on a nightly basis," typically to get insulin shots. Exhibit D, at 20:5-10 and 21:2. Lippert states that medical staff is required to check his blood sugar levels and administer an insulin shot twice a day. *See* Don Lippert's Answers to Athena Rossiter's Interrogatories, attached hereto as Exhibit F, at Answer No. 2(b). According to him, the proper procedure is to check his blood sugar and administer insulin if appropriate. *Id.*

12. The IDOC Office of Health Services published Chronic Treatment Guidelines for diabetes in June 2008. *See* Guidelines, attached hereto as Exhibit J, bates-stamped IDOC 00226-

230. Within these Guidelines, an inmate with Type 1 diabetes "must have access" to blood glucose testing and such inmates "usually need multiple [blood glucose tests] daily as necessary to control blood glucose." *Id.* at IDOC 00228.

13. As of April 8, 2010, it was ordered that Lippert receive twice daily ("BID") Accu-checks. *See* MAR, bates-stamped Lippert 000913, attached as Exhibit D to Exhibit E. Lippert was to receive 7 units of "regular insulin" with 20 units of NPH insulin in the morning, and then 5 units of regular insulin with 15 units of NPH insulin in the evening. *See* MAR, bates-stamped Lippert 000914, attached as Exhibit E to Exhibit E. That order was continued for May 2010 to last for a period of six (6) months. *Id.* Despite this medical order, there is irregular reporting of Lippert's blood sugar levels in the medical records. *See* MAR, bates stamped Lippert 000917, attached hereto as Exhibit K.

14. Lippert testified that on the morning of May 1, 2010, Adrianne Bacot (a non-party CMT employed by the IDOC) refused to provide him with his morning insulin shot. Exhibit A at 35:1-6, 16-24; Exhibit F at Answer No. 2(a).

15. Lippert stated that he had already eaten breakfast that morning so he needed his insulin shot. He testified that he ate "between 2:30/3:00. They pass out breakfast about that -- about 2:00/2:30 [in the morning]." Exhibit A at 98:16-99:2. The prescription orders show that insulin is to be held if the patient refuses to eat. *See* Exhibit K.

16. Lippert testified that he complained to Norman about his lack of insulin shot while Norman was walking around the first floor of the cell house that morning. Exhibit A at 101:1-21. At that time, Lippert was in his cell on the third floor of the cell house. *Id.* at 101:18-19; 23-24; 102:1. In response to counsel's question at deposition "Did he [Norman] respond,"

Lippert testified that "He [Norman] was laughing, ignoring me, waving me off." *Id.* at 101:11-12.

17. Norman testified that he does not recall anything about the incident on May 1, 2010. Exhibit D at 7:11-17, 11:11-15. However, according to him, the protocol for an officer to follow in response to an inmate request for medical assistance and/or insulin is to radio for a med. tech./the health care unit. *Id.* at 36:23 - 37:1-14; 67:13-19.

18. Lippert asserts that he also complained to Maldonado to request that she take him to get his insulin. Lippert testified that in response, she said nothing, did not look at him and just kept on with her duties. Exhibit A at 104:7-14.

19. Maldonado testified that she regularly worked the 7:00 a.m. to 3:00 p.m. shift. Exhibit C at 14:20-24. She stated that in May 2010, inmates received their medication in their cells; they did not leave and go to the Health Care Unit to get their medication. *Id.* at 31:19-32:4. They would "never" exit their cells to line up for medication. *Id.* at 32:5-11. Maldonado does not have any medical training or education. *Id.* at 57:13-16.

