Confidential

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DON LIPPERT,                          )
                                      )
                    Plaintiff,        )
                                      )
          vs.                         )    No. 10-CV-4603
                                      )
ATHENA ROSSITER, et al.,              )
                                      )
                    Defendants.       )

          The deposition of DON LIPPERT, called by the
Wexford Defendants for examination, taken pursuant to
notice and pursuant to the Federal Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken before
Martina Miranda Ralls, Certified Shorthand Reporter, at
Stateville Correctional Center, 16830 South Broadway,
Crest Hill, Illinois, commencing at 10:44 a.m. on
May 8, 2014.



EXHIBIT
A

Confidential

Page 2

1  APPEARANCES:
2      SEYFARTH SHAW, LLP
3      MR. JASON P. STIEHL
       MS. KRISTINE R. ARGENTINE
       131 South Dearborn Street
4      Suite 2400
       Chicago, Illinois 60603
5      Phone: (312) 460-5568
            (312) 460-5306
6      E-mail: jstiehl@seyfarth.com
            kargentine@seyfarth.com
7
       On behalf of the Plaintiff;
8
       CASSIDAY SCHADE, LLP
9      MR. MATTHEW A. ELIASER
       20 North Wacker Drive
10     Suite 1000
       Chicago, Illinois 60606
11     Phone: (312) 739-3225
       E-mail: meliaser@cassiday.com
12
       On behalf of the Wexford Defendants;
13
       STATE OF ILLINOIS
14     OFFICE OF THE ATTORNEY GENERAL
       MS. AGNES PTASZNIK
15     100 West Randolph Street
       Chicago, Illinois 60601
16     Phone: (312) 814-4217
       E-mail: aptasznik@atg.state.il.us
17
       On behalf of the Stateville Correctional
18     Center Defendants.
19
            * * * * *
20
21
22
23
24

Page 3

1              I N D E X
2  WITNESS                        PAGE
3  DON LIPPERT
4     Direct Examination by Mr. Eliaser.....  4
5     Cross-Examination by Ms. Ptasznik..... 95
6          E X H I B I T S
7  LIPPERT DEPOSITION EXHIBIT          PAGE
8     Exhibit A  Records of Don Lippert..... 20
9     Exhibit B  Answers to Interrogatories. 83
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1              (Witness sworn.)
2  WHEREUPON:
3              DON LIPPERT,
4  called as a witness herein, having been first duly
5  sworn, was examined and testified as follows:
6              DIRECT EXAMINATION
7  BY MR. ELIASER:
8      Q.   Could you, please, state and spell your full
9  name for the record?
10     A.   Don Lippert, D O N, L I P P E R T.
11     MR. ELIASER:  Let the record reflect, this is the
12 deposition of Don Lippert taken pursuant to all
13 applicable federal rules.
14 BY MR. ELIASER:
15     Q.   Mr. Lippert, my name is Matthew Eliaser.
16 I'm going to ask you some questions today.  You're
17 under oath.  I'll just go over some ground rules with
18 you just so you understand what's happening.  I'm sure
19 your attorneys have already done that, but I'll just
20 refresh your memory as some of the more important ones.
21         So I'm going to ask you questions.  Please
22 allow me to finish my question before you chime in and
23 I'll allow you to finish your answer before I ask you a
24 new question, because that just keeps the record clean

Page 5

1  for the court reporter, who's taking down everything
2  that's being said today, okay?
3      A.   Okay.
4      Q.   Secondly, when a question is posed to you
5  and you answer it, everyone will assume that you
6  understood the question, okay?  So if you don't
7  understand the question or you want it rephrased for
8  some reason, you have to let me know that, okay?
9      A.   All right.
10     Q.   Could you, please, state your date of birth?
11     A.   May 15th, 1975.
12     Q.   So that would make you 38; is that correct?
13     A.   (Nodding.)
14     MR. STIEHL:  You have to answer "yes" or "no."
15 BY THE WITNESS:
16     A.   Oh, yes.
17     Q.   That's another one that I forgot.
18         Yeah.  All the answers have to be audible,
19 so no nods or shakes of the heads.  It has to be yeses,
20 nos, verbal answers.
21     A.   All right.
22     Q.   Okay.
23     MS. PTASZNIK:  Mr. Lippert, are you on any
24 medication today that would impair your ability to

2 (Pages 2 to 5)

Confidential

Page 6

1  testify truthfully?
2      THE WITNESS: I take insulin. Other than that,
3  no.
4      MS. PTASZNIK: Do you have any reason to believe
5  that the insulin you take would impair you from
6  testifying truthfully?
7      THE WITNESS: No.
8      MR. ELIASER: Okay. Thank you.
9          Off the record.
10             (The witness was unable to provide
11              his Social Security number off the
12              record.)
13  BY MR. ELIASER:
14     Q.   You currently reside at Stateville
15  Correctional Center, right?
16     A.   Yes.
17     Q.   Do you have any plans to relocate or
18  transfer?
19     A.   Not what I know of.
20     Q.   Okay. Mr. Lippert, I'm going to discuss
21  some of your prior medical history with you, okay?
22          Is it correct that you were first diagnosed
23  with Type 1 diabetes at Pediatric Clinic Aurora,
24  Illinois, at the age of 15?

Page 7

1      A.   Yes.
2      Q.   Other than diabetes, have you ever been
3  diagnosed with any other medical conditions?
4      A.   Well, mental health.
5      Q.   Anything else?
6      A.   No.
7      Q.   Now, I'm going to direct your attention to a
8  time period that is pre-2010, okay? So the year of
9  2009 and earlier, okay?
10          I take it you had episodes of hyper- and
11  hypoglycemia prior to 2010; is that fair to say?
12     A.   Yes.
13     Q.   Okay. Do you know how many?
14     A.   Exact number, no, but quite a few.
15     Q.   Quite a few. Could you --
16     A.   Yeah.
17     Q.   Could you estimate? Could you give me a
18  range of how many that is?
19     A.   I'm going to say hundreds. I mean ...
20     Q.   So it's correct to say that prior to the
21  year 2010 you've had hundreds of episodes of hyper- or
22  hypoglycemia?
23     A.   Yeah.
24     Q.   Okay. During those episodes that we're

Page 8

1  talking about, those hundreds or so, can you tell me
2  what your symptoms are when you experience an episode
3  of hyper- or hypoglycemia?
4      A.   When I'm having a hyper-, which is high, you
5  know, I get thirsty, you know, mood swings, you know,
6  agitated. When I'm low, hypoglycemia, I start
7  sweating, you know, fidgety, hungry.
8      Q.   Anything else for hypoglycemia that you've
9  experienced pre-2010?
10     A.   Confusion.
11     Q.   Which is -- Is that hypo- or hyper-?
12     A.   Both, really, you know. But, you know,
13  hypo- is when your -- basically, when your brain shuts
14  down, so you know, more confusion.
15     Q.   Okay. Any other symptoms you've experienced
16  pre-2010 during an episode of hyper- or hypoglycemia
17  that we haven't already discussed?
18     A.   Can you explain that a little bit?
19     Q.   Well, right. You told me thirst, mood
20  swings, confusion, sweating, fidgeting, hunger,
21  confusion [sic]. Anything else that you experienced
22  pre-2010 during an episode of hyper- or hypoglycemia?
23     A.   No.
24     Q.   How about nausea? Did you experience that

Page 9

1  pre-2010?
2      A.   Well, when it's -- All right. Yeah. I'll
3  correct myself.
4      Q.   Okay.
5      A.   When it gets high, you know, the acidosis,
6  you know, will make you throw up, and I've thrown up
7  quite a bit --
8      Q.   Okay.
9      A.   -- due to a high blood sugar level.
10     Q.   Okay. Can you estimate about how many times
11  you've had nausea or vomiting pre-2010 during an
12  episode of hyper- or hypoglycemia?
13     A.   Maybe about 100 -- 100 -- Between maybe 80
14  to 100.
15     Q.   Okay. How about dizziness? I don't think
16  we talked about dizziness. Is that what you've
17  experienced during your episodes pre-2010?
18     A.   Yeah.
19     Q.   And is that a pretty common symptom during
20  an episode?
21     A.   Yeah.
22     MR. STIEHL: I'm just going to object for a
23  second, so -- generically that, obviously, Mr. Lippert
24  is not a doctor, so he can't diagnose himself. So I

3 (Pages 6 to 9)

Confidential

Page 10

1  know -- I think you're asking about his memory. And,
2  two, there's, obviously, documents in this case, his
3  medical records and grievances, that probably detail
4  these types of symptoms. So I appreciate your asking
5  him to the best of his recollection, but I just want to
6  state that objection for the record.
7       MR. ELIASER: Would you repeat his answer? I
8  think he answered the question.
9            (Record read as requested.)
10  BY MR. ELIASER:
11      Q.   How about headaches?
12      A.   I have headaches.
13      Q.   Is that a common symptom that you've had
14  during what you've perceived as an episode of hyper- or
15  hypoglycemia pre-2010?
16      A.   Yeah.
17      Q.   And how about muscle cramps? Would the same
18  be true for that?
19      A.   Yeah, that's a symptom.
20      Q.   And would that be a frequent symptom that
21  you've experienced pre-2010?
22      A.   Yeah.
23      Q.   Now, we were just talking about episodes of
24  hypo-, hyperglycemia; in other words, when your blood

Page 11

1  sugar is too high or your blood sugar is too low. Now
2  I want to turn to symptoms just related to your general
3  diabetes condition, okay? Do you understand what I'm
4  getting at there?
5      A.   Mm-hmm.
6      Q.   Okay. Have you experienced -- Well, strike
7  that.
8            You've experienced eye blurriness and poor
9  vision pre-2010; is that correct?
10      A.   Yeah.
11      Q.   And can you tell me how bad your blurriness
12  or how bad your vision was pre-2010?
13      A.   Well, I had problems. I don't know how bad
14  they were. But, I mean, you know, for a cause of
15  diabetes, you know, vision is the first thing, you
16  know, you're going to lose. So ...
17      Q.   Okay. Were you prescribed eyeglasses or
18  contacts before 2010 for your vision?
19      A.   Yes.
20      Q.   Okay. And were you prescribed that by a
21  doctor here in Stateville?
22      A.   I don't remember.
23      Q.   You've also experienced hot and cold
24  flashes, numbness, tingling, and burning in both legs

Page 12

1  and feet pre-2010, right?
2      A.   Yeah.
3      Q.   And was that a pretty frequent occurrence
4  pre-2010, those symptoms?
5      A.   No. It was, you know, over -- over time I
6  was getting worse.
7      Q.   Okay. When did those symptoms start?
8      A.   It was maybe, I'd say, about 2000- -- 2005.
9      Q.   And from 2005 through 2009, how often would
10  you experience hot-cold flashes, numbness, tingling,
11  burning in the legs and feet?
12      A.   Prior?
13      Q.   Between 2005 and 2009?
14      A.   I don't know; off and on, you know.
15      Q.   Off and on; is that what you said?
16      A.   Yeah.
17      Q.   How bad would it get?
18      A.   Some instances, it would be severe pain, you
19  know, numbness. Then, you know, it would go away, come
20  back.
21      Q.   Did it physically limit your ability to do
22  certain activities at that time?
23      A.   Yes. It hurts when ...
24      Q.   And pain in the toes, feet, and heels is

Page 13

1  something you experienced pre-2010 as well, right?
2      A.   Yep.
3      Q.   And was that as frequent as the numbness and
4  the tingling and the burning that we just talked about?
5      A.   Yep.
6      Q.   And you've also experienced sores to your
7  heels and discoloration to your skin pre-2010, right?
8      A.   Yep.
9      Q.   And can you describe for us how bad that got
10  pre-2010 in terms of sores taking a long time to heal
11  and the discoloration of your skin?
12      A.   Well, just over time, it just gets worse,
13  you know. I mean, I had symptoms of neuropathy; but
14  over time of, you know, bad medical care, it just gets
15  worse and worse and worse and worse and worse over
16  time.
17            Describe the color of the skin or sores?
18      Q.   Sure, pre-2010.
19      MR. STIEHL: If you can.
20  BY THE WITNESS:
21      A.   I could show you.
22      MR. STIEHL: He's talking about pre-2010.
23      THE WITNESS: Yeah.
24      MR. STIEHL: Okay.

4  (Pages 10 to 13)

Confidential

Page 14

1    BY THE WITNESS:
2        A.   Show you?
3        Q.   Can you describe it? I'd rather you just
4    describe it.
5        A.   Oh, just, like -- like, a brown patch of
6    skin, you know. You know, it's -- it would be, like, a
7    scab, you know, for months, you know. And then when it
8    does fall off, the color of the skin is just, like,
9    brown.
10       Q.   And it causes the skin on the legs to become
11   thin and have a shiny appearance, right?
12       A.   Yeah. The neuropathy, you know, poor
13   circulation, causes loss of hair, shiny skin, thin
14   skin.
15       Q.   And that all existed pre-2010, right?
16       A.   It was -- Yeah, it was starting.
17       Q.   Pre-2010, right?
18       A.   Yeah.
19       Q.   Okay. And we talked about the legs, but
20   let's talk about the arms and the hands. You've
21   experienced tingling, burning, and numbness in the
22   hands and the arms prior to 2010, right?
23       A.   Yeah.
24       Q.   And how frequent was that?

Page 15

1        A.   Off and on.
2        Q.   For how many years, would you say?
3        A.   I'm going to say about -- I mean, about
4    maybe -- about 2009. You know, I started getting, you
5    know, tingling in my fingers, in my arms.
6        Q.   If your medical records indicated that it
7    started in 2008, would you disagree with that, or does
8    that sound right as well?
9        A.   I could say, you know, I'm not exactly. I
10   was just going off maybe about 2009. If it was 2008,
11   then I was maybe a year off.
12       Q.   Okay. And it's true that you experienced
13   painful frequent burning during urination prior to
14   2010, right?
15       A.   I had -- Yeah, somewhat.
16       Q.   What's that?
17       A.   Yeah.
18       Q.   Yes. How often did that occur?
19       A.   When I had high blood sugars.
20       Q.   So every time you had high blood sugar, that
21   would occur?
22       A.   No, when I really had some high blood
23   sugars.
24       Q.   So it would occur when you had really high

Page 16

1    blood sugars?
2        A.   Yeah. The food ...
3        Q.   And headaches, did you -- you experienced
4    frequent headaches pre-2010; is that true also?
5        A.   Yes.
6        Q.   Okay. And you had problems losing weight
7    prior to 2010 as well; is that correct?
8        A.   Say it again.
9        Q.   You had episodes where you would lose weight
10   unintentionally prior to 2010, right?
11       A.   Unintentionally? Well, yeah. I mean, you
12   know, diabetes, high blood sugar levels, you know, it
13   will drain your weight in your body.
14       Q.   Understood. I want to ask you about a low
15   bunk pass and a low gallery permit --
16       A.   Yes.
17       Q.   -- that you were given in 2010 -- I'm
18   sorry -- in 2009. Do you remember that?
19       A.   Yeah.
20       Q.   What was the purpose of the low bunk and the
21   low gallery permit in 2009?
22       A.   Well, I had severe low blood sugar. I was
23   up on the top bunk, and, you know, they had to come in
24   there and get me, get me off the bed, you know. I was

Page 17

1    thrashing around up there, didn't know what was going
2    on, so the guards had to grab me and pull me off, you
3    know. So for all diabetics, you know, we all get a low
4    bunk and low gallery permit.
5        Q.   So let me make sure I understand the reason
6    for that. It's so that they can have better access to
7    you if you're having an episode --
8        A.   Right.
9        Q.   -- of hyper- or hypoglycemia, right?
10       A.   You know, our safety. Instead of falling
11   off -- If we're going to fall off, they'd rather have
12   us fall off from the bottom bunk; for low gallery, to
13   be easy to extract us.
14       Q.   Right. In your experience was the low bunk
15   permit and the low gallery permit also related to the
16   neuropathy in your arms and your legs, making it
17   difficult for you to climb to the top bunk?
18       MR. STIEHL: Objection, calls for speculation,
19   also not a doctor. And I'm sure there's documents that
20   probably are better evidence of it.
21       But if you know, go ahead.
22   BY MR. STIEHL:
23       Q.   Do you know if that was one of the reasons
24   you were given a low bunk pass?

Confidential

Page 18

1    A.   No, I don't.
2    Q.   Okay.  Other than the ease to access you for
3  medical treatment, is there any other reason you were
4  given the low bunk permit or low bank pass that you
5  know of?
6    A.   Not what I know of.
7    Q.   So now I want to turn to your -- your mental
8  health condition prior to May 2010, okay.  So I'm just
9  talking about the period of time from April 2010 and
10  back further in the future -- or I'm sorry -- in the
11  past, okay?  Understood?
12    A.   Yeah.
13    Q.   Okay.  When did you first begin receiving
14  treatment for mental health?
15    A.   When I was 19 -- 18, 19.
16    Q.   Okay.  And were you receiving that here in
17  the correctional center system, or were you --
18    A.   Yeah, when I came into the system in '96,
19  you know, taking stuff for depression.
20    Q.   Okay.  At any point in time, have you ever
21  been treated outside of the correctional center system
22  for mental health treatment either at a clinic or a
23  hospital or a doctor --
24    A.   Well, I was in drug rehab, Gateway, up north

Page 19

1  in Lake Villa.  That's where I was diagnosed as a manic
2  depressant.  I was, like, 18 or 19.
3    Q.   And was that before your incarceration?
4    A.   Yeah.  I got locked up at 20.
5    Q.   Okay.  So you were diagnosed as a manic
6  depressant at the drug rehab center, right?
7    A.   Yeah.
8    Q.   And you've also been diagnosed with
9  depression here at Stateville?
10    A.   Yeah.
11    Q.   And that -- When were you first diagnosed
12  with depression here at Stateville, when you first came
13  here when you were 18 or 19; is that right?
14    A.   About 20.
15    Q.   20 years old?
16    A.   (Nodding.)
17    Q.   And prior to 2010, were you diagnosed with
18  any other mental health conditions aside from being a
19  manic depressant or depression?
20    A.   Explain that a little bit better, please.
21    Q.   Prior to May 2010, you were also diagnosed
22  with anxiety disorder; is that fair to say?  That
23  you're aware of.  That's all I'm asking you.  I'm not
24  asking you to diagnose yourself.  I'm just asking

Page 20

1  you --
2    MR. STIEHL:  If you recall.
3  BY MR. ELIASER:
4    Q.   -- what diagnoses you're aware of.
5    MR. STIEHL:  If you don't recall ...
6  BY THE WITNESS:
7    A.   I don't recall.
8    Q.   Okay.  Would a medical record refresh your
9  memory, something that indicates that you'd been
10  diagnosed with that prior to May 2010?
11    A.   I would have to see it.
12    Q.   Okay.
13    MR. ELIASER:  If you guys want to follow along.
14  BY MR. ELIASER:
15    Q.   I'm going to refer you, Mr. Lippert, to --
16  if you look in this stack, Exhibit A, there's a
17  document.  At the bottom right, it's labeled
18  Lippert 000539.
19    A.   What was that again, 00- what?
20    Q.   000539.  It should be towards the end.  It's
21  a March 23rd, 2010 mental health note.
22    A.   (Indicating.)
23    Q.   Yep, you got it.
24    MR. STIEHL:  Matt, I don't know -- I mean,

Page 21

1  obviously, this document is marked confidential.  So I
2  don't know how we would -- Can we just designate the
3  entire deposition confidential and then go back and
4  re-designate between us?
5    MR. ELIASER:  I'm not sure I understand what
6  exactly you mean.
7    MR. STIEHL:  Well, this document's confidential,
8  and so you're about to ask questions about it.
9    MR. ELIASER:  Right.
10    MR. STIEHL:  And I have concerns that his
11  testimony should also be marked confidential.  I'm
12  assuming --
13    MR. ELIASER:  That's fine.  I understand.
14    MR. STIEHL:  That's fine.  So just for current
15  purposes, we'll have the deposition marked
16  confidential, and you and I can work out designations.
17    MR. ELIASER:  That's fine.
18    MR. STIEHL:  Okay.  Thank you.
19  BY MR. ELIASER:
20    Q.   If you look towards the bottom of the
21  document, Mr. Lippert, under the "Assessment/Diagnosis"
22  section -- Do you see that?
23    A.   Mm-hmm.
24    Q.   (Continuing.) -- Axis I says anxiety.  Do

6  (Pages 18 to 21)

Confidential

Page 22

1  you see that?
2      A.  Yep.
3      Q.  Does that refresh your memory as to whether
4  you were diagnosed with anxiety disorder prior to
5  May 2010?
6      A.  Not right offhand.  You know, to explain, I
7  see Zoloft.  That's for depression.  And something --
8  something else --
9      Q.  And we'll get to that.  I'm just asking you
10  if this document refreshes your memory at all about
11  whether you've been diagnosed with anxiety prior to
12  May 2010.
13      A.  No.
14      Q.  Okay.  Were you diagnosed with antisocial
15  personality disorder prior to May 2010?
16      A.  I don't recall.
17      Q.  Okay.  I'm going to direct your attention to
18  Axis II right underneath the section that we were just
19  talking about on page 539 of Exhibit A.
20      A.  Mm-hmm.
21      Q.  ASPD, I'll represent to you that that stands
22  for antisocial personality disorder --
23      MR. STIEHL:  And I'll object to that
24  representation.  I don't know that's true.

Page 23

1      MR. ELIASER:  That's fine.  It is true, but --
2      MR. STIEHL:  Are you sure?  You talked to the
3  doctor who did the diagnosis?
4      MR. ELIASER:  No, but I do medical litigation for
5  a living, and I know that's what it stands for.  Your
6  objection is noted.
7      MR. STIEHL:  Okay.
8  BY MR. ELIASER:
9      Q.  Does this refresh your memory about whether
10  you've ever been diagnosed with antisocial personality
11  disorder prior to May 2010?
12      A.  Not what I recall.
13      Q.  Okay.  Other than depression, do you know of
14  any other diagnoses, mental health diagnoses, prior to
15  May 2010?
16      A.  Nope.
17      Q.  What were your symptoms of depression that
18  you experienced prior -- prior to May of 2010 that you
19  can tell me about?
20      A.  Say it again, please.  Can you rephrase it,
21  please?
22      Q.  Sure.
23      Q.  Or repeat it.
24      Q.  Prior to May 2010, did the depression affect

Page 24

1  your life in any way?
2      A.  Yeah.
3      Q.  Can you tell us how?
4      A.  Well, I mean -- I don't know.  I mean, if I
5  didn't feel -- You know, it would be confidential if --
6  Is this going to be for treatment?
7      Q.  No, no.  What we're doing here right now is
8  not for purposes of treatment.
9      A.  Well, then --
10      Q.  But we are entitled to know your medical
11  history as it pertains to your mental health because
12  you're claiming those damages in this case.  So we need
13  to know prior to the incident what you were
14  experiencing with respect to your mental health
15  condition.
16      A.  Well, to put it, you know, frankly, you know
17  I blame my -- you know, my parents for me being in
18  here, you know, my cousin, Mom, Dad, myself, you know,
19  and a girl that, you know, I basically trusted, you
20  know, my life with but I found out, you know, she was
21  crazy too and I just found out that I put my life in a
22  crazy person's hands.  So you know -- you know -- but
23  finding out what the problem was was depression.  So
24  now, being locked up for all this shit that I say

Page 25

1  shouldn't have happened, yeah, it's depression and I'm
2  still depressed.
3      Q.  And what I want to know is, did that affect
4  you physically prior to May 2010?  Did it cause you to
5  be tired?  Did it cause you to be irritable?  Did it
6  cause you to sleep a lot?  Those kind of things prior
7  to May 2010.  Can you describe that?
8      A.  Oh, no --
9      MR. STIEHL:  I'm going to object, speculation and
10  he's not a doctor.
11      But to the extent you know, you can ...
12  BY THE WITNESS:
13      A.  I don't know.
14      Q.  You don't remember whether you were tired,
15  irritable, anything like that as a result of the
16  depression prior to May 2010?
17      MR. STIEHL:  Same objection.
18  BY THE WITNESS:
19      A.  I don't recall.
20      Q.  You don't recall?
21      A.  No.
22      Q.  Did you experience insomnia prior to
23  May 2010?
24      A.  I had -- I had a problem sleeping.

Confidential

Page 26

1    Q.   And how long were those problems -- How long
2  did you have those problems for?
3    A.   When the retaliation -- You know, when the
4  guards retaliate against me, you know, it's just -- I'm
5  going -- that's where the anxiety was coming in, you
6  know.  That's -- I can recall that anxiety because, you
7  know, it was hard for me to sleep, concentrate, you
8  know, because of retaliation of the guards, medical,
9  prior ...
10   Q.   And did that -- Did that date back to your
11 incarceration, at the time you were first incarcerated,
12 the anxiety and the insomnia and those things you just
13 talked about?
14   A.   When I first came in, no.
15   Q.   When did it start?  That's what I'm asking.
16   A.   I don't recall.
17   Q.   Did it start prior to 2005?  Did it start
18 between 2005 and 2008?  Can you give me any sort of a
19 general time frame when those -- when that started?
20   A.   I would like to say between 2000- -- between
21 2000- -- About 2008, you know, but anything over that
22 has just got worse.
23   Q.   What medications were you on for your mental
24 health prior to May 2010?

Page 27

1    A.   I know, Zoloft.  They had me on -- They, you
2  know -- They were, like -- They gave me -- tried me out
3  on a bunch of stuff, you know, like -- So I don't know.
4    Q.   Any other names come to mind in terms of
5  medications that you were on or that you tried prior to
6  May 2010 for mental health?
7    A.   I see this Vistaril.  That -- I know about
8  that.
9    Q.   And was that for the depression in your
10 understanding?
11   A.   That or for, you know, anxiety.
12   Q.   Any other medications that you can remember
13 for mental health that you were on at any time prior to
14 May 2010 that we haven't already talked about?
15   A.   Oh, they tried to give -- You know, they
16 gave me some stuff that will try and knock you out.  I
17 think, Thorazine, and I told them no and they tried to
18 give me that.  Xanax.  Prior, right?
19   Q.   Correct.
20   A.   That's all I can remember.
21   Q.   Now, I want to talk about what your daily
22 diabetic management and regimen was prior to May 2010,
23 so as of, let's say, April 2010.
24        What medications were you on for diabetes?

Page 28

1  What did your daily diabetic management consist of?
2    A.   I was on insulin.  I was taking two kinds,
3  regular, which is a fast-acting; NPH, which is for
4  long-acting.
5        For diabetes management, you know, there was
6  no diet.  They fed -- They fed me whatever they want to
7  feed, you know, sugary, high-carbohydrate foods.  The
8  stuff from commissary was just all junk food.  So for
9  nutritional, it was nonexistent.  That was bad for my
10 diabetes management.
11       Exercise, you know, is twice a week, five
12 hours total.  You know, I work -- you know, worked out
13 in the cell about four times a week.
14       Other than that, for -- to get my insulin
15 shot or Accu-Cheks, any meds, I have to count on, you
16 know, IDOC Wexford employees to give me it.
17   Q.   Were you on any other medication for your
18 diabetes other than insulin as of April 2010?
19   A.   For my diabetes?
20   Q.   Yeah.
21   A.   Wait.  Prior?  So --
22   Q.   Prior to May 2010.
23   A.   When I came in, they were trying to put me
24 on some pills for -- but it was just briefly.

Page 29

1    Q.   Were you on those pills in April 2010, or
2  was insulin the only medication for your diabetes at
3  that time?
4    A.   No.  This was way, way before 2010.
5    Q.   Okay.  So insulin was the only diabetes
6  medication you were taking in April 2010?
7    A.   Yeah.
8    Q.   How many times a day did you have insulin at
9  that time?
10   A.   Twice.
11   Q.   And what times of the day?
12   A.   In the morning and the evening.
13   Q.   Okay.  What time in the morning?
14   A.   It varied.  But the shift, it would be on
15 the 11:00-to-7:00 shift for a.m. and 3:00-to-11:00
16 shift for my evening.
17   Q.   What's the earliest in the morning you would
18 have received your insulin?
19   A.   2010 -- April, I was in F house, so it was
20 between 2:30/3:30.
21   Q.   A.m.?
22   A.   Yeah.
23   Q.   And then sometimes it would come at
24 7:00 a.m. at the end of the shift?

8  (Pages 26 to 29)

Confidential

Page 30

1    A.   No.  Then the evening shot, you know -- It
2  just varied.  You know, you got -- you got one med tech
3  or one nurse, you know, doing a bunch of people, so
4  it -- time varies when they'll show up.  So it was hard
5  to tell.
6    Q.   I'm just getting an idea of what the time
7  range would be.
8         So tell me if I'm correct.  So in the
9  morning, it may come anytime between 2:30 a.m. and
10  7:00 a.m.?
11    A.   Mm-hmm.
12    Q.   Yes?  Oh, I'll let you finish your orange
13  juice so can you say "yes."
14    A.   Yeah.
15    Q.   Okay.  And then in the evening, would it
16  come anytime between, let's say, 6:00 p.m. and
17  11:00 p.m.?  Is that correct?
18    A.   No.  I'm going to say between 4:30/7:00.
19    Q.   Okay.  And what type of insulin and what
20  were your dosages in the morning as of April 2010?
21    A.   Two shots.  The dose, I can't recall.
22    Q.   Two shots of regular?
23    A.   Oh, no, one shot of one ...
24    Q.   I got it.  One shot of regular and one shot

Page 31

1  of NPH in the morning?
2    A.   Yeah, yeah, mixed in one syringe.
3    Q.   And would the same be for the evening, one
4  shot --
5    A.   Yeah.
6    Q.   -- of regular and one shot of NPH?
7    A.   But different units.
8    Q.   Different dosages?
9    A.   Yeah.
10    Q.   Higher dosage in the evening?
11    A.   No.
12    Q.   Lower dosage in the evening?
13    A.   Yes.
14    Q.   Do you remember what the dosage was in the
15  evening?
16    A.   No.
17    Q.   Okay.  I want to talk a little bit more
18  about, let's say, April 2010, okay?  Are you with me?
19    A.   Mm-hmm.
20    Q.   Okay.  You said that you exercised twice a
21  week, which was a total of five hours.  That was
22  outside the cell, right?
23    A.   Yeah.
24    Q.   Okay.

Page 32

1    A.   If you went to yard.
2    Q.   Okay.  What kind of things would you do in
3  the yard for those five hours a week?
4    A.   It varied; walk around, you know, play
5  basketball, you know, lift weights.  That's it.
6    Q.   And you said that you worked out in your
7  cell four times a week as of April 2010, right?
8    A.   (Nodding.)
9    Q.   Can you tell me what sort of things you
10  would do in your cell during that time?
11    A.   Pushups, you know, jog around, curl bag,
12  squats, mostly cardio.
13    Q.   Cardio?
14    A.   Yeah.
15    Q.   In the cell?
16    A.   Yeah.
17    Q.   Jumping jacks?
18    A.   Jumping jacks.
19    Q.   It's hard to do cardio in the cell.  That's
20  why I'm wondering what you meant.
21    A.   Well --
22    Q.   I guess, if you do squats fast enough,
23  that's cardio, right?
24    A.   Well, you've got a big cell.  You could walk

Page 33

1  back and forth fast.
2    Q.   How big was your cell at that time?
3    A.   To [sic] the window to there, you know.
4    Q.   About as long as from the door to the
5  window?
6    A.   No, no, no
7    Q.   Right here (indicating)?
8    A.   To the window.
9    Q.   How about width?  Same as this room?
10    A.   I'm going to say to the table to the wall.
11    Q.   Okay.  So other than being in the yard doing
12  the activities you talked about and being in the cell
13  doing the activities you talked about, what other
14  things would you do just in your -- in your normal day
15  in, let's say, April 2010?  Just give me an idea of
16  your daily schedule at that time.
17    A.   Talk to a cellie, talk to a neighbor, you
18  know, call some friends.  That's it.
19    Q.   Any other physical activities that you would
20  do in your day other than what we already talked about?
21    A.   I mean, if I'm alone, you know, some girly
22  books, you know.
23    Q.   Any other --
24    A.   You want me to --

9  (Pages 30 to 33)

Confidential

Page 34

1    Q.   No, no, no, no.  I don't want to talk about
2    that.  I meant -- I guess some consider that physical
3    activity, but --
4    A.   It's cardio.
5    Q.   I mean -- Well, now I'm thrown off.  I asked
6    the question.
7         MR. STIEHL:  We actually prepped him for that, so
8    I don't know if --
9         MR. ELIASER:  It worked.  It threw me off.
10   BY MR. ELIASER:
11   Q.   All right.  So I just want to make sure I
12   have everything.
13        So in the yard, you would walk around; you
14   would play basketball; you would lift weights.
15   Anything else you would do in the yard during your five
16   hours a week?
17   A.   No.
18   Q.   That's everything?
19   A.   Yeah.
20   Q.   Okay.  I want to turn your attention to
21   May 1st, 2010, now, the day -- the reason why we're all
22   here, okay.  I want you to take me through that day in
23   your own words.  So start with the very beginning of
24   the day and tell me what happened.

Page 35

1    A.   I'm -- You know, as you know, I'm a diabetic
2    and supposed to get an insulin shot in the morning.  It
3    was 3- -- no -- 7- -- I don't remember.  Well, in the
4    morning -- I don't know what shift.  I'm thrown off --
5    I was supposed to get an insulin shot from whoever.  I
6    didn't get it.
7    Q.   You said 1:00 a.m.; is that what you said?
8    A.   No, from somebody.
9    Q.   Oh, I thought I heard 1:00 a.m.  I'm sorry.
10   Okay.
11   A.   I was supposed to get an insulin shot by a
12   nurse or a med tech, and I didn't get it.  So on
13   7:00-to-3:00 shift, you know -- no -- 11:00 to 7:00, I
14   was supposed to get my morning insulin shot.  Didn't
15   get it.
16        Then on the 7:00-to-3:00 shift, you know, I
17   was complaining to security that I need my insulin
18   shot, you know.  CMT Bacot refused to give me my
19   insulin shot when she came.  You know, the cellhouse
20   serg, you know, called and said that nothing's
21   happening.  I told him, I need to go get my insulin
22   shot --
23   Q.   You told who?
24   A.   The serg.

Page 36

1    Q.   Okay.  Sorry.  I couldn't hear you.
2    A.   (Continuing.) -- and he said he'd work on
3    something.
4         Then I was complaining to the other guards
5    that I need my insulin shot, can they take me up.  They
6    were all just laughing at me, waving me off, you know.
7         Then I started getting, you know -- because
8    I ate breakfast, you know, and I started getting -- you
9    know, my blood sugar level started going up.  I kept on
10   complaining more, you know, telling them I need to get
11   my insulin shot, you know; and they're saying, Ain't
12   nothing happening.  We're on lockdown.  No movement,
13   you know.
14        I said, This is an emergency.  You need --
15   You know, you need to take me to get my insulin shot.
16   They were all laughing and just ignored me.
17        And then kind of, like, at lunchtime, they
18   were passing out -- you know, Maldonado and Norman, two
19   guards, were passing out lunch trays on my gallery; and
20   by that time, I -- you know, I was weak and passed out.
21   You know, I -- I urinated all over myself.
22   Q.   I'm sorry?
23   A.   Urinated all over myself.  You know, they
24   were laughing at me when they came to the door.  I told

Page 37

1    them, I need to get my insulin shot.  They left, you
2    know.
3         And then the next thing I know, you know,
4    faintly, I heard, you know, this -- you know, they're
5    saying that, Hey, you need to get up here and look at
6    this guy.  He's on the floor.
7         Next thing I know, they're -- they're
8    carrying me -- carrying me out the cellhouse to the ER.
9         While at the ER, the doctor prescribed to
10   give me an insulin shot, put me in the infirmary, you
11   know, for observation.  You know, my blood sugars
12   immediately came under control.  She said that after
13   I'm done eating and getting my evening shot, I could go
14   back to the cellhouse.
15   Q.   Who said that?
16   A.   Dr. Zhang, you know.  She worked -- from
17   Wexford.
18        (Continuing.)  And, you know, she said, When
19   you're done eating and getting your insulin shot, you
20   could go back to the cellhouse, you know.
21   Q.   What meal was she referring to?
22   A.   Dinner.  Before dinner came, Nurse Breske,
23   Gloria Breske, she came, tested my blood sugar level.
24   It was 115.

