IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

DONALD LIPPERT,                     )

              Plaintiff,          )

  vs.                               )    No. 10-CV-4603

SALVADOR GODINEZ, et-al             )

             Defendants.         )

      The deposition of ALPHONSO NORMAN, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Jacqueline Shenberger, Certified Shorthand Reporter within and for the County of Cook and State of Illinois, at 16830 South Broadway, Crest Hill, Illinois, on July 9, 2014, at the hour of 9:16 o'clock A.M.

Jacqueline Shenberger

License No: 084-001524



Page 2

```
 1   APPEARANCES:
 2      SEYFARTH SHAW LLP
 3      BY:  MR. JASON STIEHL
 4      131 South Dearborn
 5      Suite 2400
 6      Chicago, Illinois  60603
 7      (312) 460-5568
 8         Representing the Plaintiff;
 9      CASSIDAY SCHADE
10      BY:  MR. MATTHEW A. ELIASER
11      20 North Wacker Drive
12      Suite 1000
13      Chicago, Illinois  60606
14      (312) 641-3100
15      meliaser@cassiday.com
16         Representing the Defendant,
17         Rossiter;
18      LISA MADIGAN ATTORNEY GENERAL OF ILLINOIS
19      BY MS. AGNES PTASZNIK
20      100 West Randolph Street
21      Chicago, Illinois 60601
22      (312) 814-4217
23      aptasznik@atg.state.il.us
24         Representing Alphonso Norman
```

Page 3

```
 1
 2              I N D E X
 3   WITNESS              EXAMINATION
 4
 5   ALPHONSO NORMAN
 6
 7   By MR. STIEHL          4
 8   By MR. ELIASER          x
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1       (Deposition commenced at 9:16 AM)
 2         (Whereupon, the witness was duly
 3         sworn.)
 4            ALPHONSO NORMAN,
 5   called as a witness herein, was examined and
 6   testified as follows:
 7              EXAMINATION
 8   BY MR. STIEHL:
 9      Q.  Good morning, Mr. Norman, thank you for
10   taking the time out today, I know there's
11   nothing enjoyable about this, so I'll make it as
12   quick and painless as I can for you.
13         The reason we're here today is I've
14   been appointed to represent an inmate at this
15   facility by the name of Don Lippert.  And Mr.
16   Lippert has named you along with several other
17   folks in a federal lawsuit pending in the
18   Northern District of Illinois, captioned Lippert
19   V Godinez, el-al, case number 10-CV-4603.
20         Mr. Norman, have you had any
21   opportunity to actually read the complaint that
22   was filed in this case?
23      A.  Yes.
24      Q.  I've read your Interrogatory Answers,
```

Page 5

```
 1   but I'm just going to start off by asking you
 2   the question, do you have any recollection
 3   independent of documents of the grievance and/or
 4   allegations raised by Mr. Lippert in his
 5   complaint?
 6      A.  No, I don't.
 7      Q.  Let me go through a couple of ground
 8   rules; have you been deposed before?
 9      A.  No.
10      Q.  Okay.  Well, first time,
11   congratulations.  I don't get that very often in
12   any of my cases.
13         Let me tell you some of the ground
14   rules, I am counsel for Mr. Lippert.  She's
15   counsel for you.  He's counsel for Wexford --
16      MR. ELIASER:  And for Miss Rossiter.
17   BY MR. STIEHL:
18      Q.  And for Miss Rossiter.  I'm going to be
19   asking you questions throughout today.  Your
20   counsel may object to those questions.  Unless
21   she instructs you not to answer, you still need
22   to answer my question.  Okay?
23      A.  Okay.
24      Q.  And I will do my best to speak clearly.
```

Page 6

1 Sometimes I rush through questions. If you
2 don't understand me, say I don't understand and
3 I'll ask it again. Okay?
4    A. All right.
5    Q. If you don't ask me that, I'll assume
6 you understood my question, and the answer you
7 give is responsive to the question I'm asking.
8 Is that fair?
9    A. Yes.
10    Q. Although we're here at my request,
11 we're here on your time, if you need a break at
12 any point, let me know. The only exception is
13 if there's a question pending, I need you to
14 answer the question, and then we can take a
15 break. Is that fair?
16    A. Yes.
17    Q. Have you -- do you have any issues with
18 medical problems, remembering things, or
19 alcoholism or drug dependencies?
20    A. No.
21    Q. Okay. Is there any reason today why
22 you can't give your best testimony?
23    A. No.
24    Q. I hate to ask you this, it's something

Page 7

1 that I ask of all witnesses; have you ever been
2 convicted of any crime before?
3    A. No.
4    Q. Do you have any outstanding warrants
5 issued for your arrest?
6    A. No.
7    Q. If this case goes to a hearing or trial
8 in the Northern District of Illinois, is there
9 any reason why you cannot attend that hearing?
10    A. No.
11    Q. That you're aware of. Okay. All
12 right. So going back to the issues that were
13 raised by Mr. Lippert, having read the complaint
14 and being asked questions by your Counsel, do
15 you now have any recollection of the May lst
16 incident of 2010?
17    A. No.
18    Q. So let's talk generically then about
19 your job. How long have you worked for the
20 Department of Corrections?
21    A. About 10 years, 6 months.
22    Q. So 2003?
23    A. Yes.
24    Q. And prior to becoming a correctional

Page 8

1 officer, what was your -- where were you
2 employed?
3    A. I worked in telecommunications prior to
4 corrections.
5    Q. Let me go the other way around. When
6 did you graduate from high school? Did you
7 graduate from high school?
8    A. Yes, 1999.
9    Q. And from 1999 to 2003 what did you do?
10    A. I did some college. I did some work.
11    Q. And what lead you to want to become a
12 correctional officer?
13    A. I had a family that worked in
14 corrections, he told me about it, I liked the
15 idea, signed up for it, passed the test.
16    Q. What kind of examination did you take
17 to become a correctional officer?
18    A. It's a standard entrance exam, typical
19 for this type of employment. Maybe like a
20 college entrance exam; reading, reading
21 comprehension, memory recollection and math.
22    Q. Okay. Upon becoming a correctional
23 officer, did you come right to Stateville?
24    A. No, we do a six week training down at

Page 9

1 the Correctional Academy in Springfield.
2    Q. And can you tell me what that training
3 entails?
4    A. Training entails what the basic
5 responsibilities of our jobs are, safety,
6 custody, control, firearms training, the rules
7 and regulations of the Department of
8 Corrections.
9    Q. Are you provided any books, binders,
10 materials to study?
11    A. Yes.
12    Q. And can you recall what those were?
13    A. They were basically pamphlets and/or
14 short collections of works, just to prepare for
15 the test that we would take at the academy. We
16 were given material and we were tested on the
17 material to make sure we knew what they needed
18 us to know.
19    Q. Are you familiar with the term
20 Institutional Directive?
21    A. Yes.
22    Q. Were you provided Institutional
23 Directives during that six weeks training --
24    A. Yes.

3 (Pages 6 to 9)

Page 10

1  Q. One thing I didn't say as part of my
2  little introduction, is whenever I am asking
3  questions, let me finish, because the court
4  reporter is over here taking down everything you
5  and I say. If we talk over each other, it's
6  very hard for her to keep up with us. So let me
7  finish, then you answer. And I likewise will
8  let you answer, and I'll wait until you're done,
9  is that fair?
10 A. Yes.
11 Q. Also when you're answering, if you can
12 do your best to answer verbally and clearly with
13 yes's and no's. Just sometimes we have a
14 tendency to make grunts and noises like uh-huh.
15 So try not to do that because it's hard for the
16 court reporter. Okay?
17 A. Yes.
18 Q. Thanks. So back, I'm sorry, you were
19 provided Institutional Directives as part of
20 your six weeks training, correct?
21 A. Yes.
22 Q. Were you provided examinations specific
23 to those directives?
24 A. I don't recall.

Page 11

1  Q. And I think there's also something
2  called Administrative Directives?
3  A. Yes.
4  Q. Okay. And were you provided those
5  during your training?
6  A. Yes.
7  Q. And do you recall being given any
8  examinations specific to the Administrative
9  Directives?
10 A. I don't recall.
11 Q. Okay. And just so we're clear as this
12 goes on, when you say I don't recall today, does
13 that mean that it didn't happen, or you just
14 don't have a memory of it?
15 A. It means I don't have a memory of it.
16 Q. Okay. Very good. Please try to keep
17 that in mind when you're answering. I'll assume
18 when you say you don't recall, that means you
19 just don't remember. Okay?
20 A. Yes.
21 Q. As you sit here today do you know if
22 there are any Institutional Directives or
23 Administrative Directives that are specific to
24 how correctional officers should handle a

Page 12

1  medical emergency?
2  A. Yes.
3  Q. Now, I'm not going to go too deep, but
4  do you remember precisely what it requires you
5  to do?
6  A. From my recollection, I believe that
7  we're suppose to alert medical staff and our
8  immediate supervisor.
9  Q. Okay. Is there a form that you need to
10 fill out as a correctional officer if there's a
11 medical emergency that you become aware of?
12 A. No.
13 Q. So as far as your role, if there's a
14 medical emergency in the prison, you just need
15 to relay that emergency to a supervisor, medical
16 staff, and from your perspective that's the end
17 of your obligation?
18 A. Yes.
19 Q. Okay. During your six weeks of
20 training were you ever put in a hypothetical or
21 pretend situation where you had to respond to a
22 medical emergency?
23 A. Not that I can recall.
24 Q. Have you ever received any training at

Page 13

1  any time during your ten plus years as a
2  correctional officer on what to do if there's a
3  medical emergency with an inmate?
4  A. Yes.
5  Q. Okay. And tell me about that training?
6  A. When the Administrative Directives were
7  taught to us, we were giving kind of examples of
8  what to do in those types of situations.
9  Q. Was that subsequent to becoming an
10 employee?
11 A. Yes.
12 Q. Do you remember approximately when that
13 was? What year?
14 A. 2003.
15 Q. No, no, I mean, I'm sorry, when you
16 received the training on the Administrative
17 Directives?
18 A. I'm sorry. That was in the academy.
19 Q. Okay. Do you recall who taught that to
20 you?
21 A. No.
22 Q. And do you recall any of the examples
23 that they give you as part of the training?
24 A. No.

Page 14

1    Q.  Is it fair to say that after the
2  training you felt comfortable to handle any
3  medical emergency that might arise while you're
4  a correctional officer?
5    A.  Yes.
6    Q.  After your six weeks of training did
7  you come then immediately to Stateville?
8    A.  Yes.
9    Q.  Okay.  So you've been at Stateville for
10 over 10 years?
11   A.  Yes.
12   Q.  And has your role -- has your position
13 changed as a correctional officer by title?
14   A.  No, sir.
15   Q.  And are you stationed in a particular
16 house within Stateville, or has your location
17 changed throughout your 10 years?
18   A.  My location has changed.
19   Q.  Does it change daily, weekly, monthly?
20 Let me ask you this way, when you come in, do
21 they tell you where you need to go, or you
22 already know which House you're going to be on a
23 given shift?
24   A.  Everyday I'm told where I need to go

Page 15

1  for that day.
2    Q.  So I noticed when I was waiting to come
3  up here there's a sign in book when the officers
4  come in.  Do you sign in everyday you show up
5  for your job?
6    A.  No.
7    Q.  How do you check in that you're here?
8    A.  We have a roll call, we show up to a
9  roll call.
10   Q.  And who keeps the roll call, do you
11 know?
12   A.  Whoever the shift commander is for that
13 particular shift and day.
14   Q.  If I wanted to check if you were in
15 Stateville on May lst, 2010, is the roll call
16 what I would check?
17   A.  The roll call is not a paper, it's an
18 oral thing where we stand.
19   Q.  Do you know if there's any written
20 documentation as to who, which correctional
21 officers are present on any given day?
22   A.  Yes.
23   Q.  What is that called?
24   A.  Roster.

Page 16

1    Q.  Now, does a roster reflect who's
2  suppose to be there or who actually shows up for
3  that day?
4    A.  I'm not sure.
5    Q.  Okay.  I assume the roster is -- I
6  shouldn't assume.  Is it your understanding that
7  the roster is what the officer reads off for
8  roll call?
9    A.  Yes.
10   Q.  If you wanted to go back and check, you
11 personally, is there some place you would go to
12 look for those rosters?
13   A.  I would communicate with the shift
14 commander of the particular night in question,
15 and ask for a copy of their roster for that
16 night.
17   Q.  And in preparation for today's
18 deposition, or in answering the interrogatories
19 that were served upon you, did you check to see
20 if you were working on May lst, 2010?
21   A.  No.
22   Q.  Do you know if your Counsel did?
23   A.  I'm not sure.
24   Q.  As you sit here today do you know if

Page 17

1  you were actually working on May 1st, 2010?
2    A.  No.
3    Q.  No, you don't know or no, you were not?
4    A.  No, I don't know.
5    Q.  So you come in through the main gate
6  area every day you work?
7    A.  Yes.
8    Q.  And then where is this roll call take
9  place?  Is it in this building we're in today?
10   A.  The roll call room is in this building,
11 the lower level.
12   Q.  Okay.  And I don't know what this -- I
13 guess it's the Administrative Building?
14   A.  Yes.
15   Q.  Okay.  Approximately how many officers
16 are present at the beginning of a shift?
17   A.  That differs per shift.
18   Q.  So can you give me an example?
19   A.  It could be 30 or it could be a
20 hundred.
21   Q.  And then you all sit in one room and
22 stand up, say here, how does it work?
23   A.  We stand up, our names are called, our
24 assignments are given.

Veritext Legal Solutions Midwest

www.veritext.com                                    888-391-3376

Page 18

1    Q.  Do you have any decision or influence
2  on where you are on a given date or is it all up
3  to the shift commander?
4    A.  It's all up to the shift commander.
5    Q.  Once you are given your assignment --
6  let me ask you this.  Do you know in 2010 which
7  house Don Lippert was staying?
8    A.  Per this report I do.
9    Q.  Okay.  Which house is that?
10   A.  F House.
11   Q.  If I asked you to describe Don Lippert,
12 as we sit here today, can you describe what he
13 looks like?
14   A.  Yes.
15   Q.  Okay.  Describe Don Lippert for me,
16 physically not personally?
17   A.  He's a White, male, average height,
18 slim built.
19   Q.  Hair color?
20   A.  I don't know.
21   Q.  In the years that you have been at
22 Stateville, how many general interactions do you
23 recall having with Don Lippert?
24   A.  I can't recall that.

Page 19

1    Q.  And I'm not looking for a specific
2  number, I'm just -- I'll try to do it even more
3  generically.  Can you recall ever having any
4  interaction with Don Lippert?
5    A.  Yes.
6    Q.  And can you recall approximately how
7  many times that happened in the last 10 years?
8    A.  Probably 50.
9    Q.  Okay.  And let's try to whittle it
10 down.  Of the approximately 50 interactions
11 you've
12 had with Mr. Lippert, how many of those
13 interactions dealt with medical situations that
14 you can recall?
15   A.  By medical situations, can you explain
16 that question a little bit better.
17   A.  Sure, of course.
18   MR. ELIASER:  Let me just ask before you do
19 that.  5-0 or 1-5?
20   A.  5-0.
21   MR. ELIASER:  Sorry.
22   MR. STIEHL:  That's okay.
23 BY MR. STIEHL:
24   Q.  So anything to do with health issues,

Page 20

1  so, needs to go see a doctor, isn't feeling
2  well, needs to get his medicine, needs to get a
3  shot, needs some sort of care, some sort of
4  medical care?
5    A.  Inmate Lippert sees a doctor or a nurse
6  pretty much on a nightly basis.  So he has to be
7  escorted from whatever cell house he's in, along
8  with the other inmates in that cell house that
9  have to see the nurse, and they all get escorted
10 to and from the Health Care Unit --
11   Q.  Okay.
12   A.  And that happens at least on my shift
13 once daily.
14   Q.  Approximately how many people do you
15 escort on a given day to a doctor or nurse in
16 this group?
17   A.  One officer can only escort 5.  The
18 most we get in a typical medical line is 10.
19   Q.  Again, we're talking generically here.
20 But generically, are the inmates typically all
21 going for the same reason, or they're going for
22 multiple reasons?
23   A.  On my shift, typically they're going
24 for the same reason.

Page 21

1    Q.  What is that?
2    A.  To get insulin shots.
3    Q.  How many -- where is Lippert -- I
4  should know this, but do you know where
5  Lippert's stationed now, which house he's in?
6    A.  No.
7    Q.  When was the last time you interacted
8  with Don Lippert?
9    A.  I can't remember that.
10   Q.  Has it been more than a year, do you
11 think?
12   A.  No.
13   Q.  Have you escorted him recently to a
14 doctor or nurse, recently, within the last month
15 or so?
16   A.  No.
17   Q.  Your estimate, approximately how many
18 inmates do you believe require an escort on a
19 daily basis for diabetic purposes for insulin?
20   A.  I can only answer for my shift.  I
21 don't know what goes on for other shifts.
22   Q.  That's fair?
23   A.  30.
24   Q.  Let me come back to this line of

6  (Pages 18 to 21)

Page 22

1  questioning. I don't want to get too far from
2  where I was before, which is the approximate 50
3  times you've interacted with Don, did that
4  include this daily -- I assume it did not
5  include the daily walk to the doctor, or did it?
6      A.  Yeah, it did.
7      Q.  Oh, okay. So take that out. Other
8  than the typical escort that you have to take
9  inmates to see the doctor or nurse,
10  approximately how many times do you believe
11  you've interacted with Don Lippert since you've
12  been a correctional officer?
13      A.  Zero times.
14      Q.  Have you ever had a situation that you
15  recall where Don Lippert required any medical
16  intervention?
17      A.  No.
18      Q.  And do you recall any situation that
19  required Don Lippert to have any sort of, I
20  don't know the right term, but any sort of
21  punishment, or you had to respond to an incident
22  with Don Lippert? He was misbehaving?
23      A.  No.
24      Q.  Okay. Did -- at any time that you had

Page 23

1  to escort Don, Mr. Lippert, to the doctor or
2  nurse, did he ever refuse to go with you?
3      A.  Yes.
4      Q.  And why was that?
5      A.  No reason was given why he refused, he
6  stated that he refused to take his medicine that
7  night.
8      Q.  On how many occasions has that
9  occurred?
10      A.  Once.
11      Q.  Do you recall when that was,
12  approximately?
13      A.  Approximately February of 2014.
14      Q.  And he didn't tell you why he was
15  refusing to take his medicine?
16      A.  No.
17      Q.  Is there any protocol as a correctional
18  officer to inquire further as to why or to
19  insist he goes to the doctor?
20      A.  No.
21      Q.  Do you have to report to anyone that
22  he's refusing to come?
23      A.  Yes.
24      Q.  And how does that -- explain to me how

Page 24

1  that works?
2      A.  I generated an incident report stating
3  that Mr. Lippert refused his medication for that
4  night, which was turned over to my shift
5  commander.
6      Q.  Do you know if that's something that's
7  then placed into Mr. Lippert's file?
8      A.  I'm not sure.
9      Q.  Okay. Do you know if it goes into his
10  medical records?
11      A.  Also not sure.
12      Q.  Okay. Is that the protocol for when an
13  inmate refuses medication to create an incident
14  report?
15      A.  Yes.
16      Q.  Other than this one incident from 2014,
17  do you have any other recollections of Mr.
18  Lippert refusing his medicine?
19      A.  No.
20      Q.  Generically, again, when you're
21  interacting with inmates, how often would you
22  say it occurs that an inmate refuses to go see
23  the doctor or nurse?
24      MS. PTASZNIK: Objection, foundation. And do

Page 25

1  you mean just on his night shift only or in all
2  cases?
3  BY MR. STIEHL:
4      Q.  Yeah, historically, I'm not focussing
5  on any particular shift, I'm looking
6  generically, high level, approximately -- is it
7  common, not common that the inmate refuses to
8  see a doctor?
9      A.  Usually it's not common.
10      Q.  Now, I'm going to be more specific to
11  diabetic inmates, how many occasions
12  historically have you witnessed an inmate
13  refused to visit a doctor or nurse for an
14  insulin shot? Again, you don't have to be
15  specific?
16      A.  When I escort a line, which I don't do
17  every night, it's not uncommon for one or two
18  out of ten guys to say I'm okay tonight.
19      Q.  And each time that occurs you have to
20  fill out an incident report?
21      A.  No.
22      Q.  Okay. But you did fill one out for
23  Don?
24      A.  Yes.

Page 26

1    Q.  Why -- tell me what the difference was
2  between Don's situation and the other one or two
3  times a night when someone says I'm okay
4  tonight?
5    A.  Because I felt like some guys get their
6  medicine on other shifts, and I don't know them
7  personally.  So I don't know when these guys get
8  their medicine, but if they come out to go get
9  their medicine and then refuse, that's my
10  incident.
11    Q.  So if Don -- I'm just trying to get a
12  better understanding.  So if Don stays in his
13  cell and says hey, man, I'm good, you would not
14  write an incident problem?
15    A.  To me that's not an incident.
16    Q.  Okay.  But if Don comes out to be in
17  line, and when you come to collect him he says
18  I'm not going, that's your problem and you need
19  to write an incident report?
20    A.  Yes.
21    Q.  Got it.  So I guess going back then,
22  can you recall an occasion where Mr. Lippert
23  didn't come out of his cell to get an insulin
24  shot?

