# Final Report of the Court Appointed Expert

# Lippert v. Godinez

December 2014

Prepared by the Medical Investigation Team

Ron Shansky, MD
Karen Saylor, MD
Larry Hewitt, RN
Karl Meyer, DDS

# Contents

**Introduction**................................................................................................................3
  Leadership and Staffing.................................................................................5
  IDOC Office of Health Services Staffing Recommendations ............................10
**Overview of Major Services** ........................................................................10
  Clinic Space and Sanitation ........................................................................10
  Reception ......................................................................................................12
  Intrasystem Transfer....................................................................................14
  Medical Records...........................................................................................15
  Nursing Sick Call .........................................................................................16
  Chronic Disease Management ......................................................................19
  Pharmacy/Medication Administration .........................................................23
  Laboratory....................................................................................................24
  Unscheduled Onsite and Offsite Services (Urgent/Emergent) ......................25
  Scheduled Offsite Services (Consultations and Procedures)........................28
  Infirmary ......................................................................................................32
  Infection Control ..........................................................................................34
  Dental Program ...........................................................................................38
  Mortality Reviews........................................................................................42
  Continuous Quality Improvement ...............................................................43
**Conclusions** ..................................................................................................45

# Introduction

Towards the end of 2013, Dr. Ronald Shansky was nominated by the parties and appointed by the court in the Lippert matter as an expert pursuant to Rule 706 of the Federal Rules of Evidence. The order appointing him lays out the scope of the duties.

> "The expert will assist the court in determining whether the Illinois Department of Corrections ("IDOC") is providing health care service to the offenders in its custody that meet the minimum constitutional standards of adequacy."

It further goes on to say that the expert "will investigate all relevant components of the health care system except for program services and protocols that relate exclusively to mental health." Furthermore,

> "If systemic deficiencies in IDOC health care are identified he will propose solutions for consideration by the parties and the court. These proposed solutions, if any, will form the bases for future negotiations between the parties in an effort to craft a final settlement of this matter or alternatively, may be offered into evidence in the trial of this matter. Furthermore, the expert will not recommend specific treatment for individual offenders unless those recommendations relate to systemic deficiencies in the health care provided to offenders in IDOC custody."

The parties have also accepted Karen Saylor, M.D., Larry Hewitt, R.N. and Karl Meyer, D.D.S. as additional team members. The expert met with the parties in late 2013 and a second time in April of 2014. The first meeting focused on the methodology to be used as well as questions that either of the parties had with regard to the process. The April meeting was intended to be an update, having visited by that time approximately half of the facilities to be reviewed. The expert thought this would be valuable because the confidential draft report was not due until the site visits and mortality reviews had been completed and therefore there would have been no opportunity to jointly update the parties until they actually received the confidential draft report. Both parties have been extremely supportive of this process. We received full cooperation at each of the prisons we visited and are extremely appreciative of the local efforts to facilitate the process.

The investigative team was assigned an explicit task, "To assist the Court in determining whether the state of Illinois was able to meet minimal constitutional standards with regard to the adequacy of its health care program for the population it serves." In order to reach this conclusion, the parties determined that we should visit at least eight facilities, six of which were jointly selected by the parties. The investigative team concurs with the parties' selections, in that those six facilities have special responsibilities within the system and are critical to a determination as to whether, when the health care systems are most challenged, they are able to adequately meet that challenge. Three of the institutions reviewed functioned as reception centers. These facilities are critical in that they perform the initial evaluation upon entry into the system. Problems that they fail to identify are much more likely to either not be addressed or sometimes at a minimum, the identification and the interventions are significantly delayed. Three facilities were maximum-security facilities which house the most challenging of populations for

which to provide health care services. Finally, one of the six houses the system's special geriatrics unit, which also creates health care challenges. It has been our experience that when a system is able to meet constitutional standards at the most challenged institutions, it is very likely to meet constitutional standards at the less challenging facilities. The converse, however, in our experience has not proven to be true.

The State indicates that the investigation team should have utilized standards such as the National Commission on Correctional Health Care or the American Correctional Association as the basis for both our investigation and our recommendations. The leader of the investigative team served on the board of the National Commission on Correctional Health Care for 10 years. He has also been involved with the development of the standards for the last 20 years, serving on three of the task forces and advising the most recent task force. In addition, he has also been requested and has provided training to all of the NCCHC surveyors with regard to the quality improvement standard and how to survey it. He himself has done surveys in each of the last three years. All of the members of the investigative team believe that the National Commission on Correctional Health Care, through its standards, its surveys and its training, have contributed substantially over the past three to four decades in helping facilities improve the quality of health care. When the survey process occurs, about 80% of that process is focused on administrative matters; policies, procedures, contracts and other administrative matters. Approximately 20% of the survey process is focused on clinical care, and during that process the lead investigator has recently been asked to help redesign the methodology used to assess care issues. Investigations that are part of litigation and assist the court in determining whether and the extent to which "deliberate indifference to serious medical needs" may exist requires that the focus be overwhelmingly on clinical care issues. Thus, virtually all of the time that we spent, other than understanding how services are provided at each facility, dealt with interviewing staff and inmates, observing processes and reviewing medical records. For the purposes of the court, clinical care is of overwhelming importance and administrative issues, though important, are much, much less important.

A recent article by Alex Friedmann published in *Prison Legal News*, October 2014, describes with specific citations about how the courts view specifically ACA accreditation, but also how the courts view accreditation in general. More commonly the courts have said that they do not rely in their determinations of constitutionality on the presence or absence of accreditation. We believe that this is based on the fact that the focus in constitutional disputes is overwhelmingly on clinical care matters, whereas in accreditation the focus is overwhelmingly on administrative issues. The wording of the constitutional definition of an Eight Amendment violation forces investigators, whether they be plaintiffs or defendants or working for both parties, to heavily focus on clinical care issues. Having said this is not meant in any way to diminish the value of the accreditation process, specifically with the National Commission on Correctional Health Care.

Having received the comments from both plaintiffs and defendants, it has been a challenge to integrate some of the comments into the final draft. The State has indicated it has done several things which are consistent with the investigative team's recommendation. Since we cannot verify where things are in the process, we are not addressing those things in the final report. Rather, any of the updates will be available to the Court in an appendix which includes both

plaintiff's and defendant's responses. On the other hand, where there are clarifications requested or alternatives proposed, we have attempted to be responsive. In some instances, the original paragraphs we feel were clear enough; in other instances, we have modified the original draft. We feel we have made a sincere effort to be responsive to the parties.

In order to perform such a review, it is necessary to utilize a variety of investigative strategies. We interviewed staff, we have interviewed inmates, we have observed care provided, we have reviewed policies and procedures and compared practice to the policies and procedures, we have reviewed minutes of meetings and we have reviewed selected records, including death records. In order to best describe a correctional health care program, we have found it useful to organize the institutional reviews along the lines of major services provided. This listing of services is not exhaustive; however, it enables a fairly comprehensive snapshot of how the program is functioning. The critical services begin with medical reception, which is designed to create an awareness and understanding of the medical needs of patients on entry to the system. We visited three reception centers; the main reception center, which is the Northern Reception Center, which receives inmates from Cook County; the reception process at the Logan Correctional Center, the major women's prison; and the Menard Correctional Center, which receives far fewer new inmates, especially those from Southern Illinois. An adjunct to the reception process for when patients are transferred from one facility to another is the intrasystem transfer process. Both reception and intrasystem transfer processes are designed to identify problems and insure continuity of care despite the potential disruption during a transfer. Other major services include nurse and provider sick call (primary care services), chronic care services, medication management services, scheduled offsite services (specialty consultations and procedures), unscheduled onsite and offsite services (urgent/emergent responses), infirmary services (onsite inpatient care), infection control services and dental services. All of these major service areas must be supported by an effective quality improvement program that not only self-monitors but also effectively identifies performance improvement needs and implements strategies that facilitate performance improvement. It is these services for which we will provide an overview in this confidential draft report and for which we will attach institutional appendices in which our specific findings within each institution are detailed. Finally, the report includes a review of 63 deaths by Dr. Saylor and Dr. Joe Goldenson, who was added to the team with the agreement of the parties in order to facilitate completion of the mortality reviews. In order to discuss services, we are forced to address both leadership issues as well as staffing issues, and the degree to which leadership or staffing were significantly problematic varies by institution. In the institutional appendices, we describe shortcomings in some detail.

## Leadership and Staffing

Leadership is a problem at virtually all of the facilities we visited. The question varied only with regard to degree. The reason why leadership is so important to a correctional health program is because they are responsible for setting the tone with regard to both structure and professional performance as well as insuring that the program effectively self-monitors and self-corrects so that problems are identified, addressed and ultimately eliminated. Through this self-correcting process potential harm to patients is continually mitigated. Without a strong and effective leadership team a program is much less able to identify the causes of systemic problems and to effectively address those problems by implementing appropriate targeted improvement

strategies. At the extreme was Dixon, a special mission (reception center, geriatric unit, special program for disabled, special housing for patients with medical or mental health problems) facility, both medical and mental health, which at the time of our visit had a vacant Health Care Unit Administrator position, a vacant Director of Nursing position and in essence a vacant Medical Director position filled by a Wexford "travelling medical director." Special mission facilities serve a function for the entire prison system and thus tend to concentrate medical pathology or problems. As a result of the concentration of medical problems, a program that is not effectively managed creates the potential for harm to the patients and legal liability to the State. The degree of breakdowns we found at Dixon were the most severe. There must be a requirement that a Medical Director hired by Wexford must be board certified in primary care, preferably either family medicine or internal medicine. In addition, the one Health Care Administrator responsible for both NRC and Stateville had been taking extended leaves of absence. This is a vehicle for failure. Additionally, the Director of Nursing position at each facility, commonly a vendor position, must have the responsibility on a full-time basis for overseeing nursing clinical services. We are told that at several sites they have an additional administrative assignment with regard to Wexford corporate responsibilities. This is not acceptable. The oversight of a substantial nursing program is a full-time job. No time should be taken away from that responsibility. The leadership vacuums at Dixon, Stateville and NRC have resulted in process and care breakdowns on a daily basis. Reception is not done timely and medical records are almost impossible to effectively utilize at NRC despite the fact that there is a person onsite in charge of medical records. At Illinois River, the Medical Director position was vacant and this was being filled two days per week by the Medical Director from East Moline. There appeared to be an effective Director of Nursing who attempted to fill in also as the Health Care Unit Administrator, since that position was filled by someone on military leave for the past year and a half. At Hill Correctional Center, both the Health Care Administrator position and Director of Nursing position were filled by individuals who appeared to be quite capable. The Medical Director position is filled by a doctor for whom we identified clinical concerns during our record reviews and mortality reviews. At Menard, the Medical Director position is filled by a clinician trained as a general surgeon. This facility also has no primary care trained clinicians, even though the overwhelming majority of clinical responsibilities fall within the primary care field. There is no Director of Nursing at Menard; however, the Health Care Unit Administrator appears quite capable and makes an effort to fill in. However, as indicated through this review of eight institutions, very few if any with the exception of Pontiac have a complete team with all positions filled by capable individuals. It is not surprising that the weaker the leadership the poorer the medical performance. Each program's performance should be measured at least annually and, where indicated, leadership changes must be made.

We found clinician quality to be highly variable across the institutions we visited and across medical records we reviewed. There were examples of high quality clinicians at some facilities, but in other instances the quality of clinical care was poor and resulted in avoidable harm to patients. For example, none of the three physicians at one institution we visited had any formal training in a primary care field. During the course of our review of the care at this facility, we came across several examples of avoidable harm to patients resulting from inappropriate management of common primary care conditions. For example, at Menard, patient [REDACTED] developed a diabetic foot ulcer that was not appropriately managed and resulted in amputation. This same patient, a type 1 diabetic, had his insulin discontinued in response to well controlled

blood sugars, which resulted in dramatic deterioration of his diabetes control. This error reflects a lack of understanding of the basic pathophysiology of this common disease. In another instance at this facility, patient [REDACTED] presented with poorly controlled diabetes and the doctor tripled his insulin dose and quadrupled the dose of his oral medication. This of course resulted in repeated episodes of low blood sugar. Luckily the patient knew to refuse his medication in order to avoid serious harm.

At Illinois River, a 26-year-old man ([REDACTED]) repeatedly informed health care staff that he had atrial fibrillation, a fact that was confirmed by his jail records, but this history was discounted until he suffered a stroke. Had clinical staff listened to the patient and reviewed his jail record, they would have learned that he should have been on blood thinners to reduce the chances of this devastating event. At the same facility, Patient [REDACTED] presented with classic signs and symptoms of lung cancer from the time he arrived in IDOC, yet these were ignored by health care staff for three months. By the time he was finally diagnosed, the only treatment he was eligible for was palliative radiation, which he declined. He died nine days later.

The hiring of underqualified clinicians into the system is problematic, as evidenced by the examples stated above. By "underqualified," we do not mean that the provider is not qualified to practice medicine, but rather underqualified to practice the type of medicine required of the position. For example, a general surgeon is underqualified to practice primary care in the same way an internist is underqualified to practice general surgery. This problem is compounded by a lack of clinical oversight and peer review, both locally and centrally, and a lack of electronic resources, which prevents clinicians from having access to information vital to medical decision making at the point of care. We recommend that all Medical Directors be board certified in a primary care field and staff physicians have successfully completed a primary care residency. It is necessary that all clinicians have access to electronic educational resources at the point of care. This means that computers with internet access should be present in the exam rooms so that providers can access essential clinical information at the time they are seeing the patients. There should be periodic peer review of clinical practice, both at the local/facility level and centrally. At most of the facilities we visited, the Medical Directors were functioning in primarily clinical roles and spent little if any time reviewing the clinical practice of the other providers or engaging in other important administrative duties.

Staffing deficiencies are facility specific to Stateville and Dixon with regard to the number of vacancies. For example, 23 of Stateville's 66 budgeted positions are vacant, and 18 of Dixon's 66 budgeted positions are vacant. Adding to the problem is that key leadership positions are vacant at these two facilities. Stateville's Health Care Unit Administrator, who is also responsible for the NRC, has been on an extended medical leave of absence. Added to that is the issue that 10 of the 20 budgeted correctional nurse II registered nurse positions are vacant, as well as 10 of the 18 budgeted correctional medical technician positions. While this number of vacant positions creates a significant operational issue, the problem becomes worse because Stateville nursing staff is required to assist at the NRC with intake and operation of the NRC health care unit, and Stateville nursing staff is reassigned to the NRC when NRC nursing staff does not report to work. The NRC schedule E of approved budgeted positions only provides for eight positions, none of which are nursing staff. As a result, health care delivery suffers significantly, which affects access to care and results in delays in treatment. Staffing at NRC

must be sufficient to insure medical intake processing is completed within one week of entry. This will require additional clinicians and possibly additional nursing staff and medical records staff.

Of Dixon's 18 vacancies, three are key health care unit leadership positions. At the time of our visit, the Medical Director, Health Care Unit Administrator and Director of Nursing positions were all vacant. The only leadership present in the health care unit was two supervising nurses, both of whom were new to their positions. One of the supervisors was employed by the State and one by the medical vendor. As a result, they each supervised a different group of staff who were assigned the same responsibilities, and each supervisor had her own agenda as a result of having different employers. Coupled with this was that seven of 16 budgeted corrections nurse I (RN) State positions were vacant.

The remaining facility vacancies (Pontiac, Logan, IL River, Hill, and Menard) ranged from nine at Menard to only one at Hill, with the other facilities falling somewhere in between. Even though the actual number of vacancies was low, there was at least one key leadership positon vacant at Logan (DON), IL River (HCUA) and Menard (DON).

Of additional concern was that at several facilities medical vendor employees who were filling key leadership positions, such as the director of nursing, supervising nurse or medical records director, were assigned additional corporate duties such as time-keeping, payroll or human resources, which took them away from their full-time responsibilities. These positions were included in the schedule E of approved budgeted positions to provide full-time service to the facility within their job description. Taking them away from that undermines the operation of the health care unit and program.

At each facility, a sick call system has been developed and implemented which permits staff other than registered nurses to review/triage sick call requests and evaluate/assess and treat patients. It is our opinion that this type of independent assessment (which is what a nurse is required to perform in responding to a sick call symptom containing request) is beyond the scope of practice for other than registered nursing staff. The State of Illinois Nurse Practice Act exclusively sanctions registered nurses to perform independent assessments, although it does allow for licensed practical nurses or others to assist in performing assessments. That assistance could include taking vital signs or asking some questions regarding the patient's history with regard to a specific problem. When a nurse performs sick call, the patient has presented a request for an assessment based on one or more symptoms. A registered nurse has the training and skills to elicit an appropriate history, perform an appropriate physical assessment based on the history and then synthesize the data into a nursing diagnosis and a related plan. Frequently, systems provide protocols to aid the registered nurses in completing these assessments. To allow staff who do not meet the requirements by training and certification of a registered nurse to perform these assessments increases the potential for harm to the patients as well as legal liability for the State.

It is critical for the Office of Health Services to establish the specifications for the health care contracts as well as to monitor and oversee the performance of those contracts and provide a direction to the field with regard to policies and procedures as well as clinical guidelines. In

order to provide such guidance the Office of Health Services requires appropriate resources. Not only is the Medical Director position critical in providing clinical guidance but also in overseeing such a large health care program, the Medical Director should be provided with regional medical directors also board certified in primary care to assist him or her in providing clinical oversight. Universally we were informed by both State employed staff as well as some vendor employed staff that there were significant problems with the vendor employed regional medical directors. We perceive the transfer of these positions directly to the State Medical Director should allow for improved oversight and guidance. The recommendations we have made are in order to eliminate the conflict of interest inherent in corporate employed physicians reviewing the work of corporate employed physicians. A decision of termination becomes an expense for the corporation. The leader of the investigative team was Medical Director in the State of Illinois for 11 years. During that time, we evaluated the performance of physicians regularly and informed vendors when such physicians could no longer be employed in the State of Illinois. We believe contractual agreements can be changed and in fact should be changed when they are in the interest of the State in providing minimally adequate constitutional care. This investigative team has been extremely disappointed in the performance of the vendor and the facility programs with regard to both professional performance review, mortality reviews and the entire quality improvement program. The requirement that physicians performing peer reviews be board certified in primary care, which is the type of service that they are evaluating, is apparent and needs not be justified.

In addition, because the quality improvement program of any and all health care organizations is so central to the development of an effective program, the central office should have a well-trained quality improvement coordinator responsible for directing the system-wide quality improvement program. This position would provide training and consultation to facilitate for each site the development of an effective quality improvement program. Analogously, the statewide infection control coordinator position should be restored to assist in educating the institutions with regard to infection control as well as monitoring the performance of those programs. This person also has a responsibility as a liaison to the State Department of Health. All of these changes should facilitate reducing the potential for harm to patients by improving the oversight and ability to respond by the State.

**Recommendations:**
1. All Medical Directors must be board certified in a primary care field. The State has misread this, indicating that all physicians must be board certified. The investigative team has indicated that other primary care staff physicians should have completed an accredited residency training program in internal medicine or family practice and be either board certified or become board certified within three years of employment. Only the State Medical Director could grant exceptions to this requirement based on his or her own assessment of the candidates. The basis for this recommendation is that in our experience and discussion with other State Medical Directors, there have been a disproportionate number of preventable negative outcomes related to primary care services provided by non-primary care trained physicians. The investigative team does not believe that experience practicing in a field without the required training is adequate in mitigating the preventable negative outcomes.
2. All clinicians should have access to electronic medical references at the point of care.

3. Every special medical mission facility must have its own Health Care Administrator.
4. The Director of Nursing position at all facilities is a full-time position whose time should not be taken away by corporate responsibilities.
5. Establish approved budgeted positions for Stateville and the NRC which allow for each facility to function independently.
6. Provide a full-time Health Care Unit Administrator as well as a full-time Quality Improvement Coordinator/Infection Control Nurse for both Stateville and the NRC.
7. Each facility is to develop and implement a plan to insure registered nursing staff is conducting sick call.
8. Medical vendor health care staff assigned to leadership positions, such as the director of nursing, supervising nurse or medical records director, will not be assigned corporate duties such as time keeping, payroll or human resources activities.
9. IDOC to develop and implement a plan which addresses facility-specific critical staffing needs by number and key positions and a process to expedite hiring of staff when the critical level has been breached.

## IDOC Office of Health Services Staffing Recommendations

1. Immediately seek approval, interview and fill the Infection Control Coordinator position.
2. Establish and fill the position for a trained Quality Improvement Coordinator who will be responsible for directing the system wide CQI program.
3. Establish, identify and fill the positions for three regional physicians trained and board certified in primary care who will report to the Agency Medical Director and perform at a minimum peer review clinical evaluations, death reviews, review and evaluate difficult/complicated medical cases, review and assist with medically complicated transfers, attend CQI meetings and one day a week, within their region, evaluate patients. Resources for these positions could be taken from monies allocated to the medical vendor for regional physicians.

# Overview of Major Services

## Clinic Space and Sanitation

Clinic space, sanitation and equipment are problematic at each facility with the exception of Hill Correctional Center. The issues ranged from no designated space identified to conduct sick call in housing units, to designated space being inadequately equipped to designated space providing no privacy or confidentiality during the health care encounter.

For example, at Statesville, on the first floor of cell houses B, C, D, E, F and the X-house, a cell has been converted for use as a sick call area. These areas in cell houses B, E and F have no examination tables. Additionally, each of the areas retains the "open-front" cell door with bars which provides for no privacy or confidentiality during a sick call encounter. As a result, these identified areas cannot be considered as appropriate clinical space. In addition, these areas are very noisy.

At the Northern Reception Center, cell houses were originally designed to include a room for health care encounters on the first floor of each housing unit. These areas have all been taken

over by security staff and are being used as the cell house security officer's office. If appropriately equipped, these areas would meet the criteria as being appropriate clinic space.

At Dixon, the examination rooms used by the physician and advance level practitioners in the health care unit are appropriately equipped and provide the required level of privacy and confidentiality. The areas designated for nursing call, however, are just the opposite. The designated rooms are inappropriately equipped as they have no examination tables, and provide for no privacy during an examination due to large windows which were required for security reasons. Additionally, one identified sick call area is in a hallway at a desk. Obviously, this area is inappropriate for use as it has no equipment, and there is a total lack of privacy and confidentiality.

Of particular concern was that supervising nursing staff was totally unaware of the deficiencies pertaining to these areas. This suggests significantly underdeveloped professional oversight.

In the housing unit used for administrative and disciplinary segregation, which is the X-house, a room was designed to be used for sick call encounters; however, the area is not being used. If appropriately equipped, this area would meet the criteria as an appropriate clinic space.

At Pontiac, cell house clinic space has been identified and is being used as such but is totally inappropriate. The areas are old communal style shower rooms which have not been redesigned in any way. The areas have no equipment and provide no privacy or confidentiality. Meager accommodations were made, in that old physical therapy tables are being used rather than examination tables. The physical therapy tables are old with cracked and torn coverings and, by design, do not allow for the head of the table to be elevated.

The Logan health care unit examination rooms are appropriately equipped and provide sufficient patient privacy and confidentiality during sick call encounters. In the X-house, where reception, segregation and maximum-security inmates are housed, two rooms have been designated for sick call. One of the rooms is used by an advanced level practitioner and the other by nursing staff. The housing unit was very noisy, to the point that a nurse performing the reception nurse screen was observed having significant difficulty talking with a patient who was sitting less than three feet away. Additionally, the nursing sick call room was very small and cramped.

At Illinois River, the health care unit examination rooms are appropriately equipped and provide sufficient privacy and confidentiality. In the X-house, which houses administrative and disciplinary segregation inmates, no clinic space has been identified. The concern is that nursing staff will not perform a needed examination because they will not bother security staff to remove the inmate/patient from his cell and escort him to the health care unit where an appropriate examination can be conducted.

There were no issues in this area at Hill Correctional Center. Health care unit examination rooms are appropriately equipped and provide sufficient privacy and confidentiality. Additionally, a room in the X-house, which houses segregation inmates, is used for sick call, and the room is appropriately equipped and provided sufficient privacy and confidentiality.

The Menard health care unit examination rooms were appropriately equipped and provided sufficient privacy and confidentiality. Space has been established in each cell house, South (upper and lower), North, North 2, East and West, to conduct either nurse or physician sick call. The identified areas were former inmate cells and never designed as a clinical environment. Currently, the areas provide little to no privacy, and all of the areas are not appropriately equipped. Renovations have begun in the East Cell House to provide for an appropriately equipped, clean, private clinical setting. Renovation of all the areas in each housing unit should be made a priority.

In North 2, an appropriately equipped room is being used for sick call; however, the area provides for no privacy during an examination. Additionally, the room used by the correctional medical technician, who conducts sick call, does not have an examination table.

In regard to sanitation, there were issues across the system. In many of the facilities, examination tables and stools, infirmary mattresses and stretchers were observed to have cracked or torn impervious outer coatings which do not allow for the items to be properly cleaned and sanitized between patients. In each instance, there had been no work order submitted to repair the item and no requests submitted for purchase of new items. Additionally, many of the facilities are not using a paper barrier, which can be changed between patients, on the examination tables, nor was their evidence of wiping down the examination table with a sanitizing liquid/spray between patients when paper is not used. At Menard, there was no sink for hand washing in the South-Lower cell house sick call area.

**Recommendations:**
1. All sick call must take place in a designated area that allows sick call to be conducted in an appropriate space that is properly equipped and provides for patient privacy and confidentiality.
2. Equipment, mattresses, etc., which have an impervious outer coating must be regularly inspected for integrity and repaired or replaced if it cannot be appropriately cleaned and sufficiently sanitized.
3. A paper barrier which can be replaced between patients should be used on all examination tables.
4. Hand washing or sanitizing must be provided in all treatment areas.

## Reception

We visited three reception centers and clearly, for males, the bulk of the newly admitted inmates enter through the Northern Reception Center. Just as custody, by using databases and fingerprints makes sure that it identifies who the patients are in order to insure that they are appropriately housed, so too the medical reception process is designed to identify acute and chronic medical problems along with acute and chronic mental health problems, as well as any potential communicable diseases and any other special needs. The purpose of doing a comprehensive medical intake is not just to identify the needs but to insure that those needs are appropriately addressed. We found problems with both the identification and the follow through in terms of meeting the patients' needs. When either type of problem occurs, this creates an avoidable liability for the patient. By avoidable liability we mean both potential harm for the

patients as well as potential legal liability for the state. At NRC there are substantial delays in medically processing patients through the reception process. In some instances, these delays extend for more than a month.

At the time of our visit to NRC, we found between 200-300 medical records of patients who had received a nurse screen and who were awaiting a physical exam by an advanced level clinician. Many of these patients had been there more than two weeks. Medical records are disorganized and inhibit the provision of adequate services. Under the presumption that patients will move out within two weeks, documents are loosely dropped into the medical record rather than being filed and yet NRC is responsible for patients, particularly at the medium-security unit, who may stay for years. These medical records are dysfunctional. The degree to which medical records are disorganized impedes the ability of clinicians to utilize and identify available clinical information and therefore impedes their ability or reduces the probability of their response being clinically appropriate. We also found that the current forms being used do not elicit questions regarding current symptoms as is standard in most systems. Finally, there is no process to insure that TB test results, blood test results and any other tests are integrated along with the history and physical into a problem list and plan for each problem. This therefore inhibits the intrasystem transfer service. Additional staffing may be necessary with regard to clinicians involved in reception at NRC as well as the medical records process at NRC. Examples of failures of the reception process at NRC include a patient entering with a history of a positive TB skin test that was never followed up. Another example is a patient whose intake laboratory screening demonstrated significant liver abnormalities but this apparently went unnoticed. Another example is a patient whose blood pressure was significantly elevated with a history of high blood pressure and there was no follow-up. This is particularly problematic because hypertension tends to be an asymptomatic disease. Although it may not be causing symptoms, while the blood pressure is elevated we know that there can be damage to the heart and the cardiovascular system. Despite a patient with HIV having abnormal laboratory studies suggestive of poorly controlled HIV, there has been no follow-up. Another example is a patient with a history of hepatitis C who was to be assessed and scheduled in two weeks but no follow-up ever occurred. Another patient newly arrived with a seizure disorder and chest wall tenderness was supposed to be followed up in one month but that also did not happen.

With regard to Menard, a patient entered with elevated lipid studies but this was never identified nor was it addressed. Another example is a patient with asthma and COPD who was placed in the infirmary but did not have a comprehensive exam for his lung problem for two weeks. At Logan, when we reviewed new intake records, a majority of those records did contain problems. Most of the problems related to delays in follow-up but there was also a patient with asthma who did not receive an adequate evaluation. These deficiencies not only suggest breakdowns which create significant liability for the patients, but also an absence of an organized system of self-monitoring in order to insure that what needs to be done is in fact done.

We would suggest assigning a person as reception process coordinator who would maintain the equivalent of an Excel-type spreadsheet with the left hand column containing the name and identifiers of the patient and then subsequent columns including date of arrival, date of nurse screen, date of lab draw, date of TB skin test, date of physical exam and finally date of initial problem list and plan which is developed from reviewing all of the data. This Excel spreadsheet

should have data input daily and patients would be directed to go to those areas for which they have not yet had the required service within the required timeframe. Finally, a clinician would review the records of patients with identified problems and insure that appropriate follow up has been initiated. A column could be created after the column on initial problem list and plan in which healthy patients would be differentiated from patients with identified problems and therefore only the latter group would have their records reviewed by the responsible clinician. On a weekly basis, the data would be reported and on a monthly basis the data would be summarized in a report to the quality improvement committee.

**Recommendations:**

1. A system that insures relevant electronic data arrives with the patients from Cook County Jail.
2. Sufficient nursing and clinician staff to complete the reception evaluation within one week.
3. A process that insures a clinician reviews all intake data, including laboratory tests, TB screening, history and physical, etc., and develops a problem list and plan for each problem.
4. Forms to identify acute symptoms.
5. A requirement that clinicians, during the history, elaborate on all positives from the nurse screen.
6. A system of placing on hold patients in the midst of appointments or incomplete treatment.
7. A policy that requires the medical record to be well organized and the staff to insure this is accomplished.
8. A quality improvement process that monitors completeness, timeliness and professional performance and is able to intervene in order to implement improvements.
9. A Medical Director trained in primary care.
10. A Health Care Unit Administrator position dedicated to NRC and appropriate supervisory resources.
11. A well-trained Quality Improvement Coordinator at each reception center and each facility dedicated to insuring the timeliness, completeness and professional appropriateness of the clinical decisions.

## Intrasystem Transfer

The policy on intrasystem transfers consists of custody providing for medical staff a list of names of people who are to be transferred, usually within 24 hours. It is medical's responsibility to review the records and identify problems, current medications, allergies, scheduled appointments and any other significant health issues. These items are listed on the intrasystem transfer summary which goes with the inmate when he is transferred. When the inmate arrives at the permanent facility, he arrives with his record, the transfer summary and any medications. The policy requires that a receiving nurse reviews the key elements of the transfer summary, such as chronic problems, medications, allergies, appointments and anything else of significance with the patient, observes the patient and performs vital signs. The purpose of this process, like medical reception, is to insure that continuity of care is facilitated. We looked at the intrasystem transfer process in several facilities. Although we found problems in almost every facility, the rate of

problems was lowest at the Hill Correctional Center and was highest at Dixon. At Dixon, the process was so broken that despite the fact that Dixon has a special medical mission, including geriatric patients, when patients arrived they were not immediately seen by a nurse with the record who reviews the transfer summary with the patient and performs vital signs. In fact, virtually every intrasystem transfer record we reviewed was significantly flawed and in many of them the process was not initiated until two or more weeks after the patient had arrived. This guarantees delays in care. Examples of delayed intrasystem transfer reviews include a 37-year-old with asthma who arrived at Dixon on 2/4/2014, but the patient was not seen and the transfer summary reviewed and completed until eight days later, and even then there was no referral to the asthma clinic. Another example is a 27-year-old with multiple sclerosis whose health transfer summary was completed approximately three weeks after he arrived, but despite the transfer process being completed, there was no referral to a chronic care clinic for his multiple sclerosis. There is a 30-year-old who arrived with thyroid problems and lipid problems. His transfer summary was completed 11 days after he arrived and again there is a failure to refer to the chronic care program for his hypothyroidism. Finally, in one of the Dixon death reviews, a patient was identified who was diagnosed with early prostate cancer at Cook County Jail. One month after reception, he was transferred to Dixon, where he was housed in the infirmary due to his oxygen needs related to chronic obstructive pulmonary disease. This patient was never referred to an urologist even though that referral should have been made on entry to Dixon. This patient died in February 2013 from complications of many of his diseases. This type of severe breakdown insures delays in access to services and disrupts continuity of care. In several facilities, although the process was more compliant with the policy than at Dixon, approximately one-third of the records we reviewed were significantly problematic. This again speaks to an absence of self-monitoring and self-correcting.

**Recommendations:**
1. Custody must propose a list of transferring inmates to medical at least 24 hours prior to transfer.
2. Inmates with scheduled offsite services should be placed on medical hold until the service has been provided.
3. A nursing supervisor should regularly review a sample of transfer summaries of patients about to be transferred to insure the completeness of the data.
4. Office of Health Services should provide a guide as to how to efficiently review a record to identify important elements to be included in the summary.
5. When patients arrive, they must be brought to the medical unit and a nurse must be responsible for facilitating continuity of required services.
6. At least quarterly this service must be reviewed by the QI program.

## Medical Records

The quality of the medical records was poor at most of the facilities we visited. Problem lists were frequently not updated and often cluttered with redundant and irrelevant information, such as each time the patient was seen in chronic care clinic. In many instances, important information was missing from the health records, such as the MARs from the last several months. There were blanks on the MARs at virtually every facility. At those institutions with a reception center function, drop filing is used, meaning loose papers are "dropped" into a folder. This results in

disorganized records that are difficult and time consuming to glean information from. The worst in this regard was NRC, where nothing was properly filed no matter how long the patients were housed there. At Logan we encountered large piles of loose filing stacked in the inside cover of most charts. Several of the facilities we visited did not file sick call slips in charts and some routinely discarded them. The extent to which medical record maintenance is disorganized and dysfunctional contributes to the likelihood of a less well informed clinician who will therefore be less able to make the appropriate clinical decisions. When less appropriate clinical decisions are made, appropriate care may either be significantly delayed or in fact not occur at all. Medical record maintenance should facilitate informed care and appropriate clinical decision making.

As writing notes by hand is cumbersome and time consuming, most notes contained very little information with respect to symptom histories (nurses tended to do better than providers in this regard), physical exams or medical decision making. In nearly all facilities, the handwriting of one or more providers was so illegible that it rendered the notes all but useless to anyone other than the author.

It is our understanding that the state has purchased an electronic health record system which will be implemented in the near future. This should solve some of these issues, such as illegibility, but it is less clear that others, such as the problem lists and thoroughness of documentation, will be improved by implementation of an electronic health record. We were told that existing records will not be scanned into the electronic system. This will result in redundancy of records and thus greater disarray and more inefficiency than currently exists. In the end, the quality of the electronic health record will determine if the transition results in an improvement in efficiency, quality and patient safety, or merely a redundancy in record keeping with the attendant problems that such a system creates.

**Recommendations:**
1. Problem lists should be kept up to date.
2. Only providers should have privileges to make entries on the problem list.
3. The system of "drop filing" should be abandoned.
4. Medical records staff should track receipt of all outside reports and ensure that they are filed timely in the health record.
5. Charts should be thinned regularly and MARs filed timely.
6. Consideration should be given to scanning specific important records into the new electronic system if possible.

## Nursing Sick Call

Nursing sick call ranges from problematic to significantly broken throughout the system, in that one or more of the elements required of a professional sick call encounter are missing. These elements are:

1. Sick call request slips are available to inmates.
2. Completed requests are placed directly by the inmate into a locked box or handed directly to a health care staff member.
3. Completed requests are collected by a health care staff member.

16

4. There is identified clinic space.
5. The clinic space is appropriately equipped.
6. The clinic space provides patient privacy and confidentiality.
7. Sick call including paper triaging is conducted by a licensed registered nurse whose education, licensure and scope of practice permit independent assessment.
8. Sick call is conducted pursuant to the policies and procedures of the IDOC Office of Health Services in regard to the use of approved treatment protocols at each encounter, required documentation, required use of over-the-counter medication dosages only and referrals/follow-up as needed.
9. A sick call system must insure confidentiality from request to treatment.
10. A sick call system which addresses all of a patient's complaints or, at a minimum, prioritizes the complaints.
11. A sick call log or tracking system has been developed and maintained.

One or more of these elements was missing at each facility inspected. There were examples at each facility of either no identified clinic space to poorly equipped clinic space that provides no patient privacy or confidentiality, to established policy and procedure not being followed, to treatment protocols not being used or followed and to non-medical staff handling confidential sick call requests. At every facility, a sick call process has been established which allows for non-registered nurses to conduct sick call and, at many of the facilities, particularly in the segregation unit, legitimate sick call is not being conducted but in its place a "face-to-face" triage where the RN, LPN or Correction Medical Technician talks to the patient through a solid steel door occurs. Without an appropriate physical assessment, this face-to-face triage results in the formulation and implementation of a plan of treatment based solely on the inmate/patient's comments with no collection of objective data such as vital signs or a physical examination. This does not meet the definition of a professional assessment requiring an adequate history, vital signs, an appropriate physical assessment and the synthesis of the data into a nursing diagnosis and the development of an appropriate plan. Without such a professional assessment there is a significantly reduced likelihood of an appropriate diagnosis and an appropriate plan and this increases the potential for harm to the patients. During the sick call process the registered nurse or in the instance suggested by the State, an LPN, is expected to do a physical assessment, that is examine the throat or eyes or ears, etc. Supervising, i.e., reviewing the documentation based on such assessments being performed does not allow one to confirm that the assessment was in fact accurate and appropriate. There is no efficient way for RNs to supervise this process and given the inadequate training that LPNs have in physical assessment, it is only appropriate that the responsibility for conducting sick call be limited to registered nurses. The NCCHC accredits 25-bed jails as well as large prisons and although there has not been agreement on defining what level of staffing should be credentialed for sick call based on the size of the institution, there have been such discussions. The Commission's position is that the scope of practice allowed within a given state is determined by the state nursing board and this is acceptable to the National Commission on Correctional Health Care. A review of the Illinois Nurse Practice Act describes independent assessments, which essentially is what a sick call assessment is, are only sanctioned for performance by registered nurses. Licensed practical nurses may assist in or participate in an assessment but may not independently perform sick call as we found in some prisons.

While it is IDOC policy that each month the institutional Medical Director reviews the documentation of two sick call encounters per provider, i.e., RN, LPN or CMT for completeness, this is a retrospective paper review to determine that the provider answered all the questions and checked all the boxes on the pre-printed treatment protocol form. There is no way, however, for the physician reviewer to determine if the provider accurately interpreted and documented physical findings in order to determine an appropriate assessment and treatment.

At each of the facilities inspected, when a non-registered nurse conducted sick call, there was no immediate review by a registered nurse or physician to insure the provider conducted an appropriate physical assessment and accurately interpreted physical findings.

Of particular concern, specifically at Stateville and Pontiac, is the frequent arbitrary cancelling of sick call encounters by security staff. Such practices represent significant impediments to access to care and result in delays in treatment.

Of notable concern at Dixon is the practice of medical staff only permitting a patient to voice one concern at an encounter despite multiple concerns listed on the sick call request. Since inmates are charged a co-pay for medical services, inmates interviewed at Dixon were of the opinion that being permitted to have only one health care complaint addressed at an encounter was a "money making" scheme for the State.

At some facilities, most notably NRC and Dixon, it was difficult to impossible to evaluate sick call because a Sick Call Log has not been developed or maintained. In fact, during the four days at NRC, a sick call list could not be presented even though requested multiple times.

Hill Correctional Center has developed a sick call system with the above numbered elements in place. Only rarely does a non-registered nursing staff member review/triage sick call requests and conduct sick call. This generally happens when sick call flows over to the 3-11 shift, and a Licensed Practical Nurse would complete any remaining sick call from the day shift.

**Recommendations:**
1. Each facility is to develop and implement a plan to insure:
   a) Sick call is conducted in a defined clinical space that is appropriately equipped and provides patient privacy and confidentiality.
   b) Sick call requests are confidential and to be viewed only by medical staff.
   c) The review/triage of sick call requests and conducting of sick call is performed by a licensed registered nurse.
   d) Legitimate sick call encounters to include collecting a history, measurement of vital signs, visual observations and a "hands-on" physical assessment.
   e) There must not be arbitrary restrictions on the number of symptoms to be addressed at an encounter.
   f) Following Office of Health Services established policy and procedure.
   g) Complete documentation.
   h) Implementation and maintenance of a sick call log.
2. Administration must insure health care activities such as sick call are not routinely cancelled, as this results in an unacceptable delay in health assessment.

## Chronic Disease Management

The IDOC chronic care program suffers from deficiencies in its policies and guidelines, as well as weaknesses with respect to the variable quality of the individual practitioners, and lack of clinical oversight both locally and centrally.

With regard to policy issues, the most important and overarching problem is the "cookie cutter" approach to chronic disease management, in that policy dictates that all patients are somewhat arbitrarily seen only three times a year regardless of how well or how poorly their disease control may be. Patients should be seen in accordance with the degree of control of their diseases, with poorly controlled patients seen with greater frequency, and well controlled patients seen less frequently. The concept of disease control in this context is derived from the NCCHC chronic disease guidelines which were in fact developed by the leader of the investigative team. He was tasked with developing these guidelines for the purpose of facilitating good disease control as expeditiously as possible in order to decrease the risk of avoidable morbidity and thereby improving patient outcomes. However, when this concept is implemented by the "designated month" approach, it does not encourage clinicians to work as aggressively as possible with their patients to achieve good disease control and thereby exposes patients to longer periods of increased risk of harm.

A quarterly visit only makes sense (and is safe) if patients' diseases are in good control. If not, then patients are exposed to the cumulative organ damage caused by inadequately controlled chronic disease. This degree of exposure is what leads to avoidable morbidity and mortality. While it is currently possible for providers to arrange for more frequent follow up, this is left entirely to the discretion of the individual practitioner and by no means occurs on a regular basis. At every facility we visited, we encountered cases of patients with poorly controlled chronic disease going months without any active management of their disease process, even if they were seen in clinic for other, less important issues.

By assigning specific months of the year for the management of each disease, the chronic care program (perhaps inadvertently) creates a fragmented and inefficient system of care wherein patients with multiple diseases are seen for only one disease per calendar month. We encountered multiple examples wherein patients who were seen in chronic clinic or at sick call for one illness had evidence of poor control of another disease, but the poorly controlled disease was not addressed, presumably because it was not the designated month (or visit type) to address it. There were notable exceptions to this, such as Menard and Hill Correctional Centers, where the chronic clinic nurses have developed comprehensive forms designed to address all chronic diseases in one visit. At other facilities, such as Stateville and Pontiac, all diseases are also addressed at a single visit but the provider fills out multiple chronic care forms, a process which is redundant, inefficient and time consuming. We recommend that the State adopt a system similar to Menard or Hill which represents a more comprehensive and unified approach to chronic disease management.

Other important policy issues relate to the management of specific diseases, most notably HIV and COPD. With respect to the HIV policy, there is no IDOC Treatment Guideline for HIV; there is only the Wexford Health HIV/AIDS Infection Control Policy, which does not require that facility providers follow the HIV patients who are not followed by the facility providers for

their HIV disease. In every facility we visited, these patients were managed solely by the ID specialist via telemedicine for their HIV infection. While the HIV consultants are excellent specialists, they are not primary care providers. These patients have a chronic disease in the same sense that diabetes, hypertension or coronary artery disease is a chronic disease. In other words, having a disease that requires the intervention of a specialist does not obviate the need for a primary care provider. While we would not expect the average primary care provider to be proficient at prescribing HIV treatment, it is expected that all providers at least be familiar with the basic principles of treatment, the importance of medication compliance and the most common side effects of frequently used medications. The HIV virus readily develops resistance mutations when medications are not taken exactly as prescribed. Once this happens, those medications become useless in the treatment of the patient's disease.

Given the limited number of medications available to treat this life-threatening infection, it is extremely important that patients understand the importance of medication adherence and are followed closely to ensure they are taking the medications correctly and tolerating them. So for example, when the HIV specialist starts or changes a medication, it is generally recommended that the patient have a follow-up appointment within a few weeks to inquire about adverse effects and adherence. We encountered numerous examples of patients going for days, weeks or months without their medications, either because of refusals or other system issues, and these treatment interruptions went unnoticed by the local providers because they are not actively following this disease process. For example, patient [REDACTED] went without his HIV medications for an entire month, but this went unrecognized until his follow-up telemedicine visit months later. Patient [REDACTED] went at least two days without any of his medications due to a cell move. Patient [REDACTED], who was on deep salvage therapy for his HIV disease, had his medication ordered, and therefore administered, incorrectly for months before it was corrected at the next telemedicine clinic visit despite the fact that he was followed in the chronic care program for his other diseases. In our opinion, the providers' lack of familiarity with these patients and with HIV disease itself places the patients at unnecessary risk of adverse outcome. We recommend that these patients are actively followed by facility providers in the chronic care program.

In most correctional systems, even when the HIV patients care is overseen by an HIV specialist, the primary care clinician within the chronic care program monitors blood test results as well as their patients' subjective and objective data. When issues are identified by the primary care clinician (e.g., rising viral loads), the patient is referred to the HIV specialist or the HIV specialist is contacted. In general, decisions to initiate or change treatment are made by the HIV specialist.

With regard to the management of pulmonary diseases, the treatment guideline is seriously deficient, in that it only addresses the treatment of asthma and not of other obstructive lung diseases such as COPD and chronic bronchitis, which are common and important causes of morbidity and mortality in the U.S. and the treatment of which differs in important ways from the treatment of asthma. It was therefore not surprising to find that in the majority of cases we reviewed, patients with lung disease were treated as if they had asthma even if they clearly had COPD, sarcoidosis or some other pulmonary disease. The NCCHC treatment guidelines, while a reasonable starting point, are nearly 15 years old and do not specifically address COPD or

pulmonary diseases other than asthma. As the incarcerated population has aged, COPD has become a much more prominent disease entity in this group and needs to be treated according to current nationally accepted clinical guidelines. The current IDOC asthma guideline appears to be based partly on the National Heart, Lung and Blood Institute (NHLBI) Expert Panel Report 3 (EPR 3). For example, the section on assessing symptom severity is consistent with the NHLBI recommendations, but the assessment of control is not. The NHLBI guidelines also take into account additional data, such as symptom interference with normal activity and peak flow monitoring when assessing degree of control. We recommend that the department adopt this strategy. We also recommend the department mimic the NHLBI in its control terminology of "well," "not well," and "very poorly" controlled rather than "good, fair, poor" control in order to heighten awareness of the need to modify therapy for all categories that are less than well controlled.

With regard to the care of patients with diabetes, we noted a number of problems at various facilities. For example, we observed that at some facilities it appeared to be common practice to routinely switch patients from insulin regimens that mimic the body's own insulin production (so-called "intensive insulin therapy") to simpler but non-physiologic regimens (known as "conventional insulin therapy") regardless of the type of diabetes the patient had. This often occurred upon arrival and in the absence of a visit with the clinician. This practice is inappropriate for several reasons. First, types 1 and 2 diabetes are quite different diseases, with the former characterized by insulin deficiency and the latter by insulin resistance. As such, they require different and individualized approaches to insulin therapy. Conventional insulin therapy is unlikely to achieve target blood sugar levels in patients with type 1 diabetes, who as mentioned are insulin deficient and for whom physiologic insulin replacement is typically recommended and is the standard of care in the community. Type 2 diabetics on the other hand retain varying degrees of insulin production until the late stages of the disease and can often be managed with simpler insulin regimens, at least until their own insulin production eventually fails and they too require more intensive regimens.

In either case, because patients differ in their eating habits, activity levels and sensitivity to insulin (especially in the case of type 2 diabetics), individualized approaches to the management of their insulin regimens is required. This entails monitoring patients' blood sugar readings over time as well as discussions with patients regarding symptoms of low or high blood sugar and evaluation of their compliance with diet, exercise and medications. Arbitrarily changing insulin regimens before taking into account all of these variables can result in deterioration of disease control and does nothing to foster a relationship based on trust and communication, which is vitally important to enhance compliance.

A second issue we encountered is that many of the facilities are still using the outdated "IDDM" (insulin dependent diabetes mellitus) vs. "NIDDM" (non-insulin dependent diabetes mellitus) terminology to categorize diabetic patients. This terminology was abandoned in the community many years ago because it is imprecise and misleading. The problem with labeling diabetics this way is that it does not differentiate between type 1 and type 2 diabetes, which are physiologically distinct entities as previously mentioned. All type 1 diabetics are insulin dependent by definition. However, many type 2 diabetics require insulin to keep their disease under control, but in many

cases it may be appropriate to also use oral agents in this population. We recommend that all patients be categorized as either Type 1 or Type 2 diabetics as is the community standard.

Regardless of the type of diabetes, it is important that all diabetics have reliable mealtimes which closely correlate with medication administration in order to maintain blood sugar levels within safe ranges. However, we noted that at some facilities, meal times can be highly variable and therefore so too can be the timing between insulin administration and the start of the meal. The extreme example in this regard is Stateville, where breakfast is served during what most people would consider the middle of the night, between 1:30 a.m. to 3:30 a.m. At Menard, morning insulin is administered between 2:30 a.m. and 3:30 a.m. and breakfast is served between 4:30 a.m. and 5:00 a.m. Considering that the onset of action of regular insulin is about 30 minutes, this presents a significant risk of low blood sugar for these patients which may cause brain damage, coma or death. When patients have a sustained elevation of blood sugar, the result is potential damage to the blood vessels in the heart, the brain, the kidneys and the eyes. Therefore, it is extremely important for patients to receive appropriate regimens that control and regulate the level of sugar in the blood.

Although there are passing comments in the Offender Physical Examination AD (04.03.101) regarding the frequency of health screening for women, these guidelines are inadequate. For example, this AD states that "A pap smear shall not be required for females over age 65 provided they have received adequate prior screening…" but does not state what "adequate prior screening" consists of. Likewise, that same policy goes on to state that "a mammogram shall be repeated every other year for females of ages 50 through 75," but does not stipulate any situations in which earlier or more frequent screening would be indicated. We noted multiple cases of women who did not receive necessary screening tests. At Logan, we noted that patients typically get a Pap smear on intake, but there were frequently delays with subsequent follow-up care and routine Paps thereafter, especially for HIV infected women who require more frequent screening than uninfected women due to their increased risk for invasive cervical cancer. We recommend the creation of a chronic disease clinic devoted to women's health that includes more specific guidance on these issues.

With regard to the management of pulmonary diseases, the treatment guideline is seriously deficient, in that it only addresses the treatment of asthma and not of other obstructive lung diseases such as COPD and chronic bronchitis, which are common and important causes of morbidity and mortality in the US and the treatment of which differs in important ways from the treatment of asthma. It was therefore not surprising to find that in the majority of cases we reviewed, patients with lung disease were treated as if they had asthma even if they clearly had COPD, sarcoidosis or some other pulmonary disease. The current asthma guideline appears to be based partly on the National Heart, Lung and Blood Institute (NHLBI) Expert Panel Report 3 (EPR 3). For example, the section on assessing symptom severity is consistent with the NHLBI recommendations, but the assessment of control is not. The NHLBI guidelines also take into account additional data, such as symptom interference with normal activity and peak flow monitoring when assessing degree of control. We recommend that the department adopt this strategy. We also recommend the department mimic the NHLBI in its control terminology of "well," "not well," and "very poorly" controlled rather than "good, fair, poor" control in order to heighten awareness of the need to modify therapy for all categories that are less than well controlled.

In the course of our reviews we noted multiple instances in which patients experienced medication discontinuity for a variety of reasons, yet this went unrecognized and therefore unaddressed by the treating clinicians. Part of the problem seems to be dysfunctional medical record keeping, whereby medication administration records (MARs) were not filed timely into the charts. In other cases, nurses had knowledge that patients were skipping doses of medications yet did not notify the prescriber. Policy should require that patients who miss medications for any reason (fail to request a refill, refuse, no-show, etc.) are referred to a provider to address the issue. The policy should also require that all chronic disease patients on nurse-administered medications have a copy of the active MAR placed in the record when the patient is seen for chronic disease follow up.

Since it is an officer's responsibility to check for and identify contraband and begin the process of sanctioning the inmate, this responsibility exists also during medication administration. Nurses do not have a responsibility professionally to be searching for contraband. If they identify it they are obligated to report it, but searching for it is not part of their responsibilities. During the medication administration process, they can be documenting the medication administration, checking the records to determine whether the next patient's medications are present, a variety of things related to the process as opposed to performing what is a typical custody function.

**Recommendations**:
1. Patients should be seen in accordance with the degree of control of their diseases, with more poorly controlled patients seen more frequently and well controlled patients seen less frequently.
2. Chronic care forms and flow sheets should be updated and be designed so that all chronic diseases are addressed at each visit.
3. HIV patients should be followed regularly by IDOC providers in the chronic care program to address their primary care needs, monitor for medication compliance, side effects of therapy and overall health status.
4. The Asthma Treatment Guideline should be replaced with a guideline on the treatment of pulmonary diseases to include COPD and chronic bronchitis as well as asthma. This guideline should be modeled after the NHLBI report.
5. There should be a chronic clinic devoted to women's health to include specific guidelines on cervical and breast cancer screening as well as other issues unique to this population.
6. The TB guideline should be updated to provide basic information regarding interferon gamma testing, including appropriate uses of this test.
7. Policy should require that patients who miss medications repeatedly or for a significant period of time are referred to a provider to address the issue.
8. Copies of the current MAR should be available for the provider's review during chronic care clinic.

## Pharmacy/Medication Administration

At all facilities, Boswell Pharmaceuticals, located in Pittsburgh, PA, provides the prescription and non-prescription medications. Boswell is licensed as a Wholesale Drug Distributor/Pharmacy Distributor and a current license was available at all sites. The service is

"fax and fill," meaning prescriptions faxed to Boswell by a designated time each day will arrive the next day. Each facility has designated a back-up pharmacy in the community to obtain urgently needed medications. Each facility had at least one full-time pharmacy technician who was responsible for the day-to-day operation of the medication room including ordering, receiving and inventorying. Boswell provides a consulting pharmacist to come on-site monthly to assist the pharmacy technicians, check inventories and attend quality improvement meetings. Random checks of controlled medication, syringe/needle and medical tool perpetual inventories were all accurate and being counted/verified at the appropriate intervals. None of the facilities reported any problems/issues with pharmacy services and none were noted.

Regarding medication administration, there is a concern at the NRC. Health care staff administer medication dose-by-dose at the cell. The NRC has a policy that health care staff is escorted at all times when in a cell house. Observation of medication administration revealed significant delays because a security staff member was not assigned and available in each cell house to provide escort. A security staff member was finally provided after several requests and a significant time delay. It was observed that the security escort provided no service other than walking with the health care staff member. It is our recommendation that security officers, following patient ingestion, should check for contraband. While we fully agree it is the responsibility of medical staff to deliver and administer medication, at the point the inmate receives the medication and elects to not ingest it, the uningested medication is contraband, and officers search/check for contraband, not medical staff. Medical staff does not function as an arm of custody. It would seem, since inmates are accustomed to security staff routinely performing cell searches for contraband, inmates would be more likely to cooperate with officers in the performance of a mouth check following medication administration. Since officer assignments include escorting medical staff during medication administration, it would seem the process would be quicker and more efficient if the officer performed the mouth check, and the medical staff member could proceed to document the medication administration and begin to prepare the medications for the next inmate.

**Recommendations:**
1. Following patient ingestion of medication, security staff should be responsible to check the mouth for contraband.
2. A security staff member must be assigned to accompany the nurse who performs medication administration.

## Laboratory

Laboratory services at each facility are provided through the University of Illinois-Chicago Hospital (UIC). Either full-time phlebotomists or nursing staff draw and prepare specimens for transport to UIC. Results are electronically transmitted back to the facility, generally within 24 hours via secure fax line located in the medical department. UIC reports all reportable cases both to the facility and the Illinois Department of Public Health. There is a current Clinical Laboratory Improvement Amendment (CLIA) waiver certificate on file at each facility. There were no reports of any problems with this service.

**Recommendations:** None

## Unscheduled Onsite and Offsite Services (Urgent/Emergent)

In order to track unscheduled services and where indicated to improve performance, it is essential that an urgent care or telephone log be maintained. Unfortunately, several facilities, including Dixon, Logan, NRC and Menard either did not maintain such a log or did not maintain it conscientiously. This demonstrates the impossibility of their being able to self-monitor and improve performance. Such a log should contain fields for patient identifiers, date, time, where the patient was seen, presenting complaint, disposition and if the patient was sent offsite, a field for retrieved offsite service paperwork as well as follow-up visit with primary care clinician or Medical Director. Unscheduled services usually begin with a phone call from a housing unit to the medical unit, although occasionally patients are brought over without any prior call. What is expected is a registered nurse performs an initial assessment and then contacts an appropriate clinician for a discussion. When the patient is sent offsite, the patient should be returned through the medical area with the paperwork so that a nurse can review any recommendations and contact a physician if an order is needed. In addition, the nurse can perform a brief assessment, including vital signs, in order to insure patient stability. Some prisons automatically place these patients in the infirmary to be seen the following day by a physician. If this does not happen, there must be a follow-up visit with a primary care clinician within a few days. In reviewing this service, we found breakdowns both by nurses and clinicians in relationship to identifying patient instability and therefore arranging for the patient to be sent offsite. In addition, we also found breakdowns in terms of patients not being brought back to the medical unit to a nurse and we also found most commonly that patients were returning with patient instruction paperwork rather than an emergency room report or when hospitalized, a discharge summary. Hospitals have to understand that corrections patients are returning to a doctor and therefore patient instructions are not useful. Rather, an emergency room report or a discharge summary can be utilized by a clinician to understand what was done, what was concluded and what was recommended. These breakdowns inhibit the provision of appropriate care. In addition, we identified some patients who were not appropriately followed up by a primary care clinician.

In order to insure outside hospitals consistently provide emergency room reports when the patient is discharged, the agreement with the hospital should be explicit in that the service which is compensated by the agency includes both the actual service and the report from the emergency room or, with a hospitalization, a discharge summary. That strategy has worked effectively in many jurisdictions.

**Failure to Identify Serious Instability-From Mortality Reviews**
This patient was a 56-year-old man who died of prostate cancer on 3/21/14. He was seen by an urologist in January 2014 and because of severe back pain he was sent to the hospital on 2/3/14. However, while housed in the infirmary on 1/30/14, following his prostate biopsy, he began developing fevers and feeling ill. Beginning on 2/2/14, he developed temperatures of up to 104° as well as an elevated pulse rate of 132. The nurses appropriately notified the physician, who did not come to assess him until 2/3/14 in the evening. He was ultimately diagnosed and treated for sepsis after being sent out at 11:15 p.m. This patient complaining of fevers and tachycardia should have been sent out immediately.

From Dixon. This is a 64-year-old man with chronic obstructive pulmonary disease, atrial fibrillation, hypertension and prostate cancer. He died on 2/28/2013 from tuberculosis, pneumonia and meningitis. On 1/24/13, he was admitted to the hospital for progressive shortness of breath and confusion. He returned to Dixon on 1/27/13. Beginning on 2/1, he became increasingly short of breath, lethargic, weak, confused and had intermittent fevers. On 2/5, the patient's temperature was 102°. The physician did not document a history or physical exam. Despite the fact that the patient had no evidence of influenza, the physician ordered Tamiflu. On 2/6, in response to a positive urine culture, the physician ordered IV antibiotics. On 2/7, the infirmary physician began documenting that the patient had an "extremely poor prognosis." On 2/11, he documented the patient was possibly septic. On 2/12, he finally sent the patient to the local hospital, where he was admitted to the ICU for respiratory failure. This patient should have been sent out much earlier and the documentation does not demonstrate sufficient concern for this patient's health and safety.

This is a 62-year-old man who entered IDOC in 2008 and died on 11/16/13 of GI bleeding from ruptured esophageal varices due to cirrhosis. This patient, on 11/13/13, presented with severe lethargy, dizziness, dyspnea and melena X 2 days. He was tachycardic, with a heart rate of 104. His blood pressure was normal and he had grossly positive stools for blood on exam. The doctor ordered labs and placed him in the infirmary at 1:10 p.m. At 1:30, the admitting nurse described him as pale and pasty. He had a small black stool consistent with acute blood loss. He complained of mild abdominal and chest pain. His blood pressure was 112/70 and his heart rate was 100. His hemoglobin was 10.2 grams and it had dropped from 13.3 grams four months earlier. At 8:00 p.m., a stat blood count was drawn and the result at 9:15 was 7.6 grams, suggestive of severe bleeding internally. At 9:45 p.m., the nurse called the doctor and he ordered IV fluids. On 11/14 at 3:25 a.m., his blood pressure was 100/60 and his pulse 104. At 9:20 a.m., the doctor saw the patient, who complained of weakness, dizziness and ongoing blood in his stools. He finally sent the patient to the hospital where he died two days later. When you identify a patient who has acute ongoing blood loss, to not send him out is incomprehensible.

**An Inadequate Response Possibly Related to Medical or Custody Staffing**
This is a patient from Dixon who is a 48-year-old with a seizure disorder. On 1/1/14, a nurse was called to the housing unit for a Code 3. In the record there is no description of the event, but the patient was brought to the clinic and ultimately wanted to return to the housing unit. The only note in the record is a note by an LPN where the assessment reads, "Post seizure." The patient was returned to the housing unit by the LPN with no contact with an advanced level clinician. There was an inadequate history and physical assessment and since only an LPN saw the patient there were significant liabilities engendered by this response. The Illinois State Nurse Practice Act clearly states, "Only a registered nurse may perform an independent assessment."

The next example is a patient from Logan who is a 35-year-old with a seizure disorder. On 12/30/13 at about 11:00 p.m., the cell house contacted the medical unit to respond to this patient, who was having seizures. When the nurse arrived, the seizures had ceased and she documented that she observed no seizures but left the patient in the housing unit without any adequate assessment. One day later at 11:40 p.m., the patient was found in the housing unit having a seizure, with blood around her mouth and blood dripping from a laceration in the back of her head. She was brought to the health care unit and sent to the local hospital. There was no

mention of contacting the physician. The patient was returned from the hospital at 4:00 a.m. on 1/1/14. There are no records from the local hospital. The physician did come in on 1/1 and saw the patient and ordered blood levels of her anti-seizure medications. However, there has been no follow up since by the physician. This patient should have been brought to the infirmary after the seizure on the first night for more careful observation and to be seen by a clinician. This characterizes a significant nursing breakdown.

The next case is from Menard and reflects inadequate nursing assessment following return from the hospital. This patient is a 61-year-old with osteoporosis who was sent out on 1/26/14. On that day at about 2:10 p.m., he complained of chest pain for two hours. He described it as a pressure in his chest and was given nitroglycerin with some relief. His blood pressure was elevated at 154/90 and his pulse rate was 116. The physician was called and the order was to send him to the hospital. The patient went to the hospital and returned one week later, on 2/3 and was placed in the infirmary for observation. He was seen later that day by the nurse, who did not ask any questions regarding chest pain, shortness of breath or the incisions on his chest. He was later seen by a nurse practitioner whose note indicates the patient had recently had coronary artery bypass graft surgery but neither the nurse practitioner nor the nurse elicited any subjective responses from the patient. The patient was ultimately released to the cell. The record, at the time of our review, still lacked any discharge summary or more importantly, the catheterization and echo reports, critical pieces that must be part of the medical record.

The next case is also from Menard and demonstrates inappropriate use of staff. This patient is a 57-year-old with hypertension, hepatitis C disease and substance abuse issues. He presented on 3/28/14 complaining of lower abdominal pain, aching and burning, with five loose stools. He was seen by a CMT (which is inappropriate since he needed an assessment). He should have been seen at a minimum by a registered nurse or a midlevel provider. He was referred to the physician the next day and when seen by the physician he was immediately sent out to rule out an acute appendicitis. In fact, he had an acute appendectomy and was returned on 3/31 and after an assessment by the Medical Director was returned to his cell. Although there was a recommendation for him to be followed up at the hospital, this never happened, nor is there any note indicating a change from that recommendation.

The next case is a 48-year-old patient with hypertension and glaucoma, also from Menard. Those two diagnoses are the only ones listed on the problem list. On 1/13/14, he complained of chest pain and was sent to the hospital. The workup at the hospital was negative for acute coronary artery disease and the diagnosis was reflux disease. He returned from the hospital and at the time of return his vital signs were normal. There is an order for an electrocardiogram and a physician assessment. The cardiogram was scheduled for 1/17, but there was a note that says it was not done because of a lockdown. This is a procedure done onsite which should never be cancelled because of a lockdown. In fact, it was not done until eight days later and at the time of our visit, there was still no cardiogram in the chart. This is a patient who had a previous history of both a heart attack and supraventricular tachycardia (rapid heart rate), although neither of these problems were on the problem list. An EKG was ordered but it was delayed unacceptably and in fact, four months later there was no report in the chart.

27

A majority of the records we reviewed contained neither an emergency room report nor, when patients were hospitalized, a discharge summary, despite the fact that these documents are crucial for appropriate continuity of care. Hospitals must be educated that compensation for a service cannot be provided as long as the service which includes the appropriate documentation has not been provided.

**Recommendations:**
1. All facilities must track urgent/emergent services through using a logbook maintained by nursing which includes patient identifiers, the time and date, the presenting complaint, the location where the patient is seen, the disposition and when the patient is sent out, the return with the appropriate paperwork, including an emergency room report and appropriate follow up by a clinician.
2. Assessments must be performed by staff appropriately licensed to be responsible for that service.
3. Guidelines should be developed for nursing staff with regard to vital signs reflecting instability that require contacting a clinician.
4. When patients are sent offsite, work with hospitals to insure that the emergency room report is given to the officer to return to nursing with the patient.
5. Patients returning from an emergency trip must be brought to a nursing area for an assessment and if not placed in the infirmary, scheduled for an assessment by an advanced level clinician.
6. The Office of Health Services should provide guidance with regard to the types of clinical problems that require services beyond the capability of the infirmary, thus sending patients to the local hospital.
7. Insure that after the patient returns he is seen by a clinician within three days where there is documentation of a discussion of the findings and plan as described in the emergency room report.
8. The QI program should monitor timeliness and appropriateness of professional responses.
9. As an aspect of the QI program, review nursing and clinician performance to improve it.

## Scheduled Offsite Services (Consultations and Procedures)

As we understand the process for obtaining consultations and procedures, it begins with the timely identification of the need for a procedure or consultation, usually for diagnostic assistance. Review of death records has revealed some delays in the timeliness of identification.

Once the clinician has determined that there is a clinical basis for offsite services, they are required to submit a form which documents the clinical justification for obtaining the service.

This form is reviewed by the site Medical Director, who either concurs and presents it to the weekly collegial review telephone discussion or suggests an alternate plan of care to the ordering clinician. When an alternate plan of care is recommended, either by the Medical Director or the collegial review teleconference, there must be a discussion between the ordering clinician and the patient so that he/she is on board with the change in plan. The telephonic collegial review is performed weekly and so there should be no more than a one-week delay due to presentation at the collegial review.

During the collegial review, the Pittsburgh-based physician either approves the service or suggests an alternate plan. We have been told by several sites that this rate of approval varies dramatically based on which Pittsburgh-based physician happens to be receiving the phone call. Some approve at a much higher rate than others. For Dixon and Stateville, despite verbal approval received over the telephone, there is a substantial delay in Pittsburgh providing the authorization code to the University of Illinois. This delay can extend up to eight weeks or more. The scheduler at Dixon and at Stateville will call the University of Illinois scheduler, who works closely with them. Wexford changed the procedure so that the authorization is no longer given directly to the scheduler at the site; rather, it is given directly to the U of I scheduler, but as we indicated, this may occur up to eight weeks later. This is clearly not acceptable. Additionally, there are several specialties for which University of Illinois may not provide access for up to three or more months. In many instances, the services could be obtained much more timely by using a local service rather than the University of Illinois.

In most correctional settings, for scheduled offsite services, emergent consultation or procedures are sent out immediately, without any utilization review until after the fact. Urgent services are obtained in no more than 10 business days and routine services are generally obtained within 30 calendar days. From what we have seen, generally these measures are obtained when using local services. The extraordinary delays tend to revolve around the utilization of the University of Illinois.

Once the patient attends the appointment and receives the service, he should be returned to an onsite nurse with any accompanying paperwork, which should be given to the nurse. There are procedures for which one anticipates dictation and transcription and for these services a staff member at the institution must insure that the offsite paperwork is obtained timely. Finally, once the paperwork is available onsite, there should be a scheduled visit with the ordering clinician or Medical Director during which there is a documented discussion of the findings and plan.

During our review of records, we found breakdowns in almost every area, starting with delays in identification of the need for the offsite services, delays in obtaining an authorization number, delays in being able to schedule an appointment timely, delays in obtaining offsite paperwork and delays or the absence of any follow-up visit with the patient. Additionally, although some of the facilities were tracking these steps fairly conscientiously, others were not, creating much less dependable outcomes. In the best of the eight facilities we reviewed, there were problems at one step or another in about 20% of the records. In other facilities, such as Dixon Correctional Center, there were problems with almost every record reviewed. What follows are examples of the differing types of problems we identified.

**Delays in Perceiving the Need for the Service**

Illinois River Death Review. The patient, [REDACTED], entered IDOC in 2000 and began complaining of constipation in January 2011, when he weighed 195 pounds. The patient returned with a complaint of constipation in May 2011 and indicated that he had lost 10 pounds. At that point, the physician did not do a rectal exam. In December of the same year he indicated that he was losing weight and in fact he had lost more than 30 pounds and weighed 158. The doctor did perform a rectal exam but found no masses, although every subsequent physician did feel a mass.

29

She ordered lab tests, which showed a mild iron deficiency anemia. She then ordered stool cards to see if there was blood in the stool and these came back positive. Finally, he was referred for a colonoscopy, which on April 13, 2012 identified a large tumor in the rectum. Once the tumor was identified, his care was appropriate. However, he survived less than a year.

Hill Death Review. Patient [REDACTED] entered IDOC in 1984 and arrived at Hill Correctional Center in 2009, having stopped smoking two years earlier. His complaints began with left neck and chest pain in February 2012. In May 2012, he told a nurse he was coughing up blood, which he connected to a shoulder injury. He was seen a week later by the physician with multiple complaints, including weight loss, for which the medical record reveals a 30-pound weight loss. The physician saw the patient a little more than two weeks later and noted a left mobile quarter-sized mass in the left superclavicular area. He ordered iron and a chest x-ray. The chest x-ray revealed a focal opacity in the left lower lobe with tenting of the left hemidiaphragm. The Medical Director saw the patient in June and twice in July, and by August the patient's weight was down to 127 pounds. On August 20, he presented coughing up blood and the doctor ordered more blood tests, which showed his anemia worsening. It was not until August 31 that a CT scan was performed which showed "a very large carcinoma which extends through the superior portion of the left hemithorax, through the apex and involves the left anterior chest extending to the anterior plural surface and invading the mediastinum with tumors surrounding the ascending thoracic aorta, extending along the aortic arch and encircling the proximal descending thoracic aorta." This patient died of lung cancer on 1/30/13.

## Delay in Obtaining Timely Appointment

Pontiac Death Review. The patient, [REDACTED], was a 42-year-old man who died of glioblastoma multiforme on 4/16/13. The tumor was first diagnosed in 2009, prior to his incarceration. He underwent excision in March 2009 and again in September 2010 for recurrence. He was admitted to IDOC in July 2012. He had a restaging MRI in October 2012 which showed no recurrence and his maintenance chemotherapy was discontinued.

A subsequent MRI on 2/1/13 showed recurrence of a low grade enhancing mass in his left temporal lobe and he was referred for neurosurgical consultation, but this was not scheduled until 4/10/13. However, on 4/1/13, he was found with altered consciousness and stroke-like symptoms and was taken to St. James Hospital, where CT showed significant edema around the mass and a 1 cm midline shift. He was transferred to UIC, where it was decided that the risks of surgery outweighed the benefits. The family decided to withdraw care on 4/15/13 and the patient died the next day.

A two-month delay in the neurosurgery consult is excessive, given the nature of the patient's diagnosis. Although his long-term survival would not likely have been much better, it seems likely that the delay allowed for enough tumor growth and associated swelling to preclude further treatment options for this patient and therefore shortened his survival.

## Delays in Processing the Approval

This is the case of a patient from Dixon whose is a 65-year-old male with hypertension, asthma, GERD and a positive TB skin test. On 11/20/13, the clinician ordered a CT scan of the chest to rule out a mass. The patient was presented at the collegial review a little over two weeks later

and on 12/4, an approval was obtained. Three weeks later, the authorization number was provided. The report, therefore, was done on 2/12/14, which indicates "suspicious for cancer." A request for a pulmonary consult was made and approved two weeks before our arrival and yet an authorization number for this still has not been provided.

**Delays in Following Up an Abnormal Result**
This occurred at Hill Correctional Center from a patient who arrived at Hill on 3/29/13. This patient had hepatitis C and a prior positive skin test. On 3/21/13, he went out for an ultrasound of the abdomen as recommended by the hepatitis C specialist. The ultrasound showed multiple masses in the liver in December 2013. This was reviewed by the physician nine days after the service was performed. On 3/7/14, the hepatitis C specialist saw the patient and recommended a CT scan. The CT scan was done on 3/21/14, but there were no results in the medical record. The patient had also had an abnormal ultrasound several months earlier which no one had acted on. We finally obtained the CT results, which showed that they are likely benign tumors of the liver; however, this patient is fortunate that despite the absence of follow-up his health is probably not in jeopardy.

**Problems with Follow Up**
This is a patient at Menard who was found to have an elevated prostate screening test and was referred to the urology clinic. He was seen there on April 8 and a recommendation was made for a transrectal-guided biopsy. This was referred to collegial review and was approved. The patient was seen and hopefully informed, but there is no note that documents the patient was aware of what was planned. We could not find any subsequent information other than the fact that a bone scan had been ordered, but there is no discussion with the patient regarding the bone scan. Nothing has happened regarding the prostate biopsy. There was also a delay in receiving any report from the offsite service.

Finally, at every facility, there were examples of patients who had received consultations or procedures but no follow up with the patient had occurred. This was quite common at some facilities, including Stateville and Dixon, and less common at others, although it was found almost universally at a rate of at least between 20% and 50% of all scheduled offsite services.

**Recommendations:**
1. The entire process, beginning with the request for services, must be tracked in a logbook, the fields of which would include date ordered, date of collegial review, date of appointment, date paperwork is returned and date of follow-up visit with clinician. There should also be a field for approved or not approved, and when not approved, a follow-up visit with the patient regarding the alternate plan of care.
2. Presentation to collegial review by the Medical Director must occur within one week.
3. When a verbal approval is given, the authorization number must be provided within one business day to the onsite scheduler.
4. When a scheduled routine appointment cannot be obtained within 30 days, a local resource must be utilized.
5. Scheduling should be based on urgency. Urgent appointments must be achieved within 10 days; if emergent, there should be no collegial review and there should be immediate send out. Routine appointments should occur within 30 days.

6. When the patient receives the service, the paperwork and the patient must be returned to the appropriate nursing area so that the nurse can identify what the needs are.
7. When the patient returns without a report, a staff member should be assigned to contact offsite services and obtain a report.
8. Either a nurse or the scheduler must be assigned responsibility for retrieving offsite service paperwork timely and this should be documented in the offsite service tracking log.
9. Nurses should contact clinicians for any orders.
10. When patients are scheduled for appointments, they should be put on a hold for as long as clinically necessary to complete the appointment before being transferred.
11. When the paperwork is obtained, an appointment with the ordering clinician or Medical Director must be scheduled within one week.
12. That encounter between the patient and the clinician must contain documentation of a discussion of the findings and plan.

## Infirmary

Each facility has an area designated as an infirmary within the health care unit except the NRC. To clarify, the NRC has an area designed and constructed as an infirmary but has chosen to not utilize the area since opening. As a result, inmates confined in the NRC are moved to the Stateville infirmary when that level of care is required.

Each of the infirmaries is staffed with at least one registered nurse 24 hours a day, seven days a week with the exception of Dixon, when one 11 pm to 7 a.m. shift every two weeks is staffed with a licensed practical nurse. It is our recommendation that all infirmaries are staffed 24 hours a day, seven days a week with at least one registered nurse available when patients are present.

It was observed there was no security staff presence in the Stateville and Dixon infirmaries. Security staff were posted outside the unit and made routine rounds through the infirmary; however, in the event of a security emergency, security staff would have to be called to report to the unit. It is our recommendation that at least one security staff member should be posted in the infirmary at all times.

Our review of infirmary care revealed deficiencies with regard to policy, practice and physical plant issues. In terms of policy issues, perhaps the most glaring is the lack of a description of the scope of services that can safely be provided in the infirmary setting. We encountered numerous examples of patients who were admitted to the infirmary with potentially or actually unstable conditions which should have been referred to a higher level of care (i.e., outside hospital). In several instances, this resulted in actual harm to the patients.

For example at Menard, Patient [REDACTED] had a history of cirrhosis and was admitted to the infirmary with recurrent active GI bleeding. Despite evidence of substantial blood loss, the patient was not sent to the hospital until the following day; he died at the hospital two days later.

At Illinois River, Patient [REDACTED] was admitted to the infirmary with rapidly progressive paralysis of the lower half of his body. Despite his requests to be sent to the hospital because he

could not move his legs, he was kept in the infirmary for two weeks, until finally a nurse intervened on his behalf and appealed to the doctor for transfer to the emergency department. He was found to have leukemia involving his spine and is now permanently wheelchair bound.

In another case at Illinois River, Patient [REDACTED], a 37-year-old diabetic, was admitted to the infirmary with symptoms highly suggestive of an acute stroke. During his infirmary stay, he continued to have neurologic episodes resulting in profound weakness and inability to function independently, yet was never sent to an outside hospital for proper diagnosis or treatment.

Wexford policy makes recommendations as to clinical scenarios which could be admitted to the infirmary and those which should not be admitted (i.e., should be referred to a higher level of care). While these recommendations are a good basis upon which to guide clinical decision-making, these criteria would be strengthened by clarifying that patients who are potentially or actually unstable should be referred to an outside hospital. "Stability" should be defined to some degree, for example, by vital sign parameters, mental status criteria, etc.

It should be mentioned here that during our site visits, when staff were asked to produce the policy governing infirmary care, the only document that was offered at any of the sites was the IDOC AD "Offender Infirmary Services" dated 9/1/2002. This document differs in important ways from the Wexford policy mentioned above, especially with respect to the care of patients under observation status or temporary placement. Under the IDOC policy, patients placed in the infirmary by nursing staff for 23-hour observation do not require evaluation by a clinician for admission or discharge and there is no requirement for follow up after they are released to the cell houses. In fact, it makes no mention of follow-up care for patients admitted to the infirmary either. In contrast, the Wexford infirmary policy stipulates that all patients placed on 23-hour observation have admission orders by the physician as well as an admit note and chart review, among other responsibilities. This is clearly not happening at any of the institutions we visited. The two policies were similar in that neither required a follow-up visit for patients after discharge from the infirmary.

Stateville, Pontiac, Dixon, Logan and Menard infirmaries have no or only a partial nurse call system, and there is not direct line-of-sight from the nursing station into each room. Dixon has a call system for some beds but not for others. A bell is provided that the patient can ring; however, if the patient drops or cannot get to the bell, he cannot call for assistance. At the other facilities, a patient must yell or beat on the door to get someone's attention. Hill and Illinois River Correctional Centers have a nurse call system for each bed in the infirmary. It is our recommendation that a system is provided which allows each patient in the infirmary to gain the attention of nursing staff.

A review of nursing infirmary documentation indicated, generally, the records contained physician and nursing admission documentation, patients were classified as chronic or acute and documentation was provided more frequently than required. Documentation was in the Subjective-Objective-Assessment-Plan (SOAP) format as required by the Department of Corrections Office of Health Services. Vital signs, intake and output, and weights were recorded as ordered by the physician for the acute care patients and pursuant to department policy for the chronic care patients. Medications were documented on each patient specific medication

administration record. It was observed that the quality of the documentation for chronic care patients decreased over time and became less and less medically informative.

It was observed at Stateville, Dixon and Pontiac that the infirmary bedding linens were in short supply and of poor quality, in that bedding, towels and washcloths were torn and frayed.

**Recommendations**:

1. It is our opinion a registered nurse should be readily available to address infirmary patient issues as needed.
2. In the large facilities, such as Stateville, Pontiac and Menard, where medical staff is assigned to work in multiple buildings/cell houses outside the main health care unit where the infirmary is located, it is recommended at least one registered nurse is assigned at all times to the building where the infirmary is located.
3. At all other facilities, it is recommended at least one registered nurse is assigned to each shift.
4. The infirmary policy should include specific clinical criteria which are appropriate for infirmary care, and those criteria which exceed the level of care which can safely be provided in an infirmary setting and would indicate referral to the hospital.
5. The infirmary policy should provide criteria outlining when patients are stable enough to be discharged from the infirmary and require follow up after infirmary discharge.
6. Develop and implement a plan to open and operate the NRC infirmary.
7. Develop and implement a plan to insure a constant security presence in the infirmary.
8. Develop and implement a plan to insure each infirmary patient is provided a nurse call device.
9. Develop and implement a plan of teaching/continuing education for nursing staff which addresses accurate and informative documentation.
10. The inconsistencies between the IDOC and Wexford infirmary policies should be rectified, specifically regarding the issue of 23-hour admissions/temporary placements.
11. The infirmary policy should clarify for nursing staff those criteria that are appropriate for temporary observation vs. those that require evaluation by a provider prior to release from the infirmary.
12. Ensure that institutions with infirmaries have at least one registered nurse available onsite 24 hours a day, seven days a week.
13. The infirmary policy should require follow up after discharge from the infirmary.
14. Develop and implement a plan to insure sufficient quality and quantities of infirmary bedding and linens.

## Infection Control

Infection control is a moving target across the system, with some facilities having well developed programs with others in their infancy. Part of the problem is the position of Infection Control Nurse (RN) is viewed as an add-on or additional duties rather than a separate and distinct job description with very specific functions. Just a few of the job duties for an Infection Control Nurse would be:

1. Develop, implement and manage the employee and inmate TB testing and surveillance program.
2. Conduct monthly documented safety and sanitation inspections focusing at a minimum on the health care unit, dietary department and cell houses/housing units with monthly reporting to the Quality Improvement Committee (QIC).
3. Develop and implement a plan to monitor food handler examinations and clearance for dietary staff and inmate food workers.
4. Develop and implement a plan to aggressively monitor skin infections and boils and work jointly with security and maintenance staff regarding cell house cleaning practices with monthly reporting to the QIC and facility administration as needed.
5. Interface with and report as needed to the County Department of Public Health and Illinois Department of Public Health.
6. Develop and implement a plan to daily monitor and document negative air pressure readings in the designated respiratory isolation rooms when the rooms are being occupied for respiratory isolation purposes and weekly when not.
7. Monitor all sick call areas to assure appropriate infection control measures are being used between patients i.e., use of a paper barrier on examination tables which is changed between patients or a spray disinfectant is used between patients, examination gloves and other personal protective equipment is always available to staff and hand washing/sanitizing is occurring between patients.

In order for the infection control nurse to perform all the responsibilities to which the IDOC has agreed, it is the opinion this would require a time commitment of at least 25% of the individuals time resulting in 10 hours a week equaling two hours a day devoted to infection control activities.

Another issue is that there is no Office of Health Services oversight since the retirement of the Communicable and Infectious Diseases Coordinator and the position has never been filled. Generally, facilities are providing tuberculosis testing and surveillance, HIV testing and treatment, food handler examinations and clearance.

Across all sites, infirmary linens were not being appropriately laundered and sanitized due to being laundered in residential style washing machines located in the health care unit and water temperatures did not reach a sufficiently high enough temperature nor was bleach used in order to render the linens sanitized. While the NCCHC standards do not specifically address infirmary linen laundering temperatures, the Office of Health Services Exposure Control Manual and the IDOC Administrative Directive 05.02.140 do because of the need to handle infirmary bedding and linens differently than general population bedding and linens. All infirmary bedding and linens must be treated as though they are contaminated because there is no way to insure that they are not. As a result, they must be laundered pursuant to Centers for Disease Control (CDC) guidelines to prevent cross contamination/infection of patients. The water temperature guidelines as outlined in A.D. 05.02.140 comply with the CDC guidelines.

With the exception of the Northern Region Reception Center which has no infirmary at present, all the other facilities inspected were laundering their infirmary bedding and linens in residential style washing machines located in the infirmary. Water temperatures measured at each of the

facilities, other than the NRC, were well below the minimum temperature of 140 degrees Fahrenheit. Additionally, as reported by the facility at the time of the inspection, hot water temperatures in the Illinois River institutional laundry were measured at 125 degrees Fahrenheit. If the infirmary bedding and linens had been laundered in the institution laundry, the hot water temperature still would not have been sufficient to decontaminant the bedding and linens.

It is recommended, in order to prevent cross contamination/infection of patients, infirmary bedding and linens be laundered pursuant to the guidelines detailed in the IDOC Administrative Directive 05.02.140.

In large congregate housing settings there is an increased risk of rapid development of outbreak of infections. The inmate population is currently at risk and will continue to be at risk if the infection control recommendations are not adopted and implemented. There is not currently, nor has there been for some period of time, any IDOC oversight and management of a system-wide infection control program. While each facility has been provided an infection control manual, the manual was developed several years ago, and the IDOC Office of Health Services Communicable Disease Coordinator position is vacant and has been vacant for some time. As a result, facilities are "doing their own thing" in regard to infectious disease surveillance, monitoring and reporting. Not all the facilities have a designated Infection Control RN and, as a result, the responsibility is added to the duties of either the Health Care Unit Administrator or Director of Nursing, neither of whom has the time to adequately do the job. For those facilities that have designated a specific RN as infection control nurse, some have developed a job description with specific responsibilities and other facilities have not. More importantly, individuals have not been provided training to know how to run an effective infection control program. While there is a recognized Office of Health Services Exposure Control Manual, during the course of the inspections, the facilities reported there was no training provided to health care unit/infirmary inmate porters at Dixon, Illinois River, Menard, Pontiac and Stateville. Additionally and as reported by the facility, there was no infection control program in place at the Northern Region Reception Center.

The Office of Health Services Environmental Health Coordinator has developed and implemented guidelines for the appropriate laundering and sanitizing of infirmary linens; however, the facilities are not following the guidelines. Infirmary linens are being washed in residential style washing machines located within the health care unit and water temperatures are not being monitored. At several of the facilities, the water temperatures were not hot enough to meet the requirements to properly sanitize infirmary linens. As a result, there is the potential for exposure and cross-contamination between patients as a result of improperly sanitized bed linens.

With the exception of the NRC, all the facilities have negative air pressure rooms to isolate patients with suspected respiratory infections with the emphasis being on tuberculosis infection. This being said, not all the facilities have a system in place to insure the rooms are at negative pressure, especially when a patient on respiratory isolation precautions is placed in one of the rooms. Similarly, not all the rooms have alarms, both audible and visual, to alert personnel if negative air pressure has been lost.

36

It was observed at several facilities that infirmary mattresses, examination tables and other equipment was in poor repair, in that the plastic protective covering was cracked or torn, making it impossible to properly sanitize the items between patients. These items need to be repaired or taken out of service, but no one is monitoring equipment to insure it is in good condition. Additionally, it was observed at several facilities that there was either no use of a paper barrier on examination tables which could be easily changed between patients or cleaning of table surfaces between patients. Again, this would be a part of the infection control nurse's duties to monitor and provide corrective action when needed.

These are just a few examples of the systemic issues due to the lack of central office oversight and management of an infection control program and which resulted in the infection control recommendations.

**Recommendations:**
1. Each facility is to do the following:
   a. Develop a position description and name an Infection Control (IC)/Quality Improvement (QI) registered nurse (IC/QI-RN) and provide training on communicable and infectious disease recognition, monitoring and reporting, and the Quality Improvement process.
   b. Develop and implement a plan for the IC/QI-RN to conduct monthly documented safety and sanitation inspections focusing at a minimum on the health care unit, infirmary and dietary department with monthly reporting to the Quality Improvement Committee (QIC).
   c. Develop and implement a plan for the IC/QI-RN to monitor food handler examinations and clearance for staff and inmates.
   d. Develop and implement a plan for the IC/QI-RN to monitor compliance with initial and annual tuberculosis screening, with monthly reporting to the QIC and facility administration as needed.
   e. Develop and implement a plan to aggressively monitor skin infections and boils and work jointly with security and maintenance staff regarding cell house cleaning practices with monthly reporting to the IC/QI-RN, QIC and facility administration as needed.
   f. Develop and implement a plan to daily monitor and document negative air pressure readings when the room(s) is occupied for respiratory isolation and weekly when not occupied.
   g. Develop and implement a training program for health care unit porters which includes training on blood-borne pathogens, infectious and communicable diseases, bodily fluid clean-up, proper cleaning and sanitizing of equipment, infirmary rooms, beds, furniture, toilets and showers.
   h. Monitor all sick call areas to insure appropriate infection control measures are being used between patients i.e., use of paper on examination tables which is changed between patients or a spray disinfectant is used between patients, examination gloves are available to staff and hand washing/sanitizing is occurring between patients.
   i. Develop and implement a plan to monthly monitor all patient care associated furniture, including infirmary mattresses, to assure the integrity of the protective outer surface with the ability to take out of service and have repaired or replaced as needed.

      j.  Interface with the County Department of Health and Illinois Department of Health and provide reporting as required by each.

      k.  Develop and implement a plan for the proper sanitizing of health care unit linens.

2.  The Office of Health Services to fill the position of statewide Communicable and Infectious Diseases Coordinator.

## Dental Program

While an executive summary is available for individual institutions, this report addresses the program weaknesses of the IDOC program as a whole. Concerns emerge when a majority of the institutions are deficient in the standard reviewed. Especially egregious practices and/or omissions are also mentioned in this report.

### Access to Care
**Orientation and Access to Care**
Access to care was inadequately detailed or not mentioned at all in the majority of the orientation manuals reviewed. Inmates do not receive adequate instructions on how to access urgent or routine care.

**Dental Sick Call Procedures**
The lag time between an Inmate Request Form for pain and alleviation of the pain was unacceptable. It often took four or more days for urgent care patients to be seen. Patients who are in pain should be able to access care within 24-48 hours.

**Broken Appointments**
The broken appointment rate was above 10% at several institutions and as high as 40% at three institutions. The latter are alarming rates.

### Quality of Care
**Screenings and Examinations**
Although a review of records revealed that the IDOC was in compliance with its screening examination policy, oral health instructions are omitted as part of the process. Rather egregious deficiencies were observed at the NRC during the screening exam. The exam was extremely cursory and did not include an adequate head and neck and soft tissue examination. The health history was sketchy and poorly documented. Radiology safety protocols were non-existent. Area disinfection and clinician hygiene between patients was very poor. Inappropriately, most dentists use this exam, the panoramic radiograph and the charting as a treatment plan from which to deliver routine care.

**Routine Care**
A review of records at each institution revealed that routine care was almost always provided without a comprehensive examination, a treatment plan, a documented periodontal assessment, a documented soft tissue examination, and without bitewings or other radiographs diagnostic for caries. Also, there was seldom a dental prophylaxis or oral health instructions provided prior to restorative care. Without these basic elements in place, quality routine care is almost impossible. As such, there is no real system in place to provide routine comprehensive Category 3 dental care.

**Removable Partial Dentures**
A review of records revealed that prior to construction of removable partial dentures, oral hygiene education and dental prophylaxis were seldom provided, the periodontium was not documented to be stable and restorative care was provided from inadequate treatment plans. Proper radiographs were seldom present. The radiographs and examinations/treatment plans were so incomplete or vague that it could not be determined if all necessary care was completed prior to impressions.

**Dental Extractions**
Although the number was relatively small, adequate radiographs were at times not available. A few records had no pre-extraction radiographs at all. A proper diagnostic reason for extraction was seldom part of the dental record. Documentation was, overall, very poor. In one institution, consent for treatment forms were not in use. Antibiotics were provided routinely after dental extractions at a couple of institutions.

**Continued Quality Improvement**
The dental contribution usually was limited to monthly statistics. Most dental programs had no studies, assessments or subsequent improvements in place. There is no peer review process in place within the IDOC dental program. There is little direction or meaningful oversight of the IDOC dental program to insure that proper policies and protocols are in place and followed, and that dental standards of care are practiced.

**Health History Documentation**
The medical health history section of the dental record was sketchy and incomplete. Conditions that require medical attention were not red flagged. Medical consultations were not documented in the dental record. The quality and consistency of the medical history in the dental record was inadequate. Blood pressures were not being taken on inmates with a history of hypertension.

**SOAP Format**
The SOAP format was not being used to document Category 1 and 2 patient encounters.

**Dental Policy and Protocol Manuals**
Institutional Policy and Protocol Manuals were usually very incomplete, outdated, or not present at all. Dental programs were implemented and managed with few guidelines and little oversight. The IDOC Administrative Directives are incomplete and provide little in the way of guidance on developing and managing a successful dental program.

Physical Resources
**Adequacy of Equipment**
Much of the equipment was old, corroded and badly worn. Cabinetry and countertops were usually badly worn, corroded or rusted, broken and not up to contemporary standards for disinfection. Non-functional equipment was not out of the norm.

Human Resources
**Dental Clinic Staffing**

Most staffing was adequate and in compliance with Administrative Directive 04.03.102, Section 9, a. b. c. Glaring omissions were the lack of dental hygienists at Dixon CC and Henry Hill CC. Dental hygienists are an essential part of the dental team.

**Safety and Sanitation**
In several institutions, proper sterilization flow was not in place. At one institution, spore testing of the autoclaves was being performed monthly rather than weekly. At another institution, bulk storage of biohazardous waste was maintained in the dental clinic proper in open, large cardboard boxes on palates. In none of the clinics were the sterilization area and the radiology area posted with proper hazard warning signs. Safety glasses were seldom worn by patients.

## Dental Program Management
The Administrative Directives are insufficient. They do not address quality of care issues, clinic management, record management or staff oversight and responsibilities. Dentist are provided no orientation to the IDOC dental program or training on how to manage their institution programs. This, in conjunction with inadequate quality assurance and peer review, suggests a lack of oversight on the part of the IDOC. There is not an administrative dentist to oversee and manage the IDOC dental program.

The policy mandating biennial routine examinations does not seem beneficial. It takes up a great deal of administrative time. Inmates have full access to dental care. Dentists should use their time providing this care, especially in light of the dental staffing guidelines.

**Dental Care Recommendations:**

**Orientation and Access to Care**
1. The IDOC develop a policy to insure that each institution has a meaningful orientation manual to instruct inmates how to access acute and routine care.

**Dental Sick Call Procedures**
1. Insure that inmates with urgent care needs be provided care within 24-48 hours.
2. That the SOAP format be used to document emergency and urgent care contacts.

**Broken Appointments**
1. The IDOC develop policies and oversight to address broken appointment rates over 10%.

**Screening Examinations**
1. Screening examinations at the reception center include a thorough, documented intra and extra-oral soft tissue examination.
2. The health history be more comprehensive and appropriate conditions red flagged.
3. Proper area disinfection and clinician hygiene be implemented.
4. Proper radiology hygiene be put in place.
5. That this screening exam not be used to develop treatment plans.

**Routine Care**

1. Routine comprehensive care be provided from a thorough comprehensive exam and treatment plans.
2. That the exam includes radiographs diagnostic for caries, a periodontal assessment, a soft tissue exam and accurate charting of the teeth.
3. That hygiene care and oral health instructions be provided as part of the treatment process.

**Removable Partial Dentures**
1. That removable partial dentures be provided as the last step in the comprehensive care process.
2. That all teeth are restored and the periodontium stable before impressions are taken.

**Dental Extractions**
1. Current diagnostic radiographs be present for every extraction.
2. A diagnosis or reason for extraction be part of the record entry.
3. A consent for care form be used for every extraction.
4. Antibiotics be prescribed only from an appropriate diagnosis.

**Continued Quality Improvement**
1. Every dental program develop a robust and meaningful CQI program to include ongoing studies and corrective measures that address identified program weaknesses.

**Peer Review**
1. The IDOC develop a clinically oriented peer review system and that dentists be available to provide these reviews, such that deficiencies in treatment quality or appropriateness can be corrected.

**Health History Documentation**
1. The IDOC develop a thorough and well documented health history section in the dental record.
2. That appropriate medical conditions be red flagged and that medical consultations and precautions be documented in the dental record.

**Dental Policy and Protocol Manuals**
1. That IDOC dental policy insures that all institution dental programs have well developed and thorough policy and protocol manuals that address all areas of the dental program. That all dental staff be familiar with these policies and protocols.
2. Policies are reviewed annually and amended as necessary.
3. An administrative dentist be available to oversee the IDOC dental program as a whole. This person could remain in the field as a part-time practicing dentist.

**Equipment Condition**
1. A system wide evaluation of existing equipment be performed and that unduly old, badly worn, rusted, corroded and non-functional units, equipment and cabinetry/countertops be replaced.

**Dental Clinic Staffing**
1. Dental hygienists be hired ASAP at Henry Hill CC and Dixon CC.

**Safety and Sanitation**
1. The IDOC insures that all dental programs follow current infection control guidelines as well defined by the Center for Disease Control, to include documented weekly spore testing of autoclaves.
2. Bulk biohazardous waste be properly stored outside the dental clinic.
3. Biohazard and radiology warning signs be in place.
4. Patients wear protective eyewear during treatment.

**Dental Program Management**
1. The IDOC evaluate its Administrative Directives and develop policies and protocols that provide meaningful guidance and oversight to the field on how to run and manage a successful dental program, to include all of the issues discussed in the body of this report. These policies should be guided by a risk assessment process that insures safe and well equipped clinics, adequate and well trained dental staff, treatment provided consistent with professional standards of care and in a timely manner, and thorough and complete record documentation.

## Mortality Reviews

The taxonomy used for the mortality reviews is described in detail in the attached Appendix B. It outlines 14 distinct types of lapses in care, with each lapse representing a serious deviation from the standard of care. Many cases had more than one lapse in care, and these are specified in the case descriptions. We chose to use this methodology which was developed by the California Prison Receivership because it has been certified by the Federal Court in *Plata v. Brown,* a case involving adequacy of medical care in the California Department of Corrections and Rehabilitation.

There were 127 deaths within IDOC between January 1, 2013 and June 1, 2014, 10 of which were violent deaths (suicides or homicides) and were therefore not reviewed for the purposes of this report. Of the remaining 117 mortalities, we reviewed 61 cases (52%), plus an additional two cases of patients who died in 2010, for a total of 63 cases. The details of each case are described in the attached Appendix B. There were one or more significant lapses in care in 38 cases (60%). This is an unacceptably high rate of deviations from the standard of care. Of those cases with significant lapses, 34 (89%) had more than 1.

The internal IDOC mortality review process is seriously flawed, in that the reviews are, for the most part, performed by the doctor most closely involved in the care of the decedent. This arrangement effectively precludes an objective review by definition. This is indeed what we found when we reviewed 20 (52%) of the death review summaries of the problematic deaths (listed in Appendix B); in none of them were any of the lapses in care identified.

Only a few deaths are reviewed by the Office of Health Services, and these are selected on the basis of lapses in care identified by the local review. As just stated, in none of the problematic

cases that we reviewed did the facility provider identify a problem with the patient's care, and as a result it is unlikely that any of these were independently reviewed at the central office level. One could argue that even a review by OHS is not truly an independent review. We recommend that all deaths be reviewed by an independent third party to provide an unbiased opinion on the quality of care, both from a clinical practice and a systems perspective. Those cases identified as problematic should then be reviewed by the Office of Health Services.

Many of the deaths that we reviewed were of patients who were chronically ill with terminal conditions. Yet there are no resources in place to assist health care staff in the care of patients who are dying or in the management of common end of life symptoms. It was obvious that once patients signed DNR (do not resuscitate) orders, they were often no longer treated for even simple reversible illness (for example, see patient #42 in the attached Mortality Review appendix). Even though DNR is an instruction not to use CPR under circumstances when it is known to be futile, often simple treatment with antibiotics or hydration or suctioning can be effective and diminish suffering. There should be a specific guideline or policy language that describes hospice or comfort care for terminally ill patients, and clarify that "do not resuscitate" does not mean, "Do not treat."

**Recommendations**:
1. All mortality reviews should be performed by an independent clinician. A regional nurse could do the initial review; those cases identified as potentially problematic and therefore requiring a secondary review should be evaluated by the central office regional physician, and not a "like" (i.e., Wexford) employee.
2. Policy should provide more specific guidance for end of life care. Specifically, this should clarify the important differences between "DNR," palliative care and hospice/end-of-life care.

## Continuous Quality Improvement

This is the program that is the basis by which health organizations, whether they be in the community or in correctional facilities, measure and identify the quality, process and professional performance with regard to many types of parameters. When that performance does not meet a set of expectations attributable to a well-run program, there must be an effort to learn the reasons why the performance is not up to standard and then once those reasons are identified, improvement strategies are designed to mitigate those reasons. A well-run quality improvement program looks at or reviews every major service provided at least annually. In the typical correctional program, for a non-reception center, the review would include:

1. intrasystem transfer services
2. sick call services, both general population and lockdown
3. chronic disease services
4. unscheduled onsite and offsite services
5. scheduled offsite services (consultations and procedures)
6. medication services
7. dental services
8. mental health services

9. laboratory and x-ray services
10. infirmary services
11. special diet services

Although this list is not meant to be exhaustive it does convey the types of health services provided in a typical prison. With regard to these services, a health care program assesses the quality of care provided by utilizing one or more of eight quality performance measures. Those measures include:
1. accessibility
2. appropriateness (correct clinical decision making)
3. effectiveness (outcomes)
4. efficiency
5. continuity of care
6. timeliness
7. safety (both avoidance of hazards as well as conformance with custody requirements)
8. quality of staff-patient interaction

In order to self-monitor quality performance measures such as timeliness or continuity of care, it is useful if not mandatory to maintain logs that allow the tracking of sick call services, urgent care services, chronic disease services, scheduled offsite services, etc. These logs facilitate an efficient review as well as data collection with regard to one or more of the quality performance measures utilized to assess the quality of services.

The Illinois Department of Corrections includes a policy on quality improvement that requires data collection with regard to many services. At some of the facilities that we reviewed, such as Stateville, NRC and Dixon, there had been very little recent quality improvement activity over the prior six to twelve months. In other facilities, although some data was collected it was never used to measure performance against standards and therefore was not part of an effort to measure the quality of the performance. It is expected that during the course of a year every service is assessed with regard to one or more of the eight quality performance measures.

We were unable to find, in any of the eight institutions we reviewed, documentation of such measurement. Only after such measurement has occurred and when the data indicates the performance is not adequate can there be an analysis of the reasons for the inadequate performance. Then tailored improvement strategies can be implemented to mitigate the reasons for the substandard performance. In none of the eight sets of minutes that we reviewed did we find anything remotely related to efforts to improve the quality of the program. Additionally, almost none of the assigned quality improvement coordinators had any formal training in quality improvement methodology. Therefore, it is not surprising that the programs designed to improve quality of service were ineffective.

Additionally, our mortality reviews identified a substantially high rate of occurrence of one or more serious lapses in care during the course of these deaths. Unfortunately, the internally performed mortality reviews identified none of these lapses. Given the inability of the existing mortality review process to accurately identify lapses in care which can then be the basis for training and implementation of opportunities for improvement, the system should contract with

44

outside contractors who have no potential conflicts of interest who can more objectively review these deaths. This is consistent with an overall quality improvement program that has not developed the capacity to identify problems and analyze the causes and, based on that analysis, implement improvement strategies. The overall quality improvement programs at all institutions need to be redesigned and restructured in a manner that effectively improves the quality of services.

In the United States, based on the direction from the Joint Commission on Accreditation of Healthcare Organizations, all health care programs, be they hospitals, clinics, surgicenters, etc., are required to be able to self-monitor and based on that self-monitoring determine whether performance is acceptable or not. When the performance is deemed not acceptable, they are expected to determine the causes or contributing factors to the unacceptable performance and then they are required to implement improvement strategies to address these causes. Finally, they are required to reassess the performance after the improvement strategies have been implemented. When hospitals, clinics or surgicenters do not have an effective quality improvement program they are not accredited by the JCAHO and as a result may lose the ability to receive federal dollars. The most important reason why JCAHO has developed this approach over the last 30 years is to facilitate a mindset within healthcare programs that focuses on protecting patients' safety and thereby reducing avoidable harm to patients. The same principles must apply to correctional healthcare services and the creation of an effective quality improvement program at every site is therefore critical to providing adequate care.

**Recommendations:**
1. A trained Quality Improvement Coordinator must be assigned to each facility.
2. Training for members of the line staff should also be provided.
3. Each facility's program should develop a calendar in which every major service is reviewed at least once a year.
4. When reviews are performed, they must utilize one or more of the eight quality performance measures.
5. Each local quality improvement program should be measured on the basis of the extent to which the program facilitates improving the quality of services.
6. The State should contract with one or more external quality reviewers for the mortality review process since the current process was extremely ineffective at identifying significant lapses in care and therefore ineffective in helping improve the quality of services provided.
7. Where the external reviews identify one or more lapses in care, the institution should be responsible for developing a corrective action plan which is provided to a regional nurse and the Medical Director.

# Conclusions

From the eight site visits, the interviews with staff and inmates, the review of institutional documents, the review of medical records, including death records and mortality reviews, we have concluded that the State of Illinois has been unable to meet minimal constitutional standards with regards to the adequacy of its health care program for the population it serves. This conclusion does not imply that there are not many dedicated professionals working within

the Department of Corrections, as recognized and appreciated by this team. When improvements are implemented, they will be better situated to achieve the outcomes they strive for.

# APPENDIX A

# Stateville Correctional Center

# (SCC) Report

February, 2014

Prepared by the Medical Investigation Team

Ron Shansky, MD
Karen Saylor, MD
Larry Hewitt, RN
Karl Meyer, DDS

# Contents

Overview ........................................................................................................................ 3

**Executive Summary** .................................................................................................... 3

**Findings** ..................................................................................................................... 5

Leadership and Staffing ............................................................................................ 5

Clinic Space and Sanitation ...................................................................................... 7

Intrasystem Transfer ................................................................................................. 8

Nursing Sick Call ...................................................................................................... 9

Provider Sick Call ................................................................................................... 11

Chronic Disease Management ................................................................................. 12

Pharmacy/Medication Administration .................................................................... 20

Laboratory .............................................................................................................. 21

Urgent/Emergent Care ............................................................................................ 22

Scheduled Offsite Services-Consultations/Procedures .......................................... 23

Infirmary ................................................................................................................. 24

Infection Control ..................................................................................................... 27

Inmates' Interviews ................................................................................................. 28

Dental Program ....................................................................................................... 29

Continuous Quality Improvement .......................................................................... 37

**Recommendations** ..................................................................................................... 38

**Appendix A – Patient ID Numbers** ......................................................................... 40

# Overview

On January 21-23, and February 24-25, 2014, we visited the Stateville Correctional Center in Joliet, Illinois. This was the first site visit to SCC and this report describes our findings and recommendations. During this visit, we:

- Met with leadership of custody and medical
- Toured the medical services area
- Talked with health care staff
- Reviewed health records and other documents
- Interviewed inmates

We thank Warden Michael Magana and his staff for their assistance and cooperation in conducting the review.

# Executive Summary

Stateville is a maximum-security facility. The current population for the entire complex (Northern Reception Center, Minimum Security Unit and Stateville proper) is 4078 inmates, approximately 1600 of whom were housed at Stateville proper, the focus of this report. The maximum-security unit has a 32-bed infirmary which serves the entire complex. There are four dialysis chairs at Stateville which can therefore accommodate up to 18 dialysis patients.

There is a major problem with access to care at this facility. Clinics are frequently cancelled due to lockdowns, staffing issues, and to a lesser degree by "no shows," thus resulting in delayed or missed chronic care clinics, telemedicine visits and sick call. In the charts that we reviewed, anywhere from 33% to 75% of scheduled appointments were cancelled for these reasons.

The Medical Director is a surgeon by training and chart reviews suggested that his primary care skills are not up to date. The other physician has more current skills, but ironically defers to the Medical Director for cases which are more complex or higher risk. Neither physician has access to any electronic medical references or resources; this decreases the likelihood that patients will be treated according to the most current accepted standards of care. This was indeed the case in many of the charts we reviewed.

A global problem with the chronic care program is that patients are not scheduled according to their degree of disease control, but rather by the calendar month. This is a statewide policy issue which needs to be corrected. We also found many instances in which patients' chronic diseases were not managed as aggressively as they should have been when their degree of control was poor. In many of the charts that we reviewed, the problem lists were not updated.

With regard to the diabetes clinic, the timing between insulin administration and the start of the meals can be quite variable, and feeding times change day-to-day, placing patients at

considerable risk of hypoglycemia. Patients requiring insulin are prescribed this therapy no more than twice a day. While this may be sufficient for many type 2 diabetics, physiologic insulin replacement (with 3-4 injections per day) is recommended for the majority of patients with type 1 diabetes.

We noted a disturbing pattern of treatment interruptions and delays in specialty care for patients with HIV infection. Telemedicine clinic visits were cancelled and postponed with similar frequency as other chronic care clinics due to lockdowns and security issues. However, compounding the problem for the HIV patients is that the onsite providers are almost completely uninvolved in managing or monitoring any aspects of patients' HIV disease. One of the consequences of this lack of involvement is that no one onsite is monitoring patients' medication adherence. Thus, when patients run out of medication or skip doses, it appears that no one notices until the patient's next ID telemedicine visit many months later. It is of crucial importance that patients not miss doses or run out of HIV meds, as this is highly associated with treatment failure and adverse outcomes.

A large part of the problem is a policy issue. The most recent copy of the Department's Chronic Illness Treatment Guidelines that we were provided did not even contain a section on HIV infection, or define an HIV chronic care clinic. Similarly, the Wexford HIV policy addresses exposure concerns for employees, but is essentially silent on the issue of HIV treatment for inmates. The facility has thus adopted a practice of leaving the entirety of HIV care to the ID consultant, access to whom is quite limited as already discussed. This has had the unfortunate effect of essentially disengaging the facility providers from any aspect of patients' HIV care. None of the HIV patients were enrolled in the chronic disease clinic in the formal way that other patients were enrolled; they were seen by the ID specialist only (and only when clinics were not cancelled as discussed above). While we would not expect the average primary care clinician to be facile in treating HIV disease itself, we would expect them to be providing primary care to this population. This would include actively monitoring this high-risk population for medication compliance, side effects, and the primary care complications related to the disease and its treatment, such as hyperlipidemia, diabetes and cardiovascular disease.

Patients admitted to the infirmary at Stateville were often not seen according to timelines described by policy, either by the clinicians or by the nursing staff. We were also surprised to observe several instances where patients' conditions were not managed as aggressively as their conditions warranted during their infirmary admission.

Stateville, given the fact that it is a maximum-security facility and houses many older and sicker patients, requires the services of a Health Care Unit Administrator dedicated specifically and exclusively to Stateville. In addition, the official staffing allocation is inadequate to meet the rather demanding medical needs. The response has been to allow for the hiring of additional staff; however, such a complex facility cannot be allowed to function on the basis of positions which can be deleted or delayed in terms of hiring on a moment's notice. The Stateville facility requires a designated number of nursing and primary care and medical records positions.

Most of the services at Stateville are frequently cancelled, due to either lock downs or "no-shows" or absence of health care staff. This results in substantial delays and sometimes problems

not ever being addressed. In addition, the absence of leadership and especially clinical leadership results in practitioner performance which is frequently ineffective with no chance of improvement because of the absence of review and feedback.

The intrasystem transfer process does not effectively insure continuity of care for patients who enter with prior diagnosed problems. In addition, the urgent/emergent responses frequently reflect problems with the initial assessment and response or with follow-ups after patients return from sendouts. Additionally, scheduled offsite services reflect persistent problems with the timeliness of access to these services or problems with follow-up once the service is provided. And finally, the quality improvement program, which should have identified the programmatic deficiencies and addressed them, is non-functional, including the responses to grievances.

Due to the maximum-security level of inmates housed in the facility, it is only necessary and appropriate that exam rooms be created in cell houses B, E and F to allow sick call to be conducted in the cell house, thus reducing the movement of inmates out of the cell house. In addition, the mealtimes, with breakfast starting at 2:00 a.m. and lunch at 9:00 a.m., cause real problems for the diabetics to maintain a normal diurnal variation with regard to eating and sleeping. Every effort should be made to move up the start of the morning meals to 3:30 a.m. at the earliest.

# Findings

## Leadership and Staffing

Staffing is difficult to assess as a result of Stateville and the Northern Reception Center (NRC) being viewed as one facility with one Schedule E of approved and budgeted staffing positions. This means there is a sharing of staff, particularly nursing staff, who are moved back and forth between the two facilities depending on a given activity or need. For example, when the intake process begins at the NRC, nursing staff at Stateville go to the NRC to assist with intake. As a result, the work being performed at Stateville stops and may not be restarted depending on the number of inmates going through intake and the length of time nursing staff are required to work at the NRC. Additionally, when nursing staff "call-off" work, scheduled staff has to be moved around to fill those vacancies. For example, if a nurse scheduled to work at the NRC does not report to work, a nurse at Stateville, who already has an assignment, is pulled off that assignment and sent to the NRC. Depending on the day of the week and how many nursing staff are working, this could result in the duties the Stateville nurse was originally assigned to perform not being done. A review of staffing schedules, "call-off" and overtime records showed a daily occurrence of nursing employees not reporting to work resulting in staffing adjustments shift by shift. The schedules reviewed indicated 100% of the time nursing staff was removed from their assignment at Stateville to fill a vacancy/need at the NRC. As a result, Stateville is chronically out of compliance with established policy for the timely completion of sick call, periodic physical examinations, chronic illness clinics and timely administration of medication. Compounding this problem is the significant number of "state" nursing position vacancies. For example, of 20 approved Correctional Nurse II positions, 10 are unfilled due to three vacancies and seven long-term leaves of absence. Also, of 18 approved Correctional Medical Technician positions, eight are unfilled due to two vacancies, and again, six long-term leaves of absence. In

order to help combat these staffing problems, the contract medical provider has been authorized to submit Adjusted Staffing Requests (ASRs) to hire staff outside of the authorized Schedule E budgeted positions. Currently, the contract medical provider has been authorized through the approval of an ASR to hire a total of 40 registered nurses (RNs) and licensed practical nurses (LPNs) over and above the budgeted Schedule E positions. At the time of the inspection, a combination of 27 RNs and LPNs had been hired.

With the view that Stateville and the NRC function as one facility, only one FTE Health Care Unit Administrator (HCUA) is approved to manage the health care programs at both facilities. Due to the significantly different missions of each facility and the high level of activity at each facility, it is strongly recommended that there is a full-time Health Care Unit Administrator assigned to each facility. Compounding this issue is the fact that the current HCUA is chronically absent and takes extended Leaves of Absence. At the time of the inspection, the HCUA was not available except for approximately four hours one morning at the NRC. The meeting had to occur at the NRC because the HCUA was no longer permitted by the warden to enter Stateville as a result of a leg brace the HCUA was required to wear. As a result, she is unable to provide any administrative oversight or monitoring of the health care program or provide any guidance to supervisory or line staff. The medical contractor Director of Nursing is managing the health care program and is quite competent.

Of additional concern is the lack of strong leadership at the NR, which further reinforces the need for a full-time HCUA position dedicated to the NRC to provide direction and oversight of the program.

The underdevelopment of the Stateville health care program is in part attributable to a Health Care Administrator position which is functionally vacant but is filled by a person on prolonged medical leave. The Medical Director position is filled by a surgeon who does not provide clinical oversight for the program. There is a functioning Director of Nursing employed by the vendor who appears to be working hard to keep the program afloat. The leadership vacuum, especially at such a complex facility, is responsible for the state of programmatic underdevelopment. This vacuum appears to have failed to identify or develop a strategy that addresses the overwhelming access problems related to lockdowns, etc.

Other staffing is listed in the following table:

*Table 1. Health Care Staffing*

| Position | Current FTE | Filled | Vacant | State/Cont. |
|---|---|---|---|---|
| Medical Director | 1.0 | 1.0 | 0 | Contract |
| Staff Physician | 1.0 | 1.0 | 0 | Contract |
| Nurse Practitioner | 1.0 | 0 | LOA | Contract |
| Health Care Unit Adm. | 1.0 | LOA | LOA | State |
| Director of Nursing | 1.0 | 1.0 | 0 | Contract |
| Nursing Supervisor | 1.0 | 1.0 | 0 | State |
| Nursing Supervisor | 1.0 | 1.0 | 0 | Contract |
| Corrections Nurse I | 0 | 0 | 0 | State |
| Corrections Nurse II | 20.0 | 10.0 | 3 vac. & | State |

| Position | Current FTE | Filled | Vacant | State/Cont. |
|---|---|---|---|---|
| | | | 7 LOA | |
| Registered Nurse | 0 | 0 | 0 | Contract |
| Licensed Practical Nurses | 7.0 | 7.0 | 0 | Contract |
| Correctional Medical Technician | 18.0 | 10.0 | 2 vac. & 6 LOA | State |
| Health Information Adm. | 1.0 | 1.0 | 0 | Contract |
| Health Info. Assoc. | 2.0 | 2.0 | 0 | Contract |
| Phlebotomist | 0.5 | 0.5 | 0 | Contract |
| Radiology Technician | 0 | 0 | 0 | Contract |
| Pharmacy Technician | 0 | 0 | 0 | Contract |
| Pharmacy Technician | 1.0 | 1.0 | 0 | State |
| Staff Assistant | 1.0 | 1.0 | 0 | Contract |
| Staff Assistant | 2.0 | 0 | 1 vac. & 1, 13 yr. LOA | Contract |
| Chief Dentist | 1.0 | 1.0 | 0 | Contract |
| Dentist | 2.0 | 2.0 | 0 | State |
| Dental Hygienist | 1.0 | 1.0 | 0 | Contract |
| Dental Assistant | 2.0 | 1.0 | 1 | Contract |
| Optometry | 0.2 | 0.2 | 0 | Contract |
| Physical Therapist | 0.4 | 0.4 | 0 | Contract |
| Physical Therapy Asst. | 0 | 0 | 0 | Contract |
| **Total** | **66.1** | **43.1** | **23 (19 state & 4 contract)** | |

# Clinic Space and Sanitation

The Stateville health care unit was clean, well lighted, reasonably well maintained and environmentally comfortable. It is a large unit consisting of four large inmate holding/waiting areas, an urgent care/emergency room, medication preparation room, medication storage, medical supply and storage, medical records department, four-chair dental clinic, a 32-bed infirmary and multiple office areas.

Inmate porters perform the janitorial duties.

The urgent care/emergency room was appropriately equipped. A random inspection of controlled medication, needles/syringes, sharp instruments and tools indicated all perpetual inventories were accurate and being counted at the appropriate intervals. Keys to access the previously mentioned items were appropriately restricted to on-duty medical staff. An automatic external defibrillator (AED) and emergency response kit are checked each shift to assure operability of the AED and adequate and appropriate emergency supplies. The dental clinic was very clean, well maintained and organized. The medical records department was less organized and

cluttered. The medication preparation and storage rooms were clean, organized and appropriately equipped with access restricted to medical personnel.

The infirmary is a large rectangle, two long hallways and two short hallways, with a nursing station centrally located in the middle of the rectangle.

Blood-borne pathogen precautions were being used in all areas as evidenced by the use of sharps containers, personal protective equipment available for use as indicated, the use of a licensed medical waste disposal company, the IDOC blood-borne pathogen manual being immediately available to staff and staff training on the subject matter.

# Intrasystem Transfer

In this area we look at how well the facility processes newly entering inmates in order to insure continuity of care. We reviewed 13 records of which seven had significant problems.

**Patient #1**
This is a 45-year-old male with hepatitis C who arrived at Stateville on 1/2/14. This patient had completed treatment for hepatitis C and yet the transfer summary lacks a description of this prior treatment.

**Patient #2**
This is a 45-year-old with hearing loss who arrived on 1/28/14. Again, the transfer summary lacks any documentation of the significant hearing loss.

**Patient #3**
This is a 38-year-old who arrived on 1/24/14. This patient, on arrival, had an elevated systolic pressure but was never referred either for monitoring or clinician visit.

**Patient #4**
This is a 26-year-old with mental health issues and polysubstance abuse who arrived on 1/2/14. In this record, the RN wrote on the transfer form, "vital signs not indicated." Vital signs should be expected without exception on all intrasystem transfers.

**Patient #5**
This patient arrived on 1/9/14, but the forms are blank.

**Patient #6**
This is a 29-year-old who arrived on 1/15/14 with a history of asthma and psychiatric problems. He was listed as his asthma being in good control without meds but there was no chronic care referral and no evaluation by a physician to determine whether the asthma should be described as resolved and therefore not in need of any follow up.

**Patient #7**
This is a 53-year-old male with hypertension and cataracts who arrived on 1/2/14. However, there is no transfer summary available in his record.

# Nursing Sick Call

Stateville uses a sick call request system for nursing sick call. Inmates wanting to access sick call complete a sick call request form that is available in the cell houses. Once completed, the inmate deposits the form directly into a locked medical drop-box which is located in each cell house. Each morning on the 7:00 a.m. to 3:00 p.m. shift, a correctional medical technician (CMT) who could be a licensed practical nurse (LPN) or a non-licensed staff member, collects and reviews each slip to determine which inmates need to be evaluated immediately versus those who can be scheduled over the next 72 hours. The CMT documents in a sick call logbook each inmate's name, number, date of request, date reviewed, date scheduled and the date to be evaluated. Inmates determined to need urgent care are referred to either a registered nurse (RN) or physician and evaluated the same day. Inmates determined to not have an immediate need are scheduled to be evaluated within 72 hours. Registered nurses (RNs) conduct sick call. Sick call in F-house, which is administrative and disciplinary segregation, is conducted three times a week, and sick call in cell houses B, C, D, E and X are conducted two times a week. Sick call is conducted in each cell house. A room has been designated on the bottom floor of each cell house for sick call; however, the rooms in cell houses B, E and F do not have an examination table. Security staff escorts each inmate to the sick call room. The RN evaluates the inmate and either treats the individual from a physician approved treatment protocol or refers the individual to the physician. Department of Corrections policy requires request slips are reviewed within 24 hours of receipt, and those individuals determined to have routine requests are scheduled and evaluated within 72 hours of request slip review. Per the Director of Nursing (DON), individuals with routine health care requests are evaluated within five days rather than the required three days.

It was reported that nursing sick call is frequently interrupted or terminated because security staff will make the decision to no longer escort inmates from the galleries down to the nurse sick call room on the first floor.

Ten nurse sick call records were reviewed as follows.

## Patient #1

This patient is a 55-year-old. He submitted a request slip dated 11/15/2013 complaining of severe abdominal pain with blood in stool; it was noted as received on 11/23. The request was reviewed by a CMT and scheduled for 11/25. He was evaluated by a RN 11/29. The SOAP note stated, "Patient complained of stabbing pain in abdomen and blood in stool for past six months." The RN noted no rebound or tenderness and bowel sounds in all four quadrants. The documented plan was to avoid fatty foods and he was referred to the physician on 12/18. He was evaluated in cardiac/hypertension clinic on 12/10, but abdominal pain and blood in stool were not addressed. He was not evaluated by physician on 12/18 due to no provider and was rescheduled for 1/9/2014. He was not evaluated by physician on 1/9 due to no provider and there were no further notes.

This patient had the same complaints in August 2013, and after submitting five requests, he was evaluated by the physician's assistant on 8/5/2013. There is a documented exam noting blood on exam glove after rectal exam and palpable internal hemorrhoids. The assessment was constipation, anal fissure and hemorrhoids. Fiber Lax and Annusol-HC suppositories were ordered. The patient's medical record reflects that he was not evaluated in sick call as scheduled on 8/19, 8/21, 8/28, 8/30, 9/9, 9/13 and 9/26/13 due to lockdown.

## Patient #2

This is a 58-year-old patient with diabetes and hypertension. He was evaluated on 12/23/13 in urgent care for complaints of stopping breathing when asleep, which wakes him with shortness of breath. Vital signs were collected and recorded; blood pressure was elevated at 148/98. There was no documented assessment or plan and he was instructed to return as needed. On 1/18/14 at 2:45 a.m., he reported to urgent care with complaints of chest pain. Vital signs were collected and documented and all were WNL. The physician was notified and an EKG ordered. The EKG was performed and reported to the physician, who ordered pain medication and Nitro 0.4 mg. SL and report back to physician in 30 minutes. The physician was contacted after 30 minutes and told that the patient reported he no longer had any pain. The patient returned to the cell house. At a cardiac clinic appointment on 1/21, the patient reported he no longer was having chest pain, but he frequently wakes up not breathing. This was not addressed in cardiac clinic.

### Patient #3
This patient is a 49-year-old. He submitted a request slip which was noted as received and triaged on 11/21/13 by a RN. He was evaluated by an RN on 11/25 for a complaint of sharp pain in his right rib cage area since playing handball a week previously. Vital signs were noted and all WNL. The patient rated his pain as 7 out of 10. No examination was noted. Acetaminophen two tabs TID for seven days were given and he was told to return as needed. There were no further notes.

### Patient #4
This patient is a 37-year-old. There is no documentation as to the date the request was received and triaged. He was scheduled to be evaluated 12/20/13 for complaint of stomach pain. He was noted as a no-show and rescheduled for 12/27. He was evaluated on 12/27 with a complaint of RLQ intermittent pain, no N/V or diarrhea and vital signs WNL. An abdominal examination noted with bowel sounds x 4 and RLQ protrusion when patient coughs. The assessment was hernia and he was referred to the physician. He was scheduled for 1/8/14, but not evaluated due to no provider. He was rescheduled for 1/21, but noted as a no-show. He was rescheduled for 2/4, but there were no further notes.

### Patient #5
This patient is a 37-year-old. There was a request noted as received and triaged 11/17/13 by a RN. He was scheduled for sick call 11/20 for complaint of URI. He was seen 11/20, but stated he no longer had any complaints and he was instructed to return as needed.

### Patient #6
This patient is a 47-year-old. There was a request noted as received and triaged 11/22/13 by a RN. There was a request to have a colonoscopy and it was scheduled for 11/30. He was not seen 11/30 due to no provider and was rescheduled for 12/7. He was not seen on 12/7 due to no provider and rescheduled for 12/11. Again, he was not seen 12/11 due to "time constraints," and rescheduled for 12/14. He was evaluated by a RN on 12/14 and referred to physician on 12/23 to discuss the procedure. He was not seen 12/23 due to no provider and there were no further notes.

### Patient #7

This patient is a 51-year-old. A request was noted as received and triaged 1/15/14 by a RN. He complained of abdominal pain and was scheduled for 1/18. He was previously evaluated on 1/2 for a compliant of constipation; Colace and Fiber Lax were ordered. On 1/10, he complained of

abdominal pain and was evaluated by a physician in urgent care. An abdominal exam was noted as WNL. H. pylori treatment was started and follow-up scheduled for 1/20. He was not seen on 1/20 due to no provider and was rescheduled for 1/22. He was seen by an LPN and rescheduled with the physician for 2/19. There were no further notes.

### Patient #8
This patient is a 32-year-old. He submitted a request slip complaining of testicular pain; there was no date on the slip and no date as to when the slip was received and triaged. He was scheduled for sick call for 1/22/14. He was seen by an RN and there was no documented examination. He was referred to a physician. He was evaluated by a physician on 1/23 and started on antibiotics. He was scheduled for follow-up on 2/19.

### Patient #9
This patient is a 32-year-old. He submitted a request slip complaining of weakness and weight loss; the request was dated as received and triaged 12/24/13. He was scheduled for sick call on 12/26. He was evaluated by an RN and scheduled for a chronic care clinic. There was no documented examination, assessment or plan and no documentation addressing weakness and weight loss.

### Patient #10
This patient is a 37-year-old. He submitted a request complaining of a dislocated thumb; the request was dated as received and triaged on 12/28/13. He was scheduled for sick call 1/3/14. On 1/3, the patient was escorted to the health care unit and evaluated by an RN. A preprinted sick call protocol form was completed but not date or time stamped. The patient was referred directly to the physician. The physician ordered "stat" lab work due to possible altered mental status, and x-ray of the left thumb. There was no documentation in the record of an x-ray being performed or any results. The note from the physician, which had no date or time, stated that the patient was informed he had a strained thumb which had healed. There was no further documentation.

## Provider Sick Call

We reviewed nine records of patients seen in PA sick call and six of the records contained some problems.

### Patient #1
This is a 31-year-old male who on 11/18/13 was referred for pain at the base of his neck. The assessment was appropriate but there is no use of a pain scale in order to quantify the severity of the pain. Neck films were ordered along with symptomatic treatment. The neck x-rays were negative and he was to be followed up in three weeks, but no visit occurred until more than two months later, at which time new treatment orders were issued.

### Patient #2

This is a 35-year-old with hypertension and obesity seen on 11/18/13 for bumps on the back of his head and also for renewal of blood pressure medicines. He was assessed as having folliculitis and the meds were reordered but not until nine days later.

**Patient #3**
This is a 35-year-old who was seen on 11/18/13 for back pain. He had been seen four days earlier by the Medical Director but back pain was not addressed. On 11/18 the CMT wrote, "No need to be seen because the patient had been seen by the physician four days earlier for the same problem." This was inaccurate. On 1/2/14, he was scheduled to see the physician but the record indicates "No provider present." Again, on 2/1 the visit was cancelled due to inadequate staffing for RN sick call. This patient has not been seen since these unresolved complaints.

**Patient #4**
This is a 49-year-old with a history of a fungal infection of his toenails as well as proptosis. He was to be seen on 11/19/13 for follow up of laboratory tests but was not seen until 12/16. Treatment was ordered in the progress note but we were unable to find the prescription. There was also a request for follow up in one month but this also never took place.

**Patient #5**
This is a 57-year-old with asthma and hyperlipidemia seen 11/21/13 for increased urination. Laboratory tests were ordered but never performed and therefore there was no follow up.

**Patient #6**
This is a 55-year-old who was seen on 11/21/13 for prostate problems. The patient has been on Flomax and he was to record the frequency of his symptoms and to return in 7-10 days. He was never seen in follow up but was seen 12/13 in his scheduled hypertension clinic, but the urinary problems were never addressed.

# Chronic Disease Management

There are two dedicated chronic disease nurses; one for the "high risk" clinics (HIV, hepatitis C, general medicine) and one for the more routine diseases (hypertension, diabetes, asthma, seizure). Likewise, the doctors' chronic care responsibilities are divided along the same lines. Patients are seen every four months regardless of degree of control, though Dr. D will often request follow-up visits in the interim. Unfortunately, these interim visits are frequently thrown off by lockdowns and instances of "no provider." Labs are reliably drawn timely before the chronic care appointments and all chronic diseases are addressed at each chronic care clinic visit, though this often requires the provider to fill out multiple forms for a single visit. Problem lists were frequently not up to date and we noted multiple instances of patients running out of their medications.

## Cardiac/Hypertension

**Patient #1**
This is a 54-year-old with diabetes, hyperlipidemia and coronary artery disease. His problem list was last updated in 1999 and does not list coronary artery disease. The patient had an MI in 2007 with stent placement, then another stent in 2008. He was seen in hypertension clinic on 5/24/13

complaining of chest pain, stating, "It feels like my heart pain." The physician noted the patient's history of coronary artery disease but did not get an ECG. Instead, the plan was to refer to Medical Director clinic for further evaluation of the chest pain and sublingual nitroglycerin was ordered as needed. She also noted that the patient's hyperlipidemia was under poor control but made no change to his medications.

She did refer the patient for ingrown toenail removal and saw him back for this on two different occasions.

The next note is dated 6/20, when the patient saw the Medical Director for dyspnea on exertion and exertional chest pain "as in 2007 and 2008 when he had cardiac stenting." He ordered a chest x-ray and ECG "this week" and referred the patient to cardiology. This was approved on 6/24, but not scheduled until 12/10, nearly six months later.[1] The x-ray was scheduled for 6/26, but not done due to lockdown. It was rescheduled for 6/28, but again cancelled due to lockdown. It was finally done on 7/10, three weeks after it was ordered.

His next chronic care visit was not until 9/27, at which time he denied chest pain or shortness of breath but was having palpitations. His LDL was still above goal at 129, so the physician stopped his simvastatin 20 mg and started pravastatin 40 mg (a higher dose of a less potent drug which essentially amounts to no change). She also ordered naproxen 500 mg twice a day routinely for six months, which is relatively contraindicated in patients with coronary artery disease. She noted "follow up with cardiology as scheduled," implying either that the six-month delay was acceptable to her or she was not aware of the scheduled appointment date. There are no further chronic care notes, though he was seen a few times for eye complaints and shoulder pain.

He then presumably went to his cardiology appointment on 12/10 and ended up being admitted to the hospital, as the next notes in the chart state that he was returning to the institution having undergone triple bypass surgery. He was admitted to the infirmary. There were no hospital notes or notes from the cardiology appointment.

*Opinion*: This patient presented with chest pain that seemed clearly anginal in nature; he even described it as identical to his known cardiac chest pain. The first doctor did nothing to work this up aside from refer the patient to her colleague, who is no more adept than she is. The Medical Director also took a very casual approach to the problem, evidently tolerating a six-month delay in specialty care for this potentially life-threatening problem.

## Patient #2
This is a 55-year-old man with hypertension, diabetes, hyperlipidemia, coronary artery disease and HIV, but his problem list mentions only diabetes and hypertension.

---

[1] We spoke to the scheduler about this excessive delay, who explained that UIC only allows a limited number of appointment slots for all prison referrals. She submits the list of patients who are approved for consultation to UIC and is later informed of the appointment information. She stated that if the provider wants the patients to be seen sooner, they can request that she arrange for the patient to see a local provider. However, there is no system in place to inform the providers of when the UIC appointment is going to occur.

At the 4/13/13 chronic care clinic his blood pressure was 140/103, but the patient had not had his meds that morning; there was no further exploration of this issue. The doctor ordered blood pressure checks and encouraged compliance. She ordered a follow-up visit in two weeks. He was scheduled on 5/4 and 5/8, but not seen due to lockdowns.

On 5/17, he was seen in chronic care clinic, at which time his blood pressure was 130/92 and lisinopril was added. His blood pressure remained elevated after that: 139/98, 130/94, 138/97, 142/84, 146/110, but he was not seen again by a provider until his next chronic care clinic five months later, on 10/15. At this visit, his blood pressure was 140/90 and again he had not taken his meds that day. The doctor ordered blood pressure checks weekly for six months but did not change his medication.

On 1/9/14, he was seen for a respiratory illness and his blood pressure was 130/94, which was not addressed.

He was scheduled for chronic care clinic on 1/17/14, but not seen due to "no show."

On 1/21 and 1/30, he was seen by the Medical Director for ongoing respiratory symptoms and his blood pressure at both visits was elevated (128/91 and 145/101) but not addressed.

On 1/30, the doctor reviewed his labs and requested a follow-up visit. He was scheduled for 2/1, but he was not seen due to "minimal movement per shift commander." He was rescheduled for 2/22, but not seen due to "no provider."

*Opinion*: This patient has not been seen timely for his inadequately controlled hypertension, nor has this problem been addressed with any vigor. There should be no such thing as a "no show" in a maximum-security prison.

## Diabetes

Breakfast is served during what most people would consider the middle of the night, 1:30 a.m. to 3:30 a.m. Diabetics get a snack bag at breakfast. A nurse is sent to the unit and waits until the food is there before administering the insulin. Lunch is between 8:45 a.m. and 12:40 p.m. and is served in the dining hall. Dinner may be served any time between 4:30 p.m. and 7:30 p.m. Patients on insulin get another snack bag at 3:00 p.m. Insulin lines are run at the health care unit prior to dinner; patients return to their cells until their tier is called. The wait times between the insulin administration and the beginning of the meal therefore can be quite variable. We were told that the feeding order changes daily due to security concerns. There are two insulin administration times a day; none of the diabetics were ordered insulin more frequently than twice a day.

We found problems in the following cases:

**Patient #3**
This is a 54-year-old with diabetes, hyperlipidemia and coronary artery disease. He was seen in chronic care clinic on 5/24/13 with diabetes control that had been deteriorating over the past

year. His A1c had gradually risen from 9.2% in August 2011 to the most recent value of 12.3% on 5/17/13, yet the provider made no changes to his insulin dose.

His next chronic care visit was on 9/27, at which time his A1c was 9.8%. His basal insulin dose was increased from 70 to 74 units at bedtime and sliding scale insulin was added. Follow up was ordered for 11/7 with another A1c prior; however, he was not seen that day due to lockdown. He was rescheduled for 11/9, but not seen that day "due to no provider." On 11/19, there is another note indicating that he was not seen "due to no provider." When he was finally seen on 11/26, it was to address an eye complaint, not his diabetes.

*Opinion*: This patient has not been seen timely for his diabetes and his disease has not been managed as aggressively as his poor control warrants.

## Patient #4
This is a 61-year-old diabetic with hypertension, hyperlipidemia, hypothyroidism and colon cancer. His problem list was last updated on 11/22/12 and does not list hyperlipidemia or hypothyroidism. His diabetes control has been improving over the past year and is now under good control. His chronic care clinics have not always occurred timely over the past year, though he has been seen for his chronic diseases four times since February 2013 and is under good control now.

His cancer care follow up has not been timely according to his most recent oncology report, which describes the patient being "lost to follow up" on two occasions, which resulted in delays in work up and treatment.

*Opinion*: This patient has not been seen timely for his cancer care, which has negatively impacted the timeliness of his treatment. His problem list needs to be updated.

## Patient #5
This is a 58-year-old man with diabetes, hypertension and asthma. His diabetes has been poorly controlled over the past year. At the 1/18/13 visit, his A1c was 10.7% and his metformin was increased. He was scheduled to be seen by the Medical Director on 1/29, 2/6, and 3/21, but was not seen on any of these dates due to "no provider." On 5/7, he was scheduled to be seen but was not due to a lock down. He was next seen on 5/30 in chronic care clinic, at which time his A1c had improved to 8.4%, but his metformin was discontinued due to renal insufficiency. There was no plan to monitor the effect of this intervention aside from following up routinely in chronic care clinic in four months.

On 7/24, his A1c was measured at 11.1%. This was reviewed by the doctor on 8/1, who ordered a follow-up appointment for 8/8, but patient was not seen due to lockdown. He was seen on 8/14, at which time the doctor acknowledged his poor diabetes control but did not adjust his medications.

On 10/2, he was seen in chronic care clinic and insulin was added. Blood work was ordered in four weeks and follow up in 5-6 weeks. He was seen on 11/6, but the doctor indicated that she did not have the lab results (though they had been resulted on 10/31) and so rescheduled him for

11/21. She noted his elevated A1c from the month prior but made no changes, given that his fingersticks were improved.

He was next seen on 1/15/14 in chronic care clinic. There were no new labs since October and no changes were made to his regimen.

*Opinion*: This patient had multiple interruptions in care due to custody and staffing issues. His diabetes does not appear to have been managed as aggressively as his poor disease control would merit. Blood work has not been well coordinated with clinic visits.

## HIV Infection/AIDS

There were 15 HIV infected patients at the time of our visit, all of whom were managed entirely by the ID consultant via telemedicine; the onsite clinicians were completely uninvolved in the care and monitoring of patients' HIV disease. This includes even the primary care aspects of the disease, such as monitoring for medication side effects, compliance and complications resulting from the disease and its treatment, such as hyperlipidemia and cardiovascular disease, which are inherently primary care issues. We think it is a mistake not to enroll these patients in the chronic disease program in the identical way that other patients are enrolled, because the end result is that this high-risk population is being monitored less diligently than other patients with chronic illnesses, despite their being more vulnerable in many cases.

There was a disturbing pattern of treatment interruption and delays in specialty care in the charts that we reviewed. The documentation in these charts was in a language of blaming the patient for running out of medication in nearly all cases. Considering there are only a handful of HIV patients at this facility, there is no reason that they cannot be monitored closely enough to ensure that treatment interruptions do not occur. The majority of the recent order sheets had been thinned from the health records, rendering it difficult or impossible to determine if medications were renewed timely or the specialist's recommendations were followed promptly after telemedicine encounters.

We reviewed six random records (40%) of patients with HIV infection. Of the 27 clinic appointments for which these patients were scheduled, only 10 were completed, for a cancellation rate of 63%. These cases are described below.

**Patient #6**

This is a 38-year-old man who was diagnosed with HIV/AIDS on 7/31/13, at which time his CD4 count was extremely low at 3. The PA saw him on 8/6, ordered appropriate labs and referred him to ID telemedicine. He was scheduled for 8/23, but not seen due to lockdown. He was scheduled to see the Medical Director on 8/22, but was not seen due to a lockdown. He was rescheduled for 9/11, but again not seen due to lockdown.

On 9/13, he was seen by ID telemedicine, who recommended he start on Bactrim, Azithromycin and Atripla urgently. The order forms had been thinned from the health record so it was not possible to determine if the recommendations were followed timely. The ID doctor wanted to see the patient back in six weeks, but the next telemedicine did not occur until January.

He was finally seen by the Medical Director on 10/3. Presumably, he had recently started on HIV therapy, but there was no discussion regarding side effects, compliance, etc. There was minimal physical exam – only a comment on his skin rash.

On 10/17, the PA wrote a note stating that she was informed by the patient's friend that the patient was out of his medication. He was not seen again until 1/3/14, when an RN quoted him as saying "Sometimes I don't always get my medication." There are no other notes in the chart, any chronic care forms or baseline intake for chronic care clinic.

On 1/7, he was seen in follow up by ID telemedicine, who noted that the patient runs out of medication for about a week each month. The consultant did not have access to the most recent labs which had been drawn on 1/3, but were not resulted until 1/9.

*Opinion*: This patient has had significant delays in accessing care with regard to specialty follow up and serious medication interruptions. It is of crucial importance that patients not miss doses or run out of HIV meds, as this is highly associated with treatment failure and adverse outcomes. Patients who are newly started on therapy need to be seen within a few weeks to evaluate for medication side effects and compliance with therapy. Patients who are newly diagnosed need particularly close monitoring and support.

## Patient #7
This is a 54-year-old man with HIV infection since 2004 who arrived at Stateville on 3/13/13. He was seen in ID telemedicine on 4/8, at which time no new labs were available. He was following up for an increased viral load from the prior visit, thought to be due to missed doses, so new labs were essential to this visit. The ID doctor therefore requested that these be done and faxed immediately and the patient be seen again in three months. Instead, he was scheduled for 8/23 (four months later), but not seen due to lockdown. He was rescheduled for 9/13, but marked "no show for HIV telemed due to security." A nurse's note states he was seen on 9/16, but there was no report in the chart. The next clinic was scheduled for November but took place on 12/18.

There were no onsite provider notes in the chart at all.

*Opinion:* This patient has not been seen timely in ID clinic and there have been disruptions in his medication continuity. Labs have not been coordinated with the ID telemedicine visits and he has received essentially no primary care since his arrival nearly a year ago.

## Patient #8
This is a 50-year-old man with HIV, end stage renal disease on dialysis, hepatitis C, hypertension, hyperlipidemia, SC trait and latent TB infection who was diagnosed with HIV in 1997. He has been seen timely for two of the last three ID clinics, the most recent being in December 2013. The latest clinic was delayed due to custody reasons. His viral load has been suppressed for at least the past year and he has been compliant with medications.

## Patient #9

This is a 55-year-old man with advanced HIV, first diagnosed in 1994, who is on "deep salvage" therapy. He also has diabetes, hypertension, coronary artery disease and hyperlipidemia, but his problem list mentions only diabetes and hypertension.

At the 8/5/13 ID telemedicine visit, the patient reported that he had only been getting half a tablet of his Intelence; it should have been 200 mg twice a day but on the MAR it shows that for several months it was ordered as 100 mg twice a day. The order sheets had been thinned from the record. At the follow-up visit in December, (one month overdue), this issue was not addressed. The more recent MARs reflect the appropriate dose.

*Opinion*: Considering that the patient's treatment options are very limited at this point, the magnitude of this error was particularly great.

**Patient #10**
This is a 51-year-old man with end stage renal disease on dialysis and HIV infection who arrived at Stateville on 10/9/13, but has yet to be seen by a facility provider since his arrival. He was seen by ID telemedicine on 12/18 and the provider requested labs, but it does not appear that these were ordered. In fact, there were no labs in the chart since the patient arrived at Stateville.

*Opinion*: This patient has not had blood work done timely and has not been seen by a provider at the facility since his arrival.

**Patient #11**
This is a 47-year-old HIV patient who has only been seen once in the past year by a facility provider. This was in June of 2013 when he was seen by the PA at the patient's request because he missed his lab appointment and his hemorrhoids were bothering him. HIV labs were ordered that visit but the patient was never seen by a facility provider again.

He was seen in ID telemedicine clinic in April 2013 at which time a three month follow up was requested. Instead, he was scheduled four months later on 8/6, but was a "no show." He was rescheduled for 8/23, but was not seen due to lockdown. On 9/13, he was a "no show for HIV telemed clinic due to security." He was seen on 9/16 per a nurse note, but there was no consult report in the chart. His most recent ID note was on 12/18.

*Opinion*: This patient has not been receiving adequate primary care. His HIV care has also not been timely.

## Pulmonary

We performed a detailed chart review of five random records of patients enrolled in the pulmonary chronic care clinic. In every case, multiple chronic clinic visits were cancelled due to lockdowns or the absence of the provider. On average, 38% of scheduled appointments were cancelled due to lockdowns or "no provider." If no-shows are also considered, the proportion of missed appointments exceeds half of all scheduled appointments (53%) for this sample.

**Patient #12**

This is a 33-year-old man with poorly controlled asthma. Attempts at providing chronic disease care over the past year have been as follows:

- 2/12/13 – Cancelled due to no provider
- 2/13 – No show
- 2/16 – Lockdown
- 3/6 – No provider
- 3/23 – No show
- 5/11 – No show
- 6/4 – Patient was seen. At this point, he was using his rescue inhaler daily due to allergies. His peak flow was 540 and he was deemed to be under "fair" control. Loratadine and Nasonex were added.
- 11/8 – No show
- 11/14 – No provider
- 12/3 – Seen. He was using his rescue inhaler multiple times daily. Peak flow readings were somewhat low at 520/500/490. Wheezing was heard on exam and his steroid inhaler was increased.
- 2/6/14 – Left without being seen
- 2/11 – Still using his rescue inhaler daily. Peak flow a bit low at 520/500/480. Meds renewed. Long discussion regarding medication usage.

There were no unscheduled visits for respiratory symptoms.

*Opinion*: This patient's asthma is poorly controlled given his daily use of the rescue inhaler. Therefore, he should have been seen more frequently for monitoring and medication adjustment. The majority of his scheduled chronic care visits did not take place for various reasons including "no show," which should be unheard of in a maximum-security prison.

**Patient #13**
This is a 45-year-old man with poorly controlled asthma. He was scheduled to be seen 12 times over the past year, but only four of these appointments were completed. On four occasions, he was not seen due to "no provider," including one occasion where this was personally written by the doctor. On three occasions he was marked "no show" and one visit was cancelled due to a lockdown.

On three of the four occasions that he was seen, he was using his rescue inhaler multiple times a day and required intensification of his treatment regimen.

During his 11/1/13 visit, he was using his inhaler four times per day and reportedly "coughing nonstop." He was wheezing on exam. Medications were added and a four-week follow-up visit was requested; however, he was not seen again for $3^1/2$ months due to three "no shows" and a lockdown.

*Opinion*: This patient has not received timely care for his poorly controlled asthma.

**Patient #14**

This is a 45-year-old man with asthma. His chronic care over the past year unfolded as follows:

On 2/1/13, the patient was seen for his annual chronic care visit. He reported that his last asthma attack was "a long time ago" and that he had run out of both his inhalers four months ago. His peak flows were low at 450/450/400. There was no wheezing on exam. Given his reportedly good control, his inhaled steroid was discontinued and the albuterol renewed.

On 6/1, he reported no recent attacks but was using his rescue inhaler twice a day. His peak flows were low at 450/450/450. Lungs were clear. His inhaled steroid was renewed and a chest x-ray was ordered.

On 8/21, he was scheduled but not seen due to a lockdown.

On 10/22, he reported that he had been using the rescue inhaler 3-4 times per day but ran out four months ago. His peak flows were low at 250/355/400. The inhaled steroid was increased and the rescue inhaler was reordered. The patient was discouraged from "overusing" his rescue inhaler.

On 10/28, he was not seen due to "no provider."

At the 2/4/14 visit, he reported that he was using his rescue inhaler twice a day. Peak flows were low at 400/400/425 and loratadine was added.

*Opinion*: This patient should not have run out of his inhalers. It seems distinctly possible that the patient was "overusing" his inhaler because his asthma was poorly controlled.

**Patient #15**
This is a 59-year-old man with asthma. In the past year, he was scheduled nine times and seen on five occasions. Twice he was not seen due to "no provider," once due to a lockdown, and once he left without being seen. Though his peak flows were low, he was relatively asymptomatic until October 2013, when he experienced an exacerbation due to allergies. He was treated appropriately and referred to nurse sick call for follow up.

*Opinion*: This patient had multiple interruptions in his chronic clinic visits.

# Pharmacy/Medication Administration

Boswell Pharmaceuticals, located in Pennsylvania, provides all prescription and over-the-counter medications for the facility. The service is a "fax and fill" system, which means patient prescriptions faxed to the pharmacy today by 2:00 p.m. will arrive at the facility the next day. Patient specific prescriptions, stock prescriptions and controlled medications arrive packaged in a 31-day bubble pack. Over-the-counter medications are provided in bulk by the bottle, tube, etc. A local "back-up" pharmacy is used to obtain medication which is needed immediately and is not available in stock. The medication storage area is staffed with one full-time pharmacy technician, and Boswell provides a consulting pharmacist to come on-site once a month to review prescription activity, to assess pharmacy technician performance and technique and to destroy outdated or no longer needed controlled medications pursuant to the requirements of the

Federal Drug Administration (FDA) and Drug Enforcement Agency (DEA). Inspection of the medication storage area revealed a clean, well-lighted and generally well-maintained area. An

interview with the pharmacy technician revealed a knowledgeable individual. Inspection of the area indicated tight accounting of controlled medications, both stock and return items, needles/syringes, sharps/instruments and medical tools. A random inspection of perpetual inventories and counts indicated all were correct. Inspection of the medication preparation room revealed a clean, well-lighted and well-maintained area. A random inspection of perpetual inventories indicated all were correct. Medication is administered by registered nurses (RN) and licensed practical nurses (LPN). Due to the cell houses being multi-tiered and not having elevators, nursing staff are unable to take medication carts to the cell houses or administer medication directly from the patient specific bubble pack. Instead, the nurse takes the appropriate dose from the bubble pack and places it in a small medication envelope which has been labeled with the inmate's name, number, name of the medication, the strength, the dosage and the cell number. The nurse then proceeds to each cell house, reports to security and is provided a security escort to go cell-to-cell. The cell houses have open-barred doors. The inmate is responsible to come to the door with a beverage and identification. The nurse positively identifies the inmate, pours the pills into the inmate's hand and observes as the inmate takes the medication, drinks and swallows. The nurse then conducts a mouth check to assure the inmate has swallowed the medication. The nurse repeats this process until all medications are administered. When completed, the nurse returns to the health care unit and documents the administration, refusal or absence on a patient-specific medication administration record (MAR). Observation of the process revealed administration by a LPN, who properly identified the patients, administered the medication, observed the ingestion, performed a mouth check and documented the administration on the MAR. Even though it is institutional policy that security staff escorts nursing staff during medication administration, after approximately 10 minutes, the security officer left the nurse and did not return. The nurse continued with medication administration until the cell house was completed.

## Laboratory

Laboratory services are provided through the University of Illinois-Chicago Hospital (UIC). The comprehensive services medical contractor provides 0.5 FTE of phlebotomy to draw and prepare the samples for transport to UIC. Results are electronically transmitted back to the facility, generally within 24 hours via secure fax line located in the medical department. There were no reports of any problems with this service; however, the phlebotomy position should be increased to 1.0 FTE. UIC reports all reportable cases to both the facility and the Illinois Department of Public Health. There is a current Clinical Laboratory Improvement Amendment (CLIA) waiver certificate that expires June 13, 2015 on file. There were no reports of any problems with this service.

# Urgent/Emergent    Care
## Offsite Services/Emergencies

We reviewed six records of patients sent offsite on an emergency basis. Four of the records demonstrate concerns with regard to either the responses onsite prior to the send out or the care following return. A common pattern throughout is the absence of emergency room reports.

### Patient #1

This is a 32-year-old male with a prior open reduction and internal fixation of the humerus after a motor vehicle accident in 2002. On 11/14/13, while lifting weights in the gym, a barbell accidently struck his head. He came to the medical unit and was treated symptomatically and was to be followed up in five days. One day later he complained of severe headache and dizziness. He was given cool compresses and referred to the physician. When seen by the physician three days later on 11/18, he was given a medicine used to treat migraines for two weeks. A day later an order was written for a lay-in and skull x-rays along with cold compresses and he was to be reevaluated in two days. On 11/20, he continued to complain of dizziness and so he was referred to RN sick call to be seen on 11/23. However, his visit from 11/23 was rescheduled to 11/25 and then to 11/27. Meanwhile, because of severe symptoms, on 11/21 he was sent to the emergency room, where he finally received a brain scan. Fortunately, the scan was negative and he returned to the prison and was seen on return by the physician. In our view there was a significant delay in accessing the necessary CT scan which could have early on provided some reassurance with regard to the nature of his problem.

### Patient #2

This is a 78-year-old male with asthma, hyperlipidemia, a history of a heart attack and hypertension. On 11/19/13, he complained of chest pain and was sent out a few hours later and returned four days later from St. Joseph's Hospital. On return he was seen by a nurse and sent to the infirmary. There were some hospital records in the chart, but most importantly no discharge summary. Several staff informed us that it was difficult if not impossible to obtain a discharge summary from patients sent to St. Joseph's Hospital. This patient was admitted for 23 hours to the infirmary and was discharged one day later. There is a note written in the chart by the physician which does not mention the patient's release to the housing unit. This patient's pain persisted and the patient was seen on 1/17/14 in the chronic care clinic. At that time, he indicated that he was using nitroglycerin for chest pain daily. His lipids were elevated. The patient was referred to the physician but still had not been seen as of 2/19. The Medical Director who tends to see these cases is booked up for a little more than a month. After our discussion this patient was seen on 1/24 by the physician.

### Patient #3

This is a 64-year-old male with coronary artery disease and prior stent placement along with hyperlipidemia, benign prostatic hypertrophy, rheumatoid arthritis and a prior cholecystectomy. On 12/6/13, he was sent out as a possible stroke. He presented with swollen hands and wrists and a sore neck along with a facial drop and he was very slow to respond. He was sent to the hospital via ambulance and returned a few days later. There is no discharge summary available; there was also no nursing note upon return. Apparently the hospital diagnosis was rheumatoid arthritis, a

flare-up, which does not really explain his slow responsiveness. He was followed up by an advanced level clinician on 2/11 and 2/16.

**Patient #4**
This is a 53-year-old male with a history of seizures, chronic chest pain and multiple stent placements. He has proven to be a difficult patient, with intermittent refusal of blood pressure medicines which then tends to lead to an elevated blood pressure and the presence of chest pain. He was admitted to the infirmary on 7/1/13 for a severely elevated blood pressure and released a day later when the blood pressure returned to normal. He also has occasionally been uncooperative with regard to vital signs. On 7/15, he refused his meds because they were crushed due to prior problems. He was counseled and scheduled to see the physician 10 days later, but a day later his blood pressure was found to be low as was his pulse and he was lightheaded. So he saw the physician urgently and the physician discontinued the use of crushed medications. He was placed in the infirmary for observation. On 7/26, he was noted to be in poor control with regard to his hypertension and on a recheck one hour later he was still poorly controlled. Despite this he was released to his cell house. At 10:00 p.m. the same day he was complaining of severe chest pain. The physician was called and the patient was placed in the infirmary for observation. The blood pressure at that time as well as a repeated blood pressure demonstrated poor control. Despite the poor control, he wished to return to his cell house. A day later, he indicates he feels his blood pressure is high and in fact it was severely elevated, along with a rapid pulse rate. A physician on call in the evening ordered medications, which were not successful in controlling the pressure for the next three days. Despite this he was eventually returned to the cell house. On 9/18, he complained of dizziness and his blood pressure was found to be extremely low. He was given IV fluids and sent to the hospital and returned five days later. At the time of return, his blood pressure was elevated but he had no complaints. He was sent for observation in the infirmary and seen by the MD one day later. Again, there is no discharge summary from the hospitalization. The absence of timely or any discharge summaries and also emergency room reports clearly compromises the ability of the onsite staff to timely and appropriately follow up on patient needs.

## Scheduled Offsite Services-Consultations/Procedures

We were informed that when an advanced level clinician orders a consultation or a procedure it is reviewed by the onsite Medical Director and if he concurs it is submitted to the Wexford UM program and discussed on Mondays with a physician in Wexford's central office. We were also told that if it is not approved, an alternate plan is recommended. Ultimately, once the approval is obtained the Wexford central office contacts UIC for the scheduling of the appointment. We learned, however, that sometimes more than a month can elapse after the approval before UIC receives the information regarding the approval.

We reviewed nine records of patients scheduled for either a consultation or a procedure. We reviewed these records with regard to the appropriateness and timeliness of the request as well as the timeliness of the service and the appropriateness of the follow up onsite. Six of the nine records demonstrated problems.

**Patient #1**

This is a 23-year-old male with type 2 diabetes and hypertension along with diabetic neuropathy and stage 4 chronic kidney disease. In addition, he also had erosive gastritis. On 10/30/13, he was scheduled for a vascular surgery consult regarding his chronic kidney disease. There is no report in the chart and no mention in any progress note since. The patient did go to the clinic but there has been no follow up.

## Patient #2
This is a 51-year-old male with type 2 diabetes mellitus who was scheduled for an ear, nose and throat consultation on 10/30/13. He had been sent there because of difficult to control epistaxis. He saw the ENT specialist and there is a nursing note upon return, but there has been no physician follow up and no orders written consistent with the ENT recommendations.

## Patient #3
This is a 53-year-old with no chronic problems who was scheduled for the vascular lab on 11/1/13. There is a note by the physician assistant regarding the pre-op meds and the vascular note is in the chart. There has been no follow up since by a physician.

## Patient #4
This is a 39-year-old with scoliosis who was referred to ortho and had an appointment scheduled for 10/28/13. The report demonstrated a left meniscus tear for which an MRI of the knee and the C spine were recommended, along with an EMG of the left upper extremity. There is a nurse return note but no physician follow up note and no orders.

## Patient #5
This is a 70-year-old who had a GU appointment scheduled for 11/6/13. This was to follow up on prostate cancer, which did not appear on his problem list; the list did include glaucoma. The report indicates that the patient needs a CT scan and a bone scan. There is no physician follow up note but there is a nurse note which indicates the patient went for the CT scan, but there is no report from the CT scan nor are there any follow up notes by a physician.

## Patient #6
This is a 47-year-old male with sickle cell trait and asthma who was sent to general surgery for an appointment on 10/28/13 for an evaluation of a right inguinal hernia. The patient went and there is a return note by a registered nurse. There is a report from the general surgeon in the chart which recommends right inguinal hernia robotic repair. There has been no follow up of any kind.

# Infirmary

The infirmary is located within the Health Care Unit. The infirmary floor plan is a rectangle, two long hallways and two short hallways. The nursing station is located in the center of the rectangle and has access to both long hallways. Patient rooms are located along the outer perimeter of the rectangle. Access to the infirmary is controlled by security staff posted just outside the infirmary. The unit is staffed 24 hours a day, seven days a week. Staffing consists of both RNs and LPNs with at least one RN on duty each shift. There are a total of 32 infirmary beds configured as 10 single cells and 11 double cells. Included in the cell configuration are two negative air pressure respiratory isolation rooms.

The beds in the 10 single rooms are an all-metal frame with a thin plastic covered mattress and 18 to 24 inches off the floor. The beds in the remaining eleven rooms are a combination of traditional single beds and hospital beds. Only five of these 22 beds allow for the head or foot to be elevated. These beds do have a thicker plastic coated mattress and are located higher off the floor. On the day of the inspection, there were a total of 28 patients classified as follows:

1. Five mental health
2. One hunger strike
3. Two acute care patients; one uncontrolled diabetic and one follow-up heart attack and uncontrolled blood pressure
4. Twenty classified as chronic care

As reported by nursing staff, the patients requiring the most care are noted as follows:
1. Two paraplegic patients
2. One patient with cancer of the prostrate which has metastasized to the spinal cord
3. One post-stroke patient
4. One Alzheimer patient
5. One cancer patient

A review of the medical records of the patients in these five categories revealed more frequent visits and documentation by the physician than required by policy. Nursing staff, too, was documenting more frequently than required by policy. Review of the documentation indicated provider specific issues as to the frequency, quality and completeness of documentation. Inmate porters perform the housekeeping/janitorial duties and are supervised by both nursing and security staff. There is no evidence inmate porters receive any specialized training in regard to appropriate cleaning and sanitizing in the health care unit.

There is a 32-bed infirmary. At the time of our visit, there were 24 Stateville inmates in the infirmary, six from NRC and two empty beds. Of the Stateville inmates, 14 were chronic/long term admissions, five were for mental health reasons and five were for acute illnesses. One of these acute admissions was a man on a hunger strike, and two of the four remaining had been discharged the morning of our visit.

The Medical Director stated that he rounds daily but does not always write a note. Indeed, according to our record reviews, it appeared that patients were not seen as frequently as policy dictates, either by the physician or by the nursing staff. We also had concerns regarding the quality of the health care provided to the patients, as outlined in the cases below.

We reviewed the following acute admissions.

### Patient #1
This is a 54-year-old with diabetes, hyperlipidemia and coronary artery disease who had bypass surgery in December 2013 and was admitted to the infirmary upon his return on 12/24. There were timely notes by the Medical Director until 12/30, but then none for two weeks. Of the 62

shifts the patient spent in the infirmary, there were 23 nursing notes. There were nine days which had no notes by any health care provider.

On 1/2/14, an RN note indicates that the patient went out to see cardiology for follow up; however, there is no note from cardiology. When we requested the cardiology notes and discharge summary, we were told that both UIC and St. Joe's require an authorization for release of information form before they will send reports.

*Opinion*: This patient was not seen according to policy either by the physician or by the nursing staff.

## Patient #2
This is a poorly controlled type 1 diabetic who was admitted to the infirmary on 2/4/14 for diabetic control. He also has hypertension, hyperlipidemia and hypothyroidism. He was managed on twice-daily NPH and regular insulin plus sliding scale.

As of the date of our visit (2/24), he had been seen on average once per week (February 4, 6, 11, 19, 24) by the physician. There were nurses notes at least daily on 18 of the 21 days he had been in the infirmary, but on three days, there were no notes at all (provider or nurse); February 12, 15, 17.

Shortly after his admission (2/6), blood work revealed that the patient's thyroid medication dose was too high (low TSH, high T4). This report was signed by one physician with attention to the other, but neither doctor adjusted the thyroid medication dose.

On the same lab report, the patient's potassium was found to be elevated (5.5) and he was on several medications known to cause hyperkalemia, including an ACE inhibitor and aldactone. No changes have been made to the meds and the potassium has not been checked since.

*Opinion*: This patient was not seen timely according to policy. We discussed this patient's lab abnormalities with the Medical Director, who had a plan in mind, but this was not articulated in the health record.

## Patient #3
This patient was admitted for acute care on 2/17/14 via telephone order after he was discharged from St. Joe's following an acute MI. He was returned from the hospital to Stateville on 2/19. Staff requested hospital reports but were basically provided only a cardiology consult and some laboratory results. Notably absent was a discharge summary which would have been critical to understanding the hospital's findings and recommendations. The Medical Director did the admission note on 2/19 and saw the patient again on 2/24. The patient's blood pressure has been uncontrolled for the entirety of his stay in the infirmary, with multiple dangerously high readings (170/60, 200/80, 220/78, 190/80, 218/70, 180/68, 210/70, etc.), but these readings were often not addressed.

On 2/20, the patient's blood pressure was 220/78 and 190/80 on recheck. The Medical Director was notified but no new orders were obtained.

On 2/21, the patient's blood pressure was 170/70 and the RN noted "MD aware," but took no new orders. Later that day, the LPN called the Medical Director three times and left messages for blood pressure readings of 190/80 and 160/68, but no new orders were received.

On 2/22, the nurse contacted the Medical Director for a blood pressure of 201/70 and received an order to start hydrochlorthiazide 25 mg/d. Later that evening, the nurse called back to report that the blood pressure was unchanged. The Medical Director responded by switching one of his blood pressure medications to another similar drug, which resulted in essentially no change at all.

The next day, the patient's blood pressure was better initially (117/52, 124/56) but by evening it was back up to 188/92.

On 2/24, the physician saw the patient, whose blood pressure was 186/84. He noted, "blood pressure not controlled yet," but made no medication changes.

*Opinion*: This patient's blood pressure has not been managed adequately, particularly in light of his recent heart attack.

**Patient #4**
This is a 60-year-old male with a history of hypertension, peptic ulcer disease, hepatitis C, COPD and he returned status post tracheostomy. He was admitted to the infirmary at Stateville after return from UIC on 1/25/14. In a progress note, his acuity level is described by the physician but there is no order and there were several days in February with no nursing notes, including 2/17, 2/18 and 2/22. This case is a reflection of the confusion around the use of an acuity level that determines the minimal frequency for both advanced level clinician as well as nursing assessments.

# Infection Control

There is a named infection control nurse who is responsible for compliance with IDOC policy concerning communicable diseases, blood borne pathogens and compliance with Illinois Department of Public Health reporting requirements. Additionally, this nurse is responsible for the HIV and Hepatitis C clinics.

The facility has a contract with a large national medical waste disposal company which comes on-site two times per month to haul away medical waste. There were no reported issues with this service.

Inspection of the infirmary, urgent care/emergency room, dental clinic, sick call areas in the medical department and cell houses and emergency response bags verified the presence of personal protective equipment. Puncture proof containers for the disposal of sharps are in use in all medical areas and are appropriately placed in the medical waste containers when full.

Inmates assigned as "porters" in the Health Care Unit and who perform janitorial duties may or may not have received any training as to appropriate cleaning and sanitation methods. They are

required to watch a blood-borne pathogen educational video and are supervised by both nursing and security staff.

Reportable STIs are picked-up and reported by UIC.

There are two negative air respiratory isolation rooms located in the infirmary. Both visual and audible alarms indicate when negative air has been lost. Additionally, nursing staff conduct a negative airflow tissue test daily when the rooms are occupied and weekly if not.

All mattresses on the infirmary beds are plastic coated and are cleaned and sanitized between patients and as needed.

When required, the infection control nurse interfaces with the County Department of Public Health and the Illinois Department of Public Health (IDPH). The nurse monitors, completes and submits to IDPH all reportable cases. Skin infections and boils are aggressively monitored, cultured and treated. Health Care Unit nursing staff conduct monthly safety and sanitation inspections in the dietary department and perform pre-assignment "food handler" examinations for staff and inmates to work in the dietary department. A tour of the health care unit, including the infirmary, verified personal protective equipment (PPE) available to staff in all areas as needed. Additionally, PPE is included in the emergency response bags and in the cell house sick call rooms. Puncture proof containers for the disposal of syringes/needles and other sharp objects are in use in all areas of the health care unit as needed and in the cell house sick call rooms. The facility uses a national commercial waste disposal company for disposing of medical waste. Institutional staff is trained in communicable diseases and blood-borne pathogens.

# Inmates' Interviews

Five insulin dependent inmates were interviewed. All five had been diagnosed several years previously, and all five were knowledgeable regarding their chronic disease. All five were knowledgeable regarding the significance of their hemoglobin A1c blood level. Four of the five knew the results of their most recent hemoglobin A1c blood level. All five reported being evaluated by the physician every 3-4 months and having the ability to perform blood glucose monitoring prior to the administration of insulin. All five were of the opinion that the physician responsible for their diabetic care does a "good job."

All five patients voiced the following issues:
1. Very little educational literature provided/available
2. Difficulty obtaining medication when first ordered and sometimes with refills
3. Difficulty receiving shoes ordered by the physician because they are denied by the medical vendor
4. No podiatry care
5. No on-site dietician
6. When evaluated by an off-site specialist, there is difficulty getting back to see the specialist and the institutional medical vendor does not follow the suggestions/orders of the specialist

7. Security staff not following physician orders, i.e., not allowing plastic basins for foot soaks
8. Being cuffed from behind too tightly and for too long
9. Breakfast starting between 1:00 and 2:00 a.m.; lunch starting at 9:00 a.m.
10. Sometimes receive insulin prior to eating and sometimes after eating.

# Dental Program

## Executive Summary

On May 21 and 22, 2014, a comprehensive review of the dental program at Stateville CC was completed with the following observations and findings.

The clinic itself is rather large and well equipped. Cabinetry and countertops are old, worn and damaged, making proper disinfection almost impossible. It is time for replacement. Although the staffing level for the providers is adequate, the lone dental assistant is overworked and often not available to assist at chair side. A second dental assistant should seriously be considered.

A major area of concern was that comprehensive care was provided without a comprehensive intra and extra-oral examination and well-developed treatment plan. A documented soft tissue examination was not provided nor was periodontal assessment part of the treatment process. Appropriate radiographs were not always available and provision of hygiene care and prophylaxis was inconsistent. Oral hygiene instructions were seldom documented.

Another area of concern was dental extractions. All dental treatment should proceed from a documented diagnosis. The reason for extractions should be part of the record entry. This was often not the case. Also, proper diagnostic radiographs were not always present. This is a serious omission. Antibiotics were often prescribed prophylactically after extractions with no diagnosis, or indication why there were provided. This is not a standard of care.

Partial dentures should be constructed as a final step in the sequence of care delivery included in the comprehensive care process. A record review revealed that all partial dentures proceeded without a comprehensive examination and treatment plan. Periodontal assessment and treatment was not provided. Oral hygiene instructions were seldom included. It was almost impossible to demonstrate that all fillings and extractions were completed prior to impressions. Periodontal health was never documented.

At Stateville CC, sick call is accessed through the inmate request form. There was no real triage system in place to evaluate urgent care needs, i.e., pain and swelling. Inmates with urgent care complaints from the request form often took six to seven days to be seen by the dentist or other appropriate health care provider. These inmates should be seen within 24-48 hours from the date of the request form.

In none of the records reviewed was the SOAP format being used. Treatment was provided with little information or detail preceding it. Record entries did not include clinical observations or diagnosis to justify treatment.

A well-developed Policy and Procedural Manual insures that a dental program addresses all essential areas and is run with continuity. The Policy and Protocol manual at Stateville CC only addressed dental personnel and their duties and responsibilities. This is not at all adequate. Issues such as access to care, dental services, provision of care, clinical management, infection control, etc. were not included at all.

Failed appointments were a real problem at Stateville CC. A rate as high as 40% was found. This is an unacceptably high percentage and reflects a real difficulty in getting inmates to the dental clinic for appointments. This results in delayed and inconsistent treatment. The problem is compensated for somewhat by over scheduling, but this is not an acceptable, long-term solution.

Medical conditions that require precautions and consultation with medical staff prior to dental treatment should be well documented in the health history section of the dental record and "red flagged" to bring them to the immediate attention of the provider. The precautions taken should also be well documented in the record entry. Anticoagulant therapy is a good bellwether condition to track the above. In three of the six records reviewed, no health history was documented at all on the dental record. None of the records were "red flagged" for anticoagulant therapy or any condition requiring precautions.

Blood pressures should, at the least, be taken on patients with a history of hypertension. When asked, the clinicians indicated that they do not routinely take blood pressures on these patients.

Although dental contributes to the Continuing Quality Improvement program at Stateville CC, it should invigorate and expand the CQI process to address the weaknesses outlined in this report.

## Staffing and Credentialing

Stateville CC has a dental staff of one full-time dentist, one 20 hour part-time dentist, two full-time assistants, and a full-time hygienist. This should be adequate to provide meaningful dental services for Stateville's 2000 inmates. Dr. Mitchell is employed by the IDOC and all the rest of the staff are contracted by Wexford Health Services.

CPR training is current on all staff, all necessary licensing is on file, and DEA numbers are on file for the dentists. The number of dentists and hygienists is adequate to meet the needs of this institution. The lone assistant is overworked in a clinic with this many dentists. On the whole, this is a strong team that works well together to create a very busy and smooth running clinic.

**Recommendations:**
1. Serious consideration should be given to hiring a second dental assistant. The lone assistant has too many duties to perform and the dentists are often left working without an assistant. This is professionally very unrewarding and can present risks to the patient. All surgeries should be performed only with an assistant.

## Facility and Equipment

The clinic consists of four chairs and units in a spacious single room area. One of the units is dedicated to hygiene care. The dental units were rather new and in good condition. The chairs were over 20 years old but were not torn or overly worn, and functioned well. Cabinetry was very old and worn. Counter tops were broken, corroded and badly water damaged in one of the corners. There was extreme water damage in the cabinet under the sink. Work surfaces were badly pitted and catered from use. Plexiglas was placed over these surfaces to provide a smooth work surface capable of disinfection. The x-ray unit is in good repair and works well. The autoclave is rather new and functions well. The compressor is in good repair. The instrumentation is adequate in quantity and quality. The hand pieces are older but well maintained and repaired when necessary. The ultra-sonic unit was not working at the time of my visit. I was told that a request for repair had been submitted.

Again, the clinic itself consisted of four chairs in a spacious work area. Free movement around each unit was acceptable Providers and assistants had adequate room to work, and none of the chairs interfered with each other. There was a separate large sterilization and laboratory area of adequate size. It had a large work surface and a large sink to accommodate proper infection control and sterilization. Laboratory equipment was in a separate area of this space and did not interfere with sterilization. The staff had a separate rather small room for office space.

**Recommendations:**
1. Replace the cabinetry and countertops as they are very old, worn and irreversibly damaged. Proper infection control is almost impossible on these surfaces.

## Sanitation, Safety and Sterilization

We observed the sanitation and sterilization techniques and procedures. Surface disinfection was performed between each patient and was thorough and adequate. Proper disinfectants were being used. Protective covers were utilized on some of the surfaces. Unit recycling was thorough and adequate. All in all, the clinic was neat, clean and orderly.

An examination of instruments in the cabinets reveals that all were properly bagged and sterilized and stored. No instruments were maintained in bulk. All handpieces were sterilized and in bags.

The sterilization procedures themselves were adequate and proper. Flow from dirty to clean to sterilized was improper, as bagging of instruments was done in front of the ultra-sonic unit. Cleaned instruments were passed back over the dirty area. The ultra-sonic was not functioning at the time of my visit.

There was not a biohazard label posted in the sterilization area. Safety glasses were not always worn by patients. Eye protection is always necessary, for patient and provider. I also observed that no warning sign was posted where x-rays were being taken to warn pregnant females of possible radiation hazards.

## Review Autoclave Log

A review of spore testing logs revealed that a "Maxi-test" in office biological indicator system was in use. The incubator was maintained in the sterilization area. The results were logged weekly. There was a gap in logged results from the last week of January to the first week in April with no real explanation provided. I was assured that the testing was done during this period. It is essential that these logs be accurately maintained over a long period of time.

**Recommendations:**
1. That the sterilization spore testing log be accurately maintained and kept on record indefinitely.
2. That safety glasses be provided to patients while they are being treated.
3. That a biohazard warning sign be posted in the sterilization area.
4. A warning sign be posted in the x-ray area to warn of radiation hazards, especially pregnant females.

## Comprehensive Care

We reviewed 10 dental records of inmates in active treatment classified as Category 3 patients.

One of the most basic and essential standards of care in dentistry is that all routine care proceed from a thorough, well-documented intra and extra-oral examination and a well-developed treatment plan, to include all necessary diagnostic x-rays. A review of 10 records revealed no comprehensive examination was performed in three of the records and very minimal examinations in three others. In only four records did a meaningful comprehensive examination precede routine care. No examination of soft tissues or periodontal assessment was part of the treatment process. Hygiene care and prophylaxis was inconsistent, provided in six of the 10 patient records. A further review showed that bitewing radiographs were part of the treatment process in eight of the 10 records. Restorations were, in two of the 10 patients, provided from the information from the panorex radiograph. This radiograph is not diagnostic for caries. A periodontal assessment was not done in any of the records. Further, oral hygiene instructions were not always documented in the dental record as part of the treatment process.

**Recommendations:**
1. Comprehensive "routine" care be provided only from a well-developed and documented treatment plan.
2. The treatment plan be developed from a thorough, well-documented intra and extra-oral examination, to include a periodontal assessment and detailed examination of all soft tissues.
3. In all cases, that appropriate bitewing or peri-apical x-rays be taken to diagnose caries.
4. Hygiene care be provided as part of the treatment process.
5. That care be provided sequentially, beginning with hygiene services and dental prophylaxis.
6. That oral hygiene instructions be provided and documented.

## Dental Screening

Although Stateville CC is not a reception and classification center, I reviewed 10 inmate dental records that were received from the reception centers within the past 60 days to determine if: 1) screening was performed at the reception center and 2) a panoramic x-ray was taken, to insure the reception and classification policies as stated in Administrative Directive 04.03.102, section F. 2, are being met for the IDOC.

**Recommendations:** None. All records reviewed were in compliance.

## Extractions

We reviewed 10 dental records of dental surgical inmates to determine if:
1. Recent pre-operative radiographs reflecting the current condition of tooth extracted. X-rays must be diagnostic value showing apices of teeth.
2. Reason for extraction is documented.
3. Consent Form is used and signed by the patient.

One of the primary tenets in dentistry is that all dental treatment proceeds from a well-documented diagnosis. In four of the 10 records reviewed, the reason for the extraction was not documented. In two of the records, a proper diagnostic x-ray was not present. This is a serious omission. Record entries are often very difficult to follow. Treatment at times seemed disjointed and lacking in continuity. The time between appointments can be long due to rescheduling associated with failed appointments. Also, antibiotics were often given after extractions. They seemed to be provided prophylactically. This is not an indicated standard of care. They should be prescribed only when indicated by a well-established diagnosis.

**Recommendations:**
1. A diagnosis or a reason for the extraction be included as part of the record entry. This is best accomplished through the use of the SOAP note format, especially for sick call entries. It would provide much detail that is lacking in many dental entries observed. It would also aid in establishing a better continuity of care.
2. Proper diagnostic x-rays be available for every surgical procedure.
3. Prescribe antibiotics only as necessary. Prescribing routinely after extractions is not a standard of care.

## Removable Prosthetics

We reviewed dental records of five patients having received completed partial dentures to determine if restorative procedures were completed prior to fabrication of partial dentures (68-MED-12 Dental Services D. Provision of Dental Care page 4 #5 and #9).

Removable partial denture prosthetics should proceed only after all other treatment recorded on the treatment plan is completed. Continuity of care is important and the periodontal, operative and oral surgery needs all should be addressed first. In only one of the five records reviewed on patients receiving removable partial dentures were oral hygiene instructions provided. Periodontal assessment was not provided in any of the records, and in only one of the five

records was a prophylaxis and/or a scaling debridement provided. Because a comprehensive examination was part of only two records and treatment plans were very incomplete, it is almost impossible to ascertain if all necessary care, including operative and/or oral surgery treatment, is completed prior to fabrication of removable partial dentures.

**Recommendations:**
1. A comprehensive examination and well-developed and documented treatment plan, including bitewing and/or periapical radiographs and periodontal assessment, proceed all comprehensive dental care, including removable prosthodontics.
2. That periodontal assessment and treatment be part of the treatment process and that the periodontium be stable before proceeding with impressions.
3. That all operative dentistry and oral surgery as documented in the treatment plan be completed before proceeding with impressions.

## Dental Sick Call

Inmates access sick call through an inmate request form or via a direct call from a staff member if it is perceived as an emergency. In addition to a "Request Log" that logs inmate request forms, there is an Emergency Log maintained which tracks patients seen as "emergency." These inmates are seen the same day as the request. For 2014 thus far, 12 inmates were seen as an emergency. All were toothaches, abscesses or trauma.

There is no real triage system in place to evaluate urgent care needs (toothaches, pain, swelling) from the request forms. Of the inmates placed in the Request Log, the average wait for appointment was about 12 days. This is for all request forms. Of the requests logged in as toothaches, pain, or swelling, the average wait was approximately six to seven days. These inmates should be seen within 24-48 hours.

In none of the dental records reviewed was the SOAP format being used. As a result, treatment was usually provided with little information or detail preceding it. Sick call record entries often did not include clinical observations or diagnosis to justify provided treatment. Little continuity was established. The use of the SOAP format would insure that a well-developed diagnosis would precede all treatment. In all records, the immediate complaint was addressed. Only emergency care was being provided.

**Recommendations:**
1. Implement the use of the SOAP format for sick call entries. It will assure that the inmate's chief complaint is recorded and addressed and a thorough focused examination and diagnosis precedes all treatment.
2. Develop a triage system that insures that inmates with urgent care complaints are seen in a more timely manner, 24 to 48 hours.

## Treatment Provision

There is no real triage system in place. The only triage system at this institution is from the request form itself. All request forms are logged into a "Request Log." Of all of the request

forms place in this log, the average wait for appointment was about 12 days. Of all of the requests forms with complaint of pain, toothache, or swelling, the average wait was six to seven days. This is an unduly amount of time. Of all the request forms, 15% are urgent care complaints (pain, toothaches, swelling). This is only about one per day. These inmates should be seen within 24-48 hours.

Inmates can seek urgent care via the inmate request form or, if they feel they need to be seen immediately, by contacting Stateville CC staff, who will then call the dental clinic with the inmate's complaint. The inmate is seen that day for evaluation. Request form complaints from inmates with urgent care needs (complaint of pain or swelling) are not seen until six to seven days later. Mid-level practitioners are available at all times to address urgent dental complaints. They can provide over-the-counter pain medication or call medical/dental staff if they feel more is needed. However, this is seldom the case.

Inmates who submit request forms for routine care are seen and evaluated in about 14 days. They are placed sequentially on a waiting list. The system seems fair and equitable.

**Recommendations:**
1. That a meaningful triage system be established such that inmates with complaints of pain are identified and prioritized.
2. That inmates with urgent care complaints are provided timely and appropriate evaluation and care. Six to seven days is not acceptable. Seeing that one per day urgent care complaint should be very doable.

## Orientation Handbook

A review of the "Offender Orientation Manual" for Stateville CC and the NRC revealed that dental was well represented and the instructions as it relates to access to care is adequate.

**Recommendations:** None

## Policies and Procedures

A well-developed Policy and Procedures manual insures a dental program that is well understood and run with continuity. It addresses all aspects of the dental program to provide consistency of care and management. The policy and protocol manual for the dental program at Stateville CC addresses only dental personnel and their duties and responsibilities. It only states that the dental program is responsible to provide dental care to the offender population. No specifics were provided on access to care, provision of care, clinic management, dental services provided, infection control, etc. The dental director said that this was developed by administration who thought it was sufficient.

**Recommendations:**
1. Develop a thorough and detailed Policy and Procedures manual that describes and guides all aspects of the dental program at Stateville CC. It should include all of the areas indicated above.

## Failed Appointments

A review of monthly reports and daily work sheets revealed a failed appointment rate that averaged 40%. This is a very high percentage and reflects a serious problem in getting inmates to the clinic for their appointment. I was told that they shared my concern and were frustrated at the lack of success in addressing this problem. I was told that the reasons for failed appointments included the following:

- Inmates do not get their passes
- Inmates go to other programs or appointments
- Inmates go to recreation
- Inmates go to commissary
- Inmates in lockdown

The percentage does reflect lockdown days, which average about two a month. The problem is compensated for by overscheduling every day. As such, a large number of inmates are seen every day, and a large number also fail to show.

I discussed this issue with the administrative staff, including the Warden, and they shared the concern and frustration of the dental staff and want to help them address the problem.

**Recommendations:**
1. Work with the institution administration to develop and implement strategies to address this problem.
2. Utilize a vigorous Continuing Quality Improvement process to address this problem. Use these finding to implement procedures to continually improve this high rate of failed appointments.

## Medically Compromised Patients

A review of six dental records of inmates who were on anticoagulant therapy revealed that three of the records had no health history documentation as part of the dental record. In the other three records, it was documented and red flagged. In all cases of provided dental care to these patients, medical staff was consulted and anticoagulant therapy precautions were addressed and followed.

When asked, the clinicians indicated that they do not routinely take blood pressures on patients with a history of hypertension.

**Recommendations:**
1. That the medical history section of the dental record be kept up to date and that medical conditions that require special precautions be red flagged to catch the immediate attention of the provider.
2. That blood pressure readings be routinely taken on patients with a history of hypertension, especially prior to any surgical procedure.

## Specialists

Dr. Frederick Craig, oral surgeon, is available on an as-needed basis, usually once a month, sometimes twice. Dr. Craig is also used by several other IDOC institutions for oral surgery. The dental program also utilizes Joliet Oral Surgeons, a local oral surgery group, for more difficult cases and for general anesthesia. Pathology services are the same as for medical pathology. They give the specimen to the appropriate medical person for processing. All radiographs were current and all record entries were adequate. The NRC utilizes these services through Stateville CC.

**Recommendations:** None

## Dental CQI

The dental program contribution to monthly CQI includes a thorough documentation of dental statistics and productivity numbers. There is an ongoing quality improvement report for the dental program that seeks to improve the ability of segregation inmates to get to the dental clinic for their appointments. It is a study that looks at the reasons why they are not getting to the clinic. These finding must be used to develop procedures to improve this problem. Consideration should be given to conduct ongoing studies with the NRC.

**Recommendation:**
1. Because of the number of deficiencies noted in the dental program, a more vigorous CQI program should be implemented to address these deficiencies. From the CQI process, policies and procedures should be established that will continually correct these deficiencies to develop a stronger program.
2. Include the NRC in this invigorated CQI process. Many areas need to be addressed for improvement at that institution.

# Continuous Quality Improvement

There have been no CQI meetings since October and no minutes were available since 7/13/13. The minutes we were shown contained no narrative, no analysis of the data presented and no studies. This can only be characterized as a non-functioning quality improvement program. The health care unit administrator is to be the QI coordinator, but she has been off due to medical leave. With regard to grievances, there is no medical grievance coordinator at either Stateville or NRC. They do report grievances, but despite the fact that the number of grievances for each month is supposed to be listed, it appears that there was a year with no grievances. Also, the grievance process never includes interviewing of the grievant. This is a non-functioning medical grievance process.

# Recommendations

**Leadership and Staffing:**
1. Stateville requires its own Health Care Unit Administrator position.
2. Stateville requires its own staffing allocation specifically to meet the Stateville service demands.
3. Only trained primary care clinicians (Internal Medicine and Family Practice) should be providing primary care to this population.
4. Physicians should be board certified in a primary care field.
5. All health care providers should have access to electronic medical references.

**Clinic Space and Sanitation:**
1. Designated exam rooms should be made available with appropriate equipment in cell houses B, E and F to allow sick call to occur with reduced movement demands.

**Intrasystem Transfer:**
1. The intrasystem transfer process needs to be appropriately addressed to effectively insure continuity of care for patients who enter with prior diagnosed problems. This should be monitored by the QI program.

**Sick Call:**
1. Custody issues should not interfere with the provision of timely health care.
2. There should be no such thing as a "no show" in a prison. Patients may refuse care but should be required to report to the health services area when scheduled.

**Chronic Disease Clinics:**
1. Patients should be scheduled in accordance with their degree of disease control, with more frequent visits when disease control is poor and less frequent visits for those under good control. This is a statewide policy issue which needs to be corrected.
2. For Diabetes Clinic:
   a. Meals should be served on a predictable schedule to facilitate the coordination of insulin administration with food consumption.
   b. Type 1 diabetics should have access to physiologic insulin replacement with 3-4 injections per day if needed.
3. For HIV Clinic:
   a. Patients with HIV infection should be formally enrolled in the chronic care program just as patients with other diseases are.
   b. Facility clinicians should be providing primary care to this population. This would include actively monitoring this high-risk population for medication compliance, side effects, and the primary care complications related to the disease and its treatment, such as hyperlipidemia, diabetes and cardiovascular disease.
   c. The chronic care nurse should be doing medication compliance checks with HIV patients at least monthly.

**Urgent/Emergent Services:**
1. The urgent/emergent program requires review and feedback both with regard to timeliness, appropriateness and continuity of care. This should be done by clinical leadership and the QI program.

**Scheduled Offsite Services-Consultations/Procedures:**
1. Scheduled offsite services need to be improved with regard to timeliness of access to these services as well as follow up after the service is provided.
2. There should be a reliable method of communication between the scheduler and the clinicians to ensure that patients who require specialty consultation are scheduled commensurate with the urgency of their need.

**Infirmary:**
1. Patients should be seen timely according to policy requirements while in the infirmary.
2. If clinicians choose not to treat patients according to currently accepted recommendations and guidelines, the rationale for these decisions should be articulated in the health record.

**Continuous Quality Improvement:**
1. The CQI program, which should have identified many of these programmatic deficiencies must be reinvigorated with leadership that has had appropriate training with regard to quality improvement philosophy and methodology.
2. There should be professional performance reviews with feedback, both for the advanced level clinicians and nurses with regard to the sick call process.
3. The leadership of the continuous quality improvement program must be retrained regarding quality improvement philosophy and methodology, along with study design and data collection.
4. This training should include how to study outliers in order to develop targeted improvement strategies.

# Appendix A – Patient ID Numbers

**Intrasystem Transfer:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | | [redacted] |
| Patient #2 | | [redacted] |
| Patient #3 | | [redacted] |
| Patient #4 | | [redacted] |
| Patient #5 | | [redacted] |
| Patient #6 | | [redacted] |
| Patient #7 | | [redacted] |

**Provider Sick Call:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | | [redacted] |
| Patient #2 | | [redacted] |
| Patient #3 | | [redacted] |
| Patient #4 | | [redacted] |
| Patient #5 | | [redacted] |
| Patient #6 | | [redacted] |

**Offsite Service/Emergency:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | [redacted] | [redacted] |
| Patient #2 | [redacted] | [redacted] |
| Patient #3 | [redacted] | [redacted] |
| Patient #4 | [redacted] | [redacted] |

**Scheduled Offsite Service:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | [redacted] | [redacted] |
| Patient #2 | [redacted] | [redacted] |
| Patient #3 | [redacted] | [redacted] |
| Patient #4 | [redacted] | [redacted] |
| Patient #5 | [redacted] | [redacted] |
| Patient #6 | [redacted] | [redacted] |

**Chronic Disease Management:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | [redacted] | [redacted] |
| Patient #2 | [redacted] | [redacted] |
| Patient #3 | [redacted] | [redacted] |
| Patient #4 | [redacted] | [redacted] |
| Patient #5 | [redacted] | [redacted] |

| | | |
|---|---|---|
| Patient #6 | [redacted] | [redacted] |
| Patient #7 | [redacted] | [redacted] |
| Patient #8 | [redacted] | [redacted] |
| Patient #9 | [redacted] | [redacted] |
| Patient #10 | [redacted] | [redacted] |
| Patient #11 | [redacted] | [redacted] |
| Patient #12 | [redacted] | [redacted] |
| Patient #13 | [redacted] | [redacted] |
| Patient #14 | [redacted] | [redacted] |
| Patient #15 | [redacted] | [redacted] |

**Nurse Sick Call:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | | [redacted] |
| Patient #2 | | [redacted] |
| Patient #3 | | [redacted] |
| Patient #4 | | [redacted] |
| Patient #5 | | [redacted] |
| Patient #6 | | [redacted] |
| Patient #7 | | [redacted] |
| Patient #8 | | [redacted] |
| Patient #9 | | [redacted] |
| Patient #10 | | [redacted] |

**Infirmary:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | [redacted] | [redacted] |
| Patient #2 | [redacted] | [redacted] |
| Patient #3 | [redacted] | [redacted] |
| Patient #4 | [redacted] | [redacted] |

# Northern Reception Center
# (NRC) Report

January 21-23, 2014

Prepared by the Medical Investigation Team

Ron Shansky, MD
Karen Saylor, MD
Larry Hewitt, RN
Karl Meyer, DDS

# Contents

**Overview** ...................................................................................................................3

**Executive Summary** ..................................................................................................3

**Findings** .....................................................................................................................5

  Leadership and Staffing ...........................................................................................5

  Clinic Space and Sanitation ....................................................................................7

  Reception Processing...............................................................................................8

  Intrasystem Transfer .............................................................................................11

  Medical Records....................................................................................................11

  Nursing Sick Call..................................................................................................12

  Provider Sick Call.................................................................................................13

  Chronic Disease Management...............................................................................14

  Pharmacy/Medication Administration ................................................................. 18

  Laboratory ............................................................................................................19

  Urgent/Emergent Care ..........................................................................................19

  Scheduled Offsite Services-Consultations/Procedures........................................20

  Infirmary ...............................................................................................................21

  Dental Program......................................................................................................22

  Continuous Quality Improvement ........................................................................33

**Recommendations** ..................................................................................................34

**Appendix A – Patient ID Numbers** ......................................................................36

# Overview

On January 20, 2014, we visited the Northern Reception Center (NRC) in Joliet, IL. This was the first site visit to NRC and this report describes our findings and recommendations. During this visit, we:

- Met with leadership of custody and medical
- Toured the medical services area
- Talked with health care staff
- Reviewed health records and other documents
- Interviewed inmates

The Northern Reception Center (NRC) opened in 2004 and houses approximately 2300 inmates, with the average length of stay being 3-4 weeks. It was reported, however, that 587 inmates on "writ status" have remained in the facility in excess of 60 days. The facility receives 500-600 inmates per week, with Cook County Jail, Chicago, IL, being the largest contributor.

There is a shared Warden, Health Care Unit Administrator (HCUA) and nursing staff between the NRC and Stateville Correctional Center (Stateville), which is located immediately adjacent to the NRC. It was reported that a HCUA position may be added specifically for the NRC. The NRC has a dedicated Medical Director, Director of Nursing, Medical Records Department Director, supervising nurse and dental staff. These are a combination of state and vendor positions, with staff being shared between the two facilities based on need at any given time. It was reported that Wexford is providing additional clinician hours on the weekends to facilitate the completion of sick call for the minimum-security unit (MSU) and the completion of reception intake physical examinations. A more complete review of staffing will be provided in the accompanying Stateville Correctional Center report.

Comprehensive medical services are provided through a contractual agreement between the Illinois Department of Corrections (IDOC) and Wexford Health Sources (Wexford) located in Pittsburg, PA. Pharmaceutical services are provided by Boswell Pharmaceuticals, also located in Pittsburg, and laboratory services are provided through the University of Illinois–Chicago Hospital.

A paper medical record continues to be in use; however, Wexford has identified a provider and is moving forward to provide an electronic medical record (EMR).

# Executive Summary

Stateville is a multi-mission facility comprised of the Northern Reception Center (NRC), a maximum-security male unit (Stateville), and a minimum-security unit (MSU). The current population of the entire complex was approximately 4000 inmates; roughly 1600 in Stateville, 280 in MSU and 2200 in the Reception Center, which was designed to house 1975. This report describes our findings at NRC and MSU. The average length of stay in the Reception Center was

approximately 3-4 weeks; however, maximum security inmates may stay 5-6 months due to limited bed availability at parent institutions. At the time of our review, more than 500 inmates had been housed at NRC longer than 60 days.

The majority of the problems we noted at this institution could be traced to the lack of leadership at the facility. The HCUA is responsible for both the NRC and Stateville medical programs. However, due to her medical leave and subsequent prohibition by custody to return to her work area due to a medical device, each facility thus suffers from lack of leadership. This leadership vacuum seriously impacts the timeliness and quality of care provided, and results in an absence of infrastructure to allow for self-monitoring, as will be evidenced in multiple areas throughout this report.

The Reception Center processes about 500-550 intakes per week, the majority from Cook County Jail, but also including inmates from around the state who are on a writ to appear in Cook County court. Numerous issues with Cook County Jail were reported, particularly having to do with poor communication. NRC reported that they often do not receive transfer summaries and thus must rely on inmate self-reporting of allergies, current medical/mental health issues, and medications. There are no "medical holds" at Cook County Jail, so an inmate could arrive one day and be scheduled for surgery the next. When NRC staff call the jail, they report substantial difficulties obtaining information. For these reasons, Wexford employs a staff member who reports to Cook County Jail three days a week to obtain current medication information for inmates transferring into the NRC.

It should be mentioned that our review was seriously hampered by the lack of organized record keeping at this institution. Logs were either not reliably filled out, or not kept at all. It was impossible to discover the average age or length of stay of the population. Sick call slips were not filed in the records, nor were they routinely kept in any other location. Sick call logs were unreliable and it was often up to the individual providers to keep track of the sickest patients whom they needed to follow.

The Reception Center plays a crucial role for inmates entering the Department. It is at this juncture that patients with acute and chronic medical conditions must be identified and triaged and long-term care plans initiated. At NRC, patients with medical conditions are identified on arrival and seen by a provider, but typically the plan ends here. Despite the presence of a chronic care nurse, there did not appear to be an organized attempt to identify patients with chronic diseases and enroll them in the chronic care program; this was largely left to the parent institutions, even for patients who were detained at NRC for months. The chronic care nurse was not available to meet with us for the bulk of our visit.

There is no infirmary utilized as such at NRC. Patients needing infirmary level of care are sent to Stateville. All four of the NRC patients admitted to the infirmary at the time of our visit were chronic/long term care, yet they were seen at least three times a week by the NRC Medical Director. Considering how busy and understaffed the Reception Center was, it is our opinion that the Medical Director's time would be better spent focusing on the areas of greatest need.

Incoming patients who are potentially or actually unstable, or who are identified by the intake nurse as needing immediate attention are referred to a provider for their history and physical on the day of their arrival. All other routine intake history physicals are supposed to be performed within seven days.

The medical records are disorganized and not conducive to providing adequate services. All documents are "drop filed," meaning loose filing is deposited into the chart folder in no particular order. There are tabs in the charts, and there is a medical records department, but nothing is properly filed no matter how long the patients stay at NRC. All the Stateville MSU medical records are maintained in the NRC medical records room and thus never become properly organized for the entire length of their stay. The medical records supervisor's explanation is that they simply "don't have time" to put records together. This drop filing philosophy is based on the assumption that all patients at NRC are part of the reception process and thus only stay 1-2 weeks; however, this is often not the case.

The CQI program was essentially nonexistent at NRC and of little to no use in evaluating the effectiveness of the program.

In summary, the health care program at NRC suffers from lack of leadership, weak infrastructure, disorganization, resource shortages and absent oversight.

# Findings

## Leadership and Staffing

With regard to leadership, we observed this as a major area of deficiency at NRC. This was true for both clinical leadership by the Medical Director and administrative leadership by the state HCUA. This combined leadership vacuum has resulted in a program ill organized to provide quality services to the many patients who circulate through the reception process or who stay longer periods of time at NRC. From an absence of professional performance review and feedback, to an absence of conscientious logging and tracking, which should be used for process improvement, to a disorganized medical records system, the NRC healthcare program creates avoidable liability for the inmates and the state.

Staffing is comprised of a combination of state and vendor positions. There is a state employed HCUA who is responsible for both the NRC and Stateville, with Stateville requiring most of her time. Additionally, the HCUA has been off-duty for medical reasons since November 2013, and was only available for approximately four hours during our four-day visit. There is a state employed Director of Nursing (DON) and supervising nurse. The medical records department is supervised by a Wexford employed Registered Health Information Technician (RHIT).

Other staffing is listed in the following
table: *Table 1. Health Care Staffing*

| Position | Current FTE | Filled | Vacant | State/Cont. |
|---|---|---|---|---|
| Medical Director | 1.0 | 1.0 | 0 | Contract |
| Staff Physician | 1.0 | 1.0 | 0 | Contract |
| Nurse Practitioner | 2.8 | 3.0 | 0 | Contract |
| Health Care Unit Adm. | 1.0 | 1.0 | 0 | State |
| Director of Nursing | 1.0 | 1.0 | 0 | State |
| Nursing Supervisor | 1.0 | 1.0 | 0 | State |
| Nursing Supervisor | | | | |
| Corrections Nurse I | | | | |
| Corrections Nurse II | | | | |
| Registered Nurse | | | | |
| Licensed Practical Nurses | | | | |
| Certified Nursing Aide | | | | |
| Health Information Adm. | | | | |
| Health Info. Assoc. | | | | |
| Phlebotomist | | | | |
| Radiology Technician | | | | |
| Pharmacy Technician | | | | |
| Pharmacy Technician | | | | |
| Staff Assistant I | | | | |
| Staff Assistant II | | | | |
| Chief Dentist | | | | |
| Dentist | | | | |
| Dental Assistant | | | | |
| Dental Assistant | | | | |
| Optometry | | | | |
| Physical Therapist | | | | |
| Physical Therapy Asst. | | | | |
| **Total** | **7.8** | **8.0** | **0** | |

Staff between NRC and Stateville Correctional Center is included in one contract/schedule E and are shared between the two facilities. This sharing makes it difficult to determine actual positions allocated compared to filled positions versus vacant positions. With the exception of the Health Care Unit Administrator (HCUA) position, the above staff FTEs are dedicated to the NRC. Of particular concern is the shared HCUA position. The NRC receives approximately 550 new inmates each week. If the NRC were only a processing center and inmates were moving out quickly, supervising nursing staff could be sufficient to make sure the process is complete for each inmate; that is, each inmate moved through each screening point, the appropriate information was collected and documented and all the boxes on the form were checked, the intake process was appropriately completed, and the inmate was transferred. However, this is not the case. The NRC house approximately 2300 inmates and has a permanent population of inmates who have significant acute and chronic illnesses which therefore requires the operation of a medical unit over and above the processing center.

While inspection of the reception process indicated no significant nursing issues, the medical unit side of the NRC presented both administrative and medical concerns that, in order to be properly monitored and managed, require the oversight of a full-time HCUA. Additionally, the current HCUA has been on an extended leave of absence which has resulted in no medical administrative oversight. While there is a full-time Director of Nursing and full-time supervising nurse, the volume of intake and permanent population inmates coupled with staffing issues leave them with no time to provide the administrative oversight required.

Delays in accomplishing the reception process within the required timeframes as well as professional performance problems suggest that there may be inadequate resources dedicated to this process.

A more detailed staffing summary will be provided in the Stateville report.

## Clinic Space and Sanitation

The NRC reception area is a large room divided into specific areas such as property storage, searches, bureau of identification, immigration interviews, mental health interviews and a large medical area with multiple stations for the following:

1. Collection and recording of medical history
2. Collection and recording of height, weight, vital signs
3. Conducting and recording a Snellen eye chart examination
4. Administering a tuberculin skin test
5. Conducting a full-mouth dental x-ray and examination
6. Drawing blood for baseline laboratory values
7. Three examination rooms for urgent care or chronic illness assessment
8. Mental health

The area was clean, well lighted and well maintained. The use of blood-borne pathogen precautions was observed, and personal protective equipment was immediately available to staff. Outside the reception area but still within the NRC is the health care unit. This is a very busy unit with a lot of foot traffic but, at the time of the inspection, appeared relatively clean, well maintained and well lighted. The unit consists of a medication preparation area, pharmacy and medication storage, x-ray, three examination rooms, emergency/urgent care/procedure room, one chair dental clinic, medical records, office spaces and an inmate holding area.

Across a hallway is a 12-bed infirmary which has never been operational except for an eight-bed mental health observation area. Inspectors were told the infirmary has not been used due to insufficient staffing. Inmates requiring infirmary placement are moved to the Stateville Correctional Center medical unit infirmary.

The three examination rooms and urgent care room were appropriately sized and equipped and provided for patient privacy and confidentiality. The other areas, pharmacy, medication preparation, etc., were appropriately sized and equipped specific to the function of the room.

The IDOC blood-borne pathogen policy and procedures are used. Personal protective equipment was available to staff, and a licensed medical waste hauler is used.

While currently there is no clinic space provided in the cell houses, it appeared there was a room designed and built to be used for cell house sick call, but the rooms are being used as office space by cell house security staff. If these rooms were to be appropriately equipped, they could easily be used to conduct sick call, in that the medical provider could speak with the inmate/patient in private, conduct an examination, assess and treat, which would eliminate some of the issues as noted under the "Nursing Sick Call" section.

## Reception Processing

The Northern Reception Center reception process occurs in a well-designed area which contains a sequence of "stations" where different aspects of the process are performed. On average, approximately 100-220 intakes per day are processed Monday thru Friday. This results in a weekly reception group of between 500-550. Although the reception process is designed to be completed within one week, in fact the reception process for some inmates may be significantly longer. On average, inmates stay at the Northern Reception Center between three and four weeks. This is an important fact because the administrative directive that deals with chronic care describes a requirement that the first chronic care visit must take place within 30 days of arrival at the permanent institution, but this directive presumes movement after one week.

NRC receives only an emailed list of medications from Cook County Jail for inmates being transferred, but no other records. This is the only clinical communication. However, this list is not typically available to the staff at the time of the intake screening or physical exam. There have been attempts at connectivity with Cook County Jail, but there have been multiple obstacles to this. Wexford staff have attempted to work more closely with Cook County Jail, but the Regional Medical Director indicates there has been minimal cooperation. Cook County Jail indicates they do not have the staff to review records prior to inmate transfer.

Patients scheduled for surgery or outside appointments at Cook County Hospital are not placed on a hold by the jail in order to accommodate the appointment. Also, there is no advanced notice regarding patients arriving on unusual or critical medications, thus resulting in avoidable delays in receipt of the medications.

The Reception Center itself houses approximately 2300 inmates and some inmates stay longer periods of time because of a shortage of available maximum-security beds. The medical portion of the reception process begins with a medical history that is performed by a medical technician, a licensed practical nurse or a registered nurse. This medical history does not contain questions designed to identify symptoms currently present in the patient. Rather, it is meant to identify significant chronic conditions as well as special needs and substance use along with mental health problems. Part of the medical history includes a collection of objective data, including vital signs, height and weight and a vision exam. There is a section for assessment and then a section for plan, which is used to identify the need for an urgent physical exam or mental health referral as well as TB results. The latter may be problematic because on occasion the physical exam is performed before it is appropriate to read the tuberculosis test exam.

After the history is performed a dental exam including a Panarex is performed, as well as lab tests and where indicated, electrocardiogram or chest x-ray. Subsequent to the history being performed, usually within one week, an advanced level clinician, that is a physician assistant, nurse practitioner or physician, performs a physical exam as well as a history geared to substance use, high risk behavior and TB symptom questions. Again, there are no structured questions to elicit any other current symptoms. After the physical exam, there is an area for the development of a problem list as well as housing placement considerations and a determination of food handler status. Unfortunately, there is currently no process to insure that the TB results, the blood test results and where indicated an electrocardiogram or chest x-ray are integrated into a final problem list and plan for each problem prior to patients being transferred to the permanent facility.

At the time of our visit, there were between 200 and 300 records of patients who had received a nurse screen and who were awaiting a physical exam by an advanced level clinician. Some of these records reflected patients who were admitted more than two weeks prior to our visit. We were told that there sometimes is a problem with custody providing a list of patients to be sent out, which may include patients who have not yet had a physical exam. We were informed that the program is able to bring in an advanced level clinician who has completed as many as 25 physical exams within 3-4 hours. Although such a physical exam may meet assembly line requirements, it is highly unlikely that such exams reflect an appropriate quality standard.

We were also informed that there is a Reception Center staff person who is at Cook County Jail from which the bulk of the transfers into reception arrive. She is at the jail three or four days per week and is able to obtain current medication lists from the pharmacy. We have been told that Cermak/Cook County Jail is working with IT to create an electronic transfer summary that will include a current problem list, medications, allergies, and any other medical needs that may require attention. It is not clear when this should become available. We do know that complex patients are arriving with no medical history other than the medication list. When these patients arrive, efforts must be made to obtain critical patient information from Cook County Jail. Despite significant delays, patients are being processed through; however, we have identified significant quality issues.

Absence of strong leadership at NRC has made our task much more difficult. The Health Care Administrator position is held by a person who has been on frequent leaves of absence and it does not appear that anyone else has stepped up to function as a leader in the face of this leadership vacuum. We found that the logs which are required for internal monitoring of the program at NRC are frequently not maintained and therefore it was very difficult for us to review records within specific categories.

We reviewed 35 records of patients who had entered within the last month to month and a half and who would be transferred the following day. Eleven of the 35 records were problematic in one or more ways. One of the records was of a patient who entered in October of last year. What follows is a list of problems identified.

**Patient #1**

This patient was identified as having a positive tuberculosis skin test but this was not addressed by the physician and does not appear on the problem list and therefore also lacks an order for a chest x-ray.

**Patient #2**
This patient entered on 10/8/13 with an open wound on his coccyx and paraplegia and hypertension. He also had urinary incontinence. He has been housed in the Stateville infirmary and has been followed for his wound and the paraplegia, but has not yet had a chronic care clinic.

**Patient #3**
This patient's intake labs indicated significantly elevated liver function tests not addressed by the physician and without any follow-up.

**Patient #4**
This patient's intake revealed hyperlipidemia but there has been no follow-up.

**Patient #5**
This patient had a blood pressure on intake of 149/83. He was listed as having a history of hypertension but has not been taking any medicine and there was no follow-up and no mention of his elevated blood pressure.

**Patient #6**
This patient was identified as having a 20 mm positive TB skin test which the physician never noticed and there was no follow-up.

**Patient #7**
This patient's lab work indicates abnormal liver function but there has been no follow-up.

**Patient #8**
This patient on intake had an elevated blood pressure which was never repeated. The patient also had hyperlipidemia which was not listed on the problem list and has not been followed up.

**Patient #9**
This patient had an elevated blood pressure on intake which was not repeated and does not seem to have been identified.

**Patient #10**
This patient entered the Reception Center on 12/28/13 but has not had his physical exam yet.

**Patient #11**
This patient was identified as having an elevated blood pressure which was repeated and he was placed on treatment but has had no chronic care visit even though he entered on 12/10/13.

These problems suggest an absence of close monitoring and quality control and are likely to lead to problems in the future for some of these patients.

# Intrasystem Transfer

Prior to transfer, medical records staff reviews all documentation to ensure everything is complete.

We looked at a random sample of 10 charts of patients who were detained at the Reception Center for more than 60 days. Five of the 10 patients had chronic health issues, yet none had been enrolled in the chronic care program or had his chronic disease intake evaluation as dictated by policy.

**Patient #12**
This patient arrived 11/1/13. He is 56-year-old man with diabetes, hyperlipidemia, GERD and chronic knee pain. He is not enrolled in the chronic care program nor has his A1c or lipids been checked since he's been here.

**Patient #13**
This patient arrived 11/7/13. He is a 23-year-old with history of asthma which was asymptomatic at the time of his intake physical, though no disease specific history was documented by the examining provider. The albuterol inhaler he came in with was not continued and he was instructed to return to the HCU if he develops symptoms. He is not enrolled in chronic care and has not been seen since.

**Patient #14**
This patient arrived 11/7/13 with a history of seizure disorder off meds, last seizure "last year." He has not yet had a physical exam.

**Patient #15**
This patient arrived on 11/14/13. He is a 28-year-old with history of asthma on albuterol with peak flow of 400 at time of intake and blood pressure 132/91. The history of asthma was overlooked at the time of his physical exam on 11/29, and his blood pressure was not rechecked. It did not appear that his albuterol was ordered as there were no order sheets in the chart. His intake labs showed a mildly elevated alt (liver enzyme) of 89. He is not enrolled in the chronic care program, nor was he seen again.

**Patient #16**
This patient arrived on 11/15/13. He is a 45-year-old man with asthma on albuterol and inhaled steroid whose peak flow on intake was 450. Intake physical exam was on 11/30; peak flow was not repeated. Patient was seen on 12/19 with shortness of breath, having run out of his inhaler. Peak flow was 200, 250. Oxygen saturation was not measured. Physician noted no wheezing on exam; assessment is "h/o asthma" and reordered the albuterol inhaler with a plan to have the patient follow up at his final institution. He is not enrolled in chronic care program.

# Medical Records

We had enormous difficulty reviewing medical records for any patient with significant problems, the reason being that the procedure at NRC is to "drop file" all documents in the records. What

this means is that documents are not fastened chronologically in specific sections; instead each document is placed loosely between the cardboard covers. For a patient purely in reception where

all of the reception documents are stapled together, this is not unreasonable. However, as we learned, over 500 of the 2300 inmates assigned to NRC have been at the facility for greater than 60 days. Several of these patients have multiple serious problems. To literally drop progress notes, medication administration records, x-ray reports, laboratory results, intake records, etc., loosely in no specific order creates chaos for the clinicians there to attempt to provide health services. It is likely that important information which may in fact be in the record will not be located. In addition, the usual types of logging and tracking were not being performed, thus further complicating the institution's ability to monitor itself. Drop filing should not be done for any patients with significant problems and all patients who are at NRC for more than 30 days.

# Nursing Sick Call

Sick call slips are collected by the officers, who place them in the sick call box. Med techs (who must now be LPNs, but there are some who are not who have been grandfathered in) collect them from the boxes and triage them according to protocols. Treatment protocols have recently been revised and are being rolled out now. If they cannot address them via protocol, they are referred to nurse sick call. Nurse sick call is combined with PA and nurse practitioner sick call.

A nurse rounds in segregation daily cell to cell, an MD once weekly. Patients needing to be examined are escorted to the clinic area.

It was reported that sick call is conducted seven days per week. The process was explained as follows:

1. Inmate completes request and submits to housing unit officer.
2. Officer places the request in a locked sick call drop box located in each cell house.
3. Medical staff collects and triages the requests daily.
4. Triaged requests are categorized as to urgent or routine.
5. Patients categorized as having an urgent request are scheduled to be evaluated the same day. Patients categorized as having a routine request are scheduled to be evaluated within 72 hours of triage.
6. A health care sick call log is to be maintained which notes the date, time, detainee name/number, date request received and triaged, date scheduled and date actually evaluated.

Were the above steps followed, there would be compliance with policy except for item 2, which is a breach of confidentiality. In actuality, it is difficult if not impossible to track sick call due to the log not being maintained. In addition, the requests were neither filed in the medical record nor available to these reviewers. The Medical Director is required to review two medical records per sick call provider per month in order to evaluate appropriateness of care. However, this was not being accomplished.

We were unable to methodically review the performance of nurse sick call due to lack of compliance with policy.

# Provider Sick Call

The sick call logs are not filled out reliably, but the few we were able to review indicated that the provider is scheduled to see 20-25 patients per day, sometimes more.

## Patient #1

This patient is a 55-year-old man who arrived at NRC on 12/12/13 with a history of knee arthritis. He placed a sick call request on 1/7 for an ingrown toenail. He was given an appointment on 1/18/14; however, he transferred to Stateville MSU on 1/11/14. He complained of an ingrown toenail at his intake assessment and saw the physician that day, who only addressed the knee arthritis. When he saw the physician again on the previously scheduled 1/18 visit, the visit addressed a viral infection and there was no mention of the toenail. On 1/19, the LPN saw him for abdominal pain and headache and the plan was to refer to the physician for further evaluation on 1/18 (the day prior to this visit). In the end, the ingrown toenail has never been addressed.

## Patient #2

This patient is a 49-year-old man who arrived at NRC on 12/23/13 with a history of mental illness, and had his physical exam on 12/26. He was also seen on 1/3, 1/10, 1/18/14, but there were no request forms in the chart. On 1/18, the LPN saw the patient at 3:00 a.m. for possible seizure activity witnessed by the cellmate. The patient stated he needed back his seizure medication. The nurse referred the patient to the doctor the next day and he was seen. It was determined by the provider that the patient had been taking Klonopin for anxiety, not seizures, and referred the patient to mental health.

## Patient #3

This patient is a 24-year-old paraplegic man who arrived at NRC on 12/30/13 having had a recent gun shot wound to the right arm (12/3/13). His physical exam was done on 12/30. He was also seen by the provider on 1/2, 1/8, 1/22/14, but there was no sick call slip in chart.

## Patient #4

This patient is a 50-year-old man with a history of hepatitis C who arrived at NRC on 1/2/14 and had his physical exam on 1/14/14. His labs drawn on 1/17 showed mildly elevated bilirubin and +hepatitis C antibody. This result was printed on 1/18 and reviewed on 1/22 by the PA who referred the patient to sick call and saw him herself that day.

## Patient #5

This patient is a 28-year-old man with a reported history of irritable bowel syndrome on admission on 11/25/13; however, he was prescribed mesalamine, which indicates that he actually likely has inflammatory bowel disease, a far more serious condition than irritable bowel syndrome. The provider who performed the physical exam failed to recognize this and perpetuated the irritable bowel syndrome diagnosis. The patient appeared to have been well controlled on mesalamine 2000 mg qid upon admission. However, the medication was changed on arrival to Delzicol 800 mg, three times a day for 30 days. There is a note from the PA on 12/24 regarding the patient's inflammatory bowel disease and that he reported bloody diarrhea for the past few weeks. There is no sick call slip in the chart. He is still at NRC and he is not enrolled in the chronic care program.

## Patient #6

This patient is a 35-year-old who arrived at NRC on 1/2/14 with mental illness and heroin withdrawal and history of seizures on no meds. He was seen by the PA on 1/22 for weakness; there is no sick call slip in the chart.

**Patient #7**
This patient is a 31-year-old man who arrived at NRC on 1/10/14 with no medical history. His blood pressure was elevated on arrival; 155/103, repeat 162/98. At his intake physical exam the next day, his blood pressure was still elevated and he was started on hydrochlorothiazide. His intake blood test was drawn on 1/10, printed on 1/11, and showed elevated liver function tests. They were reviewed on 1/14 by the PA, who requested follow up (by noting this on the lab- was no order found on order sheet), but the patient had not been seen as of the date of our review (1/23).

**Patient #8**
This patient is a 47-year-old man who arrived at NRC on 1/10/14 and had his intake physical exam on 1/11, intake labs drawn on 1/10, and printed on 1/11, which showed elevated creatinine. Follow up with a provider was noted on the lab report; this signature was not dated. As of the date of our review (1/23), he had not yet been seen, nor could anyone tell me when he would be seen.

# Chronic Disease Management

According to the information we were provided, there were at most 35 patients enrolled in the chronic care program. Considering that nearly 600 inmates were detained at the Reception Center for over 60 days at the time of our visit, this number is incredibly small.

Patients with chronic diseases are supposed to be seen for their initial chronic care intake within 30 days of arrival at their parent facility or at the Reception Center if housed there for over 30 days. This is not happening at NRC. Patients with chronic diseases are supposed to be identified at intake and referred to the chronic care nurse. However, the chronic care nurse was not available for most of our visit and her tracking system was unfamiliar to any other staff member, and so we were unable to ascertain the nature of the system, if there is one in place at NRC.

The chronic care forms in use at this institution have not been updated in 12 years. Enrollment in chronic care clinic is inconsistent at best. At the time of our visit, there were about 20 patients on medical holds, many for ongoing treatment of chronic conditions such as cancer, but none were enrolled in the chronic care program. The OTS tracks those patients with chronic diseases, but this list is only as accurate as the information fed into it. The chronic clinic nurse keeps her own list, which was inconsistent with the OTS list.

Inmates identified during intake as having a chronic illness are evaluated and, if needed, provided medication, but the baseline chronic illness clinic is not conducted until the inmate reaches his permanent facility.

A review of and interviews with diabetic inmates on insulin will be conducted and reported in the Stateville report.

On a positive note, labs are consistently drawn timely prior to the chronic care clinic visits.

- Cardiac/Hypertension (25)
- Diabetes (8)
- General Medicine (0)
- High Risk (0)
- HIV Infection/AIDS (0)
- Liver (0)
- Pulmonary Clinic (0)
- Seizure Clinic (2)
- TB infection (1)

## Cancer

### Patient #1

This patient is a 53-year-old man with metastatic pancreatic cancer who arrived at NRC on 6/13/13 and has been on a medical hold since that time to receive treatment at University of Illinois. He has been seen timely at NRC and at University of Illinois. It does not appear that he is enrolled in the chronic care program, though he has been seen regularly for his cancer follow-up.

## Cardiac/Hypertension

The chronic care form lists blood pressure goals for various degrees of control on the back, for patients with and without diabetes. However, the diabetic blood pressure goals are cut off from the form.

## Diabetes

NPH insulin is often ordered as an as needed medication – this is not appropriate use of this agent. Clinics are not occurring more frequently than the antiquated January/May/Sept strategy outlined in the outdated policy from 2002.

### Patient #2

This patient is a 31-year-old diabetic with retinopathy and hypertension who arrived at Stateville on 5/28/12. He is on Lantus, lisinopril, Atenolol and simvastatin. There is an undated and totally illegible chronic care note at which time the patient's blood pressure was 152/90. This was deemed fair control and it does not appear that any medication changes were made. The form was filed toward the front of the chart, leading us to think it was the most recent note. Piled near it were lab reports from 11/25/13; however, no A1c was obtained. Something indecipherable was scribbled in the "f/u appointment" box.

There is another chronic care visit dated 9/21/13 in the same illegible scribble. At this visit, the patient's blood pressure was 145/92, but no change is made to his blood pressure medication. His diabetes appeared to be under fairly good control with an A1c of 7% on 9/5/13, yet his Lantus

was increased from 30 to 35 units at bedtime. His lipids were above goal and a statin was added. It appears that the provider wants to see the patient back in 10 days, but again, it is difficult to tell given the nature of the handwriting.

The patient is repeatedly ordered ibuprofen 400-800 mg three times a day as needed, which is relatively contraindicated given his poorly controlled hypertension.

A third chronic care note is dated 5/18/13. There were labs done three days prior to the appointment but filed deep within the stack of papers. Of note, the patient's TSH has been elevated on several occasions but not explored further.

### Patient #3
This patient is a 23-year-old type 1 diabetic since age 17, who arrived at Stateville on 8/24/12. He is ordered NPH in the morning on an as needed basis if his blood glucose is greater than 200 and Lantus at bedtime. He is ordered twice-daily Accu-Cheks, but the MARs indicate that his blood glucose is only checked once a day in the evening; therefore, there are no documented doses of NPH. His A1c has been steadily rising from 5.2% on admission to the most recent A1c of 11.4% in August of 2013. His insulin orders have remained almost unchanged for the entire length of his stay despite the dramatic decline in his disease control.

There was only one chronic care clinic note in the health record; this was dated 9/21/13 and in the same illegible handwriting as the others. His diabetes control was acknowledged to be poor, yet no changes to his insulin were made. He has not been seen for chronic care follow up since.

### Patient #4
This patient is a 32-year-old diabetic who arrived at Stateville on 6/1/12 on oral meds. He was started on insulin in October of 2012 in response to a rising A1c (9.2%). His last three chronic care clinic visits occurred on 2/28/13, 5/18/13, and 9/21/13. At the 2/28/13 visit, he was on Lantus 40 units at bedtime and NPH in the morning if his blood glucose was greater than 200. Accu-Cheks were ordered bid but only documented in the pm, so no documented doses of NPH were given.

At the 5/18/13 visit, which is illegible, the A1c was improved at 7.7%. At the 9/21/13 visit, the A1c was up to 8.7% but no adjustments to the insulin regimen were made. He has not been seen since.

## General Medicine

### Patient #5
This patient is a 27-year-old man with a history of ORIF of right tib/fib in 2011 who now has the proximal fixating screw backing out of the IM rod about 1-2 cm into the soft tissues of his lower extremity. This was evident at his admission history and physical on 9/3/13. He was approved on 10/2/13 for ortho consult for removal of the hardware and as of the date of our visit, he had not been seen. Discussion with the scheduler/medical records supervisor, Adrianne, explained that excessively long wait times through University of Illinois-Chicago (5-6 months) contributed to this delay. She was ultimately able to identify an alternative provider with whom

Wexford has contracted to provide services and has him scheduled on 1/28/14. He is not enrolled in the chronic care program

**Patient #6**
This patient is a 36-year-old man with inflammatory bowel disease on Humira who arrived at NRC on 9/19/13 and was placed on a medical hold. He was hospitalized twice for flares of his inflammatory bowel disease from 11/9–12/15. He was housed in infirmary for 23 hours upon his return from the hospital and he was seen by the PA on 12/24 after his return to NRC. He is not enrolled in the chronic care program

**Patient #7**
This patient is a 31-year-old man who arrived at NRC on 11/5/13 with a complicated ortho history of scaphoid fracture with nonunion s/p resection, fusion and bone grafting in October 2013. He was approved for ortho follow up on 12/24 and was seen on 1/17, but no report was in the chart. The report was obtained upon our request. The K wires were removed at this appointment and it appears the fracture and fusion have healed. He is to follow up on an as needed basis. He is on a medical hold. He is not enrolled in chronic care program.

## HIV Infection/AIDS

HIV and hepatitis C services are provided via telemedicine from University of Illinois staff.

## Pulmonary

**Patient #8**
This patient is a 67-year-old man who was admitted to NRC on 1/14/14 with multiple medical problems including oxygen dependent COPD and chronic anticoagulation for atrial fibrillation. He was noted to be short of breath on arrival and admitted directly to the infirmary with COPD exacerbation and atrial flutter with a heart rate of approximately 100 bpm. It does not appear that an INR was ordered on admission despite his being on Coumadin, which was ordered.

While in the infirmary, he was seen by the physician on 1/15 and 1/17 (the date of discharge). On 1/21, it was noted that his INR had not been checked and was ordered to be done that day (yesterday).

## Seizure Disorder

**Patient #9**
This patient is a 19-year-old with a seizure disorder who arrived at NRC on 7/13/13 and is on medical hold due to an elevated Dilantin level.

## TB Infection Clinic

The PA reported that treatment for latent TB infection is delayed until the patient is transferred to the parent institution. She stated that she prescribes patients who are going to boot camp Rifampin x 4 months which is not directly observed therapy. She states that she does this in order not to hold up their going to camp.

Additionally, the TB skin tests are read at 2:00 a.m., and we have good reason to believe as a result of our discussions with staff that the accuracy of the "reading" is highly questionable at best, often consisting of gazing upon the patient's arm from the cell door as he lies in bed.

**Patient #10**
This patient was the only patient on INH treatment at the time of our visit. His intake TB skin test was +20 mm on 3/8/13. It was not mentioned on his undated physical exam. Chest x-ray was performed on 3/11 and was negative. There is no documentation of symptom assessment in relationship to the positive skin test. He refused HIV testing on intake and it does not appear that this was ever readdressed with him as part of the TB treatment program. He was transferred to Stateville MSU on 5/11/13 and started on therapy on 6/3/13. There are chronic care clinic notes on 6/3 and 7/8; no further monthly assessments were found in the chart. Review of the MAR shows seven missed doses of medication; one refusal, two no shows, one not in cell and three blanks which should be treated as medication errors.

# Pharmacy/Medication Administration

Per policy, medication is provided in blister pack cards for "keep on person" (KOP) self-administration and single dose "watch take" administration by licensed medical staff. In preparation for medication administration, medical staff identify the appropriate inmate medication administration record (MAR) and medication blister pack. The appropriate dose of medication is removed from the blister pack and placed in a small envelope labeled with the patients name, number, cell house location, name of medication and dosing instructions. The medical staff member repeats this for each patient receiving medication. This is done due to cell houses having three tiers and no elevator, so a medication cart cannot be used. When completed, the medical staff member proceeds to each cell house and reports to the cell house officer. The officer is to escort the medical staff to each cell, open the meal slot, and the medical staff member is to identify the patient, who is to have water or other beverage for ingesting the medication. Medical staff is then to administer the medication and check the patient's mouth for proper ingestion. This is done by way of a large window in the cell. When this process is completed, the medical staff member returns to the medical department and documents on each patient's Medical Administration Record.

Observation of medication administration for cell houses R, S and T yielded some significant issues as follows.

1. Upon arrival into the first cell house, no security staff was available to assist.
2. We proceeded to the next two cell houses and security staff was not available or said they were too busy to provide escort.
3. In response to questioning by the monitor, the medical staff member stated he was required to have a security staff member provide escort.
4. We proceeded back to the first cell house and there was still no security staff available; we waited.
5. Finally, a cell house officer inquired what we needed and the medical staff member stated "pill pass," to which the officer stated he was too busy. He did radio a sergeant for

assistance and, after approximately 5-10 minutes, an officer came into the cell house to provide escort.

6. We proceeded to each cell door as indicated by the medical staff member. At no time did the officer open the food slot door and at no time did the medical staff member request the door be opened.

7. The medical staff member appropriately identified each patient and passed the medication envelope through a small space between the cell door and frame.

8. The patient would retrieve the envelope, take the medication, open his mouth for the medical staff member to observe ingestion and slide the envelope back out.

9. When asked as to why the meal slot door was not being opened, the officer stated he was a "rover" who was instructed to report to the cell house to assist with medication administration and as a result did not have keys to the meal slots. Additionally, when asked why security staff did not perform the mouth checks, the monitor was informed appropriate ingestion was considered a part of medication administration and, as such, a medical staff function/responsibility.

10. The medical staff member repeated the process until completed in cell houses R and S and we proceeded to T.

11. In cell house T, the medical staff member went to the housing unit officer who was sitting at his desk and said he did not have time to provide escort for medication administration. He finally radioed his sergeant but never provided any assistance. Finally, another officer entered the cell house to deliver "papers" to the cell house officer. As she was leaving, she asked if she could help us. We told her what we were trying to accomplish, and she immediately said she would provide escort, which she did.

12. Medication administration for three cell houses took 45-60 minutes.

# Laboratory

Laboratory services are provided through the University of Illinois-Chicago Hospital (UIC). The comprehensive services medical contractor provides 2.5 FTEs phlebotomist to draw and prepare the samples for transport to UIC. Results are electronically transmitted back to the facility, generally within 24 hours via secure fax line located in the medical department. There were no reports of any problems with this service. We are recommending 3.0 FTEs for this facility.

# Urgent/Emergent Care

We found that there are no useful logs available to select records of patients being sent out for urgent or emergent problems. There is a log of inmate injuries and a separate log of officer injuries. However, there is no current log of emergencies dealt with onsite, so-called urgent problems, and also no log for emergency sendouts. We were told that they sometimes list urgent problems as an add-on to the sick call. This makes them impossible to discern. However, this particular strategy is not used during evenings or nights or weekends. In the only emergency log we were shown there has been nothing listed as occurring emergently since August of 2013. One is therefore left to assume that there have been no emergencies over the last five months or there is a disregard for the requirement to track these things. A program that does not log and track services, including emergency services, is unable to efficiently self monitor and self correct.

Patient contacts the officer in the unit who notifies medical staff. Nurse or med tech may go onsite to evaluate the patient or ask the patient to be brought to the ER. We were told initially that the nurse may review the chart and decide that the patient signs up for sick call. When questioned about this, the DON denied that they do this. There is a nurse assigned exclusively to urgent care.

## Off-Site Emergencies

These are tracked on the same log as urgent care. Code 3 is medical emergency and this includes anyone the officer feels needs immediate response, not limited to man down or unresponsiveness. There is a designated code team each shift to respond to these. RNs are assigned 24/7. There is an on-call doctor and a backup on-call. RNs are authorized to send out critical emergencies without waiting for the physician to call back. They use St. Joe's for emergency care. Other more complicated patients go to University of Illinois (cancer, neurosurgery, HIV, hepatitis C, etc). They have a locked unit for the DOC patients. They have a contract to provide up to 18 admissions and 180 onsite consults per month.

## Nursing Telephone Urgent Care Log

It appears they are only tracking those patients who are seen – not all calls. They may be missing those who are told to sign up for sick call, for example. The log needs to be initiated at the time of the phone call, not in retrospect. Day shift has a nurse assigned to this purpose. Off shifts are handled by whatever nurse is on duty.

# Scheduled Offsite Services-Consultations/Procedures

We understand that the policy that the Reception Center adheres to is based on patients being processed through the relatively quickly. However, as we learned, greater than 500 inmates had been assigned to the Reception Center for greater than 60 days. Some of these patients are in the MSU, others may be there on writs and others are delayed for other reasons. The end result is similar to any other facility; NRC must have a tracking system for all scheduled offsite services, including consultations and procedures.

We reviewed three records of patients who were referred for scheduled offsite services and two of the three were problematic.

**Patient #1**
This patient was seen at the University of Illinois Heart Center because of his pacemaker and a prior cardiac ablation procedure. He was to be followed up two weeks after his 6/6/13 visit. However, there was no record of the follow up appointment having even been scheduled at the time of our visit. We checked with the University of Illinois Heart Center and he was not on their books. The record itself was completely chaotic.

**Patient #2**
This patient had a history of cancer with lung surgery in 2002. On 12/11/13, a request was made for him to have a CT scan and MRI of the lung. This was approved on 12/31/13. As far as we know, he went for the tests in early January. At the time of our visit there were no reports in the

chart and there had been no follow up based on the results in the reports. This was presented to the NRC staff.

The site Medical Director must approve all specialty requests. Approved requests then go to Wexford for collegial review which occurs weekly. For stat consults, the provider can obtain the test, then it goes for retrospective review. Wexford uses Interqual criteria, so if the request meets criteria, it gets immediately approved by a UM nurse. Only those that don't meet criteria are discussed at collegial review. The patient is notified in writing for all requests that are disapproved. Scheduling is done at the time the request is approved. The goal is urgent within 2 weeks, routine within 1 month. The agency medical director can overrule disapproval by the vendor. There are three levels of appeal before this level. There is a 5-day turnaround time for appeals. The denials are tracked by the QI committee.

## Infirmary

There is an area at NRC constructed as an infirmary; however, the area has never been staffed and utilized as an inpatient infirmary. The area is currently being used for mental health observations and security functions. NRC inmates requiring infirmary placement are housed in the Stateville Correctional Center medical department infirmary, which is staffed 24 hours per day, seven days per week.

There were four NRC patients admitted to the Stateville infirmary at the time of our visit. All were considered "chronic" admissions who were housed in the infirmary long term. By policy, these patients require a physician visit once weekly; however, the NRC Medical Director was rounding on these patients at least three times a week at the time of our review. Considering the backlog and daily staffing shortages in the Reception Center, it was evident that the Medical Director's time would be better spent where it was most needed.

We reviewed the health records of all the NRC patients housed in the Stateville infirmary. The physician's notes were essentially illegible in nearly every instance. Despite the frequency of physician visits, we found that the care was inadequate in three of the four records as described below.

### Patient #1
This patient was admitted on 1/16/14 following surgery to repair injuries sustained by a gunshot wound to the abdomen. The Medical Director has been seeing the patient at least three times a week and his notes are almost completely illegible. The vital sign flow sheet had not been filled out since 1/25/14, though vitals are to be measured at least weekly per policy. The most recent set of vitals contained in the record as of the time of our visit on 2/24 were documented in a nurse's note on 2/14; the patient's blood pressure was noted to be quite elevated at 156/111 upon his return from a neurosurgery appointment. It was not repeated.

### Patient #2
This patient was admitted to the infirmary on 1/27/14 directly from Du Page County Hospital with paraplegia resulting from a gunshot wound to the thoracic spine. He was on two blood thinners (Coumadin and Lovenox) and his hemoglobin had dropped significantly from 11.6 on

1/28 to 9.7 on 2/17. It was impossible to tell if the physician had any plans to investigate this further, as we could not decipher his notes.

**Patient #3**
This is a 63-year-old man with a history of stroke resulting in left sided hemiplegia who was admitted to the infirmary on 9/27/13. He also has coronary artery disease with a history of bypass surgery, diabetes, and hypertension. Despite these chronic illnesses, he has not had any blood work since his admission, nor does he appear to be enrolled in the chronic care program.

# Dental Program

## Executive Summary

On May 19 and 20, 2014, a comprehensive review of the dental program at NRC was completed. Five areas of the program were addressed, including:

1. Inmates' access to timely dental care
2. The quality of care
3. The quality and quantity of the providers
4. The adequacy of the physical facilities and equipment devoted to dental care
5. The overall dental program management

The following observations and findings are provided.

The clinic itself consists of a single chair and unit in a rather small room. Two connected closet-sized rooms house the dental laboratory and sterilization area, and are used for the storage of instruments and supplies. The chair and unit are over 20 years old and show wear and tear. Some corrosion, fading and rust is evident. Cabinetry is similarly old and worn.

The Northern Reception and Classification Center (NRC) is the major reception center for the Illinois Department of Corrections. Several hundred inmates a month are moved through the screening examination process, including a dental screening examination. The dental screening examination consists of a very cursory mirror and direct view examination of the intra-oral structures, a panelipse radiograph, and an insufficient and sketchy health history. The teeth are charted for caries and pathology from the mirror examination and the panelipse radiograph. The inmate stands during the examination and lighting is poor. The soft tissue and extra-oral exam is inadequate and almost nonexistent. As a reception center, this should be the most thorough part of the examination. Early detection of soft tissue pathology is central to successful treatment.

The panelipse radiographs are taken two at a time in the same small room. The machines are about four feet apart and x-rays often taken simultaneously. The inmates wear no lead apron protection. No signs are posted warning of radiation hazards. This is a direct violation of radiation safety standards.

The NRC is a reception center for the IDOC and contains a dedicated area for the dental screening examination. This area consists of three small rooms which are adequate to meet this need.

A major area of concern is that comprehensive care was provided without a comprehensive intra and extra-oral examination and well-developed treatment plan. A documented soft tissue examination was not provided nor was periodontal assessment part of the treatment process. No bitewing nor periapical radiographs were ever part of the provided care. Hygiene care was never available nor were oral hygiene instructions ever documented. Restorations were provided from the information from a panelipse radiograph. This radiograph is not diagnostic for caries.

Many, many record entries provided pain medication and/or antibiotics with no documented examination or diagnosis. There is no indication why they were prescribed.

Another area of concern was dental extractions. All dental treatment should proceed from a documented diagnosis. The reason for extractions should be part of the record entry. In none of the records examined was a diagnosis or reason for extraction documented. Documentation, overall, was very poor.

Additionally, antibiotics were prescribed prophylactically after every extraction with no diagnosis or indication why there were provided. This is not a standard of care.

Partial dentures should be constructed as a final step in the sequence of care delivery included in the comprehensive care process. A record review revealed that all partial dentures proceeded without a comprehensive examination and treatment plan. Periodontal assessment and treatment was not provided. Oral hygiene instructions were never included. It was almost impossible to demonstrate that all fillings and extractions were completed prior to impressions. Periodontal health was never documented.

At NRC, sick call is accessed through the inmate request form. Emergencies can be called in by staff and are seen that day. There was no real triage system in place to evaluate urgent care needs, i.e., pain and swelling. Inmates with urgent care complaints from the request form often took six to seven days to be seen by the dentist or other appropriate health care provider. These inmates should be seen within 24-48 hours from the date of the request form.

In none of the records reviewed was the SOAP format being used. Treatment was provided with little or no information or detail preceding it. Record entries did not include clinical observations or diagnosis to justify treatment. As the overwhelming majority of inmates at the NRC are there for a very short time, the emphasis at the NRC should be addressing urgent care needs in a timely manner.

Failed appointments were a serious problem at the NRC. A rate as high as 43% was found. This is an unacceptably high percentage and reflects real mismanagement of the urgent care triage and scheduling process. Because most inmates are there such a short time, by the time they are scheduled to be seen, they have transferred to another institution.

Medical conditions that require precautions and consultation with medical staff prior to dental treatment should be well documented in the health history section of the dental record and "red flagged" to bring them to the immediate attention of the provider. The precautions taken should

also be well documented in the record entry. Anticoagulant therapy is a good bellwether condition to track the above. None of the records examined were "red flagged" for anticoagulant therapy.

Inmate `[redacted]` was on Coumadin therapy and had tooth #19 extracted without mention in the dental record. No precautions were taken or documented prior to the extraction.

Inmate `[redacted]` was on Plavix anti-coagulant therapy and had teeth extracted and not addressed in the dental record. When asked, the dentist said it was managed correctly but not documented. Blood pressures should, at the least, be taken on patients with a history of hypertension. When asked, the clinician indicated that she does not routinely take blood pressures on these patients.

The sterilization area is in a small closet-like room adjacent to the clinic. It was rather unkempt and cluttered. The sterilization flow from dirty to sterile was not in place. The ultra-sonic unit was between the sink and the steam autoclave. Flow should be from ultra-sonic, to sink, to packaging area, to autoclave, to storage. Also, there was not a biohazard warning sign posted in the sterilization area.

Safety glasses were not always worn by patients during treatment. No radiation hazard signs were posted in the area where x-rays are taken.

## Staffing and Credentialing

NRC has a dental staff of one full-time dentist, one 20-hour part-time dentist, two full-time assistants, and a full-time hygienist. This should be adequate to provide meaningful dental services for NRC's 2000 inmates. Dr. Mitchell is employed by the IDOC and all the rest of the staff are contracted by Wexford Health Services.

CPR training is current on all staff, all necessary licensing is on file, and DEA number is on file for the dentist.

Chris Lucey is also an assistant at Stateville CC. The dentists from Stateville are available to help at the NRC when needed. In fact, they are responsible for most of the screening examinations done at the NRC.

Staffing is adequate to meet the needs of the NRC.

**Recommendations:** None

## Facility and Equipment

The clinic consists of a single chair and unit which is over 20 years old and showing wear and tear. Some corrosion, fading and rust is evident. Cabinetry is similarly old and worn. The compressor is in good condition. Hand instruments are in good condition and adequate. The x-ray unit is old but in good repair. Hand pieces are old and many are not functioning.

The clinic itself consisted of a single unit situated in a small but adequate spaces. Free movement around each unit is acceptable Provider and assistant have adequate room to work. There are two closet-sized rooms adjacent to the clinic for storage, the dental lab, and for sterilization. Overall, the clinic was well enough equipped and Dr. Brown felt all equipment was in good shape and functional. She expressed some difficulty in getting equipment repaired due to a lack of funds and administrative support.

The area and rooms where the screening exams are provided should have chairs and be better lighted. The panelipse x-ray units are old but seem to function OK.

**Recommendations:**
1. The chair and unit should be considered for replacement in the near future. Hand pieces should be repaired.
2. The examination rooms for the screening exams should be better equipped. Patients should be seated and lighting should be adequate for the exam.

## Sanitation, Safety, and Sterilization

We observed the sanitation and sterilization techniques and procedures. Surface disinfection was performed between each patient and was thorough and adequate. Proper disinfectants were being used. Protective covers were utilized on many of the surfaces.

An examination of instruments in the cabinets reveals that most were properly bagged and sterilized. The intake screening examination mirrors were bagged and sterilized in bulk. After observing how they are managed during the examination process, which was unsanitary, perhaps is would be best to bag them individually. All hand pieces were sterilized and in bags.

The sterilization area is in a small closet-like room adjacent to the dental clinic. It is rather unkempt and cluttered. It has inadequate work space to maintain proper sterilization flow from dirty to sterilized to storage. The ultrasonic cleaner sits between the sink and the autoclave. There was not a bio hazard label posted in the sterilization area.

Safety glasses were not always worn by patients. Eye protection is always necessary, for patient and provider.

I also observed that no warning sign was posted where x-rays were being taken to warn pregnant females of possible radiation hazards.

**Recommendations:**
1. That the sterilization area be neatened and every attempt made to correct the sterilization flow. It may mean reconfiguring the space and the storage utilization therein.
2. That safety glasses be provided to patients while they are being treated.
3. That a biohazard warning sign be posted in the sterilization area.
4. A warning sign be posted in the x-ray area to warn of radiation hazards, especially pregnant females.

## Review Autoclave Log

I looked back two years and found the sterilization logs to be in place. They showed that autoclaving was accomplished weekly and documented. They utilize the Schein Maxi-test biological vial system with the incubator in the sterilization area. No negative results were obtained. I did observe that no biohazard warning sign was posted in the sterilization area.

## Comprehensive Care

We reviewed 10 dental records of inmates in active treatment classified as Category 3 patients.

As a reception center, only a very small percentage of the population is actually designated to this institution. It represents about 10% of the population at the NRC, and these inmates are housed in the minimum-security unit. This is the population that should be considered for comprehensive care. They will be there long enough to be eligible and available for this level of care. With 90% of the population as very short-term screening and classification inmates, this is where the vast majority of dental resources should be directed at the NRC. This population need not be considered for routine care. They will receive that level of care at their designated institution. The main emphasis at the NRC should be addressing emergencies and urgent care and providing the screening examinations. Access to care through the sick call process becomes all important. All complaints of pain or swelling should be seen within 24-48 hours, that is, the next working day from receipt of the complaint.

Because of the rapid turnover of inmates, most of the records reviewed were very recent, and I focused on inmates who received routine operative dentistry, that is, permanent fillings. Many, if not most, of these inmates were from the transient, short-term population.

One of the most basic and essential standards of care in dentistry is that all routine care proceed from a thorough, well documented intra and extra-oral examination and a well-developed treatment plan, to include all necessary diagnostic x-rays. A review of 10 records revealed that no comprehensive examination was performed and no treatment plans developed. No examination of soft tissues or periodontal assessment was part of the treatment process. No bitewing or periapical x-rays were ever part of the treatment. Hygiene care was never provided as part of the treatment. Oral hygiene instructions were never documented. Restorations were provided from the information from the panorex radiograph. This radiograph is not diagnostic for caries.

Many, many record entries provided pain medication and/or antibiotics with no documented examination or diagnosis. There was no indication why they were provided. An example was a record entry from 3/24/14. It read: "R/E exam; Rx Ibuprofen 400mg x 30; N.V. amalgams #'s 29, 30, 31."

Many, many record entries also were n/s (no show) and/or reschedule. When asked, the dentist said patients were rescheduled or did not show for a variety of reasons. These included no assistant, inmate transferred, security issues, quarantine, and the inmate just did not show. This issue is addressed in the failed appointment section of this report.

**Recommendations:**
1. Comprehensive "routine" care be provided only from a well-developed and documented treatment plan.
2. The treatment plan be developed from a thorough, well-documented intra and extra-oral examination, to include a periodontal assessment and detailed examination of all soft tissues.
3. In all cases, that appropriate bitewing or periapical x-rays be taken to diagnose caries.
4. Hygiene care be provided as part of the treatment process.
5. That care be provided sequentially, beginning with hygiene services and dental prophylaxis.
6. That oral hygiene instructions be provided and documented.
7. Provide comprehensive, routine care only to the designated, long term population.

## Dental Screening

We reviewed 10 inmate dental records that were received from the reception centers within the past 60 days to determine if screening was performed at the reception center and a panoramic x-ray was taken. (Administrative Directive 04.03.102 page 2, ACA Standard 4-4360).

The reception screening consists of several stations in linear succession. Inmates go from one station to the next until they are completed. Medical, mental health, and dental are all included as stations in this process.

The dental screening examination consists of a cursory mirror and direct view examination of the intra-oral structures, a panelipse radiograph, and a very sketchy health history. The teeth are charted for pathology from the direct examination and from the panelipse x-ray. One dentist was there to screen over 70 inmates. I was told there are often more. The inmate was standing while being examined. The examiner's hands never entered the oral cavity. The exam was very quickly done, taking about 15 seconds. Lighting was poor. Mirrors came from a bulk package of sterilized mirrors from the NRC dental clinic. The panelipse x-rays are taken two at a time in the same small room. The machines are about three to four feet apart. They are often taken simultaneously. The inmates wear no lead apron protection, nor are there any signs warning of radiation hazard. The radiographs are taken and developed by inmates from the minimum security unit, a satellite of NRC. They also reload the cassettes that hold the film. The films are developed, dated and labeled with inmate information. They make it to the medical record from there.

Several areas of concern are evident.

Very little area disinfection or clinician hygiene took place between patients. Gloves were not consistently changed between patients. Even though they only held the mirror handle and never entered the inmate's mouth, gloves should be changed between patients.

Mirrors were grabbed haphazardly from the pile in the opened bulk bag.

All in all, the exam is inadequately cursory. Inappropriately, many institutions use this exam as a

comprehensive exam from which treatment is delivered. The soft tissue exam should be more thorough.

Inmates are provided no protection from radiation while the panelipse is being taken. They stand three to four feet from each other while x-rays are taken simultaneously.

Caries are charted on the dental record from the panelipse x-ray.

The health history is sketchy and quickly taken. Conditions that might require medical consultation prior to treatment, e.g., anti-coagulant therapy, are not red flagged to capture the immediate attention of the clinicians.

**Recommendations:**
1. Provide a more thorough soft tissue examination. This is the most important part of the screening exam and should include intra-oral palpation and a well-lighted examination of all soft tissue surfaces.
2. Note pathology seen on the panelipse radiograph. Do not diagnose small carious lesions from this radiograph.
3. Do not provide comprehensive routine care from this examination. This is a screening examination.
4. Do not take the panelipse radiograph simultaneously with inmates standing next to each other. This is a direct violation of radiation safety. Provide protective lead apron coverage to the inmate receiving the x-ray.
5. Place signage in the radiograph area warning of radiation hazard.
6. Individually bag and sterilize the mouth mirrors or use disposable mirrors.
7. Wash hands and change gloves between patients.
8. Take a more thorough health history and "red flag" health issues that require medical attention prior to dental treatment.

## Extractions

We reviewed 10 dental records of dental surgical inmates to determine if:
1. Recent pre-operative radiographs reflecting the current condition of tooth extracted. X-rays must be of diagnostic value showing apices of teeth.
2. Reason for extraction is documented.
3. Consent form is used and signed by the patient.

One of the primary tenets in dentistry is that all dental treatment proceeds from a well-documented diagnosis. In none of the records examined was a diagnosis or reason for extraction included as part of the dental record entry. Documentation was very poor.

Additionally, antibiotics were provided to every patient post-operatively who had a dental extraction, even if not indicated. This is not a standard of care nor an appropriate use of antibiotics. It should cease immediately. There is no reason to give antibiotics routinely after extractions. They should be prescribed appropriately and only when indicated.

**Recommendations:**

1. A diagnosis or a reason for the extraction be included as part of the record entry. This is best accomplished through the use of the SOAP note format, especially for sick call entries. It would provide much detail that is lacking in most dental entries observed. Too often, the dental record includes only the treatment provided with no evidence as to why that treatment was provided.
2. Provide antibiotics appropriately from a diagnosis and only when indicated.

## Removable Prosthetics

We reviewed dental records of five patients having received completed partial dentures to determine if restorative procedures were completed prior to fabrication of partial dentures (68-MED-12 Dental Services D. Provision of Dental Care page 4 #5 and #9).

Removable partial denture prosthetics should proceed only after all other treatment recorded on the treatment plan is completed. The periodontal, operative and oral surgery needs all should be addressed first.

I was able to find three patients with partial dentures constructed or being constructed. The partial dentures are constructed through Stateville CC, the parent institution. A comprehensive examination and treatment plan was never part of the treatment process. Periodontal assessment and treatment was not provided in any of the records. Because there is no comprehensive examination or any treatment plans developed and documented in any of the records, it is almost impossible to ascertain if all necessary care, including operative and/or oral surgery treatment, is completed prior to fabrication of removable partial dentures.

**Recommendations:**

1. A comprehensive examination and well developed and documented treatment plan, including bitewing and/or periapical radiographs and periodontal assessment, precede all comprehensive dental care, including removable prosthodontics.
2. That periodontal assessment and treatment be part of the treatment process and that the periodontium be stable before proceeding with impressions.
3. That all operative dentistry and oral surgery as documented in the treatment plan be completed before proceeding with impressions.

## Dental Sick Call

Inmates access care via an inmate request form. Emergencies can be called in by staff and Dr. Brown says she attempts to see them that day. Inmate requests are logged into a large bound ledger indicating complaint, date of request and date of appointment. The requests are reviewed and somewhat prioritized by the urgency nature of the request. This is not a meaningful triage system. In none of the records reviewed was mention made of the inmate complaint. No observations were noted. No assessments were made. The only entry is the provided treatment. Often the treatment was pain medication or antibiotic with no documentation as to why they were prescribed.

I extrapolated figures from this Offender Request Log. On average, 12 requests are received by

the dental clinic daily. Of those, about 50% are with complaints of pain, swelling, or toothaches. Looking at those requests for February, March, and April, the average appointment date was seven days from the date of the request. Every effort should be made to evaluate these inmates in person within 24-48 hours from receipt of the request form.

In none of the dental records reviewed was the SOAP format being used. As a result, treatment was usually provided with little information or detail preceding it. Sick call record entries did not include clinical observations or diagnosis to justify provided treatment. The use of the SOAP format would insure that a well-developed diagnosis would precede all treatment. Routine care was not provided at these appointments.

**Recommendations:**
1. Implement the use of the SOAP format for sick call entries. It will assure that the inmate's chief complaint is recorded and addressed and a thorough focused examination and diagnosis precedes all treatment.
2. Develop a request/sick call system that insures that inmates complaining of pain/swelling/toothaches are seen by a provider and evaluated within 24-48 hours from receipt of the request.

## Treatment Provision

Inmates request care via the inmate request form emergency slips. The CMT collects them at the units and puts them in a box outside of dental. The request forms themselves are triaged and appointments prioritized based on the urgency nature of the request. No formal triage system exists.

Inmates can seek urgent care via the request form or if they feel their need is an emergency by contacting institution staff, who then call the dental clinic with the inmate's complaint. Dr. Brown said she makes every attempt to see those patients that day. Extrapolating figures from the Offender Request Log, I determined that the average wait time for inmates with complaints of pain/swelling/toothache was seven days from the time of the submission of the request form until they were scheduled. A review of several records revealed that they were often seen later than that due to the high no show and reschedule rate. Many of the inmates had transferred out of NRC by the time of their appointment. The dental program at NRC should be basically a sick call practice. Addressing urgent care complaints should be a primary mission of the dental program at this institution. They should be seen in a timely and expeditious manner and their complaints addressed.

Routine care is accessed from the request form. They are seen within 14 days and treatment started. There is no waiting list and reschedules are seen within 14 days. Although the system seems fair and equitable, this care should be available to the designated population at the MSU only. Only palliative care need be provided to the orientation population. This group represents over 90% of the population.

**Recommendations:**
1. Develop a system such that urgent care complaints (pain, swelling, toothaches) are seen

in person for evaluation and triage by the next working day, and that care be provided expeditiously. Otherwise, these inmates are transferred and gone if too much time elapses. This should be a primary mission at NRC.

2. Provide routine comprehensive care to the designated MSU population only.

## Orientation Handbook

The NRC is included in the Stateville Offender Orientation Manual. It addresses the orientation screening exam, but in little detail. Only that the inmate will receive one as soon as possible. It explains how to access emergency care but does not explain the requests form system for accessing urgent and routine care. It describes the hours of operation, partial dentures, appointments and cleanings.

**Recommendations:**
1. Insure that the orientation manual describes fully and accurately how inmates can access both urgent and routine care via the inmate request form system.

## Policies and Procedures

The Institutional Directives and policies are maintained in the Assistant Warden's office at Stateville CC and apply to both the NRC and Stateville. I will review them at Stateville CC.

**Recommendations:** None

## Failed Appointments

It became quickly apparent that failed appointments were a real problem at the NRC. To gets a more accurate picture of the problem, I chose the 23 days of appointments in March and April. This seemed to represent an accurate sample. For those 23 days, there were 409 scheduled appointments. Of that number, 165 patients were actually seen. This represents only 40% of the patients who were scheduled. The rest were rescheduled, transferred, or no showed. Of the patients who could have been seen (scheduled minus transferred), 43% failed their appointment. The 20% who were transferred reflect the time from when they were logged into the appointment book to when they were scheduled and the understandable high and rapid turnover rate at the NRC.

These are alarming numbers and reflect a probable serious mismanagement of this population.

**Recommendations:**
1. As mentioned in other sections of this report, the focus of the dental program at the NRC should reflect the mission of the institution. Almost all resources should be directed toward seeing urgent care complaints from the undesignated, short term population and in providing the screening examinations. Every effort should be made to see inmates complaining of pain or swelling in a timely manner, within 24-48 hours. These inmates need not be scheduled for operative dentistry. Only palliative care need be provided. A sick-call system should be established that can accomplish this goal. Administration should be involved in this project and in assisting the dental program in getting inmates

to the clinic for their appointment. The inmate handbook should make it clear who is eligible for routine care.

## Medically Compromised Patients

No system is in place to identify medically compromised patients and red flag those that may need medical consultation prior to dental procedures. The health history review and documentation is very cursory from the NRC screening examination.

Inmate [redacted] was on Coumadin therapy and had tooth #19 extracted. No mention was made in the dental record and no precautions were addressed or documented prior to the extraction.

Inmate [redacted] was on Plavix anti-coagulant therapy and this was not addressed in the dental record prior to a dental extraction on 5/13/14. When asked, Dr. Brown says it was managed properly, but not documented in the dental record.

When asked, Dr. Brown indicated that she does not routinely take blood pressures on patients with a history of hypertension.

**Recommendations:**
1. That the medical history section of the dental record be kept up to date and that medical conditions that require special precautions be red flagged to catch the immediate attention of the provider.
2. That blood pressure readings be routinely taken of patients with a history of hypertension, especially prior to any surgical procedure.
3. That the health history be addressed and updated on every patient and that consultation with medical be provided and documented when indicated. This issue is serious and needs to be corrected immediately.

## Specialists

Dr. Frederick Craig, oral surgeon, is utilized by the NRC for oral surgery services. The inmates are scheduled and managed from the Stateville CC parent institution. Both institutions also use Joliet Oral Surgeons for more complicated general anesthesia cases and for facial fractures. None of the information was maintained at the NRC

**Recommendations:** None.

## Dental CQI

The dental program contributes monthly dental statistics to the CQI committee. The NRC participates with the Stateville CC, CQI committee meetings, as part of the entire dental program. These minutes are maintained at Stateville CC. No studies were in place for the NRC at the time of this visit. In light of the number of program weaknesses, this is unacceptable.

**Recommendations:**

1. The Continuing Quality Improvement process should be used extensively and continuously to assist in correcting the deficiencies noted in the body of this report. A good starting point would be to focus on addressing urgent care needs in a timely and efficient manner.

## Continuous Quality Improvement

From our review of minutes and discussion with the Director of Nursing, the Health Care Unit Administrator has not been overseeing this program. We were shown minutes, but the minutes only contained studies performed at Stateville. As we have said earlier, without strong leadership insuring that the infrastructure is in place, meaning that logs are conscientiously maintained and therefore utilized in order to do monitoring, the quality improvement program has no possibility of being effective. Such logs include a reception processing log, a sick call log, an urgent care log, an emergency send out log and a scheduled offsite visit log. Without these structural elements, self-monitoring is extremely difficult, if not impossible. In our view, the quality improvement program at NRC is not functional and requires a complete overhaul.

# Recommendations

**Leadership and Staffing:**
1. NRC warrants a leadership team comparable to any other busy prison, including a Medical Director, a Health Care Administrator and a Director of Nursing.
2. NRC needs its own staffing grid with sufficient staff dedicated to meeting the service needs of NRC.

**Clinic Space and Sanitation:**
1. There should be a designated exam room in each housing unit appropriately equipped for conducting sick call.

**Reception Processing:**
1. The policy approach to NRC is inconsistent with the reality of service demands. The assumption that patients have their medical intake completed within a week and then are transferred out is not applicable to a substantial number of patients. Therefore, this philosophy must be changed. This is especially true for patients with chronic diseases or who need scheduled offsite services.
2. The intake assessment by an advanced level clinician must include questions regarding current symptoms and include the development of a problem list and relevant plan.
3. Sufficient resources should be available such that the physical exams can be completed within one week of arrival.
4. NRC must begin conscientiously using logbooks, either paper or electronic, for intake processing.

**Intrasystem Transfer:**
1. The intrasystem transfer process must be designed to insure continuity of care for identified problems.

**Medical Records:**
1. The medical records of patients at NRC who remain beyond two weeks or who are housed at the minimum-security unit must be managed in exactly the same manner as patients at any permanent institution.
2. Medical records staffing must be adequate to insure that records of patients who stay more than two weeks or who are housed in MSU are maintained in the same manner per DOC policy as records at permanent institutions.

**Sick call:**
1. Officers must be eliminated from the procedures that enable inmates to request health care services; thus, inmates must either place the requests in a lockbox or give them to health care staff.
2. There must be ongoing professional performance review of both nurse sick call and advanced level clinician sick call, which includes feedback on individual cases in order to improve professional performance.
3. NRC must begin conscientiously using logbooks, either paper or electronic, for sick call.

**Chronic Disease:**
  1. The policy regarding chronic diseases must be that patients who remain beyond two weeks must have their initial chronic care visit at NRC before a total of 30 days have passed. This is clearly the case routinely with higher security inmates.
  2. NRC must begin conscientiously using logbooks, either paper or electronic, for the chronic disease program.

**Medication Administration:**
  1. Medication administration must include a designated officer to escort the nurse and insure that patients appropriately identify themselves with their ID card, that they bring water in a container so as to ingest the medication, and so that the officer can do a mouth check after ingestion.

**Urgent/Emergent Care:**
  1. NRC must begin conscientiously using logbooks, either paper or electronic, for urgent/emergent care.

**Scheduled Offsite Services-Consultations/Procedures:**
  1. Patients whose problems require scheduled offsite services who are a higher level of security must have those scheduled while at NRC.
  2. NRC must begin conscientiously using logbooks, either paper or electronic, for scheduled offsite services.

**Continuous Quality Improvement:**
  1. The quality improvement program must be reenergized with knowledgeable leadership that has been provided specific training regarding quality improvement philosophy and methodology.
  2. The leadership of the continuous quality improvement program must be retrained regarding quality improvement philosophy and methodology, along with study design and data collection.
  3. This training should include how to study outliers in order to develop targeted improvement strategies.

# Appendix A – Patient ID Numbers

**Intrasystem Transfer:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | [redacted] | [redacted] |
| Patient #2 | [redacted] | [redacted] |
| Patient #3 | [redacted] | [redacted] |
| Patient #4 | [redacted] | [redacted] |
| Patient #5 | [redacted] | [redacted] |
| Patient #6 | [redacted] | [redacted] |
| Patient #7 | [redacted] | [redacted] |
| Patient #8 | [redacted] | [redacted] |
| Patient #9 | [redacted] | [redacted] |
| Patient #10 | [redacted] | [redacted] |
| Patient #11 | [redacted] | [redacted] |
| Patient #12 | [redacted] | [redacted] |
| Patient #13 | [redacted] | [redacted] |
| Patient #14 | [redacted] | [redacted] |
| Patient #15 | [redacted] | [redacted] |
| Patient #16 | [redacted] | [redacted] |

**Provider Sick Call:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | [redacted] | [redacted] |
| Patient #2 | [redacted] | [redacted] |
| Patient #3 | [redacted] | [redacted] |
| Patient #4 | [redacted] | [redacted] |
| Patient #5 | [redacted] | [redacted] |
| Patient #6 | [redacted] | [redacted] |
| Patient #7 | [redacted] | [redacted] |
| Patient #8 | [redacted] | [redacted] |

**Scheduled Offsite Service:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | [redacted] | [redacted] |
| Patient #2 | [redacted] | [redacted] |

**Chronic Disease Management:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | [redacted] | [redacted] |
| Patient #2 | [redacted] | [redacted] |
| Patient #3 | [redacted] | [redacted] |
| Patient #4 | [redacted] | [redacted] |
| Patient #5 | [redacted] | [redacted] |

| Patient #6 | [redacted] | [redacted] |
| Patient #7 | [redacted] | [redacted] |
| Patient #8 | [redacted] | [redacted] |
| Patient #9 | [redacted] | [redacted] |
| Patient #10 | [redacted] | [redacted] |

**Infirmary:**

| Patient Number | Name | Inmate ID |
| --- | --- | --- |
| Patient #1 | [redacted] | [redacted] |
| Patient #2 | [redacted] | [redacted] |
| Patient #3 | [redacted] | [redacted] |

# Dixon Correctional Center (DCC) Report

February 2014

Prepared by the Medical Investigation Team

Ron Shansky, MD
Karen Saylor, MD
Larry Hewitt, RN
Karl Meyer, DDS

# Contents

**Overview** ...........................................................................................................................3

**Executive Summary** ........................................................................................................3

**Findings** ...........................................................................................................................4
    Leadership and Staffing ...............................................................................................4
    Clinic Space and Sanitation .........................................................................................7
    Intrasystem Transfer ....................................................................................................7
    Medical Records ...........................................................................................................9
    Nursing Sick Call..........................................................................................................9
    Clinician Sick Call......................................................................................................13
    Chronic Disease Management......................................................................................15
    Pharmacy/Medication Administration .......................................................................21
    Laboratory ..................................................................................................................21
    Unscheduled Services/Emergency Services ..............................................................22
    Scheduled Offsite Services .........................................................................................23
    Infirmary Care ............................................................................................................25
    Infection Control .........................................................................................................32
    Dental Program...........................................................................................................32
    Continuous Quality Improvement ..............................................................................40

**Recommendations** ........................................................................................................42

**Appendix A – Patient ID Numbers** ...........................................................................46

# Overview

On February 26-28, 2014 we visited the Dixon Correctional Center (DCC) in Dixon, Illinois. This was our first site visit to DCC and this report describes our findings and recommendations. During this visit, we:

- Met with leadership of custody and medical
- Toured the medical services area
- Talked with health care staff
- Reviewed health records and other documents
- Interviewed inmates

We thank Warden Chandler and her staff for their assistance and cooperation in conducting the review.

# Executive Summary

Dixon is a multi-mission prison that houses male offenders with special needs including seriously mentally ill, developmentally disabled and geriatric inmates with cognitive and/or mobility impairments, and a hospice program. The current population is 2349 inmates. The institution is not a reception center but has a 28-bed infirmary and mental health mission. Approximately 70% or more are on medications.

The vacuum of leadership from the Medical Director position, the Director of Nursing position and the Health Care Unit Administrator position have resulted in breakdowns with almost every major service that inmates receive. The non-compliance with DOC policies is at least in part attributable to these vacancies but also possibly to line staff position vacancies. The end result is liability for both the inmates and the state. This liability begins with the absence of a functional intrasystem transfer process implemented to facilitate continuity of required services. In other facilities, newly transferred patients are brought to the medical area to initiate this continuity. This is not consistently happening at Dixon. In fact, some inmates go lengthy periods of time before this process is initiated. Additionally, unscheduled services or urgent/emergent services are not logged or tracked in any way. We attempted to review some responses through randomly provided incident reports. There is no possibility, therefore, that there can be an organized process to determine timeliness and appropriateness of responses from both nursing staff and clinician staff. In addition, we found cases where the follow-up was deficient but of course the institution was unable to identify this.

Even the clinician sick call was not tracked with the logging system and therefore the pages we were provided that listed patients who were seen by specific clinicians were overwhelmingly not seen at all or not seen within a week of the date listed on the pages provided.

Scheduled offsite services were fraught with lengthy delays, most especially after the Wexford physician had given verbal approval of the service. The U of I coordinator sometimes did not

hear of the official authorization with a number for up to two months after the verbal approval. The end result is significant delays in access to services. Many services, once the authorization number is provided, do not occur for as much as three to five months. There is no regular follow-up of these patients in the interim and sometimes even after the service is provided there is not appropriate follow-up to insure continuity of care.

There is no single designated chronic care nurse. Rather, each nurse is assigned a single chronic disease clinic. The result is a fragmented and disjointed program with no cohesive oversight. It was not surprising, therefore, that we found that the program is not being utilized effectively; we came across many patients with chronic illnesses who were not enrolled in the program and others who were enrolled but not seen according to policy.

Medical records are not adequately maintained. Many are overstuffed with outdated information while lacking current reports and MARs. Problem lists are often not kept updated.

The infirmary had multiple deficiencies. LPNs are working outside the scope of practice, and patients are not seen according to policy by providers. Rarely is there evidence that patients are physically examined by the provider. Documentation was insufficient in terms of dates/times, vital signs, signatures and the required SOAP format was not always used. Call buttons were positioned where it could be difficult or impossible for the patient to access; there were no call buttons in the patient rooms along one long hallway and no direct line-of-sight to the nursing station in six of the rooms. There was no security presence in the infirmary despite the presence of inmates of all security classifications. There was insufficient equipment and supplies.

Having described the above deficiencies, it is not surprising that the quality improvement program is non-functional. Although there are meeting minutes from August 2013 and December 2013, in neither of those meetings was there any discussion of how to improve the quality of services. The person assigned to run the program has had no training and admits that she is not knowledgeable about how to perform this duty. As alluded to earlier, in this facility there were almost no functional logbooks used to track and therefore capable of being utilized for self-monitoring and improvement activities. Therefore, it is not surprising that virtually no self-monitoring and certainly no improvement activities are occurring.

# Findings

## Leadership and Staffing

At the time of our visit, the Health Care Unit Administrator position was vacant as well as the Director of Nursing position. Both positions are state positions. Additionally, there was an acting Medical Director, which is a Wexford position, because that position had been vacant since August. The Wexford physician filling in for the Medical Director, when queried about the Medical Director duties she performed, described primarily being responsible for the scheduled offsite services utilization management and being available to consult with nurses and other clinicians when she was onsite. She was not on call, she provided no training for staff and she herself was not knowledgeable with regard to the quality improvement program. She did no clinical performance assessments. At a facility with as complex a medical mission as the Dixon

Correctional Center, the leadership vacuum raised a red flag, which was ultimately supported by our clinical findings. These vacancies must be filled as quickly as possible. There were two supervisory nursing positions, one a state nurse and one a Wexford nurse.

Other staffing is listed in the following

table: *Table 1. Health Care Staffin*

| Position | Current FTE | Filled | Vacant | State/Cont. |
|---|---|---|---|---|
| Medical Director | 1.0 | 0 | 1 | Contract |
| Staff Physician | 1.0 | 1.0 | 0 | Contract |
| Nurse Practitioner | 2.0 | 1.0 | 1 | Contract |
| Health Care Unit Adm. | 1.0 | 0 | 1 | State |
| Director of Nursing | 1.0 | 0 | 1 | State |
| Nursing Supervisor | 1.0 | 1.0 | 0 | State |
| Nursing Supervisor | 1.0 | 1.0 | 0 | Contract |
| Corrections Nurse I | 16.0 | 9.0 | 7 | State |
| Corrections Nurse II | 2.0 | 2.0 | 0 | State |
| Registered Nurse | 8.0 | 7.0 | 1 | Contract |
| Licensed Practical Nurses | 10.0 | 9.0 | 1 | Contract |
| Certified Nursing Aide | 6.0 | 4.0 | 2 | Contract |
| Health Information Adm. | 1.0 | 0 | 1 | State |
| Health Info. Assoc. | 1.0 | 1.0 | 0 | State |
| Phlebotomist | 0.5 | 1.0 | 0 | Contract |
| Radiology Technician | 1.0 | 1.0 | 0 | Contract |
| Pharmacy Technician | 3.0 | 3.0 | 0 | Contract |
| Pharmacy Technician | 1.0 | 1.0 | 0 | State |
| Staff Assistant I | 1.0 | 0 | 1 | Contract |
| Staff Assistant II | 3.0 | 3.0 | 0 | Contract |
| Chief Dentist | 1.0 | 1.0 | 0 | Contract |
| Dentist | 0.4 | 0.4 | 0 | Contract |
| Dental Assistant | 1.0 | 1.0 | 0 | State |
| Dental Assistant | 1.0 | 1.0 | 0 | Contract |
| Optometry | 0.2 | 0.2 | 0 | Contract |
| Physical Therapist | 0.2 | 0.2 | 0 | Contract |
| Physical Therapy Asst. | 1.0 | 0 | 1 | Contract |
| **Total** | **66.3** | **48.8** | **18 (10 state & 8 contract)** | |

## Staffing Concerns

Of particular concern are the vacant Medical Director, Health Care Unit Administrator and Director of Nursing positions and the length of time they have been vacant. These three positions represent the leadership team of the medical department. To have one of the three positions vacant represents a significant negative impact on the medical program, but to have all three

vacant spells disaster. Even though administrative staff has been assigned to oversee the department and has worked hard to hold the program together, this strategy is like placing a small band-aid on very large wound.

While there are two supervising RNs, both are new to their positions, and one RN is employed by the state and the other is employed by the medical vendor and functions primarily as the vendor's site contract manager. As a result, their missions are not completely aligned. Each of the individuals needs to be mentored, to be taught, to be monitored and to be evaluated. This can only be accomplished by health care educated, credentialed and licensed medical department administrative staff, i.e., a Director of Nursing and Health Care Unit Administrator.

Nursing scheduling is in shambles as a result of each supervising nurse scheduling her own staff, i.e., state employed or vendor employed. As a result, coupled with significant state nursing vacancies, overtime is used daily to provide for minimum staffing. Minimum staffing results in minimum accomplishment as there is not enough staff to effectively complete required tasks such as complete charting, intake interviews, physical examinations, chronic illness clinics, EKGs and sick call. The Director of Nursing position provides for specific oversight of the nursing function through centralized scheduling, training, monitoring and evaluating nursing staff performance.

The Health Care Unit Administrator position provides a medical administrative perspective of the total medical program and mission. The position requirements go beyond just supervision of staff but, more importantly, the constant monitoring, evaluating and editing of the program to assure compliance with established policy and procedure and the enhancement of both medical services delivery and the quality of services. This is not a onetime effort, as constant monitoring, evaluating and editing are required.

While on paper the Medical Director hours are being filled by a medical vendor provided travelling physician, it cannot be argued this arrangement is the equivalent of having a full-time Medical Director. With this arrangement, there is no ownership of the program, no continuity of administrative oversight and no continuity of medical authority as required by the comprehensive health care contract.

IDOC policy requires periodic age and gender specific physical examinations are conducted and documented during the inmate's birth month. Of 10 records reviewed, five were problematic, with multiple deficiencies. The problems noted were:

1. No documented eye examination in two records
2. No date and time of examination noted or signature of the nurse
3. No documented nursing assessment in two records
4. No documented physician treatment plan in one record

This confirms there may be problems with both administrative supervision and staffing.

# Clinic Space and Sanitation

Dixon Correctional Center originally opened in 1918 for the care of epileptics but soon housed mentally ill patients. The Department of Mental Health assumed control in 1961 and changed the name to the Dixon Developmental Center in 1975. The developmental center was later closed, purchased by the Illinois Department of Corrections and reopened in 1983 as a medium security adult male facility housing a large mental health, special needs and geriatric populations.

As a result of the original mental health hospital design, the current medical building is a large three-story building serving multiple functions. All three floors are heated and air-conditioned. The first floor includes a large inmate waiting area, x-ray suite, dental clinic, optometry clinic, medication preparation and storage, medical records, procedure room, library, two nurse sick call examination rooms, three physician/NP examination rooms and multiple offices.

The second floor, accessed by elevator or stairs, is divided in half with a 25-bed mobility impaired unit (ADA) and the other half being a 28-bed infirmary. At the time of the inspection, there were 19 patients in the ADA unit, and 22 patients in the infirmary.

The third floor, also accessible by elevator or stairs, is an 84-bed geriatric unit. To be eligible, a patient must be at least age 50 and have two or more diagnosed chronic illnesses. At the time of the inspection, all 84 beds were full.

The building was reasonably clean, well lighted and well maintained. There are inmate porters assigned to each floor for cleaning purposes. Individuals housed on the third floor are responsible to keep their rooms clean, and inmate porters provide the janitorial services for the common areas.

Medical areas are observing blood-borne pathogen precautions, and a licensed medical waste disposal company is used.

The beds on the third floor appeared extremely old and worn. Of significant concern was the style of bed being used, which was a steel frame with a system of interconnected springs on which the mattress is laid. The style is problematic for these reasons:

1. There are significant security concerns since many parts of the bed can be easily taken apart and fabricated into a weapon.
2. This style of spring support system is problematic for older patients due to it causing chronic back pain, stiffness and loss of flexibility and mobility.
3. The bed is difficult to thoroughly clean and sanitize between patients.

# Intrasystem Transfer

An adequate intrasystem transfer program begins with patients being presented to the medical unit at the time of arrival with their records and the health transfer summary form. A nurse should be reviewing the form, identifying problems, medications, allergies and any appointments that need to be scheduled based on what is documented in the medical record. This should be

accomplished on the same day the patients arrive, but certainly no later than the following day shift. The current system indicates that the nurses are not familiar with the requirements and are not appropriately trained; in addition, the process is not only not monitored but nursing staff are not being provided with feedback so that their performance improves. Given the absence of logging and tracking by the medical program, it is not at all surprising that these deficits exist and ultimately, liability is created both for the inmates and for the state. It is possible that nursing position deficits contribute to this problem.

We looked at 12 records of patients who entered as recently as February 2014 and as far back as December of 2013. Of the 12 records we reviewed, there were problems with virtually all of them. In fact, we learned that it is unusual for the normal intrasystem transfer policy to be followed. When patients are brought in, they are not brought to the medical area; instead, a nurse sees them and attempts to learn if there are any critical medication needs. There is an effort to respond to those needs, but that is the only thing that happens with regard to intrasystem transfers. We learned that due to staffing shortages, they are unable to acquit this critical obligation. We found five records which were delayed significantly and seven where they were either not done at all or done incorrectly. We will provide some examples.

**Patient #1**
This is a 36-year-old who arrived at Dixon on 2/4/14 with mental health problems and no chronic medical problems. His health transfer summary has still not been completed.

**Patient #2**
This is a patient from Pinckneyville with mental health problems and this was done incorrectly. The top part of the intrasystem transfer or health transfer summary is to be filled out by the sending institution based on a record review. The bottom half is to be filled out at the receiving institution and includes a face-to-face discussion with the inmate of the summarized problems, medications, appointments, etc. The nurse at Dixon pulled a new health transfer summary form and again filled out the top, which did not enable vital signs to be performed because the nurse did not even see the patient.

**Patient #3**
Although this patient arrived on 2/4/14, his medical record has not arrived. This is another case in which at Shawnee the top half of the form was completed and the Dixon staff person pulled another new form and repeated that information without talking to the patient or performing any vital signs.

**Patient #4**
This is a 37-year-old asthmatic with psych problems. This patient arrived on 2/4/14, the health transfer summary was completed on 2/13, eight days later, but it lacked a referral to the asthma clinic.

**Patient #5**
This is a 27-year-old with multiple sclerosis. The health transfer summary was done on 2/26/14, approximately three weeks after he arrived, but there is no referral to the chronic care clinic for his multiple sclerosis.

**Patient #6**

This is a 30-year-old who arrived 1/29/14, with mental health issues and hypothyroidism, along with hypertriglyceridemia. The transfer summary was completed on 2/9, a little more than a week after his arrival, but there is no referral to the chronic care program for his hypothyroidism and his hypertriglyceridemia.

## Medical Records

Many health records were overstuffed and in dire need of thinning. This not only hampered our review but also more importantly is an obstacle to the efficient delivery of care by the onsite providers. Not only do the charts often contain excessive amounts of outdated information, but also current reports and MARs are often missing. As described in the Chronic Disease section of this report, we found piles of MARs dating back for months in the medical records department. This of course renders it nearly impossible for providers to objectively monitor patients' medication compliance.

The infirmary charts are essentially small piles of loose filing clipped into ancient metal clipboards. The permanent files are also kept in the infirmary, but these are not used for charting even when patients are permanently housed in the infirmary. Lastly, we noted that problem lists were often not kept up to date.

## Nursing Sick Call

Nursing sick call is conducted daily, Monday through Friday.

Nursing sick call, at this time, is difficult to assess due to the following four reasons:

1. The facility is using two different procedures for inmates to access sick call.
2. When sick call request slips are used, they are not being triaged by an RN.
3. There is no maintenance of sick call request slips or a sick call log.
4. Non-RNs are conducting sick call.

The first procedure being used for sick call is the sick call request slip method. Currently, an inmate completes a request slip and gives it to a correctional officer, who places the request in a locked institutional general mail drop box located in the housing area. Institutional mail staff collects all mail, including the sick call request slips, from each drop box daily and carries them to the institutional mailroom, where all pieces of mail are sorted and delivered to each department. Once delivered to the medical department, the slips are forwarded to nursing, and a nursing staff member, which could be an RN supervisor, staff RN or LPN, reviews each request slip and writes the individual's name, number, complaint and date to be evaluated on a sick call schedule. At this point in the process, the original sick call request slip is thrown away. Either the inmate is escorted or reports to the medical department for sick call based on the date the nursing staff member records on the sick call schedule. With this method, medical staff retains the most control over the sick call schedule, since they are doing the scheduling. By IDOC policy, once

received, request slips are to be triaged within 24 hours and categorized as to urgent or routine, with individuals in the urgent category being evaluated the same day or no later than the next, and individuals in the routine category being evaluated within 72 hours.

Since the original request is being destroyed, there is no way to determine if the request was initially triaged, categorized and the inmate evaluated within the appropriate timeframe. Similarly, since a sick call log is not maintained, there is no way to measure compliance with these same policy requirements.

Additionally, with this process there are many medical confidentiality breaches. First, the inmate is required to give his completed request slip to non-medical personnel. The slip is then placed in a general mail drop box. As a result, more non-medical personnel are collecting all the mail, including the sick call request slips. All the mail is then transported to the institutional mailroom for sorting, where more non-medical personnel are handling confidential sick call requests. Finally, the mail is delivered to each department by non-medical personnel.

Sick call procedure number 2 being used is an "army-type" sick call process. Inmates are informed that if they sign-up for sick call prior to 4 p.m., they will be evaluated the next day. With this type of sick call process, the medical department has no control over scheduling. Depending on the number of inmates who sign-up, the medical department could have to evaluate one or 100 inmates with no regard for staffing requirements or other required health care activities. Additionally, while there are no breaches of medical confidentiality with this type of process, this method takes away from any assessment as to whether the individual's complaint is of an urgent or routine nature, and individuals with benign requests could be evaluated prior to individuals with more urgent issues.

Lastly, the areas being used in the medical department to conduct sick call are unacceptable because:

1. They are poorly equipped.
2. There are no exam tables on which to conduct a proper examination.
3. At times, a hallway is used where again there are no examination tables and no privacy is available or confidentiality maintained.

Outside the medical department, an unacceptable form of sick call is being conducted in the X-House. In this housing area, nursing staff, generally, Licensed Practical Nurses (LPNs) go door-to-door inquiring as to whether there are any health care complaints. If the answer is "yes," the LPN talks with the patient/inmate through the cell door. Based on the conversation, the LPN either treats the patient from established treatment protocols or refers the patient to a primary care provider.

This is not sick call but only a face-to-face triage. There is no assessment by qualified medical staff and no appropriate "hands-on" examination. As a result, it cannot be considered an appropriate sick call contact, and the patient must be referred to a primary care provider.

In order for the above process to work correctly, the complaint must be triaged by an RN and, if necessary, the patient/inmate removed from his cell to an examination area where the RN can conduct an appropriate examination while affording the patient privacy and confidentiality.

Per IDOC policy, inmates are charged a co-pay for non-emergency self-generated health care requests. In investigating the sick call process, it was learned that both physician and nursing staff are limiting inmates to one complaint per sick call contact and only addressing one complaint per contact. This practice was confirmed by both staff and inmates. One complaint per visit is inappropriate and unacceptable. All of a patient's problems must be addressed at an encounter or a plan developed to address the problem in the near future. Assessing only one problem during a sick call visit creates the impression the sick call process has been developed to generate more revenue.

Daily "wellness checks" are conducted by nursing staff on the 3 p.m. to 11 p.m. shift for all inmates in confinement or "lock-down" status. Weekly rounds are conducted by the nurse practitioner. These rounds are documented in a segregation log located in the segregation unit. In the event of a health care complaint, the nursing staff member, RN or LPN, documents the complaint on a medical unit progress note which is filed in the segregation log. Again, the assessment is performed through the door unless the inmate is transported to the medical unit for a more detailed assessment and examination. Once the inmate is released from segregation, the progress note detailing the complaint is filed in the permanent medical record.

Again, there are multiple issues as follows:

1. The assessment could be conducted by non-qualified medical staff.
2. A cell-side encounter occurs rather than a legitimate sick call encounter.
3. The inmate/patient is afforded no privacy/confidentiality in expressing his complaint to the nurse.
4. There is no appropriate assessment of the complaint and corresponding appropriate examination.
5. There is a huge breach of patient confidentiality by filing the progress note which details the medical complaint in the segregation log.

The following medical records were selected for review at random from sick call schedules.

**Patient #1**
This patient arrived at Dixon 12/31/2013 and signed a refusal to be seen in sick call.

**Patient #2**
This patient arrived at Dixon 10/2/2013 and was evaluated by RN 11/27/2013 for complaint of right ear pain. The encounter was in SOAP format with "RN Note" heading, date and time, vital signs, documented ear exam, no duration noted and treatment per protocol. Sick call 2/6/2014 by RN. Complaint of right foot pain for 12 hours. Encounter in SOAP format with "RN Note" heading, date and time, vital signs and a documented examination of the foot. Patient was referred to the M.D. and evaluated the same day.

**Patient #3**

This patient arrived at Dixon (no date) and was evaluated by RN 2/4/2014 for complaint of excruciating pain of the right hand. The encounter was in SOAP format with "RN Note" heading, date and time, no duration noted, no vital signs noted, documented hand examination. Patient referred to mid-level provider and evaluated the same day. Sick call 2/6 by LPN. The encounter was in SOAP format with "LPN Note" heading, date, no time and no vital signs. Complaint of rash on right side of neck, feet and groin area. No duration noted. Documented examination of neck, feet and groin. Assessment of Tinea pedis. Treated per treatment protocols but pre-printed protocol sheet not used; given education. Sick call 2/21 by RN. The encounter was in SOAP format with "RN Note" heading. Complaint of pain in the right knee and right wrist. Date but not time, vital signs, no duration of pain noted. No documented examination but assessment of degenerative arthritis which is not covered in nursing protocols. Patient given wrist brace, soft knee brace and Motrin increased from 400 mg. BID to 600 mg. BID but no duration noted. Patient was instructed to return as needed.

**Patient #4**
This patient arrived at Dixon 4/9/2003 and was evaluated in sick call 1/20/2014 by LPN for complaint of dandruff. Pre-printed protocol form in SOAP format used. Date and time, no vital signs except for temperature. No examination of scalp noted. Given anti-dandruff shampoo per protocol.

**Patient #5**
This patient arrived at Dixon 1/18/2012. RN sick call 2/25/2014 for complaint he lost a tooth filling. SOAP format, date and time, vital signs, duration noted and referred to dental and see the same day.

**Patient #6**
This patient arrived at Dixon 6/5/2012. RN sick call 5/15/2013 for complaint of cutting the tip of his right thumb on his bed. SOAP format, date/time, vital signs, time of accident; documented description of injury, examination and assessment. Treatment provided with no reference to a protocol. Documented treatment was to wash wound with soap and water, apply antibiotic ointment, bandage; gave TDAP and education. RN sick call 2/18/2014 for complaint of heartburn and congested ears. No SOAP format and no noted vital signs. Date/time and ear examination noted. History of heartburn noted and Mylanta worked well in the past. There was no reference to the use of a protocol but Mylanta tablets were given. The ear congestion was not addressed. RN sick call 2/25 for complaint that the Mylanta tablets were not helping. SOAP format, date/time, vital signs and history documented; referred to M.D. but not yet evaluated as of 2/28.

**Patient #7**
This patient arrived at Dixon 9/2/2009. RN sick call 12/24/2013 as a follow-up to right leg muscle pain on 11/25/2013. Complaining right leg continues to hurt as well as shoulder. SOAP format, date/time and vital signs noted. No notation as to which shoulder was hurting or the duration. No examination noted. The assessment was "pain." Patient referred to the physician and told it would be 10-14 days before he would be seen. Patient evaluated by the physician on 1/8 and 2/21/2014.

**Patient #8**
This patient arrived at Dixon 12/15/2013. LPN sick call 2/25/2014 for complaint of dandruff. The dandruff pre-printed protocol form was used. The date/time, vital signs, duration and past successful treatment was noted. Documented examination of scalp which referenced extensive flakiness of scalp. Antidandruff shampoo provided per protocol.

**Patient #9**
This patient arrived at Dixon 2/18/2010. LPN sick call for complaint of right sided pain. SOAP format, date/time, vital signs and history of an old injury documented. No documented physical examination or assessment and referred to the physician. No documentation in the medical record as having been evaluated by the physician.

**Patient #10**
This patient arrived at Dixon 4/4/2001. RN sick call 11/28/2013 for complaint of a severe toothache. No SOAP format but a detailed narrative note. Date/time, vital signs and duration noted. Evaluation of mouth and potential tooth causing the pain noted. The physician was contacted by telephone and pain medication orders received. There was no documentation of a dental referral. The toothache protocol was not referenced in the record. RN sick call 1/22/2014 for complaint of left shoulder pain for eight months. A preprinted protocol form was used. Date/time and very brief examination and assessment noted. There no vital signs noted. The patient was provided over-the-counter pain medication three times a day for three days.

## Significant Issues with Nursing Sick Call

1. Violation of the Illinois Nurse Practice Act for Licensed Practical Nurses (LPNs) to conduct sick call due to a physical examination and assessment being required which is beyond the scope of practice for an LPN.
2. IDOC policy requires sick call encounters are documented in the Subject-Objective-Assessment-Plan (SOAP) format, which is not consistently used.
3. Documentation is inconsistent and incomplete, in that frequently dates, times, vital signs, duration of complaint, examination and assessment are not documented.
4. IDOC policy requires the use of approved treatment protocols in order for a RN to conduct sick call. Sick call encounters are frequently documented with no reference to a protocol.
5. Patients are only permitted one complaint per sick call encounter.
6. The RN inadvertently prescribed a medicine by increasing the over-the-counter dosage to a prescription dosage, which is prescribing and beyond the nursing scope of practice.
7. Problems, like ear congestion, were never addressed for one patient.
8. Some patients are seen without either an adequate history or physical assessment.
9. Difficult to determine if access to sick call is impeded due to a broken system or the significant number of health care unit leadership and nursing position vacancies.

# Clinician Sick Call

Based on several appointment books given to us by the nursing supervisors, we selected 12 appointments documented as having occurred. In 10 of the 12 records, we could neither find a note on the day the appointment was written in the book nor within a week before or after that

date. It seemed clear to us that the recordkeeping, vis a vis the appointment books, was not accurate in the sense that the patients who were documented as having been seen by a clinician had no notes in their records. There were a few exceptions.

**Patient #1**
This is a 37-year-old who was seen on 12/10/13 for rheumatoid arthritis follow up. There were no notes in the record for that. However, on 12/11, the patient was seen for a cyst with pus coming out of it. The NP wrote an appropriate note and referred the patient to the physician, who saw the patient on 12/17.

**Patient #2**
This is a 53-year-old with no chronic problems. He was to be seen for an assessment of his pain meds on 12/19/13, but there is no note for that date.

**Patient #3**
This is a 22-year-old supposedly seen on 12/19/13 for back pain, but there were no notes in his record for the month of December.

**Patient #4**
This is a 47-year-old man with multiple chronic diseases. On 6/21/13, the PA saw the patient for a sebaceous cyst. He drained and packed the cyst and requested daily dressing changes and follow up in two weeks. There were no dressing changes documented in the chart and there was no follow-up visit documented at the two-week mark. He was next seen on 7/31 by a physician, but there is no mention of the wounds.

At nurse sick call on 9/24, the patient requested to see a provider regarding his COPD medications. MD line was ordered for 9/25, but there is no note in the chart corresponding to that date.

**Patient #5**
This is a 45-year-old with multiple issues, including severe refractory tremors for which he has seen in the neurology department at UIC. Their recommendation was for increasing doses of Klonopin.

On 12/12/13, he requested to have his Klonopin increased as recommended by neurology and was referred to the Medical Director. She renewed the medication that day, but neither changed the dose nor saw the patient. He was scheduled for evaluation on 12/26, but there is no note from that day.

On 1/7/14, the RN documented that she spoke to the warden about getting the patient in to see Dr. B, and was promised that the patient would be able to see the doctor that Monday, but he was not seen. He finally did see the physician a month later on 2/13, and his medication was increased. There was no follow-up note as of the date of our visit.

*Opinion*: This patient has not been seen timely (or at all) in response to his requests. This patient is housed in the Health Care Unit, making him readily accessible to the providers. Even the nurse's attempt at intervention through the warden did not result in the patient being seen.

**Patient #6**
This is an 86-year-old man with hypertension and history of prostate cancer who saw his radiation oncologist on 7/23/13 in follow-up of his prostate cancer. The consultant noted that the patient reported new onset rectal bleeding and recommended colonoscopy. When the patient saw the onsite provider on return from this trip, the recommendation for colonoscopy was brushed aside with the explanation that the patient has external hemorrhoids and a normal hemoglobin.

On 10/22, the "MD visit" stamp was crossed out and "MD chart review" was written in. The plan was to schedule a follow-up appointment to evaluate his hemorrhoids.

On 11/6, the appointment was cancelled "per MD request" and rescheduled for 11/18. On 11/18, the patient was seen for chronic care clinic. The hemorrhoids and bleeding were not addressed.

On 12/4, the patient was seen on MD line for "evaluate thrombosis." The patient reported ongoing rectal bleeding. The exam showed only small external hemorrhoid and stool was negative for blood. Another CBC was ordered and was stable at 13.3.

*Opinion*: This patient was not seen timely for his complaint of rectal bleeding nor has this complaint been thoroughly evaluated. Concluding the hemorrhoid is the culprit without excluding more serious pathology is not appropriate.

# Chronic Disease Management

There was no way to determine how many inmates are enrolled in the chronic disease clinic at this facility, nor the individual clinic enrollments, as these are not tracked in a comprehensive, updated and reliable way at this facility.

There is no single designated chronic care nurse; we were told this is due to staffing shortages. Rather, each nurse is assigned a single chronic disease clinic. The result is a fragmented and disjointed program with no cohesive oversight. The program is not being utilized effectively; we came across many patients with chronic illnesses who were not enrolled in the program and others who were enrolled but not seen according to policy.

Patients with multiple chronic illnesses are enrolled in the "MIC" or multiple illness clinic. The clinic nurses coordinate the timing of the chronic care clinics with the providers. Once dates for clinics are chosen by the providers, the nurses provide that information to the phlebotomist who coordinates the blood work with the visits. Labs are to be drawn within 30 days prior to the visit by policy.

## Cardiac/Hypertension

We reviewed five random records of patients with hypertension and had concerns with timeliness and clinical decision making in the three cases described below. In a fourth chart, the problem list had not been updated in over 10 years.

**Patient #1**

This is a 74-year-old with multiple chronic illnesses, including hypertension, whose care has been complicated by his noncompliance. The only recent lab in the chart is an electrolyte panel from a year ago. The last lab test prior to that was in 2009.

On 2/11/13, the patient was seen at MD sick call for a cough. His blood pressure was 156/90. The physician wrote, "States he doesn't need to see me. Problem resolved." The blood pressure was not addressed.

During an offsite visit to UIC oncology on 2/23, the patient's blood pressure was 194/108. He was given a dose of Clonidine by the oncology resident. There was no follow-up of the blood pressure after his return to the institution.

On 7/8, he was seen in chronic care clinic for hypertension, diabetes and asthma. The physician noted noncompliance with treatment and refusals to have labs drawn. Education was provided. There were no further chronic clinic notes as of the date of our visit.

*Opinion*: This patient is overdue for chronic care clinic. His elevated blood pressure has not been adequately addressed. Further attempts should be made to enhance this patient's compliance.

**Patient #2**

This is a 69-year-old man with oxygen dependent COPD, coronary artery disease with history of MI, hypertension and hearing impairment who arrived at Dixon on 6/11/13. His medications include an ACE inhibitor and aspirin.

His chronic disease baseline clinic was on 7/19. Labs were drawn timely prior to the visit and his blood pressure was well controlled.

The next chronic care clinic was on 10/11. There were no new labs. The patient's blood pressure was 160/80 and blood pressure checks were ordered. These were not in the chart, nor were subsequent changes made to his medication. Follow-up with the nurse practitioner was ordered for three weeks later but did not occur.

At the next chronic care clinic on 2/6/14, the provider noted that "nitroglycerin helps with his angina." There were no other details about the nature of his chest pain and no further investigation was ordered. His blood pressure was 158/80 and the ACE inhibitor was increased.

*Opinion*: This high-risk patient's report of angina needs to be investigated thoroughly. His coronary artery disease has not been managed according to current guidelines, which would include a beta-blocker and statin. His blood pressure should be monitored and treated more diligently.

**Patient #3**
This is an 86-year-old man with hypertension and history of prostate cancer. His medications included aspirin, potassium, hydrochlorothiazide and metoprolol. At his 3/11/13 chronic care clinic, his cardiac exam was described as "irregularly irregular," but no ECG was obtained. His blood pressure was elevated and medication was prescribed. Labs were done timely prior to this visit.

His next chronic care clinic occurred six months later on 9/23. No new labs were obtained. His cardiac exam was described as "RSR [regular sinus rhythm] with few irreg beats." Again, no ECG was obtained. Blood pressure was well controlled.

The next chronic care visit was on 11/18. This time his cardiac exam was, "rsr with rare ectopic beat." There were no recent labs.

*Opinion*: This patient has not been seen timely in chronic care clinic and his electrolytes have not been checked in over a year. Irregular heart rhythms should be investigated with an ECG.

## HIV Infection/AIDS

Review of the HIV clinic revealed that the ID telemedicine visits do not always occur timely and the reports were not consistently filed in the health record. The onsite providers do not participate in monitoring patients' HIV disease at this facility. While we would not expect them to be facile in prescribing HIV medications, we would expect that they would participate in monitoring patients' medication compliance, side effects and general degree of disease control.

The case below exemplifies the types of issues we observed at this facility:

**Patient #4**
This is a 47-year-old man with multiple chronic illnesses, including advanced HIV disease on salvage therapy. When he was seen by ID telemedicine in January 2013, the electronic stethoscope was broken. His regimen was changed due to concerns over potential drug interactions and a three-month follow-up was requested with blood work prior. There were no on-site provider notes after this to monitor the patient for side effects, compliance or tolerability.

When he saw ID again in April, the electronic stethoscope was still broken. The patient reported having missed 2-3 doses of medication. Labs were not done prior to this visit; this oversight was particularly crucial given the recent change in therapy. It does not appear that the labs were drawn after the visit either, as the next set of labs was dated 7/8/13. A 3-month follow up was requested but he was not seen again until September according to the nurse's note; there was no report in the health record.

At his next ID telemedicine visit on 11/15/13 he was doing well and no changes were recommended. He was next seen on 2/20/14 but there was no report in the chart.

There are no chronic care forms in the chart. The only providers managing this patient's chronic illnesses are the offsite specialists.

*Opinion*: This patient has had no on site monitoring of his HIV disease, medication compliance or side effects. His ID clinic visits have not always been timely and reports from the consultant have not been consistently obtained.

## Pulmonary

We reviewed seven records of patients with pulmonary disease, but only two appeared to be enrolled in the pulmonary clinic. Of those two cases, one was problematic (Patient #1 below). Of the remaining cases, only two mentioned (but did not address) the patients' COPD.

**Patient #5**

This is a 69-year-old man with oxygen dependent COPD, coronary artery disease with history of MI, hypertension and hearing impairment who arrived at Dixon on 6/11/13.

At his baseline clinic on 7/19, his peak flow was low at 250 and his inhalers were adjusted. At his next chronic care clinic on 10/11, he had rhonchi in both lower lobes and his peak flow was very low at 150. A third inhaler was added, but no other workup or treatment was ordered for the COPD exacerbation, nor was he diagnosed with such. Follow-up with the nurse practitioner was ordered for three weeks but did not occur.

On 1/6/14, he was seen at nurse sick call for a "cold." The patient reported shortness of breath on exertion and a productive cough. The nurse noted decreased lung sounds on exam. There were no vitals documented and no peak flow. The nurse decided that he had a cold and gave him an over-the-counter remedy. There was no referral to a provider.

Ten days later, the patient returned with difficulty breathing. He was seen by an RN, who noted that his breathing seemed unlabored. There was no lung exam documented. The assessment was illegible, and the plan was to "manage symptoms. Use inhalers as prescribed."

On 1/21, he was seen on MD line for follow up of hypertension and COPD. He reported wheezing daily in the morning and complained that his shortness of breath was getting worse. There was no pulse oximetry and no peak flow measurement. The lungs were described as clear. The doctor ordered nitroglycerin as needed and nebulizer treatments daily as needed for one year.

On 2/6, he was seen in chronic care clinic. His peak flow was low at 270. His COPD was not evaluated further and no medication changes were made.

*Opinion*: Although this patient has been seen in chronic care clinic according to policy, his disease has not been monitored or managed adequately. Nursing assessments were inadequate and nursing staff failed to refer the patient to a provider when appropriate.

**Patient #6**

This is a 47-year-old man with multiple chronic illnesses, including COPD, yet there were no chronic care forms in this patient's chart.

The first provider visit since January 2013 was dated 6/2/13 and focused mainly on the patient's anxiety about being moved to a four patient room and his risk for catching an illness.

At nurse sick call on 9/24, the patient requested to see a provider regarding his COPD medications. MD line was ordered for 9/25, but there is no note in the chart corresponding to that date.

On 10/8, he saw the nurse practitioner regarding difficulty transporting with the black box. No chronic conditions were addressed and there were no further provider notes in the chart.

*Opinion:* This patient's COPD has not been addressed in more than a year, despite his request.

### Patient #7
This is a 55-year-old man whose problem list includes only depression with suicidal ideation. He evidently also has anoxic brain injury and moderate COPD according to a pulmonary function test dated July 2013. There are no chronic care forms in the chart. There is only one mention of COPD; on 8/2/13, the patient was seen on MD line for COPD follow-up, but this was never addressed. Instead, the visit focused on the patient's back pain. Although he was seen multiple times over the next few months for back pain, his COPD was never addressed.

## Seizure Disorder

We reviewed five records of patients with seizure disorders. Two patients did not appear to be enrolled in the seizure clinic, and another case was significantly problematic as described below.

### Patient #8
This is a 70-year-old man with seizures, asthma, hepatitis C, coronary artery disease, latent TB infection and schizophrenia.

On 9/1/13, the RN responded to the unit after the patient had a seizure. The patient refused to come to the health care unit, so the nurse allowed him to rest in his cell, noting that the "CO will check on him in $1/2$ hour." Thirty minutes later, there is an RN note stating "no encounter. Spoke with security on HR3. IM Oliver sleeping soundly on his bed. Side lying position." There is no mention of calling a provider. Of note, the patient had had a subtherapeutic Tegretol level (3.4) on 8/7. The lab report was signed by a provider on 8/8, but no changes were made. The MAR shows that the patient had been compliant with his medication.

On 9/5, a note stamped "nurse sick call" states only, "already on MD line." The Medical Director saw the patient this day for a medical writ follow-up, but there is no mention of the recent seizure.

On 1/22, the patient was seen in chronic care clinic. He reported having one seizure since the last clinic. His Tegretol level had last been measured on 12/3 and was therapeutic at that time. No medication changes were made.

Two days later, the patient had a witnessed seizure and was referred to the doctor that day. The doctor noted that his most recent prior seizure was in November 2013, but there is no

documentation in the chart to that effect. The physician increased the Tegretol dose and ordered a level to be drawn in two weeks. The level was drawn on 2/7 and was not significantly different from the last value.

*Opinion*: It is not appropriate to expect security staff to perform medical monitoring of a post-ictal patient. The nurse should have gone back to the unit to monitor the patient and should have referred the patient to a provider for follow-up. Even when the patient later did see a provider, the doctor did not address the recent breakthrough seizure. It appears that this patient's seizure disorder is not adequately controlled by the medication he is prescribed.

**Patient #9**
This is a 65-year-old man with seizures, hypertension and asthma. At the 1/23/13 chronic care clinic, he reported that he had run out of his seizure medication. His last seizure was not documented. There was no subjective information; this was partly due to the structure of the chronic care form, which has not been updated in over 10 years (2002). Labs were done timely prior to the visit (1/17).

At the 7/8/13 chronic care clinic visit, there had been no interim seizure activity since the last visit. The most recent labs had been done in May.

On 10/1, it is noted that the patient "signed off" from chronic care clinic. Labs done 9/18 showed a subtherapeutic Dilantin level at 3.9.

*Opinion*: It is not clear what "signed off" from chronic care clinic means, other than to imply that the patient has disenrolled himself. This does not seem appropriate, given that he continues to receive treatment for seizures. The reasons behind his running out of medication are not clear, and his subtherapeutic medication level has not been pursued.

## TB Infection Clinic

At the time of our visit, there were four patients enrolled in this clinic. Two of the four patients were started on treatment at Dixon; the other two arrived already on therapy. In none of the four charts did the treating provider document a symptom assessment prior to initiating therapy. One patient had no recent labs in his chart despite beginning therapy over two months prior. Two of the four records had no baseline chest x-ray in the file.

None of the patients had MARs filed in their charts. There is no mechanism in place to alert the chronic care nurse (or anyone else) when patients miss doses. Missed doses are only recognized during the monthly RN visit, though this is highly doubtful, as the MARs for all the patients were in giant piles of loose filing dating back for months in the medical records office. We found five piles of MARs, each at least one foot high. It was clear from our chart reviews that the chronic disease nurse is not well informed about the status of patients' medication compliance.

One patient had missed three of his last eight doses; another informed the chronic disease nurse that he had stopped therapy entirely two weeks previously after speaking with one of the providers. No such conversation was documented in the health record. In another case, the TB

clinic nurse noted that the patient had a few missed doses, yet review of the MAR did not support this claim.

## Pharmacy/Medication Administration

Boswell Pharmaceuticals, located in Pennsylvania, provides all prescription and over-the-counter medications for the facility. The service is a "fax and fill" system, which means patient prescriptions faxed to the pharmacy today by a given cut-off time will arrive at the facility the next day. Patient specific prescriptions, stock prescriptions and controlled medications arrive packaged in a 31-day bubble pack. Over-the-counter medications are provided in bulk by the bottle, tube, etc. A local "back-up" pharmacy is used to obtain medication which is needed immediately and is not available in stock.

The medication preparation/storage area is staffed with four pharmacy technicians, three contract and one state employed, and Boswell provides a consulting pharmacist to come on-site once a month to review prescription activity, to assess pharmacy technician performance and technique and to destroy outdated or no longer needed controlled medications pursuant to the requirements of the Federal Drug Administration (FDA) and Drug Enforcement Agency (DEA).

Inspection of the medication preparation/storage area revealed a very large, clean, well-lighted and generally well-maintained area. An interview with the chief technician revealed a knowledgeable individual with many years working as a pharmacy technician. Inspection of the area indicated tight accounting of controlled medications, both stock and return items, needles/syringes, sharps/instruments and medical tools. A random inspection of perpetual inventories and counts indicated all were correct.

Medication administration consists of two methods. With method 1, medication is administered at cell-side. With method 2, inmates move in large lines to the Health Care Unit to receive their medication. The facility continues to use a paper medication administration record (MAR), and each dose of medication administered or refused is noted on the patient specific MAR.

Observation of method 1 revealed medication administration by a Licensed Practical Nurse (LPN), who properly identified the patients, administered the medication through a food slot port in the solid cell door, observed the ingestion, performed a mouth check and documented the administration on the MAR. A security officer was observed escorting the LPN during administration.

## Laboratory

Laboratory services are provided through the University of Illinois-Chicago Hospital (UIC). The comprehensive services medical contractor provides one FTE phlebotomist to draw and prepare the samples for transport to UIC. Results are electronically transmitted back to the facility, generally, within 24 hours via secure fax line located in the medical department. There were no reports of any problems with this service.

# Unscheduled Services/Emergency Services

In order to review unscheduled services, we typically attempt to review both unscheduled onsite services and unscheduled offsite services. Dixon was not able to provide a logbook that had either type of service tracked over time. Therefore, it was clear they were unable to perform any self-monitoring. They did not even have available a log of offsite or emergency sendouts. The only thing they could provide us was incident reports from the last three months. However, it appeared that the incident reports were incomplete. We reviewed six onsite emergencies and four emergency sendouts. All of the emergency services contained problems, the most common of which was that the institution never received either emergency room reports for those sent just to the emergency room or hospital discharge summaries for those admitted to the hospital. This compromises the ability of the clinicians to understand what services were provided and what the basis for any recommendations might be.

## Patient #1
This is a 69-year-old with hypertension, hypothyroidism and status post tracheostomy. On 11/26/13, a code 3 was called in the x-ray department at the facility. Apparently, the inmate was having difficulty breathing due to his tracheostomy being plugged. The tracheostomy was cleaned and the patient was sent back to the housing unit. There is no assessment or discussion with any advanced level clinician, only a brief note by an LPN. The patient was not seen by an advanced level clinician until more than a week later.

## Patient #2
This is a 48-year-old with seizure disorder. On 1/1/14, a nurse was called to the housing unit for a code 3. In the record there is no description of the event, but the patient was brought to the clinic and ultimately wanted to return to the housing unit. The only note in the record is a note by an LPN where the assessment reads, "post seizure." The patient was returned to the housing unit by the LPN with no contact with an advanced level clinician. There was an inadequate history and physical assessment since only an LPN saw the patient, and there were significant liabilities engendered by this response.

## Patient #3
This is a 57-year-old who has a positive tuberculosis skin test but has been treated and also has a seizure disorder, asthma and bipolar disorder. On 10/31/13 at about 12:15 p.m., a code 3 was called with the inmate complaining of chest pain. There is an inadequate assessment performed by an RN who indicates that the inmate states, "I'm worried about going out in four months." The vital signs were normal and the inmate is described as holding his chest. The history is inadequate. The assessment is "chest vs. anxiety." Since the patient indicated he felt better, the assessment was "rule out anxiety" and the patient was released to the housing unit. Chest pain should always require an assessment by an advanced level clinician.

## Patient #4
This is a 27-year-old with mental health problems. On 1/6/14, a code 3 was called and the patient was brought to the health care unit. The inmate had been found unresponsive in his cell, lying on the floor and having a seizure. When they entered the cell, he was still jerking or twitching on the mattress. He stated he intentionally hit his head on the wall. On 1/7/14, he is described as having

had a syncopal episode but there is no assessment. The patient was seen later by a nurse practitioner but there was no discussion of the episode occurring one day earlier.

## Patient #5

This is a 42-year-old with hyperlipidemia. A code 3 was called on 11/25/13 because the inmate was found lying on the sidewalk outside of his housing unit. He had told a nurse that he had worked out in the gym, became dizzy and sat down. When he stood up quickly he got dizzy again and then lay down on the sidewalk. The nurse performed vital signs on the sidewalk and since they were normal, released him to the housing unit. There was no follow up performed and he was not seen again until more than a month later in his regular hypertension clinic; however, the incident with the episodes of dizziness was never discussed.

## Patient #6

This is a 53-year-old with hypertension and type 2 diabetes along with hepatitis C. On 12/7/13, a code 3 was called in dietary. When they arrived the patient indicated, "My knee gave out." He was placed in the infirmary for observation and released shortly thereafter. There has been no physician assessment regarding this situation.

## Patient #7

This is a 68-year-old with mental health problems and asthma. On 10/25/13, at about 12:40 p.m., a code 3 was called and when the nurse arrived the patient was walking to a van accompanied by correctional officers. He could be heard wheezing and he was observed to be using his inhaler. The nurse performed a pulse oximeter reading, which was 85%. The patient was taken to the health care unit and was seen by the physician, who ordered both oral steroids and inhaled steroids. This patient has never been followed up on.

## Patient #8

This is a 35-year-old with mental health problems. On 11/3/13, a code 3 was called and the patient was found with blood on the floor from a laceration on his head. While being transported to the medical unit, he was noted to have projectile vomiting and therefore was sent to the hospital. On 11/5, two days later, he returned with the hospital diagnosis, "patient induced hyponatremia causing seizures." The patient was admitted to the infirmary dry cell. There were no hospital records in the medical record and on 11/12 he was discharged to his housing unit.

# Scheduled Offsite Services

We were informed that the process for accomplishing a scheduled offsite service includes, once the physician or advanced level provider orders the service, such as a consultation or procedure, the acting Medical Director reviews the request and then presents it at a weekly collegial review with Wexford central office physician staff who work for their utilization management program. Each case is discussed and there is either an approval or an alternate plan is recommended. The alternate plan may result in some additional tests to be done before the ordered service is provided. Once the Wexford central office physician has approved the service over the telephone, this utilization management program is responsible for providing an authorization number attached to the approved service and then notifying the University of Illinois at Chicago scheduler, who then will provide an appointment and notify the Dixon Correctional Center

scheduler. We found that there were lengthy delays in this process, sometimes due to a substantial delay between the verbal approval over the phone and the notification to the University of Illinois scheduler and sometimes, added to that, is a delay based on the University of Illinois not being able to timely provide an appointment. About 10-15% of scheduled offsite services are finally obtained locally because this can be accomplished more rapidly. The current tracking log does not include date of order nor date of appointment, so that the length of time between the request, the authorization and the appointment cannot be visually reviewed in an efficient manner. Also, there are occasions when an approval is provided but this scheduling process gets delayed to such an extent that then a new request must be created. Any system that allows efficient assessment of a scheduled offsite service program should have the date of order, the date of authorization, the date of the appointment and the date of the primary care clinician follow up with the patient in a tracking log.

We reviewed 11 records of patients for whom a clinician had ordered a scheduled offsite service. Eight of 11 were problematic, either due to delays or due to lack of critical follow up with the patient.

**Patient #1**
This is a 65-year-old male with hypertension, asthma, GERD, and a positive TB skin test. On 11/20/13, the clinician ordered a CT scan of the chest to rule out a mass. This patient was presented at the collegial review a little over two weeks later, on 12/4, and an approval was obtained. Three weeks later the authorization number was provided. The report done on 2/12/14 indicates suspicious for cancer. A request for a pulmonary consult was made and approved over two weeks ago and yet an authorization number for this has still not been provided.

**Patient #2**
This is a 47-year-old male with no chronic problems. On 11/13/13, a bone scan was ordered due to a prior report demonstrating bilateral densities in the ileac areas. The authorization was provided on 12/20 and yet the University of Illinois scheduler indicates that she has received no communication from the Wexford central office, so there is no appointment date provided.

**Patient #3**
This is a 62-year-old male with hypertension, diabetes type 2, congestive heart failure, gout, a pacemaker, obstructive sleep apnea and cardiomyopathy. An appointment for the cardiology clinic was ordered on 10/2/13. The patient was finally seen on 2/14/14, four months later.

**Patient #4**
This is a 64-year-old with hypertension, diabetes type 2 and a soft tissue mass. On 10/8/13, a 30-day EKG monitor was ordered based on a prior cardiology recommendation. This service was authorized on 10/24. The patient was sent back to cardiology on 1/28/14, which re-recommended the EKG monitor, but this has not yet occurred, almost half a year later.

**Patient #5**
This is a patient with hypertension and hepatitis C along with a history of a positive TB skin test. On 11/7/13, an ortho clinic appointment was ordered. It was authorized within a short period of time, but as yet it has not been scheduled.

**Patient #6**

This is a 46-year-old with a mass in his jaw. He also has a blind right eye and an ortho appointment was ordered on 9/12/13. The collegial review occurred two weeks later on 9/25, but it was recommended that an ultrasound be obtained prior to the ortho appointment. The ultrasound was ordered and approved on 10/16 and performed on 11/13. The doctor discussed the case with the patient and then reordered the orthopedic evaluation. This was authorized on 11/27, but as of yet the appointment has not occurred.

**Patient #7**

This is a 58-year-old male with an enlarged prostate and a positive TB skin test. A urology appointment was ordered on 7/30/13 and it was authorized on 8/7. The appointment has been scheduled now for 3/12/14. This is an extremely long delay.

**Patient #8**

This is a 66-year-old male with hypertension for whom a stress test was ordered on 11/12/13, based on a cardiology recommendation. The stress test was authorized on 12/27; however, the patient has still not been seen. There has as of yet been no communication to the University of Illinois from Wexford.

**Patient #9**

This is a 45-year-old with hypertension, severe tremors and a seizure disorder. He has been seen by UIC neurology who has recommended increasing doses of Klonopin (up to 4 mg twice a day) and other medications, but nothing seems to control his tremors. Neurology has not made a definitive diagnosis; at one visit, his condition is described as "non Parkinsonian tremor," at another "tremor with Parkinsonian features." The patient was seen in February and May of 2013; request for follow-up visit was denied in August. The alternate plan was to "continue to follow and treat onsite. Represent in three months." Meanwhile, the patient continues to fall frequently and must be permanently housed in the health care unit.

*Opinion*: This patient still does not have a clear diagnosis and treatment response has been suboptimal. We interviewed this patient during our visit. Considering the severity of his tremor, the degree of his disability and his young age, we would recommend either follow up with neurology, a second neurologist's opinion, or a trial of treatment for essential tremor be undertaken, such as propranolol or primidone if not already tried.

# Infirmary Care

The designated infirmary is located on the second floor of the medical building. There are 28 total beds with patient census of 22 during the inspection. Of the 22 patients, four were classified as "acute" with all others classified as either "permanent housing" or "chronic care."

The area is staffed with at least one RN per shift except for one 11-7 shift. During this shift, there is a RN in the building but not assigned to the infirmary. As a result, a Licensed Practical Nurse (LPN) is directing the care in the infirmary which, according to the Illinois Nurse Practice Act, is beyond the scope of practice for a LPN. Additionally, the facility is using Certified Nursing

Assistants (CNAs) on the 7-3 and 3-11 shifts and soon on the 11-7 shift. Use of the CNAs is going well and quite beneficial in providing care.

Inspection of the area indicated a large, well-lighted, reasonably well maintained and clean unit. The infirmary is configured in a rectangle, two long halls and two short halls at each end, with the patient rooms along the outer perimeter of the rectangle. As a result, there are numerous windows providing natural light.

Patient beds are in reasonably good shape. Recently, used traditional-style hospital beds had been purchased from the local hospital, and more are going to be purchased which will upgrade the majority of the beds. Each of the beds has a mattress with an impervious coating conducive for cleaning/sanitizing when needed, but particularly between patients.

Along one long and one short hallway, each of the beds has a call button located on the wall above the bed. The call button provides a visual indicator outside the patient room and on a numbered panel inside the nursing station; however, there is no audible indicator. Since the call buttons are mounted on the wall, depending on the patient's condition, it could be difficult to impossible for the patient to access the call button.

Along the other long hallway, there are no patient call buttons, and six of the rooms have no line-of-sight to the nursing station. Bells have been provided for the patient to manually ring. When medical personnel are in the nursing station area, doors to each hallway are closed. As a result, if personnel were in the nursing station or occupied in a patient room, it is doubtful the bell could be heard. Additionally, if the patient became incapacitated, he could not ring the bell.

Each bed had a bedside table but there are no over-the-bed tables. As a result, patients either eat holding their food tray on their laps or by placing the tray on their bed. For patients who cannot get out of bed, placement of the food tray conducive to eating is difficult.

There is one negative-air pressure respiratory isolation room located in the infirmary. Negative airflow is only checked every 30 days regardless if a respiratory isolation patient is occupying the room.

Responsibilities of RNs working the infirmary are:
1. Supervision of all staff and patients
2. IV therapy and medications
3. Assessments
4. Phlebotomy
5. Dressing changes
6. Charting

Responsibilities of LPNs working the infirmary are:
1. Supervision of CNAs
2. Administration of oral and topical medications
3. Dressing changes
4. Charting

5. Assessments

Responsibilities of CNAs working the infirmary are:
1. Collecting and recording vital signs
2. Bathing patients
3. Feeding patients
4. Changing bed linens
5. Foley catheter care
6. Measuring and recording intake and output

Inspection of infirmary linens revealed the following:
1. Threadbare sheets
2. Torn/frayed sheets
3. Torn/frayed towels and washcloths
4. Insufficient number of pillows
5. Insufficient number of blankets
6. Stained sheets, towels and washcloths

In inspecting the infirmary, there seemed to be an absence of needed patient care equipment as follows:
1. IV pumps
2. Tube Feeding pumps
3. Hoyer lift
4. Maxi-Lift Bed slide
5. Geri Chairs (current chairs need to be recovered in order to adequately clean/sanitize
6. Bed alarms

From a safety perspective, there was no security presence within the infirmary even though all security classifications, maximum-medium-minimum, are housed within this one area. There is a manned security station on the second floor, but the officer is enclosed in a room which is down a long hallway and separated by a door from the nursing station and patient care areas. Medical staff is not issued individual panic alarms or radios. Two radios are issued to the infirmary, however, on the 7-3 and 3-11 shifts if more than two staff is working. If a medical staff person was assaulted in one of the back patient care rooms and had no radio, it is doubtful the security staff person stationed 50 to 60 feet away beyond a closed door and within an enclosed room could hear any cries for help. At the least, additional radios should be provided and, optimally, individual panic alarms. Additionally, while a security escort is required during medication administration in designated housing units, no such escort is provided in the infirmary despite all security levels being housed in this one area.

Nursing staff were knowledgeable concerning the patient population, concerning acute or chronic care status, current activities/capabilities, health care/physical/social needs and personalities. While being able to easily articulate the above, nursing staff charting was very generic and uninformative. It is understandable with generally long-term, long stay skilled nursing home types of patients to fall into the habit that there is nothing new to say about the patient. If staff would put into words what they verbalized about patients, charting would be

enhanced and considerably more descriptive and informative concerning the patient's current condition.

We found the providers' documentation to be similarly lacking. In many cases, patients were not seen timely per policy, nor were evaluations comprehensive. Rarely were physical examinations or medical decision making documented, and management was questionable in several cases. Examples are described below.

### Patient #1
This patient is a 68-year-old male who was admitted on 12/27/2013. He is permanently assigned to the infirmary following a terminal diagnosis of cancer of the brain (glioblastoma) as well as chronic lymphocytic leukemia, hypertension, pulmonary hypertension and chronic atrial fibrillation. He received a series of radiation treatments in June 2013. He signed a Do Not Resuscitate (DNR) order 12/27. Per IDOC policy, the recording of vital signs and charting is required weekly for a patient of this status. A review of charting indicated, generally, daily nursing notes, and at least weekly physician notes. A physician admission note could not be located. The admission RN note was dated 12/27.

### Patient #2
This patient was admitted 10/21/2012. In January 2012, this patient was diagnosed with lung cancer which had metastasized to the brain. He received both chemo and radiation therapy. At present he is bedridden and a total care patient. Physician and nursing notes were documented at a minimum weekly.

### Patient #3
This patient was admitted 2/12/2009, and has a long-term diagnosis of Parkinson's disease. Patient has a feeding tube, Foley catheter and a 2 cm x 1 cm decubitus on the coccyx. The patient is classified as "chronic care" and, even though only weekly physician and nursing notes are required, charting is more frequent.

### Patient #4
This patient was admitted 2/25/2014. Classified as "acute care" due to influenza infection. There were appropriate physician and RN admission notes and collection and recording of vital signs, height and weight. Charting and the recording of vital signs was performed at a minimum daily.

### Patient #5
This patient is a 46-year-old man with history of asthma, seizures and mental illness who was admitted acutely to the infirmary on 2/19/14 with hyponatremia (sodium 122 mg/dL). There was an appropriate RN admission note and collection and recording of vital signs, height and weight. Additional charting, including vital signs, occurred at a minimum daily. The physician's admission note was fairly thorough except there was no neurologic exam, arguably the most important system to examine in a patient with low sodium.

There is another note by a physician on 2/21, but it is only a review of the labs; the patient was not seen. At this time, the sodium was up to 128 mg/dL and salt tablets were added. There was no work-up to determine the cause of the patient's low sodium.

On 2/25, there is a physician note describing the patient as unruly and disruptive. He was not examined, presumably due to his behavior. It was noted that the patient has been housed in a room where he has free access to water despite his order for fluid restriction.

*Opinion*: This patient has not been seen by the physician according to policy and his low sodium has not been properly investigated. Salt tablets are not appropriate treatment for the most common cause of low sodium in outpatients (SIADH).

## Patient #6
This patient was admitted 2/17/2012 and classified as "chronic care" due to end-stage COPD/Asthma. DNR signed 5/13/2011. Currently admitted to a community hospital. A review of the record indicated more than weekly nursing notes and vital sign documentation with physician notes being, at a minimum, weekly.

## Patient #7
This patient was admitted 12/24/2013. Classified as "acute care" due to uncontrolled diabetes. The patient coded 12/16/2013 in his housing unit. EMS was called and during transport to a community hospital, the patient arrested in the ambulance. The patient was revived, stabilized and transported to UIC where he remained until 12/24, when he was returned to the institution. There is a RN admission note but no physician admission note. Vital signs and nursing notes are recorded at a minimum daily.

## Patient #8
This patent is a 25-year-old man admitted to the infirmary chronically on 1/28/14 after fracturing his jaw and having it wired shut. There is nursing admission note, but it was not timed. There was a brief note by the Medical Director on 1/31, but it was the nurse practitioner who did the admission note the following day. The nurse practitioner saw him again a week later. On 2/11, the Medical Director noted a six-pound weight loss since admission; this was the last provider note in the chart as of the date of our visit 10 days hence. There were shift nursing notes and daily vital signs documented. Wire cutters are immediately available in the nursing station.

*Opinion*: This patient has not been seen timely during his infirmary admission. He should be evaluated for weight loss.

## Patient #9
This patient is a 52-year-old man with no known medical history who was admitted to the infirmary on 2/13/14 for acute care following an episode of unresponsiveness and seizures in January of this year. He was found to have sepsis from streptococcal meningitis and a cavernous sinus thrombosis. There are appropriately documented physician and nursing admission notes. There are daily vital signs and shift nursing notes; however, he has not been seen by the physician per policy while in the infirmary. There were only two physician visits documented in the chart as of the time of our visit on 2/27.

*Opinion*: This patient has not been seen by a physician per policy. Considering the severity of his illness, this is particularly problematic.

## Patient #10

This patient was admitted 8/30/2012 due to repeated falling, hallucinations and TIAs. The patient was permanently assigned to the infirmary. On 2/22/2014, while going to the bathroom, he fell, fracturing his left distal femur. He was transported to a community hospital where an intramedullary fixation was performed. The patient was returned to the facility where he remains in the infirmary. There was a thorough, well-written RN admission note; however, it was not signed.

**Patient #11**
This is a 77-year-old man with cognitive impairment who has been chronically housed in the infirmary since at least January 2013, which is when his progress notes begin. His problem list was last updated in March of 2012 and lists only BPH and psoriasis.

In April 2013, he was seen in consultation by UIC neurology for his memory loss. They requested labs, CT of the head and an EEG, as partial complex seizures were in the differential diagnosis. The EEG was not approved and the CT (done two months later) showed only small vessel ischemic changes. In July 2013, neurology follow-up was denied. The decision was that the patient probably has dementia and treatment with Aricept should be considered. It was never started.

He is on the mental health caseload and prescribed several psychotropic medications, including Risperdal, which is relatively contraindicated in elderly dementia patients and has a black box warning for this setting due to increased risk of stroke and death. He is repeatedly described as friendly, calm and cooperative in the record, so it is not clear why an antipsychotic medication is necessary; the risks appear to outweigh the benefits. He is described as delusional with some auditory hallucinations, but these do not appear to be distressing to him and are not about harming self or others.

He was seen weekly through May; the notes appeared adequate. He was not seen by a provider at all in June. In July there were two notes; the first appears to be a chart review, as there were no vitals, no exam and no subjective information. It is not clear that the provider actually saw the patient. The second note was for a skin rash.

He was seen once in August by the Medical Director. Again, there was no physical exam or subjective information. There is no convincing evidence that there was interaction between the doctor and the patient.

The Medical Director saw him weekly in September, but no notes contain a physical exam, only "up in day room," "up about," "NAD," suggesting that he was merely observed from afar.

In October, the Medical Director saw him for back pain with inspiration. There was no exam, assessment or plan. She ordered a chest x-ray, which was done the next day and reported as normal. When she saw him again five days later, there was no mention of the back pain.

On 11/17/13, the RN noted a left facial droop. The Medical Director saw the patient the next day and noted, "Reported unable to keep left eye closed at noc." There was no exam, no assessment or diagnosis. She ordered the left eye to be taped shut. The following day, she noted a left facial droop and diagnosed Bell's palsy. She ordered artificial tears and continue taping the eye shut. No work-up or other treatment was initiated.

He was seen once more in November, twice in December, weekly in January, and once in February as of the date of our visit (2/26).

Review of his permanent record (which is also kept in the infirmary) revealed that in July 2012 the patient had a colonoscopy showing two adenomatous polyps, one of which showed high-grade dysplasia on pathology. There has been no follow-up colonoscopy as of the date of our visit.

*Opinion*: This patient has not been seen according to policy while in the infirmary. The notes are inadequate; most lack subjective or objective information and rarely articulate medical decision-making. This patient should have been treated with steroids for his Bell's palsy, in accordance with currently published guidelines. A serious, precancerous condition has been overlooked in this case. This case was brought to the attention of the Medical Director for follow-up.

**Patient #12**
This is a 45-year-old with hypertension, severe tremors and a seizure disorder who was in the infirmary from at least August until November of 2013. There were two physician notes in August, roughly weekly in September, two visits in October and one in November. None contain a physical exam that reflects that the provider laid a hand on the patient. All simply describe observations; "tremor," "up to eat in day room," "in bed," etc.

*Opinion*: This patient was not seen in accordance with policy, nor do the notes reflect that he was examined in the last six months.

## Infirmary Care Issues

1. LPNs are working outside the scope of practice.
2. Patients are not seen according to policy by providers. Rarely is there evidence that patients are physically examined.
3. One 11-7 shift has no RN assigned to the infirmary and a LPN is directing the care. Again, this places the LPN in the position of working outside the scope of practice because the LPN may need to evaluate a patient complaint, examine the patient and based on the findings of the examination and patient symptoms, form an assessment, and based on the assessment, develop and implement a plan of treatment. All of this is beyond the educational preparation and scope of practice for a LPN.
4. Stale, non-descriptive and uninformative charting.
5. Incomplete charting with dates/times, vital signs, signatures missing and the required SOAP format not always used.
6. Call buttons positioned where it could be difficult to impossible for the patient to access.
7. No call buttons in the patient rooms along one long hallway and no direct line-of-sight to the nursing station in six of the rooms.

8. No security presence in the infirmary despite all security classifications being present.

9.  Not enough radios and no panic alarms available for staff.
10. Insufficient equipment.
11. Insufficient amount of non-threadbare, non-torn/frayed or non-stained linens and blankets.
12. Insufficient number of pillows.

# Infection Control

At present, there is no named infection control nurse. The two nursing supervisors are responsible for compliance with IDOC policy concerning communicable diseases, blood borne pathogens and compliance with Illinois Department of Public Health reporting requirements.

The facility has a contract with a large nationwide medical waste disposal company which comes on site two times per month to haul away medical waste. There were no reported issues with this service.

Inspection of the infirmary, sick call areas in the medical department and X-house and emergency response bags verified the presence of personal protective equipment. Puncture proof containers for the disposal of sharps are in use in all medical areas and are appropriately placed in the medical waste containers when full.

Inmates assigned as "porters" in the infirmary and who perform janitorial duties may or may not have received any training as to appropriate cleaning and sanitation methods. Nursing supervisors have not addressed the issue with the porters.

Reportable STIs are picked-up and reported by UIC.

# Dental Program

## Executive Summary

On July 15 and 16, 2014, a comprehensive review of the dental program at Dixon CC was completed. Five areas of the program were addressed: 1) inmates' access to timely dental care; 2) the quality of care; 3) the quality and quantity of the providers; 4) the adequacy of the facility and equipment devoted to dental care; and 5) the overall dental program management. The following observations and findings are provided.

The clinic itself is rather large and spacious and well equipped. It is a three-chair clinic, but one of the chairs is not functioning. No plans for repair are in place. Although the staffing level for the dentists is adequate, there is no hygienist on the dental staff. As such, hygiene care is nearly non-existent. This is a serious omission and a hygienist should be hired as soon as possible.

A major area of concern relates to comprehensive care. Comprehensive care was provided without a comprehensive intra and extra-oral examination and well developed treatment plan. No examination of soft tissues nor periodontal assessment was part of the treatment process.

Hygiene care and prophylaxis were never provided and oral hygiene instructions were never documented. Bitewing or periapical radiographs were never taken to diagnose caries. Restorations

were provided from the information on a panelipse radiograph. None of the records reviewed documented the time of the appointment.

A similar area of concern is dental extractions. All dental treatment should proceed from a documented diagnosis. The reason for extractions should be part of the record entry. In none of the records reviewed was a diagnosis or reason for the extraction included. Alarmingly, in none of the records reviewed was a consent for treatment form available. This is a serious omission and needs to be corrected immediately.

Partial dentures should be constructed as a final step in the sequence of care delivery included in the comprehensive care process. A review of several records revealed that all partial dentures proceeded without a comprehensive examination and treatment plan. Periodontal assessment and treatment was seldom provided. Oral hygiene instructions were never included. It was almost impossible to demonstrate that all fillings and extractions were completed prior to impressions. Periodontal health was never documented.

At Dixon CC, dental sick call is accessed through a daily sick call sign up through the medical department and via the inmate request form. There was no system in place to evaluate urgent care needs (pain and/or swelling) from the request form. Inmates with urgent care complaints from the request form often took four or five days to be seen by the dentist for evaluation. These inmates should be seen within 24-48 hours from the date of the request form.

In none of the records reviewed was the SOAP format being used. Treatment was provided with little information or detail preceding it. Record entries did not include clinical observations or diagnosis to justify treatment.

A well developed Policy and Procedural Manual insures that a dental program addresses all essential areas and is run with continuity. The Policy and Procedures manual at Dixon CC only paraphrases the Administrative Directives. It included nothing specific for Dixon CC and the running of the dental program. The dental director knew little of its existence and had never reviewed it.

The Dixon CC Inmate Orientation Manual only mentions dental in relation to co-pays. No mention is made on access to care.

Medical conditions that require precautions and consultation with medical staff prior to dental treatment should be well documented in the health history section of the dental record and "red flagged" to bring them to the immediate attention of the provider. The dental record is maintained in the dental clinic separate from the medical record. Identification on the dental record of inmates on anticoagulant therapy was very inconsistent and seldom red flagged.

Blood pressures should, at the least, be taken on patients with a history of hypertension. When asked, the clinicians indicated that they do not routinely take blood pressures on these patients.

The sterilization flow from dirty to sterile was improper. There was no biohazard label posted in the sterilization area. Safety glasses were not always worn by patients. A radiation hazard warning sign was not posted in the x-ray area.

The continuing quality improvement process was inadequately utilized. A study was in process but seemed rather insignificant. CQI studies should be developed to address program deficiencies noted in the body of this report.

## Staffing and Credentialing

Dixon CC has a dental staff of one full-time dentist, one 14-hour part-time dentist and two full-time assistants. There is no hygienist at Dixon CC. This is a serious omission. To expect the dentists to provide hygiene and periodontal care to a population the size of Dixon CC is unrealistic and unobtainable. It is also a poor use of a dentist's time and resources. A dental hygienist should immediately be made part of the dental staff at Dixon CC.

CPR training is current on all staff, all necessary licensing is on file, and DEA numbers are on file for the dentists.

**Recommendations:**
1. That a dental hygienist immediately be made part of the dental staff at Dixon CC.

## Facility and Equipment

The clinic consists of three chairs and units, one for each dentist and a third for either of the two dentists. Two of the dental units are two years old and in very good repair. The third chair is very old, worn and does not work at all. No plans to repair this chair are in place. There is a panorex unit in the health services x-ray department in a dedicated room. It is old but functions adequately. The x-ray unit in the clinic is in good repair and works well. The autoclave is older but functions well. The compressor is in the basement and works well. The instrumentation is adequate in quantity and quality. The dentist expressed no complaints. The handpieces are older but well maintained and repaired when necessary. The cabinetry is rather old and showing wear and corrosion and staining on work surfaces, but functionally alright. This does make disinfection of surfaces more difficult. The ultrasonic works well.

The clinic itself consists of three chairs in three separate and adequate spaces. Free movement around each unit is acceptable. Provider and assistant have adequate room to work and none of the chairs interfere with each other. There was a separate sterilization area of adequate size and surface workspace. The staff office is large with a single desk. The dental records are maintained in this room. It also houses the dental laboratory with its equipment and workspace. There is adequate room for all.

The clinic is adequate in size and function to meet the needs of the inmate population at Dixon CC.

**Recommendations:**

1. Repair or replace the chair and unit that is not working.

## Sanitation, Safety, and Sterilization

I observed the sanitation and sterilization techniques and procedures. Surface disinfection was performed between each patient and was thorough and adequate. Proper disinfectants were being used. Protective covers were utilized on some of the surfaces.

An examination of instruments in the cabinets revealed that they were properly bagged and sterilized. All handpieces were sterilized and in bags.

The sterilization procedure itself was flawed. Flow should go from dirty to sterile in a linear fashion. The ultrasonic was on the opposite side of the autoclave from the sink. It should flow from ultrasonic to sink to work area to autoclave without crossing its path.

There was not a biohazard label posted in the sterilization area. Safety glasses were not always worn by patients. Eye protection is always necessary, for patient and provider. I also observed that no warning sign was posted where x-rays were being taken to warn of radiation hazards, especially to pregnant females.

The clinic was, all in all, clean, neat and orderly.

## Review Autoclave Log

I looked back three years and found the sterilization logs to be in place. They showed that autoclaving was accomplished weekly and documented. They utilize the Maxitest system through Henry Schein. A single negative result was documented, but corrected immediately with a retest, which was negative. I did observe that no biohazard warning sign was posted in the sterilization area.

**Recommendations:**
1. That the sterilization flow to the autoclave be corrected as suggested.
2. That safety glasses be provided to patients while they are being treated.
3. That a biohazard warning sign be posted in the sterilization area.
4. A warning sign be posted in the x-ray area to warn pregnant females of radiation hazards.

## Comprehensive Care

We reviewed 10 dental records of inmates in active treatment classified as Category 3 patients. One of the most basic and essential standards of care in dentistry is that all routine care proceed from a thorough, well documented intra and extra-oral examination and a well developed treatment plan, to include all necessary diagnostic x-rays. A review of 10 records revealed that no comprehensive examination was ever performed and no treatment plans developed. No examination of soft tissues or periodontal assessment was part of the treatment process. Hygiene care and prophylaxis was never provided and oral hygiene instructions were never documented. Bitewing or periapical x-rays were never taken to diagnose caries. Restorations were provided

from the information from the panorex radiograph. This radiograph is not diagnostic for caries. A periodontal assessment was not done in any of the records. None of the record entries were time documented.

**Recommendations:**
1. Comprehensive "routine" care be provided only from a well developed and documented treatment plan.
2. The treatment plan be developed from a thorough, well documented intra and extra-oral examination, to include a periodontal assessment and detailed examination of all soft tissues.
3. In all cases, that appropriate bitewing or peri-apical x-rays be taken to diagnose caries.
4. Hygiene care be provided as part of the treatment process.
5. That care be provided sequentially, beginning with hygiene services and dental prophylaxis.
6. That oral hygiene instructions be provided and documented.
7. That all record entries include date and time.

## Dental Screening

We reviewed 10 inmate dental records that were received from the reception centers within the past 60 days to determine if: 1) screening was performed at the reception center and 2) a panoramic x-ray was taken. Although Dixon CC is not a reception and classification center, I reviewed these records to insure the reception and classification policies as stated in Administrative Directive 04.03.102, section F. 2, are being met for the IDOC.

**Recommendations:** None. All records reviewed were in compliance.

## Extractions

One of the primary tenets in dentistry is that all dental treatment proceeds from a well documented diagnosis. In none of the 10 records examined was a diagnosis or reason for extraction included as part of the dental record entry. In none of the records reviewed was a consent form available. When asked, I was told that it was just not a part of the treatment process for surgery at Dixon CC. This is a serious omission and a major violation of a well established standard of care. It leaves the institution unnecessarily exposed to potential litigation.

**Recommendations:**
1. A diagnosis or a reason for the extraction be included as part of the record entry. This is best accomplished through the use of the SOAP note format, especially for sick call entries. It would provide much detail that is lacking in most dental entries observed. Too often, the dental record includes only the treatment provided with no evidence as to why that treatment was provided. Neither the patient's complaint nor the dentist's findings.
2. That a consent form be developed and signed by the patient and the dentist. That the procedure and any potential complications be well explained to the patient.

## Removable Prosthetics

Removable partial denture prosthetics should proceed only after all other treatment recorded on the treatment plan is completed. The periodontal, operative and oral surgery needs all should be addressed first. We reviewed dental records of five patients having received completed partial dentures. In only two of the five records reviewed on patients receiving removable partial dentures were oral hygiene instructions provided. Periodontal assessment was not provided in any of the records. In two of the five records a prophylaxis and/or a scaling debridement was provided. Because there is no comprehensive examination or any treatment plans developed and documented in any of the records, it is almost impossible to ascertain if all necessary care, including operative and/or oral surgery treatment, is completed prior to fabrication of removable partial dentures. I used radiographs and record entries to conclude that extractions were probably completed.

**Recommendations:**
1. A comprehensive examination and well developed and documented treatment plan, including bitewing and/or periapical radiographs and periodontal assessment, precede all comprehensive dental care, including removable prosthodontics.
2. That periodontal assessment and treatment be part of the treatment process and that the periodontium be stable before proceeding with impressions.
3. That all operative dentistry and oral surgery as documented in the treatment plan be completed before proceeding with impressions.

## Dental Sick Call

We reviewed 10 dental sick call charts to determine if they are adequate. Inmates access dental sick call through either a sick call sign up process or via the inmate request form. The sick call sign up takes place in the health services unit every morning. They sign up one day and are seen and evaluated the next day by an RN. The RN then refers the complaint to the dental program and the inmate is scheduled for dental within four to five days. I am unsure why daily sick call is not seen directly by the dental program. The number is relatively small and could easily be accomplished. It would insure that urgent care complaints are addressed in a timely manner.

Request forms are received from the institution mail and evaluated by the dentist and scheduled for an examination and evaluation within four to five days. No system was in place to attempt to see inmates with urgent care complaints within 24 to 48 hours from the date of the request form. Again, the number is small and they could easily be scheduled for the next working day.

Emergency call-ins from staff are seen the same day.

In none of the records was the SOAP format being used. As such, little in the way of a diagnosis was available for any delivered care.

Routine care was not being provided at sick call appointments.

The chief complaint, as well as could be determined, was being addressed at sick call.

**Recommendations:**
1. Implement the use of the SOAP format for sick call entries. It will assure that the inmate's chief complaint is recorded and addressed and a thorough focused examination and diagnosis precedes all treatment.
2. Daily dental sick call should be seen and evaluated by the dentist, rather than through the medical program.
3. Requests from inmates with urgent care complaints should be scheduled for the next work day from receipt of the request form.

## Treatment Provision

A rather weak triage system is in place that prioritizes treatment needs. All inmate request forms are evaluated from the day received by the dental program and appointments provided from this evaluation, usually within four to five days. Daily sick call sign-ups are seen by the RN's by the following day, evaluated and provided pain meds if necessary. They are then referred to dental for evaluation. These referrals from the RN's from daily sick call sign-ups are evaluated by the dental program by the following day from receipt of the referral, and scheduling is prioritized. They are scheduled accordingly or placed on the treatment list. The RNs have pain medication protocols available. Non-urgent care needs are being seen in a timely manner and their issues addressed.

Inmates can seek urgent care via the inmate request form, by signing up for sick call with the RN, or, if they feel they need to be seen immediately, by contacting Dixon CC staff, who will then call the dental clinic with the inmate's complaint. Request forms are sent via the institution mail and are evaluated the day they are received in dental, and scheduled accordingly, usually three to five days. Sick call sign-ups are seen by the following day by a RN and evaluated and referred to dental by the next day. They have pain medication protocols available. As such, it takes three to five days for dental to address urgent care needs. The dental clinic receives about three request form per day and only one in three or four is for urgent care, i.e., pain, swelling and toothaches. These inmates could easily be scheduled the next workday for direct evaluation by the dentist. Also, dental could schedule the sick call patients directly, rather than through the RN. This would insure that urgent care needs are addressed in a timely manner, within one working day.

Inmates who submit request forms for routine care are evaluated in the dental clinic within one week and placed sequentially on a waiting list for this care. The waiting list is approximately two months long at this time. The system is fair and equitable.

**Recommendations:**
1. That efforts be made to see urgent care complaints via the request form in a more timely manner. They could easily be scheduled for the next day. Sick call sign-ups are seen the following day by RNs who have pain medication protocols available. Dental sick call sign-ups should be scheduled directly by dental for the following day, rather than by the RN who then refers them to dental.

## Orientation Handbook

The Dixon CC Orientation Manual only mentions dental in relation to co-pays. It describes medical sick call procedures, but no mention is made of dental sick call.

**Recommendations:**
1. Amend the orientation manual to include dental sick call procedures and instructions on how to access routine, urgent and emergency care.

## Policies and Procedures

The Policy and Procedures Manual and statements for Dixon CC only paraphrase the Administrative Directives. It includes nothing specific for Dixon CC and the running of the dental program. When asked, the dental director knew little of its existence and had never reviewed it.

**Recommendations:**
1. That the dental program at Dixon CC develop a current detailed, thorough and accurate policy and procedures manual that defines how all aspects of the dental program are to be run and managed, to include access to care, care provision, clinic management, infection control, etc. Once developed, it should be reviewed and updated on a regular basis and as needed for new policies and procedures.

## Failed Appointments

A review of monthly reports and daily work sheets revealed a failed appointment rate of about 10.4%. All failed appointment inmates are required to sign a refusal form. They are all located and brought to the dental clinic to do so. These percentages are slightly high and should be watched.

**Recommendations:** None

## Medically Compromised Patients

Because the dental record is maintained in the dental clinic separate from the medical record, identification of medically compromised patients relies on assessment by the clinician and on the history section on the cover of the dental record. Of the 10 records reviewed of inmates on anti-coagulant therapy, only one was adequately red flagged to catch the immediate attention of the provider. Four of the records did not indicate that the inmate was on anticoagulant therapy. Five of the records indicated anticoagulant therapy, but they were not sufficiently red flagged. On one record, treatment was provided and was managed properly.

When asked, the clinicians indicated that they do not routinely take blood pressures on patients with a history of hypertension.

**Recommendations:**
1. That the medical history section of the dental record be kept up to date and that medical conditions that require special precautions be red flagged to catch the immediate attention of the provider. These would include medication allergies, anticoagulants, interferon

therapy, pre-medicated cardiac conditions and any other health condition that would require medical intervention prior to dental treatment.

2.    That blood pressure readings be routinely taken of patients with a history of hypertension,
especially prior to any surgical procedure.

## Specialists

The dental program at Dixon CC utilizes the Joliet Oral and Maxillo-facial Surgery clinic in Joliet, Illinois. This case was the only one sent out in the past nine months. It was a large cyst of the body and ramus of the mandible, a very extensive surgery. All other surgeries, including impactions that require removal, surgical extractions and lesion removals, are done in-house by the dentists at Dixon CC.

**Recommendation:** None. Specialists are available and utilized.

## Dental CQI

A review of monthly minutes from the Medical CQI Committee reveals that the dental program contributes monthly dental statistics to the CQI committee. Waiting lists are a main concern. The waiting list for extractions and operative is eight weeks and for dentures is 12 weeks. These are very reasonable lengths of time. No concern was expressed. The dental program recently completed a CQI study that evaluated percentage of required denture adjustments at the time of insertion. Insertions were evaluated for January, February and March 2014. Thirty-seven and a half percent needed such adjustments. The study is still being evaluated to see if any changes can be made in the construction or delivery process to improve this percentage. No other studies are ongoing at the time of this report.

**Recommendations:**
1. That the CQI process be used extensively to address the program deficiencies outlined in the body of this report. Policies and procedures should be developed from this process to insure that measures are in place to maintain program continuity and improvement.

# Continuous Quality Improvement

There have been no meetings since there was a meeting in December of 2013, for which we reviewed the minutes. The meeting details such things as the number of patients being seen in physician or NP or nurse sick call as well as numbers of staff vacancies, numbers of incident reports, infection control data and other reports of services provided. There is no documentation of any efforts to investigate either processes or professional performance nor is there any effort to improve either area. The acting QI coordinator is a member of the nursing staff who has had no training in CQI methodology and philosophy. The previous minutes from before December 2013 were in August 2013 and similarly contained no efforts invested in improving the quality of services. This can only be described as an inactive quality improvement program. Given the absence of logs to track unscheduled onsite and offsite services or adequate logs to review such things as the timeliness of scheduled offsite services, since the date of order is not available, attempting to monitor processes will be quite inefficient. In order to assess intrasystem transfers

we had to obtain custody records of patients transferred in on a given day. There is no intrasystem transfer log also. The CQI program needs to be completely rebuilt after key staff are provided training and the leadership positions are filled.

# Recommendations

**Leadership and Staffing:**
1. Make a priority of filling the vacant Medical Director, Health Care Unit Administrator, Director of Nursing, Nurse Practitioner and seven, Correctional Nurse I (RN) positions.
2. Due to concerns regarding non-registered nurses conducting sick call and working outside of their educational preparation and licensed scope of practice and when all the Correctional Nurse I positions are filled, total registered nursing positions should be evaluated as to the need for additional positions or a reconfiguring of current positions in order to provide an "all RN" conducted sick call process.

**Clinic Space and Sanitation:**
1. Develop and implement a plan to replace the style of beds being used for geriatric patients on the third floor of the medical building.
2. Properly equip designated sick call rooms in the health care unit and X-house.

**Intrasystem Transfer:**
1. The intrasystem transfer procedure must begin with all newly transferred inmates being presented to the medical unit, where an appropriate review of the transfer summary and medical record are discussed with the patient, along with vital signs being taken, and where indicated, a plan being implemented to insure continuity of service.

**Medical Records:**
1. Medical records staff should track receipt of all outside reports and ensure that they are filed timely in the health record.
2. Charts should be thinned regularly and MARs filed timely.
3. Problem lists should be kept up to date.

**Nursing Sick Call:**
1. Develop and implement a procedure for one style of sick call.
2. Develop and implement a plan for an "all RN" sick call process.
3. Develop and implement a plan to assure non-medical personnel do not have access to inmate sick call requests.
4. Develop and implement a plan to maintain inmate sick call requests on file.
5. Develop and implement a plan to initiate and maintain a sick call log.
6. In the X-house, develop and implement a plan to conduct a legitimate sick call encounter, including listening to the patient complaint, collecting a history and objective data, performing a physical examination when required, making an assessment and formulating a plan of treatment rather than the current practice of talking to the patient through a solid steel door and basing any treatment on the conversation only.
7. Per Office of Health Services policy, assure all sick call encounters are documented in the medical record in the Subjective-Objective-Assessment-Plan (SOAP) style.
8. Develop and implement a plan to assure the Office of Health Services approved, preprinted treatment protocol forms are used at each sick call encounter.

9. Develop and implement a plan to assure each of a patient's complaints are addressed during a sick call encounter or a prioritization of needs to address during future encounters is developed rather than the current practice of allowing only one complaint per visit.

10. Develop and implement a plan of education for all nursing staff which will be conducted by the Medical Director and addresses the following issues:
    a. Assure the patient's complaint is addressed at the time of the sick call encounter.
    b. Assure documentation is complete and, at a minimum, addresses the complaint, duration, history, pain level if applicable, location of pain, location of injury, etc., collection of complete vital signs including weight, an examination if applicable and an assessment and plan.
    c. Use of the Office of Health Services approved treatment protocols at each sick call encounter.
    d. When using the protocol, staff must comply with the OTC dosages, as increasing the strength or frequency make take the OTC dosage to an unauthorized prescription dosage.

**Clinician Sick Call:**

1. The nursing department must implement a sick call logbook with fields including date, patient name, patient number, reason for visit, date of clinician appointment and if cancelled, reason for cancellation and date for the rescheduled appointment.

**Chronic Disease Program:**

1. There should be a single nurse assigned to the chronic care program to identify, enroll, monitor and track patients in an organized and comprehensive way.

2. Patients with HIV should be enrolled and monitored in the chronic disease program. There should be a system in place to identify medication noncompliance (or other missed doses) and refer those patients to a provider timely.

**Urgent/Emergent Care:**

1. Unscheduled services require a logbook that contains fields for date, time, patient name, patient number, presenting symptom, where the assessment was performed, and the disposition, including if the patient was returned to the cell house or sent offsite. When patients are sent offsite, a staff person must be assigned the responsibility of obtaining either the emergency room report or, if the patient was admitted to the hospital, the discharge summary. All patients sent offsite should be brought to the clinic for a nurse to review the relevant documents and insure the required documents, if not available, are obtained and the patient is scheduled for a follow-up visit with a primary care clinician. At the primary care clinician visit, the clinician must document a discussion of the findings and plan.

**Scheduled Offsite Services:**

1. The delays in obtaining scheduled offsite services must be eliminated. Wexford must be required within seven days after verbal approval to have provided authorization to the U of I coordinator. If the U of I is assigning an appointment date greater than 30 days in the future, an effort must be made to obtain the service locally. After the service has been

provided the patient should be returned through the medical clinic and a nurse should review the paperwork or take steps to obtain it. After the paperwork is obtained, the patient must be scheduled for a follow-up visit with the primary care clinician, who must document the discussion of the findings and plan.

**Infirmary Care:**
1. Staff the infirmary with a registered nurse 24 hours a day, seven days a week.
2. Education of nursing staff on the need for complete charting, which includes providing a thorough description of the patient's medical condition.
3. Develop and implement a plan to provide an accessible nurse call system for patients who are physically unable to access the current call system and provide for a credible system for those patient rooms with no nurse call system.
4. Establish minimum inventory levels for bedding, linens and pillows and provide acceptable items which are not torn, threadbare or frayed.
5. Provide a permanent manned security post within the infirmary.
6. Develop and implement a plan to obtain needed additional equipment as determined by the Medical Director, Health Care Unit Administrator, Director of Nursing and a nursing staff representative who is routinely assigned to the infirmary.
7. Develop and implement a plan to provide additional institutional radios to infirmary nursing staff.

**Infection Control:**
1. Develop a position description and name an Infection Control Registered Nurse (IC-RN).
2. Develop and implement a plan for the IC-RN to conduct monthly documented safety and sanitation inspections focusing at a minimum on the health care unit, infirmary and dietary department with monthly reporting to the Quality Improvement Committee (QIC).
3. Develop and implement a plan for the IC-RN to monitor food handler examinations and clearance for staff and inmates.
4. Develop and implement a plan for the IC-RN to monitor compliance with initial and annual tuberculosis screening, with monthly reporting to the QIC and facility administration as needed.
5. Develop and implement a plan to aggressively monitor skin infections and boils and work jointly with security and maintenance staff regarding cell house cleaning practices with monthly reporting to the QIC and facility administration as needed.
6. Develop and implement a plan to daily monitor and document negative air pressure readings when the room(s) are occupied for respiratory isolation and weekly when not occupied.
7. Develop and implement a training program for health care unit porters which includes training on blood-borne pathogens, infectious and communicable diseases, bodily fluid clean-up, proper cleaning and sanitizing of infirmary rooms, beds, furniture, toilets and showers.
8. Monitor all sick call areas to assure appropriate infection control measures are being used between patients i.e., use of paper on examination tables which is changed between patients or a spray disinfectant is used between patients, examination gloves are available to staff and hand washing/sanitizing is occurring between patients.

9. Develop and implement a plan to monthly monitor all patient care associated furniture, including infirmary mattresses, to assure the integrity of the protective outer surface with the ability to take out of service and have repaired or replaced as needed.

10. Interface with the County Department of Health and Illinois Department of Health and provide reporting as required by each.

**Continuous Quality Improvement:**

1. This program must be recreated and provided the leadership that has had training in quality improvement philosophy and methodology. The program should focus on both process improvement and professional performance improvement as well as grievance responses. The program must be used to improve intrasystem transfers, both nurse and provider sick call, the chronic care program, infirmary care, unscheduled services care, scheduled offsite services care, medical administration, grievances, infection control, dental services and mental health services. This program requires the use of logbooks for tracking capabilities for both intrasystem transfers, sick call, infirmary care, chronic care, unscheduled services care, scheduled offsite services and grievances.

2. The leadership of the continuous quality improvement program must be retrained regarding quality improvement philosophy and methodology, along with study design and data collection.

3. This training should include how to study outliers in order to develop targeted improvement strategies.

# Appendix A – Patient ID Numbers

**Intrasystem Transfer:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | | [redacted] |
| Patient #2 | | [redacted] |
| Patient #3 | | [redacted] |
| Patient #4 | | [redacted] |
| Patient #5 | | [redacted] |
| Patient #6 | | [redacted] |

**Nursing Sick Call:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | [redacted] | [redacted] |
| Patient #2 | [redacted] | [redacted] |
| Patient #3 | [redacted] | [redacted] |
| Patient #4 | [redacted] | [redacted] |
| Patient #5 | [redacted] | [redacted] |
| Patient #6 | [redacted] | [redacted] |
| Patient #7 | [redacted] | [redacted] |
| Patient #8 | [redacted] | [redacted] |
| Patient #9 | [redacted] | [redacted] |
| Patient #10 | [redacted] | [redacted] |

**Clinician Sick Call:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | | [redacted] |
| Patient #2 | | [redacted] |
| Patient #3 | | [redacted] |
| Patient #4 | [redacted] | [redacted] |
| Patient #5 | [redacted] | [redacted] |
| Patient #6 | [redacted] | [redacted] |

**Chronic Disease:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | [redacted] | [redacted] |
| Patient #2 | [redacted] | [redacted] |
| Patient #3 | [redacted] | [redacted] |
| Patient #4 | [redacted] | [redacted] |
| Patient #5 | [redacted] | [redacted] |
| Patient #6 | [redacted] | [redacted] |
| Patient #7 | [redacted] | [redacted] |
| Patient #8 | [redacted] | [redacted] |
| Patient #9 | [redacted] | [redacted] |

**Unscheduled Offsite Service:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | | [redacted] |
| Patient #2 | | [redacted] |
| Patient #3 | | [redacted] |
| Patient #4 | | [redacted] |
| Patient #5 | | [redacted] |
| Patient #6 | | [redacted] |
| Patient #7 | | [redacted] |
| Patient #8 | | [redacted] |

**Scheduled Offsite Service:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | | [redacted] |
| Patient #2 | | [redacted] |
| Patient #3 | | [redacted] |
| Patient #4 | | [redacted] |
| Patient #5 | | [redacted] |
| Patient #6 | | [redacted] |
| Patient #7 | | [redacted] |
| Patient #8 | | [redacted] |
| Patient #9 | [redact | [redacted] |

**Infirmary:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | [redacted] | [redacted] |
| Patient #2 | [redacted] | [redacted] |
| Patient #3 | [redacted] | [redacted] |
| Patient #4 | [redacted] | [redacted] |
| Patient #5 | [redacted] | [redacted] |
| Patient #6 | [redacted] | [redacted] |
| Patient #7 | [redacted] | [redacted] |
| Patient #8 | [redacted] | [redacted] |
| Patient #9 | [redacted] | [redacted] |
| Patient #10 | [redacted] | [redacted] |
| Patient #11 | [redacted] | [redacted] |
| Patient #12 | [redacted] | [redacted] |

# Pontiac Correctional Center
# (PCC) Report

April 3, 4, 14-16, 2014

Prepared by the Medical Investigation Team

Ron Shansky, MD
Karen Saylor, MD
Larry Hewitt, RN
Karl Meyer, DDS

# Contents

Overview ...................................................................................................................3

Executive Summary ...................................................................................................3

Findings .....................................................................................................................6

   Leadership and Staffing ..........................................................................................6

   Clinic Space and Sanitation ...................................................................................7

   Intrasystem Transfer ..............................................................................................8

   Nursing Sick Call....................................................................................................9

   Chronic Disease Management...............................................................................10

   Pharmacy/Medication Administration................................................................. 16

   Laboratory.............................................................................................................17

   Urgent/Emergent Care ..........................................................................................17

   Scheduled Offsite Services (Consultations and Procedures) ............................... 19

   Infirmary Care ......................................................................................................20

   Infection Control ...................................................................................................22

   Inmates' Interviews ...............................................................................................22

   Dental Program......................................................................................................23

   Mortality Review ..................................................................................................30

   Continuous Quality Improvement ........................................................................30

Recommendations ...................................................................................................32

Appendix A – Patient ID Numbers .......................................................................34

# Overview

On April 3-4 and 14-16, 2014, we visited Pontiac Correctional Center (PCC). This was our first site visit to PCC and this report describes our findings and recommendations. During this visit, we:

- Met with leadership of custody and medical
- Toured the medical services area
- Talked with health care staff
- Reviewed health records and other documents
- Interviewed inmates

We thank Warden Pierce and his staff for their assistance and cooperation in conducting the review.

# Executive Summary

PCC is a maximum-security prison that houses approximately 2000 offenders. The current population was 2035 inmates. The institution is not a reception center but has an infirmary and mental health mission.

The Health Care Unit is an old two-story building which was remodeled and opened in the late 1980s, and there appears to have been little to no renovation since its opening.

There are minimal staffing vacancies at Pontiac. The Medical Director and Health Care Unit Administrator (HCUA) present a strong administrative leadership team; however, the Director of Nursing (DON) did not appear to function as a part of that team. The DON, who is employed by the medical vendor, has been on site 18 months but also functions as the medical vendor's site manager, which significantly impacts on her ability to perform the DON duties.

There are nine CMTs employed at this facility, two-thirds of whom are LPNs. Although we were told otherwise, CMTs are performing sick call. There is one physician, the Medical Director, who functions almost exclusively in a clinical capacity, following the infirmary and medically complex chronic care patients. He also does urgent care/trauma. He works six days per week.

The majority of care is provided in the cell houses. There are "exam rooms" in each cell house, mostly converted bathrooms and storage rooms. The cell house clinics have old and dilapidated equipment; the "exam tables" are actually physical therapy tables that do not incline. None of the tables had paper. The Medical Director sees sick call patients in the HCU and usually sees about 10 scheduled patients per day; the number is limited based on the restrictions on movement, as each patient has to be escorted individually. A typical volume for a cell house clinic is 10-12 according to the HCUA. The large majority of the chronic care clinics are done by the midlevel providers.

We found both the Medical Director and nurse practitioner to be competent and thorough, with solid clinical decision-making skills. We found the PA's notes to be lacking in detail and had some concerns regarding his clinical acumen and therefore observed him in action, with his permission and that of the patients, during his clinic. What we observed was some of the most confrontational, argumentative and unprofessional behavior from a health care provider that we have seen in recent memory. His behavior was not only unprofessional but also unsafe in a prison environment. In our opinion, this provider should not be practicing in a correctional setting.

Medical records were orderly, neat and well maintained. However, often the problem lists were not up to date.

The current intrasystem transfer process does not effectively insure appropriate and timely follow-up for identified problems.

Sick call consists of Correctional Medical Technicians (CMTs), who could be either a Licensed Practical Nurse (LPN) or certified Emergency Medical Technician (EMT), who is assigned to specific cell houses, collecting written inmate health care requests or listening to verbal requests and reviewing the requests as to whether there is an urgent or routine need. If urgent, the inmate is escorted to the Health Care Unit for evaluation. If routine, the CMT provides treatment based on approved IDOC Office of Health Services treatment protocols. All of these actions are beyond the scope of educational preparation and practice for either an LPN or EMT, and access to health care is delayed due to inappropriate assessment.

Chronic care clinics were occurring timely with labs drawn timely prior to the visits in most cases. There is no chronic care nurse; the HCUA functions in this capacity. Although she does a good job, we recommend that there be a nurse dedicated to this position, given the volume of work entailed. There is no system in place to track important indicators of the chronic care clinics such as degree of disease control or various outcomes measurements. This makes it impossible to objectively measure how well the population is managed as a whole. In the course of our chart reviews, we came across multiple cases wherein important laboratory findings were not addressed, and several avoidable interruptions in treatment of patients with HIV infection and seizure disorders, among other problems.

Pharmaceuticals are provided by the medical vendor through Boswell Pharmaceuticals located in Pittsburg, PA. It is a "fax and fill" system, which means prescriptions faxed to Boswell by 2:00 p.m. will be received at the facility the next day. A community retail pharmacy and the local hospital are used as "back-up" providers. The medication storage/preparation room is managed by a pharmacy technician who has 13 years of experience in the field. There was tight control of medication, sharps and medical tools, with all perpetual inventories being accurate.

Laboratory services are provided by the University of Illinois-Chicago (UIC). Daily, Monday through Friday, specimens are driven to UIC and reports are faxed to the facility, generally the next day.

The unscheduled offsite and onsite services allowed for identification of the following types of problems: missing essential documentation, delays in obtaining required services and an absence of follow through on recommendations by a specialist, without the presence of an explanation of an alternative approach.

With regard to scheduled offsite services, we identified delays in obtaining appointments and also delays in obtaining reports and a delay in access to a procedure.

The infirmary, which is located on the first floor of the HCU, is a 12-bed unit staffed with at least one registered nurse 24 hours a day, seven days a week. Security staff is present in the infirmary, with inmate porters performing the janitorial duties and supervised by both nursing and security staff.

The infirmary beds are in very poor condition and need to be replaced. There is only one bed that could be considered a "hospital" bed which allows for raising and lowering the head or foot of the bed. There is no function to raise or lower the complete bed. Additionally, there are many mattresses with cracked or torn plastic coverings and many mattresses with no plastic outer covering. This presents a significant infection control issues, as the mattresses cannot be effectively disinfected.

The sink in the nursing station, which is used for hand washing, could not be used because it would not drain and it leaked. Additionally, there is no "nurse call" system in the infirmary and there is not direct line-of-sight from the nursing station into each room.

The HCUA functions as the infection control nurse. She reported aggressive monitoring, culturing and treatment of skin infections and boils. She also reported a low occurrence of culture proven MRSA.

Infirmary bedding and linens are laundered by inmate porters in a residential style washing machine located in the infirmary. Water temperatures are not sufficient to properly sanitize the bedding and linens.

Inmate porters who performs the health care unit janitorial duties have received no training on the proper sanitation of infirmary rooms, beds, furniture and linens, infectious and communicable diseases, blood-borne pathogens, bodily fluid clean-up and medical confidentiality.

The CQI program needs to effectively identify problems and analyze their causes and implement improvement strategies so that the problems identified above are ultimately mitigated.

A group interview with six insulin dependent diabetics indicated a general consensus that the physician and nursing staff attempted, within the system, to provide them with good care. They were all openly critical toward the Physician's Assistant in regard to his attitude and competence.

# Findings

## Leadership and Staffing

The Medical Director position was filled with an experienced physician with a background in internal medicine who has worked in the correctional system since the mid-1980s. He performs both clinical work as well as Medical Director Responsibilities and of course there is some overlap. Besides his strictly clinical responsibilities providing primary care services, we discussed his view of his responsibilities as Medical Director. He indicated these responsibilities included following up on all offsite referrals, both scheduled and unscheduled, as well as being referred cases which were perceived by the other primary care clinicians as too difficult or complex. He also was responsible for evaluating any alleged rape cases. He makes rounds in the infirmary on all patients. He also attends quality improvement meetings, reviews all nurse practitioner and physician assistant referrals for scheduled offsite services and then presents these cases at the collegial review discussions with the utilization management physicians in Pittsburgh for Wexford. He indicates that he does not do a regular review with feedback to the nurse practitioner and physician assistant; thus, there is no organized effort to assist them in improving their skills. He works for Wexford.

Also on site is a Health Care Administrator who has worked both for the vendor and for the state and appears to be quite knowledgeable and heavily involved in the services being provided. Finally, there is also a Director of Nursing position filled by the vendor and the Director of Nursing also is responsible, as the Wexford site manager, for handling office responsibilities such as timekeeping and payroll. This was the first facility of the five we have been to in which all of the leadership positions were filled at the time of our visit.

Other staffing is listed in the following

table: *Table 1. Health Care Staffin*

| Position | Current FTE | Filled | Vacant | State/Cont. |
|---|---|---|---|---|
| Medical Director | 1.0 | 1.0 | 0 | Contract |
| Staff Physician | 0 | 0 | 0 | Contract |
| Physician's Asst. | 1.0 | 1.0 | 0 | Contract |
| Nurse Practitioner | 1.0 | 1.0 | 0 | Contract |
| Health Care Unit Adm. | 1.0 | 1.0 | 0 | State |
| Director of Nursing | 1.0 | 1.0 | 0 | Contract |
| Nursing Supervisor | 1.0 | 0 | 1 | Contract |
| Office Associate | 1.0 | 1.0 | 0 | State |
| Corrections Nurse II | 6.0 | 5.0 | 1-LOA 4 yrs. | State |
| Registered Nurse | 13.0 | 11.0 | 2 | Contract |
| Licensed Practical Nurses | 2.0 | 2.0 | 0 | Contract |
| Correctional Medical Technician | 11.0 | 9.0 | 2 | State |
| Health Information Adm. | 1.0 | 1.0 | 0 | Contract |
| Health Info. Assoc. | 1.0 | 1.0 | 0 | State |
| Phlebotomist | 0.5 | 0.5 | 0 | Contract |

| Position | Current FTE | Filled | Vacant | State/Cont. |
|---|---|---|---|---|
| Radiology Technician | 0.3 | 0.3 | 0 | Contract |
| Pharmacy Technician | 2.0 | 2.0 | 0 | Contract |
| Pharmacy Technician | | | | State |
| Staff Assistant I | 1.0 | 0 | 1 | Contract |
| Staff Assistant II | 3.0 | 3.0 | 0 | Contract |
| Chief Dentist | 1.0 | 1.0 | 0 | Contract |
| Dentist | 0.6 | 0.6 | 0 | Contract |
| Dental Assistant | 2.0 | 2.0 | 0 | |
| Dental Hygienist | 1.0 | 1.0 | 0 | Contract |
| Optometry | 0.2 | 0.2 | 0 | Contract |
| Staff Assistant | 5.0 | 5.0 | 0 | Contract |
| Office Coordinator | 1.0 | 1.0 | 0 | Contract |
| **Total** | **58.6** | **51.6** | **7** | |

There are minimal vacancies at Pontiac. The Medical Director and Health Care Unit Administrator present a strong leadership team. The Director of Nursing, who is employed by the medical contractor, has been onsite 18 months but does not function as an integral part of the health care team. Of particular concern, the Director of Nursing also functions as the medical contractor site manager. That position alone is quite demanding and, as a result, leaves little time for her to actively function as a Director of Nursing. During the inspection, she was conspicuously absent the majority of the time.

# Clinic Space and Sanitation

The health care unit is an old two story building remodeled and opened in the late 1980s. The first floor contains a security post, three inmate holding areas, an urgent care/emergency room, an optometry clinic, telemedicine clinic, a large medication storage room, Health Care Unit Administrator office, Director of Nursing office, three-chair dental clinic, radiology room and a 12 bed infirmary. The second floor houses a large conference room and multiple offices for medical and mental health staff.

Despite the age, the building is clean, well lighted and generally well maintained.

Inmate porters, under the supervision of both security and nursing staff, perform the janitorial duties; porters do not perform or are involved in any medical care delivery. Porters are provided no orientation to the health care unit or proper cleaning and sanitation procedures, blood-borne pathogen training or communicable disease training. When indicated, they are provided personal protective equipment and supervised by nursing staff when cleaning up blood or body fluids.
Porters are responsible for laundering infirmary linens. The practice is of concern since it is doubtful the washing machine water temperature is hot enough to appropriately sanitize infirmary linens. All infirmary linens and bedding must be considered to be contaminated. The required laundering procedure to sanitize linens and bedding is to wash with laundry detergent at a water temperature of at least 160 degrees Fahrenheit for a minimum of 25 minutes or wash with laundry detergent and a bleach bath of at least 100 ppm at a water temperature of at least 140 degrees Fahrenheit for a minimum of 10 minutes. The hot water temperatures for the

infirmary washing machine need to be initially checked and routinely monitored to assure either 140-degree water temperature with a bleach bath or 160-degree water temperature with no bleach bath. It is doubtful the current water temperature is over 125-130 degrees. If the appropriate water temperature cannot be attained, infirmary linens and bedding must be laundered in the institutional laundry where, again, the appropriate water temperatures must be maintained.

From a safety and medical services delivery perspective, the stretcher in the urgent care room needs to be replaced. There are no working side rails, and the mattress easily slides off the stretcher.

# Intrasystem Transfer

We reviewed 12 records of patients who had transferred into Pontiac within the prior three months. In this review we are primarily determining whether the intrasystem transfer process facilitates continuity for all required services. In six of the 12 records we identified problems which related to arranging for appropriate follow-up.

### Patient #1
This is a 47-year-old who arrived at Pontiac on 2/11/14 with a newly positive TB skin test. His x-ray was negative, but he had never been evaluated by a primary care provider who would discuss with him the nature and required follow up for the positive TB skin test.

### Patient #2
This is a 46-year-old whose problem list contains the problems of reduced platelets and a throat tumor. He arrived at Pontiac on 2/19/14. In early November 2013, a lesion was found in his mouth which was thought to be a tumor. He went to Lawrence Memorial Hospital on 11/13/13 with a problem of bleeding. He was given two units of blood transfusions and transferred to the Carl Clinic, where he stayed approximately a month. He ultimately was given the diagnosis of thrombotic thrombocytopenic purpura as well as H. pylori infection, anemia and hypertension. At the Carl Clinic he had plasmapheresis and was given prednisone, Lasix, Coreg and proton pump inhibitors. At the time of discharge he was still anemic, with a hemoglobin of 9.1 and a hematocrit of 30. On discharge he was admitted to the Danville infirmary, where he had a central line port installed until just before he was transferred to Pontiac on 2/14/14. At the time of transfer, he was on iron for anemia and he also had decreased numbers of platelets. Although the problem list contains a tumor in the mouth, there has been no follow-up to confirm or indicate the problem has resolved.

### Patient #3
This is a 46-year-old with a seizure disorder and hyperthyroidism. He arrived on 2/26/14 at Pontiac. He has never had a chronic care visit despite entering the system in December 2013.

### Patient #4
This is a 54-year-old with hypertension who arrived at Pontiac on 2/26/14. Despite having the hypertension and entering the system in early February, he has never had a chronic care visit.

**Patient #5**
This is a 43-year-old with hepatitis C and thrombocytopenia. He arrived at Pontiac on 2/11/14. The Pontiac transfer summary does not include his having hepatitis C. His last hepatitis C chronic care visit was in July of 2013. His most recent laboratory tests were in January.

# Nursing Sick Call

On a daily basis, Correctional Medical Technicians (CMTs), who could be licensed or unlicensed, tour their assigned cell houses for inmate health care complaints. Inmates voice their complaints to the CMT through either an open cell-front barred door or a solid door. Based on the nature of the complaint or request, the CMT could make the decision to immediately refer the inmate to the physician or mid-level provider, refer the inmate for nurse sick call or use an approved Office of Health Services treatment protocol to treat the inmate. Observation of the process in North Cell House showed a non-licensed CMT listening to inmate health care complaints at cell side. Depending on the nature of the complaint, vital signs may or may not be taken. The inmate is not brought out of the cell and, as a result, a physical examination and assessment is not performed; however, the CMT may use an approved treatment protocol and provide treatment, including over-the-counter medication, in the absence of any objective findings and solely based on the inmate's subjective comments. Of 15 records reviewed, the following issues were identified.

1. In all 15 records, the encounter was performed by a Correctional Medical Technician (CMT) who could be a Licensed Practical Nurse (LPN) or unlicensed staff members who are certified Emergency Medical Technicians. CMTs are listening to complaints, collecting subjective data and, based on the inmate's complaint and the subjective data, making an assessment and based on the assessment making a decision to treat the inmate from a treatment protocol. Pursuant to the Illinois Nurse Practice Act, performing these functions is beyond the educational preparation and scope of practice for LPNs and EMTs.
2. In all 15 records, the encounter including collection of vital signs and any physical assessment was performed at cell side either through open-bar doors or in one instance through a solid door by way of the food hatch.
3. In three of 15 records, treatment was provided based only on the inmate's subjective comments.
4. In three of the 15 records, vital sign documentation was incomplete.
5. In four of the 15 records, the physical assessment was incomplete.
6. In one of the 15 records, the contact was postponed due to lockdown. The patient was evaluated four days later.
7. In only three of the 15 records was the inmate referred to the physician or mid-level provider.

As a result of the above, it is our opinion that access to health care is delayed due to inappropriate assessment.

Per IDOC policy, $5.00 co-pay is charged for non-emergency, self-generated sick call requests.

# Chronic Disease Management

It was not possible to determine how many patients are enrolled in the program, as the OTS does not have the capacity to sort the data this way. It also does not track any details regarding the chronic care clinic, such as the degree of control, etc. There is no dedicated chronic care nurse; the HCUA functions in this capacity. She keeps logbooks for each chronic care clinic which track the date each patient was last seen and some details about their degree of control or other clinics the patient is enrolled in. If patients have multiple chronic diseases, they are all addressed at the time of the chronic care clinic visit. The distribution of patients in the clinics is as follows:

- Cardiac/Hypertension (320)
- Diabetes (76)
- General Medicine (240)
- HIV Infection/AIDS (16)
- Liver (54)
- Pulmonary Clinic (146)
- Seizure Clinic (49)
- TB Infection (76)

Chronic care clinic are occurring timely with labs drawn before each clinic. All medications are renewed at the time of the chronic care visit. Problem lists were generally not up to date. The PA's exams were minimal; most organ systems were described as only "wnl" (within normal limits). The nurse practitioner's were somewhat better.

## Cardiovascular/Hypertension

We reviewed seven charts of patients enrolled in the hypertension clinic. None had updated problem lists but all were seen every four months per policy. Physical exams were minimal in many cases. We were particularly troubled by one case described below (patient #2).

### Patient #1

This is a 67-year-old man with coronary artery disease, hypertension, ankylosing spondylitis and CKD. His problem list was last updated in 2009. He is on Lasix presumably for a history of heart failure, but there is no echo report in the chart. Despite his diagnosis of coronary artery disease with prior stent, he was not prescribed a beta-blocker, statin or ACE inhibitor.

*Opinion*: This patient should be on additional medications to decrease his risk of future cardiac events.

### Patient #2

This is a 72-year-old man with coronary artery disease, hypertension, COPD and a history of prostate cancer. He had an MI in November 2012, a stent in 2011 and a CABG in 2002. He was prescribed full dose aspirin, Plavix and 600 mg of ibuprofen twice a day, among numerous other medications. He has been seen every four months in chronic care clinic for his various diseases.

At the 10/3/13 visit, he had labs prior (on 9/18) which reflected a drop in his Hb to 9.2 g/dl (down from 12.8 g/dl in May). This was not mentioned during the visit, though the lab report had

been signed on 9/20. On 10/23, the doctor saw him again for weakness after prolonged standing. Again, the anemia was not mentioned.

On 12/2, the patient saw the PA for follow up of his hypertension and reported ongoing weakness. The PA noted the low Hb but did not do a rectal exam to test the stool for blood. He ordered repeat labs and a follow up visit in one month. The labs were not done.

On 12/9, the patient saw the nurse practitioner for follow up of his abnormal labs. She also noted the drop in Hb from May to September and noted that the patient was taking the aspirin/Plavix/Motrin combination. Her assessment was "anemia, r/o GI bleed," but she did not do a rectal exam. She decreased the aspirin to 81 mg, stopped the ibuprofen and ordered follow up for one week.

On 12/10, a repeat CBC showed that the Hb had dropped further to 8.1 g/dl and the WBC count was elevated at 16.2. Two days later, there is a note from the same nurse practitioner who reviewed these results and focused entirely on the WBC elevation and embarked on a work-up to rule out infection. The anemia was not mentioned. However, the patient was seen that same day by the Medical Director who admitted him to the infirmary with fever of 102.7° and knee pain. He also noted the anemia but did not do a rectal exam, focusing instead on the possibility of a septic knee. Labs were repeated the day of the infirmary admission and the Hb was down to 7.9 g/dl but not addressed.

On 12/24, he presented to the health care unit with chest pain and was sent to the local hospital, where he was found to be in acute renal failure with a creatinine of 4 (up from baseline of 1-1.5), and anemia with an Hb of 7. He was given IVF and his renal failure improved. He was discharged back to the prison with a recommendation that he undergo an outpatient colonoscopy. The discharge summary was reviewed by the nurse practitioner upon the patient's return but there is no mention of the anemia and recommendation for colonoscopy. On 12/31, the PA saw the patient for a writ return and also focused exclusively on the renal failure with no mention of the anemia.

On 1/12/14, the patient was admitted to the infirmary for recurrent knee pain. Labs drawn the next day showed an Hb of 8.4 and WBC of 12.1. The Medical Director noted iron deficiency anemia and ordered iron supplementation; no rectal exam or other work-up. On 1/22, a repeat CBC showed the Hb down to 7.1 g/dl and the WBC count 21.3. This result was printed on 1/23, when he showed the infirmary nurse that he was having melena and was sent to the local hospital where upper endoscopy showed multiple gastric ulcers and H Pylori infection.

*Opinion*: This patient's anemia went essentially ignored for four months. Even after a colonoscopy was advised by the outside hospital staff, this recommendation was not followed.

**Patient #3**
This is a 38-year-old man with asthma, seizures, hyperlipidemia, hypertension and sarcoidosis. At the February 2013 chronic care clinic, he was started on cholesterol medication although his lipid profile did not seem to warrant it. His blood pressure was 132/90 and no medication

changes were made. His blood pressure medications were not those typically recommended as first line therapy.

The next chronic care clinic was on 6/5/13 for hypertension and hyperlipidemia. His hyperlipidemia was deemed to be well controlled, though there were no new labs since 3/13.

## Diabetes

We reviewed five records of patients enrolled in the diabetes clinic. Two patients were missing relevant lab work at their most recent chronic care visit, but otherwise we found the care to be timely and appropriate. We did come across an issue in one of the records, patient [redacted], who had an elevated PSA (8.8) in May 2013 which had not been addressed. We brought this case to the attention of the Medical Director.

## General Medicine

We reviewed five records of patients enrolled in the general medicine clinic and found opportunities for improvement in three cases described below.

**Patient #4**
This is a 67-year-old man with hypertension, hyperlipidemia and BPH who arrived at PCC on 11/16/11. The problem list was last updated 2/5/13 and does not list chronic kidney disease, though his GFR has been below 60 for the past two years.

In January 2013, the patient's PSA was elevated at 5.7 (up from 3.4 in July 2011). He was seen for his annual physical exam on 2/5/13 by the Medical Director who noted this, did a prostate exam and noted mild tenderness. He treated the patient for presumptive prostatitis and ordered a repeat PSA in two months. The lab was never done.

On 3/27/13, the patient was seen for general medicine and hypertension clinics. The notes are brief with minimal physical exams. Labs were drawn on 3/4 and resulted on 3/5, but the provider evidently did not have them, as the labs were listed as "pending." The provider decided that the patient's BPH was well controlled, although there was no historical information to support this conclusion.

*Opinion*: The rising PSA in this African American man needs follow up given the increased risk for prostate cancer in this population.

**Patient #5**
This is a 67-year-old man with coronary artery disease, hypertension, ankylosing spondylitis and CKD. His problem list was last updated in 2009. He is prescribed Indocin 50 mg twice a day routinely despite stage 4 kidney disease with creatinine of 2.6 and GFR of 24.

*Opinion*: This patient should not be on routine NSAIDs given his advanced kidney disease.

**Patient #6**
This is a 67-year-old man with diabetes whose problem list has not been updated since 2009. He has been seen approximately every four months in chronic care clinic over the past year with labs drawn timely prior to each visit.

On 5/6/13, the patient had an elevated PSA at 8.8 ng/ml. This was up from 7.4 ng/ml in 2011. The lab result was not signed, nor has it been addressed.

## HIV Infection/AIDS

We reviewed records of four patients enrolled in the HIV clinic (25%). Two patients had interruptions in their HIV medications and one was overdue for a clinic visit.

**Patient #7**
This is a 43-year-old with HIV infection who transferred to PCC in April 2013. There is no problem list in the chart. He had been seen in ID telemedicine clinic prior to his transfer (February 2013), at which time he was noted to be losing weight. He was 177 pounds at this visit as compared with 196 pounds at the visit in November 2012. His HIV disease was under good control on complera, and the consultant opined that the weight loss was perhaps due to the patient's mental illness. The specialist wanted to see him back in three months, but he was not seen again until September.

On 5/5/13, he was seen by the Medical Director for decreased appetite. His weight was 162 pounds, yet the MD noted "no obvious weight loss" and ordered monthly weight checks x 3. Labs drawn on 5/7 were notable for a blood glucose of 48 mg/dl, CD4 count of 592 and undetectable viral load.

On 5/16, he saw the PA for his HIV medication refill and requested an extra plate due to weight loss. His weight was 171 pounds. The PA denied his request for extra food.

On 5/21, ID telemedicine was cancelled due to lockdown.

On 7/18, the patient saw the PA for renewal of his ibuprofen. The PA noted hyponatremia of 128 on recent labs. He ordered 1 liter of IV fluids followed by a dose of Lasix then a repeat blood test in two weeks. This was never done.

On 8/15, he saw the nurse practitioner for weight loss. His weight was 166 pounds. She reviewed the chart and realized he had lost 30# over the past year and ordered a high protein high calorie diet.

Over the next seven months, the patient regained the 30 pounds.

On 9/16, he was seen by telemedicine. Labs were not done prior to the visit. His weight at the time was 157 pounds. The patient told the doctor at this visit that he did not get his HIV medications from May 8 to June 6. Review of the MAR shows that the patient was dispensed 30 tablets on 4/20, none in May, then began nurse-administered medication on 6/6. There were four

blanks on the MAR for the remainder of June. A three-month follow up with labs prior was requested. Three days later, the patient's weight was documented as 182 pounds at sick call, thus suggesting a substantial discrepancy between the scale in the telemedicine room and the scale in the cell house clinic.

*Opinion:* It appears that this patient does require extra calories to maintain his weight. Scales should be calibrated regularly to insure accuracy. There was an avoidable interruption in this patient's HIV medication.

### Patient #8

This is a 42-year-old man with HIV infection and a history of Kaposi sarcoma. He has been seen by ID telemedicine approximately every three months with one delay between the November 2013 and March 2014 visits. Labs are done approximately 3-4 months prior to ID visits and he has been suppressed with good CD4 counts for at least the past year.

MARs show that his medication has been dispensed timely with the exception of October 2013 when there is no documentation that one of the four drugs was dispensed. On another occasion in November, he reported to the RN during medication pass that he moved from one cell house to another and had been out of medication for two days, as his medications were in his property. The RN reported this to the Lt. who stated, "He would handle it." There is no follow-up note to verify when the patient got his medications back.

*Opinion***:** There appears to have been some disruptions in this patient's medication continuity.

### Patient #9

This is a 25-year-old transgender man with asthma and HIV whose care has been complicated by his noncompliance. He was seen roughly every three months throughout 2013. There were no ID notes in 2014 as of the date of our review (4/15). The patient has repeatedly expressed the belief that God/Jesus will take care of him/her and therefore will not take medications. The ID consultant has repeatedly requested that the patient be referred to mental health for his unstable psychiatric state with delusional and magical thinking. One such request occurred at ID telemedicine on 5/7/13, and the nurse documented the referral. The patient saw mental health the next day but there is no mention of the issue. The mental health provider noted that the patient had no mood or psychotic symptoms and that she would see him again in six weeks.

The patient was previously well controlled on medications with undetectable viral load and good CD4 count. After stopping therapy, his viral load was most recently measured at over 20K and his CD4 count has dropped to 282 (from 450 when his viral load was undetectable).

Following the 8/20 ID visit, the psychiatrist did address his HIV medication noncompliance with the patient, specifically exploring his religiosity as it pertains to his noncompliance, on several occasions. Eventually he was referred to the TRC (treatment review committee) to decide on forced medications, but no verdict has been returned in nearly six months. This case was discussed with the psychiatrist, who acknowledged the delay and stated that he would attempt to expedite this case

*Opinion*: This challenging patient does not appear to be capable of medical decision-making.

**Patient #10**
This is a 56-year-old man with asthma, hypertension and HIV infection which was diagnosed in the 1980s and has never progressed. He is ART naïve. He was seen in HIV telemedicine clinic roughly every 3-4 months until November 2013 and labs have been drawn timely prior to these visits, with the exception of the December clinic. There were no chronic care notes in 2014 as of the date of our visit (4/15/14).

*Opinion*: This patient is overdue for an HIV clinic.

## Pulmonary Clinic

We reviewed six records of patients with pulmonary diseases and had concerns about one case described below.

**Patient #11**
This is a 38-year-old man with asthma, seizures, hyperlipidemia, hypertension and sarcoidosis. Asthma clinic was scheduled for 2/26/13, but the patient refused.

At the next chronic care clinic on 6/5, the patient reported daily rescue inhaler use. His peak flow was low at 340. The nurse practitioner discussed the proper use of the rescue inhaler and decreased his daily prednisone dose (prescribed for sarcoidosis) from 40 mg/d to 30 mg/d. Other than this intervention, his sarcoidosis has not been directly addressed in chronic care clinic. The prednisone was ordered for six months but never renewed. None of the notes speak to this.

On 10/14, he was seen in chronic care clinic by the Medical Director. The asthma form is nearly blank with no subjective information and no exam.

On 3/13/14, the PA saw him for chronic care clinic. Asthma was rated as mild and under good control, though the peak flow was 300 and it is not noted how frequently he was using his rescue inhaler.

*Opinion*: The nature of this patient's pulmonary disease needs to be clarified (sarcoidosis vs. asthma), as does his prednisone use.

## Seizure Clinic

We reviewed four records of patients enrolled in the seizure clinic. In one case, the patient went without his seizure medication for four days upon his arrival at PCC. In another case, described below, a patient's reported seizure activity was seemingly discounted because it was not witnessed by health care staff.

**Patient #12**
This is a 38-year-old man with asthma, seizures, hyperlipidemia, hypertension and sarcoidosis. Seizure clinic was scheduled for 3/27/13, but was "rescheduled due to scheduling conflict;" it was never rescheduled.

On 3/5/14, the patient was brought to the urgent care unit for "alleged seizure as reported by security." The patient reported he had a seizure two days earlier as well but "staff CMT said it had to be witnessed." He was placed on sick call for the next day and was seen by the PA.

On 3/13, the PA saw him for chronic care clinic. The recent seizure was noted and the medication levels were described as "wnl" (within normal limits) though the most recent results were from a year ago.

*Opinion*: In light of his recent seizure activity, this patient should have medication levels measured and adjusted if needed.

## TB Infection Clinic

There were no patients on TB treatment at the time of our visit.

# Pharmacy/Medication Administration

Boswell Pharmaceuticals, located in Pennsylvania, provides all prescription and over-the-counter medications for the facility. Boswell is licensed as a Wholesale Drug Distributor/Pharmacy Distributor. The service is a "fax and fill" system, which means new prescriptions faxed to the pharmacy by 2:00 p.m. will arrive at the facility the next day, and refill prescriptions faxed by 10:00 a.m. will be received the next day. The local Walgreens store is the back-up pharmacy for obtaining medication which is needed immediately and is not available in stock. St. James Hospital, located in Pontiac, is used to obtain injectable medication when needed immediately and is not available in stock. Patient specific prescriptions, stock prescriptions and controlled medications arrive packaged in a 30-day bubble pack. Over-the-counter medications are provided in bulk by the bottle, tube, etc. The medication preparation/storage area is staffed with two full-time pharmacy technicians, and Boswell provides a consulting pharmacist to come on-site once a month to review prescription activity, to assess pharmacy technician performance and technique and to destroy outdated or no longer needed controlled medications pursuant to the requirements of the Federal Drug Administration (FDA) and Drug Enforcement Agency (DEA). Inspection of the medication preparation/storage area revealed a large, clean, well-lighted and generally well-maintained area. An interview with the lead technician revealed a knowledgeable individual with 13 years working as a pharmacy technician. Inspection of the area indicated tight accounting of controlled medications, both stock and return items, needles/syringes, sharps/instruments and medical tools. A random inspection of perpetual inventories and counts indicated all were correct.

All prescriptions, controlled medications, syringes, needles and other sharp tools are ordered, received and inventoried by the pharmacy technicians. Once received and counts verified, each of the items is added into the item specific perpetual inventory. Items placed in "back stock" are stored within a locked vault inside the locked and restricted access storage room. The perpetual inventories for all items located in the vault are verified daily. The crash cart inventory is verified monthly or any time the plastic security seal is broken. The controlled medication "back stock" perpetual inventory is verified daily. The perpetual inventories for controlled medication in "front or working stock" is verified each shift by an on-coming and off-going nursing staff member.

Access to the medication storage room is restricted to nursing administration, nursing staff and the pharmacy technicians. Pharmacy technicians are required to draw keys to their area at the

beginning of each shift and return the keys when leaving at the end of their shift. In the event they would leave institutional grounds with the keys, they are contacted by armory personnel to immediately return to the institution. Nursing staff members hand off their keys between shifts. Keys to the medication storage room are restricted to nursing administration, nursing staff and the pharmacy technicians. Keys to the "back stock" vault are restricted to the Health Care Unit Administrator, Director of Nursing and the two pharmacy technicians. In the absence of the pharmacy technicians, emergency procedures are in place for nursing staff, with approval of the duty warden, to sign out the keys, enter the vault and obtain the needed items. Nursing staff is required to document an incident report and submit to the HCUA the reason for entering the vault. A separate locked cabinet is used for the storage of injectable medications. All medications in this cabinet are maintained on a perpetual inventory and inventoried daily. Refrigerator temperatures are monitored and documented daily.

Correctional Medical Technicians (CMT), who could be either a licensed practical nurse (LPN) or an emergency medical technician (EMT), take "Keep on Person" (KOP) blister-packs to the assigned cell house and deliver the medication at cell-side to the appropriate inmate. Dose-by-dose medication is administered by licensed medical staff. The facility continues to use a paper medication administration record (MAR), and each dose of medication administered or refused is noted on the patient specific MAR. Observation of blister-pack delivery by an EMT indicated proper identification of the patients and delivery of the blister pack. When in cell houses, security staff only escorts female medical staff.

# Laboratory

Laboratory services are provided through the University of Illinois-Chicago Hospital (UIC). The comprehensive services medical contractor provides 0.75 FTEs phlebotomy positions to draw and prepare the samples for transport to UIC. The individual is onsite Monday through Friday for approximately six hours each day. Results are electronically transmitted back to the facility, generally, within 24 hours via secure fax line located in the medical department. UIC reports to both the facility and the Illinois Department of Public Health all reportable cases. There is a current Clinical Laboratory Improvement Amendment (CLIA) waiver certificate that expires June 13, 2015, on file. There were no reports of any problems with this service.

# Urgent/Emergent Care

## Unscheduled Offsite Services

The items we look for are whether the urgent need for services might have been mitigated and whether appropriate continuity was provided after return, including the required offsite service documents. We reviewed four records and in each of them there were significant problems, including missing documentation, delays in obtaining required procedures, and not performing or providing reasons for not performing a recommended service by a specialist.

**Patient #1**

This is a 47-year-old who was status post prosthetic hip replacement and was also identified as having a lung mass. He arrived at Pontiac on 1/8/14 from Danville. He was seen within a day by the physician who followed him up with regard to his lung lesion. Finally, a biopsy was performed, which showed metastatic leiomyosarcoma. He went to oncology on 2/12, and they recommended a PET scan. This was requested to be done as soon as possible. It was done almost a month later, on 3/8. The patient began chemotherapy on 4/11 and was seen by the physician on return. There were no notes in the chart regarding the oncology visit.

**Patient #2**

This is a 27-year-old with a history of immune thrombocytopenic purpura (ITP). This patient also had a history of right tendon surgery and was status post treatment for an anal fissure. He was sent to the hospital on 2/1/14 for a rectal fistula and a low white blood cell count. On return, he was placed in the infirmary, having been in an infirmary for almost six months. On 2/18, he was seen at the University of Illinois, and it was recommended that he be followed by neurology. Although his white blood count has improved, as has his platelet count, he has still not yet seen a neurologist.

**Patient #3**

This is a 32-year-old with a penicillin allergy which yields angioedema. On 2/12/14, he was sent out urgently to the emergency room for a dislocated shoulder. He was seen on return by the physician; however, there is no emergency room report in the chart.

**Patient #4**

This is a 46-year-old with thrombocytopenia who was sent out on 3/27/14, having arrived at Pontiac on 1/27/14. This patient did not receive a documented evaluation regarding the tumor in his mouth and also there was no discharge summary. After we requested it, it became available.

## Unscheduled Onsite Services

We reviewed 11 records of patients who received unscheduled onsite services within the last three months. In five of 11 records we identified problems. These problems included missing record entries, an absence of vital signs being performed at a hypertension encounter, failure to enroll patients in chronic care when they have chronic illnesses, and a patient with HIV disease not having that disease listed on the problem list.

**Patient #1**

This is a 23-year-old with no chronic problems who was sent out on 2/3/14 for right lower quadrant pain. He had been at Pontiac approximately nine months. Although he is recorded as having gone out on 2/3, we could find no notes either in the progress notes or in the consultation section or anywhere else.

**Patient #2**

This is a 43-year-old with hypertension and seen for hypertension on 2/4/13. On 1/30/14, he was seen for elevated blood pressure in the clinic. It is reported that he had not been taking medications. His blood pressure was 168/102. He was then referred to the physician on 2/6 and

placed on two anti-hypertensives. He was seen by a nurse on follow-up on 3/6 without vital signs being performed and without the patient being enrolled in the chronic care program.

**Patient #3**
This is a 43-year-old whose record contained no problem list. He complained of ear pain in December 2012. He was also being treated for HIV. He had last been seen at the University of Illinois for his HIV in November of 2013. This patient should have had his HIV listed on a problem list form.

**Patient #4**
This is a 22-year-old with asthma who presented on 12/2/13 with respiratory complaints. The nurse performed a peak flow, which was reported as 340, which was down from what was earlier described as a peak flow of 400. The nursing note conveys the impression that the nurse was unhappy with his attitude, as she described the patient as being angry. Her assessment indicates, "Wheezes detected left lower lobe." Her assessment was, "Rule out respiratory distress," and her plan nonetheless was, "Return to cell house and sign up for sick call." This note indicates an inadequate history regarding his asthma and particularly his use of the beta agonist canister. If one hears wheezes and is ruling out respiratory distress, this should require an immediate referral to a physician rather than telling the patient to sign up for sick call. Three days later, the patient was seen by the physician and assessed as having bronchitis with bronchospasms. The patient also had an elevated blood pressure and this was also addressed. The nursing encounter for this patient was completely inadequate and potentially compromised the patient's status.

**Patient #5**
This is a 41-year-old with type 2 diabetes who presented on 12/12/13 with an elevated blood sugar. He was seen by the physician on 12/12/13, and the patient had not been receiving his medicines for almost a month. The physician restarted both pills and insulin for the patient. The problem with this patient was that although meds had been ordered for six months in March, this patient was off medicines for four months and he was not appropriately enrolled in the chronic care program.

# Scheduled Offsite Services (Consultations and Procedures)

We discussed with the scheduler the process through which consultations and procedures are obtained. After a clinician orders a consultation or a procedure, they are all reviewed by the Chief Medical Officer, who either agrees with the plan or suggests changes. Once the Chief Medical Officer approves all requests, they then are forwarded to the scheduler. She indicated that she places a six-month hold on all patients for whom one of the scheduled offsite services is requested so that they are not transferred during the process. This seems like a very responsible procedure. Every Wednesday the Chief Medical Officer then presents these requests to the Wexford utilization management program. According to the scheduler, about 90% are approved as is and all of the services are obtained at University of Illinois, except for new orthopedics cases, gastroenterology, ophthalmology, urology and MRIs. If there is a substantial delay with one of these appointments, especially for urgent cases, she may use local sources. The scheduler is also able to retrieve reports through the University of Illinois electronic record system. She does track timeliness, but only from the date of the collegial review.

We reviewed 10 records of patients scheduled for either consultations or procedures. We found in three of these 10 records there was either a delay in obtaining an appointment, a delay in having the required reports in the medical record or a delay in access to a procedure.

**Patient #1**
This is a 50-year-old patient with hepatitis C, iron deficiency anemia, Barrett's esophagitis and non-specific colitis. He was sent for an upper GI scoping on 12/24/13. It was delayed and finally performed on 1/3/14. The report is in the medical record. After the procedure, the patient was maintained in the Stateville infirmary. On 1/7, the patient was transferred to Pontiac and placed in the infirmary. The infirmary placement is based on an order by the nurse practitioner but no progress note. The patient was finally seen three days later, on 1/10, by the CMO. We were informed that the CMO was gone for a month on a regularly scheduled vacation and there was no physician to fill in during his absence. A colonoscopy was ordered for this patient in mid-February and as of yet this service has not been provided.

**Patient #2**
This is a 55-year-old with hypertension, hyperlipidemia and cancer of the prostate. He was scheduled for a urology follow-up visit on 12/11/13. He has surgery scheduled for May 2014, which requires a work-up beforehand. He was seen on 3/19, and based on recommendations by the urologist, several tests were ordered. At the time of our visit, approximately one month later, although the lab tests were ordered there were no results in the medical record.

**Patient #3**
This is a 52-year-old with a history of a pituitary tumor status post surgery, hypertension, seizure disorder and diabetes insipidus. This patient was scheduled for an endocrinology visit on 1/17/14. He was seen by the CMO on 1/28, who reordered several lab tests; however, the results were still not in the medical record.

# Infirmary Care

The infirmary, which is on the first floor of the health care unit, is a 10-room, 12-bed unit staffed with at least one registered nurse (RN) 24 hours a day, seven days a week. Included in the bed configuration are two negative air respiratory isolation rooms and four mental health crisis rooms. The negative air isolation rooms have both visual and audible alarms to indicate loss of negative air pressure. When in use for respiratory isolation, nursing staff confirm negative air pressure each shift. Only the two reverse flow rooms are double cells, the rest are single.

At the time of our visit, the infirmary census was 6-9 patients, the majority of whom were mental health placements. One room had been sealed following an expected death of a patient with metastatic pancreatic cancer. The RN in the infirmary told us that this is standard procedure following a death, and that the room will only be cleared by the local internal affairs after the autopsy report has been received. The RN may not pronounce death; this must be done by a physician. If the patient's death was unexpected (i.e., no DNR order), then the ambulance must come to run a strip and fax it to the local ED for the ED physician to pronounce.

Security staff is present in the infirmary, and inmate porters perform the janitorial duties and are supervised by both security and nursing staff. Personal protective equipment is available as needed, and biohazard puncture proof containers were in use.

The infirmary beds are in poor condition and need to be replaced. There is only one bed that could be considered to be a "hospital" bed which allows for elevating the head of the bed, and the raising and lowering of the whole bed. The bed is not electric but hand-cranked and is difficult to operate. The remaining beds are a solid steel frame with a solid metal surface on which the mattress lays. The bed stands only approximately 18 inches off the floor. Of additional concern are the poor condition of the mattresses, where the outside plastic cover is cracked or torn and the use of mattresses with no plastic coating, which prohibits a thorough cleaning and sanitizing of the mattress.

The sink in the nursing station, which is used for hand washing, will not drain and leaks underneath.

Supplies are ordered every two weeks and are ordered by a non-medical person. We were told this presents challenges to ordering enough of the right kind of supplies.

There were three medical patients admitted to the infirmary during our visit. The two chronic admissions were a 73-year-old African-American with terminal cancer of the colon and severe anemia secondary to the cancer, admitted 2/27/14, and a 50-year-old African-American diagnosed with hypertension and dementia secondary to micro-cerebral infarcts (mini strokes) admitted 1/27/14. The third was a 23-hour admit for a nosebleed. Chart reviews revealed no issues with timeliness of provider rounds or quality of care.

The patient with cancer of the colon has signed a Do Not Resuscitate (DNR) order and routinely refuses pain medication, IV hydration and blood infusions to treat the anemia. He has received psychiatric evaluations to assure he is competent to make decisions to refuse recommended treatment. Physician and nursing staff are documenting in the patient medical record more frequently than required by policy. The patient requires assistance with activities of daily living (ADLs).

The 50-year-old patient with the mini strokes needs assistance with walking and some ADLs. It appears he would better served in a nursing home setting. This patient, too, has been evaluated by mental health professionals. Again, physician and nursing staff are documenting in the patient medical record well beyond policy requirements.

There is no nurse call system. From the nursing station, nursing staff do have line-of-sight into two of the infirmary rooms. All other patients would have to shout or beat on their door in order to gain someone's attention. In the event a patient were to be incapacitated, no staff member would know until either the nurse or security staff who make random 30 minute rounds were to find the patient.

# Infection Control

The Health Care Unit Administrator (HCUA) functions as the facility infection control nurse. When required, she interfaces with the County Department of Public Health and the Illinois Department of Public Health (IDPH). The HCUA/designee monitors, completes and submits to IDPH all reportable cases. Skin infections and boils are aggressively monitored, cultured and treated. Per the HCUA, there is a low occurrence of culture-proven Methicillin resistant Staphylococcus aureus (MRSA) infections. Health care unit nursing staff conduct monthly safety and sanitation inspections in the dietary department and perform pre-assignment "food handler" examinations for staff and inmates to work in the dietary department. A tour of the health care unit, including the infirmary, verified personal protective equipment (PPE) available to staff in all areas as needed. Additionally, PPE is included in the emergency response bags and in the cell house sick call rooms. Puncture proof containers for the disposal of syringes/needles and other sharp objects are in use in all areas of the health care unit as needed and in the cell house sick call rooms. The facility uses a national commercial waste disposal company for disposing of medical waste. Institutional staff is trained in communicable diseases and blood-borne pathogens.

As stated previously, inmate porters are washing the infirmary linens and bedding in a residential type washing machine which is located in the health care unit. The practice is of concern since it is doubtful the washing machine water temperatures are hot enough to appropriately sanitize infirmary linens. All infirmary linens and bedding must be considered to be contaminated. The required laundering procedure to sanitize linens and bedding is to wash with laundry detergent at a water temperature of at least 160 degrees Fahrenheit for a minimum of 25 minutes or wash with laundry detergent and a bleach bath of at least 100 ppm at a water temperature of at least 140 degrees Fahrenheit for a minimum of 10 minutes. The hot water temperatures for the infirmary washing machine need to be initially checked and routinely monitored to assure either 140-degree water temperature with a bleach bath or 160-degree water temperature with no bleach bath. It is doubtful the current water temperature is over 125-130 degrees. If the appropriate water temperature cannot be attained, infirmary linens and bedding must be laundered in the institutional laundry where, again, the appropriate water temperatures must be maintained.

# Inmates' Interviews

Six insulin dependent inmates were interviewed. All six had been diagnosed several years previously, and all six were knowledgeable regarding their chronic disease. All six were knowledgeable regarding the significance of their hemoglobin A1c blood level. Five of the six knew the results of their most recent hemoglobin A1c blood level. All six reported being evaluated by the physician every 3-4 months and having the ability to perform blood glucose monitoring prior to the administration of insulin. In response to questioning, all six stated that, in general, security staff was aware they were insulin dependent diabetics and were sensitive to the medical issues that created. All six were of the opinion that the nursing staff and, particularly, cell-house CMTs try as best they can within the environment to take good care of them and to "look out for them." All were of the opinion the physician responsible for their diabetic care does

a "good job;" however, they were all openly critical of the physician assistant, in terms of attitude and competence.

It was reported breakfast is served between 6:00 a.m. and 7:30 a.m.; lunch is served between 10:30 a.m. and 11:30 a.m. and dinner is served between 4:00 p.m. and 5:30 p.m. Breakfast is served in the cell, and inmates go to the dining hall for lunch and dinner. It was reported that morning insulin is administered between 5:00 a.m. and 7:00 a.m., and afternoon insulin between 3:15 p.m. to 3:45 p.m. All inmates stated breakfast could be a problem for them if they were the first to receive their insulin, around 5:00 a.m., and not receive their breakfast until last, which is around 7:30 a.m.

All five patients voiced the following issues.

1. Very little educational literature provided/available
2. Difficulty obtaining medication when first ordered and sometimes with refills
3. Difficulty receiving shoes ordered by the physician because they are denied by the medical vendor
4. No podiatry care
5. No onsite dietician
6. When evaluated by an offsite specialist, there is difficulty getting back to see the specialist and the institutional medical vendor does not follow the suggestions/orders of the specialist
7. Security staff not following physician orders, i.e., not allowing plastic basins for foot soaks
8. Being cuffed from behind too tightly and for too long
9. Breakfast starting between 1:00 and 2:00 a.m.; lunch starting at 9:00 a.m.
10. Sometimes receive insulin prior to eating and sometimes after eating.

# Dental Program

## Executive Summary

On April 3-4 and 14-16, 2014, a comprehensive review of the dental program at Dixon CC was completed. Five areas of the program were addressed to include: 1) inmates' access to timely dental care; 2) the quality of care; 3) the quality and quantity of the providers; 4) the adequacy of the facility and equipment devoted to dental care; and 5) the overall dental program management. The following observations and findings are provided.

The clinic itself had three chairs, each in a dedicated area. The cabinetry was old and showing wear and corrosion. There was a separate room for the dental laboratory and sterilization area. A small office for the staff was attached to the clinic. The space and equipment was adequate.

A major area of concern related to comprehensive care. Comprehensive care was provided without a comprehensive intra and extra-oral examination and well developed treatment plan. No examination of soft tissues nor periodontal assessment was part of the treatment process. Hygiene care and prophylaxis were provided inconsistently and oral hygiene instructions were

not always documented. Bitewing or periapical radiographs were not always available to diagnose caries. Restorations were provided from the information on a panelipse radiograph.

Another area of concern was dental extractions. All dental treatment should proceed from a documented diagnosis. A diagnosis or the reason for extractions should be part of the record entry. In less than half the records was the reason for extraction documented.

Partial dentures should be constructed as a final step in the sequence of care delivery included in the comprehensive care process. A review of several records revealed that all partial dentures proceeded without a comprehensive examination and treatment plan. Periodontal assessment and treatment was never provided. Oral hygiene instructions were seldom documented. It was almost impossible to determine that all fillings and extractions were completed prior to impressions. Periodontal health was never documented.

At Pontiac CC, dental sick call is accessed through the inmate request form. A complex system of logs and examinations at the unit insures that urgent care needs are addressed in a timely manner.

The SOAP format was not being utilized. Treatment was provided with little information or detail preceding it. Record entries often did not include clinical observations or diagnosis to justify treatment.

Medical conditions that require precautions and consultation with medical staff prior to dental treatment should be well documented in the health history section of the dental record and "red flagged" to bring them to the immediate attention of the provider. The dental record was maintained in the dental clinic, separate from the medical record. An accurate and thorough health history becomes especially important. Documentation in the health history section of the dental record of inmates on anticoagulant therapy was very inconsistent and seldom red flagged. Blood pressures should, at the least, be taken on patients with a history of hypertension. When asked, the clinicians indicated that they do not routinely take blood pressures on these patients.

A tray of bulk, unbagged instruments was being used one at a time from one of the cabinets. These should be bagged individually or in kits. There was no biohazard label posted in the sterilization area. Safety glasses were not always worn by patients. A radiation hazard warning sign was not posted in the x-ray area.

The dental program was involved in the CQI process and was gathering data to evaluate "Refusal for Treatment" rates and reasons why. Procedures were being developed to address this problem. The dental program should vigorously utilize the CQI process to address the weaknesses revealed in this review.

## Staffing and Credentialing

Pontiac CC has a dental staff of one full-time dentist, one 20-hour part-time dentist, two full-time assistants and a full-time hygienist. This should be adequate to provide meaningful dental services for Pontiac's 2000 inmates.

CPR training is current on all staff, all necessary licensing is on file, and DEA numbers are on file for the dentists.

**Recommendations:** None

## Facility and Equipment

The clinic consists of three chairs and units, one for each dentist and on for the hygienist. Two of the dental units are five years old or less and in good repair. The hygienists chair is very old, worn and in poor repair. It is being replaced at this time. The x-ray unit is in good repair and works well. The autoclave is rather new and functions well. The instrumentation is adequate in quantity and quality. The handpieces are old but well maintained and repaired when necessary. The cabinetry is rather old and showing wear and corrosion, but is functionally OK. This does make disinfection of cabinet surfaces more difficult. The oral surgeon uses a pneumatic hand piece, so a large cylinder of nitrogen is in the clinic. It takes up quite a bit of space in the hygiene area, but the hygienist works without an assistant.

The clinic itself consisted of three chairs in three separate and adequate spaces. Free movement around each unit is acceptable. Provider and assistant have adequate room to work, and none of the chairs interfere with each other. There was a separate sterilization and laboratory room of adequate size. It had a small but adequate work surface and a large sink to accommodate proper infection control and sterilization. Laboratory equipment was in a separate corner of the room. The staff had a separate room for office space. It was small and cramped and where the dental records were maintained.

**Recommendations:** None. The clinic is adequate in size and function to meet the needs of the inmate population at Pontiac CC.

## Sanitation, Safety and Sterilization

We observed the sanitation and sterilization techniques and procedures. Surface disinfection was performed between each patient and was thorough and adequate. Proper disinfectants were being used. Protective covers were utilized whenever possible .

An examination of instruments in the cabinets reveals that most were properly bagged and sterilized. There was a tray of a large stack of what I was told were sterilized instruments that were unbagged. They were being removed from the tray one at a time for use in patient care. All instruments should be bagged and sterilized. All handpieces were sterilized and in bags.

The sterilization procedures themselves were adequate and proper. Flow from dirty to clean met acceptable standards.

There was not a biohazard label posted in the sterilization area. Safety glasses were not always worn by patients. Eye protection is always necessary, for patient and provider. I also observed that no warning sign was posted where x-rays were being taken to warn of radiation hazards.

## Review Autoclave Log

I looked back two years and found the sterilization logs to be in place. They showed that autoclaving was accomplished weekly and documented. They utilize the Attest system with the incubator in the sterilization area. No negative results were obtained. I did observe that no biohazard warning sign was posted in the sterilization area.

**Recommendations:**
1. That all instruments be bagged before sterilization and not maintained loose and in bulk.
2. That safety glasses be provided to patients while they are being treated.
3. That a biohazard warning sign be posted in the sterilization area.
4. A warning sign be posted in the x-ray area to warn pregnant females of radiation hazards.

## Comprehensive Care

We reviewed 10 dental records of inmates in active treatment classified as Category 3 patients.

One of the most basic and essential standards of care in dentistry is that all routine care proceed from a thorough, well documented intra and extra-oral examination and a well developed treatment plan, to include all necessary diagnostic x-rays. A review of 10 records revealed that no comprehensive examination was performed and no treatment plans developed. No examination of soft tissues or periodontal assessment was part of the treatment process. Hygiene care and prophylaxis was inconsistent, provided in only five of the ten patient records. A review of five additional records revealed that diagnostic x-rays for caries were available for only three of the five patients. Restorations were, in two of the five patients, provided from the information from the panorex radiograph. This radiograph is not diagnostic for caries. A periodontal assessment was not done in any of the records. Further, oral hygiene instructions were not always documented in the dental record as part of the treatment process.

**Recommendations:**
1. Comprehensive "routine" care be provided only from a well developed and documented treatment plan.
2. The treatment plan be developed from a thorough, well documented intra and extra-oral examination, to include a periodontal assessment and detailed examination of all soft tissues.
3. In all cases, that appropriate bitewing or periapical x-rays be taken to diagnose caries.
4. Hygiene care be provided as part of the treatment process.
5. That care be provided sequentially, beginning with hygiene services and dental prophylaxis.
6. That oral hygiene instructions be provided and documented.

Although Pontiac CC is not a reception and classification center, I reviewed these records to insure the reception and classification policies as stated in Administrative Directive 04.03.102, section F. 2, are being met for the IDOC.

**Recommendations:** None. All records reviewed were in compliance.

## Extractions

One of the primary tenets in dentistry is that all dental treatment proceeds from a well documented diagnosis. In only four of the ten records examined was a diagnosis or reason for extraction included as part of the dental record entry.

**Recommendation:**
1.     A diagnosis or a reason for the extraction be included as part of the record entry. This                                                      is best accomplished through the use of the SOAP note format, especially for sick call entries. It would provide much detail that is lacking in most dental entries observed. Too often, the dental record includes only the treatment provided with no evidence as to why that treatment was provided.

## Removable Prosthetics

Removable partial denture prosthetics should proceed only after all other treatment recorded on the treatment plan is completed. The periodontal, operative and oral surgery needs all should be addressed first. In only two the five records reviewed on patients receiving removable partial dentures were oral hygiene instructions provided. Periodontal assessment was not provided in any of the records, but in two of the five records a prophylaxis and/or a scaling debridement was provided. Because there was no comprehensive examination or any treatment plans developed and documented in any of the records, it is almost impossible to ascertain if all necessary care, including operative and/or oral surgery treatment, was completed prior to fabrication of removable partial dentures.

**Recommendations:**
1. A comprehensive examination and well developed and documented treatment plan, including bitewing and/or periapical radiographs and periodontal assessment, proceed all comprehensive dental care, including removable prosthodontics.
2. That periodontal assessment and treatment be part of the treatment process and that the periodontium be stable before proceeding with impressions.
3. That all operative dentistry and oral surgery as documented in the treatment plan be completed before proceeding with impressions.

## Dental Sick Call

Inmates access sick call through an inmate request form or via a direct call from a staff member if it is perceived as an emergency. Dr. Mitchell reviews all request forms at least by the following day from collection of the forms. He then sees the inmate in a medical examination room in each unit as soon as possible, less than one week. He examines the inmate and determines his need. The patient is then scheduled to come to the dental clinic as soon as possible or as necessary. Urgent care needs are scheduled the next appointment for that unit. Midlevel practitioners for the units are also available daily to address urgent care complaints. Emergencies (severe toothache, infections) are seen the same day. Because of the segregation mission of the institution, seeing inmates in the dental clinic presents unique challenges at Pontiac CC. There are several units and only certain units can be seen on specific days. Insuring that inmates with urgent care needs are seen in a timely manner presents a real challenge. These

inmates are seen and evaluated by a qualified provider within 24 to 48 hours from the date of their complaint.

By policy, all inmates who submit a request form are to be seen by dental staff within 14 days. Pontiac CC was in complete compliance with this policy. Immediate toothaches or infections can be called in from any unit and the inmate will be seen that same day or the next. In none of the dental records reviewed was the SOAP format being used. As a result, treatment was usually provided with little information or detail preceding it. Sick call record entries often do not include clinical observations or diagnosis to justify provided treatment. The use of the SOAP format would insure that a well developed diagnosis would precede all treatment. Also, routine care was often provided in these appointments, always without a comprehensive examination or treatment plan. The Pontiac CC dental department keeps all request forms in the dental record.

**Recommendation:**
1. Implement the use of the SOAP format for sick call entries. It will assure that the inmate's chief complaint is recorded and addressed, and a thorough focused examination and diagnosis precedes all treatment.

## Treatment Provision

Determine whether the dental care is provided fairly and equitably for all inmates.

A triage system is in place that prioritizes treatment needs. All inmate request forms are evaluated by the dental program by the following day and their treatment needs are prioritized. Urgent care needs are addressed that day or the next. Others are scheduled accordingly or placed on the routine treatment list. Inmates are being seen in a timely manner and their issues addressed.

Inmates can seek urgent care via the inmate request form or, if they feel they need to be seen immediately, by contacting Pontiac CC staff, who will then call the dental clinic with the inmate's complaint. The inmate is seen that day for evaluation. Request form complaints from inmates with urgent care needs (complaint of pain or swelling) are seen at least by the following working day. Mid-level practitioners are available at all times to address urgent dental complaints. They can provide over the counter pain medication or call medical/dental staff if they feel more is needed.

Inmates who submit request forms for routine care are evaluated the next working day and placed sequentially on a waiting list for this care. An intricate system of several logs are maintained to keep track of care needs and who can be seen when, according to the unit in which the inmate is housed. The waiting list for routine care is approximately nine months.

The Offender Orientation Manual is well developed for dental and addresses clinic hours, access to care, types of care, scheduling, emergency care and dental hygiene care.

**Recommendations:** None. The system is fair and equitable. As intricate and complex as it is, it seems to work well. All inmates with urgent care needs are seen in a timely manner.

## Policies and Procedures

The Pontiac CC has a well developed and comprehensive policy and procedural manual developed by Dr. Mitchell that addresses all the areas concerned.

**Recommendations:** None

## Failed Appointments

A review of monthly reports and daily work sheets revealed a failed appointment rate of about 5.4%. This is well within an acceptable range. The dental staff do a good job in insuring that inmates make it to their appointments.

**Recommendations:** None

## Medically Compromised Patients

Because the dental record is maintained in the dental clinic separate from the medical record, identification of medically compromised patients relies on assessment by the clinician and on the history section on the cover of the dental record. Of the 10 records reviewed of inmates on anti-coagulant therapy, only two were adequately red flagged to catch the immediate attention of the provider. Four of the records did not indicate that the inmate was on anticoagulant therapy. Four of the records indicated anticoagulant therapy, but they were not sufficiently red flagged.

When asked, the clinicians indicated that they do not routinely take blood pressures on patients with a history of hypertension.

**Recommendations:**
1. That the medical history section of the dental record be kept up to date and that medical conditions that require special precautions be red flagged to catch the immediate attention of the provider.
2. That blood pressure readings be routinely taken of patients with a history of hypertension, especially prior to any surgical procedure.

## Specialists

Dr. Frederick Craig, oral surgeon, is available on an as needed basis, usually once a month. He sees five patients per visit. Dr. Craig is also used by several other IDOC institutions for oral surgery. Pathology services are the same as for medical pathology.

In one instance, inmate [redacted], surgery was performed from a radiograph from 2005. Radiographs should be no older than two years.

**Recommendations:**
1. Perform all oral surgery procedures from radiographs less than two years old. A nine-year-old radiograph is of little use.

## Dental CQI

The dental program contributes monthly dental statistics to the CQI committee. The dental program is currently involved with a CQI study that is evaluating "Refusal for Treatment" percentages and the reasons why. With the challenges of scheduling care in a detention institution, having scheduled inmates show for their appointment is critical. Dr. Mitchell understands the CQI process and its value.

**Recommendations:**
    1. Expand the CQI process to address the weaknesses outlined in this report.

# Mortality Review

There were two deaths at PCC over the past year. One patient who died of pancreatic cancer had no problematic issues identified on chart review. The other case had a problematic delay in care as described below.

**Patient #1**
This patient was a 42-year-old man who died of a glioblastoma multiforme on 4/16/13. The tumor was first diagnosed in 2009, prior to his incarceration. He underwent excision in March 2009, and again in September 2010 for recurrence. He was admitted to IDOC in July 2012. He had a restaging MRI in October 2012 which showed no recurrence and his maintenance chemotherapy was discontinued.

His most recent MRI on 2/1/13 showed recurrence of a low grade enhancing mass in his left temporal lobe and he was scheduled for neurosurgical referral on 4/10/13. However, on 4/1/13, he was found with altered consciousness and stroke-like symptoms and was taken to St. James hospital, where CT showed significant edema around the mass and a 1 cm midline shift. He was transferred to UIC where it was decided that the risks of surgery outweighed the benefits. The family decided to withdraw care on 4/15/13 and the patient died the next day.

*Opinion*: A two-month delay in the neurosurgery consult is excessive given the nature of the patient's diagnosis. Although his long-term survival would not likely have been much better, it seems likely that the delay allowed for enough tumor growth and associated swelling to preclude further treatment options for this patient and therefore shortened his survival.

# Continuous Quality Improvement

As with other facilities, we reviewed the minutes and found that the minutes consist of reports of collections of data on the volume of health service activities. Throughout the minutes, there was no description of any efforts to either assess the quality of performance nor therefore to improve the quality of performance. We spent time with the Health Care Administrator reviewing the need for the minutes to be educational, especially for line staff who do not attend the meetings. They must include data collection, analysis of the data in relationship to expected performance and, where indicated, based on substandard performance, an analysis of the causes for the

substandard performance as well as the development of improvement strategies designed to mitigate the causes of the substandard performance.

# Recommendations

**Intrasystem Transfers:**
1. The intrasystem transfer process must be modified in a way that provides oversight and insures that identified problems are in fact appropriately followed up.

**Chronic Disease Clinics:**
1. HIV patients should be followed by site providers in chronic care clinic.
2. Patients should be seen according to degree of disease control rather than on an every four-month basis.
3. Medically complex patients should be followed by the Medical Director, at least on a periodic basis.
4. Problem lists should be updated regularly.
5. There should be a nurse dedicated to the chronic disease program.

**Unscheduled Onsite Services:**
1. There must be a professional performance enhancement program that looks at nursing responses to onsite unscheduled services and creates an opportunity for professional performance improvement.

**Unscheduled Offsite Services:**
1. The program must implement a process upon a patient's return from an unscheduled offsite service so that necessary documentation, i.e., emergency room reports and discharge summaries, are timely retrieved and utilized in the primary care clinician follow-up visit.

**Scheduled Offsite Services:**
1. The scheduled offsite services must be managed in a way that services are obtained timely or the Medical Director is notified so that he can facilitate the scheduling.
2. Upon return from scheduled offsite services, a staff person must be assigned the responsibility of timely retrieval of the offsite service reports. When these offsite service reports are available, a follow-up visit with the primary care clinician should be scheduled and at that visit there should be documentation of a discussion of the findings and plan.

**Infirmary Care:**
1. In a facility where infirmary space is at a premium, sealing a room to investigate the expected death of a patient with a terminal disease is unnecessary and limits access to this precious resource.
2. Consideration should be given to creating alternative space for mental health crisis beds.
3. By licensure, RNs may pronounce death. To engage the services of the ambulance company to perform an ECG to confirm death is an avoidable expense which diverts a valuable community resource unnecessarily.
4. There needs to be a functioning call bell system in the infirmary.

**CQI:**

1. The CQI program must be led by people who have been trained in how to identify performance that is subthreshold, how to analyze the causes for the subthreshold performance and how to implement improvement strategies targeted to mitigate the causes and then to restudy the performance.
2. The leadership of the continuous quality improvement program must be retrained regarding quality improvement philosophy and methodology, along with study design and data collection.
3. This training should include how to study outliers in order to develop targeted improvement strategies.

# Appendix A – Patient ID Numbers

**Intrasystem Transfer:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | | [redacted] |
| Patient #2 | | [redacted] |
| Patient #3 | | [redacted] |
| Patient #4 | | [redacted] |
| Patient #5 | | [redacted] |

**Chronic Disease:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | [redacted] | [redacted] |
| Patient #2 | [redacted] | [redacted] |
| Patient #3 | [redacted] | [redacted] |
| Patient #4 | [redacted] | [redacted] |
| Patient #5 | [redacted] | [redacted] |
| Patient #6 | [redacted] | [redacted] |
| Patient #7 | [redacted] | [redacted] |
| Patient #8 | [redacted] | [redacted] |
| Patient #9 | [redacted] | [redacted] |
| Patient #10 | [redacted] | [redacted] |
| Patient #11 | [redacted] | [redacted] |
| Patient #12 | [redacted] | [redacted] |

**Unscheduled Offsite Services:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | | [redacted] |
| Patient #2 | | [redacted] |
| Patient #3 | | [redacted] |
| Patient #4 | | [redacted] |

**Unscheduled Onsite Services:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | | [redacted] |
| Patient #2 | | [redacted] |
| Patient #3 | | [redacted] |
| Patient #4 | | [redacted] |
| Patient #5 | | [redacted] |

**Scheduled Offsite Services:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | | [redacted] |
| Patient #2 | | [redacted] |
| Patient #3 | | [redacted] |

# Logan Correctional Center

# (LCC) Report

March 31-April 3, 2014

Prepared by the Medical Investigation Team

Ron Shansky, MD
Karen Saylor, MD
Larry Hewitt, RN
Karl Meyer, DDS

# Contents

Overview.................................................................................................................3

Executive Summary ..............................................................................................3

Findings .................................................................................................................7
  Leadership and Staffing ...................................................................................7
  Clinic Space and Sanitation .............................................................................8
  Reception Processing.......................................................................................8
  Nursing Sick Call...........................................................................................10
  Physician and PA Sick Call............................................................................12
  Chronic Disease Management........................................................................12
  Women's Health.............................................................................................19
  Pharmacy/Medication Administration .........................................................20
  Laboratory......................................................................................................21
  Urgent/Emergent Care ..................................................................................22
  Scheduled Offsite Services-Consultations/Procedures.................................23
  Infirmary Care ...............................................................................................24
  Infection Control ...........................................................................................26
  Responses to the Attorney Letter .................................................................26
  Dental Program..............................................................................................29
  Continuous Quality Improvement ................................................................37

Recommendations ...............................................................................................38

Appendix A – Patient ID Numbers ....................................................................41

# Overview

On March 31-April 4, 2014, we visited the Logan Correctional Center (LCC) in Logan, Illinois. This was our first site visit to LCC and this report describes our findings and recommendations. During this visit, we:

- Met with leadership of custody and medical
- Toured the medical services area
- Talked with health care staff
- Reviewed health records and other documents

We thank Warden Angela Locke and her staff for their assistance and cooperation in conducting the review.

# Executive Summary

Logan Correctional Center is the main women's reception center and the largest permanent female facility in IDOC. It has a mental health mission and a 20-bed infirmary. The population at the time of our visit was 1997, the average age was 36 and average length of stay was approximately 18 months.

The Health Care Unit is new construction and opened in 2005. The unit is linear in design. There is a long hallway with a 20-bed infirmary at one end, a security station in the middle and outpatient services at the other end. The unit was clean and well-maintained but very noisy, particularly during medication administration, as inmates are permitted to move freely to the health care unit to receive their medication. As a result, a significantly large group of inmates are gathered in the health care unit at one time. The unit is staffed with licensed nursing staff, both registered and licensed practical nurses, 24 hours a day, seven days a week.

The facility receives 30-50 inmates per week, mostly from Cook County Jail. As is true at the other reception facility we visited, obtaining medical information from CCJ is difficult despite the presence of a Wexford employee at Cook County. The facility was operating the reception process timely and there was no backlog for the intake physicals.

Overcrowding is a significant issue at this facility. For example, after the reception process has been completed, inmates may stay in the R&C area for 30 days or more due to lack of bed availability. The gym is also being used as a housing unit; currently there are 20 inmates in the gym but the number has been as high as 70.

The Health Care Unit Administrator (HCUA) is new to the position but not new to correctional health care. She previously worked as the Director of Nursing (DON) at the Lincoln Correctional Center, located adjacent to the Logan Correctional Center, when females were housed there. The Warden is very supportive of the health care program and, uniquely, the Assistant Warden of Programs is a registered nurse and a former IDOC Health Care Unit Administrator. At the time

of the inspection, the Director of Nursing (DON) position was vacant, which significantly and directly impacts on the HCUA's ability to function as the department head over the health care unit, as she has to pick-up the day-to day duties of the DON position. Of particular concern was the reported negative attitudinal issues of health care staff toward inmates, particularly female inmates.

The Medical Director is conscientious and dedicated, his notes are thorough and legible, and his medical decision making is solid. He attempts to follow his patients carefully and he documents his encounters thoroughly. There is a real sense from talking with staff and reviewing records that he is fully invested in the outcomes of his patients. He has not been performing the clinical oversight duties, particularly for the nurse practitioners or the other physician.

Provider staffing consists of one Medical Director, one staff physician, two NPs and one PA; all are full-time positions and all positions are filled. There is also a part-time OB/GYN who provides onsite care 24 hours per week. All 18 LPN positions are filled, as are 18 of 21 RN positions. Providers have access to the internet for the purposes of medical references but cannot access lab data or hospital records online.

The reception process, although utilizing a well-trained nurse and a competent nurse practitioner, has some deficiencies to overcome. The first area is that the location of the initial nurse intake screen is in an area where the noise level is so great that it interferes with the nurse's ability to perform the screen. The second problem is patients arrive with no medical information, particularly from Cook County Jail and as a result, information that could be sent from their current site prior to transfer is not made available at the time the process begins. Through the nurse screen and the nurse practitioner history and physical, there were some deficiencies with regard to adequate patient histories. There was a problem with follow up to identify problems in some cases and, consistent with the current policy, untimely follow up with regard to chronic diseases. There needs to be a process in place to track and insure that timely and appropriate follow up does in fact occur.

Nursing sick call is conducted seven days a week by a registered nurse on the 7:00 a.m. to 3:00 p.m. shift. Any sick call not completed is picked-up by the 3:00 p.m. to 11:00 p.m. nursing staff, which could be a registered nurse or licensed practical nurse. Sick call in the X-house, which houses reception and classification, segregation and maximum security inmates, is only a "face-to-face" triage rather than a true sick call encounter. In response to an inmate's written complaint, a nurse goes to the inmate's cell and discusses the complaint through a solid steel door. Based on the inmate's verbal complaint, the nurse provides treatment absent any physical evaluation. Additionally, daily "wellness checks" are conducted on the 11:00 p.m. to 7:00 a.m. shift and weekly visits by the Nurse Practitioner for all inmates housed in the segregation unit; however, neither the daily checks nor the weekly visits are documented.

Medications are obtained and provided through the comprehensive health care contract with Wexford Health Sources. The medication storage and preparation area is managed by three pharmacy technicians with the lead technician having 23 years of experience in correctional pharmacy management.

Laboratory services are provided by the University of Illinois-Chicago Hospital (UIC) and there were no reported problems with this service. Daily, specimens are transported with reports faxed to the facility, generally the next day. There were no reported issues with this service.

The infirmary is a 20-bed unit comprised of 15 designated medical beds, three mental health crises cells and two negative air pressure respiratory isolation rooms. The unit is generally staffed with a registered nurse, but there are shifts when a licensed practical nurse is the only nurse assigned to the unit. The nursing station is centrally located and there is direct line-of-sight into only four of the rooms. There is no nurse call system.

All patients are admitted and discharged by the Medical Director. It was difficult to review infirmary medical records as the files were in complete disarray with an extensive amount of loose filing and pages out of chronological order.

At the time of the inspection, a specific nurse had not been assigned the duties of Infection Control (IC-RN), and the HCUA was also fulfilling this responsibility. Inspections of the health care unit, reception and segregation unit, as well as random housing units and other areas indicated employee personal protective equipment (PPE) was available, and health care staff was appropriately disposing sharps and disposable medical tools. The facility is contracted with a nationally licensed company for disposal of medical waste.

Health care unit (HCU) assigned inmates are laundering infirmary bedding and linens in a residential style washing machine located in the infirmary area. This is of concern, as all infirmary linen and bedding must be considered to be contaminated, and the available water temperatures in the HCU are not high enough to meet the requirements to properly sanitize the bedding.

There is a considerable morale issue at this facility which appears to be negatively impacting the quality of care provided. However, the Health Care Administrator impressed us by having developed, prior to our visit, a list of critical changes that need to be made within the program, including the need for a substantial change in some of the staff's attitudes toward their patients.

We reviewed a collection of cases forwarded to us from an outside attorney and found that virtually all of the concerns expressed by the inmates were valid. To the credit of the current leadership team, many of the issues identified in the patient's complaints had been addressed by the time we visited the facility. These cases are included as a separate section of this report.

With regard to urgent/emergent services, we found a serious problem with an urgent care response in one case. The problem identified was that a patient who had an observed seizure was found at the time of the arrival of the nurse not to be having a seizure. There was no contact with a physician and no effort to place the patient in the infirmary for closer observation. One day later, the patient had another seizure and was sent to the hospital. We also found inadequate assessments by nurses which may be related to attitudinal issues as opposed to the adequacy of their training.

With regard to scheduled offsite services, we found several problems, including the fact that when patients return from their offsite service, they are not brought necessarily to the medical area and therefore the review of the paperwork and the triggering of the follow-up visit does not always occur. These problems, in terms of insuring the offsite service paperwork is available and that the patient is seen in follow up by a primary care clinician in a timely manner, must also occur.

The chronic disease program suffers from a lack of organization and oversight. There was no system in place to track any of the important indicators for the program, and there was a significant backlog in clinic appointments. Compounding the backlog was the practice of addressing only one chronic disease at each clinic visit. Though this practice is supported by policy which dictates that certain diseases be addressed during certain calendar months, it is not conducive to efficiency and comprehensive patient care. Patients should be seen according to their degree of disease control, i.e., sicker, more poorly controlled patients should be seen more frequently.

Most of the chronic clinics were assigned to one of the part-time doctors whose notes are legible only to him. His approach to chronic disease management can be described as passive at best. This doctor sees chronic care patients once a week and said he sees a patient every 10-15 minutes. This rate of speed is not, in our opinion, compatible with quality when it comes to chronic disease management.

In practice, the majority of chronic disease management is actually provided by the Medical Director during sick call. This results in patients getting the care they need, and may be contributing to the access problem for urgent care issues.

Staff were beginning to utilize the OTS system for tracking the program, but no comprehensive data were available for our review. (Indeed, OTS is not a comprehensive tracking system and not well suited for the chronic disease program, but this is a statewide issue.) The most recent data available was from November 2013 and indicated that only a small fraction of patients enrolled in the clinics were seen during the designated clinic months. We met with one of the two chronic disease nurses, who could produce no data regarding the program in terms of timeliness or outcomes.

It should be mentioned that our review was significantly hampered by the disorganized state of the health records, most of which had large piles of loose filing within the inside cover. We were told that this was in anticipation of rolling out the EMR, which was to have occurred the Monday we arrived but was postponed. Sick call request forms are not filed in the charts, but kept in a filing cabinet in the administrative area. They are not arranged by name or number, but by date; thus searching through them for the purposes of our review was next to impossible.

The problems described herein notwithstanding, this was the first of the four institutions that we had visited where we left the institution somewhat optimistic, particularly if a capable Director of Nursing is added to the leadership team.

# Findings

## Leadership and Staffing

There is a strong leadership team now in place at Logan. The Warden is very supportive of the health care program and, uniquely, the Assistant Warden of Programs is a registered nurse and a former IDOC Health Care Unit Administrator. The Medical Director is very conscientious and hardworking. The Health Care Unit Administrator (HCUA) is competent, energetic and determined to improve the program. The HCUA is acutely aware of nursing staff attitudinal issues toward inmates.

Other staffing is listed in the following

table: *Table 1. Health Care Staffin*

| Position | Current FTE | Filled | Vacant | State/Cont. |
|---|---|---|---|---|
| Medical Director | 1 | 1 | 0 | Contract |
| Staff Physician | 1 | 1 | 0 | Contract |
| Nurse Practitioner | 2 | 2 | 0 | Contract |
| Health Care Unit Adm. | 1 | 1 | 0 | State |
| Director of Nursing | 1 | 0 | 1 | State |
| Nursing Supervisor | 0 | 0 | 0 | |
| Physician's Asst. | 1 | 1 | 0 | Contract |
| Corrections Nurse I | 16 | 14 | 2 | State |
| Corrections Nurse II | 0 | 0 | 0 | State |
| Registered Nurse | 5 | 4 | 1 | Contract |
| Licensed Practical Nurses | 18 | 18 | 0 | Contract |
| Certified Nursing Aide | 0 | 0 | 0 | Contract |
| Health Information Adm. | 1 | 1 | 0 | Contract |
| Health Info. Assoc. | 2 | 2 | 0 | Contract |
| Phlebotomist | 1 | 1.0 | 0 | Contract |
| Radiology Technician | 0.6 | 0.6 | 0 | Contract |
| Pharmacy Technician | 3 | 3 | 0 | Contract |
| Pharmacy Technician | 0 | 0 | 0 | State |
| Staff Assistant I | 4 | 4 | 0 | Contract |
| Staff Assistant II | 0 | 0 | 0 | Contract |
| Chief Dentist | 0 | 0 | 0 | Contract |
| Dentist | 2 | 2 | 0 | Contract |
| Dental Assistant | 2 | 2 | 0 | Contract |
| Dental Hygienist | 1 | 1 | 0 | Contract |
| Optometry | 0.15 | 0.15 | 0 | Contract |
| Physical Therapist | 0 | 0 | 0 | Contract |
| Physical Therapy Asst. | 0 | 0 | 0 | Contract |
| **Total** | **62.21** | **58.21** | **4** | |

# Clinic Space and Sanitation

The health care unit is new construction and opened in 2005. The unit is clean, well lighted, well equipped and well maintained. The unit is linear in design; that is, a long hallway with an inpatient infirmary at one end, a security station in the middle and outpatient treatment at the other end. At one end is a hallway that includes a 20-bed infirmary, a nursing station, a medication storage room, medical records and administrative offices. In the middle of the hallway is a security desk, large medication storage room, two medication administration rooms and a two-chair dental clinic. At the other end of the hallway is a nursing station, three examination rooms with the potential for five, one urgent care/treatment room, an optometry clinic room, lab room, x-ray and various offices. The examination rooms were appropriately equipped.

Inmate porters, under the supervision of both security and nursing staff, perform the janitorial duties; porters do not perform or have involvement in any medical care delivery. Porters are provided an orientation to the health care unit which includes proper cleaning and sanitation procedures, blood-borne pathogen training and communicable disease training. When indicated, they are provided personal protective equipment. Bodily fluid clean up would be supervised by nursing staff. Porters are responsible for laundering infirmary linens. This is of concern, in that all infirmary linens must be considered to be contaminated and, as a result, must be laundered appropriately. The required laundering procedure to sanitize linens is to wash with laundry detergent at a water temperature of at least 160 degrees Fahrenheit for a minimum of 25 minutes or wash with laundry detergent and a bleach bath of at least 100 ppm at a water temperature of at least 140 degrees Fahrenheit for a minimum of 10 minutes. It is doubtful the health care unit laundry room water temperature is over 125-130 degrees and, as a result, should not be used to launder infirmary linens. The water temperature should be raised to a minimum 140 degrees and bleach provided or, if the use of bleach is not permitted, the water temperature must be raised to 160 degrees or the institutional laundry must be used. Water temperatures in the institutional laundry must be monitored and maintained at the required temperatures.

# Reception Processing

The medical reception process occurs in the relatively new X-design building in a housing unit, which includes reception beds and an area that has been converted to perform the medical reception process. Unfortunately, the nurse screen takes place in a room within the medical reception housing area that also includes several mentally ill inmates. The noise in that housing area clearly caused difficulties for both the patient to hear the nurse sitting three feet away from the patient as well as for the nurse to hear the patient. This problem needs to be addressed by some methodology. We observed the nurse screens of patients newly arrived from Cook County Jail. They arrived with no medical information. There is a Wexford staff person who usually sends medication information a few days after arrival, but the medication information is only a list of any medications that the patient had been on at Cook County Jail rather than a list of current medications at the time of transfer. This total communication breakdown is difficult to understand, since the Cook County Jail uses an electronic medical record and is capable of providing a problem list, allergies, current medications as well as any scheduled appointments. The fact that this is not happening is clearly an indictment of efforts by the state to obtain this

critical information. At a minimum, the state could have access to the county's electronic records for the Wexford person, who could insure that this information is available and yet this still has not occurred. The nurse screens tend to occur within the first 24 hours and occasionally within the first two days. The nurse performing the screen was quite conscientious and seemed to do an excellent job (we have concerns about the forms used and their completeness). In addition, we also observed a nurse practitioner performing the intake history and physical. She also seemed conscientious; however, there was no oversight of her practice.

We reviewed 11 reception records of patients who arrived in the month of February and a majority of these records were problematic. The deficiencies included inadequate querying regarding patient histories, inadequate follow up and delays in access to chronic care clinics. Examples of problem cases follow.

**Patient #1**
This is a 24-year-old who arrived on 2/1/14. She had a history of hidradenitis of the right axilla for which she was given antibiotic treatment. On 2/11, she was told to return in three days but she was not seen until almost a month later.

**Patient #2**
This is a 53-year-old who arrived on 2/14/14 with a history of hypertension and hyperlipidemia. Her blood pressure on intake was within normal limits. Her problem list included hypertension, hyperlipidemia and a history of mental problems. She was seen in the hypertension clinic on 3/24 and her blood pressure was elevated. The assessment was blood pressure uncontrolled and she was placed on medications. She had a Pap smear on intake but the specimen was unsatisfactory and this has never been followed up.

**Patient #3**
This patient arrived on 2/5/14 and her physical exam was performed on 2/13. She was found to be HIV positive. On 2/18, she was referred for a high-risk appointment at the University of Illinois. The HIV specialist recommended HIV medications and a follow-up in two weeks. This was because her CD4 count was low and her viral load was elevated. There has been no follow-up since and we could find no order for the medications.

**Patient #4**
This is a 24-year-old who arrived on 2/14/14 with a history of hepatitis C and no treatment. She was to be followed up in two weeks but no follow-up has occurred.

**Patient #5**
This patient arrived on 3/4/14 with a seizure disorder and costochondritis. She was supposed to be followed up in one month but that has not happened.

**Patient #6**
This is a 37-year-old who arrived on 2/13/14 with a history of hypertension, status post laminectomy and asthma. There is a stamp in the chart that states, "No indication for asthma treatment," but the history has no explanation of why that is the case and in fact there had been a

prescription for a beta agonist inhaler. This patient also had hyperlipidemia and there has been no follow-up.

**Patient #7**
This is a patient who arrived on 2/7/14 with asthma. There was no adequate history. This patient was referred to the asthma clinic but the chronic clinic has never occurred.

# Nursing Sick Call

Nursing sick call is conducted seven days a week.

To access sick call, an inmate completes a sick call request slip and deposits it directly into a locked medical drop box located in each housing area. Nursing staff from the 3:00 p.m. to 11:00 p.m. shift collects the slips from each drop box and carries them to the health care unit. In the health care unit, 11:00 p.m. to 7:00 a.m. shift nursing staff, which could be a registered nurse or licensed practical nurse, is responsible for date stamping and reviewing each request to determine urgent need versus routine need. Inmates determined to have urgent medical needs are immediately evaluated. Inmates determined to have routine health care needs are placed on the nurse sick call schedule to be evaluated within 72 hours. The reviewing nurse is responsible to note on the request the scheduled sick call date and to initial the request. Sick call request slips are maintained on file chronologically by date in a file cabinet.

Sick call is conducted on the day shift by a registered nurse. At the end of the shift, any sick call remaining will be performed by nursing staff on the 3:00 p.m. to 11:00 p.m. shift which could be a registered nurse or licensed practical nurse.

Outside the medical department, in the X-House where reception, segregation and maximum security inmates are housed, sick call is conducted. These inmates use the same sick call request slip process to access sick call as the general population inmates. In response to the request slip, nursing staff, either a registered nurse or licensed practical nurse, goes to the inmate's cell door to discuss the health care complaint. Nursing staff are required to be escorted by a security staff member. At cell-side, the nurse converses with the inmate through a solid metal door even though security staff, who could open the door, is present. As a result, any medical information provided by the inmate is not confidential as other individuals can hear the conversation. Based on the conversation, the nurse either treats the patient from established treatment protocols or refers the patient to a primary care provider. Hands on examinations are not being conducted.

Per IDOC policy, a $5.00 co-pay is charged for non-emergency, self-generated sick call requests. Daily "wellness checks" are conducted by nursing staff on the 11:00 p.m. to 7:00 a.m. shift for all inmates in confinement or "lock-down" status. Weekly rounds are conducted by the nurse practitioner. Neither the "wellness checks" nor the weekly rounds are documented in a health care unit segregation log or the inmate's medical record. Anyone entering the segregation unit is required by security staff to sign into the unit on a segregation log. As a result of the segregation unit log, there is documentation of nursing staff and the nurse practitioner being present in the unit, but there is no documentation verifying any inmate contact occurred or any health care complaints were addressed. Again, the assessment is performed through the cell door despite

there being a room in the building where the inmate could be taken to have a private conversation and, if necessary, perform an appropriate examination. Otherwise, the inmate is transported to the medical unit for a more detailed assessment and examination.

With the current sick call process, there are multiple issues as follows.

1. Licensed Practical Nursing (LPN) staff is reviewing the sick call requests, maybe or maybe not performing an examination, making an assessment and then formulating a plan, which could be no treatment or treating from approved treatment protocols or to refer to a provider. All of these actions are beyond the educational preparation and scope of practice for an LPN.
2. A cell-side encounter occurs, which is really a verbal triage, rather than a legitimate, hands-on sick call encounter.
3. Being required to talk through a solid metal door affords the inmate/patient no privacy/confidentiality in expressing her complaint to the nurse.
4. No appropriate assessment and corresponding appropriate examination is conducted.
5. For individuals in confinement, there is no documentation of the daily nursing "wellness checks" or the weekly physician/nurse practitioner rounds.
6. It is questionable as to the reason confinement "wellness checks" are performed on the 11:00 p.m. to 7:00 a.m. shift when the possibility for meaningful dialog between the inmate and nurse is minimal.

At random, 10 sick call requests dated January through March 2014 and the corresponding inmate medical record were reviewed. The review presented the following.

1. Nine of the 10 requests were date stamped as being received by medical staff.
2. Six of the 10 requests were initialed by the reviewing medical staff member.
3. Ten of the 10 requests were noted with a date to be seen in nursing sick call.
4. Four of the 10 patients, even though a nursing sick call date was noted on the request, were evaluated by a primary care provider.
5. In three of the 10 records, the inmate's complaint was not addressed during the sick call encounter.
6. In two of the 10 records, an LPN conducted the sick call, which is beyond the scope of practice for the LPN.
7. Two of the 10 records had no documentation of any sick call encounter or that the inmate did not report for sick call.
8. Two of the 10 records contained a narrative nursing note rather than the required Subjective-Objective-Assessment-Plan (SOAP) note.
9. In one of the 10 records, the LPN noted as the Plan (P), "$5.00 co-pay" with no treatment recorded. The patient was later evaluated and appropriately treated by the nurse practitioner.
10. In one of the 10 records, the LPN documented no evaluation and there was no SOAP note. The patient was later evaluated and appropriately treated by the physician's assistant.
11. None of the 10 randomly selected records indicated any sick call conducted by a registered nurse.

## Physician and PA Sick Call

We reviewed five records each from the nurse practitioners. In each instance, our record review demonstrated appropriate decision-making and adequate collection of history data as well as objective data. These clinicians appear to be a strength of the program.

## Chronic Disease Management

The chronic disease program suffers from a lack of oversight and organization. It is not utilized as the forum for provision of chronic disease management but instead seems to be performed as a distracted afterthought.

There are two RNs dedicated to the chronic care clinic, though they do get pulled to other tasks. They have begun entering data into OTS since the arrival of the current HCUA in December; thus, that system was not useful for mining data related to the chronic care clinic. The nurses were still maintaining a paper log printed from an Excel spreadsheet available only on the computers in their offices. It is the duty of the chronic care nurse to compile lists of patients' degree of control each month for the purpose of CQI, but this was not being done.

At the time of our visit, there was a very large backlog in the chronic disease program; only a small fraction of patients enrolled in each clinic were seen in a given month. Only one chronic disease is addressed at each clinic visit. The majority of the few chronic care forms that we found during our review were completed by one of the part-time doctors, whose notes are completely illegible (except to him) and his approach to chronic disease management can be described as passive at best. This doctor sees chronic care patients once a week and says he sees a patient every 10-15 minutes during his 4-6 hour shifts.

The majority of chronic disease management is actually provided by the Medical Director during sick call. This results in patients getting the care they need, but is clogging up sick call and may be contributing to the access problem for urgent care issues. The majority of chronic disease management should instead be happening during chronic care clinic, and it would make sense for the Medical Director to be the primary provider of this program, given that he appears to be the one best suited by our estimation.

It was impossible to determine how many patients were enrolled in the chronic disease program. The number of clinic enrollments was as follows:

- Cardiac/Hypertension (412)
- Diabetes (112)
- General Medicine (129)
- HIV Infection/AIDS (28)
- Liver/Hepatitis C (120)
- Pulmonary Clinic (184)
- Seizure Clinic (150)
- TB Infection (0)

## Cardiovascular/Hypertension

Only 77 of 412 patients enrolled in the hypertension clinic were seen in the November clinic, the most recent month with data available. We reviewed six charts and found lapses in timeliness of chronic care clinics in five of the records, including one who had not been seen at all by a provider since her arrival to Logan over a year ago.

**Patient #1**

This is a 46-year-old with poorly controlled diabetes and hypertension who has only one chronic care form in her chart, which is from September 2013. It contains nearly no information. Her blood pressure was 134/96 at this visit, but this was not addressed.

She was seen at sick call on 12/10/13. Her blood pressure was 146/88, but was not addressed.

On 3/10/14, her blood pressure was 161/103. Her blood pressure medication was discontinued and a similar medication ordered in its place. Blood pressure checks were ordered. We requested the log for review, but were told the blood pressure log is given to the patient after it is completed.

*Opinion*: This patient's blood pressure has not been adequately managed. While the patient should certainly receive a copy of the log, the main purpose of monitoring the blood pressure is for the provider to review the readings in order to better treat the patient.

**Patient #2**

This is a 23-year-old type 1 diabetic with hypertension, asthma and CKD. At her baseline clinic on 10/13/13, her blood pressure was 153/103. Blood pressure checks were ordered, but medications were not adjusted.

On 3/5/14, she was seen by the RN for chest pain and vomiting. Her blood pressure was 149/102 and pulse was 102. An ECG was obtained and showed sinus rhythm with PVCs. She was kept overnight for the physician to see in the morning. The next day, the doctor saw her for hypertension clinic. His note is completely illegible, so we asked him to read it to us. It makes no mention of the events of the prior day.

*Opinion*: This patient's blood pressure has not been managed adequately, nor was the episode of chest pain.

**Patient #3**

This is a 44-year-old with HIV and hypertension whose last hypertension clinic visit was in July 2013.

**Patient #4**

This is a 59-year-old woman with hypertension and hyperlipidemia. She was seen in hypertension clinic on 11/27/13, her first provider visit since transferring to Logan eight months earlier. No physical exam is documented; in fact, there is almost nothing documented in the note.

**Patient #5**

This is a 39-year-old woman who arrived at Logan in March 2013 with hypertension and hypothyroidism. She has never been seen by a provider at Logan.

**Patient #6**
This is a 50-year-old female with a history of hypertension, hyperlipidemia and seizures who has been sent to the local ED three times over the past year for symptoms of chest heaviness with numbness down left arm and nausea. Each time she ruled out for an acute cardiac syndrome (ACS) and was returned to the prison.

After one such outing in March 2013, the ED doctor suggested an outpatient stress test. This was requested and denied.

*Opinion*: Excluding an acute cardiac event is important, but does not exclude the possibility of underlying coronary artery disease. We agree with the ED physician that this patient should have a stress test.

## Diabetes

Diabetes clinics occur in January, May and September. Less than half (57) of the 112 enrolled patients were seen in January, 25% of whom were in poor control.

**Patient #7**
This is a 29-year-old type 1 diabetic who arrived at Logan in March 2013. She is blind from diabetic eye disease. She also has CKD, hyperlipidemia and bipolar disorder. She was seen in diabetes clinic in September and January. On 9/21/13, she was seen at DSC for nocturnal hypoglycemia and her insulin dose was decreased. Four days later, another physician saw her in diabetes clinic and increased her insulin because her A1c was 7.2%. His note contains minimal information, which is nearly impossible to decipher. It was clear he did not review the chart with regard to her recent hypoglycemic episode.

On 1/17/14, she was seen in diabetic clinic by still another doctor who opined that she was in poor control though her A1c was 7.7% on 12/20/13. No medication changes were made.

*Opinion***:** Providers are not reviewing the health record to get a well-informed picture of the patient's degree of control.

**Patient #8**
This is a 39-year-old with diabetes diagnosed at her previous incarceration in February 2012. She arrived at Logan on 2/11/14. Labs were done on admission but did not include an A1c. The intake physical exam does not list diabetes though she is enrolled in the clinic.

**Patient #9**
This is a 40-year-old woman with hepatitis C and poorly controlled type 1 diabetes. There was only one chronic care clinic note in the chart which was dated 10/5/13; it contained almost no information. Labs were drawn before this visit, but did not include an A1c.

She has been seen regularly in DSC and medications have been adjusted. As of 12/27/13, her diabetes was poorly controlled with an A1c of 9.5%.

*Opinion*: This patient has received the majority of her chronic care at DSC rather than at chronic care clinic.

### Patient #10

This is a 46-year-old with poorly controlled diabetes and hypertension who has been seen once in chronic care clinic in September 2013. There were labs on 9/5 with an A1c of 10.5%, but medications were not adjusted nor were they even renewed. She was then seen on 9/19 in DSC by the Medical Director, who renewed her medications. The last time her insulin was adjusted was August. Her most recent A1c was in December and was 10.4%. Labs were drawn on 3/4/14 but did not include an A1c.

*Opinion*: This patient's diabetes has not been managed aggressively enough. She is overdue for a chronic care appointment.

### Patient #11

This is a 23-year-old type 1 diabetic with hypertension, asthma and CKD who was on an insulin pump prior to incarceration. She has diabetic gastroparesis with refractory nausea and vomiting for which she underwent port placement for frequent intravenous fluid infusions. She has not been seen in diabetes chronic care clinic in the past year, but she is seen often by the Medical Director who is managing her diabetes at sick call. Her blood glucose levels have been erratic with frequent low readings. Her A1c was 7.5% on 9/12/13, the most recent measurement in the record as of April 1.

*Opinion*: This fragile patient should be tracked closely in the chronic care clinic.

## General Medicine

As of the date of our visit, only 17 of the 129 patients enrolled in this clinic had been seen in the prior four months. The case below was typical.

### Patient #12

This is a 39-year-old woman who arrived at Logan in March 2013 with hypertension and hypothyroidism. She has never been seen by a provider at Logan. Her TSH was normal on 1/3/14.

## HIV Infection/AIDS

Patients usually self-carry their HIV medications, which presents obvious challenges to tracking compliance. In general, we found that patients were seen timely in ID telemedicine clinic and that labs were drawn timely prior to these appointments. For those patients who are compliant with medications and whose disease is under good control, this works well. However, as is the case in other IDOC facilities, institution providers are not involved in tracking patients' HIV disease and so medication noncompliance goes undetected and unaddressed until the next ID visit, which is usually three or more months away. In addition, patients may be at risk of

medication discontinuity when they are moved to the segregation unit. The case below illustrates these problems.

**Patient #13**
This is a 29-year-old woman with HIV who arrived at Logan in March 2013 on Atripla. On 5/3/13, she reported to the nurse that she was not taking her medication every day due to side effects. She was referred to the MD. She presented again to the nurse on 5/5 with the same complaints. She was finally seen by the MD on 5/13.

On 6/4/13, she was seen by ID telemedicine. She reported that she had missed four days of medication when she was in segregation because "they didn't bring it to me." Review of the MAR confirms that there are six blank spaces that correspond to the time period she described.

She was next seen by the ID doctor on 10/3/13, at which time she reported that she had not been taking her HIV medication for 4-6 weeks, initially blaming staff for not bringing it for her, but on questioning stated that she does not want to take it in the morning. Review of the MAR shows that all spaces in August and September are blank. Her most recent labs reflected this; on 9/13/13, her viral load was detectable at 522 copies. The ID doctor had a "long and detailed discussion" with the patient about the importance of compliance. The medication was restarted and moved to evening.

At the next visit on 2/21/14, she reported 100% compliance and labs from 1/3/14 reflected that her viral load was again undetectable and CD4 was 480 cells. MARs confirm compliance from October forward.

*Opinion*: This patient was not referred timely to a provider when she reported side effects from her HIV medication. There was an avoidable interruption in medication continuity when she was housed in segregation. Thereafter, her medication noncompliance should have been identified and intervened upon had she been followed on site.

## Pulmonary Clinic

Only 30 of 138 enrolled patients were seen in the designated month of February. We reviewed five random charts of patients with asthma. One patient had been seen only once in chronic care clinic in the past year, and another patient had not been seen at all, but managed episodically at MD line. A third patient was diagnosed with milder disease than the evidence suggested. The two remaining cases revealed a variety of issues and are described below.

**Patient #14**
This is a 31-year-old woman with asthma. At her intake physical, the nurse practitioner stamped the chart with a stamp that read "no indications for asthma treatment at this time. If respiratory difficulty report to HCU for evaluation." Her inhaler was not ordered.

On 7/22/13, she was seen at nurse sick call for headache and requested her inhaler. She was referred to the MD "if shortness of breath gets worse," but not seen.

On 10/2/13, she presented to nurse sick call to request an inhaler and was put on MD line for 10/24/13. There is no note for that date.

On 12/18/13, she was seen by RN for "chest hurting, asthma and cough." Peak flows were low at 300, 325 and 350. Her heart rate was elevated at 120 beats per minute and her pulse ox was normal at 98%. She was coughing with scattered wheezes. The case was discussed with (but not seen by) the doctor, who ordered nebulizer treatments as needed and reordered her inhaler.

She was not seen again for her asthma as of the date of our visit. She does not appear to be enrolled in the chronic care program.

*Opinion*: This patient has not been seen by a provider for her asthma since she arrived at Logan a year ago. It was inappropriate for the nurse practitioner to discount her history of asthma at reception.

## Patient #15

This is a 25-year-old woman with asthma who reported taking an inhaled steroid and beta agonist when she entered IDOC in 2011, but it appears that these were not ordered for her, as she was no longer on therapy upon transfer to Lincoln in 2012 nor to Logan in March 2013. The first recent mention of asthma was August 2013 when she reported this to the physician. She had no wheezing and so was not prescribed an inhaler.

On 1/30/14, she was seen with wheezing and got a nebulizer treatment and was referred to the nurse practitioner. She was seen two weeks later, on 2/13/14, by the nurse practitioner for wheezing x 1-2 weeks and reported getting breathing treatments every other day. The nurse practitioner described the lungs as clear and wrote, "Unable to document asthma. No notes documenting breathing treatments found." She referred the patient to the asthma clinic.

On 2/17, she was seen by the RN for shortness of breath and wheezing and got a nebulizer treatment.

On 2/18, she was seen on MD line for asthma evaluation. Her peak flow was 320 and the physician ordered an inhaler.

On 2/19, she was seen for her baseline asthma clinic by a different physician. Her peak flows were low at 290, but the physician deemed her to be under good control based on no beta agonist use. He seemed unaware that she had not been prescribed an inhaler until the day before.

On 2/28, she presented to HCU for shortness of breath and chest tightness. Her vitals were abnormal with a blood pressure of 138/102 and heart rate of 101. Her oxygen saturation was normal at 94%, but peak flow was low at 325-350. Her lungs were described as clear and so the nurse sent her back to her unit.

On 3/9, there is a note from an RN stating, "I/M has been coming to HCU on a nightly basis for "as needed" breathing treatments. I/M is in no acute distress, no wheezing, no signs of any

respiratory difficulty," so she called the Medical Director and got an order to stop the nebulizer treatments.

*Opinion*: It does not appear that this patient has been evaluated adequately for asthma. If the diagnosis is in question, a pulmonary function test would be helpful.

## Seizure Clinic

Of the 184 patients enrolled in seizure clinic, only 15 were seen during the most recent clinic in December. There seems to be a somewhat cavalier attitude at this institution toward treating seizure disorders, as the cases below illustrate.

### Patient #16
This is a 49-year-old female with a seizure disorder who arrived at Logan on 1/22/14. She has not yet been seen in chronic care clinic but has had no documented seizures. Her Dilantin level was therapeutic at 17.9 on 1/27, but the physician changed her dose without a visit or explanation.

### Patient #17
This is a 37-year-old female with seizure disorder who was sent to Logan in March 2013 on no seizure medications because she was in her second trimester of pregnancy. Her chart had a huge wad of loose filing inside the front cover dating back to May of 2013. She has not been seen in seizure clinic since her arrival.

She has had very frequent reported breakthrough seizures with multiple code 3s called to her unit. Rarely has a code 3 resulted in a follow-up appointment with a provider or even transportation to the health care unit. It is clear from chart documentation that there is strong suspicion that these are not truly seizures, despite the fact that she has seen a neurologist who recommended she be treated with anti-seizure medication. She had a therapeutic medication level in November 2013, but it has not been checked since.

The last time she was seen by a provider for seizures was in the beginning of November when she was admitted to the infirmary with uncontrolled seizures. Medications were adjusted at that time.

*Opinion*: The nature of this patient's condition has not been adequately clarified. If it is determined that she has a seizure disorder, she should be enrolled and followed in the chronic disease program. If not, then treatment with anticonvulsant medication should be reconsidered.

### Patient #18
This is a 49-year-old woman with a history of brain surgery resulting in seizures, who arrived at Logan on 4/10/13. On 4/11, the nurse practitioner saw her for a baseline seizure clinic visit. The patient reported her last seizure was about one month ago. Control was rated as good.

On 8/26, her Dilantin level was undetectable. There were no new orders and no visit with the patient. The medication is self-carry and MARs show that it was dispensed to her monthly except for October 2013, which is blank.

On 10/8, the level was subtherapeutic at 4.7. The PA wrote on the lab that she was well controlled on her current dose with no seizures x 6 months, but there is no encounter in the chart.

The next visit was 12/26, when the physician noted no seizures since her last visit. The Dilantin level on 12/13 was 11.7; this was signed by the physician but misquoted in his note as 4.1. There have been no unscheduled visits for seizure activity.

## TB Infection Clinic

There were no patients enrolled in the TB clinic at the time of our visit. This is very surprising given the size of this institution and the fact that it is a reception center. Staff reviewed all reception charts and found no new positive tests and only a few self-reported positives. Although this may well be the case, it raised questions in our minds about the accuracy of reading the PPD skin tests.

# Women's Health

Patients with active women's health issues or who are at high risk for such are not tracked or monitored in an organized way. Thus, it was not surprising that we found problems in eight records (62%) of 13 charts we reviewed. The majority of the issues pertained to failure to follow up abnormal pap smears or to perform timely screening in high-risk patients. We noted that patients typically get a Pap smear on intake, but there were frequently delays with subsequent follow-up care and routine Paps thereafter, especially for HIV infected women who require more frequent screening than uninfected women.

There were two additional cases described in the section titled Responses to the Attorney Letter; one of an inexplicable delay in the work-up of a palpable breast mass, and the other who has not been adequately evaluated for incontinence.

There is an obstetrician-gynecologist who provides 24 hours per week of onsite, which does not appear to be sufficient for this population. The facility had recently recruited a women's health nurse practitioner, which should improve access for this population.

**Patient #1**
This is an HIV patient with history of an abnormal Pap smear and a prior LEEP procedure. She had an abnormal Pap in January 2012. A repeat test in March 2012 was normal. Her most recent test was on 11/28/12 and was negative. She has had no further Pap smears.

*Opinion*: Due to their increased risk of invasive cervical cancer, currently published evidence based guidelines recommend annual screening for HIV infected women.

**Patient #2**
This is a 45-year-old with HIV infection who had an abnormal Pap smear in August 2012. She underwent colposcopy with biopsy in October 2012, which showed acute and chronic cervicitis, squamous metaplasia and tubular metaplasia. She underwent cryotherapy x 2 treatments on 12/6/12, with a recommendation to repeat the Pap smear in six months. She was then transferred to Logan in March 2013 and no further exams have been done.

*Opinion*: This high-risk patient needs a follow-up Pap smear.

**Patient #3**
This is a 25-year-old woman with HIV infection who had an abnormal Pap smear on 3/6/13 which tested HPV +. She underwent colposcopy with biopsy on 5/31/13; this report was not in her chart. There has been no subsequent follow up of this issue.

*Opinion*: This high-risk patient needs a follow-up Pap smear.

**Patient #4**
This is a 29-year-old woman with HIV whose last Pap smear and pelvic exam was on 4/11/12.

**Patient #5**
This is a 44-year-old with HIV whose last Pap smear was on 11/27/12.

**Patient #6**
This is a 39-year-old woman who arrived at Logan in March 2013. Her last Pap smear was on 1/3/11.

# Pharmacy/Medication Administration

Boswell Pharmaceuticals, located in Pennsylvania, provides all prescription and over-the-counter medications for the facility. The service is a "fax and fill" system, which means patients' new prescriptions are faxed to the pharmacy by 2:30 p.m. and will arrive at the facility the next day. Refill prescriptions are faxed by 10:00 a.m. and will be received the next day. The local Walgreens store is the back-up pharmacy for obtaining medication which is needed immediately and is not available in stock. Patient specific prescriptions, stock prescriptions and controlled medications arrive packaged in a 30-day bubble pack. Over-the-counter medications are provided in bulk by the bottle, tube, etc. The medication preparation/storage area is staffed with three full-time pharmacy technicians, and Boswell provides a consulting pharmacist to come on site once a month to review prescription activity, to assess pharmacy technician performance and technique and to destroy outdated or no longer needed controlled medications pursuant to the requirements of the Federal Drug Administration (FDA) and Drug Enforcement Agency (DEA). Inspection of the medication preparation/storage area revealed a large, clean, well-lighted and generally well-maintained area. An interview with the lead technician revealed a knowledgeable individual with 23 years working as a pharmacy technician. Inspection of the area indicated tight accounting of controlled medications, both stock and return items, needles/syringes, sharps/instruments and medical tools. A random inspection of perpetual inventories and counts indicated all were accurate.

All prescriptions, controlled medications, syringes, needles and other sharp tools are ordered, received and inventoried by the pharmacy technicians. Once received and counts verified, each of the items is added into the item specific perpetual inventory. Items placed in "back stock" are stored within a locked vault inside the locked and restricted access storage room. The perpetual inventories for all items located in the vault are verified two times a day. Medication carts are inventoried daily and restocked as needed. The crash cart inventory is verified monthly or any

time the plastic security seal is broken. The controlled medication "back stock" perpetual inventory is verified two times a day. The perpetual inventories for controlled medication in "front or working stock" is verified each shift by an on-coming and off-going nursing staff member.

Access to the medication storage room is restricted to nursing administration, nursing staff and the pharmacy technicians. Pharmacy technicians are required to draw keys to their area at the beginning of each shift and return the keys when leaving at the end of their shift. In the event they would leave institutional grounds with the keys, they are contacted by armory personnel to immediately return to the institution. Nursing staff members hand off their keys between shifts. Keys to the medication storage room are restricted to nursing administration, nursing staff and the pharmacy technicians. Keys to the "back stock" vault are restricted to the Health Care Unit Administrator, Director of Nursing and the three pharmacy technicians. In the absence of the pharmacy technicians, emergency procedures are in place for nursing staff, under supervision, to enter the vault and obtain needed items. If this occurs, a complete inventory of the vault is conducted to verify perpetual inventories. A separate locked cabinet is used for the storage of injectable medications. All medications in this cabinet are maintained on a perpetual inventory and inventoried daily. Refrigerator temperatures are monitored and documented daily.

Medication administration consists of two methods. With method 1, medication is administered at cell-side in the X-house, which houses reception, segregation and maximum-security inmates. With method 2, inmates move in large lines to the health care unit to receive their medication. The facility continues to use a paper medication administration record (MAR), and each dose of medication administered or refused is noted on the patient specific MAR. The institution is in the process of transitioning to an electronic medical record (EMR). Observation of method 1 revealed medication administration by a Licensed Practical Nurse (LPN), who properly identified the patients, administered the medication through a food slot port in the solid cell door, observed the ingestion, performed a mouth check and documented the administration on the MAR. A security officer escorted the LPN during administration but performed no other function. Observation of method 2 revealed long lines of patients reporting to the health care unit and, then, based on the first letter of their last name, reporting to one of three windows for their medications. As with method 1, the patient was properly identified, the medication was administered, a mouth check was conducted and documentation was provided on the patient specific MAR.

## Laboratory

Laboratory services are provided through the University of Illinois-Chicago Hospital (UIC). The comprehensive services medical contractor provides two FTE phlebotomy positions to draw and prepare the samples for transport to UIC. Results are electronically transmitted back to the facility, generally within 24 hours via secure fax line located in the medical department. UIC reports to both the facility and Illinois Department of Public Health (IDPH) reportable cases. There were no reports of any problems with this service.

# Urgent/Emergent Care

## Offsite Services/Emergencies

There is no log that tracks either urgent calls from the housing units or a log that tracks patients sent out on an emergency basis. We were only able to identify a few records based on names listed in the quality improvement minutes. This is clearly not acceptable. The state system is not providing adequate oversight of this service.

Of the six records we reviewed, four were problematic.

**Patient #1**
This is a 32-year-old with diabetes, hypertension and coronary artery disease. This patient was seen on 2/8/14 at 3:00 p.m. by the Chief Medical Officer responding to a complaint of chest pain. The patient was sent to the local hospital via paramedics. There are no offsite service documents such as an ER report. There is also no return note when the patient checked back into the facility. The patient was seen on 2/9, one day after she was sent out. Therefore, it was in all likelihood an ER visit. The absence of records make follow-up difficult.

**Patient #2**
This is a patient who was sent out for a possible overdose. However, there is no note documenting the send out and no offsite service records and no return note. The entire episode is undocumented.

The next patient is particularly problematic.

**Patient #3**
This is a 35-year-old with a seizure disorder. On 12/30/13, at about 11:00 p.m., the cell house contacted the medical unit to respond to this patient, who was having seizures. When the nurse arrived, the seizures had ceased and she documented that she observed no seizures but left the patient in the housing unit. There was no adequate assessment. One day later, at 11:40 p.m., the patient was found in the housing unit having a seizure with blood around her mouth and blood dripping from a laceration in the back of her head. She was brought to the health care unit and sent to the local hospital. There is no mention of contacting the physician. The patient was returned at 4:00 a.m. on 1/1/14. There are no records from the local hospital. The physician came in on 1/1 and saw the patient and ordered blood levels of her anti-seizure meds. There has been no follow-up since by the physician. This patient should have been brought to the infirmary after the seizure on the first night for more careful observation and to be seen by a clinician. This was a significant nursing breakdown.

**Patient #4**
This is a 28-year-old with seizure disorder who was sent out by the physician to rule out ureteral colic. The patient was seen after she returned on 1/27/14 and was placed on antibiotics along with a stent in her ureter. She was followed up closely by the physician until 2/1, when she was discharged to the housing unit. This is another case in which the hospital records are lacking.

## Onsite Emergencies

Given the absence of a log, we were only able to identify cases through incident reports. In the four records we reviewed, three of four were problematic.

**Patient #1**
This is a 22-year-old who fell out of bed twice on 12/5/13. A nurse saw her and decided that the patient should be added to the CMO list. The nurse did an inadequate assessment, including no vital signs. The physician saw the patient and ordered a follow-up visit, which never occurred.

**Patient #2**
On 2/12/14, an officer called from the housing unit and indicated that this inmate's cellmate states that she was having trouble breathing and not responding. When a nurse arrived, the patient was sitting in the corner crying and not responding. This nurse performed no assessment and there was no follow-up of this case.

**Patient #3**
This is a patient who in February of this year complained of chest pain but was never seen with a documented note and the patient was returned to the housing unit.

## Nursing Telephone Urgent Care Log

None existed at the time of our review.

# Scheduled Offsite Services-Consultations/Procedures

We met with the scheduler who maintains a system of tracking requests, but only beginning with the collegial review approval. Therefore, she is unaware of the date that the request was submitted by the clinician. The scheduler indicated that she generally receives the authorization letter within one week of the verbal approval during the collegial review and since she obtains the appointments locally, she is usually able to schedule the appointments within two weeks. Occasionally it may take up to two months. One of the problems at this facility is that when patients return from their offsite service they are not brought to the medical area. This policy needs to be implemented in order to insure that the paperwork is received by the scheduler as soon as possible. If the patient returns without the paperwork, it is the responsibility of the scheduler to contact the offsite service in order to retrieve the reports.

We reviewed five scheduled offsite procedures. Of the five records reviewed, there were two with significant problems.

**Patient #1**
This is a 25-year-old with seizures who went out to receive a CT scan of the head on 2/15/14. She returned to the infirmary but there were no notes and she was therefore not seen. Neither was she seen on 2/15 and 2/16, despite having been sent out.

**Patient #2**
This is a 29-year-old with diabetes type 1 and diabetic retinopathy. She was sent out on 2/17/14 for retinal surgery and returned on 2/18. We could not find a surgical report and the notes were drop filed and therefore not in chronologic order.

We also reviewed five records of patients sent out for consultation. A majority of these records were problematic.

**Patient #3**
This is a 34-year-old who was sent to ENT on 1/24/14. There was no consult report in the chart nor was there any note and no follow-up visit.

**Patient #4**
This is a 26-year-old who has psoriasis and a history of seizures. She was sent out on 1/24/14 to ENT because she had a persistent ear infection. She was seen but there has been no follow-up with the physician and no order consistent with the recommendation of the ENT specialist.

**Patient #5**
This is a 29-year-old with obesity who was sent out on 3/21/14 to a hand surgeon for a boxer's fracture with a referral from 3/9/14. There is no report from the 3/21 visit and no follow-up.

# Infirmary Care

The infirmary is located at one end of the health care unit. There are a total of 20 beds with 15 medical beds, three mental health crisis rooms and two negative air respiratory isolation rooms. There is a centrally located nursing station with direct line of sight into four of the rooms. Generally, the unit is staffed with one registered nurse, but, on occasion licensed practical nurses work the unit. When this occurs, there is a registered nurse in the health care unit but not assigned to the infirmary.

Of the 20 beds, 10 are traditional style hospital beds where the head of the bed can be elevated. These beds have a thick plastic covered mattress. Five beds have a steel frame with a solid bottom and are approximately 18-24 inches off the floor. These beds have a thinner plastic covered mattress. The other five beds are concrete, which includes the two beds in the negative air respiratory isolation rooms. These beds are solid concrete approximately 24 to 30 inches high and approximately 24 inches wide. Inmates can be placed on these beds with either a mattress or no mattress. Nursing staff reported sufficient quality and quantity of bed linens. Linens are laundered in the health care unit rather than through the institutional laundry (see Infection Control section). Additionally nursing staff reported sufficient equipment.

There is no nurse call system. As a result, patients have to shout or beat on their room door in order to gain someone's attention. In the event the patient were to be incapacitated, no staff member may know until either the nurse or security staff who make random 30 minute rounds were to find the patient. The infirmary is an open hallway off the main lobby of the HCU, thus exposed to all the noise and commotion from the entryway which creates a less than therapeutic environment.

At the nursing station, there are visual and audible alarms indicating when negative air pressure has been lost in the respiratory isolation rooms.

Only the Medical Director is admitting and discharging from the infirmary. We reviewed five records of patients admitted to or housed in the infirmary and found no significant issues with timeliness or quality of the care provided in this setting. The Medical Director rounds on the acute patients at least daily, sometimes more, and sometimes on weekends. He also sees the chronic patients nearly daily. His documentation is typically thorough.

It should be mentioned that our review was significantly hampered by the poor condition of the medical records. Drop filing is used in the infirmary, even for the chronic admissions, thus rendering the charts in nearly complete disarray.

Problems identified in the infirmary were as follows:

1. Very difficult to find information due to two charts for each patient being used, with some information in one record and some information in the other record with no obvious rationale as to what information was in each file.
2. The majority of the sheets of paper in one file were loose rather than being permanently filed and all the sheets of paper in the second file were loose.
3. The greater majority of the documentation is out of chronological order.
4. Medical staff is charting on any page with open space rather than keeping the documentation in sequential or chronological date order.
5. Could never find physician admission orders to the infirmary, which are required by IDOC policy.
6. Registered nurse infirmary admission notes were inconsistently completed. This is an IDOC policy requirement.
7. Vital signs documentation was not consistently performed.
8. Consultation reports from specialists could not be found.
9. SOAP note charting, which is IDOC policy, is generally not being used. The majority of notes are in a narrative style.

We questioned one aspect of care in the case described below.

**Patient #1**

This is a 50-year-old female admitted to the infirmary on 3/27/14 for acute pancreatitis. She presented to the HCU after midnight on 3/27 and the on-call doctor actually came in and evaluated the patient at 1:30 a.m. on 3/27, including a pelvic exam. He decided to send her to the local ED where a CT scan showed pancreatitis with secondary colitis and duodenitis. Her white count was elevated but pancreatic enzymes were normal. However, by the next day her lipase was over 1000. She was sent back to the prison after discussion between the ER physician and facility physician. The physician did her admission H&P later on the morning of 3/27 (8:00 a.m.), which was quite thorough. She was treated with IV fluids but IM pain medication. The Medical Director documented that he discussed the case with the Wexford Medical Director, "who advises IM but no IV opiate in the prison setting." The patient was seen daily by the Medical Director, including on Saturday, 3/29.

*Opinion*: Using the established IV access for the delivery of pain medication would likely be more effective and less uncomfortable for this patient.

# Infection Control

At present, there is no named infection control nurse. The Health Care Unit Administrator is responsible for compliance with IDOC policy concerning communicable diseases, blood borne pathogens and compliance with Illinois Department of Public Health reporting requirements.

All staff are trained initially and annually on the IDOC blood-borne pathogen policy.

The facility has a contract with a national commercial medical waste disposal company, which comes on-site two times per month and as requested to haul away medical waste. There were no reported issues with this service.

Inspection of the infirmary, sick call areas in the medical department and X-house and emergency response bags verified the presence of personal protective equipment. Puncture proof containers for the disposal of sharps are in use in all medical areas and are appropriately placed in the medical waste containers when full.

Reportable STIs are identified by UIC and reported to the institution. The chronic illness clinic nurses and reception and classification nurse are responsible to meet the reporting requirements to the Illinois Department of Public Health.

Inmate porters, under the supervision of both security and nursing staff, perform the janitorial duties; porters do not perform or have involvement in any medical care delivery. Porters are provided an orientation to the health care unit, which includes proper cleaning and sanitation procedures, blood-borne pathogen training and communicable disease training. When indicated, they are provided personal protective equipment. Bodily fluid clean up would be supervised by nursing staff.

Porters are responsible for laundering infirmary linens. This is of concern, in that all infirmary linens must be considered to be contaminated and, as a result, must be laundered appropriately. The required laundering procedure to sanitize linens is to wash with laundry detergent at a water temperature of at least 160 degrees Fahrenheit for a minimum of 25 minutes or wash with laundry detergent and a bleach bath of at least 100 ppm at a water temperature of at least 140 degrees Fahrenheit for a minimum of 10 minutes. It is doubtful the health care unit laundry room water temperature is over 120-130 degrees and, as a result, should not be used to launder infirmary linens. The water temperature should be raised to a minimum 140 degrees and bleach provided or, if the use of bleach is not permitted, the water temperature must be raised to 160 degrees or the institutional laundry must be used. Water temperatures in the institutional laundry must be monitored and maintained at the required temperatures.

# Responses to the Attorney Letter

We reviewed the records of 15 patients whose complaints are described in a letter dated February 9, 2014 from attorney Margaret Byrne. In nearly all of these instances, the allegation in the letter was substantiated by the record review. These cases demonstrated an absence of conscientiousness on the part of health care staff.

**Patient #1**

This is a 36-year-old female who has had a palpable breast mass with nipple discharge for over a year. She has a family history of breast cancer in her mother (age 56). Chart review revealed that it took over a year to obtain a biopsy. A missed diagnosis of breast cancer is one of the most common causes of malpractice claims in the United States. According to the current medical literature, palpable masses should be biopsied. It should not have taken over a year to obtain this relatively low risk procedure which is a crucial part of the work-up. While the pathology of this mass was not yet malignant, it strongly suggested a high risk of progression to cancer.

**Patient #2**

This is a 55-year-old woman who was reportedly told in September 2013 that she would be seen by the gynecologist for her incontinence. Chart review confirmed that she was referred to the gynecologist on 9/28/13 but had not been seen as of the date of our review. She also has back and shoulder pain for which she has not been seen by a provider. We discussed this case with staff, who will schedule her with a provider.

**Patient #3**

This is a 62-year-old woman who arrived at Logan in March 2013 with a history of hypertension, hypothyroidism due to prior thyroid cancer, and a pituitary tumor treated with surgery and radiation. Chart review shows that the Medical Director referred the patient for specialty follow up in July 2013. As of the date of our visit more than eight months later, she had still not been seen.

**Patient #4**

This is a 50-year-old with severe degenerative arthrosis of her knee and claims to need a knee replacement. Chart review confirms that total knee arthroplasty had been recommended by an orthopedic surgeon prior to her arrival at Logan; however, the request was denied by collegial review after her arrival at this institution. Upon reviewing her chart, it is abundantly clear that this patient does in fact require a knee replacement. Physical therapy will not help her. This case was discussed with staff, who report that they will present the case to collegial review again and are prepared to appeal if it is denied.

**Patient #5**

This is a 43-year-old woman with arthritis who complains that her anti-inflammatory medication has not been renewed. Record review confirms that it has not been ordered since her last provider visit on 7/21/13, at which time she got a three-month supply.

**Patient #6**

This is a 53-year-old woman who arrived at Logan in May 2013. She has chronic back pain due to severe degenerative arthritis which she asserts is being treated inadequately. Since her arrival, she has been seen once by a physician for her back pain. The physician ordered medications and requested follow up at MD line in two months, but this did not occur. Her pain medication was later discontinued without a visit with the patient. It was not possible to determine the extent of this patient's back problem by the documentation in the health record, as she has not been adequately examined.

**Patient #7**

This is a 48-year-old woman with severe knee arthritis who asserts that she requires surgery and that she cannot walk due to pain. She was referred to orthopedic surgery, but this request was denied by collegial review on 10/1/13 on the basis of obesity. Her weight was 238 pounds. The degree of obesity at which knee replacement is deferred is a decision typically made by the surgeon, not the referring doctor. The alternate plan was physical therapy; there are no physical therapy notes in the chart. She has been managed with anti-inflammatories and steroid injections. On 3/24/14, the Medical Director indicated that he would present her case again to collegial review. There were no further notes in the chart as of the date of our visit.

**Patient #8**
This is an insulin requiring diabetic with ankle pain who complains that her insulin has been changed without her input, and that her ankle pain is not being treated, nor has her skin lotion been renewed. Chart review reveals that this patient's insulin was indeed changed several times without a corresponding visit. However, her diabetes has come under better control during her time at Logan as reflected in her most recent blood work. None of the provider notes specifically address ankle problems, but she has been prescribed pain medication on a regular basis. There is no mention of skin lotion.

**Patient #9**
This patient was unable to get medications, which would not have happened had she been correctly enrolled in the chronic disease clinic.

**Patient #10**
This patient also should have been enrolled in a chronic clinic and therefore did not receive medications on a regular basis. A few weeks before our visit, she was seen by a physician who ordered anti-hypertensive medication for a year, but she has still not been enrolled in the chronic disease program.

**Patient #11**
This patient has a rheumatologic disorder for which she was seen in February 2013. She was to be followed up in two months, but this has not occurred. Her follow-up appointment is more than a year overdue. She needs a rheumatology appointment.

**Patient #12**
This patient is another whose medications were disrupted. She was told to put in a sick call request for medication renewal. Had the patient been enrolled in the chronic disease program and seen regularly according to policy, this likely would not have happened.

**Patient #13**
This patient was seen in the hypertension clinic but was charged for the visit and the record substantiates this allegation. There are some problems with nursing interpretation of some policies. We were told, and this was confirmed by the leadership team, that some nurses have told patients that they cannot be referred on to an advanced level clinician until they have been seen by a nurse three times. This is absolutely untrue. In 1984, we implemented a policy

requiring nurses who have used a protocol to address a problem to be mandated to refer on to an advanced level provider if the patient perceives a lack of response after two nurse sick call visits.

This was done to protect the patient's access to advanced level clinicians. Now that policy has been turned on its head by this nursing staff, who have turned it into an obstacle to getting to an advanced level clinician. This must be changed immediately.

In addition, we were told and this was verified by other staff, that there was an instruction that both nurses and clinicians should only address one problem at an encounter. This of course creates the impression among the patients that this policy is introduced purely to generate more revenue through additional sick call slips. Neither clinicians nor nurses should be limited by a set number of problems that they can address. If a patient has a lengthy list, it is common to tell the patient to choose the three most important problems and you will deal with those and then the others at a subsequent visit. But telling the patient you as a clinician will only deal with one problem at an encounter is unacceptable.

# Dental Program

## Executive Summary

On March 31 and April 1-2, 2014, a comprehensive review of the dental program at Logan CC was completed. Five areas of the program were addressed to include: 1) inmates' access to timely dental care; 2) the quality of care; 3) the quality and quantity of the providers; 4) the adequacy of the facility and equipment devoted to dental care; and 5) the overall dental program management. The following observations and findings are provided.

The clinic itself consisted of two chairs forced into a small, single space. Free movement around each unit was limited and difficult. There was a separate dental laboratory and sterilization area of adequate size. A separate office room was available for staff. Two additional chairs are being added at this time. One will be available for the hygienist.

The equipment is very old and worn. The units are over 20 years old, faded and corroded, and not up to contemporary infection control standards. Chairs had torn fabric. Cabinetry was rusted and badly stained. The intraoral radiograph unit was very, very old and not in use. The panelipse unit was also very old.

A major area of concern relates to comprehensive care. Comprehensive care was provided without a comprehensive intra and extra-oral examination and a well developed treatment plan. No examination of soft tissues nor periodontal assessment was part of the treatment process. Bitewing or periapical radiographs were never taken to diagnose caries. Restorations were provided from the information on a panelipse radiograph. Oral hygiene instructions were not documented in the dental record.

A similar area of concern is dental extractions. All dental treatment should proceed from a documented diagnosis. The reason for extractions should be part of the record entry. In none of the records reviewed was a diagnosis or reason for the extraction documented.

Partial dentures should be constructed as a final step in the sequence of care delivery included in the comprehensive care process. A review of several records revealed that all partial dentures proceeded without a comprehensive examination and treatment plan. Periodontal assessment and treatment was seldom provided. Oral hygiene instructions were never included. It was almost impossible to demonstrate that all fillings and extractions were completed prior to impressions. Periodontal health was never documented.

At Logan CC, dental sick call is accessed through the inmate request form. The dental staff reviews the request form when received and urgent care requests are seen the same or next working day. Non-urgent requests are scheduled for evaluation within 14 days. The request forms were thrown away and not being filed.

The SOAP format was not being utilized. Treatment was provided with little information or detail preceding it. Record entries did not include clinical observations or a diagnosis to justify treatment. Routine care was often provided on sick call appointments.

A well developed policy and procedures manual insures that a dental program addresses all essential areas and is run with continuity. The policy and procedures manual at Logan CC is old and outdated. It does not address the managing and running of the dental program. It has not been reviewed or redeveloped since Logan CC changed its mission to a female institution and reception center several months ago.

Dental care is not addressed in the Logan CC Offender Handbook and Orientation Manual.

When asked, the clinicians indicated that they do not routinely take blood pressures on patients with a history of hypertension.

A loose metal junction box was on the floor in the clinic area that received several electrical cords. The box was upright and in the path of traffic flow. It presented a real safety hazard. There was no biohazard label posted in the sterilization area. Safety glasses were not always worn by patients. A radiation hazard warning sign was not posted in the x-ray areas. No consent forms were available for pregnant inmates to consent to x-rays.

The continuing quality improvement process was nonexistent. Dental only contributed monthly dental statistics. No CQI studies were in place. Ongoing CQI studies should be developed to address program deficiencies noted in the body of this report.

## Staffing and Credentialing

Logan CC has a dental staff of two full-time dentists, two full-time assistants, and one full-time hygienist. This should be adequate to provide meaningful dental services for Logan's 2000 inmates. All the staff are contracted by Wexford Health Services.

CPR training is current on all staff, all necessary licensing is on file, and DEA numbers are on file for the dentists.

**Recommendations:** None

## Facility and Equipment

Overall, the existing equipment is very old and badly worn. The clinic itself consists of two chairs forced into a very small space. I was told that the units were over 20 years old. The chairs are very old with torn and faded fabric. The units are old and faded and not up to contemporary infection control standards. Several areas of rusted metal were evident. The cabinetry was very old, worn and faded. Metallic surfaces were rusty and stained and corners were worn and frayed. Good surface decontamination and disinfection was almost impossible. The radiograph unit was an antique. It was so old that it was no longer in use. The ability to take bitewing and periapical radiographs is essential to the provision of dental care. It took up a lot of floor space and interfered with efficient clinic flow and care delivery. The panelipse radiographic unit was old and faded. The radiographs were of a rather poor quality. In the clinic itself, loose wires were strewn on the floor and plugged into a loose metal junction box, upright on the floor next to the unit. It interfered with unimpeded and efficient movement in the clinic and presented a real safety hazard. The instrumentation was adequate and of good quality. The handpieces were adequate and functioning.

The clinic itself consisted of two chairs forced into a rather small, single space. Free movement around each unit was limited and difficult. Provider and assistant had very little room to work, and if both chairs are in use, the providers can interfere with each other. There was a separate sterilization and laboratory room of adequate size. It had a large work surface and a large sink to accommodate proper infection control and sterilization. Laboratory equipment was in a separate corner of the room. The staff had a separate room for office space. It had two desks and was adequate. At the time of my visit, two additional units were being installed in another room adjacent to the clinic area. The space was rather small but sufficient to provide care. I was told the room was to be utilized for hygiene care and prosthetics, and has an extra chair to accommodate patient overflow, e.g., emergencies and examinations.

**Recommendations:**
1. The space that is used for the clinic proper and houses the two main dental units is too small to allow efficient care flow and any sense of privacy. Enlargement of this space should be considered for efficient care delivery and safety considerations.
2. All electric outlets should be wall mounted or protected by the cover for the junction box at the foot of the chair. Loose wires should be neatly arranged and out of traffic flow as much as possible.
3. All of the units, chairs and cabinetry should be replaced with a more contemporary design and of better quality. Failure of the existing equipment is imminent and repair of older equipment is difficult and costly. Surface areas should be better able to accommodate disinfection.
4. The radiograph unit in the clinic needs to be replaced immediately with a wall-mounted unit capable of digital radiography. An electronic medical record is in the early testing phase at Logan CC. The existing unit is unsafe and not being used.

5. The panelipse radiograph unit should be replaced. It is old and worn and the radiographs of rather poor quality. A reception facility such as Logan CC needs a completely functioning and reliable panelipse machine.

## Sanitation, Safety and Sterilization

I observed the sanitation and sterilization techniques and procedures. Surface disinfection was performed between each patient and was thorough and adequate. Proper disinfectants were being used. Protective covers were utilized on some of the surfaces.

An examination of instruments in the cabinets reveals that they were all properly bagged and sterilized. All handpieces were sterilized and in bags.

The sterilization procedures themselves were adequate and proper. Flow from dirty to clean met acceptable standards.

There was a loose metal junction box in the clinic that received several electrical cords from a unit. The box was upright and in the path of traffic flow. This created an unsafe electrical hazard, especially from a water spill.

Safety glasses were not always worn by patients. Eye protection is always necessary, for patient and provider.

## Review Autoclave Log

Logan CC recently changed missions, becoming a female institution. Staffing has changed to accommodate this and the closing of another institution. I looked back two years and found the sterilization logs to be in place. They showed that autoclaving was accomplished weekly and documented. They utilize a service from Henry Schein called Crostex that does the testing and maintains the results. If a result is negative, they notify the institution. A spreadsheet of the results is available and provided on a yearly basis. No negative results were obtained. I did observe that no biohazard warning sign was posted in the sterilization area.

**Recommendations:**
1. The loose metal junction box on the floor should be wall mounted and in a location that does not interfere with traffic flow. Electric cords should be neatly arranged.
2. That safety glasses be provided to patients while they are being treated.
3. That a biohazard warning sign be posted in the sterilization area.

## Comprehensive Care

We reviewed 10 dental records of inmates in active treatment classified as Category 3 patients. One of the most basic and essential standards of care in dentistry is that all routine care proceed from a thorough, well documented intra and extra-oral examination and a well developed treatment plan, to include all necessary diagnostic x-rays. In none of the 10 records reviewed was any of this present. No comprehensive examination was performed, no treatment plans developed, and no hygiene care performed before routine care. Additionally, no diagnostic x-

rays for caries were available. Restorations were provided from the information from the panorex radiograph and an inadequate screening exam. This radiograph is not diagnostic for caries. A periodontal assessment was never done. Further, oral hygiene instructions were not documented in the dental record as part of the treatment process.

**Recommendations:**
1. Comprehensive "routine" care be provided only from a well developed and documented treatment plan.
2. The treatment plan be developed from a thorough, well documented intra and extra-oral examination, to include a periodontal assessment and detailed examination of all soft tissues.
3. Appropriate bitewing or periapical x-rays be taken to diagnose caries.
4. Hygiene care be provided as part of the treatment process.
5. That care be provided sequentially, beginning with hygiene services and dental prophylaxis.
6. That oral hygiene Instructions be provided and documented as part of the treatment process.

## Dental Screening

Logan CC is the only Reception Center for female offenders. I visited the screening exam room and observed the examination process. The intra and extra oral examinations were sufficiently adequate. Panoramic x-rays were taken at the dental clinic. In all of the dental records reviewed, the screening examination was performed within 10 days, panoramic x-rays were taken and APHA priorities were designated.

In none of the records were oral hygiene instructions included. The examiner explained verbally and had written instructions available on how to access dental care. Observation of the room where the panoramic x-ray was taken showed that the area did not provide sufficient warning to pregnant females that the area was potentially hazardous. Additionally, no consent form was developed that explained the potential hazards and gave permission for the x-rays to be taken on female inmates who may be pregnant.

**Recommendations:**
1. Oral hygiene instructions be provided to the inmates at the time of the screening examination.
2. The area where x-rays are being taken have warning signs posted that clearly warn of potential radiation hazards to pregnant females.
3. Consent form be developed and used for pregnant females that explains radiation hazards and gives the examiner permission to take the x-ray.

## Extractions

One of the primary tenets in dentistry is that all dental treatment proceeds from a well documented diagnosis. In none of the 10 records examined was a diagnosis or reason for extraction included as part of the entry.

**Recommendations:**

1.     A diagnosis or a reason for the extraction be included as part of the record entry. This is best accomplished through the use of the SOAP note format, especially for sick call entries. It would provide much detail that is seriously lacking in most dental entries observed. Too often, the dental record includes only the treatment provided with no evidence as to why that treatment was provided.

## Removable Prosthetics

Removable partial denture prosthetics should proceed only after all other treatment recorded on the treatment plan is completed. The periodontal, operative and oral surgery needs all need to be addressed first. In none of the five records reviewed on patients receiving removable partial dentures were oral hygiene instructions provided. Periodontal assessment is never included, but in three of the five records a prophylaxis and/or a scaling debridement was provided. Because there is no comprehensive examination or any treatment plans documented in any of the records, it is almost impossible to ascertain that operative or oral surgery treatment is complete prior to fabrication of removable partial dentures. I used radiographs and record entries to conclude that extraction were probably completed.

**Recommendations:**

1. A comprehensive examination and well developed and documented treatment plans, including bitewing and/or periapical radiographs, precede all comprehensive dental care, including removable prosthodontics.
2. That periodontal assessment and treatment be part of the treatment process and that the periodontium be stable before proceeding with impressions. That oral hygiene instructions be provided.
3. That all operative dentistry and oral surgery be completed before proceeding with impressions.

## Dental Sick Call

Inmates access sick call through an inmate request form or via a direct call from a staff member, if it is perceived as an emergency. The dental hygienist reviews all request forms the following day from the collection of the forms. She triages the complaints and schedules per the dentists direction or as soon as possible. By policy, all inmates who submit a request form are to be seen by dental staff within 14 days. Logan CC was in complete compliance with this policy. Immediate toothaches or infections can be called in from anywhere in the institution and the inmate will be seen that same day.

In none of the dental records reviewed was the SOAP format being used. As a result, treatment was usually provided with little information or detail preceding it. The use of the SOAP format would insure that a well developed diagnosis would precede all treatment. Also, routine care was often provided at these appointments, always without a comprehensive examination or treatment plan. The Logan CC dental department does not keep request forms on file. It was therefore difficult to review sick call records from more than a month ago.

**Recommendations:**
1. Implement the use of the SOAP format for sick call entries. It will insure that the inmate's chief complaint is recorded and addressed and a thorough focused examination and diagnosis precedes all treatment.
2. Save and keep all inmate request forms on file. In the dental record would be the easiest.
3. Provide only immediate or palliative care on sick call appointments. Do not use these appointments for routine care. Provide a dedicated scheduling for these inmates.

## Treatment Provision

A triage system is in place that prioritizes treatment needs. All inmates who submit a request form are seen the following day for evaluation and their treatment needs are prioritized. Urgent care needs are addressed that day. Others are scheduled accordingly or placed on the routine treatment list.

Inmates can seek urgent care via the inmate request form or, if they feel they need to be seen immediately, by contacting Logan CC staff, who will then call the dental clinic with the inmate's complaint. The inmate is seen that day for evaluation. Request form complaints from inmates with urgent care needs (complaint of pain or swelling) are seen at least by the following working day. Mid-level practitioners are available at all times to address urgent dental complaints. They can provide over the counter pain medication or call medical/dental staff if they feel more is needed.

Inmates who submit request forms for routine care are evaluated the next working day and placed sequentially on a waiting list for this care. The waiting list is approximately six months long.

**Recommendations:** None. The system is fair and equitable and seems to work well. All inmates with urgent care needs are seen in a timely manner.

## Handbook

Dental care is not addressed in the Offender Handbook and Orientation Manual. This omission should be addressed immediately. I was told that inmates were informed about the dental program and how to access care at the reception intake screening examination. This is really not adequate.

**Recommendations:**
1. Insure that information about the dental program and how to access dental care is included in the Offender Handbook and Orientation Manual at Logan CC.

## Policies and Procedures

The existing policy and procedure manual is old and outdated and does not address the current state of how the clinic is managed and run, nor does it fully address the areas concerned with managing and running a successful clinic. The present manual addresses treatment plans, scheduling treatment, medications, dental care for inmates (directly out of Administrative

Directive), copay for offenders, security of medication and needles, instruments, etc., infection control (from 1993), job description for dentist and dental assistant. It does a poor job of defining and directing the management and running of the dental program at Logan CC.

**Recommendations:**
1. That the dental program at Logan CC develop a detailed, thorough and accurate policy and procedure manual that defines how all aspects of the dental program are to be run and managed. Once developed, it should be updated on a regular basis and as needed for new policies and procedures

## Failed Appointments

A review of monthly reports and daily work sheets revealed a failed appointment rate of about 17.5%. This is somewhat high and should be addressed. When asked, the staff related that it is often difficult for inmates to be released from the housing units to come to their appointment. Or there may be other program activities to prevent them from coming to the appointment. The staff did not feel it was a purposeful no-show on the inmates' part. A refusal form is signed if the inmate does not want to keep their appointment.

**Recommendations:**
1. The dental staff investigate to find the reasons for failed appointments and then put in place corrective action to lower the rate to a more acceptable level. A continuing quality improvement study would be a good methodological technique.

## Specialists

Dr. Frederick Craig, oral surgeon, is available on an as needed basis, usually once a month. Logan CC recently changed missions to a female institution. Dr. Craig had not yet been to the institution. He was scheduled for the near future to see a group of patients. A review of these consultation requests revealed that they were all referred to the oral surgeon for appropriate reasons. All were for difficult extractions and removal of wisdom teeth that were beyond the scope of the dentists' practice. Dr. Craig is also used by several other IDOC institutions for oral surgery. Pathology services will be the same as for medical pathology. They will give the specimen to the appropriate medical person for processing.

**Recommendations:**
1. I Suggest that they maintain an oral surgery log to include patients to be seen, the date seen, and what they were treated for and any post-surgical complications.

## Dental CQI

The dental program only contributes monthly dental statistics to the CQI committee. No CQI study was in place at the time of this review. I shared several areas where a meaningful CQI study could be initiated and how it should proceed. A recent mission change at Logan CC allowed only two months of minutes to be reviewed.

**Recommendations:**
1. That areas of program weakness or concerns be identified and meaningful quality improvement studies be initiated that lead to actions that will improve the program in those areas.

# Continuous Quality Improvement

We reviewed minutes that reflect CQI activities, but nowhere in the minutes is there any effort to improve the quality of services. The minutes consist of data collected on a number of services. These services include offsite services/hospital and ER trips, treatment protocol review, mortality reviews, new and delayed diagnosis reviews, infection control incident reports, a MRSA report, hepatitis C information, HIV information, emergency drills, the most recent of which was in June 2013, safety and sanitation inspection reports, lab redraw rates, the volume of employee use of health services, vendor injuries, quality control activities, patient satisfaction, chronic clinic data and mental health data. All of this is reported but there was no documented discussion, analysis or any efforts to improve quality. This is not an effective CQI program.

# Recommendations

**Leadership and Staffing:**
1. Seek approval and fill the Director of Nursing position as soon as possible.

**Clinic Space and Sanitation:**
1. Implement a nurse call system for each infirmary patient.

**Reception Processing:**
1. There should be a space on the intake physical form to document the breast exam.
2. There must be a more appropriate space where a nurse can interview a patient for the nurse screen or a nurse practitioner for the history and physical in which there is no auditory disturbance.
3. A system must be set up to insure that appropriate and timely follow up from the reception process does occur.

**Medical Records:**
1. There should be no loose filing inside the health records. Medical records staff should adopt a "touch it once" philosophy when it comes to filing loose documents.
2. Health service request forms should be filed in the health records.

**Nursing Sick Call:**
1. Develop and implement a plan for an "all RN" sick call process.
2. In the X-house, develop and implement a plan to conduct a legitimate sick call encounter, including listening to the patient complaint, collecting a history and objective data, performing a physical examination when required, making an assessment and formulating a plan of treatment, rather than the current practice of talking to the patient through a solid steel door and basing any treatment on the conversation only.
3. Per Office of Health Services policy, assure all sick call encounters are documented in the medical record in the Subjective-Objective-Assessment-Plan (SOAP) style.
4. Develop and implement a plan to assure the Office of Health Services approved, preprinted treatment protocol forms are used at each sick call encounter.
5. Develop and implement a plan of education for all nursing staff to address negative attitudinal issues toward inmates, particularly female inmates.
6. Develop, implement and maintain logs for sick call, infirmary and segregation.
7. Develop and implement a plan to insure segregation daily "wellness checks" and the weekly nurse practitioner rounds are documented in the segregation log and in the inmate specific medical record if any treatment is provided.
8. Develop and implement a plan to conduct the daily segregation "wellness checks" between the hours of 7:00 a.m. and 11:00 p.m.

**Chronic Disease Clinics:**
1. Consider assigning the Medical Director to the poorly controlled chronic disease patients, as this is clearly one of his strengths.

2. There should be a comprehensive tracking tool to monitor important indicators for this at-risk population. This tool should be used to identify areas of poor performance in the program to target interventions to improve quality.

3. The chronic disease nurse should rarely if ever be pulled to other duties. This position should be filled with a carefully chosen individual to actively track this at-risk population.

4. Patients should be seen according to their degree of disease control rather than the calendar month and all chronic diseases should be addressed at each chronic care clinic visit. These are statewide policy issues.

5. Patients with active women's health issues should be tracked in an organized manner, perhaps in the chronic disease program.

6. Patients with HIV infection should have yearly cervical cancer screening.

**Unscheduled Offsite Services:**

1. A system of nursing supervision with feedback must occur so that errors with regard to the adequacy of the assessment or the appropriateness of the clinical decision making are reduced substantially.

2. The administrator should develop a log that can be used to track unscheduled offsite services. The log should have the time and date, patient identifiers, the presenting complaint, what the disposition was in terms of being sent offsite and whether the reports from the offsite service are retrieved.

3. There should be a method to track the follow-up visits with the primary care clinician and whether they documented the discussion with the patient of the findings and plan based on the offsite service reports.

**Scheduled Offsite Services:**

1. The policy should require that patients returning from scheduled offsite services are brought through the clinic area where a nurse receives the paperwork, interviews the patient and ultimately insures that a timely follow-up visit with the primary care clinician does occur.

**Infirmary Care:**

1. More bed space is needed for the infirmary.

2. Rethinking the physical plant to create a more therapeutic, less chaotic environment would be beneficial.

3. Develop and implement a plan to insure 24/7 RN staffing.

4. Implement a nurse call system for all infirmary patients.

5. Develop, implement and maintain a plan for organization of infirmary medical records including but not limited to:
   a. the use of one infirmary record
   b. permanent filing of all documents in the record
   c. chronological filing of all documentation.

6. Develop and implement a plan of education for staff including but not limited to:
   a. per IDOC Office of Health Services policy, documentation to be provided in the Subjective-Objective-Assessment-Plan (SOAP) format
   b. all documentation to be provided chronologically as to date and time

    c.  documentation of vital signs as ordered by the physician

    d.  physician and nursing admission and discharge documentation required for all infirmary patients.

**Infection Control:**

1. Develop and implement a post-description for an infection control nurse.
2. Assign a specific RN to the responsibilities of infection control.
3. Develop, implement and maintain a plan to assure the proper laundering of infirmary bedding and linens.

**CQI:**

1. The staff should be trained in CQI methodology, specifically with regard to how to perform studies, how to identify subthreshold performance, how to analyze the data in order to determine the causes of subthreshold performance, and then how to develop improvement strategies based on the identified causes and finally how to restudy to determine whether the improvement strategy had the required effect.
2. The leadership of the continuous quality improvement program must be retrained regarding quality improvement philosophy and methodology, along with study design and data collection.
3. This training should include how to study outliers in order to develop targeted improvement strategies.

# Appendix A – Patient ID Numbers

**Reception Processing:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | | [redacted] |
| Patient #2 | | [redacted] |
| Patient #3 | | [redacted] |
| Patient #4 | | [redacted] |
| Patient #5 | | [redacted] |
| Patient #6 | | [redacted] |
| Patient #7 | | [redacted] |

**Offsite Services/Emergencies:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | | [redacted] |
| Patient #2 | | [redacted] |
| Patient #3 | | [redacted] |
| Patient #4 | | [redacted] |

**Onsite Service/Emergency:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | | [redacted] |
| Patient #2 | | [redacted] |
| Patient #3 | | [redacted] |

**Scheduled Offsite Service:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | | [redacted] |
| Patient #2 | | [redacted] |
| Patient #3 | | [redacted] |
| Patient #4 | | [redacted] |
| Patient #5 | | [redacted] |

**Chronic Disease Management:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | [redacted] | [redacted] |
| Patient #2 | [redacted] | [redacted] |
| Patient #3 | [redacted] | [redacted] |
| Patient #4 | [redacted] | [redacted] |
| Patient #5 | [redacted] | [redacted] |
| Patient #6 | [redacted] | [redacted] |
| Patient #7 | [redacted] | [redacted] |
| Patient #8 | [redacted] | [redacted] |
| Patient #9 | [redacted] | [redacted] |

| Patient #10 | [redacted] | [redacted] |
|---|---|---|
| Patient #11 | [redacted] | [redacted] |
| Patient #12 | [redacted] | [redacted] |
| Patient #13 | [redacted] | [redacted] |
| Patient #14 | [redacted] | [redacted] |
| Patient #15 | [redacted] | [redacted] |
| Patient #16 | [redacted] | [redacted] |
| Patient #17 | [redacted] | [redacted] |
| Patient #18 | [redacted] | [redacted] |

**Women's Health:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | [redacted] | [redacted] |
| Patient #2 | [redacted] | [redacted] |
| Patient #3 | [redacted] | [redacted] |
| Patient #4 | [redacted] | [redacted] |
| Patient #5 | [redacted] | [redacted] |
| Patient #6 | [redacted] | [redacted] |

**Infirmary:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | [redacted] | [redacted] |

**Responses to Attorney Letter:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | [redacted] | [redacted] |
| Patient #2 | [redacted] | [redacted] |
| Patient #3 | [redacted] | [redacted] |
| Patient #4 | [redacted] | [redacted] |
| Patient #5 | [redacted] | [redacted] |
| Patient #6 | [redacted] | [redacted] |
| Patient #7 | [redacted] | [redacted] |
| Patient #8 | [redacted] | [redacted] |
| Patient #9 | | [redacted] |
| Patient #10 | | [redacted] |
| Patient #11 | | [redacted] |
| Patient #12 | | [redacted] |
| Patient #13 | | [redacted] |

# Illinois River Correctional Center (IRCC) Report

April 17 & 18 and May 5 & 6, 2014

Prepared by the Medical Oversight Committee

Ron Shansky, MD
Karen Saylor, MD
Larry Hewitt, RN
Karl Meyer, DDS

# Contents

Overview .................................................................................................................................3

Executive Summary ...............................................................................................................3

Findings ...................................................................................................................................4
    Leadership and Staffing ........................................................................................................4
    Clinic Space and Sanitation ................................................................................................6
    Intrasystem Transfers...........................................................................................................6
    Medical Records ...................................................................................................................8
    Nursing Sick Call..................................................................................................................8
    Chronic Disease Management...............................................................................................9
    Pharmacy/Medication Administration ............................................................................... 16
    Laboratory ...........................................................................................................................17
    Unscheduled Offsite Services ............................................................................................ 18
    Scheduled Offsite Services ................................................................................................18
    Unscheduled Offsite and Onsite Visits.............................................................................. 19
    Infirmary Care ....................................................................................................................20
    Infection Control .................................................................................................................23
    Inmates Interviews..............................................................................................................24
    Dental Program....................................................................................................................25
    Mortality Review.................................................................................................................32
    Continuous Quality Improvement ......................................................................................34

Recommendations ................................................................................................................35

Appendix A – Patient ID Numbers ....................................................................................37

# Overview

On April 16-18, and May 5-6, 2014, we visited the Illinois River Correctional Institution (IRCC) in Canton, Illinois. This was our first site visit to IRCC and this report describes our findings and recommendations. During this visit, we:

- Met with leadership of custody and medical
- Toured the medical services area
- Talked with health care staff
- Reviewed health records and other documents
- Interviewed inmates

We thank Warden Greg Gossett and his staff for their assistance and cooperation in conducting the review.

# Executive Summary

The Illinois River Correctional Center opened as new construction in October 1989, and has been well maintained since that time.

IRCC is a medium-security prison that houses male offenders. The current population is approximately 2081 inmates. The institution is not a reception center but has an infirmary and an outpatient mental health mission.

The facility gets about 25 intakes per week, with Wednesday being the biggest intake day. Sick call is military style with a sign-up sheet in each unit. Patients have until 6 a.m. to sign up for sick call and will be seen by the nurse (RN or LPN) that day. The officer collects the sick call sign-up sheet at 6 a.m.

The facility was suffering from a leadership crisis. The HCUA was on a multiyear military leave of absence and was not expected back until October of this year. Both the Medical Director and the staff physician position were vacant at the time of our visit. Those hours were partially covered by "prn" (as needed) providers; at the time of our visit, IRCC was getting 2.5 days of physician coverage per week. There was a nurse practitioner coming one day per week until the week prior to our visit, when she got a full-time job elsewhere. They have hired a full-time nurse practitioner who was yet to receive training. It was not known when they could expect her to begin work. The acting Medical Director was coming from another facility to provide one day of coverage per week.

Since the provider vacancies earlier this year, there has been a significant backlog in chronic disease clinics. The backlog is exacerbated by the practice of addressing only one problem at a time during a chronic care clinic visit. We noted multiple cases wherein patients were seen for a particular disease clinic with evidence of poor control of another disease but the other disease

was not addressed. In our opinion, all chronic diseases should be addressed at each chronic care clinic visit.

The medical records director is highly organized and efficient. However, MARs were often not filed into the records timely, and some could not be located when we requested them. This makes it difficult to impossible for providers to objectively evaluate medication compliance. In addition, there is evidently no system in place to notify providers of medication noncompliance. Rather, it is up to the discretion of the individual nurse who identifies a lapse in continuity whether to notify the prescriber or not.

We came across several highly problematic cases during the course of our review that resulted in actual harm to patients (see Cardiovascular Clinic, Infirmary Care and Mortality Reviews), some of which were under the care of the former Medical Director who we understand no longer works for Wexford. However, there were several cases of mismanagement by providers still working in the system. This highlights the broader issue of lack of clinical oversight both locally at the facility given the vacant Medical Director position, and centrally by Wexford.

Sick call is conducted by non-registered nursing (RN) staff and is lacking in quality. Segregation sick call, also conducted by non-RN staff, is not "sick call" but a "cell side triage," because the encounter is conducted through a solid steel door and treatment is based only on the patient's subjective complaints without the benefit of any physical assessment.

Inmate porters working the Health Care Unit have not been appropriately trained in infectious and communicable diseases, blood-borne pathogens, bodily fluid clean-up, infirmary room, beds and furniture cleaning and the appropriate sanitizing of infirmary bedding and linens.

The Intrasystem process results in identified problems not being addressed timely or in some instances, existing problems are not being identified.

There are significant problems with adequate and timely follow-up for patients sent offsite for scheduled services.

The leadership of the CQI program do not have adequate training in CQI methodology. Therefore, there is no evidence that the program is utilized to improve the quality of care at IRCC.

# Findings

## Leadership and Staffing

At the time of our visit, the Health Care Unit Administrator had been on military leave for a year and a half. This military leave was due to end in approximately six months. During the leave, the Director of Nursing also functioned as the Health Care Unit Administrator. The Director of Nursing had been in her position for three years. The Medical Director position has been vacant since the end of January. There is also a vacant nurse practitioner position. The program does receive approximately two days per week fill-in from the Medical Director at the East Moline

Correctional Facility and an additional two days per week from a fill-in nurse practitioner. Although the Director of Nursing appears to be very hard working, it is extremely difficult to fill two full-time leadership positions. With the additional absence of both the Medical Director and clinical hours, there appear to be significant delays with regard to chronic care visits and other clinical assessments. It does not appear that there is adequate clinical oversight.

Other staffing is listed in the following

table: *Table 1. Health Care Staffin*

| Position | Current FTE | Filled | Vacant | State/Cont. |
|---|---|---|---|---|
| Medical Director | 1.0 | 0 | 1.0 | Contract |
| Staff Physician | | | | |
| Nurse Practitioner | 1.0 | 0 | 1.0 | Contract |
| Health Care Unit Adm. | 1.0 | 1.0 | Military LOA-2 yrs. | State |
| Director of Nursing | 1.0 | 1.0 | 0 | Contract |
| Nursing Supervisor | | | | |
| Nursing Supervisor | | | | |
| Corrections Nurse I | | | | |
| Corrections Nurse II | | | | |
| Registered Nurse | 8.0 | 7.0 | 1.0 | Contract |
| Licensed Practical Nurses | 12.0 | 12.0 | 0 | Contract |
| Certified Nursing Aide | | | | |
| Health Information Adm. | 1.0 | 1.0 | 0 | Contract |
| Health Information Associate | | | | Contract |
| Phlebotomist | | | | |
| Radiology Technician | 0.30 | 0.30 | 0 | Contract |
| Pharmacy Technician | 2.0 | 2.0 | 0 | Contract |
| Pharmacy Technician | | | | |
| Office Associate | 1.0 | 1.0 | 0 | State |
| Staff Assistant | | | | |
| Chief Dentist | 1.0 | 1.0 | 0 | Contract |
| Staff Dentist | | | | |
| Dental Assistant | 2.0 | 2.0 | 0 | Contract |
| Dental Hygienist | 0.5 | 0.5 | 0 | Contract |
| Optometry | 0.20 | 0.20 | 0 | Contract |
| Physical Therapist | | | | |
| Physical Therapy Asst. | | | | |
| **Total** | **32** | **29** | **3** | |

There are leadership issues, in that the Medical Director position is vacant, and the Health Care Unit Administrator (HCUA) has been on a military leave of absence for approximately two years. The medical contractor Director of Nursing (DON) employee is managing the health care program. Other vacancies are minimal.

A review of medical staff credentialing and licensure indicate staff who have been appropriately trained, are currently licensed and working within their respective scopes of practice. While there have been significant nursing vacancies at other facilities, seven of eight RN positions and 12 of 12 LPN positions are filled.

Of concern, with the Medical Director vacancy and the long-term HCUA leave of absence, the DON represents the only health care leadership for this large facility with a busy health care unit, yet she has been assigned by the medical contractor as the site manager. The site manager responsibilities are significant and substantially take away from her ability to focus on and manage the needs of the health care unit.

## Clinic Space and Sanitation

Illinois River Correctional Center opened as new construction in October 1989. Since that time, the facility has been well maintained. The health care unit (HCU) is a large, well-lighted and well maintained building. There is a moderate sized inmate waiting area near the entrance, as well as a medication administration window and officer's station. Further in the HCU is the outpatient nursing station, radiology suite, dental clinic, a large medication/storage room, three well-equipped examination rooms, an optometry clinic, a medical records department, a large well-equipped urgent care room, a 15-bed infirmary and multiple office areas.

## Intrasystem Transfers

We reviewed 15 records of patients who entered the facility within the prior three months. We attempted to select records of people with known medical problems. In eight of the 15 records, we identified significant problems. The problems included lack of identification of a problem at the time of the intrasystem transfer as well as problems with timely follow up for identified service needs.

**Patient #1**
This is a 53-year-old who arrived at Illinois River Correctional Center on 2/26/14. He had entered the department in October 2013. At the time of his intake, he was identified as having chronic obstructive pulmonary disease, acromegaly, obstructive sleep apnea, hypertension, atrial fibrillation, psoriasis and a history of prior heart attacks as well as congestive heart failure. On intake, his blood pressure was elevated at 142/98. He had been on Coumadin as a treatment for his atrial fibrillation but the medication had been discontinued at his request. After he arrived at Illinois River Correctional Center, he was restarted on the Coumadin on 3/5/14. This patient was seen for his hypertension chronic care clinic on 3/19; however, no other chronic problems, of which he had several, were addressed.

**Patient #2**
This is a 20-year-old patient with asthma who entered the system on 1/30/14 and arrived at Illinois River Correctional Center on 2/26. He was receiving both a steroid inhaler and a beta agonist. Although he arrived at Illinois River in February, he has still not been seen in the asthma chronic care clinic.

**Patient #3**

This is 40-year-old with hypertension and diabetes on insulin. He also has gout, although the gout is not listed on the problem list. On 4/17/14, he was seen for diabetes and hypertension but there was no effort to follow up his gout. On 4/6, he appeared to have a flare-up of his gout.

**Patient #4**

This is a 63-year-old who entered the system on 1/24/14 and arrived at Illinois River Correctional Center on 2/19. At the time of entry, he was identified as having diabetes type 2 as well as hypertension along with chronic kidney disease. Although he arrived at Illinois River on 2/19, he did not have his chronic care clinic until April of this year. At the time of the chronic care visit, his blood pressure was significantly elevated at 150/92 and yet the hypertension was listed as consistent with good control. This is clearly an error which results in a decision not to change the regimen or perform regular blood pressure monitoring.

**Patient #5**

This is a 47-year-old who entered the system on 2/6/14 and arrived at Illinois River Correctional Center on 2/21. He was identified as having hypertension, a history of a motor vehicle accident and a history of alcohol abuse. On admission, his blood pressure was 160/96 and yet his chronic clinic visit to address the hypertension was not scheduled for more than a month later. This is despite the fact that the blood pressure was elevated.

**Patient #6**

This patient entered the system on 2/19/13 and arrived at Illinois River Correctional Center on 2/21/14. He is 52 years old with type 2 diabetes, hypertension, asthma and hyperlipidemia. At the time he entered, his blood pressure was 146/98. He had developed a rash. At sick call on 2/26/14, his blood pressure remained elevated at 162/106. The nurse recommended checking the blood pressure daily for five days. The next evening, the patient presented with tremors and the physician was called and the patient was placed in the infirmary. The patient was seen the following day by the physician assistant and he was discharged to the housing unit. On 3/18, his first chronic care clinic occurred, but only the hepatitis C and the diabetes were monitored. Neither the asthma, the hyperlipidemia or the hypertension were addressed.

**Patient #7**

This patient entered the system on 1/24/14 and arrived at Illinois River Correctional Center on 2/7. He is a 44-year-old with hypertension and asthma as well as mental health problems. On 2/7, at his chronic care clinic, antihypertensives and asthma medications were ordered. On 4/4, the patient refused the medications and as a result he was discharged from the chronic care program. There is no documentation of counseling by a physician regarding the risks and benefits.

**Patient #8**

This patient entered the system on 1/30/14 and arrived at Illinois River Correctional Center on 2/19/14. This is a 45-year-old with a history of alcohol abuse, hypertension, a below the knee amputation on the left side, obstructive sleep apnea and right lung nodules. He had a cough and a fever of 101.8°, although the x-ray was normal. He was placed in the infirmary and diagnosed with influenza type A. He was later seen in the chronic care clinic on 3/13. His blood pressure was elevated and this was correctly assessed. Eight days later, he presented to sick call with a

complaint of tarry stools and abdominal pain. An LPN documented a rectal exam. LPNs generally do not have either appropriate training or experience to do this exam. A physician should have been called and either an RN or PA should have been involved.

# Medical Records

Many charts were in need of thinning. Problems lists were often not current and were buried under the order sheets. MARs were not filed timely into the records, which makes it impossible for providers to evaluate patients' medication compliance.

We learned that only the records of patients who parole are "automatically" requested (by the records office) upon their return to the system. For patients who discharge (i.e., complete their sentence), it is up to the receiving institution to request the record; they are not automatically summoned by the records office. This fact was relevant in the case of a patient with HIV infection whose status went unrecognized for several months after he was released and reincarcerated (see patient [redacted] in the HIV section of this report). This will presumably be a moot point when the electronic record goes live, but it is unclear when this will be and how much of the old records will be uploaded to the electronic format.

# Nursing Sick Call

The facility uses an "army" style or open sick call system for general population inmates. This means there are sick call sign-up sheets in each housing unit. Inmates are informed that if they sign-up for sick call by 6:00 a.m., they will be taken to the health care unit (HCU) and evaluated that same day. Inmates could be evaluated by either a Registered Nurse (RN) or Licensed Practical Nurse (LPN) who would use approved Department of Corrections Office of Health Services treatment protocols.

Inmates in segregation status are offered sick call daily, and the sick call is conducted in the segregation unit by either a RN or LPN. The sick call encounter, in actuality, is a "face-to-face" triage, in that the nurse listens to the inmate's complaint through the solid steel cell door. The nurse bases treatment or referral on the inmate's subjective comments. Very rarely does the nurse request the inmate's cell door be opened or to remove the inmate from his cell. If the nurse does request that the inmate be brought out of his cell for further assessment, the only room available is the segregation Lieutenant's office, which is not equipped as an examination room. As a result, in segregation, nurse sick call plans of treatment are formulated without the benefit of a thorough assessment which may include the need for a physical examination.

Additionally, a sick call encounter through a solid steel door provides for no confidentiality of patient medical information.

Fifteen general population sick call medical records were reviewed.

1. Thirteen of the patients were evaluated by a RN, and two were evaluated by an LPN.
2. Fifteen of the encounters included the use of an approved pre-printed protocol form.
3. Fifteen of the encounters included duration and good history of the complaint.

4. Fourteen of the 15 encounters included vital signs including a weight; two of 14, even though vital signs were collected, had no temperature recorded, and a temperature was indicated based on the nature of the patient complaint.
5. Fifteen of the encounters included a documented examination.
6. Ten of the encounters resulted in a referral to the physician or midlevel provider.

# Chronic Disease Management

There are an unknown number of inmates enrolled in the chronic disease program. The distribution in clinics is as follows:

- Cardiac/Hypertension (258)
- Diabetes (90)
- General Medicine (133)
- HIV Infection/AIDS (15)
- Liver (82)
- Pulmonary Clinic (125)
- Seizure Clinic (36)
- TB Infection (8)

Labs are usually drawn timely prior to the clinics. Clinics were occurring timely until the recent staff vacancies. Only one problem at a time is typically addressed during a chronic care clinic visit, though there were a few cases in which a multi-clinic form was used. We noted multiple cases wherein patients were seen for a particular disease clinic with evidence of poor control of another disease but the other disease was not addressed. In our opinion, all chronic diseases should be addressed at each chronic care clinic visit.

For "keep on person" medications, the nurses generate an MAR each month, upon which they write in the date that each medication was last received by the patient. There is, therefore, a system in place to identify when patients don't request medication refills timely. However, there is no mechanism by which this information is routed back to the providers. Rather, patients' noncompliance goes unaddressed until the next chronic care clinic. This was confirmed with one of the RNs on site who stated that when they questioned the last Medical Director about this, they were told the compliance issue could wait until the next chronic care clinic.

## Cardiovascular/Hypertension

We reviewed seven records of patients enrolled in the clinic and found opportunities for improvement in all cases. Record review revealed a general disinclination to address elevated blood pressure readings. When providers ordered blood pressure checks, they often did not review the readings. The DON confirmed that there is no system in place to route the blood pressure readings back to the ordering provider.

In the course of reviewing records for other clinics, we identified an additional case which was very problematic (patient #1 below). This patient was not enrolled in the cardiovascular clinic but had a devastating adverse outcome as a result of atrial fibrillation, and so is discussed here.

**Patient #1**

This a 26-year-old man who arrived at IRCC on 11/16/12. He reported a history of seizures and atrial fibrillation with prior cardioversion, which are documented on his problem list.

On 7/2/13, a code 3 was called to the unit for breathing problems and heart palpitations. The nurse noted his history of atrial fibrillation with cardioversion. An ECG showed normal sinus rhythm with a rate of 83. He also complained of dizziness and increased urination. The nurse's note states that the PA was on site to evaluate the patient but there was no note from the PA. A urine sample was obtained and the patient was treated with Bactrim.

On 7/6, the patient was transported to the HCU with shortness of breath and palpitations. His heart rate was 98 and blood pressure 144/82. The ECG showed sinus rhythm. The doctor was consulted and she recommended a psychiatric evaluation for anxiety and to follow up as needed.

On 7/11, the PA saw the patient in follow up of the July 2nd event but addressed only the urinary symptoms and concluded he had a resolved UTI.

On 11/1, he was seen by the LPN to request that "atrial fibrillation" be placed on his name badge. He was referred to the physician who told him that he had no evidence of atrial fibrillation.

On 1/9/14, a code 3 was called to the unit for an episode of unresponsiveness with rapid respirations. His blood pressure was 190/102 and heart rate was 106. The nurse noted his history of atrial fibrillation and of seizures. His ECG showed sinus rhythm. Fourteen minutes later he was described as alert and oriented. He was seen by the PA that day, who also noted the history of seizures and of atrial fibrillation with two prior cardioversions. The PA concluded that the incident may have been a seizure, placed him in the infirmary overnight, and started him on Dilantin.

On 5/4, the patient was seen for chest pain, shortness of breath and left sided weakness with left facial droop. He was sent out with a confirmed stroke and received TPA. He was still hospitalized at the time of our review on 5/6/14.

Review of prior jail records confirmed a history of atrial fibrillation for which he was cardioverted in June 2012 and placed on warfarin. However, he developed a right thigh hematoma in August and the warfarin was held. It was not resumed prior to his transfer to NRC.

*Opinion*: This is a tragic case of a very young man who suffered a devastating event which was preventable with the appropriate treatment (anticoagulation). The patient reported his history of atrial fibrillation and cardioversion multiple times throughout his stay in IDOC, and this history could have been readily validated by medical staff had they bothered to review his jail records.

**Patient #2**

This is a 58-year-old man with type 2 diabetes, hypertension, hyperlipidemia and coronary artery disease with history of bypass surgery who arrived at IRCC on 10/28/11.

On 5/9/13, he was seen in diabetes clinic. His blood pressure was 152/88, but was not addressed.

On 7/12, he was seen in cardiac clinic. His blood pressure was 164/82, which was rated as fair. The doctor noted, "IM wants to work on diet," and did not adjust his medications. Labs were ordered for 10/25 and a follow-up visit for 11/1, as well as weekly blood pressure checks. These were documented in the chart as: 144/76, 156/90, 158/88, and 176/96. There is no evidence that a provider reviewed or responded to these in any way.

On 9/9, he was seen in diabetes clinic. The blood pressure was 150/90 at this visit but was not mentioned or addressed.

On 11/1, he was seen in cardiac clinic. His blood pressure was 164/84 and one of his medications was increased. At this visit he stated that it "feels like something is moving in my chest.". This is not described further. The doctor ordered a chest x-ray, which was done on 11/4 and was unremarkable. When she saw him back at DSC on 11/15 for this, his blood pressure was 146/82 but not mentioned.

The most recent MARs in the chart were January 2014. We obtained the subsequent MARs and reviewed them. The patient did not pick up one of his medications in February.

*Opinion***:** This patient's blood pressure has not been addressed adequately. Ordering blood pressure checks is not useful if the provider doesn't review and respond to them.

### Patient #3
This is a 46-year-old man with hypertension, hyperlipidemia, diabetes and HIV infection. He has been seen timely in cardiac clinic for hypertension and hyperlipidemia. His blood pressure has been elevated at every clinical encounter so far this year, but no medication changes have been made. At the 1/7/14 diabetes clinic, his blood pressure was 150/90 but not commented upon by the PA. At the 1/28 HIV telemedicine visit, his blood pressure was 140/84 but again not mentioned. At the 3/12 chronic care clinic visit, his blood pressure was 144/90 and 130/94, yet his hypertension was rated as good control and no medication changes were made.

*Opinion*: This patient's blood pressure has not been addressed adequately.

### Patient #4
This is a 67-year-old man with diabetes, hypertension, hyperlipidemia and atrial fibrillation for which he is anticoagulated. The latter diagnosis is not on the problem list.

On 7/26/13, he was seen in hypertension clinic with a blood pressure of 108/62 and his hydrochlorothiazide was increased from 12.5 to 25 mg/d.

*Opinion*: This patient's blood pressure medication should not have been increased given his relatively low blood pressure. It appears that this may have been an error, as the doctor did not indicate that she intended to increase the dose.

### Patient #5

This is a 41-year-old man with hypertension, hyperlipidemia, asthma and a prosthetic heart valve. On 10/10/13, he was seen in asthma clinic. His blood pressure was 158/84 but not addressed.

On 11/4, he was seen in hypertension clinic. His blood pressure was 142/90, but no medication changes were made.

There were no further chronic care notes in the chart. Hyperlipidemia was not addressed at any chronic care clinic. His electrolyte and lipid panels have not been checked in over a year.

*Opinion*: This patient's hypertension and hyperlipidemia have not been adequately addressed. He is overdue for a chronic care visit and blood work.

**Patient #6**
This is a 51-year-old man with hypertension, seizures and hepatitis C infection who arrived at IRCC on 3/8/13. His blood pressure has been elevated for the majority of his time at IRCC. Blood pressure checks were ordered on several occasions but it does not appear that the results were reviewed by a provider or used for medical decision making.

Review of the MARs demonstrates that he did not pick up his blood pressure medication from December 2013 to March 2014.

*Opinion*: There is no evidence that the blood pressure checks are reviewed by the provider or used for clinical decision making. Evidently the provider is not reviewing the MARs to evaluate medication compliance.

**Patient #7**
This is a 38-year-old man with hypertension, hyperlipidemia and HIV infection who arrived at IRCC on 9/12/12. On 3/19, 7/17, and 11/6/13, he was seen in chronic care clinic for hypertension and hyperlipidemia. He was under good control, with labs drawn timely prior to the visit. However, review of MARs shows substantial lapses in medication continuity since his last clinic visit in November 2013.

*Opinion*: This patient should be seen in chronic care clinic and his medication compliance clarified.

**Patient #8**
This is a 55-year-old man who arrived 1/15/13 with a history of hypertension and seizures. His baseline clinic was 1/24/13.

On 3/11, he complained that he could not swallow his blood pressure pill, so the physician switched him to terazosin, starting at 2 mg/d and tapering up to 10 mg. This was his only blood pressure medication.

On 3/27, he was seen in hypertension clinic with a blood pressure of 132/84. This was rated as good control, but hydrochlorothiazide was added. Blood pressure checks were obtained; 50% of the readings were above goal. On 5/14, he was seen for follow-up and atenolol was added.

On 8/15, he was seen in seizure clinic. His blood pressure was 150/96 but was not addressed.

On 11/19, he was seen in hypertension clinic. His blood pressure was 150/90 and he reported that he had not taken his terazosin in over three weeks. The medication was discontinued and the other two were continued unchanged. Blood pressure monitoring was ordered as well as a follow up in three weeks. Two of six readings were high, with the last reading being 210/40, which prompted the nurse to notify the doctor, who ordered a stat dose of clonidine. The repeat blood pressure after clonidine was 160/90 and he was sent back to the unit.

On 12/2, his blood pressure was 180/110. On repeat it was 142/88 and the patient complained of chest pain. The nurse followed the chest pain protocol and discovered that he's had two days' worth of chest tightness, especially when he lies down. The pain was relieved by sitting up. She did not notify a provider despite the fact that the protocol states that the provider should be notified for all cases.

The next day he was seen in seizure clinic. At this visit, his blood pressure was 160/104 and he was admitted to the infirmary after being given a stat dose of clonidine. Lisinopril was added. He was discharged the next day.

*Opinion*: This patient should have been referred to a provider for his complaints of chest pain. The approach to this patient's care has been lacking in continuity. Terazosin is not recommended as a first line blood pressure medication.

## Diabetes

The most recent aggregate data at the time of our visit reflected that 55% of patients seen within the last fiscal year were well controlled (A1c < 7%), and 12% were under poor control (A1c > 9%). We reviewed five records of patients enrolled in the diabetes clinic and found opportunities for improvement in the two cases described below.

### Patient #9

This is a 53-year-old man with poorly controlled type 2 diabetes, hypertension, hyperlipidemia and hypothyroidism. His care over the past year has been complicated by noncompliance with medications. He was seen in diabetes clinic on 5/7/13, at which time his A1c was 9.2% (goal < 7%). It was noted that he had stopped taking one of his diabetes medications in December. (Further review revealed that he had actually reported this to the same provider eight months earlier.) There was no exploration into why the patient stopped his medication.

On 7/25, he was seen by the nurse for "pressing" chest pain for the last 24 hours, which started with activity and was described as constant and moderate in severity. He was described as clammy, grimacing and wheezing. The ECG showed new changes in the anterior leads. The computer's interpretation was "cannot rule out anterior infarct, age undetermined." The doctor was contacted and gave orders to give him a dose of Maalox and send him back to his unit.

The physician saw him in follow up of this event later that afternoon and noted "no more chest pain – relieved by Maalox...GERD?" She ordered no further work up. She had recently (7/17) signed labs showing inadequately controlled lipids (cholesterol 227, LDL 162), but did not order treatment or a follow-up appointment.

He was seen next in diabetes clinic on 9/11. His A1c was worse at 9.5%. He was described as "generally noncompliant," which was not explored further. No medication changes were made.

On 1/21/14, he was seen in diabetes clinic by the PA. His A1c was somewhat better at 8.4%. Cholesterol medication was added. There were no further chronic care notes; the patient was scheduled to be seen on 5/12/14.

The most recent MAR in the chart was January's. When we requested the more recent ones, only April's could be found. It indicated that the patient was compliant with insulin line most of the time and was picking up his oral medications.

*Opinion:* This patient's cardiovascular risk is quite high; complaints of chest pain should therefore be presumed cardiac until proven otherwise. Although the patient is repeatedly described as noncompliant, the MARs do not seem to reflect this. The status of his medication compliance and his cardiac symptoms should be explored further.

**Patient #10**
This is a 58-year-old man with type 2 diabetes, hypertension, hyperlipidemia and coronary artery disease with history of CABG x 3 who arrived at IRCC on 10/28/11.

On 5/9/13, he was seen in diabetes clinic. His A1c was 9.7% and his medications were increased. A repeat A1c was ordered for 8/26/13 with follow up in diabetes clinic on 9/9.

On 9/9, his A1c was no better. The PA acknowledged his poor diabetes control, yet made no changes to the regimen. A follow-up visit was ordered for 1/8/14 with labs on 12/19/13.

On 1/8/14, his A1c was 8.8% and his medication was increased. Follow-up was ordered for 5/6 with labs on 4/23. There were no labs for that date filed in the health record as of our visit on 5/5. He did have an A1c on 3/28, which was unchanged.

MARs demonstrate that he has been compliant with insulin.

*Opinion***:** This patient has made very little progress in the past year with regard to his diabetes control. Perhaps he should be seen more frequently.

## General Medicine

We reviewed the anticoagulation data as one of the surrogate indicators for this clinic. Most patients on Coumadin spent the majority of time within the therapeutic range over the last 3-4 months. We selected three charts at random to review. In none of the records did the providers query the patients regarding bleeding complications; in two of the records there was no subjective information at all at one or more clinic visits. Clinics occurred timely in two of three

cases; however, in one of the two "timely" cases, the reason for anticoagulation (atrial fibrillation) was never mentioned at any of the clinic visits. In fact, the patient's heart was described as "RRR" (regular rate and rhythm) at every clinical encounter.

## HIV Infection/AIDS

We reviewed four records (27%) of patients enrolled in the HIV clinic. The patients were seen timely by the ID telemedicine physician in three of four cases, and in general labs were drawn timely prior to these visits. As is the case in all the other facilities we visited, onsite providers are completely uninvolved in monitoring patients' HIV disease. Antiretrovirals are directly observed therapy at IRCC, theoretically allowing for reliable monitoring of medication compliance. If MARs were filed timely into the records, this might be more likely to occur.

**Patient #11**
This is a 25-year-old man who was newly diagnosed with HIV infection upon his intake to IDOC in December 2013. He was seen by ID telemedicine on 1/7/14. As his viral load was undetectable and his CD4 count was normal, treatment was not recommended. He was transferred to IRCC on 1/29 and has not been seen by a provider since his arrival.

*Opinion*: This patient should be seen periodically by the facility physician considering his diagnosis.

**Patient #12**
This is a 46-year-old man with hypertension, hyperlipidemia, diabetes and HIV infection. He has been seen timely in HIV telemedicine with labs done timely prior. His HIV disease is well controlled. Review of MARs reveals blanks for five consecutive doses of two of his HIV medications in January. The February and March MARs were not in the chart.

*Opinion*: There should be no blanks on the MAR. Is impossible to tell if there was medication discontinuity. MARs need to be filed in the chart timely so providers can review medication compliance.

**Patient #13**
This is a 31-year-old man with HIV infection, which is not listed on his problem list. He had been known to be HIV+ during a prior incarceration in 2012. He was released in December 2012 and was reincarcerated in March 2013. At intake, his HIV infection was not recognized and he refused HIV testing both at NRC and upon transfer to IRCC in May 2013. There was no evidence in the chart that anyone at IRCC realized he was HIV +, yet the chronic care nurse ordered HIV labs on 7/19/13 and the patient saw the ID telemedicine physician on 7/31. As a result of this visit, his medications were resumed and a six week follow-up was ordered but did not occur for three months. Thereafter he was seen timely with labs prior to the visits.

*Opinion*: Despite having a known diagnosis of HIV infection, this patient's status went apparently unrecognized for the first four months of his incarceration. We learned that this delay was likely due to the fact that there is no mechanism in place to automatically request old records of patients who are reincarcerated; only those who are parole violators are automatically requested.

## Liver

The nurse assigned to hepatitis C clinic is extremely knowledgeable and well organized. There were two patients just finishing treatment at the time of our visit. The clinic seemed to be running well. No issues were noted.

## Pulmonary Clinic

We reviewed the aggregate data for FY 2012, 2013 and 2014 to date. Interestingly, there were 0 patients rated as poor control over the last 2 $^1/_2$ years. We find this data somewhat dubious, as it is not in keeping with similar statistics in other correctional systems or in the community at large. It is likely that at least part of the problem is the way the treatment guidelines are written. These guidelines speak only to asthma, yet a large portion of patients enrolled in the clinic actually have COPD, which is a separate and distinct disease, the treatment of which differs in important ways from the treatment of asthma.

The guideline appears to be based partly on the National Heart, Lung, and Blood Institute (NHLBI) Expert Panel Report 3 (EPR 3). For example, the section on assessing symptom severity is consistent with the NHLBI recommendations, but the assessment of control is not. For example, the IDOC guideline allows patients who use up to a full canister of their rescue inhaler monthly (which averages 1-2 doses per day) to be deemed under good control, while the NHLBI guidelines rate good control as no more than twice weekly. The NHLBI guidelines also take into account additional data, such as symptom interference with normal activity and peak flow monitoring when assessing degree of control. We recommend that the department adopt this strategy. We also recommend the department mimic the NHLBI in its control terminology of "well," "not well," and "very poorly" controlled rather than "good, fair, poor" control, in order to heighten awareness of the need to modify therapy for all categories that are less than well controlled.

# Pharmacy/Medication Administration

Boswell Pharmaceuticals, located in Pennsylvania, provides all prescription and over-the-counter medications for the facility. Boswell is licensed as a Wholesale Drug Distributor/Pharmacy Distributor. The service is a "fax and fill" system, which means new prescriptions faxed to the pharmacy by 1:00 p.m. will arrive at the facility the next day, and refill prescriptions faxed by 10 a.m. will be received the next day. Either the local Walgreens store or the local hospital is the back-up pharmacy for obtaining medication which is needed immediately and is not available in stock. Patient specific prescriptions, stock prescriptions and controlled medications arrive packaged in a 30-day bubble pack. Over-the-counter medications are provided in bulk by the bottle, tube, etc. The medication preparation/storage area is staffed with one full-time pharmacy technician, and Boswell provides a consulting pharmacist to come on-site once a month to review prescription activity, to assess pharmacy technician performance and technique and to destroy outdated or no longer needed controlled medications pursuant to the requirements of the Federal Drug Administration (FDA) and Drug Enforcement Agency (DEA). Inspection of the medication preparation/storage area revealed a large, clean, well-lighted and well-maintained area. An interview with the pharmacy technician revealed a knowledgeable individual with several years working as a pharmacy technician. Inspection of the area indicated tight accounting of controlled medications, both stock and return items, needles/syringes, sharps/instruments and

medical tools. A random inspection of perpetual inventories and counts indicated all were correct. A complete inventory is conducted and verified weekly. Additionally inspection of the perpetual inventories and counts in the infirmary medication room verified all were correct. These inventories are verified each shift by on-coming and off-going infirmary nursing staff.

All prescriptions, controlled medications, syringes, needles and other sharp tools are ordered, received and inventoried by the pharmacy technician. Once received and counts verified, each of the items is added into the item specific perpetual inventory. Items placed in "back stock" are stored within locked cabinets or the vault, both of which are inside the locked and restricted access pharmacy storage room. The perpetual inventories for all items located in the locked cabinets are counted and verified each shift by on-coming and off-going nursing staff. The vault inventories are verified weekly by the Director of Nursing and the pharmacy technician. The crash cart inventory is verified weekly or any time the plastic security seal is broken. The controlled medication "back stock" perpetual inventory is verified a daily. The perpetual inventories for controlled medication in "front or working stock" is verified each shift by an oncoming and off-going nursing staff member.

Access to the medication storage room is restricted to nursing administration, nursing staff and the pharmacy technician. The pharmacy technician and nursing administration are required to draw keys to their area at the beginning of each shift and return the keys when leaving at the end of their shift. In the event they would leave institutional grounds with their keys, they are contacted by facility armory personnel to immediately return to the institution. Nursing staff pass their key rings to one another between shifts. Keys to the medication storage room and locked cabinets are restricted to nursing administration, nursing staff and the pharmacy technician. Keys to the "back stock" vault are restricted to the Director of Nursing and pharmacy technician. Refrigerator temperatures are monitored and documented daily.

Dose-by-dose medication is administered by licensed nursing staff. Inmates are moved to the health care unit in medication lines two times a day to receive their medication. Nursing staff administers directly from the patient specific blister pack and immediately documents the administration or refusal on the patient specific medication administration record (MAR). Patients refusing medication are required to sign a refusal form at the time of refusal. Medication is delivered to inmates in the segregation unit and administered dose-by-dose at cell side. Nursing staff obtains one dose of medication from the patient specific blister pack and places it in a pill envelope appropriately labeled with the patient's name and number, the name of the medication, strength, dosage and time to be administered. The nurse carries the envelopes to the segregation unit and is escorted by security staff cell to cell. At each cell, the security staff member opens the solid cell door food tray slot. The inmate is required to come to the cell door, show his identification card, state his name and have something to drink. The nurse positively identifies the inmate, gives him the medication through the food tray slot, observes ingestion and performs a mouth inspection. When completed, the nurse returns to the health care unit and documents administration or refusal of the medication on each patient specific MAR.

# Laboratory

Laboratory services are provided through the University of Illinois-Chicago Hospital (UIC). The comprehensive services medical contractor provides 0.75 FTEs phlebotomy positions to draw

and prepare the samples for transport to UIC. The individual is onsite Monday through Friday for approximately six hours each day. Results are electronically transmitted back to the facility, generally within 24 hours via secure fax line located in the medical department. UIC reports both to the facility and the Illinois Department of Public Health all reportable cases. There is a current Clinical Laboratory Improvement Amendment (CLIA) waiver certificate that expires January 27, 2015, on file. There were no reports of any problems with this service.

# Unscheduled Offsite Services

We reviewed four records of which two contained problems.

### Patient #1

This is a 31-year-old with a history of alcohol abuse, anemia and ulcerative colitis. On 3/24/14, he presented asking for his medication used to treat ulcerative colitis. He received it on 3/25; however, he had run out of the medicine on 2/10 which should not have occurred. He ended up being sent out a few days later when he presented with a sore throat and was found to have a tonsillar abscess. His temperature was 101.3° and his pulse rate was 120. He was given an injection of antibiotic and was also given steroids to reduce the swelling. He was sent back to the institution on both antibiotics and steroids. Upon return, he was placed in the infirmary and released the following day.

### Patient #2

This is a 41-year-old who arrived in the system on 7/7/11. At that time, he was found to have a right upper extremity neuropathy secondary to a gunshot wound. On 3/14/14, he was sent to the emergency room after complaining of chest pain at the mid-chest which started while he was at rest. He also felt a pressure along with headache and dizziness. Nothing had been able to relieve the pain. At that time, his vital signs were normal and his electrocardiogram showed nonspecific ST and T wave abnormalities as well as a prolonged QT phase and an accelerated junctional rhythm. He was given aspirin and nitroglycerin and sent to the emergency room. There is no emergency room report in the chart. He returned later that day and at the time of return had normal vital signs and he was placed in the infirmary for 24-hour observation. He was seen by the physician the next day in the morning and discharged to the housing unit on nitroglycerin. He was also referred for a stress test. The stress test that was ordered was not approved through the collegial review process. On 3/30, he again complained of chest pain. He was placed in the infirmary and then released to the housing unit. He had not been seen yet in a chronic care clinic.

# Scheduled Offsite Services

We reviewed 10 records of patients sent out for either consultations or procedures. Of those 10, five contained problems, mostly related to timely follow up.

### Patient #1

This is a 63-year-old who arrived in the system 1/28/13 with GERD, hyperlipidemia and hypertension. He had first reported blood in his stools in June 2013. We could not find a nurse screen on intake and his record from the Hill Correctional Center ,where he had been in June 2013, apparently is not locatable. On 3/23/14, he was referred to colorectal surgery. A

colonoscopy revealed a posterior rectal mass and a CT of the chest, abdomen and pelvis were also ordered. On the CT scan, no nodes were found. An ultrasound of the rectum has been ordered and will be performed next week. It appears that this patient may have a tumor, the diagnosis of which may have been delayed.

**Patient #2**
This patient is a 57-year-old with peptic ulcer disease, colitis, Crohn's disease, anemia and GERD. He was sent out on 2/13/14 for a colonoscopy. The report indicates large pseudo polyps without colitis. He has been maintained on Remicade by the gastroenterology specialist. Although he has been receiving Remicade, most recently on 4/21, there is no documentation in the record.

**Patient #3**
This is a 25-year-old who arrived 2/2/13. He has been diagnosed with testicular cancer with metastasis to the pulmonary valve. He has had a left orchiectomy and he also had surgery to remove the metastasis to the pulmonary valve. He also have a decubitus over his coccyx. He has been told that no more chemotherapy can be provided. This patient should be a candidate for medical parole.

**Patient #4**
This is a 33-year-old who had no chronic problems who was sent out on 3/20/14 for a biopsy of hyperplastic tissue on his lower lip. The biopsy report suggests a papilloma of the lower lip and this was excised on 3/20. However, there has been no follow up.

**Patient #5**
This is a 41-year-old with no chronic problems, sent out for Achilles tendon repair on 3/28/14. His injury occurred on 3/1 while he was playing basketball. He has had his repair on 3/28, yet there is no surgical documentation in the record.

# Unscheduled Offsite and Onsite Visits

We reviewed 10 records of which four were problematic. The types of problems we identified included lack of timely continuity of care, lack of timely onsite visits and lack of appropriate referrals.

**Patient #1**
This is a 41-year-old who had no chronic problems who presented on 3/14/14 complaining of chest pain. At that time, his vital signs were normal and an EKG was done which showed a slow heart rate. The physician was called and he ordered aspirin and nitroglycerin and then sent the patient to the hospital. When the patient returned, the physician ordered that he be placed in the infirmary to be seen by the physician the next day. He was seen by the physician and at that time was asymptomatic, and so he was discharged to the housing unit. His emergency room report recommended a stress test as soon as possible. On 3/30, he again presented with chest pain and was placed in the infirmary. The stress test was denied by the collegial review process and they indicated instead he should be monitored onsite. There was no referral for the chronic care clinic despite his slow heart rate and repeated chest pain.

**Patient #2**

This is a 35-year-old with scoliosis and eczema. On 3/18/14, he presented with symptoms of his heart racing, his pulse was 105 and he perceived the feeling of heart spasms. An EKG was done and it showed a sinus arrhythmia. The physician ordered him to return to the housing unit but there has been no follow-up and he has not been seen since.

**Patient #3**
This is a 38-year-old with no chronic problems. On 2/5/14, he complained of chest pain exacerbated by breathing deeply. His vital signs were normal as was his electrocardiogram. The physician was contacted and he ordered a pain medicine and that the patient be placed in the infirmary for observation. The pain was relieved by the pain medicine and he was released to his housing unit to be followed up in one week. The follow up by the physician never occurred.

**Patient #4**
This is a 48-year-old with hypertension and type 2 diabetes as well as a seizure disorder and a history of alcohol abuse. On 2/7/14, he presented with dizziness. At that time he was receiving metformin, lisinopril and Dilantin. His orthostatic blood pressures did not demonstrate a significant change. His fingerstick was 160. At his baseline chronic care visit, his hemoglobin A1c was 8.1 and this was assessed as good control. He should be followed up more carefully and the definition of good control for diabetes should be reviewed with the providers.

# Infirmary Care

The infirmary is a 15-bed unit configured as three, four-bed rooms and three single bed rooms. Two of the single bed rooms are functioning negative air pressure respiratory isolation rooms. The unit is minimally staffed with at least one registered nurse 24 hours a day, seven days a week whenever the infirmary is occupied. Security staff that is assigned to the health care unit performs routine rounds through the infirmary.

Inmate porters perform all the janitorial duties in the infirmary. It was learned the porters have had no training in the proper sanitizing of infirmary rooms, beds, furniture, linens, infectious and communicable diseases, blood-borne pathogens, bodily fluid clean-up or medical information confidentiality.

An infirmary daily report is maintained which lists the name and number of each patient in the infirmary, status, for example acute, chronic, crisis watch, etc., diagnosis, diet, lab tests, admission date and time, discharge date and time and comments.

An infirmary daily activity report is also maintained which details the name, number, diagnosis, location and dates admitted and discharged from outside hospitals, patients going outside the facility for outpatient services, community hospital emergency room occurrences, on-site specialty clinics and any deaths.

On the day of the infirmary inspection, April 18, 2014, there were nine patients in the infirmary; three mental health patients and six medical patients. The six medical patients were admitted with the following issues.

1. A 45-year-old admitted April 4, 2014, with esophageal strictures and colon resection due to cancer of the colon.
2. A 25-year-old admitted February 27, 2014, with postoperative left nephrectomy; excision of abdominal mass involving the aorta and inferior vena cava vessels; testicular cancer with metastasis to the heart.
3. A 39-year-old admitted April 16, 2014, with acute myeloblastic leukemia; degenerative changes of the T-spine; right pulmonary masses with pleural effusion.
4. A 29-year-old admitted April 13, 2014, with left lower quadrant pain and dysuria; r/o kidney stone.
5. A 26-year-old admitted April 17, 2014, with r/o pancreatitis.
6. A 23-year-old admitted April 16, 2014, with right upper quadrant pain for five days.

All six records contained physician and nursing admission documentation. All patients were classified as chronic or acute, and documentation was provided more frequently than required. All documentation was in the SOAP format as required by the Department of Corrections Office of Health Services. Vital signs, intake and output, and weights were recorded as ordered by the physician for the acute care patients and pursuant to department policy for the chronic care patients. Medications were documented on each patient specific medication administration record.

We reviewed seven records and found three cases in which the care was very problematic. These are described below. Of the remaining five cases, four were seen timely.

**Patient #1**
This is a 37-year-old recently diagnosed type 2 diabetic who was admitted to IDOC on 1/30/14 and transferred to IRCC on 2/19/14. The day after his arrival, a code 3 was called to his unit for a transient episode of slurred speech, dizziness and inability to walk. The doctor was notified and the patient was placed in the infirmary for observation. He had a similar but milder episode the following day.

On 2/22, another doctor saw the patient and wrote a very lengthy note detailing symptoms of numbness involving the right side of the body as well as the face, along with slurred speech and expressive aphasia; symptoms highly compatible with a neurologic event in the territory of the left middle cerebral artery. Yet the physician "explained to patient that his symptoms do not correspond to any anatomical defect." He ordered no further work-up for the patient, but kept him in the infirmary for continued observation.

On 2/24 (a Monday) at 4:40 p.m., the patient had another episode. The RN called the doctor, who ordered her to test the patient's reflexes and try walking the patient, then call him back. It took two people to walk the patient, whose gait was described as shuffling, and who leaned heavily on the nurse when lifting the right leg. His right leg strength was described as weak, and he had absent reflexes at the right knee and ankle and no plantar response on the right. The left- sided reflexes were normal. The doctor was notified of these findings but ordered no further work up.

By the next day, the right grip strength was still described as "notably weaker" and right leg "slightly lagging" during gait. On 2/26, there was still slight weakness in the right grip, but his gait was back to normal.

There were no provider notes between the date of admission (2/22) and 3/3, when he was seen by the PA and discharged from the infirmary.

On 3/18, the patient was seen in diabetes clinic by the PA. There is no mention of the neurologic event.

*Opinion*: This patient's symptoms are highly suggestive of an acute central nervous system event such as a stroke, which is a medical emergency and should have been treated as such. It was not appropriate to admit a possible stroke patient to the infirmary; he should have been sent to the hospital for further evaluation and treatment. He requires additional work up for his neurologic events.

## Patient #2

This is a 39-year-old man who first presented with symptoms of back pain and left leg weakness on 12/18/13. He was seen by the doctor that day. The exam consisted entirely of "patient in wheelchair but able to walk slowly. No back tenderness. DTR in lower extremities brisk and symmetrical. SLR negative." He admitted the patient to the infirmary for 24 hours, saw the patient the next day, noted "walks slowly with cane" and discharged him from the infirmary.

On 12/23, the patient fell in the bathroom. He reported no pain but was described as unable to bear weight and needing assistance to move. He was placed back in the infirmary. Over the next few days, he reported that he was unable to wiggle his toes and was barely moving his legs and feet. He was seen by a physician on 12/24 and 12/30. Both exams appear to be in stark contrast to what nursing staff consistently describe as apparently profound lower extremity weakness, often documenting that he requires from one to three staff members to assist him with transferring, and that nursing staff must reposition his legs in bed as he is unable to move them. Despite these detailed nursing notes, the physician documented full leg strength in his note dated 12/30; no other muscle groups were tested. He ordered a walker and to encourage ambulation.

The patient asked multiple times to be sent to the hospital for further evaluation.

On 1/2/14, the doctor finally did a more thorough neurologic exam and noted that the patient could raise his legs but was not able to move his toes or ankles. He had decreased ankle reflexes and hyperactive knee reflexes, and had decreased sensation to light touch and pinprick up to his mid chest. He decided the patient had a "spinal cord lesion" and ordered an MRI.

The doctor saw the patient again the next day and noted that he is "barely able to move toes." His assessment was "upper motor neuron lesion," and the plan was to change to chronic infirmary status and await approval for the MRI.

Meanwhile, the patient was now requiring 3-4 staff assistance for transfers and bed mobility.

The doctor saw him again on 1/6, again acknowledged his paralysis and planned to await approval for MRI. Finally, that evening the RN requested that the patient be sent to the ED after she had to lower him to the floor during a transfer and noted that he could not move or feel his legs.

At the hospital he was found to have AML (acute myelogenous leukemia)/myeloid sarcoma with acute cord compression and stayed in the hospital for over three months. He returned a paraplegic.

*Opinion*: Acute motor weakness of the legs should raise immediate concern for an acute spinal cord injury. The seriousness of his condition appeared to be more evident to nursing staff than it was to the doctor. Even after the doctor finally examined the patient appropriately and correctly concluded that he had a spinal cord lesion, he failed to appreciate the urgency of his condition. That one would simply order an MRI in the face of rapidly progressive paralysis is inexplicable. This patient should have been sent emergently to the hospital rather than languishing in the infirmary for two weeks. Had the appropriate evaluation and treatment been provided timely, he may not have suffered such severe deficits.

**Patient #3**
This is a 31-year-old man who was admitted acutely to the infirmary on 4/22 after being hospitalized for a skull fracture with intracranial bleeding causing increased intracranial pressure. There is an admission note dated 4/19/14 which is marked "late entry." There is no physical exam; instead the provider wrote "not seen at admission." It is not signed.

There is a progress note on the same date with the same handwriting. The physical exam contains nearly no information, only "A&O" and "wound on scalp healing." There is no neurologic exam.

The next provider note is dated a week later, when the patient was seen by another physician. He was seen twice more that week (4/29 and 4/30), with the second note largely indecipherable. There were no further provider notes as of the date of our visit (5/5).

*Opinion***:** This patient has not been adequately examined given the nature of his injuries. He has not been seen timely by the providers while admitted to the infirmary.

# Infection Control

The Director of Nursing (DON) functions as the facility infection control nurse. When required, she interfaces with the County Department of Public Health and the Illinois Department of Public Health (IDPH). The DON monitors, completes and submits to IDPH all reportable cases. Skin infections and boils are aggressively monitored, cultured and treated. Per the DON, there is a low occurrence of culture-proven methicillin resistant Staphylococcus aureus (MRSA) infections. Health Care Unit nursing staff conducts monthly safety and sanitation inspections in the dietary department and performs pre-assignment "food handler" examinations for staff and inmates to work in the dietary department. A tour of the health care unit, including the infirmary, verified personal protective equipment (PPE) available to staff in all areas as needed.

Additionally, PPE is included in the emergency response bags. Puncture proof containers for the disposal of syringes/needles and other sharp objects are in use in all areas of the health care unit as needed. The facility uses a national commercial waste disposal company for disposing of

medical waste. Institutional staff is trained in communicable diseases and blood-borne pathogens annually.

The Health Care Unit is clean with the janitorial duties performed by inmate porters who have had no training in the proper sanitation of infirmary rooms, beds, furniture and linens, communicable diseases, bodily fluid clean-up or blood-borne pathogens. Health Care Unit porters launder the infirmary linens in a health care unit laundry room. A test of the washing machine hot water temperature indicated a temperature of only 125 degrees F. This temperature is too low to assure the proper cleaning and sanitizing of potentially body fluid soiled bed linen.

Additionally, it was reported the hot water temperature in the institutional laundry is routinely measured at 125 degrees F, which again is too low. In order to properly sanitize, linens are to be exposed to water at least 160 degrees F for 25 minutes or given a bleach bath having an initial starting concentration of 100 parts per million and a temperature of at least 140 degrees F for at least 10 minutes.

The impervious vinyl-coating on examination stools and tables and infirmary mattresses was noted to be torn or cracked, which prevents proper sanitizing and allows for potential cross-contamination between patients. The items in question should either be reupholstered or replaced. Such items should be inspected monthly as a part of the safety and sanitation process.

## Inmates Interviews

Six insulin dependent inmates were interviewed. All six had been diagnosed several years previously, and all six were knowledgeable regarding their chronic disease. Four of the six were knowledgeable regarding the significance of their hemoglobin A1c blood level. Four of the six knew the results of their most recent hemoglobin A1c blood level. All six reported being evaluated by the physician every 3-4 months and having the ability to perform blood glucose monitoring prior to the administration of insulin. All six reported the previous Medical Director did not inform them of their hemoglobin A1c level during diabetic clinic. The inmates stated they either had to specifically ask for the results or nursing staff would share the A1c results during the nursing portion of the clinic. In response to questioning, all six stated that, in general, security staff was aware they were insulin dependent diabetics but were not sensitive to the medical issues surrounding that issue. All were of the opinion the previous Medical Director, who was responsible for their diabetic care, did not do a "good job."

It was reported breakfast is served between 5:00 a.m. and 5:30 a.m.; lunch is served between 10:15 a.m. and 11:30 a.m. and dinner is served between 4:00 p.m. and 5:30 p.m. All six inmates stated breakfast is always cold cereal and bread. It was reported that morning insulin is administered between 4:00 a.m. and 5:00 a.m., and afternoon insulin between 3:15 p.m. to 3:45 p.m.

All six inmates agreed on the following issues.

1. Very little educational literature provided/available
2. Lack of adequate exercise time
3. Bottom bunk orders are not automatically provided to insulin dependent diabetic patients
4. No podiatry care

5. Sometimes receive insulin prior to eating and sometimes after eating
6. When evaluated by an off-site specialist, there is difficulty getting back to see the specialist and the institutional medical vendor does not follow the suggestions/orders of the specialist
7. Security staff not always following physician orders, i.e. during shakedowns, taking shoes that had been ordered by the physician
8. Even though hard candy is approved for sale in the inmate commissary, when inmates carry candy to self-treat low blood sugar, security staff will take the candy when random shakedowns are being conducted
9. The previous Medical Director did not manage their disease well.

# Dental Program

## Executive Summary

On April 16-18 and May 5, 2014, a comprehensive review of the dental program at Illinois River CC was completed. Five areas of the program were addressed including: 1) inmates' access to timely dental care; 2) the quality of care; 3) the quality and quantity of the providers; 4) the adequacy of the physical facilities and equipment devoted to dental care; and 5) the overall dental program management. The following observations and findings are provided.

The clinic itself consists of three chairs and units in three linear clinic bays in a long clinic area. The space is adequate in size. The chairs and units are old and showing wear, fading and some corrosion. The intra-oral x-ray unit is in a separate room and is old and in only fair condition. The cabinetry is old and showing wear and corrosion. There is an adjoining room housing the dental laboratory and sterilization area. There is also an adjoining office for staff. Instrumentation and equipment are adequate to meet the needs of this institution.

Comprehensive care delivery was an area of concern. Although an examination and charting of the teeth was performed prior to routine care, and a treatment plan developed, the examination itself was incomplete and inadequate. No documented examination of the soft tissues nor periodontal assessment was part of the examination and treatment process. Hygiene care and prophylaxis was not provided prior to restorations. Restorations proceeded without appropriate intra-oral radiographs. Oral hygiene instructions were seldom provided.

Another area of concern was dental extractions. All dental treatment should proceed from a documented and accurate diagnosis. "Non-restorable" was often provided as a diagnosis. This is not a diagnosis, per se. Current and adequate x-rays were not always present to proceed with dental extractions.

Partial dentures should be constructed as a final step in the sequence of care delivery included in the comprehensive care process. A record review revealed that partial dentures proceeded without an adequate comprehensive examination and treatment plan. A periodontal exam and

assessment was not documented. Because, as mentioned, the comprehensive examination and treatment plans are incompletely developed, it was impossible to ascertain if all necessary care was completed prior to fabrication of removable partial dentures.

Inmates access sick call through a daily sick call sign-up. Inmates with urgent complaints (pain and swelling) are encouraged to use dental sick call. The inmates are seen that morning for a triaged evaluation. Urgent care needs are addressed at that time. Others are rescheduled based on level of need. Routine care was not provided at sick call. The system works successfully and inmates with urgent care needs are seen in a timely manner. The SOAP format was well documented.

Inmates can request routine care via the inmate request form. These inmates are seen and evaluated every Friday of that week. They are scheduled accordingly. They continue to be rescheduled until treatment is completed.

The health history section of the dental record is not thorough and poorly developed. There is no system in place to "red flag" patients with medical conditions that require medical consultation or intervention prior to dental treatment.

Blood pressures should, at the least, be taken on patients with a history of hypertension. When asked, the clinician indicated that he does not routinely take blood pressures on these patients.

The sterilization area is small and shared with the dental laboratory. Proper sterilization flow is interrupted by laboratory equipment.

Safety glasses were not worn by patients during treatment. No radiation hazard signs were posted in the area where x-rays are taken.

The continuing quality improvement program is inadequate and poorly utilized. The dental program is not involved in any ongoing CQI studies at this time. It should develop studies and corrective actions to address the weaknesses described in the body of this review.

## Staffing and Credentialing

Illinois River CC has a dental staff of one full-time dentist, one full-time assistant, two PRN assistants and a full-time hygienist. This is minimal staffing for an institution of this size. However, the dental team works well together and seems to make it work well. All staff are employed by Wexford Health Systems.

**Recommendations:** None. Staffing seems adequate.

## Facility and Equipment

The clinic consists of three chairs and units in three linear clinic bays in a long clinic area. The chairs and units are old and showing wear, fading and some corrosion. All of the operatories are functioning adequately at this time. There is no panorex in this clinic. The x-ray unit for

periapical and bitewing x-rays is in a separate room and rather old and in only fair condition. I was told it still works satisfactorily. The developer is old but working. The autoclave is rather new and functions well. The compressor is older but works well. The instrumentation is adequate in quantity and quality. The handpieces are older but well maintained and repaired when necessary.

The cabinetry is rather old and showing wear and corrosion, but is functionally OK. This does make disinfection of cabinet surfaces and work areas more difficult.

The clinic itself consisted of three chairs in three separate and adequate spaces. Free movement around each unit is acceptable. Provider and assistant have adequate room to work and none of the chairs interfere with each other. There was a separate sterilization and laboratory room of adequate size. It had a small but adequate work surface and a large sink to accommodate proper infection control and sterilization. Laboratory equipment was in a separate corner of the room. The staff had a separate room for office space. It was adequate in size and was the space in which administrative duties were performed. The facility and equipment are adequate to meet the needs of this institution.

**Recommendations:**
1. The clinic is adequate in size and function to meet the needs of the inmate population at Illinois River CC.
2. Replacement of the units should be considered sometime in the near future.

## Sanitation, Safety and Sterilization

Observation of sanitation and sterilization procedures revealed that surface disinfection was adequate and accomplished with appropriate anti-microbial wipes. All instruments, including handpieces, were properly bagged and sterilized. Protective cover barriers were used whenever possible.

The sterilization area is small and shared with the dental laboratory. Proper sterilization flow is interrupted because of this sharing of space. Flow should go from dirty to clean to sterilize to storage with no crossover or interference. Laboratory equipment interfered with this flow.

Observation at chair side during care delivery revealed that patients did not wear protective eyewear.

Observation in the x-ray area revealed that no radiation warning signs were in place to warn of potential radiation hazards.

**Recommendations:**
1. Re-arrange the sterilization/lab area so that the proper sterilization flow is accomplished.
2. That safety glasses be provided to patients while they are being treated.
3. A warning sign be posted in the x-ray area to warn of radiation hazards.

## Review Autoclave Log

I looked back two years and found the sterilization logs to be in place. They showed that

autoclaving was accomplished weekly and documented. The clinic maintains a weekly log to indicate that the tests were sent. No negative results were obtained.

## Comprehensive Care

We review 10 dental records of inmates in active treatment classified as Category 3 patients. One of the most basic and essential standards of care in dentistry is that all comprehensive (routine) care proceed from a thorough, well documented intra and extra-oral examination and a well developed treatment plan, to include all necessary diagnostic x-rays. A review of 10 inmate records revealed that although a documented examination of the teeth was performed prior to routine care, and a treatment plan developed and followed, the examination itself was incomplete and inadequate. No soft tissues examination or periodontal assessment was part of the examination or treatment process. Hygiene care and prophylaxis was provided in none of the 10 patient records reviewed. Restorations proceeded without appropriate intra-oral radiographs, to include bitewing and/or periapical x-rays; care was provided from the information from the panorex radiograph. This radiograph is not diagnostic for caries. Periodontal assessment and treatment was not provided in any of the records. Further, oral hygiene instructions were not always documented in the dental record as part of the treatment process.

**Recommendations:**
1. Comprehensive "routine" care be provided only from a well developed and documented treatment plan.
2. The treatment plan be developed from a thorough, well documented intra and extra-oral examination, to include a periodontal assessment and detailed examination of all hard and soft tissues.
3. In all cases, that appropriate bitewing or periapical x-rays be taken to diagnose caries.
4. Hygiene and periodontal care be provided as part of the treatment process.
5. That care be provided sequentially, beginning with hygiene services and dental prophylaxis.
6. That oral hygiene instructions be provided and documented.

## Dental Screening

Although Illinois River CC is not a reception and classification center, I reviewed these records to insure the reception and classification policies as stated in Administrative Directive 04.03.102, section F. 2, are being met for the IDOC.

**Recommendations:** None. All records reviewed were in compliance.

## Extractions

One of the primary tenets in dentistry is that all dental treatment proceeds from a well documented and accurate diagnosis. Many entries provided "unrestorable" as a diagnosis. This is not a diagnosis, per se. A diagnosis is based on histological assumptions derived from symptoms, examination and clinical tests. However, non-restorable could be considered a reason for extraction rather than other acceptable treatments.

In three of the ten records reviewed, adequate and current x-rays were not available.

**Recommendations:**

1. Insure that all radiographs used to provide oral surgery procedures be current and include all necessary information.
2. Provide and accurate and appropriate diagnosis as reason for extraction.

## Removable Prosthetics

Removable partial denture prosthetics should proceed only after all other treatment recorded on the treatment plan is completed. The periodontal, operative and oral surgery needs all should be addressed first. The dental program at Illinois River CC insured that all inmates receiving partial dentures were provided hygiene services, to include scaling, debridement and oral hygiene instructions. However, a periodontal exam and assessment was not documented in any of the records. Because the comprehensive examination and treatment plans are inadequately and incompletely developed and documented, it is almost impossible to ascertain if all necessary care, including operative and/or oral surgery treatment, is completed prior to fabrication of removable partial dentures.

**Recommendations:**
1. That a thorough comprehensive examination and a well developed and documented treatment plan, including bitewing and/or periapical radiographs and periodontal assessment, proceed all comprehensive dental care, including removable prosthodontics.
2. That periodontal assessment and treatment be part of the treatment process and that the periodontium be stable before proceeding with impressions.
3. That all operative dentistry and oral surgery as documented in the treatment plan be completed before proceeding with impressions.

## Dental Sick Call

We reviewed dental sick call procedures to determine if they are adequate.

Inmates access sick call through a daily sick call sign-up. They are seen that morning for a triaged evaluation. Urgent care needs are addressed at that time. Others are rescheduled based on level of need. Only urgent care needs are addressed at sick call. Routine care is not provided on sick call. The SOAP format was used in all cases reviewed and the inmate complaint was addressed.

Several records indicated "unrestorable" as the entry in the (A) section of the SOAP note. This is not strictly a diagnosis, especially for complaints of pain.

**Recommendations:**
1. Provide well developed, meaningful diagnosis' in the (A) section of the SOAP note entry.

## Treatment Provision

Inmates who submit inmate request forms are seen every Friday for triage and evaluation and at that time provided an appointment to address their treatment needs. The schedule becomes the waiting list and all inmates scheduled are seen within three to five weeks.

Sick call is run as an open sign up and is available every morning. Treatment decisions are made at that time. Treatment is provided immediately if necessary and all others are given appointments based on prioritized needs as determined by the dentist. This is a good system and insures that urgent care needs are addressed in a timely manner; in this case, that same day. Inmates request routine care via the inmate request form and all such inmates are seen and evaluated every Friday of that week. They are then given an appointment, based on this evaluation, to provide necessary treatment. Routine care patients continue to be rescheduled until their care is complete. The wait time between appointments is approximately six weeks. There is no waiting list, per se.

**Recommendations:** None. The system is fair and equitable and responds very well to inmate care needs. Urgent care is seen the same day. A very satisfactory needs generated system of care is in place.

## Orientation Handbook

Inmates can sign up daily for dental sick call and be seen that day. This also applies to medical sick call. A review of the Illinois River CC inmate health care unit procedures booklet reveals that it does not include the daily sick call sign-up procedure for urgent dental care as it does for medical.

**Recommendations:**
1. Include the dental sick call sign up procedures, along with medical, in the Inmate Health Care Unit Procedures Booklet.

## Policies and Procedures

Illinois River CC has an adequate and rather well developed policy and procedural manual documented in the Procedural Bulletin, Health Care Programs. It addresses all of the areas concerned, except it makes no mention of the daily open sick call and how to access urgent dental care.

**Recommendations:**
1. Add a section in the Procedural Bulletin, Health Care Programs, addressing daily dental sick call and accessing urgent dental care.

## Failed Appointments

The failed appointment rate was a bit high, although not alarmingly. The usual reasons for missing or refusing an appointment are that the inmate does not want to pay the $5.00 co-pay, or good food at chow that day, or nice day to be outside. Inmates are called down to sign a refusal

form if they fail to show for an appointment. The dental program is making an earnest attempt to avoid failed appointments.

**Recommendation:** None

## Medically Compromised Patients

The dental record is maintained with the medical file at Illinois River CC, so all medical information is available to the dental staff from the medical record. The health history on the dental chart is updated at the time of what is called an "initial examination" at this institution. This is a modified comprehensive examination from which a treatment plan is developed. This health history is rather inadequate and does not directly address all of the compromised medical conditions that may affect how dental care is provided. There is no system in place to "red flag" patients with medical conditions that can affect dental care. All in all, the health history in the dental chart is poorly developed and not very thorough.

When asked, the clinicians indicated that they do not routinely take blood pressures on patients with a history of hypertension.

**Recommendations:**
1. That the medical history section of the dental record be kept up to date and that medical conditions that require special precautions be red flagged to catch the immediate attention of the provider
2. That blood pressure readings be routinely taken of patients with a history of hypertension, especially prior to any surgical procedure.

## Specialists

The dental program at Illinois River CC utilizes Western Illinois Oral and Maxillofacial Surgery Ltd. in Galesburg, Illinois for cases requiring special oral surgery expertise.

Patient [redacted] was sent to oral surgery for an evaluation of a lesion. There was no write-up in the dental record describing the lesion (location, size, duration, etc.) and there was no differential diagnosis provided in the record. The reason he was sent to the oral surgeon was not indicated.

**Recommendations:**
1. Thoroughly document in the dental record all findings and reasons that led to a referral to the specialist required. Provide all information pertinent to the condition being referred.

## Dental CQI

The dental program's contribution to the CQI committee is monthly dental statistics. Nothing is done with these statistics from there. The dental program is not involved in any ongoing quality improvement studies at this time.

**Recommendations:**

1. Evaluate program deficiencies and needs as outlined in this report through ongoing continuing quality improvement studies that address these deficient areas. Develop corrective actions and procedures to improve those areas.

# Mortality Review

There were three deaths at IRCC in the past year, including one hanging. We reviewed the other two cases and found disturbing lapses in care that very likely contributed to the patients' deaths.

## Patient #1

This was a 55-year-old man with a history of hepatitis C, hypothyroidism and bipolar disorder who was admitted to IDOC through NRC on 10/25/12, transferred to IRCC on 11/20/12, and died of complications of metastatic lung cancer on 6/14/13. He had a greater than 40 pack a year smoking history, and a strong family history of lung cancer, with his mother and two sisters dying of the disease. His course unfolded as follows:

On the day after his arrival, 11/21/12, he was seen by the RN for "spitting up blood." The patient showed the nurse a quarter-sized amount of blood sitting on paper towel. The nurse gave the patient a container and instructed him to call if there was any increase in hemoptysis. He was not referred to a provider.

Later that evening, the same nurse documented that the patient had a quarter sized amount of bloody sputum in the specimen cup. Her assessment was "hemoptysis," and the plan was "continue to observe." Again the patient was not referred to a provider.

The next morning, another nurse documented that the patient had "no bloody sputum for me," but did have some visual complaints. She referred the patient to the eye doctor.

On 11/25, the patient saw the LPN for a dressing change of his foot and showed the nurse tissues containing bloody sputum. He was referred to MDSC the next day.

On 11/26, the physician saw the patient, who reported intermittent hemoptysis and right-sided pleuritic chest pain. She ordered a chest x-ray, sputum and blood work. The chest x-ray was done on 11/30, and showed, "focal opacity projected over the right lateral upper lung zone. Recommend follow-up chest CT to exclude a lung mass." The report was signed on 12/3 by the ordering physician but not acted upon; no further work-up was pursued.

On 2/7, the doctor saw the patient in chronic care clinic. He complained of chest tightness in the upper chest. She ordered a chest x-ray in one week.

On 2/14, the chest x-ray was done and showed the "interval development of right upper lobe opacity seen extending from the hilum to the right lung apex, new since prior study...right upper lobe opacity appears to be related to upper lobe collapse with elevation of the right minor fissure. This may be related to a right hilar/suprahilar neoplasm. Further evaluation with CT of the chest is recommended." The report was signed by the physician on 2/19, but again not acted upon.

On 2/28, the patient presented to nurse sick call requesting his x-ray results. He was referred to the physician and seen on 3/1 at hepatitis C chronic care clinic. He complained of ongoing chest tightness. There is no mention of the abnormal chest x-ray that she previously signed. Her plan was to repeat the chest x-ray and see the patient again when the x-ray results were back.

On 3/5, the x-ray was repeated and again showed the right upper lobe opacity with collapse and again a CT was recommended. This time she finally did acknowledge the abnormal findings when she saw the patient on 3/8, and referred him (non-urgently) for a CT of the chest. This was discussed at UM on 3/26, and it was decided to modify the request to a CT guided biopsy.

Meanwhile, on 3/23, he presented with pain in the right collar bone and was seen by an RN, who called the doctor. She ordered an x-ray on Monday 3/25, Motrin and ice. The x-ray showed a pathologic fracture of the right clavicle. The physician saw the patient that day, ordered a clavicle strap and admitted him to the infirmary.

On 4/2, there is a note stating that IR will not schedule him for the biopsy without a CT first. This was approved and performed on 4/9. It showed a 3 cm right upper lobe lung mass occluding the right upper lobe bronchus with enlarged mediastinal lymph nodes and a lytic lesion of the right clavicle.

On 5/8, he underwent biopsy of the right clavicle which confirmed metastatic non-small cell lung cancer He was referred to oncology on 5/14, was approved by UM on 5/28 and the patient was seen on 6/5. The oncologist recommended radiation treatment which the patient declined. He died nine days later.

The Wexford review was done by the treating doctor who concluded that early intervention was not possible and that there was no way to improve patient care, a conclusion with which we strenuously disagree.

*Opinion*: This patient had classic signs and symptoms of cancer from literally the moment he arrived at IRCC; these were actively ignored by both nursing staff and the doctor for more than three months. Had work up been initiated timely, when the cancer was at a stage that was resectable, it would likely have significantly prolonged his life. We inquired after this provider and were told that no longer works for Wexford. We would suggest that this case be reported to the medical board.

**Patient #2**
This was a 40-year-old man who died on 1/23/14 of metastatic rectal cancer. He was first admitted to IDOC in 2000. He first began complaining of constipation in January 2011, at which time his weight was 195 pounds. He was not referred to the doctor at that time. He returned with the same complaint in May 2011 and had lost 10 pounds. He saw the physician for constipation and abdominal pain that was worse with sitting, and urinary symptoms. He denied blood in the stool. The doctor examined his abdomen but did not do a rectal exam. She ordered an abdominal x-ray and labs, which were normal.

On 12/22/11, he presented to the LPN stating "something is wrong" and that he was losing weight. He was now down to 158 pounds. He saw the doctor that day and the doctor did a rectal exam, found no masses and no blood in the stool. (Of note, all doctors who examined him subsequently could feel a mass in the rectum). She ordered more labs and follow up in one month.

Blood was drawn on 12/30 and showed mild iron deficiency anemia. The doctor saw him in January and ordered stool cards. These came back positive in February, and in March he was referred for colonoscopy, which was performed on 4/13/12 and showed a large tumor in the rectum. Pathology showed invasive adenocarcinoma.

Although his care proceed in a timely and appropriate manner from this point on, his disease continued to progress and after a long and complicated course, he ultimately succumbed.

*Opinion*: Given his constellation of symptoms, colonoscopy should have been obtained timely after the anemia was identified, rather than 3 $^1/_2$ months later.

# Continuous Quality Improvement

We reviewed the monthly minutes which contained a substantial amount of data which is reported monthly based on institutional directive requirements. However, there is no documentation in the minutes of an analysis of what the data means and whether the services provided are of adequate quality and if not, how to improve the quality. The entire minutes appear to be data collection, but there is no organized approach to improving the quality of services. We discussed this with the leadership team.

# Recommendations

**Leadership and Staffing:**
1. Fill the Medical Director and Health Service Administrator positions.
2. Fill the Medical Director vacancy ASAP.
3. Appoint an interim HCUA.
4. The Director of Nursing should not be additionally functioning as the contractor site manager.

**Intrasystem Transfers:**
1. The quality improvement program should monitor whether problems are correctly identified and continuity of care is facilitated by this process.

**Medical Records:**
1. MARs must be filed timely into the health records so that providers can refer to them to monitor patients' medication compliance.
2. The problem list should be kept at the front of the chart, on top of other paperwork or in its own section, so that it can be readily accessed.
3. The archived records of all patients, whether released or paroled, should be immediately requested upon their reincarceration.

**Nursing Sick Call:**
1. Sick call conducted by Registered Nurses.
2. Segregation sick call should not be conducted through the solid steel cell door.
3. Collect complete vital signs at each sick call encounter.

**Chronic Disease Clinics:**
1. All chronic diseases should be addressed at each chronic care clinic visit.
2. Patients enrolled in the chronic care program should be seen according to their degree of disease control, rather than the calendar month.
3. When nurses note lapses in medication compliance, either with KOP or nurse dispensed medication, this should be reported to the provider and the patient should be scheduled for an appointment to discuss adherence.
4. When a provider orders blood pressure monitoring, those readings should be routed back to the ordering provider.
5. There must be clinical oversight of the quality of care provided, both locally by a qualified Medical Director, and centrally by Wexford.

**Unscheduled Offsite Services:**
1. The quality improvement program should monitor whether, after unscheduled offsite service are provided, there is timely receipt of offsite service reports and follow-up visits with the primary care clinician during which a discussion is documented regarding the findings and plan.

**Scheduled Offsite Services:**

1. The quality improvement program should monitor the presence of offsite service reports and timely follow-up visits with the primary care physician during which the findings and plan are discussed.

**Infection Control:**
1. Inmate porters need to be trained in communicable and infectious diseases, blood-borne pathogens, bodily fluid clean-up, the proper sanitizing of infirmary rooms, beds, furniture and the need for medical confidentiality.
2. Infirmary bedding and linens must be considered infectious and laundered appropriately.

**Mortality Reviews:**
1. Deaths should be reviewed by someone other than the treating physician.

**CQI:**
1. The leadership of the continuous quality improvement program must be retrained regarding quality improvement philosophy and methodology, along with study design and data collection.
2. This training should include how to study outliers in order to develop targeted improvement strategies.

# Appendix A – Patient ID Numbers

**Intrasystem Transfer:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | | [redacted] |
| Patient #2 | | [redacted] |
| Patient #3 | | [redacted] |
| Patient #4 | | [redacted] |
| Patient #5 | | [redacted] |
| Patient #6 | | [redacted] |
| Patient #7 | | [redacted] |
| Patient #8 | | [redacted] |

**Unscheduled Offsite Services:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | | [redacted] |
| Patient #2 | | [redacted] |

**Scheduled Offsite Services:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | | [redacted] |
| Patient #2 | | [redacted] |
| Patient #3 | | [redacted] |
| Patient #4 | | [redacted] |
| Patient #5 | | [redacted] |

**Unscheduled Onsite Services:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | | [redacted] |
| Patient #2 | | [redacted] |
| Patient #3 | | [redacted] |
| Patient #4 | | [redacted] |

# Hill Correctional Center (HCC)

# Report

May 7-9, 2014

Prepared by the Medical Oversight
          Committee Ron Shansky,
          MD Karen Saylor, MD
          Larry Hewitt, RN Karl
          Meyer, DDS

# Contents

Overview ........................................................................................................................3

Executive Summary .....................................................................................................3

Findings .........................................................................................................................5
  Leadership and Staffing ............................................................................................5
  Clinic Space and Sanitation .....................................................................................6
  Intrasystem Transfer ................................................................................................6
  Nursing Sick Call.....................................................................................................7
  Chronic Disease Management ...................................................................................8
  Pharmacy/Medication Administration .................................................................. 17
  Laboratory ...............................................................................................................18
  Unscheduled Offsite Services .................................................................................19
  Unscheduled Onsite Services ................................................................................ 19
  Scheduled Offsite Services ................................................................................... 19
  Infirmary Care .........................................................................................................21
  Infection Control .....................................................................................................22
  Inmates' Interviews .................................................................................................23
  Dental Program........................................................................................................24
  Mortality Review .....................................................................................................32
  Continuous Quality Improvement ..........................................................................37

Recommendations ......................................................................................................38

Appendix A – Patient ID Numbers ..........................................................................40

# Overview

On May 7-9, 2014, we visited the Henry Hill Correctional Institution (HCC) in Galesburg, Illinois. This was our first site visit to HCC and this report describes our findings and recommendations. During this visit, we:

- Met with leadership of custody and medical
- Toured the medical services area
- Talked with health care staff
- Reviewed health records and other documents
- Interviewed inmates

We thank Warden Akpore and his staff for their assistance and cooperation in conducting the review.

# Executive Summary

Hill Correctional Center was built as new construction and opened in October 1986. Since that time, the physical plant has been well maintained.

Hill Correctional Center is a medium-security prison that houses medium-security male offenders. The current population is approximately 1843 inmates. The average length of incarceration is two years. The institution is not a reception center but has an infirmary and an outpatient mental health mission.

Comprehensive medical services are provided through a contractual agreement with the Illinois Department of Corrections and Wexford Health Sources, located in Pittsburgh, PA. Oversight and monitoring of the medical program is provided by a state-employed Health Care Unit Administrator (HCUA).

The midlevel provider position was just vacated one month ago. The previous nurse practitioner got a job in the community but has been coming in a few days per week to help out while the Medical Director is on a three-week vacation.

Of the facilities inspected to date, Hill Correctional Center is the best staffed facility, with only one nurse practitioner vacancy. There is a strong medical department leadership team consisting of the HCUA, Director of Nursing and Medical Records Director. Although the Medical Director position is filled, he does not appear to perform some of the administrative responsibilities of a Medical Director. There are also clinical concerns. It was reported there is very little staff turnover and absenteeism and, as a result, low use of overtime.

The records were in good condition, with no loose filing and well maintained. However, the problem list is kept buried under the order sheets and is not always updated.

Log books have been developed for general population urgent and non-urgent sick call, segregation sick call, segregation "wellness checks," infirmary admissions and off-site urgent care, as well as non-urgent consultations. This level of organization made it easy to track and review medical treatment.

With respect to the chronic care program, patients were seen timely according to policy for their chronic disease clinics; that is to say, they are seen every four months regardless of their degree of disease control. While this works well for patients with stable controlled conditions, it exposes the rest of the patients to the deleterious effects of suboptimal disease management for long periods of time. We say this because we often observed a laisse faire approach to chronic disease management where suboptimally controlled disease was not addressed aggressively enough, or sometimes not addressed at all. It was apparent that providers were not objectively evaluating patients' medication compliance by reviewing the MARs, and therefore treatment interruptions were going unrecognized and unaddressed.

With respect to scheduled offsite services, we commonly found inadequate or untimely follow up. We also found that when the plan of care was changed this was not conveyed to the patient.

Unscheduled onsite services revealed poor performance by the nurses in not adequately addressing patients with possible chest pain.

Unlike many of the other facilities we have visited, all chronic conditions are addressed at every chronic care clinic visit. The chronic care nurse has invented a "multi-clinic" chronic care form for this purpose. We found this nurse to be highly organized and efficient; clearly one of the best chronic care nurses we have encountered.

Unlike the majority of facilities previously inspected, nursing staff at Hill Correctional Center administer medication directly from the pharmacy prepared patient-specific blister pack and document such at the time of administration on each patient-specific medication administration record (MAR).

The HCUA has developed an excellent program, including a written job description for training health care unit inmate porters in infectious and communicable diseases, blood-borne pathogens, bodily fluid clean-up, infirmary rooms, showers, beds and furniture cleaning and medical confidentiality. Additionally, inmate porters are provided the Hepatitis B vaccine series.

We reviewed five deaths of patients who expired since January 2013 and found the care to be extremely problematic in two cases, both of which involved avoidable delays in diagnosis and treatment, which likely contributed to the timing of their demise.

# Findings

## Leadership and Staffing

The leadership team, with the exception of the Medical Director, appears to be quite capable. Both the Health Service Administrator and the Director of Nursing demonstrated to us a firm knowledge of the processes and a sense of oversight responsibility for those processes. On the other hand, although the Medical Director was on vacation at the time of our visit, we did hear from several staff members that at times interactions with him were less than pleasant. It was suggested to us, as an excuse for his behavior, that in fact he was working too many jobs. In addition to his interpersonal deficiencies, we also identified some clinical concerns. One nurse practitioner indicated that difficulties with the Medical Director led to her recent departure. She currently fills in on a part-time basis.

Other staffing is listed in the following

table: *Table 1. Health Care Staffin*

| Position | Current FTE | Filled | Vacant | State/Cont. |
|---|---|---|---|---|
| Medical Director | 1.0 | 1.0 | | Contract |
| Nurse Practitioner | 1.0 | | 1.0 | Contract |
| Health Care Unit Adm. | 1.0 | 1.0 | | State |
| Director of Nursing | 1.0 | 1.0 | | Contract |
| Psychiatrist | 0.45 | 0.45 | | Contract |
| Clinical Psychologist | 1.0 | 1.0 | | Contract |
| Mental Health Professional | 1.0 | 1.0 | | Contract |
| Clinical Social Worker | 1.0 | 1.0 | | Contract |
| Registered Nurse | 8.0 | 8.0 | | Contract |
| Licensed Practical Nurses | 12.0 | 12.0 | | Contract |
| Health Information Adm. | 1.0 | 1.0 | | Contract |
| Health Information Associate | 4.0 | 4.0 | | Contract |
| Radiology Technician | 0.4 | 0.4 | | Contract |
| Pharmacy Technician | 1.0 | 1.0 | | Contract |
| Staff Associate | 1.0 | 1.0 | | State |
| Dentist | 1.0 | 1.0 | | Contract |
| Dental Assistant | 2.0 | 2.0 | | Contract |
| Dental Hygienist | | | | |
| Optometry | 0.2 | 0.2 | | Contract |
| Physical Therapist | 0.05 | 0.05 | | Contract |
| Physical Therapy Asst. | 0.5 | 0.5 | | Contract |
| **Total** | **38.60** | **37.60** | **1.0** | |

There is a strong leadership team with the exception of the full-time Medical Director. The strength of the team includes the Health Care Unit Administrator, Director of Nursing and

Medical Records Director. There are eight full-time registered nursing positions and 12 full-time licensed practical nursing positions and all of the positions are filled. Out of 38.60 approved FTEs, there is only 1.0 FTE nurse practitioner position vacant.

As reported by the Director of Nursing (DON) there is minimal staff turnover, limited call-offs and use of overtime and no refusal of overtime.

A review of medical staff credentialing and licensure indicate staff which has been appropriately trained, are currently licensed and working within their respective scopes of practice pursuant to written job descriptions.

## Clinic Space and Sanitation

Hill Correctional Center opened in October 1986 as new construction. Since that time, the facility has been well maintained. The health care unit (HCU) is a large, well-lighted and well maintained building. There is a moderate sized inmate waiting area near the entrance, as well as a medication administration window and officer's station. Further in the HCU is the outpatient nursing station, radiology suite, dental clinic, a large medication/storage room, three well-equipped examination rooms, an optometry clinic, a medical records department, a large well-equipped urgent care room, a 15-bed infirmary and multiple office areas.

## Intrasystem Transfer

The intrasystem process was reviewed by us through 10 record reviews, of which two were problematic. Overall, this was one of the better processes we have seen. Follow up was a problem in two of the 10 cases.

**Patient #1**
This is a 52-year-old who arrived at Hill on 2/19/14 with a history of hypertension, a previously treated positive TB skin test and a left neck mass for two years along with a seizure disorder. He had a hypertension clinic on 3/11/14 and at that point, his blood pressure was in good control. He was supposed to be receiving blood pressure checks twice weekly, but two times these checks were cancelled due to a lockdown. It is not clear why someone's blood pressure cannot be taken within the housing unit during a lockdown. He has never had follow up of his seizure disorder or his neck mass.

**Patient #2**
This is a 49-year-old who arrived at Hill Correctional Center on 3/27/2014. He had hypertension, hepatitis C and cirrhosis. On 4/22, he had his baseline chronic care clinic for hepatitis but he has never had a hypertension clinic. His hypertension medications have run out as of 4/27.

# Nursing Sick Call

The facility uses a scheduled sick call request slip style sick call system for both general population and segregation inmates. Sick call is conducted seven days a week. Request slips are available in each housing unit. When the inmate completes the request, he places it directly into a locked medical drop-box located in each housing unit. Security staff working the 11:00 p.m. to 7:00 a.m. shift collects the requests and delivers them to the health care unit. A registered nurse (RN) working the 11:00 p.m. to 7:00 a.m. shift reviews each slip for routine versus urgent health care needs. If the RN determines the request is of an urgent nature, the inmate is immediately evaluated. If the RN determines the request is of a routine nature, the inmate is scheduled for nursing sick call on the following 7:00 a.m. to 3:00 p.m. shift. This means inmates are evaluated within 24 hours of submission of their request. Department of Corrections Office of Health Services approved treatment protocols are used for each nursing sick call encounter. The protocols are on a pre-printed form and provide a pathway of treatment based on inmate provided information and physical findings. Nursing sick call could be conducted by either a Registered Nurse (RN) or Licensed Practical Nurse (LPN). Per IDOC policy, all nursing staff are initially trained by a physician on appropriate use of the treatment protocols and retrained annually. Additionally, each facility physician is required to review two medical records per nursing provider monthly for the appropriateness of use of the protocols. The Director of Nursing (DON) conducts a monthly audit of nursing sick call records and maintains a "protocol usage" log.

Segregation status inmates are offered daily sick call equivalent to the general population. Segregation status inmates submit sick call requests either to an officer or nursing staff. The requests are collected by security staff working the 11:00 p.m. to 7:00 a.m. shift and delivered to the Health Care Unit. The RN working the 11:00 p.m. to 7:00 a.m. shift reviews each slip to determine urgent versus routine health care requests. Urgent requests are addressed immediately. Inmates with requests determined to be of a non-urgent nature are scheduled to be evaluated on the immediately following 7:00 a.m. to 3:00 p.m. shift. Sick call slips can also be given to nursing staff when they are in the unit for medication administration or the daily "wellness checks."

In the segregation unit there is a designated "sick call" room that both nursing staff and the physician use to conduct sick call. The room is equipped with an examination table, and nursing staff takes other equipment and supplies needed for sick call. The nurse provides a list of inmate names to the segregation unit "wing officer" who then takes inmates one-by-one to the sick call room for the nurse to evaluate. As a result, the inmate benefits from a private, confidential encounter with the benefit of an appropriate examination if indicated. Again, the Office of Health Services approved protocols are used for each sick call encounter. The sick call encounter is documented in each detainee's medical record. Additionally, nursing staff are required to sign in and out of the segregation unit. The DON maintains a segregation log.

Segregation "wellness checks" are conducted for each inmate daily on the 7:00 a.m. to 3:00 p.m. shift. Nursing staff administering morning medication proceeds cell-to-cell talking with each

inmate in segregation status. Documentation of the "wellness check" is noted on each inmate specific flow sheet. When the inmate is released from segregation, the flow sheet is filed in the inmate medical record. Additionally, the DON maintains a segregation log.

Ten general population medical records were reviewed for sick call encounters occurring during February, March or April 2014. The 10 records accounted for 20 nursing sick call encounters with the following details.

1. Of the 20 sick call encounters, 11 were performed by a registered nurse and nine were performed by a licensed practical nurse.
2. Of the 20 encounters, 10 resulted in a referral to either the physician or mid-level provider, one physician consultation at the time of the encounter and one temporary placement in the infirmary until the physician could evaluate the patient the next morning.
3. In each of the 10 referrals, the appointment occurred on the day scheduled, and the physician or mid-level provider addressed the issue that led to the referral.
4. Of the 10 referrals, six occurred on the same day or no later than the next, one occurred within two days, two occurred within three days and one occurred within five days.
5. In all 20 encounters, the pre-printed protocol form was used, a good history and duration were documented, vital signs were recorded and examinations as indicated were documented.

Five segregation status inmate medical records were reviewed from the same time period. The five records accounted for six sick call encounters with the following details.

1. Of the six encounters, three were performed by a registered nurse and three by a licensed practical nurse.
2. Of the six encounters, three resulted in a referral to either the physician or mid-level provider.
3. In two of the referrals, the patient was evaluated the same day, and in one of the referrals, the patient, with a complaint of dry, itchy skin, was evaluated in five days.
4. In all six encounters, the pre-printed protocol form was used, a good history and duration were documented, vital signs were recorded and examinations as indicated were documented.

# Chronic Disease Management

There are 637 inmates enrolled in the chronic disease clinic in 773 separate clinics. This is approximately 34% of the population at HCC. The distribution in clinics is as follows:

- Cardiac/Hypertension (317)
- Diabetes (73)
- General Medicine (173)
- HIV Infection/AIDS (15)

- Liver (57)
- Pulmonary Clinic (176)
- Seizure Clinic (42)
- TB infection (7)

Unlike other facilities, patients at HCC have all chronic diseases addressed at each chronic care visit. The only exception to this practice is patients with HIV whose disease is not followed by any of the onsite providers. Patients with more than one chronic disease are enrolled in what they call multi-clinic. The chronic disease nurse developed his own form for this purpose and it has been adopted by some of the other facilities as well.

The chronic care nurse at HCC is one of the most highly organized and competent chronic care nurse that we have met to date. He has developed and uses a multipage Excel spreadsheet for tracking all the clinics. He is devoted to the program full-time and does not get pulled to other tasks. He knows the patients well, does all the scheduling and coordinates all the labs, telemedicine appointments, routine physical exams and TB treatment. He has arranged mandatory educational sessions for the poorly controlled diabetics and plans to do another such session with inmates who were successful at changing their lifestyles as guest speakers.

## Cardiovascular/Hypertension

We reviewed six records of patients enrolled in the clinic. Record review showed a consistent lack of evaluating medication compliance, and a reluctance to adjust medication when blood pressures were less than well controlled. Given that patients are typically only seen every four months for their chronic diseases, this exposes them unnecessarily to the deleterious effects of hypertension with the potential risk of end organ damage. Examples follow.

**Patient #1**
This is a 59-year-old man with HIV infection, hepatitis C and hypertension who was admitted to IDOC in 2007 and has been at HCC since at least 2012 when his current volume begins. His chronic care over the past year unfolded as follows.

On 7/22/13, he was seen in hypertension clinic with a blood pressure of 130/92. The physician documented no subjective information. Control is rated as fair but no medication changes were made. The medication administration record (MAR) review shows that the patient did not pick up his metoprolol in June, but this does not appear to have been recognized by the provider.
On 11/20/13, he was seen in hypertension clinic. His blood pressure was well controlled at 118/76. The MAR shows he did not pick up his metoprolol in October.

On 1/27/14, he was seen in HIV clinic. His blood pressure initially was 162/100; on recheck it was 156/100 and then 146/98. He saw no one in follow up of this.

On 3/17, he was seen in hypertension clinic. His blood pressure was 110/82. The MAR shows he did not pick up his amlodipine in December.

On 4/12, he was involved in an altercation and placed in segregation. On 4/13, a nurse doing segregation rounds noted that the patient had excessive amounts of all his medications in his cell and referred him to the doctor to discuss medication compliance. The physician saw him the next day but did not address the medication compliance issue. His blood pressure that day was 142/80.

*Opinion*: When confronted with less than adequately controlled blood pressure, the provider failed to intervene. It appears that medication noncompliance plays a significant role in this patient's inconsistent blood pressure control, but this is going unrecognized and/or unaddressed by the clinician.

## Patient #2

This is a 48-year-old diabetic with hypertension and morbid obesity who has been incarcerated since 1999 and transferred to HCC in 2010. His problem list has not been updated since 2012. Chronic care over the past year was as follows.

On 5/3/13, he was seen in multi-clinic. His blood pressure was 140/90 and is rated as fair but no changes in medications were made.

He was not seen by a provider again until the next multi-clinic in September. His blood pressure was 146/92, rated as fair but no changes made.

On 12/1, the patient was moved to segregation and it was discovered that he had multiple cards of blood pressure medications in his property. His medications were then nurse dispensed. The MARs reflect that he consistently refused his hydrochlorothiazide but was compliant with other medications. He requested to discontinue the hydrochlorothiazide and was seen by the nurse practitioner for this on 12/24. His blood pressure was 170/98. The nurse practitioner did stop the hydrochlorothiazide but made no other medication adjustments. She ordered blood pressure checks.

On 1/7/14, he was seen in multi-clinic. His blood pressure was 178/94. Blood pressure checks from 12/31 to date were 140/84, 178/94, 150/90. This was rated as fair control and the doctor made no medication changes.

On 1/11, the patient was seen at nurse sick call for hypertension. His blood pressure was 170/104 and 170/102; on recheck it was 160/90. He was not referred to a provider despite being symptomatic with headache.

On 2/28, at 4:50 p.m., he was again seen at nurse sick call for hypertension. He complained of headache and blurred vision. His blood pressure was 210/126. The nurse practitioner was contacted and ordered a one-time dose of clonidine. His blood pressure came down to 162/96 at some time thereafter, but exactly when is not clear. He was released to his unit with no follow-up. He has not been seen again as of the date of our visit 5/8.

*Opinion*: This patient's blood pressure has not been adequately addressed. He has been exposed to the damaging effects of hypertension consistently for the past year. Severely elevated blood pressure with symptoms of headache and blurred vision is a hypertensive crisis and should be managed in a monitored setting such as an emergency department.

**Patient #3**
This is a 53-year-old man with asthma, diabetes and hypertension who arrived in IDOC on 3/13/14 and was transferred to HCC on 4/7/14. He was seen in multi-clinic on 4/20/14. His blood pressure was 142/88, which was inaccurately rated as good and no changes were made.

## Diabetes

At the time of our review, there were 23 patients whose diabetes was under poor control. This represents 31.5% of all diabetic patients at this facility, which is a very high number. To his credit, the chronic care nurse tracks these patients separately and has developed and implemented special educational programs for these patients.

We reviewed five records of patients with inadequate diabetes control. Again, the theme was a non-aggressive approach to medication titration with long intervals between visits, thus exposing patients to the damaging effects of elevated blood glucose. Four of the five patients were not managed with the intensity that their poor control required. The fifth patient had just arrived at HCC a month ago, so a pattern was not yet evident.

**Patient #4**
This is a 36-year-old type 1 diabetic who was admitted to IDOC in 2007 and transferred to HCC on 9/23/13. He is prescribed a non-physiologic insulin replacement regimen consisting of NPH twice a day and sliding scale insulin with meals. At the previous facility, he was prescribed Lantus and sliding scale insulin but was summarily switched to NPH upon transfer to HCC. He is not on a statin.

He has been seen frequently for his poorly controlled diabetes, with adjustments to the NPH which have made no difference in his blood glucose, which has continued to trend upward.

*Opinion*: Type 1 diabetics should be given physiologic insulin replacement with a basal/bolus regimen. Switching to NPH was inappropriate and has had a deleterious effect on the patient's diabetes control. This is placing him at high risk for an adverse outcome. Current guidelines recommend statin therapy for all diabetics.

**Patient #5**
This is a 56-year-old man with diabetes, hypertension and asthma who was admitted to IDOC in 1983 and transferred to HCC in 2009. He is not on a statin. His chronic care over the past year has been as follows.

On 5/16/13, he was seen in multi-clinic with poorly controlled diabetes (A1c of 10.5%) and his glipizide was increased.

On 6/12 and 7/17, he was seen in MDSC for follow up of AccuChecks, which were reasonably well controlled.

On 9/19, he was seen in multi-clinic. His diabetes was under poor control with an A1c of 11.9%. The doctor increased his glipizide.

He was not seen again until 1/16/14 at multi-clinic when his diabetes was still poorly controlled with an unchanged A1c. The nurse practitioner recommended starting insulin, but patient wanted to think about it. She requested follow up in two weeks.

When she saw him again on 1/30, he did not want to start insulin but rather wanted to decrease his carb intake and exercise more. He had not been seen again as of the date of our visit.

*Opinion*: A concerted effort should be undertaken to work with this patient more closely in order to get his diabetes under better control so as to decrease the risk of an adverse outcome.

**Patient #6**
This is a 48-year-old diabetic with hypertension, hyperlipidemia and hypothyroidism who arrived in IDOC in 2004 and was transferred to HCC on 11/26/13.

On 12/17, the patient was seen in multi-clinic. His A1c was 8.4% on 11/1 and the NPH was increased.

On 1/7/14, he was seen for his annual multi-clinic. There were no new labs but the nurse practitioner increased the NPH in response to elevated finger sticks. He has not been seen since.

*Opinion*: This patient should be seen more frequently in order to get his diabetes under better control.

**Patient #7**
This is a 48-year-old diabetic with hypertension and morbid obesity who has been incarcerated since 1999 and transferred to HCC in 2010. His problem list has not been updated since 2012. Chronic care over the past year was as follows.

On 5/3/13 he was seen in multi-clinic. His A1c was 10.9 on 4/29. The nurse practitioner spent a substantial amount of time exploring his dietary habits and counseling him on diet and exercise. She increased his insulin.
He was not seen by a provider again until the next multi-clinic in September. His A1c was 10% on 8/28 and acknowledged as poor control but no changes were made.

Four months later, he was seen on 1/7/14 in multi-clinic. His A1c was 9.6% on 12/10, which was noted to be poor but the only plan was "advised ↓ weight, ↑ exercise." His diabetes has not been addressed again as of the date of our visit.

*Opinion*: This patient should be seen more frequently for diabetes management to minimize his exposure to elevated blood glucose.

## General Medicine

There were six patients on Coumadin at the time of our visit, all of whom were currently in the therapeutic range and had largely remained so throughout the calendar year. The chronic care nurse keeps an excellent flow sheet, which tracks patients' lab results, clinic dates, frequency of blood draws and out dates.

We noted that one of the patients ([redacted]) has been on Coumadin since 2001 when he developed a right lower extremity DVT following a fracture of the tibia. Health care staff have documented that there was no history of recurrent DVT, yet he remains on therapy. A single episode of provoked DVT requires only short-term anticoagulation (3-6 months). The risks of this medication may outweigh the benefits at this late date; therapy should be reevaluated.

## HIV Infection/AIDS

We reviewed five records (30%) of patients enrolled in the clinic. Record review showed that most patients were seen timely in the HIV telemedicine clinic and most labs were done timely. However, the electronic stethoscope was often not functioning and the ID consultant relied on the patient's report of medication compliance, when our review of the MARs often contradicted these reports. As is true in all of the other facilities that we have visited, the onsite providers have nothing to do with any aspect of HIV care, including monitoring medication compliance and tolerability. In our opinion, the providers' lack of familiarity with these patients and the providers' lack of familiarity with HIV disease itself places the patients at unnecessary risk of adverse outcome.

**Patient #8**
This is a 59-year-old man with HIV infection, hepatitis C and hypertension who was admitted to IDOC in 2007 and has been at HCC since at least 2012, when his current volume begins. Record review shows that the electronic stethoscope was not functioning at three of the last five ID telemedicine visits, and that there were discrepancies between his reported medication compliance and that reflected on the MARs. For example, on 11/5/13, he was seen in HIV clinic and reported 100% medication compliance, but the MAR shows he did not pick up his Atripla in September. Likewise, at the 1/27/14 HIV clinic visit, he reported 100% medication compliance, but the MAR shows that he did not pick up his Atripla in January.

On 4/12/14, he was involved in an altercation and placed in segregation. The next day, a nurse doing segregation rounds noted that the patient had excessive amounts of all his medications in his cell and referred him to the doctor to discuss medication compliance. The doctor saw him the next day but did not address the medication compliance issue.

*Opinion***:** There seems to be a discrepancy between the patient's reported compliance rate and that which the MAR reflects. This should be brought to the attention of the provider so it can be discussed with the patient during the visit.

**Patient #9**
This is a 51-year-old man with hypertension and HIV infection who arrived in IDOC on 12/5/13 and transferred to HCC on 1/29/14. He has been seen twice in ID telemedicine clinic since his arrival and the electronic stethoscope was not functioning for either visit. Otherwise, labs have been done timely and his disease is well controlled.

**Patient #10**
This is a 44-year-old man with HIV infection whose care is complicated by his noncompliance with labs, visits and medications. He was last seen in HIV clinic in January 2012, at which time the ID specialist had a long discussion with the patient, impressing upon him the dire nature of his need to start medications given his low CD4 count and level of viremia. The patient was utterly unwilling to take ARVs or even Bactrim. He was offered multiple opportunities to see the ID doctor, but he has been refusing ever since. He did have labs done on 4/3/14, which showed a further decline in his CD4 count to 38 and a rise in his viral load to over 100K. The facility physician signed this lab but made no effort to discuss this with the patient.

The ID specialist recommended a psychiatric evaluation, though he admitted that the patient seemed to be capable of decision making. This recommendation was never followed, though there is a note dated 4/8/12 labeled "mental health chart review." It states only, "Mental health follow up only as indicated or as needed at this time," and does not speak to the concerns raised by the ID doctor.

*Opinion***:** Admittedly, this is a difficult case. However, attempts should be made by one of the onsite providers to develop a rapport with this patient in order to foster an atmosphere of trust that might be conducive to acceptance of therapy.

**Patient #11**
This is a 44-year-old man with HIV infection who entered IDOC in 2011 and arrived at HCC two weeks later. He is treatment naïve and has been offered the option of therapy but choses to forego for now, as the need to treat is not urgent. He has been seen timely in ID clinic (five times since April 2013) with labs done timely before each visit. The electronic stethoscope was not functioning at four of the five visits. He has not been seen by a local provider since June 2011.

*Opinion*: This patient should be seen periodically by a facility provider for the sake of continuity.

## Pulmonary Clinic

We reviewed three random charts of patients with asthma. This limited review raised questions about the accuracy of assessing disease control. One patient's asthma was deemed to be under good control at several clinic visits without any historical information to base this conclusion on.

In another case, a patient was rated as good control despite using his rescue inhaler twice each day. We suggest the CQI program evaluate this issue in more detail.

## Seizure Clinic

There were no patients rated as poorly controlled in the seizure clinic. We chose to review the four who were rated as fair control. A common theme was inadequate monitoring or titration of anti-seizure medications as described in the following cases.

**Patient #12**
This is a 33-year-old man with seizures who was received in NRC on 2/20/14 on Depakote and Dilantin. His intake labs showed a low Dilantin level of 6, and a therapeutic Depakote level of 51.3. His medication was not changed. He was transferred to HCC on 3/4 on the same doses.

On 3/23, he had a witnessed seizure and multiple doses of Dilantin and Depakote were retrieved from his cell. The Medical Director was contacted and ordered that his morning dose of Depakote be given and to house him in the infirmary. Later that evening, he had another witnessed seizure, then another that night. There is no evidence that the nurses contacted the doctor. The Medical Director saw the patient the next day and discharged the patient back to the unit. He did not order a drug level or make the medication nurse-administered.

On 4/2, he saw the nurse practitioner in seizure clinic. There were no new labs since the intake labs in February. She noted the breakthrough seizures but rated him as fair control. She increased the Dilantin and ordered a level in one month.

Later that evening, he had another seizure. The doctor was called and ordered him placed in the infirmary but there were no other orders. He saw the patient the next day and discharged him to his cell with a level prior to next clinic, but did not specify when the next clinic should be.

On 4/24, his labs were drawn. The lab called the next day with a critical Dilantin level of 33.2. The doctor was called and ordered the medication be held for five days, then resumed at the same dose with a repeat level. Later that morning, the nurse practitioner saw the patient, who told her that he had been taking three capsules a day instead of two. She ordered the medication be administered dose-by-dose per her note but did not write this on the order sheet and indeed, the MAR does not reflect that he was getting the medication nurse administered.

On 4/29, a code 3 was called to the unit for seizures. The nurse's note states that the Medical Director was onsite but there is no note from him, only orders for blood levels of both drugs and that the morning Dilantin and Depakote doses be given, then resumed at the prior dose. Again, multiple doses of his seizure medications were recovered from his cell (108 doses total). The patient was placed in the infirmary. That afternoon, he had another seizure and was given 2 mg of Ativan for what sounds like a postictal state (sleeping, snoring loudly, drooling).

The Medical Director saw the patient the next day and discharged him back to his unit. The previously drawn drug levels were not yet reviewed by the doctor, though they were resulted that

morning. The Depakote level was undetectable and the Dilantin level was subtherapeutic at 4.7. These were signed by the doctor on 5/1, but no changes were made and the patient had not been seen in follow-up as of our visit on 5/8. Review of the MAR shows that the medications were made dose-by-dose on 4/29 and that he has been largely compliant since then.

*Opinion*: This patient's medication has not been monitored or titrated appropriately. Despite being admitted to the infirmary multiple times, he has been discharged before gaining control of his seizures and ensuring stability.

**Patient #13**
This is a 28-year-old man with seizures who was admitted to IDOC on 11/18/08 and transferred to HCC on 12/24/13 on no seizure medications. His Dilantin was discontinued at the previous institution, due to him being seizure-free for years with levels that were subtherapeutic the majority of the time.

He was seen in seizure clinic on 2/5/14 and reported having a seizure two weeks prior. There is no other documentation of this in the chart. The doctor resumed the Dilantin but did not order a level.

On 2/17, the patient had a seizure, was given a dose of Ativan and placed in the infirmary. A Dilantin level was not obtained. The doctor saw him the next day, increased his Dilantin dose and discharged him to his cell house. He did not order a drug level.

On 2/20, the patient had another witnessed seizure. Afterward, he admitted to skipping his Dilantin dose that morning; however, this was not substantiated by the MAR, which shows that he took the dose and that he had been compliant with nearly all previous doses. He was placed in the infirmary and the physician was notified. There were no new orders and no note by the physician. He was released by the RN the next morning with no evidence that the case was discussed with the physician.

On 3/4, the Medical Director saw the patient for dandruff. There was no mention of the recent seizure activity.

On 4/4, he was seen in seizure clinic. His Dilantin level was 8.4 on 3/27 and he reported skipping some doses of the medication. MAR shows that he missed 11 doses in March. No medication changes were made.

On 5/8, there is a note from the LPN stating that the patient has been refusing his a.m. Dilantin dose since 4/20. He is scheduled to see the Medical Director on 5/28.

*Opinion*: This patient's Dilantin was not adequately monitored around the time of his breakthrough seizures. No meaningful management of his seizure disorder occurred during either of his two short stays in the infirmary. This patient's noncompliance needs to be addressed timely; he will be missing doses for nearly six weeks by the time he sees the doctor.

**Patient #14**

This is a 53-year-old man with seizures who has been incarcerated since 2003 and transferred to HCC in 2010. At the August 2012 chronic care visit, the patient's Depakote level was subtherapeutic. There was no documentation of when the patient's last seizure was. The Medical Director then decreased the patient's dose with no clinical rationale documented. He was seen regularly in chronic care clinic throughout 2013 without breakthrough seizures, though his Depakote level was consistently subtherapeutic. No changes to his dose were made.

On 1/24/14, he had a seizure witness by his cellie. He was placed in the infirmary for a 23-hour observation and the doctor was contacted. He ordered the Depakote dose be increased from 500 to 1000 mg per day. No blood work was ordered. He was released from the infirmary the next day by verbal order from the Medical Director.

On 4/3, he was seen in seizure clinic by the nurse practitioner. The Depakote level was subtherapeutic at 40.8. No medication changes were made. MARs show compliance with the great majority of doses.

*Opinion*: Consider adjusting this patient's medication dose in light of the prior seizure activity.

# Pharmacy/Medication Administration

Boswell Pharmaceuticals, located in Pennsylvania, provides all prescription and over-the-counter medications for the facility. Boswell is licensed as a Wholesale Drug Distributor/Pharmacy Distributor. The service is a "fax and fill" system which means patient new prescriptions faxed to the pharmacy by 11:00 a.m. will arrive at the facility the next day, and refill prescriptions faxed by 10 a.m. will be received the next day. Two local retail pharmacies or the local hospital are the back-up pharmacy for obtaining medication which is needed immediately and is not available in stock. Patient specific prescriptions, stock prescriptions and controlled medications arrive packaged in a 30-day bubble pack. Over-the-counter medications are provided in bulk by the bottle, tube, etc. The medication preparation/storage area is staffed with one full-time pharmacy technician, and Boswell provides a consulting pharmacist to come on-site once a month to review prescription activity, to assess pharmacy technician performance and technique and to destroy outdated or no longer needed controlled medications pursuant to the requirements of the Federal Drug Administration (FDA) and Drug Enforcement Agency (DEA). Inspection of the medication preparation/storage area revealed a large, clean, organized, well-lighted and well-maintained area. An interview with the pharmacy technician revealed a knowledgeable individual with twelve years working as the health care unit pharmacy technician. Inspection of the area indicated tight accounting of controlled medications, both stock and return items, needles/syringes, sharps/instruments and medical tools. A random inspection of perpetual inventories and counts indicated all were correct. Additionally, inspection of the perpetual inventories and counts in the infirmary medication room verified all were correct. Those inventories are verified each shift by on-coming and off-going infirmary nursing staff.

Access to the medication storage room is restricted to nursing administration, nursing staff and the pharmacy technician. Nursing administration and the pharmacy technician are required to draw keys to their area at the beginning of each shift and return the keys when leaving at the end of their shift. In the event they would leave institutional grounds with the keys, they are contacted by armory personnel to immediately return to the institution. Nursing staff are permitted to pass their key rings from shift to shift. Keys to the medication storage room and locked cabinets are restricted to nursing administration, nursing staff and the pharmacy technician. Keys to the "back stock" vault are restricted to the health care unit administrator and director of nursing. Refrigerator temperatures are monitored and documented daily.

All prescriptions, controlled medications, syringes, needles and other sharp tools are ordered, received and inventoried by the pharmacy technicians. Once received and counts verified, each of the items is added into the item specific perpetual inventory. Items placed in "back stock" are stored within a locked vault inside the locked and restricted access storage room. The perpetual inventories for all items located in the vault are verified weekly by the Health Care Unit Administrator and Director of Nursing. Medication carts are inventoried daily and restocked as needed. The crash cart inventory is verified weekly or any time the plastic security seal is broken. The controlled medication "back stock" perpetual inventory is verified weekly. The perpetual inventories for controlled medication in "front or working stock" are verified each shift by an on-coming and off-going nursing staff member.

Dose-by-dose medication is administered by licensed nursing staff two times a day. For morning (7:30 a.m. to 8:30 a.m.) medication administration, inmates from housing units one and three are moved to the health care unit in medication lines, and nursing staff goes to housing units two, four and segregation and administers the medication dose by dose directly from the inmate specific 30-day blister pack. For evening (7:00 p.m. to 9:00 p.m.) medication administration, nursing staff goes to all housing units, one through four and segregation, and administers the medication dose by dose directly from the inmate specific 30-day blister pack. Inmates requiring insulin move to the health care unit, at approximately 6:00 a.m. and 4:00 p.m. to receive their insulin prior to eating. Nursing staff administers directly from the patient specific blister pack and immediately documents the administration or refusal on the patient specific medication administration record (MAR). Patients refusing medication are required to sign a refusal form at the time of refusal.

## Laboratory

Laboratory services are provided through the University of Illinois-Chicago Hospital (UIC). Nursing staff draw and prepare the samples for transport to UIC. Results are electronically transmitted back to the facility, generally within 24 hours via secure fax line located in the medical department. UIC reports both to the facility and the Illinois Department of Public Health all reportable cases. There is a current Clinical Laboratory Improvement Amendment (CLIA) waiver certificate that expires January 27, 2015, on file. There were no reports of any problems with this service.

## Unscheduled Offsite Services

We reviewed five records of patients sent offsite urgently in which two of the five reflected an absence of a discharge summary. This lack of a discharge summary makes appropriate follow up more difficult.

### Patient #1

This is a 38-year-old who arrived at Hill Correctional Center on 4/14/14. He had a history of prior coronary problems and hypertension, including the placement of stents as well as vitiligo. In four days he had developed chest pain which was described as 9 on a scale of 10 and he also had nausea and vomiting. He was given nitroglycerin, which was ineffective. At that point, his blood pressure was 210/140 and he was diaphoretic and pale. Oxygen and aspirin were given and he was transferred to the local hospital after an EKG was performed. The EKG revealed sinus tachycardia with a right bundle branch block. Later in the afternoon, he was transferred from the local hospital to Methodist Hospital. His cardiac workup was negative and he was returned to the Correctional Center on 4/19. Again, no discharge summary was available.

### Patient 2

This is a 53-year-old patient who developed chest pain radiating to his left perasternal area. He was seen by the physician. His blood pressure was 165/90 and he was admitted to the infirmary for observation. He was given nitroglycerin and after one day he was discharged from the infirmary. He had another episode of chest pain on 1/13/14 and another on 1/14, and he was ultimately sent to the local hospital and then onto Methodist Hospital, where an angiogram was performed showing right coronary occlusion. Stents were placed and he was discharged the following day. He saw a cardiologist for a follow-up visit on 1/20. On 2/11, he had a cardiac chronic care baseline visit without the benefit of a discharge summary or any follow-up recommendations from the hospital.

## Unscheduled Onsite Services

We reviewed several records, including patients [redacted], [redacted], [redacted], and in each of these the patient presented with chest and epigastric pain and in each case the patients were seen by a nurse who never contacted the physician and never performed an EKG, in violation of the required procedure.

## Scheduled Offsite Services

The process at the Hill Correctional Center consists of a clinician initiating a consult request and this is then discussed by the Medical Director at the collegial review. The medical records person does participate and faxes a list with the request to Wexford. She indicated she sometimes schedules the appointments before she receives the authorization number, which does not necessarily immediately follow the verbal telephone approval. For most appointments, she is able to obtain an appointment date within 30 days. This includes both consultations and procedures. She is also responsible for notifying custody of the appointment dates. The

specialists fill in their portion of the request form and this is brought back to the prison by custody, who takes it to the nurse in the infirmary. This nurse reviews it and takes any necessary actions and sends a copy to medical records; they will initiate any follow up recommended. If collegial review determines an alternate plan of care is indicated, the patient is supposed to be brought back to the clinician to be informed. However, in our review this did not always happen. In fact, there were some visits, especially with the Medical Director, within the required timeframe where it does not appear that the alternative plan of care was in fact discussed. We reviewed 11 records and identified significant issues in six of those. Most of the issues related to lack of timely follow-up, including slow physician reaction to ultrasound results suggesting possible tumors in the liver.

## Patient #1

This is 34-year-old with no chronic problems. This patient was seen on 1/9/14, and was found to have a lump in his testicle. An ultrasound of the testis was recommended and approved and on 2/5, the ultrasound revealed a 1.4 cm solid right epididymal mass. On 2/11, this finding was discussed with the patient and two blood tests were ordered, both of which were negative. These were also discussed with the patient. A GU consult was requested on 3/4 and this was scheduled on 3/18. The genitourinary specialist diagnosed an inflammatory mass and recommended an antibiotic be given and for the patient to return in six weeks. The follow-up visit never happened.

## Patient #2

This is a 29-year-old with myeloneuropathy. On 2/20/14, the patient was sent out for an EMG of the right hand. The clinician had observed muscle wasting in the right hand on 2/7/13. On 1/7/14, an MRI of the neck revealed no basis for the radiculopathy. A neurosurgery consult was requested and this was approved and performed at U of I. An EMG of the right arm performed by a subspecialist was recommended and approved. The EMG indicated the findings were consistent with a multifocal motor neuropathy. The recommendation was that the patient needed a specific GMI antibody test which should be done at Washington University Medical School. The specialist indicated this problem could result in disability, but it also may be treatable. This problem had not been followed up, but the Health Care Administrator contacted the hospital and arrangements will be made to send the patient out.

## Patient #3

This is a 24-year-old with chronic left mid-abdominal pain for 4-5 years. On 11/13/13, discussions were had with the patient regarding a lower GI and an upper GI along with abdominal CT exam. The collegial review initially recommended weight loss. Both the barium enema and the upper GI were negative, along with the CT scan of the abdomen. The clinician recommended sending the patient to GI, but the collegial review decided that this patient should be monitored onsite. The patient was given a letter about the change in plan. However, the letter which this observer saw does not appear to be intelligible to the average inmate.

## Patient #4

This is a 56-year-old who arrived at Hill on 3/29/13 with a prior positive tuberculin skin test as well as hepatitis C. On 3/21/13, he went out for an ultrasound of the abdomen as recommended

by the hepatitis C specialist. The ultrasound showed multiple masses in the liver in December 2013. This was reviewed by the physician nine days after the service was performed. On 3/7/14, the hepatitis C specialist saw the patient and recommended a CT scan. The CT was done on 3/21/14 but there were no CT results in the chart. This patient has had an abnormal ultrasound for several months which no one acted on. These could have been tumors. Fortunately, we obtained the CT results which showed that they are likely hemangiomas of the liver, which are in fact benign. However, this patient is fortunate that despite the absence of follow up, his health is probably not in jeopardy. This is a particularly problematic case given the delay in action by the physician.

**Patient #5**
This is a 44-year-old with hyperlipidemia, hypertension and chronic kidney disease. This patient was sent for an echocardiogram on 4/11/14, and this procedure was being done to rule out pulmonary hypertension. This was recommended by nephrology. The report shows injection fraction of 70% and mild left ventricular hypertrophy, along with diastolic dysfunction and mild mitral regurgitation. There has been no follow-up visit with the patient. In addition, the echo report was not dictated until one week after the service was provided. This is an unacceptable delay.

**Patient #6**
This is a 45-year-old with no chronic problems who was sent out on 4/18/14 for an EMG and nerve conduction study of the right leg. In March 2014, he was complaining of burning and a pulling pain in his right leg which had been present for a year. He was referred to the physician on 3/4/14. Lab tests were ordered, which were normal. EMG was approved through collegial review on 3/25. EMG was done on 4/18, and revealed spastic paraparesis, suggestive of a central nervous system lesion in the thoracic spine. There was a normal neuroconduction study of the right lower extremity. An MRI of the spine was then recommended. This was approved and performed on 4/25. The MRI report reveals disc fragments and disc protrusion causing a stenosis of the left neural foramen. There has been no follow up by the physician with the patient.

In reviewing several cases that resulted in alternative plans of care, we could not find, for several of them, any discussion between the physician and the patient about the change in plan.

# Infirmary Care

The infirmary is a 15-bed unit configured as three, four-bed rooms and three single bed rooms. The three single bed rooms are functioning negative air pressure respiratory isolation rooms. There is a "nurse call" system with a button on the wall above each bed headboard that when pushed provides both a visual and audible alarm. In the event the patient's medical condition prevents him from being able to push the wall mounted button, bedside call light cords are available as needed.

The unit is staffed with at least one registered nurse 24 hours a day, seven days a week whenever the infirmary is occupied. Security staff that is assigned to the health care unit performs routine rounds through the infirmary.

Inmate porters perform all the janitorial duties in the infirmary. When assigned to the health care unit, each porter is required to receive training on blood-borne pathogens, infectious diseases, bodily fluid clean-up, proper sanitation of infirmary room, beds, furniture and linens and confidentiality of medical information. The training is conducted by the Health Care Unit Administrator, and each inmate/porter is required to sign-off as having had the training and sign a written health care unit porter job description. Additionally, each porter is offered the Hepatitis B vaccine series.

An infirmary daily report and movement log is maintained which lists the name and number of each patient in the infirmary, status, for example acute, chronic, crisis watch, etc., diagnosis, diet, lab tests, admission date and time, discharge date and time and comments. An infirmary daily activity report is also maintained which details the name, number, diagnosis, location and dates admitted and discharged from outside hospitals, patients going outside the facility for outpatient services, community hospital emergency room occurrences, on-site specialty clinics and any deaths.

The DON reported an average daily census of 8-11 patients with 1-3 being on acute care status and the remainder being either chronic care, housing and temporary placement.

It seems that the majority of the infirmary admissions are not actually admissions but 23-hour observations. We learned that observations do not require a doctor's order to release; though IDOC encourages this, it is not required by policy. This could account for the relatively low census in the infirmary.

At the time of our visit, there were eight patients admitted to the infirmary, two of whom were on mental health watches. There was one acute patient; the rest were either chronic admissions or housing assignments. The acute admission ([redacted]) is a 46-year-old man admitted on 4/22/14 with an intra-articular fracture of the left distal tibia treated with an external fixator. He has been seen timely, including once for chronic care clinic. He consistently complains of severe pain rated as 8-10 out of 10, which does not appear to be adequately treated with the conservative medication regimen he is prescribed.

# Infection Control

The Director of Nursing (DON) functions as the facility infection control nurse. When required, she interfaces with the County Department of Public Health and the Illinois Department of Public Health (IDPH). The DON monitors, completes and submits to IDPH all reportable cases. Skin infections and boils are aggressively monitored, cultured and treated. Per the DON, there is an average of two culture-proven methicillin resistant Staphylococcus aureus (MRSA) infections per month.

Health Care Unit nursing staff conducts monthly safety and sanitation inspections in the dietary department and performs pre-assignment and annual "food handler" examinations for staff and inmates to work in the dietary department. Negative air-pressure readings in the three respiratory isolation rooms are monitored and documented each shift. A tour of the health care unit, including the infirmary, verified personal protective equipment (PPE) available to staff in all areas as needed. Additionally, PPE is included in the emergency response bags. Puncture proof containers for the disposal of syringes/needles and other sharp objects are in use in all areas of the health care unit as needed. The facility uses a national commercial waste disposal company for disposing of medical waste. Institutional staff is trained in communicable diseases and blood-borne pathogens annually.

The unit is clean, with the janitorial duties performed by inmate porters. When assigned to the health care unit, porters receive training, as provided by the Health Care Unit Administrator, in the proper sanitation of infirmary rooms, beds, furniture and linens, communicable diseases, blood-borne pathogens, bodily fluid clean-up and confidentiality of medical information. Weekly, porters are required to wash down with a solution of water, soap and bleach all the walls in the infirmary. Following each use, the infirmary shower, walls and floor, are disinfected with a solution of water, soap and bleach. Health Care Unit porters launder the infirmary linens in a health care unit laundry room. A test of the washing machine hot water temperature indicated a temperature of only 125 degrees F. This temperature is too low to assure the proper cleaning and sanitizing of potentially body fluid soiled bed linen.

Additionally, it was reported the hot water temperature in the institutional laundry is routinely measured at 125 degrees F, which again is too low. In order to properly sanitize, linens are to be exposed to water at least 160 degrees F for 25 minutes or given a bleach bath having an initial starting concentration of 100 parts per million and a temperature of at least 140 degrees F for at least 10 minutes.

The impervious vinyl coating on examination stools and tables and infirmary mattresses was noted to be torn or cracked, which prevents proper sanitizing and allows for potential cross-contamination between patients. The items in question should either be reupholstered or replaced.

## Inmates' Interviews

Six insulin dependent inmates were interviewed. All six had been diagnosed several years previously, and all six were knowledgeable regarding their chronic disease. Six of the six were knowledgeable regarding the significance of their hemoglobin A1c blood level. Five of the six knew the results of their most recent hemoglobin A1c blood level. All six reported being evaluated by the physician every 3-4 months and having the ability to perform blood glucose monitoring prior to the administration of insulin. All six reported they are informed of their most recent hemoglobin A1c level during each diabetic clinic. All were of the opinion the medical director tries to do a good job managing their diabetic care.

It was reported that breakfast is served between 5:00 a.m. and 6:00 a.m., lunch is served between 10:15 a.m. and 11:30 a.m. and dinner is served between 4:00 p.m. and 5:30 p.m. All six inmates stated that breakfast is always cold cereal, white bread and a sweet roll. It was reported that morning insulin is administered between 4:00 a.m. and 5:00 a.m., and afternoon insulin between 3:15 p.m. to 3:45 p.m.

All six inmates agreed on the following issues.

1. Very little educational literature provided/available
2. Serious lack of adequate exercise time
3. Diet is "diabetic unfriendly;" it is too high in carbohydrates and low in protein
4. Bottom bunk orders are not automatically provided to insulin dependent diabetic patients
5. No podiatry care
6. Sometimes receive insulin prior to eating and sometimes after eating
7. Even though hard candy is approved for sale in the inmate commissary, when inmates carry candy to self-treat low blood sugar, some security staff will take the candy during random shakedowns; policy is not consistent.

# Dental Program

## Executive Summary

On May 6-9, 2014, a comprehensive review of the dental program at Henry Hill CC was completed. Five areas of the program were addressed including: 1) inmates' access to timely dental care; 2) the quality of care; 3) the quality and quantity of the providers; 4) the adequacy of the physical facilities and equipment devoted to dental care; and 5) the overall dental program management. The following observations and findings are provided.

The clinic itself consists of a three chairs and units in three linear clinic bays in a long clinic area. The space is adequate in size. The chairs and units are approaching 30 years old and are in marginal to poor condition. The intra-oral x-ray unit is old and in poor condition. The cabinetry is showing wear and corrosion. There is an adjoining room housing the dental laboratory and sterilization area. There is also an adjoining office for staff. Instrumentation and equipment are adequate to meet the needs of this institution.

Comprehensive care delivery was an area of concern. No comprehensive examination and no treatment plan preceded comprehensive care delivery. No documented examination of the soft tissues nor periodontal assessment was part of the treatment process. Hygiene care and prophylaxis were not provided prior to restorations. Restorations at times proceeded without appropriate intra-oral radiographs. Oral hygiene instructions were seldom documented.

A dental hygienist is not on staff at Henry Hill CC. This omission needs to be corrected.

Another area of concern was dental extractions. All dental treatment should proceed from a documented and accurate diagnosis. A diagnosis or reason for extraction was seldom documented. Current and adequate x-rays were not always present to proceed with dental extractions.

Partial dentures should be constructed as a final step in the sequence of care delivery included in the comprehensive care process. Since a comprehensive examination and treatment plan was never part of the treatment process, it was impossible to determine what pre-prosthetic care was needed and what was done or left undone. Periodontal assessment and hygiene care were never provided. Oral hygiene instructions were seldom documented.

Inmates access sick call through a daily sick call sign-up every morning in the units. Inmates with urgent complaints (pain and swelling) are encouraged to use dental sick call. The inmates are seen that morning for a triaged evaluation. Urgent care needs are addressed at that time. Others are rescheduled based on level of need. Routine care was not provided at sick call. The system works successfully and inmates with urgent care needs are seen in a timely manner. In none of the entries was the SOAP format being utilized nor was a diagnosis present.

Inmates request routine care via the inmate request form. These inmates are seen and evaluated within four to five days and placed sequentially on the waiting list. The waiting list for routine care is 18 months long and is of major concern to inmates and administration alike. Because inmates are placed back at the end of the waiting list after a routine care appointment, they wait 18 months for their next appointment. As such, continuity of care was poor, especially with no hygienist on staff.

The health history section of the dental record was not thorough and poorly developed. There was no system in place to "red flag" patients with medical conditions that require medical consultation or intervention prior to dental treatment.

Blood pressures should, at the least, be taken on patients with a history of hypertension. When asked, the clinician indicated that she does not routinely take blood pressures on these patients.

The sterilization area was small and shared with the dental laboratory. Sterilization flow was satisfactory. Although most instruments were bagged and sterilized, a large tray of unbagged instruments was in a cabinet. The instruments were being removed one at a time when needed for dental treatment. Slow speed handpieces were sterilized and stored unbagged. Also, examination instruments were bagged and sterilized in bulk. Instruments were removed from the opened bag one at a time as needed. All instruments should be bagged and sterilized individually or in kits.

There was not a biohazard warning sign in the sterilization area. Safety glasses were not worn by patients during treatment. No radiation hazard signs were posted in the area where x-rays are taken.

Finally, bulk storage of filled biohazard materials bags was maintained in the dental clinic proper in two large open cardboard boxes on wooden pallets. This is highly irregular.

The continuing quality improvement program is inadequate and poorly utilized. The dental program should develop studies and corrective actions to address the weaknesses described in the body of this review.

## Staffing and Credentialing

Henry Hill CC has a dental staff consisting of one full-time dentist and two full-time assistants. Dr. Jackson works four 10-hour days. She is not in the clinic on Fridays. One of the assistants also works the same hours. There is no hygienist on staff. This is a serious omission, as hygiene services and periodontal therapy are essential parts of any dental program. Without this aspect of care, the principles of comprehensive care are violated. There is little in the way of preventive services offered. Preventive care is an essential aspect of comprehensive dentistry. Restorations and prosthetics proceed without addressing periodontal needs and plaque control. The primary objective of dental care is oral health. Without oral hygiene services, this objective will never be met. Dr. Jackson cannot be expected at all to provide these services in a meaningful way. This is poor use of her skills and she has not the time. She is more than busy addressing more urgent dental needs.

The current staffing is not sufficient to meet the oral health needs of the inmate population at Hill CC.

Dr. Jackson's credentials are on file and the entire dental staff is certified in CPR.

**Recommendations:**
1. Immediately hire a dental hygienist to address the hygiene services and preventive aspects of the dental program.

## Facility and Equipment

The clinic consists of three chairs and units in marginal to poor condition. The dentist uses two of these units. These units are the original ones from when Hill CC opened in 1986, so they are approaching 30 years old. They are very worn, torn and corroded. They are not up to contemporary standards for disinfection. Replacement of these three units is indicated. There is no panorex in this clinic. The x-ray unit is in similarly old and poor condition. The autoclave is rather new and functions well. The instrumentation is adequate in quantity and quality. The handpieces are older but well maintained and repaired when necessary. The cabinetry is rather old and showing wear and corrosion, but is functionally OK. This does make disinfection of cabinet surfaces more difficult and potentially compromised.

The clinic itself consisted of three chairs in three separate and adequate spaces. Free movement around each unit is acceptable. Provider and assistant have adequate room to work, and none of

the chairs interfere with each other. There was a separate sterilization and laboratory room of adequate size. It had a small but adequate work surface and a large sink to accommodate proper infection control and sterilization. Laboratory equipment was in a separate corner of the room. The staff had a separate room for office space. It was adequate in size with desks and file cabinets. The facility and equipment are adequate to meet the needs of Henry Hill CC

**Recommendations:**
1. Replace the three dental delivery units and chairs in the main clinic as soon as possible. The delivery of safe and efficient dental care is being compromised. New units are designed to meet contemporary standards of disinfection and safety.
2. Replace the x-ray unit, as it is very old, cumbersome and outdated.

## Sanitation, Safety, and Sterilization

I observed the sanitation and sterilization techniques and procedures. Surface disinfection was performed between each patient and was thorough and adequate. Proper disinfectants were being used. Protective covers were utilized on some of the surfaces.

An examination of instruments in the cabinets revealed that most were properly bagged and sterilized. There was a tray of a large stack of what I was told were sterilized instruments that were not bagged. They were removed from the tray one at a time as needed for patient care. All instruments should be sterilized and bagged. All high-speed handpieces were sterilized and in bags.

The sterilization flow from dirty to clean met acceptable standards.

There was not a biohazard label posted in the sterilization area. Safety glasses were not always worn by patients. Eye protection is always necessary, for patient and provider. Also, there was no warning sign posted where x-rays were being taken to warn of potential radiation hazard.

## Review Autoclave Log

We looked back three years and found the sterilization logs to be in place. They utilize the Crosstex system from Henry Schein. They are notified if a negative test is obtained. The sterilization area is shared with the dental laboratory. The area in general was old and rusted and rather disorganized. Proper sterilization flow from dirty to sterile was in place. Storage cabinetry was also old and corroded.

An examination and review of sterilization procedures revealed that examination instruments were packaged and sterilized in bulk. The whole sterilized package was then opened at the beginning of the day and instruments removed individually from this opened bag. This creates opportunity for cross contamination. Examination kits should be created and bagged and sterilized individually. Also, straight and right angle handpieces were sterilized but not packaged. These handpieces should be bagged and sterilized individually.

Surprisingly, bulk storage of filled biohazard material bags was maintained in the dental clinic proper, in two large, red bag lined, open cardboard boxes on wooden pallets. These were in the open clinic area, not in separate room or area. This is highly irregular and does not comply with OSHA standards for biohazard storage.

No radiation hazard warnings were seen in the x-ray area or in the clinic.

**Recommendations:**
1. That all instruments and kits, including all handpieces, be individually bagged before sterilization and not maintained loose and in bulk.
2. That a biohazard warning sign be posted in the sterilization area.
3. A warning sign be posted in the x-ray area to warn of radiation hazards.
4. That the bulk storage of filled biohazard materials bags be in a separate room, away from the clinic area, and that it meet all OSHA requirements for such storage.

## Comprehensive Care

We reviewed 10 dental records of inmates in active treatment classified as Category 3 patients. One of the most basic and essential standards of care in dentistry is that all routine care proceed from a thorough, well documented intra and extra-oral comprehensive examination and a well developed treatment plan, to include all necessary diagnostic x-rays. A review of 10 records revealed that no comprehensive examination was ever performed and no treatment plans developed. No examination of soft tissues or periodontal assessment was part of the treatment process. Hygiene care and prophylaxis was never provided. Hill CC has no hygienist on staff. This is a serious omission that will be discussed in the staffing section of this report. Those records with an examination of hard tissues had bitewing x-rays available. Restorations were provided from a panorex x-ray in five of the 13 patient records reviewed. This radiograph is not diagnostic for caries. Further, oral hygiene instructions were seldom documented in the dental record as part of the treatment process.

**Recommendations:**
1. Comprehensive "routine" care be provided only from a well developed and documented treatment plan.
2. The treatment plan be developed from a thorough, well documented intra and extra-oral examination, to include a periodontal assessment and detailed examination of all soft tissues.
3. In all cases, that appropriate bitewing or periapical x-rays be taken to diagnose caries.
4. Hygiene care be provided as part of the treatment process.
5. That care be provided sequentially, beginning with hygiene services and dental prophylaxis.
6. That oral hygiene instructions be provided and documented.

## Dental Screening

Although Henry Hill CC is not a reception and classification center, I reviewed these records to insure the reception and classification policies as stated in Administrative Directive 04.03.102, section F. 2, are being met for the IDOC.

**Recommendations:** None. All records reviewed were in compliance.

## Extractions

One of the primary tenets in dentistry is that all dental treatment proceeds from a well documented diagnosis. In only three of the 10 records examined was a diagnosis or reason for extraction included as part of the dental record entry. Additionally, all extractions should proceed from current, accurate and diagnostic x-rays. In four of the 10 records this was not the case. I reviewed five additional records and found this also to be true for four of those records. These are rather serious omissions in the safe and correct delivery of dental care. Diagnostic radiographs are essential. Extractions without adequate radiographs is risky, for patient and dentist. Consent forms were on file.

**Recommendations:**
1. A diagnosis or a reason for the extraction be included as part of the record entry. This is best accomplished through the use of the SOAP note format, especially for sick-call entries. It would provide much detail that is lacking in most dental entries observed. Too often, the dental record includes only the treatment provided with no evidence as to why that treatment was provided.
2. That all oral surgical procedures only proceed with a current diagnostic x-ray.

## Removable Prosthetics

Removable partial denture prosthetics should proceed only after all other treatment recorded on the treatment plan is completed. The periodontal, operative and oral surgery needs all should be addressed prior to partial denture construction. Since a comprehensive exam and treatment plan was never part of the treatment process, it was impossible to determine what pre-prosthetic care was needed and what was done or left undone. In only one of the five records reviewed of patients receiving removable partial dentures were oral hygiene instructions provided. Periodontal assessment was not documented in any of the records, and no hygiene care was part of the treatment process.

**Recommendations:**
1. A comprehensive examination and well developed and documented treatment plan, including bitewing and/or periapical radiographs and periodontal assessment, should precede all comprehensive dental care, including removable prosthodontics.
2. That periodontal assessment and treatment be part of the treatment process and that the periodontium be stable before proceeding with impressions. That oral hygiene instruction

always be included.
3. That all operative dentistry and oral surgery as documented in the treatment plan be completed before proceeding with impressions.

## Dental Sick Call

Inmates access dental sick call through a sign-up every morning in the unit. This dental sick call list is given to dental that morning and all of the inmates on these lists from the units are seen that same morning on the emergency dental line. Urgent dental care has priority and inmates are often treated that same day. Others are given appointments based on their needs. This is a good system and very timely in addressing urgent care needs. Segregation is done the same way. These segregation inmates are escorted and do not need to be segregated from the general population. A review of these 10 records revealed that routine care was not being provided on sick call. In all cases the complaint was addressed. In none of the entries was the SOAP format being used. Nor was any diagnosis usually provided.

**Recommendation:**
1. Implement the use of the SOAP format for sick call entries. It will assure that the inmate's chief complaint is recorded and addressed and that a thorough focused examination and diagnosis precedes all treatment.

## Treatment Provision

A triage system is in place that prioritizes treatment needs. Inmates have daily sick call sign-up available and these inmates are seen the same day and are triaged and provided care accordingly. Urgent care needs are addressed that day. Others are scheduled accordingly or placed on the routine treatment list. Inmates are being seen in a timely manner and their issues addressed.

Inmates can seek urgent care via the daily morning sick call sign-up or, if they feel they need to be seen immediately, by contacting Hill CC staff, who will then call the dental clinic with the inmate's complaint. The inmate is seen that day for evaluation. Request form complaints from inmates with urgent care needs (complaint of pain or swelling) are seen at least by the following working day. Mid-level practitioners are available at all times to address urgent dental complaints. They can provide over the counter pain medication or call medical/dental staff if they feel more is needed.

Inmates who submit request forms for routine care are evaluated within 4-5 days and placed sequentially on a waiting list for this care. There is a waiting list for routine care which is about 18 months long and a waiting list for non-urgent extractions which is about 8 months long. Inmates who are seen for routine care are placed back at the end of the routine care list after every appointment. Therefore, it is approximately 18 months between appointments. Continuity of care is impossible in such a system, especially with almost no hygiene care available. Inmates complain about this system and dental receives about one inmate grievance every week. Other difficulties associated with routine care include the fact that the dentist works only four days per

week. Also, there is a count every afternoon at 3:00 p.m. Inmates are expected to be in their unit by 2:45 p.m. and count is usually over at 3:30 p.m. To accommodate this inmate non-movement count, the final appointments for the day are scheduled at 2:15 p.m. These two or three patients are seen during and after the count until 4:00 p.m. The last 30 to 45 minutes are used to clean, do instrument counts and organize the clinic for the following day. The process seems inefficient and probably contributes to the length of the waiting list. The length of this list was a major concern to inmates and administration.

**Recommendations:**
1. Although the system seems equitable, I suggest that inmates taken off the routine care list be taken to completion rather than be placed back at the end of the list between appointments. Much better continuity of care can be accomplished and inmates may perceive that they have a much better chance of getting all of their dental work done.
2. A hygienist should be hired immediately. It is an essential part of the dental team.

## Orientation Handbook

Dental issues are not included in the Henry Hill Correctional Center Orientation Manual

**Recommendations:**
1. That the dental program information regarding access to care, types of care, and management of care be included in the Henry Hill CC Orientation Manual.

## Policies and Procedures

The policies and procedures are adequately developed and address all of the critical areas. They are out of date and should be updated and properly endorsed as soon as possible

**Recommendations:**
1. Update and properly endorse the dental policies and procedures in place at Henry Hill CC.

## Failed Appointments

A review of monthly reports and daily work sheets revealed a failed appointment rate of less that 5%. This is well within an acceptable range.

**Recommendations:** None

## Medically Compromised Patients

A review of the dental records of inmates on anti-coagulant therapy found that three of the six made no mention of this at all. The health history section of the dental record is very weak and

lacks sufficient detail. None of the records was red flagged to attract the immediate attention of the provider. The medical history in the dental section is inconsistent in identifying medically compromised patients that may need special considerations and consultation with medical staff prior to dental treatment.

When asked, the clinicians indicated that they do not routinely take blood pressures on patients with a history of hypertension.

**Recommendations:**
1. That the medical history section of the dental record be kept up to date and that medical conditions that require special precautions be red flagged to catch the immediate attention of the provider.
2. That blood pressure readings be routinely taken on patients with a history of hypertension, especially prior to any surgical procedure.

## Specialists

Dr. Jackson seldom uses the services of a community oral surgeon. She does all of the surgeries herself in house, including impacted third molars and the excision of soft tissue lesions. This is a commendable service she provides which saves costs and adds to the safe running of the institution. Oral surgery services are available with a group called Kasper and Bolofchak, OS at Western Illinois Oral and Maxillofacial Surgery in Galesburg, IL.

**Recommendations:** None.

## Dental CQI

The dental program contributes monthly dental contact and production statistics to the CQI committee. A CQI-type study was documented as completed in January of 2014. The study consisted of tracking completed restorations and seeing how often the tooth eventually needed to be extracted. The threshold was documented as "met" and no follow-up was needed. It was a bit confusing and not well designed. Meaningful studies would be focused on the length of the waiting list and on other program weaknesses.

**Recommendations:**
1. Vitalize and expand the CQI process by developing ongoing CQI studies that address the weaknesses in the dental program identified in this report. Implement developed policies and procedures that are directed toward these improvements.

# Mortality Review

There were five deaths at HCC over the past year. One was a suicide. Of the other four, one was transferred here on hospice for metastatic liver cancer, and one died of end stage liver disease but

was followed closely by Dr. Paul at Wexford who was the main provider orchestrating his care and no problems were identified. The remaining two were seriously problematic as described below.

## Patient #1

This was a 48-year-old man who was admitted to IDOC in 1984, arrived at HCC in 2009 having quit smoking two years prior and died of lung cancer on 1/30/13. He began complaining of left neck and chest pain in February 2012 and wrote several letters of concern that his problem was not being diagnosed or treated appropriately. In one such letter dated 4/11/12, he states that, "This matter has gotten worse there is convulsing pain in my rib cage which has my left rib cage protruding more than the right side." He requested to see "a physician not a nurse."

The first nurse sick call note is dated 5/8/12 when he was seen at nurse sick call stating, "I coughed up blood and it's from this injury to my shoulder." He was referred to the MD on 5/15. On that date, he saw the Medical Director for several complaints: joint pain, loss of muscle tone, (illegible) all over the body, urinary symptoms and weight loss. Chart review confirms that he had in fact lost 30 pounds over the past year. The doctor's assessment was "multiple joint pain & other complaints. Loss of weight." He ordered labs, an anti-inflammatory and a follow-up in two weeks.

When he saw the patient back on 6/5, the patient complained of left-sided chest pain radiating down the left arm, weight loss, and "spitting up thick sputum." On exam the doctor noted "left supraclavicular mobile < quarter size swelling (illegible)." He reviewed and acknowledged that the labs revealed anemia. He put the patient on iron and ordered a chest x-ray and a follow-up visit.

The chest x-ray was done that day and showed, "A focal opacity in the left lower lobe with tenting of the left hemi-diaphragm. This finding is new...superimposed acute infection cannot be excluded... follow up may be obtained."

On 6/13, the Medical Director saw the patient in follow up of the chest x-ray results. He noted that the patient had "multiple complaints" but did not enumerate them. Vitals were: 133.5#, 133/78, 99.2, P108, R18. The exam was documented as benign. He ordered the patient saline gargles and a repeat CBC after 30 days, then follow up.

On 7/17, the Medical Director saw the patient in follow up of the CBC. The only subjective information is "denies bleeding." His weight was now 130 pounds. A benign exam was documented. The anemia was slightly worse. The doctor increased the iron, ordered an HIV test and a repeat chest x-ray in December.

On 7/27, the patient submitted a grievance stating that he had lost his voice on 5/26 and that he had seen the Medical Director multiple times but the doctor was not doing anything about it. He also stated that he noticed a lump on his neck on 6/3 and on 6/5 pointed it out to the doctor, who said, "it's not a lymph node, it may be a cyst," according to the patient. He requested to be sent to an ear nose and throat specialist, "and this lump be treated for possible cancer and removed."

On 8/12, the patient wrote a letter to the Warden about his voice being "out" for three months and the lump on the left side of his neck "which may or may not be cancerous."

On 8/15, the patient was brought to the clinic to see the Medical Director. The patient reported spitting up blood since 6/17, chest pain since February, hoarseness x 3 months, pain in the left scapular area, and coughing a lot since May. His weight was 127 pounds. The doctor noted an "almond shape mobile swelling app 3.5 cm non-indurated." He ordered more labs and a Z-pack as well as an x-ray of the abdomen.

On 8/20, he presented with hemoptysis and brought a tissue with large amount of blood in it. The nurse noted his voice had a "harsh tone." She referred him to the doctor immediately. The only subjective information the doctor documented was, "says I am better than before." He documented a normal exam, assessment was "follow up hemoptysis" and plan was to "arrange blood results, will follow up accordingly." The labs ordered on 8/15 were drawn now and showed worsening anemia.

On 8/21, he presented to the nurse at 9:00 p.m. with left shoulder and chest pain. She placed him in the infirmary for observation. The RN saw the patient at 3:00 a.m. and noted that the patient rated his pain as extreme and that his left shoulder blade appeared "different." The Medical Director saw the patient on 8/22 and noted that the patient "says I am fine, I have this left shoulder pain off and on for 1-2 months." He documented a normal exam and discharged the patient back to the unit with naproxen and follow up "as needed."

On 8/29, the patient was brought to the HCU in a wheelchair because the pain in his left side was so severe he was unable to walk upright. The nurse noted that his "physique is asymmetrical, veins, muscle more pronounced on left side...skeletal more pronounced on left side...I/M states he coughed up blood." The Medical Director saw him the next day and noted the left cervical adenopathy and now new left axillary adenopathy. He ordered a repeat chest x-ray, sputum cytology and discussed the case with Dr. Baker on an emergency basis to get approval for a CT scan. He also spoke to a pulmonologist to arrange consultation. The patient was placed in the infirmary.

The CT scan was done the next day (8/31) and showed "a very large carcinoma which extends through the superior portion of the left hemithorax through the apex and involves the left anterior chest extending to the anterior pleural surface, and invading the mediastinum with tumor surrounding the ascending thoracic aorta, extending along the aortic arch and encircling the proximal descending thoracic aorta. The primary tumor extends for at least 15 cm ...[by] 10.2 cm...by 9.2 cm...there is circumferential tumor around the left mainstem bronchus and which engulfs the left upper lobe bronchi and proximal left lower lobe bronchi. Tumor also invades the pericardium and pericardial fat...and produces mass effect upon the main pulmonary artery and encircles the left pulmonary trunk almost completely obliterating the lumen...the superior vena cava is anteriorly displaced from bulky adenopathy ...There is also mass effect upon the superior posterior margin of the right atrium by bulky adenopathy ..."

The CT report was received by the institution on 9/4 and discussed with the patient the same day. He was seen by pulmonology on 9/5, but clearly his case was too far advanced for anything other than palliative treatment. He continued to decline until he died four months later.

*Opinion*: The blatant disregard for this patient's obvious symptoms of serious illness is stunning. The lapses in care are so numerous and so egregious it is hard to know where to start. Perhaps at the onset of symptoms, which took three months to finally result in a visit with the physician? But alas, at that visit and multiple visits to follow, the doctor either disregarded or failed to recognize the constellation of symptoms that were highly indicative of malignancy. Which of the two explanations is more dangerous is not clear. Given the marked discrepancies between the patient's reported symptoms as documented in his own words and the nurses' notes, and the doctor's version of these same symptoms as documented in his notes, we suspect the former explanation is more accurate. In any event, despite the patient's repeated earnest cries for help, including several instances wherein he was essentially stating "I think I have cancer," his symptoms were brushed off by the doctor until the repeated presentations of this dying man could no longer be ignored.

The death summary was done by none other than the doctor responsible for this patient's care (or lack thereof). If one reads between the lines, the lapses in care are hinted at, but not recognized as such by the author. There is no acknowledgment that this patient's death was hastened by the doctor's failure to obtain the appropriate work-up in a timely manner.

## Patient #2
This was a 56-year-old man who was admitted to IDOC on 10/12/11, transferred to HCC on 11/9/11 and died of non-Hodgkin's lymphoma on 9/9/13. He had elevated liver enzymes on reception labs, but these were not worked up. He had no known chronic diseases and so was not followed in the chronic care program.

He was seen episodically until 1/29/13, when he presented to sick call with left-sided abdominal pain and was found to have marked enlargement of his spleen. The doctor did not order imaging, only urine and blood tests. He told the patient to drink more water and ordered naproxen. The CMP showed a markedly elevated bilirubin at 7.7 and mildly elevated AST at 90. This lab was signed off by the doctor but not acted upon and there was no follow-up of this.

The patient presented again on 5/7 with ongoing left-sided abdominal pain with deep breathing and lying down. He was referred to MDSC the next day and was seen by the nurse practitioner, who took a thorough history and noted left abdominal tenderness and referred pain from right sided palpation. She described the abdomen as firm. She ordered abdominal films and an evaluation by the Medical Director.

The films were taken on 5/8 and read 5/10 as, "Soft tissue density mass noted in the left abdomen may be related to marked splenomegaly. There is also possible hepatomegaly..." A CT or US was suggested. The nurse practitioner signed the report on 5/13 and noted that the Medical Director would be following up with the patient the next day.

The doctor saw the patient the next day, again noted tender splenomegaly and stated that he would discuss the case in collegial review and follow up with the patient on 5/20.

On 5/16, his blood work showed elevated liver enzymes and bilirubin, and a low platelet count.

On 5/20, the patient saw the Medical Director, who again noted tender hepatosplenomegaly and again noted he would discuss the case in collegial review. He discussed the case the next day and US was approved. It was done on 5/30 and faxed to the institution on 6/5. It showed marked splenomegaly and CT was suggested for better detail. Labs were obtained, including a hepatitis C test which was positive. The patient was referred to Dr. Paul for hepatitis C clinic.

The patient saw the nurse practitioner on 5/24 to review the lab results. He reported "much left sided abdominal pain" and of course still had "firm enlargement from midline ...extending to left lower quadrant, tender to palpation." She asked the Medical Director about pain control and he told her to prescribe Tylenol, no narcotics.

On 6/6, he was seen in hepatitis C clinic by the nurse practitioner, who documented that he was in constant pain and the mass in his abdomen was enlarging. She spoke with the Medical Director again and referred the patient back to him "once the US report returns."

On 6/12, the patient was discussed in collegial review again for referral to Dr. Paul.

On 6/20, the patient saw the doctor, who documented that the patient stated, "Doc, I am much better. My pain is better, my health is getting better..." Again, his marked splenomegaly is noted. The plan is that he is awaiting a call from Dr. Paul or Dr. Hayes.

The patient was not seen again until two months later on 8/27, when the nurse saw him for abdominal pain, rated 8/10 with dyspnea on exertion, nocturnal cough and epistaxis. The patient was hypoxic, unable to stand and his abdomen was obviously distended. She put him on 4 liters of oxygen and referred the patient to the doctor who saw him that day, admitted him to the infirmary and placed him on antibiotics. A chest x-ray showed right middle lobe and left lower lobe consolidations. His oxygen requirements increased until he was on 10 liters by non-rebreather mask and satting in the upper 80s. He is clearly not getting better.

Finally on 8/31, the RN in the infirmary clearly has some concerns about the patient. She called the doctor who advised that the oxygen be decreased. She then called the HCUA who advised her to call the Wexford Medical Director, who then contacted the Facility Medical Director. The Facility Medical Director then called and ordered the oxygen to be increased back to 10 liters non-rebreather and to send the patient out if his oxygen sat went below 85%, which it did that afternoon.

He was transferred to Cottage Hospital, where he was admitted to the ICU in critical condition and was found to have non-Hodgkin's lymphoma with widespread adenopathy. His condition rapidly deteriorated until he died less than two weeks later.

The death summary was once again written by the Facility Medical Director who completely glossed over the significance of the enlarged spleen and focused mainly on the terminal events in the infirmary, and these are downplayed in comparison to how the chart reads.

*Opinion*: The lapses in care in this case are multiple and disturbing. This patient presented with massive splenomegaly back in January 2013. While liver disease can cause enlargement of the spleen, there are only a few conditions that cause this degree of enlargement, with malignancy being the most common cause. It took four months to obtain the first appropriate imaging test (ultrasound). When that test suggested the need for more detailed imaging by CT scan, that recommendation was ignored despite increasing clinical evidence of a serious underlying condition. As in the previous case, there is a marked discrepancy in the descriptions of the patient's condition between the nurse practitioner and the doctor, with the latter provider downplaying the situation to an unrealistic degree. Even when the patient presented as clinically unstable with severe hypoxia, the doctor did not send the patient out until he was pressed to do so. In our opinion, this can only be construed as deliberate indifference.

## Continuous Quality Improvement

We reviewed the CQI minutes with the leadership team and commended them on their data collection, which seems to be quite comprehensive. However, there is no documented analysis of the data nor do we find any documented efforts where data have been used to improve the quality of services. This was discussed in some detail with the leadership team. It appeared that some things are monitored every month even though the performance is virtually every month at 100%. We discussed the need to use the CQI program to find problems such as the ones we had been able to identify during our visit.

# Recommendations

**Leadership and Staffing**
1. The Medical Director performance, both administratively and clinically, must be significantly improved.

**Intrasystem Transfer**
1. Utilize the quality improvement program to improve follow up after identification of problems.

**Nursing Sick Call:**
1. Transition to a sick call process conducted only by Registered Nurses.
2. Medical staff, rather than security staff, should be collecting the completed sick call request forms.

**Chronic Disease Clinics:**
1. Patients should be seen according to their degree of disease control, with poorly controlled patients seen more frequently. In this way, long periods of exposure to the deleterious effects of suboptimal disease control (high blood pressure, high blood glucose, etc.) can be minimized.
2. The chronic care nurse should review the patient's medication compliance via the MARs, and have the most recent months' worth available for the clinicians' review at the time of the chronic care visits.
3. There should be a mechanism in place by which the prescribing provider is notified of patients' medication noncompliance in a timely manner.
4. Patients with HIV infection should be followed by one of the facility providers for monitoring of medication compliance and side effects and so that they are at least familiar with this high-risk population.

**Unscheduled Offsite Services**
1. The quality improvement program should monitor the presence of offsite service documents and follow up with the primary care provider. Those follow-up encounters must include documentation of a discussion with the patient regarding the findings and plan.

**Unscheduled Onsite Services**
1. Nurses must be retrained regarding their professional obligations when patients present with chest pain.

**Scheduled Offsite Services**

1. The quality improvement program must monitor the presence of offsite service documents, including a timely follow-up encounter with the primary care clinician in which there is a discussion of the findings and plan.
2. The quality improvement program must monitor follow up by the primary care clinician with the patient after the collegial review results in a change to the plan.

**Infection Control:**
1. Infirmary bedding and linens are laundered in the health care unit, and the tested water temperature is not hot enough to insure complete sanitizing. Insure infirmary bedding and linens are appropriately sanitized.
2. Infirmary mattresses and other upholstered equipment were observed to have tears and cracks in the outer impervious coating which does not allow for proper sanitizing. These items should be repaired or replaced.

**CQI**
1. The leadership of the continuous quality improvement program must be retrained regarding quality improvement philosophy and methodology, along with study design and data collection.
2. This training should include how to study outliers in order to develop targeted improvement strategies.

# Appendix A – Patient ID Numbers

**Intrasystem Transfer:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | | [redacted] |
| Patient #2 | | [redacted] |

**Unscheduled Offsite Services/Emergencies:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | | [redacted] |
| Patient #2 | | [redacted] |

**Scheduled Offsite Service:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | | [redacted] |
| Patient #2 | | [redacted] |
| Patient #3 | | [redacted] |
| Patient #4 | | [redacted] |
| Patient #5 | | [redacted] |
| Patient #6 | | [redacted] |

**Chronic Disease:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | [redacted] | [redacted] |
| Patient #2 | [redacted] | [redacted] |
| Patient #3 | [redacted] | [redacted] |
| Patient #4 | [redacted] | [redacted] |
| Patient #5 | [redacted] | [redacted] |
| Patient #6 | [redacted] | [redacted] |
| Patient #7 | [redacted] | [redacted] |
| Patient #8 | [redacted] | [redacted] |
| Patient #9 | [redacted] | [redacted] |
| Patient #10 | [redacted] | [redacted] |
| Patient #11 | [redacted] | [redacted] |
| Patient #12 | [redacted] | [redacted] |
| Patient #13 | [redacted] | [redacted] |
| Patient #14 | [redacted] | [redacted] |

**Mortality Review:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | [redacte | [redact |

| Patient #2 | [redacted] | [redacted] |

# Menard Correctional Center
# (MCC) Report

June 17-20, 2014

Prepared by the Medical Investigation Team

Ron Shansky, MD
Karen Saylor, MD
Larry Hewitt, RN
Karl Meyer, DDS

# Contents

**Overview** ........................................................................................................................3

**Executive Summary** ........................................................................................................3

**Findings** ..........................................................................................................................6
   Leadership and Staffing ...............................................................................................6
   Clinic Space and Sanitation ........................................................................................7
   Reception Processing ...................................................................................................8
   Medical Records ..........................................................................................................9
   Nursing Sick Call.......................................................................................................10
   Chronic Disease Management....................................................................................11
   Pharmacy/Medication Administration.......................................................................21
   Laboratory .................................................................................................................22
   Urgent/Emergent Care/Unscheduled Offsite Services .............................................23
   Scheduled Offsite Services (Consultations and Procedures) ....................................24
   Infirmary Care ...........................................................................................................27
   Infection Control .......................................................................................................28
   Inmates' Interviews ...................................................................................................29
   Dental Program..........................................................................................................31
   Mortality Review .......................................................................................................38
   Continuous Quality Improvement .............................................................................41

**Recommendations** .........................................................................................................43

**Appendix A – Patient ID Numbers** .............................................................................46

# Overview

On June 17-20, 2014, we visited the Menard Correctional Center (MCC) in Menard, Illinois. This was our first site visit to MCC and this report describes our findings and recommendations. During this visit, we:

- Met with leadership of custody and medical
- Toured the medical services area
- Talked with health care staff
- Reviewed health records and other documents
- Interviewed inmates

We thank Warden Kim Butler and her staff for their assistance and cooperation in conducting the review.

# Executive Summary

Menard Correctional Center is a large, old facility with original construction starting in 1870. During the inspection, the population was reported at 3750. The facility also serves as the Southern Illinois Reception and Classification center and monthly receives approximately 100 newly committed individuals to the Department of Corrections.

The Health Care Unit, a three-story building, was newly constructed and opened in 1980 and appears to have had no renovation since opening.

Menard is a maximum-security prison that also has a medium-security unit outside the main complex as well as a small minimum population that serves mainly as the cadre of workers. The current population is approximately 3233 inmates, with 595 (18%) over the age of 50. The average age is 39 years. Over 80% of the population is serving more than 10 years. The institution is a reception center which receives approximately 100 inmates per month. It has a 26-bed infirmary and outpatient mental health mission.

There is a new Health Care Unit Administrator (HCUA); however, she has worked at the facility a number of years, advancing from staff RN to supervising RN to Director of Nursing (DON) to HCUA. As a result of this most recent promotion, the DON position and one supervising RN position are vacant. There is a full-time surgically trained Medical Director.

Comprehensive medical services are provided through a contractual agreement with the Illinois Department of Corrections and Wexford Health Sources located in Pittsburgh, PA. Oversight and monitoring of the medical program is provided by the state-employed Health Care Unit Administrator (HCUA). Health care staff is on-duty 24 hours a day, seven days a week, and a physician is always available on-call.

The cell house sick call rooms are generally inadequate and unacceptable for use as an area to conduct private sick call examinations and assessments. Work has begun in the East cell house to

provide a new sick call area. Completion of this work, as well as renovating all cell house sick call areas should be a priority. Additionally, some of the areas were inadequately equipped.

Sick call is conducted seven days a week, and medication is administered seven days a week as ordered by the physician. The nursing sick call process is problematic, in that nursing staff assigned are working beyond their licensed scope of practice. As a result, patient access and appropriate assessment is delayed. A sick call procedure which is conducted by licensed registered nursing staff should be immediately implemented. To do so will result in a reconfiguring of current staff and may result in the need for additional registered nursing positions.

There were five full-time clinicians at the time of our visit; three physicians and two nurse practitioners. None of the physicians is trained in a primary care field. The Medical Director is a general surgeon who has no prior correctional health care experience and is also new to the facility. The two additional physicians were trained in ophthalmology and general surgery, respectively. There is therefore a vacuum of clinical leadership among the physicians, which is particularly problematic for the nurse practitioners, one of whom is relatively new and who therefore leans heavily upon the other nurse practitioner. This arrangement creates liability for all involved and is a consequence of the vendor's willingness to hire underqualified clinicians and unwillingness to provide appropriate clinical oversight thereafter.

As evidence of this liability, we identified a case ([redacted]) in which failure to identify and appropriately manage a common primary care condition (diabetic foot ulcer) lead to actual harm to the patient (amputation). This patient, a type 1 diabetic, then had his insulin discontinued by one of the doctors. This reflects a lack of basic understanding of this disease process.

In terms of other sources of medical information, only the Medical Director has a computer and internet access, albeit in his office and not at the point of care. The other providers can use his computer but this is not efficient or practical on a day-to-day basis. As a result, the providers rely heavily upon each other for medical information and consultations. This is worrisome considering the paucity of primary care training among the doctors.

Needless to say, this facility would benefit greatly from, and in our opinion requires, one or more primary care trained physicians.

Infection control issues need to be addressed, in that health care unit inmate/porters have not been trained in blood-borne pathogens, infectious and communicable diseases, bodily fluid clean-up, the proper cleaning and sanitation of infirmary rooms, beds, furniture and linens and confidentiality of medical information. Torn and ragged bedding and linens should be replaced and an adequate supply of clean linens maintained in inventory. Infirmary linens are not being appropriately sanitized due to insufficient hot water temperature.

The outside plastic barrier on furniture, examination tables and infirmary bed mattresses in the health care unit were cracked and torn, which prevents sanitizing between patients. Examination tables in the cell house sick call areas also had cracked or torn plastic barriers. These items need to be immediately repaired or replaced. Additionally, in both the cell house sick call areas and

the health care unit examination rooms there was no use of a paper barrier on examination tables between patients.

There is a 26-bed infirmary on the third floor of the Health Care Unit. The unit is staffed 24 hours a day, seven days a week by a RN, and the Medical Director provides the oversight for the medical management of the unit.

In the infirmary, patients are padlocked in their rooms and life/safety issues are a concern. Additionally, there is no nurse call system.

There are no visual or audible alarms indicating loss of negative air pressure for the infirmary respiratory isolation rooms. Gauges indicating current pressure are available. There is no documentation or monitoring of air pressure when a patient is in the room for respiratory isolation purposes.

Although the reception process is usually complete, that is, all the required items are performed, when abnormal findings are identified, it is quite common for them not to be adequately addressed. The process of the clinicians performing the history and physical and just listing "lab and history reviewed" without commenting on the results contributes to the inadequacy of the intake process. In addition, patients with chronic diseases such as asthma who are seen early on in a chronic care clinic will not and have not received appropriate care when the clinicians do not correctly understand the definitions of disease control.

For patients with scheduled offsite services, in general the process occurs timely; however, there are exceptions and those exceptions can take months. There should be a short circuit for the Medical Director to get to the State Medical Director in order to accomplish the service more timely. In addition, when patients are sent for scheduled offsite services, a clinically trained staff person should insure that the required documents are available timely so that there can be a productive follow-up visit between the primary care clinician and the patient during which the findings and plan are discussed and this is documented. We found visits occurring timely on a follow-up basis, but the issue for which the patient was sent offsite was not necessarily discussed; in fact, often times the required reports were not available.

With regard to unscheduled offsite services, a clinically trained person must insure that the relevant documents from the hospital, such as discharge summaries, emergency room reports, operative procedures, catheterization reports, etc., are available timely within a few days after return from the hospital so that the appropriate follow up can be performed. Again, the clinician must meet with the patient and discuss both the findings and plan.

The quality improvement program, although reflective of tremendous effort to comply with the requirements of the policy, are not connected to improving the quality of service. Therefore, the policy as well as the training of staff must be reexamined and redone. Also, the medical records director has recently been assigned to head up the quality improvement program but has not been provided adequate training in order to assume that role. This must be a prerequisite for anybody who is assigned that responsibility.

# Findings

## Leadership and Staffing

The Medical Director position is filled by a clinician trained as a general surgeon. In fact, there are no primary care trained clinicians to provide oversight and supervision to the midlevel primary care clinicians. The health care unit administrator appears quite capable but must also function as the Director of Nursing because that position is vacant. This greatly impacts the adequacy of the oversight of nursing professional performance. The Medical Records Director was recently assigned the job of Quality Improvement Coordinator. However, she has been provided no basic training for her coordinator responsibilities. Our review reflects significant problems based on these leadership issues.

There is a leadership team in place with a full-time, surgically trained Medical Director, Health Care Unit Administrator (HCUA), Medical Records Director and two supervising registered nurses. The HCUA is new to the position but has worked at the facility for several years, holding positions as a staff RN, supervising RN and, most recently, the Director of Nursing. As a result, the Director of Nursing position is now vacant, and one supervising RN position is vacant. Hiring a Director of Nursing and supervising nurse as soon as possible is needed in order to allow the new HCUA the opportunity to focus on directing a health care program rather than having to focus on day-to-day operational, i.e., staffing and personnel, issues. Five of the six budgeted contract RN positions are filled, and all 17 of the state RN positions are filled. Twenty-one of the 23 budgeted Correctional Medical Technician/Licensed Practical Nurse positions are filled. Out of 101.0 approved FTEs, there are only 9.0 FTE positions vacant.

As reported by the Health Care Unit Administrator (HCUA), there is minimal nursing staff turnover.

Additionally, the program would greatly benefit if the Medical Director position were to be filled by a primary care trained physician.

A review of medical staff credentialing and licensure indicate staff that has been appropriately trained, are currently licensed and working within their respective scopes of practice pursuant to written job descriptions.

Other staffing is listed in the following

table: *Table 1. Health Care Staffin*

| Position | Current FTE | Filled | Vacant | State/Cont. |
|---|---|---|---|---|
| Medical Director | 1.0 | 1.0 | | Contract |
| Staff Physician | 2.0 | 2.0 | | Contract |
| Nurse Practitioner | 2.0 | 2.0 | | Contract |
| Health Care Unit Adm. | 1.0 | 1.0 | | State |
| Director of Nursing | 1.0 | | 1.0 | State |
| Supervising Nurse | 3.0 | 2.0 | 1.0 | State |
| Medical Records Director | 1.0 | 1.0 | | Contract |

| Position | Current FTE | Filled | Vacant | State/Cont. |
|---|---|---|---|---|
| Medical Records Assistant | 7.0 | 5.0 | 2.0 | State |
| Registered Nurse | 6.0 | 5.0 | 1.0 | Contract |
| Corrections Nurse I (RN) | 3.0 | 3.0 | | State |
| Corrections Nurse II (RN) | 14.0 | 14.0 | | State |
| CMT-Licensed Practical Nurse | 23.0 | 21.0 | 2.0 | State |
| Office Assistant/Associate | 6.0 | 6.0 | | State |
| Staff Assistant | 3.0 | 3.0 | | Contract |
| Mental Health Administrator | 1.0 | 0.0 | 1.0 | State |
| Mental Health Staff | 7.0 | 7.0 | | Contract |
| Mental Health Staff | 4.0 | 3.0 | 1.0 | State |
| Pharmacy Technician | 2.0 | 2.0 | | Contract |
| Phlebotomist | 1.0 | 1.0 | | State |
| Phlebotomist | 1.0 | 1.0 | | Contract |
| Chief Dentist | 1.0 | 1.0 | | Contract |
| Dentist | 1.0 | 1.0 | | Contract |
| Dentist | 1.0 | 1.0 | | State |
| Dental Assistant | 5.0 | 5.0 | | Contract |
| Dental Assistant | 1.0 | 1.0 | | State |
| Dental Hygienist | 1.0 | 1.0 | | State |
| Optometry | 1.0 | 1.0 | | Contract |
| Radiology Technician | 1.0 | 1.0 | | Contract |
| **Total** | **101.0** | **92.0** | **9.0** | |

# Clinic Space and Sanitation

The Menard Correctional Center health care unit opened in 1980 as new construction. Since that time, the facility has been generally well maintained but is certainly showing age and appears to have had no major renovation since opening. The health care unit (HCU) is a three-story building with three inmate holding areas, one large and two small, outpatient medical services with three examination rooms, a four-chair dental clinic and first aid on the first floor, multiple offices, pharmacy/medication storage, central supply and radiology on the second floor and a 26-bed infirmary on the third floor.

Space has been established in each cell house, South (upper and lower), North, North 2, East and West, to conduct either nurse or physician sick call. The identified areas were former inmate cells and never designed as a clinical environment. Currently, the areas provide little to no privacy, and all of the areas are not appropriately equipped. Renovations have begun in the East Cell House to provide for an appropriately equipped, clean, private clinical setting. Renovation of all the areas in each housing unit should be made a priority.

A relatively new Reception and Classification Unit includes a small but appropriately equipped clinical area which provides for privacy during examinations or procedures.

In the HCU examination rooms, there was no use of a paper barrier on examination tables which could be changed between patients and there was no cleaning of the table surface between patients. Similarly, in the cell house sick call rooms, there was no use of paper on the examination tables and no cleaning of the tables between patients. Additionally, the South Lower cell house sick call room had no sink for hand washing. There is an assigned Infection Control RN who has been in the position three years and conducts documented monthly safety and sanitation inspections throughout the facility.

## Reception Processing

We reviewed 12 records of patients who had entered the facility since February of 2014, that is in the past four or five months. Of the 12 records reviewed, three had completely negative intake exams. Almost all records contain the required elements from the intake process, which is a nurse screen, a history and physical, tuberculosis screening as well as necessary lab reports. However, of the nine records in which there were one or more abnormal findings, there were problems with the quality of the process, and as a result, elements which should have been performed in order to insure follow up were not addressed. What follows is a list of examples of problems with the reception process.

**Patient #1**
This inmate arrived on 5/29/14. He is a 49-year-old with a history of smoking, wearing eyeglasses and a history of migraine headaches treated with Imitrex medication. His tuberculosis skin test was normal as were his vital signs. There is no documentation that we could find of an order for his migraine medication and there was no mention in the history and physical. His laboratory tests were listed as reviewed but there is no mention of the results.

**Patient #2**
This inmate arrived on 5/21/14. He is a 52-year-old who refused an HIV test. He has a history of smoking. He had a negative TB skin test and his blood pressure was 140/88. He does have a history of knee and head injuries. His lipid studies were quite elevated and yet this was not identified, nor was there any referral to address this problem.

**Patient #3**
This inmate arrived on 5/9/14. He is a 54-year-old with a history of asthma and his most recent attack was one month ago. He also has hepatitis C, diagnosed a year ago. His TB skin test was negative. He has drunk alcohol for three decades and has used marijuana and cocaine. His physical exam was performed on the sixth day after intake. He did not have a rectal exam because there was no solution available. He was referred for a chronic care visit for both asthma and hepatitis C; however, the asthma clinic visit assessed him as being in good control as an intermittent asthmatic, despite the fact that he had a recent attack and used beta agonist inhalers daily. His degree of control was not good and he probably warranted an inhaled steroid. His problem was not adequately addressed.

**Patient #4**
This patient arrived on 5/2/14. He is a 54-year-old with hypertension, substance abuse and an elevated blood pressure of 162/100. His TB skin test was negative. The nurse should have

recommended daily blood pressure checks in order to obtain more data points, but this was not done. He was seen one week later for his history and physical. He was given an antihypertensive as well as medication for elevated lipids. His sexually transmitted disease tests were negative.

**Patient #5**
This patient arrived in January 2014. He is a 47-year-old whose nursing screen was performed on 1/3/14. He arrived with a history of a left eye problem, sexually transmitted diseases, a gunshot wound to his right leg, eye surgery as a child and a prior bullet wound to the chest. His blood pressure was elevated at 148/86. His TB skin test was negative. There is no recommendation for blood pressure monitoring. Once again, there is a description that his history and laboratory studies were reviewed but no comment on the results. He also had a history of transfusions, but no date was attached and therefore there was no determination as to the risk for hepatitis C. His blood lipids were elevated and there has been no follow up for these abnormal results.

**Patient #6**
This patient arrived in March 2014. He is a 47-year-old with a history of smoking and hearing problems. His blood pressure was elevated and he had a history of wrist pain. He had right ear surgery in 2006. There were no lipid studies in his record and yet the physician wrote "reviewed labs" with no comment.

**Patient #7**
This patient arrived on 5/15/14. He is a 74-year-old whose problem list contains a history of detached retina, gout, dyslipidemia, hypertension and diabetes along with prostate cancer and a prostatectomy. His physical exam was on 5/20/14 and yet it lacks a fundoscopic exam. He was being treated for the blood pressure, the gout and hyperlipidemia. He was seen on 6/16/14. His blood tests included an elevated creatinine, but there is no mention of chronic kidney disease. Even though he was being treated for gout, there is no order for a uric acid level. His follow up needs to be more comprehensively addressed.

**Patient #8**
This patient arrived in February 2014. He is a 47-year-old with a history of hepatitis C and a past positive tuberculosis test. The form indicates lab and history reviewed. He had an interview regarding his prior positive test but should have had a chest x-ray; there was none available in the chart. He was referred for hepatitis C clinic but he refused laboratory studies.

**Patient #9**
This patient arrived on 5/23/14. He is a 55-year-old with asthma, COPD and he is oxygen dependent. His vitals were normal. His intake process indicates history and labs reviewed. His physical exam was not performed until almost two weeks after his screen. Although the location on the form for placement is blank, he apparently was placed in the infirmary, as he has been receiving oxygen.

# Medical Records

Charts were kept reasonably well thinned. Problem lists were buried under the order sheets and were cluttered with unnecessary and redundant information, such as every chronic care clinic

that had been completed. In other cases, crucial medical information was missing from the problem lists, such as one case of a patient with a history of coronary artery disease and stents. Rarely did the facility receive vital medical records from outside sources such as emergency room reports and discharge summaries following hospitalizations. Until very recently, there was a practice of discarding the sick call slips after logging them into the log book. This practice was in the process of being modified such that the sick call slips would be kept as part of the health record, as they should be.

## Nursing Sick Call

The facility uses a scheduled sick call request slip style sick call system for both general population and segregation inmates. Sick call is conducted seven days a week. Request slips are available in each cell house. Completed requests are placed directly into a locked medical drop-box located in each cell house. Medical staff, either a RN or LPN/CMT working the 7 a.m. to 3 p.m. shift collects the requests each day. When back in the health care unit, the RN or LPN/CMT who collected the requests reviews each slip for routine versus urgent health care needs and documents on each individual cell house sick call log the inmate's name, number, date, time, complaint and date to be evaluated. If the RN or LPN/CMT determines the request is of an urgent nature, the inmate is immediately evaluated by either a RN or LPN. If the RN or LPN/CMT determines the request is of a routine nature, the inmate is scheduled for nursing sick call within 48 hours. Each day, LPN/CMTs assigned to each cell house obtain their cell house sick call log for the day and conduct sick call in a designated room in each cell house. Once the nursing sick call encounter has occurred, the original inmate request slip is destroyed and all that remains is the documentation on the sick call log and in the patient specific medical record. Department of Corrections Office of Health Services approved treatment protocols are used for each nursing sick call encounter. The protocols are on a pre-printed form and provide a pathway of treatment based on inmate provided information and physical findings. Nursing sick call could be conducted by either a Registered Nurse (RN) or Licensed Practical Nurse (LPN). Per IDOC policy, all nursing staff are initially trained by a physician on appropriate use of the treatment protocols and retrained annually. Additionally, each facility Medical Director is required to monthly review two medical records per nursing provider for the appropriateness of use of the protocols. The results of the Medical Director review are discussed with each individual nursing provider and included as a part of the monthly Quality Improvement meeting.

The rooms currently in use in each cell house for sick call are less than ideal and cannot be considered as clinical settings. Inspection of each of the areas indicated noisy, cluttered and insufficiently equipped rooms with no privacy. No examination tables were available in the South-Upper and Lower sick call rooms and the North 2 LPN/CMT room. Additionally, the South-Lower room had no scale, eye chart or sink for washing hands. In the North 2 sick call area, there are no accommodations for privacy and, as a result, procedures or examinations requiring privacy cannot be conducted. There appeared to be no use of a paper barrier between patients on the examination tables, which is an infection control issue.

Renovations have begun in the East Cell House to improve the sick call setting. An inspection of this area indicated a significantly improved situation and could be considered an appropriate

clinical setting dependent on properly equipping the area. High priority should be placed on the completion of this space and prompt renovation of the remaining cell house sick call areas.

Segregation status inmates access daily sick call in the same manner as the general population. In the segregation cell house (North 2) there is a designated "sick call" area that both nursing staff and the physician use to conduct sick call. The room is equipped with an examination table, and nursing staff takes other equipment and supplies needed for sick call. The nurse provides a list of inmate names to the segregation unit "wing officer" who then takes inmates one-by-one to the sick call room for the nurse to evaluate. As a result, the inmate benefits from a private, confidential encounter with the benefit of an appropriate examination if indicated. Again, the Office of Health Services approved protocols are used for each sick call encounter. The sick call encounter is documented in each detainee's medical record.

Segregation "wellness checks" are conducted for each inmate daily on the 7 a.m. to 3 p.m. shift. Nursing staff administering morning medication proceeds cell-to-cell, talking with each inmate in segregation status. Documentation of the "wellness check" is noted on the segregation log.

Sixteen general population medical records were reviewed for sick call encounters. One patient chose to go to yard rather than stay in his cell for sick call. As a result, a sample of 15 sick call records will be used.

1. Of the 15 sick call encounters, 10 were performed by a registered nurse and five were performed by a licensed practical nurse.
2. Of the 15 encounters, five resulted in a referral to the physician, with two of the five being urgent referrals. Four of the referrals were made by a RN and one by a LPN.
3. Of the five referrals, two patients were evaluated immediately, and the other three patient appointments occurred on the day scheduled, and the physician or mid-level provider addressed the issue that led to the referral.
4. In each of the 15 encounters, the Office of Health Services approved pre-printed protocol form was used, the date and time were noted, the provider signature and title were noted, education was provided and a physical examination specific to the complaint was noted.
5. In one encounter, the duration of complaint was not noted. This encounter was conducted by a RN.
6. In ten of the 15 encounters, complete vital signs were noted. Five encounters included no weight, and one encounter included no temperature. In these encounters, a LPN did not provide the temperature and three times did not record a weight. A RN did not record a weight in two of the encounters.
7. In one encounter, the LPN did not specify a left or right ankle sprain, and in one encounter the RN did not specify the location of joint pain.

# Chronic Disease Management

There are 1170 inmates enrolled in the chronic disease program in separate clinics. This is approximately 36% of the population at CI. The distribution in clinics is as follows:

- Cardiac/Hypertension (665)

- Diabetes (173)
- General Medicine (158)
- HIV Infection/AIDS (33)
- Liver (135)
- Pulmonary Clinic (350)
- Seizure Clinic (54)
- TB Infection Clinic (10)

There was no backlog in chronic care clinics at the time of our visit. One of the nurse practitioners is devoted exclusively to chronic disease management and is assisted by one of the physicians depending on volumes, which reportedly can run quite high (25-30 per day). We found the care provided by this nurse practitioner to be of high quality, with a good knowledge base and solid decision-making skills.

Patients with multiple chronic diseases are enrolled in what they call the "combo clinic" and all conditions are addressed at each clinic visit. This should be (but isn't) the practice at all other facilities; however, the scheduler must take into consideration the time required to provide thorough care.

The chronic care nurse has developed and implemented a database using Microsoft Access which tracks data for all chronic care clinics and can be used to generate reports of countless types. The data reaches only as far back as August 2013 and so was not yet a complete picture of this population, but will be able to crunch the data in innumerable and very valuable ways.

As wonderful as this database has the capacity to be, it is only as good as the quality of the data fed into it. Unfortunately, the providers are not consistently assessing the degree of control accurately, which is corrupting the reliability of that portion of the data. Currently, it is used only as a warehouse of information, and not as a tool to improve clinical quality as it ultimately should be.

A second chronic care nurse runs all the infectious disease clinics (HIV, hepatitis C and TB). She seems conscientious and organized.

## Cardiovascular/Hypertension

Of 665 patients enrolled in the clinic, 461 (69%) were at goal blood pressure and 195 (31%) were not at goal at their most recent chronic care visit. Of those patients whose blood pressure was not at goal, 66 (34%) had no change in their plan of care. This may be partly due to the way the form is constructed. As part of the "combo clinic" form, the provider is asked if the blood pressure was at goal for 2 of the last 3 readings. Thus the provider is not prompted to adjust medications in response to an elevated blood pressure reading unless there is a pattern. Rarely did we observe the providers to order blood pressure checks when control was in question. The case below illustrates this issue.

**Patient #1**
This is a 51-year-old man with diabetes, hypertension and asthma. His blood pressure was at goal at two of the last three chronic care visits, but has been elevated on multiple occasions when

he has been seen by providers for other issues: 150/80, 148/84, 140/94, 140/100 (x 2), 166/94. None of these elevated readings were addressed by the providers.

*Opinion*: Though the patient's blood pressure has been at goal during the chronic care clinic visits, it is well above goal at almost every other clinical encounter. Providers are not addressing this patient's blood pressure, despite documenting the elevated readings in their own handwriting.

## Diabetes

Of 173 patients enrolled in the diabetes clinic, 41% were less than well controlled with 17 (10%) rated as poorly controlled and 53 (31%) under fair control. Out of the 70 patients who were less than well controlled, only 41 (59%) had a change in the plan of care. The facility is still using the outdated terminology IDDM and NIDDM; this should cease. Upon arrival, all patients on physiologic insulin replacement (Lantus, lispro) are automatically switched to NPH and regular insulin regardless of the type of diabetes they have. This is inappropriate, particularly in the case of patients with type 1 diabetes.

We reviewed five records of patients enrolled in the clinic. Record review showed lack of timeliness in two cases and several instances of serious problems with clinical decision making.

**Patient #2**
This is a 47-year-old man with HIV infection and diabetes who arrived at Menard in July 2013. About a month after his arrival, the patient presented with a diabetic foot ulcer. He was seen by the doctor after he had pulled his own toenail off. The physician documented, "no active sore on his toe at present" despite describing a "healing exposed nail bed." He ordered Neosporin and follow up as needed.

One month later, another doctor saw the patient for what is described as a gangrenous toe and admitted him to the infirmary for IV antibiotics and betadine soaks. Despite describing the lesion as "r/o gangrene," she did not order any additional workup or consultations. Finally, the previous Medical Director saw the patient on 9/24, recognized the severity of the situation and referred the patient to orthopedic surgery for amputation, which was performed on 10/2.

Later in October, his baseline diabetes clinic was performed. It was determined that he is a type 1 diabetic with onset of disease in his 20s. He has been seen timely in diabetes clinic and was very well controlled on a combination of oral medications and insulin. Then at the February visit, the doctor discontinued his insulin (he was on 26 units of NPH twice a day), as his last two A1c readings were less than 6% (5.9 and 5.5). When he was seen again in four months, his diabetes control had deteriorated dramatically with an A1c of 9.8%. The doctor then resumed the insulin and discontinued his oral medication.

*Opinion*: This patient was not managed aggressively enough for his diabetic foot ulcer. The first doctor apparently did not recognize the importance of treating diabetic foot ulcers aggressively and following them closely. The second doctor seemed able to make the correct diagnosis but unable to formulate an appropriate treatment plan. Had this wound been managed properly, the chances of it progressing to amputation would have been substantially reduced.

Discontinuing insulin on a type 1 diabetic reflects a lack of understanding of the basic physiology of this disease, which is a condition of absolute insulin deficiency.

## Patient #3

This is a 55-year-old man with poorly controlled diabetes, hypertension and hyperlipidemia who has been seen per policy in chronic care clinic. He was being appropriately managed by the nurse practitioner with improvement in his disease control. Then, at the December visit, he was seen by one of the travelling medical directors. His control had deteriorated since the last clinic visit, but no changes were made.

At the April 2014 visit, his A1c was 9.8%. The doctor ordered a tremendous increase in his insulin (from 22 to 80 units daily) and quadrupled the dose of his oral medication. One week later, the patient was at nurse sick call complaining of hypoglycemia and having been refusing his regular insulin for the last five days. He was referred back to the doctor, who adjusted the doses downward.

*Opinion*: This doctor is clearly unfamiliar with the basic principles of insulin adjustment and seemingly oblivious to the dangers of hypoglycemia. An increase in insulin of this magnitude (over 360%) could easily have resulted in harm to this patient, including the real possibility of a fatal hypoglycemic event. Luckily, the patient had the good sense to refuse the medication.

## Patient #4

This is a 50-year-old type 1 diabetic with hypertension. He is being treated with non-physiologic NPH insulin twice a day and it is therefore not surprising that his diabetes is poorly controlled. At the April 2013 chronic care visit, the doctor made no changes to the insulin regimen despite an A1c of 9%, but rather ordered a one month follow-up to determine if changes should be made. This visit did not happen.

He was not seen for diabetes again until the August chronic care clinic, at which time a traveling medical director increased the insulin dose. Six weeks later, the patient saw one of the nurse practitioners in sick call complaining of variable blood glucose and the insulin dose was adjusted downward.

The next chronic care visit did not occur until April 2014, at which time the patient's A1c was unchanged at 9.1%. The nurse practitioner increased the insulin and requested a visit in two weeks to review the AccuChecks; this did not happen.

*Opinion*: This patient's poorly controlled diabetes has not been managed aggressively enough. As a result, he has been exposed to the deleterious effects of hyperglycemia for over a year. Follow-up appointments have not occurred as requested.

## Patient #5

This is a 51-year-old man with diabetes, hypertension and asthma. He has been seen quarterly in chronic care clinic and managed appropriately, except for the December 2013 visit when the form was completely blank and the patient's A1c of 9.7% was ignored.

## Patient #6

This is a 54-year-old man with diabetes, hypertension, and paraplegia secondary to a gunshot wound. When he was seen in diabetes clinic in September 2013, his A1c was 9.6%, which was actually better than the prior reading of 12.5%. As glipizide had been recently added, the nurse practitioner decided to see the patient in three months before determining whether to change the medications. This follow-up visit did not occur. The patient was not seen for diabetes again until 4/21/14, though his glipizide was increased from 10 twice a day to 15 twice a day by one of the doctors in November. There was no note corresponding to this change. At the April visit, the A1c was 9.9% and the nurse practitioner stopped the glipizide and started insulin. She requested a one month follow-up to review the blood glucose readings, but the patient had not been seen as of the date of our visit on 6/18.

*Opinion*: This patient has not been seen for follow-up as requested by the nurse practitioner. These delays are increasing his exposure to hyperglycemia

## General Medicine

There were four patients on Coumadin at the time of our visit. Three of the patients spent the majority of time in the therapeutic range and labs were drawn monthly.

## HIV Infection/AIDS

Patients were generally seen timely by the ID telemedicine doctor but are not co-managed on site; this is true of every site we have visited so far. We reviewed six charts and found issues with timeliness in two cases There were a fair number of cancellations due to equipment malfunction.

**Patient #7**
This is a 60-year-old HIV patient with asthma. He is allowed to carry his HIV medications even though he is on mental health medications which are directly observed. MARs reveal that the medications have been dispensed to the patient monthly. However, he developed an increased viral load in September 2013 after having been suppressed on the same regimen, thus raising concern for noncompliance. The ID doctor recommended stopping the medications and checking an HIV genotype. He wanted to see the patient back in 2-3 weeks.

The patient was seen six weeks later but the viral load was not high enough to do a genotype and had to be repeated. The results were pending at the time of this visit. He recommended continuing to hold the medications and follow-up in two weeks. However, the patient was not seen again until March 2014, as the ID telemedicine clinic had been canceled once due to equipment malfunction and once due to weather.

When he was finally seen on 3/17, the labs from October were reviewed, and showed new resistance mutations to his previous regimen. He was started on new medications and these too were dispensed to him. Follow up was ordered for six weeks but he was not seen due to problems with the equipment. He had not been seen as of the date of our visit 6/17.

*Opinion*: This patient has not been seen timely in ID telemedicine due to avoidable delays. This patient should be on DOT in order to more closely monitor his medication adherence;

development of resistance is highly suggestive of noncompliance. This patient should be co-managed onsite by a facility provider.

**Patient #8**

This is a 51-year-old man with HIV infection and asthma. He developed persistently low level viremia in August 2013 despite 100% compliance on directly observed therapy. The ID doctor was initially not concerned, but when it persisted at the December 2013 visit, he recommended repeating the test immediately and following up in two weeks. That visit did not occur due to equipment malfunction, then again due to weather. He was not seen again until March 2014.

*Opinion*: This patient has not been seen timely by the ID doctor due to avoidable delays.

## Pulmonary Clinic

Of the 350 patients enrolled in the clinic, none were rated as poorly controlled, even though 52 (15%) had persistent symptoms. We reviewed five records of patients with pulmonary diseases and found that in each case either the patient's degree of control was overestimated, or his medications were not adjusted in response to his symptoms, or both. The chronic care form is designed for asthma, not COPD; this is a function of the statewide treatment guideline which speaks only to asthma. The treatment guideline allows for overestimation of disease control when compared with nationally published guidelines, including the National Heart, Lung, and Blood Institute (NHLBI) Expert Panel Report 3 (EPR 3) upon which it appears the state guideline is based. The cases below illustrate these issues.

**Patient #9**

This is a 51-year-old man with diabetes, hypertension and asthma. At the August 2013 visit, the patient reported symptoms consistent with mild persistent asthma, with daytime symptoms and albuterol use more than twice weekly but was judged to be under good control and no changes were made. At the December combo visit, asthma was not addressed at all by the traveling Medical Director. At the April 2014 visit, the patient's asthma severity was not documented by the nurse practitioner, who decided that the patient was in good control.

*Opinion*: This patient's symptoms were not adequately documented at two of the last three chronic care clinics. On at least one occasion, his disease control appeared to be worse than the provider recognized.

**Patient #10**

This is a 60-year-old HIV patient with asthma. He has been seen quarterly in chronic care clinic but his degree of control has not been assessed accurately. For example, at the December combo clinic, he reported daily beta agonist use and daily daytime symptoms as well as some limitation with normal activity, yet the doctor rated this as good control.

At the June 2014 chronic care clinic visit, the patient reported symptoms consistent with moderate persistent COPD (daily albuterol use, daily daytime symptoms, waking more than once weekly and some limitation of normal activity), and had expiratory wheezing on exam, yet was rated as good control by the covering doctor.

*Opinion*: This patient's asthma has not been accurately assessed. It is likely he would benefit from more aggressive asthma therapy. Part of the problem here is that the control criteria listed on the form allowed the doctors to draw the inappropriate conclusion:

| Components of Severity (Circle those that apply) | | | | |
|---|---|---|---|---|
| | Intermittent | Persistent Mild | Persistent Moderate | Persistent Severe |
| Short-acting beta agonist inhaler use | >2 days/week | >2 days/week but not daily | Daily | Several times a day |
| Daytime symptoms | < 2 days/week | >2 days/week but not daily | Daily | Throughout the day |
| Nighttime awakenings | <2 times/month | 3-4 times/month | >1 time/week but not nightly | Often, 7 times/week |
| Interference with normal activity | No limitation | Minor limitation | Some limitation | Extreme limitation |
| Lung function FEV1 | >80% baseline | >80% baseline | 60-80% baseline | <60% baseline |

| Components of Control (Circle those that apply) | | | |
|---|---|---|---|
| | Good | Fair | Poor |
| Beta-agonist inhaler use | No more that one canister/month | More that one canister/month | More than one canister/month |
| Visits to infirmary or outside hospital | None | One in past month | More than one per month |
| Nighttime awakenings | None | No more than once a week | More than three times a week |

**Patient #11**
This is a 51-year-old man with HIV infection and asthma. At the December 2013 chronic care visit, the covering doctor obtained nearly no historical information and the form is almost blank. At the February 2014 visit, the nurse practitioner noted that the patient was having daytime symptoms and using his rescue inhaler less than daily but more than two days per week. He was rated as good control. At the June visit, the traveling Medical Director documented minimal information but rated him as good control.

*Opinion*: This patient was not adequately evaluated at two of the three most recent chronic care clinics. His disease control has been overestimated according to nationally published guidelines.

**Patient #12**
This is a 68-year-old man with severe COPD and hypertension. There have been delays in his chronic care follow-up appointments and he has been seen several times for COPD exacerbations. These are not mentioned during his chronic care visits and although his symptoms are moderate to severe, there have been no changes to his baseline pulmonary medications.

*Opinion*: This patient's disease should be managed more aggressively considering his poor control.

**Patient #13**
This is a 33-year-old man with moderate persistent asthma who has been seen quarterly in chronic care clinic. There have been no changes to his medication regimen despite his repeated

reports of daily symptoms and rescue inhaler use, aside from the addition of Claritin at his most recent clinic visit.

*Opinion*: This patient's treatment regimen should be intensified considering his reports of daily symptoms.

## Seizure Clinic

None of the 54 patients enrolled in the seizure clinic were deemed to be in poor control. This may be because patients' reports of breakthrough seizures may be discounted if they are not witnessed by staff. Of the six patients who reported seizures since the last clinic visit, only two had a change of care documented. We reviewed four records of patients enrolled in the seizure clinic and found delays in care and opportunities for improvement in two cases described below.

**Patient #14**
This is a 57-year-old man with seizures, hyperlipidemia, and aortic valve replacement. He is chronically anticoagulated with Coumadin. He has only been seen twice in chronic care clinic in the past year. At the September 2013 visit, his Dilantin level was subtherapeutic at 6.5 and he reported 7-8 seizures since the last visit, but none are documented in the health record. His Dilantin is self-carried and has been dispensed to him monthly, though he gets his Coumadin nurse-administered.

At the next chronic care clinic on 5/8/14, he reported one breakthrough seizure, though again it was not documented in the health record. His most recent Dilantin level was even more subtherapeutic on 3/28/14 at 4.5. The doctor recommended that the dose be increased but the patient refused.

*Opinion*: This patient should be on DOT to monitor his medication adherence more closely. He already receives DOT for his Coumadin. He has not been seen timely in chronic care clinic.

**Patient #15**
This is a 47-year-old man with hypertension, HIV and absence seizures who reports frequent breakthrough seizure activity despite therapeutic medication levels. The dose was increased once during the past year but he continued to report seizure activity. This has evidently only been witnessed by the patient's cellie. He has been seen roughly quarterly in chronic care clinic. At the December 2013 clinic, the doctor's note contains almost no history and the medication was reordered incorrectly, decreasing the dose by half. This was caught by the pharmacy who questioned the change, and the patient was referred to the nurse practitioner, who referred the patient back to the prescribing doctor. It took two months for the patient to be seen by the doctor and have the medication dose clarified.

*Opinion*: This patient should not have waited two months to have his medication dose clarified. Even when his levels were therapeutic, his seizures did not appear to be under control. Consider switching this patient to another medication.

## TB Infection Clinic

There were eight patients on treatment for latent TB infection (LTBI) at the time of our visit, four of whom appeared to have converted their skin tests at Menard (see Patients #1-4 below). We discussed these with the HCUA, who stated that a contact investigation was performed for two of the patients who had been housed in the same unit and no source was identified. It was her opinion that the others were not read properly to begin with (i.e., false negatives) and so were not new conversions but rather missed on the initial skin test. While this is possible, such an assumption should not preclude some form of investigation. We did not have the opportunity to discuss this with the infection control nurse who was out on medical leave.

In two other cases (Patients #7 and #8), patients were prescribed treatment when it was not clear that they truly required it.

All reactive tests are read by two nurses and a provider.

### Patient #16
This is a 22-year-old man who was received at NRC on 2/7/12 at which time he was documented to be PPD negative. He was transferred to Menard on 5/1/13. On 4/7/14, his annual TB skin test was 10 mm reactive. No contact investigation was documented in the health record. Upon questioning by the provider, the patient denied a history of prior positive skin tests. The patient was referred for TB treatment and had appropriate pre-treatment work-up and clinical evaluation. He started medications on 5/19/14.

### Patient #17
This is a 43-year-old man who was received at Graham on 2/26/13 and transferred to Menard on 3/20/13. On reception, his PPD was read as negative. His yearly PPD was placed at Menard on 3/4/14 and was read as negative. For reasons that are not clear from chart documentation, the PPD was repeated on 5/5/14 and was reactive at 18 mm. No contact investigation was documented. He was appropriately evaluated for treatment on 5/14/14 and treatment was ordered.

### Patient #18
This is a 46-year-old man who was received at NRC on 10/4/12 and transferred to Menard on 10/17/12. His PPD was read as negative on intake. His annual PPD at Menard on 1/7/13 was read as negative. For unclear reasons, it was repeated on 1/16/13 and was again read as negative. A year later, his annual PPD was reactive at 16 mm on 3/4/14. He was seen by the doctor and referred to TB clinic for treatment. On 5/1, the patient told the doctor that his test was not positive, that it was his cellie's test that was reactive. The test was therefore repeated on 5/5 and was reactive at 22 mm. He was referred back to the doctor for pretreatment evaluation and therapy was ordered. No contact investigation was documented.

### Patient #19
This is a 44-year-old man who arrived at Menard reception in August 2013 but was not tested for TB, as it was noted that he was nonreactive per the jail records. When he was next tested on 3/1/14, he was reactive at 12 mm. He was evaluated appropriately by the doctor and started treatment on 3/18. He has been seen monthly by the ID clinic nurse.

### Patient #20

This is a 31-year-old man who was received through Menard's reception center in February 2014 and was noted to be reactive on intake. He was admitted to the infirmary by verbal order of the Medical Director when the reading RN noted the positive test. The Medical Director saw the patient the next day, took no history, and documented a minimal physical exam. Upon questioning by the nurse, the patient reported that he had a history of +PPD, but this box was checked "no" on the intake screening form. A chest x-ray was performed as part of the pretreatment work-up and showed a right hilar mass vs adenopathy as well as additional adenopathy in the right paratracheal region. He was awaiting a CT surgery consult for biopsy as of the time of our review. On 5/12/14, he was seen by the Medical Director for his baseline TB clinic and was prescribed INH and rifampin (rather than rifapentine) weekly for 12 weeks. He was then a no-show for his follow up TB clinic on 6/17.

*Opinion*: This patient appears to have bigger problems than his latent TB infection. The prescribing error was brought to the attention of the Medical Director for correction. There should be no such thing as a no-show in a maximum security prison.

## Patient #21
This is a 31-year-old who was received at NRC on 11/6/13 and transferred to Menard on 3/20/14. He did not have a PPD placed at the reception center but rather a chest x-ray "due to rapid turnaround of this R&C inmate." No one at Menard knew the meaning of this. After he arrived at Menard, his PPD was reactive at 19 mm. He was appropriately evaluated and started on treatment on 5/28/14.

## Patient #22
This is a 50-year-old man who had a positive PPD on reception at NRC on 1/12/07. He was transferred to Menard in February 2007 and was evidently not offered treatment (these records were thinned from the current volume). There were no PPD tests documented on the database for 2008–2012. He was screened in December 2013 by symptom assessment, presumably due to his history of a prior positive skin test. He then had a PPD placed on 2/13/14, which of course was reactive at 20 mm. The Medical Director saw him for his baseline TB clinic on 2/18 and took no symptom history, but ordered labs and a chest x-ray. He saw the patient back on 3/27, at which time the patient reported receiving BCG as a child. Treatment was ordered. He was seen monthly thereafter by the TB clinic nurse.

*Opinion*: Patients with a history of prior positive skin testing should not have repeat testing. Given his history of BCG vaccine, this patient should probably have gotten alternative testing with an interferon gamma assay such as the quantiferon gold to determine his exposure status prior to committing him to treatment with medications that have potential toxicities. The state TB guideline is silent on the issue of when and whether to use the interferon gamma tests, but rather leaves it to the discretion of the providers. It is therefore important that providers have an understanding of the various methods of screening for LTBI and when to use them.

## Patient #23

This patient reported a positive PPD upon reception at NRC in April 2014 and that he had received treatment in 1999. Despite this history, another PPD was placed when he transferred to Menard and was, not surprisingly, positive. He was then referred for treatment.

*Opinion*: There should have been an effort to confirm the patient's history of prior TB treatment prior to committing him to therapy with medications with potential toxicities.

# Pharmacy/Medication Administration

Boswell Pharmaceuticals, located in Pennsylvania, provides all prescription and over-the-counter medications for the facility. Boswell is licensed as a Wholesale Drug Distributor/Pharmacy Distributor and has a current license through March 2016. The service is a "fax and fill" system, which means patient new prescriptions faxed to the pharmacy by noon Monday through Friday will arrive at the facility the next day. The facility receives medication deliveries six days a week, Monday through Saturday. A local retail pharmacy and the local hospital are the back-up pharmacies for obtaining medication which is needed immediately and is not available in stock. Patient specific prescriptions, stock prescriptions and controlled medications arrive packaged in a 30-day bubble pack. Over-the-counter medications are provided in bulk by the bottle, tube, etc. The medication preparation/storage area is staffed with two full-time pharmacy technicians; one has 20 years of experience, and the other has eight years of experience. Boswell provides a consulting pharmacist to come on-site once a month to review prescription activity, to assess pharmacy technician performance and technique and to destroy outdated or no longer needed controlled medications pursuant to the requirements of the Federal Drug Administration (FDA) and Drug Enforcement Agency (DEA). Inspection of the medication preparation/storage area revealed a large, clean, organized, well-lighted and well-maintained area. Interviews with the pharmacy technicians revealed knowledgeable individuals. Further inspection of the area indicated tight accounting of controlled medications, both stock and return items. A random inspection of perpetual inventories and counts for controlled medication indicated all were correct.

Access to the medication storage room is restricted to the two pharmacy technicians and the central supply supervisor. All three are required to draw keys to their respective areas at the beginning of each shift and return the keys when leaving at the end of their shift. In the event they would leave institutional grounds with the keys, they are contacted by armory personnel to immediately return to the institution. Keys to the "back stock" caged area are restricted to the two pharmacy technicians. Refrigerator temperatures are monitored and documented daily.

All prescriptions and controlled medications are ordered, received and inventoried by the pharmacy technicians. Once received and counts verified, each of the items is added into the item specific perpetual inventory. Items placed in "back stock" are stored in a locked cage area inside the locked and restricted access storage room. The perpetual inventories for all items located in the cage are verified weekly by the pharmacy technicians. Perpetual inventories for controlled medication in "front or working stock" are verified each shift by on-coming and off-going nursing staff. The crash cart, located in the urgent care area, is inventoried weekly or any time the plastic security seal is broken. Controlled medications, syringes/needles and medical tools in this area are inventoried at the beginning and end of each shift by on-coming and off-going nursing staff.

In the absence of the pharmacy technicians, nursing staff can access the pharmacy storage area, including the cage area, to obtain needed medication only by contacting the Shift Commander who authorizes a Lieutenant to draw the keys to the area. The Lieutenant reports to the health care unit and unlocks the doors for the nurse. Both the Lieutenant and nurse are required to sign into the pharmacy on a Pharmacy Log noting the date, time, name, title, reason for entering and time leaving. The nurse obtains the needed medication, leaves a note as to which items were removed and is required to complete an Incident Report as to the need for entering the area. The Lieutenant secures the doors and returns the keys to the armory. The next morning, the pharmacy technicians conduct a count of all items on a perpetual inventory.

The central supply supervisor, who has been in the position 18 months, is responsible to order, receive and maintain perpetual inventories on all syringes/needles, sharp instruments and medical tools. Within the central supply area is a caged area where the "back stock" supply of syringes/needles, sharp instruments and medical tools are stored. A perpetual inventory is maintained for each item. Perpetual inventories are verified monthly. Keys to the central supply area are restricted to the supervisor and administrative assistant. Nursing staff can enter the area after hours under the same procedures for entering the medication storage area.

Dose-by-dose medication is administered by licensed nursing staff. Medication is delivered to inmates and administered dose-by-dose at cell side. Nursing staff obtains one dose of medication from the patient specific blister pack and places it in a pill envelope which has been hand labeled with the patient's name and number, the name of the medication, strength, dosage and time to be administered. The nurse carries the envelopes to the cell house and is escorted by security staff cell to cell. At each cell, the inmate is required to come to the cell door, show his identification card, state his name and have something to drink. The nurse positively identifies the inmate, gives him the medication, observes ingestion and performs a mouth inspection. When completed, the nurse returns to the health care unit and documents administration or refusal of the medication on each patient specific medication administration record (MAR).

Licensed nursing staff goes to the cell houses between 2:30 a.m. and 3:30 a.m. to administer morning insulin. Inmates are served breakfast in their cell between 4:30 a.m. and 5:00 a.m. The evening insulin is provided between 1:30 p.m. and 2:30 p.m. with dinner being served at approximately 3:00 p.m.

# Laboratory

Laboratory services are provided through the University of Illinois-Chicago Hospital (UIC). Two full time phlebotomists draw and prepare the samples for transport to UIC. Results are electronically transmitted back to the facility, generally within 24 hours via secure fax line located in the medical department. UIC reports all reportable cases both to the facility and the Illinois Department of Public Health. There is a current Clinical Laboratory Improvement Amendment (CLIA) waiver certificate that expires January 27, 2016, on file. There were no reports of any problems with this service.

# Urgent/Emergent Care/Unscheduled Offsite Services

We reviewed nine records of patients sent out for emergencies. More than half demonstrated significant deficiencies. In general, the deficiencies related to inadequate follow up, sometimes related to the absence of availability of appropriate paperwork and also inadequate monitoring of patients who are hospitalized after major procedures. The monitoring deficiencies began with the nursing staff.

**Patient #1**

This is a 57-year-old with hypertension, hepatitis C disease and substance abuse issues. He presented on 3/28/14 to sick call complaining of lower abdominal pain, aching and burning with five loose stools. He was seen by a CMT, which is completely inappropriate since he should have been assessed, at a minimum, by a nurse or a midlevel provider. He was referred to the physician the next day and when seen by the physician he was immediately sent out to rule out acute appendicitis. In fact, he had an acute appendectomy and was returned on 3/31, and after an assessment by the Medical Director, was sent to his cell. Although there was a recommendation for him to be followed up at the hospital this never happened, nor is there any note indicating a change from that recommendation.

**Patient #2**

This is a 61-year-old with osteoporosis who was sent out on 1/26/14. On that day at about 2:10 p.m., he complained of chest pain for two hours. He described it as a pressure in his chest and was given nitroglycerin, with some relief. His blood pressure was elevated at 154/90 and his pulse rate was 116. The physician was called and the order was to send him to the hospital. The patient went to the hospital and returned one week later on 2/3 and was placed in the infirmary for observation. He was seen that day by the nurse who did not ask any questions regarding chest pain, shortness of breath or any incision problems. He was then seen by a nurse practitioner whose note indicates history of recent coronary artery bypass graft surgery but no subjective data is elicited from the patient. The patient was ultimately released to the cell. The record still lacks any discharge summary or, more importantly, the catheterization and echo reports, critical pieces that should be part of the medical record.

**Patient #3**

This is a 30-year-old who on 5/4/14 was admitted to the infirmary prior to a medical furlough for a left inguinal hernia repair. The repair was done on 5/5 and after the patient returned, he went to his cell. On 5/6, one day later, he complained of bloody diarrhea and was placed in the infirmary for observation. He was then admitted to the infirmary and on 5/9 was sent to Carbondale Hospital as an emergency furlough. He stayed in Carbondale Hospital for a week after being diagnosed with severe colitis from the rectum to the hepatic flexure, but in addition he had a seizure, for which the work-up was negative. He returned to the infirmary on 5/16 and again the nurse notes on monitoring contain virtually no questions regarding his current symptomatology in relationship to the problems for which he was sent out. He stayed in the infirmary for a week and then was followed up as an outpatient.

**Patient #4**

This is a 48-year-old with hypertension and glaucoma. Those are the only diagnosis listed on the problem list. On 1/13/14, he complained of chest pain and was sent to the hospital. The work-up

at the hospital was negative for acute coronary artery disease and the diagnosis was reflux disease. He returned from the hospital and at the time of return his vital signs were normal. There is an order for an electrocardiogram and a physician assessment. The cardiogram was scheduled for the 17th, but it was not done because of lockdown. In fact, it was not done until eight days later and at the time of our visit, there was still no cardiogram in the chart. This is a patient who had a previous history of both a heart attack and supraventricular tachycardia, although neither of these problems were on the problem list. An EKG was ordered but it was delayed unacceptably, and in fact four months later there was no report in the chart.

**Patient #5**
This is a 48-year-old with asthma who was sent out on 3/14/14 in order to rule out an acute stroke. He was seen by the Medical Director on 3/14 complaining of chest pain, but at that visit the Medical Director noticed that he seemed to have expressive aphasia and a facial droop. He was sent to the hospital and returned two days later. Upon return his blood pressure was 144/98, indicating hypertension. He was seen the following day, on 3/17, with a diagnosis of a stroke and reflux disease. His blood pressure was rechecked on 5/28 and it was significantly elevated at 165/88. He was supposed to be seen on 5/29, but this did not occur. He was referred to a physician on 5/23, but this did not happen due to custody emergencies. He was in fact not seen until 6/13, at which point his legs were swollen. A blood pressure check two times a week for two weeks had been ordered, but there were no blood pressure checks performed or available in the medical record. This is a patient potentially at risk for whom follow through did not occur.

# Scheduled Offsite Services (Consultations and Procedures)

As we understand the process, all referrals by onsite physicians or midlevel practitioners are referred to the Medical Director, who either approves them and presents them at the collegial review or tells the ordering clinician that they are not approved and he suggests an alternative strategy. However, when an alternative strategy is recommended, there is no follow-up visit with the patient and the originating clinician. Thus, the patient receives no explanation as to why there is a change in plan. We were informed that most authorizations arrive within one week from Wexford central office. For most consults and procedures, an appointment is obtained within 30 days; however, there are exceptions which take longer. We were informed that at the collegial review there is significant variation in responses based on the physician in Pittsburgh who is hearing the presentations. We were informed that one orthospine case has been awaiting an appointment since February and yet in June no appointment has been arranged. Overall, there were problems with the process, particularly with regard to insuring appropriate follow up. This was problematic because critical documents that describe offsite services findings and recommendations were commonly not available in the medical record. Therefore, follow up is more likely to have been incomplete or delayed.

We reviewed six records of patients sent offsite for consults. Five of six contained problems.

**Patient #1**
This is a 34-year-old who had prior multiple gunshot wounds to the abdomen as well as asthma. He also had a history of hemorrhoids since 2009. He was seen for his hemorrhoids four times over a period of months before he was sent out for emergency medical furlough. He was

diagnosed at the time of send out with a thrombosed hemorrhoid and was scheduled for surgery. When he was sent out, no emergency room report from the hospital was available in the medical record. There was a brief handwritten note by a physician. Surgery was scheduled but delayed a few days due to an inability to perform the surgery in an office. The operative report is still not available. He has received follow-up by the primary care clinician although this clinician at the time of the encounter lacked the required documents..

## Patient #2

This is a 68-year-old with asthma and hypertension. On 3/17/14, he was noted to have an elevated prostate specific antigen and was referred to the urology clinic. He was seen there on 4/8 and a recommendation was made for a transrectal guided biopsy. This was referred to collegial review and was approved. The patient was then seen but there is no discussion regarding the plan for a biopsy. There has been no follow up regarding the biopsy and though a bone scan has been ordered, there has been no discussion with the patient regarding the bone scan. There was a delay in receiving any report from the offsite service. This patient needs appropriate follow.

## Patient #3

This is a 60-year-old whose problem list contains hypertension and a right inguinal hernia. Despite the fact that since being in prison he has had a heart attack and the placement of coronary stents in his heart (and had received three stents in 2005), this information is not on the problem list. On 1/22/14, he was sent out to cardiology after the request had been made on 12/16/13. At that time, a cardiac catheterization was recommended. The cardiac catheterization report demonstrated 100% right coronary occlusion and there was a recommendation to optimize medical management. The patient returned on 3/25 and was seen by the physician on 3/26. He was seen three weeks later on 4/15 and the recommendation was made that he return in one to two weeks. He has not been seen since. There is no discussion regarding the findings of 100% occlusions to his right coronary. This patient needs appropriate follow up.

## Patient #4

This is a 66-year-old with hypertension, diabetes and a history of a positive TB skin test. On 4/1/14, he was scheduled for an oncology visit due to a prior diagnosis of prostate cancer in 2011. He had been treated, both with radiation and hormonal therapy. The hormonal therapy was discontinued after three years. There is an oncology note in the chart but it lacks any plan or recommendation. The patient was seen on return by the physician and returned to the cell house for a follow up in six months. It is not clear how the physician knew that this was appropriate since there is no recommended plan. The patient was supposed to be seen two days later by the nurse practitioner, but this visit was cancelled due to a lockdown. A few days later, a check of his blood pressure was also cancelled due to a lockdown. The offsite service note was not retrieved until 5/16 from a 4/1 visit; it contains no subjective data, no objective data, no assessment and no plan. It is not clear how anyone knows what to do next with this patient.

## Patient #5

This patient was scheduled for an ortho visit on 3/19/14. He is a 53-year-old with hypertension. He has complained of hip pain since a gunshot wound to the hip many years ago. In December he had an x-ray which demonstrated worsening of his hip problem with a femoral head collapse.

On 3/19, he was sent for an ortho consult, which recommended a total hip replacement. There has been no follow up after this visit with an explanation to the patient. On 5/15, the Medical Director was supposed to have had a collegial review but this was cancelled. On 5/22, the collegial review process approved the referral but as of this date nothing further is in the record. This patient, with a collapse of his femoral head viewed in December 2013 continues to await an appropriate intervention.

Next, we reviewed eight cases for patients for whom procedures were scheduled and in five of the eight there were serious problems with patients receiving the services they needed.

## Patient #6

This is a 31-year-old who has a history of a positive TB skin test but the problem list does not describe where he is at in the process. He was scheduled for a CT scan of the thorax on 4/24/14. A chest x-ray had revealed a hilar mass in the chest. The CT scan was performed on 4/24/14 after the need for it was described on 2/26/14. There has been no clinician follow up with the patient, even though the CT scan report describes a 3.5 centimeter hilar mass or possibly adenopathy in the right inferior hilum. There are no notes on follow-up other than a collegial review, cancelled on 5/15 due to the Pittsburgh physician not being available. This case needs urgent follow-up.

## Patient #7

This is a 68-year-old with irritable bowel syndrome and coronary artery disease with stents placed in 2008. He also has GERD and low back pain. He was sent for a colonoscopy on 4/25/14. He has had GI complaints since 2013 and it is recorded that his complete blood count hemoglobin dropped from 15.7 to 12.1 within less than a year. On 3/14/14, this was discussed at collegial review in terms of obtaining colonoscopy. This was scheduled for 4/25 and he received it. The colonoscopy revealed left-sided diverticulosis. Meanwhile, in January 2014 his hemoglobin had dropped to 10.1, suggesting that he had lost a third of his blood. He was followed up on 6/16, but only because he complained of dizziness. The recommendation from GI that he receive a high fiber diet was never followed up. He has never had appropriate follow-up after the colonoscopy. He needs a complete blood count and a primary care clinician follow-up.

## Patient #8

This is a 44-year-old with a positive hepatitis B test and cirrhosis. On 2/27/14, a liver specialist recommended an esophagogastroduodenoscopy and an ultrasound for cirrhosis. The EGD was completed and it demonstrated severe reflux disease. He was seen at the University of Illinois for hepatitis B treatment and they were reluctant to start medications because he would be released soon and they wanted to insure that he would be able to continue treatment on the street. Despite the discussion with U of I, there has been no follow-up. We pressed the issue and he does have a private physician and they indicated to us they would work on the arrangements so that they could contact U of I, who could initiate treatment and then his continuity upon release would become seamless.

## Patient #9

This is a 42-year-old with coronary artery disease, a history of a heart attack, asthma, diabetes and hypertension. This patient was scheduled for an MRI on 4/21/14. On 2/19, the physician saw

him for low back pain and ordered an MRI of his spine. On 4/21, the MRI was done. He had already demonstrated really significant degenerative joint disease of the spine. This patient has had no follow up regarding the MRI and an approach to his problem. This patient requires follow up by the program.

**Patient #10**
This is a 45-year-old with a history of high blood pressure who in February complained of difficulty swallowing, increasing for two years. His problem is especially with solid foods. On 2/18/14, the doctor ordered an upper GI and this was scheduled for 4/11/14. As of 5/22/14, there was no report yet from the hospital. There has been no follow-up visit with the patient and no report. This particular case needs follow up.

# Infirmary Care

The infirmary is located on the third floor of the health care unit and can be accessed by elevator or a stairway. The area can accommodate 26 beds and is configured as two four-bed rooms, seven two-bed rooms and two two-bed negative air-pressure respiratory isolation rooms. The two four-bed rooms have no toilets or sinks within the rooms. The infirmary area is designed in a rectangle with the patient rooms along the outer perimeter and a center area containing the nursing station, supply room, patient shower and separate clean and dirty utility rooms.

There is no "nurse call" system and patients are padlocked in their rooms. Patients requiring attention would have to yell or pound on their cell door to obtain a staff member's attention. In the event the patient was unconscious, he would not be found until either nursing or security staff performed routine rounds of the area. In the event of an environmental emergency, such as a fire, security staff would need to go to each room to unlock the padlock in order to evacuate patients. On the day of the infirmary inspection, there were 13 patients and two patient care attendants in the infirmary.

The unit is staffed with at least one registered nurse 24 hours a day, seven days a week. Security staff that is assigned to the health care unit performs routine rounds throughout the infirmary.

Inmate porters perform all the janitorial duties in the infirmary but provide no medical care. Porters have received no training in blood-borne pathogens, infectious and communicable diseases, bodily fluid clean-up, proper sanitation of infirmary rooms, toilets and showers, beds, furniture and linens and confidentiality of medical information.

An infirmary daily log is maintained which lists the patient's name and number, admission date and time, status, for example mental health or medical, diagnosis, discharge date and time and comments.

Each Wednesday, as a group, the Medical Director, staff physicians, infirmary RN and supervising RN review each patient's medical record and visit each patient.

Of the 26 beds, only four are the traditional "hospital-style" bed. The remainder of the beds are approximately 18 to 24 inches high and constructed of a steel frame with a solid bottom and

permanently attached to the floor. Of the four "hospital-style" beds, only one has full length side rails.

Infirmary bedding and linens were of poor quality, in that many were torn and had ragged edges. Additionally, infirmary staff reported linens were short in supply. During the infirmary inspection, it was learned that the infirmary porters launder the infirmary bedding and linens in a residential style washing machine located on the unit. Since all infirmary bedding and linens must be considered contaminated, it is doubtful they are being adequately sanitized when washed on the unit due to the water temperature not being high enough. Staff was instructed to have the washing machine water temperature checked to assure at least 140 degrees F is being attained during the wash cycle. Staff was further instructed that in order to properly sanitize bedding linens, they need to be washed for a minimum of 25 minutes with laundry detergent at a water temperature of at least 160 degrees F, or washed for a minimum of 10 minutes with laundry detergent and a beginning bleach bath of at least 100 ppm at a water temperature of at least 140 degrees F.

On the day of the infirmary inspection, there were five medical patients in the infirmary. Three of the patients were classified as acute care and two as "boarders" rather than chronic care, with documentation more frequently than required by Office of Health Services policy and procedure. All five records contained physician and nursing admission documentation. All documentation was in the Subjective-Objective-Assessment-Plan (SOAP) format as required by the Department of Corrections Office of Health Services. Vital signs, intake and output, and weights were recorded as ordered by the physician for the acute care patients and pursuant to department policy for the chronic care patients. Medications were documented on each patient specific medication administration record. Department of Corrections Office of Health Services policy requires infirmary patients to be classified at the time of admission as to their medical acuity level by using the terms either "acute care" or "chronic care". The facility is inappropriately using the term "boarder" instead of "chronic care." The term "boarder" is a housing designation whereas the term "chronic care" is a medical acuity designation. Additionally, in the SOAP documentation format, the "A" represents "assessment." For chronic care classified patients, physicians and nursing staff are inappropriately documenting "boarder" for the assessment. Again, the term "boarder" is a housing designation and in no way describes the patient's medical condition, which should be documented in the assessment.

## Infection Control

A named registered nurse functions as the facility infection control nurse (IC-RN) and has been in the position $3^1/_2$ years. When required, she interfaces with the Department of Corrections Office of Health Services, County Department of Public Health and the Illinois Department of Public Health (IDPH). Daily, the individual reviews laboratory reports and completes and submits to IDPH all reportable cases. Skin infections and boils are aggressively monitored, cultured and treated. Per the infection control nurse, there is a low incidence of culture-proven methicillin resistant Staphylococcus aureus (MRSA) infections.

The IC-RN conducts monthly safety and sanitation inspections in the dietary department, all cell houses and the health care unit and assures personal protective equipment (PPE) is available in

all clinical areas. Additionally, she performs pre-assignment and annual "food handler" examinations for staff and inmates to work in the dietary department and monitors tuberculosis screening and testing for inmates, staff and volunteers, as well as offers and monitors Hepatitis A and B vaccine to staff. The IC-RN has trained 11 inmate peer educators in HIV disease, hepatitis C, sexually transmitted infections, tuberculosis and proper hand washing.

Negative air-pressure readings in the two respiratory isolation rooms are monitored from gauges located in the infirmary nursing station. In the event of the loss of negative air pressure, the gauges indicate such, but there are no visual or audible alarms to immediately bring to the attention of infirmary staff the loss of negative air pressure. A tour of the health care unit, including the infirmary, verified personal protective equipment (PPE) available to staff in all areas as needed. Additionally, PPE is included in the emergency response bags. Puncture proof containers for the disposal of syringes/needles and other sharp objects are in use in all areas of the health care unit as needed. The facility uses a national commercial waste disposal company for disposing of medical waste. Institutional staff is trained in communicable diseases and blood-borne pathogens annually.

The unit is clean with the janitorial duties performed by inmate porters. Porters have received no training in blood-borne pathogens, infectious diseases, bodily fluid clean-up, proper sanitation of infirmary room, beds, furniture and linens and confidentiality of medical information. Health care unit porters launder infirmary linens in a health care unit laundry room using a residential style washing machine. A test of the washing machine hot water temperature indicated a temperature of only 125 degrees F. This temperature is too low to assure the proper cleaning and sanitizing of potentially bodily fluid soiled bed linens. In order to properly sanitize, linens are to be washed using laundry detergent in water at a minimum temperature of 160 degrees F for a minimum of 25 minutes or for a minimum of 10 minutes in water at a minimum temperature of 140 degrees F using laundry detergent and a bleach bath having an initial starting concentration of 100 parts per million.

The impervious vinyl coating on examination stools and tables and infirmary mattresses was noted to be torn or cracked, which prevents proper sanitizing and allows for potential cross-contamination between patients. The items in question should either be reupholstered or replaced. Additionally, it was noted there was no use of paper on examination tables between patients in either the cell houses or the health care unit examination rooms, and there was no policy or procedure to manually disinfect the tables between patients.

One cell house sick call room did not have a sink for washing hands.

# Inmates' Interviews

Twelve insulin dependent inmates, six from South house and six from North 2, were randomly chosen and interviewed. All 12 had been diagnosed several years previously, and all were knowledgeable regarding their chronic disease. All 12 were knowledgeable regarding the significance of their hemoglobin A1c blood level and knew the results of their most recent hemoglobin A1c blood level. All reported being evaluated by the physician or PA every 3-4 months and having the ability to perform blood glucose monitoring prior to the administration of

insulin. All reported they are informed of their most recent hemoglobin A1c level during each diabetic clinic. All of the inmates assigned to South house were of the opinion that the female PA was very thorough in managing their diabetic care.

It was reported breakfast is served between 3:00 a.m. and 5:00 a.m.; lunch is served between 8:30 a.m. and 9:30 a.m. and dinner is served between 3:30 p.m. and 5:00 p.m. It was reported that morning insulin is administered between 2:00 a.m. and 3:00 a.m., and afternoon insulin between 2:30 p.m. to 3:30 p.m.

All the inmates agreed on the following issues:
1. Clinics and blood work are frequently cancelled with no explanation.
2. During clinics, eyes and feet are frequently not examined.
3. There is a serious lack of adequate exercise time.
4. The diet is "diabetic unfriendly." It is too high in carbohydrates and low in protein.
5. In North 2 (segregation), insulin is administered by health care staff through the open front cell door and nursing staff do not rotate injection sites. (This is unacceptable.)
6. All reported using their commissary to manage their diabetes.
7. Sometimes they receive insulin prior to eating and sometimes after eating. (This is unacceptable.)
8. Even though hard candy is approved for sale in the inmate commissary, when inmates carry candy to self-treat low blood sugar, some security staff will take the candy during random shakedowns. The policy is not consistent.

All the inmates were generally in agreement that security officers are quick to respond to a diabetic inmate low blood sugar issue.

In response to questioning as to what two issues, if changed, would positively impact their ability to better manage their disease, all 12 immediately answered by voicing to improve the diet and increase the amount of exercise time.

A review of 11 of the 12 (one chart not available) diabetic patient medical records indicated the following:
1. "Diabetes" was noted on each problem list.
2. The Office of Health Services approved, pre-printed chronic clinic form was used at each chronic clinic visit.
3. All 11 patients were evaluated in diabetic clinic every four months as required by the Department of Corrections policy.
4. Three patients were classified as being in "good" control, six in "fair" control and two in "poor" control.
5. Of the two patients classified as being in "poor" control, there was no documented plan to help move them into "fair" or "good" control and there was no increase in the frequency of chronic clinic evaluations.
6. In three of the 11 records, the examination was incomplete, in that there was no documented comment as to the presence, absence or quality of foot pulses or foot sensation. This omission was specific to one nurse practitioner.
7. All 11 patients were receiving twice a day AccuChecks prior to insulin administration.

# Dental Program

## Executive Summary

On June 17-19, 2014, a comprehensive review of the dental program at Menard CC was completed. Five areas of the program were addressed including: 1) inmates' access to timely dental care; 2) the quality of care; 3) the quality and quantity of the providers; 4) the adequacy of the physical facilities and equipment devoted to dental care; and 5) the overall dental program management. The following observations and findings are provided.

There are three separate dental clinics at Menard CC. A single chair clinic at North 2, a single chair clinic at the Receiving and Classification clinic, and a four-chair clinic located in the Health Service Unit (HSU). The chairs/units at the HSU are only two years old and in excellent repair. The cabinetry is old, rusting and has several areas of chipping paint. The clinics at North 2 and the Receiving and Classification are similarly old and worn. The x-ray developers at North 2 and R&C do not work at all. They should be replaced or repaired immediately. Instrumentation was sufficient.

Staffing was adequate to meet the dental needs at Menard CC.

Comprehensive care delivery was an area of concern. No comprehensive examination or treatment plans were documented preceding the delivery of comprehensive care. No documented examination of the soft tissues nor periodontal assessment was part of the examination and treatment process. Hygiene care and prophylaxis were not provided prior to restorations. Restorations proceeded without appropriate intra-oral radiographs. Oral hygiene instructions were never documented.

Dental extraction procedures were provided in compliance with the elements of the review. Radiograph were current and adequate, the reason for the extraction was documented, and a consent form was always completed prior to oral surgery.

Removable partial dentures should be constructed as a final step in the sequence of care delivery included in the comprehensive care process. A record review revealed that partial dentures proceeded without a comprehensive examination and treatment plan. A periodontal exam and assessment and periodontal care was never provided. Because the comprehensive examination and treatment plans are absent, it was impossible to ascertain if all necessary care was completed prior to fabrication of removable partial dentures.

Sick call is accessed through the inmate request form or staff referrals if the perceived need is immediate. The SOAP format was used and the patient's complaint addressed. However, treatment seldom proceeded with a proper diagnosis.

An inadequate triage is accomplished through the request form. The forms are evaluated and inmates scheduled accordingly. Urgent care needs (pain and swelling) are identified from the form and seen in five to ten days. This should be done within 24-48 hours from the date of the request. There is no system in place to provide a timely face-to-face evaluation with medical/dental staff for inmates with urgent care complaints.

Inmates who request routine care are seen and evaluated within 14 days. They are placed on waiting lists for routine care or cleanings.

The health history section of the dental record is not thorough and is poorly developed. There is no system in place to "red flag" patients with medical conditions that require medical consultation or intervention prior to dental treatment.

Blood pressures should, at the least, be taken on patients with a history of hypertension. When asked, the clinician indicated that they do not routinely take blood pressures on these patients.

The sterilization area is rather large and shared with the dental laboratory. Proper sterilization flow was interrupted by laboratory equipment. Disinfection procedures were adequate in all the clinics. Of concern was the fact that the steam autoclaves were being spore tested only once a month. Professional guidelines call for weekly testing. Immediate correction is called for.

Safety glasses were not worn by patients during treatment. No radiation hazard signs were posted in the areas where x-rays are taken.

The continuing quality improvement program was inadequate and poorly utilized. The dental program should develop studies and corrective actions to address the weaknesses described in the body of this review.

The Menard CC Policy and Procedures Manual for dental was dated 1995 with no indication that it had been updated. This is an inadequate document from which to run the dental program.

Failed appointment rates approached 40%. This is very high and must be addressed. Security precedence and unavailability of escort staff should be addressed administratively.

## Staffing and Credentialing

Menard CC has a dental staff of three full-time dentists, one dental hygienist, and three full-time dental assistants. All are Wexford Health Services employees except one of the dentists. In addition, one PRN dentist and three PRN assistants are available if needed. This meets the Administrative Directive staffing guidelines and should be adequate to provide meaningful dental services for Menard's 3700 inmates.

All providers have current credentials on file and all the staff are current with their CPR certification. The staffing is adequate to meet the needs of Menard CC.

**Recommendations:** None. Menard is adequately staffed and all privileges and credentials are in place.

## Facility and Equipment

There are three separate dental clinics at Menard CC. A single chair clinic is at North 2 and

services the segregation inmates and a general population housed in that unit. Another single chair unit is in the Receiving and Classification clinic and is used for the southern Illinois reception screening examination. It contains a panorex x-ray and developer. The third is a four chair clinic located in the Health Service Unit and services the rest of the institution. There is a 400 bed medium-security satellite institution, but it does not have a dental clinic. This population is serviced by the clinic in the Health Service Unit.

The chairs/units in the HSU clinic are only two years old and in excellent repair. There is a single x-ray unit for this entire clinic and it is very old, faded and worn. There is a panorex unit on the second floor of this building, above the dental clinic. The metal cabinetry is old, rusting and has several areas of chipping paint. Proper disinfection is difficult.

The clinic at North 2 is similarly old and worn, as is the clinic at Receiving and Classification.

A real concern is that the x-ray developers in the North 2 clinic and the R&C clinic do not work at all. All radiographs need to be brought back to the HSU clinic for developing. This is unacceptable in that x-rays are often needed immediately, especially as a diagnostic tool in urgent care situations. These developers should be replaced or repaired immediately. Instrumentation is adequate.

The four chairs/units in the HSU are in very small individual spaces. This space is barely adequate. The single chair clinics at North 2 and R&C are small but adequate. The lab and sterilization area is large. The existing facility is adequate to meet the needs of the institution. The x-ray developers need to be replaced or repaired immediately.

**Recommendations:**
    1. Replace or repair the x-ray developers in the North 2 and R&C clinics.

## Sanitation, Safety, and Sterilization

I observed the sanitation and sterilization techniques and procedures. Surface disinfection was performed between each patient and was thorough and adequate. Proper disinfectants were being used. Protective covers were utilized on most unit surfaces.

An examination of instruments in the cabinets and storage areas revealed that all were properly bagged and sterilized. All handpieces were sterilized and in bags.

The sterilization procedures themselves at the Health Service Unit clinic were improper. Flow did not proceed from dirty to clean. The ultrasonic was on the wrong side of the sink and a dental lathe and protective covers were situated between the sink and the autoclave.

The Receiving and Classification clinic used disposable instruments.

The clinic at North 2 had a proper flow of sterilization from dirty to clean. Surface disinfection was adequate and proper disinfectants were in use. Protective covers were extensively used.

No biohazard warning signs were posted in the sterilization areas. Safety glasses were not always worn by patients. Eye protection is always necessary, for patient and provider. I also observed that no warning signs were posted where x-rays were being taken to warn of radiation hazard.

## Review Autoclave Log

A review of spore testing logs revealed that spore testing of the steam autoclaves was being accomplished only once a month. This is highly irregular and violates OSHA guidelines calling for weekly spore testing of autoclaves. The dry heat sterilizer is tested on an irregular, somewhat quarterly basis. These are rather egregious deficiencies that should be corrected immediately. Steam autoclaves and dry heat sterilizers should be tested weekly.

There were no biohazard signs in the sterilization area.

**Recommendations:**
1. Develop a sterilization system that implements a proper flow from dirty to sterile. Spore test the autoclaves and sterilizers on a weekly basis and maintain proper logs.
2. Provide safety glasses to patients receiving dental care.
3. Place biohazard warning signs in the sterilization areas in the dental clinics.
4. Post warning signs in the area where x-rays are being taken to warn pregnant females of potential radiation hazards.

## Comprehensive Care

We reviewed 10 dental records of inmates in active treatment classified as Category 3 patients. One of the most basic and essential standards of care in dentistry is that all routine care proceed from a thorough, well documented intra and extra-oral examination and a well developed treatment plan, to include all necessary diagnostic x-rays. A review of 10 records revealed that no comprehensive examination was performed and no treatment plans developed. No examination of soft tissues or periodontal assessment was part of the treatment process. Hygiene care and prophylaxis was never part of comprehensive care. Restorations were, in five of the charts, provided without appropriate diagnostic x-rays for caries. No hygiene treatment was part of any of the routine care provided. Further, oral hygiene instructions were never documented in the dental record as part of treatment.

**Recommendations:**
1. Comprehensive "routine" treatment be provided only from a well developed and documented treatment plan.
2. The treatment plan be developed from a thorough, well documented intra and extra-oral examination, to include a periodontal assessment and thorough examination of all soft tissues.
3. In all cases, that appropriate bitewing or periapical x-rays be taken to diagnose caries.
4. Hygiene and periodontal care be provided as part of the treatment process.
5. That care be provided sequentially, beginning with hygiene services and dental prophylaxis.
6. That oral hygiene instructions be provided and documented.

## Dental Screening

Menard CC is the Reception and Classification Center for the Southern Region of the Illinois DOC. All records reviewed revealed that the exam was performed in a timely manner, a panoramic x-ray was taken, and the APHA categorization was completed. I did not observe the screening process but it was demonstrated to me and I found it procedurally adequate. Four of the panoramic x-rays were processed improperly and presented as an opaque negative. These radiographs are not acceptable for diagnostic use. This problem did not occur in later record reviews. I was told the developer in the reception clinic was not functioning properly. The radiographs were being developed in the main clinic.

**Recommendations:**
1. Insure that the equipment failure that is causing the radiograph problem is addressed and repair completed ASAP.

## Extractions

A review of 10 records of inmates who had dental extractions revealed that nine of the 10 were in full compliance with the aspects reviewed. The radiograph was over three years old in one of the records and the reason for extraction was not included in another. This does not rise to a level of concern. A quick scan of several other records of inmates who had teeth extracted did not reveal a repeat of these issues. In two of the records, non-restorable was provided as a diagnosis for pain. This problem was seen in other records reviewed in other areas.

**Recommendations:**
1. That proper diagnosis be part of the treatment process.

## Removable Prosthetics

Removable partial denture prosthetics should proceed only after all other treatment recorded on the treatment plan is completed. The periodontal, operative and oral surgery needs all should be addressed first. In none of the records reviewed was a comprehensive examination and treatment plan developed prior to impressions for removable partial dentures. In none were oral hygiene care or oral hygiene instructions provided. Periodontal assessment and treatment was not provided in any of the records. Because there was no comprehensive examination nor any treatment plans developed, it was impossible to ascertain if all necessary care, including operative and/or oral surgery treatment, was completed prior to fabrication of removable partial dentures.

**Recommendations:**
1. A comprehensive examination and well developed and documented treatment plan, including bitewing and/or periapical radiographs and periodontal assessment, proceed all comprehensive dental care, including removable prosthodontics.
2. That periodontal assessment and treatment be part of the treatment process and that the periodontium be stable before proceeding with impressions.
3. That all operative dentistry and oral surgery as documented in the treatment plan be completed before proceeding with impressions.

## Dental Sick Call

Sick call is accessed via the inmate request form or from staff referral if the perceived need is immediate. It takes five to ten days for urgent care complaints to be seen. This is unacceptable. They should be seen within 24-48 hours.

In all 10 records reviewed the SOAP format was used and the patient's complaint was addressed. The review showed that the sick call appointment was not being used for routine care. Treatment proceeded with a diagnosis in only two cases and an improper diagnosis in another. This lack of a proper diagnosis was seen in records reviewed in other areas that included sick call entries.

**Recommendations:**
1. That all treatment proceeds from a proper diagnosis.
2. That inmates with urgent care needs are seen with 24-48 hours.

## Treatment Provision

An inadequate triage system is in place that prioritizes treatment needs. Inmate request forms are evaluated by the dental program by the following day and their treatment needs, based upon the request form, are prioritized. Urgent care needs are identified from the request form and seen ASAP, often taking five to ten days. Others are scheduled accordingly or placed on the hygiene list if requested. All request forms are seen within 14 days.

Inmates seek urgent care via the inmate request form or, if they feel they need to be seen immediately, by contacting Menard CC staff, who can then call the dental clinic with the inmate's complaint. These inmates are seen at the dentists' discretion. Inmates with urgent care complaints (pain or swelling) from the request form often take five to ten days to be seen. They should be seen with 24-48 hours from the date of the request. Mid-level practitioners at the units do not routinely see the inmate face-to-face to evaluate urgent care needs as indicated on the request form. If an inmate complains of a toothache, swelling, or pain to the nurse making rounds, the nurse can call the dental clinic with this information. They can provide over-the-counter pain medication. Some inmates are seen immediately if correctional staff can get the inmate over to the dental clinic. There is no system in place to provide a face-to-face evaluation with medical/dental staff for inmates that complain of pain or swelling. This should be provided within 24-48 hours from the date of the request.

Request forms from inmates seeking routine care are evaluated the next working day and the inmate given an appointment to be evaluated within 14 days. Inmates requesting to have their teeth cleaned are placed on a waiting list. Inmates for routine care are placed on a waiting list in sequential order. This list is approximately nine months long.

**Recommendations:**
1. A system should be implemented immediately that insures that inmates with urgent care complaints (pain and swelling) are seen and evaluated by medical/dental staff within 2448 hours from the date on the request form. It is from this face-to-face evaluation that scheduling and treatment should proceed. The appropriate medical staff in the units should be utilized in this effort.

## Orientation Handbook

The Menard CC Orientation Manual is minimally but adequately developed for dental services and addresses types of care, access to care and how treatment is scheduled.

**Recommendation:** None

## Policies and Procedures

An interview with the Menard CC Dental Director revealed that he was not aware of a policy and procedural manual. A review of the Menard CC Policy and Procedures Manual revealed a large section devoted to the policies and procedures for dental care. It was dated 1995 with no indication that it has been updated since that time. This is not an adequate document from which to run the dental program.

**Recommendations:**
1. That the dental program at Menard CC develop a current, detailed, thorough and accurate policy and procedure manual that defines how all aspects of the dental program are to be run and managed. Once developed, it should be reviewed and updated on a regular basis and as needed for new policies and procedures.

## Failed Appointments

The failed appointment rate of about 40% is very high. I was told the reasons for missed appointments included refusal, failed, lockdown, and "other." When asked, the dentists related that "other" usually meant security precedences and unavailability of escort staff. The percentage was very high for the month of April when 362 appointments were missed because of a lockdown. When only failed appointments (inmate chose not to come to appointment) are included, the percentage drops to about 12%. In an older high-security institution with multiple missions and security concerns such as Menard CC, movement of inmates is a real challenge. That does not excuse the problem. Every effort should be made to work with administrative and correctional staff to correct this issue.

**Recommendations:**
1. Develop an aggressive CQI study to evaluate reasons for missed appointments and persistently seek remedies to correct the problem and improve getting inmates to their appointments.

## Medically Compromised Patients

A review of the dental records of the four inmates on anticoagulant therapy revealed that two records made no mention of this in the health history section of the dental chart. It was indicated but not "red flagged" in the other two. No treatment was provided to any of these inmates.

When asked, the clinicians indicated that they do not routinely take blood pressures on patients with a history of hypertension.

**Recommendations:**
1. That the medical history section of the dental record be kept up to date and that medical conditions that require special precautions be red flagged to catch the immediate attention of the provider
2. That blood pressure readings be routinely taken of patients with a history of hypertension, especially prior to any surgical procedure.

## Specialists

A local Oral Surgeon, Dr. Jay Swanson, is available and used for oral surgery procedures to include trauma, removal of difficult wisdom teeth and evaluation and removal of oral pathology. He has offices in Effingham and Mt. Vernon, Illinois. General anesthesia cases use the Effingham office. All records reviewed revealed proper case selection and good patient management, and good record documentation.

**Recommendations:** None

## Dental CQI

The dental program contributes monthly dental statistics to the CQI committee. The dental program conducted two studies, one in 2013 and another in 2014. One involved the effects of the medications Dilantin and Norvasc on the incidence of gingival hyperplasia. The other was a study of grievances as related to the different cell houses within the institution. The results of each was presented and steps taken to address the findings.

No studies were in place to address program weaknesses and problem areas.

**Recommendations:**
1. Develop vigorous CQI studies that address the weaknesses presented in this report and put in place steps to correct the problems.

# Mortality Review

From January 1, 2013, to the date of our visit, there were 12 deaths at Menard, including one hanging and two murders. Of the remaining nine cases, we chose six for review here. In three of the cases, we identified serious lapses in care that likely contributed to the timing of the patients' demise. In a fourth case, a patient with deteriorating neurologic status was not worked up for causes of his decline.

**Patient #1**

This was a 63-year-old man who entered IDOC in 2007 and died on 2/11/14 of complications following several cardiac arrests. He had no known cardiac risk factors upon intake. He was found to have hypertension in 2011, but blood pressure checks were discontinued by the MD with follow up as needed. He was not started on medication. Likewise, he had an unfavorable

lipid profile at that time but this was not treated either. His Framingham at this time was quite high, at 25%.

In September 2013, he presented with chest pain, shortness of breath and hypertension (blood pressure 180/120, 190/120). He was given a dose of clonidine and placed in the infirmary for observation. The admitting nurse obtained a history of orthopnea. The previous Medical Director saw the patient that morning and noted that he had no complaints but the patient was tachycardic with a heart rate of 130. No ECG was ordered. In fact, no other work-up or treatment was provided and his symptoms gradually resolved. He was discharged to his cell that afternoon with no specific follow up ordered.

On 1/17/14, he presented with orthopnea. His blood pressure was 140/78, pulse 104. The nurse did a thorough evaluation and elicited the history of a recent death in the family. She described him as anxious, and referred him to MD line and mental health.

On 1/21, he presented with cough, chest pain, shortness of breath, diarrhea and abdominal cramping. Blood pressure was 150/98, pulse 88. He was referred to the doctor and seen that day. The doctor noted that he reported bilateral chest pain when lying supine. He appeared apprehensive. She decided he had bronchitis vs pneumonia and gastroenteritis. She ordered a chest x-ray and antibiotic and a follow-up appointment in one week. The chest x-ray suggested a right lower lobe infiltrate, mild cardiomegaly, and a small left pleural effusion. The follow-up appointment on 1/28 was cancelled.

On 1/31, the doctor saw the patient for ongoing shortness of breath. Blood pressure was 124/100, pulse 108. His lungs were described as clear, and no pedal edema was evident. She concluded "pneumonia, rule out CHF," and ordered another chest x-ray, ECG, BNP and admitted him to the infirmary for 23-hour observation. She retreated him with the same course of antibiotic that he just completed, then later sent him to the local ED after conferring with the Medical Director. He was admitted with CHF and subsequently suffered several cardiac arrests and ultimately died.

*Opinion*: It is not appropriate to treat a hypertensive urgency in a prison infirmary; the patient should have been sent to the outside ED back in September when he initially presented with these symptoms. It is likely that his cardiac condition would have been recognized then and appropriate treatment could have been initiated, thereby substantially decreasing his risk of death.

**Patient #2**
This was a 62-year-old man who was admitted to IDOC in 2008 and died on 11/16/13 of GI bleeding from ruptured esophageal varices due to cirrhosis. He had a history of decompensated cirrhosis and prior GI bleeding in 2007.

He presented to the former Medical Director on 11/13/13 with "severe lethargy, dizziness, dyspnea, melena x 2 days." He was tachycardic with a heart rate of 104, blood pressure was 124/74 and had grossly positive stools on exam. The doctor ordered labs and placed him in the infirmary at 1:10 p.m. At 1:30 p.m., the admitting RN described him as pale and pastie (sic). He

had a small black stool. He complained of mild abdominal and chest pain. His blood pressure was 112/70 and heart rate was 100. His Hb was 10.2 g/dL, down from 13.3 in July.

At 4:00 pm, his blood pressure was 110/62, pulse 80 and he was described as weak and tired.

At 8:00 p.m., a stat CBC was drawn per the doctor's order. It was resulted at 9:13 p.m. and was 7.6 g/dL. At 9:45 p.m., the nurse called the doctor regarding these results and he ordered only IV fluids.

On 11/14, at 3:25 a.m., his blood pressure was 100/60, pulse 104. At 9:20 a.m., the doctor saw the patient, who reported weakness, dizziness and ongoing melanotic stool. He sent the patient to the local hospital, where he died two days later.

*Opinion*: To place a patient with known end stage liver disease and active GI bleeding in a prison infirmary is beyond inappropriate; in this case it may have accelerated his demise. Even when massive blood loss was evident by the dramatic drop in hemoglobin, the doctor failed to intervene appropriately until it was too late.

**Patient #3**
This was a 66-year-old man with multiple medical problems including diabetes, COPD and coronary artery disease with history of 5 vessel CABG in 2009, who was received in IDOC in 2006 and died on 4/7/13 of metastatic renal cell carcinoma. He first presented on 11/12/12 with difficulty breathing, especially when lying down. He was referred to the Medical Director, Dr. Shearing, and seen the next day. Dr. Shearing ordered a chest x-ray and ECG and admitted the patient to the infirmary for a CHF exacerbation and treated him with diuretics. The chest x-ray was performed on 11/13/12 and did show pulmonary vascular congestion. It also showed "nodular densities within the lungs bilaterally of which findings are suspicious for neoplastic-metastatic disease," a finding which escaped the attention of the doctor when he reviewed the film on the date it was taken. The patient was discharged back to his cell on 11/15/12.

The film was read on 11/15 and received by the institution on 11/26, at which time the same doctor signed the report and marked it "file" (rather than "pull chart" or "see patient").

On 11/30, the doctor saw the patient in follow up of his infirmary admission, noted that his symptoms were improved, but did not review the x-ray result with the patient or make any reference to it.

On 12/10, the patient again presented with shortness of breath and chest tightness and was referred to the Medical Director, who saw him that day. The doctor noted that the patient's symptoms were "now resolved." He concluded, "CHF, multiple medical problems," made no changes and returned the patient to his cell.

On 1/16/13, the patient was brought to the HCU via wheelchair with complaints of chest pain radiating down his left arm and shortness of breath. He was hypertensive and diaphoretic. The nurse got a verbal order to send the patient to the ED, where he was found to have metastatic renal cell cancer. He ultimately opted for palliative care and expired three months later.

*Opinion*: That the doctor overlooked the pulmonary nodules on his own reading of the chest x-ray is surprising but not inconceivable. That he then ignored them when he reviewed the final report is, in our opinion, negligent.

**Patient #4**

This was a 64-year-old man who was severely beaten by his cellie on 1/24/13 and admitted to the trauma service at Barnes Jewish Medical Center with intraventricular hemorrhages, subdural hemorrhages, airway compromise and massive injuries to the face and neck. He was stabilized and returned to the institution on 1/31/13. Over the ensuing three weeks, the patient was described with increasing disdain as being uncooperative and unwilling to participate in self-care. His behavior became increasingly problematic, in that he ultimately began smearing feces in his room, disrobing and urinating on himself. He was diagnosed with psychosis secondary to head injury and started on psychotropics. He developed difficulty swallowing and let medication and liquids spill out of his mouth. He continued to receive his usual medications, including oral diabetes medications. There was no record of his blood glucose being checked.

On 2/25/13, he was noted to be very sedated and slow to respond. His blood pressure was 78/40 and blood glucose was 54. The doctor saw the patient at 7:50 a.m. and described him as lethargic and non-verbal; he had a flexion response to pain. He ordered IV fluids and monitoring of vital signs. At 9:30 a.m., the blood pressure improved to 110/50. There are no further measurements of blood glucose. At 10:45 a.m., he coded and died.

The autopsy report listed the final cause of death as "blunt trauma to head aggravating hypertensive and arteriosclerotic cardiovascular disease and diabetes mellitus."

*Opinion*: This patient was clearly challenging to care for. However, in the face of his declining neurologic condition, work-up should have been pursued.

# Continuous Quality Improvement

We reviewed sets of minutes from December, February and March and also looked at a more recent set drafted by the new QI Coordinator, the head of the medical records program. The QI program at Menard Correctional Center clearly attempts to comply with the policy requirements and as such there is documentation of much activity. The problem is that there is not a relationship between that activity and improvements in the quality of services provided. An example follows.

There is a requirement that nursing QI performance on protocols be reviewed. Two of the items that are reviewed are, "is there a chief complaint described" and "is there a duration listed for that chief complaint." According to those two items, the performance by the nursing staff collectively is well over 90%. The problem is that those two items alone do not come close to the requirements to complete an adequate subjective history. As an example, a cough for a month as the only history written would result in an assessment of compliance with the requirement. On the other hand, an adequate history would require, was there a fever, was there shortness of breath, was there any blood coughed up, was the cough productive, were there any other related symptoms. All of these questions are critical to determining the nature of the patient's problem.

So although Menard does comply with the letter of the policy requirements, the policy requirements and training do not get the staff to the point where they are assisting the program in improving the quality of care.

Another item is whether patients sent for a scheduled offsite service are seen on return within five days. This is reported as 100%. The problem is that unless the relevant paperwork is available and there is a discussion between the physician and the patient regarding the findings on that paperwork and the recommended plan, the quality of care may still be substandard even though the performance may be at 100%. These are the kinds of issues which do need to be addressed so that the quality improvement program can be a source for improving the quality of care. In other areas, there is data collection which may demonstrate inadequate performance but there is no analysis of the causes or contributing factors to the inadequate performance and therefore there is no understanding of what would reasonably be the most effective improvement strategy and so monitoring continues independent of improvement.

# Recommendations

**Leadership and Staffing:**
1. Place a priority on filling the Director of Nursing and Supervising Nurse positions.

**Clinic Space and Sanitation:**
1. Complete the renovations to the East cell house sick call area and begin renovations to the remaining cell house sick call areas as soon as possible.
2. Immediately begin using a paper barrier which can be changed between patients on examination tables or develop a procedure to sanitize between patients.
3. Until renovated, appropriately equip cell house sick call areas and immediately provide for hand sanitizing between patients in the South Lower sick call area.

**Reception:**
1. The quality improvement program must utilize a clinician to review the records of patients who have recently gone through the reception process and for whom abnormalities have been identified in order to insure that appropriate follow up occurs. This should be an ongoing part of the quality improvement program.

**Nursing Sick Call:**
1. Transition to an all Registered Nurse triage and sick call system. Licensed Practical Nursing (LPN) staff is triaging sick call requests and may or may not perform an examination, make an assessment and, then, formulate a plan which could be no treatment or treatment from approved treatment protocols or to refer to a provider. All of these actions are beyond the educational preparation and scope of practice for an LPN.

**Chronic Disease Clinics:**
1. Physicians should be trained and certified in a primary care field. Only primary care trained providers should be managing chronic diseases.
2. The chronic disease database should be used as a tool to identify areas in which the program is underperforming so that interventions can be targeted to improve care.
3. Providers should be implementing a change to the care plan when patients have suboptimal control of their disease(s).
4. All providers need access to electronic references at the point of care.
5. There were issues with the accuracy of evaluating the degree of disease control for patients enrolled in the pulmonary clinic. This is at least partly due to the language of the policy, which should be revised to be more consistent with the NHLBI guidelines.
6. Providers should be familiar with alternative methods of TB testing, i.e., the interferon gamma assays, and their appropriate use. Efforts should be made to confirm patients' reports of previous treatment for LTBI prior to committing them to treatment.
7. The cell block clinics should be adequately equipped and present a professional clinical environment. Safety concerns among the providers need to be addressed.

**Scheduled Offsite Services:**

1. A clinically trained staff person should be responsible for insuring that all relevant offsite service reports are available for the clinician to review with the patient within a week of the offsite service having been provided.
2. When the scheduled offsite service reports are available, the physician must document a visit with the patient in which the findings and plan are discussed.
3. Services that cannot be scheduled for more than a month must be addressed by the Medical Director with the State Medical Director.

**Unscheduled Offsite Services:**
1. Nursing staff must be retrained with regard to an appropriate assessment for a patient who has been sent to the hospital and returned to the infirmary. Specifically, the training should include what subjective and objective information to collect in relationship to the problems that were addressed at the hospital
2. A clinically trained person should insure that all of the relevant offsite service reports for unscheduled offsite services are available within a few days, including discharge summaries, emergency room reports, operative reports and catheterization reports so that they can be discussed by the primary care clinician with the patient and a plan can also be discussed.
3. When a procedure or a visit is interrupted due to a lockdown, the Medical Director should be notified and he must determine whether, despite the lockdown, it must occur or can it wait until the next day and occur the following day.

**Infirmary Care:**
1. Establish a nurse call system.
2. Address life/safety concerns with infirmary patients padlocked in their rooms.
3. Train inmate health care unit porters in blood-borne pathogens, infectious and communicable diseases, bodily fluid clean-up, the proper cleaning and sanitation of infirmary rooms, beds, furniture and linens and confidentiality of medical information.
4. Replace torn and ragged linens. Maintain an adequate supply of bedding and linens.
5. Sanitize infirmary bedding and linens through appropriate laundering methods.
6. Properly document in the patient medical record a medical acuity level i.e., acute, chronic, housing, administrative placement.
7. Properly document in the patient medical record a medical assessment rather than a housing designation in the "assessment" portion of an infirmary patient SOAP note.

**Infection Control:**
1. Continue to aggressively monitor skin infections and boils.
2. Assure a practice of appropriately laundering and sanitizing infirmary bedding and linens either in the health care unit or institutional laundry. If laundering in the health care unit, water temperatures should be monitored and recorded daily to assure a 160 degree or 140 degree reading.
3. Train all health care unit porters in blood-borne pathogens, infectious and communicable diseases and the proper cleaning and sanitizing of infirmary rooms, beds, furniture, toilets and showers.
4. Since there are no visual or audible alarms for the infirmary negative pressure respiratory isolation rooms, when a patient is isolated due to respiratory infection, gauge readings

should be monitored and recorded each shift. When the rooms are empty or being used for purposes other than respiratory infection, gauge readings should be monitored and recorded weekly.

5. Install, at a minimum, an audible alarm to immediately notify infirmary staff of the loss of negative pressure in respiratory isolation rooms.

6. Critically monitor cell house sick call areas for cleanliness, the use of a paper barrier between patients on examination tables or assure table tops are sanitized between patients and appropriate hand washing/sanitizing is occurring between patients.

7. Each month, critically inspect upholstered equipment and mattresses for any tears or holes in the outer cover and assure the items are taken out of service until repaired.

**Quality Improvement Program:**

1. The QI policy and the training connected to it must be redone in order to facilitate quality improvement effectively occurring at each institution. This will entail a lengthy discussion.

# Appendix A – Patient ID Numbers

**Reception Process:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | [redacted] | [redacted] |
| Patient #2 | [redacted] | [redacted] |
| Patient #3 | [redacted] | [redacted] |
| Patient #4 | [redacted] | [redacted] |
| Patient #5 | [redacted] | [redacted] |
| Patient #6 | [redacted] | [redacted] |
| Patient #7 | [redacted] | [redacted] |
| Patient #8 | [redacted] | [redacted] |
| Patient #9 | [redacted] | [redacted] |

**Chronic Care:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | [redacted] | [redacted] |
| Patient #2 | [redacted] | [redacted] |
| Patient #3 | [redacted] | [redacted] |
| Patient #4 | [redacted] | [redacted] |
| Patient #5 | [redacted] | [redacted] |
| Patient #6 | [redacted] | [redacted] |
| Patient #7 | [redacted] | [redacted] |
| Patient #8 | [redacted] | [redacted] |
| Patient #9 | [redacted] | [redacted] |
| Patient #10 | [redacted] | [redacted] |
| Patient #11 | [redacted] | [redacted] |
| Patient #12 | [redacted] | [redacted] |
| Patient #13 | [redacted] | [redacted] |
| Patient #14 | [redacted] | [redacted] |
| Patient #15 | [redacted] | [redacted] |
| Patient #16 | [redacted] | [redacted] |
| Patient #17 | [redacted] | [redacted] |
| Patient #18 | [redacted] | [redacted] |
| Patient #19 | [redacted] | [redacted] |
| Patient #20 | [redacted] | [redacted] |
| Patient #21 | [redacted] | [redacted] |
| Patient #22 | [redacted] | [redacted] |
| Patient #23 | [redacted] | [redacted] |

**Urgent/Emergent Care:**

| Patient Number | Name | Inmate ID |
|---|---|---|

| | | |
|---|---|---|
| Patient #1 | [redacted] | [redacted] |
| Patient #2 | [redacted] | [redacted] |
| Patient #3 | [redacted] | [redacted] |
| Patient #4 | [redacted] | [redacted] |
| Patient #5 | [redacted] | [redacted] |

**Scheduled Offsite Services:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | [redacted] | [redacted] |
| Patient #2 | [redacted] | [redacted] |
| Patient #3 | [redacted] | [redacted] |
| Patient #4 | [redacted] | [redacted] |
| Patient #5 | [redacted] | [redacted] |
| Patient #6 | [redacted] | [redacted] |
| Patient #7 | [redacted] | [redacted] |
| Patient #8 | [redacted] | [redacted] |
| Patient #9 | [redacted] | [redacted] |
| Patient #10 | [redacted] | [redacted] |

**Mortality Review:**

| Patient Number | Name | Inmate ID |
|---|---|---|
| Patient #1 | [redacted] | [redacted] |
| Patient #2 | [redacted] | [redacted] |
| Patient #3 | [redacted] | [redacted] |
| Patient #4 | [redacted] | [redacted] |

# APPENDIX B

# Mortality Reviews

The taxonomy used for the mortality reviews is described in detail in Appendix 1. It outlines 14 distinct types of lapses in care, with each lapse representing a serious deviation from the standard of care. Many cases had more than one lapse in care, and these are specified by number in the case descriptions. We chose to use this methodology which was developed by the California Prison Receivership because it has been certified by the Federal Court in Plata v. Brown, a case involving adequacy of medical care in the California Department of Corrections and Rehabilitation.

There were 127 deaths within IDOC between January 1, 2013 and June 1, 2014, 10 of which were violent deaths (suicides or homicides) and were therefore not reviewed for the purposes of this report. Of the remaining 117 mortalities, we reviewed 61 cases (52%) plus an additional 2 deaths from 2010; 63 cases total. The details of each case are described below. There were one or more significant lapses in care in 38 cases (60%). This is an unacceptably high rate of deviations from the standard of care. Of those cases with significant lapses, 34 (89%) had more than 1 lapse.

# Cases with Lapses in Care

## Dixon Correctional Center

### **Patient 2**

The patient was a 56-year-old man with asthma and a seizure disorder who died of metastatic prostate cancer on 3/21/14. There were significant lapses in care. Of special note is the fact that there is no documentation that the patient was seen from 9/20/13, when he was seen for chronic care of his asthma and seizure disorder, until 1/13/14, when he was seen for a complaint of back pain.

1. The patient's PSA was 37.8 on 5/6/13. He did not see an urologist until 1/15/14. This is a Type 3 lapse in care.

2. The patient had a history of chronic low back pain. On 1/13/14, he began complaining of increasing back pain following a fall. He was seen by providers on 1/20/14 and 1/29/14 and they noted that the patient was complaining of back pain. They did not address his pain. This is of special concern, since the patient was being evaluated for prostate cancer and his back pain may have related to metastatic disease. He subsequently was diagnosed with metastases to the spine when he was admitted to the hospital on 2/3/14. These are Type 1 lapses in care.

3. The patient was housed in the infirmary following his prostate biopsy on 1/30/14. Beginning on 2/2/14, at 12:05 a.m., he began complaining of fevers and not feeling well. Over the next two days, he had temperatures of up to 104 degrees as well as tachycardia with a pulse as high as 132. Despite being notified by the nurses of these findings, a physician did not evaluate him until 2/3/14 at 5:00 p.m. and he was not sent to the

1

emergency room until 11:15 p.m. He was subsequently diagnosed and treated for sepsis. These are Type 1 lapses in care.

4. The patient's asthma and seizure disorder were not well controlled. He did not receive timely or adequate care for these problems. These are Type 2 lapses in care.

**Patient 4**

The patient was a 51-year-old man with a history of diabetes, hypertension and HIV disease who died of a cardiac arrest on 1/8/13. There were significant deviations from the standard of care.

1. The patient arrived at Dixon on 9/25/12 from STA-NRC. He saw a physician on 10/12/12 for his baseline diabetes and hypertension evaluations. The physician did not document any history related to the patient's diabetes and an inadequate history related to his hypertension. A physician did not see him again for these problems. These are Type 2 lapses in care.

2. The patient had a positive HIV test on 10/3/12. He did not see a physician for this until 12/10/12. The physician noted that the patient's CD4 count was 116. He did not order pneumocystis prophylaxis, which is indicated for a CD4 count < 200. These are Type 4 lapses in care.

3. The patient began refusing his insulin and other medications on 1/1/13. He was not referred to a provider for counseling. This is a Type 3 lapse in care.

**Patient 6**

The patient was a 57-year-old man who died of metastatic lung cancer on 1/11/13. There were significant deviations from the standard of care.

1. On two occasions (12/11/12 and 12/26/12), the patient did not receive dexamethasone as ordered prior to his chemotherapy. These are Type 9 lapses in care.

**Patient 7**

The patient was a 78-year-old man with end stage liver disease and cardiac disease who died on 8/27/13. There were significant deviations from the standard of care.

1. A physician saw the patient on 9/12/12 for increasing ascites. The physician ordered medication and follow-up in 10 days or sooner. The patient was not seen until 10/15/12, when he was seen by a PA because he was complaining of shortness of breath when lying down and that his medication had run out. The PA re-ordered the medication and an urgent referral for a therapeutic paracentesis. This did not occur until 11/1/12 when the patient was sent to the hospital for an emergency paracentesis. He was admitted for treatment of progressive ascites and abdominal pain. He was discharged on 11/5/12 with a recommendation for follow-up in liver clinic on 11/28/12. He was not seen in liver clinic until 1/15/13. He had another paracentesis on that date. On 2/11/12, the patient had another paracentesis. The interventional radiologist recommend a repeat paracentesis in 3-4 weeks. The patient did not return until 4/12/12. These are Type 3 lapses in care.

2

2. On 2/11/13, the interventional radiologist recommended placement of a shunt to manage the patient's recurrent ascites. The request was approved at Dixon on 2/28/13. The interventional radiologist did not evaluate the patient for the shunt until 5/10/13. The interventional radiologist recommended clearance by cardiology and a liver consult prior to the procedure. Neither of these consults had occurred as of 7/3/13, when the patient was sent to the emergency room for vomiting. It does not appear that the patient returned to Dixon prior to his death. (There are no notes in the medical record after 7/3/13.) These are Type 3 lapses in care.

## Patient 8

The patient was a 79-year-old man who died of metastatic prostate cancer on 6/20/13. There were significant deviations from the standard of care.

1. On 4/26/13, the patient had signed an advanced directive stating that he did not want CPR for a full cardiopulmonary arrest but that he did want attempted resuscitation if his breathing became labored and his heart was still beating. On 6/17/13, the patient was admitted to the infirmary for increasing shortness of breath. The physician ordered a chest x-ray and blood tests. The chest x-ray revealed bilateral pleural effusions with a focal density. The physician, however, only stated that the x-ray showed an infiltrate. The patient's white blood cell count was normal. The physician's assessment was that the patient had pneumonia. The physician ordered intravenous antibiotics. A physician did not see the patient on 6/19/13. On 6/20/13 (no time on note), a physician documented that the patient had been unresponsive since that morning. There is no documentation of any further evaluation of the patient by a physician. At 7:15 a.m., a nurse documented that the patient's oxygen saturation was 63% with agonal breathing. The nurse documented that she informed the physician, who did not issue any new orders. The patient's oxygen saturation was 37% at 7:45 a.m. and 45% at 8:30 a.m. There are no further notes in the patient's medical record until 1:13 p.m., when he was pronounced dead. This is a Type 3 lapse in care. If the patient had been sent to the emergency room, his respiratory distress could have been more fully evaluated and treated. If this had occurred, it is possible that he would have survived this event.

2. The patient was receiving chemotherapy. The patient saw the oncologist on 8/29/12. The oncologist ordered follow-up in four weeks. The patient did not return until 12/5/12. On 2/19/13, the oncologist ordered follow-up in one month. The patient did not return until 4/10/13. These are Type 3 lapses in care.

3. A nurse saw the patient on 2/28/13 because he was complaining that he "hurt all over and had chills." The nurse consulted with a physician who ordered pain medication, blood tests, and follow-up in the morning. The patient was not seen for follow-up of these complaints. This is a Type 3 lapse in care.

4. The patient was receiving warfarin for a history of deep vein thrombosis/pulmonary embolus. His anticoagulation was not being managed appropriately. His INR was

3

subtherapeutic from 11/30/12 to 4/3/13, when a physician inappropriately stopped it. This was never addressed. This is a Type 2 lapse in care.

5. Providers saw the patient for chronic care on 9/25/12, 1/28/13, and 5/30/13. The providers did not document a history related to any of his chronic problems. These are Type 2 lapses in care.

## Patient 9
The patient was a 71-year-old man with a history of hypertension who died on 5/27/14. A nurse evaluated the patient on 5/24/14 for nausea and vomiting. The nurse admitted the patient to the infirmary for observation. It was a weekend and he was not seen by a physician. According to nursing notes, he was stable. On 5/25/14, he became unresponsive and was sent to the hospital. There are no further notes in the medical record. The cause of death is not documented. There were significant deviations from the standard of care.

1. The patient was seen in chronic care for hypertension on 7/30/12, 11/15/12, 1/13/13, 8/7/13, 11/12/13, and 4/18/14. A provider did not document a history at any of these visits.

## Patient 10
The patient was a 73-year-old man with a history of Parkinson's dementia, anticoagulation for a deep vein thrombosis, dysphagia requiring a gastric feeding tube and COPD, who died on 5/3/14 from a respiratory arrest. He had been housed in the infirmary for a long time. There were significant deviations from the standard of care.

1. His warfarin therapy was not appropriately managed. His INR was subtherapeutic on 1/30/14. The physician increased his warfarin and ordered a repeat test in one week. It was not done until 3/19/14 and was still subtherapeutic. A physician reviewed the result on 3/20/14, but did not take any action. These are Type 2 lapses in care.

## Patient 11
The patient was a 69-year-old man with hypertension, coronary artery disease, atrial fibrillation, congestive heart failure, pulmonary hypertension, leukemia, and hyperlipidemia and brain cancer. He died on 3/23/14. There were significant deviations from the standard of care.

1. As noted above, the patient had a multitude of medical problems. He was seen for chronic care on 3/7/13. The physician did not document a history related to any of his problems. On 5/13/13, the patient was diagnosed with brain cancer for which he underwent surgery. He returned to Dixon on 5/23/13 and was admitted to the infirmary. He was discharged from the infirmary on 5/24/13. Following his discharge, the patient was seen on numerous occasions by a physician to follow-up specialty consultations. At these visits, the physician reviewed the consultant's recommendations with the patient but did not address the patient's other medical problems. A physician did not see the patient for chronic care until 12/18/13. At that time, the physician did not document a history related to any of the patient's problems. These are Type 2 lapses in care.

4

**Patient 12**
The patient was a 64-year-old man who died of metastatic penile cancer on 12/17/13. He had been housed in the infirmary for a long time. There were significant deviations from the standard of care.

    1. From 9/28/13 to 11/25/13, the patient was admitted to an outside hospital on four occasions. Over this period of time, the physician in the infirmary rarely evaluated him. The patient was not even evaluated following his return after his admissions. Due to the poor documentation in the medical record, it is not clear whether any of these hospitalizations could have been prevented. These are Type 2 lapses in care.

**Patient 14**
The patient was a 70-year-old man with diabetes, asthma, hyperlipidemia, rheumatoid arthritis and extensive metastatic disease from probable pancreatic cancer who died on or about 3/14/14. (He was sent to the hospital on 3/14/14 and never returned to the facility). There were significant deviations from the standard of care.

    1. The patient had been steadily losing weight for approximately two years. This had not been noted or evaluated. In addition, the patient was anemic. On 12/9/13, the nurse noted that he was complaining of weakness and inability to walk. The nurse gave the patient a permit for a wheelchair and referred him to a physician. On 12/14/13, the patient fell and hit his head. The nurse who evaluated him noted that the patient had been referred to see a physician but that the "MDs lines are behind." On 12/16/13, an NP saw the patient. The NP noted that the patient reported that he had been getting dizzy and falling and was very weak. The NP noted that the patient was lethargic but did not examine him. The NP further noted that the patient had had a 30-pound weight loss since December 2012 and was anemic. The NP ordered a nutritional supplement and a wheelchair for the patient. The NP did not order any laboratory tests or follow-up. On 12/24/13, a physician saw the patient to discuss denial of a referral to a rheumatologist. The physician did not address the patient's other problems other than to order laboratory tests to assess the patient's anemia. The physician ordered follow-up in 7-10 days. An NP saw the patient on 12/29/13 and noted that he was complaining of shortness of breath, vomiting and constant pain that had been going on for months. The NP advised the patient to wait until his appointment the following day and to take Tylenol and a muscle relaxant, and to rest. A physician saw the patient on 12/30/13. The physician noted that the patient had lost six pounds in two weeks. The physician also noted that the patient was complaining of extreme pain from his rheumatoid arthritis. The physician ordered Ultram for the pain (the patient had been ordered Ultram in the past and had been discontinued because it did not work) and follow-up in three weeks. The physician also continued the nutritional supplement. On 1/7/14, a NP saw the patient for complaints of weakness, shortness of breath and difficulty keeping food down. The NP ordered medication for the patient's gastrointestinal symptoms and admitted him to the infirmary for observation. On 1/10/14, a physician evaluated the patient and requested a G.I. evaluation for nausea, weight loss, and diarrhea. On 2/7/14, the patient had a colonoscopy that revealed an extrinsic mass compressing the colon. On 2/24/14, he had a CT scan which revealed extensive

metastatic disease of possible pancreatic origin. The delays in evaluating the patient's weight loss and anemia are Type 1 lapses in care.

2. The patient was not receiving timely or adequate chronic care for his diabetes, asthma, and rheumatoid arthritis. In 2013, he was only seen two times in chronic care clinic. The physician did not document any history related to the patient's problems on either of those occasions. In addition, the patient's hemoglobin A1c increased from 6.6% to 7.6%. The physician attributed this to prednisone use but did not follow-up. These are Type 2 lapses in care.

3. The patient had severe rheumatoid arthritis for which he was receiving Enbrel and methotrexate. He had not seen a rheumatologist in over four years. On 10/24/13, a physician had referred him to a rheumatologist. This request was subsequently denied. When informed of the denial, the patient stated that he needed to see a rheumatologist because he was "wasting away," adding that the "worst part is pain." On 12/30/13, a physician noted that the patient stated that he was in such extreme pain he could not sleep. The physician ordered Ultram, which, as noted above, the patient had received in the past and had been ineffective. The failure to refer the patient to a rheumatologist is a Type 3 lapse in care.

## Patient 16

The patient was a 67-year-old man with COPD, atrial fibrillation, hypertension, and prostate cancer, who died on 2/28/13 from tuberculosis pneumonia and meningitis, Pneumocystis pneumonia, and varicella encephalitis. There were significant deviations from the standard of care.

1. On 1/24/13, the patient was admitted to the hospital for progressive shortness of breath and confusion. He returned to Dixon on 1/27/13. Beginning on 2/1/13, the patient became increasingly short of breath, lethargic, weak, and confused, incontinent, and had intermittent fevers. On 2/5/13, the patient's temperature was 102° (axillary). The physician did not document a history or physical examination. Despite the fact that the patient did not have evidence of influenza, the physician ordered Tamiflu. On 2/6/13, the patient's urine culture was positive and the physician ordered IV antibiotics. On 2/7/13, the infirmary physician began documenting that the patient had an "extremely poor prognosis." On 2/11/13, he documented that the patient was possibly septic. On 2/12/13, the physician finally sent the patient to the local hospital. He was admitted to the ICU for respiratory failure. His condition continued to deteriorate and the next morning he was intubated. On 2/17/13, he was transferred to the University of Illinois Medical Center, where he died on 2/28/13. The failure to evaluate the patient when he had a fever is a Type 1 lapse in care. The delays in sending the patient to the emergency room for evaluation as his condition noticeably deteriorated are Type 3 lapses in care.

2. The patient arrived at STA-NRC on 8/12/12. It was noted that he had had an increased PSA level of 8.5 ng/ml and been diagnosed with stage 1 prostate cancer at the county jail. The patient was transferred to Dixon on 9/7/12 and housed in the infirmary due to his need for oxygen for his COPD. The infirmary physician documented the patient's history

of prostate cancer. His plan was to order a repeat PSA level in one month. The PSA was repeated on 10/19/12 and was again 8.5 ng/ml. The lab was not reviewed until 11/21/12. At that time, the Medical Director wrote a note that the test should be repeated in February 2013. The patient was never referred to an urologist for follow-up of his prostate cancer. The failure to do so is a Type 3 lapse in care.

## Patient 17

The patient was a 64-year-old man with COPD who died of metastatic rectal cancer on 4/30/13. There were significant deviations from the standard of care.

1. The patient was being followed in chronic care for his COPD. The physicians did not document a history related to his COPD at any of his chronic care visits. These are Type 2 lapses in care.

## Patient 18

The patient was a 56-year-old man with diabetes, hypertension, chronic kidney disease, metastatic pancreatic cancer and history of a stroke who died of a myocardial infarction on 10/15/13. There were significant deviations from the standard of care.

1. On 10/14/13, at 6:30 p.m., a nurse evaluated the patient because he stated that he had not been feeling well that day. The nurse noted that the patient was lethargic with irregular respirations and a low oxygen saturation of 85-87%. The patient's blood pressure was 140/80 mmHg. The nurse telephoned the physician on duty, who gave an order for the patient to be placed in the infirmary with oxygen. At 7:42 p.m., the nurse noted that the patient was lethargic and weak with a blood pressure of 80/60 mmHg. At 12:10 a.m., a nurse noted that the patient vomited and that his blood pressure was 90/60. The nurse did not contact the physician on either of these occasions. A nurse practitioner evaluated the patient the next morning and sent him to the emergency room for evaluation of acute respiratory distress. At the hospital, he was diagnosed with an acute myocardial infarction, pneumonia, congestive failure and cardiogenic vs. septic shock. The physician's failure to arrange for an evaluation of the patient when the nurse contacted him is a Type 1 delay. Given the patient's presentation, the physician needed to evaluate the patient or send him to the emergency room for an evaluation. The failures of the nurse to contact a physician when the patient's blood pressure was so low are Type 3 lapses in care.

2. The patient was being followed in chronic care. The physicians did not document a history related to his medical problems. These are Type 2 lapses in care.

## Patient 19

The patient was a 75-year-old man with coronary artery disease, diabetes, hypertension, hyperlipidemia and a history of multiple strokes who died on 1/4/13 of a likely myocardial infarction/arrhythmia. There were significant deviations from the standard of care.

1. The patient was admitted to the infirmary on 12/7/12 for increasing need of assistance with his ADLs. On 12/8/12, at 6:00 p.m., nurses noted that he was verbally non-

responsive. Nurses attempted to contact the physician on duty at approximately 6:30 p.m. There is a note from an RN that she spoke to the physician at 9:30 p.m. The

physician gave orders to observe the patient for changes and report if there were any. The nurse contacted the physician at 1:35 a.m. on 12/8/12 and notified him that the patient was hypertensive and had a low grade fever. The physician gave an order to transfer the patient to the hospital. The patient was subsequently diagnosed with an acute stroke. The delay in sending the patient to the hospital is a Type 3 lapse in care.

2. The patient was being followed in chronic care. The physicians did not document a history related to his medical problems. These are Type 2 lapses in care.

**Patient 21**

The patient was a 76-year-old man with asthma/COPD and metastatic lung cancer who died on 5/10/13. There were significant deviations from the standard of care.

1. The patient was being followed in chronic care. The physicians did not document a history related to his chronic medical problems. These are Type 2 lapses in care.

## Big Muddy River Correctional Center

**Patient 24**

The patient was a 66-year-old paraplegic man with a history of hypertension, asthma, recurrent urinary tract infections, prior sepsis and bilateral above-the-knee amputations due to gangrene, who died of sepsis and multi-organ failure on 5/22/13. He had been housed in the infirmary for a long time. The medical records from the hospital where the patient was sent on 5/19/13 were not available. There were significant deviations from the standard of care.

1. The patient began complaining of intermittent chest pain on 5/18/13 at 9:55 a.m. and again at 12:50 p.m. A nurse evaluated him and provided appropriate care. At 6:00 p.m., a nurse noted that he was complaining of being cold and of stomach, back and chest pain. The nurse noted that the patient was lying in bed shaking. The nurse contacted the physician on duty via telephone. The physician ordered an EKG, laboratory tests, two different antibiotics and Tylenol for pain. On 5/19/13, at 2:00 a.m., a nurse noted that the patient stated, "I need to go to the hospital." The nurse further noted that the patient was yelling that he was in pain and wanted to go "out." The nurse documented that the patient's hands and arms were cold, that he was exhibiting some confusion, and that she was unable to obtain either a manual or automated blood pressure. The nurse contacted the physician on duty. The nursed documented that there were no new orders. At 4:00 a.m., the nurse noted that he/she had contacted the laboratory multiple times and had not been able to obtain laboratory results. At 8:30 a.m., the nurse noted that the patient stated he was "sick." The nurse noted that the patient's respiratory rate was elevated (29/minute) and that he/she was unable to obtain a blood pressure, palpate a pulse, or obtain an oxygen saturation. The nurse contacted the physician, who advised her to send the patient to the hospital via ambulance. The patient left the facility at 9:40 a.m. The

delays in sending the patient to the emergency room for needed care are Type 3 lapses in care.

## Patient 25

The patient was a 69-year-old man with a history of hypertension, hyperlipidemia, gout and diet-controlled diabetes who died on 9/20/13 from ischemic and hypertensive heart disease. There was a significant deviation from the standard of care.

1. On 9/20/13, nurses responded to a code 3 emergency call. Upon arrival, they found the patient "blue in color with no signs of respiration and no pulse detected." The nurses initiated CPR. Custody staff had not initiated CPR. If CPR had been initiated in a timelier manner, the patient's death may have been prevented. The failure of the custody staff to initiate CPR is a Type 14 lapse in care.

## Patient 28

The patient was a 73-year-old man with a history of hypertension who died on 9/14/13 from a cardiac arrest due to an acute myocardial infarction.

1. On 9/14/13, nurses responded to a Code 3 emergency in the patient's housing area. The patient was lying in his bunk, non-responsive and without pulse or signs of breathing. Custody staff had not initiated CPR. If CPR had been initiated in a timelier manner, the patient's death may have been prevented. The failure of the custody staff to initiate CPR is a Type 14 lapse in care.

# Lincoln Correctional Center

## Patient 31

The patient was a 57-year-old man with diabetes, hypertension, coronary artery disease with bypass surgery on two occasions and hyperlipidemia who died from a cardiac arrest on 12/17/13. There were significant deviations from the standard of care.

1. On 8/28/13, a nurse responded to a Code 3 call in the dining room. The patient was complaining of crushing chest pain (10 on a scale of 10) and numbness in his left arm. The nurse contacted a physician, who ordered an EKG and observation. The EKG did not reveal any acute changes and the physician scheduled the patient to be seen the next morning. A physician evaluated the patient the next morning, ordered medications and ordered a cardiology consult for evaluation of five episodes of exertional chest pain with numbness in the left arm. The Medical Director subsequently denied the referral. On 10/12/13, the patient was seen for chronic care. The physician did not document a history related to chest pain. On 11/11/13, the patient had a syncopal event that was attributed to low blood sugar (his blood sugar was 27). The patient was treated and monitored in the infirmary overnight. The following morning the physician discharged the patient from the infirmary and noted that he "also has chest pain." The physician did not obtain any further history related to the chest pain. He ordered an EKG "as soon as possible." The EKG did not reveal any acute changes. The physician did not order any follow-up related

to the patient's chest pain. From that time until the time of his death, the patient was not evaluated by a physician. Given the patient's cardiac history, complaints of chest pain needed to be fully evaluated. The patient should have been sent to an emergency room for further evaluation on 8/28/13 and the patient should have been referred to a cardiologist for evaluation of his chest pain. Furthermore, there was no follow-up related to the patient's chest pain by the physicians at the facility even when the patient had another episode. These are Type I lapses in care.

2. Custody staff did not initiate CPR. If CPR had been initiated in a timelier manner, the patient's death may have been prevented. This is a Type 14 lapse in care.

3. The patient did not receive timely or appropriate care for his diabetes. These are Type 2 lapses in care.

## Pinckneyville Correctional Center

**Patient 34**
The patient was a 26-year-old man with a history of asthma who, according to the IDOC Death Summary, died on 9/10/13 apparently from an acute asthma attack. (There was no information in the medical record after 8/29/13.) There were significant deviations from the standard of care.

1. The patient had entered STA on 2/11/13. The only documentation from intake is a copy of the patient's problem list noting that he had a history of intermittent asthma. There is no documentation of a history or physical examination being done. There is no further documentation from STA. On 4/20/13, the patient was transferred to Vandalia. The transfer summary noted that the patient used a rescue inhaler every four hours as needed for his asthma. A physician saw the patient on 5/8/13 for his baseline asthma assessment. The physician noted that the patient had daytime symptoms but did not specify what they were or how often they occurred. On physical examination, the physician noted there was expiratory wheezing. The physician also noted that the patient used his inhaler on an as-needed basis, but did not document the actual frequency of use. The physician's assessment was that the patient had intermittent asthma. The physician ordered a rescue inhaler with instructions for the patient to use it two times per day.

On 5/16/13, the patient was transferred to Du Quoin IIP. The nurse who performed the reception screening noted that the patient used his rescue inhaler two times per day. A physician saw the patient for chronic care of his asthma on 6/5/13 at Pinckneyville. The physician noted that the patient did not have daytime or nighttime symptoms. The physician documented that the patient used his rescue inhaler two times per day. The physician's assessment was that the patient had intermittent asthma. On 8/29/13, a nurse saw the patient for a cold. The nurse noted that the patient had had a runny nose and nasal congestion for two days. On physical examination, the nurse noted that the patient had expiratory wheezes. The nurse ordered an antihistamine and advised the patient to increase his fluid intake. The nurse did not address the wheezing. This was the last entry in the patient's medical record. As noted above, he died on 9/10/13.

The documentation is not clear, but it appears that the patient was using his inhaler two times per day. According to national guidelines, if the patient used his inhaler more than two times per week, he had persistent, not intermittent, asthma and should have been treated with inhaled corticosteroids. The failure to do so is a Type 2 lapse in care. The failure of the nurse to address the patient's wheezing on 8/29/13 is a Type 1 lapse in care. Either of these lapses could have contributed to the patient's death.

## Patient 35

The patient was a 55-year-old man with a history of hypertension, diabetes, diabetic neuropathy and a myocardial infarction with angioplasty in 1999 who died on 4/25/13 from a cardiac arrest. There were significant deviations from the standard of care.

1. On 4/25/13, the patient suffered a cardiorespiratory arrest while in school. Custody staff did not initiate CPR. If CPR had been initiated in a timelier manner, the patient's death may have been prevented. This is a Type 14 lapse in care.

2. On 7/1/12, a nurse saw the patient for a complaint of lower back pain and difficulty urinating. The nurse performed a urinalysis which revealed increased ketones, bilirubin, and protein. The tests for nitrite and leukocytes were negative. (When positive, these are indicative of a possible urinary tract infection.) The nurse contacted a physician, who ordered antibiotics for a urinary tract infection without evaluating the patient. The physician also ordered observation in the infirmary for 23 hours. The physician did not order a urine culture. The physician diagnosed and treated the patient for a urinary tract infection without evaluating the patient and without any clear clinical indication that the patient had it. In addition, the physician did not order a urine culture, which is standard of care when treating a male patient for a presumed urinary tract infection. These are Type 1 lapses in care.

3. The physician saw the patient the following day, noted that he was feeling better and discharged him from the infirmary. The physician ordered follow-up with another urinalysis in one week. A physician did not see the patient until 7/23/12. This is a Type 3 lapse in care.

4. The urinalysis performed on 7/23/14 revealed that the ketones, protein, and bilirubin were negative, and that the glucose was elevated. Based on this, the physician increased the patient's diabetes medications. (On 4/26/12, the patient's hemoglobin A1c (7%) had indicated that the patient's diabetes was in good control.) On 9/6/12, a physician saw the patient for chronic care and lowered the dosage of the patient's diabetes medication. The first physician increased the patient's medication solely based on an abnormal urinalysis. This is not consistent with the standard of care. This is a Type 2 lapse in care.

## Patient 36

The patient is 59-year-old man with a history of hypertension, diabetes, metastatic prostate cancer and aplastic anemia who died of a cardiac arrest on 4/30/13. There were significant deviations from the standard of care.

11

1. Physicians saw the patient for chronic care on 3/12/12 and 11/19/12. They did not document a history related to the patient's hypertension. A physician saw the patient for chronic care on 7/13/12 and checked the boxes indicating that the patient was complaining of a headache and chest pain. The physician did not document any further history related to these complaints. A physician saw the patient for chronic care on 3/22/13. He checked the boxes noting that the patient's symptoms were headaches and transient weakness. The physician did not document any further history related to these complaints. These are Type 2 lapses.

## Stateville Correctional Center

### Patient 39

The patient was a 61-year-old man who had been incarcerated since 1979 and died at Stateville on 1/10/13 following an acute GI bleed secondary to varices from hepatitis C-related cirrhosis. He also had liver cancer (HCC) which was listed as the cause of death on the death certificate. There were significant deviations from the standard of care.

1. In January 2008, the patient saw hepatology at UIC regarding his hepatitis C and possible treatment. There is no evidence that he ever followed up with UIC after the liver biopsy. It is not clear why the patient did not receive hepatitis C treatment; the chart has conflicting documentation on this issue. There is no documentation in the chart that treatment was offered to the patient or discussed with him. Had he received treatment in 2008, his risk of progressing to hepatic decompensation and HCC would have been significantly decreased. This is a Type 2 lapse in care.

2. At the May 2012 chronic care clinic, his weight was down 15# (to 180# from 195# in January) but not acknowledged by the doctor. The PA saw him on 8/27 for ongoing weight loss; by now he was down to 156#. She ordered a work up and referred the patient to the Medical Director, who saw him in early September and ordered an ultrasound. On 9/25/12, the ultrasound showed multiple liver masses. On 10/1/12, he was approved for GI consult for liver biopsy. There were no records to indicate this was ever done. On 11/29/12, a CT scan showed a liver mass suspicious for cancer. In early December 2012, he started to decompensate with increasing ascites and worsening dyspnea on exertion. He was finally sent to the outside hospital on 12/19, three months after his abnormal ultrasound. This is a Type 3 lapse in care.

3. Generally poor chronic care is noted throughout the health record. The patient presented with severely elevated blood pressure on numerous occasions, often greater than 200/100, and each time was simply sent back to his cell with the instructions to take his medication. Even the one time he was admitted to the infirmary, he was discharged the next day, prior to gaining control of the blood pressure. This is a Type 2 lapse in care.

### Patient 40

This was a 33-year-old HIV+ man who was received at Menard on 3/19/13, transferred to Stateville on 5/13/13 and died on 8/12/13 of metastatic epithelial adenocarcinoma. There were significant deviations from the standard of care.

1. He gave a history of anal warts at his ID telemedicine visit in early April 2013 and was referred to the facility doctor for this. The doctor at Menard saw him on 5/2/13 and described "severe anal condylomata" with bleeding. He did not treat the patient, but ordered only Motrin and told him to keep the area clean. This is a Type 1 lapse in care, as anal warts (HPV) are a well-known cause of anal cancer in HIV + men.

2. After his transfer to Stateville, he saw the PA on 7/10/13 for nausea, vomiting and blood in the stool. She examined him and noted "moderate" HPV and a large mass in the right buttock measuring 4.5 x 4.5 cm. She questioned if he may have cancer (sarcoma) and referred the patient to the Medical Director. He saw the doctor on 7/25, who noted the patient had a mass in the perirectal area extending anteriorly into the right groin. He too considered that the patient may have cancer, but rather than referring the patient for biopsy, only ordered plain x-rays, pain medication and follow up in two weeks. This is also a Type 1 lapse in care.

3. One week later, he was brought to the HCU with pain in his chest, lower right side and right thigh. He was seen by the PA, who referred him to the doctor, who noted lumps in both groins and perianal area. He ordered admission to the infirmary for 23-hour observation. The infirmary provider noted a large (14 x 8) indurated irregular fixed mass in the patient's right proximal thigh for two months and concluded it was an abscess. S/he ordered IV fluids, pain medications and an antibiotic. He was not seen again by a provider while admitted to the infirmary. This sequence of events encompasses several types of lapses. Clearly there was no communication between the admitting provider and the infirmary provider as to the reason for the admission and the suspicion of the referring doctor (Type 5 lapse). The infirmary physician also failed to recognize the significance of a rectal mass in an HIV patient with a history of HPV (Type 1 lapse).

4. Two days later, on 8/3/13, the nurse was summoned to the patient's room for uncontrolled bleeding from the thigh mass. She applied a pressure dressing and notified the doctor. The only order was to call again if there was further bleeding. The next morning, the LPN noted that he was still bleeding. At 7:00 p.m., another nurse noted continued bleeding, having soaked through three ABD pads and a diaper. The doctor was notified and told the nurse to reinforce the pressure dressing. At 10:30 p.m., the nurse reassessed the patient and noted that he had soaked through another three ABD pads and a diaper. She called the doctor again and received an order to send him to the emergency department. He never returned to the facility. He died a week later. This represents a Type 3 lapse in care, for allowing the patient to remain in the infirmary with uncontrolled bleeding for two days, and also for failure to refer the patient for appropriate work up and treatment from the time the condition was first evident a month prior.

**Patient 42**

13

This was a 64-year-old man who died at Stateville of pneumonia on 7/31/13. He was chronically housed in the infirmary for advanced dementia and had a feeding tube, Foley catheter and was incontinent of stool. He also had a sacral wound which was not described further in the health record, and the care of which was rarely documented. He was rarely seen by the doctor; only four times between January and the date of death nearly eight months later. There were significant deviations from the standard of care.

1. In early June, the doctor was notified that the patient had a productive cough and low oxygen level. He ordered an antibiotic, but did not evaluate the patient. When the symptoms persisted, he ordered more of the same antibiotic and nebulizer treatments and saw the patient on 6/6/13. A sputum culture obtained on 6/3/13 grew two organisms, one of which was resistant to the chosen antibiotic, but no changes in therapy were made. This is a Type 4 lapse in care.

2. Over the next few weeks, the patient was intermittently described as having a cough productive of thick, colored mucus, but no one notified the doctor of this for an entire month. This is a Type 1 lapse in care.

3. On 7/1/13, the doctor was notified of the productive cough and ordered an antibiotic, but did not evaluate the patient. On 7/9/13, the doctor saw the patient. His entire note consisted of "Not responsive. No change. Alzheimer's Dementia. Continue same care." The patient continued to cough up and require suctioning of thick, colored sputum. By 7/24, he is described as having difficulty breathing and coughing up large amounts of thick green mucus. His vital signs were rarely documented, but on 7/25/13 his temp was recorded at 101.2° with a respiratory rate of 22. The doctor was notified and ordered a CBC and antibiotics for five days, but did not see the patient. These lapses are of a type not described in the taxonomy structure; failure to evaluate a patient identified by nursing staff as requiring medical attention.

4. The patient continued to decline. On 7/29/13, the doctor was contacted because the patient was now febrile with a temp of 102.8°, had a low oxygen saturation at 85%, large amounts of thick yellow mucus on his face and chest and difficulty breathing. He ordered the patient to be sent to the ED. The patient was returned to the facility the next evening at 10:30 p.m. in an obviously unstable condition. He was requiring high flow oxygen via a non-rebreather mask, had a low blood pressure of 95/60, and a rapid heart rate of 109. The doctor was called twice for orders but did not respond. Five hours later, the patient was found dead in his cell. This is a Type 5 lapse in care in that, one would hope that if the receiving physician had been informed of the patient's condition, he would not have accepted the patient back to the infirmary in unstable condition. This is also a Type 3 lapse because the patient had clinically obvious pneumonia for two months before he was referred to the hospital.

## Hill Correctional Center

**Patient 43**

This was a 48-year-old man who was admitted to IDOC in 1984, arrived at HCC in 2009 having quit smoking two years prior and died of lung cancer on 1/30/13. There were multiple serious deviations from the standard of care.

1. The first nurse sick call note is dated 5/8/12, when he stated, "I coughed up blood and it's from this injury to my shoulder." He saw the doctor on 5/15. He had lost 30 pounds over the past year. The doctor ordered labs, an anti-inflammatory and a follow-up in two weeks, but did not order a chest x-ray to work up the hemoptysis. This is a Type 1 lapse in care.

2. When the doctor saw the patient back on 6/5, the patient complained of left-sided chest pain radiating down the left arm, weight loss, and "spitting up thick sputum." On exam the doctor noted an enlarged supraclavicular lymph node. He reviewed and acknowledged that the labs revealed anemia. He put the patient on iron and ordered a chest x-ray and a follow-up visit. The chest x-ray was done that day and showed, "A focal opacity in the left lower lobe with tenting of the left hemi-diaphragm. This finding is new...superimposed acute infection cannot be excluded... follow up may be obtained." On 6/13, the Medical Director saw the patient in follow up of the chest x-ray results. He noted that the patient had "multiple complaints" but did not enumerate them. He ordered the patient saline gargles and a repeat CBC after 30 days, then follow-up. He did not acknowledge the abnormal chest x-ray, nor arrange for further investigation. This is a Type 4 lapse in care.

3. On 7/17, the Medical Director saw the patient in follow up of the CBC. His weight was now 130 pounds. The anemia was slightly worse. The doctor increased the iron, ordered an HIV test and a repeat chest x-ray in December, but did nothing to work up the weight loss and anemia. This is a Type 1 lapse in care.

4. The patient began submitting grievances stating that he believed he might have cancer and should be referred to a specialist for appropriate diagnosis and treatment. There is no evidence that these requests were acted upon. On 8/15, the patient was brought to the clinic to see the Medical Director. He reported spitting up blood since 6/17, chest pain since February, hoarseness x 3 months, pain in the left scapular area, and coughing a lot since May. His weight was now 127 pounds. The doctor noted an enlarged lymph node on exam but only ordered more labs and a Z-pack as well as an x-ray of the abdomen. This is a Type 1 lapse in care.

5. On 8/20, he presented with hemoptysis and brought a tissue with large amount of blood in it. The nurse noted his voice had a "harsh tone." She referred him to the doctor immediately. The only subjective information the doctor documented was, "Says I am better than before." He documented a normal exam, and his assessment was "follow up hemoptysis." The plan was to "arrange blood results, will follow up accordingly." The labs ordered on 8/15 were drawn now and showed worsening anemia. This is another Type 1 lapse.

15

6. On 8/21, he presented to the nurse at 9:00 p.m. with left shoulder and chest pain. She placed him in the infirmary for observation. The RN saw the patient at 3:00 a.m. and noted that the patient rated his pain as extreme and that his left shoulder blade appeared "different." The Medical Director saw the patient on 8/22 and noted that the patient "Says I am fine, I have this left shoulder pain off and on for 1-2 months." He documented a normal exam and discharged the patient back to the unit with naproxen and follow up "as needed." Another Type 1 lapse.

7. On 8/29, the patient was brought to the HCU in a wheelchair because the pain in his left side was so severe he was unable to walk upright. The nurse noted that his "physique is asymmetrical, veins, muscle more pronounced on left side...skeletal more pronounced on left side...I/M states he coughed up blood." The Medical Director saw him the next day and noted the left cervical adenopathy and now new left axillary adenopathy. He ordered a repeat chest x-ray, sputum cytology and discussed the case with Dr. Baker on an emergency basis to get approval for a CT scan. He also spoke to a pulmonologist to arrange consultation. The patient was placed in the infirmary.

The CT scan was done the next day (8/31) and showed massive involvement of the thoracic structures with a tumor which had wrapped itself around the patient's heart and major arteries as well as the major airways.

The CT report was received by the institution on 9/4 and discussed with the patient the same day. He was seen by pulmonology on 9/5, but clearly his case was too far advanced for anything other than palliative treatment. He continued to decline until he died four months later. There is no category of lapse to describe the overall apathy to the symptoms of serious disease in this patient.

## Patient 44
This was a 71-year-old man who was received in IDOC in 2000 and died of metastatic pancreatic cancer at HCC on 5/15/10. There were significant deviations from the standard of care.

1. He was admitted to the infirmary on 2/13/10 with a one week history of nausea, vomiting, weakness and upper abdominal discomfort. His weight was 125#. No work-up was ordered by the doctor at the time of admission. On 2/16/10, the PA saw the patient and ordered labs and a chest x-ray, which showed a moderate left pleural effusion which the PA read as consolidation. She concluded he probably had pneumonia despite the lack of fever, cough, or respiratory symptoms, and put him on Cipro, which is not the appropriate treatment for pneumonia. This is a Type 1 lapse in care.

2. Over the next five weeks, the patient hardly ate and subsisted mostly on soup. His weight dwindled down to 112#, yet during the few doctor visits, no further work-up was documented, nor was there further mention of his supposed pneumonia and pleural effusion. This is another Type 1 lapse in care. Finally on 3/21/10, another chest x-ray was ordered and showed an increase in the size of the pleural effusion. A CT scan was obtained and the patient was admitted to the hospital, where he was found to have metastatic pancreatic cancer.

16

**Patient 45**
This was a 48-year-old man with dyslipidemia who had sudden cardiac death on 9/21/10. There were significant deviations from the standard of care.

1. He first presented on 8/12/10 with 9/10 midsternal chest pain and was seen by a nurse, who elicited a family history of heart disease. She performed an ECG which was abnormal, showing ST depression in the lateral leads. She decided the patient had indigestion, gave him Maalox and did not refer him to a provider. These are Type 1 and Type 10 lapses in care.

2. On 8/26/10, he saw the PA for chest pain, which he reported was occurring approximately every other day since June 2010. She noted that his recent ECG was unchanged from priors and concluded he had GERD vs pleurisy, treated him with antacids and Motrin and requested follow up in four weeks. His Framingham risk at this time was moderate at 15%, though she did not calculate it. This is a Type 1 lapse.

3. On 9/21/10, he was found down in his cell. CPR was initiated but the patient died. Coronary atherosclerosis was the cause of death on the autopsy summary. He was not on a statin, aspirin, nitroglycerin or beta blocker at the time of his death. This is a Type 2 lapse in care.

**Patient 46**
This was a 56-year-old man who was admitted to IDOC on 10/12/11, transferred to HCC on 11/9/11 and died of non-Hodgkin's lymphoma on 9/9/13. He had elevated liver enzymes on reception labs, but these were not worked up. He had no known chronic diseases and so was not followed in the chronic care program.

1. He was seen episodically until 1/29/13, when he presented to sick call with left-sided abdominal pain and was found to have marked enlargement of his spleen. The doctor did not order imaging, only urine and blood tests. He told the patient to drink more water and ordered naproxen. This is a Type 1 lapse in care.

2. The CMP showed a markedly elevated bilirubin at 7.7 and mildly elevated AST at 90. This lab was signed off by the doctor but not acted upon and there was no follow-up of this. This is a Type 4 lapse.

3. The patient presented again on 5/7 with ongoing left-sided abdominal pain. He was referred to MDSC the next day and was seen by the nurse practitioner, who performed a thorough history and physical exam. She ordered abdominal films and an evaluation by the Medical Director. The films were taken on 5/8 and read 5/10 as, "Soft tissue density mass noted in the left abdomen may be related to marked splenomegaly. There is also possible hepatomegaly..." A CT or ultrasound was suggested. An ultrasound was done on 5/30 and faxed to the institution on 6/5. It showed marked splenomegaly and CT was suggested for better detail. This recommendation was never followed. This is a Type 4 lapse in care.

4. On 6/20, the patient saw the Medical Director, who documented that the patient stated, "Doc, I am much better. My pain is better, my health is getting better..." Again, his marked splenomegaly was noted, but no further work-up or intervention was planned aside from evaluation in the hepatitis C clinic. This is a Type 1 lapse in care because while liver disease can cause enlargement of the spleen, there are only a few conditions that cause this degree of massive enlargement, with malignancy being the most common cause.

5. The patient was not seen again until two months later on 8/27, when the nurse saw him for abdominal pain, rated 8/10 with dyspnea on exertion, nocturnal cough and epistaxis. The patient was hypoxic, unable to stand and his abdomen was obviously distended. She put him on four liters of oxygen and referred the patient to the doctor who saw him that day, admitted him to the infirmary and placed him on antibiotics. A chest x-ray showed right middle lobe and left lower lobe consolidations. His oxygen requirements continued to increase until he was on 10 liters by non-rebreather mask and satting in the upper 80s. He was clearly not getting better, yet he was kept in the infirmary rather than sent to the ER, as would have been appropriate. This is a Type 3 lapse in care.

6. Finally on 8/31, the RN in the infirmary clearly had concerns about the patient. She called the Medical Director who advised that the oxygen be *decreased*. Recognizing the inappropriateness of this order, she then contacted the HCUA and the Wexford Medical Director, who contacted the Facility Medical Director. The Facility Medical Director then called and ordered the oxygen to be increased back to 10 liters non-rebreather and to send the patient out if his oxygen sat went below 85%, which it did that afternoon. He was transferred to Cottage Hospital, where he was admitted to the ICU in critical condition and was found to have non-Hodgkin's lymphoma with widespread adenopathy. His condition rapidly deteriorated until he died less than two weeks later.

## Centralia Correctional Center

### Patient 50

This was a 56-year-old man who died of metastatic renal cell cancer on 3/22/13. There were significant deviations from the standard of care.

1. He first reported painless blood in his urine on 7/15/12. His UA showed blood, protein and WBCs. He saw the doctor the next day, who diagnosed a UTI and treated him with an antibiotic. It does not appear that the urine was cultured. His weight at this visit was 173#, down from 185# four months earlier. The weight loss was not commented upon. The doctor requested follow up in one week with repeat urinalysis. One week later, the urine still showed blood and the doctor continued the antibiotic and requested follow up in another week. Again there are no culture results to correspond to the UA. On 7/28/12, the doctor saw him again. The patient was still having painless hematuria. The doctor ordered another urinalysis with culture. He was scheduled for follow up on 8/4/12, but this MD line was marked as cancelled because he had been seen on the 28th.

These are Type 1 lapses in care; a 56-year-old man with painless hematuria and weight loss has urological cancer until proven otherwise. UTIs in men are uncommon in the absence of a precipitating factor such as catheterization, instrumentation, or bladder outlet obstruction. This patient should have had the appropriate work-up at this juncture.

2. Three months later, on 10/23/12, he presented to the nurse with right testicular pain for three weeks. A urine dip showed only blood and protein. He saw the doctor the next day, and was diagnosed with acute epididymitis and treated with Cipro. The urine was not cultured. He now weighed 166#, but again the weight loss appears to have gone unnoticed. A 10-day follow-up was requested. He was seen on 11/1 and still had pain. No change in treatment or further work-up was ordered. These are Type 1 lapses, as the clinical scenario did not support the diagnosis of epididymitis, and he was not ordered the appropriate work-up or treatment for this condition, even if it was the correct diagnosis. Meanwhile, the persistent hematuria and ongoing weight loss were not addressed.

3. Of note, the patient was frequently hypertensive during clinic visits with many systolic blood pressure readings in the 140s and 150s, yet these were not addressed and there were no chronic care notes. These are Type 2 lapses in care.

4. Over the next three months, the patient was seen multiple times for ongoing testicular pain. An ultrasound showed only a varicocele. All the while his weight loss continued. On 2/7/13, he saw the doctor for ongoing groin and testicular pain. His weight was now 158#. The doctor decided he had a chronic varicocele and ordered ibuprofen. On 2/15/13, he was back on MD line for testicular pain, at which time he reported weight loss and bloody urination. He had a palpable abdominal mass on exam. The doctor ordered a work-up which ultimately revealed an unstable aortic aneurysm with possible penetrating atherosclerotic ulcer and a renal mass as well as multiple liver lesions. These delays represent Type 1 lapses in care.

The patient was held in the infirmary, then transferred to the local hospital on 3/7/13 after discussion with a local vascular surgeon. Hospital records are limited but he evidently underwent biopsy of the pelvic mass which confirmed metastatic renal cancer. He was deemed not to be a surgical candidate for AAA repair based on this and subsequently chose a nonaggressive approach to his management and died two weeks later. Had the hematuria been worked up appropriately when he initially presented eight months earlier, the cancer may have been diagnosed at a stage more amenable to treatment.

## Patient 52

This was a 79-year-old man who was chronically housed in the Centralia infirmary and died rather abruptly on 3/26/13. There were significant deviations from the standard of care.

1. He had a history of BPH, CHF and a cardiac arrhythmia which is not described further in the record; however, the only problem ever mentioned in the chart notes is BPH. He almost certainly had prostate cancer, considering that his PSA was 49 in February 2013,

19

but this too was never mentioned in the chart. The failure to monitor and treat his chronic illnesses are Type 2 lapses in care.

2. He was in his usual state of health up through 3/22/13 judging by the nurses' brief notes. Then, at the time of his next assessment on 3/25/13 at 6:20 p.m., he was noted to be short of breath, with a thready pulse of 130, blood pressure of 130/77 and hypoxic with an oxygen saturation of 72% on room air. His color was described as ashen and his lungs had rales in the bases bilaterally. There was no fever or cough. The doctor was called and ordered oxygen, a chest x-ray and an antibiotic but did not send him to the hospital. This is a Type 3 lapse in care.

3. By 7:40 p.m., he was satting only 80% on 5 liters and so was switched to a non-rebreather mask at 9 liters in order to get his oxygen saturation to 91%. There was no evidence the nurse called the doctor for this order. This is a Type 10 lapse in care.

4. At 11:15 p.m., he was no better; still the doctor was not called. At 12:45 a.m., he fell coming out of the bathroom. His heart rate was 144, oxygen sat was 84% and he was described as pale with labored respirations. The nurse put him back to bed and increased the oxygen to 10 liters but did not call the doctor. This is a Type 1 lapse.

5. At 4:20 a.m., he coded and was finally sent out emergently with CPR in progress. Needless to say, he did not survive.

## Illinois River Correctional Center

### **Patient 54**
This was a 55-year-old man with a history of hepatitis C, hypothyroidism and bipolar disorder who was admitted to IDOC through NRC on 10/25/12, transferred to IRCC on 11/20/12, and died of complications of metastatic lung cancer on 6/14/13. He had a greater than 40 pack-year smoking history and a strong family history of lung cancer, with his mother and two sisters dying of the disease. His course contained significant deviations from the standard of care

1. On the day after his arrival, 11/21/12, he was seen by the RN for "spitting up blood." The patient showed the nurse a quarter-sized amount of blood sitting on paper towel. The nurse gave the patient a container and instructed him to call if there was any increase in hemoptysis. He was not referred to a provider. This is a Type 1 lapse in care.

2. Later that evening, the same nurse documented that the patient had a quarter-sized amount of bloody sputum in the specimen cup. Her assessment was "hemoptysis," and the plan was "continue to observe." Again the patient was not referred to a provider. This is another Type 1 lapse.

3. On 11/25/12, the patient saw the LPN for a dressing change of his foot and showed the nurse tissues containing bloody sputum. He was referred to MDSC the next day. On 11/26/12, the physician saw the patient, who reported intermittent hemoptysis and right

sided pleuritic chest pain. She ordered a chest x-ray, sputum and blood work. The chest x-ray was done on 11/30/12 and showed, "Focal opacity projected over the right lateral upper lung zone. Recommend follow up chest CT to exclude a lung mass." The report was signed on 12/3/12 by the ordering physician but not acted upon; no further work-up was pursued. This is a Type 4 lapse in care.

4. On 2/7/13, the doctor saw the patient in chronic care clinic. He complained of chest tightness in the upper chest. She ordered a chest x-ray in one week, which showed the "interval development of right upper lobe opacity seen extending from the hilum to the right lung apex, new since prior study...right upper lobe opacity appears to be related to upper lobe collapse with elevation of the right minor fissure. This may be related to a right hilar/suprahilar neoplasm. Further evaluation with CT of the chest is recommended." The report was signed by the physician on 2/19/13 but again, not acted upon. This is another Type 4 lapse.

5. On 2/28/13, the patient presented to nurse sick call requesting his x-ray results. He was referred to the physician and seen on 3/1/13 at hepatitis C chronic care clinic. He complained of ongoing chest tightness. There is no mention of the abnormal chest x-ray that she previously signed. Her plan was to repeat the chest x-ray and see the patient again when the x-ray results were back. Again, a Type 4 lapse.

6. On 3/5/13, the x-ray was repeated and again showed the right upper lobe opacity with collapse and again a CT was recommended. This time the doctor finally did acknowledge the abnormal findings when she saw the patient on 3/8/13, and referred him (non-urgently) for a CT of the chest. Meanwhile, on 3/23/13, he presented with pain in the right collar bone. An x-ray showed a pathologic fracture of the right clavicle. The patient was admitted to the infirmary.

7. On 4/9/13, the CT showed a 3 cm right upper lobe lung mass occluding the right upper lobe bronchus with enlarged mediastinal lymph nodes and a lytic lesion of the right clavicle. On 5/8/13, he underwent biopsy of the right clavicle which confirmed metastatic non-small cell lung cancer. He was seen by oncology on 6/5/13, who recommended palliative radiation treatment, which the patient declined. He died nine days later. Had this patient undergone timely work-up when he initially presented seven months earlier, it would likely have significantly prolonged his life.

## Patient 55

This was a 40-year-old man who died on 1/23/14 of metastatic rectal cancer. He was first admitted to IDOC in 2000. He first began complaining of constipation in January 2011, at which time his weight was 195#. He was not referred to the doctor at that time. He returned with the same complaint in May 2011 and had lost 10 pounds. He saw the physician for constipation and abdominal pain that was worse with sitting, and urinary symptoms. He denied blood in the stool. The doctor examined his abdomen but did not do a rectal exam. An abdominal x-ray and labs were normal.

1. On 12/22/11, he presented to the LPN stating "something is wrong" and that he was losing weight. He was now down to 158#. He saw the doctor, who did a rectal exam, found no masses and no blood in the stool. She ordered more labs and follow up in one month. Blood drawn on 12/30/11 showed mild iron deficiency anemia. The doctor ordered stool cards. These came back positive in February and he was referred for colonoscopy, which was performed on 4/13/12 and showed a large tumor in the rectum. Pathology showed invasive adenocarcinoma. Although his care proceeded in a timely and appropriate manner from this point on, his disease continued to progress and after a long and complicated course, he ultimately succumbed. Given his constellation of symptoms, colonoscopy should have been obtained timely after the anemia was identified, rather than 3 $^1/_2$ months later. This is a Type 3 lapse in care.

## Menard Correctional Center

### Patient 56
This was a 63-year-old man who entered IDOC in 2007 and died on 2/11/14 of complications following several cardiac arrests. There were significant deviations from the standard of care.

1. He had no known cardiac risk factors upon intake. He was found to have hypertension in 2011, but blood pressure checks were discontinued by the MD with follow-up as needed. He was not started on medication. Likewise, he had an unfavorable lipid profile at that time but this was not treated either. His Framingham risk at this time was high at 25%. These are Type 2 lapses in care.

2. In September 2013, he presented with chest pain, shortness of breath and hypertension (blood pressure 180/120, 190/120). He was given a dose of clonidine and placed in the infirmary for observation. The admitting nurse obtained a history of orthopnea. The Medical Director saw the patient that morning and noted that he had no complaints, but the patient was tachycardic with a heart rate of 130. No ECG was ordered. In fact, no other work-up or treatment was provided. He was discharged to his cell that afternoon with no specific follow-up ordered. This is a Type 1 lapse in care. It is not appropriate to treat a hypertensive urgency in a prison infirmary; such patients should be managed in a hospital setting.

3. He presented on several more occasions with chest pain, shortness of breath and orthopnea and was treated for pneumonia and anxiety. Finally, he was sent to the ER on 1/31/14 with shortness of breath and was admitted with heart failure. He subsequently suffered several cardiac arrests and ultimately died.

### Patient 57
This was a 62-year-old man who was admitted to IDOC in 2008 and died on 11/16/13 of GI bleeding from ruptured esophageal varices due to cirrhosis. He had a history of decompensated cirrhosis and prior GI bleeding in 2007. There were significant deviations from the standard of care.

1. He presented on 11/13/13 with "severe lethargy, dizziness, dyspnea, melena x 2 days." He was tachycardic with a heart rate of 104, blood pressure was 124/74 and had grossly bloody stools on exam. The doctor ordered labs and placed him in the infirmary at 1:10 p.m. At 1:30 p.m., the admitting RN described him as pale and pastie (sic). He had a small black stool. He complained of mild abdominal and chest pain. His blood pressure was 112/70 and heart rate was 100. His hemoglobin (Hb) was 10.2 g/dL, down from 13.3 in July. This is a Type 1 lapse in care. It is not appropriate to put a high-risk patient with active GI bleeding in a prison infirmary.

2. At 4:00 p.m., his blood pressure was 110/62, pulse 80 and he was described as weak and tired. At 8:00 p.m., a stat CBC was drawn per the doctor's order. It was resulted at 9:13 p.m. and the Hb was down to 7.6 g/dL. At 9:45 p.m., the nurse called the doctor regarding these results and he ordered only IV fluids. This is another Type 1 lapse. This dramatic drop in the hemoglobin indicates that this patient is bleeding briskly.

3. On 11/14/13 at 3:25 a.m., his blood pressure was 100/60, pulse 104. At 9:20 a.m., the doctor saw the patient, who reported weakness, dizziness and ongoing melanotic stool. He sent the patient to the local hospital where he died two days later.

## Patient 58

This was a 66-year-old man with multiple medical problems including diabetes, COPD and coronary artery disease with history of 5 vessel CABG in 2009 who was received in IDOC in 2006 and died on 4/7/13 of metastatic renal cell carcinoma. There were significant deviations from the standard of care.

1. He first presented on 11/12/12 with difficulty breathing, especially when lying down. He saw the Medical Director the next day and was admitted to the infirmary for a CHF exacerbation. A chest x-ray performed on 11/13/12 showed pulmonary vascular congestion as well as "nodular densities within the lungs bilaterally of which findings are suspicious for neoplastic-metastatic disease," a finding which escaped the attention of the doctor when he reviewed the film on the date it was taken. The patient was discharged back to his cell on 11/15/12. This is a Type 4 lapse in care.

2. The film was read on 11/15 and received by the institution on 11/26, at which time the same doctor signed the report and marked it "file" (rather than "pull chart" or "see patient"). On 11/30/12, the doctor saw the patient in follow up of his infirmary admission, noted that his symptoms were improved, but did not review the x-ray result with the patient or make any reference to it. These are also Type 4 lapses.

3. On 12/10/12, the patient was referred to the Medical Director with shortness of breath and chest tightness. The doctor noted that the patient's symptoms were "now resolved." He concluded "CHF, multiple medical problems," made no changes and returned the patient to his cell. This is a Type 1 lapse in care.

On 1/16/13, the patient was brought to the HCU via wheelchair with complaints of chest pain radiating down his left arm and shortness of breath. He was hypertensive and diaphoretic. The

nurse got a verbal order to send the patient to the ED, where he was found to have metastatic renal cell cancer. He ultimately opted for palliative care and expired three months later.

## Patient 59

This was a 64-year-old man who was severely beaten by his cellie on 1/24/13, resulting in massive head injuries. He returned to the institution on 1/31/13. There were significant deviations from the standard of care.

1. Over the ensuing three weeks, the patient was described with increasing disdain as being uncooperative and unwilling to participate in self-care. His behavior became increasingly problematic in that he ultimately began smearing feces in his room, disrobing and urinating on himself. He was diagnosed with psychosis secondary to head injury and started on psychotropics. He developed difficulty swallowing and let medication and liquids spill out of his mouth. He continued to receive his usual medications including oral diabetes medications. There was no record of his blood glucose being checked. This is a Type 2 lapse in care.

2. On 2/25/13, he was noted to be very sedated and slow to respond. His blood pressure was 78/40 and blood glucose was 54. The doctor saw the patient at 7:50 a.m, and described him as lethargic and non-verbal; he had a flexion response to pain. Rather than send this unstable patient to the hospital, the doctor ordered IV fluids and monitoring of vital signs. This is a Type 1 lapse in care.

At 9:30 a.m., the blood pressure improved to 110/50. There are no further measurements of blood glucose. At 10:45 a.m., he coded and died. The autopsy report listed the final cause of death as "blunt trauma to head aggravating hypertensive and arteriosclerotic cardiovascular disease and diabetes mellitus."

## Pontiac Correctional Center

## Patient 62

This was a 42-year-old man who died of a glioblastoma multiforme on 4/16/13. The tumor was first diagnosed in 2009, prior to his incarceration. He underwent excision in March 2009, and again in September 2010 for recurrence. He was admitted to IDOC in July 2012. He had a restaging MRI in October 2012 which showed no recurrence and his maintenance chemotherapy was discontinued. Thereafter there was a significant deviation from the standard of care.

1. A subsequent MRI on 2/1/13 showed recurrence of a low grade enhancing mass in his left temporal lobe. He was referred to neurosurgery but not scheduled for two months (4/10/13). This is a Type 3 lapse in care.

On 4/1/13, he was found with altered consciousness and stroke-like symptoms. He was taken to St. James hospital, where CT showed significant edema around the mass and a 1 cm midline shift. He was transferred to UIC, where it was decided that the risks of surgery outweighed the benefits. The family decided to withdraw care on 4/15/13, and the patient died the next day.

# Cases without Lapses in Care

## Dixon

Patient 1
Patient 3
Patient 5
Patient 13
Patient 15
Patient 20

## Big Muddy

Patient 22
Patient 23
Patient 26
Patient 27
Patient 29

## Graham

Patient 30

## Shawnee

Patient 32

## Pinckneyville

Patient 33
Patient 37

## Vienna

Patient 38

## Stateville

Patient 41

## Hill

Patient 47
Patient 48

## Centralia

Patient 49
Patient 51
Patient 53

## Menard

Patient 60
Patient 61

## Pontiac

Patient 63

# Appendix 1

## Taxonomy for Mortality Reviews

**Lapse in Care** – In the judgment of the reviewers, a clinician has committed a significant departure from the standard of care that a reasonable and competent clinician would not have committed under the same or similar circumstances.

The 14 categories of lapse are:

**Type 1** – Failure to recognize, evaluate and manage important symptoms and signs – so called clinical "red flags."

**Type 2** – Failure to follow clinical guidelines or standard of care for the management of chronic diseases, such as hypertension, asthma, diabetes mellitus, hepatitis C infection, HIV/AIDS, chronic pain, anticoagulation and care at the end of life.

**Type 3** – Delay in access to the appropriate level of care, of sufficient duration to result in a risk of harm to the patient.

**Type 4** – Failure to identify and appropriately react to abnormal test results.

**Type 5** – Failure of appropriate communication between providers, especially at points where transfers of care occur (care transitions).

**Type 6** – Fragmentation of care resulting from failure of an individual clinician or the primary care team to assume responsibility for the patient's care.

**Type 7** – Iatrogenic injury resulting from a surgical or procedural complication.

**Type 8** – Medication prescribing error, including failure to prescribe an indicated medication, failure to do appropriate monitoring, or failure to recognize and avoid known drug interactions.

**Type 9** – Medication delivery error, including significant delay in a patient receiving medication or a medication delivered to the wrong patient.

**Type 10** – Practicing outside the scope of one's professional capability (may apply to LVNs, RNs, midlevel practitioners, or physicians).

**Type 11** – Failure to adequately supervise a midlevel practitioner, including failure to be readily available for consultation or an administrative failure to provide for appropriate supervision.

**Type 12** – Failure to communicate effectively with the patient. **Type 13** – Patient non-adherence with suggestions for optimal care.

**Type 14** – Delay or failure in emergency response, including delay in activation or failure to follow the emergency response protocol.

# Appendix 2
# Death Reviews

| Patient Number | Inmate ID | Name | Institution |
|---|---|---|---|
| Patient #1 | [redacted] | [redacted] | Dixon |
| Patient #2 | [redacted] | [redacted] | Dixon |
| Patient #3 | [redacted] | [redacted] | Dixon |
| Patient #4 | [redacted] | [redacted] | Dixon |
| Patient #5 | [redacted] | [redacted] | Dixon |
| Patient #6 | [redacted] | [redacted] | Dixon |
| Patient #7 | [redacted] | [redacted] | Dixon |
| Patient #8 | [redacted] | [redacted] | Dixon |
| Patient #9 | [redacted] | [redacted] | Dixon |
| Patient #10 | [redacted] | [redacted] | Dixon |
| Patient #11 | [redacted] | [redacted] | Dixon |
| Patient #12 | [redacted] | [redacted] | Dixon |
| Patient #13 | [redacted] | [redacted] | Dixon |
| Patient #14 | [redacted] | [redacted] | Dixon |
| Patient #15 | [redacted] | [redacted] | Dixon |
| Patient #16 | [redacted] | [redacted] | Dixon |
| Patient #17 | [redacted] | [redacted] | Dixon |
| Patient #18 | [redacted] | [redacted] | Dixon |
| Patient #19 | [redacted] | [redacted] | Dixon |
| Patient #20 | [redacted] | [redacted] | Dixon |
| Patient #21 | [redacted] | [redacted] | Dixon |
| Patient #22 | [redacted] | [redacted] | Big Muddy |
| Patient #23 | [redacted] | [redacted] | Big Muddy |
| Patient #24 | [redacted] | [redacted] | Big Muddy |
| Patient #25 | [redacted] | [redacted] | Big Muddy |
| Patient #26 | [redacted] | [redacted] | Big Muddy |
| Patient #27 | [redacted] | [redacted] | Big Muddy |
| Patient #28 | [redacted] | [redacted] | Big Muddy |
| Patient #29 | [redacted] | [redacted] | Big Muddy |
| Patient #30 | [redacted] | [redacted] | Graham |
| Patient #31 | [redacted] | [redacted] | Lincoln |
| Patient #32 | [redacted] | [redacted] | Shawnee |
| Patient #33 | [redacted] | [redacted] | Pinckneyville |
| Patient #34 | [redacted] | [redacted] | Pinckneyville |
| Patient #35 | [redacted] | [redacted] | Pinckneyville |
| Patient #36 | [redacted] | [redacted] | Pinckneyville |
| Patient #37 | [redacted] | [redacted] | Taylorville |
| Patient #38 | [redacted] | [redacted] | Vienna |

| Patient Number | Inmate ID | Name | Institution |
|---|---|---|---|
| Patient #39 | [redacted] | [redacted] | Stateville |
| Patient #40 | [redacted] | [redacted] | Stateville |
| Patient #41 | [redacted] | [redacted] | Stateville |
| Patient #42 | [redacted] | [redacted] | Stateville |
| Patient #43 | [redacted] | [redacted] | Hill |
| Patient #44 | [redacted] | [redacted] | Hill |
| Patient #45 | [redacted] | [redacted] | Hill |
| Patient #46 | [redacted] | [redacted] | Hill |
| Patient #47 | [redacted] | [redacted] | Hill |
| Patient #48 | [redacted] | [redacted] | Hill |
| Patient #49 | [redacted] | [redacted] | Centralia |
| Patient #50 | [redacted] | [redacted] | Centralia |
| Patient #51 | [redacted] | [redacted] | Centralia |
| Patient #52 | [redacted] | [redacted] | Centralia |
| Patient #53 | [redacted] | [redacted] | Centralia |
| Patient #54 | [redacted] | [redacted] | Illinois River |
| Patient #55 | [redacted] | [redacted] | Illinois River |
| Patient #56 | [redacted] | [redacted] | Menard |
| Patient #57 | [redacted] | [redacted] | Menard |
| Patient #58 | [redacted] | [redacted] | Menard |
| Patient #59 | [redacted] | [redacted] | Menard |
| Patient #60 | [redacted] | [redacted] | Menard |
| Patient #61 | [redacted] | [redacted] | Menard |
| Patient #62 | [redacted] | [redacted] | Pontiac |
| Patient #63 | [redacted] | [redacted] | Pontiac |

# Appendix 3

## Internal M&M Reviews

Stateville – patient 39

Stateville – patient 40

Stateville – patient 42

Hill – patient 43

Hill – patient 44

Hill – patient 45

Hill – patient 46

Illinois River – patient 54

Centralia – patient 52

Centralia – patient 50

Menard – patient 56

Menard – patient 57

Menard – patient 58

Menard – patient 59 Big

Muddy – patient 25 Big

Muddy – patient 28

Pinckneyville – patient 34

Pinckneyville – patient 35

Lincoln – patient 31