# EXHIBIT 1

A report from The Pew Charitable Trusts and the John D. and Catherine T. MacArthur Foundation | July 2014









# State Prison Health Care Spending

An examination

The State Health Care Spending Project, an initiative of The Pew Charitable Trusts and the John D. and Catherine T. MacArthur Foundation, helps policymakers better understand how much money states spend on health care, how and why that amount has changed over time, and which policies are containing costs while maintaining or improving health outcomes. For additional information, visit www.pewtrusts.org.

## The Pew Charitable Trusts

**Susan K. Urahn**, *executive vice president*
**Michael Ettlinger**, *senior director*

**Maria Schiff**     **Samantha Chao**     **Kil Huh**
**Ellyon Bell**      **Kavita Choudhry**   **Matt McKillop**

## John D. and Catherine T. MacArthur Foundation

**Valerie Chang**, *director for policy research*
**Meredith Klein**, *communications officer*

## External reviewers

The report benefited from the insights and expertise of two external reviewers: Warren J. Ferguson, M.D., chairman of the board of directors of the Academic Consortium on Criminal Justice Health and professor and vice chair of the Department of Family Medicine and Community Health at the University of Massachusetts Medical School; and Brie Williams, M.D., M.S., associate professor of medicine at the University of California, San Francisco, and associate director of the university's Program for the Aging Century. These experts provided feedback and guidance at critical stages in the project. Although they have screened the report for accuracy, neither they nor their organizations necessarily endorse its findings or conclusions.

## Acknowledgments

We want to express our gratitude to Christian Henrichson, Sarah Galgano, Joshua Rinaldi, and Tina Chiu of the Vera Institute of Justice, and George Camp and Joseph Fenton of the Association of State Correctional Administrators for their invaluable partnership. We thank our project advisers and state officials for generously lending their time and expertise. (See Appendix A: Methodology.) We appreciate our Pew colleagues Ryan King and Adam Gelb for providing critical early guidance on research methodology and review of the draft report; Jeremy Ratner and Lisa Gonzales for their editorial input; Elizabeth DiLauro for her assistance with fact checking; and Gaye Williams, Dan Benderly, Sara Flood, Laura Woods, Lauren Dickinson, Jerry Tyson, and Liz Visser for their work preparing this report for publication.



**Contact:** Michelle Blackston, communications officer     **Email:** mblackston@pewtrusts.org     **Phone:** 202-540-6627

This report is intended for educational and informational purposes. References to specific policymakers or companies have been included solely to advance these purposes and do not constitute an endorsement, sponsorship, or recommendation by The Pew Charitable Trusts or the John D. and Catherine T. MacArthur Foundation.

# Table of contents

1   Overview

3   Spending trends

6   Distribution of spending

8   Spending drivers

13  Cost-containment strategies

15  Conclusion

16  Appendix A: Methodology

18  Appendix B: State data notes

19  Appendix C: State prison health care spending and population data

27  Endnotes

# Overview

Health care and corrections have emerged as fiscal pressure points for states in recent years as rapid spending growth in each area has competed for scarce revenue. Not surprisingly, the intersection of these two spheres—health care for prison inmates—also has experienced a ramp-up, reaching nearly $8 billion in 2011.

Under the landmark 1976 Estelle v. Gamble decision, the U.S. Supreme Court affirmed that prisoners have a constitutional right to adequate medical attention and concluded that the Eighth Amendment is violated when corrections officials display "deliberate indifference" to an inmate's medical needs.[1] The manner in which states manage prison health care services that meet these legal requirements affects not only inmates' health, but also the public's health and safety and taxpayers' total corrections bill. Effectively treating inmates' physical and mental illnesses, including substance use disorders, improves their well-being and can reduce the likelihood that they will commit new crimes or violate probation once released.[2]

The State Health Care Spending Project previously examined cost data from 44 states* and found that prison health care spending increased dramatically from fiscal year 2001 to 2008. However, new data from a survey of budget and finance staff officials in each state's department of corrections, administered by The Pew Charitable Trusts and the Vera Institute of Justice, show that some states may be reversing this trend.

This report examines the factors driving costs by analyzing new data on all 50 states' prison health care spending from fiscal 2007 to 2011.† It also describes a variety of promising strategies that states are using to manage spending, including the use of telehealth technology, improved management of health services contractors, Medicaid financing, and medical or geriatric parole.

The project's analysis of the survey data yielded the following findings:

- Correctional health care spending rose in 41 states from fiscal 2007 to 2011, with median growth of 13 percent, after adjusting for inflation.

- Per-inmate health care spending also rose in 39 states over the period, with a median growth of 10 percent.

- In a majority of states, however, total spending and per-inmate spending peaked before fiscal 2011. Nationwide, prison health care spending totaled $7.7 billion in fiscal 2011, down from a peak of $8.2 billion in fiscal 2009. The downturn in spending was due, in part, to a reduction in state prison populations.

- From fiscal 2007 to 2011, the share of older inmates—who typically require more expensive care—rose in all but two of the 42 states that submitted prisoner age data.‡ Not surprisingly, states where older inmates represented a relatively large share of the total prisoner population tended to incur higher per-inmate health care spending.

As states work to manage prison health care expenditures, a downturn in spending was a positive development as long as it did not come at the expense of access to quality care. But states continue to face a variety of challenges that threaten to drive costs back up. Chief among these is a steadily aging prison population.

Data from the survey can provide state decision-makers with information to assess both their own state's

---

* The source of these data was the Bureau of Justice Statistics.

† States' fiscal years differ. (See Appendix A: Methodology.)

‡ Project researchers partnered with the Association of State Correctional Administrators to survey state officials on the share of state inmates who were age 55 or older in each year from fiscal 2007 to 2011.

spending—over time and compared with other states—as well as cost-containment initiatives underway from fiscal 2007 to 2011. Officials in all 50 states were willing to respond to the survey and supply spending information, which is a strong indication of their eagerness to make peer comparisons and address spending in a data-driven fashion.

## The State Health Care Spending 50-State Study Report Series

The State Health Care Spending Project, a collaboration between The Pew Charitable Trusts and the John D. and Catherine T. MacArthur Foundation, is examining seven key areas of state health care spending—Medicaid, the Children's Health Insurance Program, substance abuse treatment, mental health services, prison health care, and both active and retired state government employee health insurance. The project will provide a comprehensive examination of each of these health programs that states fund. The programs vary by state in many ways, so the research will highlight those variations and some of the key factors driving them. The project is concurrently releasing state-by-state data on 20 key health indicators to complement the programmatic spending analysis. For more information, see http://www.pewtrusts.org/healthcarespending.



PhotoAlto via Getty Images

## Spending trends

In fiscal 2011, states spent a total of $7.7 billion on correctional health care—likely about a fifth[*] of overall prison expenditures. Most states' spending increased from fiscal 2007 to 2011, with median growth of 13 percent across the country, after adjusting for inflation.[†] During the same time period, states experienced moderate growth in their per-inmate spending, which rose by a median of 10 percent. (See Figure 1.)

However, spending was down from an inflation-adjusted peak of $8.2 billion in fiscal 2009, with California's decrease of $441 million from fiscal 2009 to 2011 accounting for most of this decline. Total spending peaked in 34 states (see Figure 2) and per-inmate spending peaked in 37 states prior to 2011, most commonly in 2009 and 2010.

---

[*]	In 2010, the most recent year for which total state prison expenditures were available as of the writing of this report, totaled $38.6 billion in nominal dollars. States' prison health care spending—$ 7.7 billion—represented 20 percent of this total. Prison health care likely represented a similar percentage in 2011. Tracey Kyckelhahn and Tara Martin, "Justice Expenditure and Employment Extracts, 2010—Preliminary," Bureau of Justice Statistics, July 2013, http://www.bjs.gov/index.cfm?ty=pbdetail&iid=4679.

[†]	Data for fiscal 2007 to 2010 were converted to 2011 dollars using the Implicit Price Deflator for Gross Domestic Product included in the Bureau of Economic Analysis' National Income and Product Accounts.

Figure 1

# Per-Inmate Spending on Prison Health Care Grew by a Median of 10% Over 5 Years, Peaking in 37 States Before 2011

## Change by state, 2007–11



| State | % change | | |
|---|---|---|---|
| California | 42% | $10,207 | $14,495 |
| Vermont | 17% | $10,092 | $11,761 |
| Wyoming | -7% | $11,709 | $10,870 |
| New Hampshire | 28% | $7,941 | $10,191 |
| Alaska | 14% | $8,908 | $10,160 |
| Montana | 37% | $6,176 | $8,454 |
| Massachusetts | 12% | $7,527 | $8,427 |
| Maine | 13% | $7,124 | $8,027 |
| Michigan | 14% | $6,528 | $7,465 |
| Oregon | 21% | $6,090 | $7,356 |
| New Mexico | 19% | $6,150 | $7,316 |
| Nebraska | 13% | $6,319 | $7,110 |
| Wisconsin | 5% | $6,735 | $7,080 |
| Washington | -4% | $7,317 | $7,016 |
| Delaware | 41% | $4,938 | $6,979 |
| Minnesota | 2% | $6,786 | $6,937 |
| Maryland | 6% | $6,305 | $6,674 |
| Tennessee | 16% | $5,521 | $6,388 |
| New York | 11% | $5,703 | $6,320 |
| North Carolina | 2% | $6,154 | $6,287 |
| Rhode Island | 1% | $5,844 | $5,916 |
| New Jersey | 0% | $5,801 | $5,830 |
| Ohio | -7% | $6,216 | $5,755 |
| Kentucky | 31% | $4,108 | $5,390 |
| Kansas | 0% | $5,262 | $5,243 |
| Connecticut | -4% | $5,430 | $5,211 |
| North Dakota | 14% | $4,552 | $5,201 |
| South Dakota | 4% | $4,826 | $5,026 |
| Idaho | 8% | $4,542 | $4,891 |
| Virginia | 13% | $4,293 | $4,870 |
| Pennsylvania | -8% | $5,088 | $4,705 |
| Missouri | 27% | $3,678 | $4,674 |
| Florida | -4% | $4,879 | $4,670 |
| Louisiana | 8% | $4,302 | $4,660 |
| Colorado | 17% | $3,991 | $4,650 |
| West Virginia | -5% | $4,767 | $4,545 |
| Hawaii | 8% | $4,181 | $4,513 |
| Utah | 7% | $4,122 | $4,407 |
| Iowa | 18% | $3,655 | $4,310 |
| Arkansas | -1% | $4,196 | $4,166 |
| Georgia | 5% | $3,826 | $4,018 |
| Indiana | 15% | $3,345 | $3,858 |
| Texas | 24% | $3,059 | $3,805 |
| Alabama | 22% | $3,097 | $3,769 |
| Nevada | 11% | $3,357 | $3,738 |
| Mississippi | 15% | $2,914 | $3,345 |
| Arizona | -20% | $4,083 | $3,260 |
| Illinois | 0% | $3,039 | $3,051 |
| South Carolina | 0% | $2,928 | $2,933 |
| Oklahoma | -17% | $3,071 | $2,558 |

■ 2007 spending
■ 2011 spending

Note: All spending figures are in 2011 dollars. Nominal spending data for fiscal 2007–10 were converted to 2011 dollars using the Implicit Price Deflator for Gross Domestic Product included in the Bureau of Economic Analysis' National Income and Product Accounts. See Appendix B for relevant details on specific state data. See Appendix C, Table C.3 for the data.

© 2014 The Pew Charitable Trusts

Figure 2

## Total Spending on Prison Health Care Grew by a Median of 13% Over 5 Years, Peaking in 34 States Before 2011

Change by state, 2007–11



Spending peaked before 2011

U.S. median

-14%    13%    48%

# 13%
U.S. median

Note: All spending figures are in 2011 dollars. Nominal spending data for fiscal 2007–10 were converted to 2011 dollars using the Implicit Price Deflator for Gross Domestic Product included in the Bureau of Economic Analysis' National Income and Product Accounts. See Appendix C, Table C.1 for the data.

© 2014 The Pew Charitable Trusts

### A Note on Making State-to-State Spending Comparisons

A variety of factors affect interstate spending comparisons, such as variation in the age and health status of correctional populations, regional differences in prices of health care providers, and disparities in care quality and health outcomes. Because of the range of variables that influence spending and the absence of measured outcomes, higher spending is not necessarily an indication of waste, and lower spending is not necessarily a sign of efficiency.


iStockphoto

## Distribution of spending

To gain greater insight into how states spend their correctional health care dollars and to provide detailed information to policymakers for comparison purposes, the survey broke down spending into major components: administration, medical care, dental care, mental health care, pharmaceuticals, hospitalization, and substance abuse treatment.* As in the health care system writ large, the collection and analysis of such disaggregated spending and health outcome data are necessary for the effective management of correctional health care, including the successful implementation and evaluation of cost-containment strategies. According to a group of correctional health care researchers and practitioners coordinated by the Division of Geriatrics at the University of California, San Francisco, reliable and timely outcome and cost data are particularly important for optimizing care quality and value—that is, achieving desired health outcomes at sustainable costs—for inmates age 55 and older because of the high cost of their care and their unique needs.[3]

Nearly all states provided data for one or more of the spending categories for each year, with only 10 states† doing so for all spending categories for each year requested. Among those 10, the largest component of correctional health care spending from fiscal 2007 to 2011 was general medical care—doctors, nurses, physician assistants, and medical supplies—followed by on-site and off-site hospitalization, pharmaceuticals, and mental health care. (See Figure 3.) This distribution of funds stayed relatively stable over the five years.

---

* Some states do not normally include substance abuse treatment in their official calculation of correctional health care spending.

† The 10 states included Florida, Illinois, Minnesota, Nebraska, Ohio, Oregon, Pennsylvania, Rhode Island, Utah, and Washington.

Figure 3

## General Medical Care Was the Largest Component of Prison Health Care Spending

### Average distribution of funds by category for 10 states, 2007–11



20% Hospitalization

14% Pharmaceuticals

5% Substance abuse treatment

4% Health care administration

37% General medical care

14% Mental health care

4% Dental care

1% Other

Note: These averages are limited to the 10 states that submitted complete disaggregated spending data: Florida, Illinois, Minnesota, Nebraska, Ohio, Oregon, Pennsylvania, Rhode Island, Utah, and Washington. The averages were determined by summing each spending component in each of the 10 states and calculating each component's share of total spending among all 10 states in that year. The percentage represented by each category was then averaged across the 5 years.

© 2014 The Pew Charitable Trusts

## Data and accounting limitations

The large number of states that did not submit complete disaggregated spending data for correctional health care may suggest that many could be hampered in their efforts to manage spending if their budgeting and accounting systems do not provide a deep level of granularity.

Some states have improved their data capabilities, including expanding their work to capture spending in finer detail. In 2010, for example, the South Carolina Department of Corrections converted its accounting system to one that consolidated more than 70 state agencies into a single, statewide enterprise system for finance, materials management, and payroll that allows the corrections department to collect more detailed information on health care costs.[4] Similarly, in 2006, New Hampshire changed its accounting methods to comprehensively capture correctional health care related costs that had been excluded from prior analyses.[5]

Beyond accounting system limitations, data capabilities may be limited when contractors provide correctional health care—and, in some cases, all correctional services. In such cases, the state typically pays a negotiated daily rate and does not require that specific spending items be reported. Even so, several states provided health care spending figures for inmates in private prisons, demonstrating that these data can be obtained.

States that look to for-profit companies, outside partners, and/or other state entities such as public university medical centers to fulfill all or part of their prison medical, dental, and mental health care needs would benefit by ensuring that contractors meet clearly specified goals for quality and cost. Some states, for example, have gained more control over spending on outsourced correctional health care by attaching performance standards and tracking systems to their contracts.[6]



## Spending drivers

The size, age, and health status of inmate populations are the primary determinants of states' total correctional health care spending. In addition to the number of state prisoners, several factors characteristic of most state corrections systems can affect the delivery of health care and drive costs on a per-inmate basis. These include:

- The distance of prisons from hospitals and other providers.
- The prevalence of infectious and chronic diseases, mental illness, and substance use disorder among inmates.
- An aging inmate population.

### Trends in prison populations

The significant growth in correctional health care spending from fiscal 2001 to 2008 reflected, in part, a concurrent rise in prison populations nationally. During that time period, the number of sentenced prisoners in correctional institutions increased by 15 percent, from 1.34 million to 1.54 million.[7] A multidecade trend, the number of Americans in prison nearly tripled from 1987 to 2007 and continued growing until 2009.[8] Tougher sentencing laws and more restrictive probation and parole policies that put more people in prison for longer stays drove much of the increase.[9] More recently, however, many states have begun to review and modify their corrections and sentencing policies.

The correctional health care spending downturn in 2010 and 2011 resulted, in part, from a reduction in state prison populations. According to the survey, states' average daily inmate population reached its apex in 2009 and then began to fall. This trend aligns with periodic counts from the Bureau of Justice Statistics that also showed the number of inmates in state prisons declining for the third straight year in 2012.[10]

## Location, staffing, and inmate transportation

For remote prisons far from the population centers where most medical professionals tend to work, states may need to provide higher-than-average compensation to attract and retain medical staff, or they may incur considerable overtime and temporary-worker costs if their recruitment efforts fall short. Expenses add up quickly when inmates must travel long distances to see specialists or stay overnight in hospitals. The Legislative Analyst's Office in California, for example, reported that medically related guarding and transportation costs for one inmate can exceed $2,000 per day.[11]

## Prevalence of disease and mental illness

Inmates have a higher incidence of chronic and infectious diseases, such as AIDS and hepatitis C, and mental illness than that of the general population.[12] These costly conditions, many of which are present prior to incarceration, place a significant burden on state correctional budgets, which assume the entire cost of care.

In 2010, roughly 65 percent of incarcerated adults in prisons or jails met the medical criteria for an alcohol or drug use disorder,[13] and inmates were seven times likelier than individuals in the community to have such a condition. One-third suffered from mental illness, and one-quarter had a co-occurring mental illness and substance use disorder.

Estimates of the prevalence of hepatitis C in prisons vary across the country, indicating regional differences in high-risk behaviors such as intravenous drug use. A survey of state correctional department medical directors and health administrators placed the national rate of hepatitis C among inmates at 17.4 percent in 2006.[14] By way of comparison, roughly 1 percent of all U.S. residents have chronic hepatitis C infection.[15] More conservative research estimates the prevalence of hepatitis C among prisoners at seven times that of the population outside prison walls.[16] The cost implications behind these numbers could become more significant for some states in the years ahead if they elect to make use of expensive new prescription drugs recently approved by the U.S. Food and Drug Administration to care for those with chronic hepatitis C infection.[17]

## Older inmates, greater expense

As the number of inmates who have grown old behind bars dramatically increased, so did the health care costs required to treat them. From 1999 to 2012, the number of state and federal prisoners age 55 or older—a common definition of "older" prisoners—increased 204 percent, from 43,300 to 131,500. During the same period, the number of inmates younger than 55 grew much more slowly: up 9 percent, from 1.26 million to 1.38 million.[18] (See Figure 4.) The graying of American prisons stems from the use of longer sentences as a public safety strategy and an increase in admissions of older inmates to prison.[19]

Like senior citizens outside prison walls, older inmates are more susceptible to chronic medical and mental conditions, including dementia, impaired mobility, and loss of hearing and vision. In prisons, these ailments necessitate increased staffing levels, more officer training, and special housing—all of which create additional health and nonhealth expenses. Medical experts say inmates typically experience the effects of age sooner than people outside prison because of issues such as substance use disorder, inadequate preventive and primary care prior to incarceration, and stress linked to the isolation and sometimes-violent environment of prison life.[20]

The older inmate population has a substantial impact on prison budgets. Estimates of the increased cost vary. The National Institute of Corrections pegged the annual cost of incarcerating prisoners age 55 and older with chronic and terminal illnesses at, on average, two to three times that of the expense for all other inmates, particularly younger ones.[21] More recently, other researchers have found that the cost differential may be wider.[22]

Figure 4

## The Number of State and Federal Prisoners Age 55 and Older Increased by 204%, 1999–2012

Percentage change in sentenced prison populations by age group



Note: The Bureau of Justice Statistics estimates the age distribution of prisoners using data from the Federal Justice Statistics Program and statistics that states voluntarily submit to the National Corrections Reporting Program. State participation in this program has varied, which may have caused year-to-year fluctuations in the bureau's national estimates but this does not affect long-term trend comparisons. From 2009-10, the number of states submitting data increased substantially, which might have contributed to the year-over-year increase in the national estimate between those years.

Source: U.S. Department of Justice, Bureau of Justice Statistics

© 2014 The Pew Charitable Trusts

To better understand trends in inmate age on a state-by-state level, Pew researchers partnered with the Association of State Correctional Administrators to survey state officials on the share of state inmates who were age 55 or older in each year from fiscal 2007 to 2011.* During this period, the share of older prisoners increased in all but two (Hawaii and Mississippi) of the 42 states that provided data. The average proportion of older inmates increased from 6.2 percent of all inmates to 8.2 percent. The proportion in fiscal 2011 ranged from less than 6 percent in New Jersey, Minnesota, Indiana, Hawaii, and Connecticut to more than 13 percent in Oregon, Vermont, and West Virginia. (See Figure 5.)

Figure 5

## The Share of Older Inmates in State Prison Populations Varied Throughout the Country

Percentage of inmates age 55 and older by state, 2007–11 average



Note: Data for Idaho were not available for fiscal 2007; the average is from 2008–11. Data were not available for any years in 8 states: Alaska, Nebraska, New Hampshire, Nevada, New York, North Dakota, Utah, and Washington. See Appendix C, Table C.4 for the data.

Source: Association of State Correctional Administrators

© 2014 The Pew Charitable Trusts

---

* Researchers asked survey respondents to submit the percentage of pretrial and sentenced inmates age 55 or older under the custody of state departments of corrections in adult correctional institutions and private prisons for fiscal 2007 through 2011. Respondents were asked to exclude inmates in the custody of local jails unless the corrections system in their state is a combined jail-prison system (sometimes called a "unified" system).

By comparing data between the primary survey of this report and the secondary survey focusing on the number of older inmates, project researchers found evidence of a relationship between the relative size of a state's older inmate population and its spending per inmate, though testing the causal relationship was beyond the scope of the research. States where older inmates represented a relatively large share of the total population from fiscal 2007 to 2011 tended to have higher per-inmate spending. For instance, median per-inmate spending over the study period was 37 percent higher among the 10 states with the largest share of inmates 55 and older than the 10 states with the smallest share of older inmates. (See Figure 6.) This relationship between older inmates and health care spending suggests that the share of a state's prison population represented by older inmates may be one factor among several that influences trends in per-inmate spending over time.

Figure 6

## Median Per-inmate Health Care Spending Was Higher in States Where Older Inmates Represented a Greater Share of Prison Populations

Per-inmate health care spending in states with the highest and lowest percentage of inmates age 55 and over, 2007–11 average

| Bottom 10 | Average share of prisoners age 55 and older, 2007-11 | Average health care spending per inmate, 2007-11 | Top 10 | Average share of prisoners age 55 and older, 2007-11 | Average health care spending per inmate, 2007-11 |
|---|---|---|---|---|---|
| Connecticut | 4.0% | $5,437 | Pennsylvania | 7.9% | $4,870 |
| Indiana | 5.0% | $3,529 | Michigan | 8.0% | $7,103 |
| New Jersey | 5.0% | $5,886 | Maine | 8.0% | $7,182 |
| Minnesota | 5.1% | $6,994 | Illinois | 8.8% | $3,162 |
| Maryland | 5.5% | $6,140 | Wyoming | 8.8% | $11,532 |
| Mississippi | 5.6% | $3,238 | Massachusetts | 9.4% | $8,507 |
| Delaware | 5.7% | $6,317 | Montana | 10.5% | $7,952 |
| Arizona | 5.8% | $4,050 | West Virginia | 11.2% | $4,709 |
| South Carolina | 5.8% | $2,976 | Vermont | 11.9% | $11,015 |
| Kentucky | 5.9% | $4,955 | Oregon | 12.4% | $6,727 |
| Median | 5.6% | $5,196 | Median | 9.1% | $7,142 |

Note: Each state's percentage of prisoners age 55 and older and per-inmate health care spending were averaged from 2007-11. All spending figures are in 2011 dollars. Nominal spending data for fiscal 2007-10 were converted to 2011 dollars using the Implicit Price Deflator for Gross Domestic Product included in the Bureau of Economic Analysis' National Income and Product Accounts. See Appendix C, Tables C.3 and C.4 for the data.

Source: Pew survey, Association of State Correctional Administrators

© 2014 The Pew Charitable Trusts



Getty Images

# Cost-containment strategies

As state policymakers feel the strain of correctional health care costs on their budgets and look ahead to their aging prison population, corrections officials are pursuing ways to rein in expenses without sacrificing the quality of care or public safety. Strategies being explored include using telehealth technologies, outsourcing prison health care, enrolling prisoners in Medicaid, and paroling older and/or ill inmates. Each of these strategies was discussed in detail in the project's October 2013 report, *Managing Prison Health Care Spending.*

## Telehealth

Teleheath refers to the use of electronic information and telecommunications technologies to support, among other things, long-distance health care services. This strategy can help improve prisoners' access to primary care doctors and specialists while reducing transportation and guarding expenses. Additional public safety benefits can be realized as well because inmates will likely need fewer trips off the prison grounds for medical care.

## Advances in outsourcing care

Many states look to outside partners to provide all or part of their prison health care services at lower costs while maintaining or improving the quality of care. Effective management and oversight—for example, attaching performance standards and tracking systems to contracts or monitoring the timeliness and effectiveness of prisoners' treatment—are critical to the success of these partnerships.

## Medicaid financing

A number of states have made a concerted effort to enroll eligible prisoners in Medicaid so that the program can be billed for qualifying health services, which are limited to the care delivered outside of prison, such as at an off-site hospital or nursing home, when the inmate has been admitted for more than 24 hours.

States can obtain federal Medicaid reimbursement that covers at least 50 percent of enrolled prisoners' inpatient hospitalization costs. They may save additional dollars because Medicaid typically pays the lowest provider rates of any payor in a state.

States expanding their Medicaid eligibility under the Affordable Care Act may reap the largest savings. Most inmates, as nondisabled adults without dependent children, will only become eligible for coverage of inpatient costs under this expansion. The federal government will initially reimburse 100 percent of the cost of covered services for all newly eligible enrollees, including inmates. The federal matching rate will gradually decrease to 90 percent by 2020.

States may also assist eligible inmates leaving the prison with their enrollment in Medicaid or new health insurance marketplaces, helping to preserve the continuity of health care treatments between prison and the community.

## Medical or geriatric parole

Many states have adopted medical or geriatric parole policies that allow for the release of older, terminally ill, or incapacitated inmates who meet certain requirements. Because of the high cost of incarcerating older prisoners with chronic or terminal illnesses, granting medical or geriatric parole when appropriate can achieve notable savings, even if the state retains financial responsibility for parolees' health care costs outside prison.

In practice, however, states have released relatively few people. Key barriers include narrow eligibility criteria, complicated applications, lengthy review processes, difficulty in assessing medical suitability, and a shortage of nursing home spaces for such offenders. Because many older and infirm prisoners were convicted of violent crimes or sentenced under habitual-offender laws, opposition among policymakers and the public to the concept of medical or geriatric parole has proved to be another significant obstacle.

## Conclusion

Correctional health care spending poses a fiscal challenge to state lawmakers, though evidence indicates that spending peaked at the end of the last decade. The situation posed by these expenses may be particularly acute in states where older inmates represent a relatively large proportion of the prison population.

Corrections officials will be better positioned to manage their systems effectively with access to rigorous, disaggregated spending and health outcomes data that can be used to identify cost drivers and to evaluate the value and impact of cost-containment initiatives. Moving forward, four strategies—telehealth, outsourcing care, Medicaid financing for eligible inmates, and appropriate use of medical or geriatric parole—among others, provide promising opportunities for states to save taxpayer dollars and maintain or improve the quality of inmate care while protecting public safety. Tracking future spending trends, particularly in the context of the Affordable Care Act's Medicaid expansion, will be critical in these efforts.

# Appendix A: Methodology

## Spending survey

Pew conducted a survey of states' correctional health care spending in partnership with the Vera Institute of Justice. Pew based its methodology on one used by the Bureau of Justice Statistics, or BJS, for a similar analysis of data from fiscal 2001 and 2008.[23] Minor differences between the methods are described below.

State correctional health care expenses for fiscal 2007 to 2011 were first identified and tallied through an analysis of the U.S. Census Survey of State Government Finances.[24] State-specific data were then shared with budget and finance staff officials in each state's department of corrections, who were asked to verify their accuracy, make any necessary corrections, and provide—if possible—a detailed breakout on the component costs of correctional health care.

Pew consulted a panel of advisers and five pilot states to review the project definition of health care and the survey instrument. The advisers were Michael Fine, M.D., director of the Rhode Island Department of Health and former medical program director of the Rhode Island Department of Corrections; B. Jaye Anno, Ph.D., co-founder of the National Commission on Correctional Health Care and owner of Consultants in Correctional Care; and Don Specter, director of the Prison Law Office. The pilot states were California, Louisiana, Missouri, Rhode Island, and Washington.

Pew sought to capture each state's correctional health care spending—provided by state employees and/or contracted providers—including expenses for health care administration, medical care, dental care, mental health care, substance abuse treatment, pharmaceuticals, and hospitalization. These data include correctional health care costs for inmates in the custody of private prisons, when states could provide this information. States pay for the care and custody of inmates in private prisons through a negotiated daily rate, and the specific costs of health care cannot always be disaggregated from this rate. Nine states contracting with private prisons were able to provide information about health care costs for those inmates: Arizona, Colorado, Georgia, Hawaii, Indiana, Mississippi, New Mexico, Oklahoma, and Texas. Twelve states that contract with private prisons were unable to provide information about health care expenditures for those inmates: Alabama, Alaska, California, Florida, Idaho, Kentucky, Louisiana, Montana, Ohio, Tennessee, Vermont, and Virginia. Inmates in private prisons in these 12 states are excluded from the average daily population and thus not factored into the average cost per inmate.

Substance abuse treatment is not included in some states' official calculation of correctional health care because it is categorized as rehabilitative programming. It is included in this analysis when states could provide information about these costs. Eleven states were unable to provide five years of data for substance abuse treatment costs: Alabama, Arkansas, California, Georgia, Hawaii, Mississippi, North Dakota, Vermont, Virginia, West Virginia, and Wisconsin. Thus the total cost of health care in these states is marginally underreported.

The costs of inmates in the jurisdiction of state corrections departments but in the custody of local jails are excluded from this analysis except in the six states with a unified structure in which the state operates jails and prisons: Alaska, Connecticut, Delaware, Hawaii, Rhode Island, and Vermont.

Data are reported for each state's fiscal year that ended in the year surveyed. For example, data for "fiscal 2008" is the state fiscal year that ended in calendar year 2008. Some states describe fiscal years differently. For instance, Pennsylvania describes the fiscal year that ends in 2008 as fiscal 2007 to 2008.

Once data for all 50 states were collected, researchers investigated the results of outlier states where (a) total nominal spending declined from 2007 to 2011, and (b) per-inmate spending increased dramatically relative to other states.

Data for fiscal 2007 to 2010 were converted to 2011 dollars using the Implicit Price Deflator for Gross Domestic Product included in the Bureau of Economic Analysis' National Income and Product Accounts.

### Adjustments from BJS's methodology

Pew reported fiscal 2008 correctional health care spending data in its October 2013 report, *Managing Prison Health Care Spending*, based on BJS's analysis. Nominal total spending data for fiscal 2008 in Pew's survey may differ from those reported in BJS's study because of minor adjustments Pew made to the bureau's methodology.

State spending for correctional health care provided to inmates in the custody of private prisons was included in Pew's survey.

Pew's definition of correctional health care included substance abuse treatment, and state officials were specifically asked to capture these data in their tally. Some states do not include substance abuse treatment in their official calculation of correctional health care, and these costs may be excluded for those states in BJS's analysis.

Pew calculated the average cost per inmate by dividing total spending by the average daily inmate population. The BJS divided total costs by a snapshot count of the inmate population at the end of the year.

Pew queried the amount of each component cost of health care: health care administration, medical care, dental care, mental health care, substance abuse treatment, pharmaceuticals, and hospitalization. The BJS tallied aggregate correctional health care spending. Pew did not specifically ask for capital outlays, which BJS did.

Pew uses a different index to adjust historical state spending for inflation. Data for fiscal 2007 to 2010 were converted to 2011 dollars using the Implicit Price Deflator for Gross Domestic Product included in the Bureau of Economic Analysis' National Income and Product Accounts. The BJS used the State and Local Consumption Expenditures and Gross Investment price index also included in the National Income and Product Accounts.

## Age demographic survey

Pew partnered with the Association of State Correctional Administrators to survey its members regarding the share of their inmates age 55 and older. Survey respondents were asked to submit the percentage of pretrial and sentenced inmates age 55 or older under the custody of state departments of corrections in adult correctional institutions and private prisons for fiscal 2007 through 2011. Inmates in the custody of local jails were excluded unless the corrections system in the state is a combined jail-prison system (sometimes called a "unified" system).

# Appendix B: State data notes

**Alabama:** Correctional health care costs exclude the cost of health care administration.

**California:** Correctional health care costs exclude the cost of inpatient psychiatric care, which is provided by the California Department of State Hospitals.

**Colorado:** Most correctional health care costs for inmates in private prisons are provided by the state corrections department. A small portion of health care costs for inmates in private prisons, such as expenses for basic care, are provided by the private prison but are excluded from the state total because this amount could not be obtained by the state.

**Idaho:** Correctional health care costs exclude a portion of the cost of substance abuse and mental health services.

**Iowa:** Correctional health care costs exclude the cost of hospitalization, which is provided by the University of Iowa Hospitals and Clinics.

**Kansas:** Official state reports of correctional health care exclude the cost of substance abuse treatment services. The state' total correctional health care costs, excluding substance abuse, are: $42,527,240 (2007), $44,409,217 (2008), $46,027,669 (2009), $46,350,047 (2010), and $46,384,321 (2011).

**Massachusetts:** Correctional health care costs include those for substance abuse treatment for detoxification and maintenance medications, but exclude the cost of counseling services.

**Michigan:** Correctional health care costs include the cost of substance abuse treatment, which is not included in the state's official reports of correctional health care costs.

**New York:** Correctional health care costs exclude mental health services provided by the New York State Office of Mental Health.

**North Carolina:** Correctional health care costs exclude those of health care administration because they are comingled with the administrative expenses of all other agencies.

# Appendix C: State prison health care spending and population data

Table C.1

## Total correctional health care spending (thousands)

| State | 2007 | 2008 | 2009 | 2010 | 2011 | Real change in spending, 2007-11 | Real spending peaked before 2011 |
|---|---|---|---|---|---|---|---|
| United States | $6,798,873 | $7,722,955 | $8,204,873 | $7,847,256 | $7,679,772 | 13% | Yes |
| Alabama | $89,057 | $92,465 | $94,206 | $96,215 | $97,266 | 9% | No |
| Alaska | $31,108 | $32,014 | $33,424 | $43,050 | $38,963 | 25% | Yes |
| Arizona | $138,223 | $158,454 | $161,691 | $138,273 | $129,627 | -6% | Yes |
| Arkansas | $57,741 | $58,325 | $60,136 | $65,268 | $66,888 | 16% | No |
| California | $1,688,342 | $2,277,690 | $2,577,835 | $2,218,926 | $2,137,045 | 27% | Yes |
| Colorado | $85,725 | $93,611 | $98,457 | $99,331 | $102,355 | 19% | No |
| Connecticut | $108,414 | $115,581 | $111,361 | $101,652 | $97,774 | -10% | Yes |
| Delaware | $34,987 | $45,213 | $46,983 | $45,315 | $46,094 | 32% | Yes |
| Florida | $409,646 | $443,595 | $416,244 | $427,795 | $424,592 | 4% | Yes |
| Georgia | $206,094 | $229,106 | $215,069 | $207,282 | $208,103 | 1% | Yes |
| Hawaii | $23,573 | $24,350 | $26,335 | $22,569 | $23,934 | 2% | Yes |
| Idaho | $21,515 | $24,034 | $25,086 | $25,542 | $25,232 | 17% | Yes |
| Illinois | $133,878 | $139,612 | $145,458 | $145,983 | $144,039 | 8% | Yes |
| Indiana | $80,289 | $84,838 | $90,561 | $93,894 | $103,396 | 29% | No |
| Iowa | $32,365 | $38,013 | $39,681 | $37,429 | $38,001 | 17% | Yes |
| Kansas | $46,144 | $47,590 | $48,618 | $48,004 | $46,738 | 1% | Yes |
| Kentucky | $49,933 | $59,279 | $61,226 | $65,587 | $62,972 | 26% | Yes |
| Louisiana | $69,459 | $78,186 | $83,605 | $78,602 | $73,362 | 6% | Yes |
| Maine | $14,676 | $14,195 | $14,939 | $15,798 | $17,049 | 16% | No |
| Maryland | $142,071 | $121,166 | $130,873 | $145,852 | $147,856 | 4% | No |
| Massachusetts | $81,567 | $100,606 | $102,357 | $96,261 | $95,348 | 17% | Yes |
| Michigan | $335,525 | $340,223 | $352,120 | $343,538 | $330,400 | -2% | Yes |
| Minnesota | $51,950 | $55,350 | $59,778 | $61,509 | $63,880 | 23% | No |
| Mississippi | $57,775 | $66,743 | $66,262 | $69,299 | $64,575 | 12% | Yes |
| Missouri | $110,545 | $127,086 | $132,805 | $138,756 | $142,988 | 29% | No |
| Montana | $19,721 | $26,883 | $27,315 | $28,866 | $29,284 | 48% | No |
| Nebraska | $27,709 | $28,620 | $29,453 | $31,498 | $32,363 | 17% | No |
| Nevada | $43,016 | $44,411 | $49,782 | $48,539 | $46,593 | 8% | Yes |
| New Hampshire | $19,586 | $26,884 | $24,913 | $24,817 | $23,564 | 20% | Yes |

*Continued on next page*

| State | 2007 | 2008 | 2009 | 2010 | 2011 | Real change in spending, 2007-11 | Real spending peaked before 2011 |
|-------|------|------|------|------|------|-------|-------|
| New Jersey | $158,019 | $159,238 | $150,122 | $151,170 | $141,752 | -10% | Yes |
| New Mexico | $41,036 | $52,418 | $53,533 | $55,391 | $48,790 | 19% | Yes |
| New York | $363,460 | $377,928 | $386,396 | $372,454 | $360,567 | -1% | Yes |
| North Carolina | $233,169 | $253,454 | $276,005 | $274,532 | $255,125 | 9% | Yes |
| North Dakota | $5,248 | $5,555 | $6,514 | $6,681 | $6,350 | 21% | Yes |
| Ohio | $287,087 | $281,926 | $303,040 | $301,032 | $279,716 | -3% | Yes |
| Oklahoma | $73,293 | $73,545 | $68,002 | $64,353 | $62,692 | -14% | Yes |
| Oregon | $80,778 | $82,648 | $100,872 | $93,662 | $103,836 | 29% | No |
| Pennsylvania | $218,758 | $231,421 | $241,122 | $254,647 | $262,024 | 20% | No |
| Rhode Island | $22,038 | $22,633 | $22,155 | $19,819 | $19,364 | -12% | Yes |
| South Carolina | $68,633 | $69,213 | $75,944 | $71,705 | $68,520 | 0% | Yes |
| South Dakota | $16,467 | $16,738 | $17,536 | $18,054 | $17,487 | 6% | Yes |
| Tennessee | $77,488 | $82,744 | $88,599 | $90,985 | $95,090 | 23% | No |
| Texas | $464,354 | $505,633 | $555,101 | $583,760 | $581,555 | 25% | Yes |
| Utah | $25,968 | $28,481 | $31,571 | $30,094 | $29,529 | 14% | Yes |
| Vermont | $16,340 | $16,175 | $17,279 | $18,064 | $18,077 | 11% | No |
| Virginia | $130,003 | $142,427 | $143,099 | $149,298 | $149,850 | 15% | No |
| Washington | $117,865 | $140,581 | $143,222 | $128,503 | $119,253 | 1% | Yes |
| West Virginia | $21,291 | $20,669 | $25,074 | $24,931 | $23,150 | 9% | Yes |
| Wisconsin | $151,546 | $148,519 | $156,868 | $153,093 | $156,060 | 3% | Yes |
| Wyoming | $15,397 | $16,888 | $16,243 | $19,582 | $20,707 | 34% | No |

Note: All spending figures are in 2011 dollars. Nominal spending data for fiscal 2007–10 were converted to 2011 dollars using the Implicit Price Deflator for Gross Domestic Product included in the Bureau of Economic Analysis' National Income and Product Accounts.

