## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DON LIPPERT, LEWIS RICE, MILAM MARTIN, DEBRA PATTISON, JOHN RUFFIN and EZELL THOMAS | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 10-cv-4603 |
| v. | ) ) ) | Judge Jorge Luis Alonso Magistrate Judge Daniel Martin |
| JOHN BALDWIN, LOUIS SCHICKER, BRUCE RAUNER, ALPHONSO NORMAN, MARTHA MALDONADO, and ATHENA ROSSITER, | ) ) ) ) ) | |
| Defendants | ) ) | |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

I.    Introduction .................................................................................................. 1

II.   Legal Standards ........................................................................................... 3

   A.  Plaintiffs Bear the Burden of Establishing the Requirements of Rule 23 ....................... 3

   B.  The Court Must Undertake a Rigorous Analysis, Including  the Examination of Merits Evidence Where Appropriate. ............................................... 4

   C.  The Standard of Proof Is "Preponderance of the Evidence." .......................... 5

III.  Argument ..................................................................................................... 5

   A.  Plaintiffs Have Not Met the Requirements of Rule 23(a) .................................. 5

      1.  To Show "Commonality" Under Rule 23(a)(2), Wal-Mart Requires Plaintiffs To Show That Critical Questions Can Be Answered With Classwide Proof .......... 5

      2.  Plaintiff Cannot Demonstrate Common Answers That Would Resolve Central Issues About Liability. ...................................... 7

         a) Plaintiffs' allegations regarding medical staff vacancies will not generate common answers for the class. ............................... 8

         b) Plaintiffs' allegations regarding "underqualified medical professionals" will not generate common answers for the class. ............................... 9

         c) Plaintiffs' allegations regarding reception and intrasystem transfer will not generate common answers for the class. ............................... 10

         d) Plaintiffs' allegations regarding management of chronic diseases will not generate common answers for the class. ............................... 11

         e) Plaintiffs' allegations regarding infirmary care will not generate common answers for the class. ............................... 12

         f) Plaintiffs' allegations regarding specialty care will not generate common answers for the class. ............................... 12

         g) Plaintiffs' allegations regarding medical recordkeeping will not generate common answers for the class. ............................... 13

         h) Plaintiffs' allegations regarding IDOC's quality improvement program | will not generate common answers for the class. ............................... 14

         i) Plaintiffs' allegations regarding dental care will not generate common answers for the class. ............................... 14

      3.  Because the Named Plaintiffs Do Not Allege Constitutional Violations, Their Claims Are Not Typical of the Class. ............................... 15

         a) Donald Lippert has not alleged a constitutional injury. ...................... 16

b) Lewis Rice has not alleged a constitutional injury. ............................................. 17

c) Milam Martin has not alleged a constitutional injury. ...................................... 19

d) Debra Pattison has not alleged a constitutional injury. ..................................... 21

e) John Ruffin has not alleged a constitutional injury. ........................................... 22

f) Ezell Thomas has not alleged a constitutional injury. ....................................... 23

4. The Class Definition is Vague and Indefinite. ...................................................... 25

B. The Class Does Not Meet the Requirements of Rule 23(b)(2). .................................... 28

IV. Conclusion ............................................................................................................................ 29

# TABLE OF AUTHORITIES

## Cases

*Alliance to End Repression v. Rochford*,
565 F.2d 975 (7th Cir. 1977) ........................................................................ 25

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)........................................................................................ 3

*Am. Honda Motor Co. v. Allen*,
600 F.3d 813 (7th Cir. 2010) ......................................................................... 5

*Arreola v. Godinez*,
546 F.3d 788 (7th Cir. 2008). ......................................................................... 3

*Asashunas v. Negley*,
626 F.2d 600 (7th Cir. 1980) ........................................................................ 27

*Barnes v. Am. Tobacco*,
161 F.3d 127 (3d Cir. 1998)........................................................................... 28

*Ellis v. Elgin Riverboat Resort*,
217 F.R.D. 415 (N.D. Ill. 2003)............................................................... 16, 18

*Hardin v. Harshbarger*,
814 F. Supp. 703 (N.D. Ill. 1993) ................................................................. 18

*In re Asbestos Litigation*,
90 F.3d 963 (5th Cir. 1996) .......................................................................... 25

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008)........................................................................ 4, 5

*In re Initial Public Offering Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006)............................................................................. 4

*In re Navy Chaplaincy*,
306 F.R.D. 33 (D.D.C. 2014).......................................................................... 7

*In re St. Jude Med., Inc.*,
425 F.3d 1116 (8th Cir. 2005) ...................................................................... 28

*Jamie S. v. Milwaukee Public Schools*,
668 F.3d 481 (7th Cir. 2012) ................................................................... 6, 26

*Karhu v. Vital Pharm., Inc.*,
    621 F. App'x 945 (11th Cir. 2015) ..................................................................... 26

*Kress v. CCA of Tennessee, LLC*,
    694 F.3d 890 (7th Cir. 2012) ........................................................................... 15

*LeClerq v. Lockformer Co.*,
    2001 WL 199840, *6 (N.D. Ill. 2001) (Leinenweber, J.) ................................. 26

*Lewis v. Casey*,
    518 U.S. 343 (1996) ........................................................................................ 15

*Lindh v. Dir., Fed. Bureau of Prisons*,
    No. 2:14-CV-151, 2015 WL 179793 (S.D. Ind. 2015) ....................................... 7

*Ludwig v. Pilkington North America, Inc.*,
    2003 WL 22478842, (N.D. Ill. 2003) (Zagel, J.) ............................................. 26

*National Organization for Women v. Scheidler*,
    172 F.R.D. 351 (N.D. Ill. 1997) ...................................................................... 26

*Norfleet v. Webster*,
    439 F.3d 392 (7th Cir. 2006) ........................................................................... 22

*O'Neill v. Gorurmet Systems of Minnesota, Inc.*,
    219 F.R.D. 445 (W.D. Wis. 2002) ................................................................... 27

*Prescott v. Prudential Ins. Co.*,
    729 F. Supp. 2d 357 (D. Me. 2010) ................................................................... 5

*Rahman v. Chertoff*,
    530 F.3d 622 (7th Cir. 2008). .......................................................................... 26

*Retired Chicago Police Ass'n v. City of Chicago*,
    141 F.R.D. 477 (N.D. Ill. 1992) ...................................................................... 16

*Rice v. Pollion*,
    No. 12-cv-847 (Order) (S.D. Ill. Nov. 20, 2014) ............................................. 17

*Spano v. Boeing Co.*,
    633 F.3d 574 (7th Cir. 2011). ........................................................................ 3, 5

*Steimel v. Minott*,
    No. 1:13-CV-957, 2014 WL 1213390 (S.D. Ind. Mar. 24, 2014) .......... 6, 26, 27

*Szabo v. Bridgeport Machines, Inc.*,
    249 F.3d 672 (7th Cir. 2001) ............................................................. 4

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
    546 F.3d 196 (2d Cir. 2008) ............................................................... 5

*Vulcan Golf, LLC v. Google Inc.*,
    254 F.R.D. 521 (N.D. Ill. 2008) (Manning, J) ................................ 28

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) ............................................................ passim

*Wrightsell v. Sheriff of Cook County*,
    2009 WL 482370 (N.D. Ill. 2009) .................................................. 16

## Other Authorities

225 ILCS 60/11 ........................................................................................ 9

225 ILCS 65/55-30 ................................................................................. 10

68 Ill.Admin.Code 1300:250 ................................................................. 10

American Medical Association, *Requirements for Becoming a Physician* ................................... 9

E. Ann Carson, *Prisoners in 2013*, Bureau of Justice Statistics (Sept. 30, 2014) ....................... 12

Fed. R. Civ. P. 23 ............................................................................. passim

NCCHC Standard No. P-E-07 ................................................................. 10

Defendants JOHN BALDWIN, LOUIS SHICKER, and BRUCE RAUNER, by their attorney LISA MADIGAN, Attorney General of Illinois, state as follows in response to Plaintiffs' Motion for Class Certification:

## I.    Introduction

The question to ask when deciding whether to certify a class in this case is would the evidence necessary to resolve the six named plaintiffs' claims also determine the outcome of the claims of the thousands of other inmates that the named plaintiffs seek to represent? If so, class certification should be granted; if not, it should be denied. Here, the evidence necessary to resolve the claims of the named plaintiffs would not determine the outcome of the alleged claims of all other potential class members.

Plaintiffs are not merely seeking to certify only a class of inmates at one particular facility, or only a class of diabetics, or a class of inmates seeking knee surgery. Instead, Plaintiffs seek to certify a class of *between 23,000 and 47,000 inmates*.[1] Their proposed class would involve tens of thousands of inmates at *25 different facilities*. Each of these class members has different medical conditions, has received varying treatments for those conditions, and has varying needs for future treatments. As a result, determining whether the medical treatment received by any of the tens of thousands of potential class members amounts to deliberate indifference under the Eighth Amendment would require individualized, inmate-specific evidence. And resolving the claims of the six named plaintiffs will do nothing to resolve the question of whether the Illinois Department of Corrections' ("IDOC") medical system provides

---

[1] In their discussion of numerosity, Plaintiffs allege that as of August 31, 2015, IDOC holds 47,000 prisoners in its 25 facilities, and that "almost half of state and federal prisoners had been afflicted with a chronic medical condition." Memorandum in Support of Class Certification ("Pl. Brief") at 6-7.

constitutionally adequate medical and dental care to all of the estimated 47,000 inmates in custody.

Plaintiffs seek to avoid the need for individualized evidence by identifying what they claim are "common questions." (Mem. in Sup. of Class Cert. ("Pl. Brief") at 7-20.) But, as the Supreme Court announced in its *Wal-Mart* ruling, the existence of common questions does not matter if they cannot be *answered* with proof that is common to the class. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). Moreover, any purportedly common questions must be of a type that, once answered through classwide proof, "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 131 S. Ct. at 2551. While Plaintiffs devote 14 pages of their opening brief to identifying purportedly common questions, there is no discussion <u>at all</u> about how classwide evidence could determine the claims of the named plaintiffs. Indeed, the named plaintiffs are never even mentioned in their discussion on commonality.

Plaintiffs simply have no evidence that the alleged common issues have caused any injury to the named plaintiffs or a constitutional injury. Even if they have alleged a constitutional injury for some of the named plaintiffs, evidence related to six inmates at six prisons is simply not enough to show systemic deficiencies at all 25 prisons in the IDOC system. Analysis of the "common questions" will not resolve the claims of the named plaintiffs

The named plaintiffs fail the typicality requirement of Rule 23(a) for the same reason: none of them has suffered a constitutional injury. The record shows that the named plaintiffs have generally received appropriate medical care for their conditions. Even if the named plaintiffs did not always receive the best possible care, the care given did not amount to deliberate indifference. For this reason, the named plaintiffs are not typical of the class they seek

to represent.  Moreover, one of the six named plaintiffs, Lewis Rice, is not an adequate

representative of the class because of *res judicata*.

In addition to failing to meet the express requirements of Rule 23(a), the proposed class

definition fails the implied "definiteness" requirement of Rule 23.  Plaintiffs seek to certify a

class of "all prisoners in the custody of the Illinois Department of Corrections with serious

medical or dental needs."  Pl. Brief at 4.  But Plaintiffs have not proposed a workable definition

of a "serious medical or dental need," nor have they proposed an objective, workable method of

determining which prisoners fall into the class and which prisoners do not.  Determining which

prisoners are class members would require subjective, individualized determinations.  Because

the class is not easily ascertainable, it cannot be certified.

Finally, Plaintiffs cannot meet the requirements of Rule 23(b)(2), that the "the party

opposing the class has acted or refused to act on grounds that apply generally to the class."

Plaintiffs have not demonstrated that Defendants have acted consistently to deny appropriate

medical care in the Plaintiffs' own cases, much less with regard to the entire class.  For each of

these reasons, Plaintiffs' motion to certify a class must be denied.

## II.     Legal Standards

### A.     Plaintiffs Bear the Burden of Establishing the Requirements of Rule 23.

The Plaintiffs bear the burden of establishing the propriety of class certification. *Amchem

Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). The Rule sets forth several requirements and

the failure to satisfy even one requirement precludes class certification. *Arreola v. Godinez*, 546

F.3d 788, 794 (7th Cir. 2008).  Plaintiffs must satisfy all four requirements of Rule 23(a) –

"numerosity, common questions of law or fact, typicality of claims or defenses, and adequacy of

representation." *Spano v. Boeing Co.*, 633 F.3d 574, 583 (7th Cir. 2011).  In addition, Plaintiffs

must also meet the implied "definiteness" requirement of Rule 23, *Wal-Mart*, 131 S.Ct. at 2551,
as well as the requirements of at least one subsection of Rule 23(b) regarding the type of class
actions allowed. *Spano*, 633 F.3d at 583. In this case, the Plaintiffs allege that this action
qualifies under Rule 23(b)(2) – that "the party opposing the class has acted or refused to act on
grounds generally applicable to the class, thereby making appropriate final injunctive relief or
corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2).

### B. The Court Must Undertake a Rigorous Analysis, Including the Examination of Merits Evidence Where Appropriate.

The courts, including the Seventh Circuit, have applied increasingly stringent standards
for class certification over the last fifteen years. For example, in *Szabo v. Bridgeport Machines,
Inc.*, 249 F.3d 672, 675 (7th Cir. 2001), the Seventh Circuit admonished the district court for
ignoring evidence that undermined class certification and accepting the allegations of the
complaint as true. Other circuits have similarly applied more rigorous standards. The Second
Circuit, for example, vacated the certification of a class and, citing *Szabo* with approval, held
that courts must examine merits evidence material to Rule 23 at the class certification phase. *In
re Initial Public Offering Sec. Litig.,* 471 F.3d 24, 30, 38 (2d Cir. 2006). More recently, the Third
Circuit cited *Szabo* in holding that courts must consider actual evidence, not just allegations, and
resolve conflicting evidence if it implicates the requirements of Rule 23. *In re Hydrogen
Peroxide Antitrust Litig.,* 552 F.3d 305, 316-23 (3d Cir. 2008). The Supreme Court's *Wal-Mart*
ruling cites *Szabo* as support for the "necessity of touching aspects of the merits" in deciding
whether plaintiff has satisfied Rule 23. 131 S. Ct. at 2551-52.

In short, "a district court must make whatever factual and legal inquiries are necessary to
ensure that requirements for class certification are satisfied before deciding whether a class

should be certified, even if those considerations overlap the merits of the case." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010); *see also Spano*, 633 F.3d at 583.

### C. The Standard of Proof Is "Preponderance of the Evidence."

The Plaintiffs bear the burden of establishing each Rule 23 requirement by a preponderance of the evidence. *Hydrogen Peroxide*, 552 F.3d at 307; *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 202 (2d Cir. 2008); *Prescott v. Prudential Ins. Co.*, 729 F. Supp. 2d 357, 365 n.8 (D. Me. 2010) (citing Seventh Circuit's *American Honda* opinion as support for "preponderance" standard). If Plaintiffs fail to meet their burden, certification must be denied.

## III. Argument

### A. Plaintiffs Have Not Met the Requirements of Rule 23(a).

#### 1. To Show "Commonality" Under Rule 23(a)(2), Wal-Mart Requires Plaintiffs To Show That Critical Questions Can Be Answered With Classwide Proof .

In *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550-51 (2011), the Supreme Court confronted, head-on, Rule 23(a)(2)'s "commonality" requirement. The Court held that commonality is not satisfied merely by pointing to questions that are common to the class. Instead, plaintiffs must show that "common answers," based on common evidence, will resolve key issues in the case.

The Court recognized that the language of Rule 23(a)(2) may have created confusion about what is required to satisfy it. The Court noted that, while the language of the rule requires common questions of law or fact, in class actions there will almost always be common questions, because "[a]ny competently crafted class complaint literally raises common 'questions.'" *Id.* at 2550-51 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84

N.Y.U. L. Rev. 97, 131-32 (2009)). But that is not enough; a plaintiff must also show that

common *answers* to these questions will drive the resolution of the litigation. A "common

contention," then, "must be of such a nature that it is capable of classwide resolution – which

means that determination of its truth or falsity will resolve an issue that is central to the validity

of each one of the claims in one stroke." *Wal-Mart*, 131 S. Ct. at 2551. The Court explained:

> What matters to class certification . . . is not the raising of common "questions" –
> even in droves – but, rather the capacity of class-wide proceeding to generate
> common *answers* apt to drive the resolution of the litigation. Dissimilarities
> within the proposed class are what have the potential to impede the generation of
> common answers.

*Id.*, quoting *Nagareda*, 84 N.Y.U. L. Rev. at 132. The Court expressed this concept in common

sense terms: There must be evidentiary "glue" that holds the answers together, so that the

Plaintiffs' theories "can be proved on a classwide basis." *Id.* at 2555. *Wal-Mart* departs from

prior case law on commonality, *Wal-Mart* by making the requirements more stringent. As Justice

Ginsburg stated in her *Wal-Mart* dissent, "the Court blends Rule 23(a)(2)'s threshold criterion

with the more demanding criteria of Rule 23(b)(3), and thereby elevates the (a)(2) inquiry." *Id*. at

2566.

    Not surprisingly, in the years since the *Wal-Mart* decision, numerous courts have invoked

it to deny class certification of Rule 23(b)(2) classes.  *See, e.g.*, *Jamie S. v. Milwaukee Public

Schools*, 668 F.3d 481, 497-500 (7th Cir. 2012) (applying *Wal-Mart's* "rigorous standard" and

holding that the class failed Rule 23(a)'s commonality requirement); *Steimel v. Minott*, No. 1:13-

CV-957-JMS-MJD, 2014 WL 1213390, at *19-20 (S.D. Ind. Mar. 24, 2014) (denying class

certification based on lack of commonality in ADA challenge to a state policy transitioning

children with developmental disabilities to a waiver program that reduced the state services that

they received; the state policy could not be the "glue" holding the class together because it did

not cause any children to be institutionalized); *Lindh v. Dir., Fed. Bureau of Prisons*, No. 2:14-CV-151-JMS-WGH, 2015 WL 179793 (S.D. Ind. 2015) (denying class certification, based in part on lack of commonality, to RFRA challenge to a prison policy prohibiting Muslim inmates from hemming pants above their ankles); *In re Navy Chaplaincy*, 306 F.R.D. 33, 56 (D.D.C. 2014) (denying class certification, based in part on lack of commonality, of class alleging a policy of religious denominational favoritism).

### 2. Plaintiff Cannot Demonstrate Common Answers That Would Resolve Central Issues About Liability.

Plaintiffs' attempt to meet Rule 23(a)(2) requirement fails to satisfy the *Wal-Mart* requirements. The commonality section of their brief is 15 pages long and includes nine subheadings, each of which describes an alleged common issue. Pl. Brief at 7-21. But the *Wal-Mart* decision explains that it is not enough to pose common questions; rather, a plaintiff must also show that common *answers* to these questions will drive the resolution of the litigation. And a common issue can only drive the resolution of the litigation when it is central to the question of liability.  Here, Plaintiffs offer no evidence that their alleged common issues actually caused any injury to the named plaintiffs themselves, much less to the entire class.  In fact, Plaintiffs do not even try to connect these alleged common issues to any injuries to the named plaintiffs.  Thus, the alleged common issues cannot resolve this case.

Even if an alleged common issue caused injury to one or more of the named plaintiffs, Plaintiffs still have not shown that the particular alleged common issue caused harm to the entire class.  For example, even if one of Plaintiffs' alleged common issues caused harm to Donald Lippert because of his diabetes, Plaintiffs have presented no proof that that same issue caused the same harm to other inmates suffering from hepatitis, or HIV, or an acute shoulder injury.  And even if Plaintiffs could present evidence that an issue was common to the inmates in one prison,

they have presented no evidence that the same issue exists in all 25 of the State's prisons. There are significant differences in the circumstances in different prisons. For example, two IDOC facilities, Robinson Correctional Center and Southwestern Illinois Correctional Centers, received National Commission on Correctional Health Care ("NCCHC") Accreditations. Ex. 1, Deposition of Louis Shicker ("Shicker Dep.") at 50:8-51:3. Three other facilities—Illinois River, Graham and Pinckneyville—have gone through the accreditation process and will be certified upon verification of compliance with two or three standards. *Id*. at 50:16-51:7; Ex. 2, Declaration of Louis Shicker ("Shicker Decl.") ¶ 12. IDOC's goal is to comply with all NCCHC standards at all of its facilities, regardless of whether the facility is accredited by NCCHC. *Id*.

For all these reasons, Plaintiffs have failed to show that their common issues can generate common answers that will resolve this litigation.

The sections below explain that each of Plaintiffs' alleged common questions do not, in fact, provide common answers that will drive the resolution of this litigation.

> **a)** **Plaintiffs' allegations regarding medical staff vacancies will not generate common answers for the class.**

Plaintiffs allege that "IDOC suffers from system-wide critical and chronic leadership vacancies," focusing primarily on Medical Director vacancies. Pl. Brief. at 9. But vacancies in medical positions are the unfortunate result of two facts: (1) Medical personnel are free to leave and take other positions; and (2) it takes time to identify and hire qualified medical personnel to replace them. IDOC is committed to maintaining adequate staffing and leadership and has worked diligently to fill vacancies with qualified candidates. *See* Ex. 2, Shicker Decl. ¶ 2.

Plaintiffs do not show that this alleged common issue actually has injured the class, relying instead on speculation. Plaintiffs fail to identify any named plaintiff (or even any class

member) that suffered any injury as the result of a medical vacancy at their facility. Thus, the alleged medical staff vacancies cannot satisfy the commonality requirement for the class.

> **b)** **Plaintiffs' allegations regarding "underqualified medical professionals" will not generate common answers for the class.**

Plaintiffs also allege that "the system-wide presence of underqualified medical professionals created needless risk for the prisoner population." Pl. Brief at 11. Plaintiffs argue that facility Medical Directors should be "board certified in a primary care field," and/or that they should "have completed an accredited residency training program in a primary care field." *Id*. But the Plaintiffs point to no objective standard or law that requires physicians to be board-certified or residency-trained in order to practice primary care medicine. Illinois law requires that doctors be licensed providers (225 ILCS 60/11, Medical Education Standards), while the American Medical Association requires only a license to practice medicine—not board certification.[2] Similarly, neither the American Correctional Association (the "ACA") nor the NCCHC requires anything more than state licensure in order to practice medicine. Ex. 2, Shicker Decl. ¶ 3. Moreover, Plaintiffs point to no studies demonstrating that board-certified physicians provide a higher level of care than experienced, licensed doctors lacking such certification. Plaintiffs have also failed to identify any named plaintiffs who were injured because their doctor was not board certified, and have identified only a single proposed class member with any such alleged injury. This sparse record is not enough to show that this issue is actually common to the class.

While an ideal healthcare delivery system may have all board-certified physicians, the Eighth Amendment does not require the best possible healthcare. Further, as of November 2014,

---

[2] *See* American Medical Associations, *Requirements for Becoming a Physician,* available online at http://www.ama-assn.org/ama/pub/education-careers/becoming-physician.page? (last visited March 7, 2016) (stating that a license is required to practice medicine is required, but becoming board certified "is an optional, voluntary process").

more than 80% of the doctors practicing in IDOC facilities were either Board Certified in Family Practice or Internal Medicine, or had more than 10 years of Family/Internal Medicine practice experience or correctional medicine experience. *Id*. ¶ 4.

Plaintiffs also allege that IDOC improperly allows Licensed Practical Nurses (LPNs) to triage sick call requests and to "evaluate assess, and treat patients." Pl. Brief at 11. Plaintiffs claim that this "type of independent assessment is beyond the scope of practice for anyone other than registered nursing staff." *Id*. But LPNs, as well as registered nurses ("RNs"), are routinely used to perform assessments or sick call in correctional settings. Ex. 2, Shicker Decl. ¶ 5. This practice is permitted under the professional regulations governing nurses and state law. *See* 68 Ill.Admin.Code 1300:250; 225 ILCS 65/55-30 (the Nurse Practice Act provides that appropriately trained and monitored LPNs may perform assessments). Moreover, both the ACA and the NCCHC allows nurses to respond to sick call requests, and does not distinguish between RNs and LPNs. *See* Ex. 2, Shicker Decl. ¶ 5; NCCHC Standard No. P-E-07. Like Plaintiffs' insistence on board-certified physicians, their insistence on using only RNs for sick call reflects a desire for an ideal system rather than a constitutionally adequate one.

Plaintiffs do not identify a named plaintiff, or even a class member, who was allegedly harmed because an LPN performed sick call rather than an RN. Plaintiffs have thus failed to show that this issue is actually common to the class, much less that this issue will generate common answers for the class.

### c) Plaintiffs' allegations regarding reception and intrasystem transfer will not generate common answers for the class.

Plaintiffs claim that IDOC fails to identify and follow-up on prisoners' medical needs during the intake process, and that transfers "are likewise plagued by significant problems." Pl. Brief at 12. But here again, Plaintiffs have not identified any named plaintiffs who have

experienced any medical issues related to reception or transfer, nor any proposed class member who experienced an alleged constitutional injury related to the transfer process. Moreover, in discussing the transfer process Plaintiffs only discuss past problems at Pontiac and some issues at Dixon. *Id*. at 13. Plaintiffs offer no evidence that the problems they identify are currently occurring at any other IDOC facility. Plaintiffs have accordingly failed to prove that the class has any common issues related to reception or transfer.

> d)  **Plaintiffs' allegations regarding management of chronic diseases will not generate common answers for the class.**

Plaintiffs allege that the IDOC chronic care program "suffers from deficiencies in its policies and guidelines." Pl. Brief at 13. The "most important and overarching policy problem," Plaintiffs allege, is that "all patients are seen only three times a year regardless of how well or how poorly their disease is controlled." *Id*., quoting the Shansky Report (Dkt. 339) at 19. However, the Shansky Report itself acknowledges that "it is currently possible for providers to arrange for more frequent follow up" if needed. Dkt. 339 at 19. Thus, the three-times-a-year schedule for chronic clinic patients establishes a minimum requirement, but the physician can exceed this schedule as needed. Moreover, patients whose disease is poorly controlled monitored more frequently and they can be admitted to the infirmary for intensive monitoring and daily treatment if clinically indicated. Ex. 2, Shicker Decl. ¶ 6. This "common issue" is therefore not actually common to the class. And here again, Plaintiffs have not identified a named plaintiff, or even any class member, who has suffered harm based on this IDOC policy.

Plaintiffs also allege that the chronic care system is "fragmented and inefficient system of care" because only one chronic condition is dealt with at any one visit. Pl. Brief at 13, *quoting* the Shansky Report at 19. But as the Shansky Report acknowledges, Menard, Hill, Stateville, and Pontiac all have a system in which all chronic diseases are assessed in one visit. Dkt. 339 at

19.  Thus, half of the eight facilities studied by the Shansky team do not follow this alleged policy.  As a result, this is not evidence of a common policy that sweeps across the entire IDOC system.  And again, Plaintiffs provide no evidence that any named plaintiff or class member has been injured by this alleged policy.

### e) Plaintiffs' allegations regarding infirmary care will not generate common answers for the class.

Plaintiffs allege that IDOC's policies "do not describe the scope of services that can safely be provided in an infirmary setting."  Pl. Brief at 14.  However, doctors make frequent rounds at IDOC's infirmaries, and they use their clinical judgment to determine which patients can be safely cared for in the infirmary and which patients need to be sent to an outside hospital.  Ex. 2, Shicker Decl. ¶ 7. IDOC .provides oversight to ensure that these providers are making appropriate judgments in these cases.

Moreover, Plaintiffs have not identified any named plaintiff that suffered any injury based on IDOC's infirmary policies.  Plaintiffs have therefore failed to show that this issue is common to the class.

### f) Plaintiffs' allegations regarding specialty care will not generate common answers for the class.

Plaintiffs allege that the Expert Team's mortality review shows "a pattern and practice of failing to obtain timely specialty and/or emergency treatment, with disastrous results."  Pl. Brief at 15.  However, while any death is regrettable, it is important to keep these figures in perspective.  In 2013, IDOC reported 78 deaths of inmates, which equals approximately 1.6% of the population (78/ 48,653 inmates in custody as of Dec. 31, 2013[3]).  IDOC's overall mortality rate is considerably lower than national Department of Justice statistics.  Ex. 2, Shicker Decl. ¶ 9.

---

[3] *See* E. Ann Carson, *Prisoners in 2013* at 3, Bureau of Justice Statistics (Sept. 30, 2014), available online at www.bjs.gov/content/pub/pdf/p13.pdf  (last visited March 7, 2016).

Moreover, the majority of the deaths reviewed by the Expert Team were caused by cancer, which frequent involves the provision of lengthy, multi-disciplined and complex care. *Id*. ¶ 10.  Unfortunately, in such complex medical cases, medical staff may make errors, miss diagnoses, and delay treatment.  For example, in 2010, the Office of the Inspector General of the Department of Health and Human Services reported that one in seven Medicare beneficiaries had complications from medical errors when hospitalized, contributing to about 180,000 deaths of patients per year.  *Id*.  The fact that medical errors are expected in a clinical setting does not make them any less regrettable.  But, the fact that mistakes may have been made in a handful of highly complex cases does not mean that IDOC's entire medical systems is violating the Constitution, especially considering IDOC's overall low mortality rate and the prevalence of such medical mistakes across the general public.

Plaintiffs also claim that Defendants' contract gives Wexford a financial incentive to delay or deny specialty care.  Pl. Brief at 16.  But Plaintiffs have not alleged that any of the named plaintiffs have suffered any constitutional injury because they were denied specialty care. They have therefore failed to show that this is actually a common issue for the class.

> **g)** **Plaintiffs' allegations regarding medical recordkeeping will not generate common answers for the class.**

Plaintiffs allege that IDOC's medical recordkeeping results in "disorganized and incomplete prisoner medical files."  Pl. Brief at 16.  Plaintiffs allege that these practices "hinder[] doctors' or nurses' ability to quickly identify critical health information and creates delays in diagnosis or services, or leads to care not being provided at all."  *Id*.  But, once again, Plaintiffs have failed to identify any named plaintiff, or even any class member, who has suffered any constitutional injury as the result of IDOC's recordkeeping practices.  Moreover, the handwritten paper records that Plaintiffs identify are not common to all IDOC facilities.  IDOC has

implemented an electronic medical recordkeeping system in all of its women's facilities, and is working on implementing this system at its men's facilities. Ex. 2, Shicker Decl. ¶ 10. Thus, Plaintiffs' common issue is not common to the entire system and is partly moot.

> **h)** **Plaintiffs' allegations regarding IDOC's quality improvement program will not generate common answers for the class.**

Plaintiffs claim that IDOC's quality improvement program is "a paper program that fails at every step of practice." Pl. Brief at 18. Plaintiff further claims that facilities that collected data about medical services "made no effort to determine the quality of performance by measuring data against appropriate standards." *Id*. This allegation is simply incorrect, as facility-specific data is measured against the facility's previous performance (to monitor changes in performance), against the guidelines set forth in the applicable Administrative Directive, and against data from other facilities. Ex. 2, Shicker Decl. ¶ 11. But even if IDOC's quality improvement program is not optimal, this does not mean that IDOC's medical care violates minimum constitutional standards. Indeed, Plaintiffs once again have not identified a named plaintiff, or even a single class member, who was harmed by IDOC's quality improvement program. With no concrete connection between IDOC's quality improvement program and constitutional injury to the class, Plaintiffs cannot demonstrate that this common issue will resolve any key question in this case.

> **i)** **Plaintiffs' allegations regarding dental care will not generate common answers for the class.**

Finally, Plaintiffs claim that IDOC's "provision of dental care fails at each level of policy and practice." Pl. Brief at 19. Plaintiffs allege that IDOC's policy manuals, training for dentists, and oversight is not adequate. *Id*. But Plaintiffs fail to identify any named plaintiff, or even any class member, who has suffered any injury because of these alleged deficiencies.

Plaintiffs allege that routine dental care is provided without a comprehensive examination or treatment plan, and that the medical health history sections of the dental record are incomplete. Pl. Brief at 20. But once again, Plaintiffs have failed to identify a single class member who has suffered a constitutional injury based on any of these supposed shortcomings in the dental program. Nor have the Plaintiffs demonstrated that these issues are common to all of IDOC's facilities, rather than just a few. Without actual evidence of constitutional injury, Plaintiffs cannot demonstrate that these alleged issues are common to the class.

      **3.**    **Because the Named Plaintiffs Do Not Allege Constitutional Violations, Their Claims Are Not Typical of the Class.**

The claims of the named plaintiffs in this matter are not typical of the claims of the class because their claims do not represent constitutional violations. In *Lewis v. Casey*, 518 U.S. 343 (1996), the Court had to determine whether certain inmates could maintain a claim on behalf of all other inmates against the Arizona Department of Corrections, alleging that they were deprived of access to the courts because they were furnished with inadequate legal research facilities. The Court held that the representative plaintiffs did not have standing to represent the class because they had failed to identify anything more than isolated instances of injury in fact. *Id.* In its opinion, the Court explained that whether "a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that *they personally have been injured*, not that injury has been suffered by other, unidentified members of the class to which they belong and purport to represent." *Id.,* 518 U.S. at 357 (emphasis added).

Similarly, the Seventh Circuit has rejected an attempt to create a class of prisoners who have atypical claims. In *Kress v. CCA of Tennessee, LLC*, 694 F.3d 890, 893 (7th Cir. 2012), the Court upheld the district court's holding that "[c]laims of inadequate medical care by their nature

require individual determinations, as the level of medical care required to comport with constitutional and statutory standards will vary depending on each inmate's circumstances, such as preexisting medical conditions." *See also Wrightsell v. Sheriff of Cook County*, 2009 WL 482370, *3 (N.D. Ill. 2009) (Darrah, J.) (case-by-case analysis was required for dental claims, precluding class certification). A unique defense to a named plaintiff's claim will "destroy typicality" because it "eliminate[s] a primary purpose of a class action: to allow the named plaintiffs to "establish the bulk of the elements of each class member's claims when they prove their own." *Ellis v. Elgin Riverboat Resort*, 217 F.R.D. 415, 428 (N.D. Ill. 2003) (Ashman, M.J.), quoting *Retired Chicago Police Ass'n v. City of Chicago,* 141 F.R.D. 477, 485 (N.D. Ill. 1992).

In this case, the named plaintiffs' claims do not allege constitutional violations. While each named plaintiff alleges certain deficiencies in care, none of these deficiencies constitutes deliberate indifference. Thus, for each of the named plaintiffs, Defendants can maintain unique defenses against their claims. Because of these unique defenses, none of the named plaintiffs meets the typicality requirement for the class.

### a) Donald Lippert has not alleged a constitutional injury.

Donald Lippert, an inmate at Stateville Correctional Center, alleges that he suffered hyperglycemic episodes on May 1, 2010 and in May 2014 when the medical staff at Stateville were late giving him his insulin shots. Pl. Brief at 22. Lippert cannot prove that these two isolated incidents constitute deliberate indifference. Moreover, Lippert has filed a separate lawsuit regarding the May 2014 incident. *See* Complaint, *Lippert v. Egbe*, No. 15-cv-06576 (N.D. Ill.) (attached as Exhibit 3). Because Lippert has filed a separate lawsuit relating to an incident described in this case, Lippert is not a typical representative of the class.

Moreover, Lippert also engages in frequent hunger strikes, including a hunger strike in January 2016 and an earlier hunger strike that lasted two days. Ex. 4, 2/3/16 Deposition of Donald Lippert ("Lippert Dep.") at 48:4-49:8. Medical staff at Stateville have frequently warned Lippert that going on hunger strikes has a pronounced negative effect on his blood sugar control, and Lippert acknowledges that he has had "severe" diabetic complications and "long term damage" resulting from these hunger strikes. *Id*. at 49:19-50:3. Since his own actions have had a negative effect on his blood sugar levels and his diabetic control, Lippert cannot prove that the Defendants' actions alone have had a negative effect on his health.

### b) Lewis Rice has not alleged a constitutional injury.

Lewis Rice, an inmate at Menard Correctional Center, alleges that he had an attack on July 27, 2010, in which he suffered from chest pains, dizziness, headache, and fainting. Ex. 5, Deposition of Lewis Rice ("Lewis Dep.") at 15:25-16:10, 17:23-18:5. This incident was eventually diagnosed as being caused by a medication that he was taking, and he has not suffered from dizziness or fainting since he was taken off that medication. *Id*. at 19:18-24, 23:5-12 ("When they took me off the medication, Prazosin, things basically went back to normal.") In 2012, Rice filed suit based on this July 2010 incident. *See* Complaint, *Rice v. Pollion*, No. 12-cv-847 (S.D. Ill. July 26, 2012) (attached as Exhibit 6). In November 2014, the court granted summary judgment to defendants in that case, holding that the initial diagnosis of heat exhaustion was reasonable given the circumstances. Summary Judgment Ruling at 5, *Rice v. Pollion*, No. 12-cv-847 (S.D. Ill. Nov. 20, 2014) (Yandle, J.) (attached as Exhibit 7). Since his claims related to the July 2010 incident have already been resolved in court, any claims here

resulting from that incident are barred by *res judicata*. Rice therefore cannot allege any constitutional injury here resulting from the July 2010 incident.[4]

After the July 27, 2010 incident, Rice received medical care from July 28–August 5, 2010, including care in the infirmary. Ex. 5, Rice Dep. at 23:18-25:4. Although Rice is now equivocal about whether he received appropriate medical care during this period (*compare id*. at 23:18-20 (testifying that he did *not* receive appropriate treatment from July 28-August 5, 2010) to *id*. at 24:13-25:4 (testifying that he *did* receive appropriate treatment during this period)), he made several sworn statements in his prior lawsuit that he received appropriate treatment during this period. *See* Dkt. 49, Memorandum in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment at 9, *Rice v. Pollion*, No. 12-cv-847 (S.D. Ill. Feb. 18, 2014) (attached as Exhibit 8) ("Adequate medical treatment would have aligned precisely with the level of care and attention afforded between July 27th, 2010 through July 30th and August 5th, 2010 to August 6th."); Dkt. 60, Affidavit of Lewis Rice at 5, *Rice v. Pollion*, No. 12-cv-847 (S.D. Ill. Feb. 9, 2013) ("So, returning to his cell before the 3:00 p.m. shift change, soon after he fainted again for the second time. Once again being rushed to the H.C.U., only this time he receive the kind of treatment that he contends Miss Pollion should have provided."). Rice therefore cannot allege any constitutional violation based on his treatment in this period.

