**Index of Exhibits**

| Ex. | Description | Status |
|---|---|---|
| 1 | Stipulation for Injunctive Relief, *Plata v. Davis*, No. C-01-1351 TEH, U.S.D.C. N.D. Cal. | Public |
| 2 | *Rasho v. Walker*, Amended Order on Plaintiffs' Motion for Class Certification Under Rule 23(b)(2), August 14, 2015. | Public |
| 3 | Examples of the Named Plaintiffs' Exposure to IDOC's Alleged Systemic Deficiencies | Public |
| 3A | Lippert Deposition Excerpts | Redacted |
| 3B | Martin Deposition Excerpts | Public |
| 3C | Pattison Deposition Excerpts | Public |
| 3D | Rice Deposition Excerpts | Public |
| 3E | Ruffin Deposition Excerpts | Public |
| 3F | Thomas Deposition Excerpts | Public |
| 4 | Dr. Shicker Emails of 11/6/14-11/15/14 (IDOC Update 000911-15) | Sealed |
| 5 | Wexford Death Review (11/9/14) (Pages 2510-14) | Sealed |
| 6 | Dr. Shicker Emails of 1/10/14-2/11/14 | Sealed |
| 7 | Dr. Shicker Emails of 5/28/14-5/29/14 | Sealed |
| 8 | Donald Lippert, 9/14/14 Grievance re: Dental Care & Response (11/8/14) | Sealed |
| 9 | Lewis Rice, Electrocardiograms (2/11/10, 7/28,10, 8/5/10, 11/17/10) | Sealed |
| 10 | Lewis Rice, Medication Administration Records, Outpatient Progress Notes (10/13/15); Drug Interactions (Drugs.com) | Sealed |
| 11 | Milam Martin, Offender Outpatient Progress Note (beginning 5/26/11) | Sealed |
| 12 | Milam Martin, Radiology Report (12/12/11) | Sealed |
| 13 | 10/21/14 "Service Rendered" note | Sealed |
| 14 | John Ruffin, 11/9/07 Grievance re: Dental Care & Responses (1/2/08, 2/6/08) | Sealed |
| 15 | Ezell Thomas, Patient Discharge Instructions (2/1/14 & 8/13/14) | Sealed |
| 16 | Boost Nutritional Drink Ad (Target.com) | Public |
| 17 | Dr. Shicker Emails of 9/15/15-9/17/15 | Sealed |
| 18 | Dr. Shicker Email of 9/16/15 | Sealed |
| 19 | Dr. Shicker Emails of 9/15/15-9/17/15 (continued) | Sealed |
| 20 | Dr. Shicker Emails of 10/12/15-10/13/15; September 2015 Denials & Furlough Information for Pinckneyville; SS-0012992; Dr. Shicker Emails of 9/8/15 (Alvesco users) | Sealed |
| 21 | Unpublished cases | Public |

# Exhibit 1

1  BILL LOCKYER, Attorney General
   of the State of California
2  PETER J. SIGGINS,
   Chief Deputy Attorney General
3  ROBERT R. ANDERSON
   Chief Assistant Attorney General
4  PAUL D. GIFFORD
   Senior Assistant Attorney General
5  JOHN M. APPELBAUM, SBN 149643
   Supervising Deputy Attorney General
6    1300 I Street, Suite 125
     P.O. Box 944255
7    Sacramento, CA 94244-2550
     Telephone: (916) 445-2389
8    Fax: (916) 324-5205

9  Attorneys for Defendants Davis, Gage, Presley,
   Alameida, and Pickett
10 CA2001CS0001

11                UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13

14

15 | MARCIANO PLATA, et al., | No. C-01-1351 TEH |
   |---|---|
16 | Plaintiffs, | **STIPULATION FOR INJUNCTIVE RELIEF** |
17 | v. | |
   | **GRAY DAVIS, et al.** | |
18 | Defendants. | |
19

20                    **INTRODUCTION**

21        **1.** The parties enter into this stipulation to address issues pertaining to

22 medical care services provided by the California Department of Corrections (CDC).  The

23 plaintiffs are California state prisoners who have serious medical needs.  The defendants

24 include the Governor, Director of Finance, Youth and Adult Correctional Agency

25 Secretary, Director of Corrections, and Deputy Director, Health Care Services Division,

26 and are sued in their official and individual capacities as state officials responsible for the

27 operation of the CDC and its health care delivery system.

28

                                   1

2.  This action was filed by plaintiffs on April 5, 2001, and an amended complaint was filed on August 20, 2001.  The action alleges that plaintiffs are not receiving constitutionally adequate medical care as required by the Eighth Amendment to the U.S. Constitution and that defendants are not complying with the Americans with Disabilities Act (ADA) and § 504 of the Rehabilitation Act.

3.  The parties have conducted informal negotiations since July 1999, in an effort to resolve plaintiffs' demand that medical services be improved.  Those negotiations have been undertaken at arm's length and in good faith between plaintiffs' counsel and high ranking state officials and their counsel.  The parties have reached agreement on procedures that the parties will follow in this case for resolving disputes concerning the constitutional adequacy of medical services.  The parties freely, voluntarily, and knowingly with the advice of counsel enter into this Stipulation for that purpose.

WHEREAS, a dispute exists between the parties as to the extent to which CDC's provision of inmate-medical care meets constitutionally-mandated minimum standards;

WHEREAS, this dispute arose over the course of the last fifteen years, and culminated in plaintiffs filing this statewide-medical class action;

WHEREAS, the Governor of the State of California over the past three years has allocated substantial new resources to improve the medical system and is committed to continuing the improvements to meet applicable standards;

WHEREAS, this stipulation is intended to be narrowly drawn to meet those applicable standards.

## A.  **Terms and Conditions**

4.  The CDC shall implement Health Care Services Division Policies and Procedures (Policies and Procedures), to be filed with the Court on February 15, 2002.

2

1   Defendants shall make all reasonable efforts to secure the funding necessary to

2   implement the Policies and Procedures. The Policies and Procedures are designed to

3   meet or exceed the minimum level of care necessary to fulfill the defendants' obligation

4   to plaintiffs under the Eighth Amendment of the United States Constitution. It is the

5   intent of this Stipulation to require defendants to provide only the minimum level of

6   medical care required under the Eighth Amendment. Nothing in this stipulation shall be

7   construed to require more of the defendants than is necessary to enforce the Eighth

8   Amendment of the United States Constitution. Any disputes as to whether defendants'

9   Policies and Procedures and the Audit Instrument will satisfy their obligations under the

10   Eighth Amendment shall be resolved pursuant to the dispute resolution procedures set

11   forth in ¶¶ 26-28

12        **5.** The CDC shall implement the Policies and Procedures at each prison

13   pursuant to the following schedule, which may be rearranged for the purpose of grouping

14   or clustering improvements pursuant to ¶ 24 below:

15

16   Calendar Year[1] 2003:      Northern California Women's Facility, Valley State Prison
                                              for Women, California State Prison - Corcoran; High Desert

17                                               State Prison, California State Prison - Sacramento, and
                                              Salinas Valley State Prison.[2]

18

19   Calendar Year 2004:      California Correctional Institution, Mule Creek State Prison,
                                              San Quentin State Prison, Substance Abuse Treatment

20                                               Facility, and California State Prison - Solano.

21   Calendar Year 2005:      Centinela State Prison, California Institute for Men,
                                              California Men's Colony, California Medical Facility, and

22                                               North Kern State Prison - II (Delano II).

23

24 ——————————————

25      1. The Calendar Year begins on January 1st and ends on December 31st.

26      2. If, pursuant to ¶ 8, below, the district court determines that prisoners at the

27 California Institution for Women and the Central California Women's Facility are part of
the plaintiff class, the Policies and Procedures shall be implemented at these prisons in

28 Calendar Year 2003.

3

| | |
|---|---|
| Calendar Year 2006: | California Rehabilitation Center, Deuel Vocational Center, Folsom State Prison, California State Prison - Los Angeles County, and Pleasant Valley State Prison. |
| Calendar Year 2007: | California Correctional Center, Calipatria State Prison, Chuckawalla Valley State Prison, North Kern State Prison, and Richard J. Donovan Correctional Facility. |
| Calendar Year 2008: | Avenal State Prison, Correctional Training Facility, Ironwood State Prison, Sierra Conservation Center, and California State Prison - Wasco. |

Prior to Calendar Year 2003, CDC shall initiate appropriate hiring procedures to hire medical staff for employment beginning January 1st.

**6.** Beginning January 1, 2003 defendants shall implement the following practices or procedures at each institution:

a. Registered Nurses shall staff the emergency clinics 24 hours per day every day.

b. Inter-institution transfers shall occur pursuant to the protocol established in the Policies and Procedures.

c. Treatment protocols set forth in the Policies and Procedures will be implemented at all institutions subject to the availability of additional resources.

d. A priority ducat system consistent with CDC regulations shall be instituted.

e. Outpatient special diets will be available for patients with liver and kidney end-stage organ failure.

**7.** The parties understand and agree that the 602/inmate-grievance procedure is an integral part of the provision of essential medical care and is integrated into the Policies and Procedures. Accordingly, the parties agree that, in the first instance, all complaints regarding medical care to an individual inmate, except those requiring urgent medical care, shall be submitted to defendants after utilizing the inmate grievance procedure. If after the appeal has reached the third director's level of review and all

4

1    administrative relief has been exhausted, or the CDC has not responded to the inmate's

2    appeal within 30 days at the Director's level of review and plaintiffs contend that the

3    grievance process has failed to adequately address the problem, plaintiffs may bring the

4    medical care concern to the attention of defense counsel, who shall respond in writing

5    within 30 days. Plaintiffs' counsel may also contact the Chief Medical Officers at the

6    institutions to inquire about the care furnished to particular inmates on a monthly basis.

7    Defendants' counsel shall be notified about such contacts.

8          **8.** The parties agree that this action shall be maintained as a class action

9    pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure and that the class

10    consists of all prisoners in the custody of the CDC with serious medical needs, except

11    those incarcerated at Pelican Bay State Prison. The parties disagree about whether

12    prisoners incarcerated at the California Institution for Women (CIW) and the Central

13    California Women's Facility (CCWF), previously litigated in a class action entitled

14    *Shumate v. Wilson* (E.D. Cal.) CIV S-95-0619 WBS JFM P, should be members of the

15    class. To resolve this dispute defendants shall move within sixty days after this

16    Stipulation is approved by the Court for an order determining whether prisoners at CCWF

17    and CIW should be excluded from the class on the sole ground that they are not similarly

18    situated to plaintiffs because of the previously litigated class action entitled. The motion

19    will not otherwise alter the burden of proof under Rule 23 or create a presumption

20    concerning their inclusion.

21

22    **B.** <u>**Access to Information**</u>

23          **9.** Subject to the limitations set forth in this Stipulation, plaintiffs' counsel

24    and the experts shall have reasonable access to the institutions, staff, inmates and

25    documents necessary to properly evaluate the adequacy of the medical care delivery

26    system and the proposed remedies therefor, including the Policies and Procedures and the

27    Audit Instrument, the schedule and other items required by this Stipulation. The parties

28

5

Stipulation For Injunctive Relief                                        C-01-1351 TEH

1  shall cooperate so that plaintiffs' counsel and the experts have reasonable access to

2  information reasonably necessary to perform their responsibilities required by this

3  Stipulation without unduly burdening defendants.

4          **10.**  Plaintiffs' counsel and defendants shall negotiate a discovery plan for

5  informal discovery that shall provide to plaintiffs' counsel information from the

6  Department of Corrections' headquarters and from individual institutions about the

7  medical services available to members of the plaintiffs' class, the adequacy of any

8  remedial measures proposed or undertaken by defendants, and defendants' compliance

9  with this Stipulation. Periodic monthly meetings will be scheduled between defendants'

10  and plaintiffs' counsel to discuss stipulation implementation and access to information.

11          **11.**  The discovery plan shall include, but not be limited to, access to the

12  following documents and other material subject to a protective order agreed to by the

13  parties:

14          **a.**  The complete medical files of members of the plaintiff class as

15  reasonably necessary;

16          **b.**  Internal reviews and audits of the medical services provided to

17  members of the plaintiffs' class, including QMAT and 602 survey;

18          **c.**  Non-privileged documents that relate to the amount budgeted for

19  providing medical care to prisoners. No documents reflecting the budget for any

20  particular upcoming budget year shall be discoverable until after the release of the

21  Governor's Budget. This is not intended to prohibit the production of policy and

22  planning documents.

23          **d.**  Documents maintained at individual institutions and memoranda

24  transmitted to CDC headquarters from individual institutions that are reasonably relevant

25  to assessing defendants' compliance, including but not limited to;

26              (1)  All audits of medical care,

27              (2)  Emergency Response Drill Reports,

28

6

(3) Summary of Emergency Responses,

(4) Medical Staff Vacancy Reports,

(5) Medical Staff Training Statistics,

(6) Inter-institution Transfer Log for medical transfers,

(7) Key indicator reports as are available,

(8) Medical related inmate appeals (602's) and responses, and

(9) Medical Log Books

**e.** Plaintiffs shall not have access to personnel files.

**f.** The parties have been unable to agree on whether plaintiffs must be provided with the minutes of continuous quality improvement meetings, including attachments, and death reviews, utilization management data logs, and other peer review documents. The parties agree the Court will decide this issue.

**g.** Plaintiffs' counsel shall be given access to CDC training related to implementation of this Stipulation for the first year that any such training is offered on any medical topic.

**12.** Plaintiffs' counsel and their medical consultants shall have the opportunity to conduct no more than one tour at an institution per calendar quarter, with a maximum of 40 tours in total for all institutions each calendar year. Tours shall be scheduled in a manner consistent with the requirements of this Stipulation and generally in accordance with the priorities established by the schedule promulgated pursuant to ¶ 5. Plaintiffs' counsel may resume tours based upon a finding of substantial noncompliance pursuant to ¶ 15 .

**13.** Tours by plaintiffs' counsel shall include reasonable access to housing units and all facilities where medical services are provided. Defendants shall make reasonable efforts to make available for interview departmental, custodial, clinical and program staff that have direct or indirect responsibility for providing medical services to

7

class members.  Defendants shall direct institution staff to reasonably cooperate with plaintiffs' counsel and the experts in obtaining the necessary information.  Plaintiffs' counsel shall be able to have reasonable brief discussions with inmates during the tours and shall be able to provide business cards with their name and address for distribution to specified individual inmates.  Defendants will also continuously post notices informing all inmates at each institution that complaints regarding the provision of medical care may be sent to counsel for the plaintiff class in this case.  Defendants also shall provide plaintiffs' counsel reasonable access to confidential interviews with inmates before or after the tours, during regular business hours without regard to regular visiting hours and days.  Upon a request by plaintiffs' counsel at least two weeks prior to the tour, defendants shall make available for inspection and/or copying the medical files of specified inmates.  If the need arises within one week prior to the tour, plaintiffs counsel may designate additional medical files for inspection and/or copying.

**14.**  If any party fails to make himself or herself, an employee, or an agent reasonably available for interview and the parties agree, the other party may depose the party, the employee, or agent who has not been made available.  If the parties are unable to agree, the court may order such deposition of the party, employee, or agent if such deposition is reasonably necessary to the conduct of the litigation.

**15.**  Plaintiffs' counsel and their medical consultants will cease tours at an institution after a particular institution has been found to be in substantial compliance as set forth in ¶ 22, below.  Tours may resume at a particular institution if the experts find, or in the event a party disagrees with the experts, the Court finds there has not been substantial compliance on the part of defendants, provided that such tours shall be limited to the issue or components not found to be in substantial compliance.  Non-compliance may be corrected by substantial compliance with the existing Policies and Procedures or by modifying the Policies, Procedures and Audit Instrument pursuant to ¶ 24 and complying with the Policies and Procedures as modified.  Any disputes about whether an

8

institution is in substantial compliance shall be resolved pursuant to the procedures set forth in ¶¶ 26-28, below.

### C. Independent Court Experts

16. The parties agree to jointly request that the Court appoint experts pursuant to Federal Rules of Evidence, Rule 706 to advise the Court on the adequacy and implementation of defendants' Policies and Procedures and any other matter that appropriately may be the subject of the experts' testimony. The parties shall propose to the Court that the experts' duties specified in Exhibit A shall be provided to the experts pursuant to Rule 706(a). The experts shall be entitled to reasonable compensation in an amount approved by the Court and the costs for each expert shall be borne by defendants.

17. The parties agree that the Court should appoint Joe Goldenson, M.D., Michael Puisis and Maddie LaMarre as Rule 706 experts. In the event that any of these experts can no longer serve, the parties shall attempt to agree on a replacement(s) within 30 days. In the event the parties cannot agree, they shall nominate experts in accordance with Rule 706 of the Federal Rules of Evidence. The parties understand and agree that the court may appoint a mutually agreeable fourth expert in the future. In the event that the parties are unable to agree on a fourth expert, the court may appoint a fourth expert in accordance with Rule 706 of the Federal Rules of Evidence.

18. With reasonable notice and subject to the limitations set forth in this Stipulation, the Court experts shall have reasonable access to all parts of any institution, all relevant documents, all individuals (including unprivileged interviews with staff or inmates), medical meetings, proceedings and programs to the extent that such access is reasonably needed to fulfill his or her obligations. If both parties agree, the court experts may hire additional personnel, at defendants' expense, to assist them in performing their duties. If both parties cannot agree, the court may authorize the hiring of additional

9

1   personnel, at defendants' expense, upon a showing by the court experts that such

2   additional personnel are reasonably necessary to the performance of their duties.

3

4      **D. Compliance**

5        **19.** Defendants shall audit each prison's compliance with the Policies and

6   Procedures consistent with the schedule set forth in ¶ 5, above.

7        **20.** Compliance with the Policies and Procedures shall be audited by using

8   an Audit Instrument which will be filed on February 15, 2002. This Audit Instrument

9   will be developed by the CDC in consultation with the independent court experts and

10   plaintiffs' counsel. The parties recognize that this instrument has not been tested and

11   may need to be modified to properly reflect the degree of actual compliance. No later

12   than January 15, 2004, the parties and the independent court experts shall meet and

13   confer about the need to modify the audit instrument. If all parties agree, the instrument

14   shall be modified. Any dispute about the need for modification shall be resolved

15   pursuant to paragraph 18 of the Stipulation for Injunctive Relief.

16        **21.** The audit shall be conducted as follows:

17          a. No less than 180 Unit Health Records will be reviewed.

18          b. The records shall be selected at random, but the selection shall

19             be stratified so that each category in the audit instrument is

20             adequately represented.

21          c. If defendants disagree with the appropriateness of an expert's

22             answer to any question(s) in the audit instrument relating to the

23             quality of medical care, the question(s) shall be reviewed by

24             both expert physicians and shall only count against compliance

25             if both experts agree.

26        **22.** A prison is in substantial compliance when all of the following

27   conditions are satisfied:

28

10

Stipulation For Injunctive Relief         C-01-1351 TEH

a.  The prison receives a score of 85% or higher on an audit conducted by the Court experts of the implementation of the Policies and Procedures using the Audit Instrument identified in ¶ 20.  No score less than 85% shall be considered to satisfy this requirement, except that the experts shall have the discretion to find a prison providing adequate medical care in compliance if it achieves a score of no less than 75%.  The score shall be calculated by averaging all of the indicators in the audit instrument.

b.  In determining substantial compliance, the experts will have to ascertain whether medical assessments or treatment plans provided to inmates comply with the Policies and Procedures. The medical assessment or treatment plan provided to the inmate shall be deemed adequate and appropriate under these policies and procedures only under any one of the following conditions:

(1)  The assessment or treatment plan is consistent with guidelines specifically adopted in the policies and procedures; or

(2)  The practitioner documents in the medical notes that he/she is deviating from adopted policies and procedures and that such deviation is consistent with the community standard; or

(3)  Where no treatment guidelines are specifically adopted in these policies and procedures, the

11

Stipulation  For Injunctive Relief                                        C-01-1351 TEH

assessment or plan is consistent with the

community standard.[3/]

In those instances in which a court expert finds that an assessment or treatment plan does not comply with community standards, defendants may request that the question(s) be reviewed by both expert physicians and shall only count against compliance if both experts agree.

c.  The prison is conducting minimally adequate death reviews and quality management proceedings.

d.  The prison generally has tracking, scheduling and medication administration systems adequately in place.

e.  At least two experts have not concluded that there is a pattern or practice that is likely to result in serious problems and those problems are not being adequately addressed.

**23.** Defendants shall notify plaintiffs and the court experts in writing when they believe an institution has achieved substantial compliance. Within 60 days of such notification, the experts shall conduct an audit to determine substantial compliance. If the experts find substantial compliance, the experts shall return a year later, or as soon thereafter as possible, to determine whether the institution has maintained substantial compliance.

## E. Modification

**24.** Defendants may modify the Policies and Procedures, and the Audit Instrument at any time, provided that as modified the Policies and Procedures and the Audit Instrument will meet or exceed the minimum level of care necessary to fulfill

---

3. As it is used here and throughout the policies and procedures, the phrase "community standard" means the standard of care imposed under the laws of the State of California upon health care providers licensed to practice in California.

12

Stipulation For Injunctive Relief                                    C-01-1351 TEH

defendants' obligation to plaintiffs under the Eighth Amendment of the United States Constitution. Defendants will provide plaintiffs' attorneys with a copy of the original Policies and Procedures or the Audit Instrument, the modified version and a strikeout version with the changes at least 30 days prior to implementation. In an emergency or when such delay will adversely affect the provision of medical care, notice will be provided as soon as possible, but no later than the date the policy is implemented. If the plaintiffs determine that the modifications conflict with any of the provisions of this Stipulation, they shall cooperate with the defendants to reconcile the conflict. Any disputes about whether the modifications will satisfy defendants' obligations under the Eighth Amendment shall be resolved pursuant to the dispute resolution procedures set forth in ¶¶ 26-28.

25. Plaintiffs also may seek to modify the Policies and Procedures and the Audit Instrument at any time to secure the minimum level of medical care necessary to fulfill the defendants' obligation to plaintiffs under the Eighth Amendment of the United States Constitution. Plaintiffs must submit the proposed modification to defendants. Any disputes as to whether defendants' Policies and Procedures, and the Audit Instrument must be modified to satisfy their obligations under the Eighth Amendment shall be resolved pursuant to the dispute resolution provisions set forth in ¶¶ 26-28.

### F. **Dispute Resolution**

26. If plaintiffs contend that the Policies, Procedures and Audit Instrument, as written or as modified, or any component thereof will not provide for the minimum level of medical care necessary to fulfill the defendants' obligations to plaintiffs under the Eighth Amendment of the United States Constitution, plaintiffs shall provide defendants with a brief description of the perceived deficiencies and a request that the parties enter into negotiations to resolve the question as to whether defendants' Policies, Procedures and Audit Instrument satisfies the minimum requirements of the Eighth Amendment.

13

Upon receipt of plaintiffs' request for negotiations, any party may inform the Court's experts of the area of disagreement and request that the experts evaluate the issue and prepare a report.

       **27.** At the option of any party, the parties shall conduct negotiations on any issue in dispute. Such negotiations may include the Court's experts, and a person satisfactory to the parties may at the election of either party, mediate any unresolved issues. If the parties cannot agree on a mediator, the administrator of a private dispute resolution service, such as JAMS will choose a mediator. Defendants shall pay the cost of any private mediator. The substance of the mediation and any statements made by a party, an employee of a party, or an agent of a party are confidential and not admissible in any subsequent proceeding. The Experts' report(s) shall be admissible as evidence at the request of any party in any judicial proceeding in this case.

       **28.** If the process set forth in the preceding paragraph fails to resolve the issue of whether defendants' Policies and Procedures and Audit Instrument, either as written or as modified, provides for a level of medical care sufficient to meet the minimum requirements of the Eighth Amendment of the United States Constitution, either party shall have the option of seeking relief from the Court. If the court determines that defendants' Policies and Procedures and the Audit Instrument either as written or as modified, does not provide a level of medical care sufficient to meet the minimum requirements of the Eighth Amendment of the United States Constitution, the Court may grant relief as authorized under the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626(a), which provides, in pertinent part: "The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."

      **G. <u>Enforcement</u>**

14

**29.** The Court shall find that this Stipulation satisfies the requirements of 18 U.S.C. § 3626(a)(1)(A) and shall retain jurisdiction to enforce its terms. The Court shall have the power to enforce the Stipulation through specific performance and all other remedies permitted by law. Neither the fact of this stipulation nor any statements contained herein may be used in any other case or administrative proceeding, except defendants, CDC, or employees thereof reserve the right to use this Stipulation and the language herein to assert issue preclusion and res judicata in other litigation seeking class or systemic relief. When these legal defenses are raised, defendants will send copies of such complaints to plaintiffs' counsel at the Prison Law Office.

**30.** If plaintiffs believe that defendants are not complying with some or all of the Stipulation, or any of the acts required by the Policies and Procedures produced pursuant to Stipulation, they shall notify defendants of the perceived problems. Defendants shall investigate the allegations and respond within 30 calendar days. If plaintiffs are not satisfied with defendants' response, the parties shall conduct negotiations to resolve the issue. The negotiations may include the Court's experts, and a person satisfactory to the parties may at the election of either party, mediate any unresolved issues. If the parties cannot agree on a mediator, the administrator of a private dispute resolution service, such as JAMS, will choose a mediator. Defendants shall pay the cost of any private mediator. The substance of the mediation and any statements made by a party, an employee of a party, or an agent of a party shall be confidential and not admissible in any subsequent proceeding. The Experts' report(s) shall be admissible as evidence at the request of either party in any judicial proceeding in this case. If the parties are unable to resolve the issue by negotiation or mediation, the court shall determine whether defendants are substantially complying with some or all of the Stipulation, or any of the acts required by the Policies and Procedures.

**H. <u>Termination</u>**

15

Stipulation For Injunctive Relief

C-01-1351 TEH

**31.** Notwithstanding the Prison Litigation Reform Act or any other law, defendants may move to vacate this Stipulation and dismiss the case on the ground that each institution subject to this stipulation has been found to be in substantial compliance under ¶¶ 22-23. Non-compliance may be corrected by compliance with the existing Policies and Procedures or by modifying the Policies and Procedures pursuant to ¶ 24 and complying with the Policies and Procedures as modified. The parties shall attempt to negotiate any disputes about defendants' compliance pursuant to ¶¶ 26-28, and either party may invoke the enforcement process set forth in ¶ 29-30. The final determination of such a dispute shall rest with the Court.

### I. Attorneys Fees and Costs

**32.** Plaintiffs may apply for reasonable attorney's fees to which they are entitled. Defendants shall pay plaintiffs for 90% of the work performed in connection with this Stipulation at hourly rates set forth under the PLRA, 42 USC § 1997e(d). Defendants shall pay plaintiffs for 10% of the work performed in connection with this Stipulation at hourly rates set forth under the ADA and §504 of the Rehabilitation Act.

### J. Construction of Stipulation.

**33.** This Stipulation reflects the entire agreement of the parties and supersedes any prior written or oral agreements between them. No extrinsic evidence whatsoever may be introduced in any judicial proceeding to provide the meaning or construction of this Stipulation. Any modification to the terms of this Stipulation must be in writing and be signed by a representative of the Department of Corrections and attorneys for the plaintiffs to be effective or enforceable.

**34.** This Stipulation shall be governed by and be construed according to California law. The parties waive any common law or statutory rule of construction that ambiguity should be construed against the drafter of this Stipulation, and agree that the

16

Stipulation For Injunctive Relief                                    C-01-1351 TEH

language in all parts of this Stipulation shall in all cases be construed as a whole, according to its fair meaning.

35. This Stipulation shall be valid and binding upon, and faithfully kept, observed, performed and be enforceable by and against the parties, their successors and assigns and the plaintiff class.

36. The obligations governed by this Stipulation are severable. If for any reason a part of this Stipulation is determined to be invalid or unenforceable, such a determination shall not affect the remainder.

//
//
//
//
//
//
//

17

1          **37.**  The waiver by one party of any provision or breach of this Stipulation

2  shall not be deemed a waiver of any other provision or breach of this Stipulation.

3                       **IT IS SO STIPULATED AND AGREED.**

4

5

6      Dated:_____

DONALD SPECTER
Attorney for plaintiffs

7

8      Dated:_____

ROBERT PRESLEY
Secretary for the Youth and Adult

9

Correctional Agency

10

11     Dated:_____

EDWARD S. ALAMEIDA, JR.
Director, California Department

12

of Corrections

13

14     Dated:_____

PETER J. SIGGINS
Chief Deputy Attorney General

15

Attorney for Defendants Davis and Gage

16

17

18

19

20

21

22

23

24

25

26

27

28

18

1

Dated:_____          BILL LOCKYER, Attorney General
                                 of the State of California
2                                PETER J. SIGGINS,  Chief
                                 Deputy Attorney General
3                                ROBERT R. ANDERSON, Chief
                                 Assistant Attorney General
4                                PAUL D. GIFFORD, Senior
                                 Assistant Attorney General
5

6                                PETER J. SIGGINS
7                                Chief Deputy Attorney General

8                                Attorneys for Defendants Davis, Gage,
                                 Presley, Alameida, and Pickett
9

10

11          **THE COURT SO FINDS AND IT IS SO ORDERED.**

12

13    Dated: _____

14                                 THELTON E. HENDERSON
                                   United States District Judge
15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                 19

# Exhibit 2

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| **ASHOOR RASHO, #B38970,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No.: 07-1298-MMM** |
| | ) | |
| **ROGER WALKER , et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## AMENDED ORDER ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION UNDER RULE 23(b)(2)

The parties were present by counsel on July 7, 2015 for hearing and arguments on Plaintiffs' Motion to Certify a Litigation Class Pursuant to Rule 23(b)(2), [ECF 216] and Defendants' Response [ECF 223]. Plaintiffs' Motion to Certify a Litigation Class sought to expand the scope of the class which had previously been restricted to "Seriously Mentally Ill" (SMI) inmates, for purposes of achieving settlement; to a class comprised of "SMI inmates and inmates on the mental health caseload", for purposes of pursuing litigation.

The Court advised the parties that it would certify the expanded class for purposes of litigation and asked that they file with the Court their Proposed Findings of Fact as to the class certification issue. Plaintiffs provided their Proposed Findings at [ECF 234] and Defendants at [ECF 235].

At the time of the July 7, 2015 hearing the parties arrived at an agreed upon definition of the new class:

Persons now or in the future in the custody of the Illinois Department of Corrections ("IDOC") who are identified or should have been identified by the IDOC's mental health professionals as in need of mental health treatment as

1

defined in the current edition of the Diagnostic and Statistical Manual of
Mental Disorders of the American Psychiatric Association. A diagnosis of
alcoholism or drug addiction, developmental disorders, or any form of
sexual disorder shall not, by itself, render an individual mentally ill for the
purpose of this class definition.

Plaintiff's Motion for Class Certification was brought pursuant to Fed.R.Civ.P. 23(b)(2)

which provides that class certification may be maintained where the requirements of Rule 23(a)

are satisfied and where:

the party opposing the class has acted or refused to act on grounds that
apply generally to the class, so that final injunctive relief or corresponding
declaratory relief is appropriate respecting the class as a whole.

Fed.R.Civ.P. 23(b)(2).

The requirements for class certification under 23(a) are: (1) numerosity (a class [so large]

that joinder of all members is impracticable); (2) commonality (questions of law or fact common

to the class); (3) typicality (named parties' claims or defenses are typical ... of the class); and (4)

adequacy of representation (representatives will fairly and adequately protect the interests of the

class). *Kress v. CCA of Tennessee, LLC*, 694 F.3d 890, 892-93 (7th Cir. 2012).

Plaintiffs have alleged, and Defendants have agreed, that there are currently more than

11,000 mentally ill inmates on the IDOC mental health case load. [ECF 234 p. 15]. Defendants

conceded at th time of the July, 2015 hearing that the proposed class was indeed numerous.

[Trans. P. 28 ¶1-4]. The Court, considering the number of potential Plaintiffs, the difficulty each

would experience in bringing his or her own action, and the interests of judicial economy, finds

the potential class so numerous that joinder would be impracticable. *Arenson v. Whitehall

Convalescent & Nursing Homei*, 164 F.R.D. 659, 663 (N.D. Ill. 1996). As a result, Plaintiffs

have met the first requirement set forth in Rule 23(a).

The second requirement, commonality, is met where the proposed class members share

common questions of law or fact. *Miller v. Spring Valley Properties*, 202 F.R.D. 244, 250-51 (C.D. Ill. 2001). In this case the class members claim that IDOC's deficient mental health treatment violates their rights under the Eighth and Fourteenth Amendments to the United States Constitution, the Americans with Disabilities Act , 42 U.S.C. §§ 12131 et seq., and the Rehabilitation Act 29 U.S.C. § 794. In addition to common issues of law, Plaintiffs allege common issues of fact shared by the class members which result from the alleged IDOC deficiencies. [ECF 234 p. 16].

In this case Plaintiffs have alleged, in part, that IDOC does not have sufficient numbers of mental health workers, does not have adequate resources to provide in-patient hospital treatment and places SMI inmates in segregation without consideration as to whether the infraction was due to the underlying mental illness, and maintains SMI inmates in segregation even when so doing further exacerbates the mental illness. Plaintiffs allege that these deficiencies are system-wide and "[a]lthough factual distinctions may exist as to the particular treatment of each class member, it is precisely the IDOC's systemic policies and practices which place mentally-ill prisoners at risk of harm which is at issue in this case and common to all class members." [ECF 217 p. 8].

Plaintiffs have provided a Proffer of Typicality [ECF 232] which, in addition to providing support for the typicality requirement, establishes the class members' common factual issues. In their Proffer, Plaintiffs document that named Plaintiffs Patrice Daniels, Keith Walker, Joseph Hermann, Rasheed McGee, Ashor Rasho, Doanald Collins, Otis Arrington, Gerrodo Forrest  and Henry Hersman suffer from mental illness which has not been adequately treated. Several of the named plaintiffs have purportedly undergone mental health treatment while on the other side of a locked door. Such treatment lasts as little as five minutes and is conducted by "yelling" through

the door. [ECF 232]. It is alleged, further, that many of the named Plaintiffs have received lengthy additions to their sentences due to disciplinary infractions which are the result of their mental illness. The named plaintiffs, almost universally, state that they do not have a current individualized treatment plan.

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011), discussed commonality in terms of whether the class members had suffered the same injury and whether the controversy was capable of classwide resolution. In this case Plaintiffs allege that in addition to the named plaintiffs, the proposed class as a whole is subject to the same policies which foster inadequate mental health diagnosis and treatment. As such, the Plaintiffs have met the commonality requirement

The third requirement under Rule 23(a) is that the claims of the named Plaintiffs be typical of those of the other class members. Typicality is established if the plaintiffs' claims "arise from the same event or practice or course of conduct that gives rise to the claims of other class members" and are based on the same legal theory as that of the other class members. *Arreola v. Godinez*, 546 F.3d 788, 798 (7th Cir. 2008). Typicality may be found even if there are actual distinctions between the claims of the named plaintiffs and those of the other class members. *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). The Plaintiffs cited a Ninth Circuit case *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014) which found Rule 23(a) typicality where "the named plaintiffs were all inmates in the prison official's custody and each plaintiff 'alleged that he or she [was] being exposed, like all other members of the putative class, to a substantial risk of serious harm by the challenged policies and practices' of prison officials regarding medical, mental health and dental care." *Id.* at 685. [ECF 217 p. 10].

Here, Plaintiffs have alleged a state-wide culture of inadequate mental health treatment

which exposes the proposed class to a substantial risk of serious harm. While there are certainly distinctions from one individual plaintiff's claims to those of another, the alleged harm arises from the same course of conduct on the part of IDOC and, additionally, is based on the same legal theory, deliberate indifference to a serious medical need. Additionally, the claims of the named Plaintiffs have the same essential characteristics as the class at large. *Oshana v. Coca-Cola Co.*, 472 F.3d 506. 514 (7th Cir. 2006). Accordingly, the Court finds that Plaintiffs have established the typicality requirement for class certification.

The final Rule 23(a) requirement is that the class plaintiff be adequately represented. Adequacy goes to both the quality of the class plaintiffs' legal representation and to the ability of the named plaintiffs to represent the class. *Riordan v. Smith Barney*, 113 F.R.D. 60 (N.D. Ill. 1986). The class representative must have a "sufficient interest in the outcome to ensure vigorous advocacy," and may not have interests "antagonistic to the interests of the class.," *Id.* at 64.

The named plaintiffs assert that they "share the same claims as the class members, as well as a strong interest in securing declaratory and injunctive relief to remedy the lack of appropriate screening and treatment of, and stop discrimination and civil rights violations against, individuals with serious mental illness" and, further, that "The relief sought by the plaintiffs, if granted, will benefit all members of the class." [ECF 217 p. 14]. Defendants have filed a response opposing class certification but do not refute Plaintiffs' claims that the named plaintiffs are capable of adequately representing the other class members. [ECF 223, generally]. This issue, therefore, is not in controversy.

As to the adequacy of the legal representation of the class, Plaintiffs have provided the curriculum vitae of their counsel which establishes that they are seasoned civil rights litigators.

[ECF 217 Ex. 1]. In addition, counsel for Defendants has conceded that Plaintiffs' counsel meets the adequacy requirements. [Trans July 7, 2015 hearing p. 36]. The Court finds, therefore, that is not disputed that the named Plaintiffs are able to adequately represent the interests of the class members; and that Plaintiffs' counsel is likewise able to adequately represent the interests of the class. As a result, the Court finds that Plaintiffs have met the requirements of Rule 23(a) in their request for class certification.

As noted, a party requesting class certification under Rule 23(b)(2) must first meet the threshold requirements of Rule 23(a), which Plaintiffs have done in this case. The next inquiry is to whether Plaintiff's request for class certification complies with the Rule 23(b)(2) requirement, that:

> the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

In support of their Motion Plaintiffs cite Defendants' October 6, 2014 Inpatient Status Report. This Report proposed a Remedial Plan which would be implemented to provide "solutions to the overwhelming majority of the deficiencies it [IDOC] has identified." Plaintiffs claim that these "admissions" support their claim that Defendants have failed to deliver necessary mental health treatment and that this failure represents a substantial risk of harm to the class Plaintiffs. [ECF 228]. Plaintiffs also cite the deposition testimony of Dr. Hinton wherein he acknowledges that "improvements that [sic] certainly need to be made system-wide for those [SMI inmates] in segregation. [ECF 228 p 4]. In addition, they cite the deposition testimony of Dr. Elliott, Wexford's Regional Mental Health Director indicating that IDOC has insufficient staff and facilities with which to deliver care; and have no facilities to provide in-patient hospitalization. [ECF 228 p. 4]

The Court finds that Plaintiffs have identified deficiencies sufficient to support their

claim that Defendants have "refused to act on grounds that apply generally to the class…" and that injunctive or declaratory relief is proper in this case under Fed.R.Civ.P 23(b)(2).

**IT IS THEREFORE ORDERED:**

1).     The Court hereby certifies as  a class for purposes of litigation, and pursuant to Fed.R.Civ.P 23(b)(2), "Persons now or in the future in the custody of the  Illinois Department of Corrections ("IDOC") are identified or should have been identified by the IDOC's mental health professionals as in need of mental health treatment as defined in the current edition of the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association. A diagnosis of alcoholism or drug addiction, developmental disorders, or any form of sexual disorder shall not, by itself, render an individual mentally ill for the purposes of this class definition."

2).     Plaintiffs' [216] Motion to Certify a Litigation Class Pursuant to Rule 23(b)(2) is GRANTED.

8/14/2015
ENTERED

_s/Michael M. Mihm_
MICHAEL M. MIHM
UNITED STATES DISTRICT JUDGE

# Exhibit 3

**Examples of the Named Plaintiffs' Exposure to IDOC's Alleged Systemic Deficiencies
(as detailed in declarations and depositions)**

1.  **Defendants chronically fail to fill medical leadership and other medical staff vacancies**

    **Lippert**: dep. 66:10-69:10 (discussion of Lippert's experience with staff vacancies and insufficient numbers of health care providers)

    **Pattison**: dep. 46:4-20 (Pattison laments that "we don't have a regular doctor here," and that every time there is a new one, she has to start from the very beginning); dep. 57:12-58:6 (Pattison says no doctor has been available for months other than the OB-GYN); dep. 62:8-15 (Pattison says vacancies affect her being checked and no one tells her anything; her physical therapist doesn't even know what's going on); dep. 65:9-20 (Pattison says doctors don't stay long because of pay)

    **Ruffin**: decl. ¶¶ 4 (had to see acting medical director at Dixon following sick call; has seen multiple providers at Dixon due to turnover) dep. 64:20-65:11 (Ruffin says "they shuffle doctors around so quickly around here"); dep. 156:21-161:12 (Ruffin discusses leadership vacancies, including medical directors and healthcare administrators; discusses overworked nurses, lack of dental hygienists, other staff vacancies)

    **Thomas**: dep. 112:24-118:9 (describes medical staff vacancies; low staff numbers affect ability to get care; incident where Thomas went one or two hours without his rescue inhaler because the nurse was unavailable; sees other inmates being neglected)

2.  **Defendants routinely permit underqualified medical professionals to treat IDOC prisoners, a problem compounded by lack of reliable clinical oversight and peer review processes**

    **Lippert**: dep. 14:22-36:24 (was denied a shot of insulin after asking several people several times); dep. 63:9-78:10 (discussion of Lippert's experiences with untrained and unprofessional medical staff, impacting the quality of care he receives for his diabetes; describes lack of oversight ensuring Wexford brings in quality providers)

    **Martin**: decl. ¶¶ 3-7 (received defective wheelchair; Martin was given various, conflicting explanations for rib injuries; knee, back, neck and rib injuries largely unaddressed despite complaints); decl. ¶ 9 (jaw brace lost during facility transfer; dentist refused to give him another, insisting Martin seems to be doing fine without it); decl. ¶¶ 10-11 (left in isolation cell in infirmary with the flu; refused a liquid diet); dep. 128:24-130:13 (when asked about qualified treatment, Martin complains that often he's told the ultimate decision is up to Wexford, causing delays and denials); dep. 109:10-113:24 (Martin describes having the flu and being placed in a non-ADA-compliant metal segregation box and being denied showering so as not to spread the flu)

1

**Pattison**: decl. ¶¶ 4, 13 (only treatment received is physical therapy, despite an off-site physical therapist stating, after initial injury, that they were afraid of causing more damage); decl. ¶ 8 (Pattison told knee replacement contingent on losing various amounts of weight; each goal has been met and knee replacement is still not approved); decl. ¶¶ 9-11 (wheelchair provided and taken away twice—first time to help lose weight despite having already lost weight with the wheelchair; second time no explanation; told she does not need an ADA attendant; despite continued deterioration, knee replacement not scheduled); dep. 31:24-36:3 (after a fall, taken to Health Care Unit, waited 10 hours, given Motrin and ice; after another fall, Pattison is told she is faking); dep. 41:22-43:7 (no one has told Pattison why, exactly, they want her to lose weight); 43:8-23 (Dr. Schaefer takes Pattison's wheelchair away, claims nothing is wrong with her knee, and that he can't find her MRI or x-ray results)

**Rice**: decl. ¶¶ 1-5 (complaints of chest pain and severe headache largely ignored; first bout of infirmary care lasted 5-10 minutes and Rice was simply given Tylenol); decl. ¶¶ 6-7 (passed out while waiting to be seen in healthcare for a checkup; while in infirmary, nurse said fainting was caused by a "dream suppressant" originally prescribed by psychiatrist; after discontinuing the drug, Rice continues to have headaches, chest, pains, chills); decl. ¶¶ 8-13 (several complaints of chest pains, only to be treated with aspirin (which was discontinued despite requests to continue), be told it was caused by gas, be advised to lie down and relax, or just plain ignored); dep. 20:12-16 (nurses tell Rice that his persistent chest pains are probably just gas); dep. 23:18-24:9 (Rice thinks his medical records should have been checked, he should have been checked for concussion, and other complaints about first episode of chest pains)

**Ruffin**: decl. ¶ 4 (put in for sick call about chronic pain and was seen by an LPN; nothing happened); decl. ¶¶ 4-6 (at Dixon, one medical director recommended that Ruffin see a neurologist, but Ruffin was later seen, but not examined, by a new medical director who attributed Ruffin's pain to arthritis and "getting old," despite Ruffin's age of 35, and sent him to physical therapy instead; orthopedic evaluation never took place; CAT scan and pain clinic appointments delayed) dep. 161:19-171:4 (Ruffin is asked about underqualified treatment and claims he should have been sent to a pain specialist earlier); dep. 184:9-185:1 (knows people at Dixon who seem to have died prematurely, and believes changes to IDOC policy will help save lives)

**Thomas**: decl. ¶ 7 (medical director notes iron deficiency anemia and prescribes three iron supplements a day but he receives only one per day); decl. ¶ 8 (UIC recommends follow-up for possible bone cancer issue, but no tests have been scheduled); dep. 45:18-59:13 (Thomas describes his inhalers being confiscated twice due to overuse (despite following directions), being forced to use an inhaler that he was told damages his heart, and filing grievances to get his inhalers back); dep. 81:1-82:22 (Thomas says he wasn't told about elevated protein levels until about six months after it was shown on a hematology-oncology note); dep. 97:8-102:3 (doctor recommends another bone survey in April of 2015 but it still hasn't happened and another doctor had no explanation for why not); dep. 118:10-121:23 (when asked about qualifications of medical staff, Thomas says some of them are disrespectful, don't give him the correct medication, don't send inmates

out for follow-ups, don't explain things clearly, etc.); dep. 129:18-132:19 (a nurse made him take aspirin and threatened to write him up if he didn't, despite an off-site doctor just instructing him that he should not take aspirin prior to surgery)

3.   **Defendants' procedures at reception and intrasystem transfer fail to identify medical problems, fail to identify them timely, and fail to ensure continuity of care upon transfer**

**Martin**: decl. ¶ 9 (jaw brace lost during facility transfer; dentist refused to give him another, insisting Martin seems to be doing fine without it); 96:10-103-8 (Martin describes losing his jaw brace in facility transfer and being denied a replacement several times or simply ignored)

**Pattison**: dep. 29:6-30:19 (transferred from Lincoln to Logan's Health Care Unit, but didn't receive any treatment for her injury for a ten days; leg swelling became so bad they sent her to Abraham Lincoln Hospital)

**Ruffin**: decl. ¶¶ 4-6 (chronic pain goes largely unaddressed for years after being transferred to Dixon); dep. 152:15-156:20 (Ruffin complained about problem swallowing when he was first transferred to Dixon, but received no treatment; years later after looking through his medical records he discovered the presence of a bullet fragment near his throat; unclear why this was not discovered earlier)

**Thomas**: dep. 107:2-110:12 (had dental procedure at Stateville that was supposed to be continued at Pontiac, but x-rays/documentation got lost, and no one called him to continue the procedure)

4.   **Defendants' policies and practices fail to manage chronic diseases**

**Lippert**: dep. 14:22-36:24 (was denied insulin shot after asking several people several times; had dangerous increase in blood sugar; lost consciousness; suffered headaches, muscle cramps, etc.); dep. 37:1-42:13 (received late insulin shots due to Ramadan)

**Pattison**: dep. 46:21-47:12 (Pattison hesitates to put in sick call requests due to co-pays for what she believes is now a chronic issue); dep. 58:2-61:8 (OB-GYN recommends biopsy, but it's denied; Pattison is hesitant to put in sick call request because it's an ongoing issue and she shouldn't have to pay for it)

**Rice**: dep. 33:21-34:5 (Rice believes he should be on the chronic list to be checked up on more regularly (chest pains, shoulder injury, back injury); dep. 57:13-58:12 (Rice has tried to get on the chronic list since 2010 for his back and shoulder, when they took away his walking cane)

**Ruffin**: decl. ¶ 9 (currently not enrolled in "chronic" clinic despite discussing it with healthcare staff, resulting in frequent copays and a sick call request for every renewal of

3

medication); dep. 147:24-148:16 (Ruffin discusses grievance about co-pays for pain that hasn't been deemed chronic)

**Thomas**: decl. ¶ 7 (medical director notes iron deficiency anemia and prescribes three iron supplements a day but he receives only one per day); decl. ¶¶ 9-16 (diagnosed with asthma, COPD and emphysema in 2008, Thomas had his inhalers confiscated and later returned twice, and denied an alternative inhaler that would prevent exacerbation of COPD); dep. 27:11-29:17 (Thomas describes being told by the medical director that an inhaler he was using could damage his heart, but he was unable to get an effective alternative due to cost); dep. 37:13-38:10 (gout-related pain goes largely unaddressed because ibuprofen causes stomach issues and no pain alternatives are offered); 39:9-40:17 (after prostate cancer treatment, follow-up was recommended but never happened); dep. 45:18-59:13 (Thomas describes his inhalers being confiscated twice due to overuse (despite following directions), being forced to use an inhaler that he was told damages his heart, and filing grievances to get his inhalers back); dep. 71:3-73:15 (UIC recommended three iron supplements a day but he only receives one)

5. **Defendants fail to promulgate appropriate policies governing infirmary care**

**Martin**: decl. ¶¶ 10-11 (left in isolation cell in infirmary with the flu; refused a liquid diet); decl. ¶ 12 (says infirmary is referred to as "death care," not "health care"); dep. 42:1-43:12 (Martin says inmates use the term "death care" instead of "health care," "because people die back there every day it seems like" and "you get punished for getting sick here"); dep. 135:24-137:24 (during flu quarantine, Martin is in a cold, unlit room for a period); dep. 109:10-113:24 (Martin describes having the flu and being placed in a non-ADA-compliant metal segregation box and being denied showering so as not to spread the flu)

**Pattison**: dep. 31:24-33:18 (after a fall, taken to Health Care Unit, waited 10 hours, given Motrin and ice); dep. 67:24-68:14 (Pattison was put in a locked room in infirmary and not checked on regularly, believes they should have done more)

**Rice**: decl. ¶¶ 1-5 (complaints of chest pain and severe headache largely ignored; first bout of infirmary care lasted 5-10 minutes and Rice was simply given Tylenol); decl. ¶¶ 6-7 (passed out while waiting to be seen in healthcare for a checkup; while in infirmary, nurse said fainting was caused by a "dream suppressant" originally prescribed by psychiatrist; after discontinuing the drug, Rice continues to have headaches, chest, pains, chills); 59:4-13 (Rice believes the infirmary is awful and he should have been in a hospital instead)

**Thomas**: dep. 126:20-129:12 (Thomas says the segregation box in the infirmary is like being punished; he had trouble breathing in the infirmary; he believes he should have been sent to the hospital sooner)

4

6. **Defendants have a policy and practice of delaying or denying specialty care**

**Martin**: decl. ¶¶ 3-7 (inadequate wheelchair; Martin was told various, conflicting explanations for rib injuries; knee, back, neck and rib largely unaddressed despite complaints); decl. ¶ 9 (jaw brace lost during facility transfer; dentist refused to give him another, insisting Martin seems to be doing fine without it); dep. 128:24-130:13 (when asked about qualified treatment, Martin complains that often he's told the ultimate decision is up to Wexford, causing delays and denials); dep. 138:13-143:5 (when asked about being denied specialty care, Martin says several requests for things like air mattresses or wheelchair gloves are denied); dep. 48:15-51:24 (after knee injury, Martin complained numerous times but no action was taken; eventually he stops mentioning it out of frustration and the expectation that it will go unaddressed)

**Pattison**: decl. ¶¶ 5-6 (hospital wanted to perform total knee replacement and advised Pattison not to put weight on her knee; at CC she was only given crutches and denied knee replacement several times); decl. ¶ 8 (Pattison told knee replacement contingent on losing various amounts of weight; each goal has been met and knee replacement is still not approved); decl. ¶¶ 11 (despite evidence of continued deterioration, knee replacement not scheduled); decl. ¶¶ 13-16 (despite worsening knee and advice from physical therapist and HCUA that she needs surgery, Wexford summarily denies requests); dep. 23:8-25:4 (outside doctor expresses disapproval with Wexford's denial of much-needed total knee replacement); dep. 27:2-23 (requests for surgery denied several more times; Pattison is encouraged to lose weight); dep. 37:13-40:8 (multiple doctors have told Pattison her leg probably "won't last" until she gets out); dep. 40:9-23 (another doctor recommends surgery; Pattison is told to lose 10 pounds but loses 21; Wexford denies again); dep. 58:2-61:8 (OB-GYN recommends biopsy, but it's denied; Pattison is hesitant to put in sick call request because it's an ongoing issue and she shouldn't have to pay for it)

**Rice**: decl. ¶¶ 8-13 (several complaints of chest pains, only to be treated with aspirin (which was discontinued despite requests to continue), be told it was caused by gas, be advised to lie down and relax, or just plain ignored); decl. ¶¶ 14-15 (Rice told twice that he needs surgery on shoulder, but only given Tylenol); dep. 20:12-16 (nurses tell Rice that his persistent chest pains are probably just gas); dep. 43:23-44:25 (Rice says doctors have suggested surgery, but was told it was too expensive); dep. 59:13-25 (Dr. Nwaobasi recommended Rice see a cardiologist, but he never did)

**Ruffin**: decl. ¶¶ 4-6 (first couple of years at Dixon where first medical director's recommendation to see a neurologist was thrown out by second medical director and pain was largely unaddressed; orthopedic evaluation never took place; CAT scan and pain clinic appointments delayed); decl. ¶¶ 7-8 (epidural injections delayed, too far apart, or inadequate; Medial Branch Block procedures delayed twice); decl. ¶ 10 (denied request for colonoscopy despite family history of cancer because it is "too expensive"); dep. 25:6-17 (recommended to see a neurologist or orthopedic surgeon but it was denied for some reason); dep. 26:1-32:20 (multiple sick calls to address pain; recommended to see an orthopedic surgeon multiple times, but denied every time; recommended to try

physical therapy, but discontinued; results of x-ray not disclosed); dep. 40:3-15 (records notation says orthopedic consult was approved, but Ruffin was told it was denied and he had a CAT scan instead); dep. 65:16-66:15 (Ruffin claims Dr. Wahl was confused; records say medical writ follow-up, but Ruffin had no outside treatment); dep. 115:3-116:9 (waiting for appointment at UIC; the only thing Ruffin's been told is that it's been approved); dep. 161:19-171:4 (Ruffin is asked about underqualified treatment and claims he should have been sent to a pain specialist earlier); dep. 175:1-176:9 (Ruffin believes requests for specialty care were either denied or delayed)

**Thomas**: decl. ¶¶ 3-6 (after weakness, low hemoglobin levels, diagnosis of anemia and a hospital stay, a colonoscopy was recommended but not provided); decl. ¶ 8 (UIC recommends follow-up for possible bone cancer issue, but no tests have been scheduled); dep. 27:11-29:17 (Thomas describes being told by the medical director that an inhaler he was using could damage his heart, but he was unable to get an effective alternative due to cost); dep. 37:13-38:10 (gout-related pain goes largely unaddressed because ibuprofen causes stomach issues and no pain alternatives are offered); 39:9-40:17 (after prostate cancer treatment, follow-up was recommended but never happened); dep. 44:13-45:17 (UIC recommended a 90-day follow-up but the appointment never took place); dep. 45:18-59:13 (Thomas describes his inhalers being confiscated twice due to overuse (despite following directions), being forced to use an inhaler that he was told damages his heart, and filing grievances to get his inhalers back); dep. 64:24-65:8 (after hospital stay for kidney failure a colonoscopy was recommended, but never occurred); dep. 71:3-73:15 (UIC recommended three iron supplements a day but he only receives one); dep. 81:1-82:22 (Thomas says he wasn't told about elevated protein levels until about six months after it was shown on a hematology-oncology note)

7.  **Defendants' medical recordkeeping practices result in dangerously inadequate and incomplete files**

**Pattison**: dep. 36:24-37:12 (Pattison expresses frustration that every time the doctors change, it's like starting all over again; the doctors don't look at charts); 43:8-23 (Dr. Schaefer can't find her MRI or x-ray results and takes Pattison's wheelchair away, claims nothing is wrong with her knee); dep. 46:4-20 (Pattison laments that "we don't have a regular doctor here," and that every time there is a new one, she has to start from the very beginning); dep. 68:15-24 (Pattison describes when Dr. Schaefer couldn't find her file)

**Rice**: dep. 43:23-44:25 (Rice says he has two medical files but the doctors only bring one when they see him); dep. 60:7-61:2 (Rice believes staff only keeps his most recent file on hand and does not refer to older records)

**Ruffin**: dep. 26:1-32:20 (recommended to see an orthopedic surgeon multiple times, but denied every time; recommended to try physical therapy, but discontinued; results of x-ray not disclosed); dep. 40:3-15 (records notation says ortho was approved, but Ruffin was told it was denied and he had a CAT scan instead); dep. 60:19-61:20 (records say Neurontin provided improved function, but Ruffin claims he said it just provided short term relief); dep. 152:15-156:20 (Ruffin complained about problem swallowing when he

was first transferred to Dixon, but received no treatment; years later after looking through his medical records he discovered the presence of a bullet fragment near his throat; unclear why this was not discovered earlier); dep. 176:10-179:11 (Ruffin says medical records did not include request for permit of cuff and copies of medical records could not be produced due to lack of copy paper)

**Thomas**: dep. 107:2-110:12 (had dental procedure at Stateville that was supposed to be continued at Pontiac, but x-rays/documentation got lost, and no one called him to continue the procedure); dep. 129:18-132:19 (a nurse can't find Thomas' records);

8.    **Defendants fail to implement or follow their own quality improvement program**

*All of the named Plaintiffs' past and ongoing health care challenges referenced in this document, which have persisted for years, reflect the absence of an adequate and effective quality improvement program that self-monitors, identifies performance improvement needs, and implements strategies that facilitate performance improvement.*

9.    **Defendants' provision of dental care fails at each level of policy and practice**

**Lippert**: dep. 51:8-55:5 (infected tooth goes months without treatment or antibiotics due to lockdown conditions)

**Martin**: decl. ¶ 9 (jaw brace lost during facility transfer; dentist refused to give him another, insisting Martin seems to be doing fine without it); 96:10-103-8 (Martin describes losing his jaw brace in facility transfer and being denied a replacement several times or simply ignored)

**Pattison**: dep. 54:14-55:14 (Pattison has loose teeth, pain, and a pending extraction)

**Ruffin**: dep. 156:21-161:12 (Ruffin discusses overworked nurses, lack of dental hygienists, other staff vacancies); dep. 179:16-181:7 (tooth rotted and needed extraction after request for filling; now on waiting list to get fillings again)

**Thomas**: decl. ¶¶ 17-20 (Thomas can't recall an annual check-up since he was incarcerated in 1965; appointment requests and follow-up to tooth filling delayed by several months); dep. 107:2-110:12 (had procedure at Stateville that was supposed to be continued at Pontiac but x-rays/documentation got lost and no one called him to continue the procedure; bottom tooth filling never took place; Thomas must pay $5 for dental visits)

# Exhibit 3A
## [REDACTED]

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3    DONALD LIPPERT,          )
                               )
 4              Plaintiff,     )
                               )
 5         vs.                 )    No. 10 CV 4603
                               )
 6    JOHN BALDWIN, et al.,    )
                               )
 7              Defendants.    )

 8

 9

10            The Deposition of DONALD LIPPERT,

11    taken before RENEE C. KERR, Certified

12    Shorthand Reporter, in the State of Illinois,

13    County of Cook, at Stateville Correctional

14    Center, 16830 South Broadway, Joliet,

15    Illinois, on the 3rd day of February, A.D.,

16    2016, at 10 o'clock a.m.

17

18

19

20    Reported By:  Renee C. Kerr

21    License Number:  084-001508

22

23

24
```



```
 1   as Exhibit 1.  It's a legal Complaint.  The

 2   caption is Don Lippert versus Emanuel Egbe and

 3   a number of other Defendants.  It is dated

 4   July 27, 2015; and, then if we look at the

 5   last page, it has -- there is a statement -- a

 6   statement that says pursuant to 28 USC 1746,

 7   and it has -- it's a statement under penalty

 8   of perjury, and it has your signature under

 9   it.

10                Do you see that?

11       A    Yes.

12       Q    So does seeing this refresh your

13   recollection about having filed a lawsuit?

14       A    Yes.

15       Q    Do you have any other recollection

16   now of this May, 2014 incident?

17       A    Yeah, I sure do.

18       Q    Okay.

19                So can you tell me, please, what

20   happened on May 15, 2014?

21       A    We were on lockdown and a Nurse

22   Eggby, he was assigned to the cellhouses to

23   give insulin dependents insulin shots.

24                MR. ELIASER:  I don't mean to
```



```
 1   interrupt you, but I have a concern that we

 2   are discussing the lawsuit where the attorneys

 3   for these Defendants aren't even present.

 4          MS. NEWMAN:  Well, I agree with that

 5   concern, but this incident has been -- is in

 6   the Fourth Amended Complaint, so --

 7          MR. ELIASER:  I understand that.  I'm

 8   not going to prevent you from asking

 9   questions.  I just want to show an objection

10   on the record that we are discussing -- we are

11   discussing a lawsuit where the attorneys for

12   the Defendants are not present, we are

13   discussion an incident that is the basis for

14   that lawsuit, and I think there are problems

15   with his testimony without the lawyers

16   present.

17                So I am just going to state that

18   for the record.  I understand it may be

19   pertinent to the class suit, but I wanted to

20   put that on the record.

21          MS. NEWMAN:  You can continue.

22                Do you need her to read back the

23   last thing that you said?

24          THE WITNESS:  Can you tell me --
```



```
 1                  (Record read as requested

 2                   by the Court Reporter.)

 3            THE WITNESS:  And per policy, while

 4     on Level 1 lockdown, medical is supposed to

 5     come to our cell to give us our insulin

 6     shots.

 7                  This employee refused to come to

 8     my cell to give me my insulin shot; and, you

 9     know, he lied and said that I refused,

10     nonetheless, I was denied my insulin shot.

11                  I complained on the next shift

12     to the security and other medical personnel

13     that I need my insulin shot, which in turn

14     they refused to help me, and I got sick,

15     hypo -- hyperglycemic reaction and was seen by

16     medical.

17     BY MS. NEWMAN:

18        Q    Who did you complain to about not

19     having gotten your shot?

20        A    A lot of people.

21                  The names -- it was Williams.  I

22     don't know if it was a female.

23            MR. ELIASER:  Let the record reflect

24     the witness is referring to the Complaint
```



DONALD LIPPERT  Confidential                    February 03, 2016
LIPPERT vs. BALDWIN                                          17

```
 1    while answering this question.
 2            THE WITNESS:  Michelle Williams.  I
 3    told William Butler, Cletus Shaw, Victor
 4    Calloway, Shanal Barnett, Nikki Robertson.
 5            That's it personally.
 6    BY MS. NEWMAN:
 7        Q    And are these all guards in the
 8    prison?
 9        A    Michelle Williams, she was a nurse.
10    ████████████████████████████████████
11    ████████████ and she came to my cell, and I
12    told her.
13        Q    Let me stop you there.
14            And what did Nurse Williams say
15    when you told her that you hadn't gotten your
16    shot -- I'm sorry.  Let me strike that.
17            What did you say to Nurse
18    Williams?
19            MR. RYAN:  Objection, foundation.
20            MS. NEWMAN:  You can answer.
21            THE WITNESS:  I didn't --
22    BY MS. NEWMAN:
23        Q    Did you say -- did you speak to Nurse
24    Williams?
```



800.211.DEPO (3376)
EsquireSolutions.com

```
 1      A     Yeah.  I said I need my insulin shot.

 2      Q     Did you say anything else to her?

 3      A     Yeah.  That 11 to 7 shift medical

 4  refused to give it to me.  I feel weak.

 5      Q     And what did -- did Nurse Williams

 6  respond?

 7            MR. RYAN:  Same objection as to

 8  foundation.

 9            THE WITNESS:  Just ignored me.

10  BY MS. NEWMAN:

11      Q     So she didn't say anything to you in

12  response to your statement?

13      A     No.

14      Q     And were all -- the other people that

15  you spoke to, were they all guards?

16      A     Yeah, William Butler, he was the

17  Sarg.  Cletus Shaw was the acting Lieutenant.

18  Victor Calloway was Assistant Warden for

19  Stateville.  Nikki Robertson, she was the

20  Assistant Warden, I believe, for NRC, and they

21  were doing rounds.

22      Q     And you spoke to all of those people

23  on the morning of May 15, 2014?

24      A     Yep.  Except Tarry Williams and T. S.
```



DONALD LIPPERT  Confidential                     February 03, 2016
LIPPERT vs. BALDWIN                                            19

```
 1   Keen; Lidia Lewandowska.
 2        Q    Who is the first person you spoke to
 3   that morning?
 4             MR. RYAN:  Objection, foundation.
 5             MS. NEWMAN: About not having received
 6   the insulin?
 7             MR. RYAN:  Same objection.
 8             MS. NEWMAN:  You can answer the
 9   question.
10             THE WITNESS:  It was William Butler,
11   the cellhouse Sergeant; and, Michelle
12   Williams.
13   BY MS. NEWMAN:
14        Q    You spoke to both of them at the same
15   time?
16        A    Yeah.
17        Q    And what did you say to them?
18             MR. RYAN:  Objection, foundation.
19             THE WITNESS:  That I didn't receive
20   my insulin shot by the 11 to 7 shift medical.
21   BY MS. NEWMAN:
22        Q    And did either one of those people
23   respond to your -- respond to your statement?
24        A    William Butler, the Sarg, I think, he
```



1    said something; but, at the moment, I don't

2    know.  I would have to look at the Complaint.

3    BY MS. NEWMAN:

4         Q    So you don't remember what he said?

5         A    Don't remember.

6         Q    And did -- all right.

7              And who was the next person that

8    you spoke to about not having received your

9    insulin shot?

10        A    Cletus Shaw.

11        Q    What did you say to Mr. Shaw?

12             MR. RYAN:  Objection, foundation.

13             MR. ELIASER:  Just so we are clear,

14   what is wrong with the foundation of asking

15   the witness --

16             MR. RYAN:  Well, I will be happy to

17   tell you.

18             We have no idea where this was

19   said, when this was said, who else was

20   present, any of the basic foundation questions

21   that one would ask before eliciting the answer

22   as to what was said during the conversation.

23   So my objection is foundation.

24             MS. NEWMAN:  All right.



```
 1   BY MS. NEWMAN:

 2        Q    Let's go back.

 3             When you had -- when you spoke

 4   to Mr. Butler and Ms. Williams, was there

 5   anyone else present when you had that

 6   conversation?

 7        A    My cellie.

 8        Q    And who was that?

 9        A    Diego.

10        Q    And where were you when you had

11   the -- when you had this conversation with

12   Mr. Butler and Ms. Williams?

13        A    I was in 410, B-house.

14        Q    Is that in your cell?

15        A    Yes.  Cell 410.

16        Q    And, approximately, what time was it

17   when you spoke to Mr. Butler and Ms. Williams?

18        A    I don't remember.

19        Q    Was it after breakfast?

20        A    Yeah.

21        Q    About how long after breakfast?

22        A    Hours.

23        Q    And then the next person you spoke to

24   was Cletus Shaw?
```



1       A    Yes.

2       Q    Who else was present when you spoke

3   to Mr. Shaw?

4       A    My cellie.

5       Q    And you were in your cell at the

6   time?

7       A    Yeah.

8       Q    And what did you say to Mr. Shaw?

9       A    I need someone to, you know, need

10  someone to take me up to the healthcare unit

11  to get my insulin shot; and, I am yelling for

12  a med tech or a CMT to come to Cell 410, I

13  need my insulin shot.

14              At the time, Cletus Shaw, he was

15  downstairs on the first floor escorting the

16  Assistant Wardens to administration, and he

17  looked out, looked up at me, and I told him I

18  needed my insulin shot, and he turned around

19  and said for me to shut up, or I am going to

20  write you up.

21              I told him, you know, write me

22  up, but I still need my insulin shot.

23      Q    Were you having any symptoms at this

24  point?



```
 1      A     Yeah.  Dizziness, tight muscles,

 2  thirst, frequent urination, blurry eye vision

 3  headaches.

 4      Q     Approximately, how long was it after

 5  you spoke with Mr. Butler and Ms. Williams did

 6  you talk to Mr. Shaw?

 7      A     I wouldn't know of an exact time.

 8      Q     Was it more than an hour?

 9      A     It could be.  I don't know.

10      Q     And who was the next person you spoke

11  to after Mr. Shaw?

12      A     Victor Calloway and Nikki Robertson.

13      Q     And where were you when that

14  conversation took place?

15      A     In the cell.

16      Q     Was there anyone else present?

17      A     My cellie.

18      Q     And what did you say to Mr. Calloway

19  and Ms. Robertson?

20      A     Nikki Robertson.

21      Q     Yes.

22      A     Yeah.

23            Well, I first talked to Nikki

24  Robertson, and I explained to her of the
```



```
 1   situation, that I did not receive my insulin

 2   shot by the 11 to 7 shift medical; they

 3   refused to give it to me; and, that I need my

 4   insulin shot now because I got high -- you

 5   know, I am feeling high blood sugar, you know,

 6   I am feeling dizzy and weak.

 7            She told me, well, if I feel

 8   dizzy and weak, I should sit down instead of

 9   standing up; and,, you know, that was it.

10            She said something to Victor

11   Calloway.  He asked me my name.  I gave him my

12   name, and that was it.

13       Q    What did she say to Mr. Calloway?

14       A    I don't know.

15       Q    Did you say anything to either

16   Mr. Calloway or Ms. Robertson that you needed

17   to be taken to the healthcare unit?

18       A    Well, I was addressing Nikki

19   Robertson, but if Victor Calloway is standing

20   right next to her and my, you know, my verbal,

21   you know, concerns of not receiving my insulin

22   shot, I'm sure he heard it, you know, because

23   if she heard it, he had to heard it; and, you

24   know, I took it as that I addressed him, too.
```



1    Q    And did Ms. Kelly say (sic) anything

2   else to you at that time?

3    A    After telling me that I should sit

4   down if I feel weak and dizzy, no.  They just

5   left.

6    Q    Was that Mr. Calloway or

7   Ms. Robertson that said that?

8    A    Ms. Robertson.

9    Q    All right.

10           And approximately how long was

11   this -- was this conversation after the

12   conversation with Mr. Shaw?

13    A    I don't know the exact time; give or

14   take an hour.  No more than two hours, an

15   hour.

16    Q    And who was the next person that you

17   talked to about your needing your insulin shot

18   or having insulin -- diabetic symptoms?

19    A    Shanal Barnett.

20    Q    And what is Ms. Barnett's position?

21    A    CMT.

22    Q    And where was this conversation?

23    A    Cell.

24    Q    And why was she at your cell?



```
 1              MR. RYAN:  Objection, foundation.
 2   Calls for speculation.
 3              MS. NEWMAN:  You can answer the
 4   question, if you know.
 5              THE WITNESS:  I fell out, and medical
 6   was called to come to my cell, and she -- she
 7   was the one there.
 8   BY MS. NEWMAN:
 9       Q    So you fell out.
10              Approximately, how long was it
11   after you spoke to Mr. Calloway and
12   Ms. Robertson that you fell out?
13       A    I wouldn't know the exact time.
14       Q    Was it still morning?
15       A    I believe this happened in the p.m.
16       Q    And did you become unconscious at
17   that time?
18       A    In and out.
19              MR. ELIASER:  What was that?  I
20   didn't hear that.
21              THE WITNESS:  In and out.
22   BY MS. NEWMAN:
23       Q    And, approximately, how long were you
24   in and out of consciousness?
```



 1      A     I wouldn't know.

 2      Q     And you said you fell to the ground?

 3      A     Yeah.

 4      Q     And so after you fell to the ground,

 5   what is the next thing?  After you lost

 6   consciousness, what is the next thing you

 7   remember?

 8      A     My cellie told me that he started

 9   yelling, you know, for medical attention.

10      Q     But do you remember hearing your

11   cellie yelling for medical attention?

12      A     You know, vaguely, in and out.

13      Q     What is the next thing you

14   specifically remember?

15      A     About what?

16      Q     After you fell to the ground, you

17   were unconscious.  What is the next thing you

18   remember when you became conscious?  Were you

19   still in your cell?

20      A     Yeah.  Being moved around, you know,

21   talked to by, you know, Ms. Barnett.

22      Q     And what did Ms. Barnett say?

23            Do you remember anything that

24   Ms. Barnett said to you at that point?



DONALD LIPPERT  Confidential                    February 03, 2016
LIPPERT vs. BALDWIN                                          28

 1       A     Not at the moment.

 2       Q     You said that you spoke to her.

 3             What did you say?

 4       A     That my muscles are, you know,

 5   tightening up; it is hard to breathe; I need

 6   my insulin.

 7       Q     And did Ms. Barnett offer you any

 8   treatment at that point?

 9       A     No.

10       Q     Did Ms. Barnett do anything at that

11   point?

12       A     I can't remember.

13       Q     Did she give you an insulin shot?

14       A     I don't know if she did or not.

15       Q     Was there anyone else in the cell

16   with you and Ms. Barnett at that time?

17       A     I'm not sure if my cellie was still

18   in the cell, or they put him downstairs in the

19   bullpen.

20       Q     Was there anyone else, any guards or

21   anything in the cell with you?

22       A     Not from what I can remember.

23       Q     So CMT Barnett came to your cell, and

24   then what happened?  What happened then?



DONALD LIPPERT  Confidential                    February 03, 2016
LIPPERT vs. BALDWIN                                            29

1        A      I was left in the cell.

2        Q      And how were you feeling at that

3    point?

4        A      Still the same.

5        Q      Did your symptoms -- what happened

6    with your symptoms?

7               MR. RYAN:  Object to the form.

8    BY MS. NEWMAN:

9        Q      Did your symptoms become better, or

10   worse, or did they just remain the same?

11       A      Remained the same.

12       Q      From how long did you continue to

13   have the same symptoms?

14       A      I don't remember.

15       Q      Did you speak to anyone else about --

16   about having -- that you were having diabetic

17   symptoms?

18               MR. RYAN:  Object to the form,

19   foundation.

20   BY MS. NEWMAN:

21       Q      After Ms. Barnett left, did you talk

22   to anyone else?

23       A      If I did, it would have been the

24   person who came to give me my p.m. insulin



1    shot.

2        Q    And you say, if I did.  So my

3    question to you is do you remember speaking to

4    that person -- to the person who came to give

5    you your p.m. insulin shot?

6        A    No.

7        Q    And do you know who that person was

8    that came to give you the p.m. insulin shot?

9        A    No.

10       Q    And did that person, in fact, give

11   you an insulin shot?

12       A    After?

13       Q    In the afternoon.  The person who

14   came to give you your afternoon insulin shot.

15       A    Yeah.

16       Q    You are not sure if you spoke to that

17   person who gave you the afternoon -- the

18   evening insulin shot or not, right?

19       A    I would remember talking to that

20   person, but I don't remember who it was.

21       Q    Well, what did you say to that

22   person?

23       A    That I don't remember.

24       Q    Do you remember anything that that



DONALD LIPPERT  Confidential                    February 03, 2016
LIPPERT vs. BALDWIN                                          31

1    person said to you?

2         A    No.

3         Q    Did your symptoms improve after you

4    got your p.m. insulin shot?

5         A    Yeah.  It would have, yeah.

6         Q    Did your symptoms go away completely?

7         A    Well, my high blood sugar would have

8    been going down, but the headaches, the blurry

9    vision, muscle cramps, no.  That didn't go a

10   way.

11        Q    For how long after this incident in

12   May, 2014, did you have headaches?

13        A    Can you repeat it, please?

14        Q    What?

15        A    Can you repeat it, please?

16        Q    Sure.

17             For how long after this incident

18   in May, 2014, did you have headaches?

19        A    For a while.  For a few days.

20        Q    And you hadn't been having headaches

21   before the May, 2014 incident?

22        A    Yeah.  But because of that diabetic

23   complication of the high blood sugar, it just

24   made everything more severe.



 1              At the time before this

 2    incident, I wasn't suffering, you know, muscle

 3    cramps, blurry vision, even though I do have

 4    bad eyes, you know, but it wasn't, you know,

 5    as severe.  The headaches and the blurry

 6    vision was more severe prior.

 7         Q    So how long after this incident did

 8    you have muscle cramps?

 9         A    Explain that again, please.

10         Q    Sure.  You said you hadn't been

11    having muscle cramps before this incident

12    where you missed your shot.

13              How long did you have -- and

14    then you had muscle cramps.  How long did you

15    have muscle cramps after this incident?

16         A    For a few days.

17         Q    And how bad were the muscle cramps

18    that you had?

19         A    Painful.

20         Q    On a scale of one to ten where ten is

21    the worse pain you ever had, how would you

22    rank them?

23         A    To give a better understanding of the

24    pain?  At the time I am suffering a high blood



 1  sugar level, as in that situation, it was a

 2  ten.  When I got my insulin shot and my blood

 3  sugar level is becoming under control, I'd say

 4  a seven, you know, eight, between seven and

 5  eight.

 6      Q    And it stayed the at a seven and

 7  eight for several days?

 8      A    Yeah.

 9      Q    And how long after this incident did

10  you have blurry vision?

11      A    Well, mainly with the headaches, when

12  I started getting the blurry vision, getting

13  weak, that is when the blurry vision comes in.

14      Q    So you had blurred vision when you

15  had a headache?

16      A    Yeah.

17      Q    And how bad were the headaches after

18  this incident?

19      A    After?

20      Q    Yes.

21      A    After I got my insulin shot?

22      Q    Yes.

23      A    A ten and more.  Well, you said ten

24  is the most.



```
 1      Q      Yeah.

 2             And did you complain to the

 3   medical staff about these residual symptoms

 4   that you were having?

 5      A      When I -- is this at the time I was

 6   getting my insulin shot?

 7      Q      At any point, you said for several

 8   days you were having headaches, blurry vision,

 9   muscle cramps, did you complain to the medical

10   staff?

11      A      Oh, yeah.

12      Q      Who did you complain to?

13      A      I don't know the names.

14      Q      What was the function of the person

15   you spoke to?

16      A      What was the reason?

17      Q      Yeah.  How did you -- did you put in

18   for a sick call?

19      A      Yeah.  I asked them to put me in.

20      Q      Who did you ask to put you in for a

21   sick call?

22      A      Whoever came to give me my insulin

23   shots; who came to give me my psychotropic

24   medication.
```



DONALD LIPPERT  Confidential                     February 03, 2016
LIPPERT vs. BALDWIN                                              35

 1      Q    And do you remember the names of any

 2   of those people that you spoke to?

 3      A    Not on the psychotropic medications.

 4            I do keep track of who comes to

 5   give me my insulin shots; but, at the moment,

 6   right now, I don't know the names, but I

 7   wouldn't --

 8      Q    Did you see someone on sick call?

 9      A    I don't know if I had sick call.

10            I saw someone, and I don't know

11   if it was for sick call, or for a clinic, and

12   I told them of the situation.  I don't know if

13   it was the sick call.

14            I saw Dr. -- soon after that, I

15   saw Dr. -- physician assistant, Ms. Williams,

16   and I explained to her what happened, and I

17   asked her to prescribe me for some extra

18   strength Tylenol or anything better than that

19   for the headaches.

20      Q    And did she prescribe some -- any

21   kind of meds for you?

22      A    Yeah.

23      Q    And were those -- what drugs did she

24   prescribe for you?



1       A    I believe she gave me extra strength

2    Tylenol.  It would be like 500 milligrams

3    Tylenols.

4       Q    And did that Tylenol help with the

5    pain?

6       A    A little bit.

7       Q    Did you say anything else to

8    PA Williams during this visit?

9       A    I'm sure I did, but I really don't

10   know exactly all of what was said.

11      Q    And did PA Williams give you any

12   other treatment during that visit?

13      A     If it was for a sick call, it would

14   have been just for what I complained to see

15   her about; or, if it was for the diabetic

16   clinic -- because I don't know what it was for

17   me to see her, but if it was for the diabetic

18   clinic, it would have been, you know, stuff

19   regarding diabetes, anything else that was

20   bothering me.

21      Q    But you don't specifically remember

22   if she gave you -- what other medications she

23   would have given you?

24      A    No.



1     Q     Mr. Lippert, since May, 2014, have

2   you had any other incidents of high blood

3   sugar that has been caused by missing a shot,

4   an insulin shot?

5     A     Since May?

6     Q     Yes.

7     A     Yeah.

8     Q     And when was that?

9     A     I don't know the exact dates.

10          Do you want me to explain what

11   was the reason and --

12     Q     Sure.

13          I mean, can you give me any kind

14   of an approximate date for any of them?

15     A     Not the dates, but I could tell you

16   who -- who was the -- the reason for it.

17     Q     Okay.  Let's start with the first

18   incident you can tell me about.

19     A     E manual Egbe, Holloway.  That's a

20   CMT.  Her last name is Holloway.

21     Q     All right.

22     A     And for those reasons, it was at the

23   time, it was like in the summertime, and they

24   had this service for the Muslims, Ramadan, and



 1   because we had diabetics who were on Ramadan,

 2   they would come -- the medical will come late

 3   to give everybody, you know, who was a

 4   diabetic, their insulin shots.

 5                    At the time, we are going to

 6   yard, and we are going to chow first, and then

 7   we are going to yard.  So my blood sugar

 8   levels would be high prior going to chow or

 9   yard, and I am working out, running around,

10   and my blood sugar level is getting even more

11   high because of the stress, and I have to

12   wait.

13                    I had complained to security

14   that I needed my insulin shot.  Sometimes the

15   individual will come to get inmates who are

16   not on Ramadan because inmates who are on

17   Ramadan, they can't go to chow.  They have to

18   stay in.

19                    So they know who needs their

20   insulin shots, but if we go to night yard,

21   they run our gallery first before anyone

22   else.

23                    Usually, it is four gallery, and

24   they start all the way down, three, two, but

1   you've got the medical, who don't do their

2   jobs professionally or competently.  They will

3   start up, but they are already running two

4   gallery out, and I am stuck with not getting

5   my insulin shot.

6                So when I have to complain, you

7   know, and you can say threaten, intimidation,

8   with the security, you know, tell the people

9   to get the medical over here now; there is

10  going to be problems.  I'm not feeling well.

11  They come, and they are like you should have

12  stayed in from yard, but the thing is the

13  complications of -- these diabetic, you know,

14  complications is, you know, from these people,

15  so I have been suffering, you know, high blood

16  sugar levels, and other type of situations.

17    Q    So how many times have you had this

18  issue where your insulin shots are late

19  because of Ramadan?

20    A    I don't know the exact number.  I

21  guess I could guess.

22              MR. RYAN:  Don't guess.

23              THE WITNESS:  I don't know the exact

24  number.  Quite a bit.



DONALD LIPPERT  Confidential                    February 03, 2016
LIPPERT vs. BALDWIN                                              40

1           I mean, can I explain it in

2    detail?

3           MS. NEWMAN:  Okay.

4           THE WITNESS:  It would be, I don't

5    know how many days, you know, they do Ramadan,

6    but it was close to every day for around then,

7    about that many days, you know, for how they

8    do Ramadan, they stay on Ramadan for that

9    time.

10   BY MS. NEWMAN:

11      Q    So you had this problem during every

12   day of Ramadan?

13      A    Almost every day.

14      Q    And have you had this problem more

15   than one year -- in more than one year?

16      A    No.  I only --

17      Q    So it was one year recently when

18   Ramadan was in the summer; is that right?

19      A    Yeah.  While being back in, you know,

20   F-house because any other unit they take

21   diabetics to the healthcare unit.

22      Q    So this was when you were in F-house?

23      A    Yeah.

24      Q    And you are not in F-house anymore?



 1        A     No.  I am still in F-house.

 2        Q     And you said that in the other units,

 3   they take the diabetics to the healthcare

 4   unit?

 5        A     To get their insulin shots.

 6        Q     Is that just during Ramadan or --

 7        A     Every day, unless on lockdown, and

 8   medical comes to the cellhouse.

 9        Q     And do you know why it is different

10   for F-house versus the other units?

11             MR. RYAN:  Objection, foundation.

12             MS. NEWMAN:  You can answer.

13             MR. RYAN:  Calls for speculation.

14             THE WITNESS:  Because you have seg

15   inmates that are diabetic, so for security

16   reasons, you know, they have the medical come

17   to the unit to do everybody; to give everybody

18   their insulin shots.

19   BY MS. NEWMAN:

20        Q     Because there are inmates in F-house

21   that are in segregation?

22        A     Yeah.  That are diabetics.  So for

23   security reasons, taking population, and

24   general population, or PC, you know, they just



1   say forget it.  Have the medical come to the

2   cell house to give all the diabetics their

3   insulin shots.

4        Q    But during the -- during this Ramadan

5   season, you did eventually get your shot each

6   evening; is that right?

7        A    Yeah.

8        Q    And did you have any diabetic

9   symptoms during that period because you had

10  your shot late?

11       A    High blood sugar levels.  The

12  complications, you know, muscle cramping,

13  headaches, blurry vision.

14       Q    Have there been any other incidents

15  where you were -- had high blood sugar because

16  you didn't get your insulin shot?

17       A    Because of this Ramadan?

18       Q    Or any other time.

19       A    Explain that again, please.

20       Q    Okay.

21            You have told me about -- you

22  already had a deposition about an incident in

23  2010, and we talked about an incident in May,

24  2014, and you told me about having a problem



```
 1    incident because you had already been deposed
 2    on that.  So we have talked about a couple
 3    other incidents today relating to your
 4    diabetes; and, like I said, other than your
 5    claims for diabetes care, are you raising any
 6    other medical claims in this lawsuit?
 7         A     No.
 8         Q     Are you raising any dental claims in
 9    this lawsuit?
10         A     Well, I had dental problems, you
11    know; and, you know, because we were on
12    lockdown, IDOC refused to let me go to my
13    dental clinic, you know, dental pass because
14    we were on lockdown.  So that caused me some
15    severe pain and agony and a waste of time of
16    writing grievances on it.
17         Q     And when was this -- when was this
18    incident?
19         A     I don't know the exact date.  Not too
20    long ago.
21         Q     And so you weren't able to go to the
22    dental clinic because you were on lockdown?
23         A     Yeah.  They only ran emergency, you
24    know, healthcare passes.
```



```
 1       Q    And what were you going to the dental

 2   clinic for?

 3       A    To have an infected tooth removed.

 4       Q    And did you eventually have the

 5   infected tooth removed?

 6       A    Yep.

 7       Q    And how long after did you have the

 8   infected tooth removed?

 9       A    I believe about three months later;

10   two or three months later.

11       Q    And did you have an infection the

12   entire time?

13       A    Yeah.

14       Q    Were you taking any kind of

15   antibiotics or any drugs for the infection?

16       A    No.

17            The only time they gave me any

18   antibiotics is when they removed the tooth.

19   That is the only time they prescribed me some

20   antibiotics.

21       Q    And did you put in for a sick call

22   for the tooth for the pain?

23       A    Yeah.

24            When they were doing the
```



1   cleaning, and they did an x-ray of my teeth,

2   they noticed, you know, that the tooth had

3   looked rotted, and they told me that I needed

4   it pulled before it gets infected.  Because I

5   did tell them that, you know, it does hurt.

6               So they scheduled me to come,

7   but we went on lockdown.

8               I complained.  They scheduled me

9   again for, you know, they put on the pass like

10  a procedure, and I was denied that because we

11  were on lockdown; and, because of that, it

12  took a while for them to reschedule me.

13  Because they got other people, so I had to

14  wait a little bit longer until they did remove

15  it.

16      Q    So was it actually -- did they say it

17  was actually infected, or that it might become

18  infected?

19      A    No.  It was infected.  It was

20  infected.  I looked at it.  I told them I

21  wanted to see the tooth.  It was bad.  I tried

22  to, you know, keep it, you know, show it to my

23  attorney.

24      Q    You tried to keep the tooth?



DONALD LIPPERT  Confidential                February 03, 2016
LIPPERT vs. BALDWIN                                        54

1       A    Yeah, to show it to my attorney

2   because IDOC is deliberately hindering us

3   inmates, you know, to receive our medical

4   care, which caused unnecessary delays.

5       Q    And you say you filed a grievance

6   related to this incident?

7       A    Yeah.

8       Q    And how was that grievance resolved?

9       A    They denied it.

10      Q    And you mentioned that you tried to

11  keep it to show an attorney.  Have you filed a

12  lawsuit regarding this?

13      A    I am working on one.  I am still

14  deliberating if -- debating if I want to -- I

15  am still debating if I want to because the

16  lawsuit, how it works is, you know, with the

17  medical refusing to -- the lawsuit I want to

18  work on is about how IDOC employees and

19  administration is hindering me and, you know,

20  to receive my medical care because of

21  lockdowns.

22              I mean, I know you guys know

23  that, I mean, that it's against the law,

24  constitutional rights to deny a people medical



 1   care.  The only way to fix it is to file a

 2   lawsuit; but, that -- I don't know.  It would

 3   be -- I don't know if it would be a waste of

 4   time because I already got the class action

 5   that discusses all of this.

 6       Q    Mr. Lippert, what are the injuries --

 7   what are the injuries that you are claiming in

 8   this case that resulted from the Defendants'

 9   actions or inactions?

10            MR. RYAN:  I object.  This is outside

11   the scope of the purpose of this deposition.

12            He was already deposed on his

13   individual claim for monetary damages versus

14   his class action claim involving injunctive

15   relief.  So are you asking about what his

16   injuries are as a result of the May 1st, 2010

17   incident?

18            MS. NEWMAN:  I am asking more

19   generally, but this is a class -- the injuries

20   that he is claiming in this class action.

21            MR. RYAN:  I am going to object as

22   outside the scope, but go ahead and answer, if

23   you can.

24            MR. ELIASER:  Mr. Lippert, we are not



1  deliberate indifference?

2          MR. RYAN:  I object because it's a

3  mischaracterization of his previous

4  testimony.

5          THE WITNESS:  I mean, not receiving

6  no medical.  That's what the lawsuit is about,

7  medical.

8  BY MS. NEWMAN:

9      Q    Mr. Lippert, are you aware of any

10  vacancies in the medical staff here at

11  Stateville?

12          MR. RYAN:  Object as to foundation.

13              I don't know how he would know

14  whether there were vacancies or not among the

15  staff.

16          MS. NEWMAN:  You can answer the

17  question.

18          THE WITNESS:  At this current moment,

19  no, but I have witnessed, I have seen the lack

20  of medical staff that are supposed to be

21  handling, you know, things, other job

22  descriptions.

23  BY MS. NEWMAN:

24      Q    And when did you witness this lack of



 1  medical staff?

 2      A    Oh, man.  I am going to say from -- I

 3  am going to say from 2015, January, 2015, all

 4  the way back from the time I came in it was

 5  just chaotic.

 6      Q    What was -- I'm sorry.  Go ahead.

 7      A    It was just, I mean, you know, being

 8  a diabetic, I am always in the healthcare unit

 9  getting our shots, you know, my shots; and, I

10  have witnessed and seen, you know, medical

11  personnel fighting with each other, you know;

12  you are not supposed to be doing this.  You

13  are supposed to be doing that.  You know,

14  well, we need somebody.  We don't got nobody.

15  Someone needs to do it.

16              I can give so many examples, you

17  know, but just recently what I do notice is

18  there are more nurses.  Maybe this lawsuit is

19  doing something a little bit.

20      Q    So recently there has been an

21  increase in the nursing staff?

22      A    Yeah.  But, yeah, well, I had a

23  discussion with a guard one time about the

24  incompetence, you know, and he told me, he was



 1   like, well, they might not be incompetent.

 2   They took tests, you know.  They went to

 3   college for this.  So they can't be

 4   incompetent.  They could be just they don't

 5   care, you know.

 6                    So I have seen a lot of new

 7   nurses, some that just -- I do say

 8   incompetent.  They don't know what they are

 9   doing; and, a lot of them just don't care, you

10   know, which I don't, you know -- I mean I do

11   blame them because they sign up for a job

12   where they are going to be working with a

13   bunch of bugs, assholes, you know, meaning

14   like you can have Ghandi come in here, and in

15   six months he is going to be like this

16   mother -- you know, he is going to be a

17   changed person and not in the better.

18                    So like having nurses that

19   already are speculated of doing bad jobs and

20   other jobs, it's just -- they shouldn't be

21   working here.

22                    That's what I noticed, but there

23   is a lot of very good people.  It is just

24   that, you know, IDOC, by them having the



DONALD LIPPERT  Confidential                          February 03, 2016
LIPPERT vs. BALDWIN                                                  66

1   say-so who is allowed to work in this

2   facility, they need to do a better oversight

3   job of who is working because Wexford, they

4   don't care who they hire.

5           MR. RYAN:  Can we off the record for

6   a second, Counsel?

7                   (Whereupon, a discussion was

8                   held off the record.)

9   BY MS. NEWMAN:

10      Q    I would like to go back for a bit to

11  the issues of the medical staff vacancies.

12  You were talking about whether you were aware

13  of any medical staff vacancies.

14              So my question to you is have

15  vacancies in the medical staff affected your

16  medical treatment?

17      A    Yes.

18          MR. RYAN:  I object to foundation

19  before you answer.  Objection to foundation.

20              You can answer now.

21  BY MS. NEWMAN:

22      Q    And how have the vacancies affected

23  your medical treatment?

24      A    It would be like for the prison



 1   population for Stateville, you have a -- to me

 2   it's a small healthcare unit, you know, for

 3   the general, you know, for the prison

 4   population, for medical.

 5                  To me it is too small, and you

 6   will have a medical director, one doctor, or

 7   two doctors, or a physician assistant, but

 8   only three in that medical field.

 9                  I actually think there should be

10   more doctors because if you have a lot of

11   people who need to see a doctor that the

12   nurses can't deal with, and they are referred

13   to the doctors, but you only have three, but

14   then you have to look at the situation of, as

15   I explained, IDOC putting it on lockdown,

16   canceling all medical passes who are supposed

17   to see a doctor, that is putting a backlog.

18                  Now you only have three people,

19   maybe two because one will be sick, and they

20   are just flooded, and these doctors are like,

21   man, they are not going to give us proper

22   treatment, you know.  They are just going to

23   be like okay.  You are done.  Here's some

24   Tylenol.  You are done.  Here's some more are



1   Tylenol.  You are done.  You know what I am

2   saying?

3                    That does affect me because I

4   have been through it.  That is for the

5   doctors, you know; but, nurses, you know, as I

6   said, you know, back, you know, it was a

7   problem because they didn't -- they don't know

8   what was going on.

9                    Now it is more professionally

10  coping personnel that is doing stuff now.

11      Q    And, I mean, can you give me any

12  specific examples of times where the vacancies

13  in the staff affected your personal

14  treatment?

15               MR. RYAN:  Object to foundation.

16                    Go ahead.

17               THE WITNESS:  Not exact date.  Even

18  though I had received medical treatment, but I

19  felt it was the wrong medical treatment

20  because I mean, even the Federal Court ruled

21  that Tylenol doesn't cut it for medical

22  treatment anymore.

23                    So, you know, if there was more

24  doctors, I think I could have received, along



1  with a lot of other inmates could have

2  received, but you are talking about me, so I

3  could have received a better -- better

4  treatment.

5      Q    All right.  But I just want to ask

6  you do you have any specific incident in mind

7  where you say you either didn't get treatment

8  or didn't get adequate treatment because of

9  the lack of staff?

10     A    Not right offhand.

11     Q    You said earlier that you felt that

12 some of the -- some of the newer medical staff

13 were incompetent.

14              Is that a fair characterization

15 of what you testified to earlier?

16     A    The ones I came across, because I

17 can't say everybody, because I haven't seen

18 the nurse, so for me to just use that for the

19 ones that I know are just incompetent, I just

20 can't put a blanket cover on everyone.

21              But the ones I have seen, you

22 know, you could put incompetent; but, you

23 know, they are not -- they are not qualified

24 to treat people in an environment like this.



 1          This is a maximum security

 2    prison, a male prison, you know.  So, you

 3    know, if you've got inmates disrespecting a

 4    nurse, this person is going to take it like,

 5    okay, all these inmates are assholes, and just

 6    don't care about the ones that have never

 7    disrespected this nurse.

 8          That's a lot of them that has

 9    that mentality.  You have somebody throw

10    something on a nurse, you know, urine, feces,

11    spit on a nurse.  That is going to affect a

12    person, and that is going to have this nurse

13    change and just don't care about anybody.

14          Rarely do you see a nurse get

15    squirted with feces or urine and still care;

16    and, I have seen only one nurse have that done

17    to her since I have been locked up and still,

18    you know, do her job.  The other ones -- it's

19    understandable, but it shouldn't happen, you

20    know.

21      Q    So when you said they are not

22    qualified based on their kind of emotional

23    characteristics?

24          MR. RYAN:  I just object to



DONALD LIPPERT  Confidential                    February 03, 2016
LIPPERT vs. BALDWIN                                            71

 1   foundation, form.

 2              I mean, are we qualifying him as

 3   a medical expert here to talk about whether

 4   nurses comply to the proper standard of care

 5   and has proper training?  I mean, that's

 6   fine.  I just want to know if we are.

 7          MR. ELIASER:  Opinion?

 8          MS. NEWMAN:  I was just trying to

 9   summarize what he just testified to.

10   BY MS. NEWMAN:

11      Q    Are you -- do you have any reason to

12   believe that any of the medical staff here are

13   not qualified in terms of having the right --

14   appropriate medical training?

15          MR. RYAN:  Same objection as to

16   foundation, but you can answer as a medical

17   expert.

18          THE WITNESS:  Oh, yeah.  I am stating

19   that there are nurses here that don't know

20   what is going on at all; that already have

21   been through the training showing how things

22   are supposed to go, and still don't know what

23   is going on.

24              Yeah.  There is quite a few of



 1  them here.

 2  BY MS. NEWMAN:

 3      Q    And what training are you referring

 4  to?

 5      A    Well, if you have a new medical

 6  personnel coming in, you would have the ones

 7  that have been here show them around.  This is

 8  what is supposed to be done, you know; if they

 9  are doing insulin shots, you know, this is how

10  you are supposed to do it, you know, security

11  stuff, you know -- that's separate, security

12  stuff.

13              Don't accept, don't talk about

14  personal things; but, for psychotropic

15  medications, you are supposed to watch them

16  take it, you know, show your mouth, you know,

17  that kind of stuff.

18              This is how you do your

19  reports.  This is where you put them.  That

20  type of training.  Showing the new people what

21  to do.

22  BY MS. NEWMAN:

23      Q    Are you aware of any incident where,

24  you know, the medical staff lacking certain



```
 1   qualifications has affected your personal
 2   medical care?
 3             MR. RYAN:  Object to the foundation.
 4             THE WITNESS:  I can say yeah, for not
 5   receiving my insulin shots, my diabetes,
 6   proper medical care, you know.
 7                  Policy says that we are supposed
 8   to come before breakfast; not when they want
 9   to come.
10                  For a diabetic, you see,
11   hypertension and diabetic clinics, that is
12   mandatory for all diabetics.  They ask you
13   what is your problems.  You tell them your
14   problems, but they will tell you you need to
15   put a sick call in.
16                  For diabetes, when you go to the
17   diabetic clinic, they ask you what is the
18   problem.  My feet are hurting.  I am getting a
19   burning sensation, tingling sensation, you
20   know, like my feet's on fire, you know, and I
21   trying to show them, you know, and they are
22   like, oh, you need to put a sick call in.  I
23   don't see feet.
24                  Well, then you have to argue
```



 1   with them, diabetes, you know, has to have

 2   proper foot care.  Oh, no.  Then when you

 3   start telling them their job, you are done,

 4   you know?  They start screaming, oh, he is

 5   done.  Get him out.

 6              So, yeah.  That affected me.

 7   Even though there is a doctor that is working

 8   right now, she have been doing that for me

 9   quite a few times, but I guess after she found

10   out that -- with this lawsuit, she had a bad

11   attitude, you know, understanding, to me; but,

12   I am hearing stuff, you know, bad about her

13   from other inmates, but, I mean, you know.

14       Q     What doctor was that?

15       A     Alma Jaheeda Wulf.

16       Q     Dr. Wulf?

17       A     You can say that, W-u-l-f; but, I

18   mean, to me, she is more understanding.  So

19   but in the beginning, you know, I have doctors

20   prescribe me stuff, creams, lotions, and when

21   I see her, she is taking it all away.

22              She will say, oh, Wexford is

23   stopping this.  Wexford is removing this

24   stuff, no longer giving it to inmates even



DONALD LIPPERT  Confidential                    February 03, 2016
LIPPERT vs. BALDWIN                                             75

```
 1  though they still have it; and, she does have

 2  a habit of taking things away.

 3               I can't get into other inmates'

 4  stuff.  You said about me so, you know, she

 5  removed creams, you know, lotions, to help my

 6  dry skin.

 7               I can get it off commissary,

 8  and, you know, she got a bad habit of -- she

 9  don't do that no more, but she did though.

10       Q    Has she prescribed creams for you?

11       A    Well, I haven't seen her in a while.

12       Q    Do you currently have a prescription

13  for any creams or lotions?

14       A    No.  I did but it ran out, and I -- I

15  talked to Ms. Williams, Dr. Williams.  She

16  said she is going to check and see what she

17  can order for me, but I didn't get a

18  prescription, but I had a diabetic clinic, but

19  I would like to get this on record, yeah,

20  uhmm-uhmm.

21               I had a diabetic clinic, a

22  hypertension clinic, and security came and

23  told me at like 11 o'clock, you've got a

24  clinic pass.  I am like, I didn't never
```



1   receive the pass, but I am like, I am going to

2   get ready.

3                    So the guard was coming around.

4   I am like, I am ready.  He is like, oh.  They

5   put a freeze on all healthcare passes.  I'm

6   like, what do you mean?  They are cancelling

7   all healthcare passes.

8                    I said, are we on lock down?  He

9   said, I don't know yet.  We might.

10                   Nonetheless, IDOC put us on

11  lockdown because they are switching over to

12  some computer thing for inmate tracking, you

13  know, 360.  So I guess the computer just shut

14  down, so they stopped all movement.  I

15  couldn't go to my clinic passes.

16                   Now, the nurse who fills out the

17  slips, you know, for the healthcare passes for

18  appointments, I saw her.  She is like, you are

19  a no show.  I am like, I was no no show.  She

20  is like, well, you didn't want to come up;

21  and, I am telling her, who told you this?

22                   She is like, well, you didn't

23  show up.  Well, you just said, I didn't want

24  to come.  I'm like, who told you this, you



 1  know.

 2              Needless to say, the rules state

 3  whoever sees a chronic illness for -- the

 4  doctor for a chronic illness, no matter what,

 5  they are supposed to come to the healthcare

 6  unit.  She just, I don't want to talk, you

 7  know, and I was in the healthcare unit to see

 8  Dr. Williams; and, she is like, I don't want

 9  to talk.

10              So, nonetheless, I missed my

11  very important clinics.  I had to put in to

12  see the sick call.  I just went to get another

13  lab.  So I should be seeing, you know, this

14  Dr. Jaheeda pretty soon for my diabetic

15  clinic.

16              The incompetence, the ignorance

17  of this nurse, didn't do her job, didn't

18  follow no rules, the policies at all.  So she

19  just basically said screw me.  You ain't

20  getting nothing; and, that's what happened.  I

21  didn't get my clinics.

22              Now, I am off my diet.  My diets

23  haven't been renewed because I didn't see the

24  doctor.  Now, that is throwing my blood sugar



DONALD LIPPERT  Confidential                     February 03, 2016
LIPPERT vs. BALDWIN                                              78

 1  levels out of whack because before I came up,
 2  when I woke up, I was suffering an insulin
 3  reaction, a low blood sugar level.  I would
 4  have had a.m. snack for breakfast, but since I
 5  couldn't see a doctor because this nurse
 6  didn't want to do her job and reschedule me,
 7  it is causing a lot of problems right now at
 8  this moment, until, if we don't go on
 9  lockdown, can get back on my diet and my
10  diabetes treatment, management.
11              MR. RYAN:  Off the record.
12                  (Whereupon, a discussion was
13                  held off the record.)
14  BY MS. NEWMAN:
15      Q    Have you ever had a request for
16  specialty care, to go out for specialty care
17  that was denied?
18      A    No.
19      Q    You have been in the infirmary a few
20  times, right?
21      A    Yes.
22      Q    Did you -- at that time, did you
23  think it was appropriate for you to be in the
24  infirmary rather than being in the hospital?



# Exhibit 3B

MILAM MARTIN                                      January 19, 2016
LIPPERT v. BALDWIN                                                1

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3
    DON LIPPERT, LEWIS RICE,      )
 4  MILAM MARTIN, DEBRA           )
    PATTISON, JOHN RUFFIN and     )
 5  EZELL THOMAS,                 )
                                  )
 6              Plaintiffs,       )
                                  )
 7  vs.                           ) No. 10-CV-4603
                                  )
 8  JOHN BALDWIN, LOUIS           )
    SHICKER, and BRUCE RAUNER,    )
 9                                )
                Defendants.       )
10

11

12

13
               DEPOSITION OF MILAM MARTIN
14              Taken January 19, 2016

15

16

17

18

19

20

21

22

23        Reporter:  Beverly S. Hopkins, RPR

24     IL CSR No. 084-004316, MO C.C.R. No. 968
```



```
 1          A.   Okay.

 2          Q.   And I was going to ask you now because

 3    I remembered to do so.

 4          A.   I like that because that means you're

 5    human after all.

 6          Q.   Yes, yes.

 7          A.   No.  No, I don't have any medication

 8    that affect me.

 9          Q.   Okay.  Any other reason that you might

10    not be able to give, you know, give accurate

11    testimony today?

12          A.   No.

13          Q.   Okay.  All right.  Are you currently

14    taking any medication?

15          A.   Yes.

16          Q.   All right.  What are you taking

17    currently?

18          A.   I'm taking high blood pressure

19    medication and a pill called Tegretol.  I think I

20    take Motrin as needed.

21          Q.   All right.  What is Tegretol for?

22          A.   Tegretol is for phantom pain, phantom

23    pain or phantom, you know, feelings, you know,

24    needle sticks or something.
```



MILAM MARTIN                                      January 19, 2016
LIPPERT v. BALDWIN                                              42

1          Q.   How long did you have -- how long did
2     you have the wheelchair and it was defective?
3          A.   Quite a time.  I can't remember how
4     long, but it was quite some time.  Long enough
5     for me to injure myself for certain.  I shouldn't
6     have it a day.  That's just something that
7     shouldn't have happened.  They should have gave
8     me a loaner immediately.  And if they didn't have
9     a loaner one, that they should have placed me in
10    death care until such time that they could have
11    gotten me a chair and then that way I wouldn't
12    have been traveling in a wheelchair that would
13    subject me to injury.  And they know that.
14    They're health care professionals.
15         Q.   You say should have placed you in
16    death care?
17         A.   Yeah.
18         Q.   What's that?
19         A.   Okay, I'm sorry.  I thought you knew.
20    Health care.
21         Q.   Oh, health care?  I misheard you.
22         A.   No, you didn't.  You heard exactly
23    what I said.  I said death care --
24         Q.   Okay.



1        A.    -- because that's what we refer to it

2   as here.  We refer to as death care.  And we do

3   that for a reason.

4        Q.    And what's that reason?

5        A.    Because people die back there every

6   day it seems like.  And then the care that they

7   give you is care that would cause you to die,

8   meaning, they don't really give you no care most

9   of the time.  They put you in a stressful

10  environment.  You get sick here, they lock you up

11  and make you sicker.  You get punished for

12  getting sick here.

13       Q.    Okay.  All right.  So you were -- what

14  day was it -- do you know what day was it that

15  you fell out of the wheelchair?

16       A.    I know it was -- I believe I just

17  looked at those notes too.  2011.

18       Q.    Do you remember what month it was?

19       A.    I know it was in October, something

20  like that.  I'm not certain.  It's in the record

21  though.

22       Q.    Right.  Was it towards the beginning

23  of the month, the end of the month?

24       A.    No.  No, it might have been in the



MILAM MARTIN                                        January 19, 2016
LIPPERT v. BALDWIN                                               44

```
 1    middle of the month.  But it's in the record, the
 2    exact date.
 3         Q.   Mr. Martin, I realize that there's a
 4    lot of things like that that are in the record.
 5    And we'll probably take -- we'll take a look at
 6    those medical records, but I also want to know
 7    what you remember.  That's part of what a
 8    deposition is.
 9         A.   I understand.
10         Q.   So, you know, when I ask you when a
11    date is, I mean, you know that's why I asked --
12         A.   All right.
13         Q.   -- to be able to see what you
14    remember.
15         A.   I just want to be certain.
16         Q.   Right.  I understand.
17         A.   I don't want to say anything that is
18    contrary to the actual date and then you hold it
19    against me.
20              MS. BENNETT:  I'm just going to object
21    to the extent that you're telling the witness how
22    to answer the question.
23    BY MS. NEWMAN:
24         Q.   Let's see here.  So you said you fell
```



 1   out of the wheelchair and I believe you said the

 2   major and some other people took you --

 3        A.   Major, inmates too and helped me back

 4   into the chair and took me over to the -- over

 5   there.

 6        Q.   All right.  And what happened when you

 7   got to the health care unit?

 8        A.   I sat there for a while at the door.

 9   I just sat there by the door.  And then they

10   brought me back over there and told me that they

11   had finally got another chair for me.  But I was

12   injured and I explained that I was injured.  And

13   to my recollection they had attempted to give me

14   an x-ray.

15        Q.   And so did they -- did they take an

16   x-ray?

17        A.   I think I sat in the chair because I

18   couldn't stand because my knees hurt sometimes.

19   And they give me an x-ray.  I believe what they

20   said was they couldn't make a determination

21   because of it.  So at some point they finally

22   sent me out for what is known as a CAT scan over

23   there in Mt. Vernon where they discovered my ribs

24   had been broken.



1    Q.    Were you having pain in your chest?

2    A.    Excruciating.  I still have pain in my

3  knees, back.

4    Q.    You still have pain in your chest?

5    A.    I don't have pain as far as the ribs

6  are concerned anymore, but I have pain in the

7  ribs for quite some time.  I couldn't even take

8  deep breaths without feeling pain.  In fact, they

9  were over the unit calling me the king of pain.

10  That's how much pain that I was -- have endured

11  and continue to endure.

12    Q.    Who -- who gave you that name?

13    A.    Some of the inmates, you know.  You

14  know how they do.  You know how people are.

15  Human nature.

16    Q.    So how long -- about how long did you

17  have pain in your ribs?

18    A.    Oh, for a long time, a long time.  At

19  least -- at least eight to nine weeks before it

20  started subsiding a little and all that.  And, of

21  course, I was OD'ing on Motrin because it was not

22  good for your liver.  But it was that or not

23  getting no rest sometimes.

24    Q.    So were you -- were you kept in the



```
 1   infirmary during --

 2         A.    No.

 3         Q.    -- this time?

 4         A.    No.

 5         Q.    Did you want to be kept in the

 6   infirmary?

 7         A.    Well, I say again, that's death care,

 8   so -- so I would say no.  Absolutely, positively

 9   not.  Because to be kept in the infirmary means

10   they lock you behind a door, 24 hours more than

11   likely.

12         Q.    Was there some -- was there a

13   treatment for the -- treatment for the -- your

14   broken ribs?

15         A.    They gave me no treatment at all.

16         Q.    Well, was there some treatment -- what

17   treatment do you think you should have been given

18   for the -- for your broken ribs?

19         A.    I'm not a doctor.  But I tell you this

20   much.  They could have treated me with more

21   empathy than they did because there's braces for

22   that type of injury, that much I know.  There's

23   various different type of medications, you know.

24   They could have gave me a -- put me in a -- gave
```



1  me a soft mattress where it gives as opposed to

2  laying on the steel.  None of those factors were

3  implemented.

4          Q.   All right.  And you said you also had

5  pain in your knee?

6          A.   Still got pain in my knee.  You know,

7  that feels better.  We talked about it.  It feels

8  --

9          COURT REPORTER:  I'm sorry, I can't

10  hear you.  I didn't hear what you said.

11          A.   Don't worry about that.  I'm talking

12  to myself now.  That's off the record.  I'm just

13  talking to myself now.

14  BY MS. NEWMAN:

15          Q.   And did you receive any -- any

16  treatment for your knee during -- after you were

17  injured?

18          A.   No.

19          Q.   Have you received any treatment since

20  then for your knee?

21          A.   No.  They didn't even CAT scan it.

22  They didn't x-ray it.  They didn't do anything.

23  They should of.  There's something wrong with it.

24  There might be a municipal [sic] tear or



 1  something, you know.  Those things go untreated

 2  and they just deteriorate.

 3       Q.   Have -- and have you told the medical

 4  team --

 5       A.   I made mentioned of it, absolutely

 6  made mention of it.

 7       Q.   And --

 8       A.   And also hurt my knee.

 9       Q.   Okay.

10       A.   And what they did was it didn't seem

11  like anything, they said that's all.  In order to

12  know definitively it would seem to me you would

13  have to take an MRI or CAT scan and then that

14  would make a definitive determination as to

15  what's going on.  Sometimes you can't feel

16  through things, you got to see through things.

17  But, you know, that's expensive.  It costs money

18  to take CAT scans and MRIs.  That's not a cheap

19  process.

20       Q.   And have you -- have you told -- have

21  you told them in the interval between 2011 and

22  today, have you told them that your knee is

23  continuing -- continues to hurt?

24       A.   Well, I'm going to be honest with you,



MILAM MARTIN                                        January 19, 2016
LIPPERT v. BALDWIN                                                50

1  you know, you tell somebody something for so long

2  and they do nothing about it, what you doing then

3  is wasting energy.  So I don't waste energy, you

4  know.  I just take Motrin periodically to get

5  through the pain.

6       Q.   So you -- so you haven't told anyone

7  at the prison that your -- that your knee still

8  hurts?

9       A.   I have made mention of it but, you

10  know, not on a consistently nagging basis.

11       Q.   All right.  When's the last time you

12  made mention of it, that your knee was hurting?

13       A.   I saw the doctor for -- one of those

14  times.  That I saw the doctor, I made mention of

15  it.

16       Q.   And approximately when was that?

17       A.   I can't pinpoint it now.  But I did, I

18  have mentioned it to them for sure.  I can't

19  pinpoint anymore.

20       Q.   Was it within the last year?

21       A.   Oh, yeah.  Oh, yeah.  I mentioned it

22  to them when he sees me about my blood pressure

23  medication or my Tegretol level.  I made mention

24  of it.



MILAM MARTIN                                January 19, 2016
LIPPERT v. BALDWIN                                       51

1          Q.    Was it within the last two months?

2          A.    No.   We don't see each other like

3     that.  He usually sees me every six months now,

4     once every six months now.  He usually spaces it

5     out to about six months now.  And if that

6     particular day, you know, or maybe a couple few

7     days or before if he's not doing anything to

8     bother me, then, you know, I don't mention it.

9     I'm not a chump.

10         Q.    And what do you mean by that?

11         A.    I endure a lot of pain.  I don't, you

12    know, complain and complain and complain about

13    something that nobody seems to want to do

14    anything about.  But, you know, I have to take

15    care of me.  I have to give myself the best

16    therapy that I can give because they not going to

17    provide it for me.

18              You get frustrated if you continue to

19    ask someone to do right by you and they refuse to

20    do right and they brush it off, and so you

21    generally saying nothing, you know.  So I try to

22    take the high road because it can get low.

23    Sometimes they make me wonder how I keep from

24    going under, but I try to stay the course.

 1   to request that we could get copies of those --

 2   of his materials.

 3            MS. BENNETT:  We do not have copies

 4   currently, so...

 5       A.   I got -- I've got a rough draft copy.

 6            MS. BENNETT:  Go ahead.

 7   BY MS. NEWMAN:

 8       Q.   All right.

 9       A.   But, you know, they never processed

10   it.

11       Q.   All right.  So you had -- you say you

12   have a rough draft, did you -- did you create a

13   final draft of the grievance?

14       A.   No.  See, I filed the grievance, then

15   from my copy, because I didn't want to wait to

16   get to the law library because sometime it takes

17   eons for you to get there and then they say your

18   time expires, so in order to have a copy of it, I

19   made my own.  I copied it, which I considered a

20   rough draft, because when I did it over, I made

21   it better.  Every time I do it over, it makes it

22   better and better and better, better wording,

23   better description, better scenario of the

24   description.  And so then I filed it over and the



1    second one I submitted.  And they never processed

2    it.

3          Q.    What do you mean they never processed

4    it?

5          A.    They never processed it.  They didn't

6    get back with me.  They didn't send it back,

7    anything.  They do that normally.  They do that a

8    lot here.  In fact, the John Howard Association

9    can substantiate that this goes on because I got

10   letters from them where I complained about them

11   not processing my grievance.  Not just mine but a

12   whole lot of others as well here.  I got that in

13   black and white because I wanted to put it on the

14   John Howard Association's record that this is

15   what goes on.  And the reason that they do that

16   is because, as you know, it's mandatory that we

17   exhaust all administrative remedies before we can

18   seek relief in the court.

19          The reason I went that route was so

20   that I would have some proof that, yes, I'm

21   filing grievances.  Yes, I did file a grievance.

22   But this is what they do here.  They -- lately

23   they've stopped doing it as much and they have

24   made the forms available.  But many times from



```
 1   month on end they'll even tell us, they have been

 2   telling us we don't have no grievance forms.  We

 3   don't have no grievance forms.  You only get a

 4   certain amount of time to file a grievance.  If

 5   you don't file them in a timely manner, then they

 6   don't accept grievances late.  So that was a

 7   tactic that they using today, the advantage here

 8   in this institution.

 9            And also I have affidavits to that

10   effect where others have signed affidavits to

11   corroborate what I'm telling you as it now

12   pertains to grievance system.  Lately they

13   haven't been doing it, but I do got proof that

14   they have been doing it because I made it my

15   business to do just that.

16        Q.   Okay.  So -- so you did just file the

17   grievance with the counselor?

18        A.   I signed it on the counselor's letter.

19   It never came back to me.

20        Q.   When you -- let me ask you a question.

21   When you file a grievance, do you -- do you get

22   something that's like stamped or anything -- any

23   indicate -- any kind of receipt to indicate that

24   it's filed?
```



MILAM MARTIN                                          January 19, 2016
LIPPERT v. BALDWIN                                                 80

1        A.   No, you just have to wait.  And then

2   when counselors put his comments down -- I sure

3   wish I have brought a grievance form so you can

4   see.  They have -- last night I looked for this

5   grievance.  I know I got it.  I looked for it.

6   But I couldn't locate it as of right now but it

7   may be in my -- what they call my legal property

8   box, which you can only access those boxes when

9   you get a pass from the law library to go over

10  and, you know, and then you go in your legal box.

11  So it may be over there but it could very well be

12  in my cell.  I just got to look a little bit

13  harder.  I really wanted to get it.  I really

14  did.  I wanted to get not just that, but I wanted

15  to get others.  I've got a lot of grievances back

16  there, but I wanted to get other grievances that

17  I filed as it pertained to the medical issues.

18       Q.   Okay.  Did -- and when you say it was

19  never processed, did you ever get a comment back

20  from the counselor?

21       A.   No.

22       Q.   All right.  Did you -- did you ever

23  talk to the counselor about the grievance?

24       A.   Yep.



1        Q.    When was that?

2        A.    This is 2016.  It was a long time ago.

3        Q.    Okay.  Was it -- I mean, did you

4    follow up right after the grievance was filed

5    or --

6        A.    I waited -- like you have to wait, you

7    know.  They'll tell you that, you know, you have

8    to wait and we got a lot of grievances that we're

9    processing, so, you know, it's going to come back

10   to you.  So when I asked them about it, I haven't

11   got it yet, I'm sure it's there, but I haven't

12   got it yet.  I got a lot of grievances.

13          I'm one man and so a lot of you, so

14   give me time.  So I gave them time, so much so

15   until they probably -- until -- until it expires

16   because the irony of that is this.  Even if they

17   sign off on your grievance and have the date that

18   they signed off on your grievance, often times

19   Springfield will still say that you're tardy even

20   though you have no power over when they send you

21   your grievance back.  I have had that happen to

22   me on several occasions.  Springfield see that,

23   oh, he didn't get it back until such and such and

24   so and so and then you processed it right away.



1   But they'll still say untimely.  I have had that

2   happen to me more than once, so have a lot of

3   other inmates.

4           Then the John Howard Association will

5   testify under oath that that's been a big

6   complaint coming from this institution.  And I

7   got letters in my cell right now from them.  I

8   could have brought them over here too for you.

9       Q.   All right.

10      A.   If you like me to I can go back and

11  get them.  I'm pretty sure I can dig them up.

12      Q.   Okay.

13      A.   Or I can send them to you.

14      Q.   Let me ask you, so the grievance that

15  you filed, I mean, what -- what was your

16  complaint in -- for the grievance?

17      A.   My complaint in that grievance was

18  that I, on several occasions, explained to them

19  not only the discomfort that I was receiving as

20  the reason I was being slouched like this falling

21  out the back constantly, but that the maintenance

22  should never have put a back on the wheelchair

23  that I had bigger than the one that should have

24  been back there.  And that as a result of it I



MILAM MARTIN                                     January 19, 2016
LIPPERT v. BALDWIN                                            83

1   fell out and injured myself and these injuries

2   were so, so, so this, that, and the other.

3        Q.   All right.  So the grievance was

4   related to the chair not being -- not being

5   maintained properly?

6        A.   And me falling as a result and being

7   injured and breaking my ribs and maybe even

8   something wrong with my knee and bruising my --

9   whatever the injuries were, I incorporated them

10  in that grievance.

11       Q.   Did you also in that grievance have

12  any complaints about the -- about the medical

13  treatment you received after the fall?

14       A.   I believe I did, yeah.  I believe I

15  did.

16       Q.   And what were those complaints?

17       A.   That they didn't give me something

18  soft and gentler to sleep on.  That they didn't

19  give me -- they didn't seem to do anything for

20  me.  I didn't believe that the treatment

21  thereafter was appropriate to the injury.  They

22  didn't even monitor me on a consistent basis.

23  They waited, okay, so many weeks or months past

24  then, you all right.  They didn't even monitor



MILAM MARTIN                                        January 19, 2016
LIPPERT v. BALDWIN                                              96

1        Q.   Okay.  Is there anything else you want
2   to add to your testimony from this morning?
3        A.   No, I just wanted to check -- I just
4   wanted to find out what was going on there
5   because it's been such a long time and I don't
6   recall that, but --
7        Q.   All right.  So going back to the
8   brace, for your -- for your jaw, right?
9        A.   Uh-huh.
10        Q.   So at some point you lost this brace
11   or it was taken away from you, is that right?
12        A.   Yeah, they got -- it got lost in one
13   of these -- you see all those multiple transfers?
14        Q.   Yes.
15        A.   Well, they seize your property.  They
16   don't say, here, you take your property.  They
17   seize it and they stretch your roll and they
18   shake it down.  And one of those two, they
19   eventually got shuffled.
20        Q.   Which transfer was it?
21        A.   I haven't the slightest idea.
22        Q.   Approximately how long ago was it that
23   you lost the brace?
24        A.   It's been quite some time because I've



1    been trying to supplement my own set of

2    circumstances and it's just not working out.

3          Q.   Was it more than ten years ago?

4          A.   Might have been about eight years ago,

5    maybe seven years ago I had all of it at that

6    time.  At some point they -- I actually supposed

7    to renew it too, you know.  Something like that

8    only last -- it's only so durable and it's only

9    going to last for so long.

10              But, you know, I had been putting

11   cardboard and tissue and trying to keep it lined

12   to the best of my ability, and it works some but

13   it doesn't work like that brace.  So I find

14   myself resting on the side where gravity will

15   shift opposite and then that causes another

16   problem altogether, just resting on one side all

17   the time.

18         Q.   All right.  And you said you've

19   requested -- you've requested a new brace?

20         A.   Yes.

21         Q.   All right.  And when did you make

22   those requests for a new brace?

23         A.   I made them on several occasions.  I

24   think the last time I made the request was maybe,



1   what, eight, nine months ago.  I don't know.  I

2   read it somewhere recently in one of the medical

3   records where I had made that request.

4          Q.   And who did you -- who did you make

5   the request to?

6          A.   To the dentist.  To two different

7   dentists that's here, maybe three.

8          Q.   All right.  And --

9          A.   The first dentist that I made the

10  request to had a stroke recently.  So then I saw

11  other dentist -- oh, that might have been the

12  dentist that had the stroke.  There's been two

13  dentists maybe twice, maybe three times because

14  when they -- you have sometimes -- sometimes they

15  give you an annual checkup.  This past birthday

16  they didn't give me a dentist checkup at all.

17  And I was in July the 2nd and then beyond --

18  before and beyond I still haven't had a dental

19  checkup since my last birthday at all.

20          Basically the only time I get to make

21  such a request, because I put in to see the

22  dentist, then they charge me $5 and they still

23  going to more than likely not give me the brace.

24  So I spent -- I would have then exhausted funds



```
 1   that I don't have readily available to do such a
 2   thing.  I try to hold on to my pennies,
 3   particularly since I get no result.  That
 4   copayment can add up.
 5         Q.   All right.  So the first dentist that
 6   you talked to about -- about this, approximately
 7   when was that?
 8         A.   I'm not certain.  I'd have -- I'd have
 9   to look in the file to see the exact date.
10   Though I do know for a fact it is in the file.
11         Q.   And did the -- what did the dentist
12   say when you asked for this brace?
13         A.   They probably won't give you one.
14         Q.   He said they probably wouldn't give
15   you one?
16         A.   Yep.
17         Q.   And did he say why?
18         A.   I don't believe he did.  I explained
19   to him what I was doing in order to sustain
20   myself, and I think he said he thought that,
21   well, you know, you been doing pretty good
22   supplementing toilet tissue and cardboard and
23   laying on one side.  Whatever you can do to
24   survive, keep doing it, you know.  That's
```



1   basically the way they feel about it.

2          Q.   All right.

3          A.   That don't necessarily make it right,

4   but that's the way they feel about it.  So what

5   can I do to change the minds of hard-hearted men

6   and women?

7          Q.   And you said that you talked to a

8   second dentist about -- about this same issue?

9          A.   I've requested -- I've requested -- in

10  fact, I just recently read in the record, in one

11  of these medical files that I got where I

12  requested it.

13         Q.   All right.

14         A.   And that's not been that long ago.

15  You get tired of asking somebody to do right by

16  you, right?

17         Q.   So the second time you asked for a

18  brace, what did that dentist have to say?

19         A.   He said we will ask Wexford.  We'll

20  send a request to Wexford.  I can't do it without

21  Wexford's permission, that's what he said.  It's

22  as though he wouldn't mind doing it, but he had

23  to get permission I imagine from his employer.

24         Q.   And did you ever have -- find out



```
 1  if -- what happened with that request?

 2         A.   Yes, I did.

 3         Q.   All right.  What happened?

 4         A.   I didn't get it.

 5         Q.   So the dentist told you it was not --

 6         A.   No, I didn't get it.

 7         Q.   Oh.

 8         A.   When they going to do something, they

 9  call you and they make a plaster mold.

10         Q.   Okay.

11         A.   And then after they get the plaster

12  mold, they'll send it to whoever manufactures it

13  and they'll duplicate it from the mold, and then

14  they'll call you over there and give it to you.

15         Q.   So were you ever told that whether or

16  not -- whether -- that the request was denied?

17         A.   I never was told anything.  I just

18  haven't got it.  It's been a while, a good while.

19  It could be up to a year now.  It's been, you

20  know, it haven't been given to me.  So what

21  should I suspect?

22         Q.   All right.  And you said that there

23  may have been a third dentist that you talked to

24  about this?
```



1      A.   You know, I've talked not just in this

2  facility, I've asked -- I've requested it many

3  times.  And not necessarily the dentists in other

4  places but the actual MDs, the actual doctor.

5      Q.   All right.  Have you talked to any of

6  the doctors here at Big Muddy about this -- about

7  the brace?

8      A.   The doctor is a dentist.  The dentist

9  is a doctor.

10      Q.   Yes.  I'm saying other -- other

11  doctors other -- other than -- other than the

12  dentist?

13      A.   I think I made mention of it to a

14  doctor and he said you see the dentist, as though

15  that's his field of profession, not mine.  His

16  field, you see, of profession and not mine.

17      Q.   And when was that?

18      A.   I've talked to him -- I've made

19  mention of that to Dr. Larson some time ago in

20  the many occasions that I've had an opportunity

21  to see him.  But I can't tell you definitively

22  when that was.

23      Q.   Okay.  Do you know when the last time

24  was that you talked to Dr. Larson about it?



MILAM MARTIN                                    January 19, 2016
LIPPERT v. BALDWIN                                           103

1        A.    I don't continue to talk to Dr. Larson

2    about something that he had absolved himself

3    from.  He had already gave me -- pointed me in

4    the direction of where I should go and that's the

5    end of that.  I can't beat that man about

6    something he's passed on to someone else because

7    I'm going to get the same results.  That would be

8    insanity.

9        Q.    Mr. Martin, have you filed any

10   grievances with relation to this -- to the jaw

11   brace?

12       A.    No, I haven't.  Do you know why?

13       Q.    Why?

14       A.    Because I've been rough managing.

15   I've been just rough managing going through the

16   changes of having to do -- improvise with toilet

17   paper and cardboard or laying on a side where the

18   gravity don't pull this way, which causes me to

19   break down -- well, okay.  All right.  That's it.

20   That's what happening.

21       Q.    Okay.

22       A.    See this right here, I got a big gap.

23   You see that?

24       Q.    Okay.



MILAM MARTIN                                    January 19, 2016
LIPPERT v. BALDWIN                                           109

1    pretty good.  You keep them pretty white and

2    clean, you know, what you got to work with.  And

3    I said, well, can I use a little gargle today.

4    And she said, you can use a little.  And I sit

5    there and gargle.  And, you know, it's a pleasant

6    experience.  We're not at odds with one another.

7                MS. NEWMAN:  Go off the record.

8                (A discussion was held off the

9                record.)

10        Q.    All right.  So, Mr. Martin, you had

11   the flu in May 2015, is that right?

12        A.    Pretty sure I did.

13        Q.    And what treatment were you given at

14   that time?

15        A.    Let me make sure on my point here

16   because I was sick twice.  Where they had to --

17   where they put me in death care?  The first time

18   they had an epidemic of the flu here, are we

19   speaking in terms of that time when the whole

20   institution was quarantined?

21        Q.    Mr. Martin, I don't know.  Is that --

22   is that -- I'm -- there was --

23        A.    No, you said 2015.

24        Q.    2015.



MILAM MARTIN                                          January 19, 2016
LIPPERT v. BALDWIN                                                110

 1          A.   No, that was the most recent time.

 2    Okay.  Yeah.  No, no.  Yeah, yeah, yeah.

 3          Q.   Okay.

 4          A.   Well, I don't know -- I don't believe

 5    it was the flu.  I'm thinking it was walking

 6    pneumonia at that time because I've had it

 7    before.  Because I've had walking pneumonia

 8    before, I know what the symptoms are, based on

 9    experience.

10          Q.   And what were your symptoms?

11          A.   I couldn't stand.  I couldn't eat.  I

12    was sweating, cold, hot, so hot that I'm burning

13    up and so cold that I'm shivering.  You know, in

14    fact, when they took me, I worked myself up

15    because they had no parallel bars in the

16    isolation cell that they put in, and there's none

17    in there now, in death row seg over there, death

18    row -- death care, and I fell, so porters had to

19    help me get up.  And by that time I had an

20    accident on myself a little because -- my

21    intentions were to use the toilet.  And so I

22    realized then that I wasn't going to be able to

23    get up out of the bed, so I asked for a urinal

24    but I continued to urinate when I needed to



1   because of course I couldn't eat food either.  It

2   was all over the same symptoms that I experienced

3   in times past when I was diagnosed with

4   pneumonia.

5        Q.   And so -- and what treatment did you

6   receive during that time?

7        A.   Tylenol and water.  Tylenol and water.

8        Q.   Did you ask for any other medications?

9        A.   No.  I'm not a doctor.  I did ask for

10  soup so I could put something on my stomach.  I

11  was just a dying and that just went out one ear

12  and out the other.  So the porters were eating my

13  food up, which was fine because I'd rather give

14  it away than to waste.

15       Q.   Were you given -- given any other

16  liquids besides water?

17       A.   Water.

18       Q.   Were you -- so you were kept in the

19  infirmary while you were --

20       A.   The segregation cell observation,

21  segregation.  And they got a camera in the cell

22  and another camera by the door and no parallel

23  bars.  So should you need to hold onto something,

24  there's nothing there in a joint that's been ADA



1    approved.  I find that quite strange.  And water,

2    Tylenol, and they would come in and of course,

3    you know, they try to give me high blood pressure

4    medicine, but I get that medication.  It has

5    nothing to do with the sickness.  So they come in

6    and, oh, let's take your -- oh, your temperature

7    went up or it went down or your blood pressure

8    went up too high or it's down too low.  That went

9    on for a whole week.

10        Q.   So you were in the infirmary for about

11   a week?

12        A.   Not infirmary.  They got a part where

13   they got general population inmates, where --

14   they got -- where they have a private bathroom

15   or -- no, they put me in segregation.  That was a

16   segregation cell over there.  They locked me

17   behind the door and punished me for being sick,

18   that's what they did, and put me on a steel box

19   this high from the floor.  It's bolted to the

20   floor.  It's a box made of metal.  And put a thin

21   mattress on it with no parallel bars in the cell.

22   And I had to threaten to go on a hunger strike if

23   they didn't let me up out of there.  And I fared

24   better in my -- in the cell in the cell house



1   than I did over there.  And I got sick again and

2   they tried to put me over there and there's no

3   way.  I'm not going to even tell them if I get

4   sick.

5        Q.   Do you know why you were kept in

6   segregation during this?

7        A.    That's what they do.  They just

8   recently did Joseph Brown the same identical way,

9   did him in the same identical way.  And he's not

10  the only one.  That's what they do.  It's another

11  guy on my unit, they did him the same way.  They

12  got two of those -- got two or three of those

13  types of cell and they throw you in there.  If

14  you get the doors locked, they don't open,

15  there's no coming out.  None of that.  They

16  wouldn't even give me a shower.  You can't get a

17  shower or bath because of what's going on with

18  your body, you can't get that.  So for a whole

19  week I went without a shower or even a bath

20  because they -- the doctor didn't -- thought that

21  would be dangerous because I might -- he said you

22  might pass out in there, yet all you're giving me

23  is water and Tylenol.  And I'm sure that's in the

24  record because that's all he gave me.



 1   in there that long.  Awful.  I sure wish you

 2   could have saw it.

 3        Q.   Are you aware of any -- any vacancies

 4   in terms of the -- in terms of the dentists --

 5   dentist staff?

 6        A.   Well, I do know that dentist himself

 7   had a stroke and had to -- and had -- and they --

 8   I think they had to replace that dentist.  So

 9   maybe there was probably a small vacancy that

10   didn't probably last that long.  But you speaking

11   in terms of something permanent vacancy, is that

12   what you're saying?

13        Q.   Or a long -- long duration.

14        A.   No, I can't say that I do.  No, I

15   can't say.  I have to say, no, I don't know.

16   Trying to help you but I don't know.

17        Q.   I understand.  I understand.  So the

18   medical doctors that you see here, has it been

19   primarily Dr. Larson?

20        A.   That's who it is.

21        Q.   Okay.  Have you -- do you feel that

22   Dr. Larson is a qualified doctor?

23        A.   I would say he probably is.

24        Q.   Okay.  Have you had any experiences



```
 1   where you felt like he -- he wasn't -- that he
 2   didn't treat you right because he wasn't
 3   qualified?
 4        A.   No, I wouldn't say that.  But I would
 5   say that there's been a couple of doctors that
 6   probably want to do the right thing but in the
 7   instance -- it's -- it's Wexford's call and
 8   they've often told me that.
 9            Say you need a brace, like they
10   ordered me a brace to rest in at night for this
11   hand so that it will be a certain way.  And
12   that's been almost six months ago.  And they
13   ordered me some eyedrops and that's been almost
14   six months ago, you know.  I suffered that Bell's
15   palsy and it periodically -- this periodically at
16   night, this eye, it's not as strong as it was
17   before.  It will open and then it will get so dry
18   until it's like cracking.
19            So Dr. Larson at the time he ordered
20   me the brace, which has been about six months
21   ago, he told me it's going to be a long, long --
22   it's going to take a long, long time.  So I
23   accepted that and I still accept that.  So I
24   conclude based on him making the assessment and
```



MILAM MARTIN
LIPPERT v. BALDWIN

January 19, 2016
130

1    them ordering it for me that he meant well.  But

2    he also have cautioned me on many occasions it's

3    ultimately Wexford's call.  I can diagnose you

4    and say I know this is exactly what you need, but

5    it's Wexford's call that will ultimately

6    determine whether you get what you need.

7              In fact, that's what the dentist told

8    me as well with the brace, he sure did, now that

9    I think of it.  The last one that I asked the

10   brace for, he sure did tell me that.  He sure did

11   say -- he said the same thing.  You've energized

12   my mind.  Yeah, brought me back to life.  You

13   sure did.

14        Q.   All right.  Mr. Martin, do you have

15   any chronic -- any chronic diseases or

16   conditions?

17        A.   I've had bronchitis all my life and I

18   saw, you know, like I said, I deal with things.

19   So I wouldn't consider that chronic now, you

20   know.

21        Q.   You did say that you took medicine for

22   high blood pressure?

23        A.   They give me high blood pressure

24   medicine.



1  I don't look out for myself, who's going to look

2  out for me?

3       Q.   Do you have -- do you have visits

4  relating to your high blood pressure?

5       A.   Well, whenever I go to see the doctor,

6  which is lately every six months, every half a

7  year, they take my blood pressure.  That's one of

8  the first things they do.  And it's been

9  consistently good.  So they do have some people

10 who they regulate their blood pressure more often

11 than that.

12      Q.   And how often do some of those people

13 have their blood pressure checked?

14      A.   Sometimes every day.  That might be

15 the reason why we're so overcrowded over there.

16 You're bumper to bumper.  Those are called

17 treatments.

18      Q.   Okay.

19      A.   But I don't know, the nurses might be

20 overwhelmed here.  They just might not -- they

21 just might not be but a couple hours and smoke

22 cigarettes.  And they take a lot of cigarette

23 breaks too, more than you expect.

24      Q.   Other than -- other than that, the



1  time we talked about where you were -- you were

2  in the infirmary in May of 2015, have you ever --

3  are there any other times when you've been in the

4  infirmary for treatment?

5        A.   Yeah, I was in the infirmary when they

6  had the quarantine.

7        Q.   And when was that?

8        A.   2013, 2014, something like that I

9  believe it was.  I just seen it.  I was -- they

10  had a quarantine here because of a flu outbreak.

11  And they came around late and asked me about

12  Theraflu.  It was kind of late in the game.  And

13  I had been doing everything that I know to battle

14  the symptoms, which I definitely had the flu, and

15  I felt that it seemed as though that it was

16  subsiding.

17           And then all of a sudden my face

18  froze, literally froze.  And the nurse, when she

19  came around to give me the Tegretol, Raven, I

20  said my face is froze.  So she said when I finish

21  passing out my medication, I'll send somebody to

22  get you.  And to make a long story short, they

23  did just that.  They took me over to the hospital

24  and all the lights was out in the floor unit over



```
 1    there and I was over there on a very serious
 2    situation.  Melissa decided that she would send
 3    me out to the cold lobby while they sat in the
 4    warm area.  And I was like, nobody seeing the
 5    lights out, okay.  This is an attack on me, all
 6    right.  So I knocked on the window and told her
 7    get me back over to the unit.  And when I did
 8    that, Raven looked and said, what are you doing
 9    out there?  I said, she told me to go out there.
10    She said, oh, no.  I got the doctor on the phone.
11    You're not going anywhere.  You got to go back to
12    the infirmary.  You got Bell's palsy.  She
13    described the symptoms over the phone to Dr.
14    Larson.  You got Bell's palsy.  So I went back
15    there.
16            And this time, which was the first
17    time, they didn't put me in the isolation
18    chamber.  They put me in with live-ins.  That's
19    her first name, Raven.  Pretty good kid.  Pretty
20    good girl.  They put me in with live-ins, and I
21    stayed there and they gave me medication.  I
22    think I stayed there a little over a week, and I
23    still couldn't really talk a lot on this side.
24    And they let me go back to the cell house and the
```



1    quarantine was just lifted.

2         Q.   What medication did they give you for

3    the Bell's palsy?

4         A.   Some kind of antibacterial medication

5    I believe it was.

6         Q.   Do you believe you should have been

7    sent to the hospital if that --

8         A.   That was good.  I was cool.

9         Q.   That was good.

10        A.   They acted in a capacity that

11   acceptable to me.  But that's a rare, rare, rare

12   commodity.  Since that time, no.

13        Q.   Have you ever had a request for some

14   specialty care like outside care that has been

15   denied?

16        A.   I've been locked up 35 years.  You

17   asked me a question like that and you know that

18   there's been times that I've asked for things

19   that -- on the outside and didn't get it,

20   absolutely --

21        Q.   I mean.

22        A.   -- but what are you speaking of?  In

23   recent time are you talking about?

24        Q.   Yeah, say in the last eight years or



1  so.

2        A.  Let me see.  Let me think.  Let me

3  think.  Everything that I've asked them for that

4  they could accommodate me with here and right now

5  like with wheelchair gloves, they don't give us

6  wheelchair gloves.  This is abrasive.  To move

7  around like this and touching steel and stuff,

8  you know, you cut your hand.  I cut my hand over

9  here real bad, you know, falling down through

10  here.  With the wheelchair gloves that never

11  would have happened.  They don't accommodate us

12  with wheelchair gloves here, but guys sometimes

13  from other places, they got them.  So what's

14  really going on.  Is it spreading their wealth or

15  you can get them over here but you can't get them

16  over there, you know what I'm saying?

17          Air mattresses, they won't give --

18  they just told me that in order for me to get an

19  air mattress, I would have to be in death care.

20  And so that now they've come to a conclusion that

21  we can accommodate the two guys that did have air

22  mattresses in the general population, so they

23  went out there and they cut the bed and made them

24  wider and made them longer to accommodate two



 1 │ live-ins that they had back there so they could

 2 │ be out here.  But now the problem with the air

 3 │ mattress are, they real expensive.  Okay, work

 4 │ with me.  I told them I understand those air

 5 │ mattresses are real expensive, but give me a less

 6 │ expensive one, one that blows up like this so the

 7 │ steel won't continue to dig into my side where I

 8 │ got atrophy at since you don't give us air crates

 9 │ anymore.  You say air crates is a -- is a health

10 │ hazard.  They roll out.  They real cheap, but

11 │ that's your call.  So you say that they're health

12 │ hazards.  So since they're health hazards, you

13 │ just don't accommodate us with nothing.  You

14 │ don't supplement us with anything.

15 │         And I'm not the only one.  There's a

16 │ lot of people out here in sheer pain day in and

17 │ day out because they refuse to give us air crates

18 │ or to give us blowup air mattress.  So they don't

19 │ have an excuse for the air mattresses no more

20 │ because the guys that they had back there is now

21 │ in the population.  There's only two of them.

22 │ They both in the population now.  So now what's

23 │ the excuse?  The doctor told me give me time.

24 │ And I believe he means well, give me time.  But



1   in the meantime in between time I'm suffering and

2   have been.

3           I got a piece of sponge that I took

4   out of this right here to try to lay on to keep

5   from killing myself, keep from bruising and being

6   in pain and stuff and cut to the bone.  They

7   don't care about that.  I'm not human.  Just

8   continue to suffer me in ways, and not just me

9   but a host of others, in ways that I believe is

10  criminal.  A lot of us here.  So, yeah, I have

11  been denied of a whole bunch of things.  They got

12  nothing to do when necessary.  You got to be near

13  dead to almost to go out here anyway.

14          You throw a man in a segregation like

15  they did and like they're doing when they sick,

16  that just makes you sicker.  It's probably scary

17  for a whole lot of people.  It's very stressful

18  for me.  Stress can kill you.  And that's what

19  they trying to do.  I don't know.  I got to be

20  careful, got to be careful.  I got to be careful.

21      Q.   So let me ask you since -- in the last

22  few years since you've been to Big Muddy here

23  this last -- this last time, had there been an

24  occasion where the doctor told you you needed to



```
 1    go out for specialty care and then that request
 2    was denied?
 3         A.   No, they didn't tell me that I needed
 4    to go out.  But I know some people that have been
 5    denied and had to go through a multitude of
 6    changes.  And one of them is on my unit right
 7    now.  He had to go through hell and high water to
 8    try to get out and has a municipal [sic] tear for
 9    five years and they just now recently operated on
10    him after five years.  He's been wrestling and
11    begging to have -- and they didn't want to give
12    the man an hour for all those years.  His last
13    name is Harris.  Finally he gets out and they
14    can -- and all what he's been telling them and
15    complaining about has come to fruition.  Now they
16    agreed, the doctors from out there say you should
17    have had this done a long time ago.  So it's not
18    just about me.
19              But guess what, if it -- it can be
20    just about me at some point because certainly if
21    they doing it to them, then I'm next in line.
22    I'm telling you that they need to do better.  And
23    if they need more money, I don't know what the
24    situation is.  If they need more resources or
```



 1   whatever the case may be, then that's something

 2   they will have to work out.  Because if they --

 3   you know, there's a consultation fee, if you ask

 4   me, you know, but certainly they need to work

 5   that out.

 6        Q.   All right.  Mr. Martin, we talked

 7   about your -- the jaw brace and you feel that you

 8   need one.  Are there any other -- are there any

 9   other dental concerns that you have other than

10   what we've already discussed?

11        A.   Nope.

12        Q.   Okay.

13             (Defendant's Exhibit No. 3, Fourth

14             Amended Complaint, was marked for

15             purposes of identification.)

16        Q.   Here you go, Mr. Martin.  I handed you

17   what we marked as Exhibit 3.  It's titled Fourth

18   Amended Complaint and --

19        A.   You want me to read this in its

20   entirety?

21        Q.   No.  Well, I mean, it's your -- that's

22   your call if you --

23        A.   I read it before but it's -- I'm

24   saying are you needing me to read this?



```
1          Q.   I'm saying Martin -- do you agree with
2     that first part, Martin believes he also --
3          A.   Yeah, yeah, that's true.
4          Q.   Okay.
5          A.   That's accurate.
6          Q.   Okay.  But no testing was ever
7     performed to determine if this was true despite
8     his complaints to the health care staff of pain
9     in the knee and difficulty in standing?
10         A.   Yeah, that's true.
11         Q.   Paragraph 119, among the earlier
12    injuries Martin received in prison was a broken
13    jaw?
14         A.   That's accurate.
15         Q.   Okay.  At one time he had a plastic
16    molded brace to stabilize the jaw but this was
17    lost during one of Martin's transfers between
18    prisons?
19         A.   That's true.
20         Q.   He had repeatedly asked the dentist at
21    Big Muddy for a replacement brace.  Pause there.
22    Is that accurate?
23         A.   That's true.
24         Q.   Without it his jaw slips especially
```



MILAM MARTIN                                    January 19, 2016
LIPPERT v. BALDWIN                                            150

1  lying down and it is very painful?

2        A.   Yes.

3        Q.   But the dentist has not provided him

4  with another brace leaving Martin to try to

5  stabilize the jaw himself by stuffing tissue in

6  his mouth?

7        A.   And cardboard.

8        Q.   All right.  Paragraph 120, in May 2015

9  Martin came down with the flu?

10       A.   They called it flu.

11       Q.   Yeah.  Is that --

12       A.   They told me themselves that it wasn't

13 the flu.  Because if it was the flu, then that

14 would be like a virus.  And then we would then go

15 to the -- and we give you something for a virus,

16 they said that to me.

17       Q.   Okay.  Well, what did they say you

18 had?

19       A.   They didn't.  But I know what it was.

20 It was pneumonia.  And the reason I know is, like

21 I said before, I had it before and the same

22 identical symptoms existed.  And I've had it --

23 I've had it two or three times either as a child.

24       Q.   Okay.  All right.



 1              And that night I couldn't eat.  It

 2      would have been the same way in the cell, but I

 3      would have felt better over there.  But that's

 4      how that happened.  That's exactly how that went

 5      down.

 6          Q.   All right.  So you said that you had a

 7      fever of 103 and chills, is that accurate?

 8          A.   That's good, yeah.

 9          Q.   All right.

10          A.   It went up more than that too, a

11      little higher than that, a little higher than

12      that at one point.

13          Q.   Health care staff placed him in an

14      isolation room in the infirmary --

15          A.   Read that back.  Read that back,

16      please.

17          Q.   Okay.

18          A.   Health care did what?

19          Q.   Health care staff placed him in an

20      isolation --

21          A.   Isolation.

22          Q.   -- room in the infirmary at Big Muddy.

23      Is that --

24          A.   That's right.



MILAM MARTIN                                                January 19, 2016
LIPPERT v. BALDWIN                                                      154

1        Q.    That's right.  With water and Tylenol

2   and left him in the room -- left him alone in the

3   room which had a solid door and no way to call

4   for help?

5        A.    No call button.

6        Q.    Defendants' records reflect that even

7   during the first few days when Martin was sickest

8   it could be six or more hours between the time

9   when health care professional -- personnel

10  checked on him in his locked cell?

11       A.    That's right.

12       Q.    Okay.

13       A.    Balled up on that steel box they had

14  me on suffering.

15       Q.    So the room lacked any bars to help

16  him stand up or move around?

17       A.    Well, I don't know if you should say

18  bars.  You should say parallel bars because

19  that's what it is.  They call them parallel bars.

20  When you say bars, it might -- it applies that we

21  talked about bars on windows, but parallel bars.

22       Q.    Martin could not eat the food he was

23  given but health care staff refused to give him a

24  liquid diet?



MILAM MARTIN
LIPPERT v. BALDWIN

January 19, 2016
155

1      A.   It was not actually incumbent on the
2  staff themselves to give me a liquid diet.  It's
3  incumbent on the doctor to order that I get a
4  liquid diet and then the health care staff will
5  deliver that liquid diet.
6           I told Dr. Larson I can't eat, man.  I
7  can't even eat nothing.  I can't eat.  It
8  won't -- it won't work, and he didn't order that
9  I get a liquid diet, even if it was just bullion
10  cubes.  He didn't even order that for me to get
11  that, so I had to suffer.
12          So I don't know if this is worded in
13  the best way is what I'm saying.  I don't know if
14  it's worded in the best way when you say health
15  care staff refused to give me a liquid diet.  I
16  think it would be better worded that Dr. Larson
17  did not order a liquid diet --
18      Q.   Okay.
19      A.   -- even though I told him that I can't
20  eat, man.  I cannot eat.  You get that -- get
21  that walking pneumonia, you'll just see what I'm
22  talking about.
23      Q.   Martin was in the infirmary for almost
24  six stressful days?



 1          A.   I was in there for six days, probably

 2     seven days.  I got out six days and then on the

 3     seventh day I rested.  That's when I got out.

 4     That's when I was able to get some rest.  Six

 5     days.  And then I got out on the seventh day

 6     after I told Dr. Larson I'm going to go on a

 7     hunger strike if you keep me back in there.  I

 8     was good enough to go.

 9               MS. NEWMAN:  Mr. Martin, that's all

10     the questions I have for you.  I turn it to your

11     attorney in case they want --

12               MS. BENNETT:  No questions.

13               MR. RAMAGE:  No questions.

14               MS. NEWMAN:  All right.  I do want to

15     say, you know, even though we've marked -- we

16     produced these unredacted, they -- all the

17     medical records are -- that we consider all the

18     records that we've -- all the medical records be

19     confidential and potentially -- potentially

20     privileged.  And I would like to designate the

21     entire deposition transcript as confidential as

22     well.

23               MS. BENNETT:  This is the unredacted

24     version of the complaint, which the plaintiffs



# Exhibit 3C

Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 142 of 369 PageID #:9162

DEBRA PATTISON                                      February 05, 2016
LIPPERT vs. BALDWIN                                                  1

1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
2                          EASTERN DIVISION

3
     DON LIPPERT, LEWIS RICE, MILAM      )
4    MARTIN, DEBRA PATTISON, JOHN    )
     RUFFIN and EZELL THOMAS,           )
5                                        )
                          Plaintiffs,    )
6                                        )
     vs.                                 ) No. 10-CV-4603
7                                        )
     JOHN BALDWIN, LOUIS SHICKER, and    )
8    BRUCE RAUNER,                       )
                                         )
9                         Defendants.    )

10

11          THE DEPOSITION of DEBRA PATTISON, the

12   Plaintiff herein, called by the Defendant for

13   examination in the above-entitled cause, pursuant to

14   the Federal Rules of Civil Procedure, taken before me,

15   Brenda L. Zeitler, CSR-RPR, License No. 084-004062, at

16   Logan Correctional Center, 1096 1350th Street, in the

17   City of Lincoln, County of Logan, and State of

18   Illinois on the 5th day of February, 2016, commencing

19   at 10:15 a.m.

20

21

22

23

24



1   see the actual MRI.  I guess Decatur Memorial Hospital

2   Radiology Department made a disk or something and sent

3   it to him.

4        Q.   So when you saw him, did he have that disk?

5        A.   This was after I'd seen him.

6        Q.   Oh, after?

7        A.   Yes.

8        Q.   What happened during your visit with

9   Dr. Olysav?

10       A.   He told me that -- he had me have x-rays.

11   He said my knee is older than what my age is, that it

12   needed a total knee replacement.  He wasn't concerned

13   about my weight.  He told me that he needed a yes from

14   me, an okay from Wexford, and he could have it done by

15   the end of the month.

16       Q.   Did he explain to you why he felt you needed

17   a total knee replacement at that point?

18       A.   He told me that it didn't look good and that

19   the ACL -- he could tell there was problems with it.

20       Q.   Did he mention why it would not be useful to

21   try to fix the ACL or repair the ACL or the other

22   ligaments?

23            MS. MILLER:  Form.

24       A.   He wanted it done right then, and Wexford



DEBRA PATTISON                                February 05, 2016
LIPPERT vs. BALDWIN                                            24

 1   kept making excuses.  It's been almost four years, and
 2   they're still making excuses.
 3       Q.   You said he wasn't concerned about your
 4   weight at that point?
 5       A.   Right.
 6       Q.   Did he actually say, "I don't care about
 7   your weight"?
 8       A.   Yeah.  He said he wanted it done and that it
 9   should have been done when I initially tore my ACL
10   back in 1979.  He knew who my surgeon was at that
11   time.  And at that time, they had just started doing
12   the total knees.
13            I told him what my surgeon had told my
14   family, that because I was active in sports, wore
15   skirts, dresses, shorts, and all that, he didn't feel
16   that he should do that because I would have, like, a
17   12- to 15-inch scar on my leg.
18            Over the years, it just kept getting worse.
19   And he was very upset that Wexford kept making
20   excuses, him and Dr. Springer both.
21       Q.   Dr. Olysav was upset that Wexford kept
22   making excuses?
23       A.   Yeah.  He's done everything Wexford has
24   asked.  Wexford has asked for -- after I saw him,



```
 1   Wexford asked for his opinion.  They had a conference
 2   call with him and Dr. Springer.  He sent his initial
 3   report.  Dr. Springer sent his report.  And it's like
 4   they were just giving me the run-around.
 5        Q.  So have you spoken with Dr. Olysav since
 6   your --
 7        A    No.  No.  And the doctors here, the three
 8   doctors I have seen here, have asked for a second MRI,
 9   and I have been denied.  The physical therapist has
10   even asked for a second MRI, and we've been denied.
11        Q.  I just want to go back.  If you haven't
12   talked to Dr. Olysav since October 2012, how do you
13   know that he is frustrated with Wexford?
14        A.  Because I get told from the Health Care
15   Administrator and Warden Sharon.  Lisa Johnson is the
16   Health Care Administrator.  Warden Sharon has -- those
17   two ladies have been with me since I injured --
18   reinjured my knee in 2012, and they have been fighting
19   for me for the surgery since.
20        Q.  All right.  So Lisa Johnson and Warden
21   Sharon told you that Dr. Olysav was frustrated with
22   Wexford?
23        A.  Uh-huh.  (Nodding head up and down.)
24        Q.  When did they say that?
```



 1      A.   No.

 2      Q.   All right.  So at some point after that, did

 3  Dr. Springer make another request for you for surgery?

 4      A.   I think he made three, maybe four, five more

 5  attempts.  He even came in on the day he was moving

 6  out of state in 2013 to try and plead with them to do

 7  my surgery.

 8      Q.   Was that before March 2013?

 9      A.   Yes.  It was around the first part of

10  February of 2013.

11      Q.   All right.  So Dr. Springer made a number of

12  attempts, of requests for surgery?

13      A.   Yes, ma'am.

14      Q.   But all of those requests were denied?

15      A.   Yes, ma'am.

16      Q.   And were you ever given any specific reasons

17  for those denials?

18      A.   No.  Just that they needed to keep doing

19  things.  I'm frustrated.  They kept telling him they

20  wanted me down to 140, and he said there's no way.

21           Now, if the surgeon isn't concerned about my

22  weight, why would an insurance -- why would the health

23  insurance company be concerned about my weight?

24      Q.   So from October 2012 to March 2013, before



DEBRA PATTISON                                    February 05, 2016
LIPPERT vs. BALDWIN                                            29

```
1    that period before you moved to Logan?
2         A.    No, ma'am.
3         Q.    How were you getting around?
4         A.    Crutches.
5         Q.    On crutches?
6               So you were then moved to Logan in March of
7    2013?
8         A.    Yes, ma'am.
9         Q.    And you were -- were you put into the ADA
10   Unit when you arrived here?
11        A.    No.  I went Health Care to Health Care.  It
12   was 10 days later, 10 to 14 days later, that I was put
13   on the ADA Unit.
14              And at that time, it wasn't the ADA Unit.
15   We didn't get that started until May or June.  It was
16   just Housing Unit 6.  It was right there in the
17   vicinity of everything:  visiting room, voc school,
18   program center, health care, chow hall, church.
19        Q.    It was just a unit that was close by --
20        A.    Yes, ma'am.
21        Q.    -- all the key buildings?
22        A.    Yes, ma'am.
23        Q.    So when you first came into Logan, you went
24   into the Health Care Unit?
```



Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 148 of 369 PageID #:9168

DEBRA PATTISON                                      February 05, 2016
LIPPERT vs. BALDWIN                                                 30

1          A.   Yes, ma'am.

2          Q.   And you were there about ten days?

3          A.   Yes, ma'am.

4          Q.   Did you receive any treatment during that
5     period?

6          A.   No, ma'am.  I did not see a doctor until
7     March or -- I'm sorry.  I didn't see a -- yeah, it was
8     the latter part of March.  I had more swelling; so
9     they kept me overnight.

10              I saw Dr. Cotterman around the 23rd, 24th of
11    March 2013.  He told me he was going to send me back
12    out to check for blood clots because my foot was three
13    times the size it should have been, the foot and leg.

14         Q.   Did he send you out at that time?

15         A.   Yes.  He sent me out in the middle of a snow
16    storm.

17         Q.   Did you go to Abraham Lincoln?

18         A.   Yes, ma'am.  And they found no blood clots
19    at that time.

20         Q.   Did Dr. Cotterman say anything about your
21    knee at that time?

22         A.   He said there was no blood clots.  He gave
23    me a wheelchair and told me to stay in the chair.

24         Q.   Did he say anything about why it would be



1  better for you to use a wheelchair?

2      A.   He didn't want me putting any weight on the

3  leg.  Afraid I'd do more damage.

4      Q.   Did it help to get -- when you got the

5  wheelchair, did that help your symptoms?

6      A.   Yeah.  Yes.  It helped because it wasn't --

7  I wasn't putting any pressure on the leg or the hip.

8  Now that I've been using the leg -- because on the

9  house, I have to use a walker -- I have been having

10  problems with my left hip.

11     Q.   Have you had any additional injuries to your

12  knee since 2012?

13     A.   Uh-huh.  (Nodding head up and down.)  If I

14  go to sit down in my chair and I'm not sitting right,

15  the leg will be underneath me, and it will cause --

16  feels like something is tearing in it.

17          And when they had put me back on crutches

18  and the walker, I was coming back and had really bad

19  sharp pains in my hip.  I don't know if I done damage

20  in the hip now or what.

21          Just within the last month, I've been having

22  problems with my right knee.  And I've been letting

23  the physical therapist know everything when I see him.

24     Q.   How often have you had this problem where



DEBRA PATTISON                                    February 05, 2016
LIPPERT vs. BALDWIN                                             32

1   you feel like something is tearing in your knee?

2        A.   Every time it gives out on me.  It gets to

3   the point where I can't feel the lower half, and I

4   fall.  Does that make any sense?

5        Q.   Yes.  How often has that happened to you?

6        A.   Quite a bit.  The last few times it's

7   happened, I was in the shower.  But I haven't said

8   anything because if I go to Health Care, they're going

9   to say I'm faking.

10       Q.   Why do you believe that they would say you

11  were faking?

12       A.   Because they've told me.  "There's nothing

13  wrong with your knee.  Quit faking."

14            There was one time there was a Lieutenant in

15  the chow hall.  This happened about 10:30.  He told us

16  -- I was on crutches.  He told us to get up -- for our

17  house to get up and go.

18            I went to stand up.  My knee gave out, and I

19  fell between the tables.  He called a Code 3 on me.

20  That was about 10:30 in the morning.  I don't remember

21  exactly when that was.

22       Q.   Do you remember what year?  Was it last

23  year?

24       A.   No.  2013, I believe it was.



DEBRA PATTISON                                    February 05, 2016
LIPPERT vs. BALDWIN                                            33

 1        Q.    So somebody from the medical staff came to
 2   look at you at that time?
 3        A.    They just sent a health care porter to come
 4   and pick me up.
 5        Q.    And did the porter take you to the Health
 6   Care Unit?
 7        A.    Yes, ma'am.  I sat over there a good ten
 8   hours before I was finally seen.
 9        Q.    Who saw you at that time?
10        A.    One of the nurses over there.  I don't
11   remember who it was.  I know my knee swelled up.  Told
12   me to -- sent me back to the house.  Charged me $5.
13   Gave me Motrin.  Told me to put ice on it.
14        Q.    Did the nurse at that time tell you that she
15   thought you were faking?
16        A.    Not at that time because she seen how fast
17   my knee had swelled.  I mean, I was sitting over there
18   in a wheelchair for ten hours.
19        Q.    So when was it that someone told you that
20   they thought you were faking?
21        A.    Just within the last year.
22        Q.    Who was it that said that to you?
23        A.    The nurses that saw me.
24        Q.    Which nurses?



Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 152 of 369 PageID #:9172

DEBRA PATTISON                                    February 05, 2016
LIPPERT vs. BALDWIN                                              34

1      A.   One of them is Jo Starr.  Another one, her

2  first name is Jennifer, but I don't know the last

3  name.  Those are two of the ones that have seen me.

4      Q.   All right.  And Jo Stark said -- is Jo a man

5  or a woman?

6      A.   Female.  They're both females.

7      Q.   So Jo Stark said she thought you were

8  faking?

9      A.   Uh-huh.  Said there was nothing wrong my

10  leg.

11          MR. HENNESSY:  For the record, was that

12  Starr, S-t-a-r-r?

13          THE WITNESS:  Yes.

14          MS. NEWMAN:  Thank you for that.  I heard

15  Stark.

16          THE WITNESS:  I did say Starr, right?

17          MR. HENNESSY:  You did.

18          MS. NEWMAN:  I just misheard it.

19      Q.   So at the time you saw Nurse Starr, what

20  were the circumstances?  Why did you go and see -- go

21  to see her?

22      A.   Because the knee gave out and I fell in the

23  shower.

24      Q.   This was sometime in 2015?



DEBRA PATTISON                                February 05, 2016
LIPPERT vs. BALDWIN                                          35

1      A.    Between 20-- latter part of 2014 to 2015.

2           There was one other time I fell in the

3    bathroom.  I didn't have anybody call because I didn't

4    know how they would treat me.

5           My knee gave out, and I fell and landed on

6    my left foot and broke the little toe.  I didn't know

7    it had been broke until December 2013, when they did

8    an x-ray.  They did an x-ray on the leg, and they

9    found that.

10     Q.   You also said a nurse with first name

11   Jennifer had told you --

12     A.   Uh-huh.

13     Q.   What were the circumstances that you saw

14   Jennifer?

15     A.    I've been having mini-TIAs now for a year,

16   and I had been upset that day.  I was in the shower

17   and started to have one.  My knee gave out at the same

18   time, and I split my head open.

19           She told me, "No person hits their head in

20   the same spot more than once."  It wasn't bad enough

21   to where it needed stitches, but it was already on a

22   scar that I have.

23     Q.   So did she specifically say she thought

24   there was nothing wrong with your knee?



DEBRA PATTISON                                    February 05, 2016
LIPPERT vs. BALDWIN                                              36

1       A.    She did an exam on my leg and said there was

2   nothing wrong, even though there's a little bit of

3   crunching in it, and said that I was faking.

4       Q.    Since those two incidents, there have been

5   some times that you've fallen?

6       A.    Yes.

7       Q.    And you haven't gone to the Health Care

8   Unit?

9       A.    No.

10      Q.    How many times have you fallen?

11      A.    Quite a bit.  My roommates get mad at me if

12  I get on my knees to clean the floor.  They don't want

13  me doing nothing to where I'm on that knee.

14      Q.    Ms. Pattison, you've had some additional

15  x-rays since 2012; is that right?

16      A.    Yes.  I've had three x-rays:  December 2013,

17  July 2014, October 2015.  It just keeps progressively

18  getting worse, and the bones are starting to twist

19  now.

20          The way Dr. Cotterman described it, he put

21  it:  Your knees are supposed to be like this, with a

22  gap between them.  Mine is bone-on-bone, doing this.

23  And it shows in the x-rays that it's doing that.

24      Q     When did Dr. Cotterman tell you that your



1   bones were twisting?

2        A.    In December of 2013.

3        Q.    So that was after the first x-ray?

4        A.    Yes, ma'am.

5              And then he left.  We got Dr. Duncan.  Every

6   time we get a new doctor, I have to start everything

7   over.

8              I'm getting frustrated due to the fact that

9   they won't look in the charts to see what alls been

10  done.  They just keep doing everything over.  And they

11  keep asking for a second MRI, but Wexford keeps

12  denying me.

13       Q.    All right.  When Dr. Cotterman said that

14  your bones were twisting, did he say that was

15  something that could be fixed as part of the surgery?

16             MS. MILLER:  Form.

17       A.    He said that, with the total knee

18  replacement, it would be repaired.  But because

19  Wexford keeps denying me, he feels that my leg will

20  not last until I am released.

21       Q.    Dr. Cotterman said that?

22       A.    Yes.  My out date is July 5, 2022.  Even the

23  physical therapist doesn't think it would last until

24  then if something doesn't get done right now.



1       Q.   What do you mean by the leg "won't last"?

2       A.   I won't have full use of my leg.  There will

3   be so much damage that it will be like it's dead.  The

4   lower half of my leg will be dead.

5       Q.   And your physical therapist has also said

6   that he thinks your leg won't last?

7       A.   Yes, ma'am.

8       Q.   When did he -- I am assuming it's a he?

9       A.   Yes.  Every time I see him.

10           I ride the bike for up to ten minutes, and

11  that's about all he can do for me.  I tell him exactly

12  what's going on, where I'm having the pain.

13           Recently, I told him that I started having

14  trouble with my right knee.  There's really not much

15  he can do for me until the surgery.  And once the

16  surgery is done, then we can work on getting it taken

17  care of.

18      Q.   And the physical therapist has said there's

19  not much he can do for you --

20      A.   Yes.

21      Q.   -- without surgery?

22      A    Yes.

23      Q.   When did he say that?

24      A.   When he first started working with me in



1    2013.

2         Q.   And you've been having physical therapy

3    continuously since 2013?

4         A.   When he's there, yes.

5              When I'm having really bad problems with my

6    knee, he says, "We're not going to do nothing today."

7    He just tells me to relax.  When I'm having pain and

8    swelling in my knee, he don't want to touch my knee.

9    He don't want me doing anything with it.

10        Q.   How often do you have physical therapy

11   sessions?

12        A.   Once a week, sometimes more if he's here.

13        Q.   So you ride on a stationary bike during your

14   therapy session?

15        A.   Yes, ma'am.

16        Q.   Does he have you do any stretching?

17        A.   He tells me what I can do like, when I'm

18   laying in my bed, lay on my right ride and bend my

19   knee up to my chest, stretch it out.  Do like three

20   sets of those, three sets of ten.

21        Q.   Do the stretching exercises help you?

22        A.   No.

23        Q.   Do you do any other exercises in physical

24   therapy?



DEBRA PATTISON                                    February 05, 2016
LIPPERT vs. BALDWIN                                             40

1      A.   No.  I used to walk on the treadmill; but
2   since they had me walking with my walker on the house,
3   he don't have me doing that.
4      Q.   Do you do any exercises for your upper body?
5      A.   Yeah.  I do crunches.  I lay on the floor
6   and put my legs on my bed and do them that way.
7      Q.   Any other exercises that he's --
8      A.   Huh-uh.  No.
9      Q.   Ms. Pattison, when you came to Logan, did
10  Dr. Cotterman recommend surgery for you?
11     A.   Yes.  When I finally got to see him, he
12  recommended surgery; and they denied it.  They
13  suggested I lose 10 pounds.  And within four or five
14  months, I lost 21 pounds.
15     Q.   So after you lost the 21 pounds, was there
16  another -- did the doctor make another request for you
17  for surgery?
18     A.   He resubmitted, and they denied me.  Didn't
19  know why.  I've never gotten anything in writing on
20  the denials.
21     Q.   So you never heard why that particular
22  request was denied?
23     A.   No.
24     Q.   The most recent request for surgery was in



1   2015?

2        A.   July 2015.

3        Q.   Who put in that request for you?

4        A.   Lisa Johnson and Nurse Practitioner Warner,

5   Shelby Warner.  She's the one that put me on the

6   gluten-free diet, and she's the one that told me that

7   they want me to get down to 180.

8             They're not taking into consideration that

9   I've already lost over 200 pounds.  I was over 400

10  pounds when I got arrested.

11       Q.   You've lost 200 pounds?

12       A.   Yeah.  I'm down to 199.  Last Friday, I was

13  199 when they weighed me.

14       Q.   Congratulations.  Wow.

15            So in 2012 --

16       A.   I was 235, I believe, and that's why the

17  doctor said he wasn't concerned about my weight.

18            Now, if it had been both knees he was going

19  to do it on, he would probably have me lose some

20  weight; but with it just being the one knee, he wasn't

21  concerned.

22       Q.   All right.  So in July 2015, there was a

23  request, and the response was that you needed to get

24  down to 180?



DEBRA PATTISON                                    February 05, 2016
LIPPERT vs. BALDWIN                                          42

1        A.   Yes, ma'am.  I was put on a gluten-free diet

2    July 17, 2015.  I was, like, 208 at the time.  I got

3    down to 188; and over the holidays, I gained 20

4    pounds.  I'm slowly losing that again.

5        Q.   So did anyone say why you needed to get down

6    to 180 particularly?

7        A.   No.  I think what they're trying to do is

8    get me down to the initial 140, where they wanted me

9    to begin with, when we first put in for me to have the

10   surgery.  That means another 59 pounds I would have to

11   lose.

12       Q.   Did anyone ever explain why the concern over

13   your weight with relation to surgery?

14       A.   No.  No.  Nobody.

15       Q.   But Nurse Practitioner Warner put you on a

16   gluten-free diet?

17       A.   Yes.

18       Q.   Was it low fat as well?

19       A.   Low fat, low cholesterol, gluten free.

20       Q.   Has that diet been helpful to you in losing

21   weight?

22       A.   Yes.  I can't buy certain things on

23   commissary.  No snack cakes.  No flour tortilla

24   shells, nothing like that.



1      Q.   The order also blocks you from buying

2   certain extra things on your own?

3      A.   I can buy, like, all the condiments --

4   mayonnaise, ketchup, stuff like that -- meats.  I can

5   buy candy bars.  I just can't buy three different

6   ones.  Danishes, Pop-Tarts, things like that --

7   anything with flour in it, I can't have.

8      Q.   When is the last time you talked to the

9   doctors -- a doctor here about your knee?

10     A.   October 23, 2015.  And he took my wheelchair

11  from me on the 30th of October.  He actually did a

12  physical exam on my leg.  He told me that he didn't

13  see anything wrong with my knee and that there was no

14  reason why I should be in a wheelchair, that I should

15  use my walker.

16          He did the exam when I was standing up, not

17  laying down.

18     Q.   Did he look at your medical file, your

19  previous --

20     A.   He couldn't find it.  Those were his words.

21  "I cannot find your MRI or x-rays in your chart."

22     Q.   What doctor was that?

23     A.   Dr. Schaefer.

24     Q.   Have you not had access to a wheelchair



Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 162 of 369 PageID #:9182

DEBRA PATTISON                                          February 05, 2016
LIPPERT vs. BALDWIN                                                    46

1   my leg on the house.  It doesn't make any sense.

2   There's so much damage in my knee that it doesn't even

3   make sense for me to try and walk on it.

4        Q.   Who was it that told you that they wanted

5   you to try to strengthen the leg?

6        A.   Dr. Schaefer.

7        Q.   When was that?

8        A.   October 23, 2015.

9        Q.   You haven't seen him at all since then?

10       A.   No.  We don't have a regular doctor here.

11  Every time we get a new one, I have to start from the

12  very beginning.

13       Q.   Is Dr. Schaefer still the doctor?

14       A.   No.  No, ma'am.

15       Q.   Do you know who the doctor is now?

16       A.   We've got a few of them.  I've heard a

17  Dr. Gavin and Dr. Gruen, but I haven't seen any one of

18  them.  And I was told I'd be seeing Dr. Gruen for my

19  mini-TIAs.

20            And we have Dr. Ristic, who is OB-GYN.

21       Q.   Have you put in a sick call request related

22  to your knee since October of 2015?

23       A.   No, ma'am, because every time I go over

24  there, they keep charging me.  They're not supposed to



 1  keep charging me $5, and that's what they're doing.

 2      Q.   You say they're not supposed to be charging

 3  you a copay?

 4      A.   No.  Because it's been an ongoing thing

 5  since 2012.

 6      Q.   Have they always charged you a copay for --

 7      A.   It just depends on who the nurse is.

 8      Q.   Have you ever had a time when they wouldn't

 9  see you because you didn't have the money for the

10  copay?

11      A.   No.  They still take it off whether you have

12  money on or don't have money on.

13      Q.   Have you ever had cortisone injections in

14  your knee?

15      A.   Yes.  I had one.

16      Q.   When was that?

17      A.   Latter part of 2014, beginning of 2015.

18      Q.   And you only had the one injection?

19      A.   I only had the one injection.  That's all my

20  leg could take.

21      Q.   Why do you say that?

22      A.   Dr. Duncan did it.  He put lidocaine in my

23  knee.  Then he drained the knee, and then he gave me

24  the cortisone shot.



1     A.    No.  Yes.  Yes, it was.

2     Q.    Approximately, was it back in the summer?

3     A.    It was in September.

4     Q.   So September 2015?

5     A.    Right.  Because she had me come in two months after I'd been on the diet and saw that I was losing the weight and said she would put me back in to see her, but I haven't -- the only time I see her is in passing, when I'm sitting at Health Care for a pass or something.

11    Q.   Have you filed any grievances related to the ministrokes or the TIAs?

13    A.    No.

14    Q.   Are you complaining about any dental issues in this lawsuit?

16    A.    No.  But I have had problems.  I've asked the dentist to remove the rest of my teeth on the bottom because the roots are starting to show.  They said that they could not do that because it would be a lawsuit if they did that.

21    Q.   When did you make that request?

22    A.    The last time I saw them, and that was sometime, I believe, in October or September.  I saw them.  They checked my teeth.  They said they were



1  putting me down for an extraction and cleaning.  I've

2  had the cleaning, but they haven't done anything else

3  to them.

4      Q.    They were going to extract one tooth?

5      A.    Uh-huh.  Yes, ma'am.

6      Q.    But you haven't yet had that extraction?

7      A.    No.

8      Q.    Are you having any pain with that tooth?

9      A.    I'm having a lot of pain with my bottom

10  teeth.  They're loose and hurt really bad, and the

11  gums are -- the roots are starting to show.

12      Q.    Have you filed any grievances relating to

13  your dental problems?

14      A.    No.

15      Q.    Ms. Pattison, what are your injuries in this

16  case that you claim resulted from the Defendants'

17  actions or inactions?

18          MS. MILLER:  Form.

19      A.    Can you rephrase that?

20      Q.    All right.  So I mean, are you claiming --

21  do you have injuries in this case that you're seeking

22  some relief from?

23      A.    Yes.  I've done more damage to the knee.

24      Q.    How did that damage result from these



1   go home.  I still got six years left.

2        Q.   What are you seeking from this lawsuit?

3        A.   The surgery and better health care for

4   everybody else and the surgeries for other women and

5   men that need it.

6        Q.   Do you have any monetary damages?

7        A.   No.  Right now, I'm not looking for that.

8        Q.   So you understand that this lawsuit is not

9   seeking any kind of monetary damages for the named

10  plaintiffs?

11       A.   Yes, ma'am.

12       Q.   Ms. Pattison, are you aware if there are any

13  vacancies in the medical staff at Logan?

14       A.   I know we need a full-time doctor that will

15  stay here and not leave after so many months.  We need

16  nurses that care about us and not treat us with

17  disrespect, because we don't disrespect them.

18       Q.   So you've had problems with doctors leaving

19  after --

20       A.   Yes.

21       Q.   -- a short period of time?

22       A.   Yes.

23       Q.   Has there been any period of time where

24  there was no doctor available?



1  A.   Yes.

2  Q.   How long of a time was there with no doctor?

3  A.   Probably three, four months.  I don't even

4  know if we have a doctor now.  The only doctor that is

5  steady is Dr. Ristic, the OB-GYN.  She's here three

6  days a week.

7  Q.   And Dr. Ristic is -- how long has Dr. Ristic

8  been here?

9  A.   She's been here since we moved here.  She

10  came over here with us from Lincoln.

11  She has put in for me to have biopsies on my

12  left breast and a bio-- let's see, a

13  biopsy/hysterectomy, and they refuse to do that.

14  Q.   When did she put in for a biopsy for your

15  breast?

16  A.   Latter part of 2014.

17  I seen her again in January of 2015, and she

18  told me again that it had been denied.  I said, "Was

19  there a reason why?"  She said, "No."

20  Q.   Why did she want to do a biopsy?

21  A.   They found a lump.  She said I also have

22  polycystic breast disease, and they found some fibroid

23  tumors in my uterus, in and on my ovaries.

24  Q.   Has Dr. Ristic made any further requests for



DEBRA PATTISON                                February 05, 2016
LIPPERT vs. BALDWIN                                         59

1   you?

2       A.   I haven't seen her since January of last

3   year.

4       Q.   She also wanted you to have a

5   biopsy/hysterectomy?

6       A.   Yes, ma'am.

7       Q.   Why did she want you to have that procedure?

8       A.   Because cervical, uterine, and ovarian

9   cancer runs in my family, and so does breast cancer.

10  Colon cancer, heart disease, diabetes, all of that

11  runs in my family.

12      Q.   But did she have any particular reason to

13  think you might have one of those cancers?

14      A.   Heavy bleeding.  I go through 7 to 8 packs

15  of pads, 24 pads in one pack.

16      Q.   That request was denied as well?

17      A.   Yes, ma'am.

18      Q.   Any explanation as to why it was denied?

19      A.   No, none.

20      Q.   You haven't seen Dr. Ristic since last year?

21      A.   Yes, ma'am.

22      Q.   Are you able to request to see her?

23      A.   I would be charged -- I would be put in for

24  sick call and then --



DEBRA PATTISON                                February 05, 2016
LIPPERT vs. BALDWIN                                          60

1          Can you rephrase the question?

2      Q.   Yes.  I guess I'm just not sure what the --

3  I'm trying to figure out what the procedure is.

4      A.   The procedure is that we have to drop a slip

5  for sick call.  We go to sick call two or three times,

6  and then they will put us in to see the doctor.

7      Q.   So if you didn't do that, you wouldn't have

8  -- would you have some sort of regular appointment

9  with the OB-GYN?

10     A.   Yes.  I'm supposed to have a regular one to

11 begin with.  Every six months, I'm supposed to be

12 seeing somebody because I had some -- in March of

13 2014, I had some real bad bleeding.  It felt like I

14 was in the last stage of labor, and then I felt

15 something pop, like my water breaking; and it was all

16 blood.  Sorry if I'm grossing anybody out.

17     Q.   So you saw Dr. Ristic after that?

18     A.   I saw a different nurse practitioner,

19 Melissa Jenkins, but she's no longer here.

20          She ordered ultrasounds, and that's where

21 they found the fibroid tumors in my ovaries and

22 uterus.

23     Q.   All right.  So since January 2015, have you

24 seen any medical staff for your OB-GYN issues?



 1        A.    No, ma'am.  None.

 2        Q.    But you haven't put in for a sick call for

 3   those issues?

 4        A.    No.  I'm not going to do that.

 5        Q.    Why do you not want to do that?

 6        A.    It's not that I don't want to.  They would

 7   charge me for something that's been ongoing, and

 8   they're not supposed to do that.

 9                    (Lunch recess in proceedings.)

10        Q.    Before we broke, we were talking about your

11   OB-GYN issues.  Have you had any further symptoms that

12   you've noticed since January of 2015?

13        A.    I had regular periods up until July, and

14   then I didn't have any until last month.  And I went

15   through, like, six packs of pads in a week's time.

16        Q.    Have you filed any grievances relating to

17   any of your OB-GYN issues?

18        A.    No.

19        Q.    Before we started talking about the OB-GYN

20   stuff, I was asking you about the vacancies in the

21   medical staff and there being some gaps.

22              You said there was three or four months

23   where there wasn't a doctor --

24        A.    Right.



DEBRA PATTISON                                       February 05, 2016
LIPPERT vs. BALDWIN                                                 62

 1          Q.   -- on staff.  Except Dr. Ristic was on

 2     staff?

 3          A.   Right.  We have nurse practitioners that

 4     come in.

 5          Q.   So was there ever a time where you didn't

 6     have nurse practitioners on staff?

 7          A.   No.

 8          Q.   Have any of these medical staff vacancies

 9     affected your treatment for your knee?

10               MS. MILLER:  Form.

11          A.   Just being checked.  I mean, whether or not

12     they're approving the second MRI, I need to know

13     things like that.  Nobody is telling me anything

14     anymore.  The physical therapist doesn't even know

15     what's going on right now.

16          Q.   You're still seeing the physical therapist

17     once a week?

18          A.   Yes.  He's on my house.  Sometimes twice a

19     week, sometimes three times a week, depending on when

20     he's here or when they tell him it's okay to come in.

21          Q.   Do you believe that the medical staff here

22     at Logan are qualified to treat your medical issues?

23          A.   Not really.  Some of the nurses that are

24     here have worked emergency rooms, worked for private



1  inmates?

2      A.   Yes.  Because they have to go through

3  training.  They all go through training before they

4  work here.

5          It shouldn't matter if you're working in a

6  prison or if you're working in a hospital or a nursing

7  home.  We're the same people that you took care of in

8  those two places that are here.

9      Q.   What about the doctors who work here?  Do

10 you believe they're qualified to treat inmates?

11     A.   I believe they're qualified, but the ones

12 that have been here leave after a period of time.

13         Dr. Springer was qualified to work here, but

14 they didn't want to pay him double what he was making

15 in Lincoln; so he went out of state to start his own

16 practice.  Had they offered him what he wanted, I

17 think he would have stayed.

18         You have to have nurses and doctors that

19 care, that care for you as a person, not look at you

20 as if you're an inmate, an offender, a prisoner.

21     Q.   Ms. Pattison, when you were transferred from

22 Lincoln to Logan in 2013, did you have any medical

23 problems or issues that resulted from that transfer?

24     A.   No.  Just that I was in a cramped van and I



DEBRA PATTISON                                    February 05, 2016
LIPPERT vs. BALDWIN                                              67

```
 1    months.

 2         Q.    Do you find these clinics to be helpful in

 3    treating those conditions?

 4         A.    Yes.

 5         Q.    Do you have good control over your

 6    hypertension, your high blood pressure?

 7         A.    I'm on medication for that.  My last blood

 8    pressure check was 117/67, something like that.

 9         Q.    What about your diabetes?  Is that under

10    good control?

11         A.    I don't know what it is.  Last time it was

12    checked, it was like 6.7, I believe.

13         Q.    Your HbA1c?

14         A.    Yes.

15         Q.    And do you have problems with your asthma?

16         A.    Yes.  But it's being taken care of.  I'm on

17    two different inhalers.

18         Q.    And your inhalers are effective for treating

19    it?

20         A.    Yes.

21         Q.    Have you ever needed treatment for any of

22    these conditions in between the chronic clinic?

23         A.    No.

24         Q.    You've been kept in the infirmary for
```



DEBRA PATTISON                                    February 05, 2016
LIPPERT vs. BALDWIN                                            68

1   treatment at various times; is that right?

2        A.   Yes.

3        Q.   Several times because of your knee?

4        A.   Right.

5        Q.   Have you been kept in the infirmary for

6   other conditions?

7        A.   No.

8        Q.   When you were in the infirmary for your

9   knee, did you feel like you needed -- you should have

10  been sent out to a hospital outside?

11       A.   I felt like they should have done more for

12  me than what they did.  Lincoln was doing everything

13  they could for me.  This place kept me in a locked

14  room.  Didn't check on me or anything.

15       Q.   Have you ever had a problem with the medical

16  staff not being able to read or find your medical

17  file?

18       A.   Yeah.  Dr. Schaefer said he couldn't find my

19  medical file.

20            When he did my physical exam on my leg, he

21  had me standing up.  But to do a physical exam on

22  somebody's leg, you're supposed to lay them down flat

23  and do what they call a "Drawer" exam, where they move

24  the leg back and forth.



# Exhibit 3D

```
 1

 2
                    UNITED STATES DISTRICT COURT
 3
                   NORTHERN DISTRICT OF ILLINOIS
 4
                         EASTERN DIVISION
 5

 6
    DON LIPPERT, et al.,            )
 7                                  )
         Plaintiffs,                )
 8                                  )
    vs.                             ) No.  10-CV-4603
 9                                  )
    JOHN BALDWIN, et al.,           )
10                                  )
         Defendants.                )
11

12

13

14

15

16               DEPOSITION OF LEWIS RICE

17          Taken on behalf of the Defendants

18                  January 21, 2016

19

20

21

22

23

24

25
```



 1  improve?

 2      A    That improved, but didn't improve at a

 3  significant rate.  You know, it improved though.

 4  Because they was telling me they were starting to get

 5  my blood pressure back up after each episode.

 6      Q    How long did it take before you saw -- before

 7  you saw an improvement with the dizziness?

 8      A    About two days.  About.

 9      Q    Okay.  All right.  But the chest pains -- you

10  continued to have the chest pains?

11      A    Yes.

12      Q    How often were you having chest pains at that

13  time?

14      A    Wow.  It was like every -- seemed like every

15  other day.  The nurses told me it probably was just

16  gas.

17      Q    So approximately every other day you would

18  have chest pains?

19      A    Yeah.

20      Q    How long did the chest pain last?

21      A    It didn't last long.  Seemed like they -- as

22  soon as it came in, it went away.

23      Q    Was it any particular time of day when you

24  would have the chest pain?

25      A    Mainly at night before I laid down and went to



 1  approximately every other night?

 2      A    Oh, wow.  That went on for about a year.

 3  Every time I tried to see a doctor, they'd cancel the

 4  call pass.

 5      Q    All right.  Did you have any other fainting

 6  spells after August?

 7      A    No.  No.  No more fainting spells.

 8      Q    Did you have any further dizziness?

 9      A    No.

10      Q    Any further issues with low blood pressure?

11      A    No.  When they took me off the medication,

12  Prazosin, things basically went back to normal.

13      Q    Had you had the chest pains before July, 2010?

14      A    No.

15      Q    So the incident on July 27th, 2010, was the

16  first time you had chest pain?

17      A    Yes.  Yes.

18      Q    Do you believe that you received appropriate

19  treatment from July 27th to August 5th, 2010?

20      A    No.

21      Q    No?  What treatment do you think you should

22  have received during that time?

23      A    They should have checked my medical records to

24  see what medications I was taking, to see what could

25  have caused fainting episode.  I feel as if they should



1 have listened to me when I told them I was having chest

2 pains.  I told them I was having headaches.  And they

3 didn't check me for a concussion or anything because

4 when I fainted, my head hit the concrete floor.  They

5 just -- it was just a drive-by checkup that they did on

6 me.  And what I mean by drive-by, I mean they took my

7 vitals, didn't check my heart, didn't check me for

8 concussion.  They just took my vitals and said that I

9 was having back pain and that was it.

10   Q And was that -- that was the first time that

11 you fainted?

12   A Yes.

13   Q All right.  And then the second time you

14 fainted, when you were admitted to the infirmary.

15   A I talked to Dr. Fahim and told Dr. Fahim I was

16 having chest pain and that I was feeling dizzy,

17 lightheaded and -- I was just hurting.

18   Q All right.  And you were -- so -- and then

19 Dr. Fahim admitted you to the infirmary?

20   A Yes.

21   Q For about four days?

22   A Yes.

23   Q All right.  And do you believe you received

24 appropriate treatment during that four-day period?

25   A Yes.



1      Q     All right.  And then on August 5th when you

2   went to the infirmary again, do you believe you

3   received appropriate treatment at that time?

4      A     Yes.

5      Q     So you said you had -- your chest pains were

6   about -- continued approximately the same frequency for

7   about a year?

8      A     Yes.

9      Q     All right.  And after a year did the chest

10  pains change?

11     A     Yeah.  They stopped coming as frequently as

12  they were.  I started watching what I ate so it

13  wouldn't be blamed on gas and heartburn.  So I started

14  watching what I ate.  And the medical staff, they -- I

15  can't remember.  They'll check me.  And they're telling

16  me that everything is fine.

17     Q     And what was involved in this check?

18     A     In this check.  They just -- the stethoscope,

19  the heart instrument.  They just listened to my heart

20  and tell me everything was fine.  Listened to my chest

21  and tell me everything is fine.

22     Q     All right.  And how frequently were you --

23  have you been checked by the medical staff with your

24  heart?

25     A     Every time I put a sick call in.  Complained



 1   about chest pains.  You know, they'll tell me put a

 2   sick call in when I complained about my chest pains.

 3        Q    Have you had any other EKGs since August of

 4   2010?

 5        A    No.  No.

 6        Q    You didn't have one in November of 2010?

 7        A    Not that I know of.

 8        Q    Okay.  Did you see a Dr. Fuentes in November

 9   of 2010 for your chest pain?

10        A    I think that pass was canceled.  Yeah.  That

11   pass was canceled.  I was supposed to meet with her.

12   The pass was canceled.

13        Q    Okay.

14             (Defendant's Exhibit 4 was marked for

15   identification.)

16   QUESTIONS BY MS. NEWMAN:

17        Q    Mr. Rice, I'm showing you what's -- it's a

18   compilation of some pages from your medical record.

19   And you can see that they are stamped at the bottom

20   with what we call a Bates Number.  It says, Rice, and

21   there's a number.  The first page says 18.  And then

22   the last page says 52.  But it's not completely

23   contiguous.  There are various pages that relate to the

24   chest pains.

25        A    Right.



1    A    No.  They was just giving me chewables.  The
2  nurse sick call just gave me chewables.
3    Q    And have you discussed your chest pain with
4  the medical staff at Menard since November, 2010?
5    A    Yes, I have.
6    Q    All right.  How often have you talked to them
7  about the chest pain?
8    A    Every chance I got a chance to see them, which
9  was not that often.  Every chance I got to see them, I
10  told them about my chest pain.
11    Q    What's the most recent time that you talked to
12  them about the chest pain?
13    A    I just had a checkup from Dr. McGoran
14  (phonetic).  That's the doctor's name.  Dr. McGoran.
15  And she was giving me my yearly checkup.  And I was
16  telling her about my chest pain.
17    Q    All right.  And how frequently do you have
18  chest pains now?
19    A    I'm all better now.
20    Q    Okay.
21    A    I'm all better now.  They -- like I said,
22  maybe it was gas, like they said.
23    Q    All right.  So when's the last time you had a
24  chest pain?
25    A    About two months ago.



1     Q     Okay.  And so you told Dr. -- so when was your

2   checkup with Dr. McGoran?

3     A     That was around my birthday.  Around November

4   of last year.

5     Q     November of 2015?

6     A     Yes.

7     Q     All right.  And so had you had -- when you had

8   your checkup, had you had a chest pain recently?

9     A     No.

10    Q     Okay.  And so what did -- did Dr. McGoran say

11  anything about your chest pains?

12    A     No.  She just looked at my medical files and

13  seen that I was having trouble with my chest pains, my

14  shoulder, and my back.

15    Q     And did she give you any -- prescribe any

16  medications at that time?

17    A     No.  She had prescribed chewables for my

18  heartburn.  No other medication.

19    Q     So during this period from August, 2010, to --

20    A     Now.

21    Q     -- currently, til now, do you think -- what

22  treatment do you think you should have received for

23  your chest pains?

24    A     Well, I shouldn't have ever been taken off the

25  aspirin regimen.  That's one thing that I've been



1  trying to get back on.  And I've been trying to get

2  checked regularly.  You know what I'm saying?  Put on

3  the chronic list, so I can be checked regularly for

4  chest pains, and shoulder injury, back injury.  All my

5  ailments.  And they haven't put me on chronic.

6      Q    When were you taken off the aspirin regimen?

7      A    I don't remember.  I don't remember.  I took

8  it for about a year and a half.  I don't remember when

9  I was taken off of it.

10      Q    Okay.  Mr. Rice, you filed a grievance

11  relating to the -- for the July 27 fainting spell.  Is

12  that right?

13      A    Yes, I did.

14          MS. NEWMAN:  All right.  I have a copy of that

15      here for you.

16          (Defendant's Exhibit 5 was marked for

17  identification.)

18  QUESTIONS BY MS. NEWMAN:

19      Q    Mr. Rice, I'm showing you what we've marked as

20  Exhibit 5.  You see at the top of the -- at the top

21  there's a heading that says, Case Number 3:12-CV-0847.

22      A    Uh-huh.

23      Q    All right.  It says, filed, 7/26/12.  This is

24  a document that I got off, again, off the court website

25  from your earlier case.



1     Q     And did you have pain in your shoulder at that

2   time?

3     A     Yes.  They took an x-ray of my shoulder here.

4   They said I have a separated bone and I needed surgery.

5   But no one wants to foot the bill.

6     Q     Okay.  All right.  Going back though to

7   February, 2007.  Did you have an x-ray of your shoulder

8   then at St. Mary's?

9     A     Yes.

10     Q     All right.  What did that x-ray show?

11     A     Separated bone.

12     Q     And did the doctors there tell you that you

13   needed surgery on the shoulder?

14     A     No.

15     Q     Did they say -- did they recommend -- give you

16   any treatment for your shoulder?

17     A     They gave me some Vicodin.

18     Q     Did they give you a brace or anything, a sling

19   or anything to wear?

20     A     For my shoulder, no.  For my broken arm, yes.

21     Q     All right.  So it was -- I'm sorry.  So your

22   left arm was broken?

23     A     My left arm was broken and my right shoulder

24   was dislocated.  Well, I think it was dislocated.

25     Q     And did they pop it back into place?



1        A     Yes.

2        Q     Okay.  So did the doctors -- did the doctors

3   that you saw in February of 2007, did they recommend

4   any further treatment for your right shoulder?

5        A     They just gave me pain pills, Tylenol 3.

6        Q     So from the period -- so from February, 2007,

7   until -- I'm sorry.  What month was it when you were

8   arrested in 2007?

9        A     September.

10       Q     September.  All right.  So from February to

11  September did you have any treatment -- --

12       A     I was going through therapy, physical therapy.

13       Q     All right.  So you were in physical therapy?

14       A     Yes.

15       Q     All right.  And that was on -- for your right

16  shoulder?

17       A     For my back and my shoulder.

18       Q     Back and shoulder.  And did you finish the

19  therapy?

20       A     No.

21       Q     Why didn't you finish the therapy?

22       A     I got arrested.

23       Q     Okay.  Was the physical therapy helping your

24  shoulder?

25       A     Yes.



1      Q     Did a doctor prescribe the physical therapy

2  for you?

3      A     Yes.

4      Q     All right.  When did they prescribe physical

5  therapy for you?

6      A     Right after surgery.  I can't remember when I

7  had my surgery, but right after surgery they prescribed

8  the physical therapy for me.

9      Q     And that was the surgery on your left arm?

10      A     Right.

11      Q     Okay.

12      A     Yes.

13      Q     All right.  And did -- so from this period of

14  February to September was the pain in your shoulder the

15  same or did it improve?

16      A     No, it didn't improve.  It was always there.

17  I can barely lift with my arm.  I can't sleep on my

18  right side because of the shoulder pain.  Pain keeps me

19  up at night.  I told the nurses and the doctors.  All

20  they want to give me is Motrin.  But I can't take

21  Motrin because of my stomach ulcers.  And Tylenol don't

22  help.

23      Q     Okay.  So the pain has been more or less

24  constant since --

25      A     Yes.



LEWIS RICE  Confidential                                  January 21, 2016
LIPPERT vs. BALDWIN                                                      42

1       Q     -- February of 2007?

2       A     Yes.

3       Q     And did you see -- did you see any doctors

4   between the time you had the accident and the time you

5   were arrested, did you see any doctors for your

6   shoulder?

7       A     Yes.

8       Q     How many times did you see a doctor?

9       A     Once a week.

10      Q     And what did the doctors say about your

11  shoulder?

12      A     Torn rotator cuff.

13      Q     And did the doctor recommend any treatment for

14  that?

15      A     They just gave me Tylenol.  Tylenol 3.

16      Q     So the doctor did not recommend any surgery?

17      A     No.  I didn't know I needed surgery until I

18  got here when the doctors examined me and told me I

19  needed surgery here.

20      Q     All right.  And so a doctor here at Menard

21  told you that you needed -- told you that you needed

22  surgery for your shoulder?

23      A     Yes.

24      Q     When was that?

25      A     About two years ago.



Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 189 of 369 PageID #:9209

LEWIS RICE  Confidential                                    January 21, 2016
LIPPERT vs. BALDWIN                                                       43

1    Q    And who was that that told you?

2    A    Nwaobasi.

3    Q    Nwaobasi?

4    A    Yeah.  I think that's how you pronounce his

5  name.  N-w-a-o-b-a-s-i.

6    Q    So this was about sometime in 2013?

7    A    Yes.

8    Q    All right.  And so did you go to see

9  Dr. Nwaobasi because of your shoulder?

10    A    Yes.  I get a double cuff permit every year so

11  the handcuffs won't -- I won't have to go through the

12  pain and stuff from that again because being slapped on

13  me.

14    Q    All right.  And what does a double cuff --

15    A    Permit.  They put two handcuffs on me and cuff

16  me in the back.  For my arm to relax.

17    Q    Okay.  As opposed to -- rather than pulling

18  your arm all the way back to your back?

19    A    Yes.

20    Q    So in 2013 you went to get your double cuff

21  permit renewed; is that right?

22    A    Get it renewed every year.

23    Q    Okay.  And so -- and Dr. Nwaobasi said you

24  needed surgery?

25    A    Yes.



1       Q     What kind of surgery did --

2       A     He didn't explain it to me.

3       Q     And did he say he was going to refer you for

4    surgery?

5       A     He said he was going to refer me, but at the

6    time he had -- everything had to go through Dr. Fahim.

7    And I don't know what happened.  All I know, the other

8    doctors told me that they're not going to do surgery on

9    me because it was too expensive.

10      Q     Who told you that?

11      A     Dr. Shearing, Dr. Callaway, Frost --

12   Dr. Frost.  Those were just some of the doctors that I

13   seen for my shoulder.  And nurse practitioner.  I can't

14   remember her name.

15      Q     All right.  So Dr. Nwaobasi in 2013 said that

16   you needed surgery?

17      A     Yes.

18      Q     All right.  Has any other doctor here at

19   Menard ever said you needed surgery?

20      A     They won't look at my x-rays.  Dr. Fahim said

21   I needed surgery, but he left.  He went somewhere else.

22   Every other doctor I talked to, they talk about it's my

23   rotator cuff.  And I told them my x-rays show a

24   separated bone in my shoulder.  And I got two medical

25   files.  They only bring one when they come see me.

1      Q    Okay.  All right.  So Dr. Fahim said you

2   needed surgery.  Is that right?

3      A    (Witness nods head.)

4      Q    She needs --

5      A    Yes.

6      Q    She needs a verbal.

7      A    Yes.  Yes.  I'm sorry.  I am so sorry.

8      Q    It's okay.  It's very easy to do.

9           When was that that Dr. Fahim said that?

10     A    I can't remember.

11     Q    Was it before or after Dr. Nwaobasi said that?

12     A    It was after Nwaobasi said it.

13     Q    All right.  Was it more than -- more than a

14   year after that?

15     A    No.  It was less than that.

16     Q    Was it within the month?

17     A    No.  It was spaced out.  I say about six

18   months, six to eight months.

19     Q    All right.  And that -- when you went to see

20   Dr. Fahim, this was not -- that wasn't to renew the

21   double cuff permit, was it?

22     A    No.  No.

23     Q    Okay.

24     A    That was just a regular checkup.

25     Q    Okay.  And had you -- was this an appointment



1   that you requested or was this --

2      A    That I requested.

3      Q    Okay.  And did you request it because of your

4   shoulder pain?

5      A    Yes.

6      Q    Did you have any other issues at that time?

7      A    Back pain.

8      Q    And at that time Dr. Fahim said that you

9   needed -- said that you needed surgery?

10     A    Yes.

11     Q    What kind -- did he explain what kind of

12  surgery you needed?

13     A    No.  No one explained what kind of surgery I

14  needed.

15     Q    Did he give you any treatment at that time for

16  your shoulder?

17     A    Tylenol.  Regular Tylenol.

18     Q    Is the Tylenol effective at managing the pain?

19     A    No.

20     Q    Have any of the doctors here ever given you

21  any other drugs other than Tylenol for your shoulder?

22     A    No.

23     Q    So you've never been given Ultram?

24     A    No.  Ultram, what's that?

25     Q    That's a prescription.  A stronger painkiller.



```
 1        A     No.

 2        Q     Okay.

 3        A     Not that I know of.

 4        Q     Okay.  We'll take a look -- it looks in some

 5   of the medical files that you've been prescribed Ultram

 6   at some point?

 7        A     Yeah?

 8        Q     Yeah.

 9        A     I can't remember.

10        Q     You don't remember having gotten that?

11        A     No.

12        Q     All right.  And so Dr. Fahim -- when you saw

13   Dr. Fahim, was that still in 2013, or was that in 2014?

14        A     I think it was '13 because he left somewhere

15   in '14, if I'm not mistaken.  I don't know when he

16   left.  But he ain't worked here anymore.

17        Q     And since that time you've seen several

18   different doctors?

19        A     I've seen several different doctors.

20        Q     You mentioned Dr. Shearing, Dr. Callaway and

21   Dr. Frost.

22        A     Right.

23        Q     Okay.  So what did Dr. Shearing say about your

24   shoulder?

25        A     He thought it was a rotator cuff.  Told me I
```



 1  need to do some exercises on my shoulder.  And I told

 2  him I do exercises, but the pain be so excruciating

 3  that I have to stop.  And he ordered me some Tylenol.

 4       Q    And when was that?

 5       A    I can't remember.  I'm sorry.

 6       Q    That's okay.  Was that since -- since the

 7  beginning of 2014?

 8       A    Yes.

 9       Q    All right.  Do you think it was in 2015?

10       A    No.  It was in 2014.

11       Q    All right.  And then you also saw

12  Dr. Callaway?

13       A    Yes.  He renewed one of my permits.

14       Q    Was that in 2014 or 2015?

15       A    No.  I think that was in 2014 or '15.  Let's

16  say '15.

17       Q    Okay.  And what did Dr. Callaway say?

18       A    Same thing.

19       Q    And what -- I'm sorry.  What do you mean by

20  the same thing?

21       A    That they won't pay for the surgery.  That I

22  have to get Tylenol for the pain and put a hot towel on

23  my shoulder.

24       Q    And you say they won't pay for the surgery.  I

25  mean, did the doctor bring up the surgery or did you



1  staff here at Menard while you've been here?

2      A      No.

3      Q      The doctors that you've seen while you've been

4  here at Menard, do you believe that they're qualified

5  to treat you?

6      A      The doctors, I don't . . .

7      Q      Okay.

8      A      I can't say.

9      Q      All right.  And do you believe that any -- all

10  right.  So have you ever had any reason to believe that

11  one of them was not qualified to treat you?

12     A      No.

13     Q      All right.  And you said earlier that you had

14  tried to get on the chronic -- the chronic list?

15     A      Yes.

16     Q      When did you ask to be put on the chronic

17  list?

18     A      When I first got here because when I first got

19  here in February, 2010, I was walking with a cane.  And

20  they took the cane from me.  They gave me a low bunk

21  permit for six months.  That didn't help any.  I've

22  been trying to go on the chronic list since 2010.

23     Q      And what -- for what problems were you -- do

24  you feel are chronic?

25     A      My back and shoulder.  That way I won't have



1   to pay the $5 co-pay.

2       Q    All right.  And have you received any response

3   for your request?

4       A    No.

5       Q    When's the last time you made a request to be

6   put on the chronic list?

7       A    I think when I saw Dr. McGoran, the doctor

8   that gave me the checkup.

9       Q    So that was two months ago?

10      A    Yeah.

11      Q    And what did Dr. McGoran say?

12      A    Nothing.

13      Q    So other than, you know, in 2010 you were in

14  the infirmary twice because you -- after you fainted.

15  Is that right?

16      A    Yes.

17      Q    All right.  Other than those two incidents

18  have you ever been kept in the infirmary for treatment?

19      A    No.

20      Q    Do you believe it was appropriate -- it was

21  appropriate treatment for you to be kept in the

22  infirmary those two times in 2010?

23      A    Yes.

24      Q    All right.  Do you believe you should have

25  been sent to the hospital at that time?



LEWIS RICE  Confidential                                    January 21, 2016
LIPPERT vs. BALDWIN                                                      59

```
 1      A    They recommended me to see a cardiologist, but
 2   I never did.  I feel I should have seen the
 3   cardiologist.
 4      Q    All right.  But did you -- do you believe you
 5   needed to be in a hospital rather than in the
 6   infirmary?
 7      A    Yes.
 8      Q    And why was that?
 9      A    The infirmary here sucks.  They're just bad
10   over there.  They don't -- they don't check in on you
11   like they're supposed to.  They don't give you proper
12   care in the infirmary like they're supposed to.
13      Q    All right.  And so you were told in 2010 that
14   you should see a cardiologist?
15      A    That's what Dr. Nwaobasi recommended.
16      Q    All right.  Did Dr. Nwaobasi tell you that in
17   2010?
18      A    No.  He just recommended that I seek getting
19   my medical file.
20      Q    All right.  So you saw it in your medical
21   file?
22      A    Right.  Yes.
23      Q    Okay.  And you didn't -- you never did see a
24   cardiologist?
25      A    No.
```



```
1      Q    All right.  Were you ever --

2           MR. NEWMAN:  Strike that.

3  QUESTIONS BY MS. NEWMAN:

4      Q    Have you ever gone out -- gone outside for any

5  specialty care?

6      A    No.

7      Q    Earlier you said something about a doctor not

8  having your complete medical file.

9      A    Right.

10     Q    When was that?

11     A    Every time they come see me.  I can't remember

12  the dates.  But when they come see me, they only just

13  bring one file.  They don't bring both of them.  They

14  bring the most recent file.

15     Q    And does that affect your treatment?

16     A    I think so.

17     Q    How do you believe that affects your

18  treatment?

19     A    Because they don't know what to treat me for.

20     Q    And when you say that they bring the most

21  recent file, is that just the last -- is that the last

22  time you saw the doctor, or --

23     A    Yes.

24     Q    Okay.  So they don't -- they only had your

25  very last appointment?
```



Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 199 of 369 PageID #:9219

LEWIS RICE  Confidential                                    January 21, 2016
LIPPERT vs. BALDWIN                                                      61

 1      A     Something like that.  Do you have my whole

 2   file?

 3      Q     What?

 4      A     Do you have my whole medical file?

 5            (Off-the-record discussion.)

 6            (Defendant's Exhibit 7 was marked for

 7   identification.)

 8   QUESTIONS BY MS. NEWMAN:

 9      Q     All right.  So, Mr. Rice, I've handed you what

10   we've marked as Defendant's Exhibit 7.  It's titled,

11   Fourth Amended Complaint.  And the caption is, Don

12   Lippert, Lewis Rice, Milam Martin, Debra Pattison, John

13   Ruffin and Ezell Thomas, plaintiffs, versus, John

14   Baldwin, Louis Shicker and Bruce Rauner, defendants.

15   And if you look at the very -- the next-to-the-last

16   page, which is Page Number 53, it's dated December 7th,

17   2015.

18      A     Yes.

19      Q     And it's submitted on behalf of the

20   plaintiffs.  And the signature -- and there's Alan

21   Mills, as you had said earlier, about -- and the

22   other attorneys including Ms. Bennett are assigned.

23            So this is the proposed current complaint in

24   the matter -- in this case.  And so my first question

25   to you is, have you seen this document before?



1      Q     Again, he was admitted to the infirmary.

2      A     Right.

3      Q     Ultimately, health care staff decided that

4   Rice's problems were caused by a medication called

5   Prazosin.

6      A     That's how you pronounce it?

7      Q     I don't know.  P-r-a-z-o-s-i-n.  I have no

8   idea how you pronounce that.  Is that part correct

9   though?

10     A     Yes.

11     Q     All right.  Which had been prescribed for Rice

12  by the Menard psychiatrist who said it was a dream

13  suppressant.

14     A     Right.

15     Q     Rice was taken off Prazosin, if that's how you

16  say it, but continues to this day to have headaches and

17  chest pain sometimes accompanied by chills.

18     A     Yes.

19     Q     All right.  So you're still having headaches?

20     A     Not as often.

21     Q     All right.

22     A     I think something else is causing the

23  headaches.  I don't know what it is.

24     Q     All right.  Do you have the headaches at the

25  same time as you have the chest pains?



```
 1      A     No.

 2      Q     And how frequently do you have headaches?

 3      A     Oh, wow.  Almost every other week.

 4      Q     Okay.  And you said -- and this is sometimes

 5   accompanied by chills.  Are the headaches accompanied

 6   by chills?

 7      A     Yes.

 8      Q     Are the chest pains accompanied by chills?

 9      A     Yes.

10      Q     Okay.  But the headaches and the chest pains

11   don't occur together?

12      A     No.  No.

13      Q     Okay.  The headaches are frequent.  Is that

14   true?

15      A     Yes.

16      Q     All right.  The chest pains occur

17   approximately every six months.

18      A     Right.

19      Q     In the past few years at Menard when Rice has

20   told doctors or nurses that he has chest pains, they

21   have said it was nothing.

22      A     Yes.

23      Q     Or told him to lie down and breathe deep.

24      A     Yes.

25      Q     Or said that it was probably just gas.
```



```
 1        A      Dr. Nwaobasi.

 2        Q      Dr. Nwaobasi?

 3        A      Yes.

 4        Q      All right.  And when did Dr. Nwaobasi tell you

 5    that?

 6        A      I just read it in the medical file.  He didn't

 7    actually say anything to me about it, but I read it in

 8    the medical file.

 9        Q      Okay.

10        A      I tried to talk to him about it, but I never

11    seen him again.  I never seen him on that situation.

12        Q      Okay.  All right.  So he didn't tell you, but

13    he put it in your file that --

14        A      Yes.

15        Q      And then the next part of the sentence said,

16    another doctor contradicted this.

17        A      Dr. Fahim.

18        Q      All right.  So Dr. Fahim told you that you did

19    not need a pacemaker?

20        A      He didn't say anything to me about it.

21        Q      Okay.  And so how do you know that Dr. Fahim

22    contradicted Dr. Nwaobasi's?

23        A      Medical file.

24        Q      From the medical file.  Rice has never been

25    referred to a cardiologist or received a pacemaker.
```



1    A    No.

2    Q    So that's correct?

3    A    Yes.

4    Q    All right.  The only medications he has been

5    prescribed for chest pains is aspirin.

6    A    Yes.

7    Q    But he was taken off even that.

8    A    Yes.

9    Q    Though he is trying to persuade health care

10   staff to put him back on it.

11   A    Yes.

12   Q    Paragraph 123.  Rice has also been told that

13   he has a separated bone in my -- should be my

14   shoulder -- due to a past car accident.

15   A    Yes.

16   Q    Rice gets a double cuff permit every year now

17   as a result, which has to be approved by a doctor.

18   A    Yes.

19   Q    On one occasion when he saw a doctor to renew

20   the permit, the doctor told Rice that he needed surgery

21   on his shoulder.

22   A    Yes.

23   Q    On the shoulder.  Sorry.  And that was

24   Dr. Nwaobasi?

25   A    Yes.



LEWIS RICE  Confidential                                    January 21, 2016
LIPPERT vs. BALDWIN                                                       73

1    Q    Have you asked to be put in a chronic --

2    A    Yes.

3    Q    -- clinic --

4    A    Yes.

5    Q    For the chest pains.

6    A    Yes.

7    Q    Have you asked based on your headaches?

8    A    Yes.

9    Q    Okay.  And you've asked about the shoulder

10   pain?

11   A    Yes.

12   Q    Okay.  Rice worries about his medical

13   condition.

14   A    Yes.

15   Q    Okay.  And would like to know if something is

16   wrong with his heart.

17   A    Yes.

18   Q    All right.  He files regular grievances about

19   his medical problems.

20   A    No.

21   Q    All right.  And we've talked about the

22   grievances that you filed.

23   A    Right.  Right.

24   Q    All right.  He is told by the counselors that

25   they're on top of it, but he does not get a response.



```
 1   Dr. Fuentes.

 2       Q    Did you ever ask them what you mean you can't

 3   prescribe me a stronger painkiller?

 4       A    No.

 5       Q    And Ms. Newman may have asked you this.  If

 6   she did, I apologize.  When was the last time you had

 7   an episode of chest pain, approximately?

 8       A    It was recent.  I can't remember.  It was

 9   recent though.  They told me it was just gas.

10       Q    So within the past six months?

11       A    Yes.  It was within the past six months.

12       Q    Within the past three months?

13       A    Yes.  Somewhere around there.

14            MS. BENNETT:  Okay.  That's all I have.  Thank

15       you.

16            MS. NEWMAN:  I have a few -- just a couple

17       follow-ups from those questions.

18                      REDIRECT EXAMINATION

19   QUESTIONS BY MS. NEWMAN:

20       Q    All right.  First, you were talking about the

21   counselors coming around every six months?

22       A    Right.

23       Q    And you said that -- said that basically in

24   your mind that was a substitute for filing a grievance?

25       A    Right.
```



# Exhibit 3E

Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 207 of 369 PageID #:9227

JOHNNY M. RUFFIN, JR.  CONFIDENTIAL                     January 14, 2016
LIPPERT vs. GODINEZ                                                    1

1                   IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
2                            EASTERN DIVISION

3

DON LIPPERT, WILLIAM EARL        )
4   BASSETT, LEWIS RICE, and      )
MILAM MARTIN,                     )
5                                 )
             Plaintiffs,          )
6                                 )   No. 10-CV-4603
    -vs-                          )
7                                 )   Judge Jorge L.
SALVADOR GODINEZ, LOUIS           )      Alonso
8   SCHICKER, BRUCE RAUNER,       )   Magistrate Judge
ALPHONSO NORMAN, MARTHA           )      Daniel Martin
9   MALDONADO, and ATHENA         )
ROSSITER RAUNER,                  )
10                                )
             Defendants.          )
11

12

13              The confidential deposition of JOHNNY M.

14   RUFFIN, JR., taken in the above-entitled cause before

15   CAROLYN J. HAWKES, Certified Shorthand Reporter

16   within and for the County of Boone and State of

17   Illinois, taken pursuant to the Federal Rules of

18   Civil Procedure for the United States District

19   Courts, at 2600 North Brinton Avenue, Dixon,

20   Illinois, on the 14th day of January, 2016, at 9:45

21   a.m.

22

23

24



1    A.   Albert.  I'm not sure.  I'm not sure.

2    Q.   Okay.  And did he -- did he prescribe any

3  medications for you at that time?

4    A.   I'm not sure.  It's been so long.  I'm not

5  sure if he did.  He probably -- I'm not sure.

6    Q.   All right.  And what was the result of the --

7  you said he recommended a neurologist or an ortho?

8    A.   Um-hum.

9    Q.   Did you see a neurologist or an ortho at that

10  time?

11    A.   No.  No, I didn't.  And I think they told that

12  me that it was -- either the nurse or someone told me

13  that it was denied.

14    Q.   And did that person tell you why that it was

15  denied?

16    A.   I can't recall the reason why they said it was

17  denied.

18    Q.   All right.  Do you know -- when was the next

19  time you saw a doctor for your -- for this issue?

20    A.   I know I put back in for sick call like soon

21  after that.  And I was scheduled to see a doctor in

22  December of 2009, but I guess our schedule collide

23  because I was in -- I think I was on attorney visit

24  and they had to reschedule me.



1  Q.  All right.  And when were you rescheduled to?

2  A.  I rescheduled -- I want to say January 2010.

3  Q.  Okay.  And what happened in January of 2010?

4  A.  I think I talked to Dr. Carter and -- about

5  the pain I was feeling on my right side, in my neck

6  and shoulders.  And I think he prescribed me

7  medication.  He said he would put me in for ortho,

8  orthopedic to see.

9  Q.  And did you get -- did you get scheduled for

10  an orthopedic at that time?

11  A.  I think about a month later I was told that --

12  during -- during collegiate review, that they denied

13  it and they was going to go with an alternative plan

14  for -- I guess an X-ray to compare my September

15  X-ray, to see if the bullets was moving or something

16  like that.

17  Q.  And did you have an X-ray at that time?

18  A.  I got an X-ray -- I want to say June 2010.

19  Q.  Okay.  Did you have any other visits with a

20  doctor between January and June 2010?

21  A.  Yes.  I'm pretty sure, yes.

22  Q.  Do you remember the dates on those?

23  A.  I think March 2010.  Yeah.  I seen a nurse

24  sick call -- sick call nurse and a -- I think



1  Dr. Carter.

2     Q.  And what did Dr. Carter say in March?

3     A.  Well, he basically explained to me that they

4  denied the ortho and that they was going to do an

5  X-ray, that I should continue on the meds, the pain

6  meds, and stuff.

7     Q.  Which pain -- what pain meds was he

8  prescribing for you at that time?

9     A.  I can't recall.  I can't recall.  I'm not

10  sure.

11     Q.  All right.  And then you say you had the --

12  you had the X-ray in you think June 2010?

13     A.  Yes, ma'am.

14     Q.  That was here at Dixon?

15     A.  Yes, ma'am.

16     Q.  All right.  And did you learn the results of

17  that X-ray?

18     A.  Well, when I had the X-ray, they didn't --

19  they never called me.  So I had to put back in for

20  sick call.  And to put -- to get back on the doctor

21  call line.  And I think that was in August, August

22  2010.

23     Q.  All right.  And so did you see a doctor in

24  August?



1    A.   I want to say I seen a PA -- the PA first,

2  yeah.

3    Q.   Okay.

4    A.   It's PA Kogan I seen at the end of August.

5  And then I explained to her about my chronic pains I

6  was having in my spinal cord and my shoulders and

7  stuff.  And she referred me to Dr. Carter for a

8  referral for ortho again, put me back in for ortho,

9  to go out to ortho.

10   Q.   So PA Kogan put in the referral for ortho or

11  she --

12   A.   Yes.

13   Q.   Okay.

14   A.   But she had to -- she came -- you know what

15  I'm saying?  She can't order.  She just put me on

16  Dr. Carter call line to -- for referral for ortho.

17   Q.   Okay.  And so you -- did you see Dr. Carter

18  then at that -- in August?

19   A.   No.  I seen Dr. Carter I want to say about a

20  week after that, like September.

21   Q.   Okay.  And what did Dr. Carter do at that

22  time?

23   A.   Basically, he told me that -- he said well,

24  you know, Wexler don't have the money to -- you know,



Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 212 of 369 PageID #:9232

JOHNNY M. RUFFIN, JR.  CONFIDENTIAL                          January 14, 2016
LIPPERT vs. GODINEZ                                                      29

1  to send you out, to pay for you to go see an ortho,

2  and that the pain you feeling is probably just -- you

3  just old and you got arthritis.  You know what I'm

4  saying?  So basically just continue on this pain med

5  regimen.

6    Q.  Did he make any changes to your pain

7  medication at that time?

8    A.  I'm not sure.  I think that's when he first

9  prescribed me Neurontin.  I'm not sure, though.

10   Q.  All right.  And then when is the next time you

11  saw -- you saw a doctor?

12   A.  I think I seen him again in October.  I

13  complained about -- complained again about the same

14  pain I was having.

15   Q.  All right.  And did he -- did you receive any

16  treatment at that time?

17   A.  Basically, the same old, same old.  The same

18  pain meds, same. . .

19   Q.  And were those pain medications effective?

20   A.  No.  Get relief, but that's about it.

21   Q.  And when was the next time you saw a doctor?

22   A.  I think I seen him next month, November.  I

23  seen him again, complaining about the same chronic

24  neck pain and shoulder.



JOHNNY M. RUFFIN, JR.  CONFIDENTIAL                    January 14, 2016
LIPPERT vs. GODINEZ                                                    30

 1    Q.  And that was Dr. Carter again in November?

 2    A.  Yes, ma'am.

 3    Q.  All right.  And did you receive -- did you

 4  receive any treatment in November?

 5    A.  Well, he told me that he refer me again to

 6  collegiate review for ortho, to go see an ortho.

 7    Q.  And did you see an ortho at that time?

 8    A.  No.  They -- they denied it, and they put in

 9  an alternative plan to send me to KSB to receive a

10  CAT scan on my chest or something like that.

11    Q.  So in November you didn't go to the

12  orthopedic --

13    A.  No.

14    Q.  You didn't go to the UIC Pain Clinic?

15    A.  No, ma'am.

16    Q.  What was the result of the CAT scan?

17    A.  I know -- I know it showed like fragments,

18  bullet fragments and stuff, that was in my -- in my

19  shoulders and stuff.  I'm not -- I'm not sure

20  everything, the terminology that the radiologist said

21  in the report, but. . .

22    Q.  Okay.  And I should say when was that CAT

23  scan?

24    A.  I think later on that month, in November.



 1    Q.  All right.  And did you see any -- did you see

 2   a medical professional at any time later in 2010?

 3    A.  Yeah.  I think I seen Dr. Carter again like

 4   that first week of December for a medical writ

 5   follow-up.  And -- and I think that's when he ordered

 6   me -- he say well, take the pain meds and I'm going

 7   to order you to go see physical therapy.

 8    Q.  And did you go to physical therapy?

 9    A.  Yes, I did.

10    Q.  How long did you go to physical therapy for?

11    A.  I think I went twice.

12    Q.  And when was that?

13    A.  In December.  I know that the physical therapy

14   here, he physically examined me.  Like that last --

15   he performed several tests and stuff.  And that last

16   time I seen him he did a test on my neck, and he

17   discontinued me.  He said physical therapy was --

18   ain't going to do me no justice, I need to go out.

19    Q.  So he said physical therapy wouldn't be --

20   wouldn't help you?

21    A.  Yes.  And he discontinued it.

22    Q.  But you take -- you had physical therapy in --

23   before, and you said in 2003, 2004 and so on;

24   correct?



1    A.  Yes.  But he was saying the reason why I can't

2  have physical therapy because of the pain I was

3  feeling.  And, like I say, he did a -- an exam on my

4  neck.

5    Q.  An exam?

6    A.  Yeah.  Like a stretch or something.  I

7  can't -- some type of range of -- rotation he did on

8  my neck.  And he heard something like -- kind of like

9  pop.  And he was like no, physical therapy not going

10  to help you, you need to go out for this issue.

11    Q.  All right.  And so did the physical therapist

12  make a -- make a recommendation to refer you?

13    A.  I don't know.  Only thing I know that's what

14  he told me.  I don't know if he put that in his files

15  or not.

16    Q.  Okay.  And did you see any other -- any other

17  medical professional in 2010?

18    A.  No.  I think soon after, like in January of

19  2011, I put in for sick call, complained about the

20  same chronic injury, pain.

21    Q.  Okay.  Let me take a moment here.  I'm going

22  to mark our first exhibit, which we'll call

23  Defendants' 1.

24                    (WHEREUPON, documents were marked



Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 216 of 369 PageID #:9236

JOHNNY M. RUFFIN, JR.  CONFIDENTIAL                    January 14, 2016
LIPPERT vs. GODINEZ                                                    40

1   A.  I would say the same type of relief, temporary

2   relief.

3   Q.  All right.  And then if you could flip to the

4   next page.  There's a notation where it says

5   collegial review.  Underneath it says ortho -- UIC

6   ortho clinic visit, and it's circled -- approve is

7   circled with November 16, 2010.  So were you ever

8   notified that they had -- that they approved an

9   ortho -- an ortho clinic visit for you?

10   A.  No.  I was -- I was notified that they denied

11   sending me to ortho, but alternative send me out to

12   KSB for a CAT scan instead.

13   Q.  All right.  So you never went to the ortho --

14   to the UIC ortho clinic?

15   A.  No, ma'am.  Nope.

16   Q.  All right.  And then on the last page of this

17   document we have -- there is a notation.  It looks

18   like 12/3/10.  Again, Dr. Carter?

19   A.  You say 12/3/10?

20   Q.  Yeah.  I'm sorry.  The very last page.

21   A.  Oh, okay.

22   Q.  The very last page.  There is in the middle of

23   the page 12/3/10?

24   A.  Oh, I see.



Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 217 of 369 PageID #:9237

JOHNNY M. RUFFIN, JR.  CONFIDENTIAL                    January 14, 2016
LIPPERT vs. GODINEZ                                                    60

1    Q.  With?

2    A.  UIC Pain Clinic.

3    Q.  Okay.  All right.  And then if you go to the

4    next page, please, the one that says -- I think it's

5    6/2/11?

6    A.  Um-hum.

7    Q.  I'd say.  All right.  It shows M.D. visit

8    with, and it's signed by Dr. Carter.  Do you see

9    that?

10   A.  Yes.

11   Q.  Does this refresh your recollection about

12   having -- having had some -- a visit in June?

13   A.  Yes, ma'am.

14   Q.  All right.  And what do you remember about

15   that visit with Dr. Carter in June?

16   A.  I guess he -- I guess he renewed the

17   Neurontins.  You know what I'm saying?  So that's

18   about it.

19   Q.  All right.  I'd like to ask you about the

20   first -- the note that Dr. Carter made.  It says has

21   improved function on Neurontin, wants to stay on this

22   Rx.

23   A.  Um-hum.

24   Q.  So do you remember telling Dr. Carter that the



1   Neurontin was helping you?

2     A.   Actually, I told him that it -- it provided a

3   short relief.  You know what I'm saying?  Not no

4   improved function.  I don't know where he get that

5   from.  But -- I remember telling him that it provides

6   some short relief, you know.

7     Q.   Did you want to stay on the medication?

8     A.   Yeah, I asked to stay on it, yeah.

9     Q.   Okay.  And did he change -- did he change your

10  dosing -- dose of Neurontin?

11    A.   I see that he increased it.  I think it was at

12  300, now it's at 400 I guess right here.

13    Q.   Did that provide any additional relief for

14  you?

15    A.   I -- in my opinion, it was the same.  Short

16  term.  It wasn't nothing lasting, like where I can

17  sleep a whole eight hours, you know.

18    Q.   Okay.  But it -- so it didn't provide any

19  increased -- any increased relief?

20    A.   No.  In my opinion, no.

21    Q.   Okay.  All right.  If you flip a couple of

22  pages, there are some notes.  The first one is

23  7/6/11.  Do you see that?

24    A.   You say 7/6/11?  At the top?



1    Q.  And does that correspond to your memory about

2  when you went -- about your trip to UIC Pain Clinic

3  in August 2011?

4    A.  Yes.  Yes, ma'am.

5    Q.  All right.  And did that one -- did that

6  treatment help more -- that was the treatment that

7  helped, that lasted a couple of days; is that right?

8    A.  Yes, ma'am.

9    Q.  All right.

10    A.  I guess I also see right here it was actually

11  Dr. Wahl I seen as follow-up.  It wasn't Carter,

12  so --

13    Q.  Dr. Wahl?

14    A.  Yeah.  August 29, 2011.

15    Q.  Okay.

16    A.  So that's Dr. Wahl I actually seen.  It wasn't

17  Carter.

18    Q.  That was Dr. Wahl?

19    A.  Yeah.

20    Q.  Okay.  Had you seen Dr. Wahl before?

21    A.  Yes, I seen Dr. Wahl -- no, actually, I

22  haven't seen Dr. Wahl.  She was -- I was scheduled to

23  see her like in -- in '09.

24    Q.  Okay.



1    A.  But, you know, they shuffle doctors around so

2    quickly around here, so I didn't actually -- I don't

3    think I actually saw her until -- until this point

4    right here.

5    Q.  All right.  And so did Dr. Wahl say anything

6    about your treatment during that visit?

7    A.  Well, you know, I explained to her -- she was

8    like -- she was kind of like confused in a way, I

9    guess.  And -- and I guess she said she would have to

10   go to collegiate review or something for the

11   follow-up or something like that.

12   Q.  Okay.  All right.  And I just want to ask you,

13   if you'll look on the next page, there's a notation

14   that says 10/3/11?

15   A.  Yes, ma'am.

16   Q.  And there's a stamp that says medical writ

17   follow-up?

18   A.  Right.

19   Q.  Did you have some sort of treatment outside in

20   October -- in October 2011?

21   A.  Between when I last went in August?  No, I

22   didn't have no outside, no.

23   Q.  Okay.

24   A.  So I guess this was the medical -- that's why



1   I -- I think on the -- the 29th, because Dr. Wahl was

2   new, that she was confused.  If I do recall, I think

3   on this date, October the 3rd, 2011, I seen another

4   doctor.  I don't know if it was Dr. Funk or some

5   other doctor.  I can't recall.  It's been so long

6   ago.

7     Q.  So you saw a different doctor other than

8   Dr. Wahl or Dr. Carter?

9     A.  Yeah.  For this October 3, 2011, follow-up,

10  medical writ follow-up.

11    Q.  All right.  And what did that doctor do for

12  you in terms in treatment?

13    A.  Basically, they just said that we're going to

14  approve to send you back out to UIC to get the CESI

15  procedure.

16    Q.  All right.  If we turn a couple pages, there's

17  some entries for 11/10/11?

18    A.  Yes.

19    Q.  And that's the -- some entries regarding your

20  visit to -- your next visit to the UIC Pain Clinic?

21    A.  Yes.

22    Q.  All right.  And then on that same -- on that

23  same page, down from there, there's a mark -- an

24  indication -- a notation for 11/17/11?



```
 1    A.  I don't recall.  I don't recall who the

 2   medical director was at that time.

 3    Q.  And what did you discuss at the follow-up?

 4    A.  Basically, they said they going to -- he or

 5   she said that they was going to present it -- present

 6   the doctor's recommendation to the collegiate review

 7   to send me out to get the MBB procedure.

 8    Q.  And was the procedure approved?

 9    A.  Yes, ma'am.

10    Q.  All right.  And what was your next -- your

11   next appointment?

12    A.  I think that December.

13    Q.  And what was -- what was that appointment?

14   Did you --

15    A.  That's when I went to have the -- I went to

16   UIC Pain Clinic and I had the MBB procedure.

17    Q.  And who did you see at that time?

18    A.  If I do recall, I think it was Dr. Mohammed.

19    Q.  And did you talk with him at all during this

20   appointment?

21    A.  Basically, he -- he prepped me for what was

22   going to go down and just gave me the run-down what

23   was going to happen, if I -- if I feel this, let him

24   know, you know, so --
```



JOHNNY M. RUFFIN, JR.  CONFIDENTIAL                    January 14, 2016
LIPPERT vs. GODINEZ                                                108

1      Q.   Okay.   And was that -- the MBB procedure
2   completed?
3      A.   Yeah.   He completed it that day, yeah.
4      Q.   All right.   And what were the results from
5   that procedure?
6      A.   Well, he told me I was going to do a follow-up
7   for additional -- I guess it's secondary to the -- I
8   don't understand what -- what the follow-up thing was
9   after the MBB.   I supposed to do like a -- I think a
10  cervical facek enthopath procedure (sic), something
11  like that.   That's what's the next -- that was his
12  recommendation as a follow-up.
13     Q.   Is that a follow-up if the MBB procedure
14  didn't work?
15     A.   No, no, no.   I guess this is something that
16  goes like a -- you know, it's like med -- I guess
17  this is something like once you do this, then this
18  come -- like a -- what's the term?   Quid pro quo or
19  something.   That's how -- like something that's --
20  comes afterwards.   Like you do this, then this has to
21  come afterwards.   That's how I understood it.
22     Q.   Okay.   And when were you supposed to go have
23  that second procedure?
24     A.   I think within a month.



 1    Q.  And did you have that second procedure?

 2    A.  Yup.  I had it on January 15, 2015, yeah.

 3    Q.  All right.  And was that -- so that was at the

 4  UIC Pain Clinic again?

 5    A.  Yes, ma'am.

 6    Q.  All right.  And did you see Dr. Mohammed at

 7  that time?

 8    A.  I don't recall if it was Mohammed or another

 9  doctor.  I don't recall.

10    Q.  All right.  So this -- the -- this doctor did

11  this second procedure?

12    A.  Yes.

13    Q.  All right.  So I should back up a little.

14  Between -- after the MBB procedure, how did you feel?

15    A.  Oh, yeah.  It was a lot better.  A way lot

16  better.  I was able to sleep.  It wasn't -- it wasn't

17  affecting my normal daily activities, you know.  It

18  felt -- it felt normal for a change.

19    Q.  And that was immediately after -- immediately

20  after the procedure?

21    A.  Yeah, yeah.  Yes, ma'am.

22    Q.  And did -- and after you had the MBB procedure

23  in December, did you have a follow-up with a doctor

24  at Dixon?



1     A.  Yes.  Yes, I did.

2     Q.  Okay.  And who did you see there?

3     A.  I don't recall who the doctor was.

4     Q.  And do you remember what that doctor said?

5     A.  Basically, I guess they approved me to go back

6   out, to go back out for this additional procedure.

7     Q.  All right.  So in January you had the second

8   procedure?

9     A.  Yup.

10    Q.  And what were the results of that procedure?

11    A.  Well, we went out there -- like when I went

12  out there, it was like testing my nerve function.  So

13  it's like he -- from C4 to the C -- C7 they put -- I

14  don't know if it's needles.  Some type of electronic

15  device and he'll turn the frequency up to see what

16  nerves function.

17    Q.  Oh, so this was like a testing?

18    A.  I guess that's what it was.

19    Q.  A test?

20    A.  After the -- right.

21    Q.  To see how -- to see how successful --

22    A.  Exactly.

23    Q.  -- how successful the MBB procedure has been?

24    A.  Exactly, yeah.



Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 226 of 369 PageID #:9246

JOHNNY M. RUFFIN, JR. CONFIDENTIAL                    January 14, 2016
LIPPERT vs. GODINEZ                                              115

1  that I was feeling, you know.

2    Q.  All right.  And what did the staff tell you?

3    A.  That I was approved and that they can't tell

4  me when I was going to go out.

5    Q.  And have you had -- have you been to UIC since

6  then?

7    A.  No.  I'm still waiting actually.

8    Q.  Has anyone told you when an appointments's

9  been scheduled?

10   A.  Nope.  They're saying it's a security

11  protocol, they can't tell me.

12   Q.  Has anyone told you, I mean, anything else --

13  anything else about --

14   A.  The only thing they told me I was approved in

15  October 2015 and that I'm -- I'm approved.  That's

16  it.

17   Q.  Okay.

18   A.  I think the -- I think the nurse practitioner

19  said that she was going to talk to the scheduling

20  person, whoever that person was here at Dixon.  But

21  at the time she -- she expressed some trepidation as

22  if it's on them, if it's on UIC.  I don't know.

23   Q.  When --

24   A.  She was confused herself, you know, to be --



 1 | my conversation with her, you know.
 2 |   Q.  So she wasn't sure if the scheduling issue
 3 | was related -- was on IDOC's side or on --
 4 |   A.  Yes.  Wexford.
 5 |   Q.  -- or on UIC's side?
 6 |   A.  Yeah.
 7 |   Q.  And when was that that she said that?
 8 |   A.  That was between October and now.  I don't
 9 | know specific dates.
10 |   Q.  We went right through 2014 to 2015.  Okay.
11 |                    (WHEREUPON, documents were marked
12 |                     as DEFENDANTS' Exhibit Nos. 6 and
13 |                     7, for identification.)
14 |                    (WHEREUPON, said documents were
15 |                     tendered to the witness.)
16 | BY MS. NEWMAN:
17 |   Q.  Okay.  All right.  So going back -- starting
18 | with Exhibit 6 then.  All right.  There was -- on the
19 | first page there's a notation for the 3/3/2014 --
20 | 3/3/14?
21 |   A.  Yes, ma'am.
22 |   Q.  M.D. visit.  Okay.  And you had testified that
23 | you thought you saw Dr. Wahl in January or February
24 | 2014?



800.211.DEPO (3376)
EsquireSolutions.com

JOHNNY M. RUFFIN, JR.  CONFIDENTIAL                    January 14, 2016
LIPPERT vs. GODINEZ                                                    147

1    A.  Yes, it is.  Yup.

2         MS. NEWMAN:  Counsel, I'd like to request

3    that you --

4         MS. SCHULT:  We'll turn it over.

5         MS. NEWMAN:  -- please turn over all of the

6    documents relating to that, as well as any

7    other documents relating to his 2010 grievance.

8         MS. SCHULT:  Anything we get, we'll turn it

9    over.  That's fine.

10   BY THE WITNESS:

11   A.  Well, for the record, I had -- when I last

12   talked to my attorneys, I said that, you know, my

13   legal box is so scattered and I know I have documents

14   everywhere, but I have bits and pieces, so I have

15   to -- I asked her if she could get it.  You know, and

16   I know they got it when they filed.  But if I find

17   copies of it, I will submit it to them.

18   BY MS. NEWMAN:

19   Q.  All right.  Okay.  So for the colonoscopy

20   grievance, since -- if that's pending in front of the

21   ARB, I'm assuming it was denied -- that it was denied

22   at this level?

23   A.  Yes.

24   Q.  Okay.  All right.  And you said you also filed



 1   a grievance relating to medication or to co-pays?

 2      A.  Co-pay, yeah.  Why they was charging me for

 3   co-pay for a chronic -- a chronic injury.

 4      Q.  When was that?

 5      A.  I don't recall what year or date.  I do not

 6   recall.

 7      Q.  And what was the outcome of that grievance?

 8      A.  I know that they denied it, and I don't

 9   remember the exact date they denied it.

10      Q.  So they denied it here at the local -- a local

11   level?

12      A.  Yes.

13      Q.  Did you appeal it to the ARB?

14      A.  I really don't recall exactly if I did.  I

15   don't recall right now.  I couldn't give you an

16   answer right now for sure.

17      Q.  Do you have -- are there any other grievances

18   that you filed relating to any medical issues?

19      A.  I filed -- I filed grievances about the ADA

20   van and -- it's more ADA issues, not really medical.

21   More ADA discrimination issues.

22      Q.  Okay.  And what was the outcome of that --

23   that grievance?

24      A.  Well, one of the grievances, the construction



Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 230 of 369 PageID #:9250

JOHNNY M. RUFFIN, JR.  CONFIDENTIAL                    January 14, 2016
LIPPERT vs. GODINEZ                                                  152

1   truthful with you.  You know what I'm saying?  And I

2   take it in -- like I say, you know, the meds may give

3   me a quick relief for about an hour, but there it is,

4   it's the pain.  You know, it's just a persistent

5   pain.  I don't know how to describe it to you, you

6   know.  It's just -- it's just what I'm feeling in my

7   body.  You know what I'm saying?

8      Q.  Right.  So the -- so the medications you're on

9   give you some relief, it's just not lasting?

10     A.  No, it's not lasting.

11     Q.  But they do give you some relief?

12     A.  Well, I have built up a tolerance to it too,

13  so I guess that also a factor in it too, because I've

14  been taking it so long.

15     Q.  So, Mr. Ruffin, do you have any complaints

16  about the treatment that you received at the UIC Pain

17  Clinic?

18     A.  I guess -- I don't know.  Is there a

19  complaint -- I guess that one time where the guy made

20  that mistake kind of scared me.  But it was one thing

21  that stood out that I learned just recently when I

22  got my medical record is that when I went to see the

23  UIC radiologist and they had the diagnosis of the

24  report, I noticed that the radiology also found, in



Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 231 of 369 PageID #:9251

JOHNNY M. RUFFIN, JR.  CONFIDENTIAL                    January 14, 2016
LIPPERT vs. GODINEZ                                              153

1    addition to my cervical injury, C6-C7 injury, he

2    noticed that there was a bullet fragment or shrapnel

3    that's embedded close by my trach, my trachea.

4            And that -- and the radiologist's opinion

5    that there is pulomanar (sic) vascular in that area

6    that's in my -- that's I guess leaking in my left

7    lobe, lung lobe, I guess.  And the radiology

8    requested that I need to see someone about that

9    specific issue.

10           Now, I -- all these years I had -- either

11   the doctors from here when they -- when they looked

12   at it, they either ignored it or missed it, whatever.

13   But I thought that was kind of like in -- that was

14   kind of interesting.

15           Because this is something that I

16   complained for years when I first came to the

17   facility, that my swallowing was being impeded.

18   Because like whenever I eat or drink something, I

19   feel like a lump in my neck.  And I never knew what

20   was going on, even now today.

21           And when my lawyer sent me those medical

22   records and I looked at that -- that report, I was

23   like wow, you know, how that condition -- when they

24   got hold to that report, why didn't they address it?



1   You know what I'm saying?

2          So that was -- that was something that

3   stood out.  That's one of the things that stood out.

4   And that's something I will be addressing in the

5   future, about that.

6    Q.  Okay.  Are you feeling -- I mean, you said you

7   feel like there's a lump.  Do you have any other

8   symptoms relating to this?

9    A.  It's like a -- like a -- it's like any time

10  you swallow, it's like real constricted like.  You

11  know what I'm saying?  I know it's there.  Like if I

12  lay down on a pillow and my neck is tilted a little

13  forward, that I could feel it -- feel it there, you

14  know.

15         But all the time I thought that this is

16  just something hey, you know, you've got these

17  bullets in you, they can't take it out because

18  it's -- wherever it's at.  But when I looked up the

19  term pulomanar (sic) vascular, that's like some fluid

20  or something.  You know what I'm saying?

21         I don't -- I'm not a doctor to understand

22  it, but this -- this radiologist specialist felt for

23  certain enough to highlight in her C-scan -- in a

24  C-scan report that this is something that should be



JOHNNY M. RUFFIN, JR.  CONFIDENTIAL                    January 14, 2016
LIPPERT vs. GODINEZ                                                155

1   addressed.  And the Dixon medical staff when they

2   reviewed the C-scan report didn't -- I guess they

3   either ignored it or just didn't care, I guess.

4     Q.  Had you ever raised it with the Dixon medical

5   staff?

6     A.  I haven't raised.  Because, like I told you, I

7   had raised it earlier with prior medical staff in

8   another facility years ago.  And -- and, like I said,

9   they was -- I recall one year, like in -- as a matter

10  of fact, in 2000 I think the doctor I seen, I spoke

11  to him about it, like this is a problem and he, you

12  know, basically, said some terms -- derogatory things

13  to me.

14          But, you know, it never got addressed.

15  They wasn't going to address it.  It's just something

16  they put in my head, that this is something you got

17  to live with, you got shot these many times, there

18  ain't nothing they can do about it, they can't get

19  the bullet out of there.  You know what I'm saying?

20          So the only thing I can do as a patient is

21  I communicate it to them, and they didn't -- they

22  didn't feel like it was -- I guess serious enough to

23  even address.  You know what I'm saying?  So -- and

24  that was before I came to Dixon.



1            So this is -- this is how my mind been

2     worried, that this is something I got to handle.  But

3     when I recently read that report, it was strange that

4     that radiologist told -- put a note -- specifically a

5     note for that, that this issue should be addressed by

6     somebody.  Or a specialist.  You know what I'm

7     saying?  So -- and so that was kind of like wow, you

8     know, the Dixon medical staff had that information

9     and they didn't act on it.  You know what I'm saying?

10    Q.  Right.  But, again, you never -- you never

11    brought it up to the Dixon medical staff?

12    A.  No, I didn't.  No, I haven't.  But I -- like I

13    said, I just found this out when I just recently got

14    these medical records.  You understand what I'm

15    saying?

16    Q.  Um-hum.

17    A.  Yeah, so I didn't know that -- like I say, I

18    knew something was wrong years ago, but I didn't

19    know -- I guess the diagnosis, the term, until I read

20    that CAT scan report.

21    Q.  Okay.  Mr. Ruffin, are you aware of any

22    vacancies in the medical staff at Dixon during --

23    since 2000, since you've arrived?

24    A.  Yes.  Yes, there been times where there was no



Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 235 of 369 PageID #:9255

JOHNNY M. RUFFIN, JR.  CONFIDENTIAL                     January 14, 2016
LIPPERT vs. GODINEZ                                              157

 1  healthcare administrator, no -- I guess no medical

 2  directors at one point.  There was never no dental

 3  hygienist.  Yes, it was -- those are some of the

 4  things I can think of right now.

 5          I think there was a nurses shortage or

 6  something like that, that they -- I heard the staff

 7  complaining about nurses overworked, had to work

 8  overtime, they was -- they be bickering and be like

 9  why I got to be mandated over, I been here all this

10  time, I don't want to be here, they need to hire more

11  staff.  This is what I heard from nurses and stuff.

12          Yeah, there was a time where we didn't

13  have no -- at one time we didn't have no healthcare

14  administrator or nothing.  The warden -- assistant

15  warden of the program was the acting assistant warden

16  and healthcare administrator.  And I thought that was

17  kind of odd.  Yeah, so --

18  Q.   Okay.  And have those -- have those vacancies

19  affected your treatment for your spinal injury?

20  A.   Well, I mean, what?  As far as the healthcare

21  administrator?  I don't think she's like a doctor, I

22  guess.  She's not -- I don't know if -- if that

23  physician is responsible for like scheduling or

24  something like that, but she didn't -- I don't know



1   how to really answer that question.  That's what I'm

2   saying.  I don't really honestly -- I don't really

3   grasp the duties and responsibility of a healthcare

4   administrator or DON.  As far as prescribing certain

5   medical treatment, I'm thinking that was just

6   strictly for the medical director.

7            But there was a time where we didn't have

8   no medical director, and so I guess that's where it

9   probably affected that.  Like we didn't have no

10  medical director.  But I was seeing like a

11  practitioner, PA or something like that, instead of a

12  medical director.

13  Q.  So there have been times when you were unable

14  to see a doctor?

15  A.  No, not no -- no.  A medical director.  An

16  acting med -- now, they had -- you know, they got

17  doctors on staff.  Like, you know, one doctor that I

18  know that been there persistent -- consistently.

19  That's Dr. Dominguez.  She's always been there.

20           But they've been shuffling doctors out so

21  rapidly around here.  You know what I'm saying?  And

22  I have seen where they tried to hire a healthcare

23  administrator and then the next week she -- he or she

24  is gone.  You know what I'm saying?  For one reason

Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 237 of 369 PageID #:9257

JOHNNY M. RUFFIN, JR.  CONFIDENTIAL                    January 14, 2016
LIPPERT vs. GODINEZ                                                     159

1   or another.  So --

2    Q.  All right.  But has there been a time when

3   you -- that you can think of when you wanted to

4   see -- wanted to see a doctor for your spinal

5   injury --

6    A.  I know I put in for -- I know a time I put in

7   for sick call to see the medical doctor, and I guess

8   they pushed me onto a nurse practitioner or a PA.

9   Now, I don't know if that was the reason why they did

10  that, because they didn't have a medical director at

11  the time.  I'm not sure.  I'm not privy to when

12  these -- these doctors are hired or on staff, you

13  know.

14   Q.  Okay.  All right.  And has the -- have any of

15  the medical staff vacancies affected your request for

16  a colonoscopy?

17   A.  No, not -- no.  Because I -- I had a chance to

18  talk to a medical doctor, so --

19   Q.  All right.  And have -- I mean, is there any

20  other way that you know medical staff vacancies

21  have -- have affected your medical care, as far as

22  you know?

23   A.  Yeah.  Dentist hygienists.  You know, I think

24  that is necessary, you know, to keep your teeth



JOHNNY M. RUFFIN, JR.  CONFIDENTIAL
LIPPERT vs. GODINEZ

January 14, 2016
160

1  clean, you know, to avoid them extracting your teeth,

2  you know.  I thought that -- I thought every facility

3  supposed to have a dentist hygienist.  I mean, every

4  facility I have been in has one except for this one.

5           And then I guess these people down here

6  when I asked them -- only just recently I just

7  inquired into it, about it.  I went to -- I went

8  to -- to the dentist -- I put in for the dentist,

9  because I felt like I have -- my enamel on my tooth

10  is decayed, that I need a tooth filling.  And I also

11  asked them for a dental hygienist to get my teeth

12  cleaned.

13           And they're like well, we don't have a

14  dental hygienist and if you want one, you got to try

15  for a joint that does.  That's -- that's how it is.

16  I guess they sarcastic responses to my request.

17    Q.  When was that that you requested that?

18    A.  This was recently.  I want to say either late

19  December or early this month.  I'm not sure what

20  actually date.  I think it was later this month.

21  Earlier this month.  I'm sorry.  And also I was told

22  this once before, earlier, years -- years before too,

23  the same thing.

24    Q.  When were -- when were you told that?



1   A.  I don't -- I don't know specifically what

2   date, what date when I seen the dentist.

3   Q.  So you did see a dentist earlier?

4   A.  I seen a dentist earlier.  Originally, I seen

5   him for a teeth filling.  And it took so long my

6   teeth rotted out, got swollen, so I never got the

7   filling and they end up putting a -- they end up --

8   they ended up extracting the tooth rather than

9   filling it, than saving a tooth.

10  Q.  And when was that?

11  A.  Man, it was years ago.  I don't know

12  specifically what year, year this happened.

13  Q.  Was that when you were in Dixon?

14  A.  Yeah, I was in this -- this facility.

15  Q.  Okay.  Mr. Ruffin, do you believe that any of

16  the medical personnel that you've -- that you've seen

17  here at Dixon are under qualified?

18  A.  Oh, yeah.  Oh, yeah.

19  Q.  And who -- who do you believe to be under

20  qualified?

21  A.  Where do I begin?  You know.  I mean, as far

22  as what?  As far as dealing with my situation or just

23  in general like?

24  Q.  Well, in general -- let's talk about in



1  relation to treating your spinal injury.

2    A.  Okay.  You know, people like Dr. -- like

3  Dr. Dominguez, I don't think she's -- her responses

4  are just -- I mean, in my opinion, is unprofessional,

5  you know.  Like -- you know what I'm saying?  I think

6  Dr. Carter.  I don't think -- I don't know if it's

7  unqualified or just straight-up unprofessional or

8  just -- it just -- he followed the policy.  You know

9  what I'm saying?  Of -- of his employer.

10          It's the only thing I can just deem my

11  views of what I believe, but -- I don't have -- I

12  don't have straight up facts of why I feel like -- I

13  don't know his credentials, but I -- the only thing I

14  can go to is my interaction with him, that he was

15  very unprofessional, being a doctor in any hospital

16  would have conducted themself in that -- in that

17  manner.

18    Q.  And what about his inter -- interactions with

19  you were unprofessional?

20    A.  I mean, for instance -- I mean, this is --

21  this is -- this is the highlight of it.  I mean, when

22  I inquire about something that's chronic and

23  persistent and severe pain and his response is that

24  well, Wexler is not going to pay the money to send



Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 241 of 369 PageID #:9261

JOHNNY M. RUFFIN, JR.  CONFIDENTIAL                    January 14, 2016
LIPPERT vs. GODINEZ                                              163

1   you out to see an ortho and you old and you just got

2   arthritis.  He just -- he just brushed off something

3   I feel that I was going through with severe -- he

4   just brushed it off like it was just an agitation,

5   that -- you know.

6            And he made -- and in my opinion, just

7   from his comments to me, by him mentioning the

8   fact -- budget, Wexler's budget.  What that got to do

9   with -- with my medical treatment?  You know what I'm

10  saying?  I mean, that's -- that's what you all do

11  now, you all -- you all think about oh, how much

12  money it cost?  Even if it cause me even more pain

13  and suffering.  You know what I'm saying?  If it cost

14  them more money or cause me more pain and suffering.

15  That's why I feel like he was unprofessional and, you

16  know, unqualified.  I mean, that's in my opinion.

17            Him and Dr. Dominguez said the same thing

18  about the colonoscopy.  You know, that was the first

19  thing to come out of her mouth.  Well, you're too

20  young and -- first of all, Wexler, they don't have

21  the money to pay for you to send you out to get this

22  expensive test.

23            So, you know, when you got people like

24  that, that's in their mind frame and you see the



JOHNNY M. RUFFIN, JR.  CONFIDENTIAL                    January 14, 2016
LIPPERT vs. GODINEZ                                                    164

1  results that you get, where people are dying around

2  here prematurely, you know, because it's a money

3  thing, you know.

4    Q.  Okay.  But are you -- I mean, do you have any

5  examples, whether with Dr. -- whether with Dr. Carter

6  or any of the other professionals, where their --

7  their being under qualified actually caused you to

8  have

9  some --

10   A.  Like I said before, I don't have privy to

11  their credentials, their schooling, their education,

12  qualification.  I don't know that.  You know what I'm

13  saying?  The only thing I can communicate to you is

14  what I experienced with this doctor these particular

15  times.  So --

16       MS. SCHULT:  Can you define what you mean by

17     under qualified for him?

18       MS. NEWMAN:  Well, I'm using -- taking that

19     from your class action --

20       MS. SCHULT:  Yeah.  I'm just trying to make

21     it a little easier for you.

22       MS. NEWMAN:  I mean, you know, we have -- all

23     right.  Yeah, let's go ahead, we'll go -- we'll

24     just -- we'll go at it this way.



1      Can you mark that No. 9?

2                (WHEREUPON, documents were marked

3                 as DEFENDANTS' Exhibit No. 9,

4                for identification.)

5                (WHEREUPON, said document was

6                 tendered to the witness.)

7      BY MS. NEWMAN:

8        Q.  So, Mr. Ruffin, I'm showing you what's been

9      marked as Exhibit -- Defendants' Exhibit 9.  It's

10     entitled Memorandum of Law in Support of Plaintiffs'

11     Motion for Class Certification.  Do you see that?

12       A.  Yes, ma'am.

13       Q.  And if you look at the very last page, you can

14     see that this document was filed by your attorneys in

15     this matter on December -- December 7, 2015.

16       A.  Yes.

17       Q.  Do you see that?  And my first question to you

18     is have you seen this document before?

19       A.  Yes, I have.

20       Q.  All right.  And when did you -- did you first

21     see it?

22       A.  I just received this in the mail about a week

23     ago.

24       Q.  Okay.  And have -- have you reviewed this?



1    A.  Yes, I have.

2    Q.  Okay.  So I'd like to then go ahead and draw

3   your attention to page 11 -- well, let's start --

4   let's start on page -- I'll start again -- sorry --

5   on page 7.  All right.  And there is a -- a heading

6   that says Commonality?

7    A.  Yes.

8    Q.  And it talks about that the plaintiff must

9   show that there are questions of law or fact common

10  to the class.  Do you see that?

11   A.  Where do you see that at?

12   Q.  In the first sentence.  To meet the

13  commonality requirement --

14   A.  Questions of law or fact common.  Yeah.  Okay.

15   Q.  All right.  And then if you could turn to page

16  9 then, it says -- the first full paragraph up at the

17  top it says the amended complaint identifies the

18  following contentions about IDOC's systematic

19  policies and practices that raise questions common to

20  all members of the proposed class.  Do you see that?

21   A.  Yes.

22   Q.  All right.  And then there's a heading A.  And

23  then if you turn to page 11 -- all right? -- there's

24  a heading B.  And the heading says defendants



JOHNNY M. RUFFIN, JR.  CONFIDENTIAL                    January 14, 2016
LIPPERT vs. GODINEZ                                                      167

1    routinely permit under qualified medical

2    professionals to treat IDOC prisoners, a problem

3    compounded by lack of reliable clinical oversight and

4    peer review processes.

5        A.  Yes, I see that.

6        Q.  All right.  And it says -- the second

7    paragraph -- the second sentence of that paragraph

8    underneath it says that defendants do not require

9    their facility medical directors to be board

10   certified in a primary care field, nor do they

11   require staff physicians to have completed an

12   accredited residency training program in a primary

13   care field.

14       A.  Okay.  So my understanding of that is --

15   primary care field like a specialized field, right?

16   Or just a general --

17       Q.  Primary care is -- is being able to treat, you

18   know -- I would say --

19           MS. SCHULT:  General.

20   BY MS. NEWMAN:

21       Q.  Treat general conditions.  Being able -- being

22   qualified -- you know, when you go to your regular

23   doctor, your primary care physician, you get treated.

24       A.  Okay.



1    Q.  So are you -- I mean -- I mean, you've said

2  basically you're not aware of what their -- of what

3  Dr. Carter's training or Dr. --

4    A.  I don't have this --

5    Q.  Any of their training might be.  So are you

6  able to point to -- can you point to anything

7  where -- whether if -- you know, him not being --

8  assuming he's not board certified -- I have no -- no

9  idea one way or the other -- but him not being board

10  certified or having completed an accredited --

11  accredited residency training had any effect on your

12  care?

13    A.  I don't know.  I don't have -- I don't have

14  access to that information.

15    Q.  All right.

16    A.  But I can say this:  Is that to my

17  understanding, if -- if there is a situation -- a

18  medical situation where a prisoner that is beyond his

19  qualifications, he must refer me to an outside

20  specialist, some type of specialist.  And for -- for

21  a long time they was -- he was resistant to that.

22    Q.  And he being Dr. Carter?

23    A.  Dr. Carter and all the other doctors that

24  was -- I guess -- that was also resistant.



JOHNNY M. RUFFIN, JR.  CONFIDENTIAL        January 14, 2016
LIPPERT vs. GODINEZ                                    169

1   Q.  Which other doctors were resistant?

2   A.  So I guess -- I guess the doctors, that I

3   don't know specifically, that was on Wexler

4   collegiate review, when they have -- they go for them

5   to -- to approve whether or not I can go to see the

6   specialist.

7         And, I mean, I just -- the only thing I

8   can go off their acts of repeatedly being resistant

9   to this, my obvious symptoms of something ain't right

10   that I was communicating to them about my injury.

11   And they knew that it was beyond they's specialized

12   care and they didn't send me out.  You know what I'm

13   saying?  And turn me around.

14         So for a long time I suffered.  You know

15   what I'm saying?  Up under this ineffective --

16   inadequate care.  That's my opinion.  Of what I

17   suffered.  But, like I say, I don't know nothing

18   about they background, medical training, or anything.

19   The only thing I can go off is their acts, their

20   actions.

21   Q.  And when you say that they -- that they

22   resisted your requests to be sent for specialty care,

23   you mean the -- are you referring to in 2010 when

24   you -- when they put you in for -- for an ortho visit

JOHNNY M. RUFFIN, JR.  CONFIDENTIAL
LIPPERT vs. GODINEZ

January 14, 2016
170

1  and that was denied?

2    A.  Even before that.  You know, in '09.  I was

3  submitted, if I'm not mistaken, to a neurologist or

4  ortho by a different doctor.  That was denied.  And

5  then 2010 the same thing.  I was denied repeatedly.

6  And even though I was consistently coming to them and

7  explaining to them what was going on with me -- with

8  my body, what I was going through.

9    Q.  Do you feel that the -- you know, that the

10  medical personnel not -- that your doctors not --

11  perhaps not having board certification or -- or

12  being -- having completed an accredited residency

13  training in primary care, that that -- has that had

14  any effect on your request for a colonoscopy?

15    A.  Do I know that they had this training?  Like I

16  say, I don't know.  I don't have this information.

17    Q.  Are you aware of any other way in which

18  your -- in which your doctors', you know,

19  qualifications may have had some effect on your

20  medical care?

21    A.  Like I say, again, only thing I can go off of

22  is their actions towards me, so -- and what I

23  suffered during that period of time is unacceptable.

24  So I don't believe that -- I don't believe no



Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 249 of 369 PageID #:9269

JOHNNY M. RUFFIN, JR.  CONFIDENTIAL                    January 14, 2016
LIPPERT vs. GODINEZ                                                    171

 1  reasonable doctor in that position -- and I don't

 2  believe that their action was according to the

 3  medical community standard of care.  You know what

 4  I'm saying?  I mean -- that's just my opinion.

 5    Q.  Did you experience any medical issues or

 6  problems when you transferred from Pinckneyville to

 7  Dixon?

 8    A.  Oh, yeah.

 9    Q.  And what was that?

10    A.  Well, I know I'm having pain with my -- my

11  neck and shoulder area.  I didn't understand what was

12  going on, but I was complaining to the staff at

13  Pinckneyville about it.  I mean, how far back are you

14  trying to go on there?  I mean, right up until the

15  time or what?

16    Q.  I mean, did -- I mean, during the -- did the

17  transfer from Pinckneyville to Dixon have any effect

18  on your -- on your medical problems you were having?

19    A.  Well, I felt -- well --

20      MS. SCHULT:  Well, I'm just --

21  BY THE WITNESS:

22    A.  Well, I was going through pain and stuff and

23  they was just medicating me in the other facility.

24  But when I -- you know, when I got to Dixon, I felt



Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 250 of 369 PageID #:9270

JOHNNY M. RUFFIN, JR.  CONFIDENTIAL                                    January 14, 2016
LIPPERT vs. GODINEZ                                                                                175

1    Q.   Okay.  We've -- I mean, we've discussed it,

2    but have you ever -- have you ever had a request for

3    specialty care denied?

4    A.   Yes.

5    Q.   All right.  And that was the request for the

6    ortho -- for ortho in 2010?

7    A.   Yup.  And in 2009.

8    Q.   But eventually, it was -- was that

9    eventually -- eventually, you did get sent out for

10   specialty -- for specialty care?

11   A.   Yeah.  After almost a couple -- a year and

12   a-half later, yeah.

13   Q.   Do you believe IDOC delays in getting you

14   appointments at the UIC Pain Clinic?

15   A.   I believe that, yeah.  Because it was referred

16   to me by -- like I say, Dr. Dominguez told me one

17   time and by, you know, a couple of medical staffs,

18   something like they -- they was confused what was the

19   delay or -- they didn't go into the details of the

20   whole step by step, as far as scheduling from this

21   facility to UIC, but yes, it been -- it been -- it

22   been addressed to me that something --

23   something -- something went wrong.

24   Q.   All right.  Do you believe those delays are



1    intentional?

2      A.  I mean, I don't know.  I mean, maybe it could

3    be intentional.  It could be just unprofessional.  Or

4    it just could be bad policy.  I -- I don't have -- I

5    don't have the -- like I say, I don't know the people

6    who's responsible for the scheduling.  I don't

7    understand the whole process, the scheduling process.

8    Because they don't tell us.  You know what I'm

9    saying?

10     Q.  Have you ever had a problem with any of the

11   medical staff not being able to read or find part of

12   your medical file?

13     A.  Could you repeat that question?

14     Q.  Sure.

15          MS. NEWMAN:  Can you read it back for me?

16                    (WHEREUPON, the record was read

17                     by the reporter as requested.)

18   BY THE WITNESS:

19     A.  Oh, yeah.  It was one incident I was going on

20   a writ, and I know I had a permit for my -- my

21   FlexiCuff, I had it in my possession, but somehow it

22   was not in my medical file.  And the security staff

23   and also the medical staff looked for it.  You know

24   what I'm saying?  So I thought that was strange.  I

JOHNNY M. RUFFIN, JR.  CONFIDENTIAL
LIPPERT vs. GODINEZ

January 14, 2016
177

1    had to pay $5 to get that renewed and it wasn't even

2    in my file.  I thought that was -- that was -- that

3    was one incident.

4    BY MS. NEWMAN:

5       Q.  So that was for -- a permit for your -- for

6    the cuff that you wear?

7       A.  Yeah.  A special -- like no -- no black box,

8    just a cuff and -- a FlexiCuff around my brace when I

9    go on court writs and medical writs.

10      Q.  Can I ask -- can I ask why you need -- why you

11   need the brace and --

12      A.  Well, because I'm -- my spinal cord injury,

13   I'm partially paralyzed on this side, so it's like

14   a -- like -- my hand involuntary, it goes into like a

15   claw.  So what this -- what this brace does, it keeps

16   my fingers like this, flattened out, so it doesn't

17   get stuck like this.  Because if I don't wear it,

18   it'll get stuck like this.  You know what I'm saying?

19      Q.  Okay.  And you wear -- you wear the brace all

20   the time?

21      A.  Yeah, I wear it -- so I take it off sometimes.

22   You know, because, like the doctor say, you know,

23   sometimes go ahead, just take it off and stretch it,

24   try to work it out.  You know what I'm saying?  So I



1  do that -- I do that during the days and stuff.

2    Q.  So this was a permit that allows you to wear

3  this and not have the black box?

4    A.  Yes.

5    Q.  A cuff?

6    A.  A-ha.

7    Q.  Okay.  Did that have -- did not being able to

8  find that permit have some effect on your medical

9  care?

10    A.  On my medical care?  Well, it causes I guess

11  an inconvenience because we have to wait -- I went to

12  court late, and they had to go to run around and try

13  to get another permit that day.  They wouldn't let me

14  go until they got it, everybody was on the same page,

15  you know.

16          And what the lieutenant told me at the

17  time, that he said Ruffin, it's not your fault,

18  medical staff dropped the ball on this, but he talked

19  to I guess the -- the doctor at the time to -- I

20  guess to approve for that day for me to go out with

21  that permit to have no black box.

22    Q.  Sure.  Okay.  Are you aware of any other

23  incidents in which someone was -- you know, a medical

24  staff was unable to read or find part of your medical



Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 254 of 369 PageID #:9274

JOHNNY M. RUFFIN, JR.  CONFIDENTIAL                    January 14, 2016
LIPPERT vs. GODINEZ                                                179

1   file?

2      A.  Well, as of recently, I tried to submit a

3   request for a medical record.  They said because of

4   the budget crisis, they don't have paper -- this was

5   what they told me, saying they don't have paper to

6   get me copies of my -- honor my request for copies of

7   my medical records.

8      Q.  Okay.  And did that have any effect on your

9   medical care?

10     A.  Well, no.  I just wanted to know -- I wanted

11  to know what's going on.

12     Q.  Okay.  All right.  Earlier you mentioned that

13  you had put in a couple of times for some -- for

14  dental care?

15     A.  Yes.

16     Q.  And you did receive dental care -- you did

17  receive -- did you get to see a dentist at one point?

18     A.  Yeah, I seen -- I seen the dentist.  It was

19  earlier since I was there.  I put in for a filling,

20  but I guess over time my teeth rotted out to a point,

21  the delay, they end up not giving me a filling, but

22  end up extracting the tooth.

23     Q.  How long was it between the time that you put

24  in for the filling and the time you saw the dentist?



1    A.  I don't -- I don't recall how long.  I don't

2  recall that.

3    Q.  And you said that just -- just within the last

4  month you asked -- you've requested --

5    A.  Yes, ma'am.  I have -- my tooth enamel in a

6  couple of my tooth had deteriorated and I want to ask

7  for a filling.  They said -- a couple of them, they

8  just ranted, you know, you can't get a filling for

9  this one, and they agreed to give me a filling for

10  one tooth out of the three that I showed them.

11    Q.  Okay.  So you have seen a dentist?

12    A.  Yeah, I've seen a dentist, yeah.

13    Q.  And do you have a -- you have an appointment

14  to get that filling?

15    A.  I'm on the waiting list.  So whenever that --

16  whenever that time occur.  He didn't tell me when

17  they was going to call me or how long the waiting

18  list.  But from my experience and being around other

19  guys' experience, the waiting list could take a year

20  and a-half.

21         You know, I know one fellow for a fact he

22  was on that waiting list to get his teeth filled, he

23  wanted to save his tooth, and he was on their waiting

24  list like a year and-a half, until it just -- the

1   situation got so worse where they have to extract it.

2   You know what I'm saying?

3         And he -- you know, it was just like

4   they -- you know, is just like -- you know, just from

5   my experience, like they'd rather extract the teeth

6   than to save it, like putting a filling in.  And this

7   was my experience too.

8     Q.  Have you ever filed any grievances relating to

9   any request for dental care?

10    A.  I'm not sure, man.  I'm not sure that I did or

11  not.  I more so think I did, I did file a grievance,

12  but I'm not sure.  I can't really recall right now.

13    Q.  And when -- when would that have been?

14    A.  This had to be -- if I did, it had to be right

15  around the time when my tooth was extracted.

16    Q.  Before or after the tooth was extracted?

17    A.  I don't recall.

18    Q.  And so if you're not sure if you filed a

19  grievance, do you know if that grievance -- how that

20  grievance was handled?

21    A.  I don't recall.  I'm sorry.  I don't recall.

22    Q.  Okay.  All right.

23        MS. NEWMAN:  Let's go off the record.

24                  (WHEREUPON, a recess was had.)



Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 257 of 369 PageID #:9277

JOHNNY M. RUFFIN, JR.  CONFIDENTIAL                    January 14, 2016
LIPPERT vs. GODINEZ                                              184

 1  BY MS. NEWMAN:

 2    Q.  All right.  So you -- you received -- received

 3  the report about -- that report from -- from the

 4  attorneys in this case?

 5    A.  Yeah, my -- my personal copy, yeah.

 6    Q.  All right.  And when was that?

 7    A.  I guess a few months back.  I'm not sure.  I

 8  don't recall what exact date.

 9    Q.  All right.  Why did you decide to become a

10  named plaintiff in this lawsuit?

11    A.  Well, because, like I say, like I -- you know,

12  from my experience being here -- not just my

13  situation.  Because I believe in -- I believe in the

14  changes that they could possibly have in the medical

15  system in these facilities.

16          Being on the front line, I have -- I have

17  friends, good friends, that died -- in my opinion,

18  died prematurely from cancer.  That I seen, you know,

19  just from being around them.  You know, what -- what

20  they going through.

21          And I think some of the -- some of the

22  changes and modifications in the policies can be

23  helpful and maybe save lives.  So that's -- that's

24  why I wanted to be a part of the lawsuit.  It ain't



JOHNNY M. RUFFIN, JR.  CONFIDENTIAL                    January 14, 2016
LIPPERT vs. GODINEZ                                                    185

 1  | about the money with me.
 2  |     Q.  So how did you -- how did you come to be a
 3  | named plaintiff in the lawsuit?
 4  |     A.  I guess I was chose, I guess.
 5  |     Q.  So you were approached by your attorneys?
 6  |     A.  I'm pretty sure, yeah.
 7  |     Q.  All right.  And when was that?
 8  |     A.  I don't know.  I don't remember what date that
 9  | was.
10  |     Q.  Was it within the past year?
11  |     A.  Yeah.
12  |     Q.  Okay.  Was it within the past three months?
13  |     A.  Probably somewhere around that vicinity, you
14  | know.
15  |     Q.  Okay.  So what are you seeking from this
16  | lawsuit?
17  |     A.  Like I said before, you know, I believe in --
18  | I believe in the -- the cause, as far as making
19  | modification and change to the system that I have
20  | seen have done a lot of -- of my co -- counterparts
21  | harm, you know.  So I believe that there should be a
22  | change in the medical system, you know, and the way
23  | we receive treatment.  So that's my -- that's my
24  | motive of being a part of this.



# Exhibit 3F

Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 260 of 369 PageID #:9280

EZELL THOMAS                                              January 29, 2016
LIPPERT vs. BALDWIN                                                      1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF ILLINOIS

 3                    EASTERN DIVISION

 4     DON LIPPERT, LEWIS RICE, MILAM     )

 5     MARTIN, DEBRA PATTISON, JOHN       )

 6     RUFFIN, and EZELL THOMAS,          ) No. 10-CV-4603

 7                  Plaintiffs,           )

 8         vs.                            )

 9     JOHN BALDWIN, LOUIS SHICKER,       )

10     and BRUCE RAUNER,                  )

11                  Defendants.           ))

12

13   THIS TRANSCRIPT CONTAINS CONFIDENTIAL INFORMATION.

14

15            The deposition of EZELL THOMAS, called

16   for examination, taken pursuant to the Federal

17   Rules of Civil Procedure of the United States

18   District Courts pertaining to the taking of

19   depositions, taken before INA RUTH EAVENSON, a

20   Notary Public within and for the County of

21   Kankakee, State of Illinois, and a Certified

22   Shorthand Reporter of said state, at Pontiac

23   Correctional Center, Pontiac, Illinois, on the

24   29th day of January, A.D. 2016, at 9:30 a.m.
```



Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 261 of 369 PageID #:9281

EZELL THOMAS                                    January 29, 2016
LIPPERT vs. BALDWIN                                          26

1   recall that, but I know I have been back.

2        Q.    Okay.  Was it -- have you been to have

3   them check your heart at UIC more than -- has it

4   been more than five times?

5        A.    I done been back, but like on

6   follow-ups, I guess.

7        Q.    Right, for follow-up.  But you're not

8   sure how many follow-ups you have been there for

9   for your heart?

10       A.    No.

11       Q.    Okay.  Mr. Thomas, are you making any

12  claims in this lawsuit based on your heart

13  condition?

14       A.    What do you mean, make a claim?

15       Q.    Do you have any claims in this lawsuit

16  based on your treatment for your heart?

17       A.    (No audible response.)

18       Q.    Do you have any complaints?

19       A.    Yeah, I have complaints.

20       Q.    About your heart?  About your treatment

21  for your heart condition?

22       A.    Oh.  Well, I don't like to tell no lie,

23  but like I have a problem with my chest.  I don't

24  know whether it's a heart problem or a lung



1  problem because it's shortness of my breath.  They

2  said I have angina or whatever that is.

3          The little valve closes up.  That's

4  when I have to take the nitro.  I don't know if

5  that's happening or not.  I have shortness of

6  breath quite often.  Sometimes I take the nitro,

7  it works; sometimes it don't.  So then I take the

8  inhalers because I think it's my lungs, so I don't

9  be knowing which one it is.

10         Q.    Got you.  Okay.

11         A.    One more thing.  You asked me a

12  question.  I was told by the doctor, the medical

13  director, a specialist in Bloomington that I'm not

14  to take albuterol inhaler because it will damage

15  my heart.  And I have seen the doctor over and

16  over, and they haven't changed it yet.  That's

17  been going on since 2011.

18         Q.    All right.  In 2011, was it a doctor at

19  St. Joseph's?

20         A.    No.  The doctor at St. Joseph told me

21  that I can't take albuterol.  In fact, the doctor

22  here take me off albuterol because it's damaging

23  my heart -- antilog (phonetic), whatever that

24  is -- and they put me back on Lopressor for my



800.211.DEPO (3376)
EsquireSolutions.com

```
 1   heart.
 2        Q.    All right.  And did you -- after you
 3   came back from the hospital in 2011, did you talk
 4   to the doctors here at Pontiac about that?
 5        A.    Yes.
 6        Q.    About the albuterol?
 7        A.    Yes.
 8        Q.    And what did the doctor say here at
 9   Pontiac?
10        A.    What I was asking for, it was --
11   Wexford wasn't going to pay for it because it's
12   too expensive.
13        Q.    And at some point were you taken off
14   the albuterol?
15        A.    I was taken off the albuterol and put
16   on Xonex (phonetic) or whatever you pronounce
17   that, but that's the same as albuterol.  It's the
18   same thing.
19        Q.    Is that the Alvesco?
20        A.    No, no, Xonex.
21        Q.    Is that the one that starts with the X
22   here?
23        A.    Right here (indicating).
24        Q.    Okay.
```



1        A.     That's the same as albuterol.

2        Q.     When were you changed from albuterol to

3    the Xopenex?

4        A.     I can't tell you that.  I don't know

5    that, but I know it was a while.

6        Q.     Have you talked to the doctors more

7    than once about the albuterol being dangerous for

8    your heart?

9        A.     Yes.

10       Q.     How many times have you talked to them?

11       A.     Almost every time I have seen him.  I

12   can't tell you how many times, the numbers, but

13   it's been quite a few times.

14       Q.     And has he ever said anything other

15   than Wexford wasn't going to pay for it?

16       A.     Last time I said something to him about

17   that, there wasn't no response at all.

18       Q.     And when was that?

19       A.     That was -- let me see.  It was right

20   after they called me over on a follow-up.  Let me

21   see.  What day was that? A follow-up.  That was

22   on a follow-up.  I had had an asthma attack, and

23   they gave me oxygen treatment.  It ain't been that

24   long.  It was in December, I think.



EZELL THOMAS                                        January 29, 2016
LIPPERT vs. BALDWIN                                              30

1          Q.     December of 2015?

2          A.     Right.

3          Q.     Have you ever filed any grievances

4     about your being put -- not being taken off

5     albuterol and put on a different medication?

6          A.     I've filed grievances about my

7     inhalers, but -- now, wait a minute.  I filed

8     grievances concerning my inhalers; but albuterol,

9     the name had changed to Xonex or whatever it is.

10         Q.     Okay.

11         A.     Yeah, I filed grievances because I was

12    stating in the grievance where I'm not being

13    issued what the specialist from UIC ordered for

14    me.  Yes, I filed a grievance.

15         Q.     And when did you file that grievance?

16         A.     I have had two or three grievances

17    filed.  One is in 2015.

18         Q.     All right.  When were the others?

19         A.     The last one I can remember is 2015.  I

20    can't give you the dates on the others.

21         Q.     Okay.  But were there two other

22    grievances before 2015?

23         A.     I'd say at least two, three.

24         Q.     All right.  And how --



1  the gout, how do they treat that?

2      A.   Well, since then, I haven't -- when it

3  comes, I can't tell you until it hits me.  You

4  know what I mean?

5           Since I have been taking the

6  Allopurinol, the swelling in my feet and the bones

7  and whatnot, the only thing that helps me with

8  that is the Ibuprofen and -- what you call that

9  stuff?  Ibuprofen, and there's another green

10  capsule they give me.  I can't even think of the

11  name of it.  But anyway, that's the only time I

12  use that.

13      Q.   All right.  Mr. Thomas, do you have any

14  claims or complaints based on your treatment for

15  gout that -- based on the doctors here and how

16  they treated your gout?

17      A.   Well, when the pain comes now, I mean

18  they can't give me no medications for it.  I'm not

19  in pain now, but when it comes I just got to use

20  my mind power to get rid of the pain.

21      Q.   But -- and the reason they can't give

22  you the medication is because it would hurt your

23  stomach?

24      A.   Yes.  I think they could give me



1  something else.  I mean there's got to be

2  something else they can give you.

3       Q.    Have you asked them for other pain

4  medication?

5       A.    I just asked for pain medicine.

6       Q.    And have they given you any pain

7  medications when you've asked for it?

8       A.    The only thing they gave me was the

9  stuff for the muscle relaxer, and they took that

10 off.  It didn't do any good anyway, though.

11      Q.    When's the last time you had a gout

12 attack?

13      A.    Well, I guess it's been about -- I

14 guess it's been eight or nine months or something.

15 That's not a fact, now.  I don't know.  It's about

16 eight or nine months.

17      Q.    You also had prostate cancer back in

18 about 2008 to 2010; is that right?

19      A.    2008, I think.

20      Q.    2008 is when you were diagnosed?

21      A.    Right.

22      Q.    All right.  And how was that treated?

23      A.    (No audible response.)

24      Q.    Did you receive treatment for it?



1      A.     44 treatments of radiation.

2      Q.     And where did you have those radiation

3  treatments?

4      A.     UIC Chicago.

5      Q.     And what were the results from the

6  treatment?

7      A.     Well, it went down to 2.9 I think it

8  was.  I imagine that was good.

9      Q.     All right.  And have you had any

10  follow-up visits at UIC based on --

11      A.     Yeah, I had follow-ups.  But the last

12  follow-up they say in a month I was to come back.

13  And I don't remember the date, but I know -- I

14  don't know the date.

15      Q.     Okay.

16      A.     But I was supposed to go back on a

17  follow-up, but I never went.  They never sent me

18  back.

19      Q.     When did they -- at UIC, when did they

20  say you should come back for a follow-up?

21      A.     I think that was in 2008.

22      Q.     So you haven't been back to UIC urology

23  since 2008?

24      A.     Wait a minute.  Let me get this right.



EZELL THOMAS                                            January 29, 2016
LIPPERT vs. BALDWIN                                              40

1   I don't know the last time I was there for the

2   prostate cancer, but I know I was diagnosed in

3   2008.

4        Q.    Right.

5        A.    And I got treatments.  I got 44

6   treatments.  I can't tell you the day it ended

7   because I don't know that, the final date.  So

8   2009 -- that might have been 2009 or 2010 that

9   they said I needed to come back on follow-up.

10       Q.    Okay.  And you haven't been to UIC

11  urology department at all since 2010?

12       A.    Not for prostate cancer.

13       Q.    Have you been to the UIC's urology

14  department since 2010 for --

15       A.    No.

16       Q.    Is that a --

17       A.    No.

18       Q.    -- no?

19       MS. NEWMAN:  Off the record.

20             (WHEREUPON, discussion was had off

21             the record.)

22       MS. NEWMAN:  Okay.  Back on the record.

23  BY MS. NEWMAN:

24       Q.    All right.  Mr. Thomas, now, you have



EZELL THOMAS                                January 29, 2016
LIPPERT vs. BALDWIN                                        44

1  That's when I was diagnosed.

2            But earlier, before then, the doctor

3  here -- Mahone or either Tillman; I don't know

4  which one it was -- said I had asthma.  They put

5  me on Qvar.

6       Q.    Q-val?

7       A.    Qvar.

8       Q.    Was the Qvar helpful for your symptoms?

9       A.    No.

10      Q.    And so then the doctors here sent you

11  out to UIC?

12      A.    Right.

13      Q.    And then at UIC they diagnosed you with

14  asthma, COPD, emphysema?

15      A.    Right.

16      Q.    And at UIC, did they prescribe some

17  medications for you?

18      A.    What happened is this:  I went there

19  and I took the test.  And after they give me the

20  test they said I was to return within 90 days to

21  get the results and see what type of treatment I

22  need because Spiriva might not -- it might not be

23  Spiriva.  It might be something else.  But I was

24  never called back on the follow-up.



EZELL THOMAS                                              January 29, 2016
LIPPERT vs. BALDWIN                                              45

```
1          Q.    That was in 2008?

2          A.    Right.

3          Q.    So since 2008 you've never been back to

4    UIC for your breathing problems?

5          A.    No.  Wait a minute.  I ain't for sure.

6    I said 2008.  When they told me to come back on

7    follow-up -- no, 2008.  That's when it was, yeah.

8          Q.    All right.  You have not been back to

9    UIC --

10         A.    No.

11         Q.    -- since then for your breathing

12   problems?

13         A.    No.  Now, I have been back for other

14   things and they seen that I was having breathing

15   problems.  You might find some paperwork on

16   something like that because I think in 2015 they

17   got a lot about my COPD and other things.

18         Q.    All right.  And you have a chronic --

19   you enrolled in a chronic clinic at Pontiac for

20   your breathing problems?

21         A.    Come again.

22         Q.    Is there a clinic that you go to here

23   at Pontiac for your --

24         A.    The clinic?
```



EZELL THOMAS                                         January 29, 2016
LIPPERT vs. BALDWIN                                              46

1        Q.    Yeah, the chronic clinic.

2              And how often do you go to the chronic

3    clinic for your breathing problems?

4        A.    I answered that one already.  Every six

5    months.

6        Q.    Okay.  And when you're at the clinic,

7    what do they do for you in regard to your

8    breathing?

9        A.    They put the thing on my finger, take

10   my blood pressure, and check my heart out from the

11   front and the back.

12       Q.    Do you have problems with your

13   breathing in between the chronic clinics?

14       A.    Sure.

15       Q.    What do you do if you have breathing

16   problems in between the clinic visits?

17       A.    What do I do?

18       Q.    Yes.

19       A.    I use my inhalers.

20       Q.    Okay.  Are the inhalers -- I mean have

21   you had breathing problems where the inhalers

22   weren't enough for you or didn't help?

23       A.    No.  The inhalers that I'm taking, they

24   don't really work because -- I mean they



1  probably -- now, the albuterol, which I'm not

2  supposed to be taking, it helps me breathe when I

3  take it, but at the same time it's damaging my

4  heart, you know.

5          When I walk for so long, I have to stop

6  because it cuts my breath off.  Sometimes I can be

7  sitting down, like right now, and I get up quick

8  and an attack hits me.  It cuts -- shortness of my

9  breath, you know.  Or I'll get too excited about

10  something and it shortens my breath.

11          If me and you grab one another and

12  start wrestling, it takes my breath.  I don't

13  mean -- you know, it takes my breath.  In other

14  words, I have very little energy, you know?

15      Q.    Okay.  So do you keep your inhalers

16  with you in your cell currently?

17      A.    Recently, since I got them back, I keep

18  them.

19      Q.    All right.  When did you get them back?

20      A.    When I lost them in December -- let me

21  see.  This month -- it was in December I lost

22  them, but within a couple of days they give them

23  back.  But before then they had took them and kept

24  them about two months.



EZELL THOMAS                                    January 29, 2016
LIPPERT vs. BALDWIN                                          48

1      Q.    All right.  So I'm going to ask you

2  first about the time you said they kept them about

3  two months.

4      A.    Right.

5      Q.    When was that?

6      A.    That was in -- let me see.  This was in

7  2015, but I can't think of the month.  Let's see.

8  Wait a minute.  They took them in -- oh, man.

9           They took them in 2015.  I don't know

10  what month it was.  I forgot the month.  And I got

11  them back in 2015.  It was two months and six days

12  I know that they -- that I was without my

13  inhalers.

14      Q.    And when you say you were without your

15  inhalers, I mean were you allowed to use the

16  inhalers at all?

17      A.    No.  They had took the inhalers from

18  me.  They said I had abused my privilege.

19      Q.    And did they explain what they meant by

20  that?

21      A.    They said I was using them -- too much

22  of it, and I wasn't letting them last for three

23  months.  That's the Atrovent.  But the

24  instructions on the box on the label and from



 1  Dr. Todd, they tell me I was supposed to take two

 2  puffs four times a day from the Atrovent, but

 3  Dr. Todd cut it down to one puff four times a day.

 4  Dr. Tillman cut it down to one puff two times a

 5  day.  The UIC specialist said I'm to take it two

 6  times, four puffs a day.

 7        Q.    I'm sorry, four puffs?

 8        A.    No, two puffs four times a day.

 9        Q.    Okay.

10        A.    Now, the inhaler only has 200 puffs in

11  it, and if I take four puffs out of it, you divide

12  four into 200 and you get 50 days.  I can't get no

13  three months.  You get seven weeks and one day.

14        Q.    So you were using it the four times a

15  day?

16        A.    No.  I was using it as -- the last

17  one -- first I was using it two times four times a

18  day, but Ms. Todd changed it to one puff four

19  times a day.  So I started taking one puff four

20  times a day, and they say I was abusing it.

21              They later say -- all the medical

22  techs, the nurses, they said that it was

23  impossible for me to make it last three months

24  because it only has 200 puffs in it.  And the



Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 276 of 369 PageID #:9296

EZELL THOMAS                                     January 29, 2016
LIPPERT vs. BALDWIN                                            50

1   doctor, the medical director, he knows this here,

2   but he still put me down for one puff two times.

3   And the specialist from UIC said two four times a

4   day.

5        Q.   All right.  So there was a two-month

6   period when you were not able to keep -- you

7   didn't have your inhalers with you; is that right?

8        A.   Right.

9        Q.   But you were still given at least how

10  often -- you were still allowed to take the

11  medicine, right?

12       A.   The nurse would bring it around twice a

13  day, so I couldn't get no more than two times a

14  day, one puff of Atrovent two times a day, one

15  puff off the Alvesco, one puff two times a day,

16  and the Xodex (phonetic) were neither.

17       Q.   The what?

18       A.   I can't pronounce the words that good.

19  The Xodex, whatever you call it.

20       Q.   The one that starts with the X?

21       A.   Right.

22       Q.   That's when needed?

23       A.   Right.  It says one puff twice a day as

24  needed.  That's the instructions on the box.



1    Q.    That's only when you're having actual

2  breathing problems?

3    A.    Sometimes I need it more than twice a

4  day.  If I have got to walk somewhere, it has an

5  effect on my breathing.  Cold, wind, I don't know

6  why, but it cuts my breath off.  If I walk too

7  fast -- I can walk, but if I walk too fast it cuts

8  my breath, so I have to use it.

9    Q.    And did it have -- was -- did it have

10  an effect on you when you weren't allowed to keep

11  your inhalers with you?

12    A.    Yes.

13    Q.    What were the -- what was the effect?

14  How did that affect you?

15    A.    I get weak.  I mean I get short of

16  breath.  It looks like it's the last -- this is

17  it.  I can't describe it.

18    Q.    Did you have any -- like an asthma

19  attack during that period?

20    A.    Well, you know, listen.  I got to tell

21  you, I don't know when I be having an asthma

22  attack or COPD.  I don't know.  All I know is

23  shortness of breath.

24    Q.    Did you have some sort of attack during



Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 278 of 369 PageID #:9298

EZELL THOMAS                                    January 29, 2016
LIPPERT vs. BALDWIN                                          52

1    that period where you were having a lot of

2    difficulty breathing?

3        A.    Breathing, yes.

4        Q.    How many of those episodes did you have

5    during --

6        A.    Three times I had it so bad I had to go

7    over there and they had to put me on the machine.

8    Now, don't ask me, but it's just recently.  That

9    was in 2015.

10       Q.    Was that during the period when you

11   didn't have your inhalers with you?

12       A.    2015?  Let me see.  I think I had

13   received -- just received them back.  I think I

14   had just received them back.  Let me make sure.  I

15   had my inhalers, I had my inhalers, yeah.  The

16   last two times that I was on the machine I had my

17   inhalers.

18       Q.    So it was just one time that you were

19   on the machine you needed to go on the machine --

20       A.    I was on there three times.  I don't

21   know about -- the first time might have been a

22   little longer.  It might not have been in December

23   of 2015, but I know two of them was.

24       Q.    Okay.  So two of them were in December?



1  Two of these episodes were in December?

2       A.    Right.  It might have been all three of

3  them, but I'm sure it was two.

4       Q.    And so you don't know if you had any of

5  these episodes while you didn't have access to

6  your inhalers?

7       A.    Yes, but I couldn't give you the time.

8  Let me see.  Wait a minute.  It's from September,

9  I think.  I don't know if I'm getting the years

10 right.  From September of '15 to October.  I think

11 it was from September to October.  I know it was

12 two months and six days.  I know it was two months

13 and six days that I went without.

14            And I did have -- that's right, two

15 months, 16 days.  That's from September to

16 October -- I forget the other one.  But that was

17 two months and six days.  I remember that one.

18            That other one, it was only two days.

19 And there was one long before then, but I can't

20 tell you that because I'd have to have my medical

21 records to show you that one.

22       Q.    Show there was a two-month period --

23       A.    Two months, six days.

24       Q.    Right.  So there was a



```
 1   two-month-six-day period, and then there was a

 2   second period which you said was two days?

 3        A.    Right after the grievance.

 4        Q.    That was December 2015?

 5        A.    Yeah.

 6        Q.    Why were you without your inhalers

 7   during that two-day period?

 8        A.    They said I was abusing my inhalers by

 9   using them too much.

10        Q.    And they said that again in December?

11        A.    Yes, by the same medical tech.

12        Q.    All right.  And how was that resolved?

13        A.    Through a grievance.

14        Q.    You filed another -- a grievance in

15   December 2015?

16        A.    Yeah.  The second grievance didn't go

17   anywhere but to the grievance office because they

18   gave it back to me in two days.  One went two

19   months and six days.  That was from the -- two

20   months and six days.  That was from September

21   to -- I forget the months.

22        Q.    All right.  So looking then at that

23   first period, that two-month period, when did you

24   file a grievance about them having taken your
```



EZELL THOMAS                                          January 29, 2016
LIPPERT vs. BALDWIN                                                55

```
 1   inhalers from you?
 2        A.    It was in 2015.  It was --
 3        Q.    Was it right after they took -- right
 4   after --
 5        A.    Right.
 6        Q.    -- it happened?  All right.
 7              And you sent that to the grievance
 8   counselor?
 9        A.    I don't know which one.  The first one,
10   I sent the first one to the warden for emergency
11   grievance, and they said it was not an emergency.
12   I took it to be an emergency because they already
13   told me I'd suffer irreparable damage to my lungs.
14        MS. NEWMAN:  Hold on a second.
15              (WHEREUPON, there was a short
16              interruption.)
17   BY MS. NEWMAN:
18        Q.    Sorry.  I didn't mean to interrupt you.
19   I just could see he was at the door.
20        A.    The one warden said it wasn't an
21   emergency.  He told me to file it, send it to the
22   grievance committee.  So I sent it to the
23   grievance committee, and that's when they decided
24   they were going to give it back to me.  They had
```



1   me see the doctor first.  They said they was going

2   to straighten it out, going to give me all the

3   inhalers, the ones that I needed.

4             But -- they gave them back to me, but

5   it was the same ones.  It was not the ones that I

6   needed.  I didn't get no Spiriva and I didn't get

7   no Symbicort.  It ain't no thing that they don't

8   give that here or it's too expensive because lots

9   of people here get Symbicort and Spiriva.

10       Q.   So if there are other people who are

11  getting those drugs, do you know why you haven't

12  gotten them?

13       A.   Only thing they ever told me was

14  Wexford said it's too expensive.

15       Q.   Have you filed any other grievances

16  relating to your breathing problems other than

17  these two we've already talked about?

18       A.   All the grievances that I filed I

19  brought up here.  I didn't bother to see -- I got

20  some on -- I got an eye problem, prostate cancer,

21  I've got -- I don't know what's all in the

22  package.

23       Q.   Okay.  But you don't recall having any

24  other -- filing any other grievances relating to



1  your breathing issues?

2       A.    The ones I told you already.

3       Q.    Yeah.

4       A.    Some time ago I had -- you might find

5  three in there.

6       Q.    Okay.  So you think there may be as

7  many as three grievances?

8       A.    Yeah.

9       Q.    And the grievances related to --

10      A.    My breathing problems.

11      Q.    -- that you want the other medications,

12  the Symbicort and the Spiriva, and the other would

13  be --

14      A.    Only on two of them.

15      Q.    Two of them would be the Symbicort and

16  Spiriva, and then one or two of them was also

17  relating to not being able to keep the inhalers?

18      A.    One was just Spiriva because that's

19  where it started off at.  That started off at

20  Stateville, but when my record come here it's

21  supposed to have followed me.  Whatever they had

22  ordered for me there I should be getting here, but

23  it didn't wind up like that.

24      Q.    So you were receiving Spiriva at



1    Stateville?

2          A.    Yes.  And the doctor here told me that

3    they just -- some doctor there named Shaeffer

4    discontinued it.

5                I can't talk real loud because I'm

6    hoarse.

7          Q.    We can hear you.  It's a small room.

8    You're good, you're good.

9                So you were receiving Spiriva while you

10   were at Stateville?

11         A.    Yes.

12         Q.    And who was it that discontinued it,

13   you said?

14         A.    A doctor named Dr. Shaeffer.

15         Q.    And that was a doctor here at Pontiac?

16         A.    No.  He was at Stateville.

17         Q.    And do you know why he discontinued the

18   Spiriva?

19         A.    No.  I couldn't tell -- I can't answer

20   that.

21         Q.    Did you ever talk to Dr. Shaeffer?

22         A.    When I was in Stateville I talked to

23   him, but it was not about that because he hadn't

24   discontinued it.  It didn't get discontinued until



1    I come here.  When I found out about it being

2    discontinued is when I came here.

3         Q.    So when you arrived here, you were told

4    that Dr. Shaeffer had discontinued the Spiriva?

5         A.    Right.

6         Q.    But you never talked to Dr. Shaeffer

7    about the Spiriva?

8         A.    I wasn't there.  I was here.  I talked

9    to Dr. Tillman about it.

10        Q.    And what did Dr. Tillman say?

11        A.    Well, he ain't told me but one thing,

12   Wexford -- it's too expensive, and they don't keep

13   it in stock here.

14        Q.    And when was that that you -- that was

15   in -- was that in 2009?

16        A.    What --

17        Q.    When did you have that conversation

18   with Dr. Tillman?

19        A.    Oh.  Man, I have been having that ever

20   since I have been back.  I come back in 2011.

21        Q.    2011, sorry.  I just had a confusion.

22        A.    Every time I see him I discuss it, that

23   and my follow-ups and my stent and my groans

24   because I be hurting all the times.  I be thinking



1   and whatever the renal thing is, I had that.  And

2   I could have swore they talked about my stool

3   turning black.  I might have it all mixed up.

4        Q.    Did you also have a diagnosis of anemia

5   at that time?

6        A.    Right.

7        Q.    All right.  And did UIC have any

8   recommendations for you at that time?

9        A.    The only thing I know of is that they

10  gave me a lot of the medicine.  And when they

11  discharged me they told me I had to come back.  It

12  was a month and I come back on follow-up.

13           I forget for how much time, but a

14  certain time they had to call me back.  And I went

15  back for evaluation or whatever.  I forgot.  Then

16  they found something else that was wrong and they

17  had to put me down for another follow-up,

18  outpatient follow-up for -- what do you call it?

19  The renal and kidney failure.  I remember that was

20  on the 28th.

21           I went there on the 28th.  See, I don't

22  know if all that was on paper.  That's what they

23  told me at that time.

24        Q.    Did they tell you at that time that you



1   needed to have a colonoscopy?

2        A.    Yes.

3        Q.    All right.  And why did they want you

4   to have a colonoscopy?

5        A.    I guess it was to check to find out was

6   something wrong with me, I guess.

7        Q.    Did you ever have a colonoscopy?

8        A.    No.

9        Q.    At some point in -- were you -- at some

10  point in January 2014, were you sent back to UIC?

11       A.    I went back in 2014, but I don't know

12  about the month.

13       Q.    Were you there -- were you admitted to

14  the hospital there at UIC?

15       A.    See, I have been back there so many

16  times, I really can't say was I admitted or not.

17  In 2014?  I don't think so.

18       Q.    All right.  Was that when you got the

19  diagnosis about -- you said something about the

20  pylori?

21       A.    I thought that was the last time I went

22  there.  I went down there on April 22 and

23  April 28.  That's the last time I went to UIC.

24  And then one of them times I was told about these



1    things.

2         Q.    Okay.

3         A.    I had to go back on follow-up on each

4    one of them, but I never went back on follow-up on

5    either one.  That was upper GI and oncologist.

6         Q.    Okay.

7         A.    I never went back on follow-up.

8         Q.    But in January 2014, did they do any

9    tests to -- on you to make your -- to determine

10   whether you had -- that you had this H. pylori?

11        A.    Which year was this, now?

12        Q.    January 2014.

13        A.    January?  Now, listen.  I hate to even

14   answer that.  I know I was sent back there to UIC

15   and they only give me a blood test.  I don't know

16   what month it was.

17        Q.    All right.

18        A.    I don't know if it was 2014.  I don't

19   know if it was '14 or '15.

20        MS. NEWMAN:  They made me take all my paper

21   clips out, so my papers are a mess.

22             Mark this for me, please.

23                  (WHEREUPON, a certain document was

24                  marked Thomas Deposition Exhibit



1              No. 2, for identification, as of

2              1-29-16.)

3         THE WITNESS:  Oh, this is the first time I

4    went there.

5    BY MS. NEWMAN:

6         Q.    Is that the first time?

7         A.    Yeah.

8         Q.    Okay.  Well --

9         A.    Not the first time, but it was the time

10   before the one I'm talking about.  The last one I

11   went on was April 22.

12        Q.    Right.  I'm not talking about the first

13   time.  I want to talk about this particular time

14   you were in, okay?

15             So this was -- there is a date that

16   says February 1, 2014.  There is a title that says

17   Final Report, University of Illinois at Chicago

18   Medical Center discharge summary.  And it says

19   admit date, 1-24-2014, discharge date, 2-1-2014.

20             Do you see all that?

21        A.    Right.

22        Q.    Does that help refresh your

23   recollection whether you were admitted at that

24   time?



1        A.    Yeah, I was admitted here.

2        Q.    Okay.

3        A.    Yeah, I was there for a little while.

4        Q.    All right.  Under -- it says here -- it

5    says:  Discharge diagnosis, gastric ulcers

6    secondary to H. pylori infection, colitis of

7    unknown etiology, abnormal urine -- I think that's

8    supposed to be protein.  It looks like

9    p-r-e-o-t-e-i-n, but I think that's just a typo.

10            Electrophoresis, and then distal upper

11    extremity thromboembolism.

12            This is -- you were talking about you

13    having the H. pylori?

14        A.    Right.

15        Q.    All right.  So if you turn to the

16    second page with me, at the very top it says B,

17    stomach endoscopic biopsy.  It also says a couple

18    lines down colonoscopy impression.

19            Do you see that --

20        A.    Yeah.

21        Q.    -- on page 2?  All right, yes.

22            And if you look on the third page with

23    me, the second paragraph, there are some sentences

24    in bold that says:  He then underwent a



EZELL THOMAS                                    January 29, 2016
LIPPERT vs. BALDWIN                                          69

1  colonoscope which had similar findings with

2  obvious etiology on preliminary pathology.  Final

3  pathology is still pending at this time.  The CT

4  was also notable for some pulmonary nodules and a

5  repeat CT in three months is requested to assess

6  for growth.

7            So, Mr. Thomas, I mean according to

8  this report you did have a colonoscopy when you

9  went in the UIC in January 2014, at least -- do

10 you have any reason to believe that this report is

11 not correct?

12       A.    No.  That's what I'm saying.  Like I

13 think it's April 22.  See, I didn't have no

14 papers.  I didn't have this here from April 22.

15       Q.    April 22 of --

16       A.    Of 2015.

17       Q.    Okay.

18       A.    I was supposed to go back.  I thought

19 that was what this was supposed to be for.  I know

20 this here was given, but I'm talking about from

21 the one from the 22nd when I had the upper GI.

22       Q.    Okay.  So in December 2013 UIC said you

23 should have a colonoscopy; is that right?

24       A.    I was supposed to come back.  Let me



1  see.  I don't want to get it mixed up, but I think

2  it's April 22 I was on the upper GI.  I think on

3  this here, it says this was never completed

4  either.  Let me see.  It says this exam was not

5  adequate for screening purposes.

6        Q.    Okay.

7        A.    But in April 22, 2005, I was on a

8  medical van for upper GI.  This is when I think I

9  was informed that I was supposed to go back for

10 this.

11       Q.    So on April 22, 2015, you were told

12 that you were supposed to go back for a

13 colonoscopy?

14       A.    I think that's what it was.

15       Q.    And who told you that?

16       A.    That was by the people that was seeing

17 me.  I was supposed to go back on follow-up.

18       Q.    You were supposed to go back on a

19 follow-up for a colonoscopy --

20       A.    No.

21       Q.    -- or just for --

22       A.    All I know is for a follow-up.

23       Q.    And so after you were released from

24 UIC -- this would be February 1, 2014 -- were you



1    kept in the infirmary for a while after that?

2           A.    I'm not for sure.

3           Q.    Okay.  All right.  I understand that

4    sometime around -- around early 2014 a doctor at

5    Pontiac prescribed three iron supplements a day

6    for you.

7           A.    Right.

8           Q.    Who was that?

9           A.    Well, let me answer you like this:

10   Dr. Tillman is the one that ordered the -- I

11   mean -- I guess he prescribed the medication for

12   me, but I got a piece of paper from UIC from the

13   doctor recommending that this would be given to

14   me.

15          And Dr. Tillman started giving me one

16   vitamin a day -- not vitamin, one iron pill a day.

17   And I'm supposed to get three a day by the orders

18   of the specialist from UIC.

19          Q.    So the specialist recommended that you

20   get three --

21          A.    Iron pills.

22          Q.    And Dr. Tillman prescribed one?

23          A.    Right.

24          Q.    And did you talk to Dr. Tillman about



1   this?

2         A.    Yes.

3         Q.    When did you talk to him?

4         A.    I talked to him -- let me see.  I know

5   it was in 2015.  I don't know what month it is.

6         Q.    All right.

7         A.    He told me that I really didn't need

8   none of it.  And I don't need to be on it too much

9   longer, but I still get them, one.

10        Q.    So in early 2014 when you -- you know,

11  you were still only given -- you were only given

12  one per day?

13        A.    Yes.

14        Q.    You talked to him in early 2015?

15        A.    Yes.

16        Q.    Okay.

17        A.    I can't see him when I want to see him,

18  you know.  I ain't going to pay him no $5 just to

19  go say I didn't get no pill.

20        Q.    Are you still having any problems with

21  anemia?

22        A.    Well, I know my name; you know, I know

23  where I'm at.  I figure I done got better.  I

24  don't know if I'm fully recuperated.  I'm not a



Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 295 of 369 PageID #:9315

EZELL THOMAS                                        January 29, 2016
LIPPERT vs. BALDWIN                                              73

1  doctor, but I feel I'm all right.  I might not be.

2  I don't know.

3      Q.    The doctor in 2015 said you probably

4  didn't really need it anymore?

5      A.    Right.  No.  Talking about the --

6      Q.    The iron supplement.

7      A.    No.  He's the one that put me on it.

8  When I got here, he only gave me one a day.  I was

9  supposed to get three a day.

10          And he didn't put me on as soon as I

11 come back.  I had to tell him two or three times

12 before he even put me on there.  He showed me a

13 piece of paper, and I looked at it, and I told him

14 to read that.  And he read it, and so he put me on

15 one a day.

16     Q.    When you were released -- when they

17 sent you -- UIC sent you home in February -- sent

18 you back here in February 2014, did they put you

19 on any medication for your stomach problems?

20     A.    Only medicine I know of is the medicine

21 I'm getting right now, and I can't tell you what

22 date they put me on what, you know.

23     Q.    Did they tell you you had stomach

24 ulcers at that time?



1      Q.    All right.  At some point later on in

2   2014, do you remember going back to UIC to talk

3   about -- to talk to the -- what they call the

4   hematology oncology department?

5      A.    Yes.

6      Q.    All right.  Why did they send you to

7   the hematology oncology department?

8      A.    I don't know what time you're referring

9   to when they carried me back.  The time I know of

10   they carried me back was on the 28th.

11            That's because they found my body had

12   two proteins and it's supposed to be only one

13   protein in my body.  That's what I was told.  That

14   was a sign if I had bone cancer.  That was 2015.

15   Let me see.  Yeah, 2015.

16      Q.    Okay.  Do you remember seeing anybody

17   in about -- in October 2014?

18      A.    I may have.  I don't know.

19                  (WHEREUPON, a certain document was

20                  marked Thomas Deposition Exhibit

21                  No. 5, for identification, as of

22                  1-29-16.)

23   BY MS. NEWMAN:

24      Q.    All right.  And this was -- okay.



1            So I'll show you Defendant's Exhibit 5.

2     It's another document from UIC Medical Center.

3     This one is dated October 29, 2014, and it says

4     note type is hematology-oncology note.

5            Then under reason for consult, it says

6     elevated lamba/kappa protein, concern for MGUS/MM.

7            Mr. Thomas, is this what you were

8     telling me about about there being -- you know,

9     having the wrong kind of protein in your blood?

10    Is that what you were trying to tell me?

11        A.    Yes, but this wasn't the time I learned

12    about it.  I didn't know about it until they told

13    me about it, and that was in April 28, 2015.

14    That's when I was told.

15        Q.    Okay.

16        A.    They said I had to come back on a

17    follow-up.

18        Q.    So you weren't told at this time that

19    you had -- you weren't told in October 2014 that

20    you had this elevated lamba/kappa protein?

21        A.    I wasn't told this.  When I knowed

22    about protein was on the 28th of April, 2015.

23        Q.    Okay.  So did anybody tell you why you

24    were going to the hematology oncology department



EZELL THOMAS                                             January 29, 2016
LIPPERT vs. BALDWIN                                                    97

```
1         A.    Yeah.  I thought it was the oncologist.

2         Q.    Well, it does say hematology-oncology.

3   So hematology is blood, right?  And oncology is

4   for cancer.  All right.

5              But is this the visit you were talking

6   about?

7         A.    Yes.

8         Q.    And so the doctor told you at this time

9   that you should have a second bone -- another bone

10  survey?

11        A.    Right.

12        Q.    Did the doctor say anything else

13  about -- at that time?

14        A.    The only thing he told me is that I

15  have -- they found two proteins, and I'm only

16  supposed to have one, and it's a strong

17  possibility that I have bone cancer, and it's a

18  month that I return on follow-up.

19        Q.    Okay.  And --

20        A.    I forgot what time it was.

21        Q.    Okay.  It's --

22        A.    Three months, six months, whatever, I

23  done forgot.

24        Q.    Okay.
```



1    A.    But I know I haven't been back.

2    Q.    So you haven't been back to UIC at all

3    since April 2015?

4    A.    No.

5    Q.    Have you talked to any of the medical

6    staff here about that you were -- to tell them

7    that you were supposed to be going for follow-up?

8    A.    Well, I think last week was the -- his

9    name is Caruso.  He's the assistant for the

10   doctor.  I talked with him about it.  He told me

11   to see Tillman.

12        I had already seen Tillman.  It was

13   right after I got the last breathing treatment.  I

14   done forgot the date.  It was in December though.

15   I know that much.

16   Q.    All right.  So you talked to

17   Dr. Tillman in December 2015?

18   A.    Right.

19   Q.    And what did Dr. Tillman say about --

20   A.    He didn't give me an answer when I was

21   going back or whether I was going back or not.  I

22   told him it was in my file because they send them

23   back.  They sent -- all the records that we come

24   back with, they send them by the officer.  The



1   officer gives them to the nurse, them the nurse is

2   supposed to give them to Dr. Tillman.

3        Q.    All right.

4        MS. NEWMAN:  We can go off the record now.

5              (WHEREUPON, a lunch recess was had.)

6   BY MS. NEWMAN:

7        Q.    Hello again, Mr. Thomas.  I just want

8   to remind you you're still under oath.

9        A.    Yes.

10       Q.    All right.  Before we broke for lunch,

11  we talked about several different health issues

12  you have had in the past couple of years.

13             I wanted to ask:  Have you filed any

14  grievances that related to your treatment for your

15  GI issues?

16       A.    For my GI?

17       Q.    Yes.

18       A.    I don't think I have.

19       Q.    Okay.  Anything -- any grievances

20  relating to your treatment for anemia?

21       A.    No.

22       Q.    Okay.  Have you filed any --

23       A.    I just found out about that in 2015 --

24  I mean in 2015 in December or sometime.  I mean



1    last time I went.  I didn't know anything about

2    all that stuff until -- no, 2008 is when I found

3    out about the pylori, anemia and renal.  That's

4    when I found out that.

5              But I had already been back to the

6    hospital before that, but I didn't know anything

7    about it because nobody had never told me anything

8    about it.

9         Q.    Okay.  But you haven't filed any

10   grievances related to that since April 2015?

11        A.    No.

12        Q.    Okay.  And are -- you were telling me

13   before the break that when you had this April 28th

14   or 29th appointment they told you that you needed

15   to see -- needed to have a bone scan?

16        A.    Yes.

17        Q.    All right.  And -- but you haven't been

18   scheduled to have one of those?

19        A.    No.

20        Q.    All right.  Have you filed any

21   grievances related to that?

22        A.    No.

23        Q.    Are there any other --

24        A.    I haven't filed no grievance, but I



1   have complained with the doctors and -- what you

2   call them?  The doctor's assistant.

3        Q.   Physician assistant?

4        A.   Physician Assistant Caruso.

5        Q.   All right.  And what did Physician

6   Assistant Caruso have to say?

7        A.   Well, Caruso, he knew about a

8   follow-up, but he couldn't tell me what -- because

9   he didn't know everything enough to tell me, I

10  don't guess.  He told me to see Dr. Tillman.

11           If I go back to UIC, when I come off my

12  visit I'll see him then on a follow-up if I come

13  back in.  But you don't always get a chance to see

14  the doctor because the doctor ain't there.  It

15  might take a few days or a week or so.

16       Q.   Have you seen Dr. Tillman since April

17  2015?

18       A.   Yes.

19       Q.   All right.  And you talked to him about

20  needing a follow-up to --

21       A.   The follow-up, yes, but I never spoke

22  to him about no -- I can't pronoun the word.  I

23  discussed the follow-up for the April 22 and

24  April 29.



EZELL THOMAS                                    January 29, 2016
LIPPERT vs. BALDWIN                                         102

1      Q.    All right.  And what did Dr. Tillman
2  say about the follow-ups for those appointments?
3      A.    He didn't say anything.
4      Q.    When was this that you talked to him
5  about it?
6      A.    That was on the last day that I got --
7  I went on a follow-up.  They took oxygen -- they
8  gave me oxygen treatment for my asthma.  That was
9  in December.  I can't tell you the date.  I don't
10 remember that.
11     Q.    But that was in December 2015?
12     A.    Right.
13     Q.    Just a month or so ago?
14     A.    Right.  That was on a follow-up from
15 the treatment.
16     Q.    Okay.  All right.  So we talked today
17 about some issues you have had in terms of your
18 treatment with breathing problems, we talked about
19 your treatment in the last couple of years with
20 the GI issues and the possibility of cancer.
21          Are there any other medical issues that
22 you're complaining about in this lawsuit?
23     A.    The renal and kidney thing.
24     Q.    Right.



 1    have went back.

 2         Q.    Okay.  Mr. Thomas, are you complaining

 3    about any dental issues in this lawsuit?

 4         A.    Yeah.

 5         Q.    And what are those -- what are your

 6    complaints of the dental issues?

 7         A.    Well, No. 1, I was in Stateville, and I

 8    went over there to have some teeth removed.  But

 9    at that time they said that I needed dentures, and

10    if I keep these teeth, then I have somewhere to

11    hold them in.

12              So they did x-rays and they found out

13    that most of my teeth wasn't connected to the

14    bone, and it was to the gum.  See, my tongue

15    catches or anything catches it when I chew, it was

16    pain.  So I had them to pull that one out, the one

17    that hurt me.

18         Q.    Okay.

19         A.    Then I was supposed to go back to get

20    something did.  I don't know what it was.  No,

21    x-ray, something happened to the x-ray.  They

22    either lost them or did something, but they had to

23    redo it, and it was scheduled to a later date.

24    But I wasn't there on that later date because they



1  transferred me back to Pontiac.

2          Now, when I got back to Pontiac, didn't

3  nobody call me.  The dentist didn't call me over

4  there.  I had to put in.  I caught him and talked

5  to him, and I explained to him that I had seen the

6  dentist in Stateville and what they didn't do.

7          I said it should be in my record

8  because y'all supposed to do it here since I

9  transferred back to Pontiac, what needs to be

10  done.  But he didn't know anything about it, so he

11  had to check into it.

12      Q.    When was that?  Was that right after

13  you transferred back?

14      A.    Yeah.  But it wasn't like no day or

15  two.  I can't give you the time and day on it, but

16  anyway, they told me that I need fillings.  I got

17  the filling.

18          I had to pay $5 to get that filling.  I

19  had already paid $5 before I left Stateville, and

20  it didn't get done.  And that should have been,

21  what I had been charged, fixed, but it wasn't.

22  Later I got a filling up here at the top

23  (indicating), but at the same time I was supposed

24  to get one at the bottom.  At least that's what



 1   they told me.

 2          But they give it to me -- they didn't

 3   give it to me.  They give me the one at the top,

 4   and I was supposed to go back in 90 days and get

 5   the bottom, but I was never called.

 6      Q.   So did you ever get the filling in the

 7   bottom tooth?

 8      A.   No, only in top.

 9      Q.   And when was this that you were told

10   that you needed the other filling?

11      A.   I can't give you the date.  I don't

12   know the date.

13      Q.   Was it in the last couple of years

14   or --

15      A.   Yeah.

16      Q.   Was it in the last year?

17      A.   It had to have been in '13 or '14.  It

18   wasn't in 2015.

19      Q.   Okay.  Are there any other dental

20   issues?

21      A.   I haven't been called back for what I

22   put in for.  That's about it.

23          Oh, yeah, another thing, they have --

24   like I come here in 2002.  Now, like I first come



1    to the penitentiary in '61.  Anytime an inmate

2    arrives in a penitentiary, he is supposed to get

3    examinations.  Okay.

4           The dentist, when I come here in 2002,

5    they never called me for -- to examine me when,

6    you know, when you first come in on arrival.

7           Q.    Uh-huh.

8           A.    So the only time I got to see the

9    dentist I had to pay $5.  I explained to him I

10   hadn't seen him on exam because I wanted to know

11   why I was paying $5 because they had never

12   examined me.

13          Q.    But that was in 2002?

14          A.    Yeah.  Okay.

15          Q.    All right.  Have you filed any

16   grievances related to any dental issues?

17          A.    Did I file any grievance on it?  No, I

18   ain't filed on that, but I've got -- I mean I got

19   proof I seen him.  I got the P-96 where I paid the

20   $5.  I'm quite sure the record officer that give

21   you the pass, they could give you the date.  They

22   have to send you a pass, and they keep all that in

23   the records.

24          Q.    Mr. Thomas, how did you first learn



1   might get the consideration.  If this was won, I

2   might be able to get some of these medicines,

3   medical treatment or treatments.

4           Plus, not only that, for everybody in

5   here that suffers the way I suffer.

6       Q.   What do you hope to get from this

7   lawsuit?

8       A.   I just explained it.

9       Q.   Okay.

10      A.   If I get some type of treatment.  I'm

11  not looking for no money or anything.

12      Q.   Okay.  All right.

13      A.   I might could get my inhalers, what I'm

14  supposed to get, my Spiriva and Symbicort.

15  Everybody else gets it.  Why can't I get mine?  I

16  feel like I'm getting discriminated against.

17          I just had a stent put in my heart in

18  2011, and I've got letters from that place writing

19  me and the doctor telling me to send me there.

20  They never send me back.  I have pain in my chest

21  off and on now.  It could be coming from that.

22  I'm not saying it is because I don't know because

23  I have a lot of other problems.

24      Q.   Mr. Thomas, are you aware of any



1    vacancies in the medical staff here at Pontiac?

2         A.    Well, they had Ms. Toni Roy.  She

3    was -- I know she ain't here now, but I have

4    written to her a couple of times about my

5    problems.  But it was no response, and I found out

6    that she had quit.  I think her name is Toni Roy

7    or Royal.

8              And they had a director of nurses they

9    had put -- I forget her name.  I don't know what

10   happened to her, but they had to put an acting

11   director nurse.

12             You talking about just the medical

13   field, right?

14        Q.    Right, just in the medical field.

15        A.    Then there's been a whole lot more that

16   I don't know if they quit or they on vacation or

17   what, but they be short.

18        Q.    Okay.  Have these vacancies been -- has

19   that affected your medical treatment while you

20   have been -- in the last -- since say 2008?

21        A.    Well, I can say yes and I can say no.

22   Where I needed my rescue inhaler, that was in

23   December of 2015.  It was one evening going on

24   night, and they told me that they had called, but



1   at the time she couldn't come because she was on

2   the farm.  She had to do the farm first, and when

3   she come back that she would stop.  And that's

4   when I got a chance to see her.

5           But that's an hour and a half or two

6   that went by.  I mean I ain't died or nothing, but

7   I had to go through -- you know, to get a rescue

8   inhaler I had to take a couple of puffs off

9   someone else's inhaler by taking my inhaler,

10  taking it out and putting his in there because he

11  didn't want my mouthpiece on his piece, so I used

12  the medical part.  So I had to use his.

13      Q.    And did -- was this when you didn't

14  have your inhalers with you or you just didn't

15  have a rescue inhaler?

16      A.    I didn't have no rescue inhaler.

17      Q.    Do you currently have a rescue inhaler?

18      A.    I'm allowed to have them now, but for a

19  while they had took them.  At this time -- this

20  time when I had this attack I had an inhaler, the

21  rescue inhaler, but there was nothing in it.

22      Q.    It was empty?

23      A.    Yeah.  That's why I had to go somewhere

24  else.  That was on the last time -- that would be



 1   on record.  It was on the last time they had to

 2   give me the oxygen --

 3        Q.    Okay.

 4        A.    -- in case I got to take it, so you

 5   have to check.  And that was in December.

 6        Q.    So when the -- was that the nurse, when

 7   the nurse finally came to check on you?

 8        A.    It was a medical tech.  They had called

 9   a medical tech to bring it, but at the time she

10   was visiting the farm.  You know, they have to

11   make their rounds all over the institution, carry

12   medicine back to the east house, west house, north

13   cell house and the farm.

14        Q.    When you said she was on the farm, I

15   heard "on the phone."  So now I understand.

16        A.    No.

17        Q.    She was off making her rounds?

18        A.    Right.

19        Q.    Giving out medication?

20        A.    Right.

21        Q.    Okay.  So have the vacancies -- you

22   know -- you said -- when I asked you if the

23   vacancies had affected you, you said "I can say

24   yes and I can say no."  So in what sense --



1       A.    Well, it had an effect on me.

2       Q.    Yeah.

3       A.    I couldn't get my stuff, but she did

4    come.  And I could say no.  I didn't die, but it's

5    a possibility I could have died.  I mean I don't

6    know if you ever went through it, but when your

7    breath is leaving you have very little energy.

8            All the energy be lost out of your

9    body, and it's lost out of my body.  I think if

10   this was a pencil (indicating), I'd be hardly able

11   to pick it up because of lack of oxygen.  There is

12   no oxygen in the blood going to my heart.  There

13   is nothing there.

14      Q.    Are there any other times in which the

15   vacancies in the staff has affected your medical

16   care that you can think of?

17      A.    Well, physically it didn't affect me,

18   but I mean mentally I have been affected.  It

19   ain't really got to me physically because I have

20   seen other people die from it, you know, from

21   being neglected.  And it disturbs me because I

22   could be the next victim, you know, because this

23   lack of responsibility or, No. 1, not being -- how

24   exactly could I word this?



 1          Well, I can say it like this:  If the

 2    staff, the medical staff is not on their job, you

 3    know, they're unqualified or -- I don't know what

 4    words you would use, but -- because these things

 5    wouldn't occur if they was on time or if they had

 6    enough people to work here where you could bring

 7    stuff to people.

 8          Like in the cell house, you have a

 9    medical room downstairs on the first floor.

10    That's in all three max penitentiaries.  Now,

11    Menard, they got someone, a nurse or somebody from

12    the hospital, there at all times.  Someone is

13    appointed for that.

14          I don't know how they do Stateville,

15    but I know they have got an office in Stateville

16    because I have been in it, but I don't know if

17    somebody is in it all the time.

18          Here the only time they use that is

19    when they have clinic and sick call, you know?

20    And there is people getting sick every day, and

21    trying to get you to the hospital ain't easy

22    unless you got a P-96 to pay $5.  Everybody in

23    there don't get money from the street.  Everybody

24    in there ain't got no job.  Everybody can't pay no



1   $5.

2          And when they do, they do do it, the

3   ones that do do it, they do pay it, but when it's

4   time for them to go buy some cosmetics or

5   something, they ain't got it because these people

6   done took it from him, you know?  And now the

7   ailment, he ain't sick no more because when he put

8   in for the sick call they call him three weeks

9   later.  That's the problems we deal with.

10      Q.    You said that you thought the medical

11  staff was unqualified.  Is that your opinion?

12      A.    Well, I'll say it like this:  Med Tech

13  Brown, I should have filed a grievance, but I

14  didn't.

15          When I stopped, asked him about my

16  inhalers that they had took, he told me that -- he

17  said -- I don't want to tell no lie.  I'm going to

18  tell you just like he told me.  "You getting on my

19  fucking nerves.  You can't be having no attack and

20  you're talking to me," you know.

21          I've got a thing up in here

22  (indicating), I don't know what it is, but it

23  seems like it cuts my breath off.  And this is the

24  answer he give me.  I'm getting on his fucking



1   nerves, you know?  I know he wasn't trained to

2   talk to me like that.

3          And he was talking to the right one

4   because I wasn't capable of doing anything to him

5   because he could have talked to somebody else like

6   that and he might not be working here no more.

7          Q.   Do you think -- believe that the

8   doctors here are qualified to treat the inmates?

9          A.   Well, this doctor hasn't given me my

10  medicines.  He don't want to give me my medicines,

11  he don't want to send me out on my follow-ups.

12         I got a leg problem.  I have been

13  asking -- ever since I have had the leg problem

14  I've been asking for something, and the only thing

15  he ever gave me was Ibuprofen.  And I got that

16  gout medicine, but Ibuprofen, and it's a green

17  capsule.  I don't know the name of that.

18         And I've got this one inhaler

19  (indicating).  I'm not supposed to take this, but

20  I take it.  If I don't I'd probably be dead

21  without it.  But the doctor took me off of this.

22  He said it's damaging my heart.  I still use this.

23  I see this man about this every time I see him,

24  and I still use this.  I think I've gotten on his



1   nerves because I ask him the same thing every time

2   I see him.

3              These here (indicating), I don't know

4   if they help or not.  This is for COPD, and I

5   think this is for asthma.  Now, if it's for

6   asthma, I mean I take it as I am instructed, one

7   twice a day.  I don't know if it's doing good or

8   bad.

9              I don't even know if I'm having asthma

10  problems right now or not because every time I say

11  anything to anybody about it, like UIC on the

12  outside and Bloomington, they say COPD is my

13  problem, and I need Spiriva and Symbicort.

14             I asked for that, and I ain't been able

15  to get it.  And it's on the record that I'm

16  supposed to get it because the doctors out there

17  send him -- some of this paperwork that you've

18  got, he sends it to them.

19             I've been trying to get copies of it.

20  They haven't called me over to give me copies yet.

21  I've got one set of copies.  I had to get that

22  from -- I had to go to UIC, but I guess they have

23  got their office set up in Atlanta somewhere

24  because Atlanta is the one that sent them to me.



1    Q.    I mean these issues that you've

2  identified about not getting your medicine, not

3  being sent on follow-ups, do you think that's

4  because -- that that's happening because the

5  doctor is not qualified to treat you?

6    A.    No.  It could be a whole lot of

7  reasons, you know?  Not just he's not qualified.

8  He might have been working here too long and got

9  so relaxed he's not concerned anymore or

10  something.  Could be a lot of things.  I can't say

11  what's wrong with him.  I can't say whether he's

12  qualified or not.  Who am I to say?

13          I'm saying I see it because of the

14  medicine and the treatment that I'm not getting.

15  And what the professional medical people from

16  outside say, he's ignoring what they say because

17  he's not doing anything that they say.  He's not

18  getting my medicine right, he's not getting my

19  inhalers right, he's not calling me back on

20  follow-ups.

21          Now, don't you think there is a problem

22  there somewhere?  I'm just asking you personally.

23  They don't have to write it down.

24    Q.    I'm not testifying today, so, you



1        Q.    All right.  Are you limited to -- you

2    know, to only being able to see the doctor every

3    six months for those problems?

4        A.    I don't see no doctor.

5        Q.    Okay.

6        A.    I see the -- what you call that?

7        Q.    PA, physician assistant?

8        A.    Physician assistant.

9        Q.    Okay.  But are you limited to only

10   being able to see medical people once every six

11   months about your problems?

12       A.    As far as the chronic clinic, that's

13   what's that's for every six months.  But if I see

14   him for anything other than that -- or it could be

15   for chronic -- they are going to tell me sign a

16   P-96.

17       Q.    Okay.  But you can see a medical --

18   somebody if you need it?

19       A.    Right.

20       Q.    And -- all right.  So you have been

21   kept in the infirmary a number of times here at

22   Pontiac; is that right?

23       A.    Yeah.  Don't ask me how many times,

24   now.  It ain't been a whole bunch of times, but I



1  have been there.  I don't remember how many.

2      Q.    Okay.  Were you cared for -- were you

3  given good care while you were in the infirmary?

4      A.    Well, when you're in the infirmary here

5  it's like being in segregation, like you done

6  killed somebody and you're being punished.  Only

7  time you see a nurse is when they bring the

8  medicine around.

9           Like in my case, I can't speak to other

10  people, but when I needed to see him about my

11  breathing problem they had me in a room where

12  there's very little air.  It's behind steel doors

13  and there's no air.

14          I mean there's air in there coming

15  towards him, but I'm not getting enough air where

16  I can breathe right.  I had to have the little

17  door down there.  It has a little thing about this

18  long, this wide (indicating) where he could open

19  it.  It's like where the air be pulling through

20  like you open a door or something.  That's how I

21  had to breathe.

22          And they sent for a nurse.  They have

23  got nurse quarters up there where they do whatever

24  work they do.  I don't know what they do, but in



 1  the evening time after 3:00 o'clock, you very

 2  seldom see a nurse at that office.  Once they take

 3  them pills, bag them up, I don't know where they

 4  go, but the nurses ain't in their quarters.

 5          So if you've got a problem you're

 6  lucky -- I think what kills most people over

 7  there -- and they're dying pretty regular -- and

 8  that's stress.  You get no yard.  It's some people

 9  over there just -- they might be sick, like me,

10  they put me in there, see?

11          I need sunshine.  I need air.  I need

12  to walk.  I use a cane.  I can lay up in my bed,

13  and in three months I won't even be able to walk.

14  I'll be worse than when I -- before I went over

15  there.  I didn't experience that.

16      Q.    Has there been a time where you have

17  been kept in the infirmary that you thought you

18  should have been sent out to the hospital?

19      A.    Yeah.  When I went over there for this

20  in 2013 they kept me over there.  I don't know how

21  many days they kept me -- five, six, seven --

22  because, like I say, I lost my memory.

23          They knew I had something wrong because

24  the doctor said my stool was black and that I was



1   losing my memory, my mind or something.  I mean
2   they knew that the day they put me in there.
3              So if they knew I was having amnesia
4   then, why would they wait six, seven days or two
5   weeks later?  Because I was already complaining I
6   was weak, losing weight.
7              I'm still losing weight.  You can look
8   at my neck and see I had meat in here.  You see
9   all that?  That's like fat now, but that's weight
10  lost.  My arms, I used to weigh 245.  I used to
11  lift weights.  I used to be thick and broad.  But
12  I'm telling you --
13       Q.   Have you ever had a problem with
14  someone not being able to -- with the medical
15  staff not being able to find part of your -- find
16  or read part of your medical file?
17       A.   Ask me that again.
18       Q.   Have you ever had a problem because --
19  caused by the medical staff not being able to read
20  or find part of your medical file?
21       A.   You going to ask me today, and I've got
22  this information in my cell.  I didn't think you
23  would need that.
24              It was in 2008 I requested to be called



Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 322 of 369 PageID #:9342

EZELL THOMAS                                    January 29, 2016
LIPPERT vs. BALDWIN                                          130

1   over there to medical records to view my file

2   because I wanted -- see, I can't tell you the date

3   that I wanted it, that I wanted stuff on because I

4   don't remember it.  But I got it in my cell.

5        Q.    Okay.  That's okay.

6        A.    But Ms. Beecher, she was a nurse.  She

7   was -- me and the lady get out our records, and

8   she said she couldn't find them.

9             And as she said that, Dr. Mahone was

10  coming out one of the offices and went into the

11  hall, and Ms. Beecher asked her about it -- told

12  her about she couldn't find my records.  And she

13  said that she had them on her desk and that she

14  had to read them, and that I could get them when

15  she finished.

16            But as of this date I've put back in,

17  but I have never received the records.

18  Ms. Beecher -- they have got it written, I've got

19  it in my cell on that thing you sign to get your

20  medical records with her name.  I've got

21  everything on there.  She signed on the top saying

22  that it was lost.  No, they couldn't find it.

23       Q.    Okay.

24       A.    But the medical director already said



 1  she had it on her desk.

 2       Q.    All right.  But have you ever had a

 3  situation where you're being in care -- in getting

 4  medical care where somebody said they couldn't

 5  find your -- couldn't find part of your medical

 6  file or anything like that?

 7       A.    I just told you they couldn't find it.

 8       Q.    Other than that time.

 9       A.    That's about the only time I can

10  recall.  Wait a minute.  No, one more thing.

11            They had me going out.  This is during

12  the prostate cancer period.  They had me going to

13  UIC, and I was told not to take aspirin because

14  they was going to do surgery, you know.  It was

15  just a biopsy, but I could bleed to death if I had

16  aspirins.

17            And I was threatened by a nurse named

18  Joyce to take these aspirins because it come with

19  my medication.  And I explained to her I couldn't

20  take it and -- but I'm knowing I ain't got to take

21  no medication if I don't want it.  Then she got to

22  talking about writing me up.  I told her I'm going

23  to take it; give me here, and I took it.

24            But B.B. -- it was an officer.  He



1   called and asked her was she going to send me out

2   without giving me -- you've got to wash your

3   insides out.  You've got to drink this water.

4        Q.    An enema?

5        A.    Yeah, an enema.  Before I could breathe

6   out she wouldn't give me the enema and she made me

7   take the aspirin.  She didn't make me; I took the

8   aspirin.  She threatened me, but I took it.

9            So I went back, and I explained it to

10  UIC that I had to take the aspirins.  They sent me

11  right back.  Also, B.B. can verify this.  They

12  brought me back and didn't give me the biopsy.

13           Later on they signed me in the hospital

14  about a week later, and I had to drink this great

15  big jug of stuff.  The enema was what you put in

16  it, but this time I had to drink a big jug of

17  stuff, and it, you know, cleaned me out, and then

18  they sent me out to get the biopsy for the

19  prostate.

20       Q.    Okay.

21               (WHEREUPON, a certain document was

22               marked Thomas Deposition Exhibit

23               No. 9, for identification, as of

24               1-29-16.)



# Exhibit 4

# [UNDER SEAL]

# Exhibit 5

## [UNDER SEAL]

# Exhibit 6

## [UNDER SEAL]

# Exhibit 7

## [UNDER SEAL]

# Exhibit 8

## [UNDER SEAL]

# Exhibit 9

## [UNDER SEAL]

# Exhibit 10

## [UNDER SEAL]

# Exhibit 11

## [UNDER SEAL]

# Exhibit 12

## [UNDER SEAL]

# Exhibit 13

## [UNDER SEAL]

# Exhibit 14

## [UNDER SEAL]

# Exhibit 15

## [UNDER SEAL]

# Exhibit 16

Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 338 of 369 PageID #:9358

**65 or older?** you may be at increased risk for pneumococcal pneumonia.    Pfizer    PP-PNA-USA-0582-05 ©2016 Pfizer Inc,
All rights reserved. February 2016    learn more ›

sign in / account    my store    weekly ad    gift cards    lists / registries    REDcard    email offers
Highland    sign up & save

shop all categories    all    search    your cart

free shipping on orders of $25+ & free returns on every order.  view details ›

Like

Target    health    diet & nutrition



overview overview
label info label info
q&a q&a
reviews reviews
shipping & returns shipping & returns
**details**
A complete nutritional drink to help you stay strong and active.
Getting the right amount of nutrition can be a challenge. That's where BOOST®
nutritional drink can help. Every 8 fl oz serving of this delicious nutritional drink has
240 calories, 10 grams of high-quality protein, and 26 vitamins and minerals,
including calcium and vitamin D to help support bone health. Complete and balanced
nutrition that's equally ideal as a mini meal or nutritious snack.
Appropriate for these diets: suitable for lactose intolerance*, gluten-free, low-residue,
kosher, cholesterol-restricted
*Not for individuals with galactosemia
**Serving Size:** 8.000
**Servings per Container:** 12.0
**Containers per Package:** 12.000
**Form:** liquid
**Flavor:** chocolate
**Health Concern:** Weight Management
**other info.**
**Online Item #:** 14358841
**Store Item Number (DPCI):** 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
Item can be gift wrapped.
Made in the USA or Imported
**disclaimer.**
Content on this site is for reference purposes only. Target does not represent or
warrant that the nutrition, ingredient, allergen and other product information on our
Web or Mobile sites are accurate or complete, since this information comes from the
product manufacturers. On occasion, manufacturers may improve or change their
product formulas and update their labels. We recommend that you do not rely solely
on the information presented on our Web or Mobile sites and that you review the
product?s label or contact the manufacturer directly if you have specific product
concerns or questions. If you have specific healthcare concerns or questions about
the products displayed, please contact your licensed healthcare professional for
advice or answers.

## guests who viewed this item also viewed




$13.99



5.0 (3)    q&a (2)

ntity:

1  +

subscribe for  5% off
**$13.29** + free shipping



...very service options available in cart
n more
pping
nd $25, get free shipping

order pickup
not available
In Stock at Cedar Rapids South
find in another store

$15.99

**Boost High Protein Rich
Chocolate Ready ...**

Boost

spend $25, get free shipping

(4)

notes
Prices, promotions, styles and availability may vary by store and online.

add to list / registry     share



**$19.99**

Ensure® Complete
Balanced Nutrition® Nut...

Ensure

spend $25, get free shipping

(39)



**$9.99**

Ensure Plus Strawberry
Nutritional Shake...

Ensure

spend $25, get free shipping

(59)

**$7.99**

Ensure® Strawberry
Nutrition Shake - 6 p...

Ensure

spend $25, get free shipping

(35)

guests who viewed this item ultimately bought

# Exhibit 17

## [UNDER SEAL]

# Exhibit 18
## [UNDER SEAL]

# Exhibit 19

# [UNDER SEAL]

# Exhibit 20
## [UNDER SEAL]

# Exhibit 21

Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 345 of 369 PageID #:9365

2013 WL 5230238
Only the Westlaw citation is currently available.
United States District Court,
S.D. Illinois.

Michael BOYD, Paul Lee and Kendrick Pearson, on behalf
of themselves and all others similarly situated, Plaintiffs,

v.

S.A. GODINEZ, Director of the Illinois Department of Corrections and Randy Davis,
Warden of Vienna Correctional Center, in their official capacities, Defendants.

Civil Action No. 3:12–cv–704–JPG–PMF.

|

Sept. 16, 2013.

**Attorneys and Law Firms**

Kathleen Patricia Lally, Andrew T. Gehl, Malorie R. Medellin, Mark S. Mester, Robert Christian Collins, III, Latham & Watkins LLP, Chicago, IL, Alan S. Mills, Uptown People's Law, Chicago, IL, for Plaintiffs.

Christopher L. Higgerson, Illinois Attorney General's Office, Springfield, IL, for Defendants.

### *MEMORANDUM AND ORDER*

J. PHIL GILBERT, District Judge.

**\*1** This matter comes before the Court on the Plaintiffs' Unopposed Motion for Class Certification for Purposes of Settlement (Doc. 33).

## I. Background

The plaintiffs in this case seek declaratory and injunctive relief relating to the living conditions at Vienna Correctional Center ("Vienna"), an institution within the Illinois Department of Corrections ("IDOC"). Specifically, the plaintiffs allege that Vienna is severely overcrowded; the facility is poorly maintained—raw sewage overflows in the toilets and backs up in the showers; the entire facility, including the kitchen and dining hall, is infested with insects and vermin; the facility lacks adequate ventilation, exposing prisoners to extreme temperatures; and the buildings are infested with mold. They further allege that defendants IDOC Director S.A. Godinez and Vienna Warden Randy Davis have been and continue to be deliberately indifferent to the health and safety risks those conditions pose by failing to make reasonable efforts to correct them, all in violation of the Eighth Amendment rights of inmates housed at Vienna. [1]

[1]   These Eighth Amendment rights are applicable to state prisoners through the Fourteenth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 101–02, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

The plaintiffs seek to represent the following class of inmates for settlement purposes only:

> All inmates housed at Vienna Correctional Center since June 13, 2012, and all inmates to be housed at Vienna Correctional Center.

The defendants do not object to the certification of this class so long as it is only for the purposes of settlement of this case. The plaintiffs also ask the Court to appoint them as class representatives and to appoint their current counsel as counsel for the class.

## II. Class Certification Requirements

A principal purpose of class certification is to save the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical manner. *See General Tel. Co. of S.W. v. Falcon,* 457 U.S. 147, 155, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). The Court may certify a class if it satisfies all four provisions of Federal Rule of Civil Procedure 23(a), at least one provision of Rule 23(b) and the implied prerequisites that a class be ascertainable and that the class representatives be within the class. It is the moving party's burden to establish that each of the prerequisites of Rule 23 is satisfied. *Falcon,* 457 U.S. at 161. A plaintiff's failure to satisfy any of the Rule 23 requirements precludes class certification. *Retired Chi. Police Ass'n v. City of Chi.,* 7 F.3d 584, 596 (7th Cir.1993) (citing *Harriston v. Chicago Tribune Co.,* 992 F.2d 697, 703 (7th Cir.1993)). Generally, when ruling on a motion for class certification, the Court does not consider the merits of the case; rather, the Court focuses on whether the certification requirements are satisfied. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

The Court must rigorously assess whether the prerequisites have been met, *see Falcon,* 457 U.S. at 161, and, if the party seeking class certification meets each of them, the Court must certify the proposed class, *see Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,* 559 U.S. 393, 398–99, 130 S.Ct. 1431, 176 L.Ed.2d 311 (2010) (noting "a categorical rule entitling a plaintiff whose suit meets the specified criteria [of Rule 23] to pursue his claim as a class action"). The Court has broad discretion to determine whether a proposed class satisfies the requirements, *Keele v. Wexler,* 149 F.3d 589, 592 (7th Cir.1998), and should err in favor of maintaining class actions, *King v. Kansas City S. Indus., Inc.,* 519 F.2d 20, 26 (7th Cir.1975).

### A. *Implied Prerequisites*

**\*2** Before the Court can address the issues raised by Rule 23, the moving party must satisfy two implied prerequisites of Rule 23. The first is that the class is sufficiently defined so as to be identifiable as a class. *Oshana v. Coca–Cola Co.,* 472 F.3d 506, 513 (7th Cir.2006). The second is that the named representative fall within the class. *Alliance to End Repression v. Rochford,* 565 F.2d 975, 977 (7th Cir.1977).

The plaintiffs' proposed class is sufficiently identifiable as a class and is not overbroad. It will be a relatively simple matter to ascertain from prison records who has been or is housed at Vienna during the relevant time period. Furthermore, it is clear that the named plaintiffs fall within the class definition in that they were housed in Vienna after June 13, 2012. Thus, the plaintiffs have satisfied the implied prerequisites to class certification.

### B. *Rule 23(a)*

Rule 23(a) allows a plaintiff to sue on behalf of a class only if all four of the following elements are satisfied:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a); *see Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 613, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

### 1. *Numerosity of Parties*

2013 WL 5230238

Rule 23(a)(1) requires that the proposed class be so numerous that joinder of all members is impracticable. Fed.R.Civ.P. 23(a)(1). When the class is large, numbers alone may be dispositive of numerosity. *See Riordan v. Smith Barney,* 113 F.R.D. 60, 62 (N.D.Ill.1986). In light of the fact that Vienna houses more than 1,000 inmates at any given time and that inmates are transferred in and out or are released on a regular basis, it is clear that joinder of all class members would be impracticable. The plaintiffs have satisfied the numerosity requirement.

## 2. *Commonality of Issues*

A named class representative may sue on behalf of the class only if there are questions of law or fact common to the class. This commonality requirement serves the dual purposes of (1) fair and adequate representation of the interests of absent class members and (2) practical and efficient case management. 5 James Wm. Moore *et al., Moore's Federal Practice* ¶ 23.23 (3d ed.1999). "A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." *Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir.1998) (quoting *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir.1992)). Common nuclei of fact are typically manifest where the defendants have engaged in standardized conduct towards members of the proposed class. *Id.* Some factual variation in the details of individual claims does not defeat a finding of commonality. *Rosario,* 963 F.2d at 1017. Courts give Rule 23(a)(2) a "highly permissive reading," requiring plaintiffs to show only that there is more than one issue of law or fact in common. *See Markham v. White,* 171 F.R.D. 217, 222 (N.D.Ill.1997). Though the commonality requirement is permissive, an issue of law or fact is not "common" unless its resolution "will advance the litigation." *See Sprague v. General Motors Corp.,* 133 F.3d 388, 397 (6th Cir.1998). Standardized conduct with respect to the conditions of confinement in a penal institution can satisfy the commonality requirement. *See, e.g., Flynn v. Doyle,* No. 06–C–537, 2007 WL 805788, at *3 (E.D.Wis.2007); *Williams v. Lane,* 96 F.R.D. 383, 385–86 (N.D.Ill.1982); *Green v. Cady,* 90 F.R.D. 622, 623 (E.D.Wisc.1981).

**\*3** There is clearly a common nucleus of operative facts and law at issue with respect to the putative class. All putative class members have been exposed to nearly identical living conditions when they were housed in Building 19 upon entry into Vienna and substantially similar living conditions in other housing assignments thereafter. Furthermore, the defendants have engaged in a standardized course of conduct toward all members of the proposed class in their responses to the living conditions at Vienna. Whether the conditions at Vienna objectively posed a serious risk to inmate health and safety and whether the defendants knew about and disregarded that risk are issues common to all putative class members. Deciding these common issues of law and fact would be a fair, practical and efficient way to advance this litigation. For this reason, the Court finds that the highly permissive commonality requirement is met.

## 3. *Typicality of Claims and Defenses*

Whether the named plaintiffs' claims are typical of those of the class members they seek to represent is closely related to the commonality inquiry, but problems with commonality often take on greater significance in the typicality context. *See Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir.1992) ("The question of typicality in Rule 23(a)(3) is closely related to the ... question of commonality."). Subsection (a)(3) directs the Court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large. *De La Fuente v. Stokely–Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983). A "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Id.*

Despite the apparent similarity, the commonality and typicality requirements serve different functions. The commonality requirement questions the relationship of the claims among the class itself, while the typicality requirement focuses on the relation between the representatives and the class as a whole. The Court should concentrate on the defendants' alleged conduct and the plaintiffs' legal theory to satisfy Rule 23(a)(3). *Rosario,* 963 F.2d at 1018. The typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members. *De La Fuente,* 713 F.2d at 232. Thus, similar legal theories may control even in the face of different facts. *Id.* "Properly applied, these guidelines should uphold the rationale behind the typicality requirement, namely that 'a plaintiff with typical claims will pursue his or her own self-interest in the litigation and in so doing will advance the interests of the class members, which are

**WESTLAW** © 2016 Thomson Reuters. No claim to original U.S. Government Works. 3

**Boyd v. Godinez, Slip Copy (2013)**
Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 348 of 369 PageID #:9368

2013 WL 5230238

aligned with ... those of the representative.' " *Insolia v. Philip Morris Inc.,* 186 F.R.D. 535, 544 (W.D.Wis.1998) (quoting 1 H. Newberg, *Newberg on Class Actions,* § 3.13 (3d ed.1992)).

**\*4** The named plaintiffs' claims are typical of those of the rest of the putative class. They all rely on the same legal theories—the defendants' observance of inmates' right to be free from cruel and unusual punishment—and arise out of the same set of living conditions at Vienna. The Court is confident that in pursuing their own claims, the named plaintiffs will advance the interests of the putative class members. Thus, the plaintiffs' claims are typical of those of the proposed class.

### 4. *Adequacy of Representation*
The adequacy of representation requirement tends to merge with the commonality and typicality criteria of Rule 23(a). *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 626 n. 20, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). The proposed class representatives must at a minimum "possess the same interest and suffer the same injury as the class members." *East Tex. Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977) (internal quotations omitted). They must also not have any interests in conflict with those of other members of the class and must have a sufficient interest in the litigation to ensure vigorous advocacy. *Chandler v. Southwest Jeep–Eagle, Inc.,* 162 F.R.D. 302, 308 (N.D.Ill.1995)) (internal quotation omitted); *see Spano v. The Boeing Co.,* 644 F.3d 574, 586–87 (7th Cir.2011). When an inmate is released from a correctional facility with no reasonable likelihood that he will return and face the same problems faced by the putative class, he is not a good candidate for class representative in a suit seeking injunctive relief. *See, e.g., Arreola v. Godinez,* 546 F.3d 788, 799 (7th Cir.2008) (released plaintiff did not meet adequacy requirement where it was possible for a more suitable representative to emerge).

The Court is given pause at this point. While there is no indication the named plaintiffs have any interests that conflict with putative class members, they no longer have a personal interest in the outcome of the case. Each named plaintiff was released from Vienna in 2013, consequently, will not be affected by any injunctive or declaratory relief (or lack thereof) that might result from this lawsuit. Although they have actively participated in the litigation to this point and have stated that they are committed to continuing to participate, their continuing interest in this litigation appears—at least as documented in the file at the present time—insufficient to allow them to represent the interests of the putative class. The plaintiffs have failed to satisfy this requirement.

Nevertheless, because, as explained in the rest of this order, this is the only deficiency in the request for class certification, rather than denying the motion for class certification outright, the Court will reserve ruling and allow the plaintiffs to remedy this deficiency. It will allow them an opportunity to recruit a substitute plaintiff who could serve as an adequate class representative during the later phases of this case, including settlement negotiations. Plaintiffs' counsel has indicated this may be difficult because Vienna inmates are unlikely to be housed at Vienna long enough to exhaust administrative remedies as required by 42 U.S.C. § 1997e(a), especially where prison officials have the ability to drag out administrative proceedings beyond what is necessary to address inmates' complaints. For this reason, as an alternative, the Court will also allow the plaintiffs an opportunity to present a compelling argument why the Court should allow them to be named as class representatives despite their lack of personal stake in the outcome of this case. The Court further reminds the parties that, as part of a potential settlement agreement, the defendants may agree to waive the affirmative defense of failure to exhaust.

**\*5** The Court now turns to the requirements of Rule 23(b).

### C. *Rule 23(b)*
If all of the elements of Rule 23(a) are established, the moving party must also show one of the elements outlined in Federal Rule of Civil Procedure 23(b). *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). The plaintiffs request certification first under Rule 23(b)(2), which states that a class action may be maintained if:

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

Rule 23(b)(2) is satisfied where a defendant's conduct or refusal to act was generally applicable to the class and where final injunctive or declaratory relief with respect to the entire class would be the appropriate remedy. *Retired Chi. Police Ass'n v. City of Chi.,* 7 F.3d 584, 596 (7th Cir.1993). "As a general matter, Rule 23(b)(2) is invoked in cases where injunctive or declaratory relief is the primary or exclusive relief sought." *Buycks–Roberson v. Citibank Fed. Sav. Bank,* 162 F.R.D. 322, 335 (N.D.Ill.1995).

Here, the defendants have acted or refused to act in a manner generally applicable to the class with respect to their response to the conditions of confinement at Vienna, and the plaintiffs seek only declaratory and injunctive relief. Accordingly, class certification is appropriate under Rule 23(b)(2).

### D. *Appointment of Class Counsel*

Under Rule 23(g)(1), if the Court certifies a class, it must appoint class counsel to fairly and adequately represent the interests of the class. *See* Fed.R.Civ.P. 23(g)(4). In naming class counsel, the Court must consider:

(i) the work counsel has done in identifying or investigating potential claims in the action;

(ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

(iii) counsel's knowledge of the applicable law; and

(iv) the resources that counsel will commit to representing the class.

Fed.R.Civ.P. 23(g)(1)(A). It may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed.R.Civ.P. 23(b)(1) (B).

Mark Mester and Kathleen Lally, of Latham & Watkins LLP, and Alan Mills, of Uptown People's Law Center, seek appointment as class counsel in this case. The materials submitted in support of their appointment show they are well-qualified to represent the plaintiff class in this case.

### III. Conclusion

For the foregoing reasons, the Court **RESERVES RULING** on the motion for class certification for settlement purposes (Doc. 33). The Court further **ORDERS** that the plaintiffs shall have up to and including October 25, 2013, to either (1) recruit an adequate substitute plaintiff to intervene in this case or (2) file a supplemental brief in support of their motion for class certification addressing why the Court should allow the plaintiffs to be named as class representatives despite their lack of personal stake in the outcome of this case. Should this time period be insufficient, the Court would entertain a motion for a reasonable extension of time.

**\*6  IT IS SO ORDERED.**

### All Citations

Slip Copy, 2013 WL 5230238

---

  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 1393527
Only the Westlaw citation is currently available.
United States Court of Appeals,
Seventh Circuit.

Lula DIXON, Independent Administrator of the Estate of Kevin P. Dixon, Plaintiff–Appellant,

v.

COUNTY OF COOK, Katina M. Bonaparte, and Newworld Eboigbe,[1] Defendants–Appellees.

No. 13–3634.
|
Argued Oct. 26, 2015.
|
Decided April 8, 2016.

**Synopsis**

**Background:** Mother of pretrial detainee, who died shortly after release from county jail, brought action against county and jail officials who oversaw detainee's care at jail's healthcare facility, asserting claims under § 1983, based on allegations that officials violated the Eighth Amendment and state law by being deliberately indifferent to detainee's medical needs. The United States District Court for the Northern District of Illinois, Thomas M. Durkin, J., 2013 WL 5874573, dismissed action. Mother appealed.

**Holdings:** The Court of Appeals, Wood, Chief Circuit Judge, held that:

[1] fact issue as to whether systemic and gross deficiency in facility's medical records system was moving force behind detainee's injuries precluded summary judgment;

[2] allegations were sufficient to support claim that medical facility official was deliberately indifferent to detainee's medical needs; and

[3] allegations were sufficient to support claim that nurse was deliberately indifferent to detainee's medical needs.

Reversed and remanded.

Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 09 C 6976—Thomas M. Durkin, Judge.

**Attorneys and Law Firms**

Michael D. Robbins, Attorney, Law Offices of Michael D. Robbins & Associates, Robert J. Robertson, Attorney, Law Offices of Robert Robertson, Chicago, IL, for Plaintiff–Appellant.

Thomas Cargie, Attorney, Office of the Cook County State's Attorney, Chicago, IL, for Defendants–Appellees.

Before WOOD, Chief Judge, and BAUER and SYKES, Circuit Judges.

## Opinion

WOOD, Chief Judge.

**\*1** In September 2008 Kevin Dixon was sent to the Cook County jail as a pretrial detainee. A month later, he developed severe and persistent pain in his back and abdomen. In early December, he had a CT scan that revealed a paratracheal mass. Over the next few weeks, the mass grew rapidly. Medical personnel at the jail were aware of the problem, but they accused Dixon of malingering, gave him over-the-counter analgesics, and ordered him to seek psychiatric care. By January 5, 2009, Dixon's condition had deteriorated severely. He was finally taken to Stroger Hospital, where he was diagnosed with lung cancer. He died two months later.

Acting in her capacity as the Independent Administrator of Dixon's Estate, Lula Dixon (Dixon's mother) sued Cook County, as well as Dr. Katina Bonaparte and Nurse Newworld Eboigbe, who had overseen Dixon's care at the jail's Cermak Acute Care Facility. (We refer to plaintiff as Lula, and to her son as Dixon. Lula also sued several corrections officers, but the district court dismissed her claims against them and she has not appealed from that ruling.) Lula asserted claims under 42 U.S.C. § 1983 for deliberate indifference to Dixon's serious medical condition in violation of the Eighth and Fourteenth Amendments to the Constitution, and state-law claims for intentional infliction of emotional distress. In response to the defendants' motions, the district court dismissed the claims against defendants Bonaparte and Eboigbe under Federal Rule of Civil Procedure 12(b)(6); it later granted summary judgment in Cook County's favor, and this appeal followed.

## I

**[1]** For purposes of both Rule 12(b)(6) and Rule 56, we take the facts as alleged and view them in the light most favorable to Lula. See *Tamayo v. Blagojevich,* 526 F.3d 1074, 1081 (7th Cir.2008); *Shields v. Ill. Dep't of Corrections,* 746 F.3d 782, 786 (7th Cir.2014). The only difference is that the facts before us are limited to those in the complaint for the Rule 12(b)(6) ruling, and they include the full summary judgment record for the Rule 56 ruling.

Dixon was arrested and taken to the jail on September 5, 2008. His symptoms began to bother him in October. In response to his complaints, he was sent to the jail's Cermak Health Services facility, where he had a chest x-ray on December 10 and a follow-up CT scan the next day. The tests revealed a paratracheal tumor (that is, a tumor next to his trachea). On December 15, a Cermak physician's assistant referred Dixon for an "urgent" pulmonary consultation. The word "urgent" did not have much force: eight days later, Dixon met with a pulmonologist. He reported intermittent pain for the past two months, which he rated at 10 out of 10 for severity. The pulmonologist reviewed the December 11 scan, ordered another CT for January 2, 2009, and scheduled a follow-up appointment for January 6.

But Dixon could not wait that long for treatment. By December 30, he was experiencing intense abdominal pain, difficulty breathing, difficulty moving his legs, and an inability to use the toilet. As he lay on the floor in partial paralysis after falling from his bunk, a corrections officer informed Nurse Eboigbe of his condition. Eboigbe took no action; instead, the guard scheduled Dixon for "sick call" three days later. Later that day, another nurse relieved Eboigbe of his shift and got Dixon admitted to the Cermak Acute Care Facility. Despite the documentation of his tumors (which because of the records problem we discuss below might have been unknown to the people staffing Acute Care), the physician's assistant at the Acute Care facility thought that Dixon was malingering and so ordered a psychiatric consultation.

**\*2** On December 30 and 31, Dixon received additional CT scans, which revealed growth of the tumor and fecal matter in his colon. At that point Dr. Bonaparte, the supervisor of the hospital ward, first saw him. Dr. Bonaparte did not have instant access to Dixon's medical records and previous CT and x-ray results, because there was a backlog in the system for scanning medical records into the Cook County system. Nor did she have Dixon's paper medical records in front of her. She knew about his tumor, but she did not recall making any effort to find out about the results of the December 30 tests. Critically, she knew

that more information was available but proceeded without collecting it. She agreed with the physician's assistant (based on the incomplete records before her) that a psychiatric consult was in order to rule out malingering. She ordered that, as well as a second consultation with a pulmonologist; she marked the latter request "RUSH." She noted that she would see him again three days later.

The next day, January 1, Cermak nurses reported that Dixon was on the floor and had soiled himself. He complained that he could not walk. On January 2, he was taken for the follow-up CT ordered by the first pulmonologist. The notes from that scan described the tumor as "6 x 4 cm in the left upper lung lobe which extends to the level of the aortic arch and invades the mediastinum and posterior chest wall" and stated, "[f]indings are most indicative of malignant neoplasm." The scan also identified a 12 x 9 mm nodule in the right upper lobe that was likely metastatic and appeared to extend into the spinal canal. The notes also mentioned emphysema and bullous changes in both lungs.

Less than two hours after these words were written, Dr. Bonaparte discharged Dixon from Cermak. She ordered that Dixon be allowed to use his wheelchair only for transport; he was not permitted to use it inside the jail. He was given Motrin, but no other pain medication.

Three days later, Dixon was brought back to Cermak with severe weakness in his legs, bladder and bowel incontinence, and pressure sores on his right buttock. The physician who saw him on his arrival transferred him to Stroger Hospital, where he remained until he received compassionate release from Cook County custody and went home, where he died on March 4, 2009, officially from lung cancer. This suit followed.

## II

Lula's lawsuit focuses on the fact that it took 26 days for Dixon to receive palliative care from the time when the jail personnel first became aware of his tumor; she does not contend that he could have been cured with faster or better treatment. But he suffered during the period when, rather than receiving treatment for his pain, he was transferred back and forth between the county jail infirmary and a regular cell and treated as if he were faking his illness. Lula fixes the blame in several places. First, she argues that County policy resulted in such poor communication among the medical providers who saw Dixon that nobody put all the pieces together, figured out what was wrong and how serious it was, and took appropriate steps. Second, she asserts that the individual defendants knew about (or had reason to know of) Dixon's condition and were deliberately indifferent in the face of that knowledge. We address the institutional claim first, and then the individual claims.

## A

**\*3** **[2]** **[3]** **[4]** The essence of Lula's claim against the County is that it implemented a records policy that created barriers to informed care. She relies on *Monell v. Dep't of Soc. Servs. of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), which requires a plaintiff suing a municipality or comparable entity to demonstrate that the entity's official policy, widespread custom, or action by an official with policy-making authority was the "moving force" behind his constitutional injury. *City of Canton v. Harris,* 489 U.S. 378, 379, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). An unconstitutional municipal policy can "take the form of an implicit policy or a gap in expressed policies." *Thomas v. Cook Cnty. Sheriff's Dep't,* 604 F.3d 293, 303 (7th Cir.2009). This part of the case was resolved on summary judgment, and so the question before us is whether Lula presented enough in response to Cook County's motion to demonstrate genuine issues of material fact requiring a trial.

**[5]** **[6]** Lula relies primarily on Cook County's official policy with respect to medical records in the jail; to a certain extent, she also relies on "widespread custom" and action by an official with final authority. In order to prove the policy, she looks both to written records and to indirect proof. For the latter, a "plaintiff must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision."

Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 353 of 369 PageID #:9373

*Phelan v. Cook County,* 463 F.3d 773, 790 (7th Cir.2006). This requires more than a showing of one or two missteps. *Id.* As applied to a case such as this one, we look to see if a trier of fact could find "systemic and gross deficiencies in staffing, facilities, equipment, or procedures" in a detention center's medical care system. And even if there are such deficiencies, a *Monell* claim can prevail only if a policy-making official knows about them and fails to correct them. *Wellman v. Faulkner,* 715 F.2d 269, 272 (7th Cir.1983); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 130, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

Lula alleges that the County's records policy led inexorably to inadequate medical care for inmates. The problem was twofold: first, there were both a paper record-keeping system and an electronic record-keeping system, and the two were not coordinated; second, to the extent the County for whatever reason was still relying primarily on paper records, access to them was haphazard. The predictable result was that its medical providers were hamstrung in their ability to reach a proper diagnosis and treatment. Lula argues that if all the doctors involved in treating Dixon had access to all his records, he would not have experienced such a delay in diagnosis and thus his pain would have been addressed much sooner.

The evidence she provided includes a Department of Justice (DOJ) report condemning the inadequacy of Cook County medical care system for detainees, as well as a statement by Dr. Avery Hart, who became Chief Medical Officer at Cermak in July 2008, that new policies to correct the failures outlined in the DOJ report were not implemented until 2009, after Dixon's death. Importantly, Dr. Hart was the highest-level County official at Cermak during Dixon's entire stay at the jail, and Dr. Hart had received direct notice from DOJ that the policies in place were highly likely to cause serious injury to the inmates. Nevertheless, no changes were made until after the events in this lawsuit occurred.

**\*4** Lula also presented testimony from Dr. Cruz, the physician who ultimately transferred Dixon to Stroger Hospital. Dr. Cruz reported that he was sometimes unable to obtain access to a patient's medical records because the records had not been scanned into the electronic records database and were not otherwise readily available. In addition, Lula offered expert testimony from Dr. Robert Greifinger, the primary DOJ investigator during its 17–month investigation into the Cook County jail's healthcare system. Dr. Greifinger opined that systemic inadequacies in the County's detainee healthcare policy, including the failure to coordinate health information, caused the delay in palliative care and prolonged suffering that Dixon experienced. Although the district court struck the portion of Dr. Greifinger's Rule 26(a)(2) report in which he concluded that Dixon's care fell below the prevailing standard of care and that defendants displayed deliberate indifference (both of which the court deemed to be too conclusory), it found that Dr. Greifinger is qualified as an expert and considered the remainder of the report.

Taking the County's records policy, the evidence from Dr. Hart, the evidence from Dr. Cruz, the DOJ report, and the additional testimony from Dr. Greifinger together, we conclude that a reasonable jury could find that pervasive systemic deficiencies in the detention center's healthcare system were the moving force behind Dixon's injury. It was therefore error to grant summary judgment in the County's favor on the *Monell* claim.

**B**

**1**

**[7]** Before we address Lula's argument that it was error to dismiss her claims against the individual defendants under Rule 12(b)(6), we must address a preliminary procedural point. The defendants argue that Lula improperly relies on facts from the summary judgment record that were not alleged in the original complaint. They have not specified, however, what exactly is new, and it is not obvious to us. In any event, a plaintiff attacking a dismissal under Rule 12(b)(6) is entitled to rely on new facts on appeal, as long as they are "consistent with the well-pleaded complaint." *Reynolds v. CB Sports Bar, Inc.,* 623 F.3d 1143, 1147 (7th Cir.2010). Our own review of the amended complaint satisfies us that any additional facts Lula has mentioned on appeal are consistent with it. The amended complaint lays out the basis for Dixon's claims against both Dr. Bonaparte and Nurse Eboigbe: that each was aware of the seriousness of Dixon's condition, yet each was not just negligent, but deliberately indifferent to his needs. We therefore turn to the merits.

2

**[8]** **[9]** To state a claim for relief based on inadequate medical care while in detention, a plaintiff must demonstrate (1) an objectively serious medical condition and (2) that the defendant subjectively "acted with a 'sufficiently culpable state of mind' " in failing to provide adequate care or treatment for that condition. *Greeno v. Daley,* 414 F.3d 645, 653 (7th Cir.2005). The parties here agree that Dixon's metastatic lung cancer was an objectively serious medical condition. As is often the case, the debate is over the subjective element of the plaintiff's claim. That element requires the plaintiff to be able to prove facts from which something more than negligence or even medical malpractice can be inferred; the plaintiff need not, however, shoulder the burden of proving that the defendant acted or failed to act with the purpose of causing harm. *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (deliberate indifference "is satisfied by something less than acts or omissions for the very purpose of causing harm").

**\*5** **[10]** **[11]** **[12]** The amended complaint alleged that Dr. Bonaparte knew about Dixon's chest tumor no later than December 31, 2008, and yet she offered him only non-prescription pain medication, discharged him from the jail's hospital, ordered a psychiatric consult to determine if he was malingering, and ordered that his wheelchair be removed upon his arrival back at the regular jail. A jury could find, based on these facts, that her behavior was "so plainly inappropriate as to permit the inference that [she] intentionally or recklessly disregarded his needs." *Hayes v. Snyder,* 546 F.3d 516, 524 (7th Cir.2008). It might also draw the opposite inference, if it thought that she was unable to learn about the results of Dixon's earlier tests through no fault of her own. Dixon's claim is not, however, defeated by the possibility that the most Dr. Bonaparte might have been able to do differently was to provide Dixon with six additional days of palliative care (from December 31 through January 5 when he was transferred to Stroger Hospital). Six days of intense pain cannot be considered to be *de minimis* for Eighth Amendment purposes. Furthermore, a plaintiff can state a claim of deliberate indifference even if he has a condition that may not be curable. *Williams v. Liefer,* 491 F.3d 710, 716 (7th Cir.2007).

We make no prediction about the way this part of the case might turn out. We conclude only that Lula's amended complaint plausibly alleged enough to survive a motion to dismiss for failure to state a claim.

3

**[13]** Lula's case against Nurse Eboigbe presents a closer question. In the end, however, we conclude that it is one that deserves at least the development that summary judgment would permit. Eboigbe first learned of Dixon's condition on December 30, when he was told that Dixon was experiencing intense abdominal pain, difficulty breathing, difficulty with leg movement, and incontinence. Eboigbe heard that Dixon had fallen out of his bunk and was lying on the floor of his cell, partially paralyzed. A jury could find that this was an obvious enough problem that even a layperson who discovered it would have at least consulted a doctor for instructions, and failing that would have called 911 for emergency help. Eboigbe did neither, according to the amended complaint. He did nothing: it was the guard who scheduled Dixon for "sick call" *three days* later. A different nurse later on December 30 was the one who took steps to get Dixon admitted immediately to the Acute Care Facility. Again, we stress that these are allegations; the facts are yet to be determined. But they are enough to state a claim against Nurse Eboigbe for deliberate indifference to Dixon's serious medical condition.

4

**[14]** **[15]** Finally, the district court dismissed Lula's state-law claims against Dr. Bonaparte and Nurse Eboigbe for intentional infliction of emotional distress because the standards for such a claim are higher than deliberate indifference, and the court had found the latter claim insufficient. In Illinois, this tort requires a showing of (1) extreme and outrageous conduct by the

Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 355 of 369 PageID #:9375

defendant, (2) either intent to cause distress or knowledge that there was a high probability that the defendant's conduct would cause severe emotional distress, and (3) severe emotional distress that actually resulted. *Feltmeier v. Feltmeier,* 207 Ill.2d 263, 278 Ill.Dec. 228, 798 N.E.2d 75, 83 (Ill.2003); see also *Wilson v. Norfolk & W. Ry. Co.,* 187 Ill.2d 369, 240 Ill.Dec. 691, 718 N.E.2d 172, 180 (Ill.1999). The conduct must "be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized community." *Feltmeier,* 278 Ill.Dec. 228, 798 N.E.2d at 83. Behavior that is otherwise rude, abrasive, or inconsiderate can be intentional infliction of emotional distress if the plaintiff is particularly susceptible to emotional distress and the defendant is aware of plaintiff's susceptibility. *McGrath v. Fahey,* 126 Ill.2d 78, 127 Ill.Dec. 724, 533 N.E.2d 806, 811 (Ill.1988).

**\*6** We think it best for the district court to take another look at these allegations, which rely on the court's supplemental jurisdiction. See 28 U.S.C. § 1367(a). The requirement of finding "extreme and outrageous" conduct is a demanding one, and it will not be met in every instance where a plaintiff has stated a claim under the Eighth Amendment (which itself sets a high bar). The adequacy of the complaint will depend on Lula's ability to allege that the individual defendants *knew* that Dixon was not malingering and was in severe pain, and nonetheless provided no immediate respite. Without prejudging the result, we thus vacate this part of the district court's judgment as well and return it for a second look.

### III

The judgment of the district court is therefore REVERSED and the case is remanded for further proceedings consistent with this opinion.

### All Citations

--- F.3d ----, 2016 WL 1393527

### Footnotes

1    When this suit began, Mr. Eboigbe was known as Nathan Omeke. He changed his name to Newworld Eboigbe, and so we use that name in this opinion. Some of the filings spell his last name with an initial "A," but it appears that this was in error.

**End of Document**                                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 356 of 369 PageID #:9376

2011 WL 304648
Only the Westlaw citation is currently available.
United States District Court,
S.D. Indiana,
Indianapolis Division.

Alan KRESS and Randy Carr, on their own behalf and on behalf of a class of those similarly situated, Plaintiffs,
v.
CCA OF TENNESSEE, LLC, Marion County Sheriff Frank Anderson,
Virginia Lee, Timothy Little, Jeff Conway, and Neil Probst, Defendants.

No. 1:08–cv–00431–LJM–DML.
|
Jan. 25, 2011.

**Attorneys and Law Firms**

Adam Lenkowsky, Kenneth T. Roberts, Paul K. Ogden, Tasha Rebecca Roberts, Roberts and Bishop, Indianapolis, IN, for Plaintiffs.

Michael Rosiello, William A. Hahn, Barnes & Thornburg LLP, Anthony W. Overholt, Frost Brown Todd LLC, Jennifer Lynn Haley, City of Indianapolis, Corporation Counsel, Marc Pe-Caine Sultzer, Office of Corporation Counsel, Indianapolis, IN, for Defendants.

### ORDER ON PLAINTIFFS' MOTION FOR RECONSIDERATION OF ORDER OF CLASS CERTIFICATION AS TO FACILITY–WIDE ORDER TO ELIMINATE THIRD PILL CALL ROUND

LARRY J. McKINNEY, District Judge.

**\*1** Pending before the Court is plaintiffs', Alan Kress and Randy Carr on behalf of themselves and others similarly situated (collectively, "Plaintiffs"), Motion for Reconsideration on Order of Class Certification as to Facility–Wide Order to Eliminate Third Pill Call Round (Dkt. No. 113) ("Motion to Reconsider"). The Court has considered the parties' arguments and, for the reasons set forth below, Plaintiffs' Motion to Reconsider (Dkt. No. 113) is **DENIED.**

### I. BACKGROUND

Defendant CCA of Tennessee, LLC ("CCA") is a private company specializing in running correctional facilities under contract with local law enforcement agencies. Dkt. No. 111 at 1. CCA operates Marion County Jail II ("Jail II") under contract with the Marion County Sheriff's Department ("Marion County"). *Id.* Defendants Virginia Lee, Timothy Little ("Mr.Little"), Jeff Conway, and Neil Probst ("Dr.Probst") (collectively, "Employee Defendants") are employees of CCA who work at Jail II. [1] *Id.* at 2. For ease of discussion, CCA, Marion County, and the Employee Defendants will be referred to collectively as "Defendants ." Plaintiffs are former inmates at Jail II. [2] *Id.* at 3.

[1]     In their Reply, Plaintiffs request that the Court impose sanctions on Defendants because "Dr. Neil Probst and Administrator Timothy Little perjured themselves when asked about the elimination of [the] pill call round in depositions." Dkt. No. 115 at 1. Although the Court takes perjury seriously and has the power to sanction a party who commits perjury—*see Montano v. City of Chi.,* 535 F.3d 558, 563 (7th Cir.2008)—the Court concludes that neither Dr. Probst nor Mr. Little perjured himself. Dr. Probst's deposition testimony

—given in *Ellis v. CCA of Tennessee, LLC,* No. 1:08–CV–254 (S.D. Ind. filed Feb. 26, 2008)—that the third pill call had not been eliminated is consistent with his statement at a hearing in this case that not all inmates had their prescriptions reduced from three to two times per day. *Compare* Dkt. No. 107–3 at 4, *with* Dkt. No. 115–1 at 2–3. Mr. Little's testimony that the third pill call was not eliminated completely is also consistent. *See* Dkt. No. 2–3. In short, the Court concludes that Dr. Probst and Mr. Little did not commit perjury and, therefore, no sanction is appropriate.

2   On August 5, 2007, Plaintiff Carr was transferred from Jail II. Dkt. No. 111 at 3. Plaintiff Kress was transferred from Jail II fourteen days later. *Id.*

In their Complaint, Plaintiffs allege that Defendants committed a number of violations of state and federal law in the operation of Jail II. *Id.* at 2. In April 2008, Plaintiffs filed a motion seeking to serve as representatives for a class defined as "any and all persons currently, or who will be in the future, confined in the Jail # 2 facility." *Id.* at 3. In a November 29, 2010 Order ("Certification Order"), the Court certified Plaintiffs' requested class for Plaintiffs' allegations of unsafe prison conditions, violations of the Health Insurance Portability and Accountability Act ("HIPAA") during the intake process, and improper financial incentives for CCA administrators. *See generally id.* at 11–12, 15. The Court denied class certification on Plaintiffs' remaining allegations and, because Plaintiffs' transfer from Jail II rendered their individual claims moot, dismissed the remaining counts of the Complaint in their entirety. *Id.* at 9–11, 15.

On December 10, 2010, Plaintiffs filed the present Motion to Reconsider asking the Court to reconsider its decision to deny class certification and dismiss Counts One, Two, and Thirteen of the Complaint (the "Medical Care Counts"). *See generally* Dkt. No. 113. In the Medical Care Counts, Plaintiffs alleged that Defendants' decision to eliminate a third round of pill call in Jail II violated inmates' constitutional rights under the Eighth and Fourteenth Amendments, as well as Title 210, Section 3–1–11 of the Indiana Administrative Code.[3] Dkt. No. 17 ¶¶ 84–85, 98. Plaintiffs do not challenge any other parts of the Certification Order.

3   For purposes of a § 1983 suit, violations of the Indiana Administrative Code are examined under the federal constitutional framework. *See Estate of Clark v. Harris,* No. 2:03–CV–215, 2004 WL 2538644, at *3 (S.D.Ind. Oct. 19, 2004) (McKinney, C.J.); *see also Moore v. Marketplace Rest., Inc.,* 754 F.2d 1336, 1349 (7th Cir.1985); *Noland v. Wheatley,* 835 F.Supp. 476, 486 (N.D.Ind.1993).

The Court adds additional facts as necessary below.

## II. STANDARD

Rule 54(b) provides that:

> any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liability.

**\*2** FED. R. CIV. P. 54(b). Plaintiffs have asked the Court to reconsider aspects of a prejudgment interlocutory decision. Such decisions may be reconsidered at any time. *See In re 949 Erie St., Racine, Wis.,* 824 F.2d 538, 541 (7th Cir.1987); *Cameo Convalescent Ctr., Inc. v. Percy,* 800 F.2d 108, 110 (7th Cir.1986). Under the "law of the case" doctrine, the Court may refuse to consider that which has already been decided. *See Cameo Convalescent Ctr.,* 800 F.2d at 110. However, the Court has "the discretion to make a different determination of any matters that have not been taken to judgment or determined on appeal." *Id.* A motion to reconsider must be based on the need "to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.,* 90 F.3d 1264, 1269 (7th Cir.1996). "A 'manifest error' is not demonstrated by the disappointment of the losing party. It is the 'wholesale disregard, misapplication, or failure to recognize controlling precedent.' " *Oto v. Metro. Life Ins. Co.,* 224 F.3d 601, 606 (7th Cir.2000) (quoting *Sedrak v. Callahan,* 987 F.Supp. 1063, 1069 (N.D.Ill.1997)).

## III. DISCUSSION

In the Certification Order, the Court denied class certification for the Medical Care Counts, concluding that the allegations underlying the Medical Care Counts failed to meet the typicality requirement necessary for class certification under Federal Rule of Civil Procedure 23 ("Rule 23"). Dkt. No. 111 at 9. The Court stated:

> Claims of inadequate medical care by their nature require individual determinations, as the level of medical care required to comport with constitutional and statutory standards will vary depending on each inmate's circumstances, such as preexisting medical conditions. In examining prisoner claims regarding medical care, other courts have reached similar conclusions. *See, e.g., Orr [v. Elyea,* No. 08–CV–2232], 2009 WL 3837553, at *5 [ (C.D.Ill. Nov. 16, 2009) ] (concluding that claims of inadequate hepatitis treatment lacked typicality); *Smith v. Sheriff of Cook Cnty.,* No. 07–C3659, 2008 WL 1995079, at *2–*3 (N.D.Ill. May 6, 2008) (same for claims of inadequate dental care). The Court concludes that Plaintiffs have not shown the requisite typicality of the Medical Care Counts.

*Id.* In their Motion to Reconsider, Plaintiffs contend that because the Medical Care Counts involve a facility-wide policy of eliminating the third pill call, all members of the class 4 suffered the same violation and the named Plaintiffs' claims are typical. Dkt. No. 113 at 1. Plaintiffs allege that cost cutting, rather than individual patient welfare, drove the decision to eliminate the third pill call. *Id.* at 2–3. Because individual circumstances were not taken into account in eliminating the third pill call, Plaintiffs argue, individual determinations will be unnecessary to adjudicate the claims. *Id.* at 4.

**\*3** Plaintiffs' argument fails to appreciate the nature of the legal claims underlying the Medical Care Counts. As one court has said, typicality under Rule 23 is destroyed when "[t]here is a strong likelihood that each Plaintiff's case would necessarily be different ." *Orr v. Elyea,* No. 08–CV–2232, 2009 WL 3837553, at *5 (C.D.Ill. Nov.16, 2009). Under the Eighth and Fourteenth Amendments, inadequate medical care of prisoners is a violation when prison officials display "deliberate indifference to serious medical needs of prisoners." *Greeno v. Daley,* 414 F.3d 645, 652 (7th Cir.2005) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). Even assuming that elimination of the third pill call caused some injury to members of the requested class, whether the injury constitutes "deliberate indifference" is an individualized inquiry that requires an examination of the medical needs [4] of each prisoner and determine whether the elimination of the third pill call compromised a "serious medical need" of that prisoner. *Accord. id.* These necessary and individualized inquiries defeat typicality for Rule 23 purposes, and the Medical Care Counts are, therefore, inappropriate for class certification. [5] *See* Orr, 2009 WL 3837553, at *5. Plaintiffs have not shown a "manifest error" in the Certification Order, and, therefore, their Motion to Reconsider must be **DENIED.** *See Oto,* 224 F.3d at 606.

4      Issues relevant to this examination would include the type and dosage of medication at issue, the prisoner's overall health condition, possible efforts to adjust medication at other pill call opportunities, and other individual inquiries.

5      In contrast, Plaintiffs' allegations that Jail II's intake policy violates HIPAA's privacy provisions provide an example of a policy that leads to typical claims. *See* Dkt. No. 111 at 11–12. If the policy at issue is proven, the resulting HIPAA violations occur for all prisoners subjected to the policy—their private

## IV. CONCLUSION

For the reasons set forth herein, Plaintiffs' Motion to Reconsider (Dkt. No. 113) is **DENIED.**

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 304648

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue Flag – Appeal Notification

Appeal Filed by   YAHYA LINDH v. CHARLES SAMUELS, JR.,   7th
Cir.,   March 16, 2015

2015 WL 179793
Only the Westlaw citation is currently available.
United States District Court,
S.D. Indiana,
Terre Haute Division.

Yahya (John) LINDH, on his own behalf and
on behalf of those similarly situated, Plaintiff,
v.
DIRECTOR, FEDERAL BUREAU OF
PRISONS, in his official capacity, Defendant.

No. 2:14–cv–151–JMS–WGH.
|
Signed Jan. 14, 2015.

**Attorneys and Law Firms**

Kenneth J. Falk, Gavin Minor Rose, ACLU of Indiana,
Indianapolis, IN, for Plaintiff.

Jonathan A. Bont, Thomas E. Kieper, United States
Attorney's Office, Indianapolis, IN, for Defendant.

**Opinion**

JANE MAGNUS–STINSON, District Judge.

**\*1** Presently pending before the Court is Plaintiff Yahya
(John) Lindh's Motion to Certify Class. [*Filing No. 6.*] Mr.
Lindh is a prisoner in the Communications Management
Unit ("CMU") of the Terre Haute Federal Correctional
Institution. [*Filing No. 1 at 1.*] He brings a claim against
Defendant pursuant to the Religious Freedom Restoration
Act ("RFRA"), seeking injunctive relief from Defendant's
policy that "Islamic inmates may not hem or wear their
pants above the ankle." [*Filing No. 1 at 1.*] Mr. Lindh seeks
to represent a class defined as "all male Muslim prisoners
confined within the Bureau of Prisons." [*Filing No. 1 at 2.*]
Alternatively, he proposes a narrowed class that includes all
male Muslim prisoners confined within the Bureau of Prisons
who identify, or will identify, themselves as being required
by their religious beliefs to wear their pants above the ankle.
[*Filing No. 26 at 6.*] Defendant opposes class certification.
[*Filing No. 16.*] For the reasons that follow, the Court denies
Mr. Lindh's Motion to Certify Class. [*Filing No. 6.*]

**I.**

**STANDARD OF REVIEW**

It is the plaintiff's burden to prove that the class should be
certified. *Oshana v. Coca–Cola Co., 472 F.3d 506, 513 (7th
Cir.2006* ). The Court "may certify a class of plaintiffs if
the putative class satisfies all four requirements of Federal
Rule of Civil Procedure 23(a)-numerosity, commonality,
typicality, and adequacy of representation-and any one of the
conditions of Rule 23(b)." *Id.* The plaintiff also must show
that the class is "indeed identifiable as a class." *Id.*

The primary question when ruling on class certification is
"whether plaintiff is asserting a claim which, assuming its
merit, will satisfy the requirements of Rule 23." *Szabo v.
Bridgeport Machs., Inc., 249 F.3d 672, 675 (7th Cir.2001* ).
But Rule 23 "does not set forth a mere pleading standard."
*Parko v. Shell Oil Co., 739 F.3d 1083, 1085 (7th Cir.2014),
reh'g denied.* "Rather, when factual disputes bear on issues
vital to certification ... the court must receive evidence and
resolve the disputes before deciding whether to certify the
case." *Id.; see also Szabo, 249 F.3d at 676* (when deciding
whether to certify a class, the Court must "make whatever
factual and legal inquiries are necessary under Rule 23" to
resolve contested issues).

Mr. Lindh seeks to certify a class and obtain injunctive relief
in this action pursuant to Rule 23(b)(2). [*Filing No. 7 at 2.*]
Members of a Rule 23(b)(2) class do not receive notice and
cannot opt out. *Rahman v. Chertoff, 530 F.3d 622, 626 (7th
Cir.2008* ). A class may be certified under that section "only if
the party opposing the class acted or refused to act on grounds
that apply generally to the class." *Id. at 627.*

**II.**

**BACKGROUND**

Mr. Lindh is a prisoner housed in the CMU of the Terre
Haute federal prison. [*Filing No. 1 at 1; Filing No. 15 at 1*
(admitting allegation).] It is the policy of the Federal Bureau
of Prisons ("BOP") that inmates may not hem or wear their
pants above the ankle. [*Filing No. 1 at 1; Filing No. 15 at
1* (admitting that "it is the policy of the [BOP] that inmates

may not hem or wear their pants above the ankle").] Mr. Lindh is Muslim and alleges that "it is a clear tenant of Islam that Muslim men are prohibited from wearing pants below their ankles." [*Filing No. 1 at 1; Filing No. 15 at 1* (denying this allegation).] Mr. Lindh has been disciplined for wearing his pants above his ankles. [*Filing No. 1 at 4; Filing No. 15 at 4* (admitting allegation).] Mr. Lindh has exhausted his administrative remedies without Defendant altering the policy at issue. [*Filing No. 1 at 4; Filing No. 15 at 4* (admitting allegation).]

**\*2** In May 2014, Mr. Lindh filed a putative class action against Defendant. [*Filing No. 1.*] He contends that Defendant's policy of not allowing him to wear his pants above the ankle imposes a substantial and unjustified burden on his religious exercise, violating RFRA. [*Filing No. 1 at 1* (citing *42 U.S.C. § 2000bb–1*).] He seeks injunctive relief from the challenged policy on behalf of himself and the putative class members. [*Filing No. 1 at 1.*] Mr. Lindh proposes a class defined as "all male Muslim prisoners confined within the Bureau of Prisons." [*Filing No. 1 at 2.*] He now requests that the Court certify his proposed class, [*Filing No. 6* ], which Defendant opposes, [*Filing No. 16* ].

### III.

### DISCUSSION

In addition to the class certification prerequisites specifically enumerated in Federal Rule of Civil Procedure 23, it is the plaintiff's burden to prove "that the class is indeed identifiable as a class." *Oshana, 472 F.3d at 513*. The Court will address that requirement first, and then turn to the other class certification requirements set forth in Rule 23.

**A. Whether an Identifiable Class Exists**
In his opening brief, Mr. Lindh proposes a class of "all male Muslim prisoners confined within the Bureau of Prisons." [*Filing No. 7 at 2.*] He contends that this proposed class is identifiable and may be obtained by reference to objective criteria. [*Filing No. 7 at 3.*] Although Mr. Lindh acknowledges that a class "cannot be made up of membership contingent on any specific state of mind," he contends that his proposed class it still identifiable because it "is based on an objective criterion that is administratively feasible-the religious preference noted by male prisoners within the BOP." [*Filing No. 7 at 3.*]

In response, Defendant disagrees that Mr. Lindh's proposed class is sufficiently identifiable. [*Filing No. 16 at 4–8.*] Defendant claims that not all Muslims hold the same theological views regarding the required length of their pants. [*Filing No. 16 at 5.*] As support, Defendant submits an affidavit from Osama Said, a religious leader of the Muslim faith employed by the BOP. [*Filing No. 16–1.*] Because Mr. Said attests that not all Muslims hold the same theological views on this issue, Defendant argues that Mr. Lindh's proposed class "sweeps too broadly" and cannot be properly defined by objective criteria because the claim at issue hinges on inherently subjective questions regarding sincerely held religious beliefs. [*Filing No. 16 at 5–6.*]

In reply, Mr. Lindh emphasizes that Defendant has not submitted any evidence from Muslims incarcerated in the BOP who do not believe that they have to wear their pants above their ankles. [*Filing No. 26 at 4.*] He concedes that it is "certainly possible that there are a number who would continue to wear their pants long even if Mr. Lindh prevails in this action," but he argues that "[e]very Muslim prisoner is potentially harmed by the challenged policy." [*Filing No. 26 at 4–5.*] Mr. Lindh also points out that his proposed class could easily be redefined as "all male Muslims confined within the Bureau of Prisons who have identified themselves, or who will identify themselves, to the Bureau of Prisons as being required to wear their pants above their ankles in order to exercise their religious beliefs." [*Filing No. 26 at 6.*]

**\*3** To obtain class certification, "[t]he plaintiff must ... show ... that the class is indeed identifiable as a class." *Oshana, 472 F.3d at 513*. When "there is no way to know or readily ascertain who is a member of the class," the class "lacks the definiteness required for class certification." *Jamie S. v. Milwaukee Public Schools, 668 F.3d 481, 495 (7th Cir.2012* ).

"A sufficiently definite class exists if its members can be ascertained by reference to objective criteria." *Wallace v. Chicago Hous. Auth., 224 F.R.D. 420, 425 (N.D.Ill.2004* ) (citation omitted). "Cases have recognized the difficulty of identifying class members whose membership in the class depends on each individual's state of mind." *Simer v. Rios, 661 F.2d 655, 669 (7th Cir.1981);see also Wallace, 224 F.R.D. at 425* ("A class description is insufficient, however, if membership is contingent on the prospective member's state of mind."). The class definition must be sufficiently precise to make it "administratively feasible for the Court to

determine whether a particular individual is a member of the proposed class." *Wallace, 224 F.R.D. at 425.* The Seventh Circuit Court of Appeals has rejected certifying "across-the-board classes" pursuant to Rule 23(b)(2) as "a vehicle for nationwide injunctive relief." *Rahman v. Chertoff, 530 F.3d 622, 626 (7th Cir.2008);see also Jamie S., 668 F.3d at 496* (noting that previous "tolerance of a wildly indefinite class definition under Rule 23 is no longer the norm. We have noted that ... is a relic of a time when the federal judiciary thought that structural injunctions taking control of executive functions were sensible. That time is past.") (quotation omitted).

Mr. Lindh asserts a RFRA claim regarding Defendant's policy that he may not wear his pants above his ankles. [*Filing No. 1.*] RFRA "prohibits the federal government from placing substantial burdens on 'a person's exercise of religion' unless it can demonstrate that applying the burden is the 'least restrictive means of furthering ... [a] compelling governmental interest.' " *Korte v. Sebelius, 735 F.3d 654, 682 (7th Cir.2013* ) (quoting *42 U.S.C. § 2000bb–1(a)–(b)), cert. denied.* At a minimum, a substantial burden exists when the government compels a religious person to "perform acts undeniably at odds with fundamental tenets of [his] religious beliefs." *Korte, 735 F.3d at 682* (citing *Wisconsin v. Yoder, 406 U.S. 205, 218, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)* ). "Checking for sincerity and religiosity is important to weed out sham claims." *Korte, 735 F.3d at 683.*

The Court agrees with Defendant that Mr. Lindh's proposed class definition is not sufficiently definite. He seeks to represent a class of "all male Muslim prisoners confined within the Bureau of Prisons," [*Filing No. 6 at 1* ], but there is evidence in the record from a Muslim religious leader that there "is no uniformity of opinion or practice in the Muslim jurisprudence regarding the claims made by [Mr.] Lindh" regarding the required pant length, [*Filing No. 16–1 at 3* ]. The Court recognizes that Mr. Lindh submitted numerous declarations with his reply brief from other Muslim inmates attesting that they also believe that they are required by Islam to wear their pants above their ankles. [1] [*SeeFiling No. 26–4 to Filing No. 26–48.*] But Defendant has not disputed that Mr. Lindh and other prisoners may hold a sincerely held religious belief regarding the length of their pants. Instead, Defendant contends, and submits supporting evidence, that not all Muslims hold this same belief. The affidavits submitted with Mr. Lindh's reply do not address this point, which is crucial since Mr. Lindh seeks to represent a class of "*all* male Muslim prisoners confined within the

[BOP]" and it is his burden to prove that the class should be certified. [*Filing No. 6 at 1* (emphasis added).] If the Court were to certify a class that included prisoners who did not sincerely hold the religious belief at issue, the class would improperly include members who could not prove an element of the asserted RFRA claim. *See Oshana, 472 F.3d at 513–14* (affirming district court's decision not to certify class because some members of proposed class would be unable to prove elements of claim). Thus, certification is inappropriate.

1  The Court reminds counsel that new evidence should not be submitted with a reply and that it may be stricken. *Silver Streak Indus., LLC v. Squire Boone Caverns, Inc., 2014 WL 220682, at *1 (S.D.Ind.2014* ). Mr. Lindh may believe that he was replying to arguments raised in Defendant's response, but the Court finds that to be a risky position here, particularly since it is a plaintiff's burden to prove that a class should be certified. Mr. Lindh's opening brief was rather pro forma, stating conclusions but supported by little evidence. Reply is not the time to provide the evidentiary support that is required in the first place. Nevertheless, Defendant did not object, and the Court will consider the belated declarations in this case, however, because they does not affect the ultimate result of the Mr. Lindh's motion.

**\*4** In his reply brief, Mr. Lindh alternatively proposes redefining the class definition to include "all male Muslims confined within the [BOP] who have identified themselves, or who will identify themselves, to the [BOP] as being required to wear their pants above their ankles in order to exercise their religious beliefs." [*Filing No. 26 at 6.*] This narrowed definition, however, still fails because class membership would be based on a putative class member's state of mind. As Mr. Lindh acknowledges in his opening brief, a class "cannot be made up of membership contingent on any specific state of mind." [*Filing No. 7 at 3* (citing case law).] Mr. Lindh also acknowledges in his opening brief that the "class must be ascertainable by reference to objective criteria." [*Filing No. 7 at 3* (citing case law).] There is no evidence in the record, however, that members of the narrowed class would be ascertainable by reference to objective criteria-*i.e.,* that male Muslim prisoners ever specifically disclose to the BOP their position as to whether their understanding of Islam requires them to wear their pants above their ankles. In fact, the parties' Stipulation regarding the BOP's inability to produce information regarding the number of male Muslim prisoners who have been disciplined for wearing their pants above the ankle suggests otherwise. [*Filing No. 25.*] Because Mr. Lindh has not proposed a sufficiently definite class, his request for class certification must be denied.

## B. Federal Rule of Civil Procedure 23(a)

Although the Court has already concluded that Mr. Lindh has not proposed a sufficiently definite class for purposes of certification, it will summarily address the other certification factors set forth in Rule 23.

### 1) Numerosity

Mr. Lindh contends that his putative class is so numerous that joinder of all members is impracticable. [*Filing No. 7 at 3–5.*] He asserts that there are more than 174,000 prisoners in BOP custody, that more than 93% are male, and that approximately 6% are Muslim. [*Filing No. 7 at 4.*] Thus, Mr. Lindh calculates that there are approximately 9,709 members of the putative class he seeks to represent-all male Muslim prisoners confined within the BOP. [*Filing No. 7 at 4.*]

In response, Defendant argues that Mr. Lindh has not shown numerosity. [*Filing No. 16 at 8–10.*] He relies on his arguments regarding the lack of ascertainability of the class, specifically that because it is not ascertainable, numerosity should not be presumed just because Mr. Lindh asserts a civil rights claim seeking injunctive relief. [*Filing No. 16 at 9–10.*]

In reply, Mr. Lindh submits declarations from 45 Muslim prisoners who he contends share his religious belief that they should not wear pants below their ankles, but that the BOP policy at issue requires them to do so. [*Filing No. 26 at 10* (referencing *Filing No. 26–4* to *Filing No. 26 48* ).]

The Court can only certify a class that "is so numerous that joinder of all members is impracticable." *Fed. R. Civ. Pro. 23(a) (1 )*. "Although there is no 'bright line' test for numerosity, a class of forty is generally sufficient to satisfy Rule 23(a)(1)." *McCabe v. Crawford & Co., 210 F.R.D. 631, 644 (N.D.Ill.2002* ) (collecting cases); *Hubler Chevrolet, Inc. v. GMC Corp., 193 F.R.D. 574, 577 (S.D.Ind.2000* ). Geographic dispersion is one of the factors considered when evaluating the impracticability of joinder of all class members. *Young v. Magnequench Int'l, Inc., 188 F.R.D. 504, 506 (S.D.Ind.1999* ).

**\*5** The 45 declarations submitted by Mr. Lindh confirm that there are Muslim inmates geographically dispersed throughout the United States who share Mr. Lindh's sincerely held religious belief that they are required to wear their pants above the ankle. [*See Filing No. 26–4* to *Filing No. 26–48.*] Thus, although the Court has concluded that Mr. Lindh has

not proposed a sufficiently definite class, he has submitted sufficient evidence to show that his proposed class meets the numerosity requirement of Rule 23.

### 2) Commonality & Typicality

Mr. Lindh argues that his claim presents a common question of law-whether the Defendant's policy regarding pants length violates RFRA. [*Filing No. 7 at 6–7.*] Mr. Lindh contends that his claim is typical of the claims of the putative class members who he seeks to represent because "[t]here is a uniform policy affecting all class members." [*Filing No. 7 at 7.*]

In response, Defendant applies his arguments regarding the lack of ascertainability to the commonality and typicality requirements. [*Filing No. 16 at 10–12.*] Defendant argues that Mr. Lindh cannot show commonality because "he cannot show that the class claims arise from the same legal or remedial theory." [*Filing No. 16 at 11.*] Defendant specifically contends that "he has not shown (and cannot show) that the policy similarly burdens the religious practices of all Muslims in the Bureau of Prisons." [*Filing No. 16 at 11.*] Defendant argues that Mr. Lindh cannot satisfy typicality for similar reasons because the proposed class members do not necessarily have the same beliefs as Mr. Lindh; thus, his claim is not typical because some of the putative class members would have no injury. [*Filing No. 16 at 12–13.*]

In reply, Mr. Lindh claims that if his proposed class is amended to only include male Muslim prisoners who identify, or will identify, themselves as being required by their religious beliefs to wear their pants above the ankle, typicality and commonality are met. [*Filing No. 26 at 11–12.*] He emphasizes that Defendant's policy "is a common scheme affecting all class members and the class and Mr. Lindh have the same essential characteristics." [*Filing No. 26 at 11.*]

A class action requires "questions of law or fact common to the class," *Fed. R. Civ. Pro. 23(a)(2)*, and the plaintiff's claims or defenses must be "typical of the claims or defenses of the class[,]" *Fed. R. Civ. Pro. 23(a) (3 )*. Commonality is satisfied when there is a "common nucleus of operative fact," that is, a "common question which is at the heart of the case." *Rosario v. Livaditis, 963 F.2d 1013, 1018 (7th Cir.1992* ) (citation omitted). All questions of fact or law need not be identical; rather, the requirement is satisfied as long as the class claims arise out of the same legal or remedial theory. *In re Ready–Mixed Concrete Antitrust Litig., 261 F.R.D. 154, 167 (S.D.Ind.2009* ). The commonality and typicality requirements tend to merge because both "serve

as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of the Southwest v. Falcon, 457 U.S. 147, 158 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740* (1982 ). Although typicality may exist even if there are factual distinctions between the claims of the named plaintiffs and other class members, the requirement "directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *Muro v. Target Corp., 580 F.3d 485, 492 (7th Cir.2009)* (citation omitted ). "[S]uperficial common questions-like ... whether each class member 'suffered a violation of the same provision of law'-are not enough." *Jamie S., 668 F.3d at 497* (quoting *Wal–Mart Stores, Inc. v. Dukes, ––– U.S. –––, –––, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011)* ). Rather, commonality requires "that the class members have suffered the same injury," *Jamie S., 668 F.3d at 497,* and typicality requires that plaintiff's claims or defenses must be "typical of the claims or defenses of the class[,]" *Fed. R. Civ. Pro. 23(a)(3)* .

**\*6** The Court agrees with Defendant that deficiencies in the ascertainability of Mr. Lindh's proposed class adversely affect the existence of commonality and typicality as well. The superficial common question of law that Mr. Lindh proposes-whether Defendant's policy regarding the length of Muslim prisoners' pants violates RFRA-is insufficient because he seeks to represent all male Muslim prisoners housed by the BOP and the undisputed evidence in the record is that not all male Muslim prisoners share his religious belief on this issue. [*Filing No. 16 1.*] Commonality requires "that the class members have suffered the same injury," *Jamie S., 668 F.3d at 497,* but that cannot happen with the original class that Mr. Lindh proposes. Accordingly, Mr. Lindh has not met his burden to show that his proposed class meets the commonality and typicality requirements of *Federal Rule of Civil Procedure 23(a)(3).*

The Court also concludes that Mr. Lindh's narrowed class definition-all male Muslims confined within the BOP who have identified themselves, or who will identify themselves, to the BOP as being required to wear their pants above their ankles in order to exercise their religious beliefs-still does not meet the commonality and typicality requirements. Analyzing individualized factors to determine the parameters of individual claims is the antithesis of typicality. *See Puffer*

*v. Allstate Ins. Co., 255 F.R.D. 450, 469* (N.D.Ill.2009 ) ("Where, as here, a court would have to examine numerous individualized factors to determine the parameters of individual claims, the typicality requirement is not met.") (citing *Payton v. Cnty. of Carroll, 473 F.3d 845, 854 (7th Cir.2007)* ). Additionally, Mr. Lindh has been disciplined for wearing his pants above his ankles. [*Filing No. 1 at 4; Filing No. 15 at 4* (admitting allegation).] But of the 45 declarations that he submits from other prisoners, only two assert that they have also been disciplined for violating the BOP policy at issue. [*Filing No. 26–29; Filing No. 26–39.*] Thus, Mr. Lindh's claim may not "have the same essential characteristics as the claims of the class at large" because he may be entitled to relief that differs from most putative class members. *Muro, 580 F.3d at 492.* For these reasons, the Court concludes that even considering the narrowed class definition that Mr. Lindh proposes, he has failed to satisfy the commonality and typicality requirements of *Rule 23.*

### 3) Adequacy of Representation

*Federal Rule of Civil Procedure 23(a)(4)* requires the Court to find that "the representative parties will fairly and adequately protect the interests of the class." Mr. Lindh asserts that he and his counsel are adequate representatives for this class action. [*Filing No. 7 at 7–8.*] Defendant does not object in his response. [*Filing No. 16.*]

The adequacy inquiry is composed of two parts: "the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest[s] of the class members." *Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d 584, 598 (7th Cir.1993)* (citation and quotation marks omitted). To adequately represent the class, the representative plaintiff "must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689* (1997 ) (citation and quotation marks omitted).

**\*7** The Court has no reason to doubt the adequacy of Mr. Lindh's counsel. However, "[t]he adequacy-of-representation requirement tend[s] to merge with the commonality and typicality criteria of *Rule 23(a),* which serve as guideposts for determining whether ... maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id. at 626 n. 20* (citation and quotation marks omitted). For the same reasons the Court concluded that the

Case: 1:10-cv-04603 Document #: 499-1 Filed: 07/29/16 Page 365 of 369 PageID #:9385

commonality and typicality criteria are not met, the Court concludes that Mr. Lindh has not met his burden with this factor.

## C. Federal Rule of Civil Procedure 23(b)(2)

Federal Rule of Civil Procedure 23(b)(2) provides that "[a] class action may be maintained if *Rule 23(a)* is satisfied and if ... the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Fed. R. Civ. Pro. 23(b) (2 )*. Mr. Lindh claims that his proposed class should be certified pursuant to this rule. [*Filing No. 7 at* 8.] Defendant disagrees. [*Filing No. 16 at 13–14.*]

The requirements of *Rule 23(a)* are "prerequisites" to certification under *Rule 23(b). Szabo, 249 F.3d at 676.* "The key to the [Rule] (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted-the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal–Mart, 131 S.Ct. at 2557* (citation and quotation marks omitted). Moreover, "[t]he injunctive or declaratory relief sought must be final to the class as a whole." *Jamie S., 668 F.3d at 499* (citation and quotation marks omitted). "In other words, *Rule 23(b)(2)* applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Wal–Mart, 131 S.Ct. at 2557.*

The Court already has concluded that Mr. Lindh has not carried his burden to identify a sufficiently definite class and has failed to meet three of the four requirements under *Rule 23(a)*. This weighs against certification pursuant to *Rule 23(b)(3)* since the requirements of *Rule 23(a)* are "prerequisites."

*Szabo, 249 F.3d at 676.* Mr. Lindh maintains, however, that because he "seeks injunctive relief to prevent future alleged illegal deprivations of civil rights," he asserts a "prime example" of a proper class under *Rule 23(b)(2).* [*Filing No. 26 at 13* (citing *Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r, Indiana Dep't of Corr., 2010 WL 1737821, at *2 (S.D.Ind.2010)).*] While at first blush Mr. Lindh appears to seek injunctive relief from a uniform policy that applies to the putative class members, the undisputed evidence is that not all Muslims share the religious belief at issue, class membership would be contingent on a specific state of mind, and the class members would not be ascertainable by reference to objective criteria. It is also undisputed that Mr. Lindh has been disciplined for wearing his pants above his ankles, [*Filing No. 1 at 4; Filing No. 15 at 4* (admitting allegation) ], but that only two of the 45 declarants assert that they have also been disciplined for violating the policy at issue, [*Filing No. 26– 29; Filing No. 26–39* ]. Thus, it is possible that Mr. Lindh may be entitled to certain relief that most other putative class members are not. For these reasons, the Court concludes that certification under *Rule 23(b)(2)* is inappropriate.

## IV.

## CONCLUSION

**\*8** For the reasons detailed herein, the Court **DENIES** Mr. Lindh's Motion to Certify Class. [*Filing No.* 6.] The Court requests that the assigned Magistrate Judge set a case management conference with the parties. The Court also requests that the Clerk docket the applicable Practices and Procedures in this action.

## All Citations

Not Reported in F.Supp.3d, 2015 WL 179793

---

End of Document

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
**Distinguished by**    Holmes v. Godinez,    N.D.Ill.,    October 8, 2015

2009 WL 482370
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Lance WRIGHTSELL, Plaintiff,

v.

SHERIFF OF COOK COUNTY; and Cook County, Illinois, Defendants.

No. 08 CV 5451.
|
Feb. 19, 2009.

**Attorneys and Law Firms**

Kenneth N. Flaxman, Kenneth N. Flaxman, P.C., Thomas Gerard Morrissey, Chicago, IL, for Plaintiff.

Michael L. Gallagher, Cook County State's Attorneys Office, Chicago, IL, for Defendants.

### *MEMORANDUM OPINION AND ORDER*

JOHN W. DARRAH, District Judge.

 **\*1**  Plaintiff, Lance Wrightsell, has filed a Complaint under 42 U.S.C. § 1983 against Defendants Sheriff of Cook County and Cook County, Illinois. Wrightsell moves the Court to certify the case a class action pursuant to Federal Rule of Civil Procedure 23(b)(3), (Docket No. 10.) For the reasons stated below, the motion is denied.

### BACKGROUND

Wrightsell alleges that he was confined at the Cook County Jail from March 5, 2007 to September 19, 2007; he submitted repeated written requests to see a dentist because he was experiencing "severe tooth pain." However, he was not permitted to see a dentist during the entire time of his stay at the Cook County Jail and suffered permanent damage to his mouth. Wrightsell alleges that Defendants adopted a policy of providing dental care only in cases of extreme emergency and, in 2007, eliminated the positions of many of the dentists employed at the jail, leaving only one dentist responsible for the care of ten thousand people. Wrightsell alleges that this conduct constitutes a policy of "deliberate indifference to the dental needs of prisoners," causing injury to him and others similarly situated.

Wrightsell seeks an order that this case may be maintained as a class action on behalf of "[a]ll persons who, while confined at the Cook County Jail on and after September 23, 2006, made a request for treatment of dental pain and were not examined by a dentist within 7 days of that request." (Pltf. Mot. at 1.)

## LEGAL STANDARD

The Eighth Amendment prohibits prison officials from showing deliberate indifference to prisoners' serious medical needs. *Estelle v. Gamble,* 429 U.S. 103 (1976). In order to make out a claim of deliberate indifference, a plaintiff must show that he had an "objectively serious" medical or dental need and that prison officials were "deliberately indifferent" to that need. *Board v. Farnham,* 314 F.3d 469, 479–80 (7th Cir.2005).

The requirements for class certification are well known. To obtain class certification, a plaintiff must satisfy all four elements of Fed.R.Civ.P. Rule 23(a): (1) numerosity (the class must be "so numerous that joinder of all members is impracticable"); (2) commonality ("there are questions of law or fact common to the class"); (3) typicality ("the claims or defenses of the representative parties are typical of the claims or defenses of the class"); and (4) adequacy of representation ("the representative parties will fairly and adequately protect the interests of the class") Fed.R.Civ.P. 23(a).

In addition, in order to be certified, the action must fall within at least one of the three categories identified in Fed.R.Civ.P. Rule 23(b). Wrightsell seeks certification under Rule 23(b) (3), which provides that a class action may be maintained if:

> (3) the court finds that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

**\*2** Fed.R.Civ.P. 23(b)(3).

The party seeking certification bears the burden of establishing that certification is proper. *Trull v. Plaza Assoc.,* Case No. 97 C 0704, 1998 WL 578173, \*2 (N.D.Ill. Sept.3, 1998). The district court has broad discretion in determining the propriety of certification. *Keele v. Wexler,* 149 F.3d 589, 592 (7th Cir.1998); *Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 596 (7th Cir.1993).

## ANALYSIS

Wrightsell contends all of the requirements of Rule 23 are satisfied. As to Rule 23(a), numerosity exists because Defendants produced, in a prior case in this district, *Smith v. Sheriff of Cook County, et al.,* Case No 07 CV 3659 (Smith), more than 200 grievances by prisoners complaining of inadequate dental care in the Cook County Jail. Commonality exists because one "overriding issue" is common to all potential class members in the case—*i.e.,* "Did defendants' action in 2007 to leave one dentist responsible for the care often thousand persons cause plaintiff and others similarly situated to be deprived of rights secured by the Fourteenth Amendment?" Wrightsell's claims are typical of the class because the claims of each plaintiff "are united in their allegation that they all received constitutionally inadequate treatment flowing from the same systemic deficiencies in defendants' dental program." They all allege "dental pain, a request to see a dentist, and either no dental treatment, or a long delay before being seen by a dentist." Finally, there is adequacy of representation because Wrightsell does not have any conflict with other proposed class members and is represented by competent counsel.

Wrightsell contends certification is appropriate under Rule 23(b) (3) "because common questions predominate over individual issues ... and a class action is superior to other methods for the fair and effective adjudication of the controversy."

Defendants oppose certification, disputing the existence of commonality and typicality under Rule 23(a), as well as predominance under Rule 23(b)(3). [1] Defendants rely primarily on Judge Leinenweber's decision in Smith denying class certification on similar facts.

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works. 2

2009 WL 482370

1    Defendants also dispute Wrightsell's adequacy as a class representative on the basis that he lacks credibility due to his history of multiple felony convictions.

In *Smith,* as here, plaintiffs challenged the constitutional adequacy of the dental care afforded prisoners at the Cook County Jail. The *Smith* plaintiffs alleged—as Wrightsell does here—that the Cook County Jail and Cook County had a policy of deliberate indifference to the dental needs of inmates at the jail, and this constituted a violation of the Eighth Amendment. The *Smith* plaintiffs also alleged—as Wrightsell does here—that the defendants drastically reduced the dental staff at the jail in 2007 such that only one dentist was responsible for the care of the nearly ten thousand inmates detained there.

Judge Leineneweber found these facts insufficient to support certification under Rule 23 in an intial opinion and a subsequent opinion addressing a motion for reconsideration. Although *Smith* acknowledged that the issue of deficient staffing at the jail was a common one (such that the plaintiffs could potentially show "system-wide indifference" to prisoners' dental needs in a single proceeding), that case held that commonality and typicality were lacking. Specifically, because an Eighth Amendment claim would require resolution of both an objective and subjective element for each prisoner, a detainee must first show that he had "an objectively serious medical need that resulted in significant harm or injury by inattention." In addition, the detainee must show "that the inattention was a result of a sufficiently culpable state of mind so as to constitute deliberate indifference, a subjective inquiry." *Smith,* 2008 WL 1995059, at *1. *Smith* thus found that each prisoner must show "that he had a condition that required dental care; ... that he did not receive adequate dental care; ... that he suffered significant injury or harm; and ... that the injury or harm was causally related to the inadequate care." Further, in light of these necessary but highly individualized inquiries, *Smith* found that "each plaintiff's case would necessarily be different" and "no case would be typical," making the case inappropriate for certification under Rule 23(a). *Smith,* 2008 WL 1995059, at *2.

 **\*3**  After considering plaintiffs' motion for reconsideration, the court held that certification was not appropriate under Rule 23(b) (3). The court reasoned that even if common issues (in particular, the issue of the system-wide inadequacy of dental staffing at the jail) could be determined "separate and apart from the individualized inquiries pertaining to each prisoner's condition and care," a bifurcated approach was not "an efficient or superior means of resolving Plaintiffs' claims." *Smith,* 2008 WL 4866071, at *2. The court noted that the common issue presented would "not be fact intensive" but, rather, "the issues of individual causation and damages will likely encompass the vast majority of the time and resources necesssary to judge Plaintiffs' claims.... Therefore, certification of the narrow issue of the jail's reduction of dental staff would not satisfy the predominance requirement of Rule 23(b)(3)." *Id.* The court concluded, "[t]he issues of individual causation and injury will be more appropriately and efficiently resolved in separate proceedings, and the Plaintiffs' claims will not be meaningfully advanced or more quickly resolved by uniform decision on the common issue of staff reduction." *Id.* The Seventh Circuit subsequently denied a petition by the *Smith* plaintiffs for permission to appeal Judge Leinenweber's decision in *Smith* pursuant to Fed.R.Civ.P. 23(f), which permits courts of appeal to accept interlocutory appeals from class certification decisions.

Wrightsell urges the Court to decline to follow *Smith* and certify this virtually identical case as a class action for three reasons: (1) the proposed class in *Smith* is different from the proposed class here; (2) the factual assumptions underlying *Smith* are inconsistent with recent findings of the United States Department of Justice about inadequate dental care at the jail; and (3) the legal theories applied in *Smith* are contrary to the Seventh Circuit's decision in *Arreola v. Godinez,* 546 F.3d 788 (7th Cir.2008) (*Arreola* ).

Judge Leinenweber's analysis in *Smith* is instructive, and his reasoning is applicable here. Individual—not common—issues predominate in the case, and a class action would not be a superior means of resolving the alleged Eighth Amendment claim regarding dental care at the Cook County Jail. Wrightsell's assertions to the contrary are not persuasive.

First, Wrightsell's argument that the proposed class is defined differently than in *Smith* is not persuasive. The proposed class in *Smith* was defined as all persons who made a request for treatment of dental pain while confined at the Cook County Jail and "did not receive *timely* treatment of a dentist"; whereas, the proposed class here is defined as all persons "who made a request for treatment of dental pain and were not examined by a dentist within *7 days* of that request." This change in the class proposed here does not obviate the deficiencies with the commonality, typicality and predominance requirements addressed in *Smith* and

2009 WL 482370

present here. Rather, "timeliness" as proposed in *Smith* as the standard of adequate care is consistent with determining whether Defendants acted with deliberate indifference to dental needs (the substantive constitutional claim). This standard requires a case-by-case analysis and factual determination as to the degree of seriousness of dental impairment of each detainee versus the time within which treatment was provided. The proposed class here purports to make the failure to render dental treatment within seven days of request by a detainee actionable. This proposed time period could be inconsistent in some cases with the constitutional requirement. The reasonableness of the time of treatment measured from seven days of a detainee's request could be unreasonable for a very obvious and serious painful dental emergency requiring immediate treatment. Conversely, treatment for a minor dental problem could be adequate even if provided two weeks or more from the date of the request.

**\*4** Further, contrary to Wrightsell's assertion, the legal theories applied in *Smith* are not contrary to the Seventh Circuit's decision in *Arreola. Arreola* did not hold that a district court must certify a class under Rule 23(b)(3) under the circumstances here. Rather, the court narrowly held that "the need for individual damages determinations does not, in and of itself, require denial of [a] motion for certification." *Arreola,* 546 F.3d at 801.

## CONCLUSION

For all of the reasons stated above, Wrightsell's motion for class certification is denied.

## All Citations

Not Reported in F.Supp.2d, 2009 WL 482370

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.