# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DON LIPPERT, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Case No. 10 C 4603 |
| v. | ) |
| | ) Judge Jorge L. Alonso |
| JOHN BALDWIN, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Before the Court is plaintiffs' motion for class certification [394]. For the reasons set forth below, the motion is granted.

## BACKGROUND

This is a putative class action alleging that the health care provided to incarcerated individuals in the Illinois Department of Corrections ("IDOC") violates constitutional standards. Plaintiffs seek injunctive relief barring unconstitutional practices and requiring defendants to submit and implement a plan to address violations. A court-appointed medical expert, Dr. Ronald Shansky, has conducted an investigation and issued a final report [339].[1]

## STANDARD

"To certify a class, a district court must find that each requirement of Rule 23(a) (numerosity, commonality, typicality, and adequacy of representation) is satisfied as well as one subsection of Rule 23(b)." *Harper v. Sheriff of Cook Cty.*, 581 F.3d 511, 513 (7th Cir. 2009). "Plaintiffs bear the burden of showing that a proposed class satisfies the Rule 23 requirements . .

---

[1] The parties filed an agreed motion pursuant to Fed. R. Evid. 706 to appoint Dr. Shansky as the expert in this case [240]. That motion was granted in December 2013 [244].

. by a preponderance of the evidence." *Messner v. Northshore Univ. Health Sys.,* 669 F.3d 802, 811 (7th Cir. 2012). "Failure to meet any of the Rule's requirements precludes class certification." *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008).

## DISCUSSION

Plaintiffs seek to certify a class of "all prisoners in the custody of the Illinois Department of Corrections with serious medical or dental needs." (Pls.' Mem. at 4.)

**<u>Ascertainability</u>**

"An implied requirement of Rule 23(a) dictates that the plaintiffs' proposed class definition be 'sufficiently definite that its members are ascertainable.'" *Holmes v. Godinez,* 311 F.R.D. 177, 213 (N.D. Ill. 2015) (quoting *Jamie S. v. Milwaukee Pub. Schs.,* 668 F.3d 481, 493 (7th Cir. 2012)). To satisfy this requirement, plaintiffs "must define the class with reference to 'objective criteria' and propose 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Id.* (quoting *Jenkins v. White Castle Mgmt. Co.,* 12 C 7273, 2015 WL 832409, at *5 (N.D. Ill. Feb. 25, 2015)). "[A] class of unidentified but potentially . . . eligible . . . [individuals] is inherently too indefinite to be certified." *Jamie S.,* 668 F.3d at 496.

Defendants argue that plaintiffs' proposed class lacks the definiteness required for certification, contending that there is "no objective, administratively feasible way to determine which inmates have serious medical or dental needs" and that they do not maintain a master list of inmates with serious medical or dental needs. (Defs.' Resp. at 26-27.) Defendants also contend that plaintiffs do not have standing to sue because they have received proper medical treatment. (*Id.* at 27.) Plaintiffs counter that the class is plainly identifiable—inmates with diagnosed medical or dental needs—and that defendants' own records "list thousands of

2

prisoners diagnosed as needing medical or dental treatment." (Pls.' Mem. at 4-5; Pls.' Reply at 7.)[2] Plaintiffs further contend that the Seventh Circuit has rejected a heightened ascertainability standard and that there are adequate records to identify class members. (Pls.' Reply at 25-26.) Finally, plaintiffs assert that defendants wrongly insist that this case is about inmates who have suffered past harm. (*Id*. at 27.) Plaintiffs emphasize that they are seeking injunctive relief from future harm for which they (and class members) are at risk because of defendants' flawed healthcare system. (*Id*.)

For purposes of the Eighth Amendment, "[a] serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley,* 414 F.3d 645, 653 (7th Cir. 2005). Contrary to defendants' assertions, the Court finds several documents attached as exhibits to the briefs that can serve as "objective, administratively feasible way[s] to determine which inmates have serious medical or dental needs." For example, Menard's "Monthly Quality Improvement Meeting Agenda" dated October 27, 2015 is attached as Exhibit 4 to plaintiffs' memorandum in support of its motion for class certification. Therein, objective measures of inmates' health for September 2015 are delineated as follows: nine inmates visited the ER, six were hospitalized, sixty had their cases brought to the collegial review board, thirteen had outpatient surgery, thirty-five had initial or follow-up consults, nine had CTs or MRIs, two had dental surgery, three died, eleven had new diagnoses, forty-two were admitted to the infirmary, forty were injured, and over fifteen hundred were enrolled in chronic clinics. (Pls.' Mem. Ex. 4 IDOC Update 002331-41.) The last page of the agenda indicates that the next meeting was scheduled for November 30, 2015, and that the report had been prepared by Annette

---

[2] In support of that contention, plaintiffs cite evidence indicating that in September 2015 there were 1,520 prisoners enrolled in chronic clinics at Menard and over 1,000 enrolled in similar clinics at Dixon. (Pls.' Mem. at 6; Exs. 4 & 5.)

