**Statewide Summary Report Including Review of Statewide Leadership and Overview of Major Services**

**Report of the 2nd Court Appointed Expert**

**Lippert v. Godinez**

October 2018

Prepared by the Medical Investigation Team

Mike Puisis DO
Jack Raba, MD
Madie LaMarre MN, FNP-BC
Catherine M. Knox RN, MN, CCHP-RN
Jay Shulman, DMD, MSPH

# Table of Contents

**Background** ........................................................................................................................ 2

**Methodology** ..................................................................................................................... 2

**IDOC Prisons Overview** ................................................................................................ 6

**Key Findings** ..................................................................................................................... 9

**Statewide Medical Operations** ............................................................................... 12
    Leadership, Staffing, and Custody Functions .............................................................. 12
    Wexford Provider Staffing and Physician Credentialing .......................................... 21
    Statewide Use of University of Illinois ......................................................................... 31

**Statewide Overview of Major Services** ................................................................. 32
    Clinical Space and Equipment ....................................................................................... 32
    Medical Records .............................................................................................................. 37
    Medical Reception ........................................................................................................... 42
    Intrasystem Transfer ...................................................................................................... 45
    Nursing Sick Call .............................................................................................................. 48
    Chronic Care ..................................................................................................................... 52
    Urgent/Emergent Care ................................................................................................... 59
    Specialty Consultations .................................................................................................. 62
    Infirmary Care .................................................................................................................. 69
    Pharmacy and Medication Administration ................................................................. 77
    Infection Control ............................................................................................................. 84
    Mortality Reviews ........................................................................................................... 91
    Dental Program ............................................................................................................. 103
    Internal Monitoring and Quality Improvement ....................................................... 118

**Recommendations** ..................................................................................................... 121
    Key Recommendations of Second Court Expert ...................................................... 121
    Organizational Structure, Facility Leadership, and Custody Functions ............... 122
    Clinic Space and Equipment ........................................................................................ 124
    Medical Records ............................................................................................................ 126
    Medical Reception ......................................................................................................... 127
    Intrasystem Transfer .................................................................................................... 129
    Nursing Sick Call ............................................................................................................ 129
    Chronic Care ................................................................................................................... 131
    Urgent/Emergent Care ................................................................................................. 133
    Specialty Consultations ................................................................................................ 135
    Infirmary Care ................................................................................................................ 137
    Pharmacy and Medication Administration ............................................................... 138
    Infection Control ........................................................................................................... 140
    Mortality Reviews ......................................................................................................... 146
    Dental Program ............................................................................................................. 147
    Internal Monitoring and Quality Improvement ....................................................... 150

# Background

This report is produced for the United States District Court for the Northern District of Illinois Eastern Division with respect to the litigation Don Lippert, et al. v. John Baldwin, et al. No. 10-cv-4603. The Court has asked for the Expert to:

> "Assist the Court in determining whether the Illinois Department of Corrections ("IDOC") is providing health care services to the offenders in its custody that meet the minimum constitutional standards of adequacy."[1]

The Court gave further direction. The Court asked the Expert to determine primarily whether any of the systemic deficiencies identified by the First Court Expert as reported in December of 2014 currently exist. The Court asked the current Expert, in the course of the evaluation, to identify any additional systemic deficiencies. Finally, the Court asked for assistance in forming recommendations to correct identified deficiencies. The Court asked the current Expert to consider the solutions proposed by the First Court Expert or to suggest alternate solutions. For newly identified deficiencies, the Court asked for new recommendations.

In order to form our opinion to answer these questions, the Expert, Michael Puisis DO, formed an investigative team consisting of Jack Raba MD, nurse practitioner Madie LaMarre MN, FNP-BC, Catherine Knox MN, RN, CCHP-RN, and dentist Jay Shulman DMD, MSPH.

# Methodology

The current Court Expert met with parties on December 18, 2017 to discuss his methodology and plan. The methodology explained to parties was one typically used by correctional experts in answering questions regarding adequacy of medical care in correctional settings. We interview staff and patients. We observe delivery of care as it occurs for selected processes. We review Administrative Directives, policies, and other documents such as budgets, staffing documents, quality improvement meeting minutes, and reports, etc. We tour facilities' areas where care is provided and observe the setting of care to determine the adequacy of resources that support care. Lastly, we review a sample of health records, including death records. From these interviews, tours, document reviews, and record reviews, we form our opinions and recommendations.

During our five site visits we reviewed 362 medical records and 363 dental records.[2] In addition, we reviewed 33 death records. Dr. Puisis performed all mortality reviews. Findings in site visit record reviews corroborated findings in death reviews. Charts for urgent care, specialty care, and hospital care record review were chosen based on having an ambulatory care-sensitive

---

[1] Second Order Appointing Expert, United States District Court for the Northern District of Illinois Eastern Division, No. 10-cv-4603 filed 12/8/17.

[2] A table with details of record reviews is found at the end of this report as an appendix.

condition.[3] For all other site visit medical record reviews, records were chosen of patients that had an actual or potential serious medical needs. In the case of chronic illness,[4] records were chosen randomly by type of disease (e.g., diabetes, autoimmune, HIV, etc.) For nursing sick call, we selected records nursing sick call logs of patients with potentially serious medical needs such as shortness of breath or chest pain instead of persons complaining of athlete's foot or wanting a low bunk.

For mortality reviews, there were 174 deaths in 2016 and 2017. We asked for 89 records but only reviewed 33 records due to the truncated investigation. We excluded from selection nine suicide deaths, three overdose deaths, and one death from injury. Record selection was somewhat limited by the availability of records. We asked for death records when the Expert first met with the attorneys in December of 2017. We started receiving records on March 7, 2018. Initially we reviewed six records,[5] as they were the only records we had available. Twenty-one records were then chosen from sites we were visiting.[6] We then randomly chose two records from sites that the First Court Expert had visited.[7] The remaining four records were chosen at random from sites that neither Expert visited. The only information available at the time of record selection was the name, date of death, age, facility, and cause of death. The cause of death was not provided for all patients; some patients had "natural causes," "cardiac arrest," or "unknown" listed as the cause of death. Autopsies were not available for all deaths; even when an autopsy was done it was not consistently available. We randomly chose more records from facilities we were visiting intending to allow for a comparison with observed care during site visits. We reviewed one to two years of documentation of care in these records.

Our mortality review consisted of describing episodes of care, and for each episode we identified errors using a classification of 18 different error types. This allowed us to identify common and systemic problems within the health program. Error types were summarized as an appendix in the mortality review document. We summarized the mortality reviews in a narrative summary, but also provided the spreadsheets used to document each individual episode of care reviewed so that reviewers can see the specific instances of care that formed our opinion in the narrative. The mortality reviews are integral to our opinion and should be reviewed. These documents are provided as an appendix.

For dental records, the chart selection methodology is described in each element of the dental program.

The IDOC, in their comments on our report, asserted that the report "relies primarily on a subjective review of the health record" and failed to use "objective clinical measurements such

---

[3] Ambulatory care sensitive conditions (ACSC) are conditions that can be managed in an outpatient setting. HEDIS, the Agency for Healthcare Research and Quality (AHRQ) and quality improvement programs use ACSC to select records to review to assess whether hospitalization might be preventable or whether care reveals quality or systemic issues. For more information see the Prevention Quality Indicator Overview at https://www.qualityindicators.ahrq.gov/modules/pqi_overview.aspx.
[4] We presume that all patients with chronic illness have a potential or actual serious medical illness.
[5] Patients #1, 2, 3, 4, 5, and 6.
[6] Patients #7 through 27 inclusive.
[7] Patients #30 and 31; Pontiac had no deaths.

as those found with the Healthcare Effectiveness Data and Information Set ("HEDIS"[8]) guidelines or critical process assessments."[9] The IDOC does not participate in HEDIS measurement so there was no IDOC data to review with respect to HEDIS measures.[10] Moreover, quality improvement reports did not include objective data measures similar to HEDIS that might have informed. IDOC lacks useable data for analysis of clinical care, which is evident in their quality improvement efforts. The First Court Expert in his analysis of the quality improvement program also identified this problem.[11]

In their comments on our reports, the IDOC asserted that we believed that prison health care systems should provide care "significantly in excess of what is available in the community" and that our report "takes the position that inmates are entitled to a perfect healthcare delivery system." We do not agree with those assertions. The benchmarks we use are community and correctional standards of care,[12] not a hypothetical standard "in excess of what is available in the community."

---

[8] The Healthcare Effectiveness Data and Information Set (HEDIS) is a performance measurement system managed by the National Committee for Quality Assurance (NCQA). There are over 90 HEDIS measures over six domains including safety, effectiveness, patient-centered, timely, efficient, and equitable. Large health maintenance organizations and practices use HEDIS to measure their performance. Data submission used for HEDIS reporting is strictly controlled and defined. These measures are a useful comparator between managed care organizations and other health organizations. These measures do not address acute or emergency care, access to specialty services, access to hospital care, access to an appropriate provider, timely access to a professional opinion and evaluation, access to medication, or many other areas specific to the correctional setting. These performance measures are useful but are not designed for correctional health care programs

[9] Letter via email from John Hayes and Michael Arnold, Office of the Attorney General to Dr. Puisis: Re: *Lippert v. Baldwin,* No. 10-cv-4603 – Defendants' comments to the Draft Report of the 2nd Court Appointed Expert, dated September 10, 2018.

[10] Although IDOC does not track HEDIS measures or participate in HEDIS, we made comments on and/or reviewed care in multiple areas that correspond to HEDIS measures. Our report documents record reviews or other investigations that identified quality of care and/or systemic issues in all of the following HEDIS measurement areas: Adult BMI assessment; Colorectal cancer screening; Care for older adults; Use of spirometry testing in the assessment and diagnosis of chronic obstructive pulmonary disease; Statin therapy for patients with cardiovascular disease and diabetes; Comprehensive diabetes care; Follow-up after emergency department visit for people with multiple high-risk chronic conditions; Medication management in the elderly; Fall risk management; Management of urinary incontinence in older adults; Influenza and pneumococcal vaccination status for older adults; Hospitalizations for potentially preventable complications; Acute hospitalization utilization; and Emergency Department utilization.

[11] On page 44 of the First Court Expert's summary report he states, "although some data was collected it was never used to measure performance against standards and therefore was not part of an effort to measure the quality of performance."

[12] As examples of references reflecting community standards of care, we utilized the U.S. Preventive Services Task Force Recommendations for Primary Care Practice; CDC Recommended Immunization Schedule for Adults Aged 19 Years or Older, United States, 2018; MMWR (2006) Prevention and Control of Tuberculosis in Correctional and Detention Facilities; Standards of Medical Care in Diabetes by the American Diabetes Association; 2013 American College of Cardiology/American Heart Association Guideline on the Treatment of Blood Cholesterol to Reduce Atherosclerotic Cardiovascular Risk in Adults; Global Initiative for Chronic Obstructive Lung Disease updated 2016; American College of Cardiology/American Heart Association Guidelines for the Management of Patients With Unstable Angina and Non-ST-Elevation Myocardial Infarction; Evidence-Based Guideline for the Management of High Blood Pressure in Adults, Report from the Panel Members Appointed to the Eighth Joint National Committee (JNC 8); Centers for Disease Control and Prevention; HIV Testing Implementation Guidance for Correctional Settings. 2009; National Commission on Correctional Health Care, 2014 Standards for Health Services in Prisons; HCV Guidance: Recommendations for Testing, Managing, and Treating Hepatitis C, Last Updated  May 24, 2018; American Association for the Study of Liver Diseases and Infectious Diseases Society of America; Occupational Safety and Health Standards – Toxic and Hazardous substances. 29 CFR 1910.1096(e)(3)(i); Guidelines for Infection Control in Dental Health-Care Settings--2003. MMWR, December 19, 2003/52(RR17):1:16; Stefanac SJ. Information Gathering and Diagnosis Development; American Dental Hygiene Association Standards for Clinical Dental Hygiene Practice Revised 2016; Makrides, N. S., Costa, J. N., Hickey, D. J., Woods, P. D., & Bajuscak, R. (2006); Correctional Dental Services. In M. Puisis (Ed.), Clinical Practice in Correctional Medicine (2nd edition); Dental Radiographic Examinations: Recommendations for Patient Selection and Limiting Radiation Exposure.

In addition to record reviews, we toured five facilities: Northern Reception Center (NRC), Stateville Correctional Center (SCC), Dixon Correctional Center (Dixon), Logan Correctional Center (LCC), and Menard Correctional Center (MCC). Four Experts visited each site; two doctors, a dentist, and a nurse. During each facility visit, we:

- Met with leadership of custody and medical
- Toured the medical services areas and housing units
- Talked with health care staff
- Reviewed health records and other documents
- Interviewed inmates

The First Court Expert mentioned in his report that the State provided comments that the Investigative Team should utilize standards from the National Commission on Correctional Health Care (NCCHC) or the American Correctional Association (ACA) as the basis for their investigation. We agree with the First Court Expert's response that NCCHC standards are useful as a basis to evaluate IDOC Administrative Directives and certain processes of care. We do use the NCCHC standards for that purpose and mention this in this report. However, the request of the Court is to determine adequacy of care for serious medical needs. In order to do that, one must do more than evaluate whether Administrative Directives meet NCCHC standards. Adherence to NCCHC standards does not verify that quality of clinical care is adequate, which is arguably the most important aspect of determining adequacy of care. The limitations of the NCCHC standards as a sole measure for constitutional adequacy require additional investigative measures to answer the Court's request. Observation of actual practices at the facilities form the basis for evaluation of actual care as it is delivered, and review of records forms the basis for evaluation of clinical care.

To facilitate comparison with the First Court Expert's report, we have utilized similar headings of major services reviewed. We agree with the First Court Expert's organization of topics of study as presented in his table of contents. One change we made was to combine laboratory functions and clinic space and sanitation, and to include other diagnostic testing available onsite. These items are all support functions and were combined for that reason. We have added a section in the summary document discussing the statewide operations of the IDOC, UIC, and Wexford, the medical vendor, including a section on credentialing of physicians on a statewide basis. We also included a brief summary describing the statewide monitoring effort of the current medical contract.

The Second Order Appointing Expert gave authority to perform tours of eight facilities that had been reviewed by the First Court Expert. The Court's Order gave the Expert discretion to decline visiting any of the facilities if determined to be unnecessary. The Court's Order required the Expert to meet parties after the first 120 days of the investigation to establish a plan and timeline for concluding the review in a timely and cost-effective manner.

---

American Dental Association and U.S. Food and Drug Administration, 2012. For items for which there is no standard of care, we utilized information as found in Up-To-Date, an online medical reference.

We started this project intending to review eight facilities. At the 120 day meeting, the Expert discussed preliminary findings and announced that it was his opinion that review of the eight facilities was not necessary. The findings were consistently similar facility to facility and confirmed by the First Court Expert's findings. Review of death records from 12 facilities demonstrated consistently poor care and the evidence was so overwhelming that the Expert found it unnecessary to continue visiting the full complement of eight facilities. The Expert strongly believes that further visits would not add to our opinions, except for site-specific recommendations. We terminated visits after five facilities were visited. These included: NRC, SCC, Dixon, LCC, and MCC. It is our opinion that this complement of facilities is adequate to form an opinion of statewide services. The sample includes the main male and female reception centers, the center used to house geriatric patients, two of the three maximum security prisons, the largest IDOC facility (Menard Correctional Center), and facilities from Northern, Central and Southern areas of the state. We are confident that review of this group of facilities gives a representative sample of the IDOC health care system.

With respect to this report, for each section in which the First Court Expert had findings, we summarize his findings in a paragraph and make a subsequent statement whether his findings were still present or have been resolved. We then present our own findings. With respect to recommendations, we do the same. We list, verbatim, the First Court Expert's Recommendations and document whether we agree or not. If we disagree or had additional comments we add those. When we comment on the First Court Expert's Recommendations we do so in italics so our comments can be distinguished from the First Court Expert's comments.

# IDOC Prisons Overview

The Illinois Department of Corrections was established in 1970 to administer and operate state prisons, juvenile centers, and juvenile and adult parole services. In 2006, the Illinois Department of Juvenile Justice was formed, which separated the adult and juvenile correctional systems. In 1970, the IDOC operated seven adult prisons. Currently, the IDOC operates 25 adult prisons,[13] a facility for housing the severely mentally ill (Joliet Treatment Center), and four transition centers.[14] The population of Illinois prisons has increased from approximately 6000 inmates in 1974 to approximately 49,000 inmates in 2015,[15] an eight-fold increase in population. The most recent information given to us by the IDOC is that the correctional center population as of November 30, 2017 is 41,376.[16]

Illinois prisons are overcrowded. The latest data from 2015 comparing prisons nationwide show that, based on design capacity, Illinois is the second most overcrowded prison system in the

---

[13] NRC and SCC are considered one facility for custody purposes, but NRC and SCC now have separate medical programs. Therefore, for purposes of this report there are 26 facilities. When we refer to prisons with respect to the medical programs we will refer to 26 prisons.

[14] Agency Overview on the IDOC website found on December 16, 2017 at https://www.illinois.gov/idoc/aboutus/Pages/IDOCOverview.aspx.

[15] Illinois Prison Overview, Illinois State Commission on Criminal Justice and Sentencing Reform, 2015, as found at http://www.icjia.org/cjreform2015/research/illinois-prison-overview.html.

[16] 180126 Presley Rated Capacity on November 30, 2017, provided to us by IDOC.

nation. Alabama is the most overcrowded.[17] That 2015 data showed that Illinois had a population at 145% of capacity. Since 2015, the population has been reduced by several thousand. Still, as of November 30, 2017, the IDOC is at 131% of rated capacity. It houses 41,376 inmates in facilities rated to hold 31,525 inmates.[18]

Many IDOC facilities are old and hard to maintain. The state, on several occasions, has attempted to close some of these older facilities, including SCC, Pontiac, and Vandalia. In recent years parts of the Stateville Correctional Center, including the old Roundhouse building, have been closed. Of its 25 adult prisons, only four were opened in the 21st century, and two of these facilities (Decatur and Sheridan) were older facilities that were rehabilitated. Thirty-eight percent of inmates in IDOC reside in facilities built before 1981. Two of the facilities housing approximately 11% of the IDOC population were built in the 19th century (MCC 1878 and Pontiac 1871), and two facilities were built in the early 20th century (Vandalia 1921 and SCC 1925). All of the male maximum security beds in the IDOC are in structures built in the 19th century or early 20th century (MCC 1878, Pontiac 1871, and SCC 1925). Maximum security facilities house approximately 7500 inmates (approximately 17% of the IDOC population) who spend more in-cell time. These structures make delivery of medical care more difficult and less efficient, are difficult to maintain, and may negatively affect inmate health in a variety of ways. These health-related effects include heat exposure issues, particularly at the Menard facility, and potential for rodents and vermin. In addition, these facilities present challenges in health care delivery, including access to care, medication administration, and providing ordered medical care. As our reports show, we found some of these problems in the older facilities we visited. We did note an additional egregious issue at NRC, where inmates are locked down 24 hours a day except for four hours per week. In some cells, inmates had no functioning lights for weeks at a time, inhibiting nurses' ability to properly identify inmates when administering medications. These conditions are a serious obstacle to health care access.

With respect to IDOC health care costs, a 2017 study detailed costs of health care in state prison systems between 2010 and 2015. [19] In 2015, the average per inmate per year health care spending for persons in state prisons in the U.S. was $5,720. Illinois spent $3,619. This was 37% below national average. Nationwide, per capita expenditures for health care for state prisoners ranged from a low of $2,173 to a high of $19,796. Illinois ranked seventh lowest in the U.S. in terms of per capita spending per inmate per year as noted in the table below.[20]  We were given information from the IDOC Chief Financial Officer that for 2017 the annual spending per inmate increased to approximately $4800 per inmate per year, but there is no comparable data for

---

[17] Appendix Table 1, Prison facility capacity, custody population, and percent capacity, December 31, 2015, as found in Prisoners in 2015, Bureau of Justice Statistics, US Department of Justice, December 2016, NCJ 250229 located on the web at https://www.bjs.gov/content/pub/pdf/p15.pdf.

[18] 180126 Presley Rated Capacity on November 30, 2017, as provided by IDOC.

[19] Data from Prison Health Care: Costs and Quality; a report from the PEW Charitable Trust, October 2017, as found at http://www.pewtrusts.org/en/research-and-analysis/reports/2017/10/prison-health-care-costs-and-quality.

[20] We note that the Kaiser Family Foundation reported that Illinois civilians had per capita health care expenditures of $8,262. This can be compared to the $3,619 per capita health expenditures per inmate per year. Health Care Expenditures per Capita by State of Residence for 2014 for the Illinois civilian population is found at https://www.kff.org/other/state-indicator/health-spending-per-capita/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

other state prison systems nationwide.[21]  IDOC Spending in 2017 is still below the average 2015 spending of prisons nationwide.

| Ten Lowest Per Capita Expenditures for Health Care in US State Prison Systems in 2015 | |
| --- | --- |
| **State** | **Per Capita Annual** |
| Louisiana | $2,173 |
| Alabama | $3,234 |
| Indiana | $3,246 |
| Nevada | $3,246 |
| South Carolina | $3,478 |
| Arizona | $3,529 |
| Georgia | $3,610 |
| Illinois | $3,619 |
| Kentucky | $3,763 |
| Mississippi | $3,770 |

For most state systems, the number of employees, age, and percent of female population were the largest drivers of cost of prison health programs. The Federal Bureau of Prisons assessed that institutions with the highest percentages of aging inmates spent five times more per inmate on medical care and 14 times more per inmate on medication than institutions with the lowest percentage of aging inmates. The National Institute of Corrections estimates that inmates over age 55 cost, on average, two to three times more than the expense for all other inmates.[22] Based on this same 2017 report, Illinois has the seventh *lowest* rate of persons over age 55 (8.5%). As well, in 2015 IDOC had a female population of 5.8%, the ninth *lowest* rate of females incarcerated in state prison systems. These two factors should lower the costs of care somewhat, but are not so great as to account for the difference in IDOC cost from the mean health expenditure of state prison systems.[23]

Staffing appears to be the biggest contributor to the low IDOC spending on health care. In fiscal year 2015, Illinois has the second lowest number of full-time equivalent (FTE) health care workers (19.3 per 1,000 inmates) of all 50 state prison systems. The range of FTEs per 1,000 in the 50 state systems range from 18.6 FTEs per 1,000 inmates to 86.8 FTEs per 1,000 inmates.[24]

---

[21] In his deposition, Mr. Brunk the Chief Financial Officer for the IDOC stated on pages 12-13 that the total expenditures on health care in the IDOC were approximately $203 million. Using a population of approximately 42,000 the expenditures per inmate per year would be approximately $4,800.

[22] Prison Health Care: Costs and Quality; a report from the PEW Charitable Trust, October 2017 as found at http://www.pewtrusts.org/en/research-and-analysis/reports/2017/10/prison-health-care-costs-and-quality.

[23] Prison Health Care: Costs and Quality; a report from the PEW Charitable Trust, October 2017 as found at http://www.pewtrusts.org/en/research-and-analysis/reports/2017/10/prison-health-care-costs-and-quality.

[24] Prison Health Care: Costs and Quality; a report from the PEW Charitable Trust, October 2017 as found at http://www.pewtrusts.org/en/research-and-analysis/reports/2017/10/prison-health-care-costs-and-quality.

There is a direct correlation between the FTEs per 1,000 inmates and per-inmate annual spending. A low number of staff can reflect a more efficient system of care or understaffing with its attendant negative consequences for provision of health care. In our study, we found that in 2018 there were 25 employees per 1,000 inmates, which still places Illinois approximately in the lower 10% of state prison systems based on 2015 data. This will be discussed later in this report.

## Key Findings

Overall, the health program is not significantly improved since the First Court Expert's report. Based on record reviews, we found that clinical care was extremely poor and resulted in preventable morbidity and mortality that appeared worse than that uncovered by the First Court Expert.

Governance of the IDOC medical program is subordinated to custody leadership on a statewide level and at the facility level. The subordination of health care to custody leadership has resulted in a medical program that is not managed on sound medical principles and one that is without medical leadership.

The existing IDOC system of care was established to have a more robust central office capable of monitoring vendor activity. The IDOC central office has been progressively diminished over the years to the point where it is incapable of effective monitoring.

The medical program does not have a separate budget. The IDOC could not provide to us a document that included expenditures for medical care. Authorization and responsibility for medical expenditures does not reside with the health authority.

IDOC Administrative Directives are inadequate policies for this state system. The IDOC medical policies need to be refreshed, augmented, and address all National Commission on Correctional Health Care (NCCHC) standards.

The IDOC does not have a staffing plan that is sufficient to implement IDOC policies and procedures. The staffing plan does not incorporate a staff relief factor.

Custody staffing has also not been analyzed relative to health care delivery to determine if there are sufficient custody staff to deliver adequate medical care.

Budgeted staffing was increased but vacancy rates were higher than noted in the First Court Expert's report. Staff vacancy rates are very high.

The vendor, Wexford, fails to hire properly credentialed and privileged physicians. This appears to be a major factor in preventable morbidity and mortality, and significantly increases risk of harm to patients within the IDOC. This results from ineffective governance.

Wexford and the IDOC fail to monitor physician care in a manner that protects patient safety. There is no meaningful monitoring of nurse quality of care. If care is provided it is presumed to be adequate, when in fact it may not be adequate.

The inability to obtain consultation reports and hospital reports appears to be a long-standing system wide problem. This is a significant patient safety issue.

The collegial review process of accessing specialty care is a patient safety hazard and should be abandoned until patient safety is ensured.

Specialty care is not tracked with respect to whether it is timely. The Wexford system of utilization management is ineffective and for many patients is a barrier to timely care. The use of free care at UIC appears to have resulted in unacceptable delays. Waiting for unacceptable time periods for free care when care needs to be performed timelier has harmed patients.

Patients are not consistently referred for specialty care when it is warranted. We view this as a problem of hiring unqualified physicians and as a problem of the utilization process itself.

The paper medical record system creates significant barriers to delivery of safe health care, including inaccessibility of prior reports and prior diagnostic tests. The current paper medication administration records (MARs) are inconsistently filled out, filed, or able to be viewed by clinicians. The paper record also makes monitoring health care processes exceedingly difficult. An electronic medical record is needed.

Sanitation, maintenance, and equipping health care units is not standardized. Many clinical areas are inadequately sanitized.

The reception process does not ensure a thorough initial medical evaluation that will correctly identify all of a patient's problems in order to develop an appropriate therapeutic plan. Provider medical histories are inadequate. Follow up of abnormal findings is inconsistent. Laboratory tests and other studies needed for an initial evaluation of a patient's chronic illnesses are inconsistently obtained. Tuberculosis (TB) screening is improperly performed due to custody rules at NRC.

The chronic disease system promotes fragmentation of care and fails to adequately address all of a patient's problems from the perspective of the patient. Patient problems are lost to follow up or are not addressed in the context of a patient's complement of diseases.

The chronic care disease guidelines need to be updated. Alternatively, contemporary existing guidelines by major specialty organizations should be used in lieu of IDOC-specific chronic care

guidelines. These specialty organization guidelines are periodically updated and are based on latest scientific evidence. For the Office of Health Services to attempt to duplicate these guidelines is unrealistic.

The Administrative Directive for periodic examination [25] is inconsistent with current standards of preventive care.[26] Inmates are therefore not offered all preventive services that are typically offered to individuals in the community. The most important missed preventive care is colorectal cancer screening in individuals over 50 years of age.

Housing of the elderly and disabled is inadequate. The IDOC needs to perform an assessment of its geriatric and disabled population to determine housing needs for this population. It is likely that new or rehabilitated housing for this population is needed.

There is no active infection control program. Infection control practices lack guidance from a physician with expertise in infection control practices. This is evident in HIV testing, TB screening, and analysis of surveillance practices.

The quality improvement program operates on a legacy system of principles that no one any longer understands or effectively implements. No one in the IDOC has experience or knowledge of contemporary quality improvement methodology and practice. The quality improvement program is ineffective statewide.

The quality improvement program does not have a means to identify problems for study and does not associate identified problems with systemic processes.

Data for quality improvement is obtained by manually counting events. Logs tracking processes of care are either not maintained or maintained in a manner such that the data is not easily useable.

The methods of preparing and administering medications is not standardized across the system. There are pervasive and systemic issues with respect to medication administration that place inmates at risk of harm. When these occur, there is no system to identify or correct the systemic problem.

Overall, the dental program has not improved since the First Expert Report. Dental care continues to be below accepted professional standards and is not minimally adequate. Examinations are inadequate and routine care is provided without intraoral x-rays, a documented periodontal assessment, and a treatment plan. Periodontal disease is rarely diagnosed and treated.

---

[25] Offender Physical Examination; Illinois Department of Corrections Administrative Directive 04.03.101.
[26] As exemplified by the US Preventive Services Task Force Recommendations.

There is no systemwide capital replacement plan for dental equipment. As examples, the panoramic x-rays taken at the R&C centers are inadequate and the x-ray devices are outdated. IDOC has no dentist on the Medical Director's staff and the clinical oversight of the dental program is inadequate.

Dental staffing is insufficient to provide adequate and timely care.

# Statewide Medical Operations

## Leadership, Staffing, and Custody Functions

**Methodology:** We interviewed the Agency Medical Director, the Regional Coordinators, the Regional Medical Coordinator, Chief of Programs and Support Services, the Wexford Vice President of Operations, the Wexford Director of Operations, two Wexford Regional Managers, and two Wexford Regional Medical Directors. We reviewed the table of organization, and reviewed selected documents. We obtained and reviewed staffing documents. We reviewed peer review documents and credentialing documents provided by Wexford.

### First Court Expert Findings

The First Court Expert found that leadership was a problem at all facilities visited. Many leadership positions were vacant. Some Wexford supervisory staff spent considerable time on Wexford corporate duties rather than on the operational assignments they were being paid for. Several physicians did not have primary care training and hiring of underqualified physicians was a problem. Clinical quality was variable and compounded by lack of clinical oversight, peer review, and access to electronic resources to access clinical information. Medical Directors spent little time in reviewing clinical practice of other providers or engaging in important administrative duties. Staffing deficiencies were present at several facilities but were facility specific. Nurses other than registered nurses (RNs) were performing independent assessments, which is not consistent with the State of Illinois Nurse Practice Act. The Office of Health Services was under-resourced and unable to provide clinical oversight. The First Court Expert was informed by State and vendor staff of problems [unspecified] with Wexford Regional Medical Directors. Professional performance review, mortality review, and quality improvement were described as extremely disappointing.

### Current Findings

We agree with the findings of the First Court Expert and note that, with minor exceptions, findings are the same. There have been staffing increases, particularly at NRC and SCC, but vacancies are increased. Staffing is deficient, in our opinion, even if vacancies were filled. The IDOC does not know how many staff are necessary because a staffing analysis has not been performed, even for development of Schedule E staffing budgets for contract medical services. There are fewer HCUA position vacancies. The HCUA leadership staff at all five facilities was very good. Physician leadership, however, is worse. We had additional findings regarding the governance of the health program, monitoring of clinical services, credentialing of physicians, and policy concerns. There is no centralized medical health authority that develops the budget,

determines recommended staffing levels, monitors the contract, and provides oversight of clinical care. Because operational control of the medical program is under the authority of the Wardens of individual facilities, processes can be established that are not consistent with appropriate medical management practices.

<u>Structure of Medical Services and IDOC Leadership</u>
The organizational structure of the IDOC health program was established in the 1980s and early 1990s. The program was structured so that the IDOC staff would maintain administrative control over the health program and have a variety of vendors provide physician staff and other staff the state was unable to provide. Staffing of the facilities was provided by contract medical vendors with a considerable number of state employees. Currently, dialysis services are provided at three facilities by NaphCare. University of Illinois at Chicago provides laboratory services statewide and statewide management of HIV and hepatitis C patients with anti-viral medication via telemedicine. Wexford Health Sources provides the remaining medical, dental, vision, and pharmacy services under the guidance of the IDOC Agency Medical Director and in accordance with their contract.

Currently, the IDOC medical program table of organization is not organized on a medical model. Governance of the IDOC medical program is subordinated to custody leadership on a statewide level and at the facility level. The health authority[27] is the Chief of Programs and Support Services, and is an ex-warden. The IDOC medical program has no named responsible physician,[28] although in practice some aspects of this responsibility appear to reside with the Agency Medical Director, who appears to be primarily a consultant. The budget of the health program is not a separate budget. At a facility level, wardens are the Chief Administrative Officer and are responsible for operations of the health program.

The health authority is not responsible for operational management of the statewide medical program. Instead, authority and responsibility are diffuse. This results in gaps in management, oversight, and monitoring, and leads to poor performance. The Office of Health Services is not responsible for determining staffing levels, budget needs, equipment needs, or oversight of the medical program.

The responsible health authority is the Chief of Program and Support Services, who reports to the Director. This is a custody position. The current organizational structure does not require that the health authority have health care education and training commensurate with the requirements of the position. Requirements of the health authority position are not explicit in the Office of Health Services policies. This position is currently filled by a licensed clinical psychologist who was previously with the Department of Mental Health in Chester, Illinois and recently was the Warden at Southwestern Illinois Correctional Center. She has ultimate responsibility for oversight of medical care and ensuring that systems are in place to ensure

---

[27] A health authority is a person responsible for health care services. This person arranges for all levels of health care and ensures that all levels of service are provided, and that care is accessible, timely, and of good quality.
[28] A responsible physician is a physician who has final authority regarding clinical issues.

adequate care. We have concerns with the health authority being a custody person, particularly because it can be filled with non-health care personnel without experience in managing a clinical medical program. In an interview with the Chief of Program and Support Services, she had minimal knowledge of operational features of the medical program, was not intimately involved in the medical budget, was not responsible for the medical contract, and was not involved in developing or managing staffing levels.

Custody personnel have considerable responsibilities over health care. In addition to the Chief of Program and Support Services being the health authority, Wardens have authority over medical operations on a facility level. An Assistant Director is responsible for implementation of the electronic medical record. Another Deputy Director, who was previously a nurse, is occasionally asked to develop staffing analyses of selected facility medical programs. This level of custody authority and involvement over management of the health program is considerable. Because oversight authority of the medical program is not medical staff, there is the risk that medical autonomy will be lost and that clinical operational processes will be disadvantaged with respect to custody processes and that clinical and operational independence will be lost. This is contrary to two fundamental NCCHC standards which are critical to an adequate correctional health care medical program.[29] We did see evidence of this with respect to medication administration and health request processes at several facilities. We also noted at NRC that inmates were locked in their cells, except for brief periods, for 24 hours a day. This is similar to a super-maximum prison and is excessive. This practice impaired the ability of nurses to adequately pass medication, read TB skin tests, and to appropriately access medical care. Despite this ongoing barrier to medical care as a result of this custody practice, there was no evidence of medical advocating for ways to appropriately perform their work. Because the Warden supervised the medical program, it is our opinion that medical staff were unlikely to advocate for improved care.

The IDOC Agency Medical Director reports to the Chief of Program and Support Services. The Agency Medical Director has limited responsibility with respect to the health program. He is responsible for formulation of statewide health care policy and chronic care guidelines. Through subordinates, he monitors and reviews medical services, but he has insufficient physician staff to perform adequate monitoring, especially for physician care. *He has no authority to manage operations of the health program.* He has no responsibility for the budget except in a consultative role. He participates in scoring prospective vendors of the medical contract and in reviewing staffing recommendations in the contract. But this is mostly an advisory and consultative role. According to his job description and interview, he does not function as the authority in establishing budgets, staffing levels, or equipment purchases. Although he appears to be the final clinical medical decision maker, one has to infer this responsibility because it is nowhere stated in his job description.

---

[29] P-A-02 Responsible Health Authority and P-A-03 Medical Autonomy, Standards for Health Services in Prisons 2014; National Commission on Correctional Health Care.

Each facility is managed by a health care unit administrator (HCUA), which is a state position. However, most facilities have a mix of state and Wexford employees. Because of co-employment rules,[30] the mixed staff creates supervisory confusion between Wexford and IDOC supervisors working under the HCUA. This is most evident at the NRC and SCC. The Wexford staff are supervised by Wexford employees who are not under supervision of the HCUA.

Each HCUA reports to the assistant warden of programs of the facility. Each facility medical program is therefore under the operational management responsibility of the Warden of the facility, not the Agency Medical Director. This means that medication administration or access to sick call, as examples, are under ultimate control of the Warden through the supervision of the HCUA. Wardens have no knowledge of how to manage medical program operations. This arrangement reduces the Office of Health Services to a consultative role as opposed to operational control. The Office of Health Services needs to have final authority over health care policies, not merely a consultative role.

The Office of Health Services has a staff of four employees assisting the Agency Medical Director in his monitoring function: an Agency Medical Coordinator who is a nurse and three Regional Coordinators who are also nurses. There is no dentist on staff. These individuals act mostly as regional resources to facility staff with respect to interpretation and implementation of the Administrative Directives and clinical guidelines. They also provide a monitoring function. Because they do not have authority to change operational practices, their monitoring function lacks the authority to direct operational changes, even if they disagree with how practices are being managed.

The Agency Medical Director monitors and reviews care through contract monitoring reports[31] and verbal reports of the Regional Coordinators. Contract monitoring reports are the responsibility of the HCUA. In the absence of the HCUA, the Assistant Warden of Programs at the facility is responsible for the contract monitoring report. The Agency Medical Director monitors the quality of doctors through review of credentials at annual CQI meeting, review of problematic peer reviews, and studies of the quality improvement meetings.[32] However, the credential reviews are inadequate, as will be described later in this report. The peer reviews are performed by Wexford doctors on each other and are ineffective. And the quality improvement studies do not monitor clinical quality of care.

Two of three of the Regional Coordinator positions are currently vacant and filled on an acting basis by HCUAs who are still responsible for managing their facility. While an HCUA filling in as a Regional Coordinator on short-term basis is reasonable, longer than 60-90 days is likely to result in reduced effectiveness at the HCUA's home facility. The Agency Medical Coordinator fills in

---

[30] Co-employment is a relationship between two or more employers whereby each has legal responsibilities to the same employee. In this case, line staff may be Wexford but have an IDOC supervisor and IDOC employees may have a Wexford supervisor. This created problems at multiple facilities we visited. This is particularly problematic with respect to scheduling and disciplinary issues.
[31] Page 26 Dr. Meeks 30(b)(6) deposition on July 25, 2017.
[32] Page 33 Dr. Meeks 30(b)(6) deposition on July 25, 2017.

periodically for one of the HCUAs when she is performing as a Regional Coordinator. When Regional Coordinators visit sites, they monitor clinical care but do not issue reports on their work. Each Regional Coordinator has a monthly phone call with the Agency Medical Director, Agency Medical Coordinator, and HCUAs, Assistant Wardens, and other staff in their region to discuss any issues. The Regional Coordinators do not engage in direct review of nursing practice at individual facilities that results in reports. We were told they occasionally review records of nursing care. We found no evidence of formal reports of oversight over nursing practice on a regional level. This includes oversight of nursing independent evaluations and medication administration practices.

On a regional level, because Regional Coordinators and the Agency Medical Coordinator are nurses, they are unable to monitor or review physician care, leaving a large gap in oversight of the quality of medical care. The Regional Coordinators perform mortality reviews using a structured format which result in reports, which were not made available to us. A Regional Coordinator, who is a nurse, testified that he reviews deaths and complicated medical cases.[33] In these reviews, he has never found care to be inadequate. We found many preventable deaths and inadequate care on most death reviews we performed, even ones at the facility supervised by the Regional Coordinator, who never found inadequate care. This work needs to be done by a physician, not a nurse, but the only physician in the Office of Health Services is the Agency Medical Director. The Agency Medical Director cannot monitor or review physician care at 26 facilities. The Agency Medical Director does not perform any mortality reviews. It would be difficult to impossible for him to review every death. The time allowed in his job description for monitoring physicians is less than 15 hours a week, which is inadequate time to monitor all physicians statewide. This task is not apparently performed by Wexford either. The Agency Medical Director told us that he has not received any communications from Wexford Regional Medical Directors with respect to problems identified in mortality review or peer review. As a routine, the IDOC Agency Medical Director stated in deposition that he does not review Wexford peer reviews except for isolated peer reviews for problematic providers.[34] As a result, oversight of facility physicians, including Medical Directors, is virtually non-existent. As this program is currently staffed, the Agency Medical Director is unable to effectively act in accordance with his job description, specifically to monitor medical care, especially physician care. IDOC oversight is inadequate and has not identified physician practice problems largely because of lack of physician oversight.

The IDOC has contracted with Wexford Health Sources Inc. for approximately 20 years. When IDOC first contracted out its medical services in the 1980s, the IDOC managed the contract. Sometime in the mid-2000s, the Illinois Department of Healthcare and Family Services (HFS) became responsible for letting this contract, including monitoring and oversight of the contract. The latest contract with Wexford was completed in 2011. Sometime after that contract was awarded, responsibility for monitoring and managing the contract returned to IDOC. The contract expired April 30, 2016 and provided for renewals of one or more years for a period of

---

[33] Page 34 Joseph Ssenfuma deposition on September 28, 2017.
[34] Page 33 Dr. Meeks 30(b)(6) deposition on July 25, 2017.

five additional years through 2021. The latest renewal of this contract signed in April of 2016 was signed by IDOC. HFS is no longer involved in letting the contract, choosing the vendor, or in monitoring the contract. This responsibility returned to the IDOC, which is not prepared to monitor this contract.[35]

With respect to monitoring medical care including physician care, there is a large gap. In the most recent contract with Wexford in 2011, the onsite Wexford Medical Director is assigned responsibility for monitoring the performance of medical personnel and is to report deficiencies to the HCUA.[36] However, the onsite Medical Director is a Wexford employee and therefore clinical monitoring is self-monitoring by the vendor, rather than independent monitoring by IDOC. Moreover, about half of the Medical Directors do not have primary care training and are unable to effectively give guidance on appropriate care. The IDOC is therefore depending on the vendor to monitor itself with respect to clinical physician care, but the vendor has hired persons who are not always trained sufficiently to understand what constitutes appropriate care.

The contract monitoring on the part of the state is inadequate. Formal contract monitoring is performed by HCUAs via the monthly contract monitoring reports.[37] The HCUA is the only IDOC staff that is specifically assigned for formal contract monitoring. HCUAs are provided a spreadsheet to use for this purpose. There are five performance targets that are assessed. The performance targets are:
- Whether all hours in the contract are fulfilled
- Whether all bills have been paid timely
- Whether there has been any Court finding of deliberate indifference
- Whether Administrative Directives have been complied with
- Whether Wexford met provisions of the contract.

We found no clinical quality of care items in contract monitoring reports of the five sites we visited, even when we noted significant clinical issues during our site visits. This is a major deficiency. No one is monitoring clinical care, particularly physician care. Even non-clinical deficiencies are not monitored adequately. Most sites had performance issues with respect to staffing and some Administrative Directive performance targets, yet the IDOC has never levied penalties against Wexford based on these performance targets.[38] Because of IDOC tardiness in invoice payments to Wexford, it has been difficult for IDOC to penalize Wexford for its infractions. While this has an element of fairness to the vendor, overall it contributes to lack of enforcement of the contract as a result of budgetary realities.

---

[35] 1299433 Deposition of Jared Brunk Chief Financial Officer of the IDOC. In this deposition in January of 2018, Mr. Brunk acknowledges that there was more than one person in the IDOC who thought that it would be useful to have additional contract monitoring on pages 80-83. This Chief Financial Officer could not describe how the contract is monitored.
[36] Item 2.2.2.21 Contract between Wexford Health Sources Inc. and IL Department of Healthcare & Family Services signed 5/6/11.
[37] 30(b)(6) deposition of Dr. Meeks on July 25, 2017 on page 26.
[38] Deposition of Jared Brunk, Chief Financial Officer of the IDOC conducted January 31, 2018.

The HCUA positions are filled by nurses. Nurses are not able to monitor clinical care of physicians, including appropriateness of referral, chronic care, and infirmary care. Several of the HCUAs remarked on their inability to monitor the clinical care of the Wexford physicians and were unaware of quality issues, even when they existed.[39] Because HCUAs cannot monitor physician care, the contract monitoring is ineffective and incomplete. The only monitoring of clinical performance of the physicians is Wexford peer review, in which Wexford physicians monitor other Wexford physicians. Many of these physicians are unqualified to practice primary care medicine. We found that these peer reviews are ineffective and fail to critically monitor physician performance. Peer reviews will be discussed later in this report.

Wexford has a regional management structure that contributes to the fractured organizational structure of the IDOC medical program. Administratively, there is a Wexford Director of Operations and five Regional Managers. Each Regional Manager is responsible for five facilities, with one Manager taking responsibility for six facilities. The clinical medical management structure includes two Regional Medical Directors, each being responsible for 13 facilities. The span of control of the two Wexford Regional Medical Directors is so large that it is very difficult to spend meaningful time on site at any facility, and in our opinion not possible to effectively supervise clinical care.

The Director of Operations and two of the five Regional Managers (50% of Wexford senior administrative management staff) are ex-wardens and have no training in provision of medical care. Because the IDOC HCUAs administratively manage operations at each facility, the Wexford administrative managers have no role in managing operations at any of the IDOC facilities. The Wexford view of duties and responsibilities[40] of the Regional Managers include:

- Oversee leadership of Health Services Administrators (HSA)[41] in the operation of facility health care units.
- Provide HSAs with management guidance strategies for regional growth and operational assistance.
- Oversee HSAs' resolution of health care unit personnel issues.
- Supervise the performance of the HSA and department heads, conducting annual evaluations.
- Instill a sense of accountability among the HSA team members through fair and consistent oversight of individual and organization performance standards.

These duties and responsibilities appear inaccurate and not applicable to IDOC. The Regional Managers do not oversee or supervise the HCUAs. The Regional Managers do not oversee health care unit personnel issues except for Wexford employees. The Regional Managers

---

[39] For example, we spoke to the HCUA at Dixon about a death. We found the death preventable. She was unaware that there were problems with the death. No one from Wexford had brought up clinical issues with respect to this death with her even though in our opinion problems were significant.

[40] There is no job description for this position. There is a position summary listing duties and responsibilities on the Wexford website which was advertising for a Regional Manager. This was provided to us as representative of a job description for the Regional Manager. This is found at https://jobs.wexfordhealth.com/search/jobdetails/regional-manager/73d40fc0-c935-47d4-b51f-b8095ad79af0?s_cid=ssEmail.

[41] We understood the term Health Service Administrator to be the same as Health Care Unit Administrator (HCUA).

appear to mainly act as intermediaries with respect to personnel issues, obtaining supplies and equipment, and other similar issues related to adjusted service requests (ASRs). They also act as customer relations functionaries. We were challenged in determining what they are actually responsible for. They do not participate in CQI, analysis of operational issues at the sites, resolution of operational issues, or other similar typical operational activity. They add little value to the operational effectiveness of the IDOC management structure with the exception of personnel issues of the Wexford staff.

The Regional Manager who was responsible for SCC, NRC, and Dixon Correctional Center told us that he knew of no consistent problems at these facilities; yet we found serious operational problems with medical records, medication administration, and evaluation of health requests. Physician care, follow up of specialty care, and intake evaluations were also inadequate. To not understand that there were problems is to be unengaged or indifferent to significant serious issues. At Menard Correctional Center, where there were also serious operational problems, the Regional Manager stated there were no problems and no areas of concern. These responses were not in line with problems identified by the HCUA. Neither Regional Manager we spoke with actively participates in quality improvement activities. One of the managers perceived his role as administering the contract. Despite significant operational issues at all sites we visited (e.g., lack of hospital and consultation reports, medication administration issues, staffing concerns, problems with medical records, and supply issues), these Regional Managers do not appear to be engaged in improving operations.

Based on interviews with HCUAs, neither the Regional Managers nor the Regional Medical Directors spend much time at the facilities, nor do they participate in solving significant problems. The most pressing problem of four of the five HCUAs was staffing and vacancies. HCUAs were universally unhappy with the effort of Wexford on these issues.

The Wexford Regional Medical Directors are responsible for ensuring that direct patient care is consistent with community standards and with contract requirements. They supervise the facility Medical Directors and are responsible for peer reviews of Medical Directors, and must ensure and/or conduct death reviews.[42] Since there is inadequate oversight by the IDOC over physicians, the supervision of Wexford Regional Medical Directors is the only oversight of physicians. Wexford is thereby evaluating its own performance and does this extremely poorly.

Although the Wexford Regional Medical Directors have a clinical supervisory role over their physicians, based on their job descriptions we could not verify that they perform this adequately, as they perform no peer review, mortality review, or formal written review of clinical work. According to the Agency Medical Director, he receives no formal communication regarding clinical oversight of Wexford physicians, including Regional Medical Director initiated peer review, mortality review, or other review of clinical care. There is no evidence we could find that verifies their oversight of physicians except their statements that they review the work of the physicians. Neither Regional Medical Director stated that clinical care review is on their

---

[42] Regional Medical Director's Responsibilities as provided by Wexford Health Sources.

list of major responsibilities or tasks, except for addressing questions of the physician staff. Because neither IDOC nor Wexford performs effective review of clinical care of physicians, poorly performing physicians continue to perform poorly without apparent oversight. We noted this on multiple chart reviews and mortality reviews.

Wexford Regional Medical Directors are also responsible for ensuring patient care is consistent with community standards.[43] Yet we found many examples of physicians providing care inconsistent with current standards of care that appear to be systemic practices. For example, IDOC does not provide colorectal cancer screening based on current standards of care and does not appear to routinely screen patients with cirrhosis for varices or hepatocellular carcinoma. Persons with chronic obstructive lung disease (COPD) are not provided pulmonary function testing, which is a cornerstone of management of COPD. The current management of lipid disorders is not in line with current standards or with the Office of Health Services treatment guideline. We will discuss these later in the Chronic Disease section of this report. These deficiencies need to be corrected because these deficiencies have caused morbidity and mortality. There is no evidence of participation of the Wexford Regional Medical Team in identifying these deficiencies to the IDOC or ensuring that their physicians are practicing based on contemporary standards of care.

With respect to facility leadership, administrative supervision by HCUAs at individual facilities has improved since the First Court Expert's visit. The IDOC HCUAs are responsible for administrative operational supervision of each facility. Of the 26 HCUA positions, all but one is now filled. However, two of the HCUAs also serve as acting Regional Coordinators, making them much less effective as HCUAs. Effectively, only 23 of 26 HCUA positions are filled. HCUAs were all competent and were engaged in solving administrative problems, even though some problems appeared unrecognized. This is one of the most significant and positive advances since the First Court Expert's report and is a strength that the program can build on.

Medical Directors are all Wexford positions. Of the 26 Medical Directors statewide, 8.5 (33%) are vacant.[44] This is an enormous vacancy rate for this key leadership position. Approximately only half of physicians have training in primary care, which will be discussed later in this report. This is a very small percentage of physicians trained in primary care. When a Medical Director is not trained in primary care it is very difficult to be responsible for monitoring performance of medical staff rendering direct patient care. An untrained physician is not likely to know how that care is supposed to be provided. We found that onsite monitoring of clinical care was very poor to nonexistent.

Director of Nursing (DON) positions can be either Wexford or IDOC. Fifteen (58%) of the DON positions are staffed by Wexford. Eleven (42%) are staffed by the IDOC. Seven (27%) of DON positions are vacant; four DON vacancies are Wexford positions and three DON vacancies are

---

[43] Regional Medical Director's Responsibilities as provided by Wexford Health Sources.
[44] Illinois Medical Vacancy Report with ASRs as of 6/18/18 provided by the Attorney General's Office from Wexford Health Sources. This report gives staffing at all facilities as of 6/18/18.

IDOC positions. Nursing staff can be either IDOC or Wexford, making it difficult, because of co-employment rules,[45] to properly supervise line staff.

Of the 78 leadership positions (Medical Director, DON, and HCUA) at the 26 facilities, 16.5 (21%) are vacant. The vacant positions are compounded by co-employment issues[46] and use of two HCUAs as Regional Coordinators. The leadership vacancies are significant on a statewide basis. The lack of Medical Directors is dramatic and is compounded by using physicians in these positions who are, in our opinion, unqualified by virtue of not having primary care training.

In summary, administrative supervision by HCUAs is adequate but clinical-medical supervision and management, particularly physician care, is inadequate and places patients at significant risk of harm. The clinical supervision at the facility level is inadequate based on Medical Director and DON vacancies, and poor qualifications of physicians.

IDOC Policy

The IDOC provides policy direction on clinical care through its Administrative Directives and chronic care guidelines. The medical Administrative Directives are a part of the larger IDOC Administrative Directives which include all custody policy. We will discuss the chronic disease guidelines in the section on Chronic Disease and dental guidelines in the Dental section. The Medical Administrative Directives are inadequate with respect to the breadth of guidance that is necessary for a correctional medical program. The IDOC has only 18 Administrative Directives. In comparison, the National Commission on Correctional Healthcare[47] has 68 standards, which is a minimum panel of policies for a large prison system. There are essential areas of service that are not governed by Administrative Directives and thereby are not guided by policy and not standardized statewide. Though each facility can have additional institutional policies and procedures, the lack of statewide guidance means that practices are not standardized. The Office of Health Services needs to be responsible for statewide policy guidance in all areas of service, with local policy following statewide policy. The 18 medical Administrative Directives are inadequate for this purpose. The National Commission on Correctional Health Care standards are a reasonable guideline to determine the scope of processes of care that should be governed by Administrative Directives.

## Wexford Provider Staffing and Physician Credentialing

It is our opinion that the quality of physicians in the IDOC is the single most important variable in preventable morbidity and mortality, which is substantial. The first step in provision of quality of care is to ensure appropriately credentialed medical staff. In its response to the First

---

[45] Co-employment means that there are two employers (IDOC and Wexford), each of whom has some legal responsibility for the same employees.

[46] When a State employee HCUA is responsible for managing the health care unit but staff are Wexford, there are some limitations with respect to discipline and assignment as a result of union rules. When a DON is a Wexford employee and staff nurses are state employees, the same occurs. These co-employment issues affect multiple facilities we visited.

[47] The National Commission on Correctional Healthcare is the leading organization establishing standards for correctional health programs.

Court Expert's report,[48] on page 4 an attorney for the State states that, "More than 80% of WHS' [Wexford Health Services] physicians are either Board Certified in Family Practice or Internal Medicine, or have more than 10 years of Family/Internal Medicine practice experience or correctional medical experience." This is a misleading statement that gives an inaccurate representation of the credentials of physicians. Credentialing information provided by Wexford shows that only six (20%) of the physicians are board certified in a primary care field. Because physicians typically work alone in these facilities, experience alone is no guarantee that performance will improve to be consistent with current standards of care. We document multiple preventable deaths in the mortality review section of this report. It is our opinion that poorly credentialed physicians contribute significantly to those preventable deaths.

Currently, there are 30 Wexford physicians working in IDOC facilities. Of these, only 16 (53%) have completed training in primary care. Of the 16 that completed primary care training, only six (20% of the 30) are board certified in primary care. Two doctors are obstetricians who work at LCC doing women's care, for which they are appropriately credentialed and privileged; one of these is board certified. These doctors only provide obstetrical and gynecological care, not primary care. Five physicians have an internship or a year or two of primary care training but did not complete a residency.[49]  The remaining seven include:

- One anesthesiologist
- One doctor with two years of occupational medicine
- One doctor with some training in pathology
- One doctor with a year of physical medicine
- One surgeon
- Two radiologists, one of whom did not complete residency training.

Credentialing is a process whereby a physician's qualifications are evaluated by reviewing their education, training, experience, licensure, malpractice history, and professional competence with respect to the work they will be expected to perform. Proper credentialing is the foundation of protecting patient safety. Credentialing must ensure that a physician is properly trained for the work they will be performing. Credentialing protects patient safety by preventing incompetent, *poorly trained*, or impaired physicians from engaging in patient care. In correctional facilities, the scope of practice required and the health care needs of patients are mostly primary care, which requires physicians who have residency training in a primary care field. However, the only requirement in the IDOC with respect to credentialing is to verify that a physician has a license. A Regional Coordinator testified that the only review of credentials is to verify that the doctor has a license, and that their training, board certification, or disciplinary history is not part of credentialing review.[50]

---

[48] Letter via email to Dr. Shansky, First Court Expert from William Barnes, representing the IDOC dated 11/3/14.
[49] This information comes from items 42Z9081-42Z8845-Part 1; 42Z9082-42Z8845-Part 2; 42Z9085-42Z8845-Part 4; 42Z9088-42Z8845-Part 3; and 42Z9090-42Z8845-Part 5. This credentialing information was provided by Wexford Health Sources, Inc.
[50] Deposition of Joseph Ssenfuma, Regional Coordinator, on September 28, 2017.

Privileges are the services and procedures that a physician is qualified to perform based on training and experience. The credentials and training of a physician determine what privileges that physician should have. As an example, a doctor who is trained and credentialed in general surgery can obtain privileges to perform appendectomies and cholecystectomies. A physician trained and credentialed in obstetrics can obtain privileges to deliver babies. Physicians trained and credentialed in internal medicine or family practice can obtain privileges to practice primary care. Physicians trained and credentialed in internal medicine cannot obtain privileges to deliver babies or perform appendectomies. And physicians trained and credentialed in radiology or general surgery cannot obtain privileges to provide primary care. Because the scope of practice and needs of the patients in a correctional medical program are primary care, physicians should be credentialed and privileged in primary care. In IDOC, physicians are credentialed to perform primary care even when they have no training in primary care. This is a serious problem with the credentialing process. For this reason, we agree with the First Court Expert that Medical Directors be board certified in a primary care specialty. Given the size of the IDOC facilities, there is only one physician on staff at most facilities. When this physician is not trained in primary care, there is no other available physician to care for the patient.

Because there are so many physicians who have not completed a primary care residency, the level of supervision of their care should be at a higher level than for board certified physicians. This is not the case. There is no special monitoring for this group. All physicians receive the same type of peer review.

Peer review is a means to monitor the quality of physician and other provider care, and thereby protects patient safety. Peer review of physicians in the community is typically of two types. One type of peer review is done on a routine basis for all physicians and is done as a monitoring device to ensure quality of care. This type of peer review is often called performance evaluation program or PEP. A second type of peer review is done when a member of the medical staff may have committed a serious gross or flagrantly unacceptable error or exhibits a serious character or behavior problem and needs to be evaluated with respect to possible reduction of privileges or referral to a medical board. The latter type of peer review is generally a formal quasi-legal procedure that has significant implications for the physician's employment and professional status. We found that the first type of peer review is done for all physicians and mid-level providers in the IDOC, but the second type of peer review does not appear to occur in IDOC, based on information made available to us. As will be detailed later in the mortality review section of this report, there were numerous grossly and flagrantly unacceptable episodes of care that should have resulted in peer review but did not. Peer review in the IDOC is ineffective, as physicians who commit repeated egregious medical errors continue to practice and continue to harm patients.

The first type of peer review which is performed by Wexford is a structured questionnaire performed by one Wexford physician on another Wexford physician. We noted at one facility that a general surgeon performed the peer review of the primary care work of a nuclear radiologist. It is our opinion that this type of performance evaluation is defective and unlikely to

result in meaningful evaluation, as neither doctor is adequately trained to practice primary care and would not be able to know when care was adequate.

Also, the peer review that is done is so poor that it is unlikely to identify problems. The Wexford peer review consists of a review of 10 single episodes of care for five areas of service. For each of these areas of service there are a series of questions ranging from 10 to 15. Some of the questions are not relevant to clinical quality, such as:

- Is the handwriting legible?
- Is the signature with professional designation legible?
- Is the patient enrolled in all relevant clinics?
- Are all medications written on a script?
- Does the clinic include pertinent vital signs?

While it is important to write a legible note, legibility does not evidence clinical competence. Many questions require an interpretation. For example, the question "Was treatment appropriate for this visit" requires that a physician know the appropriate treatment. The problem is that when only 20% of doctors are board certified and 23% have no training in primary care, many doctors will not know the appropriate treatment. Doctors performing these evaluations need to be expected to know what the appropriate treatment is, otherwise the test will not perform as expected. Also, these episodes of care are picked at random and may not include patients that have serious illness. When someone does not have a serious illness, it is difficult to test the clinician, because it is very difficult to make an error if there is no decision to make with respect to the treatment. Additionally, it appears that these reviews are not taken seriously and appear to be done merely because these are requirements of the contract. For these reasons, it is not surprising that almost all peer reviews were scored 100% adequate. When we compare these results with death chart reviews we performed, there is dramatic discrepancy. Most chart reviews we performed contained many errors. We reviewed the care provided over two years prior to the death. Of 33 death charts we reviewed, there were over 1700 errors. Many had serious errors. Some had egregious errors that resulted in death. We noted the same level of medical error in chart reviews we performed on site visits. The Wexford methodology of peer review does not appear to accurately review physician practice, based on a comparison to our record review of clinical care. This process is not working as intended.

The First Court Expert opined that Wexford hired underqualified physicians, and recommended that facility Medical Directors be trained in primary care and be board certified. We agree with this finding, based on the credentialing information above, and we agree with his recommendation.

In reviewing the Defendants' comments to the First Court Expert's Draft Report,[51] the Defendants challenged the assertion of the First Court Expert that Wexford Health Services has hired "underqualified clinicians." In their attempt to refute that assertion, the Defendants

---

[51] Re: Lippert v. Godinez – Defendants' comments regarding Confidential Draft Report via email dated November 3, 2014, authored by William Barnes.

stated that, "The community standard, as espoused by the American Medical Association, requires physicians to possess only a license to practice medicine." This is misleading and inaccurate. This statement implies that the current community standard of medicine is for physicians to only have a license to practice medicine, presumably in any field. We disagree. It is our opinion that the community standard in the U.S. is for physicians working in primary care to have residency training in a primary care field. One would never see a pathologist delivering babies. The Defendants' statement also implies that the American Medical Association (AMA) endorses their position. This statement of Defendants is neither the community standard nor is it a standard we could identify as espoused by the AMA.

It is true that it is legal for a doctor without residency training to open a private practice in the community and practice primary care medicine without any training in primary care. However, it is becoming increasingly uncommon, and particularly in urban areas, it is now extremely uncommon to find doctors without residency training in primary care who work in general practice. The standard in the community is for physicians in organized medical practices to undergo credentialing and privileging, and to have residency training consistent with their scope of practice.

With respect to the recommendation to hire board certified physicians, the State's response said,

> "This recommendation, along with any recommendations dictating specific training or certification for licensed correctional physicians, lacks any justification or support in state law and community, ACA, AMA, and NCCHC standards. Accordingly, this recommendation *exceeds minimum constitutional standards of adequacy*" [my emphasis].[52]

With respect to the assertion that use of board certified primary care physicians exceeds minimum constitutional standards of adequacy, we note as an example that there has been Federal Court intervention requiring use of primary care trained physicians when that training was necessary to protect inmate-patients. For years, the California Department of Corrections and Rehabilitation (CDCR) had poorly credentialed physicians, which resembled the current situation in the IDOC. In 2004, in the California prison system, many physicians were not trained in primary care; instead, they had training in surgery, radiology, gynecology, pathology, etc., similar to the IDOC situation in 2018. Many physicians had prior or current sanctions of their licenses and evidence of clinical incompetence by virtue of malpractice claims, which we were unable to evaluate for Wexford physicians. It was the opinion of the Court in California that the lack of qualified physicians resulted in increased morbidity and preventable death. We believe that the situation in California is similar to the situation in the IDOC. In California, as a result of that situation, the Federal Court issued an order[53] requiring the use of physicians who were

---

[52] Letter via email to Dr. Shansky, First Court Expert from William Barnes, representing the IDOC dated 11/3/14.

[53] Proposed Stipulated Order Re: Quality of Patient Care and Staffing; Marciano Plata, et. al., v. Arnold Schwarzenegger, et al.; United States District Court Northern District of California No. C-01-1351 T.E.H., originally filed 9/17/04. In that order, the Court stated: "As of January 15, 2005, defendants shall not hire independent contractor primary care physicians who are not board-eligible or board certified in internal medicine or family practice." p. 3.

board certified or board eligible[54] in internal medicine or family practice.[55] We note that in the California prison system in 2007, there were 18 preventable and 48 potentially preventable deaths, and in 2017, when all physicians were required to be board certified, there were 0 preventable deaths and 18 potentially preventable deaths.[56] Although there were other systemic improvements that helped reduce the number of preventable deaths, improvements in physician credentialing played the major role. Improving credentials of physicians and removal of unqualified physicians has been shown to reduce mortality.[57]

We have learned that in the mid-1980s, approximately 12 IDOC prison facilities were accredited by the Joint Commission on Accreditation of Healthcare Organizations (JCAHO). At that time, the Agency Medical Director approved all facility Medical Directors and his requirement was that Medical Directors completed primary care training. Accreditation by JCAHO required privileging based on appropriate credentials. At that time, the IDOC placed into its Administrative Directives the requirement that all physicians have one-time primary source verification of their credentials, which was a requirement to verify training. The IDOC ended their accreditation with JCAHO but kept in the Administrative Directives the requirement of primary source verification. Over the years this practice was ignored and currently the HCUAs we interviewed do not even know what primary source verification is. The only credentialing review is to ensure at the annual CQI meeting that every physician has a license.

<u>Physician Staffing</u>
Physician staffing in IDOC is very poor. The Vice President of Operations for Wexford could not remember the last time there was a full physician staff. She thought in 2014 there was only one vacancy, but that was as close to full staffing as the program got. We noted earlier in this report that IDOC lacks adequately trained physicians. This is compounded by vacancies in physician positions. Persistent and ongoing vacancies in the Medical Director position title contribute significantly to physician staffing deficiencies. In addition to vacancies of Medical Directors, all five facilities we visited were missing a physician. Two facilities had replaced a physician position with a nurse practitioner because of the inability to fill physician positions. Statewide, the total days of missing Medical Directors totaled 22% of total days these positions were supposed to be filled,[58] an unacceptable vacancy rate.

Because of vacancies, physicians are moved from site to site as "Traveling Medical Directors." One of the facilities we investigated, NRC, had a Traveling Medical Director. This individual did

---

[54] Board eligible is a term used to describe a physician who has completed a residency training in a field and is therefore qualified to take a board certification test for that specialty. For example, a board eligible internist is one who has completed a residency in internal medicine and is qualified to take the board certification test but has not yet done so.

[55] Since this order, the California Department of Corrections and Rehabilitation, through the Receiver's office, requires board certification in family practice or internal medicine.

[56] Based on annual analyses of inmate deaths as reported by Dr. Imai, consultant to the medical receiver in California as found under the heading of Death Review at https://cchcs.ca.gov/reports/.

[57] Terry Hill, Peter Martello, Julie Kuo; A case for revisiting peer review: Implications for professional self-regulation and quality improvement. Plos One at https://journals.plos.org/plosone/article/file?id=10.1371/journal.pone.0199961&type=printable.

[58] Document 42P5621-IDOC Facilities lacking permanent medical directors 7-1-15 to 11-26-17 Bates number 550.

not participate meaningfully in quality improvement, did not show any evidence of oversight of the medical program, and had clinical issues.

The turnover of Wexford physicians is also very high. Of 33 physicians listed on a 9/19/14 report[59] by Wexford, only 18 (54%) are still working three and a half years later. The inability of Wexford to hire and *retain* qualified physicians is a serious problem and was mentioned as a significant problem by every HCUA we spoke with. There has been no formal analysis of this that we could find. The Vice President of Operations for Wexford told us that it was harder to recruit to corrections because of the impression that if you worked in corrections, you were a bad doctor. We disagree. In our opinion and from experience, recruitment in corrections depends on establishing conditions of work that are professional and foster a sense of providing a worthwhile service. When that occurs and when doctors are properly supported, qualified doctors can be found and retained in correctional environments and elsewhere.

At the five sites we visited, none had a long-tenured Medical Director. LCC had a Medical Director who had the longest tenure of the five facilities we inspected. She had been Medical Director since May of 2016. The Medical Director at Dixon started in October of 2017. The Medical Director at MCC has been in his position since June of 2017. One Medical Director was at Dixon for a short period of time before being moved to NRC. After several months at NRC, he was moved to SCC. About two months after being moved to SCC, he resigned. His position at NRC was filled in coverage by the ex-Medical Director at Hill, who the First Court Expert stated had identified clinical issues. This musical chairs rearrangement of Medical Director assignments is demonstration of the failure to create an environment likely to attract qualified physicians. The IDOC needs to determine why it is that their vendor cannot recruit and retain qualified physicians.

Physician leadership was not improved based on the First Court Expert's comment that,

> "the Medical Directors were functioning in primarily clinical roles and spent little if any time reviewing the clinical practice of other providers or engaging in other important administrative duties."[60]

Several of the HCUAs spoke about poor physician quality as an issue. Two of the Medical Director positions were vacant. A coverage physician at one facility with a vacant Medical Director position did not participate meaningfully in quality work or in providing clinical leadership. In two of the remaining three facilities we visited, the HCUA spoke of having problems with the Medical Director. One was described as only doing chart reviews, not wanting to see patients, not reviewing deaths, and having to be urged to see patients. When leadership and quality of physicians is inadequate, patients are placed at risk because poor quality will not be identified or corrected.

---

[59] 40C0134- IL Physicians Report 9 19 14 Key Produced by Wexford Health Services.
[60] Final Report of the Court Appointed Expert, Lippert v. Godinez December 2014 p. 7.

Non-Physician Staffing

On a statewide basis, exclusive of dialysis and the HIV and hepatitis C telemedicine program, there are 1119.6 medical staff in the IDOC program, with an inmate population at mid-year 2017 of 43,075. This amounts to 26 staff per 1000 inmates, which places IDOC approximately in the lowest 10% of state prison systems in the country[61] with respect to staffing numbers *based on 2015 data*. Of the 1119.6 staff, 401 (36%) are employed by IDOC and 718.6 (64%) are employed by Wexford Health Sources. Of the 1119.6 medical staff, there are 245.8 (22%) vacancies, not including leave of absences, which would increase this number a few points. Wexford has an 18% vacancy rate for its 718.6 employees and IDOC had a 29% vacancy rate for its 401 employees. These are very high vacancy rates and compound a very low staffing level, making staffing a critical problem statewide. This was confirmed by HCUAs at sites we visited.

We compared facility staffing for mutually visited facilities. In 2014, the First Court Expert determined that for the five facilities we visited there were 303.41 budgeted positions, an 18% vacancy rate, and 25 staff per 1000 inmates.

**Positions, Vacancies, and Positions per 1000; First Court Expert's 2014 visit[62]**

| Facility | Positions | Vacancies | % Vacancy | Population | Staff per 1000 |
|----------|-----------|-----------|-----------|------------|----------------|
| SCC & NRC | 73.90 | 23 | 31% | 4078 | 18 |
| LCC | 62.21 | 4 | 6% | 1997 | 31 |
| Dixon | 66.30 | 18 | 27% | 2349 | 28 |
| MCC | 101 | 9 | 9% | 3750 | 27 |
| **Total** | **303.41** | **54** | **18%** | **12174** | **25** |

For the same five sites we visited, there were 405.05 budgeted positions. There were 99 (23.5%) vacancies. This is a very large vacancy rate, which makes it difficult to effectively operate a health program.[63] Four of the five facilities we visited had unacceptable vacancy rates.[64] We note several key differences in the staffing differences between 2014 and 2018. The population in the five facilities we reviewed decreased by 2177 (18%). The number of positions

---

[61] Prison Health Care: Costs and Quality, Pew Charitable Trusts, October 2017. We note that the staffing levels given in the Pew study reflect 2015 numbers. However, these 2018 IDOC staffing numbers still would rank Illinois in the lowest 10% of state prison systems comparing IDOC 2018 staffing to nationwide 2015 numbers.

[62] This table is constructed from data taken from tables presented in the First Court Expert's report.

[63] In Defendants' comments on our report they noted that there is a national nursing shortage and cite a survey of readily available health care facilities in the United States in January 2018 by Nursing Solutions, Inc. a recruitment firm. Defendants note that over 25% of the hospitals in this country who responded to the survey have Registered Nurse (RN) vacancy rates of greater than 10%. This same study reported that the average vacancy rate for Registered Nurses is 8.2%. In either case, nursing vacancies in the IDOC facilities we visited exceeded the average from this survey and were much more than the maximum of 12.5% used in the study.

[64] Except for LCC, all IDOC facilities had vacancy rates of 20% or greater. These vacancy rates are much higher than Federal Bureau of Prisons policy that establishes that vacancy rates not exceed 10% during any 18-month period (Program Statement P3000.03: Human Resources Management Manual, Chapter 3, page 11 obtained at https://www.bop.gov/PublicInfo/execute/policysearch#. There are no published reports comparing vacancy rates amongst health care providers working in state prison settings.

increased by 101.64 (33%).[65] The staff per 1000 inmates increased by 16 (64%). But the vacancy rate increased from 18% to 23.5%, a 30% increase.

**Positions, Vacancies, and Positions per 1000 Inmates; 2018 visits**

| Facility | Wexford and IDOC staff | Vacancies | % Vacancy | Population | Staff per 1000 |
|----------|------------------------|-----------|-----------|------------|----------------|
| SCC | 98.00 | 24 | 24% | 1183 | 83 |
| NRC | 69.00 | 29 | 42% | 1681 | 41 |
| LCC | 53.15 | 1 | 2% | 1806 | 29 |
| Dixon | 93.80 | 19 | 20% | 2298 | 41 |
| MCC | 91.10 | 26 | 29% | 3029 | 30 |
| **Total** | **405.05** | **99** | **23.5%** | **9997** | **41** |

While budgeted staffing increased at three of five facilities we visited, it decreased at two of five facilities. There are 44 additional staff working at these facilities than there were when the 2014 report was written.

Four of five facilities we visited had significant vacancy rates, as high as 42%, which are mostly nursing staff. Almost every HCUA told us that there were insufficient nursing staff. This was confirmed in the deposition of the Agency Medical Coordinator, who noted that over the past several years there have been nursing shortages at SCC, Pontiac, Decatur, Graham, Southwestern, and MCC.[66]

Most HCUAs told us that if all their positions were filled they believed that there would be adequate staff. We do not agree. The IDOC has not performed a staffing analysis based on expectations of the Administrative Directives and special care needs, including infirmaries and geriatric care. Relief factors have not been included in staffing considerations and budgeted staffing numbers do not appear to be adequate. In our opinion, despite increased nurse budgeted staffing and even when vacancies are filled, there will still be nursing shortages. The IDOC, in their comments on our report, assert that the IDOC in the current fiscal year and Wexford in the past year spent a total of $8,283,718 on overtime wages. We acknowledge that this is a significant expenditure. Based on our investigation, overtime is used to cover some but not all vacant shifts. However, reliance on overtime contributes to staff fatigue, increased errors, staff dissatisfaction and turnover as well as higher incidence of poor patient outcomes.[67] While we did not evaluate working conditions for staff, we did find ample evidence of error and

---

[65] Dixon appears to have had a significant increase in staffing, but as the HCUA related to us, this is artefactual, as 22 nurses were moved from the mental health program to the medical program but still had assignments in mental health. Their reassignments did not create increased staffing for the medical program, but gave the impression that there had been a large increase in staffing. If these 22 nurses are removed from the Dixon staffing, the actual increase in staffing would be 79.64 positions or a 26% increase, not a 33% increase.

[66] Deposition of Kim Hugo, Agency Medical Coordinator pp. 25-31, April 11, 2018.

[67] Institute of Medicine (2004) Keeping Patients Safe: Transforming the Work Environment of Nurses. National Academies Press, Washington, D.C., Stanton, M. (2004). Hospital nurse staffing and quality of care. Agency for Healthcare Research and Quality. Research in Action, Issue 14.

poor patient outcomes in our review of health care provided to IDOC prisoners. The use of overtime does not change our opinion that a staffing analysis is needed or that there is lack of adequate staffing.

The Wexford component of staffing is memorialized in a contract document called a Schedule E. Based on interviews with senior leadership of Wexford and IDOC, we could not determine who is responsible for developing staffing levels found in the Schedule E. The Wexford Vice President of Operations told us that the Schedule E staffing is the recommended staffing of the IDOC to which the vendor can make suggestions. Mr. Brunk, the Chief Financial Officer, told us that the Schedule E is developed by the Wexford Regional Manager and reviewed by the IDOC Office of Health Services. The Agency Medical Director told us that he had input into the Schedule E for new facilities but otherwise had no input into the Schedule E, and that Mr. Brunk or Wexford developed the Schedule E, which the Office of Health Services approved. The Chief of Programs and Support Services, who is the health authority, told us that the Agency Medical Director was responsible for development of the Schedule E. Development of the Schedule E is not in the job description of the Agency Medical Director. The lack of a central health authority, we believe, contributes to this confusion. Furthermore, the Schedule E as represented in the current contract does not include input from HCUAs, Regional Coordinators, or even the Agency Medical Director in addressing clinical needs in their facilities. Given these responses, it is our opinion that the Schedule E does not reflect actual staffing need, as it does not appear based on any staffing analysis we could identify after discussions with health leadership who we thought would be responsible for this document.

No one we spoke with has responsibility for determining if total staff (state and Wexford) is adequate. The IDOC Agency Medical Director and the Agency Medical Coordinator told us that an Assistant Warden of Programs (AWP) from Sheridan, who also was a nurse, was engaged in analyzing staffing at various sites, but the extent of this analysis was not known to the Agency Medical Director. The Illinois Nursing Association (INA) is the union for the registered nurses in the IDOC. The Agency Medical Coordinator participates on an INA standing committee that meets monthly to discuss INA related nursing issues. The INA has raised issues with respect to staffing at certain facilities. When this occurs, the AWP from Sheridan performs a staffing analysis, brings it to the standing committee, which then considers staffing recommendations, and forwards them the Agency Medical Director for review. Other than this effort, we could identify no analysis of staffing need state wide.

Based on conversations with senior IDOC leadership, staffing increases at NRC and SCC were a result of union negotiations. Senior IDOC Office of Health Services staff were not involved in this decision,[68] although a Regional Coordinator gave recommendations on how many nurses were needed. These increases were not based on a thorough staffing analysis, as relief factors were not used and because no positions other than RN positions were considered. At no facility has there been an analysis of staffing need based on adherence to the Administrative Directives. This creates a gap between clinical need and staffing levels that affects all facilities.

---

[68] See pages 14-16 of deposition of Kim Hugo, Agency Medical Coordinator, April 11, 2018.

Because we only visited a small number of facilities, the true staffing deficiency is unknown. The program should undertake a staffing analysis, considering all job classifications with relief factors. This was a recommendation of the First Court Expert and we agree with that recommendation. This analysis should not be performed by a custody person and probably should be performed by an outside expert.

We noted at four sites there were inadequate supervisory nurses. At MCC, SCC, Dixon, and LCC, we felt that budgeted supervisory nurse positions were inadequate. At Dixon, SCC, and LCC, the HCUA provides some nursing supervision due to vacancies.

Custody staffing was not addressed by the First Court Expert. At several facilities we visited, there were issues related to insufficient officer staffing to properly accompany nurses in medication administration or to escort patients for scheduled appointments. While we did not study this in depth and lack the ability to review officer staffing, the numbers of officers need to be sufficient to ensure that medical services can be timely and appropriately provided. For this reason, we believe that officer staffing with respect to medical services needs to be studied and additional officers hired as indicated.

## Statewide Use of University of Illinois

**Current Findings**

The First Court Expert did not address services provided by University of Illinois at Chicago (UIC). UIC provides laboratory services statewide. We found no problems with laboratory services at any facility we visited. UIC also provides HIV and some hepatitis C services via telemedicine statewide. Everyone we spoke with commented on the high quality of these services. All patients with HIV are scheduled for care by UIC clinicians. The First Court Expert found that coordination of care between UIC and IDOC providers could be improved. We agree, but found that overall when patients are referred, care was of very good quality.

For hepatitis C, IDOC physicians evaluate patients with hepatitis C in a hepatitis C chronic clinic. We found that these clinics were not performing well. When patients reached a level of fibrosis that is equivalent to stage 3 fibrosis, the IDOC physician refers the patient to a Wexford internist, who evaluates whether the patient should be referred to UIC and whether any other testing needs to occur. In our opinion, this process only serves to delay access to hepatitis C care and we found multiple cases of delayed hepatitis C care that caused harm.

Furthermore, because IDOC physicians lack primary care training, they appear to not know how to manage cirrhosis. There is no evidence that patients with cirrhosis from hepatitis C obtain timely baseline esophagogastroduodenoscopy (EGD) to screen for varices or every six month ultrasound screening for hepatocellular carcinoma, which is a standard of care. We noted on death reviews a patient who died of bleeding varices who never had an EGD to screen for this condition.

As a result of these problems with referral for hepatitis C, it is our opinion that fewer people are treated than who should be treated based on barriers to referral for care. Once engaged at UIC, care appeared appropriate.

What was clear in reviewing the program at UIC was that credentialing of physicians is part of the hiring process at UIC and all physicians are qualified. Progress notes are reasonable and clinically adequate. Referrals are appropriate. There were no identified errors. The UIC medical school correctional program is a significant resource that has potential to provide qualified physicians to the IDOC correctional medical program. The UIC School of Medicine has a subsidiary school of medicine in Rockford which has a significant primary care program. The Southern Illinois School of Medicine is also a potential significant resource which is close to many of the southern Illinois prisons. As we will discuss later in the recommendations, we believe that the UIC program or some combination of state affiliated medical school programs can be the basis for improving physician quality in the IDOC system of care. This needs to be carefully explored. The UIC program also has potential to provide dialysis services. Telemedicine services can include specialty care some of which can reduce but not eliminate the need for transportation of inmates for offsite encounters. We believe that an affiliation with a university based program like UIC can reduce some costs by use of 340B pricing discounts.[69] The IDOC would be remiss in not exploring these options.

We note the UIC and SIU both have dental schools, which is a potential resource for oversight functions and possibly for direct service provision.

# Statewide Overview of Major Services

## Clinical Space and Equipment

**First Court Expert Findings**
In the final report, the First Court Expert noted that clinical space, sanitation, and equipment were problematic at virtually every facility. The report noted facilities that lacked designated space to conduct sick call in the housing units, did not have the clinical equipment needed to perform adequate examination and screening, and had examination areas that did not allow sufficient privacy or confidentiality during clinical encounters. There were nurse sick call and provider clinical spaces that did not have examination tables. In housing units without designated sick call rooms, nurses performed sick call duties at the cell doors without any potential for confidentiality and no opportunity to perform an adequate physical examination if so warranted.

System wide deficiencies in sanitation were identified. In many facilities, examination tables and stools, infirmary mattresses, and stretchers had cracked or torn impervious outer covers

---

[69] 340B pricing is a government sponsored price discount on pharmaceuticals that can be provided to disproportionate share hospitals that provide care to underserved populations. 340B pricing is currently used for the HIV/hepatitis C telemedicine program.

which did not allow proper cleaning and sanitation. Many facilities were not using paper barriers on exam tables which could be changed between patients nor, alternatively, was there evidence that the tables were cleaned with a sanitizing solution after each patient use. Some clinical examination rooms lacked handwashing sinks.

**Current Findings**

The experts inspected the physical plants and equipment in the medical care areas at the NRC, SCC, Dixon, LCC, and MCC. Overall, we found problems with nurse sick call rooms, infirmary spaces, and examination rooms in all facilities we visited. The dialysis unit at SCC is inadequate and needs renovation. These problems detracted from the ability to provide care.

Nurse Sick Call Rooms

The nurse sick call rooms in three of the five facilities have been situated in the housing units to increase access to care. In two facilities, the sick call rooms are located in a centralized health care building.

NRC has established nurse sick call rooms on the first floor of each of the three tiered cell houses. These rooms are also used by providers to perform intake physical examinations that were deferred during the intake process. Nurses commonly do sick call interviews cell by cell through closed doors, moving some patients to the sick call rooms, which have a few plastic chairs or four bolted metal chairs with shackles. The sick call rooms do not have examination tables or desks, and all clinical equipment is carried in the during sick call session. Not all rooms have sinks or soap and paper towels. The sinks were dirty and the floors poorly scrubbed. In this condition, these rooms are unacceptable for the performance of nurse sick call or provider intake physical examinations.

SCC established nurse sick call rooms in the all six housing units. The rooms are adequately sized and equipped, having examination tables with paper rolls. The oto-ophthalmoscopes in two of the six rooms were not functioning. These rooms were generally clean and organized. One room did not have a sink but sanitizing hand gel was available for hand cleaning.

Dixon primarily provides nurse sick call in two dedicated and two part-time rooms in the centralized health care unit (HCU). (There were two additional satellite sick call rooms in the distant disciplinary segregation building). One nurse sick call room in the HCU had two desks and two exam tables; this room lacked any auditory and visual privacy. The other three rooms did not have examination tables. Only two of the four rooms had sinks. Having two exam tables in one room and none in the other three is a barrier to the delivery of care and does not allow for adequate privacy and confidentiality.

LCC provides nurse sick call in the ambulatory care wing of centralized health care building. Two exam rooms and occasionally a third room were utilized for nurse sick call; all had sinks and were adequately equipped. The exam tables had small tears in the upholstery and one oto-ophthalmoscope was not functional. Due to the need to share the examination rooms with the

provider staff, there were times when there were not enough exam rooms to meet the nurse sick call needs of the women at LCC.

MCC has established seven clinical examination areas in the facility's cell houses that are used for daily nurse and intermittent provider sick call and chronic care. In cell houses with only a single examination room, nurse sick call and provider clinics cannot be provided simultaneously and have to be separately scheduled so as not to overlap. The condition of these satellite clinics varied from cell house to cell house. Some rooms were well maintained, others had cracked and peeling paint, uncovered electrical outlets and ceiling vents, boxes cluttering the exam area, and records and supplies stacked on exam tables during clinical sessions. One of the exam areas did not have a sink. Not all of the areas were properly equipped; some lacked oto-ophthalmoscopes, oximeters, peak flow testing mouthpieces, blood sugar testing devices, automated external defibrillators, and other supplies. One of the exam rooms in the East cell house was cramped by the presence of correctional items, including three large file cabinets, water damaged cardboard boxes, and an ancient refrigerator with a totally rusted door Unsealed emergency bags were found in a number of the clinical spaces.

Infirmary Space

NRC opened a 12-bed medical infirmary in 2016. The nursing station is in a converted storage closet with no sink, no electrical outlets, no phone, no computer, and only one desk for two to three nurses. The size and condition of this nurse station hampers the efficiency of the infirmary nursing staff. There were functioning patient nurse call devices at each infirmary bed. The monitoring panel in one of the two negative pressure isolation rooms was not operational. Even though the majority of the patients housed in the medical infirmary were chronically ill, and had clinical issues including frailty, disability, ambulation deficits, inability to provide self-care, or bladder or bowel incontinence, there were no adjustable hospital beds with safety rails in the infirmary. Many of the mattresses had torn covers and could not be properly sanitized. One patient with urinary incontinence had an uncovered porous foam egg crate cushion in lieu of a mattress that was odiferous, dirty, and could not be cleaned and sanitized. The weekly supply of clean linens was insufficient to meet the needs of the infirmary patient population of incontinent, diapered patients who frequently soil their sheets. The medical infirmary rooms were shabby and unacceptably dirty.

The SCC infirmary's nursing station's design does not allow direct line of sight of any of the 32 patient beds. Functional nurse call devices were in all of the two-bed rooms but not in the single bed medical rooms. The HEPA filters and negative pressure units in both the isolation rooms were non-functional; its filters and vents were clogged with dust. Low, fixed position beds were not suitable to allow appropriate examination or to meet the clinical needs of the patients housed on the infirmary. The head and leg sections could not be raised or lowered, beds had broken wire springs, and safety railings were broken. The condition of the infirmary beds created a safety hazard for the staff and patients. The tub room had large cracks in the floor and no safety grab bars, rendering it unusable. The rooms were inadequately cleaned. The cleanliness of the room varied based on the ability of the individual patients to assist with cleaning their rooms. Elderly, physically and mentally impaired individuals who were unable to

assist with cleaning their rooms had unacceptably dirty rooms. Only a single room with two more physically fit patients was judged to be adequately clean. Flies, gnats, and cockroaches were noted in patient rooms and in the corridor.

Dixon's second and third floors contain the infirmary, ADA housing unit, and the geriatric housing unit. The building's two elevators were broken; one had been disabled for a long time and the other had become non-operational on the day before the expert's visit. The malfunctioning of elevators created a major potential safety threat to the expeditious evacuation of these floors, given the clinical condition (elderly, frail, bedridden, physically ambulation impaired, etc.) of the patients housed on the health care building's upper floors. Most of the infirmary beds were functional, second-hand hospital beds with intact mattresses and adjustable sections. However, one patient with dementia had a broken bed with a middle section that sagged nearly to the floor. The infirmary rooms had nurse call devices and the negative pressure unit in the isolation room was functional. The ADA and geriatric units have fixed metal frame beds without adjustable sections with metal wire mattress supports. The wire mattress supports were commonly broken and replaced with strips of sagging tied bed sheets. The fixed metal beds must be replaced with more suitable beds; these beds are inadequate and put the safety and health of the geriatric patients at risk. Peeling paint, cracked wall plaster, rusted, dusty vents, and poorly ventilated showers were noted on both floors. As throughout the entire health care building, floor tiles are cracked and loose; this is major safety hazard for staff and the at-high-risk-for-fall patient population.

LCC's infirmary occupies one wing of the health care building. Relatively new hospital beds in excellent condition with adjustable height and head and leg sections were in all of the single (non-crisis) and double bed rooms. There were nurse call devices next to all the medical beds. The unit was clean and well organized. Both of the negative pressure units and the monitor at the nurse station were not functional, even though the nursing logs had previously indicated that they were operational.

MCC's infirmary is located on the third floor of the centralized health care building and can be reached by stairs or a single elevator. Overall, the infirmary was clean and in good repair. The heavy doors to the patient rooms are kept locked with individual padlocks. This is a safety hazard because emergency evacuation of the infirmary would be significantly delayed due to correctional staff having to open each of the padlocks. These padlocked rooms are also a safety hazard because there are no nurse call devices in any of the infirmary rooms; patients who are able to ambulate have to bang on the doors to get medical attention. Patients unable to ambulate have to call for help. The nurse station is in an enclosed room that is not within sight or sound of the patient rooms. Twenty three of the 26 beds were low, fixed-position metal beds without safety railings or adjustable heights and head and leg sections. The low to the ground fixed position beds made it difficult and even unsafe for the staff to properly examine and transfer patients into and out of bed. One patient with risk for falls slept on a mattress on the floor because there were no available beds with safety railings. The negative pressure units were operational, but the anterooms in these isolation rooms were cluttered and had overflowing waste bins. The shower room used by the infirmary's chronically and acutely ill

patients did not have safety grab bars; the ceiling vent in the shower rooms was clogged with lint and dirt.

Health Care Unit Space

The NRC health care unit did not have a sufficient number of exam rooms to accommodate the facility's four providers and the monthly UIC telemedicine specialty team. There are sessions when one provider has to be shifted into a cluttered interview/storage room without an examination table or clinical equipment. This is inappropriate for the use by clinical providers. Two additional examination rooms are needed to assure that access to clinical care is not hampered by the lack of examination space. The three exam rooms have non-adjustable exam tables and none had paper rolls. Sinks in all the rooms were crusted with mineral deposits, and uncovered paper memos were taped on the walls, creating a fire safety hazard. The wall mounted oto-ophthalmoscopes were non-functional in every exam room and in the treatment room. One portable scope was shared by the providers. Even though many infirmary and general population patients have physical disabilities, there was not a single adjustable exam table or an electric table in the clinic.

SCC's health care unit was reasonably clean and organized. The unit had two provider exam rooms and a telehealth room; if needed, the adjacent treatment room was used as a third provider room. The four-chair hemodialysis suite was in deplorable condition, with peeling paint; dirty, unbuffed floors; standing water on the floor of the deionization room; and an uncovered waste container. The front of refrigerator door was totally rusted and impossible to sanitize. The suite, deionization room, and the storage areas were cluttered, creating a safety and fire hazard. The space of the suite did not allow for the required separation of the hepatitis B infected dialysis patients. A very few of these egregious deficiencies had been noted on Monthly Safety and Sanitation reports, but no action had been taken by IDOC, Wexford, or the dialysis vendor to expeditiously correct these problems. The Hemodialysis Unit does not meet the community standards of care or the CDC guidelines for prevention of the infections in dialysis units (Reference CDC, Recommendations for Preventing the Transmission of Infections among Chronic Dialysis Patients). The Hemodialysis Unit should be closed until all these deficiencies in the physical plants and practice have been corrected; these conditions would not be tolerated in community dialysis centers.

Dixon's health care unit on the first floor of the health care building had three adequately equipped provider examination rooms with an additional telehealth room. There were sufficient exam rooms to accommodate all three providers at the same time. One of the examination tables did not have a paper roll. The provider offices in an adjacent corridor were reportedly to allow access to electronic medical references. The HCU was generally clean and well maintained; however, as in the entire health building, there were cracked and missing floor tiles throughout the first floor. This is a safety, sanitation, and infection control concern for patients and staff.

LCC's ambulatory health care unit occupied one wing of the health care building. Provider chronic care clinics, provider sick call, and OB-gynecology specialist clinics, along with nurse sick

call, are co-located in this area. The five examination rooms are not adequate to accommodate the 7.5 budgeted full-time equivalent providers and nurses assigned to provider and nurse clinical sessions. All of the examination rooms are adequately equipped; one oto-ophthalmoscope was not operational. One room did not have a sink, two of the five rooms did not have a paper barrier on the exam table. Emergency jump bags are kept in the health care unit and in a car used to transport nurses to distant cell houses on this large campus; these bags were noted to be unsealed. The facility's failure to restock and reseal the emergency bag after every use jeopardizes the next response to an emergency on the campus.

MCC's health care building's first and second floor houses radiology services, telehealth room, nurse staffed treatment room, dental suite, optometry, physical therapy, and support and administration offices. Nurse and provider sick call and chronic care clinics formerly provided in the four exam rooms on the first floor have been relocated to the cell houses. With the exception of the telehealth room, the examination rooms are not well maintained; examination tables and chairs have torn upholstery, oto-ophthalmoscopes were not functional, one of the rooms was cluttered with supplies. These rooms are used intermittently for nurse sick call and treatment room overflow, and should be kept in operational condition.

## Medical Records

**Methodology:** We toured medical record areas, interviewed medical records personnel, and reviewed medical records.

### First Court Expert Findings
The First Court Expert found the quality of medical records poor at most facilities visited. This included problem lists not updated and cluttered with redundant, irrelevant information. MARs were incompletely filled out. "Drop filing" occurred mostly at NRC and LCC. The IDOC fails to file health requests in the medical record. Progress notes often contain no information with respect to history, examination, or clinical decision making. Illegible handwriting made many notes unreadable and unusable, except by the author.

### Current Findings
LCC has corrected the problems with drop filing. With that exception, there has been no improvement. We found several additional significant problems. These include:

- With the exception of MCC, charts are so large that they frequently come apart, making the record extremely difficult to use. This promotes loss of documents.
- Record rooms are too small to accommodate all records. Therefore, additional storage space is necessary, making finding an older document extremely cumbersome.
- Record rooms are not secure and therefore violate Administrative Directives and fail to follow Illinois Department of Human Services guidelines on protection of the medical record.
- There is not a standardized tracking system in place to sign out a record.

- Any staff member can access the records room and pull and re-file records. This promotes loss of records and does not safeguard confidentiality or use by unauthorized persons.
- Access to a medical record for use during clinical encounters is not universal.
- Data for use in quality improvement is obtained manually. This makes measurement of health care processes extremely cumbersome.
- We noted inability of the IDOC to find all documents in mortality records sent to us.
- Records of on-site dialysis are maintained separately from the IDOC medical records and the medical record fails to contain updated information about what is occurring in dialysis.

At the time of the First Court Expert visits in 2014, the IDOC was in the process of implementing an electronic medical record. This effort started at LCC and Decatur, the only two female facilities. The record was incompletely implemented; the electronic MAR was not implemented. After part of the electronic record was implemented at LCC and Decatur, the electronic record project was aborted. We did note on our review at LCC that there were some serious problems with the electronic record. This record defaults vital signs from the last vital signs obtained. The record will automatically present vitals in a note from months previous if no more recent vital signs were done. This is dangerous and should be stopped, as it is a patient safety issue.

The IDOC is considering implementation of a different electronic record. The IDOC has placed a custody Deputy Director in charge of the project to implement an electronic medical record. It is our opinion that someone with medical expertise and medical record expertise should head this effort, not custody personnel. No funding has been provided for this project.

A correctional health program generates large volumes of paper. Infirmaries, mental health units, the health request process, and administration of medication are hospital-like with respect to the volume of paperwork that is generated. As a result, inmates who remain incarcerated for a long period of time generate massive paper medical records. Three problems ensue. One problem is that there is no place to store all the paper record volumes so that they are easily accessible. A second problem is that the paper record comes apart, making use of the documents contained therein extremely cumbersome. The third problem is that the current volume of documents often does not contain all of the documents necessary to provide care. This can result in physicians acting without complete information about the patient. This is particularly true because of the frequency of changes in physician staff.

Almost all inmates with chronic illness or with mental health problems have multiple volume files, easily in the thousands of pages per inmate. Record rooms in the prison facilities do not have the capacity to store all volumes of the record. As a result, most of the volumes of records are placed in storage someplace on the grounds of the facility, but not always close to the medical unit. The most current volume of a record often does not contain a key test result, consultation report, hospital summary, or diagnostic test result that is necessary to understand the progress of the patient. In our own review of records, we had to frequently ask for additional volumes of the record. When this occurs, clerks have to go to the storage unit to find

the document. This delay is not workable if a provider is with the patient. The entire patient record should be available for use, but this would be exceedingly impractical using a paper record.

Also, the paper medical records frequently come apart. All paper documents are two-hole punched and held together by a plastic binding clip. The plastic clip is glued to a pressboard binder that is used for covers of the record. These covers are expandable. The thinning process is standardized except for when to initiate the thinning process. By IDOC rules, certain documents are carried forward to the current volume. The carry-forward documents often do not include critical test reports, consultation reports, or other clinical information that is critical to understanding the patient's diagnosis or therapeutic plan. Other than MCC, the IDOC has no rule on when to thin the record. Several facilities allowed records to expand well beyond two inches. One facility told us they could not afford to purchase the pressboard covers, so charts were not thinned when they should have been.

There are major problems with this process. Medical record volumes that may contain important information are not easily accessible. A newly thinned record may have insufficient medical record documents to properly care for the patient. Medical record volumes that are not thinned come apart. The plastic clips come undone and the clinician is left with a pile of paper that can easily become misplaced in the medical record. This promotes poor care.

None of the facilities we visited had a completely secure record room. Medical records are considered confidential and must be secure. The Illinois Department of Human Services guidelines for providers in maintaining a medical record state that medical records must be maintained in accordance with accepted medical standards which require confidentiality, secured by lock when not in use, and safeguarded against loss or use by unauthorized personnel.[70] Typically, when paper records are used, staff maintaining the record must keep the records in a locked room to which no one except authorized medical record employees have access. Records are pulled by medical records staff only. When a record is pulled, a placeholder is inserted into the space where the record was, containing information on where the record is. After-hours record use is strictly managed so that only authorized persons are permitted in the records room. None of the facilities we visited ensured that this happened at all times and in all circumstances.

The NRC record room was the worst of all facilities. Everyone had access to the record room. Any staff member could pull and refile records they used. Paper documents were not in a pressboard folder and sometimes were merely stapled together or in piles. When a pile of record documents was removed from the room, there was no indication where the record was. In chart reviews we conducted, it appeared that many documents were missing.[71] This arrangement is a patient safety hazard and needs to be corrected as soon as possible. We were

---

[70] Illinois Department of Human Services website as found at http://www.dhs.state.il.us/page.aspx?item=40657.

[71] We noted on four mortality records that there were parts of the record that were missing that made it impossible to evaluate the death. These records included Mortality Review Patient #11 from SCC/NRC; Mortality Review Patient #12 SCC/NRC; Mortality Review Patient #16 SCC/NRC; and Mortality Review Patient #31 Illinois River.

told that the State had funded additional clerical positions for this unit. However, the room size is so small that we do not believe that the room can accommodate any additional employees. This process will require significant work to remedy.

Some patient encounters occur without a medical record; this mostly pertains to nursing sick call at MCC and NRC. All patients need to be seen with a medical record. When patients are seen without a medical record, nurses write their note on a blank progress note without benefit of review of the patient's current problems, medications, or other significant information. The progress notes are filed later. This is inappropriate medical care and is likely to lead to mistakes, placing patients at risk of harm. All nursing and provider evaluations must occur with a medical record.

Some of the First Court Expert's findings are a result of use of a paper medical record and some are staffing and practice issues as well as medical record issues. The First Court Expert found deficiencies with problem lists. Problem lists are easier to maintain in an electronic record than in a paper record. However, in both electronic and paper records, the quality of the problem list is directly related to medical staff participation in maintaining it. The failure to maintain the problem lists in IDOC is a failure on multiple levels. Leadership has not instituted standardized practices with respect to who can enter a problem on the problem list. When providers do not work to place accurate problems in a standardized methodology on the list, the list also becomes inaccurate. While this problem is easier to correct with an electronic record, it is a matter of leadership, supervision, and practice, and is related to personnel and practice issues rather than medical record issues.

Incomplete MARs can be a staffing or process problem. When there are insufficient nurses to administer medications, the records can be incompletely filled out. Also, the practice of recording medication administration hours after medication has actually been administered, which occurs at several sites we visited, will result in inaccurate entries. This appears to be a staffing issue and a process issue. We believe that the burden of using, filing, and reviewing paper MARs is so great that it alone is a compelling argument for implementation of an electronic medical record. If paper records are to be continued in the IDOC, significant root cause analysis and process work needs to be done to discover what the problems are so that they can be fixed.

Paper requests for health care contain the patient's written complaint that nurses address in the sick call process. In our opinion, these written complaints are health record documents, as they describe the patient's problem. The IDOC does not include these in the medical record and discards them. These documents need to be included in the paper record or scanned to the electronic medical record.

The issue brought up by the First Court Expert that many practitioners fail to document a history, physical examination, or therapeutic plan is not a medical record problem in our opinion. This is a problem of physician quality. As an example, we noted one physician at SCC who was a surgeon and not primary care trained who, for six months, was following an

infirmary patient who had dementia. His entire note for 19 consecutive patient evaluations consisted of the statement, "No specific complain, no change, dementia, continue same care."

The patient was ultimately hospitalized for a cardiopulmonary condition but because the doctor failed to evaluate the hospital record it wasn't clear why the patient was hospitalized. Ultimately, the patient developed metastatic colon cancer not diagnosed until the patient had advanced disease. For almost a year following hospitalization, the doctor wrote the following note repeatedly, "No specific complaint, no change, dementia, post colectomy for metastatic ca [cancer]. Continue same care."

This repeated note was written during a time when the patient experienced falling repeatedly, developed incontinence, developed pustular otitis, and severe malnutrition and dehydration. This was negligence and incompetence of the provider and not a result of the medical record. Many notes failed to contain adequate history, physical examination, assessments, or development of therapeutic plans. In review of 33 death records, we found 276 episodes of care with inadequate history; 249 episodes of inadequate examination; and 228 episodes in which a therapeutic plan was inadequate. In our opinion, this is not a problem with the medical record, but is a problem of physician quality.

Illegible handwriting is an individual problem which is extremely difficult to correct with a paper medical record system. We noted problems with legibility at all sites except at LCC, where an electronic record is used.

We also note that use of a paper record means that accessing data from the record for the purpose of measuring performance must be done manually. This is extremely cumbersome and discourages quality investigations. An electronic record can significantly improve data use.

Dialysis is provided by a vendor. Even though dialysis occurs onsite at IDOC facilities, the records of dialysis are not incorporated in the medical record. We noted at SCC that the nephrologist will occasionally write a few comments on a referral form but these are not thorough or fully inform the status of the patient's condition or treatment. These dialysis records should either be incorporated into the record or a reasonable complete summary of the patient's status and treatment should be provided on a regular basis to update the medical record.

In summary, there were many problems with use of the paper record that will be difficult to correct. These include storage of important information due to excessive chart size, documentation on the MAR, ensuring confidentiality of the record, legibility, and functionality. It is our recommendation to implement an electronic medical record statewide to include electronic medication administration functions. The system should be designed and acquired so that the IDOC has easily accessible data for use in measuring performance. Data analysts who are expert in obtaining data from the electronic record for quality purposes should be employed.

## Medical Reception

The medical reception evaluation and treatment plan establishes a baseline for the patient's medical, mental health, and dental conditions, and serves as a blueprint for the patient's care following transfer to the patient's parent institution. Failure to identify and treat serious medical conditions at intake increases the risk of harm to patients and liability to IDOC. Our review showed that the medical reception process generally occurs timelier since the First Court Expert report; however, there are persistent issues related to the reliability of various processes (e.g., TB skin testing) and quality of medical reception evaluations. There are also issues related to the timeliness of follow-up of serious medical conditions. Our report confirmed findings of the previous report and identified previously undescribed problems.

### First Court Expert Findings

The First Court Expert reviewed three reception centers, noting that the purpose of the medical reception process is to identify and treat acute and chronic medical and mental health problems, including communicable diseases, and to identify any special medical needs. The Court Expert found the following problems:

- IDOC forms do not elicit current symptoms (all facilities).
- Nurse screenings being performed in areas that were noisy and did not provide adequate privacy (LCC).
- Significant delays in performance of clinician history and physical examinations of newly arriving inmates, sometimes for more than a month (NRC).
- Lack of integration of TB and laboratory test results into the history and physical examination so that all medical conditions are timely diagnosed with an accompanying treatment plan for each condition and documentation on the problem list (NRC, Menard).
- Medical record disorganization that impeded clinicians' ability to identify and utilize clinical information to timely diagnose and treat patients appropriately (NRC).
- Delays in follow-up and treatment of chronic diseases and other medical conditions (NRC, MCC, LCC).

### Current Findings

This review showed that improvements have taken place with respect to the timeliness of completion of the medical reception process at some facilities (NRC and LCC) but not uniformly across the system (MCC).

Record review showed that county jails forwarded medical transfer information that was available to health care staff at the time of arrival. However, NRC providers did not document that they reviewed the information and, in some cases, missed important medical diagnoses (e.g., prostate cancer, pancreatic cancer, pulmonic valve regurgitation) or medications for high blood pressure (e.g., hydrochlorothiazide). One such error resulted in death.

We noted two cases in mortality reviews that included significant problems with failing to review transfer information or to take an adequate history. In one case, a provider failed to

take an adequate history of a patient in the midst of getting valve replacement for a congenital anomaly.[72] The provider made the wrong diagnosis, failed to contact the patient's civilian doctor, and even failed to read a letter in the IDOC medical record from the patient's civilian doctor. As a result of this failure, the patient's planned surgery was never done, his condition was unrecognized in IDOC for six months, and the patient died from complications of his heart condition without having obtained surgery. Another patient from LCC was at Cook County Jail and was sent to Stroger Hospital for a pancreatic mass. A biopsy was non-diagnostic but the mass was strongly suggestive of pancreatic cancer and follow up was recommended.[73] The doctor at LCC presumed that the patient had a benign pancreatic mass and no follow up was initiated for five months. Pain medication history was also not taken and the patient was placed on inadequate doses of pain medication and suffered in pain over the last five months of her life.

Medical reception was conducted in clinic examination rooms that were not standardized with respect to medical equipment and supplies. There was no microscope available at LCC to the provider to diagnose vaginal infections.

Clinic examination room furniture was often in disrepair (e.g., torn exam table covers) and needs to be repaired or replaced. Exam tables did not have paper to use as a barrier between patients and there was no schedule of sanitation and disinfection activities. Exam rooms were dirty, and in some cases filthy. At NRC, the lack of a water softening system at the facility (reportedly due to budget issues) results in mineral deposit buildup on sinks and faucets, making disinfection difficult, if not impossible. At LCC, the nurse and clinician conduct the medical reception process in rooms that are small and difficult to clean. These conditions present a risk of infection to patients.

On the day of patient arrival, nurses perform a medical history, TB symptom screen, height and weight, vital signs, visual acuity, and plant a tuberculin skin test. Phlebotomists draw labs including hepatitis C and HIV opt out testing. At NRC we found that the scales were not calibrated.[74] Nurses incorrectly measured visual acuity by having the patient sit in a chair to read the visual acuity chart approximately 10 feet away instead of having the patient stand 20 feet away and testing visual acuity for each eye separately. NRC nurses incorrectly read tuberculin skin tests by having the patient show his arm in the cell window rather than palpating the patient's arm for induration. Tuberculin skin test results were not consistently documented in the health record. At LCC, nurses did not document urine pregnancy testing on all patients of childbearing age upon arrival.

Lab tests performed as part of intake screening routinely include serum chemistry, syphilis, and opt-out hepatitis C and HIV testing. Although HIV is supposed to be opt-out,[75] the

---

[72] Mortality Review Patient #2.
[73] Mortality Review Patient #20.
[74] One of the experts stepped on two scales which gave a 10 pound discrepancy between the scales.
[75] Opt-out testing means that testing will be performed unless the patient refuses the test. Opt-in testing means that the patient is offered testing and is performed only upon patient consent.

Administrative Directive (AD) requires that consent be obtained before drawing blood for HIV, which essentially renders the process as opt-in.[76] Opt-out testing is recommended by the Centers for Disease Control because it supports early identification and treatment. Data shows that significantly fewer inmates are being tested for HIV than hepatitis C infection.

A nurse performs the medical history. The IDOC Offender Medical History form is limited with respect to chronic diseases and does not include COPD, thyroid, kidney, liver, autoimmune diseases, or cancer. Importantly, as noted in the previous Court Expert report, the form also does not include a section for review of systems (e.g., chest pain, shortness of breath, abdominal pain, blood in stool, difficulty with urination, etc.) that are typically included in a comprehensive history and physical examination. This poses a risk that important medical diagnoses or symptoms of serious illness will be missed and not medically evaluated, increasing risk of harm to the patient.

The IDOC Offender Physical Examination form (DOC 0099, Rev. 11/20/12) includes a section for substance abuse, risk factors for blood borne infections (e.g., HIV and HCV), and TB symptoms, but does not include a section for chronic disease pertinent review of systems (e.g., chest pain, SOB, polyuria, polydipsia, neuropathy, etc.), which contributes to the assessment of disease control.

The timeliness of clinician history and physical examinations has generally improved. At NRC and LCC, a medical provider saw patients with acute or chronic diseases within 24 hours of arrival. At MCC, only 60% of examinations took place in seven days or less. Although timeliness of physical examinations has generally improved, clinicians did not consistently elaborate on positive findings noted by the nurse,[77] and the history and physical examinations were often cursory and lacking in quality. Because nurses complete the patient history, providers generally do not complete a thorough history leaving a gap of information about the patient's illnesses. In many cases, NRC clinicians simply noted the patient's diagnosis rather than perform a medical history, review of systems, and assess the patient's disease control. At LCC, record review shows a physician assistant was conscientious and did an excellent job.

Providers wrote orders to enroll patients into the chronic disease program in 30 days and assigned patients low bunk/gallery status as clinically indicated. At NRC, providers also ordered diagnostic tests (e.g., chest x-ray, EKG) and labs for some chronic diseases (e.g., thyroid, anticoagulation), but did not order HbA1C for any diabetics. At NRC, medical provider orders (EKG, chest x-ray, blood pressure monitoring, etc.) were not consistently implemented by nurses.

Clinicians usually ordered medications on the day of arrival; however, in some cases they did not provide continuity of care with respect to patients' chronic disease medications, either omitting or changing medications (e.g., insulin types) without documenting a clinical indication.

---

[76] Administrative Directive 04.03.11 Section5 II. F. 5. D.
[77] MCC Medical Reception Patients #12, 13 & 14.

MARs did not consistently reflect that the patients received the medications. At NRC, nurses gave some patients blister-packed medications from stock supplies but did not create a MAR and document that it was given to the patient. In some cases, nurses documented giving medication to the patient on the physician order form, but in other cases there was no documentation that the patient received the medication.

A clinical concern is that at NRC, three patients were being treated for heroin withdrawal at the time of admission, but the provider did not order Clinical Opiate Withdrawal Scale (COWS) monitoring to assess whether the patients' symptoms were improving or worsening, and that may have required changes in medication withdrawal regimens.

We observed a NRC dentist perform dental screening examinations without changing gloves between patients (See Dental Section).

With respect to follow-up, medical providers did not timely address abnormal lab test results and did not complete the initial chronic disease form when seeing patients at the first follow-up visit.

There are no mechanisms in place to monitor timeliness of the intake process or to evaluate the quality of intake screening, the health history, or physical examination. There were no CQI studies provided that indicate the intake screening is monitored for quality or timeliness. This is a high volume, high-risk area of health care delivery in the correctional setting and should be regularly reviewed as part of the CQI program.[78]

## Intrasystem Transfer

Our report confirmed findings of the previous Court Expert report and identified previously undescribed problems. Overall, we find that the timeliness of medical screening following transfer has improved, but there continue to be problems with the completeness of the forms and continuity of care following transfer. We also found that the CQI program does not consistently address continuity of care provided following intrasystem transfer.

### First Court Expert Findings

The previous Court Expert found problems with the intrasystem transfer process at almost every facility resulting in discontinuity of care (e.g., medications, chronic disease follow-up). At Dixon, the process was so broken that despite having a special medical mission, nurses did not perform the process for two to three weeks after patients' arrival, resulting in discontinuity of care. The Court Expert also found that continuity of care following intrasystem transfer is not studied to identify and correct problems.

### Current Findings

---

[78] National Commission on Correctional Health Care. 2014. Standards for Health Services in Prisons. Pp. 13-14.

IDOC Administrative Directive 04.03.103, Offender Health Care Services, does not include a policy and procedure for how custody and health care staff are to conduct the intrasystem transfer process. SCC Operations Policies and Procedures includes a Transfer Screening policy that is consistent with NCCHC Standards for Health Care Services in Prisons (P-E-03). However, the policy is not site-specific with respect to how custody notifies health care staff of inmates who are transferring into and out of the facility, which health care staff performs medical screening, how patients are to be enrolled into the chronic disease program, and the procedure for providing continuity of medications.

We found that institutions did not use a tracking log to document completion of required services following transfer into the facility (e.g., enrollment into the chronic disease program, periodic health assessments, etc.).

NRC does not receive a large volume of patients transferring into the facility. Inmates who transfer into NRC are typically scheduled to go out to court or receive specialized medical services in the Cook County area. At the time of our review there were 29 inmates at the facility for greater than 90 days. Of this number, 12 were for medical reasons, 12 were for parole board hearings, two were boot campers, two were pending WRITS and one was for discharge. A review of five records showed that all patients were timely seen upon arrival, but one of three eligible patients was not timely enrolled into the chronic disease program.

Transfers to SCC average less than 50 per month. Inmates received on transfer are brought to urgent care in the health care area for nurse screening before placement in population. The nurse reviews the sending facility transfer form and inquires if the inmate is currently receiving treatment or has any other immediate need for medical attention. The nurse then schedules the inmate for subsequent health care (i.e., enrollment in a chronic care clinic, initiation of medications, etc.) as needed. The nurse also provides a verbal explanation and handout about how to access health care at the facility.

SCC does not keep a log, list, or other method to track inmates received on transfer. A sample of 12 records was obtained from other sources. Ten of these inmates had health care requirements that needed continuation at SCC. The transfer process was complete in seven of the 10 charts reviewed of inmates with ongoing health care needs. One transfer summary did not list psychotropic medications that were prescribed, but these were identified by the nurse upon review of the chart and continued.[79] In another, there was no transfer summary for an inmate with diabetes and hypertension. The nurse who reviewed the chart noted his medical history, enrolled him in chronic care and ensured that his medications were continued.[80] In another chart reviewed, an inmate on prescribed psychiatric medications was not scheduled to see a provider urgently and no other attempt was made to continue medication upon his arrival at SCC.[81] Transfer screening at SCC has improved since 2014. However, record review revealed

---

[79] SCC Intrasystem Transfer Patient #11.
[80] SCC Intrasystem Transfer Patient #12.
[81] SCC Intrasystem Transfer Patient #10.

that for 30% of the inmates requiring continuity of care, transfer information was incomplete or care was not provided as prescribed. Continuity of care upon transfer needs to be more reliable. At SCC, the First Court Expert recommended that the CQI program address the intrasystem transfer process with respect to continuity of care. However, CQI minutes and related material for the calendar year 2017 showed no reports monitoring the continuity of care following transfer.

At Dixon, the process has improved since the previous Court Expert's report. All transferred inmates are brought to the dispensary upon arrival at DCC. Registered nurses review the transfer summary, take vital signs, and conduct a brief screening interview to identify any immediate medical needs and reconcile prescribed medications so that treatment can be continued. Each inmate receives an individual explanation from the nurse about how to request health care attention for urgent and routine medical needs. The next day these inmates are seen again by nurses, who complete a lengthier interview using the intake screening questions and review the medical record. At this encounter, the nurse ensures the problem list is up to date, completes any screening not done at intake, and identifies any pending referrals or appointments. Inmates who have chronic diseases are enrolled in chronic care clinic, and medication, treatments, and labs are ordered. At this second encounter, the nurse answers any questions and confirms the inmates' understanding of how to request care, procedures to receive KOP and pill line medications, and obtain refills.

A review of eight records showed opportunities for improvement. In two cases, the transfer summary did not include the name of the sending facility and information on TB screening.[82] In two cases, the inmate was not scheduled for a chronic care appointment within 30 days of arrival for an initial evaluation.[83] Five patients had medications which were provided without dose interruption when received at DCC.[84] However, one of these ran out two weeks after the transfer and was not reordered.[85] It was a KOP medication. It was not possible to ascertain if the discontinuity was because the inmate did not know how to request a refill, or the patient was lost to follow up. Two others were not taking medication at the time of transfer but were referred to a provider who ordered medication that was within 24 hours.[86]

Our review showed that timeliness of intrasystem transfer has improved since the First Court Expert report. However, the completeness of these evaluations, as well as continuity of care following arrival, needs improvement. Given the number of errors and omissions found in the chart review that affect patient care, we recommend that health care leadership establish a process to monitor and provide feedback as part of the CQI program. When facilities send inaccurate or incomplete information on the intrasystem transfer form, the receiving facility should provide feedback to the sending facility. Errors and omissions should be subject to focused study to improve the accuracy of transfer information and continuity of patient care.

---

[82] DCC Intrasystem Transfer Patients #1 & 2.
[83] DCC Intrasystem Transfer Patients #2 & 3.
[84] DCC Intrasystem Transfer Patients #1, 2, 5, 6, 7, & 8.
[85] DCC Intrasystem Transfer Patient #1.
[86] DCC Intrasystem Transfer Patients #3 & 4.

## Nursing Sick Call

Our report confirmed findings of the previous Court Expert report and identified previously undescribed problems. Overall, we find that IDOC lacks an adequate system for access to care through nursing sick call, creating a systemic risk of harm to patients. The findings at NRC were particularly egregious, in part due to lockdown of the population 24 hours a day, and warrants immediate attention.

### First Court Expert Findings

The previous Court Expert found that nursing sick call ranged from problematic to significantly broken throughout the system, in that one or more of the elements required of a professional sick call encounter are missing. These elements are:

- Sick call request forms are available to inmates.
- Completed requests are placed directly by the inmate into a locked box or handed directly to a health care staff member.
- Completed requests are collected by a health care staff member.
- There is identified clinic space.
- The clinic space is appropriately equipped.
- The space provides patient privacy and confidentiality.
- Sick call, including paper triage, is conducted by a licensed RN whose education, licensure, and scope of practice permit independent assessments.
- Sick call is conducted pursuant to IDOC policies and procedures with regard to the use of approved treatment protocols at each encounter, use of over-the-counter (OTC) medication dosages only, and referrals follow-up as needed.
- A sick call system must ensure confidentiality from request to treatment.
- A sick call system which addresses all a patient's complaints or, at a minimum, prioritizes the complaints.
- A sick call log and tracking system has been developed and maintained.

Particularly problematic was that the sick call process permitted non-registered nurses to conduct sick call at many facilities. The Illinois Nurse Practice Act does not permit LPNs to perform independent nursing assessments, which is being done in IDOC. Moreover, in segregation units, nurses did not conduct meaningful assessments but rather talked to the patient through a solid steel door. There was no immediate review by an RN or physician to ensure that the LPN conducted an appropriate assessment. At Stateville and Pontiac, there was frequent and arbitrary canceling of sick call by custody staff. At Dixon, inmates were permitted to raise only one complaint per sick call visit. At NRC and Dixon, there was no sick call log. Hill Correctional Center's sick call system did have many of the required elements.

### Current Findings

IDOC Administrative Directive Offender Health Care Services 04.03.103 6. (a-c) addresses review of sick call requests. However, the policy provides insufficient operational guidance to staff regarding how to implement the sick call program. For example, the policy does not address what sick call request forms are to be used, how they are ordered, which staff is

responsible for ensuring that health care request forms are available to inmates, how inmates are to submit their requests to protect confidentiality, etc. The policy does not address where sick call is to be performed, by what level of staff, or the disposition of written health requests (i.e., scanning into the health record). Thus, the policy is inadequate. In addition, the policy is not consistent with NCCHC standards.

The previous Court Expert found standardization with respect to how inmates access nurse sick call; through submission of written health requests that nurses collected, triaged, and assigned a priority to be seen. We found lack of standardization in how inmates access health care in IDOC, with some institutions using a written health request process that is consistent with IDOC Administrative Directives and some institutions using a daily sign up system, which is not consistent with current Administrative Directives. The sign-up system (which does not include the nature of the patient's complaint), does not allow nurses to prioritize which patients should be seen first based upon the urgency of their complaint and does not result in scanning of the patient's complaint into the medical record. At LCC, staff retain sign-up sheets, which are the only record that the patient has requested to be seen; however, we found that multiple sign-up sheets were missing. This is a concern because then there is no medical-legal documentation that the patient requested health care.

In IDOC facilities, both RNs and LPNs perform sick call using Treatment Protocols. In the State of Illinois, LPNs are to practice "under the guidance of a registered professional nurse, or an advanced practice registered nurse, or as directed by a physician assistant, physician…to include *conducting a focused nursing assessment and contributing to the ongoing assessment of the patient performed by the registered professional nurse."* LPN's may also collaborate in the development and modifications of the RN or advanced practice registered nurse's (APRN) plan of care, implement aspects of the plan of care, participate in health teaching and counseling, and serve as an advocate for the patient by communicating and collaborating with other health service personnel.[87] However, Illinois scope of practice does not permit LPNs to perform assessments independent of an RN or higher level professional, as is currently being done in IDOC. Neither does the scope of practice permit LPNs to perform independent assessments according to protocols. LPNs do not have requisite education and training, including physical assessment skills, needed to perform independent assessments.[88] *Thus, some IDOC patients do not receive evaluations by health care staff licensed to perform independent assessments. This increases the risk of harm to patients.* In addition, we found that nurse to provider referrals are not made when clinically indicated, and when made are not timely performed.

Although we found some improvements in nursing sick call relative to the previous Court Experts report, these improvements were uneven across the system, with some facilities demonstrating significant improvement with access to care and others none at all.

---

[87] Illinois LPN Scope of Practice. Section 55-30.

[88] NCCHC defines Qualified Health Care Professionals to include nurses without distinguishing between registered and licensed practical nurses. However, RN and LPN practice must remain within their education, training, and scope of practice for their respective state.

The findings at NRC were the most egregious and warrant special mention. At NRC, there is no functional sick call system that provides timely access to care. Inmates are not provided approved health request forms to submit their requests; therefore, inmates write their requests on small scraps of paper or generic Offender Request forms. Inmates may or may not have pens or pencils to write their health requests. Staff reported that inmates could borrow a pen from another inmate, but an officer commented to a court expert: "Yes, but it will cost them a lunch tray."

Inmates cannot submit their requests confidentially by placing them in a locked box accessible only by health care staff. Instead, they place the piece of paper in a crack in the door that could be picked up by anyone walking by, even inmate porters on the unit. Sometimes officers pick up the forms and place them in open folders to be picked up later by a nurse. *Even if there were sick call boxes on each unit, inmates cannot submit their forms because throughout NRC inmates are locked down 24 hours a day except for four hours per week.[89] Thus, the institutional practice to lock offenders down 24 hours per day is a serious obstacle to access to care.*

At NRC, health care staff does not collect health request forms on a daily basis. Staff does not date, time, and sign when health requests are received. Nurses do not triage patient health requests within 24 hours, nor do nurses document the urgency of the disposition (e.g. urgent, routine) on the request. The Director of Nurses reported that some nurses did not see patients and threw the health request away rather than file the request in the health record. For example, if a CMT/LPN triaging the request noted the patient had not yet had a physical examination, the request would be thrown away under the assumption that the complaint would be addressed at the time of the physical. Likewise, if the CMT/LPN noted that a provider saw the patient in the last day or two, the request would be thrown away under the assumption that the complaint had been addressed. Nurses do not assess patients with symptoms within 24 hours of triage according to IDOC administrative directives. Nurses are to have the health record available to them for a sick call encounter but during our tour, a nurse reported she was only able to locate three of 10 health records of patients she was scheduled to see. Nurses conduct sick call in inadequately equipped and supplied rooms in housing units without access to a sink for handwashing. This contributed to inadequate patient assessments. Nurses did not consistently refer patients to providers when clinically indicated and when made, referrals to providers did not timely take place.

At other facilities we found that some of the problems identified in the previous Court Expert's report had been resolved but other problems persisted.

- At SCC, access to sick call is through a combination of a written health request and sign-up system. Problems related to the frequency of sick call clinics and custody's failure to escort patients to clinic exam rooms have been resolved. Improvements were noted with the standardization of exam room equipment and supplies, and availability of the medical record at nursing encounters. However, issues persist with respect to LPNs conducting sick call; inadequate health assessments; inadequate privacy in segregation;

---

[89] This information was confirmed by correctional officers on the units and the Superintendent.

and failure of nurses to refer patients to providers in accordance with IDOC treatment protocols or to document the urgency of referrals (i.e., routine, urgent).

- At Dixon, access to nurse sick call is through a written health request. Problems related to confidentiality of sick call request forms have been resolved through installation of sick call boxes on the housing units. RNs are assigned to perform sick call, but LPNs are assigned when there are insufficient RNs available, exceeding their scope of practice. Dixon has implemented a sick call log that is used to monitor the timeliness and appropriateness of nursing decisions. Persistent problems from the previous report include health requests not being filed in the health record; inadequately equipped and supplied examination rooms; inadequate nurse assessments; lack of access to health records in X-house; nurses not triaging patients with dental pain; and patients not being timely seen by a provider or dentist in accordance with IDOC treatment protocols.

- At LCC, our review showed some improvement from the previous Court Expert's report but other issues persist. To access sick call, inmates sign up for sick call on a sheet of paper in the housing unit rather than submitting a written request with the nature of the complaint. Patients are supposed to be seen the following day; however, in a sample of records reviewed, 31% of patients were not seen due to no show, refusal, or lockdown. This is a concern because if nurses cannot see all patients within 24 hours, they need to be able to triage patients according to the urgency of their complaint. However, this is not possible because inmates do not document the nature of the complaint on the sign-up sheet. This is a serious disadvantage of the sign-up system versus the written request system, which also provides documentation in the medical record of the patient's complaint. Sick call tracking logs show extraordinarily high no-show or refusal rates, in some cases exceeding 50%. In X-building, where segregated inmates are housed, correctional officers do not escort inmates to a clinic area and nurses still perform cell-front assessments. An RN is assigned to perform sick call, but records also show that LPNs also performed sick call. Record review showed that some patients who require a medical diagnosis are assessed only by a nurse and not medically evaluated by a provider and/or do not receive ordered medical treatment.

- At MCC, our review found that some of the problems with sick call described in the previous Court Expert's report have been resolved while other problems persisted. Positively, the rooms used by nursing staff to conduct sick call are uniformly equipped and supplied. Many of the exam rooms have a Plexiglas door which ensures auditory privacy during the sick call encounter. However, we found that LPNs also performed independent assessments, nurses did not have the patient's record when performing patient assessments, assessments were inadequate, and referrals to providers were not timely.

## Chronic Care

### First Court Expert Findings

The First Court Expert found variable provider quality with respect to provision of medical care and that there was lack of oversight of the providers. He also found deficiencies in chronic care guidelines and policy. The First Court Expert's Report raised concerns about the organizational approach to the delivery of chronic care in the IDOC; patients were predominantly seen in single disease clinics that arbitrarily dictated that patients were seen only two to three times a year regardless of the their disease control. The First Court Expert found patients with poorly controlled chronic illnesses who went many months without active management of their disease as they awaited the next disease specific clinic that were only scheduled for two-three months out of the year. This process created a fragmented and inefficient system of care for patients with chronic illnesses. The report also found fault with the lack of involvement of the primary care providers with monitoring the condition of patients with human immunodeficiency virus (HIV) between their intermittent telehealth visits with UIC specialists, the failure to define whether diabetic patients had type I or II diabetes, and the failure to synchronize the delivery of insulin with meal times. The First Court Expert found that the IDOC guidelines did not clearly define when Pap smear screening could be discontinued, when mammograms should be performed more frequently, and the need for increased Pap smear screening in women with HIV infection. The First Court Expert also noted that chronic obstructive pulmonary disease (COPD) and asthma were treated identically which is inappropriate. There were no guidelines for treatment of COPD. He noted that they found discontinuity of medication without anyone noticing, compounded by physicians evaluating patients in clinic without having access to the MAR. He also noted that patients frequently missed their HIV medications without any chronic care monitoring.

### Current Findings

We found that the IDOC now uses a UIC HIV chronic care guideline. Aside from this there have been no improvements based on the First Court Expert's findings.

The poor training and qualifications of physicians was the most important deficiency that resulted in significant morbidity and mortality with respect to managing chronic illness. The deficiencies of many providers based on record reviews included not understanding how to diagnose or manage certain chronic illnesses, failure to timely or appropriately manage patients whose disease was not well controlled, failure to monitor key tests or other variables with respect to disease management, failure to identify or properly manage red-flag or other critical abnormalities involving chronic illness, failure to consistently document the rationale for clinical decisions and diagnoses in the chronic care patient progress notes, failure to document adequate histories, physical examinations or therapeutic treatment plans, failure to incorporate specialty recommendations with respect to management of chronic illness into a unified therapeutic treatment plan, failure to refer for specialty care when indicated, and failure to monitor medication management is a safe manner. Chronic disease guidelines, chronic disease procedure, schedules, forms, or other processes appear to fail to overcome the deficiencies of provider quality with respect to managing chronic care conditions in the IDOC.

A chronic medical condition is an illness that typically lasts longer than three months and requires medical management on a continuous basis. Typically, a primary care physician will address all of a patient's chronic illnesses at each visit. In IDOC the primary care physician will only manage a single disease at each chronic care visit. Typically, when a primary care physician encounters a condition they are incapable of managing they refer that patient to a specialist who knows how to manage the condition. In IDOC this often does not occur and patients are frequently not referred for specialty care when it appears indicated. Typically, when a specialist evaluates a patient, a primary care doctor will integrate the specialist's recommendations and findings into the care plan of the patient. In IDOC, the primary care doctors often do not even obtain specialty care reports and do not appear to consistently review or integrate specialty findings or recommendations into the patient's therapeutic plan. In IDOC, primary care physicians are poorly trained and do not appear to know how to diagnose or manage many chronic illnesses. Many illnesses appear to not be followed in chronic clinics and some conditions are not managed. The result is fragmented care that fails to address all of a patient's problems.

Four years ago, the First Court Expert found that most of the IDOC chronic care clinics addressed only a single disease and were conducted every four to six months. We found chronic care clinic schedules were unchanged. With the exception of a few multiple illness clinics (MIC) for a select group of conditions at Dixon and MCC, patients with multiple chronic illnesses continue to have their illnesses addressed in single disease clinics spread over the course of a year. The non-baseline chronic care clinics (asthma, cardiac/hypertension, diabetes, hepatitis C, high risk/HIV, seizure) are silos in which only a single disease is managed. The schedule for these clinics is inflexible and not based on the degree of control of a patient's illness.[90]

Failure to manage patients based on the degree of control of their illness has the potential to harm patients, as patients are evaluated on a fixed schedule irrespective of the degree of control of their illness. Therefore, persons who need greater attention because their disease is poorly controlled may not receive it. We view this as inefficient, wasteful, and potentially harmful. Patients should be evaluated as frequently as is necessary to establish disease control and not based on an inflexible schedule. Primary care doctors also need to coordinate care for the patient integrating treatment for all of the patient's conditions. When specialists manage a single illness, they typically list all of the patient's other medical conditions and medications, and consider the implication of all diseases on the condition being monitored. In the IDOC, every single disease is managed as if it is the only disease the patient has. Diseases are often interrelated, such as metabolic syndrome. Drug-drug interactions need to be considered in the

---

[90] IDOC's chronic care clinic annual schedule is generally, with some site variation, as follows: asthma (January and July,) diabetes (April, August, and December), cardiac/hypertension (A-L March and September; M-Z April and October), general medicine (May and November), hepatitis C (June and December), high risk/HIV (monthly), seizure (February and August), and TB (monthly, annual evaluation). LCC has combined two conditions, diabetes/lipids and diabetes/hypertension, for simultaneous evaluation in the initial baseline clinic but not in the follow-up chronic care clinic sessions. Dixon and Menard have created a limited number of multiple illness clinics that combine the treatment of diabetics with a few other chronic illnesses.

management of medications. Some illnesses have an effect on other illnesses. When IDOC providers evaluate patients in individual chronic care clinics, they do not list the patient's other illnesses and do not address any other conditions, even when a condition may not be in control or may have an impact on the condition being treated. There has been limited movement since the First Court Expert's Report to develop chronic care clinics that consolidate the evaluation of multiple illnesses in a single visit. Dixon and MCC have established a few combined illness clinics called MIC (multiple illness clinics); these clinics generally address diabetes and one or two other chronic illnesses. There was no evidence or communication during the site visits that combined illness clinics would continue to expand at Dixon or MCC or would be initiated at any other sites.

A single chronic disease clinic (General Medicine Clinic) is used as a vehicle to manage all diseases other than disease specific chronic illness clinics. But we found that there are many diseases that are not managed in IDOC chronic clinics and therefore are unmonitored. This included patients with cirrhosis, cancer, heart failure, substance abuse, and rheumatoid arthritis as examples. This is consistent with deficient problem lists. We found that problem lists were incomplete indicating that providers were unaware of all of the patient's problems. When patients were seen in either chronic clinics, routine provider clinics, or on an emergency basis, a complete list of problems was not documented and at no clinics did all of a patient's diseases receive monitoring.

Also, some diseases are monitored in a clinic that is inappropriate for their condition. As an example, COPD is a common respiratory condition affecting about five percent of the population and is the third-ranked cause of death in the United States.[91] IDOC treats COPD in the asthma clinic and utilizes identical forms and nomenclature for control and management as if COPD were the same disease as asthma. They are not the same disease even though there can be an overlap syndrome. Diagnosis, staging, and management of these two conditions are different. Yet in IDOC they appear to be treated the same. The First Court Expert commented on this but there has been no modification to guidelines, forms, or management practices based on our findings.

Some illnesses are managed in specialty clinics. All individuals with HIV and eligible patients cleared for treatment with hepatitis C are managed via telehealth by the UIC infectious disease telehealth clinic. UIC HIV telehealth clinics are held monthly. A monthly telehealth renal clinic staffed by a consulting nephrologist is scheduled as needed. Dialysis patients are seen monthly by a NaphCare nephrologist even though the nephrologist does not document his notes in the medical record. Hepatitis C is managed in the hepatitis C chronic clinic. When IDOC physicians deem a patient is a candidate for treatment the patient is referred to a Wexford corporate doctor who makes a decision on referral to UIC. This system has become a barrier to access to care for hepatitis C.

---

[91] UpToDate, Chronic obstructive pulmonary disease: Definition, clinical manifestations, diagnosis, and staging.

There are currently 2,500 active hepatitis C patients in the IDOC. Even though effective, short-course regimens of medications that result in a high percentage of cures have been developed and are in common use in the community, only 345 patients (3%) of the nearly 10,500 hepatitis C patients incarcerated in the IDOC between 2010 and 2016 were offered and received treatment.[92] An additional 125 patients have completed treatment from 2017 through June 2018.[93] At the present time, only 10 hepatitis C patients are currently receiving treatment. The low rates of treatment are primarily due to a restrictive screening protocol that limits patients' eligibility for treatment which was developed, in no small part, to control the costs of the medications. These eligibility restrictions limit hepatitis C treatment to patients who have developed advanced stages of liver fibrosis (cirrhosis). The failure to aggressively treat hepatitis C in the IDOC has negative public health and health care cost impacts, both in the IDOC and ultimately in the non-incarcerated communities of the Illinois. We support more aggressive treatment of hepatitis C and elimination of barriers to access to the UIC program.

Patients with uncontrolled or partially controlled chronic illnesses were not consistently well managed. When medications for chronic conditions were modified in chronic care clinics there was no follow up on the impact of this treatment adjustment until the next chronic care clinic which could be four to six months later. We noted some patients who were not followed up appropriately after a modification in the treatment plan.[94] Some patients whose chronic illnesses were complicated and difficult to control were not appropriately or timely referred to medical specialists for consultation.[95] The care of many diabetics was found to be flawed and put patients at risk for hypo and hyperglycemia, and ultimately for end organ damage.[96] Patients on Vitamin K antagonist anticoagulation medication (warfarin) were rarely well controlled. The adjustment of anticoagulation medication to attain a therapeutic level of anticoagulation was often not aggressively pursued, leaving the patient at risk for repeated clot formation. The logistics of testing and adjusting warfarin dosages placed a number of patients at risk.[97] IDOC should consider placing patients requiring long term anticoagulation on direct factor Xa inhibitor anticoagulants that do not require ongoing testing and dose adjustment. The current prescribing of warfarin puts patients and the institution at risk and we noted one death in a patient on warfarin who was not being properly monitored.[98] Providers virtually never documented in the chronic care progress notes that they had reviewed patients' MARs or communicated with nursing staff to assess the frequency of medication administration and patient compliance.[99] The failure of the chronic care providers to routinely monitor patient compliance with prescribed medication put the patient at notable risk for overprescribing and needlessly increasing medications dosages. Weights of patients were recorded with vital signs

---

[92] Email communication 12/28/2016 from DOC.
[93] UIC Liver Telemed Treatment Analytics.
[94] NRC Chronic Care Patients #1, 2, 10.
[95] NRC Chronic Care Patient #9; SCC Chronic Care Patients #7, 13; Dixon Chronic Care Patient #14; LCC Chronic Care Patients #4, 6; MCC Chronic Care Patient #2.
[96] Dixon Chronic Care Patient #13; LCC Chronic Care Patient #6; MCC Chronic Care Patient #9.
[97] SCC Chronic Care Patient #12; Dixon Chronic Care Patients #7, 10; MCC Chronic Care Patient #11.
[98] Patient #30 Death Review Records.
[99] NRC Chronic Care Patient #3; SCC Chronic Care Patients #6, 8; Dixon Chronic Care Patient #6; LCC Chronic Care Patient #10; MCC Chronic Care Patients #2, 8.

at most clinical encounters, but the chronic care providers seldom documented that they had reviewed weights for significant gains or losses. Weight loss in correctional settings is an ominous sign; patients with weight loss need to be aggressively evaluated for an underlying cause, which may include cancer, uncontrolled diabetes, hyperthyroidism, and other etiologies. The failure of chronic care, infirmary, and sick call clinical teams to monitor and address changes in patient weights can result in significant delays in the diagnosis of treatable medical conditions and illness in IDOC patients.[100]

The First Court Expert had significant concerns about the care provided to diabetics in the IDOC. The system wide failure of the providers to differentiate treatment differences between type I or type II diabetes and the IDOC universal practice of treating all diabetics on insulin with the same regimen of medications is not consistent with the level of care provided in the community and, in some circumstances, puts the patient at risk for hypoglycemic episodes. Type 1 and type 2 diabetes are different metabolic diseases and require different management. Type 1 diabetes occurs in patients who fail to produce sufficient insulin. These patients have an insulin deficiency. Type 2 diabetes is a metabolic condition of excess weight causing insulin resistance. The body fails to respond appropriately to insulin causing glucose levels in the blood to increase. The IDOC does not appear to differentiate these conditions with respect to use of insulin therapy. Every patient taking insulin prior to incarceration is automatically placed on a twice daily regimen of an injectable long acting insulin (either NPH or Humulin 70/30 insulin which combines a long and short acting insulin in a single injection) and a sliding scale short acting insulin. The standard of care is not to use pre-mixed insulins (70/30) in the treatment of type 1 diabetes. Use of pre-mixed insulins in type 2 diabetics is also not preferable if normal blood sugars are desired.[101] The sliding scale dosage is based on the results of capillary blood glucose (CBG) finger stick testing that is performed before every breakfast and dinner meal on all insulin using diabetics. This practice is inherently flawed.

Most type I diabetics will require three or four, not two, times per day CBG testing to determine the quantity of short acting insulin that is needed to be administered before meals. Most type II diabetics who cannot be adequately controlled on oral medication alone are typically placed a variety of long acting insulins, some of which are given once a day, others twice a day. Although some Type II diabetics will require the addition of pre-meal short acting insulin, most do not. Type II diabetics, even if they are on insulin, generally require intermittent but not twice a day CBG testing. Placing patients on unnecessary pre-meal CBG testing is not without risks. Short acting insulin alone or in combinations should be administered in close timing with meals to minimize the risk of a sudden drop in blood sugar. The timing of insulin administration and meal delivery in IDOC's large correctional facilities is consistently poorly coordinated and puts diabetics on short acting insulin at heightened risk of hypoglycemic attacks. IDOC exacerbates this risk by placing many insulin-using diabetics on 70/30 insulin, which contains a combination that is 70% long acting and 30% short acting. For example, a patient on 40 units of 70/30 insulin will receive 28 units of long acting and 12 units of short acting insulin with each injection.

---

[100] Dixon Chronic Care Patients #1, 10; Dixon Infirmary Patient #1; LCC Infirmary Patients #1, 4.
[101] See UpToDate® section on premixed insulins in General Principles of Insulin Therapy in Diabetes Mellitus.

Adding an additional sliding scale-determined two to eight or more units of rapid acting regular insulin to the patient's dose because the pre-meal CBG is elevated further increases the risk of sudden drops in blood sugar. This practice endangers the health of IDOC diabetics and should be reevaluated. IDOC should consult with an endocrinologist/diabetologist to review its current prescribing of insulin and the frequency of CBG testing.

The experts also noted that there was varying provider compliance with national diabetes standards of care concerning testing of urine protein and microalbuminuria, and the prescribing of medications to diminish the risk or progression of chronic kidney disease; annual eye evaluations for diabetic retinopathy; examination for diabetics' feet to prevent foot ulcers; sensory testing of lower extremities; administration of pneumococcal 23 vaccination; and the appropriate initiation of HMG CoA reductase inhibitors (statin) to minimize a diabetic's risk of cardiovascular disease. The care of diabetes in the IDOC does not consistently meet the standard of care provided to diabetics in the community.

The IDOC annual or biannual examinations fail to provide a number of nationally recommended preventive and screening interventions that are designed to prevent certain chronic illnesses. All patients with chronic illnesses including diabetes, asthma, COPD, chronic kidney disease, congestive heart failure, HIV infection, and other chronic conditions are to be vaccinated with the pneumococcal-23 vaccine.[102] A review of the medical records of 52 patients with chronic illnesses revealed that only eight (15.4%) had received the pneumococcal 23 vaccine. All adults 65 years of age and older are to be administered both the pneumococcal 23 and 13 vaccinations. Only three (14.3%) of 21 patients 65 years of age or older had been administered pneumococcal-23 and not a single one (0%) of these elderly individuals had been offered the pneumococcal 13 vaccine.[103] All HIV patients are also to receive the pneumococcal 13 and meningococcal disease vaccines. None (0%) of the 12 charts of patients with HIV had documentation that either pneumococcal 13 or meningococcal vaccines had been administered. The IDOC is putting its patients and staff at risk for preventable infections by not providing basic adult immunizations to its at-risk patients. This does not meet the community standard of care. IDOC is administratively negligent by not purchasing either pneumococcal 13 or meningococcal vaccines for use in its correctional facilities.

It is a national recommendation that all adults (men and women) 50 years of age or older are to be screened for colon cancer.[104] The charts of 50 IDOC patients with chronic illnesses who were 50 years of age or older were reviewed; none (0%) of these patients had been electively screened for colon cancer using any of the acceptable screening methodologies (colonoscopy, fecal immunochemical test, stool guaiac cards, flexible sigmoidoscopy with stool guaiac cards). IDOC is grossly negligent in not providing nationally recommended colon cancer screening to the incarcerated men and women 50 years of age or older in their facilities; this is resulting in preventable deaths and avoidable morbidity in the IDOC.

---

[102] CDC, Recommended Vaccination Schedule Adults 18 Years or Older, United State 2018 and IDOC Office of Health Services, Chronic Illness treatment Guidelines, Diabetes, Asthma  March 2016.
[103] CDC, Recommended Vaccination Schedule Adults 18 Years or Older, United State 2018.
[104] United States Preventive Service Task Force, Colorectal Cancer Screening, June 2016.

Women at LCC are generally being appropriately screened for cervical and breast cancer on a regular basis. The medical charts of 14 (93%) of 15 women had received a cervical cancer screening (Pap smear) in the last three years as per IDOC policy. However, the IDOC practice guidelines failed to note that women with HIV are to have annual Pap smears until three consecutive annual negative smears have been documented, and thereafter cervical cancer screening can be performed at three year intervals. One HIV patient was found have only one negative Pap smear and, as of three years later, had not received a repeat test. HIV patients are at high risk for cervical cancer; this woman was not being properly screened for cervical cancer. Four (80%) of five women over 45 years of age had received a mammogram in the last two years in accord with IDOC protocols.

A large number of patients assigned to chronic care clinics are at risk for or already have had a stroke, heart attack, or peripheral vascular disease. National[105] and IDOC standards[106] recommend that all at-risk patients over a certain age and patients with diabetes, high blood pressure, hyperlipidemia, other selective conditions have their 10-year risk of arteriosclerotic cardiovascular (ASCVD) calculated. If their risk is 7.5% or higher or they already had suffered a cerebral-cardiovascular event, they are to be prescribed a high dosage of a high intensity HMG CoA reductase inhibitor (statin) medication. Forty-eight medical records of chronic clinic patients over 50 years of age and others with a history of arteriosclerotic disease, diabetes, hypertension, hyperlipidemia, etc., were reviewed. IDOC providers had not calculated the 10-year ASCVD risk on any of these 48 patients. We assessed the 10-year risk for these 48 patients and noted that 46 of the 48 patients' scores exceeded the percentage that indicated that a high dosage of a high intensity statin be prescribed; only one of those patients whose risk was 7.5% or higher had been prescribed a high intensity statin, but it was not at the recommended level of intensity dosage. IDOC is failing to meet the national and its own standard of care by not calculating at risk patient's ASCVD 10-year risk and not prescribing the appropriate HMG CoA reductase inhibitor (statin) medication to minimize patients' future risk of heart attack, stroke, and peripheral arterial vascular disease.

Chronic care, provider sick call, and infirmary progress notes frequently lacked useful clinical information about the patient's clinical status. Providers rarely listed an alternative diagnosis that was being considered as a reason for a change in the patient's conditions or symptoms. We noted earlier that lack of training affected the ability of IDOC physicians to diagnose and manage chronic illnesses. This is compounded by lack of access to current electronic medical reference services that might assist them with the care of routine and complex patients. IDOC providers failed to consistently or appropriately seek the assistance of specialists in many patients whose complexity warranted additional advice which resulted in delays in diagnosing or initiating appropriate testing and treatment. Providers whose primary care skills are limited

---

[105] Stone NJ, Robinson JG, Lichtenstein AH, et al; 2013 ACC/AHA Guideline on the Treatment of Blood Cholesterol to Reduce Atherosclerotic Cardiovascular Risk in Adults: A Report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines; Circulation Nov 2013, 129 S1-S45 as found at https://www.ahajournals.org/doi/abs/10.1161/01.cir.0000437738.63853.7a.
[106] Office of Health Services, Chronic Illness Treatment Guidelines, Hyperlipidemia Guidelines March 2016.

would be expected and should be encouraged to more readily request consultation with specialists when they are unsure of a patient's diagnosis or treatment.

# Urgent/Emergent Care

The IDOC requires that all facilities be prepared and equipped to respond to medical emergencies in a timely and orderly fashion. This includes the ability to provide first aid and cardiopulmonary resuscitation by trained correctional staff until medical personnel arrive. Emergency response drills are to be conducted on each shift at least semi-annually, one of which must involve multiple casualties.[107] The IDOC-Wexford contract requires the vendor to provide emergency treatment procedures that include the provision of in-service training on first aid and emergency response, policies and procedures for emergency transfer and transport, 24-hour coverage by a physician and psychiatrist, immediate transfer capability, automatic external defibrillators (AED), and emergency response. The vendor is required to report all referrals for emergency services monthly.[108]

### First Court Expert Findings
Findings of the First Court Expert for this service were that nurses and clinicians failed to identify when patients required emergency room services and/or hospitalization. Other findings were that patients were not assessed by nurses upon return from the emergency department or hospital, and that the record of offsite care was not obtained. Finally, some patients were not appropriately followed up by a primary care clinician. Unscheduled services were not tracked, and performance was not monitored.

The key criteria for the adequacy of unscheduled services defined by the First Court Expert include:

1. A nurse performs an initial assessment of any patient with an urgent or emergent need for health care attention.
2. The nurse contacts the appropriate clinician to discuss the findings and obtain direction for subsequent care.
3. If the patient is sent offsite, they are brought back to the medical unit with a report from the offsite provider, and seen by a nurse.
4. The nurse reviews the recommendations from the offsite provider and obtains orders as necessary. If no report accompanies the patient's return, the nurse contacts the offsite provider to obtain the report and treatment recommendations.
5. The nurse also assesses the patient, including vital signs, and determines if the patient can be discharged to population or, if unstable, the patient is admitted to the infirmary or another location where the patient can be cared for appropriately.
6. The patient is seen by a primary care physician for follow-up within the next few days.
7. A log of all unscheduled services is kept, and used to monitor and improve performance.

---

[107] IDOC Administrative Directive 04.03.108 Response to Medical Emergencies dated 9/1/2017.
[108] IDOC Wexford Contract 2.2.3.12, 2.2.3.19.1, 2.9.3.2.1.3.

**Current Findings**

Our findings are unchanged from those of the First Court Expert. Among charts reviewed that were obtained from lists of patients sent to the ED, seen in sick call, chronic care clinics, specialty care, and hospitalizations, we found numerous instances of incomplete nursing assessments and failure to contact a higher-level clinician,[109] patients returning without records from the offsite provider,[110] failure to assess patients upon their return from offsite care,[111] and lack of appropriate follow up by the primary care provider.[112] Here are a few recent examples:

- On 1/22/18, a 51-year-old woman with a history of asthma, hypertension, and chronic hepatitis C infection was seen urgently for burning in the center of her chest radiating to her throat, and vomiting.[113] The chest pain protocol instructed the nurse to call the provider urgently for patients with a history of hypertension. The LPN did not refer the patient to a provider, but instead ordered Pepcid. On 2/17/18, an LPN responded to an emergency called on the same woman. The patient was found sitting on the floor stating that she was dizzy. The nurse did not perform any cardiovascular review of systems (e.g., chest pain, SOB). The patient's vital signs were normal. The nurse determined that the patient should rest in her cell and did not contact a provider. Two days later the woman had another episode of chest pain and dizziness. The LPN who saw her urgently performed no cardiovascular review of systems. Vital signs were normal, but the patient's last EKG showed nonspecific T-wave abnormality. The LPN did not contact a provider. On three occasions LPNs responded to this patient's complaints of chest pain and never contacted a provider. The independent decisions made by the LPNs in this case are well beyond their scope of practice. The use of unqualified personnel, failure to conform to written direction and the failure to consult a higher-level clinician placed this woman at risk of harm from a cardiovascular emergency that could be avoided with appropriate and responsive clinical care.

- A nurse saw a patient on 4/16/2018 for a boil on his buttocks that had been present for one and a half weeks. The nursing assessment was incomplete. The nurse referred the patient to see the provider the next day. However, he was not seen for five days, at which point an antibiotic was ordered. No labs or wound care was ordered. The provider did order a follow-up appointment in four to five days. The patient was not seen for eight days and at this encounter was sent to the ED because he was having lower abdominal pain. There is an outbound note, but it contains minimal information. Upon his return, the inbound note documents the medications and dressing change recommendations that were on the patient discharge summary from the ED visit. He did not see a provider for another two days. The nursing assessment of this patient's

---

[109] Dixon Urgent/Emergent Patients #1-3; MCC Urgent/Emergent Patient #1; Sick Call Patients #1-2; Specialty Consultations and Hospitalization Patient #6.

[110] SCC Urgent/Emergent Patient #1; DCC Urgent/Emergent Patient #2; MCC Urgent/Emergent Patient #1; Specialty Consultations and Hospitalization Patients #6-9.

[111] SCC Urgent/Emergent Patients #1-3; DCC Urgent/Emergent Patients #2-3.

[112] SCC Urgent/Emergent Patients #1, 3, 5-7; Dixon Urgent/Emergent Patient #2; MCC Urgent/Emergent Patient #1; Sick Call Patient #4; Specialty Consultations and Hospitalization Patients #6-7.

[113] LCC Urgent/Emergent Patient #3.

condition was incomplete, access to definitive care was delayed, and he was treated symptomatically with antibiotics without a thorough evaluation. Documentation of the ED visit was not obtained from the hospital and he was not seen promptly upon his return to the facility. This is a patient whose condition deteriorated because it was not managed in a timely and clinically appropriate manner by nurses and providers.

- A patient with shortness of breath, dehydration, renal failure, and anemia was hospitalized for nearly a month.[114]  When he returned to the facility on 11/19/17, the nurse who admitted him to the infirmary assessed his condition visually but did not examine him or take vital signs. The nurse also did not review the patient discharge instructions that accompanied him or contact the facility physician for orders. The patient was seen the next day by a physician. While much of the hospital record was available, the physician only listed diagnostic possibilities and was not clear about the plan of care. The treatment plan consisted of monitoring and comfort care only. There is no documentation that the patient was seen by a physician for the next seven days. In the meantime, nurses documented clear signs that the patient's condition was worsening, including bloody stools, diminished lung sounds, pitting edema of the legs, poor oxygenation, and low blood pressure (98/62). When the provider was contacted, the nurses were instructed to continue monitoring the patient and report if his condition worsens.

  On 11/27/17 the physician documented in an encounter that the patient needed to be more compliant; the patient was demanding a change in his diet. Vital signs are described as stable;  also, that he had better aeration and his lower legs seemed improved. The provider took no steps to definitively treat the patient; instead continued monitoring and comfort care. There is no documentation that the patient agreed to palliative or hospice care. The patient was not seen by a provider the next day, even though he was bleeding from the mouth and had petechia on his trunk and upper extremities. The following day, 11/29/17, the provider saw the patient and mused about whether the dose of anticoagulant medication was correct. Ultimately, he ordered the patient transferred to the local emergency room. There is an outbound note written by a nurse, but it does not contain all the information relevant to the patient's ongoing care and there is no specific statement of the reason higher level care was being sought. The patient was admitted to the hospital from the ED and died 20 days later.

The review of 33 deaths corroborates the findings from the review of records of patients seen for urgent or emergent conditions. Errors made in urgent/emergent services provided to patients who later died included the failure by nurses to refer to a higher-level clinician,[115] failure to recognize patient instability and the need for hospitalization,[116] patients who were returned to the facility for whom the record of offsite care was never obtained or reviewed,[117]

---

[114] Dixon Urgent/Emergent Patient #1.
[115] See Mortality Review Patients #1, 7, 14, 15, 18, 23, 25 and 30.
[116] See Mortality Review Patients #7-9, 13, 17-19, 21-23, 25, 28-29, 32-33.
[117] See Mortality Review Patients #6, 9, 17, 21, 28.

and patients who did not receive adequate follow up and implementation of recommendations.[118]

Emergency equipment and supplies vary greatly from site to site. There are no standardized expectations for the type and amount of emergency response equipment that is to be available at each facility. All facilities had emergency response bags that are taken by responding health care providers to the site of an emergency. At Dixon, the contents and their location in the emergency response bags were standardized and listed on the outside. These bags were sealed with a numbered, breakable seal to signify that the bag was ready to use. This was not the case at any of the other facilities. At MCC, the contents of the bags are standardized but they are not sealed to indicate readiness for use. At SCC and NRC, the contents of the emergency response bags are poorly organized, poorly kept, and unsealed. All facilities except NRC check that the emergency response equipment is available and functional. At NRC, the AED had expired electrodes; at the other facilities, emergency equipment was checked and found functional. Mass disaster bags were available at NRC and MCC, but in both cases were dusty, dirty, and contained outdated supplies. These bags are not checked by health care staff regularly. Facilities also have first aid kits available in the housing units and program areas. We found that these were not always current and stocked.

Facilities varied in compliance with the IDOC requirement for emergency response drills. NRC had not conducted a drill for the eight months prior to our visit in January 2018; all other facilities were doing drills, but not in the frequency required by the AD. Except for Dixon, critiques of these drills were brief, not very thorough, and seldom were areas of needed improvement noted. None of the facilities developed plans for performance improvement in emergency response. Emergency response drills as well as the list of emergency visits are reported to the institution CQI committee, but there is no discussion of the information or evaluation of quality or performance measurement. While we were provided with lists of emergency visits at all facilities except NRC, the tracking tool recommended by the First Court Expert has not been implemented. There is no review of clinical care the patient received prior to unscheduled urgent or emergent health care encounters to determine if it could have been avoided; nor is care provided afterwards reviewed to ensure that a provider reviewed and acted upon recommendations timely.

## Specialty Consultations

**Methodology:** Interview personnel responsible for tracking/approval of specialty services. Review tracking logs. Perform record reviews of persons having specialty care needs.

### First Court Expert Findings
The First Court Expert found that every area of the specialty care process showed problems. This included delays in perceiving a need for specialty care; delays in obtaining an appointment; delays in processing approvals; delays in following up on abnormal consultation findings; and

---

[118] See Mortality Review Patients #20-21, 27, 32.

problems with follow up of the consultation by facility staff. The First Court Expert found that the rate of approval by Wexford corporate utilization physicians is variable and dependent on the physician reviewer. He also noted that at Dixon and SCC there were substantial delays in obtaining authorization for offsite specialty care, especially for care obtained at UIC. Consultation reports are often not obtained.

**Current Findings**

There was no improvement since the First Court Expert's report. Our opinion is that the specialty care process of collegial review is a patient safety hazard and should be abandoned until such time that patient safety is ensured.

Specialty care is needed when a patient requires a special service or consultation that is unavailable at the facility. This is managed by Wexford Health Sources Inc. in a process called collegial review. In this process, whenever a physician or mid-level provider believes that a special service is necessary, the provider refers the patient to the Medical Director of the facility. If the Medical Director believes that the service is necessary, then the patient is referred for collegial review. A significant problem with this aspect of the process is that only 20% of Medical Directors are board certified in primary care and only about half have finished residency training in primary care. Therefore, there are many Medical Directors who have not been trained on when to appropriately refer for consultation. We found this problem repeatedly in record reviews. In our opinion, these deficiencies are due to lack of training or to overly restrictive barriers to specialty care. These episodes of care would not be found on the specialty care tracking log as they were never referred.

The collegial review is a phone conference call attended by a utilization physician in Pittsburgh, the facility Medical Director, and the scheduling clerk from the facility. At these calls, the corporate utilization physician reviews the list of referrals from the facility over the prior week. The utilization physician either approves or denies the referral. If a service is approved, the facility scheduling clerk then schedules the patient for the service. If a service is denied, the utilization physician is to provide an alternate treatment plan for the facility. After the specialty consultation service occurs, a follow up by a facility provider is to occur within five days. This visit is to include evaluation of the consult report and any follow up concerns. Each of these steps (referral, collegial review approval or alternative treatment plan, appointment, and follow up) are to be documented in the medical record. Though it is not a requirement of the administrative directives, each of these steps is tracked in logs maintained by the scheduling clerks.

We listened in on one of these collegial review conference calls and spoke to staff about the calls at other sites. The calls are brief. One scheduling clerk said sometimes the calls are canceled because the utilization physician believes all referrals are appropriate. The same clerk said that typically the calls take 10 minutes. The call we witnessed had no clinical collegial discussion about individual cases but was more of an approval process in which the utilization physician states approval or recommends getting another test before the approval is made.

There is a lack of guidance in policy with respect to specialty care. The IDOC-Wexford contract has no specifications with respect to timeliness of specialty care. There is no administrative directive (AD) on specialty care, including timeliness of care. AD 04.03.103 Offender Health Care Services describes the requirements of obtaining specialty care. With the exception of a requirement that the vendor Utilization Management Unit will review all referrals within five working days, there are no timelines associated with obtaining specialty care. None of the facilities tracked timeliness of specialty consultations. Dixon did perform a one-time study of timeliness of UIC consultations, which showed significant delays.

Medical records we reviewed did not consistently contain documentation of all benchmark events including referral, collegial review, alternate treatment plans, appointment, or follow up, even though documentation in the medical record is either required or implied because these benchmarks are medical events that need to be documented in the medical record. This made verification of specialty care impossible.

Each site had a tracking log detailing the benchmark dates of specialty care. None of the tracking logs was complete and some were inaccurate. Tracking logs were similar but not standardized. These tracking logs were under Wexford management. The purpose of tracking logs is both to manage current referrals to ensure scheduling occurs and to review logs for the purpose of ensuring that all steps of the process are occurring as expected. We noted that tracking logs showed significant errors. At Dixon, 22% of consultations on the tracking log did not have a referral date. At MCC, 44% of referrals in 2017 did not have a referral date documented on the tracking log and only 53% had the date the appointment was completed documented. Because of lack of information on these tracking logs, we found them unreliable. Some were inaccurate. At SCC for a three month period on the log, 7% of collegial reviews were documented as occurring *before* the date of referral, which is not possible. Also, at SCC for a period in January of 2017, 60 consultations were documented as being completed before the referral was made. These impossible scenarios imply that the tracking log is not accurately maintained and make the log unreliable for validation of knowing whether referrals are timely.

The Administrative Directives require that the specialty care benchmarks are to be documented in the medical record. We did not find alternative treatment plans documented in the progress notes of the medical record. These are typically included in utilization doctor's approval sheet in the consultation section of the medical record, but it is never clear how the primary provider incorporates this into actual practice. At NRC, because we were not provided a tracking log, we attempted to verify all specialty care benchmarks in the medical record. Only 14 (63%) of 22 consultations had a referral. Only three (14%) had a collegial review documented. Only nine (41%) had an approval. Only 15 (65%) were seen within five days in follow up of the consultation. As a result, using the medical record, we were unable to verify that benchmarks for specialty care occur as expected.

A major but unmonitored problem with specialty care is underutilization. The First Court Expert found the same problem and described it as delays in perceiving a need for the service. This can occur when physicians are unaware that a specialty procedure or consultation is necessary or

when the utilization process is so restrictive that providers fail to refer because they believe that it will not be approved. We were unable to specifically identify the cause in the IDOC but have definitively identified that it occurs. On the 33 death records reviewed, we noted 95 instances when a procedure should have been requested but was not, and 81 instances where specialty consultations should have been requested but were not. This is a large number of unrecognized specialty care referral in just 33 patients and demonstrates significant underutilization. This does not include need for radiologic studies such as CT scans. We view this deficiency as a result of improperly trained physicians and a learned process of not requesting care. This lack of referral places patients at risk of harm and has caused preventable morbidity and mortality. This is a systemic problem that appears at all facilities we investigated. In multiple cases on record reviews, patients who needed referral were not referred. Some resulted in death. Others resulted in morbidity with delayed diagnosis. These cases are found in record reviews of individual sites and in mortality reviews.

Underutilization is incorporated into IDOC practice. For example, the IDOC has no formal policy on colorectal cancer screening. Community standards are to screen non-high risk patients for colon cancer beginning at age 50 with either highly sensitive fecal occult blood tests, colonoscopy, CT colonography, or flexible sigmoidoscopy. The IDOC does not provide this screening and has no written guideline. AD 04.03.101 Offender Physical Examination requires periodic examinations every five years until age 30, every three years between ages of 30 and 39, and every two years for persons 40 years and older. Policy requires an annual TB skin test and females are screened with Papanicolaou (PAP) test and a screening mammogram at appropriate ages. There are no other recommendations for screening tests, which is not consistent with current standards.[119] Current IDOC practice for colorectal cancer screening, not clarified in policy, is to perform digital rectal examination at the annual or biannual examinations with fecal occult blood testing. Digital rectal examination with or without single office-based guaiac fecal occult blood testing is not adequate screening for colorectal cancer and is not recommended. At Danville, a patient who was only offered digital rectal examinations for colorectal cancer screening died from complications of advanced colorectal cancer.[120] We viewed this death as preventable. Another 56-year-old man who developed locally invasive rectal cancer described below is another example.

Current standard of care for all persons with COPD and asthma is to have spirometry or full pulmonary functions tests. Asthma and COPD are different diseases which have different monitoring objectives. Yet in IDOC they are treated the same, resulting in inappropriate care. Almost no patients we reviewed with either COPD or asthma have evidence of referral for spirometry or pulmonary function testing. This is inadequate management and inconsistent with contemporary standards of care.

---

[119] Routine screening recommendations are provided by the US Preventive Services Task Force as found at https://www.uspreventiveservicestaskforce.org/Page/Name/recommendations.
[120] Mortality Review Patient #1.

It is recommended that persons with cirrhosis have screening upper endoscopy to evaluate for varices; treatment with beta-blocker medication if varices are identified; and referred for screening ultrasound every six months to screen for hepatocellular carcinoma. These screening tests are only occasionally completed in IDOC and this practice is not codified in policy or in clinical guidelines. It appears that many facility physicians do not understand how to care for persons with cirrhosis and do not order these tests when indicated.

We also noted that a significant number of consultations occur without evidence of a report.[121] The IDOC refers patients to consultants and to hospitals, but when those consultations and hospitalizations are completed, the IDOC does not obtain a report of the consultation or hospitalization in a significant number of these referrals. This is a patient safety risk. When a report is not present, the providers will be unaware of other recommended testing or consultations, and will be unaware of the consultant or hospital findings that have a significant impact on therapeutic plans.

Even when consultation and hospital reports are obtained, they are not always reviewed. An example was at NRC. We reviewed 22 consultations; only eight consultation reports were present. On these eight reports there were 19 recommendations of consultants which were not carried out. This may have been due to the extremely dysfunctional medical record system at NRC.

At NRC, only eight (36%) of 22 specialty consultations included a report. At SCC, only 19 (35%) of 35 consultations included a report in the medical record. At LCC, five (63%) of eight consultations included a report. At MCC, the scheduling clerk told us that approximately 50% of consultations will not have a report. When reports are not present, the providers will not know the status of the patient and may fail to understand recommendations, placing the patient at risk of harm. A referral sheet is sent with patients on all offsite referrals. Consultants usually, but not always, will write brief comments on these forms to communicate key items to the primary doctor. However, this is an unreliable system and is incomplete, as it does not give the full consultant report.

The contract between Wexford and the IDOC requires that the vendor is to meet with hospital and other providers to coordinate referral of inmates, including the reporting of test results and medical records.[122] The contract also requires that medical records are to contain hospital discharge summaries and reports of consultations.[123] Yet the IDOC has taken a position[124] that they have no control over consultants or outside hospitals, and therefore obtaining a report is beyond the IDOC's control. They were mainly speaking of hospital emergency room reports. We

---

[121] As an example, on 33 mortality review records, there were 137 episodes when records were unavailable from offsite specialty care or hospital care. This included both specialty consultation reports and hospital discharge summaries.

[122] Contract between Wexford Health Sources Inc. and State of Illinois Department of Healthcare & Family Services dated 5/6/11 and found at 2.2.3.11 on page 9.

[123] Contract between Wexford Health Sources Inc. and State of Illinois Department of Healthcare & Family Services dated 5/6/11 and found at 2.2.3.13.5 on page 10.

[124] Letter to First Court Expert regarding Defendants' comments regarding the confidential draft report of the First Court Expert dated 11/3/14 and signed by William Barnes on pages 22-23.

assumed that they hold the same position for consultation reports. They maintain that Wexford has implemented a system which provides the Medical Director with reliable and timely information so that appropriate care is provided. We did not find that this was accurate. There is no evidence in the five day follow up to consultations or in the follow up after hospitalizations that doctors consistently understood what occurred during the offsite event. If they did, they did not document it. At times, doctors would document that there was no report and made no changes to the therapeutic plan because information was still pending. This is a serious problem. In our experience managing contract medical services and a county-managed health program, we have always been able to negotiate with consultants and hospitals timely access to consultant and hospital reports. We view this as a failure of the vendor to perform and should be fixed via the oversight process.

A special situation exists with respect to use of UIC for consultant care. Years ago, UIC agreed to provide IDOC with a certain amount of free care. This amounted to 216 inpatient hospital admissions and 2160 outpatient visits per year. Only four facilities are permitted to participate: SCC, Dixon, Pontiac, and Sheridan. NRC and SCC are considered the same institution. Each facility is permitted to send approximately 520 patients a year for specialty consultations. For a variety of reasons, these specialty consultations are delayed. At Dixon, consultations to UIC average six months to complete and range from 100 days for a cardiology consultation to 239 days for a gastroenterology consultation. These delays have resulted in morbidity and mortality, and place the patients at significant risk of harm. There is no process to assess whether a patient's condition needs earlier attention. Because the cost of UIC is free and the cost of alternate care is borne by Wexford, there is significant incentive to send patients to UIC even if it results in delayed care.

An example of this was at SCC. The patient[125] was a 56-year-old who complained of blood in his stool on 11/8/16. A fecal occult blood test verified blood in his stool. The patient also had weight loss. The standard of care for a 56-year-old with weight loss and blood in the stool is prompt colonoscopy and possibly additional work up to exclude colon cancer. This man was not referred for colonoscopy; instead, he was referred for a gastroenterology appointment on 1/4/17, about two months later. The gastroenterology appointment did not occur until 7/7/17, about six months after the referral. The gastroenterologist recommended colonoscopy, which did not occur until 11/27/17, when a locally invasive rectal cancer was identified. This delay of over a year resulted in unnecessary spread of the cancer. Physicians were aware of the delay but there was no effort to schedule the patient to a local gastroenterologist for this procedure.

We reviewed aggregate specialty care visits for 2017. They are listed in the table below. Though the populations at SCC and MCC are similar in that they are both maximum security prisons without special medical missions, the referrals numbers and rates are quite different. We question whether the four times higher rate of referral at SCC is related to the free care provided at UIC. Dixon and SCC, which have free care at UIC, had the highest numbers and rates

[125] SCC Hospitalization Patient #6.

Case: 1:10-cv-04603 Document #: 767 Filed: 11/14/18 Page 69 of 153 PageID #:11500

of referral. This implies that other sites may have suppressed referral rates because the cost of care is borne by the vendor.

| Site | Population | Referrals[126] per year | Referrals per 1000 | Denials per year | Denials per 1000 | % Denied |
|------|-----------|-------------------------|--------------------|------------------|--------------------|----------|
| NRC | 1681 | 242 | 144 | 8 | 5 | 3% |
| SCC | 1183 | 1731 | 1463 | 87 | 74 | 5% |
| Dixon | 2298 | 1666 | 724 | 109 | 47 | 7% |
| LCC | 1806 | 753 | 417 | 71 | 39 | 9% |
| MCC | 3029 | 994 | 328 | 237 | 78 | 24% |

Dr. Meeks testified[127] that if the site Medical Director or HCUA feel that any request denied is necessary, it can be appealed directly to the Agency Medical Director. Dr. Meeks stated that over an eight-month period he thought he had received about 10-15 appeals on a statewide basis. It is our opinion based on record reviews that there are a substantial number of patients who are not referred for services who need them. We were unable to identify any data to show who appeals utilization decisions to the Agency Medical Director, but based on interviews it appears that the HCUA at the facility is the person who does this. But the HCUA is a nurse who is not trained to determine whether a referral is necessary. This manner of oversight is therefore flawed and will not adequately protect patient safety because this should be done by a physician, and needs to include review of care so that persons who never get referred but should be referred are identified.

Based on multiple record reviews, including mortality reviews, we have identified considerable morbidity and mortality associated with untimely or lack of referral for higher level of care. In review of 33 deaths, we found 93 episodes of care when a patient should have been referred to a hospital. Many of these delayed or failed hospital admissions contributed to patient death. While we believe that this occurs as a result of poorly qualified physicians, the utilization process appears to be a significant barrier to access to timely specialty and higher level of care. The defects in this cost containment mechanism effectively result in denial of necessary medical services that harm inmates. For that reason, we make a strong recommendation to abandon the collegial review process until patient safety can be ensured.

IDOC providers should be strongly encouraged to request specialty consultation when patients' clinical conditions are complicated, exceed the skills and training of the providers, or are not responding the initial treatment regimens. It would be in the best interest of the patient and the IDOC if there was a system wide specialty consultation plan that included contracts with specialty providers for face-to-face, telehealth, and e-consult consultation. IDOC should expand and build on the current telehealth program that provides ready access to HIV, hepatitis C, and renal consultation. The present relationship with the University of Illinois Chicago could be used

---

[126] Referral and denials were taken from the latest year's annual CQI reports provided to us by the IDOC.
[127] Page 23 30(b)(6) deposition of Dr. Meeks on July 25, 2017.

as a template to expand the number and type of specialty consultations that are readily available to IDOC providers.

## Infirmary Care

### First Court Expert Findings

The First Court Expert noted in the final report that there were deficiencies in infirmary policies, practices, and physical plants. The expert stated that IDOC policies failed to provide a detailed description of the scope of services that could be safely provided in the infirmary setting and did not provide guidelines that would assist the clinical staff in determining which patients should be referred to the hospital and not be admitted to the infirmary. The report criticized the 23-hour observation policy that allowed nurses to directly admit patients to the infirmary for short term observation without contacting the provider or to discharge patients without arranging for post-observation follow-up. They report that Dixon did not have 24 hour/7 days per week registered nurse presence in the infirmary, and that there was no or only partial nurse call systems in five facilities. It was also noted that in some infirmaries, bedding linens were of poor quality and in short supply.

### Current Findings

All five of the correctional centers inspected had infirmaries including NRC, SCC, Dixon, LCC, and MCC. The NRC infirmary was opened in 2016, two years after the First Court Expert's site visit.

The physical plants of the infirmaries were described in the section on Clinical Space and Equipment, which noted serious problems with the level of cleanliness, lack of adjustable hospital beds, torn mattresses, non-functioning negative pressure units in isolation rooms, the absence or incomplete distribution of nurse call devices, and unsafe shower rooms in many of the infirmaries.

There was overall compliance with timeliness of nursing admission notes, which were consistently written at the time of admission, and the frequency of nursing progress notes. Nursing progress notes were consistently entered no less than daily even when the policy required only weekly notes. There was varying compliance with the timeliness of provider admission notes, which were to be written within 48 hours of admission.[128] A number of provider admission notes were not entered in accord with this standard.[129] As also directed by the Offender Infirmary Services directive (see reference above), provider progress notes were to be written three times a week for "acute" admissions and weekly for "chronic" admissions. There was inconsistent compliance with this directive in the IDOC infirmaries.[130]

The Offender Infirmary Services Administrative Directive dated 9/1/2002 states that "the scope of infirmary services available on site shall be based upon the nature of offender population

---

[128] Offender Infirmary Services 04.03.120.
[129] NRC Infirmary Patients #1, 3, 4; Dixon Infirmary Patient #1.
[130] NRC Infirmary Patients #3, 4; Dixon Infirmary Patients #3, 5; MCC Infirmary Patient #2.

and the prevalence of disease entities or disabilities that might benefit from infirmary services within the facility's population."[131] It has not been modified since the First Court Expert's visit. There are still no written policies that provide guidance to the IDOC clinical staff on which conditions or level of instability exceed the capabilities of the infirmaries and should be promptly referred to a hospital. Moreover, based on record reviews, the current complement of Wexford physicians does not appear to appreciate when patients are unstable and require hospitalization. This places patients at significant risk of harm. The lack of a clear scope of service contributed to admission of patients to the infirmaries whose presenting or ongoing conditions warranted referral to a higher level of care, whether to a hospital or a skilled nursing facility. Many of these failures to refer to a higher level of care resulted in death.[132]  Two examples of failure to refer to higher level of care based on infirmary record review during facility visits included the following.

A patient with recent assaultive head trauma and an episode of falling out of his bed presented with fluctuating altered mental status, disorientation, and confusion, and was admitted to the NRC infirmary.[133] The provider's admission note did not document a neurological exam, the bruises on the patient's head, the recent head trauma, and the past history of a cerebroventricle-peritoneal shunt. This patient's condition warranted direct referral to a hospital emergency room for brain imaging study (CT scan) and neurology evaluation to rule out an intracranial hemorrhage or increased intracranial pressure. This patient's clinical condition exceeded the capabilities of the infirmary and he should have been hospitalized. The care of this patient was negligent and did not reflect the standard of care in the community.

Another patient with a chronic draining leg ulcer was not able to be properly diagnosed and treated in the infirmary.[134] The indicated preliminary diagnostic testing and specialty consultation were not initiated. When the patient did not improve with the initial antibiotic regimen, she should have been hospitalized to have additional definitive diagnostic testing and the timely initiation of the proper intensive antibiotic treatment. Her complex non-healing leg ulcer, which most likely was due to chronic osteomyelitis, exceeded the scope of service that could be adequately diagnosed and managed in the IDOC infirmary setting.

At the time of the Experts' site visits, a high percentage of the patients in the infirmaries were physically and/or mentally impaired patients with dementia, traumatic brain injuries, advanced cardiovascular disease, and cerebrovascular disease. Many were incontinent of bladder and bowel and needed partial or full assistance with activities of daily living (ADLs), including toiletry, feeding, bathing, dressing, and transfers in and out of beds and chairs. This was especially true of the Dixon facility which includes a special mission of housing geriatric patients. Nine (50%) of the 18 patients in the Dixon infirmary were judged by the infirmary nursing staff as needing full or partial assistance with ADLs and would be better served in a

---

[131] Offender Infirmary Services, Administrative Directive 04.03.120.
[132] We noted in 33 mortality reviews that there were 93 episodes in 33 patients when the patient should have been referred to a higher level of care but was not. Many of these resulted in death.
[133] NRC Infirmary Patient #3.
[134] LCC Infirmary Patient #5.

skilled nursing facility.[135] Health care administrators, nursing leadership, and correctional staff leadership in a number of the facilities communicated their concerns about the increasing number of elderly mentally and physically disabled individuals in the IDOC and their concerns about the infirmaries' capability of caring for this complicated patient population. It was apparent that the IDOC is aware of the need for additional skilled nursing care facilities and geriatric care housing but has not taken action to address this problem.[136] In our opinion, the Dixon facility is inadequate as the principal housing placement for the geriatric and disabled population. There has been no evaluation to assess the number of persons needing geriatric care or skilled nursing placement within the IDOC and no apparent effort to correct existing inadequate housing for these individuals.

One example at NRC included a patient with diabetes, lymphoma on chemotherapy, deep vein thrombosis with an inferior vena cava filter, urinary incontinence, decubitus ulcer, and a hospitalization in 2017 for altered mental status, repeated falls, and cranial burr hole procedures who spent most of his day in bed.[137] He needed assistance with ADLs including straight catheterization to empty his bladder. He could not walk without assistance. He had a decubitus ulcer that appears to have developed while in the infirmary. His constant needs exceeded the capabilities of the NRC infirmary; he would be more appropriately housed in a skilled nursing facility.

An elderly, incontinent patient at SCC with dementia was noted having his diaper changed.[138] The staff stated that he required total care and constant observation. Later in the day, the patient was observed to be unattended and precariously laying half off the bed at significant risk for fall.

One long term patient in the Dixon infirmary with advanced dementia had developed contractures of his upper and lower extremities and deep, infected decubitus ulcers.[139] He required total care including gastric tube feeding, diapers, bathing, and dressing. The extreme contractures and recurrent pressure sores developed while he was in the infirmary. The manifestation of these findings indicated that the Dixon infirmary was incapable of providing the level of care that would be expected in a skilled nursing facility. Once the patient started to develop contractures, he should have been transferred to a skilled nursing facility in the community. These and other mentally and physically impaired patients have clinical and nursing care needs that cannot be adequately met in IDOC infirmaries. IDOC must either internally develop a certifiable skilled nursing facility that is properly designed, staffed, and equipped or transfer high risk chronic care patients to certified skilled nursing facilities in the community.

With the exception of LCC, the provider infirmary admission notes contained very limited history of the reason for admission, the diagnosis, any differential diagnoses, and only brief

---

[135] Verbal communication with Dixon infirmary nurse.
[136] Deposition of Kim Hugo, April 11, 2018 pp. 69-70.
[137] NRC Infirmary Patient #2.
[138] SCC Infirmary Patient was observed during rounds. His chart was not reviewed.
[139] Dixon Infirmary Patient #3.

diagnostic and treatment plans. With the exception of the infirmary at LCC which has an electronic medical record, the provider progress notes were commonly illegible. Provider progress notes commonly offered limited if any clinical information, did not include justification for modifications in treatment plan or medications, and were exceedingly brief with little clinical information. The assessment and plan in provider progress notes often repeatedly contained little more than phrases such as stable, no change in condition, or continue present management.[140] Other than limited notes about the illness that prompted the infirmary admission, there was virtually no documentation or clinical updates about any of the patients' other chronic illnesses including diabetes, hypertension, congestive heart failure, chronic kidney disease, etc. The provider progress notes during one SCC infirmary patient's seven month admission never commented, even once, on the status or control of his seizure disorder.[141] It was extremely difficult for Experts and other providers to understand the course of the patient's condition and the rationale for any of the modifications in treatment. A provider recently assigned to the SCC infirmary stated that the notes of the previous infirmary provider were incomprehensible and made it extremely difficult for him to comprehend the status of the patient and the treatment plan.[142] The lack of informative, comprehensive provider notes that legibly addressed both the acute and chronic needs and illnesses of each infirmary patient put the health and safety of infirmary patients at risk. The illegibility of the provider and some of the nursing notes provides strong justification for implementation of an electronic medical record in all IDOC facilities.

Some infirmary problem lists were missing, had erroneous entries, or failed to include key chronic illnesses.[143] Absent, inaccurate, or incomplete problems created a potential risk to the comprehensiveness and continuity of the care delivered to a patient housed in IDOC infirmaries.

The care provided to a number of infirmary patients, as identified during site visits, was found to be suboptimal and of poor quality. When the admitting diagnosis was not clear or the patient was not responding to the initial treatment, the providers failed to consider reasonable alternative diagnoses and order additional diagnostic tests to investigate the initial or other diagnoses. Patients were prescribed confusing regimens of antibiotics and other anti-infection agents. Chronic conditions were not aggressively managed, resulting in delays in attaining reasonable levels of control. This lack of clinical adequacy put the health of patients at risk. Examples of patients whose infirmary care was suboptimal are provided below.

---

[140] In Mortality Review Patient #9, over six months a doctor wrote an identical note 19 times despite fluctuating clinical condition of the patient. The note consisted of the sentence, "no specific complaint, no change, dementia, continue same care." After the patient had a cardiopulmonary event undocumented by the provider and colon cancer the provider over the course of approximately a year wrote the identical note repeatedly, "no specific complaint, no change, post colectomy for metastatic ca [cancer], continue same care." This was despite the patient having repeated falls and other clinical events described by nurses.

[141] SCC Infirmary Patient #2.

[142] Verbal communication from Dr. Roz Elazegui.

[143] SCC Infirmary Patients #1, 2, 3; LCC Infirmary Patient #5; MCC Infirmary Patient #1.

- A newly incarcerated diabetic patient entered NRC with a black toe and should have been immediately referred to a hospital emergency room.[144] However, he was placed in the general population and received no follow-up care until two weeks later, when he had to be emergently referred to the hospital. His hospital treatment included IV antibiotics for septicemia and surgical amputation of his infected gangrenous toe. Upon discharge from the hospital he was admitted to the NRC infirmary. After five weeks in the infirmary, the recommended follow-up appointments with vascular surgery and podiatry had not yet been scheduled. The infirmary provider notes were mostly illegible and contained limited clinical information about the post-hospital wound healing. Upon initial entry to NRC, this patient's syphilis test was found to be reactive with a high RPR titer of 1:124 treatment (active syphilis); he was not treated for syphilis prior to his hospitalization and was not identified as having active syphilis until 33 days after his admission to the SCC infirmary. The provider had not reviewed the intake laboratory testing when the patient was admitted to the infirmary. The delay in initiating the treatment of active syphilis was negligent and put the patient at risk for syphilitic complications.

- Another NRC infirmary patient with recent head trauma and a ventriculoperitoneal (VP) shunt that had been previously placed to treat hydrocephalus was admitted to the infirmary with altered mental status, confusion, and disorientation; he also had bruises and a hematoma on his head.[145] This patient should have been directly sent a hospital emergency room but was not. Ten days after admission to the infirmary, the provider had not performed a neurological exam and had not ordered a brain imaging study to rule out cerebral hemorrhage, subdural hematoma, and increased intracranial pressure. The care provided to this patient did not meet the standard of care in the community and was grossly and flagrantly unacceptable.

- Another NRC patient was an insulin using diabetic with a wired jaw on sliding scale insulin and a total liquid diet who had widely fluctuating blood sugars with episodes of marked hypoglycemia after injection of short acting regular insulin.[146] The provider did not comment on the possible impact of the patient's entirely liquid diet, which can result in extreme variations of blood sugar levels. The provider did not comment on whether this patient had type I or II diabetes. The continued use of sliding scale short acting insulin should have been discontinued in this patient. The lack of a clear plan about treating this diabetic who was temporarily unable to eat solid foods put this patient at risk. Consultation with a diabetic specialist was needed but had not been solicited. Treatment was also not ordered to address protein in the urine nor was the pneumococcal vaccine 23 administered; both these interventions are the standard of care for all diabetics. The care provided to this patient was substandard.

---

[144] NRC Infirmary Patient #1.
[145] NRC Infirmary Patient #2.
[146] NRC Infirmary Patient #4.

- A patient in the SCC infirmary had recurrent deep vein thromboses (DVT) and was prescribed chronic anticoagulation with warfarin.[147] After nine weeks of anticoagulation, the level of anticoagulation (INR testing) were still sub-therapeutic. The infirmary provider failed to more expeditiously increase warfarin dosage to achieve a therapeutic level. This patient was still at risk for a recurrent DVT after nine weeks at SCC. At one point, the UIC providers requested that the warfarin order be stopped and the anticoagulant be switched to injectable low molecular weight heparin in preparation for an upcoming surgical repair of the patient's post-operative abdominal wound. The infirmary provider discontinued the oral anticoagulant but failed to prescribe the injectable anticoagulant, leaving the patient without any blood thinning medication. The lack of aggressive management of his oral anticoagulation medication and the failure to immediately prescribe the temporary injectable anticoagulant put the patient at heightened risk for additional clot formation.

- Another SCC infirmary patient whose diagnoses included cardiovascular disease, diabetes, DVT, and seizure disorder had episodes of black outs and significant drops in blood pressure documented in the nursing notes.[148] The infirmary provider failed to document or address these occurrences of syncope in his progress notes. This patient should have been, but was not, assessed or tested for arrhythmia, atypical seizure, and orthostatic hypotension. The provider progress notes never once commented on the control of patient's seizure disorder. The patient also had a history a massive DVT but he had not been prescribed anticoagulant medication and the provider did not provide any rationale for not treating this potentially life threatening condition. The care provided to this infirmary patient was grossly and flagrantly unacceptable.

- Another SCC infirmary patient had a history of arteriosclerotic heart disease (ASHD), hypertension, and cerebral vascular accident (stroke).[149] For the last seven months he had multiple elevated blood pressure recordings documented in the infirmary record without any change being made in his antihypertension medication regimen. It was not until a new provider was assigned to the infirmary in 2018 and increased the blood pressure medication that the blood pressure finally become controlled. The management of this patient's hypertension was negligent and put the patient at increased risk for another stroke.

- A patient at LCC had repeatedly sought medical attention since late 2016 for abdominal pain, blood in her stool, mucous in her stool, change in her bowel patterns, and progressive weight loss.[150] She was seen repeatedly and had been presumptively started on antibiotics for diverticulitis; the nurses and providers consistently failed to comment on her steady loss of weight which was readily viewable in LCC's electronic medical record. Failing to note that the patient had already lost 29 pounds, one provider wrote

---

[147] SCC Infirmary Patient #1.
[148] SCC Infirmary Patient #2.
[149] SCC Infirmary Patient #4.
[150] LCC Infirmary Patient #1.

in July 2017 that this patient had no "red flags" for cancer. He was wrong; weight loss is a strong warning sign for cancer. Due to increased abdominal pain and blood in her stool, the patient was admitted to the infirmary in September 2018 and treatment for diverticulitis was continued. It was not until her twelfth day in the infirmary that a provider recognized that the patient had lost another 18 pounds during the infirmary admission and a total of 40 pounds since January 2017. Another 20 days passed before an abdominal CT scan revealed abnormalities consistent with colon cancer with metastases to abdominal lymph nodes and the liver. Biopsy at UIC Springfield verified the diagnosis of colon cancer and on 12/18/17, 73 days after her admission to LCC's infirmary, the patient had a hemicolectomy with a colostomy performed and she was started on chemotherapy. The pre-infirmary and infirmary care of this patient failed to meet the standards of care in the community. The failure of the providers in the clinics to recognize the patient's weight loss and symptoms as being suggestive of a malignancy was indifferent and grossly and flagrantly unacceptable. The slow scheduling of diagnostic tests and referrals while the patient was housed in the infirmary was inexcusable; the two and one-half month delay between infirmary admission and surgery potentially decreased the quality and duration of this patient's life.

Patients admitted to the infirmaries with less complicated conditions (post-op, basic wound care, no assistance with ADL's, etc.) were more likely to be adequately managed. However, patients with complicated conditions and multiple diagnoses that required close monitoring and diligent provider involvement were frequently noted to have received substandard levels of care. Some of these patients had clinical needs that exceeded the clinical experience and knowledge of the providers. IDOC providers do not have timely, if any, access to nationally respected, comprehensive, current electronic medical references when they need expedited answers to clinical questions. Most importantly, the negative impact of the provider's knowledge gap would have been lessened if the infirmary providers readily requested specialty consultation concerning diagnostic testing and treatment. There were multiple instances when the infirmary (and sick call and chronic care) providers failed to consult specialists when there were clear indications that clinical advice and assistance was needed. The infirmary providers either lacked the knowledge and competence to recognize that they needed clinical assistance or they were reluctant to seek outside consultation due to institutional culture and practice. The Wexford "collegial" process that required providers to submit justification for offsite specialty consultations and offsite (and some onsite) diagnostic tests only serves an administrative "gate keeper" function and is an unnecessary barrier that delays or prevents the scheduling of needed consultation.

Examples of infirmary patients whose clinical conditions should have generated a request for specialty consultation but for whom the provider failed to submit requests for this clinically warranted specialty assistance follow.

- A insulin requiring diabetic patient in the NRC infirmary with a wired, fractured jaw on a total liquid diet had widely fluctuating blood sugar levels that were not able to be

controlled by the infirmary provider.[151] This is an unusual clinical situation and the advice of an endocrinology specialist was needed but not requested. The infirmary provider's insulin orders put the patient at significant risk for hypoglycemia.

- Another patient in the SCC infirmary with severe cardiovascular disease, peripheral artery disease, iliac artery stent, diabetes, seizure disorder, and a history of DVT had, over a seven month duration, episodes of black outs and significant drops in blood pressure recordings.[152] The infirmary provider ordered no interventions and failed to seek consultation with cardiac and vascular specialists. When a new infirmary provider was assigned to the infirmary, the patient was immediately referred to both cardiology and vascular surgery specialty clinics.

- A patient in LCC's infirmary had multiple chronic conditions including congestive heart failure, atrial fibrillation, and mitral valve replacement.[153] She developed persistent dark colored, draining, and itching sores. The infirmary provider's attempts to treat this skin problem were unsuccessful. The provider never considered that one of the patient's medications, known to cause itching and blistering skin lesions, could be the cause of her skin condition. Dermatology consultation should have been requested but was not. Over an eight month period in the infirmary, the patient's vital signs documented eight episodes of bradycardia (slow heart rates less than 60 beats per minute) that were never addressed in the provider's progress notes. No consideration was given to the decreasing one of the patient's medications that commonly causes bradycardia. The patient's severe chronic cardiac illnesses and her eight documented episodes of bradycardia never resulted in a referral to cardiology specialists. The patient was urgently hospitalized when her pulse rate increased to 130 beats per minute and her oxygen saturation suddenly dropped. While hospitalized she was found to have sick sinus syndrome, which can cause intermittent bradycardia and tachycardia; a cardiac pacemaker was implanted. This patient's conditions were complicated, yet specialty consultation with cardiology and dermatology were not solicited prior to her emergency hospitalization. Her intermittent episodes of bradycardia went unnoticed by the provider; it appears that the provider was not reviewing the vital signs that were frequently recorded by the nursing staff. The care provided to this patient was negligent. The failure to adequately monitor this patient and to seek timely specialty consultation for complex dermatological and cardiac conditions did not meet the standard of care in the community.

- Another patient in the LCC infirmary with blackened toes due to frost bite was treated with an array of antibiotics but was not immediately referred to a podiatrist as is the standard of care in the community.[154] Only after two months in the infirmary, when her right large toe became gangrenous was she referred to a podiatrist. The podiatrist

---

[151] NRC Infirmary Patient #4.
[152] SCC Infirmary Patient #2.
[153] LCC Infirmary Patient #2.
[154] LCC Infirmary Patient #3.

arranged for the toe to be surgically amputated. Immediate referral for podiatric consultation when the patient was admitted to the infirmary could potentially have prevented the need for the amputation.

- Another patient in the LCC infirmary had a history of recurrent DVT with pulmonary emboli and a chronic draining lower extremity leg ulcer.[155] During her infirmary stay, the patient was treated with five different antibiotics in six different, confusing combinations. The working diagnosis appears to have been osteomyelitis but this was never noted in the provider's treatment plan. The provision of multiple antibiotics in varying combinations without a definite diagnosis was not in accord with national standards of care and put the patient at risk for drug resistance and severe gastrointestinal complications. A definite workup for osteomyelitis, including bone probing, bone biopsy, and specialized bone scans, was never ordered. Infectious disease, orthopedic, and possibly dermatology consultation to clarify the diagnosis was needed but was not requested. The provider's extremely belated requests for infectious disease consultation for assistance with the choice of antibiotics, not to establish a diagnosis, was inappropriately denied by Wexford's collegial referral process. If even the appropriate preliminary diagnostic tests and consultations had been performed at the infirmary, this patient should have been hospitalized for definite diagnostic tests and intensive treatment. The failure to solicit specialty consultation during this patient's six month stay in the LCC infirmary without resolution of her draining leg ulcer and the inexplicable combinations of antibiotics and antifungal agents reflected poor understanding of this patient's possible diagnoses, and was incompetent.

## Pharmacy and Medication Administration

Prescription medication is a common form of medical treatment today. In the general community, 37% of adults aged 18-44 took a prescription drug in the last 30 days, 70% of adults aged 45-64 took a prescription drug in the last 30 days, and 91% of those aged 65 and older took a prescription drug in the last 30 days.[156] Persons incarcerated in correctional facilities are well known to have a greater disease burden than the general community.[157] A survey done by the Bureau of Justice Statistics of inmates in jails and prisons in 2011-2012 found that 66% of those in prison reported taking prescription medication for a chronic medical condition.[158]

---

[155] LCC Infirmary Patient #5.

[156] National Center for Health Statistics. (2017) Health, United States, 2016 with Chartbook on Long-term Trends in Health. Hyattsville, MD. https://www.cdc.gov/nchs/fastats/drug-use-therapeutic.htm.

[157] Nowotny. K., Rogers, R. & Boardman, J. (2017) Racial disparities in health conditions among prisoners compared with the general population. SSM-Population Health. 3; 487-496. Elsevier. Macmadu, A. & Rich, J. (2015) Correctional Health is Community Health. Issues in Science and Technology. 31 (1). Binswanger, I., Krueger, P., Steiner, J. (2009) Prevalence of chronic conditions among jail and prison inmates in the USA compared with the general population. Journal of Epidemiology and Community Health. 63(11):912-919.

[158] Maruschak, L. (2015) Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-2012. Bureau of Justice Statistics available at https://www.bjs.gov/index.cfm?ty=pbdetail&iid=5219.

The use of prescription medication in health care is governed by both state and federal regulations designed to provide protection for the patient, treating clinicians, and the general community. The safety of medications in the delivery of patient care has been a major area of emphasis since the 1990's, when the Institute of Medicine reported that medication errors were a significant contributor to morbidity and mortality.[159] Since then, numerous organizations, including the federal government and accreditation organizations, have studied the problem of medication safety and put forth guidelines that improve patient safety. These include computerized provider order entry, medication reconciliation, use of clinical pharmacists, patient-specific unit dose packaging, adherence to the "five-rights" of medication safety, bar code medication administration, and minimization of interruptions during all aspects of medication preparation and delivery.[160] The methods to deliver medication in correctional facilities are expected to be like those evident in the general community, including implementing changes to improve safety.

Availability and access to medications involves the cooperation of custody and other programs. Correctional officer support is essential to complete medication administration efficiently and safely. This includes providing escort, controlling movement, reducing distractions (e.g., television, noise levels, fights, etc.), accounting for missing inmates, and ensuring that inmates ingest medication that has been administered. Custody officer support needs to be guided by custody post orders or Administrative Directives that give standardized guidance to custody staff on how they are to cooperate with nurses when they administer medication. When this does not occur, nurses must individually negotiate with officers, resulting is varying levels of cooperation when nurses attempt to administer medication. This reduces standardization of practice, causes inefficiency and delay, and as a result increases risk of medication errors.

Medications may be only needed once a day, but a few medications may require as many as four to six doses in a 24-hour period. Correctional facilities may reduce some of the burden of medication administration by allowing inmates to keep and take their own medications as needed, but this is usually limited to groups of medications not likely to be misused and to inmates who are capable of self-administration. When inmates are unable or not allowed to take medication on their own, a nurse must administer each dose. There are also some patients who need closer monitoring of their clinical condition, such as when medications are first initiated, the patient is experiencing side effects, or the when the patient's condition is not improving. These patients should be scheduled for nurse administered medication.

Patient adherence with medication treatment is essential in achieving desired clinical outcomes. When patients do not receive medication as ordered, treatment is compromised. There are many reasons a patient in a correctional facility does not receive medications as prescribed. These can include the medication has not yet been received from the pharmacy, the nurse did not see that the medication was ready and available to administer, the officer

---

[159] Institute of Medicine. (1999) To err is human: building a safer health system. Washington DC: National Academy Press.
[160] Patient Safety Primer (2017) *Medication Errors* available at https://psnet.ahrq.gov/primers/primer/23. Agency for Healthcare Research and Quality, U.S. Department of Health and Human Services.

may not have released the inmate from his cell to obtain the medication, the inmate may be elsewhere (at court, in the visiting room, with an attorney, attending a program, working etc.), the inmate may have been transferred to another housing location or institution, or the inmate may not want to take the medication. Each of these reasons requires a different action by the nurse to ensure that the patient receives ordered treatment. For example, inmates may refuse medication, but if so, the nurse needs to refer the patient to a provider to discuss a change in the plan of care. If the inmate has been transferred, the nurse needs to locate the inmate and transfer his medication, or notify the new location that the inmate needs to receive medication, and so forth. Whenever an inmate is not present or refuses a prescribed dose of medication, the nurse must investigate further to determine what steps must be taken to continue the inmate's care. Each of these missed medications and the reason must also be documented on the MAR.

Nurses and correctional officers must work collaboratively to ensure that patients ingest medications, as medications that are diverted in the correctional setting become contraband and are a challenge to safety and security of operations. Correctional officers are responsible for preventing and eliminating contraband. A single pill or capsule is considered contraband when it is not being administered by a nurse or taken by an inmate as a keep on person (KOP) medication. It is important that policies and procedures clearly identify when it is not acceptable for medication to be in the possession of an inmate and that correctional staff are vigilant in monitoring for the presence of contraband and the potential for misuse or drug overdose.

**First Court Expert Findings**
The First Court Expert found no problems with the system to provide pharmacy/medication administration services. The Expert found discontinuity in medication treatment for individuals with chronic disease, which was unrecognized and not addressed by treating clinicians. This was because the MAR was not filed timely in the medical file and nurses did not notify providers when an inmate missed taking medication. The Expert also found at NRC that medication administration was significantly delayed because an officer was not assigned to escort the nurse, per policy.

**Current Findings**
We agree with the First Court Expert's findings. We have additional findings that evidenced a far worse situation from the First Court Expert's report. We found systemic medication administration practices that are unsafe and not consistent with community standards at every facility visited. We also found that some problems with medication are not recognized and those that are recognized are not addressed. The failure to rigorously monitor and address problems with medication treatment is a systemic issue that results in medication errors, resulting in adverse patient events and creating on ongoing risk of harm to patients.

<u>Pharmacy Services</u>
Most pharmaceuticals are provided by BosWell Pharmacy Services, an institutional pharmacy located in Pennsylvania. Orders are either faxed, or in the case of LCC, entered by computer.

Each order is verified by a pharmacist, the prescription filled, and the medication shipped to the institution, arriving the next day. Staff assigned to work in the medication storeroom at the institution track each medication that has been ordered, reconcile its receipt, and put it into the area used by nurses to prepare medication for administration. UIC provides medications to treat inmates with HIV and HCV via an interagency agreement. Each institution also has a "back-up" pharmacy in the local community which can fill prescriptions needed more urgently than can be delivered by BosWell. We did not find any significant issues with the availability or timeliness of prescribed medication supplied by either BosWell or UIC.

A consulting pharmacist visits each site regularly at least once a quarter to inspect the medication area and audit charts. The results of these reviews are included in the institution CQI meetings. We identified concerns when we inspected medication rooms. There was no schedule of sanitation and disinfection activities for the medication areas. At NRC and LCC, medication storage rooms were dirty and disorganized. At Dixon and LCC, we found multiple use containers (e.g., Lidocaine) that were open and not dated. We also found expired medication and testing material at these two facilities.

Policy and Procedure

IDOC provides minimal direction and guidance about how medications are ordered and administered. For example, it states that prescriptions must be signed by a physician or dentist; it does not state the elements of a complete order. Facilities have operational procedures for pharmacy services and medication administration. Procedures we reviewed were several years old and often not signed. While they do provide more specific directions about when and how medication will be accounted for and administered at the facility, they still are too general. For example, the operational procedure at LCC does not state the elements of a complete order. It also does not specify how the nurse administering medication is to identify that it is the correct inmate. Health care staff are therefore left to their own devices and there is no mechanism to insist upon legible, complete orders or instructions about how inmates are to be identified before receiving medication. This leads to variation and unsafe practices as described in the following paragraphs.

An example of how the absence of policy and procedure leads to poor practices is one we observed at MCC. Nurses used a list of inmates who are prescribed controlled substances to select and sign out medication from the cabinet where controlled substances are kept. All the medications were put into a collective cup. Once all the controlled substances were collected, the nurse took the cup to the medication room and, by visual identification only, selected which controlled substances each patient was to receive and put them into the respective patient envelope. Not only was the nurse dispensing; there was no accountability for the proper disposition of each medication and the potential for error magnified by not using the MAR to select medications. In another example, at LCC, unlicensed staff delivered KOP medications to inmates without the MAR present to verify the medication against the physician order and to document that the medication was administered. We found many MARs in which there was no documentation that the patient received ordered medication.

The IDOC has no Administrative Directives or post orders that provide guidance on how officers are to cooperate with nursing staff when nurses administer medication. At NRC, as an example, nurses individually negotiate for this cooperation when they administer medications. This practice at NRC resulted in the poor practices we observed at that facility. There needs to be a standardized procedure for officer cooperation with nurses during medication administration that ensures nurses are able to satisfactorily administer medication in accordance with accepted nursing practice.

Medication Orders

Dispensing and administration of medication must only be done under physician order. Illinois statute[161] requires that a physician prescription contain the name of the patient; the date when the prescription was issued; the name and strength of the drug or device prescribed; the quantity; the directions for use; the prescriber's name, address, and signature; and the DEA number for controlled substances. We did not find evidence that the prescription process in IDOC conforms to state regulation. Providers do not always write orders on the order form; we found multiple examples among charts reviewed of orders written on the physical exam form or on the lab results or in the progress notes, but a corresponding order was not written on the physician order form. It is the order form that is used to inform the pharmacy that there is a prescription to be filled, otherwise care is not implemented. Providers write orders that at times were not legible to the experts or the nurses working with the provider who wrote the order. Some orders were incomplete and documentation in the chart did not indicate the reason or intended goal of treatment.

Nurses are responsible for transcribing orders onto the MAR. At all facilities, we found orders which had not been transcribed onto the MAR or that were transcribed late. At NRC, nursing staff give KOP medication to inmates at intake without consistently transcribing the order and documenting administration of medication onto the MAR. Therefore, there was no documentation that the patient received ordered medical care. We also found instances of nurses overwriting new orders over old orders on the MARS at every facility. This is alteration of a legal record and should be ceased immediately. Finally, we observed nursing staff transcribing orders onto the MAR using the label on the blister pack instead of the original order; this is a poor practice because it does not identify dispensing errors.

Medication Administration

At all the facilities we visited, the process for medication administration was fraught with problems. None of the methods used to administer medication at the five facilities we visited ensure that the *five rights* of medication administration are observed. These are the *right patient*, the *right medication*, the *right dose*, the *right route,* and the *right time*. Problems which were universal included:

---

[161] Illinois Compiles Statutes; 225 ILCS 85/3 as found at
http://www.ilga.gov/legislation/ilcs/fulltext.asp?DocName=022500850K3.

1. Failure to identify that it was the right inmate, using two-part identification (e.g. use of identification badge and verification of date of birth or institution number).
2. Failure to verify that the inmate received the right medication in the right dose at the time of administration.
3. Lack of hand hygiene, cross contamination of the envelopes, and occasionally the pills themselves.
4. Untimely or failure to document medication administration to include the reason why an inmate did not receive a medication that was due.
5. Not observing the inmate to ensure that medication has been ingested.
6. Not accounting for missing inmates or arranging to administer the dose later.
7. Not signing the MARs so that it was possible to identify from the initials who had documented on the MAR.

Most medications are taken orally, in tablet or capsule form. These are packaged in 30-day blister packs that are labeled specifically for each patient. This is patient-specific unit dose packaging. This type of packaging reduces medication errors made by nurses in preparing and administering medication. At every facility we visited, this safety feature is totally abandoned because nurses take the pills out of the pharmacy dispensed package and put them in improperly labeled envelopes, which are repeatedly used, or medicine cups. This practice is known as pre-pouring and is widely recognized as unsafe. Nurses essentially duplicate what has already been done by the pharmacy, introducing the possibility of putting the wrong medication into the wrong patient envelope or another type of error. It also wastes the cost of packaging, which is expensive compared to other forms of stock medication.

We were told that pre-pour is necessary because doing it correctly takes too much time and, in some facilities, the physical plant makes it impossible to use a medication cart. We note that two of three of the IDOC maximum security facilities (MCC and Pontiac Correctional Center) were built in the 19th century, and the remaining maximum security facility (SCC) was built in the early 20th century. These facilities are so old that they are an impediment to appropriate administration of medication. Some areas do not have elevators and nurses are not able to use medication carts when they administer medications in many areas of these facilities. At NRC, inmates are essentially locked down 24 hours a day (except four hours per week), resulting in nurses delivering all medications cell to cell. Physical plant and operational practices are common reasons given for reluctance to adopt safer practices that meet nursing practice standards. However, IDOC is not so unique that these problems have never been experienced elsewhere and not been resolved. Other correctional systems have implemented patient specific unit dose systems and were able to address these types of problems in the process.

Because of these conditions, nurses make an accommodation to custody in using medication administration procedures (e.g., pre-pouring, not opening doors to properly identify inmates, and not having the MAR with them when they administer medication) that are not in keeping with current standards of nursing practice. Instead, custody should develop with the medical program an acceptable and safe alternative, given the existing physical plant barriers. In every facility, the Warden is the Chief Administrative Officer and the HCUA of the facility reports to

the Warden. This appears to have resulted in procedures that accommodate custody needs even when it results in medication administration practices that violate nursing practice standards.

Further, we observed nurses floating medication well in advance of administration, which alters the medication's properties, and crushing medication that was put in the reused envelopes, which contaminates other medications put into the envelope. These practices put inmates at risk of receiving ineffective treatment and adverse drug reaction.

Medication Continuity

Chronic disease patients are not monitored to ensure continuity in treatment nor is their compliance with prescribed treatment assessed. Chronic disease medications are provided to patients either as "Keep on Person" (KOP) or each dose is administered by a nurse. We found many examples of patients whose ordered medications were never provided, were delayed starting, and were stopped because the patient had not been seen by a provider to renew medication. Record reviews indicated that appointments for chronic care are not scheduled to take place prior to expiration of chronic disease medication orders. As a result, providers often reorder medications without seeing the patient to conduct a clinical evaluation to determine whether the treatment plan should be continued or changed, based upon the how well the patient's chronic disease is controlled.

Facility policy and procedures[162] direct that the MAR be available with the medical record at the time of a chronic care provider visit. However, we saw no evidence that current MARs were available at the time a patient saw a provider. We also saw no evidence that providers review the MAR and discuss the patient's adherence as part of chronic care appointments. Facility policy and procedures[163] also instruct nurses to refer patients to a provider for evaluation and possible change in treatment if they refuse to take prescribed medication. In the records we reviewed, there were multiple examples of patients not taking medication as prescribed who were not referred for provider evaluation.

Monitoring Performance

Pharmacy audits and inspections, which are done routinely, document the problems described above. These reports are reviewed and included in the institution CQI meetings. They document ongoing problems system wide with medication, including: use of the envelope rather than MAR to prepare medication; failure to document medication given on the MAR; failure to transcribe orders onto the MAR; administering medication for which there was no order, or when the inmate was not present at the facility; administering medications that differ from the order; documenting in advance that medication was administered; and the presence of open, undated, multi-use containers of medication. There has been some coaching and

---

[162] LCC, SCC, and DCC Operations Policy and Procedure P. 107 Management of Chronic Disease and MCC Policy and Procedure V3-12 Medical management of offenders with a chronic condition. No policies and procedures were provided for NRC.
[163] LCC, SCC, and DCC Operations Policy and Procedure P. 128 Medication Services and MCC Policy and Procedure V 4-1 Pharmacy Services. No policies and procedures were provided for NRC.

counseling of individuals, but there has been no review or analysis done to identify root causes for these persistent failures, and no effort made to eliminate systemic causes of failure or improve performance through corrective action planning. In the meantime, inmates are subjected to delays and interruptions of treatment, unsanitary conditions, and medication errors.

We note that some of the root cause problems appear to be related to custody control of medical processes within the institution and the apparent reluctance of health staff to openly discuss with custody the need for their cooperation in the process of medication administration. The governing bodies of CQI committees at several facilities were mostly custody-trained staff. This is an impediment to effective monitoring of clinical processes, such as medication treatment. Participation and support of custody staff in CQI is very important; however, medical staff must direct and control the monitoring of health care and be able to drive necessary performance improvements.

## Infection Control

Infection control is an essential element of an adequate health care system. The inmate population has a high prevalence of communicable and infectious diseases. Because of the high prevalence of communicable diseases, a highly functioning infection control program must be in place to identify, track, and assist in management of these illnesses.

Approximately 4-6% of TB cases reported in the United States occur among people incarcerated at the time of diagnosis. The incarcerated population contains a high proportion of people at greater risk of TB than the overall population.[164]  In 2013, there were 36,064 persons with HIV infection in the civilian population of Illinois, with a population over 18 years old of 9.7 million or 0.4% of the population. In 2010-2015, IDOC had 686 inmates with HIV infection or 1.5% of its population.[165] The IDOC HIV prevalence was almost four times as high as the civilian HIV prevalence. It is estimated that approximately 160,000 persons in Illinois have hepatitis C or about 1.6% of the Illinois population, as opposed to 5.6% known cases in IDOC and an estimated 10% overall estimated prevalence. The IDOC had at least 3.5-6.25 times the rate of hepatitis C infection of the civilian population. The burden of sexually transmitted disease, MRSA, and scabies are also typically higher in prison systems.

Conditions of confinement promote the spread of disease because of environmental conditions within the prisons. Inmates are housed in close quarters. In our IDOC Prison Overview section we spoke about how crowded the IDOC prisons are. The overcrowded conditions, particularly in antiquated facilities, promote transmission of multiple types of infections and contagious diseases. Individuals have no control over the quality of air they breathe via the facility ventilation system; they live in cells or dormitories that have been occupied by others and are

---

[164] TB in Correctional Facilities in the United States, Centers for Disease Control and Prevention as found at https://www.cdc.gov/tb/topic/populations/correctional/default.htm.
[165] HIV in Prisons, 2015 – Statistical Tables , Laura Maruschak and Jennifer Bronson, Ph.D., *BJS* Statisticians; August 2017, NCJ 250641, US, Department of Justice *Bureau of Justice Statistics.*

expected to clean their living area with supplies that are available; they are provided food prepared by inmate workers to eat with silverware and plates cleaned by inmate workers; they are provided linens and clothing that are washed by inmate workers or wash linens themselves with laundry soap that is available; they use toilets, sinks, and showers that are used by many others. Every one of these activities of daily living carries multiple opportunities for communicable or infectious disease transmission and illness for both staff and inmates. Infection control programs in the correctional setting establish and monitor procedures to prevent exposure to diseases that can be transmitted in the correctional setting. Infection control programs also identify sources of infection through screening and take steps to prevent or mitigate infection of others, to treat persons with infectious diseases, and improve the health and safety of staff and inmates by providing information on prevention, education on self-care, and immunizations.[166] These efforts require surveillance of disease by accurate statistical means, both for required reporting purposes and so that the IDOC medical program can understand how to study, plan, and prepare for the care they will need to provide. The infection control program is usually coordinated by a registered nurse with consultation from a designated provider with expertise in infectious diseases,[167] and supported by data collection methods that can reasonably track diseases within the prison system.

**First Court Expert Findings**

The First Court Expert found IDOC's infection control program was a moving target across the system, with some facilities having well developed infection control programs and other facilities having programs described as being in their infancy. Facility health care staff had been provided with an exposure control manual, but IDOC provided no oversight of infection control. At some facilities, no one was clearly designated with responsibilities for infection control, and the duties were simply added to those of the HCUA or DON. Other facilities had identified a specific nurse responsible for infection control, but the duties of the position had not been defined. In addition, no training in how to operate an effective infection control program had been provided to those individuals who had been assigned responsibility for infection control.

Examples of systemic issues described by the First Court Expert which occurred as a result of the disarray in infection control monitoring and lack of oversight from IDOC included the failure to launder bed linens of infirmary patients in water temperatures hot enough to destroy pathogens transmitted by blood and body fluids; negative pressure rooms that were not functional and not monitored to ensure that negative pressure was maintained to prevent transmission of airborne illnesses; lack of proper sanitation of medical equipment;  and lack of disinfection procedures to provide clean surfaces when examining patients.

**Current Findings**

The systemic issues described in the First Court Expert Report still occur today. While there has been some improvement in the use of paper barriers on examination tables, little else has

---

[166]Bick, J. (2006) Infection Control in the Correctional Setting. In M. Puisis, (Ed.) *Clinical practice of Correctional Medicine*. (2nd ed.) Philadelphia: Mosby Elsevier. 230-231.

[167] Lane, M. (2006) The infection control program. In M. Puisis, (Ed.) *Clinical practice of Correctional Medicine*. (2nd ed.) Philadelphia: Mosby Elsevier. 460-461.

changed with regard to the infection control program. The following summary of our findings reinforces the findings of the First Court Expert. We had multiple additional findings that give us concern.

The IDOC has had numerous recent outbreaks of contagious and infectious diseases. Since 2008, there have been several outbreaks of scabies in Illinois prisons. The latest was in Taylorville in 2016, in which the prison was locked down and 214 inmates were treated.[168] In 2012, a norovirus outbreak sickened 140 inmates at SCC.[169] The numbers of inmates affected in these outbreaks reflects poorly on the surveillance and typical preventative measures enacted by infection control procedures to abort the contagion earlier and prevent the widespread infections that occurred at these facilities. An inmate at SCC also contracted Legionnaire's disease in 2015.[170] At the Danville Correctional Center, 78 persons were affected by histoplasmosis in 2013, likely from soil disruption. This outbreak was initially thought to be adenovirus, but required investigation by the federal Centers for Disease Control and Prevention and was found to be histoplasmosis.[171, 172]

Typically, outbreaks such as these are monitored and sometimes managed by the infection control program. Yet in the IDOC, there was no designated individual responsible for infection control at four of five facilities we visited, including at SCC, where one of the outbreaks described above occurred, as well as the isolated case of Legionnaire's disease. At SCC, infection control duties were dispersed amongst several staff nurses, the DON, and the HCUA, and the program was not effective. The norovirus outbreak at SCC was large, and typically early infection control measures would be expected to reduce the size of such an outbreak. At the same four facilities there were no schedules for routine sanitation and disinfection of health care areas. Basic maintenance of rooms was lacking. MCC has an extensive collection of policies and procedures that detail cleaning and sanitation of every room in the health care building.

At MCC, responsibility for infidoc control resides with one of the nursing supervisors. Her responsibilities are managing TB surveillance, performing sanitation inspections, ensuring food handlers are cleared for work, monitoring skin infections, interface with the Illinois Department of Public Health, monitoring negative pressure rooms, and monitoring hygiene in clinical spaces. In addition, she manages HIV and hepatitis C clinics, coordinates follow-up of patients treated for TB infection, and provides supervision of inmate peer educators. It is our opinion that the infection control nurse is an essential component of the health care program at IDOC facilities and is a full-time position.

---

[168] Scabies Outbreak Causes Temporary Lockdown of Taylorville Prison, Doug Finke, The State Journal Register, September 19, 2016.
[169] Norovirus Outbreak Hits Illinois Prison; Food Safety News December 29, 2012.
[170] Stateville Inmate Diagnosed with Legionnaire's Disease, Dawn Rhodes, Chicago Tribune August 12, 2015.
[171] New details regarding illness among inmates at Danville Correctional Center. Found at https://www2.illinois.gov/idoc/news/2013/pages/danvillecillness.aspx.
[172] Centers for Disease Control and Prevention website Outbreaks and Investigations lists Histoplasmosis in an Illinois Prison. Details given were that this occurred in August-September 2013 with 78 cases and likely related to disruption of soil containing bird droppings. Found at https://www.cdc.gov/fungal/outbreaks/index.html.

We observed significant challenges to safety and sanitation at every facility visited. For example, at SCC we observed cockroaches, gnats, and flies in the infirmary; the room used for hemodialysis (considered a sterile procedure) had peeling paint on the walls, there was standing water on the floor, and the garbage can was not covered. The kitchen/dining area was occupied by birds, and their droppings were evident on the walls and floors. At Dixon, all three floors of the medical building had missing floor tiles, which is a sanitation issue in an area dedicated to the delivery of health care.

NRC is the only facility among the five we visited that does not conduct monthly safety and sanitation inspections. At the other facilities, safety and sanitation inspections do not adequately identify problems requiring remediation. For example, we found faulty negative pressure isolation rooms and nonfunctional dental equipment that were not identified because they are not included in the safety and sanitation inspections. We also found furniture, equipment, and hard surfaces (floors, ceilings, sinks, cabinetry) were rusted, broken, or deteriorated in health care areas at all facilities, which had not been documented as issues needing repair on safety and sanitation rounds.

Moreover, review of safety and sanitation findings in the minutes of CQI meetings document the persistent failure or lengthy delay in remedying identified problems. Safety and sanitation inspections should inspect or monitor the condition, function, and annual certification of clinical equipment, functionality of the negative pressure rooms, integrity of bed and chair upholstery, completeness of medical cart and emergency response bag logs, the training of health care unit porters, and other health care issues.

The TB prevention and control program in IDOC is not effective. The hallmarks of an effective TB program in correctional facilities are: initial and periodic TB screening, successful treatment of TB disease and infection, appropriate use of airborne precautions, comprehensive discharge planning, and thorough and efficient contact investigation when a case of TB disease is identified.[173]

At IDOC, TB screening is improperly performed, treatment of infection is delayed, and negative pressure rooms (an airborne precaution) often are not functional or monitored. We did not evaluate TB discharge planning or contact investigation, although in the absence of an individual assigned responsibility for infection control, these interventions are most likely sporadic and haphazard as well. At NRC, nurses do not read tuberculin skin tests properly and only document results in the health record when they have time. Instead of inmates being escorted to the medical clinic for nurses to read their tuberculin skin tests, nurses must go cell to cell. In addition, NRC officers do not open the food port for inmates to extend their arm for nurses to palpate and measure the results of the test. Instead, nurses read the test by looking through the glass window of the cell door, which is inappropriate technique.[174] There was

---

[173] TB in Correctional Facilities at https://www.cdc.gov/tb/topic/populations/correctional/, Epidemiology of Tuberculosis in Correctional Facilities 1993-2014 at https://www.cdc.gov/tb/publications/slidesets/correctionalfacilities/default.htm.
[174] A tuberculin skin test is read by manually palpating the size of induration of the test site with good overhead lighting. To read a tuberculin skin test through a glass window is inappropriate.

evidence in the review of records that other sites distrust TB screening performed at reception centers and rescreen inmates upon arrival at their parent facility. We also observed that nurses at Dixon merely look at the skin test site through the cell door rather than palpating and measuring induration in a well-lit area. We did not observe nurses reading tuberculin skin tests at all facilities, but based upon the two sites where we observed poor practices, we conclude that TB screening at IDOC is not adequate.

We reviewed the records of four patients who had completed treatment for latent TB infection. In three cases, the patient was subjected to multiple skin tests (which were positive) and multiple chest radiographs, which were unnecessary, before treatment was finally initiated. In the other case, treatment was initiated even though skin testing was ordered but never completed, based upon a history of a positive skin test reported by the inmate when he requested treatment initiation. Initiation of treatment for latent infection was haphazard and delayed.

Negative pressure isolation rooms were either not functional or the monitor was not working at three of the five sites we visited. At NRC, the monitor in one room was not working and in the other room the vent was taped shut, disabling the negative pressure. At SCC, neither room was functional and the equipment had not been serviced for years. At LCC, two of three rooms were not functional. Negative pressure rooms need to be maintained and ready for use; this is not the case in the IDOC, and places patients and staff at risk of airborne infection.

The UIC provides treatment of inmates with HIV and hepatitis C via telemedicine. For hepatitis C, UIC has no role in managing hepatitis C patients before referral and after antiviral treatment and has no role in screening for these diseases. UIC provides no assistance in managing other complications of hepatitis C including cirrhosis, varices, or ascites as examples. IDOC facility providers are responsible for that care but do not appear to know how to provide it. One or more nurses are designated at each site to coordinate these clinics and the care of these patients. The quality is highly dependent upon the interest and capability of each nurse assigned these responsibilities. There is no one identified to monitor or oversee the work of the clinic coordinators, who must negotiate with all the other users of the telemedicine space to schedule clinics timely. Coordination between the UIC infectious disease specialists and primary care providers is problematic, as evidenced in the example of one patient with HIV; the specialist recommended lowering the patient's dose of metformin (a medication used to treat diabetes) because of an interaction with one of the HIV medications prescribed.[175] The primary care provider at the facility responsible for the patient's diabetic care never acted on the recommendation. The HIV specialist reduced the dose of metformin at the next visit. The patient was at risk of clinical deterioration because of the primary care provider's omission for five months.

IDOC has adopted what it describes as opt-out HIV testing at intake, but policy and practice are not consistent with the use of this term. Opt-out testing is recommended by the Centers for

---

[175] Dixon Infection Control Patient #3.

Disease Control because it supports early identification and treatment.[176] The IDOC Administrative Directive still requires that consent be obtained before drawing blood for HIV, and in practice this consent is still obtained.[177] The practical effect is that fewer newly arriving inmates are screened for HIV as compared to hepatitis C. The IDOC should revise the Administrative Directive to eliminate the requirement for written consent and initiate opt-out HIV testing.

We also question the effectiveness of periodic screening programs for HIV and hepatitis C infections. We noted on one death review[178] a man who was not known to be HIV infected and was not offered HIV screening at two annual health evaluations we reviewed, despite having a history of multiple sexual partners, prior blood transfusions, and a history of sexually transmitted disease all of which were risk factors for HIV infection. He ultimately developed severe HIV disease, which was unrecognized for several years until he was finally admitted to a hospital, where he died of severe complications of his undiagnosed and untreated HIV disease. Sentinel cases such as these should prompt an investigation into why the system failed to timely screen, diagnose, and treat this patient, whose death was preventable. The infection control nurse should monitor results of HIV and HCV screening to verify that policies to screen for communicable diseases are effective.

All five of the facilities visited report cases of culture positive *Methicillin-resistant Staphylococcus Aureus* (MRSA) as is required by IDOC. However, only MCC tracks all skin and soft tissue infections (independent of whether a culture is performed) as recommended by the First Court Expert. In addition, tracking should include culture and sensitivity results to ensure correct antibiotic selection and housing location of the patient. Infection control nurses should review tracking results to identify clusters of infections by housing unit, perform additional case-finding, and identify environmental factors that may be promoting infection. Factors in correctional settings found to contribute to skin and soft tissue infections include sharing towels and soap, ineffective laundry practices, poor sanitation of exercise equipment and showering facilities, poor hygiene practices, unnoticed infections that leak pus, and poor access to medical care.[179] Tracking enables sources of infection to be identified and steps taken to eliminate factors associated with disease transmission. For example, at MCC one of two cases of skin infection reviewed was a patient who developed infection six days after hernia surgery and having been returned immediately to general population at the facility.[180] This case of soft tissue skin infection raises questions about the ability of the patient to adhere to wound care instructions and suggests consideration of a policy of admitting inmates to the infirmary only after it is determined that the patient is stable and able to adhere to wound care instructions.

---

[176] Opt-out testing means that testing will be performed unless the patient refuses the test. Opt-in testing means that the patient is offered testing and it is performed only upon patient consent. The IDOC has large rates of refusal of HIV testing, unlike other similar correctional centers that offer opt-out testing. Opt-out testing generally raises the rates of screening.

[177] Administrative Directive 04.03.11 Section5 II. F. 5. d.

[178] Mortality Review Patient #22.

[179] Smith, S. (2013) Infectious Diseases. In L. Schoenly and C. Knox (Eds.) *Essentials of Correctional Nursing*. New York: Springer. P. 189.

[180] MCC Infection Control Patient #7.

The IDOC requires a monthly report of communicable diseases and infection control data. This report includes items such as the number of MRSA cases, HIV and HCV tests performed, the number of tuberculin skin tests administered, the use of negative pressure rooms, etc. We found that these reports are submitted to the Quality Improvement Committee (QIC) and included in the monthly minutes. However, there is no trending or analysis of infection control data. There is no discussion in the infection control report or CQI minutes of, for example, why only half of incoming inmates are tested for HIV, given the statewide opt-out policy. A more notable example of the lack of introspection about communicable and infectious disease are three needle stick injuries which occurred in 2017 at Dixon, and the fact that there has been no focused review of these injuries to determine what measures would increase worker safety.

We found numerous examples of poor infection control practices on the part of health care professionals. At all facilities, inmates are not routinely provided eye protection during dental procedures. At NRC, the dentist examined patients without changing gloves between patients and reached into a bag of sterile mirrors to select one for use, contaminating all the other mirrors which were then used on subsequent patients. At SCC, the hemodialysis unit does not have a dedicated chair and technician for dialysis of patients who have hepatitis B, thereby exposing other dialysis patients to this blood borne infection. At NRC and SCC, paper barriers are not available to use on any of the examination tables and they are not cleaned between patients. Finally, the order in which instruments were sterilized was incorrect in four of five facilities we visited. The placement of sterilization equipment and procedures should proceed from dirty to sterilized. At four of five facilities we visited, the placement of the ultrasonic cleaner required clean instruments to pass over the dirty area, thus contaminating their sterilization. At SCC, sterilized instruments were removed from their packages and put in an open bin in the trauma room, making them clean, rather than sterile, instruments. The nursing supervisor could not explain why these instruments were clean rather than sterile.

Inmate porters are assigned to work in the health care areas of each of the five facilities we visited. At only two of the facilities had the inmate porters received training in how to clean and sanitize patient care areas, and how to take personal protective measures before working in the health care area. Only two facilities had vaccinated the inmate porters for viral hepatitis. The assignment of untrained and unvaccinated inmates to clean and sanitize health care areas exposes these inmates as well as patients receiving care to several infectious diseases with potentially serious health consequences, and is deliberately reckless.

Infirmary linens are still laundered in residential style washers and dryers at all the facilities we visited, except NRC. At NRC, a log provided by the institution showed water temperatures were less than the 165°F required by AD 05.02.180 about 30% of the days reviewed. Water temperatures were not hot enough to effectively sanitize laundry from the infirmary at any facility we visited. We also observed furniture and equipment throughout each of the health care areas at every facility we visited that was torn, frayed, rusted, and corroded. These objects, including stretchers, exam tables, stools, cabinets, and work surfaces cannot be properly sanitized and are sources of communicable disease in a setting that treats and cares for patients who are ill, medically fragile, and immunocompromised. While some have been

identified as needing repair or replacement, the safety and sanitation rounds do not often include these health care areas and there is no effective tracking of the repair or replacement of these items. It is understood that it takes time to repair or replace worn equipment, but in IDOC the volume of items needing repair and the length of time that unacceptable conditions linger indicate pervasive and systemic problems with environmental controls to prevent communicable disease.

The First Court Expert noted that the Communicable and Infectious Diseases Coordinator in the Office of Health Services retired some time ago and that the position was never filled. That is true today as well. There is no one in the Office of Health Services who has responsibility statewide to direct and oversee infection control in the IDOC. The IDOC also does not have an infectious disease physician responsible for directing infection control activity within the department. The Infection Control Manual was last updated in 2012, and many of the resources in the manual are out of date or more current material is available. The facility health care programs have some policies and procedures for infection control, but we found these also not up to date. Nursing Treatment Protocols are also provided by the IDOC for possible infections such as scabies, rash, urinary infection, pediculosis, chicken pox, and skin infections. These were last updated in March 2017 and are adequate, but stand-alone rather than as part of a comprehensive infectious disease program. The need for statewide oversight is evident to resolve issues, such as the conflict between the IDOC practice of HIV opt-out testing and the AD, to eliminate the continued insufficient laundering of infirmary linens, to address the problem of needle stick injuries, to provide meaningful analysis of communicable disease surveillance, and to provide guidance to facility health care programs on infection control performance expectations.

## Mortality Reviews

**Methodology:** We interviewed the Agency Medical Director and senior leadership of Wexford, reviewed death summaries, and reviewed death records.

### First Court Expert Findings
The First Court Expert and his team evaluated a total of 63 deaths records. There were one or more significant lapses of care in 38 (60%) of cases. Of cases with significant lapses, 34 (89%) had more than one lapse. The internal IDOC mortality review process was seriously flawed. Reviews are performed by the doctor most closely involved in care of the patient. Twenty (52%) of death summaries were reviewed. In none were any lapses of care identified. Only a few deaths were reviewed by the Office of Health Services, but these were selected based on lapses identified by local review. The First Court Expert found that for many patients who were chronically ill with terminal conditions there were no resources in place to assist health care staff with management of end of life symptoms. As well, the First Court Expert found that once a patient signed a do-not-resuscitate order, they were no longer treated even for simple reversible illness.

### Current Findings

We confirmed all the First Court Expert's findings and found additional evidence of clinical lapses of care with respect to deaths. We added a perspective of preventable deaths because preventable deaths reflect the degree of harm to patients.

The U.S. Department of Justice (USDOJ) tracks inmate deaths.[181] For 2014, the latest year of available statistics, The IDOC had the sixth lowest mortality rate (182/100,000 inmates) of the 50 state systems. The average mortality rate of state correctional systems was 275 per 100,000 inmates. The IDOC, in their comments on our report, assert that "the low IDOC mortality rate would be representative of a health system functioning at or above the norm of its comparators."[182] However, these data are not adjusted[183] for any risk or variable. According to the Department of Justice authors, "overall mortality rates and mortality rates by state and by cause of death may not be directly compared between states due to differences in age, sex, race or Hispanic origin, and other decedent characteristics."[184] It is misleading to use crude mortality rates alone to compare quality of health care of different prison systems without any adjustment for these multiple variables.[185]  As the IDOC states later in their comments on our report, specifically about use of hepatitis C and age as they relate to mortality, "One would have to conduct an adjusted multivariable statistical analysis with complete and comparable data from all other state DOCs to examine the independent contributions of age and hepatitis C to the variation in mortality rates across systems." We agree with that statement and note that to the best of our knowledge, reliable risk, age, and sex adjusted mortality rates are not available, allowing for use of crude mortality data to compare medical care between state prison systems.

The Court has asked the Expert to "assist the Court in determining whether the Illinois Department of Corrections (IDOC) is providing health care services to the offenders in its custody that meet the minimum constitutional standard of adequacy." We have used mortality review to identify quality of care and systemic issues that can provide definitive information in

---

[181] Mortality in State Prisons, 2001-2014 – Statistical Tables; Margaret Noonan, US Department of Justice, Bureau of Justice Statistics, December 2016, NCJ250150.
[182] Letter via email from John Hayes and Michael Arnold, Office of the Attorney General to Dr. Puisis: Re: *Lippert v. Baldwin,* No. 10-cv-4603 – Defendants' comments to the Draft Report of the 2nd Court Appointed Expert dated September 10, 2018.
[183] Adjusting allows for comparison of different populations by reducing variations and to standardize populations. Adjustment is a statistical technique to reduce variability between populations when multiple variables affect the outcome. This allows for different populations to be compared.
[184] Page 2, bullet on Deaths reported by state in Mortality in State Prisons, 2001-2014 – Statistical Tables; Margaret Noonan, US Department of Justice, Bureau of Justice Statistics, December 2016, NCJ250150.
[185] To support the assertion that the IDOC mortality rate indicates above average medical care, the State references a study from Centers for Medicare & Medicaid Services (CMS). This study was a study of hospitalized patients. CMS used a "risk-standardized rate of mortality within 30 days of hospital admission" for their study and studied only patients over 65 years of age. According to the CMS report (Hospital-Side All-Condition, All-Procedure Risk-Standardized Mortality Measure: Draft Measure Methodology for Interim Public Comment prepared by Centers for Medicare & Medicaid Services (CMS) October 2016 as found at https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-Instruments/MMS/Downloads/Hospital-Wide_All-Condition_All-Procedure_Risk-Standardized-Mortality-Measure_Public-Comment.pdf) they adjusted for case mix, types of conditions, and procedures of patients; did not include patients if 30-day mortality could not be reasonably considered a signal of quality; and did not include patients under 65 years of age. This methodology does not make the case that use of crude prison mortality can be used as a measure of quality of medical care, as the crude mortality rates did not adjust for any variables affecting prison populations.

answering the Court's question. We performed in-depth evaluations of 33 deaths. These mortality reviews identified numerous quality of care issues that are systemic and are important in answering the question required by the Court. These reviews demonstrate significant systemic and quality of care issues that were confirmed in site-visit record reviews, on-site observations, and interviews.

Of the deaths that occur, it is critical to understand whether mortality is preventable or demonstrates correctable errors. For this purpose, correctional programs typically perform organized mortality review. Organized mortality review should be performed for every death. Participants in this review should be senior physicians, administrative and nursing staff, and other senior leaders of relevant disciplines whose services may have had an impact on the death (e.g., pharmacy, mental health, etc.). Generally, most correctional centers include a custody representative in mortality review meetings. Persons directly responsible for care of the patient are interviewed for their perspective on the care they rendered. However, persons who cared for the patient should never be placed in positions of reviewing the death, as they could not be expected to give an unbiased review.

Mortality reviews typically review care as far back as necessary to understand the evolution of the patient's illness and can be six months to a year or more. Mortality reviews should be constituted as to identify errors and problems with care. These errors and problems need to be addressed in a follow-up manner (typically through quality improvement corrective actions or investigations) so as to prevent the error or problem from occurring again.

There were 174 deaths in the IDOC in 2016 and 2017.[186] We intended to review 89 death records but because of time limitations we were only able to review 33 (19%) deaths from 12 facilities, which is a sample of 46% of the IDOC facilities. Eleven of 33 deaths were preventable. Eight of 33 were possibly preventable. Nineteen (58%) of the 33 deaths reviewed were either preventable or possibly preventable. This is an extraordinary number of preventable or possibly preventable deaths and speaks to the ongoing serious harm to patients from care in the IDOC. We do not assert that this sample can be extrapolated to the entire population. However, even if there were only 19 preventable or possibly preventable deaths out of the 174 deaths, that would be 11% of the deaths, which is still a very high number. Our findings confirmed the First Court Expert's report that none of the Wexford death summaries identified any problems. All of the Wexford death summaries that we were provided were performed by physicians who were responsible for care of the patient and failed to identify any problems, even when grossly and flagrantly unacceptable care was provided.

We reviewed two years of care as documented in the health record for most of the 33 deaths. The reviews were detailed reviews of individual episodes of care. We have provided the spreadsheets which give detail on every episode of care reviewed as well as detailed narrative

---

[186] Defendants stated in their comments that we requested 174 death records, but this was inaccurate. There were a total of 174 deaths in 2016 and 2017. Of these deaths we chose 89 records to review. We asked to receive death records in December 2017, but did not receive records until March 2018 and received almost all records by April of 2018, well into our investigation.

summaries for each death.[187] We identified 1757 errors in care. Many of these were common errors, but many were serious. These errors reflect poor primary care knowledge and training. Most were related to primary care functions, such as taking adequate history, examining the patient, and developing a treatment plan, which accounted for almost half of errors. In our opinion, this demonstrates the lack of primary care training of the medical staff. About 8% of errors were nursing errors related to nurses not referring or consulting a physician for serious problems such as abnormal vital signs, red-flag symptoms or signs, or other serious abnormalities. Approximately 10% of errors were related to not referring a patient to a specialist or for special testing. This verifies our finding that significant underutilization occurs in the IDOC. About 5% of errors were related to not timely sending patients to a hospital for evaluation. Many of these errors contributed significantly to the deaths.

The 33 death record reviews contained 73 episodes of grossly and flagrantly unacceptable care. For a few record reviews, there was a repetitive pattern of inappropriate care that in aggregate constituted grossly and flagrantly unacceptable care. This type of care is so egregious that it would typically result in a peer review for possible reduction of privileges or referral to licensing boards for evaluation of sanction of their license. These are serious errors. A sampling of these included the following:

- A 30-year-old man was in the process of valve replacement surgery for a congenital heart condition when he was incarcerated.[188] IDOC physicians failed to contact his cardiologist and his planned surgery was never recognized, even though a letter from his civilian cardiologist recommending surgery was in the IDOC medical record. He was routinely referred to UIC cardiology, who requested an echocardiogram and old records because the history was uncertain. The echocardiogram report documented that valve surgery was indicated. This report was never obtained or reviewed. When the patient developed arrhythmia, hypotension, and near syncope, a doctor failed to take action. The patient's diagnosis was unknown for six months of incarceration and he died of complications of his congenital heart problem without IDOC physicians ever knowing what his diagnosis was.

- A patient had diabetes, decompensated cirrhosis, and an unknown skin condition.[189] She developed fever (101.8°F), hypotension (88/50), and periorbital swelling. Her condition indicated sepsis and warranted hospitalization, yet the patient was treated without a diagnosis with oral Bactrim, pushing fluids, and Tylenol with infirmary admission by phone consultation. The doctor stated he would consider laboratory tests and a chest x-ray in the morning. The next day, the doctor noted right upper quadrant pain with a distended abdomen. The doctor ordered routine labs and diagnosed fever. Two days after infirmary admission, the doctor referred the patient to a hospital when the blood pressure was 60/palpable. When the patient returned from the hospital there

---

[187] The spreadsheet detailing episodes of care is included as an appendix to this report. Also, a table of the breakdown of the 1757 errors is also listed as an appendix to the mortality narrative summary.
[188] Mortality Review Patient #2.
[189] Mortality Review Patient #6.

was no report and it was not clear that staff knew what occurred. The day the patient returned from the hospital, she vomited dark red emesis and was hypotensive (75/48). The only order was to "continue present management." The patient had repeated episodes (four) of bloody emesis during the night. The doctor was called at home but took no action. In the morning and when the patient was in shock, the doctor obtained a "do not resuscitate" (DNR) order from the patient. Her barely legible signature did not match her typical signature and the signature appeared to have been obtained under duress. After obtaining a DNR, the doctor sent the patient to the hospital, where no intervention was taken because of the DNR order. The patient expired of bleeding varices.

- A 51-year-old had headache, complaint of fever, and vomiting.[190] Treatment for this condition was infirmary admission, IV fluid, and intravenous antibiotics for presumed pharyngitis. These signs were inconsistent with pharyngitis. The patient continued to vomit, yet continued to be managed for pharyngitis. The provider ordered labs on the second infirmary day that were not done. Later, on the second day on the infirmary, the patient developed altered mental status and hypothermia, and was not responding. These are red-flag signs. The patient was not sent to a hospital despite signs of acute sepsis. No laboratory tests had yet been done after two days of infirmary housing. On the third infirmary day, the patient was found on the floor and would open his eyes only to severe stimulus. He was not sent to a hospital until he was found unresponsive and in shock (BP 68/palpable). The patient died in the hospital; there was no autopsy.

- A 45-year-old mentally ill man developed a firm neck mass.[191] He was initially diagnosed with parotitis, even though the parotid gland is on the face, not the neck, and the parotid gland demonstrated no evidence of infection. There was therefore a two month delay in diagnosing his neck cancer. After four months, the patient was still awaiting treatment when he passed out and had hypotension (60/40). This warranted hospitalization. The doctor diagnosed loss of consciousness; the plan was to place the patient on the infirmary for observation without ordering any diagnostic testing. Radiation therapy was started. About a month after radiation started, the patient was hospitalized for chemotherapy. A day after return from the hospital, the patient was found on the floor and was lethargic and unresponsive. A nurse called a doctor who ordered "neuro checks," but did not send the patient to a hospital. The following day, the patient had a single dilated pupil consistent with brain damage, a red-flag sign that should have resulted in immediate hospitalization. The doctor ordered morphine for unclear reasons. Later that day a doctor evaluated the patient and noted that the patient had a fall the day before. The doctor did not examine the patient and apparently failed to note the dilated pupil. The doctor took no action except to increase morphine. The following day the patient was found unresponsive and was sent to a hospital, where

---

[190] Mortality Review Patient #7.
[191] Mortality Review Patient #8.

he died. A hospital EKG showed that the patient was in atrial fibrillation. One of the side effects of atrial fibrillation is stroke, which may have accounted for the dilated pupil.

- A 24-year-old with mental illness swallowed two plastic sporks (combination spoon and fork) that was witnessed by a correctional officer.[192] A doctor did not evaluate the patient but ordered an x-ray, which would not likely show the ingested plastic item. The x-rays were normal. About two and a half months later, a nurse practitioner evaluated the patient. The NP failed to recognize a 33-pound weight loss, but the patient did tell the NP that he had swallowed a spork a long time ago and needed it removed. The NP made an assessment that the patient had an ingested spork but took no action. The patient remained untreated and eventually lost 54 pounds and had repeated episodes of abdominal pain with an inability to eat without pain, nausea, and diarrhea. Eventually the patient was found unresponsive, was sent to a hospital, and died. On autopsy, the two swallowed sporks were found having caused esophageal perforation, which was the cause of death.

- A 70-year-old man with atrial fibrillation and severe bradycardia needed and received a pacemaker.[193] Two years after the pacemaker was inserted, the patient experienced leg edema, weight gain, and had signs of heart failure (BNP 712; shortness of breath, orthopnea, and edema). Although the doctor noted a heart rate of 44 and questioned whether the pacemaker was functioning, the doctor took no action with respect to the pacemaker. An EKG showed aberrant ventricular conduction with ventricular escape, indicating pacemaker malfunction. The patient needed immediate hospital admission, but the doctor only admitted the patient to the infirmary and treated for heart failure on the infirmary. The patient continued to have low heart rate and began complaining of chest pain. If the pacemaker was functioning, the heart rate would not be expected to fall below the set point of the pacemaker, so it was clear the pacemaker was not functioning. Yet the doctor took no action. Two days later, the patient was found dead.

- A 75-year-old man experienced weight loss and anemia, yet was never offered colonoscopy.[194] He had pancytopenia, which corrected to anemia; and thrombocytopenia, low albumin, and weight loss, but was not evaluated for these problems. He had a prosthetic leg from prior amputation from osteomyelitis and the prosthesis was causing an ulcer. Wexford initially denied repair of the prosthesis but then authorized a limited repair, which failed to correct the problem. The patient began using a wheelchair because of the problem with the prosthesis. After using the wheelchair, the patient developed a pressure ulcer on his buttock which was inadequately monitored. The patient was kept in general population. The ulcer began draining pus and a sedimentation rate of 60 indicated possible osteomyelitis (infection of bone), yet no evaluation occurred. The pressure ulcer worsened, yet providers failed

---

[192] Mortality Review Patient #15.
[193] Mortality Review Patient #18.
[194] Mortality Review Patient #19.

to manage the pressure ulcer in accordance with contemporary standards, and appeared not to know how to manage the patient. Instead of referring to a skilled nursing unit, the patient was still housed for a long period of time in general population. Nurses described a tunneling wound draining pus and at one point even showing bone, yet providers failed to document a thorough examination of the wound and even described the wound as "healthy," without ordering any diagnostic studies to eliminate osteomyelitis. The patient lost 42 pounds. Despite these abnormal findings, the patient was kept in general population, where eventually a cell mate reported that the patient had not eaten in two days. A nurse placed the patient on the infirmary and called a doctor, who ordered IV antibiotics by phone without diagnosis. Later that day, the patient was found unresponsive and was sent to a hospital, where he died. He had overwhelming sepsis, with both bacteria and fungus growing in blood cultures, likely from his infected pressure ulcers.

- Another 72-year-old patient was inadequately evaluated over an eight-month period for abdominal pain, but eventually was sent to an emergency room, where a CT scan showed a large retroperitoneal mass consistent with cancer.[195] The patient was sent back to the prison with a recommendation for outpatient work up. One would expect this to be worked up within weeks. This did not occur. The patient had lost 50 pounds. Over three subsequent months a work up did not take place, although referrals were made. The patient was not monitored well. Eventually, while in general population, the patient developed pressure ulcers and had significant weight loss, yet he was not housed on the infirmary. Three months after the diagnosis of the mass, the patient was admitted to the infirmary only because *security* complained that he could not be managed in general population. He was admitted as a chronic care patient. The day following admission to the infirmary, a doctor noted that the patient was confused, which was a red-flag sign, but undertook no evaluation. This was a new diagnosis and the patient should have been hospitalized. Two days later, the patient remained confused and was incontinent but was still not evaluated or sent to a hospital. That day the patient became delirious and was talking to people in his cell who weren't there. A nurse referred the patient to mental health. Two days later, the patient still had no evaluation and was noted to be lethargic, confused, mumbling unintelligibly. A doctor took no action. Later that day the patient was sent to a hospital for lethargy and uneven respirations. The patient died in the hospital never having a diagnosis of his retroperitoneal mass found over three months ago.

- Another 46-year-old man had neutropenia[196] for over three years without appropriate evaluation.[197] The patient had intermittent fevers and altered mental status for over a year without appropriate evaluation. The patient had confusion and was incontinent without recognizing that it was inappropriate, yet evaluation for serious central nervous

---

[195] Mortality Review Patient #21.
[196] Neutropenia is a low white count. In this case the patient had low lymphocytes, one of the white blood cell types. This element, when low, is consistent with HIV infection and should have prompted that test.
[197] Mortality Review Patient #22.

system disorder was not done. The doctor, who was a surgeon, inappropriately believed that the patient had lupus, a collagen vascular disorder, which was an incompetent diagnosis and unquestionably related to his lack of primary care training. A rheumatologist initially refused to see the patient because the patient did not have serologic evidence of lupus. A rheumatologist eventually saw the patient almost a year later and again confirmed that the patient was unlikely to have lupus. Despite the confusion, the patient was kept in general population. Eventually, the doctor provided the patient with an assistive device without attempting diagnosis of his difficulty ambulating. The doctor took virtually no history and performed virtually no examinations for extended periods of time. The patient was mistakenly given methotrexate, a medication that can lower white counts. Eventually the patient was unable to walk and was given a wheelchair. When he developed severe hypoxemia (70%), hypotension (90/66) and tachycardia (128), he was sent to a hospital, where septic shock and HIV infection were diagnosed. He died in the hospital with an AIDS-related central nervous system disorder and disseminated systemic infection, never having been appropriately evaluated at the prison for his problem. The patient was described as having multiple pustular lesions on his left leg, right foot, right hip, penis, and abrasions on the hip and shoulder, none of which were recognized at the prison. The patient also had severe unrecognized malnutrition. We incidentally note that this patient was evaluated at least twice on annual examinations and had risk factors for HIV infection (blood transfusions, multiple sexual partners, and a sexually transmitted disease), and yet was never offered HIV testing.

- Another patient had hepatitis C and cirrhosis evident as early as June of 2012, yet facility providers failed to list cirrhosis as a problem and did not monitor the patient for this condition.[198] Doctors did not initially order tests typically ordered for cirrhosis (EGD to screen for varices and ultrasound to screen for hepatocellular carcinoma) and the patient was not monitored for ascites. In May of 2015, the patient eventually received an ultrasound, which showed a liver mass. A CT scan later that month confirmed a liver mass. The patient was referred for interventional radiology for a biopsy in August 2015, but this was denied by Wexford UM and instead an MRI was recommended. The reason was unclear, as a biopsy was indicated. An MRI was done in October but a biopsy was never done. The patient developed hypoxemia (oxygen saturation of 79%) with hypotension (96/64) and the patient was admitted to the infirmary, but should have been admitted to a hospital. The day following admission to the infirmary the patient developed fever, but no action was taken. The patient had massive ascites, fever, hypotension, and hypoxemia, yet was kept on the infirmary. The following day the patient again developed hypotension (88/60) and hypoxemia (84%) on four liters of oxygen and was sent to a hospital, where he died. The delay in transfer to a hospital contributed to his death. He also never had a biopsy of his liver mass and therefore never had a diagnosis.

---

[198] Mortality Review Patient #23.

- Another patient was being treated for a lymphoma but treatment was delayed four months.[199] The chemotherapy treatment resulted in low white counts, for which medication was prescribed (Granix) to be administered after chemotherapy to raise the white count. After one of the chemotherapy sessions, the patient failed to receive the Granix. After this error, the patient developed fever and inability to stand independently. This was a red-flag sign indicating infection and warranting hospitalization, but instead the patient was placed on a medical housing unit without any diagnostic intervention. Two days later the patient had nausea and diarrhea and fever of 101°F. This was a life-threatening status and red-flag warning, and the patient should have been admitted to a hospital; instead, a doctor started oral antibiotics without ordering laboratory tests (WBC, platelets, blood cultures, or other diagnostic tests for infection). The following day the patient was hypotensive (90/60) and felt sick, but no action was taken. On the third day on the medical housing unit the patient developed pus draining from his ear, a red-flag sign in a potentially neutropenic patient, yet the doctor only ordered a blood count and metabolic panel, tests which were never done. The following day the doctor again noted pus coming from the ear and ordered intravenous Levaquin for otitis externa, which is not a typical plan for otitis externa. This patient needed admission to the hospital, as he had life threatening status. He was not seen for three days when he was found unresponsive, bleeding from his mouth and penis, with a 101°F fever and in shock. He was finally hospitalized. The bleeding and fever were most likely due to complications of his chemotherapy, after which the patient failed to receive necessary medication. The patient apparently expired in the hospital.

- Another patient, a 66-year-old African American man with history of hypertension, high blood lipids, diabetes, asthma, and chronic kidney disease was only being monitored for hypertension, diabetes, asthma, and high blood lipids.[200] He had poorly controlled diabetes, was a smoker, and had hypertension yielding a 46% 10-year risk of heart disease or stroke, yet was only on a low-intensity statin. His diabetes was poorly controlled for two years. The patient had repeated episodes of shortness of breath with exertion yet was not evaluated with appropriate testing (EKG, echocardiogram, stress test, or pulmonary function test), even though the diagnosis was uncertain. Shortness of breath can be a sign of angina. On 1/28/16, a doctor saw the patient for chest pain with elevated blood pressure (169/94). The EKG was equivocal, showing non-specific STT wave changes, which can be consistent with angina. The doctor, however, noted no acute changes on the EKG and told the patient he would need a cardiac treadmill *after* he paroled. The doctor increased Norvasc for the blood pressure. This was indifferent, as work-up of the angina should not be delayed until the patient paroled. Ten weeks later, the patient experienced shortness of breath and oxygen saturation of 85%. A doctor started Lasix by phone, but the oxygen saturation decreased to the 60s. The

---

[199] Mortality Review Patient #25.
[200] Mortality Review Patient #28.

patient was sent to the hospital, but expired. Autopsy showed an active plaque rupture consistent with myocardial infarction.

- Another patient had prior traumatic injury resulting in a VP[201] shunt in his brain.[202] He also had seizure disorder and history of deep vein thrombosis. The patient also had an IVC filter,[203] but this was unrecognized at IDOC facilities. He was also treated with Coumadin, an anticoagulant, and aspirin. The reason for being on aspirin was not documented, but this placed the patient at risk for life-threatening bleeding. There was no indication for aspirin. IVC filters are typically used when there is a contraindication to anticoagulation, such as the repeated seizures the patient had. When an IVC filter is used in conjunction with anticoagulation medication, a specialist should be consulted. Typically, when an IVC filter is used, the patient is not treated with anticoagulation. The patient had repeated seizures but was nevertheless not sent to a neurologist, although doctors could not manage the seizures. The patient was transferred to the Hill facility; after transferring he experienced repeated seizures and was hospitalized. The patient was found to have pseudoseizures.[204] After hospitalization, the patient was admitted to the infirmary. On admission, a NP noted that the patient had ataxia and unequal pupils, which are red-flag signs of central nervous system disease. The patient had a recent normal CT scan in the hospital. Nevertheless, unequal pupils and ataxia, particularly in a patient with a VP shunt, are serious signs which warranted immediate re-hospitalization or confirmation with the hospital regarding the prior diagnoses. The patient was unsteady, and instead of hospitalizing the patient, the NP placed his mattress on the floor. The patient remained on the infirmary for three weeks. The patient experienced progressively deteriorating altered mental status. He was noted by nurses to be unable to stand, incontinent, and not responsive for several weeks. Yet during this time there was no adequate neurologic examination of the patient, despite his ataxia and unequal pupils. The patient also developed bruising over elbows, then buttock, back, arms, and legs. Yet despite being on Coumadin and aspirin, the doctor did not order an INR a test to measure whether the patient was over anticoagulated. The grossly and flagrantly unacceptable care continued for weeks until the patient began urinating blood. Still, the doctor only incompetently treated for a presumed UTI. The doctor still did not check an INR. The patient had gross bleeding for several days with bleeding from urine, from bruises on his back, from a nasal laceration, and in his stool. He developed bleeding around his eyes spontaneously. Still no action was taken. Finally, a nurse found the

---

[201] Normally, cerebrospinal fluid circulates in the ventricles of the brain. Due to injury or congenital abnormalities, there may be defects which cause the cerebrospinal fluid to accumulate, causing excess pressure on the brain. In order to resolve this, a drainage system is created to drain cerebrospinal fluid from the brain to the peritoneal cavity. This ventriculo-peritoneal (VP) shunt is subject to blockage and when a person has a VP shunt, any alteration of mental status should prompt evaluation of the shunt by brain imaging to ensure that excess fluid is not accumulating in the brain.

[202] Mortality Review Patient #30.

[203] An IVC filter is a filter placed in the inferior vena cava to block thromboses from the legs. Typically, when IVC filters are used, anticoagulation is not necessary. This patient probably had the IVC filter because of history of repeated seizures which placed the patient at risk for intracranial bleeding. Yet this IVC filter was unrecognized throughout his incarceration.

[204] This is seizure-like activity without corresponding EEG abnormalities of brainwaves, indicating that the episode is psychogenic.

patient unresponsive, with new bruises on his hip and head, and fixed pupils bilaterally. The patient was finally sent to a hospital. At the hospital, the INR was 10 and the patient had a massive subdural bleed causing a brain shift and herniation. The diagnosis was hypercoagulable state from Coumadin causing brain hematoma and herniation.

- Another patient was a 58-year-old man who was transferred to Robinson from Graham.[205] He had high blood pressure for at least seven months, but it was not treated. He also had elevated risk for heart disease for at least seven months, but was not treated with a statin. The patient was bleeding from his rectum, but never received a colonoscopy and was continued on non-steroidal medication. After being at Robinson for about six months, the patient experienced chest pain with nausea and dyspnea, with blood pressure 200/118 and pulse of 129. An EKG showed new onset atrial fibrillation with marked ST depression in lateral leads. This is consistent with acute coronary syndrome and warrants immediate hospitalization and cardiac catheterization. Even the automated reading said, "immediate clinical assessment of this individual is strongly recommended." Instead, a nurse called a doctor, who gave an order by phone for single doses of Inderal and clonidine. The patient was having acute coronary syndrome and should have been hospitalized for immediate catheterization. The following day, the doctor took a history of typical chest angina with exertional squeezing, chest pain associated with nausea, and shortness of breath. Another EKG was done, and the atrial fibrillation was no longer present. Instead of immediately obtaining cardiac catheterization or cardiology evaluation, the doctor started a statin and aspirin but no anti-angina medication. Weeks later, a family member called with concern that the patient was having chest pain when walking to the dining hall. An administrator scheduled a routine referral to a physician, who instead of admitting the patient for catheterization ordered the patient a wheelchair. The doctor added Norvasc for elevated blood pressure. This potentially could have increased the risk for myocardial infarction. The patient had another episode of exertional chest pain with shortness of breath diagnosed as chest wall pain. After another episode of chest pain, a nurse obtained an EKG that again showed ST segment depression consistent with acute ischemia, warranting immediate hospitalization and catheterization. Instead, a doctor ordered 23-hour observation without any intervention. The nurse told the patient to change his job assignment so he wouldn't have to work in a job that precipitated chest pain. Four days after this episode, the doctor referred the patient for a routine stress test. Instead of a stress test, the Wexford UM program had the patient referred for a routine cardiology appointment, which would ultimately delay the cardiac intervention. This appointment occurred a month later. The cardiologist recommended cardiac catheterization "in the near future." About two weeks later, the patient again developed chest pain. A nurse obtained an EKG that showed atrial fibrillation, which the nurse described as "A fib same as previous." This should have resulted in immediate hospitalization. Instead, a doctor ordered 23-hour observation without intervention. About six hours later, the patient was found on the floor with a forehead laceration and

---

[205] Mortality Review Patient #33.

surrounded by vomit. He had no pulse or respirations and was transferred to a hospital, where he was pronounced dead.

At least nine of 19 of preventable or possibly preventable deaths were cared for by poorly trained physicians. One preventable death involved care by a nuclear radiologist. Two involved care by a surgeon. Three preventable and two possibly preventable deaths involved care by another surgeon. Another death involved care by a doctor who had a year of training in pathology. The remaining doctors either had illegible signatures or we were unable to determine their training because we did not have credentials for them. It is our firm opinion that the lack of primary care physicians in the IDOC health care system is resulting in preventable deaths, which shows a gross departure from normal standards of care.

The IDOC leadership is unaware that they have preventable deaths. Both Dr. Meeks and a Regional Coordinator testified that the Regional Coordinators perform mortality review.[206]  We have asked for but have not received these Regional Coordinator mortality reviews. The Agency Medical Director does not independently conduct mortality review. Dr. Meeks stated that Wexford performs a mortality summary, but there is no formal Wexford mortality review that we were provided. The Regional Coordinators are nurses and would not be able to effectively review physician care or identify if it was adequate or inadequate. These reviews, if done, are insufficient as mortality review. One of the Regional Coordinators, who is responsible for a region where we found preventable death, testified that none of the death reviews he performed indicated inadequate care.[207] Wexford does not perform mortality review; instead, it completes a death summary, which is a non-critical summary of the death. This is done by the Medical Director of the site who is often the same doctor who cared for the patient and who often was responsible for the incompetent care. The 2011 contract with Wexford has no requirement for mortality review; its only requirement is that there shall be documentation of deaths.[208] Wexford has no process to critically review deaths and therefore any critical clinical deficiencies are unnoticed and unmonitored, resulting in ongoing harm to patients in the IDOC.

Identification of errors can be perceived by the vendor as well as the IDOC as a liability concern. This possibility may result in failure to identify errors or to hide errors to reduce their liability and protect their reputation. If this occurs, significant errors remain unaddressed. The needs of the jurisdiction and vendor, however, should not be contraposed to the needs to protect patient safety. The system of mortality review should be constructed to protect patient safety. For these reasons, when vendors provide medical care, the hiring authority should lead or participate in mortality review to ensure that patients are protected and/or an independent evaluator should perform this review. In this respect, we agree with the First Court Expert on his recommendation to have an independent reviewer of all deaths.

---

[206] Page 34 deposition of Joseph Ssenfuma, Regional Coordinator, on September 28, 2017 and page 34, 30(b)(6) deposition of Dr. Meeks on July 25, 2017.

[207] Page 35 deposition of Joseph Ssenfuma, Regional Coordinator, on September 28, 2017.

[208] Item 7.1.2.1.2 Contract between Wexford Health Sources Inc. and Illinois Department of Healthcare and Family Services signed on 5/6/11.

## Dental Program

## Dental: Executive Summary
While aspects of the dental programs at some prisons we visited have improved and others have declined, the net result is a worsening of the dental programs since the First Court Expert's Report. Our visits confirmed most of the First Court Expert's findings and identified issues the First Court Expert did not mention. Based on the prisons we visited, IDOC dental care remains not minimally adequate; and it is substantially below accepted professional standards despite the four years the IDOC and Wexford had to remedy the previously identified program deficiencies.

## Dental: Staffing and Credentialing
**Methodology:** Reviewed staffing documents, interviewed dental staff, reviewed the Dental Sick Call Logs, and other documents.

**First Court Expert Findings**
Most staffing was adequate and in compliance with Administrative Directive 04.03.102, Section 9, a, b, and c. Glaring omissions were the lack of dental hygienists at Dixon and Henry Hill Correctional Centers. Dental hygienists are an essential part of the dental team.

**Current Findings**
Staffing has deteriorated since the First Court Expert's Report. We concur with the First Court Expert's finding that dental hygienists are essential members of the dental team and should be on staff at all IDOC facilities.[209] Notwithstanding the finding that staffing followed Administrative Directive 04.03.102, we found staffing (primarily dentist) shortages at several facilities due to IDOC's and Wexford's inability or unwillingness to fill vacancies timely.[210]

Adequate staffing requires the appropriate number and mix of dental personnel positions and that these positions be filled. While NRC and SCC appear to have adequate dental staffing to address patient treatment timely, this is not true for Dixon and MCC. In fact, in 2017 MCC prisoners had to wait more than 15 months for fillings and for dentures. Dixon staffing is particularly problematic, since there is no dental hygienist and staffing shortages have resulted in the clinic being closed Mondays for more than a year. It is noteworthy that the Dixon dental hygienist position has not been established despite the First Expert's finding that it is essential.

Among the dental program's systemic inadequacies we identified are under diagnosis and under treatment of dental disease. Consequently, when diagnosis and treatment become minimally adequate, the prevalence of diagnosed dental disease will be higher and necessitate

---

[209] Makrides, N. S., Costa, J. N., Hickey, D. J., Woods, P. D., & Bajuscak, R. (2006). Correctional Dental Services. In M. Puisis (Ed.), Clinical Practice in Correctional Medicine (2nd ed., pp. 556-564). Philadelphia, PA: Mosby Elsevier, p. 557 ("In prisons where routine dental care will be provided, the basic dental team should consist of a dentist, dental assistant, and dental hygienist")
[210] For example, MCC has two dentist vacancies. One vacancy is an IDOC position that has been unfilled for approximately two years. We were told that IDOC has asked Wexford to fill it.

increased dental staffing. We do not consider this in our assessment of dental staffing but recognize that this will have to be addressed as part of remediation.

## Dental: Facility and Equipment

**Methodology:** Toured dental clinics, radiology areas, and dental intake areas to assess cleanliness, infection control procedures, and equipment functionality. Reviewed the quality of x-rays and compliance with radiologic health regulations.

### First Court Expert Findings

Much of the equipment was old, corroded, and badly worn. Cabinetry and countertops were generally badly worn, corroded, or rusted, broken, and not up to contemporary standards for disinfection.

### Current Findings

Overall, facilities and equipment have deteriorated since the First Court Expert's Report. We concur that most of the equipment in the clinics is old and worn, with many chair and counter surfaces cracked and difficult to decontaminate. Four years have passed since that assessment, and while some equipment has been replaced, for the most part, equipment has deteriorated. In addition, we found that the most problematic deficiency to be the inadequate panoramic x-ray units and processor at NRC, which will be discussed in a later section. Not only are many panoramic x-rays clinically inadequate but the NRC clinic intraoral film processor been inoperative for three years and dentists at Dixon have not been able to take intraoral x-rays for several months. Similarly, the x-ray film processor in the MCC North clinic has been inoperative and exposed film must be carried to the radiology clinic for processing.

## Dental: Sanitation, Safety, and Sterilization/Autoclave Log

**Methodology:** Reviewed Administrative Directive 04.03.102. Toured dental clinics and dental intake examination areas. Observed dental treatment room disinfection. Interviewed dental staff. Observed intake dental examinations and patient treatment. Reviewed last two years of entries in autoclave log.

### First Court Expert Findings

In several institutions, proper sterilization flow was not in place. At one institution, spore testing of the autoclaves was being performed monthly rather than weekly. At another institution, bulk storage of biohazardous waste was maintained in open, large cardboard boxes on pallets in the dental clinic. In none of the clinics were the sterilization area[211] and the radiology area posted with proper hazard warning signs. [212] Safety glasses were seldom worn by patients.

---

[211] CFR 1901.145(e)(4). ("The biological hazard warning shall be used to signify the actual or potential presence of a biohazard and to identify equipment, containers, rooms, materials, experimental animals, or combinations thereof, which contain, or are contaminated with, viable hazardous agents.")

[212] Occupational Safety and Health Standards – Toxic and Hazardous substances. 29 CFR 1910.1096(e)(3)(i). "Each radiation area shall be conspicuously posted with a sign or signs bearing the radiation caution symbol and the words, 'CAUTION RADIATION AREA'". Emphasis in original.

**Current Findings**

Overall, sanitation, sterilization, and, safety have deteriorated since the First Expert's Report, primarily due to inadequate hand sanitation at NRC and MCC. However, autoclave log maintenance has improved at SCC and MCC. We concur with the First Court Expert's finding of lack of appropriate warning signs, patient protective eyewear and lead aprons with thyroid collars not used routinely,[213,214,215] and inadequate sterilization flow at several facilities. However, while the instrument flow was less than ideal, instruments could still be sterilized and stored adequately.

In addition, we found that surface decontamination was adequate but made challenging by the cracked and inadequate dental chair surfaces and countertops in many clinics. The most problematic issue (not found by the First Court Expert) was the inadequate infection control practices between intake exam patients at NRC, in which the patients were examined by a dentist who typically did not change gloves (or wipe them with alcohol between exams) and MCC (where the dentist did not wash his hands or disinfect them with alcohol wipes between changing gloves).[216] That this egregious breach of infection control could occur suggests inadequate monitoring by Wexford and the IDOC.

## Dental: Comprehensive Care/Removable Dental Prosthetics

Comprehensive or routine care (to include removable dental prosthetics) is non-urgent treatment that should be based on a health history, a thorough intraoral and extraoral examination, a periodontal assessment, and a visual and radiographic examination. A sequenced plan (treatment plan) should be generated that maps out the patient's treatment.

**Methodology:** Interviewed dental staff, reviewed dental charts of inmates who received non-urgent care to include removable prosthetics, observed dental treatment. Selected charts for

---

[213] Guidelines for Infection Control in Dental Health-Care Settings ---2003. MMWR, December 19, 2003/ 52(RR17):1:16; pp. 17-18. ("PPE [personal protective equipment] is designed to protect the skin and the mucous membranes of the eyes, nose, and mouth of DHCP [dental health care provider] from exposure to blood or OPIM [other potentially infectious materials]. Use of rotary dental and surgical instruments (e.g., handpieces or ultrasonic scalers) and air-water syringes creates a visible spray that contains primarily large-particle droplets of water, saliva, blood, microorganisms, and other debris. This spatter travels only a short distance and settles out quickly, landing on the floor, nearby operatory surfaces, DHCP, *or the patient*. The spray also might contain certain aerosols (i.e., particles of respirable size, <10 μm). Aerosols can remain airborne for extended periods and can be inhaled" and "Primary PPE used in oral health-care settings includes gloves, surgical masks, *protective eyewear*, face shields, and protective clothing (e.g., gowns and jackets). All PPE should be removed before DHCP leave patient-care areas (*13*). Reusable PPE (e.g., clinician *or patient protective eyewear* and face shields) [...]"). Emphasis added. Moreover, eyewear protects eyes from objects or liquids accidentally dropped during the course of treatment.

[214] Why we Take Infection Control Seriously. UIC College of Dentistry. Viewed at https://dentistry.uic.edu/patients/dental-infection-control, viewed February 2, 2018 ("We use personal protective equipment [...] *as well as provide eye protection to patients for all dental procedures*.") Emphasis added.

[215] While radiation exposure from dental radiographs is low, dentists should follow the ALARA Principle (As Low as Reasonably Achievable) to minimize the patient's exposure. Dentists should follow good radiologic practice and (*inter alia*), *use protective aprons and thyroid collars*. Dental Radiographic Examinations: Recommendations for Patient Selection and Limiting Radiation Exposure. ADA and FDA (2012), 14. Emphasis added.

[216] Centers for Disease Control and Prevention. *Summary of Infection Prevention Practices in Dental Settings: Basic Expectations for Safe Care*. Atlanta, GA: Centers for Disease Control and Prevention, US Dept of Health and Human Services; October 2016, p.7.

review randomly from Prosthetics List (patients with two partial dentures) and Daily Dental Reports (patients who received fillings and biennial examinations).

**First Court Expert Findings**

Routine care was almost always provided without a comprehensive examination, a treatment plan, a documented periodontal assessment, a documented soft tissue examination, and without bitewings or other radiographs diagnostic for caries.

There was seldom a dental prophylaxis or oral health instructions provided prior to routine restorative care to include removable prosthetics. Without these basic elements in place, quality routine care is almost impossible. As such, there is no real system in place to provide routine comprehensive Category 3 dental care.

The radiographs and examinations/treatment plans were so incomplete or vague that it could not be determined if all necessary care was completed prior to prosthetic impressions.

Blood pressures were not being taken on inmates with a history of hypertension.

**Current Findings**

Overall, comprehensive care is unchanged since the First Court Expert's Report. We concur that routine care (to include removable prosthetics) is inadequate and is provided without adequate x-rays, periodontal assessment, and documented oral hygiene instruction and a sequenced treatment plan.[217,218] Moreover, we agree that the biennial examination, as currently performed, is of little clinical value.

Rather than relying on intraoral x-rays, the accepted professional standard for routine examinations,[219] dentists base their charting for caries on the panoramic x-ray in conjunction with a visual exam. Not only is this insufficient to diagnose interproximal (between the teeth) decay but it ignores the existence of periodontal disease. Moreover, even when periodontal disease is occasionally categorized per Administrative Directive 04.03.102 (Dental Care for Offenders), there is no documented periodontal probing[220] and the location of the disease is

---

[217] Stefanac SJ. Information Gathering and Diagnosis Development. In Treatment Planning in Dentistry [electronic resource]. Stefanac SJ and Nesbit SP, eds. Edinburgh; Elsevier Mosby, 2nd Ed. 2007; pp. 11-21, *passim.*

[218] IDOC agreed that "[r]outine comprehensive care should be provided for through a comprehensive exam and treatment plans. The exam [should include] radiographs diagnostic for caries, a periodontal assessment, a soft tissue exam, and accurate charting of the teeth," and "hygiene care and oral health instructions are provided as part of the treatment process." IDOC Response, ¶XIII (5).

[219] Dentate or partially dentate adults who are new patients should receive an "[i]ndividualized radiographic exam consisting of posterior bitewings with panoramic exam or posterior bitewings and selected periapical images." Furthermore, recall patients [i.e., biennial exam patients] should receive posterior bite wing x-rays every 12 to 36 months based on individualized risk for dental caries. With respect to periodontal disease, "[i]maging may consist of, but is not limited to, selected bitewing and/or periapical images of areas where periodontal disease (other than nonspecific gingivitis) can be demonstrated clinically." Dental Radiographic Examinations: Recommendations for Patient Selection and Limiting Radiation Exposure. American Dental Association and U.S. Food and Drug Administration, 2012. Table 1, pp. 5-6.

[220] Stefanac SJ. (A panoramic radiograph has insufficient resolution for diagnosing caries and periodontal disease. Intraoral radiographs (e.g., bite wings) and periodontal probing are necessary), p. 17. Also, (Periodontal Screening and Recording (PSR), an early detection system for periodontal disease, advocated by the ADA and the American Academy of Periodontology since

not noted.[221] As with most of the other patients who received comprehensive care including removable prosthetics, sequenced treatment plans and periodontal assessments that included documented probing were absent.

Biennial exams were scanty and of minimal clinical value since they were informed by neither bite wing x-rays nor documented periodontal probing. Documented oral cancer screening and sequenced treatment plans were rare.

Absent a sequenced treatment plan informed by intraoral x-rays[222] and periodontal probing, the dentist does not have sufficient information to make an informed decision. In the community, what is called a biennial exam is analogous to a periodic exam.[223] The biennial exam is cursory, and not substantially different from the inadequate exam performed at intake.

Not only is periodontal disease underdiagnosed but it is undertreated. In none of the dental charts reviewed was there a treatment plan that identified specific non-surgical periodontal procedures such as scaling and root planing. Moreover, the Daily Treatment Report that lists the treatment provided to each patient has no section for periodontal treatment.[224] The IDOC and Wexford dentists and dental hygienists we interviewed who were in private practice were familiar with the industry-standard dental procedure codes. However, there is no column for scaling and root planing (SRP)[225] and no way of knowing if it is performed. Similarly, dentists and dental hygienists knew what periodontal screening and recording (PSR) was but did not use it in IDOC, although many acknowledged using it in private practice.

The Wexford contract specifies that "[v]endor shall provide dental checkups to offenders every two years, or more often if clinically indicated, and evaluations must be provided within 14 days after the offender's request for routine care treatment." However, it is mute on the more critical issue, the maximum waiting time for *treatment*. So, under current dentist staffing, a prisoner who needs (for example) three fillings that require three appointments could conceivably wait more than three years for the last tooth to be filled. It is more likely than not that the teeth awaiting filling will become more difficult to fill or become non-restorable and require extraction and cause preventable pain.

---

1992, is an accepted professional standard.), pp. 12-14. See American Dental Hygiene Association. Standards for Clinical Dental Hygiene Practice Revised 2016, pp. 6-9. (Periodontal probing is also a standard of practice for dental hygiene).

[221] The only categories related to specifically periodontal disease are Ib ("acute periodontal abscess"), Ic ("acute periodontitis"), Ie ("acute gingivitis"), IIIb ("localized gingival involvement"), and Vb ("lack of visible gingival irritation"). *Id.* Attachment A.

[222] See NCCHC P-E-06 (Oral Care), ¶8 ([r]adiographs are used in the development of the treatment plan".)

[223] The 'uniform record system' sponsored by the American Dental Association is the Code on Dental Procedures and Nomenclature. "In August 2000 the CDT Code was designated by the federal government as the national terminology for reporting dental services on claims submitted to third-party payers. The industry standard code for a periodic exam is D0120. It is defined as "[a]n evaluation performed on a patient of record to determine any changes dental and medical health status since a previous comprehensive or periodic examination. This includes an oral cancer evaluation, and periodontal screening where indicated, [...])"." American Dental Association Dental Procedure Codes, 2015, pp. 1, 5.

[224] The categories are "scale and prophylaxis," "gingivitis," and "periodontal." While "scale and prophylaxis" is mappable to ADA treatment code D1110 that has a standard profession-wide definition, "gingivitis" and "periodontal" are not directly mappable to an ADA code. The IDOC and Wexford dentists and dental hygienists we interviewed who were in private practice were familiar with the industry-standard dental procedure codes.

[225] ADA codes D4341 and D4342.

Wait times are most problematic at MCC, with April 2018 backlogs for fillings and dentures more than 15 months. While Wexford does not report periodontal treatment wait times, dental hygienist caseload (in number of patients) is reported in the monthly April 2018 CQI minutes. We imputed dental hygienist wait time to be approximately 16 months.[226] While a cleaning or prophy is not a periodontal procedure, it is often a precursor to periodontal treatment (if periodontal treatment has been prescribed by a dentist on the treatment plan). A wait of more than a year before periodontal treatment can begin, even if it is diagnosed, is unreasonable and such a treatment delay can result in preventable disease progression with concomitant bone loss.

While patients planned for removable prosthetics are not treated by outside specialists but rather onsite dentists, approval for dental prosthetics must be obtained from Wexford through a process referred to as "collegial review." The reviewer is Dr. Karanbir Sandhu, who serves on a part-time basis as a Wexford Prosthetic Advisory Dentist. Dr. Sandhu is not specialist in prosthodontics, or for that matter any other aspect of dentistry.

## Dental: Intake (Initial) Examination[227]
**Methodology:** Reviewed dental records and panoramic x-rays of inmates who have received recent intake (initial) examinations. Reviewed Administrative Directive 04.03.102.

### First Court Expert Findings
Although a review of records revealed that the IDOC followed its screening examination policy, oral health instructions are omitted as part of the process. Egregious deficiencies were observed at the NRC during the screening exam. The exam was extremely cursory and did not include an adequate head and neck, and soft tissue examination. The health history was sketchy and poorly documented. Radiology safety protocols were non-existent. Area disinfection and clinician hygiene between patients was very poor. Inappropriately, most dentists use the screening exam, the panoramic radiograph, and the charting as a treatment plan from which to deliver routine care.

Conditions that require medical attention were not red-flagged. Medical consultations were not documented in the dental record. The quality and consistency of the medical history in the dental record was inadequate.

### Current Findings
Overall, the initial examination is unchanged since the First Court Expert's Report. We concur that the initial examination is inadequate and fails to include appropriate head, neck, and soft

---

[226] The April 2018 CQI minutes (based on March data) reported a dental hygienist caseload of 1018 patients and the March 2018 Dental Report noted that the hygienist performed 61 cleanings/prophylaxes. This equates to a more than 16-month backlog.

[227] The First Court Expert Report describes the examination performed at intake screening as a "Screening Examination;" however, Administrative Directive 04.03.102 describes it as a "complete dental examination." We use the terminology of the Administrative Directive and refer to the intake or initial dental examination as a complete dental examination.

tissue assessments. While the First Court Expert found that area disinfection was poor[228], there was no mention of the breaches of infection control by the NRC and MCC dentists described in previous reports. In addition, we found as follows.

The initial examination is governed by Administrative Directive 04.03.102 which states (*inter alia*) that

> Within ten working days after admission to a reception and classification center or to a facility designated by the Director to accept offenders with disabilities for a reception and classification center, each offender shall receive a ***complete dental examination by a dentist***.[229]

While "complete dental examination" is not defined in Administrative Directive 04.03.102, the examination performed at the three R&C centers we visited is by no means "complete" because it is too brief and not informed by intraoral x-rays, a documented periodontal probing, and a consistently performed oral cancer screening.[230, 231] The deficiencies of this examination are particularly problematic, since it is used to classify treatment needs and determine treatment priority.

Notwithstanding the plain text of Administrative Directive 04.03.102, it is apparently IDOC's position that the dental examination performed at intake is a screening examination (citing NCCHC Oral Care Standard P-E-06) is cursory and need not be performed by a dentist. [232] However, compliance with Oral Care Standard P-E-06 (assuming IDOC adopts it as its standard) requires that in addition to an oral screening, an oral examination should be performed by a dentist within 30 days of admission.[233, 234, 235]

---

[228] Which we found at NRC.

[229] Administrative Directive 04.03.102 (¶II F 2) (emphasis added). Furthermore, the exam should include, "[c]harting of the oral cavity and categorization of status or treatment needs in accordance with the American Public Health Association's priorities delineated in Attachment A." *Id.* at (¶II F 2a).

[230] This is generally done by holding the anterior portion of the tongue with 2x2 gauze and reflecting the tongue with a mouth mirror. This is a professional standard for an oral examination. *See*, for example, National Institutes of Health. National Institute of Dental and Craniofacial Research. Detecting Oral cancer. A Guide for Professionals. Viewed 6/4/2018 at https://www.nidcr.nih.gov/sites/default/files/2017-09/detecting-oral-cancer-poster.pdf.

[231] Stefanac SJ. ("Evaluation of head and neck structures for evidence of tissue abnormalities or lesions constitutes an important part of a comprehensive examination."), p. 12. See also Shulman JD, Gonzales CK. Epidemiology/Biology of Oral Cancer. In Cappelli DP, Mosley C, eds. Prevention in Clinical Oral Health Care. Elsevier (2008) ("Regular, thorough intraoral and extraoral examination by **a** dental professional is the most effective technique for early detection and prevention of most oral cancers. [...]") p. 41.

[232] IDOC Response to First Expert Report, pp. 32-33.

[233] 2014 NCCHC Oral Care Standard P-E-06, p. 81 and 2018 NCCHC Oral Care Standard P-E-06, pp. 96-97.

[234] IDOC's selective invocation of the NCCHC Standard is inappropriate. If (as the IDOC Response maintains), initial dental examination is a screening and not a "complete dental examination" as set forth in the Dental AD, when does an IDOC prisoner receive an oral examination (that per NCCHC P-E-06 should be performed within 30 days of admission)?

[235] IDOC Response to First Expert Report, p. 33. ("Initial dental contacts between clinicians and offenders at IDOC reception centers constitute dental screenings, as defined by the NCCHC. Accordingly, the reception center dentist performs a "visual observation" and notes "obvious or gross abnormalities requiring immediate referral to a dentist." Subsequent referrals result in a dental examination, which comports with the NCCHC definition of "examination." Because its procedures meet NCCHC standards, IDOC believes they meet the minimum constitutional standard of adequacy.) They do not.

However, IDOC's assertion that since subsequent referrals result in a dental examination IDOC complies with the NCCHC Oral Care Standard ignores the plain text of P-E-06, since under IDOC's idiosyncratic interpretation, the only prisoners who would receive a dental examination would be those who were referred based on a screening that could be performed by a non-dentist or even the current inadequate intake examination performed by a dentist.

While IDOC does not define "complete dental examination," the definition of a comprehensive or complete dental examination is set forth by the American Dental Association (ADA) and the NCCHC.[236] The ADA defines a Comprehensive Oral Examination (Procedure Code D0150).[237] Similarly, a comprehensive clinical examination includes an intraoral and extraoral soft tissue examination (primarily screening for oral cancer); a periodontal examination using, at a minimum, Periodontal Screening and Recording (PSR); an examination of the teeth; and a radiographic examination using panoramic *and* intraoral x-rays.[238] Furthermore, as mentioned earlier, the ADA and Food and Drug Administration (FDA) recommend that intraoral x-rays should be part of a dental examination.

At two prisons (NRC and LCC), the dentists did not document a thorough soft tissue examination. For example, they did not visualize the lateral and posterior regions of the tongue, potential sites of squamous cell carcinoma. Performing a thorough soft tissue examination is critical for a new inmate, since unless the prisoner requests care within two years, the next exam will be biennial under current policy.[239]

We visited three prisons that performed intake screening; NRC, LCC, and MCC. The NRC has the largest volume, processing 15,942 prisoners in 2017. All inmates have a panoramic x-ray taken and receive a cursory direct-view oral examination that includes a scanty health history. Not only is the exam uniformly deficient, but the quality of the panoramic x-rays used is poor and documentation was deficient.[240] Furthermore, infection control was inadequate at two

---

[236] "Oral examination by a dentist includes taking or reviewing the patient's oral history, an **extraoral head and neck examination**, charting of teeth, and examination of the oral cavity with a mouth mirror, explorer, and adequate illumination." NCCHC Oral Care Standard P-E-06, 2018, p. 96. Emphasis added.

[237] "[This code is] [u]sed by a general dentist and/or a specialist when evaluating a patient comprehensively. This applies to new patients; established patients who have had a significant change in health conditions or other unusual circumstances, by report, or established patients who have been absent from active treatment for three or more years. It is a thorough evaluation and recording of the extraoral and intraoral hard and soft tissues. It may require interpretation of information acquired through additional diagnostic procedures. […] This includes an evaluation for oral cancer where indicated, the evaluation and recording of the patient's dental and medical history and a general health assessment. It may include the evaluation and recording of dental caries, missing or unerupted teeth, restorations, existing prostheses, occlusal relationships, periodontal conditions (including periodontal screening and/or charting), hard and soft tissue anomalies, etc." American Dental Association Code on Dental Procedures and Nomenclature, 2015; p. 6.

[238] Stefanac SJ, pp. 12-15, *passim*. Emphasis added.

[239] This deficiency is compounded by the fact that dentists do not document soft tissue examinations at biennial exams (see infra).

[240] Of 20 panoramic x-rays from screening exams performed January 23, 2018, nine (45%) were clinically inadequate; characterized by poor contrast (washed out) or the presence of artifacts that interfered with interpretation. Our findings were confirmed by an SCC Quality Improvement Study in which intake screening charting was compared with the results of clinical examinations performed on the same patients. Of the 21 NRC charts, 62% had no charting of pathology (e.g., "abscessed teeth, teeth that needed extraction, [and] periodontal disease, (+3) mobility in teeth, grossly decayed teeth, impacted wisdom teeth in the maxillary sinus, and numerous visible dental caries"), with the remainder having only a partial charting.

facilities.[241,242]

The oral hygiene instructions (OHI) were inadequate at all prisons we visited. For example, at MCC, they consisted of consisted of saying, "make sure you brush and floss," and took no more than a minute.[243] This is not adequate oral hygiene instruction. Furthermore, while spooled dental floss is deemed contraband at MCC, the dentist did not mention the existence of (not to mention how to use) floss alternatives.

## Dental: Extractions
**Methodology:** Reviewed records of inmates who had extractions, randomly selected from Daily Dental Reports October 2017 through January 2018 and Dental Sick Call Logs. Interviewed dental staff.

**First Court Expert Findings**
Antibiotics were provided routinely after dental extractions at some institutions.

A proper diagnostic reason for extraction was seldom part of the dental record. Documentation was, overall, very poor.

**Current Findings**
Our finding that extraction care is adequate diverges from that of the First Court Expert which suggests that many of the previously identified deficiencies have been remedied. Moreover, we identified current and additional findings as follows.

With few exceptions, extractions were informed by adequate preoperative x-rays and were accompanied by signed consent forms. However, while the tooth to be extracted was identified, the reason for the extraction was rarely noted. On the other hand, most of the health history forms were not updated. Generally, patients with dental infections who were prescribed antibiotics had the tooth extracted timely,[244] that is within the therapeutic window of the antibiotic[245] (i.e., within 10 days – the duration of most of the antibiotic prescriptions).[246]

---

[241] The most egregious example was at NRC which we discuss in the NRC Report. "The dentist donned gloves, selected mouth mirrors from a bag of sterile mirrors that he opened and placed on a bracket table before the first exam. A standard dental light illuminated the patient's mouth. He reviewed the panoramic x-ray and took a cursory health history. He used one or two mirrors to reflect the cheeks and adjusted the light for optimal illumination. While his gloved hands did not always touch the patient, in approximately half the exams we observed, they touched the patient's face, lips, or mouth. He did not change gloves between patients consistently. In fact, there were several instances where he examined a patient wearing the gloves he used to touch a previous patient's mouth or face. He did not wash hands between patients because the exam room had no sink." Centers for Disease Control and Prevention.

[242] *Summary of Infection Prevention Practices in Dental Settings: Basic Expectations for Safe Care.* Atlanta, GA: Centers for Disease Control and Prevention, US Dept. of Health and Human Services; October 2016, p.7.

[243] Oral Hygiene Instructions (ADA Code D1330) "may include instructions for home care. Examples include tooth brushing technique, flossing, and the use of special oral hygiene aids." ADA Procedure Codes.

[244] MCC was particularly problematic. "Of the 11 who were prescribed antibiotics, all but one (91%) waited more than 10 days." MCC Report. *See* sick Call discussion *supra.*

[245] Shulman JD, Sauter DT. Treatment of odontogenic pain in a correctional setting. *Journal of Correctional Health Care* (2012) 18:1, 58 – 69; p. 68.

## Dental: Sick Call/Urgent Care / Treatment Provision

**Methodology:** Interviewed dental staff. Reviewed Dental Sick Call Logs and Daily Dental Reports. Reviewed randomly selected records of inmates who were seen on sick call. Reviewed recent intake examination records.

**First Court Expert Findings**

The SOAP format was not being used to document urgent care encounters.

The lag time between an Inmate Request Form for pain and alleviation of the pain was unacceptable. It often took four or more days for urgent care patients to be seen. Patients who are in pain should be able to access care within 24-48 hours.

**Current Findings**

Overall, urgent care has not changed materially since the First Court Expert's Report and remains inadequate. We concur with the First Court Expert that urgent care was generally untimely. In addition, we identified current and additional findings as follows.

Prisoners access dental care via submitting a written request, going on nurse sick call, or communicating their problem with staff. There is substantial variation in the wait time for prisoners with a painful dental condition who submit a sick call request or sign up for nurse sick call, with several prisons (e.g., MCC, SCC, and Dixon) having median times to be seen by a provider for dental pain of more than two days. Some prisons have a nurse sick call process where prisoners who state dental pain are assessed timely by a nurse using a "dental pain" protocol and are palliated and referred to the dental service.[247] At some prisons, requests for dental urgent care that are sent directly to the dental service are delayed due to an intervening weekend or when the dentist is not available  (e.g., NRC, Dixon), or a staff shortage (e.g., MCC).

When a patient with an urgent care complaint is seen by the dentist, the SOAP format is not consistently used for dental sick call progress notes (e.g., NRC, SCC) nor is the health history updated – a system wide problem.

## Dental: Orientation Handbook

**Method**: Reviewed the Orientation Handbook and other orientation documents.

**First Court Expert Findings**

---

[246] Makrides, N. S. et al.("[d]elayed dental treatment of the original focus of the [tooth-related] infection may turn a minor problem into a serious condition. Although infection is usually self-limiting and spatially-confined, it may spread because of a highly virulent organism. Complications could include Ludwig's angina, mediastinitis, cerebral abscess, maxillary sinusitis, chronic fistulous tracts, and infective endocarditis." (p. 559).

[247] At NRC, there is no process for nurses, when the dentist is not available, to perform a face-to-face examination on dental patients who state they have pain to identify pain and infection and provide analgesics and referral to a mid-level or advanced level provider if immediate treatment is necessary.

Access to care was inadequately detailed or not mentioned at all in most of the orientation manuals reviewed. Inmates do not receive adequate instructions on how to access urgent or routine care.

**Current Findings**
Overall, inmate orientation to dental care has improved since the First Court Expert's Report. While we concur with the First Court Expert that the orientation handbook could benefit from additional information about access to dental care, there was sufficient information provided about sick call in general for inmates to access dental care. Furthermore, dentists provided relevant information during the NRC, LCC, and MCC intake exams.

## Dental: Policies, Procedures, and Program Management
**Methodology:** Reviewed Administrative Directives that deal with the dental program. Interviewed dental staff. Reviewed dental charts. Toured dental clinical areas. Reviewed organizational charts.

**First Court Expert Findings**
Institutional Policy and Protocol Manuals were usually very incomplete, outdated, or not present at all. Dental programs were implemented and managed with few guidelines and little oversight. The IDOC Administrative Directives are incomplete and provide little guidance for developing and managing a successful dental program.

The Administrative Directives do not address quality of care issues, clinic management, record management, or staff oversight and responsibilities. Dentists are provided no orientation to the IDOC dental program or training on how to manage their institution's programs. This, in conjunction with inadequate quality assurance and peer review, suggests a lack of oversight on the part of the IDOC and Wexford. Moreover, there is no administrative dentist to oversee and manage the IDOC dental program.
The policy mandating biennial routine examinations does not seem beneficial. It takes up a great deal of administrative time. Inmates have full access to dental care. Dentists should use their time providing this care, especially considering the dental staffing guidelines.

**Current Findings**
Overall, policies, procedures, and program management have not improved materially, and we concur that they are inadequate. In addition, we identified current and additional findings as follows.

Administrative Directive 04.03.102 is flawed and should be rewritten. The components of the initial examination should be specified. Is it a "complete examination" per ¶ II F (2) or a "screening examination?" To remove ambiguity, all procedures should be defined to be consistent with the federally recognized ADA Procedure Codes.[248] So, for example, a complete

---

[248] The uniform record system sponsored by the American Dental Association is the Code on Dental Procedures and Nomenclature. "In August 2000 the CDT Code was designated by the federal government as the national terminology for

oral examination for a new patient (D0150) has a profession-wide definition, as does periodic oral examination for an established patient (D0120) that is analogous to a biennial examination.

As noted by the First Experts, Administrative Directives, and dental program guidance from IDOC are lacking.

The IDOC Medical Director stated that while he is responsible for the dental program, he relies on a Wexford dentist for oversight. He acknowledged that this was not a good arrangement and prefers a Chief of Dentistry who is a state employee as part of his regional team.[249]

In a response to a recommendation made in the First Expert Report, IDOC stated that it has committed to creating and filling a 0.25 FTE Statewide Dental Director position.[250, 251] After almost four years, no such position has been established.

## Dental: Failed Appointments
**Methodology:** Reviewed Dental Sick Call Logs. Interviewed dental staff. Reviewed Daily Dental Reports.

**First Court Expert Findings**
The broken appointment rate was above 10% at several institutions and as high as 40% at three institutions. The latter are alarming rates.

**Current Findings**
Overall, failed dental appointments have not improved materially since the First Court Expert's Report.[252] While the failed appointment rate appears to have improved compared to the First Expert Report, it could not be determined for NRC and Dixon. However, a scan of Dixon daily and monthly dental logs suggests that failed appointments may be a problem.

## Dental: Medically Compromised Patients
**Methodology:** Reviewed health history form and records from recent intake exams. Compared the health history in the dental chart to the medical problem list. Reviewed randomly selected charts of patients on Chronic Care Lists for diabetes and anticoagulant therapy.

**First Court Expert Findings**
The medical health history section of the dental record was sketchy and incomplete. Conditions that require medical attention were not red-flagged. Medical consultations were not documented in the dental record. The quality and consistency of the medical history in the

---

reporting dental services on claims submitted to third-party payers." American Dental Association Dental Procedure Codes, 2015, p. 1.
[249] Meeks Interview, ¶35.
[250] IDOC Response pp. 9, 31.
[251] IDOC should have at a minimum a 0.5 FTE position for a Statewide Dental Director to oversee the Wexford contract as it relates to dental care. Leaving dental oversight to the vendor is inviting the fox to guard the hen house.
[252] A facility that does not track and routinely report the failed appointment rate is deemed inadequate.

dental record was inadequate. Blood pressures were not being taken on inmates with a history of hypertension.

**Current Findings**
Documenting the health history of medically compromised patients has not changed materially and remains inadequate since the First Court Expert's Report. We concur with the First Court Expert's findings. In addition, we identified current and additional findings as follows.

The health history form is too limited and omits conditions relevant to dental care, for example, anticoagulant therapy. Moreover, there is insufficient room on the form for adding information. Health histories were not filled out or updated at the last visit in most charts. In addition, there was no documented periodontal assessment and request for follow-up for diabetics, which is particularly problematic given the relationship between periodontal disease and diabetes.[253]

## Dental: Specialists
**Methodology:** Interviewed dental staff, reviewed CQI documents, and reviewed dental charts of all inmates who were seen by an oral surgeon.

**First Court Expert Findings: None.**

**Current Findings**
Dental specialty referral has not changed materially since the First Court Expert's Report and remains adequate. We concur with the First Court Expert's findings. In addition, we identified current and additional findings as follows.

Approval for onsite or offsite oral surgery consultations requires the consent of the Wexford Regional Medical Director through a process referred to as "collegial review." The reviewer for oral surgery consultations is Dr. Karanbir Sandhu, who serves on a part-time basis as a Prosthetic Advisory Dentist. Dr. Sandhu is neither an oral surgeon nor a specialist in any other aspect of dentistry.

Several prisons have arrangements for local oral surgeons to provide care on site for less complex procedures and transport prisoners to the oral surgeon's practice for complex procedures. Other prisons send all prisoners who require oral surgery care off site. Oral surgery consultations we reviewed were appropriate, and appointments were made timely.

## Dental: CQI
**Methodology:** Reviewed CQI minutes and reports. Interviewed dental staff.

---

[253] See, for example, Herring ME and Shah SK. Periodontal Disease and Control of Diabetes Mellitus. *J Am Osteopath Assoc.* 2006; 106:416–421; Patel MH, Kumar JV, Moss ME. Diabetes and Tooth Loss. *JADA 2013;144(5);478-485* (adults with diabetes are at higher risk of experiencing tooth loss and edentulism than are adults without diabetes); and Teeuw WJ, Gerdes VE, and Loos BG. Effect of Periodontal Treatment on Glycemic Control of Diabetic Patients. *Diabetes Care* 3 (3) :421-427, 2010 (periodontal treatment leads to an improvement of glycemic control in type 2 diabetic patients).

**First Court Expert Findings**

The dental contribution usually was limited to monthly statistics. Most dental programs had no studies, assessments, or subsequent improvements in place. There is no peer review process in place within the IDOC dental program. There is little direction or meaningful oversight of the IDOC dental program to ensure that proper policies and protocols are in place and followed, and that dental standards of care are practiced.

**Current Findings**

The dental CQI program has improved marginally since the First Court Expert's Report but remains inadequate. We concur with the First Court Expert. In addition, we identified current and additional findings as follows.

CQI studies were limited in scope and follow up with corrective action plans was lacking.[254] For example, the 2016-2017 SCC CQI Report described study of compliance with the charting at the initial examinations at NRC. Among the findings from the NRC charts were that 62% had no charting of pathology, with the remainder having only a partial charting; for example, visible heavy tartar [calculus], and periodontal needs were never charted or indicated. Moreover, the panoramic radiographs from NRC varied in diagnostic quality. However, we were not provided with any corrective action plans.

The LCC 2017 Annual Governing Body Report described a quality improvement study on "[t]he time frames for dentures start to finish including healing. Is it within 3 months?" There were neither recommendations nor a planned follow up. The study was, at best, trivial. Given the inadequacy of the clinical aspects of the dental program described in this report, a 'study' of how long it takes to fabricate a denture ignores far more relevant issues, such as inadequate health histories, inadequate diagnosis of periodontal disease, and failure to use intraoral x-rays.

We were provided with a summary of two MCC studies. A study of 50 patients who were on the restoration (filling) list May 2015 to December 2015, with treatment dates ranging from August 2016 until September 2016, found that 94% had successful restorations without need of extraction. However, the actual study was not provided, just a five-line summary, so its validity cannot be assessed. Another MCC study summary, "Effects of lockdowns and dental coverage on filling numbers and backlog numbers," had no analysis, just a recitation of findings.

Peer Review

We asked to see all peer reviews of dentists working at the eight facilities on our site visit schedule and were informed that dentists (unlike other practitioners) are not routinely peer reviewed. According to Attorney Ramage, speaking for Wexford,[255] neither the IDOC contract[256]

---

[254] While a study of the quality of SCC onsite oral surgery consultations and one follow-up was performed, the Root Cause Analysis recommended by Dr. Meeks was not performed. Furthermore, Dr. Meeks recommended that Dr. Funk and Mr. Mote monitor the oral surgeon's performance at other institutions. We requested the Root Cause Analysis and other follow-up material; however, they were not provided,

[255] Email from Andrew Ramage to Michael Puisis 3/29/2018.

nor Wexford policy requires that dentists be peer reviewed.[257] He further stated that "[r]outine peer reviews of dentists are not a mandatory standard of NCCHC;"[258] however, he is confuted by the NCCHC, which specifically includes dentist peer reviews in its Clinical Performance Enhancement Standard P-C-02.[259]

Moreover, "Wexford Health has never found a true dentist 'peer review' to be a productive means to determine clinical quality."[260] Finally, it is Wexford's position that the dentist peer reviews are not a part of the community standard.[261] While clinical peer review is not the community standard for dental care in a private practice environment, it is the community standard for organized dental practices such as the military, Department of Veterans Affairs, and Departments of Corrections that have recently emerged from federal monitoring (e.g., California and Ohio.)[262]

We were provided with peer reviews of Drs. Crisham (performed 12/30/15) and O'Brien (performed 1/16/17) who practiced at Dixon, and we were able to locate five of the 20 charts on which the peer review was based. Our findings were consistent with those of the reviewer; however, several critical elements were absent from the checklist, and were not evaluated. Consequently, many of the fundamental flaws we found in the dental care provided at Dixon, such as inadequate treatment plans, failure to use bite wing x-rays to inform caries diagnosis, and failure to diagnose and treat periodontal disease, were undiscovered. Dental peer review *as implemented by Wexford* is poorly designed and does not therefore determine clinical quality.

---

[256] The contract addresses "physician peer review," which applies to the onsite Medical Director, staff physicians, nurse practitioners, physician assistants, and psychiatrists; however, dentists and psychologists are excluded. Wexford Contract, ¶2.2.2.19 and ¶7.1.5.

[257] However, Wexford Clinical Performance Enhancement Policy P-403 states, "[a] minimum of one annual "peer review" [will be performed] whereby a practitioner's clinical performance is evaluated by a senior or supervising practitioner, and, when necessary, senior practitioners are evaluated by regional/corporate staff. [...]" ¶III A3; and "[t]he senior dentist will complete a peer review for each dentist and ensure the completion of the biennial external review for those qualified. The Regional Medical Director will assign a peer reviewer for small contract locations having single or part-time dentists." Wexford Resp. RTP#5, Question 2, p. 0405.

[258] Ramage email, *id*.

[259] "In contrast [to an annual performance review], a clinical performance enhancement review focuses only on the quality of the clinical care that is provided. This type of review should be conducted only by another professional of at least equal training in the same general discipline. For example, an RN should evaluate other RNs and LPNs, a physician should review the work of a physician, and *a dentist should review the work of a dentist;*" and "[Clinical Performance the standard requires that the facility's direct patient care clinicians and RNs and LPNs are reviewed annually. Direct patient care clinicians are all licensed practitioners who provide medical, dental, and mental health care in the facility. This includes physicians, dentists, midlevel practitioners, and qualified mental health professionals (psychiatrists, psychologists, psychiatric social workers, psychiatric nurses, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for mental health needs of patients). NCCHC recognizes that there are many other professions that have licensed practitioners (e.g., dental hygienists) who may be considered direct patient care clinicians. While it is good practice to include these professionals in the clinical performance enhancement process, technically it is not required by the standard." National Commission on Correctional Health Care, Clinical Performance Enhancement (https://www.ncchc.org/clinical-performance-enhancement-1) viewed 3/30/18 (emphasis added).

[260] Ramage e-mail, *id*.

[261] *Id*.

[262] California Department of Corrections Inmate Dental Services Program. September 2014, ¶ 4.3; Ohio Department of Corrections Policy 68-MED-12, ¶ VI B 3.

## Internal Monitoring and Quality Improvement

**Methodology:** Interview facility health care leadership and staff involved in quality improvement activities. Review the quality improvement meeting minutes and annual CQI reports.

### First Court Expert Findings

The First Court Expert found that the IDOC does not have the ability to monitor itself in part because it lacks data on key processes of care. For that reason, he recommended use of tracking logs to facilitate efficient review and data collection of quality performance measures. He found that data sources, including tracking logs, are not consistently used. He found that some facilities performed no quality improvement activity and other facilities collected data but did not measure the quality of performance against a standard. He was unable to find any facility they investigated that measured quality of performance against a standard. He also failed to find any facility that initiated any effort to improve the quality of the program. None of the quality improvement coordinators had any formal training in quality improvement methodology. He also noted that although his team found a high rate of lapses of care in mortality review, internal mortality review identified no lapses in care.

### Current Findings

We found there were some improvements since the First Court Expert's report. We did not confirm the finding that some of the facilities performed no quality improvement activity. Every facility we investigated had quality improvement meetings, produced quarterly and annual reports, and performed studies. We found, however, that annual reports and quality improvement studies were ineffective. We also did not find that facilities were not measuring quality against a standard. Some studies were undertaken that measured against Administrative Directive requirements as a standard. The First Court Expert failed to find any facility that initiated any effort to improve quality. We found that all facilities we investigated initiated effort, but these efforts were ineffective. The lack of experienced or knowledgeable CQI staff and the failure to integrate quality into the fabric of operations was significant and made the CQI programs ineffective. There was also an absence of evaluation of *clinical* quality, which contributes to preventable morbidity and mortality. The ineffectiveness of the CQI program, in our opinion, was a result of the following.

None of the facilities investigated had anyone who had expertise or knowledge of CQI methodology or implementation. CQI coordinators at NRC, SCC, and MCC are medical records personnel. None had any experience or training in CQI and had no knowledge of how to implement a CQI program. They were named CQI coordinators apparently because they could manage the paperwork requirements with respect to producing monthly minutes and annual reports. At two facilities, Dixon and MCC, the HCUAs were acting CQI coordinators by default because there was no one else available for this task. These individuals had no experience or training in CQI methodology. It did not appear that facilities understood how to design or implement an outcome study, and process studies failed to include any discussion or analysis of

variables involved in the process of care being studied. Outcome and process studies are required elements of the IDOC Administrative Directive on quality improvement.

None of the facilities had a reasonable CQI plan. An annual CQI plan needs to identify the major areas of investigation that the CQI committee is working on in the upcoming year. These plans should be based on the most important identified problems at the facility. Instead, the annual CQI plans at all facilities were generic and gave no formulation of the plan for the upcoming year's CQI work. The SCC and NRC plans were identical and copied one from the other, even though each site had separate types of problems. Problems were not identified and CQI studies did not match problems that existed at the facilities we visited.

None of the facilities had a Medical Director who participated meaningfully in CQI work. The absence of clinical medical leadership in quality improvement work is significant, as studies lack a clinical perspective necessary for medical CQI work.

Quality of physician care was not included in any CQI studies. The lack of physician quality reviews was significant. Mortality review is not performed. Peer review, as has been discussed, was ineffective and, in our opinion, did not accurately reflect the quality of provider care at the facilities we investigated. CQI studies evaluate mostly whether an intervention such as sick call or chronic illness clinic happened. But there is no evaluation as to whether it was adequately performed from a clinical basis.

All facilities had difficulty in identification of their key problems, indicating that a critical analysis of their processes of care was lacking. We view this as a lack of knowledge of how to implement CQI. When facilities were able to identify problems, they failed to thoroughly evaluate the problems. One facility, NRC, did identify medication errors as a problem, which we agreed with. However, there was no analysis of why the problem was occurring and no attempt to establish corrective action plans to correct the problem, so the problem persisted and was repeatedly reported in CQI meeting minutes. SCC identified that referral from nurse sick call to providers was not timely. This study was repeatedly performed without any evaluation as to why this was occurring with an attempt to fix the problem. The problem persisted.

We noted pervasive and systemic problems with preparing and administering medications. This process is not standardized across the system. Problems with administration of medication place inmates at risk of harm. We noted problems with failure to complete parts of the intake process. There is a problem with timely scheduling of specialty care and chronic care. There were problems with surveillance and tracking of infectious and contagious disease. There were problems with standardization of maintaining equipment and supplies. There was no standardized sanitation program. There is no system to monitor sentinel events or adverse clinical events. The IDOC lacks both a process to identify problems and lacks the ability to correct these systemic problems. In systems under Court supervision that we have monitored, a fundamental element of the exit strategy is the ability of the system to self-monitor by identifying problems and taking corrective action to fix the problem. The ability to self-monitor

is essential for a correctional health program but the IDOC currently does not demonstrate capacity to self-monitor.

Access to data useful for quality improvement purposes was poor at all facilities. The First Court Expert recommended that facilities utilize logs for various services as data sources to evaluate processes of care. This is still not in evidence at any facility. Data that is available is not useful for the purposes of quality improvement. The annual CQI reports give statistical data without any analysis that identifies problems or gives evidence that the system is performing as expected. The IDOC does not use data to measure adequacy of the program. Data is presented without analysis. The type of data provided give no indication of whether the program is in control.

Many "studies" were in areas that would be expected to yield good results. These were meaningless studies, as there was no effort to improve the program; instead, a study was designed so that it yielded a good result.

Review of primary source credentials of physicians at the annual meeting is not done. Instead, the site only verifies that the physician has a license. This affects the quality of physicians.

The Governing Body at SCC and NRC have three members, two of whom are custody trained staff; the Warden and the Regional Manager of Wexford. Half of the Governing Body at MCC are also custody staff. The Governing Body of the CQI program should be predominantly medical staff, as it is a medical program.

# Recommendations

We have listed below key recommendations from the Second Court Expert. These are followed by the verbatim First Court Expert recommendations with our comments on each placed in italics after the First Court Expert recommendation. We include our additional recommendations following the First Court Expert recommendations.

## Key Recommendations of Second Court Expert

**Current Recommendations**

1. Governance of the medical program must change. The medical program needs to be under medical control, not custody control. This would entail a restructuring of the medical program and Office of Health Services such that custody leadership are not responsible for medical operational control of the medical program. This will require an augmentation of the Office of Health Services so that it is capable of managing and monitoring clinical care. The health authority and responsible physician, if they are not the same person, need to be members of the Office of Health Services. The Office of Health Services needs regional physicians to monitor physician quality; an Infection Control physician and coordinator; a quality improvement coordinator; and sufficient data analysts to maintain data and statistical information necessary for operational management.

2. The medical program should have a budget that is managed by the health authority. Any vendor contracts should be under control and direction of the health authority.

3. IDOC should conduct a staffing analysis under the direction of medical, **not custody,** leadership that determines systemic staffing needs necessary to adhere to Administrative Directives and acceptable standards of medical and nursing care. This analysis needs to consider all levels of staffing and must include relief factors.

4. Physician staff must be properly trained, credentialed, and privileged. In order for this to happen, we strongly recommend that the IDOC negotiate with the state universities that have medical school programs to provide physician and possibly comprehensive care in the IDOC.[263]  Physicians should be required to be credentialed similar to state university medical school requirements. Such a program should have an enhanced telemedicine component, including for specialty care.

5. The collegial review process should be immediately abandoned as a patient safety hazard. If a utilization program is re-instituted, the Office of Health Services should hire an additional board certified physician to perform prospective review.

6. The medical policies of the IDOC need to be augmented and refreshed and be made consistent with standards of the National Commission on Correctional Health Care. These policies should cover all aspects of a medical program and must be maintained by the IDOC, not the vendor.

---

[263] These universities might include University of Illinois Chicago; Southern Illinois University; and the Rockford School of Medicine.

7. The IDOC should negotiate with the Illinois Department of Public Health for IDOC to fund and maintain an infectious disease-trained physician and infection control coordinator who would jointly work with IDPH and IDOC and would coordinate, advise, and lead the infection control program in the IDOC. This can be pursued as an interagency agreement. The infection control coordinator should be a person with a master's training in public health nursing.

8. An analysis of geriatric and disabled patient needs in the IDOC needs to be done. The purpose would be to determine the numbers of individuals who require skilled nursing, supportive nursing, and infirmary levels of care. The IDOC needs to build or rehabilitate facilities to accommodate the current needs of these types of patients, with facilities that are appropriate for the level of need. Alternatively, if this cannot be done, the IDOC needs to find placement for the geriatric population in community facilities appropriate for their needs and properly licensed and managed in accordance with community standards.

9. The IDOC needs to have a statewide electronic medical record that includes physician order entry and electronic MARs. The implementation would include a device survey to determine the number of devices that need to be in place; a wiring survey to assess the capacity of existing communication wiring; access to an electronic medical reference system paired with the electronic record such as UpToDate®; and consideration to augment the current communication wiring to accommodate a more robust telemedicine program.

10. The IDOC needs to hire a statewide dental director, establish standardized statewide dental policies, and establish a monitoring system to ensure adequate dental services are provided.

11. The IDOC medical program needs to be able to effectively self-monitor all aspects of the medical care program. This will require knowledge of quality improvement methodology, data systems to obtain the necessary information to analyze and monitor care, and capable staff who can provide leadership.

12. The IDOC should develop combined medical and custody Administrative Directives that specify the participation of custody in ensuring that patients attend all scheduled medical appointments in the desired location and ensuring that custody collaborates with nurses so that nurses are able to properly administer medications.

## Organizational Structure, Facility Leadership, and Custody Functions

**First Court Expert Recommendations**

1. All Medical Directors must be board certified in a primary care field. The State has misread this, indicating that all physicians must be board certified. The investigative team has indicated that other primary care staff physicians should have completed an accredited residency training program in internal medicine or family practice, and be either board certified or becoming board certified within three years of employment. Only the State Medical Director could grant exceptions to this requirement based on his or her own assessment of the candidates. The basis for this recommendation is that in our experience and discussion with other State Medical Directors, there have been a disproportionate

number of preventable negative outcomes related to primary care services provided by non-primary care trained physicians. The investigative team does not believe that experience practicing in a field without the required training is adequate in mitigating the preventable negative outcome. *We generally agree with this recommendation. All physicians practicing primary care need to be trained in primary care. We believe that this recommendation will not be accomplished using the current contract process. See Key Recommendation #4 above.*

2. All clinicians should have access to electronic medical references at the point of care. *We agree with this recommendation.*

3. Every special medical mission facility must have its own Health Care Administrator. *We agree with this recommendation.*

4. The Director of Nursing position in all facilities is a full-time position whose time should not be taken away by corporate responsibilities. *We agree with this recommendation.*

5. Establish approved budgeted positions for SCC and the NRC which allow for each facility to function independently. *We agree with this recommendation.*

6. Provide a full-time Health Care Unit Administrator as well as a full-time Quality Improvement Coordinator/Infection Control Nurse for both SCC and NRC. *We agree that a full time HCUA should be budgeted at SCC and NRC. However, we recommend that every site have a full time CQI coordinator. The infection control nurse FTE equivalent should be determined based on the expected activities at that facility. For intake facilities the infection control nurse should be full time. For large facilities with any medical mission, infection control positions should also be full time.*

7. Each facility is to develop and implement a plan to insure registered nurse staff is conducting sick call. *We agree with this recommendation.*

8. Medical vendor health care staff assigned leadership positions, such as the director of nursing, supervisory nurse, or medical records director, will not be assigned corporate duties such as time keeping, payroll, or human resource activities. *This is similar to recommendation #4 above and we agree with this recommendation.*

9. IDOC [is] to develop and implement a plan which addresses facility specific critical staffing needs by number and key positions, and a process to expedite hiring of staff when the critical level has been breached. *We agree with this recommendation but note that this should be part of the staffing analysis recommended above in Key Recommendation #3.*

First Court Expert's IDOC Office of Health Services Staffing Recommendations

1. Immediately seek approval, interview, and fill the Infection Control Coordinator position. *We agree with this recommendation but add that the infection Control Coordinator can be a nurse consistent with Key Recommendation #7. This nurse needs to work collaboratively with an infectious disease trained physician. The Infection Control Coordinator should have a master's degree in public health nursing.*

2. Establish and fill the position for a trained Quality Improvement Coordinator who will be responsible for directing the system wide CQI program. *We agree with this recommendation. The required training for this position can be a systems engineer, nurse, or other person trained in CQI methodology (e.g. six sigma). Persons considered*

*for this position need to have CQI training prior to hiring. They should not learn on the job.*

3. Establish, identify, and fill the positions for three regional physicians trained and board certified in primary care who will report to the Agency Medical Director and perform at a minimum peer review clinical evaluations, death reviews, review and evaluate difficult/complicated medical cases, review and assist with medically complicated transfers, attend CQI meetings, and one day a week, within their region, evaluate patients. Resources for these positions could be taken from monies allocated to the medical vendor for regional physicians. *We agree with this recommendation.*

**Additional Recommendations**

1. IDOC custody should perform a staffing analysis to ensure that they have sufficient officer staff to ensure that medical programs can appropriately and effectively function. This is particularly true with respect to medication administration and ensuring that patients show up in required clinic spaces for appointments that are ordered. This study should include a survey of available transport van to ensure that IDOC has sufficient transportation vehicles to transport inmates for their scheduled appointments.

2. Contract monitoring needs to be improved to include meaningful operational metrics and must include quality of care for physicians, mid-level providers, and nurses.

3. Privileges for physicians should only be granted to doctors who have residency training in the service for which they are seeking privileges.

4. The physician performance evaluation component of peer review needs to be performed by persons trained in primary care and needs to be augmented to adequately reflect quality of care.

5. The sanctioning component of peer review needs to be started. Any physician committing grossly and flagrantly unacceptable care needs to undergo peer review for possible reduction of privileges.

## Use of University of Illinois

The First Court Expert had no recommendations related to UIC.

**Current Recommendations**

1. In addition to Key Recommendation #4 above, we strongly suggest that IDOC explore the possibility of utilizing the university programs to assist with respect to comprehensive medical care, dialysis, dental, nursing, and pharmacy programs.

## Clinic Space and Equipment

**First Court Expert Recommendations**

1. All sick call must take place in a designated area that allows sick call to be conducted in an appropriate space that is properly equipped and provides for patient privacy and confidentiality. *We agree with this recommendation. The existing spaces and conditions at NRC, Dixon, and some of the rooms at MCC are unacceptable for the performance of*

*sick call services, and to protect patient privacy and confidentiality. Non-functional or missing equipment and supplies were noted in clinical areas at almost all of the five facilities inspected. These deficiencies present barriers to the delivery of care and create an unprofessional work environment for both clinical and correctional staff.*

2. Equipment, mattresses, etc., which have an impervious outer coating must be regularly inspected for integrity and repaired or replaced if it cannot be appropriately cleaned and sufficiently sanitized. *We agree with this recommendation. Torn mattress coverings and/or uncovered foam cushions were noted at NRC, SCC, and MCC. Varying degrees of torn examination table upholstery were noted at SCC, LCC, and MCC. Frayed and ripped upholsteries on staff chairs in the clinical areas were noted at SCC and MCC. These deficiencies make it impossible to properly clean and sanitize the beds and examination tables, creating infection control risks and an unprofessional work environment for clinical staff.*

3. A paper barrier which can be replaced between patients should be used on all examination tables. *We agree with this recommendation. Varying degrees of absent changeable paper barriers on examination tables and no evidence of a suitable alternate method to sanitize examination tables between patients were identified at all of the facilities, with the exception of MCC. This deficiency creates an infection control risk for patients and staff.*

4. Handwashing and sanitizing must be provided in all treatment areas. *We agree with this recommendation. Sinks were lacking in all nurse sick call areas and one provider backup exam room at NRC, one nurse sick call room at SCC, three nurse sick call rooms at Dixon, one provider room at LCC, and one clinical exam room at MCC. Hand sanitizing gel was not consistently identified as available in treatment rooms lacking sinks.*

**Additional Recommendations**

5. All of the infirmaries must have sufficient numbers of hospital beds with adjustable heights, heads, and legs, and safety railings to meet the clinical and safety needs of the high-risk infirmary patient population. The infirmaries at NRC, SCC, and MCC lacked an adequate quantity of hospital beds.

6. Nurse call devices must be installed in all infirmaries. The infirmary at MCC was the only infirmary found to be lacking nurse call devices.

7. All facilities must have a sufficient number of examination rooms to accommodate all the nurses and providers who are simultaneously assigned to see patients. NRC, Dixon, and LCC do not have an adequate number of properly equipped examination rooms to accommodate all of their treating nurses and providers. This is a barrier to access to care at these facilities.

8. The showers in the infirmaries and other special housing units (geriatric, ADA, etc.) must have intact, non-slip floors, safety grab bars, shower chairs, and proper ventilation to assure the safety and health of the high-risk population assigned to these special housing units. Showers in special housing units in all of the facilities inspected had notable structural and safety deficiencies that put the health and safety of this compromised population at risk.

9. The physical condition of the hemodialysis unit at SCC must be immediately addressed by the contracted vendor, IDOC, and Wexford.

10. The flooring on all three floors of the health care building at Dixon must be immediately replaced. The vast number of cracked, missing, and loose floor tiles throughout the three-story health care building puts patients, medical staff, and correctional staff at risk for injury.

## Medical Records

**First Court Expert's Recommendations**

1. Problem lists should be kept up to date. *We agree with this recommendation but believe it is a physician practice issue not a medical record issue.*

2. Only providers should have privileges to make entries on the problem list. *We agree with this recommendation.*

3. The system of "drop filing" should be abandoned. *We agree with this recommendation.*

4. Medical records staff should track receipt of all outside reports and ensure that they are filed timely in the health record. *We agree with this recommendation. See also First Court Expert's recommendation #8 in specialty care below.*

5. Charts should be thinned regularly and MARs filed timely. *We agree with this recommendation.*

6. Consideration should be given to scanning specific important records into the new electronic system if possible. *It is our opinion that all medical record documents that are not electronic need to be scanned to the electronic record. This should not occur just "if possible;" it is required.*

**Additional Recommendations**

7. See Key Recommendation #9 above.

8. If paper records are continued, *all records* need to be located near by the medical records office so that any volume of the record can be easily obtained for clinical care.

9. The medical record must include dialysis records or summaries of dialysis records so that clinical staff understand the status of the patient's dialysis.

10. Medical records rooms need to be secured. Only medical record staff should pull or re-file medical records. Only authorized personnel should be permitted in a medical record room.

11. Records should be maintained in accordance with guidance from the Illinois Department of Human Services.

12. When records are pulled for use, an outguide should be used to identify that the record has been pulled and where the record is.

13. Policy for medical records needs to be revised to include the electronic medical record currently in use and should also address security and confidentiality of the medical record paper or electronic.

## Medical Reception

**First Court Expert Recommendations**

*We agree with the First Court Experts recommendations which include*:

1. Sufficient nursing and clinician staff to complete the reception evaluation in one week.
2. A process that ensures that a clinician reviews all intake data, including laboratory tests, TB screening, history and physical, etc., and develops a problem list and plan for each problem.
3. Forms to identify acute symptoms (i.e., a review of systems).
4. A requirement that clinicians, during the history, elaborate on all positives from the nurse screen.
5. A system of placing patients on hold in the midst of appointments or incomplete treatment.
6. A policy that requires the medical record to be well organized and the staff to ensure this is accomplished.
7. A quality improvement process that monitors completeness, timeliness, and professional performance, and is able to intervene in order to implement improvements.
8. A Medical Director trained in primary care.
9. A HCUA dedicated to NRC and appropriate supervisory resources.
10. A well-trained Quality Improvement Coordinator at each reception center and each facility dedicated to ensuring the timeliness, completeness, and appropriateness of clinical decisions.

*We disagree with the First Court Expert's recommendation to have a system that ensures relevant electronic data arrives with patients from Cook County Jail. While access to the electronic medical record is desirable, we find that provision of a paper medical transfer summary is adequate.*

**Additional Recommendations**

11. IDOC health care leadership should develop and implement an electronic medical reception tracking log that documents the timeliness of completion of all required medical reception transfer activities.
12. IDOC should amend medical reception forms to include a comprehensive review of systems (ROS) to identify serious medical conditions.
13. Providers need to take and document a medical history and not rely only on the nurse history.
14. At medical reception, medical records staff should initiate a green jacketed medical record for each patient, with documents filed under the correct tab, eliminating drop filing.
15. Examination rooms should be adequately equipped and supplied, including paper for examination tables to provide infection control barriers between patients. Furniture that is torn or in disrepair should be replaced.

16. At LCC, a microscope should be purchased for medical reception evaluations to diagnose vaginal infections.
17. Staff should change gloves and wash their hands between patients.
18. The IDOC Administrative Directive 04.03.101 should be revised to eliminate obtaining written consent for HIV testing given the opt-out policy that has been established.
19. Weight scales should be periodically calibrated (e.g., weekly).
20. At LCC, nurses should perform and document urine pregnancy testing on all women of child-bearing age.
21. Nurses should measure uncorrected and corrected visual acuity in each eye and document results in the medical record. If large Snellen charts are used, the nurse should ensure the patient stands the correct distance away from the chart. Consider smaller hand-held Snellen charts.
22. Use QuantiFERON testing to detect TB infection rather than tuberculin skin testing.
23. As long as TST is being performed, nurses should correctly read tuberculin skin tests via palpation and measurement of induration. This should be done in a medical setting, not through the food port.
24. Nurses should timely document tuberculin skin test results in the medical record (e.g., within 24 hours).
25. Providers should document review of medical transfer information sent by county jails.
26. Providers should perform a history to include pertinent review of systems for each chronic disease and/or significant illness.
27. Providers should order CIWA and/or COWS monitoring in accordance with current guidelines for patients withdrawing from alcohol, opiates, or other drugs.
28. Providers should provide continuity of medications unless there is a clinical indication for changing medication regimens (e.g., glargine to NPH insulin, etc.).
29. Providers should document all significant medical conditions onto the patient's problem list.
30. Nurses should transcribe all medication orders (i.e., KOP and nurse administered) onto a MAR at medical reception and document administration of KOP medications at the time they are administered to the patient.
31. Health care leadership should develop systems to ensure that all physician orders are timely implemented (e.g., EKG, blood pressure monitoring, etc.).
32. Providers should timely follow-up on all abnormal labs.
33. Providers should use a chronic disease form or document that they are evaluating the patient for chronic care when seeing patients for the first chronic disease appointment within 30 days.
34. Health care leadership should revise medical reception policies and procedures to provide sufficient operational detail to staff to adequately complete each step of the process.
35. Health care leadership should develop and monitor quality indicators related to each step of the medical reception process.

## Intrasystem Transfer

**First Court Expert Recommendations**

1. Custody must propose a list of transferring inmates to medical at least 24 hours prior to transfer.
2. Inmates with scheduled offsite services should be placed on medical hold until the service has been provided.
3. A nursing supervisor should regularly review a sample of transfer summaries of patients about to be transferred to ensure completeness of the data.
4. Office of Health Services should provide a guide as to how to efficiently review a record to identify important elements to be included in the summary.
5. When patients arrive, they must be brought to the medical unit and a nurse must be responsible for facilitating continuity of required services.
6. At least quarterly, this service must be reviewed by the QI program.

*We agree with these recommendations.*

**Additional Recommendations**

7. IDOC should develop an intrasystem transfer policy and procedure consistent with NCCHC standards, and that provides sufficient operational guidance to staff regarding each step of the process.
8. IDOC/Wexford should train staff regarding the revised policy.
9. Nurses should complete each element on the intrasystem transfer form and address all aspects of health care requiring continuity.
10. A system should be developed and implemented that provides sending facilities feedback when there are errors on the intrasystem transfer form.

## Nursing Sick Call

**First Court Expert Recommendations**

1. Each facility is to develop and implement a plan to ensure:
   a. Sick call is conducted in a defined space that is appropriately equipped and provides patient privacy and confidentiality.
   b. Sick call requests are confidential and viewed only by health care staff.
   c. The review/triage of sick call requests and conducting of sick call is performed by a licensed RN.
   d. Legitimate sick call encounters to include collecting a history, measurement of vital signs, visual observations, and a "hands on" physical assessment.
   e. There must not be arbitrary restrictions on the number of symptoms to be addressed at an encounter.
   f. Following Office of Health Services policy and procedure.
   g. Complete documentation.
   h. Implementation of a sick call log.
   i. Administration must ensure health care activities such as sick call are not routinely cancelled, as this results in unacceptable delay in health assessment.

*We agree with these recommendations.*

**Additional Recommendations**

2. IDOC should revise its Administrative Directives on nursing sick call to provide adequate policy, operational, and procedural guidance regarding how to implement the policy.[264] The policy should include:

   a. Designating what IDOC forms are used for inmates to submit written health requests and which staff are responsible for ensuring that they are available to inmates on a daily basis.

   b. Developing a standardized paper or electronic Nursing Sick Call Tracking Log.

   c. Installation of lockable Health Request form boxes that are accessed only by health care staff in each inmate housing unit.

   d. Inmates must be permitted out of their cells on a daily basis to confidentially submit their health requests into health request boxes, except in restricted housing units where nurses collect health request forms.

   e. Health care staff should collect health care request forms seven days per week.

   f. Health care staff should legibly date and time receipt of health requests.

   g. An RN should triage health requests and document a disposition on the form (e.g. urgent, routine). Nurses should legibly date, time, and sign the form, including credentials.

   h. Each health request should be entered onto the Sick Call Log, including the urgency of the disposition.

   i. A nurse should schedule patients to be seen in accordance with the urgency of their complaint.

   j. Nursing sick call should be conducted in adequately lighted, equipped, and supplied rooms with access to a sink for handwashing. This includes a desk and chairs so the nurse and patient can be seated, and an examination table, otoscope, scale, etc. Consider installing lockable cabinets to store supplies (e.g., nurse protocol forms, gauze, tape, tongue blades, etc.).

   k. Nurses should have the medical record available at the time of the sick call encounter.

   l. An RN nurse should perform and document an assessment of each patient in accordance with treatment protocol forms and/or sound nursing judgement.

   m. Nurses should refer patients to providers in accordance with the treatment protocol and in accordance with sound nursing judgment.

   n. Health requests should be filed chronologically in the medical record.

   o. At the regional and institutional level, health care leadership should develop and monitor quality indicators associated with each step of the sick call process.

3. IDOC should standardize the nursing sick call process to all institutions.[265]

---

[265] Variances to the policy should only be granted to institutions that have demonstrated that access to care is timely and appropriate.

## Chronic Care

**First Court Expert Recommendations**

1. Patients should be seen in accordance with the degree of control of their diseases, with more poorly controlled patients seen more frequently and well controlled patients seen less frequently. *We agree with this recommendation.*

2. Chronic care forms and flow sheets should be updated and designed so that all chronic diseases are addressed at each visit. *We agree with this recommendation. We add that use of an electronic medical record can eliminate the problem of inadequate forms and the time wasted completing multiple forms for persons with multiple chronic illnesses.*

3. HIV patients should be followed regularly by IDOC providers in the chronic care program to monitor for medication compliance, side effects of therapy, and overall health status. *We agree that IDOC physicians should monitor patients between UIC telemedicine visits to address problems that occur.*

4. The Asthma Treatment Guideline should be replaced with a guideline on the treatment of pulmonary diseases to include COPD and chronic bronchitis as well as asthma. This guideline should be modeled after the NHLBI.[266] *We agree in part. It is our opinion that it is not efficient or productive for the IDOC to write chronic clinic guidelines, as they will not have the expertise or time to do this. Their guidelines should be confined to the timeliness and frequency of clinics, the required laboratory and other testing for inmates with chronic illness, and the conditions under which patients are referred for specialty management of a chronic illness. It is our opinion that the IDOC should refer providers to national standards of medical care in lieu of chronic disease guidelines. These should include at a minimum:*

   o *Standards of Medical Care in Diabetes, American Diabetes Association as found at* http://care.diabetesjournals.org/content/38/Supplement_1/S1.full.

   o *2014 Evidence-Based Guideline for the Management of High Blood Pressure in Adults, Report from the Panel Members Appointed to the Eighth Joint National Committee (JNC 8). As found at* http://jama.jamanetwork.com/article.aspx?articleid=1791497.

   o *Guidelines for the Diagnosis and Management of Asthma (EPR-3), National Heart, Lung, and Blood Institute as found at* http://www.nhlbi.nih.gov/health-pro/guidelines/current/asthma-guidelines.

   o *2013 American College of Cardiology/American Heart Association Guideline on the Treatment of Blood Cholesterol to Reduce Atherosclerotic Cardiovascular Risk in Adults as found at* https://circ.ahajournals.org/content/early/2013/11/11/01.cir.0000437738.63853.7a.full.pdf.

   o *Prevention and Control of Tuberculosis in Correctional and Detention Facilities: Recommendations from CDC found at* http://www.cdc.gov/mmwr/PDF/rr/rr5509.pdf

---

[266] National Heart Lung and Blood Institute; Guidelines for the Diagnosis and Management of Asthma (EPR-3) published August 2007 as found at https://www.nhlbi.nih.gov/health-topics/guidelines-for-diagnosis-management-of-asthma.

o *Global Initiative for Chronic Obstructive Lung Disease updated 2016 as found at [http://www.goldcopd.org/uploads/users/files/WatermarkedGlobal%20Strategy%202016(1).pdf.](http://www.goldcopd.org/uploads/users/files/WatermarkedGlobal%20Strategy%202016(1).pdf.)*
o *HIV/AIDS guidelines sponsored by National Institutes of Health found at [https://aidsinfo.nih.gov/guidelines.](https://aidsinfo.nih.gov/guidelines.)*
o *The Management of Sickle Cell Disease, National Institute of Health/National Heart, Lung, and Blood Institute as found at [http://www.nhlbi.nih.gov/files/docs/guidelines/sc_mngt.pdf.](http://www.nhlbi.nih.gov/files/docs/guidelines/sc_mngt.pdf.)*

*When a patient has a disease other than one supported by a referenced guideline, the IDOC should require that provider refer to UpToDate® as a reference.*

5. There should be a chronic clinic devoted to women's health to include specific guidelines on cervical and breast cancer screening as well as other issues unique to this population. *We agree with this, but note that IDOC has Administrative Directive guidance on initial and subsequent cervical and breast cancer screening. Even though there is an obstetrician available for pregnancy care, access of females to care for female care issues could be improved.*

6. The TB guideline should be updated to provide basic information regarding interferon gamma testing, including appropriate uses of this test. *It is our opinion as stated in Infection Control Recommendation 1.d. that interferon gamma testing should replace Mantoux skin testing for tuberculosis screening of all individuals.*

7. Policy should require that patients who miss medications repeatedly or for a significant period of time are referred to a provider to address the issue. *We agree with this recommendation.*

8. Copies of the current MAR should be available for the provider's review during chronic care clinic. *We agree with this recommendation.*

**Additional Recommendations**

9. All chronic illnesses should be monitored at every chronic disease clinic.

10. Consult with an endocrinologist or diabetes specialist to perform a comprehensive review, recommendations and training concerning the management of diabetes, and in particular, insulin-prescribed diabetes in the IDOC.

11. Implement and utilize current Center for Disease Control (CDC) age-based and disease-based standards for the administration of adult immunizations.

12. Implement and utilize current United State Preventive Services Task Force (USPSTF) guidelines for screening adults for cancer and other conditions. The IDOC should adopt the A and B recommendations of the USPSTF.

13. Calculate and document the ten year cardiovascular risk score on all appropriate adults to assist with the decision and timing to initiate HMG-CoA reductase inhibitors (statins).

14. Revise the current restrictive criteria and lengthy screening and approval process utilized to determine in order to expand the number of active hepatitis C patients are eligible for treatment and when treatment is initiated.

15. Particularly given the current configuration of physicians, when a physician has not been trained in residency training to manage an illness, the physician should refer that patient to a physician who is trained in managing that condition.

16. Increase access to specialty care throughout the IDOC by increasing the number of onsite specialty consultants, expanding the existing telehealth specialty program to include additional medical specialists to assist facility providers with the management of complex and common medical conditions including diabetes, hypertension, cardiology, dermatology, neurology, and non-HIV, non-hepatitis C infectious diseases, and establishing an e-consult program that would allow providers to readily consult with specialists about diagnostic and treatment questions.

17. Develop a plan to shift anticoagulation treatment from vitamin K antagonists (warfarin) to new types of anticoagulants that do not require frequent ongoing lab testing and frequent dose modifications to achieve an adequate state of anticoagulation.

## Urgent/Emergent Care

**First Court Expert Recommendations**

1. All facilities must track urgent/emergent services through using a logbook maintained by nursing which includes patient identifiers, the time and date, the presenting complaint, the location where the patient is seen, the disposition and when the patient is sent out, the return with the appropriate paperwork including an emergency room report, and appropriate follow up by a clinician. *We agree with this recommendation. All facilities, except NRC, provided a list of patients sent to the ED, but did not provide a log that contains a list of all unscheduled urgent/emergent encounters. Patients seen urgently, but not sent to the ED, are not consistently tracked on a log. The current list does not include the location the patient was seen (cell front, sick call area, trauma room, yard etc.), whether a report was returned with the patient, and the date the patient was seen by a provider for follow up after receiving offsite services. Existing logs should be modified to include this data.*

2. Assessments must be performed by staff appropriately licensed to be responsible for that service. *We agree with this recommendation. The use of CMT and LPNs to respond to medical emergencies is not within their scope of practice. Only registered nurses have a scope of practice that allows them to make independent decisions about whether to contact a clinician. There should be sufficient registered nurse staffing so that an RN is assigned to respond to evaluate patients with urgent/emergent complaints.*

3. Guidelines should be developed for nursing staff with regard to vital signs reflecting instability that require contacting a clinician. *We agree with this recommendation. We note that the IDOC issued a revised set of nursing treatment protocols in March 2017. The document does provide guidance to nurses on vital sign results among the determinants in contacting a provider. Ongoing review of urgent/emergent clinical performance using the criteria in the protocols would aid in improving nursing performance and is also useful in identifying revisions or additions that should be made to the protocols.*

4. When patients are sent offsite, work with hospitals to ensure that the emergency room report is given to the officer to return to nursing with the patient. *We agree with this recommendation. We found many examples of patient discharge instructions but few actual records from emergency room visits or hospitalizations. This was particularly true of hospitals in the local community. The First Court Expert recommended developing an understanding that payment for services included receiving at least the discharge summary from a hospital. We agree that this is one way to accomplish this.*

5. Patients returning from an emergency trip must be brought to a nursing area for an assessment and if not placed in the infirmary, scheduled for an assessment by an advanced level clinician. *We agree with this recommendation. The follow up by an advanced level clinician needs to be within three days (see recommendation #7 below). We found many instances of patients returning from offsite services who were not seen promptly upon return or not seen at all. We also found instances of patients returning from offsite services who should have been put in the infirmary, but instead were housed in general population.*

6. The Office of Health Services should provide guidance with regard to the types of clinical problems that require services beyond the capability of the infirmary, thus sending patients to the local hospital. *We agree with this recommendation.*

7. Insure that after the patient returns, he is seen by a clinician within three days where there is documentation of a discussion of the findings and plan as described in the emergency room report. *We agree with this recommendation. However, given the number of hospital visits where the patient is never seen, we suggest IDOC consider requiring patients sent off site in an emergency be admitted to the infirmary upon return to the facility until evaluated by a provider and a plan for ongoing care established.*

8. The QI program should monitor timeliness and appropriateness of professional responses. *We agree with this recommendation. All unscheduled urgent/emergent encounters should be reviewed by a nurse manager as soon as possible after the encounter but no longer than the next business day. The review by the nurse manager should include review of the nursing assessment for compliance with the relevant treatment protocol as well as timeliness of the response. These reviews should be documented, and an analysis given to the QI committee monthly, including recommended areas of improvement. The QI committee should direct corrective action or performance improvement plans and monitor implementation. In addition, a sample of patients sent to the ED should be reviewed at least quarterly to evaluate whether the care of the patients in the months preceding the offsite could have better addressed the clinical reason the patient required unscheduled urgent/emergent care. Examples of conditions which should be considered for review are seizures, hypoglycemia, ketoacidosis, infection, etc. The results of chart review should be analyzed to identify individual clinicians who would benefit from coaching or other performance improvement measures as well as systemic factors that would improve care. The analysis should be presented to the QI committee and the systemic factors discussed to identify corrective action to be taken.*

9. As an aspect of the QI program, review nursing and clinician performance to improve it. *We agree with this recommendation. See discussion of #8 above.*

**Additional Recommendations**

10. The Office of Health Services should standardize the equipment and supplies that are at the facilities for emergency response. This should include specifying the contents of the emergency bag, identifying the minimum number and location of AEDs and other equipment (oxygen tanks, suction, cervical collars, etc.) for each site, and whether one or more trauma or disaster bags are kept in addition to the emergency bags. The contents of the emergency bag (and if kept on-site, trauma and disaster bags) should be listed on the outside of the bag and include the expiration date of any medicine or other supplies. Every opening on the emergency bag (and trauma or disaster bags) should be sealed with a numbered, plastic seal or lock to indicate that the contents are undisturbed.

11. Emergency equipment and supplies should be checked each shift and documented on a standardized log. The log should list what specifically is to be checked (i.e., the expiration date of the electrodes on the AED, the pressure in the oxygen tank, etc.) and include the numbers of the tags on the sealed emergency bag. If the locks are intact, the bag does not have to be opened and checked. If the bag has been opened, it is removed from service until it has been replenished and a new seal applied. The log is checked daily by a nurse manager to ensure that equipment is being checked and is functional.

12. The Office of Health Services should monitor to ensure compliance with expectations for emergency response equipment and that drills are conducted per the AD. The Office of Health Services should also develop a template with criteria to be considered in the review and analysis of emergency response and mass disaster drills, and monitor the reporting and corrective action pursued through the facility CQI committees.

13. The Office of Health Services needs to incorporate in its quality improvement program review of sentinel events.[267] These should be reviewed consistent with methodology used for mortality review in an attempt to discover correctible process errors or other errors.

## Specialty Consultations

**First Court Expert Recommendations**

1. The entire process, beginning with the request for services, must be tracked in a logbook, the fields of which would include date ordered, date of collegial review, date of appointment, date paperwork is returned and date of follow-up visit with clinician. There should also be a field for approved or not approved, and when not approved, a follow-up visit with the patient regarding the alternate plan of care. *We agree that offsite specialty care needs to be tracked and this system of tracking should continue if a prospective review process is continued. This tracking should be standardized across all IDOC facilities and directed and/or managed by IDOC.*

2. Presentation to collegial review by the Medical Director must occur within one week. *See Key Recommendation #5 above. We believe the collegial process should be abandoned as a patient safety hazard. Doing so makes this recommendation mute.*

---

[267] Sentinel events are unexpected events involving death or serious physical harm or risk of harm.

3. When a verbal approval is given, the authorization number must be provided within one business day to the onsite scheduler. *See Key Recommendation #5 above. We believe the collegial process should be abandoned as a patient safety hazard. Doing so makes this recommendation mute.*

4. When a scheduled routine appointment cannot be obtained within 30 days, a local resource must be utilized. *We generally agree with this recommendation. But we note that some referrals are meant to be longer than 30 days out. This recommendation relates to UIC referrals presumably and we agree that for routine appointments that are meant to occur as soon as can be reasonably scheduled local resources should be used when UIC cannot provide a timely appointment.*

5. Scheduling should be based on urgency. Urgent appointments must be achieved within 10 days; if emergent, there should be no collegial review and there should be immediate send out. Routine appointments should occur within 30 days. *We agree with this recommendation. But we note that some referrals are meant to be longer than 30 days out (e.g., a patient is referred by a cardiologist to be seen in follow up in six months)*

6. When the patient receives the service, the paperwork and the patient must be returned to the appropriate nursing area so that the nurse can identify what the needs are. *We agree with this recommendation.*

7. When the patient returns without a report, a staff member should be assigned to contact offsite services and obtain a report. *We agree in principle with this recommendation. However, it is our opinion that the root cause of this problem is a failure of the vendor to negotiate with contract hospitals and consultants in order to obtain reports. To force line staff to attempt to obtain reports is misplaced and is unlikely to succeed. The vendor must correct this problem systemically.*

8. Either a nurse or the scheduler must be assigned responsibility for retrieving offsite service paperwork timely and this should be documented in the offsite service tracking log. *We agree in principle with this recommendation. However, it is our opinion that the root cause of this problem is a failure of the vendor to negotiate with contract hospitals and consultants in order to obtain reports. To force line staff to attempt to obtain reports is misplaced and unlikely to correct the problem. The vendor must correct this problem.*

9. Nurses should contact clinicians for any orders. *We agree with this recommendation.*

10. When patients are scheduled for appointments, they should be put on hold for as long as clinically necessary to complete the appointment before being transferred. *We agree with this recommendation.*

11. When the paperwork is obtained, an appointment with the ordering clinician or Medical Director must be scheduled within one week. *We agree with this recommendation.*

12. That encounter between the patient and the clinician must contain documentation of a discussion of the findings and plan. *We agree with this recommendation.*

**Additional Recommendations**

13. See Key Recommendation #5 above.

14. We recommend that IDOC investigate and negotiate for expanded specialty coverage via telemedicine with UIC or SIU. Given the degree of underutilization, additional

specialty care resources will be indicated. To the extent possible (onsite providers, onsite radiography, etc.) IDOC will need to increase specialty care resources to attain adequacy. The extent to which unqualified doctors continue to be used, the expansion of specialty care necessary to attain adequacy will be considerable.

## Infirmary Care

**First Court Expert Recommendations**

1. It is our opinion a registered nurse should be readily available to address infirmary patient issues as needed. *We agree with this recommendation.*

2. In the large facilities, such as SCC, Pontiac, and MCC, where medical staff is assigned to work in multiple buildings/cell houses outside the main health unit where infirmary is located, it is recommended that at least one registered nurse is assigned at all times to the building where the infirmary is located. *We agree with this recommendation provided the analysis called for in Key Recommendations #3 and #8 are completed and this level of coverage is sufficient to ensure the safety and meet the needs of patients in the infirmary. We also have concerns that nurses in the building but not on the infirmary will not hear the alarm unless they are present on the infirmary unit.*

3. At all other facilities, it is recommended at least one registered nurse is assigned to each shift. *We agree with this recommendation.*

4. The infirmary policy should include specific clinical criteria which are appropriate for infirmary care, and those criteria which exceed the level of care which can safely be provided in an infirmary setting and would indicate referral to the hospital. *We agree with this recommendation.*

5. The infirmary policy should provide criteria outlining when patients are stable enough to be discharged from the infirmary and require follow up after infirmary discharge. *We agree with this recommendation.*

6. Develop and implement a plan to open and operate the NRC infirmary. *The NRC infirmary was opened in 2016 and this recommendation is no longer necessary.*

7. Develop and implement a plan to insure a constant security presence in the infirmary. *We agree with this recommendation. Security staff are stationed at desks outside the SCC and Dixon infirmaries. During the day shifts, correctional officers were observed inside both of these infirmaries.*

8. Develop and implement a plan to insure each infirmary patient is provided a nurse call device. *We agree with this recommendation. Nurse call devices are in place in all patient rooms at the NRC and LCC infirmaries and in some infirmary rooms at SCC and Dixon. MCC's infirmary has not placed nurse call devices in any infirmary patient rooms.*

9. Develop and implement a plan of teaching/continuing education for nursing staff which addresses accurate and informative documentation. *We agree with this recommendation.*

10. The inconsistencies between IDOC and Wexford Infirmary policies should be rectified, specifically regarding the issue of 23-hour admissions/temporary placements. *We agree with the recommendation. Wexford policies were no longer in use at the time of our visits*

11. The infirmary policy should clarify for nursing staff those criteria that are appropriate for temporary observation vs. those that require evaluation by a provider prior to release from the infirmary. *It is our opinion that if a nurse believes that a patient needs to be placed on the infirmary for observation, a physician should examine the patient the following day. The rationale is that if a nurse judges a patient to have an urgent medical condition requiring infirmary admission, a physician should see the patient.*

12. Ensure that institutions with infirmaries have at least one registered nurse available onsite 24 hours a day. *We agree with this recommendation. See also recommendation #2 above.*

13. The infirmary policy should require follow up after discharge from the infirmary. *We agree with this recommendation.*

14. Develop and implement a plan to insure sufficient quality and quantities of infirmary bedding and linens. *We agree with this recommendation. We note that with the exception of NRC, a sufficient quantity of bedding and linens in reasonably good condition were available in the infirmaries inspected. This does not address the laundering of linens which is addressed in the Infection Control Recommendations below.*

**Additional Recommendations**

15. Health care leadership and the quality improvement committee should develop, monitor, and report quality indicators that measure and track provider and nurse adherence to the infirmary policy and the quality of the acute and chronic care provided to infirmary patients.

16. Problem lists in the infirmary charts must be complete and accurate.

17. Provider infirmary notes must be legible, communicate the rationale for modifications in treatment, list reasonable differential diagnoses, document pertinent physical findings and symptoms, record clear treatment plans, and include regular comprehensive progress notes that update the status of each and every acute and chronic illness.

18. Provider infirmary admission notes and progress notes should be performed in accord with the timeframes detailed in IDOC policy 04.03.120, Offender Infirmary Services.

19. Physical therapy services must be provided in the infirmary for those patients who cannot be readily moved to the physical therapy treatment rooms.

20. Patients whose clinical needs and support for their activities of daily living exceed the capability of the infirmaries must be transferred to a licensed skilled nursing facility in the community or to an infirmary in the IDOC that meets all the State of Illinois standards for licensure at a skilled nursing facility. See Key Recommendation #8.

21. Educate, encourage, and direct infirmary providers to expeditiously consult with surgical and medical specialists to address the care of complex infirmary patients.

## Pharmacy and Medication Administration

**First Court Expert Recommendations**

1. Following patient ingestion of medication, security staff should be responsible to check the mouth for contraband. *We agree with this recommendation. Some officers we observed do check for ingestion, but it was sporadic. See also Key Recommendation #12*

*which recommends that the IDOC develop, in collaboration with the Office of Health Services, an Administrative Directive that provides standardized guidance to custody staff on the expectations for safe delivery of medications. The IDOC should translate this into post orders at each site that explicitly detail correctional officers' responsibilities during medication administration. This should ensure that nurses are safe and can administer medication in accordance with established nursing standards.*

2. A security staff member must be assigned to accompany the nurse who performs medication administration. *We agree with this recommendation. See Key Recommendation #12. Correctional officer support is essential to complete medication administration swiftly and safely. This includes not just escort but also controlling movement and distractions in the environment (television, fights, etc.), accounting for missing inmates, and ensuring that inmates ingest medication that has been administered. Many facilities identify these duties in the officers' post orders as discussed in the recommendation above.*

**Additional Recommendations**

We provide detailed recommendations in the facility reports for improvements needed in pharmacy and medications services. They are so numerous and basic that they are not restated here. The five recommendations below are overarching and require the concerted and immediate attention of IDOC.

3. Pharmacy and medication services need to be completely redone to bring practices into conformance with standards of care. This should be accomplished by leadership from the Office of Health Services and managed as a comprehensive plan of change with clear targets, steps to proceed, timeframes, and outcomes.

4. IDOC Office of Health Services needs to establish more detailed operational guidance (See Key Recommendation #6) that specifies how medication is prescribed, how and by when treatment is initiated, how medication is to be administered safely and timely, including support to be provided by the facility, and establish how and by when documentation of medication administration takes place. At a minimum this should include:
   a. Nurses should timely transcribe medication orders onto a MAR;
   b. Nurses should have the MAR present at all times medication is administered to patients;
   c. Nurses should administer medications to patients directly from pharmacy-dispensed containers and contemporaneously document administration on the MAR.

5. Computerized provider order entry should be implemented at all facilities. This will resolve problems with legibility and, if a template is created, assist providers to write complete orders. The MAR should also be automated. Automation of the MAR will make information on medication orders and treatment available to providers, who can use this information to guide decisions about subsequent care. Automation will provide detailed and accurate statistical measures of medication administration and of compliance of medication by individual inmates. Automation will also provide staff and

managers with information which directs work and identifies outliers, which can be immediately resolved. See also Key Recommendation #9 above.

6. Facility operations need to provide sufficient access to inmates so that medications are administered safely. This may mean that schedules need to be renegotiated or additional personnel or equipment must be obtained. The compromise of widely accepted practices to administer medication is unacceptable. See Key Recommendation #12 above.

7. Health care programs at each facility should be expected to monitor the extent practices comply with the expectations of the Office of Health Services (as described in recommendation #4) and to report these results to the CQI committee. CQI committee meetings should document the analysis of root causes of systemic problems, develop corrective action plans, and monitor the results of corrective action. The Office of Health Services needs to monitor facility compliance with the comprehensive plan of change as well as performance criteria outlined in the operational guidelines.

## Infection Control

**First Court Expert Recommendations**

1. Each facility is to do the following:

    a. Develop a position description and name an Infection Control (IC)/Quality Improvement (QI) registered nurse (IC/QI-RN) and provide training on communicable and infectious disease recognition, monitoring and reporting, and the Quality Improvement process.

    *We agree, but would modify the recommendation as follows: The IDOC should develop the position description for an infection control nurse that includes the duties listed by the First Court Expert on page 35 of his report as well as responsibility for coordination of clinics and care for patients with HIV and HCV; the initiation and follow up of treatment for patients with tuberculosis; monitoring and managing vaccination programs for inmates and staff; managing and providing surveillance of infectious and contagious disease screening programs; monitoring and resolving problems with conditions of confinement that are known risks for communicable disease transmission; monitoring and managing Occupational Safety and Health Administration (OSHA) requirements to provide protection from infectious disease by delivering training, overseeing the availability and use of PPEs, and screening with vaccination of staff and inmates; and conduct surveillance, manage and report on resolution of communicable disease outbreaks in collaboration with the Illinois Department of Public Health. Each facility should be expected to fill this position and operate an infection control program consistent with the position description adopted by IDOC. This model is in place at MCC and should be used as a model for other facilities. It needs to be a dedicated position but does not have to be a nursing supervisor. We note that the First Court Expert recommends combining the infection control and quality improvement responsibilities. It is our recommendation that*

*each of the infection control positions be a dedicated full time position and not combined with quality improvement responsibilities.*

*In addition, the IC-RN should report to the statewide Communicable and Infectious Diseases Coordinator for clinical performance.*

b. Develop and implement a plan for the IC/QI-RN to conduct monthly documented safety and sanitation inspections, focusing at a minimum on the healthcare unit, infirmary, and dietary department, with monthly reporting to the Quality Improvement Committee (QIC).

*We agree with this recommendation and would amplify it as follows: Safety and sanitation inspections should monitor the condition, function, and annual certification of clinical equipment, the cleanliness and sanitation of clinical rooms, the integrity of all flat surfaces for sanitation, functionality of the negative pressure rooms, integrity of bed and chair upholstery including on infirmaries and ADA units, completion of medical cart and emergency response bag logs and ensuring proper sealing of these bags, the safety of shower areas used by special needs populations, the training of health care unit porters, and other health care issues. Reporting should include request and completion dates of all repair or replacement requests. Delays longer than 30 days should be reported to IDOC Office of Health Services for further efforts at resolution.*

c. Develop and implement a plan for the IC/QI-RN to monitor food handler examinations and clearance for staff and inmates.

*We do not agree with this recommendation. A medical examination of persons to work as a food handler is not necessary because it only represents that individual's condition on the day of the exam and is not predictive of future illness or disease that would contradict working as a food handler. Instead, we recommend that staff and inmates working in food service be trained and pass an examination on proper food handling techniques, sanitation procedures, and what health conditions need to be reported to the food services supervisor. This training should be approved by the IDOC Communicable and Infectious Diseases Coordinator. In addition, food service supervisors should be trained and certified by IDOC or the IDPH in supervision of food handlers and prevention of food borne illnesses. The food services supervisor's job description should include responsibility to prevent food borne illnesses by monitoring workers' compliance with policy and procedures for food safety, and vigilance for health conditions that should exclude workers from food preparation and serving.*

d. Develop and implement a plan for the IC/QI-RN to monitor compliance with initial and annual TB screening, with monthly reporting to the QIC and facility administration as needed.

*We agree with this recommendation and would amplify it to include the following: Monitoring shall include observation of TB screening practices as well as chart review. In addition, we recommend that IDOC replace skin testing with interferon gamma testing to screen for TB. We also recommend that each facility IC-RN complete training in TB control offered through the Southeastern National TB Center or online at the Centers for Disease Control.[268] The statewide Communicable and Infectious Diseases Coordinator should work with the Tuberculosis Control Section of the IDPH to determine rates of TB infection in the state correctional centers and establish parameters to monitor the quality and efficacy of TB screening, prevention and treatment.*

e.  Develop and implement a plan to aggressively monitor skin infections and boils, and work jointly with security and maintenance staff regarding cell house cleaning practices, with monthly reporting to the IC/QI-RN, QIC and facility administration as needed.

*We agree with this recommendation. Only one of the facilities we visited had implemented this recommendation. Given the poor conditions of the physical plant, particularly the showers and sinks, as well as the sanitation issues we observed with water temperatures and poor surface cleanliness, skin infection should be a major area of focus for infection control. Detailed records of each case should be kept on a log that identifies the housing and work assignments and places frequented by the inmate for programming. The log should be surveilled by the infection control nurse to identify cells and other locations to receive targeted deep cleaning. Finally, vigilance for skin infection referral needs to be broadly disseminated throughout the institution. Identification of possible skin and soft tissue infection needs to originate from sick call visits, provider visits, and use of urgent care, not just from the lab (culture) or pharmacy (antibiotics). Referrals from correctional officers to infection control of inmates with possible skin infection should be supported by the facility and health care program.*

*We also recommend that this tracking and monitoring include scabies and lice, two types of skin infection readily transmissible in correctional facilities and easily contained with astute and early intervention.*

f.  Develop and implement a plan to daily monitor and document negative air pressure readings when the room(s) is occupied for respiratory isolation and weekly when not occupied.

---

[268] https://www.cdc.gov/tb/education/professional-resources.htm, specifically the online course "TB 101 for Health Care Workers" and the Self Study Modules 1-9 as well as https://sntc.medicine.ufl.edu/home/index#/catalog, which provides a course "Arresting TB: Best Practices for Controlling TB in Corrections" and other seminars.

*We agree with this recommendation and would amplify it to include the following: Negative pressure rooms or alarm systems that are not functional after five days shall be reported to the Office of Health Services and a plan for correction established with the approval of the Office of Health Services. In addition, the statewide Communicable and Infectious Diseases Coordinator should establish, in consultation with the TB Control Section of the IPHD, the number of negative pressure isolation rooms that are needed and the location for each of these rooms based upon the population served.*

g.  Develop and implement a training program for healthcare unit porters which includes training on blood-borne pathogens, infectious and communicable diseases, bodily fluid clean-up, proper cleaning and sanitizing of equipment, infirmary rooms, beds, furniture, toilets, and showers.

*We agree with this recommendation and would supplement it with the following: Inmates shall not be assigned to work in the health care area until such training has been documented as received in the inmate's institution record. We would add that inmates will not be assigned work in the health care area until vaccinated for hepatitis A and B, a record of such vaccines has been documented in the inmate's record, and clearance for assignment to the health care area provided by health services is placed in the inmate's institution file.*

*In addition to the training, each facility should have procedures for the cleaning and sanitation of each area in the health care area to include proper use of PPEs. The policies and procedures at MCC should be considered an example once they have been updated.*

h.  Monitor all sick call areas to insure appropriate infection control measures are being used between patients, i.e., use of paper on examination tables which is changed between patients or a spray disinfectant is used between patients, examination gloves are available to staff, and hand washing/sanitizing is occurring between patients.

*We agree with this recommendation but would expand it to include all health care areas.*

i.  Develop and implement a plan to monthly monitor all patient care associated furniture, including infirmary mattresses, to assure the integrity of the protective outer surface, with the ability to take out of service and have repaired or replaced as needed.

*We agree with this recommendation and would supplement it with the following: Such monitoring shall include the condition, function, and annual certification of clinical equipment, the integrity of all flat surfaces for sanitation, integrity of bed,*

*chair, and other upholstery. Additionally, a record of each item found in disrepair, the date taken out of service, and the date repaired or replaced should be documented on a log. We would also recommend that IDOC establish the practice of recording the expected useable life and replacement date for each piece of patient care equipment with a replacement cost greater than $50 on a capital repair and replacement log. This log should be used to plan and requisition replacement equipment and furniture.*

j.  Interface with the County Department of Health and Illinois Department of Health, and provide reporting as required by each.

*See our Key Recommendation #7 above. We agree with this requirement and found that an individual at each facility had been designated with this responsibility. We did not evaluate if reportable conditions were being reported as required to the county and state health departments. There was evidence of collaboration between IDOC facilities and the county/state health departments.*

*However, this interface should be for more than just reportable conditions, as it is now. The relationship with county health departments and the state should include establishing prevalence rates for certain communicable diseases, validation of communicable disease screening processes and results, access to the state vaccine registry and to vaccines, assistance with monitoring environmental safety and sanitation, and so forth. The statewide Communicable and Infectious Diseases Coordinator should be principally involved in establishing these relationships and developing organizational relationships that translate Illinois' interests and goals for the health and safety of its citizens into the state prisons.*

k.  Develop and implement a plan for the proper sanitizing of healthcare unit linens.

*We agree with this recommendation. IDOC has known that linens are not adequately sanitized since at the least the First Expert's report and has not corrected it. This is an example of how pervasive and systemic the conditions for transmission of infection with communicable disease are in IDOC. The same could be said for the lack of protection provided during dialysis of patients with chronic hepatitis B. The fact that at SCC birds still fly through the kitchen and roost over the dining area today, after an outbreak of histoplasmosis at the Danville facility in 2013, is unfathomable except as a reflection of deliberate indifference to the health and safety of inmates.*

*These are problems that require the attention of infection control personnel who are trained and qualified in measures to prevent and control transmission of communicable disease in the prison setting. In addition to training and qualifications, the infection control nurse must have the authority to drive change in both institution and health care practices, with accountability to the Office of Health Services. In addition, a schedule for sanitation and disinfection for each area of the*

*institution should be established. The IC-RN should monitor compliance with the schedule as part of Safety and Sanitation rounds.*

2. The Office of Health Services to fill the position of statewide Communicable and Infectious Diseases Coordinator.

    *We agree with this recommendation. See Key Recommendation #7. There are obvious areas of infection control that should be dealt with at a statewide level. The first and most obvious is that the Administrative Directive related to communicable disease screening is not current with articulated policy, the Infection Control Manual is out of date, and the facility policies and procedures vary widely and are not up to date. Other areas of primary responsibility include establishing the job expectations and performance criteria for infection control at each of the state facilities, ensuring vaccination rates are compatible with age and disease related expectations, implementing policy for robust communicable disease screening, the standardization of policy and procedures for infection control practices, monitoring surveillance activities, acting as a point person with IDPH on contagious disease outbreaks, and analyzing statistics to identify and address areas of disease progression and infection control that are problems.*

    *A problem cited at every facility was that the infection control reports made to the CQI committee did not contain any analysis of disease prevalence or trends in disease identification. In addition, we found at one facility that a TB conversion was not identified as such in the monthly report. The statewide Communicable and Infectious Diseases Coordinator must be responsible for establishing the methods and means for IC-RNs to analyze and trend infectious disease data correctly and meaningfully. This information needs to be reviewed and further analyzed at a statewide level by the Communicable and Infectious Diseases Coordinator. It should be used as a basis for decision making by the IDOC Medical Director on policy and program direction.*

    *The statewide Communicable and Infectious Diseases Coordinator should be a masters prepared public health nurse and should be guided and supported by a part-time infectious disease physician specialist to advise on policy and updated recommendations for prevention and control of communicable disease. For example, while the IDOC does inconsistently offer pneumococcal 23 vaccine to a few individuals with high-risk conditions, it does not offer the pneumococcal vaccine 13 in accord with the CDC's aged and illness-based adult vaccination guidelines. IDOC also fails to provide meningococcal vaccine to individuals with immunodeficiency (e.g., HIV, etc.).[269] The infectious disease specialist would also design and carry out prevalence studies to monitor disease rates,*

---

269

 

2018 immunization
adult-combined-sche

*train and monitor quality of the work performed by the IC-RNs, evaluate the performance of disease monitoring clinics provided by UIC, and consult in treatment and prevention of communicable disease. We suggest that IDOC consider establishing this position within the IDPH. This would provide access to resources of the IDPH and support collaboration with the IDOC.*

## Mortality Reviews

**First Court Expert Recommendations**

1. All mortality review should be performed by an independent clinician. A regional nurse could do the initial review; those cases identified as potentially problematic and therefore requiring a secondary review should be evaluated by the central office regional physician, and not a "like" (i.e., Wexford) employee. *We do not completely agree with this recommendation. It is our opinion that under current circumstances an independent physician should review all deaths. Under circumstances of adequate IDOC central office staff (when and if that occurs), it is our opinion central office IDOC physicians and nurses can perform this review. We do not believe that regional nurses should be responsible for reviewing physician clinical care with respect to mortality review. That is currently what is occurring and as we note, regional nurses find no problems when significant problems exist. Physicians should review physician care in mortality review and nurses should review nursing care. Nurses should not review physician care. We agree that IDOC physicians, not vendor physicians should conduct mortality review.*

2. Policy should provide more specific guidance for end of life care. Specifically, this should clarify the important differences between "DNR," palliative care and hospice/end-of-life care. *We agree that that an end-of-life policy needs to be developed. This policy needs to ensure that **informed** consent is specifically given and that when a person is not competent to provide informed consent that reasonable legal options are taken. This policy also needs to address the current practice of palliative sedation to ensure that it is not used merely to hasten death or engage in euthanasia. Palliative sedation also needs to follow strict guidelines with respect to informed consent. The policy should also address end of life pain management as this appears to be an area of deficiency in the medical program.*

**Additional Recommendations**

3. Morality review should be completed for all deaths. We recommend that this be done at a central office level when the central office is adequately staffed.

4. We recommend that the Office of Health Services (OHS) make a determination of preventability and track preventable, possibly preventable, and non-preventable deaths.

5. Mortality review should be structured and include:
    a. A brief summary of the care of the patient;
    b. A list of all of the patient's medical conditions;
    c. A list of all the patient's most current medications;
    d. The age, date of incarceration, current housing unit, and the location of death;

e. The preliminary cause of death;
f. The coroner's cause of death;
g. A psychological autopsy in the event of a suicide;
h. Inclusion of any administrative or custody reports of the death;
i. A list of all problems identified on review of the death; and
j. A summary of any corrective actions or referrals taken with respect to identified problems.

6. All deaths should include an autopsy.
7. All deaths should be tracked by the OHS and a summary report made at the end of the year. This report should be forwarded to the Director of the IDOC and reviewed at the statewide medical meeting. This should include reporting on the numbers of preventable deaths. Analysis of recommendations based on deaths should be provided at an annual statewide meeting.

# Dental Program

### First Court Expert Recommendations

1. Screening [initial] examinations at the reception center should include a thorough, documented, intra and extra-oral soft tissue examination. *We note that per Administrative Directive 04.03.102, the examination performed at the R&C center should be a complete examination; however, it is not complete at all.*
2. The screening [initial] exam should not be used to develop treatment plans.
3. The examination should include radiographs diagnostic for caries, a periodontal assessment, a soft tissue exam, and accurate charting of the teeth.
4. Appropriate medical conditions should be red-flagged, and medical consultations and precautions should be documented in the dental record.
5. The health history should be more comprehensive, and appropriate conditions red-flagged. *We note that the health history form should be expanded in scope and reside on a separate page.*
6. Proper area disinfection and clinician hygiene should be implemented.
7. Proper radiology hygiene should be put in place. *We note that this includes, at a minimum, using a lead apron with a thyroid collar,[270] and posting radiological hazard signs in the areas where x-rays are taken.*
8. Routine comprehensive care should be provided from a thorough, comprehensive examination and treatment plan.[271]
9. Hygiene care and oral health instructions should be provided as part of the treatment process.

---

[270] While radiation exposure from dental radiographs is low, it is F to follow the ALARA Principle (As Low as Reasonably Achievable) to minimize the patient's exposure. Dentists should follow good radiologic practice and (*inter alia*), **use protective aprons and thyroid collars**. Dental Radiographic Examinations: Recommendations for Patient Selection and Limiting Radiation Exposure. ADA and FDA (2012), 14. Emphasis added.

[271] IDOC agreed that "[r]outine comprehensive care should be provided for through a comprehensive exam and treatment plans." The exam [should include] radiographs diagnostic for caries, a periodontal assessment, a soft tissue exam, and accurate charting of the teeth," and "hygiene care and oral health instructions be provided as part of the treatment process. IDOC Response, ¶XIII (5).

10. Removable partial dentures should be provided as the last step in the comprehensive care process.

11. All teeth should be restored, and the periodontium should be stable before partial denture impressions are taken.

12. A proper diagnosis should be part of the treatment process. *We note that except for NRC, the diagnoses were appropriate in most of the charts we reviewed.*

13. Inmates with urgent care needs should be provided care within 24-48 hours.

14. The SOAP format should be used to document emergency and urgent care contacts. *We note that the SOAP format was used consistently, except for NRC and SCC.*[272]

15. A proper diagnosis should be part of the treatment process. *We note that except for NRC, the diagnoses were appropriate in most of the charts we reviewed.*

16. The IDOC should develop a policy to ensure that each institution has a meaningful orientation manual to instruct inmates how to access acute and routine care.

17. The IDOC should insure that all institution dental programs have well-developed and thorough policy and protocol manuals that address all areas of the dental program.

18. All dental staff should be familiar with these policies and protocols.

19. Policies should be reviewed annually and amended as necessary.

20. An administrative dentist should be available to oversee the IDOC dental program. This person could remain in the field as a part-time practicing dentist.[273] *We feel the position should be 0.5 FTE. See Key Recommendation #10.*

21. The IDOC should insure that all dental programs follow current infection control guidelines as well-defined by the Centers for Disease Control, to include documented weekly spore testing of autoclaves.

22. Bulk biohazardous waste be properly stored outside the dental clinic.

23. Biohazard and radiology warning signs should be in place.

24. Patients should wear protective eyewear during treatment.

25. Every dental program should develop a robust and meaningful CQI program to include ongoing studies and corrective measures that address identified program weaknesses.

26. The IDOC should develop a clinically oriented peer review system and dentists should be available to provide these reviews, such that deficiencies in treatment quality or appropriateness can be corrected.

27. A systemwide evaluation of existing equipment should be performed and old, badly worn, rusted, corroded, and non-functional units, equipment, and cabinetry/countertops should be replaced. We agree and note that this should be part of a systemwide capital equipment replacement plan.

---

[272] IDOC agreed with the First Court Expert that "the SOAP format be used to document emergency and urgent care contacts." IDOC Response to First Expert Report, ¶ XIII (2).

[273] We note that Dr. Meeks, the IDOC Medical Director, opined that while he is responsible for oversight of the dental program, he relies on the Wexford Dental Director, which is not a good arrangement. He prefers a Chief of Dentistry, who is a state employee and part of his management team. Meeks Interview ¶¶35-36. Note that IDOC stated (in 2014) that it is committed to filling the statewide position of Dental Director, who would spend 25 percent of his time on statewide administrative duties and 75 percent of his time on facility dental practice. IDOC Response, p. 31.

28. Dental hygienists be hired ASAP at Henry Hill[274] and Dixon Correctional Centers. *While we did not visit Henry Hill Correctional Center, we note that all prisons should have dental hygienists on staff.*

*We agree with these recommendations.*

## Additional Recommendations

29. Valid oral hygiene instructions should be provided, and if they are not, the dental chart should not record that they have been provided.

30. All inmates should have a comprehensive examination within 30 days of intake. This exam should use the criteria of the ADA Procedure Code D0150 (Comprehensive Oral Examination–New or Established Patient) and biennial exams should use the criteria of Procedure Code D0120 (Periodic Oral Examination).

31. Treatment performed should be reported using standard (ADA) definitions and procedure codes, or entries that can be mapped to the treatment codes. Similarly, dental statistics reported to the CQI Committee should use profession-standard definitions.

32. The health history should be updated at every examination and treatment.

33. The consent form should specify the tooth to be extracted and the reason for the extraction (i.e., the diagnosis).

34. When an antibiotic is prescribed for a tooth-related infection, the tooth should be extracted within the therapeutic window of the antibiotic. A follow-up appointment for the extraction should be made so that the tooth is extracted within 10 days.

35. When an antibiotic is prescribed, the reason for the prescription (i.e., the diagnosis) should be recorded.

36. The panoramic x-ray units and film processor at NRC should be replaced immediately. It is strongly recommended that all dental x-ray units be digital.

37. The dental CQI program (as well as all other components of the dental program) lacks guidance from a dentist with experience in corrections. This expertise should reside centrally at IDOC and not from a Wexford employee or contractor. IDOC should retain a 0.5 FTE dental director. See Key Recommendation #10.

38. IDOC should develop protocols for periodontal diagnosis that include the use of periodontal screening and recording, and appropriate intraoral radiographs.

39. All routine dental examinations should include a sequenced treatment plan.

40. All dental assistants should be capable of taking intraoral x-rays.

41. Nurses should triage all requests for dental care. Non-urgent requests (cleaning, routine exams, fillings, etc.) should be sent to the dental clinic for scheduling. All other dental complaints should be assessed at nursing sick call, treated for pain as needed, and referred to the dentist based upon clinical urgency.

42. Diabetics should be referred for a periodontal assessment that includes periodontal probing every six months, and those diagnosed with periodontal disease should be offered an oral prophylaxis every six months and non-surgical periodontal treatment

---

[274] Since we did not visit Henry Hill Correctional Center, we express no opinion about its staffing. However, as a general principle, all IDOC prisons should have a dental hygienist assigned.

(i.e., scaling and root planing) if clinically indicated. This should be part of the chronic care program.

## Internal Monitoring and Quality Improvement

**First Court Expert Recommendations**

1. A trained Quality Improvement Coordinator must be assigned to each facility. *We agree with this recommendation. This should be a dedicated position.*

2. Training for members of the line staff should also be provided. *We agree with this recommendation.*

3. Each facility's program should develop a calendar in which every major service is reviewed at least once a year. *This strategy is reasonable but it is more important that high priority problems be identified and resolved. See Key Recommendation #11. Instead of annual review of each area of service the program should develop standardized metrics that measure major areas of service on an ongoing basis. These should be regular reports to the QIC. We note that these metrics are difficult to attain with a paper medical record. Examples of these types of metrics could include:*

    a. *Percent of new medication orders that the patient receives within 24 hours.*
    b. *Percent of medications that are received by the patient. We note that this item is only possible if there were an electronic medical record.*
    c. *Percent of preventable hospitalizations.*
    d. *Percent of patients who fail to show up for a scheduled appointment.*
    e. *Percent of patients transferring from an intake facility who do not have a thorough therapeutic plan based on a list of all patient problems.*
    f. *Number and percent of nursing and physician clinical care episodes that are of poor quality- based on professional performance evaluations.*
    g. *Number of items remaining uncorrected on sanitation and safety inspection.*
    h. *Number of unfilled positions.*
    i. *Intake opt-out screening results.*
    j. *Emergency bags which are not in compliance.*
    k. *The number of examination rooms that are out of compliance with respect to space, equipment, supplies or sanitation as evidenced on monthly environmental inspections.*

4. When reviews are performed, they must utilize one or more of the eight quality performance measures.[275] *We agree that these measures are important and can form the basis of reviews. However, it is more important that the program focus on high priority deficiencies whether or not they include one of these eight measures.*

5. Each local quality improvement program should be measured on the basis of the extent to which the program facilitates improving the quality of services. *We agree with this recommendation.*

---

[275] These Joint Commission on Accreditation of Healthcare Organizations include Accountability, Availability, Effectiveness, Efficiency, Quality of Providers, Safety of Environment, Continuity and Timeliness.

6. The State should contract with one or more external quality reviewers for the mortality review process since the current process was extremely ineffective at identifying significant lapses in care and therefore ineffective in helping improve the quality of services provided. *Under current circumstances, we agree with this recommendation. Ultimately, mortality review can be conducted by IDOC OHS as described in recommendations 3-7 under Mortality Review above.*

7. Where the external reviews identify one or more lapses in care, the institution should be responsible for developing a corrective action plan which is provided to a regional nurse and the Medical Director. *We agree with this recommendation.*

**Additional Recommendations**

8. The IDOC needs to develop a system of identifying key problems. Mortality review and sentinel event reviews should be included in that system. See Key Recommendation #11.

9. The IDOC should hire a statewide CQI leader who has training qualifications in quality improvement (e.g., systems engineer, six-sigma blackbelt, etc.). See Key Recommendation #1.

## Chart Review Details

| Area of Record Review | Dixon | LCC | MCC | NRC | SCC | Totals | Totals |
|---|---|---|---|---|---|---|---|
| Medical Reception/ Intrasystem Transfer | 8 | 10 | 15 | 26 | 12 | 71 | |
| Nursing Sick Call | 29 | 22 | 15 | 11 | 27 | 104 | |
| Chronic Care | 14 | 14 | 14 | 3 | 13 | 58 | |
| Urgent Care | 5 | 4 | 5 | | 8 | 22 | |
| Hospitalization and Specialty care | 7 | 9 | 11 | 7 | 9 | 43 | |
| Infirmary Care | 7 | 8 | 7 | | 6 | 28 | |
| Medication Administration | 12 | | 11 | | 6 | 29 | |
| Infection Control | | | 7 | | | 7 | |
| Totals | | | | | | 362 | 362 |
| | | | | | | | |
| Death Reviews (12 Facilities) | 33 | | | | | | 33 |
| **Total Medical Records Reviewed** | | | | | | | **395** |
| | | | | | | | |
| **Dental Records Reviewed** | **Dixon** | **LCC** | **MCC** | **NRC** | **SCC** | **Total** | |
| Dental Comprehensive Care | 12 | 10 | 16 | 1 | 10 | 49 | |
| Dental Biennial Exams | 10 | 10 | 8 | | | 28 | |
| Dental Outside Oral Surgery | 2 | | 5 | | 4 | 11 | |
| Dental Medically Compromised Patients | 12 | 8 | 8 | | 10 | 38 | |
| Dental Extractions | 11 | 10 | 11 | 5 | 9 | 46 | |
| Dental Scheduled Extractions | | | 15 | | | 15 | |
| Dental Prosthetics | 8 | 6 | 4 | | 6 | 24 | |
| Dental Sick Call | 10 | 32 | 5 | 5 | 10 | 62 | |
| Dental Nurse Sick Call | | | 7 | | 7 | 14 | |
| Dental Peer Reviews | 5 | | | | | 5 | |
| Dental Intake (initial examination) | 11 | 20 | 10 | 20 | 10 | 71 | |
| **Total Dental Records Reviewed** | | | | | | 363 | **363** |