# Dixon Correctional Center

# 2nd Court Appointed Expert Report

# Lippert v. Godinez

Visit Date: April 2, 2018 – April 5, 2018

Prepared by the Medical Investigation Team

Mike Puisis, DO
Jack Raba, MD
Catherine Knox, MN, RN, CCHP-RN
Jay Shulman, DMD, MSPH

## Table of Contents

**Overview**..........................................................................................................................2

**Executive Summary** ........................................................................................................2

**Findings**............................................................................................................................6

Leadership, Staffing, and Custody Functions.................................................. 6

Clinic Space .............................................................................................. 10

Sanitation ................................................................................................ 16

Medical Records........................................................................................ 18

Reception Processing and Intrasystem Transfer ........................................... 20

Nursing Sick Call ....................................................................................... 22

Chronic Care ............................................................................................ 26

Urgent/Emergent Care............................................................................... 46

Specialty Consultations.............................................................................. 58

Infirmary Care .......................................................................................... 65

Pharmacy and Medication Administration .................................................... 72

Infection Control ....................................................................................... 77

Radiology Service ...................................................................................... 80

Dental Program ........................................................................................ 82

Internal Monitoring and Quality Improvement .............................................. 95

**Recommendations** ..................................................................................... 100

Leadership, Staffing, and Custody Functions................................................ 100

Clinic Space ............................................................................................. 100

Sanitation ............................................................................................... 101

Medical Records....................................................................................... 101

Reception Processing and Intrasystem Transfer .......................................... 102

Nursing Sick Call ...................................................................................... 102

Chronic Care ........................................................................................... 104

Urgent/Emergent Care.............................................................................. 106

Specialty Consultations............................................................................. 107

Infirmary Care ......................................................................................... 107

Pharmacy and Medication Administration ................................................... 108

Infection Control ...................................................................................... 110

Radiology Service ..................................................................................... 111

Dental Program ....................................................................................... 111

Internal Monitoring and Quality Improvement ............................................ 116

**Appendix A**............................................................................................... 118

# Overview

From April 2, 2018 through April 5, 2018, the Medical Investigation team visited the Dixon Correctional Center (DCC) in Dixon, Illinois.

DCC has a capacity for 2529 inmates. On the day of our visit there were 2298 inmates, with an occupancy of 90.4%. DCC is a low security prison. Only 5.5% of inmates are maximum security inmates, with 39% minimum security and 55% medium security. Sixty-seven percent of inmates have a sentence of five years or less. Thirty-one percent of inmates have a sentence of less than a year. DCC has a significant mental health mission and a significant elderly population. There are 761 (33%) inmates with a severe mental illness.

The nationwide average of inmates over 50 years of age in state and federal prisons is 19.2%.[1] In the IDOC, the percent of inmates over the age of 50 is 17.6%. At DCC, 26% of inmates are over 50 years of age. DCC has a 23-bed American Disabilities Act (ADA) unit, an 84-bed geriatric unit, and a 28-bed infirmary. Most of the ADA, geriatric, and infirmary units (135 beds) are filled with elderly. The remainder of the elderly population (472) is housed in general population. The health program at DCC is served by two local hospitals and one remote hospital. Katherine Bethea Hospital is within three miles and CGH Medical Center is in Sterling Illinois, about 14 miles away. University of Illinois Chicago (UIC) is used for the majority of hospitalizations and is over 100 miles away.

This report describes our findings and recommendations. During this visit, we:
- Met with custody and medical leadership
- Toured the medical services area
- Talked with health care staff
- Reviewed health records and other documents.

We thank Warden Varga and staff for their assistance and cooperation in conducting the review.

# Executive Summary

Based on a comparison of findings as identified in the First Court Expert's report, we find that the intrasystem transfer and sick call processes have improved since the First Court Expert Report but clinic space, medication administration, and the infirmary processes are worse, and the remainder are the same. Access to specialty care and physician quality of care were so poor that overall, we find that Dixon Correctional Center (DCC) is not providing adequate medical care to patients, and that there are systemic issues that present ongoing serious risk of harm to patients and result in preventable morbidity and mortality. The deficiencies that form the basis of this opinion are provided below.

---

[1] Prisoners in 2015, Bureau of Justice Statistics, US Department of Corrections.

Although a competent Health Care Unit Administrator (HCUA) is now in place, the remainder of the leadership team is either new or not in place. Leadership staff is still deficient. The Director of Nursing (DON) position is vacant but is to be filled by a State supervisory nurse. When that happens, two of three nurse supervisor positions will be vacant. The remaining nurse supervisor is deemed ineffective and spends considerable time on managing the onsite personnel matters for Wexford as opposed to actual nursing supervision. The Medical Director position is recently filled but the staff physician position is vacant. The HCUA acts as the HCUA, CQI Coordinator, supervisor of medical records, infection control coordinator, and as a supervisory nurse, including taking call. The new DON will also act as a supervisory nurse. Even if all positions were filled, it is our opinion that additional nursing staff is needed on the infirmary to provide the necessary level of care. Three supervisory nursing positions are inadequate given the population size and mission of this facility. Given the complexity of clinical care at this facility, it is our opinion that an additional physician is needed. Also, our opinion is that the lack of consistently filled physician positions over the years and lack of physicians with primary care training has contributed to preventable morbidity and mortality.

The physical plant is not well maintained. On the initial day of our visit both elevators in the three-floor medical unit were not functioning, and patients needed to be evacuated for safety reasons. Nursing examination rooms do not all have a standardized set of equipment, including examination tables. Privacy and confidentiality is not yet ensured for all nursing examination rooms. The ADA unit needs to be remodeled and refurbished, and beds need replacement. Equipment for the disabled needs to be present in shower areas. Infirmary beds are not all in acceptable condition. The infirmary needs to be refurbished by replacing cracked tiles, repairing missing and cracked plaster, removing peeling paint, and repainting. The geriatric unit needs refurbishing. Cracked and missing tile needs replacement to prevent falls in the elderly. Vents need to be cleaned. Showers need refurbishing to improve ventilation and remove mold. Otherwise, clinical areas were generally clean. The negative pressure room unit was functional and regularly inspected. Medical equipment is mostly regularly inspected.

Problem lists are not up to date in medical records. The medical record jackets are still too large to be effectively used; they come undone. Thinning records has been problematic due to lack of availability of funds to purchase medical record folders. Hospital and consultant reports are obtained for only about 10-15% of offsite visits. This adversely affects clinical care.

All inmates transferring into DCC are now brought to the dispensary for evaluation, which was not occurring during the First Court Expert's visit. Nurses are identifying new needs, taking vital signs, updating problems, and reconciling medications. The establishment of this process resolved a finding of the First Court Expert. However, chart reviews indicate that performance could be improved but is not being monitored effectively through the quality improvement program.

With respect to nursing sick call and access to care, we found that some of the problems identified by the First Court Expert have been resolved. Boxes have been put in place to receive health care requests and these are picked up daily. A log has been established. We found that

sick call requests were timely triaged. Because licensed practical nurses (LPNs) work in close proximity and under supervision of an RN, nursing sick call now conforms to the Illinois Nurse Practice Act requirements. Sick call is no longer done in the hall. Rooms are designated for this function, but rooms are not all equipped adequately. Other problems identified by the First Court Expert remain and there are new problems. Sick call requests are still not filed in the medical record. Nurse documentation is inconsistent or absent, and did not consistently give an indication of the assessment or plan of care. Quality review of nurse performance is not done. Medical records are not available in X house; patients there are seen without a medical record. Provider follow up on nurse referrals was not timely. Segregation inmates only have access to sick call once a week. We noted that care of dental patients with pain have their pain addressed inconsistently by medical staff until a dentist can evaluate the patient. This process should be standardized so that pain is timely addressed.

Emergency response equipment and supplies were available, properly sealed, and maintained. Equipment is regularly checked. Mass casualty drills are performed and are thorough, although critiques of the drills seldom find any problems. No strengths or weaknesses are found, and the quality improvement minutes do not reflect any discussion of these drills. Two of five patients sent out on an emergency basis had problematic care as described in the report.

Our review of records of persons hospitalized identified preventable hospitalization and preventable morbidity. It is our view that this is a result of systemic issues, including the inadequate physician staffing and inadequate credentialing of physicians.

There has been no improvement in management of specialty care. The tracking log does not accurately record the date of referral. Referrals, collegial reviews, and approvals are not consistently documented in the medical record. Providers do not update the status of the patient after consultations. There are significant and unacceptable delays in getting patients scheduled at UIC, which accounts for approximately 80% of specialty consultations. Delays to gastroenterology average 239 days and all UIC consultations average about six months. When significant delays occur, alternate consultants are not used. This results in harm to patients. Consultation reports were frequently unavailable, making it difficult to determine the clinical status of the patient. Record reviews identified that doctors did not document knowledge of the patient's status or condition after consultation visits. Care of patients before and after consultations was poor, as described in the specialty care section, and placed patients at significant risk of harm and possibly caused harm for several patients.

Medication rooms were clean, secured, and uncluttered. Medication refrigerators were well maintained. Narcotic counts were accurate. However, medication administration practices are unsafe and outdated. Medication orders are incomplete, and providers do not consistently document the decision to order medications or the rationale. There were problems with handwritten transcription of orders to medication administration records (MAR). Only 37% of MARs reviewed had complete documentation. Only 70% of new medication orders had the first dose administered within 24 hours. Nurses pre-pour medications. On the STC, mental health unit nurses use unsanitary envelopes to administer medication and do not have the MAR when

they administer medication. Medication administration is inconsistently documented at the time medication was actually provided. Continuity of medication for persons with chronic disease is not ensured and compliance with medication in chronic illness patients is not assessed. Reported medication errors are not analyzed to identify systemic causes or subjected to corrective action in order to improve care.

There have been no improvements in the infection control program since the First Court Expert's visit. There is no person with leadership and responsibility to effectively manage infection control. Safety and sanitation inspections are performed monthly, but deficiencies reported since September of 2017 have not yet been corrected. Infirmary porters were not offered hepatitis A vaccination and only one of two porters completed vaccination for hepatitis B. Communicable disease data collected for continuous quality improvement (CQI) is not analyzed or discussed. We noted, for example, four occupational exposures to blood borne pathogens in 2017. Three of these were needle stick injuries. There was no discussion of this in the CQI minutes. We were told that Wexford has not responded to address this issue. Not addressing this issue is an OSHA violation, as an employer must evaluate environmental and engineering controls to reduce exposure to blood borne pathogens.

Radiology services are inspected and current. Access to plain film x-rays is acceptable and turnaround time is good. The x-ray technician does not wear a dosimeter to measure radiation exposure, which may not be in accord with State regulations.

We found infirmary services worse than in the First Court Expert's report. Patients housed on this unit have needs that exceed the capacity of the program to manage. There are insufficient nurses and equipment to manage the population of patients requiring total or partial assistance with activity of daily living care or to manage those with skilled nursing care needs. There is no physical therapy on the unit. Provider notes contain limited clinical information or rationale for treatment plans and fail to document key history, physical findings, or treatment plan components. Provider admission notes and progress note timeliness and frequency do not meet IDOC policy standards.

Dental staffing is inadequate. A dental hygienist and an additional dentist should be hired immediately. The clinic is closed on Mondays due to inadequate dentist scheduling and should be open five days a week. Routine treatment is inadequate since it is not informed by a comprehensive oral examination (i.e., intraoral x-rays, a periodontal assessment, and a treatment plan). The failures of the dental program documented in this report place patients at risk of preventable pain and tooth loss by fostering widescale underdiagnosis and treatment of dental disease. Dentists consistently fail to update health histories, which is particularly problematic since the dental chart is separate from the medical record. The dental program has not changed materially since the First Court Expert Report, and the treatment provided to IDOC inmates remains substantially below accepted professional standards and is not minimally adequate.

The First Court Expert found an inactive CQI program. We found that the CQI program was in place but had not yet become effective. There is no CQI coordinator. The program does not have a CQI plan specific for DCC. The CQI program is not performing all IDOC required studies. Monthly meeting minutes are brief and lack discussion about existing problems. Most studies measure only that care was provided, not whether it was effective, of good quality, or whether it could be improved. Peer review was ineffective. Mortality review does not occur. There were 26 deaths over a two-year period of 2016-2017. We asked for charts for 13 deaths and reviewed six of these deaths. Of the six deaths reviewed, four were preventable in our opinion, and two were possibly preventable. We found systemic failures and grossly and flagrantly unacceptable clinical practice resulting in preventable death. This is an extraordinary number of preventable and possibly preventable deaths.

# Findings

## Leadership, Staffing, and Custody Functions

**Methodology:** We interviewed medical and custody leadership, reviewed staffing documents, and other pertinent documents.

### First Court Expert Findings

At the time of the First Court Expert's visit to DCC, the HCUA, DON, and Medical Director positions were all vacant. The Medical Director position was filled by a traveling Medical Director, but this person was not performing all duties typical of a Medical Director. The lack of a Medical Director dedicated to the program resulted in no continuity of medical authority. Both supervisory nurses were new to their positions, so there was a significant leadership gap. Because of the lack of leadership, there was a lack of monitoring of program effectiveness. The First Court Expert recommended prioritizing filling the Medical Director, HCUA, DON, nurse practitioner (NP), and seven RN positions. The First Court Expert also recommended reevaluation of total nursing positions to determine whether additional RNs should be added. He made this recommendation because non-RN nurses were involved in conducting sick call, which was outside the scope of their license.

### Current Findings

There have been changes since the First Court Expert's report, but the net result is only a minimal change in overall staffing and leadership. Currently, the HCUA position has been filled since 2015. The DON position is vacant. One of the current state nurse supervisors will fill this position beginning on 4/16/18. In 2014 the DON was vacant, but two of three nursing supervisor positions were filled. Now the DON will be filled but two of three nursing supervisor positions are vacant. In 2014 the Medical Director position was vacant, but the staff physician was filled. Currently, the Medical Director is filled, and the staff physician is vacant. The net effect of all these changes is not much change except for the HCUA, which will be discussed below. In comparison to the First Court Expert's report, there have been some improvements, but these are insufficient to create an adequate program. We agree with the First Court Expert's recommendations to reevaluate nursing positions.

We identified additional findings or confirm First Court Expert findings, including:

- There has been no effective change in budgeted staffing since 2014 with the exception of three additional staff assistants for medical records.
- The effective vacancy rate (long-term leave of absence and vacancies) is 23%, which is an improvement from the 28% vacancy rate in 2014. However, a 23% vacancy rate is an unacceptably high vacancy rate.
- There is a deficiency of nurse supervisory positions. The existing nurse supervisory positions are not filled, resulting in the DON and HCUA undertaking nurse supervision roles that detract from their ability to manage the program.
- The only consistent elements in physician staffing have been continual change of physicians and moving of physicians to other facilities. Quality of physician care has been poor. Insufficient time has passed to evaluate clinical quality of the new physician. Care we reviewed showed preventable morbidity and mortality.
- There are insufficient nursing staff managing patients on the infirmary unit.
- Given the population and numbers of complex geriatric patients, there needs to be an additional physician.

We provide a staffing table in Appendix A. What appears to be an increase in staffing as compared to the 2014 Court Expert's report is not really a staffing increase. There were always two state nursing supervisors and one Wexford nurse supervisor, but only one State nurse supervisor and one Wexford nurse supervisor were documented in the First Court Expert's report. There has been no increase in nurse supervisor positions since 2014. Also, we list 48 RN staff. This appears to be a significant increase in nurses compared to the 26 RNs in the 2014 report. But the total complement of RN staff has not changed. Twenty-two mental health nurses were moved to the medical program, making it appear as an increase when there was no increase. These 22 nurses were responsible for mental health programming and administration of medication to mental health inmates and will still be responsible for those tasks. This change was done to allow the DON to be more flexible in using nurses for various assignments. Thus, mental health nurses can work on medical units and medical nurses can pass medication on mental health units. Whether this will adversely affect nurse staffing for medical tasks is uncertain. The only increase in staffing from 2014 to 2018 is a permanent increase of a 0.5 FTE phlebotomy position and an increase of three staff assistants who assist in the medical records department.

One significant change is that the State has filled the HCUA position with a very capable person. She appears to have led changes that have resulted in improvements noted in this report. The HCUA has been in her position since 2015. This person has provided leadership, but she lacks nursing supervisors and a consistent Medical Director, and therefore the program still does not have adequate medical leadership. Also, because of staffing shortages, the HCUA serves as the CQI coordinator, supervisor of medical records, infection control coordinator, and acts as a supervisory nurse, including taking call. One person is incapable of effectively performing all of these roles.

Supervisory nursing positions are deficient. It is our opinion that three nurse supervisory positions (two state and one Wexford) are inadequate given the large population and mission to care for the elderly. There is one Wexford supervisory nurse who is also the Wexford Site Manager and supervises 10 LPNs and six CNAs. The HCUA and the Assistant Warden of Programs believe this individual is ineffective and is not performing at a level expected of a supervisory nurse. Wexford will not replace this person. Because this person is ineffective and because only one of three State supervisory nurse positions (DON and two nurse supervisors) are filled, the DON will be the only effective supervisory nurse responsible for the performance of 48 registered nurses. Therefore, the HCUA, who is a nurse, acts as a supervisory nurse, including taking call, and this detracts from her effectiveness as a HCUA. Because the DON has to act as a supervisory nurse, she too will be less effective in her role as DON, which includes establishing policy and procedure, response to grievances, monitoring of nursing practice, and implementing program improvement. Given the sizeable population of vulnerable patients in the mental health program, infirmary, ADA unit, and geriatric unit, additional nursing supervision is needed. It is our opinion that there should be a daytime inpatient and swing shift supervisor for the infirmary, ADA, and geriatric units; an outpatient daytime nursing supervisor; and an evening outpatient nursing supervisor. Given the large mental health population, it is our opinion that daytime and swing shift mental health nursing supervisors are needed. The lack of nursing supervision is significant and negatively affects the program.

The Medical Director position was not filled from the time of the First Court Expert's review in February of 2014 until July of 2015. It was then filled from July of 2015 until May of 2017. The position was unfilled from May of 2017 until a traveling Medical Director filled the position from July to October of 2017. Since October 2017, a new Medical Director has been in place. The new Medical Director works four 10-hour days. Because there is no staff physician, there is no onsite physician on Fridays. The Medical Director covers the infirmary and has administrative duties, leaving most of chronic care management to the nurse practitioners (NP). Also, the second physician position has not been consistently filled over the past four years. When this second physician position has been filled, according to the HCUA, it has been filled by less than qualified doctors. On multiple occasions Wexford was asked to replace these doctors on the basis of quality of care.

The infirmary and geriatric units in combination require more than a full-time physician, particularly if the Medical Director covers these units in addition to the other Medical Director duties. Currently, all medical care outside of the infirmary is managed by the two NPs. While it is uncertain what the situation would be like if all four medical provider positions (Medical Director, physician, two mid-level providers) were filled, it is our opinion that for a population of 2300 with a significant elderly population, an additional budgeted physician is indicated.

The frequent changes and lack of primary care trained physicians appears to have continued since the First Court Expert's report. We note that the new Medical Director has primary care training but has not been in place long enough to determine if quality will improve. The past lack of qualified physicians has resulted in a significant absence of quality of medical leadership and physician coverage. Based on chart reviews and death reviews we performed, we identified

preventable morbidity and mortality, which will be described later in this report. The lack of adequate and qualified physician coverage is causing harm and is the single most important factor in preventable morbidity and mortality in our opinion.

There are 93.8 health care employees.[2] There are 19 (20%) vacancies. Three staff are on long-term leave of absence. If these are added to the vacancies, the effective vacancy rate is 23%. This is a significant vacancy rate and contributes to an inadequate program. More than half of the state vacancies (52%) are RN positions. There are more RN vacancies now than there were in 2014, although it is uncertain what the effect has been with respect to combining mental health and medical nursing staff. There are 57 state employees and 36.8 Wexford employees in the medical program. The vacancy rates for state employees is 28% and for Wexford employees 17%. However, because the Wexford employees include physicians, the Wexford vacancies in the Medical Director and physician positions, over recent years, impact the program significantly more than any other position.

It is our opinion that there are insufficient numbers of budgeted positions in the nursing categories even if vacancies were filled. The infirmary unit is understaffed with nurses and nursing assistants. The geriatric unit on the third floor has people who should be on the infirmary and require a higher level of nursing care than is now being provided. These units attract elderly patients from all IDOC facilities, yet these units have insufficient staff to provide care at a necessary level based on our review of services on that unit. Inmates provide considerable assistance on these units. Services that require health trained personnel are either not provided or are provided at a level inadequate for the designed purpose of these units.

During this visit we were also able to interview the Wexford Regional Manager. This individual manages seven facilities. He has a background in criminal justice and has no formal training in any aspect of health care. He worked for the IDOC beginning in the 1990s and left IDOC in 2004, when he was a warden at Pontiac Correctional Center. He said that though he had no training in health care or health care management, he felt his administrative experience with the IDOC as a warden was sufficient to warrant his being a manager of a health care program. We disagree. Criminal justice training is not a sufficient background to obtain a high-level health care management position.

The Wexford Regional Manager said that he was not aware of any persistent problems at any of the sites we had visited. The problems at the three sites that he manages and that we visited are considerable. Failure to be aware of these ongoing problems demonstrates a level of disinterest or failure to understand how to manage a health care program. Both the Assistant Warden of Programs and the HCUA detailed year-long problems that they had brought to his attention, mostly involving the performance of physicians, filling positions, and performance of the Wexford supervisory nurse. The Wexford Regional Manager perceived his role as only administrative, which was difficult to understand. He stated that he referred any clinical issues to other clinical staff. However, as a manager of a health program he must be involved in

---

[2] See Appendix A.

clinical issues, as the program is a clinical medical program. He also has not meaningfully participated in quality improvement efforts at any of the facilities he manages. His lack of knowledge of ongoing problems at the facilities he manages and his lack of involvement in attempts to improve the program are demonstration of why a person with a criminal justice background should not be involved in managing a health care program.

## Clinic Space

**Methodology:** Accompanied by a correctional officer, the acting Director of Nursing, and the Wexford site administrator, we inspected the three-story medical building. Accompanied by the HCUA and the Assistant Warden, we separately visited the nurse sick call rooms and medication rooms in the X-building (Segregation Unit).

**First Court Expert Findings**
The First Court Expert found the clinical areas at DCC reasonably clean and well maintained. The expert raised concerns about the metal beds on the third floor being taken apart to make weapons, contributing to musculoskeletal problems for the third floor's geriatric population, and being difficult to clean and sanitize.

**Current Findings**
- The three provider exam rooms in the medical building are insufficient to accommodate the four budgeted clinical providers.
- The telehealth room used for UIC HIV and hepatitis C care, renal specialty consultation, and telepsychiatry is clean and adequately sized. The telehealth room is not shared with the clinical providers and thus there is no competition for this space.
- Nurse sick call rooms are not all properly equipped, and all do not provide for patient privacy and confidentiality.
- One of the two dedicated nurse sick call rooms on the first floor of the medical building has two exam tables; the other only a desk and chairs. Having two exam tables in one room and none in the other is a barrier to the delivery of care and does not allow for adequate patient privacy and confidentiality.
- When not in use, the optometry and telehealth rooms are used as backup nurse sick call rooms; neither of these backup rooms have an exam table.
- The location of a satellite nurse sick call room in a housing unit of the X building maximizes the segregated patient-inmates' access to sick call.
- The infirmary beds, ADA unit beds, and the geriatric beds were not all in acceptable condition. Broken beds need to be properly repaired or replaced.
- The low height and limited mattress support of the metal beds in the geriatric unit make it difficult for this aging patient population to effectively and safely utilize them.
- The negative pressure unit in the infirmary is regularly inspected. The unit was fully functional. The unit has documented inspections on a weekly basis. The unit should be regularly checked during the environmental rounds and the condition noted in the monthly Medical Safety and Sanitation Report.

- Both elevators in the three-floor medical building were non-functional on the first day of the site visit.
- Most but not all of the medical equipment and devices in the medical building had documentation of annual inspection by biomedical engineering.
- Multiple air vent covers were missing. Many air vents and air vent covers were rusted and cannot be fully sanitized.
- All three floors of the medical building had cracked and missing floor tiles. This is a safety, sanitation, and infection control concern for patient-inmates and staff who use these areas. This is a special concern for the high-risk-for-fall population that is housed on the second and third floor.
- All the showers in the medical building were poorly ventilated, had peeling ceilings, had musty odors, and evidence of mold. There were an insufficient number of shower chairs; the existing shower upholstery needs to the repaired or the chair replaced.

The medical unit contains three floors. The first floor outpatient clinical unit houses medical exam rooms, nurse sick call rooms, an urgent care center, physical therapy, dental clinic, telehealth rooms, x-ray suite, optometry clinic, mental health interview rooms, nurse medication preparation room, the pill call/KOP medication pick up window, medical records department, storeroom, health care administrative offices, provider and nurse work areas, and a conference room. The second floor houses the infirmary, the ADA housing unit, and mental health offices. The third floor houses the geriatric housing units.

With the exception of the nurse sick call held in the X building (segregation unit), all medical health care is provided on the first and second floors in the three-story medical building that is located in the central area of the expansive DCC campus. There are two elevators in the medical building. One has not been functional for a long time. On the day before the experts' site visit, the only operational elevator broke down. Patients housed on the second and third floor who were ambulatory were moved to backup housing in outlying buildings on the DCC campus. Non-ambulatory patients in the ADA unit and the infirmary were not moved. One elevator was fixed and operational by the end of the first day of the experts' visit. The second elevator remained non-operational during the entire visit and there was not a repair team working this elevator. Both elevators need to be operational, assuring that all patients residing on the second and third floors of the medical building can be safely and readily relocated in the case of environmental and medical emergencies. This is a significant life-safety and fire-safety issue.

The first floor of the medical building is the hub of the health care delivery services provided at DCC. It is separated into two sections, with the patient-inmate entrance to the building in the middle of the two sections. Inmates walk approximately 200-1000 feet to the medical building from multiple housing units located on two divided sides (general population and mental health) of the campus to pick up keep-on-person (KOP) medications and nurse administered medications just inside the entrance, and to receive ambulatory reception, medical, dental, limited specialty, diagnostic, and urgent care services. Mental health patients have their medication administered dose-by-dose in their housing units.

The west side of the first floor houses the medication preparation and medication storage areas, and the pill call window and medical supplies.

The east end of the first floor has three interconnected corridors. The main/central corridor houses the urgent care and procedure room, two centralized nurse desks, three provider exam rooms, a three-chair dental suite, three observation bays, physical therapy unit, medical records, conference room/backup telehealth room, and a waste disposal room. The north corridor has the plain film x-ray suite, an optometry suite, a telehealth room, and two nurse sick call rooms. When not in use, the optometry and telehealth rooms are also used by the sick call nurses. The north corridor houses the health administrative and provider offices, medical supply storeroom, and a conference/breakroom.

Although generally clean, there were cracked and missing floor tiles in all three corridors on the first floor of the medical building. This is a safety, sanitation, and infection control concern for patient-inmates and staff who use these areas.

The treatment and procedure room has one adjustable table with an intact mattress and paper barrier, a new ECG machine, oxygen tanks in racks, an AED with a current inspection sticker and pads that do not expire until 2019, a Gomco suction machine, nebulizers, three backboards, medical supplies, and an emergency response bag. The handwashing sink in the room is clean. The space is adequately sized to provide treatment and urgent care. The counters in this treatment room are congested with supplies, and the two alcoves used for storage are cluttered, with 10-15 wooden crutches leaning against one wall, and staff bags and coats. The slop sink in one alcove is crusted and not able to be fully sanitized.

Two desks in the main corridor serve as a nursing station where pre-visit interviews and vital signs are performed, and reception screening and transfer forms are completed by nursing personnel. This layout does not allow optimal audiovisual privacy for patient interviews.

Despite having four budgeted providers, there are only three provider exam rooms in proximity to the nursing desks. All three are clean, adequately sized, and similarly outfitted with exam tables with intact upholstery, a desk, two chairs, functional oto-ophthalmoscopes, medical supply cabinets, a handwashing sink, gloves, and paper towels. One exam table did not have a paper barrier, one sink was crusted with mineral deposits, a few paper memos without protective sleeves were taped on the walls, and a single box of fecal occult blood testing cards had expired in October 2017. A 23-year-old Physician Desk Reference (PDR) was found in one room; however, it was reported to the experts that the three providers had access to UpToDate® electronic medical reference on the computers in their offices in the adjacent administrative corridor.

Three curtained observation bays with flat beds are located in the main corridor. They are used for short term observation and nebulization treatments when the treatment room is occupied. There is no equipment or supplies kept in these bays. The bays are a few steps away from the nursing desks and in voice range but not in line of sight of the nurses. A large conference room

in the main corridor is used as the chronic care nurse office/computer workstation and serves as a backup telehealth room on the occasion when overlapping tele-specialists are scheduled. The telehealth unit in the conference room does not have an electronic stethoscope.

A three-chair dental suite is situated off the main corridor and will be described in the dental section of this report.

The physical therapy (PT) room with multiple stations, mats, and equipment is located at the west end of this corridor. Visual inspection did not identify any notable deficiencies. Every bit of space in the PT room is utilized; although crowded with equipment and mats, it is well organized.

On the north side of the central patient-inmate entrance is the T-shaped north corridor. The top section of this T houses four clinical rooms. Two rooms are designated exclusively for nurse sick call service. One nurse sick call room has two exam tables and two desks; the other has a desk and two chairs but no exam table or sink. The other two rooms house the telehealth room and the optometry service. The telehealth unit is located in a large room with the telehealth unit along one wall with a desk and a chair facing the monitor. The unit has an electronic stethoscope. Three part-time services (HIV/hepatitis C, renal, and psychiatry) use the telehealth room. The fourth room is the generously sized optometry clinic with storage cabinets, a variety of optometry instruments (none of which had inspection labels), a sink, a desk, and a chair. The optometry clinic is only in session eight hours per week. When the optometry and telehealth rooms are not in use, the rooms are used as additional nurse sick call rooms. Since only one of the four dedicated or part-time nurse sick call rooms has an exam table, nurses interview patients and bring them over to the room with two exam tables if further physical evaluation is required. This could result in a breach of privacy if two patients are examined in the same room at the same time. Two of the other rooms could readily accommodate an exam table and this should be done. Handwashing gel was noted in the rooms without a sink, or if not is brought in by the nurses when they use these rooms.

The x-ray suite is in the long arm of the north corridor. During the expert's visit, the existing and aging plain film radiology unit was removed and a used but updated non-digital unit was being installed. The interior space was adequate but could not be walked through due to the construction. The radiology technician has a work space at the entrance to the suite that is separated from the corridor by a floor-to-ceiling metal screen. There is limited foot traffic on this corridor.

The second floor of the medical building has three separate units: mental health staff offices, the medical infirmary, and an ADA housing unit for inmates with ambulatory deficits, including those requiring wheel chairs. There is a security station staffed by a correctional officer in front of the entrances to these three units on the second floor.

The mental health staff offices are used almost exclusively for administrative duties and functions. Only on a rare occasion are selective patients interviewed in this area.

The ADA housing unit is a 23-bed housing unit for patient-inmates with significant difficulties with ambulation. Many of the men on this unit use ambulation aides, including wheel chairs. On the day that this unit was toured, there were only eight men on the unit; 15 had been temporarily relocated to buildings 31 and 41 until the elevator was repaired. The men housed on this unit must be able to provide for all their activities of daily living. Some get intermittent limited assistance from inmate health aides. There are no nursing personnel assigned to this unit and clinical providers do not make rounds on the ADA area. Individuals seeking medical attention must submit a sick call request sheet to access non-urgent care. The ADA unit is a housing unit located with good proximity to 24-hour medical services in the building, but it is not a medical treatment unit. The beds are almost universally metal bed frames with metal wire mattress supports. Some of the wire supports have been separated from the metal legs and struts and held together with strands of ripped sheets. The separated metal wires had sharp ends and constitute a potential safety hazard. These beds are less than optimal for individuals with heightened risk for decubitus ulcers. Unoccupied metal beds were turned on end and this presented a notable safety risk. There are three showers on the ADA unit. Only two of the showers are functional; the ceiling paint in all three showers is peeling, and the ceiling light in front of the showers is not functioning. The single shower chair has ripped upholstery and needs to be sealed or replaced. The showers cannot accommodate wheelchairs; we were advised that some men are moved to the infirmary to bathe and shower. There are cracked and missing tiles in the patient rooms, the hallway, and in front of the showers; this is a significant safety hazard for this high-risk population and for staff. Many of the ceiling air vents are dirty and/or missing covers. The slop sink in the janitorial closet was dirty, rusty, and had constant running watering that could not be turned off. The floor in this closet was dirty. A correctional officer was on the unit at the time of the inspection.

The 28-bed U-shaped infirmary is located across from the ADA unit. The patient rooms have two to three beds per room. Most rooms appeared to have two beds per room. There were a few individuals who were housed alone. At the time of the expert visit 18 beds were occupied. Most of the beds were hospital beds with intact mattresses and adjustable heads. There were no electrical beds in the infirmary. Most of the hospital beds have been acquired from local hospitals as they upgraded their beds.

A central nursing station with glass on both sides has doors to each of the two side corridors. A shower and tub room also can be accessed from both sides of the unit. A dayroom with a TV is situated in the middle of each side of the infirmary; this room is also used for meals for some of the patient-inmates. A biohazard room is located on the unit; waste material is removed one to two times per day. There is a restraint room with a single impervious covered, cushioned four-point restraint bed; the room was clean, and the bed was intact. Call buttons were available in the patient rooms. Four were tested and the warning monitor in the nursing station appropriately lit up.

The restraint room (room 35) also serves as the negative pressure room; the exhaust was turned on and the tissue paper test demonstrated a high level of negative pressure. The negative pressure monitor in the nursing station has been non-functional for a long time; the

monitor is old, and it was reported that replacement parts are no longer available. The negative pressure log in the nursing station verified that the room was tested weekly for functionality. It was reported that the negative pressure had recently failed due to a blown fuse; the problem was corrected that day by the engineering team. The restraint room is directly across from the nursing station, allowing a moderate degree of direct observation.

The infirmary nursing staff checks and logs the results for the three glucometers on a daily basis and the negative pressure room functionality (tissue paper method) and the emergency response bag on a weekly basis. Inspection of the infirmary logs verified that these devices and equipment were being monitored as described. Oxygen tanks were full and kept in safety racks. Review of the equipment in the storage room or the nursing station identified that one of the three oxygen concentrators, one of three nebulizers, two of two IVAC pumps, two of two Gomco suction units, and the AED had a current bioengineering stickers. No explanation was provided on why some of the devices had not been inspected within the last year.

