# Menard Correctional Center
# 2nd Court Appointed Expert Report
# Lippert v. Godinez

Visit Date:  May 21-24, 2018

Prepared by the Medical Investigation Team

Mike Puisis, DO
Jack Raba, MD
Catherine M. Knox RN, MN, CCHP-RN
Jay Shulman, DMD, MSPH

## Table of Contents

**Overview**.................................................................................................................. **3**

**Executive Summary** ................................................................................................ **3**

**Findings**.................................................................................................................. **7**

    Leadership, Staffing, and Custody Functions.................................................... 7

    Clinic Space ........................................................................................................ 9

    Sanitation ......................................................................................................... 16

    Radiology Service ............................................................................................. 17

    Medical Records ............................................................................................... 18

    Medical Reception and Intrasystem Transfer.................................................. 20

    Nursing Sick Call .............................................................................................. 22

    Chronic Disease Management .......................................................................... 25

    Urgent/Emergent Care .................................................................................... 39

    Specialty Consultations ................................................................................... 51

    Infirmary Care .................................................................................................. 62

    Pharmacy/Medication Administration ............................................................ 66

    Infection Control .............................................................................................. 71

    Dental Program ................................................................................................ 75

    Internal Monitoring and Quality Improvement Activities ............................... 90

**Recommendations** ............................................................................................... **93**

    Leadership, Staffing, and Custody Functions.................................................. 93

    Clinical Space.................................................................................................... 93

    Sanitation ......................................................................................................... 94

    Radiology Services ........................................................................................... 94

    Medical Records ............................................................................................... 94

    Medical Reception and Intrasystem Transfer.................................................. 95

    Nursing Sick Call .............................................................................................. 95

    Chronic Disease Management .......................................................................... 96

    Urgent/Emergent Care .................................................................................... 97

    Specialty Consultations ................................................................................... 98

    Infirmary Care .................................................................................................. 99

    Pharmacy and Medication Administration .................................................... 100

    Infection Control ............................................................................................ 101

    Dental Program .............................................................................................. 102

    Internal Monitoring and Quality Improvement.............................................. 107

**Appendix A**......................................................................................................... **108**

# Overview

From May 21 to May 25, 2018, the Medical Investigation team visited the Menard Correctional Center (MCC) in Chester, Illinois. MCC is a maximum security prison. MCC houses 3029 inmates. The capacity of the prison is 3812 and the prison is at 79% of capacity. Eighty-one percent of inmates are classified as maximum security. Approximately 10% of inmates are medium security and approximately 9% are minimum security. Only 49 (1.6%) inmates were in the reception housing unit on the day of our visit. MCC had an infirmary unit, which on the day of our visit housed eight patients.

This report describes our findings and recommendations. During this visit, we:
- Met with leadership of custody and medical
- Toured the medical services area
- Talked with health care staff
- Reviewed health records and other documents
- Interviewed inmates

We thank Warden and staff for their assistance and cooperation in conducting the review.

# Executive Summary

Based on a comparison of findings as identified in the First Court Expert's report, we find that except for minor improvements in nursing sick call and infection control, all areas were either the same or worse than the First Court Expert's findings. Clinical care in all areas of record reviews appeared worse and, in some cases, resulted in harm. Mortality review identified preventable and possibly preventable death. We find that overall, the Menard Correctional Center (MCC) is not providing adequate medical care to patients, and there are systemic issues that present ongoing risk of harm to patients and result in preventable morbidity and mortality. The deficiencies that form the basis of this opinion are provided below.

There are an extraordinary number of vacancies (33%) at this facility. This includes two physician positions, nurse practitioner positions, Director of Nursing, medical records director, Dental Director and 39% of nursing positions. It takes approximately 10 months to fill a state position, and the IDOC needs to reduce that timeframe or it will be unable to timely fill positions. The Medical Director does not provide clinical leadership at the facility. The Wexford regional team does not appear to participate in identification or resolution of operational problems. A staffing plan needs to be done, as it is unclear how many staff are necessary to provide services.

In order to accommodate custody, sick call and provider visits are conducted in housing units. But these housing unit examination rooms are not all appropriately equipped, were not well maintained, and were cluttered, making them inappropriate for clinical care. Some examinations occur with the patient in a chair. The panorex unit in intake is not shielded, which increases risk of radiation exposure to staff and other inmates. The infirmary has no examination room and

patient rooms have no nurse call devices. Equipment is not maintained or routinely inspected. Showers in the infirmary and in American for Disability (ADA) units were not well maintained and are in need of repair. There was a lack of automated external defibrillators. There was a lack of maintenance and repairs throughout all clinical areas, which we were told was a result of funding.

Most but not all examination tables had paper barriers. Sharps, gloves, sinks, and paper towels were available. Maintenance of equipment and physical plant was not being done. Sanitation rounds were being done but findings were not corrected. Environmental rounds need to include clinical equipment, electrical safety, emergency bags, negative pressure rooms, and clinical areas.

Radiology equipment, inspections, and safety were adequate except for the panorex in the reception area, which lacked shielding, making it a potential safety risk. Access to radiological services was adequate. The need for dosimeters should be reviewed with the State of Illinois Emergency Management Agency.

Medical records are properly thinned but the number of volumes of medical records is so large that additional storage space is needed to accommodate excess volumes. This makes access to a complete medical record extremely difficult. An electronic medical record is needed. Medical records are not available for nurses performing sick call in housing units. They write their notes on blank progress notes without access to review medical record information. Their notes are filed at a later date. All staff need to have access to a medical record for every clinical encounter. Any staff is authorized to pull or re-file medical records, which violates confidentiality and promotes loss of medical documents. Hospital and consultation reports are only available 50% of the time. This adversely affects clinical care.

Intake physical examinations are not timely; only 60% of new inmates have their intake physical examination within a week. As with NRC, although HIV testing is supposed to be opt-out, it still requires consent and may account for only 50% of incoming inmates being screened.[1] This is not trivial. We found on death reviews a man from MCC who was never screened for HIV despite having multiple risk factors. He died of unrecognized advanced AIDS and his death was preventable if he had been screened.[2] Although there were additional problems with the care of this patient, the lack of HIV screening was significant. The Center for Disease Control recommends opt-out screening as the optimal testing method for HIV in correctional centers and this should be put into place in the IDOC.[3] Follow up of tuberculin skin testing was not always done and occasionally is not administered. Follow up of abnormal findings was inconsistent. There is no system to monitor these deficiencies.

---

[1] In our experience, opt-out testing typically results in rates greater than 95% acceptance. This is borne out by the experience in Rhode Island Department of Corrections, which had a rate of acceptance of testing of 98%. This is found in the following article. Beckwith CG, Bazerman L, Cornwall AH, Patry E, Poshkus M, Fu J, and Nunn A: An Evaluation of a Routine Opt-Out Rapid HIV Testing Program in a Rhode Island Jail. AIDS Educ Prev June 23, 2011 23(30): 96-109 and found at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3734962/.

[2] Patient #22 Mortality Review.

[3] HIV Testing Implementation Guidance for Correctional Settings; Centers for Disease Control and Prevention, January 2009 as found at https://www.cdc.gov/hiv/pdf/group/cdc-hiv-correctional-settings-guidelines.pdf.

Since the First Court Expert's visit, MCC now has properly equipped rooms used to conduct nursing sick call evaluations. All sick requests we reviewed were seen timely, including urgent sick call requests. We verified this in interviews of inmates. Nurses failed to appropriately assess and examine patients in 20% of sick call requests we reviewed. We also found that licensed practical nurses independently perform sick call even though it is not within the scope of their license. This places inmates at risk of harm. Nurses also evaluate inmates for their requests without having the medical record with them during the evaluation. This violates IDOC protocols and MCC's policy. Only 20% of nurse referrals to providers occurred timely

About half of chronic illness patients are still managed in one-disease-only clinics. We examined hepatitis C chronic clinics at MCC and found that patients are unmonitored for ongoing harm of hepatitis C, including complications of cirrhosis and hepatocellular carcinoma. These failures have caused death.[4] The insertion of a Wexford corporate hepatitis C physician into the process of referral to UIC is an additional barrier that serves to delay treatment of patients with antiviral medication. Facility physicians are not adhering to IDOC hepatitis C guidelines and fail to obtain required testing necessary to evaluate patients for treatment. Physicians seeing patients in chronic care clinics failed to consistently document rationale for their treatment decisions, failed to document review of the medication records, failed to review blood glucose levels in diabetics, failed to refer diabetic patients for annual retinopathy screening, failed to prescribe statins based on current IDOC guidelines, failed to screen for colon cancer, and failed to vaccinate patients in accordance with current recommendations. We found many deficiencies on record reviews.

Emergency supplies and equipment are standardized but bags are not sealed. Emergency bags are routinely checked but we did find some outdated supplies in these bags. All automated defibrillators were routinely checked and were found functional. Emergency response drills are performed as required. Although critiques of these drills were adequate, there was no discussion of analysis or plans for improvements in CQI meetings. Tracking of emergency evaluations ceased in 2017. In records reviewed of nursing evaluation of urgent episodes of care and in physician care of persons hospitalized, there were numerous deficiencies of clinical care.

Specialty care was not tracked, so it was not possible to evaluate timeliness of care. MCC had the second lowest rate of referral of all facilities we reviewed but the highest rate of denials. We found that many denials were inappropriate. In record reviews we noted delayed specialty care, lack of follow up after consultations, including noting the status of the patients and failure to describe the therapeutic plan developed by the consultant, failure to timely schedule specialty care, and failure to obtain specialty care reports. Access to care appeared so poor that we recommend abandoning the collegial review program.

We found that some patients on the infirmary had conditions that required a higher level of care, such as a skilled nursing unit. Provider notes on the infirmary failed to include adequate history, examination, or plans, and had limited clinical information or rationale for treatment plans. Infirmary beds are inadequate for the type of patients housed on this unit. The infirmary had no

---

[4] Mortality Review Patient #23.

examination room. The fixed infirmary beds are so close to the ground that it was difficult to imagine how an adequate examination could be accomplished. There are no call devices on the infirmary and rooms had padlocks on them, creating an evacuation-safety hazard and making it impossible for bedridden patients to gain the attention of a nurse in an emergency.

We noted that medication rooms were clean and orderly, and that storage of medication was appropriate. Medication administration, however, is not safe and medication services do not meet standards of practice. We found that morning medication administration starts at three in the morning, which we find unwarranted. There are numerous transcription errors on medication records that can result in errors in providing medication. Pre-pouring of medication, including crushed and floated medication, is inconsistent with good nursing practice. There were numerous other problems with administration of medication that make this practice unsafe. The use of a list to prepare controlled substances and the placement of doses for multiple patients into a collective container is dangerous and should be stopped immediately. The MAR is not available during medication administration and therefore medication is not documented as given when the medication is actually administered. Instead, nurses document medication administration as given when they pre-pour the medication. We noted lapses of medication continuity in several patients and noted that chronic disease patients are not monitored to ensure continuity of prescribed medication.

There is a dedicated full-time nurse assigned to infection control, and important improvements have been made to the program. MCC tracks infectious disease and has the most advanced tracking of persons with infectious disease of all the facilities we have visited. This nurse could provide a better service if she worked in coordination with an infectious disease doctor so that her work could be guided by current infection control practices. Analysis of surveillance data needs attention, and repair and maintenance of clinical areas needs to improve.

Dental staffing is grossly inadequate; consequently, wait times for fillings and dentures is greater than 15 months. Patients who were prescribed antibiotics for dental infections do not have the teeth extracted timely. Two dentist positions should be filled immediately, and an additional 0.5 FTE dental hygienist position should be established. Routine dental treatment is inadequate since it is not informed by a comprehensive oral examination (i.e., intraoral x-rays, a periodontal assessment using probing, and a sequenced treatment plan). The failures of the dental program documented in this report place patients at risk of preventable pain and tooth loss by fostering widescale underdiagnosis and under-treatment of dental disease. The program has deteriorated markedly since the First Court Expert Report, and the treatment provided to IDOC inmates remains substantially below accepted professional standards, and is not minimally adequate.

The quality improvement program coordinator has no training in quality improvement and no knowledge of current quality improvement methodology. Half of the Governing Body of the quality improvement program consists of custody trained staff. This body needs to be predominantly medically trained. Staff performing studies did not appear to know the difference between outcome and process studies. CQI activities did not address major problems of the facility. Mortality review is not performed and there is currently no critical analysis of deaths,

even though we found that four of seven death records reviewed had preventable or possibly preventable mortality.

# Findings

## Leadership, Staffing, and Custody Functions

**Methodology:** We reviewed the Schedule E. We interviewed leadership staff and custody leadership.

### First Court Expert Findings
There were no primary care physicians on staff. The Medical Director was a surgeon and the two staff physicians included another surgeon and an ophthalmologist. The Health Care Unit Administrator (HCUA) also served as the Director of Nursing. One of the supervising nurse positions was vacant. This left a lack of supervisory nurse staff. The vacancy rate was approximately 9%.

### Current Findings
The medical leadership team is still incomplete. Currently, the Medical Director position is filled with a board-certified internist and the HCUA position has been filled by the same person since 2014. The Director of Nursing (DON) position, however, is vacant. There is no medical records director; a medical records technologist acts as the medical records director. The three supervisory nurse positions are all filled but two of these positions have been recently filled. The Dental Director position is vacant.

The HCUA position is filled by a nurse who is competent and well qualified for her position. Her effectiveness is diminished by not having a DON, an effective Medical Director, or a reliable quality improvement resource person knowledgeable in continuous quality improvement (CQI) methodology. There was no evidence of support by the vendor in improving programmatic deficiencies.

The Medical Director is not providing administrative clinical leadership. This position is filled by an internist who has been Medical Director since June of 2017. He sees patients on the infirmary and in the clinic, performs peer reviews for the nurse practitioners, addresses grievances, and attends the collegial review conference calls. There is no evidence of any participation in other administrative medical functions, particularly related to quality improvement or solving medical clinical problems. He was unaware of the plan for quality improvement and told us that the facility had no ongoing quality problems. He seemed unaware of any programmatic issues of the facility and saw his role with respect to quality improvement as providing good care. As an example, when asked if getting consultation reports was a problem he answered yes. His solution to this was to tell the scheduler about the lack of reports. He presumed that the Regional

Manager and Regional Medical Director knew of the problem but was unaware and not involved in any effort to correct this deficiency.

The IDOC Regional Nurse Coordinator was present for our visit. She does spend time at the facility and was aware of problems that the facility faced. However, she also serves as the full-time HCUA at Vandalia and does not spend full-time as the Regional Coordinator. She did indicate that she has trained staff at Vandalia to assume most of her functions at Vandalia; however, we were unable to verify the extent of time she spends in each of her positions.

The Wexford Regional Manager was present for our visit. She has been with Wexford for three years. She has no medical training or medical administration training. She previously worked as a warden in the IDOC. When asked what the top five problems were at MCC, she said that there were no problems at the facility and no areas of concern from her perspective as Regional Manager. She does not participate in quality improvement activity and has no role in mortality review. She said that no one has brought to her attention any problems with respect to mortality. She knew of no clinical issues with respect to the previous Medical Director, who was a surgeon. With respect to the current Medical Director, she knew that he needed additional training in order to be able to perform suturing of lacerations. From her perspective, operations worked well and were without problems. In our opinion, custody-trained personnel should not be hired to manage the medical program, as they have no experience or training in the provision of medical care.

The Wexford Regional Medical Director was not present for our visit. According to the HCUA, he rarely is present at the facility. He comes for annual Continuous Quality Improvement (CQI) meetings and rarely comes when there is a coverage issue. There was no evidence of his participation in clinical oversight at the facility based on documents we reviewed. He is available to the Medical Director by phone.

There are 91.1 staff positions at MCC. Sixty-six are state staff and 25.1 are Wexford staff. A table of staffing is present as an appendix to this report. There are 29 vacant positions and one long-term leave of absence, yielding approximately a 33% effective vacancy rate. This is a deterioration and a significantly higher vacancy rate than the 9% rate cited in the First Court Expert's report. This vacancy rate is extremely high and makes it impossible to effectively manage the program. State positions have a 33% (22 of 66) vacancy rate, most of which are nursing positions. Wexford has a 28% (7 of 25.1) vacancy rate. Both of these vacancy rates are extremely high. The vacancies for Wexford included the Dental Director, a dentist, and two physician positions, which are critical clinical positions. We were told that there have been applicants for many of the state vacant positions but that the state hiring process is so cumbersome that prospective employees take other positions before the state hiring process is completed. We were told that for a recent hire it took 10 months from the time of application to the time the employee started work.

Wexford has been unable to provide adequate physician coverage for this facility. The First Court Expert reported that all three positions were filled by non-primary care trained physicians and the Medical Director was a surgeon. This was deemed inadequate, which we agree with. The

current Medical Director is board certified in internal medicine, but the other two physician positions are vacant. We received a contract monitoring report covering seven months from June 2017 to December of 2017. This report documents that the physician position has been vacant since September of 2014. We were told that one of the two vacant physician positions was downgraded to a nurse practitioner position because it also could not be filled; this change is not evident in the Schedule E provided to us. That nurse practitioner position is currently vacant as well. The contract monitoring report for MCC shows that the Medical Director hours have mostly been filled. Only approximately 50% of the staff physician hours have been filled and only approximately 50% of nurse practitioner hours have been filled. Downgrading the physician position to the nurse practitioner position has apparently not resulted in additional provider staffing as expected. The current vacant physician position is partly covered by a coverage physician who received one year of a rotating internship and one year of a pathology residency in 1976. This facility still lacks adequate physician coverage and one of the coverage physicians has no primary care training. In terms of hours filled, physician coverage is worse than in 2014 but is slightly better with respect to coverage with primary care trained physicians. The lack of primary care physicians is evident in problems found in record reviews and mortality reviews, and this results, in our opinion, in preventable morbidity and mortality.

Nurse supervisory budgeted staffing is deficient. There are three nurse supervisory staff but there is no weekend or evening coverage. On-call nurses act as proxy evening and weekend supervisory staff. Nurse staffing is also deficient. Though 21 (39%) of 54 nurse positions are vacant, we believe that there remains a deficiency of budgeted nurse staff. The HCUA was unaware of any staffing plan developed for this facility. In addition to nursing positions, clerical positions also appear to be deficient. The number of medical appointments is large at this facility due to its size, and the one scheduling clerk is insufficient to adequately manage the paperwork and scheduling duties. As with other facilities, a staffing plan based on the expectations of the administrative directives with relief factor adjustments needs to be done to accurately determine staffing levels.

We did not review officer staffing. As with other facilities, we believe an officer staffing assessment needs to be done to ensure that all appointments timely occur, and officers assist nurses in a standardized manner when nurses administer medications.

## Clinic Space

**Methodology:** Accompanied by a correctional officer, a nurse manager, and occasionally the HCUA, the experts inspected the nurse and provider sick call rooms on the housing units, the three-story health care unit which housed medical exams rooms, telehealth room, treatment room, physical therapy, nurse medication preparation room, phlebotomy room, dental clinic, sterilization room, medical records department, health care administrative offices, and the infirmary, optometry room, and radiology suite.

### First Court Expert Findings
The First Court Expert found that the then 30-year-old health care unit was well maintained but aging, the nurse and physician sick rooms in the cell houses lacked privacy and were not

adequately equipped, and the Reception and Classification Unit was small but appropriately equipped. He noted that all of the clinical areas in the cell houses should be renovated to provide clean, private clinical settings.

**Current Findings**

- The location of the nurse and provider sick calls in the housing units maximizes the patient-inmates' access to sick call and chronic care services.
- The provider and nurse sick call rooms in the cell houses are generally small; some were not well organized and not in good physical condition.
- The only two exam tables (one is actually a gurney) in one cell house (North) were cluttered with supplies and medical charts, and were not usable for patient examination. Exams, if needed, were performed while the patient was in a chair.
- All of the clinical rooms, including the nurse and provider exam rooms, in the cell houses were wired for computers, but none had computers.
- Some exam rooms in the cell houses had been recently painted but others had cracked paint and walls, frayed wall paper, an electrical outlet without a cover plate, and a missing ceiling vent cover.
- Torn upholstery was noted on three exam tables on the campus.
- Missing or non-functional oto-ophthalmoscopes were noted in four exam rooms on the campus.
- Only three of the 26 beds in the infirmary had adjustable head and leg sections. One was an aged metal bed and the other two were hospital beds.
- There are an inadequate number of adjustable hospital beds to meet the needs of the complicated patient-inmates admitted to the infirmary.
- There is not an exam room in the infirmary.
- The low level of the beds makes it difficult and unsafe for the clinical team to properly examine and transfer patients.
- There were no nurse call devices in the infirmary patients' rooms. The HCUA stated that consideration is being given to installing wall-mounted bedside audible alarms that are currently in use at LCC.
- Not all medical equipment had documentation of annual electrical safety inspections.
- Out-of-date medical references were found in a number of clinical areas.
- The group shower in South Lower used by older men, some with physical impairments, was in poor repair that created safety and sanitation concerns.
- The infirmary shower was poorly ventilated, had a clogged ceiling vent, a non-functional shower head, a rusted grab bar near the tub, and no safety grab bars near the functioning shower.
- The anterooms in both infirmary isolation rooms were dirty and cluttered.
- The negative pressure units in the infirmary isolation rooms were functional and had regular documented inspections.
- The layout of the radiology room in the Reception & Classification building predisposes the staff and patients to the potential risk of radiation exposure.

- There are no automated external defibrillators (AEDs) in the Reception & Classification building or in every cell house.

At the time of the site visit, MCC housed 2,580 maximum security male inmates on the main campus and an additional 440 men at its Medium Security Unit located a few miles from the main facility. MCC serves as the Reception and Classification Center for a number of detention centers and jails in southern Illinois, receiving 90-150 new admissions per month. It also accepts transfers from all of the IDOC facilities and directly from the North Reception Center (NRC) near Chicago.

The Reception and Classification Center is located in a separate building with an adjacent housing wing that temporarily houses 30-50 new admissions until their intake screenings have been completed. The clinical screening is provided in four rooms (medical, TASC, mental health, and dental) along a single corridor. The medical exam room has an exam table with torn upholstery, paper barrier for the exam table, a desk, two chairs, a scale, sink with eye washing attachment, and paper towels. The wall mounted oto-ophthalmoscope was not functional. Unprotected paper directives were taped on the wall; this is a fire safety hazard. Vital signs and clinical histories and exams are performed in this room. Dental screening is provided one day per month. Panorex x-rays are taken in an unshielded, unleaded room. Prior to taking an x-ray, the radiology technician has to stop foot traffic in the corridor and pull the trigger cord into the corridor to minimize the risk of radiation exposure. The radiology technician does not wear a radiation exposure dosimeter badge. An automated external defibrillator (AED) is not kept in the R&C building.

Men are housed in two long, multi-story housing structures that have been subdivided into seven cell houses. One structure houses North 2, North Lower, North Upper, South Lower, and South Upper cell houses; the other has the East and West cell houses. Each of cell houses has two galleys on each side, each galley had two tiers that are not connected. The cell houses hold from 250-400 patient-inmates. Each cell has a toilet, a sink, and a bunk bed with two men; some inmates are housed alone. The doors are barred. Large open showers are located on each floor. There are steep stairs to each of the upper levels, but there is also an elevator for those who are unable to navigate the stairs. Men are allowed access to the shower three times per week. The group shower in South Lower that is used by an older population, including some individuals with physical disabilities, was inspected. The shower room had five shower chairs, safety grab bars, and ramps to access the showering area. The area was poorly ventilated, the ceilings were peeling, the concrete floor had large cracks, and metal doors, fans, and vent covers were completely rusted. The cracked floors pose a safety risk to this aged patient-inmate population and to staff. The rusted metal fixtures and the peeling ceiling are not able to be fully sanitized and create a risk for mold and the growth of bacteria and fungi. The correctional staff stated that the state funding has been inadequate to perform routine maintenance and repair of this shower and other service areas on the campus.

Each of cell houses has a clinical space where nurse and provider sick call and chronic care clinics are held; these clinic spaces vary from cell house to cell house in size, privacy, equipment, and upkeep.

North 2 medical area is located on an upper floor and serves the cell house's segregation unit, a general population unit, and an older patient, some with disabilities, unit. The area has a 10-person waiting room. The space is relatively tight but has two medical exam spaces, a tele-psych room, a single chair dental suite, and three mental health interview rooms. This is the most expansive clinical space in the cell houses. A provider uses one of the medical rooms one to two days per week. This room has a gurney covered with medical charts that serves as the exam table, a desk, two chairs, no computer, a sink with soap and paper towels, and a blood pressure unit. This exam room did not have an oto-ophthalmoscope; it was reported that it was broken. There was 13-year-old Physician Desk Reference (PDR) in the room. When questioned about the availability of electronic medical references, the physician stated that he can access online clinical references from the computer in his office in the health care unit, but he was unable to list even one comprehensive online resource that he uses. The gurney that reportedly serves as the exam table was so completely covered with medical charts that it was unlikely that it would or could be used during this session. Nurse sick call is performed in an adjacent exam room with an exam table which has tears in the upholstery and is covered with medical supplies; this exam table could not be readily, if at all, used for patient examination. The room had paper barriers, scale, BP unit, peak expiratory flow rate (PERF) meter, pulse oximeter, sink, desk, two chairs, phone, sharps box, and a stair chair. There was a functioning otoscope. An unsealed emergency bag with an ambu bag, EpiPen, glucose gel, expired glucagon, Accu-Chek machine (no safety inspection label) was inspected. There was no AED in the bag: it was reported to be broken. The nurse reported that the bag is checked every shift, but a log could not be identified. There were 18 and 19-year-old PDR's on the nurse's desk; she stated she does not have access to online medical references. The nurse holds daily sick call and sees most patients within one to three days after a request is submitted.

The medical area in North 1 Upper (population 350-370) had a small waiting room and two small, clean, recently painted, similarly equipped exam rooms. Each had exam tables with intact upholstery, paper barriers, two fixed chairs, and no computer. There was not a sink in the rooms. In the atrium just outside the exam rooms was a scale, and a sink with soap and paper towels, and a locked medical cabinet with a functional oto-ophthalmoscope, PEFR meter, stethoscope, digital thermometer, and medical supplies.

North 1 Lower (population 247) sends its general population patients to North 1 Upper for sick call and chronic care clinics and its second floor medical area serves the protective custody patients (62 individuals) housed in this cell house. This clinic has only a single exam room with an exam table with intact upholstery, paper barrier on the table, desk, two chairs, phone, hand sanitizer, paper towels, a functional oto-ophthalmoscope, scale, BP unit, a stethoscope, and no computer. There was no PEFR meter or mouthpieces or a pulse oximeter or Accu-Chek unit in this clinical area. The paint was cracked on the wall and an electrical plate was missing just above the exam table.

South Lower (population 316) has two clinics. A clinic on the first floor serves an older population, some with physical disabilities, housed on the adjoined lower levels of this cell house. The clinic has a single exam room with an exam table with intact upholstery, a sink with soap, scale, BP

unit, stethoscope, pulse oximeter, gloves, desk, two chairs, phone, and no computer. Wallpaper in the clinic was frayed, preventing the walls being properly cleaned. South Lower also has a clinic on the second floor that serves a general population and a worker/porter housing unit. This clinic has a single exam room with an exam table with intact upholstery, paper barrier on the table, scale, eye chart, functional otoscope, BP unit, pulse oximeter, two PEFR meters, desk, two chairs, phone, and no computer.

West Cell House (406 population) has a second floor clinic with one small exam room with an exam table with intact upholstery, paper barrier on the table, functional otoscope, PEFR meter with mouthpieces, pulse oximeter, desk, two chairs, and hand sanitizer. The space was cluttered, unprotected paper directives were taped on the walls, paint was cracked, the ceiling vent did not have a cover, and cardboard boxes filled with toothpaste nearly touching the ceiling were piled on top of a file cabinet. The accompanying West Cell House correctional officer stated that he would have the boxes and the paper directives removed immediately. He stated that the state funding has slowed down the completion of non-urgent repairs throughout the campus. The boxes and paper taped on the walls posed a fire safety hazard. The cracked paint made it impossible to properly sanitize this clinic space and creates an unprofessional work environment for the clinical staff.

East Cell House (310 population) has a second floor clinic with a tele-psych room with a counter and one chair, and an additional exam room that is shared by medical and mental health staff. The exam room has an exam table, a desk, and two chairs. The exam room is cramped and cluttered due to the presence of three large correctional metal file cabinets, water damaged cardboard boxes stacked on top of these cabinets, and an ancient refrigerator used by correctional staff with a totally rusted front. These items should not be located in a clinical exam area. The East Cell House Major who joined our inspection stated that he will have the file cabinets, cardboard boxes, and refrigerator removed from the exam room.

Patient-inmates interviewed in the cell houses were all knowledgeable about the sick call request procedure. Most stated that they are seen by a nurse within a few days after they place a request in the locked box. If they were referred by the nurse to see a provider, it will take three to four days up to a few weeks before they were seen in a provider sick call.

The health care unit is a three-story building located in the central section of the MCC campus. The first floor has four exam rooms, one of which is used for HIV, hepatitis C, and renal telehealth consultation. Only the telehealth room is now actively used for the delivery of medical care. The other three exam rooms are primarily used as mental health interview rooms and by at least one LPN as a storage and staging area. Since the provider sick call and chronic care clinics were moved into the cell houses, three of these exam rooms are only occasionally, if ever, used by nurses for the delivery of sick call and after-hours care. All the exam rooms have desks, chairs, sinks, soap, paper towels, exam tables, and oto-ophthalmoscopes. A scale was identified in one exam room. The exam tables in two of the rooms had torn upholstery. Only two of the four oto-ophthalmoscopes were functional, and one lacked a currently safety inspection label. Some of

chairs had torn and frayed upholstery. Only the telehealth room appeared to be organized and optimally clean. Nineteen and 13-year-old PDR's were noted in one of the exam rooms.

The first floor also has a sterilization room that also stores trauma bags, crutches, transport cots, a backboard, two autoclaves with current safety inspection labels, a dental suite that will be reviewed in the dental care section, medication storage and preparation room, medication records, a lab room with a current CLIA certificate, a phlebotomy chair, four centrifuges with current safety inspection labels, and a treatment room. The treatment room serves as the urgent care center for the MCC campus. It has an adjustable gurney, three oxygen tanks, a Gomco suction machine, pulse oximeters, digital thermometer, Accu-Chek machines, ambu bag, AED, an ECG machine, a functional oto-ophthalmoscope, and a variety of medical supplies. An emergency bag with emergency supplies, medications, and equipment, and an AED with pads were kept in the treatment room. None of the medications inspected had expired. Two new stair chairs and a backboard are stored in this area, cluttering an already tight space. An oxygen storage room within the treatment care area was packed with large and small tanks; only the small tanks were held in safety racks. The unracked large tanks pose a safety risk to patient-inmates and staff. It was reported that the Accu-Cheks are calibrated daily, but this activity was not logged. The ECG machine did not have an electrical inspection tag. Two additional gurneys and one additional stair chair were kept in an alcove in an adjacent corridor. There was no crash cart in the treatment room. MCC does not have a crash cart; the institution performs basic CPR, applies the AED, and calls 911 for cardiac arrests. This is an acceptable option for responding to codes/cardiac arrests. The second floor of the health care unit houses physical therapy, optometry, radiology suite, and clinical administrative and provider offices. The physical therapy room is small and has two matted tables, a cold/hot pack unit, steps, exercise balls, door mounted pulleys, a desk, chairs, and a storage cabinet. The radiology suite performs non-digital plain film x-ray examinations and panorex studies (see radiology section for further information). The clinical administrative and provider offices have computers that have access to the internet.