20. According to Maldanado, at approximately 7:00 a.m. on May 1, 2010, she was on gallery three to do her normal morning count of the inmates. *Id.* at 19:13-24. Lippert told her that he did not receive his medication, so she went downstairs to gallery one to tell her sergeant, Lanel Palmer ("Palmer"). *Id.* Maldonado testified that she heard Palmer call the Health Care Unit and advise that "Lippert had not received his medication on the 3 to 11 shift, and the 11 to 7 shift, and that he was requesting his medication." *Id.* at 34:6-37:19. Lippert testified that he advised the officers as much and that he needed his "insulin shot." Exhibit A at 35:11-24. Maldonado did not hear what was said in return on the phone call and went on with her duties. Exhibit C at 19:13-24; 20:1-12; 34:6-14; 35:20-24.

21. According to Lippert, at this time, he began to get weak and feel his muscles tightening. Exhibit A at 104:17-23. As Maldonado was walking by Lippert's cell after she returned to gallery three, Lippert reported to Maldonado that he was dizzy and going to pass out, that he was going to drop to the floor, and she heard him laughing and giggling. Exhibit C at 45:8-18; 74:20-24; 75:23. She testified that she passed by his cell as he was saying those things; she then took a couple more steps and heard a thump and him laughing. *Id.* at 74:13-19. She turned around toward his cell and observed him lying on the floor of his cell, on his side in almost a fetal position. *Id.* at 75:16-18. She testified that he was conscious, his eyes were open, and he could talk. *Id.* at 48:17 - 49:1. She did not see him fall. *Id.* at 48:1-6. Lippert said he had peed on himself, but according to Maldonado, there was only liquid on the floor of his cell and none on his body or clothes. *Id.* at 77:23 – 78:13. Given his alertness, laughter, and giggling, she did not suspect that he was having a medical emergency. *Id.* at 80:1-81:4.

22. Lippert testified that he complained to the guards that morning that he needed his insulin shot because he had not received it from Bacot that morning when she came by and that the Sergeant had called and that "nothing [was] happening." Exhibit A at 35:16-24. Lippert stated that Maldonado and Norman were passing out lunch trays on his gallery around lunchtime, but by then, he had already passed out and had urinated on himself. *Id.* at 36:17-24. Lippert stated he could hear Norman and Maldonado laughing and talking about him, even though he told them he needed insulin. *Id.* at 36:23 - 37:2; 107:8-22.

23. Lippert testified that after Maldonado and Norman left, at some point later, he heard Norman, not Maldonado, calling for Palmer to come up to Lippert's cell because he was on the ground. *Id.* at 108:22-109:2; 109:21-24; 110:13-20. He then recalled officers being in his cell who picked him up to take him out of his cell to the Health Care Unit. *Id.* at 37:3-8; 112:6-8.

24. Maldonado testified she went back down to gallery one from gallery three and advised Palmer of what occurred. Exhibit C at 49:5-15; 76:2-6. She testified that Sergeant Palmer and another unnamed officer went upstairs to gallery three to attend to the situation, and Maldonado stayed downstairs. *Id.* Maldonado stated she witnessed Palmer and the other officer carrying Lippert out of his cell. *Id.* at 50:11-18. Maldonado does not know why they carried him out of his cell, and carrying an inmate out of his cell is not something that typically happens when an inmate falls. *Id.* at 50:22 - 51:1. After being carried down two flights of stairs, Lippert was placed in the bullpen located on the first floor of the F House "until the med tech comes, or whatever they decide they're going to do with the inmate." *Id.* at 51:11-24; 52:1-21.

25. Maldonado testified that, while being carried out of his cell, he appeared to her to be alert, coherent, did not look like he was in distress, and had a "smirky smile" on his face. *Id.* at 78:18-79:21; 83:9-12.

26. Maldonado testified that every cell house unit contains a log book where the sergeant records incidents and happenings from the day. *Id.* at 53:4-55:15. In response to the question of "Had this type of incident ever occurred before with Mr. Lippert, where he requested medication," Maldonado responded "No." *Id.* at 56:10-13. According to Maldonado, even though he had claimed to have fallen in his cell, and was physically removed by two officers, it did not merit being recorded as an incident in the log book. *Id.* at 55:16-57:4. The IDOC has been unable to locate the requested log books from April to May 2010. *See* Decl. of James Laris, IDOC, attached as Exhibit L.