Confidential

Page 38

1   Q.   One, one, five, right?
2   A.   Yeah.
3   Q.   Okay. Which is normal, right?
4   A.   Yeah.
5   Q.   Okay.
6   A.   And she left, you know. I got my dinner.
7  They told me to eat. You know, I ate. I'm expecting
8  my insulin shot. I told the guard, you know, Can you
9  tell the nurse, you know, to come back and give me my
10 insulin shot?
11      The guard left, came back and said, You're
12 not getting it.
13      I told him, you know, I'm a diabetic. I
14 need to get my insulin shot.
15      So she told Gloria, you know, Breske. She
16 came back to the cell in the infirmary and she told me,
17 Your blood sugar level is normal. You ain't getting
18 it.
19      Q.   Who told you, Breske?
20      A.   Yeah. So you know, I was telling her, you
21 know, What are you talking about? You know, I need my
22 insulin shot. I'm a diabetic. You can't just deny it,
23 you know.
24      She said something about, This is the

Page 39

1  doctor's orders, you know.
2      Q.   Do you remember exactly what she said?
3      A.   Yeah -- Well, exactly verbatim or close?
4      Q.   Well, what do you remember? What did she
5  say to you?
6      A.   Breske?
7      Q.   Yeah.
8      A.   When she came to the door, she's like, you
9  know, before she tested my blood sugar, you know, Let
10 me test your blood sugar before you eat. She's like,
11 Ah, that's pretty good, you know, normal, and she left.
12      I eat, you know -- So I ate. She, you know,
13 told the guard -- she comes to my cell and she's like,
14 You're not getting it, you know.
15      I said, Why not?
16      She said that you know your blood sugar
17 level's normal. You don't need it.
18      I go, What do you mean, I don't need it?
19 I'm a diabetic. I need my insulin shot.
20      She said, Per doctor's orders, that if it's
21 normal, you don't get your insulin shot.
22      You know, you want me to (unintelligible)
23 the swear words, you know. Are you crazy? You know,
24 you can't deny me my insulin shot. I'm a diabetic.

Page 40

1      She told the guard, He could go back to the
2  cellhouse. That's from her, from Breske.
3      So while the guard was escorting me back out
4  the healthcare unit, you have the ER, you know; and
5  while I was going past it, I stopped and I saw Nurse
6  Rossiter, Athena Rossiter, and another nurse.
7      Q.   Do you know who the other nurse was?
8      A.   No, I -- No.
9      Q.   Okay. What does Rossiter look like? Can
10 you describe her?
11      A.   You know, maybe 5'5", 5'9", chubby, long --
12      Q.   Did you say blond?
13      A.   No. Chubby, long -- long brown --
14 blondish-brown hair.
15      Q.   So you said 5'5" to 5'9", chubby with long
16 blondish-brown hair, right?
17      A.   Maybe a little shorter.
18      Q.   Any other characteristics you can describe
19 to me of Athena Rossiter, physical-appearance-wise?
20      A.   She -- She looks like she's got a -- just a
21 disgusted look on her face, you know.
22      Q.   She always looks like that or --
23      A.   Yeah.
24      Q.   Yeah?

Page 41

1      A.   Yeah, like, You guys shouldn't get nothing,
2  you know. I don't know; that look, you know, like ...
3      Q.   She always looks like that?
4      A.   Yeah, just, like, a disgusted look like, I
5  shouldn't even be here. Why am I here? That's what --
6  Like, I don't want to work here, you know, that type of
7  look.
8      Q.   Does she still work here?
9      A.   But I'm not a mind reader, so --
10      Q.   I understand. I'm just asking you for
11 physical appearance.
12      Does she still work here; do you know?
13      A.   Rossiter?
14      Q.   Yeah.
15      A.   Yeah.
16      Q.   Okay. Have you seen her recently?
17      A.   Yeah.
18      Q.   When was the last time you saw her?
19      A.   Within a week. I don't know what day, but,
20 you know ...
21      Q.   Did she look the same back then as she does
22 now, same general appearance that you just described to
23 me?
24      A.   Yeah.

Confidential

Page 42

1    Q.   Okay. All right. So we left off at the
2  guard was escorting you through the ER back out to your
3  cell, right?
4    A.   Yes. I stopped at the ER, and I told them,
5  you know -- I told them I need my insulin shot.
6    Q.   You told who?
7    A.   Rossiter and the other nurse.
8    Q.   You told Rossiter to her face?
9    A.   Yeah. They were -- They were behind a cart
10  putting psychotropic medication in little envelopes,
11  and I told them that I need my insulin shot.
12       And they're like, with a smile, like, you
13  know, Hey, you know, Breske said that you don't get it.
14    Q.   That's what Rossiter said?
15    A.   Yeah, and the other nurse. And I told them,
16  What do you mean? I'm a diabetic. You know I'm a
17  diabetic. I need my insulin shot, you know.
18       They're like, you know -- put their hands
19  up -- One nurse did. The other nurse that I don't know
20  put her hands up, you know. Rossiter, she just, you
21  know, didn't do nothing, didn't respond.
22       Then --
23    Q.   What time was that?
24    A.   I don't recall. It was -- It was -- It was

Page 43

1  late in the evening, about, maybe, 6:00/7:00, maybe
2  8:00.
3    Q.   Somewhere between 6:00 and 8:00 p.m.?
4    A.   Yeah. So --
5    Q.   How long after dinner -- How long after you
6  ate dinner were you escorted out of the infirmary?
7    A.   When I left the infirmary out to the
8  healthcare unit?
9    Q.   Right.
10    A.   It took about, maybe less than five minutes.
11    Q.   So you ate dinner, and then five minutes
12  later, you were escorted out to go --
13    A.   Oh, I thought --
14    Q.   -- back to your cell?
15    A.   -- you were talking about when I was --
16  left.
17    Q.   No, no, no, no. That -- No. I'm asking --
18  What time did you eat dinner that day in the infirmary?
19    A.   I don't remember.
20    Q.   Can you give me an estimate like you did
21  just a few minutes ago?
22    A.   I'm going to say between 3:30 and 4:30.
23    Q.   Okay. Okay. Keep going.
24    A.   And then --

Page 44

1    Q.   So after Rossiter went back to putting her
2  psychotropic meds into the envelopes, that's what
3  was -- That's where we left off, right?
4    A.   Yeah.
5    Q.   And the other nurse had put her hands up
6  saying, I can't do -- you know, indicating she couldn't
7  do anything?
8    A.   Yeah.
9    Q.   Okay. So then what happened?
10    A.   You know, I went out, got escorted back to
11  the cellhouse.
12    Q.   And that was between 6:00 and 8:00 p.m., you
13  said?
14    A.   Yeah, about -- Yeah, about then.
15    Q.   Okay. What happened next?
16       Who escorted you, first of all?
17    A.   I don't know the guard's name.
18    Q.   Okay. What happened next?
19    A.   I was put back in my cell and, you know,
20  saw, you know, the -- I told the guard when they were
21  doing a count, you know, Hey, can you have the nurse,
22  you know, come and give me my insulin shot? I need my
23  insulin shot.
24       And he said, The nurse is coming around with

Page 45

1  the meds.
2       So I waited till the nurse came around, and
3  when I saw Rossiter again, I told her, Hey, I need my
4  insulin shot. You know, I mean I feel weak.
5    Q.   What time was this, when Rossiter came
6  around?
7    A.   I'm going to say about between 9:00 --
8  between 9:00 and 10:00.
9    Q.   P.m.?
10    A.   Yeah.
11    Q.   Okay. And what was Rossiter doing when
12  she --
13    A.   Passing out -- She gave me my meds, passed
14  out meds.
15    Q.   Okay. So she physically gave you some
16  medication?
17    A.   Yeah.
18    Q.   What did she give you?
19    A.   Right offhand, I don't know. I think it was
20  Zoloft, I believe, Vistaril.
21    Q.   Were you taking both at the time?
22    A.   (Nodding.)
23    Q.   Yeah. So it would have been "and"; it would
24  have been Zoloft and Vistaril, right?

Confidential

Page 46

1     A.   Yeah.
2     Q.   Okay.  Was she just handing out just
3  psychotropic meds or was she handing out all types of
4  meds?
5     A.   Just psychotropic.
6     Q.   Okay.  So she handed you your medication,
7  right?
8     A.   And I told her that I feel weak, dizzy, and
9  I need my insulin shot, you know.  I mean, you could
10  test my blood sugar level and it will show you that I
11  need an insulin shot.  She said she'll come back, you
12  know, test me, and give me my insulin shot.  But after
13  she was done, you know, passing out the meds, you know,
14  she never came back.
15     Q.   So tell me exactly what she said to you
16  after you told her that you felt weak and dizzy and
17  that you need your insulin shot.  What did -- exactly
18  did she say to you?
19     A.   She said that after I'm done passing out the
20  meds, you know, because she had to do another
21  cellhouse, she'll come back -- I'll come back, I'll
22  test your blood sugar, and give you your insulin shot,
23  all right?
24          I'm like, Okay.  I need it.

Page 47

1          Then she left, and she never came back.
2     Q.   Somebody did come back, though, that night
3  to test your blood sugar and give you an insulin shot,
4  right?
5     A.   Yeah, another nurse on the 11:00-to-7:00
6  shift.
7     Q.   Okay.  Who was that?
8     A.   I forgot his name.
9     Q.   It was a man?
10     A.   Yeah.
11     Q.   Okay.  So it would have been between
12  11:00 p.m. on May 1st and 11:59 p.m.?
13     A.   Yeah, about that.
14     Q.   Okay.  You don't remember the guy's name?
15     A.   Gary.  Yeah, Gary.
16     Q.   Okay.  When he came, did he say anything to
17  you?
18     A.   I don't know what, you know -- verbatim, you
19  know.  He just tested my blood sugar level, and he
20  just -- Here, I'm going to give you a few units of
21  regular insulin.  I'll be working.  Again, I'll see
22  you, you know, in the morning when I do rounds.
23     Q.   Okay.
24     A.   So he stopped by and he saw me and he tested

Page 48

1  my blood sugar level.  It was normal.
2     Q.   Did you say anything to him when he came to
3  see you?
4     A.   Yeah.
5     Q.   What did you say to him?
6     A.   I told -- He's like, you know, Are you doing
7  all right?
8          I'm like, Yeah.
9          He's like, you know, What happened?
10          And I go, They refused to give me my insulin
11  shot.
12          He said, Who?
13          I said, Gloria Bacot -- Well, first I
14  explained from the beginning, you know, Bacot -- you
15  know, I told him exactly what happened, what we just
16  got done talking about.
17          And he's like (vocally demonstrating), and
18  he just shook his head like, you know, this shit's
19  crazy.
20     Q.   Okay.  So he asked you -- I'm trying to --
21  You said that he asked you --
22     A.   Are you doing all right?  You know, that's
23  it.
24     Q.   He said, Are you doing all right?

Page 49

1          You said, Yeah.
2          And then you told him what happened earlier
3  in the day?
4     A.   Mm-hmm.
5     Q.   And that's all you recall telling him?
6     A.   (Nodding.)
7     Q.   Okay.  And -- Yes?
8     A.   Yes.
9     Q.   Okay.  What was your blood sugar when he
10  tested it?
11     A.   Two-something.  I don't know the exact
12  number.  I think it's in the grievance.  Can I look at
13  the grievance?
14     Q.   Sure.  I can look ...
15          So you say in the -- I'm looking at
16  page Lippert 491.  You don't need any of that.  You can
17  just look at what I gave you.  It's in there.  Don't
18  worry.  It should be towards the end.  Yeah, so keep
19  going.  The page on the bottom right of Exhibit A is
20  Lippert 491.  Are you there?  Go to 491.  Go to the
21  second page of that -- that grievance -- Oh, no.
22  That's the wrong grievance.
23          MS. ARGENTINE:  It should be the last page, I
24  think.

Confidential

Page 50

1    MR. ELIASER: Yeah, you're right. It is. It's
2  the last page. That would have been an easier way to
3  describe it. That's for sure.
4    MR. STIEHL: And, Don, feel free to look -- look
5  through the whole document if you need to. I think the
6  document starts a page or two earlier.
7    THE WITNESS: 277, yeah.
8  BY MR. ELIASER:
9    Q. Do you remember the dosage of insulin he
10  gave you?
11    A. No. He gave me -- He gave me some regular,
12  though, some fast-acting to bring my blood sugar level
13  down.
14    Q. Okay. He didn't give you any NPH?
15    A. No.
16    Q. Okay. When you had your shot of insulin in
17  the infirmary earlier that day, what type of insulin
18  was it and what dosage was it?
19    A. If I would have got it.
20    Q. No, no, when you did get it.
21    A. I didn't get it in the infirmary.
22    Q. When you were first taken to the
23  infirmary --
24    A. Oh, from the cellhouse?

Page 51

1    Q. Right.
2    A. Oh.
3    Q. When you were first taken there and you were
4  seen by Dr. Zhang, you were given insulin, right?
5    A. Yeah.
6    Q. Do you remember what dosage or what type of
7  insulin it was?
8    A. No. That was regular insulin. I don't know
9  what the dose was.
10    Q. No NPH?
11    A. No NPH, because it wouldn't -- No NPH.
12    Q. Did you know who the nurse, Gary, was? Had
13  you seen him before?
14    A. Yeah.
15    Q. Who was he?
16    A. Just some male -- a male nurse.
17    Q. Did he test your blood sugar and give you
18  insulin prior to that day? I mean, did you know him
19  from that?
20    A. Yeah, yeah. He -- He did -- passed out
21  meds, did insulin shots, because he came back early in
22  the morning.
23    Q. Again, on May 2nd?
24    A. To give me my insulin shot --

Page 52

1    Q. Okay.
2    A. -- on 11:00-to-7:00 shift in the morning.
3    Q. Gotcha. Mr. Lippert, I'm going to turn your
4  attention to one of your grievances in Exhibit A, and
5  that is the grievance against the F house security.
6  That starts on page 278. On the bottom right, you'll
7  see Lippert Master File 000278. Let me know when you
8  find that.
9    Are you there?
10    A. Yep.
11    MS. ARGENTINE: Don, make sure you have 278, 279,
12  and 280. That's the whole grievance.
13    THE WITNESS: I got 278, 279, and 280.
14  BY MR. ELIASER:
15    Q. Yep.
16    MS. ARGENTINE: Okay.
17  BY THE WITNESS:
18    A. All right.
19    Q. All right. So you know how this process
20  works. You -- You author a grievance, and there's a
21  counselor's response, which is what we see here on this
22  page, right?
23    A. Mm-hmm.
24    Q. Okay. And if you'll look at the counselor's

Page 53

1  response for me --
2    A. Mm-hmm.
3    Q. -- it says per nursing staff, you did not
4  receive insulin because you did not get up when called?
5    A. That's a lie. I was up. I was watching TV
6  because they -- they passed out breakfast. So I was
7  already up, and I was expecting my insulin shot. So I
8  wasn't asleep.
9    Q. So you were up watching TV?
10    A. Yeah.
11    Q. And Nurse Bacot -- Is that how you pronounce
12  it?
13    A. Bacot.
14    Q. Bacot?
15    A. Yeah.
16    Q. Did she come around to your cell at all that
17  morning?
18    A. No, she didn't stop at my cell at all.
19    Q. Did you see her walking around?
20    A. I saw someone, because when I was laying
21  down, my TV, you know, don't have a good view. You
22  have a good view of the door. And it's perforated, so
23  you see a bunch of holes. On that shift, the lights
24  are down, but I saw someone walk past. And I thought

Page 54

1    it was the guards doing the a.m. count. No one came
2    back, you know. No one stopped at my cell. So then
3    next shift, I started hollering, you know, I need my
4    insulin shot.
5         But I was up. This is a lie, but ...
6    Q.    Okay. Give me one second.
7         How did you know it was Nurse Bacot if you
8    just saw this person from a distance and you didn't
9    actually have an interaction with her that morning?
10   A.    Because the other diabetics said it was her.
11   Q.    On that day?
12   A.    Yeah.
13   Q.    You asked -- You asked your neighbors?
14   A.    Yes, I asked them. I'm like, Man, you know,
15   did you get your insulin shot?
16        And he said, Yeah.
17        I'm like, Who came?
18        Bacot.
19   Q.    And they told you it was Nurse -- it was
20   Bacot?
21   A.    Yeah.
22   Q.    Do you remember the people that you talked
23   to about this, the neighbors? Who were they?
24   A.    Well, not my neighbors, other diabetics that

Page 55

1    was on the gallery.
2    Q.    How did you talk to them if you were --
3    A.    Just yelled.
4    Q.    You yelled. Okay. Who were they?
5    A.    Lowe (phonetic), you know, Inmate Lowe. He
6    [sic] a diabetic, and he hollered down and said it was,
7    you know, Bacot.
8    Q.    Is he on a different level than you?
9    A.    Yeah.
10   Q.    What level were you on?
11   A.    I was on three gallery.
12   Q.    And he was on what level?
13   A.    He was on four.
14   Q.    Okay. And was it only Lowe, or was there
15   someone else that also told you that morning that it
16   was Bacot?
17   A.    Just Lowe.
18   Q.    Just Lowe. How did you know it was Lowe?
19   Could you see him?
20   A.    No. I called him. I know his --
21   Q.    You know his voice?
22   A.    Yeah.
23   Q.    Okay. But you didn't see him?
24   A.    Well, I saw him at the door. I know -- When

Page 56

1    you're at the door, you can see the person, you know.
2    So I know who I was talking to.
3    Q.    I'm just trying to be clear here. You
4    didn't see his face, but you saw his cell and you heard
5    his voice, right?
6    A.    Well, see him perfectly like the way I can
7    see you, it wasn't like that; but I could see, you
8    know, it was him.
9    Q.    Okay. So when you first arrived in the
10   infirmary -- Am I using that term correctly, or do you
11   say ER? When you first arrived -- What would you call
12   that, the infirmary or the --
13   A.    That was the ER.
14   Q.    That was the ER. Okay. So when you first
15   arrived, you were seen by Dr. Zhang, right?
16   A.    Yeah.
17   Q.    Okay. And your complaint to Dr. Zhang was
18   that you didn't receive your insulin that morning,
19   right?
20   A.    Right.
21   Q.    Did you make any other complaint to him, or
22   was it just, I didn't receive my insulin?
23   A.    Ms. Bacot was there, too. I said, She
24   refused to give me my insulin shot, you know.

Page 57

1    Q.    Okay.
2    A.    And then, you know, somebody said something
3    about, Oh, you refused, you know. And I'm -- You know,
4    the nurse -- Zhang was like, you know, We're going to
5    give you an insulin shot.
6    Q.    Okay. Did you --
7    A.    You know, to keep me shut up, here's your
8    insulin shot. Here. That was it.
9    Q.    Okay. So you told him you didn't get the
10   insulin that morning, and you told him that Bacot had
11   made rounds but didn't give you the insulin.
12        Did you make any other complaint to him, or
13   is that what you said to Dr. Zhang at that time? Is
14   that everything?
15   A.    I told her this.
16   Q.    Oh, I'm sorry. Her. Is that everything you
17   told her at that time?
18   A.    Yeah.
19   Q.    Yes?
20   A.    Yeah, what I know of.
21   Q.    Okay. Now, the last person that came in and
22   evaluated you in the infirmary was Nurse Breske, right,
23   when she checked your blood sugar and it was 115?
24   A.    Nurse Breske.

Confidential

Page 58

1    Q.    Right.  What did you tell her at that time?
2    A.    I told her nothing.  She said, Let me test
3  your blood sugar, you know.
4    Q.    Okay.  And you said --
5    A.    I told her, Well, you know, where's my
6  insulin shot?
7         She said, Eat first.
8         You know, I ate; and I told the guard, you
9  know, Hey, I need my insulin shot.
10    Q.    But you didn't make any other complaints to
11  Breske at that time, right, other than you requesting
12  your other insulin shot?
13    A.    Yeah.  Then when she -- Yeah.
14    Q.    Okay.  After Nurse Gary gave you your
15  insulin shot between 11:00 p.m. and 11:59 p.m., did you
16  feel fine after that?
17    A.    Yeah.
18    Q.    Okay.
19    A.    I mean, better than I was when he came and
20  showed up, yeah.  But I still had problems, you know;
21  muscle tightness, headaches, you know.
22    Q.    When did those go away?
23    A.    The headaches and muscle cramps?
24    Q.    Yeah.  Did they go away in the morning of

Page 59

1  May 2nd?  Because you had --
2    A.    Oh, no.  I felt that -- I felt that stuff
3  for days, I mean, like, three, four days afterwards.  I
4  mean, it was just -- I mean, when you have high blood
5  sugar, especially if you're being refused your insulin
6  shots twice, you know, the acidosis will just ...
7    Q.    So you had muscle cramping and headaches for
8  a couple days after --
9    A.    Yeah.
10    Q.    -- May 1st?
11    A.    (Nodding.)
12    Q.    Okay.  Did those feel like the same
13  headaches and the same muscle cramps that we talked
14  about earlier in the deposition that you had
15  experienced in prior episodes?  Did you feel like that?
16    A.    Worse.
17    Q.    Worse?
18    A.    Yeah.
19    Q.    How so?
20    A.    How so?
21    Q.    Yeah.
22    A.    It's just -- It's blurry vision, you know,
23  headache.  It's just ...
24    Q.    And you're saying that's the worse you ever

Page 60

1  felt those headaches in the hundreds of hyper- --
2  hyper- and hypoglycemia episodes you had in the past?
3    A.    I'd say, yeah.  You know, I mean ...
4    Q.    And that was the worse muscle cramping you
5  had ever felt in the hundreds of episodes you had
6  before that?
7         MR. STIEHL:  Objection, mischaracterizes his
8  testimony.
9         Go ahead.
10  BY MR. ELIASER:
11    Q.    You can answer the question.
12    A.    I can answer?
13    Q.    You can answer my question.
14    A.    I wouldn't -- I would compare it -- Yeah.  I
15  mean, I would -- I don't know what to say because I
16  didn't have my insulin shots for, basically, a whole
17  day, you know, my regular doses.  So yeah, my body, it
18  was -- Yeah, it was a lot worse than, you know, having
19  300, you know, blood sugar levels, 400, because I get
20  my insulin shot right after, you know.
21    Q.    Yeah.  So --
22    A.    But this time, I didn't have my insulin
23  shots for a whole day except little units of regular.
24  So it -- my body was -- Yeah, it was hurting a lot

Page 61

1  more.
2    Q.    Did you call -- Did you complain to people
3  about your headaches and your muscle cramps?
4    A.    Yeah.
5    Q.    Who did you complain to?
6    A.    To the doctors, physician assistant,
7  Dr. Williams.
8    Q.    When they came around to your cell, you
9  mean?
10    A.    You know, I saw her when she was doing sick
11  call, you know, doing sick call in the cellhouse.
12  Going on a visit, you know, I'd stop and tell her, Hey,
13  you know what, I need to be put on sick call.
14    Q.    What day was that?
15    A.    I don't know.
16    Q.    Was it the next day?  Was it two days after?
17    A.    I can't recall, but I know I've -- I seen,
18  you know ...
19    Q.    So what did you tell Williams when you saw
20  her?
21    A.    I just told her I got some -- man, some bad
22  headaches, you know.
23         And she's like, What happened?
24         Well, I told her.  I'm like, Man, I'm just

16  (Pages 58 to 61)

Page 62

1    being refused my insulin, you know.
2        When was this?  You know.
3        I told her, Hey, just a while.  You know,
4    they just refused to give me my insulin shot for a
5    whole day, you know.  I just got low insulin.  You
6    know, I -- just my muscles are hurting.  My head's
7    hurting.  You know, can you put me on for sick call?
8    You know.  And I told her some other problems, you
9    know, for my feet.  So --
10       Q.    Did she put you on sick call?
11       A.    Yeah.
12       Q.    So did you see someone in sick call?
13       A.    Yeah.
14       Q.    Who did you see?
15       A.    Dr. Williams.
16       Q.    A different day?
17       A.    Yeah.
18       Q.    What day?
19       A.    I can't recall what day it was.
20       Q.    Was it less than a week after May 1st?
21       A.    I couldn't tell you.
22       Q.    Was it a month after May 1st?  Was it --
23       A.    No.  It wasn't like that.
24       Q.    Less than a month after May 1st?

Page 63

1        A.    Yeah, yeah.
2        Q.    So other than the headaches and the muscle
3    cramps -- that lasted a few days, you said?
4        A.    Yeah.
5        Q.    (Continuing.) -- anything else?
6        A.    No.
7        Q.    No.  Okay.
8        MR. STIEHL:  Do you need to take a break and
9    stretch out?  Are you okay?  You can take a break.
10       THE WITNESS:  No, no, no.  It's just I got a
11   charley horse.  I could listen, but I'm going to be ...
12   BY MR. ELIASER:
13       Q.    You can stand up if you want.
14       Okay.  So I just want to make sure -- have
15   you now told us about all the conversations and
16   interactions you had with people on May 1st, 2010?
17   Have we covered everything on that day?
18       A.    Yeah.
19       Q.    Yes?
20       A.    Yep.
21       Q.    You authored three grievances on May 12th,
22   2010, right?
23       A.    Yeah, I believe.
24       Q.    You can take a look if you want.  There's

Page 64

1    one against F house security.  That's what we just
2    looked at, 278 to 280.  There's one on 494 and 495.
3    That's against Nurse Adrian Bacot.  And there's one --
4        A.    And Zhang.
5        Q.    -- from 489 to 491.  That's authored against
6    Dr. Zhang, Nurse Breske, and two unnamed nurses, right?
7        A.    Yeah.
8        Q.    Okay.  So I want to talk about that
9    grievance that you wrote against Dr. Zhang, Nurse
10   Breske, and the two unnamed nurses, okay?
11       A.    All right.
12       Q.    So you did not name Nurse Rossiter by name
13   in this grievance, right?
14       A.    No.
15       Q.    I'm correct?  What I said was correct, that
16   you had -- you did not name Rossiter by name in the
17   grievance, right?
18       A.    Correct.
19       MR. ELIASER:  What did he say?
20       MR. STIEHL:  Correct.
21       MR. ELIASER:  Okay.  Sorry.  I couldn't hear.
22   BY MR. ELIASER:
23       Q.    Okay.  So you didn't know that the unnamed
24   nurse was Nurse Rossiter at the time you wrote this

Page 65

1    grievance?
2        A.    I knew what she looked like, yeah.  I didn't
3    know her name.
4        Q.    Okay.  How did you find out her name?
5        A.    I asked her.  I asked an inmate who just,
6    you know, passed out the meds.
7        Q.    So you recognized Rossiter as the unnamed
8    nurse, and then you asked her what's her name?
9        A.    Yeah.
10       Q.    And that happened -- must have happened
11   after May 12th, right?
12       A.    When she -- she was passing out meds.
13       Q.    Do you know what day that was?
14       A.    No.
15       Q.    How long after May 12th was it?  Was it a
16   few days?  Was it a few months?  Was it a few weeks?
17   Can you give me any sort of a time frame when you
18   stopped her and asked her what her name was?
19       MR. STIEHL:  Objection, misstates his testimony.
20   BY MR. ELIASER:
21       Q.    You can answer my question.
22       MR. STIEHL:  If you --
23       MR. ELIASER:  I'll rephrase it.
24       MR. STIEHL:  Thanks.

17  (Pages 62 to 65)

Confidential

Page 66

BY MR. ELIASER:
1
2      Q.   We know that you did not know the name of
3  Ms. Rossiter on May 12th, 2010, right?
4      A.   Yeah.
5      Q.   Okay.  We know that later -- We know that
6  after May 12th, 2010, you asked her what her name was,
7  right?
8      A.   Yeah.
9      Q.   When was that?  How long after May 12th was
10  that?
11      A.   Maybe a week.
12      Q.   Did you ever ask the other unnamed nurse
13  what her name was?
14      A.   I tried, but, you know, it was no luck.
15      Q.   Do you know who that person is to this day?
16      A.   No.
17      Q.   Did you ever see that person walking around
18  after May 1st?
19      A.   What, the unnamed nurse?
20      Q.   The other unnamed nurse, yeah.
21      A.   After May 1st, yeah, I saw her a couple
22  times; but --
23      Q.   But you didn't --
24      A.   -- it was, you know, from a distance.

Page 67

1      Q.   So you never saw her in close enough
2  proximity where you were able to ask her her name?
3      A.   Yeah.
4      Q.   Does that nurse still work here?
5      A.   I haven't seen her, to tell you the truth.
6  I don't know if she does.  I haven't seen her.
7      Q.   Now, the grievance we were talking about
8  earlier, the one against the F house security, the one
9  on pages 278 to 290, we saw that there was a
10  counselor's response that we already talked about,
11  right?
12          I'll give you time to get organized there.
13  Yeah, you got it.
14          There's a counselor's response, right?
15      A.   Mm-hmm.
16      Q.   Yes?
17      A.   Yep.
18      Q.   Okay.  And there's a stamp at the top right
19  that says received, grievance office, June 7, 2010,
20  right?
21      A.   Yep.
22      Q.   So you would have submitted this grievance
23  to who?
24      A.   To the counselor.

Page 68

1      Q.   Okay.  And it would have made its way to the
2  grievance office, right?
3      A.   It would have made it to the counselor
4  first.  Then she would have forwarded it back or
5  forwarded it to the healthcare unit.
6      Q.   Okay.  And then I want to look at the other
7  two grievances, the one against Nurse Bacot and the one
8  against Dr. Zhang, Breske, and two unnamed nurses.
9      A.   Mm-hmm.
10      Q.   Those don't have any counselor's response
11  and don't have any stamps at the top right; is that
12  correct?
13      A.   Correct.
14      Q.   So is it fair to say, then, these were never
15  submitted to the counselor?
16      MR. STIEHL:  Objection, misstates evidence.
17          If you know -- and calls for speculation.
18          You can answer if you know.
19  BY THE WITNESS:
20      A.   I did send them.  All of them came back.
21  You know, these two were like this, you know.
22      Q.   They all came back together?
23      A.   Yeah.
24      Q.   And only one had the stamp and the response

Page 69

1  on it?
2      A.   That's it, from the counselor.
3      Q.   Did you submit all three of these at the
4  same time?
5      A.   Yeah.
6      Q.   All three of them to the counselor?
7      A.   Yeah.
8      Q.   Who was the counselor at the time?
9      A.   Whitting (phonetic).
10      Q.   Who?
11      A.   Whitting, Kevin Whitting.
12      Q.   Do you actually remember physically handing
13  these to the counselor?
14      A.   No.  I mailed them.
15      Q.   You mailed them to the counselor.  Okay.
16  But you specifically put them -- you remember putting
17  them in the mail?
18      A.   Yeah.  I wrote -- You know, I wrote
19  grievances against him for not doing his job, you know,
20  answering grievances.
21      Q.   Why did you wait 11 days to author these
22  grievances?
23      A.   Well, I was -- I had to get the name, you
24  know, and then got sidetracked with some other stuff.

18  (Pages 66 to 69)

Page 70

1    Q.   Get the name of who?
2    A.   Well, Rossiter, you know, and the other
3  unnamed nurse. Then I got sidetracked with some
4  other -- this other stuff. That's why I waited.
5    Q.   But you never got their names prior to the
6  grievance, right?
7    A.   No.
8    Q.   So why did you ultimately submit it on
9  May 12th without getting their names?
10   A.   Because I didn't get them then. So I can't
11 put a name, you know, that I don't know on a grievance
12 that, you know -- I'm not going to say Bob did it but
13 Earnest was there.
14   Q.   You said that you got sidetracked.
15   A.   Yeah.
16   Q.   What did you get sidetracked with between
17 May 1st and May 12th?
18   A.   I don't know; something. It's prison.
19   Q.   You just know generally that you got
20 distracted by something else and so you didn't get
21 around to authoring the grievances until May 12th; is
22 that correct?
23   A.   Yep.
24   MS. PTASZNIK: Can we take a short break?

Page 71

1    MR. ELIASER: Yeah. I was just going to say that.
2          (A short break was had.)
3  BY MR. ELIASER:
4    Q.   Mr. Lippert, you've experienced symptoms of
5  diabetes post May 1st, 2011, right?
6    A.   Yes.
7    Q.   And are they the same symptoms that we
8  talked about earlier today: the eye blurriness; poor
9  vision; hot and cold flashes; numbness, tingling and
10 burning in the legs and feet; pain in the toes, feet,
11 and heels; and everything else that we talked about at
12 the beginning of the deposition?
13   A.   Over time, I mean, I had the symptoms, but
14 it's just constant, you know, medical problems, you
15 know, bad medical care. And the damage over time, it's
16 just -- you know, it's causing more problems and it's
17 getting worse and worse and worse, you know, you know.
18   Q.   But it was getting worse and worse prior to
19 2010, right?
20   A.   Yeah, but, I mean, you know, this incident,
21 you know, the May 1st incident, is -- is just making it
22 worse, you know, for the long run.
23   MR. ELIASER: I'll move to strike that answer
24 because he doesn't have the foundation to testify as to

Page 72

1  that.
2    MR. STIEHL: You asked him the question, but
3  that's okay.
4    MR. ELIASER: I can also object to what his answer
5  is, though.
6    MR. STIEHL: That's fine. I think, out of anyone
7  in the room who has the foundation, it's him.
8    MR. ELIASER: The question I asked him was not, in
9  your opinion, is it related to the accident, because he
10 would have the foundation to testify to that.
11 BY MR. ELIASER:
12   Q.   My question is: Other than the symptoms of
13 diabetes that we talked about earlier in the deposition
14 that you experienced prior to 2010, are there any new
15 ones that you're now experiencing that did not exist
16 prior to 2010?
17   A.   Just worse. It's just worse. I feel worse,
18 you know. My eyes are more blurrier, you know,
19 headaches.
20   Q.   So the symptoms feel worse --
21   A.   Yeah.
22   Q.   -- now, as you sit here today, but there's
23 no different symptoms -- different types of symptoms
24 than what was present prior to 2010, right?

Page 73

1    A.   Yeah.
2    Q.   Okay. Did you have episodes -- Did you have
3  additional episodes of hypo- or hyperglycemia between
4  May 1, 2010, and today?
5    A.   Not what I -- I can recall.
6    MR. ELIASER: Did he say, Not that I can recall?
7    MR. STIEHL: Yeah.
8  BY MR. ELIASER:
9    Q.   And is your daily routine and activities the
10 same today as it was as of April 2010? Remember we
11 talked about the five hours in the yard and the four
12 times a week working out in your cell and the things
13 you would do in the yard and cell? Do you still do
14 those today?
15   A.   No.
16   Q.   What don't you do today that we talked about
17 earlier?
18   A.   Instead of, like, four times, it would be,
19 like, two. If the weather was nice -- You know, during
20 the winter, I ain't going out, so I just work in the
21 cell.
22   Q.   So you work out in the cell two times a week
23 now?
24   A.   About that.

Confidential

Page 74

1    Q.   And why is that?  Why two times a week and
2  not four times a week?
3    A.   Legal work, you know, some other stuff, you
4  know, just --
5    Q.   So you're spending time doing other things?
6    A.   Yeah.
7    Q.   Okay.  Do you still spend five hours a week
8  in the yard?
9    A.   In the wintertime, no.
10   Q.   In the what?
11   A.   In the wintertime, no.  I --
12   Q.   All right.  Let's talk about last summer.
13  Were you --
14   A.   Last summer?
15   Q.   Were you in the yard for the same five hours
16  or so a week?
17   A.   I don't know if I was inside or not.
18   Q.   Are you still allotted five hours a week --
19   A.   Yeah.
20   Q.   -- in the yard?
21   A.   Yeah.
22   Q.   Okay.  And last summer when it was nice out,
23  were you still out there?
24   A.   If I was -- If I could, I was going out,

Page 75

1  yeah, so -- I don't know if I was in seg or not.
2    Q.   What do you mean, if you could?  What do you
3  mean by that?  You mean if they'd let you out?
4    A.   Well, see, if you get a ticket, a
5  disciplinary ticket, they could give you yard
6  restriction.
7    Q.   Gotcha.  Okay.  So if you weren't out there
8  in the yard --
9    A.   And if it's nice out, I'm going.
10   Q.   So if you weren't out there in the yard
11  walking around, playing basketball, lifting weights,
12  let's say, last summer, it was because you were
13  restricted by -- by the prison or you would be given
14  some citation that you couldn't go out there?
15   A.   Yeah.
16   Q.   Okay.  Was there any other reason why you
17  wouldn't be out there doing that same thing last summer
18  for five hours a week?
19   A.   No.
20   Q.   Okay.  You treated with a psychiatrist by
21  the name of Dr. Kartan (phonetic) -- Am I pronouncing
22  that right?
23   A.   Kartan.
24   Q.   Kartan.  (Continuing.) -- from July 2012 to

Page 76

1  November 2013.  Does that sound right?
2    A.   Yeah, I seen her.
3    Q.   Are you still -- Is it a girl or --
4    A.   A female.
5    Q.   Do you still see Dr. Kartan?
6    A.   Yeah.
7    Q.   Okay.  And does that sound about right, that
8  you started seeing Dr. Kartan around July 2012?
9    A.   I think so.
10   Q.   Okay.  And what -- what has Dr. Kartan been
11  treating you for?
12   A.   Well, I tell her, you know, how I feel; and
13  she'll prescribe me what, you know, she thinks.
14   Q.   What do you tell her about how you feel?
15       MR. STIEHL:  I'm just going to object.  I just --
16  I'm sorry.  I don't know what the -- There's probably
17  HIPAA issues, and there's also probably patient-doctor
18  privileges.  I don't know what the restrictions are per
19  our protective order regarding those issues.  I
20  understand why you're asking the question.
21       MR. ELIASER:  Okay.  I mean, if there are those
22  issues, I suppose we can always work those out
23  afterwards.
24       MR. STIEHL:  Yeah.