Page 27

1    A.  No.
2    Q.  Can you think of any other occasion
3  where you had to write an incident report for
4  Mr. Lippert?
5    A.  No.
6    Q.  I know I asked you physically to
7  describe him, how would you describe Don Lippert
8  on a personal level?
9    A.  I can't.
10    Q.  Okay.  You have no feeling about Mr.
11  Lippert one way or the other?
12    A.  No.
13    Q.  Okay.  Are there some inmates that if I
14  asked you that question you'd have something to
15  say about them probably?
16    A.  No.
17    Q.  Okay.  You try not to get too deep into
18  understanding the inmates perhaps, is that fair
19  to say?
20    A.  Yes.
21    Q.  Okay.  Let's focus on the May 1st
22  incident that Mr. Lippert raises in his
23  complaint.  Mr. Lippert states in his grievances
24  that his first complaint was to Sergeant Palmer,

Page 28

1  do you know who Sergeant Palmer is?
2    A.  Yes.
3    Q.  Who is Sergeant Palmer?
4    A.  Sergeant Palmer is a Correctional
5  Sergeant.
6    Q.  Is Sergeant Palmer still a Correctional
7  Sergeant?
8    A.  Yes.
9    Q.  And can you explain to me generally in
10  the F House, where do the correctional
11  officers hang out, where are you guys usually
12  stationed during the shift?
13    A.  During the shift in F House the
14  correctional officers are either on their
15  assigned galleries--
16    Q.  Okay.
17    A.  Or in the Sergeant's office getting
18  there -- what they need to do from the Sergeant.
19    Q.  Getting direction from the Sergeant?
20    A.  Yes.
21    Q.  Okay.  So and I've never been in there,
22  thankfully, but my understanding is the F House
23  is designed in a circular fashion, is that
24  right?

Page 29

1    A.  Yes.
2    Q.  And there are -- are there four floors?
3    A.  Yes.
4    Q.  And then there's a station in the
5  center, which is where the Sergeant is located,
6  correct?
7    A.  No.
8    Q.  Where is the Sergeant located?
9    A.  The Sergeant's office is located on the
10  first gallery in the row with the rest of the
11  cells, it's not in the center.
12    Q.  Okay.  So on a compass do you know
13  which direction, right, north, east, south,
14  west, do you know which direction of the cells
15  the Sergeant's office is located?
16    A.  No.
17    Q.  Okay.  I'm not very good with
18  directions either so I won't hold it against
19  you.
20        When you say first floor, is that first
21  floor ground level or --
22    A.  Ground level.
23    Q.  And so I mean, again, I'm trying to
24  visualize it; could I be walking down cells,

8  (Pages 26 to 29)

Page 30

1    cells, cells, then Sergeant's office?
2       A.  Yes.
3       Q.  Okay.  Is there a central tower located
4    in the F House?
5       A.  Yes.
6       Q.  And who's stationed, if anyone, in the
7    central tower?
8       A.  A correctional officer designated to
9    that post that day.
10      Q.  Okay.  There's also a correctional
11   officer located on each gallery?
12      A.  Yes.
13      Q.  Typically on a shift then there are
14   five correctional officers in the F House?
15      A.  No.
16      Q.  Okay.  How many?
17      A.  Ten.
18      Q.  Ten.  Can you just tell me where are
19   they located, where are the correctional
20   officers usually located on a given shift in the
21   F House?
22      A.  On the galleries or in the Sergeant's
23   office or near that area.  There's an officer on
24   the door as well that controls who comes in and

Page 31

1    who goes out.
2       Q.  So you got one on the door, one on the
3    tower?
4       A.  One on the tower.
5       Q.  One on each gallery?
6       A.  Two on galleries.  One and two escort
7    officers, depending on what needs to be done
8    that day, where the inmates have to be escorted
9    that day, and how many inmates have to be
10   escorted that day.
11      Q.  Okay.  On any -- again, generically,
12   how many times do you think you've had to
13   respond in the F House to a medical emergency?
14   Over ten?
15      A.  Over ten.  I can't give you a specific
16   number but --
17      Q.  That's fine, less than fifty?
18      A.  Yes.
19      Q.  Can we be more specific than that or is
20   that about as close as you can estimate?
21      A.  That's about as close as you're going
22   to get.
23      Q.  All right.  Fair enough.  I should have
24   gone with twenty instead of fifty.  Of the ten

Page 32

1    to fifty incidents that you recall generically
2    happening, have any of those, as far as you
3    know, resulted in a grievance being filed
4    against you?
5       A.  I wouldn't know that.
6       Q.  Okay.  So let's walk through that real
7    quick, I know I'm bouncing around.  But the --
8    if a grievance -- how are you informed, if at
9    all that a grievance has been filed against you?
10      A.  I am not.
11      Q.  Okay.  So no one ever tells you that a
12   grievance has ever been filed against you?
13      A.  No.
14      Q.  Are you aware of any grievance that's
15   being filed against you?
16      A.  No.
17      Q.  Let's be specific now to Mr. Lippert's
18   grievance.  Did anyone prior to the litigation
19   being filed, did anyone discuss with you Mr.
20   Lippert's grievance?
21      A.  No.
22      Q.  Did anyone conduct any interviews or
23   meetings with you to determine whether or not
24   Mr. Lippert's statement of the incident was

Page 33

1    accurate?
2       A.  Besides the --
3       Q.  Besides the litigation?
4       A.  No.
5       Q.  I should have said this at the
6    beginning too, I'm forgetting things.  Anything
7    you talk about with your Counsel, I don't want
8    you to tell me about.  So if I ask you a
9    question and it requires you to talk about
10   something you discussed with your Counsel,
11   please don't.  All right.  That's an
12   attorney-client privilege, and I don't want to
13   interfere with that, okay?
14      A.  Okay.
15      Q.  So again, prior litigation, I just want
16   to make sure I heard you answer correctly, no
17   one conducted any sort of interview or meeting
18   with you to determine if Mr. Lippert's
19   recitation of the facts was accurate?
20      A.  No.
21      Q.  Did you hear from any other officer or,
22   you know, rumor mill, just chitchatting, at any
23   point that Mr. Lippert had filed a grievance
24   against you?

Page 34

1    A.  No.
2    Q.  When was the first time you learned
3  that Mr. Lippert had filed a grievance against
4  you?
5    A.  When I got these little packets.
6    Q.  And these little packets, is that the
7  Interrogatory Answers that were served on you?
8    A.  Yes.
9    Q.  And when you received the information
10  what else was in the packet?  Was it a copy of
11  the complaint against you?  Let me show you the
12  Second Amended Complaint, it's got a caption, a
13  big long caption on it, it says complaint on it,
14  then it's got paragraphs.  You said you've seen
15  something like this before?
16    A.  I believe so.
17    Q.  Okay.  Is that included in the packet
18  you received?
19    A.  Yes.
20    MR. ELIASER:  Just for the record, I think
21  we're on the Third Amended Complaint, aren't we?
22    MR. STIEHL:  We are.
23    MR. ELIASER:  Okay.
24    BY MR. STIEHL:

Page 35

1    Q.  When you received the packet of
2  information, there was also a list of what's
3  called -- do you know what Interrogatories are?
4    A.  Yes.
5    Q.  Did you, without going into anything
6  you talked about with your Counsel, did you fill
7  out the Interrogatory Answers by yourself, or
8  did you spell them out with the assistance of
9  Counsel?
10    A.  I filled them out by myself.
11    Q.  And did you send them back to Counsel?
12    A.  Yes.
13    Q.  Again, I don't want to know
14  specifically, but after filling them out and
15  sending them back to your Counsel, were there
16  any changes made to your answers?
17    A.  No.
18    Q.  So I take it then even after reviewing
19  Mr. Lippert's complaint and the Interrogatories
20  that were served on you, nothing about them
21  refresh your memory at all about Mr. Lippert's
22  grievance?
23    A.  No.
24    Q.  Now, going back to the grievance

Page 36

1  itself, Mr. Lippert claimed that on the 7 to 3
2  shift on May 1st, and I want to make sure I'm
3  clear that's 7 to 3 is 7 AM to 3 PM, correct?
4    A.  Yes.
5    Q.  Okay.  On the 7 to 3 shift he had
6  yelled to Sergeant Palmer that he needed medical
7  assistance.  Do you have any recollection of
8  that occurring?
9    A.  No.
10    Q.  Do you know if on May 1st you were part
11  of the 7 to 3 shift?
12    A.  Yes.
13    Q.  And were you part of the 7 to 3 shift?
14    A.  Yes.
15    Q.  So you have no recollection of Mr.
16  Lippert yelling to Sergeant Palmer that he
17  needed medical assistance?
18    A.  No.
19    Q.  Do you have any knowledge whether or
20  not Sergeant Palmer in fact did call for medical
21  assistance?
22    A.  I don't recall.
23    Q.  If an inmate requests medical
24  assistance, what is the protocol for an officer

Page 37

1  to make a request for medical assistance?  How
2  do they do that?
3    A.  By radio.
4    Q.  And who do they call?
5    A.  A med tech.
6    Q.  Okay.  And if it's someone that needs
7  an insulin shot, is that the same process?
8    A.  We don't know if they need an insulin
9  shot, so.
10    Q.  No, no, I'm asking, like if someone
11  specifically says I need my insulin, do you
12  still call the med tech?
13    A.  We still call the med tech or the
14  hospital.
15    Q.  Okay.  Do you know if there's any
16  report done internally that that call was made?
17    A.  No.
18    Q.  Okay.  No, you don't know, or no, there
19  were no calls --
20    A.  No, I don't know.
21    Q.  And so if Sergeant Palmer did or did
22  not make that call there would be no, as far as
23  you know, there would be no paperwork that
24  reflects that call?

Page 38

```
 1        A.   As far as I know, no.
 2        Q.   Okay.  The next portion of Mr.
 3   Lippert's grievance states that he called to a
 4   group of officers for assistance at about 9 AM.
 5   Is there a way for you to check whether or not
 6   the officers he lists were also on the floor
 7   with you in the F House that day, other than the
 8   roster we talked about before?
 9        A.   No.
10        Q.   So do you recall, as you sit here, on
11   May 1st whether or not Officer Hernandez,
12   Clemmons, Dangerfield, Jones, Jackson, Maldonado
13   and Cernecki were also on the floor with you
14   that day?
15        A.   Since I can't recall that day, I can't
16   say for sure who was there.
17        Q.   Okay.  Generally speaking back from our
18   historic conversation, the officers you'd be
19   stationed with on any day would change, I guess,
20   is that true?
21        A.   Yes.
22        Q.   Okay.  Do you ever recall, I know it's
23   kind of an obscure question, do you ever recall
24   being in the F House with the officers I just
```

Page 39

```
 1   listed?
 2        A.   Can you list those names again?
 3        Q.   Sure.  Officers Hernandez, Clemmons,
 4   Dangerfield, Jones, Jackson, Maldonado and
 5   Cernecki?
 6        A.   Yes, except for Hernandez.
 7        Q.   Okay.  And why not?  Why --
 8        A.   I don't recall ever working with
 9   Hernandez.
10        Q.   Okay.  Do you know an Officer
11   Hernandez?
12        A.   I know an Officer Hernandez.
13        Q.   Do you know what his or her first name?
14        A.   No.
15        Q.   So I know you've already answered
16   generally, but let me ask you again, a little
17   more specifically, sorry, Lippert claims that he
18   yelled for assistance from Sergeant Palmer and
19   Sergeant Palmer stated back to him a very
20   specific quote, do you recall on May 1st, 2010
21   where Don Lippert was actually residing in the F
22   House?
23        A.   No.
24        Q.   Okay.  Is it common for -- would the
```

Page 40

```
 1   Sergeant leave, generally speaking, would the
 2   Sergeant leave his office to talk to an inmate?
 3        A.   On occasion.
 4        Q.   Do you recall -- I know what your
 5   answer is going to be, but I have to ask you
 6   anyway.
 7             Do you recall May 1st whether or not
 8   Sergeant Palmer left his office to talk to Don
 9   Lippert?
10        A.   No, I do not recall.
11        Q.   And if Sergeant Palmer were to have
12   stayed in his office, can inmates typically,
13   let's just say Lippert was stationed across the
14   F House, can inmates typically hear what the
15   Sergeant is saying?  Is that too far to hear?  I
16   mean, the Sergeant yelled to you, let's say,
17   forget the inmate, let's say you were standing
18   outside of the furthest cell away from
19   Sergeant's office, on the other side of the F
20   House, could you hear what the Sergeant was
21   saying to you?
22        A.   It's possible.  It depends on the noise
23   level that day.
24        Q.   Okay.  How noisy is it typically in the
```

Page 41

```
 1   F House on the 7 to 3 shift?
 2        A.   Kind of like a basketball stadium.
 3        Q.   Like when the Bulls are good, or when
 4   they're not?
 5        A.   Both.
 6        Q.   So is it loud or is it kind of a
 7   constant buzz?
 8        A.   On the day shift it's pretty loud.
 9        Q.   And how about the beginning, we're
10   talking about the beginning, right, the 7 to 9
11   AM portion?
12        A.   It's a buzz, but it's not as loud, you
13   might be able to hear a few things.
14        Q.   Okay.  But it could be somewhat
15   difficult to hear typically someone talking at
16   one side of the House, the F House?
17        A.   At those hours it's possible.
18        Q.   Okay.  So let me ask you specifically
19   then, we kind of set the background, Lippert
20   states that Sergeant Palmer said to him, I'm not
21   a doctor, what do you want me to do.  Do you
22   recall Sergeant Palmer saying that to Lippert?
23        A.   No, I do not recall.
24        Q.   Have you ever heard Sergeant Palmer say
```

Page 42

1  that to any inmate?
2      A.  Not at all.
3      Q.  If an inmate is claiming a medical
4  emergency, can a correctional officer escort
5  that inmate to the hospital?
6      MS. PTASZNIK:  Objection, can you clarify
7  claiming a medical emergency, is he saying I'm
8  having a medical emergency, or is the officer
9  suppose to assess a medical emergency?
10     MR. STIEHL:  I'll ask it both ways.  That's
11 fair.  I think I understand.
12 BY MR. STIEHL:
13     Q.  If the inmate is claiming a medical
14 emergency, if the inmate says I'm having a
15 medical emergency, can the officer escort that
16 inmate to the hospital?
17     A.  No, as far as I know.
18     Q.  All right.  Now, if the inmate is
19 claiming a medical emergency, do you as an
20 officer undertake any effort to evaluate whether
21 or not his claim of -- the inmate's claim of
22 medical emergency is accurate or not?
23     A.  No, not at all.
24     Q.  And again, from reading the

Page 43

1  interrogatories because you as a correctional
2  officer have no formal medical training, is that
3  correct?
4      A.  Yes.
5      Q.  All right.  So then going back to what
6  I believe your answer was before.  If a inmate
7  is claiming medical emergency, your only option
8  is to report it to your supervisor and call a
9  med tech or the hospital, is that accurate?
10     A.  Yes.
11     Q.  So hypothetically speaking, if an
12 inmate is bleeding all over the floor, you
13 couldn't take that inmate to the hospital, as
14 far as you know?
15     A.  As far as I know.
16     Q.  You would in this hypothetical
17 situation, you'd say Sergeant, we've got a
18 problem, and either you or the Sergeant would
19 call the hospital, or med tech?
20     A.  No, I'd call the hospital first and
21 then let the Sergeant know I called the hospital
22 and that they're coming, what the problem is.
23     Q.  And you would call the hospital, you
24 got a radio that you carry with you at all

Page 44

1  times?
2      A.  Yes.
3      Q.  Okay.  So you would just pick up your
4  radio and click a button, or how does it work?
5      A.  Yes, it's just a standard --
6      Q.  Like a walkie-talkie?
7      A.  Yes.
8      Q.  So your first step is call some sort of
9  medical personnel?
10     A.  Yes.
11     Q.  And your second step is to report it to
12 your supervisor?
13     A.  Yes.
14     Q.  Do you recall generically any inmate
15 ever yelling for his or her insulin shot outside
16 of the normal escort process?
17     A.  No.
18     Q.  So then specifically you have no
19 recollection of Don Lippert on May 1st yelling
20 or for an insulin shot?
21     A.  No.
22     Q.  Are the inmates in the F House, are
23 they celled alone, are they in individual cells?
24     A.  No.

Page 45

1      Q.  Okay.  Do you know if Donald Lippert on
2  May 1st, 2010 had a cell mate?
3      A.  I can not recall that.
4      Q.  Is there something that we can check to
5  determine whether or not he did or did not have
6  a cell mate at that time?
7      A.  I'm not sure of that.
8      Q.  If Don claims that he was laying on the
9  floor when discovered, generically, have you
10 ever walked a gallery and found an inmate laying
11 on the floor?
12     A.  Yes.
13     Q.  Okay.  And in that situation what would
14 be your process?  What would you do?
15     A.  Radio medical staff, explain the
16 situation we have.
17     Q.  And on how many occasions has that
18 happened to you?
19     A.  Two times.
20     Q.  And approximately when, if you recall,
21 did that happen?
22     A.  2004.
23     Q.  And who were the inmates --
24     A.  2006.

Page 46

1    Q.  Which Houses did those occur?
2    A.  I House for 2004.  I don't remember the
3  House for 2006.
4    Q.  Who were the inmates?
5    A.  I have no clue.
6    Q.  Okay.  And what were, if you know, the
7  medical situations?
8    A.  I don't know.
9    Q.  Okay.  Did any of the -- either one of
10  those two incidents, '04 or '06 involve any
11  medical concern that you could visualize, that
12  you could easily see, foaming at the mouth,
13  urination, bleeding, anything like that?
14    A.  No.
15    Q.  No, it didn't happen, or you don't
16  recall your?
17    A.  I don't recall.
18    Q.  Okay.  If there is some sort of fluid
19  leakage, whether it's from the mouth, urinary,
20  or elsewhere, is there a process as a
21  correctional officer to insure that that is
22  cleaned up?
23    A.  No.
24    Q.  Okay.  So is if an inmate creates a

Page 47

1  mess of some sort in his cell, and you see it,
2  there's nothing that a correctional officer --
3  there's no process for the correctional officer
4  to report that mess?
5    MS. PTASZNIK:  Objection, can you clarify any
6  mess or a medical mess?
7    MR. STIEHL:  That's fair, I'll separate them
8  out.
9  BY MR. STIEHL:
10    Q.  I'll start with any non medical mess,
11  spillage of some sort, fluids on the floor,
12  water spilled, anything, is there any process
13  for a correctional officer to report that for
14  clean up?
15    A.  No.
16    Q.  Typically do you report those kinds of
17  things for clean up purposes?
18    A.  No.
19    Q.  Is there a reason why not?
20    A.  We don't deal with -- correctional
21  officers don't deal with the spillage of fluids
22  or waste, or anything like that.
23    Q.  How often does a janitorial type person
24  come in to clean the cells?

Page 48

1    A.  We have inmate workers here, and they
2  typically do those types of jobs.
3    Q.  Okay.  And how often would someone go
4  cell to cell to clean the cells out?
5    A.  We let the inmates clean their own
6  cells on a weekly basis.
7    Q.  Are they just provided some sort of
8  cleaning supplies or --
9    A.  Yes.
10    Q.  Okay.  So there's no procedure or
11  process for a non medical, unusual mess clean up
12  procedure?
13    A.  No.
14    Q.  On a medical side of things, if there's
15  again, blood, vomit, urinary discharge, is there
16  any process for either you or an inmate or
17  anyone else, not the inmate itself who's created
18  to clean up that mess?
19    A.  As far as I know the inmate janitors
20  are responsible for cleaning up anything.
21    Q.  So the reason I'm asking this is if
22  there was a clean up of it, there wouldn't be
23  any sort of documentation one way or the other
24  about having to clean it up?

Page 49

1    A.  No, there wouldn't.
2    Q.  No, there would --
3    A.  There wouldn't.
4    Q.  Okay.  So Mr. Lippert claims that he
5  was laying on the floor and had urinated on
6  himself, I take it you have no recollection of
7  that?
8    A.  I have no recollection of that.
9    Q.  And if that were true there would be no
10  special clean up to be done of Mr. Lippert's
11  urination on the floor, other than the typical
12  janitorial clean up, as far as you know?
13    A.  As far as I know.
14    Q.  Is that true likewise for clothing, I
15  mean, inmates are issued, I assume, some sort of
16  clothing that they wear, correct?
17    A.  Yes.
18    Q.  And if they stain it or soil it in any
19  way, is there a process for them to request a
20  new outfit?
21    A.  Not that I know of.
22    Q.  How often are they allowed to clean
23  their outfits?
24    A.  Weekly.