© 2014 The Pew Charitable Trusts

## Table C.2
## Average daily prison population

| State | 2007 | 2008 | 2009 | 2010 | 2011 | Change in average daily population, 2007-11 | Average daily population peaked before 2011 |
|---|---|---|---|---|---|---|---|
| United States | 1,265,239 | 1,268,096 | 1,278,759 | 1,271,416 | 1,270,036 | 0% | Yes |
| Alabama | 28,760 | 25,523 | 26,179 | 25,841 | 25,806 | -10% | Yes |
| Alaska | 3,492 | 3,707 | 3,534 | 3,753 | 3,835 | 10% | No |
| Arizona | 33,856 | 34,658 | 35,649 | 36,394 | 39,764 | 17% | No |
| Arkansas | 13,762 | 14,402 | 14,529 | 15,136 | 16,057 | 17% | No |
| California | 165,406 | 154,483 | 157,219 | 152,799 | 147,438 | -11% | Yes |
| Colorado | 21,479 | 22,138 | 22,551 | 22,254 | 22,011 | 2% | Yes |
| Connecticut | 19,965 | 20,633 | 19,662 | 19,264 | 18,762 | -6% | Yes |
| Delaware | 7,086 | 7,171 | 7,048 | 6,764 | 6,605 | -7% | Yes |
| Florida | 83,965 | 87,035 | 90,417 | 91,574 | 90,927 | 8% | Yes |
| Georgia | 53,864 | 54,629 | 54,767 | 53,704 | 51,794 | -4% | Yes |
| Hawaii | 5,638 | 5,520 | 5,461 | 5,258 | 5,303 | -6% | Yes |
| Idaho | 4,737 | 4,861 | 4,919 | 5,000 | 5,159 | 9% | No |
| Illinois | 44,049 | 43,992 | 44,310 | 44,742 | 47,212 | 7% | No |
| Indiana | 23,999 | 24,903 | 26,017 | 26,417 | 26,800 | 12% | No |
| Iowa | 8,856 | 8,765 | 8,712 | 8,384 | 8,816 | 0% | Yes |
| Kansas | 8,770 | 8,651 | 8,473 | 8,575 | 8,914 | 2% | No |
| Kentucky | 12,154 | 12,205 | 12,101 | 12,234 | 11,684 | -4% | Yes |
| Louisiana | 16,147 | 16,205 | 16,586 | 15,849 | 15,742 | -3% | Yes |
| Maine | 2,060 | 2,149 | 2,177 | 2,167 | 2,124 | 3% | Yes |
| Maryland | 22,532 | 22,943 | 22,778 | 21,786 | 22,155 | -2% | Yes |
| Massachusetts | 10,837 | 11,181 | 11,325 | 11,267 | 11,315 | 4% | Yes |
| Michigan | 51,397 | 50,577 | 48,435 | 45,652 | 44,262 | -14% | Yes |
| Minnesota | 7,655 | 7,720 | 8,230 | 9,024 | 9,209 | 20% | No |
| Mississippi | 19,824 | 20,553 | 20,788 | 19,812 | 19,305 | -3% | Yes |
| Missouri | 30,053 | 29,988 | 30,255 | 30,447 | 30,595 | 2% | No |
| Montana | 3,193 | 3,199 | 3,309 | 3,408 | 3,464 | 8% | No |
| Nebraska | 4,385 | 4,387 | 4,400 | 4,462 | 4,552 | 4% | No |
| Nevada | 12,813 | 12,992 | 12,818 | 12,529 | 12,466 | -3% | Yes |
| New Hampshire | 2,467 | 2,481 | 2,490 | 2,445 | 2,312 | -6% | Yes |
| New Jersey | 27,238 | 26,787 | 25,923 | 24,928 | 24,316 | -11% | Yes |
| New Mexico | 6,672 | 6,459 | 6,363 | 6,671 | 6,669 | 0% | Yes |

*Continued on next page*

| State | 2007 | 2008 | 2009 | 2010 | 2011 | Change in average daily population, 2007-11 | Average daily population peaked before 2011 |
|-------|------|------|------|------|------|---------------------------------------------|---------------------------------------------|
| New York | 63,728 | 63,538 | 61,457 | 59,237 | 57,054 | -10% | Yes |
| North Carolina | 37,886 | 38,684 | 40,108 | 40,426 | 40,581 | 7% | No |
| North Dakota | 1,153 | 1,162 | 1,180 | 1,198 | 1,221 | 6% | No |
| Ohio | 46,187 | 47,683 | 48,726 | 48,796 | 48,602 | 5% | Yes |
| Oklahoma | 23,867 | 24,309 | 24,391 | 24,549 | 24,511 | 3% | Yes |
| Oregon | 13,264 | 13,766 | 13,620 | 13,819 | 14,116 | 6% | No |
| Pennsylvania | 42,998 | 46,028 | 50,622 | 53,416 | 55,696 | 30% | No |
| Rhode Island | 3,771 | 3,860 | 3,773 | 3,502 | 3,273 | -13% | Yes |
| South Carolina | 23,437 | 23,958 | 24,081 | 24,105 | 23,358 | 0% | Yes |
| South Dakota | 3,412 | 3,373 | 3,428 | 3,496 | 3,479 | 2% | Yes |
| Tennessee | 14,035 | 14,095 | 14,103 | 14,640 | 14,885 | 6% | No |
| Texas | 151,814 | 151,713 | 150,570 | 151,227 | 152,841 | 1% | No |
| Utah | 6,300 | 6,389 | 6,321 | 6,338 | 6,700 | 6% | No |
| Vermont | 1,619 | 1,545 | 1,552 | 1,555 | 1,537 | -5% | Yes |
| Virginia | 30,286 | 32,060 | 32,078 | 30,337 | 30,772 | 2% | Yes |
| Washington | 16,108 | 16,280 | 16,564 | 16,995 | 16,997 | 6% | No |
| West Virginia | 4,448 | 4,917 | 4,940 | 5,052 | 5,093 | 15% | No |
| Wisconsin | 22,500 | 22,627 | 22,294 | 22,325 | 22,042 | -2% | Yes |
| Wyoming | 1,315 | 1,212 | 1,526 | 1,864 | 1,905 | 45% | No |

© 2014 The Pew Charitable Trusts

## Table C.3
# Per-inmate correctional health care spending

| State | 2007 | 2008 | 2009 | 2010 | 2011 | Real change in spending, 2007-11 | Real per-inmate spending peaked before 2011 |
|---|---|---|---|---|---|---|---|
| United States | $5,374 | $6,090 | $6,416 | $6,172 | $6,047 | 13% | Yes |
| Alabama | $3,097 | $3,623 | $3,599 | $3,723 | $3,769 | 22% | No |
| Alaska | $8,908 | $8,636 | $9,458 | $11,471 | $10,160 | 14% | Yes |
| Arizona | $4,083 | $4,572 | $4,536 | $3,799 | $3,260 | -20% | Yes |
| Arkansas | $4,196 | $4,050 | $4,139 | $4,312 | $4,166 | -1% | Yes |
| California | $10,207 | $14,744 | $16,396 | $14,522 | $14,495 | 42% | Yes |
| Colorado | $3,991 | $4,229 | $4,366 | $4,464 | $4,650 | 17% | No |
| Connecticut | $5,430 | $5,602 | $5,664 | $5,277 | $5,211 | -4% | Yes |
| Delaware | $4,938 | $6,305 | $6,666 | $6,699 | $6,979 | 41% | No |
| Florida | $4,879 | $5,097 | $4,604 | $4,672 | $4,670 | -4% | Yes |
| Georgia | $3,826 | $4,194 | $3,927 | $3,860 | $4,018 | 5% | Yes |
| Hawaii | $4,181 | $4,411 | $4,822 | $4,292 | $4,513 | 8% | Yes |
| Idaho | $4,542 | $4,944 | $5,100 | $5,108 | $4,891 | 8% | Yes |
| Illinois | $3,039 | $3,174 | $3,283 | $3,263 | $3,051 | 0% | Yes |
| Indiana | $3,345 | $3,407 | $3,481 | $3,554 | $3,858 | 15% | No |
| Iowa | $3,655 | $4,337 | $4,555 | $4,464 | $4,310 | 18% | Yes |
| Kansas | $5,262 | $5,501 | $5,738 | $5,598 | $5,243 | 0% | Yes |
| Kentucky | $4,108 | $4,857 | $5,060 | $5,361 | $5,390 | 31% | No |
| Louisiana | $4,302 | $4,825 | $5,041 | $4,959 | $4,660 | 8% | Yes |
| Maine | $7,124 | $6,605 | $6,862 | $7,290 | $8,027 | 13% | No |
| Maryland | $6,305 | $5,281 | $5,746 | $6,695 | $6,674 | 6% | Yes |
| Massachusetts | $7,527 | $8,998 | $9,038 | $8,544 | $8,427 | 12% | Yes |
| Michigan | $6,528 | $6,727 | $7,270 | $7,525 | $7,465 | 14% | Yes |
| Minnesota | $6,786 | $7,170 | $7,263 | $6,816 | $6,937 | 2% | Yes |
| Mississippi | $2,914 | $3,247 | $3,188 | $3,498 | $3,345 | 15% | Yes |
| Missouri | $3,678 | $4,238 | $4,390 | $4,557 | $4,674 | 27% | No |
| Montana | $6,176 | $8,404 | $8,255 | $8,470 | $8,454 | 37% | Yes |
| Nebraska | $6,319 | $6,524 | $6,694 | $7,059 | $7,110 | 13% | No |
| Nevada | $3,357 | $3,418 | $3,884 | $3,874 | $3,738 | 11% | Yes |
| New Hampshire | $7,941 | $10,836 | $10,004 | $10,150 | $10,191 | 28% | Yes |
| New Jersey | $5,801 | $5,945 | $5,791 | $6,064 | $5,830 | 0% | Yes |
| New Mexico | $6,150 | $8,115 | $8,413 | $8,303 | $7,316 | 19% | Yes |

*Continued on next page*

| State | 2007 | 2008 | 2009 | 2010 | 2011 | Real change in spending, 2007-11 | Real per-inmate spending peaked before 2011 |
|---|---|---|---|---|---|---|---|
| New York | $5,703 | $5,948 | $6,287 | $6,288 | $6,320 | 11% | No |
| North Carolina | $6,154 | $6,552 | $6,882 | $6,791 | $6,287 | 2% | Yes |
| North Dakota | $4,552 | $4,781 | $5,520 | $5,577 | $5,201 | 14% | Yes |
| Ohio | $6,216 | $5,913 | $6,219 | $6,169 | $5,755 | -7% | Yes |
| Oklahoma | $3,071 | $3,025 | $2,788 | $2,621 | $2,558 | -17% | Yes |
| Oregon | $6,090 | $6,004 | $7,406 | $6,778 | $7,356 | 21% | Yes |
| Pennsylvania | $5,088 | $5,028 | $4,763 | $4,767 | $4,705 | -8% | Yes |
| Rhode Island | $5,844 | $5,864 | $5,872 | $5,659 | $5,916 | 1% | No |
| South Carolina | $2,928 | $2,889 | $3,154 | $2,975 | $2,933 | 0% | Yes |
| South Dakota | $4,826 | $4,962 | $5,116 | $5,164 | $5,026 | 4% | Yes |
| Tennessee | $5,521 | $5,870 | $6,282 | $6,215 | $6,388 | 16% | No |
| Texas | $3,059 | $3,333 | $3,687 | $3,860 | $3,805 | 24% | Yes |
| Utah | $4,122 | $4,458 | $4,995 | $4,748 | $4,407 | 7% | Yes |
| Vermont | $10,092 | $10,469 | $11,133 | $11,616 | $11,761 | 17% | No |
| Virginia | $4,293 | $4,443 | $4,461 | $4,921 | $4,870 | 13% | Yes |
| Washington | $7,317 | $8,635 | $8,646 | $7,561 | $7,016 | -4% | Yes |
| West Virginia | $4,787 | $4,204 | $5,076 | $4,935 | $4,545 | -5% | Yes |
| Wisconsin | $6,735 | $6,564 | $7,036 | $6,858 | $7,080 | 5% | No |
| Wyoming | $11,709 | $13,934 | $10,644 | $10,505 | $10,870 | -7% | Yes |

Note: All spending figures are in 2011 dollars. Nominal spending data for fiscal 2007–10 were converted to 2011 dollars using the Implicit Price Deflator for Gross Domestic Product included in the Bureau of Economic Analysis' National Income and Product Accounts.

© 2014 The Pew Charitable Trusts

Table C.4
## Percentage of inmates age 55 and older

| State | 2007 | 2008 | 2009 | 2010 | 2011 | 2007-11 average | Percentage change, 2007-11 |
|-------|------|------|------|------|------|-----------------|----------------------------|
| 42-state average | 6.24% | 6.63% | 7.12% | 7.55% | 8.21% | 7.15% | 33% |
| Alabama | 6.30% | 6.70% | 6.70% | 7.20% | 7.90% | 6.96% | 25% |
| Arizona | 5.00% | 5.20% | 5.70% | 6.30% | 6.80% | 5.80% | 36% |
| Arkansas | 5.80% | 6.50% | 7.40% | 7.60% | 8.20% | 7.10% | 41% |
| California | 5.70% | 6.40% | 7.10% | 7.90% | 8.80% | 7.18% | 54% |
| Colorado | 5.30% | 5.70% | 6.30% | 7.00% | 7.70% | 6.40% | 45% |
| Connecticut | 3.29% | 3.56% | 3.99% | 4.52% | 4.76% | 4.02% | 45% |
| Delaware | 4.83% | 5.07% | 5.59% | 6.16% | 7.07% | 5.74% | 46% |
| Florida | 7.00% | 7.00% | 7.00% | 8.00% | 9.00% | 7.60% | 29% |
| Georgia | 6.30% | 6.76% | 6.93% | 7.50% | 7.91% | 7.08% | 26% |
| Hawaii | 6.00% | 6.04% | 6.04% | 6.06% | 5.96% | 6.02% | -1% |
| Idaho | N/A | 5.40% | 5.80% | 6.20% | 6.50% | 5.98% | 20% |
| Illinois | 8.00% | 8.00% | 9.00% | 9.00% | 10.00% | 8.80% | 25% |
| Indiana | 4.32% | 4.75% | 4.89% | 5.18% | 5.61% | 4.95% | 30% |
| Iowa | 5.30% | 6.30% | 6.80% | 7.10% | 7.50% | 6.60% | 42% |
| Kansas | 5.80% | 6.60% | 6.70% | 7.10% | 8.20% | 6.88% | 41% |
| Kentucky | 5.27% | 5.54% | 5.80% | 6.38% | 6.28% | 5.85% | 19% |
| Louisiana | 5.61% | 6.03% | 6.77% | 7.21% | 7.96% | 6.72% | 42% |
| Maine | 6.57% | 7.56% | 8.69% | 8.43% | 8.95% | 8.04% | 36% |
| Maryland | 5.00% | 4.50% | 5.00% | 6.00% | 7.00% | 5.50% | 40% |
| Massachusetts | 8.48% | 8.76% | 9.42% | 9.93% | 10.41% | 9.40% | 23% |
| Michigan | 7.00% | 8.00% | 8.00% | 8.00% | 9.00% | 8.00% | 29% |
| Minnesota | 4.40% | 5.00% | 5.20% | 5.20% | 5.70% | 5.10% | 30% |
| Mississippi | 6.00% | 5.00% | 5.00% | 6.00% | 6.00% | 5.60% | 0% |
| Missouri | 5.93% | 6.66% | 7.16% | 6.78% | 7.54% | 6.81% | 27% |
| Montana | 9.00% | 9.50% | 10.20% | 11.20% | 12.70% | 10.52% | 41% |
| New Jersey | 4.15% | 4.59% | 5.00% | 5.45% | 5.81% | 5.00% | 40% |
| New Mexico | 6.10% | 6.60% | 7.30% | 7.20% | 8.00% | 7.04% | 31% |
| North Carolina | 5.26% | 5.60% | 6.06% | 6.38% | 6.99% | 6.06% | 33% |
| Ohio | 5.86% | 6.26% | 6.53% | 6.80% | 7.48% | 6.59% | 28% |
| Oklahoma | 6.60% | 7.00% | 7.30% | 8.10% | 8.80% | 7.56% | 33% |
| Oregon | 10.67% | 11.80% | 12.69% | 12.82% | 13.83% | 12.36% | 30% |
| Pennsylvania | 7.30% | 7.40% | 7.70% | 8.30% | 8.90% | 7.92% | 22% |
| Rhode Island | 5.10% | 5.60% | 6.20% | 6.30% | 6.70% | 5.98% | 31% |

*Continued on next page*

| State | 2007 | 2008 | 2009 | 2010 | 2011 | 2007-11 average | Percentage change, 2007-11 |
|---|---|---|---|---|---|---|---|
| South Carolina | 4.80% | 5.10% | 5.80% | 6.40% | 7.00% | 5.82% | 46% |
| South Dakota | 6.00% | 6.00% | 7.00% | 7.00% | 8.00% | 6.80% | 33% |
| Tennessee | 6.34% | 6.95% | 7.61% | 7.86% | 8.25% | 7.40% | 30% |
| Texas | 6.60% | 7.00% | 7.60% | 8.10% | 8.70% | 7.60% | 32% |
| Vermont | 10.10% | 10.40% | 12.30% | 12.90% | 13.70% | 11.88% | 36% |
| Virginia | 6.10% | 6.50% | 7.10% | 8.00% | 8.60% | 7.26% | 41% |
| West Virginia | 9.30% | 10.90% | 11.10% | 11.60% | 13.20% | 11.22% | 42% |
| Wisconsin | 5.20% | 5.70% | 6.10% | 6.80% | 7.50% | 6.26% | 44% |
| Wyoming | 8.00% | 8.50% | 8.30% | 9.30% | 9.90% | 8.80% | 24% |

Note: Prison population age data for Idaho were not available for fiscal 2007; the average is from 2008–11. Data were not available for any years in 8 states: Alaska, Nebraska, New Hampshire, Nevada, New York, North Dakota, Utah, and Washington.

Source: Pew survey; Association of State Correctional Administrators

© 2014 The Pew Charitable Trusts

# Endnotes

1   William J. Rold, "Thirty Years After Estelle v. Gamble: A Legal Retrospective," *Journal of Correctional Health Care* 14, no. 1 (2008): 11–20, doi:10.1177/1078345807309616.

2   Steve Aos, Marna Miller, and Elizabeth Drake, "Evidence-Based Adult Corrections Programs: What Works and What Does Not," Washington State Institute for Public Policy (2006), http://www.wsipp.wa.gov/rptfiles/06-01-1201.pdf; Elizabeth Maier, Peter Wicklund, and Max Schlueter, "Evidence-Based Initiatives to Reduce Recidivism," Vermont Center for Justice Research (December 2011), http://66.147.244.94/~vcjrorg/reports/reportscrimjust/reports/ebiredrecid_files/DOCRR%20LitRev%20Report.pdf; Fred Osher et al., "Adults With Behavioral Health Needs Under Correctional Supervision: A Shared Framework for Reducing Recidivism and Promoting Recovery," Council of State Governments Justice Center (2012), http://www.asca.net/system/assets/attachments/4908/9.27.12_Behavioral_Framework_v6_full.pdf?1348755628; David Mancuso and Barbara E.M. Felver, "Providing Chemical Dependency Treatment to Low-Income Adults Results in Significant Public Safety Benefits," Washington State Department of Social and Health Services Research and Data Analysis Division (February 2009), http://www.dshs.wa.gov/pdf/ms/rda/research/11/140.pdf; and Melissa Ford Shah et al., "The Persistent Benefits of Providing Chemical Dependency Treatment to Low-Income Adults," Washington State Department of Social and Health Services Research and Data Analysis Division (November 2009), http://www.dshs.wa.gov/pdf/ms/rda/research/4/79.pdf.

3   Cyrus Ahalt et al., "Paying the Price: The Pressing Need for Quality, Cost, and Outcomes Data to Improve Correctional Health Care for Older Prisoners," *Journal of the American Geriatrics Society* 61, no. 11 (2013): 2013–9, doi:10.1111/jgs.12510.

4   The Pew Charitable Trusts interview with Martha Roof, deputy director of administration, South Carolina Department of Corrections, March 4, 2014.

5   The Pew Charitable Trusts interview with Bob Mullen, director of administration, New Hampshire Department of Corrections, February 7, 2014.

6   The Pew Charitable Trusts, *Managing Prison Health Care Spending*, (October 2013), http://www.pewtrusts.org/~/media/Imported-and-Legacy/uploadedfiles/pcs_assets/2014/PCTCorrectionsHealthcareBrief050814pdf.pdf.

7   Paige M. Harrison and Allen J. Beck, "Prisoners in 2001," Bureau of Justice Statistics (July 2002), http://bjsdata.ojp.usdoj.gov/content/pub/pdf/p01.pdf; William Sabol, Heather C. West, and Matthew Cooper, "Prisoners in 2008," Bureau of Justice Statistics (June 2010), http://www.bjs.gov/content/pub/pdf/p08.pdf.

8   The Pew Charitable Trusts, "One in 100: Behind Bars in America 2008" (February 2008), http://www.pewtrusts.org/~/media/Imported-and-Legacy/uploadedfiles/wwwpewtrustsorg/reports/sentencing_and_corrections/onein100pdf.pdf. After decades of growth, the U.S. prison population declined in 2010, 2011, and 2012, according to the U.S. Justice Department.

9   The Pew Charitable Trusts, "Time Served: The High Cost, Low Return of Longer Prison Terms" (June 2012), http://www.pewtrusts.org/en/research-and-analysis/reports/0001/01/01/time-served.

10  E. Ann Carson and Daniela Golinelli, "Prisoners in 2012: Trends in Admissions and Releases, 1991-2012," Bureau of Justice Statistics (December 2013), http://www.bjs.gov/content/pub/pdf/p12tar9112.pdf.

11  Aaron Edwards and Brian Brown, "Providing Constitutional and Cost-effective Inmate Medical Care," California Legislative Analyst's Office (April 2012), http://www.lao.ca.gov/reports/2012/crim/inmate-medical-care/inmate-medical-care-041912.pdf.

12  Henry J. Steadman et al., "Prevalence of Serious Mental Illness Among Jail Inmates," *Psychiatric Services* 60, no. 6 (2009): 761–5, http://ps.psychiatryonline.org/data/Journals/PSS/3881/09ps761.pdf; Barbara DiPietro, "Frequently Asked Questions: Implications of the Federal Legislation on Justice-involved Populations," Council of State Governments Justice Center (2011), http://www.asca.net/system/assets/attachments/2683/FAQs_Federal_Health_Legislation_on_Justice_Involved_Populations_REV.pdf?1301593564.

13  The National Center on Addiction and Substance Abuse at Columbia University, "Behind Bars II: Substance Abuse and America's Prison Population" (February 2010), http://www.casacolumbia.org/addiction-research/reports/substance-abuse-prison-system-2010.

14  Anne C. Spaulding et al., "Impact of New Therapeutics for Hepatitis C Virus Infection in Incarcerated Populations," *Topics in Antiviral Medicine* 21, no. 1 (2013): 27–35, http://www.iasusa.org/sites/default/files/tam/21-1-27.pdf.

15  Gregory L. Armstrong et al., "The Prevalence of Hepatitis C Virus Infection in the United States, 1999 Through 2002," *Annals of Internal Medicine* 144 (2006): 705–14, http://natap.org/2010/HCV/NHANESHCV.pdf.

16  The National Center on Addiction and Substance Abuse at Columbia University, "Behind Bars II."

17  U.S. Food and Drug Administration, "FDA Approves Sovaldi for Chronic Hepatitis C" (December 2013), http://www.fda.gov/newsevents/newsroom/pressannouncements/ucm377888.htm; Kerry Young, "Costly Pills Put Financial Burden on Health Systems," *CQ Roll Call*, Jan. 13, 2014, http://www.rollcall.com/news/costly_pills_put_financial_burden_on_health_systems-230117-1.html.

18  Harrison and Beck, "Prisoners in 2001," Table 15. Number of Sentenced Prisoners Under State or Federal Jurisdiction, by Gender, Race, Hispanic Origin, and Age, 2001. Data for 2012 were generated using the Bureau of Justice Statistics' Corrections Statistical Analysis Tool.

19   The Pew Charitable Trusts, *Managing Prison Health Care Spending*.

20   Tina Chiu, "It's About Time: Aging Prisoners, Increasing Costs, and Geriatric Release," Vera Institute of Justice (April 2010), http://www.vera.org/sites/default/files/resources/downloads/Its-about-time-aging-prisoners-increasing-costs-and-geriatric-release.pdf.

21   B. Jaye Anno et al., *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, National Institute of Corrections (February 2004), http://static.nicic.gov/Library/018735.pdf.

22   Ahalt et al., "Paying the Price."

23   Tracey Kyckelhahn, "State Corrections Expenditures, FY 1982-2010," Bureau of Justice Statistics (April 2014), http://www.bjs.gov/content/pub/pdf/scefy8210.pdf.

24   U.S. Census Bureau, "State Government Finances," http://www.census.gov/govs/state/, accessed May 19, 2014.



**Cover photos:**
**1.** iStockphoto   **2.** Getty Images   **3.** Josef Kubes, Thinkstock   **4.** PhotoAlto via Getty Images





macfound.org

pewtrusts.org

# EXHIBIT 2



# John Howard Association of Illinois

375 East Chicago Avenue, Suite 529  Chicago, IL 60611
Tel. 312-503-6300 Fax. 312-503-6306 www.thejha.org

# Executive Summary:
# Monitoring Visit to Hill Correctional Center
# 5/31/2011

On May 31, 2011, John Howard Association (JHA) visited Hill Correctional Center (Hill), a Level 2 Secure Medium adult male facility. Hill is located in northwest Illinois in the city of Galesburg, about three and a half hours away from Chicago and two hours away from Springfield.



**Vital Statistics:**

Population: 1,830
Rated Capacity: 896
Operational Capacity: 1,866
Average Annual Cost Per Inmate: $16,321
Average Length of Stay: 10 months, 28 days
Average Age: 35
*(Source: IDOC 5/31/2011)*

**Key Observations:**

- Shortages in security staff raise safety concerns. Medical and correctional staff members indicate that inadequate security presence has created heightened pressure and instability for inmates and staff alike, and increased opportunities for violence. The Department of Corrections quarterly report of April 1, 2011, confirms that ratio of inmates to security staff at Hill is higher than at other Level 2 Secure Medium facilities in the state.

- Hill operates a successful on-site industries program that employs 76 inmates in processing milk, juice, and meat for use in correctional facilities across Illinois. Hill's industries allow inmates to earn a wage, increase their self-sufficiency and obtain essential work skills for reentry, while minimizing costs to the State.

- Hill, in line with other Illinois facilities, charges inmates in excess of the 25 percent markup that is authorized by statute for some of its commissary items.

- The racial makeup of Hill's population is 62 percent African-American; 20 percent White; 17 percent Hispanic; less than 1 percent Asian; and less than 1 percent American Indian. The majority of Hill inmates were convicted in Cook County.

# Monitoring Visit to Hill
# Correctional Center
# 5/31/2011

John Howard Association (JHA) visited Hill Correctional Center (Hill) on May 31, 2011. Hill is designated a Level 2 Secure Medium Adult Male facility, and is located in north central Illinois in the city of Galesburg, about three and a half hours away from Chicago and two hours from Springfield .[1] The facility sits on 71 acres of land, 38 acres within the security fences, and has a total of 29 buildings. It includes four housing units, one orientation/receiving unit, one segregation unit, an infirmary unit, and two main recreational yards.

When Hill first opened in 1986, it was intended to help alleviate overcrowded conditions in other facilities. Today, Hill faces serious overcrowding of its own. Originally designed to house 896 adult male inmates, on the day of JHA's visit Hill housed 1830. Like many Illinois prisons, Hill's greatest challenges include overcrowding, coupled with lack of staffing, equipment and funding needed to manage the ever-increasing population and provide essential services and rehabilitation opportunities.

The overall picture that emerged from JHA's visit was of a comparatively well-functioning facility that regrettably is being pushed to the brink and far beyond its limits by lack of resources. Despite the aspirations of administration and staff to critically assess and make improvements at Hill, the blunt reality is that the Illinois Legislature and Governor created the underlying systemic problems of overpopulation, understaffing, and underfunding, and only they can fix these. Unfortunately, success invites failure in Illinois corrections, in that the more functional the facility, the more demands that are placed on it to accommodate greater and greater population - until the facility ultimately is rendered dysfunctional by overcrowding and inadequate resources. Absent decisive leadership by Illinois elected officials to address the issue of prison overcrowding, the judiciary inevitably will be left to address it through protracted and costly litigation.[2]

## Housing and Living Conditions

---

[1] Illinois correctional facilities are categorized according to security level designations as follows: Level 1-Maximum-Security; Level 2- Secure-Medium Security; Level 3- High-Medium Security; Level 4- Medium Security; Level 5- High-Minimum Security; Level 6-Minimum Security; Level 7- Low-Minimum Security; Level 8-Transitional Security.

[2] The U.S. Supreme Court's recent decision in *Brown v. Plata*, 131 S. Ct. 1910 (2011), in which the court upheld the lower court's order that California drastically reduce its prison population, perfectly illustrates this point. There, the court found this unprecedented remedy was the only way to address the "serious" and "uncorrected" violations of constitutional and human rights caused by overcrowding, where California's elected officials lacked the political will and courage to address the issue.

Inmates are assigned to housing units according to their vocational and educational assignments, as well as their medical needs. The Department of Corrections (DOC) also uses a screening process to ensure that inmates are suitable cellmates, taking into account aggression levels and other individual factors. However, overcrowding and limited space inevitably mean that inmates who are less than suitable cellmates sometimes are housed together. One Hill inmate convicted of a non-violent offense and serving a short sentence complained of being celled with an inmate who was convicted of a violent offense and serving 60 years. Another inmate, who was gay and currently housed in segregation, reported that he previously had been housed with a cellmate who was aggressively homophobic.

In the face of overcrowding, inmates who request relocation to another cell because they fear harm from a cellmate have no option other than to refuse housing, and be placed in segregation. Although these inmates have not committed wrongdoing, they are treated the same as inmates who are housed in segregation for disciplinary reasons; and, thus, are subject to the same suspension of privileges and punitive restrictions on visitation, property, movement, and recreation. This policy is alarming because of its obvious potential to discourage inmates from voicing safety concerns, so that staff may timely intercede to prevent violence before it occurs. Several inmates that JHA spoke with were understandably distraught that seeking help and voicing concerns for their personal safety would result in being punished with segregation.

With respect to living conditions, several inmates reported being extremely cold in the winter. Others reported not being provided with enough winter clothing to keep warm, unless lucky enough to obtain one of the limited inmate work assignments.

Living units are not air-conditioned. Inmates in the general population can buy individual fans to cool their cells. In addition, two new fans were recently installed in the units. In segregation cells, however, excessive heat is a concern. Unlike many facilities, inmates in segregation do have access to some outside airflow through a small, external window located in each cell. However, individual fans cannot be used in the segregation cells. In response to prior incidents of inmate tampering, power outlets in Hill's segregation cells were disconnected.

Responding to JHA's report, the administration indicated that it takes proactive steps in summer months to anticipate and address overheating in the summer by monitoring weather forecasts and temperatures in the living units. The administration reported that when high temperatures are forecasted, it issues directives to hand out ice to inmates twice a day; is careful to monitor temperatures in the segregation unit; limits the amount of time inmates spend in outside sports; and issues bulletins to inmates and staff to avoid overexertion in physical activities.

Inmates in both the general population and segregation are permitted to shop at the commissary two times a month. Access to the commissary is very important, as this gives inmates some ability to supplement their diets according to their needs and preferences,

as well as something to look forward to. Both inmates and staff expressed dissatisfaction with Hill's policy of prohibiting inmates from using hotpots. Despite the hotpot ban, numerous items sold in the commissary, such as chili packets, require heating. Allowing inmates to purchase these food items greatly increases the quality of life and inmate morale, which are critical to ensuring the safety of both correctional staff and inmates. However, as explained by one staff member, Hill's total ban on hotpots creates a Catch-22, in that inmates are enticed to tamper with power outlets and craft contraband devices to heat food; which in turn leads to inmates being disciplined and losing good-time sentencing credit; which in turn leads to inmates being imprisoned longer; which in turn perpetuates prison overcrowding.

A significant number of inmates, including some previously housed in other facilities, reported that Hill's commissary prices are exceptionally high. According to the administration, Hill's commissary profit margin is 17.61 percent and its commissary goods, on average, are marked up between 25 percent and 32 percent over the purchase price. Under the Illinois statutes, the selling price for non-tobacco goods in prison commissaries (which now constitute all commissary goods, since Illinois prisons went tobacco-free) is capped at the purchase price plus an additional markup of not more than 25 percent.[3] Several prior studies by the Illinois Procurement Policy Board (Board) indicate that overcharging for commissary goods, lack of competitive bidding among vendors for contracts, and wide disparities in pricing among facilities are ongoing problems in the DOC.[4] Despite the Board's prior recommendation that the DOC seek an advisory opinion from the Illinois Attorney General on whether it is legal to charge inmates commissary fees in excess of the 25 percent provided by statute, an opinion has not been obtained or issued.

## Medical Treatment

Hill has a 15-bed infirmary, including three private rooms with reverse air flow for the treatment of contagious patients. There is not a separate mental health unit. When JHA visited, there were ten inmates in the infirmary. The infirmary was clean and well-maintained.

Sick call and medication distribution are performed daily by nursing staff, who visit each housing unit accompanied by a security escort. Nursing positions are fully-staffed and nursing coverage is provided 24 hours a day, seven days a week. Inmates may request medical treatment by filing out a request form. Inmates are charged a $2 co-payment for medical appointments. This co-payment does not apply to scheduled follow-up visits or visits to treat ongoing chronic illness. However, inmates who seek a second appointment because their symptoms were not resolved by their initial treatment must pay another $2 co-payment. This policy, which is not unique to Hill, is troubling insofar as it unfairly

---

[3] *See* Section 3-7-2a of the Illinois Unified Code of Corrections, 730 ILCS 5/3-7-2a (2011).

[4] *See* State of Illinois Procurement Policy Board, *Department of Corrections Commissary Study*, April 1, 2011, *available at*: http://www2.illinois.gov/ppb/Documents/110511.Comm_Study_Final.pdf.

penalizes inmates with an additional charge where the reason for their return medical visit is misdiagnosis or ineffectual treatment.

Approximately 700 inmates are in chronic clinics, and 893 inmates are taking medication. An on-site dentist, dental hygienist, and pharmacy technician are employed full-time (each 40 hours per week). Telemedicine is also used. According to the administration, telemedicine has been particularly successful in treating inmates with Hepatitis C, as it affords these patients greater continuity of care and allows them the opportunity to consult with a Hepatitis C expert on a regular basis.