Rice alleges that he has continued to have chest pains since the July 2010 incident. Ex. 5, Rice Dep. at 19:19-24. These pains, which feel like a tightening in his chest, came only at night when he was lying down. *Id*. at 18:6-10, 20:9-21:3. It is important to note that Rice also suffers

---

[4] Since many of his claims are barred by *res judicata*, Rice is also an inadequate representative of the class. *Ellis*, 217 F.R.D. at 429 ("[T]he presence of even an arguable defense against the named plaintiff that is not applicable to the proposed class ... can vitiate the adequacy of named plaintiff's representation."), quoting *Hardin v. Harshbarger*, 814 F. Supp. 703, 708 (N.D. Ill. 1993).

from gastroesophageal reflux disease, which can cause chest pains. *Id*. at 29:19-30:1. His chest pains lessened in frequency and severity about a year after the July 2010 incident, when he began making a concerted effort to eat better. *Id*. at 25:5-16. He also testified that his chest pains have completely gone away: "I'm all better now.· They -- like I said, maybe it was gas, like they said." *Id*. at 31:21-22. Under these circumstances, Rice cannot maintain a claim that his chest pains were not treated appropriately.

Rice also alleges that he has a "separated bone" in his shoulder from a car accident before his incarceration. Pl. Brief at 25. After his car accident, he had surgery on his broken left arm, but his doctors never recommended any surgery on his right shoulder. Ex. 5, Rice Dep. at 38:13:22, 39:6-40:5. Between his accident in February 2007 and his arrest in September 2007, he saw a doctor once a week for his shoulder, but these doctors never recommended surgery. *Id*. at 42:3-19. Rice claims that his shoulder hurts if he attempts any lifting, but he does pushups and other exercises to strengthen his shoulder. *Id*. at 72:10:23. Rice has not filed any grievances related to his shoulder. Since his doctors outside prison did not diagnose him as needing surgery, and he made no effort to have any surgery before his incarceration, Rice cannot show that his condition is objectively serious. He therefore cannot show deliberate indifference to an objectively serious medical need.

### c) Milam Martin has not alleged a constitutional injury.

Milam Martin, an inmate at Big Muddy Correctional Center, is partially paralyzed and uses a wheelchair due to an attack by another inmate that he received in prison. Ex. 10, Deposition of Milam Martin ("Martin Dep.") at 37:10-39:1. In Fall of 2011, Martin was approved for a new wheelchair to replace his old wheelchair, which was in need of repairs. Ex. 11 (10/25/11 note). In an unfortunate coincidence, Martin fell from the old wheelchair on his way to get the new wheelchair. Ex. 10, Martin Dep. at 41:1:11. X-rays/CT scans showed that he

had some broken ribs, and he was given Motrin for the pain. Ex. 12, Ex. 11 (10/27/11 note). Martin claims that he should have also been given a brace for his ribs and a softer mattress while his ribs were healing. Ex. 10, Martin Dep. at 47:16-48:3. Martin cannot show deliberate indifference with respect to his request for a new wheelchair because medical staff requested and obtained a new wheelchair. He cannot show deliberate indifference with regards to his broken ribs because he received appropriate treatment for those injuries. There is no treatment for broken ribs other than time, rest, and painkillers, which Martin received. While Martin can come up with other comfort measures that he claims he would like to have received, the failure to give additional comfort measures is not in itself a constitutional violation.

Martin also claims that he was given a plastic molded brace to stabilize his jaw after it was broken in 1984. This appliance was lost during one of his transfers between prisons, and he has requested a replacement appliance from the dentist at Big Muddy. Pl. Brief at 24. The dental records show that the dentist did not refuse to provide such an appliance; rather, he was unsure exactly what kind of appliance was originally provided. Ex. 13. The dentist noted that he needed to seek Martin's old dental records to identify the appliance and develop a treatment plan, including sending Martin to an outside dentist for treatment. *Id.* Thus, the record shows that the dentist was not deliberately indifferent, but rather was seeking to help Martin.

It is important to note that Martin's dental appliance claim is the only dental claim that has been raised by the named plaintiffs in this case. Martin's dental claim is thus not typical of the dental claims of the class, which relate to alleviation of tooth pain and the lack of "comprehensive routine dental care." Pl. Brief at 20. In fact, Martin has frequently refused dental cleanings (*see* Ex. 14), further reinforcing the conclusion that he is not a typical dental plaintiff.

Finally, Martin alleges that he came down with the flu in May 2015. Fourth Amended Complaint ¶ 120. He was cared for in the infirmary at Big Muddy, but he alleges that was not checked on frequently enough by the nurses there. *Id.* He also alleges that the room lacked grab bars to help him move around, and that he was not given a liquid diet as he requested. *Id.* None of these allegations amount to a constitutional violation for deliberate indifference. Rather, the record shows that he was kept in the infirmary, checked frequently, and given medication, water, and food. Ex. 15. While Martin can come up with additional treatment that he would have preferred, that does not make the treatment that he actually received a constitutional violation.

### d) Debra Pattison has not alleged a constitutional injury.

Debra Pattison, a prisoner at Logan Correctional Center, originally tore her anterior cruciate ligament ("ACL") as a teenager in 1979. Ex. 16, Deposition of Debra Pattison ("Pattison Dep") at 9:13-10:1. Over the years, she has had several surgeries on her knee, most recently in 2001. *Id.* at 9:19-10:9. In June 2012, Pattison injured her knee again while incarcerated at Lincoln Correctional Center. *Id.* at 16:9-20. The medical staff at Lincoln sent Pattison out for an MRI, which showed tears to the ACL and another ligament in her leg. Ex. 17 (9/6/12 note). In October 2012, Lincoln medical staff sent Pattison to an outside orthopedist, who recommended a total knee replacement surgery. Ex. 16, Pattison Dep. at 22:16-21, 23:8-15. However, Wexford denied the procedure in collegial review because Pattison was obese. At the time, Pattison weighed over 230 pounds, which is a BMI of 38 (classified as Class II obesity). *Id.* at 26:21-22. In their most recent review, Dr. Ritz stated that Pattison needed to weigh 180 pounds or less before Wexford could approve the surgery. Ex. 18. A weight of 180 pounds translates to a BMI of 30 or less, which is classified as "overweight" rather than "obese." Dr. Ritz explained that "overweight patients DO NOT do well after TKA." *Id.* Pattison has been given a low-fat and gluten-free diet to assist her in losing weight. Ex. 19.

In these circumstances, Pattison cannot prove deliberate indifference. While Pattison believes she needs surgery, Wexford has made a legitimate medical decision that she should not have surgery until she reaches a BMI of 30 or less. Such a legitimate medical judgment cannot be considered deliberate indifference. *See Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) ("To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.").

### e) John Ruffin has not alleged a constitutional injury.

John Ruffin is a prisoner at Dixon Correctional Center. His spinal cord was injured in a shooting when he fled from the police in a high-speed chase; there are bullet fragments lodged in his shoulder and between two neck vertebrae that could not be removed due to their proximity to his spine. Pl. Brief at 25; Ex. 20, Deposition of John Ruffin ("Ruffin Dep.") at 187:12-19, 16:5-17:12. Ruffin complains of sharp shooting pain on his right side. Ex. 20, Ruffin Dep. at 16:15-18. Ruffin was prescribed painkillers and anti-spasmodic drugs at Dixon, including Percocet and Neurontin. *Id.* at 39:20-40:2, 37:20-38:9. When these drugs proved ineffective at controlling his pain, the medical staff at Dixon sent Ruffin to the UIC Pain Clinic. *Id.* at 43:2-15. Between March 2011 and January 2015, Ruffin has been seen twelve times at the UIC Pain Clinic. *Id.* at 43:13-15 (March 2011), 46:5-17 (July 2011), 48:18-22 (August 2011), 52:2-5 (November 2011), 69:2-10 (January 2012), 71:15-21 (June 2012), 75:23-76:1 (November 2012), 91:11-92:3 (February 2013), 94:5-15 (July 2013), 104:23-105:4 (November 2014), 107:10-16 (December 2014), 108:22-109:2 (January 2015). Doctors at UIC first tried epidural injections, which had only limited effectiveness. After six epidural injections, the UIC pain specialists attempted a medial branch block procedure. *Id.* at 107:10-16. The medial branch block procedure is risky because there is a significant chance of permanent paralysis with each procedure, so it is not

attempted until less risky options are exhausted. *Id*. at 105:6-106:7, 50:7-15. Fortunately, this procedure in January 2015 was successful and relieved Ruffin's pain until August 2015. *Id*. at 109:13-18, 111:24-112:2. Ruffin had another successful medial branch block procedure in February 2016. *See* Ex. 21.

In these circumstances, Ruffin cannot prove a deliberate indifference claim. Far from being denied treatment, Ruffin has been sent out for specialty care over and over again. While there were some unfortunate delays in getting some appointments at UIC, Ruffin continued to receive painkillers and other treatment at Dixon. The record in this case simply does not support any claim for deliberate indifference.

Ruffin also alleges that he has been seeking a colonoscopy because of a family history of cancer, but that Wexford will not approve the procedure because it is too expensive. Pl. Brief at 26. But Ruffin is only 40 (Ex. 20, Ruffin Dep. at 8:15-17), and a colonoscopy is generally not recommended for patients under 50. Ruffin was given two fecal occult blood tests; both tests came back negative for any sign of cancer. Ex. 22. Wexford recommended placing Ruffin in the infirmary to confirm the presence of bloody stools and to re-present the request for a colonoscopy if need. *Id*. Given Ruffin's negative test results, the medical staff's decision not to order a colonoscopy at that time cannot be considered deliberate indifference.

### f) Ezell Thomas has not alleged a constitutional injury.

Ezell Thomas, a prisoner at Pontiac Correctional Center, suffers from coronary artery disease and had open-heart surgery in 2001 and a stent inserted in 2011. Ex. 23, Deposition of Ezell Thomas ("Thomas Dep.") at 22:16-19, 23:22-24:6. He was diagnosed with prostate cancer in 2008 and was successfully treated at UIC. *Id*. at 38:17-39:8.

Thomas suffers from asthma, chronic obstructive pulmonary disease ("COPD"), and emphysema. Pl. Brief at 26. He takes several medicines for these conditions through inhalers.

*Id*. Although Thomas was allowed to keep his inhalers with him for years, medical staff repeatedly warned of the dangers of inhaler abuse. *See, e.g.*, Ex. 24 (10/2/13 note detailing a "pattern of inhalers abuse" with inhalers lasting "1-2 months only"; Ex. 25. In September 2015, Thomas' access to his inhalers was restricted because of his continued inhaler abuse. Ex. 23, Thomas Dep. at 53:10-12. Thomas filed a grievance and his inhalers were returned. *Id*. at 55:20-56:10. The medical staff's confiscation of his inhalers was justified given Thomas' history, and in any case his inhalers have been returned. Thomas also claims that a physician at St. Joseph's Hospital told him that his current inhalers were harmful to his heart given his COPD diagnosis. *Id*. at 27:11-28:1. But as long as he is receiving reasonably appropriate treatment, Thomas does not have the right to insist on being given a different drug that he might prefer.

In late 2013, Thomas began suffering from unusual weakness and chest pains. *Id*. at 61:7-17, 63:4-6. In December 2013, he was sent out to UIC for treatment, where he was diagnosed with anemia and acute renal failure. *Id*. at 62:21-63:9; Ex. 26. UIC recommended that Thomas have a colonoscopy (Ex. 26 at 4), and Thomas claims that this colonoscopy was never performed. Pl. Brief at 27. However, UIC records show that they performed this colonoscopy in January 2014, just a month later. Ex. 27 at 3 ("We obtained CT C/A/P with contrast to work up oft malignancy or abscess and the notable finding was acute colitis in the ascending and proximal tranverse colon. He then underwent colonoscope which had similar findings with obvious etiology on preliminary pathology." Thus, his claim that he never received a colonoscopy is false and cannot support a constitutional claim.

During that same stay at UIC in January 2014, Thomas was diagnosed with and treated for an h. pylori infection (*i.e.*, ulcers) and colitis. *Id*. at 1. After treatment, subsequent test results showed that Thomas was no longer anemic. Ex. 29 at 3 (#chronic Anemia - resolved").

Thus, Thomas's claim that he received only one iron supplement per day rather than three (Pl. Br. at 27) is moot.

Thomas also claims that UIC recommended that he be checked for possible bone cancer, and that this has not happened. Pl. Brief at 27. However, UIC records show that he had a bone scan in January 2014, which was negative for bone cancer. Ex. 27 at 3 ("Further immunologIcal studies and bone scan were obtained."), Ex. 30 at 1 ("Bone survey was obtained which was negative."). From January 2014 through April 2015, Thomas saw specialists at UIC seven times. Ex. 27-33. These specialists treated his gastrointestinal issues (Dep. Ex. 27-29) and evaluated him for blood cancer (Ex. 30, 33), bone cancer (Ex. 30 at 1), and prostate cancer (Ex. 31-32), but found no evidence of cancer. At his last visit to UIC in April 2015, the UIC oncologists recommended that he return in one year (*i.e*., in April 2016) to repeat certain tests. Ex. 33 at 3 "RTC in year with repeat SPEP/IFE/Serum Light chain Analysis/Basic met profile/CBC with Diff/UPEPIFE"). Assuming those test results are normal, he can be discharged from their care. *Id*. Thomas has no claim because he has, in fact, received appropriate medical care.

### 4. The Class Definition is Vague and Indefinite.

In addition to all of the prerequisites of Rule 23(a), there is an additional "definiteness" requirement implied in Rule 23(a) that must be met. *Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir. 1977). The ascertainability requirement dictates that "the description of a class [be] sufficiently definite to permit ascertainment of the class members." *Id*. "Compliance with the rule might prevent [a court] from lumping people with divergent interests into a single class, but the rule is *meant* to do just that." *In re Asbestos Litigation*, 90 F.3d 963, 1008 (5th Cir. 1996) (emphasis in original).

A class can be properly identified so long as it is defined by objective criteria, such that it is administratively feasible for the court to determine whether a particular individual is a class member. *Ludwig v. Pilkington North America, Inc.*, 2003 WL 22478842, *1 (N.D. Ill. 2003) (Zagel, J.); *LeClerq v. Lockformer Co.*, 2001 WL 199840, *6 (N.D. Ill. 2001) (Leinenweber, J.) ("An identifiable and definite class exists if 'its members can be ascertained by reference to objective criteria.'") (*quoting National Organization for Women v. Scheidler*, 172 F.R.D. 351, 357 (N.D. Ill. 1997)). When "there is no way to know or readily ascertain who is a member of the class," the class "lacks the definiteness required for class certification." *Jamie S. v. Milwaukee Public Schools*, 668 F.3d 481, 495 (7th Cir. 2012). As the Seventh Circuit explained, the courts' "tolerance for a wildly indefinite class definition under Rule 23 is no longer the norm. [Such tolerance] is a relic of a time when the federal judiciary thought that structural injunctions taking control of executive functions were sensible. That time is past." *Jamie S.*, 668 F.3d at 496, quoting *Rahman v. Chertoff*, 530 F.3d 622, 626 (7th Cir. 2008).

"A plaintiff cannot establish ascertainability simply by asserting that class members can be identified using the defendant's records; the plaintiff must also establish that the records are in fact useful for identification purposes, and that identification will be administratively feasible." *Karhu v. Vital Pharm., Inc.*, 621 F. App'x 945, 948 (11th Cir. 2015). The courts of the Seventh Circuit apply the same ascertainability standards to a proposed 23(b)(2) class as to any other class; there is no "relaxed ascertainability standard" for 23(b)(2) classes. *Steimel v. Minott*, No. 1:13-CV-957-JMS-MJD, 2014 WL 1213390, at *6 (S.D. Ind. Mar. 24, 2014), citing *Jamie S.*, 668 F.3d at 495.

Here, the proposed class is not ascertainable because there is no objective, administratively feasible way to determine which inmates have "serious medical or dental needs"

and thus are members of the class. Plaintiffs breezily announce that the class is "readily identifiable" (Class Cert. Brief at 4), but they provide no method for identifying the class. Plaintiffs state that "Defendants' own records list thousands of prisoners diagnosed as needing medical or dental treatment (*id.*), but they do not argue that this is a sufficient method of identifying the class. Nor could they. Defendants do not maintain a "master list" of inmates with "serious medical or dental needs." Instead, Defendants maintain a medical file for each inmate, and these files are often hundreds of pages long. Thus, determining who is in the class would require combing through the medical files of all 47,000 inmates held by IDOC. Such individualized inquiries would not be administratively feasible, and thus the class is not ascertainable. *See Steimel*, 2014 WL 1213390 at *7 (denying class certification where the "identities of class members [were] unascertainable short of a complex, highly individualized review").

In addition, the class is too broadly defined to include individuals who lack standing to maintain the action on their own behalf. To have a properly defined class, it must be reasonably clear that the proposed class members have all suffered a constitutional or statutory violation warranting some relief. *Asashunas v. Negley,* 626 F.2d 600, 603 (7th Cir. 1980); *see also, O'Neill v. Gorurmet Systems of Minnesota, Inc.,* 219 F.R.D. 445, 452 (W.D. Wis. 2002). However, in this case, it is clear that many of the class members, including the named plaintiffs, have received proper medical treatment. These prisoners clearly would not have standing to sue regarding the plaintiffs' claims.[5] Thus, the class is not properly defined and certification should be denied.

---

[5] Under the PLRA, the requested injunctive relief in this action "shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C.A. § 3626(a)(1). By proposing a class definition that would extend to plaintiffs who have not suffered a constitutional

27

### B.     The Class Does Not Meet the Requirements of Rule 23(b)(2).

In addition to failing to meet the requirements of Rule 23(a), Plaintiffs have also failed to meet the requirements of Rule 23(b)(2).  Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2).  Rule 23(b)(2) presumes that "the interests of the class members are cohesive and homogeneous such that the case will not depend on adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members." *Vulcan Golf, LLC v. Google Inc.*, 254 F.R.D. 521, 535 (N.D. Ill. 2008) (Manning, J). Indeed, "even greater cohesiveness generally is required than in a Rule 23(b)(3) class." *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1121 (8th Cir. 2005); *Barnes v. Am. Tobacco*, 161 F.3d 127, 142-43 (3d Cir. 1998).

Here, Plaintiffs assert that they have satisfied Rule 23(b)(2), because the Defendants have "placed them at risk of grave physical harm through their deliberate indifference to IDOC's inadequate medical and dental care policies and practices." Pl. Brief at 30.  However, the record does not support Plaintiffs' claims.  As discussed in the Section III.A.3 above, the evidence shows that the named plaintiffs have received appropriate medical care, and that any deficiencies in care do not rise to the level of a constitutional injury.  Without evidence that even the named plaintiffs have been subjected to deliberate indifference, the Plaintiffs cannot show that all class members are at risk of "grave physical harm."  There is thus no basis for an injunctive relief, and accordingly the class should not be certified.

---

injury, the plaintiffs, in essence, have requested the court to issue equitable relief beyond that allowed under the PLRA. This is further support that the proposed class definitions cannot be certified.

## IV. Conclusion

**WHEREFORE**, for the reasons stated above, Defendants respectfully request that the Court deny Plaintiffs' Motion for Class Certification and provide such further relief that the Court deems reasonable and just.

Respectfully Submitted,

LISA MADIGAN
Attorney General of Illinois

_/s/ Sarah H. Newman_
THOR Y. INOUYE
SARAH H. NEWMAN
Assistant Attorneys General
General Law Bureau
100 W. Randolph St., 13th Fl.
Chicago, Illinois 60601
312-814-3632 / 312-814-6131
tinouye@atg.state.il.us
snewman@atg.state.il.us

# Exhibit 1

Page 1

```
1          IN THE UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF ILLINOIS

3                    EASTERN DIVISION

4

5   DON LIPPERT, et al.,          )

6                Plaintiffs,  )

7        -vs-                      ) No. 10-cv-4603

8   JOHN R. BALDWIN, et al.,       )

9                Defendants.   )

10

11      The 30(b)(6) deposition of LOUIS SHICKER, M.D.,

12   called by the Plaintiffs for examination, taken

13   pursuant to the Federal Rules of Civil Procedure of

14   the United States District Courts pertaining to the

15   taking of depositions, taken before CORINNE T.

16   MARUT, C.S.R. No. 84-1968, Registered Professional

17   Reporter and a Certified Shorthand Reporter of the

18   State of Illinois, at the offices of Roger Baldwin

19   Foundation of ACLU, Inc., Suite 2300, 180 North

20   Michigan Avenue, Chicago, Illinois, on

21   November 23, 2015, commencing at 10:35 a.m.

22

23

24
```

Page 2

```
1   APPEARANCES:

2     ON BEHALF OF THE PLAINTIFFS:

3         ROGER BALDWIN FOUNDATION OF ACLU, INC.
           180 North Michigan Avenue, Suite 2300
4          Chicago, Illinois  60601-1287
           312-201-9740
5          BY:  BENJAMIN S. WOLF
               bwolf@aclu-il.org
6              CAMILLE E. BENNETT
               cbennett@aclu-il.org
7              LINDSAY S. MILLER
               lmiller@aclu-il.org
8

9     ON BEHALF OF THE DEFENDANTS:

10        OFFICE OF THE ATTORNEY GENERAL,
           STATE OF ILLINOIS
11         100 West Randolph Street
           Chicago, Illinois  60601
12         312-814-3632
           BY:  THOR YUKINOBU INOUYE
13             tinouye@atg.state.il.us

14

15    ON BEHALF OF WEXFORD:

16        BROWN, HAY & STEPHENS, LLP
           205 South Fifth Avenue, Suite 700
17         P.O. Box  2459
           Springfield, Illinois  62705
18         217-544-8491
           BY:  DAVID P. HENNESSY
19             dhennessy@bhslaw.com

20

21   ALSO PRESENT:

22        MS. LASHONDA HUNT, Chief Legal Counsel,
           Illinois Department of Corrections.

23

24   REPORTED BY:  CORINNE T. MARUT, C.S.R. No. 84-1968
```

Page 3

```
1                I N D E X

2   LOUIS SHICKER, M.D.               EXAMINATION

3      BY MR. WOLF...................    5

4

5            E X H I B I T S

6   SHICKER DEPOSITION EXHIBIT         MARKED FOR ID

7   No. 1    document, "Final Report of the      49
            Court Appointed Expert"

8

    No. 2    12/22/08 e-mail string from          64

9            Michael Puisis to Pat Frueh
            and Nancy King with attachment

10

    No. 3    10/17/12 e-mail from Lisa Moss       77

11           to various individuals with
            attachment

12

    No. 4    8/25/14 e-mail string, top          82

13           e-mail from Louis Shicker to
            Shannis Stock; Bates Nos. IDOC

14           UPDATE 001591 - 001598

15   No. 5    7/16/14 e-mail from Marna Ross      93

16           to Dmote@wexfordhealth.com;
            Bates No. IDOC Update 000900

17   No. 6    various e-mails; Bates Nos.        121

18           IDOC UPDATE 001581 - 00153 and
            001588 - 001590

19   No. 7    9/16/15 e-mail from Louis          132

20           Shicker to Lisa Prather, et
            al.; Bates Nos. IDOC UPDATE

21           001693 - 001694 and 001704

22   No. 8    3/1/10 e-mail from Louis           151

23           Shicker to Roberts Fews, et
            al., "Staffing at Stateville"

24
```