Rodgers, Medical Records Supervisor. (*Id*. at 002348.) On its face, this report demonstrates that defendants have lists (apart from inmates' individual medical files) indicating which inmates requested and/or received treatment, presumably for serious medical conditions. Even if such records did not exist, requiring a review of individual medical files would not preclude class certification. *See Moreno v. Napolitano,* Case No. 11 C 5452, 2014 WL 4911938, at *6 (N.D. Ill. Sept. 30, 2014) ("[T]he necessity of manually reviewing [tens of thousands of] forms does not preclude certification of the class."). The Court also rejects defendants' standing argument because the Supreme Court has held that "the Eighth Amendment protects against future harms to inmates" and a "remedy for unsafe conditions need not await a tragic event." *Helling v. McKinney,* 509 U.S. 25, 33 (1993); *see also Henderson v. Sheahan,* 196 F.3d 839, 846-47 (7th Cir. 1999) ("[T]he Eighth Amendment protects prisoners not only from a prison['s] . . . deliberate indifference to a prisoner's current serious health problems, but also from . . . deliberate indifference to conditions posing an unreasonable risk of serious damage to the prisoner's future health."). Accordingly, the Court finds that plaintiffs' class is ascertainable.

### **Rule 23(a)**

#### **Numerosity**

A class may be certified if it is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiff argues that numerosity is easily satisfied here because the proposed class has thousands of members. (Pls.' Mem. at 5.) As of August 2015, IDOC housed 47,000 prisoners, thousands of whom are afflicted with serious health conditions. (*Id*. at 5-6; Exs. 2 & 4.) Defendants confirm these numbers. (Defs.' Resp. at 1.) The Court finds that plaintiffs therefore meet the numerosity requirement. *See Streeter v. Sheriff of Cook Cty.,* 256 F.R.D. 609, 612 (N.D. Ill. 2009) (finding that the numerosity requirement was met

when plaintiffs submitted evidence demonstrating the proposed class consisted of "at least several thousand members").

**Commonality**

To meet the commonality requirement, plaintiffs must show there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff[s] to demonstrate that the class members have 'suffered the same injury.'" *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2551 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 157 (1982)). "The class 'claims must depend upon a common contention,' and '[t]hat common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Jamie S.,* 668 F.3d at 497 (quoting *Gen. Tel. Co.,* 457 U.S. at 157). "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Suchanek v. Sturm Foods, Inc.,* 764 F.3d 750, 756 (7th Cir. 2014).

Plaintiffs assert Eighth and Fourteenth Amendment challenges to defendants' system-wide policies and practices that allegedly deprive all proposed class members of access to adequate healthcare and put them at risk for harm. (Pls.' Mem. at 7.) They argue that the prospect of common answers regarding systemic deficiencies in IDOC's healthcare system that create a risk of harm for all class members satisfies the commonality requirement. (*Id*.) Plaintiffs contend that courts routinely find commonality and certify classes seeking injunctive relief to address unconstitutional prison conditions, including inadequate healthcare, where prisoners allege system-wide practices or failures that result in constitutional violations. (*Id.* at 8.) Plaintiffs allege nine IDOC policies and practices, laid out in detail in the expert report, that

5

commonly affect the class. (*Id*. at 9-20; 4th Am. Compl. ¶¶ 15, 21-104.) These policies and practices include:

> 1) chronically failing to fill medical leadership and other medical staff vacancies (*See, e.g.,* Pls.' Reply Ex. 3C Pattison Dep. at 46, 57-58; *Id.* Ex. 3E Ruffin Dep. at 156-160.);[3]
>
> 2) routinely permitting under-qualified medical professionals to treat prisoners (*See, e.g.,* Pls.' Mem. Ex. 27 Ruffin Decl. ¶ 4.);[4]
>
> 3) failing to timely identify medical problems at reception and intrasystem transfer (*See, e.g.,* Pls.' Mem. Ex. 25 Martin Decl. ¶ 9; Pattison Dep. at 29-30.);[5]
>
> 4) failing to manage chronic diseases (*See, e.g.,* Pls.' Mem. Ex. 22 Lippert Dep. at 28; *Id.* Ex. 26 Rice Decl. ¶¶ 2-13; *Id.* Ex. 28 Thomas Decl. ¶¶ 7, 10-16.);[6]
>
> 5) failing to promulgate appropriate infirmary policies (*See, e.g.,* Martin Decl. ¶¶ 10-12.);[7]
>
> 6) delaying and denying specialty care (*See, e.g.,* Pls.' Mem. Ex. 23 Pattison Decl. ¶¶ 4-6, 8-11, 13-16; Martin Decl. ¶ 6; Rice Decl. ¶¶ 15, 17; Ruffin Decl. ¶¶ 4, 6-9; Thomas Decl. ¶¶ 6, 8.);[8]

---

[3] The expert team noted that "Leadership is a problem at virtually all of the facilities [they] visited." (Expert Report at 5.) Plaintiffs contend that "without reliable leadership, a healthcare unit cannot provide safe, consistent care." (Pls.' Mem. at 9.)