There are cracked and/or missing floor tiles throughout the infirmary, including the nursing station, the hallways, the patient rooms, the biohazard room, and the patient bathrooms. This creates a safety hazard for this very high-risk-for-fall patient population. A patient with dementia was occupying a broken bed in Room 33. Unrepaired cracks and missing plaster were noted in some of the patient rooms. Peeling paint was noted on the ceiling of the shared shower room. Room 29 had a dirty sink and a cracked electrical outlet cover with exposed live electrical connections. A number of ceiling vents were missing and/or rusty. The ceiling in the nursing station had rust stained tiles.

The third floor of the medical building is divided into two wings and serves as an 84-bed geriatric housing unit. Seventy-six patients were assigned to the third floor on the day of the inspection, but 26 had been temporarily relocated to building 41 due to the non-functional elevators. Patient rooms have two to three beds and a toilet with a sink. Similar to the ADA unit, the vast majority of the beds on the geriatric housing unit had non-adjustable fixed metal frames with an intertwined wire mattress support. The wires provide limited mattress support for this geriatric population. The wires on some beds were separated from the metal and were tied with ripped sheets to the frame. Unoccupied beds are flipped on end in the rooms, creating a risk for injury. The men must be able to independently manage their activities of daily living. Each room has a call buzzer next to the door. Inmates in three separate rooms were knowledgeable about the use of the call buzzer and demonstrated competency in its use. Many patients have their own TV sets at their bedside. There are dayrooms that are also used to eat meals and these have a TV.

Each side of the third floor had a shared five-cubicle shower room. One shower cubicle on each side was not functional. The showers emanated a musky odor, mold was noted in some of the showers, ceilings in both showers were peeling, the vents were rusty, and the shower space was humid and steamy when in use. The showers were poorly ventilated. Only one shower chair was noted in each of these two shower rooms. Cracked and missing floor tiles were noted throughout all areas of the third floor. This creates a safety risk for this aging population and is

a barrier to the effective cleaning and sanitation of the units. Missing and/or rusted ceiling vent covers were noted throughout the third floor. Some of the vents were blocked with medical chucks, others were clogged with dust.

There are no nurses assigned to the geriatric unit. Patients place a request in locked boxes on the floor to seek medical attention. Patients reported that their requests are screened by a nurse within 24 hours and, if needed, they are seen in two to three days in nurse sick call on the first floor.

There is a staging kitchen area on the west end of the third floor; food is served by inmate workers. Dirty trays are placed in different carts than those used to bring food to the floor. The temperature in the food refrigerator is checked and logged on the day and evening shifts; the recorded temperature was always less than or equal to 41°F.

In summary, the medical building was generally clean and organized; the exceptions are the infirmary, ADA, and geriatric units, which need refurbishing, including providing functional shower equipment, installing ventilation in the showers, fixing broken tiles, and fixing plaster and painting. This can be a safety issue for elderly and disabled patients. There are insufficient provider examination rooms. A number of physical plant and maintenance deficiencies were identified that have created safety, sanitation, and infection control risks. The metal beds used in the geriatric unit are not appropriate for use in this population. The nurse sick call rooms are not all adequately equipped nor do these rooms allow for patient privacy and confidentiality. All of the beds in the infirmary must be hospital-quality beds with adjustable sections.

We agree with the recommendations of the First Court Expert. We have additional recommendations found at the end of this report.

## Sanitation

**Methodology:** We inspected the infirmary rooms, the ADA unit, the geriatric floor, the first-floor health care unit, and the sick call rooms in the medical building and the X building. We interviewed nurses, correctional officers, infirmary patient-inmates, health care leadership, and inmate porters. The Safety and Sanitation reports for the months of September 2017 to February 2018 were reviewed.

**First Court Expert Findings**
The First Court Expert reported that the clinical spaces were generally well-maintained and made no specific recommendations about sanitation.

**Current Findings**
- Monthly safety and sanitation inspections and reports are being done by the health care team at DCC.

- The safety and sanitation reports fail to address the condition of the patient beds in the infirmary, ADA unit, and geriatric floor; the compliance with annual inspections of all clinical equipment and devices; and the lack of exam tables in all nurse sick call rooms.
- The clinical areas in the medical building and in the X building and the patient rooms in the infirmary, ADA unit, and the geriatric floor were generally clean.
- It is not possible to fully sanitize areas with rusted vents, broken or missing floor tiles, and cracked walls and peeling paint.

Safety and sanitation inspections (environmental rounds) are performed by the health care team on a monthly basis and reported by the HCUA to the Assistant Warden. September 2017 to February 2018 reports were reviewed by the experts. These rounds identified concerns, some of which appear to have been corrected or are being addressed. However, the inspection reports repeatedly noted a number of deficiencies, including cracked and missing tiles, mold in the showers, non-functional ceiling light fixtures, peeling paint, rusty ceilings, and non-functional showers that have not been corrected. During this site visit, the experts noted the same not yet addressed defective conditions throughout the entire medical building and in all the housing areas in the medical building. In addition, the experts identified missing and rusty vent covers and vents, a few sinks crusted with mineral deposits, 10-15 crutches leaning the treatment room wall, the shower chair in the ADA unit had torn upholstery, a broken bed being used by a demented patient in the infirmary, and oxygen concentrators and nebulizers that had not been inspected in the last year.

Sharps boxes, gloves, handwashing sinks, or sanitizing gel was found in all clinical areas. Inmate porters sweep and mop the floors of the infirmary rooms two to three times a week. They report that they spray and clean the toilets, sinks, and showers on a regular basis. They reported that they clean and spray beds of discharged patients prior to another patient being placed in that bed. Two infirmary porters were interviewed.[3] The first floor medical unit was generally clean. The rusty vents and vent covers noted in almost all areas of the medical building cannot be fully sanitized. As previously noted, the shower rooms on the second and third floor were poorly ventilated, and subsequently, musky odors and mold were noted in all the shower rooms, and the ceilings in the shower rooms had peeling paint. Although most sinks were clean, at least one sink on each floor was found be dirty or crusted with mineral deposits. We noted the broken and missing tiles on multiple areas in the Clinic Space section of this report. Broken and missing tiles make proper sanitation difficult.

In summary, although the First Court Expert had no findings with respect to sanitation, we noted several problems as described above. Overall, the cleanliness of the health care unit and patient housing areas is generally good except for the infirmary, ADA, and geriatric units. Monthly safety and sanitation inspections are being done in the health care areas. The rounds have appropriately identified problems with the maintenance of the physical plant but these problems are not consistently corrected. These inspections also must focus more attention on the beds and clinical equipment.

---

[3] Infirmary Patients #6 & 7.

## Medical Records

**Methodology:** Interview medical records staff, inspect the medical records room and filing system, and by way of record review, identify any problems.

**First Court Expert Findings**

The First Court Expert noted that medical records were "overstuffed and in dire need of thinning." Because the paper records were so large, they were difficult to use and were deemed an obstacle to efficient delivery of care. Medication Administration Records (MARs) were often missing, making it difficult to determine if patients were receiving ordered medication. There were large backlogs of MAR documents that had not been filed. Also, the infirmary charts were on clipboards even when infirmary patients were permanently housed on that unit. This would make it difficult to follow the care of the patient because the paperwork was not organized.

The First Court Expert recommended that charts should be thinned regularly, MARs should be promptly filed, and problem lists should be kept up to date. He also recommended timely filing of all offsite medical reports.

**Current Findings**

Since the First Court Expert's report, MARs appear now to be timely filed in the medical record. Three additional medical record staff have been added since the First Court Expert's visit in 2014, which has helped in this regard. However, the remaining problems identified by the First Court Expert have not been resolved. Our key findings include the following, which confirm problems identified by the First Court Expert and include an additional finding.

- We confirmed that problem lists are not up to date. This is a pervasive problem and has not been fixed.
- The infirmary use of clipboards as the medical record makes it harder to track paper documents relevant to each patient.
- The paper medical charts are too large to be effectively used. They come undone frequently. Chart thinning sometimes results in critical documents to be missing from active records.
- Consultant and hospital reports are obtained for only approximately 10-15% of offsite visits. In most cases, it is not clear what the status of the patient is from the perspective of the consultant. This makes it extremely difficult to impossible to provide adequate continuity of care.

Medical records are stored in a single room that connects the main and the administrative corridors. The medical record system is entirely paper. The records are stored on multi-tiered shelves in two double sided aisles with a central counter. The space is extremely cramped but well organized. The experts received every chart that was requested during the four-day visit.

A medical record director position and health information assistant position are vacant. The medical record director position has been vacant since 2005 and the HCUA serves as the

supervisor. There are now three additional staff assistant positions for medical record filing. The filing backlog, including for MARs, was negligible and total backlog of filing was less than a few inches. However, there are backlogs in copying records for legal purposes and when inmates request a copy of their medical record. This has been an improvement since the last visit.

However, the remaining findings of the First Court Expert are the same. Clipboards holding medical documents are still used on the infirmary. These clipboards contain documents that are periodically moved to the formal paper medical record binder. Documents in the clipboard are not in any sorted order. This makes it more difficult to manage patients.

Charts at DCC tend to be large. Thirty-three percent of the inmates at DCC have serious mental health conditions and 26% of inmates are over 50 years of age. This results in a large number of medical documents, as these populations are more frequent users of the medical program and have increased medical or mental health documents to file. Recent changes in the mental health program have resulted in a large increase in mental health documents to maintain. Patients at DCC, therefore, have large charts consisting of many medical record documents.

Chart folders consist of an accordion-like pressboard folder with a fixed plastic binder. The binder consists of two flexible plastic tubes of about an eighth of an inch in diameter that fit into a forked clip. The paper record documents have two holes punched that fit over the flexible plastic tubing. The plastic tubing can easily become dislodged from the plastic fork and papers can come loose from the binder. The accordion pressboard folder is approximately one and three quarters of an inch wide. But the volume of paperwork in most charts far exceeds this amount, so the charts become distended and put pressure on the plastic tubing, and it comes undone frequently when staff leaf through the record and when progress notes are written. Charts we reviewed were difficult to use without dislodging the plastic tubing from the paper documents. The program has not been able to adequately thin excessively large records because they are short of funds to purchase additional pressboard folders.

A chart is thinned when a nurse notifies medical records to thin the chart or when a medical record clerk believes the chart is too large for use. Chart thinning is also dependent on the availability of medical record folder stock. When a chart is thinned, the forward volume is required to contain the following information from the previous chart:

- One year of AIMS testing
- Any psychosexual evaluations
- All problem lists
- All intake and yearly physical evaluations
- Two years of documents in the "Lab" section
- Approximately a year of progress notes
- At least six months of mental health documentation
- Chronic illness flow sheets
- The general medical consent sheet if the inmate is under 18 years old

- Any existing living will
- A month of medication refusals
- One year of other refusals

Critical consultant reports and specialized tests (EEGs, pulmonary function tests, CT scans, etc.) are not required to be moved forward, but are often critical in understanding the clinical status of the patient. Without these documents, clinicians have a much more difficult time determining the existing problems of the patient, particularly since physicians change so frequently. In our own chart reviews, we frequently had to ask for a prior volume to obtain necessary information about the patient. Not having critical information readily available may be a reason for some of the problems with following clinical care that we identified on chart review. Also, this carry forward volume of documents can be substantial and newly thinned records therefore start with a fair-sized volume. Most patients have multiple chart volumes. Any clinician attempting to understand the clinical course of care would need to go back and review multiple old volumes to obtain necessary information about the existing problems of a patient, particularly since problem lists are so out of date. This lack of maintaining critical information in the existing volume in use and the difficulty in using the paper record make the paper record system a significant barrier to adequate care. An electronic medical record should be used.

Nurses in X house see patients without a medical record. When this occurs, they write their note on separate documents and present these documents later to medical records for filing. This is inappropriate and supports the implementation of a fully electronic medical record.

Unlike most IDOC facilities, DCC maintains its dental charts in the dental clinic, and not as a component of the health record.[4] While there are some advantages to this practice, it makes documenting a patient's health history in the dental chart critical, since the medical problem list will not be available unless it is requested.

## Reception Processing and Intrasystem Transfer

**Methodology:** To evaluate the medical screening of inmates received at DCC as transfers from other Illinois DOC facilities we interviewed health care staff, toured the dispensary where transfer screening takes place, reviewed the IDOC health status form, DCC Admission Checklist, the Health Care Unit (HCU) Operations Policy and Procedure P-118 Transfer Screening, and health records of inmates received at DCC.

### First Court Expert Findings

The previous Court Expert found that transfer screening was either not done at all or was significantly delayed, and when done was completed incorrectly. Inmates were not brought to medical for transfer screening; instead, nurses interviewed inmates on the housing unit (without the medical record or transfer summary) and attempted to address any critical

---

[4] DCC received a variance from AD 04.03.102 10/21/16.

medication needs they learned about from the interviews. Nurses were not familiar with the requirements for intrasystem transfer screening. There was no process in place to log and track intrasystem transfers so that the timeliness and appropriateness of this health care encounter could be monitored, and feedback provided to improve performance.[5]

**Current Findings**

The previous Court Expert's recommendation has been achieved. All transferred inmates are brought to the dispensary upon arrival at DCC. Nursing staff (RNs) review the transfer summary, take vital signs, and conduct a brief screening interview to identify any immediate medical needs and reconcile prescribed medications so that treatment can be continued. Each inmate receives an individual explanation from the nurse about how to request health care attention for urgent and routine medical needs. The next day these inmates are seen again by nurses who complete a lengthier interview using the intake screening questions and review the medical record. At this encounter the nurse checks to make sure the problem list is up to date, completes any screening not done at intake, and identifies any pending referrals or appointments. Inmates who have chronic diseases are enrolled in chronic care clinic, and medication, treatments, and labs are ordered. At this second encounter, the nurse answers any questions and confirms the inmates' understanding of how to request care, procedures to receive KOP and pill line medications, and obtain refills.

We reviewed eight charts of inmates arriving as an intrasystem transfer between May 19, 2017 and April 4, 2018. These eight charts were selected from lists of patients prescribed medications that cannot be missed. The transfer summary and documentation of continuing care (medication administration, enrollment in chronic care clinic, pending appointments, etc.) was reviewed. In two cases, the transfer summary did not include the name of the sending facility and information on tuberculosis screening.[6] In two cases the inmate was not scheduled for a chronic care appointment within 30 days of arrival for an initial evaluation.[7] Five patients had medications which were provided without dose interruption when received at DCC.[8] However, one of these ran out two weeks after the transfer and was not re-ordered.[9] It was a KOP medication. It was not possible to ascertain if the discontinuity was because the inmate did not know how to request a renewal, or the patient was lost to follow up. Two others were not taking medication at the time of transfer but were referred, and medication was ordered and administered within 24 hours.[10]

It appears that problems with intrasystem transfer at DCC that were identified by the First Court Expert have been resolved. However, the quality of these evaluations is not uniformly good quality. Given the number of errors and omissions in the information found in the chart review of intrasystem transfers that affect patient care, we recommend that health care

---

[5] Lippert Report DCC pp. 7-9.
[6] Intrasystem Transfer Patients #1 & 2.
[7] Intrasystem Transfer Patients #2 & 3.
[8] Intrasystem Transfer Patients #1, 2, 5, 6, 7, & 8.
[9] Intrasystem Transfer Patient #1.
[10] Intrasystem Transfer Patients #3 & 4.

leadership establish a process to monitor and provide feedback as part of the CQI program. When facilities send inaccurate or incomplete information on the intrasystem transfer form they should hear about the mistake from the receiving facility. Errors and omissions should be subject to focused study to improve the accuracy of transfer information and continuity of patient care.

## Nursing Sick Call

**Methodology:** Nursing sick call was evaluated by reviewing DCC Institutional Directive 04.03.103K Offender Health Care Services, HCU Operations Policies and Procedure P 103 Non-Emergency Health Care Requests and Services, and IDOC Treatment Protocols. We observed the boxes on the housing units where inmates put their health care requests, and observed nurses conducting sick call. We inspected the rooms used for sick call in the dispensary and X-house. We also reviewed tracking logs and used them to select records to review. Twenty-nine sick call requests were reviewed. Fifteen were selected from sick call logs from July 2017 through March 2018, with complaints of potentially serious conditions (chest pain, acute infection, shortness of breath, seizures, etc.), and their charts reviewed; three were observed at sick call on Tuesday April 3, 2018, and charting was reviewed. Eleven requests were selected for review because of complaints of dental pain; six were obtained from the dental clinic and five were selected from sick call logs for February 2018.[11]

### First Court Expert Findings

The previous Court Expert found that original sick call requests were discarded after triage and that no log was maintained to evaluate timeliness or responsiveness of nursing sick call. There also were significant breaches of medical confidentiality because sick call requests were handled through the general mail system. Unqualified personnel (LPNs) were assigned responsibility for sick call triage in the X-House and because these encounters took place "cell-side," an adequate examination of the inmate's complaint was impossible. In other parts of the facility the areas used for sick call were not adequately equipped, lacking an exam table; sometimes a hallway or other open area was used, with insufficient privacy. Also, inmates were limited to only one complaint per sick call request, which limits access. Nursing documentation was absent (times, dates, etc.) or not in SOAP format. Nursing treatment protocols were not used consistently. In segregation, nurses did not have access to the inmates' medical record and so left progress notes made during sick call encounters in the segregation log until they were released from segregation. Referrals to providers often did not take place, were not timely, were not documented, or the problem for which the patient was referred was not addressed at the provider appointment.[12]

### Current Findings

Our review found that some of the problems with sick call described in the previous Court Expert's report have been resolved. DCC has put specific boxes on each of the housing units

---

[11] Sick Call Patients #1-26.
[12] Lippert Report DCC pp. 9-15.

designated for inmates to put their sick call requests into. These requests are picked up by nursing staff seven days a week and triaged, so problems with confidentiality and delay have been resolved. DCC has also implemented a sick call log, so it is possible to monitor the timeliness and appropriateness of nursing triage and referral decisions. Documentation of timeliness in responding to sick call requests was evident from review of the sick call logs. Of 15 medical sick call requests, all were triaged within 24 hours and all were seen within 48 hours of receipt. Four urgent requests were seen the same day the request was received.[13] DCC nursing staff are assigned to monitor that the log is filled out. Undoubtedly, this helps to ensure that the log is current and timelines are being met.

For the month of March 2018, staffing assignments for nursing sick call were in accordance with the Illinois Nurse Practice Act. An LPN was assigned to do sick call along with an RN on two of the four Fridays in the month. The minimum number of staff assigned to sick call is two. Some days, three or four RNs are assigned to sick call. Practices at DCC are to assign an LPN to sick call only when it cannot be staffed with two or more RNs. When an LPN is assigned sick call, he or she works under the direction of the RN assigned to sick call. This information was verified by nursing staff who were interviewed while observing sick call. However, the use of LPNs to assist in conducting sick call risks patient harm and is an example of how RN vacancies (23%) affect quality of patient care.

Sick call assessment is no longer done in the hallway, cell side, or in rooms without access to an exam table. Rooms have been designated and equipped in the dispensary and in X-House to see patients requesting sick call attention. See the description of these areas in the previous section on Clinic Space. These rooms are not adequately equipped, lacking exam tables and examination equipment.

Four rooms in the dispensary area are used to perform nursing sick call. These are adjacent to each other or across a small hallway. One of the rooms has an exam table with paper. There also are two alcoves down the hall with beds and curtains that were also used for unclothed examination. The nurses share an otoscope and two weight scales. Each room has hand washing capacity and equipment to take vital signs. Forms and treatment supplies are kept in a locked medication cart in one of the rooms, which all of the nurses performing sick call can access. Nurses share the examination table and otoscope, which promotes lack of confidentiality and is disruptive of nursing services. Our opinion is that the sharing of examination tables is inappropriate and unreasonable. We do not endorse that practice for physicians and likewise do not endorse that practice for nurses. Each nurse should be afforded the equipment and supplies necessary to conduct their work.

The day sick call was observed (4/4/2018), an officer was stationed at a table in the hallway and managed inmate movement from the cell blocks to the waiting area and to the sick call nurses. The nurses had the inmate's sick call request and their health record at the time of the encounter. Nurses used the IDOC treatment protocols; assessments were appropriate to the

---

[13] Sick Call Patients #4, 7, 10, 12.

complaint and responsive to the patients' medical issues. Inmates were not limited to one complaint in the encounters we observed, or the records reviewed. Four registered nurses saw 29 patients from general population and four from the Special Treatment Center (STC).

In X-House, sick call requests are picked up daily and triaged by registered nurses. Registered nurses see patients for sick call Monday through Friday. Patients are seen for sick call in an examination room located at the front of the segregation unit. The room has an examination table with paper, a desk, chairs, scale, and examination light. Examination equipment and hand wash is brought to the room when sick call is conducted. This room is also used when the provider sees patients housed in this building.

Problems with sick call identified in the initial Lippert report that were still evident include:

- Original sick call requests are not filed in the inmate's medical record. It is an improvement that the nurse has the actual request at the time the patient is seen. However, there is no record of the patient's actual request for health care attention. Documentation of the patient's complaint on the nursing note is not verbatim; it is often shortened and interpreted by the nurse. This is not an accurate reflection of the patient's request for medical attention. Sick call requests should be filed in the patient's medical record.

- Nursing documentation was absent (times, dates, etc.) or not in SOAP format, and nursing treatment protocols were not used consistently to guide the assessment and plan of care. In the charts of 15 medical requests reviewed, there were 12 that resulted in a face-to-face nursing assessment. Of these, only six (50%) were adequately assessed and an appropriate plan of care developed. Either the assessment was incomplete,[14] the nursing protocol was not used,[15] the nurse did not address the complaint,[16] or did not follow up on significant symptoms.[17] A rate of 50% inaccuracy in the nursing assessment and follow-up of medical requests for potentially serious complaints (unexplained weight loss, numbness, chest pain, infection, etc.) puts patients at significant risk of harm.

- A quality improvement study of the use of nursing treatment protocols was included in the 2016 CQI Annual Review.[18] This QI tool only monitors whether nurses used a protocol, identified their credentials, and documented the date and time the patient was seen. There is no evaluation of the quality or completeness of the nursing assessment or the appropriateness of clinical decision making. In addition, the DCC Medical Director reviews two records of every nurse assigned sick call each month and reports these findings at the monthly CQI meeting. Performance of less than 80% on criteria used to evaluate sick call was reported month after month in CQI minutes reviewed.[19] The only corrective action was counseling and progressive discipline. No

---

[14] Sick Call Patient #14 complained of "bladder issues," and a urine dipstick was not done per the IDOC Nursing Treatment Protocol for Urinary Tract Symptoms.
[15] Sick Call Patients #4, 13.
[16] Sick Call Patients #4,10, 11.
[17] Sick Call Patients #10, 11, 15.
[18] Dixon Correctional Center Annual Governing Body Report, September 21, 2016 p. 19.
[19] Criteria include whether a full set of vital signs were taken, was the assessment thorough, was a treatment protocol used, etc. DCC CQI Minutes May 2016, July 2016, August 2016, January 2017, March 2017.

attempt has been made to trend problem areas or to analyze systemic factors that contribute to poor performance; instead, individuals are blamed.

- Medical records are not available in X-House. The IDOC Nursing Treatment Protocols state that "sick call evaluation using these protocols should be performed with a medical record."[20] Patients with medical complaints are evaluated without consideration of their problem list or medical history, which contributes to inadequate assessments and plans of care. Nurses document the sick call encounter on IDOC medical record forms which are kept in the nurses' office. This loose filing is incorporated into the inmate's medical file eventually.

- Inmates who were referred from nurse sick call were not seen or not seen timely by providers. Providers failed to follow up at intended intervals and treatment orders were not completed.

- In the charts of 15 medical requests reviewed, nine were referred to a provider. Two additional patients should have been referred by the nurse and were not.[21] Of those referred, three were referred urgently and all were seen within 24 hours (100%). Of the other six patients referred to a provider non-urgently,[22] only one was seen in less than 72 hours for higher level medical attention (16%).[23]

- Health Care Unit Policy and Procedure P-103 states that provider sick call for general population and the special treatment program takes place Monday through Friday from 8 a.m.to 4 p.m. However, in segregation, provider sick call only takes place once a week. The frequency of provider sick call and scheduling practices results in patients not being seen timely. Patients' medical conditions are at risk of deterioration when medical attention is untimely, and can result in harm.

A new problem identified by the Court Appointed Experts is a practice variation in how complaints of dental pain are handled. Sometimes nurses forward complaints about dental pain directly to the dental department and other times the patient is seen by nursing staff in sick call and then referred to the dentist. The problem with forwarding complaints about dental pain directly to the dental program is that it may be several days before the patient is seen. In the meantime, the patient's pain is untreated. The pain may also mask other more serious conditions, such as infection, that needs to be attended to immediately to prevent more serious consequences.

We were told by both nursing and dental staff that requests for dental care are routed to the dental program for triage and appointment. We used six sick call requests found in the dental clinic from patients who complained of having dental pain and looked at their medical records to see if the request had been triaged and assessed by nursing staff.[24] None of these patients had their complaint of dental pain triaged or assessed by nursing staff; instead, the request was routed directly to the dental program.

---

[20] IDOC Nursing Treatment Protocols p. 6.
[21] Sick Call Patients #4 and 11.
[22] Sick Call Patients #1, 8, 10, 13, 14, 15.
[23] Sick Call Patient #1.
[24] Sick Call Patients #24-D through 29-D.

The IDOC Nursing Treatment Protocols provide instruction to nurses in the assessment and treatment of dental complaints.[25] A toothache without fever or swelling is to be referred to the physician or dentist for evaluation within 24 hours. Using the nursing sick call log, we found five patients who had dental complaints in February 2018. Each of these patients had been triaged by nursing and a progress note written in the chart. Three patients agreed to be seen at nursing sick call and the nursing protocol was used to guide the assessment, urgency of referral, and to provide care in the interim until seen by the dentist.[26] In two of the three referrals, the patient was not seen for evaluation by a dentist or physician within 24 hours as specified in the protocol.[27]

We brought this practice variation to the attention of the IDOC Nursing Supervisor and did not receive any clarification about what nurses were expected to do when triaging complaints of dental pain. We recommend that an expectation be established that complaints of dental pain are assessed in nursing sick call, then referred to the dentist based upon urgency, and interim treatment options considered (use of OTCs or obtain a provider order).

The nursing treatment protocol for toothache/dental complaints should be revised by the IDOC. Separate protocols for dental decay, infection, and trauma to the oral cavity should be developed. Expectations for the assessment, directions on determining the urgency of referral provided, and the timeframe in which the dentist or physician is to see the patient should be specified. A review and revision of the treatment protocol can also delineate options for nurses to treat pain while the patient awaits appointment.

In summary, some of the problems with sick call identified in the previous Court Expert's reports have been corrected. Problems with sick call currently include:

- Sick call requests are not filed in the patient's medical record.
- Nursing assessments and documentation of sick call encounters are not adequate.
- Rooms used by nurses for sick call are not adequately equipped or supplied.
- Patient medical records are not used for evaluations in the X-House and cannot be used to reference the problem list, medical history, or orders when seeing patients.
- Patients referred to providers from sick call are not seen timely.
- Complaints of dental pain are not consistently triaged and assessed by nursing staff.

## Chronic Care

**Methodology:** The Chronic Care Nurse was interviewed about the chronic clinic processes and scheduling. The 2016-2017 and 2017-2018 chronic care clinic statistics, the current chronic care clinic annual schedule, and the chronic care patient lists were reviewed. The medical records of 14 patients with chronic medical illnesses and conditions were reviewed. The Office of Health Services Chronic Illness Treatment Guidelines dated March 2016 were reviewed as needed.

---

[25] IDOC Nursing Treatment Protocols p. 80.
[26] Sick Call Patients #20-D through 22-D.
[27] Sick Call Patients #21-D and 22-D.

**First Court Expert Findings**

The previous court expert noted that it was difficult to determine how many patients were enrolled in chronic care clinics, that the chronic care tracking system was inadequate, that patients with chronic illnesses were not all enrolled in a chronic care clinic, and some without chronic illnesses were erroneously registered in chronic care clinics. The expert stated that the chronic care clinic process was fragmented and disjointed. The absence of a single chronic care nurse to coordinate the chronic care clinics was a prominent contributing factor to the lack of an effective chronic care program. It was noted that DCC has established multiple illness clinics (MIC) that allows patients to have more than one chronic illness assessed and managed in a single visit.

**Current Findings**

DCC now has a single dedicated nurse coordinating chronic care. Patient are assigned and seen in chronic care clinics and patients are tracked and reported. The remaining problems identified by the First Court Expert have not been corrected. In addition, we identified additional findings and confirmed some of the First Court Expert's findings as follows:

- DCC now has a single, designated nurse to staff and coordinate the chronic care clinic program.
- Patients assigned to chronic care clinics are regularly seen in these disease specific clinic sessions. Chronic care patient lists identify the next scheduled appointments of the patients.
- Chronic care clinic statistics are tracked and reported.
- The names of patients enrolled in one chronic care (HIV) clinic list was compared to the HIV medication list. With the exception of four patients who had recently been transferred and one patient who had not yet been started on HIV medications, the two lists were in accordance.
- DCC has established biannual MIC clinics (two non-diabetes chronic illnesses) and MIC diabetes clinics (diabetes and at least one other chronic illness). This allows patients with more than one chronic illness to have their multiple chronic conditions managed in a single comprehensive clinic visit.
- The handwritten notes in the chronic care visits are generally legible; this is a notable improvement from the previous site visits.
- The current practice of not rescheduling chronic care patients who refuse to attend their scheduled appointment until the next chronic care clinic, which may be as long as six months later, is not in the best interest of the patient or the institution.
- Providers are primarily documenting changes in warfarin anticoagulation dosages on the INR lab report sheet but not in the progress notes. This important, even life affecting, information is inappropriately filed in the wrong section of the medical chart where it is likely to be undiscoverable.
- The chronic care clinic notes inconsistently contained needed clinical information, did not always indicate that needed examinations had been performed, did not universally document the rationale for clinical decisions and therapy modifications, and did not clearly outline the patient's treatment plan.

- The care of chronic illnesses (diabetes, hepatitis C, seizure, asthma, hyperlipidemia) and the provision of age-based routine health maintenance screenings are not in full accord with both the Office of Health Services Chronic Illness Treatment Guidelines and national standards of care.
- Asthmatic and COPD patients do not have documentation in their medical record that they have been educated and have demonstrated competency in the use of metered dose inhalers (MDI). Poor technique in the use of MDIs contributes to poor control of asthma/emphysema and increased morbidity.
- Asthmatic and COPD patients who present with respiratory symptoms to nurse sick call do not routinely have their peak expiratory flow rates (PEFR) measured. This is not in compliance with IDOC Asthma Treatment Guidelines.
- Diabetics at DCC were seen regularly, had HbA1C and urine microalbumin creatinine ratio testing performed at reasonable intervals, and received annual optometric screening for diabetic retinopathy. However, detailed foot exams, preventive pneumococcal vaccinations, and evaluation of 10-year heart disease and stroke risk scores that are recommended in the IDOC diabetes treatment guidelines and in national standards of diabetes care fail to be performed.
- The one chart of a patient 65 years of age or older whose chart documented a past history of tobacco use had no documentation in his record that he was offered one-time screening for aortic abdominal aneurysm as recommended by national standards of care.[28] DCC failed to screen all patients over 50 for colon cancer and repeat the screening at intervals based on the results and the methodology of screening utilized. The charts of seven patients 50 years of age or older were reviewed; six (86%) of the seven eligible patients had not been screened for colon cancer.[29] The one patient credited for being screened was not routinely screened for colon cancer but had a colonoscopy performed when he was 49-year-old to evaluate bloody stools.
- Nationally recommended vaccinations for adults are not consistently administered. Pneumococcal and meningococcal vaccinations were not offered or given as recommended by national age and disease-based guidelines.[30]
- Warfarin is the anticoagulation therapy provided at DCC. The monitoring of this modality of anticoagulation is staff intensive and logistically complicated, which makes it extremely difficult to maintain a safe level of anticoagulation. Patients are not adequately anticoagulated for a significant percentage of the time that they are on treatment.
- Uncontrolled chronic illnesses with problems that appear to be beyond the expertise of the DCC providers are not referred for specialty consultation.

---

[28] USPSTF AAA 2014.
[29] Chronic Care Patients #2,4,5,8,9,12,13.
[30] In references, CDC Recommended Immunization Schedule for Adults 19 Years or Older by Medical Conditions or Other Indications, 2018).

- The chronic care providers did not document any review of the MAR, the CBGs, the nursing and provider sick call notes and blood pressure readings when they saw patients in the disease-specific chronic care clinics or in the intervals between chronic care visits.
- The Medical Director reported that the providers have access provided by Wexford on their administrative office computers, but not in the infirmary or clinic exam rooms. Nurses do not have access to electronic medical references in the sick call exam rooms. This lack of ready access to current clinical diagnostic and therapeutic information is a barrier to the delivery of comprehensive, quality care at DCC.
- Chronic care scheduling in separate clinics for each individual disease is wasteful, without basis in contemporary medical primary care practice, and may be harmful to patients. On the basis of patient safety we recommend this practice be discontinued.

Two advanced practice nurses are assigned to staff the chronic care clinics. The single physician at DCC provides care to the infirmary patients and does administrative duties, but does not staff chronic care clinics.

Chronic care clinics at DCC are scheduled to be seen at specific monthly intervals that are inflexible.[31] These schedules are not based on the degree of control of the patient's illness. Patients need to be seen as frequently as is necessary to obtain control for their illness, not based on an inflexible schedule. The practice of seeing patients in disease specific chronic illness clinics encourages providers to ignore the implications of any one disease on another disease and to ignore the multitude of drug-drug interactions that exist in the practice of medicine. Many chronic illness are clinically interrelated. Metabolic syndrome, for example, is a condition that consists of obesity, diabetes, high blood lipids, and hypertension. Yet in the IDOC, each of these diseases (diabetes, high blood lipids, and hypertension) may be evaluated in a separate chronic clinic. In the IDOC, these disease specific clinics also do not include documentation that the provider evaluating the patient is aware of the patient's other clinical conditions. Each individual illness is documented on a separate medical record document, which makes it impossible to obtain a unified perspective with respect to therapeutic treatment planning. This redundant documentation is wasteful of time, unnecessary, and is clinically inappropriate. Unless a specialist is managing an individual disease, there is no legitimate clinical basis for this practice, which we believe should be discontinued on the basis of patient safety and elimination of waste.