The third floor of the health care unit houses the 26-bed infirmary. The infirmary offices and patient rooms were generally clean. Room 304 emitted a smell of urine. This room houses the only restraint bed in the infirmary. The porters were directed to buff the floor. Twenty-three of the 26 beds were low fixed-position metal beds. The infirmary beds are low to the floor and cannot be raised. The head of the beds cannot be elevated. There were only three adjustable beds; one was an aged metal bed and the other two were relatively new hospital beds. This is an insufficient number of hospital beds to meet the needs of the complicated patients that are admitted to the infirmary. There is no exam room in the infirmary; patients are examined in their beds. The low to the ground fixed-position metal beds make it difficult and even unsafe for the staff to properly examine and transfer patients into and out of the bed. The bed mattresses were relatively thin and covered with an intact cleanable covers. Because of a lack of appropriate beds, one patient, with fall risk, had his mattress placed on the floor. His mattress had an uncovered, deteriorating foam head rest that was impossible to sanitize. This patient should be assigned to an adjustable hospital bed with safety railings. There were two negative pressure/isolation rooms. The negative pressure units were turned on and demonstrated to be operational using both the pressure gauge and the tissue paper test. The negative pressure units are checked and

logged daily. There were no patients in the negative pressure rooms. Both negative pressure room anterooms were dirty and cluttered with gloves, chucks, and paper forms. Both rooms had full red waste bins. These anterooms had not been used in quite a long time and need to the cleaned and kept ready for use.

The floor of the shower and tub room was clean. One shower head was not functional. There were no safety grab bars in the shower; the grab bar near the tub was totally rusted. The ceiling ventilation covers were rusted and the return vent near the tub was densely clogged with debris. The staff directed the porter to clean the vent. It was reported that the more frail patients in the infirmary have live-in inmate aides who assist them with bathing and other activities of daily living.

The clean and soiled utility rooms and an equipment room were organized and clean. Only one of the two IVAC units in the equipment room had a current safety inspection label; it was reported that the other one was new. A scale that could accommodate a wheel chair was demonstrated to be functional. The laundry room has a non-boosted washer and a dryer. Bleach is added to all laundry loads; significantly soiled sheets are sent to the main laundry, which washes clothes at a higher temperature. Cleaned sheets in the laundry room were noted to be in good condition.

There a linear nursing station that connects into the two long corridors of the rectangular shaped infirmary. The doors at each end of the nursing station are kept closed. The patient rooms have solid metal doors with a small viewing window. There are no rooms that are in the direct line of sight to the nursing station and only a few are possibly within sound of the nursing station. Correctional officers are housed in the corner of one of the corridors. The officers also do not have direct line of sight into patient rooms from their desk. The nurse station has a long counter with two work areas, a medication cart, an operational AED with non-expired pads, oxygen tanks, ambu bag, functional Gomco suction machine, and a number of out of date nursing textbooks. An office at the entrance to the infirmary was soon be assigned to a nurse manager who provides oversight of the infirmary. This room has a computer with access to the internet.

In summary, the relocation of all nurse sick calls, provider sick calls, and chronic care clinics to the cell house allows for improved access to primary care services. The physical condition of the some of these exam rooms is deficient and needing of repair of cracked paint and wallpaper, and replacement of missing and rusty vents, and missing electrical plates. The correctional staff repeatedly commented that repairs of the clinical areas had been requested but were not readily done because of inadequate State of Illinois funding. The types of medical equipment and supplies varied between cell house clinics; all of the cell house clinical areas need to be equally equipped and stocked. The staff do not have ready access to current clinical references while they are providing care in the cell houses or in the health care unit; decades old textbooks and PDRs were noted in many clinical areas. This could be readily corrected by installing computers in the already wired exam rooms in the cell houses and health care unit. Two showers were inspected (South Lower and infirmary); both needed repairs and improved ventilation, and both create safety and sanitation risks for patient-inmates and staff.

## Sanitation

**Methodology:** The sick call and chronic care rooms on the housing units, the infirmary rooms, the health care unit, and the showers were inspected. Nurses, correctional officers, infirmary patient-inmates, and inmate porters were interviewed. Monthly Safety and Sanitation reports from January through April 2018 were reviewed.

**First Court Expert Findings**
The First Court Expert reported that the facility was generally well maintained.

**Current Findings**
We did not find that the facility was well maintained. We noted additional findings.

- The infirmary is generally clean with the exception of the anterooms in both isolation rooms, which were dirty and cluttered.
- Paper barriers were consistently used on most but not all examination tables throughout the facility.
- The upholstery on a number of exam tables in clinical areas had tears in their protective outer surfaces and could not be adequately sanitized.
- An uncovered foam head rest in one infirmary room could not be adequately sanitized.
- Physical plant deficiencies including peeling paint, cracked paint and walls, rusty and missing vents, frayed wall paper, missing electrical outlet cover plate, torn upholstery, rusted cabinets, and missing ceiling vent cover were noted in the clinical areas in the cell houses and the HCU. These deficiencies create a non-professional work environment for the clinical staff and make it impossible to adequately sanitize the clinical areas.
- Monthly Safety and Sanitation rounds and reports were being completed. Many of the same findings were noted and went unaddressed from January through April 2018.
- There are no environmental rounds that focus on the inspection and documentation of non-functional clinical equipment, the presence of current electrical safety inspections, and the completion of logs of inspections of clinical concerns, including emergency bags and equipment, negative pressure units, organization of clinical areas, etc.

The nurse and provider sick call and chronic care areas in the cell houses were generally clean, but the physical plant had a number of deficiencies (also noted in the Clinical Space section) that interfered with the ability to fully sanitize these areas. The reception and Classification clinical area had torn upholstery on an exam table. North 2 clinical area needed to be repainted. North 1 Lower had cracked paint and walls, and a missing electrical outlet cover plate just above the exam table. South Lower had frayed wall paper. West had cracked paint, no cover on the ceiling vent, and boxes stacked on top of file cabinets. East had the clinical space cramped with correctional file cabinets, deteriorating boxes with correctional logs and papers, and a totally rusted correctional staff refrigerator. The HCU was generally clean, with some missing ceiling tiles and uncleaned infirmary isolation anterooms. The showers in South Lower had peeling paint, cracked floors, rusted vents and metal doors, and poor ventilation. The infirmary had no safety hand grab bars, clogged ceiling vent, and poor ventilation. These physical plant deficiencies pose safety and infection control risks.

Inmate porters sweep, mop, and buff the floors of the infirmary rooms two to three times a week or more frequently as needed. They report that they spray with cleaning agent and bleach mixture. They clean the toilets, sinks, and showers on a regular basis.

In summary, the First Court Expert made a number of specific recommendations concerning sanitation and infection control. We have added recommendations that are found at the end of this report.

## Radiology Service

Methodology:  We reviewed the radiology unit.

**First Court Expert Findings**
The First Court Expert's report did not include any findings about the radiology equipment or services.

**Current Findings**
- The Illinois Emergency Management Agency (IEMA) radiation safety inspections and reports for the radiology units at MCC are current. The active x-ray equipment at MCC was found to be compliance with the Radiation Protection Act of 1990.
- The access to plain film x-rays at MCC is acceptable.
- The turnaround time for radiologist readings and return of the reports is acceptable.
- The lack of a shielded post to take panorex films in the Reception and Classification area has the potential for radiation exposure to the radiology technician and other staff.
- The system decision not to have the x-ray technician wear radiation exposure dosimeters may not be in accord with State of Illinois regulations and is definitely not in accord with community practice.

The radiology equipment had current IEMA inspection and certification. Plain film non-digital x-ray services and panorex studies are provided Monday through Friday during the daytime hours by a single full-time radiology technician who staffs and manages the unit. Patients requiring advanced or emergency studies are referred to the nearby Chester Memorial Hospital or to other health care systems, including Southern Illinois Health Care (SIHC).

It was reported that there is a three to five day waiting list for non-urgent onsite x-rays. The five x-rays ordered on 5/17/18 were being taken on 5/22/18, three working days after being ordered. Most x-rays are reported to be taken within one to two days after receiving the order. Weekend and holiday requests are completed on the next working day. The requests and the radiology log for eight patients who had films taken on 5/21/18 were reviewed. The waiting time for this small sample, between x-ray ordering and being taken, was 7.6 days, with a range of four to 10 days. Films are sent to a contracted radiologist in Bloomington, Illinois for reading. Reports are initially faxed back to MCC on the same or next day, with the hard copies sent within two to three days. Audits of films taken verified that the reading turnaround time was one to two days.

Onsite ultrasound exams are provided once a month by a contracted vendor. Ultrasound examinations must be reviewed and approved by the Wexford collegial review process. On the day of the inspection there were four patients on the ultrasound schedule. Some were awaiting Wexford approval.

The chest x-ray unit and the plain film table are in a second floor HCU room that has a shielded post for the technician to stand behind while the film is being taken. The radiology technician has a dark room and a work space immediately adjacent to the plain film suite. An additional panorex is located in an exam room in the Reception and Classification building. This room does not have a shielded post that can be used when panorex films are taken; the technician has to stretch the trigger cord as far as she can out the exam room door and into the main clinical hallway to minimize her risk of radiation exposure.

The x-ray technician was noted not to be wearing a radiation exposure dosimeter badge. She stated she had been told that the State of Illinois does not require the use of dosimeters as long as she was more than five to seven feet away from the unit. This radiology technician does not work at an outside medical center.

In summary, the radiology services at MCC have reasonable access to x-ray services and reasonable turnaround time of radiologist readings and reports. The location of the second panorex in a clinical exam room in the Reception and Classification building, which does not have a shielded post to take panorex films, raises concerns about the risk of radiation exposure. The decision of the system to not provide radiation exposure dosimeter badges is not in accord with community standards and needs to be further reviewed by the State of Illinois IEMA and possibly OSHA.

The First Court Expert's report did not have any recommendations about the radiology services. We have recommendations that are noted at the end of the report.

## Medical Records

**Methodology:** We inspected the medical records room, interviewed medical records staff, and reviewed multiple medical records.

### First Court Expert Findings
Charts were thinned so that the size of the medical record was manageable. Problem lists were cluttered with redundant information and with items that were not medical problems. The facility rarely received consultant reports or hospital reports. Sick call slips were not maintained in the medical record.

### Current Findings
All of the findings of the First Court Expert are still present. Paper medical records are used and were thinned to a reasonable size. The problem lists were still incomplete and filled with

unnecessary, redundant information. Hospital and consultant reports are still not consistently obtained and sick call requests are still not filed in the medical record.

MCC does not have a medical records director position in their budget, but a health information technologist is a licensed medical records professional and serves in that capacity. The medical records room is insufficiently sized to accommodate all volumes of records and only the most current volume of a record is kept in the medical records room. Additional warehouse storage spaces are used for additional volumes of the current records and for death records. During record reviews, when we wanted a particular consultant report or other document, we had to ask for the additional volume, which took some time to obtain. The delay would be significant for clinical interactions with active patients. The inability to easily obtain all volumes of a record during every clinical encounter was a problem and is a reason why an electronic medical record should be installed statewide.

We confirmed the First Court Expert's finding that medical record volumes are thinned. Whenever a volume reaches two inches in depth, medical record staff thin the volume, and for all charts we reviewed, volumes were thinned to two inches or less. Charts we used for medical record reviews came apart much less frequently than occurred at other sites, but this still occurred.

There was minimal filing backlog. For most record documents there was only approximately a half inch of back filing. For medication administration records (MAR), there was two to three inches. This is not a significant volume of backlog filing.

With respect to access to the record, medical records staff pulls medical records for provider scheduled appointments. Nursing sick call evaluations occur without the availability of a medical record, which is inappropriate and subjects the patient to risk. When nurses perform health request evaluations in remote sites, they need to know the conditions of the patient, recent problems, and medications. For health request evaluations, nurses write notes on a single progress note and bring these at a later time to the medical records office. Some nurses will file the progress note in the patient's chart and some nurses will give the documents to records staff to file. Any staff is authorized to pull or re-file a medical record. This violates medical record confidentiality and promotes loss of medical information. All clinical encounters should occur with the availability of the medical record.

The First Court Expert found that the facility rarely received consultation or hospital reports. Obtaining these is the responsibility of the scheduling clerk, who indicated that approximately 50% of reports were obtained. In our record reviews, consultation and hospital reports were not consistently present and providers did not consistently document the status of the patient after consultation. Based on record reviews, the lack of consultation and hospital reports appeared to significantly and adversely affect clinical care.

Sick call requests are not filed in the medical record. In our opinion, the patient requests for care have clinical information and are therefore a medical record document and need to be filed in the medical record.

The lack of timely access to medical record documents for clinical encounters and lack of timely access to a complete medical record support the need for an electronic medical record. Lack of timely and accurate documentation in the MAR, which will be described in the medication section of this report, also supports use of an electronic medical record with an eMAR function.

## Medical Reception and Intrasystem Transfer

**Methodology:** To assess medical evaluation of newly arriving inmates we toured the medical reception area, interviewed health care staff, reviewed IDOC health record forms, and reviewed 15 health records. Records were selected from a log documenting referral from the reception nurse to the provider due to a history of chronic disease, since October 2017.

### First Court Expert Findings
The previous Court Appointed Expert found problems with the quality of the intake process, particularly the recognition and work up of abnormal findings.[5]

### Current Findings
Our review showed that the quality of the intake process is still hampered by omissions in screening and failure to follow up on the information obtained. We also found that intake physical examinations were not completed timely. Finally, IDOC has adopted a policy of opt-out HIV testing, but the procedure still requires written consent for testing.

MCC receives an average of 86 inmates a month.[6] Intakes arrive generally Monday through Friday from county jails or directly from the community as parole violators. According to staff interviewed, usually they have several hours' notice of inmates who will arrive as new admissions. Parole violators may arrive without notice.

Intake screening takes place in three rooms on a corridor adjacent to the booking and holding cells. There is a dental examination room, a medical examination room, and a room to complete the mental health evaluation. Other offices in the corridor include classification, and alcohol and drug screening. The medical examination room is used by nurses to conduct receiving screening and collect lab samples. It is also used by a provider to complete physical examinations. This room was clean, well-lighted, properly equipped, and maintained.

Intake screening includes a medical history, tuberculosis symptom screen, height and weight, vital signs, visual acuity, and planting a tuberculin skin test (TST). According to a recent nursing schedule provided to the Court Appointed Expert, about half the time this responsibility is

---

[5] Lippert Report Menard pp. 8-9.
[6] Data provided in advance of the site visit to Menard for the time period April 2017 through April 2018.

assigned to an LPN and half the time it is assigned to an RN.[7] Nurses consistently contacted a provider to obtain telephone or verbal orders in order to continue medications inmates reported taking or those which were listed on the transfer summary from jail. Medication was provided as ordered the next time medications were due.[8] Patients were not always followed up to have the tuberculin skin test read, and in one case, the skin test was not administered.[9] These omissions were identified a few days later by the nurse completing the review of record prior to the physical exam; the test was administered again, and results obtained timely.

Lab tests performed as part of intake screening at MCC routinely include serum chemistry, syphilis, and opt-out HIV testing. Although HIV is supposed to be opt-out, the administrative directive (AD) requires that consent be obtained before drawing blood for HIV.[10,11] Opt-out testing is recommended by the Centers for Disease Control because it supports early identification and treatment. The AD should be revised to eliminate explicit written consent to be consistent with an opt-out policy.[12] Data reported to the CQI committee shows that on average only half the incoming inmates are tested for HIV, which is consistent with an opt-in rather than opt-out testing policy.

A medical history and physical examination are to be completed within seven working days of intake.[13] The medical history and physical examination by a physician, nurse practitioner, or physician's assistant took place within the first seven working days after admission in only 60% of the charts reviewed. Untimely physical exams were between nine to as many as 18 days after admission. As noted in the previous Court Expert report, the recognition and work up of abnormal findings was sometimes problematic. Providers did not consistently elaborate on positive findings noted by the nurse, and the history and physical examination were cursory and lacking in quality.[14] Enrollment of patients in the chronic care program has improved since the previous Court Expert's review. Inmates with chronic diseases were usually seen for their first chronic care appointment at the time of the intake physical exam. This initial visit includes a review of relevant lab results, amplification of the disease history, assessment of disease control, and initiation of a treatment plan.

There are no mechanisms in place to monitor timeliness of the intake process or to evaluate the quality of intake screening, the health history, or physical examination. There were no CQI studies provided that indicate intake screening is monitored for quality or timeliness. This is a high

---

[7] Nursing schedule 4-16-2018 through 4-28-2018.

[8] Medical Reception Patients #5, 6, 10, 11, 13.

[9] Medical Reception Patients #3 & 4.

[10] Opt-out testing means that testing will be performed unless the patient refuses the test. Opt-in testing means that the patient is offered testing and is performed only upon patient consent.

[11] Administrative Directive 04.03.11 Section5 II. F. 5. d.

[12] Centers for Disease Control and Prevention. HIV Testing Implementation Guidance for Correctional Settings. 2009: p. 8.



cdc-hiv-correctional
-settings-guidelines.

[13] Administrative Directive 04.03.101, Section II. G. 2. a.

[14] Medical Reception Patients #12, 13 & 14.

volume, high-risk area of health care delivery in the correctional setting and should be regularly reviewed as part of the CQI program.[15]

We found errors in tuberculosis screening, and the intake physical examinations are not timely or sufficiently thorough to ensure continuity of care. The procedural direction to obtain consent or HIV testing in IDOC Administrative Directive 04.03.11 conflicts with the policy of opt-out HIV testing and needs to be corrected.

## Nursing Sick Call

**Methodology:** Nursing sick call was evaluated by:
- Reviewing Menard Institutional Directive 04.03.103 Offender Health Care Services, Health Services Policy and Procedure-Health Care Screening (Sick Call), and IDOC Treatment Protocols.
- Interviewing nursing and supervisory staff.
- Observing the boxes in each building where inmates put their health care requests.
- Inspecting the rooms used for sick call in each of the buildings, except MSU.
- Reviewing tracking logs, which were used to select records for chart review.
- Reviewing documentation of 15 sick call encounters. These were selected from Sick Call Logs from February 25, 2018 through May 9, 2018, with complaints of potentially serious conditions (chest pain, acute infection, shortness of breath, seizures etc.) and their charts reviewed.
- Reviewing the triage of 16 sick call requests that were picked up Thursday morning May 24, 2018 from the sick call box in North 1.

**First Court Expert Findings**

The previous Court Expert described the sick call system as one that relies on the inmate to submit a written request. These requests are picked up each morning and triaged by nursing staff. Each inmate was scheduled to be seen either that day if the problem was urgent or within the next 24 to 72 hours if the problem was routine. Inmates were seen by either LPNs or RNs who had been trained initially by a physician. Each month the charting of nursing sick call was reviewed by the facility Medical Director and the results discussed with individual nurses. The chart review results were also reported in the monthly CQI meeting. Most of the rooms used to conduct nursing sick call were inadequate, lacking privacy and appropriate equipment. Notable exceptions were North 2 and the renovations in East Cell House. The medical record was available to nursing staff conducting sick call, but the original requests were discarded after the sick call encounter had taken place. Chart review indicated that there were omissions in data collected during the assessment (incomplete vital signs, failure to indicate duration of the complaint, not documenting the precise location of injury).[16]

**Current Findings**

---

[15] National Commission on Correctional Health Care. 2014. Standards for Health Services in Prisons pp. 13-14.
[16] Lippert Report Menard pp. 10-11.

Our review found that some of the problems with sick call described in the previous Court Expert's report have been resolved. Most notably, the rooms used by nursing staff to conduct sick call are uniformly equipped with accurate weight scales, an otoscope, blood pressure cuff and stethoscope, peak flow monitor, pulse oximeter, and exam table with paper. Most have sinks to wash hands and those that do not had hand sanitizer available (in two rooms the hand sanitizer was empty). Each exam room had a flyer mounted on the wall reminding nurses to change paper between patients. Wall mounted oto-ophthalmoscopes did not work in most rooms but there were hand-held ophthalmoscopes in all the rooms. Many of the rooms have a plexiglass door which ensures auditory privacy during the sick call encounter.

Sick call requests may be written on any piece of paper and put into the designated sick call boxes in each building. Inmates may also give their request directly to nursing staff whenever they are on the gallery. The nurse then triages each request and determines whether the inmate needs to be seen at all, and if so, whether they should be seen that day because it is a problem of urgent nature or should be scheduled and seen the following day. Documentation of timeliness in responding to sick call requests was evident from review of the sick call logs. Of 15 medical sick call requests, all were triaged within 24 hours and all were seen within 48 hours of receipt. Eight urgent requests were seen the same day the request was received.[17] We also interviewed several inmates in the North and South buildings about access to care. They consistently reported that they were seen for sick call within two days after putting in a written request and saw a provider in about a week, if referred by the nurse. The Health Care Unit studied timeliness in responding to sick call requests, which demonstrated compliance with the Administrative Directive in 2016. There have been no more recent studies of timeliness in responding to sick call requests. Timeliness of nursing sick call should be monitored at least annually.[18]

We interviewed an LPN who had picked up 16 sick call requests from inmates in the North 1 building Thursday morning May 24, 2018. Of these, 15 were requests to refill keep-on-person (KOP) medications. There was one request for attention to a problem of blood in the urine with clots. The nurse was not familiar with the inmate and had not reviewed the inmate's medical file. The nurse's triage decision was that the complaint was not urgent, and he would be scheduled to be seen the next day. We disagree with the nurse's triage decision and would have seen the inmate that day.

IDOC Nursing Treatment Protocols guide the nurse's assessment of inmates' sick call complaints. Nurses appropriately assessed and examined the inmate in 12 of 15 sick call encounters reviewed (80%).[19] In one encounter, the nurse did not follow up on an inmate's elevated blood pressure and did not complete an opiate withdrawal screening (COWS).[20] In another encounter, the inmate complained of diverticulitis and gave a recent history of treatment for this disease. The nurse did not use the nursing treatment protocol for abdominal pain, choosing instead to use the

---

[17] Sick Call Patients #1-8.
[18] National Commission on Correctional Health Care. 2014. Standards for Health Services in Prisons. P. 14.
[19] Sick Call Patients #3, 6-11, 13-15.
[20] Sick Call Patient #12.

one for non-specific complaints.[21] In another encounter, there is no nursing assessment of the patient's urgent complaint, but only an outbound note that he was sent to the ED.[22]

LPNs are assigned to perform triage and sick call approximately half of the time.[23] Sick call is conducted in the housing unit and thus each sick call nurse acts independently and autonomously from any other health care staff. This assignment is outside the Illinois scope of practice for LPNs. LPNs are to practice "under the guidance of a registered professional nurse, or an advanced practice registered nurse, or as directed by a physician assistant, physician…to include *conducting a focused nursing assessment and contributing to the ongoing assessment of the patient performed by the registered professional nurse."* [24] <u>The Illinois nurse practice act does not permit LPN's to perform assessments independent of a registered professional nurse or higher level professional, as is currently being done at MCC. Neither does the scope of practice permit LPNs to perform independent assessments according to protocols</u>. We agree with the First Court Expert's finding that LPNs do not have the educational preparation or scope of practice to examine patients, make an assessment, and formulate a treatment plan.[25] *Thus, some patients at MCC do not receive evaluations by health care staff licensed to perform independent assessments. This increases the risk of harm to patients.*

Nursing sick call documentation is monitored by the facility Medical Director monthly. The results of these reviews are documented in the CQI minutes. The April 2018 CQI minutes include a table with results of these chart reviews for 11 months. This internal review appears to monitor important aspects of nursing sick call (complete vital signs taken, documentation of subjective complaint, observation of signs and symptoms, appropriateness and thoroughness of the assessment, appropriateness of referral, etc.). The results suggest that issues are seldom identified, especially the observation of signs and symptoms or appropriateness and thoroughness of the assessment. These findings differ from our chart review and suggest that the internal review is not objective or self-critical. This is an audit function that would be more appropriately done by expert clinical nurses employed by IDOC.

Two nurses, responsible for completing nursing sick call in the housing units, were interviewed. Neither reported having the patient's medical record with them when seeing patients. One said that it would be too cumbersome to carry the records to the nursing sick call room. However, there were several examples among the charts reviewed where the patient's previous medical history was relevant to the current sick call complaint.[26] The IDOC Nursing Treatment Protocols state that "sick call evaluation using these protocols *should be performed with a medical record*."[27] MCC's Health Services Policy and Procedure also states that the patient's medical record will be pulled the day prior and taken to medical area in the unit to document the findings

---

[21] Sick Call Patient #3.
[22] Sick Call Patient #4.
[23] Scheduled nursing assignments 4/16/2018 – 4/28/2018.
[24] Illinois LPN Scope of Practice. Section 55-30.
[25] Lippert Report Menard p. 43.
[26] Sick Call Patients #3, 4, 8, 12, 13.
[27] IDOC Nursing Treatment Protocols p. 6; *emphasis added*.

and treatment provided during the sick call encounter.[28] Practices at MCC do not comply with IDOC guidelines or their own policy and procedure for sick call. We discussed with the HCUA various ways it would be possible for nurses to have the record when seeing the patient.

An improvement since the First Court Appointed Expert's report is that the sick call request written by the inmate is filed chronologically in the Miscellaneous section of the Medical Record. Apparently other HCUAs have complained about this practice but the HCUA at MCC has persisted. The previous Court Expert recommended that the inmate's written request be filed in the health care record and we agree. The practice at MCC should be adopted at all the IDOC facility health care units.

Inmates who were referred from nurse sick call were not seen timely by providers. Referrals to providers were appropriately generated for each of the 15 sick call encounters reviewed, but only three were seen within 48 hours.[29] One patient was referred after being seen for smoke inhalation; he was not seen by a provider for 11 days.[30] Another was seen by the nurse for epigastric pain. The provider was called and ordered medication and follow up in the chronic care clinic. His next chronic care appointment was five months in the future.[31] Another patient was seen by a nurse after having a seizure. The nurse practitioner was contacted and directed that the patient be seen the next day. The expected appointment did not take place and was never re-scheduled.[32] One patient complained of a possible ankle fracture. The nurse contacted a provider by telephone, who ordered x-rays of the ankle, a splint, and a lay-in. The patient had a severe sprain and was not seen by a provider for two weeks.[33] Patients such as these are at risk of deterioration when medical attention is untimely, and the result can cause harm.

In summary, some of the problems with sick call identified in the previous Court Expert's reports have been corrected. Problems with sick call currently include:
- LPNs are assigned responsibility to perform sick call, which is outside the scope of practice in Illinois.
- Nursing assessments and examinations are inadequate.
- Nurses do not use the patient's medical record during the sick call encounter.
- Patients referred to providers from sick call are not seen timely.

## Chronic Disease Management

**Methodology:** The HCUA was interviewed about the chronic care scheduling processes. The current chronic care schedule, the chronic care patient lists, and the chronic illness medication lists were reviewed. The telemedicine nurse manager, the Wexford hepatitis C physician coordinator, and the UIC Telehealth (HIV and hepatitis) lead physician were interviewed. A

---

[28] V3-9 Health Care Screening (Sick Call).
[29] Sick Call Patients #5, 13, 14.
[30] Sick Call Patient #2.
[31] Sick Call Patient #3.
[32] Sick Call Patient #6.
[33] Sick Call Patient #7.

chronic care provider was briefly interviewed. The records of 17 patients with chronic care illnesses were reviewed. The Office of Health Services Chronic Illness Treatment Guidelines dated March 2016 and the IDOC Hepatitis C Guidelines December 2015 and 2017 were reviewed as needed.

**First Court Expert Findings**

The First Court Expert noted that there wasn't a scheduling backlog of chronic care patients. Combination clinics had been started in which all conditions can be addressed at the same visit. One of the two current providers assigned to the chronic care clinics was providing a high quality of care although overall care was not good. The report stated that the providers were not consistently assessing the degree of control accurately. Thirty-four percent of the 66 patients in the hypertension clinic who were not in good control had no change in their plan of care. Only 59% of 70 patients in less than adequate diabetes control had a change in their plan of care. Regardless of the type of insulin patients used as civilians they were all changed to NPH and regular insulin upon arriving at Menard which was described as inappropriate. Three of four patients on anticoagulation had therapeutic anticoagulation levels. Even though 15% of patients in pulmonary clinic had persistent symptoms, all were noted to be in good control which is contradictory as persistent symptoms is inconsistent with good asthma control. Five records of patients in asthma clinic had a degree of control that was overestimated or medications were not adjusted appropriately. Of six patients in seizure clinic who reported seizures since the last clinic only two had a change in therapy. There were delays in care of four of six seizure cases reviewed. Four of eight patients on latent tuberculosis treatment had converted their tuberculosis skin test while at Menard.[34] The HCUA presumed that this was a result of inaccurate tuberculosis skin testing and not conversions. This is inappropriate infection control. It was also noted that MCC was using a database that could be used to generate a variety of reports.

**Current Findings**

We had similar findings to the First Court Expert's findings. However, we identified current and additional findings as follows:

- Patients assigned to chronic care clinics are regularly seen in these clinics.
- MCC continues to utilize combination chronic care clinics, which allows some but not all chronic illnesses to be managed in a single clinic session.
- Problem lists occasionally are incomplete or inaccurate.
- Some providers' chronic care notes were illegible or partially legible; these difficult-to-interpret notes created barriers to the delivery of continuous, comprehensive care.
- Providers at MCC inconsistently document the rationale for clinical decisions and diagnoses in the chronic care progress notes.
- The MCC chronic care providers and nurses do not have access to current, comprehensive electronic medical references, such as UpToDate, in all clinical exam rooms. A few

---

[34] This implies that the patients acquired the disease while at Menard and that there was someone at Menard with active tuberculosis or that the skin tests were inappropriately done. While it may be true that the skin tests were inappropriately done, an tuberculosis outbreak investigation should have been done.

administrative offices distant from the chronic care clinical locations have access to the internet.

- Uncontrolled chronic illnesses with problems that appear to be beyond the expertise of the MCC providers are not referred for specialty consultation.

- There was no documentation that the providers reviewed the MARs at the time of chronic care visits for important data about medication compliance and capillary blood glucoses (CBG).

- A hospitalized patient returned with a prescription for a direct factor Xa inhibitor anti-coagulation medication; the MCC providers immediately stopped this medication and started warfarin. MCC providers were unable to obtain therapeutic anticoagulation in patients we reviewed. This places patients at risk of harm. Newer direct factor Xa inhibitor drugs should be used.

- The practice of treating diabetics on 70/30 insulin (70% long acting and 30% short acting insulin) concomitantly with a sliding scale administration of another short acting insulin puts patients at risk for hypoglycemia.

- The MAR is still completed manually by the nursing staff. Blank months for KOP medication delivery were noted on some patients' MARs. The lack of accuracy of the MARs is a barrier to verifying a patient's compliance with medications and determining the efficacy of the treatment.

- MCC did not screen patients over 50 years of age or individuals with certain high risk clinical conditions for colon cancer as is recommended by all national guidelines. Not one of the 14 MCC patients 50 years of age or older whose records were reviewed had been screened for colon cancer.

- MCC did not calculate 10-year cardiovascular risks for adult patients as directed by the ACC/AHA and IDOC treatment guidelines. Patients with high risk for cardiovascular events were not administered the statin medications and dosages recommended by IDOC Treatment Guidelines and by the American College of Cardiology.

- MCC did not administer age-based and disease-based pneumococcal 13 and 23 and meningococcal adult preventive vaccinations as recommended by the CDC.

- Two (14.3%) of 14 at-risk patients had received pneumococcal 23 vaccination, zero (0%) of the eight at-risk patients had received pneumococcal 13 vaccination, and zero (0%) of the two patients had been administered meningococcal vaccination.