27. Dr. Zhang evaluated the patient and authored a progress note at approximately 12:00 p.m. on May 1, 2010. Exhibit E, at ¶ 3 and Progress Note, bates-stamped 000410, attached thereto. According to Dr. Zhang, her progress note, and Lippert's testimony, Lippert did not

make any medical complaints to Dr. Zhang other than his complaint that he did not receive his insulin that morning. *Id.*; Exhibit A at 56:14-20; 57:9-20. His blood sugar was high, so Dr. Zhang ordered regular insulin "7u STAT." Exhibit E, at ¶ 3. Lippert testified that after receiving this insulin shot, his blood sugar was immediately brought under control. Exhibit A at 37:11-12.

28. Dr. Zhang also ordered that nurses perform an Accu-check before Lippert's next meal, and if his blood sugar was less than 300, the nurses were to administer regular insulin 5u and NPH insulin 15u, but if his blood sugar was greater than 300, to notify Dr. Zhang. Exhibit E at ¶ 3 and Progress Note, bates-stamped 000410, and Prescription Order, bates-stamped 000672, attached thereto. Dr. Zhang ordered that Lippert could be discharged the following morning after his a.m. insulin shot, and admitted him to the health care unit for 23-hour observation. *Id.*

29. Dr. Zhang next evaluated Lippert at approximately 2:50 p.m. on May 1, 2010 and authored a progress note. Exhibit E at ¶ 4 and Progress Note, bates-stamped 000410, attached thereto. Lippert reported to Dr. Zhang that he was fine and he made no complaints. *Id.* His blood sugar was at a "very steady level of 125." *Id.* Dr. Zhang changed her order from before, and ordered that he could be discharged after his p.m. insulin and meal on May 1, 2010. *Id.* She determined that he could be discharged earlier than originally ordered, because his blood sugar had resolved so quickly and adequately, and he had no complaints at all. *Id.*

30. Nurse Kenlyn Grote saw the patient and authored a progress note at approximately 3:00 p.m., on May 1, 2010. Exhibit E, at ¶ 5 and Progress Note, bates-stamped 000411, attached thereto. She re-affirmed Dr. Zhang's findings that the patient's blood sugar level was 125 and charted that Lippert was to be discharged after his upcoming meal, in accordance with Dr. Zhang's note from ten minutes prior. *Id.* Grote also charted that Lippert was educated about his insulin order. *Id.*

31. Grote also amended Dr. Zhang's Prescription Order on May 1, 2010. Exhibit E, at ¶ 5 and Prescription Order, bates-stamped 000672, attached thereto. After Dr. Zhang had written her original orders, which correspond with her 12:00 p.m. progress note, Grote later circled the "reg insulin 7u STAT" order and wrote "ok" next to it indicating that it was completed. *Id.* She also crossed out Dr. Zhang's original order for the p.m. insulin and wrote "void." *Id.*

32. The final progress note was authored by Nurse Gloria Breske at approximately 4:30 p.m. on May 1, 2010. Exhibit E, at ¶ 6 and Progress Note, bates-stamped 000411, attached thereto. According to the note, Lippert's blood sugar had come down even more to 115, meaning that his blood sugar was normal and exceptionally stable. *Id.* Lippert confirmed this interaction and that the results were normal. Exhibit A, at 37:22 - 38:4. Breske charted that the patient had no complaints at that time. Exhibit E, at ¶ 6 and Progress Note, bates-stamped 000411, attached thereto. Breske charted that no insulin was given at that time and re-affirmed Dr. Zhang's 2:50 p.m. order that Lippert could be discharged to his cellhouse. *Id.*

33. Lippert testified about his interaction with Breske, where she told him that, per the doctor's orders, since his blood sugar was normal, he was not going to receive any additional insulin at that time. Exhibit A at 38:15 - 39:1, 16-21. Other than requesting an additional insulin shot, Lippert did not make any other complaints to Breske at that time. *Id.* at 58:10-13.