Page 77

1        MR. ELIASER:  I mean, you're going to allow him to
2  answer the question, right?
3        MR. STIEHL:  I'm just thinking.
4        MR. ELIASER:  Yeah.  That's fine.
5        MR. STIEHL:  What was the question again?
6            (Record read as requested.)
7        MR. STIEHL:  I think there's another way to ask
8  the question without having to get into those issues
9  with --
10       MR. ELIASER:  All right.  Let me see if I can try
11  to rephrase it.
12  BY MR. ELIASER:
13   Q.   Is Dr. Kartan treating you for depression?
14   A.   Yeah.
15   Q.   What else is she treating you for?
16   A.   I believe -- I don't know -- anxiety.  I
17  don't know.
18   Q.   Anything else?
19   A.   They gave me -- She prescribed me some new
20  medication.  I forgot the name of it.  But, you know,
21  it was for anger, you know.
22   Q.   For anger.
23   A.   Yeah.
24   Q.   Okay.  Did you recently become more angry

Confidential

Page 78

1 than you used to be?
2     A.   Yeah.
3     Q.   When did you become more angry?
4     A.   After doing about 20 years of this, you
5 know ...
6     Q.   So it's just sort of built up being in the
7 prison system over the 20 years?  That's what's caused
8 the anger in your mind?
9     A.   Yeah.
10     Q.   Okay.  Other than depression, anxiety, and
11 anger, is she treating you for anything else?
12     A.   Not what I know of.
13     Q.   Does she tell you what has caused your
14 depression, anxiety, or anger?
15     A.   No.  She -- She don't -- She don't do that.
16 She's the one that prescribes meds.  I see another --
17 The one that prescribes meds is, what, a psychiatrist?
18     A.   Yeah.
19     Q.   I see a psychologist.  That's Dr. Larry
20 (phonetic).
21     Q.   Dr. Larry?
22     A.   Yeah.  I forgot her first name, though.  But
23 I tell her, you know -- She asks what's going on up
24 here (indicating).

Page 79

1     Q.   Dr. Larry asks you that?
2     A.   Yeah.
3     Q.   I see.  And what do you tell her?
4     MR. STIEHL:  I'm going -- Same objection.  Again,
5 I think you can ask the question outside of the
6 relationship with the doctor as to how he feels or what
7 he's thinking.  I just don't think you need to impinge
8 upon his conversations with his doctor.  That's my
9 concern.
10     MR. ELIASER:  Well, I can't get his symptoms
11 without asking him what he tells his doctor --
12     MR. STIEHL:  Sure, you can.
13     MR. ELIASER:  Well, I tried asking that earlier in
14 the deposition, and he didn't understand what I was
15 saying.  I'll try again.
16     MR. STIEHL:  Okay.  I think the word "symptom" is
17 the problem, but -- I don't want to tell you how to
18 take your deposition, but I just -- I don't want him to
19 impinge on the doctor-patient privilege.  That's all.
20     MR. ELIASER:  Give me a second.
21 BY MR. ELIASER:
22     Q.   Do you still experience the same insomnia
23 that you told us you experienced prior to 2010?
24     A.   No.  I -- They gave me Remeron, which is,

Page 80

1 you know, a sleep ...
2     Q.   So the insomnia is gone?
3     A.   Well, just -- You know, it all depends.  You
4 know, I mean -- You know, I go through another incident
5 with, you know, these guards, you know, retaliating
6 against me, the medical, you know, basically trying to
7 kill me, you know, I'm going to be, you know, uptight,
8 you know.
9     Q.   It depends on what happens to you on a
10 particular day, is what you're saying.
11     A.   Yeah.  So ...
12     Q.   Sometimes you have insomnia, sometimes you
13 don't depending on what that day held for you, right?
14     A.   (Nodding.)
15     Q.   Would the same be true for anxiety?  It
16 depends on what happened that particular day?
17     A.   Yeah.
18     Q.   Okay.  And would the same be true about
19 feelings of depression?  Does it depend on what
20 happened to you that particular day?
21     A.   I just get more depressed, you know.  I
22 mean, I'm already depressed.  I'm depressed right now.
23     Q.   And in your mind, that's built up as a
24 result of being in prison for this amount of time?

Page 81

1     A.   Yeah.
2     Q.   I'm just asking.  I'm not trying to insult
3 you.  I'm just asking you.
4     A.   Yeah.
5     Q.   Yes?
6     A.   (Nodding.)
7     Q.   Okay.  Does Dr. Larry -- Well, strike that.
8     You said that Dr. Kartan does not explain to
9 you what the causes of your mental health conditions
10 are, right?
11     A.   Well, they -- they know about it.  It's just
12 like what I explained to you, you know, earlier in the
13 deposition, you know.
14     Q.   Well, let me give you an example.  Does
15 Dr. Kartan say, for example, Your depression/your
16 anxiety is caused because of this?  Does Dr. Kartan
17 make representations to you like that or is that
18 something Dr. Larry does or both?
19     A.   Well, both.
20     Q.   Both.
21     A.   But mostly Dr. Larry.
22     Q.   Okay.  What does Dr. Larry tell you in terms
23 of the cause of your mental health issues?
24     A.   She basically tells me, You need to move on.

21  (Pages 78 to 81)

Confidential

## Page 82

1   Just forgive. Just move on.
2      Q.  Okay. Move on from what? Does she tell you
3  anything further?
4      A.  Well, just like I told you earlier in the
5  deposition.
6      Q.  Okay. Move on from your past relationships
7  with the people in your life; is that what you mean?
8      A.  Yeah. I mean --
9      Q.  Okay.
10     A.  -- I believe I shouldn't be here, and I told
11  you why.
12     Q.  Okay.
13     A.  So she's saying, You need to move on. It's
14  not doing nothing. It's hard to, you know -- So ...
15     Q.  Does she or Dr. Larry or -- Strike that.
16      Does Dr. Larry or Dr. Kartan say anything
17  else about the cause of your mental health issues other
18  than what we've already talked about today? I don't
19  want to make you say it again.
20     A.  No.
21     Q.  Nothing else? That's everything?
22     A.  Yeah.
23     Q.  I just want to ask you a few questions about
24  your interrogatory answers, Mr. Lippert. You have a

## Page 83

1  copy right there. That's Exhibit B.
2     A.  It's getting hot in here.
3      (Discussion off the record.)
4  BY MR. ELIASER:
5     Q.  The second-to-last page in Exhibit B --
6  there you go -- is that your signature?
7     A.  Yep.
8     Q.  Yes?
9     A.  Yep.
10     Q.  Okay. So you recognize this document; you
11  reviewed the answers in this document and signed it
12  indicating that -- Well, strike that. That's a
13  horrific question. I wasn't even going to try and save
14  that one.
15      You reviewed this document, correct?
16     A.  Yep.
17     Q.  Okay. And so all the answers in there, to
18  the best of your knowledge, are true, accurate, and
19  complete?
20     A.  Yep.
21     Q.  Turn to page 4 for me, please. I'm going to
22  direct your attention to the answer to No. 5. You list
23  some people that have knowledge of the incident at
24  issue, right?

## Page 84

1     A.  Mm-hmm.
2     Q.  Okay. I want to ask you about these people.
3      Who is Leslie Lippert?
4     A.  My brother.
5     Q.  And why is this person listed as one who has
6  knowledge of the incident? Did you tell him about it?
7     A.  Yeah, I told him what happened.
8     Q.  Okay. Did you tell him anything else other
9  than what happened on May 1st, 2010? Was that -- Was
10  the subject of your conversation with him just limited
11  to that one day?
12     A.  That, and a bunch of other, you know --
13     Q.  Like, non-related stuff?
14     A.  Yeah, non-related to 2010.
15     Q.  Okay.
16     A.  Terra Johnson is his wife.
17     Q.  And did you have that conversation with both
18  of them at the same time?
19     A.  Yeah.
20     Q.  Yeah.
21     A.  You know, I talk to my brother on the phone
22  and then --
23     Q.  Who's your brother?
24     A.  Les.

## Page 85

1     Q.  Who?
2     MR. STIEHL:  Leslie.
3  BY THE WITNESS:
4     A.  (Continuing.) -- talk to her on the phone.
5     Q.  Okay. And your conversation with Terra,
6  again, would have been just limited --
7     A.  The same.
8     Q.  -- to May 1st, 2010?
9     A.  (Nodding.)
10     Q.  Okay. And who's Roger Thornton? Well, I
11  see it says Stateville Correctional Center --
12     A.  Inmate.
13     Q.  -- Plaintiff's former cellmate. I see that.
14      Okay. When was -- Was he your cellmate
15  during the incident?
16     A.  No.
17     Q.  When was he your cellmate?
18     A.  2006/2007. He's in the cellhouse. So you
19  know, I saw him, you know, going to the healthcare
20  unit, and I told him what happened (inaudible) --
21     THE COURT REPORTER:  I'm sorry. I can't hear you.
22     MS. ARGENTINE:  Don, could you speak up a little?
23     THE WITNESS:  I'm sorry.
24     THE COURT REPORTER:  No. That's okay.

22  (Pages 82 to 85)

Page 86

1    THE WITNESS: No, it's not that. It's just me not
2  talking ...
3  BY THE WITNESS:
4    Q.  So you saw Roger on May 1st, 2010, during
5  the incident?
6    A.  No.  No, I didn't see him.  He wasn't in the
7  cellhouse.  He's from a different cellhouse.  I saw him
8  within the compound, you know, at the healthcare unit.
9  He's up there for his medical treatment, and I saw him,
10  you know.  And I told him about the incident.
11    Q.  You saw him and told him about it on
12  May 1st, 2010?
13    A.  No.
14    Q.  No.  On a day after?
15    A.  You know, after.
16    Q.  How many -- How long after?
17    A.  I don't know; not even -- you know, less
18  than a month.
19    Q.  But in your knowledge, Roger was not there
20  on that day --
21    A.  No.
22    Q.  -- right?
23    A.  No.
24    Q.  Right?

Page 87

1    A.  Right.
2    Q.  Okay.  Yeah.  Okay.  Melvin Jordan, law
3  clerk.  Why is Melvin listed here?
4    A.  He -- In F house, they had law clerks from
5  the law library come to the cellhouse and do rounds.
6  So I know him, and, you know, I told him about what
7  happened, you know.
8    Q.  Okay.  After the fact?
9    A.  After the fact.
10    Q.  Okay.  And how about Fabin (phonetic)?  Am I
11  pronouncing that right?
12    A.  Fabian.
13    Q.  Fabian.  Yeah.  When was he your cellmate?
14    A.  Before the fact.
15    Q.  Okay.
16    A.  And I told him after the fact.
17    Q.  After the fact.  Okay.  And did you have a
18  cellmate during this incident?
19    A.  No.
20    Q.  Who is Romeo Jackson?
21    A.  Kitchen worker.
22    Q.  He worked in the kitchen.  So is this
23  another person you --
24    A.  After the fact.

Page 88

1    Q.  -- would have told about the incident after
2  the fact?
3    A.  After the fact.
4    Q.  Okay.  And same with Glenn Verser?
5    A.  Same thing, after the fact.
6    Q.  And same with Burl Mason?
7    A.  After the fact.
8    Q.  Okay.  Now, in the next answer -- So right
9  under Burl Mason, you'll see Interrogatory No. 6.  Do
10  you see that?
11    A.  Yes.
12    Q.  This asks who you or your attorneys had
13  discussions with, and the three people listed, if you
14  want to turn the page, are Dr. Zhang, Wendy Olson, and
15  Bobby Nadpaul.
16    A.  Mm-hmm.
17    Q.  Did you have conversations with Dr. Zhang
18  about May 1st, 2010, after the fact?
19    A.  Yeah.  You know, I tried to tell her, you
20  know, Why did you refuse to give me my insulin?  You
21  know.
22    Q.  And what did she say?
23    A.  She didn't say nothing.  She just looked at
24  me and said, You're done.  I don't want to see you.

Page 89

1    Q.  How long after the incident was that?
2    A.  I can't recall for that.
3    Wendy Olson --
4    Q.  Well, hold on.  Hold on.  Hold on.  I have a
5  question before you go on to Wendy.
6    A.  Okay.
7    Q.  Was it a few days after the incident, was it
8  a few months after the incident when you confronted
9  Dr. Zhang again about it?
10    A.  I couldn't even tell you when exactly; you
11  know, a week, a month, two weeks, three weeks.
12    Q.  Could it have been more than a month?
13    A.  Could be.  Could have been.
14    Q.  Could have been?
15    A.  Could have been.
16    Q.  Could have been.  Okay.  Wendy Olson.  Did
17  you have discussions with Wendy Olson?
18    A.  Yeah.
19    Q.  When?
20    A.  Soon right after.  I'm going to say a couple
21  days, within -- you know, within a week.  You know, she
22  was giving me my insulin shot, you know; and I told
23  her, you know.
24    Q.  Okay.  But she didn't witness the incident

Confidential

Page 90

1  on May 1st?
2      A.  No.
3      Q.  I'm correct?
4      A.  I was trying to get her, you know -- No, she
5  didn't witness it.
6      Q.  Okay.
7      A.  I was trying -- I asked her for the names of
8  the nurses. I described them, and she's like, I'm not
9  telling you. Why? You know, so ...
10     Q.  How about Bobby Nadpaul? Did Bobby witness
11 the incident?
12     A.  He didn't witness it, but I told him. You
13 know, he came to give me my insulin shot. Again, I
14 tried to ask him, you know -- I gave him a description
15 and told [sic] him does he know the names of these
16 people, you know.
17     Q.  How long after the incident was that?
18     A.  Not even a week.
19     Q.  Not even a week. A few days?
20     A.  About that.
21     Q.  Okay.
22     A.  Because he had come to my cell to give me my
23 insulin shot.
24     Q.  And Interrogatory No. 11 is on page 8. That

Page 91

1  asks you whether you went outside the correctional
2  center as a result of the May 1st, 2010 incident, and
3  the answer is no; is that -- is that true?
4      A.  Correct.
5      Q.  Okay. Interrogatory No. 16 is on page 10.
6  This asks whether you filed other lawsuits. One of
7  them listed is Lippert vs. Elyea, right?
8      A.  Elyea?
9      Q.  Elyea?
10     A.  Elyea.
11     Q.  Elyea. Okay. What was that lawsuit about?
12     A.  I was refused my insulin shot by a CMT, you
13 know -- Well, I had low blood sugar; and he refused to
14 give me my insulin, told me to go, he'll come back,
15 test it, and give me my insulin. Well, he never came
16 back. So you know, due to eating, I got sick, you
17 know; and I fell out, you know. So I -- you know, I
18 sued him. And Elyea is the agency medical director and
19 he had policies for, you know, these people to follow
20 and they didn't follow them. And he didn't enforce
21 these policies to be followed by IDOC employees, so I
22 sued him as a defendant.
23     Q.  Did you give a deposition in that case?
24     A.  No. I settled out.

Page 92

1      Q.  Before you gave a deposition?
2      A.  Yeah.
3      Q.  So you never did what we're doing here
4  today?
5      A.  No.
6      Q.  Have you done a deposition in any other
7  case?
8      A.  No.
9      Q.  This is your very first deposition?
10     A.  Yeah.
11     Q.  What was the Lippert vs. Williams case
12 about?
13     A.  It was about retaliation. I wrote some
14 grievances against a guard, you know, for refusing to
15 let me leave my cell to go eat knowing I just got my
16 insulin shot. So I wrote grievances against him.
17         So you know, he refused to let me go out, so
18 I -- I had to go -- they brung me downstairs to a
19 bullpen. And I had an insulin reaction, you know,
20 because I didn't have no food in me; and they were
21 playing games, you know. So I sued him, but they put
22 that case and my other case -- they merged them
23 together, and I settled out. But it was about
24 retaliation.

Page 93

1      Q.  I forgot to ask you this. Prior to the
2  May 1st, 2010 incident, during previous episodes of
3  hyper- or hypoglycemia, had you ever urinated on
4  yourself before?
5      A.  No.
6      Q.  That never happened?
7      A.  Well, maybe when I was drunk, maybe, but I
8  don't remember. Not in prison.
9      Q.  Not in prison?
10     A.  No. I was probably, you know -- Not in
11 prison, though.
12     Q.  Had you ever passed out from an episode of
13 hyper- or hypoglycemia prior to the May 1st of 2010
14 incident?
15     A.  Yeah. I -- I fell out on -- in 2006, you
16 know.
17     Q.  What about other than 2006?
18     A.  You know, dizzy, you know, cramps. I had to
19 just sit down. But fall out where I'm basically going
20 unconscious, about 2006.
21     Q.  Did you go unconscious on May 1st, 2010?
22     A.  I was out, yeah.
23     Q.  In the morning before you -- before you went
24 to the ER?

Confidential

Page 94

1    A.   Mm-hmm.
2    Q.   Right?
3    A.   I was -- I was out, you know.  Then with all
4  the commotion and they were grabbing, you know, I was,
5  you know, coming through.  When they came in, I was --
6  I didn't even know they came in until I started feeling
7  people grabbing me, moving me, yelling and smacking me
8  in the face.
9    Q.   Did you urinate on yourself when -- before
10  you passed out, or is it your understanding that it
11  happened when you were unconscious?
12    A.   I don't recall; probably -- I don't recall.
13    Q.   You don't know?
14    A.   No.
15    Q.   How do you know that you urinated on
16  yourself?
17    A.   Because they said I -- you know, I smelled
18  like piss.
19    Q.   Who said that?
20    A.   I smelled like piss when I went to the ER,
21  and they were saying, Man, what did you do?  Did you
22  pee on yourself?  You smell like urine.  So ...
23    MR. ELIASER:  All right.  I think I only have one
24  more interrogatory answer here.  Give me one second.

Page 95

1    (Brief pause.)
2    MR. ELIASER:  Just give me a minute.  I'm just
3  going to flip through my notes and make sure I'm done.
4    MR. STIEHL:  Sure.
5    MS. ARGENTINE:  Sure.
6    (Brief pause.)
7    MR. ELIASER:  All right.  I'm done.  Who's next?
8    CROSS-EXAMINATION
9  BY MS. PTASZNIK:
10    Q.   My name, again, is Agnes, and I represent
11  Defendants Norman and Maldonado in this case.  So I'm
12  just going to ask a few questions surrounding the
13  allegations in your complaint regarding those
14  defendants, okay?
15    A.   All right.
16    Q.   Who was the first correctional staff member
17  you complained to about not getting your insulin shot
18  on May 1st, 2010?
19    A.   Sergeant Palmer.
20    Q.   And about what time of the day was it?
21    A.   About eight o'clock.
22    Q.   8:00 a.m.?
23    A.   (Nodding.)
24    Q.   Is that correct?

Page 96

1    A.   About, yeah.
2    Q.   And what ex- -- Do you remember what exactly
3  you said to Sergeant Palmer?
4    A.   I told him I needed my insulin shot, you
5  know.  They refused to give me my insulin shot in the
6  morning.
7    Q.   Where was Sergeant Palmer when you told him
8  this?
9    A.   Right by the office downstairs.
10    Q.   Is your cell near the office?
11    A.   No.  It's facing it.
12    Q.   So how far away is your cell from Sergeant
13  Palmer's office?
14    A.   On the other side of the building.
15    Q.   Do you know how many feet, approximately,
16  this might be?
17    A.   No.
18    Q.   Would you say it's a short distance, a long
19  distance?
20    A.   I mean, how do you take it?
21    Q.   Let me strike the question.
22    Were you able to express your concern in the
23  volume that we're speaking at right now, or did you
24  have to yell?

Page 97

1    A.   Well, I had to yell, yeah, just like he
2  would have yelled, you know ...
3    Q.   Was it quiet in the cellhouse at this time?
4    A.   I mean, there's people talking; but, I mean,
5  how the building is, how the building is made, it's
6  just -- noise travels, you know.  So --
7    Q.   How is the building made?
8    A.   It's brick, steel, round, circular.  So you
9  know, when you holler, you -- the noise is -- it
10  travels.
11    Q.   Do you know if Sergeant Palmer heard your
12  request?
13    A.   Oh, yeah.
14    Q.   How do you know that?
15    A.   Because he said he's going to call, you
16  know.  And he came, you know, about half an hour, or
17  something like that, later; and I'm like, Man, what's
18  going on?  You know.  You going to take me up?
19    He's like, We on a Level 1 lockdown.
20  There's no movement.
21    I don't care.  I need my insulin shot.
22    He's like, I already called.  What do you
23  want me to do, man?  I can't force them to come here.
24  I called.  That's all I could do.

Confidential

Page 98

1      I go --
2      Q.   Just -- I'm sorry.  Did Sergeant Palmer come
3  to your cell to tell --
4      A.   No.
5      Q.   -- you this?
6      A.   No.  He's still yelling by his office, you
7  know.  And I'm telling him, Man, you know, by you being
8  a serg, you got the authority to take me up to the
9  healthcare unit to get my insulin shot.  That's your
10  job.
11          He's like, No.  We on Level 1 lockdown, man.
12          And then I ...
13     Q.   At that point in time, had you eaten your
14  breakfast?
15     A.   Yeah.
16     Q.   So you had eaten your breakfast before
17  9:00 a.m.?
18     A.   I ate about -- maybe about three-something,
19  you know.
20     Q.   So you had eaten your breakfast much earlier
21  that day --
22     A.   Oh, yeah.
23     Q.   -- around 3:00 in the morning?
24     A.   Yeah, because they would have came for the

Page 99

1  insulin shot about -- between 2:30/3:00.  They pass out
2  breakfast about that -- about 2:00/2:30.
3      Q.   What happened after the sergeant told you
4  that he placed the call to healthcare?
5      A.   Well, he started ignoring me because, you
6  know, I was still hollering at him, you know, telling
7  him how to do his job.
8          So then I started telling the other guards,
9  you know, because, you know, they got the authority to,
10  you know -- Hey, we need to get Lippert up to the
11  healthcare unit, you know.  They're security, you know.
12  It's their job to make sure I'm all right.  All they
13  did was laugh and wave me off and went in the
14  sergeant's office and just did nothing.
15     Q.   Do you know who has the highest authority of
16  all the officers on the 7:00-a.m.-to-3:00-p.m. shift in
17  your cellhouse?
18     A.   It would be -- At that time?
19     Q.   Yes.
20     A.   A lieutenant, and I didn't see no
21  lieutenant.
22     Q.   Is a lieutenant --
23     A.   Above --
24     Q.   -- a higher authority figure than a

Page 100

1  sergeant?
2      A.   Yeah.  It goes lieutenant, sergeant, and a
3  guard.
4      Q.   Do you remember which guards you complained
5  to soon after you complained to Sergeant Palmer?
6      A.   Norman, Maldonado, Dangerfield, and --
7      MR. ELIASER:  Danger Field?
8      THE WITNESS:  Yeah.
9      MR. ELIASER:  Is that the person's name?
10     THE WITNESS:  Dangerfield.
11     MR. ELIASER:  Dangerfield.  I thought it was first
12  name Danger, last name Field.  I'm like, that's the
13  coolest name ever.  Sorry.  Go ahead.
14  BY THE WITNESS:
15     A.   I don't know.  Right offhand, I don't know.
16     Q.   Do you remember which officer you first
17  complained to after you reported it to Sergeant Palmer?
18     A.   I'm going to -- I'm going to say
19  Dangerfield.  I believe, Dangerfield, and then Norman.
20  And then when I -- You know, it's just the ones I see,
21  I'm going at them, you know, because they weren't all
22  visually where I could see them.  So I saw Dangerfield
23  first, Norman, Maldonado.  I think I saw some other
24  guards, but ...

Page 101

1      Q.   In terms of Officer Norman, where was
2  Officer Norman in relation to you when you first
3  expressed your concern about the shot?
4      A.   He was downstairs by the sergeant's office
5  door walking around on one gallery.
6      Q.   So you're saying he was running rounds
7  around in the first gallery?
8      A.   Just walking around doing nothing when I saw
9  him, so I hollered at him, you know.  He just
10  laughed --
11     Q.   Did he respond?
12     A.   He was laughing, ignoring me, waving me off.
13     Q.   How far away from you, more or less, was he
14  when you expressed your concern?
15     A.   Basically, he's the same distance, you know,
16  maybe a couple feet closer to me.
17     Q.   Were you on Gallery 1 at this time?
18     A.   I was in my cell.  I was up on three
19  gallery.  The serg --
20     Q.   So you were --
21     A.   The serg's office is on one gallery.  So all
22  the guards were downstairs on one gallery.
23     Q.   And you were on Gallery 3, which, I presume,
24  is the second gallery above the first gallery?

26 (Pages 98 to 101)

Confidential

Page 102

1    A.   No, third.
2    Q.   Third.  Is that the second floor of the
3  house, the cellhouse?
4    A.   No.  You got one gallery, two gallery, three
5  gallery, four gallery, F house.
6    Q.   And you stated Officer Norman just waved his
7  hand?
8    A.   Yeah.  Dangerfield ...
9    Q.   How do you know that the waving of his hand
10  was in response to your concern?
11    A.   I took it as, you know, shut up, you know,
12  and just keep walking.
13    Q.   Did he say anything to you?
14    A.   He looked at me, laughed, you know, and
15  waved me off.
16    Q.   What was the volume of conversations in the
17  house at this time?
18    A.   Well, I mean, it was audible.  If he would
19  have said something, you know, I mean, I could hear
20  him.  I could hear him laughing, you know, when he went
21  into the sergeant's office.  I could hear him laughing.
22  That's how quiet it was.
23         But when -- when other inmates saw how the
24  guards were treating me, you know, and know that I'm

Page 103

1  right when I told him, Man, you know, it's your job to
2  take me up there.  Do it, you know, then other inmates
3  started getting, you know, loud, telling him, Man, get
4  this guy up.  He needs his insulin shot.  You know,
5  who?  I really wasn't paying attention, you know,
6  because I don't know who it was; but, you know, people
7  were yelling.
8    Q.   Let me backtrack a little.  When you
9  expressed your concern to Sergeant Palmer, did you see
10  Officer Norman in the area?
11    A.   About -- Not at the time, no.
12    Q.   Did you see Officer Maldonado in the area
13  when you were speaking to Sergeant Palmer?
14    A.   At the time, I didn't know it was her
15  because there was people still in the office, you know.
16  If you're -- If people are in the office, you really
17  can't see the face; but I knew it was a female because,
18  I mean, you know, you could see all down.  But when she
19  came out, then I knew who was working, you know, and
20  who I hollered at.
21    Q.   And so then you spoke to Officer Maldonado
22  after --
23    A.   I asked her how, you know --
24    Q.   -- you spoke to Officer Norman and Sergeant

Page 104

1  Palmer?
2    A.   There was Sergeant Palmer, Norman -- No.
3  Sergeant Palmer, Dangerfield, Norman, Maldonado.  I
4  think -- I believe there were some other guards, but I
5  don't know if I put him on there or -- I didn't know
6  the names.
7    Q.   What did you say to Officer Maldonado?
8    A.   I basically told her too, you know, You're
9  not doing nothing.  Take me up there to get my insulin
10  shot.  She didn't say nothing, didn't look at me, just
11  kept on doing what she was doing, nothing.
12    Q.   Where was Officer Maldonado in relation to
13  you and your cell unit?
14    A.   First gallery by the offices.
15    Q.   And about what time of the day was this?
16    A.   After 8:00.
17    Q.   So what happened after you expressed your
18  concern to all these individuals?
19    A.   What happened?
20    Q.   Yes.  What happened later?
21    A.   Well, my blood sugar started fluctuating up,
22  you know.  I started getting, you know, weak.  Muscles
23  are starting to tighten up, you know.
24    Q.   On that morning between 7:00 a.m. and the

Page 105

1  time of your incident, were there any officers that did
2  rounds on your gallery?
3    A.   Yeah.  They do rounds about seven o'clock.
4    Q.   Did they do rounds at any point later that
5  morning?
6    A.   They're supposed to, but, you know, we're on
7  a Level 1 lockdown.  They -- They didn't do nothing.
8  They didn't want to do nothing.  That's too much work
9  for them.  They're supposed to do rounds, but they
10  didn't come up.
11    Q.   Was there any other staff, including medical
12  staff, that made rounds on your gallery that morning?
13    A.   I think so.  I don't know who, but I'm sure
14  there was.  I don't know.  To tell you the truth,
15  because, you know, people -- it had been a problem
16  about med techs and nurses doing rounds in F house,
17  though.  I don't know if they came by.  I didn't see
18  any.
19    Q.   So you don't recall seeing anyone --
20    A.   That would be the best answer.  I don't
21  recall.
22    Q.   And about what time did you have -- or
23  experience the incident in your cell?
24    A.   About the time they were passing out lunch.

27  (Pages 102 to 105)

Confidential

Page 106

```
 1   I don't know what time that was. It was when they were
 2   passing out lunch.
 3       Q.  Normally, around what time do they pass out
 4   lunch?
 5       A.  We were on lockdown, so I mean it could have
 6   been late. 12:00 -- You know, it could have been
 7   11:00/12:00/1:00, because there's no inmates -- it's
 8   all security doing the stuff. So ...
 9       Q.  So between the start of the shift, the
10   7:00-a.m.-to-3:00-p.m. shift and the time of your
11   incident, did you ever have a face-to-face conversation
12   with Officer Norman?
13       A.  Prior to this?
14       Q.  On May 1st, 2010, between 7:00 a.m. and the
15   time of your incident, did you ever have a face-to-face
16   conversation about your need for an insulin shot?
17       A.  I don't recall.
18       Q.  And what about Officer Maldonado? Did you
19   have a chance to speak to Officer Maldonado face to
20   face at any point from the beginning of the shift to
21   the incident -- to the time of your incident?
22       A.  No, I don't recall.
23           (Short interruption.)
24   BY MS. PTASZNIK:
```

Page 107

```
 1       Q.  Do you recall seeing Officer Norman near
 2   your cell around the time of your incident?
 3       A.  Not what I remember.
 4       Q.  So you have no recollection of Officer
 5   Norman near your cell at the time of your incident?
 6       A.  Oh, at the time.
 7       Q.  Yes.
 8       A.  I thought you were -- Yeah. You know, when
 9   they came to the cell to give me my lunch tray, you
10   know, I heard them laughing, you know, talking about me
11   when I was on the floor. And I'm telling them, I need
12   my insulin shot. I wasn't face to face because I was
13   too weak, you know, cramped up on the floor, and they
14   were laughing, you know. Maldonado made a comment and
15   put the tray in my chuck hole, and they left. That's
16   the only time being in close prox-- -- you know, them
17   being towards my door. That's the only time I can
18   remember other than that.
19       Q.  So you saw Officer Maldonado and Officer
20   Norman near your cell at the time that they were
21   passing out lunch trays?
22       A.  Yeah.
23       Q.  And you saw them put a tray in your chuck
24   hole?
```

Page 108

```
 1       A.  They were yelling, Get up. Grab your tray,
 2   you know.
 3       Q.  And where were you in your cell at this
 4   time?
 5       A.  On the floor cramped up, complaining about,
 6   I need my insulin.
 7       Q.  Were you closer to the door or further away
 8   from the door of your cell?
 9       A.  I couldn't even remember. I was in the
10   cell. Probably close -- Probably in the back because I
11   was trying to make it to the toilet.
12       Q.  Did Officer Norman say anything to you at
13   this time?
14       A.  I think he was laughing, you know.
15       Q.  Do you know what Officer Norman was laughing
16   at?
17       A.  Maldonado stated, Oh, look, he in the right
18   position, you know, when I was on the floor.
19           I told her, you know, You're telling jokes
20   and you won't give me my insulin. And they just
21   laughed.
22       Q.  I'm sorry. They laughed or they left?
23       A.  They laughed and then left, and that's it.
24       Q.  Did any of the officers say that they would
```

Page 109

```
 1   send for help for you?
 2       A.  No.
 3       Q.  Did you request medical help from Officer
 4   Norman or Officer Maldonado at that time?
 5       A.  I told them that I -- you know, I need my
 6   insulin shot --
 7       MS. ARGENTINE: Don, can you just keep your voice
 8   up a little?
 9       THE WITNESS: Huh?
10       MS. ARGENTINE: Speak up a little.
11       MR. STIEHL: Yeah. You're facing that way, so
12   it's hard for her.
13   BY THE WITNESS:
14       A.  -- when -- you know, when they came. And
15   they were laughing, and I'm telling them -- you know,
16   because they were yelling, telling me to get up and
17   grab my tray; and I'm telling them, I need my insulin
18   shot, you know. And then, you know, the cracks, the
19   jokes, the laughs, you know, that's all I remember
20   hearing from them.
21           And then sometime later, you know, I hear
22   them yelling at me, you know, and I -- Not Maldonado.
23   Norman said, Man, Palmer, you need to come up here, you
24   know. Lippert's on the ground, on the floor.
```

Confidential

Page 110

1    Q.   How soon after they passed your cell after
2  they left off the tray did you hear them again?
3    A.   I don't -- I don't know.
4    Q.   Do you remember if it was a shorter period
5  of time or longer period of time?
6    A.   I don't know.
7    Q.   Did you see Officer Norman or Officer
8  Maldonado when you heard them again at your cell?
9    A.   No.  Nope.
10   Q.   What was your position in the cell the
11 second time you heard them near your cell?
12   A.   I don't even remember.
13   Q.   How did you know it was those officers at
14 your cell at that time?
15   A.   Because when they were yelling about the
16 garbage, you know, and, you know, Norman had yelled,
17 you know, that -- You know, he got on the radio, I
18 think, but I know I heard him yelling to Palmer.  Then
19 I heard Palmer, Hey, we need to get up here.  Lippert's
20 on the floor.
21   Q.   So you heard Officer Norman call to
22 Officer -- to Sergeant Palmer?
23   A.   Yeah, to tell him to get up to my cell, you
24 know, because I'm on the floor.

Page 111

1    Q.   Do you recall if Officer Maldonado was there
2  at that time?
3    A.   I don't remember.  I didn't see Norman.  I
4  just -- I heard him.
5    Q.   And. --
6    A.   I wasn't completely unconscious, you know.
7  I was in and out as he was yelling, you know.
8    Q.   You said Officer Norman was yelling about
9  garbage.  What did you mean by that?
10   A.   You know, if I had any garbage.  They passed
11 out the trays, you know, so they're coming around
12 picking up the garbage.
13   Q.   Do you know how long it usually takes for
14 the officers to come back for the garbage after they've
15 passed out a lunch tray?
16   A.   It varies.
17   Q.   It varies from what range to what range?
18   A.   Anywhere from 30 [sic] to four hours, you
19 know, or -- if that.  They'll let the next shift deal
20 with it.
21   Q.   And what is your next memory after you
22 remember Officer Norman calling for Sergeant Palmer?
23   A.   People yelling, smacking me in the face, you
24 know, Wake up.  You know, what's wrong?  You know,

Page 112

1  telling me, You smell like urine.  You peed on
2  yourself, you know.  Watch out --
3    Q.   Do you remember -- sorry.
4    A.   -- you know.  Then somebody saying, We need
5  him up in the ER.
6    Q.   Do you remember where you were at this time?
7    A.   I believe I was in my cell.  I remember them
8  were dragging me, picking me up.
9    Q.   Were you able to see at this time?
10   A.   Down, you know.
11   Q.   Were you able to see officers that were in
12 your cell at this time?
13   A.   It was blurry.  I -- I saw people in my
14 cell.  I don't know who.  It was blurry.
15   Q.   So you don't recall which officers were
16 assisting at that time?
17   A.   No.
18   MS. PTASZNIK:  I have no further questions.
19   MR. STIEHL:  I think we'll reserve signature.
20        (The witness reserved signature and
21         was excused at 1:22 p.m.)
22
23
24

Page 113

1              C E R T I F I C A T E
2      I, Martina Miranda Ralls, Certified Shorthand
3  Reporter, do hereby certify that DON LIPPERT was first
4  duly sworn in by me to testify the whole truth and that
5  the above deposition was reported stenographically by
6  me and reduced to typewriting under my personal
7  direction.
8      I further certify that the said deposition
9  was taken at the time and place specified and that the
10 taking of said deposition commenced on May 8, 2014, at
11 10:44 a.m.
12      I further certify that I am not a relative or
13 employee or attorney or counsel of any of the parties,
14 nor a relative or employee of such attorney or counsel,
15 nor financially interested directly or indirectly in
16 this action.
17      The signature of the witness, DON LIPPERT,
18 was reserved by agreement of counsel.
19      In witness whereof, I have hereunto set my
20 hand as a Certified Shorthand Reporter on May 29, 2014.
21
22
23
   _____
24 MARTINA MIRANDA RALLS, CSR
   CSR No. 084-004341

                    29  (Pages 110 to 113)

Confidential

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT NO: 1846187
CASE NAME: Lippert, Don v. Rossiter, Athena, et al.
DATE OF DEPOSITION: 5/8/2014
WITNESS' NAME: Don Lippert
In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
I have made no changes to the testimony
as transcribed by the court reporter.