13  (Pages 46 to 49)

Page 50

1   Q. So if there's a problem with it on
2 Monday, can they somehow expedite, speed up when
3 they can clean up their outfits?
4   A. I'm not sure of that process.
5   Q. I guess then if there was some sort of
6 documentation of it you wouldn't be familiar
7 with that at all if there is or isn't?
8   A. Right, you're correct.
9   Q. What time -- is there a typical time
10 for lunch to be served in the F House?
11   A. Yes, that time changes year to year.
12   Q. Okay. So in 2010 do you recall
13 approximately when lunch was served in the F
14 House?
15   A. I can only estimate, probably around 10
16 AM.
17   Q. Okay. And tell me -- can you explain
18 to me the process of how lunches are distributed
19 to the F House during 2010?
20   A. During 2010 lunches were brought in on
21 Styrofoam plastic trays, and those trays were
22 handed out by Officers on each gallery.
23   Q. So which ever officer was stationed at
24 a particular gallery, it was his responsibility

Page 51

1 to then distribute the food trays?
2   A. Yes.
3   Q. And do you typically ask the inmate if
4 they would like their food tray, or do you just
5 simply give them their food tray? I mean, is it
6 just like here's your tray, or do you say would
7 you like lunch now?
8   A. We say here's your tray.
9   Q. And how often generally do inmates
10 refuse their food?
11   A. Never that I can recall.
12   Q. Mr. Lippert states in his grievance
13 that it was you that first saw him laying on the
14 floor, do you have any recollection of that?
15   A. No.
16   Q. Do you believe you would have
17 remembered that happening?
18   A. I think I would have.
19   Q. And it's his recollection that he --
20 that you took the step of asking Sergeant Palmer
21 to check him out, do you have any recollection
22 of that?
23   A. No.
24   Q. From what I just understood you saying,

Page 52

1 that would not have been your process, is that
2 fair? Your first thing to do, in fact, would
3 have been to radio for help if you saw him on
4 the ground?
5   A. If I found him on the floor, my first
6 step would be to radio medical for help.
7   Q. During the food distribution, from your
8 previously discussion, I understand that there
9 would be two officers on the first and second
10 floors, first and second galleries, correct?
11   A. Yes.
12   Q. Do you ever remember during 2010
13 being stationed on the same floor as Officer
14 Maldonado?
15   A. No, I do not remember.
16   Q. Do you think you would remember that
17 happening?
18   A. Probably not.
19   Q. Okay. So it's possible it could have
20 happened, it could not have happened?
21   A. Right.
22   Q. How often have you worked with Officer
23 Maldonado, just generally in the same House?
24   A. Very frequently from not at all; from

Page 53

1 about 2008 to 2010, and not at all for all the
2 other years I've worked there.
3   Q. Does he still work here?
4   A. She still works here.
5   Q. Oh, she. Do you know why it is that
6 you all haven't been stationed together?
7   A. There are about 1000 officers and three
8 different shifts, so sometimes we work together,
9 sometimes we don't.
10   Q. You've changed shifts since that period
11 of time?
12   A. Yes.
13   Q. And what shift do you work now?
14   A. 11 PM to 7 AM.
15   Q. Are you just coming off a shift then
16 before this deposition?
17   A. Yes.
18   Q. Back in 2010 you were working the
19 morning shift, the 7 AM to 3 PM, correct?
20   A. Yes.
21   Q. So it's possible if she stayed on that
22 same shift you wouldn't see her at all,
23 probably, correct?
24   A. Yes.

Page 54

1    Q.  Do know what shift Miss Maldonado works
2  now?
3    A.  I'm not sure.
4    Q.  How would you describe Maldonado?  Is
5  she tall, short, skinny, overweight, back in
6  2010?  I won't hold it against you.
7    A.  Average height, average build.
8    Q.  Okay.  Do you know anything about her
9  background at all?
10    A.  No.
11    Q.  Have you ever hung out with Miss
12  Maldonado outside of Stateville?
13    A.  No.
14    Q.  All right.  I apologize for asking
15  this, but have you ever had a relationship with
16  Miss Maldonado?
17    A.  No.
18    Q.  Would you describe her as quiet or
19  aggressive?
20    A.  Quiet.
21    Q.  Have you ever witnessed Miss Maldonado
22  be aggressive with an inmate?
23    A.  No.
24    Q.  Have you ever witnessed Miss Maldonado

Page 55

1  yell at an inmate?
2    A.  No.
3    Q.  Have you ever witnessed Miss Maldonado
4  speak in a high, angry tone with an inmate?
5    A.  No.
6    Q.  Have you ever heard Maldonado say
7  anything inappropriate to an inmate?
8    A.  No.
9    Q.  Mr. Lippert claims Miss Maldonado said
10  that "he's in the right position."  Do you ever
11  recall Miss Maldonado saying that to Don
12  Lippert?
13    A.  No, I do not.
14    Q.  Do you believe Miss Maldonado said that
15  to Don Lippert?
16    A.  Absolutely not.
17    Q.  Have you ever personally laughed at an
18  inmate who was in medical distress?
19    A.  No.
20    Q.  Have you ever witnessed any I.D.O.C
21  employee laugh at an inmate in medical distress?
22    A.  No.
23    Q.  Do you think you'd recall that if it
24  had happened?

Page 56

1    A.  Probably.
2    Q.  All right.  Is there a process for a
3  correctional officer to file a report against
4  another officer if they think that officer has
5  acted incorrectly?
6    A.  Yes.
7    Q.  What's that called?
8    A.  It's the same incident report when
9  anything else we observe, that we think should
10  be reported, it goes in that same paper and it's
11  turned into our shift commander.
12    Q.  And I think from our previous testimony
13  you're not sure what happens to that report
14  after that, correct?
15    A.  Right.
16    Q.  Have you ever filed an incident report
17  against another officer?
18    A.  No.
19    Q.  Has any officer ever filed one against
20  you?
21    A.  No.
22    Q.  Have you ever reported any officer in
23  any fashion for misconduct?
24    A.  No.

Page 57

1    Q.  Do nurses ever come directly to cells?
2    A.  Can you please explain that question?
3    Q.  Yeah, and I'm trying to picture it.
4  You said earlier there's a med tech, is that
5  person like an emergency nurse, emergency
6  doctor, do you know what their medical position
7  is?
8    A.  From what I know, I believe we have
9  nurses and we have med techs.  And I think that
10  the med techs are not exactly nurses, from my
11  knowledge.
12    Q.  So kind of like an ambulance operator,
13  emergency kind of person would be a med tech
14  and, to your understanding, the next level is a
15  nurse and then a doctor?
16    MR. ELIASER:  I would just object to the form
17  of that question.
18  BY MR. STIEHL:
19    Q.  I'm trying to get a picture in my mind.
20    A.  I think if we use the hospital for an
21  example, there's a registered nurse, and then
22  there's kind of like a nurse assistant.  I think
23  a med tech probably falls somewhere between
24  those two.

Page 58

1    Q. Okay. And so with that as your
2  understanding, I don't know if it's accurate or
3  not, I won't hold you to it, I just want to get
4  the hang of it. So based upon that, is there
5  ever a situation where nurses would come to
6  cells to assist inmates?
7    A. Yes.
8    Q. Okay. Give me an example of when that
9  would occur?
10   A. When there's a medical emergency,
11 whoever is available comes.
12   Q. Can you recall any situation in your
13 ten years where one nurse has come to see an
14 inmate by him or herself?
15   MR. ELIASER: I would just object to the
16 foundation, in terms of whether he is aware of
17 that individual is a nurse or a med tech. I'm
18 not so sure he would know that information at
19 the time or even now.
20      So he can answer the question.
21   A. They look pretty much the same. I'm
22 not sure who's who, but I hear the terms med
23 tech and nurse, so I assume they're one or the
24 other.

Page 59

1  BY MR. STIEHL:
2    Q. Okay. I guess my question wasn't
3  specific to what their role is. I'm just
4  wondering have you ever seen just a single
5  individual come treat an inmate?
6    A. Yes.
7    Q. Have you ever seen where two
8  individuals, whether or not they're nurses or
9  med techs come together to treat an inmate?
10   A. Yes.
11   Q. All right. Have you ever seen a doctor
12 come and treat an inmate in his or her cell?
13   A. Is this also an emergency situation?
14   Q. Yes.
15   A. No.
16   Q. Okay. So Mr. Lippert states that two
17 nurses came to his cell during this incident,
18 that could have happened, is that fair?
19   A. Yes.
20   Q. Do you have a recollection of that
21 happening?
22   A. No.
23   Q. All right. And if you had to let
24 nurses in if there was a medical emergency that

Page 60

1  was handled in the House that you were in, is
2  there any paperwork that has to be filled out
3  for that?
4    A. Not that I know of.
5    Q. If a nurse has to come through a gate,
6  a particular gate, is there anything that
7  registers that person coming in and out of the
8  gate at any given time?
9    A. No.
10   Q. They just have to tell the person
11 that's handling the gate, let me in and they're
12 allowed in if they have the right credentials?
13   A. Yes.
14   MR. STIEHL: Let's take a quick break.
15      (Whereupon, a short break was
16      taken.)
17 BY MR. STIEHL:
18   Q. I have a couple of other questions and
19 then hopefully we'll be done with you. This
20 reserve my right to ask more questions depending
21 on what your Counsel and Counsel for Miss
22 Rossiter ask, if anything.
23      We went through a list of folks that
24 were on -- Mr. Lippert claims were in the F

Page 61

1  House during this incident. One name that was
2  not mentioned was a correctional officer by the
3  name of Nelson. Do you know any correctional
4  officers named Nelson?
5    A. Yes.
6    Q. Do you know if there was a Nelson that
7  worked with you in 2010?
8    A. No, I do not know that.
9    Q. There's a reference to an F House log
10 book, are you familiar with the log book?
11   A. Yes.
12   Q. Do you as a correctional officer sign
13 that when you get to the F House?
14   A. No.
15   Q. Who signs the log book?
16   A. The log book is filled out by the Unit
17 Sergeant.
18   Q. So the log book indicates who came in
19 or out of the F House that day?
20   A. Not necessarily who came in and out,
21 but who is assigned to work in the F House.
22   Q. If there's a nurse that came in for any
23 good reason would the Sergeant have to log that
24 person in the F House log book?

Page 62

1    A.  I'm not sure of that.
2    Q.  Have you ever -- I assume because
3  you're not a Sergeant, but have you ever handled
4  the filling out that log book?
5    A.  Yes.
6    Q.  Okay.  Is that something -- a task that
7  a Sergeant might give you, or how did you come
8  to fill out the log book?
9    A.  At times we have to have officers fill
10 positions of Sergeants, so then the Sergeant's
11 responsibilities go to the officer, the senior
12 officer in charge.
13   Q.  Would the log book indicate which
14 gallery a particular officer worked on that day?
15   A.  Yes.
16   Q.  So in addition to the possible roster
17 we talked about before, the log book for the F
18 House should reflect who was in which gallery
19 that day, on May lst, theoretically?
20   A.  Who was assigned to certain galleries.
21   Q.  Okay.  That could change as the shift
22 went on?
23   A.  Officers help each other out, so.
24   Q.  Do you know if -- how to you get up and

Page 63

1  down the galleries, stairs or --
2    A.  Stairs.
3    Q.  Is the only entrance to the F House on
4  the first floor?
5    A.  Yes.
6    Q.  So if a person was on the second or
7  third floor of the F House the med tech or
8  whomever came to assist would have to go
9  upstairs to get to that person?
10   A.  Yes.
11   Q.  Is there a process for how the med tech
12 should assist the prisoner?  Does the med tech
13 go to the cell or the prisoner is brought down
14 to the med tech?
15   A.  I'm not aware of any process.
16   Q.  In a situation where you found someone
17 laying on the floor in 2004, 2006, did the med
18 tech, to your recollection, did the med tech or
19 the nurse come to the cell, or did you take the
20 inmate down to the med tech?
21   A.  The med tech came to the cell.
22   Q.  On both occasions?
23   A.  Yes.
24   Q.  Have you ever witnessed a situation

Page 64

1  where correctional officers would assist a
2  inmate to a med tech?
3    A.  No.
4    Q.  If you witnessed that a inmate had
5  urinated all over the floor, is it my
6  understanding from your testimony that there's
7  nothing that you are required to do as an
8  officer?
9    A.  Not that I know of.
10   Q.  Have you ever witnessed an inmate
11 urinating on the floor before?
12   A.  Not that I can recall.
13   Q.  Have you ever witnessed when you walked
14 by an inmate's cell and seen urine just standing
15 on the floor before?
16   A.  Not that I can recall.
17   Q.  Would that be unusual to see that?
18   A.  Yes.
19   Q.  I think, I just want to make sure I
20 asked this.  Correctional officer Nelson, do you
21 know what his or her first name is?
22   A.  No.
23   Q.  Did you work -- do you recall working
24 the same shift as correctional officer Nelson in

Page 65

1  2010?
2    A.  No. Also can I state, you asked if I
3  knew a correctional officer Nelson.  The answer
4  to that question was yes, however there are
5  multiple correctional officers named Nelson, and
6  I have no clue who we're referring to here.
7    Q.  That's fine.  Yeah, I'm just asking, I
8  don't frankly know who it is.  It's written here
9  as Nelson, but I don't know who that is.
10       Do you know if there are any
11 correctional officers Nelsons that you worked
12 with in 2010 on the same shift?
13   A.  No.
14   Q.  Would you recall that, do you think?
15   A.  I think so.
16   Q.  Just to be clear, you have never
17 received any formal medical training, correct?
18   A.  Correct.
19   Q.  And if an inmate was claiming the need
20 for medical assistance, you would not make any
21 effort to assess the truth or falseness of that
22 inmate's claim, correct?
23   A.  That's correct.
24   Q.  And that's what you believe the

Page 66

1  Institutional Administrative Directives require
2  you to do, correct?
3      A.  Yes.
4      Q.  Have you ever personally had to give an
5  insulin shot to an inmate?
6      A.  No.
7      Q.  Would you be allowed to give an insulin
8  shot to an inmate, do you believe?
9      A.  No.
10     MR. STIEHL:  I think that's all I have for
11 now.
12     MS. PTASZNIK:  No questions.
13     MR. ELIASER:  I have a couple follow ups.
14              EXAMINATION
15          BY MR. ELIASER:
16     Q.  Officer Norman, I'm Matthew Eliaser, we
17 met earlier, I represent Nurse Rossiter who was
18 a Wexford employee at the time of the incident.
19     A.  Okay.
20     Q.  I just have a couple of questions for
21 you, just following up with what the Plaintiff's
22 attorney asked you.
23     Am I correct that at no time did you
24 have any conversations with Rossiter about this

Page 67

1  incident?
2      A.  You are correct.
3      Q.  You testified earlier that you had one
4  interaction with Lippert in February of 2014
5  where he refused his medication, right?
6      A.  Yes.
7      Q.  Was that a refusal of his insulin?
8      A.  I don't know for sure.  I believe so.
9      Q.  And why do you believe so?
10     A.  Because we were moving a line
11 designated as the insulin line.
12     Q.  That would be a good reason.
13     A couple times earlier you used the
14 term hospital in terms of radioing the hospital,
15 calling the hospital or communicating with the
16 hospital.  I take it you did not mean an outside
17 hospital, you meant the Correctional Center
18 Health Care Unit, right?
19     A.  Health Care Unit, yes.
20     MR. ELIASER:  That's all I have.  Thank you.
21     MR. STIEHL:  I don't have any follow ups, but
22 I do want to state on the record, I know we have
23 letters saying it.  But we have requested on
24 multiple occasions from both the Department as

Page 68

1  well as Nurse Rossiter, some indication as to
2  who was present when, whether or not that be the
3  House log books, or other documentation that may
4  reflect who may or may not have seen Don Lippert
5  on the April 30th, May 1st timeframe, May 2nd
6  timeframe.  It seems apparent to me now, having
7  taken this deposition, that at the very least
8  those should how been referenced prior to
9  answering any documents requests or
10 interrogatories, that it does not appear that it
11 has not been done.  So I do want to state for
12 the record my frustration with that and I'm
13 hopeful Nurse Rossiter and the Department of
14 Corrections will take our letters seriously and
15 provide the clarity to our request.
16     MR. ELIASER:  I would just like to respond
17 that we are in receipt of that correspondence.
18 I think that was dated July 3rd or something
19 along those lines.  We're in the process of
20 getting response, full response in regards to
21 what documentation, if any, we have in that
22 regard.
23     MS. PTASZNIK:  And just for the record, the
24 Department of Corrections is actively

Page 69

1  investigating and trying to locate any
2  documents, if they exist, this many years after
3  the incident in order to respond to the request.
4      MR. STIEHL:  I appreciate it.  Thank you.
5      COURT REPORTER:  Signature?
6      MS. PTASZNIK:  We'll waive.
7      (Deposition concluded at 10:36 AM)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

18 (Pages 66 to 69)

Page 70

```
 1    STATE OF ILLINOIS    )
 2                         ) SS:
 3    COUNTY OF COOK       )
 4       I, Jacqueline Shenberger, Certified Shorthand
 5    Reporter within and for the County of Cook and
 6    State of Illinois, do hereby certify that
 7    heretofore, to-wit, on July 9, 2014, personally
 8    appeared before me, at 16830 South Broadway,
 9    Crest Hill, Illinois, ALPHONSO NORMAN, in a
10    cause now pending and undetermined in the United
11    States District Court, Northern District of
12    Illinois, Eastern Division, wherein DONALD
13    LIPPERT is the Plaintiff, and SALVADOR GODINEZ,
14    et-al are the Defendants.
15       I further certify that the said witness was
16    first duly sworn to testify the truth, the whole
17    truth and nothing but the truth in the cause
18    aforesaid; that the testimony then given by said
19    witness was reported stenographically by me in
20    the presence of the said witness, and afterwards
21    reduced to typewriting by Computer-Aided
22    Transcription, and the foregoing is a true and
23    correct transcript of the testimony so given by
24    said witness as aforesaid.
```

Page 71

```
 1       I further certify that the signature to the
 2    foregoing deposition was waived by counsel for
 3    the respective parties.
 4       I further certify that the taking of this
 5    deposition was pursuant to Notice, and that
 6    there were present at the deposition the
 7    attorneys hereinbefore mentioned.
 8       I further certify that I am not counsel for
 9    nor in any way related to the parties to this
10    suit, nor am I in any way interested in the
11    outcome thereof.
12       IN TESTIMONY WHEREOF:  I have hereunto set my
13    hand and affixed my notarial seal this 18th of
14    July, 2014.
15
16
17
18
19       Jacqueline Shenberger
20       Certified Shorthand Reporter,
21       Cook County, Illinois
22       LIC. NO. 084-001524
23
24
```

19  (Pages 70 to 71)

37893/01245/MHW/MAE

## U.S. DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

DON LIPPERT, et al.,

                Plaintiffs,

v.

PARTHA GHOSH, et al.,

                Defendants.

No. 10 cv 4603

Judge Sara Ellis

### AFFIDAVIT OF LIPING ZHANG, M.D.

I, Liping Zhang, M.D., being first duly sworn upon oath, state that I have personal knowledge of the facts set forth herein, that I am competent to testify and if called to testify would state, in part, as follows:

1. I am currently a medical doctor, licensed to practice medicine in the state of Illinois. In May, 2010, I was a staff physician, working at Stateville Correctional Center, employed by Wexford Health Sources, Inc. In May, 2010, I was a medical doctor, licensed to practice medicine in the state of Illinois.

2. I have reviewed the plaintiff's medical records from Stateville Correctional Center from May 1, 2010 (attached hereto as Exhibits A-E) and portions of the deposition transcript of Don Lippert and Athena Rossiter that pertain to the May 1, 2010 care at issue. Although I do not specifically recall the plaintiff or my treatment of him on May 1, 2010, my sworn statements herein are based upon my review of the above materials and my custom, practice, knowledge, training, and experience.

3. On May 1, 2010, I evaluated the patient for the first time at approximately 12:00 p.m. and authored a progress note. See Exhibit A (Progress Notes bates-stamped 000410), attached hereto. His only subjective complaint to me at that time was that he did not have his insulin the morning of May 1, 2010. Had he made any other subjective complaints, I would have charted them in my note. His blood sugar was high, so I ordered regular insulin 7u STAT. See Exhibit A; see also Exhibit B (Prescription Order bates-stamped 000672), attached hereto. I also ordered that nurses perform an accu-check before his next meal, and if his blood sugar was less than 300, to administer regular insulin 5u and NPH insulin 15u, but if his blood sugar was greater than 300, to notify me. See Exhibits A and B. I also ordered that he may be discharged the following morning after his a.m. insulin shot and admitted him for 23 hour observation. See Exhibit A.

4. I evaluated the patient next at approximately 2:50 p.m. on May 1, 2010 and authored a progress note. See Exhibit A. He reported to me that he was fine. Had he made any



subjective complaints, I would have charted them in my note. His blood sugar was way down from before, at a very steady level of 125. I ordered that he could be discharged after his p.m. insulin and meal. See Exhibit A. I determined that he could be discharged much earlier than I originally ordered because his blood sugar had resolved so quickly and adequately, and he had no complaints at all.

5.  From my further review of the progress notes on May 1, 2010, I see that Nurse Kenlyn Grote authored a progress note at approximately 3:00 p.m. See Exhibit C (Progress Notes bates-stamped 000411). She re-affirmed the patient's blood sugar level of 125, and charted that the inmate was to be discharged after his dinner meal (in accordance with my 2:50 p.m. progress note). She also charted that the inmate was educated about his insulin order. Kenlyn Grote was also the nurse that signed off on my Prescription Orders on May 1, 2010. See Exhibit B. While I wrote the actual orders on the Prescription Orders document, Grote came in after that and circled the "reg insulin 7u STAT" order and wrote "ok" next to it indicating that it was completed. She crossed out my original order for the p.m. insulin and wrote "void." See Exhibit B.

6.  The final progress note was authored by Nurse Gloria Breske at approximately 4:30 p.m. on May 1, 2010. See Exhibit C. According to her note, the patient's blood sugar had come down even more to 115, meaning that his blood sugar was normal and exceptionally stable. She charted that the patient had no complaints. She also charted that no insulin was given at that time and re-affirmed my 2:50 p.m. order that he could be discharged to the cellhouse. See Exhibit C.

7.  From my review of these progress notes and the prescription order where Grote crossed out my afternoon insulin order, there is only one conclusion to make as to why the patient did not receive afternoon insulin before being discharged. The patient had received 7u of regular insulin STAT around 12:00 p.m. (11:45 a.m. to be more exact, according to the MAR bates-stamped 000913, attached hereto as Exhibit D), which brought his blood sugar down to a normal reading of 115 by 4:30 p.m. That, in combination with the lack of medical complaints by the patient meant that he did not need another dosage of insulin prior to his discharge like I initially contemplated when I first made the order. Thus, I orally instructed Nurse Grote to cancel the afternoon insulin, and she reflected that verbal order by crossing it out and writing "void." Nurses do not cancel physicians' orders on their own accord.

8.  There would have been little benefit to administering the patient's second dosage of insulin at a time when his blood sugar was already at a normal level of 115. Rather, it was much more medically sound for the patient to receive his next dosage much later on May 1, 2010, which he did according to the MAR (bates-stamped 000914 and attached hereto as Exhibit E) initialed by "GD" (who is Gary Dropp, a CMT), and corroborated by the plaintiff's deposition testimony on pp. 47-48 and Athena Rossiter's deposition testimony on pp. 89-91.