There is a 13-month backlog for dental care, and a one-year backlog for eye care. Of the inmates JHA spoke with, several reported not receiving their medications, and others of being denied medical care for an ongoing condition. To its credit, the administration was very responsive in following up on these reports, although patient confidentiality precluded providing JHA with specific information. Inmates who complained of being unable to receive treatment were scheduled for medical appointments. JHA subsequently learned that poor communication was the cause of the one inmate's complaint of not receiving medication, as he was not aware that his prior medication had been switched to a new medication by his healthcare provider. Lack of adequate communication between healthcare providers and inmates is a serious problem that JHA has found to be widespread in DOC.

The most frequent healthcare complaint among Hill inmates concerned the demeanor of some staff. More than a few inmates reported being humiliated, demeaned, and treated "like an animal" in a medical interaction. Most medical staff that JHA met presented as caring and supportive, and did not exhibit this temperament. However, some staff we met expressed open disdain for inmates' medical needs, were mocking and condescending in speaking of and to inmate-patients, and asserted that inmates' medical problems were largely fictitious. Significantly, several inmates refused to speak with JHA about their medical concerns until they were convinced that JHA had no affiliation with the medical unit.

The liability and potential harm to inmate welfare from entrusting medical care to hostile staff is self-evident. Further, the presence of such staff can only damage the morale, mindset, and effectiveness of the majority of healthcare workers who want to provide humane, professional, competent treatment to Hill inmates. In healthcare settings, communication breakdowns between patients and caregivers can have dire consequences, including misdiagnosis, drug treatment errors, increased patient anxiety, fear and pain, unnecessary or inappropriate treatment, and even death.[5] Further, patients with access to

---

[5] Notably, an eight-year study by the Joint Commission on Accreditation in Health Care Organizations (JCAHO) placed "communication" at the very top of the list of causes for "sentinel events" in a healthcare setting- *i.e.,* unexpected serious injury, death, or increased risk of the same. *See Sentinel Event Statistics: Root Causes of Sentinel Events (All Categories; 1995-2004)*, Joint Commission on Accreditation of Healthcare Organizations, at http:// www. jcaho.com.

communication and information have less pain, increased satisfaction with their care, feel more in control, and generally have better outcomes.[6]

It would be reductive and unfair, however, to simply lay blame on the personal or professional failings of providers. Healthcare providers are human, and those working in Illinois prisons operate under extraordinarily stressful conditions, with minimal staff, scarce treatment and medication options, few referral resources, limited space, aging equipment and huge patient populations, many from backgrounds of poverty, substance abuse, neglect, and untreated physical and mental illness. As recently recognized by the United States Supreme Court in *Brown v. Plata*, prison overcrowding and understaffing have created a medical culture of "cynicism, fear, and despair" for inmates and medical providers alike. Under the circumstances, it is hardly a surprise that communication breakdowns between healthcare providers and inmates are endemic in DOC.

Responding to JHA's report, the administration indicated that it considers the professionalism of all staff, particularly medical staff, to be very important and has disciplined staff in the past for failing to act professionally towards inmates. The administration also indicated that a substantial number of grievances had not been filed by inmates against the specific medical staff complained of to JHA. Finally, the administration countered the reports of misconduct with an illustrative instance in which one of the medical staff complained of took action to protect inmate welfare, by alerting the administration that precautions should be taken to protect an asthmatic inmate in the summer months. The administration nevertheless agreed that, if funding were available, providing all facility staff with increased training in communication and conflict avoidance skills could greatly enhance the facility's functioning.

## Mental Health Treatment

Hill employs a full-time psychologist (40 hours per week), and a part-time psychiatrist (8 to 9 hours per week). Telepsychiatry is also used one day a week. Approximately 14 percent of the population is receiving psychotropic medications. Staff reported that the number of inmates with mental health issues has greatly increased over the last decade - coinciding with the closing of state mental health institutions and elimination of funding for many mental health services. Whereas the portion of Hill's population with mental health issues used to hover around 3% to 4%, it is now over three times that amount.

Faced with this demand, Hill's psychologist and psychiatrist are burdened with heavy caseloads. The psychologist's caseload consists of roughly 300 inmates, with 600+ contacts per month. The psychiatrist's caseload consists of 207 inmates, with about 94 contacts per month. There currently is a three month backlog on mental health appointments. Substance abuse treatment is available to inmates through the psychologist.

---

[6] Beck, R. S., Daughtridge, R., Sloane, P. D., *Physician-Patient Communication in the Primary Care Office: A Systematic Review*, J Am Board Fam. Pract. 2002 15: 25-38.

There were 20 inmates receiving substance abuse treatment at the time of JHA's visit, and 20 inmates on the waitlist to receive treatment. An empathy skills program is also available to sex offenders one day a week. The group size for the empathy skills program is limited to five inmates at a time, between six and ten inmates regularly attend the program, and there is no waitlist. In addition, Hill offers one-hour programs in stress management, anger management and coping skills each week. These programs are held on separate days and group size for each is limited to ten inmates. There currently is a collective waitlist of approximately ten inmates for these programs.

In the preceding six months, 17 inmates completed the 12-week substance abuse program; 20 completed the six-week anger management program; and 17 completed a 12-week life skills program. In April 2011, 75 inmates nearing their out dates also attended the reentry summit, which occurs bi-annually and assists inmates in acquiring skills to transition back into the community.

## Service and Staffing Issues

### Security Staffing

Lack of adequate staffing is a serious challenge for most Illinois facilities, and Hill is no exception. At Hill, budget cuts across the board and lack of sufficient security staff also raise safety concerns. While Hill is authorized for 202 correctional officers, it currently is understaffed with only 199. This number does not accurately reflect the extent of Hill's security staff shortage, however, in that security staff also are required to perform clerical rather than security duties for a total of 30 hours each week because there is a shortage of clerical staff as well.

While Hill is authorized for six shift supervisors, at the time of JHA's visit it was operating at only half that amount with a total of three. However, an additional shift supervisor was hired and scheduled to begin work in July. Hill also has been without a permanent Assistant Warden of Operations for more than four years, as this position instead has been filled by acting assistant wardens. The absence of permanent staff in this critical position is troubling because this helps to ensure accountability, stability, and predictability in a facility's daily operations.

Significantly, a number of staff, both correctional and medical, reported that inadequate security and overcrowding have created heightened stress, pressure, and instability for inmates and staff, and increased opportunities for violence. There was at least anecdotal evidence of this on the day of JHA's visit, when a fight broke out between two inmates in a general population housing unit. The weekend prior to JHA's visit there was also an incident where an inmate went missing, causing the facility to go on lockdown until the inmate was located hiding in a ventilation shaft.

Without reliable data on the frequency of such occurrences, JHA cannot speak to whether these incidents were anomalies or evidence of a more systemic safety issue. However, the DOC's last published quarterly report of April 1, 2011, confirms that the ratio of inmates to security staff at Hill is considerably higher than at any other Level 2 Secure Medium

facility in Illinois.[7] At a bare minimum, security staffing should be at a level that reasonably allows medical staff to perform daily sick call and administer medications without being unduly preoccupied with safety. Significantly, a security staff member that JHA spoke with also expressed concern that a metal detector in the labor management/custodial maintenance area was broken, and had not worked for some time. This staff member explained this is a significant safety concern because there are materials available in that area that could be used as weapons.

With regard to the conduct of security staff, several inmates reported that one specific correctional officer purposefully destroyed inmates' property during cell searches. To its credit, the administration took this report seriously and indicated that it would investigate and that it had disciplined staff in the past for such conduct. Complaints about correctional staff were not universal, however, as several inmates also praised one particular correctional officer for being exceptionally fair, ethical, and evenhanded.

It should go without saying that adequate staffing, including security staffing, is essential for any facility to function safely, predictably, and humanely for both inmates and employees. Every action has its price, and the inmate population in Illinois cannot continually be increased without likewise increasing funding and staffing of Illinois prisons. Hill's overpopulation, underfunding and understaffing, particularly with respect to security staff, indicate that the Illinois government has forgotten this.

**Clinical Services Department and Staffing**

Another area in which Hill is understaffed, but in which improvements have been made, is in its Clinical Services Department. Correctional counselors in this department serve as the primary point of contact for inmates to obtain information about reentry and facility policies and practices, access services, and raise grievances.

Inmates can contact their correctional counselors by either writing to them or speaking to them during hours the counselor is scheduled to visit their housing unit. While Hill is authorized to employ nine correctional counselors, it employed only seven at the time of JHA's visit. Heavy caseloads and backlogs on inmate requests are serious challenges for counselors, who each are assigned to handle 360 inmates on average.

Following JHA's visit, the administration reported that a new counselor was hired, reducing the number of counselor vacancies to one. According to the administration and staff, the recent hiring of a full-time Clinical Services Casework Supervisor has also significantly improved the functioning of Hill's clinical services department. The filling of existing vacancies doubtless can only enhance the facility's functioning. However, whether the number of authorized staff positions, even filled, is sufficient to actually meet the needs of a population this size is another question entirely.

---

[7] *See* Illinois Department of Corrections, Quarterly Report April 1, 2011, *available at* http://www.idoc.state.il.us/subsections/reports/quarterly_reports.

**Administrative and Clerical Support Staff**

Like other facilities, Hill struggles with underfunding and understaffing of administrative and clerical support positions. Hill is authorized for 72 clerical/administrative support staff. At the time of JHA's visit, however, the total number of administrative/clerical support staff was 67, with three staff members also on leave of absence.

There were two full-time job vacancies in the mailroom, and two full-time job vacancies in the records department. Faced with these shortages, two correctional officers must perform 15 to 20 hours of mailroom assistance each week. Security staff also perform an additional 10 hours of audit work each week. Hill has been without a full-time library associate for over a year. While the vacancy was posted previously, hiring has since been put on hold by DOC. Thus, a correctional officer/librarian is temporarily assigned or borrowed from another facility one day each week to perform library duties.

Underfunding and understaffing of administrative and clerical support staff is a serious problem. It undermines the capacity of correctional facilities to function efficiently and effectively and provide critical services to inmates. It can also seriously undermine safety, where correctional officers must be redirected from security duties to provide clerical services. At Hill, where security staffing is already stretched thin, the need for sufficient administrative and clerical support staff is particularly important, and should be addressed without delay. This issue, however, is routinely ignored by Illinois elected officials, who have done nothing to either reduce the prison population or provide facilities with the resources needed to manage this huge population.

### (i) Mailroom

Hill's mailroom has been chronically understaffed for many years, and has not been fully staffed since the 1990's. Indeed, from 2001 through 2009, only a single staff person was employed full-time in the mailroom. Despite understaffing, Hill has always managed to timely process outgoing mail on the day received. Unsurprisingly, however, backlogs in processing incoming mail have been a recurrent problem.

The timely processing of incoming mail is vitally important. Inmate morale and quality of life are greatly increased by having support and communication with family and friends, which in turn positively impacts the safety and stability of the facility. Maintaining strong relationships with friends and family is also crucial to inmates' successful reentry into the community. Further, inmates must rely primarily on correspondence from attorneys for information on the status of pending appeals and the deadlines for filing their post-conviction petitions. Fortunately, the recent hiring of an additional mailroom assistant has all but eliminated Hill's prior backlog on incoming mail, which is now being processed within one to two days of receipt.

Understaffing can impact not only the quantity of mail processed, however, but the quality of mail processing as well. Numerous inmates complained of a general lack of care and discretion used in screening and handling incoming mail, resulting in mail being needlessly delayed, damaged, misdirected, or destroyed. Several inmates also reported

not being notified when incoming mail was received but rejected under mailroom regulations.

Under the DOC's mailroom regulations, there are many reasons, apart from objectionable content, that incoming mail or publications may be rejected. For example, a single newspaper or magazine article cannot be sent to an inmate, as the entire publication containing the article must be sent. In addition, items sent in boxes will not be accepted.

In short, many mail regulations are highly technical and not self-apparent to an ordinary sender. Given this fact, and the fact that rejected mail is destroyed if an inmate does not pay its return postage, it is essential that notification be given when mail is received, but rejected. The DOC should seriously consider posting all mailroom regulations on its website, so that senders can easily access these to ensure compliance before sending items to inmates. In turn, this could significantly increase efficiency and reduce the time and resources staff must expend dealing with non-compliant mail articles.

### (ii) Library

The lack of a full-time library associate is also a challenge for Hill. Inmates can only access the library one day a week because a temporary library associate is only available one day. Several inmates, who had spent time at other facilities of equal or higher security levels, indicated their access to the libraries at those facilities was greater than access at Hill. Absent full-time, permanent staff in this position, the administration is required to continually expend valuable time and resources locating librarians to fill the position on a temporary basis.

A total of 24 inmates are permitted in the law library area at a time, and 16 are permitted in the general library area. While inmates in segregation cannot visit the library, they can access library services one day a week, in that copies of specific cases or legal materials will be brought to their cells on request. However, books are not permitted in segregation. A notary is made available to inmates in both the general population and segregation units every Friday. To the credit of administration and staff, there was no backlog of inmate library requests at the time of JHA's visit.

The materials in the law library are not up-to-date, and inmates do not have access to any computerized legal research. All books in the general library are donated. Adequate law library resources and access are very important because indigent offenders in Illinois have no right to attorney assistance in preparing post-conviction petitions, but must prepare and file the pleadings on their own. The administration expressed that it is committed to ensuring that inmates have uninterrupted access to library services on at least a weekly basis, despite ongoing staffing issues.

## Dietary Department and Staffing

Hill's dietary department, which provides all meals and regulated dietary requirements to inmates, suffers from underfunding and staff shortages. At the time of JHA's visit, the

department employed 13 staff, including one dietary manager. One staff member has been away on leave of absence for two years, and four additional dietary staff vacancies are open due to staff retiring. Rising food costs have caused Hill's dietary expenditures to exceed the budget of the dietary department. Hill's total daily food cost is $5,112, which equates to $2.75 daily food cost per inmate, and $1.22 per meal served.

Staff and administration make admirable efforts to create positive morale in the facility by serving special meals on holidays like Cinco de Mayo, Thanksgiving, Christmas, Super Bowl weekend, and Black History month. However, understaffing and underfunding inevitably impact services. Several inmates and staff reported meals often being of very poor quality and extremely unpalatable. Some inmates in segregation also complained of not receiving enough food. The minimum allowable daily caloric intake for inmates is not determined by Hill, however, but is set by DOC regulation. Administration officials reported to JHA that food portions at Hill are larger than at some other Illinois facilities and that, in their experience, complaints about food quality are not greater than at other Illinois facilities.

The State of Illinois, as of May, had not paid an outstanding balance owed to the vendor that provides Hill with Styrofoam products. Thus, Hill is no longer able to obtain Styrofoam products from the vendor and is hard-pressed for the Styrofoam trays needed to feed inmates in their cells when the facility is on lockdown. According to one staff member, this shortage of Styrofoam trays has serious security implications because it provides an incentive to avoid lockdown, even where safety concerns might otherwise warrant it.

# Segregation

At the time of JHA's visit, there were 52 inmates in disciplinary segregation and 41 inmates in orientation segregation. Inmates are double-celled. According to the administration, inmates in orientation segregation on average are held for two weeks before being moved into the general population. In general, inmates are not housed in segregation longer than six months before being transferred to another facility or back into the general population. Once a week, the Warden makes a point of visiting and walking through the segregation unit. This is a prudent practice and good policy, as it allows the administration to directly observe and monitor inmates and conditions in the unit.

Segregation inmates are given a total of five hours of outside-cell time each week. This consists of allowing inmates to use the yard for two and a half hours twice a week, following which they may shower. Showers occur immediately after yard time, but inmates who refuse yard time are showered first. Because yard time and showers are scheduled back-to-back, in a given week, an inmate in segregation may effectively only leave his cell on two occasions. If staffing levels permit, the facility should seriously consider staggering shower times and yard times so that segregation inmates have a few more opportunities to leave their cells.

Inmates have control over some cell lighting, with the exception of inmates in psychiatric segregation, where lighting is wholly controlled by staff. Inmates also have access to a small, external window in the individual cells that can be opened and closed. Lighting inside the segregation cells generally appeared very dim. Lighting outside the cells is bright, constant, and controlled by the facility.

No electronics are allowed in segregation. Inmates cannot visit the library or request books from the law library, but can only request copies of specific legal materials by name. This is problematic in that an inmate is unlikely to be able to identify a particular case or statute that is relevant to his legal proceedings without being able to perform some general legal research in the first instance. The administration emphasized that these library services, although limited, are provided to segregation inmates once a week, along with weekly access to a notary.

Segregation inmates are allowed two visits monthly, and one weekly phone call (excluding attorney visits and phone calls). As previously stated, segregation inmates cannot use individual fans to cool their cells because the power outlets in segregation cells have been disconnected. This raises some serious concerns about overheating. However, as previously indicated, the administration reported that it takes several precautions to prevent segregation inmates from overheating.

## Population Demographics

The average age of inmate at Hill is 35 years old. Approximately 19 percent of the population is between the ages of 17 and 25, and 9 percent is over the age of 50. The racial makeup of Hill's population is 62 percent African-American; 20 percent White; 17 percent Hispanic; less than 1 percent Asian; and less than percent American Indian.

The average length of stay for an inmate at Hill is 10 months and 28 days. Inmates with 97 to 240 months left to serve on their sentences make up the largest portion of Hill's population at 30 percent. Inmates with less than 12 months to serve on their sentences makeup 27 percent; inmates with 25 to 60 months left to serve make up 17 percent; and inmates with 12 to 24 months left to serve make up 15 percent of the population. Inmates with life sentences, indeterminate sentences or more than 240 months left to serve each make up about 1 percent of the population.

The majority of inmates are designated as low escape risk (62 percent). Approximately 25 percent of the population is incarcerated for murder; 31 percent for Class X offenses; 15% for Class 1 offenses; 18 percent for Class 2 offenses; 5 percent for Class 3 offenses; and 5 percent for Class 4 offenses.[8] The DOC assigns all inmates a disciplinary grade status of A, B, or C. Inmates who are "A grade" are in good disciplinary standing and afforded the most privileges. The vast majority of inmates at Hill, 74 percent of the

---

[8]In Illinois, felony offenses, other than murder, are categorized in descending order of seriousness and length of sentencing range as Class X, Class 1, Class 2, Class 3, or Class 4 (with Class X being the most serious, and Class 4 being the least).

population, are A grade; of those remaining, 15 percent are B grade and 12 percent are C grade.[9]

The majority of Hill inmates, 63 percent, were convicted in Cook County. Unsurprisingly, many inmates reported that Hill's distance from Chicago prevents them from regularly seeing their families. Several inmates also reported that being incarcerated far from Chicago has prevented them from seeing their newborn children. The added strain on family relationships caused this geographic isolation is troubling, given the mounting evidence that family dissolution and lack of bonding between fathers and their children greatly contributes to crime and delinquency.[10]

## Gang Control

The administration reports that just over 50 percent of Hill's population is affiliated with a "Security Threat Group" (STG), the common term for a prison gang. The Gangster Disciples are the largest STG, comprising roughly 15 percent of the population (283 inmates); followed by the Black P Stones at 5 percent (91 inmates); the Conservative Vice Lords at 4 percent (74 inmates); the Four-Corner Hustlers at 4 percent (66 inmates); and the Latin Kings at 4percent (77 inmates). A variety of other STGs are also present in smaller numbers.

Hill's strategy for gang control involves placing members from different STG's in the same housing units and cells to force them to cooperate and live together daily. This is a standard correctional practice for controlling gang activity, and practically speaking, this is the only strategy available at Hill. The alternate strategy of separating STG members into different living units is impracticable at Hill, and most Illinois facilities, given the density and diversity of STG groups, and the sheer size of the population. The downside of the 'mix them up' approach is the increased potential for fighting when inmates of rival STGs are housed together. The benefit of this approach is its capacity to undermine the solidity and internal organization of STGs, and discourage any one STG from exercising control.[11]

One staff member expressed concern that lack of adequate security staff to monitor inmates during religious services provides STGs with undue opportunities to meet and organize. This is a legitimate safety concern. Approximately 750 inmates attend religious services weekly. Security presence during religious services must be sufficient to thwart gang activity. A careful balance must be struck, however, to allow inmates to freely take

---

[9] The DOC statistics cited in this section of the report are based on a reported total population of 1,826. At the time of JHA's visit, Hill's population had increased by an additional four inmates to a total of 1,830.

[10] *See The Vicious Circle: Race, Prison, Jobs & Community in Chicago, Illinois and the Nation*, Chicago Urban League (2002), published at http://www.prisonpolicy.org/scans/theviciouscircle.pdf

[11] *See* Knox, G., *The Problem of Gangs and Security Threat Groups (STG's) in American Prisons Today: Recent Research Findings From the 2004 Prison Gang Survey* (2005), published by the National Gang Crime Research Center, available at http://www.ngcrc.com/report/report.html.

part in religious services without interference and intimidation by STGs or unjustified intrusiveness by security monitoring.

## Industries, Education & Vocational Programming

Inmates, administration, and staff all uniformly expressed a desire for greater educational, employment, and vocational programming for the population. However, the reality is that Hill's staff and resources are already stretched exceedingly thin by severe overpopulation. Many inmates expressed great frustration at being unable to access educational, employment, and vocational training or work in industries. According to staff, this is a safety concern as well, because inmate idleness, lack of education and work assignments, lack of space, and competition over scarce resources lead to greater inmate aggression. The administration reports that, on average, an inmate at Hill spends 17 hours a day in his cell.

One underused resource that could allow more inmates access to rehabilitative programming is the use of volunteers. Volunteers currently are used only to assist in religious services and Alcoholics Anonymous meetings. A diverse variety of religious services are offered, and religious programming is well-staffed with 67 volunteers. However, no efforts have been made to recruit or use volunteers in any other areas of programming, such as literacy classes or job skills.

### Industries

One of Hill's strengths and successes is its on-site industries program, which employs 76 inmates in processing milk, juice, and meat for use in DOC facilities across Illinois. Work in industries allows inmates to earn a wage, increase their self-sufficiency and self-esteem, and obtain essential vocational training and skills for reentry. At the same time, the products produced by Hill's industries for DOC help to minimize costs to the State and support DOC's fiscal efficiency.

There are 31 inmates employed in Hill's 24-hour juice and milk processing industries, which is divided into three separate work shifts. In addition 45 inmates work in meat processing, which has only one work shift. While JHA received one prior report of Hill's processing facilities being unclean, they appeared reasonably clean and well-maintained on the day of our visit. Inspections of these facilities are performed by the Illinois Department of Health. Although administration and staff expressed a strong desire to expand Hill's industries, their ability to do so is seriously curtailed by insufficient staff, and the funding needed to obtain additional equipment. An inmate must have more than 12 months left to serve on his sentence to obtain a position in industries.

### Educational Programming

Like other Illinois facilities, Hill does not have the staff or resources necessary to provide educational assistance to all the inmates who desire it. Three Adult Basic Education (ABE) courses are available to inmates, which are mandatory for all inmates who test

below a sixth grade reading level. There were 45 inmates enrolled in ABE courses at the time of JHA's visit and 211 inmates on the waitlist. Three GED classes are also offered, with 60 inmates enrolled, and 24 were on the waitlist at the time of JHA's visit. There are four teacher vacancies, which have been open for some time. Long-term prisoners and prisoners serving life sentences are permitted to take educational courses, but first-time offenders receive priority. With the exception of first-time offenders, inmates are placed in classes and taken off the waitlist on a first-come, first-serve basis.

Lakeland College, which services 15 to 16 other Illinois correctional centers, also provides some secondary education classes to Hill inmates. Fortunately, five classes (each eight-weeks long), will be offered to inmates this summer, including classes in Biology, English, Art, and Accounting. These courses will be open to a total of 175 inmates (35 inmates per class). At the time of JHA's visit, there were already 30 inmates on the wait list.

**Vocational Programming**

Several vocational and work training programs are available to Hill inmates and provided through Lakeland College. A three-week Job Preparation course is offered to up to 20 inmates at a time who are nearing their release dates. The administration is in the process of hiring an instructor to teach a Career Technologies course, which will replace Job Preparation. The new course will focus on providing more instruction in document preparation; job applications; personal development; and finding, obtaining, and keeping employment.

Other vocational offerings include a three-month long custodial maintenance class in which 17 inmates are enrolled, and 34 are on the waitlist; and a six-week long remedial skills and remedial youthful offender class in which a total of nine inmates are enrolled, for which there is no waitlist. Although the vocational opportunities available to Hill inmates are already extremely limited, the DOC eliminated an Auto Diesel program and an Education to Careers program from Hill's curriculum. Six inmates are employed in the Office of Adult Vocational Education Services.

# Other Observations

**Leisure Time and Visiting**

Five to seven hours of yard or gym time are provided to general population inmates weekly. The yard includes five pavilions, four basketball courts, and a small, congested area of weight equipment. The gym resembles a high school gym and contains two basketball courts, bleachers and a weight area. The gym is generally well-maintained, but the floor is in need of refinishing. In summer months, no gym time is offered, but evening yard time is provided for about one and a half hours nightly. A two-hour dayroom period is offered each day, at which time inmates can make phone calls. A total of four dayroom periods are held in each housing daily, as the upper levels and lower levels of each wing are let into the dayroom at separate times.

The visiting room was clean, well-lit with natural light from windows, and contained vending machines and board games for children. Apples previously were available for sale, but this was discontinued because they were not selling. There are 26 tables, with four stools attached to each, for visiting. Some of the tables were in need of painting, but the room was generally inviting and well-maintained. Inmates are allowed five four-hour visits per month, but only two of these visits can occur on weekends or holidays.

**Grievance process**

When a grievance is brought by an inmate, the inmate's counselor responds, unless the grievance concerns the counselor, in which case a supervisor responds. If the grievance is not resolved through the inmate's counselor, one of two hearing officers on staff is assigned to hear the grievance; and can conduct a quasi-preliminary investigation to determine if there is a factual basis for the claim. The hearing process concludes with the hearing officer writing a recommendation on the grievance, which is then sent to the Warden's office for signature, and the Warden or the Assistant Wardens are charged with making the final decision.

On average, 180 grievances are filed by Hill inmates each month. The most common grievances concern discipline, staff conduct, and medical care, and requests by inmates that their good-time sentencing credit be restored. According to staff, property grievances are more likely to be sustained than any other kind of grievance because property claims can be objectively verified. On the other hand, grievances regarding medical care, discipline, and staff conduct are likely be denied because deference in the hearings is giving to the "expert"- *i.e.* any person who is not an inmate. At the time of JHA's visit, 1.9 percent of grievances in the year to date had been found to have merit. The rate at which grievances are sustained fluctuates, and at times has been as high as 4.5 percent.

The most obvious flaw in the grievance process, which is not unique to Hill, is its patent imbalance and inherent tendency to insulate staff conduct from any meaningful examination, investigation, or accountability. Absent a total overhaul of the grievance process to allow some degree of impartiality and more effective truth-seeking procedures, it is critical, at the very least, that administrators conscientiously track, investigate, and act when multiple inmates repeatedly report an unsafe condition or specific staff misconduct.

###

***This report was written by Maya Szilak, Director of the Prison Monitoring Project, for the John Howard Association. Maya may be reached at (312) 503-6302 or mszilak@thejha.org.***

***Contributing to this report were Angela Weis, Counsel & Policy Analyst, for the John Howard Association, Aviva Futorian, John Howard Association Board Member, and citizen observers: Grace Warren, Andy Dallos, and Pamela Gretza.***

Since 1901, JHA has provided public oversight of Illinois' juvenile and adult correctional facilities. Every year, JHA staff and trained volunteers inspect prisons, jails and detention centers throughout the state. Based on these inspections, JHA regularly issues reports that are instrumental in improving prison conditions.

# EXHIBIT 3



# John Howard Association of Illinois

375 East Chicago Avenue, Suite 529  Chicago, IL 60611
Tel. 312-503-6300  Fax. 312-503-6306  www.thejha.org

# Monitoring Visit to Vienna Correctional Center
# 9/27/2011

The John Howard Association (JHA) visited Vienna Correctional Center (Vienna) on September 27, 2011.  It is a male minimum-security prison located in Vienna, Illinois about six hours south of Chicago.



**Vital Statistics:**

Population: 1,616
Rated Capacity: 685
Average Annual Cost Per Inmate: $20,714
Average Age: 35
Source: DOC, 12/19/2011

**Key Observations**

- As of December 19, 2011, Vienna is Illinois' most overcrowded prison. It is designed to hold 685 inmates, but houses more than 1,600, which makes it about 240 percent over its design capacity.

- Most of Vienna's inmates serve less than one year at the facility.

- If Governor Quinn restored Meritorious Good Time, the early-release program he suspended in late 2009, Vienna could potentially empty its most overcrowded, dilapidated housing areas.

- At the time of JHA's visit in September 2011, Vienna had only one mental health professional to meet the needs of more than 1,600 inmates.

- Approximately 12 percent of Vienna's population is 50 or older.  The racial-ethnic makeup of Vienna's population is roughly 67 percent African American, 21 percent White, 11 percent Hispanic, and approximately 1 percent Native American and Asian combined.

# Monitoring Visit to Vienna Correctional Center 9/27/2011

### Executive Summary

On September 27, 2011, JHA visited Vienna Correctional Center (Vienna).  Vienna is a Level Six minimum-security adult male facility that houses mostly low-level offenders. It also operates Dixon Springs-Impact Incarceration Program (IIP), a co-ed boot camp. Located on the fringes of Shawnee National Forest and adjacent to Shawnee Correctional Center, a male minimum-security prison, Vienna is about 350 miles south of Chicago and 170 miles west of Nashville, Tennessee.

Vienna represents the best of what Illinois Department of Corrections (DOC) can be and the worst of what it has become through a lack of vital resources and severe overcrowding.

For most of its more than 40-year history, Vienna was widely regarded as Illinois' most successful and innovative prison.  It was designed to function as a small town where inmates could learn how to become responsible citizens.  Until a little over 10 years ago, the facility did not have a fence, and inmates did not wear uniforms.

Education was critical to Vienna's rehabilitative mission.  The prison's education and vocational program rivaled—and in some cases surpassed—the area's best technical high schools and post-secondary institutions.  In fact, Vienna's programming was so good that local area residents took classes in the prison with inmates.

During this period, Vienna embodied a mutually beneficial relationship between prison and community that went far beyond the typical economic support prisons provide to their local economies.  Up until the mid 1990s, Vienna inmates volunteered in the local community, umpired baseball games on weekends, and even ran an Emergency Technician Program, which supplied the surrounding area with a 24-hour ambulance service staffed by specially trained inmates.

Today Vienna has gone from being Illinois' most innovative and successful prison to its most overcrowded.  Although the facility was designed to hold 685 inmates, it now houses more than 1,600 people.  Years of neglect and lack of essential maintenance and upkeep have made these conditions worse, as mostly low-level offenders are crammed into dilapidated buildings infested with mice and cockroaches.

While Vienna's staff and administration are acutely aware of the problems they face, they believe if given the appropriate resources they could turn the facility around.  They point to current renovations, which include a desperately needed re-roofing project.  They also note how last spring, when the region faced some of the worst flooding it has ever seen,

inmates and staff volunteered and helped prepare more than 400,000 sandbags, which saved countless homes and buildings from serious damage.

At JHA's meeting with Vienna's administration, a senior member aptly described the current state of the facility: "Vienna is a good place with a proud history in need of help." Most urgently, Vienna needs the help of the governor and the legislature to enact legislation and support programs that will safely reduce the state's prison population, which has reached almost 50,000 inmates, a record high. In particular, Illinois needs to find more cost-effective alternatives to incarceration for low-level, non-violent offenders who have swelled minimum-security prisons like Vienna at great cost and little benefit to taxpayers.

With a reduction in population, DOC could return Vienna to a model, re-entry prison that inmates could earn their way into through good behavior. This proposal is based not on liberal or conservative approaches to crime, but on cost-effective use of tax dollars and state resources. Ultimately, the choice for elected officials is not whether to spend money on its prison system. It is whether to put money into smart re-entry programming or an endless cycle of re-incarceration.

## *Recommendations:*

(1) The Illinois Governor and General Assembly must reduce the prison population through sentencing reform, enact a safe replacement for Meritorious Good Time, and provide Vienna and other DOC facilities with the funding and staffing needed to meet the population's basic medical and mental health needs. If such action is not taken, it is all but inevitable that this issue will end up being litigated in the courts.

(2) Assuming elected officials find ways to safely reduce the state's prison population, DOC should consider investing in Vienna and making it into a premiere re-entry prison which inmates must earn their way into.

(3) As soon as it can feasibly do so, Vienna's administration should remove inmates from the second and third floor of Building 19, the prison's most decrepit, overcrowded living quarters.

(4) Vienna should consider using the segregation bullpen to house inmates only for short periods of time due to the fact that it is unfit for long-term living.

(5) To address the needs of its population, Vienna needs more mental health staff.

(6) DOC and Vienna should continue its efforts to rehab the facility.

**(7)** As recent studies have shown that prison visits reduce inmates' likelihood of recidivating, Vienna should improve its visiting area, making it more child and family friendly.

## Introduction

This report examines the following issues: Vienna: Past and Present; Housing and Living Conditions; Segregation; Physical and Mental Health; Staffing & Inmate Programming; Visiting Area; and Population Demographics.

## Vienna: Past & Present

It is impossible to understand Vienna today and its unrealized future potential without appreciating its unique past. Opened in 1965, Vienna was once widely regarded as the "most successful state prison in Illinois."[1] The facility was designed as if it were a small town, complete with a fishing pond, athletic fields, and dorms for which inmates had their own keys. For the first three decades of its existence, the facility did not have a fence, and for a short period, the prison was co-ed. As one study from the 1970s put it, Vienna "approaches the quality of [a] non-penal institution. Buildings resembling garden apartments are built around a 'town square' complete with churches, schools, shops, and library. Paths lead off to 'neighborhoods' where 'homes' provide private rooms in small clusters."[2]

The idea behind this design was to provide a rehabilitative environment for inmates to learn how to become responsible citizens. Education was key to this mission. The prison was known for its programs, which "equal[ed] or surpass[ed] those of many technical high schools."[3] Until the mid 1990s, the prison offered classes not only to its inmates, but also to citizens of the surrounding communities, who would come to the facility to take evening college classes and participate in daytime vocational programs.

---

[1] James B. Jacobs, Notes on Policy and Practice, Social Service Review (December 1976) 623.

[2] Jacobs, Notes on Policy and Practice, 623.

[3] National Advisory Commission on Criminal Justice Standards and Goals: Report on Corrections (Washington, D.C.: 1973), 345.

Vienna blurred the boundaries between prison and the surrounding community. Of course, like most prisons, the facility employed a significant number of local residents and helped support the local economy. More surprisingly, inmates would umpire local baseball games and volunteer for community projects. The prison even ran a program called the Emergency Technician Program, which was an "ambulance service manned by eighteen trained inmates working twenty-four-hour shifts."[4]



In Vienna's early days, Illinois' prison system was a different place than it is now. For most of the 1970s, Illinois prisons held less than 10,000 people. Through multiple factors—including the war on drugs, the war on crime, and the de-institutionalization of mental health— that number began to steadily increase. [5] Today, Illinois has almost 50,000 people in its prisons, which is almost a 400 percent increase in four decades.

During this period of unprecedented growth in the prison population, the prison system became not only more crowded, but also more violent. As veteran DOC staff and inmates from the 1980s and early 1990s recall, gangs had almost complete control of prison operations. Assaults on inmates and staff were commonplace, and in some prisons, gang leaders were so powerful that they assigned new inmates to cells based on their gang affiliation.

Ultimately Illinois' prison violence spilled into Vienna's model correctional community. In 1993, inmates staged what the local state attorney called a "mini riot." Shortly after that incident, an inmate sexually assaulted a correction officer and left her for dead. DOC officials soon erected a fence around the facility, citizens stopped going into the prison for classes, and the prison's inmate-run Emergency Technician Program was shuttered. [6]

These events effectively ended what the <u>Chicago Tribune</u> called Vienna's "experiment with trust." Around the same time, as the facility struggled to retain its programming

---

[4] Jacobs, 628.

[5] On the rise of prison population, see Heather Ann Thompson, Why Mass Incarceration Matters, Journal of American History, (December 2010), 703-734; and Mark Mauer, Race to Incarcerate (New Press, 2006).

[6] "Model prison can no longer escape violence," Chicago Tribune, October 22, 1996.

focus, funding for prison education diminished. In 1994, President Bill Clinton signed the Violent Crime Control and Law Enforcement Act, which, among other things, banned prisoners from using Pell Grants to pay for classes. As Illinois' finances began to fail, governors and legislators found funding for prison education an attractive item to cut from the state's budget.

Then, in 2002, Governor George Ryan proposed closing Vienna to cut the state's budget. Although Governor Ryan eventually dropped the plan, state government seemed to abandon the prison and treat it as if it were a closed facility. Several critical administrative positions were left vacant for years. Essential upkeep and maintenance ceased, as requests for repairs were either ignored or never submitted.

When JHA visited Vienna in September of 2011, we found staff and a new administration trying to dig the facility out from years of neglect and disrepair. A couple of months earlier, a housing unit had to be closed due to mold infestation. At the time of our visit, administration was trying to make the building inhabitable by tearing out the dry wall and fixing windows and shower areas. The administration noted that when they first arrived in April 2011, nearly every building had serious leak and rusting problems.

During JHA's visit, Vienna's staff and administration described several on-going renovation projects, including a desperately needed re-roofing effort. They also noted how staff and inmates helped prepare more than 400,000 sandbags, a reminder of the partnership between prison and community that Vienna used to represent.