Page 4

```
1              E X H I B I T S

2   SHICKER DEPOSITION EXHIBIT         MARKED FOR ID

3   No. 9    4/8/14 e-mail string; Bates        158
            Nos. IDOC UPDATE 001575

4

    No. 10   9/11/15 e-mail string; Bates       161

5            Nos. IDOC UPDATE 001688 -
            0016889 and 001692

6

    No. 11   various e-mails; Bates Nos.        170

7            IDOC Update 001034 - 001051

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```



1  know who her boss is.
2      Q.   Can you give it a shot to spell her
3  name?
4      A.   S-h-i-p-i-n-s-k-i.
5      Q.   Phonetic?
6      A.   Yeah.
7      Q.   Let's look at the report together.
8          MR. WOLF:  I'm asking the Court Reporter to
9  mark as Exhibit 1 for the Shicker deposition a
10  December 2014 report by Dr. Shansky and his team.
11             (WHEREUPON, a certain document was
12             marked for identification as
13             Shicker Deposition Exhibit No. 1:
14             Document, "Final Report of the
15             Court Appointed Expert.")
16  BY MR. WOLF:
17     Q.   Doctor, I'm showing you what's been
18  marked as Exhibit 1.  Do you recognize it?
19     A.   Yes, sir.
20     Q.   This is the final report of Dr. Shansky
21  and his team that we've been talking about?
22     A.   Yes, sir.
23     Q.   Let's look at page 4 of the report.  In
24  the first full paragraph, the first sentence says,

1  "The State indicates that the investigation team
2  should have utilized standards such as the National
3  Commission on Correctional Health Care or the
4  American Correctional Association as the basis for
5  both our investigation and our recommendations."
6          Do you see that sentence?
7      A.   Yes.
8      Q.   Is it your view that the standards of
9  the National Commission on Correctional Health Care
10  or the ACA should have been used in the
11  investigation?
12     A.   Yes.
13     Q.   In what respect would the conclusions
14  have been different, do you think, if those
15  standards had been used?
16     A.   Well, I mean, the only way I can answer
17  that question is by saying that we are currently
18  undergoing accreditation from NCCHC.
19     Q.   NCCHC is the National Commission on --
20     A.   Correctional Health Care.
21     Q.   -- Correctional Health Care.
22     A.   And we have gone through five facilities
23  currently.  Two have been certified and three we're
24  waiting for the committee, committee's report.

1      Q.   Which two have been certified?
2      A.   Robinson Correctional and Southwestern
3  Illinois Correctional Center.
4      Q.   And which three are you waiting?
5      A.   Illinois River, Graham and
6  Pinckneyville.  And we are due to have at least
7  three more next year.
8      Q.   Do you think all of the facilities
9  currently meet the standards under the NCCHC?
10     A.   That's our goal.  Does everything -- is
11  everything met currently?  I don't think everything
12  is met, but we're certainly working to get it to
13  that goal.
14     Q.   Why aren't all of them currently
15  certified by the NCCHC?
16     A.   Because we haven't gone through the
17  certifying process.
18     Q.   Why haven't you gone through the
19  certifying process?
20     A.   That's a decision that is made by people
21  above me that have to pay for it and you have to
22  decide to do it.
23     Q.   Do you believe that all of the
24  facilities right now could be certified if they

1  went through the process without any changes in
2  what they're doing?
3      A.   There would probably have to be some
4  changes made.
5      Q.   Why?  Because they don't currently meet
6  the standards?
7      A.   Because there are lots of -- there are
8  60 plus standards and whereas most of the standards
9  or the vast majority are met, some of them may not
10  be met.  And some of them are essential and some of
11  them are non-essential standards.
12     Q.   Later on in that paragraph we have been
13  looking at on page 4 of Exhibit 1 Dr. Shansky says
14  about 80% of the NCCHC process is focused on
15  administrative matters, and he contrasts that with
16  their investigation that was focused mostly on what
17  he describes as clinical matters.
18         Do you agree with that characterization
19  of what NCCHC does?
20     A.   A big focus of NCCHC is access to care,
21  chronic clinics.  So, a fair amount is on clinical
22  matters.  They -- I do -- they're not going to
23  go -- they don't go into arguing about what was
24  done.



# Exhibit 2

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DON LIPPERT, LEWIS RICE, MILAM MARTIN, DEBRA PATTISON, JOHN RUFFIN and EZELL THOMAS | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 10-cv-4603 |
| v. | ) ) ) | Judge Jorge Luis Alonso Magistrate Judge Daniel Martin |
| JOHN BALDWIN, LOUIS SCHICKER, BRUCE RAUNER, ALPHONSO NORMAN, MARTHA MALDONADO, and ATHENA ROSSITER, | ) ) ) ) ) | |
| Defendants | ) ) | |

**DECLARATION OF LOUIS SHICKER, M.D.**

I, Louis Shicker, M.D. state that I have personal knowledge of the facts set forth herein, that I am competent to testify and if called to testify would state as follows:

1.     Since November 16, 2009, I have served as the Medical Director of the Illinois Department of Corrections ("IDOC").  As Medical Director, I oversee health care services for the correctional population of Illinois.

2.     IDOC believes that it has adequate staffing and leadership and is committed to these important principles. Nevertheless, in an attempt to make the delivery of health care even better, IDOC has filled a number of the vacancies identified in the Report of the Court Appointed Expert ("Shansky Report").

3.     Neither the American Correctional Association ("ACA") nor the National Commission on Correctional Health Care ("NCCHC") require anything more than state licensure in order to practice medicine in a correctional setting.

4.    In November 2014, more than 80% of the doctors practicing in IDOC facilities are either Board Certified in Family Practice or Internal Medicine, or have more than 10 years of Family/Internal Medicine practice experience or correctional medicine experience, while a significant majority of the doctors currently practicing in IDOC facilities have these credentials.

5.    Both Licensed Practical Nurses ("LPNs") and registered nurses ("RNs") are routinely used to perform assessments or sick call in correctional settings.  The practice of using LPNs to perform sick call is accepted by both the ACA and NCCHC.

6.    In IDOC facilities, patients with chronic diseases whose disease is poorly controlled are monitored more frequently and they can be admitted to the infirmary for intensive monitoring and daily treatment if clinically indicated.

7.    Almost all IDOC facilities have infirmary care, staffed by 24-hour nursing staff. IDOC infirmaries care for patients with both acute and chronic conditions.  Providers make rounds frequently, and they use their clinical judgment to determine which patients can be safely cared for in the infirmary and which patients need to be sent to an outside hospital.  IDOC .provides oversight to ensure that these providers are making appropriate judgments in these cases.

8.    In 2013, IDOC reported 78 deaths of inmates, which equals approximately 1.6% of the overall population.  IDOC's overall mortality rate is considerably lower than national Department of Justice statistics for a state of its size.

9.    The majority of the deaths reviewed by the Expert Team and detailed in the Shansky Report were caused by cancer, which frequent involves the provision of lengthy, multi-disciplined and complex care.  Unfortunately, in such complex medical cases, medical staff may make errors, miss diagnoses, and delay treatment.  For example, in 2010, the Office of the

Inspector General of the Department of Health and Human Services reported that one in seven Medicare beneficiaries had complications from medical errors when hospitalized, contributing to about 180,000 deaths of patients per year.

10. IDOC implemented an electronic medical recordkeeping system in all of its women's facilities. IDOC is working on implementing this system at its men's facilities.

11. Under IDOC's quality improvement program, facility-specific data is measured against the facility's previous performance (to monitor changes in performance), against the guidelines set forth in the applicable Administrative Directive, and against data from other facilities.

12. Two IDOC facilities, Robinson Correctional Center and Southwestern Illinois Correctional Centers, have received NCCHC accreditations. Three other facilities—Illinois River, Graham and Pinckneyville—have gone through the accreditation process. All three will be certified upon verification of compliance with two or three standards. IDOC's goal is to comply with all NCCHC standards at all of its facilities, regardless of whether the facility is accredited by NCCHC.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 7, 2016.

_____++
Louis Shicker, M.D.

# Exhibit 3

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Donald Lippert, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1-15-cv-06576 |
| | ) | |
| Emmanuel Egbe, Michelle Williams, | ) | |
| William Butler, Cletus Shaw, Victor | ) | |
| Callaway, Nikki Robertson, Shanal Barnett, | ) | **JURY TRIAL DEMANDED** |
| Candice Kaminski, Lidia Lewandowska, | ) | |
| And Jane Doe, Nurse | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## <u>AMENDED COMPLAINT</u>

Plaintiff, Don Lippert, by his attorney Neal Thompson, states as follows for his complaint against Defendants:

## <u>INTRODUCTION</u>

1.     In this civil rights action, Plaintiff, who suffers from Type 1 Diabetes, requires daily insulin shots and blood sugar tests.  Defendants – certain Wexford Health Source, Inc. medical employees and certain Department of Corrections ("IDOC") employees who work at the facility in which Plaintiff is incarcerated or work for "IDOC" – have, on two occasions outlined below, denied Plaintiff his insulin shots and access to medical care and knowingly disregarded excessive risks to Plaintiff's health by, among other things: (a) knowingly and deliberately refusing to provide Plaintiff with daily insulin shots and blood sugar tests; and (b) knowingly and deliberately refusing to comply with "IDOC" policies, procedures, directives, and rules relating to medical orders and medical care while on Institutional Lockdowns.

2.     Plaintiff brings **COUNT I** of this action against Defendants Egbe, Williams, Butler,

Shaw, Calloway, Robertson and Barnett for their deliberate indifference to Plaintiff's medical needs, in violation of the Eighth and Fourteenth Amendments on May 15, 2014.

3.      In connection with **COUNT I**, Plaintiff seeks damages and injunctive relief, as well as attorney fees and court costs from Defendants' violations.

4.      Plaintiff brings **COUNT II** of this action against Defendants Egbe, Butler, Kaminski, Williams and Jane Doe "Nurse" for their deliberate indifference to Plaintiff's serious medical needs, in violation of the Eighth and Fourteenth Amendments on May 16, 2014.

5.      In connection with **COUNT II**, Plaintiff seeks damages and injunctive relief, as well as attorneys' fees and court costs resulting from Defendants' violations.

6.      As a result of Defendants' actions and omissions, Plaintiff suffered and still suffers serious harm and injuries.

## JURISDICTION, VENUE, AND EXHAUSTION OF REMEDIES

7.      This action is brought pursuant to 42 U.S.C. §1983. This Court has jurisdiction pursuant to 28 U.S.C. §1331 and §1343 because the matters in controversy arise under the Constitution and laws of the United States.

8.       Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Northern District of Illinois.

9.      Before filing this Complaint, Plaintiff had exhausted any necessary administrative grievance procedures, and administrative remedies. Exhibit A.

## PARTIES

10.     Plaintiff, Don Lippert is and has at all relevant times been a citizen of the United States.  He is and was at all relevant times an inmate at Stateville Correctional Center in Crest Hill,

Illinois, where he was housed on May 15 and 16, 2014.

11.     On information and belief, Defendant Emmanuel Egbe is a contractor for Stateville, acting as a Licensed Practical Nurse. On May 15 and May 16, 2014, he had medical responsibilities, including administration of inmates' daily medical care. Plaintiff sues Egbe in his individual capacity.

12.     On information and belief, Defendant Michelle Williams is a contractor for Stateville, acting as a Licensed Practical Nurse. On May 15 and May 16, 2014, she had medical responsibilities, including administration of inmates' daily medical care. Plaintiff sues Williams in her individual capacity.

13.     Defendant William Butler is a correctional sergeant at Stateville employed by IDOC. He was the acting sergeant for Plaintiff's Cell House and had security responsibilities, including the daily safety and well-being of inmates under his supervision on May 15 and May 16, 2014. Plaintiff sues Butler in his individual and official capacity.

14.     Defendant Cletus Shaw is a correctional lieutenant at Stateville employed by IDOC. He was the acting lieutenant for Plaintiff's Cell House and had security responsibilities, including the daily safety and well-being of inmates under his supervision on May 15, 2014. Plaintiff sues Shaw in his individual and official capacity.

15.     Defendant Nikki Robertson was at all relevant times employed at Stateville as an Assistant Warden by IDOC. At all relevant times, she acted under color of state law, as a state official acting on behalf of the state. On May 15, 2014, she had security responsibilities, including the daily safety and well-being of inmates under her supervision. Plaintiff sues Robertson in her individual and official capacity.

16.     Defendant Victor Calloway was at all relevant times employed at Stateville as an

Assistant Warden by IDOC. At all relevant times, he acted under color of state law, as a state official acting on behalf of the state. On May 15, 2014, had had security responsibilities, including the daily safety and well-being of inmates under his supervision. Plaintiff sues Calloway in his individual and official capacity.

17.     Defendant Shanal Barnett was at all relevant times employed at Stateville as a Correctional Medical-Technician by IDOC. At all relevant times, she acted under color of state law, as a state official acting on behalf of the state. On May 15, 2014, she had medical responsibilities, including administration of inmates' daily medical care. Plaintiff sues Barnett in her individual and official capacity.

18.     On information and belief, Defendant Candice Kaminski is a contractor for Stateville, acting as a Registered Nurse. On May 16, 2014, she had medical responsibilities, including administration of inmates' daily medical care. Plaintiff sues Kaminski in her individual capacity.

19.     On information and belief, Defendant Lidia Lewandowska is a contractor for Stateville, acting as a Registered Nurse. On May 16, 2014, she had medical responsibilities, including administration of inmates' daily medical care. Plaintiff sues Lewandowska in her individual capacity.

20.     On information and belief, Defendant "Jane Doe Nurse" is a contractor for Stateville, acting as a Nurse. On May 16, 2014, she had medical responsibilities, including administration of inmates' daily medical care. Plaintiff sues "Jane Doe Nurse" in her individual capacity.

21.     At all relevant times, Defendants acted in their individual and official capacities in their positions as nurses, medical technicians, guards and IDOC administrative officials.

4

22.     As of and prior to May 15 and May 16, 2014, Plaintiff required two daily insulin shots with blood sugar level tests for the purpose of treating and managing Plaintiff's chronic Type1 Diabetes and other medical care as needed, which was necessary to keep Plaintiff healthy and safe from serious injury due to his Type 1 Diabetes.

### COUNT I
### DEFENDANTS' FAILURE TO PROVIDE NECESSARY MEDICAL CARE
### ON MAY 15, 2014

(Alleged against Defendants Egbe, Williams, Butler, Shaw, Robertson, Calloway and Barnett)

23.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 22 as if fully restated here.

24.     Plaintiff has been diagnosed with Type 1 Diabetes.  At all relevant times hereto each of the Defendants knew of and were aware of Plaintiff's serious medical condition.

25.     Prior to May 15, 2014, Plaintiff was prescribed to receive two insulin shots and blood sugar level tests for his diabetes, including but not limited to daily visits by nurses and/or CMT's for the purpose of testing Plaintiff's blood sugar level and administering insulin shots in the A.M. and P.M. and providing other medical care as needed.

26.     Frequent testing and timely insulin shots were critical to Plaintiff's safety and health.  As an incarcerated prisoner, Plaintiff was at the mercy of Defendants and other correctional staff to provide that testing and those insulin shots to keep Plaintiff healthy and safe from serious injury.

27.     Defendants were deliberately indifferent to Plaintiff's serious medical needs by knowingly refusing to follow institutional policies, rules, directives and procedures while the prison was on Level 1 Lockdown by denying Plaintiff his timely prescribed testing and insulin shots.

28.     On May 15, 2014, Defendant Emmanuel Egbe was working on the 11 pm-7 am ("11-7") shift and assigned to come to Plaintiff's cell to provide Plaintiff with his insulin shots because of institutional Lockdown.

29.     Defendant Egbe knew that Plaintiff was an insulin-dependent diabetic but deliberately refused to provide Plaintiff with his insulin shots at his cell.

30.     Defendant Egbe deliberately refused to provide Plaintiff with his insulin shots because Defendant did not want to walk up a flight of stairs and walk down Plaintiff's gallery to give Plaintiff his insulin shots at his cell.

31.     Defendant Egbe acted at all relevant times with evil motive or intent, or recklessly or with callous indifference to Plaintiff's constitutional rights.

32.     As a result of Defendant's deliberate indifference towards Plaintiff's life and well-being, the plaintiff suffered severe diabetic complications of hyperglycemia, which caused Plaintiff to become very weak, dizzy and caused him to collapse on the floor.

33.     An unreasonable amount of time later, at about 8 A.M., Plaintiff informed Defendant William Butler that Plaintiff needed medical attention due to the refusal of 11-7 shift medical personnel to give Plaintiff his insulin shot.

34.     On May 15, 2014, Defendant Butler knew of Plaintiff's serious medical situation because: (a) Plaintiff yelled for a Med-Tech and nurse; and (b) Plaintiff yelled to be taken up to the Health Care Unit to get his insulin shot.

35.     Aware that Plaintiff was denied his diabetes medicine by 11-7 shift medical personnel, Defendant Butler knowingly disregarded excessive risks to Plaintiff's health and well-being because he: (a) refused to take appropriate corrective action measures; and (b) knowingly and deliberately refused to use sound decision-making in his duty and obligation to assist.

36.     Defendant Butler acted at all relevant times with evil motive or intent, or recklessly or with callous indifference to Plaintiff's constitutional rights.

37.     As a result of Defendant's actions and omissions, Plaintiff suffered and still suffers injuries of further worsening diabetic neuropathy, severe headaches, depression.

38.     On May 15, 2014, Defendant Michelle Williams knew of Plaintiff's serious medical situation because Plaintiff informed her that he was denied his insulin shot by the 11-7 shift medical personnel and that he felt very weak and dizzy.

39.     Aware that Plaintiff was denied his diabetes medicine by 11-7 shift medical personnel, Defendant Williams disregarded excessive risks to Plaintiff's health and well-being because she: (a) refused to take appropriate corrective action measures; (b) knowingly and deliberately refused to use sound decision-making by trying to obtain his diabetes medicine; and (c) allowed and condoned the gross misconduct of the medical personnel who denied Plaintiff's medical care/treatment.

40.     Defendant Williams acted at all relevant times with evil motive or intent, or recklessly or with callous indifference to Plaintiff's constitutional rights.

41.     As a result of Defendant's actions and omissions, Plaintiff suffered and still suffers injuries of further worsening Diabetic Neuropathy, severe headaches, and depression.

42.     On May 15, 2014, Defendant Cletus Shaw knew of Plaintiff's serious medical situation because: (a) Plaintiff yelled for a Med-Tech and a Nurse; (b) Plaintiff yelled to be taken up to the Health Care Unit to get his insulin shot; and (c) Defendant threatened Plaintiff with disciplinary action if he did not stop yelling.

43.     Aware that Plaintiff was denied his diabetes medicine by 11-7 shift medical personnel, Defendant Shaw deliberately and knowingly disregarded excessive risks to Plaintiff's

health and well-being because he: (a) refused to take appropriate corrective action measures; (b) made threats against Plaintiff because he was yelling for his insulin shot; and (c) knowingly and deliberately refused to use sound decision-making in his duty and obligation to assist.

44. Defendant Shaw acted at all relevant times with evil motive or intent, or recklessly or with callous indifference to Plaintiff's constitutional rights.

45. As a result of Defendant's actions and omissions, Plaintiff suffers and still suffers from the injuries of further worsening of Diabetic Neuropathy, severe headaches, and depression.

46. On May 15, 2014, Defendant Nikki Robertson knew of Plaintiff's serious medical situation because: (a) Plaintiff yelled for a Med-Tech and a Nurse; (b) Plaintiff informed her that he was an insulin-dependent diabetic who was denied his diabetes medicine by medical personnel on the 11-7 shift; (c) Plaintiff informed her that B-House Security is refusing to take him up to the Health Care Unit because of lockdown/no movement; (e) Defendant informed Plaintiff that he should sit down if he feels weak and dizzy so he won't get hurt; and (f) Plaintiff yelled to be taken to the Health Care Unit to get his insulin shot.

47. Aware that Plaintiff was denied his diabetes medicine by 11-7 shift medical personnel, Defendant Robertson merely told Plaintiff that he should sit down if he feels weak and dizzy so he won't get hurt.

48. Defendant Robertson knowingly and deliberately disregarded excessive risks to Plaintiff's health and well-being because she: (a) knowingly and deliberately refused to use sound decision-making by not trying to obtain Plaintiff's diabetes medicine; and (b) allowed and condoned the gross misconduct of the medical personnel who denied Plaintiff's medical care/treatment.

49. Defendant Robertson acted at all relevant times with evil motive or intent, or

8

recklessly or with callous indifference to Plaintiff's constitutional rights.

50. As a result of Defendant's actions and omissions, Plaintiff suffered severe hyperglycemia and still suffers further injuries of worsening Diabetic Neuropathy, severe headaches, and depression.

51. On May 15, 2014, Defendant Victor Calloway knew of Plaintiff's serious medical situation because: (a) Plaintiff yelled for a Med-Tech and a Nurse; (b) Plaintiff yelled to be taken to the Health Care Unit to get his insulin shot; (c) Plaintiff informed him that he was an insulin-dependent diabetic who was denied his diabetes medicine by medical personnel on the 11-7 shift; (d) Plaintiff informed him that he needed his insulin shot immediately because he felt weak and dizzy; (e) Plaintiff informed him that he had told B-House Security of his medical emergency, and they did not care; (f) Plaintiff informed him that he was threatened with disciplinary action because he was yelling to get his diabetes medicine that was deliberately denied to him; and (g) Defendant informed Plaintiff that he was not threatening Plaintiff but giving him a direct order to stop yelling.

52. Defendant Calloway knew that Plaintiff was denied his diabetes medicine by the 11-7 shift medical personnel, and he knowingly and deliberately disregarded excessive risks to Plaintiff's health and well-being because he: (a) knowingly and deliberately refused to use sound decision-making by not trying to obtain Plaintiff's diabetes medicine; and (b) allowed and condoned the gross misconduct of the medical personnel who denied Plaintiff's medical care/treatment.

53. Defendant Calloway acted at all relevant times with evil motive or intent, or recklessly or with callous indifference to Plaintiff's constitutional rights.

54. As a result of Defendant's actions and omissions, Plaintiff suffered severe hyperglycemia and still suffers the further injuries of worsening Diabetic Neuropathy, severe

headaches, and depression.

55.     On May 15, 2014, Defendant Shanal Barnett knew of Plaintiff's serious medical situation because she: (a) responded to B-House Security call for a Medical Emergency Response to Plaintiff's cell; (b) was informed by a cellmate of Plaintiff that Plaintiff was denied his insulin shot by medical personnel on the 11-7 shift; and (c) tested Plaintiff's blood sugar level, which was high.

56.     Aware that Plaintiff was denied his diabetes medicine by 11-7 shift medical personnel, Defendant Barnett knowingly and deliberately disregarded excessive risks to Plaintiff's health and well-being because she: (a) refused to follow medical protocols, policies and procedures after realizing how high Plaintiff's blood sugar level was; (b) refused to provide the proper medical care/treatment to Plaintiff; and (c) knowingly refused Plaintiff medical care by leaving Plaintiff on the floor in his cell in pain.

57.     Defendant Barnett acted at all relevant times with evil motive or intent, or recklessly or with callous indifference to Plaintiff's constitutional rights.

58.     As a result of Defendant's actions and omissions, Plaintiff suffered and still suffers the further worsening injuries of Diabetic Neuropathy, severe headaches, and depression.

59.     Defendants' ongoing deliberate indifference to Plaintiff's medical needs has deprived Plaintiff of his right to be free from cruel and unusual punishment as secured to him under the Eighth and Fourteenth Amendments to the United States Constitution, and has resulted in actual physical, mental, and medical harm to Plaintiff.

**WHEREFORE,** Plaintiff respectfully requests that this Court:

(A)     Declare the conduct of Count I Defendants to have violated the rights guaranteed to Plaintiff under the Eighth and Fourteenth Amendments to the United States

Constitution;

(B)    Grant an Order: (i) enjoining and prohibiting Count I Defendants, their successors, and other current and future employees of IDOC and Wexford from further depriving Plaintiff of his constitutional rights; and (ii) requiring COUNT I Defendants and their successors to ensure that Plaintiff receives his daily medical treatment on a timely basis and in accordance with IDOC's and Wexford's medical and Institutional Lockdown policies, rules, and procedures;

(C)    Award Plaintiff actual, consequential, compensatory, punitive, and any other damages that the Court may deem appropriate against Count I Defendants; and

(D)    Award Plaintiff his costs and reasonable attorneys' fees pursuant to 42 U.S.C. §1988.

## COUNT II
## DEFENDANTS' FAILURE TO PROVIDE NECESSARY MEDICAL CARE
## ON MAY 16, 2014

(Alleged against Defendants Egbe, Butler, Kaminski, Williams, Lewandowska,
and Jane Doe)

60.    Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 59 as if fully restated here.

61.    On May 16, 2014, Defendant Egbe was assigned to come to Plaintiff's cell house to provide Plaintiff his insulin shot on the 11-7 shift, because of institutional lockdown, at his cell.

62.    Defendant Egbe clearly knew that Plaintiff was an insulin-dependent diabetic, but knowingly and deliberately refused to provide Plaintiff with his insulin shot because Defendant did not want to walk up a flight stairs and walk down Plaintiff's gallery to give him his insulin at his cell while on lockdown.

63.    Defendant Egbe acted at all relevant times with evil motive or intent, or recklessly

11

or with callous indifference to Plaintiff's constitutional rights.

64.     As a result of Defendant's deliberate indifference towards Plaintiff's life and well-being, Plaintiff suffered severe diabetic complications of hyperglycemia, which caused the Plaintiff to become very weak, dizzy and caused him to collapse on the floor in severe pain.

65.     As a result of Defendant's actions, Plaintiff suffered and still suffers the injuries of further worsening of Diabetic Neuropathy, severe headaches, and depression.

66.     On May 16, 2014, Defendant Butler knew of Plaintiff's serious medical situation because: (a) Plaintiff informed him that Plaintiff was refused his insulin shot by 11-7 shift medical personnel; (b) Plaintiff yelled at him for a Med-Tech and/or a Nurse to come to Plaintiff's cell; and (c) Plaintiff yelled at him to take Plaintiff up to the Health Care Unit to receive his insulin shot.

67.     Aware that Plaintiff was denied his diabetes medicine by 11-7 shift medical personnel, Defendant Butler knowingly and deliberately disregarded excessive risks to Plaintiff's health and well-being because he: (a) refused to take appropriate corrective action measures; (b) refused to use sound decision-making in his duty and obligation to assist; and (c) allowed and condoned the gross misconduct of the medical personnel who denied Plaintiff's medical care/treatment.

68.     On May 16, 2014, Defendant Candice Kaminski knew of Plaintiff's serious medical situation because: (a) Plaintiff informed her that he was denied his insulin shot by 11-7 shift medical personnel and that he felt very weak and dizzy; and (b) Plaintiff informed her that she needed to tell security to take him up to the Health Care Unit to get his insulin shot.

69.     Defendant Kaminski knowingly disregarded excessive risks to Plaintiff's health and well-being because she: (a) knowingly and deliberately refused to  take appropriate corrective

action measures; (b) knowingly and deliberately refused to use sound decision-making in her duty and obligation to assist; and (c) allowed and condoned the gross misconduct of the medical personnel who denied Plaintiff's medical care/treatment.

70.     On May 16, 2014, Defendant Michelle Williams knew of Plaintiff's serious medical situation because: (a) Plaintiff yelled for a CMT or Nurse to come to Plaintiff's cell; and (b) she was present in the Medical Office when inmate "Shakey" came to the door and informed her of Plaintiff's medical need.

71.     Aware that Plaintiff was denied his diabetes medicine by 11-7 shift medical personnel, Defendant Williams knowingly and deliberately disregarded excessive risks to Plaintiff's health and well-being by, among other things: (a) knowingly and deliberately refusing to take appropriate corrective action measures; (b) knowingly and deliberately refusing to use sound decision-making in her duty and obligation to assist; and (c) allowed and condoned the gross misconduct of the medical personnel who denied Plaintiff's medical care/treatment.

72.     On May 16, 2014, Defendant Lidia Lewandowska knew of Plaintiff's serious medical situation through, among other things: (a) Plaintiff's yelling for the need of a CMT or Nurse to come to Plaintiff's cell; and (b) being present in the Medical Office when inmate "Shakey" came to the door and informed her of Plaintiff's medical need.

73.     Defendant Lewandowska was well-aware that Plaintiff was denied his diabetes medicine by 11-7 shift medical personnel and knowingly and deliberately disregarded excessive risks to Plaintiff's health and well-being because she: (a) knowingly and deliberately refused to take appropriate corrective action measures; (b) knowingly and deliberately refused to use sound decision-making in her duty and obligation to assist; and (c) allowed and condoned the gross misconduct of the medical personnel who denied Plaintiff's medical care/treatment.

74.     On May 16, 2014, Defendant Jane Doe "Nurse" knew of Plaintiff's serious medical situation because: (a) Plaintiff yelled for a CMT or Nurse to come to Plaintiff's cell; (b) she was present in the Medical Office when inmate "Shakey" came to the door and informed her of Plaintiff's medical need; and (c) she tested Plaintiff's blood sugar level.

75.     Aware that Plaintiff was denied his diabetes medicine by 11-7 shift medical personnel, Defendant Jane Doe "Nurse" knowingly and deliberately disregarded excessive risks to Plaintiff's health and well-being because she: (a) knowingly and deliberately refused to take appropriate corrective action measures; (b) knowingly and deliberately refused to use sound decision-making in her duty and obligation to assist after finding out that Plaintiff's blood sugar level of 291 warranted emergency medical attention; and (c) allowed and condoned the gross misconduct of the medical personnel who denied Plaintiff's medical care/treatment.

76.     Each COUNT II Defendant had acted at all relevant times with evil motive or intent, or recklessly or with callous indifference to Plaintiff's constitutional rights.

77.     Defendants Egbe, Williams and Butler each: (a) intentionally repeated acts of negligence or deliberate indifference to the serious medical needs of Plaintiff; (b) disregarded and failed to follow medical policies, procedures, rules and directives; and (c) failed to take steps to ensure that Plaintiff's treatment plan was properly carried out, including providing timely administration of medications, insulin shots, and other necessary medical treatment on a daily basis.

78.     Defendants' continued failure to provide Plaintiff adequate medical treatment causes him to suffer ongoing injuries related to Plaintiff's serious medical condition, including, without limitation, diabetic neuropathy, severe headaches, poorer eye vision and depression. In fact, Plaintiff's injuries, caused by Defendants' nonfeasance, have required emergency treatment

on several occasions.

      **WHEREFORE**, Plaintiff respectfully requests that this Court:

(A)     Declare that the conduct of Count II Defendants has violated the rights guaranteed to Plaintiff under the Eighth and Fourteenth Amendments to the United States Constitution;

(B)     Grant an Order: (i) enjoining and prohibiting Count II Defendants, their successors, and other current and future employees of IDOC and Wexford from further depriving Plaintiff of his constitutional rights; (ii) requiring Count II Defendants and their successors to ensure that Plaintiff receives his daily medical treatment on a timely basis and in accordance with IDOC's and Wexford's medical policies, procedures and rules;

(C)     Award Plaintiff actual, consequential, compensatory, punitive, and any other damages that the Court may deem appropriate against Count II Defendants; and

(D)     Award Plaintiff his costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

Plaintiff hereby requests a trial by jury.

                                   Respectfully submitted,

                                   /s/Neal Thompson

                                   _____

                                   Attorney for Plaintiff

Neal F. Thompson (6181456)
Michaels, Schulwolf & Salerno, P.C.
300 S. Wacker Drive, Suite 1650
Chicago, Illinois 60606
312-428-4723
312-575-8679 (fax)

# Exhibit 4

Page 45

1    A    A couple times they have.
2    Q    When was that?
3    A    A while back, but it got cleared up.
4    Q    And so, generally, you don't have a
5    problem getting your tray when you haven't had
6    your insulin shot?
7         MR. RYAN:  Objection.
8    Mischaracterizes his previous testimony.
9         MS. NEWMAN:  You can answer the
10   question.
11        THE WITNESS:  No.  I don't get
12   problems, you know.  If I need my tray to
13   bring back because I didn't get my insulin
14   shots, no.  There are no more problems.
15           What they do now is they call
16   the cellhouse and verify if medical came in.
17   BY MS. NEWMAN:
18   Q    So have you had any other incidents
19   where you have had problems with your diabetes
20   because of the medical care you were
21   receiving?
22   A    Could you please explain?
23   Q    Okay.
24           Other than having -- getting

Page 46

1    your shot late at times, are there any other
2    times where you have had problems getting
3    medical care for your diabetes?
4    A    No.  If --
5    Q    I just wanted to make sure you were
6    finished with your answer.
7           All right.  Mr. Lippert, did you
8    file any grievances relating to the May, 2014
9    incident?
10   A    Yes, I did.
11   Q    And what did you complain about in
12   that grievance?
13   A    Exactly the same thing in the
14   lawsuit.
15   Q    And you filed that lawsuit and when
16   you filed the lawsuit, you filed the complaint
17   that has been marked as Exhibit 1?
18   A    Yeah.
19   Q    And in that Complaint, did you state
20   the facts of that incident to the --
21   accurately, to the best of your knowledge?
22   A    Yeah.
23   Q    Have you filed any other grievances
24   relating to your care for your diabetes since

Page 47

1    August, 2010?
2    A    Since 2010?
3    Q    Yes.
4    A    Yeah.
5    Q    And when did you -- when did you file
6    those grievances?
7    A    I couldn't give you exact dates.
8    Q    And what were those grievances
9    related to?
10   A    Being refused insulin shots.  Being
11   denied access to medical treatment.
12   Retaliation by medical, violating State and
13   Federal HIPAA laws, and violating IDOC rules,
14   policies, and procedures.
15   Q    Did you file any grievances relating
16   to the period during Ramadan when your shots
17   were late?
18   A    Yep.  They are still pending with the
19   Administrative Review Board in Springfield.
20   Some have been answered.  Springfield denied
21   them.
22        MR. RYAN:  What time is it, Counsel?
23        MS. NEWMAN:  Off the record.
24

Page 48

1           (Whereupon, a discussion was
2           held off the record.)
3    BY MS. NEWMAN:
4    Q    Mr. Lippert, have you ever gone on a
5    hunger strike while in prison?
6    A    Yep.
7    Q    How many times?
8    A    I can't give you an exact number, but
9    more than five.
10   Q    When was the last one that you --
11   that you went on that you remember.
12   A    Just recently, last month.  I forgot
13   the date, but it was -- I probably didn't even
14   document it, but it was more like a stand.
15           The cellhouse security were
16   playing games with us inmates, you know, and
17   everybody went on a hunger strike, you know.
18   Q    How long did you -- how long were you
19   on a hunger strike last month?
20   A    I missed a meal.  I think it was
21   lunch.  I missed a lunch meal.
22   Q    And did missing the lunch meal have
23   any effect on your blood sugar?
24   A    No.  I was all right.



Page 49

1    Q   Have you ever been on a hunger strike
2  that was longer than a single meal?
3    A   Yeah.  I don't know what date that
4  was.  It would have been probably a couple
5  days.
6    Q   So there was an incident where you
7  went a couple days without eating?
8    A   Yeah.
9    Q   How did that affect your diabetes?
10   A   It shot my blood sugar levels up.
11   Q   It what?
12   A   I suffered hypo -- hyperglycemia,
13  acidosis.  It's severe, you know, diabetic
14  complication.
15   Q   Why did you go on the hunger strike
16  at that time?
17   A   Security did something to me.  I
18  can't remember exactly what was the reason.
19   Q   Has the medical staff here ever told
20  you that going on a hunger strike is harmful
21  to your diabetes care?
22   A   They sure have.
23   Q   And have you had any long term
24  effects after you have been on a hunger

Page 50

1  strike?
2    A   I'm sure I have suffered long term
3  damage.
4    Q   Have you ever refused to take an
5  insulin injection?
6    A   Since I have been locked up?
7    Q   Yes.
8    A   I think when I first came in into
9  IDOC, in '96, '97, somewhere around there.
10   Q   Why did you refuse the insulin
11  injection at that time?
12   A   I don't remember.  ▮▮▮▮▮▮▮, you
13  know.
14   Q   So have you ever refused to --
15  refused an insulin injection since 2010?
16   A   No.
17   Q   Mr. Lippert, other than your claims
18  that we have talked about for your diabetes
19  care, are you raising any other medical claims
20  in this lawsuit?
21   A   In the one we are talking about?
22   Q   Yeah.  We have been -- we are talking
23  about the class action lawsuit today; and, we
24  didn't really talk about the May, 2010

Page 51

1  incident because you had already been deposed
2  on that.  So we have talked about a couple
3  other incidents today relating to your
4  diabetes; and, like I said, other than your
5  claims for diabetes care, are you raising any
6  other medical claims in this lawsuit?
7    A   No.
8    Q   Are you raising any dental claims in
9  this lawsuit?
10   A   Well, I had dental problems, you
11  know; and, you know, because we were on
12  lockdown, IDOC refused to let me go to my
13  dental clinic, you know, dental pass because
14  we were on lockdown.  So that caused me some
15  severe pain and agony and a waste of time of
16  writing grievances on it.
17   Q   And when was this -- when was this
18  incident?
19   A   I don't know the exact date.  Not too
20  long ago.
21   Q   And so you weren't able to go to the
22  dental clinic because you were on lockdown?
23   A   Yeah.  They only ran emergency, you
24  know, healthcare passes.

Page 52

1    Q   And what were you going to the dental
2  clinic for?
3    A   To have an infected tooth removed.
4    Q   And did you eventually have the
5  infected tooth removed?
6    A   Yep.
7    Q   And how long after did you have the
8  infected tooth removed?
9    A   I believe about three months later;
10  two or three months later.
11   Q   And did you have an infection the
12  entire time?
13   A   Yeah.
14   Q   Were you taking any kind of
15  antibiotics or any drugs for the infection?
16   A   No.
17       The only time they gave me any
18  antibiotics is when they removed the tooth.
19  That is the only time they prescribed me some
20  antibiotics.
21   Q   And did you put in for a sick call
22  for the tooth for the pain?
23   A   Yeah.
24       When they were doing the



# Exhibit 5

Page 1

```
 1
 2
                  UNITED STATES DISTRICT COURT
 3
                NORTHERN DISTRICT OF ILLINOIS
 4
                       EASTERN DIVISION
 5
 6
     DON LIPPERT, et al.,         )
 7                                )
            Plaintiffs,           )
 8                                )
     vs.                          ) No.  10-CV-4603
 9                                )
     JOHN BALDWIN, et al.,        )
10                                )
            Defendants.           )
11
12
13
14
15
16               DEPOSITION OF LEWIS RICE
17            Taken on behalf of the Defendants
18                   January 21, 2016
19
20
21
22
23
24
25
```

Page 2

```
 1                    I N D E X
 2                                          PAGE
 3   TITLE PAGE                               1
 4   INDEX                                    2
 5   DEPOSITION INFORMATION                   3
 6   APPEARANCES                              4
 7   EXAMINATIONS
         Direct Examination by Ms. Newman     5
 8       Cross Examination by Ms. Bennett     75
         Redirect Examination by Ms. Newman   79
 9
     EXHIBITS
10       Defendant's Exhibit 1               10
         Defendant's Exhibit 2               10
11       Defendant's Exhibit 3               10
         Defendant's Exhibit 4               26
12       Defendant's Exhibit 5               34
         Defendant's Exhibit 6               49
13       Defendant's Exhibit 7               61
14   NOTARIAL CERTIFICATION AND SEAL         82
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                  UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION
 3
 4   DON LIPPERT, et al.,           )
                                    )
 5       Plaintiffs,                )
                                    )
 6   vs.                            ) No.  10-CV-4603
                                    )
 7   JOHN BALDWIN, et al.,          )
                                    )
 8       Defendants.                )
 9
10           IT IS STIPULATED AND AGREED by and between
11   Counsel for Plaintiff and Counsel for Defendant that
12   the deposition of Lewis Rice, may be taken by and on
13   behalf of the Defendants, pursuant to the provisions of
14   the Illinois Civil Practice Act as amended, and the
15   provisions of the Supreme Court Rules pertaining to
16   depositions taken on January 21, 2016, at the Menard
17   Correctional Center, 711 Kaskaskia Street, Menard,
18   Illinois, before Rebecca L. Lucas, Certified Court
19   Reporter and Notary Public within and for the State of
20   Illinois; and that this deposition may be taken with
21   the same force and effect as if all statutory
22   requirements had been complied with.
23
24
25
```

Page 4