[4] The team explained that the term underqualified clinician means that the provider is "underqualified to practice the type of medicine required of the position." (Expert Report at 7.) According to the experts, such staffing has resulted in "avoidable harm" caused by "inappropriate management of common primary care conditions." (*Id*. at 6.)

[5] According to the expert report, the team "found problems in almost every facility[.]" (Expert Report at 14.) At one institution the team noted that "virtually every intrasystem transfer record we reviewed was significantly flawed . . . [which] guarantees delays in care." (*Id*. at 15.)

[6] The expert report indicates that "the most important and overarching problem is the cookie cutter approach to chronic disease management, in that policy dictates that all patients are somewhat arbitrarily seen only three times a year regardless of how well or how poorly their disease control may be." (Expert Report at 19.) This practice "exposes patients to longer periods of increased risk of harm." (*Id*.)

[7] The expert team remarked, "the most glaring [policy issue] is the lack of a description of the scope of services that can safely be provided in the infirmary setting." (Expert Report at 32.) This leads to "failed or inadequate responses to serious medical instability." (Pls.' Mem. at 14.)

[8] The expert report indicates that at some IDOC institutions, the delay from verbal approval by Wexford to receipt of approval by the off-site provider "can extend up to eight weeks or more." (Expert Report at 29.) The team further stated, "During our review of records, we found breakdowns in almost every area,

7) poor recordkeeping, resulting in inadequate and incomplete files (*See, e.g.,* Rice Decl. ¶ 19; Pls.' Reply Ex. 3F Thomas Dep. at 129-30.);[9]

8) failing to implement or follow their own improvement program;[10] and

9) failure to properly manage dental care services (*See, e.g.,* Martin Decl. ¶ 9; Thomas Decl. ¶¶ 17-20.).[11]

Defendants argue that plaintiffs offer no evidence that their alleged common issues actually injured the entire class. (Defs.' Resp. at 7.) They further argue that even if plaintiffs could present evidence of a common issue to the inmates at one prison, they have presented no evidence that the same issues exist at all twenty-five IDOC prisons. (*Id.* at 7-8.)[12] Specifically, defendants contend that plaintiffs rely on speculation when they allege that medical staff vacancies have injured the class. (*Id.* at 8.) They also assert that no named plaintiffs have experienced medical issues related to reception or transfer or that there are any current problems with either of these procedures. (*Id.* at 10-11.) Defendants argue that plaintiffs have not identified a named plaintiff who has suffered from IDOC's policy of only being seen by medical

---

starting with delays in identification of the need for the offsite services, delays in obtaining an authorization number, delays in being able to schedule an appointment timely, delays in obtaining offsite paperwork and delays or the absence of any follow-up visit with the patient." (*Id.*)

[9] The team noted, "[t]he quality of the medical records was poor at most of the facilities we visited . . . [and] [i]n many instances, important information was missing from health records[.]" (Expert Report at 15.) Such disorganized record keeping impedes the ability "to make appropriate clinical decisions." (*Id.* at 16.)

[10] The expert report indicates that the team was "unable to find [documentation of a services assessment], in any of the . . . institutions [they] reviewed." (Expert Report at 44.)

[11] The team also stated that "[t]he Administrative Directives [to the dental programs] are insufficient. They do not address quality of care issues, clinic management, record management or staff oversight and responsibilities." (Expert Report at 40.) These lapses put patients at risk for inadequate and non-continuous care. (Pls.' Mem. at 20.)

[12] The Court notes that among the expert report, the fourth amended complaint, and the briefs related to plaintiffs' motion for class certification, there is documentation of at least one instance in which policies or practices at each of the twenty-five IDOC facilities have allegedly deprived class members of access to adequate health care and/or put them at risk for harm.

staff three times a year or that all IDOC facilities follow this policy. (*Id*. at 11.) They further contend that none of the named plaintiffs have alleged that they suffered a constitutional injury due to the denial of specialty care, defendants' record-keeping practices, IDOC's quality improvement program, or deficiencies in IDOC's dental program. (*Id*. at 12-14.) Plaintiffs counter that at this stage, they only need to establish, by a preponderance of the evidence, that there are systemic problems that endanger all class members. (Pls.' Reply at 2.) Plaintiffs contend that they have met this burden, because the expert report has established that these systemic issues exist. (*Id.*) Plaintiffs assert that the prospective relief they seek does not require a past injury; rather, it requires that they are put at substantial risk by defendants' healthcare system. (*Id*. at 4.) Plaintiffs further assert that the evidence of common answers is provided for in the expert report, wherein several systemic deficiencies are identified and led the expert team to conclude that defendants violated minimum constitutional standards. (*Id.* at 9-10.)[13] Plaintiffs contend that the parties do not disagree about the common questions, but about what the answers are—which is the purpose of trial. (*Id.* at 13-14.)