For these reasons, patients with chronic medical conditions should be seen for all of their chronic medical conditions each time they are evaluated unless a specialist is managing their care. A patient in a primary care practice with six chronic conditions might be seen four times a year or more frequently if clinically indicated. In the IDOC, a patient with six chronic illnesses

---

[31] At DCC, asthma chronic clinic is scheduled in January and July. Diabetes chronic clinic is scheduled in April, August, and December. MIC/DM is scheduled in April, August, and December. Hepatitis C clinic is scheduled in June and December. High risk/HIV clinic is scheduled monthly. Hypertension/Cardiac clinic is scheduled in March and September. Seizure clinic is scheduled for February and August. Tuberculosis clinic is scheduled monthly. General Medicine clinic is scheduled May and November. Renal clinic is scheduled monthly via telehealth by a consulting nephrologist.

can have up to 24 chronic care documents in the medical record each having been developed in a separate clinic session.

The chronic care clinic enrollment and scheduling processes were reported as follows:

1. Within 24 hours of admission, the admitting RN documents names of patients and their chronic illnesses in the clinic log.
2. The chronic care nurse reviews the clinic log on a daily basis, adds patients to the appropriate chronic care list, arranges for the next chronic clinic visit based on the due date and the date of the previous visit, and arranges lab testing if the patient is to be seen within the next 30 days.
3. Within one week, an advanced practice nurse (APN) reviews the charts of all newly admitted individuals, identifies missed chronic illnesses, orders any needed labs, and if needed, sees patient within 30 days if a chronic illness baseline is required.
4. During the interval before the first chronic care visit at DCC, APNs will renew expiring medications.
5. The chronic care nurse reviews all patients to be seen in the upcoming month's chronic clinic, and arranges required lab tests to be drawn in advance.
6. Medical record staff generate the passes no less than the day before the clinic and a movement list/clinic schedule is printed and sent to the correctional staff. The chronic care nurse arranges the passes/list for the telehealth specialties (HIV, hepatitis C, renal).
7. Refusals for chronic care appointments (and treatments, dressings, nebulizer treatments, insulin injections) must be documented in person in the health care unit.

Medications will be renewed if needed for patients who refuse a chronic clinic appointment. But the patients who refuse an appointment will then be rescheduled at the next chronic illness clinic, which could be as long as six months later. This places the patient at risk for having a sustained period of lack of control without any clinical intervention unless their condition deteriorates to the level of causing clinical symptoms. We view this as indifferent. Patients at DCC include the mentally ill and many geriatric patients who have mental challenges. Refusals of care, particularly in this group of patients, must be viewed with the perspective that this group may have cognitive challenges. IDOC must therefore establish procedures that ensure that high-risk, non-cooperative, or non-compliant patients who refuse visits are rescheduled promptly based on their existing clinical need. In all other respects, monitoring of these patients must continue as ordered. On the other hand, as opposed to refusals, all no shows due to lockdowns, NP call-ins, offsite site writs, and hospitalizations are currently automatically rescheduled and seen shortly after the missed appointments.

There were 2,560 chronic care visits at DCC from July 2016 through June 2017. In the first eight months of FY 2017-18 (July 2017 to February 2018), 1,781 chronic care clinic visits were provided; this projects to a slightly higher annualized volume than the previous year.

## Chronic Care Clinic Statistics
July 2017 – June 2018
Table 1

| Clinic | HTN | DM | Sz | Asth/COPD | Gen Med | Hep C | HIV | INH | MIC* | MICDM | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Average Pt. Roster | 307 | 28 | 59 | 173 | 238 | 129 | 27 | 1 | 96 | 128 | 1185 |
| Annual Visits | 605 | 85 | 113 | 356 | 501 | 256 | 80 | 12 | 196 | 368 | 2560 |
| Visits per patient/year | 2 | 3 | 1.9 | 2.1 | 2.1 | 2.0 | 3.0 | 2 | 2 | 2.9 | |
| | | | | | | | | | | | |
| % of DCC Population | 13.4% | 1.2% | 2.6% | 7.6% | 10.4% | 5.7% | 1.2% | 0 | 4.2% | 5.6% | |

*MIC includes patients with ≥2 conditions: hypertension, seizures, asthma/COPD, gen med. MIC DM includes patient with diabetes **and** ≥1 of these conditions: hypertension, seizures, asthma/COPD, or gen med.

Over 50% of all the patients at DCC have a chronic illness. Based on the data noted in Table One and the review of the medical records of 14 chronic care patients, most patients with chronic illnesses at DCC are seen by a provider approximately twice a year.

At the time of the site visit to DCC, 11 patients were receiving chronic anticoagulation using warfarin (Coumadin or Jantoven). Patients receiving warfarin treatment must have frequent International Normalized Ratio (INR) testing to assure that the level of anticoagulation is within a recommended therapeutic range. Lower than therapeutic range results predispose the patient to recurrent clots and possible pulmonary emboli; elevated levels create risks of serious bleeding. The experts had difficulty evaluating the care provided to this patient population who were at high risk for serious complications. The progress notes and chronic care clinic notes had limited if any documentation of INR results and clinical decisions to modify warfarin doses. Ultimately, the experts identified, albeit inconsistently, scribbled annotations at the bottom of lab reports buried amidst multiple lab results noting a change in warfarin dosage. This vital clinical decision and the rationale for dose modification must be documented in progress notes which providers and nurses commonly use to comprehend and verify the care provided to a patient. This must be expeditiously addressed by IDOC and DCC medical leadership. The utilization of INR testing was tracked on two patients receiving warfarin for chronic anticoagulation. One patient had 24 INRs in 16 months; nine (38%) were in the recommended therapeutic range, 11 (46%) above this range, and four (17%) below the therapeutic range.[32] The other had 43 INRs over 41 months; 31 (72%) in the therapeutic range, three (7%) above this range, and nine (21%) below the therapeutic range.[33] The varying levels of anticoagulation in these two patients resulted in multiple increases and decreases in the dosage of warfarin. Given the logistical difficulty in maintaining therapeutic levels of anticoagulation in the correctional setting, IDOC must strongly consider switching to the use of newer anticoagulants that do not require INR testing and the subsequent frequent adjustments of the anticoagulant dosages.

---

[32] Chronic Care Patient #7.
[33] Chronic Care Patient #10.

The documentation in the chronic care clinic notes does not consistently contain sufficient, pertinent clinical information needed to clarify and understand the status of a patient's chronic illness or justify a change in the treatment plan. This lack of consistent clinical documentation creates a barrier to the continuity and quality of care delivered to the DCC patient population. The experts found limited documentation that the chronic care providers had reviewed the MAR (refusals, compliance with prescribed medications), the CBGs, the previous nurse and provider sick call notes, and the blood pressure readings taken in the previous sick call visits when they assessed patients in the disease specific chronic care clinic visits. This failure to review and document the data and information that had been gathered between chronic care visits contributes to inappropriate clinical decisions for DCC's patient population.

The chronic care clinic notes are handwritten but were, for the most part, legible. The legibility of the chronic care handwritten notes was a notable improvement from the Experts' site visits to the previous two correctional facilities.

It was reported that the providers have access to the UpToDate® electronic medical reference on their administrative office computers, but this important access to current diagnostic, treatment, and clinical information is not available to providers or nurses in their clinical work areas (infirmary, nursing stations, exam rooms), making access to this information not available when it is needed.

Most of the chronic care patients had completed problem lists. However, four (29%) of the 14 charts reviewed had important diagnoses missing from the problem list and one had diagnoses that were either incorrect or no longer active problems.

The care provided to diabetics and patients on chronic anticoagulation, antihypertensive, and asthma/emphysema medications had deficiencies. The Office of Health Services Chronic Illness Treatment Guidelines were not fully adhered to: diabetics did not receive pneumococcal vaccines or have documented detailed foot examinations. Asthmatics did not receive pneumococcal vaccination and did not have pulmonary function tests performed when there was uncertainty about their diagnosis. Seizure patients did not have documentation of the occurrence of their most recent seizure. Hepatitis C patients did not have a baseline HCV RNA measured. Some diabetics, hypertensives, and patients on warfarin anticoagulation remained uncontrolled for lengthy periods of time, and detailed foot and lower extremity sensory exams are not documented in the diabetes chronic care notes. Recommended vaccines are not universally provided to patients whose age or disease warrant such vaccination. Compliance with prescribed medication is important for all chronic illnesses and the impact of not taking or receiving diabetic, hypertension, anticoagulation, and seizure medications can result in rapid deterioration and morbidity. There was no documentation in the chronic care provider notes that they were reviewing the MAR's or nursing notes to assess compliance with medication and initiating appropriate interventions as needed.

All 14 (100%) of the patient records had some degree of problems identified in the provision of care. The following patient summaries highlight the concerns and the findings noted above.

**Chronic Care Patient Summaries**

- This patient is a 49-year-old male with diabetes, hypertension, obesity, ETOH abuse, and paranoid schizophrenia, whose medications included glipizide 5mg, metformin 1000mg BID, fenofibrate 54mg/d, metoprolol 50mg BID, hydrochlorothiazide 25mg/d, and aspirin EC.[34] There was no documentation in the database of pneumococcal vaccination, which is recommended for all diabetics. He was followed in DCC's combined chronic (MIC DM) clinic. Lab testing in 2013 revealed cholesterol 206, LDL 95, TG 343 (45-150), and HbA1C 8.6%. In 2015, simvastatin was discontinued and fenofibrate was started due to an elevated TG (343). This is a questionable clinical choice, with only a mildly elevated TG. The national guidelines recommend statins for patients with high risk of cardiovascular disease. This patient's 10-year cardiovascular risk score was not assessed by the DCC providers, but we calculated his risk to be 20.5%, which warranted prescription of a statin.[35] His diabetic control improved and his HbA1C was maintained between 5.4 and 5.7%. He has chronic kidney disease (creatinine 1.77) but his urine microalbumin was within normal range. The optometry visit in March 2017 identified no findings of diabetic retinopathy. His blood pressure was controlled; however, in 2016 a prescription for lisinopril, an antihypertensive that is strongly indicated in diabetics with early kidney disease, was discontinued. The rationale for this decision was not noted. At none of his chronic care visits was there documentation that a detailed foot exam had been performed. At the 8/6/17 annual exam, his cognition was felt to be somewhat impaired, but the provider did not list any reasons or possible etiologies for the assessment of mild cognitive impairment. The patient lost 51 pounds over six years (311 lbs. in 2011 and 260 lbs. in October 2017). This may be due to exercise and better food choices, but there was no documentation by the provider that a wider differential (hyperthyroidism, cancer, malabsorption, etc.) was considered. This patient will be 50 years old later this year and consideration should be given to additional age-based screening (e.g., colon cancer screening). A review of recent MARs showed good administration and compliance with medications.

  In summary, for the most part, this patient's diabetes (HbA1C's consistently in the 5 range) and hypertension have been well controlled for the last two years. The improvement in his diabetes may be due to his weight loss. Although the repeated HbA1C's in the 5 range put the patient at risk for hypoglycemia, the provider did not reassess the diabetes medications and did not consider discontinuing at least one of the two anti-glycemic medications (for example glipizide). His 10-year risk of heart disease and stroke was greater than 7.5%. Based on current standards and on the IDOC Chronic Illness Guidelines, this patient should have been prescribed a statin to lower his risk of cardiovascular events. Also, the providers failed to comply with the IDOC guidelines by not documenting a foot examination, and not ordering a pneumococcal 23 vaccination. The providers failed to identify, monitor, and evaluate the reason for the patient's

---

[34] Infirmary Patient #1.
[35] ACC/AHA Heart Risk Calculator.

notable 51-pound weight loss during his incarceration. This puts the patient at risk from potentially preventable morbidity and even mortality.

- This patient is a 53-year-old male with HIV infection, hyperlipidemia, hypertension, asthma, substance use disorder, and a past history of positive TB skin test.[36] His medications included lisinopril 20mg, QVAR MDI, albuterol MDI, pravastatin, Genvoya, and darunavir. The patient was transferred in September 2017 from Northern Reception Center (NRC)  to DCC. He was followed in the UIC HIV telehealth clinic and the MIC chronic care clinic. In the past 21 months he has been seen three times in the UIC HIV clinic while at NRC and DCC, three times in  the hypertension chronic clinic at NRC, and two times at the MIC clinic at DCC. His HIV has been stable on Stribild/darunavir and then Genvoya/darunavir, with viral loads <20 and CD4s ranging between 680 and 838. His HIV medications included protease inhibitors. The patient was on simvastatin from June 2016 to March 2017. Simvastatin is contraindicated in persons on protease inhibitors, which this patient was on, yet this contraindication was not recognized for 10 months.  He had been seen three times in the NRC hypertension chronic care clinic before this contraindicated medication was discontinued. There is no documentation in the chart that he was offered or administered the pneumococcal 13 or 23 or the meningococcal vaccinations. His asthma was well controlled with no exacerbations noted in the medical record, and his PEFRs ranged between 600 and 750 L/min. His blood pressure was controlled over the last 21 months. On 3/21/17, when simvastatin was discontinued at SCC, gemfibrozil was ordered without a rationale documented in the medical record. Gemfibrozil is not recommended for lipid lowering in the absence of high triglycerides. An elevated triglyceride level was not identified in the medical record. A different statin drug other than simvastatin should have been chosen. Labs on 7/20/17 showed a cholesterol of 251, LDL 173, TG 156. The patient transferred to DCC in late 2017. In March 2018, gemfibrozil was discontinued and an appropriate statin (pravastatin) was finally initiated. The decision to appropriately start statin medication was delayed by the providers' failure to calculate the patient's 10-year ASCVD risk score as is mandated in the IDOC diabetes treatment guidelines.[37]  This patient's estimated 10-year cardiovascular risk   was 9.7%; the national and IDOC guidelines recommend starting a statin when the 10-year risk is >7.5%.[38] This 53-year-old has not yet been screened for colon cancer; all individuals should be screened for colon cancer beginning at the age of 50.[39]

In summary, this patient was continually seen in HIV and chronic care clinics. His HIV, asthma, and hypertension were adequately controlled. Even though this patient was seen three times in an NRC/SCC chronic care clinic, for seven months he was left on a type of statin that has serious drug interactions with HIV medications before this contraindicated statin was recognized and discontinued. This delay put the patient at

---

[36] Chronic Care Patient #2.
[37] IDOC Chronic Illness Treatment Guidelines, Diabetes 2016.
[38] ACC/AHA Heart Risk Calculator.
[39] USPHS Taskforce.

risk and supports a recommendation that chronic care clinic providers need to be engaged and knowledgeable about the care provided in other chronic care and specialty clinics and in sick calls. There was no rationale documented in the medical record for starting gemfibrozil after the contraindicated statin was stopped; triglycerides were never more than mildly elevated. The providers failed to comply with the IDOC and national guidelines by not calculating the 10-year ASCVD risk and delaying the ordering of another statin that was not contraindicated for use with HIV medications. The providers failed to comply with national guidelines to offer screening for colon cancer to all individuals at the age of 50 years and to offer pneumococcal and meningococcal vaccination to this patient with HIV.

- This patient is a 29-year-old male with asthma. His only medication is levalbuterol MDI.[40] His database noted a negative PPD and hepatitis B vaccination series being administered in 2017. There was no documentation of pneumococcal or flu vaccines. In 2016, he was seen three times in nurse sick calls for upper respiratory infections and asthma exacerbations. The nurses did not measure peak expiratory flow rates (PEFR) but did measure oxygen saturations. The patient improved with increased use of the levalbuterol inhaler. The patient was seen in asthma chronic care clinics four times between July 2016 and January 2018. In the asthma clinic his peak flows ranged from 450 to 500 L/min. The providers did appropriately document the frequency of levalbuterol usage as one to three times per week when the weather was cold. There was no documentation in the medical record by nurses or providers that the patient's inhaler technique was reviewed and found to be appropriate. MARs reviewed in 9/2017 and 11/2017 documented the distribution of the KOP inhalers to this patient.

  In summary, the patient had very stable asthma that only required intermittent use of his rescue inhaler. He was seen regularly in the asthma chronic care clinic. There was no evidence in the medical record that he had been offered pneumococcal vaccination, as is nationally recommended for all asthmatics. The nurses did not measure PEFRs when the patient was seen in nurse sick calls for breathing issues. Nurses should measure and record PEFRs before and after treatment on all asthmatics who are evaluated in sick call or in the urgent care treatment rooms. Oxygen saturation testing has a place in the evaluation of symptomatic patients in respiratory distress or those not responsive to treatment, but does not replace the measurement of PEFRs. Asthmatic and COPD patients should have documented ongoing training and documented observation of their inhaler technique. This is not being done at DCC and should be incorporated into the standard care provided to all users of inhalers. Failure to do this puts the patient's health at risk.

- This patient is a 81-year-old male housed on the geriatric floor with diabetes, hypertension, hyperlipidemia, and decreased vision.[41] His medications include

---

[40] Chronic Care Patient #3.
[41] Chronic Care Patient #4.

simvastatin, metoprolol, furosemide, aspirin, lisinopril, and metformin. The patient was seen regularly in the diabetes/hypertension MIC chronic care clinic. His HbA1Cs have ranged from 5.4 to 5.7 for the last 2¾ years. His blood pressure was 178/90 on 1/12/16 and furosemide was added to this anti-hypertensive regimen. His blood pressure was also elevated (158/80) in December 2017, but no treatment modifications were made at this visit. There was no documentation in the medical record that this patient received the pneumococcal vaccines, which are indicated for all diabetics and every patient 65 years of age or older. He also was not screened for colon cancer, which is indicated for all patients 50 years of age or older.

Since 2015, this patient has been followed by the DCC optometrist for failing vision, worse in the right eye. He was referred the UIC cataract clinic in February 2017. On 3/8/17, the optometrist documented that the patient could only count fingers at five feet with his right eye and had visual acuity of 30/40 on the left. On 4/26/17, the optometrist noted that he was still looking into the request to get approval for cataract surgery. On 5/4/17, the optometrist found that the patient's vision deteriorated to a visual acuity of 20/100 on the left, and only finger counting on the right at five feet. The optometrist submitted another request for referral to UIC. On 10/11/17, eight months after the initial referral, the patient was seen at UIC, where retinal swelling was noted and drops in both eyes continued for glaucoma. A two week follow up was recommended. On 11/8/17, the optometrist found the patient's vision to be only finger counting at two feet in both eyes. The optometrist added a second eye solution and wrote "need to get back to retina specialist…will refer again." On 12/13/17, the intraocular pressure of both eyes was normal. The optometrist noted that the patient had a history of retinal swelling due to diabetic retinopathy and advised that the patient keep the eye appointment with the retinal specialist. No further visits to the UIC eye specialists were located in the medical record. The patient's MAR indicated compliance with all medications.

In summary, the patient was seen regularly in the chronic clinics and his diabetes appeared to be over treated because his HbA1C level was significantly below goal. The risk of hypoglycemia should have prompted reevaluating the need for metformin in this elderly patient. Failure to offer and administer pneumococcal 13 and 23 vaccines is not in compliance with community practice nor with IDOC diabetes treatment guidelines. Failure to screen this patient for colon cancer is also not in accord with national standards. The patient's vision was rapidly deteriorating. It took eight months before the visit to the UIC eye specialist was arranged. The optometrist had to submit a second request three months after his initial request. The patient was seen in October 2017 at UIC and was to return in two weeks; the optometrist wrote on 11/8/17 that the patient needed to see the retina specialist and re-submitted a referral request. As of 12/13/17, the patient had not yet been seen back at UIC. The patient's vision has notably deteriorated. There have been delays with the initial and follow-up appointments at UIC that may have contributed to his failing vision. The delays in obtaining specialty

ophthalmology consultation at UIC should have prompted DCC to consult with a local ophthalmologist. These delays place the patient at risk of loss of vision.

- This a 53-year-old male with hepatitis C, asthma, hyperlipidemia, and a psychiatric disorder.[42] His database noted PPD negative in 2017 and hepatitis A and B vaccination series in 2013-14. He was followed in the asthma and hepatitis C chronic clinics. His medications were levalbuterol and ciclesonide MDIs. There was no evidence in the medical record that he received the pneumococcal vaccine as is recommended for persons with asthma or emphysema. His last asthma attack was documented as occurring in 2013. Given he had infrequent asthma exacerbations, he had questionable need for inhaled steroid medication. His PEFRs ranged from 325 to 520 L/min, but the PEFR was not always recorded when he was seen at his chronic care visits. There was no evidence in the medical record of pulmonary function testing. This testing was needed to identify if this patient had asthma as opposed to emphysema. His lipid profile in September 2015 noted cholesterol 263, HDL 61, and LDL 159. His 10-year ACC/AHA cardiac risk was not assessed by the DCC providers, but we calculated this risk to be 10.8%. In spite of this elevated risk, his statin medication was discontinued without a clinical explanation in 2016. The patient was followed for hepatitis C infection since at least 2013. His liver enzymes were slightly elevated, and his platelet counts were within normal ranges. He was treated for oral thrush with Diflucan (fluconazole). There was no rationale given for why this patient developed an oral candida infection. Although the cause might have been the use of an inhaled steroid, oral thrush is rarely seen in patients who do not have AIDS or diabetes. He was not tested for HIV. His APRI was calculated to be 0.418, which is below the IDOC criteria for treatment. We were not able to identify lab testing for HCV quantitative RNA testing as is required in the IDOC Hepatitis C Guidelines 2017.[43] There was no documentation in the medical record that this over 50-year-old patient has been screened for colon cancer.

In summary, this patient was seen four times over 31 months in the asthma clinic. His respiratory condition was stable. He failed to receive necessary pulmonary function testing. There was no clinical justification in the medical record indicating that this patient needed to continue to use inhaled steroids. There was no documentation in the medical record that this patient was trained on the use of the MDI or successfully demonstrated proper technique during any of this asthma clinic visits. There was no evidence in the medical record that hepatitis C virus (HCV) RNA testing had been ordered as directed in the hepatitis C guidelines. The cause of oral thrush was not identified; HIV testing was clearly needed but was not ordered. This poses a significant risk to this patient. This patient was over 50 years old, yet has not received colon rectal screening, which is indicated by both national and community standards of care.

---

[42] Chronic Care Patient #5.
[43] Hepatitis C Guideline, December 2017.

- This patient is a 38-year-old male with hepatitis C infection, seizure disorder, and depression.[44] His database noted that he had received hepatitis A and B vaccination series in 2016-17. His medications included valproic acid 500mg BID. He was followed in the hepatitis C and seizure clinics. He was admitted to IDOC in July 2016 and was seen three times in the hepatitis C clinic. His liver enzymes were slightly elevated, his platelets were normal, and his APRI scores was less than 0.46, which meant that the patient could have significant fibrosis but was unlikely to have cirrhosis. There was no documentation in the medical record that he had been tested for HCV RNA as directed in the hepatitis C guidelines.[45] Based on current institutional criteria, he was not a candidate for hepatitis C treatment. In the 5/15/17 seizure clinic, it appeared that he had stopped or had not received his seizure medications and valproic acid was re-started. On 2/27/18, he was examined in the seizure clinic. His valproic acid level was low 27.4 (50-100) and the ALT test result was 53. There was no mention about when he had his last seizure. Review of the MAR documented that he had received his KOP monthly supply of valproic acid from September 2017 to December 2017, but there is no documentation that he received valproic acid in January and February 2018. There is no indication or documentation that the provider in the seizure chronic care clinic reviewed the MAR and documented the most recent failure to receive his valproic acid. None of the seizure clinic notes document when the patient had his last seizure.

  In summary, there is no evidence in the medical record that this patient has ever had HCV RNA testing; this is not in accord with the system's hepatitis C guidelines. If the test showed that there was no active infection, the patient would no longer need to be followed and repeatedly examined and tested with respect to treatment of hepatitis C. The seizure clinic notes fail to document if the patient had any epileptic seizures since the previous visit. The failure to record this key clinical information poses a health risk for this patient. There was a question about the patient's ability or willingness to take his seizure medications, but he continued to be allowed to self-medicate his seizure treatment instead of placing him on nurse administered medication.

- This patient is a 44-year-old male whose problem list includes DVT since 2016 on chronic warfarin anticoagulant treatment, seizure disorder, NIDDM, congestive heart failure, and migraine headaches.[46] His medications include warfarin, levetiracetam, phenytoin, haloperidol, and levalbuterol and ipratropium MDIs. The problem list included no documentation that the patient had a mental health disorder yet, he was noted as receiving haloperidol, a psychotropic medication. The patient was receiving a rescue bronchodilator, but neither asthma nor COPD were noted on the problem list. Heart failure and diabetes were on his problem list, but he was not prescribed any medications for the treatment of either condition. During the past two years, the patient had no asthma attacks or emphysema exacerbations. Based on the inhalers

---

[44] Chronic Care Patient #6.
[45] Hepatitis C Guidelines.
[46] Chronic Care Patient #7.

being prescribed, it appears likely that this patient was being treated for emphysema, yet pulmonary function testing was never performed to verify the patient's actual diagnosis. His PEFRs ranged between 270 and 400. He attested to using his inhalers two to three times per week. There is no documentation in the record that this asthma/emphysema patient was offered pneumococcal vaccination in accord with national guidelines. While housed at Pontiac Correctional Center, his carbamazepine level was 2.6 (4-12) and his phenytoin level was 9.4 (10-20) both of which were below therapeutic levels. There was no comment in the clinical notes made about recent seizure activity nor about these low drug levels. The patient's history and physical exam notes were extremely limited to the point of being non-contributory. The patient was transferred to DCC and was seen in the asthma/seizure clinic on 6/2/16. A more thorough history noted that his last seizure was in May 2016 and that he was using his rescue MDI two to three times per week. His carbamazepine and phenytoin levels were now within therapeutic range; carbamazepine was discontinued and levetiracetam was started. At the 12/15/16 MIC clinic, he reported having a seizure one week ago; he was reported to have been noncompliant with his anti-seizure medication. At the 1/17/18 asthma/seizure clinic, the provider documented that there had been no seizures since the last visit and his phenytoin level was found in the therapeutic range. The management of this patient's chronic anticoagulation was complicated by the failure of the NPs providing chronic care to clarify in the medical record why this patient had to be prescribed long-term anticoagulation with warfarin or any other anticoagulant. From 8/14/15 through 12/21/16 (16 months), 24 INR tests were performed. Only nine (38%) were in the recommended therapeutic range; 11(46%) were high and put the patient at risk for serous hemorrhage; and four (17%) were low, creating the potential of new clot formation. Due to these varying levels of anticoagulation, the warfarin dosage had to be changed at least eight separate times. Warfarin was eventually discontinued because of the patient's propensity to self-mutilate. At one point, the patient developed anemia from bleeding from self-inflicted lacerations. At two clinical visits (7/30/17, 1/17/18), the provider's plans were "see orders" and "see RX." These short cut plans are an impediment to the effective communication to nurses and other providers about the treatment of this patient.

In summary, this patient's likely diagnosis was COPD, but the patient failed to have pulmonary function testing to make that determination. The patient was never offered or administered the pneumococcal vaccines; this is not compliant with the standard of care in the community. The patient's anticoagulation treatment was in the therapeutic range only 38% of the time in 2015-2016. The provider's documentation at the 7/30/17 and 1/17/18 chronic care clinics to "see orders or RX" instead of documenting a therapeutic plan of care has the potential to disrupt the continuity of care for this patient and put the patient's health at risk.

- This patient is a 51-year-old male with hyperlipidemia.[47] He was followed in the general medicine chronic clinic. He was not on medication; simvastatin was discontinued in 2012 due to non-compliance. In 1/8/2007, initial labs showed cholesterol 280, HDL 33, LDL indeterminate and TG 461. One month later on 2/19/2007, repeat lipid testing revealed cholesterol 196, HDL 23, LDL 128, and TG 224. We were not aware whether the patient was on statin medication when this test was taken. At the general medicine clinic on 6/10/15, the patient's dyslipidemia was controlled with diet. There was no documentation in the record why and when the statin had been discontinued. The patient was subsequently seen four times in the general medicine clinic between November 2015 and November 2017. His weight decreased from 230 in 2014 to 219 on 11/12/17. He continued to be advised by the providers to exercise, increase dietary fiber, and eat a healthy diet. There was no documentation in his chart, as recommended in the IDOC Hyperlipidemia Guidelines 2016, that his 10-year risk for heart disease or stroke was calculated.[48] Using his most recent lipid profile, we calculated his 10-year ASCVD Risk to be 4.7% which does not meet the criteria for treatment with a statin medication. In 2015, the patient had an episode of bright red blood per rectum (BRBPR). He was evaluated twice by DCC providers and the bleeding was thought to be caused by an external hemorrhoid. He had a colonoscopy done at UIC on 9/2/15; a sessile polyp was removed. The patient is to have a repeat colonoscopy in 2020. He was not told about the colonoscopy results until eight months later, when he asked for this information.

  In summary, this patient was followed regularly in the general medicine chronic care clinic. He has had six chronic care clinic visits in the last 29 months. Although the 10-year ASCVD risk score was below the threshold to initiate anti-cholesterol medication, the providers failed to follow the IDOC hyperlipidemia guidelines by not regularly calculating this risk. The colonoscopy performed in 2015 to evaluate BRBPR fulfilled the age-based screening for colon cancer in this over 50-year-old patient.

- This patient is a 70-year-old male with COPD and a previous 50-year history of smoking tobacco.[49] His database noted a flu shot on 9/20/17 and a pneumococcal 23 vaccine. His medications included fluticasone and vilanterol inhaler, levalbuterol inhaler and ipratropium, and albuterol inhaler. He was seen seven to eight times in the asthma chronic care clinic from July 2015 through January 2018. His medications were modified on a number of occasions to address his respiratory status. His PEFRs were consistently low, 110-130 L/min, and his oxygen saturations ranged from 95 to 97%. He was admitted to the infirmary on two occasions (1/8-22/2016, 4/4-20/16) for exacerbations of his COPD. The patient was referred to UIC pulmonary clinic on 1/20/17, but there was no evidence in the medical record that this has been accomplished. His weight dropped from 125 on 7/17/15 to 116 on 2/21/17, but has remained stable through 1/17/18 at

---

[47] Chronic Care Patient #8.
[48] IDOC Treatment Guidelines Hyperlipidemia.
[49] Chronic Care Patient #9.

115 lbs. He initially refused cancer screening and lab screening on 2/21/17. A lipid profile performed in October 2017 showed cholesterol 179, HDL 59, LDL 103. We calculated the patient's 10-year ASCVD risk as 16.3% which warrants treatment with a statin. There is no documentation in the medical record that he has been offered or received pneumococcal 13 vaccine. Though the patient had COPD, a pulmonary function test was not evident in the medical record. Though the patient was a 70 year old ex-smoker, abdominal aortic ultrasound testing was not done to screen for an aortic aneurysm.[50] It is unclear which cancer screening he refused on 2/21/17. Given that the patient was recently allowing lab testing again, colon cancer screening should be revisited. There is no documentation in the medical record that colon cancer screening has been offered in the last 12 months.

In summary, this patient has been seen regularly in the COPD clinic and his medications have been adequately modified to include a corticosteroid, short-acting beta agonist, long-acting beta agonist, and an anticholinergic bronchodilator. He has never had a pulmonary function test to fully verify the clinical diagnosis of emphysema. His COPD is quite severe, and it is in his best interest that the pulmonary specialty appointment requested in January 2017 be resubmitted. Per IDOC hyperlipidemia guidelines, the providers should have (but have not been) calculating his 10-year ASCVD risk. His 16.3% 10-year risk indicates that he should have been offered a statin medication. This patient is not being offered nationally recommended age and risk-based tests to screen for abdominal aortic aneurysm and colon cancer. He also has not been offered and administered the pneumococcal 13 vaccine. The failure to offer these preventive and early detection screenings puts this patient's health at risk.

- This patient is a 43-year-old male with asthma, DVT on chronic anticoagulation with coumadin, psychiatric disorder, past history of seizure disorder (no longer on antiepileptic medications), traumatic brain injury (TBI) in 1999 due to MVA, and blindness in one eye.[51] His database noted a flu shot and HIV Ab negative test in 2017. His medications included levalbuterol and ciclesonide inhalers, and warfarin. He was followed semi-annually in the asthma chronic care clinic, with eight chronic care visits in the last 40 months. His PEFRs have ranged been 300 and 650 L/min, with a mean of 380-400. He has had no urgent care or ED visits for asthma attacks. The patient was prescribed warfarin for the past treatment of DVT. We could not find a comprehensive note in the medical record explaining why he is receiving chronic anticoagulation. On 8/13/17, the lead physician wrote that the NP primary care provider needed to determine if there was clinical justification to continue anticoagulation; the NP then only noted in the 10/16/17 progress note that a history of multiple DVTs was the reason for the ongoing warfarin treatment. Forty-three INR tests were done in the last 41 months: 31 (72%) were in the therapeutic range, nine (21%) below, three (7%) above this range. Warfarin doses were modified six times during this timeframe. The patient's

---

[50] USPSTF AAA 2014.
[51] Chronic Care Patient #10.

weights were recorded as 301 lbs. on 2/6/15, 291 on 8/11/15, 281 on 12/8/16, and 228 on 1/29/18. He lost 73 lbs. in 36 months. On 5/13/17, lab tests revealed a normal HbA1C and TSH, ruling out diabetes and hyperthyroidism. There is no documentation in the chart that discusses this notable weight loss. This patient needs to be fully evaluated to determine that the weight loss is not caused by an underlying medical condition.

In summary, the patient was seen regularly in the asthma chronic care clinic; he has not had any exacerbations and his PEFRs are stable. There was no evidence in the chart that he has been trained about the use of an inhaler and his technique verified to be competent. The patient continually received INR testing to assess the adequacy of anticoagulation for his past history of DVT(s). The patient was therapeutically anticoagulated only 72% of the time. The providers need to thoroughly review this patient's history of DVTs to ensure that anticoagulation was still necessary, as an adverse side effect of warfarin is serious risk of bleeding. The frequent lab testing and medication adjustments needed when warfarin is prescribed are logistically complicated and put patient-inmates at risk for poor outcomes. Utilizing newer anticoagulation medications that do not require frequent ongoing measurement of the level of anticoagulation should be strongly considered by the IDOC. The patient's significant weight loss has not been fully and comprehensively evaluated. The providers have not taken a careful history, performed a thorough physical exam, and ordered additional laboratory and diagnostic tests to evaluate the unexplained weight loss. This must be initiated immediately.