- None (0%) of the five diabetic charts reviewed had documentation that optometry screening for diabetic retinopathy had been performed within the previous year.

- The process to determine eligibility for hepatitis C treatment is excessively lengthy and a barrier to the initiation of treatment. It is not consistent with processes in other correctional facilities and public health systems.

- Only 1 (0.7%) of the 134 patients at MCC with hepatitis C has been treated.

MCC has 1,037 individual patients, or 34% of the prison's population, enrolled in chronic care clinics.[35] Forty-one percent of patients at MCC are seen in chronic illness clinics for a single disease. However, wherever possible, multiple chronic illnesses are combined into a single session at the next available chronic care clinic. The MCC Clinic Count report dated May 21, 2018, indicated that 59% of patients with chronic diseases have at least some of their visits in combination clinics. The chronic conditions of a number of patients continue to be managed in single disease chronic care sessions. As discussed in other reports, we find single disease chronic clinic visits inefficient, wasteful, and potentially harmful. This is also consistent with the opinion of the First Court Expert. Patients are seen based on an inflexible schedule as opposed to the degree of control of their illness and do not have their various diseases coordinated into a unified therapeutic plan.

During the week of the experts' visit, the MCC census was 3,036, including 440 patients housed in the nearby Medium Security Unit. The May 2018 Chronic Care roster was as follows:

| Chronic Care Clinic | Patients | Prevalence in ADC (3,036) |
|---|---|---|
| Asthma | 275 | 9.1% |
| Cardiac/Hypertension | 431 | 14.3% |
| Diabetes | 136 | 4.5% |
| General Medicine | 403 | 13.3% |
| Hepatitis C | 134 | 4.4% |
| High Risk/HIV | 22 | 0.7% |
| Seizure | 68 | 2.2% |
| **Total non-unique patients** | **1,333** | |

During the time of the First Court Expert's visit, the chronic care clinics were primarily conducted in the exam rooms on the first floor of the health care building. With the creation of air-conditioned satellite clinics in all of the cell houses, all of the chronic care clinics have been relocated to the cell houses. The only exception are three telehealth specialty clinics: UIC High/Risk, UIC Liver Clinic, and Renal Clinic that continue to be held in the telemedicine exam room on the first floor of the health care building. Chronic care patients in the satellite clinics are seen intermixed with provider sick call and walk-in patients.

Two nurse practitioners and two providers (one is part-time) staff chronic care clinics. The charts of chronic care patients indicate that patients with chronic illnesses are seen regularly at MCC. None of the clinical areas at MCC have access to electronic medical references, although it was reported that a few of the administrative offices in the distant health care building have internet access. When one provider was asked which current electronic medical references he could access, he could not list a single online medical reference that he utilized. This partially explains

---

[35] MCC's chronic care clinic schedule was listed as follows: asthma (January and July), seizure (February and August), cardiac 1 (A-L) (March and September), cardiac 2 (M-Z) ( April and October), diabetes/combo (April, August, and December), general medicine (May and November), and hepatitis C (June and December).

some of the clinical decisions and medications prescribed that were not in accord with current national and community standards of care.

The chronic care nurse maintains spread sheets on patients being followed in each of the chronic care clinics, listing the last clinic date and the most recent laboratory test date. The spread sheets also rate the clinic status of each condition as good, fair, poor, and stable. This method of rating degree of control is very limited; it would be more useful if objective criteria were used.

Onsite specialty consultation is limited. Optometry examinations are provided in the health care building for 20 hours per week. UIC HIV infection, UIC liver (hepatitis B and C), and renal consultation and management are provided to MCC patients via the telehealth program. All other specialty consultations are provided at outside private practices and medical centers in southern Illinois and a few in St. Louis, Missouri.

A dedicated nurse manager is assigned to assist and coordinate the telehealth clinics. This nurse is present in the exam rooms during all the UIC High Risk/HIV clinic, UIC telemedicine liver clinic, and the renal telehealth clinic appointments. She coordinates the appointments for these three specialty clinics, manages the completion of hepatitis C pre-treatment database, and tracks the clinical status and lab results of the referrals to UIC liver clinic. This telehealth nurse manager maintains clinically useful spread sheets on patients being followed in the High Risk/HIV clinic that tracks the status of the preliminary workup and approval process for hepatitis C patients.

We examined care of hepatitis C patients at MCC. Patients with hepatitis C are followed in a hepatitis C chronic clinic. When a patient tests positive for hepatitis C, they are followed by facility providers and tested every six months for an APRI level.[36] When treatment of hepatitis C is deferred and when there is active virus present, there is a risk of ongoing harm to the patient and ongoing monitoring of liver disease is recommended.[37] Yet, except for continuing to obtain an APRI level, providers in hepatitis C clinic do not monitor for cirrhosis or its complications or other possible complications of hepatitis C infection. When patients develop cirrhosis, it is recommended that they receive a baseline EGD to screen for varices and every-six-month ultrasound or CT scan screening to evaluate for hepatocellular cirrhosis. This is seldom done, even when patients have significantly elevated APRI levels. We note that in four death reviews of patients at various facilities who died of complications of hepatitis C, the patients were not monitored with EGD, ultrasound or for their ascites.[38] One example at MCC was a patient who had APRI levels indicative of cirrhosis as early as 2012, but the patient failed to receive endoscopy until August of 2015.[39] The patient did not have screening for hepatocellular carcinoma until May of 2015. At that time, a liver mass was found on a CT scan but was not timely worked up. Edema

---

[36] An APRI test is the AST to Platelet Ratio Index. The AST is a liver enzyme and platelets are a blood element that are decreased in advanced liver disease. The ratio between the AST and platelets yield a number that correlates with the degree of liver fibrosis. When the APRI reaches > 0.7 there is a greater than 70% chance that there is significant fibrosis.

[37] HCV Guidance: Recommendations for Testing, Managing, and Treating Hepatitis C; Last Updated May 24, 2018, American Association for the Study of Liver Diseases and Infectious Diseases Society of America as found at https://www.hcvguidelines.org/sites/default/files/full-guidance-pdf/HCVGuidance_May_24_2018a.pdf.

[38] Patients #6, 12, 23, and 28 in Mortality Reviews.

[39] Patient #23 Mortality Reviews.

and ascites are complications of cirrhosis. The patient had edema as early as 2012 and ascites was noted on the CT scan in May of 2015, yet the patient was not treated with a diuretic until he had massive ascites over a year later, in June of 2016. The patient ultimately died of complications of his cirrhosis (hepatocellular carcinoma) without ever having a diagnosis of the liver mass known for over a year and without being appropriately treated for the complications of his cirrhosis. It does not appear that physicians knew how to monitor for ongoing liver disease and the hepatitis C clinic does not include monitoring for ongoing liver damage. The purpose of this clinic appears to be to monitor the APRI until the provider refers the patient for treatment. This is inconsistent with IDOC hepatitis C guidelines and places patients at risk of harm, and has resulted in preventable or possibly preventable deaths.

The IDOC hepatitis C guideline states that workup of all hepatitis C positive patients, including the decision to refer to the UIC Liver Telemedicine Clinic, will be the sole responsibility of the IDOC providers at each individual IDOC facility.[40] This does not occur, as Wexford has inserted an additional utilization barrier into this process. When the APRI is elevated above 1.0 or above 0.7 with low platelet counts or albumin, facility physicians are to refer patients to a Wexford corporate internist who makes the decision on whether to refer the patient to UIC.

After the facility physician refers the patient to the Wexford corporate hepatitis C internist, a pre-approval packet is also forwarded to the Wexford corporate internist, who reviews the database and orders pre-treatment tests. This Wexford corporate hepatitis C internist must approve all requests for diagnostic workups including EGD, ultrasound, fibroscan, additional lab tests, and the referral to the UIC Telemedicine Liver Clinic.[41] This physician stated that she only is involved with patients who are referred to her for approval to start the process for hepatitis C treatment; she does not track or receive any data on patients at MCC with hepatitis C who have not been referred to her office.

Based on mortality records and on case reviews we performed, it appears that referral to the Wexford corporate hepatitis C internist is significantly delayed. Because these referrals are not tracked through the normal utilization process and because facility providers do not always document when they are referring to the Wexford corporate hepatitis C internist, it is not clear when patients are referred based on the medical record. Because the Wexford corporate hepatitis C internist does not write notes to the medical record, it is also unclear what her therapeutic plan is for the patient. At MCC, a chronic care nurse maintains a spreadsheet tracking patients who have hepatitis C, including those with referrals to the Wexford corporate hepatitis C internist. Review of three hepatitis C referrals indicated that once the referral was received by the Wexford corporate hepatitis C internist, the required diagnostic testing was quickly approved. The Wexford corporate hepatitis C internist did state that she was aware that the current IDOC policy does not prioritize patients co-infected with hepatitis C and HIV for expedited treatment. She also stated that she was aware that co-infected patients in the community who

---

[40] Hepatitis C Guidelines, December 2017.
[41] The Wexford corporate hepatitis C internist does not have to go through the Wexford collegial process to obtain approval but is authorized to approve these tests directly.

have F2 fibroscans are advanced to treatment as opposed to IDOC's practice of treating only those with F3 and F4.

In April 2018, 134 men were on the Hepatitis Report maintained by the chronic care nurse. Only one (0.7%) had completed hepatitis C treatment. This is consistent with statewide data that shows that approximately 2.9 patients are treated per facility per year.[42]  Another 12 (9.0%) were in the process of being worked up. Even though IDOC guidelines[43] mandate testing of HCV viral load on all patients, 17 (12%) of the 134 hepatitis C patients have not yet had their HCV RNA viral load tested. 87.3% of the hepatitis C patients have not yet had a fibroscan performed, even though the IDOC Hepatitis C Guidelines mandate that all patients have fibroscans done as part of their initial evaluation. IDOC restricts HCV treatment to patients with APRI score greater than or equal to 1.0 or with APRI scores between 0.7 and 0.99 with additional abnormal labs and high risk conditions, or advanced liver disease. This threshold limits the number of patients who are eligible for treatment. The process of accessing UIC also has considerable barriers. These barriers limit the numbers of patients treated and cause unnecessary delays in treatment that harm patients.

### MCC Hepatitis C Report April 2018

| Category | Number | % of MCC Population |
|---|---|---|
| Total Hepatitis C Patients | 134 | 4.4% |
| Total HCV Patients with HIV infection | 0 | 0% |
| Total HCV Patients currently on treatment | 0 | 0% |
| Total Completed HCV treatment | 1 | 0.7% |
| Total with HCV RNA viral load | 117 | 87.3% |
| Total without HCV RNA viral load | 17 | 12.7% |
| Total with a Fibroscan | 24 | 17.9% |
| Total without a Fibroscan | 110 | 82.1% |
| Total with APRI ≥ 1.0 | 10 | 7.5% |
| Total with APRI ≥1.0 in workup | 7 | 70% 3 release dates ≤ 12 mos. |
| Total APRI ≥1.0 with Fibroscans | 5 | 50% |
| Total with APRI ≥0.7 and ≤1.0 | 16 | 11.9% |
| Total with APRI ≥0.7 and ≤1.0 in workup | 3 | 19% 1 F3 with release date ≤ 12 mos. |
| Total APRI ≥0.7 and ≤1.0 with Fibroscans | 8 | 50% |
| Total in Workup | 10 | 7.5% |

A patient with new onset atrial fibrillation was started on a direct factor Xa inhibitor anticoagulant by the hospital. The MCC providers immediately changed the anticoagulant medication to warfarin, medication that requires frequent testing and dose modification. There was no justification written in the provider note about this change. Over the next 150 days, 92% of the patient's anticoagulation tests (INR) were either above or below the therapeutic range,

---

[42] Data we received from UIC is that for the three years 2015 through 2017 inclusive, 227 patients were treated for hepatitis C. This is approximately 2.9 patients per facility per year.
[43] Hepatitis C Guidelines December 2017.

resulting in nine dosage adjustments. At the time of the Experts' site visit, five patients were taking direct factor Xa inhibitors and 12 were prescribed warfarin. It was reported that direct factor Xa inhibitors are non-formulary and require a collegial approval. It is in the best interest of the patient and the institution that the preferred choice of oral anticoagulation be a medication in the direct factor Xa inhibitor class, especially in light of the inability of MCC providers to obtain therapeutic anticoagulation levels.

The clinical care provided to a number of patients at MCC with chronic illnesses had deficiencies and were not in accord with national standards of care. The providers did not consistently document the rationale for the selection of medications, changes in the dosages, and types of medications. The MCC provider progress notes are occasionally illegible; these difficult-to-interpret notes complicate the facility's ability to provide safe and quality care to its patient population. There was no documentation in any of the charts audited that the providers had reviewed the MAR for compliance of the prescribed medications or for the results of capillary blood glucose testing; clinical decisions were made without this important clinical data. In the charts of the five diabetics we reviewed, not a single one of these five patients have been screened by the facility's optometrist on an annual basis as mandated by the IDOC's diabetes treatment guidelines. This is the only one of the five IDOC facilities visited by the experts that was not meeting this IDOC diabetic retinopathy screening guidelines.

The primary and secondary prevention of arteriosclerotic cardiovascular disease (ASCVD) provided was not in alignment with current national and IDOC standards. The providers did not even once calculate patients' 10-year ASCVD risk score, which would have assisted them in determining the proper preventive medication and dosage. Patients were prescribed low intensity HMG-CoA reductase medications (statins) when high-intensity statins at higher dosages were indicated. Non-statin anti-hyperlipidemia (niacin, gemfibrozil) were prescribed without any documented clinical justification; these categories of medication have limited impact on the prevention or progression of cardiovascular disease. The providers concomitantly order 70/30 insulin and sliding scale short acting insulin before meals. The simultaneous use of these two types of short acting insulin puts diabetic patients at risk for hypoglycemic attacks. Fifty years of age and older patients are not regularly screened for colon cancer, putting patients at risk for the development of preventable cancer and delayed identification of potentially treatable colon cancer. Not one (0%) of 14 patients 50 years and older had been screened for colon cancer. The providers do not adhere to the CDC's recommendations for the vaccination of adults. MCC providers do not order pneumococcal 13 vaccinations for patients 65 years of age or older and immunocompromised individuals, or meningococcal vaccinations for HIV patients; or consistently order pneumococcal 23 vaccination for patients with chronic illnesses, patients 65 years of age or older, and those with immunocompromised conditions.

Many of the records of patients with chronic illnesses were found to have concerns about the clinical care provided. The following patient summaries highlight the concerns and the findings noted above.

- This patient is 73-year-old male whose diagnoses included hypertension, dyslipidemia, hepatitis C, and schizophrenia. [44] Due to the system's failure to order a HCV RNA viral load, which was found to be negative in 2018, he was erroneously diagnosed with ongoing hepatitis C infection for many years, resulting in multiple unnecessary lab tests and provider visits. His hypertension was adequately controlled but he inexplicably was not seen in the hypertension chronic care clinic for an 11 month period from September 2016 until August 2017. Based on his medication, it is likely that this patient was being treated for coronary artery disease and angina. He has had four episodes of chest pain in the last four months and he was prescribed nitroglycerin tabs. However, there was not a single mention of the etiology of his chest pain in the medical chart nor is angina listed on the patient's problem list. The progress notes about the chest pain were brief and did not adequately assess the clinical characteristics of the chest pain. His 10-year ASCVD risk score was not calculated by the MCC providers. (The score was determined to be an extremely high 21%). The providers have failed to prescribe a high-intensity statin as clearly indicated by his extremely high cardiac risk score and the presumptive diagnosis of angina. This patient is not receiving the same standard of care as would be received in the community. This 73-year-old has not been screened for colon cancer and has not been offered or administered nationally recommended adult immunizations (pneumococcal 13 and 23 vaccines). The failure of the providers to follow national preventive, treatment, and screening standards puts the health of this patient at risk.

- This 23-year-old with a history of seizure disorder had not initially provided IDOC providers with a complete history of his medical problems.[45] Once the patient told the MCC providers that he had previously taken anti-epileptic medications, even though he had not had a seizure in six to eight months; his seizure medications were restarted. Although drug levels were in the therapeutic range, the patient reported at the 2/3/18 chronic care visit that he was having one to two unverified seizures per month. This patient's history was complicated; additional past clinical history and treatment was needed to assure that this patient needs to be taking seizure medications and that the currently prescribed medication is appropriate. The MCC provider did not document that clinical records of the patient's care in the community were requested. The provider did not request consultation with a neurologist. The MARs document that the patient is taking only 30-50% of his seizure medication; yet the provider did not comment on this lack of compliance and likely did not even review this important clinical information during the chronic care clinic visits, nor comment on the presence of therapeutic carbamazepine drug levels in a non-compliant patient. The failure to monitor this patient's compliance with medication and seek neurology consultation jeopardizes the health of this complex individual.

---

[44] Chronic Care Patient #1.
[45] Chronic Care Patient #2.

- This patient is a 52-year-old male with a history of HIV infection, seizure disorder, and intravenous drug use.[46] HIs problem list also noted hypertension, but he was not on anti-hypertensive medications and his blood pressures were within acceptable range. MCC consulted with a neurologist when the patient's seizures were uncontrolled. The reports from two return visits to the neurologist in 2017 were not in the medical record. The latest visit to the clinic suggested the seizures were not fully controlled. The provider should have, but did not, order immediate drug levels of the anti-seizure medications. The patient's HIV was moderately well controlled; however, he has not been administered the nationally recommended pneumococcal 13 and 23, and meningococcal vaccinations. This 50-year-old patient has not been screened for colon cancer; this is not in accord with national standards of care. This patient has had lacunar infarcts of his brain, a sign of arteriosclerotic cerebrovascular disease. He should have been prescribed a high-intensity statin.

- This 69-year-old male with hypertension also had a Left Bundle Branch Block (LBBB) that was not noted on his problem list.[47] He had a number of biannual physicals but has never been screened for colon cancer, had never had his 10-year ASCVD risk calculated (it was extremely high 21.6%), and he had never been administered pneumococcal vaccinations. In spite of his elevated cardiac risk and LBBB, he has not been started on a high-intensity statin. This patient has not received a level of care that approaches that available in the community.

- This patient is a 43-year-old male with diabetes type II, hypertension, hyperlipidemia, and asthma.[48] He has been seen regularly in a combined chronic care clinic. His diabetes was not optimally controlled but the providers have appropriately initiated and increased the dosage of an additional medication (glipizide). There was no documentation that the patient's feet had been examined for sensory neuropathy. This diabetic patient has been housed at MCC for six months and has not yet been seen by an optometrist. This is an unacceptable delay for a patient at risk for diabetic retinopathy. Although recommended by the IDOC Treatment Guidelines, the providers did not calculate this patient's 10-year ASCVD risk score (it was determined to be 12.6 %). As recommended for diabetics with a high 10-year risk of a cardiovascular event, this patient should have been started on a high-intensity statin. The patient has not been administered the pneumococcal 23 vaccine, which is nationally recommended for all diabetics and asthmatics.

- This 33-year-old asthmatic who failed to tell IDOC that he had asthma was appropriately treated until he presented with an acute asthma attack.[49] The type of nebulization administered (two drugs) is generally used for COPD patients. A short burst course of prednisone and an inhaled corticosteroid inhaler in addition to albuterol should have been provided to this patient, who was at heightened risk for another exacerbation in the

---

[46] Chronic Care Patient #3.
[47] Chronic Care Patient #4.
[48] Chronic Care Patient #5.
[49] Chronic Care Patient #6.

near future. Montelukast is not recommended to be used in a patient whose asthma is not stabilized. The patient was not administered the pneumococcal 23 vaccine that is nationally recommended for all asthmatics.

- This 43-year-old patient had diabetes type II and two gunshot wounds (GSW).[50] The GSWs were not noted on his problem list. He had a HbA1C of 6.8% in June of 2015. Patients with HbA1C ≥6.5% are diagnosed as having diabetes. The providers failed to acknowledge this abnormal test and did not counsel the patient about lifestyle changes that might impact on the progression of diabetes, and did not initiate medication to address this newly diagnosed type II diabetes. Two year later, the HbA1C was repeated, again was found to elevated, and a diabetic oral agent was prescribed. The two-year delay was unacceptable and put the patient at risk for diabetic morbidity. The patient had an optometry visit on 6/15/17, but funduscopic exam of the retina for signs of diabetic retinopathy was not performed. National adult immunization guidelines recommend that all diabetics receive a pneumococcal 23 vaccine; this has not been done. The patient's 10-year ASCVD risk score should have been assessed, but it was not calculated. The 2018 MARs revealed that the patient was taking only one half of his KOP diabetic medication. The misunderstanding or non-compliance with this prescribed diabetic medication should have been noted in the February and April 2018 diabetes clinic. The chronic care providers are not routinely reviewing the MARs.

- This patient is a 48-year-old with diabetes and hypertension.[51] Diabetic medications were incrementally increased until an acceptable level of control was reached. However, there was a period of nine months (3/23/17 to 12/21/17) when his HbA1C's were 9.2% and 8.3% before the indicated increase in medications was ordered. Control would have been reached more quickly if medication adjustment had been made more expeditiously. Diabetics are to be screened annually for the diabetic retinopathy; inexplicably, this diabetic has not been screened for the last four years. In February 2018, the MAR indicated that the patient had not received his KOP diabetic and hypertensive medications; however, there was no comment on this potential lack of compliance or failure to deliver his medications in the progress notes. The failure to review this important clinical information in the MAR put the patient's health at risk. The MCC providers are not following national recommendations to administer a second pneumococcal 23 vaccine five years after the first vaccination.[52] The providers are not adhering to IDOC treatment guidelines and national recommendations to calculate the 10-year risk of ASCVD for adult patients with diabetes and, if the risk is greater than or equal to 7.5%, to initiate a high-intensity statin. His risk was determined to be greater than 20%, yet a high-intensity statin was not prescribed.[53] This patient's health care is not being properly protected.

---

[50] Chronic Care Patient #7.
[51] Chronic Care Patient #8.
[52] CDC Recommended immunization Schedule for Adults 2018.
[53] IDOC Office of Health Services Treatment Guidelines Hyperlipidemia March 2016.

- This patient is a 60-year-old with insulin-requiring diabetes and coronary artery disease who had only been at MCC for a few weeks.[54] The intake HbBA1C of 6.7% suggests that the patient's diabetes had been adequately treated prior to his incarceration. The decision to add additional short acting regular insulin (on a sliding scale) to this patient who was already receiving short acting insulin 19.5 units before breakfast and 18 units before dinner (30% of his 70/30 insulin, 65U/am and 60U pm, is short acting regular insulin) put the patient at increased risk of hypoglycemic episodes. The providers did not adhere to IDOC treatment guidelines by failing to prescribe a high-intensity statin in this diabetic with a documented history of coronary artery disease. They also failed to calculate his 10-year ASCVD risk (determined to be 19.1%), which should have led them to prescribe a high-intensity statin.[55] The providers missed an opportunity to administer the pneumococcal 23 vaccine to this diabetic as is recommended by both national adult immunization guidelines[56] and by IDOC treatment guidelines.[57]

- This patient is a 59-year-old with hypertension, hyperlipidemia, HIV infection, and a history of tobacco abuse.[58] His hypertension was only moderated controlled, but his medication had been increased. His HIV infection was well controlled; his medications have been thoughtfully modified. The patient was not given pneumococcal 13 and 23 and meningococcal immunizations. This is contrary to national guidelines.[59] The MCC providers did not calculate the patient's 10-year ASCVD risk score (determined to be 14.4%); this is not in accord with IDOC treatment guidelines.[60] There was no documented justification for the use of gemfibrozil; this patient should have been prescribed a high-intensity statin. The patient has received four biannual physicals since he was 50 years old yet he was not offered screening for colon-rectal cancer. National guidelines recommend that individuals aged 50 to 75 years should be screened for colon cancer.[61]

- This patient is a 57-year-old male with a history of coronary artery disease (CAD) with stent placements, paroxysmal atrial fibrillation on chronic oral anticoagulation, degenerative joint disease, fatty liver, and tobacco use.[62] The placement of coronary artery stents, fatty liver, and chronic anticoagulation were not noted on the problem list. Upon return from the hospital where he been prescribed apixaban anticoagulant on 11/6/17, the Graham providers switched the anticoagulation to warfarin 5mg/day. On 11/21/17, the patient was transferred to MCC. His anticoagulation treatment was poorly controlled on warfarin: 92% of his 13 INRs over the last five months (11/10/17 to 4/23/18) were non-therapeutic. On nine occasions, the warfarin medication was stopped or the dose changed. The providers' notes did not always document the reason for the dosage

---

[54] Chronic Care patient #9.
[55] IDOC Office of Health Services Treatment Guidelines Hyperlipidemia March 2016.
[56] CDC Recommended immunization Schedule for Adults 2018.
[57] IDOC Office of Health Services Treatment Guidelines Diabetes March 2016.
[58] Chronic Care Patient #10.
[59] CDC Recommended immunization Schedule for Adults 2018.
[60] IDOC Office of Health Services Treatment Guidelines Hyperlipidemia March 2016.
[61] USPSTF  Colorectal Cancer Screening June 2016.
[62] Chronic Care Patient #11.

adjustments or why/when anticoagulation was temporarily stopped or held. The lack of comprehensive progress notes made it extremely difficult to track the care that was being provided to this patient. It is risky to continue to treat this patient with warfarin. It would be in the best interest of the patient and the institution if he was prescribed a direct factor Xa inhibitor that does not require frequent testing and dose adjustment, especially since providers at MCC were unable to obtain therapeutic control. This patient should have been administered pneumococcal 23 vaccine[63] and should have been screened for colon cancer;[64] neither one of these were performed. The provider notes were rarely adequately informative and were occasionally illegible. This jeopardizes MCC's ability to provide continuity of care to this complex patient. There was no rationale in the progress notes documenting the clinical reason that this patient was receiving fenofibrate. He was also prescribed a high-intensity statin, but at a dose that is less than recommended for a patient with arteriosclerotic coronary health disease.[65]

- This is a 54-year-old patient with hypertension, diabetes-type II, hyperlipidemia, and an EKG suggestive of a previous myocardial infarction.[66] His diabetes and hypertension were adequately controlled. This was the only patient that we reviewed at five IDOC facilities that was appropriately administered two pneumococcal 23 vaccines. The MCC staff failed to calculate the patient's 10-year ASCVD risk score (determined to be 19.6%) or take into account his past history of a previous inferior wall MI when they prescribed a moderate-intensity rather than a high-intensity statin, as was recommended in the IDOC treatment guidelines.[67] The patient was prescribed niacin, presumably as part of the treatment of his hyperlipidemia, but there was no justification documented in the chart for the usage of this medication. The patient did not have an eye exam in the last two and a half years; diabetics are recommended to have annual exams for diabetic retinopathy.[68] This over 50-year-old patient was not screened for colorectal cancer.[69]

- This patient is a 55-year-old with a complicated to treat and difficult to control seizure disorder.[70] His medications were changed a number of times, with the phenytoin dose changing from 400mg/day to 500mg/day to 200mg BID, and his levetiracetam starting at 500mg BID and then increasing to 1000mg BID, then back to 500mg BID. His phenytoin levels were tested nine separate times; five exceeded the therapeutic range, one was below the therapeutic level, and three were at the recommended levels. Providers had difficulty in maintaining the phenytoin level in the therapeutic range. Consultation with a neurologist was clearly needed but was never requested. The provider and chronic care progress notes did not document or justify the reason for the medication adjustments. The lack of comprehensive provider notes made it difficult to understand the course of

---

[63] CDC Recommended immunization Schedule for Adults 2018.
[64] USPSTF Colorectal Cancer Screening June 2016.
[65] IDOC Office of Health Services Treatment Guidelines Hyperlipidemia March 2016.
[66] Chronic Care Patient #12.
[67] IDOC Office of Health Services Treatment Guidelines Hyperlipidemia March 2016.
[68] IDOC Office of Health Services Treatment Guidelines Diabetes March 2016.
[69] USPSTF Colorectal Cancer Screening June 2016.
[70] Chronic Care Patient #13.

care. A new provider would struggle to comprehend the care being provided to this patient. The MCC providers must request specialty consultation for patients with conditions that do not readily respond to initial treatment. National standards recommend that all patients over 50 years of age be screened for colon cancer using a validated screening methodology,[71] but this patient has never been screened. His 10-year ASCVD risk score has not been calculated by the MCC providers.[72]

- This patient is a 65-year-old with diabetes, hypertension, hyperlipidemia, obesity, and hypothyroidism.[73] His problem list did not note obesity and hypothyroidism. This recently incarcerated (1/28/18 admission) patient's diabetes and hypertension were moderately well controlled. To date, the patient was not evaluated for diabetic retinopathy. His statin was changed from atorvastatin 10mg/d to simvastatin 10mg/d, a low-intensity statin. The providers, in violation of the IDOC treatment guidelines, failed to calculate his 10-year ASCVD risk score (determined to be extremely high, 28.4%).[74] If they had done this, perhaps they would have prescribed a high-intensity statin to minimize his risk of stroke and heart attack. Contrary to national standards, this patient has not been administered pneumococcal 13 and 23 immunizations.[75] The patient has not been screened for colorectal cancer; this is not in accord with national guidelines that recommend that screening begin at 50 years of age.[76]

- This patient is a 58-year-old with hepatitis C who was unsuccessfully treated with interferon and ribavirin in 2009-2010.[77] Liver biopsy in 2009 revealed extensive peri-portal fibrosis and moderate bridging (stage 2). On 9/19/16, the hepatitis C clinic deemed this patient eligible for treatment; 20 months later, treatment had not yet been initiated. On 3/29/18, a fibroscan was read as F4 (advanced liver scarring, cirrhosis). Eighteen of the months of delay appear to have been due to internal delays at MCC. At least two months of the delay were due to the workup that is required by the UIC Hepatitis C clinic, which includes psychiatric evaluation and EGD. Psychiatric evaluation and EGD are not recommended evaluations prior to treatment with the newer anti-hepatitis C medications.[78] The HCV RNA viral load was not located in the medical record but was eventually located on the Hepatitis Report that is maintained by the telemedicine nurse manager. The lengthy wait to retreat this patient with advanced hepatitis C is unacceptable and puts the patient's health at risk. There is no documentation in the

---

[71] USPSTF Colorectal Cancer Screening June 2016.

[72] ACC/AHA ASCVD Risk Score.

[73] Chronic Care Patient #14.

[74] IDOC Office of Health Services Treatment Guidelines Hyperlipidemia March 2016.

[75] CDC Recommended immunization Schedule for Adults 2018.

[76] USPSTF Colorectal Cancer Screening June 2016.

[77] Chronic Care Patient #14.