34. Dr. Zhang has confirmed that it was her order to discharge Lippert without him receiving additional insulin prior to discharge. Exhibit E, at ¶ 7. She asserted that after Lippert received 7 units of regular insulin STAT when he first arrived in the health care unit, his blood sugar returned to a normal reading of 115 prior to his discharge. *Id.* That, in combination with the lack of medical complaints by the patient, meant that another dosage of insulin prior to his discharge was not medically indicated. *Id.* at ¶¶ 7-8.

35. According to Dr. Zhang, there would have been little benefit to administering the patient's second dosage of insulin at a time when his blood sugar was already at a normal level of 115. Exhibit E, at ¶ 8. Rather, Dr. Zhang stated it was much more medically sound for the patient to receive his next dosage later in the evening on May 1, 2010. *Id.* Rossiter testified from a retrospective review of the record that Lippert received appropriate care and treatment on May 1, 2010. Exhibit B at 97:12 – 98:9; 108:19 – 110:15.

36. Lippert testified that, while being escorted out of the health care unit to return to his cell, he came across Rossiter and an unidentified nurse, who were packaging psychotropic medications for distribution. Exhibit A at 40:3-6; 42:1-11. Lippert testified that on his way out of the Health Care Unit, he told them he needed his insulin shot. *Id.* at 42:4-5.

37. Rossiter and the unidentified nurse apparently responded by informing Lippert that, per Breske's statement to Rossiter and the unidentified nurse, he did not need an insulin shot and not to give him one. Exhibit F, at Answer No. 3.

38. Rossiter testified that she did not recall anything about the May 1, 2010 incident or even whether she was working at Stateville on May 1, 2010. Exhibit B at 62:12-15; 63:15 - 64:7; 71:6-9.

39. Rossiter testified that, assuming Lippert's recollection was correct about him stating his complaint to her on his way out of the health care unit, she would have spoken to Breske and inquired into Lippert's complaint. *Id.* at 76:22 - 78:1-4. It was well within the standard of care for Rossiter to rely on Breske's statements, as the treating nurse, regarding the patient's care. *Id.* at 77:8-19; 78:5-8.

40. Lippert testified that, later that evening, around 9-10 p.m. on May 1, 2010, Rossiter was passing out the psychotropic medications on gallery three. Exhibit A at 45:2 - 46:5.

He testified that he told Rossiter that he felt weak and dizzy and needed his insulin shot. *Id.* at 45:2-4; 46:8-9. Lippert further testified that Rossiter responded by stating that she would come back to test his blood sugar and give him his insulin after finishing passing out the medications to the inmates, but she never came back. *Id.* at 46:11-14.

41. While Rossiter did not recall the incident of May 1, 2010, she testified that, assuming Lippert's recollection was correct, Rossiter would have called the med. tech. right away, explained that Lippert did not feel well due to his blood sugar, asked the med. tech. to come check his blood sugar, and relied on the med. tech. to do so. Exhibit B at 86:24-87:22. She testified that her actions were well within the standard of care. *Id.* at 88:3-9. It was the med. tech.'s duties to check blood sugar levels and administer insulin and it was Rossiter's duties, as an LPN, to finish passing out psychotropic medications to the remainder of the inmates on schedule. *Id.* at 54:11-24; 55:16-18; 56:8-14; 87:19 - 88:9.

42. Rossiter testified that if she suspected that Lippert was going into diabetic shock during this alleged encounter with him, she would have personally done an Accu-check, called a doctor and obtained an insulin order. *Id.* at 15:20 - 16:5. If a patient was suffering from diabetic shock, she would expect to see the following symptoms: vomiting, nausea, shakiness, and stomach cramps. *Id.* at 15:2-14.