_____ _____
Date            Don Lippert
Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:

They have read the transcript;
They have signed the foregoing Sworn
Statement; and
Their execution of this Statement is of
their free act and deed.

I have affixed my name and official seal

this _____ day of_____, 20____.

_____
Notary Public

_____
Commission Expiration Date

---

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
ASSIGNMENT NO: 1846187
PAGE/LINE(S) /      CHANGE      /REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

_____ _____
Date            Don Lippert
SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
DAY OF _____, 20_____ .

_____
Notary Public

_____
Commission Expiration Date

---

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT NO: 1846187
CASE NAME: Lippert, Don v. Rossiter, Athena, et al.
DATE OF DEPOSITION: 5/8/2014
WITNESS' NAME: Don Lippert
In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
I have listed my changes on the attached
Errata Sheet, listing page and line numbers as
well as the reason(s) for the change(s).
I request that these changes be entered
as part of the record of my testimony.

I have executed the Errata Sheet, as well
as this Certificate, and request and authorize
that both be appended to the transcript of my
testimony and be incorporated therein.

_____ _____
Date            Don Lippert

Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:
They have read the transcript;
They have listed all of their corrections
in the appended Errata Sheet;
They signed the foregoing Sworn
Statement; and
Their execution of this Statement is of
their free act and deed.
I have affixed my name and official seal

this _____ day of_____, 20____.

_____
Notary Public

_____
Commission Expiration Date

Veritext Legal Solutions Midwest

www.veritext.com                                    888-391-3376

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

DONALD LIPPERT, ET-AL,          )

              Plaintiffs,          )

  vs.          )   No. 10 cv 4603

SALVADOR GODINEZ, ET-AL,          )

            Defendants.          )

      The deposition of ATHENA ROSSITER, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Jacqueline Shenberger, Certified Shorthand Reporter within and for the County of Cook and State of Illinois, at 16830 South Broadway, Crest Hill, Illinois, on June 27, 2014, at the hour of 10:30 o'clock AM.

Jacqueline Shenberger

License No: 084-001524



APPEARANCES:

SEYFARTH SHAW, LLP

BY: MS. KRISTINE ARGENTINE

131 South Dearborn

Suite 2400

Chicago, Illinois 60603

(312) 460-5000

Kargentine@seyfarth.com

Representing the Plaintiffs;

CASSIDAY SCHADE


BY: MR. MATTHEW A. ELIASER

20 North Wacker Drive

Suite 1000

Chicago, Illinois 60606

(312) 641-3100

Meliaser@cassiday.com

Representing the Wexford Health Services;

LISA MADIGAN,

*Page 2*

ATTORNEY GENERAL OF STATE OF ILLINOIS

BY: MS. AGNES PTASZNIK

100 West Randolph Street

Chicago, Illinois 60601

(312) 814-4217

aptasznik@atg.state.il.us

Representing State Defendants

*Page 3*

I N D E X

| WITNESS | EXAMINATION |
|---|---|

ATHENA ROSSITER

| By MS. ARGENTINE | 5 |
| By MR. ELIASER | 74 |
| By MS. ARGENTINE | 97 |
| By MR. ELIASER | 106 |


E X H I B I T S

| NUMBER | MARKED FOR ID |
|---|---|

Deposition Exhibit
No. 1 - Medication Administration
    Record    31
Deposition Exhibit
No. 2 - Illinois Department of
    Corrections Offender
    Outpatient Progress Notes    70

*Page 4*

(Whereupon, the witness was
    duly sworn.)
    (Deposition commenced at 10:47 AM)
    ATHENA ROSSITER,
called as a witness herein, was examined and
testified as follows:
    EXAMINATION
    BY MS. ARGENTINE:
    Q. Miss Rossiter, my name is Kristine
Argentine, I represent the Plaintiffs in this
case, including Donald Lippert.
    Have you ever been deposed before?
Have you ever given a deposition?
    A. Yes.
    Q. How many times?
    A. Once.
    Q. When did that occur?
    A. About a month ago.
    Q. And what was that for?
    A. For another inmate.
    Q. Were you a Defendant in that suit?
    A. A Defendant, yes.
    Q. Do you know the name of the lawsuit?
    A. The inmate that was suing?

*Page 5*

1      Q.  Hmm, hmm?
2      A.  Taylor.
3      Q.  Do you remember -- do you know what
4  that lawsuit involved, medical issues or prison
5  issues?
6      A.  Of course, it was medical because I was
7  there.
8      Q.  What type of medical issues?
9      A.  Something about medication.
10     Q.  Do you remember anymore specifics about
11  it, what type of medication or whether it was
12  with respect to distribution?
13     A.  Yes.
14     Q.  Yes, it was a distribution issue?
15     A.  Inmate states that he didn't get his
16  medication, yes.
17     Q.  And you said that was just once you've
18  been deposed?
19     A.  Yes.
20     Q.  Okay.  Have you been involved in any
21  other lawsuits that you can think of in the last
22  five years?
23     A.  (Inaudible responses).
24     MR. ELIASER:  All of your answers have to be

6

1  audible.
2      A.  Oh, no.
3  BY MS. ARGENTINE:
4      Q.  I just want to go over a few rules with
5  you.  Like Matt said your answers need to be
6  audible so the court reporter can take them
7  down.  We want to try not to talk over each
8  other, let me finish my question, and I'll let
9  you finish your answer.  That way the court
10  reporter can get everything down that we're
11  saying.  If you need to take a break, feel free
12  to let me know, all I ask is that you answer
13  whatever question is pending, and you can take a
14  break.
15      Do you have any questions about any of
16  that?
17     A.  No.
18     Q.  If you do answer a question, I'm going0
19  to assume you understood it.  That being said,
20  if you don't understand a question, or you want
21  me to rephrase it, just feel free to ask.  Okay?
22     A.  Yes.
23     Q.  Miss Rossiter, what documents did you
24  review for this deposition today, if any?

7

1      A.  I reviewed the doctor's notes and the
2  MAR.
3      MR. ELIASER:  We also reviewed -- I'll make
4  it easy; we reviewed the Progress Notes from May
5  lst, 2010.  The orders from May lst, 2010, the
6  M-A-R-'s from May lst, 2010.  We looked at her
7  interrogatory answers.  And we reviewed some of
8  the deposition testimony.  I think that's
9  everything, unless you remember anything else.
10     A.  No.
11  BY MS. ARGENTINE:
12     Q.  Can you state for the record what M-A-R
13  is?  What does that stand for?
14     A.  Documentation that we use for, you
15  know, giving out medication.
16     Q.  You don't know what M-A-R stands for?
17     A.  No.
18     Q.  Did you have any conversations with
19  anyone about this deposition, other than your
20  attorney prior to it occurring?
21     A.  No.
22     Q.  Miss Rossiter, do you know who Don
23  Lippert is?
24     A.  Yes.

8

1      Q.  How do you know him?
2      A.  Just an inmate.
3      Q.  Have you provided Mr. Lippert with
4  medical care?
5      A.  I'm sure I have, yes.
6      Q.  Do you know specifically what type of
7  medical care you provided to Mr. Lippert, say in
8  the past -- how long have you been at
9  Stateville?
10     A.  Four and a half years.
11     Q.  Have you known Mr. Lippert all four and
12  a half years?
13     A.  I'm sure I've come across Lippert.  But
14  do I really know who Lippert was?  Not until
15  just recently.  I mean, who he was, I put two
16  and two together with the lawsuit and Lippert.
17     Q.  Can you recall any specific treatment
18  that you provided to Mr. Lippert in the past
19  four and a half years?
20     A.  You mean specific occasions?
21     Q.  Sure, if you remember those?
22     A.  I'm not really -- I mean, he's a
23  diabetic, so I'm assuming when I was a med tech
24  I gave him his insulin, yes.

9

1    Q.   Would you have done Accu-Cheks for Mr.
2  Lippert in the past?
3    A.  Yes, I'm sure I have.
4    Q.   And distributed medication?
5    A.  Well, if he's made it to the E.R., I'm
6  sure I have.
7    Q.   Would you have distributed medication
8  to him in his F House?
9    A.  It would depend on if he was on
10 medication.  Is he on medication, you know --
11   Q.   Just if you remember specifically?
12   A.  No, I don't really remember.
13   Q.   Have you ever encountered Mr. Lippert
14 in a diabetic clinic?
15   A.  No, I don't do diabetic clinics, no.
16   Q.   In the four and a half years that
17 you've worked for Wexford, how often would you
18 say you are in F House?
19   A.  Rarely.
20   Q.   And by rarely, would you say once a
21 month, once every couple of months, if you can
22 pin it down a little further?
23   A.  Within this last year, maybe once every
24 three months, four months.  Prior to that it

10

1  might have been a couple of times a month.
2  Prior to the last year, the last year I've had a
3  new assignment and prior -- okay.
4    Q.   So in May of 2010 as kind of a time
5  point, how often would you say you were in F
6  House in May of 2010, if you know?
7    A.  Again, I'm not sure, couple of times
8  maybe a month, if that.
9    Q.   And you know that Mr. Lippert is a
10 diabetic?
11   A.  Yes.
12   Q.   And how do you know that?
13   A.  He's on the Diabetic Board.  And I have
14 passed insulin to him, over the four and a half
15 years that I have passed insulin, I have, you
16 know, not knowing him, but I mean, with this
17 it's really, you know, when you see the lawsuits
18 come, then you can go back and oh, okay, that's
19 Lippert.
20   Q.   What do you mean -- what's the Diabetic
21 Board?
22   A.  We have a Diabetic Board that lists our
23 diabetics.
24   Q.   Like a bulletin board?

11

1    A.  Yes.
2    Q.   And it lists the names of everyone
3  that's a diabetic?
4    A.  It doesn't state on there they're
5  diabetic.  It's just that as we nurses in our
6  med room, that only nurses see, medical staff
7  see, those are the diabetics.
8    Q.   Does it say anything else about
9  different inmates?
10   A.  No.
11   Q.   What type of diabetics they are?
12   A.  No.
13   Q.   What type of treatments they receive?
14   A.  No.
15   Q.   Do you remember whether prior to May of
16 2010 you would have given Mr. Lippert an insulin
17 shot at any time?
18   A.  Could you repeat that?
19   Q.   Prior to May of 2010 would one of your
20 -- would you have ever -- do you recall ever
21 giving Mr. Lippert his insulin shot?
22   A.  I don't recall the specific occasion.
23   Q.   Was that one of your duties prior to
24 May of 2010 to give insulin shots to inmates in

12

1  F House?
2    A.  If I was assigned to that job duty that
3  day, yes.
4    Q.   Do you have an opinion as to what a
5  diabetic patient not receiving his insulin shot,
6  what kind of affect that could have?
7        MR. ELIASER:  I would object to the vagueness
8  of the question.  I think it depends on the
9  patient and his insulin requirements, and how
10 long he hasn't received the insulin for.  I
11 think it's a difficult question to answer when
12 it's that vague.
13       MS. PTASZNIK:  Join.
14       MR. ELIASER:  If you can answer that
15 question, otherwise you can ask her to be more
16 specific.
17   A.  Can you repeat it?
18 BY MS. ARGENTINE:
19   Q.   Sure.  I'm just wondering if you have
20 an opinion as to what types of medical -- if you
21 have an opinion, a medical opinion, as to what
22 types of affect an inmate that was diabetic not
23 receiving their insulin shot could have?
24       MR. ELIASER:  Same objection.  You can answer

13

1  the question if you understand it.
2      A.  Yeah, it's kind of hard to understand.
3  I mean, it would just depend on the inmate, it
4  would depend on the situation.
5  BY MS. ARGENTINE:
6      Q.  Could an inmate that didn't receive
7  their insulin shot go into any sort of shock?
8      A.  Sure.
9      Q.  Under what circumstances would you say
10  that would happen?
11      A.  Their blood sugar level needs to be
12  high.
13      Q.  What if their blood sugar level was too
14  low?
15      A.  Same thing.
16      Q.  They could go into shock?
17      A.  Yes.
18      Q.  What type of symptoms do you see with a
19  diabetic patient that is potentially going into
20  shock, or in some sort of shock as a result of
21  not receiving insulin?
22      A.  It would really depend on the whole
23  situation.  I mean, missing one dose of insulin
24  normally does not put anybody into shock, it

14

1  takes time.
2      Q.  Sure.  I'm just wondering if you saw an
3  inmate that you knew to be diabetic, what types
4  of symptoms would you see that would make you
5  think perhaps that patient was going into shock,
6  vomiting or nausea --
7      A.  Well, yeah, of course, those are some
8  of the symptoms.  But they also are symptoms of
9  a lot of other things too.
10      Q.  What other symptoms would you look for?
11      A.  Vomiting, nausea, shakiness.
12      Q.  Anything else?
13      A.  Maybe stomach cramps.  But I mean --
14  yeah.
15      Q.  Anything else?
16      A.  That's about it.
17      Q.  What sort of treatment would you offer
18  a patient that you viewed as going into
19  potential shock?  Let me rephrase that.
20          What sort of treatment would you offer
21  a diabetic patient that you viewed as
22  potentially going into shock?
23      A.  Going into diabetic shock?
24      Q.  Yes?

15

1      A.  What type of treatment?
2      Q.  Hmm, hmm.
3      A.  I would do his Accu-Chek, call the
4  doctor and get an insulin order, depending, you
5  know, on what I get from the doctor.
6      Q.  Miss Rossiter, what is your highest
7  degree you have education wise?
8      A.  An Associates Degree in Nursing.
9      Q.  From where?
10      A.  South Suburban.
11      Q.  You said it's in nursing?
12      A.  Yes.
13      Q.  Any specific specialization in nursing,
14  or just --
15      A.  Registered Nurse.
16      Q.  Any other types of formal education
17  you've received?
18      A.  Associates in Science.
19      Q.  And where is that from?
20      A.  South Suburban.
21      Q.  What year did you receive that degree?
22      A.  The same year that -- 2012.
23      Q.  Was that the same year you received
24  your Associates in Nursing?

16

1      A.  Yes.
2      Q.  Any other degrees you have?
3      A.  CNA License.
4      Q.  And when did you get that?
5      A.  '96.
6      Q.  And what types of education or training
7  did you need to receive that license?
8      A.  Nursing degree.
9      Q.  You needed a nursing degree?
10      A.  To receive what license?
11      Q.  I'm sorry, the CNA license?
12      A.  Could you repeat the question?
13      Q.  Yes.  What types of training or
14  education did you need to go through to receive
15  your CNA license?
16      A.  The CNA program through South Suburban.
17  And I also -- I completed the LPN, I had an LPN
18  license before I was an RN.
19      Q.  When did you get your LPN license?
20      A.  2010.  No, 2009, I'm sorry.
21      Q.  And what type of education did you
22  receive to get your LPN license?
23      A.  A year of schooling.
24      Q.  Was that at South Suburban as well?

17

1    A.  Yes.
2    Q.  Any other medical licenses or training
3  that you have?
4    A.  CPR.
5    Q.  Is that something you renew every year?
6    A.  Yes.
7    Q.  Anything else?
8    A.  No.
9    Q.  Any other licenses or certifications or
10  education that you have that isn't in the
11  medical field?
12    A.  No.
13    Q.  Now, Miss Rossiter, you said you
14  started working at Stateville four and a half
15  years ago, is that right?
16    A.  Yes.
17    Q.  Is that when you started working for
18  Wexford?
19    A.  Yes.
20    Q.  Was that 2009?
21    A.  2010.
22    Q.  And did you do any type of work in the
23  medical field prior to working for Wexford?
24    A.  I was an LPN.

18

1    Q.  Where were you an LPN?
2    A.  At McAllister's.
3    Q.  And where is McAllister's located?
4    A.  Country Club Hills.
5    Q.  And what were your job responsibilities
6  at McAllister's?
7    A.  Patient care.
8    Q.  Anything else?
9    A.  Passing out medications, dressing
10  changes, feed tube feedings, dressing changes,
11  documentation.  I mean, there's quite a bit to
12  it, in taking, patient assessment.
13    MR. ELIASER:  Try to keep your voice up a
14  little bit.  I know it's hard.  Feel free to
15  shout out your answers.
16    A.  Okay.
17    BY MS. ARGENTINE:
18    Q.  Any other medical training or any other
19  jobs in the medical field prior to working for
20  Wexford?
21    A.  I was a CNA.
22    Q.  And where was that?
23    A.  Where would you like me to begin?
24    Q.  Let's start -- so you became a CNA, got

19

1  a CNA license in 1996, where did you work after
2  that?
3    A.  Crestwood Terrace.
4    MR. ELIASER:  Crestwood Terrace?
5    A.  Yes.
6  BY MS. ARGENTINE:
7    Q.  And what is Crestwood Terrace, is that
8  a hospital?
9    A.  A nursing home.
10    Q.  And where did you work -- how long did
11  you work there?
12    A.  About three months.
13    Q.  Where did you work after that?
14    A.  Lexington in Orland.
15    Q.  What is that?
16    A.  Another nursing home.
17    Q.  How long were you there?
18    A.  Two and a half years.
19    Q.  Okay.  And after that?
20    A.  I worked for Rosewood.
21    Q.  What is Rosewood?
22    A.  A nursing home.
23    Q.  How long were you at Rosewood?
24    A.  About two years.

20

1    Q.  How about after that?
2    A.  I worked for a warehouse.
3    Q.  What did you do for the warehouse?
4    A.  I counted parts.
5    Q.  What type of warehouse was it?
6    A.  Arrow Electronics.
7    Q.  How long were you there?
8    A.  About a year and a half.
9    Q.  Okay.  After that?
10    A.  I worked for Pet Co.
11    Q.  How long did you work for Pet Co?
12    A.  About three months maybe, not very
13  long.
14    Q.  What was your position there?
15    A.  Picking.
16    Q.  Picking?
17    A.  We picked like animal stuff, I mean,
18  cat food, dog food, went down the aisles
19  picking.
20    Q.  How about after Pet Co?
21    A.  I went to another nursing home.
22    Q.  Do you remember the name?
23    A.  It was in Crestwood, I'm sorry, I
24  forgot.

21

1    Q.  How long were you there?
2    A.  I want to say about a year and a half.
3    Q.  Okay.  And where did you go after that?
4    A.  Another nursing home.
5    Q.  Do you remember the name?
6    A.  Ridgeland.
7    Q.  I'm sorry, what did you say?
8    A.  Ridgeland.
9    Q.  How long were you there?
10   A.  Maybe a year?
11   Q.  And after that?
12   A.  I worked for Comcast Cable.
13   MR. ELIASER:  You have an amazing memory, do
14   you know that?
15   A.  It's hard to remember.  I forgot the
16   one nursing home.
17   BY MS. ARGENTINE:
18   Q.  So this is between 1996 and 2010,
19   right?
20   A.  Well, I've had some moves, moved from
21   one area to about 45 minutes away.  You know, I
22   tried to get out of being a CNA, something paid
23   a little better, better hours, so then I always
24   ended up going back to being a CNA.

22

1    Q.  Okay.  And how long were you at
2    Comcast?
3    A.  I want to say about a year.
4    Q.  After that?
5    A.  I was unemployed.
6    Q.  For how long?
7    A.  Probably about a year.  I was getting
8    my LPN.
9    Q.  And after that where did you work?
10   A.  I worked at a nursing home,
11   McAllister's.
12   Q.  Okay.
13   A.  As an LPN for about three months.  And
14   then I've been here.
15   Q.  Okay.  Have you ever worked at any of
16   the other prisons in the Illinois Department of
17   Corrections other than Stateville?
18   A.  No.
19   MR. ELIASER:  And NRC, right?
20   A.  Yes.
21   MR. ELIASER:  Yeah.  I think they're
22   considered the same -- well, I'll let you answer
23   that.
24   A.  Well, I mean, they're considered two

23

1    different buildings, but it's still considered
2    as one job for us, you just go back and forth to
3    both buildings.
4    BY MS. ARGENTINE:
5    Q.  Okay.  So would you be -- you could be
6    assigned to the NRC one day OR one week and then
7    you could be assigned to Stateville another
8    week, is that accurate?
9    A.  Yes.
10   Q.  And what position -- what title did you
11   hold when you started in 2010 for Wexford?
12   A.  Licensed Practical Nurse.
13   Q.  And what were your job
14   responsibilities?
15   A.  Passing medications, dressing changes,
16   emergency calls, noting charts, transcribing
17   orders, filling the med cart.  You know, putting
18   meds away.  Cleaning the med card.  Going
19   through our MAR's.  But, I mean, those are the
20   jobs of a LPN.  My main job was the night shift
21   and we did shipment.
22   Q.  What do you mean by shipment?
23   A.  We shipped the inmates out.  We didn't
24   ship them out.  We did their health statuses for

24

1    them.  We went through their charts, we gathered
2    all the information we need because NRC is our
3    Northern Receiving Center, you know, we do
4    x-rays there, we do the blood work there.  So we
5    try to get all that gathered, all their health
6    history gathered on the night shift, along with
7    their charts and then we put it in one big
8    bucket along with their meds, and when they're
9    shipped to their parent institution they have
10   all their health history.
11   Q.  Okay.  So you were working mostly in
12   the NRC then?
13   A.  On the night shift, yes, 2010.
14   Q.  And those were inmates that were being
15   brought into be processed and then they would go
16   to, you referred to it as their parent
17   institution --
18   A.  To serve their time, yes, their
19   assigned institution.
20   Q.  And do you remember what month you
21   started in 2010?
22   A.  February.
23   Q.  How long did you work the night shift?
24   Did you ever switch?

25

1     A.  I worked the night shift for three and
2  a half years.
3     Q.  So in May of 2010 you were working the
4  night shift?
5     A.  I don't know if I was working that day.
6     MR. ELIASER:  In general?
7     A.  Oh, yeah.
8  BY MS. ARGENTINE:
9     Q.  When you say you were working the night
10  shift, would you be working it every day or was
11  that most commonly what you worked?
12    A.  That was my shift, 11 to 7, yes.
13    Q.  So how many days a week was that?
14    A.  5 days.
15    Q.  Did you ever have the ability to pick
16  up extra shifts or switch shifts?
17    A.  Pick up extra shifts, yes.
18    Q.  Okay.  And after February of 2010 when
19  you were an LPN, did your title ever change?
20    A.  Yes.
21    Q.  When did it change?
22    A.  Yes, 2012.
23    Q.  And what did it change to?
24    A.  A Registered Nurse.
                                              26

1     Q.  And what were your job responsibilities
2  as a Registered Nurse?
3     A.  Nursing assessment, emergency calls,
4  dressing changes.
5     Q.  How was it different from being an LPN?
6     A.  We do more of the assessment skills
7  than the LPN does.  The assessment is left up to
8  the RN to do.
9     Q.  Can you give me some examples of some
10  of the assessments you would do?
11    A.  As an RN, if an inmate came in, and you
12  know, we did all his vitals, and you know, we
13  took his symptoms down, checked his medication,
14  you know, and I would call the doctor.
15    Q.  Would that be on sick call would you do
16  those?
17    A.  Yes, you mean --
18    Q.  I'm just trying to get a sense of when
19  these nursing assessments take place?
20    A.  They take place anytime you encounter
21  an inmate who's sick.
22    Q.  Would that be only at sick call or if
23  you saw them in their cell, and they said they
24  weren't feeling well would you do an assessment?
                                              27

1     A.  Yes.
2     Q.  Yes to both?
3     A.  Hmm, hmm.  Yes.
4     Q.  Any other times you would do a nursing
5  assessment?
6     A.  Only when you encounter a sick patient
7  would you do a nursing assessment.
8     Q.  Did you ever do them at the NRC?
9     A.  As an RN.
10    Q.  Hmm, hmm?
11    A.  Yes.
12    Q.  What other job responsibilities do you
13  have as an RN that you didn't have as an LPN?
14    A.  You would be left like senior nurse if
15  you're an RN, the night shift.  You know,
16  everybody might be LPN, you're the only RN.
17    Q.  Did your shift change or do you still
18  work the 11 to 7?
19    A.  No, my shift has changed.
20    Q.  And what's your shift?
21    A.  7 to 3.
22    Q.  And has it been that since 2012?
23    A.  No, since June 1st of 2013.
24    Q.  What was your shift prior to that?
                                              28

1     A.  11 to 7.
2     Q.  And are you still an RN here at
3  Stateville?
4     A.  Yes.
5     Q.  In 2010 when you were an LPN, did you
6  ever hand out medication?
7     A.  Yes.
8     Q.  Did you ever give insulin shots?
9     A.  Yes.
10    Q.  Did you ever do Accu-Cheks?
11    A.  Yes.
12    Q.  And when you would hand out medication,
13  was there a way you would track that
14  information?
15    A.  Through our MAR's.
16    Q.  And what type of information would you
17  write down?
18    A.  Well, I would -- I would put my
19  initials on the date that I gave the medication.
20    Q.  Would you write down the type of
21  medication?
22    A.  The medication would already be written
23  on the MAR, you're just initialing that you gave
24  that medication.
                                              29

1    Q.  So each inmate has a MAR that's
2  specific to them that's already filled with
3  certain information, is that correct?
4    A.  Yes.
5    Q.  Would you track the insulin shots you
6  would give in the same way?
7    A.  Yes.
8    Q.  Would you keep track of when you would
9  give an inmate an Accu-Chek?
10    A.  Yes.
11    Q.  Would that be tracked on the MAR?
12    A.  Yes.
13    Q.  In 2010 when you were an LPN did you
14  ever work in the Health Care Unit?
15    A.  Yes.
16    Q.  What type of things did you do in
17  there?
18    A.  Pack medication.
19    Q.  Anything else?
20    A.  Note charts, carry out orders, call the
21  doctors, dressing changes, clean carts, organize
22  the medications, answer phone calls, clean the
23  Health Care Unit, stock medications, stock
24  equipment.  Count, we count our narcotics.

30

1    Q.  And do you --
2    MS. ARGENTINE:  Do you want to continue from
3  the last number?
4    MR. ELIASER:  No, we can start over.
5    MS. ARGENTINE:  Could we mark this as Number
6  1.
7      (Whereupon, Deposition Exhibit
8      No. 1 was marked for
9      identification.)
10  BY MS. ARGENTINE:
11    Q.  Miss Rossiter, you have been handed
12  what's been marked as Exhibit Number 1 for this
13  deposition.  Is this the MAR that you're talking
14  about, an example of one?
15    A.  This is an example of one, yes.
16    Q.  So this -- I just want to go through
17  generally what is being shown on this page.  So
18  this is -- if you look down at the bottom, this
19  is a MAR for Donald Lippert, do you see where
20  I'm referring to?
21    A.  Yes.
22    Q.  And when you're-- and is this for
23  handing out medication, this specific one that
24  we're looking at on top?

31

1    A.  This is for insulin, which is the
2  medication, yes.
3    Q.  So this MAR would be specific to
4  insulin and no other medications that he was
5  receiving at that time, is that correct?
6    A.  Correct.
7    Q.  So there would be another MAR if he
8  was, for instance, receiving psychotropic drugs
9  at the time, there would be a separate MAR for
10  that, is that correct?
11    A.  Yes.
12    Q.  Now, along the left side it says
13  effective date, how are those filled in?  It
14  looks like, you know, the top one says April 8th
15  of 2010, and then it says discontinue,
16  10-8-2010, when would those be filled in, those
17  dates?
18    A.  The day the doctor wrote the order out.
19    Q.  So that would be filled in by a
20  physician?
21    A.  No, a nurse would fill this out
22  following the orders of the doctor.
23    Q.  And where would they get that order
24  from?

32

1    A.  What we call a script, medication
2  script.
3    Q.  So a doctor would write out -- is that
4  like a prescription?
5    A.  Yes, he would write out a prescription.
6    Q.  And give it to the nurse?
7    A.  And then we would carry out the orders.
8    Q.  Okay.  So you would fill in the
9  original order date; what does the discontinue
10  date mean?
11    A.  10-8 of '10.
12    Q.  What does that mean?
13    A.  The date that the -- the medication
14  ends that day.
15    Q.  And in between that time does it
16  indicate anywhere on this chart how often that
17  medication is given?
18    A.  Yes.
19    Q.  Where do you see that?
20    A.  Like the first sign says AM.
21    Q.  So would that be on April 8th of 2010?
22    A.  That it started?
23    Q.  Right.  I guess -- let me ask it a
24  different way.  I'm just wondering based on this

33

1  chart if it tells you anywhere on here how often
2  Mr. Lippert was receiving this particular
3  medication, this insulin?
4      A.  Twice a day, AM and PM.
5      Q.  And how can you tell that from this
6  chart?
7      A.  He gets insulin in the AM and then it
8  looks like he's getting more insulin in the PM.
9      Q.  Does this chart indicate anywhere the
10  days that he's receiving those insulin shots?
11      A.  The initial.
12      Q.  Okay.  So the initials under these
13  numbers were 1 to 31, those are dates, is that
14  correct?
15      A.  Yes.
16      Q.  And the initials are whose initials?
17  Not a specific person, but would that be like a
18  nurse, or --
19      A.  A med tech.
20      Q.  A med tech.  And those initials would be
21  for whoever administered insulin, is that
22  correct?
23      A.  Who gave him his insulin, yes.
24      Q.  And you corrected me by saying by who

34

1      A.  The medical staff is always there
2  present when he gets his dose, his Accu-Chek and
3  he pulls up his insulin.  He pulls up his own
4  insulin, in his own bottle in front of medical
5  staff and gives his own injection.
6      Q.  Has that always been the case?
7      A.  Yes, here at Stateville, yes.
8      Q.  Since you started here four and a half
9  years ago, correct?
10      A.  Stateville side, yes.
11      Q.  Who administers the Accu-Chek?
12      A.  They do, they do their own Accu-Chek in
13  front of us, or we assist them, you know.
14      Q.  Do you know specifically whether or not
15  Don Lippert does his own Accu-Chek?
16      A.  In front of the medical staff, yes.
17      Q.  And where would these -- where would
18  the medication -- scratch that.
19          Where would this take place, the giving
20  him -- where Don would give himself the
21  Accu-Chek and insulin shot in front of the
22  medical staff?
23      A.  Depending on where they're housed.
24      Q.  It takes place like, for instance, if

36

1  gave him his insulin.  Was there a difference
2  between gave and administered?  Does he give
3  himself his insulin?
4      A.  Yes.
5      Q.  How long has he been doing that?
6      MR. ELIASER:  I would object to the form of
7  the question.  If you want to rephrase it.
8      MS. ARGENTINE:  Sure.
9  BY MS. ARGENTINE:
10      Q.  At some point, at any time did a med
11  tech or nurse administer the insulin shots for a
12  patient?
13      A.  Yes, we have administered.
14      Q.  At some point did that policy change?
15      A.  Policy?
16      Q.  I'm guess, I'm just wondering why now
17  Lippert administers his own, as opposed to on
18  what occasion would a med tech or a nurse
19  administer it for him versus him administering
20  it himself?
21      MR. ELIASER:  She's just asking in what
22  situations would the inmate administer his own
23  insulin versus having the medical staff
24  administer it?

35

1  Don was in F House, it would take place in F
2  House?
3      A.  In his cell, yes.
4      Q.  In his cell.
5          Was that true in 2010?
6      A.  Yes.
7      Q.  Now, if you look at the last entry, it
8  seems to me -- let's look at the second to last
9  one, Accu-Chek, do you see where I'm looking?
10      A.  Yes.
11      Q.  Did Don not receive any insulin on that
12  particular day?  Or are these -- I guess, what
13  are these four entries for, because it wouldn't
14  just be a day, right?  Are these four different
15  types of treatments?
16      MR. ELIASER:  What she's asking you if those
17  are four different types of orders and different
18  types of treatment?
19      A.  Oh, yes.
20  BY MS. ARGENTINE:
21      Q.  Four different types of orders?
22      A.  Yes.
23      Q.  So the Accu-Chek is a separate script
24  from the doctor?

37

1      A.  It would probably be on the same script
2  with the other medications.
3      Q.  It's a separate task?
4      A.  A separate order, yes.
5      Q.  And it looks like on 5-1-2010 there's a
6  new script for an insulin shot, is that
7  accurate?  Looking at the fourth box down?
8      A.  Yes.
9      Q.  And do you know whether -- do you have
10  any idea why he received a new script on
11  5-1-2010?
12      A.  No.
13      Q.  Is this medication that he's receiving
14  on 5-1-2010 and ending on 5-1-2010 different
15  from what the script that he's receiving
16  starting on 4-8-2010?
17      A.  It's a stat order, a now order.
18      Q.  A stat order?
19      A.  It says now.
20      Q.  Okay.  So this was a one time order, is
21  that accurate?
22      A.  That's what it looks like, yes.
23      Q.  Is your initials anywhere on this page,
24  can you tell?
                                    38

1      A.  It could be on a separate one.
2      Q.  So it looks like this is for April of
3  2010, is that right, so there should be a May
4  MAR, correct?
5      A.  Yes.
6      Q.  If you can flip to the second page,
7  it's marked Lippert 914.  Would that be the May
8  chart for 2010 for Mr. Lippert's insulin shot?
9      A.  Where?
10      MR. ELIASER:  Yeah, she's just asking is this
11  the May 2010 insulin MAR?
12      A.  Yes.
13  BY MS. ARGENTINE:
14      Q.  And do you see your initials anywhere
15  on this page?
16      A.  Yes.
17      Q.  Where do you see them?
18      A.  May 9th.  May 20th.
19      Q.  For May 9th you're looking at the last
20  medication at the bottom?
21      A.  Yes.
22      Q.  Okay.  Sorry, did you say another one?
23      A.  May 21st, May 22nd.
24      MR. ELIASER:  I think it's the 20 and 21,
                                    40

1      A.  April 17th it looks like, maybe, could
2  be, it looks like it.
3      MR. ELIASER:  For which order?
4      A.  The Accu-Chek.
5  BY MS. ARGENTINE:
6      Q.  Which one are you looking at?  The AM
7  or PM?
8      A.  PM Accu-Chek.
9      Q.  Okay.  So that's your initials here, it
10  kind of looks like?
11      MR. ELIASER:  What does it look like?
12  BY MS. ARGENTINE:
13      Q.  What does it look like?
14      A.  AR.
15      Q.  Okay.  So for the record we're looking
16  at the Accu-Chek, the third box down, the PM and
17  then the April 17th line?
18      A.  Yes.
19      Q.  Anywhere else do you see your initials
20  on here?
21      A.  No.
22      Q.  If Mr. Lippert had received any other
23  scripts for 5-1-2010 would it be on this page or
24  would it be on a separate one?
                                    39

1  right?
2      A.  Oh, okay.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
                                    41

1    BY MS. ARGENTINE:
2        Q.  Anywhere else?
3        A.  No.
4        MR. ELIASER:  Is that right, 20 and 21?  May
5    the 20th and 21st?
6        A.  Yes, May 20th and 21st.
7    BY MS. ARGENTINE:
8        Q.  And based on this note, what medication
9    were you giving to Mr. Lippert on May 9th, May
10   20th and May 21st?
11       A.  NPH, 15 units.
12       Q.  What is that, NPH?
13       A.  Insulin.
14       Q.  Okay.  You can put that aside.
15           Now, Miss Rossiter, when you would get
16   your schedule for your shift, is there a
17   schedule you would receive on a weekly basis
18   that would tell you what days that week you were
19   working?
20       A.  Yes.
21       Q.  Is that in paper?
22       A.  Yes.
23       Q.  And you would receive that when, like
24   the week before?