Further Affiant Sayeth Not.

2

_Liping Zhang_

_____
Liping Zhang, M.D.

SUBSCRIBED and SWORN to before me
this 13th day of _November_ , 20 14

_Cynthia M Warner_
_____
Notary Public

7987472 MELIASER;MELIASER

OFFICIAL SEAL
CYNTHIA M WARNER
Notary Public - State of Illinois
My Commission Expires Sep 26, 2016

3

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

_____ S T A  N R C _____ Center

| Offender Information: | | |
|---|---|---|
| Lippert | Donald | ID#: B74054 |
| Last Name | First Name | MI |

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| | MD NOTE | |
| 5/11/10 12pm | S: I didn't have my insulin this Am | Pl: reg insulin 7u stat 2 accu check before |
| | O: OX 3 NAD | next meal if < 300 |
| | P 3aa Ur 60 m 2 | may have regular insulin |
| | Ambulance w/o gait | 5u. NPH insulin 15u. |
| | problems. | if glucose >300. notice |
| | Accu check 450 | MD. |
| | A Hyperglycemia | 3 may discharge problem |
| | A Non compliance | 7 to cell house. tomorrow |
| 5/1/10 | MD Note | after Am insulin. |
| | S/O I am fine. I | 4. Admit for 23° observa |
| Acu √ | need my common food | |
| PE | O: OX 3 NAD | |
| | guts teach | Pl. discharge pt after |
| | cns. intra— | pm insulin and meal |
| | A Non compliance | |

Distribution: Offender's Medical Record

EXHIBIT A

DOC 0084 (Eff. 9/2002)
(Replaces DC 7147)

LIPPERT 000410

*BEGIN USING FROM BOTTOM UP

State of Illinois
Dept. of Corrections

**PRESCRIPTION ORDER**
Chart Copy (Not a prescription)

Patient Lippert, Ronald      Reg. # B74054      Date 5/1/10

Problem _____

ORDER: (Physician's Signature After Last Order)  Reg insulin 7u stat.   OK

notice unit  Accu check before next meal if glucose > 300

otherwise give NPH 15u and Regular 5u

DEA/Illinois Lic. # _____      Physician (Print) L ZHANG MD

☑ May Substitute                                        M.D.
☐ May Not Substitute                                    M.D.

DCA 7000
IL 426-1417         Noted by: _____      Date: 5/1/10

---

State of Illinois
Dept. of Corrections

**PRESCRIPTION ORDER**
Chart Copy (Not a prescription)

F 123

Patient Lippert, Ronald      Reg. # B74054      Date 4/8/10

Problem _____

ORDER: (Physician's Signature After Last Order)  Excedrin headache # 200D x 5 ou

prn

DEA/Illinois Lic. # _____      Physician (Print) L ZHANG MD

☑ May Substitute                                        M.D.
☐ May Not Substitute                                    M.D.

DCA 7000
IL 426-1417         Noted by: _____      Date: 4/8/10

---

State of Illinois
Dept. of Corrections

**PRESCRIPTION ORDER**
Chart Copy (Not a prescription)

F 123

Patient Lippert, Ronald      Reg. # B74054      Date 4/8/10

Problem _____

ORDER: (Physician's Signature After Last Order)  NPH insulin 20u QAM 15u QPm

Reg insulin 7u QAM 5u QPm

ASA 81mg QD      Caputen 12.5mg QAM

MVI QD, Vitamin ATD one QD x N?  OICAPH/QuQPm

DEA/Illinois Lic. # _____      Physician (Print) L ZHANG MD

☑ May Substitute                                        M.D.
☐ May Not Substitute                                    M.D.

Noted by: _____      LIPPERT 000672  Date 4/8/10

EXHIBIT
B

ILLINOIS DEPARTMENT OF CORRECTIONS

**Offender Outpatient Progress Notes**

_____ S T A   N R C _____ Center

| Offender Information: | | |
|---|---|---|
| Lippert | Donald | ID#: B74054 |
| Last Name | First Name | MI |

| Date/Time | Subjective, Objective, Assessment | Plans |
|---|---|---|
| 5/1/10 3pm | RN Note | ↑ Accu Cw 2pm /25 |
| | Iium (i) to be discharged [illegible] | |
| | p dinner meal | |
| | Iium consulted about | |
| | his insulin order | |
| | [signature] | |
| 5/1/10 4/3p | RN Note | D. Discharge + callback |
| | Accucheck are prior to | of 4th meal |
| | evening meal Accucheck | |
| | 115- Ø insulin given | |
| | A 9 J x 3. Ø complaints | [signature] |
| | voiced at this time | |
| | m D Note | |
| 6/9/10 accu 127 | S: refuse to eat after 27 | P1. aumin for 23° 065. |
| | u insulin | 2. hold insulin if refuse |
| | O: 0 x 3 nad PGRLA Com 2 gait steady | treat 3 accu check Bid x 2d |
| | A IRDm | 3. refer to m.h. Ø Zha [signature] |

EXHIBIT
C

Distribution: Offender's Medical Record

DOC 0084 (Eff. 9/2002)
(Replaces DC 7147)

CONFIDENTIAL

# MEDICATION ADMINISTRATION RECORD

## BOSWELL PHARMACY SERVICES
### 814-629-1397 • Fax: 814-629-7644

APRIL 2010

| EFFECTIVE DATE | MEDICATIONS | HOUR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4/8/10 Original Order Discontinue | NPH 20 u' 9 Am ⓐ REG INSULIN 7U 9 Am | Am | | | | | | | | | | | | | | | DB/M/60 | | DB/M/60 | | | | | | JB 6/6/10 | | | | 8J | | | |
| 4/8/10 Original Order Discontinue | NPH 15 u' 9 Pm ⓐ REG INSULIN 5U 9 Pm | Pm | | | | | | | | NPH 60 | | | | | DBS/PD | | DT 131 | | 97 B/O/PA | | | | | | | | | | | | | |
| 4/8/10 Original Order Discontinue 4/22/10 | Accu ✓ B10 | Am Pm | | | | | | | 7/40' | | | | | | | | | Lot | | | | | | | | | | | | | | | |
| 5/1/10 Original Order Discontinue 5/1/10 | Reg Insulin 7u subq now | | M/18 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| | Initial / Signature | Initial / Signature | Initial / Signature | Initial / Signature |
|---|---|---|---|---|
| | | | | |

DIAGNOSIS

CHART NO FOR 1.  THROUGH 1/5

RESIDENT NAME AND NUMBER  LIPPERT DONALD  B74057   FACILITY

DATE OF BIRTH OR SOC SEC NO.   ALLERGIES

**EXHIBIT D**

CONFIDENTIAL

# MEDICATION ADMINISTRATION RECORD

## BOSW"L PHARMACY SERVICES
814-629-1397 • Fax: 814-629-7644

MAY 2010

| MEDICATIONS | HOUR |
|---|---|
| Accu V weekly x 2 | 10 am |
| NPH 35 U Am (sub Q) | AM |
| 5 U Reg (Sub Q) | AM |
| ASG Insulin 7 U now | 6 am |
| NPH 204 & 5m c ASG Insulin 7 U q AM x 6 mos | 720 AM →60 |
| NPH 15 U q AM c 5 U OF ASG x 6 mos | pm |

ALLERGIES  N/K/A

DATE OF BIRTH OR SOC SEC NO

EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| DON LIPPERT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Case No. 10-cv-4603 |
| | ) |
| ATHENA ROSSITER, et al, | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF DON LIPPERT'S ANSWERS TO**
**DEFENDANT ATHENA ROSSITER'S INTERROGATORIES**

NOW COMES, Plaintiff Don Lippert, by and through his attorneys, Seyfarth Shaw LLP,

and for his Answer to Defendant Athena Rossiter's Interrogatories, states as follows:

**INTERROGATORY NO. 1:**

State your full name, as well as your current residence address, social security number, inmate identification number, date and place of birth, and any other name by which you have ever been known.

**ANSWER:**

Plaintiff refers Defendant to his answer to Interrogatory No. 1 to Defendant Wexford

Health Sources, Inc.'s Interrogatories in Connection with Class Certification and hereby

incorporates by reference that answer into his answer to Interrogatory No. 1.

**INTERROGATORY NO. 2:**

Describe the administration or omission of any and all procedures, tests, therapies, medications, and/or treatments for which you claim cause or contributed to the injuries for which you seek damages and as to each, state:

    a.    The date or dates thereof;

    b.    The name and address of each witness;

    c.    The names and addresses of all other persons having knowledge thereof and as to each such person the basis for his or her knowledge; and

16992660v.1

**EXHIBIT**

F

d.    The location of any and all documents, including without limitation, hospital, medical, and/or prison records reflecting such acts and/or omissions.

**ANSWER:**

Plaintiff objects to Interrogatory No. 2 because the question calls for a narrative response that is more appropriate for a deposition. Without waiving these objections, and subject to these objections and further investigation into the information provided by Defendants and through third-party discovery in this case, Plaintiff believes that medical staff at Stateville acted deliberately indifferent to his diabetes on May 1, 2010 as follows.

(a)    On May 1, 2010, CMT Adrianne Bacot refused to provide Plaintiff with his insulin shot. As a result, Plaintiff suffered severe diabetic complications of hyperglycemia. After suffering said complications, Plaintiff was sent to the health care unit ("HCU") because his blood sugar level was at a dangerous level of 451. At the HCU, Plaintiff received a shot of insulin. Thereafter, Wexford employees nurse Rossiter and an unknown nurse refused to provide plaintiff with his proscribed insulin shot after dinner. Later than night, Plaintiff felt as though he might be again suffering from hyperglycemia; therefore, he requested that nurse Rossiter check his blood sugar level and, if necessary, administer an insulin shot. Nurse Rossiter stated that she would return to check his blood sugar levels but failed to do so.

(b)    The proper treatment would have been to check Plaintiff's blood sugar level and administer an insulin shot if appropriate. In order to control his condition, Stateville medical staff is required to check Plaintiff's blood sugar levels and administer an insulin shot twice a day. That procedure was not followed on May 1, 2010 causing Plaintiff to suffer symptoms of hyperglycemic shock multiple times in one day.

(c)    As a result of not receiving his insulin shot in a timely manner, Plaintiff suffered from hyperglycemia, which if not properly treated can lead to a coma or possibly death.

**INTERROGATORY NO. 3:**

State what independent recollection you have, if any, of any and all of your interactions with Athena Rossiter on May 1, 2010, if any.

2

**ANSWER:**

Plaintiff objects to Interrogatory No. 3 because the question calls for a narrative response that is more appropriate for a deposition. Further, Plaintiff objects to this request as certain information may rest in the possession of the Defendants that Defendants have either refused to produce, or produced only in part. This information may refresh Lippert's recollection, or provide further detail as to his recollection.

However, without waiving, and subject to these objections, and subject to further modifications based upon review of such information, Lippert states that, to the best of his recollection as of today, on May 1, 2010, Plaintiff first encountered Defendant Rossiter in the HCU at Stateville. Lippert had been sent to the HCU that morning because he collapsed after the medical staff failed to provide him with his insulin shot. Rossiter was in the HCU depositing inmates' medication into envelopes for later distribution. Plaintiff asked Rossiter and another unknown nurse for an insulin shot prior to returning to his cell. Both Rossiter and the other nurse refused, stating that Nurse Breske had told them that he did not need an insulin shot and not to give him one. Following Plaintiff's conversation with Rossiter in the HCU, Plaintiff returned to his cell. Later that day, Plaintiff encountered Rossiter again while she was handing out inmates' medications in his cell block. Rossiter gave Plaintiff his medications (unrelated to his diabetes). At that time, Plaintiff requested that Rossiter check his blood sugar level because he was not feeling well. Rossiter stated that she would return to check Plaintiff's blood sugar level when she finished handing out medications. Rossiter never returned and Plaintiff again suffered hyperglycemia. As a result, an emergency nurse had to be called to Plaintiff's cell to administer an insulin shot.

3

**INTERROGATORY NO. 4:**

State what independent recollections you have, if any, of any and all of your interactions with Athena Rossiter before and after May 1, 2010.

**ANSWER:**

Without waiving and, subject to, the previous objections and answer to Interrogatory No.

3, Plaintiff states that his only interactions with Rossiter both prior to and after May 1, 2010 were

when Rossiter was handing out medications in Plaintiff's cell block.

**INTERROGATORY NO. 5:**

State the full name, last known address, telephone number, occupation and/or profession, employer, or business affiliation, and relationship to you of each person of has or claims to have knowledge that the defendant(s) were deliberately indifferent toward you. As to each person, state:

    a.    The nature of such knowledge;

    b.    The manner whereby it was acquired;

    c.    The date or dates upon which such knowledge was acquired; and

    d.    The identity and location of any and all documents reflecting such alleged deliberate indifference.

**ANSWER:**

Plaintiff objects to Interrogatory No. 5 as overly broad and unduly burdensome. Without

waiving, and subject to, this objection, Plaintiff has identified the following individuals as those

with knowledge that the Defendants violated his constitutional right to receive adequate medical

treatment on May 1, 2010:

    1.    Leslie Lippert
            2112 W. Bradley St.
            Chicago, Illinois, 60614
            773-327-7559

    2.    Terra Johnson
            2112 W. Bradley St.

4

Chicago, Illinois, 60614
773-327-7559

3.     Roger Thorton
Prison Number N67569
Stateville Correctional Center
Plaintiff's former cellmate

4.     Melvin Jordan
Prison Number K96712
Stateville Correctional Center
Law Clerk

5.     Fabin Santiago
Prison Number B79716
Stateville Correctional Center
Plaintiff's former cellmate

6.     Romeo Jackson
Prison Number B45361
Stateville Correctional Center
Works in kitchen

7.     Glenn Verser
Prison Number N72074
Stateville Correctional Center

8.     Burl Mason
Prison Number N12353
Stateville Correctional Center

## INTERROGATORY NO. 6:

Please state the name and address of all physicians, nurses, medical technicians, correctional officers or other persons with whom your or your attorneys have discussed any off the following:

a.     The acts and/or omissions of deliberate indifference described in your Complaint;

b.     The nature and extent of any injuries suffered by you;

c.     The relationship between the acts and/or omissions on the part of the defendant(s) and such injuries.

16992660v.1

**ANSWER:**

Plaintiff objects to Interrogatory No. 6 as overly broad and unduly burdensome. Plaintiff

further objects to this request as seeking information that resides within the custody, control or

possession of the Defendants in this action.

Without waiving, and subject to, this objection, Plaintiff has identified the following

medical staff as those with knowledge that the incident on May 1, 2010:

1.      Dr. Liping Zhang
        Stateville Physician

2.      Wendy Olson
        Stateville CMT

3.      Bobby Nadpaul
        Stateville CMT

**INTERROGATORY NO. 7:**

Do you know of any statements made by any person relating to the incident, care and
treatment, or the injury or damages alleged in the Complaint? If so, give the name and address
of each such witness and the date of the statement, and state whether such statement was written
or oral and if written, the present location of each such statement.

**ANSWER:**

Plaintiff refers Defendant to his answer to Interrogatory No. 11 to Defendant Wexford

Health Sources, Inc.'s Interrogatories in Connection with Class Certification and hereby

incorporates by reference that answer into his answer to Interrogatory No. 7.

**INTERROGATORY NO. 8:**

Please identify and state the location of any of the following documents relating to this
issues in this case which wither bear the name, handwriting and/or signature of the defendant(s):

**ANSWER:**

Plaintiff objects to interrogatory No. 8 as being unduly burdensome. Answering further,

Plaintiff states that such information is within the possession, custody and control of the

Defendants in this case, and therefore no answer is required.

6

Subject to and without waiving these objections, Plaintiff has previously produced all documents in his possession, custody, and control which may be responsive to this request. Answering further, Plaintiff refers Defendant to his answer to Interrogatory No. 14 to Defendant Wexford Health Sources, Inc.'s Interrogatories in Connection with Class Certification and hereby incorporates by reference that answer into his answer to Interrogatory No. 8.

## INTERROGATORY NO. 9:

Describe the medical injuries sustained by you as a result of the defendant(s) alleged acts and/or omissions described in your Complaint.

## ANSWER:

Plaintiff objects to this request as outside the scope of his expertise, residing within the documents previously produced in this case, and subject to expert testimony on the subject.

Subject to and without waiving these objections, Plaintiff states that, as a result of Defendants' failure to provide Plaintiff with his required insulin injection and/or adequately respond to his request for medical treatment, Plaintiff experienced dizziness, blurred vision, and suffered severe diabetic complications of hyperglycemia on May 1, 2010. In addition, consistent failure to receive timely insulin injections causes ongoing headaches, weight loss, muscular tightening, damage to his liver, damage to his kidneys, and reduced circulation.

## INTERROGATORY NO. 10:

With regard to your injuries, state:

a.     The name and address of each attending physician and/or health care professional that has seen or treated you;

b.     The name and address of each consulting physician and/or other health care professional;

c.     The name and address of each person and/or laboratory taking any X Ray, MRI, and/or other radiological tests of you;

d.     The date or inclusive dates on which each of them rendered you service;

e.  The amounts to date of their respective bills for service; and

f.  From which of them you have written reports.

**ANSWER:**

Plaintiff objects to this request as within the possession, custody and/or control of the

Defendants.  Subject to, and without waiving these objections, Plaintiff saw Dr. Liping Zhang on

May 1, 2010 for treatment after he was denied his insulin injection for the first time on that day.

After Rossiter failed to check Plaintiff's blood sugar level, Plaintiff was treated by an unknown

nurse who arrived to administer his insulin shot after collapsing for the second time on May 1,

2010.  Since May 1, 2010, Plaintiff has seen various health care professionals in connection with

his attendance at the diabetic clinic at Stateville.  The exact names of the healthcare professionals

and dates of treatment are unknown and reside within the possession of the Defendants in this

case.

**INTERROGATORY NO. 11:**

As a result of your injuries, were you a patient in any hospital, medical institution and/or
clinic?  If so, state the names and addresses of all hospitals, medical institutions, and/or clinics,
the amounts of their respective bills and the date or inclusive dates of their services.

**ANSWER:**

No.

**INTERROGATORY NO. 12:**

List each and every doctor, nurse, and/or health care provider who has treated the patient
in the past ten (10) years and identify each condition and/or purpose for which each doctor,
nurse, and/or health care provider treated the patient.

**ANSWER:**

Plaintiff refers Defendant to his answer to Interrogatory No. 4 to Defendant Wexford

Health Sources, Inc.'s Interrogatories in Connection with Class Certification and hereby

incorporates by reference that answer into his answer to Interrogatory No. 12.  Answering

8

further, all treatment records from the last ten years are contained in Plaintiff's medical records which are in the possession, custody, and control of the IDOC and have been produced in this case.

## INTERROGATORY NO. 13:

State any and all other expenses and/or losses you claim as a result of the acts and/or omissions described in the Complaint. As to each expense and/or loss, state the date or dates it was incurred, the name of the person, firm, and/or company to whom such amounts are owed, whether the expense and/or loss in question has been paid and, if so, by whom it was so paid and describe the reasons and/or purpose for each expense and/or loss.

## ANSWER:

Plaintiff objects to this request as subject to expert testimony, and also premature as the presentation of damages will be made upon complete review of the medical records, documents produced in this case, and any further treatment necessary as a result of the Defendants actions in this case.

Subject to and without waiving these objections, Plaintiff states he has suffered damage to his health, as well as, to the extent recoverable, any fees or costs expended in the preparation of his defense in this matter.

## INTERROGATORY NO. 14:

Had you suffered any personal injury or prolonged, serious and/or chronic illness within ten (10) years prior to the incident(s) described in your Complaint? If so, state when and how you were injured and/or ill, where you were injured and/or ill, describe the injuries and/or illness suffered and state the name and address of each physician, or other healthcare professional, hospital, health care unit and/or clinic regarding your treatment for each injury and/or chronic illness.

## ANSWER:

Plaintiff refers Defendant to his answer to Interrogatory No. 15 to Defendant Wexford Health Sources, Inc.'s Interrogatories in Connection with Class Certification and hereby incorporates by reference that answer into his answer to Interrogatory No. 14.

9

**INTERROGATORY NO. 15:**

Have you suffered any personal injury or prolonged, serious and/or chronic illness since the incident(s) alleged in your Complaint? If so, state when you were injured and/or ill, where and how you were injured and/or ill, describe the injuries and/or illness suffered, and state the name and address of each physician or other health care professional, hospital, health care unit and/or clinic rendering you treatment for each injury and/or chronic illness.

**ANSWER:**

Plaintiff refers Defendant to his answer to Interrogatory No. 16 to Defendant Wexford

Health Sources, Inc.'s Interrogatories in Connection with Class Certification and hereby

incorporates by reference that answer into his answer to Interrogatory No. 15.

**INTERROGATORY NO. 16:**

Have you ever filed any other lawsuits for injuries either before or after the filing of this lawsuit? If so, state the nature of the injuries claimed, the courts and the captions in which filed, the years filed, and the titles and case or docket number of the suits.

**ANSWER:**

Plaintiff objects to Interrogatory No. 16 as irrelevant and not likely to lead to the

discovery of admissible evidence, as well as available in the public records. Subject to and

without that objection, in 2006, Plaintiff filed a lawsuit in the Northern District of Illinois related

to medical treatment, case caption Lippert v. Elyea, et al, case number 1:06-cv-03537. In 2008,

Plaintiff filed a lawsuit in the Northern District of Illinois related to medical treatment, case

caption Lippert v. Williams, et al, case number 1:11-cv-00187.