Despite the facility's disrepair, JHA believes that the staff and surrounding community are ready to restore Vienna to what it once was. For this to happen though, Illinois' elected officials first must stop wasting precious resources on imprisoning low-level, non-violent offenders who currently fill prisons like Vienna and instead continue to invest in safe and cost-effective alternatives to incarceration, like Adult Redeploy.[7] This would not only help decrease Illinois' overcrowded prison system, but allow DOC to increase programming for inmates in all of its prisons. In so doing, DOC could learn from the lessons of Vienna's past and turn the facility into the state's premiere re-entry prison, an institution which inmates must earn their way into and which offers innovative educational and vocational programs to facilitate their successful return to free society. This proposal is based not on liberal or conservative approaches to crime, but on cost-effective use of tax dollars and state resources. Ultimately, the choice for elected officials is not whether to spend money on its prison system. It is whether to put money into smart re-entry programming or an endless cycle of re-incarceration.

---

[7] From Adult Redeploy's website: "Adult Redeploy Illinois was established by the Crime Reduction Act (Public Act 96-0761) to provide financial incentives to local jurisdictions for programs that allow diversion of non-violent offenders from state prisons by providing community-based services. Grants are provided to counties, groups of counties, and judicial circuits to increase programming in their areas, in exchange for reducing the number of people they send to the Illinois Department of Corrections." To learn more, go to http://www.icjia.state.il.us/public/redeploy/.

# Crowding

Vienna is Illinois' most crowded prison.  It is designed to hold 685 inmates, but as of December 19, 2011, housed more than 1,600 people, making it almost 240 percent over its design capacity.

As of the publication of this report, Illinois has almost 50,000 people in its prison system, which is designed to hold about 33,000. Although Illinois' prison population has exceeded its design capacity for decades, the number of prisoners has increased by almost 10 percent since 2010.  This sudden surge in the state's population is largely due Governor Pat Quinn's suspension of Meritorious Good Time (MGT), a 30-year-old, statute-based program that allowed inmates to earn as many as 180 days off their sentences.[8]

| Average length of stay at Vienna (Reported 9/25/11) |
| --- |
| 12 months or less 53% |
| 1-2 years 26% |
| 3-4 years 21% |

As most inmates sentenced for violent offenses were ineligible for MGT, low-level offenders have been the most affected by its suspension.  Consequently, while every prison struggles with the state's exploding inmate population, medium and minimum-security prisons, like Vienna, which overwhelmingly incarcerate low-level offenders serving short sentences, face the most severe overcrowding. For instance, one administrator JHA interviewed at Vienna noted that if the governor restored MGT, they could empty the most decrepit and overcrowded parts of the prison.

The overcrowding of Illinois' medium and minimum-security prisons can undermine security and proper functioning on multiple levels.  As JHA noted in its 2011 report on the Northern Reception and Classification Center, "administrators at several medium and minimum-security facilities independently have reported to JHA that, with the increased population, they have received a substantial influx of inmates poorly suited to be housed at their facilities because they present too great a security risk or have too severe mental health problems and treatment needs that the facilities are not designed to handle."[9]

On JHA's visit to Vienna, we heard several examples of such classification problems. For instance, the administration noted they recently sent back an inmate to NRC on discovering that he had an outstanding warrant for murder.  This is a problem because, as a minimum-security prison, Vienna allows a degree of freedom that an inmate facing a murder charge might use to escape.  Another example: administration recently returned an inmate that had been sent to Vienna's boot camp, because boot camp requires participants to engage in strenuous exercise and activity and the inmate was so physically impaired that he could hardly walk.  As described by one administrator, the inmate barely

---

[8] Malcolm Young, "Setting the Record Straight: The Truth About 'Early Release,'" October 28, 2010.

[9] *See* JHA Monitoring Report of Stateville Northern Reception & Classification Center, July 12, 2011, found at http://www.thejha.org/NRC.

had the physical strength and capacity to get off the bus at Vienna, let alone participate in a boot camp.

On top of the classification problems, administration has no choice but to pack its living quarters and house prisoners in unsuitable living areas because Vienna has significantly more prisoners than it was designed to hold. This kind of crowding also stretches vital but limited resources, from programming to healthcare. These conditions frustrate rehabilitation efforts and create a dangerous environment for inmates to live and staff to work.

At JHA, we often hear in response to our work that prisoners deserve to live in these kinds of harsh conditions, and that doing so will teach them not to break the law. These assertions fail to appreciate two vital points. First, housing prisoners in overly harsh conditions hurts not only prisoners, but also public safety as it ends up costing taxpayers more money with increased crime and high recidivism rates. More than 90 percent of people who are sent to prison eventually are released, most after serving a short sentence. For instance, most prisoners at Vienna serve less than one year before they are released. While there is no evidence to suggest that exposure to harsh and overcrowded conditions makes prisoners less likely to commit new crimes, there is strong evidence that it makes prisoners worse and more likely to re-offend when they are released.[10]

Second, harsh prison conditions can severely undermine prison security. Studies confirm that poor prison conditions correspond to significantly higher rates of violence and staff assaults.[11] In addition, such conditions have a profoundly damaging impact on the physical and mental well-being of staff, by increasing the potential for violence, escalating workload pressures and making it much more difficult for staff to monitor inmates and safely and effectively perform their jobs.[12] A long time Vienna correctional officer that JHA spoke with expressed the same opinion, and said that most correctional officers see overcrowding and lack of inmate programming to be serious security problems because they lead to more fights and staff assaults.

---

[10] *See* M. Keith Chang, Yale University and Cowles Foundation, Jesse M. Sapiro, University of Chicago and NBER, *Do Harsh Prison Conditions Reduce Recidivism? A Discontinuity Based Approach, available at http: //faculty.som.yale.edu/keithchen/papers/Final_ALER07.pdf.*

[11] *See* David M. Bierie, *Is Tougher Better? The Impact of Physical Prison Conditions On Inmate Violence*, International Journal of Offender Therapy and Comparative Criminology (April 13, 2011), *available at* http: // ijo.sagepub.com/ content/early/2011/04 /09/ 0306624X11405157.full.pdf

[12] *See* David M. Bierie, *The Impact of Prison Conditions on Staff Well-Being*, International Journal of Offender Therapy and Comparative Criminology (November 30, 2010) available at http://ijo. sagepub.com/ content/ early/2010/ 11/29/ 0306624X10388383.full.pdf+html; Commission on Safety and Abuse in America's Prisons, Executive Directives and Prison Violence (2005) available at http ://www. prisoncommission.org/ statements/ thompkins_douglas.pdf.

In short, packing prisons beyond their capacity and allowing prison conditions to deteriorate serves no one's interests—not inmates, not staff, and not the public.

## Housing & Living Conditions

The layout of Vienna is organized around a town square concept, with a centrally located dining facility, library, chapel, commissary, barbershop and gymnasium. Six double-celled housing units are situated around the square and connected to each other by paths. From the outside, the units look extremely non-institutional, and resemble small apartment complexes more than prison housing. The presence of flowers and landscaping on the prison grounds adds to the residential feeling.

On our visit, JHA toured Building 1, a typical general population-housing unit. When we arrived, dozens of inmates crowded the building's dayroom, which consisted of a table on one side which inmates used to play cards and board games and a small television set mounted on the wall on the other side. JHA interviewed several inmates in Building 1, all of whom had similar complaints and observations about their living conditions. They noted the building had a significant cockroach problem. During JHA's interview with administration, the administration acknowledged that there were bugs, mice, and other "varmints" throughout the facility. The administration believed that the varmint problem was caused by its past pest-control vendor who had provided substandard treatment due to the state's failure to timely pay for its services. At the time of JHA's visit, administration had just finished contracting with a new pest-control vendor and hoped it would provide better results.

Inmates also noted the bathroom was generally disgusting and in a state of disrepair, which JHA staff and volunteers confirmed. A rusty-colored liquid dripped from the ceilings, which inmates had to artfully dodge as they brushed their teeth or used the restroom. The walls were similarly discolored with patches of rust and grime.

Inmates in Building 1 also reported that air constantly blew through the air vents, making the cells very cold. Some inmates had stuffed toilet paper into the vents to block the airflow. They indicated that they risked being issued a disciplinary ticket for doing this, but that it was worth the risk, because their cells were uncomfortably cold.

Throughout JHA's visit, we also heard from both inmates and staff about the lack of property boxes for inmates to store their personal belongings. Administration acknowledged this was a significant issue and estimated they were short more than 400 property boxes. If inmates do not have a secure place to store their belongings, they are inviting theft, which could lead not only to the loss of property, but also fights between inmates. Administration explained that it was doing everything it could to order more property boxes and repair broken ones.

Multiple inmates also complained of being issued underwear and clothing that was stained, heavily used, and worn threadbare. Based on the tattered clothing JHA saw

inmates wearing on the date of our visit, it is fair to say these inmates' reports were accurate. Administration reported that in addition to the clothes inmates are already wearing on arriving at the facility, they are given two pairs of pants, two pairs of socks, two boxers, two shirts and one coat. Laundry service is available five days a week. Shoes are issued on an "as needed" basis. Inmates are also provided with one blanket, one pillowcase and one set of sheets. General population inmates have the opportunity to shop at the commissary about twice a month, and are allowed one hour of outside recreation/yard time three days a week, for a total of three hours yard time per week.

JHA also had the opportunity to visit Building 19, a three-story structure that houses both general population and segregation inmates and is one of Vienna's original buildings. The first floor of Unit 19 houses segregation inmates in both double-bunk cells and a small "bullpen" area. There were 26 inmates in segregation on the date of JHA's visit. The second and third floors of Building 19 house inmates on double bunk-beds in dormitories with communal living, shower and bathroom areas. On the date of JHA's visit, 200 inmates were housed on the second floor of Building 19 and 400 inmates were housed on the third floor.

JHA found housing conditions on the second and third floors of Building 19 to be deplorable and generally unfit for the 600 hundred men who lived there. As JHA entered the second floor, we saw hundreds of inmates with nothing to do except pace around the room or huddle around a small television in the corner of the room. A Vienna staff member seemed to recognize the stunned look on our faces. "This is a nightmare," he said quietly to one of JHA's staff. "This should not be."

The second floor of Building 19 features a large open area lined with metal bunk beds for approximately 200 inmates. The third floor is divided into four separate quadrants, filled with metal bunk beds for about 400 inmates. On both floors, windows were broken and without screens. As a result, birds had flown into the living areas and built nests in the light fixtures. Inmates complained that mice, cockroaches, and other insects were everywhere.

JHA volunteers saw what appeared to be rodent droppings on the floors of Building 19. Multiple inmates reported that rodent and vermin infestation was even worse in the dietary unit and dining hall. An inmate who worked in the dietary unit confirmed that mice were everywhere in the dining hall and frequently ran across the floors during meals. Inmates also reported that they were not given sufficient time to consume meals, as they were only allotted five minutes to eat.

Inmates told JHA that because Building 19 lacked air conditioning, the building was unbearably hot in the summer time, and because several windows were broken, it could become frigid in the winter. Inmates use sheets and paper to cover broken windows. The administration indicated it was in the process of soliciting contractors to have the windows fixed, and hoped that the project would be completed before harsh winter weather set in.

The metal bunk beds were also in varying states of disrepair. One inmate showed a JHA staff member how some of the beds were not bolted to the floor and could easily tip over if a heavier inmate shifted his weight unevenly when attempting to climb onto the top bunk. Another inmate showed a JHA staff member how several top bunk mattresses lacked sufficient support. As a result, when a person laid down on the top bunk, his mattress would sink and, in some instance, come close to touching the person in the bunk below.

In the living area, half of the lights were not functioning. Some fixtures showed clear water damage and appeared beyond repair. On the third floor, JHA volunteers observed large brown rectangular ventilation units that did not appear to be functioning. The vents were covered in grime and dust.

JHA found conditions in the bathrooms on both floors to be particularly disturbing. On entering the second floor bathroom, a JHA volunteer noted a strong smell of fecal matter and sewage, which several inmates reported was a constant problem. The floors were wet and slippery. One section of the bathroom had a significant amount of water leaking from the ceiling, which an inmate was trying to mop up. Throughout the bathroom, pipes in the ceiling were exposed and in serious disrepair. The second floor bathroom contained three toilets and three sinks, but inmates reported the toilets often do not work. Inmates also reported that when using the toilets, brown liquid drips onto them from the ceiling above.

Because the second floor bathroom lacks showers, all Building 19 inmates must share the seven showers that are located on the third floor. Inmates reported that several of these showers were unusable because they lacked sufficient water pressure and merely dribbled out a small stream of water. A second floor inmate explained that at 3:00 p.m. each day, correctional staff usher inmates from the second floor to the third floor to shower. Because of the sheer number of persons demanding to use the showers, it is rare that all second floor inmates have the opportunity to shower each day.

In addition to showers, the third floor bathroom contained four toilets, four sinks and two urinals. Upon walking into the third floor bathroom, JHA volunteers immediately noted a strong paint smell and signs that it had been recently painted. Despite these cosmetic efforts, the air was noticeably stuffy, humid, and fetid, and the shower seemed to lack functioning ventilation. As in the second floor bathroom, water dripped from the ceilings' exposed and rusted pipes. Apart from the conditions of the bathroom, the third floor had only one functioning phone at the time of JHA's visit. Already frustrated by the conditions of their confinement, inmates reported that the lack of adequate phones has led to repeated fights.

Exacerbating the situation, there are only a handful of correctional officers assigned to monitor inmates in Building 19. Administration reported that two correctional officers are assigned to monitor the second floor and three correctional officers are assigned to the third floor 24 hours a day. However, a correctional officer that JHA spoke with indicated

to the contrary that only two correctional officers are assigned to the third floor during the night shift.

In either case, JHA finds these security staffing levels to be insufficient and unsafe. Indeed, an inmate reported to JHA that, in the absence of a sufficient security presence, inmates often begin fights and "jump" each other on the stairway between the second and third floors because there are no correctional officers assigned to monitor the area.

Perhaps the most powerful condemnation of Building 19's conditions came from an inmate that JHA spoke with who was recently released from Vienna, but previously lived in Building 19's dorms. He reported that, while he was at Vienna, he knew several inmates who purposefully started fights and committed major rule infractions solely for purposes of being transferred from Vienna to another facility. Although these inmates apparently recognized their infractions would result in a lengthy period of segregation, the loss of good time credit time, and serving a longer sentence in higher security, they found these preferable to living in Building 19's awful conditions.

## Segregation

Vienna's segregation cells are located on the first and third floors of Building 19. They can hold approximately 30 people in total. The first floor segregation area consists of double-bunk cells and a bullpen area that holds roughly ten inmates. The third floor contains several additional individual segregation cells.

During JHA's visit, most of the inmates we interviewed were in segregation for refusing housing. According to administration, inmates typically will not spend longer than two weeks in segregation because inmates who commit serious infractions leading to longer segregation times are usually "stepped up" and transferred to a higher security facility. Administration further reported that, at the time of JHA's visit, none of the inmates in segregation were receiving psychotropic medications or mental health treatment.

Segregation inmates are allowed one hour of out-of-cell recreation time per week and to shower once every three days. In addition, segregation inmates are permitted to have one one-hour "no contact" visit with family behind a glass enclosure each week. Segregation inmates are fed all meals in their cells and their access to personal property is limited, as televisions and radios are forbidden. Access to commissary is also limited. Once a week, segregation inmates are permitted only to buy writing paper, envelopes or shower shoes from the commissary. Hygiene products and pens are provided on an "as needed" basis, as is access to library services.

As in Vienna's other living units, JHA saw evidence and heard multiple reports of cockroach and insect infestation in segregation housing. However, we were most struck by the exceedingly harsh living conditions of the bullpen segregation area. The bullpen, which contained a single toilet and a single sink, was cramped, dark, windowless, poorly ventilated and generally miserable in every respect. On the date of JHA's visit, it housed ten inmates in double bunk beds. These inmates, left to lie on their beds for hours in the

dark, were thoroughly despondent and dejected. Unlike the inmates in segregation that JHA generally encounters on visits, the inmates in the bullpen were neither animated nor eager to speak with us, but seemed listless and defeated.

The administration acknowledged that the bullpen was far from an ideal place for housing segregation inmates. It indicated that, if possible, it would like to knock down the bullpen's walls to create individual segregation cells. The administration nevertheless found the bullpen to be workable and tolerable, at least for the foreseeable future, on the basis that inmates were generally not housed there for more than a few weeks. JHA asked the administration to consider the possibility of mitigating the harsh living conditions of bullpen inmates by giving them more yard time. The administration stated that increasing yard time was not a top priority given the facility's more urgent, immediate challenges, but that it would consider the possibility.

## Physical and Mental Health

While Vienna has a medical observation room and a mental health unit, the facility lacks an infirmary and crisis cells for inmates experiencing severe psychological episodes. When inmates require an infirmary or are placed on crisis/suicide watch, they must be housed in Shawnee Correctional Center, a male medium-security prison that is adjacent to Vienna.

Both the medical and mental health offices are located on the first floor of Building 19. The facility is authorized for and employs one full-time physician and one full-time pharmacy technician. While authorized to employ eleven full-time nurses, Vienna was understaffed with only ten nurses at the time of JHA's visit. On average, nurses must see and treat 70 to 90 inmates on the sick call each day. In addition, medications must be distributed to inmates through medication lines conducted twice daily out of the centrally located town square.

According to the health care administrator, medical staff members are managing their caseloads fairly well, despite a great need for more nurses. At the same time, the administrator noted that the facility struggles to provide care for inmates with chronic illnesses (see chart), as well as a growing number of mentally

| Number of Vienna Inmates Diagnosed with Chronic Illnesses (Reported 9/27/2011) |
| --- |
| Asthma 138 |
| Cancer 4 |
| Diabetes 64 |
| Hepatitis C 94 |
| Chronic Hepatitis B 1 |
| HIV 22 |
| Hypertension 322 |
| Seizures 32 |
| Tuberculosis 29 |

ill inmates with medication needs. A mental health staff member noted that Vienna's lack of crisis cells in particular poses a huge problem, given this growing number of mentally ill inmates. At the time of JHA's visit, Vienna had only one part-time psychiatrist (eight hours per week) and one full-time on site psychologist (40 hours per week) to address the

needs of almost 1,700 inmates.

JHA had the opportunity to speak with Vienna's psychologist, and was profoundly impressed with her dedication and professionalism. However, JHA believes that this mental health staffing level cannot possibly begin to meet the needs of an inmate population this size. We also believe that these work conditions will eventually exhaust and burn out even the most dedicated and qualified staff.

The mental health staff member we spoke with noted that she tries to check each inmate who is receiving mental health treatment every 30 days, which means she needs to see about 20 inmates a day. Even as she aims to work at this feverous pace, she is still 62 percent behind. This is not surprising given the demanding mental health needs of Vienna's population.

According to staff, the number of inmates receiving mental health treatment has tripled in the last three years. At the time of JHA's visit, 196 inmates were under psychiatric care. Of these, 152 inmates were receiving psychotropic medications, none involuntarily. The mental health staff member explained that she currently was treating inmates with the following diagnoses: 135 affective disorders, 35 psychotic disorders, five developmentally disabled, and the rest inmates with a variety of general to severe mental disorders. She suspected that some inmates' mental illnesses were exacerbated by the anxiety of being in a less structured environment than they have grown accustomed to in other prisons. It is equally probable that the high stress from Vienna's overcrowded environment and extremely poor living conditions exacerbate or independently generate new symptoms of mental illnesses.[13]

The mental health staff also described how the lack of crisis cells interferes with her work. When inmates decompensate and need to be closely monitored, Vienna's staff must take them to Shawnee's crisis unit. In a typical month, Vienna's health care staff sends about six to eight inmates to Shawnee for this purpose. Even though these inmates are housed in Shawnee's crisis unit, they remain Vienna's responsibility. Consequently, Vienna's sole mental health care worker must regularly visit these inmates, which is important, but takes her away from the facility and the other inmates in her care.

To address the lack of medical and mental health staffing, DOC utilizes telemedicine, a program that uses telecommunications and information technology to administer health care remotely. Both the heath care administrator and mental health staff were ambivalent about telemedicine. In general, they said telemedicine relies on two things that Vienna currently lacks: adequate support staff and an electronic system for medical records

In addition to all these issues, Vienna lacks sufficient dental providers to meet the needs

---

[13] See Terry A. Kupers M.D., *Trauma and Its Sequelae In Male Prisoners: Effects of Confinement, Overcrowding and Diminished Services*, American Journal of Orthopsychiatry Vol. 66, Issue 2 (April, 1996) (discussing research that links prison overcrowding and diminished services to increased violence, psychiatric decompensation, suicide, hypertension, and other medical and mental health conditions).

of its population. While the facility is authorized for and employs one full-time dentist and one full-time dental assistant, it does not have a dental hygienist to perform teeth cleanings. Further, it has only one functioning dental chair. Consequently, there are substantial backlogs for inmates to receive dental treatment. At the time of JHA's visit, the administration reported the following wait times: one to two weeks wait for tooth extractions; two years for dentures; two years for fillings; and two and a half years for teeth cleaning.

## Staffing & Inmate Programming

Severe overcrowding, understaffing and lack of programming at Vienna have placed a tremendous strain on correctional staff. A senior correctional officer reported to JHA that while he did not believe in "catering to inmates," increasing programming, inmate jobs and regular recreation times at Vienna was important for safety reasons because inmate idleness and frustration had led to short tempers, increased staff assaults and inmate fighting. As this officer expressed, "We all want to be able to go to work, do our jobs, and come home at the end of the day." This officer was heartened that money was finally being reinvested in Vienna to fix some of its severe physical plant issues, like broken windows in housing units and roofs that were collapsing. However, he was skeptical that the situation would improve significantly without increasing inmate programming and clerical and security staffing levels.

With 186 correctional officers, 16 correctional sergeants, and six shift supervisors, Vienna was considered "fully staffed" for these positions at the time of JHA's visit. However, with 14 correctional lieutenants, it was well below its authorized staffing level of 17 lieutenants. Vienna was also severely understaffed with respect to clerical/ administrative support personnel. While authorized for 32 clerical support staff, only 25 of these positions were filled when JHA's visited. Consequently, to make up for this insufficiency in clerical staff, three correctional officers had to be reassigned from their security duties to perform clerical work 22 days each month (for a total of 495 hours monthly).

Alongside of Vienna's current staffing problems, it faces a critical wave of retirements, which, according to the administration, will "cripple" the facility and efforts to improve operations. There are 28 persons retiring, including some of the most senior, experienced staff. Among persons retiring: seven lieutenants, five sergeants, two dietary supervisors, two clinical services supervisors, two counselors, a secretary, three persons in the records office, and a supervisor at the boot camp.

At the time of JHA's visit, there were four Adult Basic Education (ABE) classes offered. A total of 58 inmates were enrolled in these, and 170 inmates were on the waitlist for ABE classes. In addition, there were two GED classes in which 31 inmates were enrolled. A total of 43 inmates were on the waitlist for GED classes.

Vienna offers some vocational training to inmates, including courses in auto body, auto mechanics, commercial custodial work, food services, career technologies and cosmetology. Administration did not provide specific data to JHA on the number of inmates involved in vocational training, but indicated that the number was very small. The vast majority of Vienna's inmates do not have the opportunity to participate in any educational or vocational courses.

Vienna's administrators reported to JHA that when they first arrived at the facility, almost 90 percent of inmates had job assignments. As a result, Vienna was running $2,000 over budget each month in paying inmate wages. Administrators explained that to get the budget under control, they had to cut about 1,000 inmate jobs, which left a great number of inmates idle, frustrated, and without a means to earn money. According to administration, the job cuts were necessary, not only for budgetary reasons, but because there was not enough work to go around. Thus, multiple inmates were being assigned to jobs and getting paid for work that required only one man.

JHA agrees that budgetary constraint and fiscal responsibility are essential to a well-run facility. However, JHA remains troubled by the whole-scale cutting of inmate jobs at Vienna, particularly given the lack of other educational and vocational opportunities for Vienna inmates. Prison employment helps rehabilitate inmates, decrease recidivism, and reduce inmate idleness, increasing safety and security in the correctional environment.[14] To balance the needs of both rehabilitation and budgetary responsibility, Vienna's administration should explore and seriously consider bringing an industry to Vienna, as this could help to both increase inmate employment and work skills and reduce costs to taxpayers through the sale of inmate-produced goods.

## Visiting Area

General population inmates are allowed eight personal visits per month. Visits can occur on weekend days and on one weekday each week. There are no time limits on the visits, with the exception that when the visiting room becomes overcrowded, visits will be limited to two hours. Visiting hours are held Monday through Friday from 9 a.m. to 6 p.m., and on Saturdays, Sundays and holidays from 9 a.m. to 2 p.m. and from 3:30 p.m. to 8:30 p.m. Visitors and inmates can hold hands above the visiting tables and are allowed to hug and kiss once upon greeting and once upon leaving. Inmates are also permitted to hold their infant children. As previously stated, segregation inmates are limited to one one-hour "no contact" visit with immediate family members behind a glass enclosure each week.

JHA had the opportunity to see Vienna's visiting room. While there some crayons and books for children, the area was otherwise very drab, dreary and institutional looking.

---

[14] *See* Kerry L. Pyle, *Prison Employment: A Long-Term Solution To the Overcrowding Crisis,* 77 Boston University Law Review 178 (1997); Jessie L. Krienert, Mark S. Fleisher, *Crime and Employment: Critical Issues in Crime Reduction for Corrections* (2004 AltaMira Press).

Administration reported that work was scheduled to soon begin painting a mural in the visiting room. At the time of JHA's visit, the visiting room was furnished with 16 tables, each table having four adjoining chairs. These furnishings were paint-chipped and in shabby condition, adding to the general gloominess of the surroundings.

As DOC refurbishes Vienna, it should improve the visiting area, making it more family and kid friendly. Visiting areas serve a vital function in any prison. They not only provide inmates with space to meet with family, friends, and loved ones, but they can also help reduce recidivism and save taxpayer money. A recent study from Minnesota Department of Corrections found that inmates who received regular visits were "significantly less likely to recidivate."[15]

Moreover, parent-child visitation has beneficial effects on the emotional adjustment of children to the grief and loss caused by parental incarceration. Given that prison-visiting rooms are, in fact, public spaces often used by children, the needs of children for a physically and emotionally safe visiting environment should be recognized. Monochromatic visiting rooms areas with sparse metallic furnishings and fixtures are reminiscent of medical settings, which are often frightening to children and offer no visual reassurance. Inexpensive modifications to prison visiting rooms, such as painting visiting room walls with bright colors or murals can help to lessen the stress of this environment for children and incarcerated parents alike.[16]

## Population & Facility Demographics

The average age of inmates at Vienna is 35. Approximately 12 percent of Vienna's population is 50 or older. The racial-ethnic makeup of Vienna's population is roughly 67 percent African American, 21 percent White, 11 percent Hispanic, and approximately 1 percent Native American and Asian combined.

### ###

---

[15] *See* Minnesota Department of Corrections, "The Effects of Prison Visitation on Offender Recidivism," Nov 2011, found at http://www.doc.state.mn.us/publications/publications.htm.

[16] *See* Denise Johnston, *Parent-Child Visits In Jails,* Children's Environments, Vol. 12 (1) 33-56 (March 1995) available at http://colorado.edu/journals/cye/12_1/12_1article2.pdf.

*This report was written by John Maki, Executive Director, and Maya Szilak, Director of the Prison Monitoring Project, for the John Howard Association. Maya may be reached at (312) 503-6302 or mszilak@thejha.org.*

*Contributing to this report were citizen observers: Laurie Jo Reynolds and Scott Main.*

Since 1901, JHA has provided public oversight of Illinois' juvenile and adult correctional facilities. Every year, JHA staff and trained volunteers inspect prisons, jails and detention centers throughout the state. Based on these inspections, JHA regularly issues reports that are instrumental in improving prison conditions.



JHA's work on healthcare in DOC is made possible through a generous grant by the Michael Reese Health Trust.

# EXHIBIT 4



John Howard Association of Illinois

375 East Chicago Avenue, Suite 529  Chicago, IL 60611
Tel. 312-503-6300 Fax. 312-503-6306 www.thejha.org

# Monitoring Tour of Stateville Correctional Center
## September 14, 2010

*Summary: Too many responsibilities, not enough resources.*

On September 14, 2010, eight representatives of the John Howard Association of Illinois conducted a monitoring tour of Stateville Correctional Center. Opened in 1925, Stateville contains maximum-security, protective custody, and a medical unit.  Stateville also serves as the Northern Reception and Classification Center for Cook and its collar counties.  The Northern R&C is tasked with receiving inmates, assessing their risk status and health issues, transporting them to and from court if necessary, and ultimately sending them to an appropriate facility.

Marcus Hardy has been Warden of Stateville for almost one year.  Warden Hardy has done a commendable job managing Stateville's multiple functions and working to bring volunteers into Stateville to increase the facility's limited educational and vocational opportunities.  However, Warden Harvey's efforts are often hamstrung by the fact that the prison is given too many responsibilities without adequate resources.

### The Context

To understand current conditions at Stateville, it is necessary to appreciate two significant problems the facility faces.

Like all of Illinois' prisons, Stateville has long suffered from a lack of resources, but the state's budget crisis has made this problem worse. In recent months, the state has had problems paying venders who are already contracted to deliver goods and services. This issue affects all aspects of the prison.

One telling example is sanitation. Cockroaches are a chronic problem throughout the prison, according to staff and inmates. When JHA representatives asked Warden Hardy about this issue, he agreed and attributed the problem to the fact that the prison's exterminator has not been able to adequately do his job because the state has repeatedly failed to pay for his services on time.

Stateville's lack of resources is compounded by the fact that it serves as the Northern Reception and Classification Center for all incoming inmates from the northern part of the state, the region that sends the most inmates to IDOC. This operation puts a significant strain on resources that the prison does not possess in abundance. The Northern R&C houses more inmates than Stateville proper—on September 26, the R&C housed 2,036, while Stateville housed 1,584.

Warden Hardy is acutely aware of these problems, but the reality is that there is little either he or the Department of Corrections can do to solve them. As long as the state continues to send record numbers of people to prison, the Department of Corrections has to incarcerate them, regardless of its ability to do so.

Because the budget crisis is hurting all state agencies, it may seem tempting to ignore the situation of our state prisons. That would be a serious mistake. These problems create significant safety concerns for inmates and staff. And of course, poor prison conditions also present a safety risk for the general public, as the overwhelming majority of people who are sent to prison will eventually be released back into society.

## Medical and Mental Health Care

Medical and correctional staff said the Health Care Unit has significant understaffing problems. For example, there is no permanent Nursing Director.

That position is being filled on a temporary basis by a Wexford Health Sources employee who is not licensed to work as a nurse in Illinois.

Deficits in hours of service are in most instances made up by overtime. Many medical staff are working 64 hours a week or more. This is expensive and can lead to employee burnout and mistakes in care.

Staff said the 32-bed infirmary is nearly always full. Patient-inmates must sometimes be sent back to their cells and treated there to free an infirmary bed for an inmate more in need of it. Meanwhile, the 10-bed infirmary at the Reception and Classification Center is unstaffed and empty.

Staff said they must send some inmates to other institutions for dialysis because Stateville is unable to treat the number of patients requiring it. The physical therapist has yet to see some patient-inmates who made their appointment in 2009.

Patients needing sophisticated care such as orthopedic or gastro-intestinal surgery generally go to the University of Illinois Medical Center. Staff said they are unable to get quick treatment for patient-inmates, however.

Medical staff said that staff shortages similar to those cited above have been the norm at Stateville for at least four years. They said the situation has worsened recently.

On the positive side, Stateville has its full complement of five authorized physicians and psychiatrists. Medical staff said they expect to hire a psychologist in the foreseeable future, bringing the prison to its full complement of seven.

Mental health services are especially important at Stateville, as 951 inmates are receiving psychiatric care and 532 are receiving psychotropic medication.

*Observations: Stateville's population is aging as many inmates are serving long sentences or life terms. This means they need more medical and mental health care than the typical prison. This need is likely to be magnified in the future as the longer sentences handed down over the past two decades lead to an increasingly elderly prison population.*

*Recommendation: Fully staff Stateville's medical and mental health care staff.*

## Inmate Mail and Visiting Hours

Nearly every inmate JHA interviewed reported significant problems with the mail service and visiting hours. It can take as long as three months to receive a letter, and visitors have to wait as long as three hours before they could see a family or loved one, according to some inmates.

While Warden Hardy said it has never taken longer than six-weeks for an inmate to receive a letter, he confirmed that there were delays in mail and visiting. He attributed these problems to a lack of staffing. He also told JHA that since he became Warden, he has made it a priority to decrease these delays.

*Observation: It is taking too long for inmates to receive mail, and visitor are waiting too long before they can see their friend or family member.*

*Recommendation: Prison administration should continue to work to bring down these delays.*

## F-House

Stateville is home to F-House, the only functioning panopticon left in the



United States. The brainchild of 19th century British philosopher Jeremy Bentham, panopticons have a single center tower with rows of cells circled around it. The purpose of this design was intended to make it easier for one observer to monitor large groups of inmates. Bentham argued that the panopticon would also create "a new mode of obtaining power of mind over mind," as inmates would internalize the tower's gaze and eventually learn to monitor themselves.

Whatever lofty goals Bentham envisioned for his panopticons, the reality of Stateville's F-House is far from ideal. As soon as the inmates begin to shout to each other, the room acts as an amplifier and is soon deafening. While the observation tower is supposed to enable corrections officer to effectively monitor inmates, it is hard to believe this is possible, as the cell doors are almost impossible to see through.

The F-House contains four different classifications of prisoners. It houses inmates in segregation, inmates who are appealing their removal from protective custody, general population inmates, and inmates bound for court in the northern part of Illinois.

The F-House presents several security issues.  Given that its structure allows inmates to easily communicate with one another, it is ill suited for segregation, which is intended to isolate inmates from one another.  It is unfair to subject non-segregated inmates to segregation, and puts a strain on staff to manage so many different kinds of population in a single house.  Holding such diverse populations together violates a basic principle of correctional policy.

*Observation: F-House has too many different and conflicting classifications of inmates and is ill equipped for inmates in segregation.*

*Recommendation: Ideally Department of Corrections would close the F-House. Until that happens, prison administration should find alternative space for its inmates in segregation.*

## X-House

X-House is where Stateville once housed death row inmates.  Today it houses inmates who are in protective custody.  Staff JHA interviewed reported serious safety concerns about X-House.  They felt that the walls were not thick enough and that the doors lacked adequate locks, both of which presented escape risks.

*Observation: X-House seems ill suited to house inmates.*

*Recommendation: While space is limited, prison administration should explore the possibility of closing X-House.*

## Programming

Like all maximum-security prisons in Illinois, Stateville has extremely limited educational or vocational opportunities.  The prison offers a small GED program, a barber program, as well as a handful of on-site industries jobs, but most inmates have nothing to do but sit in their cell.  Moreover, while the average length of stay is one year, Stateville houses many long-term prisoners

who are sentenced to 20 years or more. It is the policy of the Department of Corrections to allow inmates with shorter sentences to take available educational and vocational classes before inmates with longer sentences. While this policy is designed to ensure that inmates are prepared to reenter society, it has the unintended of consequence of barring long-term prisoners from participating in programming.

Staff interviewed by JHA all said that the lack of programming created security risks for themselves and inmates. "We have to give these guys something to do," said one correction officer. "If we don't, they're going to be more likely to cause problems."

Since he came to Stateville in December, Warden Hardy has worked to provide additional educational and vocational opportunities for inmates. During his brief tenure, Warden Hardy has hosted several volunteer programs, including Lutheran Social Services Story Book Program that enables incarcerated fathers to send recorded stories to their children and the SMART program that teaches inmates stress management techniques.

*Observation: While Stateville needs more educational and vocational programming, prison administration should be commended for recruiting volunteers.*

*Recommendation: Prison administration should continue to explore how volunteers can increase educational opportunities, especially for long-term prisoners who otherwise would be unlikely to participate in prison programming.*

*This report was written by John Maki, Coordinating Director of the John Howard Association. He may be reached at (312) 503-6305 or jmaki@thejha.org.*

*Chris Bernard (JHA Staff), Philip J. Carrigan (JHA Board Member), Shuntay Grant (JHA Citizen Observer) Tony Lowery (JHA Citizen Observer), Robert Manor (JHA Staff), Alan Rubens (JHA Board Member), Tija Walters (JHA Citizen Observer), and Beth Webb (JHA Citizen Observer) contributed to this report.*

Since 1901, JHA has provided public oversight of Illinois' juvenile and adult correctional facilities. Every year, JHA staff and trained volunteers inspect prisons, jails and detention centers throughout the state. Based on these inspections, JHA regularly issues reports instrumental in improving prison conditions.

###

# EXHIBIT 5




Unasked Questions,
Unintended Consequences:
Fifteen Findings and Recommendations
on Illinois' Prison Healthcare System

A Special Report by
The John Howard Association

Photo Credit: IDOC

*JHA's work on healthcare in IDOC is made possible through a generous grant by the Michael Reese Health Trust*

**The John Howard Association of Illinois (JHA)**
*Promoting Community Safety Through Cost-Effective Prison Reform*

Founded in 1901, JHA is Illinois' only non-partisan prison watchdog. Our mission is to achieve a fair, humane, and cost-effective criminal justice system by promoting adult and juvenile prison reform, leading to successful re-integration and enhanced community safety.

Through our longstanding Prison Monitoring Project and Juvenile Justice Project, JHA staff and trained volunteers regularly tour all facilities in the Illinois Department of Corrections and the Illinois Department of Juvenile Justice. During these tours, monitors are able to observe the challenges faced by both inmates and correctional staff and ensure that policies are implemented in a way that promotes public safety.