```
 1                  A P P E A R A N C E S
 2
 3       FOR THE PLAINTIFFS:
 4           Roger Baldwin Foundation of ACLU, Inc.
             180 North Michigan Avenue, Suite 2300
 5           Chicago, IL  60601
             By:  Ms. Camille E. Bennett, Esq.
 6           (312) 201-9740
 7
 8       FOR THE DEFENDANTS:
 9 Illinois   Office of the Attorney General State of
             100 W. Randolph Street
10           Chicago, IL  60601
             By:  Ms. Sarah Newman, Esq.
11           (312) 814-3720
12           Brown, Hay & Stephens, LLP
             205 South 5th Street
13           Springfield, IL  62701
             By:  Mr. Andrew M. Ramage, Esq.
14           (217) 544-8491
15
16       PROFESSIONAL SHORTHAND REPORTER:
17           Rebecca L. Lucas
18
19
20
21
22
23
24
25
```



Page 13

1     Q     No?  Okay.  Who wrote it for you?
2     A     I can't think of his name.  Chris -- his first
3   name is Chris.  I can't think of his last name.
4     Q     Okay.  Is Chris an inmate here at Menard?
5     A     Yes, he is.
6     Q     All right.  Did you read through this document
7   before --
8     A     Yes, I did.
9     Q     All right.  And did you agree with everything
10  that was said in it?
11    A     Yes, I did.
12    Q     Okay.  And then if you look at the last page
13  of the document.  Again, there's --
14    A     Declaration of perjury.
15    Q     Under penalty of perjury.  Yes.
16    A     Yes.
17    Q     And that's your signature?
18    A     Yes, it is.
19    Q     All right.  And then it says here that, I,
20  Lewis Rice, do hereby declare under the penalty for
21  perjury that the information contained herein this
22  document is true and accurate to the best of my
23  knowledge, understanding, and belief.
24    A     Yes.
25    Q     And was everything that you said in the

Page 14

1   document true to the best of your understanding and
2   belief?
3     A     Yes.
4     Q     Okay.  One more.  If you could turn with me to
5   Exhibit 3.  It's a document that's titled, Objection to
6   Report and Recommendation.  And the filing date's
7   November 6th, 2014.  Do you see that?
8     A     Yes.
9     Q     All right.  And this is another document that
10  you filed in the case, in that earlier case?
11    A     Yes.
12    Q     All right.  And is this another -- did then
13  Chris draft this document for you?
14    A     Yes.
15    Q     All right.  But you reviewed it and you agreed
16  with everything that was in it?
17    A     Yes.
18    Q     All right.  And then if you turn with me to
19  the second-to-the-last page of this document, Page 4 of
20  5.  There's an attachment.
21    A     Affidavit.
22    Q     Affidavit.  And it starts with I, Lewis Rice.
23  So this was an affidavit that you submitted in the
24  case?
25    A     Yes.

Page 15

1     Q     All right.  And then if you look on the last
2   page, it's signed by you.  And same question again is,
3   is to the best of your knowledge everything stated in
4   the affidavit is true and accurate?
5     A     Yes.
6     Q     All right.  Thank you.  So you -- did you also
7   give a deposition in that earlier case?
8     A     Yes, I did.
9     Q     All right.  And you were under oath when you
10  testified in that deposition?
11    A     Yes, I was.
12    Q     All right.  And you did your best to testify
13  accurately --
14    A     Yes, I did.
15    Q     -- in that deposition?  Okay.  All right.  And
16  is there any -- do you now have any reason to believe
17  that anything that you testified to --
18    A     No.
19    Q     I'm sorry.  Can you just let me finish?  It's
20  going to -- do you now have any reason to believe that
21  anything that you testified to in that earlier
22  deposition is not true or not accurate?
23    A     No.
24    Q     Okay.  That will speed things up just a bit.
25  Okay.  So you had -- I understand that you had a

Page 16

1   fainting episode in July, 2010?
2     A     Yes.
3     Q     All right.  And so it was, I believe, July
4   27th, 2010?
5     A     Yes.
6     Q     And you actually fainted twice that day.  Is
7   that right?
8     A     Yes.
9     Q     All right.  And after you fainted the second
10  time, you were admitted to the infirmary?
11    A     Yes.
12    Q     All right.  And the next day you had an EKG;
13  is that right?
14    A     Yes.
15    Q     Okay.  What were the results of that EKG?
16    A     They didn't share that with me.
17    Q     Okay.
18    A     They just shared it with the doctor.
19    Q     What doctor was that?
20    A     Dr. Fahim.
21    Q     Dr. Fahim?
22    A     Yes.
23    Q     So --
24    A     This was the EKG.
25    Q     Oh, they gave you the EKG report?



Page 17

1    A    Yes.
2    Q    Did Dr. Fahim say anything about what the EKG
3    report --
4    A    He didn't share it with me.
5    Q    Oh, he didn't share it with you.
6    A    No.
7    Q    You got that later on?
8    A    Yes, I got this from when I asked for my
9    medical records.
10   Q    Okay.  And so around in July, 2010, did
11   anybody talk to you about the EKG results?
12   A    No.
13   Q    Okay.  How long were you kept in the infirmary
14   for that first time?
15   A    I think for about four days.
16   Q    What treatment did you receive during that
17   time?
18   A    A saline drop.
19   Q    So you had an IV?
20   A    Yes.
21   Q    Did you receive any other medication?
22   A    They put me on an aspirin regimen for a year.
23   Q    And then about a week later you had another
24   fainting episode?
25   A    Yes.

Page 18

1    Q    All right.  What were your symptoms at that
2    time?
3    A    Dizziness, low blood pressure, chest pains.
4    That about sums it up.  Dizziness, low blood pressure,
5    chest pains.
6    Q    All right.  And can you tell me about the
7    chest pains?  What were they like?
8    A    It was like tightness in my chest, pins and
9    needles.  I felt that on my arm.  And it just hurt.  My
10   chest just hurt.
11   Q    The pins and needles were down your left arm?
12   A    Yes.
13   Q    Was the tightness in your chest more on one
14   side than the other or was it --
15   A    On my left side.
16   Q    Okay.  And were you given any treatment after
17   this --
18   A    They put me on -- let's see.  That was August
19   5th.  They did another EKG.  And that was it.  No
20   medication.  No nothing.  They put me on the saline
21   drop again.  They put me back on the saline drop.
22   Q    Were you admitted back into the infirmary at
23   that time?
24   A    Yes, I was.
25   Q    How long were you in the infirmary?

Page 19

1    A    Overnight.
2    Q    Did anyone discuss with you the results of the
3    second EKG?
4    A    Nurse Schott did.  She said that my heart
5    wasn't pumping blood.  That's all she told me.
6    Q    Did she say anything else to you?
7    A    No, she didn't.
8    Q    All right.  At some point someone told you
9    that your symptoms were caused by some medicine that
10   you were taking?
11   A    Nurse Schott did.  Said that my symptoms was
12   caused by ▮▮▮▮▮▮▮ Prazosin.  And then she
13   immediately took me off of it.
14   Q    And was that after -- when was that that she
15   told you that the drug was causing --
16   A    My second episode.
17   Q    So was that in August?
18   A    August.
19   Q    And did your symptoms improve when you were
20   taken off the medication?
21   A    No.  I was still having chest pains.
22   Q    Did the dizziness -- did you still have the
23   same dizziness?
24   A    No.  Just the chest pains.
25   Q    What about the low blood pressure, did that

Page 20

1    improve?
2    A    That improved, but didn't improve at a
3    significant rate.  You know, it improved though.
4    Because they was telling me they were starting to get
5    my blood pressure back up after each episode.
6    Q    How long did it take before you saw -- before
7    you saw an improvement with the dizziness?
8    A    About two days.  About.
9    Q    Okay.  All right.  But the chest pains -- you
10   continued to have the chest pains?
11   A    Yes.
12   Q    How often were you having chest pains at that
13   time?
14   A    Wow.  It was like every -- seemed like every
15   other day.  The nurses told me it probably was just
16   gas.
17   Q    So approximately every other day you would
18   have chest pains?
19   A    Yeah.
20   Q    How long did the chest pain last?
21   A    It didn't last long.  Seemed like they -- as
22   soon as it came in, it went away.
23   Q    Was it any particular time of day when you
24   would have the chest pain?
25   A    Mainly at night before I laid down and went to



1  sleep.  Right before medication came.  Medication gets
2  passed out at seven o'clock.  And it was around that
3  time.
4        MS. BENNETT:  Mr. Rice has brought some
5  documents.
6        THE WITNESS:  That's the aspirin regimen.
7        MS. NEWMAN:  All right.  I'd like to go ahead
8  and mark this as -- no.  I mean, I'd like to do
9  something.
10       MS. BENNETT:  I understand.  I think --
11       MS. NEWMAN:  We can go off the record.
12       (Off-the-record discussion.)
13  QUESTIONS BY MS. NEWMAN:
14   Q    All right.  I'd like the record to reflect
15  that Mr. Rice has handed me a copy of a document
16  titled, prescription order.  It's dated 8/5/10.  And it
17  says the order is for ECASA, 325 milligrams, PO daily,
18  I believe.  And that's assigned by K. Criss.  Is that
19  right?
20   A    Kimberly Criss.
21   Q    And that's when you were prescribed the
22  aspirin regimen?
23   A    Yes.
24   Q    And on the same page there's two other
25  prescription orders.  One dated 7/29/10.  It says,

1  repeat EKG in one week from today on 8/5 --
2   A    That never happened.
3   Q    Okay.  Well, but you did say you had an EKG --
4   A    I had one August 5th.  Okay.  That's right.
5   Q    Yeah.  On August 5th.
6   A    That's right.
7   Q    And then that's signed by, I think, Dr. Fahim?
8   A    Fahim.
9   Q    And the third prescription order is dated
10  7/28/10.  And that also is for ECASA, 81, PO, three
11  times a day.  That's also for the aspirin regimen?
12   A    Yes.
13   Q    All right.  And we do believe that there is a
14  copy of this document in there so --
15   A    Okay.
16   Q    We can let Mr. Rice keep his copy of the
17  document.  All right.  So after the August -- after
18  your August incident you continued to have chest pains
19  at night about approximately every other night.  Is
20  that right?
21   A    Right.
22   Q    All right.  And did you continue to have your
23  chest pains with that same frequency?
24   A    Yeah.
25   Q    For how long did you have chest pains

1  approximately every other night?
2   A    Oh, wow.  That went on for about a year.
3  Every time I tried to see a doctor, they'd cancel the
4  call pass.
5   Q    All right.  Did you have any other fainting
6  spells after August?
7   A    No.  No.  No more fainting spells.
8   Q    Did you have any further dizziness?
9   A    No.
10   Q    Any further issues with low blood pressure?
11   A    No.  When they took me off the medication,
12  Prazosin, things basically went back to normal.
13   Q    Had you had the chest pains before July, 2010?
14   A    No.
15   Q    So the incident on July 27th, 2010, was the
16  first time you had chest pain?
17   A    Yes.  Yes.
18   Q    Do you believe that you received appropriate
19  treatment from July 27th to August 5th, 2010?
20   A    No.
21   Q    No?  What treatment do you think you should
22  have received during that time?
23   A    They should have checked my medical records to
24  see what medications I was taking, to see what could
25  have caused fainting episode.  I feel as if they should

1  have listened to me when I told them I was having chest
2  pains.  I told them I was having headaches.  And they
3  didn't check me for a concussion or anything because
4  when I fainted, my head hit the concrete floor.  They
5  just -- it was just a drive-by checkup that they did on
6  me.  And what I mean by drive-by, I mean they took my
7  vitals, didn't check my heart, didn't check me for
8  concussion.  They just took my vitals and said that I
9  was having back pain and that was it.
10   Q    And was that -- that was the first time that
11  you fainted?
12   A    Yes.
13   Q    All right.  And then the second time you
14  fainted, when you were admitted to the infirmary.
15   A    I talked to Dr. Fahim and told Dr. Fahim I was
16  having chest pain and that I was feeling dizzy,
17  lightheaded and -- I was just hurting.
18   Q    All right.  And you were -- so -- and then
19  Dr. Fahim admitted you to the infirmary?
20   A    Yes.
21   Q    For about four days?
22   A    Yes.
23   Q    All right.  And do you believe you received
24  appropriate treatment during that four-day period?
25   A    Yes.



Page 25

1    Q    All right.  And then on August 5th when you
2  went to the infirmary again, do you believe you
3  received appropriate treatment at that time?
4    A    Yes.
5    Q    So you said you had -- your chest pains were
6  about -- continued approximately the same frequency for
7  about a year?
8    A    Yes.
9    Q    All right.  And after a year did the chest
10  pains change?
11    A    Yeah.  They stopped coming as frequently as
12  they were.  I started watching what I ate so it
13  wouldn't be blamed on gas and heartburn.  So I started
14  watching what I ate.  And the medical staff, they -- I
15  can't remember.  They'll check me.  And they're telling
16  me that everything is fine.
17    Q    And what was involved in this check?
18    A    In this check.  They just -- the stethoscope,
19  the heart instrument.  They just listened to my heart
20  and tell me everything was fine.  Listened to my chest
21  and tell me everything is fine.
22    Q    All right.  And how frequently were you --
23  have you been checked by the medical staff with your
24  heart?
25    A    Every time I put a sick call in.  Complained

Page 26

1  about chest pains.  You know, they'll tell me put a
2  sick call in when I complained about my chest pains.
3    Q    Have you had any other EKGs since August of
4  2010?
5    A    No.  No.
6    Q    You didn't have one in November of 2010?
7    A    Not that I know of.
8    Q    Okay.  Did you see a Dr. Fuentes in November
9  of 2010 for your chest pain?
10    A    I think that pass was canceled.  Yeah.  That
11  pass was canceled.  I was supposed to meet with her.
12  The pass was canceled.
13    Q    Okay.
14        (Defendant's Exhibit 4 was marked for
15  identification.)
16  QUESTIONS BY MS. NEWMAN:
17    Q    Mr. Rice, I'm showing you what's -- it's a
18  compilation of some pages from your medical record.
19  And you can see that they are stamped at the bottom
20  with what we call a Bates Number.  It says, Rice, and
21  there's a number.  The first page says 18.  And then
22  the last page says 52.  But it's not completely
23  contiguous.  There are various pages that relate to the
24  chest pains.
25    A    Right.

Page 27

1    Q    Are these documents that were used in the
2  earlier case that we were talking -- your other earlier
3  case?
4    A    These are the documents that I received when I
5  requested my medical file.
6    Q    All right.
7    A    This is what they gave me.
8    Q    All right.  If you could look with me on the
9  next-to-the-last page.  I think it's 51.  I'm not sure.
10    A    51.
11    Q    Yeah.  All right.
12    A    Okay.  It says Dr. Fuentes.
13    Q    Yeah.  There's a note there for November 17th,
14  2010.
15    A    I didn't remember that.
16    Q    Okay.  Do you have any reason to believe that
17  you didn't see the doctor on that date?
18    A    No.
19    Q    Okay.  There's a note down at the last line
20  that says, a chest pain, and then -- it looks like
21  ETIO, question mark.  Says, probably muscular in
22  nature.  Do you remember Dr. Fuentes telling you that
23  your chest pain was muscular in nature?
24    A    No.
25    Q    All right.

Page 28

1        MS. BENNETT:  I just note that there's some
2  other word there that's --
3        MS. NEWMAN:  Yes, there is some other word.
4        MS. BENNETT:  Unintelligible.
5        MS. NEWMAN:  Unintelligible.
6        MS. BENNETT:  And it looks like ITIO to me,
7  but who knows.
8        MS. NEWMAN:  ITIO.  Okay.  It's possible.
9  QUESTIONS BY MS. NEWMAN:
10    Q    At any point do you remember Dr. Fuentes
11  telling you what she thought was the cause of your
12  chest pain?
13    A    No.  She didn't tell me anything.
14    Q    So you go in and you say, I have chest pain.
15  And she said nothing?
16    A    She -- like I said, I don't remember seeing
17  her until this.  You know what I'm saying?  She
18  checked -- wait a minute.  Wait a minute.  Wait a
19  minute.  I want to get it straight.  I don't remember
20  seeing her because, like I said, the call pass was
21  canceled when I was scheduled to see her.  And she
22  never told me anything about muscular or anything like
23  that when I told them that I was having chest pains.
24  They never said anything about that.  The only person
25  that said something about my chest pain was Nurse



Page 29

1  Schott. And she said that my medication that I was
2  taking was causing it.
3    Q   Okay. And you haven't taken that medicine
4  since August, 2010?
5    A   No, I haven't taken the medicine since 2010.
6    Q   All right. You said that you -- after about a
7  year or so your chest pains got less frequent. Is
8  that --
9    A   Yes.
10   Q   And that was -- and you think partly because
11 you started watching what you were --
12   A   Eating. And they took me off the medication.
13   Q   What medication did they take you off of?
14   A   Prazosin.
15   Q   Okay.
16   A   That was causing chest pain. Whatever is
17 causing my whole episode, everything, my dizziness, my
18 low blood pressure, heart rate.
19   Q   At some point did you begin having some
20 symptoms of like -- of heartburn or acid reflux?
21   A   Yes.
22   Q   And when was that?
23   A   I have acid reflux -- I've got GERD, gastro
24 reflux intestinal disorder. So I have acid reflux
25 almost daily. They got me on -- right now I'm taking

Page 30

1  chewable tablets for that, for my acid reflux disease.
2    Q   And what kind of tablets are you taking?
3    A   They compare it to Tums, but they don't work
4  like Tums.
5    Q   Do you have any other medications for the
6  GERD?
7    A   No. ████████████████████
8  ████████████████████ It's an allergy pill. ████████
9  ████████████████
10   Q   Okay. Any other medications that you're on
11 right now?
12   A   No.
13   Q   When did you first start taking medications
14 for the GERD?
15   A   2007 when I was in the county jail.
16   Q   And have you been taking medication for GERD
17 continuously since then?
18   A   Yes.
19   Q   Have you been on the same medication the
20 entire time?
21   A   No. They'll change it up from Zantac to
22 Prilosec. Now I'm on chewable tablets. I didn't want
23 to take the Zantac because of the side effects.
24   Q   What side effects did you have from the
25 Zantac?

Page 31

1    A   Well, it was just a verbal -- from what the
2  doctor told me, that they interfered with my nature.
3    Q   And what do you mean by that?
4    A   My nature. Told me I couldn't get it up.
5    Q   Okay. I see. I understand. All right. And
6  so then you changed to the Prilosec after that?
7    A   Yes.
8    Q   All right. And did you have any side effects
9  with the Prilosec?
10   A   No.
11   Q   And when were you on -- when were you on the
12 Prilosec?
13   A   It's been a long time since I've been on the
14 Prilosec.
15   Q   All right.
16   A   I can't remember.
17   Q   And how long have you been on the current
18 medication?
19   A   About two months now.
20   Q   So before two months ago you were on --
21   A   Nothing.
22   Q   Nothing. And how long were you on no
23 medication for the GERD?
24   A   For about six months. Six to eight months.
25   Q   And before that were you on the Prilosec or --

Page 32

1    A   No. They was just giving me chewables. The
2  nurse sick call just gave me chewables.
3    Q   And have you discussed your chest pain with
4  the medical staff at Menard since November, 2010?
5    A   Yes, I have.
6    Q   All right. How often have you talked to them
7  about the chest pain?
8    A   Every chance I got a chance to see them, which
9  was not that often. Every chance I got to see them, I
10 told them about my chest pain.
11   Q   What's the most recent time that you talked to
12 them about the chest pain?
13   A   I just had a checkup from Dr. McGoran
14 (phonetic). That's the doctor's name. Dr. McGoran.
15 And she was giving me my yearly checkup. And I was
16 telling her about my chest pain.
17   Q   All right. And how frequently do you have
18 chest pains now?
19   A   I'm all better now.
20   Q   Okay.
21   A   I'm all better now. They -- like I said,
22 maybe it was gas, like they said.
23   Q   All right. So when's the last time you had a
24 chest pain?
25   A   About two months ago.



1    Q    Okay.  And so you told Dr. -- so when was your
2  checkup with Dr. McGoran?
3    A    That was around my birthday.  Around November
4  of last year.
5    Q    November of 2015?
6    A    Yes.
7    Q    All right.  And so had you had -- when you had
8  your checkup, had you had a chest pain recently?
9    A    No.
10   Q    Okay.  And so what did -- did Dr. McGoran say
11 anything about your chest pains?
12   A    No.  She just looked at my medical files and
13 seen that I was having trouble with my chest pains, my
14 shoulder, and my back.
15   Q    And did she give you any -- prescribe any
16 medications at that time?
17   A    No.  She had prescribed chewables for my
18 heartburn.  No other medication.
19   Q    So during this period from August, 2010, to --
20   A    Now.
21   Q    -- currently, til now, do you think -- what
22 treatment do you think you should have received for
23 your chest pains?
24   A    Well, I shouldn't have ever been taken off the
25 aspirin regimen.  That's one thing that I've been

1  trying to get back on.  And I've been trying to get
2  checked regularly.  You know what I'm saying?  Put on
3  the chronic list, so I can be checked regularly for
4  chest pains, and shoulder injury, back injury.  All my
5  ailments.  And they haven't put me on chronic.
6    Q    When were you taken off the aspirin regimen?
7    A    I don't remember.  I don't remember.  I took
8  it for about a year and a half.  I don't remember when
9  I was taken off of it.
10   Q    Okay.  Mr. Rice, you filed a grievance
11 relating to the -- for the July 27 fainting spell.  Is
12 that right?
13   A    Yes, I did.
14     MS. NEWMAN:  All right.  I have a copy of that
15   here for you.
16     (Defendant's Exhibit 5 was marked for
17 identification.)
18 QUESTIONS BY MS. NEWMAN:
19   Q    Mr. Rice, I'm showing you what we've marked as
20 Exhibit 5.  You see at the top of the -- at the top
21 there's a heading that says, Case Number 3:12-CV-0847.
22   A    Uh-huh.
23   Q    All right.  It says, filed, 7/26/12.  This is
24 a document that I got off, again, off the court website
25 from your earlier case.

1    A    All right.
2    Q    But the date on the actual grievance is dated
3  8/31/10.
4    A    Correct.
5    Q    All right.  So is this the grievance that you
6  filed in relation to your July 27th, 2010, fainting
7  spell?
8    A    Yes.
9    Q    All right.  And I should also say the first
10 two pages are the grievance and then the --
11   A    Responses.
12   Q    And then the other is the responses that you
13 received from the grievance all from -- all relating --
14 all a part of a document that you filed exhibits to --
15 exhibits to your complaint, in fact.  So my first
16 question -- so the first two pages -- this is the
17 grievance that you filed in August, 2010.  Is that
18 right?
19   A    Yes.  Yes, ma'am.
20   Q    All right.  And this grievance related to your
21 treatment after your first fainting spell; is that
22 right?
23   A    Uh-huh.
24   Q    All right.  And you did not file a grievance
25 relating to your treatment after --

1    A    After the second one.  No, I didn't.
2    Q    Okay.  All right.  And what was the response
3  about the -- to your grievance?
4    A    My response?
5    Q    The response you received.
6    A    They sent medical records.  Employees' issues
7  aren't discussed with offenders.
8    Q    Okay.  And so when you received that response,
9  how did you proceed after -- did you do anything
10 further after that?
11   A    I filed a lawsuit.
12   Q    All right.  So did you appeal first to the
13 ARB?
14   A    Yes.  To Springfield.
15   Q    All right.  And did you receive any response
16 from the ARB?
17   A    Yes, I did.
18   Q    All right.  And what was that response?
19   A    Grievance denied.
20   Q    Okay.  And then you -- so then you filed the
21 lawsuit.
22   A    Right.
23     MS. BENNETT:  Just for the record, I think
24   that response is part of Exhibit 5.
25 QUESTIONS BY MS. NEWMAN:



Page 37

1    Q   Let me ask that and see.  So if we look at
2  Page 4 of the exhibit, is that the response you
3  received from the ARB?
4    A   Yes.
5    Q   Okay.  Mr. Rice, have you filed any other
6  grievances related to your treatment for chest pain?
7    A   Only on the officers, the attack team.  I
8  filed a grievance on them because I had told them that
9  I was having chest pains before I passed out.  The
10  attack team guys that had us in the chapel.
11    Q   And that -- but that's also related to the
12  July 27th, 2010?
13    A   Yes.  All that was related.
14    Q   Okay.  And so have you filed any grievance
15  since -- have you filed --
16    MS. NEWMAN:  Sorry.  Let's start that again.
17  QUESTIONS BY MS. NEWMAN:
18    Q   Have you filed any grievances relating to your
19  treatment for your chest pain after July 27th, 2010?
20    A   No.  No.
21    Q   Okay.
22    A   There was no need to.  They was trying to do
23  their best to take care of me, but they wasn't.
24    MS. NEWMAN:  All right.  Let's go off the
25    record a second.

Page 38

1    (Off-the-record discussion.)
2    (Short break.)
3  QUESTIONS BY MS. NEWMAN:
4    Q   All right.  Now, Mr. Rice, your shoulder was
5  injured in a car accident; is that right?
6    A   Yes.
7    Q   All right.  And when was that?
8    A   February, 2007.
9    Q   So that was before you were --
10    A   Locked up.
11    Q   Before you were locked up.
12    A   Yes.
13    Q   Were you hospitalized after that car accident?
14    A   Yes.  I had a broken arm.
15    Q   Where were you in the hospital?
16    A   St. Mary's, East St. Louis.
17    Q   How long were you in the hospital?
18    A   Overnight.
19    Q   All right.  And so you had a broken arm?
20    A   Yeah.  They did surgery.
21    Q   Okay.  They put in like a pin or something?
22    A   Yes.
23    Q   All right.  And what other injuries did you
24  have from the car accident?
25    A   Neck pain, back pain.

Page 39

1    Q   And did you have pain in your shoulder at that
2  time?
3    A   Yes.  They took an x-ray of my shoulder here.
4  They said I have a separated bone and I needed surgery.
5  But no one wants to foot the bill.
6    Q   Okay.  All right.  Going back though to
7  February, 2007.  Did you have an x-ray of your shoulder
8  then at St. Mary's?
9    A   Yes.
10    Q   All right.  What did that x-ray show?
11    A   Separated bone.
12    Q   And did the doctors there tell you that you
13  needed surgery on the shoulder?
14    A   No.
15    Q   Did they say -- did they recommend -- give you
16  any treatment for your shoulder?
17    A   They gave me some Vicodin.
18    Q   Did they give you a brace or anything, a sling
19  or anything to wear?
20    A   For my shoulder, no.  For my broken arm, yes.
21    Q   All right.  So it was -- I'm sorry.  So your
22  left arm was broken?
23    A   My left arm was broken and my right shoulder
24  was dislocated.  Well, I think it was dislocated.
25    Q   And did they pop it back into place?

Page 40

1    A   Yes.
2    Q   Okay.  So did the doctors -- did the doctors
3  that you saw in February of 2007, did they recommend
4  any further treatment for your right shoulder?
5    A   They just gave me pain pills, Tylenol 3.
6    Q   So from the period -- so from February, 2007,
7  until -- I'm sorry.  What month was it when you were
8  arrested in 2007?
9    A   September.
10    Q   September.  All right.  So from February to
11  September did you have any treatment -- --
12    A   I was going through therapy, physical therapy.
13    Q   All right.  So you were in physical therapy?
14    A   Yes.
15    Q   All right.  And that was on -- for your right
16  shoulder?
17    A   For my back and my shoulder.
18    Q   Back and shoulder.  And did you finish the
19  therapy?
20    A   No.
21    Q   Why didn't you finish the therapy?
22    A   I got arrested.
23    Q   Okay.  Was the physical therapy helping your
24  shoulder?
25    A   Yes.



Page 41

1    Q   Did a doctor prescribe the physical therapy
2  for you?
3    A   Yes.
4    Q   All right.  When did they prescribe physical
5  therapy for you?
6    A   Right after surgery.  I can't remember when I
7  had my surgery, but right after surgery they prescribed
8  the physical therapy for me.
9    Q   And that was the surgery on your left arm?
10   A   Right.
11   Q   Okay.
12   A   Yes.
13   Q   All right.  And did -- so from this period of
14  February to September was the pain in your shoulder the
15  same or did it improve?
16   A   No, it didn't improve.  It was always there.
17  I can barely lift with my arm.  I can't sleep on my
18  right side because of the shoulder pain.  Pain keeps me
19  up at night.  I told the nurses and the doctors.  All
20  they want to give me is Motrin.  But I can't take
21  Motrin because of my stomach ulcers.  And Tylenol don't
22  help.
23   Q   Okay.  So the pain has been more or less
24  constant since --
25   A   Yes.

Page 42

1    Q   -- February of 2007?
2    A   Yes.
3    Q   And did you see -- did you see any doctors
4  between the time you had the accident and the time you
5  were arrested, did you see any doctors for your
6  shoulder?
7    A   Yes.
8    Q   How many times did you see a doctor?
9    A   Once a week.
10   Q   And what did the doctors say about your
11  shoulder?
12   A   Torn rotator cuff.
13   Q   And did the doctor recommend any treatment for
14  that?
15   A   They just gave me Tylenol.  Tylenol 3.
16   Q   So the doctor did not recommend any surgery?
17   A   No.  I didn't know I needed surgery until I
18  got here when the doctors examined me and told me I
19  needed surgery here.
20   Q   All right.  And so a doctor here at Menard
21  told you that you needed -- told you that you needed
22  surgery for your shoulder?
23   A   Yes.
24   Q   When was that?
25   A   About two years ago.

Page 43

1    Q   And who was that that told you?
2    A   Nwaobasi.
3    Q   Nwaobasi?
4    A   Yeah.  I think that's how you pronounce his
5  name.  N-w-a-o-b-a-s-i.
6    Q   So this was about sometime in 2013?
7    A   Yes.
8    Q   All right.  And so did you go to see
9  Dr. Nwaobasi because of your shoulder?
10   A   Yes.  I get a double cuff permit every year so
11  the handcuffs won't -- I won't have to go through the
12  pain and stuff from that again because being slapped on
13  me.
14   Q   All right.  And what does a double cuff --
15   A   Permit.  They put two handcuffs on me and cuff
16  me in the back.  For my arm to relax.
17   Q   Okay.  As opposed to -- rather than pulling
18  your arm all the way back to your back?
19   A   Yes.
20   Q   So in 2013 you went to get your double cuff
21  permit renewed; is that right?
22   A   Get it renewed every year.
23   Q   Okay.  And so -- and Dr. Nwaobasi said you
24  needed surgery?
25   A   Yes.

Page 44

1    Q   What kind of surgery did --
2    A   He didn't explain it to me.
3    Q   And did he say he was going to refer you for
4  surgery?
5    A   He said he was going to refer me, but at the
6  time he had -- everything had to go through Dr. Fahim.
7  And I don't know what happened.  All I know, the other
8  doctors told me that they're not going to do surgery on
9  me because it was too expensive.
10   Q   Who told you that?
11   A   Dr. Shearing, Dr. Callaway, Frost --
12  Dr. Frost.  Those were just some of the doctors that I
13  seen for my shoulder.  And nurse practitioner.  I can't
14  remember her name.
15   Q   All right.  So Dr. Nwaobasi in 2013 said that
16  you needed surgery?
17   A   Yes.
18   Q   All right.  Has any other doctor here at
19  Menard ever said you needed surgery?
20   A   They won't look at my x-rays.  Dr. Fahim said
21  I needed surgery, but he left.  He went somewhere else.
22  Every other doctor I talked to, they talk about it's my
23  rotator cuff.  And I told them my x-rays show a
24  separated bone in my shoulder.  And I got two medical
25  files.  They only bring one when they come see me.



Page 69

1    A    Dr. Nwaobasi.
2    Q    Dr. Nwaobasi?
3    A    Yes.
4    Q    All right. And when did Dr. Nwaobasi tell you
5    that?
6    A    I just read it in the medical file. He didn't
7    actually say anything to me about it, but I read it in
8    the medical file.
9    Q    Okay.
10   A    I tried to talk to him about it, but I never
11   seen him again. I never seen him on that situation.
12   Q    Okay. All right. So he didn't tell you, but
13   he put it in your file that --
14   A    Yes.
15   Q    And then the next part of the sentence said,
16   another doctor contradicted this.
17   A    Dr. Fahim.
18   Q    All right. So Dr. Fahim told you that you did
19   not need a pacemaker?
20   A    He didn't say anything to me about it.
21   Q    Okay. And so how do you know that Dr. Fahim
22   contradicted Dr. Nwaobasi's?
23   A    Medical file.
24   Q    From the medical file. Rice has never been
25   referred to a cardiologist or received a pacemaker.

Page 70

1    A    No.
2    Q    So that's correct?
3    A    Yes.
4    Q    All right. The only medications he has been
5    prescribed for chest pains is aspirin.
6    A    Yes.
7    Q    But he was taken off even that.
8    A    Yes.
9    Q    Though he is trying to persuade health care
10   staff to put him back on it.
11   A    Yes.
12   Q    Paragraph 123. Rice has also been told that
13   he has a separated bone in my -- should be my
14   shoulder -- due to a past car accident.
15   A    Yes.
16   Q    Rice gets a double cuff permit every year now
17   as a result, which has to be approved by a doctor.
18   A    Yes.
19   Q    On one occasion when he saw a doctor to renew
20   the permit, the doctor told Rice that he needed surgery
21   on his shoulder.
22   A    Yes.
23   Q    On the shoulder. Sorry. And that was
24   Dr. Nwaobasi?
25   A    Yes.

Page 71

1    Q    Okay. Another Menard doctor told Rice the
2    same.
3    A    Yes.
4    Q    Okay. As it is, Rice is given Tylenol for the
5    pain, and that is all.
6    A    Yes.
7    Q    Rice cannot sleep on his right side because of
8    the pain from his shoulder.
9    A    Yes.
10   Q    Any lifting also causes Rice pain.
11   A    Yes.
12   Q    Are you required to do any lifting as part of
13   your work?
14   A    No. No one told me, but I try to do something
15   to strengthen my arm.
16   Q    So you attempt -- you're doing exercises to
17   strengthen your arm?
18   A    Yes.
19   Q    What kind of exercises do you do?
20   A    Just simple things like lifting a book,
21   push-ups, stretch, exercises, things of that nature.
22   Q    So you do push-ups with your right shoulder?
23   A    I try to. It don't work.
24   Q    You said earlier that one of the doctors had
25   said you needed to do some exercises for your shoulder.

Page 72

1    A    Yes.
2    Q    Did that doctor tell you what exercises you
3    should do?
4    A    No.
5    Q    You had -- you said earlier that you had some
6    physical therapy before you -- before you were
7    arrested.
8    A    Yes.
9    Q    Were you given exercises to do at that time?
10   A    Yes. They gave me an exercise ball and told
11   me -- and some rubber bands and -- that was it.
12   Q    Okay. And did they tell you what -- give you
13   exercises to perform at home?
14   A    No.
15   Q    No. Okay. All right. Going back. So this
16   has been going on for ten years.
17   A    Yes.
18   Q    The car accident was in 2007. Is that right?
19   A    Yes.
20   Q    So to be precise, it's almost nine.
21   A    Eight years. Right.
22   Q    Rice is not -- not in any chronic clinic at
23   Menard for his chest pains, headaches, or shoulder
24   pain.
25   A    No.



# Exhibit 6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

Lewis Rice
_____
_____
_____

Plaintiff/Petitioner(s),

-vs-

R. Pollion, R. Skidmore
Sgt. T. Payne, C/o Tindal
_____
_____
_____

Defendant/Respondent(s).

Docket No. 12-847-JPG

(To be supplied by the Clerk)

☐ **CIVIL RIGHTS COMPLAINT**
pursuant to 42 U.S.C. §1983
(State Prisoner)

☐ **CIVIL RIGHTS COMPLAINT**
pursuant to 28 U.S.C. §1331
(Federal Prisoner)

☒ **CIVIL COMPLAINT**
pursuant to the Federal Tort Claims
Act, 28 U.S.C. §1346, 2671-2680

*FILED*
*JUL 26 2012*
*CLERK, U.S. DISTRICT COURT*
*SOUTHERN DISTRICT OF ILLINOIS*
*EAST ST. LOUIS OFFICE*

SCANNED AT MENARD and E-mailed
7/26/12   by KSE   48   pages
date      initials   No.

I.    JURISDICTION

A.    Plaintiff's mailing address and/or register number and present place of confinement.

B20391  Menard Correctional Center  P.O. Box 1000  Menard
Il. 62259

B.    Defendant    R. Pollion    is employed as
(Name of First Defendant)

A Nurse
(Position/Title)

with  # Illinois department of correction
(Employer's Name and Address)

Menard Correctional Center  P.O. Box 1000  Menard Il. 62259

At the time the claim(s) alleged in this complaint arose, was the defendant employed by the
state, local or federal government?

Yes (X)        No ( )

If your answer is "yes", briefly explain:

Nurse R. Pollion is a medical nurse Practitioner at the
Menard Correctional Center    Menard, Il.

Rev. 2/00

**DEFENDANT'S EXHIBIT**
1
RLL   1/21/16

C.    Defendant _R. Skidmore_ is employed as
               (Name of Second Defendant)

_a medical Technician_
              (Position/Title)

with _Illinois department of Correction_
              (Employer's Name and Address)

_Menard Correctional Center  P.O.Box 1000  Menard Il. 62359_

At the time the claim(s) alleged in this complaint arose, was the defendant employed by the state, local or federal government?

         Yes (X)          No ( )

If your answer is "yes", briefly explain:

_R. Skidmore is a medical Technician with the menard Correctional Center healthcare unit menard, Il. 62259_

D.    Using the outline of the form provided, include the above information for any additional defendant(s).

_Sgt. T. Payne is a security guard with the Illinois Department of Correction, menard Correctional Center_

_Sgt. C/o Tindal is a security guard with the Illinois Department of correction, Menard Correctional Center Menard, Il. P.O.Box 1000_

II.    **PREVIOUS LAWSUITS**

A.    Have you begun any other lawsuits in state or federal court relating to your imprisonment?

         Yes ( )          No (X)

B.    If your answer to "A" is "yes", describe the lawsuit(s) in the space below. (If there is more than one (1) lawsuit, you must describe the additional lawsuits on another sheet of paper, using the same outline.) **Failure to comply with this provision may result in summary denial of your complaint.**

Rev. 2/00

- 2 -

1. Parties to previous lawsuits:
   Plaintiff(s) _____

   Defendant(s) _____
   _____
   _____

2. Court (if Federal Court, name the District; if State Court, name the County)
   _____

3. Docket number _____

4. Name of Judge to whom case was assigned _____

5. Type of case (for example  Was it a Habeas Corpus or Civil Rights action?)
   _____

6. Disposition of case (for example: Was the case dismissed? Was it appealed? Is it still pending?)
   _____

7. Approximate date of filing lawsuit _____

8. Approximate date of disposition _____

## III.  GRIEVANCE PROCEDURE

A. Is there a prisoner grievance procedure in the institution? _Yes_____

B. Did you present the facts relating to your complaint in the prisoner grievance procedure?
   Yes (X) No ( )

C. If your answer is "yes",
   1. What steps did you take? _Petitioner filed a grievance with the institution grievance proceedings_

   2. What was the result? _The grievance officer claimed to have address my grievance. But the P.R.B denied said grievance_

D. If your answer is "no", explain why not. _____
   _____
   _____
   _____

E.   If there is no prisoner grievance procedure in the institution, did you complaint to prison authorities?  Yes ( )    No ( )

F.   If your answer is "yes",
1.   What steps did you take? _____

_____

_____

2.   What was the result? _____

_____

_____

G.   If your answer is "no", explain why not. _____

_____

_____

_____

H.   Attach copies of your request for an administrative remedy and the response(s) you received. If you cannot do so, explain why not:

_____

_____

_____

IV.   STATEMENT OF CLAIM

State here, as briefly as possible, the FACTS of your case.  State who, what, when, where and how you feel your constitutional rights were violated.  Do not cite cases or statutes.  If you choose to submit legal arguments or citations, you must do so in a separate memorandum of law.  If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph.  If your claims relate to prison disciplinary proceedings, attach copies of the disciplinary charges and any disciplinary hearing summary as exhibits.

Only two (2) extra pages (8½ x 11") are permitted, if necessary, to complete your statement of claim.  Additionally, attach any relevant, supporting documentation.

Petitioner Collapsed July 17, 2010 and need medical attent-
ion nurse Pollion and med Tech Skidmore improperly examine petit-
ioner who was having severe chest pains and headaches which
he suffered from a head injury when he collapsed causing the
need for medical care but nurse R.Pollion and med Tech R. Skid-
more were not treating petitioner for chest pains even after
petitioner complained about chest pains. Petitioner was sent back
to his housing unit but before leaving the healthcare unit Plaint-
iff complain to health care unit Sgt T.Payne about chest pains
and Sgt T.Payne replied that you can go back to your housing
unit or go to seg. after waiting for 9½ hours Plaintiff constantly
complain about chest pain and med Tech Skidmore told Sgt T.
payne that I was fine. When C/o Sgt Tindall showed up to escort me

to the housing unit I complained to him about the chest pain and sgt. C/o Tindal said "It's time for me to go home and I can't deal with this shit." After being in the cell for a short time I collapsed again and had to be rushed back to the health care.

Plaintiff Eighth amendment was voilated when Plaintiff didn't receive proper medical care from healthcare nurse R.Pollion and med. Tech. R.Skidmore, sgt. T.Payne and C/o sgt Tindal

The Eighth amendment prohibits on cruel and unusual punish-ment extends to protect prisoners from deliberate indifference to serious medical needs.

Rev. 2/00

## V.    REQUEST FOR RELIEF

State exactly what you want the Court to do for you.  If you are a state or federal prisoner, and seek relief which affects the fact or duration of your imprisonment (for example:  illegal detention, restoration of good time, expungement of records or parole release), you must file your claim on a Habeas Corpus form, pursuant to 28 U.S.C. §2254, 28 U.S.C. §2255, or 28 U.S.C. §2241.

Plaintiff is seeking $50,000 dollars for deliberate indifference. and $50,000 dollars in punitive damages and other relief the Court deems

## VI.    JURY DEMAND *(check one box below)*

The plaintiff does ☒    does not ☐    request a trial by jury.  *(See Fed.R.Civ.P. 38.)*

## DECLARATION UNDER FEDERAL RULE OF CIVIL PROCEDURE 11

I, the undersigned, certify to the best of my knowledge, information, and belief, that this complaint is in full compliance with Rule 11(a) and 11(b) of the Federal Rules of Civil Procedure.   The undersigned also recognizes that failure to comply with Rule 11(a) and (b) may result in sanctions, monetary or non-monetary, pursuant to Federal Rule of Civil Procedure 11(c).

The plaintiff hereby requests the Court issue all appropriate service and/or notices to the defendant(s).

Signed this 25 day of July , 2012 .

_____
Signature of Plaintiff

_____
Signature of attorney, if any

Rev. 2/00                          - 6 -

# Exhibit 7

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| LEWIS RICE, B20391, | | |
| Plaintiff, | | |
| vs. | | Case No. 12-cv-847-SMY-PMF |
| R. SKIDMORE and R. POLLION, | | |
| Defendants. | | |

**MEMORANDUM AND ORDER**

This matter comes before the Court on the Report and Recommendation ("R & R") (Doc.

59) of Magistrate Judge Philip M. Frazier recommending that the Court grant defendants'

Motions for Summary Judgment.  (Docs 37, 42).  Plaintiff Lewis Rice filed an objection (Doc.

60) to the R & R.  For the following reasons, the Court adopts the R & R and grants Defendants'

Motions for Summary Judgment.

The Court may accept, reject or modify, in whole or in part, the findings or

recommendations of the magistrate judge in a report and recommendation. Fed. R. Civ. P.

72(b)(3).  The Court must review *de novo* the portions of the report to which objections are

made.  The Court has discretion to conduct a new hearing and may consider the record before the

magistrate judge anew or receive any further evidence deemed necessary.  *Id.*  "If no objection or

only partial objection is made, the district court judge reviews those unobjected portions for clear

error." *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir. 1999).  Because Plaintiff filed an

objection to the R & R, the Court will review the record *de novo*.

Rice is serving a life sentence for murder at Menard Correctional Center ("Menard"). On

July 26, 2012 Rice filed a civil rights lawsuit (Doc. 1) pursuant to 42 U.S.C. § 1983 alleging that

his constitutional rights were violated by Menard staff. The 28 U.S.C. § 1915A merits review (Doc. 3) held that Rice articulated a colorable Eighth Amendment deliberate indifference to a serious medical condition claim against Skidmore and Pollion. Both defendants now move for summary judgment. Rice's claim arises out of incidents that occurred at Menard in 2010. At about noon on July 27 of that year Menard staff conducted a "shakedown" of the inmates' cells. A shakedown is a procedure where the prison staff conducts a thorough search of the inmates' cells and belongings for contraband. Rice along with all of the other inmates in the cell block were taken to the prison chapel while their cells were searched. The inmates were lined up directly against and facing a wall. After about 20 to 30 minutes in the chapel, Rice developed a headache and began to experience tightness in his chest. He notified the staff several times that he was not feeling well, and at about 2:00 P.M. Rice passed out.

When Rice awoke he was on a stretcher in the Menard health care unit. Nurse Pollion, Medical Technician Skidmore, Dr. Fahim, and Dr. Nwaobasi were also in the health care unit. Nurse Pollion checked Rice's vital signs and gave him a cup of water along with two pills of Tylenol. Dr. Nwaobasi told Rice that he was being treated for heat exhaustion. The health care unit at Menard is air conditioned, but the chapel and cell houses are not. Rice attempted to tell Pollion, Skidmore, Fahim and Nwaobasi that he did not think he was suffering from heat exhaustion because he was experiencing chest pain. However, the health care unit staff decided to send Rice back to the cell house.

Rice was in his cell for only a few minutes when he again fainted. Rice awoke back in the health care unit and he was treated by Skidmore and Fahim. Skidmore checked his vitals, and then Rice was examined by Fahim. Because his blood pressure was dangerously low, Rice was

admitted into the health care unit and he would remain there for the next four days. After the four days in the health care unit, Rice was released back to his cell.

On August 5, 2010 Rice again passed out while waiting in a health care unit holding cell. Rice was in the holding cell waiting to be examined as part of a regular checkup. After he passed out, Rice was admitted into the health care unit and treated by Nurse Natalie Schott. Schott told Rice that she thought his fainting was being caused by medication Rice had been taking, specifically a drug called Prazosin. About a month prior on July 7, Rice was prescribed Prazosin by psychiatrist Dr. Kowalkowski for sleep disruption and nightmares. However the drug is also used to treat high blood pressure and side effects may include weakness, tiredness, and headache. Kowalkowski discontinued the Prazosin subscription on August 4. Rice was kept under observation at the health care unit after the August 5 fainting spell and he was released on August 6. After the August 5 incident Rice had no other fainting spells. Approximately two years after these events occurred, Rice filed this lawsuit. Both defendants filed a motion for summary judgment (Docs. 37 and 42). Rice filed a response (Doc. 48) to defendant Pollion's motion, but did not file a response to Skidmore's motion.

Magistrate Judge Frazier filed his R & R (Doc. 59) on October 23, 2014, in which he recommended the Court grant Defendants' motion for summary judgment. Specifically, regarding defendant Pollion's Motion, Magistrate Judge Frazier noted that Plaintiff failed to provide evidence that the defendants' possessed the "sufficiently culpable state of mind". Magistrate Judge Frazier concluded that the evidence presented, even when viewed in the light most favorable to Plaintiff, was insufficient to create a material issue of fact. Regarding defendant Skidmore's Motion, Magistrate Judge Frazier pointed out that the Plaintiff did not

respond to the Motion and therefore considered the failure to respond as an admission of the merits of the motion.

Plaintiff filed an objection (Doc. 60) to the R & R.  Plaintiff makes several arguments: that there are "a lot of very important facts that distinguish" Plaintiff's case from other cases of mere medical malpractice; that his being treated for heat exhaustion was not just an error in judgment but was unreasonable; that his symptoms were not consistent with heat exhaustion and defendant Pollion ignored him and "wrote him off" after being informed by Plaintiff of his concerns, and; that the evidence he presented supports a "strong finding in favor of both the objective and subjective components" of the required standard.(Doc. 60).  The Court will now consider whether Defendants are entitled to judgment as a matter of law.

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);  *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000).  The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.  Where the moving party fails to meet its strict burden of proof, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists.  Fed. R. Civ. P. 56(e)(2); *Celotex*, 477 U.S. at 322-26;

*Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). A genuine issue of material

fact is not demonstrated by the mere existence of "some alleged factual dispute between the

parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts,"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine

issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving

party] on the evidence presented." *Anderson,* 477 U.S. at 252.

The Eighth Amendment imposes liability on prison officials who "intentionally disregard

a known, objectively serious medical condition that poses an excessive risk to an inmate's

health." *Gonzalez v. Feinerman*, 663 F.3d 311, 313-14 (7th Cir. 2011) (citing *Farmer v.*

*Brennan*, 511 U.S. 825, 837 (1994)). Accordingly, Plaintiff must establish he suffered from an

"objectively serious medical condition" and medical officials "were aware of the serious medical

need and were deliberately indifferent to it." *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir.

2012).

Here, Plaintiff fails to introduce any evidence of defendant Pollion's deliberate

indifference. From the evidence presented, the initial diagnosis of heat exhaustion was not

unreasonable, and the diagnosis was immediately supported by a medical doctor. Even looking

at the evidence in the light most favorable to the Plaintiff, there is no evidence that defendant

Pollion, under these circumstances, had the required culpable state of mind. Accordingly,

defendant Pollion is entitled to judgment as a matter of law.

Regarding defendant Skidmore's Motion, there was no response from Plaintiff. Pursuant

to Fed. R. Civ. P. 56, "if a party fails to properly address another party's assertion of fact" the

court may "consider the fact undisputed for purposes of the motion." And under Local Rule 7.1,

"failure to timely file a response to a motion may, in the Court's discretion, be considered an

admission of the merits of the motion." Therefore, the Court holds that Plaintiff's failure to respond is an admission of the merits of Skidmore's Motion for Summary Judgment. However even if Rice had filed a response, the involvement of Skidmore's in Rice's treatment was minimal and conducted under the supervision of Dr. Fahim. Therefore, there is insufficient evidence to create an issue of material fact regarding an Eighth Amendment violation.

For the foregoing reasons, the Court

- **ADOPTS** the R & R (Doc. 59) in its entirety;

- **GRANTS** Defendants' Motions for Summary Judgment (Docs. 37 & 42);

- **DISMISSES with prejudice** Plaintiff's claims against defendants Skidmore and Pollion; and

- **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED:** November 18, 2014

s/ Staci M. Yandle
**STACI M. YANDLE**
**DISTRICT JUDGE**

6

# Exhibit 8

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ILLINOIS

Lewis Rice,

    Plaintiff,


    V.            No. 12-cv-847

R. Pollion,

    Defendant.

---

MEMORANDUM IN SUPPORT OF PLAINTIFF'S RESPONSE TO

TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT


    NOW COMES the Plaintiff, Lewis Rice, proceeding pro se, and whom hereby moves before this Honorable Court, and presents this Memorandum to support the attached Response, respectfully seeking that A.R.N.P. Pollion's Motion for Summary Judgment be denied.

    In further support, it is henceforth stated:

DEFENDANT'S EXHIBIT
2
RLL  1/21/16

    The defendant's factual allegations are incorrect, they have failed in submitting an adequate case for summary judgment. Plaintiff disputes those facts alleged and provides his presentation of the claims by setting forth this evidentiary support.


    What is at issue here is that plaintiff suffered an episode that is the result of his medication's side-effects, coupled with the physical stress imposed upon him in having to stand for an incessantly ___ ___

prolonged period of time and an ongoing painful pressure in his chest (Ex. A p. 8 L. 22-25; p. 9 L. 1; & p. 17 L. 23-25; p. 18 L. 1-12). The condition of his health at that particular moment caused him to fall to the floor unconscious. This is what plaintiff asserts, had warranted Miss Pollion's attention on July 27th, 2010 (Ex. B, July 27th medical records).

The claim of deliberate indifference to Mr. Rice's serious medical need had arisen out of this first fainting episode. More to the point, he contends that had Miss Pollion taken all of the information, that was available to her, into consideration, rather than simply perform a cursory examination and improperly tending to his needs, any potential future harm could have been prevented. The injury sustained to Mr. Rice, consisting of the second fainting episode on the same day, would never have occurred.

Careful consideration of Mr. Rice's current state at the time, combined with an understanding of his complaints that he was experiencing chest pains and "light-headedness" caused by his medication, would have compelled any reasonable person to treat for those symptoms. (Ex. A p. 26 L. 11-25; p. 27 L. 1-25; p. 28 L. 1-25; p. 29 L. 1-24) Instead, Miss Pollion treats for heat-exhaustion while having no rational basis for such a presumption. If she would have acknowledged that his medication had caused these complications (Ex. A p. 24 L. 3-25; p. 25 L. 1-25; p. 26 L. 1-10), she could have easily arrived at the conclusion that, if he were to return to his cell (dismissing him as she did)(Ex. A p. 29 L. 9-14) his condition would only be exacerbated (Ex. A p. 30 L. 7-14).

To prevent this it is Miss Pollion's duty to take necessary precautions (utilizing all of the information available to her) to ensure that Mr. Rice had received adequate treatment. Such treatment that she had a professional obligation to perform. She made the conscious decision to ignore his complaints that the side-effects of his psychotropic medication (please see medical record dated July 7th, 2010), coupled with painful pressure in his chest, made his condition worse. Obstinately, she decided to check his vital signs and then released him to return to the cell house, merely treating him for heat exhaustion, providing very little medical attention. All just to write him off.

The intentional refusal for providing adequate treatment came about when Miss Pollion decided to pursue the least most effective means of care. After concluding he was okay, "because that's what his vital signs indicated," she refused to delve any deeper into his condition, completely disregarding the symptoms he described (Ex. A p. 26 L. 11-25; p. 27 L. 1-25; p. 28 L. 1-25; p. 29 L. 1-24).

This could not be considered adequate medical treatment when she barely did anything. In making the conscious decision to ignore Mr. Rice and then doing so little, only to make it appear as if he is being treated, essentially implies she did nothing.

Then, only to make matters worse, he passed out again as a direct result of Miss Pollion knowingly subjecting him to the same set of conditions that caused the incident in the first place (Ex. A p. 30 L. 24-25; p. 31 L. 1-2). Doing absolutely nothing to alleviate his suffering

Whereby, Mr. Rice had been injured in that he was made to suffer all over again. Only this time he was in even worse condition, to such an extent he was kept in observation for over two days. The treatment he received the second time is exactly what Miss Pollion should have done immediately, perhaps an EKG, or other medical tests, could have foreseen this from happening to him (Ex. A p. 31 L. 3-25; p. 32 L. 1-23). Not to mention, she should have checked his medications and made notes for a reccomendation to have it adjusted (Ex. A p. 24 L. 3-25; p. 25 L. 1-25; p. 26 L. 1-10).

From July 27th, 2010, at approximately 4:00 pm, through July 30th and from August 5th, 2010 through August 6th, the medical staff duly note possible heart problems and likely complications from his medication (please cross-reference the above dates to the appropriately corresponding medical records in Exhibit B). The same information was available to Miss Pollion, the difference in treatment is not professional judgment, it is the difference between Deliberate Indifference and Adequate Medical Treatment. These necessary precautions would have prevented Mr. Rice from forceably experiencing any further suffering. You see, not only did Miss Pollion refuse to adequately treat him, he had also been forced to suffer as a result. Also, as a side note, if she presumed him to be suffering from heat exhaustion, would it not have been more reasonable to let him recooperate for the night in the infirmary where it is air-conditioned, instead of returning him back to his cell, where it is known that the temperature exceeds that of the outdoors?, notwithstanding of course, that he did not suffer from Heat Exhaustion (Ex. A p.17 L.21-22; p. 22 L. 12-14).

## STANDARD OF REVIEW

Adopting the following as the standard for an Eighth Amendment Inadequate Care claim as set forth, by the Honorable Magistrate Judge Frazier, in Heard v. Wexford, 2011 WL 4475168 (S.D. Ill.):

Roe v. Elyea, 631 F.3d 843 (7th Cir. 2011) "succinctly summarizes the applicable law of this Circuit with regard to Eighth Amendment claims for inadequate medical care as applied to prison medical professionals.

"The Eighth Amendment's prohibition against the cruel and unusual punishment, which embodies 'broad and idealistic concepts of dignity, civilized standards, humanity and decency,' prohibits punishments which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society.' Estelle [v. Gamble], 429 U.S. [97,] 102, [97 S.Ct. 285, 50 L.Ed.2d 251 (1976).] (quotation marks omitted). It thus requires that the government provide 'medical care for those whom it is punishing by incarceration, Id. at 103 [97 S.Ct. 285]. The Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.' Id. Accordingly, 'deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution. Id. at 104 [97 S.Ct. 285].

"Rodriguez v. Plymouth Ambulance Service, 577 F.3d 816, 828 (7th Cir. 2009) (parallel citations omitted).

"A successful deliberate indifference claim is comprised of both an objective and a subjective element. Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). First, an inmate must demonstrate

that, objectively, the deprivation he suffered was 'sufficiently serious; that is, it must result in the denial of the minimal civilized measure of life's necessities.' Walker v. Benjamin, 293 F.3d 1030, 1037 (7th Cir. 2002). In the medical care context, this objective element is satisfied when an inmate demonstrates that his medical need itself was sufficiently serious. Gutierrez v. Peters, 111 F.3d 1364, 1369 (7th Cir. 1997). A medical need is considered sufficiently serious if the inmate's condition 'has been diagnosed by a physician as mandating treatment or ... is so obvious that even a lay person would perceive the need for a doctor's attention.' Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005) Notably, '[a] medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated.' Gayton v. McCoy, 593 F.3d 610, 620 (7th Cir. 2010). Second, an inmate must establish that prison officials acted with a '"sufficiently culpable state of mind"' to support liability under § 1983. Greeno, 414 F.3d at 653 (quoting Farmer, 511 U.S. at 834, 114 S.Ct. 1970, 128 L.Ed.2d 811). Although negligence or inadvertence will not support a deliberate indifference claim, an inmate need not establish that prison officials actually intended harm to befall him from the failure to provide adequate care. Walker, 293 F.3d at 1037. '[I]t is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk.' Greeno, 414 F.3d at 653.

"Applying the above to prison medical professionals, we have stated that [a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances.' Sain v. Wood, 512 F.3d 886, 894-95 (7th Cir. 2008) (internal quotations omitted). 'A medical professional

acting in his professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." Id. (Internal quotations omitted). The burden is high on a plaintiff making such a claim: "Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts." Duckworth v. Ahmad, 532 F.3d 675, 679 (7th Cir. 2008). However, a successful plaintiff need not "show that he was literally ignored" in his demands for medical treatment, and a defendant's showing that a plaintiff received "some" treatment does not resolve the issue conclusively if the treatment was "blatantly inappropriate." Greeno, 414 F.3d at 653-54 (emphasis in original) (internal quotation marks omitted). Finally, the Eighth Amendment "protects [an inmate] not only from deliberate indifference to his or her current serious health problems, but also from deliberate indifference to conditions posing an unreasonable risk of serious damage to future health." Board v. Farnham, 394 F.3d 469, 479 (7th Cir. 2005) (emphasis in original)."

    Roe, 631 F.3d at 856-58


      To establish an eighth amendment violation for the instant cause, this court only needs to rely on plaintiff's sworn statement, the response motion and this memorandum with attached exhibits for evidentiary support. See also, Kelley v. McGinnis, 899 F.2d 612, 616-17 (7th Cir. 1990) (per curiam) (prisoner could prevail on an eighth amendment claim with evidence that defendant "gave him a certain kind of treatment knowing that it was

ineffective.")

To satisfy the requirements for dismissal of summary judgment a reviewing court must determine issues of law regarding whether a genuine issue of material fact exists as to each element of the claims the nonmoving party has raised. A genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505 (1986). The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. Anderson, 477 U.S. at 255.

## ARGUMENT

A). A.R. N.P. Pollion had been deliberately indifferent to Mr. Rice's serious medical needs.

Summary Judgment should not be granted for the defendant. She has not submitted an adequate factual case, there are however sufficient facts before this court to show that there is a genuine factual issue as to each point on which plaintiff bears the burden of proof. Since the defendant has not submitted an evidentiary basis for summary judgment, and with the factual presentation shown by the plaintiff being sufficient to meet the requirements of the nonmoving party, he respectfully requests that the defendant's motion be denied.

The problem we face here is that Miss Pollion simply refused to make any effort to prevent from going beyond such minimal steps. Adequate medical treatment would have aligned precisely with the level of care and attention afforded between July 27th, 2010 through July 30th and August 5th, 2010 to August 6th (please refer to Ex. B medical records, and see Ex. A p. 31 L. 3-25; p. 32 L. 1-23 for the second episode, and see also p. 32 L. 24-25; p. 33 L. 1-9 for the third episode). The treatment provided by Dr. Fahim actually proved useful and is the level of treatment that the defendant should have provided (Ex. A p. 26 L. 5-25). Also, thanks to Nurse Schott's attention, she made the reasonable decision to address the issue with Mr. Rice's medication (please refer to Ex. B medical records from August 5th, 2010 and August 6th, as well as Ex. A p. 24 L. 3-25; p. 25 L. 1-25; p. 26 L. 1-10), the same medication that was the culprit, combined with his heart problems, that were the instigators of the first fainting episode.

The record is clear that Mr. Rice verbally indicated that the medication has been causing him trouble (Ex. A p. 20 L. 22-25; p. 21 L. 1-25), he told "Orange Crush" about his condition first. Then, he explained it to Miss Pollion (see Affidavit), who ignored him, only to tell the Sergeant at the H.C.V.'s front desk (Ex. A p. 29 L. 4-14) when Pollion dismissed him. Plaintiff believes that the treatment she should have provided would require more extensive attention (Ex. A p. 33 L. 23-25; p. 34 L. 1-25).

The medical records, "psychiatric note", on July 7th, 2010 indicates "o/c Haldol, Prazosin," there appears to be a connection

with the Haldol combined with the Prazosin that had the serious affect on Mr. Rice. It was only after this that the fainting episodes began. Then, on August 4th, 2010, the Haldol had been completely removed from his prescription. He had some minor difficulty after that on August 5th, 2010, however everything became better when he was completely taken off of the Prazosin. There is an exception to infrequent chest pains and headaches (Ex. A p. 33 L. 23-25; p. 34 L. 1-25). Regardless, Miss Pollion could have easily acknowledged Mr. Rice's complaints, reviewed the July 7th, 2010, Psychiatric Notes and noticed what the medications are and looked into their side-effects. There does seem to be a correlation to heart problems and the side-effects from these medications.

Of course, "hindsight is 20/20," though that is beside the point. A.R.N.P. Pollion is an experienced, qualified and educated health care professional. It is absurd to think she does not have enough good sense to look into these things while considering what to treat Mr. Rice for, and how to treat him in general.

After looking through the record (i.e. the deposition, medical records and plaintiff's affidavit) it appears to be a ludicrous assumption to believe that someone, with the knowledge and experience of A.R.N.P. Pollion, would have actually done so little when presented with a patient in Mr. Rice's condition.

There should be no great difficulty in arriving at the conclusion that a reasonable jury could find Miss Pollion guilty of being deliberatel-

indifferent to plaintiff's serious medical needs.

   B). The defendant is not entitled to Qualified Immunity.

   The defendant's conduct has violated Mr. Rice's eighth amendment right which removes any protection from liability. Throughout the response and this memorandum Mr. Rice goes to great length exposing the injustice and moral wrong done to him. He does not stop there though, using only the relevant information and referencing the record, he reveals that in truth his rights have been violated. That says alot when considering Mr. Rice never conducted discovery. In sum, he has been deprived of adequate medical care that amounts to the denial of a basic human need, and then he was subjected to a second fainting episode on the same day, which could have been avoided had she treated him properly the first time.

   WHEREFORE, for the foregoing reasons and with the record for support having been taken into consideration, Mr. Rice respectfully requests that this Honorable Court deny the defendant any relief on their motion and allow plaintiff to proceed to a jury trial.

                              Respectfully submitted,

                              B.Lewis Rice

                              Lewis Rice

DECLARATION UNDER PENALTY OF PERJURY

I, Lewis Rice, the plaintiff pro se, do hereby declare under the penalty for perjury, pursuant to 28 U.S.C. §1746, that the information contain herein this document is true and accurate to the best of my knowledge, understanding and belief.

B/ Lewis Rice

Lewis Rice

# Exhibit 9

STATE OF ILLINOIS )
                  ) No. 12-cv-847
COUNTY OF RANDOLPH )

## A F F I D A V I T

I, Lewis Rice being first duly sworn upon my oath depose and state that the following matters are both true and correct, made upon personal knowledge and belief, and if called as a witness, I am competent to testify.

1). The affiant herein is the plaintiff pursuing the claim of an 8th Amendment violation against R. Pollion, having filed a Civil Rights Complaint in accordance with 42 U.S.C. § 1983, this affidavit is in support of the attached Response to Defendant's Motion for Summary Judgment.

2). In the hours preceeding noon, on July 27th, 2010, Mr. Rice had been rushed off to the chapel for a tactical "shake-down" of his cell. On the way and while in the chapel, he explained to the "Orange Crush" tactical team members that he felt ill, informing them of his severe chest pains and light headedness. After ignoring his complaint and after approximately two hours has passed, he passed out and had been brought to Menard's H.C.U. while unconscious.

3). Inside of the infirmary, Mr. Rice came to his senses, regaining consciousness he explained to Miss Pollion (as she checked his vital signs, never referencing his medical records) that his chest hurt and

Exhibit A-1

Case: 1:10-cv-04603 Document #: 491 Filed: 07/26/16 Page 102 of 162 PageID #:8890
Case 3:12-cv-00847-SMY-PMF   Document 60   Filed 11/06/14   Page 5 of 5   Page ID #457
Case 3:12-cv-00847-JPG-PMF

that his medications has been making him dizzy. She too ignored him and told him he has heat exhaustion, even though Mr. Rice told her he has not experienced any problems from the heat, and gave him some water and tylenol. After writing him off he explained to Sergeant Payne and the front desk of the H.C.U. that he still felt dizzy and had alot of pressure in his chest, expressing disconcern, Mr. Rice then told Officer Tindol (the officer escorting plaintiff back to his cell) and he said he didn't care, he just wants to go home.

  4) So, returning to his cell before the 3:00 pm shift change, soon after he fainted again for the second time. Once again being rushed to the H.C.U., only this time he received the kind of treatment that he contends Miss Pollion should have provided. Since Mr. Rice believes that if Miss Pollion would have adequately treated him, instead of being deliberately indifferent to his serious medical needs, it is his contention that he was injured as a result, that the second fainting episode could have been avoided. Mr. Rice believes that Miss Pollion never addressed any of his immediate and serious medical concerns.

  Affiant Further Sayeth Naught

  Pursuant to 28 U.S.C. §1746, I declare, under the penalty for perjury, that every thing contained herein is true and accurate to the best of my knowledge and belief; I do also declare and affirm that the matter at hand is not taken either frivously or maliciously and that I believe the foregoing matter is taken in good faith, completely in compliance with Rule 56, Fed. R. Civ. Proc..

  Signed on this 9th day of February, 2013.   ʁ/: Lewis Rice

              Lewis Rice

Exhibit A-2

# Exhibit 10

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
 2                   EASTERN DIVISION
 3
    DON LIPPERT, LEWIS RICE,      )
 4  MILAM MARTIN, DEBRA           )
    PATTISON, JOHN RUFFIN and     )
 5  EZELL THOMAS,                 )
                                  )
 6              Plaintiffs,       )
                                  )
 7  vs.                          ) No. 10-CV-4603
                                  )
 8  JOHN BALDWIN, LOUIS           )
    SHICKER, and BRUCE RAUNER,    )
 9                                )
                Defendants.       )
10
11
12
13
                DEPOSITION OF MILAM MARTIN
14            Taken January 19, 2016
15
16
17
18
19
20
21
22
23      Reporter:  Beverly S. Hopkins, RPR
24    IL CSR No. 084-004316, MO C.C.R. No. 968
```