Here, plaintiffs (and the Court-appointed expert) have identified nine IDOC policies and practices that allegedly put them at substantial risk of serious harm in violation of the Eighth Amendment. The question common to all plaintiffs, then, is whether each of defendants' policies and practices do in fact put inmates with serious medical conditions at risk. As other courts have held, such a question satisfies Rule 23's commonality requirement. *See Parsons v. Ryan,* 754 F.3d 657, 678, 681 (9th Cir. 2014) ("What all members of the putative class . . . have in common is their alleged exposure, as a result of specified statewide [department of corrections'] policies and practices that govern the overall conditions of health care services . . .

---

[13] Plaintiffs reiterate that the expert was Court-appointed and agreed to by the parties. (Pls.' Reply at 9.)

to a substantial risk of serious future harm to which the defendants are allegedly deliberately indifferent. . . . The putative class . . . members thus all set forth numerous common contentions whose truth or falsity can be determined in one stroke: whether the specified statewide policies and practices to which they are all subjected by [the department of corrections] expose them to a substantial risk of harm. . . . [E]ither each of the policies and practices is unlawful as to . . . inmate[s with serious medical needs] or it is not. That inquiry does not require us to determine the effect of those policies and practices upon any individual class member or to undertake any other kind of individualized determination. . . . [H]ere there is only a single answer to questions such as 'do [department of corrections'] staffing policies and practices place inmates at a risk of serious harm?'"); *see also Phillips v. Sheriff of Cook Cty.,* 828 F.3d 541, 557 (7th Cir. 2016) ("If plaintiffs can present classwide evidence that a prison is engaging in a policy or practice which rises to the level of a systemic indifference, then we can identify 'conduct common to members of the class' which advances the litigation. . . . [A] class action probably could be brought where plaintiffs presented some evidence that a prison had a policy that regularly and systematically impeded timely examinations [or] had such a consistent pattern of egregious delays in medical treatment that a trier of fact might infer a systemic unconstitutional practice.").

"[N]umerous courts have concluded that the commonality requirement can be satisfied by proof of the existence of systemic policies and practices that allegedly expose inmates to a substantial risk of harm." *Parsons,* 754 F.3d at 681 (citing *Chief Goes Out v. Missoula Cty.,* No. 12 Civ. 155, 2013 WL 139938, at *5 (D. Mont. Jan. 10, 2013); *Butler v. Suffolk Cty.,* 289 F.R.D. 80, 98 (E.D.N.Y. 2013); *Hughes v. Judd*, No. 12 Civ. 568, 2013 WL 1821077, at *23 (M.D. Fla. Mar. 27, 2013); *Rosas v. Baca*, No. 12 Civ. 428, 2012 WL 2061694, at *3 (C.D. Cal. June 7, 2012); *Ind. Prot. Advocacy Servs. Comm'n v. Comm'r Ind. Dep't of Corr.,* No. 08 Civ. 1317,

9

2012 WL 6738517, at *18 (S.D. Ind. Dec. 31, 2012)). The Court agrees with these courts and finds that by identifying specific policies and practices that allegedly put inmates with serious medical needs at substantial risk for harm, plaintiffs have met Rule 23's commonality requirement. *See Braggs v. Dunn,* 317 F.R.D. 634, 655-56 (M.D. Ala. 2016) ("Here, plaintiffs have identified eight different specific policies or practices, and offered significant proof that they are common to the class of prisoners in Alabama with serious mental illnesses. This is all plaintiffs need to for purposes of class certification[.]").

This case is factually distinguishable from those cited by defendants in which class certification was denied. For example, in *Phillips*, the Seventh Circuit affirmed the district court's decision to decertify a class of prisoners when the evidence showed "that the detainees' claims were best characterized as claims of isolated instances of indifference to a particular inmate's medical needs." 828 F.3d at 554.[14] That is not the case here; while the investigative team did not visit each IDOC facility, it did visit eight facilities[15] and noted that in the team's experience, "when a system is able to meet constitutional standards at the most challenged institutions, it is very likely to meet constitutional standards at the less challenging facilities. The converse, however, in [its] experience has not proven to be true." (Expert Report at 4.) The

---

[14] The court initially found a question common to the class concerning inadequate dental staffing. *Phillips,* 828 F.3d at 548. However, remedial measures, including increasing the number of dentists and implementing policies that aligned with national standards, eliminated that common question. *Id.* Further, none of the newly-alleged common questions "pointed to a systematically deficient practice," so the court found that the commonality requirement was no longer met and decertified the class. *Id.* at 549.