- This patient is a 40-year-old male with hypertension and a history of anemia.[52] His database noted a diphtheria/tetanus vaccine in 2013**.** His medications included diltiazem 240mg ER, metoprolol 50mg bid, losartan, and hydrochlorothiazide 12.5mg/d. He has been followed in the hypertension and general medicine chronic care clinic at Danville and DCC. From September 2016 through April 2018, he was seen seven times in the hypertension and general medicine clinics. His blood pressure was controlled until 10/2/17, when he ran out of his medications and his blood pressure was noted to be 165/109; his BP medications were renewed. On 10/20/17, he was transferred to DCC. His blood pressure at the 11/3/17 hypertension clinic was 150/100. At the 3/20/18 hypertension clinic, even though his blood pressure was 126/80, lisinopril was added to his blood pressure regimen. At the next hypertension clinic on 3/28/18, his blood pressure was 142/88. The lisinopril was stopped because of the development of a cough, and losartan was substituted. Over the next week, blood pressures ranged from 122/74 to 158/98. At the 4/4/18 hypertension clinic, the blood pressure was 130/90, with a follow-up pressure in two weeks.

On 7/10/17, while housed at Danville CC, the patient presented with a history of rectal bleeds, and he was found to be significantly anemic, with a hematocrit of 22.4%, hemoglobin of 6.3g/dl, and an MCV of 57. This was suggestive of an iron deficiency

---

[52] Chronic Care Patient #11.

anemia. A rectal exam was not performed. No additional workup was ordered or initiated. He was placed on iron tablets. At a follow-up visit on 7/27/17, his hemoglobin level had improved to 8.6g/dl, his bleeding had ceased, a rectal exam was deferred but hemorrhoids were noted as the cause of the blood loss. By 10/2/17, the blood counts had returned to normal ranges. The patient has voiced complaints of constipation. This serious bleed should have been but was not fully investigated. It would have been fully justified to have initially admitted the patient to the hospital to stabilize, monitor, and evaluate the etiology. The patient's investigations should have included additional blood tests and upper and lower endoscopies.

In summary, the patient has been prescribed four hypertensive medications and his BP control was not yet stabilized. The exchange of lisinopril for losartan was not fully explainable; both can cause dry cough and the patient's cough was under control on the day of the change. The use of four medications at less than optimal dosing is questionable. The Danville CC providers put this patient at risk by not hospitalizing and fully investigating his profound blood loss. The patient's health and life could have been in jeopardy if he had suffered further bleeding episodes at the prison. Upon transfer to DCC three months after the anemia had first been detected, the DCC providers should have initiated the warranted evaluations. They failed to do this even though they had received transfer information noting that one of his problems included anemia.

- This patient is a 76-year-old male with hypothyroidism, atrial fibrillation, type 2 diabetes, prostatic hypertrophy (BPH), glaucoma, and cataracts.[53] His medications included metformin, levothyroxine, metoprolol, aspirin, and terazosin. He had been in IDOC for at least seven years. He was not offered pneumococcal vaccination. He was followed in the diabetes/hypertension chronic care clinic. He had 10 visits to the chronic care clinic between March 2015 and December 2017. Without any reason being documented, his statin medication was stopped on 3/20/15. The patient was taking 250mg of metformin for his diabetes and multiple HbA1C's were between 5.1 and 5.5, all reflecting totally normalized blood sugars. This indicated that the patient may be too tightly controlled or might not even require any diabetic medications. Multiple thyroid stimulating hormone (TSH) tests were documented to be between 1.65 and 3.85 over the last two years. All of these thyroid tests are so close to normal and the dose of levothyroxine so low that it would in the best interest of the patient to further lower or discontinue this medication. Unneeded thyroid supplementation in this elderly patient's very mild underactive thyroid disease could stimulate an exacerbation of his atrial fibrillation. The patient's blood pressure was usually in the low normal range. He was taking two medications for reasons other than hypertension that could lower blood pressure: terazosin (BPH) and metoprolol (likely for heart rate control of atrial fibrillation). On 12/2/16, his blood pressure dropped to 90/62; the metoprolol and terazosin were appropriately discontinued. His levothyroxine was decreased to 25

---

[53] Chronic Care Patient #12.

mcg/d. Even though this is a very low dose of thyroid medication, the use of this medication puts the patient at risk of a possible exacerbation of atrial fibrillation.

In summary, this elderly patient should not be taking levothyroxine, metoprolol, and metformin. This is in accord with the standards of care in the community. His hypothyroidism does not require treatment, he no longer requires treatment for diabetes, and the discontinued low dose of metoprolol had very limited benefit for this patient. The patient's 10-year risk of cardiovascular disease is extremely high (>30%) and warrants consideration for the reinstitution of a statin and the continuation of aspirin. The preventive health maintenance of this patient has been ignored; he had not received either pneumococcal vaccination, and there is no evidence in his medical record that he has been screened for colon cancer.

- This patient is a 60-year-old male with diabetes, hypertension, hepatitis C, and bipolar disorder.[54] His medications included 70/30 insulin, metformin, nifedipine xl, and losartan. He was followed in the hepatitis C and the MIC diabetes/hypertension clinics. At NRC his blood pressure was elevated at 174/115, and his antihypertensive medications were switched to nifedipine xl and losartan. There was no rationale for these changes documented in the medical record. His initial diabetes medications were 70/30 insulin 40U BID, metformin 1000mg/d, and sliding scale regular insulin before breakfast and dinner. This insulin regimen contains two short acting insulins. One component of 70/30 insulin is regular insulin. The patient was also on a sliding scale insulin, which is regular insulin. There is a risk of hypoglycemia when simultaneously administering two short acting insulins. He was seen three times in the MIC diabetes/hypertension chronic care clinic between October 2017 and March 2018. His blood pressure control was never at goal of 130/80 and his HbA1C results have only modestly improved (9.85 to 8.8%). Even though his diabetes was not controlled, the 70/30 insulin dosages were lowered in October and December 2017. The reason for decreasing the insulin doses was not documented in the medical record, which would have been especially important to document, since the HbA1Cs indicated poor control. There were no documented instances of hypoglycemia and his capillary blood sugars in November and early December 2017 ranged between 80 and 354, with a mean in the mid-100s. The optometrist identified no evidence of diabetic retinopathy and the patient's urine microalbumin was normal. The March MAR noted "missed no insulin injections."

The patient was seen twice at the hepatitis C clinic in 2017. His liver enzymes, platelet counts, and coagulation studies were within normal limits. His APRI score was less than 0.3 and did not qualify him for treatment. There was no documentation in the medical record of HCV RNA testing. If this test were normal, this patient would not have active hepatitis C infection and would no longer need to be followed in the hepatitis C chronic

---

[54] Chronic Care Patient #13.

care clinic for purposes of treatment for hepatitis C. The failure to order HCV RNA is not in compliance with the IDOC hepatitis C guidelines.[55]

This elderly diabetic patient has not been offered pneumococcal vaccination or colon cancer screening as recommended in national age and disease-based prevention and screening guidelines. His 10-year ASCVD risk score has not been assessed by DCC providers, and was calculated to be 27.1%; but he has not been offered a high intensity statin medication.

In summary, after six months this patient's diabetes and hypertension are not yet adequately controlled. The decision to order two diabetic injections that can rapidly lower blood sugars puts the patient at increased risk for hypoglycemic episodes. HCV RNA viral load has not been drawn. If this test was negative, there would be no need for this patient to be followed in the hepatitis C clinic for hepatitis C treatment. DCC providers are not adhering to national standards of providing pneumococcal vaccines to all diabetics and those over 65 years old, and of offering colon cancer screening to individuals 50 years of age or older. The failure to assess the patient's 10-year risk of cardiovascular disease and to administer a statin is not in line with the practice of medicine in the community.

- This patient is a 49-year-old male with insulin requiring diabetes, hepatitis C, and psychiatric disorder.[56] His database noted flu shot on 9/27/17 and completion of hepatitis A and B vaccines, but not the administration of pneumococcal 23 vaccination. His medications include NPH insulin and sliding scale regular insulin. The patient's blood pressure was not elevated during his incarceration at DCC. Since March 2016, he was seen four times in the hepatitis C clinic; his liver enzymes were normal or minimally elevated, his APRI scores ranged between 0.258 and 0.519. HC RNA viral load levels had not been drawn. Per IDOC guidelines, the patient is currently not a candidate for hepatitis C treatment. He has been seen six times in the diabetes chronic care clinic. His HbA1Cs have been 9.1, 9.7, 9.2, 8.7, and 8.9%, and have not yet reached adequate control during his two-year incarceration. Due to early morning episodes of near hypoglycemic symptoms, his NPH insulin has been decreased from 28U/am and 26U/pm to 19U/am and 17U/pm. The optometrist visit on 3/2/17 identified trace diabetic background retinal changes; his creatinine is minimally abnormal (1.6) with a normal urinary microalbumin. The patient's morning and evening CBGs widely range from the 50s to 400. The MARs indicate that the patient is compliant with his prescribed regimen. Pneumococcal 23 vaccination has not been offered or provided to this diabetic as is nationally recommended.

In summary, after two years of incarceration, this patient's diabetes is not yet controlled. His insulin dosages have been deceased in spite of this lack of control. The

[55] Hepatitis C Guidelines.
[56] Chronic Care Patient #14.

episodes of near hypoglycemia occurred in the early morning hours and the provider efforts should have focused on correcting this issue rather than lowering both the morning and the evening doses. The ongoing difficulty of fully controlling this patient's diabetes warrants consultation with an endocrinology/diabetes specialist. Pneumococcal 23 vaccination should be offered to this diabetic patient. The failure to perform HCV RNA testing is not in accord with IDOC Hepatitis C Guidelines.

## Urgent/Emergent Care

**Methodology:** We interviewed the Nursing Supervisor (IDOC), toured the medical clinic, and assessed the availability and functionality of emergency equipment and supplies. We also reviewed emergency drills, CQI reports, written directives, and medical records. Medical records were selected from the list provided by DCC of emergency room visits beginning in January 2017. This list includes the reason for the ED visit. Records selected for review were those conditions sensitive to ambulatory care, such as seizure, withdrawal, infection, diabetic complications, abdominal pain, chest pain, etc. A total of five records were reviewed. We also reviewed six records of patients who were admitted to a hospital for conditions sensitive to ambulatory care to assess clinical quality of care.

### First Court Expert Findings

Emergency room reports or hospital records were absent in all the medical records reviewed. The emergency care of patients at DCC was inadequate, usually lacking a thorough assessment and failing to involve advanced level clinicians. Patients referred to a provider either were not seen or the problem was not addressed at the next provider appointment. No records of emergency response or transports to the emergency department were kept and there was no self-monitoring.[57]

### Current Findings

DCC does not have a crash cart. The institution performs basic CPR, applies the AED, and calls 911 for cardiac arrests. This is an acceptable option for responding to codes/cardiac arrests. DCC also provides first aid. There are two emergency response bags kept in the dispensary nursing office that contain first aid supplies, personal protective equipment (PPEs), stethoscope, blood pressure cuff, equipment and supplies to start an IV, and a few medications (i.e., glucagon, an EpiPen, aspirin). The contents of the bags are standardized,[58] and they are sealed with a lock to indicate that the bag is fully supplied and ready for use. An automatic external defibrillator (AED), stretcher with backboard and cervical splint, ambu bag, portable oxygen, EKG machine, suction, nebulizer, and oto-ophthalmoscopes are available in the urgent care room adjacent to the nursing office. AEDs and emergency equipment are also available in

---

[57] Lippert Report DCC pp. 22-23.
[58] Contents of emergency response bags



DCC list of
emergency supplies.p

the infirmary and in X-House. The Nursing Supervisor (IDOC) said that there was no trauma bag as described in DCC's ID #04.03.108. Instead, a staff member is posted in the urgent care area to collect additional equipment and supplies if radioed from the scene that they are necessary.

The presence and functionality of the first aid equipment is checked each shift and documented on a log. We recommended to the Nursing Supervisor (IDOC) that the expiration date for each medication in the bag be added to the log so that it was apparent when it needed to be replaced. We checked the AED and other emergency equipment listed above and found all were functional. DCC ID #04.03.108 lists the contents and location of first aid kits available in housing units, program areas and vehicles, but we did not evaluate the accuracy of this information.

The DCC ID #04.03.108 and DCC Health Care Unit Policy and Procedure P-112 differ in the requirements for drills. The ID requires drills twice a year on each shift. One of these is to be a mass casualty drill involving multiple people with injuries. One is to be an emergency response drill and an actual emergency can be substituted. The Health Care Unit Policy and Procedure P-112 requires only one mass casualty drill annually and one emergency response drill on each shift annually. Actual practice appears to conform to P-112 rather that ID #04.03.108, in that one mass casualty drill is completed annually. We recommend revising the ID to conform to actual practice; it has not been updated since 2011. The mass casualty drills for 2016 and 2017 were reviewed and found to be thorough, with good multidisciplinary participation, and candid critique of strengths and weaknesses. However, no corrective action or plans to improve were developed as a result of these critiques. An incident report is written each time there is an emergency response and sometimes these are reviewed and critiqued. The report and critique are kept in binders available for review. We reviewed all emergency response reports and critiques in these binders from January 2017 to the present. Critiques are very complimentary and seldom identify needed improvement. Of the five medical emergencies selected for chart review, two were critiqued by DCC Health Care; no strengths or weakness in the response to either were identified. Emergency response is an item regularly on the agenda of the Quality Improvement Meetings. The minutes of these meetings do not reflect any discussion, analysis of issues, or plans for improvement in emergency response.

We reviewed the medical records of five patients sent to the ED in 2017 and found that the ED visit could have been prevented in two of the cases if the patients' care had been different in the preceding months. Information and recommendations from the ED were not obtained, or if they were, not incorporated into the patients' subsequent treatment plan. These findings are detailed in the following paragraphs.

- The first patient is also discussed in the hospital section below; his death was possibly preventable if care in the preceding months had been better.[59] This patient had returned to DCC on 11/19/17 after nearly a month of hospitalization. A physician described his discharge problems as COPD exacerbation, hypercalcemia, pleural

---

[59] Urgent/Emergent Patient #1 and Hospitalization and Specialty Care Patient #7.

effusion, post-chest tube, pneumonia, anemia, renal failure and DVT. However, what the doctor failed to acknowledge was that the patient had a large retroperitoneal mass, likely a malignant lymphoma, which was not addressed in the plan of care. The diagnosis was pending. While much of the hospital record was available, the physician only listed diagnostic possibilities and was not clear about the plan of care. The treatment plan consists of monitoring and comfort care only. The inbound note written by a nurse describes the patient's condition based upon a visual assessment only. The nurse did not document a review of the discharge instructions or contact the facility physician for orders as required by Health Care Unit Policy and Procedure P-104.[60]

There was no plan of care in place in the nine days immediately before his last hospitalization on 11/29/2017. In the meantime, nurses documented clear signs that the patient's condition was worsening, including bloody stools, diminished lung sounds, pitting edema of the legs, poor oxygenation, and low blood pressure (98/62). When the provider was contacted, the nurses were instructed to continue monitoring the patient and report if his condition worsens.

On 11/27/17, the physician documented an encounter and that the patient needed to be more compliant; the patient was demanding a change in his diet. Vital signs are described as stable and that he had better aeration and his lower legs seemed improved. The provider took no steps to definitively treat the patient and made no effort to uncover the diagnosis of the retroperitoneal mass. Instead, the doctor continued monitoring and comfort care. There is no documentation that the patient agreed to palliative or hospice care. The patient was not seen by a provider the next day even though he was bleeding from the mouth and had petechia on his trunk and upper extremities. This should have prompted immediate concern, since the patient was on anticoagulation. No action was taken until the following day, 11/29/17, when the provider saw the patient and mused about whether the dose of anticoagulant medication was correct. Ultimately, he ordered the patient transferred to the local emergency room. There is an outbound note written by a nurse on the intrasystem transfer form, but it does not contain all of the information relevant to the patient's ongoing care, and there is no specific statement of the reason higher level care was being sought. The patient was admitted to the hospital from the ED and died 20 days later.

Problems with the medical care of this patient post-hospitalization include: an inaccurate problem list (not updated since 1/2017); the nurse did not adequately examine and document her findings and did not summarize the discharge recommendations or contact the Medical Director for orders when he returned from hospitalization on 11/19/17; the physician did not incorporate information obtained from the hospital discharge records into the patient's plan of care; the physician did not see the patient as frequently as required by DCC Health Care Unit Policy and Procedure

---

[60] Continuity of Care During Incarceration pg. 6, II. G and III. A.

P-113[61] or as indicated by his deteriorating condition; and the note written to accompany his transfer to the emergency room on 11/29/17 did not contain all of the information relevant to the patient's ongoing immediate care.

- The next patient was hospitalized emergently on 5/31/17 because he was having signs of a stroke including slurred speech, inability to move or grasp with right arm, tongue deviated to the right side, and delayed thought processing.[62] He was 61 years old at the time. His problem list dated 6/23/16 included dyslipidemia, insulin dependent diabetes, CVA (2012), gunshot wound to the head, and degenerative disorder of the thoracic spine.

  There is no nursing treatment protocol for stroke; the nursing assessment included vital signs and blood glucose and the symptoms described above. The provider was contacted and ordered a transport to the emergency department. No orders were given to start O2 or an IV while awaiting transport, and there is no documentation of subsequent assessment of the patient while awaiting transport. No transfer note was written.

  There is no note summarizing recommendations from the hospital after he was returned to DCC on 6/14/17 with a diagnosis of cerebral vascular accident (CVA). The provider admitted the patient to the infirmary as an acute patient, ordered regular medications, and a physical therapy evaluation. No comment was made about discharge recommendations from the hospital and there was no documentation of the rationale for not implementing the recommendations.

  This patient's medical care in the months prior to the emergency room visit was problematic. First, he was transferred from Big Muddy Correctional Center 18 months earlier because of increasing blood glucose levels. He was received at DCC on 4/14/16. The receiving nurse noted that he also was followed in the hypertension clinic (HTN is not on his problem list), he had a diagnosis of sleep apnea and used a CPAP machine. Sleep apnea is not on the problem list and neither the diagnosis of sleep apnea nor the need for a CPAP machine are listed on the transfer summary. The CPAP machine was not in his property when transferred. The problem of sleep apnea was not identified or treated, and he never received a CPAP machine in the 18 months after being received at DCC. This may have been a factor contributing to the stroke this patient had in May 2017.

  He was seen in chronic care clinic for diabetes in August 2016, December 2016, and May 2017. HbA1C was elevated in December (9.9), so the provider ordered a nighttime dose of Lantus in addition to Metformin, with follow up in two weeks. The follow-up appointment did not take place. His HbA1C was still elevated when next seen in clinic on

---

[61] Infirmary Care III. 1. A. p. 25.
[62] Urgent/Emergent Patient #3.

5/4/17 (9.5) and 70/30 insulin twice a day was ordered; the Lantus and metformin were discontinued. Aspirin 81 mg. was also ordered at this visit. Medication for HTN and dyslipidemia were continued.

This patient was also being treated for wounds on his buttocks from August through October 2016. A note written by a provider on 8/9/16 indicates that this is related to the patient's paralysis, but the extent of his paralysis is never described. Another episode of skin breakdown on his left hip was being treated in May 2017. Undoubtedly his skin wounds affected his diabetes and vice versa, and yet this was never considered by providers who were treating him. This patient's diabetes was not managed to obtain good control and changes in the plan of care were slow and inadequate.

- Another patient was a 61-year-old man seen in the emergency room on 2/11/17 for chest pain.[63] His problem list contains diagnoses of insulin dependent diabetes with neuropathic pain in his feet, which is inaccurate given that the problems listed on the outbound transfer summary include hypertension, chronic obstructive pulmonary disease, asthma, and hepatitis C. The problem list also does not identify that he has a pacemaker.

The patient was brought to the health care unit. The nurse used the chest pain protocol to assess the patient, but did not describe precipitating factors or do an EKG. The provider was contacted and ordered transport to the ED. Oxygen and an IV were started before transport. A transfer note was written to give to the ED upon arrival. The patient was admitted and treated for congestive heart failure and thrombocytopenia until discharge on 2/14/17.

The hospital summary was reviewed by a physician the day after he was released from the hospital, 2/15/17. He does comment on the discharge recommendations. He put lisinopril and Aldactone on hold until the nephrologist approved resumption. There was no note that the nephrologist was contacted to make this decision. The Lisinopril was never restarted. He also held the patient's Lasix for four days. This was a KOP medication and there was no note that the patient was instructed to do this. He also ordered labs, which were drawn, but the results were never commented on. At the next chronic care appointment in April 2017, the provider did not comment on the patient's hospitalization in February.

While the emergency response was adequate, the fact that the problem list is grossly out of date makes treatment of the patient a guessing game. Even after the patient returned from hospitalization, the problem list was not updated to ensure its accuracy. There were several aspects of care ordered after the patient's return to DCC that were not followed up on, including the medications to be held and restarted, consultation with the nephrologist, and lab results. The failure to comment on the patient's recent

---

[63] Urgent/Emergent Patient #2.

hospitalization at the next chronic care visit is emblematic of episodic treatment rather than managed chronic care.

A 24-year-old man with no history of health problems was treated in the ED for chest pain on 7/19/17.[64] The emergency response was good, including use of the chest pain protocol and documentation. However, the patient returned from the emergency room with no treatment records and was not seen by a provider. While this man appears to be in good condition, he had been seen in January for chest pain and had an abnormal EKG at the time of the ED visit in July. Knowing what diagnostic and clinical work was done at the ED is essential for the provider to ensure that clinically appropriate care is continued after return to the prison. Not only is a provider visit required by the Health Care Unit Policy and Procedure P-104, it was clinically indicated.[65]

In summary, we concur with the First Court Expert's findings that ED reports were often absent in the medical records reviewed and the care of patients was problematic before the ED visit and after the patient's return to SCC. We agree with the First Court Expert's recommendations and make additional recommendations found at the end of this report.

We reviewed six patients who were hospitalized to assess for quality of care at the facility before and after admission to the hospital. We noted that hospital reports were inconsistently present in the medical record. We agree with the First Court Expert's recommendation in the Emergency Services section that after all offsite emergencies, a provider should see the patient to document a discussion of findings and a discussion of any changes to therapeutic plans. We found that while physicians generally evaluated patients after hospitalization, discussion of findings and a change of therapeutic plan were not well documented. We suspect that this was because providers do not appear to have the hospital report. Lacking the hospital report, clinicians do not know what occurred at the hospital and often appeared to be unaware of the status of the patient's clinical condition. This makes establishment of a therapeutic plan difficult to develop.

We found in the review of records of persons hospitalized that clinical care preceding hospitalization was poor and often resulted in a problem deteriorating and needing to be addressed on an emergency basis. There were preventable hospitalizations, preventable morbidity, and preventable mortality. These findings on record reviews are summarized below.

- One example was a patient with severe coronary artery disease that resulted in prior bypass surgery and multiple cardiac stents.[66] The patient also had peripheral artery disease, hypertension, high blood lipids, and diabetes, which were all risk factors for coronary artery disease. The patient had no problems documented on the problem list until March of 2017. The patient saw a provider on 6/29/16. The provider took no

---

[64] Urgent/Emergent Patient #5.
[65] Continuity of Care During Incarceration II. F and III. A. pp. 6-7.
[66] Hospitalization and Specialty Care Patient #4.

history with respect to angina but did note that the patient was to see the cardiologist soon. The patient saw a cardiologist at UIC on 7/6/16. There was no report. Brief comments on the referral form noted increased angina over the past two months. The cardiologist recommended titrating up nitrate medication (Imdur) for angina and noted that the patient needed "aggressive" medical management.

The patient did not see a physician timely after this appointment. On 7/22/16, a nurse saw the patient for chest pain and used an "Indigestion/Heartburn" protocol despite the patient complaining of three months of chest pain, "like getting stabbed in the chest [after] eating + when walking." This description is typical of angina. The nurse should have used a chest pain protocol. The nurse should also have obtained an EKG and should have immediately referred to a physician. Instead, the nurse noted that the patient had been on Pepcid and switched to Zantac, both of which are for acid reflux disease and neither of which were working. The nurse initially referred the patient to a physician urgently, but this was scratched out and a routine appointment was made. This was a serious error. This patient had significant angina, but a nurse assumed his complaint was for acid reflux disease. The patient was not properly referred, which placed him at significant risk of harm.

On 7/25/16, a nurse again evaluated the patient for chest pain, this time using the chest pain protocol. The nurse noted pressure-like chest pain and referred the patient to a doctor. An EKG was done. This EKG did not include an automated reading but showed ST elevation in lead III consistent with acute ischemia. Dr. Meeks, the Agency Medical Director, was at DCC on the day we were reviewing this record. He is an emergency medicine physician. He reviewed the record and agreed that this was an ST elevation consistent with ischemia. This should have resulted in immediate transfer to a hospital. Instead, the physician ordered Prilosec, a medication for acid reflux, and a follow up on 8/10/16. This was grossly and flagrantly unacceptable practice that placed the patient at risk of death.

On 7/28/16, a doctor saw the patient for the five-day follow up from the 7/6/17 cardiologist visit. The doctor noted that the cardiologist recommended increasing the Imdur, but the doctor took no history and failed to note the evaluation by the nurse four days earlier for what appeared to be typical angina, and more importantly failed to note the evaluation three days earlier with the EKG showing acute ischemia with typical symptoms of angina. The doctor documented referral to cardiology and ophthalmology but took no other action and did not update the status of the patient's therapeutic care. Since referrals to cardiology at UIC take on average 100 days, the patient should probably have been sent to a local cardiologist.

On 8/1/16, a doctor saw the patient because Zantac was not working for his presumed gastric reflux disease. The doctor took no history of the patient's pain and advised the patient to elevate the head of his bed without realizing that the patient's symptoms might be from his angina. The doctor failed to recognize the prior abnormal EKG. The

therapeutic plan was not evaluated or refreshed. This lack of knowledge about how to manage angina was significant.

On 9/16/16, the patient had an episode of chest pain walking up stairs which was relieved by nitroglycerin. The doctor recommended a "medical movement" pass and increased Prilosec, but did not increase anti-anginal drugs or order cardiac testing (EKG, stress testing, or cardiac catheterization). The doctor failed to properly treat angina and may have failed to recognize that the patient's symptoms were angina. The episode of care failed to follow generally accepted guidelines or usual practice.

On 10/27/16, a doctor saw the patient and noted that the patient had chest pain, but the doctor was not sure if the pain was related to "gas" or to angina. The doctor thought that the patient had lactose intolerance and prescribed a gas relieving medication and documented that he would "consider" increasing Imdur (the anti-anginal medication) if there was no improvement. This was a judgment error, in our opinion. Gastro-esophageal reflux disease (GERD) is not life-threatening. His angina was life threatening. The doctor was placing greater significance on a condition that was much less likely to cause harm. This was incomprehensible practice.

On 11/30/16, a practitioner noted that his chest pain "resolved" since eliminating dairy and assessed likely lactose intolerance and discussed elimination of lactose from his diet.

On 3/22/17, an NP saw the patient in chronic care clinic but took no history and noted that the patient offered no complaints. The NP did not address the chest pain, evaluate the prior EKG, and did not address the angina. Notably, the patient had peripheral vascular disease that was not being monitored.

On 3/24/17, a doctor noted that the patient complained of chest pain lying flat that was relieved by nitroglycerin. The patient also described chest pain when walking accompanied by calf pain when he walked. This description is consistent with angina and claudication, a condition of atherosclerosis of leg arteries. Although the patient's description of pain was consistent with angina and peripheral artery disease, the doctor prescribed Tums antacid and increased the dose of reflux medication. There was no examination of the pulses to assess the peripheral artery disease. The doctor noted that a cardiology appointment was pending and ordered a three-week follow up. The doctor did not increase anti-anginal medication. This was not generally accepted practice for treating angina.

On 4/17/17, an NP saw the patient and documented that the patient was waking up in the middle of the night with chest pain and difficulty breathing. The NP did not order an EKG and made an assessment of "chest pain/? GERD," and advised the patient to take Tums first when he got this pain, and if the pain was not resolved to take his nitroglycerin. The NP did not adjust the anti-anginal medication. This patient needed to

be diagnostically evaluated for ongoing unstable angina, but providers appeared ignorant of what should be done.

On 4/20/17, a nurse evaluated the patient for chest pain at 1:05 a.m. The patient had steady pressure in his chest with dyspnea. The nurse called a doctor and the patient was referred to a hospital where NSTEMI [myocardial infarction] was diagnosed. The patient had two stents placed.

The care for this patient was grossly and flagrantly unacceptable. The patient had multiple risk factors for heart disease and had established severe heart disease. A cardiologist recommended titrating up the anti-anginal medication for angina. Despite this, the providers at DCC treated his symptoms of angina with antacids on multiple occasions and never increased anti-anginal medication. On one occasion, the patient had evidence on EKG of acute coronary syndrome that was not addressed and unrecognized by a physician reviewing the EKG. The patient should have been referred much earlier for cardiac diagnostic assessment, including nuclear stress testing and/or cardiac catheterization, but this was not done until the patient had a heart attack. The hospitalization and heart attack may have been prevented if earlier diagnostic evaluation (cardiac catheterization) occurred. This is another case of underutilization, which will be discussed in the specialty care section.

- Another patient had HIV infection, high blood cholesterol, and prostate cancer.[67] He was 66 years old. On 8/25/16, the patient was evaluated in chronic clinic for high blood lipids. Although the doctor mentioned the patient's HIV infection and prostate cancer, the doctor did not address these conditions. A prior abnormal laboratory result (abnormal renal function) was not addressed. On 11/22/16, a doctor saw the patient again for chronic disease clinic. The patient asked the doctor about radiation treatment for his prostate cancer, but the doctor did not document a response. The kidney function was still abnormal (creatinine 1.78), but not addressed.

  On 5/21/17, a doctor saw the patient for chronic disease clinic, but except for high blood lipids, none of the patient's other problems were addressed. The patient reported right flank pain, but the doctor took no further history of this and ordered no laboratory tests. We believe that all problems should be address at each chronic disease clinic visit. Under the current system, many chronic illnesses are never monitored.

  On 6/7/17, a doctor saw the patient for abdominal pain with episodes of vomiting since the night before. The patient had anemia, but this was not addressed. The doctor admitted the patient to the infirmary for intravenous fluid but ordered no laboratory testing. Abdominal pain with vomiting warranted laboratory testing and possibly radiologic testing (CT scan or ultrasound), yet these were not done.

---

[67] Hospitalization and Specialty Care Patient #2.

The patient was evaluated on 6/8/17 by a doctor and still had abdominal pain, but the physician still ordered no diagnostic work up, instead diagnosing abdominal pain of unknown etiology, and prescribed Toradol. Prescribing pain medication for abdominal pain of unknown etiology was a failure to follow accepted standards of care, as the doctor did not know what the source of the pain was. The doctor should have initiated a work up of the abdominal pain.

On 6/9/17, a doctor ordered that the patient be given a regular diet the following day and then be discharged to general population. The following day, the patient complained to a nurse that he was weak and in a lot of pain. The nurse described the patient as "looks like he is in pain, squinting, and not moving, breathing slowly." The nurse documented that she would talk to the doctor about not discharging the patient. The patient was nevertheless discharged.

On 6/14/17, a doctor saw the patient, who had constant abdominal pain, weakness, and diarrhea. The patient had lost 11 pounds over approximately three months. The abdomen was tender, and the doctor noted an enlarged liver. The doctor admitted the patient to the infirmary and ordered laboratory tests but no diagnostic radiologic studies (ultrasound or CT scan). The patient exhibited dehydration (BUN 26), abnormal kidney function (creatinine 1.75), possible malnutrition (albumin 2.5), and altered liver function (AST 385 and ALT 368). Despite these significantly abnormal blood tests, no diagnostic radiologic testing was ordered. The patient should have had a CT scan or ultrasound of the abdomen on an immediate basis.

There was no infirmary note on 6/15/17, but the patient was sent offsite for an ultrasound. The patient should have been sent to an emergency room for this study. Instead, it was ordered as a consultation. The patient returned to the prison after the ultrasound, and on 6/16/17, the ultrasound report was unavailable. The doctor noted abdominal pain of unknown etiology and made no other effort to diagnose the patient's condition. This placed the patient at significant risk of harm. There were no physician notes on the infirmary from 6/16/17 through 6/21/17, even though the patient had an acute illness.

The ultrasound report, dated 6/15/17, appeared to have been faxed to the facility on 6/19/17. The report documented a perforated viscus with fluid around the dome of the liver. Cirrhosis was also present. These are life threatening findings, yet no one reviewed the report for two more days, when an NP noted the findings and described the patient as having severe abdominal pain with nausea. The patient was sent to a hospital, where he remained after surgery for a perforated viscus. Care for this patient was grossly and flagrantly unacceptable and placed him at risk of death. Earlier diagnostic intervention was indicated. Serious, potentially life-threatening symptoms were treated as a routine. There was a lack of physician follow up. Notably this was during a time when there was no physician on staff at the facility.

- Another patient had an annual physical examination on 2/15/16 and weighed 345 lbs.[68] The patient had anemia for over four years without a work up, which fails to follow generally accepted guidelines. This patient had high blood lipids, COPD/asthma, prior hip replacements, and GERD. In February of 2016, the patient was found to have carcinoma in situ of a rectal condyloma, a wart like condition. The patient had seven colorectal follow-up visits and one dermatology visit for his rectal lesion. Only two of the seven visits included a report, so the therapeutic plan was unclear. At a dermatology visit on 1/11/17, biopsies were done and follow up was requested pending biopsy results, but the biopsy results were never obtained or followed up by DCC physicians. It was not clear what the patient's clinical status was, as the doctors at DCC failed to review reports. On 1/18/17, a liver biopsy, EGD, and colonoscopy were approved in collegial review. It was not clear why these tests were recommended, as there was no progress note documenting the rationale. The consultation reports were almost all missing and the status of the patient was unclear. The patient refused a 4/5/17 colorectal appointment, but it was not clear why. The patient was not seen after this for over five months. The biopsies taken by dermatology on 1/11/17 were never checked on. The liver biopsy, EGD, and colonoscopy were never approved or completed. A physician never followed up with the patient about his rectal squamous cell cancer or on the failed appointment back to colorectal service.

On 7/11/17, blood tests done for unclear reasons showed persistent anemia and elevated alkaline phosphatase, a liver enzyme, but these were never followed up by a physician at the facility.

On 9/8/17, the patient developed difficulty breathing and was unable to get up off a chair. An NP admitted the patient to the infirmary and ordered tapering prednisone, antibiotics, a chest x-ray, CBC, and CMP.

A doctor covering at the facility discharged the patient from the infirmary on 9/11/17. The doctor documented reviewing the x-ray, which he perceived as normal. The x-ray report actually showed an elevated left diaphragm and left pleural effusion with left lower lobe atelectasis abnormalities that should have resulted in immediate physician examination and further radiological diagnostic studies (CT scan). The elevated diaphragm suggested something was pushing up on the diaphragm and this needed to be diagnostically resolved, but was not.