[78] Recommended Assessments Prior to Starting Antiviral Therapy as found in HCV Guidance: Recommendations for Testing, Managing, and Treating Hepatitis C, last updated May 24, 2018: The American Association for the Study of Liver Diseases and the Infectious Diseases Society of America as found at: https://www.hcvguidelines.org/sites/default/files/full-guidance-pdf/HCVGuidance_May_24_2018a.pdf.

medical record that this patient was administered the pneumococcal 23 vaccination.[79] The patient was over 50 years old but had not been screened for colon cancer.[80]

- This patient is a 66-year-old with hepatitis C infection.[81] Sixteen months after having been deemed eligible for hepatitis C treatment, the patient's workup was still not completed. Twelve months of this delay was due to the internal processes at MCC. His liver fibroscan on 2/19/18 was read as F4 (advanced liver scarring, cirrhosis). The UIC Telemedicine Liver Clinic requested additional labs, EGD, liver ultrasound, and dermatology consultation, which also contributed to the long processing time. The EGD and liver US was pending collegial approval by Wexford, although the experts were informed that Wexford's Hepatitis C coordinator could directly approve these tests. Most institutions do not require such extensive pre-treatment diagnostic testing prior to treatment with the newer anti-hepatitis C medications. The lengthy wait to initiate treatment for hepatitis C puts this patient's health at risk. Colon cancer screening was not provided to this patient, who is over 50 years old.[82]

- This patient is a 50-year-old male with hepatitis C.[83] Twelve months after having been deemed eligible for hepatitis C treatment, the patient's workup was still not completed. His liver fibroscan on 3/29/18 was reported as F4 (advanced liver scarring, cirrhosis). The UIC Telemedicine Liver Clinic's request for a psychiatric consultation has prolonged the waiting time. Most institutions do not require such extensive pre-treatment diagnostic testing including psychiatric consultation prior to treatment with the newer anti-hepatitis C medications. Colon cancer screening has not been performed on this patient, who is over 50 years old.[84]

## Urgent/Emergent Care

**Methodology:** We interviewed the Nursing Supervisor (IDOC), toured the medical clinic, and assessed the availability and functionality of emergency equipment and supplies. We also reviewed emergency drills, CQI reports, written directives, and medical records. Medical records were selected from the list provided by MCC of emergency room visits beginning in January 2017. This list includes the reason for the ED visit. Records selected for review were those conditions sensitive to ambulatory care, such as seizure, withdrawal, infection, diabetic complications, abdominal pain, chest pain, etc. These were used to evaluate nursing response to emergencies. A total of five records were reviewed. We also reviewed records of five patients who were hospitalized for ambulatory sensitive conditions to assess whether their pre and post hospital physician care was adequate.

---

[79] CDC Recommended immunization Schedule for Adults 2018.
[80] USPSTF  Colorectal Cancer Screening June 2016.
[81] Chronic Care Patient #16.
[82] USPSTF  Colorectal Cancer Screening June 2016.
[83] Chronic Care Patient #17.
[84] USPSTF  Colorectal Cancer Screening June 2016.

**First Court Expert Findings**

The records of nine patients were reviewed, and more than half demonstrated significant deficiencies in patient care. These deficiencies included absence of important information from the hospital, inadequate assessments by nursing staff, untimely physician follow up, and failure to monitor or intervene.[85]

**Current Findings**

MCC provides basic CPR and first aid. Emergency response bags are kept in the first aid room in the main clinic, the armory between north and south buildings, and at the medium security unit. These bags can be transported by responding nursing staff to the site. This equipment and supplies are used to conduct an initial triage, provide first aid, and CPR. The first aid room, North II Medical Clinic, and MSU are equipped to provide space and equipment to treat medical emergencies. The nursing staff must make a clinical decision to transport a patient in a medical emergency to the first aid room in the main clinic, which has the most extensive emergency equipment, or to the use an outlying room.

The emergency bags contain first aid supplies, personal protective equipment, stethoscope, blood pressure cuff, cervical collar, equipment and supplies to start an IV, and a few medications (i.e., glucagon, an epi pen, aspirin). The contents of the bags are standardized but not sealed. We checked the contents of several of these bags and found them to be adequately supplied. We discussed with the nursing supervisor who accompanied us the advantages of using plastic numbered locks to indicate a bag that was fully stocked and ready for use. The first aid room has, in addition to the emergency bags, two transport chairs, an automatic external defibrillator (AED), crash cart, stretcher with backboard, portable ambu-bag, portable oxygen, EKG machine, suction, nebulizer, and oto-ophthalmoscopes. A mobile crash cart with AED is also available in the infirmary and in the MSU clinic. Disaster trunks which contain triage tags and more first aid supplies are located in the first aid room, the armory between north and south housing units, in the MSU clinic, and in the North II clinic area.

The presence and functionality of the emergency response equipment is checked each shift and documented on a daily equipment log. No outdated supplies were found in the emergency bags we checked, but we did find outdated material in the disaster trunk in the armory. We checked the AED and other emergency equipment and found all were functional. Menard Health Services Policy V1-25 lists the contents and location of first aid kits available in housing units, program areas, and vehicles, but we did not evaluate the accuracy of this information.

The Menard ID #04.03.108 and Menard Health Services Policy and Procedure V1-26 P-112 are consistent with one another. Both require emergency response drills twice a year on each shift. In addition, one mass casualty or disaster drill must be conducted annually. Actual practice appears to conform to these directives. The mass casualty drill for 2017 was reviewed and found to be thorough, with good multidisciplinary participation and candid critique of strengths and weaknesses. The results were presented to the CQI committee; however, there was no specific

---

[85] Lippert Report Menard pp. 23-24.

plan to improve areas that were considered weaknesses. We also reviewed the emergency response drills for 2017 and 2018. They are sufficient in number and there is some critique, although not very thorough. These are also presented to the CQI committee. The minutes of the CQI meetings do not reflect any presentation of trends, discussion, analysis of issues, or plans for improvement in emergency response.

Emergency responses are documented in a log that includes the date, time, inmate name and number, location, and diagnosis. Only two emergencies were listed for 2017. When we inquired about this, the HCUA said that the nurses had stopped documenting in the log. She discovered this when she asked for the urgent care log in February. Entries since then are much more numerous than those recorded for 2017. We selected five patient charts to review from the list provided by MCC of emergency room visits beginning in January 2017.

Incomplete or inadequate nursing assessments were discussed in the earlier section on Nursing Sick Call. Two of these patients were seen by nurses for urgent complaints. One was seen for abdominal pain and the nurse assessed the patient using the protocol for non-specific complaints.[86] The assessment of his condition would have been more thorough if the protocol for abdominal pain were used. This patient had been seen in the ED three days earlier and diagnosed with diverticulitis. The nurse contacted the provider and was given a verbal order for a liquid diet. The provider did not see the patient for six days after his return from the ED. The other patient was seen urgently for priapism and the only documentation is the outbound note that he was sent to the ED.[87] The nurse conducted no assessment and did not even take the patient's vital signs.

- The first patient was seen in nursing sick call on 4/16/2018 for a boil on his buttocks that had been present for one and a half weeks.[88] The nursing assessment was incomplete. He was referred to see the provider the next day. However, he was not seen for five days, at which point an antibiotic was ordered. No labs or wound care was ordered. The provider did order a follow-up appointment in four to five days. The patient was not seen for eight days and at this encounter was sent to the ED because he was having lower abdominal pain. There is an outbound note, but it contains minimal information. Upon his return, the inbound note documents the medications and dressing change recommendations that were on the patient discharge summary from the ED visit. He did not see a provider for another two days. The nursing assessment of this patient's condition was incomplete, access to definitive care was delayed, and he was treated symptomatically with antibiotics without a thorough work up. Documentation of the ED visit was not obtained from the hospital and he was not seen promptly upon his return to MCC. This is a patient whose condition deteriorated because it was not managed in a timely and clinically appropriate manner by providers at MCC.

---

[86] Sick Call Patient #4.
[87] Sick Call Patient #5.
[88] Urgent/Emergent Care Patient #1.

- Another patient whose ED visit could have been avoided on 4/23/2018 had been seen in the emergency room on 11/1/2017 because of acute urinary retention.[89] He was diagnosed with septicemia resulting from bladder infection. He returned to MCC three days later with an indwelling catheter and a recommendation to see a urologist in two to three weeks. The provider tried to remove the catheter twice only to have another one reinserted because the patient could not urinate. He was discharged to general population and returned three weeks later because the catheter was not draining and had clots of blood in the tubing. A new catheter was inserted. He saw the urologist the next day, or five weeks after it was recommended, rather than two to three weeks later. The urologist recommended cystography, dilatation, and bladder biopsy for a chronic urinary tract infection. None of these procedures were completed and he continued with an indwelling urinary catheter until 1/18/2018, when it was removed at his request. On 4/23/2018, he was unable to urinate and was sent to the ED. He was hospitalized, and a prostatectomy was done. His discharge diagnosis was sepsis secondary to urinary tract infection with underlying severe BPH and possible nephritis. A cardiology consult was recommended four weeks post discharge, but has not been done per direction from the facility Medical Director. There is no note documenting the rationale for not having a cardiology consult on the patient. This patient would have benefited from prostate surgery that was worked up and done as a planned procedure. The delay in scheduling urology consults and diagnostic procedures resulted in an avoidable emergency and unplanned surgery. The prolonged reliance on an indwelling catheter to relieve urinary retention harmed the patient because of the increased risk of infection.[90]

We also reviewed five patients who were hospitalized, in order to assess whether the hospitalization might have been prevented and whether follow-up care was appropriate. We, indeed, found preventable hospitalization and poor care in general. We found problems with all records reviewed.

- One patient had hypertension and elevated cholesterol as early as 2008.[91] However, due to his age (46), his 10-year heart disease risk did not warrant use of a statin in 2008. In 2008, the patient did have EKG findings (T wave abnormalities suggesting lateral ischemia), but these abnormal findings did not appear to result in follow-up investigation. On 10/21/17, the patient sustained a myocardial infarction with cardiac arrest, for which he was hospitalized. He was resuscitated and was found to have stenosis of his left main coronary artery, for which he received a stent. The patient was discharged on a high-intensity statin, Brilinta, a beta blocker, Lisinopril, and aspirin, all of which he received upon return to the facility. The Brilinta was changed to a formulary medication (Plavix),

---

[89] Urgent/Emergent Care Patient #5.

[90]

  

Managing Urinary Retention in Men - P     cauti-guidelines.pdf

[91] Patient #1 Specialty Consultation and Hospitalization.

which is a reasonable substitution. A cardiologist saw the patient on 11/14/17 after the hospitalization. The cardiologist recommended follow up in three months, which did not occur. The specialty care tracking log documented the 11/14/17 visit, but no other referrals were documented. We could not find any documentation that the patient's heart condition was being monitored in chronic care visits. We could not locate the patient on the chronic illness roster provided to us by IDOC in preparation for our visit. A doctor did see the patient in follow up of the cardiology visit, but there were no further provider visits until 3/30/18. On that day, the doctor noted that the patient had a prior myocardial infarction. The doctor ordered no laboratory tests and did not enroll the patient in chronic care clinic. His coronary artery disease was not being monitored. We brought this to the attention of the HCUA, so he could be enrolled.

- Another inmate had problems listed as diabetes, hypertension, and asthma.[92] However, the patient actually had chronic obstructive lung disease (COPD). Asthma and COPD are different diseases and not managed in the same manner. The patient was described in multiple chronic care visits as having various stages of asthma (mild persistent, moderate persistent, etc.) when he actually had COPD based on radiologic examinations. These descriptions for asthma were not pertinent to his actual diagnosis. There was no evidence in the medical record that the patient had a pulmonary function test, the cornerstone of diagnosis and management for COPD and asthma.

  We reviewed the record for this patient for a two-year period. Over those two years the patient was seen on seven occasions for chronic care. The patient was diagnosed on all those occasions as having asthma, even though a chest x-ray on 10/26/17 showed hyperinflation and fibrotic changes consistent with COPD, and even though a CT scan of the abdomen incidentally showed fibrosis of the lung with emphysema consistent with COPD. The patient had wheezing on several occasions that were treated with steroids. Pulmonary function testing should have been ordered to clarify his diagnosis. Also, the wheezing may have been due to other conditions, including heart failure. Additional testing was indicated, specifically an echocardiogram. The patient should have been referred to a pulmonologist for clarification of his diagnosis so appropriate therapy could be provided, or MCC providers should have ordered a pulmonary function test. The patient was not on an anti-cholinergic inhaler, never had a pulmonary function test, had no assessment of exercise capacity, did not have an evaluation for the need for oxygen therapy (even though having an oxygen saturation of 85% on 1/9/17), and had no consideration for pulmonary rehabilitation.[93] This patient should also have been considered for evaluation of heart failure.

  The patient was 82 years old in 2015. In 2015, he had a 43% 10-year risk of heart disease and should have been on a moderate or high-intensity statin and aspirin. Additionally, the

---

[92] Patient #6 Specialty Consultation and Hospitalizations.
[93] Generally, persons with a room air oxygen saturation of less than 88% should be started on oxygen therapy. This person should at least have been tested to determine if oxygen supplementation was necessary. If the facility physicians were untrained in how to do this, referral to a pulmonologist was indicated.

patient had an EKG in 2013 that showed T wave abnormalities consistent with possible ischemia. Despite this, the patient was not on a statin or aspirin until 11/17/17, when he was started on a low-intensity statin. This placed the patient at risk of harm.

The patient weighed 208 pounds in a chronic clinic visit on 5/5/15. On 12/14/15 in chronic clinic, the patient weighed 182 pounds. This 26-pound weight loss was unrecognized. On 1/4/16, a doctor documented a 40-pound weight loss. The patient complained of abdominal pain, loss of appetite, diarrhea, and emesis. The doctor's only diagnostic evaluation was to order a blood count and abdominal x-ray. Despite having diabetes, the doctor did not check blood sugar values. The CBC showed anemia (hemoglobin 12.2) but no action was taken. GI symptoms with anemia and weight loss need to result in colonoscopy and other testing to determine if a serious medical condition is present. On 1/21/16, a doctor referred the patient for an abdominal CT scan. A plain abdominal CT scan is not adequate screening for colorectal cancer, but may be useful for other purposes. Specialized CT scanning for colorectal screening is called CT colonography. However, CT colonography was not ordered. This patient's CT scan showed emphysema, aortic atherosclerosis, hepatic cysts, renal cysts, infra-renal ectasia (abdominal aortic aneurysm), bilateral common iliac aneurysms, and compression fracture of the L1 vertebra. None of these problems were added to the problem list or monitored. The identification of aneurysms was of concern and should be monitored and referred, if indicated. The identification of aortic atherosclerosis in combination with diabetes, hypertension, and a greater than 40% risk of cardiovascular events should have prompted use of a statin drug, but this was not done at this time. There was no follow up of the CT scan or the problems identified on the CT scan. There was no follow up of the weight loss or anemia. The patient did not have a follow-up blood count until two years later on 1/19/18, and the hemoglobin was 9.9, a significant deterioration. At that time, the doctor ordered iron studies and gave the patient cards for fecal occult blood testing. Colonoscopy was not done.

On 11/4/16, the creatinine was 1.66, indicating chronic kidney disease. This was not added to the problem list and was not followed as a problem. Specifically, on 12/19/16, the patient was evaluated in diabetic and hypertension chronic clinics. The blood pressure was 142/84. For persons with chronic kidney disease and diabetes, the blood pressure should be controlled to less than 130/80, yet this was not done, and the chronic kidney disease was unrecognized as a problem. On several other occasions (9/10/15, 12/14/15, 5/3/16, 12/19/16, 11/17/17, 1/8/18), providers saw the patient with either a systolic pressure above 130 or a diastolic pressure above 80 without intervention or comment on why intervention was unnecessary.

On 1/9/17, a nurse evaluated the patient for shortness of breath and obtained an oxygen saturation of 85%, which improved with treatment with a beta agonist inhaler. Because of the patient's myriad problems, a physician examination was indicated; instead, a doctor presumed the etiology was asthma and ordered prednisone by phone. If the diagnosis was asthma, an oxygen saturation at this level would have been life-threatening

and the patient should have been admitted to a hospital. Even if COPD was the presumed diagnosis, an oxygen saturation of 85% should have prompted consideration of hospitalization for diagnostic evaluation. Treatment over the phone with prednisone without knowing the diagnosis or reason for the new hypoxemia was inappropriate.

HbA1C levels from 2015 through 2017 indicated good diabetic control. However, capillary blood glucose checks being done every other week started to show a rise in blood sugar values. These were not monitored. On 11/14/17, the blood sugar was 256. On 11/22/17, the blood sugar was 446. On 11/28/17, the blood sugar was 414. On 12/5/17, the blood sugar was 423. On 12/12/17, the blood sugar was 411. On 12/18/17, the blood sugar was 471. There were no interventions after any of these blood sugars which indicated out of control diabetes. On 12/19/17, a doctor saw the patient and noted that the most recent HbA1C value was 6.1, but that a recent blood sugar value was 460. The blood sugar had been significantly out of control for over a month. The doctor did not adjust medications; instead, they ordered that the patient be seen in the diabetic clinic in two weeks with an HbA1C test. On 12/23/17, a nurse practitioner saw the patient and documented that the patient had vomiting, agitation, and was not feeling well. The nurse practitioner did not check a blood sugar even though vomiting in an out of control diabetic can be caused by ketoacidosis. The nurse practitioner ordered a month follow up despite this being an acute problem. This patient should have had emergent blood testing and evaluation to determine if an acute medical problem was present. Instead, the patient was not seen again until the patient was sent to a local emergency room on 1/2/18, presumably for evaluation for possible diabetic ketoacidosis. There were no progress notes from MCC before the hospitalization, so it could not be determined why the patient was hospitalized. There was no hospital report, so it could not be determined what occurred at the hospital. When the patient returned to the prison, a nurse documented that the patient was to follow up with a provider in five days. The hospital patient instructions listed diabetes, vomiting, hyperglycemia, and abdominal aortic aneurysm as problems, but the patient instruction sheet had little information. If the admission was for diabetes, it was preventable. Poor management of the patient's out of control diabetes resulted in harm (hospitalization) to the patient. The problem of aneurysm was never addressed despite potentially being life threatening.

The patient was not seen in five days as ordered. On 1/8/18, a nurse saw the patient for chest pain. The pulse was 110 and blood pressure 140/88. A doctor did not write an independent note but wrote an annotation to the nursing note stating that the patient had numbness of his fingers for 10 years and had no chest pain. He documented that the EKG showed no acute changes. He diagnosed COPD and chronic numbness and took no action. He did not check a blood sugar or review the hospital record. The EKG showed non-specific STT changes with V2-6 T wave inversions that can be associated with ischemia.

On 1/9/18, a nurse notified a doctor about a blood sugar over 500. The doctor ordered regular insulin and increased metformin to 1-gram BID and ordered blood tests. The

doctor did not examine the patient. The patient was not evaluated after hospitalization until 1/13/18, 11 days after hospitalization. The doctor noted that the blood sugar control was poor but did not review the hospitalization or findings during hospitalization. A HbA1C on 1/19/18 was 11.4, indicating very poor diabetic control.

On 2/13/18, the patient was seen for his diabetes, hypertension and "asthma." The doctor took little history but did note that the patient was short of breath. The patient was started on an antibiotic without explanation of why. The patient was noted to be on Lantus insulin, but the recent hospitalization was not discussed. Many of the patient's problems were not addressed or even listed as medical problems, including anemia, prior weight loss, prior abdominal pain with vomiting, recent chest pain, abdominal aortic aneurysm, chronic kidney disease, renal and hepatic cysts, and atherosclerosis. The patient's COPD was still being managed as if it were asthma.

In summary, this patient had multiple chronic medical conditions, many of which were not being managed at all and some of which were managed inappropriately. It did not appear that clinicians knew how to manage this patient's medical problems. He was hospitalized, and it was not even clear, based on the medical record, that providers understood why he was hospitalized. Follow up of serious medical conditions (abdominal aortic aneurysm, anemia, renal and hepatic cysts, chronic kidney disease, atherosclerosis, and COPD) was non-existent. For most of these problems physicians appeared unaware that the patient even had the problem. This placed this patient at significant risk of harm.

- Another patient had a problem list that documented hypertension and asthma.[94] However, the patient also had hepatitis C, chronic kidney disease, and first-degree heart block, which were not being monitored.

Although the patient's chronic kidney disease was not listed as a problem and was not being followed in chronic clinic visits, the patient saw a nephrologist for this on 6/1/17. The specialty care tracking log documented that the patient was again seen in nephrology clinic on 10/5/17, but there was no report of the 10/5/17 visit or documentation in the medical record that this appointment occurred, or what occurred at that appointment. On the 6/1/17 visit, the nephrologist had recommended a vitamin D level, PTH level, urine protein/creatinine ratio, and a four-month follow up.

Based on a 12/23/17 chronic clinic visit, the patient had a 14% risk of heart disease and should have been on a moderate to high-intensity statin, but was not. He also should have been considered for aspirin therapy as primary prevention of cardiovascular disease. These were not provided to the patient and were not discussed with the patient.

On 12/25/17, the patient was admitted to a local emergency room for fever and diarrhea. He was diagnosed with acute kidney injury secondary to dehydration and diarrhea. There

---

[94] Patient #7 Specialty Consultation and Hospitalizations.

was no documentation of a follow up of this hospitalization and it was not entirely clear what occurred at the hospital, due to a lack of a complete report. The next physician visit was not until 2/24/18, when the patient was seen in asthma and hypertension chronic clinics. The blood pressure was documented as 120/18, but this clearly was a data entry error and was unnoticed and uncorrected.

A doctor saw the patient in chronic clinic on 3/6/18, and noted that the patient was recently hospitalized, but did not document what occurred at the hospital. The doctor did note that the patient for hospitalized for fever, dehydration, and chronic kidney injury, but there was no other history.

Several of this patient's problems were not even identified or monitored as problems. The patient did not have reports of a consultation visit and a hospitalization. Doctors did not acknowledge what had occurred at the hospitalization and at one of the nephrology visits. Lack of review of consultation and hospital reports meant that the patient's clinical status was unknown to medical staff. The patient should have been on a statin and possibly aspirin, but doctors appeared unaware of this need.

- Another 28-year-old patient had a medical reception screening at MCC on 8/18/17.[95] The nurse took a history of congenital heart disease, but the specific details were not documented. The patient's actual condition was not identified. A doctor did note that the patient had a venous stasis ulcer on his right leg, but the type of heart disease was not identified. On the day following medical reception, 8/19/17, a CMT evaluated the patient for chest pain, shortness of breath, oxygen saturation of 82%, and atrial flutter. The patient was sent to a local hospital.

The hospitalization log provided to us by Defendants in preparation for our visit showed that the patient went to Chester Memorial Hospital on 8/19/17, and from there was transferred to Carbondale Memorial Hospital on 8/22/17. A discharge summary from Carbondale was not available, but an echocardiogram showed tricuspid atresia with a possible small clot in the right ventricle. The patient was started on Lovenox, an anticoagulant. A report from the local hospital noted that the patient had atrial fibrillation, a stage II stasis ulcer, prior ablation procedures for atrial fibrillation, and had tricuspid atresia[96] with surgical correction at age five. The lack of the hospital record was significant, as it was not clear from the medical record what the opinion of the cardiologist was regarding the patient's serious heart condition.

---

[95] Patient #8 Specialty Consultations and Hospitalizations.

[96] Tricuspid atresia is a congenital absence of the heart valve between the right atrium and right ventricle, impairing flow of blood to the lungs and preventing oxygenation of blood. This is typically corrected by a Fontan procedure which diverts blood appropriately to the lungs from the inferior vena cava. When this procedure is done, patients require lifelong follow-up with a cardiologist experienced with complex congenital heart disease. Annual evaluation is recommended at a minimum, as additional interventions may be needed. These patients can acquire a number of complications which require intervention, including venous stasis ulcers and venous insufficiency, protein losing enteropathy, cirrhosis, thromboembolic events, arrhythmias, heart failure, and restrictive lung disease.

The patient was sent to Barnes Jewish Hospital in St. Louis the following day on 8/25/17, but there was no discharge summary and it was not clear what the therapeutic plan was for the patient, except that the patient was on metoprolol, diltiazem, and Lovenox. Barnes Jewish Hospital recommended a two to three week follow up.

On return from the hospital, the patient was admitted to the infirmary. The admitting physician did not document a therapeutic plan or acknowledge what had been recommended at Barnes Hospital. The doctor noted problems as atrial fibrillation, tricuspid atresia, and hypoplastic right ventricle. The doctor prescribed metoprolol, diltiazem, and Lovenox, but it was not clear what the therapeutic plan was.

Between 8/25/17 and 9/27/17, the patient was evaluated by providers six times. On none of those occasions was an accurate description of the patient's problems documented. None of these notes documented a therapeutic plan for the patient's serious medical conditions. At several clinic appointments, the only assessment was "cardiac." When we asked the physician who wrote this assessment what he meant, he stated that the patient had some type of cardiac issue. On one note, a doctor ordered a benzodiazepine and referred to mental health for palpitations, when the patient actually had atrial fibrillation which was possibly the cause of the palpitations.

According to the hospital log provided to us, the patient was sent to Memorial Hospital of Carbondale on 9/27/17. It was not clear why the patient was sent to a hospital based on progress notes before the admission. There was no hospital report, so it was not clear what occurred. On 9/28/17, the patient developed abdominal pain with an oxygen saturation of 79%, and the patient was sent to Barnes Jewish Hospital. There was no hospital report for this admission. On 9/29/17, a nurse practitioner documented that the patient "apparently had scan of G bladder, CT of chest, labs, EKG, US of abd [with] a note 'fit for confinement.'" The therapeutic plan was not documented. This uninformed note failed to document the results of any of these tests.

On 10/4/17, a cardiologist at Barnes Jewish Hospital saw the patient on a consultation and documented that the patient had pulmonary and tricuspid atresia with atrial septal defect and had multiple complications of his surgery, including atrial arrhythmia with prior cardioversion and ablation, iliac vein obstruction with venous stasis ulcers, and atrial thrombus. The cardiologist recommended stopping Lovenox, starting Eliquis, a liver ultrasound, and referral to an electrophysiologist for possible ablation therapy.

On return from the cardiologist, the patient was seen twice by a doctor. On both occasions, the doctor did not document review of the report. The recommendations for referral for ultrasound and for electrophysiology were not documented as recognized and do not appear to have occurred.

Progress notes document that the patient went offsite for a medical furlough on 11/4/17, but the specialty consultation log documents this as occurring on 12/4/17. Progress notes

do not document what the patient went offsite for. There was no report. On 12/4/17, a scheduling clerk documented that the patient was discussed in collegial review and approved for follow up. The clerk did not specify what the referral was for. On 12/15/17, Wexford utilization approved a six-month follow up with cardiology. Progress notes document that on 12/22/17 the patient went to Prairie Cardiology, but the reason for this appointment was not clear. The specialty care tracking log does not have this appointment in the log. The medical record remarkably did not detail the ongoing care of the patient.

On 1/10/18, a doctor documented that the patient had been to a cardiologist but did not document what occurred. The only diagnosis was "cardiac." There was no therapeutic plan.

Between 1/10/18 and 5/11/18, the patient was evaluated on three occasions. One of these was a chronic clinic visit. On none of these visits did physicians document review of prior consultations. On 2/9/18, a doctor wrote, "He is planned to have a procedure? At SLUH." The doctor did not appear to know what the therapeutic plan was or what procedure the patient was scheduled for. The other notes, including the chronic clinic visit, do not document understanding of what occurred at consultation visits or what the therapeutic plan was.

On 5/11/18, the patient went offsite for a medical furlough. There was no report. The specialty care tracking log did not document a visit for this patient on this date. A nurse practitioner saw the patient on 5/17/18 and documented that the patient had been offsite but that there was no report and no action was taken.

Care for this patient was grossly and flagrantly unacceptable as providers at MCC, despite three consultations, did not identify all of the patient's conditions, did not document a therapeutic plan for the patient, and were not monitoring all of the patient's medical conditions in chronic care clinics. No one documented what had occurred at the consultations, including status of the patient or recommendations for further care. One doctor diagnosed the patient repeatedly as "cardiac," and did not appear to understand what the patient's conditions were. It appeared that at least two recommendations of the cardiologist (ultrasound of the liver and referral to an electrophysiologist) did not occur. Two of the consultations had no report and it was not clear what the patient was seen for. The patient had multiple abnormalities that were not documented as being monitored including:

o Transformation of the EKG to first degree AV block with left atrial enlargement and STT wave changes
o Thrombocytopenia of 79,000 and white count of 3.8 on 9/11/17
o Bilirubin 1.3 on 2/5/18
o The venous stasis ulcer

The tracking log failed to accurately document specialty care appointments. Post consultation visits failed to include documentation of understanding of what occurred at the consultation or hospitalization. Three of five hospitalizations did not include a report. Two offsite consultations did not include a report. It was not possible, reading the medical record of this patient, to understand what the patient's status was or what the therapeutic plan of the cardiologist was. The patient's serious medical condition was so poorly managed that he is placed at serious risk of ongoing harm.

- Another patient was 66 years old with a history of hypertension.[97] This patient's medical conditions were mismanaged over a two-year period. The patient had wheezing on 10 separate occasions from late 2016 until April of 2018 without a diagnosis being made. Although presumably treated for asthma, the patient was not diagnosed with asthma and was not in chronic clinic for this condition. The patient's wheezing occurred with cardiomegaly and a chest x-ray showing an enlarged heart. These are consistent with heart failure, yet when providers referred the patient to a pulmonologist and cardiologist, the Wexford utilization doctor denied the referrals without recommending an adequate plan of action. Echocardiogram and pulmonary function tests should have been done. The referrals to cardiology and pulmonary were appropriate but not permitted. A second cardiology referral was again denied without an adequate alternative treatment plan. A nurse practitioner again referred the patient for CT scan and a pulmonary consult, but the CT scan was denied, and although the pulmonary consult was approved, there was no evidence it ever occurred.

  In early 2018, the patient developed shortness of breath, wheezing, and tachycardia, and was seen on three occasions (4/21/18 and twice on 4/22/18) by nurses who did not even refer the patient to a doctor. The patient should have been immediately referred and this placed the patient at life-threatening risk, as there was no diagnosis yet. When a nurse practitioner finally saw the patient on 4/23/18, the nurse practitioner treated the patient for an infection and apparently for asthma, even though this diagnosis had never been made and was not made at this evaluation. A chest x-ray was ordered and was consistent with heart failure. But when a nurse practitioner saw the patient on 4/27/18, the chest x-ray was not documented as being evaluated. On 5/4/18, the patient was admitted to the hospital for a supraventricular arrhythmia and was diagnosed with atrial fibrillation. An echocardiogram was consistent with heart failure. When the patient returned to the facility on 5/8/18, the patient did not receive two ordered medications (Lopressor and diltiazem) for two days. The patient was never documented as having heart failure and his wheezing remained undiagnosed, although it appears he was treated as having asthma.

  Also, we noted that this patient had elevated alkaline phosphatase as high as 217 on 12/15/17 and had an elevation of this test dating from 12/18/15, yet it was never evaluated. He may have undiagnosed serious liver or bone disease. Also, the patient had

---

[97] Patient #9 Specialty Consultations and Hospitalization.

an elevated 10-year risk of heart disease dating from at least 2/24/16, yet was not treated with a moderate or high-intensity statin, which is recommended; or considered for aspirin treatment, which is also recommended, but was not done. The care placed the patient at continual risk of ongoing harm. The care of this patient was grossly and flagrantly unacceptable, particularly the denial for cardiology and pulmonary referral when the patient had undiagnosed symptoms of pulmonary disease or heart failure that were not diagnosed or monitored.

In summary, the deficiencies in Urgent/Emergent Care were similar in frequency and type to those reported by the First Court Appointed Expert. These include absence of important information from the hospital, inadequate assessments by nursing staff, untimely physician follow up, and failure to monitor or intervene. We found many additional deficiencies, including inappropriate denials of care by the Wexford utilization physician, failure to review or complete recommendations of consultants, ignorance of the status or therapeutic plan recommended by consultants, and failure to follow up on abnormal test results. Several episodes of care were grossly and flagrantly unacceptable, sufficient to typically result in peer review of the clinician caring for the patient. We agree with the First Court Appointed Expert's recommendations and make additional recommendations found at the end of this report.

## Specialty Consultations

**Methodology:** We reviewed 12 specialty consultations in four patients and reviewed other records. We spoke with the clerk who schedules specialty care. We reviewed the specialty care log and other documents.

**First Court Expert Findings**
Providers do not explain alternate treatment plans to patients. Follow up was inconsistent and problematic. Consultant reports were frequently unavailable, making follow up difficult.