43. Lippert testified that an individual named "Gary" did come by later in the evening on May 1, 2010, at some time between approximately 11:00-11:59 p.m., to test his blood sugar and give him insulin. Exhibit A at 47:2-22. According to Lippert, his blood sugar was normal when Gary tested it. *Id.* at 47:24 - 48:1. In response to Gary's question of whether he was doing alright, Lippert responded, "yeah." *Id.* at p. 48:6-8. Lippert's blood sugar level registered at 220,

which according to Rossiter is considered above normal, but not high. Exhibit B, at 90:10-15; 92:1-2.

44. Rossiter and Dr. Zhang stated that Gary (Dropp) was in fact the individual that checked Lippert's blood sugar and administered insulin to him late in the evening on May 1, 2010. Exhibit B, at 89:1-24; 90:7 - 91:8; Exhibit E, at ¶ 8 and Medication Administration Record, bates-stamped 000914, attached thereto.

45. Lippert testified that he felt fine after Gary gave him his insulin that evening, but continued to have muscle tightness and headaches for a few days thereafter, but no other symptoms. Exhibit A at 58:14-59:11; 63:2-6.

*B. Grievance Investigation and Report*

46. Lippert authored three separate grievances on May 12, 2010, regarding the May 1, 2010 incident and complained of misconduct by Stateville officers and medical staff in response to his request for medical attention. Exhibit A at 63:21-64:7. Stateville Prison Grievance Officer, Colleen Franklin ("Franklin"), was in charge of investigating and responding to Lippert's May 12, 2010 grievance with respect to addressing his claims of medical and staff misconduct. *See* Offender's Grievance, bates-stamped 000278-280, attached hereto as Exhibit G; see also deposition transcript of Colleen Franklin, attached hereto as Exhibit H, at 18:15-21; 27:1-4.

47. She received the grievance on June 7, 2010, nearly one month after the grievance was made. *Id.* at 16:14-17. Prior to the grievance being referred to the Grievance Office, however, there is a "unit counselor" assigned to each "house" of inmates, and Kevin Whittington ("Whittington") was the counselor in F-House, where Lippert was housed. *Id.* at 14:10-15:12; 17:10-16. Whittington received the grievance on May 17, 2010 and responded to it on June 3,

2010. *See* Exhibit G. He concluded that, per the nursing staff, Lippert did not receive his insulin that morning because he did not get up when called. *Id.*

48. Based on Lippert's complaints of staff misconduct in the grievance, Franklin determined that she needed additional information other than what was recorded by Whittington. Exhibit H at 21:18-22:4; 22:13-23:5. It is not typical for Franklin to speak with the unit counselor (i.e., Whittington) before performing her additional investigation, and she did not recall speaking to Whittington in this case. *Id.* at 58:3-14. She did not recall whether she went to "double check" the accuracy of Whittington's conclusion. *Id.* at 28:7-21. Even so, part of the process requires her to rely on the initial investigation by the unit counselor and put it in her final report. *Id.* at 36:23-37:4; 39:3-10.

49. Franklin testified that she interviewed Maldonado, Norman, and Palmer in connection with her investigation and any notes recorded from the interviews would have been incorporated into the final report. *Id.* at 24:4-25:4; 27:1-4; 27:20-28:1. She did not recall when she specifically interviewed these witnesses regarding the May 1, 2010 incident, however, her normal practice would be as close to the actual typing of the report as possible, so sometime near or around September 29, 2010. *Id.* at 30:15-31:4; 56:17-57:6; 57:15-19. At no time did she personally interview or follow-up with Lippert regarding his grievance. *Id.* at 15:10-23.