42

1        A.  That's not guaranteed you're going to
2    be there.
3        Q.  Okay.
4        A.  Nothing is a guarantee.
5        Q.  Can you think of what -- can you recall
6    what the different slots were that you could
7    have been put into in May of 2010?
8        A.  It depends on, you know, my regular
9    shift is 11 to 7, so --
10       Q.  Sure.  I'm just wondering what the
11   options are, Health Care Unit, Sick Call --
12       A.  Health Care Unit, it depends on where
13   you're at, whether you're at the NRC or the
14   Stateville side.
15       Q.  Would that information be on the
16   schedule?
17       A.  There's two different schedules, yes.
18       Q.  Okay.  If you're on the Stateville side
19   what types of information would be on there with
20   respect to where you would be at on a particular
21   day?
22       A.  It would be whether you're at Bravo,
23   Charlie, Delta, Edward, F and X --
24       Q.  Are those houses?

44

1        A.  That Friday, yes.
2        Q.  And who would give that to you?
3        A.  The supervisor would put it out.
4        Q.  And you would receive a copy of it?
5        A.  You got to make your own.
6        Q.  But you had the ability to do that?
7        A.  Yes.
8        Q.  Would you make copies of your schedule?
9        A.  Sometimes.
10       Q.  Would you have your schedule from May
11   of 2010 still?
12       A.  No.
13       Q.  What information would be on that
14   schedule?
15       A.  The days you're working.
16       Q.  Would it say what tasks you had for
17   those particular days, whether you were working
18   in the Health Care Unit or handing out
19   medications?
20       A.  Yes.
21       Q.  That would be stated on that schedule?
22       A.  You would be slotted into that spot,
23   yes.
24       Q.  And what --

43

1        A.  Yes.
2        Q.  And then you said you could be in the
3    infirmary?
4        A.  Yes.
5        Q.  Or the Health Care Unit?
6        A.  The Health Care Unit -- it's all one
7    Health Care Unit, okay, whether you're in the
8    E.R. or in the infirmary.
9        Q.  Okay.  What are the other options that
10   would be on there?
11       A.  For the nursing staff?
12       Q.  Hmm, hmm.
13       A.  That would be it.
14       Q.  So you were either passing medications
15   or you were in the Health Care Unit, are those
16   the two options?
17       A.  The infirmary.
18       Q.  The infirmary.  And you said that that
19   could change, how would that change?
20       A.  Well, you could be at the Stateville
21   side, or you could come in and find out you're
22   on the NRC side.  You can find out you're going
23   to work the infirmary.  You're not going to pass
24   meds.  You're going to be the med tech for the

45

1 day, if you're an LPN, on the NRC side, or
2 you're going to be the med tech on the
3 Stateville side. It just depends on the staff
4 changes.
5 **Q. It would depend on who was there that**
6 **day?**
7 A. Yes.
8 **Q. And when you came in for your shift**
9 **would you have to sign in?**
10 A. We punch in.
11 **Q. You punch in. Where would you punch**
12 **in?**
13 A. Where ever you're assigned to.
14 **Q. So the infirmary would have a separate**
15 **punch in --**
16 A. No.
17 **Q. You're talking NRC versus Stateville?**
18 A. Each building has its own box to punch
19 in.
20 **Q. Okay. And are we talking like a card**
21 **that you actually --**
22 A. Your finger.
23 **Q. Can you explain that?**
24 A. You type in your last 4 digits of your

46

1 social security number and then you put your
2 little finger on there, that's how we punch in.
3 **Q. And do you similarly punch out the same**
4 **way?**
5 A. Yes.
6 **Q. And do you know whether the State or**
7 **Wexford keeps the schedules going back four**
8 **years, five years, or if they have those stored**
9 **electronically somewhere?**
10 MS. PTASZNIK: I'm not sure. I haven't heard
11 of something like that.
12 MR. ELIASER: I'm not such either. I think
13 they may for some facilities for sometime, maybe
14 not for others.
15 BY MS. ARGENTINE:
16 **Q. Or if they keep a track of who punches**
17 **in, when, is that stuff kept electronically?**
18 MR. ELIASER: If you want to make a request,
19 we'll check and see.
20 MS. ARGENTINE: Do you want me to make a
21 written request?
22 MR. ELIASER: Yeah, let's talk about it
23 afterwards.
24 MS. ARGENTINE: Okay.

47

1 BY MS. ARGENTINE:
2 **Q. Ms. Rossiter, how much -- on your 11 to**
3 **7 shift in 2010, do you know how many nurses**
4 **would be staffed on that shift at Stateville?**
5 A. Nurses and med techs, three nurses.
6 **Q. How many med techs?**
7 A. One.
8 **Q. Any other medical staff?**
9 A. No.
10 **Q. Was there no doctor on staff for the 11**
11 **to 7 shift?**
12 A. No.
13 **Q. Were all the nurses LPN's?**
14 A. No.
15 **Q. An RN?**
16 A. Yes.
17 **Q. How many RN's?**
18 A. There has to be one per facility.
19 **Q. When you started in 2010 what type of**
20 **training did you receive from Wexford, medical**
21 **treatment for the inmates?**
22 A. Three weeks of orientation.
23 **Q. And that was headed by Wexford**
24 **specifically?**

48

1 A. Yes.
2 **Q. And were those classes -- how was the**
3 **orientation run?**
4 A. On the job training.
5 **Q. So you would follow another nurse as**
6 **she completed her tasks for the day, is that it?**
7 A. Yes.
8 **Q. Anything else?**
9 A. No.
10 **Q. Do you have any formal or informal**
11 **training from the Illinois Department of**
12 **Corrections?**
13 A. Yes.
14 **Q. What did you do?**
15 A. We did a week training course.
16 **Q. And where did that take place?**
17 A. The NRC.
18 **Q. And what type of training did that**
19 **involve?**
20 A. Well, what to expect from the inmates
21 and what are inmates.
22 **Q. Who ran those trainings?**
23 A. I.D.O.C.
24 **Q. Would it be a medical staff member?**

49

1    A. No.
2    Q. Warden, correctional officer, do you
3 remember?
4    A. I don't think it was the warden, it
5 wasn't the warden. I don't know who runs those.
6    Q. Was the I.D.O.C. training specific to
7 medical?
8    A. No, not that we were training, no.
9    Q. Did you receive any other training from
10 I.D.O.C.?
11    A. We did receive one day training, CPR,
12 which we do yearly.
13    Q. Anything else?
14    A. We also had another day of -- they
15 brought us up, teach us about 434, how to write
16 a 434. A 434 is like a complaint that you have.
17    Q. That you as a staff member have?
18    A. Well, how to like write up an inmate,
19 write, you know, issues, we use 434's for if
20 we're sending an inmate out, to let the warden
21 know, or not the warden, the shift commander
22 know what's going on.
23    Q. Sending an inmate out for what?
24    A. Like the inmate had to go to the

50

1 hospital, or an incident happened, like a fight,
2 an inmate on inmate fight, you write a 434.
3    Q. So the only medical training you
4 received from Wexford or I.D.O.C. was that three
5 week orientation?
6    A. Yes.
7    Q. Okay. And what types of training did
8 you receive during that three weeks?
9    MR. ELIASER: Well, she had also testified to
10 the additional one week of training course
11 through the I.D.O.C., right?
12    MS. ARGENTINE: But that was not medical.
13    MR. ELIASER: Correct, that was not medical?
14    A. That was not medical.
15 BY MS. ARGENTINE:
16    Q. So what types of training, medical
17 training, did you receive during the three week
18 orientation?
19    A. They showed me how they go about
20 passing medication, how they transcribe their
21 orders, how they go through the chart, how we
22 pull charts, how we're looking for an inmate.
23    Q. What do you mean by how we're looking
24 for an inmate?

51

1    A. Like if we're looking for a chart for
2 an inmate, how -- okay, they taught me all about
3 medical records, how to pull a chart when
4 looking for a location for an inmate.
5    Q. Is that like computer training?
6    A. No.
7    Q. Or are these hard files that you're
8 looking at?
9    A. Yeah.
10    Q. Okay. Anything else?
11    A. They taught me, you know, again, how to
12 pass medication, how to organize the cart, you
13 know, how they organize, how they do things, you
14 know, how they do their dressing changes, who
15 comes up on dressing changes. You know, that
16 was on the first shift of week training. On the
17 second shift, you know, we learned how that
18 shift is ran. Everything is pretty much basic,
19 you know, inmates come up for dressing changes,
20 some come up for medication, how to pack the
21 meds.
22    Q. So in that three weeks were you rotated
23 through the three different shifts?
24    A. I got one week on days, one week on 3

52

1 to 11, and then I went to my night shift.
2    Q. Did you have any training specific to
3 treating diabetic patients?
4    MR. ELIASER: From Wexford or just --
5    MS. ARGENTINE: During this orientation?
6    A. Yes.
7 BY MS. ARGENTINE:
8    Q. And what training did you have for
9 that?
10    A. They taught me -- I already knew how to
11 use an Accu-Chek machine, just familiarizing me
12 with their Accu-Chek machine, and how they go
13 about giving their insulin.
14    Q. And that would be on the job training,
15 through the shadowing of another nurse?
16    A. Yes.
17    Q. When are Accu-Cheks done? Are those
18 done with the medication distribution?
19    A. No.
20    Q. When are they done?
21    A. They're done AM and PM by a med tech.
22    Q. Is that prior to giving the insulin
23 shot?
24    A. Yes.

53

1      Q.   Are Accu-Cheks ever done outside of
2  administering or giving the insulin?
3      A.   Yes.
4      Q.   On what occasions would that occur?
5      A.   The inmate's request.
6      Q.   Is there any sort of procedure for an
7  inmate requesting an Accu-Chek or is it just
8  automatically done if an inmate requests it?
9      A.   Well, if an inmate requests it, we try
10  to get it done, yes.
11      Q.   If an inmate were to request an
12  Accu-Chek check while you were distributing
13  medication, what type of procedure would you
14  follow then?
15      A.   I would go -- I would go get a med
16  tech, that's the med tech's duty to do the
17  Accu-Chek.
18      Q.   You wouldn't necessarily do the
19  Accu-Chek, stop distributing medication to do
20  the Accu-Chek right there?
21      A.   Well, we don't carry it.  If I'm having
22  nursing duties that day, not med tech duties, I
23  would be out passing medication, I would call
24  the med tech.

54

1  Accu-Chek, if I was in the Health Care Unit, he
2  wanted it, I would give it to him, of course.
3      Q.   Okay.  But typically it's the med
4  tech's responsibility on a routine basis to
5  treat diabetic patients, is that accurate?
6      A.   Yes.  They have duties, the nurses have
7  duties.
8      Q.   And what are the nurses specific
9  duties?
10      A.   Medication, packing the medication,
11  going through our carts, stocking our
12  medication, nursing orders, transcribing,
13  charts, phone calls, dressing changes, emergency
14  calls.
15      Q.   Did you receive any training on
16  emergency treatment for inmates.
17      MR. ELIASER:  During the orientation?
18      A.   I've seen emergency calls, I've gone
19  through them.
20  BY MS. ARGENTINE:
21      Q.   Did you receive any specific training
22  during your orientation on them?
23      A.   Well, yes, I mean, if there's an
24  emergency, there's a Code 3 called and the

56

1      Q.   Explain to me the difference between
2  nursing duties and med tech duties?
3      A.   Well, the med techs they do all the
4  diabetics and they pass out blister packs and
5  medication.
6      Q.   I'm sorry, blister packs?
7      A.   Blister pack medication.
8      Q.   What's a blister pack?
9      A.   It's a blister pack of medications, it
10  has 30 days worth of medication, a 30 day supply
11  of medications, usually maintenance meds,
12  creams, ointments, shampoos.
13      Q.   Okay.  And they distribute those to the
14  inmates?
15      A.   Yes.
16      Q.   And you say the med tech deal
17  exclusively with the diabetic patients?
18      A.   Yes.
19      Q.   So a nurse would never give an insulin
20  shot or give an Accu-Chek as part of his or her
21  duties?
22      A.   If I had to, yes, of course I would,
23  yes.  I mean, if the inmate came up and said I
24  feel my blood sugar is low, if I had the

55

1  inmates were brought up to the E.R. as soon as
2  possible, we have a certain amount of time, we
3  have drills that are done for Code 3.
4      Q.   How often are drills done?
5      A.   I want to say twice, three times a
6  year.  And that's a response time on a Code 3.
7      Q.   Since that orientation have you
8  received any formal or informal training related
9  to diabetic patients?
10      A.   During our nurses meeting, we have a
11  nursing meeting once a month.  If something new
12  comes up, they'll usually, you know, give you a
13  handout, and teach us about it, if they're
14  changing anything.
15      Q.   Did you receive policies or procedures,
16  written policies or procedures when you became a
17  nurse in 2010?
18      A.   For here?
19      Q.   Yes, from Wexford?
20      A.   They're in our Health Care Unit.
21      Q.   They're like in binders in the Health
22  Care Unit?
23      A.   Yes.
24      Q.   Do you have copies at your house or

57

1    personal copies that you keep?
2        A.  No.
3        Q.  Did you ever have any training where
4    you went over those policies in detail from
5    Wexford or the Illinois Department of
6    Corrections?
7        A.  Not in detail.  But, you know, if
8    something changes or something new comes up,
9    they usually introduce it to us, you know, at
10   the nursing meeting.
11       Q.  Is there any other documentation that
12   would show who was working on a particular day
13   other than the schedule that we talked about
14   earlier?
15       A.  We sign in and sign out.
16       Q.  The punch in and punch out that you
17   were talking about or is it something separate?
18       A.  We sign in and sign out too.
19       Q.  Where do you do that?
20       A.  There's a book by the punch-in.
21       Q.  Was that true in 2010?
22       A.  Yes, I can remember that, yes.
23       Q.  Are there any other forms of
24   documentation that would show who was working on

58

1    a particular day?
2        A.  Well, I mean, if you signed any MAR's
3    that day it would show, if you did any nurses
4    notes that day.
5        Q.  Anything else?
6        A.  Just any documentation on anything
7    you've done that day would show that you were
8    there.
9        Q.  What's the procedure that nurses follow
10   if an inmate requests medical treatment not
11   through sick call?
12       MR. ELIASER:  I would object to the vagueness
13   of the question, incomplete hypothetical.  Are
14   you referring to now?  Today?
15   BY MS. ARGENTINE:
16       Q.  Well, would that be different from
17   2010?  I'm referring to 2010, if it is different
18   from today; is there any further procedures that
19   nurses or med techs follow when an inmate
20   requests medical treatment by not filing a sick
21   call?
22       MR. ELIASER:  Same objection.
23       A.  I'm confused.
24

59

1    BY MS. ARGENTINE:
2        Q.  Sure.  You know, if an inmate --is it a
3    typical procedure for an inmate if they need
4    medical treatment, if it's not an emergency to
5    file for sick call?
6        A.  They put in a sick call slip.
7        Q.  If an inmate were to request from a
8    nurse or a med tech in either the infirmary or
9    while passing out medications, medical
10   treatment, what is the procedure the nurses or
11   the med tech would follow with respect to
12   providing that medical treatment?
13       MR. ELIASER:  Same objection.
14       A.  Would you repeat that?
15   BY MS. ARGENTINE:
16       Q.  Sure.  If an inmate while you were
17   passing out medications requested some sort of
18   medical treatment that wasn't, had nothing to do
19   with the medication, what would you as a nurse
20   do?
21       MR. ELIASER:  Same objection.
22       MS. PTASZNIK:  Join.
23       MR. ELIASER:  You can answer.  I mean, she's
24   just asking you generally if an inmate requests

60

1    treatment, what would you do.  Can you answer a
2    question that vague?
3        A.  Every situation is different.
4        MR. ELIASER:  All right.  I would suggest
5    being more specific, if you want to talk about
6    this case.
7        MS. ARGENTINE:  Sure.
8    BY MS. ARGENTINE:
9        Q.  I think we went already went over this,
10   but if an inmate requested an Accu-Chek while
11   you were handing out medication, would you
12   typically give that inmate the Accu-Chek?
13       MR. ELIASER:  And that was asked and
14   answered.  So when I state an objection, you
15   still have to answer the question, if you can,
16   if you understand it, you can answer the
17   question.  I'm just stating an objection for the
18   record, because I object to the way the question
19   was formed, it was phrased.  So if you
20   understand -- and my objection to that last
21   question was that you already were asked that
22   question, you already answered that question
23   earlier.  Remember she asked you when you were
24   passing out medications and an inmate requests

61

1  an Accu-Chek, what would you do, right, you
2  already answered that question?
3      A.  Yes.
4  BY MS. ARGENTINE:
5      Q.  That's fine, we can move on.  You said
6  you don't work at clinics, is that correct?
7      A.  No.
8      Q.  In 2010 you never worked at clinics,
9  you never worked at the diabetic clinic, is that
10 accurate?
11     A.  Yes.
12     Q.  Now, I want to turn your attention to
13 May lst of 2010; do you recall whether you were
14 working that day?
15     A.  No.
16     Q.  Is there anything that would refresh
17 your recollection as to whether or not you were
18 working that day?
19     A.  No.
20     Q.  But it would be stated on the schedule
21 whether or not you were working that day?
22     A.  Hmm, hmm.  Yes.
23     Q.  And you would have signed in that day,
24 correct?

                                        62

1      A.  Yes.
2      Q.  And if you were working in the
3  infirmary you perhaps would be on medical
4  records from that day, is that correct?
5      A.  Yes.
6      Q.  If you were handing out medication that
7  day, what records would show that you were
8  handing out medications that day?
9      A.  The MAR's that were signed for that
10 day.
11     Q.  If you're distributing any type of
12 medication your initials would be on a MAR's, is
13 that accurate?
14     A.  Yes.
15     Q.  So you don't recall having any
16 interaction with Mr. Lippert on May lst, 2010?
17     A.  I can't remember that day.
18     Q.  Do you remember a time in or around May
19 lst, 2010 where you saw Mr. Lippert in the
20 infirmary and he asked for a insulin shot?
21     A.  No.
22     Q.  Do you recall on or around May lst,
23 2010 a time when you were handing out
24 medications and Mr. Lippert asked you to do an

                                        63

1  Accu-Chek for him?
2      A.  No.
3      Q.  Do you recall a time on or around May
4  lst, 2010 where Mr. Lippert told you he wasn't
5  feeling well and he felt that he needed an
6  insulin shot that he didn't receive?
7      A.  No.
8      Q.  Do you know if Mr. Lippert had asked
9  you to give him an Accu-Chek would that be
10 documented somewhere, just his request?
11     A.  No.
12     Q.  If he had asked you to give him an
13 insulin shot on or around May lst, 2010, would
14 his request be documented somewhere?
15     A.  If it was -- if I gave that man an
16 insulin shot, yes, it should be documented.
17     Q.  Sure.  Would his request be documented
18 some where, whether or not -- if you did not
19 give him an insulin shot, would his request of
20 receiving an insulin shot be documented some
21 where?
22     MR. ELIASER:  She's asking you if he asked
23 you for an insulin shot, would that be
24 documented, would you document that?

                                        64

1      A.  An insulin shot, yes.
2      MR. ELIASER:  She's not asking if you gave it
3  to him, she's asking simply if he just requested
4  an insulin shot, would you document that simple
5  request, right?
6      MS. ARGENTINE:  Yes.
7      MR. ELIASER:  That's all she's asking.
8      A.  No.
9  BY MS. ARGENTINE:
10     Q.  Do you recall a time on or around May
11 lst, 2010 where Mr. Lippert had to be taken to
12 the infirmary for an emergency insulin shot?
13     A.  No.
14     Q.  Are you aware of anyone that would
15 remember any incident with Mr. Lippert on May
16 lst, 2010?
17     A.  People who seen him in the infirmary
18 that day, maybe, I don't know.
19     Q.  Have you ever had any conversations
20 with anyone about a medical incident occurring
21 with Mr. Lippert on May lst, 2010 other than
22 your attorney?
23     A.  No.
24     Q.  You were working the 11 to 7 shift in

                                        65

1    May of 2010, is that correct?
2      A.  That's what I was scheduled for, yes.
3      MR. ELIASER:  The NRC, right?
4      A.  Yes.
5    BY MS. ARGENTINE:
6      Q.  I'm sorry, the NRC?
7      A.  Yes.
8      Q.  How often would you be at Stateville?
9      A.  It would depend, you never know.  I
10   mean, for my shift, I work at the NRC.
11     Q.  And working at the NRC for your shift,
12   you wouldn't typically not have any interactions
13   with handing out medications to inmates in F
14   House, is that accurate?
15     A.  Yes.
16     Q.  Do you recall any times in May of 2010
17   when you were working at Stateville?
18     A.  I don't recall, no.
19     Q.  Do you recall the names of the nurses
20   that were working that shift, the 11 to 7 shift
21   in Stateville in May of 2010?
22     A.  Can you repeat the first part of that?
23     Q.  Sure.  I'm just wondering if you recall
24   the names of the nurses that would have been
                                                    66

1    working the 11 to 7 shift at Stateville as
2    opposed to the NRC in May of 2010?
3      A.  No.
4      Q.  Do you recall the names of any med
5    techs that would have been working at
6    Stateville, the 11 to 7 shift in May of 2010?
7      A.  No.
8      Q.  Do you recall any medical -- scratch
9    that.
10         Do you recall any times in May 2010 or
11   otherwise that Mr. Lippert specifically
12   requested you give him an Accu-Chek?
13     A.  No.
14     Q.  Have you ever had any conversations
15   with Mr. Lippert?
16     A.  Besides when he comes up for insulin,
17   sometimes.
18     Q.  Have you ever had conversations with
19   Mr. Lippert about May 1st, 2010?
20     A.  No.
21     Q.  Have you ever had any conversations
22   with Doctor Zhang about Mr. Lippert that you can
23   recall?
24     A.  No. I don't recall the doctor.
                                                    67

1      Q.  Have you ever had any conversations
2    with Nurse Breske about Mr. Lippert that you can
3    recall?
4      A.  No.
5      Q.  Have you ever had any conversations
6    with the other Defendants in this case,
7    Correctional Officer Norman or Maldonado about
8    Mr. Lippert, that you can recall?
9      A.  No.
10     Q.  Are you aware that Mr. Lippert filed a
11   grievance in this case about a May 1st incident,
12   or about incident on May 1st, 2010?
13     A.  No.
14     Q.  So you've never been asked to review
15   any medical records with respect to a grievance
16   that he filed from May 2010?
17     A.  No.
18     Q.  What training outside of Wexford have
19   you received with respect to diabetes?
20     A.  In school.
21     Q.  What types of training did you receive?
22     A.  How to administer insulin shots, some
23   of the signs and symptoms of hyper, hypo,
24   different types of medications, how long the
                                                    68

1    medications last in the system, the sugar
2    levels, what they should be, between normal,
3    high.
4      Q.  Did you have any experience with
5    diabetic patients in any of the nursing homes or
6    jobs in the medical field?
7      A.  Yes.
8      Q.  And did you have experience
9    specifically with patients that had Type 1
10   Diabetes?
11     A.  Yes.
12     Q.  And did you have experience giving
13   Accu-Chek and insulin shots to those patients?
14     A.  Yes.
15     Q.  And you were talking before about a
16   bulletin board that had -- called a diabetic
17   list, I think, or a list of inmates that have
18   diabetes; how long has that list been up at the
19   nurses station?  Has that been there since 2010?
20     A.  It's not a nurses room, it's for
21   medical staff.  I don't know if it's been up
22   there since 2010.  I can't remember.
23     Q.  You don't recall when that was first
24   put up there?
                                                    69

1    A. No.
2    Q. Do you recall when you learned that Mr.
3  Lippert was a diabetic?
4    A. I mean, we had a diabetic that come up,
5  but do I specifically know who Lippert was, no.
6    Q. Was there any sort of training,
7  informal or formal, where you would learn
8  specifically about the inmates and what their
9  medical needs were in the different houses?
10   A. No.
11   Q. So any, correct me if I'm wrong, so any
12 understanding that you would have of an inmate's
13 medical needs would come from your day-to-day
14 treatment and interactions with those
15 individuals, is that correct?
16   A. Yes.
17   MR. ELIASER: And what the medical charts of
18 the patient say, is that right?
19   A. Oh, yeah.
20 BY MS. ARGENTINE:
21   Q. On what occasions though would you go
22 through their medical charts? Just when they
23 needed medical treatment?
24   A. When it came up, yes. Pulled the

70

1  inmate's chart, I go through his medical
2  history, yes.
3    Q. You don't have any recollection of any
4  occurrences from May lst, 2010 -- scratch the
5  question.
6       Do you have any recollection of being
7  at Stateville or working at Stateville on May
8  lst, 2010?
9    A. No.
10   MS. ARGENTINE: Can we take a few minutes?
11   MR. ELIASER: Sure.
12        (Whereupon, a short break was
13        taken.)
14        (Whereupon, Deposition Exhibit
15        No. 2 was marked for
16        identification.)
17 BY MS. ARGENTINE:
18   Q. Miss Rossiter, you've been handed
19 what's been marked as Exhibit 2.
20      Can you tell me what this document is?
21   A. A note.
22   Q. What do you mean by a note?
23   A. Like what we call documentation, when
24 we document an incident that had happened.

71

1    MR. ELIASER: Can we just swap this out with
2  what I brought? You can see barely anything on
3  the second page. I have the same note, and I
4  have a package of records. Can we just make
5  this Exhibit 2 instead?
6    MS. ARGENTINE: Sure.
7    MR. ELIASER: It has the same two progress
8  notes that you have in your copy.
9  BY MS. ARGENTINE:
10   Q. Okay. I'm sorry, Miss Rossiter, you
11 were saying this is a note that would be filed
12 out in the event of an emergency, or an
13 incident, you said?
14   A. These are the types of sheets we use to
15 document any type of medical that is given to an
16 inmate.
17   Q. Would it be at a particular -- would
18 this only be in the infirmary, or would this be
19 used at anytime, anytime any medical treatment
20 was given to an inmate?
21   A. Anytime medical treatment was given.
22   Q. Is there any indication on the first
23 two pages of what you have in front of you that
24 show where this treatment was given?

72

1    A. Say that again?
2    Q. I'm just wondering if there's any
3  indication on this note that would show you
4  whether this treatment was given in the
5  infirmary versus in Mr. Lippert's cell, can you
6  tell that from here?
7    A. It says he's to be discharged after PM
8  insulin.
9    Q. So what would that indicate to you?
10   A. That he's being discharged from the
11 Health Care.
12   Q. Okay. And can tell you tell from these
13 notes whether this was --
14   A. And then it says admitted for 23 OPS.
15   Q. What does that mean?
16   A. He was admitted to the infirmary.
17   Q. And do you know who fills these
18 progress notes out? Would it be a doctor or a
19 nurse or --
20   A. Could be one or the other or both.
21   Q. Okay. Can you tell from the first two
22 pages of this note who filled this one out?
23   A. I don't know who the signature of these
24 two are. I don't know who that one is. This

73

1    one is Breske's.
2    Q.  I'm sorry, which one?
3    A.  5-1, 4:30 PM, that's Breske's.
4    Q.  And we're looking at 5-1-2010:
5    A.  4:30 PM.
6    Q.  How about the bottom one.  Do you know
7    who filled that one out?
8    A.  No.
9    Q.  Do you see any part of these 2 pages
10   that you filled out?
11   A.  No.
12   Q.  Now, at the top it says Offender
13   Outpatient Progress Notes, STA NRC Center.  Is
14   that the same -- would those be the same
15   locations, the Stateville and the NRC, is that
16   the same location for the infirmary?
17   A.  It says STA, so it's Stateville and
18   NRC.
19   Q.  I'm sorry.  All I'm trying to figure
20   out is that one location?
21   A.  It's two locations.
22   Q.  That's two separate locations?
23   A.  Hmm, hmm.
24   Q.  Is there a reason they're both typed up

                                                    74

1    here, do you know?
2    A.  Probably so they can distribute these
3    sheets to both locations.
4    Q.  Okay.  So that's always filled in,
5    standard, right there, that wouldn't be filled
6    in the day that the inmate came in, is that
7    accurate?
8    A.  No -- yes, that's accurate, yes.
9    Q.  And if you look at the first note on
10   it, it says S with a colon and O with a colon.
11   Do you know what those stand for?
12   A.  S stands for subjective, what the
13   inmate states.  O is objective, what the nurse
14   or doctor sees.
15   Q.  Okay.  I have nothing further?
16       Can you just state your name for the
17   record and spell your last name?
18   A.  Athena Rossiter, R-o-s-s-i-t-e-r.
19   MS. ARGENTINE:  Thank you.
20       EXAMINATION.
21   BY MR. ELIASER:
22   Q.  Miss Rossiter, you had an opportunity
23   to review the Plaintiff's deposition testimony
24   as it pertained to what he alleges his

                                                    75

1    interactions were with you on May lst, 2010,
2    right?
3    A.  Yes.
4    Q.  And he testified that when he was being
5    escorted out of the infirmary on May lst of
6    2010, he had walked by you while you were
7    packaging psychotropic medications into little
8    envelopes in the front of the E.R., right?
9    A.  Could you repeat that, I'm sorry.
10   Q.  Sure.  He testified in his deposition,
11   the Plaintiff, Mr. Lippert, testified in his
12   deposition that he was being escorted out of the
13   infirmary on May lst, 2010, and he saw you
14   packaging psychotropic medications, right, that
15   was his testimony?
16   A.  That's what he states, yes.
17   Q.  And you don't remember anything about
18   that, correct?
19   A.  No.
20   Q.  No, I'm correct?
21   A.  Yes.
22   Q.  I want to propose a hypothetical to
23   you, okay, let's say you were there at that time
24   packaging psychotropic medications, and Mr.

                                                    76

1    Lippert walked by you and said to you I didn't
2    receive my afternoon insulin, what would you
3    have done in that situation?
4    A.  I would have went to the nurse in the
5    back and asked her if Lippert got his insulin,
6    he's stating he didn't get his insulin before he
7    went to the cell house.
8    Q.  Okay.  And if the nurse said he's being
9    discharged without it because his blood sugar is
10   normal, and I'll get his insulin during the next
11   shift, would it have been legitimate for you to
12   rely on what that nurse said to you?
13   A.  Yes.
14   Q.  And why would it have been legitimate
15   for you to rely on that?
16   A.  Because she's a nurse, she cares for
17   him in the infirmary.  She knows what's going
18   on, I mean, I would have just let her know
19   what's going on, what he stated.
20   Q.  Am I correct that page 411 of Exhibit 2
21   indicates that Nurse Breske is the nurse that
22   was caring for him in the infirmary at that
23   time?
24   A.  Yes.

                                                    77

1    Q.  And so Nurse Breske would have been the
2  one that you would have spoken to about this
3  issue, right?
4    A.  Yes.
5    Q.  And is it true that relying on what a
6  treating nurse tells you about the patient's
7  care is well within the standard of care?
8    A.  Yes.
9    Q.  We also just reviewed these 2 progress
10  notes on page 410 of Exhibit 2.  And you said
11  that you don't immediately recognize whose
12  writing or signature this is, right?
13    A.  Yes.
14    Q.  If I represent to you that it's Doctor
15  Zhang, would you have any reason to disagree
16  with that?
17    A.  If that's what you state, I mean, I
18  have no other --
19    Q.  Did Doctor Zhang work at Stateville as
20  of May 2010?
21    A.  Yeah, I think she did.
22    Q.  And as a nurse who works at Stateville,
23  or the NRC in 2010, are you familiar with the
24  writing of certain doctors and nurses as it

78

1  pertains to progress notes?
2    A.  No.
3    Q.  Are you able to make out Doctor Zhang's
4  writing as it pertains to the 12 PM note?
5    A.  Some of it, yes.
6    Q.  Okay.  What were the Plaintiff's
7  subjective complaints at that time?
8    A.  I didn't have my insulin this AM.
9    Q.  Okay.  And according to the objective
10  section of the note, the patient's physical exam
11  was normal, is that correct?
12    A.  He was alert and orientated, he
13  ambulated to Health Care.  It looks like he
14  ambulated.
15    Q.  Is that without?
16    A.  It looks like without.
17    Q.  Okay.
18    A.  And Accu-Chek 450, assessment,
19  hyperglycemia.
20    Q.  What does it say under hyperglycemia?
21    A.  Non compliance.
22    Q.  What do you take that to mean that the
23  assessment is hyperglycemia with non compliance?
24    A.  The inmate is not compliant with his

79

1  insulin.
2    Q.  Doctor Zhang's plan, according to the
3  12 PM note, was regular insulin, 7 units stat,
4  right?
5    A.  That's what it states, yes.
6    Q.  Okay.  And the second part of the plan
7  was Accu-Chek before next meal, if less than 300
8  may have regular insulin, 5 units, right?
9    A.  Yes.
10    Q.  And if glucose was greater than 300
11  during the Accu-Chek before the next meal, then
12  instead he would have NPH insulin, 15 units,
13  right?
14    A.  Yes.
15    Q.  Okay.  The third part of the plan is
16  may discharge to cell house tomorrow after AM
17  insulin, right?
18    A.  Yes.
19    Q.  Doctor Zhang's plan was to admit him
20  for 23 hour observation, is that right?
21    A.  Yes.
22    Q.  Then Doctor Zhang charts another
23  progress note at approximately 2:50 PM on May
24  1st, 2010, is that right?

80

1    A.  Yes.
2    Q.  And the Plaintiff's subjective
3  complaints at that time was that he was fine and
4  that he needs his commissary food, right?
5    A.  Yes.
6    Q.  What is commissary food?
7    A.  Food that they order from the
8  commissary.
9    Q.  What is commissary?
10    A.  For them it's like a store for shopping
11  for food.
12    Q.  And what kind of things can they order?
13    A.  They can order soups, Honey Bun, pop,
14  chips, sausage roll, I mean, that's all -- I
15  mean, there's probably tons more that they can
16  order, that's just the basics.
17    Q.  And is it true the diabetic inmate has
18  complete control over what he orders from the
19  commissary?
20    A.  He can order anything he wants, if he
21  has enough money.
22    Q.  So in other words, it's up to the
23  inmate as to what types of food he orders and
24  the sugar contents of that food, is that

81

1  correct?  Food or drink, right?
2      A.  Yes.
3      Q.  According to Doctor Zhang's note his
4  physical exam was normal at this time as well?
5  The 2:50 PM note, right under --
6      A.  I am fine, I ordered my commissary food
7  --
8      Q.  I need my commissary food, right?
9      A.  Yes.
10     Q.  And then the assessment is still non
11  compliant, right?
12     A.  Yes.
13     Q.  Okay.  And Doctor Zhang's orders had
14  actually changed from his first note, right, now
15  his order says discharge patient after PM
16  insulin and meal, right?
17     A.  Yes, that's what it states, yes.
18     Q.  Okay.  In your experience why would a
19  doctor decide to discharge the inmate sooner
20  than he planned to do during the first time he
21  saw the patient?
22     A.  Probably the inmate became stable, and
23  it states here the inmate states I'm fine, the
24  inmate must have been stable, and the doctor
                                                    82

1  said just go ahead and release him, we probably
2  -- I'm just assuming, use the bed for somebody
3  else.
4      Q.  Let's turn to the second page of
5  Exhibit 2, that's the RN note at 3 PM on May
6  lst, 2010, do you see that?
7      A.  Yes.
8      Q.  Okay.  And you said you didn't
9  recognize the signature, but let's talk about
10  the note, if you can read it, tell me if I'm
11  correct, it says that inmate is to be discharged
12  after dinner meal, right?
13     A.  Yes.
14     Q.  And inmate educated about his insulin
15  order, right?
16     A.  Yes.
17     Q.  And in the plan section, this nurse
18  notes that the patient's Accu-Chek, or excuse
19  me, the patient's blood sugar level was 1.5 at
20  the time, right?
21     A.  Yes.
22     Q.  Then I want to turn to the third page
23  of Exhibit 2, that is the -- that is the order
24  from May lst, 2010, at the top of the page.
                                                    83

1  That one, yeah.  It's marked Lippert 672 at the
2  bottom right.  We're looking at the order at the
3  top.  Are you with me?
4      A.  Hmm, hmm.
5      Q.  Okay.  This is the same nurse who
6  authored the 3 PM progress note, right?
7      A.  It looks like the same signature, yes.
8      Q.  Okay.  And it looks like this was
9  Doctor Zhang's original order, as we see it in
10  the plan section of the 12 PM note, right?
11  Regular insulin, 7 units stat, Accu-Chek before
12  next meal if glucose greater than 300 and so on
13  and so forth, right?
14     A.  Yes.
15     Q.  And we see that other than regular
16  insulin, 7 units stat, the remainder of
17  the order is crossed out, do you see that?
18     A.  Yes.
19     Q.  And the regular insulin 7 unit stat is
20  circled with an ok next to it, do you see that?
21     A.  Yes.
22     Q.  Okay.  What does that indicate to you
23  as to what this nurse was doing with Doctor
24  Zhang's original order?
                                                    84

1      A.  She gave the regular -- the 7 units of
2  regular insulin stat was given, and the rest was
3  voided.
4      Q.  In your experience does a nurse void an
5  order on her own accord?
6      A.  Only by the doctor's order.
7      Q.  Okay.  So the fact that she crossed out
8  the rest of this order would tell you that she
9  got this direction from Doctor Zhang, is that
10  correct?
11     A.  Yes.
12     Q.  And is it also true that crossing out
13  the second portion of that order would accord
14  with the fact that patient's blood sugar has
15  come down to 125?
16     A.  Possibly, yes.
17     Q.  Then we see the -- we see the final
18  nurse's note on page 411 of Exhibit 2 that was
19  authored by Nurse Breske at 4:30 PM, right?
20     A.  Yes.
21     Q.  Okay.  And Nurse Breske is indicating
22  that the patient has a blood sugar of 115,
23  right?
24     A.  Yes, at 4:30.
                                                    85

1    Q.  At 4:30 PM?
2    A.  Yes.
3    Q.  And that's normal, 115?
4    A.  Normal is between 70 and 110.
5    Q.  Okay.  But the blood sugar of 115 is
6    nothing to be concerned about, is that correct?
7    A.  It's good.
8    Q.  It's good.  It's controlled, right?
9    A.  Yes.
10   Q.  And Nurse Breske charts that the
11   patient had no complaints voiced at that time,
12   is that right?
13   A.  Yes.
14   Q.  Now, the Plaintiff also testified that
15   he had a second encounter with you on May lst,
16   2010, right?
17   A.  Yes, that's what he states.
18   Q.  Right.  And in fact, he testified that
19   you were passing out medications, not only on
20   his floor, but also directly to him, and he told
21   you that he felt weak, dizzy and needed his
22   insulin shot, right, that's what he's claiming?
23   A.  That's what he states.
24   Q.  Yes.  Now, again, I know that you don't

86

1    remember anything from May lst, 2010, and I want
2    to pose this hypothetical to you one more time.
3    If in fact that did occur, we're not saying it
4    did, but if it did occur, if you're passing out
5    medications on his floor and he told you he felt
6    weak and dizzy and needed his insulin shot, what
7    would you have done in response to that?
8    A.  I would have gone down and called the
9    med tech and asked the med tech to come up.
10   Q.  Would you have done that right away, or
11   would you finished passing out the remainder of
12   your medications on that floor, on that level?
13   A.  I would have done that right away.
14   Q.  What would you have told the med tech
15   on the phone?
16   A.  That the inmate states his blood
17   sugar -- he doesn't feel good and if you can
18   bring an Accu-Chek out and do one.
19   Q.  And it was entirely legitimate for you
20   to rely on the med tech to do that, is that
21   right?
22   A.  Those were his duties, yes.
23   Q.  And your duties at the time were to
24   finish passing out the medications in that

87

1    house, right?
2    A.  Yes.
3    Q.  And that is well within the standard of
4    care to for you to communicate that information
5    to the med tech and rely on the med tech to take
6    the situation from there, right?
7    A.  Yes.  I have a certain timeline that I
8    have medication that I have to pass.  Those are
9    the med tech's duties.
10   Q.  Mr. Lippert also testified that you
11   said to him at that time that you would come
12   back, test his blood sugar and give him his
13   insulin shot.  In this hypothetical is that
14   something you would have said to him?
15   A.  No.
16   Q.  And why is that?
17   A.  Because I would have called the med
18   tech.  I don't have an Accu-Chek machine on me.
19   Q.  And isn't it true that you wouldn't
20   have said that because you actually in fact
21   would have communicated that to the med tech and
22   would have gone on to finish your
23   responsibilities of passing out the medication?
24   A.  Yes.