**INTERROGATORY NO. 17:**

Did defendant(s) or anyone associated with defendant(s) give you information or discuss with you the treatment to be given to you or withheld from you? If so, state the date(s) and place(s) such information was given or discussions were had, the name(s) of the person(s) providing such information or engaging you in the discussion and give a description of the information provided or discussed with you.

**ANSWER:**

Plaintiff objects to this request to the extent it seeks information that resides within the possession, custody and/or control of the Defendants.

Subject to, and without waiving these objections, on May 1, 2010, Plaintiff was treated by Dr. Liping Zhang who administered an insulin shot for him and prescribed an additional insulin shot after dinner. While in the HCU after being treated by Dr. Zhang, Nurse Breske tested Plaintiff's blood sugar level and found it was a normal level. Plaintiff later encountered Nurse Rossiter and another unknown Nurse after dinner and requested his insulin shot. Rossiter and the other nurse stated that they would not give him his prescribed insulin shot because Nurse Breske had previously said he did not need one.

**INTERROGATORY NO. 18:**

Are you claiming any psychiatric, psychological and/or emotional injuries as a result of the acts and/or omissions described in the Complaint? If so, state:

    a.    The name of any psychiatric, psychological, and/or emotional injury claimed, and the name and address of each psychiatrist, physician, psychologist, therapist, or other health care professional rendering you treatment for each injury;

    b.    Whether you had suffered any psychiatric, psychological, and/or emotional injury prior to the date of the act and/or omissions described in the Complaint, and

    c.    If (b) is in the affirmative, please state when and the nature of any psychiatric, psychological and/or emotional injury and the name and address for each psychiatrist, psychologist, therapist, or other health care professional rendering you treatment for each injury.

**ANSWER:**

Plaintiff refers Defendant to his answer to Interrogatory No. 17 to Defendant Wexford Health Sources, Inc.'s Interrogatories in Connection with Class Certification and hereby incorporates by reference that answer into his answer to Interrogatory No. 18.

16992660v.1

**INTERROGATORY NO. 19:**

Provide the name and address of each witness who will testify at trial and the subject of their testimony.

**ANSWER:**

Plaintiff objects to Interrogatory No. 19 as unduly burdensome and premature. Subject to and without waiving these objections, Plaintiff will provide this information when required under the Federal Rule of Civil Procedure and Local Rules.

**INTERROGATORY NO. 20:**

Do you have any photographs, movies, and/or videotapes relating to the acts and/or omissions which are described in your Complaint and/or the nature and extent of any injuries for which recovery is sought? If so, state the date or dates on which such photography, movies, and/or videotapes were taken, who was displayed therein, who now has custody of them, and the name, address, occupation and employer of the person taking them.

**ANSWER:**

None.

**INTERROGATORY NO. 21:**

Have you had any conversations with any person other than your attorney, at any time with regard to the manner in which the care and treatment described in your complaint was provided, or have you overheard any statement made by any person at any time with regard to the injuries complained of by plaintiff or in the manner in which the care and treatment alleged in the complaint was provided? If so, state:

a.  The date or dates of such conversation(s) and/or statement(s);

b.  The place of such conversation(s) and/or statement(s);

c.  All persons present for the conversation(s) and/or statement(s);

d.  The matter and things stated by the person in the conversation(s) and/or statement(s);

e.  Whether the conversation(s), was oral, written, and/or recorded; and

f.  Who has possession of the statement(s) if written and/or recorded.

16992660v.1

**ANSWER:**

Plaintiff refers Defendant to his answer to Interrogatory No. 5 of these Interrogatories and

No. 18 to Defendant Wexford Health Sources, Inc.'s Interrogatories in Connection with Class

Certification and hereby incorporates by reference those answers into his answer to Interrogatory

No. 21.

**INTERROGATORY NO. 22:**

Have you received payment and/or other consideration from any source in compensation
for the injuries alleged in your complaint? If your answer is in the affirmative, state:

    a.    The amount of such payment and/or other consideration received;

    b.    The name of the person, firm, insurance company, and/or corporation making
such payment or providing other consideration and the reason for the payment
and/or consideration; and

    c.    Whether there are any documents evidencing such payment and/or consideration
received.

**ANSWER:**

None.

**INTERROGATORY NO. 23:**

Identify any statements, information, and/or documents known to you and requested by
any of the foregoing interrogatories which you claim to be work product or subject to any
common law or statutory privilege, and with respect to each interrogatory, specify the legal basis
for the claim.

**ANSWER:**

All documents known to Plaintiff to relate to the foregoing Interrogatories have been

produced in this case.

**INTERROGATORY NO. 24:**

List the manner and dates for which Plaintiff contends he exhausted each step of
administrative remedies with regard to this claim (as set forth in 20 Ill. Admin. Rule 504).
Further, please identify with specificity:

    a.    Each document that evidences such exhaustion;

b.     the date of each grievance and/or appeal filed;

c.     To whom each grievance and/or appeal was addressed;

d.     The procedure taken for filing each grievance and/or appeal;

e.     The purpose for each grievance and/or appeal; and

f.     The exact number of complaints raised in each grievance and/or appeal.

**ANSWER:**

Lippert objects to this request as being unlikely to lead to the discovery of admissible evidence, as well as requesting information that resides within the possession, custody and/or control of the Defendants.

Subject to, and without waiving these objections, Lippert states that on May 12, 2010, Plaintiff filed three grievances, related to medical treatment and staff-conduct, with the Illinois Department of Corrections for the incidents occurring on May 1, 2010. The grievances were provided to counselor David Mansfield. (Lippert 00489-495). On June 8 and June 19, 2010, Plaintiff wrote a letter to Kevin Whittington, Counselor of F-House, asking for a counselor's response to his May 12, 2010 grievances. (Lippert 00487-88). On July 26, 2010, Chretien wrote a letter to the Grievance Office notifying them of his May 12, 2010 grievances and informing the Grievance Office that he had not yet received a counselor's response. (Lippert Arb 002258). On August 2, 2010, Plaintiff received a memorandum from Colleen Franklin, CCII Grievance Office, advising Plaintiff that his May 12, 2010 grievances were being reviewed by the Grievance Office. (Lippert Arb. 002257). Plaintiff wrote another letter to the Grievance Office on October 24, 2010 asking for a response to his May 12, 2010 grievances. (Lippert 00483-486). On November 4, 2010, Plaintiff wrote a letter to the Administrative Review Board of Inmate Issues to inform the ARB of his three grievances written on May 12, 2010 and asking them to

review his grievances. (Lippert Arb. 002266). On November 23, 2010, Plaintiff received a response from the Administrative Review Board. (Lippert 00482; Lippert Arb. 002251).

The Grievance Officer's Report indicates that Plaintiff's May 12, 2010 grievances were received by the Grievance Office June 7, 2010 and reviewed September 29, 2010. (Lippert Master File 00277). The Grievance Officer recommended that the grievances be denied. (*Id.*) On November 29, 2010, the Chief Administrative Office provided its response, concurring with the Grievance Office Report. (*Id.*) On December 6, 2010, Plaintiff notified the Chief Administrative Office that he was appealing its decision to the Director. (Lippert Arb. 002217). On March 25, 2011, Plaintiff received a letter from the Administrative Review Board finding that the relief requested on his May 12, 2010 grievances be denied.

## INTERROGATORY NO. 25:

List the names and addresses of all persons (other than yourself and persons heretofore listed) who have knowledge of the facts regarding the care and treatment complained of in the Complaint filed herein and/or the injuries claimed to have resulted therefrom.

## ANSWER:

None other than the individuals previously listed in Plaintiff's response to these interrogatories, documents produced by the Defendants in this case, and those individual identified in Plaintiff's grievances related to May 1, 2010.

Lippert reserves the right to supplement this Interrogatory if, and when, additional information becomes known.

15

16992660v.1

DATED:  April 22, 2014

Respectfully submitted,

SEYFARTH SHAW LLP

By _____
            One of Its Attorneys

Jason P. Stiehl
Kristine Rinella Argentine
SEYFARTH SHAW LLP
131 South Dearborn Street, Suite 2400
Chicago, Illinois  60603
(312) 460-5000 (telephone)
(312) 460-7000 (facsimile)

16

16992660v.1

## **VERIFICATION**

I, Don Lippert, under penalty pursuant to 28 U.S.C. § 1746, declare that I have read Plaintiff Don Lippert's attached Answers to Defendant Athena Rossiter Interrogatories to Plaintiff and that the responses therein are true and correct to the best of my knowledge, information and belief.

Executed this _6_ th day of April 2014.

Don Lippert

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that she caused a true and correct copy of the foregoing PLAINTIFF DON LIPPERT'S ANSWERS TO DEFENDANT ATHENA ROSSITER'S INTERROGATORIES to be served upon the following counsel of record via email and US mail on this 22nd day of April 2014:

Matthew H. Weller
Matthew A. Eliaser
CASSIDAY SCHADE LLP
20 North Wacker Drive, Suite 1000
Chicago Illinois 60606
mweller@cassiday.com
meliaser@cassiday.com

Kevin Lovellette
Agnes A. Pataznik
Saira Alikhan
Illinois Attorney General's Office
100 West Randolph Street
13th Floor
Chicago, IL 60601
aptasznik@atg.state.il.us
KLovellette@atg.state.il.us

Kristine Argentine

18

16992660v.1

CONFIDENTIAL

ILLINOIS DEPARTMENT OF CORRECTIONS
**OFFENDER'S GRIEVANCE**

| Date: 5-12-2010 | Offender: (Please Print) Don Lippert | ID#: B-74054 |
|---|---|---|

Present Facility: Stateville C.C.    Facility where grievance issue occurred: Stateville C.C.

**NATURE OF GRIEVANCE:**

- ☑ Personal Property
- ☑ (Staff Conduct)
- ☐ Transfer Denial by Facility
- ☐ Mail Handling
- ☐ Dietary
- ☐ Transfer Denial by Transfer Coordinator
- ☐ Restoration of Good Time
- ☐ Medical Treatment
- ☐ Disability
- ☐ HIPAA
- ☐ Other (specify)

☐ Disciplinary Report: ____ / ____ / ____
Date of Report _____ Facility where issued

*Received Grievance Office JUN 0 7 2010*
*1472*

**Note:** Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

**Complete:** Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:

**Counselor**, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
**Grievance Officer**, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
**Chief Administrative Officer**, only if EMERGENCY grievance.
**Administrative Review Board**, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

**Brief Summary of Grievance:** This is a Grievance on ALL F-House Security for being Deliberate Indifference towards my life and well-being.

On 5-7-2010, 7-3 Shift at about 8 a.m. I had informed Sgt. Palmer that I needed a Med-Tech due to not getting my insulin shot by medical on 11-7 Shift and that I needed my insulin shot now. This IDOC Employee, Sgt. Palmer informed me that he'll call them. At about 8:30 a.m. I started
OVER

**Relief Requested:** *PLEASE NOTE* : Due to the long Inmate Relief Requested my Relief Request will be on the last page of this grievance...

☐ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

_____ _____ ____/____/____
Offender's Signature    ID#    Date
(Continue on reverse side if necessary)

---

| | **Counselor's Response** (if applicable) | |
|---|---|---|

Date Received: 5/17/10    ☐ Send directly to Grievance Officer    ☐ Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277.

Response: Per Nursing staff, you did not receive insulin because you did not get up when called.

_K. Whitlaw_ _____ _6 3 10_
Print Counselor's Name    Counselor's Signature    Date of Response

---

| | **EMERGENCY REVIEW** | |
|---|---|---|

Date Received: ____ / ____ / ____

Is this determined to be of an emergency nature?
- ☐ Yes; expedite emergency grievance
- ☐ No; an emergency is not substantiated. Offender should submit this grievance in the normal manner.

_____ ____/____/____
Chief Administrative Officer's Signature    Date

Distribution: Master File; Offender      Page 1      DOC 0046 (Rev. )
Printed on Recycled Paper

**EXHIBIT**
G

CONFIDENTIAL    ILLINOIS DEPARTMENT OF CORRECTIONS
**OFFENDER'S GRIEVANCE** (Continued)

yelling for Sgt. Palmer which he responded and I had informed him again that I needed my insulin shot and this IDOC Employee, Sgt. Palmer stated to me, "Lippert, I'm not a doctor what do you want me to do. I called them already if they don't come I can't force them to come." I then yelled back to Sgt. Palmer and told him that since he is the Sgt. of this cellhouse he can take me or have someone take me to the Hospital so that I can get my insulin shot. This IDOC employee just laughed and walked into his office.

At about 9 a.m. I started asking and yelling at other F-House Security Officer's: C/o Hernandez, C/o Clemons, C/o Dangerfield, C/o Jones, C/o Jackson, C/o Maldonado, C/o Norman and C/o Zernicke if they can take me to the Hospital so that I can get my insulin shot because I didn't get it yet and I'm starting to feel very weak. These IDOC Employee's all ignored my pleas for medical emergency help and I just got laughs for my yelling for medical help.

Due to suffering from severe Hyperglycemic complications I had gotten to weak and collapsed to the floor. While laying on the floor in severe pain I had urinated on my self. While laying in my urine in pain I had heard C/o Norman and C/o Maldonado at my cell door asking me if I wanted my food tray (Lunch). I then heard C/o Norman yell to Sgt. Palmer, "Lippert is on the floor I think you need to check him out". I then heard C/o Maldonado state, "he's in the right position". Then I heard these IDOC employee's laughing.

Sometime later two (2) nurses had came to my cell with F-House Security Officers so that they could be let into my cell. While in my cell they had tested my blood sugar level which the reading was 451. Due to this I had to be taken to the E.R. given some Regular insulin and admitted to the Infirmary.

LIPPERT MASTER FILE 000279

CONFIDENTIAL

**ILLINOIS DEPARTMENT OF CORRECTIONS**
**OFFENDER'S GRIEVANCE** (Continued)

# INMATE RELIEF REQUESTED.

(1) To have all the above named IDOC employee's punished for Knowingly & Wantonly endangering my life and well-being for refusing to take me to the H.C.U. to get my life sustaining Diabetes medicine (Insulin), (2) To have Sgt. Palmer, C/O Norman and C/O Maldnado suspended 3 days without pay for their dangerous unprofessional conduct against me in the begining and during my medical emergency pleas for help, (3) To have all the above named F-House Security Officers retrained and tested in Responding to Medical Emergencys and Medical Situations, (4) To be safe guarded from future retaliation by these IDOC employees for me using my Inmate Grievance rights, (5) To have this Grievance placed into their Job File Jacket for future reference.

LIPPERT MASTER FILE 000280

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF ILLINOIS
 3                 EASTERN DIVISION
 4   DONALD LIPPERT, et-al      )
 5              Plaintiffs,     )
 6      vs.                     )  No. 10-cv-4603
 7   SALVADOR GODINEZ, et-al,   )
 8              Defendants.     )
 9        The deposition of COLLEEN FRANKLIN,
10   called for examination pursuant to the Rules of
11   Civil Procedure for the United States District
12   Courts pertaining to the taking of depositions,
13   taken before Jacqueline Shenberger, Certified
14   Shorthand Reporter within and for the County of
15   Cook and State of Illinois, at 11683 South
16   Broadway, Crest Hill, Illinois, on
17   September 26, 2014, at the hour of 1:28 o'clock
18   P.M.
19
20
21
22   Assignment No:  1928202
23   Jacqueline Shenberger
24   License No:  084-001524
```

Page 3

```
                    I N D E X
 1
 2   WITNESS                        EXAMINATION
 3
 4   COLLEEN FRANKLIN
 5
 6     By MS. MARSH                      4
 7     By MR. ELIASER                   52
 8     By MS. MARSH                     62
 9
10
11
12
13
14              E X H I B I T S
15   NUMBER                     MARKED FOR ID
16
17   Franklin Deposition Exhibit
18        No. 1                         63
19
20
21   Maldonado Deposition Exhibit
22        No. 1 (previously marked)     16
23   Maldonado Deposition Exhibit
24        No. 3 (previously marked)     27
```

Page 2

```
 1   APPEARANCES:
 2        SEYFARTH SHAW LLC
 3        BY:  MS. ROBYN MARSH
 4        131 South Dearborn
 5        Suite 2400
 6        Chicago, Illinois  60603
 7        (312) 460-5000
 8             Representing the Plaintiff, Lippert;
 9        CASSIDAY SCHADE LLP
10        BY:  MR. MATTHEW A. ELIASER
11        20 North Wacker
12        Suite 1000
13        Chicago, Illinois  60606
14        (312) 641-3011
15             Representing the Defendant, Rossiter;
16
17        LISA MADIGAN ILLINOIS ATTORNEY GENERAL
18        BY: MR. KEVIN LOVELLETTE, and
19        MS. JENNIFER LUTZKE
20             Assistant Attorney General
21        100 West Randolph
22        Chicago, Illinois  60601
23        (312) 814-3720
24
```

Page 4