Following our visits, JHA issues a written report that focuses on critical matters such as education, medical and mental health care, disciplinary procedures for youth and adults, and the physical condition of the facilities. These widely disseminated reports are read by everyone from lawyers to legislators, wardens to reformers, members of the Governor's office to members of the public at large; they provide essential transparency and oversight to an otherwise overlooked institution and drive safe and cost-effective criminal justice reform.

To read JHA's prison reports and learn more about our work, please visit at our website at http://www.thejha.org.

Contact information:
The John Howard Association (JHA)
375 East Chicago, Suite 529
Chicago, IL 60611
Tel: 312-503-6305 Fax 312:503-6306
http://www.thejha.org
Email: dhoffman@thejha.org

**Unasked Questions, Unintended Consequences:**
**Fifteen Findings and Recommendations on Illinois' Prison Healthcare System**

The Illinois Department of Corrections (IDOC) is not just an agency of 27 prisons. It is also a healthcare system for nearly 50,000 inmates.

This is an important fact that has profound and under-examined implications for state and local budgets, public safety, and civic health.

The United States Constitution's prohibition against cruel and unusual punishment requires prison officials to provide adequate healthcare for inmates.

Over the past 40 years, as Illinois' inmate population has increased by more than 700 percent, IDOC's constitutional healthcare obligations have become increasingly difficult to fulfill.

As of August 2012, IDOC housed almost 50 percent more inmates than it was designed to hold. Many minimum and medium security facilities housed more than 100 percent beyond their design capacity. These numbers place a nearly impossible demand not only on IDOC's ability to house inmates, but also on its ability to deliver healthcare services. Compared to the general public, inmates have significantly greater healthcare problems, with higher rates of chronic and infectious disease, addiction, and mental illness. The more inmates that IDOC incarcerates, the more sicknesses it must treat.

Apart from overseeing the care of its general population, IDOC also struggles to treat the growing number of inmates with special needs. For instance, over the past decade, Illinois' elderly prison population grew by more than 300 percent, far outstripping increases in other age groups.[1] While exact estimates vary and there is no Illinois-specific data, it is widely accepted that U.S. prisons and jails house more mentally ill people than psychiatric hospitals.[2] Additionally, a 2010 study by the National Center on Addiction and Substance Abuse at Columbia University found that 65 percent of the U.S. prison population meets the DSM IV medical criteria for substance abuse or addiction, though only 11 percent receive treatment.[3]

These special populations and the costs associated with their care stem from decades of choices made by elected officials with the support of the public. Decisions to lengthen sentences, mandate harsher punishments for drug-based offenses, and close public mental health institutions have filled IDOC with inmates who are drug addicted, mentally ill, and growing older. As a consequence, state prisons have become *de facto* hospitals, asylums, drug treatments facilities, and retirement homes.

Faced with unprecedented prison overcrowding, IDOC's healthcare responsibilities put an enormous burden on correctional staff and administrators. In this way, the state of

prison healthcare system directly affects IDOC's ability to promote public safety. With Illinois' fiscal crisis, IDOC has limited resources. The more resources IDOC must devote to healthcare, the less it has to provide inmates with programming that is proven to reduce criminal behavior. For instance, in Fiscal Year 2013, IDOC officials have reported that the agency must devote approximately 98 percent of its funding to basic operations, with less than two percent to spend on rehabilitative programming.

IDOC's healthcare system is not just an issue for the state's prisons. Every year, almost 35,000 inmates leave IDOC to return to their communities. If the prison system is not able to meet its healthcare obligations, cities, counties, and the general public will inevitably pay a higher price when inmates are released, with increased transmissions of infectious diseases, emergency room visits, and higher recidivism rates.

This is not meant as criticism of IDOC's staff and administration. It is a testament to the men and women who staff Illinois' prisons that the system is able to function as well as it does. Moreover, in spite of scarce resources, IDOC is making critical healthcare improvements, including recently partnering with the University of Illinois at Chicago to offer telemedicine clinics for inmates infected with Hepatitis C and HIV and implementing a much-needed electronic medical record keeping system.

The greatest problem facing IDOC's healthcare is not its staff or administration. It is that IDOC's healthcare system was created and is still defined by unasked questions and unintended consequences. When elected officials mandate harsher sentences or shutter community-based mental health programs, their intent is to be tough on crime or save taxpayer money, not to fill prisons with elderly inmates or inmates with special and expensive healthcare needs. As a result, IDOC's healthcare needs are never meaningfully taken into account when elected officials determine the laws, policies, and funding that govern the state's prison system.

Through decades of passing laws and supporting policies that have filled our prisons with an unprecedented number of inmates, we have built a prison healthcare system without asking difficult and yet fundamental questions about what we have created. Where will we find the resources to ensure our prison system can provide constitutionally adequate healthcare? Given Illinois' fiscal crisis, is prison the most cost-effective way to treat people with special healthcare needs? Do we want our prisons to double as hospitals for the mentally ill or the elderly?

Of course, failing to ask these questions is also a way of answering them: we just keep our current system, which will exhaust our resources, strain our prison system, and result in diminishing levels of care of inmates, most of whom will eventually leave IDOC and return to our communities.

The John Howard Association (JHA), Illinois' only non-partisan prison watchdog group, believes that through smart laws and policies and criminal justice reforms that safely

reduce the prison population, we can create a more cost-effective prison healthcare system that makes wise use of our limited resources and balances the needs to provide adequate healthcare and promote public safety.

With the support of the Michael Reese Health Trust and the cooperation of IDOC's staff and administration, JHA concentrated its 2011-12 advocacy and monitoring efforts on the healthcare operations of 12 state prisons. Based on our work, we have issued specific reports on each facility, with particular attention paid to healthcare. These reports, which are fact-checked by IDOC, stem from our research of best-practices, analysis of facility operations, JHA's database of inmate communications (which tracks the more than 3,000 communications we receive each year from inmates and their family members), observations of JHA staff and trained volunteer on monitoring visits, and conversations with IDOC inmates, staff, and administrators.

From our research, monitoring visits, and facility reports, JHA has produced the following 15 findings and recommendations on prison healthcare. As we note, IDOC is already implementing aspects of many of these proposals. JHA intends that our recommendations and advocacy support IDOC's important reforms in these instances. In cases where problems are unresolved, we will use our findings and recommendations to drive cost-effective correctional healthcare reform.

While this report is critical of prison healthcare, JHA agrees with the opinion we often hear from IDOC's healthcare administrators: the vast majority of the prison population receives more and better healthcare services in prison than they have received or could receive in their communities. This is not a reason to be satisfied with our current system. It is a reason to change it. As it stands, communities are not obligated to provide adequate healthcare, while prisons are. This is a symptom of backward priorities. We have created a system where a significant number of Illinois' citizens have to go prison before they receive access to basic healthcare, even though we know that community-based services, including substance abuse and mental health treatment, can help prevent people from going to prison, reduce victimization, keep offenders from recidivating, and do a better job of cost-effectively promoting public health and safety. To reform prison healthcare, we must not only change particular policies and practices inside our prisons, we must change our priorities on the outside as well. We must realize that prison health *is* public health.

## Findings and Recommendations

*The late act for preserving the health of prisoners requires that an experienced Surgeon . . . be appointed to every jail: a man of repute in his profession. His business is, in the first place, to order the immediate removal of the sick, to the infirmary; and see that they have proper bedding and attendance. Their irons should be taken off; and they should have, not only medicines, but also diet suitable to their condition. He must diligently and daily visit them himself; not leaving them to journeymen and apprentices. He should constantly inculcate the necessity of cleanliness and fresh air; and the danger of crowding prisoners together: and he should recommend, what he cannot enforce. I need not add, that according to the act, he must report to the justices at each quarter-sessions, the state of health of the prisoners under his care.*

*John Howard, founding father of prison reform, namesake of JHA,*
*The State of Prisons in England and Wales* (1777).

**(1) Increase external oversight of correctional healthcare.**

JHA finds there is insufficient external oversight of IDOC healthcare services, particularly with respect to services provided under contract by the private vendor, Wexford Health Sources (Wexford). In 2011, Wexford negotiated a 10-year contract to provide healthcare services to all 27 IDOC facilities at the cost of $1.36 billion to the state. While administrators in individual IDOC facilities are charged with performing quality improvement reviews and monitoring the delivery of healthcare services, they do not have the resources to perform comprehensive quality control monitoring and financial auditing of services under the contract. The Office of the Illinois Auditor General, the entity that typically performs such comprehensive public financial audits, does not audit the Wexford contract.[4]

To ensure cost-containment and the timely delivery of adequate healthcare, JHA recommends that the Illinois Governor and General Assembly appoint an independent performance audit review task force to assess IDOC's oversight of healthcare services, the cost and quality of services provided by Wexford, and the adequacy of correctional healthcare planning, and present and publish a report of its findings for legislative and public scrutiny.

**(2) Improve medical records and data collection and sharing to allow greater continuity of care between county and state correctional facilities, and promote the implementation of data-based correctional healthcare policies and planning.**

During its 2011-12 monitoring, JHA found that IDOC's existing medical records/data sharing systems are inadequate to ensure continuity of healthcare, particularly for inmates entering the state's prison system from county jails. It should be noted IDOC will pilot an

electronic medical records program in fall of 2012, with plans of expanding the program system-wide in spring of 2013. This new system will constitute an enormous improvement from the current paper-based system and should result in better care and significant cost-savings. For instance, the use of an electronic medical records program in Texas' prisons has saved that state's taxpayers an estimated $1 billion over the past 10 years and improved the quality of healthcare for inmates. Instituting an electronic medical records program in Illinois will also enable IDOC to identify and track key areas of correctional healthcare utilization in relation to the population's age, ethnicity, race, and gender, and to better plan for the healthcare needs of special populations.

While IDOC's new electronic medical records system will help improve care within state correctional facilities, it will not address significant problems that arise when inmates are transferred from county to state custody. For instance, there is currently no electronic system that allows IDOC to access medical records from county jails or hospitals. Most often, the only medical information IDOC officials have when inmates enter state custody is what inmates self-report. As such, even if county medical personnel have diagnosed an inmate with an illness and prescribed him or her medication, IDOC will have no way of verifying this when the inmate enters state custody. If the inmate tells IDOC's medical staff that he or she is taking medication, IDOC's policy is to offer "bridge" medication until they can make their own assessment so as to prevent potential abuses. While this is a reasonable policy given the existing state of affairs, it illustrates the need for reform and a reliable record sharing system that will allow medical histories to follow inmates from county to state custody, reduce duplicative medical work, and ensure continuity of care and timely delivery of services.

IDOC is currently working to interface with the University of Illinois at Chicago (which provides HIV and Hepatitis C management to IDOC inmates) and Cermak Hospital (which provides healthcare services to the approximately 10,000 detainees housed in the Cook County Department of Corrections and the Department of Community Supervision and Intervention) to share electronic medical data. The prospect of data sharing between separate agencies raises legal and confidentiality challenges. However, IDOC is confident that these issues can be addressed and worked through.

JHA recommends that IDOC, in partnership with county jails and hospitals and government health agencies, continue to work towards creating an integrated electronic medical records system that will allow the prison agency to access and share information with their county counterparts. A potential model for such a system can be found in the Jail Data Link, a successful Illinois program that allows county jails to access and share information with the state's mental health system.[5]

Consistent with the American Bar Association's Standards on the Treatment of Prisoners regarding continuity of care, JHA also recommends that IDOC modify its existing

policies to recognize and continue medication and healthcare treatment prescribed to
inmates by licensed healthcare providers prior to their transfer to IDOC, unless and until
a qualified healthcare professional directs otherwise upon individualized consideration.[6]

JHA further recommends that the Illinois Governor and General Assembly implement a
permanent, reliable, centralized system for data collection, auditing, and analysis of
inmate healthcare services to assist policy makers, legislators and IDOC administrators in
the current and future management of correctional healthcare, particularly with special
populations such as the mentally ill and the elderly.

**(3) Increase availability of substance abuse treatment within IDOC facilities and as
an alternative to incarceration.**

JHA finds that IDOC facilities lack sufficient space, staffing, and funding to provide
substance abuse treatment to all the inmates who need and would benefit from such
treatment. Further, incarceration is overused as a primary means to manage drug and non-
violent offenders, whose criminal behavior is driven by untreated substance abuse and
addiction and mental health disorders. This comes at great cost to taxpayers and has little
positive impact on recidivism or public safety.

JHA recommends that the Illinois Governor and General Assembly prioritize funding
drug abuse treatment within IDOC facilities, given the evidence that providing such
treatment greatly reduces recidivism, crime rates, and the cost to taxpayers. JHA further
adopts recommendations previously set forth by both the Center for Health and Justice at
TASC and Chicago Metropolis Strategies, including that the Illinois Governor and
General Assembly: (1) expand the use of community-based treatment, drug courts and
mental health courts as alternatives to incarceration; (2) roll back statutory provisions that
limit access to treatment alternatives; and (3) require that a fiscal and community impact
analysis be conducted for any proposed penalty enhancements for drug crimes.[7]

**(4) Increase the availability of medical and therapeutic diets for chronic disease
management and special populations, including female and elderly prisoners.
Identify challenges and strategies for improving menus and access to therapeutic
diets, and increasing nutritional counseling and education for inmates.**

JHA finds that that inmates with special dietary needs, such as diabetics, have limited or,
at best, inconsistent access to medical diets depending upon the facility where they
reside. JHA also finds that while IDOC menus comply with minimal daily caloric and
nutritional standards, the quality and palatability of food is generally poor, but varies
between facilities. As inmates generally and understandably dislike the food provided in
daily meals, many rely on the commissary to feed themselves and choose foods that are
high in fat, sugar, and salt. JHA further finds a general lack of nutritional education and
counseling for inmates, and noticeable evidence of obesity among female populations.

JHA recommends that IDOC, in line with best practices and minimum standards of care, analyze its correctional menus and work with food vendors to institute an affordable, palatable "heart-healthy" therapeutic meal option (reduced sodium, high fiber, low fat and sugar, with an emphasis on fruits and vegetables) to be made available to inmates system-wide, along with nutritional counseling and education on obesity and the relationship between diet and chronic disease.[8] IDOC indicated that overall it has switched to a "heart healthy" type diet in menu planning. JHA commends this effort, and encourages IDOC to work with vendors and dieticians to review and improve the quality of food provided to inmates.

JHA notes that IDOC provides low carbohydrates and concentrated sweets to diabetics who have difficulty controlling their eating patterns. To improve upon this policy, JHA recommends that IDOC work to institute the American Diabetes Association (ADA) proposed protocols for management of diabetes in correctional institutions, which include diabetic menu-planning and providing inmates with nutritional information and education to assist them with self-management of their disease.[9]

JHA further recommends that the Illinois Governor and General Assembly, in line with sound fiscal and public policy, provide IDOC with the requisite funding, staffing and flexibility needed to implement dietary analysis and reforms. Because good nutrition greatly reduces the risk for many chronic diseases, including heart disease, hypertension and stroke, promoting therapeutic dietary changes is a key step in preventing and managing chronic diseases (particularly the hypertensive/cardio-vascular diseases that are endemic to prison populations) and thereby reducing correctional healthcare costs.[10] In addition, there is emerging evidence indicating that improving the nutrition of prisoners' diets with the inclusion of increased vitamin, minerals and essential fatty acids can have a profound impact on antisocial behavior, improve morale, and reduce violence and depression amongst inmates.[11]

Finally, JHA observes that mismanagement of correctional diets can have serious health and fiscal consequences. Accordingly, JHA urges IDOC to use caution and careful planning in implementing its newly-initiated "brunch" program which reduces the number of daily meals provided to inmates from three to two on weekends.[12] Significantly, the Correctional Institution Inspection Committee, the entity charged with monitoring Ohio's prison system, found use of a similar brunch program created serious medical issues for some inmates and ultimately increased medical costs because inmates were unable to readily digest medications due to lack of adequate food in their stomachs on days that "brunch" was served.[13]

**(5) Abolish the fee-for-services inmate medical co-payment program. Alternatively, reassess and modify the existing medical co-payment program to conform to the recommendations of the National Commission on Correctional Health Care to insure that inmates' access to care is not impeded.**

JHA finds that IDOC's existing $5 fee-for-services inmate co-payment program unduly restricts inmates' access to healthcare and disproportionally penalizes and discourages indigent inmates from receiving necessary healthcare services, thereby jeopardizing the health of inmates, staff, and the public and increasing public healthcare costs long term.

To be clear, IDOC's policy is to not charge inmates co-payments for the treatment of significant chronic conditions, referrals for follow-up care that are requested by medical providers, emergency care, MRSA-related infection or any IDOC mandated healthcare service. Further, 730 ILCS 5/3-6-2 (2012), the statute that regulates inmate co-payments, contains an exception providing that "[a] committed person who is indigent is exempt from the $5 co-payment and is entitled to receive medical or dental services on the same basis as a committed person who is financially able to afford the co-payment."[14]

However, JHA found discrepancies between policy and practice at facilities. Inmates at every facility we visited reported inconsistencies in how co-payments are actually implemented and administered. Numerous inmates reported being charged multiple, multilevel co-pays to obtain necessary follow-up care or medication refills for chronic conditions. Inmates also reported unpredictability and lack of uniformity regarding which chronic health conditions and treatments require copayments and which are exempted. Some inmates reported that, as a prerequisite to being referred to a doctor for examination, they must first be seen by a nurse on sick call three times. Inmates indicated they are charged separate $5 co-pays for each of these visits, even where the reason for their return visit is misdiagnosis or ineffectual treatment. Inmates also reported their ability to timely access medical care was frustrated by the practice of staff refusing to address more than one medical issue per $5 visit. Thus, inmates suffering from multiple medical problems commonly put off treatment until medical conditions become serious and more difficult and costly to treat.

Finally, the reality is that when inmates have to choose between seeking medical attention or ordering food and toiletries from a commissary, many will choose the later.[15] This can lead to inmates foregoing treatment for minor medical problems, which, in turn, become major illnesses that entail substantially higher costs for the agency.[16]

JHA, in agreement with the National Commission on Correctional Health Care (NCCHC), therefore opposes the fee-for-services inmate medical co-payments program and recommends that the Illinois General Assembly abolish the statutory provision, 730 ILCS 5/3-6-2, that authorizes the program in Illinois.[17]

Alternatively, JHA recommends that the Illinois Governor and General Assembly, in collaboration with IDOC: (1) reassess and modify the existing inmate medical co-payment program to conform with the 10 guidelines set forth by the NCCHC to minimize impediments to inmates' access to care; and (2) perform data collection and analysis to determine whether infection levels and other adverse outcome indicators, including incidents of delayed diagnosis and treatment of serious medical problems within facilities, are either consistent with or lower than the levels before implementation of the

2012 legislation that increased the amount of inmates' medical co-payments from $2 to
$5.[18]

**(6) Increase bi-lingual staff and improve access to services, particularly healthcare
services, for Spanish-speaking inmates.**

JHA finds a great need for more bilingual Spanish-speaking staff, including healthcare
staff, at IDOC facilities, particularly facilities that serve as temporary places of detention
for inmates awaiting transfer to Immigration and Customs Enforcement (ICE) centers for
deportation proceedings. Lack of access to Spanish-speaking staff isolates Spanish-
dominant inmates and prevents them from being able to use basic services, including
healthcare services. In the absence of bilingual staff, bilingual inmates are often used as
translators for Spanish-dominant inmates in communications with staff and
administrators that demand confidentiality and reliability, such as medical consultations,
grievance procedures, and disciplinary actions. These practices run contrary to minimum
standards of care.[19] However, IDOC is to be commended for making significant strides
this year towards improving access for Spanish-speaking inmates by making grievance
forms, orientation manuals, and informational health fliers available to inmates in
Spanish.

In accord with best correctional and healthcare practices, JHA additionally recommends
that the Illinois General Assembly and Governor, in partnership with IDOC: (1)
undertake a study to identify and determine the number of non-English speaking inmates
in IDOC's population, the number of bilingual staff at each facility, and the ideal number
of bilingual staff needed at each facility needed to provide access to services, based on
the size of the non-English speaking population; (2) implement a program to recruit and
retain staff who reflect the cultural and linguistic diversity of the prison populations being
served, including bilingual healthcare staff; and (3) develop and implement a strategic
plan to provide culturally and linguistically appropriate services to groups of non-English
speakers who are significantly represented in the prison population, particularly Spanish-
dominant speakers.

**(7) Institute opt-out HIV and Hepatitis C testing at IDOC reception and
classification centers, provide HIV and Hepatitis C treatment to more inmates
during their incarceration, and facilitate greater continuity of care for these
conditions upon inmates' reentry to the community.**

JHA finds that IDOC has a strong Peer Education Program for HIV and other sexually
transmitted diseases. As of the publication of this report, IDOC is in the process of
implementing opt-out HIV testing at reception and classification centers in accordance
with 2011 legislation authorizing this testing regime.[20] This will mark an improvement
from current policy, which is to offer all inmates HIV testing on admission to their parent
facility and prior to discharge, as well as offer additional HIV testing every six months if
the inmate requests it or his or her doctor feels it is medically necessary.

JHA commends IDOC for this action and recommends that IDOC continue to implement and monitor the use of opt-out HIV testing at all reception and classification centers, and coordinate efforts with county jails to prevent unnecessary expense from redundant retesting of inmates for HIV. JHA further recommends that the Illinois Governor and General Assembly fund implementation of opt-out HIV testing at IDOC reception and classification centers.

To date, opt-out Hepatitis C has not been authorized or implemented at IDOC reception and classification centers. Currently, inmates are referred for Hepatitis C testing only on an individualized basis if they report having risk factors for the disease. Inmates who are identified with Hepatitis C, who otherwise would be appropriate candidates for treatment during incarceration, are often excluded from Hepatitis C treatment due to medical protocols that defer treatment if an inmate is likely to be released within 12 months before treatment can be completed. IDOC allows exceptions to this protocol on a case-by-case basis.

The clinical reasons for not offering opt-out testing and deferring treatment for inmates with less than a year to serve include: (1) a relatively small percentage of Hepatitis C infected patients go on to have significant disease from the infection; (2) it takes between 20-30 years from infection to develop those problems; (3) Hepatitis C treatment requires regular monitoring to identify potentially serious side effects; and (4) partial Hepatitis C treatment may select out resistant organisms and may not be beneficial to the inmate-patient. IDOC also noted that when Hepatitis C treatment cannot be completed in prison, the inmate must often "start from scratch" with the treatment upon release, even if resistance has not developed.

Despite these reasons, there are strong arguments for providing more robust and consistent Hepatitis C testing and treatment for inmates. Undiagnosed Hepatitis C infection among the prison population presents a serious threat to public health and invariably results in greater rates of infection and increased mortality among inmates and the general public, and increased public health costs. Untreated Hepatitis C exacts a high toll on the public health, today killing more Americans than HIV. Some states, like New York, have been successful in modifying correctional treatment protocols and extending treatment to more inmates by connecting newly-released inmates to "medical homes" for ongoing Hepatitis C treatment and monitoring, thereby allowing treatment to be initiated during incarceration without regard to an inmate's length of stay in prison. Improving Hepatitis C diagnosis, access to treatment, and prevention services for the prison population is a proven public health/disease-control strategy that benefits the community by reducing rates of disease transmission and reducing public health costs.[21]

The Centers for Disease Control (CDC) recently recommended that all baby boomers (*i.e.* those born between 1945 and 1965), be tested for Hepatitis C.[22] Public health and medical experts likewise have called for increased testing and treatment of Hepatitis C among the prison population as the best means to curtail the Hepatitis C epidemic in the United States.[23] IDOC is aware of these recommendations, but indicated that a large

percentage of the population is already tested for Hepatitis C under existing CDC
guidelines, which recommend that correctional facilities provide Hepatitis C testing at
intake to inmates who report a history of risk factors, especially intravenous drug use.[24]

The problem with risk-based Hepatitis C testing, however, is that this method has been
shown to underestimate the prevalence of Hepatitis C in correctional settings and limit
the opportunity for diagnosis and treatment.[25] For instance, a study of the Rhode Island
Department of Corrections found that most inmates who were Hepatitis C infected would
not have been tested and identified under the CDC guidelines for risk-based testing.[26]
"One factor contributing to this underestimation is that self-reporting of injection drug
use requires inmates to disclose illegal and stigmatized behaviors within the correctional
setting. The timing and context of the screening itself may prevent many injection drug
users from discussing incriminating behaviors."[27] Testing only those inmates with
reported risk behaviors also reinforces the stigma of Hepatitis C and drug use that may
have led to incarceration and further marginalize these individuals.[28]

For these reasons, JHA recommends that: (1) the Governor and General Assembly, in
cooperation with IDOC, initiate a pilot opt-out Hepatitis C testing program at county
jails/IDOC's reception and classification centers, at least with respect to inmates born
between 1945 and 1965; and (2) that IDOC, in partnership with the General Assembly
and Governor, county jails, public health agencies and hospitals, and the division of
parole, devise a pilot program to provide ongoing access to Hepatitis C treatment and
continuity of care to newly-released inmates and modify treatment protocols to allow the
initiation of Hepatitis C treatment by more inmates during incarceration regardless of
their length of stay. Developing a plan now to broaden Hepatitis C testing and continuity
of treatment to inmates during and subsequent to their incarceration is critical, given that
implementation of the Affordable Care Act in 2014 will eventually finance post-release
care for people who receive a Hepatitis C diagnosis while they are in prison.

**(8) Reassess and increase staffing levels of physicians, nurses, psychiatrists, mental
health professionals, dental staff, optometrists and security and clerical staff as
needed to ensure that inmates receive timely access to quality healthcare, including
routine and preventative healthcare, and implement a strategic plan to timely fill
staff vacancies.**

JHA finds the quality of healthcare services and the ability of inmates to timely access
healthcare treatment varies greatly among facilities depending upon available resources,
the size and healthcare needs of the population, and inmate-to-healthcare staff ratios.
Overall, however, JHA finds that healthcare resources and staffing are inadequate to meet
minimum standards of care throughout IDOC. In particular, systemic nursing shortages
prevent inmates from timely accessing sick call and necessary healthcare services.
However, lack of adequate medical staffing and resources in all areas—medical, mental
health, dental, vision—threaten serious harm by delaying diagnosis and treatment and
inviting medical error. Inadequate medical staffing levels also contribute to staff burnout
and turnover, which, in turn, help perpetuate chronic understaffing throughout IDOC.

Compounding these problems, vacancies for healthcare staffing positions, both through
the state and the private contractor, Wexford, frequently remain unfilled for long periods
of time. To ensure adequate access to healthcare, sufficient security and clerical staffing
also must be maintained to allow the safe delivery of healthcare services in a secure
setting and facilitate the timely maintenance and transmission of medical records and
data.

Minimum standards of care dictate that correctional authorities employ a sufficient
number of qualified medical, dental, and mental health professionals at each correctional
facility to render preventive, routine, urgent, and emergency health care in a timely
manner consistent with accepted health care practice and standards.[29] The Eighth
Amendment of the U.S. Constitution likewise requires the government to provide inmates
with adequate medical and mental health care.[30]

To rectify systemic deficiencies in the delivery of healthcare services to IDOC inmates,
prevent harm to inmates, staff and the public, satisfy the constitutional duty to provide
adequate medical care, and foreclose civil litigation, JHA recommends that the Illinois
Governor and General Assembly, in partnership with IDOC and Wexford: (1)
comprehensively assess the healthcare needs, utilization of services, delays in service,
staffing levels and adverse outcomes at each facility, and increase minimum medical
staffing levels to address identified inadequacies and meet minimum standards of care;
and (2) develop and implement a strategic plan to increase medical staffing levels and
recruitment and ensure that medical staff vacancies are filled on a timely basis.

**(9) Continue to explore and implement safe alternatives to long-term segregation
and abandon segregation to punish mentally ill inmates.**

JHA finds that a significant number of inmates in disciplinary segregation throughout
IDOC are taking psychotropic medications and diagnosed with serious mental illnesses.
JHA finds that a substantial number of inmates housed in long-term isolation exhibit
signs of mental illness. An increasing body of data, literature, studies, and research
establish that long-term isolation can have severely detrimental effects on inmates'
physical and mental health, and is particularly hazardous for inmates with preexisting
mental illness.[31]

In line with the United Nations' and the American Bar Association's standards on the
treatment of prisoners and expert medical authorities, JHA recommends that the long-
term solitary confinement and use of long-term isolation for mentally-ill inmates should
be banned altogether and a *per se* prohibition placed on holding inmates at Tamms
Correctional Center who have a history of mental illness or self-harm.[32] To this end, JHA
commends IDOC for taking action on this issue and working with the Vera Institute of
Justice to decrease its use of long-term segregation.

**(10) Ensure that female inmates receive gender-based programming grounded in evidence-based best practices.**

JHA finds that IDOC's Women Division has made significant progress in creating and sustaining programming that focuses on the needs and issues that bring women into the criminal justice system. The vast majority of female inmates come from backgrounds of serious trauma and physical, sexual or emotional abuse. Female inmates also have substantially higher rates of mental illness, self-injuring behaviors, and drug abuse than male inmates. Approximately 80 percent are also mothers, and many were the sole parent-providers for their children prior to their incarceration. IDOC is working to address these issues through gender-specific programming, including several initiatives that facilitate strengthening relationships between mothers and their children, such as the Moms and Babies program at Decatur Correctional Center that enables specially-screened pregnant inmate to deliver and care for their child while they are incarcerated. In line with JHA's recommendations, IDOC confirmed its commitment to hiring more female correctional officers.

To build upon this progress, JHA recommends that IDOC require that female prisoners be "attended and supervised only by woman officers."[33] In accord with best correctional practices, JHA further advises that: (1) all staff assigned to work with female populations (including all cadets and staff in training) be screened to ensure they are sympathetic and open to working with female inmates; and (2) that all staff assigned to work with female inmates be given gender-sensitive specific training to ensure knowledge of and sensitivity to female inmates' special issues and needs, including issues of prior trauma, cross-gender supervision issues, the role of security staff, and the importance of using gender-responsive strategies when working with female populations.[34]

**(11) Study Illinois' growing elderly inmate population with an eye toward proposing safe, cost-effective approaches to their care in prison and potential alternatives to incarceration.**

JHA finds that Illinois' elderly inmates represent the fastest growing segment of prisoners.[35] Over the past decade, Illinois' elderly prison population grew by more than 300 percent. It is unclear how Illinois will pay for the housing, treatment, and medical care of this growing elderly inmate population. Indeed, it is unclear how Illinois can currently pay for elderly inmates' housing and care today, which is conservatively estimated to cost $428 million a year, about a third of IDOC's budget.[36] Estimates place the average cost of incarcerating an elderly inmate between $60,000 to $70,000 per year, compared to the $27,000 per year it costs on average to house a general population inmate.[37] Because the federal government generally does not pay for state inmates' medical care, these costs are borne almost entirely by Illinois taxpayers.[38]

While IDOC has long recognized that the rise in the elderly population presents a burgeoning fiscal and healthcare crisis, it is constrained from addressing the issue head-on by limited budgets, overcrowding, understaffing, scarce resources, and the lack of

political will to tackle this difficult issue.[39] Indeed, in 2010, IDOC proposed construction of a 448-bed geriatric prison to address the needs posed by this population.[40] With the state's ongoing fiscal hardships, this proposal has since stalled. Likewise, legislative efforts aimed at allowing earlier release for long-term elderly prisoners have repeatedly failed to obtain requisite support.[41]

To ensure that IDOC is positioned to address the needs of its aging population, JHA supports recommendations set out in recent studies by the Vera Institute of Justice, Human Rights Watch, and the Prison Reform Trust on the treatment and care of elderly prisoners, including that: (1) elected officials should support an analysis of the factors contributing to the growth of the elderly prison population and existing sentencing and parole policies, including geriatric release mechanisms, to determine whether modifications could be made to reduce the population of elderly prisoners without appreciable risk to public safety; (2) IDOC should provide training for correctional officers working with older persons, including training on physical and mental conditions of elderly inmates; and (3) IDOC facilities should implement a regular process for consulting with elderly inmates by holding elderly inmate forum/focus group meetings on a recurring basis to enlighten staff and administrators on the issues, problems, and assistance required by older inmates.[42]

### (12) Export Dixon Correctional Center's Hospice Program to other facilities.

While all of IDOC's facilities house aging inmates, Dixon Correctional Center is Illinois' *de facto* special population prison for male inmates, with a special unit for elderly prisoners. Dixon is also home to one of the most innovative and successful correctional hospice/adult-care programs in the country.

Given the exponential growth of the elderly prison population and the rising cost of correctional healthcare, JHA recommends that elected officials establish a commission to study the projected hospice/adult-care needs of this growing elderly population and the feasibility of expanding and importing Dixon's outstanding hospice/adult-care program to other facilities in the state.

### (13) Continue and explore expanding telemedicine and telepsychiatry.

JHA finds that IDOC has made innovative and cost-effective use of telemedicine and telepsychiatry. Telemedicine clinics, in collaboration with the University of Illinois at Chicago, are provided to qualifying inmates with HIV and Hepatitis C, depending on the time remaining on their sentence. Wexford offers telepsychiatry in some facilities. While JHA heard some complaints from IDOC staff about problems scheduling visits, we noted overall broad-based support for this technology from inmates, staff, and healthcare professionals.

Given the success of telemedicine and telepsychiatry, JHA recommends that IDOC
explore expanding their use. In particular, telemedicine clinics seem ideally situated to
oversee care of physical therapy, diabetes, and hypertension.

**(14) Assess and improve IDOC grievance system.**

JHA finds IDOC's grievance system to be flawed and unreliable. JHA has received
multiple reports from inmates of grievances being lost, not responded to or even
acknowledged. An inmate grievance system is a fundamental element of a functional
prison system. "When inmates view the system as credible, they can also serve as a
source of intelligence to staff regarding potential security breaches in addition to
excessive force or other staff misconduct. Not only should the grievance system be
readily available and easily accessible to all inmates, it should also allow prisoners to file
their grievances in a secure and confidential manner without threat of reprisal, and have
them answered by staff that performs its responsibilities in a responsive and prompt
manner."[43]

In our discussions with staff and administration, JHA has not uncovered a uniform,
consistent system or policy in IDOC to ensure that grievances, once turned over by a
prisoner to the facility, are logged, docketed and recorded as having been filed. This is
problematic, given that: (1) the Illinois Administrative Code, which governs the
grievance process, places time limits on filing a grievance;[44] and (2) the Prison Litigation
Reform Act of 1995 ("PLRA") makes exhaustion of administrative remedies under the
grievance system mandatory prerequisite for a prisoner to bring a claim over prison
conditions in Federal Court.[45]

Lack of reliability, credibility and consistency in the Illinois prison grievance system are
not new problems, but were noted by JHA and the Illinois Bar Foundation decades ago in
studies conducted on the grievance systems in Cook County Jail, Stateville Correctional
Center and Vienna Correctional Center.[46]

To rectify these longstanding issues, JHA recommends that the Illinois Governor and
General Assembly, in cooperation with IDOC, appoint an ombudsmen panel, including at
least one independent medical professional and one mental health professional, to: (1)
study, review and audit prisoner grievances and the grievance systems at each individual
facility; (2) identify problems and sources of unreliability or inconsistency in the existing
grievance system and make recommendations for improvement; and (3) formulate and
present a plan to the General Assembly for instituting a permanent prison ombudsman
program to provide independent, external oversight and regular review of inmate claims
and grievances.[47]

**(15) Prepare to enroll all inmates in Medicaid in 2014.**

In 2014, the Affordable Care Act (ACA) will make people under 65 years of age with
income below 133 percent of the federal poverty level eligible for Medicaid. Once this

change is in effect, virtually all inmates will become Medicaid eligible once they leave prison. This change in federal law will create an enormous opportunity for state and local governments to establish much-needed continuity of care for inmates as they leave prison. Providing inmates with access to medical and mental health care post-release promises to greatly reduce recidivism, cut costs at the local level, and save lives, as inmates leaving prison are at high risk of death due to the current lack of supportive services.[48]

As approximately 35,000 inmates leave and enter IDOC every year, this effort will require extraordinary coordination among and between state and local agencies. JHA finds that promising work is already being accomplished on this front, as the Illinois Department of Healthcare and Family Services recently issued a new policy that jail detainees who are currently Medicaid eligible shall retain their Medicaid-eligibility rather than having it terminated or suspended prior to conviction. This initiative is not only commendable improvement in itself, but also provides a potential template for working with increased populations under the changes in Medicaid eligibility forthcoming under the ACA.[49]

As Illinois gets ready to implement the ACA, JHA recommends that IDOC, the Illinois Department of Healthcare and Family Services, and Illinois Department of Human Services in collaboration with local governments, service providers, and advocates develop a strategic plan to ensure that inmates are pre-enrolled to receive Medicaid healthcare coverage and care upon exiting prison.

## Methodology and Acknowledgements

In summer of 2011, JHA, with the generous support of a grant from the Michael Reese Health Trust, embarked on a project to examine the state of healthcare in IDOC. We selected 12 diverse facilities to visit and study which, together, form a representative cross-section of IDOC's healthcare system. The facilities include all of the state's maximum-security facilities (Menard Correctional Center, Stateville Correctional Center, Pontiac Correctional Center, and Dwight Correctional Center); the state's only supermax facility (Tamms Correctional Center); several facilities that serve special populations (Dixon Correctional Center, Illinois special population prison for male inmates, and Sheridan Correctional Center, one of Illinois' drug-treatment prisons); several medium and minimum security facilities (Vienna Correctional Center, Lincoln Correctional Center, and Pinckneyville Correctional Center), and two of the state's Reception and Classification Centers.