**Page 2**

```
 1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
 2                   EASTERN DIVISION
 3
    DON LIPPERT, LEWIS RICE,      )
 4  MILAM MARTIN, DEBRA           )
    PATTISON, JOHN RUFFIN and     )
 5  EZELL THOMAS,                 )
                                  )
 6              Plaintiffs,       )
                                  )
 7  vs.                          ) No. 10-CV-4603
                                  )
 8  JOHN BALDWIN, LOUIS           )
    SHICKER, and BRUCE RAUNER,    )
 9                                )
                Defendants.       )
10
11  APPEARANCES:
12  For Plaintiffs:
    By Camille E. Bennett, Esq.
13  Roger Baldwin Foundation of ACLU, Inc.
    180 North Michigan Avenue
14  Suite 2300
    Chicago, IL  60601
15
    For State of Illinois:
16  By Sarah Newman, Esq.
    Attorney General's Office
17  100 West Randolph
    JRTC Suite 13
18  Chicago, IL  60601
19  For Wexford Health Services:
    By Andrew M. Ramage, Esq.
20  Brown, Hay & Stephens, LLP
    205 S. Fifth Street
21  Suite 700
    Springfield, Il  62705
22
23
24
```

**Page 3**

```
 1              INTERROGATION INDEX
                                        Page
 2
    Direct Examination by Ms. Newman     5
 3
 4              EXHIBITS
 5  Defendant's
    1    Medical records             52
 6  2    X-ray reports,              56
    3    Fourth Amended Complaint   143
 7
 8  (All exhibits were original documents and
    therefore attached to the transcript.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1         IT IS STIPULATED AND AGREED by and
 2  between counsel for plaintiffs and counsel for
 3  defendants that the deposition of MILAM MARTIN
 4  may be taken pursuant to and in accordance with
 5  the Federal Rules of Civil Procedure, by and on
 6  behalf of the defendant, on January 19, 2016, at
 7  Big Muddy Correctional Center, 251 North Illinois
 8  Highway 37, Ina, Illinois, before Beverly S.
 9  Hopkins, a Certified Shorthand Reporter and
10  Registered Professional Reporter; that the
11  issuance of notice is waived, and that this
12  deposition may be taken with the same force and
13  effect as if all Federal Rules had been complied
14  with.
15         IT IS FURTHER STIPULATED AND AGREED
16  that any and all objections to all or any part of
17  this deposition are hereby reserved and may be
18  raised at the trial of this cause; and that the
19  signature of the deponent is reserved.
20         (The deposition began at 9:52 a.m. and
21         finished at 2:50 a.m.)
22      MILAM MARTIN, produced, sworn, and examined
23  as a witness on behalf of the defendant,
24  testified and deposed as follows:
```



Page 37

1    Q.   So, okay.  All right.  All right.  Why
2  don't we go off the record a second.
3        (A discussion was held off the
4        record.)
5    Q.   Back on.  So, Mr. Martin, I understand
6  one of the issues that you are complaining about
7  in this case is -- relates to a -- to your fall
8  from your wheelchair in 2011?
9    A.   Yes.
10   Q.   And I'd like to back up.  I know that
11  you -- how did you -- how did you end up in a
12  wheelchair?
13   A.   I got stabbed in the back.  I think I
14  said that before.
15   Q.   You did.  I just wanted to -- and when
16  was that that you were stabbed?
17   A.   '86.
18   Q.   And I believe you said there were --
19  that Clifford Thomas and 13 other people --
20   A.   Yes.
21   Q.   -- stabbed you?
22   A.   Yes, yes, yes.
23   Q.   So were you -- how many times were you
24  stabbed?

Page 38

1    A.   Oh, so many.  You can't even stop
2  counting.  In the neck, in the back, the lower
3  back, in the back back.
4    Q.   Literally.  And originally you --
5  originally you were a quadriplegic because of
6  that, you had -- you weren't able to move below
7  the neck?
8    A.   Yes.
9    Q.   But you've -- your condition has
10  improved somewhat since that time, is that right?
11   A.   Yes, I imagine so.  Yes.
12   Q.   Well, I mean, you're able to -- you're
13  able to move -- move --
14   A.   I'm able to stand.
15   Q.   You're able to stand?
16   A.   I'm able to walk.  They said I would
17  never do that again.  They said you would never
18  walk.  You would never talk.  But, you know, God
19  is great and he regulates all things.
20   Q.   So you're able to walk with some --
21  with -- do you need some --
22   A.   I walk with a cane.  I walk behind a
23  chair.  And I can walk, you know, periodically.
24  You know, it depends on what day it is and how my

Page 39

1  body is functioning.
2    Q.   All right.  But you still need the
3  wheelchair for most of the time?
4    A.   Yes, I use the wheelchair most of the
5  time, especially since they don't accommodate you
6  with much -- much here.  They don't accommodate
7  you with much.
8    Q.   How long did it take before you
9  recovered some of your ability to walk?
10   A.   A long time.
11   Q.   Okay.  About when were you able to --
12  about what year was it that you were finally able
13  to walk some?
14   A.   I probably was hobbling along a bit in
15  the early '90s, maybe '91 or '90, something like
16  that, trying in '89.  Doing a little better in
17  '90.
18   Q.   All right.  So -- all right.  So going
19  back to 2011, you -- you were injured in a fall
20  from your wheelchair, is that right?
21   A.   Yes.
22   Q.   All right.  What happened?
23   A.   That particular day?
24   Q.   Yes.

Page 40

1    A.   Well, I was traveling to -- I had a
2  hospital call.  And I was in a dilapidated
3  wheelchair because the maintenance put a false
4  back on it from a chair that was wider than the
5  one that I was in.  And I told them several times
6  that I was slipping out of the back of it here
7  because the gap had -- was so big that I was
8  slipping out to shift my weight more backwards
9  than should have been.  And I complained to them
10  about it over and over.
11       In fact, I explained to them that the
12  reason that they have professional wheelchair
13  people that ordinarily does maintenance on
14  wheelchairs is because they're professionals and
15  they know that these wheelchairs have to be
16  maintenanced in a certain way.  But to save
17  money, they took the chair over to maintenance
18  over here and they allowed them to go and take a
19  big wheelchair and put -- this is the back of it.
20  Took the back off the big wheelchair and put it
21  on that small wheelchair that I had, which is the
22  reason why there was a gap in the back like it
23  was, so I explained that to them over and over
24  and over and over again.


ESQUIRE
SOLUTIONS

Page 41

1        And when they finally got a wheelchair
2 for me to accommodate my circumstances, while I
3 was en route, let's see where we at. Yeah, en
4 route, to the death care is right behind you
5 here. So when I was en route, certainly the
6 chair flipped right here through administration
7 building, right here. And the Major, Ms. Sharum,
8 her name is Ms. Sharum, she and others came to my
9 aid. They had to pick me up off the ground, put
10 me back in the defaulted wheelchair and take me
11 into health care.
12     Q. Okay. When you say you -- I want to
13 back up a second. You said you had asked -- you
14 had asked them for -- told them over and over
15 that you needed a new wheelchair or it needed
16 repaired --
17     A. That the wheelchair I was in was
18 faulty and dangerous.
19     Q. Who did you talk to?
20     A. Nurses, the hospital, Dr. Larson. And
21 he said there's a chair that's been ordered for
22 you. In the meantime in between time I'm
23 traveling faulty, but they do that often here.
24 That's not just me.

Page 42

1     Q. How long did you have -- how long did
2 you have the wheelchair and it was defective?
3     A. Quite a time. I can't remember how
4 long, but it was quite some time. Long enough
5 for me to injure myself for certain. I shouldn't
6 have it a day. That's just something that
7 shouldn't have happened. They should have gave
8 me a loaner immediately. And if they didn't have
9 a loaner one, that they should have placed me in
10 death care until such time that they could have
11 gotten me a chair and then that way I wouldn't
12 have been traveling in a wheelchair that would
13 subject me to injury. And they know that.
14 They're health care professionals.
15     Q. You say should have placed you in
16 death care?
17     A. Yeah.
18     Q. What's that?
19     A. Okay, I'm sorry. I thought you knew.
20 Health care.
21     Q. Oh, health care? I misheard you.
22     A. No, you didn't. You heard exactly
23 what I said. I said death care --
24     Q. Okay.

Page 43

1     A. -- because that's what we refer to it
2 as here. We refer to as death care. And we do
3 that for a reason.
4     Q. And what's that reason?
5     A. Because people die back there every
6 day it seems like. And then the care that they
7 give you is care that would cause you to die,
8 meaning, they don't really give you no care most
9 of the time. They put you in a stressful
10 environment. You get sick here, they lock you up
11 and make you sicker. You get punished for
12 getting sick here.
13     Q. Okay. All right. So you were -- what
14 day was it -- do you know what day was it that
15 you fell out of the wheelchair?
16     A. I know it was -- I believe I just
17 looked at those notes too. 2011.
18     Q. Do you remember what month it was?
19     A. I know it was in October, something
20 like that. I'm not certain. It's in the record
21 though.
22     Q. Right. Was it towards the beginning
23 of the month, the end of the month?
24     A. No. No, it might have been in the

Page 44

1 middle of the month. But it's in the record, the
2 exact date.
3     Q. Mr. Martin, I realize that there's a
4 lot of things like that that are in the record.
5 And we'll probably take -- we'll take a look at
6 those medical records, but I also want to know
7 what you remember. That's part of what a
8 deposition is.
9     A. I understand.
10     Q. So, you know, when I ask you when a
11 date is, I mean, you know that's why I asked --
12     A. All right.
13     Q. -- to be able to see what you
14 remember.
15     A. I just want to be certain.
16     Q. Right. I understand.
17     A. I don't want to say anything that is
18 contrary to the actual date and then you hold it
19 against me.
20        MS. BENNETT: I'm just going to object
21 to the extent that you're telling the witness how
22 to answer the question.
23 BY MS. NEWMAN:
24     Q. Let's see here. So you said you fell



Page 45

1    out of the wheelchair and I believe you said the
2    major and some some other people took you --
3        A.   Major, inmates too and helped me back
4    into the chair and took me over to the -- over
5    there.
6        Q.   All right.  And what happened when you
7    got to the health care unit?
8        A.   I sat there for a while at the door.
9    I just sat there by the door.  And then they
10   brought me back over there and told me that they
11   had finally got another chair for me.  But I was
12   injured and I explained that I was injured.  And
13   to my recollection they had attempted to give me
14   an x-ray.
15       Q.   And so did they -- did they take an
16   x-ray?
17       A.   I think I sat in the chair because I
18   couldn't stand because my knees hurt sometimes.
19   And they give me an x-ray.  I believe what they
20   said was they couldn't make a determination
21   because of it.  So at some point they finally
22   sent me out for what is known as a CAT scan over
23   there in Mt. Vernon where they discovered my ribs
24   had been broken.

Page 46

1        Q.   Were you having pain in your chest?
2        A.   Excruciating.  I still have pain in my
3    knees, back.
4        Q.   You still have pain in your chest?
5        A.   I don't have pain as far as the ribs
6    are concerned anymore, but I have pain in the
7    ribs for quite some time.  I couldn't even take
8    deep breaths without feeling pain.  In fact, they
9    were over the unit calling me the king of pain.
10   That's how much pain that I was -- have endured
11   and continue to endure.
12       Q.   Who -- who gave you that name?
13       A.   Some of the inmates, you know.  You
14   know how they do.  You know how people are.
15   Human nature.
16       Q.   So how long -- about how long did you
17   have pain in your ribs?
18       A.   Oh, for a long time, a long time.  At
19   least -- at least eight to nine weeks before it
20   started subsiding a little and all that.  And, of
21   course, I was OD'ing on Motrin because it was not
22   good for your liver.  But it was that or not
23   getting no rest sometimes.
24       Q.   So were you -- were you kept in the

Page 47

1    infirmary during --
2        A.   No.
3        Q.   -- this time?
4        A.   No.
5        Q.   Did you want to be kept in the
6    infirmary?
7        A.   Well, I say again, that's death care,
8    so -- so I would say no.  Absolutely, positively
9    not.  Because to be kept in the infirmary means
10   they lock you behind a door, 24 hours more than
11   likely.
12       Q.   Was there some -- was there a
13   treatment for the -- treatment for the -- your
14   broken ribs?
15       A.   They gave me no treatment at all.
16       Q.   Well, was there some treatment -- what
17   treatment do you think you should have been given
18   for the -- for your broken ribs?
19       A.   I'm not a doctor.  But I tell you this
20   much.  They could have treated me with more
21   empathy than they did because there's braces for
22   that type of injury, that much I know.  There's
23   various different type of medications, you know.
24   They could have gave me a -- put me in a -- gave

Page 48

1    me a soft mattress where it gives as opposed to
2    laying on the steel.  None of those factors were
3    implemented.
4        Q.   All right.  And you said you also had
5    pain in your knee?
6        A.   Still got pain in my knee.  You know,
7    that feels better.  We talked about it.  It feels
8    --
9            COURT REPORTER:  I'm sorry, I can't
10   hear you.  I didn't hear what you said.
11       A.   Don't worry about that.  I'm talking
12   to myself now.  That's off the record.  I'm just
13   talking to myself now.
14   BY MS. NEWMAN:
15       Q.   And did you receive any -- any
16   treatment for your knee during -- after you were
17   injured?
18       A.   No.
19       Q.   Have you received any treatment since
20   then for your knee?
21       A.   No.  They didn't even CAT scan it.
22   They didn't x-ray it.  They didn't do anything.
23   They should of.  There's something wrong with it.
24   There might be a municipal [sic] tear or



# Exhibit 11
# (Under Seal)

# Exhibit 12
# (Under Seal)

# Exhibit 13
# (Under Seal)

# Exhibit 14
# (Under Seal)

# Exhibit 15
# (Under Seal)

# Exhibit 16

Page 1

```
 1            UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
 2                 EASTERN DIVISION

 3
   DON LIPPERT, LEWIS RICE, MILAM    )
 4 MARTIN, DEBRA PATTISON, JOHN      )
   RUFFIN and EZELL THOMAS,          )
 5                                   )
                     Plaintiffs,     )
 6                                   )
   vs.                               ) No. 10-CV-4603
 7                                   )
   JOHN BALDWIN, LOUIS SHICKER, and  )
 8 BRUCE RAUNER,                     )
                                     )
 9                   Defendants.     )
10
11      THE DEPOSITION of DEBRA PATTISON, the
12 Plaintiff herein, called by the Defendant for
13 examination in the above-entitled cause, pursuant to
14 the Federal Rules of Civil Procedure, taken before me,
15 Brenda L. Zeitler, CSR-RPR, License No. 084-004062, at
16 Logan Correctional Center, 1096 1350th Street, in the
17 City of Lincoln, County of Logan, and State of
18 Illinois on the 5th day of February, 2016, commencing
19 at 10:15 a.m.
20
21
22
23
24
```

Page 2

```
 1 APPEARANCES:
 2
        ACLU, Roger Baldwin Foundation of ACLU
 3      BY:  LINDSAY S. MILLER, ESQ.
        and  CAMILLE E. BENNETT, ESQ.
 4      Attorneys at Law
        180 North Michigan Avenue
 5      Suite 2300
        Chicago, Illinois  60601-1287
 6      (312) 201-9740
        lmiller@aclu-il.org
 7      cbennett@aclu-il.org
             On Behalf of the Plaintiffs.
 8
        OFFICE OF THE ATTORNEY GENERAL
 9      SARAH H. NEWMAN, ESQ.
        Assistant Attorney General
10      General Law Bureau
        100 West Randolph Street
11      Chicago, Illinois  60601
        (312) 814-6131
12      snewman@at.state.il.us
             On Behalf of John Baldwin, Louis
13           Shicker, and Bruce Rauner.
        BROWN, HAY & STEPHENS, LLP
14      BY:  DAVID P. HENNESSY ESQ.
15      Attorney at Law
        205 South Fifth Street, Suite 700
16      P.O. Box 2459
        Springfield, Illinois  62705
17      (217) 544-8491
        dhennessy@bhslaw.com
18           On Behalf of Wexford Health Sources.
19
20
21
22
23
24
```

Page 3

```
 1                  I N D E X
 2
   WITNESS:
 3                                          Page
   DEBRA PATTISON
 4      Examination by Ms. Newman .............   4
 5
 6 EXHIBITS:
 7      DEPOSITION EXHIBIT NUMBER 1 ...............  69
            Fourth Amended Complaint
 8
   NOTE:  EXHIBIT IS DESIGNATED AS CONFIDENTIAL AS WELL
 9         AS THE ENTIRE TRANSCRIPT!
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1
 2
 3              (Witness sworn.)
 4              DEBRA PATTISON,
 5 a Plaintiff herein, called by the Defendants, after
 6 having been first duly sworn to tell the truth, was
 7 examined upon her oath and testified as follows:
 8              EXAMINATION
 9           BY MS. NEWMAN:
10    Q.  Good morning.  Can you please give your full
11 name for the record?
12    A.  It's Debra Sue Pattison.
13    Q.  And your IDOT number?
14    A.  B22217.
15       MS. NEWMAN:  Ms. Pattison, have you ever
16 given a deposition before?
17    THE WITNESS:  No, ma'am.
18       MS. NEWMAN:  Okay.  So I'll spend a few
19 minutes just explaining things and going over how it
20 works so that there's no confusion.
21       You understand that there is a court
22 reporter here, and she's going to write down
23 everything that is said today.  I'm going to ask you
24 some questions, and you'll answer.  That's so we'll
```



Page 9

1    A.  Yes, ma'am.
2    Q.  Have you filed any other lawsuits against
3  either the State or IDOT?
4    A.  No, ma'am.
5    Q.  I apologize.  I meant to ask you this
6  earlier as part of our preliminaries.  Is there any
7  reason that you -- any reason you might not be able to
8  give any complete or accurate testimony today?
9    A.  No.
10    Q.  So you're not on any medications that could
11  affect your memory or your ability to testify?
12    A.  No.
13    Q.  Ms. Pattison, you first injured your knee in
14  1979; is that right?
15    A.  Yes.
16    Q.  What happened in 1979?
17    A.  I disobeyed my dad.  My sister and I raced
18  down a hill, and I sprung my knee.
19    Q.  Did you need treatment at that time?
20    A.  Yeah.  I was on crutches, told not to put
21  any weight on it.  Then in October of '79, I had
22  arthroscopic surgery where they went in and repaired
23  the cartilage.  I was told that the ACL was torn, but
24  they didn't want to do the actual surgery that it

Page 10

1  needed.
2    Q.  So they didn't actually repair the ACL at
3  that time?
4    A.  No, ma'am.
5    Q.  Did you have any other surgeries after that?
6    A.  I've had three other surgeries.  The last
7  one I had was November 1, 2001, where they went in and
8  cut some tendons, some muscles, and put the knee back
9  in place.
10    Am I going too fast?
11    Q.  You're fine.  If you're going too fast for
12  the court reporter, she'll let us know.  She's pretty
13  quick.
14    All right.  So you had one surgery in 1979,
15  and then you had a surgery in November 2001.  You said
16  you had --
17    A.  A couple others where they went in and
18  repaired the cartilage.  I don't remember when those
19  were.
20    Q.  Okay.  So sometime between 1979 and 2001 you
21  had two other surgeries?
22    A.  Yeah.  Yes, ma'am.
23    Q.  Can you tell me again what they did in 2001?
24    A.  They had to put my knee back in place; so

Page 11

1  they went in arthroscopically, cut a couple tendons
2  and muscles, and put it back in place.
3    Q.  Where was that surgery?
4    A.  Mt. Vernon, Illinois, Good Samaritan
5  Hospital, with Dr. Houle.
6    Q.  Was that surgery successful?
7    A.  Yeah, until I went to stand up in 2012 over
8  in Lincoln, when I felt some things tear in the knee.
9    Q.  So after your surgery in 2001, you didn't
10  have any further problems with your knee?
11    A.  I did.  I had swelling, but they didn't do
12  the surgery I needed.  They didn't repair the ACL at
13  all.  They wanted to try this procedure they did to
14  see if it would help it.
15    Q.  So the ACL -- did you ever have your ACL
16  repaired?
17    A.  No, ma'am.
18    Q.  So your ACL has been torn since 1979?
19    A.  Yes, ma'am.
20    Q.  Why did Dr. Houle not repair the ACL in
21  2001?
22    A.  He thought maybe if he could put the knee
23  back in place, that it would last for a while.  He
24  thought it would last for about ten years doing it

Page 12

1  that way.
2    Q.  And was there some reason that he couldn't
3  repair the ACL at the same time?
4    A.  No.  That's what I don't understand.  My
5  initial surgeon didn't want to do it because I was
6  still in school and active.  I played softball.  He
7  just didn't want to do it.  At that time, they weren't
8  doing them on females.
9    Q.  So after the surgery in 2001, you had some
10  swelling?
11    A.  I had a lot of swelling.  I was on crutches
12  for a month.
13    Q.  But did you continue to have swelling and
14  pain afterwards?
15    A.  Yes, ma'am, I did.
16    Q.  Did those symptoms ever improve?
17    A.  No.  They just kept getting worse.  I've
18  been very cautious with my leg, but I still worked.
19    Q.  Before you were incarcerated in 2005, when
20  was the last time you saw an orthopedist about your
21  knee?
22    A.  2004.
23    Q.  What doctor did you see at that time?
24    A.  Houle, Dr. Houle, in Mt. Vernon.