[15] The expert team was tasked with "assist[ing] the Court in determining whether the state of Illinois was able to meet minimal constitutional standards with regard to the adequacy of its health care program for the population it serves." (Expert Report at 3.) To answer that question, the parties determined that the expert team should visit at least eight facilities, six of which were jointly selected. (*Id.*) The parties agreed that these six facilities have "special responsibilities within the system and are critical to a determination as to whether, when the health care systems are most challenged, they are able to adequately meet that challenge." (*Id.*)

expert report concludes: "From the eight site visits,[16] the interviews with staff and inmates, the review of institutional documents,[17] the review of medical records, including death records and mortality reviews,[18] we have concluded that the State of Illinois has been unable to meet minimal constitutional standards with regards to the adequacy of its health care program for the population it serves." (*Id.* at 45.)[19] The Court concludes that plaintiffs have established commonality.

---

[16] The expert team visited and issued individual reports for Stateville, Northern Reception Center, Dixon, Pontiac, Logan, Illinois River, Hill, and Menard. (Expert Report Ex. A.) In the agreed order appointing Dr. Shansky as the expert, the parties "tentatively recommended" that the expert visit Stateville/Northern Reception Center, Dixon, Logan, Hill, and Western. (Expert Order at 3-4.) The Order also indicated that "the Expert may elect to visit other facilities or decline to visit any of the recommended facilities at his discretion." (*Id*. at 4.)

[17] An email sent in September 2015 from IDOC Medical Director Louis Shicker indicated that there were medical backlogs at Dixon, Hill, Illinois River, Jacksonville, Logan, Menard, Pinckneyville, Taylorville, and Vienna because they "do not have their providers." (4th Am. Compl. ¶ 28; Ex. 7.) The same email notes that Decatur and Big Muddy have "unacceptable dental" and that Western is "getting bad." (*Id*.) In a death review of an inmate who had recently been transferred to Robinson, Wexford noted that there "were communication deficiencies that occurred during the transfer." (Pls.' Reply Ex. 5 at 4.) IDOC emails about the inmate's death reveal that Robinson did not have a doctor at the time. (*Id*. Ex. 4.) Email communication in December 2012 between IDOC officials and Wexford administrators indicated that there were "way too many Medical Director vacancies" and listed key medical vacancies at Northern Reception Center, Stateville, Dwight, Logan, Shawnee, Taylorville, Pontiac, Hill, Lawrence, and Southwestern. (Pls.' Mem. Ex. 7.)

[18] The expert team reviewed 52 percent of the non-violent deaths that occurred in IDOC facilities from January 2013 through June 2014. (Expert Report Ex. B at 1.) The team found one or more significant lapses in care in 60 percent of those cases. (*Id*.) The deaths they reviewed occurred at Dixon, Big Muddy, Lincoln, Pickneyville, Stateville, Hill, Centralia, Illinois River, Menard, Pontiac, Graham, Shawnee, and Vienna. (*Id*. at 1-26.)

[19] In addressing variations in needs of plaintiffs and levels of care at different facilities, the court in *Braggs* stated, "Although it is true that there are some differences between the various men's facilities, in terms of the populations incarcerated there and the ways certain forms of mental-health care are delivered . . . this does not defeat commonality for two principal reasons. First, plaintiffs' experts have cited evidence showing, and concluded, that the practices at issue are fairly consistent across the major facilities they inspected. . . . [and] [s]econd , . . . the named plaintiffs' records clearly reflect that they are transferred very frequently between a large number of different facilities[.]" 317 F.R.D. at 660-61.

**Typicality**

To meet the typicality requirement, the named plaintiffs' claims must be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The Seventh Circuit has instructed that "there must be enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. The Boeing Co.,* 633 F.3d 574, 586 (7th Cir. 2011).