The radiologist x-ray report was not reviewed until 9/13/17. The doctor reviewing the report did not examine the patient, but documented that the patient was doing well and planned to repeat the x-ray in three weeks. This was unacceptable. The patient should have been examined and a CT scan should have been done promptly.

---

[68] Hospitalization and Specialty Care Patient #7.

The chest x-ray was repeated on 9/20/17 and showed a density in the left base, a possible combination of pleural effusion and infiltrate. A doctor again did not examine the patient, but wrote a note that he would schedule the patient and would *consider* repeating the x-ray. This was grossly and flagrantly unacceptable. The patient had an abnormal x-ray indicating a serious infection or other serious disease and to not examine the patient is unacceptable practice.

By 10/5/17, the patient told a nurse that he had not been able to walk for six weeks. The patient had come to the infirmary in a wheelchair from general population to take a shower. The patient was dizzy and was not able to independently transfer. The nurse noticed that he was wheezing. The nurse referred to a doctor for possible infirmary placement. The patient should have been evaluated promptly, yet was not seen for three days. This patient's serious medical condition was being neglected.

On 10/10/17, a doctor noted the prior abnormal chest x-ray and expiratory wheezing, and assessed COPD; a chest x-ray, prednisone, nebulizer treatment, and oxygen were ordered. No laboratory tests were ordered. The patient was ordered to the infirmary but was not admitted to the infirmary until 10/14/17, four days later. On admission to the infirmary the patient weighed 300 lbs. The patient had a 45-pound weight loss over 20 months, which was unrecognized. This is either a serious systemic deficiency or indifferent medical care or both. The infirmary admission note failed to acknowledge the abnormal chest x-ray or develop a plan for that. The doctor noted that the patient had COPD and a self-care problem. No other history was taken. The prior history of squamous cell carcinoma of the rectum was not recognized. The doctor ordered no diagnostic studies; a CT scan was indicated. No laboratory tests were ordered but should have been done. The patient should have been admitted to a hospital, but no diagnostic studies were done. Care was grossly and flagrantly unacceptable.

Even though the patient was admitted to the infirmary for COPD, the patient was not seen regularly. After the 10/14/17 infirmary admission note, a doctor did not see the patient until 10/27/17, almost two weeks later. The patient was not eating or drinking, and the doctor documented abdominal pain, decreased appetite, and that the patient appeared dehydrated. The patient should have been admitted to a hospital. Instead, the doctor documented that he would consider permanent placement and ordered a CBC and CMP. The failure to recognize acute and serious problems was grossly and flagrantly unacceptable medical practice.

The blood work reported 10/27/17 showed significant dehydration (BUN 69), renal failure (creatinine 2.46), a life-threatening serum calcium (16), and anemia (hemoglobin 11.9). *These life-threatening laboratory results were not reviewed for three days*, when the doctor next saw the patient. This was grossly and flagrantly unacceptable practice. The patient was sent to a hospital.

The patient was discharged from the hospital almost a month later, on 11/19/17. He had been diagnosed with hypercalcemia, pleural effusion requiring a chest tube, pneumonia, anemia, renal failure, bilateral deep vein thromboses, and an undiagnosed retroperitoneal mass thought to be lymphoma. His last two weeks at DCC are described above in the Urgent Care patient #1 record review. The patient died after a second hospitalization about a month later.

A coroner's report listed multi-organ failure and sepsis as the causes of death, but noted that the patient had lymphoma which had not been previously diagnosed. Remarkably, the autopsy documented that the retroperitoneum was "unremarkable" and the regional lymph nodes were "unremarkable," yet during hospitalization at UIC, a CT scan showed a large retroperitoneal mass and multiple lymph nodes. The coroner did document that the patient had lymphoma, and it was not clear if the coroner had the lymph node biopsy result, which the facility never obtained.

This patient's death was possibly preventable. Follow up of the patient's rectal cancer was poor and the patient was lost to follow up. A biopsy in January of 2017 was never followed up. Liver biopsy, EGD, and colonoscopy approved in collegial review in January of 2017 were never done. The patient had anemia that was not worked up for four years. Once the patient developed a pleural effusion in September, he was incompetently managed for almost two months, at which time his disease was so advanced that he could not be treated. Earlier diagnosis and treatment may have prevented his death.

## Specialty Consultations

**Methodology:** Review specialty tracking logs. Interview the scheduling clerk. Perform record reviews of persons who have had specialty consultation.

### First Court Expert Findings
The First Court Expert found lengthy delays in obtaining an appointment at UIC. The date of the order for consultation and the date of the appointment are not included on the DCC offsite tracking log. This made it very inefficient to track the timeliness of the appointment based on the order. On occasion, appointments are delayed so long that new referrals have to be made. The First Court Expert's opinion was that if a system wants to efficiently track whether offsite specialty consultations are timely, they must track the date of order, date of authorization, date of appointment, and date of primary care follow up for discussion of the consultation with the patient.

The First Court Expert recommended that delays in scheduled offsite appointments must be eliminated. He recommended that DCC obtain authorization from the UIC scheduling coordinator within seven days after approval of the consultation. When UIC cannot provide the service within 30 days, a local service needs to be used. He also recommended that immediately after the patient returns from the offsite service, a nurse review the paperwork

reports related to the consultation and, if unavailable, take steps to obtain these reports. After paperwork is obtained, a primary care appointment needs to be scheduled so the primary care clinician can review the report and discuss findings and recommendations with the patient. This discussion needs to be documented in the medical record.

**Current Findings**

The findings of the First Court Expert were confirmed by our review as still in existence. We agree with the First Court Expert's recommendations. We confirmed the First Court Expert's findings and identified additional problems as listed below.

- The scheduling log is not standardized from facility to facility and does not appear to be used to monitor timeliness of offsite consultations.
- At DCC, 22% of consultations on the scheduling log do not have a referral date. The collegial review appears to be the milestone used to establish the onset of a referral for care.
- Milestones, especially the referral and collegial review, are not consistently memorialized in the medical record.
- The five-day "writ return" visit occurs without a consultation report. Providers do not typically update the clinical status of the patient. The only information conveyed on the five-day writ return provider note is to document the recommendations of the consultant, if they are known. The diagnoses of the consultant are not included on the problem list or followed as part of the chronic illness program, and are not consistently documented as part of the five-day writ return review. In this respect, the provider is merely acting as a second scheduling clerk and not as a medical provider following the clinical status of the patient.
- Care before and after consultations was poor and resulted in preventable adverse events.
- There remain significant delays in getting patients scheduled at UIC. Yet even though delays are significant, alternate sources of consultation are not used. This results in delays of care that can be harmful.

Studying scheduled offsite events has been difficult at all IDOC facilities.[69] The referral process at DCC requires the doctor to write a referral on a form that is received by the scheduling clerk and discussed at the next collegial review.[70] The scheduling clerk transmits this information to the corporate UM doctors. After the collegial review, referrals that have been approved and are for local services are promptly scheduled. Referrals that are to go to UIC are placed in folders

---

[69] At NRC, we never received the scheduling tracking log we requested, even though the document we requested is apparently used by the scheduling clerk. We were not able to talk to her until after the visit. At SCC, we did not receive the scheduling tracking log we requested until after the visit. Before the visit, we received a tracking log nonresponsive to our request. At DCC, we received a tracking log, but it did not contain information for a year as we had asked and was again nonresponsive to our request. We asked again for this information after the visit. We were then told that prior to August 2017, a tracking log for specialty care was not being used, which we verified as accurate.

[70] A collegial review is a Wexford utilization management process. Doctors from each correctional facility have a conference call with a Wexford corporate physician and every consultation referral is discussed. During this process, the Wexford corporate utilization physician either approves or denies the consultation request. These conference call meetings ostensibly occur weekly.

for the corresponding specialty service. The scheduling clerk has 21 folders for UIC referrals. The specialty services with the largest volume include cardiology, neurology, ophthalmology, orthopedic surgery, urology, rheumatology, and radiology. On the day of our visit there were 75 requests for service that had not yet received an appointment.

The scheduling clerk faxes the requests to a UIC scheduler, who arranges for appointments. The UIC scheduler permits 10 scheduled appointments a week. This amounts to 520 appointments a year. The arrangement with UIC is that IDOC is allowed 2160 outpatient visits a year at no cost. IDOC facilities allowed to participate in this arrangement include Stateville, Pontiac, Sheridan, and DCC. The 520 permitted visits a year at DCC approximates the average number of allowable visits for each of these four facilities (2160 divided by four). It appears therefore that consultation timeliness is predicated on the availability of free care and not on the need of the patient. By contract, Wexford is responsible for the cost of offsite medical care and should they choose to have the patient seen elsewhere, they would be responsible for the cost.[71] We were told that approximately 90% of offsite medical care goes to UIC, which is 100 miles away, as opposed to the 3-15 miles for local hospital providers. By design, IDOC has placed the geriatric unit with many of the sickest patients at DCC. Yet, it has dramatically reduced access of this population to specialty services. This has caused predictable morbidity and mortality.[72]

A quality improvement study in April 2017 showed that appointments were delayed for many services. The *average* time to see a consultant was as follows:
- 239 days for gastroenterology
- 225 days for rheumatology
- 187 days for urology
- 179 days for neurology
- 175 days for orthopedic surgery
- 172 days for radiology
- 147 days for oncology
- 137 days for pain clinic
- 134 days for endocrinology
- 133 days for infectious disease
- 100 days for cardiology

The criteria used by IDOC in this study was that urgent consults were to occur in a week and non-urgent consults were to occur within eight weeks based on the Wexford-IDOC contract. None of these averages meet contract requirements and probably most patients require an earlier appointment. These data show that the specialty care to UIC is significantly delayed and thereby fails to protect patients from harm.

---

[71] Exhibit 1, Schedule E, page 1 Non-Hospital Services states that Wexford is responsible for all professional services that are NOT in a hospital setting. Contract between State of Illinois, Department of Healthcare and Family Services and Wexford Health Services dated 5/6/11.

[72] We note in the mortality review section that there were six death records from DCC reviewed and all six were preventable. Many were related to lack of access to timely specialty care or other higher level services.

We were told by the Wexford attorney that prior to August 2017 there was no scheduling log at DCC. It appears that the scheduling log is a convenience log for the scheduler to coordinate scheduling with offsite consultants. It is not used as a log to determine if patients receive timely care. The only consistent item tracked on the offsite log is the collegial review date. It is present on all entries. Referral dates appear to be less important events. 172 of 785 (22%) appointments in the specialty tracking log do not have a referral date. It therefore appears that the key variable in a referral is when the referral is approved, not when it is referred.

The First Court Expert found that appointments to UIC are not consistently timely and that these appointments are not tracked. We found that 142 (18%) of referrals on the log (excluding refusals and denied referrals) do not have an appointment date and are therefore pending. Of 142 pending referrals, 32 (23%) have been waiting longer than three months. Of the 32 appointments pending longer than three months, seven (22%) do not have a referral date, so the length of time from referral to appointment cannot be tracked.

According to the HCUA, for a period of time when there was no physician at the site, collegial reviews were not done. The HCUA discovered piles of requests for offsite referrals, apparently from mid-level providers, that were not being evaluated in collegial review. The HCUA started demanding that selected referrals be immediately scheduled based on her clinical sense of the need and the scheduling clerk began scheduling patients at the direction of the HCUA.

With respect to documentation of specialty care which is required by IDOC Administrative Directives, we could not find evidence in progress notes of consistent documentation of referrals or collegial reviews. We could also not find evidence that doctors seeing the patients after consultation understood what had occurred at the consultation. This resulted in fragmented care, lack of continuity of care, and in some instances, preventable adverse events. Due to lack of funds, the number of transportation vans has been reduced over the years. In the past, the facility had as many as 42 cars for transportation and this has been reduced to 13. There is one functioning wheelchair van for use for the disabled. This van is borrowed by other facilities regularly, including from Illinois River, Stateville, Hill, and Sheridan. It was not possible to verify whether the lack of adequate transportation vehicles is a barrier to timely attendance for offsite consultation care, but it should be studied. Many patients, including those with significant disabilities, complained as documented in medical records about a black box. One inmate was injured when being transported while in a black box. The inmate did not appear to be secured with a seat belt. We were unable to review this during our visit and noticed this episode of injury on a chart review. But transportation for appointments should be evaluated by IDOC to ensure patient safety.

We confirmed the First Court Expert's finding that consultant reports were frequently unavailable. This had an adverse effect on patient care.

We reviewed four records that verified our findings and demonstrated poor clinical care. A summary of these is provided below.

- One patient had acute myeloid leukemia and was receiving chemotherapy and oncology care at UIC.[73] The patient went to chemotherapy five times from 2/27/17 to 3/28/17. There were no reports from UIC. For the five oncology visits there were only one five-day post writ follow up by a provider. That note did not document the problems of the patient or include a therapeutic plan update. The patient was apparently losing weight, but it was not being documented. On 3/9/17, the patient had a potassium of 6, which is a critical value, yet it was unnoticed at the facility. This level of potassium requires immediate attention, especially in someone with kidney disease, which this patient had. About a week after this critical value, UIC called about a treatment for elevated potassium noticed on one of their labs, but the nurse appeared to transcribe their directions inaccurately. The nurse documented that UIC recommended lactulose for an elevated potassium, which is not recommended therapy.

  Doctors at DCC failed to document all of the patient's problems in their notes and failed to document a therapeutic plan for the patient throughout the course of care we reviewed. The therapeutic plan of the oncologist was only known in its general terms and the only communication with the oncologist was by way of very brief recommendations on the referral form. The DCC physicians were not following laboratory values during chemotherapy, even though chemotherapy can cause significant deterioration of blood counts. About a week after a series of chemotherapy sessions, a DCC doctor saw the patient, but did not monitor laboratory values, did not document knowledge of the therapeutic plan, and did not document all problems. The patient was documented as having no complaints. The following day, the patient was emergently hospitalized for multi-lobe pneumonia with a critically low neutropenia (0.5), low platelets (9), and hypotension. The low white blood count was likely due to chemotherapy, and this was unrecognized and unmonitored by providers at DCC. This patient was basically unmonitored throughout this series of specialty consults, which placed him at risk of significant harm and may have resulted in a preventable hospitalization.

- Another example was a 48-year-old man who was transferred to DCC in February of 2015 with a diagnosis of metastatic colon cancer.[74] The thinned chart volume we reviewed was labeled volume three of three volumes, but we actually discovered that there were six volumes of medical records for this individual.[75] When the patient transferred to DCC, he was being followed by oncology and was on chemotherapy. The patient was to be scheduled for chemotherapy at the infusion center and also with the oncologist for clinic follow-up visits. We started review of this patient for a 1/3/17 chemotherapy visit. The patient was scheduled for nine chemotherapy visits, which appeared to occur timely. Only three of the nine visits included a report. There were recommendations for oncology clinic follow up on two occasions, but we could not

---

[73] Hospitalization and Specialty Care Patient #3.
[74] Hospitalization and Specialty Care Patient #1.
[75] This is yet another example of why an electronic medical record is necessary.

verify that these occurred. A recommended CT scan was done a month late and there was no report of the CT scan in the record. A recommended Doppler test was done two months late and there was no report of this test in the medical record. The five-day post-consultation physician visits seldom occurred. Moreover, it was not possible reviewing the progress notes of the DCC medical staff to understand the progress, status, or problems of the patient. The chemotherapeutic agents being used were not identified. A complication of chemotherapy (hand foot syndrome and response or non-response to chemotherapy) was not documented as known to DCC physicians and was not being monitored. It appeared that the scheduling clerk was managing this patient's care. This care was indifferent.

- Another patient had Crohn's disease, an inflammatory bowel disease.[76] The patient transferred to DCC from SCC. He was being followed at UIC for infusions of vedolizumab, a monoclonal antibody medication that is used as an alternative to tissue necrosis factor medication for moderate to severe Crohn's disease. On 1/31/17, while at SCC, the patient weighed 235 lbs. Crohn's disease is an intestinal disorder characterized by inflammation of the colon or small intestines causing pain, diarrhea, bloody stool, and weight loss. Between 2/8/17 and 4/24/17, the patient was treated with vedolizumab three times in the infusion clinic at UIC. Reports were not available for these visits. Doctors saw the patient after each of these visits, but we could not verify that a report was returned or was reviewed. The doctors did not take a history after these visits or note the status of the patient. The doctors would merely reschedule infusion therapy without monitoring the progress of the patient. At a five-day post-consultation visit on 3/28/17, a doctor documented that the patient complained of weight loss, but the doctor took no history, failed to verify the amount of weight loss, and merely stated, "doing well per GI and pt." This was despite the patient complaining of weight loss. On a nurse visit on 4/24/17, a nurse documented that the patient had abdominal discomfort. The patient weighed 190 lbs., which was a 45-pound weight loss since transferring from SCC on 2/2/17. This weight loss was unrecognized. The patient's disease was not being monitored. Reports from UIC were unavailable. UIC and DCC were not coordinating care. The patient may have been deteriorating and was apparently losing weight without being monitored. The DCC providers were indifferent to this patient's serious medical condition.

- Another patient had severe mental illness and hypertension.[77] He had persistent hyponatremia (low serum sodium) for more than three years, probably due to his psychotropic medication or mental illness, yet this was not documented as a problem and not documented as being monitored by medical staff. The patient had an inguinal hernia that progressively enlarged and was not treated for two and a half years, when it had enlarged into the scrotum. This patient also developed a pressure ulcer on his left hip on 6/14/17, which continues to affect the patient as of 4/4/18. The only staging of

---

[76] Hospitalization and Specialty Care Patient #5.
[77] Hospitalization and Specialty Care Patient #6.

the wound was on 7/26/17, when an NP diagnosed a stage II ulcer. An NP documented ordering DuoDERM on 7/26/17. When we asked the current physician at the site about this wound, he replied that the patient picks at the wound and is mentally ill. Neither of these explanations is documented in the medical record as an etiology of the persistence of the wound. The patient has had this wound for over eight months and should have evaluation for a chronic non-healing ulcer, which includes evaluation for osteomyelitis. Wound care was not well documented. This type of wound can result in systemic infection and should be managed more carefully. On 7/31/17, without explanation, the patient became disoriented, drinking shampoo, and vomiting. He was initially placed on mental health crisis watch but subsequently became disoriented and was talking to himself. He was referred to mental health and was then sent to a hospital. There were no medical notes prior to his transfer to the hospital.

Upon return to DCC, there were only limited notes from the hospital and no hospital discharge summary. The patient had four of four blood cultures in the hospital growing gram positive bacteria and the patient had rhabdomyolysis (breakdown of muscle) and bilateral hydronephrosis (enlarged kidneys typically from inability to drain urine). How this patient developed such a serious systemic infection at DCC is unknown because of the paucity of medical evaluations prior to hospitalization. It may very well have been due to his pressure ulcer. His care appeared neglectful. The patient was discharged from the hospital on 8/8/17. The DCC doctor noted that the patient had bilateral hydronephrosis and needed an ultrasound. The DCC doctor also noted that an infectious disease doctor requested weekly CBC and CMP with an infectious disease follow up in four weeks. The patient had a Foley catheter. The doctor at DCC did not document the diagnosis or the reason for the blood infection or the reason for the Foley catheter. Blood cultures were ordered for 10/1/17 and 10/2/17, after completion of antibiotics. An ultrasound was completed on 8/25/17, but the report was not obtained. The patient saw the infectious disease doctor on 9/8/17, but there was no report. The patient still had the Foley catheter and the infectious disease doctor recommended consulting the urologist about discontinuing the catheter. A doctor discontinued the Foley catheter without consultation with an urologist. An urologist saw the patient on 10/2/17. There was no report. The referral form had brief comments by the urologist recommending urine culture, ultrasound of the kidneys, continuing Flomax, and return in two to four weeks. When the intravenous antibiotics were completed the patient was sent to general population. An ultrasound was completed on 10/18/17, and showed bilateral hydronephrosis with distended urinary bladder, and large post void residual. This condition can cause permanent kidney damage if untreated. On 10/19/17, the patient was referred to urology. This referral was approved on 12/12/17 and approved again on 2/1/18. As of 4/4/18, the patient had still not seen a urologist. Uncorrected hydronephrosis can result in end-stage renal disease. This patient has been waiting over six months for a follow-up urology visit. We note that the average wait to see urology is 187 days. This person needed a more timely consultation, as he may sustain permanent kidney damage. The lack of reports was significant and made it impossible to

understand the status of the patient. It appeared that the lack of reports also made it difficult for DCC providers to understand how to manage this patient.

# Infirmary Care

**Methodology:** The clinic space and equipment in the infirmary was inspected, nursing staff were questioned, clinical charts audited, nurse logs reviewed, porters questioned, and patient-inmates interviewed. There was only limited contact with the infirmary physician.

### First Court Expert Findings
The First Court Expert noted that infirmary LPNs were working outside the scope of practice, patients were not seen by the provider at the minimum required intervals, an RN was not assigned to the infirmary on all shifts, the provider charting was limited in format and content, call buttons were not available in all rooms, there was insufficient equipment in the infirmary, and there were defective and/or insufficient sheets and pillows.

### Current Findings
With the exception of the finding that LPNs were working outside of their scope of practice, we agree with the findings of the First Court Expert's findings and we identified the following additional findings:

- Fifty percent of the patient-inmates housed in the infirmary were classified as requiring total or partial care with their activities of daily living.
- One long-term patient had developed contractures of all his limbs and stage 4 decubitus ulcers while housed in the infirmary.
- At least half of the infirmary patient population requires skilled nursing care; however, the infirmary is neither staffed nor equipped to provide this level of care.
- Physical therapy services are not provided in the infirmary.
- Provider admission and progress notes were brief and contained limited clinical information or rationale for treatment plans.
- Provider admission and progress notes did not meet the frequency and timeliness standards established by the IDOC.
- Admission RN notes are written in accord with the established timelines. Nurse notes are written daily and provide useful information on the clinical status of a patient.
- The quality of provider notes was inconsistent and failed to reflect key components of the patients' histories, physical findings, and the treatment plan.
- In spite of the high level of physical and mental impairment of the patients housed on the infirmary, there were no electric beds in the infirmary. This is a barrier to the delivery of needed care and put the staff at risk for injuries.

The infirmary is located on the second floor of the medical building across from the ADA housing unit. The infirmary has 28 beds; the census was 18 on the day of the inspection. The physical plant and layout is unchanged since the First Court Expert's report. Nurses reported that the provider is expected to write progress notes within 48 hours of admission and three

times a week for "acute" admissions, twice a week for "chronic" patients, and once a week for "permanent" patients. The provider concurred that acute admissions are to have thrice weekly notes, but chronic and permanent patients were only required to have weekly progress notes. IDOC Policy 04.03.120 Offender Infirmary Services[78] directed providers to write admission notes with 48 hours and progress notes no less than three times a week for acute patients and once a week for chronic patients. Review of five infirmary records verified that four of five provider admission notes were written within 48 hours or on the next working day. One record of an "acute" did not yet have a provider admission note or a progress note as of the sixth day of admission. The frequency of the provider progress notes for these five patients were: no note to date as of day six of stay,[79] one progress note five days after admission and then none for the next two weeks,[80] six progress notes in 21 days,[81] one note in 20 days,[82] and one note in nine days.[83] The timeliness of the progress notes was not found to be fully in compliance with this policy; four of the five infirmary records did not comply with this established policy. Nursing notes were consistently entered no less than daily and commonly on every shift.

It was reported that an RN is assigned to the infirmary on all shifts seven days a week. LPNs and CNAs provide added staffing in the infirmary. A number of inmate hospice workers supervised by the nursing staff assist with a variety of tasks.

Nine of the individuals in the infirmary were designated as requiring assistance with activities of daily living (seven partial assistance, two with total care); thus 50% of the infirmary patient population were unable to fully care for themselves. Included in this non-independent group were individuals with metastatic cancer, dementia with contracted limbs, post CVA, advanced multiple sclerosis, and dementia. The RN on duty stated that all nine would be permanently housed in a skilled nursing facility if they were not incarcerated.

We note that the IDOC acknowledges a lack of appropriate housing for the infirm and disabled elderly prisoners. In her deposition, the IDOC Agency Medical Coordinator[84] answered questions on this issue.

"Q. What were you proposing in this e-mail of August 2nd, 2016?
A. For them to consider an assisted living environment at Kewanee or in another facility or changes to a current facility.
Q. And in this you say that you're writing to bring attention to the effect our aging population has on the facility infirmaries, right?
A. Correct.

---

[78] Reference Offender Infirmary Services.
[79] Infirmary Patient #1.
[80] Infirmary Patient #2.
[81] Infirmary Patient #4.
[82] Infirmary Patient #3.
[83] Infirmary Patient #5.
[84] This nursing position reports to the Agency Medical Director and supervises the Regional Nurse Coordinators.

Q. And we are having problems placing offenders due to our infirmaries being full and this is only going to continue to get worse as the baby boomer population ages, right?

A. That's what I wrote, yes.

Q. Do you know if anything has come of this suggestion?

A. I do not know.

Q. Getting tired of having to figure out where to put aging and elderly prisoners?

A. I want to appropriately place them for care, for appropriate care, and meet the operational needs of our department."[85]

Although approximately half of the infirmary rooms had nurse call buttons, many of the patients were unable to utilize them due to their advanced mental and physical conditions. Only the restraint/negative pressure room has direct line of sight from the glass window in the nurse station.

We identified a number of concerns and deficiencies in the care provided to infirmary patients as noted below.

- This patient was admitted to the DCC infirmary on 3/30/18 upon transfer from Schwab Rehabilitation Center in Chicago.[86] The nurse admission note written on Thursday morning/early afternoon of 3/30/18 listed the diagnoses as neurogenic bladder, seizure disorder, and low back pain, and noted that the patient used a seizure helmet, wore a diaper due to urinary incontinence, was confused and disoriented, and walked with a cane. The admission nursing note failed to note that the patient had advanced multiple sclerosis. The patient was assigned to the "Acute" status. Nursing notes were written on every shift. As of 4/3/18, five days after admission, there was not a provider admission note or a progress note in the infirmary record. Five days after infirmary admission, this patient had not been seen by a provider. This is not in accord with IDOC policy.[87] One of the other DCC providers should have been scheduled to cover infirmary admissions during the vacation of the assigned provider.

- The next patient is a 35-year-old patient who was admitted to the infirmary on 11/22/17 with abdominal pain and weight loss.[88] Prior to admission to the infirmary he had been in nurse sick call on 10/25/17 for abdominal pain and constipation, and his weight was 165 lbs. He was seen again in five nurse sick calls in October and November 2017 for similar symptoms. His abdominal pain worsened with meals, he had nausea and vomiting, and was provided a variety of over the counter medications. On 11/8/17, his weight had dropped to 154 lbs.

  On 11/22/17, nursing referred him to the NP because of knife-like abdominal pain for two weeks and a pulse of 120. The NP noted that the patient's weight was 144, a drop

---

[85] Deposition of Kim Hugo, April 11, 2018 pp. 69-70.
[86] Infirmary Patient #1.
[87] Reference #IDOC Policy 04.03.120 Offender Infirmary Services.
[88] Infirmary Patient #2.

of 21 pounds within one month. The NP admitted him to the infirmary for observation and a battery of stat tests (CBC, CMP, amylase, lipase, thyroid studies). The lab results showed urine ketones, mildly elevated total bilirubin (1.5), and mild electrolyte abnormalities. The infirmary nurse spoke with the physician, who advised continuation of the current management. On the same day, the patient voiced having pain near/behind his umbilicus. For the next few days he continued to have abdominal pain with poor appetite, and the hard marble sized spot above his umbilicus continued to cause pain. On 11/27 and 11/28/17, the physician examined the patient and felt that he had a non-reducible umbilical hernia. The physician sent the patient to the KSB Emergency Room on 11/28/17. An abdominal CT Scan at KSB showed no evidence of a hernia but showed terminal ileum inflammation. KSB recommended follow-up with a surgeon for a possible inflamed umbilical stump due to inflammatory bowel disease. At the patient's request he was discharged on 11/29/17 from the infirmary, and referrals for gastroenterology and general surgery consultations were submitted. Only an admission weight had been recorded during his eight day stay in the infirmary. No order was placed to repeat the abnormal comprehensive metabolic panel (total bilirubin) or to schedule an EGD and a colonoscopy.

The patient was seen by the NP 12/24/17 and had a weight of 141 lbs. Nurses saw the patient in nurse sick call on 12/24/17, 1/4/18, 1/8/18, 1/9/18 (141 lbs.) for abdominal pain. An NP saw the patient again on 1/12/18 for abdominal pain and a mass of unknown origin near the umbilicus. Nurses saw the patient again at nurse sick call on 1/14/18, 1/16/18 (130 lbs.), and 1/18/18 (130 lbs.) for abdomen pain and tenderness, left testes pain, and abdominal bloating. On 1/23/18 (123.7 lbs.), a nurse noted that the patient was jaundiced/icteric, and his abdomen was tender to the touch. On 1/25/18, the patient was sent to Town Square General Surgery for the consultation requested on 11/29/17. The patient returned with a diagnosis of significant jaundice. Stat labs drawn at the surgeon's office showed elevated total bilirubin of 14.9, alkaline phosphatase 509, ALT 327, and AST 136 with normal amylase and lipase levels.

On 1/26/18, the patient as transported to the UIC ED and admitted to the hospital. His 3/7/18 UIC discharge summary noted the diagnosis of mucinous producing adenocarcinoma/cholangiocarcinoma, biliary stents insertion, and s/p excision of an umbilical nodule. The patient was readmitted from the infirmary to UIC on 3/13/18 for weight loss and malnutrition. He was started on Gemcitabine chemotherapy and returned to DCC on 3/16/18 with the diagnosis of Metastatic Cholangiocarcinoma.

The patient was readmitted to the DCC infirmary on 3/16/18. The patient was transported to receive chemotherapy infusion at UIC on 3/20/18 and 3/27/18, and went to an oncology appointment on 3/24/18. Nursing notes were written on nearly every shift from 3/19/18 to 4/2/18. The patient's condition is determined to be terminal and chemotherapy is palliative. The patient's weight has decreased from 111 lbs. on 3/21/18 to 104 lbs. on 3/28/18.

Although the patient had multiple encounters with the DCC health care team between 10/25/17 and 1/25/18, including one admission to the infirmary and a referral to KSB emergency, they missed opportunities to more expeditiously and thoroughly evaluate this patient's symptoms and condition.

Following a month of unexplained abdominal pain, when the patient was noted on 11/22/17 to have lost 21 pounds and laboratory tests and a CT scan at KSB failed to identify a cause, he should have been admitted for additional diagnostic workup. EGD, colonoscopy and contrast CT were indicated. The general surgery consultation requested on 11/29/17 was not scheduled until 1/25/18, at which time the patient was already overtly jaundiced. This two-month delay for a surgical consultation in a continuously symptomatic patient was unacceptable. Although the total bilirubin performed on 11/22/17 was only mildly elevated, the comprehensive metabolic panel should have been repeated after his infirmary discharge on 11/29/17, especially since the patient continued to have abdominal pain and lost another 20 pounds over the next two months. All of these missed administrative and clinical opportunities to intervene and appropriately manage this patient's care resulted in avoidable delays that have negatively impacted on his care and his health.

- The next patient is an elderly patient with long standing dementia, history of pica,[89] hypertension, upper and lower extremity contractures, and deep decubiti ulcers.[90] He was thought to have Picks Disease (frontotemporal dementia). He has been housed in the infirmary for a number of years. The infirmary record reveals daily vital signs and nursing notes. He requires total care (feeding via gastric tube, bathing, diapers). His limbs are fully contracted, he remains in a fixed fetal position. He was observed being transferred to a tub by the CNA and a hospice worker. He has chronic decubitus ulcers (pressure sores) over his coccyx and left gluteus. These ulcers have required antibiotic treatment on at least two occasions in the past year (September 2017 and October 2017). The wounds are now emitting a foul-smelling discharge and one was noted as deeply tunneling toward bone. The nurses write no less than daily progress notes. On 3/15/18, the nurses noted that the coccyx ulcer was foul smelling and on 3/20/18 the nurse wrote that one of the ulcers had a putrid smell and was tunneling. She requested a consult from the infirmary provider. On 3/21/18, the provider saw the patient, advised continued local wound care, and submitted a referral request to the wound care clinic at CGH Hospital in Sterling, IL. This was the only note written by the provider between 3/15/18 through 4/3/18. A single provider note in nearly three weeks for this permanent resident of the infirmary with an infective decubitus ulcer is not in compliance with the IDOC Offender Infirmary Services guidelines.[91] The extreme contractures and the recurrent pressure sores in this patient are strong indications that the past and current level of care in the DCC infirmary does not meet the community

---

[89] Pica is an eating disorder typically defined as persistent eating of nonnutritive substances.
[90] Infirmary Patient #3.
[91] Reference IDOC Policy 04.03.120 Offender Infirmary Services.

standard of care. Contractures are preventable with ongoing physical therapy; decubitus ulcers are preventable with frequent repositioning of the patient in beds or wheel chair. The manifestation of these findings in this long-term patient indicates that the DCC infirmary is not able to provide a level of care that is expected to be provided in skilled nursing facilities. Once the patient started to develop contractures, he should have been transferred to a facility in the IDOC or in the community that could have provided the needed preventive care.

- The next patient is a 46-year-old who was admitted on 3/14/18 to the infirmary.[92] Nurse and provider admission notes were completed on the day of admission. His admitting diagnosis was right foot ulcer/cellulitis with a purulent discharge. Intravenous fluids and antibiotics were started. The patient also has a history of depression, schizophrenia, and cardiac murmur. There were nursing notes written at least once on every shift; dressing changes were performed multiple times a day. There were six provider notes from 3/14/18 through 4/2/18 (19 days). On 3/19/18, wound cultures grew MRSA, which is sensitive to the antibiotics being administered. The patient was placed in contact isolation, where he remained until isolation was discontinued on 4/1/18. Progress notes on 3/19/18 (improved), 3/20/18 (no drainage), 3/21/18 (granulating), 3/22/18 (healing), 3/27/18 (slow healing), and 4/1/18 (sanguineous discharge) documented the status of the infection. The care provided to this patient was deficient and did not meet the community standard of care. The failure of the provider to initiate investigations to identify an underlying, potentially correctable, etiology of this chronic foot ulcer of six-month duration was unacceptable.

  During this infirmary admission there was no reference to the previous treatment in September to December 2017 for an infection at the same site. This important clinical information would have raised the possibility that there was some underlying cause for this recurrent infection. A recurrent infection would have warranted further lab studies including blood glucose, HbA1C, CBCs and a careful examination for the adequacy of arterial circulation (pulse, arterial blood flow) and sensation in the involved foot. None of these indicated tests and examinations were performed. There was also no documentation that the patient's history of a cardiac murmur resulted in an examination of his heart. The cause of this recurrent infection was never evaluated nor explained, minimizing the opportunity to implement prevention measures and putting the patient at risk for another reoccurrence of this serious infection.