**Current Findings**
We found that all of the First Court Expert's findings were still present. There was no documentation of a discussion by the primary care provider with the patient following consultation visits of the consultant's recommendations or after an alternative treatment plan was initiated. We found that the alternative treatment plans were occasionally described by the scheduling clerk in progress notes. However, alternative treatment plans were not being documented by the primary care provider. According to the scheduling clerk, consultation reports are present for only about half of the consultations. We also found that follow up of recommendations was inconsistent.

The process of obtaining specialty care was similar to all other facilities. The expectation is that there is to be a written referral for specialty care, an approval of the referral in a collegial conference call, a scheduled appointment, and a follow up of the appointment with the primary care provider. All of these events are to be documented in the medical record.

Specialty care referrals at MCC are not tracked on a log in a manner that accurately documents all steps of the referral process. Three hundred ninety-nine (44%) of 892 referrals in 2017 did not have a referral date documented in the specialty clinic tracking log. Of the 892 appointments, 877 (98%) had an approval date documented on the log, but only 469 (53%) had the date of the completed appointment documented on the log.

It was not possible, using the specialty care tracking log, to determine whether patients were timely receiving care. In chart reviews, the referral, approval, appointment, and follow up were not consistently documented in the medical record. This made it impossible to verify the timeliness or completeness of specialty care benchmarks using either the tracking log or the medical record. As with other facilities, the approval date was the most frequently documented item on the specialty care log, making it appear that approval of care is the most important tracked item.

There were a low number of referrals for specialty care and an extraordinary number of denials of care at MCC. The 2018 annual CQI report lists 994 referrals for care in fiscal year 2018.[98] This is the second lowest number of referrals per 1000 population of all five sites we have visited.[99] Despite having a very low rate of referrals, MCC also has the highest number and rate of denials of care of the five facilities we have visited.[100] The CQI report documents 237 (24%) denials of care. The five facilities we visited averaged 9.5% denials of referred cases. The CQI report did not analyze the reason for the high number of denials. We were told that the Medical Director was asked by patients for certain services which the Medical Director did not feel comfortable telling the patients were unnecessary. So, the Medical Director would refer the patient for a service knowing that the utilization physician would deny it. If this is accurate, this is a cynical misuse of a referral process, disrespectful of patients, and violates effective communication of the treating physician and the patient. We were told that this practice is no longer occurring. This practice does not explain the very low rate of referral. We were told that the Medical Director is also now taking referrals more seriously and preparing a rationale prior to the collegial reviews so that a greater number of referrals are approved. It is our opinion that, based on record reviews in this report, many persons who need specialty services are not referred. The lack of primary care physicians and the Wexford utilization process itself are likely the cause of this phenomena.

The program had a concern about the number of denials and initiated a CQI study on denials. The title of this study was Re-education in Amount of Medical Specialty Service Denials. The plan of the study was to decrease denials of specialty care by 30%. The hypothesis of the CQI study was that if a doctor reviewed documents being sent to the utilization physician prior to the collegial review conference call to ensure that all treatments and steps that should have been taken before referral were done and that all clinical information was available to the utilization physician, that the number of denials would decrease. The CQI study compared the usual referral process to a process with additional Medical Director preparation of referral documents. The

---

[98] The fiscal year in Illinois is July 1 through June 30.
[99] NRC was the lowest, at 144 referrals per 1000 population. MCC had 994 referrals a year or 328 referrals per 1000 inmates.
[100] We include a table of referrals and denials in the Specialty Care section of our Summary Report. Please refer to that section to review these data.

number of referrals for consultations was 578 in a six-month period prior to the Medical Director review of referral documentation material and 189 over a three-month period of study when the Medical Director reviewed documents in advance. There were 153 denials over the six-month period prior to the study and 55 denials in the three-month study period. This revised practice resulted in a decrease in both referrals and in denials.

Although the intention was to reduce denials, the most important result, in our opinion, was to reduce referral. Given that MCC has one of the lowest rates of referral for specialty care, we were concerned that this process will place inmates at greater risk of harm by further reduction of necessary referral.[101] Based on record reviews, including mortality reviews, we found that far fewer patients were referred for consultations than should have been. It is our opinion that under referral is a more important problem than over referral. It is also our opinion that if the collegial review process worked as designed, unnecessary denials should be eliminated in the collegial discussion. What can the Medical Director prepare the day in advance that could not be discussed the day of the "collegial" review discussion? We view the collegial review process as a barrier to specialty care and believe it should be eliminated as it currently exists.

The program does not track whether clinical staff document benchmark events of specialty care (referral, collegial review, appointment date, and five-day follow up) in the medical record. The tracking log is so poorly maintained that it was not possible to use it for this purpose. As discussed above, 44% of referrals and 53% of appointments listed on the log did not have a date associated with them. Based on record review, we found that these specialty care benchmarks are not consistently documented in the medical record. There was therefore no means to verify whether care was timely or was being followed up.

The attorney for Wexford communicated by email to us that we would need to review individual records to obtain the alternative treatment plan information, as it was not centrally maintained. On chart reviews we performed we were unable to locate alternative treatment plans for all denials. The scheduling clerk, but not the doctor, would sometimes document the alternate treatment plan, based presumably on information obtained on the collegial review calls.

For specialty consultations that were completed, we noted multiple problems. These included:
- Delayed specialty care due to the collegial process
- Lack of follow up of recommendations of the consultant
- Failure to timely schedule follow-up appointments
- Failure to obtain reports of consultation care
- Failure to appreciate the status of the patient as reported by the consultant
- Failure to monitor the clinical care of the patient as recommended by the consultant and
- Failure to refer patients for specialty care when it was clinically indicated.

---

[101] Referrals per 1000 inmates was 328 at MCC ,which was the second lowest number of the five sites we visited. This information is available in a table in the Summary Report section of the overall report.

We reviewed four records of patients who had multiple specialty visits. All four had significant problems. The following record reviews illustrate these problems.

- The first patient had hypertension, epilepsy, and asthma.[102] On three occasions in 2016, EKGs had T wave tracings consistent with possible ischemia. In April of 2016, he had over a 10% risk of heart disease but was not on a statin or on aspirin, both of which the patient should have been on. Eventually, in August of 2016 the patient was hospitalized for chest pain, and a cardiac catheterization showed 60% stenosis of the circumflex coronary artery and 15-20% stenosis of the left main coronary artery. It was recommended that he be aggressively medically managed, including with a high-intensity statin, and Brilinta, an anticoagulant.

  On return to the facility from the hospital, medication was started as recommended. In November of 2017, the patient experienced chest pain and was again hospitalized. He had a myocardial infarction. A stent was inserted. The patient was documented as receiving two doses of medication at MCC during the times when he was hospitalized, indicating problems with documentation and medication administration. When discharged from the hospital, a cardiology consultation was recommended. This appointment occurred in December of 2017. The cardiologist recommended a follow-up cardiology consultation, but that referral never took place and there was no explanation in the record as to why the patient was not sent back to the cardiologist. The patient was on Brilinta, likely because of the myocardial infarction and because he had a stent. Some stents require use of a medication like Brilinta to prevent clotting in the stent. Yet in February of 2018, a doctor at MCC stopped the Brilinta without explanation and without substitution with a similar drug. This placed the patient at significant risk of stent clotting and further myocardial infarction. Based on documentation, it did not appear that the physician evaluating the patient reviewed the cardiology consult or understood the reason for being on Brilinta.

  Problems with this patient's care included not being started on a statin drug or aspirin early in his disease, which placed the patient at higher risk for myocardial infarction. The patient was documented as receiving medication at MCC when he was hospitalized, which is a problem with documentation of medication administration. A recommended follow-up cardiology appointment never occurred and there was no explanation why. The post-cardiology physician visit at MCC was two months after the consultation and the doctor did not review the cardiology consultation report. Effectively, there was no follow-up medical appointment to determine the status of the patient's condition after the cardiology consultation. The doctor stopped the anticoagulant despite the patient having had a cardiac event and a recent stent. There was no explanation given for discontinuation of the medication. This placed the patient at significant risk of stent clotting and myocardial infarction.

---

[102] Patient #2 Specialty Consultations and Hospitalization.

- Another patient initially complained to a nurse of neck pain in March of 2016, and the nurse did not refer to a provider, but gave the patient ibuprofen by protocol.[103] In December of 2016, the patient again complained of a sore throat and swelling on the left side of his neck. The nurse evaluating the patient used an upper respiratory protocol, which was not an appropriate protocol to use. The nurse noted an enlarged lymph node on the left which was tender. No referral was made. This was inappropriate; the nurse should have referred to a provider.

A CMT evaluated the patient again for sore throat on 1/6/17. The CMT noted an "enlarged lymph node" and gave the patient acetaminophen by protocol. A nurse practitioner saw the patient on 1/11/17 and noted that the left neck was swollen and "hard." The nurse practitioner diagnosed pharyngitis and ordered an x-ray and an antibiotic. No follow up was ordered. A hard neck swelling is not consistent with pharyngitis. Other work up (CT scan and lab tests) were indicated but not done.

An LPN evaluated the patient on 2/7/17 for neck pain, which the patient described as having since December. The LPN noted a "large swollen lump under L side jaw." Presumably, the LPN referred the patient to a physician. On 2/15/17, a clerk documented that a doctor presented the patient at collegial review for a CT scan, which was denied by a Wexford utilization physician. The CT scan was appropriate and should have been approved, in our opinion.

On 3/3/17, a CMT evaluated the patient again for neck pain and noted a large lump on the left side of the neck. The CMT described the lump as getting bigger and harder. On 3/8/17, a doctor again referred the patient for a CT scan, which was discussed in collegial review on 3/8/17 and again denied. The Wexford UM physician recommended a neck ultrasound as an alternative plan. Ultrasounds are useful tests to evaluate thyroid conditions, but hard neck masses are best evaluated with CT scan. Getting an ultrasound would only serve to delay the diagnostic effort.

An ultrasound was done on 4/4/17 and showed a mass. The radiologist recommended a CT scan. The doctor at MCC referred the patient for CT scan on 4/12/17 and it was approved on 4/17/17. The CT scan was not done until 5/22/17 and showed a complex mass suspicious for malignancy.

On 6/8/17, a doctor referred the patient to a general surgeon for biopsy, but in collegial review on 6/22/17, the Wexford utilization physician changed the referral to an Ear Nose and Throat (ENT) surgeon. The consultation with the ENT occurred on 7/31/17 and the surgeon recommended a biopsy. The biopsy was approved on 8/4/17 and done on 8/18/17. The biopsy showed squamous cell carcinoma of the tongue. This significant delay (eight months) in diagnosis of a head and neck cancer appeared to be caused by the collegial review process and inability of primary care doctors to timely evaluate a hard neck mass.

---

[103] Patient #3 Specialty Consultations and Hospitalization.

On 9/13/17, a doctor at MCC saw the patient but there was no report yet of the biopsy. A doctor saw the patient again on 9/27/17 and again there was no report. Apparently, the ENT surgeon working through the scheduler had multiple pre-operative appointments made at Barnes Jewish Hospital in St. Louis. The patient ultimately had surgery on 10/4/17 to remove an advanced disease tumor with metastases to lymph nodes. The patient was discharged with recommendation for speech therapy, a swallow study, and ENT and oncology follow up.

On 10/17/17, the patient went for an offsite appointment, but it was not clear what the patient was seen for. On 10/18/17, a doctor at MCC documented that the patient had a swallow study, but did not document what the therapeutic plan was for the patient regarding eating or follow up. A report of the swallow study noted that the patient could start eating with nutritional supplements and could upgrade the diet. Swallowing exercises were recommended during radiation therapy. These recommendations were not documented by MCC physicians as incorporated into the patient's therapeutic plan and it was not clear that they occurred. On 10/26/17, the patient was discharged from the infirmary without a documented therapeutic plan except that the patient was to start radiation therapy. Documentation was poor, and it was not clear whether the patient kept the ENT, oncology, or initial radiation therapy appointments.

Problems with this patient's care included a delay of eight months from the time the patient complained of a lump in his neck until the squamous cell carcinoma was definitively diagnosed and an additional two months until resection of the tumor occurred. The patient had advanced cancer and the delay may have contributed to its spread. The Wexford utilization physician made an improper decision in twice denying a CT scan for a hard neck mass. Consultant reports after surgery were not available in the medical record and doctors did not document understanding of the therapeutic plan except that the patient was to receive radiation therapy. There is no evidence in the records that some of the recommendations for follow up with consultants occurred or whether a recommendation for swallowing exercises was discussed with the patient. Also, there was no evidence we could find of a comprehensive dental examination, including of the oral cavity, that may have identified the oral cancer earlier. This speaks to the lack of comprehensive dental evaluations.

- Another patient had long standing hip pain.[104] On 8/22/08, an x-ray showed marked reduction of the left hip joint with sclerosis of the joint. The impression was severe osteoarthritis with no change since the last study. X-rays were taken again in 2009, 2011, 2013, and 2014, all showing continued deterioration. A 2015 x-ray showed "near obliteration of the joint space with prominent juxta-articular bone spurs and subcondylar cysts." Indications for hip replacement are failure of conservative management, debilitating pain, and significant decrease in activities of daily living. This patient appeared to have indications for hip replacement surgery as early as 2008.

---

[104] Patient #4 Specialty Consultations and Hospitalization.

On 3/8/16, a nurse saw the patient. Indications for hip replacement were present. The nurse documented that a physician requested a collegial review because the hip "comes out of joint when walking. Painful movements noted, appearance of possible foot drop." We could not find the collegial review for this patient around March of 2016 in the record. So, it is not clear if the collegial review happened or if it was denied or just not documented.

On 6/5/16, a nurse saw the patient and noted pain in the hip, unsteady gait, and difficulty in standing up, and requested a low bunk for that reason. There were a lack of physician evaluations documenting a thorough history and physical examination during this time period. However, the nurse sent the patient to a nurse practitioner, who saw the patient on 6/8/16 and referred the patient to the Medical Director for a consultation referral for the hip.

On 6/10/16, a doctor referred the patient to an orthopedic surgeon. On 6/15/16, a clerk documented that the patient was discussed in collegial review, but a final decision was pending. On 6/29/16, a clerk documented that the referral was denied. The clerk did not document the alternative treatment plan. There were no physician notes documenting the plan of care for the patient. However, it appears that the alternate treatment plan was to refer to a physical therapist.

On 7/22/16, the patient went to a physical therapist in Carbondale. The therapist noted that the patient had a hard time walking and was unstable when standing and had crepitance of the left hip. The therapist gave the patient exercises but noted that the patient probably needed hip replacement.

No action was taken based on the 7/22/16 therapy consultation until 11/11/16, when an MCC physician referred the patient to an orthopedic surgeon again. This referral was an appeal of the prior decision. Because it was an appeal, the IDOC was involved. The referral was approved on 11/22/16.

An orthopedic consultant saw the patient on 12/20/16. The consultant noted that the patient could not put weight on the joint and struggled to walk, and pain medication was no longer effective in relieving pain. The consultant recommended total hip replacement. The patient was now on tramadol for pain relief. Tramadol is an opioid pain medication.

The MCC doctor referred the patient for total hip replacement on 12/23/16. The procedure was approved by Wexford on 1/6/17. Despite the approval for hip replacement, the pre-operative evaluation was not approved until 2/20/17. The hip replacement was not performed until 3/20/17. The hospital's procedure for hip replacement was to start an anticoagulant and perform a Doppler study of the legs to rule out DVT in four weeks. During the entire post-operative period when the patient was on anticoagulation, the INR was not checked once even though it is standard practice to do so.

On 4/4/17, an orthopedic surgeon saw the patient and again recommended obtaining a venous Doppler study and, if negative, to stop the anticoagulation. However, when a doctor at MCC saw the patient on 4/13/17, about nine days after the consultation, the doctor ignored the recommendation for a Doppler study and just stopped the anticoagulant. The doctor did not document review of the orthopedic consultant note. The patient was not referred for physical therapy until July 2017.

Problems with this patient's care included a significant delay in hip replacement surgery. There was x-ray evidence of severe degeneration of the joint since 2008. Physician notes failed to document a thorough history or physical examination in any notes of the current volume. However, a nurse noted that the patient could not walk due to the joint problem. Even after a doctor referred the patient to an orthopedic consultant, it was initially denied. Referral to a physical therapist resulted in an opinion that hip replacement was needed. The patient ultimately went to an orthopedic consultant. But after a recommendation for hip replacement, the surgery was delayed for another three months. A recommendation by the orthopedic consultant to obtain a Doppler study to assess for thrombosis was ignored by MCC staff. It was not even clear that they reviewed the consultant report. Physical therapy was not initiated for four months after the surgery. While hip replacement is an elective procedure, the surgery was delayed apparently for years, resulting in pain and disability endured by the patient for an extended period of time.

- Another patient did not have appropriate management of his goiter or appropriate follow up of his rheumatoid arthritis.[105] On 10/23/15, a dentist told a CMT to refer the patient to a doctor for a goiter first noticed by the dentist. The goiter had been unrecognized previously by medical staff. The dentist ordered a thyroid panel and an antinuclear antibody test. The antinuclear antibody test is a test for autoimmune disease and is not a test typically ordered to evaluate a goiter. A doctor, not a dentist, should have been initiating care for the patient. A doctor did not initially evaluate the patient's goiter by taking a history or performing a physical examination of the goiter. Goiters should be evaluated to assess whether they are so large that they are obstructive and impinge on the trachea. The reason for the goiter should also be determined; some multi-nodular goiters are cancerous. The TSH ordered by the dentist was reviewed by a doctor and was elevated, indicating hypothyroidism. A doctor ordered Synthroid but did not document a discussion of this medication with the patient, did not perform an evaluation of the etiology of the goiter, did not evaluate for obstruction, and did not appear to see the patient.

About two months after the dentist referred the patient, a doctor apparently saw the patient on 12/15/15. The doctor did not take a history of the patient's condition or perform a physical examination, so it was not clear from the note whether the doctor evaluated the patient in person. Goiters may be caused by a variety of conditions or may

---

[105] Patient #5 Specialty Consultations and Hospitalization.

be large and cause obstruction of the trachea. The doctor failed to evaluate for the cause of the goiter, did not evaluate for obstruction, and merely noted that the patient was not taking the Synthroid. The doctor did not document a discussion with the patient about why the Synthroid was necessary. The doctor did not document a diagnosis. The doctor was treating the elevated TSH without establishing a diagnosis. The doctor was a surgeon and may not have understood how to properly evaluate a goiter. The patient, therefore, should have been referred to an endocrinologist.

The TSH remained elevated. On 1/21/16, a physician saw the patient. Again, there was no history or physical examination. The doctor noted that the rheumatoid factor test was elevated (348) and that the Synthroid was recently increased. No action was taken with respect to the elevated rheumatoid factor. A year earlier the patient had complained to a nurse about multiple joint pains, but this had not resulted in a physician evaluation of the joint pains. Also, no evaluation was initiated to evaluate the cause of the goiter. It appeared that the doctor did not know how to evaluate the patient's conditions and the patient should have been referred to someone who knew how to manage these problems.

Two months later, on 3/15/16, without explanation, the doctor referred the patient for an ultrasound of the thyroid gland. This test was an appropriate test for the goiter but should have been ordered four months earlier, when the goiter was first identified. The doctor's only history was that the patient still had polyarticular pain. The doctor, knowing that the rheumatoid factor was significantly elevated, took no other history of the joint pains and performed no examination of the patient's joints. The doctor took no history of symptoms of obstruction of the trachea and performed no examination of the goiter. The only actions taken were to refer for an ultrasound, to order a TSH, and to increase the Synthroid. The doctor did not appear to know how to manage this patient's polyarticular arthritis or goiter.

On 5/20/16, an ultrasound of the goiter showed an enlarged thyroid gland with multiple nodules. Multinodular goiter can be caused by multiple different conditions, which had yet to be determined.

On 5/25/16, a doctor saw the patient for joint pains and ordered x-rays of the elbows and wrists. Another rheumatoid factor test was ordered and was again elevated.

On 6/13/16, a different doctor noted the positive rheumatoid factor and that the patient had an enlarged thyroid gland with multiple nodules. This doctor, who was an internist, referred the patient back to the primary doctor, who was a surgeon, to consider referral for a thyroid nuclear scan. A thyroid nuclear scan would be indicated if the patient was hyperthyroid, but this patient was hypothyroid. A thyroid scan would not typically be recommended. What was necessary was to determine the cause of the multinodular goiter and to determine if the goiter was causing obstruction.

On 6/16/16, a doctor saw the patient and noted painful wrists, but did not document a thorough examination of the joints.

On 7/7/16, a doctor saw the patient and noted that the patient had multinodular goiter and that the TSH was still elevated, and increased the Synthroid. The doctor initiated no further evaluation to determine the cause of the multinodular goiter. The doctor did not evaluate the size of the goiter and did not determine if it was causing obstructive symptoms. The doctor did finally refer the patient to a rheumatologist.

A rheumatologist saw the patient on 12/16/16. The rheumatologist diagnosed likely rheumatoid arthritis and recommended a tapering steroid dose. He requested hepatitis tests and, if negative, would start methotrexate. A six to eight week follow up was recommended.

A nurse practitioner saw the patient on 12/16/16, the day of the rheumatology consultation. The patient had not been evaluated at MCC for his arthritis or goiter since July. Apparently, he was not enrolled in chronic clinics for these conditions. The nurse practitioner noted that the rheumatologist had recommended a tapering steroid dose for the arthritis and that a surgery consultation was also recommended. The reason for the surgery consultation was not stated. The nurse practitioner did not document review of the rheumatology note; apparently this had not yet been provided. A doctor saw the patient post-rheumatology visit on 12/22/16, but did not document review of the consultation except to note that the patient was on a tapering steroid dose. The doctor took no history, performed no physical examination, and did not make any assessment of any of the patient's conditions.

Although the rheumatologist recommended a six to eight week follow up, the patient did not return to the rheumatologist until 3/28/17, over three months later. A report of this visit was in the medical record. The rheumatologist diagnosed seropositive erosive rheumatoid arthritis and recommended methotrexate titrated up to a dose of 20 mg weekly. He recommended monthly CBC and CMP to monitor for methotrexate toxicity and a six to eight week follow up.

There was no follow up by an MCC physician after the rheumatology visit. Rheumatoid arthritis was not added as a problem and was not being followed in chronic illness clinic. A CBC and CMP were done on 4/6/17, but monthly follow-up tests were not documented as reviewed by physicians.

The follow up with the rheumatologist occurred in about three months, on 6/16/17, later than recommended. The rheumatologist noted that the requested CBC and CMP tests were unavailable and that requested x-rays of the hands and a TB skin test result were also not sent as requested. The rheumatologist tried to contact the MCC Medical Director but could not contact him. The rheumatologist added sulfasalazine and was considering adding hydroxychloroquine for the arthritis, but wanted an ophthalmology evaluation

before adding hydroxychloroquine. The consultant recommended a CBC, CMP every 30 days along with ESR and CRP tests, an ophthalmology evaluation, and return in six to eight weeks.

The patient was not evaluated by a physician post-rheumatology consultation. On 8/24/17, more than two months after the rheumatology visit, a doctor documented that the patient was recently seen by a rheumatologist and that the patient was on methotrexate and folate. There was no history, physical examination, or update on the patient's status. The doctor did not document review of the rheumatology note and appeared unaware that the rheumatologist had recommended sulfasalazine. There was no evidence in the medical record or on the specialty tracking log that an ophthalmology referral was made. The doctor did not document review of the CBC and CMP for methotrexate toxicity.

On 9/22/17, a doctor documented that the patient had seen a rheumatologist but that there was no report. The tracking log documented that the patient was seen by a rheumatologist on 9/22/17, but there was no report in the medical record and no evidence in the medical record that an appointment had occurred. The doctor at MCC did document prescribing sulfasalazine on 9/22/17. There was no history, physical examination, or updates on the status of the patient's conditions. The multinodular goiter was not addressed. The patient was not monitored with CBC or CMP for methotrexate toxicity and neither the multinodular goiter nor rheumatoid arthritis were not being followed in chronic clinics. Since there was no report, it was not clear if a follow up rheumatology consultation was recommended.

The patient was not seen again for these problems by a physician until 12/30/17, when a coverage doctor saw the patient. There was no history or physical examination. The rheumatology note was still not present. The doctor wrote, "Pt wants [treatment] for Crohn's prescribed by consultant." The doctor prescribed sulfasalazine. The sulfasalazine had expired without notice. Also, the doctor presumed that the patient was taking the sulfasalazine for Crohn's disease, when he was taking it for rheumatoid arthritis. The doctor took no history, performed no physical examination, did not review the rheumatology report, did not monitor the patient for methotrexate toxicity, did not document or understand the therapeutic plan for the patient, and did not even know what conditions the patient had. There was a complete absence of management or monitoring of this patient's serious medical conditions.

There were multiple problems with the care of this patient. The goiter was not appropriately evaluated, and a diagnosis was not made as to the etiology of the goiter. There was no evidence of a history or physical examination determining whether or not there were obstructive symptoms. Physicians did not document whether the ultrasound indicated that a biopsy was needed. Because the physicians appeared unable to appropriately evaluate this condition, the patient should have been referred to an endocrinologist. Also, the patient had long-standing pain in multiple joints. The patient

never had an adequate evaluation for this condition at MCC over two years. The patient was sent to a rheumatologist but return appointments were late. Recommended testing was not done or not provided to the rheumatologist. A recommendation by the rheumatologist for ophthalmology evaluation was unnoticed or ignored by MCC physicians. Consulting reports were not all available, and doctors and MCC did not document knowledge of the status of the patient's condition. Recommended medication was not timely prescribed. One doctor appeared unaware of the patient's actual diagnosis. Doctors appeared unaware of the treatment plan of the rheumatologist and were not monitoring the patient as recommended. The patient's rheumatoid arthritis and goiter were not identified as problems and were not being monitored in chronic illness clinic. The doctors at MCC did not appear to know how to manage the rheumatoid arthritis. Even though the patient was sent to a rheumatologist, the follow up was non-existent and placed the patient at risk of harm.

- Another patient was incarcerated on 3/3/17 at MCC.[106] The patient had a history of hepatitis C. The platelets were not initially done, but by 7/18/17 the platelets were 147 and AST was 141, which yielded an APRI score of 2.4, indicating likely cirrhosis. The patient was released on parole and re-incarcerated on 5/4/18. Despite having likely cirrhosis on APRI in March of 2017, the patient did not have an evaluation for cirrhosis, did not receive an upper endoscopy to screen for varices, and did not receive semi-annual ultrasound tests to screen for hepatocellular carcinoma. Patients in IDOC are not typically screened for cirrhosis, do not typically receive endoscopy when they have likely cirrhosis, and do not consistently receive screening for hepatocellular carcinoma. We have seen this repeatedly in IDOC. We note that the IDOC hepatitis C guidelines require a fibroscan for patients with an elevated APRI. This was not done for this patient. A fibroscan would have provided additional information as to whether the patient had cirrhosis.

- Another patient had an APRI score of 1.14 from at least 5/1/17, yet a year later, as of 5/16/18, the patient was still not referred to UIC for treatment of his hepatitis C.[107] The patient was evaluated in hepatitis C clinic twice. Yet when seen in this clinic, there was no evaluation for cirrhosis, no endoscopy to screen for varices, and no ultrasound to screen for hepatocellular carcinoma. This is significant underutilization that places the patient at risk of harm. We discuss deficiencies in hepatitis C care in the Chronic Care section of this report.

## Infirmary Care

**Methodology:** The clinic space and equipment in the infirmary was inspected, nursing staff were questioned, clinical charts audited, nurse logs reviewed, porters questioned, and patient-inmates interviewed. The infirmary physician was not interviewed.

---

[106] Patient #11 Specialty Consultations and Hospitalizations.
[107] Patient #10 Specialty Consultations and Hospitalizations.

**First Court Expert Findings**

The First Court Expert noted that the infirmary was staffed 24 hours a day and seven days per week with RN's. The infirmary patient rooms were padlocked and did not have nurse call devices. He commented that padlocked rooms created a serious barrier to the expedited evacuation of patient-inmates in the case of fire or other emergencies. The First Court Expert reported that the porters had not been trained about blood borne pathogens, infectious and communicable diseases, body fluid cleanups, the proper sanitation of the patient-inmate areas, and the confidentiality of patient information. Only four of the 26 infirmary beds were hospital beds and only one of these four hospital beds had functional safety rails. The infirmary bed linen was torn and ragged. The First Court Expert also noted that the infirmary linens were being cleaned in a residential level washing machine that did not achieve the temperature required to sanitize contaminated linen.

**Current Findings**

With the exception of the finding that the porters now had received documented training and the linens were generally good condition, we agree with the findings of the First Court Expert and we identified the following additional findings:

- Nearly half of the patient-inmates were permanently assigned to the infirmary.
- Two of the patients primarily require skilled nursing care that the infirmary is neither staffed nor equipped to provide.
- Provider admission and progress notes met the frequency and timeliness standards established by the IDOC.
- Admission RN notes are written in accord with the established timelines. Nurse notes are written daily and provide useful information on the clinical status of a patient.
- The quality of provider notes was inconsistent and failed to reflect key components of the patients' histories, physical findings, and the treatment plan.
- Provider admission and progress notes were brief and contained limited clinical information or rationale for treatment plans.
- The infirmary provider does not write intermittent comprehensive progress notes that summarize and update the patient's current condition and treatment plan.
- Only three of the 26 infirmary beds were hospital beds with adjustable heights and head and leg sections. In spite of the high level of physical and mental impairment of the patients housed on the infirmary, there were an insufficient number of adjustable hospital beds in the infirmary. The low level fixed metal beds make it difficult to examine and transfer patients. This is a barrier to the delivery of needed care and put the staff at risk for injuries.
- There is no exam room in the infirmary.
- None of the infirmary patient rooms have nurse call devices.
- The padlocked patient room doors are an obvious barrier to the infirmary's ability to safely evacuate patient-inmates in emergency situations.
- The level of nursing staffing, the type and quality of the beds, and the diligence of the infirmary provider are not adequate to provide the level of care needed by patients who require skilled nursing services and monitoring of complicated conditions.

The infirmary is located on the third floor of the health care unit. The infirmary has 26 beds; the census was six on the day of the inspection. The physical plant and layout is unchanged since the First Court Expert's report. Nurses reported that the provider generally makes rounds once a week and that most patients have a weekly provider note. A review of the charts revealed that nurse admission notes and vital signs were recorded on the day of admission. This is in accord with IDOC policy 04.03.120.[108] In-depth review of four infirmary records verified that all four had provider admission notes written within 48 hours of admission and, with one exception, there were at least weekly provider progress notes. Nursing notes were consistently entered no less than daily and commonly on every shift.

It was reported that an RN is assigned to the infirmary on all shifts seven days a week and that there are generally two nursing personnel on each shift. Patients who need additional assistance with activities of daily living (ADL) may have an inmate assistant who is assigned to a bed in the same room as the patient. At the time of the inspection, one of the six patients had a live-in inmate assistant. Three porters also live in a separate room in infirmary.

Three of the individuals in the infirmary were designated or soon to be designated as requiring assistance with some activities of daily living. Included in this non-independent group were two individuals with metastatic cancer, one of whom refused all further treatment and had signed a Do Not Resuscitate form (DNR). Another individual has severe spinal arthritis; the risk for fall was so high that his mattress was placed on the floor. This individual should have been assigned to the hospital bed that had functional safety railings.

None of the infirmary rooms had nurse call devices. The HCUA is aware of this problem and is working to purchase the same type of nurse call device that has been installed at LCC. None of the patient rooms at MCC's infirmary was in the direct line of sight from the nurse station or the correctional officer desk. Since the infirmary rooms are padlocked, patients stated that they would have to bang on their padlocked door and yell if they had an urgent condition. The condition of at least two of the patients precludes their capability to stand up, walk to the door, and bang for assistance. As noted during the First Court Expert's report, the patient rooms continue to be padlocked at all hours; this creates a significant safety risk if the floor needs to be evacuated during a fire.