50. A final recommendation was not made by Franklin until September 29, 2010, where she recommended that Lippert's grievance and request for relief be denied. *Id.* at 31:21-33:3. Franklin provided two reasons as the basis for her denial. First, Lippert's request that certain IDOC employees be "punished for knowingly and wantonly endangering my life and well-being for refusing to take me to the Health Care Unit to get my life sustaining diabetes

medicine [insulin]" could not be addressed by Franklin because she did not have the authority to discipline officers or staff, or request the discipline of those persons. *Id.* at 32:4-21.

51. Second, she determined that through her investigation in speaking with the officers named in the grievance, the allegations of misconduct were unfounded. *Id.* at 32:4-33:2. Relying on Counselor Whittington's initial report, Franklin repeated "Per nursing staff, [Lippert] did not receive insulin because [he] did not get up when called." *Id.* at 21:18 - 22:5; 33:4-5; *see also* Exhibit G, bates-stamped 000278. Franklin testified that she checked the log books to confirm whether rounds were made that morning to pass out insulin, even though there was no documentation in her final report to confirm that she had done so. Exhibit H at 54:11-14; 62:22-63:15. Likewise, Franklin also testified that she did not recall whether she confirmed with nursing staff that Lippert refused, or did not get up when called, if insulin was offered to him that morning. *Id.* at 37:5-8; 39:3-16. Even so, she concluded that Lippert was given an opportunity to take his insulin the morning of May 1, 2010 and refused. *Id.* at 33:4-5.

52. Franklin further testified that based on her interviews with the correctional officers, she concluded that they had followed procedure by calling the med. tech. in the health care unit in response to Lippert's complaints on May 1, 2010. *Id.* at 33:7-34:1. She concluded there was no justification for the officers to take additional action beyond that because she determined that Lippert's laughter and joking gave no indication that there was a medical emergency. *Id.* at 33:7-24; 58:15-23. Further, she did not believe there was any misconduct or retaliation by the staff. *Id.* at 33:7-34:1; 58:15-21.

53. Franklin also concluded that Lippert's allegation that he urinated on himself as a result of his hyperglycemic shock was untrue based on her interview with Palmer, who only observed liquid on the floor and not on Lippert's body or clothes. *Id.* 59:4-19. She further

concluded, based on her interview with Maldonado and Palmer, that Lippert was coherent and laughing and joking all the way down the stairs when being carried by security staff to the health care unit. *Id.* at 59:23-60:6; *see* Grievance Officer's Report, bates-stamped 000277, attached hereto as Exhibit I.

54. After her conclusions and recommendations were made, her Grievance Officer's Report goes to the Warden's office for him to "sign off" on the final disposition. Exhibit H, at 34:5-18. The Warden's office signed off on Franklin's recommendation to deny the grievance on November 30, 2010. Exhibit I. On December 6, 2010, Lippert executed an authorization indicating that he intended to appeal to the Director, as was his right, and to abide by the procedural requirements to do so. *See* Grievance Officer's Report, bates-stamped 002217, attached hereto as Exhibit I(a).

Respectfully submitted,

CASSIDAY SCHADE LLP

By: s/ Matthew A. Eliaser
Attorney for ATHENA ROSSITER, LPN

Respectfully submitted,

LISA MADIGAN, Attorney General of Illinois

By: s/ Kevin Lovellete
Attorney for MARTHA MALDONADO and ALPHONSO NORMAN

Respectfully submitted,

SEYFARTH SHAW LLP

By: s/ Jason P. Stiehl
Attorney for DON LIPPERT

Matthew H. Weller (6278685)
Matthew A. Eliaser (6305792)
CASSIDAY SCHADE LLP
20 North Wacker Drive, Suite 1000
Chicago, IL 60606
(312) 641-3100
(312) 444-1669 – fax

**CERTIFICATE OF SERVICE**

I hereby certify that on December 19, 2014, I electronically filed the foregoing document with the clerk of the court for the Northern District of Illinois, Eastern Division, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of E-Filing" to the attorneys of record in this case.

s/ Renee Buzonik

8005027;MELIASER