88

1    Q.  Now, we know that ultimately someone
2    did come by to give him his insulin later that
3    night, as Mr. Lippert testified to, right, a
4    Nurse Gary he recalls, do you remember that?
5    A.  That's what he states.
6    Q.  And let me show you the MAR, yeah,
7    let's look at Exhibit 1, it's the second page of
8    Exhibit 1, it's Lippert 914, we're looking at
9    one, two, three, four, five rows down at the
10   order for NPH 20 units every morning with
11   regular insulin, seven units every morning for
12   six months.  We're looking at that row, right?
13   A.  Yes.
14   Q.  Okay.  And you see where there are
15   initials for GD on the column for May 2nd?
16   A.  Yes.
17   Q.  Okay.  Do you know whose initials that
18   would have been?
19   A.  Gary Drop.
20   Q.  How do you spell Drop?
21   A.  D-r-o-p.
22   Q.  Okay.  Was Gary Drop a med tech at the
23   time?
24   A.  He was an LPN.

89

1        Q.   He was an LPN.  And LPN's were also
2    responsible at times, depending on the
3    situation, for handing out insulin, is that
4    right?
5        A.   If they were assigned to that spot for
6    the day.
7        Q.   Okay.  And this would tell us that
8    Nurse Gary Drop was assigned?
9        A.   Yes, he was assigned that MAR.
10       Q.   And we see the number 220 above GD, is
11   that right?
12       A.   Yes.
13       Q.   And am I correct that that would refer
14   to the patient's blood sugar level at that time?
15       A.   Yes.
16       Q.   Now, we see that there's an AM written
17   just to the left of GD.  I take it that AM still
18   would have been written there even if the inmate
19   received his insulin very late in the evening on
20   May 1st, 2010, right?
21       A.   If it was very late, yeah, he probably
22   would have, could have.
23       Q.   What time was the morning insulin shots
24   distributed at that time, inmates in 2010, what

90

1    was the shift or the time frame?
2        A.   11 to 7.
3        Q.   11 PM to 7 AM?
4        A.   Yes.
5        Q.   So if even if an inmate was given his
6    insulin let's say at 11:30 PM, that still would
7    have been considered the AM insulin shot?
8        A.   Yes.
9        Q.   Now, you've had experience, you've had
10   a lot of experiences over the years with
11   diabetic inmates and treating those diabetic
12   inmates, right?
13       A.   Yes.
14       Q.   And you're familiar with blood sugar
15   levels and signs and symptoms of hyperglycemia,
16   right?
17       A.   Yes.
18       Q.   In a patient with a blood sugar level
19   of 220, in your experience, would that patient
20   be complaining of dizziness and weakness?
21       A.   In my experience?
22       Q.   Yes?
23       A.   No.
24       Q.   And why is that?

91

1        A.   Even though 220 is considered above
2    normal, it's not considered high.
3        Q.   What blood sugar level would you expect
4    to see in an inmate that's complaining of
5    weakness and dizziness, assuming the weakness
6    and dizziness is being caused by the increased
7    blood sugar level?
8        A.   I'd say anywhere starting maybe 5 to 6.
9        Q.   What about in the 4's?
10       A.   It would depend on the patient.
11       Q.   But it's possible?
12       A.   Possible, yes.
13       Q.   And let me ask you about a patient
14   specifically with a blood sugar level of around
15   450, in your experience would you expect that
16   patient to suffer from unconsciousness and
17   urinary incontinence?
18       A.   Again, it would depend on the patient.
19   If you have a young insulin diabetic compared to
20   a 90 year old insulin dependent, you know, it
21   really depends.  The younger you are the less
22   likely you're going to experience those types of
23   signs.  Where if in you're 60's, 70's and 80's,
24   you know, a small drop or a small increase for

92

1    them, the elderly, makes a difference for them.
2    But in a younger group --
3        Q.   Let's talk about a patient such as Mr.
4    Lippert, who I believe was in his mid 30's at
5    the time of this alleged incident.  A patient in
6    his mid 30's who's otherwise healthy, would you
7    expect a blood sugar level of 450 to lead to
8    unconsciousness and urinary incontinence?
9        A.   No.
10       Q.   What level would you have to see, what
11   blood sugar level would you have to see for
12   unconsciousness and urinary incontinence to
13   become a factor?
14       A.   That I have experienced in the past?
15       Q.   Yes?
16       A.   600, I mean, I've only seen it happen
17   one time, and it was in the 900's.
18       Q.   The 900's?
19       A.   But, I mean, for safety precautions, I
20   would say 5, 6.  The only time I've ever seen
21   anyone pass out was in the 900's.  And I
22   technically didn't see that, he was brought up
23   to the Health Care Unit.  I wasn't involved in
24   that whole incident.

93

Page 94

1    Q. That patient with the blood sugar level
2 of 900, that's what you're referring to?
3    A. Yes.
4    Q. Okay. Mr. Lippert also testified he
5 had horrible headaches and muscle cramps for
6 days after May lst, 2010, right, that's what
7 he's claiming in his deposition?
8    A. That's what he states.
9    Q. Would you expect a patient with a
10 medical course such as the one that he
11 experienced on May lst, 2010 to have muscle
12 cramps, horrible muscle cramps and horrible
13 headaches for days thereafter?
14    A. No. Once he was given the insulin he
15 shouldn't, he should be fine.
16    Q. Now, the medical records from May lst,
17 2010 do not reflect any entries or any
18 signatures authored by you, correct?
19    A. Correct.
20    Q. And that would indicate to you that you
21 didn't have any interactions with this patient
22 or any involvement in his care or treatment,
23 right?
24    A. Yes.

Page 95

1    Q. Mr. Lippert also testified in his
2 deposition, and I did state this earlier, that
3 at the time of your alleged second interaction
4 with him on May lst, 2010, you were passing out
5 medication directly to him, right?
6    A. That's what he states.
7    Q. Let's take a look at Exhibit 1, the
8 page is marked Lippert 919. Do you have that?
9 Everyone's with me?
10    This M-A-R reflects that the patient
11 was receiving 100 milligrams every morning of
12 Zoloft in May 2010, right?
13    A. Yes.
14    Q. He was not receiving any psychotropic
15 medications or any medications or any
16 medications, other than insulin in the afternoon
17 or evening as of May 2010, correct?
18    A. Correct.
19    Q. Now, I know you don't recall any
20 interactions with Lippert from May lst, 2010,
21 but is it correct to say that you do remember
22 other interactions with Mr. Lippert after May
23 lst, 2010?
24    A. That would probably be more recent.

Page 96

1    Q. What did those interactions involve?
2    A. I mean, I've done an insulin line a few
3 times on the night shift.
4    Q. So you've administered -- well, strike
5 that.
6    You've given Lippert his insulin on
7 occasions after May lst, 2010, is that fair to
8 say?
9    A. Well, after, yes.
10    Q. And in your experience with Mr.
11 Lippert, has he ever refused his insulin when
12 you tried to give it to him?
13    A. Well, as it's been offered to him, yes.
14    Q. By you personally, you personally tried
15 to offer it to him and he declined it, is that
16 right?
17    A. On a few occasions I've come across
18 that, yeah.
19    Q. How many occasions would you say that
20 occurred?
21    A. Well, I mean, maybe in the last year
22 that I've done diabetic in the last two years, a
23 few times.
24    Q. Does Mr. Lippert have a reputation for

Page 97

1 refusing insulin among the other med techs and
2 the nurses?
3    A. I've heard it before, yes.
4    Q. And do you know why he refuses his
5 insulin?
6    A. No.
7    Q. And the refusal of insulin, from your
8 knowledge and experience, is what Doctor Zhang
9 is referring to when he states non compliance on
10 the progress notes, right?
11    A. Yes.
12    Q. Now, we know that Mr. Lippert received
13 his insulin at approximately 11:45 PM on May
14 lst, 2010 as indicated in the MAR on the first
15 page of Exhibit 1, right?
16    A. Yes.
17    Q. And then we also know that as of 4:30
18 PM on May lst, 2010 he had a blood sugar level
19 of 115, right?
20    A. Yes, that's what's written.
21    Q. And we further know that he received
22 his insulin either late in the evening on May
23 lst, 2010 or very early in the morning on May
24 2nd, 2010, as indicated in the MAR on page 914,

1    right?
2        A.  Yes.
3        Q.  In retrospect is all that treatment,
4    all that insulin that was administered to Mr.
5    Lippert -- well, strike that.
6            In retrospect does that medical course
7    make sense for a diabetic inmate such as this
8    patient?
9        A.  Yes.
10       MR. ELIASER:  That's all I have.
11       MS. PTASZNIK:  No questions.
12       MS. ARGENTINE:  I have a few questions.
13              EXAMINATION
14           MS. ARGENTINE:
15       Q.  Miss Rossiter, if you can take a look
16   at Exhibit 1, the second page, which is marked
17   Lippert 914.  We were talking about Gary Drop
18   and Mr. Eliaser was indicating he was
19   administered an insulin shot in the AM, is that
20   correct?
21       A.  Yes.
22       Q.  There's no where on here as to what
23   time he was administered an insulin shot, is
24   that correct?

                                            98

1        A.  No -- I mean, yes.
2        Q.  It does say that?
3        A.  Can you repeat the question.
4        Q.  Sure.  I'm just asking, all I see is
5    the AM next to Gary Drop's initials, is there
6    anywhere on here that would indicate to you what
7    time that insulin shot was actually
8    administered?
9        MR. ELIASER:  She's just asking you if --
10       A.  No, there's no time.
11       BY MS. ARGENTINE:
12       Q.  Do you recall whether or not Mr. Drop
13   worked the 11 to 7 shift in May of 2010?
14       A.  No.
15       Q.  So he could have been working -- what's
16   the next shift after that?
17       A.  7 to 3.
18       Q.  7 to 3.  He could have been working the
19   7 to 3 shift, is that correct?
20       A.  Yes.
21       Q.  And if he was working the 7 to 3 shift,
22   it's possible that he still could have
23   administered the insulin shot in the AM,
24   correct?

                                            99

1        A.  No, we don't give insulin in the AM.
2        Q.  What do you mean by that --
3        A.  We don't give insulin 7 to 3, insulin
4    is given 11 to 7, 3 to 11.
5        Q.  3 to 11 and 11 to 7.  Okay.  So there
6    would be -- even if he was working the 11 to 3
7    -- I'm sorry, the 7 to 3, typically there's no
8    insulin administered?
9        A.  Unless he came to the Health Care Unit,
10   yes.
11       Q.  Is there any indication on this M-A-R
12   as to where this insulin was provided?
13       A.  Where?
14       Q.  Yes.
15       A.  You mean on the inmate?
16       Q.  I mean the location, was it in the
17   cell, did he come to the Health Care Unit, can
18   you tell that from this chart?
19       A.  No.
20       MR. ELIASER:  From this record or from the
21   medical chart as a whole?
22       MS. ARGENTINE:  I'm talking about this
23   record.
24       MR. ELIASER:  She's just asking if this

                                           100

1    document, just this one document tells you where
2    he received his insulin?
3        A.  No, it doesn't.
4    BY MS. ARGENTINE:
5        Q.  The insulin that Mr. Drop gave Mr.
6    Lippert that day is that the regular insulin
7    shot, like a standard dosage of insulin, do you
8    know?
9        A.  That's what the doctor had ordered.
10       Q.  And you can tell by the fact that
11   it says regular insulin?  I'm just wondering,
12   you know, the day before there was a separate
13   notation for insulin that had the word stat or
14   now next to it, that's seem to be different from
15   this dosage?
16       A.  Yes.
17       Q.  Do you know whether or not this dosage
18   is what Mr. Lippert would receive on a daily
19   basis as opposed to something that was ordered
20   in the event of an emergency?
21       A.  This is what he would receive on a
22   daily basis, other than emergency purposes.
23       Q.  Okay.  Now, in your experience with a
24   diabetic patients that are receiving insulin

                                           101

1　twice a day; even if their blood sugar level is
2　normal would they still receive insulin twice a
3　day?
4　　A.　Yes.
5　　Q.　Why is that?
6　　A.　Because even though their blood sugar
7　is normal, they're eating and they have to, you
8　know, compensate for what they eat.
9　　Q.　So if someone checked Mr. Lippert's
10　blood sugar level and it was normal, there would
11　be no medical reason to not give him his second
12　insulin shot for the day, is that correct?
13　　MR. ELIASER:　Objection to the form of the
14　question.
15　BY MS. ARGENTINE:
16　　Q.　Does that question make sense?
17　　A.　State it again?
18　　Q.　Sure.　Even if someone had checked Mr.
19　Lippert's insulin level, or blood sugar level,
20　and it was normal, but he had not had his second
21　insulin shot for the day, would there be a
22　reason not to give him that second insulin shot
23　for the day?
24　　MR. ELIASER:　Same objection.

102

1　　A.　I mean, if there's a order called for,
2　it depends on the order.
3　BY MS. ARGENTINE:
4　　Q.　It depends on the prescription that Mr.
5　Lippert gets every day or specific doctor's
6　order?
7　　A.　Specific doctor's order.
8　　Q.　If a diabetic patient was experiencing,
9　high levels or low levels of blood sugar
10　multiple times in a day, could that affect that
11　inmate's symptoms with respect to what you were
12　talking about with Mr. Eliaser, about dizziness,
13　headaches, incontinence?
14　　A.　Can you repeat that again?
15　　Q.　Sure.　If a diabetic experienced high
16　levels of blood sugar level, or low levels of
17　blood sugar level multiple times in one day,
18　could that affect the symptoms that they could
19　experience as far as dizziness, headaches and
20　incontinence?
21　　MR. ELIASER:　Object to the form of the
22　question.　It depends on his age.　It's vague.
23　BY MS. ARGENTINE:
24　　Q.　Do you understand the question?

103

1　　A.　It's kind of vague.
2　　MR. ELIASER:　Yeah, she's asking general
3　questions, if you can't answer them as phrased,
4　just say it.　If you can answer them as phrased,
5　then go ahead and answer.
6　　A.　Could you repeat the question again.
7　BY MS. ARGENTINE:
8　　Q.　I'll try to be more specific.　If Mr.
9　Lippert in this case, we're looking at his
10　medical records, says that he experienced a
11　blood sugar level of 450 earlier in the day,
12　received an insulin shot, and then later he was
13　complaining of having dizziness and headaches --
14　strike that.
15　　　　What did you say the normal range of
16　blood sugar level was for a patient like Mr.
17　Lippert?
18　　A.　7 to 110.　I mean, 70 to 110.
19　　Q.　So if Mr. Lippert experienced blood
20　sugar levels earlier in the day of 450, received
21　his insulin shot and had levels of 220 later in
22　the day, could that multiple high levels affect
23　symptoms he was experiencing as far as
24　dizziness, or vomiting, or incontinence?

104

1　　A.　I mean, you're talking about
2　unconsciousness at 450.　He would experience
3　some minor, you know, experience maybe some
4　nausea or shakiness, you know, stomach cramps.
5　But every patient is different.
6　　Q.　Sure.　And the risk of those symptoms
7　could be increased by the fact that he had a
8　high blood sugar level multiple times in one day
9　as opposed to once a day?
10　　A.　Hmm, hmm.　Yes.
11　　Q.　If you look at Exhibit 1, if you go to
12　the 919, it's the page with the Zoloft
13　medication listed.　How can you tell that he
14　wasn't receiving any psychotropic drugs based on
15　this M-A-R?
16　　MR. ELIASER:　In the PM you mean?　Or --
17　because it does -- that is a psychotropic
18　medication.
19　　MS. ARGENTINE:　Right.
20　BY MS. ARGENTINE:
21　　Q.　I'm sorry.　Any other ones?　Would all
22　the psychotropic drugs be listed on this M-A-R?
23　　A.　Yes.
24　　Q.　What other types of drugs -- would any

105

1   other types of medications be listed on this
2   M-A-R, or is this one specific to psychotropic
3   drugs for Mr. Lippert?
4     A. It looks like this one -- I mean, it's
5   specific to psychotropic drugs already.
6     Q. And then we have another one that was
7   specific to his insulin?
8     A. Yes.
9     Q. If he was receiving any other
10   medication would there be additional MAR's
11   specific to Mr. Lippert's medication?
12     A. Yes, that would be his maintenance
13   meds.
14     MR. ELIASER: Are referring to Lippert 920?
15     A. Yes.
16   BY MS. ARGENTINE:
17     Q. Now, you said that the fact that your
18   signature is not on any of the medical records
19   for Mr. Lippert's treatment on May lst, 2010, it
20   would indicate you weren't involved in any
21   interactions with Mr. Lippert, is that correct?
22     A. Yes.
23     Q. Would you have documented some where in
24   his medical records in Mr. Eliaser's --

106

1     MR. ELIASER: Eliaser.
2   BY MS. ARGENTINE:
3     Q. Let me start over. I kind of got
4   distracted there. Would you have documented
5   anywhere in the medical records or anywhere else
6   a phone call that you made to a med tech to
7   indicate that a patient needs medical treatment?
8     A. No.
9     Q. Would you indicate in the medical
10   records or anywhere else a conversation that you
11   had with an inmate regarding treatment that
12   other nurses or doctors had given him on a
13   particular day?
14     A. No.
15     MS. ARGENTINE: Nothing further.
16     MR. ELIASER: I just have one follow up
17   question.
18         EXAMINATION
19       By MR. ELIASER:
20     Q. Plaintiff's Counsel asked you a little
21   earlier if a patient receives insulin twice a
22   day regardless of blood sugar level, and you
23   said, yes, right?
24     A. Yes.

107

1     Q. But in this exact situation we know
2   that he received insulin at 11:45 PM on May lst,
3   2010, right, according to the M-A-R, the MAR on
4   9-13?
5     A. That was a stat?
6     Q. Right?
7     A. 7 units given in the AM.
8     Q. Okay. That was given at 11:45 PM,
9   right?
10     A. Could be PM.
11     Q. Well, we know that Doctor Zhang ordered
12   that insulin stat at about 12 PM?
13     A. Right. Oh, 12 PM, right.
14     Q. Okay.
15     MS. ARGENTINE: So that would be 11:45 AM,
16   right?
17     MR. ELIASER: Yes. I don't know what I said.
18   BY MR. ELIASER:
19     Q. Okay. We know that the patient
20   received insulin on May lst, 2010, around 11:45
21   AM or 12 PM, right?
22     A. Hmm, hmm.
23     Q. Yes?
24     A. Yes.

108

1     Q. And we also know that approximately
2   four and a half hours later, according to the
3   progress notes, his blood sugar level was 115,
4   right?
5     A. Yes.
6     Q. So isn't it true that it would be too
7   soon to give him another round of insulin with a
8   blood sugar level of 115?
9     A. Well, the doctor's orders say not to
10   give him insulin if it's below 300.
11     Q. Doctor Zhang's first order says if less
12   than 300 may have regular insulin, 5 units?
13     A. Oh, okay.
14     Q. But then we know, we talked about this
15   earlier, that portion of the order was crossed
16   out by the nurse on or around 2 PM of May lst,
17   2010, right?
18     A. Yes.
19     Q. And like we talked about earlier, we
20   know that Doctor Zhang changed his order and
21   that the only insulin to be given in the
22   infirmary that day was regular insulin, 7 units
23   stat, right?
24     A. Yes.

109

1      Q.  So we know that insulin was given and
2  then we know that his blood sugar level was 115
3  at about 4:30 PM, right?
4      A.  Yes.
5      Q.  So wouldn't it be too soon to give him
6  his second round of insulin that day given those
7  facts?
8      A.  Yes.
9      Q.  Wouldn't it make more sense to give him
10  his insulin later in the day?
11     A.  Hmm, hmm.  Yes, I'm sorry.
12     Q.  And according to Mr. Lippert's own
13  deposition testimony, we know that he got the
14  second round of insulin later that day, right?
15     A.  Yes.
16     MR. ELIASER:  Thank you.
17         Anything else?
18     MS. ARGENTINE:  No.
19     MS. PTASZNIK:  No questions.
20     MR. ELIASER:  I think we're done.  We'll
21  reserve.
22         (Deposition concluded at 1:02 PM)
23
24
                                           110

1  STATE OF ILLINOIS    )
2                       )  SS:
3  COUNTY OF COOK       )
4      I, Jacqueline Shenberger, Certified Shorthand
5  Reporter within and for the County of Cook and
6  State of Illinois, do hereby certify that
7  heretofore, to-wit, on June 27, 2014, personally
8  appeared before me, at 16830 South Broadway,
9  Crest Hill, Illinois, ATHENA ROSSITER, in a
10  cause now pending and undetermined in the United
11  States District Court, Northern District of
12  Illinois, Eastern Division, wherein DONALD
13  LIPPERT, ET-AL are the Plaintiffs, and SALVADOR
14  GODINEZ, ET-AL are the Defendants.
15     I further certify that the said witness was
16  first duly sworn to testify the truth, the whole
17  truth and nothing but the truth in the cause
18  aforesaid; that the testimony then given by said
19  witness was reported stenographically by me in
20  the presence of the said witness, and afterwards
21  reduced to typewriting by Computer-Aided
22  Transcription, and the foregoing is a true and
23  correct transcript of the testimony so given by
24  said witness as aforesaid.
                                           111

1      I further certify that the signature to the
2  foregoing deposition was not waived by counsel for
3  the respective parties.
4      I further certify that the taking of this
5  deposition was pursuant to Notice, and that
6  there were present at the deposition the
7  attorneys hereinbefore mentioned.
8      I further certify that I am not counsel for
9  nor in any way related to the parties to this
10  suit, nor am I in any way interested in the
11  outcome thereof.
12     IN TESTIMONY WHEREOF:  I have hereunto set my
13  hand and affixed my notarial seal this 11th of
14  July, 2014.
15
16
17
18
19         Jacqueline Shenberger
20
21
22
23
24
                                           112

1              DEPOSITION REVIEW
             CERTIFICATION OF WITNESS
2
      ASSIGNMENT NO: 1886906
3  CASE NAME: Lippert, Donald v. Godinez, Salvador
   DATE OF DEPOSITION: 6/27/2014
4  WITNESS' NAME: Athena Rossiter
5    In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
     I have made no changes to the testimony
7  as transcribed by the court reporter.
8
9  _____    _____
   Date              Athena Rossiter
10    Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11  the referenced witness did personally appear
   and acknowledge that:
12
     They have read the transcript;
13   They signed the foregoing Sworn
     Statement; and
14   Their execution of this Statement is of
     their free act and deed.
15
     I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
18  _____
   Notary Public
19
   _____
20  Commission Expiration Date
21
22
23
24
25

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT NO: 1886906
CASE NAME: Lippert, Donald v. Godinez, Salvador
DATE OF DEPOSITION: 6/27/2014
WITNESS' NAME: Athena Rossiter
In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
I have listed my changes on the attached
Errata Sheet, listing page and line numbers as
well as the reason(s) for the change(s).
I request that these changes be entered
as part of the record of my testimony.

I have executed the Errata Sheet, as well
as this Certificate, and request and authorize
that both be appended to the transcript of my
testimony and be incorporated therein.

_____
Date          Athena Rossiter

Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:
    They have read the transcript;
    They have listed all of their corrections
    in the appended Errata Sheet;
    They signed the foregoing Sworn
    Statement; and
    Their execution of this Statement is of
    their free act and deed.
    I have affixed my name and official seal
this _____ day of _____, 20____.

_____
Notary Public

_____
Commission Expiration Date

---

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
ASSIGNMENT NO: 1886906
PAGE/LINE(S) /    CHANGE    /REASON

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

_____
Date          Athena Rossiter
SUBSCRIBED AND SWORN TO BEFORE ME THIS
DAY OF _____, 20_____.

_____
Notary Public

_____
Commission Expiration Date

Page 115

1    ERRATA SHEET

     VERITEXT LEGAL SOLUTIONS MIDWEST

2         ASSIGNMENT NO: 1886906

3    PAGE/LINE(S) /      CHANGE        /REASON

4    p.83 / Line 19 / 1.5 should be 125 / transcribed incorrectly

5    p.95 / Line 15-16 / "or any medications," should be removed / Same clause

6    p.97 / Line 13 / PM should be AM / transcribed incorrectly    transcribed 2x

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

                          _Athena Rossiter_

20   _____           _____
       Date                   Athena Rossiter

21   SUBSCRIBED AND SWORN TO BEFORE ME THIS 22nd

22   DAY OF August , 20 14

23

        Notary Public

                                    OFFICIAL SEAL
                                    LORA L HAVEN
                                    NOTARY PUBLIC - STATE OF ILLINOIS
24                                  MY COMMISSION EXPIRES:12/26/17

      Feb 25 2017
25   _____
     Commission Expiration Date

Page 1

```
1            IN THE UNITED STATES DISTRICT COURT
2             NORTHERN DISTRICT OF ILLINOIS
3                   EASTERN DIVISION
4    DONALD LIPPERT, et al.,      )
5              Plaintiffs,        )
6       vs.                       )  No. 10-cv-4603
7    SALVADOR GODINEZ, et al.,    )
8              Defendants.        )
10     The deposition of MARTHA MALDONADO, called for
11   examination pursuant to the Rules of Civil
12   Procedure for the United States District Courts
13   pertaining to the taking of depositions, taken
14   before Jacqueline Shenberger, Certified
15   Shorthand Reporter within and for the County of
16   Cook and State of Illinois, at 11683 South
17   Broadway, Illinois, on September 26, 2014, at
18   the hour of 10:07 o'clock A.M.
19
20
21
22   Assignment No:  1928202
23   Jacqueline Shenberger
24   License No:  084-061524
```

Page 3

```
1                    I N D E X
2    WITNESS                         EXAMINATION
3
4    MARTHA MALDONADO
5
6      By MS. MARSH                       4
7      By MR. ELIASER                    77
8      By MR. LOVELLETTE                 84
9      By MS. MARSH                      86
10     By MR. ELIASER                    91
11
12
13
14
15
16               E X H I B I T S
17   NUMBER                     MARKED FOR ID
18
19   Maldonado Deposition Exhibit
20       No. 1                            92
21   Maldonado Deposition Exhibit
22       No. 2                            92
23   Maldonado Deposition Exhibit
24       No. 3                            92
```

Page 2

```
1    APPEARANCES:
2        SEYFARTH SHAW
3        BY:  MS. ROBYN MARSH
4        131 South Dearborn
5        Suite 2400
6        Chicago, Illinois  60603
7        (312) 460-5000
8            Representing the Plaintiff, Lippert
9        CASSIDAY SCHADE LLP
10       BY:  MR. MATTHEW A. ELIASER
11       20 North Wacker
12       Suite 1000
13       Chicago, Illinois  60606
14       (312) 641-3011
15           Representing the Defendant, Rossiter;
16       LISA MADIGAN - ILLINOIS ATTORNEY GENERAL
17       BY: MR. KEVIN LOVELLETTE, and
18       MS. JENNIFER LUTZKE
19       Assistant Attorney General
20       100 West Randolph Street - 13th floor
21       Chicago, Illinois  60601
22       (312) 814-3720
23
24
```

Page 4

```
1        (DEPOSITION COMMENCED AT 10:07 A.M.)
2        (Whereupon, the witness was duly sworn.)
3                  MARTHA MALDONADO,
4    called as a witness herein, was examined and
5    testified as follows:
6                   EXAMINATION
7              BY MS. MARSH:
8        Q.   Could you please state your full name
9    for the record, spelling your last name?
10       A.   Martha Maldonado, M-a-l-d-o-n-a-d-o.
11       MS. MARSH:  Let the record reflect that this
12   is the discovery deposition of Martha Maldonado,
13   taken pursuant to subpoena and further agreement
14   of the parties, and all applicable rules.
15   BY MS. MARSH:
16       Q.   May I call you Martha?
17       A.   You sure can.
18       Q.   Is this your first deposition?
19       A.   Yes.
20       Q.   Okay.  I'm just going to briefly go
21   over the rules with you and then we can go ahead
22   and get started.
23       I'm sure your attorney kind of went
24   over them, but just so you and I are on the same
```

EXHIBIT
C
tabbies

Page 5

1   page. I'm obviously going to be asking you
2   questions today regarding the case Lippert vs.
3   Godinez, et-al, in which you've been named as a
4   Defendant. And so most of the questions I'm
5   going to be asking you here today will be
6   general, but then also relevant to this case.
7   So if I ask a question and you don't understand,
8   please ask me to rephrase it, that's my fault
9   not your's, and I will be happy to rephrase it
10  in some way that hopefully you can answer.
11          If you do answer, I'm going to assume
12  you understood the question I asked. Is that
13  fair?
14      A.   Yes.
15      Q.   The court reporter is here taking down
16  what I'm saying and what you're saying. It's
17  helpful, even though you can likely anticipate
18  what I'm going to say, that you wait until I
19  finish asking my question before you answer.
20          Finally, a lot of times it's human
21  nature that we say hmm, hmm, uh-huhs, shake our
22  head, shrug our shoulders, the court reporter
23  can't pick that up. So please make sure that
24  all your answers are out loud. Is that fair?

Page 7

1   incident, are you talking about the grievance
2   report from May, 2010.
3       A.   Yes.
4       Q.   And did you review the complaint?
5       A.   Yes.
6       Q.   Did you review your Answers to
7   Interrogatories?
8       A.   Yes.
9       Q.   Anything else?
10      A.   No.
11      Q.   Okay. Have you ever been convicted of
12  a crime involving fraud or dishonesty?
13      A.   No.
14      Q.   And are you taking any medications that
15  may affect your testimony here today?
16      A.   No.
17      Q.   Okay. Let's talk about your
18  educational background. When did you graduate
19  high school?
20      A.   1987.
21      Q.   And did you have any subsequent
22  education after that, college, associates
23  degree?
24      A.   No.

Page 6

1       A.   Yes.
2       Q.   Okay. Have you ever been a party to a
3   lawsuit before?
4       A.   No, I have not.
5       Q.   When did you find out that you were a
6   party to this lawsuit?
7       A.   Back in May of 2014.
8       Q.   And how did you come to learn that you
9   were a party to this lawsuit?
10      A.   I received a phone call from Miss Laura
11  Haven, which I was connected to Kevin.
12      MR. ELIASER: Say hello, Kevin.
13  BY MS. MARSH:
14      Q.   Okay. And did you receive a copy of
15  the complaint?
16      A.   Yes, I did.
17      Q.   And did you review anything in
18  preparation for your deposition today?
19      A.   Yes.
20      Q.   And what was that?
21      A.   The incident that took place back to
22  what is in question regarding Mr. Lippert, and
23  pretty much what the case involves.
24      Q.   So when you say you reviewed the

Page 8

1       Q.   And when did you start becoming a
2   correctional officer?
3       A.   January 8th, 1996.
4       Q.   And so what did you do in between 1987
5   and 1996?
6       A.   I worked for Economy Currency Exchange.
7   I was there for a few years.
8       Q.   And anything else? That didn't take up
9   the entire span in between '87 and --
10      A.   Before that I worked for Chernin Shoes,
11  which is no longer in existence.
12      Q.   So you did nothing in the law
13  enforcement field prior to becoming a
14  correctional officer --
15      A.   No.
16      Q.   Just let me finish. Nothing in the law
17  enforcement field before being a correctional
18  officer, correct?
19      A.   Correct.
20      Q.   And to become a correctional officer
21  did you take any classes ahead of time, was that
22  a requirement?
23      A.   It's a requirement from IDOC for us to
24  go to training in Springfield.

Page 9

1    Q.   And how long is that training?
2    A.   8 weeks.
3    Q.   Is there an exam afterwards?
4    A.   Yes, there is.
5    Q.   And is it a written exam?
6    A.   Yes.
7    Q.   And is it one day, two days?
8    A.   Pretty much divided over the 8 week
9    period.  So it's classes.
10   Q.   Okay.  But there's not one final exam
11   at the conclusion of 8 weeks?
12   A.   No.
13   Q.   And so after you became a correctional
14   officer that would have been at the end of 1995?
15   A.   I'm sorry.  Can you repeat that?
16   Q.   Was it at the end of 1995 that you
17   finished your training?
18   A.   1996.  January 8th, 1996, so that was 8
19   weeks.  During that time when we were hired they
20   send us out to the academy.
21   Q.   Okay.  So you were hired January 8th,
22   1996?
23   A.   1996, that's correct.
24   Q.   And 8 weeks thereafter is the

Page 10

1    training --
2    A.   The training.
3    Q.   I understand.  And what was your first
4    position as a correctional officer?  Was it at
5    Stateville?
6    A.   Yes, it was.
7    Q.   And have you been at Stateville since
8    1996?
9    A.   Yes.
10   Q.   Have you held the same position since
11   1996?
12   A.   Yes.
13   Q.   Have you always been in the F House
14   since 1996?
15   A.   No, I have not.
16   Q.   Can you tell me other places that
17   you've been stationed?
18   A.   I've been stationed in H House, the
19   Catwalk, F House, detailed, and I am currently
20   in Tower 5.
21   Q.   What is the difference between Tower 5
22   and F House?
23   A.   Tower 5 is a wall tower where our
24   duties are only to watch the inside and the

Page 11

1    outside of the wall.
2    Q.   But no inmates?
3    A.   No.
4    Q.   How long were you in F House?
5    A.   About four years, four years.
6    Q.   Can you give me the time span of when
7    to when?
8    A.   I don't remember.
9    Q.   But in 2010 you were in F House?
10   A.   Yes, I was.
11   Q.   What are your job responsibilities as a
12   correctional officer?
13   A.   Custody, secure and control of inmates.
14   Q.   Anything else?
15   A.   No.
16   Q.   How many inmates total are there in the
17   F House?
18   MR. LOVELLETTE:  You mean now or back in
19   2010?
20   BY MS. MARCH:
21   Q.   In 2010 when you were stationed there?
22   A.   I don't remember.
23   Q.   More than a hundred?
24   A.   Yes.