```
 1        (DEPOSITION COMMENCED AT 1:28 P.M.)
 2             (Whereupon, the witness was duly
 3             sworn.)
 4             COLLEEN FRANKLIN,
 5   called as a witness herein, was examined and
 6   testified as follows:
 7             EXAMINATION
 8        BY MS. MARSH:
 9        Q.   Please, state your full name for the
10   record, spelling your first and last name.
11        A.   Colleen Franklin, C-o-l-l-e-e-n,
12   F-r-a-n-k-l-i-n.
13        MS. MARSH:  Let the record reflect that this
14   is the discovery deposition of Colleen Franklin,
15   taken pursuant to subpoena and further agreement
16   of the parties and all applicable rules.
17        BY MS. MARSH:
18        Q.   May I call you Colleen?
19        A.   Yes.
20        Q.   Colleen, my name is Robyn Marsh, I
21   previously introduced myself.  I represent the
22   Plaintiff in the case of Lippert versus several
23   people, I'm forgetting the first Defendant's
24   name, Godinez.  And I'm going to ask you just a
```


EXHIBIT

Page 5

1  few questions today.
2          Have you ever been deposed before?
3      A.   I have.
4      Q.   Okay.  So I won't belabor the point
5  with all the rules, but just make sure that your
6  answers are out loud, no nods of the head,
7  shrugs of the shoulder, we have to get
8  everything on the record.  Okay?
9      A.   Okay.
10      Q.   Okay.  Just a little bit of background
11  information to start, did you review anything in
12  preparation for your deposition today?
13      A.   Review?
14      Q.   Any documents, the complaint, grievance
15  forms?
16      A.   I did look up his -- my grievance
17  response.
18      Q.   In response to Mr. Lippert?
19      A.   Yeah.
20      Q.   Okay.  And we'll go over that later,
21  but I just want to make sure we're talking about
22  the same thing, and that is the June 7, 2010
23  response with your signature on it?
24      A.   Yes.

Page 6

1      Q.   Okay.  That's been previously marked as
2  Maldonado Exhibit 3, and we will get to that
3  later.
4      MR. ELIASER:  Just for the record that's the
5  date received.  The day we've been using is
6  September 29th, 2019.
7      MS. MARSH:  Oh, okay.
8      MR. ELIASER:  I just want to make sure it's
9  clear.
10  BY MS. MARSH:
11      Q.   Is that -- and that is the extent of
12  what you reviewed in preparation for today's
13  deposition?
14      A.   Yes.
15      Q.   Okay.  And let's start with your job
16  title, what is your job title here?
17      A.   I'm a Correctional Counselor 2.
18      Q.   2 as in t-w-o?
19      A.   Yes.
20      Q.   And what does that job involve?
21      A.   Depending on which assignment you
22  actually have.  We have numerous assignments
23  here that -- so it kind of depends on what your
24  assignment is.  Some are cell house correctional

Page 7

1  counselors, who deal face-to-face with the
2  inmates, dealing with -- they're basically the
3  liaison between the inmate and all the other
4  departments.  We have some counselors that work
5  in the Field Services Department, that work
6  strictly with finding places and approving
7  places for the offender when they parole.  We
8  have some that work at DNRC, and they interview
9  and classify offenders.  We have counselors that
10  are assigned to the Grievance Office.  So we
11  have an array of different job responsibilities,
12  depending on what our assignment is.
13      Q.   What is your particular assignment?
14      A.   Currently I am assigned to the Minimum
15  Security Unit as a Unit Counselor.
16      Q.   And in that capacity you would have
17  face-to-face contact with the inmate?
18      A.   Yes, I do.
19      Q.   The Minimum Security Facility?
20      A.   Yes.
21          Off the record.  Isn't the air working
22  in here?
23      MS. MARSH:  We turned it off.
24      MR. ELIASER:  Yeah, we turned it off because

Page 8

1  the court reporter was having a problem hearing.
2  BY MS. MARSH:
3      Q.   In May of 2010 what was your position?
4      A.   In May of 2010 I was assigned to the
5  Offender Grievance Office.
6      Q.   And is that located here at this
7  facility?
8      A.   It is.
9      Q.   This facility being Stateville?
10      A.   Yes.
11      Q.   Okay.  And how long did you hold that
12  position in the Offender Grievance Office?
13      A.   Approximately a year and a half, if I
14  remember correctly.
15      Q.   When did you start working for
16  Stateville?
17      A.   February 1st of 1994.
18      Q.   And prior to that had you worked for
19  the Illinois Department of Corrections at
20  another facility or was Stateville your first
21  position?
22      A.   Yes.
23      Q.   Stateville was your first position?
24      A.   Yes.

Page 9

1      Q.   Let's just go over your educational
2  background briefly.  What kind of training and
3  education did you receive in order to be a
4  counselor with the IDOC?
5      A.   I don't have a degree, so I did take
6  classes, but I never finished my degree.  So I
7  did take college courses, but I never finished
8  it.  I actually got my Certificate through the
9  Upward Mobility Process.
10      Q.   And is that facilitated through the
11  Illinois Department of Corrections?
12      A.   It is.
13      Q.   And when did you receive that
14  Certificate?
15      A.   I became a counselor in two thousand --
16  approximately 1998.
17      Q.   So what were you doing from 1994 to
18  1998?
19      A.   I was a dental assistant.
20      Q.   A dental assistant?
21      A.   Yes, here in the Health Care Unit.
22      Q.   And then are the classes that you can
23  take online, or you just read a bunch of books,
24  and then you take an exam, or are you in a

Page 11

1      Q.   And when was that timeframe, if you
2  recall?
3      A.   2001 and they closed in 2002, like
4  later in the year of 2002.
5      Q.   Okay.  So probably -- approximately
6  from 2002 you've been a Counselor here at
7  Stateville?
8      A.   Yes.
9      Q.   And you mentioned other assignments in
10  the beginning of our deposition.  Have you held
11  all of those assignments -- been assigned to
12  different capacity or one more than the other?
13      A.   I've been a Unit Counselor more than
14  I've been any of the other positions.
15      Q.   Were you ever a Unit Counselor for F
16  House?
17      A.   Yes.
18      Q.   Do you recall when that was?
19      A.   I do not.
20      Q.   Would it have been prior to 2010?
21      A.   Yes.
22      Q.   Okay.  In your current position you
23  work face-to-face with inmates in terms of the
24  grievance process as a counselor, is that

Page 10

1  classroom?
2      A.   The Upper Mobility Process is both.
3  There is a test that you can take, that if you
4  pass all of the sections of the test, you get
5  your Certificate.  I also took classes at the
6  College of DuPage.
7      Q.   And were they specialized classes to be
8  a Counselor or are they just general liberal
9  arts classes?
10      A.   Criminal Justice, everything else was
11  just basic.
12      Q.   So since 1998 you've been a Counselor?
13      A.   2001.
14      Q.   Okay.  So did you remain in the
15  position as a dental assistant from 1994 through
16  2001?
17      A.   Yes.  April 1st of 2001 I became a
18  Counselor.
19      Q.   And again, it's only been at the
20  Stateville facility?
21      A.   Stateville and Joliet.  And then Joliet
22  closed and I came back.
23      Q.   Okay.  For how long were you at Joliet?
24      A.   Approximately a year and a half.

Page 12

1  correct?
2      A.   They turn their grievances into me, I
3  address them at the initial level.
4      Q.   Okay.
5      A.   Once I address it at the initial level
6  it goes back to the offender or depending on the
7  type of grievance it goes to the Grievance
8  Office.
9      Q.   What type of grievance would go to the
10  Grievance Office?
11      A.   Medical grievances, staff conduct
12  grievances and property grievances.
13      Q.   Like missing property?
14      A.   Yes.
15      Q.   And then what are the types of
16  grievances that you deal with on the initial
17  level that go back to the offender and don't go
18  to the Grievance Office?
19      A.   Property issues that have been
20  resolved, trust fund issues that have been
21  resolved, mail issues, any of those types of
22  things that are resolvable.
23      Q.   Okay.  So even though you have the
24  instances where -- that you just previously

Page 13

1   named, the medical grievance, staff conduct or
2   property grievance, that would go eventually to
3   the Grievance Office, do you still deal with it
4   on the initial level?
5       A.   Yes.
6       Q.   Okay.  And how is it in your position
7   that you do deal with it?  What are your
8   responsibilities at that initial level?
9       A.   To do the initial investigation of
10  whatever the allegations are, a broken TV, is
11  the TV actually broken, getting a copy of the
12  contract, getting a copy of his receipt, so that
13  when we forward it to the Grievance Office, the
14  Grievance Office already has all the pertinent
15  documentation.
16      Q.   Okay.  And then are you involved
17  thereafter?
18      A.   No.  Once it got to the Grievance
19  Office.
20      Q.   You're done?
21      A.   Yes, we are out of it.
22      Q.   So going back to May of 2010, you were
23  in the Grievance Office, is that correct?
24      A.   Correct.

Page 14

1       Q.   Do you recall the May, 2010 grievance
2   from Don Lippert?
3       A.   Only after I read it.
4       Q.   And meaning after you read it in
5   preparation for today's deposition?
6       A.   Correct.
7       Q.   Okay.  Would you have read -- sorry.
8   One second.
9            Well, let's just go back a second.
10  Tell me what your job would have been in the
11  Grievance Office when you received a form, a
12  grievance form that comes to you?
13      A.   The process in the Grievance Office is
14  once we receive a grievance sent to us by the
15  Counselor or a grievant can also send it to us,
16  if he doesn't like the response that was given
17  to him by his counselor.  We get it, they're
18  logged, they're separated by, you know, medical
19  grievances, property grievances, that kind of
20  thing.  But once we're actually addressing that
21  particular grievance, just a matter of reviewing
22  the counselor's response, if the counselor's
23  response doesn't really have all the information
24  needed for us to really make any type of a

Page 15

1   decision, then we would contact, you know,
2   whoever we needed to contact based on the
3   grievance.  If it was the property officer that
4   we're trying to figure out what happened to this
5   guy's property, you know, contacting medical, if
6   it happens to be a medical issue.  You know, we
7   would do whatever research we needed to do to
8   come to a better conclusion about the grievance.
9       Q.   Okay.  And then there's not necessarily
10  limits to it.  You can also talk to the inmate
11  on that as well, or it just depends on whatever
12  you need to do?
13      A.   Once the inmate writes his grievance,
14  his statement is what is in the grievance.
15      Q.   Okay.  So your further investigation is
16  as you just described, depending on what the
17  grievance is, if it's property, property
18  officer, but you don't necessarily go back to
19  the inmate?
20      A.   No.
21      Q.   Other than what's in the grievance
22  form?
23      A.   Hmm, hmm.
24      Q.   Okay.  When you were a counselor

Page 16

1   assigned to F House do you remember working with
2   Don Lippert?
3       A.   I don't recall ever having him on my
4   caseload.
5       Q.   Okay.  Do you know what he looks like?
6       A.   I do not.
7       Q.   Okay.  With respect to the May 12, 2010
8   grievance, referring to a May 1, 2010 incident.
9   I'm going to show you what has been marked as
10  Maldonado Exhibit 1.  And if you can just
11  briefly look at it and tell me if this is the
12  type of thing that would come to the Grievance
13  Office?
14      A.   I haven't seen this since apparently
15  when I did, it looks like we received it in the
16  Grievance Office on June 7th and it was logged
17  in as Grievance Number 1477.
18      Q.   So typically, not specific to this,
19  because I know you don't remember it, but is
20  this the type of form that would come to the
21  Grievance Office?
22      A.   Yes, hmm, hmm.
23      Q.   And that was filled out by a prisoner
24  and then you go from there?

Page 17

1    A.   Yes.
2    Q.   Now, on the bottom half of the form it
3  looks like there is a space for the counselor to
4  fill out, and that is presumably what you --
5  maybe it's a different form now, but this is
6  what you do in your current position, where you
7  address it from the initial level before it goes
8  to the office?
9    A.   Yes.
10    Q.   Okay.  The handwriting is a little off,
11  but do you recognize the name Kevin Whittington?
12    A.   Yes, I do.
13    Q.   Okay.  And he would have presumably
14  been a counselor assigned to F House who dealt
15  with Mr. Lippert at the initial level?
16    A.   Correct.
17    Q.   Okay.  And based on your review of the
18  grievance officer's report authored by you, that
19  you said you reviewed prior to this deposition,
20  do you have any recollection of the events as
21  they were described in the report?
22    A.   I do not.
23    Q.   Do you have a general understanding
24  from reviewing your report what it was about,

Page 18

1  what the grievance was about?
2    A.   What the grievance was about?
3    Q.   Yes.
4    A.   Yes.
5    Q.   Can you just explain to me what you
6  understand it to be before I go on with my
7  questioning so we're on the same page.
8    A.   Well, Lippert wrote a grievance
9  indicating that he did not get his insulin shot
10  --
11    Q.   Okay.
12    A.   On May 1, 2010.
13    Q.   Right.
14    A.   According to his grievance, yes.
15    Q.   Okay.  And then you, you being the
16  office, the Grievance Office would have received
17  this grievance and then you further investigate
18  from there, correct?
19    A.   Hmm.
20    Q.   Correct?
21    A.   Yes.
22    Q.   So when you would receive a report like
23  this you would -- tell me what's the first thing
24  you would do with it when it would come to the

Page 19

1  Grievance office?
2    A.   We would stamp it in --
3    Q.   Hmm, hmm.
4    A.   -- the day we receive it.  We log it,
5  it's given a number, and then it gets put in a
6  file.  I don't know what the numbers are, but
7  when I was in the Grievance office we could get
8  250 to 300 grievances a week.
9    Q.   Okay.
10    A.   So that being said, we would review
11  them, we would scan them quickly to make sure
12  there was nothing that needed immediate
13  attention, something that was life threatening
14  to an individual.  We would, obviously, do those
15  first.  The other ones would get put in a file,
16  and we would address, you know, however many we
17  could address on a daily basis.  Once we were
18  actually reviewing the grievance, then we would
19  go through it to see if the answer, was it
20  appropriately addressed by the counselor.  Was
21  the issue resolved.  If the issue was resolved
22  then we basically our response is that.  That,
23  you know, it has been resolved by the staff
24  already.

Page 20

1    Q.   Okay.  So when it's chosen to start
2  going through the grievance after you've
3  addressed the ones that take top priority, is it
4  -- I'm assuming there's more than one grievance
5  counselor --
6    A.   There's two.
7    Q.   To deal with 300 per week?
8    A.   Yes, and no clerical staff.
9    Q.   Okay.
10    A.   Yeah.
11    Q.   So do you work on them individually
12  then, you just kind of divide and conquer --
13    A.   Hmm, hmm.
14    Q.   It's not both of you on each case,
15  working together?
16    A.   No, we divide and conquer.
17    Q.   So in this particular case we will
18  assume, based on your report, that it was just
19  you handling Mr. Lippert's case?
20    A.   Correct.
21    Q.   Okay.
22    MR. ELIASER:  Miss Franklin, could you make
23  sure you just allow her to finish her question
24  before you chime in?

Page 21

1    A.    Yes.
2         MR. ELIASER:  It just makes it a lot easier
3    on the court reporter.  I know you know where
4    she's going to go with it, but just let her
5    finish it, it's easier.
6         A.    I'm sorry.
7    BY MS. MARSH:
8         Q.    So in this particular instance you
9    would get the form after it had been logged in
10   and all that stuff, and you would have read
11   through it.  And then do you read the grievance
12   first and then the response from the counselor,
13   or just all is one thing, or does it depend?
14        A.    There's no particular way of doing it.
15        Q.    I'm just asking what your practice was,
16   if you had one?
17        A.    I don't think I did.
18        Q.    Okay.  So in this case you would have
19   read Mr. Lippert's grievance and you would have
20   seen the response from the counselor.  Can you
21   read that, by any chance?
22        A.    Read?
23        Q.    The response from the counselor, can
24   you read that handwriting?

Page 23

1    claiming that he did not get proper medical
2    care, so my concern would have been what
3    happened after he didn't -- because he already
4    addressed why he didn't get his insulin, he
5    didn't get up.
6         Q.    So your job was -- you decided to do
7    further investigation because you did not
8    consider that the grievance was fully solved,
9    based on the initial level with Mr. Whittington,
10   is that correct?
11        A.    Due to his accusations of staff
12   conduct, we talked to the staff that was on
13   duty, or as many -- I don't even know if he even
14   names the specific people in here, because I
15   haven't read this grievance in over four years.
16        Q.    Okay.  Actually, why don't we just take
17   a moment and you kind familiarize yourself with
18   it.  And then we can just proceed from there.
19        A.    Okay.
20        Q.    After reading through that did
21   that refresh your recollection at all as to this
22   incident?
23        A.    I mean, the actual incident or talking
24   to anybody, it doesn't.

Page 22

1         A.    Yes, I can.
2         Q.    If you can just read it into the record
3    what it says?
4         A.    Per nursing staff, you did not receive
5    insulin because you did not get up when called.
6         Q.    Okay.  And based on that response what
7    was the -- I know you don't specifically
8    remember, but given that there is a report from
9    here, how did you handle that?
10        A.    I would have talked to whoever because
11   I don't recall, you know, I don't recall.  We
12   used to do hundred and hundreds of grievances.
13        Q.    Let me ask a better question, that was
14   kind of crummy.  Given that there is further
15   investigation and a grievance report, is it fair
16   to say that you needed the first level, Mr.
17   Whittington's comments to be inadequate to
18   satisfy the grievance?
19        A.    In my -- I would have wanted to get
20   more information.
21        Q.    Okay.
22        Q.    Okay.  So what happened after Mr. -- I
23   mean, he made a lot of accusations in here about
24   staff, his overall thing was that he was

Page 24

1         Q.    Okay.  That's fine, I just wanted to
2    make sure.
3         A.    Okay.
4         Q.    So in your investigation -- well, first
5    of all, let me back up, in just reading this did
6    you see names of particular staff within the
7    grievance?
8         A.    Yes.
9         Q.    And knowing that particular staff is
10   named, what is you next step?
11        A.    Apparently from my grievance response,
12   I contacted Sergeant Palmer --
13        Q.    Hmm, hmm.
14        A.    And got a statement from him.
15   Maldonado.  And apparently this is a typo,
16   because it looks like in his grievance it says
17   Norman not Nelson.
18        Q.    Okay.  And why did you choose to
19   interview those three persons, because it looks
20   like he named several correctional officers on
21   duty?
22        A.    That would be inmate relief requested,
23   number 2, to have Sergeant Palmer, CO Norman,
24   and CO Maldonado suspended three days without

Page 25

1  pay for their dangerous, unprofessional conduct
2  against me in the beginning and during my
3  medical emergency. So that would be the reason
4  that I would have interviewed them.
5       Q. So just based on inmate request --
6       A. Yes.
7       Q. Okay. Typically would you go outside
8  the request for relief and see if there were
9  other witnesses to the event to interview other
10 CO's that were on duty that day?
11      A. If I felt that there was a need to do
12 so.
13      Q. Okay. So it's just situational, it
14 just depends?
15      A. Absolutely, yes.
16      Q. Okay. And how do you go about
17 conducting interviews, do you set up a time and
18 they come to your office, do you make sure to
19 see them after their shift, how do you work out
20 doing interviews?
21      A. It varies, depending on days off vary,
22 shifts vary, so it just depends on the person.
23 If I go to the unit to talk to them, they may
24 stop in the office. I don't remember where I

Page 26

1  talked to them at. Yeah, it varies, it's very
2  situational as far as the availability of the
3  person they need to interview.
4       Q. Okay. And when you go -- or before you
5  go rather, at any time do you provide a copy of
6  the grievance form against the person that the
7  grievance is filed?
8       A. No.
9       Q. Is that against the rules, does that
10 just never happen?
11      A. I can't say it never happens, I can
12 just tell you that I didn't do that. I would
13 talk to the person regarding the incident, not
14 allow them to read the grievance.
15      Q. Okay.
16      A. I would just ask them to recall, do you
17 recall the situation, what happened.
18      Q. Okay. And would you ask them to give
19 you a written statement, would you take notes,
20 how would you go about responding?
21      A. Normally I would take notes.
22      Q. And what do you do with those notes?
23      A. Throw them away when I'm done writing
24 this.

Page 27

1       Q. Okay. So anything that you would have
2  recorded in your interviews is transferred
3  eventually to your final report?
4       A. Correct.
5       Q. Okay. Is there any time where somebody
6  who's mentioned in a grievance report has an
7  opportunity to respond in writing, if they
8  wanted to, is that something that ever happens?
9       A. A staff member respond in writing?
10      Q. Well, if there's a grievance against
11 somebody for misconduct, they want to respond,
12 they would like it in the file?
13      A. Could they do that?
14      Q. Yes.
15      A. We wouldn't refuse to accept it,
16 absolutely not.
17      Q. Okay. But it's not necessarily
18 required?
19      A. No, it is not.
20      Q. Okay. And so it looks like based on
21 your report, Martha Maldonado Exhibit 3, yes.
22 That you would have spoken to Sergeant Palmer,
23 Officer Norman, even though it says Nelson, and
24 Officer Maldonado, is that correct?

Page 28

1       A. Yes.
2       Q. Okay. Do you know if you would have
3  talked to them all on the same day, or again, it
4  would have been situational?
5       A. It would have been. I don't recall
6  when or where.
7       Q. Okay. When you have this type of
8  initial grievance, the one from Mr. Lippert, and
9  then you have the portion from the counselor,
10 the unit counselor saying that he -- the reason
11 on here why he didn't get his insulin. Is that
12 something that you just accept and investigate
13 the remaining allegations, or do you investigate
14 the entire grievance as a whole?
15      A. It depends again on the grievance and
16 on the response. I don't always double check
17 the work of other people. I don't know -- I
18 don't recall whether I went to the Health Care
19 Unit to double check that or to talk to anybody.
20 If it's not in here, I don't know if I did or
21 not.
22      Q. Okay. So let's just walk through your
23 report a little bit then. It looks like it was
24 received as logged on the stamp, June 7, 2010.

Page 29

1  But not reviewed until September 29, 2010, is
2  that correct?
3      A.   According to this, yes.
4      Q.   Okay.  Is that typically the amount of
5  time it takes to address a grievance?
6      A.   Not necessarily.  Some grievances are
7  addressed, you know, I mean, there is no
8  specific time frame that I can say it takes to
9  address a grievance.
10     Q.   Is there a policy in place or something
11 that grievances must be addressed within six
12 months or anything like that?
13     A.   DR504 states that there is a time frame
14 for offenders as far as when they have to
15 report.  But there's no specific day time frame
16 as to how long we have to respond.  They ask
17 that we respond in a reasonable time frame.
18     Q.   Okay.  And does the inmate get a copy
19 of the grievance report?
20     A.   Yes, he does.
21     Q.   And do you talk about it with the
22 inmate or do they just get a copy?
23     A.   They get a copy in the mail.
24     Q.   Okay.  I understand you don't

Page 30

1  specifically remember this incident, but going
2  from the first paragraph and it's written as
3  Grievance Officer finds, that would be you,
4  you're the Grievance Officer in that respect?
5      A.   Yes.
6      Q.   Okay.  So you would have -- I'm just
7  trying to understand the timing a little bit on