On monitoring visits to the 12 facilities, JHA staff and trained citizen volunteers inspected physical conditions and interviewed inmates, staff, and administrators. We focused particular time and attention on interviewing prison healthcare staff and administrators, as well as inmates receiving healthcare treatment. With the cooperation of facility and healthcare administrators, we also gathered objective statistical data regarding staffing, healthcare services, and the incidence of disease among the

populations. We additionally conducted confidential, in-depth interviews with a cross-section of inmates who communicated with JHA by mail or phone about healthcare problems. The knowledge and information we gained from the totality of these methods forms the basis of our healthcare findings and policy recommendations.

John Maki, the Executive Director of JHA, and Maya Szilak, the Director of JHA's Adult Prison Monitoring Program, led the project. To ensure that JHA's study and research addressed healthcare authoritatively, JHA formed a task force of healthcare experts and clinicians to advise us on the project. JHA is indebted to the following task force members for their contributions and advice: Alexander Brown, Linda Emanuel, Dan Cooper, John Fallon, Robyn Golden, Thomas K. Kenemore, Patricia O'Brien, Elena Quintana, Taryn Roch, Melissa Kraus Schwarz, and Kathie Kane-Willis.

JHA's interns, Jonathan Yoni Siden, Gwyneth Troyer, Courtney Widuch, Octavia Rodney, and Lisa Hendrickson were also instrumental and provided critical assistance in researching and drafting this report's findings and recommendations. We thank them.

JHA also thanks the many citizen volunteers who contributed to the project with dedication, focus, and hard work on the facility visits. They include: Samantha Arauz, Rick Artwick, Lindsay Bostwick, Megan Brady, Alexander Brown, Phil Carrigan, Allison Dussias, Sandra Fernbach, Aviva Futorian, Pamela Gretza, Robyn Inaba, Stephanie Kollmann, Mariya Kozlova, Lindsey LaPointe, Scott Main, Paddy McNamara, Frank Nicholas, Juanita Ortiz, Laurie Jo Reynolds, Joan Shapiro, Jonathan Yoni Siden, Jean Maclean Snyder, Stephanie Tang, Sandy Teran, Jim Thomas, Gary Tomlinson, Marian Tomlinson, Gwyneth Troyer, Sarah Vitzthum, Angela Weis, Courtney Widuch, and Sarah Zaslow.

This report would not have been possible without IDOC's openness and cooperation in allowing JHA access to facilities and healthcare data. JHA thanks IDOC Director, S.A. Godinez, and Medical Director, Louis Shicker, for their assistance and steadfast support of this project. JHA is also especially thankful to the medical administrators of the 12 IDOC facilities we visited, who expended considerable time and effort completing exhaustive questionnaires about healthcare operations that were essential to JHA's understanding. We further thank IDOC's staff, particularly healthcare staff, who were patient and generous with their time and knowledge in answering JHA's many questions.

Finally, JHA thanks the thousands of inmates and inmates' family members who contributed to this report and honored JHA with the gift of candidly sharing their personal experiences.



JHA's work on healthcare in IDOC is made possible through a generous grant by the Michael Reese Health Trust.

[1] *See Minutes of the Illinois Department of Corrections Adult Advisory Board Meeting
(*July 26, 2010), p.2, available at:
http://www2.illinois.gov/idoc/aboutus/advisoryboard/Documents/20100726_Advisory_Board_Minutes.pdf.

[2] *See* International Association for Correctional and Forensic Psychology, *Standards for
Psychology Services in Jails, Prisons, Correctional Facilities, and Agencies*, Journal of
Criminal Justice and Behavior, Vol. 37, No. 7, 749-808, p. 754. (July 2010), available at:
http://cjb.sagepub.com/content/37/7/749.full.pdf+html.

[3] *See* National Center on Addiction and Substance Abuse at Columbia University, *Behind
Bars II: Substance Abuse and America's Prison Population* (February 2010), available at:
http://www.casacolumbia.org/articlefiles/575-report2010behindbars2.pdf.

[4] In a 9/27/12 email exchange with the Office of the Illinois Auditor General (OIAG)
subsequent to the publication of this report, an official from the agency provided the
below response to our findings. While the official noted state agencies are responsible for
overseeing their own contracts, he did point out the OIAG periodically reviews state
agencies' financial records and compliance performance reviews. However, as we state in
our findings, the OIAG does not perform regular comprehensive audits of IDOC's
healthcare system as part of its regular work.

From the OIAG: "The management of each State agency is responsible for overseeing the
contracts that agency procures and executes. However, in our role as post-auditors, the
Auditor General's Office does review, on a sample basis, each State agency's financial
records and compliance performance for the purpose of making recommendations and
aiding the legislature in considering general improvements in governmental operations.
Since our reviews are conducted on a sample basis, we do not obtain or maintain
complete records of an audited agency's financial transactions or review all of its
transactions in the course of our work.

With regard to contractual services testing at the Department of Corrections, our
examination procedures resulted in three audit findings for the period ended June 30,
2010 (the most recent completed examination). Copies of those findings are attached. The
full report can be found on our website at
http://www.auditor.illinois.gov/Audit-Reports/Compliance-Agency-List/Corrections/FY10-Corrections-Fin-Comp-Full.pdf."

[5] For further information on the Jail Data Link system, see the Illinois Department of
Human Services homepage discussing the program, available at:

https://sisonline.dhs.state.il.us/jaillink/home.asp. In addition, see David Gruenenfelder,
*Evaluation of the Jail Data Link Program Prepared for the Illinois Criminal Justice
Information Authority*, Institute for Legal, Legislative and Policy Studies Center for State
Policy and Leadership, University of Illinois at Springfield, 1-113 (May 2009), available
at:
http://www.icjia.state.il.us/public/pdf/ResearchReports/Jail%20Data%20Link%20Final%
20Report%20May%202009.pdf.

[6] *American Bar Association (ABA) Standards on Treatment of Prisoners,* Standard 23-
6.5, Continuity of Care, available at:
http://www.americanbar.org/publications/criminal_justice_section_archive/crimjust_stan
dards_treatmentprisoners.html#23-6.5.

[7] *See* Lisa Braude, Melody M. Heaps, Pamela Rodriguez, and Tim Whitney, Center for
Health and Justice at TASC, *No Entry: Improving Public Safety through Cost-Effective
Alternatives to Incarceration in Illinois*, 1-32 (May 2007), available at:
http://www.centerforhealthandjustice.org/IllinoisNoEntry_Final.pdf; Metropolis 2020,
*Position Paper: Alternatives to Incarceration*, 1-19, available at:
http://www.chicagometropolis2020.org/documents/AlternativestoIncarcerationPaper.pdf.

[8] *See* Federal Bureau of Prisons, *Inmate Information Handbook: Food Service* 1-91, p. 16
(January 2012), available at:
www.bop.gov/locations/institutions/spg/SPG_aohandbook.pdf. *See also ABA Standards
on Treatment of Prisoners*, Standard 23-3.4(b), which dictates that correctional
authorities "[m]ake appropriate accommodations for prisoners with special dietary needs
for reasons of health or age***," available at:
http://www.americanbar.org/publications/criminal_justice_section_archive/crimjust_stan
dards_treatmentprisoners.html#23-3.4.

[9] *See* American Diabetes Association Position Statement*: Diabetes Management in
Correctional Institutions*, Diabetes Care, Volume 33, Supplement 1, 575-81, (January
2010), available at:
http://care.diabetesjournals.org/content/33/Supplement_1/S75.full.pdf+html.

[10] *See, e.g.,* Barbara Wakeen, T*urning Lemons Into (Sugar-Free) Lemonade: How Food
Budgets Cuts Can Improve Diets*, National Commission on Correctional Healthcare,
CorrectCare, (Summer 2008), available at:
http://www.ncchc.org/pubs/CC/food_budgets.html; Arlene J. Spark, *Nutrition in Public
Health: Principles, Policies, and Practice*, 1-552, p. 230-36, CRC Press (May 2007).

[11] *See* C. Bernard Gesch, Sean Hammond, Sarah Hampson, Anita Eves. Martin Crowder*,
Influence of Supplementary Vitamins, Minerals and Essential Fatty Acids on the
Antisocial Behaviour of Young Adult Prisoners,* British Journal of Psychiatry, 22-18
(2002), available at: http://bjp.rcpsych.org/content/181/1/22.full.pdf+html; Ap Zaalberg,

Henk Nijman, Erik Bulten, Luwe Stroosma, Cees van der Staak, *Effects of Nutritional Supplements on Aggression, Rule-Breaking, and Psychopathology Among Young Adult Prisoners*, Aggressive Behavior, Volume 36, 117–126 (2010), available at: http://onlinelibrary.wiley.com/doi/10.1002/ab.20335/abstract.

[12] *See, e.g.,* Chicago Sun-Times *"Illinois Prisons' Cost-cutting Plan: Give Prisoners Brunch on Weekends,"* (April 20, 2012), available at: http://www.suntimes.com/news/metro/12024375-418/illinois-prisons-cost-cutting-plan-give-prisoners-bruncn-on-weekends.html.

[13] Adam Jackson, *Evaluation of Correctional Food Services: A Correctional Institution Inspection Committee Summary and Evaluation of DRC Food Services*, 1-20, p. 13 (2010), available at: www.ciic.state.oh.us/download-document/332-evaluation-of-correctional-food-services.html.

[14] "Indigent" under the statute means "[a] committed person who has $20 or less in his or her Inmate Trust Fund at the time of such services and for the 30 days prior to such services." *See* 730 ILCS 5/3-6-2, available at: http://www.ilga.gov/legislation/ilcs/fulltext.asp?DocName=073000050K3-6-2.

[15] *See* Lt. Sean McGillen, *Research Paper: The Financial Impact of Inmate Healthcare: Maintaining a Cost Effective and Efficient System*, 1-14, p. 2 (cataloged March 28, 2011), available at: http://nicic.gov/Library/024920.

[16] National Commission on Correctional Heath Care, *Position Statement: Charging Inmates a Fee for Health Care Services* (October 2005), available at: http://www.ncchc.org/resources/statements/healthfees.html.

[17] *Ibid.*, note 15.

[18] *See* Public Act 097-0562, effective date January 1, 2012, which amended 730 ILCS 5/3-6-2 by increasing inmates' medical co-payments from $2 to $5, available at: http://www.ilga.gov/legislation/publicacts/fulltext.asp?Name=097-0562.

[19] *See ABA Standards on Treatment of Prisoners*, Standard 23-7.2(f), which provides, in relevant part: "[C]orrectional authorities should make reasonable attempts to communicate effectively with prisoners who do not read, speak, or understand English. This requirement includes: (i) to the extent practicable, the translation of official documents typically provided to prisoners into a language understood by each prisoner who receives them; (ii) staff who can interpret at all times in any language understood by a significant number of non-English-speaking prisoners; and (iii) necessary interpretive services during disciplinary proceedings or other hearings, for processes by which a prisoner may lodge a complaint about staff misconduct or concerns about safety, and during provision of health care," available at:

http://www.americanbar.org/publications/criminal_justice_section_archive/crimjust_standards_treatmentprisoners.html#23-7.2. *See also* U.S. Department of Health and Human Services, Office of Minority Health, *Final Report: National Standards for Culturally and Linguistically Appropriate Services in Health Care,* 1-109 (March 2001), available at: http://minorityhealth.hhs.gov/assets/pdf/checked/finalreport.pdf; Laurie M. Anderson, Susan C. Scrimshaw, Mindy T. Fullilove, Jonathan E. Fielding, Jacques Normand, and the Task Force on Community Preventive Services, *Culturally Competent Healthcare Systems: A Systematic Review*, American Journal of Preventative Medicine, Volume 24, Issue 3S, 68-79 (2003), available at: http://www.wrha.mb.ca/osd/files/soc-AJPM-evrev-healthcare-systems.pdf.

[20] Specifically, Public Act 097-0323 (effective August 12, 2011), amended 730 ILCS 5/3-6-2, 3-8-2, and 3-10-2, authorized county jails and IDOC to provide opt-out HIV testing to inmates, available at:
http://www.ilga.gov/legislation/PublicActs/fulltext.asp?Name=097-0323.

[21] *See* Duncan Smith-Rohrberg Maru, Robert Douglas Bruce, Sanjay Basu, and Frederick L. Altice, *Clinical Outcomes of Hepatitis C Treatment in a Prison Setting: Feasibility and Effectiveness for Challenging Treatment Populations*, Clinical Infectious Diseases, Volume 47, Issue 7, 952-961, p. 952 (October 2008), available at:
http://www.ncbi.nlm.nih.gov/pubmed/18715156; *See, e.g.,* Tan JA, Joseph TA, Saab S., *Treating Hepatitis C in the Prison Population is Cost-saving*, Hepatology, Volume 48, Issue 5, 1387-95 (2008); Harvey J. Alter and T. Jake Liang, *Hepatitis C: The End of the Beginning and Possibly the Beginning of the End, Annals of Internal Medicine*, Volume 156, Issue 4 317-18 (February 21, 2012), available at:
http://annals.org/article.aspx?volume=156&issue=4&page=317; Anne C. Spaulding and David L. Thomas, *Screening for HCV Infection in Jails*, Journal of the American Medical Association, Volume 307, Issue 12, 1259-60 (March 2012) available at:
http://app.jamanetwork.com/ama.jama/307/12/10_1001-jama_2012_374.html.

[22] CDC, *Recommendations for the Identification of Chronic Hepatitis C Virus Infection Among Persons Born During 1945–1965*, Morbidity and Mortality Weekly Reports (August 17, 2012), available at:
http://www.cdc.gov/mmwr/preview/mmwrhtml/rr6104a1.htm?s_cid=rr6104a1_w.

[23] *See* Anne C. Spaulding and David L. Thomas, *Screening for HCV Infection in Jails*, Journal of the American Medical Association (March 26, 2012), available at:
http://www.natap.org/2012/HCV/032812_02.htm; *Hepatitis News:Jail Screening Could Impede Hep C's Spread* (April 5, 2012), available at:
http://www.hepmag.com/articles/Correctional_System_Screening_2501_22202.shtml.

[24] *See* CDC: *Correctional Facilities and Viral Hepatitis*, available at:
http://www.cdc.gov/hepatitis/Settings/corrections.htm.

[25] Grace E. Macalino, Darpun Dhawan, and Josiah D. Rich, *Missed Opportunity: Hepatitis C Screening of Prisoners*, American Journal of Public Health, 1739–1740 (October 2005), available at: http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1449429/

[26] *Ibid.*, note 24.

[27] *Ibid.*, note 24.

[28] *Ibid.*, note 24.

[29] *ABA Standards on Treatment of Prisoners,* Standard 23-6.4, Qualified Health Care Staff, available at:
http://www.americanbar.org/publications/criminal_justice_section_archive/crimjust_standards_treatmentprisoners.html#23-6.4.

[30] *See Estelle v. Gamble*, 429 U.S. 97 (1976) available at:
http://www.law.cornell.edu/supct/html/historics/USSC_CR_0429_0097_ZO.html; *Brown v. Plata*, 563 U.S.__(2011), available at: http://www.law.cornell.edu/supct/html/09-1233.ZS.html.

[31] Documented physiological effects of long-term isolation include: gastro-intestinal, cardiovascular and genitourinary malfunctions; hypertension; migraine headaches; profound fatigue; heart palpitations; diaphoresis (sudden excessive sweating); insomnia; back and joint pain; deterioration of eyesight; weight loss; lethargy; weakness; diarrhea; tremors; and aggravation of preexisting medical conditions. Documented psychological effects include: anxiety; panic attacks; major depression; poor impulse control; outbursts of physical and verbal violence against others, self and objects; cognitive disturbances, memory loss, disorientation; perceptual distortions, hypersensitivity to noises and smells; disorientation in time and space; depersonalization and derealisation; hallucinations affecting all five senses: visual, auditory, tactile, olfactory and gustatory (*e.g.* hallucinations of objects or people appearing in the cell, or hearing voices when no-one is actually speaking); paranoia; psychosis, persecutory ideation; psychotic episodes; and aggravation of preexisting mental illness. In addition, a direct link has been found between long-term isolation and self-harm, auto-aggression, self-mutilation, and suicide among inmates. *See* Hans Toch, *Men in Crisis: Human Breakdowns in Prison*, 1-342, p.40 (Transaction Publishers, 2007); Sharon Shalev, *A Sourcebook on Solitary Confinement, The Health Effects of Solitary Confinem*ent, Manheim Centre for Criminology London School of Economics and Politics, 1-98, p. 21 (October 2008), available at: http://solitaryconfinement.org/uploads/sourcebook_web.pdf; Craig Haney, *Mental Health Issues in Long-Term Solitary and Supermax Confinement*, Crime & Delinquency, Vol. 49, No. 1, p. 124-156 (January 2003); Lorna A. Rhodes, *Pathological Effects of the Supermaximum Prison*, American Journal of Public Health 95(10), 1692–1695 (October 2005), available at:

http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1449421; Terry A. Kupers, *What To Do
With the Survivors? Coping With the Long-Term Effects of Isolated Confinement*,
Criminal Justice and Behavior, Vol. 35, No. 8, 1005-1016 (August 2008), available at:
http://cjb.sagepub.com/content/35/8/1005.abstract; Human Rights Watch, *Ill-Equipped:
U.S. Prisons and Offenders with Mental Illness*, 1-214, p. 145-185 (2003) available at:
http://www.hrw.org/sites/default/files/reports/usa1003.pdf; Stuart Grassian, *Psychiatric
Effects of Solitary Confinement*, 326 Washington University Journal of Law & Policy,
Vol. 22:325, 325-380 (2006), available at:
http://law.wustl.edu/journal/22/p325grassian.pdf; Jeffrey L. Metzner and Jamie Fellner,
*Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical
Ethics*, The Journal of the American Academy of Psychiatry and the Law, Volume 38,
Number 1, (March 2010); and *The Istanbul Statement on The Use and Effects of Solitary
Confinement*, International Psychological Trauma Symposium (December 9, 2007),
available at:
http://www.univie.ac.at/bimtor/dateien/topic8_istanbul_statement_effects_solconfinment.
pdf.

[32] Consistent with prevailing scientific, psychological, sociological and medical evidence,
solitary confinement has largely been abandoned in Europe and is widely viewed as a
form of cruel, inhuman and degrading treatment that violates international human rights
conventions. The UN Special Rapporteur of the Human Rights Council on Torture has
specifically held that solitary confinement "can amount to torture;" that "solitary
confinement should be used only in very exceptional circumstances, as a last resort, for as
short a time as possible;" and that "prolonged solitary confinement, in excess of 15 days,
should be subject to an absolute prohibition."*Interim Report of the Special Rapporteur of
the Human Rights Council on Torture and Other Cruel, Inhuman or Degrading
Treatment or Punishment* (August 2011), 1-27, p.23, available at:
http://solitaryconfinement.org/uploads/SpecRapTortureAug2011.pdf. *See also* United
Nations News Centre, "*Solitary Confinement Should be Banned in Most Cases, UN
Expert Says*" (October 8, 2011) available at:
http://www.un.org/apps/news/story.asp?NewsID=40097; Elizabeth Vasiliades, *Solitary
Confinement and International Human Rights: Why the U.S. Prison System Fails Global
Standards*, American University International Law Review, Volume 21, Issue 1, 71-98
(2005). Likewise, in recognition of the deleterious effects of long-term isolation, the
American Bar Association's standards call for severe restrictions on its use. *See ABA
Standards on Treatment of Prisoners*, Standards 23.2-1, *et seq.*, available at:
http://www.americanbar.org/publications/criminal_justice_section_archive/crimjust_stan
dards_treatmentprisoners.html.

[33] United Nations Congress on the Prevention of Crime and the Treatment of Offenders,
*Standard Minimum Rules for the Treatment of Prisoners*, Rule 53(3), available at:
http://www2.ohchr.org/english/law/treatmentprisoners.htm. As Rule 53 notes, this
requirement "does not, however, preclude male members of the staff, particularly doctors

and teachers, from carrying out their professional duties in institutions or parts of
institutions set aside for women."

[34] U.S. Department of Justice, National Institute of Corrections, *Prison Staffing Analysis:
A Training Manual With Staffing Considerations for Special Populations*, 1-233, p. 115-
117 (December 2008), available at:
http://www.asca.net/system/assets/attachments/2086/staffing_analysis-1-
3.pdf?1296162143.

[35] *See* Carrie Abner, *Graying Prisons: States Face Challenges of an Aging Inmate
Population*, The Council of State Governments, available at
http://www.csg.org/knowledgecenter/docs/sn0611GrayingPrisons.pdf; Human Rights
Watch, *US Number of Aging Prisoners Soaring: Corrections Officials Ill-Prepared to
Run Geriatric Facilities* (January 27, 2012), available at:
http://www.hrw.org/news/2012/01/26/us-number-aging-prisoners-soaring.

[36] *Ibid.,* note 1.

[37] U.S. Department of Justice, National Institute of Corrections, *Correctional Health
Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates,* p.44
(February 2004), available at: http://static.nicic.gov/Library/018735.pdf.

[38] Significantly, in exception to the general rule precluding federal reimbursement of
states for inmate medical care, a 1997 ruling by the Federal Department of Health and
Human Services held that inmates who are otherwise eligible for Medicaid effectively
lose their inmate status and obtain "inpatient status" when they are admitted to a hospital
for 24 hours or more, in which event Medicaid reimbursement funds are available to the
state. *See* December 12, 1997, *Letter from Director of Disabled and Elderly Health
Programs Group Center for Medicaid and State Operations to all Associate Regional
Administrators regarding Clarification of Medicaid Coverage Policy for inmates of a
Public Institution*, available at:
http://www.colorado.gov/cs/Satellite?blobcol=urldata&blobheader=application%2Fpdf&
blobkey=id&blobtable=MungoBlobs&blobwhere=1251618397983&ssbinary=true.
Under the Patient Protection and Affordable Care Act ("ACA"), Medicaid coverage will
greatly expand in 2014, such that virtually all state inmates could be eligible for Medicaid
coverage for inpatient hospital stays. To collect Medicaid reimbursements for these
inmates, however, a state must actually bill Medicaid, which many states neglect to do.
*See, e.g.,* Sandra Yin "Failing *to Bill Medicaid for Inmate Care Costs State [of North
Carolina] Millions*," Fierce Healthcare News Letter (August 25, 2010), available at:
http://www.fiercehealthcare.com/story/failing-bill-medicaid-inmate-care-costs-state-
millions/2010-08-25; Mal Leary, "*State [of Maine] Considers Putting Prisoners on
Medicaid*," Capitol News Service (November 27, 2011), available at:
http://bangordailynews.com/2011/11/27/news/state/corrections-commissioner-exploring-
medicaid-for-some-prisoners/; The Crime Report, "*State Prison Inmates Could Get*

*Medicaid Hospital Coverage in 2014*" (October 18, 2011), available at:
http://www.thecrimereport.org/archive/2011-10-medicaid-prisoners.

The Illinois Department of Health and Family Services (DHFS) ostensibly has a practice
of billing Medicaid for inmate inpatient hospital stays already. *See DHFS Chapter H-200,
Policy and Procedures for Hospital Services, H-254.7,* "Claims for Illinois Department of
Corrections (IDOC) and Illinois Department of Juvenile Justice (IDJJ) Inmates,"
available at: www.hfs.illinois.gov/assets/h200.pdf. With the slated expansion of Medicaid
under the ACA in 2014, however, new legislation was introduced this last year, Senate
Bill 3175: The Medicaid Billing for Inmate Inpatient Hospital and Professional Services
Act, which was aimed at reducing correctional healthcare costs by requiring hospitals and
other medical service providers to bill Federal Medicaid for eligible inmate inpatient
hospital stays. *See 97th Illinois General Assembly, Senate Bill 3175*, available at:
http://www.ilga.gov/legislation/BillStatus.asp?DocTypeID=SB&DocNum=3175&GAID
=11&SessionID=84&LegID=64107. The legislation languished in assignments and never
passed into law, and JHA is unaware of any current efforts to renew the legislation.

[39] *See ,e.g.,* Jessica Pupovac, "*Guarding Grandpa: Illinois is Spending Money it Doesn't
Have To Keep Convicts Who Can Barely Walk Behind Bars*," The Chicago Reader
(January 6, 2011),

available at: http://www.chicagoreader.com/chicago/illinois-prisons-budget-elderly-old-
inmates/Content?oid=3013140.

[40] *See Minutes of the Illinois Department of Corrections Adult Advisory Board Meeting
(*July 26, 2010), p.2, available at:
http://www2.illinois.gov/idoc/aboutus/advisoryboard/Documents/20100726_Advisory_B
oard_Minutes.pdf.

[41] For instance, HB 4154 would have allowed prisoners who served 25 consecutive years,
reached age 50, and demonstrated genuine, consistent behavior change over a period of
years, to apply to the original sentencing courts for a sentence adjustment. However, like
prior legislative efforts to this effect, was defeated. *See* 97th Illinois General Assembly,
Bill Status HB 4154, available at:
http://www.ilga.gov/legislation/BillStatus.asp?DocNum=4154&GAID=9&DocTypeID=
HB&LegId=34373&SessionID=51.

[42] *See* Tina Chiu, *It's About Time: Aging Prisoners, Increasing Costs, and Geriatric
Release* , Vera Institute of Justice (April 2010), 1-16, p. 11-12, available at
http://www.vera.org/download?file=2973/its-about-time-aging-prisoners-increasing-
costs-and-geriatric-release.pdf; Human Rights Watch*, Old Behind Bars: The Aging
Prison Population in the United States*, 1-110, p. 13 (January 27, 2012), available at:
http://www.hrw.org/sites/default/files/reports/usprisons0112webwcover_0.pdf; Francesca
Cooney with Julia Braggins, *Doing Time: Good Practice with Older People in Prison*,

Prison Reform Trust, 1-87, p.14 (2010), available at: http://www.prisonreformtrust.org.uk/Portals/0/Documents/doing%20time%20good%20practice%20with%20older%20peop,.pdf.

[43] *See* Ashley M. Belich, Note: *Dobbey v. Illinois Department of Corrections: A Small Piece of a Growing Policy Puzzle*, 5 Seventh Circuit Review 272, p. 301-302 (2009), available at: http://www.kentlaw.iit.edu/Documents/Academic%20Programs/7CR/v5-1/belich.pdf.

[44] *See* Title 20 Illinois Administrative Code, Section 504.810, "Filing of Grievances," available at: http://www.ilga.gov/commission/jcar/admincode/020/020005040F08100R.html.

[45] *See* 42 U.S.C. § 1997e (2000), available at: http://www.law.cornell.edu/uscode/text/42/1997e.

[46] *See Ibid.,* note 42, p. 297-306.

[47] *See* Van Swearingen, *Imprisoning Rights: The Failure of Negotiated Governance in the Prison Inmate Grievance Process*, California Law Review Volume 96, Issue 5, Article 5, 1353-1382 (October 31, 2008), available at: http://scholarship.law.berkeley.edu/cgi/viewcontent.cgi?article=1165&context=californialawreview.

[48] *See* Ingrid A. Binswanger, Marc F. Stern, Richard A. Deyo, Patrick J. Heagerty, Allen Cheadle, Joann G. Elmore, and Thomas D. Koepsell, *Release from Prison — A High Risk of Death for Former Inmates*, New England Journal of Medicine, Volume 356,157-165, (January 11, 2007), available at: http://www.nejm.org/doi/full/10.1056/NEJMsa064115#t=articleTop.

[49] *See* Illinois Department of Healthcare and Family Services, MR #12.19, *Medical Benefits for Persons in an Illinois Jail*, available at: http://www.dhs.state.il.us/page.aspx?item=56511.

# EXHIBIT 6
(under seal)

# EXHIBIT 7
(under seal)

# EXHIBIT 8



# John Howard Association of Illinois

P.O. Box 10042, Chicago, IL 60610-0042
Tel. 312-291-9237 Fax. 312-526-3714

# 2015 Monitoring Report Pontiac Correctional Center

Pontiac Correctional Center (Pontiac) is composed of a male maximum-security facility and medium-security unit. The maximum side houses administrative detention, disciplinary segregation, protective custody, and mental health populations. Pontiac is designated within the Illinois Department of Corrections (IDOC) to house hundreds of IDOC inmates with more than six months of disciplinary segregation. This report focuses on the maximum prison and the continuing challenges of housing inmates who may be deemed unsafe in general population, including a discussion of Solitary Confinement, Administrative Detention, Mental Health, and Inmate Concerns.



**Vital Statistics**:
Population: 2,018
Rated Capacity: 1,800
Average Age: 38
Average Annual Cost per Inmate (FY14): $34,287
Population by Race: 58% Black, 24% White, 17% Hispanic, 1% Other
Committing Offense: 36% Murder, 31% Class X, 11% Class 1, 14% Class 2, 4% Class 3, and 3% Class 4 felonies.
*(Source: IDOC, March 2015)*

**Key Observations:**

- To begin to address concerns regarding "solitary confinement," Illinois must expand inmate out-of-cell time and programming, and ensure that inmates have meaningful opportunities to earn reductions in segregation time and greater privileges for behavior improvement.

- More than 600 inmates were serving terms of disciplinary segregation at Pontiac. Of these, more than 60 inmates were serving terms over 10 years. Only 38% of Pontiac inmates are housed in single-cells and segregation double-cells are smaller than 65 square feet.

- In general, JHA believes all practices affecting inmates should be governed by uniform, clear, specific written policy, to ensure fair notice, application, and appropriate oversight. Uncertainty produces unnecessary hardship for inmates and staff. JHA recommends increased attention to ensuring communications are responsive, including detailing

requirements for inmates to earn privileges or reasons for an inmate to remain in administrative detention.

- Staffing levels were improved since JHA's 2013 Pontiac visit and report. Importantly, mental health staffing and services at Pontiac have increased. Anecdotally, this increase appears to help in reducing issues related to inmate behavior. JHA continues to have concerns regarding systemic difficulties for hiring key staff necessary to improve our correctional facilities.

- IDOC must do a better job tracking data and making detailed, timely, relevant data publically available so that policy-makers and the public can make informed decisions about correctional practices and policies, and adequately resource facilities to avoid costly litigation.

- In a year, more than 90 men were released from segregation at Pontiac directly to the community, some without any mandated continued law enforcement supervision.

## Facility Summary

JHA noted improvements during our 2015 visits.[1] Pontiac staffing had improved dramatically from the time of JHA's 2013 visit, with 754 out of 761 authorized employee positions filled in March 2015.[2] In JHA's 2013 report we pointed out that mental health staffing was chronically inadequate and recommended that mental health staffing and programming at this facility be prioritized. In 2015, importantly, mental health staffing and programming had increased and JHA observed quality-of-life improvements attributable to this and other requirements put in place in relation to ongoing litigation regarding mental healthcare in IDOC, *Rasho v. Walker* (*Rasho*).[3]

---

[1] This report is based on a monitoring visit to Pontiac on March 17, 2015 and an abbreviated follow up visit on September 16, 2015, as well as ongoing communications with inmates, staff, and concerned citizens. IDOC officials and Pontiac administrators reviewed and fact-checked a draft of this report and it was last discussed with JHA on October 7, 2015. No factual substantive changes have been made since that time prior to publication. All statements of opinions and policy recommendations herein are JHA's unless otherwise stated. See JHA's 2013 publication *How JHA's Prison Monitoring Works*, available at www.thejha.org/method. Inmates may send privileged mail to JHA, P.O. Box 10042, Chicago, IL 60610-0042. Other concerned parties may also reach us by email or phone. Prior JHA reports on this facility are available at http://thejha.org/pontiac.

[2] Of the 754 positions filled, 631 are security positions. Approximately 21% of the staff are non-Caucasian and 22% female This represents a substantial increase in both staffing numbers and diversity compared to the time of the JHA's February 2013 visit when Pontiac reported 589 employees with approximately nine percent being non-Caucasian and 19% female. Pontiac gained many staff members from the closure of Dwight Correctional Center in March 2013. Lack of counselor attention was a significant area of concern in JHA's 2013 report, and the number of correctional counselors at Pontiac had nearly doubled from seven to 13 since 2013. Vacancies at the time of our March 2015 visit included an executive secretary, an account technician, a correctional counselor, a maintenance craftsman, and an educator. Healthcare vacancies included a nurse supervisor, a nurse, a medical records director, a psychologist, an activity therapist, and a psychiatric-nurse. At the time of JHA's September 2015 revisit we did not obtain a full report of vacancies but we noted that some key vacancies were mentioned including a psychologist, a correctional counselor position, an educator, and the Health Care Unit Administrator (HCUA).

[3] *Rasho v. Walker, et al.*, 07-CV-1298 (C.D. Ill.) On August 14, 2015, the Court in *Rasho* certified the class for purposes of litigation as: "Persons now or in the future in the custody of the Illinois Department of Corrections

At the time of JHA's March 2015 visit to Pontiac, almost a third of the population were in disciplinary segregation (656 inmates), a quarter of were in Protective Custody (PC) (522 inmates), six percent were in Administrative Detention (AD) (125), and three percent were in the Mental Health Unit (MHU) (65).[4] A quarter of the population were in the Medium Security Unit (MSU) (494 inmates).[5] Positively, administrators noted in September 2015 that the



**Pontiac CC Population**
March 2015

- Segregation
- PC
- MSU
- AD
- MHU
- Other

---

("IDOC") who are identified or should have been identified by the IDOC's mental health professionals as in need of mental health treatment as defined in the current edition of the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association. A diagnosis of alcoholism or drug addiction, developmental disorders, or any form of sexual disorder shall not, by itself, render an individual mentally ill for the purposes of this class definition." *See also* recent news report regarding status of this litigation, Brady-Lunny, Edith, "Breakdown: State's prison mental health system faces long recovery," *Pantagraph*, Aug. 23, 2015, available at http://www.pantagraph.com/lifestyles/health-med-fit/breakdown-state-s-prison-mental-health-system-faces-long-recovery/article_ad63c921-592f-50d8-b866-655b62e3a619.html.

[4] In March 2015, the remaining approximately 150 inmates at Pontiac fell into other classifications/populations housed as: "NRC temps" or inmates who were temporarily housed at Pontiac from Stateville Northern Reception & Classification Center who were designated for placement at a maximum-security facility, inmates temporarily housed at Pontiac due to writs or active warrants, inmates being released to Immigration and Customs Enforcement (ICE) custody, and some inmates considered to be "segregation release" meaning that they had finished their disciplinary segregation term but were awaiting transfer to a new parent facility. Pontiac's healthcare unit had a capacity for 12 inmates in the infirmary. In Pontiac segregation inmates are sometimes moved from the North cellhouse (which also houses AD inmates) to the West and then the East cellhouse (which houses other non-segregation populations) as their time in segregation lessens. In the North cellhouse inmates do not generally have audio-visual privileges with the exception of some in AD. The South cellhouse housed PC inmates on six galleries and MHU inmates on the other two. Inmates in Pontiac's PC unit may be designated various security classifications, and as of September 2015, about 94% were classified as maximum-security.

[5] The MSU's "rated" or "design" capacity is for 300 inmates and its physical plant is composed of five X-style buildings, each with four wings with dorm areas. During the September 2015 revisit, JHA briefly toured the MSU. We were impressed to learn that about 75% of the MSU inmates have work or school assignments. This assignment percentage is one of the better ones for IDOC non-substance abuse treatment prisons. Only about 70 of these assignments are for MSU inmates to work in the maximum-security part of the facility. MSU inmates may have up to 20 years left on their sentences. We noted the MSU visiting area had a child-friendly mural and was close to full with about eight visitor groups. The MSU has several produce gardens, a large yard recreation yard with a handball area, and a pleasant educational facility and library. Administrators noted they would welcome seed donations for facility gardens. While JHA did not conduct a full MSU monitoring visit or have the opportunity to extensively interview MSU inmates, we were pleased to note that several inmates expressed that they were doing well in the MSU. Some inmates expressed frustration with commissary delays due to lockdowns on the maximum-security side. JHA also noted that the dayroom bulletin boards on units seemed to have very little information posted, and some inmates reported that they had not yet been given orientation despite having been the facility longer than a few days. We note that providing inmates with timely, reliable institutional information is critically important to a facility's effective function, but requires adequate resources, including staffing. During the visit, JHA randomly selected a vacant MSU cell for inspection and noted a number of maintenance issues including that the metal ventilation grate on the ceiling was not fully attached and a porcelain sink that was broken around the drainage hole. Staff noted that because the buildings were built in the 1980s, maintenance issues are expected. MSU inmates are confined to cells for much less time than maximum-security inmates. Administrators reported that MSU inmates are generally confined to cells only from 9:30 p.m. until 7 a.m.

total population at Pontiac had dropped about 70 inmates since March.[6]

As observed in prior JHA Pontiac reports, this is a well-managed facility with many dedicated and experienced staff. Administrators stated a facility strength has been its ability to manage its charge of housing so many distinct populations and adapting to evolutions in correctional practice. Strong leadership, staff training, and support are critical to the continued success of this facility because staff must continue to adapt to contemporary standards that challenge the facility to work rehabilitative ideals into a harsh, punitive environment without having all the space, staff, or tools required for necessary reforms.

Pontiac opened in 1871 when Ulysses S. Grant was the United States President. Many concerns with this facility relate to intractable physical plant issues, such as lack of appropriate space to provide programming or more humane housing. Double-cells measure less than 65 square feet. Inmates ask about the legality of being double-celled in segregation and some particularly comment on the difficulty of being so closely housed with others who are experiencing mental health issues.[7]

There are obvious challenges to implementing modern correctional best practices in a crowded, antiquated facility. There are additional challenges to improving facilities when management of statewide finances creates serious uncertainty about everything from staffing, to major construction projects, to adequate supply of basic goods, like paper, as remarked upon by staff during the September 2015 revisit. Nonetheless, Pontiac administrators commented on the steadfast morale and professionalism of the facility staff, and JHA commends the facility for this and for advances made since 2013. During both visits, JHA observed that Pontiac's common areas were generally very clean. Administrators indicated that despite the challenges posed by Pontiac's aging physical plant, maintaining cleanliness is a facility priority because it has an important impact on the well-being of staff and inmates. JHA was pleased to hear that grant funding made several physical plant facility improvements possible since our 2013 monitoring report, including lighting replacement and new boilers that increased efficiency. To illustrate, in

---

[6] Further, the facility was no longer housing temporary inmates from Stateville NRC, which has seen significant population reduction in 2015, with IDOC's total population dropping about a thousand inmates between March and September 2015 to just below 47,000.