Page 13

1    Q.   I mean, why did you go see Dr. Houle at that
2  time?
3    A.   Follow-up from the surgery.  I was seeing
4  him every six months as a follow-up.
5    Q.   And were you having problems with your knee
6  at that time?
7    A.   Some.
8    Q.   What problems were you having?
9    A.   It popping out a lot.
10    Q.   What do you mean by "popping out"?
11    A.   My knee would pop, and it would -- like it
12  was dislocating.
13    Q.   The knee joint itself?
14    A.   Yeah.  Yes.
15    Q.   I just want to make sure if you're talking
16  about the knee joint or the kneecap.
17    A.   The knee joint.  And my husband at the time
18  would have to put my leg back in place.
19    Q.   So you saw Dr. Houle.  What did he say about
20  your knee at that time?
21    A.   Just to stay off of it.  Put ice on it if it
22  swelled.  About all he could do.
23    Q.   And did you tell him that it frequently
24  would pop out of place?

Page 14

1    A.   Yes, I did.
2    Q.   And did he say anything about that issue?
3    A.   No.
4    Q.   Did you have any MRIs done on your knee
5  before you were incarcerated?
6    A.   Yeah.  Sorry.  Yes.
7    Q.   When was the last MRI that you had done on
8  your knee before --
9    A.   I believe it was when I was living in
10  Missouri, in Carthage, Missouri.  Dr. Bryant did it.
11    Q.   Was this before your surgery in 2001?
12    A.   Yes.  He had to do -- he did an MRI on my
13  knee and then also did an MRI on my back, where they
14  found degenerative joint and bone disease, disc
15  disease.
16    Q.   So approximately how long before the 2001
17  surgery did you have the MRI done?
18    A.   '97.
19    Q.   '97?
20    A.   Yes.  I don't remember what month that was
21  in.
22    Q.   And what did that MRI show on your knee?
23    A.   That the ACL was torn.
24    Q.   Did Dr. Bryant recommend any treatment for

Page 15

1  your knee?
2    A.   Not really.  What they were more concerned
3  about was the joint disease and disc disease that I
4  had.  He sent me to a neurologist, and then I had to
5  see the disability doctors.
6    Q.   So after you were incarcerated, you
7  continued to have problems with your knee popping out?
8       MS. MILLER:  Form.
9    Q.   You can answer.
10    A.   Yes.  And they would call Code 3s on me, and
11  the nurse would have to put it back in place.
12    Q.   Sorry, but what does a Code 3 mean?
13    A.   Emergency, medical emergency.
14    Q.   So a nurse would come to you and help you
15  put it back into place?
16    A.   Nurses and officers.  Some of the times they
17  would have an officer help them put it back in place.
18  They just told me to put ice on it and gave me Motrin,
19  and that was all.  I continued to work and go to
20  school.
21    Q.   So from 2005 to 2012, about how often would
22  you say that you had these incidents where your knee
23  popped out?
24    A.   Probably more than ten times.

Page 16

1    Q.   And did you ever during that time try to put
2  in for sick call about your knee problems?
3    A.   The doctor would see me.  Dr. Springer would
4  see me.  They'd just say, "Keep it on ice.  Keep it
5  elevated."
6    Q.   Did you ever see anyone else other than
7  Dr. Springer?
8    A.   No.
9    Q.   So you had a new injury to your knee in
10  2012; is that right?
11    A.   Yes, ma'am.
12    Q.   Approximately when was that?
13    A.   June 17, 2012, around 9:00 p.m. that night.
14    Q.   All right.  And where were you when --
15    A.   I was in Lincoln Correctional Center in the
16  day room getting ready to go to my room.
17    Q.   And so what happened?
18    A.   I stood up and felt like somebody had hit me
19  on the side of my leg, and it put me back down in the
20  chair.  I felt a lot of things tear in my knee.
21    Q.   What did you do then?
22    A.   I went to my room and had the girls go get
23  the officer, and he called a medical emergency, Code
24  3.  I was in so much pain.  I felt like I broke my



Page 17

1  leg, is what it felt like.
2      Q.  Was there anyone else there in the day room
3  with you when you --
4      A.  Yeah.  The whole day room was full.  It was
5  right before they closed it down to get ready for
6  count.
7      Q.  Do you remember anyone specifically who was
8  there?
9      A.  Not offhand.  Sorry.
10     Q.  That's okay.  All right.  So you walked back
11  to your room from the day room?
12     A.  I had some help going back.
13     Q.  Who helped you?
14     A.  Some of my roommates.
15     Q.  And you said you had some of the girls to go
16  and get help for you?
17     A.  Yes.
18     Q.  All right.  And by the girls, you mean your
19  roommates?
20     A.  Yes, ma'am.
21     Q.  Who were your roommates at the time?
22     A.  I had 19 of them.
23     Q.  Okay.  So you don't remember specifically
24  who went to go get help?

Page 18

1      A.  No, I don't.
2      Q.  So some of your roommates went for the
3  guard?
4      A.  Yes, ma'am.
5      Q.  I believe you said the guard called in that
6  you had a Code 3?
7      A.  Yes, ma'am.
8      Q.  All right.  Did someone from the medical
9  staff come to see you?
10     A.  Yes.  And they took me to Health Care, and I
11  stayed in Health Care a day or two.
12     Q.  Who was it that came to you that night?
13     A.  Some nurses, officers, lieutenants.
14     Q.  Do you remember the names of any of them?
15     A.  No.
16     Q.  So they took you to the infirmary?
17     A.  Yes, ma'am.
18     Q.  How long were you in the infirmary?
19     A.  A day or two.
20     Q.  That night, the night of June 7, when they
21  took you to the infirmary, what treatment did they
22  give you at that time?
23     A.  They put a lot of ice on my knee and had me
24  elevate it and gave me some Motrin for pain.  I was

Page 19

1  given crutches and told to stay off the leg.
2      Q.  You were given crutches when you were sent
3  out from the infirmary?
4      A.  Yes.
5      Q.  Did you receive any other treatment while
6  you were in the infirmary?
7      A.  They just kept coming in and checking the
8  swelling in the leg.
9      Q.  Did you see the doctor while you were in the
10  infirmary?
11     A.  Yes.
12     Q.  Who was the doctor at the time?
13     A.  Springer, Michael Springer.
14     Q.  Did the doctor say anything about your knee?
15     A.  He said he would talk to a orthopedic and
16  see what we could do to have something done.  And he
17  was going to talk to Wexford to see if we could get
18  some tests done.
19     Q.  Did he mention what tests he wanted to run?
20     A.  X-ray and MRI.
21     Q.  All right.  So at some point, did you have
22  an MRI?
23     A.  Yes, ma'am.
24     Q.  When did you have the MRI?

Page 20

1      A.  September 3, 2012.
2      Q.  So between June and September, did you see
3  Dr. Springer about your knee?
4      A.  Yes, ma'am.  I was going once a week over
5  there.  He also said that he had talked to Wexford,
6  and Wexford wanted me to go see a physical therapist
7  before we had the MRI.
8          The physical therapist at Abraham Lincoln
9  Memorial Hospital advised me they could not work on my
10  leg due to the injury that I had.  They felt that if
11  they worked on it, it would cause more problems; so we
12  waited until after the MRI was done.
13     Q.  So the physical therapist at --
14     A.  Was in August 2012.
15     Q.  August 2012, you saw a physical therapist,
16  but they --
17     A.  Yes.
18     Q.  But they didn't want to do anything to your
19  leg?
20     A.  No.  No.  She examined it, but it caused me
21  a lot of pain; so she just said, "No, we're not going
22  to do anything more until we get the MRI and see what
23  the surgeon says.
24     Q.  All right.  So you had the MRI in September



Page 21

1  2012. Is that what you said?
2      A. Yes, ma'am.
3      Q. At some point, did somebody talk to you
4  about the results of that MRI?
5      A. Yes. Dr. Springer told me what the results
6  were, and he also gave me a copy of the MRI, which I
7  had until I got moved over here and I had to give it
8  to the doctors.
9      Q. What were the results of that MRI?
10     A. Complete tear of the ACL, partial tear of
11 the PCL, macerated tears of the tibia and fibula
12 ligaments, and there was also a Baker's cyst in the
13 knee.
14     Q. All right. You said Dr. Springer talked to
15 you about these results?
16     A. Yes, ma'am.
17     Q. Approximately when was that?
18     A. Before I went to see the orthopedic surgeon
19 the latter part of September. I was put in health
20 Care in September.
21     Q. What do you mean by "put in Health Care in
22 September"?
23     A. He assigned me -- Dr. Springer assigned me
24 to Health Care. Because I was having to walk over

Page 22

1  there for meals every day, he just decided it would be
2  easier for me to live in Health Care.
3      Q. So starting in September, you were living in
4  the Health Care Unit?
5      A. In the infirmary, yes, ma'am.
6      Q. So when you saw Dr. Springer in late
7  September 2012, what did he say about your MRI
8  results?
9      A. He didn't realize my knee was that bad. I
10 told him that happened, I felt something
11 tear, and I knew I felt something tear. And he said,
12 "Yeah, it's really messed up."
13     Q. Did he talk about what he wanted to do for
14 treatment at that point?
15     A. To see an orthopedic surgeon.
16     Q. And at some point, you did see an orthopedic
17 surgeon; is that right?
18     A. Yes, ma'am, October 4, 2012.
19     Q. Who did you see?
20     A. Dr. Olysav at Abraham Lincoln Memorial
21 Hospital at the Springfield Clinic.
22     Q. So Dr. Olysav had your MRI results?
23     A. No. He had to send to Decatur for a copy of
24 the disk. He had the written one, but he wanted to

Page 23

1  see the actual MRI. I guess Decatur Memorial Hospital
2  Radiology Department made a disk or something and sent
3  it to him.
4      Q. So when you saw him, did he have that disk?
5      A. This was after I'd seen him.
6      Q. Oh, after?
7      A. Yes.
8      Q. What happened during your visit with
9  Dr. Olysav?
10     A. He told me that -- he had me have x-rays.
11 He said my knee is older than what my age is, that it
12 needed a total knee replacement. He wasn't concerned
13 about my weight. He told me that he needed a yes from
14 me, an okay from Wexford, and he could have it done by
15 the end of the month.
16     Q. Did he explain to you why he felt you needed
17 a total knee replacement at that point?
18     A. He told me that it didn't look good and that
19 the ACL -- he could tell there was problems with it.
20     Q. Did he mention why it would not be useful to
21 try to fix the ACL or repair the ACL or the other
22 ligaments?
23         MS. MILLER: Form.
24     A. He wanted it done right then, and Wexford

Page 24

1  kept making excuses. It's been almost four years, and
2  they're still making excuses.
3      Q. You said he wasn't concerned about your
4  weight at that point?
5      A. Right.
6      Q. Did he actually say, "I don't care about
7  your weight"?
8      A. Yeah. He said he wanted it done and that it
9  should have been done when I initially tore my ACL
10 back in 1979. He knew who my surgeon was at that
11 time. And at that time, they had just started doing
12 the total knees.
13         I told him what my surgeon had told my
14 family, that because I was active in sports, wore
15 skirts, dresses, shorts, and all that, he didn't feel
16 that he should do that because I would have, like, a
17 12- to 15-inch scar on my leg.
18         Over the years, it just kept getting worse.
19 And he was very upset that Wexford kept making
20 excuses, him and Dr. Springer both.
21     Q. Dr. Olysav was upset that Wexford kept
22 making excuses?
23     A. Yeah. He's done everything Wexford has
24 asked. Wexford has asked for -- after I saw him,



Page 25

1  Wexford asked for his opinion.  They had a conference
2  call with him and Dr. Springer.  He sent his initial
3  report.  Dr. Springer sent his report.  And it's like
4  they were just giving me the run-around.
5      Q.  So have you spoken with Dr. Olysav since
6  your --
7      A   No.  No.  And the doctors here, the three
8  doctors I have seen here, have asked for a second MRI,
9  and I have been denied.  The physical therapist has
10  even asked for a second MRI, and we've been denied.
11      Q.  I just want to go back.  If you haven't
12  talked to Dr. Olysav since October 2012, how do you
13  know that he is frustrated with Wexford?
14      A.  Because I get told from the Health Care
15  Administrator and Warden Sharon.  Lisa Johnson is the
16  Health Care Administrator.  Warden Sharon has -- those
17  two ladies have been with me since I injured --
18  reinjured my knee in 2012, and they have been fighting
19  for me for the surgery since.
20      Q.  All right.  So Lisa Johnson and Warden
21  Sharon told you that Dr. Olysav was frustrated with
22  Wexford?
23      A.  Uh-huh.  (Nodding head up and down.)
24      Q.  When did they say that?

Page 26

1      A.  The last time I talked to the two of them
2  was probably August or September of last year.
3      Q.  So after you came back from meeting or
4  seeing Dr. Olysav in October 2012, at some point you
5  were told that your request for surgery was denied?
6      A.  Uh-huh.  (Nodding head up and down.)
7      Q.  And when did you first hear that?
8      A.  Latter part of October, first part of
9  November of 2012.
10      Q.  Who told you first that the surgery had been
11  denied?
12      A.  Dr. Springer.
13      Q.  What did Dr. Springer say at that time?
14      A.  He just told me that they said no.  They
15  made up an excuse of something like they had to talk
16  to the two doctors together or they wanted me to live
17  in Health Care the rest of my stay.  They wanted me to
18  get down to 140.
19          And Dr. Springer told them that I couldn't,
20  that I was living in Health Care and that there was no
21  way I could get exercise to get down to 140.  At that
22  time, I believe I was 230-something.
23      Q.  Did they tell you why they wanted you to get
24  down to 140?

Page 27

1      A.  No.
2      Q.  All right.  So at some point after that, did
3  Dr. Springer make another request for you for surgery?
4      A.  I think he made three, maybe four, five more
5  attempts.  He even came in on the day he was moving
6  out of state in 2013 to try and plead with them to do
7  my surgery.
8      Q.  Was that before March 2013?
9      A.  Yes.  It was around the first part of
10  February of 2013.
11      Q.  All right.  So Dr. Springer made a number of
12  attempts, of requests for surgery?
13      A.  Yes, ma'am.
14      Q.  But all of those requests were denied?
15      A.  Yes, ma'am.
16      Q.  And were you ever given any specific reasons
17  for those denials?
18      A.  No.  Just that they needed to keep doing
19  things.  I'm frustrated.  They kept telling him they
20  wanted me down to 140, and he said there's no way.
21          Now, if the surgeon isn't concerned about my
22  weight, why would an insurance -- why would the health
23  insurance company be concerned about my weight?
24      Q.  So from October 2012 to March 2013, before

Page 28

1  you moved to Logan, did you receive any treatment at
2  Lincoln for your knee?
3      A.  I stayed in -- I was living in the Health
4  Care.  They were coming in, checking my leg.  Wexford
5  -- I guess Wexford told the doctor they wanted me to
6  wear a brace.  They came in and measured my leg.  I
7  had a brace.  I wore it practically 24/7 unless I was
8  in the shower.  And if I went on visits, I couldn't
9  wear it because it had metal in it.
10          I was to keep my leg elevated.  And in
11  January of 2013, with my leg being elevated, they had
12  to send me out to see if I had blood clots in my leg
13  because I had discoloration in my leg and the swelling
14  in it going down into my foot.
15      Q.  Did you have blood clots in your leg at that
16  time?
17      A.  Not at that time, no ma'am.
18      Q.  Did the brace help at all?
19      A.  No.
20      Q.  Were you given any medication during that
21  period?
22      A.  Yes, ma'am.  I was given Flexeril, Ultrams.
23  I was given what they could give me.
24      Q.  Were you doing any physical therapy during



# Exhibit 17
# (Under Seal)

# Exhibit 18
# (Under Seal)

# Exhibit 19
# (Under Seal)

# Exhibit 20

Page 1

```
1           IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION
3

DON LIPPERT, WILLIAM EARL      )
4  BASSETT, LEWIS RICE, and     )
   MILAM MARTIN,                )
5                               )
                                )
6        Plaintiffs,            )
                                )  No. 10-CV-4603
   -vs-                         )
7                               )  Judge Jorge L.
   SALVADOR GODINEZ, LOUIS      )    Alonso
8  SCHICKER, BRUCE RAUNER,      )  Magistrate Judge
   ALPHONSO NORMAN, MARTHA      )    Daniel Martin
9  MALDONADO, and ATHENA        )
   ROSSITER RAUNER,             )
10                              )
         Defendants.            )
11
12
13           The confidential deposition of JOHNNY M.
14  RUFFIN, JR., taken in the above-entitled cause before
15  CAROLYN J. HAWKES, Certified Shorthand Reporter
16  within and for the County of Boone and State of
17  Illinois, taken pursuant to the Federal Rules of
18  Civil Procedure for the United States District
19  Courts, at 2600 North Brinton Avenue, Dixon,
20  Illinois, on the 14th day of January, 2016, at 9:45
21  a.m.
22
23
24
```

Page 2

```
1  COUNSEL PRESENT:
2      ROGER BALDWIN FOUNDATION OF ACLU, INC.
       180 North Michigan Avenue, Suite 2300
3      Chicago, Illinois  60601, by:
       MS. LINDSAY MILER,
4
            - and -
5
       UPTOWN PEOPLE'S LAW CENTER
6      4413 North Sheridan Road
       Chicago, Illinois  60640, by:
7      MS. NICOLE SCHULT,
8          appeared on behalf of the Plaintiffs;
9      OFFICE OF THE ATTORNEY GENERAL
       STATE OF ILLINOIS
10     100 West Randolph Street
       Chicago, Illinois  60601, by:
11     MR. THOR YUKINOBU INOUYE and
       MS. SARAH NEWMAN,
12     Assistant Attorneys General,
13         appeared on behalf of John Baldwin, Louis
           Shicker, and Bruce Rauner;
14
       BROWN, HAY & STEPHENS, LLP
15     205 S. Fifth Street, Suite 700
       P O Box 2459
16     Springfield, Illinois  62705, by:
       MR. ANDREW M. RAMAGE,
17
           appeared on behalf of Wexford Health
18         Sources.
19
20  REPORTED BY: CAROLYN J. HAWKES, C.S.R No. 084-003296
21
22
23
24
```

Page 3

```
1                  I N D E X
2  WITNESS:                        EXAMINATION
3  JOHNNY M. RUFFIN, JR.
4  By  Ms. Newman                   4 & 212
       Ms. Schult                    211
5
6
7
8              E X H I B I T S
9  NUMBER                    MARKED FOR ID:
10  RUFFIN Exhibit
11  No. 1                          32
        2                          55
12      3                          79
        4 & 5                      96
13      6 & 7                     116
        8                        142
14      9                        164
        10                       196
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
1           (WHEREUPON, the following
2            proceedings are designated
3            confidential:)
4           (WHEREUPON, the witness was
5            first duly sworn.)
6           JOHNNY M. RUFFIN, JR.,
7  called as a witness herein by the Defendants, having
8  been first duly sworn, was examined and testified as
9  follows:
10              EXAMINATION
11  BY MS. NEWMAN:
12   Q.  So, Mr. Ruffin, do you know -- understand what
13  a deposition is?
14   A.  Yes, ma'am.
15   Q.  All right.  So I'm going to ask you questions
16  today about your claims in this lawsuit, and -- and
17  then it's your -- it's very important that you --
18  that during -- that when I ask you a question, that
19  you answer out loud so that the court -- because the
20  court report's going to be taking down every word
21  that we say, and she can't write down that you nodded
22  your head or said -- you know, and things like a-ha
23  and um-hum are very confusing when you actually try
24  to read those later, as to what that means.
```



Page 5

1    A.  Okay.
2    Q.  So just try to remember to give audible
3  answers to questions.
4    A.  Okay.
5    Q.  All right.  Can we start off can you give your
6  name for the record, please?
7    A.  All right.  My name is Johnny M. Ruffin, Jr.
8    Q.  Okay.  And how do you spell that, please?
9    A.  J-o-h-n-n-y M. R-u-f-f-i-n, Jr., J-r.
10    Q.  Okay.  And your IDOC number?
11    A.  K80541.
12    Q.  Okay.  And I should start have you ever given
13  a deposition before?
14    A.  Yes, ma'am.
15    Q.  All right.  And so you understand that, as I
16  said, the court reporter's taking down everything
17  that's said here today?
18    A.  Yes.
19    Q.  Okay.  And you understand that the oath --
20  that you've given an oath to tell the truth?
21    A.  Yes.
22    Q.  And that oath is just -- just the same as if
23  you were in a courtroom?
24    A.  Yes.

Page 6

1    Q.  All right.  Is there any reason today that you
2  can't give complete, accurate testimony?
3    A.  I'm not sure about that.  What you mean?
4    Q.  All right.  Are you on any medications that
5  would affect your ability to, say, remember things or
6  to just tell things accurately or is there -- I'll
7  start with that.  Or any medications that might
8  affect your ability to testify?
9    A.  I'm on medication, but I don't know if it --
10  I'm not sure if they -- I don't think they have no
11  effect on my testimony here today.
12    Q.  Okay.  And just -- I just want to give you the
13  opportunity to say if there is anything that you
14  think would make you unable to remember or unable to
15  testify accurately.
16    A.  Other than the -- the time.  You know what I'm
17  saying?  Like the years in the past, you know, my
18  memory could be a little, you know --
19    Q.  Right.
20    A.  -- not really accurate, you know, I mean, as
21  far as memory-wise specifics.
22    Q.  Okay.  All right.  If you don't hear a
23  question that I ask or you don't understand a
24  question, I just -- if that's -- if it's unclear for

Page 7

1  any reason, I'd just ask that you let me know, and I
2  will rephrase -- you know, rephrase or explain the
3  question.  If you answer the question, I'm going to
4  assume that you understood what the question was.
5    And then one thing I ask is please wait
6  until I finish answering the question -- asking the
7  question before you start answering.  And at the same
8  time -- and at the same time, I will try my best to
9  make sure that I don't interrupt you and let you
10  finish -- I want to make sure you get a complete
11  answer to my question.
12    If I do start asking the next question
13  before you finish, just let me know.  Because we want
14  to try to avoid talking over one another so it's
15  clear on -- it's clear in the transcript.  Okay?
16    A.  Yes.
17    Q.  If you want to take a break at any time,
18  that's fine.  Let me know.  The only thing I'd ask is
19  if I've already asked a question, that you go ahead
20  and answer that question before we take the break and
21  then you're -- then you'll be, you know, free to take
22  that break.  Okay?
23    A.  Okay.
24    Q.  All right.  So, as I said -- as I said before,

Page 8

1  my name is Sarah Newman.  I'm one of the -- one of
2  the attorneys that represent the state -- the state
3  defendants in this case.  So Mr. Baldwin,
4  Mr. Shicker, Governor Rauner.  So you understand that
5  I don't represent you in this lawsuit?
6    A.  Yes.
7    Q.  Okay.
8    A.  Totally.
9    Q.  Understood.  And you have your own -- you have
10  your own attorneys here representing you?
11    A.  Yes.
12    Q.  All right.  Do you have any questions about
13  anything that I've said so far?
14    A.  No.  I'm ready to get this going.
15    Q.  All right.  Good.  All right.  So how old are
16  you?
17    A.  I'm forty.
18    Q.  Okay.  And you currently -- you're currently
19  here at Dixon Correctional Center?
20    A.  Yes, ma'am.
21    Q.  All right.  What unit are you in?
22    A.  Healthcare unit, second floor.
23    Q.  All right.  And are you currently serving a
24  sentence for any conviction?



Page 13

1    A. Yes, ma'am.
2    Q. Okay. And what does it mean to be in -- what
3 does that mean for you?
4    A. Well, it's -- it's ADA. You know, people
5 that's like wheelchair-bound, has some sort of like
6 gait issue, that either walk a cane, something like
7 that.
8    Q. Okay. So it -- it's easier to get around in
9 the unit?
10    A. Yes.
11    Q. All right. Have you filed any -- any other
12 lawsuits against the State of Illinois or IDOC?
13    A. Yes, ma'am.
14    Q. All right. Can you tell me about the first
15 one?
16    A. Well, the first one was medical delivery
17 indifference against the doctors at Pinckneyville and
18 Lawrenceville and ADA issues too and retaliation
19 issues, harassment issues. And I filed against
20 Pinckneyville and Menard. And I think the second one
21 was against the doctors and correctional staff at
22 Lawrenceville.
23    Q. All right. So the first one in Pinckneyville,
24 when did you file that?

Page 14

1    A. Approximately the end of 2002 or the beginning
2 of 2003. I'm not sure. It's between that time.
3    Q. All right. And how is -- and you took -- you
4 took -- you were -- you took a deposition -- a
5 deposition was taken in that case?
6    A. Yes, ma'am.
7    Q. All right. And how was that -- how did that
8 case resolve?
9    A. Well, we settled -- I settled with the medical
10 doctors, and I went to trial on the ADA issue against
11 correctional, IDOC. And I was awarded.
12    Q. What were you awarded?
13    A. I think it was like $17,000, something like
14 that.
15    Q. Were you awarded any kind of injunctive
16 relief? Did they have to do anything?
17    A. I know they made changes. I don't know -- I'm
18 not sure. I'm not sure.
19    Q. All right. And you said the second one was
20 against the doctors and the correctional facility at
21 Lawrenceville?
22    A. Yes.
23    Q. And when was that? When did you file that I
24 mean?

Page 15

1    A. I'm not sure. I want to say maybe 2003, 2004.
2 I'm not sure.
3    Q. All right. And what were the -- what were
4 your claims in that lawsuit?
5    A. They was denying me access to a physical
6 therapy that I was prescribed. A couple ADA issues.
7 And staff harassment and retaliation.
8    Q. And was your deposition taken in that matter?
9    A. A-ha. Yes.
10    Q. All right. And how was that case resolved?
11    A. Actually, I lost that on summary judgment
12 proceedings.
13    Q. Okay. Have you any other -- any other
14 lawsuits against the state or IDOC?
15    A. No.
16    Q. Okay. All right. Are you currently taking
17 any medication today?
18    A. Yes.
19    Q. All right. What medication are you on?
20    A. Neurontins, Percogesic, and Robaxin.
21    Q. I'm sorry, what was that third one?
22    A. Robaxin.
23    Q. Robaxin?
24    A. Yeah.

Page 16

1    Q. Okay. And what are those medications for?
2    A. Well, Neurontin is for my nerves, Percogesic
3 is for like pain, Robaxin is like a muscle relaxant,
4 for spasms.
5    Q. Okay. All right. So, Mr. Ruffin, what's the
6 medical condition that you're -- that you're
7 complaining about in this case?
8    A. Well, I have a cervical C6-C7 spinal cord
9 injury, which has deteriorated. It's degenerated.
10 You know what I'm saying? Because of the bullet
11 fragment between the two vertebrates (sic). And in
12 my layman's term is that the calcium buildup, it's --
13 it's putting pressure on my nerves that's -- the
14 nerve branches that comes through my vertebrate (sic)
15 for my spinal cord. It's causing severe chronic
16 pain, shooting from my neck down my shoulders, back
17 down my arms, to my hand. Right side. Right side of
18 my spinal cord.
19    Q. All right. And how long have you had this
20 spinal injury?
21    A. Since '99.
22    Q. All right. And what happened in 1999?
23    A. '99 I got shot by the Kane County Sheriff
24 Department.



Page 17

1   Q. All right. And there are some -- some bullet
2   fragments that --
3   A. Yes.
4   Q. -- that were not removed?
5   A. Yes. I have -- I have several bullet
6   fragments in between my shoulder, like in the rotator
7   cuff. I have a bullet fragment that's in my -- my --
8   well, you know about my spinal cord. I have -- also
9   have a bullet embedded close by my trach. And I have
10  one in my chest right here, my left -- right side of
11  my chest. And I have a bullet fragment on my left
12  shoulder blade.
13  Q. All right. And you're in -- you use a
14  wheelchair because of this injury?
15  A. Yes, ma'am.
16  Q. All right. Are you able to walk at all?
17  A. Yes. With a little assistance.
18  Q. So where were you first treated for your
19  spinal injury?
20  A. I was in Swedish American Hospital in
21  Rockford, Illinois.
22  Q. All right. And what did they -- what did they
23  do for you?
24  A. Well, initially, I was stabilized with a --

Page 18

1   what you call it? A halo, a halo brace, where they
2   drill it in my head, stabilize my neck. Because I
3   was in a quadriplegic state. So I was in that
4   position for some months. And there they worked with
5   me with physical therapy, neurologist, ortho --
6   different specialists and stuff.
7   Q. All right. And so -- so, obviously, you
8   regained some of your --
9   A. Yes.
10  Q. -- some of your abilities to move?
11  A. Yes.
12  Q. All right. And how long did that take?
13  A. Well, I started regaining on my left side, you
14  know, early, like around the end of '99, but not
15  fully. You know what I'm saying? It took some -- it
16  took some time for me to get -- my left side came
17  back quicker than my right side. You know what I'm
18  saying?
19  Q. Okay. Now, has your -- has this -- since --
20  you know, since you recovered -- you recovered some
21  use of your -- some use in you say 1999, 2000; is
22  that right?
23  A. Yeah, on my -- on my right side -- on my left
24  side I mean, yeah.

Page 19

1   Q. All right. So has your condition changed over
2   time since then?
3   A. Yeah. It's -- gradually, I started getting
4   some -- some sort of movement on my -- my right side.
5   Q. And how long did that -- did that take?
6   A. It was -- it was years. Like gradually. I
7   guess I could say like a progressive over the years.
8   I'd say from the span between -- well, I was set
9   back -- when I went to Menard, I got set back. You
10  know, because I was in seg. You know, I was in
11  isolation for like almost two years, so I got set
12  back.
13      So once I got back to like Pickneyville in
14  '04, I was able to get physical therapy. And doing
15  physical therapy there for several years helped a
16  whole lot for me to regain back my -- you know, my
17  movement in my left and right side.
18  Q. And how long did you have physical therapy?
19  Assuming --
20  A. Once --
21  Q. I'm sorry. Go ahead.
22  A. Okay. You want to go backward from '04 or
23  when I first came to the --
24  Q. Oh, you said -- you said from -- you said in

Page 20

1   2000 -- 2004 that you had physical therapy for
2   seven -- for seven years?
3   A. No, no, no.
4   Q. No.
5   A. For several years.
6   Q. Several years. Sorry.
7   A. From 2004 to I think 2007 or '08.
8   Q. Okay.
9   A. And. . .
10  Q. All right. And so you said that you have --
11  at this point that you have severe chronic pain --
12  A. Yes, ma'am.
13  Q. -- in your shoulder? All right. When did
14  that develop?
15  A. As far as the -- the chronic pain?
16  Q. Yes.
17  A. It's been for years, but -- like I want to say
18  like the beginning -- I mean, like the end of 2008 it
19  started getting -- my pain started worsening. And
20  then it progressively got, you know, worse.
21  Q. All right. And so did you -- did you seek
22  treatment for the pain --
23  A. Yes.
24  Q. -- in 2000 -- when it began to get worse?



Page 33

1              as DEFENDANTS' Exhibit No. 1,
2              for identification.)
3              (WHEREUPON, said documents were
4              tendered to the witness.)
5 BY THE WITNESS:
6    A. This is mine?
7 BY MS. NEWMAN:
8    Q. That's for you to look at here. Mr. Ruffin,
9 the court reporter has handed you a document that
10 we've marked as Defendants' Exhibit 1. These are
11 some pages from your medical records at Dixon. They
12 are -- these are documents that your attorneys sent
13 to us.
14      So I just want to go through some of these
15 things. And these are actually just -- these are the
16 records from 2000 -- from 2010, and I just wanted to
17 flip through and kind of verify some of the dates and
18 some of the -- and some of the things that you've
19 talked about.
20    A. Okey doke.
21    Q. All right. So the first item -- the first --
22 the first medical appointment you've listed -- it's
23 listed here, it has a date of 1/14/10. Do you see
24 that on the first page?

Page 34

1    A. A-ha.
2    Q. And it's M.D. visit?
3    A. Yup.
4    Q. All right. And down there at the bottom
5 right-hand corner, where it looks like that's
6 Dr. Carter's signature?
7    A. Yes.
8    Q. As far as -- I mean, and you had -- you had
9 already said you had seen Dr. Carter in January, is
10 that right?
11    A. Yes. Yes.
12    Q. All right. And over here on the right-hand
13 side it says plans. It does say ortho. So I believe
14 that you had already testified that you thought that
15 he had referred you -- referred you for an ortho
16 consult?
17    A. Yes, ma'am.
18    Q. All right. Looking to the third page -- I
19 apologize, these aren't Bates stamped or anything, so
20 we just have to go by the dates on them -- I'm going
21 to look at the entry that's marked March -- it's
22 3/29/10. Do you see that?
23    A. Oh, 3/29/10? Okay.
24    Q. Yes. This, again, is a -- it's another M.D.