Plaintiffs argue that their claims are typical of the proposed class as a whole because each of them has serious medical or dental needs, has suffered harm, and is at risk of further harm because of the defendants' systemic health care inadequacies. (Pls.' Mem. at 21-22.) The named plaintiffs and proposed class seek the same injunctive relief—reform of the systemic deficiencies in the provision of health and dental care in IDOC. (*Id*. at 27.) Plaintiffs assert that differences in injuries or needs is not fatal to certification, because Rule 23(a)(3) requires that plaintiffs' claims only need to be typical of the class, not identical to each other or every class member's. (*Id*.) Further, because the risk of injury arises from IDOC's system-wide policies and practices, the plaintiffs' claims are typical of those of the class. (*Id*. at 28.) Defendants argue that none of the named plaintiffs in this case have alleged constitutional violations because none of them have been treated with deliberate indifference and so their claims are not typical of the class. (Defs.' Resp. at 15-25.) Plaintiffs counter that defendants ignore their claim of typicality, which asserts that the named plaintiffs and the class members share the risk of harm as a result of the unreasonably dangerous healthcare system run by defendants. (Pls.' Reply at 2.) Plaintiffs reiterate that the class is not seeking relief for past injuries and that when plaintiffs seek only injunctive relief (as they do here) they need not wait until an actual injury is suffered because the constitutional injury is the exposure to the risk of future harm. (*Id*. at 15-16.)

Plaintiffs contend that their past and ongoing experiences demonstrate that they are at substantial risk of harm and have therefore alleged constitutional injuries. (*Id*. at 16-22.)

Here, plaintiffs are all IDOC inmates with serious medical or dental needs who allege that they, like all other putative class members, are exposed to a substantial risk of serious harm because of the challenged IDOC practices and policies. Their particular allegations are as follows.

Donald Lippert

This Stateville inmate has Type I Diabetes, has never received his medically-prescribed diet, and has experienced regular delays in receiving insulin shots. (4th Am. Compl. ¶¶ 113-19; Pls.' Mem. at 22; Ex. 22.) Defendants contend there were only two instances when medical staff were late in giving Lippert insulin shots and that he engages in frequent hunger strikes. (Defs.' Resp at 16-17.) Plaintiffs reiterate that the defendants' past treatment places Lippert (and all other class members) at substantial risk for future harm, since defendants do not dispute that they have failed to provide him the medication he needs. (Pls.' Reply at 17.) Lippert also testified that he endured a painful infected tooth for a few months without antibiotics before it was extracted. (*Id*.; Ex. 3A Lippert Dep. at 52-53.)

Lewis Rice

Despite being told he needed a pacemaker by a Menard doctor after experiencing severe headaches and chest pains and repeatedly collapsing, Rice has never seen a cardiologist or received a pacemaker. (4th Am. Compl. ¶¶ 124-26; Pls.' Mem. at 23; Ex. 26.) Defendants argue that *res judicata* bars Rice's claim because he filed a lawsuit regarding these issues in the Southern District of Illinois. (Defs.' Resp. at 17.) Plaintiffs assert that Rice's prior damages suit

does not preclude his claims here because he is at ongoing risk of harm for which he seeks injunctive relief. (Pls.' Reply at 18.)

<u>Milam Martin</u>

This Big Muddy River inmate, who is partially paralyzed and wheelchair-bound, experienced a six-month delay in receiving a new wheelchair to replace the broken one he was initially issued. (4th Am. Compl. ¶ 120; Pls.' Mem. at 23; Ex. 25.) When he tipped out of the first wheelchair, Martin suffered broken ribs that went undiagnosed for two months until he was finally sent out to a hospital for a CT scan. (4th Am. Compl. ¶ 120; Pls.' Mem. at 23-24; Ex. 25.) Due to a prison transfer, Martin also lost a jaw stabilizer that has yet to be replaced. (4th Am. Compl. ¶ 122; Pls.' Mem. at 24; Ex. 25.) Defendants assert that Martin received appropriate treatment for his rib injuries and that the dentist was seeking old dental records to identify the correct jaw stabilizer. (Defs.' Resp. at 20.) They also argue that Martin is the only plaintiff with a dental claim and that because it relates to a dental appliance, not to the alleviation of tooth pain or the lack of comprehensive routine dental care, it is not typical of the class. (*Id.*)[20] Further, plaintiffs contend that that after two years of consulting records, defendants have still failed to determine which jaw stabilizer is appropriate for Martin. (Pls.' Reply at 19.) This delay is indicative of the future harm plaintiffs risk without injunctive relief. (*Id*.)

<u>Debra Pattison</u>

In October 2012 an offsite orthopedic surgeon told this Logan inmate[21] that she needed knee replacement surgery for a complete anterior cruciate ligament ("ACL") tear, but that procedure has been repeatedly denied in collegial review. (4th Am. Compl. ¶¶ 127-36; Pls.'

---

[20] As evidenced by the declarations and depositions of other named plaintiffs, it is clear that Martin is not the sole plaintiff who experienced issues with IDOC dental care.

[21] Pattison was transferred from Lincoln to Logan in March 2013. (Pattison Decl. ¶ 1.)