- The next patient is a 61-year-old with a history of hypertension, hyperlipidemia, BPH, psychiatric disorder, and atrial fibrillation. [93] He was admitted to the infirmary on 3/27/18 with dizziness. His medications on admission included Atorvastatin, aspirin, Flomax (Tamsulosin), Zoloft (sertraline), Cogentin, Haldol, and possibly Norvasc (amlodipine). A nurse admission note was recorded on 3/27/18. The nursing note on

---

[92] Infirmary Patient #4.
[93] Infirmary Patient #5.

3/28/18 documented orthostatic drops in blood pressure and the patient was placed on fall precautions. On 3/29/18, the first and only provider note stated that the patient was now off Norvasc (a medication for blood pressure) and that Midodrine was being administered TID. The provider note made no mention of the recent past history of atrial fibrillation, the recent history of admission to Karen Shaw Berea (KSB) hospital for similar symptoms and did not include a cardiac examination. Nursing notes were written almost on every shift with orthostatic blood pressure measurements performed twice daily. The patient was asymptomatic but had orthostatic drops in blood pressure of 20mmHg.

The patient had been admitted to KSB approximately 10 days prior with orthostatic hypotension with syncope. He was also found to have paroxysmal (intermittent) atrial fibrillation with a low-moderate CHADS-VASc[94] score for which anti-platelet treatment (aspirin) was initiated at this time. His hematocrit was 40 and hemoglobin 13.5; his echocardiogram revealed an ejection fraction of 60-65% with a moderately dilated left atrium and trace mitral valve regurgitation. None of this pertinent information was recorded on any of the progress notes during this infirmary admission.

There was only a single very limited provider note recorded from 3/27/18 to 4/3/18 (eight days) for this acute admission. This is not in accord with IDOC Policy,[95] which directed that acute admissions have three provider notes per week. The failure to even succinctly summarize the recent KSB admission and testing put the patient at risk for being inappropriately managed in the infirmary. The patient should have had a basic metabolic panel (glucose, BUN, electrolytes), CBC, and an ECG performed. The provider note did not indicate the cause of this patient's dizziness and persistent orthostatic hypotension nor document possible alternative etiologies. Consideration should have been given to a cardiac arrhythmia or side effects of some of the patient's other medications (Tamsulosin, sertraline) and to seeking specialty consultation for this patient's unexplained orthostatic hypotension.

In summary, a number of the patients admitted to the DCC infirmary require a higher level of care than can be delivered in the DCC infirmary. These high-risk patients need to be transferred to a skilled nursing facility in the community until this higher level of care can be provided in an IDOC facility. The provider notes in the infirmary failed to meet the IDOC standard for timeliness and do not adequately address the acute and chronic needs and illnesses of the each infirmary patient.

With the exception that since RN's are assigned to all shifts in the infirmary, we did not find that LPNs are working outside their scope of services, we agree with the recommendations of the First Court Expert and have additional recommendations that are found at the end of this report.

---

[94] The CHAD score determines whether a patient requires anticoagulation for atrial fibrillation.
[95] Reference #IDOC 02.04,120 Offender Infirmary Services.

## Pharmacy and Medication Administration

**Methodology:** We reviewed medication services by touring the medication room with the Nursing Supervisor (Wexford) who is also the vendor's Site Manager. We observed nurses as they prepared, administered, and documented medication administration. We reviewed medication administration records and corresponding medical records of 12 patients selected from lists of patients on medications that cannot be missed. We also reviewed medication room inspection reports, pharmacy reports, the Wexford–IDOC contract, Administrative Directives, and DCC operational policies and procedures.

### First Court Expert Findings

The system used and policies and practices described in the First Court Expert's report are unchanged today. Medications are provided by BosWell, a subcontractor to Wexford, using a "fax and fill" system. Pharmacy assistants are responsible for sending orders and requisitions for stock medication to be dispensed by BosWell. These same personnel receive shipments and verify medications received against those ordered. Once this is completed, the medications are moved to the medication room where they are prepared by nurses for administration. Medications were either administered by nursing staff to a line of patients waiting in line at the health care unit or were taken to the living units and administered through the food port at the cell door. A security officer escorted the nurse while administering medication cell side. Documentation of medication administered, refused, or not available is done on a paper Medication Administration Record (MAR) that is kept in a binder in the medication room for the current month and filed in the medical record the month after.[96]  The First Court Expert had no adverse findings with respect to medication administration.

### Current Findings

Medication administration has apparently deteriorated since the First Court Expert report. Medication administration at DCC is problematic and relies on outdated practices that are no longer considered safe from patient harm. These problem areas include:

- Handwritten and incomplete orders
- Inconsistent documentation by providers in the progress notes about the decision to order medication and clinical rationale
- Handwritten transcription of orders to the MAR
- Late transcription of orders
- Pre-pouring medication
- Use of unsanitary envelopes to administer medications in the Special Treatment Center[97] (STC)
- Not having the MAR available during medication administration in STC
- Not documenting administration of medication at the time it is given.

---

[96] Lippert Report DCC p. 21.
[97] This is a mental health unit at the DCC.

Chronic disease patients are not monitored to ensure continuity in treatment. Their compliance with prescribed treatment is not assessed. Prescription end dates do not coincide with chronic clinic appointments and require patients to request renewals via sick call.

In addition, we found that medication errors are documented and reported, but not analyzed to determine root causes or trended to identify problems and improve patient safety. Persistent problems with medication practices are not subject to corrective action or systematic quality improvement.

<u>Orders and Delivery of Medication</u>

Medications are obtained from BosWell Pharmacy Services, via subcontract with Wexford. Prescriptions are faxed to BosWell and filled in 30-day "blister packs" and then delivered to DCC. A pharmacy assistant at DCC receives and inventories the medications and then puts them into the medication room nurses use to prepare medication to give to patients. The lead pharmacy assistant reported that prescriptions faxed to BosWell by mid-afternoon are received the next day. Prescriptions faxed after that take another day to arrive. If medications are urgently needed, they can be obtained from a local pharmacy.

We toured the room used to administer medications to inmates housed in general population, the medication storage room where nurses work, and the area where the pharmacy assistants send and receive medication supply. These rooms were clean, uncluttered, well-lighted, and kept secure. There is a refrigerator with a thermometer and temperature log that was up to date. All other refrigerators used to store medications had thermometers and documentation of daily temperature checks. Of the logs inspected, temperatures were within the correct range. There was an opened bottle of lemon juice in the refrigerator that was undated. Multiple dose containers should always be dated when opened and not used for more than 30 days after opening. We also found four undated insulin vials of the 10 being used by nurses in the dispensary on Monday April 2, 2018 to give insulin to diabetic patients. Multidose vials should also be dated when opened. No outdated medication was found in the pharmacy/medication administration areas. We did find expired HIV rapid test material in the refrigerator in the dispensary, occult blood testing material, and eye wash solution in the nurses' room in X-House.

Issues with accountability of controlled substances were identified by facility audits of Institutional Directive (ID) #04.03.110 in the spring of 2016.[98] Accountability of controlled medications was also found in pharmacy inspections during that same time.[99] Corrective action was implemented and substantial compliance with ID #04.03.110 was found in performance by the fourth quarter of the year and was sustained in 2017.[100] On Monday April 2, 2018, we observed the count between day and evening shift, and verified that it was accurate. Other issues identified in the pharmacy inspection reports were pre-signing for medication

---

[98] Facility Review Report, April-June 2016, July-September 2016.
[99] Dixon Correctional Center Annual Governing Body Report, September 21, 2016 pp. 142-143.
[100] Facility Review Report, October 2016-December 2016, January-March 2017.

administered, outdated medications still being administered, patient specific blister cards used for stock, medication not stored correctly, and failure to document medication administered. The only corrective actions taken were education and counseling. There is no systemic analysis to determine root cause and develop solutions that support performance improvement or prevent human error.

Orders for prescription medication were often barely legible. The lead pharmacy assistant reported that BosWell seldom returns orders because they are unreadable. However, a nurse could not decipher a provider's handwriting when asked by the Expert during chart review. Only 73% of the orders reviewed were complete (signed, dated, and timed). Only 64% of the orders had a corresponding progress note. Sometimes there was a comment written on a lab or diagnostic study report indicating intent to order medication; however, there was no progress note. The providers need to document their decisions and rationale about treatment in the progress note, but at DCC this is not done consistently.

Nurses transcribe provider medication orders onto the patient's MAR. We did not find any transcription errors among the 12 charts reviewed. We did find that sometimes nurses handwrite the new order over an old order.[101] This is an alteration of the record and should be prohibited. We also found a consistent pattern of transcribing orders more than a day after the order was written.[102] This causes a delay in the initiation of treatment. In fact, only 70% of the medications ordered had the first dose administered within 24 hours of the start date.

Transcription errors are by far the most common type of medication error reported to the DCC CQI committee.[103] These errors are evaluated to document whether there was harm to the patient. There is no other documentation or other report that medication errors are trended or analyzed to identify systemic sources of error, nor has it been identified as a problem for possible improvement by the CQI committee.[104]

Medication errors have long been recognized as a substantial area of focus in improving the safety of patient care.[105] Handwritten orders and transcription have been eliminated in many correctional health care programs. An obvious solution is to install computerized provider order entry (CPOE). This eliminates transcription by hand. Labels generated from the computerized order after it has been reviewed by a pharmacist are affixed to the MAR.[106] Automated dispensing cabinets are also being used more often now to record the withdrawal of controlled substances and eliminate manual inventory control systems like that implemented at DCC because of non-compliance on the audit at DCC. Upgrading pharmacy services in this way

[101] Pharmacy/Medication Administration Patients #3 & 7.
[102] In four of 11 charts (36%), the order was transcribed more than eight hours later.
[103] DCC Annual Governing Body Report, September 21, 2016 p. 144.
[104] HCU Policies and Procedures P-129 p. 68 only requires analysis of individual events but does not analyze error trends. See also the DCC Annual Governing Body Report, September 21, 2016 p. 144. The report of medication errors made to the CQI committee does not include root cause analysis nor is there any discussion of change.
[105] Institute of Medicine (2000), To Err is Human: Building a Safer Health System. Washington DC: The Academies Press.
[106] Patient Safety Network. (2017) Medication Errors, Agency for Healthcare Research and Quality available at https://psnet.ahrq.gov/primers/primer/23/medication-errors.

requires capital expenditure and would only likely happen as a statewide decision made by IDOC. But if these pervasive problems are not identified, discussed, studied, or reported at the facility level, IDOC is without notice that there is a systemic issue that must be addressed statewide.

When the medication arrives from BosWell, a pharmacy assistant verifies the medication received against the order, which serves to identify dispensing errors. Once verified, the medication is put in the nurses' medication work room into boxes designated by the housing location of the inmate.

Medication Administration
There are two ways medications are administered at DCC. Inmates in general population come to the HCU and stand in line to receive their medication. In the STC, a mental health treatment program, medications are brought to the inmate by a nurse and administered cell-side. Practices of staff are problematic with both methods.

Nurses pre-pour all medication administered to inmates in general population. The only exception is "as needed" (PRN) medications. Pre-pouring entails multiple steps: looking at the MAR; selecting the right medication for the patient; and popping the pill out of the blister pack into a soufflé cup. The soufflé cups are placed in a tray with a card with the patient's name on it. If it is a medication that must be crushed, the nurse will crush it in advance as part of the pre-pour. If the patient had a pattern of not taking the medication, the nurse waits until the inmate appears at the window and indicates he will take it. Then the nurse obtains it from the blister pack, crushes it and administers it to the patient. We were told by the Nursing Supervisor (Wexford) that all controlled medications are crushed; any others are only crushed as a result of an order to do so. Blanket crushing policies such as this are not recommended. Any medication to be crushed should only be as a result of a provider order. We did not observe medication being floated. Documentation that medication was given takes place after all medications have been administered to the general population. The only exception to this practice is "as needed" medications, which are documented as given at the time administered.

Correctional officers supervise inmates waiting in line for medication. Inmates are called over by housing unit, so the line does not become too long. There is also an officer near the medication window who monitors the inmate's behavior during and immediately after medication is administered. Nurses use the name and photo on the inmate's identification card to verify that it is the right patient. When asked if they had ever had an inmate exchange identification cards, the nurses said no and were surprised to hear that it occurs with some regularity at other correctional facilities. Because of the window between the nurse and the patient, there is very little interaction that takes place. This barrier diminishes the opportunity for inmates to ask questions or voice concerns about the medication, side effects, or other symptoms they may experience. Nurses are also unable to observe more than the inmate's face and so cannot identify changes in the inmate's condition at these encounters.

Problems with this method of medication administration are:

- Pre-pouring defeats the purpose of patient specific packaging. As soon as the medication is taken out of the blister pack, verification that it is the correct medication, for the right patient, at the right time, and the right dose is not possible. This is a patient safety risk and unnecessarily exposes the patient to errors in administration (receiving the wrong drug). It is also a wasteful use of the cost of blister packaging.
- Nurses do not have a way to verify medication that is not taken. Visual identification of remaining medication is not accurate.
- Medication is not documented at the time it is given. This practice is a source of errors and omissions in documentation of patient care.

Medications administered to inmates in the STC are also pre-poured. Adjustments have been made in times when medication is administered to accommodate expectations for inmate treatment programming and the time available for any one medication pass is limited.

We accompanied a nurse escorted by a correctional officer during the midday medication pass in STC. The medications to be administered were in small envelopes with each inmates' name. The officer approached the cell door and the nurse called out the inmate's name as it was opened. Each cell had one or two inmates. The inmate stood in the doorway. The nurse asked to see the inmate's identification card but did not use a second identifier. The nurse poured the medication into the inmate's hand or, if the medication was "floated," into a glass of water that the inmate had. The nurse and the officer observed the inmate swallow the medication and checked his mouth afterward. If the inmate did not want to take a particular medication the nurse put it back in the envelope. One inmate questioned the identity of one of the medications he was to receive. Because the medication was not in its original container the nurse could not identify it. Instead, the inmate returned the medication to the nurse. She said that she would check and tell him what the medication was at the next medication pass. The interaction between the nurse, officer, and inmates was professional.

The MAR is not taken when the nurse administers medication in the STC and so the nurse did not document administration at the time the medication was given. The nurse is instead expected to document after returning to the nurses' medication work room.

Problems with medication administration in the STC are the same as those listed for the method used in general population and in addition include:
- Repeated use of the same envelopes is a source of transmission for infectious disease because they are handled multiple times.
- Crushed medications in the envelope contaminate other medication in the envelope and may cause an adverse interaction.
- The MAR is not available to the nurse at the time medication is administered and therefore is not used as a reference when there is a concern or question at the point of patient care.

Only 37% of the MARs selected for review were complete.[107] Documentation of doses given, refused, or not available was missing from five of eight charts reviewed. This is extremely poor performance and calls into question the accuracy of the MARs. Contemporaneous charting on the MAR at the time of administration is considered the nursing standard of practice. DCC does not meet this standard of professional performance.

KOP medications are delivered to inmates in general population once a day at a line designated for this purpose. There are no KOP medications in the STC.

When we shared feedback about our findings with the HCUA, we were told that the programming requirements of STC are such that the only way medications can be delivered is the method being used now. Similarly, she explained that they tried to administer directly from the patient specific blister packs in general population but that it took too much time, so they reverted to pre-pour. It is true that pre-pour reduces the amount of time the nurse is with the patient, but it significantly increases the risk of medication error and patient harm. Both arguments are another way of saying that facility operations are impeding nurse's ability to provide patient care safely and in accordance with contemporary standards of practice. This is dangerous and needs to be fixed.

<u>Renewal of Chronic Disease Medications</u>
Chronic disease medications are provided to patients monthly either as KOP or each dose is administered by a nurse. The scheduled appointments for chronic disease clinic do not coincide with the end date on medications ordered for chronic disease. Providers are to be notified of impending expiration dates.[108]

DCC HCU Policies and Procedures for Chronic Disease require providers to review current medications and ensure continuity of prescription medicines.[109] During our record review we identified several patients prescribed medication that required continuity who had lapses on their care.[110] Chronic disease patients are not monitored to ensure continuity in treatment nor is their compliance with prescribed treatment assessed.

In summary, DCC medication services do not meet the standard of practice, they employ outdated methods that compromise patient safety, and they are not reviewed and analyzed to make improvements that prevent human error.

# Infection Control

**Methodology:** We interviewed the medical lab technician assigned to track and report on infection control. We also interviewed inmate-porters, reviewed the Infection Control Manual,

---

[107] Pharmacy/Medication Administration Patients #6, 7, 8, 9 & 12.
[108] HCU Policies and Procedures P-128 Medication Services p. 61.
[109] HCU Policies and Procedures P-107 p. 11.
[110] Intrasystem Transfer Patient #1, Pharmacy/Medication Administration Patients #1, 2 & 4, Infection Control Patient #1.

CQI minutes, and other documents related to communicable diseases and infection control. We also reviewed the charts of two patients who completed a course of TB prophylaxis.

**First Court Expert Findings**

The First Court Expert Report noted that there was no named infection control nurse at DCC. Two nursing supervisors shared responsibility for compliance with IDOC policy concerning communicable diseases, blood borne pathogens, and compliance with Illinois Department of Public Health reporting requirements. Inspection of the health care areas and inquiry about infection control practices revealed that personal protective equipment was available, and that infectious waste was properly disposed. He was unable to confirm that inmate porters assigned to work in the infirmary had received any training in cleaning and sanitation; the Nursing Supervisors had not addressed the issue with the porters.[111]

**Current Findings**

We agree with the findings of the First Court Expert's report. In addition, we identified additional findings and confirmed some of the findings of the First Court Expert's findings as follows:

- Paper barriers were noted to be used on most but not all examination tables.
- The floors and surfaces in the health care building, particularly the second and third floor, are dirty or have deteriorated to the extent that they are a medium for transmission of infectious disease.
- Inmate porters are allowed to work in the infirmary without being trained in proper cleaning procedures and personal protection.

When we asked the Nursing Supervisor (IDOC) to speak with the person responsible for infection control, we were directed to the medical lab technician (Wexford). The lab technician did not see herself as having responsibility for infection control. She does submit reports of infectious conditions as required to the state Health Department. She also tabulates the monthly infection control report that is presented at the CQI meeting. This report lists the number of patients placed in isolation, compliance with testing the room for negative pressure, cases reportable to Public Health, MRSA cases, and patients screened for, monitored, and treated for HIV, and HCV. She was knowledgeable of the facility's infection control manual, including control of infectious disease outbreak, and has assisted in several investigations including norovirus, chicken pox, and MRSA. She also has experience with the facility's approach to controlling influenza transmission. The chronic care nurse manages the HIV and HCV clinics. The HCUA stated that she has overall responsibility for infection control only because of the number of vacancies in her supervisory staff. There is no single person with leadership and responsibility for infection control. The lab technician has insufficient training to be responsible for the infection control program.

CQI Minutes and the 2016 Annual Report show that communicable disease data is collected and reported monthly. There is minimal to no discussion of the meaningfulness of the data

---

[111] Lippert Report DCC p. 33.

reported. CQI Minutes also report statistics regarding skin infections due to MRSA. Data does not include tracking of skin infections due to other pathogens. Equipment and instructions for prevention, response, and reporting of occupational exposures were readily available at the facility.

The IDOC Infection Control Manual was reviewed. It was last updated in 2012. While the material in the manual is thoughtful and many resources are provided, some of them are out of date. The manual should be updated at least every two years. An up to date and accurate infection control manual is critically important in guiding the work of staff assigned these duties in the absence of dedicated positions for trained infection control staff, as is the case at DCC. The IDOC Nursing Treatment Protocols, revised March 2017, were reviewed, and provide guidance to nurses in the care of common infectious diseases and infections such as scabies, urinary infection, rash, pediculosis, chicken pox, and skin infections.

We note in the Clinic Space and Sanitation sections of this report many infection control challenges and hazards that were observed during our site visit at the facility that need to be remedied to prevent spread of infection or safety hazards to patients, including elderly inmates at risk of falls.

The CQI minutes report four occupational exposures to blood borne pathogens in 2017.[112] The HCUA reported that three of these were needlestick injuries. She requested Wexford provide a different type of re-sheathing needle to help prevent additional injury. To date, Wexford has not responded to her request. At a minimum, Wexford should conduct an evaluation of the effectiveness of existing hypodermic needles and review of feasibility of instituting more advanced engineering controls as required by Occupational Safety and Health Administration (OSHA).[113] Further, the CQI committee should conduct a focused review of these injuries and determine what measures to implement in order to increase employee safety.

One porter had documentation in his medical record that he had received formal training on blood borne pathogens and had been vaccinated against hepatitis B. The other porter had not yet been trained concerning his duties in sanitizing patient rooms, showers, tub rooms, and showers, and had received only the first of the three required hepatitis B vaccination shots. He is reportedly scheduled to receive the required training. Neither porter had been offered hepatitis A vaccination, even though there is a higher risk of exposure to pathogens, and a more frequent and higher degree of sanitation is needed in the infirmary.

Tuberculosis screening is completed annually. We did not evaluate actual practices for TB screening. We reviewed the charts of two patients who completed prophylaxis. In one case, the

---

[112] DCC Infection Control Minutes August, September, and October 2017.
[113]



osha3161
preventing needlestic

inmate gave a history of a positive skin test and there was a record of a normal chest x-ray in 2006. In April 2017, a physician ordered the skin test and x-ray repeated. The x-ray was normal but no results for the skin test were recorded. Six months later at a chronic care clinic, the inmate requested TB prophylaxis. The NP documented that he was asymptomatic and had a normal chest x-ray and initiated treatment. Once initiated, the inmate was seen in TB clinic monthly for review of medication compliance and symptom review. Labs were drawn as ordered.[114]

The other patient received three TB skin tests in July and August 2017, all recorded as 20mm, which is considered positive. A chest x-ray was normal, and he was asymptomatic. TB prophylaxis was initiated shortly thereafter. He was seen by the nurse monthly in TB clinic for review of medication compliance and symptom review. Labs were drawn as ordered.

In both cases, initial tuberculosis skin testing and follow up was haphazard. Once treatment was initiated and the patient seen by the TB control nurse, monthly care was timely and appropriate.[115]

If tuberculosis prevention were managed by specifically designated nurses according to standardized protocol with provider consultation, the initiation of preventive treatment would be more timely and precise. We note as described in the Clinic Space section of this report that the negative pressure unit in Room 35 of the infirmary is tested, with results documented in a nursing log on a weekly basis.

Inmates may request HIV testing at any time and it is also offered to inmates just before release from incarceration. Inmates who are infected with HIV are managed as part of the chronic clinic program with oversight from UIC. Hepatitis C (HCV) disease is also managed via the chronic care clinic, with their work up and treatment directed by UIC.

## Radiology Service

### First Court Expert Findings
The First Court Expert's report did not include any findings about the radiology equipment or services.

### Current Findings
- The Illinois Emergency Management Agency (IEMA) radiation safety inspections and reports for the radiology units at DCC are current. The active x-ray equipment at DCC was found to be in compliance with the Radiation Protection Act of 1990.
- The access to plain film x-rays at DCC is acceptable.
- The turnaround time for radiologist readings and return of the reports is good.

---

[114] Infection Control Patient #1.
[115] Infection Control Patient #2.

- The system decision not to have the x-ray technician wear radiation exposure dosimeters may not be in accord with State of Illinois regulations and is definitely not in accord with community practice.

Plain film and fluoroscopy x-ray services are provided Monday-Friday during the daytime hours. A single radiology technician staffs and manages the unit. This technician also assists the management of the optometry clinic, which is located 20 feet from the radiology suite. Studies not provided at DCC are referred to UIC or two local hospitals. Patients requiring emergency x-rays are generally referred to the nearby Katherine Shaw Bethea Hospital (KSB) emergency room.

It was reported that there is not a waiting list for non-urgent onsite x-rays. Most x-rays are reported to be taken within one to two days after receiving the order. Weekend and holiday requests are completed on the next working day. The requests and the radiology log for four patients were reviewed. All four had films taken within one to three days of the request. All of the films were read within 24 hours, with a report faxed to DCC on the day after the reading. The films are read by a local contracted radiologist.

During the Expert's visit the existing and aging plain film radiology unit was removed, and a used but updated non-digital unit was being installed. The radiology technician has a work space inside the entrance to the radiology suite that has a locked door.

Although the Illinois Emergency Management Agency (IEMA) Division of Nuclear Safety, Certificate of X-ray Registration was not posted in the radiology suite, the x-ray technician produced the certificate, the IEMA list of active equipment, and a April 25, 2017 letter from IEMA stating that during the April 18, 2017 radiation safety inspection, that the DCC "radiation producing equipment and operative procedures reviewed by the inspector were in compliance with applicable Illinois radiation protection regulations."[116] The x-ray technician produced her current license that is valid through July 31, 2018.

The x-ray technician was noted not to be wearing a radiation exposure dosimeter badge. She stated she had been told by Wexford that the State of Illinois does not require the use of dosimeters. She communicated that she is required to wear separate dosimeters at two different medical facilities in the Rockford area where she works in her off hours.

In summary, the radiology services at DCC have reasonable access and turnaround time of reading and reports. The decision of the system to not provided radiation exposure dosimeter badges is not in accord with community standards and needs to be further reviewed by the IEMA.

The First Court Expert's report did not have any recommendations about the radiology services. We have noted recommendations that are noted at the end of the report.

---

[116] Reference IEMA Division of Nuclear Safety Certificate and Letter.

## Dental Program

<u>Dental: Staffing and Credentialing</u>

**Methodology:** Reviewed staffing documents, interviewed dental and other staff, reviewed the Dental Sick Call Log and other documents.

**First Court Expert Findings**

- DCC has one full-time dentist, one 14-hour part-time dentist, two full-time assistants, and no dental hygienist, a serious omission. To expect the dentists to provide hygiene and periodontal care to 2300 inmates in addition to their expected dental workload is unrealistic and, in our opinion, cannot be done. It is also a poor use of a dentist's time and resources.
- CPR training is current on all staff, all necessary licensing is on file, and DEA numbers are on file for the dentists.

**Current Findings**

Dental staffing has not changed materially since the First Court Expert's Report. We agree with the First Court Expert that dental staffing is inadequate and the lack of a dental hygienist is a serious omission.[117] Moreover, we identified current and additional findings as follows.

Most dental personnel work 10-hour days (from 6 a.m. to 4 p.m.); however, patients are not treated until count ends, typically after 8 a.m.[118] Dentists are paid for two hours (6 a.m. to 8 a.m.) when patients are not available. The clinic has been closed Mondays for about a year, since Dr. O'Brien reduced his time by 10 hours, and Wexford has been unable or unwilling to find a dentist to work Mondays. The dental assistant is present on Mondays, the day there are no dentists present. This is a foolish waste of patient treatment time resources and should be corrected immediately.[119]

We were told that an IDOC dental assistant position vacated by a retirement two years ago has finally been advertised.[120] In addition, there is one dental assistant vacancy. The current (Wexford) dental assistant has not had formal dental assisting training and does not take x-rays,

---

[117] Makrides, N. S., Costa, J. N., Hickey, D. J., Woods, P. D., & Bajuscak, R. (2006). Correctional dental services. In M. Puisis (Ed.), <u>Clinical Practice in Correctional Medicine</u> (2nd ed., pp. 556-564). Philadelphia, PA: Mosby Elsevier, p. 557 ("In prisons where routine dental care will be provided, the basic dental team should consist of a dentist, dental assistant, and dental hygienist").

[118] Dr. Crisham: Wednesday 6 a.m. to 4 p.m. & Friday 6 a.m. to 10:30 a.m.; Dr. O'Brien: Tuesday, Wednesday & Friday 6 a.m. to 4 p.m.; and Dr. Schmidt: Friday: 6 a.m. to 4 p.m. There are 54.5 hours of dentist coverage Tuesday through Friday, or 1.36 full-time dentist equivalents (FTE). Of the 54.5 dentist hours, 12 (21%) are between 6 a.m. and 8 a.m., a period when patients are not available. This 'dead time' comprises 0.3 FTE, reducing the dentist FTEs available for treatment to 1.06 FTEs

[119] While a case can be made for one dental assistant arriving shortly before patient treatment begins to prepare the clinic for patients' arrival, two hours is too much time. Moreover, since the dental assistant leaves at 3:30 p.m., it is unlikely the dentists (whose day ends at 4 p.m.) are treating patients.

[120] "In need of a dental assistant. It has been vacant since 2016 and it is starting to effect productivity. Backlog numbers are starting to go up again." Dixon Correctional Center Quality Improvement Committee, August QI Meeting Minutes, September 2017, p. 1 (emphasis in original). That the position had not been filled at the time of our visit (April 2018) illustrates the indifference IDOC has shown to the Dixon dental program.

a critical deficiency. CPR is current on all dental staff. Licensure and DEA registration is current for all dentists.

## Dental: Facility and Equipment

**Methodology:** Toured the dental clinic and radiology area to assess cleanliness, infection control procedures, and equipment functionality. Reviewed the quality of x-rays taken at DCC and the reception centers. Reviewed compliance with radiologic health regulations. Observed clinical care.

**First Court Expert Findings**

- The clinic consists of three chairs and units with adequate free movement around them. Two dental units are two years old and in good repair. The third chair is old, worn, and does not work. There are no plans to repair this chair.
- There is a panoramic unit in the health services x-ray department in a dedicated room. It is old but functions adequately. The x-ray unit in the clinic works well. The autoclave is old but functions well. The compressor is in the basement and works well. The instrumentation is adequate in quantity and quality. The handpieces are old but well-maintained and repaired when necessary.
- The cabinetry is old and showing wear and corrosion and staining on work surfaces, but is functional, although this makes disinfection of surfaces more difficult. The ultrasonic works well.
- There was a separate sterilization area of adequate size and surface workspace. The staff office is large with a single desk. The dental records are maintained in this room. It also houses the dental laboratory with its equipment and workspace. There is adequate room for all. The clinic is adequate in size and function to meet the needs of the inmate population.

**Current Findings**

Dental facilities and equipment have not changed materially since the First Court Expert's Report and are adequate. While we concur with the First Court Expert, we identified current and additional findings as follows.

The clinic comprises three chairs and units, with adequate free movement around them. Dentists and assistants have adequate room to work unimpeded. Two dental units are in good repair. The third chair is old and has not worked for at least four years.[121] There are no plans to repair this chair. There is no ultrasonic scaler.

The foot pedal controls on three sinks are non-functional and are secured with clear packing tape. According to the dental assistant, a work order was placed approximately one year ago, and she was told that the parts are not available.

---

[121] The chair will have to be repaired or replaced to accommodate a dental hygienist, who should be hired immediately.

There is an old but functioning panoramic x-ray unit in the health services x-ray department. X-rays are taken by the x-ray technician. The intraoral x-ray unit, autoclave, compressor, and ultrasonic cleaner work well. The instrumentation is adequate in quantity and quality. The handpieces (drills) are old but well-maintained and repaired when necessary. The x-ray units have recently passed inspection by a health physicist.

The dental assistant said that they have not taken bitewing x-rays in months and dentists order panoramic x-rays for biennial exams if they feel the panoramic x-ray taken at the reception center is dated or clinically inadequate.[122]

## Dental: Sanitation, Safety, and Sterilization

**Methodology:** Reviewed Administrative Directive 04.03.102. Toured the dental clinic and observed dental treatment room disinfection. Interviewed dental staff and observed patient treatment.

**First Court Expert Findings**
- Adequate surface disinfection using proper disinfectants was performed between patients. Protective covers were used on some surfaces.
- Instruments were properly bagged and sterilized, with handpieces sterilized and in bags.
- The sterilization procedure was flawed because instrument flow was improper, since it did not go from dirty to sterile in a linear fashion.
- The ultrasonic was on the opposite side of the autoclave from the sink. It should flow from ultrasonic to sink to work area to autoclave without crossing its path.
- A biohazard label was not posted in the sterilization area and there was no warning sign where x-rays were being taken to warn of radiation hazards.
- Safety glasses were not always worn by patients.
- The clinic was neat and orderly.

**Current Findings**
Dental sterilization, safety, and disinfection has not changed materially since the First Court Expert's Report and are adequate. While we concur with the First Court Expert's findings, we identified current and additional findings as follows.

The clinic was neat and clean. Surface disinfection between patients was adequate and instruments were bagged and stored properly. The sterilization procedure was flawed because instrument flow did not go from dirty to sterile in a linear fashion. The ultrasonic cleaner was on the opposite side of the autoclave from the sink. Instruments should flow from ultrasonic to sink to work area to autoclave without crossing the ultrasonic cleaner's path.

A biohazard label was not posted in the sterilization area[123] and there was no warning sign where x-rays were being taken to warn of radiation hazards.[124]

---

[122] This is highly problematic and will be addressed in the section on comprehensive care.

Neither a stethoscope nor a sphygmomanometer was present. According to the dental assistant, dentists borrow them from nursing when they feel that patients have a problem, and often nurses will come to the clinic to take the blood pressure.

According to the dental assistant, patient eye protection is not used routinely;[125,126] however, we noted that the dentist suggested a patient wear his own glasses for protection.

## Dental: Review Autoclave Log

**Methodology:** Reviewed the last two years of entries in autoclave log, interviewed dental staff, and toured the sterilization area.

**First Court Expert Findings**

- Spore testing was performed weekly and was documented, and no negative results were recorded.
- The past three years were reviewed and showed that autoclaving was accomplished weekly and documented.
- They utilize the Maxitest system through Henry Schein. A single negative result was documented, but corrected immediately with a retest, which was negative.

**Current Findings**

Autoclave log maintenance is unchanged since the First Court Expert's Report and is adequate. We agree with the First Court Expert's findings and note that the sterilization log for the past two years was in order. Testing was performed weekly and documented. No negative results were recorded.

## Dental: Comprehensive Care

---

[123] 29 CFR 1901.145(e)(4). "The biological hazard warning shall be used to signify the actual or potential presence of a biohazard and to identify equipment, containers, rooms, materials, experimental animals, or combinations thereof, which contain, or are contaminated with, viable hazardous agents.")

[124] Occupational Safety and Health Standards – Toxic and Hazardous substances. 29 CFR 1910.1096(e)(3)(i). Each radiation area shall be conspicuously posted with a sign or signs bearing the radiation caution symbol and the words, "CAUTION RADIATION AREA." Emphasis in original.