A number of concerns and deficiencies in the care provided to infirmary patients was noted. We describe these concerns and deficiencies below.

- A 63-year-old patient's problem list failed to note that this patient had a stroke, deep vein thrombosis on chronic anti-coagulation medication, an inferior vena cava filter, and urinary incontinence.[109] This creates a barrier to the delivery of continuous care to this very complicated patient. The infirmary provider notes were generally extremely brief,

---

[108] Reference Offender Infirmary Services.
[109] Infirmary Patient #1.

with "no change" being the entire note. Providers did not write an intermittent comprehensive provider note that addressed all of the patient's clinical conditions with the current treatment plan. There were no formal consultant reports from the interventional radiologist in the medical record. There was a seven-month period of time during which the patient's anticoagulation level was subtherapeutic on five of seven (71%) lab tests before the provider finally increased the dosage of warfarin. The patient had an expressive aphasia that interfered with his ability to communicate, yet there was no documentation in the chart that he had ever received speech therapy or if the aphasia had worsened or improved. This patient with documented stroke and hypertension was at risk for a recurrent cerebrovascular accident (stroke) and a myocardial infarction, yet had not been prescribed a high-intensity statin. This is not in accord with national and IDOC guidelines.[110] The patient had a ASCVD risk of >15% which warranted therapy.

- Prior to his recent return from the hospital and admission to the infirmary, another patient, a 58-year-old with hyperlipidemia on a moderate intensity statin, was seen three times in nurse sick calls during the month of March 2018 for mid-abdominal and chest pain and pressure, neck and shoulder pain with vomiting, and for EKG review.[111] An EKG with new ST elevation was inaccurately interpreted as having no changes from an EKG in 2017. There is no documentation that the provider compared these two EKGs. The only notes were written by nurses. The patient saw the provider on 3/30/18 with exercise-related shortness of breath and chest discomfort; he was sent to the hospital, where he underwent a coronary artery bypass after being diagnosed with a heart attack. He was returned to MCC with a LifeVest due to increased risk of ventricular arrhythmia resulting from decreased LVEF (24%) and ischemic cardiomyopathy. Based on his symptoms and his abnormal EKG, he should have hospitalized at least 12-24 days prior to his heart attack. His pre-heart attack ASCVD risk score was elevated (>7.5%) but the MCC clinical team did not calculate this risk and did not prescribe a high-intensity statin. He was seen twice by the infirmary provider during the first week, but then was not seen for next 21 days. This high-risk patient (post-op, congestive heart failure, high-risk for ventricular arrhythmia) should be followed and monitored more closely by the infirmary provider. To date, MCC providers have failed to screen this over 50-year-old patient for colon cancer[112] and to vaccinate this patient against pneumococcal 23 as indicated by national adult immunization standards.[113]

- A 48-year-old patient with an abdominal cancer that has progressed while on treatment is being followed by medical oncology, radiation oncology, and urology specialists.[114] He had been in the infirmary for over a year. Although the chart had weekly provider notes, these notes are extremely brief and contain very little clinical information about the

[110] Office of Health Services, Treatment Guidelines, Hyperlipidemia, March 2016, and ACC/AHA Arteriosclerosis Cardiovascular Risk Estimator.
[111] Infirmary Patient #2.
[112] USPSTF Colon Cancer Screening 2016.
[113] CDC 2018 Vaccines for Adults.
[114] Infirmary Patient #3.

patient's status and treatment. There were no intermittent comprehensive progress notes that summarize the current status and treatment plan for this complicated patient. Reading only the provider notes, it was difficult to follow the care that is being provided to this complicated cancer patient. If another provider had to assume responsibility for the care of the infirmary patients, it would extremely difficult to comprehend the status of this patient's cancer and the plan of treatment. This puts the health of the patient at risk for errors. There is also no documentation that the patient has received pneumococcal 13 and 23 vaccinations.[115]

- The next patient is a 79-year-old with metastatic prostate cancer on heavy analgesia who was intermittently confused and had difficulty ambulating, who suffered a torn urethral meatus that was reported to have occurred when the patient (or another person) stepped on the tubing of the catheter that was dangling and laid on the floor.[116] This could have been prevented with proper nursing management of the tube and bag. This patient is dying; there is no documentation that he has been considered for compassionate release from the IDOC. There is no documentation that this patient had ever been previously screened for colon cancer[117] during times prior to his metastatic cancer or administered the age recommended pneumococcal vaccines.[118] The patient has never been treated for hepatitis C, but based on his current condition, he is not a candidate for treatment.

With the exception of the previous recommendations that have been addressed, we agree with the recommendations of the First Court Expert and have additional recommendations that are found at the end of the report.

## Pharmacy/Medication Administration

**Methodology:** We reviewed medication services by touring the medication room with the Nursing Supervisor (IDOC) and interviewed four of five nurses preparing medication for delivery the afternoon of Wednesday, May 23, 2018. They were documenting medication as having been given as it was prepared and put into envelopes or pill cups to be administered later. We observed the count of controlled substances in the trauma area between shifts on Monday May 21, 2018. We also observed a nurse count out controlled substances to administer that evening. We also toured the medication storage area and interviewed one of the pharmacy assistants. Medication administration was not observed. We reviewed medication administration records and corresponding medical records of 11 patients selected from lists of patients on medications that cannot be missed.

### First Court Expert Findings

The system used, and policies and practices described in the previous Court Expert's report, are mostly unchanged today. Medications are provided by BosWell, a subcontractor to Wexford,

---

[115] CDC 2018 Vaccines for Adults.
[116] Infirmary Patient #4.
[117] USPSTF Colon Cancer Screening 2016.
[118] CDC 2018 Vaccines for Adults.

using a "fax and fill" system. Pharmacy assistants are responsible for sending orders and requisitions for stock medication to be dispensed by BosWell. These same personnel receive shipments and verify medications received against those ordered. Once this is completed, the medications are moved to the medication room where they are prepared by nurses for administration. Medications are administered by nursing staff at the cell door. Documentation of medication administered, refused, or not available is done on a paper Medication Administration Record (MAR) that is kept in binders in the medication room for the current month and filed in the medical record the month after.[119]

**Current Findings**

Medication administration at MCC is problematic and relies on outdated practices that are no longer considered safe from patient harm. These problem areas include:

- Handwritten orders and transcription of orders to the MAR
- Late transcription of orders
- Pre-pouring medication, including medications that are crushed and floated
- Use of unsanitary envelopes to administer medications
- Not having the MAR available during medication administration
- Not documenting administration of medication at the time it is given.

Chronic disease patients are not monitored to ensure continuity in treatment nor is their compliance with prescribed treatment assessed. Prescription end dates do not coincide with chronic clinic appointments and require patients to request renewals via sick call.[120]

In addition, we found that medication errors are not identified and/or not reported. One of the charts reviewed was a patient who had been hospitalized for several days and yet the MAR documents that nurses at MCC administered medication to him.[121] This is a significant documentation error that was not recognized or reported. Also, there is no accountability for the medications that were prepared but not administered to this patient.

In 23 months of CQI minutes provided for review, medication errors were reported only in four of those months.[122] Only once was there an attempt to categorize the types of errors reported. Pharmacy inspection reports are also not discussed at CQI meetings. There was no discussion or analysis to determine root causes of medication errors or trending to identify problems with the system to provide medications, or improve patient safety. Persistent problems with medication practices are not subject to corrective action or systematic quality improvement.

Medication errors have long been recognized as a substantial area of focus in improving the safety of patient care.[123] Handwritten orders and transcription have been eliminated in many correctional health care programs because of error and inefficiency. An obvious solution is to

---

[119] Lippert Report Menard pp. 21-22.
[120] Pharmacy/Medication Administration Patients #8-11.
[121] Patient #2 Specialty Consultation and Hospitalization
[122] MCC CQI agenda and minutes June 2016 – April 2018.
[123] Institute of Medicine (2000), To Err is Human: Building a Safer Health System. Washington DC: The Academies Press.

install computerized provider order entry (CPOE). This eliminates transcription by hand. Labels generated from the computerized order after it has been reviewed by a pharmacist are affixed to the MAR.[124] Automated dispensing cabinets are also being used more often now to record the withdrawal of controlled substances and eliminate manual inventory control systems like that implemented at DCC because of non-compliance on the audit at DCC. Upgrading pharmacy services in this way requires capital expenditure and would only likely happen as a statewide decision made by IDOC. But if these pervasive problems are not identified, discussed, studied, or reported at the facility level, IDOC is without notice that there is a systemic issue that must be addressed statewide.

<u>Orders and Delivery of Medication</u>

Medications are obtained from BosWell Pharmacy Services, via subcontract with Wexford. Prescriptions are faxed to BosWell and filled in 30-day "blister packs," and then delivered to MCC. A pharmacy assistant receives and inventories the medications in the medication storage area and then puts them into the room nurses use to prepare medication to give to patients. The pharmacy assistant we interviewed reported that prescriptions faxed to BosWell generally are received the next day. Delays in receiving medications were because the order needed clarification, a drug-drug interaction had to be addressed, or they required higher level approval (nonformulary). If medications are urgently needed, they can be obtained from a local pharmacy. The pharmacy technician stated that there is communication with the hospital before patients are discharged and if they are on medications that are not on formulary or will require time to obtain, the Medical Director will ask the hospital to keep the patient until the medication can be obtained from BosWell. Rarely is the back-up community pharmacy used.

We toured the medication storage room where the pharmacy assistants send and receive medication supply and the medication room where the nurses prepare medication for administration. These rooms were clean, uncluttered, well lighted, and kept secure. There is a refrigerator with a thermometer and temperature log that was up to date. All other refrigerators used to store medications had thermometers and documentation of daily temperature checks. Of the logs inspected, temperatures were within the correct range. No outdated medication was found in the medication storage or preparation rooms. On Monday May 21, 2018, we observed the count of controlled substances and instruments between day and evening shift, and verified that it was accurate.

Medication orders in the charts reviewed were complete and there was an accompanying progress note that indicated the reason for the order. Transcription of the order by a nurse to the MAR was delayed in two of the charts reviewed (82%); therefore, the delivery of either antiviral or anticoagulation medication to the patient was delayed. We also noted that one of the charts reviewed for sick call had an order that was not transcribed for five days after the patient was seen by the provider for constipation.[125] We also found an instance of a nurse who wrote

---

[124] Patient Safety Network. (2017) Medication Errors, Agency for Healthcare Research and Quality available at https://psnet.ahrq.gov/primers/primer/23/medication-errors.
[125] Pharmacy/Medication Administration Patient #1, 4 and Sick Call Patient #14.

the date of the new order over the old order, rather than writing the new order on a new line on the MAR.[126] This is an alteration of the record and should be prohibited.

When the medication arrives from BosWell, a pharmacy assistant verifies the medication received against the order, which serves to identify dispensing errors. Once verified, the medication is put in the nurses' medication work room into boxes designated by the housing location of the inmate.

Medication Administration

The morning medication pass is scheduled to take place between 3:00 a.m. and 5:00 a.m. and the evening medications are administered between 6:00 p.m. and 8:00 p.m.[127] Nurses pre-pour all medications administered to patients at MCC. We observed the preparation of medications, which is done in a large room in the health care unit that contains shelves with boxes for patients in each housing unit and three ring binders of MARs for the current month. Pre-pouring entails looking at the MAR, selecting the right medication for the patient, popping the pill out of the blister pack, and putting it into an envelope labeled with the patient's name and medication. The envelopes are re-used for the same patient.

We also observed a nurse prepare controlled substances for administration. Controlled substances are stored in a double locked cabinet in the trauma room. A list of inmates with orders for controlled substances is used to guide the nurse in removing individual doses for each inmate on the list. Once removed from the blister card and signed out on the controlled substances log, the medication is put into a collective cup. The nurse takes the cup to the medication room. The nurse then selects the correct medication for each patient from the collective medications in the cup and puts it into the envelope for the individual patient.

Once all the medications the patient is scheduled to receive are in the envelope, it is placed in a tray and into a bag that the nurse transports to the housing unit. If it is a medication that must be crushed, the nurse will crush it in advance as part of the pre-pour. We also observed a nurse prepare a medication that was crushed and then floated in liquid. This is kept in a medicine cup with a lid until it is delivered to the patient sometime in the next several hours.

We interviewed a nurse preparing medications in the medication room. She requests that the patient provide identification only when she does not recognize or know the inmate. We also asked what happened when a pill fell onto the floor when being given to a patient. She said that the patient can choose to pick it up and take it or give it to her and she will waste it. She did not offer to obtain another pill to replace the one that was wasted. This is consistent with what one of the chronic care patients complained about during our visit.[128]

---

[126] Pharmacy/Medication Administration Patient #3.
[127] Email communication dated May 17, 2018 from Nicholas Staley, AAG to Michael Puisis.
[128] Pharmacy/Medication Administration Patient #11.

Documentation that medication was given takes place at the time it is prepared rather than at the time it is given to the patient. If a patient refuses the medication or is not on the unit, the nurse will circle their initial on the MAR to indicate that the medication was not given after returning to the medication room in the clinic. Only 9% of the MARs selected for review were complete.[129] Documentation of doses given, refused, or not available was missing from 10 of 11 charts reviewed. This is extremely poor performance and calls into question the accuracy of the MARs.

Contemporaneous charting on the MAR at the time of administration is considered the nursing standard of practice. MCC does not meet this standard of professional practice.

None of the MARs reviewed contained the signatures and initials of nurses who administered medication. This practice violates MCC's own policy and procedure and demonstrates lack of supervision and oversight failure.[130] We asked the HCUA if a signature sheet was maintained and were told that at one time a signature sheet was kept but that it was not up to date. Therefore, it was not possible to identify any of the nurses who administered medication in the health record of a patient.

Problems with medication administration practices at MCC are:
- Pre-pouring defeats the purpose of patient specific packaging. As soon as the medication is taken out of the blister pack, verification that it is the correct medication, for the right patient, at the right time and the right dose is not possible. This is a patient safety risk and unnecessarily exposes the patient to errors in administration (receiving the wrong drug). It is also a wasteful use of the cost of blister packaging.
- Reuse of individual envelopes to hold medication is unsanitary.
- Use of a list rather than the MAR to select controlled substances for administration increases risk of medication error.
- Combining controlled substances for multiple patients into a single container and then selecting the right medication, in the right dose for the right patient by sight is an extremely risky practice and exposes patients to unnecessary harm from medication error.
- Crushing and floating medication in advance of administration is time consuming, but also dangerous because it changes the nature of the drug and can cause problems with absorption or irritation of the GI tract. The medication should instead be provided in another form (liquid or injectable).
- Two-part identification is not used to identify inmates before administration, greatly increasing the risk of giving the wrong medication to the wrong patient.
- When medication is dropped during administration, patients are not given replacement medication. It is cruel for nurses to make a patient choose between missing a dose or ingesting medication that has been dropped and unsanitary.

---

[129] The only MAR that was complete was Pharmacy/Medication Administration Patient #3.
[130] V4-1. Pharmacy Services p. 5.

- Nurses do not have a way to verify medication that is not taken. Visual identification of medication remaining after administration is not accurate.
- Medication is not documented at the time it is given. This practice is a source of errors and numerous omissions in documentation of patient care.

Renewal of Chronic Disease Medications

Chronic disease medications are provided to patients monthly either as "Keep on Person" (KOP) or each dose is administered by a nurse. The scheduled appointments for chronic disease clinic do not coincide with the end date on medications ordered for chronic disease.[131] Providers often order medications for patients with chronic conditions without seeing the patient.[132]

MCC's policy on provider visits is that the MAR is available with the medical record at the time of a provider visit.[133] We saw no evidence that current MARs were available at the time a patient saw a provider. If filing is up to date, the MAR from the previous month will be in the chart for the provider to review. However, MCC's policy and procedure on care of patients with chronic conditions makes no suggestion that the MAR be reviewed to evaluate patient adherence to prescribed treatment.[134] Further, MCC's policy is that if an inmate refuses medication twice in two days they are referred to a provider for evaluation and possible change in treatment.[135] There were multiple examples of patients not taking medication as prescribed in the charts we reviewed which were not referred for provider evaluation. The record review also identified several patients prescribed medication that required continuity who had lapses in their care.[136] Chronic disease patients are not monitored to ensure continuity in treatment nor is their compliance with prescribed treatment assessed.

In summary, medication services at MCC do not meet the standard of practice, they employ outdated methods that compromise patient safety, and are not reviewed and analyzed to make improvements that prevent human error and harm to patients.

## Infection Control

**Methodology:** We interviewed the nursing supervisor responsible for infection control, reviewed the infection control procedures, CQI Minutes, tracking logs, and other documents related to communicable diseases and infection control. Infirmary porter training agenda and training materials were reviewed. We also reviewed the charts of patients treated for tuberculosis infection (two), HIV disease (three), and skin infection (two).

**First Court Expert Findings**

---

[131] Pharmacy/Medication Administration Patients #1,9.
[132] Pharmacy/ Medication Administration Patients #9, Sick Call Patients #1, 3, 8, 12.
[133] V3-11 Assisting Physician Call Lines page 1.
[134] V3-12 Medical Management of Offenders with Chronic Conditions.
[135] V4-1. Pharmacy Services p. 5.
[136] Pharmacy/Medication Administration Patients #6, #9; Sick Call Patient #1.

The First Court Appointed Expert Report found that MCC had a named infection control nurse (IC-RN). This individual was responsible for reporting infection to the Illinois Department of Public Health. The facility also had an aggressive program to monitor and treat skin infections. Monthly safety and sanitation infections were conducted by the IC-RN, as well as food handler screening, tuberculosis monitoring, and hepatitis vaccination for staff and inmate workers. The IC-RN also supervised the inmate peer education program.

Tours of the health care areas at the prison verified the availability of personal protective equipment (PPE). Puncture proof containers were available for disposal of needles, syringes, and other sharps in all areas where patient care took place. Problems identified with the infection control program were that there were no alarms on the negative air pressure rooms to indicate loss of pressure, porters had received no training and the water temperature used in the washing machine in the infirmary was too low to sanitize soiled linens, impervious vinyl on exam stools, tables and infirmary mattresses was torn or cracked, a paper barrier was not used between patients on the exam table, and there was no policy to clean the table between patients. Finally, one of the sick call rooms did not have a sink for handwashing.[137]

**Current Findings**

MCC continues to dedicate one FTE to infection control. One of the Nursing Supervisors is responsible for infection control. Her responsibilities include all those described by the First Court Appointed Expert. In addition, she manages the HIV and HCV clinics. She was very knowledgeable of the facility's policies and procedures for infection control.

The IC-RN also tabulates the monthly infection control report that is reviewed at the CQI meeting. This report lists the number of patients placed in isolation, status of the negative pressure room, occupational exposures to blood borne pathogens, cases reportable to Public Health, skin infections treated, patients screened for, monitored, and treated for HIV and HCV, and results of tuberculosis skin testing. Review of CQI minutes from June 2016 through April 2018 reflect minimal analysis of the data reported. We also found an instance of incorrect data reporting on the monthly infection control report. This was a patient we reviewed who was positive on the annual tuberculin skin test (PPD) given in October 2017.[138] He should have been reported as a converter, since there were three prior PPDs that were documented as 0 millimeters, which is considered negative.[139] Neither the October 2017 or November 2017 infection control reports identify any TB converters.

The IDOC Infection Control Manual was reviewed. It was last updated in 2012. While the material in the manual is thoughtful and many resources are provided, some of them are out of date. The manual should be updated at least every two years. The IDOC Nursing Treatment Protocols, revised March 2017, were reviewed and provide guidance to nurses in the care of common

---

[137] Lippert Report Menard pp. 28-29.
[138] Infection Control Patient #4.
[139] Persons who have a previous negative skin test that becomes positive are labeled TB convertors. These are red-flag type infection control issues as they mean that the incarcerated person has acquired TB within the prison. These need to be tracked and investigated.

infectious diseases and infections such as scabies, urinary infection, rash, pediculosis, chicken pox, and skin infections. In addition, the Menard Health Services Policies and Procedures provide detailed instructions for infection control, sanitation, and patient education material for several common communicable diseases (syphilis, herpes, HIV, tuberculosis infection, etc.). The Health Services Policies and Procedures were last reviewed in 2015 and need to be brought up to date.

Puncture proof containers were available for disposal of needles, syringes, and other sharps in all areas where patient care took place. Menard Health Services Policies and Procedures include detailed instructions for sanitation in the health care areas.[140] Paper was present on all the exam tables and there were sinks in all but one exam room. Hand sanitizer containers were in all patient care areas, but two were empty.[141] Two of the infirmary porters were interviewed and the records of these two and one other infirmary porter were reviewed.[142] The porters were knowledgeable about their duties and stated that they had received formal training about their duties. Their records revealed that all three had received training in 2017 or 2018. All three had completed or initiated hepatitis B (and A for two) vaccination series. The infection control nurse manager provided copies of their training curriculum.

As noted by the First Court Expert, the infirmary washing machine does not attain a high enough temperature to adequately sanitize body fluid-contaminated linens. The infirmary has attempted to address this deficiency by directing the porters to place bleach in all loads of linens being washed and having a practice to separately bag and send obviously contaminated patient linen to the facility's industrial level laundry. This does not fully address the sanitation level required to fully sanitize all patient linen for this high-risk patient population, who have bladder catheters and issues with fecal and urine continence. We did not find among the Menard Health Services any policy and procedure for laundering patient linens in the infirmary. There are policies and procedures to clean, but nothing was found on laundry. We recommended to the HCUA that testing the water temperature be done periodically and that a booster on the hot water inlet could be used to increase temperature.

The IC-RN conducts Safety and Sanitation rounds monthly. The results of these inspections are reported to the CQI committee monthly. We reviewed these reports and note that action taken to correct identified problems is slow.[143] We suggested revisions to the items looked for during Safety and Sanitation rounds to incorporate items we were looking for during our site visit (vents, chipped paint, paper posted on walls, torn upholstery, working examination equipment, availability of hand wash, etc.).

---

[140] V4-64 through V4-69.
[141] North 1 Lower, South Lower.
[142] Infirmary patients #5, 6, 7.
[143]



Menard Safety and
Sanitation Inspection

Tuberculosis screening is completed annually. We did not evaluate actual performance of TB screening. We reviewed the charts of two patients who completed prophylaxis.

- In one case, at intake at NRC on 3/25/2018, the patient had a PPD of 10 millimeters, which is considered positive for tuberculosis infection.[144] The chest radiograph done on 3/26/2018 was normal. The health appraisal done at NRC on 4/6/2018 does not comment or elaborate on the patient's tuberculosis screening results and it is not noted on transfer screening. The screening results should have been documented on both the health appraisal and transfer summary. When the patient was received at MCC on 4/11/2018, tuberculosis screening was done again with a 12-millimeter induration and a second chest radiograph was done. He was seen promptly by the IC-RN and started on prophylaxis. He was also screened for HIV and syphilis. He had baseline labs done and has received medication as ordered. The secondary screening done when he transferred to MCC was unnecessary and could have been avoided if the results of screening at NRC had been apparent at the time of transfer.

- The other chart reviewed was the patient who was a tuberculosis test converter which was discussed earlier.[145] We suggested that the IC-RN consider calculating the rate of new conversions at MCC to assess risk on an annual or biannual basis per the CDC recommendations for prevention and control of tuberculosis in correctional facilities.[146]

Inmates may request HIV testing at any time and it is also offered to inmates just before release from incarceration. See the comments and suggestion regarding HIV opt-out testing made in the earlier section of this report on Medical Reception and Intrasystem Transfer. Inmates who are infected with HIV are managed by UIC. Three charts of patients seen by the UIC HIV clinic were reviewed. In all three records reviewed, medication was initiated timely and each patient was seen at scheduled intervals with labs done in advance. One patient did not receive medication daily as prescribed and there is no documentation on the MAR as to the reason.[147] See comments about incomplete charting of medication administration in the section of this report on Pharmacy and Medication Administration.

- Another patient was seen in the HIV clinic on 11/17/2017 and the specialist recommended that his dose of Metformin be reduced below 500 mg. because of an interaction with one of the HIV medications.[148] His primary care providers at MCC did not act on this recommendation. When the patient was next seen by the HIV specialist on 4/10/2018, he was still on the same dose of Metformin. This time the HIV provider noted the drug interaction and wrote the order to reduce the dose of Metformin. The patient went for five months taking Metformin at a dose that was contraindicated. The HIV specialist reduced the dose when his primary care provider failed to act on the

---

[144] Infection Control Patient #5.
[145] Infection Control Patient #4.
[146] https://www.cdc.gov/mmwr/preview/mmwrhtml/rr5509a1.htm.
[147] Infection Control Patient #1.
[148] Infection Control Patient #3.

recommendation. This is an example of uncoordinated and contradictory care of a patient with multiple chronic conditions.

We also reviewed the charts of two patients with skin infection.

- The first was seen in nurse sick call for a complaint of having a boil for about a week.[149] The nursing documentation does not indicate what the nurse's action were to treat the complaint, but there is documentation by a nurse practitioner later that day. The nurse practitioner ordered an antibiotic (Bactrim) for 10 days. He saw the nurse practitioner 15 days later, who documented that the patient did not take the Bactrim because he did not know what it was. This patient's treatment was delayed because he misunderstood the treatment plan and none of the nurse's explained it to him.

- The second patient had surgery to repair a hernia on 4/4/2018.[150] Upon his return, he was cleared for general population, with a follow up with a provider in five days. On 4/10/2018, the provider saw the patient for follow up. He ordered daily dressing changes and an antibiotic (Levaquin) for 10 days. There is no documentation about the surgical site and whether it is infected. We suggested to the IC-RN that a review of post-surgical infections might result in a suggestion to use infirmary placement for a day or two after return to the institution to ensure the patient was capable of their own wound care.

Hepatitis C (HCV) disease is also managed via the chronic care clinic, with the work up and treatment of these patients directed by UIC.

The infection control program at MCC is managed by a dedicated nursing supervisor. Important improvements have been made in the sanitation and safety of health care delivery at MCC since the report of the First Court Appointed Expert. However, there are still areas that need attention, including the analysis of clinical information to prevent infection and improve patient care, updating of written directives, and the repair and maintenance of patient care areas and equipment. We also found examples of patient care that were delayed, unneeded repetition of screening and testing, and incomplete documentation that are consistent with systemic problems in the delivery of health care at MCC that are discussed earlier in this report.

## Dental Program

### Dental: Staffing and Credentialing
**Methodology:** Reviewed staffing documents, interviewed dental and other staff, reviewed the Dental Sick Call Log and other documents.

**First Court Expert Findings**

---

[149] Infection Control Patient #6.
[150] Infection Control Patient #7.

- MCC has a dental staff of three full-time dentists, one dental hygienist, and three full-time dental assistants. All are Wexford employees except one of the dentists. In addition, one PRN dentist and three PRN assistants are available if needed. This meets the Administrative Directive staffing guidelines and is adequate for MCC's 3700 inmates.
- All providers have current credentials on file and all the staff are current with their CPR certification.

**Current Findings**

While we agree with the First Court Expert that the number of authorized dental personnel positions is adequate, staffing has deteriorated materially since the First Expert's Report. When all positions are filled, the clinic is staffed by three dentists, three dental assistants, one dental hygienist, and one clerk. Currently, two dentist positions are unfilled[151] and wait times for routine care are approximately 15 months (see Figure 1 *infra*).

State positions are filled by a dental hygienist, a dental assistant, and a dental office associate. Per the HCUA, the state dentist position had been open for more than two years. It had been advertised several times, and there were applicants; however, the position expired (and had to be reposted). Due to the inability of IDOC to fill the position, it asked Wexford to fill it.

## Dental: Facility and Equipment

**Methodology:** Toured the dental clinic to assess cleanliness, infection control procedures, and equipment functionality. Observed intake screening and evaluated the quality of x-rays taken at intake. Reviewed compliance with radiologic health regulations.

**First Court Expert Findings**

- There are three clinics: a single chair clinic at North 2 that serves the segregation inmates and a general population housed in that unit. A single chair unit is in the Receiving and Classification clinic and is used for reception screening examinations. It contains a Panorex x-ray and developer. The third is a four-chair clinic located in the HSU and serves the rest of the institution. There is a 400-bed medium security satellite institution that does not have a dental clinic. This population is served by the clinic in the Health Service Unit. Both North 2 and R&C clinics have old and worn equipment.
- The chairs/units in the HSU clinic are only two years old and in excellent repair. There is a single x-ray unit for this entire clinic and it is very old, faded, and worn. There is a Panorex unit on the second floor of this building, above the dental clinic. The metal cabinetry is old, rusting, and has several areas of chipping paint. Proper disinfection is difficult.
- The x-ray developers in the North 2 clinic and the R & C clinic do not work and radiographs must be brought to the HSU clinic for developing. This is unacceptable, in that x-rays are often needed immediately, especially as a diagnostic tool in urgent care situations.
- The four chairs/units in the HSU are in small individual spaces. This space is barely adequate. The single chair clinics at North 2 and R&C are small but adequate. The lab and

---

[151] A Wexford dentist recently retired, leaving a vacancy.

sterilization area are large. The existing facility is adequate to meet the needs of the institution. The x-ray developers need to be replaced or repaired immediately.

**Current Findings**

We concur with the First Court Expert's findings with respect to the inadequacy of the dental facilities and equipment. Moreover, they have not improved materially. We identified current and additional findings as follows.

The panoramic x-ray unit in the R&C clinic does not have shielding between the unit and the door. Before an x-ray is taken, people in the corridor are asked to move away from the door. There is no x-ray processor in the North clinic because an inoperative unit was not replaced. Exposed film is processed in the radiology clinic. There is an area in the MSU health clinic designated for a dental clinic.

## Dental: Sanitation, Safety, and Sterilization

**Methodology:** Reviewed Administrative Directive 04.03.102. Toured the dental clinics and observed dental treatment room disinfection. Interviewed dental staff and observed patient treatment.

**First Court Expert Findings**

- Surface disinfection was performed between each patient and was thorough and adequate, and protective covers were utilized on most unit surfaces. Instruments were properly bagged and sterilized. All handpieces were sterilized and in bags.
- The sterilization procedures themselves at the Health Service Unit clinic were improper. Flow did not proceed from dirty to clean. The ultrasonic was on the wrong side of the sink, and a dental lathe and protective covers were situated between the sink and the autoclave.
- The R&C clinic used disposable instruments.
- The clinic at North 2 had a proper flow of sterilization from dirty to clean. Surface disinfection was adequate. Protective covers were used appropriately. No biohazard warning signs were posted in the sterilization areas. [152]
- Safety glasses were not always worn by patients. Eye protection is always necessary, for patient and provider. No warning signs were posted where x-rays were taken to warn of radiation hazard.

**Current Findings**

Sanitation, safety, and sterilization have deteriorated since the First Court Expert's Report. We concur with the findings and we observed inadequate hand sanitation by the dentist between initial examination patients (see Initial Examination section *infra*). We observed initial exams at the R&C clinic, and treatment at the North 2 and HSU clinics. Surfaces were disinfected

---

[152] CFR 1901.145(e)(4). "The biological hazard warning shall be used to signify the actual or potential presence of a biohazard and to identify equipment, containers, rooms, materials, experimental animals, or combinations thereof, which contain, or are contaminated with, viable hazardous agents.")

appropriately between patients and instruments were disinfected, bagged, and stored appropriately. The HSU and North 2 clinics have protective glasses for patients; however, we did not see them worn when we observed treatment at the HSU clinic[153].