Page 12

1    Q.   More than two hundred?
2    A.   Yes.
3    Q.   Less than five hundred?
4    A.   Yes.
5    Q.   And as I understand it it's a circular
6    building, is that correct?
7    A.   Correct.
8    Q.   And there's four levels?
9    A.   Yes.
10   Q.   Is the inside of the circle open then
11   so that you can see down from the top floor to
12   the bottom floor?
13   A.   Yes.
14   Q.   And where would you be stationed when
15   you were in the F House?  Do you always have the
16   same assignment?
17   A.   No.
18   Q.   How is that assigned?
19   A.   The sergeant would assign it on a daily
20   basis.
21   Q.   So how many correctional officers are
22   on a given shift in the F House in 2010?
23   A.   About ten officers.
24   Q.   And are there certain stations on each

Page 13

1   floor as to where you are supposed to be
2   standing, or do you have a desk, how do you know
3   where to be?
4       A.    Walk around the gallery.  We're active,
5   so we don't have a station where we just
6   maintain throughout the whole shift.
7       Q.    Do you receive a salary or are you --
8       A.    Salary.
9       Q.    And what is that based on, forty hours
10  a week?
11      A.    Yes.
12      Q.    Have you always been salaried?
13      A.    Yes.
14      Q.    So when you come into the facility is
15  there an area for correctional officers that you
16  keep your personal belongings, where you check
17  in?  Does that happen or do you just go straight
18  to F House?
19      A.    We attend roll call, every shift has a
20  roll call.
21      Q.    And where does that take place?
22      A.    Down in the entry level, by the
23  canteen.
24      Q.    So not in F House?

Page 14

1       A.    No, it's not in F House.
2       Q.    And is it all the correctional officers
3   for the entire shift, for the entire facility?
4       A.    Yes.
5       Q.    And how do you know -- I'm sorry.  Let
6   me back up.  As I understand it, there are three
7   shifts, is that correct?
8       A.    Yes.
9       Q.    7 to 3, 3 to 11 and 11 to 3 --
10      A.    11 to 7.
11      Q.    11 to 7, sorry.
12      MR. ELIASER:  You're a lawyer, you don't know
13  math.
14      MS. MARSH:  That's true.
15  BY MS. MARSH:
16      Q.    Did you work the same shift in 2010?
17      A.    Yes.
18      Q.    Consistently?
19      A.    Yes.
20      Q.    And what shift was that?
21      A.    7 to 3.
22      Q.    And that's 7 A.M. to 3 P.M., is that
23  correct?
24      A.    Yes.

Page 15

1       Q.    So what time would you normally get to
2   the facility to be ready for role call?
3       A.    6:45 A.M.
4       Q.    Would role call start promptly at 7
5   A.M.?
6       A.    6:45.
7       Q.    Okay.  And who would take role call?
8       A.    The shift commander.
9       Q.    And was it always the same shift
10  commander?
11      A.    No, it is not.
12      Q.    Now is that decided, if you know?
13      A.    I have no idea.
14      Q.    Is the shift commander also a
15  correctional officer?
16      A.    No.
17      Q.    Is it a sergeant?
18      A.    A major.
19      Q.    And is it alphabetical, how do they
20  take role call?
21      A.    Per their roster, they go according to
22  roster.
23      Q.    So how do you know what shift you are
24  supposed to be working?

Page 16

1       A.    That is given to us when we are hired
2   and we're -- that comes from personnel.
3       Q.    So you know that you would be working
4   the 7 A.M. to 3 P.M. shift Monday through
5   Friday, is that normally what you did?
6       A.    I worked Tuesday through Saturday.
7       Q.    And that was told to you by personnel?
8       A.    That was given to us in the slip.
9       Q.    What if you wanted to change shifts?
10      A.    We would have to put in a bump, a
11  b-u-m-p, bump.
12      Q.    And who would you submit that to?
13      A.    Personnel.
14      Q.    And is personnel located here at --
15      A.    Yes.
16      Q.    Did you have a person that you directly
17  reported to that you considered your boss?
18      A.    In 2010 that would have been either
19  Major Matrisiano, who is now retired.
20      Q.    I'm sorry, could you just spell the
21  last name.
22      A.    Matrisiano, M-a-t-r-i-s-i-a-n-o.
23      Q.    Thank you.  Who's no longer here?
24      A.    He's retired now.

Page 17

1  Q.  And so would it vary by shift, or was
2  he consistently the person that you would report
3  to?
4  A.  Between him and Major Niles, D. Niles,
5  who is also retired now.
6  Q.  And again, would that vary by shift or
7  it didn't matter?
8  A.  It didn't matter.  Whoever was holding
9  shift that day, that's who you would report to.
10  Q.  So when you were in the F House, can
11  you explain to me, from the time of the role
12  call until the end of your shift, typically what
13  a normal day would be like for you?
14  A.  A normal day for me would start at 7:00
15  o'clock when we report to our Unit.  We are
16  assigned our assignments per our sergeant for
17  that day.  We go up to the gallery along with
18  another officer and count, turn in our counts,
19  and assume the rest of the duties that were for
20  that day.
21  Q.  When you say counts, do you mean count
22  the inmates?
23  A.  Yes.
24  Q.  And when you say you go through the

Page 18

1  gallery with another officer, is that the
2  officer from the previous floor?
3  A.  It's also a 7 to 3 officer.
4  Q.  Okay.  So is there two CO's per floor?
5  A.  It's one per floor, but to count it's
6  two.  There's two to count and to feed.
7  Q.  And when you were finished with your
8  count did you write that down or give that to
9  the sergeant?
10  A.  Yes, we did.
11  Q.  Which would you do?
12  A.  Write it down and turn it into our
13  sergeant, who in return would turn it to the
14  major, who keeps the daily counts for the whole
15  institution.
16  Q.  When you would come onto your shift
17  would you have an exchange with the previous
18  shift to understand what had gone on the night
19  before, if there was anything that you needed to
20  know, an inmate had been removed from the cell
21  because of, you know, any sort of reason, health
22  reason, or you needed to know something that had
23  happened the previous shift, would you have a
24  discussion about that?

Page 19

1  A.  No.
2  Q.  If you needed to know anything in
3  advance of your particular shift, who would that
4  come from?
5  A.  The sergeant.
6  Q.  Let's talk about May 1, 2010.  Do you
7  have an independent recollection of that date?
8  A.  Somewhat.
9  Q.  Can you just tell me what you recall,
10  without having to go through the pieces of paper
11  that we will look through, but if you can tell
12  me what you recall?
13  A.  At 7:00 o'clock I went on the gallery
14  to conduct my count for that day.  And I
15  approached the cell that was occupied by
16  Lippert, I can't remember the cell number.
17  Lippert stated that he had not received his
18  medication.  He stated that the 3 to 11 med tech
19  and the 11 to 7 med tech had not given him his
20  medication, so that he needed his medication at
21  that time.  I in turn went downstairs from the
22  third gallery down to the sergeant's office and
23  I relayed the information to my Unit Sergeant,
24  which was Sergeant Palmer.

Page 20

1  Q.  And what would you have said?
2  A.  I told him that Lippert in cell, that I
3  can't remember, needed his medication.  Sergeant
4  Palmer picked up the phone, called the Health
5  Care Unit and advised whoever the attending
6  Health Care Unit nurse or whoever was there that
7  Lippert needed his medication.
8  Q.  And then what?
9  A.  And I was in with my daily activities
10  that I needed to do with my gallery, and that
11  was the end of it.  I didn't go back up there
12  for anymore about Lippert.
13  Q.  You did or you did not?
14  A.  I did, but for other things.  That was
15  the only time that I dealt with Lippert and the
16  medication issue.
17  Q.  So you reported back to the third floor
18  then?
19  A.  Yes, I did.
20  Q.  Just for clarity sake, when you say
21  gallery, and I say floor, we're talking about
22  the same thing?
23  A.  Yes.
24  Q.  Do you recall who else was assigned to

Page 21

1 the F House that day?

2     A.  No, I do not.

3     Q.  Would you typically work with the same

4 officers on your 7 to 3 shift?

5     A.  Yes, we did.  But there was some times

6 when other people were not there, other officers

7 weren't there, we would get floaters, which were

8 other assigned officers.

9     Q.  When you said that Lippert said he

10 needed his medication, did you know what

11 medication that was?

12     A.  No.

13     Q.  He didn't tell you what type of

14 medication he needed?

15     A.  No.

16     Q.  In 2010 had you already been working in

17 the F House for a period of time?  You said you

18 were in the F House for four years, I'm just

19 trying to gauge how long you had been in the F

20 House in 2010, do you know?

21     A.  I was there before that, yes, before

22 2010, I don't remember exactly.

23     Q.  At least a year?

24     A.  Yes.

Page 22

1     Q.  So you were familiar with the inmates,

2 correct?

3     A.  Yes.

4     Q.  Do you normally identify inmates by

5 their names, by their cell number, by their

6 prisoner number?

7     A.  By name.

8     Q.  What time were you made aware of the

9 grievance that Mr. Lippert filed with the IDOC?

10     A.  I was not aware until I received the

11 call from Laura Haven, which was in May of 2014.

12     Q.  So you never saw a grievance form?

13     A.  No, I did not.

14     Q.  You were never interviewed with respect

15 to the grievance form?

16     A.  No, I was not.

17     Q.  Have you ever had a grievance filed

18 against you before, from any inmate?

19     A.  Not that I know of.

20     Q.  How does the grievance process work?

21 Is that something that you are oriented to in

22 your training?

23     A.  Yes.

24     Q.  And do you know how it works?

Page 23

1     A.  Yes.

2     Q.  Could you briefly explain to me how you

3 understand how it works?

4     A.  When there is a complaint by an inmate,

5 an inmate reports it to his counselor, the

6 counselor in turn interviews the officer or

7 whomever is in question.  And I guess they call

8 it a grievance form.

9     COURT REPORTER:  I'm sorry?

10     A.  It's called a grievance form.

11     COURT REPORTER:  Is there anyway we can turn

12 the air conditioner off, it's really difficult

13 to hear?

14     MR. ELIASER:  Yeah, let me check.

15     (Whereupon, a discussion was had

16     off the record.)

17     MS. MARSH:  Back on the record.  Are we good?

18 BY MS. MARSH:

19     Q.  So you mentioned the counselor, is

20 there a counselor per house?

21     A.  Yes.

22     Q.  Okay.  And is it typically the same

23 counselor?

24     A.  No.

Page 24

1     Q.  And is that counselor assigned to all

2 the inmates in that house?

3     A.  Yes.

4     Q.  Is there a counselor at every shift?

5     A.  That I really have no idea.  I don't

6 know how 3 to 11 and 11 to 7 work.

7     Q.  Okay.  For your shift --

8     A.  For 7 to 3, yes.

9     Q.  Okay.  Let me just get this question

10 out.

11     Typically for your shift when you were

12 working 7 A.M. to 3 P.M. you would see that

13 there was a counselor on shift?

14     A.  Yes.

15     Q.  Okay.  So does Counselor Whittington

16 sound familiar to you?

17     A.  Yes.

18     Q.  Do you know his first name?

19     A.  No.

20     Q.  So you said the first time you knew

21 about the grievance form is in May of 2014 when

22 Laura Haven told you about the lawsuit, is that

23 correct?

24     A.  Correct.

Page 25

```
 1        Q.    And were you shown the grievance form?
 2        A.    Yes.
 3        Q.    By Laura Naven?
 4        A.    Yes.
 5        Q.    Okay.  So you said typically a
 6   counselor will interview the officer or whoever
 7   is in question in the grievance form, do you
 8   know why you weren't interviewed?
 9        A.    No.
10        Q.    Were you ever given a time where you
11   were able to respond to the comments that were
12   made in the grievance form?
13        A.    Yes.
14        Q.    And when was that?
15        A.    Regarding this incident with me?
16        Q.    Regarding the May 2010 incident?
17        A.    Repeat it.  I'm sorry, I'm not
18   understanding what you're trying to say.
19        Q.    Okay.  So May, 2014 you were made aware
20   of the May 12, 2010 grievance form filed by Don
21   Lippert?
22        A.    Yes.
23        Q.    Okay.  Were you given an opportunity
24   subsequent to May, 2014 to address the comments
```

Page 27

```
 1   we need to call the med tech.
 2        Q.    When you say call, is that on an actual
 3   telephone or is it a radio?
 4        A.    Radio.
 5        Q.    And where is the Health Care Unit in
 6   relation to the F House?
 7        A.    Towards the front of the prison.
 8        Q.    So could you walk there?
 9        A.    Yes.
10        Q.    And when you called the med tech --
11   well, first of all, let's back up.  How do you
12   know -- how do you discern what a medical
13   emergency is with an inmate?
14        A.    Depending what the request of the
15   inmate is, if it's for medication, we'll call,
16   if it's where there's blood or if he's been
17   stabbed, or whatever the situation is, that's
18   where we know where to take it from, depending
19   what the emergency is.
20        Q.    Do you have any medical training
21   yourself?
22        A.    No, I do not.
23        Q.    So are you told ahead of time when you
24   start your shift if there are -- strike that.
```

Page 26

```
 1   that were in the grievance form?
 2        A.    No.
 3        Q.    Were -- do you recall working with a CO
 4   Norman that day?
 5        A.    Yes.
 6        Q.    Did you read Officer Norman's
 7   deposition?
 8        A.    No, I did not.
 9        Q.    When you were in the F House and you
10   came to know a lot of the inmates, I'm sure,
11   having been there for four years, is that
12   correct?
13        A.    They come and go, it's not the same
14   inmate throughout the whole four years.
15        Q.    I'm sure that's true.  But for the most
16   part of the general statement, would you say
17   that you got to know the inmates?
18        A.    Yes.
19        Q.    And when you were going through your
20   training at the 8 week training you were talking
21   about down in Springfield, were you given any
22   training on medical emergencies with inmates?
23        A.    We were trained that whatever the
24   situation is, depending what the situation is,
```

Page 28

```
 1        Is there a certain time that
 2   medications are dispensed to the inmates?
 3        A.    No.
 4        Q.    So if an inmate has, for example, a
 5   heart condition and needs to take a certain
 6   pill, they can take it at any time, there's not
 7   a prescribed time?
 8        A.    I would not know because I do not
 9   distribute the medication, so that would be the
10   nurses that come around and distribute that.  I
11   would have no idea.
12        Q.    Okay.
13        A.    It comes from the Health Care Unit not
14   from officers.
15        Q.    Okay.  I understand.  So do nurses or
16   personnel from the Health Care Unit come during
17   each shift?
18        A.    Yes.
19        Q.    And how does that work, the medical --
20   when they come in do you assist and walk around
21   with them when they need to dispense
22   medications?  Do they do it on their own, how
23   does that work?
24        A.    In F House we did need to escort the
```

1   nurses around for medication.
2      Q.   When you say need, does it differ by
3   house?
4      A.   Yes, it does.
5      Q.   And why in the F House did you need to
6   escort?
7      A.   Because F House is also -- it also
8   houses segregation inmates.
9      Q.   What does that mean?
10     A.   Segregation inmates, it's a different
11   procedure for that.  You have to open a
12   chuckhole in order for the inmate to have access
13   to the medication.
14     Q.   And is there always one CO there for
15   that or is there two?
16     A.   One.
17     Q.   And how do you know which inmate -- is
18   there a certain way that you know it's the
19   Segregation Unit, that it has a certain protocol
20   or is it by inmate?
21     A.   By gallery.
22     Q.   And what gallery is the Segregation
23   Unit?
24     A.   One Gallery and Two Gallery in F House.

1   Care Unit, what kind of information do you relay
2   to them?
3      A.   Nature of the call, inmate name, inmate
4   number, inmate location.
5      Q.   And then when you say nature of the
6   call, what could that entail?  I'm assuming it
7   varies?
8      A.   The necessity of the inmate, what he
9   would need a med tech for, whatever the nurse is
10   needed for.
11     Q.   So if you're saying that they need
12   medication and you don't know the type of
13   medication, is that something the Health Care
14   Unit knows what type of medication?
15     A.   They would look it up, because when you
16   call them and give them the inmate number, the
17   name, they look up to see, unless they're
18   familiar with that inmate.
19     Q.   At any time when medications are
20   dispensed do the inmates leave their cells to go
21   to the Health Care Unit to get medication, as
22   opposed to how you described it where they come
23   to the F House to dispense medication?
24     A.   They receive the medication in their

1      Q.   And do you know if Lippert was in
2   Segregation Gallery?
3      A.   He was not.  He was on 3 Gallery.
4     MR. ELIASER:  During this incident, that's
5   what you're asking, Robyn?
6     MS. MARSH:  Yes.
7   BY MS. MARSH:
8      Q.   Just to be clear, for further, all my
9   questions, he makes a good point, everything I'm
10   going to asking for the next few minutes will be
11   about the May, 2010 incident.
12      So if a inmate is asking for
13   medication, do you have the radio on your person
14   to make the call or is the radio located
15   somewhere that you have to go and get it?
16     MR. ELIASER:  Objection, calls for
17   speculation.  No, it doesn't.  Lack of
18   foundation.
19      Go ahead and answer.
20     A.   Answer?
21   BY MS. MARSH:
22     Q.   Yes.
23     A.   Yes, it's on our person.
24     Q.   Okay.  And when you call the Health

1   cells, they do not leave for medication.  Unless
2   procedures have changed, I haven't worked the
3   back since 2011.  I don't know if they changed
4   procedures or not.
5      Q.   But in May, 2010 they -- excuse me.  In
6   May of 2010 the medication was dispensed to the
7   inmates in their cell?
8      A.   Yes.
9      Q.   They would never exit their cell and
10   lineup?
11     A.   Never.
12     Q.   Back to May 1, 2010, you said that
13   Lippert told you he needed medication, is that
14   correct?
15     A.   Correct.
16     Q.   He did not tell you what type of
17   medication?
18     A.   No.
19     Q.   And your response was that you went and
20   told Sergeant Palmer?
21     A.   Yes.
22     Q.   Why is it that you did not radio the
23   Health Care Unit first?
24     A.   Because he had stated, Lippert, inmate

Page 33

1  Lippert had stated that he had not received his
2  medication, and because he was diabetic, that he
3  needed it right there and then.  So I felt that
4  I needed to go downstairs and tell my sergeant,
5  because it would have been a lot easier for him
6  to get a hold of the nurse or the med tech to
7  come, versus me telling them as an officer.
8      Q.   Did you typically have a hard time
9  getting med techs to respond to you as a
10 correctional officer?
11     A.   Sometimes.
12     Q.   And why is that, do you know?
13     A.   I have no idea.
14     Q.   Do inmates typically ask you for
15 medication as opposed to just waiting for the
16 nurses or med techs to come to the F House, for
17 example --
18     A.   Sometimes.
19     Q.   Let me finish.  So before they come to
20 F House to dispense medication?
21     A.   Sometimes.
22     Q.   And what instances are those, would
23 they need to ask for, you know, a Tylenol, or
24 their regular medication or is it a variety?

Page 35

1      A.   You can see it from the galleries.
2      Q.   Are there glass windows so you can see
3  inside?
4      A.   There's no glass.
5      Q.   Okay.  Is it an open office --
6      A.   Yes, open.
7      Q.   -- or is it closed?
8      A.   Open.
9      Q.   So what do you recall the sergeant,
10 excuse me, Sergeant Palmer, am I correct, it was
11 Sergeant Palmer?
12     A.   Palmer.
13     Q.   What was Sergeant Palmer saying on the
14 phone when he picked up the phone to call about
15 Lippert?
16     A.   That inmate Lippert had not received
17 his medication on the 3 to 11 shift, and the 11
18 to 7 shift, and that he was requesting his
19 medication.
20     Q.   And do you know what was said in
21 response to him?
22     A.   No, I do not.
23     Q.   So the call was not on speaker phone?
24     A.   No, it was not.

Page 34

1      A.   It's a variety.
2      Q.   Do you have any way of checking
3  yourself, as a correctional officer, whether or
4  not an inmate received their medication?
5      A.   No.
6      Q.   So did you make any phone calls --
7  excuse me.  Did you make any radio
8  communications on May 1st, 2010 to the Health
9  Care Unit asking for Mr. Lippert's medication?
10     A.   No.
11     Q.   Do you know if your sergeant did?
12     A.   Yes.
13     Q.   And how do you know that?
14     A.   I was standing there.
15     Q.   And would he also have used a radio or
16 does he use the telephone?
17     A.   He used the telephone at that time.
18     Q.   And does the sergeant have an office?
19     A.   Yes, he does.
20     Q.   And is that the first floor of F House?
21     A.   Yes.
22     Q.   Is that -- where is it situated on the
23 first floor?  Can you see it from the galleries,
24 or do you have to walk down a hallway?

Page 36

1      Q.   Do you know why Mr. Lippert did not
2  receive his medication in those two previous
3  shifts?
4      A.   No.
5      MR. ELIASER:  I would object,
6  mischaracterizing the record.
7      MS. MARSH:  I'm going off of what she said.
8      MR. ELIASER:  Okay.  But you asked her does
9  she know why he didn't receive his medication,
10 that's assuming he did not receive his
11 medication.  Lack of foundation, she wasn't
12 there.
13 BY MS. MARSH:
14     Q.   Based on your testimony -- I'll
15 clarify.  Based on your testimony, Mr. Lippert
16 stated that he did not receive his medication
17 the 3 to 11 shift or the 11 to 7 shift, is that
18 correct?
19     A.   Correct.
20     Q.   And based on your testimony on what he
21 said, did you know why he may not have received
22 his medication during those shifts?
23     A.   No.
24     Q.   Thank you.  Is lunch time, or excuse

1  me, is meal time at the same time everyday?

2    A.  No.

3    Q.  Typically is it in a range of time, 12

4  to 1?

5    A.  There is no time.  When the kitchen

6  calls us and tells us that it's ready, we pick

7  them up and deliver them to the unit.

8    Q.  And then do you deliver the food to

9  each cell?

10    A.  Yes.

11    MR. LOVELLETTE:  This is F House in 2010,

12  correct?

13    A.  Correct.

14  BY MS. MARSH:

15    Q.  So after the sergeant made the phone

16  call, do you recall what time that was?

17    A.  About 7, between 7, 7:30, no later than

18  8.

19    Q.  Can I ask you how you have an

20  independent recollection of this if you were

21  never interviewed, why this sticks out in your

22  mind?

23    A.  I have a good memory, not good, good,

24  but I have a good memory, I mean, I remember the

1  incident.

2    Q.  And why does this incident stick out in

3  your mind?

4    A.  Like other incidents that stick out,

5  it's just part of my job.  Sometimes things just

6  stick to me.  Not because it's a particular

7  case, it's just that I recall.

8    Q.  So after the sergeant made the phone

9  call, what did you do?

10    A.  That was it.  I didn't stick around.  I

11  went back up to 3 Gallery to assume the other

12  duties that I had.

13    Q.  And nothing else happened?

14    A.  Not that I know, no.

15    Q.  But you remember four years ago going

16  down to the sergeant's office to make a simple

17  phone call and nothing else happened?

18    MR. ELIASER:  Objection, form of the

19  question.

20      Go ahead and answer.

21    A.  That is all I remember as far as that.

22  BY MS. MARSH:

23    Q.  And you were never contacted from a

24  counselor or any other superior regarding a

1  grievance form filed against you?

2    A.  No.

3    Q.  Do you know if a grievance form was

4  filed against Sergeant Palmer?

5    A.  No.

6    Q.  Do you know if a grievance form was

7  filed against Correctional Officer Norman?

8    A.  No, I do not.

9    Q.  Is there a correctional officer Nelson

10  that you know of?

11    A.  I have no idea, no.

12    Q.  Do you know who Colleen Franklin is?

13    A.  She is a counselor.

14    Q.  Was she assigned to the F House?

15    A.  I don't remember if she was assigned

16  back then.

17    Q.  But you know her?

18    A.  Yes.

19    Q.  Corresponded with her before?

20    A.  Yes.

21    Q.  So the first time, as I understand it,

22  you saw this grievance form was after --

23  sometime around May of 2014, is that correct?

24    A.  Yes.

1    Q.  I just want to go through it with you.

2  Have you read the whole thing again recently

3  since May of 2014?

4    A.  Yes.

5    Q.  Okay.  I can give you a copy, because I

6  have several.

7    MS. MARSH:  Can we mark this as an Exhibit,

8  or do you want to do it at the end?

9    COURT REPORTER:  We can do it at the end, as

10  long as you keep track.

11    MS. MARSH:  Okay.  Thank you.

12  BY MS. MARSH:

13    Q.  Okay.  I'm just going to go ahead and

14  hand that to you, and you can take a look at it

15  again.

16    MR. LOVELLETTE:  Before we go forward, when

17  you mark it, can we mark one that you haven't

18  written on?

19    MS. MARSH:  I'm assuming the sticker is going

20  to go right over that.

21    MR. LOVELLETTE:  Okay.  That will work.

22    MS. MARSH:  I just wanted to keep track of it

23  that way.

24  BY MS. MARSH:

Page 41

1      Q.   So let's just start from the beginning.
2   Have you ever seen a grievance form prior to
3   seeing this form in May, 2014?
4      A.   Yes.
5      Q.   And how have you come to see grievance
6   forms?
7      A.   We are shown -- we have them laying
8   around in the office.
9      Q.   Okay.  And when you say office, what
10  office --
11     A.   The sergeant's office, the shift
12  office, pretty much everywhere.
13     Q.   Can you fill out a grievance form, if
14  you want to?
15     A.   No.
16     Q.   These are only for inmates?
17     A.   Yes.
18     Q.   And as I understand it you never had a
19  grievance form filed against you, other than the
20  one you see before you right now?
21     MR. ELIASER:  Objection, mischaracterizes her
22  testimony.
23          Go ahead and answer.
24     A.   I have no idea of that.

Page 43

1      A.   Yes, he did.
2      Q.   And did he go to Mr. Lippert's cell?
3      A.   Yes.
4      Q.   And were you with Sergeant Palmer when
5   that happened?
6      A.   No, I stayed downstairs.
7      Q.   And could you hear a conversation
8   between the two of them?
9      A.   No.
10     Q.   Do you know why Sergeant Palmer went up
11  to his cell?
12     A.   After I had went up to the gallery the
13  second time around, Lippert stated that he was
14  feeling dizzy, and that he was going to pass
15  out.
16     Q.   Let's back up.  You said you went back
17  up to the gallery after going down to the
18  sergeant's office where he made the phone call,
19  is that correct?
20     A.   Yes.
21     Q.   And so you went back up to the third
22  floor, and do you know how many cells there are
23  per floor?
24     A.   It varies by gallery, so 3 Gallery

Page 42

1
2   BY MS. MARSH:
3      Q.   You've never seen one is my question?
4      MR. LOVELLETTE:  Objection, that was not your
5   question.
6          Go ahead and answer.
7      A.   Not for me, not with my name on it.
8   BY MS. MARSH:
9      Q.   Thank you.
10          If you would go to the second page of
11  the grievance form, the narrative.  Mr. Lippert
12  explained that he was yelling for Sergeant
13  Palmer, do you see that at the top?
14     A.   Yes.
15     Q.   Do you have any recollection of that
16  happening?
17     A.   No.
18     Q.   From where Sergeant Palmer's office is
19  to Gallery 3, where Mr. Lippert was located,
20  could somebody yell and it be heard?
21     A.   Sometimes if the unit was quiet, yes,
22  you can hear it.
23     Q.   Okay.  Do you recall if Sergeant Palmer
24  accompanied you back to Gallery 3 that morning?

Page 44

1   probably had 60 cells.
2      Q.   And they are arranged in a circle --
3      A.   In a circle, correct.
4      Q.   And do you recall where Lippert's cell
5   was situated from when you came up the stairs,
6   to the left, to the right?
7      A.   To the right -- to the left, I'm sorry.
8      Q.   Was it near the stair entrance?
9      A.   No. Towards the first twenty cells.
10     Q.   What does Mr. Lippert look like?
11     A.   You want me to --
12     Q.   A description?
13     A.   Oh, a description, okay.  About -- I
14  would say about 5'2, short hair, Caucasian,
15  skinny.
16     Q.   Any discernable markings, birthmarks,
17  freckles, tattoos, that you know of?
18     A.   Not that I remember.
19     Q.   Facial hair, is that allowed?
20     A.   Yes, but I don't remember if he had
21  facial hair.
22     Q.   So when you came back from the
23  sergeant's office, you said that you had another
24  interaction with Mr. Lippert, is that correct?

Page 45

```
 1      A.   Yes, when I went up there, yes, second
 2  time for something else.
 3      Q.   To resume your duties you said?
 4      A.   Yes.
 5      Q.   Okay.  And he -- did you initiate the
 6  conversation with him, did he initiate with you,
 7  how did that happen?
 8      A.   No, I did not, it wasn't a direct
 9  conversation with him.  I don't remember what I
10  had went up there for, but as I was coming
11  around towards the front of the cells, that's
12  when Lippert stated that he wanted Sergeant
13  Palmer because he still had not received his
14  medication, and that he was feeling dizzy and
15  that he was going to pass out.
16      Q.   And then what did you do?
17      A.   And he also stated that he was going to
18  drop to the floor and he started laughing.
19      Q.   And then what happened?
20      A.   That was it.  I continued doing
21  whatever I was doing.
22      Q.   At what point did Sergeant Palmer come
23  up --
24      A.   That's when I went downstairs and I
```

Page 47

```
 1      Q.   That entire shift?
 2      A.   They could have went after the fact,
 3  but I don't remember during that time that
 4  Health Care Unit showed up.
 5      Q.   I'm sorry.  When you say that time, do
 6  you mean that morning or your entire shift?
 7      A.   I didn't see anybody through my whole
 8  shift, I didn't notice anybody.
 9      Q.   And I only care about your knowledge,
10  don't speculate about anybody else?
11      A.   Hmm, hmm.
12      Q.   Do you know if Mr. Lippert ever got his
13  medication?
14      A.   No, I do not.
15      Q.   During that shift, I should say?
16      A.   No.
17      Q.   At any time was Mr. Lippert removed
18  from his cell to go to the Health Care Unit
19  during that shift?
20      A.   Yes, he was.
21      Q.   Do you know when that was?
22      A.   I don't know.
23      Q.   Do you know why that was?
24      A.   Because he had fell in his cell.
```

Page 46

```
 1  told Sergeant Palmer again, and that's when he
 2  went up.
 3      Q.   And do you know if Sergeant Palmer made
 4  another phone call before he went back up?
 5      A.   No.
 6      Q.   No, you don't know, or no, he did not?
 7      A.   I don't know if he did.
 8      Q.   Okay.  And again, you were not present
 9  for any conversation that Sergeant Palmer may
10  have had with Mr. Lippert?
11      A.   No.
12      Q.   And you said you were downstairs on the
13  first floor area when Sergeant Palmer went up,
14  is that correct?
15      A.   Correct.
16      Q.   And approximately what time was that,
17  if you know?
18      A.   I don't remember.
19      Q.   And do you know if the medical
20  technician or nurse or anybody from the Health
21  Care Unit, for that matter, came to the F House
22  to distribute medication?
23      A.   No, I didn't see anybody from the
24  Health Care Unit.
```

Page 48

```
 1      Q.   And did you witness the fall, or did
 2  you come upon him and he had already fallen?
 3          MR. LOVELLETTE:  Objection to the form of the
 4  question.
 5          Go ahead and answer.
 6      A.   He had already fallen.
 7  BY MS. MARSH:
 8      Q.   And do you know how he came to fall?
 9      A.   No.
10      Q.   And what position was he in when you
11  got there?
12      A.   On the floor, by the door.
13      Q.   Face up, on his side, face down?
14      A.   Sideways.
15      Q.   On his side?
16      A.   Yes.
17      Q.   Was his back facing outside or could
18  you see his face?
19      A.   You could see his face.
20      Q.   And was he conscious?
21      A.   Yes.
22      Q.   Were his eyes open?
23      A.   Yes.
24      Q.   Could he talk?
```

Page 49

1    A.   Yes.

2    Q.   Did he say what had happened?

3    A.   He just said he fell, that he passed

4 out.

5    Q.   What is your response when that

6 happens, in general?

7    A.   I told Sergeant Palmer.

8    Q.   And did you go downstairs to tell

9 Sergeant Palmer?

10    A.   Yes.

11    Q.   And what was Sergeant Palmer's

12 response?

13    A.   He said okay and went upstairs.

14    Q.   And did you accompany Sergeant Palmer?

15    A.   No, I didn't, I stayed downstairs.

16    Q.   And is that typical protocol that you

17 would stay behind, or is that something --

18    A.   It's just something that I just did.

19    Q.   Okay.

20    A.   I had other things that I was doing.

21    MR. ELIASER:  I'm sorry.  Can I just clarify?

22 Is this a third interaction with Lippert, or is

23 this the second one?

24    A.   The second one.

Page 50

1    MR. ELIASER:  This is the part of the second

2 interaction?

3    A.   Yes.

4    MR. ELIASER:  Okay.  Sorry, Robyn, I just

5 wanted to be clear before you kept going.

6 BY MS. MARSH:

7    Q.   I should also state that if you need a

8 break at anytime, please tell me, for any

9 reason.

10    A.   Okay.

11    Q.   Okay.  So he had said to you he had

12 fallen, you went and got Sergeant Palmer.  You

13 stayed down on the first floor.  Sergeant Palmer

14 went up there, is that correct?

15    A.   Correct.

16    Q.   Then what happened?

17    A.   I seen Sergeant Palmer and another

18 officer bring him out of the cell.

19    Q.   Do you know which officer that was?

20    A.   No. I kind of just glanced, and really

21 didn't see who else was with him.

22    Q.   And do you know why they took him out

23 of the cell?

24    A.   No, I do not.  I guess because he was

Page 51

1 on the floor.

2    Q.   Is that something that typically

3 happens when an inmate falls?

4    A.   No.

5    Q.   Do you know why it was in this case?

6    A.   No.

7    Q.   So you saw Sergeant Palmer and another

8 officer carry Mr. Lippert out of his cell,

9 correct?

10    A.   Yes.

11    Q.   And where did they carry him to?

12    A.   Downstairs.

13    Q.   And are the stairs just straight down

14 or are they spiral stairs?  What do the stairs

15 look like?

16    A.   They go in levels.

17    Q.   So they had to go down three levels to

18 get to the first floor?

19    A.   From the third they went to the second,

20 from the second they went to the first.  It's

21 not one direct -- they're levels.

22    Q.   I understand.  But they took the stairs

23 all the way to the first level?

24    A.   Yes.

Page 52

1    Q.   Then what?

2    A.   I didn't observe anything else after

3 that.  I think they put him in the bull pen.

4    Q.   What's that?

5    A.   Where -- the general holding area for

6 the inmates.

7    Q.   On the first floor?

8    A.   Yes.

9    Q.   In the F House?

10    A.   Yes.

11    Q.   And why would an inmate be placed in

12 there?

13    A.   It's regular protocol, proper procedure

14 for us to do that.

15    Q.   Okay.  Then what?  They stay in there

16 for a period of time?

17    A.   They stay there until the med tech

18 comes, or whatever they decide they're going to

19 do with the inmate.  If they're going to take

20 him up to the Health Care Unit, whatever they

21 got to do.

22    Q.   I thought the med tech comes to the F

23 House to distribute medications in a person's

24 cell?