8  this.
9           So I understand that the date of review
10 is September 29, 2010, is that the day that you
11 would have had all of these interviews and come
12 back and written your report, or does it happen
13 over a period of time?
14     A.   Does what happen over a period of time?
15     Q.   I'm sorry, that's my fault.  Okay.  So
16 the date of review is September 29, 2010, did
17 all of your interviews take place on that date,
18 then you come back to the office and write this
19 report, or does your investigation happen, say
20 you started looking at it September 1 and then
21 you complete your report September 29?
22     A.   I don't remember with this specific
23 incident.  The date of the review is the date
24 that I actually sit down and put it on paper.

Page 31

1  So I don't remember specifically with this.  But
2  from anywhere between when we receive the
3  grievance to when I sit down and type it, there
4  could have been, but I don't remember.
5      Q.   Okay.  If you had maybe dealt with the
6  grievance back in June, and for whatever reason
7  couldn't necessarily get everybody coordinated
8  to talk to them, and it had to happen over
9  several months, do you ever note in your records
10 like on August 1 I spoke to Sergeant Palmer, or
11 anything like that?
12     A.   I don't recall as far as like
13 specifically what I do.  So are you asking me
14 why there's not dates like when I spoke to them?
15     Q.   I'm just asking in your practice, if
16 you would do that for your own personal records
17 to know, okay --
18     A.   On my notes I may, yes, on my notes I
19 may.  But I don't know for sure in this instance
20 whether I did or not.
21     Q.   That's fine, I understand that you
22 don't specifically recall.  Just going through
23 generally in your report, your further -- excuse
24 me, your final recommendation is that the

Page 32

1  grievance is denied.  What was it, based on this
2  report, that you made you feel that the
3  grievance should be denied?
4      A.   His relief, his first request was to
5  have all the above named IDOC employees punished
6  for knowingly and wantonly endangering my life
7  and well-being for refusing to take me to the
8  Health Care Unit to get my life sustaining
9  diabetes medicine, which was his insulin.  His
10 second one was to have Sergeant Palmer, CO
11 Norman, CO Maldonado suspended three days
12 without pay.  And I had read that one
13 previously.  And to have all the above named F
14 House security officers retained and tested in
15 responding to medical emergencies and medical
16 situations, to be safeguarded from future
17 retaliations.  To have this grievance filed in
18 their job file jacket.  First of all, one of the
19 reasons it would be denied, is that offenders do
20 not have the authority to discipline or call for
21 the discipline of anybody.
22     Q.   Right.
23     A.   The other thing would be that his
24 allegations of misconduct, I found through my

Page 33

1  investigation in talking to the witnesses that I
2  did talk to, were unfounded.
3       Q.   Okay.
4       A.   It appears that he was given an
5  opportunity to get his insulin, he chose not to
6  and when he requested to have his insulin,
7  according to my report, they did call for a med
8  tech, the med tech was busy.  We had one
9  apparently on duty that day.  And they were
10 going to see him as soon as they could.  It says
11 the offender was laughing and joking, which gave
12 the sergeant no indication of a medical
13 emergency.  So based on the fact that there
14 didn't appear to be -- and Mr. Lippert also made
15 a comment in here that he was suffering from low
16 blood sugar, but then said his blood sugar was
17 451.  So it didn't appear to me that there was
18 any misconduct or retaliation by the staff.  It
19 looked like the staff did exactly what the
20 procedure is.  We called Health Care, alert them
21 to what the problem is, is it an emergency or is
22 it not, if he's laughing or joking as the staff
23 said.  So I didn't see that there was any
24 justification that there was any type of

Page 34

1  misconduct.
2       Q.   Did you -- and I understand that an
3  inmate cannot be in charge of disciplining --
4       A.   Okay.
5       Q.   I get that.  Aside from the requested
6  relief, is there the ability within the
7  Grievance Office to determine if further review
8  or discipline is needed of staff?  I'm not
9  saying in this instance, I'm saying generally?
10      A.   We as the Grievance Office don't have
11 any authority to recommend discipline or
12 anything else.  The Warden or the Warden's
13 designee obviously signs off on these
14 grievances.  The Grievance Office doesn't.  We
15 just put the facts that we found, what our
16 findings were, what our recommendation is, and
17 the CAO or his designee is the one that makes
18 the final decision.
19      Q.   What does CAO stand for?
20      A.   The Warden's --
21      MR. LOVELLETTE:  Chief Administrator --
22      A.   Thank you.
23      MS. MARSH:  Thank you.
24 BY MS. MARSH:

Page 35

1       Q.   In the Warden's office then?
2       A.   Yes, he is the Warden.
3       Q.   Okay.
4       MR. LOVELLETTE:  That was your moment, Kevin,
5  you did great.
6  BY MS. MARSH:
7       Q.   My question then is as opposed to
8  saying grievance denied, if it said grievance
9  granted, then do you have no further
10 involvement?  It goes directly to the Warden's
11 office and they take it from there, how does
12 that work?
13      A.   It depends on the situation of the
14 grievance.  You know, there's a lot of different
15 types of grievances, so it all, you know, some
16 grievances we find that they have, you know,
17 there's substance to their grievance, and maybe
18 we do owe them money for lost or broken
19 property.  That would be our recommendation.
20      Q.   Okay.  In the instance of staff
21 misconduct specifically.  If you do find there
22 is misconduct how do you go about noting that?
23 Does that go in the report?
24      A.   We put the facts into the report, and

Page 36

1  again, our report with the facts in it, whatever
2  that may be would go to, you know, the Warden,
3  and he would -- he does whatever he does, I
4  don't know.  But we don't recommend discipline
5  either.  The only thing we would do is put the
6  facts, you know, what did we find, who did we
7  talk to.  That's basically our role in the
8  grievance process.
9       Q.   My point is after your recommendation,
10 at the bottom, grievance denied, grievance
11 requested, the form goes forward to the Warden's
12 office and you have no further involvement with
13 respect to that grievance after you concluded
14 your investigation.
15      A.   Correct.  Once we sign off on it, it
16 goes to the Warden's office for review, they
17 decide based on the grievance information, the
18 counselor's response, and the grievance officers
19 response, if they agree or disagree.
20      Q.   Okay.
21      A.   So whether they -- I don't know what
22 they do with them after that.
23      Q.   Okay.  In this report it says that per
24 Counselor K. Whittington on 6-3-2010, it appears

Page 37

1  to me that you are taking verbatim his writing
2  on Maldonado Exhibit 1 and just putting it in
3  the top part of your report, is that correct?
4      A.   That is part of the process, yes.
5      Q.   Okay.  Would you have confirmed with
6  medical whether or not Mr. Lippert actually
7  indeed received his insulin?
8      A.   I don't recall.
9      Q.   Is it typical that you -- strike that.
10  Would you -- strike that.
11          Have you had any occasion where you
12  would check with medical as to whether or not a
13  patient received certain -- excuse me, an inmate
14  received certain medication.  Are you privy to
15  see medical records?
16      A.   I am.
17      Q.   Have there been instances where you
18  have checked medical records?
19      A.   There has.
20      Q.   If you had checked medical records is
21  that something that you would mark in your
22  report or note in your report?
23      A.   Not unless I found something
24  contradicted what was already in the report.

Page 39

1      Q.   You can answer, if you understand?
2      A.   Yeah, I understand.  No, I don't.
3      Q.   Okay.  His statement says per nursing
4  staff you did not receive insulin because you
5  did not get up when called, am I correct?
6      A.   Yes, that's what it states.
7      Q.   Okay.  Would you have confirmed that he
8  refused or did not get up when called, insulin
9  when offered to him?
10      A.   I don't recall whether I did or not.
11      Q.   Okay.  If you had done that would that
12  be something that you would put in your report?
13      MR. ELIASER:  Objection, form of the
14  question.
15          Go ahead.
16      A.   I don't recall.
17  BY MS. MARSH:
18      Q.   Okay.  Do you know who else was in the
19  Grievance Office with you in May, 2010.
20      A.   Counselor Anna McBee.
21      Q.   Again, this is something that you would
22  have handled on your own?
23      A.   Correct.
24      Q.   But it looks like based on the file

Page 38

1      Q.   In this report can you tell if you
2  followed up on Mr. Whittington's statement or
3  just accepted it as is?
4      MR. ELIASER:  I'll just object to the form of
5  the question.  Are you asking her whether she
6  followed up with nursing staff or whether she
7  followed up with Counselor Whittington?
8      MS. MARSH:  I'm asking if she followed up at
9  all in any way.
10      A.   No, I don't recall specifically.  The
11  only thing that it does say grievant was taken
12  to the Medical Unit where he received medical
13  care for his elevated blood sugar.  I don't
14  recall whether I got that from his medical
15  record, or I got that from the nursing staff.
16  But yeah, that would be the only thing that
17  would indicate to me that I checked with them.
18      Q.   Okay.  But would you have checked with
19  respect to Counselor Whittington's statement
20  about prior doses?
21      MR. LOVELLETTE:  Objection form of the
22  question.
23          Go ahead.
24  BY MS. MARSH:

Page 40

1  that subsequent to you sending this report to
2  Mr. Lippert, that you received further
3  correspondence from him.  Do you recall having
4  any face-to-face contact with him after this
5  report?
6      A.   No, I don't recall Mr. Lippert.
7      Q.   Okay.  I'm going to show you -- it
8  looks like this was done, this report is
9  September 29th, 2010, correct?
10      A.   Hmm, hmm.
11      Q.   That's Maldonado Exhibit 3, for the
12  record.
13          I'm going to show you a letter that was
14  sent to -- or a memorandum rather, sent to Mr.
15  Lippert from you in the Grievance Office, saying
16  that the issue was currently being reviewed by
17  the Office, is that correct?
18      MR. LOVELLETTE:  Can I see it before she
19  starts answering questions about it.  I just
20  don't know what you're talking about.  Go ahead.
21  BY MS. MARSH:
22      Q.   Is that correct?
23      A.   I don't remember the question.
24      Q.   I'm showing you a memorandum from the

Page 41

1 date, August 2, 2010, from you to Mr. Lippert
2 saying that the issue is currently being
3 reviewed by the Office, is that correct?
4     A.   Yes, this appears to be a letter that I
5 would have sent him.
6     Q.   Okay.  And does that go in Mr.
7 Lippert's file?  Where do copies of this, where
8 do they go to?
9     A.   This is -- this memorandum is basically
10 just a form letter that we use for offenders
11 that are asking about the status of grievances
12 that they have submitted.  Or again, I mean,
13 there's several things that you can check, but
14 with the amount of grievances that we received
15 in the Grievance Office, we had, you know, this
16 memo that we could quickly refer back to an
17 offender, letting them know what was going on
18 with their grievance.
19     Q.   I understand --
20     A.   So we would not necessarily keep a copy
21 of that in his file.
22     Q.   Okay.  When a inmate will send the
23 correspondence to the counselor in their unit,
24 does that automatically mean that the Grievance

Page 42

1 Office also gets a copy of that, or is that to
2 be dealt with at the initial stage by the Unit
3 Counselor before going to the Grievance Office?
4     A.   We don't necessarily receive letters or
5 copies of letters if they went to the Unit
6 Counselor, that would be to the Unit Counselor.
7     Q.   Okay.  So unless specifically addressed
8 to the Grievance Office you don't necessarily
9 see copies of everything that goes directly to
10 the counselor?
11     A.   Correct.
12     Q.   Okay.  So your investigation with
13 respect to the grievance, this is Bates stamped
14 Lippert R2218 through 2220.  It's the same
15 grievance form, but it has these handwritten
16 notes on it?  Okay?
17     A.   Okay.
18     Q.   Is that your handwriting?
19     A.   It is.
20     Q.   Okay.
21     MR. LOVELLETTE:  Before you ask a question
22 this time, let's both of us take a look at it.
23     Go ahead.
24     MR. ELIASER:  This is a part of what Exhibit?

Page 43

1 What are we doing?
2     MS. MARSH:  Franklin Exhibit 1.
3     MR. ELIASER:  Oh, okay.
4 BY MS. MARSH:
5     Q.   With respect to the note on the left,
6 it has to do with Sergeant Palmer, is that
7 correct?
8     A.   Hmm, hmm.
9     Q.   So this is your handwriting, correct?
10     A.   Hmm, hmm.
11     Q.   Is that a yes?
12     A.   Yes.
13     Q.   Okay.  If you could just read to me
14 what your note says below the name Sergeant
15 Palmer?
16     A.   Sergeant Palmer, that actually looks
17 like it should have been toted down, they toted
18 down, laughed when being carried, pants not on
19 the floor.
20     Q.   So toted down, what does that mean?
21     A.   I don't know.  I don't recall.  I can
22 -- I'm assuming -- well, I'm not going to
23 assume.
24     Q.   That's best.

Page 44

1     MR. LOVELLETTE:  If you don't know, you don't
2 know.
3     A.   Yeah, I don't know.
4 BY MS. MARSH:
5     Q.   Okay.  It looks like a Post-It Note,
6 though, is that correct, right here?
7     A.   Right.  It says here security staff
8 carried offender down the stairs for medical
9 staff.
10     Q.   And then with the note to the right of
11 that, it has to do -- the first line has
12 Maldonado, so are these your notes presumably
13 from your interview with her?
14     A.   Yes.
15     Q.   Okay.  And then this note here at the
16 bottom right hand corner, can you read that into
17 the record, please?
18     A.   F House log book for 11 to 7 nurse.
19     Q.   What does that mean?
20     A.   I probably checked the log book to make
21 sure that it showed that she actually did
22 rounds.
23     Q.   So in the log book it would say who
24 comes in, when they come?

Page 45

1    A.    Yes, it does.    If they remember to sign
2  it.
3    Q.    And is that supposed to happen every
4  shift?
5    A.    I don't know how often they go to the
6  cell houses.
7    Q.    When you were -- when you are in a
8  unit, do you ever have to sign the log book?
9    A.    I do sign the log book.
10    Q.    Okay.    And is that to document why
11  you're coming and going or what?
12    A.    For security purposes, who's in the
13  unit, who's not in the unit.
14    Q.    Okay.    So everyday you sign a log book?
15    A.    If I walk in there, yes.
16    Q.    Okay.    So that note, that presumably
17  means, as you just said, that you would have
18  checked the log book, correct?
19    A.    Yes.
20    Q.    Okay.    Do you ever attach things to
21  your report as a result of your investigation,
22  would you make a copy of the log book, would you
23  make a copy of the medical record or a picture
24  of property that is damaged.    Would you ever do

Page 46

1  that?
2    A.    No, I don't recall ever doing that.
3    Q.    Okay.    So I have a couple of pieces of
4  correspondence subsequent to your report from
5  September, 2010 that were sent directly to you
6  in the Grievance Office.    And I'm sorry if I
7  already asked you this, do you know when you
8  left the Grievance Office?
9    A.    I don't, I don't recall.
10    Q.    Would it have been after 2011?
11    A.    I don't recall.
12    Q.    If you weren't in the Grievance Office
13  anymore would my mail directed to you still find
14  its way to you?
15    A.    If it was regarding grievances, it
16  would -- the name would be disregarded and it
17  would go to the Grievance Office.
18    Q.    Okay.    I'm going to show you a January
19  14, 2000 letter that is addressed to you from
20  Mr. Lippert.    The subject being outstanding
21  unanswered grievances.    I just want to know if
22  it looks familiar to you, if it's something that
23  you would have received or remember receiving?
24    A.    Not that I recall.

Page 47

1    Q.    It appears that Mr. Lippert also sent
2  you correspondence on February 15, 2011
3  regarding the outstanding grievance from May of
4  2010.    I'm going to show it again to you, and
5  you just let me know if you recall it?
6    A.    I don't recall that letter.    I don't
7  recall that one either.
8    Q.    Okay.    But they are addressed, with the
9  exception of this one, the February 15 and the
10  January 14, 2011 letters are both addressed to
11  you, is that correct?
12    A.    Yes, that is correct.
13    Q.    Now, I'm going to show you something
14  that came from the Illinois Department of
15  Corrections on February 23, 2011, and it is from
16  you in the Grievance Office going to Mr.
17  Lippert.    I'm going to show it to your Counsel
18  first just to make sure he's finds it.
19    MR. ELIASER:    Kevin, can I see it after you
20  look at it?
21    MR. LOVELLETTE:    Sure.
22  BY MS. MARSH:
23    Q.    Okay.    So what is the date on that,
24  please?

Page 48

1    A.    February 23rd of 2011.
2    Q.    Okay.    And at the bottom it appears
3  that there is a response to Mr. Lippert in bold,
4  correct?
5    A.    Correct.
6    Q.    And that is saying to him, and I'm not
7  speaking verbatim, but the gist of it is that it
8  is being -- that his case has been reviewed and
9  that a report from September of 2010, authored
10  by you, had been sent to him regarding the
11  disposition of his grievances, is that correct?
12    A.    No, it actually states that the
13  Grievance Office response, dated 11-30-10 was
14  sent to the offender.    Grievance 1477, medical
15  staff conduct, Grievance Office response dated
16  11-30-2010, and sent to the offender Grievance
17  Office is not in receipt of any other medical
18  grievances.    Dated 5-12-2010.
19    Q.    And the 11-30-2010 date is a reflection
20  of the signature from the Chief Administrators
21  Officer's response at the bottom of your report,
22  is that correct?
23    A.    Yes.
24    Q.    Do you have any reason to believe--

Page 49

1    strike that.
2         Do you know that Mr. Lippert received a
3    copy of your report?
4         A.   I do not know that.
5         Q.   Are there steps that are taken to make
6    sure that the inmate knows of the disposition of
7    their grievance outside of sending them the
8    report?
9    MR. LOVELLETTE:   Objection, lack of
10   foundation.
11        A.   They are sent a copy of the grievance
12   response, they are sent a copy of their original
13   grievance with the Warden, with the grievance
14   officer response in the mail.
15   BY MS. MARSH:
16        Q.   Okay.  And is there any other steps
17   taken, if you know, that go back to the inmate
18   to let them know how their grievance was
19   handled?
20        A.   No.
21        Q.   Okay.  And you don't know whether or
22   not Mr. Lippert received your report?
23        A.   I have no way of knowing that, no.
24        Q.   Finally, I just have some, you know,

Page 50

1    housekeeping questions for you.  Did you go
2    through any specific training to be a counselor
3    for the Illinois Department of Corrections?
4         A.   Training in regards to --
5         Q.   What your position would entail, how to
6    fill out grievance forms, how to handle
7    grievance forms, any training specific to your
8    position?
9         A.   Yes, we have a lot of different types
10   of training classes, specifically with
11   grievances we do a DR504 Training Session.
12        Q.   And is that -- does that take place
13   here at Stateville, is it a statewide thing that
14   you go to Springfield for?
15        A.   It's -- the training is out of the
16   Springfield office and their representative goes
17   to the different facilities.
18        Q.   So does the training happen on an
19   annual basis or some other semi regular basis?
20        A.   I don't know the training schedule.
21        Q.   How often do you have training?
22        A.   I had DR504 training twice.
23        Q.   Since you've been a counselor?
24        A.   Yeah.

Page 51

1         Q.   Beginning on 2001?
2         A.   Nmm, hmm.
3         Q.   Okay.  Yes?
4         A.   Yes.
5         Q.   Do you have any medical training?
6         A.   No.
7         Q.   Okay.  If there is a change in a policy
8    or procedure, such as, you know, a 504 that you
9    mentioned, do you get a memo or a new handbook,
10   or something to advice you of a change in a
11   policy?
12        A.   We should.
13        Q.   Has that ever happened?
14        A.   We do get updates for administrative
15   directives, administrative directives, if
16   there's an update we do get a memo.
17        Q.   Okay.  And then is there additional
18   training that stems from that or is it --
19        A.   If necessary.
20        Q.   Okay.
21   MS. MARSH:  I think those are all my
22   questions for you.  I'm going to hand it over to
23   the other attorneys, they may have questions for
24   you.  Thank you for your time.

Page 52

1    MS. FRANKLIN:  Okay.  Thank you.
2    MR. ELIASER:  Me?
3
4              EXAMINATION
5    BY MR. ELIASER:
6         Q.   Miss Franklin, my name is Matthew
7    Eliaser, I represent Wexford, in this particular
8    case I represent a Wexford employee who is named
9    in this case, Athena Rossiter.
10        I just have some questions for you,
11   I'll try not to take long at all.  I've been
12   pretty good today.
13        Just to follow up, you said you got a
14   certificate in 1998, correct?
15        A.   Yes.
16        Q.   What type of certificate?
17        A.   It's just a Upward Mobility
18   Certificate.  You take a proficiency exam for --
19   as far as we're discussing the counselor
20   certificate through Upward Mobility.  So it's a
21   proficiency exam.  If you're proficient in the
22   different areas, then you get the certificate.
23        Q.   Okay.  Did you take that for purposes
24   of working within the IDOC?

Page 53

1    A.   I did.
2    Q.   And is that required to be a counselor
3  or a grievance officer, that type of a
4  certificate?
5    A.   You can -- that's one of the ways of
6  getting on -- of getting promoted to a
7  counselor.  Either you have to have the
8  certificate -- the proficiency certificate or a
9  bachelors degree in criminal justice or
10 psychology, one or the other.
11   Q.   Okay.
12 MR. ELIASER:  Can I see Franklin Exhibit 1,
13 please?
14 BY MR. ELIASER:
15   Q.   Your note says that you followed the
16 log book for the 11 to 7 nurse, right?
17   A.   It says check P House log book for 7 to
18 11 nurse, yes.
19   Q.   Okay.  Did you do that?
20   A.   I don't recall.
21   Q.   If you had written that to yourself is
22 it likely that you would have done that?
23   A.   Yes.
24   Q.   Okay.  And what were you -- what were

Page 54

1  you trying to accomplish by doing that, what was
2  the purpose of doing that?
3    A.   To verify that the nurse had been in
4  the unit making the morning rounds, to do the
5  insulin.
6    Q.   Okay.  If you had found that the nurse
7  did not make morning rounds to give out the
8  insulin, is that something you would have noted
9  in your report?
10   A.   Yes.
11   Q.   So then it's fair to conclude that
12 after looking at the log book you concluded the
13 nurse did in fact make the rounds that morning?
14   A.   Yes.
15   Q.   We've done a lot of depositions today.
16   A.   I see that.
17   Q.   This grievance officer's report that
18 we've spoken about at length today, that you
19 authored on September 29th, 2010, is this the
20 type of document that you've completed many
21 times in your career?
22   A.   Yes.
23   Q.   Is it normal for you to complete a
24 document like this and to store and maintain a

Page 55

1  document like this for your records?
2    A.   Yes.
3    Q.   Did you speak with Athena Rossiter
4  about this incident?
5    A.   I don't recall.
6    Q.   Do you know who Athena Rossiter is?
7    A.   Yes, I do.
8    Q.   If you had spoken with Athena Rossiter
9  is that something that you would have noted in
10 your report, most likely?
11   A.   Most likely, yes.
12   Q.   And your report doesn't indicate either
13 way whether you spoke with her, is that fair to
14 say?
15   A.   It does not.
16   Q.   This grievance aside, have you reviewed
17 other grievances from Lippert pertaining to
18 other incidents in the past?
19   A.   I don't recall specific ones.  But his
20 name is a regular in the Grievance Office, yes.
21 But I don't remember specifically what the
22 grievances were about.
23   Q.   What do you mean his name is regular?
24   A.   He files a lot of grievances.

Page 56

1    Q.   About a lot of different things?
2    A.   Yes.
3    Q.   Anything that you can specifically
4  remember?
5    A.   No, I don't, I really don't recall, but
6  his name was common.
7    Q.   I just want to ask you a few questions