[7] In the 1980s, Pontiac inmates brought suit challenging the constitutionality of double-celling non-segregation general population inmates and the case contains extensive discussion of prison conditions and the effects of double-celling in small cells. *See Smith v. Fairman*, 528 F. Supp. 186, 188 (C.D. Ill. 1981). On appeal, the 7th Circuit found no constitutional violation given the totality of circumstances at the time, 690 F2d 122 (7th Cir. 1982). *See also*, Debra Borenstein, *Double-Celling at Pontiac: Are Inmates Being Subjected to Cruel and Unusual Punishment Arising out of Overcrowded Conditions - Smith v. Fairman*, 60 Chi.-Kent. L. Rev. 291 (1984), available at http://scholarship.kentlaw.iit.edu/cklawreview/vol60/iss2/9. While cell sizes have not changed over the past 40 years, the amount of time inmates spend in cells and types of inmates subject to double-celling have increased to largely include those in segregation or protective custody status, as well as general population. The advisory American Bar Association (ABA) Standards for Criminal Justice (Third Edition), Treatment of Prisoners (2010), Standard 23-3.8(d) states that no segregation cell should be smaller than 80 square feet. Pontiac's maximum-security facility is composed of stacked cellhouses that contain multiple levels of cells with varying cellfronts that face onto galleries across from walls with windows. This stacked design, also still in use at the other male maximum-security IDOC facilities, Menard and Stateville, enables noise and ventilation to travel throughout the cellhouse more easily than smaller more closed cellhouse designs.

March, the facility reportedly had already saved $100,000 on heating.[8] Moreover, the facility has taken some positive steps to increase programming for isolated populations as JHA has repeatedly recommended.

Pontiac has been a locus for the debate regarding use of long-term isolation in Illinois since the closure of the supermax prison, Tamms Correctional Center, in 2013. At the time of JHA's March 2015 visit to Pontiac, administrators reported that there were 125 individuals in Administrative Detention, and about 656 individuals housed in disciplinary segregation with an average term of 3.83 years. However, most Pontiac inmates reportedly have disciplinary segregation terms between one and two years. Twenty-four men had "indeterminate" segregation terms, which administrators stated are periodically reviewed and reserved for inmates who commit serious violent acts while imprisoned, such as killing a cellmate.[9]

JHA has continually recommended that the use of isolation be strictly circumscribed with all prisoners.[10] Consistent with best practices, isolation should be used cautiously, for minimal periods of time, and only when required to preserve safety. Further, long-term isolation should be prohibited with inmates who have a history of mental illness, and inmates held in isolated conditions must be monitored for developing mental health issues. Over the last two years, the issues of mental health and isolation have come to the forefront of prison reform consciousness.

## Solitary Confinement

The United Nations identifies "solitary confinement" as physical and social isolation of individuals who are confined to their cells more than 22 hours a day, and classifies "prolonged

---

[8] Given the age and condition of many correctional facilities in use in Illinois, JHA has continually recommended that Illinois' government officials and IDOC: (1) undertake a comprehensive investigation of ventilation and temperature control practices in all IDOC facilities; and (2) institute a strategic plan, including external oversight and regular monitoring, and facility design modifications where necessary, to ensure effective ventilation and temperature control. This task is especially critical in segregation areas where ventilation is often more of an issue. With a few exceptions, IDOC facilities for the most part do not have air conditioning in areas housing inmates outside of the health care units. IDOC policy requires that temperatures be recorded and ice distributed in sufficiently hot weather. In March 2015, administrators reported that Pontiac's South cellhouse needed rehab of shower rooms on four decks, and other improvements to piping, walls and lighting. The repairs and improvements related to the mental health facility upgrades are ongoing. At that time, administrators also reported that the facility needed more office space in the health care unit for mental health staff and improvements in dietary including coolers and freezers, kettles, ovens, exhaust and other upgrades. Additional maintenance items included work on roofs, walls, outer perimeter areas, and towers. During the September 2015 revisit, JHA was able to observe newly created mental health staff space in the health care unit utilizing materials repurposed from other former state uses. We were also informed that several other improvements requested in March had been approved. As at many other Illinois correctional facilities, JHA noted the need for improvements to roads and walkways within grounds, which contained many potholes and other trip hazards.
[9] *See* 20 Ill. Admin. Code 504.115. Some other challenging classifications of inmates at Pontiac included in March 2015: 18 inmates designated as Weapons Violators/Staff Assaulters, who wear striped uniforms but are housed in various locations; 55 inmates who are designated as extremely high escape risk; and 20 inmates who are designated for elevated security with additional security requirements for movement. Some inmates are cross classified.
[10] For a detailed discussion of the physiological and psychological effects of long-term isolation, *see e.g.* JHA's 2012 report, *A Price Illinois Cannot Afford: Tamms and the Costs of Long-Term Isolation,* available at http://thejha.org/sites/default/files/TammsReport.pdf.

solitary confinement" of more than 15 days as torture.[11] Responding in part to concern about use of this practice within United States prisons, outside auditors performed the first review of the federal Bureau of Prison's use of restricted housing in 2014, with findings released in 2015.[12] Also this year, President Obama and U.S. Supreme Court Justice Anthony Kennedy both publically questioned whether purported safety justifications for the common use of solitary confinement in U.S. prisons are adequate to outweigh concerns about its inhumanity and harms. People are now asking does solitary confinement make us safer?[13]

This discussion of "solitary confinement" encompasses two issues. First is a question of physical isolation. What is isolation compared to the typical conditions of being incarcerated? Does cell size matter or having natural sunlight or a window? If a person has access to phones, mail, and audio visual devices, does this make a meaningful difference? Does having a cellmate mean a person is not "solitarily" isolated? Or where cellfronts are not closed and individuals may communicate through them with other inmates on a unit, or multiple correctional staff, is that still isolation? Some of the debate around this issue focuses on vastly varying physical cell designs or an individual's classification. Individuals may be isolated for the safety of themselves or others, for medical or disciplinary reasons, it may be voluntary or involuntary. Outside of looking at the cell itself and who is housed within, with access to what resources or privileges, JHA believes that it is simplest to define "solitary confinement" by how often a person is allowed out of a cell.

Several thousand IDOC inmates are confined in their cells more than 22 hours a day. For all IDOC inmates in disciplinary segregation the only out-of-cell time mandated is five hours a week, and that minimum applies only after 90 days.[14] IDOC has not seen a decrease in the

---

[11] *See* United Nations Press Release "Special Rapporteur on Torture Tells Third Committee Use of Prolonged Solitary Confinement on Rise, Calls for Global Ban on Practice," October 18, 2011, available at http://www.un.org/press/en/2011/gashc4014.doc.htm, citing the report of United Nations' Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Juan Méndez. This stance was formalized in May 2015, in revisions to the United Nations Standard Minimum Rules for the Treatment of Prisoners, known as the "Mandela Rules." The U.S. Department of Justice has similarly defined the terms "solitary confinement" and "isolation" as "the state of being confined to one's cell for approximately 22 hours a day or more, alone or with other prisoners, that limits contact with others." DOJ May 31, 2013 *Letter Re: Investigation of the State Correctional Institution at Cresson and Notice of Expanded Investigation*, p. 5, available at http://www.justice.gov/sites/default/files/crt/legacy/2013/06/03/cresson_findings_5-31-13.pdf. This opinion letter also emphasizes that additional factors can exacerbate the stress of solitary confinement for prisoners, including mental illness (and under-diagnosis of mental illness), confinement in cells smaller than 100 square feet, and not informing inmates of the projected length of time they will stay in solitary confinement.

[12] Available at http://www.bop.gov/resources/news/20150226_cna_shu_review-assessment.jsp.

[13] For a summary of current discourse on this subject, *see* Vera Institute of Justice's, May 2015 report, "Solitary Confinement: Common Misconceptions and Emerging Safe Alternatives," available at http://www.vera.org/sites/default/files/resources/downloads/solitary-confinement-misconceptions-safe-alternatives-report_1.pdf.

[14] 20 Il. Admin. Code 504.670, Recreation for Persons in Segregation Status, provides that inmates in segregation for less than 90 days only need be allowed to recreate outside their cells for a minimum of one hour a week, and after 90 days a minimum of five hours a week. However, even this time out-of-cell may be limited by the Warden for various reasons, such as for extreme weather or poor behavior of the inmate on yard. There is currently no presumption that recreation canceled because of weather or staffing issues will be made up at a later time. While some wardens and staff accommodate greater recreation opportunities for inmates, there is no set expectation that this occur. There are also no set minimum recreation standards for non-segregated inmates in IDOC. IDOC medium-security facility inmates typically expect to have an average of six hours out-of-cell time per day between recreation,

number of inmates in disciplinary segregation over the past few years, unlike many other state systems.[15] Hundreds of IDOC inmates serve disciplinary segregation terms of more than a year.[16] Frequently unassigned maximum-security, PC, and reception inmates also have no more than five hours of weekly recreation.

For out-of-cell time to improve, Illinois would likely need to revise the minimum recreational standards in the Administrative Code. Current minimum standards for amount of time outside cells clearly do not meet international human rights standards. Notably, this year the Illinois Department of Juvenile Justice (IDJJ), which may house youth up until they turn 21, reached a settlement in litigation effectively banning solitary confinement and mandating that youth spend eight hours a day out of their cell.[17]

---

dayroom, and movement to and from the dining hall. Maximum-security facilities generally do not offer dayroom. The vast majority of IDOC maximum-security inmates do not have work or school assignments and many general population maximum-security inmates have only five hours of yard or gym a week. While they may move to the dining hall for meals, this adds very little additional time to out-of-cell time, so that most will only average under two hours of out-of-cell time a day. Unassigned PC inmates at Pontiac approximated that they were out of their cells on average only about two hours a day, taking into account movement for dining and the five hours allotted for weekly recreation. Also, within IDOC the minimum weekly five hours of recreation is often offered on only one or two days, for five hours or 2.5 hours at one time, making any cancelation result in a greater detriment to average time for outside activity. Many inmates state that in county jails they are told they have a right to an hour out-of-cell each day, which is the requirement set out in the advisory American Bar Association (ABA) Standards for Criminal Justice (Third Edition), Treatment of Prisoners (2010), Standard 23.3.6(b), but is often not the case within IDOC.

[15] As of the end of 2014, IDOC stated that there were 2,441 inmates with disciplinary segregation terms, representing about five percent of the total population. This total shows no decrease from 2010, when IDOC reportedly held 2,204 inmates in segregation with 2.8 years as an average length of stay system-wide. *See* Written Testimony of Michael Jacobson, President and Director of Vera, to the U.S. Senate Committee on the Judiciary, June 19, 2012, at p. 4, available at http://www.vera.org/sites/default/files/resources/downloads/michael-jacobson-testimony-on-solitary-confinement-2012.pdf. IDOC's disciplinary segregation percentage of about five percent of total population is similar to use of restrictive housing in other correctional systems. For a recent comprehensive review of use of restrictive housing and discussion about some of the differences among systems, *see* "Time-in-Cell: The Liman-ASCA 2014 National Survey of Administrative Segregation in Prison," p. 15, Table 1, (September 2015) (however, note that the definition used for the survey, "Administrative Segregation," is limited to what is referred to as "Administrative Detention" or AD in Illinois, as it specifically excluded disciplinary segregation and protective custody), available at http://www.law.yale.edu/news/19864.htm.

[16] As of the end of 2014, IDOC reported that of the 2,441 serving segregation terms in IDOC, 663 were serving terms of six months of more, and 499 were serving more than nine months. At that time, IDOC reported that Pontiac housed 777 inmates with disciplinary segregation: 468 with terms of more than six months and 330 with terms of more than nine months. Pontiac's Mental Health Unit housed 27 inmates with disciplinary segregation terms of more than nine months. These numbers fail to capture the substantial number of individuals who are serving disciplinary segregation terms of more than a year or multiple years. In September 2015, administrators reported that at Pontiac 97 inmates had segregation terms of nine months to a year, 102 had between one and two years, 42 had between two and three years, 21 had between three and four years, 18 had between four and five years, seven had between five and six years, nine had between six and seven years, seven had between seven and eight years, nine had between eight and nine years, four had between nine and 10 years, and 64 had more than ten years of segregation. This totals 380 with segregation terms longer than nine months and 283 with more than a year. While Pontiac houses most male IDOC inmates with lengthy segregation terms, remember that these totals do not include inmates at other IDOC facilities. Some lengthy segregation terms imposed will not actually be served due to inmates completing their custodial sentences prior to the end of their segregation terms.

[17] *R.J. v. Jones*, Case No. 12-cv-7289 (N.D. Ill.), documents available at http://www.aclu-il.org/r-j-v-bishop22/. Other aspects of the settlement relate to increased mental health and educational staffing and supports, as well as tracking and reporting of any use of isolation, even use under an hour for a "time out."

The second issue involved in solitary confinement relates to questions of discipline: what behaviors merit what restrictions and for how long?[18] Should this practice be reserved only for those who are violent and pose a safety concern, or should it be used also with those who are merely disruptive, or should it be used across the board with anyone who breaks any rule? Are there particular classes of people, such as inmates with mental illness, dementia, those under the age of 18, or those who pose no risk physical harm to others who should not be subject to isolation? These questions are also part of the much larger national debate regarding mass incarceration.[19] JHA believes punishment must be certain and equitable to be effective and humane, and that it should be used with an intent that, where possible, a person will return to their community. There is a point of diminishing returns in using isolation to manage prisoners. If a term of a month produces the same effect as years, it is fairer and more humane to have a preference for a term of a month. As noted above, there are still major questions regarding whether isolation is effective and, if it is effective, for what length of time it should be used. We have not yet even been able to define solitary confinement and track its use as needed to allow for an informed debate. As with mass incarceration, there is a growing recognition that solitary confinement is unevenly doled out, often for minor offenses, and disproportionately directed against marginalized populations, including racial minorities, transgender inmates, or inmates who may have difficulty conforming in a correctional environment because of developmental, medical or mental health issues.[20]

Although Pontiac no longer houses inmates under the age of 18, there are numerous individuals who entered IDOC when they were younger than 18, and having exhibited behavioral issues, now find themselves housed in Pontiac maximum-security.[21] Arguably some of these behavioral issues related to their difficulty adjusting to an adult correctional setting as minors. The histories of some of these individuals contain extremes of physical, sexual, and mental abuse, prior acting out, self-harm, and isolation. For some we have seen a downward spiral in which inmates act out destructively, begetting harsher punishment and longer isolation, which in turn exacerbates inmates' behavioral problems leading to further punishment and more isolation. We remain concerned that Pontiac may not be adequately addressing the tremendous needs of this population as the facility has been historically geared towards security with extremely limited services and programming for reentry or emphasis on fostering positive change.

---

[18] At Pontiac in March 2015, most inmates, 1,142 were A Grade, 171 were B Grade, and 715 inmates were C Grade, meaning they had the most privilege restrictions and may only participate in yard, restricted commissary, and visits, and do not have phone privileges. *See* 20 Il. Admin. Code 504.130. Some administrators report commissary restrictions alone are often effective punishments.

[19] Also as with the anti-mass incarceration movement to reduce population, few people are bold enough to risk being wrong about someone's unknowable future behavior. No one wants to be the politician, Governor, or prison official to sign the papers for an individual who goes on to do another great harm. This is particularly difficult when the harm could be a violent attack on a colleague when you work in a tight knit environment where you must trust others with your safety.

[20] At the time of the March 2015 visit, administrators reported that Pontiac housed two transgender inmates and JHA spoke with one of these individuals in PC. During the September 2015 revisit, JHA spoke with another transgender individual in PC.

[21] As of August 2015, JHA was informed that male 17-year-olds in IDOC custody will be housed at Illinois River Correctional Center on a special unit in order to comply with federal Prison Rape Elimination Act (PREA) standards. JHA expects to visit and report on this unit soon. Prior to the PREA standards issuance in 2012, 17-year-olds in IDOC were not systematically separated from older inmates. JHA has advocated for improvements for these youth and will continue to advocate to keep them out of the adult system.

At Pontiac and throughout IDOC and IDJJ there is a long history of inadequate provision of mental health services, and still today, no matter an individuals' age or educational level, there is minimal programming for them in segregation. Almost 20% of Pontiac's population, 375 inmates, were under age 25 at the time of JHA's March 2015 visit.[22] Contemporary brain science recognizes that key development in the frontal lobe, which manages decision-making ability and impulse control, can occur up until the age of 25. Therefore it is unsurprising that many younger inmates in IDOC act out impulsively, end up in disciplinary segregation, and often stay there for repeating poor behavior.[23] JHA believes IDOC has a duty to provide developmentally appropriate interventions, particularly with youthful inmates. The majority of these young men will leave IDOC and return to their communities.

Even individuals with no chance of returning to free society still need to be granted the basic human dignity that permits them to improve their situation and have a sense of purpose. The treatment and outlook of all individuals affects the culture and environment where staff and inmates live and work. Fostering hopelessness within a prison ultimately harms and endangers correctional and healthcare staff who must work with these prisoners, as well as other inmates, and the loved ones of those at the facility, including inmates' families and children. Even those with life long sentences will also in some way have contact with the larger world. Most Pontiac inmates will transfer out of Pontiac to other IDOC facilities before their release. Some may be temporarily transferred from Pontiac custody to jails for court cases or hospitals for medical treatment. While many individuals housed at Pontiac will never walk outside the prison door, the majority will return to the community.[24] For example, an inmate with a 78-year disciplinary segregation term for staff assaults was still expected to parole within a few years. Another inmate in the MHU similarly reported that he had a segregation outdate 89 years in the future, but he had just nine years until his expected parole date. Absent a viable program for inmates to earn time off of segregation terms, these inmates will likely be released directly into the community after years of isolation. In the last year, nearly a hundred men paroled from segregation at Pontiac directly to the community. Of these, nearly 40 left without any continued law enforcement supervision due to the fact that they had already completed their required term of supervision while incarcerated, due to not having approved housing in the community.[25]

---

[22] The average age of inmates at Pontiac was 38. Approximately 19%, or 391 inmates, were over 50 years old.

[23] "For youthful inmates in segregation, effects of isolation and lack of positive programming and congregate opportunities on cognitive and social development may be especially damaging. During the formative stage of adolescence, when basic developmental needs for interaction and guidance are not met, youth may be developmentally unable to view the isolation as temporary, to self-soothe, to reason with themselves about delaying relieve, or to stabilize themselves without support and training. Youth are particularly vulnerable to depression and agitation when isolated, which may be expressed by irritability and acting out, leading to additional segregation time and sometimes to self-harm. Research on children who were abused or neglected also provides evidence that past experiences of trauma increase vulnerability, even to mild stressors, and they may respond aggressively to control attempts and perceived threats when memories of past abuse have been triggered." Vera Institute of Justice, *Keeping Vulnerable Populations Safe under PREA: Alternative Strategies to the Use of Segregation in Prisons and Jails*, April 2015, p. 6, available at
www.prearesourcecenter.org/sites/default/files/library/keepingvulnerablepopulationssafeunderpreaapril2015.pdf.

[24] About 300 inmates at Pontiac (15%) had life sentences. Of these, at least 20 were JLWOPs, i.e. juveniles when they committed crimes for which they were sentenced to life without parole. Administrators also reported that 136 Pontiac inmates had sentences between 20 and 40 years and 54 had more than 40 years.

[25] 92 inmates over the year prior to JHA's March 2015 visit had been released from segregation at Pontiac to the streets on parole (Mandatory Supervised Release, "MSR"), while 36 "maxed out," or were released after spending

The effects of what happens at Pontiac are not simply confined to the facility. The manner in which prisoners are punished impacts the safety and well-being of not just prisoners and correctional staff, but also the community and public at large. The public continues to have a public safety interest in rehabilitation, as well as a moral one.[26]

Within IDOC, Pontiac consistently has the highest reported incidence of inmate-on-staff assaults with 100 reported in FY14 and 146 in FY13 (out of an agency total of 578 and 541 respectively). Administrators reported 65 inmate-on-staff assaults and 107 inmate-on-inmate assaults from January 1, 2014 through March 13, 2015.[27] In the year prior to JHA's March 2015 visit, administrators reported inmates at Pontiac received 2,971 major and 1,982 minor tickets. JHA encourages greater agency data collection, specificity, and reporting for incidents to enable analysis and determination of necessary safety improvements. It would be useful to know how many new criminal cases and additional lengthy disciplinary segregation terms originate in isolated housing, as well as what percentage of self-harm and suicide attempts occur there. Some would take Pontiac's numbers to reflect that isolating inmates removes the risk of violence from other facilities, while others would say that isolation itself causes behavior issues. In JHA's experience, many mutable characteristics commonly observed in correctional isolation including idleness, lack of autonomy, and feelings of hopelessness, also tend to engender facility violence.[28]

Correctional best practice standards recommend that segregation inmates be assessed and given treatment plans and greater opportunity to control outcomes.[29] As discussed in prior JHA reports, Pontiac does offer some segregation reduction programs for inmates who have been without any disciplinary reports for 90 days and without any serious disciplinary violations for the prior year. In total, 632 inmates had earned segregation reductions totaling more than 77 years through these programs from January 2014 through March 2015. At Pontiac, administrators again reported that they are struggling to find people who qualify for the Long-Term Segregation Incentive Program and at the time of the March visit only one inmate was participating with an additional five submitted for approval.[30]

---

the maximum amount of time at the facility that the state could legally detain them for (their sentence time plus half of their MSR term) without any further parole supervision. Officials were not able to provide a number for how many inmates annually transferred out of Pontiac to other facilities.

[26] Also, as pointed out in prior JHA reports, and by many others, isolated housing is typically more expensive due to single-celling and greater staff attention in most systems. Additional fiscal costs could also be considered in this analysis.

[27] Shortly after JHA's March 2015 visit, an AD inmate at Pontiac managed to inflict puncture wounds on three officers when he was underneath his bed resisting a cell extraction. Staff were aware it was likely the inmate had a weapon at the time of the extraction. This individual, who had been isolated for years, had a history of staff assaults. He was listed on IDOC's inmate locator website as weighing 142 lbs.

[28] *See e.g.*, "Confronting Confinement: A Report of the Commission on Safety and Abuse in America's Prisons," available at http://www.vera.org/sites/default/files/resources/downloads/Confronting_Confinement.pdf.

[29] *See e.g.* American Bar Association (ABA) Standards for Criminal Justice (Third Edition), Treatment of Prisoners (2010), Standard 23.2.9, Procedures for placement and retention in long-term segregated housing, and Standard 23-3.8(c) Segregated housing.

[30] At the time of the visit, criteria for this program included that the inmate be within two years of his segregation release date (the Warden may grant exceptions), not have received any disciplinary reports in the prior 90 days, and not have been found guilty in the past year of 100 Violent Assault of any Person, 203 Drug and Drug Paraphernalia, 104 Dangerous Contraband, 102 Assaulting Any Person, 105 Escape, 107 Sexual Misconduct (habitual) three more guilty findings in the last year, 108 Sexual Assault, 205 Security Threat Group-Unauthorized Organizational

JHA has advocated for such programs to be formalized, expanded, and to include a range of rewards to acknowledge and incentivize demonstrated improved behavior. The ongoing lack of eligible inmates in Pontiac's segregation reduction program suggests that the program as currently conceived is unsuitable for the population. JHA remains concerned that some inmates cannot comprehend the connection between good behavior and the reward of segregation reduction, first because of the length of time it takes to receive the reward, and secondly because of the abstraction of taking time off of long segregation terms. Intermediate tangible rewards could enable more inmates to succeed. Administrators acknowledged that inmates often seek "immediate gratification." Recognizing this psychological tendency, JHA believes that an effective segregation reduction program should be structured to provide inmates with both immediate and long term incentives for improved behavior. We also recommend that inmates be automatically considered for participation in segregation reduction programs, as currently an inmate must make this request. JHA and staff at Pontiac recognize that many inmates have low literacy levels and may be at a disadvantage in advocating for themselves to improve their situations. JHA appreciates that Pontiac counselors and other staff appear to be increasing efforts to be present on units so that inmates may make in person requests.

Many other states, including Mississippi, Ohio, Maine, New York, Colorado, New Mexico, Washington, Virginia, Michigan, New Mexico, Wisconsin, and California, have taken measures to clarify and reform segregation policies, to restrict its use to more serious offenses, to increase opportunities for step down and release, and increase productive activity in segregation units, with positive results.[31]

## Administrative Detention

Administrative Detention (AD) is a "nondisciplinary status" intended to remove the inmate from the general population.[32] These inmates are segregated not for being found guilty of a disciplinary infraction but for either investigative or safety and security reasons. Living

---

Activity, or 601 Aiding or Abetting, Attempt, Solicitation, or Conspiracy for any of the previously listed offenses. For several of these tickets the Warden has discretion to review and make an exception to permit participation on a case by case basis.

[31] This list includes states that have instituted segregation reforms that reach beyond those for juveniles or seriously mentally ill populations. Numerous additional states have reformed segregation practices for those special populations. *See e.g.* the Marshall Project's summary of some states' changes, "Shifting Away from Solitary," (December 23, 2014), available at https://www.themarshallproject.org/2014/12/23/shifting-away-from-solitary. On September 1, 2015, California agreed to significantly reform how isolation is used in its prisons as a result of a class action lawsuit, including: no longer placing inmates in restricted status solely for gang status, circumscribing indeterminate placements and lengthy stays, increasing out-of-cell time, shortening time required in the Step Down Program, and increasing staff training, data collection, and oversight of the reforms' implementation. *See Ashker v. Brown*, Case No. 09-cv-5796 (N.D. Ca.), Document 424, filed 9/1/2015, "Notice of Joint Motion and Motion for: (1) Conditional Certification of Settlement Class; (2) Preliminary Approval of Settlement Agreement; (3) Stay of the Proceedings; (4) Notice to Class Members; and (5) Schedule Setting Fairness Hearing for Final Approval." In Illinois, in addition to the *Rasho* litigation regarding mental healthcare and discipline of seriously mentally ill inmates within IDOC, on June 22, 2015, a lawsuit was filed by inmates represented by some of the same *Rasho* counsel generally seeking to represent a class of "all prisoners who are subjected to harmful punitive isolation sentences and who are or who will be confined in Illinois' prisons." *Coleman v. Taylor*, 15-cv-5596 (N.D. Ill.)

[32] 20 Ill. Admin. Code 504.660 Administrative Detention.

conditions for AD must minimally meet disciplinary segregation standards, but AD is not meant to be equivalent to disciplinary segregation.[33] IDOC implemented new AD policy in May 2014.

At the time of JHA's March 2015 visit, 29 of 125 AD inmates at Pontiac were in Phase 1, the most restrictive phase of AD status, 36 inmates were in Phase 2, and 60 were in Phase 3, the least restrictive phase.[34] Inmates in Phase 1 are housed in cells with solid door cellfronts, wear segregation jumpsuits, and are only permitted individual recreation in cages. AD inmates may be double-celled with other inmates classified in the same phase after being reviewed using the standardized segregation double-celling assessment. Some AD inmates do not want to be double-celled or choose not to recreate with others when given the option in later phases. Administrators stated the average length of stay for most inmates in Phase 1 is 90 days, while Phase 2 averages a stay of six months to a year, and Phase 3 averages more than a year. Administrators reported in March 2015 that fewer than 20 inmates had been moved out of AD at Pontiac to the general population since May 1, 2014. In September 2015, administrators reported that three individuals had completed AD Phase 3 since JHA's March 2015 visit. [35]

AD inmates are evaluated by a review committee 30 days after their initial placement. Thereafter, the committee performs a review of the inmate's placement in AD minimally every 90 days, and the inmate has an opportunity to appear at the review hearing every six months. Pontiac's review committee consisted of a Chair (Pontiac's Assistant Warden of Operations) and representatives of Pontiac Intelligence, regional IDOC Intelligence, clinical services, and mental health. Staff from other areas are also part of AD review on occasion. To progress in the step-down program to a less restrictive phase or to general population the committee must find the AD inmate to be a "non-threat" to safety and security with no credible intelligence suggesting otherwise. This is a high bar.

Administrators described the committee reviews as labor intensive. In making determinations the committee reviews inmate files and considers disciplinary tickets, the initial AD placement determination documents, information from any prior AD reviews, the inmate summary prepared

---

[33] *See* 20 Ill. Admin. Code 504.620 Segregation Standards and 20 Ill. Admin. Code 504.670 Recreation for Persons in Segregation Status.

[34] In Phase 1 inmates, unless otherwise restricted, have five hours of recreation (minimum), two one-hour non-contact visits per month (only one may be on a weekend or holiday), one 30-minute phone call per month, are permitted property with no food items, have commissary twice a month with a $40 maximum for basic hygiene and correspondence items, and have two showers per week (ten minutes minimum). In Phase 2 inmates, unless otherwise restricted, have six hours of recreation (minimum), three two-hour non-contact visits per month (only one may be on a weekend or holiday), two 30-minute phone calls per month, are permitted property with food items, have commissary twice a month with a $40 maximum, and have three showers per week (ten minutes minimum). In Phase 3 inmates, unless otherwise restricted, have six hours of recreation (minimum), five two-hour non-contact visits per month with a "Meet & Greet," meaning an opportunity to briefly have contact, as security measures allow (three visits may be on a weekend or holiday), one 30-minute phone call per week, are permitted property with food items, have commissary twice a month with a $60 maximum, and have three showers per week (ten minutes minimum). During the September 2015 revisit, JHA noted Phase 3 AD inmates playing basketball in a group on yard while other more restricted inmates were in yard caged areas. The May 2014 revision to IDOC policy has resulted in inmates more commonly receiving the same property (e.g. audio-visual) privileges as prior to their AD placement; however, this can also be modified by the Adjustment Committee (who determines disciplinary sanctions) or the Warden.

[35] JHA interviewed one inmate in AD Phase 3 during the March 2015 visit who was expecting to be moved out of AD shortly and has since been moved to Menard.

by Intelligence, mental health reports, the inmate's statements and reports, any information pertaining to an inmate's accomplishments, e.g. education achievements, etc. Inmates are to receive a notice of the review in writing at least five days prior to the hearing informing them of the date of the hearing and giving "reasonable specificity" for the reason for placement. Administrators explain that basically they are assessing the risk an inmate poses to system safety with the information they have, and not making a determination of guilt. Administrators reported that when an inmate comes to a hearing the committee tends to asks a lot of questions to gauge the inmate's "mindset," and whether he is sincere in his answers. They are looking for a positive change.

A serious concern of the committee is gang activity or involvement in a Security Threat Group (STG). Administrators report about 61% of Pontiac's population is identified as STG affiliated. Where someone has a history of gang or STG involvement, administrators state that it is possible for them to advance in the AD program, but the individual must show that he has moved past that mindset. Denial or silence are generally construed as evidence that a person has not progressed and accepted responsibility. Administrators stated if they believe that someone in AD is "calling shots," or directing gang activity, they will not let him out of AD because they need him to remain in a controlled setting. Some of these individuals will complete their sentences in a few years and max out of prison from AD. Nonetheless, administrators will not sign off on someone leaving AD unless they are certain the inmate will do well in general population because they feel they are responsible if the inmate gets out of AD and it leads to someone getting hurt.

Administrators reported that general population inmates tell them they feel safer because certain individuals are removed to AD and they reported that some of the individuals in AD also feel safer being removed from general population and do not want to leave. Some inmates want to remain in AD because they know they will be pressured to get involved with gangs upon leaving. JHA notes that AD should not be used as a keep-separate-from (KSF) or PC alternative and that there are other methods available for more closely monitoring inmates in general population, including more targeted monitoring of communications.

If an AD inmate receives a ticket resulting in disciplinary segregation, he must first serve his segregation term before he is reviewed for placement in AD Phase 1. JHA objects to the practice of requiring inmates to serve terms of disciplinary and administrative segregation consecutively. Reducing inmates' privileges, delaying inmates' progression to the next AD phase, or returning inmates to an earlier, more restrictive AD phase would serve the same ends without unduly prolonging the time inmates are isolated. We note that pursuant to a recent reform, prisoners in California now will be allowed to serve disciplinary and administrative segregation terms concurrently instead of consecutively. JHA recommends that this policy be adopted in IDOC. Many AD inmates believed that they were ticketed and sent to segregation to pull them back into AD and not let them progress.

AD inmates universally complained that they were provided with no specific explanation as to why they were placed in AD, why they were denied a transfer from AD, or why there required to remain in AD  based on charges that were not sustained. Inmates stated the review hearings did not illuminate the reason they remained in that status. JHA viewed some notices AD inmates

received with explanations for placement that were extremely general. Administrators were insistent that inmates "knew" why they were in AD. Nonetheless, JHA finds it easy to appreciate the frustration and hopelessness that inmates feel when they are subjected to an AD process that does not include clear, plausibly rebuttable or changeable explanations of why they remain in AD status. Many inmates stated they have no idea why they continue to be confined in AD despite good behavior. Administrators confirmed that while good behavior may result in some increase of privileges, it will not in itself result in a transfer from AD.

Some inmates recounted being asked questions at their review hearings that suggested that administrators believed the inmates had knowledge about gang activity or other inmates that they were withholding. Some inmates report being stuck in a Catch-22 where if they deny gang involvement, officials will insist they are lying, but if they lie and state they are gang-involved they will be stuck in AD for not fully divulging things they do not know about. Inmates in general are faced with a difficult task to challenge or disprove something in their hearing files. Several inmates reported submitting affidavits of other inmates attesting that the AD inmate was not involved in the incident believed to be the impetus for the inmate's AD placement. Such documents did not appear helpful, as many officials seem inclined to summarily dismiss such inmate testimony on the basis that it is inherently self-interested or untrustworthy. Other inmates stated that the reasons given for denying them phase advancement through AD included past gang involvement or tickets that the inmate received before placement in AD, years or even decades in the past, which are unchangeable.[36] If this is true, it amounts to something like an indefinite disciplinary term being imposed *ex post facto* to penalize inmates more severely for past conduct. Further, inmates are not provided with any insight or guidance regarding what they must demonstrate to the committee to show that they are of a sufficient low risk to merit AD advancement. Administrators acknowledged that some inmates were considered such high risk they would never transfer out.

JHA appreciates the need for enhanced control over some inmates and recognizes that inmates do not have a right to be housed in particular locations. However, we do object to indefinite placements without a meaningful recourse for regular review.[37] It is one thing to be separated by placement as an administrative decision, but another to be deprived of non-safety related privileges without recourse. JHA asked inmates why it was worse to be housed in later AD phases compared to maximum-security general population, given that they would be unlikely to receive greater privileges, since availability of programming is so limited throughout IDOC. One inmate explained that it would be better to be in maximum-security general population than AD Phase 3 simply because then he could walk to commissary and have time outside with grass. Other AD inmates felt they were disadvantaged because they were in a situation where they had no chance to progress or vindicate themselves. JHA cannot overly stress that correctional

---

[36] One inmate said he had not received a ticket in 11 years. Another stated that he was given three different reasons for his AD placement, had not received a ticket since 2011, had been in Phase 3 for a year and a half, and was going to parole relatively soon and wanted access to educational resources. Another inmate had a history of making threats but did not have any STG affiliation, and it was unclear why he would not just be ticketed for this behavior or have this considered as a mental health issue instead of being held in AD.

[37] For a recent comprehensive review of use of restrictive housing in prison systems throughout the United States *see* "Time-in-Cell: The Liman-ASCA 2014 National Survey of Administrative Segregation in Prison," (September 2015), available at http://www.law.yale.edu/news/19864.htm.

programs without clear application, or with indefinite duration, produce considerable needless anxiety.

Inmates in AD are housed in the North cellhouse, which also is used to house more aggressive inmates with long-term disciplinary segregation terms. While JHA can neither confirm nor deny individual inmate reports based on our observations during recent visits, in this area, JHA received numerous complaints regarding chemical agents spreading throughout the cellhouse.[38] A few AD inmates commented about the difficulty of various restrictions, such as being hungry when having commissary restrictions during Phase 1. Anxiety and isolation relating to lack of contact with friends and families due to barriers to phone calls, visitation approvals, and mail, was a common AD report. AD inmates' communications are closely monitored. JHA received numerous complaints regarding the slowness of mail with several inmates reporting about a month delay for mail coming or going. Some inmates expressed particular concern about mail relating to legal issues being delayed. Pontiac inmates, along with inmates in other IDOC facilities, report that service through the phone provider, Securus, frequently cuts out and is temporarily blocked if there is background noise. Inmates with restricted phone time, like those in AD, suffer greater detriment when phone service is not reliable. An AD Phase 3 inmate was distressed that it had taken a week to get a call approved after his father died and he felt that staff had been insensitive to his situation. Inmates often tell JHA that deaths of family or friends, or anniversaries of those dates, act as strong triggers for them and often correspond to periods of acting out or mental decompensation.

During the March 2015 visit, administrators stated that they would like to offer some sort of educational opportunities or group religious services in AD, but money, infrastructure, and staff were lacking.[39] JHA believes that this is advisable and more suitable for AD inmates who are held in a "non-disciplinary" status. This sort of programming could likely be better accommodated at a high-medium IDOC facility where there could be secure monitoring of inmates in a setting where they would also have access to programs not generally accessible in maximum-security or long-term segregation facility.