Page 35

1 visit. Do you see the stamp that says M.D. visit at
2 the top there? And that's also -- that was also
3 Dr. -- that's -- is that when you saw Dr. Carter?
4    A. Yup.
5    Q. In March? All right. And I notice under
6 plans he puts in for the -- there is -- there's a
7 mark, it states, I take it -- it looks like it says
8 X-ray in three months?
9    A. Yeah. Yes.
10    Q. Is that when he said he was going -- he
11 wanted -- they wanted you to take an X-ray?
12    A. Yeah.
13    Q. Okay. All right. And then going to the next
14 page, which is 6/11/10, do you see that?
15    A. Yes, ma'am.
16    Q. Wait a minute. Are these out of order? Yeah.
17 Darn it.
18    A. Oh, yeah. I see.
19    Q. Okay. Sorry. Let's see if there's any --
20 okay. We don't need those pages anyway, so I still
21 want you to look at the June 11, 2010. That's
22 another visit with -- another M.D. visit with Dr. --
23 again, Dr. Carter?
24    A. Yes.

Page 36

1    Q. All right. So you did have a visit -- you did
2 see Dr. Carter in June --
3    A. Yes.
4    Q. -- 2010? And did he -- is that when -- when
5 the X-ray was done?
6    A. Soon after that visit. I see it right here.
7 It was on the 14th. June 14, 2010, I had the X-ray.
8    Q. Okay. So in June 2010 you had -- when you
9 visited with Dr. Carter, did he give you any
10 treatment at that time?
11    A. Basically what it says right here, that he
12 gave me more Per -- Percogesic pain meds. Some
13 things about my brace. Repeat -- I guess that's
14 X-ray. I think that's the term mean, repeat X-ray
15 right shoulder. Yeah. That's about it, yeah.
16    Q. And do you -- is this -- do these treatment
17 notes correspond to your -- to your memory?
18    A. Yes.
19    Q. Do you remember this?
20    A. Yes.
21    Q. Okay. And this is what he -- this was the
22 treatment?
23    A. Um-hum. I mean yes. I'm sorry.
24    Q. All right. It's hard to remember.



Page 37

1    A.  Yeah.
2    Q.  It's very easy to --
3    A.  Bad habits die old.  Sorry.
4    Q.  All right.  Okay.  And then skipping forward
5  to an entry on -- here there's -- the page has two
6  entries.  One is 8/27/10, it's a nurse sick call, and
7  then 8/31/10, it looks like a PA visit.  And
8  that's -- is that when you had the -- your
9  appointment with PA Kogan?
10   A.  Yes.  Yes.
11   Q.  And that's when you say she referred you to
12  one of the -- wanted to put in a referral for UIC
13  ortho?
14   A.  Actually, she did, resubmitted me for ortho
15  evaluation, yup.
16   Q.  Okay.  All right.  And then going to the next
17  page, you have -- it has a mark -- it's marked
18  September 8 -- 9/8/2010 or 9/8/10.  Do you see that?
19   A.  9/8/2010.  Yes, I see it.
20   Q.  All right.  And is that the visit you
21  mentioned on -- in September 2010 with Dr. Carter?
22   A.  Yes, ma'am.
23   Q.  All right.  And you had said before that this
24  may have been when he first prescribed Neurontin for

Page 38

1  you?
2    A.  Yes.
3    Q.  And then at the top it does, in fact, say
4  begin Neurontin, 300 PM?
5    A.  Yes.
6    Q.  And how -- did the Neurontin help you with
7  your pain?
8    A.  Temporary relief.  Like two or three hours
9  maybe.
10   Q.  All right.  Was it more -- did it give you
11  more relief than the medications you had been on
12  previously?
13   A.  Well, it's like, you know, a combination of
14  them, you know.  Both, you know.
15   Q.  But it did provide more relief than you had --
16  than you had received before?
17   A.  I wouldn't say it provide more relief.  More
18  of the same.  You know what I'm saying?
19   Q.  Okay.  All right.  And then -- all right.  And
20  then going to the next page, I think it's hard -- it
21  looks like it's 10/11/10 here on the date?  Is
22  that --
23   A.  Yeah, 10/11.
24   Q.  All right.  And is that -- and that's also --

Page 39

1  that's also got Dr. Carter's signature there?
2    A.  Yes.
3    Q.  All right.  And is that the October visit --
4    A.  Yes, ma'am.
5    Q.  -- that you were discussing earlier?
6    A.  Yes, ma'am.
7    Q.  All right.  And then finally, going -- it's
8  the same -- down at the bottom, the same page, on
9  here it says 11/8/10 and, again, Dr. Carter's
10  signature.  Do you see that?
11   A.  Yes, ma'am.
12   Q.  All right.  And do you see -- is that the
13  visit in November -- the visit in November that you
14  were talking about?
15   A.  Yes, ma'am.
16   Q.  All right.  And I do note that he said --
17  under plans it says collegial review for UIC ortho
18  eval?
19   A.  Yes, ma'am.
20   Q.  All right.  And to renew your Perc -- it looks
21  like Percocet?
22   A.  Yes.
23   Q.  So you were taking -- was the Per -- did the
24  Percocet help with your pain?

Page 40

1    A.  I would say the same type of relief, temporary
2  relief.
3    Q.  All right.  And then if you could flip to the
4  next page.  There's a notation where it says
5  collegial review.  Underneath it says ortho -- UIC
6  ortho clinic visit, and it's circled -- approve is
7  circled with November 16, 2010.  So were you ever
8  notified that they had -- that they approved an
9  ortho -- an ortho clinic visit for you?
10   A.  No.  I was -- I was notified that they denied
11  sending me to ortho, but alternative send me out to
12  KSB for a CAT scan instead.
13   Q.  All right.  So you never went to the ortho --
14  to the UIC ortho clinic?
15   A.  No, ma'am.  Nope.
16   Q.  All right.  And then on the last page of this
17  document we have -- there is a notation.  It looks
18  like 12/3/10.  Again, Dr. Carter?
19   A.  You say 12/3/10?
20   Q.  Yeah.  I'm sorry.  The very last page.
21   A.  Oh, okay.
22   Q.  The very last page.  There is in the middle of
23  the page 12/3/10?
24   A.  Oh, I see.



Page 41

1    Q.  Do you see that?
2    A.  Yes.
3    Q.  All right.  And, again, it says M.D. visit
4  and, again, Dr. Carter's signature is there?
5    A.  Um-hum.
6    Q.  And is that the December visit that you were
7  referring to earlier?
8    A.  Yes.
9    Q.  All right.  And I note that on the plan it
10  says okay for PT referral?
11   A.  Yup.
12   Q.  All right.  And you've already discussed that
13  you went to the physical therapy appointments at that
14  time?
15   A.  Yes, ma'am.
16   Q.  Okay.
17      MS. NEWMAN:  Can we go off the record for a
18    second?
19           (WHEREUPON, discussion was had
20              off the record.)
21  BY MS. NEWMAN:
22   Q.  All right.  I believe you said that you
23  returned to the doctor in January of 2011?
24   A.  Yes.

Page 42

1    Q.  All right.  And was that Dr. Carter again?
2    A.  Yes.
3    Q.  All right.  And what did you say to Dr. Carter
4  at that time?
5    A.  Basically, right here.  I told him I have
6  persistent pain in my right shoulder.
7    Q.  I'm sorry, this is January 2010.  So --
8    A.  Oh, I'm sorry.  I'm sorry.
9    Q.  That won't help you.
10   A.  Okay.  I'm sorry.
11   Q.  Just so you don't get confused.
12   A.  Oh, I'm sorry.
13   Q.  I prefer -- just -- I'm not trying to trick
14  you, but I prefer to first find out what you
15  remember.
16   A.  Okay.
17   Q.  And then we'll look at the documents.
18   A.  I know -- I know for a fact that I told him
19  that I still had like chronic nerve pains, shooting
20  pains and stuff, that was -- you know.
21   Q.  Okay.
22   A.  Um-hum.
23   Q.  And did you discuss -- did you discuss with
24  him what the physical therapist had said?

Page 43

1    A.  Yes, I did.
2    Q.  All right.  And what did he say about that?
3    A.  He told me he -- he said well, I'm going to
4  put you back in for -- to go to UIC Pain Clinic.
5  That's what he said.
6    Q.  All right.  And did he make any changes -- any
7  other changes to your treatment at that time?
8    A.  If I -- I think I recall, I was still on the
9  same pain med regimen.
10   Q.  Did -- and was that visit to the UIC Pain
11  Clinic approved?
12   A.  Yes, it was.
13   Q.  Okay.  And when you actually -- when did you
14  go to the UIC Pain Clinic?
15   A.  I first went out there maybe March 2011.
16   Q.  Okay.  And who did you see at the UIC Pain
17  Clinic?
18   A.  I think the doctor name was Quadri Mohammed.
19   Q.  And what did Dr. Mohammed do at this
20  appointment?
21   A.  Well, basically, it was just a medical
22  consult, where I told him what I was going through,
23  the pain, gave him a history of my injuries and stuff
24  like that.

Page 44

1    Q.  Okay.  Did he examine you?
2    A.  Yes, he did.
3    Q.  And what did he say at that time?
4    A.  Well, he said -- we discussed some possible
5  treatments, and he said he -- he will give his
6  specific treatment plan, but he needed a CAT scan on
7  my cervical -- my cervical spinal cord area.
8    Q.  What kind of treatments did you discuss as
9  possible treatments?
10   A.  It was CESI.  That's cervical epidural steroid
11  injection procedure.
12   Q.  And that was -- was that the -- that was the
13  one treatment he thought would be best for you?
14   A.  That he was considering at that time, yeah.
15   Q.  Okay.
16   A.  But he couldn't -- he couldn't give me -- he
17  couldn't -- he couldn't give me that treatment until
18  he has a CAT scan on my cervical -- cervical spinal
19  cord area.
20   Q.  All right.  Did he give you any -- do any
21  other treatments at that point?
22   A.  I'm not sure.  Did he recommend certain
23  medications?  I'm not sure.  I can't recall.
24   Q.  Okay.  All right.  And did you have a CT on



Page 45

1 your spine, a C scan?
2 A. Yes, I did.
3 Q. When was that?
4 A. Maybe May. May 2011.
5 Q. And did you ever -- did you ever talk to
6 anyone about this -- about the CT, about the results
7 of the CT?
8 A. Yes. I talked to -- I think it was
9 Dr. Carter. I did a medical follow-up with him.
10 Q. And what did Dr. Carter say about your --
11 about the CT results?
12 A. Well, he just said, you know, follow up
13 with -- with Dr. Mohammed's previous order to --
14 after the CAT scan, I supposed to have -- went to
15 Dr. Mohammed two weeks after the CAT scan. So there
16 was a follow-up, to go to Dr. Mohammed for a
17 follow-up.
18 Q. All right. And when did you have the
19 follow-up with Dr. Carter? Was that in May as well?
20 A. You talking about with Dr. Carter?
21 Q. Yes. After the CT.
22 A. I don't know. May or June. I'm not sure.
23 Either May or June.
24 Q. All right. And did Dr. Carter do -- make any

Page 46

1 changes to your treatment during that visit?
2 A. He just -- he just ordered follow -- he
3 ordered according to Dr. Mohammed's previous order,
4 for me to follow up with him.
5 Q. Okay. So -- and when was the next time you
6 saw a doctor after that?
7 A. I went back to UIC in July 2011.
8 Q. All right. And was that when you -- did you
9 see Dr. Mohammed again?
10 A. No. I think it was a different doctor.
11 Q. All right. And who did you see at that time?
12 A. I can't recall the name.
13 Q. And what did you discuss with the doctor at
14 that time?
15 A. He discussed the CAT scan results and gave
16 his -- he or she gave the recommendation for the
17 cervical epidural steroid injection procedure.
18 Q. Okay. So you don't remember if it was a male
19 doctor or a female doctor?
20 A. Yeah. I don't remember that. It was so many
21 different doctors.
22 Q. All right. So what did the doctor -- the
23 doctor say about the CAT scan results?
24 A. They showed there's a lot of -- I got a lot of

Page 47

1 damage in my spinal cord vertebrate (sic) area, you
2 know, for the C6-C7. Medical terminology shout at me
3 that I really don't too much understand, you know,
4 like cervical degeneration and stuff of that nature,
5 you know.
6 Q. All right.
7 A. But I remember that they said that probably
8 was the main cause of the pain was the fact that
9 those shrapnels was in the area of my vertebrate
10 (sic) and the calcium has built up around it. You
11 know, the whole -- I guess the whole -- I guess your
12 body build calcium to hold foreign objects in place.
13 You know, like lock it in. And they kind of like
14 pinching on the nerves that shoot from my -- my
15 vertebrate (sic) area. So that's what's -- he
16 believed -- he or she believed what the main cause of
17 my nerve pain.
18 Q. All right. And what did the doctor recommend?
19 A. Follow up to have the cervical epidural
20 steroid injection.
21 Q. And did that doctor make any changes to your
22 oral medications?
23 A. I'm not sure. I don't recall.
24 Q. All right. Do you remember anything else

Page 48

1 about that visit?
2 A. That's about it.
3 Q. Okay. When was the next time that you saw a
4 doctor in 2011?
5 A. I think as soon as I come back from the visit,
6 I seen Dr. Carter again for a follow-up, a medical
7 appointment follow-up.
8 Q. In July?
9 A. I think so, yeah.
10 Q. All right. And what did Dr. Carter say at
11 that time?
12 A. Basically, he say he was going to put me back
13 in to follow up with the doctor's -- UIC doctor's
14 previous order.
15 Q. Did he make any changes to your medication at
16 that time?
17 A. I don't recall.
18 Q. And when was the next time that you saw --
19 that you saw a doctor?
20 A. I went to -- I think it was in August 2011.
21 That's when I went back to UIC, had the cervical
22 epidural steroid injection procedure.
23 Q. And who did you see at that time at UIC?
24 A. I think it was Dr. Mohammed. I think it was



Page 49

1  Dr. Mohammed.
2      Q.  And was it Dr. Mohammed had who performed the
3  procedure?
4      A.  Yes, ma'am.  Him -- it was another doctor
5  that -- with him.  I can't recall who the other
6  doctor was.
7      Q.  So there was a second doctor assisting?
8      A.  Yeah.
9      Q.  All right.  So this was the first time you got
10  the -- the cervical epidural steroid injection?
11      A.  Yes.
12      Q.  And how did it work for you?
13      A.  I think it last about -- I want to say a
14  couple days.  Also, Dr. Mohammed also told me this
15  too.  He said that -- he said the plan was that I
16  should have these -- these cervical injection shots
17  two or three times and if it proves to be
18  ineffective, the next treatment would be the MBB,
19  medial branch block, procedure at that -- at that --
20  at that meeting.
21      Q.  All right.  But the doctor -- but Dr. Mohammed
22  recommended trying this -- trying the epidural -- the
23  epidural injections at least two or three times
24  before moving on to the branch block option?

Page 50

1      A.  Yes, ma'am.
2      Q.  And did he say why he recommended that?
3      A.  He said if it proved to be ineffective, that
4  would be the next course of treatment.
5      Q.  Okay.
6      A.  That was his --
7      Q.  But did he -- did he explain why he wanted to
8  try the epidural procedure first?
9      A.  Yeah.  He said well, you know, usually, you
10  know, it -- it varies from patient to patient.  He
11  said your case is kind of severe, but he said some
12  patient, they can take these shots and they can get
13  relief for a year, six months to a year.  Or even
14  longer.  So I guess he wanted to try that step first
15  before we go to a more advanced procedure I guess.
16      Q.  Okay.  So that was in August that you -- that
17  you received that first injection?
18      A.  Yes.
19      Q.  When was the next time you sought out
20  treatment or that you had treatment?
21      A.  I had a follow-up with I think Dr. Carter
22  again.
23      Q.  Was that in August or September?
24      A.  I'm not sure.  I'm not sure.  Either the end

Page 51

1  of August or the beginning of September.  I'm not
2  sure.
3      Q.  Do you remember how many days it was after
4  the -- after the injection?
5      A.  Maybe a week.  I'm not sure exactly.
6      Q.  And what did you say to Dr. Carter at that
7  appointment?
8      A.  Well, he asked me the effects of it.  And I
9  told him, I said it probably last like a couple of
10  days and then the pain returned.
11      Q.  What did he say at that point?
12      A.  He said he was going to put me back in for a
13  follow-up, follow the -- I guess the UIC medical
14  doctor recommendation for another follow-up
15  treatment.
16      Q.  All right.  When was the next time you saw --
17  you saw a doctor in 2011?
18      A.  I don't know if I seen Dr. Carter in between
19  that initial exam to when I went back out to UIC in
20  November.  I'm not sure.
21      Q.  So you're not sure if you saw him between --
22  if you saw Dr. Carter between September and November?
23      A.  Yeah, after -- yeah, after I -- after the
24  medical follow-up.  I don't know if I seen him again

Page 52

1  between then.  You know, I'm not sure.
2      Q.  All right.  So what's the next -- the next
3  medical visit that you remember?
4      A.  I want to say November 2011 I went back to UIC
5  for another cervical epidural steroid injection.
6      Q.  Okay.
7      A.  It's okay I say CESI, acronym?
8      Q.  Oh, please.  I'll be happy.  All right.  CSI,
9  is that --
10      A.  CESI.
11      Q.  CESI?
12      A.  Yes.
13      Q.  I will use the same acronym.
14      A.  Okay.
15      Q.  All right.  So you had -- so you had another
16  CESI at that appointment?
17      A.  Yes, ma'am.
18      Q.  All right.  And who did you see at that
19  appointment?
20      A.  I can't recall who the doctor that performed
21  it.
22      Q.  Was it Dr. Mohammed?
23      A.  I can't recall.  Because they -- I noticed
24  when I go back out there, I see different --



Page 69

1    A. Okay.
2    Q. When did you first see the doctor in -- a
3  doctor in 2012?
4    A. I think -- 2012 I had -- I went back out to
5  UIC Pain -- Pain Clinic.
6    Q. All right. When was that?
7    A. In January of 2012.
8    Q. Okay. And what happened at that appointment?
9    A. Well, they performed another CESI procedure on
10  my C6-C7 spinal cord area.
11    Q. Who did you see at that time?
12    A. I can't recall who the doctor specifically
13  was.
14    Q. Did the doctor say anything at that time?
15    A. I can't recall. If I can recall, he said
16  something -- I guess continue on the meds and a
17  follow-up -- a follow-up -- a follow-up appointment.
18    Q. What was the result of that procedure?
19    A. Relief to my -- as far as the relief?
20    Q. Yes.
21    A. I think it a week or two. I'm not sure. I
22  know it was short-lived. That's why I can say that.
23    Q. And at this appointment did you -- did you
24  discuss with the doctor that continued -- continuing

Page 70

1  with the CESI treatment?
2    A. I think that was the plan, you know, for a
3  follow-up.
4    Q. Okay. Did you have -- did you see a doctor
5  back at Dixon after the -- after you had your UIC
6  pain appointment in January?
7    A. Yes, I know I did.
8    Q. Was that in January as well?
9    A. I'm not sure. I'm not sure. I'm not sure
10  now.
11    Q. All right.
12    A. I know I seen a doctor maybe at the end of
13  January or the beginning of February.
14    Q. Okay. Do you remember who that was, that
15  doctor?
16    A. 2012?
17    Q. Yes.
18    A. No, I don't recall who the doctor was.
19    Q. Do you remember what the doctor said at that
20  appointment?
21    A. I think I was supposed to be put back in for a
22  follow-up at UIC Pain Clinic.
23    Q. Was this before -- before or after the relief
24  from the treatment ran out?

Page 71

1    A. I don't recall.
2    Q. All right. When was the next time you saw a
3  doctor in 2012?
4    A. Oh, I seen several between the approval. And
5  I went back out to UIC like June of that year. I
6  know I talked to Dr. Dominguez like May 1. And I
7  inquired, and I told her about I was still having
8  pain. And I inquired to the status of the writ. You
9  know, why it's taking so long.
10    And I think she expressed to me then that
11  it was some sort of confusion in the scheduling or
12  something, that she was going to talk to some lady
13  that does the scheduling and ask them. They couldn't
14  tell me exactly when I was supposed to go out or
15  something like that. But I think that was like May,
16  May 1, 2012. And then I went back out to UIC June
17  2012.
18    Q. Okay. And then what happened -- what happened
19  at the June 2012 appointment?
20    A. The same thing. I had a CS -- CESI procedure.
21  The same thing.
22    Q. All right. What doctor did you see at that --
23  in June 2012?
24    A. I do not recall who the specific doctor was.

Page 72

1    Q. Okay. And at that time did you discuss with
2  that doctor that these -- you know, that these
3  injections were only lasting, you know, a couple of
4  weeks, giving you relieve for a couple of weeks?
5    A. I'm pretty sure I did. Yeah, I'm pretty sure
6  I did tell them.
7    Q. And what did the doctor say about that?
8    A. I guess he wanted to try it a couple more
9  times, then -- I don't know.
10    Q. Did he say why he wanted to try the CESI
11  procedure a couple more times?
12    A. I don't recall specifically. Because they
13  were changing different doctors. It was like I was
14  getting different doctors every time I go back up
15  there. I didn't see the original Dr. Mohammed. You
16  know what I'm saying? I know it was more than one
17  doctor that was there, that was doing the procedure.
18    So, you know, I don't know if there was
19  some confusion, the original plan. Because the
20  original plan was like three injections, and if that
21  didn't affect it, then MBB. But I kept seeing
22  different doctors, so I'm not sure. I don't recall
23  specifically -- what was discussed specifically on
24  that day about the plans.



Page 73

1   Q. And when you said -- you used the acronym MBB.
2   Is that the medial branch block?
3   A. Yes, ma'am. I'm sorry.
4   Q. That's okay. Just for the court reporter's
5   sake. And just -- and I'm fine with using that
6   acronym. I just wanted to make sure it was clear.
7   All right. So that was June 2011?
8   A. Yes, ma'am.
9   Q. You had to have the CESI procedure. And what
10  were the results of that -- of that treatment?
11  A. The same old story.
12      MS. SCHULT: I think this is June of 2012.
13      MS. NEWMAN: I'm sorry. You're right. I
14  misspoke.
15  BY MS. NEWMAN:
16  Q. So June 2012 you had the CESI. And how did
17  that work for you?
18  A. The same. The same results. The same.
19  Q. And what do you mean by the same results?
20  About how long did it last?
21  A. I guess it was like short-lived. I'm not
22  specifically sure like how long. I don't recall how
23  long. But it was -- it was temporary I guess is the
24  best term, temporary.

Page 74

1   Q. All right. Did it last longer than the
2   previous injection?
3   A. I don't recall. I don't recall.
4   Q. Okay. Did you have a follow-up at Dixon after
5   your June 2012 --
6   A. Yes.
7   Q. -- appointment? And was that in June as well?
8   A. I do not recall. Was it in June or was it in
9   July? I do not recall.
10  Q. Okay.
11  A. I know it was soon after, though. So it might
12  have been in June or July.
13  Q. Okay. And who did you see at that time?
14  A. I don't remember who the doctor was because
15  they were switching them. Yeah, they were switching
16  them, so I don't -- I don't recall.
17  Q. Did the follow-up take place before or after
18  the relief from the CESI procedure ran out?
19  A. I do not recall now.
20  Q. Okay. And what did the doctor say at that
21  time?
22  A. If I recall, I think it was -- the plan was to
23  go back out to UIC for another procedure.
24  Q. Okay. What's the next time you saw -- you saw

Page 75

1   a doctor?
2   A. It was between -- 2012?
3   Q. Yes. After June 2012.
4   A. I know I seen a doctor between June 2012 to
5   the next UIC appointment. I don't recall when,
6   specific date, and who the doctor was. But I know I
7   seen someone.
8   Q. So sometime -- you saw someone sometime
9   between --
10  A. Yes.
11  Q. -- July and your next appointment?
12  A. Yeah, I seen someone.
13  Q. Okay. When did you next go to the UIC Pain
14  Clinic?
15  A. I think November.
16  Q. Okay. So you saw -- you saw a doctor at Dixon
17  sometime between July and November?
18  A. I think so, yeah.
19  Q. But you don't remember what doctor you saw?
20  A. No, ma'am.
21  Q. Okay. What was discussed at that appointment?
22  A. I don't recall.
23  Q. So November 2012 you go back to the UIC Pain
24  Clinic?

Page 76

1   A. Yes, ma'am.
2   Q. All right. And what doctor did you see at
3   that time?
4   A. I think this guy's name was Stuart Connell,
5   C-o-n-n-e-l-l.
6   Q. Okay. Is that the first time you saw
7   Dr. Connell?
8   A. I'm not sure.
9   Q. Okay. What did Dr. Connell have to say that
10  time?
11  A. Well, I remember him because he -- he started
12  the CESI procedure, but he made a medical error,
13  where he pushed the needle too far, where it went
14  into -- towards the -- I guess the -- I can't
15  remember the medical terminology. It's -- it's
16  like -- I'll say the gel that's around your spinal
17  cord.
18      And he went past the dura -- epidural
19  space, and -- and they had -- spinal cord fluid came
20  through the -- through the puncture wound, and he had
21  to abort the -- the procedure.
22  Q. All right. Did that cause -- I mean, did it
23  cause you any problems?
24  A. Yes. Yeah, it's caused like headaches, stuff



Page 89

1    A. I guess it's -- I guess it was about the
2  wheelchair, I guess. I'm seeing -- I can't
3  understand his handwriting.
4    Q. Okay. And you don't remember --
5    A. No.
6    Q. -- specifically yourself?
7    A. No.
8    Q. All right. And then there's -- flipping to
9  the next page, there's an entry for 10/12/12?
10   A. Yes.
11   Q. And the note says here for medical referral?
12   A. Yes.
13   Q. Do you see that? And there is -- on the
14 right-hand side there is a notation that says zero
15 charge?
16   A. Yes, ma'am.
17   Q. Do you see that? Okay. Okay. And then 11 --
18 there's -- two pages ahead there's a notation
19 11/19/12?
20   A. Yes, ma'am.
21   Q. All right. There's an R note, remember,
22 inmate scheduled for a medical writ to UIC Pain
23 Clinic? Do you see that?
24   A. Yes, ma'am.

Page 90

1    Q. All right. And then the next -- so that's
2  approximately when you were going to -- when you had
3  your visit at the UIC Pain Clinic, in November?
4    A. Yes, ma'am.
5    Q. All right. And then after -- then on the same
6  page, 11/27/12, it's marked medical writ follow-up?
7    A. Yes, ma'am.
8    Q. All right. And there's a notation there --
9  that's when you saw the doctor from after the --
10 after your appointment at UIC, is that right?
11   A. Yes, ma'am.
12   Q. All right. And there's a notation that says
13 failed cervical epidural?
14   A. Yes, ma'am.
15   Q. Okay. And -- all right. And then that's all
16 on that one.
17      MS. NEWMAN: Off the record.
18         (WHEREUPON, a recess was had.)
19 BY MS. NEWMAN:
20   Q. So, Mr. Ruffin, before the break, I believe we
21 got through the end of 2012.
22   A. Okay.
23   Q. And before I move on, I just want to ask if
24 there is anything else you want to add to your

Page 91

1  testimony, you know, about what we've already
2  testified -- about what you've already testified to?
3    A. No.
4    Q. Okay. All right. So in 2013 when did you
5  see -- next see a doctor about -- regarding your
6  spinal injury?
7    A. I'm not sure if I seen a doctor between the
8  end of 2012 until when I actually went back out to
9  UIC in February of 2013. I don't recall if I seen a
10 doctor between then.
11   Q. All right. So in February of 2013 you went
12 back to the UIC Pain Clinic?
13   A. Yes, ma'am.
14   Q. All right. And what doctor did you see at
15 that time?
16   A. The same doctor that did the prior procedure.
17   Q. That was Dr. Connell?
18   A. Yup.
19   Q. Okay. And did Dr. Connell discuss a treatment
20 plan with you at that time?
21   A. I don't recall specifically what plan he -- I
22 know I supposed to come back out one more time or
23 something like that.
24   Q. All right. What did he do at that -- at that

Page 92

1  visit?
2    A. He did the CESI procedure again. This time he
3  completed it.
4    Q. Okay. All right. And what were the results
5  from that procedure?
6    A. As far as the relief, I don't recall. I think
7  it was short-lived, though. I'm pretty sure it was
8  short-lived.
9    Q. All right. And during that visit, did you
10 discuss, you know, your treatment options with him?
11 Did you discuss the -- continuing the CESI
12 treatment?
13   A. I know that they didn't -- I supposed to come
14 back out one more time. And I know he asked about
15 what medication I was taking and stuff like that.
16 But I -- I don't recall whether or not he ordered
17 additional medication or whatever.
18   Q. Did he discuss the medial branch block
19 procedure as an option?
20   A. No, he didn't. Like I say, you know, that's
21 where it was -- I think the confusion came in.
22 Because the original doctor I seen, Dr. Mohammed,
23 laid out the original plan was to have three CESI
24 procedure and then if that was ineffective, then we



Page 93

1  supposed to go to the MBB procedure.  So I think
2  because I was seeing a different doctor, maybe there
3  was a breakdown somewhere, you know.
4     Q.  Okay.
5     A.  That's just my opinion.  You know what I'm
6  saying?  So --
7     Q.  Right.  All right.  And did you see a doctor
8  at Dixon -- follow up with a doctor at Dixon after
9  the February procedure?
10    A.  Yes.
11    Q.  And was that in February as well?
12    A.  I do not recall.
13    Q.  All right.  And who did you see at that time?
14    A.  I do not recall.
15    Q.  Do you remember anything that was said during
16  that time?
17    A.  I do recall at that meeting that I was
18  supposed to be put back in for a follow-up at UIC
19  Pain Clinic for another CESI procedure.
20    Q.  And was this -- was this follow-up before or
21  after the treatment stopped working for you?
22    A.  I do not recall, ma'am.
23    Q.  Okay.  All right.  And when was the next time
24  you saw -- you saw a doctor for your spinal

Page 94

1  condition?
2     A.  I'm pretty sure I seen a doctor, I do not
3  recall, between -- I guess the last procedure to I
4  think July of the 13th -- June -- July 13th, 2013.
5     Q.  Okay.  And what happened in July 2013?
6     A.  I went back to the Pain Clinic.
7     Q.  Okay.  And who did you see at that time?
8     A.  I don't remember who the doctor specific was,
9  who it was.
10    Q.  All right.  And what happened at that -- at
11  that appointment?
12    A.  Well, they performed -- they performed a CESI
13  procedure again, so --
14    Q.  And that procedure was completed as well?
15    A.  Yes.
16    Q.  And what were the results from that procedure?
17    A.  I guess the same thing, temporary relief.  It
18  was short-lived.  I can't put a duration on it, how
19  short-lived it was, but -- I don't recall.
20    Q.  Was it a matter of months?  Weeks?  Days?
21    A.  I do not recall at that time what -- how long.
22    Q.  All right.  At that appointment -- at that
23  July appointment did you discuss any alternative
24  treatment options at that time with the doctor?

Page 95

1     A.  I think -- you talking with the doctor -- UIC
2  doctor?
3     Q.  Yes.
4     A.  I don't recall what exactly his plans was
5  after that -- that procedure.  I don't recall
6  specifically.
7     Q.  Okay.  And did you have a follow-up at Dixon
8  after your --
9     A.  Yes, ma'am.
10    Q.  And was that -- was that in July as well?
11    A.  I'm not sure.
12    Q.  Okay.  And who did you see at Dixon in July --
13  in that -- after that?
14    A.  2013?
15    Q.  Yes.
16    A.  I don't recall.
17    Q.  And what did you discuss at that appointment?
18    A.  I know we discussed the procedures that was
19  done at the UIC Pain Clinic, and I think I -- they
20  wanted me to just follow the same medical regimen.
21    Q.  So the same med -- you kept the same
22  medication?
23    A.  Same medication regimen.
24    Q.  Was it at -- did you see a doctor for your

Page 96

1  spinal injury any other time in 2013?
2     A.  I'm not sure.  I'm not sure.  I think I may
3  have seen him in the end or at the beginning of 2014.
4  I'm not specifically sure.
5        MS. NEWMAN:  Can you mark these two
6     separately?
7           (WHEREUPON, document were marked as
8           DEFENDANTS' Exhibit Nos. 4 and 5,
9           for identification.)
10          (WHEREUPON, said documents were
11          tendered to the witness.)
12  BY MS. NEWMAN:
13    Q.  All right.  Mr. Ruffin, I'm showing you what's
14  been -- we've marked as Exhibit 4 and Exhibit 5.
15  These are some excerpts from your -- from your
16  records from 2013.  There were a lot of records that
17  had to do with other -- with calls for other reasons,
18  and so rather than have a lot of extra bulk, I just
19  pulled out these few pages for us to look at.
20    A.  Got you.
21    Q.  All right.  So looking at Exhibit 4, at the --
22  there is a notation 12/25/13, and it says remember,
23  scheduled for a medical visit to UIC Pain Clinic on
24  2/25/13.  Do you see that?



1  Okay. So do you remember anything else you want to
2  talk about from 2013 with regard to your -- your
3  treatment of your spinal injury?
4    A. Yeah. I know I went back to sick call
5  complaining about, you know, the pain and stuff.
6    Q. Okay.
7    A. You know.
8    Q. And when was that?
9    A. I think December 2013 -- December 11, 2013.
10   Q. Okay. And, in fact, if we look at the
11  December -- if we look at Exhibit 5, there is a note
12  for December 11, 2013?
13   A. Yeah.
14   Q. All right. And what did the nurse say at that
15  time?
16   A. New medication and follow up with -- I guess
17  follow up with the doctor.
18   Q. Okay. And did you have a follow-up
19  appointment with the doctor?
20   A. Yes.
21   Q. And when was that?
22   A. I think January. January or February 2014.
23   Q. All right. And what doctor did you see at
24  that time?

1    A. I'm not sure. I'm not sure.
2    Q. And was there treatment prescribed at that
3  time?
4    A. I think it was -- I think it was not actually
5  a doctor I saw the first time from the sick call. I
6  think it was a nurse practitioner or a PA I seen.
7  And we discussed about the chronic -- you know, the
8  chronic pain I was having from my cervical neck
9  injury to -- following Dr. Mohammed's previous
10  recommendation to send me out to get MBB procedures.
11   Q. So that was in January or February?
12   A. Yeah, 2014. Yeah, she made that
13  recommendation. And I was referred to the medical
14  director. I believe it was -- man, there's so many
15  doctors. I'm trying to -- I think Dr. Wahl came
16  back.
17   Q. And when was that that you saw Dr. Wahl?
18   A. Soon after. Like either January or February
19  of 2014.
20   Q. And what did you discuss with Dr. Wahl at
21  this -- at that appointment?
22   A. We talked about the -- the sharp, shooting
23  pain that's persisting in my right side of my neck,
24  shooting down my right side of my body. And we

1  talked about, you know, how the -- the C -- the CESI
2  procedure kind of failed, it didn't really -- it
3  didn't really provide long-lasting relief. And that
4  we should consider sending me out to UIC Pain Center
5  to get the MBB treatment procedure.
6    Q. So you were requesting the MBB procedure?
7    A. Yeah. I brung it to her attention, that
8  originally, the game plan was that -- from
9  Dr. Mohammed that I seen was to try the C -- the
10  CESI, you know, injection, and if that proved to be
11  ineffective, then we should consider this other
12  treatment, which is the MBB treatment.
13   Q. And what did Dr. Wahl say?
14   A. She said she would -- she would present the
15  issue to collegiate review and see if they approved
16  it.
17   Q. And did you -- what was the next time you had
18  an interaction, your next visit?
19   A. I don't know if I seen her again. I don't
20  know if I seen her again between that time until like
21  April, where they actually approved sending me out to
22  UIC. April of 2014.
23   Q. So -- so you saw her in April 2014?
24   A. I don't recall. I don't recall. I know I was

1  approved in April 2014, but I don't recall if I seen
2  her actually.
3    Q. And you don't remember if you had another
4  visit between January or February and April?
5    A. No, ma'am. I don't recall.
6    Q. Okay. What's the next medical visit that you
7  had after that?
8    A. Well, between April until October 2014, when I
9  actually went out to the UIC for a medical consult
10  for the MBB procedure, I know I seen the doctor
11  several times between that, but I don't know exactly
12  what dates. You know what I'm saying? Or what was
13  actually discussed between those dates.
14   Q. All right. Do you remember who you saw at
15  those -- during those visits?
16   A. No, not off the top of my head. No, ma'am. I
17  don't recall specifically.
18   Q. Okay. All right. And you said it was October
19  you were sent for a consult to UIC?
20   A. No. No, no, no. November.
21   Q. November?
22   A. November 2014.
23   Q. I'm sorry. So November 2014 you went to --
24  went for a consult to the UIC Pain Clinic?