Mem. at 24-25; Ex. 23.) Defendants counter that Pattison must be below a certain weight before Wexford will approve the surgery and that they have placed her on a low-fat, gluten-free diet to assist her in losing weight. (Defs.' Resp. at 21.) Plaintiffs point out that the expert team concluded that "it is abundantly clear that Pattison does in fact require a knee replacement." (Pls.' Reply at 19-20 (citing Expert Report at 233.)) Plaintiffs also note that defendants do not dispute that they have failed to adequately manage Pattison's pain or justify their decision to discontinue her wheelchair access despite her limited mobility. (*Id*. at 20.)

John Ruffin

This wheelchair-bound Dixon inmate[22] has experienced repeated delays in treatment for chronic pain and was awaiting a medical branch block that was approved in October 2015. (4th Am. Compl. ¶¶ 137-42; Pls.' Mem. at 25-26; Ex. 27.) In February 2016, after plaintiffs' motion for class certification was filed, Ruffin received the medical branch block. (Defs.' Resp. at 23; Ex. 21.) Plaintiffs assert that Ruffin's past experiences with delays in treatment reflect IDOC's systemic failures and show that he faces an ongoing risk of future harm. (Pls.' Reply at 20-21.)

Ezell Thomas

This Pontiac inmate,[23] diagnosed with asthma, chronic obstructive pulmonary disease, and emphysema, had his prescribed inhaler confiscated. (4th Am. Compl. ¶¶ 143-45, 150; Pls.' Mem. at 26; Ex. 28.) Requests for alternate inhalers have been rejected. (4th Am. Compl. ¶ 151; Pls.' Mem. at 26; Ex. 28.) In July 2015, Thomas underwent testing after protein was discovered in his blood, which is suggestive of bone cancer. (4th Am. Compl. ¶ 149; Pls.' Mem. at 26; Ex. 28.) He has not received those test results, and no follow-up appointment has been scheduled.

---

[22] Ruffin has been incarcerated in IDOC since 2000. (Ruffin Decl. ¶ 1.) He transferred to Dixon in 2009. (*Id*. ¶ 4.)

[23] Thomas has been housed in numerous IDOC facilities since he entered in 1983, including Menard, Stateville, and Pontiac. (Thomas Decl. ¶ 1.)

(*Id*.) Thomas has been incarcerated since 1965 and has no recollection of seeing a dentist for an annual check-up. (Thomas Decl. ¶ 17.) Defendants counter that Thomas had access to his inhalers restricted because he was abusing them, but that after he filed a grievance, they were returned. (Defs.' Resp. at 24.) They also maintain that he has been tested by specialists at UIC who found no evidence of cancer. (*Id*. at 25.) Plaintiffs contend that Pontiac medical staff reduced the UIC specialist recommended inhaler dosage and then confiscated it for non-compliance with their revised dosage. (Pls.' Reply at 21.)

These plaintiffs have alleged a wide variety of serious medical and dental issues—chronic and deteriorating conditions, pain, and physical maladies—that are generally representative of the health issues IDOC inmates with serious medical and dental issues experience. If plaintiffs demonstrate that IDOC's policies and procedures in treating these conditions do not meet constitutional standards and constitute deliberate indifference, the resulting injunctive relief would likely benefit plaintiffs as well as other similarly-afflicted IDOC prisoners. Accordingly, the Court finds that Rule 23's typicality requirement is met. *See Parsons,* 754 F.3d at 686 ("It does not matter that the named plaintiffs may have in the past suffered varying injuries or that they may currently have different health care needs; Rule 23(a)(3) requires only that their claims be typical of the class, not that they be identically positioned to each other or to every class member."); *see also Scott v. Clarke,* 61 F. Supp. 3d 569, 589 (W.D. Va. 2014) (certifying a class of prisoners alleging that as a consequence of their prison's systemic failures in medical care, they were placed at risk of serious harm); *Riker v. Gibbons,* No. 3:08-CV-00115-LRH-RAM, 2009 WL 910971, at *4 (D. Nev. Mar. 31, 2009) (finding that a class of prisoners met the typicality requirement and stating: "Plaintiffs claim that [the prison] fails to afford them the level of medical care required by the Eighth Amendment;

thus, on a general level, the Plaintiffs' injuries are identical. Further, on a more specific level, Plaintiffs allege they face a risk of injury and unnecessary pain due to [the prison's] inadequate medical system. Although the risk will differ according to each plaintiff's current medical condition, such differences do not defeat typicality giving Rule 23(a)(3)'s permissive standards."). As with the plaintiffs in *Parsons*, descriptions of the named plaintiffs' experiences with IDOC's policies and practices "were not submitted to support individual Eighth Amendment claims; rather, the plaintiffs submitted [them] as evidence of the defendants' unlawful policies and practices, and as examples of the serious harm to which all inmates . . . are allegedly exposed." 754 F.3d at 672. Accordingly, the Court finds unavailing defendants' argument that none of the named plaintiffs have suffered constitutional deprivations. *See Braggs,* 317 F.R.D. at 664 ("For purposes of typicality, plaintiffs need to show that there are named plaintiffs who have been exposed to the policies or practices that create the substantial risk of serious harm they challenge, <u>not</u> that they have actually suffered harm in the past.").