[125] Guidelines for Infection Control in Dental Health-Care Settings ---2003. MMWR, December 19, 2003/ 52(RR17):1:16; pp. 17-18. ("PPE [personal protective equipment] is designed to protect the skin and the mucous membranes of the eyes, nose, and mouth of DHCP [dental health care provider] from exposure to blood or OPIM [other potentially infectious materials]. Use of rotary dental and surgical instruments (e.g., handpieces or ultrasonic scalers) and air-water syringes creates a visible spray that contains primarily large-particle droplets of water, saliva, blood, microorganisms, and other debris. This spatter travels only a short distance and settles out quickly, landing on the floor, nearby operatory surfaces, DHCP, or the patient. The spray also might contain certain aerosols (i.e., particles of respirable size, <10 μm). Aerosols can remain airborne for extended periods and can be inhaled" and "Primary PPE used in oral health-care settings includes gloves, surgical masks, **protective eyewear**, face shields, and protective clothing (e.g., gowns and jackets). All PPE should be removed before DHCP leave patient-care areas (*13*). Reusable PPE (e.g., clinician *or patient protective eyewear* and face shields) […]"). Emphasis added. Moreover, protective eyewear prevents injury from objects or liquids accidentally dropped by providers.

[126] Why We Take Infection Control Seriously. UIC College of Dentistry. Viewed at https://dentistry.uic.edu/patients/dental-infection-control, viewed February 2, 2018 ("We use personal protective equipment […] *as well as provide eye protection to patients for all dental procedures*."} Emphasis added.

Comprehensive, or routine care[127] is non-urgent treatment that should be based on a health history, a thorough intraoral and extraoral examination, a periodontal examination, and a visual and radiographic examination.[128] A sequenced plan (treatment plan) should be generated that maps out the patient's treatment.

**Methodology:** Interviewed dental staff, reviewed randomly selected dental charts of an inmates who received non-urgent care based on Dental Reports.

**First Court Expert Findings**
- A review of 10 records revealed that no comprehensive examination was ever performed, and no treatment plans were developed.
- A periodontal assessment was not done in any of the records and no examination of soft tissues or periodontal assessment was part of the treatment process.
- Hygiene care and prophylaxis were never provided, and oral hygiene instructions were never documented.
- Bitewing or periapical x-rays were never taken to diagnose caries. Restorations were provided from the information from the panoramic radiograph. This radiograph is not diagnostic for caries.
- None of the record entries were time documented.

**Current Findings**
Comprehensive care has not improved materially since the First Court Expert's Report and remains inadequate. We concur with the First Court Expert's findings; however, we identified current and additional findings as follows.

Of 12 records reviewed, none had a periodontal assessment documented. All but one[129] had the treatment plan that consisted only of charting dental problems (primarily decay) with no mention of periodontal disease. In fact, the standard instrument pack for an examination contains a mirror and an explorer but lacks a periodontal probe.[130] Moreover, none of the treatment plans were informed by bitewing x-rays. Of 10 records of patients who received biennial exams, none was informed by a periodontal assessment or bitewing x-rays.[131,132] None had signed and updated health histories.

---

[127] Category III as defined in Administrative Directive 04.03.102.

[128] Stefanac SJ. Information Gathering and Diagnosis Development. pp. 11-15, *passim*.

[129] Comprehensive Care patient #9.

[130] This is consistent with the dental program's indifference to periodontal disease.

[131] While all had panoramic x-rays, it is below accepted professional standards to diagnose caries and periodontal disease with a panoramic x-ray alone. Furthermore, many of the x-rays were inadequate (Biennial Exam Patients #2, 5, 6, 8, 9, and 10).

[132] Dentate or partially dentate adults who are new patients receive an "[i]ndividualized radiographic exam consisting of posterior bitewings with panoramic exam or posterior bitewings and selected periapical images." Furthermore, recall patients should receive posterior bitewing x-rays every 12 to 36 months based on individualized risk for dental caries. With respect to periodontal disease, "[i]maging may consist of, but is not limited to, selected bitewing and/or periapical images of areas where periodontal disease (other than nonspecific gingivitis) can be demonstrated clinically." Dental Radiographic Examinations: Recommendations for Patient Selection and Limiting Radiation Exposure. American Dental Association and U.S. Food and Drug Administration, 2012. Table 1, pp. 5-6.

Per the dental assistant, the dentists review charts of newly arrived prisoners using the panoramic x-ray taken at the reception center and decide whether to place the prisoner on a treatment list.[133] It takes approximately 90 days to be seen for routine care; however, once treatment commences, subsequent appointments are said to occur within a few weeks. Co-pay is not charged when the appointment is generated by the clinic (as opposed to a patient request).

Diagnosis and treatment of periodontal disease is nonexistent. Not only are comprehensive and biennial examinations not informed by periodontal probing and appropriate intraoral x-rays, but oral prophylaxis is not included in the exiguous treatment plans when present. [134,135]  To illustrate the dental program's turning a blind eye to periodontal disease, the daily and monthly treatment logs do not have a category for oral prophylaxis and scaling and root planning, procedures that are essential to prevention and early non-surgical treatment of periodontal disease.[136]

Wait times for extractions, fillings, and dentures were four, eight, and 12 weeks, respectively.[137] However, since the dental program neither diagnoses nor treats periodontal disease and provides inadequate examinations for caries that are not informed by intraoral x-rays, the amount of dental disease that should be treated is understated substantially, and the wait times and backlogs are artificially deflated.[138]

## Dental: Intake (Initial) Examination[139]
**Methodology:** Reviewed 11 dental records of inmates that have received recent intake (initial) dental examinations and Administrative Directive 04.03.102 (Dental Care for Offenders).

**First Court Expert Findings**
- Reviewed 10 inmate dental records that were received from the reception centers within the past 60 days to determine if: 1) screening was performed at the reception center and 2) a panoramic x-ray was taken, to insure the reception and classification

---

[133] However, most of the panoramic x-rays taken at the NRC are clinically inadequate and even an adequate x-ray is insufficient to diagnose caries and periodontal disease.

[134] Stefanac SJ. Information Gathering and Diagnosis Development. A panoramic radiograph has insufficient resolution for diagnosing caries and periodontal disease. Intraoral radiographs (e.g., bitewings) and periodontal probing are necessary (p. 17). Also, Periodontal Screening and Recording (PSR), an early detection system for periodontal disease, advocated by the American Dental Association and the American Academy of Periodontology since 1992, is an accepted professional standard. *Id.*, pp. 12-14. See American Dental Hygiene Association. Standards for Clinical Dental Hygiene Practice Revised 2016. Periodontal probing is also a standard of practice for dental hygiene.

[135] Makrides et al., p. 560 (Early diagnosis of periodontal disease is important since the disease is often painless and the prevalence of moderate to severe periodontal disease in correctional populations is high and often not associated with pain).

[136] These procedures can be performed by a dentist or dental hygienist, and a dental practice that does not provide these treatments is operating substantially below accepted professional standards.

[137] Dixon Correctional Center Quality Improvement Committee Minutes, October 12, 2017, p. 1.

[138] Providing x-rays for caries, and periodontal diagnosis and treatment consistent with accepted professional standards would require more treatment capacity or the waiting times would increase markedly.

[139] The First Expert Report describes the examination performed at intake screening as a "Screening Examination;" however, Administrative Directive 04.03.102 describes it as a "complete dental examination." We use the terminology of the Administrative Directive and refer to the intake or Initial Dental Examination as a complete dental examination.

policies as stated in Administrative Directive 04.03.102, section F. 2, are being met for the IDOC.

**Current Findings**

Dental intake examinations have not changed materially since the First Court Expert's Report and remain inadequate. The First Court Expert focused on the initial examination ***process*** (i.e., whether the clinic complied with the Directive 04.03.102), while we focused on the ***clinical domain*** (e.g., quality of the panoramic radiographs). We believe since the Directive 04.03.102 is inadequate, measuring DCC's compliance with it would be unproductive.

Of 11 charts recently received from reception centers, only one panoramic x-ray[140] was of diagnostic quality. Most were washed out, some contained artifacts, and others were improperly aligned. Two were classified IIa for oral surgery.[141]

## Dental: Extractions[142]

**Methodology:** Interviewed dental personnel and reviewed 11 dental and medical records randomly selected from Daily Dental Reports. In none of the 11 records reviewed was the medical history updated. While some medical history forms had markings (e.g., a vertical line suggesting no medical issues), none had the date last reviewed and the dentist's signature.

All the extractions relied on panoramic x-rays; several[143] were more than three years old.[144] Consequently, only five x-rays were clinically adequate.[145] Signed consent forms were present in all charts; however, they did not list the reason the tooth was to be extracted. Furthermore, the clinical progress note in one record did not document the reason for the extraction.[146]

**First Court Expert Findings**

- All dental treatment should proceed from a well-documented diagnosis. In none of the 10 records examined was a diagnosis or reason for extraction included as part of the dental record entry.
- In none of the records was a consent form available. When asked, I was told that it was just not a part of the treatment process for surgery at DCC. This is a serious omission and a major violation of a well-established standard of care.

**Current Findings**

---

[140] Dental: Intake (Initial) Examination Patient #2.
[141] Dental: Intake (Initial) Examination Patient #7: Teeth #3, 13, and 18 were charted IIa for oral surgery but the referral disposition box not marked. Patient #9: Tooth #17 was charted IIa for oral surgery, but referral disposition box not marked. Patient 10: Tooth #19 was charted IIa for oral surgery, but referral disposition box not marked.
[142] The dental assistant said that she requests the medical charts for all scheduled extraction patients.
[143] Extraction Patients #3, 4, 6, and 7.
[144] The only x-ray that shows the roots of #14 is a panoramic x-ray that has no date or other patient information on the label.
[145] Extraction Patients #1, 2, 9, and 11.
[146] Extraction Patient #5.

We concur with the First Court Expert's findings Expert and note that documentation associated with extractions has improved; however, it remains inadequate. Moreover, we identified current and additional findings as follows.

While the First Court Expert found that the diagnosis of the tooth that was extracted was not documented, and consent forms were not present, we found that all 11 records had signed consent forms and all but one chart[147] documented the reason for the extraction.

In none of the 11 records reviewed was the medical history updated. While some medical history forms had markings (e.g., a vertical line suggesting no medical issues), none had the date of last review and the dentist's signature.

All the extractions relied on panoramic x-rays; several[148] were more than three years old.[149] Consequently, only five x-rays were clinically adequate.[150]

## Dental: Removable Prosthetics
**Methodology**: Reviewed eight charts of patients who received partial dentures in the past year selected randomly from the Prosthetics List and interviewed dental staff.

**First Court Expert Findings**
- In only two of the five records reviewed on patients receiving removable partial dentures were oral hygiene instructions provided.
- Periodontal assessment was not documented in any of the records. In two of the five records a prophylaxis and/or a scaling debridement was provided.
- Because comprehensive examinations and treatment plans were not documented in any of the records, it is almost impossible to ascertain if all necessary care, including operative and/or oral surgery treatment, is completed prior to fabrication of removable partial dentures.

**Current Findings**
We concur with the First Court Expert and note that removable prosthetics care has not changed materially and remains inadequate. Moreover, we identified current and additional findings as follows.

Of eight patients who received partial dentures, none had a sequenced treatment plan. While the Treatment Needed portion of the chart was marked, there was no date or signature, nor was a treatment sequence indicated. Moreover, none of the treatment was informed by bitewing or periapical x-rays, or periodontal probing. This is not an adequate treatment plan. None had documented oral prophylaxis or oral hygiene instruction.

---

[147] Extraction Patient #5.
[148] Extraction Patients #3, 4, 6, and 7.
[149] The only x-ray that shows the roots of #14 is a panoramic x-ray that has no date or other patient information on the label.
[150] Extraction Patients #1, 2, 9, and 11.

## Dental: Sick Call/Treatment Provision

**Methodology:** Interviewed dental staff; reviewed Dental Sick Call Logs, Daily Dental Reports, and reviewed records of 10 inmates who were seen on sick call for dental problems randomly selected from Daily Dental Reports and Sick Call Logs.

**First Court Expert Findings**

- Inmates access dental sick call through either a sick call sign-up process or via the inmate request form. The sick call sign-up takes place in the health services unit every morning. They sign up one day and are seen and evaluated the next day by an RN. The RN then refers the complaint to the dental program and the inmate is scheduled within four to five days.
- Request forms are received from the institution mail, evaluated by the dentist, and scheduled for an examination and evaluation within four to five days.
- No system was in place to attempt to see inmates with urgent care complaints within 24 to 48 hours from the date of the request form. Emergency call-ins from staff are seen the same day.
- In none of the records was the SOAP format used.
- Minimal diagnosis was available for any delivered care. Routine care was not being provided at sick call appointments. The chief complaint, as well as could be determined, was being addressed at sick call.

**Current Findings**

The dental clinic is now closed on Monday, reducing access to care markedly. We concur with the First Court Expert; however, we note that sick call treatment documentation has improved since the SOAP format is now used consistently. Moreover, we identified current and additional findings as follows.

Inmates seeking dental care place a request in a box in the housing unit, send it through prison mail, or communicate directly with staff. Written requests are screened by nursing and referred to the dental clinic for scheduling, and typically staff communicate directly with dental personnel. Since the clinic is closed on Mondays, patients with urgent care issues may have to wait four or five days to be seen by a dentist.

The SOAP format was used for all sick call entries; however, in none of the 10 charts reviewed was the health history updated. There were several instances where treatment was performed without adequate x-rays or a treatment plan.[151]

According to the dental assistant, the dentist reviews charts of newly arrived prisoners and, using the panoramic x-ray that is typically taken at the reception and classification center,

---

[151] Sick Call Patient #4: fillings (teeth #18, 19) done without intraoral x-rays or treatment plan. Patient #5 complained of pain in the right side. The dentist concluded there was no decay and treatment was not indicated. However, intraoral x-rays were not taken, and the most recent x-rays were almost three years old. This is insufficient data to base a diagnosis. Patient #7 had a fractured tooth that was scheduled to be filled without recent intraoral x-rays. The most recent x-rays were dated 4/30/10.

decides whether to place the prisoner on a treatment list. It takes approximately 90 days to be seen; however, once treatment commences, subsequent appointments are within a few weeks. Co-pay is not charged when the appointment is generated by the clinic (as opposed to a patient request).

## Dental: Orientation Handbook
**Methodology:** Reviewed Orientation Manual and related documents.

**First Court Expert Findings**
The Orientation Manual only mentions dental care in relation to co-pays. It describes medical sick call procedures, but no mention is made of dental sick call.

**Current Findings**
Inmate orientation to dental care has improved since the First Court Expert's Report. The First Court Expert found that the orientation manual did not describe how to access dental care. While there are now two orientation manuals for DCC, one for the General Population and for the Special Treatment Center, neither manual addresses access to dental care. There is, however, an adequate description of how to access health care via sick call.

## Dental: Policies and Procedures
**Methodology:** Reviewed Administrative Directives that deal with the dental program. Interviewed dental staff. Reviewed dental charts. Toured dental clinical areas. Reviewed DCC organizational chart.

**First Court Expert Findings**
The Policy and Procedures Manual and statements for DCC only paraphrase the Administrative Directives. It includes nothing specific for DCC and the running of the dental program. When asked, the dental director knew little of its existence and had never reviewed it.

**Current Findings**
Dixon policies and procedures have not changed materially since the First Court Expert's Report. We concur with the findings in the First Court Expert's Report that the Policy and Procedures Manual is inadequate and should be revised. We were provided with institutional directives covering several domains; however, none addressed dental care. There is a binder in the clinic that contains (inter alia) Administrative Directive 04.03.102 (Dental Care for Offenders), blank forms used by the dental program, and an outdated version of the *Illinois Dental Practice Act.* There was an untitled, undated, unsigned policy relating to dentures of uncertain provenance.

## Dental: Failed Appointments
**Methodology:** Reviewed Dental Sick Call log. Interviewed dental staff. Reviewed Daily Dental Reports.

**First Court Expert Findings**

A review of monthly reports and daily work sheets revealed a failed appointment rate of about 10.4%. All failed appointment inmates are required to sign a refusal form. They are all located and brought to the dental clinic to do so.

**Current Findings**

Failed appointments have remained unchanged since the First Court Expert's report. We concur with the findings in the First Court Expert's Report and note that failed appointments are not an area of concern at Dixon. Moreover, we identified current and additional findings as follows.

As noted in the First Expert report, inmates who fail to appear for a dental appointment are located and made to sign a refusal form. This is an excellent practice and should be employed by all IDOC dental programs.

Since the failed appointments are not reported to the CQI Committee or noted in the Daily and Monthly Dental Logs, it is difficult to determine retrospectively; however, it appears not to be a substantial problem.

## Dental: Medically Compromised Patients

**Methodology:** Reviewed health history form and records from recent intake exams. Compared the health history in the dental chart to the medical problem list.

**First Court Expert Findings**

- Because the dental record is maintained in the dental clinic separate from the medical record, identification of medically compromised patients relies on assessment by the clinician and on the history section on the cover of the dental record.
- Of the 10 records reviewed of inmates on anticoagulant therapy, only one was adequately red-flagged to catch the immediate attention of the provider. Four of the records did not indicate that the inmate was on anticoagulant therapy. Five of the records indicated anticoagulant therapy, but they were not sufficiently red-flagged. On one record, treatment was provided and was managed properly.
- When asked, the clinicians indicated that they do not routinely take blood pressures on patients with a history of hypertension.

**Current Findings**

Health history documentation for medically compromised patients is unchanged from the First Court Expert's Report and we concur that it is inadequate. Moreover, we identified current and additional findings as follows.

Of the 12 records randomly selected of prisoners who were taking insulin or anticoagulant medication who appeared on the Chronic Care Program Report, the relevant medical condition was not noted in the health history in the dental charts of two patients.[152] There was no

---

[152] Medically Compromised Patients #1 and 11.

documented periodontal assessment and request for follow-up for the diabetics, which is particularly problematic given the relationship between periodontal disease and diabetes.[153,154] Of the patients on anticoagulant therapy,[155] all but one on anticoagulant therapy had it noted on the health history.[156] Health histories were not filled out or updated at last visit in most charts.[157]

## Dental: Specialists

**Methodology:** Interviewed dental staff, reviewed CQI documents, and reviewed dental charts of inmates who were seen by an oral surgeon.

**First Court Expert Findings**

The dental program utilizes the Joliet Oral and Maxillo-facial Surgery group. This case was the only one sent out in the past nine months. It was a large cyst of the body and ramus of the mandible, a very extensive surgery. All other surgeries, including impactions that require removal, surgical extractions, and lesion removals, are done by the dentists at DCC.

**Current Findings**

Oral surgery consultations have not changed materially since the First Court Expert's Report. We agree that oral surgery consultations appear to be adequate. We reviewed the charts of two inmates who were referred to the Joliet Oral and Maxillo-facial Surgery group within the past year. Both cases were extensive, and the referral and treatment provided appeared to be appropriate.

## Dental: CQI

**Methodology:** Reviewed CQI minutes and reports. Interviewed dental staff.

**First Court Expert Findings**

- The dental program contributes monthly statistics to the CQI committee.
- The waiting list for extractions and fillings is eight weeks and for dentures is 12 weeks. These are very reasonable lengths of time. No concern was expressed.
- The dental program recently completed a CQI study that evaluated percentage of required denture adjustments at the time of insertion. The study is under evaluation to see if any changes can be made in the construction or delivery process.
- No other studies are ongoing at the time of this report.

---

[153] Patients #1, 2, 3, 4, 5, 10, and 12. None of the records documented that an oral prophylaxis (prophy) was performed.
[154] See, for example, Herring ME and Shah SK. Periodontal Disease and Control of Diabetes Mellitus. *J Am Osteopath Assoc.* 2006; 106:416–421; Patel MH, Kumar JV, Moss ME. Diabetes and Tooth Loss. *JADA 2013;144(5);478-485* (adults with diabetes are at higher risk of experiencing tooth loss and edentulism than are adults without diabetes); and Teeuw WJ, Gerdes VE, and Loos BG. Effect of Periodontal Treatment on Glycemic Control of Diabetic Patients. Diabetes Care 3 3 :421-427, 2010 (periodontal treatment leads to an improvement of glycemic control in type 2 diabetic patients).
[155] Patient #6, 7, 8, 9, and 11.
[156] Medically Compromised Patient #11.
[157] Medically Compromised Patients #1, 2, 3, 4, 5, 6, 7, 8, 9, and 10.

**Current Findings**

The Dental CQI program has not improved since the First Court Expert's Report. Since dental peer review records and facility reviews were not available to the First Court Expert, it is difficult to compare our findings except with respect to the number of CQI reports.

Peer Review

We asked to see all peer reviews of dentists working at the eight facilities on our site visit schedule and were informed that dentists (unlike other practitioners) are not routinely peer reviewed. According to Attorney Ramage, speaking for Wexford,[158] neither the IDOC contract[159] nor Wexford policy requires that dentists be peer reviewed.[160] He further stated that "[r]outine peer reviews of dentists are not a mandatory standard of NCCHC;"[161] however, he is confuted by the NCCHC, which specifically includes dentist peer reviews in its Clinical Performance Enhancement Standard P-C-02.[162]

Moreover, "Wexford Health has never found a true dentist 'peer review' to be a productive means to determine clinical quality."[163] Finally, it is Wexford's position that the dentist peer reviews are not a part of the community standard.[164] While clinical peer review is not the community standard for dental care in a private practice environment, it is the community standard for institutional care; that is in the military and Department of Veterans Affairs, and Departments of Corrections that have recently emerged from federal monitoring, for example, California and Ohio.[165]

---

[158] Email from Andrew Ramage to Michael Puisis 3/29/2018.

[159] The contract addresses "physician peer review," which applies to the on-site medical director, staff physicians, nurse practitioners, physician assistants, and psychiatrists; however, dentists and psychologists are excluded. Wexford Contract, ¶2.2.2.19 and ¶7.1.5.

[160] However, Wexford Clinical Performance Enhancement Policy P-403 states, "[a] minimum of one annual "peer review" [will be performed] whereby a practitioner's clinical performance is evaluated by a senior or supervising practitioner, and, when necessary, senior practitioners are evaluated by regional/corporate staff. […]" ¶III A3; and "[t]he senior dentist will complete a peer review for each dentist and ensure the completion of the biennial external review for those qualified. The Regional Medical Director will assign a peer reviewer for small contract locations having single or part-time dentists." Wexford Resp. RTP#5, Question 2, p. 0405.

[161] Ramage email, *id*.

[162] "In contrast [to an annual performance review], a clinical performance enhancement review focuses only on the quality of the clinical care that is provided. This type of review should be conducted only by another professional of at least equal training in the same general discipline. For example, an RN should evaluate other RNs and LPNs, a physician should review the work of a physician, and *a dentist should review the work of a* dentist; and "[Clinical Performance the standard requires that the facility's direct patient care clinicians and RNs and LPNs are reviewed annually. Direct patient care clinicians are all licensed practitioners who provide medical, dental, and mental health care in the facility. This includes physicians, dentists, midlevel practitioners, and qualified mental health professionals (psychiatrists, psychologists, psychiatric social workers, psychiatric nurses, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for mental health needs of patients). NCCHC recognizes that there are many other professions that have licensed practitioners (e.g., dental hygienists) who may be considered direct patient care clinicians. While it is good practice to include these professionals in the clinical performance enhancement process, technically it is not required by the standard. National Commission on Correctional Health Care, Clinical Performance Enhancement (https://www.ncchc.org/clinical-performance-enhancement-1) viewed 3/30/18 (emphasis added).

[163] Ramage e-mail, *id*.

[164] *Id*.

[165] California Department of Corrections Inmate Dental Services Program. September 2014, ¶ 4.3; Ohio Department of Corrections Policy 68-MED-12, ¶ VI B 3.

We were provided with peer reviews of Drs. Crisham (performed 12/30/15) and O'Brien (performed 1/16/17) and were able to locate five of the 20 charts on which the peer review was based. Our findings were consistent with those of the reviewer; however, several critical elements were absent from the checklist, and were not evaluated. Consequently, many of the fundamental flaws we found in the dental care provided at DCC, such as inadequate treatment plans, failure to use bitewing x-rays to inform caries diagnosis, and failure to diagnose and treat periodontal disease, were undiscovered. Dental peer review *as implemented by Wexford and countenanced by IDOC* is poorly designed and is not therefore determinative of clinical quality.

<u>Facility Reviews</u>
We were provided with several facility in which the dental program was deemed to be compliant with the Administrative Directive 04.03.102.[166] However, the Administrative Directive does not address clinical adequacy; so while the findings of the reviews may be useful, they omit the most important domain and provide a false sense of security considering the myriad clinical deficiencies reported by the First Court Expert and confirmed by our inspection.

## Internal Monitoring and Quality Improvement

**Methodology:** Interview facility leadership and staff involved in quality improvement activities. Review CQI Committee meeting minutes, including the Annual Meeting minutes.

### First Court Expert Findings
The First Court Expert found that the only data used for purposes of quality improvement were statistics that served no purpose with respect to quality improvement. There was no documented effort to investigate processes of care or professional performance with an intention of improving the program. The Acting CQI Coordinator had no experience in CQI. The First Court Expert described the CQI program as inactive. He also commented that there was a lack of data (specifically tracking logs) that could be used to determine the timeliness of scheduled services.

The First Court Expert recommended that the program needs CQI leadership that has training in quality improvement philosophy and methodology. He recommended that operational processes and professional performance must be studied. Studying grievances in a meaningful way was recommended. The First Court Expert recommended that this program be used to improve every operational process in the medical program. He recommended use of logbooks to track information for use in studying these processes. He recommended retraining the CQI leadership regarding quality improvement philosophy and methodology as well as study design and data collection. He recommended studying outliers in order to develop targeted improvement strategies.

### Current Findings

---

[166] December 2015 to May 2016, and June 2016 to November 2016. While these purport to be semi-annual reviews, we were not provided with reviews for 2017 and do not know whether the dental program was reviewed since November 2016.

While the First Court Expert described the quality improvement program as inactive, we would describe it as nascent. There has been an effort to initiate quality studies and the HCUA has a desire to improve the program. However, because she acts as the HCUA, CQI Coordinator, supervisory nurse, and director of medical records, she is spread thin and has less than necessary time to devote to this task. While there have been some small improvements, the quality improvement program has a considerable way to go.

There is no CQI coordinator. The HCUA has not had any training in CQI. No one at the site had experience in CQI methodology or implementation. The HCUA did have the IDOC CQI manual. This is the first facility to have this document, which is required in the AD on quality improvement.[167] This document was produced in 1992 and has not been modified since then. Despite its age, this document has some valuable information and gives reasonable instruction on how to set up and maintain a quality improvement program. Because this manual is already available it should be used in the CQI effort, but it is not. This manual should be updated. The apparent effort to train staff on CQI methodology appears nonexistent.

The CQI program is not performing all required studies as stipulated in the ADs. Primary source verification is not done except to verify an existing state license. Offsite services are not reviewed with respect to quality or appropriateness as required by the AD. There is no evidence of 100% review of denials of specialty care in CQI minutes.

Monthly CQI meeting minutes contain very little information. Most of the statistical data provided has no bearing on quality improvement. For example, while listing the number of persons seen in NP, physician, and nursing sick call is useful administratively, it gives no measure of the quality of those visits and gives no information as to whether there is a problem with these processes. The same could be said of most of the statistical information provided in this report. We noted in the Infection Control section of this report that needle sticks and blood borne pathogen data is provided but not analyzed. This misses an opportunity to protect employees and reduce unnecessary needle stick injuries.

As with the prior two IDOC facilities we have reviewed, the CQI plan is a generic plan that gives no specific information on the work that the CQI committee will be engaged in for the upcoming year. The short-range goals for the year were to fill vacancies and to develop an orientation program. Long-term goals were generic goals that did not include identification of problem prone areas of service. The CQI plan needs to be a site-specific plan on what the quality improvement program will be engaged in during the upcoming year with respect to improving care.

The 2016 annual CQI report provided to us contained nine medical studies. One study on diabetes care in mental health patients had no methodology and it was not clear what the

---

[167] AD 04.03.125 Quality Improvement Program page 2 of 10: II.F.1. "The Agency Medical Director shall develop, maintain, and distribute to the facility Health Care Unit Administrators a Quality Improvement Manual. The Health Care Unit Administrators shall maintain the Quality Improvement Manual locally."

study was measuring. Another study that studied 100 patients referred urgently for specialty care was intended to study how many had consultations completed within two weeks. The data was not included, and the results were therefore not provided.

Of the remaining seven studies, five were outcome studies and two were process studies. Four of the five outcome studies were:
- Two studies of whether x-rays were received back timely from the radiologist.
- A study of whether inmates who received education after evaluation for injury then re-injured themselves.
- A study of whether nurse referrals to providers were seen timely.
- A study of whether inmates with poorly controlled hypertension were improved after a year of routine management.

Two of these were true outcome studies; the other two were not outcome studies. Clinical outcomes are end point measures of health status; for example mortality, hospitalization, an HbA1C level of 7 or less, or normal blood pressure. An outcome study measures the effectiveness of interventions based on the ultimate outcome measure. An example would be to study the effect of colorectal cancer screening on colon cancer mortality or the effect of increasing the interval of chronic clinic visits on obtaining a normal blood pressure.

One of the studies at DCC that was an outcome study assessed whether education had an effect on the outcome of re-injury. This study showed that two of 13 individuals re-injured themselves after education. However, the study did not make any analysis of whether the education had an effect or not. The study drew no conclusions, so it was not clear what the purpose of the study was. Also, we question why this topic was chosen when there are so many other important problems at this facility. The second outcome study looked at 10 individuals who were in poor hypertension control. The study looked at their status after a year of typical management to assess whether their degree of control had improved with typical management. Four patients were improved. Four patients were discharged and two patients refused. There was no comment on this study. The sample was so small that its value is questionable. The remaining "outcome" studies were not outcome studies but were performance measures.

DCC studies were mostly measurements of performance. Performance measurement of typical processes are reasonable ways to study job performance, but these are not CQI outcome or process studies. More important, almost none of these studies looked at clinical outcomes or clinical performance, which remains unstudied.

The CQI program appears to make no effort to evaluate the clinical quality of care. We heard complaints from IDOC custody and IDOC health care leadership about the poor quality of physician care. We agree that physician quality is poor, based on mortality reviews and chart reviews. Yet there was no evidence of the CQI program monitoring for this.

The Wexford peer review program is supposed to be a method of evaluating for clinical quality of care. This program is an episode-of-care based system using a single episode of care to

answer up to 10 or 11 discrete questions to determine whether care was adequately provided. These episodes of care are randomly selected. There was one prior peer review of the former Medical Director and two peer reviews of NPs. Virtually all episodes of care were 100% adequate, which given our chart reviews does not accurately reflect what we would consider the status of quality of provider care at this facility.

The medical record documents that are used for these peer reviews are typically not provided. Also, it is not possible to know the context of care when evaluating a single episode of care. In death records that we have reviewed, we noted multiple patients who had considerable weight loss that was not identified, laboratory tests that were recently done that were not reviewed, medical conditions that were not identified or followed up, etc. These problems will not be identified by looking at a single episode of care because the prior orders and problems will not be available for review. We find that using single episodes of care does not work well for this system. Also, because so many physicians have inadequate primary care training, they will not be able to review primary care with a level of expertise that is equivalent to a typical community standard of care. Doctors not trained in primary care are often reviewing other doctors also not trained in primary care. It is not unexpected that few problems are identified.

There is no mortality review at DCC. Monthly and annual CQI minutes list the deaths. A Wexford physician, typically the doctor who cared for the patient, writes a death summary. This is a non-critical summary of events from the perspective of the Medical Director. There is no evidence that anyone is examining deaths to understand if there were quality issues or identified problems that should be addressed to prevent further deaths. Although no one is reviewing deaths in an attempt to prevent further death, we found that of six deaths we reviewed, four were preventable and two were possibly preventable. Details of these deaths are found in the mortality review section of the summary report. The high number of preventable deaths at DCC justifies a robust mortality review process performed by persons not associated with care of the patient.

We found serious problems with clinical medical care at DCC in these reviews, including:

- Multiple episodes of care that failed to follow generally accepted guidelines and multiple episodes of grossly and flagrantly unacceptable care.
- In multiple deaths, each patient lost significant amounts of weight without anyone recognizing that the patient was losing weight. In one of these cases the patient had lost 60 pounds.
- In several patients, significant life-threatening laboratory values were not timely addressed.
- Care for patients with mental health issues was not well coordinated with the mental health staff.
- On multiple occasions, patients who should have been hospitalized or sent to a specialist were not. This underutilization contributed to or resulted in death.

In most cases, these deficiencies related to physician quality; some might have been systemic deficiencies. Untimely specialty care and delayed hospitalization may be a result of inadequate

physician training or barriers to use of these services by the vendor. The doctors who cared for the patient should not be documenting a death summary. Because they cared for the patient, they have a conflict in reviewing their own care and may be unlikely to find problems when problems exist. For that reason and under these circumstances, mortality review should be conducted by either the Office of Health Services or an external reviewer. The vendor should not be permitted to perform the only mortality review on their own services.

# Recommendations

## Leadership, Staffing, and Custody Functions

**First Court Expert Recommendations**

1.  The First Court Expert recommended to make a priority of filling the vacant Medical Director, Health Care Unit Administrator, Director of Nursing, Nurse Practitioner, and seven Correctional Nurse I (RN) positions. *We agree with this. The Medical Director and Health Care Unit Administrator, Director of Nursing, and Nurse Practitioner positions have been filled. However, two nurse supervisor positions, the Director of Medical Records, staff physician, and multiple nursing positions are now vacant. All positions need to be filled. It is critical to fill supervisory positions, but that does not mean that staff positions can remain vacant. A vacancy rate of 23% is unacceptable.*

2.  The First Court Expert's recommendation was as follows. Due to concerns regarding non-registered nurses conducting sick call and working outside of their educational preparation and licensed scope of practice, and when all the Correctional Nurse I positions are filled, total registered nursing positions should be evaluated as to the need for additional positions or a reconfiguring of current positions in order to provide an "all RN" conducted sick call process. *We agree with this recommendation, but believe that the nurse staffing, particularly on the infirmary and geriatric units, and the physician budgeted staffing are deficient. For this reason, it is our recommendation to perform a staffing analysis based on the existing service requirements of the program. Staffing should be augmented based on that analysis. The analysis should be based on policy requirements and clinical care requirements of the program.*

**Additional Recommendations**

3.  Physicians receiving privileges to practice primary care at this facility must have completed residency in a primary care program. This needs to be inserted in the contract obligations of the vendor.

4.  The IDOC contract needs to require that vendor health care managers have training in a health discipline appropriate for their management responsibilities.

5.  The current vendor is unable to provide physicians of sufficient training and in sufficient numbers. The IDOC needs to explore alternate avenues to fill physician spots with qualified physicians.