## Dental: Review Autoclave Log

**Methodology:** Reviewed the last two years of entries in autoclave log, interviewed dental staff, and toured the sterilization area.

**First Court Expert Findings**

- Spore testing of the steam autoclaves was being accomplished only once a month. This is highly irregular and violates OSHA guidelines calling for weekly spore testing of autoclaves. The dry heat sterilizer is tested on an irregular, somewhat quarterly basis. These are egregious deficiencies that should be corrected immediately. Steam autoclaves and dry heat sterilizers should be tested weekly.

**Current Findings**

Autoclave log management has improved since the First Court Expert's Report and is adequate. We identified current and additional findings as follows.

The dry heat sterilizer in the HSU clinic has not been used for two years and is not subject to spore tests. Weekly spore tests for the steam sterilizers were documented, and the deficiencies noted by the First Experts have been remedied.

## Dental: Comprehensive Care

Comprehensive, or routine care[154] is non-urgent treatment that should be based on a health history, a thorough intraoral and extraoral examination, a periodontal examination, and a visual and radiographic examination.[155] A sequenced plan (treatment plan) should be generated that maps out the patient's treatment.

**Methodology:** Interviewed dental staff, reviewed dental charts of an inmates who received non-urgent care that were randomly selected from the Daily Dental Reports. Reviewed Daily and Monthly Dental Reports.

**First Court Expert Findings**

- A review of 10 records revealed that a comprehensive examination was not performed, and sequenced treatment plans were not developed. Examination of soft tissues for oral cancer was rarely documented and periodontal assessments employing probing was not part of the treatment process.

---

[153] Why We Take Infection Control Seriously. UIC College of Dentistry. Viewed at https://dentistry.uic.edu/patients/dental-infection-control, viewed February 2, 2018. "We use personal protective equipment […] *as well as provide eye protection to patients for all dental procedures*.". Emphasis added.

[154] Category III as defined in Administrative Directive 04.03.102.

[155] Stefanac SJ. Information Gathering and Diagnosis Development. In Treatment Planning in Dentistry [electronic resource]. Stefanac SJ and Nesbit SP, eds. Edinburgh; Elsevier Mosby, 2nd Ed. 2007, pp. 12-15, *passim*.

- Hygiene care and prophylaxis were never part of comprehensive care. Restorations were, in five of the charts, provided without appropriate diagnostic x-rays for caries. No hygiene treatment was part of any of the routine care provided.
- Oral hygiene instructions were never documented in the dental record as part of treatment.

**Current Findings**

We concur with the First Court Expert's finding that comprehensive care is inadequate. Moreover, it has not improved materially. We identified current and additional findings as follows.

Routine care is provided without adequate x-rays and periodontal assessment. Rather than relying on intraoral x-rays, the accepted professional standard, the dentist bases his charting for caries on the panoramic x-ray in conjunction with a visual exam.[156] Not only is this insufficient to diagnose interproximal (between the teeth) decay but it ignores periodontal disease. In fact, even when periodontal disease is occasionally categorized per Administrative Directive 04.03.102 (Dental Care for Offenders), there is no documented periodontal probing[157,158] and the location of the disease is not noted.[159] Dr. Assemeier stated that he occasionally does periodontal probing but does not record PSR; however, none of the records reviewed had documented probing. He said that he routinely did PSR on his military patients when he was in private practice and occasionally on his other patients, but not at MCC.[160]

Of 16 inmates who received comprehensive (routine) care, none had documented periodontal probing or a sequenced treatment plan. While 10 (56%) had a recent Treatment Needed form

---

[156] Dental Radiographic Examinations: Recommendations for Patient Selection and Limiting Radiation Exposure. American Dental Association and U.S. Food and Drug Administration, 2012. Table 1, pp. 5-6. (Dentate or partially dentate adults who are new patients receive an "[i]ndividualized radiographic exam consisting of posterior bitewings with panoramic exam or posterior bitewings and selected periapical images. " Furthermore, recall patients [i.e., biennial exam patients] should receive posterior bite wing x-rays every 12 to 36 months based on individualized risk for dental caries. With respect to periodontal disease, "[i]maging may consist of, but is not limited to, selected bitewing and/or periapical images of areas where periodontal disease (other than nonspecific gingivitis) can be demonstrated clinically.")

[157] Stefanac SJ. Information Gathering and Diagnosis Development. In Treatment Planning in Dentistry [electronic resource]. Stefanac SJ and Nesbit SP, eds. Edinburgh; Elsevier Mosby, 2nd Ed. 2007. A panoramic radiograph has insufficient resolution for diagnosing caries and periodontal disease. Intraoral radiographs (e.g., bite wings) and periodontal probing are necessary (p. 17). Also, Periodontal Screening and Recording (PSR), an early detection system for periodontal disease, advocated by the American Dental Association and the American Academy of Periodontology since 1992, is an accepted professional standard. Id., pp. 12-14. See American Dental Hygiene Association. Standards for Clinical Dental Hygiene Practice Revised 2016. Periodontal probing is also a standard of practice for dental hygiene.

[158] Makrides, N. S., Costa, J. N., Hickey, D. J., Woods, P. D., & Bajuscak, R. (2006). Correctional dental services. In M. Puisis (Ed.), Clinical Practice in Correctional Medicine (2nd ed., pp. 556-564). Philadelphia, PA: Mosby Elsevier, p.560 (Early diagnosis of periodontal disease is important since the disease is often painless and the prevalence of moderate to severe periodontal disease in correctional populations is high and often not associated with pain).

[159] The only categories related to specifically periodontal disease are Ib ("acute periodontal abscess"), Ic ("acute periodontitis"), Ie ("acute gingivitis"), IIIb ("localized gingival involvement"), and Vb ("lack of visible gingival irritation"). Id. Attachment A.

[160] None of the dental charts reviewed at MCC documented periodontal probing.

completed,[161] five (31%) had the Treatment Needed assessment informed by bite wing x-rays,[162] and (38%)[163] had a cleaning (prophy or oral prophylaxis) that preceded treatment.[164]

Biennial exams are scanty and of minimal clinical value. Of eight patients who received biennial exams, none of the exams were informed by bite wing x-rays or documented periodontal probing, none had a sequenced treatment plan, and two had no documented oral cancer screening.[165]

While the dental examinations performed by the dentist did not document a periodontal assessment, the dental hygienist documented a periodontal assessment when she saw a patient. However, she did not document periodontal probing, a standard of care for dentistry and dental hygiene.

Absent a sequenced treatment plan informed by intraoral x-rays and periodontal probing, the dentist does not have enough information to make an informed decision. In the community, what is called a biennial exam is analogous to a periodic exam.[166,] To summarize, what is called a biennial exam is cursory, and not substantially different from the inadequate "complete" examination performed at intake.

Not only is periodontal disease underdiagnosed but it is undertreated. In none of the MCC dental charts reviewed was there a treatment plan that identified specific non-surgical periodontal procedures such as scaling and root planing. Moreover, the Daily Treatment Report that lists the treatment provided to each patient has no section for periodontal treatment.[167] Both the dentist and dental hygienist stated that they were in private practice and were familiar with the standard procedure codes which are required for billing third parties and are industry standard. However, there is no column for SRP and no way of knowing if it is performed.[168, 169] The hygienist said that the she classifies SRP as "periodontal;" however, she does not record the number of quadrants, nor are there details of the treatment (e.g., that a SRP procedure was performed, and which

---

[161] Comprehensive Care Patients #2, 6, 8, 9, 10, 11, 12, 13, 14, and 16.

[162] Comprehensive Care Patients #7, 10, 12, 14, and 15.

[163] Comprehensive Care Patient #1, 4, 11, 12, 14, and 16.

[164] Dr. Assemeier said that while he does not do a sequenced treatment plan, he often includes a treatment plan in his clinical progress notes.

[165] Biennial Exam Patients #1 and 8.

[166] The profession standard code for a periodic exam is D0120. It is defined as "[a]n evaluation performed on a patient of record to determine any changes dental and medical health status since a previous comprehensive or periodic examination. This includes an oral cancer evaluation, and periodontal screening where indicated, […]]." Dental Procedure Codes. American Dental Association, 2015.

[167] The categories on the form are "scale and prophylaxis," "gingivitis", and "periodontal." While the procedure "scale and prophylaxis" corresponds to American Dental Association treatment code D1110 that has a profession-wide definition and treatment, "gingivitis" and "periodontal" do not have a standard treatment. ADA Treatment Codes, 2015.

[168] The 'uniform record system' sponsored by the American Dental Association is the Code on Dental Procedures and Nomenclature. "In August 2000 the CDT Code was designated by the federal government as the national terminology for reporting dental services on claims submitted to third-party payers." American Dental Association Dental Procedure Codes, 2015, p. 1.

[169] ADA Treatment Codes D4341 and D4342.

teeth were treated). The hygienist also said that she does not document PSR, although she did so in some of the private practices where she worked.

<u>Dental: Intake (Initial) Examination</u>[170]

**Methodology:** Observed intake examination process. Reviewed dental records of inmates that have been examined recently. Reviewed Administrative Directive 04.03.102.

**First Court Expert Findings**

- All records reviewed revealed that the exam was performed timely, a panoramic x-ray was taken, and the APHA categorization was completed.
- Screening was not observed; however, based on its description, it appeared to be procedurally adequate.
- Four panoramic x-rays were processed improperly and presented as an opaque negative. These radiographs are not acceptable for diagnostic use. This problem did not occur in later record reviews. I was told the developer in the reception clinic was not functioning properly. The radiographs were being developed in the main clinic.

**Current Findings**

The "Initial Examination" is governed by Administrative Directive 04.03.102 (¶II F 2), which states (*inter alia*) that

> Within ten working days after admission to a reception and classification center or to a facility designated by the Director to accept offenders with disabilities for a reception and classification center, each offender shall receive a ***complete dental examination by a dentist***.[171]

The initial examination process has not changed materially since the First Court Expert's Report and remains inadequate. While we agree that the initial examination was performed timely and the APHA categorization was completed, we find it to be inadequate nonetheless. We cannot compare our findings to those of the First Court Expert since the First Court Expert did not observe the exam.

MCC receives approximately 100 prisoners each month. The dentist (standing) examined a patient seated in a dental chair with a dental light. He performed a cursory oral exam using a mouth mirror, which lasted approximately five minutes, with a dental assistant acting as recorder. He used a mouth mirror to illuminate the lateral border, and the tongue and floor of the mouth. The dentist wore gloves and changed them between patients; however, he did not wash his hands (or disinfect them using alcohol wipes) between donning new gloves. This is a breach of infection control protocol.

---

[170] The First Expert Report describes the examination performed at intake as a "Screening Examination;" however, Administrative Directive 04.03.102 describes it as a "complete dental examination." We use the terminology of the Administrative Directive and refer to the intake or initial dental examination as a complete dental examination.

[171] Administrative Directive 04.03.102 (¶II F 2). Emphasis added. Furthermore, the exam should include, "[c]harting of the oral cavity and categorization of status or treatment needs in accordance with the American Public Health Association's priorities delineated in Attachment A. *Id.* at (¶II F 2a). Emphasis added.

In addition to the charting of existing and needed dental treatment, the record noted that OHI (oral hygiene instruction) was provided, and that an oral cancer screening (OCS) was performed and the results were negative or WNL (within normal limits). The "OHI" consisted of saying, "make sure you brush and floss" – and took no more than a minute.[172] This is not adequate oral hygiene instruction. Furthermore, while spooled dental floss is deemed contraband at MCC, he did not mention the existence of (not to mention how to use) floss alternatives.

Of 10 charts of inmates who had recent intake examinations, nine (90%) panoramic x-rays were clinically adequate. Since the panoramic x-rays are not available to inform the charting, the dentist completes the charting when the x-ray is available. Oral cancer screening was documented in all charts; however, no chart documented periodontal probing.

## Dental: Extractions
**Methodology:** Interviewed dental personnel and reviewed 11 dental records of patients who had teeth extracted selected from the Daily Dental Report and 14 charts of patients who were scheduled to have extractions.

**First Court Expert Findings**
- A review of 10 records of inmates who had dental extractions revealed that nine of the 10 were in full compliance with the aspects reviewed. The radiograph was over three years old in one of the records and the reason for extraction was not included in another. This does not rise to a level of concern. A quick scan of several other records of inmates who had teeth extracted did not reveal a repeat of these issues.
- In two of the records, non-restorable was provided as a diagnosis for pain. This problem was seen in other records reviewed in other areas.

**Current Findings**
Our findings diverge from those of the First Court Expert and suggest that the treatment of dental extractions has deteriorated since the First Court Expert Report. While the First Court Expert found documentation to be generally adequate, we found that while of 11 patients who had extractions, all were informed by adequate preoperative x-rays and were accompanied by signed consent forms, nine (82%) forms[173] listed the tooth number but not the reason the tooth was to be extracted, and nine (82%)[174] did not document an updated health history.

Of 12 patients who were scheduled for extractions, the wait time ranged from seven to 41 days, with a median of 26 days (see Figure 2 *infra*).[175] Of the 11 who were prescribed antibiotics, all but one (91%) waited more than 10 days.[176] This is problematic, since the tooth should be

---

[172] Oral Hygiene Instructions (D1330) "may include instructions for home care. Examples include tooth brushing technique, flossing, and the use of special oral hygiene aids." American Dental Association Codes extract.
[173] Extractions Patients #1, 2, 4, 6, 7, 8, 9, 10, and 11.
[174] Extractions Patients #1, 2, 3, 4, 5, 8, 9, 10, and 11.
[175] The patient was seen with a complaint of pain, palliated, and scheduled for an extraction appointment. Scheduled Extractions Patients #1, 3, 4, 5, 8, 9, 10, 11, 12, 13, 14, and 15.
[176] Scheduled Extractions Patients #1, 2, 3, 6, 8, 9, 10, 11, 12, 13, 14, and 15.

extracted within the therapeutic window of the antibiotic,[177] which for these patients was 10 days.[178]

## Dental: Removable Prosthetics

**Methodology**. Reviewed four charts of patients who received partial dentures (selected from the Prosthetics List) in the past year and interviewed dental staff.

**First Court Expert Findings**

- Removable partial denture prosthetics should proceed only after all other treatment recorded on the treatment plan is completed. The periodontal, operative, and oral surgery needs all should be addressed first. In none of the records reviewed was a comprehensive examination and treatment plan developed prior to impressions for removable partial dentures.
- In none were oral hygiene care or oral hygiene instructions provided.
- Periodontal assessment and treatment were not provided in any of the records.
- Because there was no comprehensive examination, nor any treatment plans developed, it was impossible to ascertain if all necessary care, including operative and/or oral surgery treatment, was completed prior to fabrication of removable partial dentures.

**Current Findings**

We concur with the First Court Expert that removable prosthetics treatment is inadequate. Moreover, it has deteriorated since the First Court Expert's Report, as wait times have increased (see Figure 1 *infra*). As with most of the other patients who received comprehensive care, none had a sequenced treatment plan or a periodontal assessment that included documented probing. Three (75%) had no documented oral hygiene instruction.

## Dental: Sick Call/Treatment Provision

**Methodology:** Interviewed dental staff, reviewed Dental Sick Call Logs, Daily Dental Reports, and reviewed records of 12 inmates who were seen on sick call.

**First Court Expert Findings**

- Sick call is accessed via the inmate request form or from staff referral if the perceived need is immediate. It takes five to 10 days for urgent care complaints to be seen. This is unacceptable; they should be seen within 24-48 hours.
- In all 10 records reviewed the SOAP format was used and the patient's complaint was addressed.

---

[177] Shulman JD, Sauter DT. Treatment of odontogenic pain in a correctional setting. *Journal of Correctional Health Care* (2012) 18:1, 58 – 69; p. 68.

[178] Makrides et al.("[d]elayed dental treatment of the original focus of the [tooth-related] infection may turn a minor problem into a serious condition. Although infection is usually self-limiting, and spatially-confined, it may spread because of a highly virulent organism. Complications could include Ludwig's angina, mediastinitis, cerebral abscess, maxillary sinusitis, chronic fistulous tracts, and infective endocarditis." (p. 559).

- The sick call appointment was not used for routine care. Treatment proceeded with a diagnosis in only two cases and an improper diagnosis in another. This lack of a proper diagnosis was seen in records reviewed in other areas that included sick call entries.
- An inadequate triage system is in place that prioritizes treatment needs. Inmate request forms are evaluated by the dental program by the following day and their treatment needs, based upon the request form, are prioritized. Urgent care needs are identified from the request form and seen ASAP, often taking five to 10 days. Others are scheduled accordingly or placed on the hygiene list if requested. All request forms are seen within 14 days.
- Inmates seek urgent care via the inmate request form or, if they feel they need to be seen immediately, by contacting staff, who can then call the dental clinic with the inmate's complaint. These inmates are seen at the dentists' discretion.
- Inmates with urgent care complaints (pain or swelling) from the request form often take five to 10 days to be seen. They should be seen with 24-48 hours from the date of the request. Mid-level practitioners at the units do not routinely see the inmate face-to-face to evaluate urgent care needs as indicated on the request form. If an inmate complains of a toothache, swelling, or pain to the nurse making rounds, the nurse can call the dental clinic with this information. They can provide over-the-counter pain medication.
- Some inmates are seen immediately if correctional staff can get the inmate to the dental clinic. There is no system in place to provide a face-to-face evaluation with medical/dental staff or inmates that complain of pain or swelling. This should be provided within 24-48 hours from the date of the request.
- Request forms from inmates seeking routine care are evaluated the next working day and the inmate given an appointment to be evaluated within 14 days. Inmates requesting to have their teeth cleaned are placed on a waiting list. Inmates for routine care are placed on a waiting list in sequential order. This list is approximately nine months long.

**Current Findings**

Dental sick call has deteriorated since the First Court Expert's Report. We concur with the findings of First Court Expert that dental sick call for urgent care issues is often untimely and the sick call triage system for dental problems is inadequate. We also identified current and additional findings as follows.

*Sick Call*

Prisoners access sick call by placing written requests (kites) in boxes in the cellhouses or by signing up for nurse sick call. Of five patients who submitted kites for dental sick call, the wait time ranged from five to 14 days, with a median of nine days. All progress notes were in the SOAP format.

Of seven entries in the nurse sick call log that suggested dental pain, all were referred to the dental service and five (71%) received face-to-face assessments by nursing. All those assessed received analgesics. Of six patients whose records document treatment, wait time to see a

dentist ranged from five to 14 days, with a median of six days.[179] Patients who signed up for nurse sick call were generally seen by nursing staff the next day.

*Timeliness of Care*

Figure 1 is a summary of patient wait times based on monthly dental reports from May 2017 to April 2018. The wait time for fillings is more than 60 weeks (15 months),[180] higher than it has been since May 2017. Moreover, with only one dentist available, the backlog will continue to grow. According to the April dental report, 45 extractions and 18 fillings were performed; a 2.5:1 ratio, which suggests that MCC has insufficient dentist staffing to provide needed routine care and instead must focus on urgent care needs.

Wait time for dentures seems to have stabilized at around 15 months as well. However, since the standard of care is to complete the needed fillings and periodontal treatment before the denture impressions are done, there may be an additional delay of several years before denture fabrication can begin.

**Figure 1. Wait Time for Filling and Denture Appointments**



The kite log from January through April 2018 comprises 413 entries, listed by service requested.[181] Before a prisoner may have a filling appointment, he must first have a "filling evaluation," to determine if a filling is an appropriate treatment. If a filling is deemed to be the

---

[179] Nurse Sick Call Patient #6 has no documented treatment for this episode.

[180] The First Court Expert reported that the routine care wait list was approximately nine months long (see *supra*), which shows that the MCC dental program has deteriorated markedly since then.

[181] Per memo from Colleen Runge to Gail Walls, HCUA, dated 5/21/18, the Dental Codes are O1 (written request), O2S (filling evaluation), O3S (filling evaluation), O4S (denture adjustment), O1x1 (extraction), O2x1 (filling), O3x1 (impressions), O6 (oral prophylaxis), O6x1 (dentist-referred prophylaxis), and O6D (Dilantin prophylaxis).

appropriate treatment, the patient is placed on the filling list.[182] Of the 39 entries for fillings on the kite log, 28 were for filling evaluations and 11 were for fillings.

The Wexford contract specifies that "[v]endor shall provide dental checkups to offenders every two years, or more often if clinically indicated, and evaluations must be provided within 14 days after the offender's request for routine care treatment."[183] However, it is mute on the more critical issue, the maximum waiting time for **treatment**.[184] So, under current dentist staffing, a prisoner who needs (for example) three fillings that require three appointments may wait more than three years for the last tooth to be filled. It is more likely than not that the teeth awaiting filling will become more difficult to fill and cause preventable pain.

While Wexford does not report periodontal treatment backlogs, dental hygienist caseload is reported in the in the monthly CQI minutes. The April CQI minutes (based on March data) reported a dental hygienist caseload of 1018 patients and the March 2018 Dental Report noted that the hygienist performed 61 cleanings/prophylaxes. This equates to a more than 16-month backlog. While a cleaning or prophy is not a periodontal procedure,[185] it is often a precursor to periodontal treatment (if periodontal treatment has been prescribed by a dentist on the treatment plan).[186] A wait of more than a year before periodontal treatment can begin, even if it is diagnosed, is unreasonable and a such a treatment delay can result in preventable disease progression with concomitant bone loss.

Figure 2 shows that while the wait time for extractions has decreased from its high of 12 weeks in August 2017, it is currently at an unacceptable level for reasons explained in the extraction section, *supra*.

---

[182] X-rays may be taken then, rather than at the biennial or initial exam. However, by delaying taking x-rays until the filling evaluation, valuable time may be wasted, and undiagnosed decay may progress to a point where the tooth becomes more difficult (or impossible) to fill.

[183] HFS# 2010-05-008, ¶ 2.2.6.1

[184] If the filling evaluations occur within 14 days, Wexford is deemed to be complying with the contract even if the queue for fillings is infinite. Similarly, if prisoners receive timely biennial examinations, Wexford is deemed to be in compliance even if the exams are incomplete and below accepted professional standards.

[185] The American Dental Association Classifies it as a preventive procedure (Code D1110).

[186] Treatment plans rarely prescribe periodontal treatment.

**Figure 2. Wait Time for an Extraction**[187]



## Dental: Orientation Handbook

**Methodology**:  Reviewed orientation manual and related documents.

**First Court Expert Findings**

The orientation manual is minimally but adequately developed for dental services and addresses types of care, access to care, and how treatment is scheduled.

**Current Findings**

We were not provided with an inmate orientation manual.

## Dental: Policies and Procedures

**Methodology:** Reviewed Administrative Directives that deal with the dental program. Interviewed dental staff. Reviewed dental charts. Toured dental clinical areas. Reviewed DCC organizational chart.

**First Court Expert Findings**

The Dental Director was not aware of a policy and procedures manual. A review of the MCC Policy and Procedures Manual revealed a large section devoted to the policies and procedures for dental care. It was dated 1995, with no indication that it has been updated since then. This is not an adequate document from which to run the dental program.

**Current Findings**

---

[187] Wait time was not reported for February 2018.

The First Court Expert found that MCC dental policies and procedures were outdated and should be rewritten. This was done in 2015. However, the intake examination is still not consistent with the plain text of Administrative Directive 04.03.102.

The dental program is governed by Administrative Directive 04.03.102, amended 1/1/2012. It specifies that within 10 working days after admission to a reception and classification center, offenders shall receive "*a complete dental examination by a dentist*" (¶F2; emphasis added). The initial examination done at intake was not a complete examination by any reckoning and was in violation of IDOC policy.[188]

We reviewed three MCC policies that relate to dental care: V1-15 (dental reporting and statistics), V1-16 (dental radiography), and V1-17 (handling instruments). All were revised January 2015. The policies suffer from several problems. First, the versions we were provided were unsigned. Second, the previous Medical Director's signature block is present and there is no evidence that the current Medical Director is aware of (and approves of) these policies. Finally, there is no signature block for the Dental Director – the individual directly responsible for implementing the policies.

## Dental: Failed Appointments

**Methodology:** Reviewed dental sick call log. Interviewed dental staff. Reviewed daily dental reports.

**First Court Expert Findings**

- The failed appointment rate of about 40% is very high. Reasons included refusals, lockdowns, and "other." When asked, the dentists related that "other" usually meant security precedence and unavailability of escort staff.
- The percentage was very high for the month of April, when 362 appointments were missed because of a lockdown.
- When only failed appointments (inmate chose not to come to appointment) are included, the percentage drops to about 12%. In an older high security institution with multiple missions and security concerns such MCC, movement of inmates is a challenge. That does not excuse the problem. Every effort should be made to work with administrative and correctional staff to correct this issue.

**Current Findings**

We concur with the findings of First Court Expert that failed appointments are a problem, despite apparent improvement. However, the April 2018 failed appointment rate (15.2%) is the lowest it has been this year.[189] On the other hand, there were 31 refusals, almost a yearly high.

## Dental: Medically Compromised Patients

---

[188] See section on Comprehensive Care, *supra*.
[189] Source: Monthly Dental Reports.

**Methodology:** Reviewed health history form and randomly selected records of eight patients who were on Chronic Care Lists with diabetes or on anticoagulant therapy and had a dental encounter within the past two years.

**First Court Expert Findings**
- A review of the dental records of the four inmates on anticoagulant therapy revealed that two records made no mention of this in the health history section of the dental chart. It was indicated but not "red flagged" in the other two. No treatment was provided to any of these inmates.
- When asked, the clinicians indicated that they do not routinely take blood pressures on patients with a history of hypertension.

**Current Findings**
Documentation of the health record of medically compromised prisoners has not improved materially since the First Court Expert Report and we concur that documentation of the health record of medically compromised patients is inadequate. However, we identified current and additional findings as follows.

Of eight charts reviewed, five (63 %) did not document an updated health history at the last encounter.[190] There was no documented periodontal assessment and request for follow-up for the diabetics,[191] which is particularly problematic given the relationship between periodontal disease and diabetes.[192]

## Dental: Specialists
**Methodology:** Interviewed dental staff, reviewed CQI documents, and reviewed dental charts of inmates who were seen by an oral surgeon.

**First Court Expert Findings**
- A local oral surgeon, Dr. Jay Swanson, is available and used for dental conditions such as trauma, removal of difficult wisdom teeth, and evaluation and removal of oral pathology. He has offices in Effingham and Mt. Vernon, Illinois. General anesthesia cases use the Effingham office.
- All records reviewed revealed proper case selection and good patient management, and good record documentation.

---

[190] Medically Compromised Patients #2 (anticoagulant therapy), #3 (diabetes), #5 (diabetes), #6 (anticoagulant therapy), and #7 (anticoagulant therapy).

[191] Medically Compromised Patients #3 (generalized bone loss noted but periodontal probing was not documented, and treatment plan was not revised to include non-surgical treatment), and #5 (dental hygienist performed a prophylaxis; however, periodontal probing was not documented).

[192] See, for example, Herring ME and Shah SK. Periodontal Disease and Control of Diabetes Mellitus. *J Am Osteopath Assoc*. 2006; 106:416–421; Patel MH, Kumar JV, Moss ME. Diabetes and Tooth Loss. *JADA 2013;144(5);478-485* (adults with diabetes are at higher risk of experiencing tooth loss and edentulism than are adults without diabetes); and Teeuw WJ, Gerdes VE, and Loos BG. Effect of Periodontal Treatment on Glycemic Control of Diabetic Patients. Diabetes Care 3 3 :421-427, 2010 (periodontal treatment leads to an improvement of glycemic control in type 2 diabetic patients).

**Current Findings**

Oral surgery consultations have not changed materially since the First Court Expert's Report and remain adequate and we concur with the First Court Expert's findings. Of five dental charts of patients sent to an offsite oral surgeon, all patients appear to have received appropriate treatment.

<u>Dental: CQI</u>

**Methodology:** Reviewed CQI minutes and reports. Interviewed dental staff.

**First Court Expert Findings**

- The dental program contributes monthly statistics to the CQI committee. The dental program conducted two studies, one in 2013 and another in 2014. One involved the effects of the medications Dilantin and Norvasc on the incidence of gingival hyperplasia. The other was a study of grievances as related to the different cellhouses within the institution. The results of each was presented and steps taken to address the findings.
- No studies were in place to address program weaknesses and problem areas.

**Current Findings**

The dental CQI program, has improved since the First Court Expert's Report and is adequate. We were provided with a summary of two studies.[193] We concur with the First Court Expert's findings that there is an ongoing dental CQI program. Moreover, current and additional findings follow.

A study of 50 patients who were on the restoration (filling) list May 2015 to December 2015, with treatment dates ranging from August 2016 until September 2016, found that 94% had successful restorations without need of extraction. However, the actual study was not provided – just a five-line summary, so its validity cannot be assessed.

Another study summary, "Effects of lockdowns and dental coverage on filling numbers and backlog numbers" had no analysis – just a recitation of findings.

# Internal Monitoring and Quality Improvement Activities

**Methodology:** We reviewed annual and monthly CQI meeting minutes. We interviewed the CQI coordinator. We reviewed multiple death summaries and death records.

**First Court Expert Findings**

There was no relationship between CQI activity and improvements in the quality of services provided.

**Current Findings**

We agree with the First Court Expert's finding. We were told in interviews that a medical records technologist is the CQI Coordinator. She has no training in CQI. Although she told us that she

---

[193] Since we were not provided with the actual studies, we have no basis to assess their validity.

spends half of her working hours on CQI work, this work is mostly paperwork and organizing data collection and combining that into the CQI report. There is no one at the facility with any expertise or training in CQI. No one with CQI experience or knowledge of CQI methodology is involved in developing the CQI studies.

Three of six persons on the CQI Governing Body are custody-trained personnel (The Warden, Assistant Warden of Programs and the Wexford Regional Manager who is an ex-warden). Our opinion is that a Governing Body for a medical CQI program should not be directed by custody personnel. The medical CQI program should have a majority of medical personnel. The three persons on the Governing Body who are health personnel are the Agency Medical Director, the HCUA who is a nurse, and the Wexford site Medical Director.

The CQI plan is a generic plan that is not specific to issues at MCC. The CQI plan lists administrative directive requirements of the CQI program but does not indicate what the specific plan for CQI is at MCC.

There were 10 CQI medical studies. There were six outcome studies and four process studies. The six outcome studies were:
- Whether medication renewal for chronic illness was renewed prior to expiration.
- Whether a viral load was performed for persons with a positive hepatitis C antibody test.
- The percent of x-ray appointments which actually were completed when scheduled.
- The percent of inmates referred to the health unit for injuries who needed to be sent to a higher level of care.
- Whether inmates were seen within five days of discharge from the infirmary.
- Whether inmates with diabetes had medications renewed prior to expiration.

None of these were outcome studies. Two of these studies were poorly defined and we did not understand what the study was meant to measure. One was a study of viral load testing for hepatitis C. The study purpose was not defined. Another outcome study consisted of measuring the number of persons requiring treatment outside of the facility after being evaluated for injury. We could not figure out the purpose of this study or what clinical outcome it was meant to measure. The remaining four studies were performance measures, not outcome studies. As with other sites, none of these outcome studies included a clinical outcome. While some of these performance measurement were useful, none appeared to be amongst the most serious clinical problems at this facility.

We have comments on two of the process studies. One study had a declared intention of reducing denials by 30%. The study did not study variables of the referral process with an intention of improving the quality of referrals, but there was an intervention. The study resulted in a reduction of 389 referrals and a reduction of 98 denials. The intervention resulted in a reduction of referrals of 33 per month and a reduction of denials of 18 per month. Our concern is that it appears that patients who need referral are not receiving it. The study did not evaluate whether the reduced referrals were necessary or not. It's only intent was to reduce denials. Improvement

of quality was not the intent of the study. Reduction of referrals and denials only improves quality if the referrals and denials are unnecessary, which was not evaluated.