Page 53

```
1        A.    Yes.
2        Q.    Why not in this case?
3        A.    I have no idea.
4        Q.    When a inmate has to leave the F House
5   to go to the Health Care Unit, is there a
6   process where you have to make a record of that
7   happening, of the prisoner leaving the F House
8   and not being there for a period of time?
9        A.    Yes, you log it in a daily shift sheet,
10  which is where we -- everybody that goes in and
11  out of the unit is marked down.
12       Q.    And when you say unit, you mean F
13  House?
14       A.    Correct.
15       Q.    And where are those shift sheets
16  located?
17       A.    The main entrance of F House.
18       Q.    And who -- so do you -- when you do
19  your counts, as you said, at the beginning of
20  your shift, do you have to log that in the shift
21  sheet?
22       A.    No, the count goes on different paper.
23       Q.    Okay.  So what typical things would go
24  on the logbook?  Just as you mentioned, when an
```

Page 54

```
1   inmate goes in and out, is there anything else
2   that would go on there?
3        A.    In the logbook, the logbook is only for
4   officers and incidents that took place that day.
5        Q.    Okay.  Can you give me an example of an
6   incident that would go in a logbook?
7        A.    A fight, the feed, officers assigned to
8   that unit, that's it.
9        Q.    When you say feed, do you mean --
10       A.    Chow.
11       Q.    -- when they receive their lunch or
12  whatever meal?
13       A.    Yes.
14       Q.    And do you write what officers were
15  responsible for handing out the meals or just
16  the time that they received the meals?
17       A.    The time that was for that meal.
18       Q.    Okay.
19       A.    Beginning and ending time for each
20  gallery.
21       Q.    And if there's a fight, how do you
22  document that?
23       A.    Write the inmate's name, number,
24  whoever -- whatever parties were involved, and
```

Page 55

```
1   that's it.
2        Q.    And what about resolution, were they
3   separated, was somebody written up, was somebody
4   had to see, you know, the sergeant, if there's a
5   disposition of the fight?
6        A.    That would not go in that logbook.
7        Q.    Okay.  Who would handle that?  The
8   sergeant?
9        A.    Yes.
10       Q.    And what happens at the end of your
11  shift to that logbook, do you know?
12       A.    It stays in the unit.
13       Q.    So there are several entries to allow
14  for any particular happening per shift?
15       A.    Yes.
16       Q.    Did you mark this incident in the
17  logbook?
18       A.    No.
19       Q.    Why not?
20       A.    It wasn't -- there was no need for it.
21       Q.    But you mentioned previously that a
22  prisoner had fallen, correct?
23       A.    Yes.
24       Q.    And he was removed from his cell,
```

Page 56

```
1   correct?
2        A.    Correct.
3        Q.    And was possibly -- he was put in the
4   bull pen to possibly be taken to the Health Care
5   Unit, is that correct?
6        A.    Or the nurse comes to the unit to give
7   him his medication.
8        Q.    And that did not merit an incident?
9        A.    No.
10       Q.    Had this type of incident ever occurred
11  before with Mr. Lippert, where he requested
12  medication?
13       A.    No.
14       Q.    This was the only time?
15       A.    Yes, that I remember.
16       Q.    And because it was an isolated incident
17  that you can recall, that did not merit
18  something going in the logbook for you?
19       A.    No.  For the record, the sergeant is the
20  one that writes in the book.  The officers do
21  not write in that book, we don't write in there.
22       Q.    Only the sergeants --
23       A.    Only the sergeants.  That's the
24  sergeant's daily activities and that's it.
```

Page 57

1      Q.   Okay.  Thank you.  I didn't know that.
2           Do you know if Sergeant Palmer wrote in
3    the logbook?
4      A.   I don't know.
5      Q.   At any time on May 1st, 2010 did you
6    hear or witness any type of communications
7    between Sergeant Palmer and Mr. Lippert?
8      A.   No.
9      Q.   Do you recall having a conversation
10   with Correctional Officer Norman about Mr.
11   Lippert?
12     A.   No.
13     Q.   Do you have -- I understand you don't
14   have any medical training or education, is that
15   correct?
16     A.   Correct.
17     Q.   Do you have a general understanding of
18   what diabetes is?
19     A.   Yes.
20     Q.   And what's your understanding?
21     A.   Depending on the stage of the diabetes,
22   there are some that are pill dependent, and then
23   there are some that are insulin dependent.
24     Q.   And do you know -- I believe you said

Page 58

1    before that you knew that -- excuse me, that Mr.
2    Lippert told you he was diabetic, correct?
3      A.   He stated, I did not confirm if he was
4    or was not.
5      Q.   I understand.  But he told you he was
6    diabetic?
7      A.   Yes.
8      Q.   And do you have any knowledge one way
9    or the other what type of diabetes he had, as
10   you described it, pill or insulin?
11     A.   No.
12     Q.   So when he said medication, you didn't
13   know what type of medication?
14     A.   Correct.
15     Q.   Do you have an understanding of how
16   often a diabetic needs medication?
17     A.   No.
18     Q.   So after Mr. Lippert was placed in the
19   bull pen, you don't know what time that was
20   during your shift, is that correct?
21     A.   Correct.
22     Q.   Did you -- you said you didn't see
23   anything after that; did he remain in the bull
24   pen for the rest of your shift, do you know?

Page 59

1      A.   I don't remember.
2      Q.   Do you remember seeing him in his cell
3    again during your shift?
4      A.   I don't remember.
5      Q.   So do you -- strike that.
6           In this grievance form in front of you
7    on what looks like the third paragraph.
8      MR. LOVELLETTE:  Of the second page?
9    BY MS. MARSH:
10     Q.   On the second page still.  It starts
11   with due to --
12     A.   Hmm, hmm.
13     Q.   Can I just ask you to read that to
14   yourself, and let me know when you're done.
15     A.   Okay.  I'm done.
16     Q.   Okay.do you have a recollection of any
17   of that happening?
18     A.   No.
19     Q.   Do you recall that there was urine
20   anywhere in the cell?
21     A.   There was water on the floor when I
22   looked in, but that was-- I couldn't identify
23   it, if was urine or not.
24     Q.   There was a liquid of some sort?

Page 60

1      A.   Yes, liquid.
2      Q.   What time -- what instance was that?
3    Was that the first time that Lippert spoke to
4    you or the second time?
5      A.   The second.
6      Q.   Was it near the front of the cell,
7    center of the cell?
8      A.   Center of the cell.
9      Q.   Did you -- if there is liquid in an
10   inmate's cell, what is done about that?  Are
11   they asked to clean it up, do you bring a
12   janitorial staff in, what happens?
13     A.   They clean it up themselves.
14     Q.   That's not considered a hazard?
15     A.   Everybody takes care of their own
16   cells.  We don't have any mops and brooms that
17   go in the cell because of it being Unit F.
18     Q.   Is that something that you would point
19   out to a prisoner, saying you need to clean that
20   up, or what is that, is that just a common
21   occurrence?
22     A.   No, it's just a common occurrence.
23     Q.   Okay.  Do you recall one way or another
24   if -- sorry, before I move onto that.

Page 61

```
1         You stated that you don't recall any of
2  these events, excuse me, any of these events as
3  you just read them on page 2 of the Grievance
4  Report, is that correct?
5     A.   Correct.
6     Q.   If you look in the paragraph directly
7  above that, on the fourth line.  Your name is
8  identified there, is that correct?
9     A.   Yes.
10    Q.   And then also in the paragraph that you
11 just read, the second to last line, your name is
12 in there again, correct?
13    A.   Correct.
14    Q.   And he seems to quote you, is that
15 correct?
16    A.   Yes.
17    Q.   Okay.  Now, because your name is
18 mentioned in here on this grievance form, I
19 believe you mentioned earlier that you're
20 contacted if your name is on a grievance form to
21 further investigate, is that correct?
22    A.   Correct.
23    Q.   But you were never contacted about this
24 grievance form?
```

Page 62

```
1     A.   No.
2     Q.   Do you know who would typically contact
3  you to discuss a grievance form?
4     A.   The counselor.
5     Q.   Is it always the counselor?
6     A.   Yes.
7     Q.   Is the counselor the one who -- sorry.
8  Is the counselor present when the grievance form
9  is written, do you know?
10    A.   I have no idea.
11    Q.   If you had a problem during a shift
12 with how another correctional officer behaved or
13 handled a situation, could you write it up
14 somehow?  Do you guys have your own grievance
15 form process?
16    A.   Yes, we do.
17    Q.   And what is your process like, how does
18 that work out?
19    A.   Can I answer that?
20    MR. LOVELLETTE:  Is it through the Union?
21 Will we be talking about the Union?
22    A.   Yes.
23    MR. LOVELLETTE:  Then I'm going to object.
24 It's completely irrelevant.  And the Union
```

Page 63

```
1  process has nothing to do with the inmate.
2  BY MS. MARSH:
3     Q.   So when you -- do you do it in the
4  cell, is my question, would you report it right
5  away or is it something you do later, if it had
6  to do with a fellow correctional officer,
7  sergeant?
8     A.   It would have to be reported right
9  away.
10    Q.   Okay.  As you state -- strike that.
11         You said you learned about the
12 grievance process when you were in your 8 week
13 training down in Springfield, correct?
14    A.   Correct.
15    Q.   And how did you come to learn about it?
16 Is there a day or a week or a certain amount of
17 time allotted to learning about policies and
18 procedures?
19    A.   During the whole 8 weeks it's
20 distributed throughout, it's not one particular
21 day or one week.  It's throughout the whole 8
22 weeks.
23    Q.   And is it somebody from -- sorry.
24 Strike that.
```

Page 64

```
1         Who talks to you about the grievance
2  form process?
3     A.   The instructors.
4     Q.   And are you given materials, a binder,
5  a handbook, any of that to follow along with?
6     A.   Yes.
7     Q.   And what is -- if you recall, this was
8  in '96, I understand that.
9     A.   Yes.
10    Q.   If you recall, what was the gist of
11 what was explained to you about the grievance
12 process?
13    A.   The form is shown to us in blank, and
14 we look over it, we see it, observe it and that
15 is it.  We don't write it.  We don't need to
16 write on it because that's not for us.
17    Q.   But during that orientation did they
18 explain to you that if an inmate fills it out
19 and your name is included, you will be asked
20 about it?
21    A.   Yes.
22    Q.   Okay.  And do you have an opportunity,
23 if you know, if they come to you about the
24 grievance form where you could respond to any
```

## Page 65

1  allegations or comments that are made in the
2  grievance form?
3      A.   Yes.
4      Q.   And is that done through an interview,
5  do you write your own report, do you know?
6      A.   Through a verbal interview.
7      Q.   And is that with a counselor?
8      A.   Yes.
9      Q.   And to be clear, that has never
10 happened to you, correct?
11     A.   Correct.
12     Q.   Okay.  Do you know who, if anybody, on
13 your shift, on May 1, 2010 was interviewed with
14 respect to this grievance form?
15     A.   I don't know.
16     Q.   You never talked with anybody about the
17 interview process?
18     A.   No.
19     Q.   Do you have to sign any forms when you
20 start, demonstrating that you will comply with
21 the policies and procedures of the IDOC or the
22 Stateville prison at the completion of your
23 training.  Do you remember if you had to do
24 that?

## Page 66

1      A.   I don't remember.
2      Q.   Do you ever have refresher courses in
3  training, like if there's a change in policy, or
4  they're instituting a new type of procedure for
5  correctional officers, do you have ongoing
6  training?
7      A.   Yes.
8      Q.   And is that sporadic, it's not like
9  every January you have to have new training, or
10 is it --
11     A.   On a yearly basis.
12     Q.   So you do have it on a yearly basis?
13     A.   Yes.
14     Q.   And when is that?
15     A.   Whenever your cycle ends.  It goes --
16 every officer has a different cycle, so
17 whatever, it's a year from each expiring last
18 date.
19     Q.   And how long is that refresher course,
20 let's call it that?
21     A.   Three days.
22     Q.   And is that in Springfield again?
23     A.   No, here.
24     Q.   Okay.  At the facility?

## Page 67

1      A.   Yes.
2      Q.   What is your cycle?
3      A.   April?  April.
4      Q.   After your training in Springfield in
5  1996, did you feel comfortable that you could
6  assume the role as a correctional officer, that
7  you had sufficient training?
8      A.   Yes.
9      Q.   Is there with respect to medical
10 emergencies, are you given a handbook on knowing
11 how to handle certain emergencies?
12     A.   No.
13     Q.   Are you given any direction on how to
14 handle certain emergencies?
15     A.   No.
16     Q.   So there's not specific protocol to be
17 followed in the event of a medical emergency?
18     A.   Correct.
19     Q.   What happens at the end of your shift?
20 Do you have to sign out?  Is there a role call
21 again?  What do you have to do?
22     A.   We are relieved by the 3 to 11 shift,
23 assuming that assignment.
24     Q.   And again, do you have any

## Page 68

1  conversations with the oncoming shift about
2  events from your shift?
3      A.   No.
4      Q.   Have you ever been present where a
5  inmate has a medical emergency and the -- sorry.
6           Let me ask that.  Have you ever been
7  present when an inmate has a medical emergency?
8      A.   I don't remember.
9      Q.   Can you describe to me what you would
10 believe to be a medical emergency?
11     A.   Depending on what the circumstances
12 are.  You want specifics, or do you want what my
13 medical term would be for an emergency?
14     Q.   Well, if there's no protocol or policy
15 on what a medical emergency is, am I correct?
16     A.   Correct.
17     Q.   That it seems to me that it is based on
18 independent judgment of each correctional
19 officer, is that correct?
20     A.   Correct.
21     Q.   So for you, your independent judgment,
22 what would you deem to be a medical emergency
23 that would require further intervention with the
24 inmate?

1     MR. LOVELLETTE:  Objection to the form of the

2  question.

3     MR. ELIASER:  I'll join.

4     You can answer.

5     A.  Somebody's that having chest pain,

6  can't breath, somebody that is bleeding, broken

7  bones.

8  BY MS. MARSH:

9     Q.  And in those instances what would you

10  do to deal with that emergency?

11     A.  Call the nurses or the med techs on the

12  radio.

13     Q.  On the radio?

14     A.  If it's a severe emergency, on the

15  radio or base.  Base is the radio person,

16  whoever has base that day.

17     Q.  And what is the response to that?  Do

18  they tell you what to do, or do they come to

19  you?  Does it depend?

20     A.  They actually call, whoever is the

21  assigned med tech is, for wherever the situation

22  is at, for whatever unit and they just have

23  somebody go there.

24     Q.  So as I understand it, or I'm trying to

1  understand rather, that there is a med tech

2  affiliated with the Health Care Unit that is

3  assigned to a house at any given shift?

4     A.  Yes.

5     Q.  So there is one assigned or perhaps

6  more than one med tech assigned to P House?

7     A.  There's just one that I know of.

8     Q.  Okay.  Is it typically the same med

9  tech then, so they would know --

10     A.  No.

11     Q.  Okay.  Is there one med tech assigned

12  per shift?

13     A.  There's a few med techs.

14     Q.  Okay.  So there's always a med tech

15  available?

16     A.  Yes.

17     Q.  Is it a med tech that typically

18  responds as opposed to a nurse, or does it

19  depend?

20     A.  It depends.

21     Q.  Do you know how the Health Care Unit

22  prioritizes responses to requests?

23     A.  No.

24     Q.  Do you -- have you ever had to be in a

1  position where they gave you direction before

2  they can get to the unit?

3     A.  No.

4     MS. MARSH:  I'm just going go through my

5  notes briefly.  The other attorneys might have

6  questions for you.  And I will turn it over to

7  them, and hopefully we can go be done with this

8  soon.

9     MR. ELIASER:  Can we take a quick break, and

10  then I have probably 5 minutes of questions.  It

11  seems like a good time to take a quick break.

12     MS. MARSH:  Sure.

13          (Whereupon, a short break was

14          taken.)

15     MS. MARSH:  Okay.  Back on the record.

16  BY MS. MARSH:

17     Q.  All right.  Do you recall receiving

18  what we call interrogatories and request for

19  production.  Do you recall receiving those,

20  discovery documents?

21     A.  No.

22     Q.  Do you know what an interrogatory is?

23     A.  Yes, I know what that is.

24     Q.  Okay.  So have you ever seen these

1  documents?

2     MS. MARSH:  I'm handing her what we received

3  as her discovery responses, her answers to

4  interrogatories.

5  BY MS. MARSH:

6     Q.  Have you seen these before?

7     A.  Yes.

8     Q.  And when would you have seen them, if

9  you recall?

10     A.  Back in May.

11     Q.  And did you answer them with the

12  assistance of Counsel?

13     A.  No.

14     Q.  You don't recall answering them?

15     A.  I don't recall, I don't remember.

16     Q.  Okay.  Is this your signature?

17     A.  Yes, that is.

18     Q.  So does this refresh your recollection

19  at all?

20     A.  Yes.

21     Q.  Okay.  I'm going to go ahead and mark

22  the interrogatories as Exhibit 2.  Okay.

23     So do you recall if you answered these

24  yourself?

Page 73

1    A.    Yes.
2    Q.    And then your Counsel provided them for
3  filing and service and all that good stuff.
4    A.    Yes.
5    Q.    So I just want to go back over your
6  interactions with Mr. Lippert again.  The first
7  time, I believe you said that he said he hadn't
8  received his insulin, you went down and told the
9  sergeant, correct?
10   A.    Correct.
11   Q.    You did not make a radio phone call --
12 excuse me.  You did not call the medical or
13 Health Care Unit on your radio, you went
14 directly to your sergeant?
15   A.    Yes.
16   Q.    Okay.  And then after you talked to the
17 sergeant about it, you went back up to Gallery
18 3?
19   A.    Yes.
20   Q.    And you said that you started walking
21 around and you came upon Mr. Lippert's cell,
22 correct?
23   A.    Correct.
24   Q.    And he was on the ground, correct?

Page 74

1    A.    Correct.
2    Q.    And did he say anything to you?
3    A.    No.
4    Q.    And did you say anything to him?
5    A.    Yes, he said that he wanted the med
6  tech, that why wasn't the med tech there, and
7  that he was going to pass out.
8    Q.    Okay.  But he was already on the
9  ground?
10   A.    And he fell on the floor.
11   Q.    Okay.  So when you came upon him he was
12 --
13   A.    I continued to walk as he was saying
14 that, I don't remember if I was collecting the
15 trays, the foams, the trays that they throw on
16 the floor.  I continued to walk, he said that he
17 was going to fall and pass out.  I continued --
18 I continued to take a couple of steps, that's
19 when I heard the thump and he was laughing.
20   Q.    So when you first came upon the cell he
21 was not on the ground, correct?
22   A.    Correct.
23   Q.    Okay.  And he was laughing, you said?
24   A.    Yes.

Page 75

1    Q.    In what --
2    A.    Not laughing, giggling, but kind of
3  like a smirky, giggly laugh.
4    Q.    Did he say anything?
5    A.    That he was going to pass out, when I
6  told him that I had already advised Sergeant
7  Palmer that he needed a med tech in regards to
8  his medication that he had not received.
9    Q.    Okay.  So you, just so I'm clear, you
10 started to walk pass, but you didn't see him
11 actually fall, you heard it?
12   A.    When I went past him he was still
13 standing, he said he was going to pass out
14 because he was feeling dizzy.  I took a couple
15 of steps, continued to do what I had to do and I
16 heard something.  So when I went back, he was on
17 the floor in an almost fetal position, he wasn't
18 facing anything, he was on his side and there
19 was a puddle of water, like he was alert, and he
20 said that he was going to pass out, but he was
21 still talking to me.
22   Q.    Okay.
23   A.    He was giggling.
24   Q.    And at that point you did what?  You

Page 76

1  went downstairs?
2    A.    I went downstairs and I advised sarg
3  again what had happened.  I stayed downstairs,
4  sarg went upstairs.  I don't remember the other
5  officer that went upstairs, but I stayed
6  downstairs to do other things.
7    Q.    And the other officer that was with the
8  sergeant, was that, I know you don't remember
9  his or her name, but was that officer already on
10 Gallery 3?
11   A.    When I turned and looked, sarg was
12 there with another officer, who I really -- I
13 did a real quick glance, I started to either
14 answer the phone or do something else, that's
15 when I noticed they were upstairs.  I turned
16 back and continued to do my things.  But I
17 really didn't focus on who was the other person
18 that was up there with him.
19   Q.    I'm sorry, maybe I missed it.  Do you
20 know if that person was already on Gallery 3 or
21 if they went --
22   A.    I don't know if he went up from another
23 gallery, but I seen another by there.
24   Q.    I understand.

Page 77

1    A.   I don't know where he came from.

2    Q.   Got it.  Thank you.

3    MS. MARSH:  Okay.  Now I'm really going to

4  pass on the questions.  And I think that I'm

5  going to go through my notes again, I think

6  we're good.  Thank you very much.

7              EXAMINATION

8         BY MR. ELIASER:

9    Q.   Miss Maldonado, I'm Matthew Eliaser,

10 and I represent Athena Rossiter in this case,

11 who was a Wexford employee at the time.  I am

12 also General Counsel for Wexford as well.

13         I just have a few questions for you, if

14 you don't mind, let me just get organized here

15 for a second.

16         Okay.  It's a few more than a few.

17         After that first interaction with

18 Lippert you said you were present when Palmer

19 made the call to the Health Care Unit, right?

20   A.   Yes.

21   Q.   Do you know who Palmer spoke with?

22   A.   No.

23   Q.   During that second interaction with

24 Lippert you said you saw a liquid on the floor,

Page 78

1  right?

2    A.   Yes.

3    Q.   Did you see any liquid on his body or

4  his clothes?

5    A.   No.

6    Q.   So it was only on the floor?

7    A.   Yes.

8    Q.   Did he say anything to you about the

9  liquid?

10   A.   The only thing he stated was that he

11 peed on himself.

12   Q.   Okay.  Those exact words?

13   A.   Yes.

14   Q.   You also said that you saw Officer

15 Palmer and another officer escorting him out of

16 the cell and going downstairs, right?

17   A.   Yes.

18   Q.   Did you -- well, what was Lippert's

19 condition while he was being carried by Palmer

20 and the other officer?

21   A.   He was alert.

22   Q.   His eyes were open?

23   A.   Yes.

24   Q.   He was talking?

Page 79

1    A.   I don't know if he was talking, but I

2  know that he was alert, because his body was not

3  limp.

4    Q.   Okay.  Was doing anything else?  Was

5  he laughing, crying, screaming, anything that

6  you remember?

7    A.   No.

8    Q.   You don't remember?

9    A.   No, I don't remember.

10   Q.   Did he appear to be in distress when he

11 was being carried out of the cell by Palmer and

12 the other officer?

13   A.   No.

14   Q.   And what makes you say that?

15 MS. MARSH:  Objection, foundation.

16   A.   He didn't look like he was in distress.

17 MS. MARSH:  Can you define distress?

18 By MR. ELIASER:

19   Q.   You said that he was alert, he wasn't

20 crying, he wasn't screaming, right, correct?

21   A.   Correct.

22   Q.   Was he saying anything else that you

23 remember at that time?

24   A.   No.

Page 80

1    Q.   So basically all you remember about his

2  condition when he was being carried out of the

3  cell is that he was alert and he did not appear

4  to be distress, is that fair?

5    A.   Yes.

6    Q.   You described to us what your

7  definition of a medical emergency was.  Do you

8  remember that earlier in this deposition?

9    A.   No.

10   Q.   Okay.  I think you said someone who's

11 bleeding, someone who has heart pain, someone

12 who has a broken bone, things along those lines

13 are people with a medical emergency, right?

14   A.   Correct.

15   Q.   Okay.  Would I be correct to say then

16 that in your determination at the time Mr.

17 Lippert was not having a medical emergency?

18   A.   Yes.

19   Q.   Okay.  Why would you -- why did you

20 make that determination?

21   A.   Because he was talking to me.  He did

22 not seem like he was at the level where he

23 needed the next extreme medical -- somebody in

24 medical to come and see him.

Page 81

1  Q.  And I take it his laughter and his
2  giggling also indicated to you that he was not
3  having a medical emergency?
4  A.  Yes.
5  Q.  Anything else we haven't talked about
6  that made you determine that he wasn't having a
7  medical emergency at the time?
8  A.  No.
9  Q.  Have you ever spoken with Athena
10  Rossiter about this incident?
11  A.  No.
12  Q.  Do you know Athena?
13  A.  No, I do not.
14  Q.  Other than this incident, have you been
15  involved in a situation where Lippert has
16  refused medication?
17  A.  No.
18  Q.  So this was the only -- well, strike
19  that.
20     I'm going to mark an Exhibit.  We're on
21  3, right?
22  COURT REPORTER:  Yes, 3.
23  MR. ELIASER:  Just for the record, this is
24  Exhibit 3, which purports to be a Grievance

Page 82

1  Officer's Report, dated September 29th, 2010.
2  The Bates stamp is Lippert Master File 000277.
3  BY MR. ELIASER:
4  Q.  Miss Maldonado, do you have that
5  document in front of you?
6  A.  Yes.
7  Q.  Have you ever seen this document
8  before?
9  A.  The information on it or the actual
10  document itself?
11  Q.  Either.
12  A.  I've seen the paper, yes.  But I have
13  not seen this one.  This particular --
14  Q.  So you've seen a grievance officer's
15  report before, you just haven't seen this
16  particular one?
17  A.  Yes.
18  Q.  I'm going to direct your attention to
19  the third to last sentence that starts with per
20  C/O Maldonado, do you see that?
21  A.  Yes.
22  Q.  Okay.  Could you review that for me and
23  let me know when you're done.
24  A.  Okay.

Page 83

1  Q.  Does that refresh your recollection in
2  any way as to any other things that you
3  witnessed while the inmate was being escorted
4  out of the cell by Palmer and the other
5  correctional officer?
6  A.  Yes.
7  Q.  And tell me what your recollection is
8  now?
9  A.  As Sergeant Palmer and the other
10  officer was carrying him downstairs when he was
11  still coherent, he was giggling, I mean, not
12  giggling, but he had a smirky smile.
13  Q.  Okay.  So just so I understand, now as
14  you sit here today, you recall that he had a
15  giggly smile and was laughing when he was being
16  escorted out of the cell by Palmer, is that
17  correct?
18  A.  Yes.  He was facing the center of the
19  rotunda, coming off of 3 Gallery.
20  Q.  And you could see his face when he was
21  being escorted?
22  A.  Yes.  Not escorted, but being brought
23  down.
24  Q.  Being brought down.  Was he being

Page 84

1  carried?
2  A.  Yes.
3  Q.  Okay.
4  A.  Carried in arm and feet kind of carry.
5  Somebody had him -- sarg had him by the arms and
6  somebody else had him by the feet.
7  Q.  Does this refresh your recollection at
8  all as to whether you were ever interviewed with
9  respect to this grievance that was filed against
10  you?
11  A.  No.
12  Q.  So this doesn't refresh your
13  recollection at all as to whether Colleen
14  Franklin or any other counselor or officer spoke
15  to you about this incident for purposes of
16  responding to the grievance?
17  A.  No.
18  Q.  Did you speak with anyone from the
19  medical staff on May 1st, 2010?
20  A.  No.
21  MR. ELIASER:  Okay.  That's all I have.
22  MR. LOVELLETTE:  Can we have just a second.
23     EXAMINATION
24  BY MR. LOVELLETTE:

Page 85

1    Q.   I just have one question.  I want to
2  clear up something.  At any point on May 1st of
3  2010 did Mr. Lippert tell you that he did not
4  get a specific type of medication?
5    A.   No.
6    Q.   Did he ever tell you that he did not
7  get his "insulin"?
8    A.   No.
9    Q.   What did he tell you about his
10 medication?
11   A.   He said that 3 to 11 had not given him
12 his meds.
13   Q.   And was that his word?
14   A.   Meds.
15   Q.   Is that's a word that's used by
16 inmates?
17   A.   Yes.
18   Q.   Okay.  And let's switch and talk a
19 little bit about Exhibit 3.  Is it possible that
20 you were -- that someone did speak to you before
21 this report, in order to write this report and
22 you don't remember it?
23   A.   Yes.
24   MR. LOVELLETTE:   That all I have.

Page 86

1    MS. MARSH:   I just have a few more.  No,
2  really a few.
3                EXAMINATION
4             BY MS. MARSH:
5    Q.   Just so we're clear on the record, I
6  believe Matt asked you a question. if you ever
7  had knowledge of an incident where Mr. Lippert
8  had refused medication.  Do you remember that
9  question?
10   A.   Yes.
11   Q.   Do you have any reason to believe that
12 Mr. Lippert has refused medication before?
13   A.   No.
14   Q.   Okay.  You said that earlier, probably
15 the first to go around with you and I, that you
16 knew that Mr. Lippert was a diabetic, correct?
17   A.   He stated that he was a diabetic, I
18 can't prove it.
19   Q.   I understand that.  What my question is
20 to you, you understood, based on his
21 representations to you, that he was a diabetic,
22 correct?
23   A.   Correct.
24   Q.   And he had been in the F House for at

Page 87

1  least a year before May of 2010, correct?
2    A.   Correct.
3    Q.   So than when he said that he didn't get
4  his medication to you, would you have presumed
5  that it was diabetes related?
6    A.   No. He said a med, I didn't ask him,
7  because if he told me a name of pill, I would
8  know what kind of a pill.  He just said I did
9  not receive my meds.
10   Q.   I understand.  Did he have other
11 ailments in which he often received medication?
12   A.   No, I don't know.
13   MR. ELIASER:   And I would object to
14 foundation on that question.
15 BY MS. MARSH:
16   Q.   Had you been present before to see
17 other inmates get their medication during your
18 shift?
19   A.   Yes.
20   Q.   So you knew that however many inmates
21 in the F House were recipients of consistent
22 medication from that Health Care Unit?
23   MR. ELIASER:   Objection to the form of the
24 question.

Page 88

1    Go ahead.
2    A.   There is inmates that do receive it on
3  a daily basis.  But I really don't know which
4  one's are the one's.  Because like I said, from
5  the time that we enter that unit, it's very
6  busy, so that unit that is in question, they
7  float inmates around a lot.  So you don't have
8  the same inmate in 345 today, and then tomorrow
9  he might be in there.  So it fluctuates.
10   Q.   When you say 345, does that mean a cell
11 number?
12   A.   Yes.
13   Q.   Oh, okay.  So regardless, that's not
14 your responsibility as a correctional officer to
15 maintain a list of which inmates receive
16 medication?
17   A.   Correct.
18   Q.   So you don't typically know, as you've
19 stated, when an inmate is supposed to receive
20 medication?
21   A.   Correct.
22   Q.   And have you ever heard, you know what,
23 strike that.
24   When Mr. Lippert said to you that he

Page 89

1  did not receive his meds, as you said, correct?
2       A.   Correct.
3       Q.   Do you automatically accept that -- my
4  question is do you ask questions about to
5  further investigate why perhaps an inmate didn't
6  get their medication or get further information
7  for you to report to the Health Care Unit?
8       A.   No.
9       Q.   So you just accept that what they say
10 is true and then you make -- you determine your
11 actions thereafter, is that correct?
12      A.   Correct.
13      Q.   So in this instance you accepted from
14 Mr. Lippert that he said he had not received his
15 medication in the two previous shifts, correct?
16      A.   Correct.
17      Q.   And your response was to go down and
18 directly tell your sergeant?
19      A.   Correct.
20      Q.   You did not ask Mr. Lippert what
21 medication that was?
22      A.   No.
23      Q.   So you did not know why he needed the
24 medication?

Page 90

1       A.   Correct.
2       Q.   When he advised you that he was
3  feeling -- I believe this was a second
4  interaction you had with him, that he was
5  feeling weak or dizzy, I believe those were the
6  words?
7       A.   Faint, yes.
8       Q.   Did he say why he was feeling those
9  things?
10      A.   Because that's when he stated that he
11 was diabetic.
12      Q.   But as I understood it before he had
13 told you previously on another occasion that he
14 was diabetic?
15      A.   No, I had not -- that day.
16      Q.   That day he told you he was diabetic?
17      A.   Yes.
18      Q.   So at no other time in the year or so
19 on the F House did you know him to receive
20 medication?
21      A.   No.
22      MS. MARSH:  Hold on one second, please.  I
23 just want to make sure I've gone through
24 everything.

Page 91

1       That's all the questions I have for
2  you.  Thank you.
3       MR. ELIASER:  I just have one question, I
4  swear.  I promise.
5                  EXAMINATION
6            BY MR. ELIASER:
7       Q.   Did he say to you that he had not
8  received his meds on the previous two shifts or
9  just that he had not received his meds, which
10 one was it?
11      A.   On 3 to 11, and 11 -- the previous
12 shift.
13      Q.   So when you had the interaction -- this
14 first interaction with him you were -- this was
15 during the 7 to 3 shift, right?
16      A.   Yes, 7 to 3, yes, he had not received
17 his meds the prior two shifts, which was 3 to
18 11, 11 to 7, that's when he spoke to me at 7:00
19 o'clock that morning, during my shift, my
20 regular work day.
21      MR. ELIASER:  Okay.  Nothing further.
22      MR. LOVELLETTE:  We will reserve signature.
23
24

Page 92

1       (Whereupon, Deposition Exhibit
2       Nos. 1, 2 and 3 were marked for
3       identification.)
4       (DEPOSITION CONCLUDED AT 11:56 A.M.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 93

1    STATE OF ILLINOIS     )
2                          )  SS:
3    COUNTY OF COOK        )
4        I, Jacqueline Shenberger, a Certified
5    Shorthand Reporter within and for the County of
6    Cook and State of Illinois, do hereby certify
7    that heretofore, to-wit, on September 26, 2014,
8    personally appeared before me, at 11638 South
9    Broadway, Crest Hill, Illinois, MARTHA
10   MALDONADO, in a cause now pending and
11   undetermined in the Circuit Court of Cook
12   County, Illinois, wherein DONALD LIPPERT, et-al
13   is the Plaintiff, and SALVADOR GODINEZ, et-al is
14   the Defendant.
15       I further certify that the said witness was
16   first duly sworn to testify the truth, the whole
17   truth and nothing but the truth in the cause
18   aforesaid; that the testimony then given by said
19   witness was reported stenographically by me in
20   the presence of the said witness, and afterwards
21   reduced to typewriting by Computer-Aided
22   Transcription, and the foregoing is a true and
23   correct transcript of the testimony so given by
24   said witness as aforesaid.

Veritext Legal Solutions Midwest
www.veritext.com                     888-391-3376

Page 94

1        I further certify that the signature to the
2    foregoing deposition was reserved by counsel for
3    the respective parties.
4        I further certify that the taking of this
5    deposition was pursuant to Notice, and that
6    there were present at the deposition the
7    attorneys hereinbefore mentioned.
8        I further certify that I am not counsel for
9    nor in any way related to the parties to this
10   suit, nor am I in any way interested in the
11   outcome thereof.
12       IN TESTIMONY WHEREOF:  I have hereunto set my
13   hand and affixed my notarial seal this 10th of
14   October, 2014.
15
16
17
18
19
20   ------------------------------
     Certified Shorthand Reporter
21
22
23
24

Veritext Legal Solutions Midwest
www.veritext.com                     888-391-3376

Page 95

1                DEPOSITION REVIEW
               CERTIFICATION OF WITNESS
2
       ASSIGNMENT NO: 1928202
3      CASE NAME: Lippert, Donald, Et Al. v. Norman, Et Al.
       DATE OF DEPOSITION: 9/26/2014
4      WITNESS' NAME: Martha Maldonado
       In accordance with the Rules of Civil
5    Procedure, I have read the entire transcript of
     my testimony or it has been read to me.
6      I have made no changes to the testimony
     as transcribed by the court reporter.
7
8    _____     _____
     Date                    Martha Maldonado
9
       Sworn to and subscribed before me, a
10   Notary Public in and for the State and County,
     the referenced witness did personally appear
11   and acknowledge that:
12       They have read the transcript;
         They signed the foregoing Sworn
13       Statement; and
         Their execution of this Statement is of
14       their free act and deed.
15     I have affixed my name and official seal
16   this _____ day of _____, 20____.
17
18   _____
     Notary Public
19
     Commission Expiration Date
20
21
22
23
24

Veritext Legal Solutions Midwest
www.veritext.com                     888-391-3376

Page 96

1                DEPOSITION REVIEW
               CERTIFICATION OF WITNESS
2
       ASSIGNMENT NO: 1928202
3      CASE NAME: Lippert, Donald, Et Al. v. Norman, Et Al.
       DATE OF DEPOSITION: 9/26/2014
4      WITNESS' NAME: Martha Maldonado
       In accordance with the Rules of Civil
5    Procedure, I have read the entire transcript of
     my testimony or it has been read to me.
6      I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
7    well as the reason(s) for the change(s).
8      I request that these changes be entered
     as part of the record of my testimony.
9
10     I have executed the Errata Sheet, as well
     as this Certificate, and request and authorize
11   that both be appended to the transcript of my
     testimony and be incorporated therein.
12
13   _____     _____
     Date                    Martha Maldonado
14
       Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
         They have read the transcript;
17       They have listed all of their corrections
         in the appended Errata Sheet;
18       They signed the foregoing Sworn
         Statement; and
19       Their execution of this Statement is of
         their free act and deed.
20     I have affixed my name and official seal
21   this _____ day of _____, 20____.
22
23   _____
     Notary Public
24
25   Commission Expiration Date

Veritext Legal Solutions Midwest
www.veritext.com                     888-391-3376