8  about the report, the specifics of the report
9  and then I'll be done and you can go on with
10 your day after that.
11   Robyn had asked you some questions
12 about when you might have interviewed these
13 witnesses in relation to the September 29th
14 date.  Do you remember when we were talking
15 about that?
16   A.   Yes, I do.
17   Q.   Okay.  And I know you said you don't
18 specifically remember when you interviewed these
19 witnesses, but I just want to ask you based on
20 your custom and practice, based on your custom
21 and practice when do you typically interview
22 witnesses before you author your report, what's
23 the time frame like?
24   A.   Normal practice would be as close to

Page 57

1  the actual typing of the report as possible.
2      Q.   Okay.  Your practice is to write your
3  own notes when you interview them, go back, look
4  at your notes and author the actual report,
5  correct?
6      A.   Yes.
7      Q.   Okay.  And I take it that it's very
8  hard for you to remember what occurred in the
9  interview if a long time has passed between the
10  time you made those notes and the time you
11  authored the report, is that fair to say?
12      A.   Say that again?
13      Q.   Yeah, sure, it was a poor question.
14          Let me rephrase it.
15          I take it your practice would be to
16  author this report as soon as you can after
17  interviewing those witnesses and authoring your
18  original notes, is that correct?
19      A.   Yes.
20      Q.   And that's because it's probably hard
21  for you to remember what occurred in that
22  interview, and it's hard for you to interpret
23  your notes when a long time passes in between
24  the interview and the authoring of this report,

Page 58

1  is that fair to say?
2      A.   Yes, it is.
3      Q.   Based on what you see in this report,
4  do you think you talked with Counselor
5  Whittington about his initial investigation?
6      MS. MARSH:  Objection, asked and answered,
7  calls for speculation.
8      A.   I don't recall.
9  BY MR. ELIASER:
10      Q.   When a counselor makes a finding like
11  this in a case like this, is it typical for you
12  to go speak with the counselor about what his
13  finding was?
14      A.   No.
15      Q.   Your conclusion was that the grievance
16  should be denied and part of that conclusion was
17  based on the interview with Sergeant Palmer
18  about the fact that the grievant was laughing
19  and joking with the staff and the other
20  offenders, giving no indication that there was a
21  medical emergency, and also based on Counselor
22  Whittington's investigation, right?
23      A.   Yes.
24      Q.   Okay.  Was it also based on what

Page 59

1  Sergeant Palmer had said that's noted higher up
2  in the paragraph with respect to -- strike that
3  question.
4          Was another inconsistency that you
5  found between the inmate's story and Sergeant
6  Palmer's story with respect to the question of
7  whether he urinated on himself?
8      A.   Yes.
9      Q.   Okay.  What was your conclusion based
10  on Sergeant Palmer's statement?
11      A.   That there was urine on the floor, but
12  it wasn't on him.
13      Q.   And in saying that, are you concluding
14  that he did not urinate on himself?
15      A.   Yes.
16      Q.   I take it that was another basis for
17  your conclusion that the grievance should be
18  denied?
19      A.   Yes.
20      Q.   You also interviewed Maldonado,
21  correct?
22      A.   Yes, I did.
23      Q.   And she also told you that the inmate
24  was coherent and laughing all the way down the

Page 60

1  stairs when he was being carried by security
2  staff, right?
3      A.   According to my report, yes.
4      Q.   Was that another basis for denying the
5  grievance?
6      A.   Yes, it was.
7      Q.   You also interviewed Officer Norman,
8  correct?
9      A.   Yes.
10      Q.   And his statement was that the grievant
11  appeared coherent while being carried by
12  security staff, right?
13      A.   Yes.
14      Q.   And was that another basis for your
15  conclusion that the grievance should be denied?
16      A.   Yes, it was.
17      Q.   Is that your signature down there above
18  the line that's entitled Grievance Officer
19  signature?
20      A.   Yes, it is.
21      Q.   And are you familiar with Marcus
22  Hardy's signature?
23      A.   Yes, I am.
24      Q.   Is that his signature, to the best of

Page 61

1  your knowledge?
2      A.  That is his designee's signature.
3      Q.  By designee, do you mean some sort of
4  an assistant?
5      A.  Yes.
6      Q.  Okay.  But to your knowledge, Mr. Hardy
7  or someone acting on his behalf reviews all the
8  work that you and the counselor did to
9  investigate the grievance, is that correct?
10     A.  Yes.
11     Q.  And we see the date of November 30th,
12 2010 next to Mr. Hardy's designee's signature,
13 right?
14     A.  Yes.
15     Q.  And to your knowledge is that the date
16 that this report would have been sent to Mr.
17 Lippert to inform him of the conclusion?
18     A.  Not necessarily.
19     Q.  Are you aware of any other steps that
20 occur between Mr. Hardy signing off on the
21 report and a copy of the report being sent to
22 the inmate?
23     A.  There's no additional steps, it would
24 just be a matter of when we get the stack of

Page 62

1  grievances that the Warden or his designee signs
2  off on, having time to actually copy it and
3  forward it to the offender.
4      Q.  So Mr. Hardy's office does not forward
5  it to the offender, it goes back to the
6  Grievance Office, i.e. you, who then disperses
7  it to Mr. Lippert, is that correct?
8      A.  Yes.
9      Q.  I think I'm done, just give me a second
10 just to make sure.
11         Everything you seen today and
12 everything we talked about today does not in any
13 way refresh your recollection as to your
14 involvement with this grievance process with
15 respect to this grievance, am I correct?
16     A.  Yes, you are correct.
17     MR. ELIASER:  I'm all done.  Thank you, Miss
18 Franklin.
19     MR. LOVELLETTE:  We will reserve signature.
20             EXAMINATION
21         BY MS. MARSH:
22     Q.  Just going back to your report, where
23 in here does it reflect -- sorry.  When I say
24 your report, just for the record it's marked as

Page 63

1  Maldonado Exhibit 3.  Anywhere in here does it
2  reflect that you would have checked the log
3  books as is noted in your handwritten note on
4  Franklin Exhibit 1, that we've already gone
5  over?
6      A.  It does not.
7      Q.  So looking at this report, Mr. Lippert
8  who presumably received a copy of it, if it was
9  sent to him, he had no way of knowing if the log
10 books were checked, is that correct?
11     A.  Correct.
12     Q.  And the Warden's Office that review it,
13 they would have no way of knowing if the log
14 books were correct, were checked, I'm sorry?
15     A.  Correct.
16     MS. MARSH:  Thank you.  I don't think I have
17 any further questions.
18     MR. LOVELLETTE:  Now we'll reserve.
19         And you're done.
20         (Whereupon, Franklin Deposition
21         Exhibit No. 1 was marked for
22         identification.)
23     (Deposition concluded at 2:50)

Page 64

1  STATE OF ILLINOIS       )
2                          )  SS:
3  COUNTY OF COOK          )
4      I, Jacqueline Shenberger, a Certified
5  Shorthand Reporter within and for the County of
6  Cook and State of Illinois, do hereby certify
7  that heretofore, to-wit, on September 26, 2014,
8  personally appeared before me, at 11638 South
9  Broadway, Chicago, Illinois, COLLEEN FRANKLIN,
10 in a cause now pending and undetermined in the
11 Circuit Court of Cook County, Illinois, wherein
12 DONALD LIPPERT, et-al is the Plaintiff, and
13 SALVADOR GODINEZ, et-al is the Defendant.
14     I further certify that the said witness was
15 first duly sworn to testify the truth, the whole
16 truth and nothing but the truth in the cause
17 aforesaid; that the testimony then given by said
18 witness was reported stenographically by me in
19 the presence of the said witness, and afterwards
20 reduced to typewriting by Computer-Aided
21 Transcription, and the foregoing is a true and
22 correct transcript of the testimony so given by
23 said witness as aforesaid.
24     I further certify that the signature to the

---

Page 65

1  foregoing deposition was reserved by counsel for
2  the respective parties.
3      I further certify that the taking of this
4  deposition was pursuant to Notice, and that
5  there were present at the deposition the
6  attorneys hereinbefore mentioned.
7      I further certify that I am not counsel for
8  nor in any way related to the parties to this
9  suit, nor am I in any way interested in the
10 outcome thereof.
11     IN TESTIMONY WHEREOF:  I have hereunto set my
12 hand and affixed my notarial seal this 10th of
13 October, 2014.
14
15
16
17
18
19     ------------------------------
       Certified Shorthand Reporter
20
21
22
23
24

---

Page 67

1              DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
2
3      ASSIGNMENT NO: 1928202
       CASE NAME: Lippert, Donald, Et Al. v. Norman, Et Al.
       DATE OF DEPOSITION: 9/26/2014
4      WITNESS' NAME: Colleen Franklin
       In accordance with the Rules of Civil
5  Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
       I have listed my changes on the attached
7  Errata Sheet, listing page and line numbers as
   well as the reason(s) for the change(s).
8      I request that these changes be entered
   as part of the record of my testimony.
9
10     I have executed the Errata Sheet, as well
   as this Certificate, and request and authorize
11 that both be appended to the transcript of my
   testimony and be incorporated therein.
12
13 _____     _____
   Date                     Colleen Franklin
14
       Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17     They have read the transcript;
       They have listed all of their corrections
18     in the appended Errata Sheet;
       They signed the foregoing Sworn
19     Statement; and
       Their execution of this Statement is of
20     their free act and deed.
21     I have affixed my name and official seal
22 this _____ day of _____, 20____.
23
            _____
24          Notary Public
25          _____
            Commission Expiration Date

---

Page 66

1              DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
2
3      ASSIGNMENT NO: 1928202
       CASE NAME: Lippert, Donald, Et Al. v. Norman, Et Al.
       DATE OF DEPOSITION: 9/26/2014
4      WITNESS' NAME: Colleen Franklin
       In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7      I have made no changes to the testimony
   as transcribed by the court reporter.
8
   _____     _____
9  Date                     Colleen Franklin
10     Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
       They have read the transcript;
13     They signed the foregoing Sworn
       Statement; and
14     Their execution of this Statement is of
       their free act and deed.
15
       I have affixed my name and official seal
16 this _____ day of _____, 20____.
17
            _____
18          Notary Public
19          _____
            Commission Expiration Date
20
21
22
23
24
25

---

Page 68

1              ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
2           ASSIGNMENT NO: 1928202
3  PAGE/LINE(S) /     CHANGE     /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____     _____
   Date                     Colleen Franklin
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20_____ .
23
            _____
            Notary Public
24
25          _____
            Commission Expiration Date

CONFIDENTIAL

ILLINOIS DEPARTMENT OF CORRECTIONS
**RESPONSE TO COMMITTED PERSON'S GRIEVANCE**

| Grievance Officer's Report | | |
|---|---|---|
| Date Received: JUNE 07, 2010 | Date of Review: September 29, 2010 | Grievance# 1477 |
| Committed Person: DON LIPPERT | | ID#: B74054 |

Nature of Grievance: STAFF CONDUCT – MEDICAL TREATMENT DENIAL

**Facts Reviewed:** Grievant alleges that he was denied medical treatment by F house staff and wants them disciplined.

**Counselor response:** Per Counselor K. Whittington on 8/03/10, per nursing staff you did not receive insulin because you did not get up when called.

Grievance Officer finds that per Sgt. Palmer, he did call for a Med-Tech upon grievants request. He was informed that there was only one Med Tech that day and it would be awhile before somebody came to see him. At that time Offender was laughing and joking which gave the Sgt. no indication of a medical emergency. When Sgt. Palmer went to grievants cell when he was notified by cell house staff that the grievant was on the floor he found the grievant laying on the floor. The grievant had not urinated on himself. However, there was urine on the floor of the cell. Security staff carried Offender down the stairs for Medical staff. While being carried Grievant was laughing and joking with staff and other Offenders, again giving no indication to Sgt. Palmer or the medical staff of a medical emergency.

Grievant was taken to the Medical unit where he received medical care for his elevated blood sugar.

Per C/O Maldanado, she witnessed Grievant being carried down by security staff and he was coherent and laughing all the way down the stairs.

Per C/O Nelson, he was not assigned to that gallery and only witnessed Grievant who appeared coherent being carried by security staff.

This grievance officer finds that allegations of misconduct and retaliation by Staff are unfounded. There is no justification for any monetary award.

**Recommendation:** Grievance denied.

| | |
|---|---|
| __Colleen Franklin__ | _Colleen Franklin_ |
| Print Grievance Officer's Name | Grievance Officer's Signature |

(Attach a copy of Committed Person's Grievance, including counselor's response if applicable)

| Chief Administrative Officer's Response | | |
|---|---|---|
| Date Received: 11/29/10 | ☑ I concur   ☐ I do not concur | ☐ Remand |
| Comments: | | |

| | |
|---|---|
| _Marcus Hardy_ | 11/30/10 |
| Chief Administrative Officer's Signature | Date |

| Committed Person's Appeal To The Director |
|---|
| I am appealing the Chief Administrative Officer's decision to the Director. I understand this appeal must be submitted within 30 days after the date of the Chief Administrative Officer's decision to the Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277. (Attach a complete copy of the original grievance, including the counselor's response, if applicable, and any pertinent documents.) |

| | | |
|---|---|---|
| Committed Person's Signature | ID# | Date |

EXHIBIT
I

**CONFIDENTIAL** ILLINOIS DEPARTMENT OF CORRECTIONS
**RESPONSE TO COMMITTED PERSON'S GRIEVANCE**

| Grievance Officer's Report |
|---|

Date Received: JUNE 07, 2010        Date of Review: September 29, 2010        Grievance# 1477

Committed Person: DON LIPPERT                                    ID#: B74054

Nature of Grievance: STAFF CONDUCT – MEDICAL TREATMENT DENIAL

Facts Reviewed: Grievant alleges that he was denied medical treatment by F house staff and wants them disciplined.

Counselor response: Per Counselor K. Whittington on 6/03/10, per nursing staff you did not receive insulin because you did not get up when called.

Grievance Officer finds that per Sgt. Palmer, he did call for a Med-Tech upon grievants request. He was informed that there was only one Med Tech that day and it would be awhile before somebody came to see him. At that time Offender was laughing and joking which gave the Sgt. no indication of a medical emergency. When Sgt. Palmer went to grievants cell when he was notified by cell house staff that the grievant was on the floor he found the grievant laying on the floor. The grievant had not urinated on himself. However, there was urine on the floor of the cell. Security staff carried Offender down the stairs for Medical staff. While being carried Grievant was laughing and joking with staff and other Offenders, again giving no indication to Sgt. Palmer or the medical staff of a medical emergency.

Grievant was taken to the Medical unit where he received medical care for his elevated blood sugar.

Per C/O Maldanado, she witnessed Grievant being carried down by security staff and he was coherent and laughing all the way down the stairs.

Per C/O Nelson, he was not assigned to that gallery and only witnessed Grievant who appeared coherent being carried by security staff.

This grievance officer finds that allegations of misconduct and retaliation by Staff are unfounded. There is no justification for any monetary award.

Recommendation: Grievance denied.

**Colleen Franklin**
Print Grievance Officer's Name                    Grievance Officer's Signature
(Attach a copy of Committed Person's Grievance, including counselor's response if applicable)

| Chief Administrative Officer's Response |
|---|

Date Received: 11/29/10        ☑ I concur        ☐ I do not concur        ☐ Remand

Comments:

Chief Administrative Officer's Signature                    Marcus Hardy                    11/30/10
                                                                                    Date

| Committed Person's Appeal To The Director |
|---|

I am appealing the Chief Administrative Officer's decision to the Director. I understand this appeal must be submitted within 30 days after the date of the Chief Administrative Officer's decision to the Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277. (Attach a complete copy of the original grievance, including the counselor's response, if applicable, and any pertinent documents.)

Committed Person's Signature                    B74054                    12/6/10
                                                        ID#                        Date

Distribution:  Master File; Committed Person                    Page 1                    DOC 0047 (Eff. 10/2001)

Printed on Recycled Paper

RECEIVED
DEC 15 2010
OFFICE OF
INMATE ISSUES

EXHIBIT
I (a)

LIPPERT ARB 002217



**Illinois**
Department of
**Corrections**

ROD R. BLAGOJEVICH
Governor

Roger E. Walker Jr.
Director

James R. Thompson Center / 100 W. Randolph Street / Suite 4-200 / Chicago, IL 60601 / Telephone: (312) 814-3017 / TDD:(800) 526-0844

# OFFICE OF HEALTH SERVICES

# CHRONIC ILLNESS

# TREATMENT GUIDELINES

## Diabetes

June 2008

EXHIBIT

J

1

CONFIDENTIAL IDOC:00226

I.   <u>Diabetes Mellitus</u>

1. Diagnosis
   a. For patients with suspected new onset diabetes, the diagnosis must be made with a fasting blood sugar not a hemoglobin A1c or a capillary blood glucose (CBG-finger stick) value.
   b. Enroll all patients with known diabetes in chronic clinic and maintain chronic clinic roster

2. Baseline
   a. History:
      - Diabetes must be classified as Type 1 (insulin dependent), Type 2, Gestational, or Other (e.g. due to cystic fibrosis, pancreatitis, or steroids).
      - Age and onset of diabetes
      - Current treatment including medication history, diet measures, and history of utilizing CBG testing
      - Prior episodes of DKA and hypoglycemia including frequency, severity and cause
      - History of diabetes related complications (e.g. CVD, retinopathy, nephropathy, neuropathy, etc.)
   b. Physical Examination:
      - Vitals with attention to blood pressure and weight
      - Fundoscopic
      - Heart evaluation
      - Skin evaluation
      - Neurological and foot examination including vibration and monofilament evaluations
      - Palpation of DP/PT pulses
   c. Base line Laboratory:
      - A1c
      - Chemistry panel with creatinine and calculated GFR and liver function tests
      - <u>Fasting</u> lipids
      - Microalbumin
      - TSH
      - EKG for those over 40

2

d. Treatment:
- Medication management
  - Lipids
  - Antihypertensive medications
  - ACE inhibitor for microalbumin
  - ASA for patients with cardiovascular disease (coronary heart disease, stroke, peripheral vascular disease)
  - Diabetic medication
- Patient education (diet, foot care, signs and symptoms of hypo or hyperglycemia, and medication side effects);
- Foot wear as indicated for impaired sensation
- Evaluation for special placement, program or assignment needs;
- Pneumococcal vaccine and influenza vaccine in season.
- Treatment of end-organ conditions (CVD, nephropathy, retinopathy, and neuropathy)

3. Monitoring
   a. All persons with type-1 diabetes must have access to CBG (finger-stick) blood glucose testing as ordered by the institutional physician. Type 1 diabetics usually need multiple CBG daily as necessary to control blood glucose.
   b. Persons with type 2 or other diabetes must have access to CBG testing as clinically indicated and as ordered by the physician.
   c. Therapeutic goals:
      - A1c < 7%
      - Pre-prandial CBG 90-130 mg/dl
      - Peak post prandial CBG <180
      - Blood pressure < 130/80
      - LDL cholesterol <100
   d. Hypoglycemia
      - 15-20 gram of carbohydrate
      - Glucagon for severe hypoglycemia (hypoglycemia requires assistance of another

3

person or unable to ingest carbohydrate due
to mental status change)

4. Follow up Clinics

a. Frequency: January - May - September or more frequently
as indicated. Clinics may be combined if on multiple clinics.
b. Clinic monitoring to include:

- Determination of degree of control
- Document modification of treatment if patient not in
  good control
- Review episodes of hypo/hyperglycemia, medication
  problems, compliance, and any new symptoms
- Physical examination
- Weight and vital signs
- HGB A1c; other labs as indicated
- Review documentation of hemoglobin A1c, CBG (finger
  stick glucose) and other laboratory testing
- Manage any complications

c. Assessment of Control: Good – Fair – Poor
- Good control: Upper limit of the HgbA1c laboratory
  normal
- Fair Control: Within 2 points above the upper limit
  of HbgA1c laboratory normal
- Poor Control: Any range beyond the 2 points above
  the upper limit of the HgbA1c laboratory normal

5. Annual Clinic requirements:

- Diabetic eye screening by an optometrist or
  ophthalmologist
- Hemoglobin A1c
- Fasting lipids
- Microalbumin unless abnormal and on ACE
  inhibitor

4

CONFIDENTIAL IDOC 00229

- Chemistry panel to include creatinine (with calculated GFR)
- Neurological examination including monofilament and vibratory testing (128 Hz tuning fork)
- Vitals including weight and blood pressure
- Annual influenza vaccination

6. Complications:
   a. Treat blood pressure to lower below 130/80
   b. Treat blood lipids to maintain LDL-cholesterol < 100mg/dl
   c. Use low dose aspirin for diabetics with history of any cardiovascular disease
   d. Refer to nephrology patients with GFR < 60 ml/min or a creatinine > 2
   e. Baring contraindications persons with microalbuminuria should be treated with an ACE inhibitor
   f. Patients with retinopathy should follow at least annually with an ophthalmologist or more frequently as ordered by the ophthalmologist
   g. Patients with neuropathy require visual inspection of feet every visit and education regarding foot care.
   h. Patients with foot ulcer should be managed by physician expert in managing diabetic foot ulcers
   i. Patients with reduced DP/PT pulse or history of claudication refer for ABI testing

7. Referrals:     All patients who are in poor control for two consecutive visits should be referred to the Regional Medical Director for consideration for referral to an expert in diabetes management.

5

CONFIDENTIAL IDOC 00230



CONFIDENTIAL

MEDICATION ADMINISTRATION RECORD

BOSWELL PHARMACY SERVICES
814-629-1397 • Fax: 814-629-7644

EXHIBIT

K

LIPPER 000017



RECEIVED
OCT 14 2014
SEYFARTH SHAW

OFFICE OF THE ATTORNEY GENERAL
STATE OF ILLINOIS

October 10, 2014

**Lisa Madigan**
ATTORNEY GENERAL

Ms. Kristine Argentine
Seyfarth Shaw LLP
131 S. Dearborn, Suite 2400
Chicago, Illinois 60603

   Re: Lippert v. Godinez, et al. (personal claims only)
     10 C 4603

Dear Ms. Argentine:

  Please find enclosed a copy of the Declaration regarding the log books from April and May, 2010.

       Sincerely,

       KEVIN LOVELLETTE
       Assistant Attorney General
       General Law Bureau
       100 W. Randolph, 13th Floor
       Chicago, Illinois 60601
       (312) 814-3720

cc:  Matthew Eliaser, Esq.

> **EXHIBIT**
>
> L

IN THE UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DON LIPPERT,                          )
                                      )
                Plaintiff,            )        No. 10 C 4603
                                      )
        v.                            )        Honorable Sara Ellis
                                      )        Judge Presiding
GODINEZ, et al.                       )
                                      )
                Defendants.           )

## DECLARATION

JAMES LARIS, if called as a witness in this matter would state upon oath that the following facts are true and correct to the best of his knowledge and belief:

1.  I am an employee of the Illinois Department of Corrections. I am currently assigned to Stateville Correctional Center.

2.  Upon a request from our legal department, I searched for the April and May, 2010, log books from F-House in the storage locations where these documents are normally stored at Stateville.

3.  I also checked in the Stateville legal office to determine if the F-House log books from April and May, 2010, were in the legal office.

4.  Despite my searches, I was unable to locate the F-House log books for April or May, 2010.

**DECLARANT STATES NOTHING FURTHER.**

Under the penalties pursuant to the perjury laws of the United States of America, I hereby declare that the statements in this Declaration are true and correct.

_10/3/14_
Date

James Laris