During the September 2015 revisit, administrators informed JHA that volunteers from Willow Creek church have been visiting the AD unit and holding five bible study sessions with up to five AD inmates in each group weekly. Additionally, JHA was told that a different counselor has been assigned to the AD population who was certified to provide programming. Plans had been developed to begin offering Drug Treatment[40] and Lifestyle Redirection programming in AD, as soon as October. Administrators report that for each class, 20 AD inmates will receive materials and work in their cells with feedback from the instructor, and participants in these programs will receive certificates upon completion. Counseling staff also intend to begin offering Anger Management soon to more individuals in the North cellhouse, including those with lower literacy levels than are required for formal programming. Administrators stated that they still intend to

---

[38] *See also* Inmate Concerns section of this report.

[39] Documents provided to JHA stated that "Offenders in administrative detention may request basic educational materials in the form of worksheets and workbooks from the library or Educational Facility Administrator." During JHA's September 2015 visit, administrators reiterated that materials could be requested.

[40] This program will utilize some Hazelden materials, *see* http://www.hazelden.org/OA_HTML/item/140109?A-New-Direction-A-Cognitive-Behavioral-Treatment-Curriculum-Revised&src_url=itemquest#prodDetails.

hire an educator who will have AD programming as their primary role; however, first an existing educator vacancy must be filled. JHA has noted IDOC's difficulties attracting educators and other professionals to fill vacancies in a timely manner, in part due to Illinois' complex, lengthy state hiring procedures. JHA commends Pontiac for positive programming developments. We will continue to monitor programming implementation and other AD issues.

## Mental Health

In total more than 580 inmates at Pontiac in March 2015 were on the mental health caseload and more than 400 were on psychotropic medications, with about 30 involuntarily medicated.[41] At that time, Pontiac's Mental Health Unit (MHU) housed about 65 inmates and had a reported capacity of 94. Mental health staffing had improved significantly from the time of JHA's 2013 Pontiac visit and report, and was expected to increase from 11 staff at the time of the March 2015 JHA visit, to more than 13 shortly after the visit date. However, as of September 2015, administrators reported no notable net change in mental health staffing, remarking that they had lost a psychologist in June and there had not yet been any applicants for the posted position.

Administrators noted that the additional mental health treatment was expected to lower the number of inmates in mental health housing and designated as Seriously Mentally Ill (SMI) because provision of more treatment would help stabilize them. Pontiac administrators reported that at the time of the March 2015 visit about 200 inmates were designated as SMI and that this had increased from about 65 so designated prior to the reevaluation prompted by the *Rasho* litigation.[42] They reported that the number of SMI inmates spiked to about 300 initially after the reevaluations, which they attributed to new staff over-designating inmates as SMI when they were unaccustomed to the population and environment. Administrators stated that there was a learning curve for new staff and they also had to deal with attention seeking behavior from inmates responding to the presence of new staff, including an increase of inmates on crisis watch. Pontiac has been offering crisis training onsite to increase the overall number of staff with this training, which was 146 security and mental health staff members as of September 2015.

A mental health staff member opined that Pontiac was reasonably well staffed for mental health coverage, but they were still planning to increase staffing to have coverage seven days a week with increased evening hours.[43] Administrators noted that they had instituted regular mental health contact when transfer buses arrive at Pontiac. Two mental health staff members were assigned to each housing unit. The number of times mental health staff see inmates on their caseload depends on the inmates' housing classification and treatment needs. At minimum, mental health staff make  rounds once a month for inmates on their caseload in non-MHU

---

[41] Pontiac housed 17 individuals found to be "Guilty but Mentally Ill." *See* 730 ILCS 5/5-2-6.

[42] At the time of the September 2015 JHA revisit, eight individuals in AD and 58 in segregation status were designated SMI.

[43] At the time of the March visit, administrators reported that mental health staff onsite coverage had been extended by adding staff on the noon til 8 p.m. shift five days a week and the facility planned to hire so that there would be another staff person on that shift on the uncovered days.

housing, weekly in the MHU, and daily for inmates in crisis cells.[44] An administrator stated that there was not currently a set number of out-of-cell time or therapy time per inmate in the MHU.[45]

During both visits JHA viewed the planned Residential Treatment Unit (RTU) treatment space, which formerly was used as a dining area adjacent to the South cellhouse. The plans for the RTU include modifications in the South cellhouse, increasing the number of crisis cells, further increasing mental health staffing, and increasing training for both mental health staff and security. The RTU capacity will be 144 inmates single-celled. Assessment for placement in the RTU will consider the inmate's disease and level of functioning. The RTU is intended to permit more out-of-cell treatment and is intended to facilitate return to general population. An administrator stated the RTU is not like hospice, where you are not coming out. This setting will be aimed to help people get better and be able to function in general population. The facility plans to eventually increase mental health staff coverage to 10 hours a day to support RTU services of 10 hours of structured and 10 hours of unstructured programming a week per inmate. This RTU treatment space is designed to streamline movement. JHA observed the RTU floor plan taped on the floor, outlining areas including group rooms, individual therapy rooms, and holding cells. In March, administrators stated that they were told that construction may begin in June 2016 and be completed by the end of 2016. Some were openly skeptical that the work would be completed in that time. During JHA's September 2015 revisit, RTU construction plans had been suspended due in part to lack of a state budget.

JHA was concerned by the small size of many of the taped off RTU areas. Inmates who have spent years in small spaces could benefit from exposure to larger spaces so that they can learn to be comfortable in varied environments. Many inmates find being in cramped spaces with others to be distressing and counter-therapeutic. One MHU inmate during the March visit reported that he would like to be in the group therapy but cannot be because being in such close quarters with people made him feel too anxious and panicked. Although it was difficult to imagine what the RTU treatment area would look like when completed, positively, it did seem like the area would permit more programming and facilitate more inmate movement.

Since JHA's 2013 report, new mental health groups have been added at Pontiac, including groups on topics ranging from Art and Creative Writing to Self Care for inmates who are lower-functioning. There were more than 15 groups, some of which are offered to as many as 15 inmates at once, depending on the activity. One MHU inmate reported he participated in six groups. The MHU also has a mentorship program where inmates who have done well can teach their mentee what they have learned about coping and self care in the environment. Groups were being offered not only for inmates in the MHU but also to some inmates in segregation in the West cellhouse and there were reportedly plans to extend groups to inmates in the East cellhouse.

---

[44] Crisis cells were located in North (12), MHU (8), East (1), and the HCU (6).

[45] Like all Illinois maximum-security inmates, those in MHU currently receive just five hours of recreation a week absent unusual circumstances such as lockdown, extreme temperature, etc. However, an administrator noted that staff cannot make the men leave their cells for those five hours of recreation if they do not elect to, implying that some do not take advantage of the limited out-of-cell time currently offered. Staff observed that some inmates need to be given instruction on basic self-care and hygiene and to feel comfortable coming out of their cells or using showers.

Some of the groups are specifically targeted to address coping with long segregation terms and pre-release and segregation-release concerns.

In March, JHA visited a group therapy session lead by a mental health staff member where 13 inmates were shackled to wooden benches along the walls in a small room. Inmates expressed considerable enthusiasm for the group, with about half the men speaking up to JHA about their experiences. One stated that this was "the best program." Some inmates stated that they really liked having a larger group and being able to help one another since many do not have family. Another stated that the program should be available throughout the nation because mental health is a big problem in the United States. Another inmate stated that in the cellhouse they are like "brothers" and they learn from each other. This was a common theme and comment from the inmates reflecting MHU inmates supporting one another. A member of the group expressed dismay that they had not been able to do anything to prevent a recent suicide attempt on the unit, but appeared to appreciate that they had not had warning signs. JHA also saw the "soothing room," which is decorated with a mural of a tree and is used to calm inmates down if they have issues in group. Inmates may be suspended from a group for 30 days for major disciplinary tickets. Other treatment areas are available where safety requires there to be a barrier between staff and an inmate.

JHA was pleased to hear that some one-on-one out-of-cell work had been incorporated into treatment plans for some individuals with significant histories of poor behavior to improve their coping skills and address problems with acting out. We were impressed by staffs' apparent dedication to helping inmates work on positive identity and future orientation to enable inmates to better navigate within the correctional system. One mental health staff member shared that many men at Pontiac struggle with cognitive distortions and self-defeating outlooks, but focusing them on goals can be helpful. One tactic employed was to have inmates describe three core values or character traits of the person they wish to become, and then staff holds them accountable to those traits through their behavior. This type of intervention can help inmates to focus on identifying what is good and redeemable in them that they can work on. Staffs' work with inmates reinforces the importance of respect, boundaries, and learning to make conscious choices about their behavior. Another important area for many inmates is learning how to express emotions without acting out. Many of the men struggle with expressing emotion out of fear that it will be interpreted as weakness. Staff reported some success stories including an inmate with an extensive history of self-mutilating behavior and assaults who had gotten only one ticket in two years and another inmate with four prior staff assaults who had gone 14 months without a ticket. JHA notes these successes and commends this important work. We also advise that data comparing treatment provision and inmate disciplinary issues be formally tracked.

In relation to the *Rasho* litigation, administrators noted that that all SMI inmates' segregation time has been reviewed and that a significant amount of time has been reduced. In the course of this review of past discipline for SMI inmates, administrators reported that at Pontiac 44 SMI inmates received segregation reductions of a total of 74 years and six months. This required going back over decades of disciplinary history in some cases, to review whether mental health issues were involved and if so, whether segregation time should be reduced or eliminated. Simultaneously, mental health staff is now being called on to make similar judgments as they are consulted in disciplinary hearings where mental illness may be a factor. Mental health staff

stated that if there was any degree of planning regarding the act of misconduct, the ticket would stand as the inmate would be considered to be responsible for his action. For example, if someone classified as an SMI inmate is psychotic and does something wrong, he might receive a ticket but not segregation time, because he is less culpable. However, if the same inmate engages in more sophisticated or premeditated misconduct like sending a message in code, he would be punished like any other inmate. If an inmate hurts himself or commits misconduct that does not involve planning, he will likely not be found guilty and accountable. Acts against staff or other inmates that appear to be a result of an impulse control issue stemming from mental illness may be a case where the review will determine that the inmate should not be punished or given a reduced punishment. A staff member gave as examples of non-culpable behavior situations where an inmate drops or throws something because his medication caused physical shaking, or where an inmate reacts poorly to being given a shot. The examples given by staff, involved actions by inmates that seem more obviously involuntary. A much more challenging situation is where an inmate's medication is changed causing him to destabilize and act out inappropriately. Likewise, isolated individuals often destructively act out as a common decompensation behavior reflecting a need for stimulation or human contact. These behaviors are arguably directly related to a person's mental illness, warranting mitigation of their punishment, even though the behaviors may appear planned or intentional.

It is only now that an inmate's mental illness and the exacerbation of mental illness through isolation are being considered as mitigating factors in determining whether and to what degree an inmate warrants a punishment. Many inmates who suffer from serious mental illness, including those who developed mental illness as a result of long term isolation, acquired long disciplinary records and severe sanctions over the years, including lengthy segregation terms and loss of good time credit, without any consideration of these mitigating factors. While some might feel certain inmates may not deserve a clean slate, if there is recognition in contemporary understanding of the harms some environments produce for individuals who suffer from mental illness, this same recognition should be factored into judgment exercised by inmates in the past. Whether records contain enough support for findings regarding mental health status is doubtful given the historical lesser appreciation for mental health issues and staffing to document such issues. JHA believes that barring some affirmative evidence showing that an inmate suffering from a mental illness acted willfully, with premeditation in committing past misconduct, decisions should be made to eliminate tickets or reduce punishments. Inmates with questionable mental health histories and disciplinary records could simply be given a probationary period to earn their way out of long-term segregation. JHA appreciates the extent of the completed historical review and efforts involved, but we question the method, uniformity of review, and lack of independent oversight. We also note that it has been historically common for inmates to incur debts for harm to others or property destruction and we do not believe such related penalties were concurrently reconsidered.

Pontiac MHU did not appear to be appropriate housing for some individuals due to the inmate's low level of intellectual functioning or severity of mental illness, where the individual would be better served be in a psychiatric hospital setting. In addition, some MHU inmates did not have a history of committing the types of serious offenses that would typically warrant placement in a maximum-security prison. JHA appreciated that some staff seemed familiar with the special circumstances of inmates in the MHU. Posted on the door of one inmate's cell were detailed

instructions for staff on how to move the inmate because he was known to react poorly, lashing out in certain situations. In March, JHA observed that some MHU inmates' cells were dirty and some inmates complained about cell conditions, like toilets not being promptly repaired. Some inmates that we interviewed while they were celled in the MHU appeared visibly agitated. At least one inmate did not appear to be able to communicate. Several MHU inmates, like others at Pontiac, felt they would never get out of isolated housing. One individual stated that his medications did not work, that he still is hearing voices, and that he was tired of talking to Pontiac staff about it because he felt they did not believe him. Other inmates also similarly expressed concerns that they felt staff did not credit what they were trying to convey. For example, an inmate stated that Intelligence staff would not come speak to him about an incident he wanted to report. It was clear that the MHU was a difficult area for correctional staff to manage based on inmates at times being lucid, but at other times delusional. Several MHU inmates expressed a desire to be hospitalized or housed at Dixon where they had more programming and freer movement. One inmate explained that he felt he paradoxically needed more mental health treatment than the MHU offered in order to conform his behavior so that he would be allowed to be in a setting with more treatment available.

Staff stated that some individuals housed in Pontiac's MHU are likely to be civilly committed at the end of their IDOC sentence, in one case due to the inmate continually making threats to public officials. Others inmates are highly likely to be civilly committed as Sexually Violent Persons.[46] Some MHU inmates reported they wanted anger management classes and sex offender treatment. Nearly 20% of Pontiac's population, 397 inmates, are sex offenders, and there is no special programming for them. A mental health staff member stated that many people with mental illness are afraid to leave institutional settings and cannot manage in the free world. While that may be true for some, formulating generalizations based on a historical precedent of abysmal treatment and supports available seems unduly pessimistic. JHA was pleased to see progress with Pontiac offering more treatment positively orienting patients toward increased functioning and goals.

## Inmate Concerns

JHA details inmate concerns herein, as these were issues repeatedly brought to our attention – however, we can typically neither confirm nor deny unobserved facts underlying individual positive or negative reports.[47] We again note that individual perceptions inform facility culture, that culture often dictates safety, and where people feel their concerns are unheard, conflicts are more likely.[48]

JHA was extremely pleased to note that some inmates reported that they had nothing negative to report or were doing alright or better than they had been doing at other facilities or previously at Pontiac. Administrators stressed that Pontiac houses the most violent inmates in IDOC and the success of the facility is a testament to staff professionalism. JHA was pleased to hear inmates voice concerns to the administrators and staff who accompanied us during our visits, showing

---

[46] See 725 ILCS 207, Sexually Violent Person Commitment Act.

[47] See www.thejha.org/method.

[48] See e.g., "Confronting Confinement: A Report of the Commission on Safety and Abuse in America's Prisons," available at http://www.vera.org/sites/default/files/resources/downloads/Confronting_Confinement.pdf.

that, although the inmates were dissatisfied with certain issues, the inmates knew the staff, did not feel too intimidated to raise issues, and they had some expectation that problems would be corrected. Sometimes, especially where there is frequent leadership turnover at facilities, inmates do not recognize or know the names of administrative leaders. Also positively, some inmates complimented the food in comparison to other facilities.

*Grievance Process*

As discussed throughout the instant report and in prior JHA reports on Pontiac and other IDOC facilities, inmates throughout IDOC feel that the grievance process is ineffective to resolve their concerns. JHA heard from various inmates that while they are expected to follow rules, staff and IDOC are not. As examples, inmates noted that disciplinary and grievance procedures or timelines were not complied with, and that hearings were pointless because they are biased and unfair. In one instance, JHA was told by administrators that a grievance filed five months previously was still pending. While this perhaps was preferable to a hasty denial of a grievance without reasonable consideration, five months is a long time to await a reply. JHA again recommends that IDOC improve the grievance system, including implementing a system permitting inmates to retain a record of their grievance and supporting documents. Some inmates reported concerns about retaliation for complaints, grievances, and lawsuits. While we recognize this concern, JHA can only note that if situations are not reported and documented, they will generally not be addressed and cannot be reviewed.

*Property Issues*

JHA again received complaints about property destruction during shakedowns. Inmates felt that some tickets were given unfairly for possessing items that they previously were allowed and purchased through the commissary. JHA hears this as a common issue at various facilities, often because items permitted at one facility are not allowed at another. If a staff member misses an item when an inmate is transferred, or there is a later rule change, often an inmate arguably has no notice that the item is disallowed and now considered contraband. Pontiac inmates also reported instances where they report something as an issue when moved into a new cell, such as a hole in a mattress, and staff tell them not to worry about it and then another staff member will later penalize them. JHA continues to advise inmates to retain documentation where possible and advises IDOC to attempt to conform permitted property across facilities and give notice to inmates when items are no longer permitted, ideally compensating them for items purchased from commissary that are later disallowed. Sometimes officials state that memos were issued or allowed property lists revised but based on particular instances reviewed, JHA doubts that inmates reliably see such documents or that the documents are always sufficiently clear.

*Physical Plant & Cleanliness*

JHA received several complaints relating to physical plant issues, including plumbing and problems of sewer odors from burst pipes behind walls. Ventilation issues continue to be a major inmate concern. Such issues result in problems of extreme high and low temperatures. Some cells lack outlets meaning that inmates in those cells cannot have a fan. Where inmates are confined in their cells for such extended periods, it is even more important that they be provided

clean, safe conditions. JHA received some inmate reports regarding cleanliness, mostly relating to shower, cell, and yard areas.[49] JHA encourages inmates to document and report any such issues promptly. Administrators reiterated that they uphold a consistent expectation for a high level of cleanliness at Pontiac.

*Chemical Agents*

Pontiac reported 97 uses of chemical agents from January 1, 2014 through March 13, 2015. Again, JHA encourages greater data collection and detailed reporting relating to the use of chemical agents to enable analysis and for targeted training in alternative deescalation tactics as necessary. Administrators stated that the vast majority of uses of chemical agents at Pontiac occur in the North cellhouse, which houses the most challenging inmates. Administrators were not able to easily provide more detailed data, which might be useful in detailing types of incidents, times of day (e.g. whether the majority of events occur during particular staff shifts, or times when mental health staff is not onsite or available), whether multiple instances were occurring with a particular inmate, or identifying inmate populations typically involved. Inmates expressed concerns that chemical agents or mace are used as a first alternative rather than a last resort by staff. Numerous inmates independently recounted that chemical agents are used frequently, that nearby inmates have no way to protect themselves from exposure, that areas are not cleaned sometimes prior to other inmates being moved into affected cells, and that individuals directly involved in an incident are not permitted to shower in a timely manner. Inmates further reported that requests to have exhaust fans used to remove mace from the area are reportedly refused by staff on the ground that they are to be used only in the event of a fire, that inmates who have asthma are particularly affected, and that related medical requests are at times refused. Many complaints JHA received relate to the experience of inmates who are housed in areas affected by an incident but are not directly involved and we believe that more can be done to "limit the noxious side effects" for bystanders.[50]

IDOC policy states that planned cell extractions with use of chemical agents are to be videotaped and inmates involved are to receive multiple warnings. However, other uses may occur in exigent circumstances. Administrators went over the procedure for planned use of chemical agents during cell extractions with JHA during the September 2015 revisit and stated that after incidents occur, medical technicians are required to make rounds in larger areas that may have been affected and inmates may request or refuse medical attention. Administrators stated that if a seriously mentally ill inmate is involved, mental health staff will be consulted and they noted that frequently mental health staff are helpful in having inmates comply with necessary security

---

[49] We received several complaints about lack of cleanliness and mold in showers. In March, an inmate observed that now that MSU inmates clean showers on the unit they are not as clean. Some remarked that food trays are dirty. We received some pest complaints. Inmates again reported that segregation cages have bodily waste in them such as feces, urine, or spit. In JHA's 2013 report, we recommended that inmates be given some positive outlet on yard and that the cleaning of this area be reviewed. When inmates have such limited opportunity for out-of-cell recreation it is especially important that this area be clean and safe. Other inmates commented that the yard was a "mud pit" in the Spring. JHA also received multiple reports that cells were not appropriately sanitized between inmate transfers. While JHA observed common areas to be generally clean, it can be difficult to view areas that are occupied by inmates.

[50] Some of the requirements discussed are set out in the Illinois Administrative Code, also referred to as Department Rule (DR) 501.710. *See* 20 Il. Admin. Code 501.70, Use of Chemical Agents in Cells (Consent Decree).

orders. However, mental health coverage is not 24/7 and we would expect that there are some times when mental health staff is needed for such assistance and are unavailable. Secondly, some of the procedures discussed with administrators do not appear to be documented in written policy and we recommend that they be formalized to ensure appropriate practice and training. Other states, like California, have developed more specific policy around the issue of use of chemical agents, training, and use with the seriously mentally ill. In Illinois, IDJJ policy prohibits use of chemical agents with mentally ill or disabled youth and some cumulative data regarding all mace use is now regularly made publically available. In addition to policy review, JHA also recommends greater vigilance regarding expected chemical agent practices at Pontiac and encourage inmates to report any issues promptly to help ensure that existing policy is consistently adhered to and appropriately comprehensive.

*Healthcare*

Inmates complained of lack of movement making medical physical conditions worse and the lack of physical therapy availability. Several reported that medical permits that were previously available were no longer given, or that medical accommodations given at other facilities were being denied at Pontiac. Some inmates who had physical difficulties requiring special accommodations stated they were unaware of the Americans with Disabilities Act (ADA). One older PC inmate stated he could not attend congregate church services because they were held up stairs. The PC dining area is also located up stairs. ADA information is provided in the current orientation manual.

JHA spoke with several inmates who reported instances where they or others on the unit were not getting appropriate healthcare or responses to requests.[51] JHA continued to hear some reports regarding delays in outside care and follow ups, as well as complaints of how inmates are treated by some healthcare staff. In addition to individual claims, there is an ongoing class action lawsuit regarding healthcare provision in IDOC, referred to as *Lippert*.[52]

As at other IDOC facilities, there were backlogs for dental and eyecare. Administrators reported a 16-week wait time for dentures and JHA interviewed an inmate who had waited about three months but received his dentures shortly thereafter. Healthcare vacancies at the time of JHA's March 2015 visit included one registered nurse, a nursing supervisor, a medical records director, a psychologist, an activity therapist, and a psychiatric nurse. During the September 2015 revisit, JHA did not receive a full report of vacancies but administrators noted that the facility was without a Healthcare Unit Administrator (HCUA) and a psychologist and there had not yet been any applicants for these posted positions.

---

[51] JHA received one report that security staff distributed medications on a unit, which should be done by Correctional Medical Technicians (CMTs) or healthcare staff, and that they were not changing gloves between coming into contact with inmates and medication cups.

[52] *Lippert v. Godinez*, 10-CV-4603 (N.D. Ill.). Pontiac was one of the eight facilities audited by the agreed experts for this litigation.

*Safety Concerns*

We received multiple concerning reports involving inmates being disciplined for trying to get staff attention, in some cases for medical attention. It may be difficult for staff to make a call regarding whether someone is pounding on a door to be disruptive or pounding on a door because of legitimate medical distress. Of concern to JHA were some reports that requests for mental health crisis teams were not honored, in one case because an inmate had "cried wolf" too often. We again received some complaints regarding incompatible cellmates and staff not being willing to reassign inmates without punishment.[53] Although JHA commonly hears that IDOC inmates are told they must refuse housing and go to segregation to be reassigned, we believe inmates should not be required to be disciplined in cases where they feel unsafe.[54] While we cannot determine the validity of particular inmate concerns, we encourage inmates to document and report such instances.

*Lack of Productive Activity*

For the most part, inmates in Pontiac's maximum-security facility lack productive activity and request more. Inmates in PC have more activity than other inmates, with 245 out of 522 inmates having work or school assignments.[55] During the September 2015 revisit, JHA saw a garden within the maximum-security facility that was tended to by PC inmates. The July 2015 IDOC Quarterly Report showed one person participating in a college two-year-degree educational program and 12 in Career Technologies, with a non-duplicative total of 11 inmates served at Pontiac's maximum-security facility.[56] PC inmates have access to a GED program on TV and administrators stated that the school district will provide those TVs.[57] A mental health staff member also stated that GED books are available to MHU inmates. Given that GED classes and testing are now computerized this program is not in itself sufficient for an inmate to earn a GED while at Pontiac and is just an educational aid. PC inmates also can partake in limited volunteer offerings relating to substance abuse education and fathering. During the March 2015 visit, administrators noted that they were trying to increase the number of volunteers who work with

---

[53] The December 2014 homicide at Pontiac, which IDOC reports was the first in 24 years at the facility, occurred in a double-cell in the East cellhouse where both inmates were reportedly serving relatively brief segregation terms. The victim's cellmate has since been charged.

[54] *See Gevas v. McLaughlin*, No. 13-1057 (7th Cir., Aug. 20, 2015), P. 16, "[A] prisoner is not obligated to commit a disciplinary infraction in pursuit of his own safety. […] once the defendants were made aware [that the cellmate] was threatening [plaintiff inmate], it was their obligation as prison officials to address it if they found it to be a real one. The defendants may not attempt to transfer that obligation to [plaintiff inmate] by insisting that he go so far as to engage in insubordination in order to take himself out of danger."

[55] In 1981, 1,110 inmates at Pontiac had work or school assignments, 210 were in segregation, 230 were in protective custody (then precluding them from assignments), and 303 others were unassigned. *See Smith v. Fairman*, 528 F. Supp. 186, 188 (C.D. Ill. 1981).

[56] As noted above, 375 of 495 MSU inmates had assignments. In the July 2015 quarterly report, 107 inmates at the medium-security facility were served with 116 educational assignments, with 38 in Mandatory Adult Basic Education, nine in Adult Basic Education, 16 in English as a Second Language, and 53 in GED classes. Administrators noted that online GED programming for MSU students had just begun in the past month or two. IDOC had considerable difficulty getting necessary wiring set up throughout facilities. JHA noted that the MSU educational building and library appeared to be positive and productive environments.

[57] Some inmates believed that audio visual privileges were not given fairly. One inmate suggested that IDOC adopt a general rule to govern privileges, such as those without a ticket for six months can have contract item privileges restored.

segregation inmates and stated that representatives of Willow Creek Church would start visiting in a pilot in April 2015, and this group had begun weekly visits with AD and segregation inmates by September. JHA repeats our 2013 recommendation that Pontiac increase programming activities, as expanded opportunities can be accommodated despite physical space challenges and security concerns.

*###*

*This report was written by Gwyneth Troyer, Director of JHA's Prison Monitoring Project. Gwyn can be reached at (312) 291-9241 or <u>gtroyer@thejha.org</u>.*

*Media inquiries should be directed to JHA's Executive Director, Jennifer Vollen Katz, at (312) 291-9555 or <u>jvollen@thejha.org</u>.*

*Contributors to this report also include: JHA staff members, Maya Szilak and Phillip Whittington, and citizen volunteers.*

Inmates may send privileged mail to JHA, P.O. Box 10042, Chicago, IL 60610-0042.

Since 1901, JHA has provided public oversight of Illinois' juvenile and adult correctional facilities. Every year, JHA staff and trained volunteers inspect prisons, jails and detention centers throughout the state. Based on these inspections, JHA regularly issues reports that are instrumental in improving prison conditions.

 JHA's work on healthcare in IDOC is made possible through a generous grant by the Michael Reese Health Trust.

# EXHIBIT 9
(under seal)

# EXHIBIT 10
(under seal)

# EXHIBIT 11
## (under seal)

# EXHIBIT 12
## (under seal)

# EXHIBIT 13
(under seal)

# EXHIBIT 14
(under seal)

# EXHIBIT 15
## (under seal)

# EXHIBIT 16
## (under seal)

# EXHIBIT 17

G.O.# 1477

ILLINOIS DEPARTMENT OF CORRECTIONS
**OFFENDER'S GRIEVANCE**

| Date: 5-12-2010 | Offender: (Please Print) Don Lippert | ID#: R-74054 |

| Present Facility: Stateville C.C. | Facility where grievance issue occurred: Stateville C.C. |

**NATURE OF GRIEVANCE:**

☐ Personal Property    ☐ Mail Handling    ☐ Restoration of Good Time    ☐ Disability
☒ Staff Conduct    ☐ Dietary    ☐ Medical Treatment    ☐ HIPAA
☐ Transfer Denial by Facility    ☐ Transfer Denial by Transfer Coordinator    ☐ Other (specify): _____

☐ Disciplinary Report: ____/____/____     Facility where issued _____
      Date of Report

Note:   Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:
     Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
     Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
     Chief Administrative Officer, only if EMERGENCY grievance.
     Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary
     administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief
     Administrative Officer.

Brief Summary of Grievance: This is a Grievance on ALL F-House Security
for being Deliberate Indifference towards my life and
well-being.
     On 5-1-2010, 7-3 Shift at about 8 a.m. I had
informed Sgt. Palmer that I needed a Med-Tech
due to not getting my insulin shot by medical on
11-7 Shift and that I needed my insulin shot now.
This IDOC Employee, Sgt. Palmer informed me that
he'll call them. At about 8:30 a.m. I started
                 OVER

Relief Requested: *PLEASE NOTE*: Due to the long Inmate Relief
Requested my Relief Request will be on the last page
of this grievance...

☐ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

_____     _____     _____
Offender's Signature           ID#          Date
(Continue on reverse side if necessary)

**Counselor's Response (if applicable)**

| Date Received: ____/____/____ | ☐ Send directly to Grievance Officer | ☐ Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277. |

Response: _____

_____

_____

_____

_____     _____     _____
Print Counselor's Name        Counselor's Signature        Date of Response

**EMERGENCY REVIEW**

| Date Received: ____/____/____ | Is this determined to be of an emergency nature? | ☐ Yes; expedite emergency grievance ☐ No; an emergency is not substantiated. Offender should submit this grievance in the normal manner. |

RECEIVED
NOV 17 2010
OFFICE OF
INMATE ISSUES

_____     _____
Chief Administrative Officer's Signature        Date

Distribution: Master File; Offender           Page 1           DOC 0046 (Rev. 3/2005)
                            Printed on Recycled Paper

ILLINOIS DEPARTMENT OF CORRECTIONS
**OFFENDER'S GRIEVANCE** (Continued)

yelling for Sgt. Palmer which he responded and I
had informed him again that I needed my insulin
shot and this IDOC Employee, Sgt. Palmer stated to
me, "Lippert, I'm not a doctor what do you
want me to do, I called them already if they
don't come I can't force them to come." I then
yelled back to Sgt. Palmer and told him that
since he is the Sgt. of this cellhouse he can
take me or have someone take me to the Hospital
so that I can get my insulin shot. This IDOC
employee just laughed and walked into his office.

At about 9 a.m. I started asking and yelling
at other F-House Security Officer's: C/o Hernandez,
C/o Clemons, C/o Dangerfield, C/o Jones, C/o Jackson,
C/o Maldnado, C/o Norman and C/o Zernicke if
they can take me to the Hospital so that I can
get my insulin shot because I didn't get it yet
and I'm starting to feel very weak. These IDOC
Employee's all ignored my pleas for medical emer-
gency help and I just got laughs for my yelling
for medical help.

Due to suffering from severe Hyperglycemic
complications I had gotten to weak and collapsed
to the floor. While laying on the floor in severe
pain I had urinated on my self. While laying
in my urine in pain I had heard C/o Norman and
C/o Maldnado at my cell door asking me if I
wanted my food tray (Lunch). I then heard
C/o Norman yell to Sgt. Palmer, "Lippert is on the
floor, I think you need to check him out". I
then heard C/o Maldnado state, "he's in the right
position". Then I heard these IDOC employee's
laughing.

Sometime later two (2) nurses had came to my
cell with F-House Security Officers so that they
could be let into my cell. While in my cell they
had tested my blood sugar level which the
reading was 451. Due to this I had to be
taken to the E.R. given some Regular insulin
and admitted to the Infirmary.

# EXHIBIT 18

ILLINOIS DEPARTMENT OF CORRECTIONS
**OFFENDER'S GRIEVANCE**

| Date: 5-12-2010 | Offender: (Please Print) Don Lippert | ID#: B-74654 |

Present Facility: Stateville C.C.  Facility where grievance issue occurred: Stateville C.C.

**NATURE OF GRIEVANCE:**

| ☐ Personal Property | ☐ Mail Handling | ☐ Restoration of Good Time | ☐ Disability |
| ☒ Staff Conduct | ☐ Dietary | ☒ Medical Treatment | ☐ HIPAA |
| ☐ Transfer Denial by Facility | ☐ Transfer Denial by Transfer Coordinator | | ☐ Other (specify): |

☐ Disciplinary Report: _____ / _____ / _____
　　　　　　　　　　　　Date of Report　　　　　　Facility where issued

**Note:** Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:
　　Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
　　Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
　　Chief Administrative Officer, only if EMERGENCY grievance.
　　Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary
　　administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief
　　Administrative Officer.

Brief Summary of Grievance: This is a Grievance on Dr. Liping Zhang,
Nurse Gloria Breske and two (2) unnamed nurses for
being deliberate indifference towards my life and well-
being.
　　On 5-1-2010, 7-3 Shift I was brought into the
E.R. with a blood sugar level of 451. While in the
E.R. I was given 5u of Regular Insulin and admitted
to the Infirmary Per orders of Dr. Zhang. While in the
Infirmary Dr. Zhang had come to my cell with c/o Winters
　　　　　　　　　OVER

Relief Requested: ** PLEASE NOTE ** Due to the long Inmate Relief Requested
my Relief Request will be on the last page of the Grievance.

☐ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

_____  _____  _____ / _____ / _____
　　Offender's Signature　　　　　　　ID#　　　　　　　　Date

(Continue on reverse side if necessary)

| **Counselor's Response (if applicable)** |

Date
Received: _____ / _____ / _____　　☐ Send directly to Grievance Officer　　☐ Outside jurisdiction of this facility. Send to
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Administrative Review Board, P.O. Box 19277,
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Springfield, IL 62794-9277

Response: _____

_____

_____

_____

_____  _____  _____
Print Counselor's Name　　　　Counselor's Signature　　　Date of Response

| **EMERGENCY REVIEW** |

Date
Received: _____ / _____ / _____　　Is this determined to be of an emergency nature?　　☐ Yes; expedite emergency grievance
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　☐ No; an emergency is not substantiated.
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Offender should submit this grievance
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　in the normal manner.

_____　　　　　　　　　　　　　　　_____ / _____ / _____
Chief Administrative Officer's Signature　　　　　　　　　　　　　　Date

RECEIVED
NOV 17 2010
OFFICE OF
INMATE ISSUES

Distribution: Master File; Offender　　　　　　Page 1　　　　　　DOC 0046 (Rev. 3/2005)

Printed on Recycled Paper

and had told me that I can go back to the cell house on 3-11 shift after I get my PM Insulin shot and eat dinner.

Well Dr. Liping Zhang had knowingly lied to me because on 3-11 shift at about 3:30-4:30 P.M, IDOC Employee, Nurse, Gloria Breske who was the Infirmary nurse had tested my blood sugar level which was 115. Then hours later dinner was passed out to me which I had eaten. I then asked the Infirmary Officer if he can get the nurse for me so that I can get my Insulin shot. While waiting Infirmary Nurse, Breske had came to my cell and informed me that, "Since your blood sugar level was normal you don't need your insulin now - you can wait until tomorrow's morning so I'm not giving it to you".

I then informed this IDOC Employee, Nurse, Breske that I had just eaten my dinner and I now need my Insulin shot. Nurse, Breske then stated that, "medical orders per Dr. Zhang states that if you're blood sugar level is normal to withhold your insulin".

I was then DISCHARGED from the Health Care Unit at about 6:25 PM - 7:25 PM. While I was leaving the H.C.U, I had asked the Infirmary Officer to ask the two (unnamed) nurses that were in the E.R. if I can have my blood sugar level tested and to have my insulin shot. He did this and I heard one of the nurses say, "No, he don't get it he can leave".

Then at about 8:30 PM - 9:30 PM, I had informed (one of the unnamed nurse who was in the E.R. when I was discharged and refused to give me my insulin) the nurse who was passing out psychotropic meds. on F-House 3 gallery that, "I feel very sick and weak due to not receiving my insulin shot. You can test my blood sugar level and I'm very sure it'll show you that I need my insulin shot". This IDOC employee nurse then stated to me that she'll give me my insulin shot after she's done passing out meds in F-House.

Needless to say, this IDOC employee, "nurse" did not return to test my blood sugar level nor to give me my insulin shot. Due to being denied my diabetes medicine (insulin) I started to CONT.

suffer again of severe complications of Hyperglycemia, which had caused me to become weak and sick which this caused me to collapsed to the floor vomiting.

Sometime during Institutional count in F-House, Security had found me on the floor of my cell vomiting. A Medical emergency call was placed and nurse Gary had came to my cell. While in my cell he tested my blood Sugar level and it was 277. He then gave me some insulin (Su of Regular) and told me that he'll see me in the morning.

# INMATE RELIEF REQUESTED.

(1) To have all the above named IDOC Employees Dr. Liping Zhang, Nurse Gloria Breske and the two (2) unnamed nurses that was working on 5-1-10, 3-11 shift punished for knowingly and wantonly endangering my life and well-being for refusing to give me my diabetes medicine (insulin shot) on 3-11 Shift, (2) To have all the above named and unnamed IDOC Employees suspended 3 days without Pay (3) To be safe guarded from further denial of medical treatment, (4) To be safe guarded from future retaliation by these IDOC employees for me using and writing this grievance on them, (5) To have this Grievance placed into their Job File Jacket for future reference.

RECEIVED
NOV 17 2010
OFFICE OF
INMATE ISSUES