Page 105

1    A.  Yes, ma'am.
2    Q.  And who did you see at that time?
3    A.  Dr. Mohammed.
4    Q.  All right.  And what did Dr. Mohammed say at
5  that time?
6    A.  We talked about the -- the many times I took
7  this -- the CESI injection and how it didn't
8  provide -- it didn't provide long-lasting relief.
9  And he described -- then we talked about doing the
10  MBB procedure.  And he told me the -- the risks and
11  the benefits of this procedure.
12    Q.  And what were those risks that he talked
13  about?
14    A.  I think the risks is, you know, it's possibly,
15  you know, you can be paralyzed from the neck down
16  because you're dealing with the spinal cord area.
17  So -- and I got shrapnels and bullet fragments right
18  there.  And so --
19    Q.  And what were the benefits that he --
20    A.  The benefit, that I could get relief from six
21  months to a year or even longer.  He also explained
22  too what the procedure was -- was about, you know.
23  In my layman's term, my understanding, what he
24  explained to me is that they was going to go from the

Page 106

1  C4, C5, C6, C7, and I think the T1, that they was
2  going to do a procedure where they kind of like numb
3  the nerves between those vertebrates (sic) so it
4  doesn't -- basically, localize the -- the pain so it
5  doesn't shoot -- continue to shoot down my right
6  side.  So they was going to numb it.  Or deaden it is
7  the correct term, you know.
8    Q.  And what was your reaction during this --
9  during this conversation?
10    A.  At first I was nervous, scared, because he
11  said I could -- I could be paralyzed from the neck
12  down.  But my desperation and my pain, I was willing
13  to try anything, even if -- even if I could have been
14  paralyzed from the neck down.  That's how -- that's
15  how severe, you know, the pain was.  I was willing to
16  take that risk if it'll help.
17    Q.  So at that -- during that visit, did you tell
18  him you wanted to go ahead with it or did you say you
19  wanted to think about it?
20    A.  No.  I says let's do it.  Let's do it.
21    Q.  All right.  So did you have a follow-up visit
22  at Dixon after this -- after this appointment?
23    A.  Yes, ma'am.
24    Q.  All right.  Who did you see then?

Page 107

1    A.  I don't recall.  I don't recall who the
2  medical director was at that time.
3    Q.  And what did you discuss at the follow-up?
4    A.  Basically, they said they going to -- he or
5  she said that they was going to present it -- present
6  the doctor's recommendation to the collegiate review
7  to send me out to get the MBB procedure.
8    Q.  And was the procedure approved?
9    A.  Yes, ma'am.
10    Q.  All right.  And what was your next -- your
11  next appointment?
12    A.  I think that December.
13    Q.  And what was -- what was that appointment?
14  Did you --
15    A.  That's when I went to have the -- I went to
16  UIC Pain Clinic and I had the MBB procedure.
17    Q.  And who did you see at that time?
18    A.  If I do recall, I think it was Dr. Mohammed.
19    Q.  And did you talk with him at all during this
20  appointment?
21    A.  Basically, he -- he prepped me for what was
22  going to go down and just gave me the run-down what
23  was going to happen, if I -- if I feel this, let him
24  know, you know, so --

Page 108

1    Q.  Okay.  And was that -- the MBB procedure
2  completed?
3    A.  Yeah.  He completed it that day, yeah.
4    Q.  All right.  And what were the results from
5  that procedure?
6    A.  Well, he told me I was going to do a follow-up
7  for additional -- I guess it's secondary to the -- I
8  don't understand what -- what the follow-up thing was
9  after the MBB.  I supposed to do like a -- I think a
10  cervical facek enthopath procedure (sic), something
11  like that.  That's what's the next -- that was his
12  recommendation as a follow-up.
13    Q.  Is that a follow-up if the MBB procedure
14  didn't work?
15    A.  No, no, no.  I guess this is something that
16  goes like a -- you know, it's like med -- I guess
17  this is something like once you do this, then this
18  come -- like a -- what's the term?  Quid pro quo or
19  something.  That's how -- like something that's --
20  comes afterwards.  Like you do this, then this has to
21  come afterwards.  That's how I understood it.
22    Q.  Okay.  And when were you supposed to go have
23  that second procedure?
24    A.  I think within a month.



Page 109

1   Q. And did you have that second procedure?
2   A. Yup. I had it on January 15, 2015, yeah.
3   Q. All right. And was that -- so that was at the
4   UIC Pain Clinic again?
5   A. Yes, ma'am.
6   Q. All right. And did you see Dr. Mohammed at
7   that time?
8   A. I don't recall if it was Mohammed or another
9   doctor. I don't recall.
10  Q. All right. So this -- the -- this doctor did
11  this second procedure?
12  A. Yes.
13  Q. All right. So I should back up a little.
14  Between -- after the MBB procedure, how did you feel?
15  A. Oh, yeah. It was a lot better. A way lot
16  better. I was able to sleep. It wasn't -- it wasn't
17  affecting my normal daily activities, you know. It
18  felt -- it felt normal for a change.
19  Q. And that was immediately after -- immediately
20  after the procedure?
21  A. Yeah, yeah. Yes, ma'am.
22  Q. And did -- and after you had the MBB procedure
23  in December, did you have a follow-up with a doctor
24  at Dixon?

Page 110

1   A. Yes. Yes, I did.
2   Q. Okay. And who did you see there?
3   A. I don't recall who the doctor was.
4   Q. And do you remember what that doctor said?
5   A. Basically, I guess they approved me to go back
6   out, to go back out for this additional procedure.
7   Q. All right. So in January you had the second
8   procedure?
9   A. Yup.
10  Q. And what were the results of that procedure?
11  A. Well, we went out there -- like when I went
12  out there, it was like testing my nerve function. So
13  it's like he -- from C4 to the C -- C7 they put -- I
14  don't know if it's needles. Some type of electronic
15  device and he'll turn the frequency up to see what
16  nerves function.
17  Q. Oh, so this was like a testing?
18  A. I guess that's what it was.
19  Q. A test?
20  A. After the -- right.
21  Q. To see how -- to see how successful --
22  A. Exactly.
23  Q. -- how successful the MBB procedure has been?
24  A. Exactly, yeah.

Page 111

1   Q. Okay. And what were the results of the test?
2   A. Everything was -- well, you know, outside of
3   the fact that I got substantial spinal cord damage,
4   vertebrate (sic) damage in that area, everything was,
5   I guess, according to him, just -- nothing was
6   unusual, I guess, outside of what I was --
7   Q. It was normal for you?
8   A. Yeah. For me, yeah.
9   Q. All right. So did you have a follow-up
10  appointment at Dixon after this -- after this testing
11  procedure?
12  A. Yes.
13  Q. And when was that?
14  A. I want to say soon after. I'm not sure
15  specifically. It was in January or February. I'm
16  not sure.
17  Q. All right. And who did you see at that time?
18  A. I don't recall who the doctor was.
19  Q. And what did you discuss with the doctor at
20  that time?
21  A. Well, I told her that -- I told her or he that
22  man, I felt good. I mean, the -- the procedure
23  worked.
24  Q. And how long did -- how long did your pain

Page 112

1   relief last from the MBB procedure?
2   A. Oh, man. Until like August -- August of 2015.
3   Q. And when it -- when the pain came back, did it
4   come back gradually or all at once?
5   A. I'd say like gradually. It wouldn't come like
6   suddenly. It was like gradually. You know, first
7   when it came, it was tolerant. You know what I'm
8   saying? It wasn't like -- it was like -- I guess
9   like -- how can I explain it? Like you -- you could
10  hear like -- you could feel like little angst -- I
11  don't know what the right term. You'll feel it a
12  little bit. So over the time, it just gradually got,
13  you know, back -- it returned back to normal. I
14  mean, to where I was, where it was shooting, sharp,
15  persisting pain.
16  Q. All right. When did you -- when did it go
17  back -- how long did it take you to get back to --
18  A. I want to say like the end of July to like the
19  end of August, that's when it was like -- I'm like
20  no, I got to -- I got to put in to see about this.
21  But up until then, you know, between that time when
22  I had it and with the medication I was taking, it
23  was -- I was good. You know what I'm saying? I was
24  good for a time.



Page 185

1  about the money with me.
2  Q. So how did you -- how did you come to be a
3  named plaintiff in the lawsuit?
4  A. I guess I was chose, I guess.
5  Q. So you were approached by your attorneys?
6  A. I'm pretty sure, yeah.
7  Q. All right. And when was that?
8  A. I don't know. I don't remember what date that
9  was.
10  Q. Was it within the past year?
11  A. Yeah.
12  Q. Okay. Was it within the past three months?
13  A. Probably somewhere around that vicinity, you
14  know.
15  Q. Okay. So what are you seeking from this
16  lawsuit?
17  A. Like I said before, you know, I believe in --
18  I believe in the -- cause, as far as making
19  modification and change to the system that I have
20  seen have done a lot of -- of my co -- counterparts
21  harm, you know. So I believe that there should be a
22  change in the medical system, you know, and the way
23  we receive treatment. So that's my -- that's my
24  motive of being a part of this.

Page 186

1  Q. Do you have any damages relating to your
2  medical treatment?
3  A. Could you --
4  Q. Do you have -- do you believe you are owed
5  any -- owed money damages because of your medical
6  treatment?
7  A. Well, like I said, it ain't about the money
8  with me, you know. As far as my personal belief, I
9  considered -- I considered when I filed a grievance
10  to file a lawsuit. But from my experience, I didn't
11  want to go through the headaches of filing a lawsuit.
12  You know, plus I didn't have the money to get a
13  lawyer and stuff of that nature.
14  Q. So you considered filing a lawsuit in 2010?
15  A. Yeah. Yup.
16  Q. But you decided not to do so?
17  A. Yeah. Because I didn't have the resources
18  that I need in order to fight. You know what I'm
19  saying? That means lawyer, hiring medical expert
20  witness. I didn't -- I know I was going -- going
21  to be a tough road for me, to pro se represent
22  myself, so --
23  Q. Okay. Do you understand that this lawsuit is
24  not -- is not seeking any kind of monetary

Page 187

1  compensation for the named plaintiffs?
2  A. Yes. That was told to me. Yup.
3  Q. All right. And you're okay with that?
4  A. Yes.
5  Q. Okay. All right. Mr. Ruffin, can you tell me
6  some more about how you -- about how you got -- how
7  you were shot originally? I believe you said it was
8  in 1999?
9  A. Yeah. I was -- I got shot by the Kane County
10  Sheriff Department in my arrest for this -- for this
11  case.
12  Q. All right. And, I mean, what were the
13  circumstances of that -- of that shooting?
14  A. They shot me in my back.
15  Q. Were you running away?
16  A. Yeah, we was -- I was in a high-speed chase.
17  At the point of me being shot the vehicle was
18  upsidedown on its roof, and -- and I got shot by two
19  different officers from two different directions.
20  Q. So you were -- you were in a car? You were --
21  A. I was in a truck. I was in an SUV.
22  Q. All right. So you were in -- you were in an
23  SUV and you were fleeing from the police?
24  A. Yes.

Page 188

1  Q. All right. And then -- and the SUV flipped?
2  A. Yes.
3  Q. And then you were -- and then you were shot by
4  two different officers, is that --
5  A. Yes, ma'am.
6  Q. While you -- while you were in the car?
7  A. Yes, ma'am.
8  Q. Were you -- were you armed at the time?
9  A. There was a weapon found.
10  Q. There was a weapon found in the SUV?
11  A. Yes.
12  Q. What weapon was found in the SUV?
13  A. That question. . .
14  MS. SCHULT: Just a second.
15  (WHEREUPON, discussion was had
16  between MS. SCHULT and the
17  witness.)
18  BY MS. NEWMAN:
19  Q. Do you need the question repeated back?
20  A. Yeah. What was the question?
21  (WHEREUPON, the record was read
22  by the reporter as requested.)
23  BY THE WITNESS:
24  A. A firearm. A handgun.



# Exhibit 21
# (Under Seal)

# Exhibit 22
# (Under Seal)

# Exhibit 23

Page 1

```
1          IN THE UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF ILLINOIS
3                  EASTERN DIVISION
4  DON LIPPERT, LEWIS RICE, MILAM     )
5  MARTIN, DEBRA PATTISON, JOHN       )
6  RUFFIN, and EZELL THOMAS,          ) No. 10-CV-4603
7              Plaintiffs,            )
8       vs.                           )
9  JOHN BALDWIN, LOUIS SHICKER,       )
10  and BRUCE RAUNER,                 )
11             Defendants.            ))
12
13  THIS TRANSCRIPT CONTAINS CONFIDENTIAL INFORMATION.
14
15          The deposition of EZELL THOMAS, called
16  for examination, taken pursuant to the Federal
17  Rules of Civil Procedure of the United States
18  District Courts pertaining to the taking of
19  depositions, taken before INA RUTH EAVENSON, a
20  Notary Public within and for the County of
21  Kankakee, State of Illinois, and a Certified
22  Shorthand Reporter of said state, at Pontiac
23  Correctional Center, Pontiac, Illinois, on the
24  29th day of January, A.D. 2016, at 9:30 a.m.
```

Page 2

```
1  PRESENT:
2  On behalf of the Plaintiffs:
3      MS.  NICOLE SCHULT
        UPTOWN PEOPLE'S LAW CENTER
4      4413 North Sheridan Road
        Chicago, Illinois 60640
5      773-769-1411
        nicole@uplcchicago.org
6
        -- and --
7
        MS. LINDSAY S. MILLER
8      ROGER BALDWIN FOUNDATION OF ACLU, INC.
        180 North Michigan Avenue, Suite 2300
9      Chicago, Illinois 60601-1287
        312-201-9740, Ext. 315
10      LMILLER@ACLU-IL.ORG
11  On behalf of the Defendants:
12      MS. SARAH NEWMAN
        OFFICE OF THE ATTORNEY GENERAL OF THE
13      STATE OF ILLINOIS
        100 West Randolph Street
14      Chicago, Illinois 60601
        312-814-3000
15      snewman@atg.state.il.us
16  On behalf of Wexford:
17      MR. ANDREW M. RAMAGE
        BROWN HAY & STEPHENS LLP
18      205 South Fifth Street, Suite 700
        Springfield, Illinois 62705
19      217-544-8491, Ext. 255
        aramage@bhslaw.com
20
    REPORTED BY:  INA RUTH EAVENSON, CSR No. 84-4293.
21
22
23
24
```

Page 3

```
1          (WHEREUPON, the witness was duly
2      sworn.)
3          EZELL THOMAS,
4  called as a witness herein, having been first duly
5  sworn, was examined and testified as follows:
6          EXAMINATION
7  BY MS. NEWMAN:
8      Q.  Good morning, Mr. Thomas.
9      A.  Good morning.
10     Q.  Can you please give your full name for
11  the record?
12     A.  Ezell Thomas.
13     Q.  And your IDOC number?
14     A.  A-10203.
15     Q.  Mr. Thomas, have you ever given a
16  deposition before?
17     A.  Not like this.
18     Q.  I'm sorry?
19     A.  No.
20     Q.  No.  Okay.  So let's just take a few
21  minutes, you know, to go over kind of how it's
22  going to work and everything so that everything is
23  clear.
24          So first of all, you understand this
```

Page 4

```
1  lady is the court reporter (indicating), and she's
2  going to write down everything that's said today.
3  Do you understand?
4      A.  Right.
5      Q.  All right.  And you have just taken an
6  oath to tell the truth; do you understand that?
7      A.  Yes.
8      Q.  And that oath is just the same as if
9  you were standing in a courtroom in front of a
10  judge?
11     A.  Yes.
12     Q.  All right.  Is there any reason that
13  you can't give complete and accurate testimony
14  today?
15     A.  No.
16     Q.  Okay.  So you're not on any medications
17  that might affect your memory or your ability to
18  testify accurately?
19     A.  No.
20     Q.  So if you don't hear one of my
21  questions or you don't understand it, just let me
22  know and I will rephrase it or reask it.  But if
23  you answer the question that I ask, I'm going to
24  assume you understood it.  Is that fair?
```



Page 21

1    Q.   Right.  Yeah.  All right.
2        And the last one is T-e-r-a-z-o-s-i-n;
3  is that right?
4    A.   T-e-r-a -- what's that, z-o?  Is that a
5  z or what?
6    Q.   I think so.
7    A.   Z-o-s-i-n.  Right here (indicate)?
8    MS. SCHULT:  Yeah, looks like a Z.
9    MS. NEWMAN:  Okay.
10   MS. SCHULT:  In parentheses it says
11 H-y-t-r-i-a, which is on the list there, Hytrin.
12   THE WITNESS:  It ain't on here (indicating).
13 BY MS. NEWMAN:
14   Q.   It's on here under Hytrin.  That's the
15 generic.
16   A.   Oh, all right.
17   Q.   All right.  Then on this list there is
18 a couple of things here at the top.
19   A.   Atrovent.  That's an inhaler.
20   Q.   Yeah.  Alvesco, Atrovent,
21 X-o-p-e-n-e-x, are those your inhalers?
22   A.   Right.
23   Q.   Those three.
24       Then it says Nitrostat.  Those are

Page 22

1  nitroglycerin tablets?
2    A.   Right.
3    Q.   And is that something you just take
4  when you need it?
5    A.   Nitroglycerin, yeah.  It's for my
6  heart, like, you know -- what do you call it?
7  Angina?  I can't pronounce the word good, but when
8  it acts up I take it.
9    Q.   Got you.  All right.  I'd like to start
10 by talking a little bit about some of your medical
11 history.  First of all, you can put that to the
12 side in case we need to look at it later.
13       So you have had heart problems for a
14 while; is that right?
15   A.   Yes.
16   Q.   When did you first start having heart
17 problems?
18   A.   In 2001 I had open heart surgery, but I
19 can't give you the exact date because I don't
20 really know.  It started before 2001.
21   Q.   Right.  Was it a short time before 2001
22 or was it a long time?
23   A.   Let me see.
24   Q.   Was it more than ten years before 2001

Page 23

1  that you had some heart problems?
2    A.   Let me see.  It was pretty close to
3  2000.  It wasn't no ten-year period.
4    Q.   So you have roughly a year or so
5  before --
6    A.   Let me get it right.  2001 I had open
7  heart surgery.  They said I had one previous
8  before that that was shown on the machine, but I
9  never knew I had it.  So that would be -- I'll say
10 about 1998.  I'm not for sure on the date.
11   Q.   So about 1998 you began to have
12 problems with your heart?
13   A.   Right.
14   Q.   And how did you know you were having
15 problems?
16   A.   I went to the hospital.
17   Q.   Why did you go to the hospital?
18   A.   I had chest pains.
19   Q.   In 2001 you had open heart surgery; is
20 that right?
21   A.   Right.
22   Q.   And have you had any other procedures
23 for your heart since 2001?
24   A.   In 2011 I had another heart attack.

Page 24

1    Q.   Did you go to the hospital at that
2  time?
3    A.   Yeah.  They sent me to St. Joe's
4  Medical Center in Bloomington, Illinois.
5    Q.   How did they --
6    A.   They put a stent.
7    Q.   They put a stent in?
8        Have you had any other procedure done
9  on the heart since 2011?
10   A.   No.
11   Q.   Are you -- here at Pontiac, are you
12 seen -- do you go to the cardiac care clinic that
13 they have three times a year?
14   A.   About every six months.
15   Q.   And what do the doctors do for you
16 during the this clinic, the cardiac clinic?
17   A.   What do they do for me?
18   Q.   Yeah.  Do they change your medications
19 or --
20   A.   No, they keep me on the same
21 medication.
22   Q.   Monitor your blood pressure?
23   A.   Yeah, they put -- I can't name the
24 thing.  They put the little thing on my finger,



Page 25

1 they take my blood pressure, and they get the
2 scope and check my heart from the front and the
3 back.
4     Q.    Have you ever been to the UIC
5 cardiology department for treatment?
6     A.    Yes.
7     Q.    How recently have you been there?
8     A.    Last two times -- I can't give you the
9 date on that because I don't know.
10     Q.    All right.  Was it after 2011 when you
11 had the heart attack?
12     A.    See, I don't want to tell no lie
13 because I don't know.
14     Q.    So you're not sure?
15     A.    I'm not sure.
16     Q.    But you have been to UIC cardiology
17 department more than once?
18     A.    Been where, now?
19     Q.    More than once?
20     A.    To where?
21     Q.    To UIC cardiology.
22     A.    I have been there more than once, but I
23 haven't kept up with how many times I went in
24 2015, 2014.  I can't tell you that because I don't

Page 26

1 recall that, but I know I have been back.
2     Q.    Okay.  Was it -- have you been to have
3 them check your heart at UIC more than -- has it
4 been more than five times?
5     A.    I done been back, but like on
6 follow-ups, I guess.
7     Q.    Right, for follow-up.  But you're not
8 sure how many follow-ups you have been there for
9 for your heart?
10     A.    No.
11     Q.    Okay.  Mr. Thomas, are you making any
12 claims in this lawsuit based on your heart
13 condition?
14     A.    What do you mean, make a claim?
15     Q.    Do you have any claims in this lawsuit
16 based on your treatment for your heart?
17     A.    (No audible response.)
18     Q.    Do you have any complaints?
19     A.    Yeah, I have complaints.
20     Q.    About your heart?  About your treatment
21 for your heart condition?
22     A.    Oh.  Well, I don't like to tell no lie,
23 but like I have a problem with my chest.  I don't
24 know whether it's a heart problem or a lung

Page 27

1 problem because it's shortness of my breath.  They
2 said I have angina or whatever that is.
3         The little valve closes up.  That's
4 when I have to take the nitro.  I don't know if
5 that's happening or not.  I have shortness of
6 breath quite often.  Sometimes I take the nitro,
7 it works; sometimes it don't.  So then I take the
8 inhalers because I think it's my lungs, so I don't
9 be knowing which one it is.
10     Q.    Got you.  Okay.
11     A.    One more thing.  You asked me a
12 question.  I was told by the doctor, the medical
13 director, a specialist in Bloomington that I'm not
14 to take albuterol inhaler because it will damage
15 my heart.  And I have seen the doctor over and
16 over, and they haven't changed it yet.  That's
17 been going on since 2011.
18     Q.    All right.  In 2011, was it a doctor at
19 St. Joseph's?
20     A.    No.  The doctor at St. Joseph told me
21 that I can't take albuterol.  In fact, the doctor
22 here take me off albuterol because it's damaging
23 my heart -- antilog (phonetic), whatever that
24 is -- and they put me back on Lopressor for my

Page 28

1 heart.
2     Q.    All right.  And did you -- after you
3 came back from the hospital in 2011, did you talk
4 to the doctors here at Pontiac about that?
5     A.    Yes.
6     Q.    About the albuterol?
7     A.    Yes.
8     Q.    And what did the doctor say here at
9 Pontiac?
10     A.    What I was asking for, it was --
11 Wexford wasn't going to pay for it because it's
12 too expensive.
13     Q.    And at some point were you taken off
14 the albuterol?
15     A.    I was taken off the albuterol and put
16 on Xonex (phonetic) or whatever you pronounce
17 that, but that's the same as albuterol.  It's the
18 same thing.
19     Q.    Is that the Alvesco?
20     A.    No, no, Xonex.
21     Q.    Is that the one that starts with the X
22 here?
23     A.    Right here (indicating).
24     Q.    Okay.



Page 37

1  the gout, how do they treat that?
2      A.   Well, since then, I haven't -- when it
3  comes, I can't tell you until it hits me.  You
4  know what I mean?
5          Since I have been taking the
6  Allopurinol, the swelling in my feet and the bones
7  and whatnot, the only thing that helps me with
8  that is the Ibuprofen and -- what you call that
9  stuff?  Ibuprofen, and there's another green
10  capsule they give me.  I can't even think of the
11  name of it.  But anyway, that's the only time I
12  use that.
13      Q.   All right.  Mr. Thomas, do you have any
14  claims or complaints based on your treatment for
15  gout that -- based on the doctors here and how
16  they treated your gout?
17      A.   Well, when the pain comes now, I mean
18  they can't give me no medications for it.  I'm not
19  in pain now, but when it comes I just got to use
20  my mind power to get rid of the pain.
21      Q.   But -- and the reason they can't give
22  you the medication is because it would hurt your
23  stomach?
24      A.   Yes.  I think they could give me

Page 38

1  something else.  I mean there's got to be
2  something else they can give you.
3      Q.   Have you asked them for other pain
4  medication?
5      A.   I just asked for pain medicine.
6      Q.   And have they given you any pain
7  medications when you've asked for it?
8      A.   The only thing they gave me was the
9  stuff for the muscle relaxer, and they took that
10  off.  It didn't do any good anyway, though.
11      Q.   When's the last time you had a gout
12  attack?
13      A.   Well, I guess it's been about -- I
14  guess it's been eight or nine months or something.
15  That's not a fact, now.  I don't know.  It's about
16  eight or nine months.
17      Q.   You also had prostate cancer back in
18  about 2008 to 2010; is that right?
19      A.   2008, I think.
20      Q.   2008 is when you were diagnosed?
21      A.   Right.
22      Q.   All right.  And how was that treated?
23      A.   (No audible response.)
24      Q.   Did you receive treatment for it?

Page 39

1      A.   44 treatments of radiation.
2      Q.   And where did you have those radiation
3  treatments?
4      A.   UIC Chicago.
5      Q.   And what were the results from the
6  treatment?
7      A.   Well, it went down to 2.9 I think it
8  was.  I imagine that was good.
9      Q.   All right.  And have you had any
10  follow-up visits at UIC based on --
11      A.   Yeah, I had follow-ups.  But the last
12  follow-up they say in a month I was to come back.
13  And I don't remember the date, but I know -- I
14  don't know the date.
15      Q.   Okay.
16      A.   But I was supposed to go back on a
17  follow-up, but I never went.  They never sent me
18  back.
19      Q.   When did they -- at UIC, when did they
20  say you should come back for a follow-up?
21      A.   I think that was in 2008.
22      Q.   So you haven't been back to UIC urology
23  since 2008?
24      A.   Wait a minute.  Let me get this right.

Page 40

1  I don't know the last time I was there for the
2  prostate cancer, but I know I was diagnosed in
3  2008.
4      Q.   Right.
5      A.   And I got treatments.  I got 44
6  treatments.  I can't tell you the day it ended
7  because I don't know that, the final date.  So
8  2009 -- that might have been 2009 or 2010 that
9  they said I needed to come back on follow-up.
10      Q.   Okay.  And you haven't been back to UIC
11  urology department at all since 2010?
12      A.   Not for prostate cancer.
13      Q.   Have you been to the UIC's urology
14  department since 2010 for --
15      A.   No.
16      Q.   Is that a --
17      A.   No.
18      Q.   -- no?
19      MS. NEWMAN:  Off the record.
20          (WHEREUPON, discussion was had off
21          the record.)
22      MS. NEWMAN:  Okay.  Back on the record.
23  BY MS. NEWMAN:
24      Q.   All right.  Mr. Thomas, now, you have



Page 49

1  Dr. Todd, they tell me I was supposed to take two
2  puffs four times a day from the Atrovent, but
3  Dr. Todd cut it down to one puff four times a day.
4  Dr. Tillman cut it down to one puff two times a
5  day.  The UIC specialist said I'm to take it two
6  times, four puffs a day.
7      Q.   I'm sorry, four puffs?
8      A.   No, two puffs four times a day.
9      Q.   Okay.
10     A.   Now, the inhaler only has 200 puffs in
11  it, and if I take four puffs out of it, you divide
12  four into 200 and you get 50 days.  I can't get no
13  three months.  You get seven weeks and one day.
14     Q.   So you were using it the four times a
15  day?
16     A.   No.  I was using it as -- the last
17  one -- first I was using it two times four times a
18  day, but Ms. Todd changed it to one puff four
19  times a day.  So I started taking one puff four
20  times a day, and they say I was abusing it.
21         They later say -- all the medical
22  techs, the nurses, they said that it was
23  impossible for me to make it last three months
24  because it only has 200 puffs in it.  And the

Page 50

1  doctor, the medical director, he knows this here,
2  but he still put me down for one puff two times.
3  And the specialist from UIC said two four times a
4  day.
5      Q.   All right.  So there was a two-month
6  period when you were not able to keep -- you
7  didn't have your inhalers with you; is that right?
8      A.   Right.
9      Q.   But you were still given at least how
10  often -- you were still allowed to take the
11  medicine, right?
12     A.   The nurse would bring it around twice a
13  day, so I couldn't get no more than two times a
14  day, one puff of Atrovent two times a day, one
15  puff off the Alvesco, one puff two times a day,
16  and the Xodex (phonetic) were neither.
17     Q.   The what?
18     A.   I can't pronounce the words that good.
19  The Xodex, whatever you call it.
20     Q.   The one that starts with the X?
21     A.   Right.
22     Q.   That's when needed?
23     A.   Right.  It says one puff twice a day as
24  needed.  That's the instructions on the box.

Page 51

1      Q.   That's only when you're having actual
2  breathing problems?
3      A.   Sometimes I need it more than twice a
4  day.  If I have got to walk somewhere, it has an
5  effect on my breathing.  Cold, wind, I don't know
6  why, but it cuts my breath off.  If I walk too
7  fast -- I can walk, but if I walk too fast it cuts
8  my breath, so I have to use it.
9      Q.   And did it have -- was -- did it have
10  an effect on you when you weren't allowed to keep
11  your inhalers with you?
12     A.   Yes.
13     Q.   What were the -- what was the effect?
14  How did that affect you?
15     A.   I get weak.  I mean I get short of
16  breath.  It looks like it's the last -- this is
17  it.  I can't describe it.
18     Q.   Did you have any -- like an asthma
19  attack during that period?
20     A.   Well, you know, listen.  I got to tell
21  you, I don't know when I be having an asthma
22  attack or COPD.  I don't know.  All I know is
23  shortness of breath.
24     Q.   Did you have some sort of attack during

Page 52

1  that period where you were having a lot of
2  difficulty breathing?
3      A.   Breathing, yes.
4      Q.   How many of those episodes did you have
5  during --
6      A.   Three times I had it so bad I had to go
7  over there and they had to put me on the machine.
8  Now, don't ask me, but it's just recently.  That
9  was in 2015.
10     Q.   Was that during the period when you
11  didn't have your inhalers with you?
12     A.   2015?  Let me see.  I think I had
13  received -- just received them back.  I think I
14  had just received them back.  Let me make sure.  I
15  had my inhalers, I had my inhalers, yeah.  The
16  last two times that I was on the machine I had my
17  inhalers.
18     Q.   So it was just one time that you were
19  on the machine you needed to go on the machine --
20     A.   I was on there three times.  I don't
21  know about -- the first time might have been a
22  little longer.  It might not have been in December
23  of 2015, but I know two of them was.
24     Q.   Okay.  So two of them were in December?



Page 53

1 Two of these episodes were in December?
2     A.   Right.  It might have been all three of
3 them, but I'm sure it was two.
4     Q.   And so you don't know if you had any of
5 these episodes while you didn't have access to
6 your inhalers?
7     A.   Yes, but I couldn't give you the time.
8 Let me see.  Wait a minute.  It's from September,
9 I think.  I don't know if I'm getting the years
10 right.  From September of '15 to October.  I think
11 it was from September to October.  I know it was
12 two months and six days.  I know it was two months
13 and six days that I went without.
14        And I did have -- that's right, two
15 months, 16 days.  That's from September to
16 October -- I forget the other one.  But that was
17 two months and six days.  I remember that one.
18        That other one, it was only two days.
19 And there was one long before then, but I can't
20 tell you that because I'd have to have my medical
21 records to show you that one.
22     Q.   Show there was a two-month period --
23     A.   Two months, six days.
24     Q.   Right.  So there was a

Page 54

1 two-month-six-day period, and then there was a
2 second period which you said was two days?
3     A.   Right after the grievance.
4     Q.   That was December 2015?
5     A.   Yeah.
6     Q.   Why were you without your inhalers
7 during that two-day period?
8     A.   They said I was abusing my inhalers by
9 using them too much.
10     Q.   And they said that again in December?
11     A.   Yes, by the same medical tech.
12     Q.   All right.  And how was that resolved?
13     A.   Through a grievance.
14     Q.   You filed another -- a grievance in
15 December 2015?
16     A.   Yeah.  The second grievance didn't go
17 anywhere to the grievance office because they
18 gave it back to me in two days.  One went two
19 months and six days.  That was from the -- two
20 months and six days.  That was from September
21 to -- I forget the months.
22     Q.   All right.  So looking then at that
23 first period, that two-month period, when did you
24 file a grievance about them having taken your

Page 55

1 inhalers from you?
2     A.   It was in 2015.  It was --
3     Q.   Was it right after they took -- right
4 after --
5     A.   Right.
6     Q.   -- it happened?  All right.
7        And you sent that to the grievance
8 counselor?
9     A.   I don't know which one.  The first one,
10 I sent the first one to the warden for emergency
11 grievance, and they said it was not an emergency.
12 I took it to be an emergency because they already
13 told me I'd suffer irreparable damage to my lungs.
14     MS. NEWMAN:  Hold on a second.
15        (WHEREUPON, there was a short
16        interruption.)
17 BY MS. NEWMAN:
18     Q.   Sorry.  I didn't mean to interrupt you.
19 I just could see he was at the door.
20     A.   The one warden said it wasn't an
21 emergency.  He told me to file it, send it to the
22 grievance committee.  So I sent it to the
23 grievance committee, and that's when they decided
24 they were going to give it back to me.  They had

Page 56

1 me see the doctor first.  They said they was going
2 to straighten it out, going to give me all the
3 inhalers, the ones that I needed.
4        But -- they gave them back to me, but
5 it was the same ones.  It was not the ones that I
6 needed.  I didn't get no Spiriva and I didn't get
7 no Symbicort.  It ain't no thing that they don't
8 give that here or it's too expensive because lots
9 of people here get Symbicort and Spiriva.
10     Q.   So if there are other people who are
11 getting those drugs, do you know why you haven't
12 gotten them?
13     A.   Only thing they ever told me was
14 Wexford said it's too expensive.
15     Q.   Have you filed any other grievances
16 relating to your breathing problems other than
17 these two we've already talked about?
18     A.   All the grievances that I filed I
19 brought up here.  I didn't bother to see -- I got
20 some on -- I got an eye problem, prostate cancer,
21 I've got -- I don't know what's all in the
22 package.
23     Q.   Okay.  But you don't recall having any
24 other -- filing any other grievances relating to



1 times. It comes when it -- when it decides to
2 come it comes.
3     MS. NEWMAN: We can go off the record.
4         (WHEREUPON, discussion was had off
5         the record.)
6 BY MS. NEWMAN:
7     Q.    All right. So, Mr. Thomas, I
8 understand sometime in 2013 you began to have some
9 weakness when you had to stand for long periods of
10 time; is that right?
11     A.    Yes.
12     Q.    All right. About when did you first
13 experience that problem?
14     A.    I guess about -- I can't be for sure,
15 but I think about four, five days before I went to
16 the hospital for it I had been getting weak and
17 feeling drowsy and sick.
18         And in here (indicating) I get to
19 shaking. I get real nervous, you know, like my
20 body be trembling on the inside. And I get warm,
21 and I was -- I think I was spitting up blood. And
22 I checked in the hospital -- not checked in, but
23 went to sick call, and they admitted me.
24     Q.    All right. When did they admit you --

1 they admitted you into the infirmary?
2     A.    In the infirmary.
3     Q.    When was that?
4     A.    That was in 2013. I don't know the
5 date and the month, but they admitted me. And I
6 don't know how long I was in there because in the
7 few days' time that I was there that I remember --
8 I don't know how many days I really stayed there
9 because I lost -- my memory began to fade.
10     Q.    So you had some memory issues during
11 that time?
12     A.    I couldn't -- I lost my mind. I guess
13 you'd say I lost my memory. They said something
14 about my electrolytes dropping. That's all I
15 remember.
16     Q.    All right. At some point during
17 that -- was that about December 2013 that you were
18 in the infirmary?
19     A.    It might have been close to it. I
20 don't want to really say. I know it was in 2013.
21     Q.    Okay. And at some point were you sent
22 out to --
23     A.    UIC.
24     Q.    Sent out to UIC?

1     A.    Yeah.
2     Q.    And you were in the hospital at UIC?
3     A.    Right.
4     Q.    And were you having chest pains at that
5 time?
6     A.    Yes.
7     Q.    And that was -- was that in December
8 2013?
9     A.    I know it was in 2013.
10     Q.    Do you know what your diagnosis was at
11 that time?
12     A.    Well, the diagnosis, they said that --
13 I didn't learn this until -- you know, until they
14 was discharging me. I had kidney failure and -- I
15 can't pronounce words that good. Some stuff
16 called powder or -- it started with a P.
17     Q.    Pylori?
18     A.    Right.
19     Q.    Yeah. Was that the first time that you
20 were in the hospital or was that the second time
21 that you got that diagnosis?
22     A.    That might have been the second. I
23 don't want to get it mixed up, now. I remember I
24 went there in '13. I know I had kidney failure,

1 and whatever the renal thing is, I had that. And
2 I could have swore they talked about my stool
3 turning black. I might have it all mixed up.
4     Q.    Did you also have a diagnosis of anemia
5 at that time?
6     A.    Right.
7     Q.    All right. And did UIC have any
8 recommendations for you at that time?
9     A.    The only thing I know of is that they
10 gave me a lot of the medicine. And when they
11 discharged me they told me I had to come back. It
12 was a month and I come back on follow-up.
13         I forget for how much time, but a
14 certain time they had to call me back. And I went
15 back for evaluation or whatever. I forgot. Then
16 they found something else that was wrong and they
17 had to put me down for another follow-up,
18 outpatient follow-up for -- what do you call it?
19 The renal and kidney failure. I remember that was
20 on the 28th.
21         I went there on the 28th. See, I don't
22 know if all that was on paper. That's what they
23 told me at that time.
24     Q.    Did they tell you at that time that you



# Exhibit 24
# (Under Seal)

# Exhibit 25
# (Under Seal)

# Exhibit 26

# (Under Seal)

# Exhibit 27
# (Under Seal)

# Exhibit 28
# (Under Seal)

# Exhibit 29
# (Under Seal)

# Exhibit 29
# (Under Seal)

# Exhibit 30
# (Under Seal)

# Exhibit 31
# (Under Seal)

# Exhibit 32

# (Under Seal)

# Exhibit 33
# (Under Seal)

# Exhibit 34
# (Under Seal)