**Adequacy**

A class may be certified only if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Plaintiffs contend that, as individuals currently incarcerated in IDOC facilities, their interests are coextensive with those of the class and that they will therefore adequately and vigorously protect the class's interests. (Pls.' Mem. at 28.) Defendants do not challenge adequacy.

There is no evidence before the Court that indicates that any of the named plaintiffs have conflicting interests with members of the class they seek to represent or that they seek different relief for themselves than that which they seek for the class as a whole. Plaintiffs seek injunctive relief requiring defendants to provide care that meets constitutional standards and the serious

17

medical and dental needs of IDOC prisoners. Accordingly, the Court finds that the named plaintiffs serve as adequate class representatives. *See Riker,* 2009 WL 910971, at *5 (finding that plaintiffs served as adequate class representatives for a class of prisoners even if they were pursuing their own separate actions for damages).

**Rule 23(b)(2)**

"A class action may be maintained if Rule 23(a) is satisfied" and one of the requirements under Rule 23(b) is met. Fed. R. Civ. P. 23(b). Plaintiffs bring this case pursuant to Rule 23(b)(2), which authorizes certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2); *see also Kartman v. State Farm Mut. Auto. Ins., Co.,* 634 F.3d 883, 892 (7th Cir. 2011).

Plaintiffs argue that class certification is appropriate because the injunction they seek addresses the systemic factors that place them at risk of physical harm. (Pls.' Mem. at 30.) Plaintiffs further contend that if they prevail, the resulting injunctive relief will apply to and benefit all members of the proposed class. (*Id.*) Defendants again counter that because the named plaintiffs have not been subjected to deliberate indifference, they cannot show that all class members are at risk of harm and thus there is no basis for injunctive relief. (Defs.' Resp. at 28.) Plaintiffs contend that defendants' argument ignores the evidence in the expert report and the judgment of other courts that systemic problems like those presented here require class certification. (Pls.' Reply at 23.)

The Court finds that plaintiffs have sufficiently alleged that defendants have provided deficient medical care on a systemic basis that jeopardizes the ongoing well-being of plaintiffs and other prisoners in IDOC with serious medical needs. If plaintiffs ultimately prevail, the

resulting injunctive relief will apply to all class members. As many courts and commentators have recognized, this is exactly the type of case for which Rule 23(b)(2) certification was intended. "[I]t should be noted that a common use of Rule 23(b)(2) is in prisoner actions brought to challenge various practices or rules in the prisons on the ground that they violate the constitution. For example, Rule 23(b)(2) class actions have been utilized to challenge prison policies or procedures alleged to . . . violate the prisoners' Eighth Amendment rights to be free from cruel and unusual punishment[.]" 7AA Charles Alan Wright et al., *Federal Practice and Procedure* § 1776.1. The requirements of Rule 23(b)(2) "are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *Parsons*, 754 F.3d at 688. In this case, all class members are "allegedly exposed to a substantial risk of serious harm by a specified set of centralized [IDOC] policies and practices[.] . . . While each . . . polic[y] . . . may not affect every member of the proposed class . . . in exactly the same way, they constitute shared grounds for all inmates in the proposed class[.]" *Id.* "[B]y allegedly establishing systemic policies and practices that place every inmate . . . in peril, and by allegedly doing so with deliberate indifference to the resulting risk of serious harm to them, the defendants have acted on grounds that apply generally to the proposed class . . . , rendering certification under Rule 23(b)(2) appropriate." *Id.* at 688-89. The Court grants class certification under Rule 23(b)(2).

**Rule 23(g)**

Finally, plaintiffs assert that their counsel from the ACLU, Seyfarth Shaw LLP, and Uptown People's Law Center are qualified, experienced, and capable of conducting the proposed litigation. (Pls.' Mem. at 28.) In support, plaintiffs rely on counsel's years of experience identifying, investigating, and developing plaintiffs' claims. (*Id.* at 29; Ex. 24.) Defendants

have not submitted any evidence to contradict these assertions, and the Court agrees that plaintiffs' counsel will continue to pursue this action zealously on behalf of the class.

## CONCLUSION

For the reasons set forth above, plaintiffs' motion for class certification [394] is granted. Accordingly, the Court certifies a class of all prisoners in the custody of the Illinois Department of Corrections with serious medical or dental needs. Status hearing set for May 16, 2017 at 9:30 a.m. The parties are directed to file a joint status report by May 12, 2017 informing the Court their intended next steps.

**SO ORDERED.**            **ENTERED: April 28, 2017**

                         _____
                         **JORGE L. ALONSO**
                         **United States District Judge**