6.  This facility needs infection control and quality improvement positions.

## Clinic Space

**First Court Expert Recommendations**

1.  Develop and implement a plan to replace the style of beds being used for geriatric patients on the third floor of the medical building.

2.  Properly equip designated sick call rooms in the health care unit and X-house.

*We agree with these recommendations.*

**Additional Recommendations**

3. All medical equipment must be inspected, calibrated, and tagged no less than annually by a qualified bioengineering team.
4. Each room used for nurse sick call should be on the first floor of the medical building.
5. Each room must have its own exam table and be properly equipped. The use of two exam tables in the same open room is to be discontinued.
6. Both elevators must be operational at all times.
7. All the beds in the infirmary must be hospital beds with adjustable heights and sections.
8. At least one electrically adjustable hospital bed should be available in the infirmary.
9. The metal beds in the geriatric unit need to be replaced with beds that are safe, can be readily sanitized, and meet the needs of the geriatric population.
10. Additional shower chairs need to be provided in the patient housing areas of the medical building. Existing shower chairs with torn upholstery need to be repaired or replaced.
11. The cracked and missing floor tiles noted throughout the entire medical building are safety hazards for both patient-inmates and medical and correctional staff, and should be expeditiously repaired, replaced, and maintained.
12. The environmental rounds and the deficiencies noted in the monthly Medical Safety and Sanitation Report should be expanded to include the condition of the patient beds, the functionality of the negative pressure infirmary room, the compliance with annual inspection of medical devices, and other clinical space and equipment findings.

# Sanitation

**First Court Expert Recommendations**
The First Court Expert had no recommendations

**Additional Recommendations**

1.  Safety and sanitation inspections need to include all areas of clinical space including infirmary beds, ADA units, the geriatric floor, annual inspection of clinical equipment and devices, and all other clinical areas.
2. Maintenance needs to be done to replace missing tiles, rusted vents, cracked walls, and peeling paint.

# Medical Records

**First Court Expert Recommendations**

1. *Medical records staff should track receipt of all outside reports and ensure that they are filed timely in the health record. We agree with this recommendation. This presumes that outside reports are all obtained. We strongly recommend that all outside reports be obtained timely and filed within timeframes required by the IDOC Administrative Directive.*

2. Charts should be thinned regularly, and MARs filed timely. *We agree with this recommendation if a paper record continues to be used.*
3. Problem lists should be kept up to date. *We agree with this recommendation.*

**Additional Recommendations**
4. An electronic medical record needs to be implemented in the IDOC. The difficulty in maintaining and finding paper documents in this system is a systemic barrier to care.
5. If a paper record continues to be used, thinning charts should include carrying forward key diagnostic studies and consultant reports that are important to track the status of the patient's conditions.

## Reception Processing and Intrasystem Transfer

The previous Court Expert's recommendation has been achieved. All newly transferred inmates are brought to the dispensary and screened upon arrival to identify immediate medical needs and reconcile prescribed medications so that treatment can be continued. The next day, these inmates are seen again by nurses who complete an in-depth interview, review the medical record, and initiate the plan of care.[168]

**Current Recommendations**
1. We recommend that health care leadership establish a process to monitor and provide feedback as part of the CQI program. Errors and omissions should be subject to focused study to improve the accuracy of transfer information and continuity of patient care.
2. Written directives of IDOC and Wexford be revised to add responsibility for the sending IDOC facility to accurately complete the Health Status Summary in advance of inmate transfer.[169]
3. When facilities send inaccurate or incomplete information on the intrasystem transfer form they should hear about the mistake from the receiving facility.

## Nursing Sick Call

**First Court Expert Recommendations**
1. Develop and implement a procedure for one style of sick call. *This recommendation has been implemented at DCC.*
2. Develop and implement a plan for an "all RN" sick call process. *We agree with this recommendation.*
3. Develop and implement a plan to assure non-medical personnel do not have access to inmate sick call requests. *This recommendation has been implemented at DCC.*
4. Develop and implement a plan to maintain inmate sick call requests on file. *We agree with this recommendation.*

---

[168] Lippert Report DCC p. 42.
[169] Documents to be revised include the IDOC-Wexford contract, Wexford Policy and Procedure P-118 Transfer Screening, and DCC HCU Policies and Procedure P-118 Transfer Screening.

5. Develop and implement a plan to initiate and maintain a sick call log. *This recommendation has been implemented at DCC.*

6. In the X-House, develop and implement a plan to conduct a legitimate sick call encounter, including listening to the patient complaint, collecting a history and objective data, performing a physical examination when required, making an assessment, and formulating a plan of treatment, rather than the current practice of talking to the patient through a solid steel door and basing treatment on the conversation only. *This recommendation has been implemented at DCC, but the medical record is still not available to the nurse to refer to during the sick call encounter. This must be corrected.*

7. Per Office of Health Service policy, assure sick call encounters are documented in the medical record in the Subjective-Objective-Assessment-Plan (SOAP) style. *We agree with this recommendation and found practices more consistent with this recommendation.*

8. Develop and implement a plan to assure the Office of Health Services' approved, preprinted treatment protocol forms are used at each sick call encounter. *We agree with this recommendation and found practices more consistent with this recommendation.*

9. Develop and implement a plan to ensure each of a patient's complaints are addressed during a sick call encounter, or a prioritization of needs to address future encounters is developed, rather than the current practice of allowing only one complaint per visit. *We agree with this recommendation and did not find any instances of patients being limited to only one complaint per encounter.*

10. Develop and implement a plan of education for all nursing staff which will be conducted by the Medical Director and addresses the following issues:

    a. Assure the patient's complaint is addressed at the time of the sick call encounter.

    b. Assure documentation is complete and, at a minimum, addresses the complaint, duration, history, pain level if applicable, location of pain, location of injury, etc., and collection of complete vital signs including weight, an examination if applicable, and an assessment and plan.

    c. Use of the Office of Health Services approved treatment protocols at each sick call encounter.

    d. When using the protocol, staff must comply with the OTC dosages, as increasing the strength or frequency may take the OTC dosage to an unauthorized prescription dosage.

    *We found that there is still significant room for improvement in the quality of nursing sick call. We agree that sick call encounters should include elements a–d above. We do not agree that training conducted by the Medical Director is necessary to accomplish this level of performance. We recommend instead a trended analysis of specific areas that are problematic and a system review of process to identify structural or other barriers to desired performance.[170]*

---

[170] For example, are nurses distracted or rushed during sick call encounters? Do they have all of the equipment and supplies necessary to perform the work? Are the Treatment Protocols clear in guiding the nursing assessment and treatment plan?

11. The nursing department must implement a sick call logbook with fields including date, patient name, patient number, reason for visit, date of clinician appointment, and if cancelled, reason for cancellation and date for the rescheduled appointment. *A sick call log has been implemented. However, the problem of providers seeing patients timely when referred from nursing sick call still exits. Providers also failed to follow up at intended intervals and treatment orders were not carried out. We recommend filling vacant provider positions with qualified practitioners and adding physician positions as described in the recommendations under the heading Leadership, Staffing and Custody Functions.*

**Additional Recommendations**

12. The quality of nursing assessments and the plan of care should be monitored by nursing service as part of the peer review or quality improvement. This should replace Medical Director review.
13. Rooms used for nursing sick call should each have an exam table, equipment, and supplies to conduct a thorough physical assessment without having to move the patient or share equipment.
14. Medical records must be available when the nurse sees patients housed in X-House. This is one example of the benefit of having an electronic health record.
15. The sick call documentation forms should be revised to indicate if the referral is emergent, urgent, or routine. The indicated urgency should be used to schedule provider appointments.
16. Providers should see patients timely according to the urgency of the referral.[171]
17. Revise HCU Policy and Procedure P-103 so that patients in segregation are seen by providers according to the urgency of the referral rather than holding clinic on a single day of the week.
18. Require nurses to assess patients who request sick call for dental pain according to an IDOC Nursing Treatment Protocol.
19. Revise the IDOC Nursing Treatment Protocol for Toothache/Dental Complaints to clarify expectations regarding dental pain, particularly the assessment, factors in determining the urgency of referral, the timeframe to see the dentist, and options to treat pain until seen by a dentist. We suggest accomplishing this by developing separate protocols for dental infection, dental trauma, and dental pain.

# Chronic Care

**First Court Expert Recommendations**

1. There should be a single nurse assigned to the chronic care program to identify, enroll, monitor, and track patients in an organized and comprehensive way.

---

[171] Emergent referrals should be seen immediately, urgent referrals should be seen the same day, and routine referrals seen within 72 hours.

2. Patients with HIV should be enrolled and monitored in the chronic disease program. There should be a system in place to identify medication noncompliance (or other missed doses) and refer those patients to a provider timely.

*We agree with these recommendations.*

**Additional Recommendations**

3. Problem lists in the medical record must be complete and accurate.

4. The care of chronic illnesses must be in accord with national standards of care and the Office of Health Services Chronic Illness Treatment Guidelines.

5. Age-based routine health maintenance, including cancer screening and immunizations for patients with and without medical conditions, must be provided in accord with the United States Preventive Services Task Force (USPSTF) guidelines and other national standards of care.

6. Chronic care visits must address *at every visit* all interrelated medical conditions that impact on the treatment, control, and outcomes of that clinic's specific disease. Strictly focusing on a single specific disease and not addressing other associated clinical problems is not in the best interest of the patient and delays needed interventions.

7. The chronic care providers must regularly document the review of the MAR, the CBGs, nursing and provider sick call notes, and blood pressure readings when they see patients in the disease-specific chronic care clinics.

8. Nursing or quality improvement staff should do monthly medication compliance audits on all patient with HIV, diabetes, chronic anticoagulation, seizure disorders, and other chronic illnesses as needed. The results should be communicated to the providers and to the QIC.

9. The IDOC should develop a plan to shift anticoagulation treatments from Vitamin K antagonists (warfarin) to newer types of anticoagulants that do not require frequent ongoing lab testing to determine the adequacy of anticoagulation. The frequent lab testing and medication adjustments are logistically complicated and put patient-inmates at risk for poor outcomes. Utilizing newer anticoagulation medications that do not require frequent ongoing measurement of the level of anticoagulation should be strongly considered by the IDOC.

10. Patients with selected chronic illnesses including diabetes, hypertension, and hyperlipidemia should have the 10-year cardiovascular risk calculated to determine if they require a HMG CoA-reductase inhibitor (statin drug) at a proper dosage to minimize the risk of myocardial infarction, stroke, and other cardiovascular diseases.

11. Providers should be provided with access to electronic medical references and/or cell phones with internet capability that would allow clinical staff to readily access updated clinical information in their offices and in all clinical service areas. This is the standard of care in the community.

12. DCC and IDOC must establish a process to monitor the status of high-risk patients who refuse chronic clinic appointments during the interval between chronic care clinics. The current practice of not rescheduling chronic care patients who refuse to attend their scheduled appointment until the next chronic care clinic, which may be as long as six

months later, is not in the best interests of the patient or the institution. These patients should be promptly rescheduled based on the urgency of their medical condition.

13. Providers must document any modification of warfarin dosage and the INR result in the patient's progress notes, chronic care notes, or a warfarin log. The current practice of documenting changes in warfarin doses on the INR lab form is a barrier to continuity of care and the communication of this vital clinical decision.

14. Providers must consistently document key clinical information, the performance of indicated examinations, the rationale for clinical decisions and therapy modifications, and any modifications of the treatment plan in the chronic care progress notes.

15. DCC must develop a process to ensure that all patients 50 years of age or older are screened for colon cancer and men 65 years of age or older with a history of tobacco use are screened for abdominal aortic aneurysm (AAA).

16. Uncontrolled Chronic illnesses with problems that appear to be beyond the expertise of the DCC providers are to be referred for specialty consultation.

## Urgent/Emergent Care

**First Court Expert Recommendations**

1. A log book be maintained that contains fields for date, time, patient name, patient number, presenting symptom, where the assessment was performed, and the disposition, including if the patient was returned to the cellhouse or sent offsite. *We agreee with the previous Court Expert and found that such a log is maintained when inmates are sent to the Emergency Department. All onsite emergency response incident reports and critiques are maintained in a binder kept on site and reviewed in the monthly CQI meetings.*

2. When patients are sent offsite, a staff person be assigned responsibility to obtain either the emergency room report or, if the patient was admitted to the hospital, the discharge summary. *We agree with this recommendation.*

3. All patients sent offsite should be brought to the clinic for a nurse to review the relevant documents and ensure the required documents, if not available, are obtained (see recommendation #2) and the patient is scheduled for a follow-up visit with a primary care clinician. *We agree with this recommendation and recommend, in addition, that the follow-up visit be scheduled the next working day.*

4. At the primary care clinician visit, the clinician must document a discussion of the findings and plan. *We agree with this recommendation.*

**Additional Recommendations**

5. Determine if the Health Care Unit is to maintain a trauma bag for mass casualty disaster as specified in DCC ID #04.03.108.

6. Add the expiration dates of medications and solutions kept in the emergency response bags to the equipment checklist to identify products nearing expiration so that they can be replaced.

7. Revise DCC ID #04.03.108 to reduce the number of mass casualty drills required. It should conform to the HCU Policy and Procedure P-112.

8. A corrective action or improvement plan should be developed based upon the critique of the annual mass casualty drill. Implementation of the plan should be monitored by the CQI Program.

9. The process or persons assigned to critique emergency responses should be revised to provide meaningful feedback on strengths and weaknesses. This feedback should be reviewed by CQI for trends and areas identified for correction or improvement.

10. All emergency room visits should be reviewed with regard to timeliness, appropriateness of preceding care, accuracy of information in the health record, and continuity of care upon release back to the facility. This should be done by clinical leadership and the QI program.

11. Sentinel events resulting in hospitalization should be monitored by the Office of Health Services to ensure that quality of care is practiced and that the sentinel event was not preventable.[172]

12. Potentially preventable hospitalizations should be monitored by the Office of Health Services to ensure that quality of care is practiced.

## Specialty Consultations

**First Court Expert Recommendations**

1. The delays in obtaining scheduled offsite services must be eliminated. Wexford must be required, within seven days after verbal approval, to have provided authorization to the UIC coordinator. If the UIC is assigning an appointment date greater than 30 days in the future, an effort must be made to obtain the service locally. After the service has been provided, the patient should be returned through the medical clinic and a nurse should review the paperwork or take steps to obtain it. After the paperwork is obtained, the patient must be scheduled for a follow-up visit with the primary care clinician, who must document the discussion of findings and plan. *We agree with this recommendation. However, certain adjustments should be made for those follow-up appointments that are requested for periods longer than 30 days (for example, when a consultant recommends a six month follow up).*

**Additional Recommendations**

2. Given the existing problems with the Wexford system of obtaining offsite care, it should be abandoned. Patients are being harmed. Until a system is put in place that protects patients, all referrals by providers should be scheduled without utilization review.

3. Senior management from Wexford or IDOC needs to obtain medical records from consultants and hospitals on a timely basis.

## Infirmary Care

**First Court Expert Recommendations**

---

[172] A sentinel event is any unanticipated event in a health care setting resulting in death or serious physical injury to a patient not related to the natural course of the patient's disease.

1. Staff the infirmary with a registered nurse 24 hours a day, seven days a week.
2. Educate nursing staff on the need for complete charting, which includes providing a thorough description of a patient's medical condition.
3. Develop and implement a plan to provide an accessible nurse call system for patients who are physically unable to access the current call system and provide for a credible system for those patient rooms with no nurse call system.
4. Establish minimum inventory levels for bedding, linens, and pillows and provide acceptable items which are not torn, threadbare, or frayed.
5. Provide a permanent manned security post within the infirmary.
6. Develop and implement a plan to obtain needed additional equipment as determined by the Medical Director, Health Care Unit Administrator, Director of Nursing, and a nursing staff representative who is routinely assigned to the infirmary.
7. Develop and implement a plan to provide additional institutional radios to the infirmary nursing staff.

*We agree with these recommendations.*

**Additional Recommendations**

8. Provider infirmary admission notes and progress notes should be performed in accord with the timeframes detailed in IDOC policy 04.03.120, Offender Infirmary Services.
9. Provider notes must communicate the rationale for modifications in treatment; list reasonable differential diagnoses; document pertinent histories, physical findings, and symptoms; record clear treatment plans; and write regular comprehensive progress notes that update the status of each and every acute and chronic illness.
10. All Infirmary beds must be functional hospital beds with the capability to adjust the height, head, and foot of the bed, and have operational safety railings. Non-functional infirmary beds put the safety of patient-inmates and staff at risk. At least one electrical bed should be available for use in the infirmary.
11. Physical therapy services must be provided in the infirmary for those patients who cannot be readily moved to the physical therapy treatment room on the first floor of the medical building.
12. Patients whose clinical needs and support of their activities of daily living exceed the capability of the DCC infirmary must be transferred to a licensed skilled nursing facility either in the IDOC or in the community.
13. Given the numbers of elderly patients and the skilled nursing needs that are not now provided, the IDOC should perform a statewide analysis of its geriatric needs and develop a plan that ensures safe housing in an appropriate level of care for this population. Based on a review of this facility it appears that IDOC needs a new skilled nursing unit. But this effort should not be undertaken before an analysis of the need is completed.

# Pharmacy and Medication Administration

The First Court Appointed Expert made no recommendations concerning pharmacy and medication administration.

**Current Recommendations**

1. Adopt a computerized provider order entry (CPOE) program to eliminate handwritten orders. Replace handwritten transcription of orders to the MAR with printed labels after the pharmacy has reviewed and verified the order. Medications which must be started urgently may be transcribed in handwriting onto the MAR. When the label arrives, it should be affixed to a new line on the MAR and documentation continued on the new line.

2. Evaluate continuity of care with respect to prescription medication for chronic illness.[173] Included in this review should be whether there is a progress note written to correspond with the order describing rationale and plan of care regarding prescription medication. The results of these reviews should be reported and analyzed in CQI. The Regional Medical Directors need to review these CQI efforts and provide coaching and feedback to the providers.

3. Order implementation should take place within 24 hours. Adopting CPOE eliminates delays in treatment resulting from not transcribing orders timely.

4. Medication should be administered in patient specific, unit dose packaging. The practice of pre-pouring should be eliminated in GP and STC, as well as the multiuse envelopes in STC.

5. The MAR should be used by the nurse to verify that the medication, dose, and route of administration is correct immediately before giving the medication to the patient. The nurse should have the MAR available to answer any questions or concerns the patient has about the medication.

6. Medication should be documented on the MAR at the time it is administered.

7. Printed labels should be provided to place on the MAR when a new order is dispensed. Orders should not be handwritten on the MAR unless it is a medication to be given immediately.

8. A system for timely renewal of chronic disease and other essential medications should be developed.

9. Nurses should refer any patient who does not receive three consecutive doses of medication critical in managing a chronic disease (insulin, Plavix, factor H, HIV medication, antirejection medications, etc.) to the treating provider. The treating provider should meet with the patient and determine if treatment can be modified to improve adherence.

10. Patient adherence with KOP medications prescribed to treat chronic disease should be monitored at regular intervals (monthly by nursing and by the provider at each chronic disease visit).

11. Revise the policy and procedure for medication administration to provide sufficient operational guidance to administer medications in accordance with accepted standards of nursing practice.

12. The CQI program should develop, implement, and monitor quality indicators related to pharmacy services and medication administration.

---

[173] National Commission on Correctional Health Care (2014) Standards for Health Services in Prisons. E-12 Continuity and Coordination of Care During Incarceration. p. 93.

13. Root cause analysis and corrective action plans should be used to target the causes of performance that is below expectations. Corrective action should consider system improvements such as computerized provider order entry, use of bar coding, patient specific unit dose packaging, EMAR, etc., to support desired performance.

## Infection Control

**First Court Expert Recommendations**

1. Develop a position description and name an Infection Control Registered Nurse (IC-RN). *We agree with this recommendation.*

2. Develop and implement a plan for the IC-RN to conduct monthly documented safety and sanitation inspections focusing at a minimum on the health care unit, infirmary, and dietary department, with monthly reporting to the Quality Improvement Committee (QIC). *We agree with this recommendation.*

3. Develop and implement a plan for the IC-RN to monitor food handler examinations and clearance for staff and inmates. *We do not agree with this recommendation. A medical examination of persons to work as a food handler is not necessary because it only represents that individual's condition on the day of the exam and is not predictive of future illness or disease that would contradict working as a food handler. Instead, we recommend that staff and inmates working in food service be trained and pass an examination on proper food handling techniques, sanitation procedures, and what health conditions need to be reported to the food services supervisor.*

4. Develop and implement a plan for the IC-RN to monitor compliance with initial and annual tuberculosis screening, with monthly reporting to the QIC and facility administration as needed. *We agree with this recommendation.*

5. Develop and implement a plan to aggressively monitor skin infections and boils, and work jointly with security and maintenance staff regarding cellhouse cleaning practices, with monthly reporting to the QIC and facility administration as needed. *This recommendation has been accomplished with regard to MRSA infection. Reporting and surveillance should be expanded to include skin infections in addition to MRSA.*

6. Develop and implement a plan to daily monitor and document negative air pressure readings when the room(s) are occupied for respiratory isolation, and weekly when not occupied. *This recommendation has been accomplished. However, the room air exchange monitor does not work, and parts are no longer available. Staff use the tissue test to monitor air flow. An HVAC expert should evaluate negative airflow in the room annually.*

7. Develop and implement a training program for healthcare unit porters which includes training on blood-borne pathogens; infectious and communicable diseases; bodily fluid clean-up; and proper cleaning and sanitizing of infirmary rooms, beds, furniture, toilets, and showers. *This recommendation has been partially accomplished. Apparently, training has been developed, but porters are assigned work before this training is completed. We agree that porters should be trained and vaccinated before being assigned work in the infirmary.*

8. Monitor all sick call areas to assure appropriate infection control measures are being used between patients, i.e., use of paper on examination tables which is changed between patients or a spray disinfectant is used between patients, examination gloves are available to staff, and hand washing/sanitizing is occurring between patients. *We agree with this recommendation.*

9. Develop and implement a plan to monthly monitor all patient care associated furniture, including infirmary mattresses, to assure the integrity of the protective outer surface, with the ability to take the furniture out of service and have repaired or replaced as needed. *We agree with this recommendation. Safety and sanitation inspections take place monthly, but items that need to be repaired or replaced are not taken out of service.*

10. Interface with the County Department of Health and Illinois Department of Health and provide reporting as required by each department. *This recommendation has been accomplished.*

**Additional Recommendations**

11. Infections and communicable disease data should be analyzed and discussed as part of the monthly and the annual CQI meetings. This should include discussion of trends, updates from the CDC, and review of practices. For example, employee exposures to blood borne pathogens, such as the needlestick injuries in 2017, should be analyzed by CQI with consideration of alternate systems, products, and methods to reduce potential injury.

12. Track and report skin infections due to all pathogens, not just MRSA, including infestations with scabies or body lice.

13. Update the IDOC Infection Control Manual now and at least every two years.

14. Airborne Infection Isolation (AII) rooms need to be regularly serviced, inspected by knowledgeable individuals, and monitored regularly. The maintenance of adequate air changes and pressure should be documented on a log specifically as part of the infection control program.

15. The cracked and missing floor tiles noted throughout the entire medical building interfere with the proper cleaning and sanitation and create infection control hazards for both patient-inmates and medical and correctional staff and should be expeditiously repaired, replaced, and maintained.

# Radiology Service

No recommendations.

# Dental Program

## Dental: Staffing and Credentialing
**First Court Expert Recommendations**

1. Hire a dental hygienist immediately. We agree with this and specify that the dental hygienist should be full-time. *We agree with this recommendation.*

**Additional Recommendations**
2. Dentist staffing should be increased to 2.0 FTEs.
3. Dental assistant staffing should be increased to 2.5 FTEs.
4. All dental assistants should be qualified to take intraoral x-rays.
5. The clinic should be open for patient treatment five days per week.
6. Dentists' hours should coincide with patient availability.
7. Dentist and dental assistant schedules should be coordinated so that dentists are not treating patients when an assistant is not available.

## Dental: Facility and Equipment
**First Court Expert Recommendations**
1. Repair or replace the chair and unit that is not working. *We agree with this recommendation.*

**Additional Recommendations**
2. Purchase an ultrasonic scaler.
3. Repair the faulty foot pedal controls on all sinks. If repair is not feasible, the sinks should be replaced.

## Dental: Sanitation, Safety, and Sterilization
**First Court Expert Recommendations**
1. Sterilization flow to the autoclave should be from dirty to sterile in a linear fashion; from ultrasonic to sink to work area to autoclave.
2. Safety glasses should be provided to patients while they are being treated.
3. That a biohazard warning sign be posted in the sterilization area.
4. A warning sign should be posted in the x-ray area to warn pregnant females of radiation hazards.

*We agree with these recommendations.*

**Additional Recommendations**
5. The clinic should obtain a stethoscope and a sphygmomanometer.

## Dental: Review Autoclave Log
**First Court Expert Recommendations:** None.

**Additional Recommendations**: None.

## Dental: Comprehensive Care
**First Court Expert Recommendations**

1. Comprehensive "routine" care should be provided only from a well-developed and documented treatment plan.
2. The treatment plan should be developed from a thorough, well documented intra and extra-oral examination, to include a periodontal assessment and detailed examination of all soft tissues.
3. In all cases, that appropriate bitewing or periapical x-rays be taken to diagnose caries.
4. Hygiene care should be provided and documented as part of the treatment process.
5. Care should be provided sequentially, beginning with hygiene services and dental prophylaxis.
6. All record entries should include date and time.

*We agree with these recommendations.*

**Additional Recommendations**
7. The health history should be updated and signed at all biennial exams.
8. A periodontal probe should be added to a mirror and explorer in all examination packs.
9. All prisoners who arrive from a reception center should receive a comprehensive exam within 30 days.
10. The daily and monthly log forms should be amended to include oral prophylaxis and scaling and root planing.

## Dental: Intake (Initial) Examination
**First Court Expert Recommendations**
Although no recommendations were made, the First Court Experts did not review the quality of the panoramic x-rays or the disposition of potential urgent care issues noted at intake.

**Additional Recommendations:** None.[174]

## Dental: Extractions
**First Court Expert Recommendations**
1. A diagnosis or a reason for the extraction be included as part of the record entry. This is best accomplished through the use of the SOAP note format, especially for sick call entries. It would provide much detail that is lacking in most dental entries observed.
2. A consent form be developed and signed by the patient and the dentist. That the procedure and any potential complications be well explained to the patient. While all records contained signed consent forms, we recommend that the consent forms specify the reason for the extraction.

*We agree with these recommendations.*

**Additional Recommendations:**
3. The heath history should be updated before a tooth is extracted.
4. Teeth should not be extracted without clinically adequate x-rays.

---

[174] We address the inadequacy of the panoramic x-rays in the NRC report.

## Dental: Removable Prosthetics
**First Court Expert Recommendations**
1. A comprehensive examination and well-developed and documented treatment plan, including bitewing and/or periapical radiographs and periodontal assessment, precede all comprehensive dental care, including removable prosthodontics.
2. Periodontal assessment and treatment should be part of the treatment process and that the periodontium should be stable before proceeding with impressions.
3. That all operative dentistry and oral surgery as documented in the treatment plan be completed before proceeding with impressions.

*We agree with these recommendations.*

**Additional Recommendations:** None.

## Dental: Sick Call/Treatment Provision
**First Court Expert Recommendations.**
1. Implement the use of the SOAP format for sick call entries. It will assure that the inmate's chief complaint is recorded and addressed, and a thorough focused examination and diagnosis precedes all treatment. *We note that all the sick call records we reviewed used the SOAP format.*
2. Daily dental sick call should be seen and evaluated by the dentist, rather than through the medical program. *We do not agree with this recommendation. Instead, we recommend that nurses triage all requests for dental care. Non-urgent requests (cleaning, routine exams, fillings, etc.) should be sent to the dental clinic for scheduling. All other dental complaints should be assessed at nursing sick call, treated for pain as needed, and referred to the dentist based upon clinician urgency.*
3. Requests from inmates with urgent care complaints should be scheduled for the next work day from receipt of the nursing referral from sick call. *We agree with this recommendation.*
4. Efforts should be made to see urgent care complaints via the request form in a timelier manner. They could easily be scheduled for the next day. Sick call sign-ups are seen the following day by RNs who have pain medication protocols available. Dental sick call signups should be scheduled directly by dental for the following day, rather than by the RN who then refers them to dental. *We do not agree that urgent complaints should be scheduled directly by the dental service. Only requests for routine (non-urgent) care should be scheduled by the dental service.*

**Additional Recommendations**
5. RNs should perform face-to-face examinations on patients with complaints that suggest pain or infection and refer or palliate per protocol. Nurses should refer patients to the dentist according to criteria for urgency established in the treatment protocol.
6. The health history should be updated at each clinical encounter.

## Dental: Orientation Handbook

**First Court Expert Recommendations**
1. Amend the orientation manual to include dental sick call procedures and instructions on how to access routine, urgent and emergency care. *The recommendation is moot since recent revisions adequately address sick call procedures and access to health care.*

**Additional Recommendations:** None.

## Dental: Policies and Procedures
**First Court Expert Recommendations**
1. The dental program should develop a current detailed, thorough, and accurate policy and procedures manual that define show all aspects of the dental program are to be run, to include access to care, care provision, clinic management, infection control, etc. Once developed, it should be reviewed and updated on a regular basis and as needed for new policies and procedures. *We agree with this recommendation.*

**Additional Recommendations**
2. The Dental Program Binder should be reviewed and updated.

## Dental: Failed Appointments
**First Court Expert Recommendations**
1. Failed appointment percentages are slightly high and should be watched. We agree with this recommendation.

**Additional Recommendations**
2. Failed appointment percentages should appear on the Monthly Dental Logs and be reported to the Quality Improvement Committee.

## Dental: Medically Compromised Patients
**First Court Expert Recommendations**
1. The medical history section of the dental record should be kept up to date and that medical conditions that require special precautions be red flagged to catch the immediate attention of the provider. These would include medication allergies, anticoagulants, interferon therapy, pre-medicated cardiac conditions and any other health condition that would require medical intervention prior to dental treatment.
2. That blood pressure readings be routinely taken of patients with a history of hypertension, especially prior to any surgical procedure.

*We agree with these recommendations.*

**Additional Recommendations**
3. Diabetics diagnosed with periodontal disease should be offered an oral prophylaxis every six months and non-surgical periodontal treatment (i.e., scaling and root planing) if clinically indicated as part of the chronic care program.

<u>Dental: Specialists</u>
**First Court Expert Recommendations**

None. Specialists are available and utilized.

**Additional Recommendations:** None.

<u>Dental: CQI</u>
**First Court Expert Recommendations**
1. The CQI process should be used extensively to address the program deficiencies outlined in the body of this report. Policies and procedures should be developed from this process to ensure that measures are in place to maintain program continuity and improvement. *We agree with this recommendation.*

**Additional Recommendations**
2. Annual dentist peer reviews should be implemented immediately.
3. The dentist peer review form should be modified to focus on substantive aspects of clinical care such as diagnosis, treatment planning, the appropriate use of periodontal probing and x-rays, and the treatment of periodontal disease.
4. Facility reviews of the dental program should be performed semi-annually. They should encompass clinical aspects of the dental program and be reviewed by a disinterested dentist.

## Internal Monitoring and Quality Improvement

**First Court Expert Recommendations**
1. This program must be recreated and provided the leadership that has had training in quality improvement philosophy and methodology. The program should focus on both process improvement and professional performance improvement as well as grievance responses. The program must be used to improve intrasystem transfers, both nurse and provider sick call, the chronic care program, infirmary care, unscheduled services care, scheduled offsite services care, medication administration, grievances, infection control, dental services, and mental health services. This program requires the use of logbooks for tracking capabilities for both intrasystem transfers, sick call, infirmary care, chronic care, unscheduled services care, scheduled offsite services, and grievances.
2. The leadership of the continuous quality improvement program must be retrained regarding quality improvement philosophy and methodology, along with study design and data collection.
3. This training should include how to study outliers in order to develop targeted improvement strategies.
*We agree with these recommendations.*

**Additional Recommendations**

4.  We recommend that the current peer review program of Wexford be revised. The Office of Health Services or outside reviewers should monitor physician performance for sentinel event reviews and mortality reviews. Standardized professional performance evaluations by Wexford should focus on whether the patient's care over a span of time was adequate and resulted in an expected outcome. The professional performance evaluation should be related to privileges granted at re-credentialing.

# Appendix A

**DCC Staffing as of 4/5/18**

| Position | Budgeted positions | Vacancies | LOA long-term | Effective vacancies | State or Wexford |
|---|---|---|---|---|---|
| Health Care Administrator | 1 | 0 | 0 | 0 | State |
| Director of Nursing | 1 | 1 | 0 | 1 | State |
| Medical Director | 1 | 0 | 0 | 0 | Wexford |
| Medical Record Director | 1 | 1 | 0 | 1 | State |
| Physician | 1 | 1 | 0 | 1 | Wexford |
| Nurse Practitioner | 2 | 0 | 0 | 0 | Wexford |
| Nursing Supervisor | 2 | 1 | 0 | 1 | State |
| Nursing Supervisor | 1 | 0 | 0 | 0 | Wexford |
| RN | 48 | 10 | 1 | 11 | State |
| LPN | 10 | 2 | 1 | 3 | Wexford |
| Certified Nurse Assistant | 6 | 1 | 1 | 2 | Wexford |
| Pharmacy Tech | 1 | 0 | 0 | 0 | State |
| Medication Room Assistants | 3 | 0 | 0 | 0 | Wexford |
| Chief Dentist | 1 | 0 | 0 | 0 | Wexford |
| Dentist | 0.4 | 0 | 0 | 0 | Wexford |
| Dental Assistant | 1 | 1 | 0 | 1 | State |
| Dental Assistant | 1 | 0 | 0 | 0 | Wexford |
| Office Coordinator | 1 | 0 | 0 | 0 | State |
| Health Information Assistant | 1 | 1 | 0 | 1 | State |
| Staff Assistants | 7 | 0 | 0 | 0 | Wexford |
| Phlebotomist | 1 | 0 | 0 | 0 | Wexford |
| Optometrist | 0.2 | 0 | 0 | 0 | Wexford |

| | | | | | |
|---|---|---|---|---|---|
| Physical Therapist | 0.2 | 0 | 0 | 0 | Wexford |
| Physical Therapy Assistant | 1 | 0 | 0 | 0 | Wexford |
| Radiology Technician | 1 | 0 | 0 | 0 | Wexford |
| | 93.8 | 19 | 3 | 22 | |

*The Director of Nursing will be filled on 4/16/18.

**One of the filled nursing supervisor positions will be vacant beginning 4/16/18.