One study reviewed 1637 inmates with chronic illness with an intent apparently of studying whether their chronic illness appointment was timely. This study identified every staffing deficiency or lockdown situation with the resulting backlog in chronic illness clinic appointments. However, the study did not map the process and did not draw conclusions, so it was not clear what was learned or what actions could be taken to improve chronic illness appointments.

The HCUA identified staffing, scheduling appointments, and utilization management as the top three problems at the institution. There was only one study reasonably related to these three highest priority problems. This was a study of specialty care denials. This study was described in the specialty care section of this report. The study was initiated as an attempt to reduce denials without an analysis of whether denials were appropriate. The outcome of the study intervention was a greater reduction in referrals than a reduction of denials. In our opinion, the major problems related to specialty care referral are the lack of qualified primary care physicians who understand when to refer patients for consultation care, and the specialty care process itself, which we view as a barrier to care. The collegial review process and the impact of primary care training on referrals was not evaluated. Our opinion is that patients are not referred for necessary specialty care, but the CQI process had no mechanism to evaluate that question.

Deaths were listed in the CQI 2018 Annual Report. Death summaries were included in the report, but the death summaries had no critical analysis of the deaths. There was no mortality review and no problems were identified in the death summaries. Performing critical mortality review is a way to identify systemic problems so that future deaths can be prevented. This is not currently done. We reviewed seven deaths from MCC. Of those seven deaths, two were preventable and two were possibly preventable. This is an extraordinary large number of preventable deaths. We identified problems on all of the death reviews we performed. Summaries of these death reviews are present in the mortality review appendix of this report.

# Recommendations

## Leadership, Staffing, and Custody Functions

**First Court Expert Recommendations**

1. Place a priority on filling the Director of Nursing and Supervising Nurse positions. *We agree with this but believe that a priority should be placed on all supervisory positions and include physician and dental positions.*

**Additional Recommendations**

2. All budgeted positions should be filled.
3. A staffing plan should be developed that ensures sufficient staff to adequately provide care and to ensure administrative directives are adequately accomplished. This plan should include appropriate relief factors and include budgeted staff for infection control and CQI activities.
4. Vendor regional leadership positions should be filled with persons trained in a health care field.
5. IDOC Regional Coordinator positions should be filled by full-time persons without other IDOC responsibilities.

## Clinical Space

**First Court Expert Recommendations**

1. Renovations in all the cell house sick call areas be completed.
2. All sick call areas be appropriately equipped.

*We agree with these recommendations.*

**Additional Recommendations**

3. Repairs (cracked walls, chipped and peeling paint, clogged vents, missing electrical outlet plates, etc.) and ongoing maintenance of the exam rooms in the cell houses and the medical building must be done to allow effective cleaning and create a safe patient care and professional environment.
4. Exam rooms and exam tables are not be used as storage spaces.
5. Replace all the non-adjustable infirmary beds with hospital beds with safety railings that have the capability to adjust the height, the head section, and the lower extremity sections. One of these beds should be an electrically adjustable bed.
6. Nurse call devices must be installed next to all infirmary beds.
7. Showers in the infirmary and geriatric housing units must be repaired and maintained to minimize the risk of falls.
8. Each cell house and the medical building must have an automated external defibrillator.
9. All clinical devices must have documented annual electric safety inspections.

## Sanitation

**First Court Expert Recommendations**
1. *Critically monitor cell house sick call areas for cleanliness and the use of paper barrier between patients on examination tables, or assure that table tops are sanitized between patients and appropriate hand washing/sanitizing is occurring between patients. We agree with this recommendation.*

**Additional Recommendations**
2. Expand environmental rounds and the monthly Medical Safety and Sanitation Report to include the condition of the infirmary beds and exam tables, the functionality of the infirmary's negative pressure rooms, the compliance with annual inspection of medical devices, and other clinical space and equipment findings. The findings should be presented to the Quality Improvement Committee.

## Radiology Services

**First Court Expert Recommendations**
The First Court Expert did not have any recommendations regarding radiology services.

**Current Recommendations**
1. IDOC needs to contact the Illinois Emergency Management Agency (IEMA) and Occupational Safety and Health Administration (OSHA) to review the reported decision that IDOC x-ray technicians do not need to wear radiation exposure devices (dosimeter badges) while working in IDOC radiology suites as outlined in Illinois Administrative Code 32-340 510 and 520. This current practice is not in alignment with the radiation safety practices in the community.
2. Contract with a radiation safety expert to assess the safety of the panorex (mandible films) unit's current location in an unleaded exam room in the MCC Reception and Classification building without a shielded area for the technician to stand when panorex films are being taken.

## Medical Records

**First Court Expert Recommendations**
There were no recommendations of the First Court Expert for Medical Records.

**Current Recommendations**
1. An electronic medical record should be initiated statewide. This record should include electronic medication administration capability.
2. When charts are thinned, carry forward documents should include critical consultation reports, hospital reports, and specialized test reports that have significant impact on patient care.

3. Only medical records staff should file documents in medical records and only medical records staff should refile medical records.
4. Sick call requests by inmates should be filed in the medical record, as they are medical record documents.

## Medical Reception and Intrasystem Transfer

**First Court Expert Recommendation**

1. The quality improvement program must utilize a clinician to review the records of patients who have recently gone through the reception process and for whom abnormalities have been identified in order to ensure that appropriate follow up occurs. This should be an ongoing part of the quality improvement program.[194] *We agree with this recommendation.*

**Additional Recommendations**

2. We recommend that the steps in the intake screening and reception process be monitored by adding data fields to the intake logs that indicate the timeliness of each step, including the physical examination, tuberculosis screening, etc.
3. The IDOC Administrative Directive 04.03.101 should be revised to eliminate obtaining written consent for HIV testing given the opt-out policy that has been established. HIV testing should be opt-out testing.

## Nursing Sick Call

**First Court Expert Recommendation**

1. *Transition to an all Registered Nurse triage and sick call system. Licensed Practical Nursing (LPN) staff is triaging sick call requests and may or may not perform an examination, make an assessment and then formulate a plan, which could be no treatment or treatment from approved treatment protocols or to refer to a provider. All of these actions are beyond the educational preparation and scope of practice for an LPN.[195] We agree with this recommendation.*

**Additional Recommendations**

2. Timeliness of nursing sick call should be monitored by CQI at least annually.[196]
3. The quality of nursing assessments and the plan of care should be monitored by nursing service as part of the peer review or quality improvement. This should replace Medical Director review.
4. Medical records must be taken to sick call and used by nurses when seeing patients. This is one example of the benefit of having an electronic health record.

---

[194] Lippert Report Menard p. 43.
[195] Lippert Report Menard p. 43.
[196] National Commission on Correctional Health Care. 2014. Standards for Health Services in Prisons. P. 14.

5. Providers should see patients timely according to the urgency of the referral.[197]

# Chronic Disease Management

### First Court Expert Recommendation

1. Physicians should be trained and certified in a primary care field. Only primary care trained providers should be managing chronic illnesses.
2. The chronic disease database should be used as a tool to identify areas in which the program is underperforming so that interventions can be targeted to improve.
3. Providers should be implementing a change to the care plan when patients have suboptimal control of their disease.
4. All providers need access to electronic references at the point of care.
5. There were issues with the accuracy of evaluating the degree of disease control for patients enrolled in the pulmonary clinic. This is partly due to the language of the policy, which should be revised to be more consistent with the NHLBI guidelines.
6. Providers should be familiar with alternative methods of TB testing, i.e., the interferon gamma assays and their appropriate use. Efforts should be made to confirm patient's reports of previous treatment for LTBI prior to committing them to treatment.
7. The cell block clinics should be adequately equipped and present a professional clinical environment. Safety concerns among the providers need to be addressed.

*We agree with these recommendations.*

### Additional Recommendations

8. Update problem lists so that they include all current and significant past clinical conditions and procedures. Failure to develop a complete and accurate problem list puts patients' continuity of care at significant risk.
9. Monitor the providers' documentation in the chronic care progress notes for the rationale for clinical decisions, diagnoses, and treatments.
10. Expand the existing telehealth and/or establish an e-consult specialty program to include additional medical specialists to assist primary care providers with the management of complex and common medical conditions including diabetes, hypertension, cardiology, dermatology, neurology, and infectious diseases.
11. Perform hepatitis C RNA viral loads and fibroscans on all patients with hepatitis C as required by IDOC policy.
12. Revise the hepatitis C Guidelines to increase the number of the patients who are eligible to receive treatment. It is the best interest of the patient-population, the institution, and the non-incarcerated community to treat all patients with hepatitis C. It is impossible to clinically and legally justify waiting for patients to develop cirrhosis before initiating treatment.

---

[197] Emergent referrals should be seen immediately, urgent referrals should be seen the same day and routine referrals seen within 72 hours.

13. Streamline the prerequisite testing required prior to initiating hepatitis C treatment to match the processes utilized in the community. The current lengthy pre-treatment testing and evaluation contributes to the unacceptably prolonged delays in hepatitis C treatment.
14. Implement and utilize current United States Preventive Services Task Force (USPSTF) guidelines for screening adults for cancer and other conditions (abdominal aortic aneurysm, etc.).
15. Implement and utilize CDC age-based and disease-based standards for the administration of adult immunizations.
16. Calculate and document the 10-year cardiovascular risk score on all appropriate adults to assist with the decision, timing, and medication selection for the prevention of cardiovascular disease.
17. Consult with endocrinologists/diabetologists to provide a comprehensive review and recommendations concerning the medical management and the frequency of CBG testing of type 1 and type 2 insulin-prescribed diabetics at MCC and in the IDOC system.
18. Develop a plan to change anticoagulation treatment from Vitamin K antagonists (warfarin) to newer types of anticoagulants that do not require frequent ongoing lab testing to determine the adequacy of anticoagulation. This should especially be considered when physicians are unable to obtain a therapeutic anti-coagulation level.
19. Provide all chronic care providers and nurses with access to current, comprehensive electronic medical reference services such as "UpToDate" in all clinical areas and clinical offices.

## Urgent/Emergent Care

**First Court Expert Recommendations**
1. Nursing staff must be retrained with regard to an appropriate assessment for a patient who has been sent to the hospital and returned to the infirmary. Specifically, the training should include what subjective and objective information to collect in relationship to the problems that were addressed at the hospital. *We agree with this recommendation.*
2. A clinically trained person should insure that all of the relevant offsite service reports for unscheduled offsite services are available within a few days, including discharge summaries, emergency room reports, operative reports, and catheterization reports, so that they can be discussed by the primary care clinician with the patient and a plan can also be discussed. *We agree with this recommendation.*
3. When a procedure or a visit is interrupted due to a lockdown, the Medical Director should be notified and must determine whether, despite the lockdown, it must occur or can wait and occur the following day[198]. *We agree with this recommendation. There were no instances of a procedure or visit being interrupted because of a lockdown among the charts we reviewed.*

**Additional Recommendations**

---

[198] Lippert Report Menard p. 44.

4. Each of the openings in the emergency response bag should be sealed with a numbered plastic tag. The integrity of the seal should be checked and documented on the emergency equipment log at the beginning of each shift.

5. A corrective action or improvement plan should be developed based upon the critique of the annual mass casualty drill. Implementation of the plan should be monitored by the QI program.

6. The critique of emergency responses should be reviewed by CQI for trends and areas identified for correction or improvement.

7. All emergency room visits should be reviewed with regard to timeliness, appropriateness of preceding care, accuracy of information in the health record, and continuity of care upon release back to the facility. This should be done by clinical leadership and the QI program.

8. IDOC medical supervisors should conduct reviews of sentinel events, including preventable hospitalizations. These reviews need to identify deficiencies and develop corrective actions. Providers who commit grossly and flagrantly egregious infractions should be referred to peer review and these actions should be reviewed with respect to their privilege renewal.

## Specialty Consultations

### First Court Expert Recommendations

1.  A clinically trained staff person should be responsible for ensuring that all relevant offsite service reports are available for the clinician to review with the patient within a week of the offsite service having been provided. *We agree with this recommendation but add that the responsibility for this rests on the vendor that establishes the contract with the consultant and hospital. They must be held accountable for this deficiency. A clinically trained staff at the facility can be responsible for getting reports but responsibility for the process resides with the vendor.*

2. When the scheduled offsite service reports are available, the physician must document a visit with the patient in which the findings and a plan are discussed. *We agree with this recommendation but add that the physician must review the offsite service report and key findings and recommendations, and discuss all of these with the patient in an effective manner so that the patient understands the therapeutic plan resulting from the consultation. A rationale for not accepting recommendations needs to be documented and discussed with the patient. This must be done timely. A week timeframe is acceptable.*

3. Services that cannot be scheduled for more than a month must be addressed by the Medical Director with the State Medical Director. *We agree with this recommendation.*

### Additional Recommendations

4. The collegial review process should be abandoned because it is, in our opinion, a patient safety hazard.

5. Referral for hepatitis C to UIC should not be required to go through Wexford utilization review. IDOC physician should refer patients directly.

6. Referral to the Wexford infectious disease doctor for approval for ultrasound and EGD for persons with cirrhosis should be abandoned on the basis of patient safety. If a Wexford doctor is not primary care trained (board certified or board eligible in a primary care field), then all patients with APRI > 0.7 should be used as a benchmark to begin diagnostic screening for cirrhosis (upper endoscopy for varices and biannual ultrasounds to screen for hepatocellular carcinoma). Primary care trained doctors should document cirrhosis as a problem when it is identified and begin appropriate screening as recommended for cirrhosis (screening EGD as baseline and ultrasounds biannually for hepatocellular carcinoma).

7. Tracking specialty care should be standardized and under control of IDOC, not Wexford. IDOC should track whether hospital reports and all types of specialty care reports are received within five working days of the service date. Summary statistics on reports received later than five days after the service date need to be reported in CQI monthly and annual reports. This should be included in the contract as a monitored item associated with penalties for poor performance (e.g., <95% of reports available within five days).

## Infirmary Care

**First Court Expert's Recommendations**
1. Address life/safety concerns with infirmary patients padlocked in their rooms.
2. Train inmate health care unit porters in blood borne pathogens; infectious and communicable diseases; bodily fluid clean-up; the proper cleaning and sanitation of infirmary beds, furniture, and linens; and confidentiality of medical information.
3. Replace torn and ragged linens. Maintain an adequate supply of bedding and linens.
4. Sanitize infirmary bedding and linens through appropriate laundering methods.
5. Properly document in the patient medical record a medical acuity level, i.e., acute, chronic, housing, administrative placement.
6. Properly document in the patient medical record a medical assessment rather than a housing designation in the "assessment" portion of an infirmary patient SOAP notes.

*The First Court Expert's recommendations to train the infirmary porters and to maintain an adequate supply of linens have been addressed. We concur with the remaining recommendations of the First Court Expert.*

**Additional Recommendations**
7. Adjust the level of nurse staffing to assure that patient-inmates with significant physical and mental disabilities have their medical, physical, and safety needs met.
8. The IDOC needs to perform an assessment of housing for disabled, and elderly inmates who need skilled nursing care. IDOC needs to build or otherwise find acceptable housing for these inmates.
9. Transfer patients whose clinical needs exceed the capability of the MCC infirmary to a licensed clinical skilled-nursing facility either within IDOC or in the community.
10. Educate, monitor, and track the comprehensiveness of the provider infirmary notes to assure that progress notes adequately document the clinical status of the patient and the

current treatment plan. Failure to document this information puts the health of the patient at risk.

11. Educate, monitor, and track provider notes to assure that the clinical justifications and reasons for clinical decisions and treatments are documented. Failure to document this information puts the health of the patient at risk.

## Pharmacy and Medication Administration

**First Court Expert Recommendations**

The First Court Appointed Expert made no recommendations concerning pharmacy and medication administration.

**Current Recommendations**

1. Adopt a computerized provider order entry (CPOE) program to eliminate handwritten orders. Replace handwritten transcription of orders to the MAR with printed labels after the pharmacy has reviewed and verified the order. Medications which must be started urgently may be transcribed in handwriting onto the MAR. When the label arrives, it should be affixed to a new line on the MAR and documentation continued there.

2. Order implementation should take place within 24 hours. Adopting CPOE eliminates delays in treatment resulting from not transcribing orders timely.

3. Medication should be administered in patient specific, unit dose packaging. The practice of pre-pouring and the use of multiuse envelopes should be stopped.

4. The use of a list to prepare controlled substances and the placement of doses for multiple patients into a collective container should be stopped *immediately*.

5. Alternative forms of medication should be used rather than crushing and floating (liquid or injectable).

6. The MAR should be used by the nurse to verify the medication, dose, and route of administration is correct immediately before giving the medication to the patient. The nurse should have the MAR available to answer any questions or concerns the patient has about the medication.

7. When medication is dropped on the floor, the patient should be offered a replacement and not be forced to choose between going without or ingesting a medication that is unsanitary.

8. Medication should be documented on the MAR at the time it is administered. When medication is not given, the reason must be documented on the MAR.

9. Every MAR should have the signature and initials of every nurse who has administered medication to that patient. An electronic MAR would document the identity and credentials of any person administering medication automatically.

10. Printed labels should be provided to place on the MAR when a new order is dispensed. Orders should not be handwritten on the MAR unless it is a medication to be given immediately.

11. A system for timely renewal of chronic disease and other essential medications should be developed.

12. Nurses should refer any patient who does not receive three consecutive doses of medication critical in managing a chronic disease (insulin, Plavix, factor H, HIV medication, antirejection medications, etc.) to the treating provider. The treating provider should meet with the patient and determine if treatment can be modified to improve adherence.

13. Patient adherence with KOP medications prescribed to treat chronic disease should be monitored at regular intervals (monthly by nursing and by the provider at each chronic disease visit).

14. Revise the policy and procedure for medication administration to provide sufficient operational guidance to administer medications in accordance with accepted standards of nursing practice.

15. The CQI program should develop, implement, and monitor quality indicators related to pharmacy services and medication administration.

16. Root cause analysis and corrective action plans should be used to target the causes of performance that is below expectations. Corrective action should consider system improvements such as computerized provider order entry, use of bar coding, patient specific unit dose packaging, EMAR, etc., to support desired performance.


## Infection Control

**First Court Expert Recommendations**

1. Continue to aggressively monitor skin infections and boils. *We agree with this recommendation.*

2. Assure a practice of appropriately laundering and sanitizing infirmary bedding and linens either in the healthcare unit or institutional laundry. If laundering in the healthcare unit, water temperatures should be monitored and recorded daily to assure a 160°F or 140°F reading. *We agree with this recommendation and further recommend that a policy and procedure be written on how patient linens are laundered to include instruction to send linens soiled with body fluid to the institution laundry, that water temperature be tested and logged periodically, and that a booster be added to the hot water inlet on the washing machine.*

3. Train all healthcare unit porters in blood-borne pathogens, infectious and communicable diseases, and the proper cleaning and sanitizing of infirmary rooms, beds, furniture, toilets, and showers. *This recommendation has been accomplished.*

4. Since there are no visual or audible alarms for the infirmary negative pressure respiratory isolation rooms, when a patient is isolated due to respiratory infection, gauge readings should be monitored and recorded each shift. When the rooms are empty or being used for purposes other than respiratory infection, gauge readings should be monitored and recorded weekly. *Pressure is monitored and recorded consistent with this recommendation.*

5. Install, at a minimum, an audible alarm to immediately notify infirmary staff of the loss of negative pressure in respiratory isolation rooms. *Audible alarms are in place for the isolation rooms; therefore, this recommendation has been accomplished.*

6. Critically monitor cellhouse sick call areas for cleanliness, the use of a paper barrier between patients on examination tables or assure table tops are sanitized between

patients, and appropriate hand washing/sanitizing is occurring between patients. *This recommendation has been accomplished.*

7. Each month, critically inspect upholstered equipment and mattresses for any tears or holes in the outer cover and assure the items are taken out of service until repaired. *We agree with this recommendation and suggest that it be added to the Safety and Sanitation Rounds. We found numerous upholstered items which need to be removed and repaired.*

**Additional Recommendations**

8. Infections and communicable disease data should be analyzed and discussed as part of the monthly and the annual CQI meetings. This should include discussion of trends, updates from the CDC, and review of practices.
9. Update the IDOC Infection Control Manual now and at least every two years.
10. Update the Health Services policies and procedures that relate to sanitation and infection control now and at least every two years.

# Dental Program

## Dental: Staffing and Credentialing
**First Court Expert Recommendations:** None.

**Current Recommendations**
1. Hire two dentists immediately.
2. Until three full-time dentists are hired, and the backlogs are reduced, Wexford should provide one or more full-time PRN dentists.
3. An additional 0.5 FTE dental hygienist should be hired.
4. Dentist staffing should be revisited after dentists incorporate bite wing x-rays and periodontal probing into their examinations, since it is likely that additional pathology will be identified when examinations and treatment comport accepted professional standards.

## Dental: Facility and Equipment
**First Court Expert Recommendations**
Replace or repair the x-ray developers in the North 2 and R&C clinics immediately.
1. The space in the HSU clinic that houses the two main dental units is too small to allow efficient care flow and any sense of privacy, and enlargement should be considered for efficient care delivery and safety considerations.
2. All electric outlets should be wall-mounted or protected by the cover for the junction box at the foot of the chair. Loose wires should be neatly arranged and out of traffic flow. We note that this issue has been addressed.
3. All the units, chairs, and cabinetry should be replaced, and surface areas should be better able to accommodate disinfection.
4. Replace the radiograph unit in the clinic immediately with a wall-mounted unit capable of digital radiography.

5. The Panelipse [panoramic] radiograph unit should be replaced. This is critical for a reception center.

*We agree with these recommendations.*

**Additional Recommendations**

6. While the quality of the radiographs is adequate, given the age of the panoramic x-ray unit and the R&C mission of MCC, a replacement should be high in the capital equipment replacement list. Moreover, the replacement should be digital.

## Dental: Sanitation, Safety, and Sterilization

**First Court Expert Recommendations**

1. Sterilization at the HSU clinic is improper. MCC should develop a sterilization system that implements a proper flow from dirty to sterile. *We agree, but note that notwithstanding the inadequate design, the instruments were sterilized appropriately.*

**Additional Recommendations:** None.

## Dental: Review Autoclave Log

**First Court Expert Recommendations**

1. Spore test the autoclaves, and sterilizers should be tested on a weekly basis and proper logs should be maintained. We note that the previously identified deficiencies have been corrected.
2. Safety glasses should be provided to all patients receiving dental care.
3. Biohazard warning signs should be posted in the sterilization areas in the dental clinics.
4. Warning signs should be posted in the area where x-rays are taken to warn pregnant females of potential radiation hazards.

*We agree with these recommendations.*

**Additional Recommendations**

5. The dry heat sterilizer in the HCU clinic has been out of service for approximately two years and should be removed.

## Dental: Comprehensive Care

**First Court Expert Recommendations**

1. Comprehensive "routine" treatment should be provided only from a well-developed and documented treatment plan.
2. The treatment plan should be developed from a thorough, well documented intra and extra-oral examination, to include a periodontal assessment and thorough examination of all soft tissues.
3. In all cases, appropriate bite wing or periapical x-rays should be taken to diagnose caries.
4. Hygiene and periodontal care should be provided as part of the treatment process.
5. Care should be provided sequentially, beginning with hygiene services and dental prophylaxis.

6. Oral hygiene instructions should be provided and documented.

*We agree with these recommendations and emphasize that current MCC practice falls well below accepted professional standards.*

**Additional Recommendations**

7. Treatment performed should be reported using standard (American Dental Association) definitions and procedure codes or entries that can be mapped to the treatment codes.
8. Biennial exams should include a documented oral cancer examination.

## Dental: Intake (Initial) Examination

**First Court Expert Recommendations**

1. Oral hygiene instructions should be provided at the time of the initial examination.
   *We agree. However, the OHI provided at the intake screening was inadequate.*
2. The area where x-rays are taken should have warning signs posted that clearly warn of potential radiation hazards to pregnant females. *We agree with this recommendation.*
3. *A consent form should be developed and used for pregnant females that explains radiation hazards and gives the examiner permission to take the x-ray. This is moot since MCC is a male facility.*

**Additional Recommendations**

4. The oral hygiene instructions provided by the dentist should be more thorough, or in the alternative, they should be provided by other dental personnel.
5. The dentist should view the panoramic x-ray while the patient is being examined.
6. The dentist should wash hands before re-gloving or, in the alternative, use alcohol wipes.[199]
7. The initial exam should document Periodontal Screening and Recording (PSR), which is a professional standard.

## Dental: Extractions

**First Court Expert Recommendations**

1. *A proper diagnosis should be part of the treatment process. We agree with this recommendation; however, we note that the diagnoses were appropriate in the charts we reviewed.*

**Additional Recommendations**

2. When an antibiotic is prescribed for a tooth-related infection, the tooth should be extracted within the therapeutic window of the antibiotic. A follow-up appointment for the extraction should be made so that the tooth is extracted within 10 days.
3. The health history should be updated before a tooth is extracted.

---

[199] Centers for Disease Control and Prevention. *Summary of Infection Prevention Practices in Dental Settings: Basic Expectations for Safe Care*. Atlanta, GA: Centers for Disease Control and Prevention, US Dept of Health and Human Services; October 2016, p.7.

4. The consent form should specify the tooth to be extracted and the reason for the extraction (i.e., the diagnosis).

## Dental: Removable Prosthetics
**First Court Expert Recommendations**
1. A comprehensive examination and well developed and documented treatment plan, including bitewing and/or periapical radiographs and periodontal assessment, precede all comprehensive dental care, including removable prosthodontics.
2. Periodontal assessment and treatment should be part of the treatment process and that the periodontium should be stable before proceeding with impressions.
3. All operative dentistry and oral surgery as documented in the treatment plan be completed before proceeding with impressions.

*We agree with these recommendations and note that **current** practice is substantially below accepted professional standards.*

**Additional Recommendations:** None.

## Dental: Sick Call/Treatment Provision
**First Court Expert Recommendations**
1. All treatment should proceed from a proper diagnosis.
2. A system should be implemented immediately that insures that inmates with urgent care complaints (pain and swelling) are seen and evaluated by medical/dental staff within 24-48 hours from the date on the request form. It is from this face-to-face evaluation that scheduling, and treatment should proceed. The appropriate medical staff in the units should be utilized in this effort. We note that patients who sign up for nurse sick call with complaints of dental pain or swelling are seen within 48 hours by a nurse and are offered non-narcotic analgesics. Furthermore, patients who sign up for nurse sick call generally have timely face-to-face assessments and receive analgesics when appropriate.

*We agree with these recommendations.*

**Additional Recommendations**
3. Nurses should triage all requests for dental care. Non-urgent requests (cleaning, routine exams, fillings, etc.) should be sent to the dental clinic for scheduling. All other dental complaints should be assessed at nursing sick call, treated for pain as needed, and referred to the dentist based upon clinician urgency.
4. The Wexford contract should be amended to specify a maximum wait time for a routine care appointment to 90 days.

## Dental: Orientation Handbook
**First Court Expert Recommendations:** None.

**Additional Recommendations:** None.

Dental: Policies and Procedures

**First Court Expert Recommendations**

1. The dental program should develop a current, detailed, thorough, and accurate policy and procedure manual that defines how all aspects of the program are to be managed. Once developed, it should be reviewed and updated on a regular basis and as needed for new policies and procedures. *We agree with this recommendation.*

**Additional Recommendations**

2. The Dental Director should sign the policies. Moreover, all dental personnel should sign a memo acknowledging having read the policies.

Dental: Failed Appointments

**First Court Expert Recommendations**

1. Develop a comprehensive CQI study to evaluate reasons for missed appointments and seek remedies to correct the problem and improve getting inmates to their appointments. *We agree. Although the failed appointment rate has fallen to a yearly low, it is still worthwhile to see if there remains room for improvement. Furthermore, the refusal rate is worth studying.*

**Additional Recommendations:** None.

Dental: Medically Compromised Patients

**First Court Expert Recommendations**

1. The medical history section of the dental record should be kept up to date and that medical conditions that require special precautions should be red-flagged to catch the immediate attention of the provider.
2. Blood pressure readings be routinely taken of patients with a history of hypertension, especially prior to surgical procedures.

*We agree with these recommendations.*

**Additional Recommendations**

3. Diabetics should be referred for a periodontal assessment that includes periodontal probing every six months.
4. Diabetic patients diagnosed with periodontal disease should be offered an oral prophylaxis and non-surgical periodontal treatment (i.e., scaling and root planing) every six months if clinically indicated. This should be part of the chronic care program.

Dental: Specialists

**First Court Expert Recommendations:** None.

**Additional Recommendations**: None.

Dental: CQI

**First Court Expert Recommendations**
1. Develop vigorous CQI studies that address the weaknesses presented in this report and put in place steps to correct the problems. *We agree with this recommendation.*

**Additional Recommendations**
2. IDOC should hire an individual experienced in health services research to guide the local CQI studies effort.

## Internal Monitoring and Quality Improvement

**First Court Expert Recommendations**
1. The QI policy and the training connected to it must be redone in order to facilitate quality improvement effectively occurring at each institution. This will entail a lengthy discussion. *We agree with this recommendation*.

**Additional Recommendations**
2. The paperwork requirements of putting together information for the annual CQI report need to be separated from the role of leading CQI efforts in improving care.
3. The Governing Body of the health care program needs to be predominantly medical personnel.
4. CQI plans need to be specific to the facility and address major concerns or problems at that facility.
5. A mortality review process needs to be initiated. This process should be managed and performed by non-vendor personnel under direction of the Office of Health Services. This group should review all deaths and sentinel events to identify problems and offer solutions that the facility CQI program addresses and responds to.

# Appendix A

| Staffing for Menard Correctional Center | | | | | |
|---|---|---|---|---|---|
| Position | State or Wexford | Filled | Vacant | LOA | Positions |
| HCUA | State | 1 | 0 | | 1 |
| DON | State | 0 | 1 | | 1 |
| Nursing Supervisor | State | 3 | 0 | | 3 |
| Office Coordinator | State | 2 | 0 | | 2 |
| Office Assistant | State | 1 | 3 | | 4 |
| Staff Assistant | Wexford | 1 | 0 | | 1 |
| Office Associate | State | 2 | 0 | | 2 |
| Clerk II | State | 1 | 0 | | 1 |
| Health Info Assoc | State | 2 | 0 | | 2 |
| RN | State | 18 | 10 | 1 | 28 |
| LPN | State | 12 | 8 | | 20 |
| LPN | Wexford | 4 | 2 | | 6 |
| Dental Director | Wexford | 0 | 1 | | 1 |
| Dentist | Wexford | 1 | 1 | | 2 |
| Dental Assistant | Wexford | 2 | 0 | | 2 |
| Dental Assistant | State | 1 | 0 | | 1 |
| Dental Hygienist | State | 1 | 0 | | 1 |
| Medical Director | Wexford | 1 | 0 | | 1 |
| Physician | Wexford | 0 | 2 | | 2 |
| NP | Wexford | 2 | 1 | | 3 |
| Wexford Site Manager | Wexford | 1 | 0 | | 1 |
| Med Room Asst | Wexford | 2 | 0 | | 2 |
| Radiology Tech | Wexford | 1 | 0 | | 1 |
| Phlebotomist | Wexford | 1 | 0 | | 1 |
| Optometrist | Wexford | 1 | 0 | | 1 |
| PT aide | Wexford | 1 | 0 | | 1 |
| Physical Therapist | Wexford | 0.1 | 0 | | 0.1 |
| Total | | 62.1 | 29 | 1 | 91.1 |