# Northern Reception and Classification Center
# 2nd Court Appointed Expert Report
# Lippert v Godinez

Visit Date: January 29-February 1, 2018

Prepared by the Medical Investigation Team

Mike Puisis, DO
Jack Raba, MD
Madie LaMarre MN, FNP-BC
Catherine Knox, MN, RN, CCHP-RN
Jay Shulman, DMD, MSPH

## Table of Contents

**Overview** ................................................................................................ 2

**Executive Summary** ........................................................................... 3

**Findings** ............................................................................................... 7

Leadership, Staffing, and Custody Functions .......................................... 7
Clinic Space, Sanitation, Laboratory, and Support Services .................. 15
Medical Records ..................................................................................... 22
Medical Reception .................................................................................. 27
Intrasystem Transfer .............................................................................. 34
Nursing Sick Call .................................................................................... 35
Chronic Care .......................................................................................... 40
Urgent/Emergent Care ........................................................................... 50
Specialty Consultations .......................................................................... 51
Infirmary Care ........................................................................................ 56
Pharmacy and Medication Administration ............................................. 62
Infection Control .................................................................................... 67
Dental Program ...................................................................................... 68
Internal Monitoring and Quality Improvement ...................................... 84

**Recommendations** ......................................................................... 94

Leadership, Staffing, and Custody Functions ........................................ 94
Clinic Space, Sanitation, Laboratory, and Support Services .................. 95
Medical Records ..................................................................................... 95
Medical Reception .................................................................................. 96
Intrasystem Transfer .............................................................................. 98
Nursing Sick Call .................................................................................... 98
Chronic Care .......................................................................................... 99
Urgent/Emergent Care ......................................................................... 100
Specialty Consultations ........................................................................ 101
Infirmary Care ...................................................................................... 102
Pharmacy and Medication Administration ........................................... 102
Infection Control .................................................................................. 104
Dental Program .................................................................................... 104
Internal Monitoring and Quality Improvement .................................... 110

**Appendix A** ..................................................................................... 111

**Appendix B** ..................................................................................... 112

**Appendix C** ..................................................................................... 115

# Overview

From January 29, 2018 through February 1, 2018, the Medical Investigation Team visited the Northern Reception and Classification Center in Joliet, Illinois. This report describes our findings and recommendations. During this visit, we:

- Met with leadership of custody and medical
- Toured medical services areas and housing units
- Talked with health care staff
- Reviewed health records and other documents
- Interviewed inmates

We thank Warden Randy Pfister and his staff for their assistance and cooperation in conducting the review. We had complete cooperation from the Illinois Department of Corrections (IDOC).[1]

The Stateville Northern Reception Center's (NRC) primary mission is a reception center where staff performs intake processing of new inmates before they are sent to other IDOC facilities within the state. It was built in 2004 and is the largest reception center in the state of Illinois. On 1/29/18, the first day of our visit, the NRC census was 1,493 inmates, with an additional 188 inmates housed in the minimum security unit (MSU), for a total of 1,681 inmates. The NRC population includes 53 inmates in segregation, and 15 inmates in boot camp.

In 2017, the NRC received 15,942 inmates or approximately 307 inmates a week. NRC has a 20-bed infirmary; 12 beds are assigned to medical and eight beds are assigned to mental health.

NRC is part of a two-facility complex that includes Stateville Correctional Center (SCC). SCC is the parent facility of this complex and a single Warden manages both facilities. Each of these facilities is a stand-alone facility; they are not physically connected. They are separated by security perimeters and one must drive a short distance and reenter a second security gate to enter the other facility.

The population design capacity for NRC is not calculated separately from SCC. For SCC and NRC combined, the population is currently 89% of design capacity. Twenty-nine inmates were housed at the facility greater than 90 days. We note that this is significantly fewer than the 587 individuals who remained at the facility greater than 60 days at the time of the First Court Expert's NRC report.[2] This implies that intake evaluations and transfers are occurring at a faster rate than previously. The 29 inmates who remain at NRC greater than 90 days include 12 inmates who remain at the facility for medical reasons. Of these, six have disabilities and are

---

[1] We did not experience complete cooperation from Wexford Health Sources. Their attorney required that he be present for interviews with Wexford staff but was unable to attend our tour, prohibiting some interviews with the Medical Director, physician assistant, offsite scheduler, and follow-up questions with the Director of Medical Records. We are in discussions about how to improve the cooperation with Wexford so that it does not impair our ability to conduct interviews with staff.
[2] Northern Reception Center (NRC) Report, January 21-23, 2014 prepared by the Medical Investigation Team.

awaiting ADA placement at other facilities. The remaining six individuals are on hold for medical reasons, mostly for continuing specialty medical treatment. NRC has a consistent mental health caseload of approximately 450 inmates and eight rooms designed for mental health watches. Inmates attending Court in the northern district are housed at both SCC and NRC. These are called WRITS. The combined population of WRITS at SCC and NRC is 55.

# Executive Summary

Based on a comparison of conditions as identified in the First Court Expert's report, we find that conditions appear to have deteriorated. We find that NRC is not providing adequate medical care to patients. There are systemic issues that present ongoing serious risk of harm to patients and result in preventable morbidity that could also result in mortality. The deficiencies that form the basis of this opinion are provided below.

Though NRC is a large facility with over 1400 inmates, it is still treated as part of SCC. NRC and SCC share a Warden, Assistant Warden of Programs, and medical staff. These facilities are unique facilities, each with a different mission; they need separate medical staff and need to operate independently due to their separate and unique missions.

While the leadership staff is now in place, they are all recently hired. The Medical Director is a nuclear radiologist and performs inadequately in primary care, and provides little to no clinical leadership. He has been with Wexford for years and has continued to perform poorly, and yet has been assigned to be a Medical Director. There is no evidence that Wexford performs any credentialing or privilege assessment except to ascertain that the provider has a license. This is below community standard of practice. Wexford has hired an ex-warden without formal medical training as Regional Manager, which in our opinion is unacceptable.

NRC has inadequate staffing. There is a 42% vacancy rate, which is extraordinarily high. The mixed staff of Wexford and IDOC employees creates confusion regarding supervisory lines of authority. The IDOC has not performed a staffing needs assessment. Some areas of service are understaffed or not staffed at all (e.g., infection control, quality improvement and clerical staff). Relief factors are not incorporated into projecting staffing needs. The numbers of custody staff appears inadequate to support the medical requirements of providing security to nurses as they administer medication and to transport inmates for clinical appointments.

We found that the conditions of confinement are a major impediment to the delivery of health care. At NRC, inmates are locked down 24 hours a day except for four hours per week. We have not observed the conditions of confinement found at NRC at any other correctional facility in the country except supermax prisons, where even these inmates are granted one hour out-of-cell time per day.

As a result, NRC inmates are unable to confidentially submit their health requests into locked boxes accessed only by health care staff because they are not allowed out of their cells. Nurses

do not adhere to standards of nursing practice with respect to medication administration due to the conditions of confinement. This has resulted in systemic medication errors and ongoing risk of harm to patients. (See Pharmacy and Medication Management).

NRC has a number of clinical space and sanitation problems. Inmates in the housing units are not brought to the health care unit for nursing sick call and these evaluations are performed in housing unit rooms unacceptable for clinical evaluations. The number of providers exceeds the number of examination rooms in the health care clinic, which results in prioritization of work schedules and promotes missed evaluations. In almost every clinical area, sanitation and maintenance of the physical plant was not at an acceptable level for provision of health care. Some equipment was non-operable, negative pressure rooms were not functioning, patient examination tables lacked paper barriers, examination tables and infirmary beds were nonadjustable, and sinks and faucets all had mineral deposits, making them harder to sanitize. Adequate clean linens were not in supply on the infirmary for incapacitated patients who frequently soil themselves. These deficiencies are typically addressed by a regular sanitation schedule and performance of environmental rounds, which do not happen at this facility.

Medical records are inadequate and promote poor clinical care. Because of the lack of staffing, NRC does not maintain the medical records in accordance with its own administrative directives. It also does not maintain medical records in accordance with guidelines from the Illinois Department of Human Services. Documents are not present in the medical record in an organized manner, making the record difficult to use. Laboratory and consultation reports are often not present in the medical record, making it difficult to provide adequate clinical care. The medical record room is undersized, cluttered, and not secure. There is no medical records tracking system to provide accountability for the location of medical records.

Although the timeliness of reception screening has improved since the First Court Expert's report, there are still numerous deficiencies. Equipment is not maintained or calibrated. Visual acuity testing is inaccurately performed and yields inaccurate results. Staff incorrectly read Tuberculin skin tests and inconsistently record results in the health record. HIV opt-out testing is inconsistently performed. Intake evaluations uniformly lack adequate history, and physical examinations are cursory. Providers do not consistently perform adequate assessments or order labs tests necessary to determine the patient's disease control. Providers often omit or change a patient's medications upon arrival without clinical indication. Nurses do not consistently initiate a medication administration record when giving patients stock medication in the reception area. Provider medical reception orders are inconsistently carried out. Provider follow up of abnormal reception laboratory tests is not consistently and timely performed.

Inmates are not provided access to approved health request forms and do not have a secure location to place these requests, which creates a barrier to access to care. Staff do not collect health requests daily and do not date-stamp requests when they receive them. Requests are not triaged within 24 hours and nurses do not indicate the urgency of follow up evaluations. Requests are evaluated without the patient's medical record. Nurses conduct health request evaluations in rooms that are inadequately equipped and supplied. Health requests are

inconsistently filed in the medical record. Correctional Medical Technicians/Licensed Practical Nurses perform assessments but are not licensed to perform independent assessments. A recently established sick call log does not adequately track the status of each patient request. The IDOC Administrative Directives provide insufficient operational guidance regarding nursing sick call.

NRC does not track persons with chronic disease because the nurse assigned to perform this task is typically pulled for other assignments. Because patients with chronic illness are not tracked, many are not followed for their chronic illness even when they remain at the facility for extended periods of time. The provider notes for patients with chronic illness are deficient. They lack adequate history, reasons for modifying treatment plans, and have inadequate physical examinations. Diabetes care, in particular, is not provided consistent with contemporary standards of care. There were significant gaps on medication records, making it appear that inmates do not receive ordered medications for their chronic illnesses. Patients with problems beyond the expertise of NRC providers were not referred for appropriate consultation.

The emergency response bags and equipment were disorganized and not sanitized. Emergency response drills were conducted but the critique was limited. When deficiencies were identified there was no corrective action plan. NRC does not track emergency response on a log so it is not possible for the program to evaluate its performance through the CQI program.

Planned staffing for the infirmary is appropriate but actual staffing shows lack of staffing and no RN coverage for some shifts. Provider notes are generally written on a weekly basis, even when patients had need for more frequent notes. The quality of physician care on this unit was inconsistent and often inadequate. Progress notes lack documentation of the rationale for therapeutic plan changes and fail to identify a differential diagnosis or clear treatment plan. There was no documentation that pertinent physical examinations were being performed. We noted that care of persons with diabetes was especially problematic. The level of provider care placed patients on this unit at risk of harm.

Medication administration is impaired because of lack of sufficient cooperation by security staff, which appears to be due to insufficient custody staff. Nurses do not administer medication consistent with accepted nursing practice. Administration is not hygienic. Nurses do not appropriately confirm the identity of the patient receiving medication. Doors are not opened for medication administration and nurses pass medication through cracks in the door and do not adequately visualize patients to confirm their identity. Nurses do not document on the medication administration records at the time they administer the medication to the patient. When inmates do not take medication there is no process to refer the patient to a provider for counseling. The nursing medication room is dirty, cluttered and disorganized. Process issues with the contract pharmacy result in nurses having to transcribe large numbers of medication orders onto new medication administration records (MARs) at the end of each month instead of the pharmacy providing preprinted MARs. This creates an enormous work load for nurses and results in documentation errors. CQI reports indicate that staff repeatedly

commit errors in medication administration, yet an effective correction action plan has not been developed.

NRC has no infection control program, and no one assigned for this work. Sanitation, disinfection, and environmental inspections are not done or are poorly performed. No one evaluates the effectiveness of infection control issues, including: TB skin test reading, effectiveness of intake infection control screening, or surveillance for contagious or infectious disease.

The dental clinic is small, with capital equipment approaching the end of its useful life cycle, and there is no replacement plan. While critical equipment has been repaired, recent history suggests that there are systemic problems in obtaining repairs. There is no documentation that the dental x-ray units have been inspected by a therapeutic radiological physicist per Illinois Administrative Code. Clinic disinfection and infection control are adequate; however, infection control at the intake screening exams is unacceptable and must be addressed immediately. Routine dental treatment occurs without a comprehensive oral examination (i.e., intraoral x-rays, a periodontal assessment, and a treatment plan), placing patients at risk of preventable pain and tooth loss. Clinical notes are inadequate. Antibiotics and analgesics are often dispensed without a diagnosis having been recorded, and the patient's chief complaint is rarely recorded. The dental sick call process is disorganized, and it is not possible to determine how long patients wait to be treated, or the failed appointment rate. There is no process for mid-level providers to triage and palliate patients whose sick call request states or suggests pain or infection when the dentist is not available. The dental program has not changed materially since the First Expert's Report. It represents a substantial departure from accepted professional treatment standards and is not minimally adequate.

Quality improvement is a critical form of self-monitoring and is necessary to identify and correct defective systemic issues. NRC did not have its own Continuous Quality Improvement (CQI) program until recently. It has not yet become effective. The Traveling Medical Director is an ineffective leader and ineffective in promoting quality improvement. No one at NRC has experience, training, or dedicated time to perform or lead the CQI effort. The NRC CQI plan is identical to the SCC CQI plan, even though these are different institutions. The CQI coordinator has no training in CQI, does not understand what CQI consists of, and has a full-time assignment that restricts her CQI to a few hours a month, which are mainly occupied in secretarial functions. The CQI program does not monitor for quality of clinical care. Peer review is ineffective and does not reflect the current status of clinical care. Mortality review and sentinel event reviews are not done. Data support for the CQI program is insufficient.

# Findings

## Leadership, Staffing, and Custody Functions

**Methodology:** We interviewed leadership of the health care program, the Warden and some of the Warden's staff. We evaluated staffing documents and discussed these with the leadership. We reviewed other selected documents.

### First Court Expert Findings
The First Court Expert found that leadership provided by the Medical Director and Health Care Unit Administrator (HCUA) was deficient and resulted in a program ill-organized to provide quality services. The HCUA was on leave and her absence left the facility bereft of administrative leadership. The lack of leadership resulted in the absence of performance review, lack of data provided by tracking logs, and disorganized medical records, which were ascribed to the lack of leadership. The HCUA was a position shared with SCC. Staff was shared between SCC and NRC, which made it difficult to know how many staff work at each of these facilities.

### Current Findings
Our review showed one improvement. NRC now has its own budgeted leadership team, including its own HCUA, Director of Nursing (DON), and Medical Director, even though these positions are not all filled.

The remainder of the problems cited in the First Court Expert's report persist. We identified additional findings, including:

- None of the leadership staff at NRC, including the Warden, was aware of or had read the 2014 First Court Expert's Lippert report. The leadership at NRC was not aware of the First Court Expert's recommendations or findings even when the IDOC agreed with the First Court Expert's findings or recommendations in their response to that report.
- The Medical Director position is vacant and filled by a "Traveling Medical Director" who does not adequately fill those responsibilities and who is poorly qualified to provide the type of medical care needed at this facility.
- The practical implementation of "Traveling Medical Directors" does not address the responsibilities required of a Medical Director.
- The Wexford Regional Manager for this facility is an ex-warden and has no formal training in health management.
- All leadership positions (HCUA, DON, Medical Director, and Director of Medical Records) are only recently filled. The HCUA is the longest tenured leadership position and this was filled nine months ago.
- NRC is understaffed, yet the program does not have a staffing plan that matches the medical needs at the facility.

- NRC still shares staff with SCC. There are not clear lines of authority in the table of organization with respect to assignment and supervision of staff that move between facilities. The hours shared-employees work at each facility are ineffectively tracked.
- A relief factor has not been used for staffing at NRC, which will result in understaffing.
- The budgeted staffing does not include clerical positions, quality improvement nursing hours, or infection control nursing hours.
- Budgeted positions do not appear to have been developed with respect to current workloads for many categories of employees, including physicians and mid-level providers, nurses, medical record clerks.
- There is no current document reflecting actual staffing at this facility.
- None of the senior staff at NRC participated in the development of the schedule E for this facility, indicating the lack of participation of local leadership in developing a needs assessment for the facility.
- There is a lack of custody staffing to timely assist nurses during medication administration. Inmates are not all brought timely for their medical appointments.

NRC no longer shares medical leadership with SCC, which is an improvement. This is consistent with one of the First Court Expert's recommendations. The HCUA, DON, and Director of Medical Records positions are all filled. The Medical Director position is now vacant, but this position was filled during the time of the First Court Expert's report. An NRC staff physician was recently promoted and is currently serving as the "Traveling Medical Director" at NRC, which is equivalent to a coverage position. The IDOC and Wexford both perform regional oversight of the medical program. The Northern Regional Coordinator, a nurse position for the IDOC, is filled. The Regional Manager and the Regional Medical Director for Wexford Health Services are both filled.

The Wexford Regional Manager was unable to be present for our tour. We learned from Wexford Vice President of Special Projects that the Wexford Regional Manager is an ex-warden by training.[3] We have concerns that a person with criminal justice training will not have the skills necessary to manage a clinical medical program. This was confirmed in our discussion with the HCUA, who thought that the Wexford Regional Manager did not always understand medical issues as presented in the quality improvement meetings and, as an example, did not understand that using drop files in medical records is inappropriate.

The Regional Coordinator for the northern district of the IDOC is an RN and has an additional Bachelor of Science in nursing. This well-qualified individual has been in his position for two years. He covers 10 facilities for the IDOC, which is a large span of supervision. He does participate in quality improvement meetings and appears to be an active participant in issues at NRC and was present and engaged during our tour.

NRC leadership positions have only recently been filled. The HCUA is an IDOC employee and started at NRC in April of 2017. She is a RN and was previously a nurse at the Sheridan facility

---

[3] Interview with Cheri Laurent 1/25/18.

and transferred as the HCUA at Pontiac before transferring to NRC as the HCUA. The HCUA told us that she inherited a facility that had not been properly managed for years. The DON, also an IDOC employee, started in September of 2017, only four months before our tour. The Medical Record Director, a Wexford employee, started two months ago in her position. The Medical Director position had been vacant for an extended time period. The physician assistant at NRC told us that over the past five years there have been seven Medical Directors. During the same five year period there was no Medical Director for a period of about 24 months. According to the HCUA, several months ago a physician moved from Dixon to serve as the NRC Medical Director. A few weeks ago, this physician, after being at NRC as Medical Director for only approximately three months, was moved to be Medical Director at SCC when its Medical Director died.

The NRC Medical Director position is now vacant but is filled by a "Traveling Medical Director." The HCUA was not pleased with the current Traveling Medical Director's lack of participation in leadership functions. The HCUA told us that she needed a strong medical leader in the Medical Director position and attempted to have the newly appointed SCC Medical Director remain at NRC but was unsuccessful.

The title of "Traveling Medical Director" is a misnomer, in our opinion. At NRC, the current Traveling Medical Director does not provide typical duties of a Medical Director based on our discussion with the HCUA. A full-time Medical Director knowledgeable in primary care medicine is needed. Furthermore, it appears from staffing documents provided to us from Wexford that physicians and Medical Directors are frequently moved from facility to facility.[4] The lack of coverage by a consistent Medical Director detracts from having effective guidance from a reliable physician with respect to clinical issues at the facility. The lack of a permanent Medical Director at NRC significantly impairs the ability of the leadership team to improve the program through active participation of a physician in quality improvement and other activities.

The newly appointed Traveling Medical Director at NRC was the Medical Director at the Hill facility during the last First Court Expert visit to that facility and was described in that report as not performing some administrative responsibilities, having "clinical concerns," and having interpersonal deficiencies. Also, a Wexford discipline report of 11/26/17 lists this physician as having been given a final warning on 2/16/16 for performance.[5] We also noted, in record reviews, our own clinical concerns for this physician. Given his history and lack of clinical proficiency, we have concerns that he will be successful in this new role.

The NRC is grossly understaffed. The lack of staffing is reinforced by NRC management in several comments in quality improvement meeting minutes, including:

---

[4] 40C0134-IL Physicians Report 9-19-14 key; 42P5643-IDOC Position History 7-1-2015 to 11-22-17 Bates #520-548; and 4253412-IDOC Physicians as of 1-25-18 Bates #124.
[5] Bates document #549, 42P5751 Discipline Report – Employees Disciplined between 7-1-15 to 11-26-17 for Misconduct or Performance.

- "Not enough nurses or staff assistants. [The IDOC Regional Coordinator] wants some numbers. [The Wexford Regional Manager] said to let him know and he'll get them. Breakdown of how many of each for every shift. Do staffing plan and review."[6]
- "Mandates causing mistakes because nurses are working a lot but they are getting good pay and can still lose their license for their actions."[7]
- "AWP says we are doing good with lack of staff…[Regional Coordinator] says things fall through because no nursing/staff or tracking issue."[8]
- "[Director of Nursing] was supposed to assign a nurse for 30-day assignment to be held accountable. There is not enough staff for accountability."[9]

Every individual we spoke with told us that staffing shortages were the most significant problem at this facility. However, an adequate and thorough staffing analysis based on need has not been done.

Staff is still shared between NRC and SCC. We were told that between September and October of 2017, the IDOC negotiated a labor agreement with the Illinois Nurses Association (INA) to have all registered nurse (RN) staff at five facilities (Menard, Pontiac, Dixon, Graham, and NRC) become state employees under the INA union contract and that all licensed practical nurses (LPNs) would be Wexford employees. For NRC this was intended to be part of a plan for NRC to function independently from SCC. The Vice President of Special Projects for Wexford, the Northern Regional Coordinator for the IDOC and the HCUA of NRC all told us that this arrangement was in planning stages but that there was no written agreement that they had seen.

Related to that negotiation, on October 6, 2017, only three months before our visit, the Regional Coordinator for the northern region estimated, for purposes of these negotiations, that NRC needed 33 nurses.[10] This analysis was given to us as a staffing needs assessment at the facility. This analysis did not take supervisory nurses into account and did not address special functions, such as chronic disease nursing, quality improvement, or infection control. The negotiation was with the nursing union and only nursing staff was addressed in the staffing analysis. More importantly, this analysis did not include a relief factor, which means that the number of necessary nurses may be 1.4 to 1.7 times (46-56 nursing positions) as high as the 33 nurses given in this analysis.[11] An adequate staffing analysis needs to be done to determine adequate staffing levels for all staffing categories required to accomplish tasks. Also, because many tasks are not now being performed, it will be difficult to perform this analysis until

---

[6] September 19, 2017 Quality Improvement Meeting minutes.

[7] September 19, 2017 Quality Improvement Meeting minutes.

[8] November 21, 2017 Quality Improvement Meeting minutes.

[9] August 15, 2017 Quality Improvement Meeting minutes.

[10] Email from Joseph Ssenfuma to Edward Jackson, Natalie Norther, Robin Best, Kim Hugo, and Steven Meeks on 10/6/17.

[11] A relief factor analysis determines how many hours of staffing does one post require for a year. The total coverage hours required for each position is divided by the number of hours each full-time employee is available to work. The number of hours each employee is available to work is calculated by the paid hours minus the hours off for vacation, holidays, weekends, sick leave, and training. In my management experience, each full-time post requires approximately 1.7 to 1.9 FTE employees.

leadership includes all tasks required by the administrative directives (AD) into a staffing analysis.

Because staff is shared between SCC and NRC, three different managers supervise NRC nursing staff: the NRC HCUA, the SCC Wexford DON, and the SCC HCUA. This results in supervisory conflicts that arise due to union contract rules. Wexford staff must be given assignments and have personnel actions given by Wexford supervisors. State employees must be given assignments and have personnel actions given by state supervisors. This means that when a Wexford employed staff works at NRC where there is no Wexford nursing supervisor, the staff at NRC does not have the ability to discipline or technically to make an assignment. The current table of organization does not provide clear lines of management authority and does not reflect this confusing supervisory structure. This makes managing NRC complicated, difficult, and can result in confusion.

SCC is the parent facility in its relationship to NRC. Since SCC and NRC are sharing staff, someone has to be responsible for making decisions on who is to get greater staffing, especially during times when staff is off sick or on vacation. This responsibility has not yet been assigned. We were told that the HCUAs of SCC and NRC are trying to work out a staffing schedule of shared staff and for assignment of nursing staff from SCC who will assist at NRC. Shared-staffing assignments appear to be an extemporaneous negotiation. When the SCC Wexford staff provides service at NRC, their hours are tracked by the Wexford management. The HCUA has complained to the Regional Manager of Wexford that the hours provided at NRC by the Wexford nursing staff from SCC are inaccurate. This shared staffing arrangement creates a "nightmare" as described by the HCUA.

The current schedule E provided to us by the IDOC is not accurate, as it does not reflect the recently negotiated changes in nursing staff at NRC and does not represent the portion of shared staff from SCC that can regularly be counted on to work at NRC. The HCUA could not provide me an official document that describes state medical employees and Wexford medical staffing at NRC. A table in Appendix 1 was based on the HCUA and the IDOC Regional Coordinator giving me the current configuration of staffing at NRC, which is not yet memorialized in a document. Shared staffing between NRC and SCC is not definitively apportioned in budget documents.

Our staffing table shows a total vacancy rate of 42%, although this reflects a large number of newly allocated positions. Still, this is an extraordinary vacancy rate. We note that this staffing level has not been developed with respect to staff needs at all levels. At best, it is a reflection of a recent analysis of nursing need without relief factor.

NRC provider staffing consists of two physician assistants, one staff physician, and a Medical Director. There are four budgeted providers but only three providers positions filled at NRC. We were told that all three providers work in the morning in the clinic, seeing patients for physical examinations, physician sick call, chronic care visits, and infirmary visits. At about noon, we

were told that all three providers go to intake to perform physical examinations. In the 2016-17 annual CQI the following statistics were provided:

| Intake evaluations | 17847 |
|---|---|
| PA sick call | 3062 |
| MD sick call | 2369 |
| MD urgent care | 616 |
| MD encounters | 6190 |
| Referred to MD | 1088 |
| Total | 31172 |

This amounts to 599 provider encounters per week or 119 encounters per day in a five-day work week. If there are four providers, each provider must see 29 patients per day. If there are three providers, each provider must evaluate 39 patients per day. At 29 patients per day, this is approximately four patients per hour if no lunch is taken. At 39 patients a day this is approximately five patients per hour if no lunch is taken. This does not include infirmary patients or review of labs, x-rays, collegial reviews, review of consultant reports, hospital reports, and quality improvement activity. This is consistent with the First Court Expert's report, which noted that providers may perform 25 or more physical examinations in three to four hours.[12] These are unrealistic patient loads not likely to promote quality care. This staffing pattern does not include a relief factor. This patient load is made worse given the lack of adequate support services, particularly poorly maintained medical records and failure to provide consultant reports to providers. This may account for an almost complete absence of adequate history taking and incomplete evaluations of many patients identified on record reviews.

An important aspect of physician staffing is physician credentialing. Administrative Directive 04.03.125 Quality Improvement Program requires one-time primary source verification be conducted by the vendor and presumably reviewed by the IDOC. Primary source verification is defined as verification from the original source of a specific credential to determine the accuracy of the qualification of an individual health care practitioner. Credentials include completion of medical school, training, licensure, and board certification if applicable. This would mean, for example, that one-time primary source verification would include:

- Query of the AMA Physician Masterfile for verification of US medical school graduation and postgraduate education completion. Alternatively, a letter from the medical school verifying graduation.
- Query of the Education Commission for Foreign Medical Graduates (ECFMG) for verification of a physician's graduation from a foreign medical school.
- A letter from a residency training program or hospital internship program regarding completion of internship or residency in part or in full.

---

[12] Northern Reception Center (NRC) Report, January 21-23, 2014, p. 9.

- The American Osteopathic Association (AOA) Physician Database for pre-doctoral education accredited by the AOA.
- The Federation of State Medical Boards for all actions against a physician's license or the National Practitioner Data Bank full report.
- A letter from fellowship programs for any fellowships completed.
- Query of the American Board of Medical Specialties (ABMS) for verification of a physician's board certification.

We agree with the requirement of the AD and believe this information should be available to the IDOC Agency Medical Director and Regional Coordinators so they can know whether the assignment of physicians by Wexford is appropriate from a clinical perspective.

Currently, in the IDOC, primary source verification is currently interpreted as including verification of only the physician's current medical license and DEA license. The HCUA and Regional Coordinator were unaware of the meaning of primary source verification in typical physician credentialing. The Medical Director at NRC told us that he completed three years of training in radiation oncology but did not finish the program. He then completed two years of nuclear medicine training and said he finished the program but never practiced in nuclear medicine. After finishing nuclear medicine training, this physician began working in the IDOC as a primary care physician. It is our opinion that this credential does not make this physician qualified to serve as a Medical Director or to obtain privileges to practice primary care medicine. When we spoke with the Agency Medical Director on January 19, 2018, we asked whether he would seek care from a nuclear radiologist if he had diabetes. He answered no and stated that using nuclear radiologists as primary care physicians in inconsistent with community standards. With respect to his prior emergency medicine business, he stated that he had never hired a nuclear radiologist and agreed that most Illinois residents seeking primary care would see a primary care trained physician.

There is no clerical support staff at NRC. The need for clerical staff needs to be taken into account in development of a staffing plan.

The schedule E is the staffing requirements of the existing vendor contract. Remarkably, none of the senior supervisory staff involved in the medical program we talked to are involved in the development of staffing needs that ultimately become incorporated into the schedule E. We understand that the last contract was developed well before any of the current leadership was in place. Nevertheless, current staffing needs are not reflected in the current schedule E. We asked the recent Vice President of Operations for Wexford, the Agency Medical Director, the IDOC Regional Coordinator, and the HCUA if any of them had input or created the schedule E staffing pattern. None of them had final authority or significant input into the schedule E. This means that the staffing needs of the facility are not brought to the attention of whoever is in charge of contracting for medical services or who is in charge of approving positions for the IDOC.

Though we did not review custody staffing, we heard complaints from supervisory staff that there are insufficient custody staff to escort patients to their appointments and to ensure that nurses have a custody escort when nurses administer medications to inmates. Because of lack of ability to bring segregation inmates for their appointments, doctors often go up to the segregation unit and see patients in a room not equipped for examinations and which only has a chair.

The Warden told us that there are no post orders for how officers are to assist nurses when they pass medications and no post orders or procedures for how inmates are to be scheduled and brought for their medical appointments. The health care program does not track how many people do not show up for appointments and there is no tracking of how often nurses encounter difficulties with respect to administration of medication. The Warden agreed that officers may monitor more than one housing unit due to staffing and that this was not their desired staffing arrangement. Medical staff told us that when that occurs, nurses have to wait for a custody escort, which delays medication administration. We were told that this is particularly problematic on the evening shift.

The CQI program should track the number of patients who fail to show up for all categories of appointments to determine if there is a problem with custody escorts. A custody staffing analysis should be done to determine if there is sufficient custody staff to ensure that patients are timely medicated and brought for ordered medical care.

With respect to a comparison of our findings with the findings and recommendations of the First Expert report, NRC now has its own leadership team, allocated in the budget, which was a recommendation of that report. There was a Medical Director in place at the time of the First Expert report. However, the Medical Director position is now vacant and is temporarily filled by an individual who is ineffective in that role and who has a history of clinical deficiencies and who Wexford has given a final warning with respect to clinical care. The First Expert report recommended a separate staffing grid for NRC. We agree with that recommendation but a staffing needs assessment and staffing allocation specific for NRC is still not in place. Staffing is still a combination of state and Wexford positions, which causes confusion and supervision problems.

The First Expert report found that the majority of problems could be traced to the lack of leadership at the facility. The condition does not appear to have improved, because the leadership team is only recently been formed and because the Traveling Medical Director does not provide clinical or administrative leadership in his role. Tracking logs and other data sources are still not reliable and therefore ineffective in analyzing processes of care. The leadership team also has not yet developed a plan of action, evidenced in their CQI plan, to correct systemic problems at the facility.

## Clinic Space, Sanitation, Laboratory, and Support Services

**Methodology:** Accompanied by a nurse supervisor, we inspected the intake reception area, housing units, mental health crisis unit, medical infirmary, and the outpatient clinic (exam rooms, interview room, treatment room, storage closets, and x-ray suite). Staff in these areas were interviewed.

### First Court Expert Findings
The First Court Expert found the reception space adequate and well maintained. At the time of the First Court Expert visit, the infirmary was not being used at NRC. The medical unit clinic had three examination rooms and an emergency care/urgent care/procedure room. The First Court Expert found the medical unit clinic clean and well maintained. The First Court Expert noted that there were no clinical spaces in the housing units to adequately perform sick call or physical examinations.

### Current Findings
We agree with the First Court Expert's finding that there are no adequately equipped and supplied clinical examination rooms in which to perform sick call within the housing units. We identified additional findings and confirmed some of the First Court Expert's findings as follows:
- Since the First Court Expert's report, the 12-bed medical infirmary has been opened.
- There are functional patient-activated call assistance devices on the wall next to each medical infirmary bed.
- Overall, the reception area is adequate in size and is acceptably maintained except for the provider examination rooms, which are unsanitary, cluttered, and have poorly maintained furnishings.
- There are two negative pressure rooms in the medical infirmary. The negative pressure monitor was not working at the time of the current visit. The vent in one of the two negative pressure rooms was taped shut, disabling the negative pressure capability of that room.
- The recently relocated nurse office/work station in the medical infirmary is cramped and does not have a sink, phone, computer, or electrical outlets.
- The designated clinical spaces in the housing units are unsuitable for the provision of sick call and physical examinations, lacking exam tables, appropriate chairs, desks, paper towels, and in some rooms, sinks for hand washing.
- The three exams rooms in the clinic are insufficient to accommodate all four providers, nursing staff, and the UIC telemedicine physician, who may need to see patients at the same time.
- The interview room used as an overflow exam room lacked an examination table and clinical equipment.
- The wall mounted oto-ophthalmoscopes were non-functional in all the exam rooms.
- There was broken equipment (scale and refrigerator) in the clinical area.
- The providers' desks in the health care unit examination rooms were poorly maintained.

- The exam tables were flat and nonadjustable. The head could not be raised. There was not an electric exam table in the clinic that could be used by non-ambulatory and disabled patients.
- All the health care unit and infirmary clinical and patient spaces were poorly maintained and inadequately sanitized.
- There were a number of infection control violations and safety hazards noted in the clinical areas.
- None of the examination tables in the clinic had paper barriers that could be changed after use by a patient. The gurneys in the treatment room did have paper barriers.
- The nurse sick call rooms in the housing units, the clinic examination rooms, storage spaces, the treatment room, and the infirmary beds and patient rooms are not properly cleaned, are poorly maintained, and disorganized, creating unprofessional and unacceptable work and patient care areas. Environmental and infection control rounds must be immediately instituted, and corrective actions aggressively pursued as indicated. There is no sanitation schedule for cleaning and sanitizing clinical medical areas.
- Sinks in multiple areas have mineral deposits in the sink bowl and on faucets.
- The quantity of linens was inadequate to meet the needs of the medical infirmary patient population.
- The lockdown practices of this facility force health care staff to conduct clinical interactions on the housing units (medication administration, reading TB skin tests, nurse sick call, and provider examinations) in conditions that are inappropriate for the clinical interaction and do not permit adequate care to occur.

The intake reception area is essentially the same as was described in the First Court Expert's report. The reception area is designed to perform a production line screening of all new admissions to the NRC. Once the security team has completed its intake process, new admissions are guided through a step-by-step clinical screening process including phlebotomy, dental, nurse history, and provider physical examinations. The phlebotomy area and nurse screening areas were clean and orderly. The examination rooms where providers perform examinations were dirty and furniture was in disrepair. Examination tables did not have paper to provide infection control between patients. There is accumulation of mineral deposits on faucets and in sinks, impeding sanitation and infection control.[13] There is no schedule of sanitation and disinfection practices to be carried out in these rooms.

The Minimum Security Unit (MSU) at NRC is a dormitory setting with a capacity of 272 beds housing inmate workers. The main NRC prison housing consists of 24 housing units A through X. A, B, and C are segregation units; the remainder are general population housing units. All the housing units at NRC are structurally the same. Each unit has three tiers with cells housing one or two individuals. The cells have a vertical glass slot and a chuck hole. We were told that the inmates on these units were allowed out of their cells for three showers a week and for two 2-

---

[13] NRC has "hard" water (i.e., high mineral content) which causes build-up of mineral deposits in pipes, faucets, and sinks. The institution needs a water-softening system; however, according to custody leadership, there is no funding for it.

hour yard sessions per week. During inclement weather, the yard sessions are cancelled, resulting in men not leaving their cells except for showers and medical care. There are no pill call lines. Nurses pass medications, read tuberculosis skin tests, and not uncommonly do sick call interviews cell by cell with the cell door locked. There is a correctional room/office on the first level of each unit with a sink/phone/desk and a cut-down tool and a first aid kit. Next to the security office, there is an approximately 8' x 10' room that is used by the nurses to do sick call when the inmates cannot be moved to the first level. None of the nurse rooms inspected had an exam table or a desk. Not all the rooms had a sink. There were two chairs in one of the rooms and four bolted metal chairs with shackles in another. The room on housing A had a sink with hot water but no soap or paper towels. There is no equipment in these rooms. We were told that nurses bring equipment with them when they use these rooms for sick calls. Providers also use these rooms for the completion of intake physical exams that were deferred during the reception process. We were also told that these rooms are occasionally used for chronic care clinic visits. Sanitation of these rooms was poor. Floors and sinks were dirty. Although these rooms are well situated to increase access of the inmates to sick call services and minimize inmate movement to the clinic, in their current condition they are unacceptable for the performance of sick call or provider clinical examinations.

The infirmary has a separate entrance from the main corridor and a short internal connecting hallway that links the infirmary with the clinic. Although the mental health crisis beds have been utilized for some time, the medical section was only opened in 2016. The medical infirmary was not opened during the First Court Expert's visit in 2014 and resulted in a recommendation to open and staff this unit. There is a wing with eight single cell mental health crisis beds and an adjoining corridor with 12 medical beds (six rooms, each with two beds). The nursing office was recently moved away from the mental health wing due to environmental concerns when mental health patient-inmates would flood their cells or MACE was used. The new office was previously a closet and has one desk, a dressing cart, a medication cart, a file cabinet, and a medical record holder in a very cramped space. There is no sink, no phone, no electrical outlets, and no computer. There were two unmounted sharps boxes in the room. It was reported that work orders have been submitted to address these deficiencies, which currently hamper the efficiency of the nursing staff. Unprotected paper memos and directives were taped on the walls, creating a fire safety issue.

The medical infirmary was inspected. Eleven of the 12 medical beds were occupied. There is a call buzzer at each bed. The buzzers were found to operational in all rooms that were tested, and the patient-inmates understood how to use this system. There were two negative airflow rooms (A-105-106), but the monitoring panel was not operational; the maintenance team was contacted and was working on this problem on the final day of our visit. The ceiling vent in A-106 was also taped over, interfering with the operation of the negative airflow system. Porters (inmate workers) were directed by a nurse supervisor to remove the tape.

The medical infirmary rooms were shabby. The beds are fixed in a flat position without the capability to raise the head or raise/lower the height of the bed. Most of the mattresses had open cracks and thus could not be adequately sanitized. One patient bed lacked a mattress and

had an uncovered porous foam egg crate full bed cushion that was dirty and absolutely could not be cleaned and sanitized. Even though two-thirds of the 11 individuals housed in the medical infirmary were chronically ill with issues of fragility, ambulation, self-care, disability, or continence, there were no adjustable hospital beds in the infirmary.

The mental health infirmary is generally for short-term crisis management. Three men were housed in the eight-bed mental health unit during the site visit. One of the individuals was smearing feces on the walls of his room.

The health care unit has administrative offices, a medical record room, a pharmacy/medication prep room, three examination rooms, one interview room, a single chair dental suite, a treatment room, a plain film x-ray room, a Panorex unit, and a central nursing station. Four providers are budgeted for doctor/provider sick call visits and chronic care clinics on Monday-Friday. A single provider also staffs a Saturday sick call. In the evening, nurse sick call is done. The clinic treats all urgent referrals in the treatment room. Each of the three exam rooms have non-adjustable upholstered tables without paper rolls, a sink, a wall mounted sphygmomanometer, and a desk. All of the desks no longer have veneer on the edges. Uncovered paper memos/directives/guidelines are taped on the walls. The mounted oto-ophthalmoscopes were missing electric cords and were non-functional in all the exam rooms. One room had a functional backup oto-ophthalmoscope placed on the exam table. There was not a single adjustable exam table or electric table in the clinic, making it extremely difficult to impossible to examine certain types of disabled patients. The sinks in the exam rooms were crusted with mineral deposits. One room lacked hand drying paper. A broken scale was in one room. Three crutches were stacked in the corner of one examination room for the entire site visit. There is an interview room with a desk and sink but without an examination table that is used by a provider when all four providers are on duty or one of the exam rooms is in use by the UIC Telemedicine specialty clinic. There were boxes on the floor and a broken desk-top refrigerator on a counter next to the desk. There were two closets in the interview room. One was stacked from the floor to almost the ceiling in violation of infection control and fire safety standards. The other closet was completely filled with oxygen tanks. Most were appropriately in security racks but six to seven were not; this is a safety hazard.

This clinic has an insufficient number of examination rooms. There are only four examination rooms and there are four providers. However, during morning sessions when all providers work in the health care unit, all rooms are occupied. There is then no space for a nurse to evaluate patients or for the UIC HIV/Hep C telemedicine clinic sessions. This lack of space results in prioritization and promotes failed appointments.

The treatment room had a suction unit, four secured oxygen tanks, two AEDS (one had an expired pad), crash cart, an EKG machine, two wall mounted oto-ophthalmoscopes without electric cords, and nebulization units. The crash cart is inspected on every shift; this was verified on the crash cart log. An emergency bag was inspected and was noted to have a variety of appropriate equipment (ambu bag, BP unit, stethoscope, dressings, ammonia capsules,

glucagon, thermometer, FSBG testing materials but not naloxone (Narcan). The treatment room was somewhat cluttered but operational.

In summary, we had additional findings as compared to the First Court Expert. We agree with the single recommendation of the First Court Expert that there should be a designated examination room in each housing unit appropriately equipped to conduct sick call. We have additional recommendations found at the end of this report.

<u>Sanitation Schedule</u>
**Methodology:** The reception screening area, the sick call rooms on housing units, the mental health crisis unit, the medical infirmary, and the clinic were inspected. Nurses, nurse supervisor, correctional officers, a sanitation sergeant, porters, and patients in the medical infirmary were interviewed.

**First Court Expert Findings**
The previous Court Expert reported that the clinical spaces were well maintained.

**Current Findings**
Although the First Court Expert had no findings with respect to sanitation, we noted multiple problems including:
- The level of sanitation in almost all the clinical areas has deteriorated since the visit of the First Court Expert.
- The cleanliness of the designated clinical spaces in the housing units, the mental health crisis unit, the medical infirmary, and the clinic was notably deficient, creating an unsanitary and non-professional clinical environment.
- The cleanliness of the reception screening was overall acceptable.
- Although requested, no documentation of training provided to the porters who sweep, mop, and sanitize the clinic and the infirmary beds was provided. The porters stated that they had received no environmental training and had learned their duties on-the-job. This may violate OSHA rules that govern exposures to blood borne pathogens.
- The porters wore surgical gloves that they did not change as they cleaned infirmary rooms/sinks/toilets and the clinical areas.
- Mattresses in the medical infirmary and the treatment room's gurneys' upholstery were torn and cracked.
- There was no documentation in the medical infirmary correctional log that beds and mattresses were sanitized before a new admission was assigned to a bed.
- There are no regular/monthly environmental or infection control rounds being performed at NRC.

NRC had posted a sanitation schedule in the clinic nursing station, but it does not specifically list the clinic and infirmary on the schedule. Interviews with a sanitation sergeant and two porters (inmate workers) related that the clinic and the infirmary are swept and mopped one to two times per week and as needed. The floors in both of these clinical areas are clearly not routinely

buffed. There is no record in the infirmary correctional log about the routine disinfection of occupied mattresses or after a bed has been vacated and before a new patient is assigned to that bed. The porters were noted not changing surgical gloves while they moved between infirmary rooms after cleaning sinks, toilets, and showers. They related that they had not received any training about their cleaning duties and the use of protective gear.

The porters are also responsible for the cleaning and disinfection of mental health crisis rooms that had been smeared with fecal material. They reported that there are Hazmat kits (gowns, face shields, gloves, booties) that they are to wear while cleaning body fluid on exposed floors/walls. However, the Hazmat kits are not always in stock. (Three Hazmat kits were found in the nursing supply area.) The sanitation sergeant stated that he did not know if there was any documented record/log about the sanitation training provided to the porters. The general uncleanliness of the infirmary and clinic is indicative of poorly trained and supervised workers.

The reception screening area was generally clean and in good condition except for the provider rooms. As noted in the Reception Screening section of this report, nursing staff sanitize their own work stations, but this service should be provided by porter staff in an organized manner for all areas, including provider examination rooms.

The overall cleanliness of the medical infirmary and mental health crisis unit was extremely poor. The sinks, toilets, and showers were functional but crusty and poorly cleaned. The floors in some of the infirmary rooms were painted, some were tiled. The painted floors were faded, and the blue color was discoloring the socks of the occupants. The edges of all the rooms had a rim of smudge and dirt. The wall in one medical room was splashed with some dried liquid material. Only one room (A-O6) was judged to be acceptably clean; this room was occupied by two more physically able patient-inmates who regularly clean their own space. The tile floor was shiny, the sink and toilet were not crusty, and the shower was clean. One vacant room in the mental health crisis unit was inspected; a section of the wall had a missing chunk of plaster, the floor was dirty and not been swept, the toilet had not been cleaned, the borders of the floor were dirty. The hallway in the mental health unit had missing and cracked tiles.

The edges of the clinic floors were smudged and dirty. The veneer on the sides of the providers' desks was missing, making it difficult to clean and sanitize. The supply cabinets in the clinic's exam rooms were cluttered and disorganized. Beverages/coffee were on the desks in two of the rooms. A provider's lunch was found in one of the cabinets.

The two gurneys in the treatment room had tears and cracks in the upholstery. The treatment room was disorganized and cluttered.

The infirmary and institutional sheets and bedding are washed in the central laundry. The plumbing staff maintains a log of the temperature of the hot water provided to these washing machines. The temperature logs from 10/1/17 to 1/29/18 noted 10 of the 121 days when the temperature was less than the 165 degrees (range 160-164 degrees) recommended in IDOC Administrative Directive 05.02.140.

In summary: The cleanliness and sanitation of nearly all of the clinical and patient care areas in NRC is notably deficient. There is an urgent need for the institution of vigilant, regular sanitation, and environmental and infection control rounds. The training of the inmate porters is nonexistent. Additional recommendations are noted at the end of this report in the Clinic and Sanitation and the Infection Control sections.

Environmental Rounds
**Methodology:** The HCUA, a nurse supervisor, nurses, and a sanitation sergeant were interviewed.

**First Court Expert Findings**
The First Court Expert did not address environmental rounds.

**Current Findings**
The NRC clinical leadership stated that routine environmental are not being done at NRC. Accordingly, there is no available documentation of such rounds. If the rounds were regularly performed, many of the deficiencies noted in the Clinic Space and Sanitation section would have been identified and corrective actions initiated. HCUA and nurse supervisors communicated that work orders are submitted for the repair or removal of broken equipment and furniture.

Radiology
**Methodology:** We toured the radiology unit and the radiology technician was interviewed.

**First Court Expert Findings**
The previous Court Expert did not comment on the radiology suite.

**Current Findings**
- There is no waiting list or backlog for plain x-ray studies at NRC.
- The turnaround time for the radiologist's reading and report is one to three days.
- During the upcoming visit to SCC, additional requests will be made to obtain any radiation physicist's reviews and certifications for NRC radiology units and discuss whether IDOC x-ray technicians are candidates for the use of monitoring devices as outlined in Illinois Administrative Code 32 -340 510 and 520.

NRC has a radiology suite in the clinic area that does non-contrast plain films. X-rays are performed Monday-Friday. A radiologist is onsite on Tuesday, Wednesday, Friday, Saturday, and Sunday to read films and write handwritten reports. The turnaround for receiving the radiologist's readings is one to three days. Six x-ray reports of films taken on 1/30/18 were audited; five were read within one day, and one was read in two days. There is no backlog and no waiting list for x-rays. Six patients were scheduled for studies on 1/31/18. Four had been x-rayed before noon; the arrival of other two men was awaited. It was reported that "no shows" are always rescheduled on the next working day.

It was not clear whether a Nuclear Radiation Physicist inspects the radiology unit in the clinic. There was not a certification posted in the suite. The administrative personnel who might have the certification was off duty during the four-day inspection. The x-ray technician stated that repairs are quickly done if so needed. The x-ray technician was not wearing a radiation exposure dosimetry monitoring device (badge); she was advised that this was not necessary at NRC.

In summary: Additional investigation is needed to verify whether the NRC Radiology unit is in compliance with the State of Illinois Radiation Safety regulations.

## Medical Records

**Methodology:** We interviewed medical records staff, toured the medical record room, and performed record reviews from which we determined the state of the medical records.

**First Court Expert Findings**
The First Court Expert and his team had enormous difficulty in reviewing medical records because of "drop filing." The First Court Expert found that drop filing creates "chaos for clinicians" and that important information will not be located. The First Court Expert found that stapling intake documents together was not unreasonable. The First Court Expert also found that there was no system of logging and tracking medical records. The First Court Expert recommended drop filing should not be done for patients with significant problems and all patients at NRC for more than 30 days.

**Current Findings**
We agree with all of the findings of the First Court Expert with one exception. We disagree with the practice of stapling intake medical documents together as a substitute for creating a medical record folder. We add the following additional findings:
- The medical records room is too small to accommodate the number of staff.
- Medical records are not maintained in accordance with IDOC requirements or in accordance with guidelines from the Illinois Department of Human Services.
- The medical record room is not secure. Unauthorized medical record staff can access the room at will. NRC fails to maintain privacy and confidentiality of the medical record.
- There is no tracking and accountability system for medical records. Because there is no sign-out process for medical records, it is not possible to know who has the medical record.
- Any staff member can pull and re-file medical records. This promotes loss of medical record documents and does not safeguard confidentiality or use by unauthorized persons.
- The intake packets of medical record documents include separate documents for dental, medical, and mental health. These are unified at a later date. There needs to be a unified medical record at the time a medical record is initiated.

The medical record at NRC is a paper record maintained in a green pressboard binder. There is a small medical record office in the health care unit to maintain and process the documents contained in the medical record. This office is too small for the number of staff. There are currently four medical record clerks and the room appears too small for this number of employees. Due to the inability to file records, five additional clerks have been added to this group. The space appears too small to accommodate nine employees and the volume of medical records. One wall of the records room is lined by file cabinets containing green medical record binders and manila folders containing individual inmate medical record documents. Opposite the file cabinets are a series of several desks used by medical records clerks to conduct their work. The space is extremely cramped and cluttered.

Medical records are not maintained in accordance with requirements of the IDOC Administrative Directives[14] or with the Illinois Department of Human Services requirements[15] for maintaining medical records. Medical records are so poorly maintained that the poorly maintained records are likely to adversely affect clinical care. This is similar to the finding in the First Expert report.

The Administrative Directive 04.03.100 Offender Medical Records gives requirements for how medical records are to be maintained. It states:

"A medical record for each offender shall be established by the appropriate reception and classification center."

The AD describes the manner of maintaining a medical record, including:
- The tabbed sections of the medical record
- The tabbed section of the medical record that documents are kept in
- That medical records are confidential
- That every entry is legible
- That progress notes are filed within one day
- That reports from community health providers are filed within 14 days
- That consultation reports are filed within three days.

The IDOC AD on medical records requires use of a green binder for all inmates. This binder is a thick hard-backed pressboard folder with a medical record number. Each binder has nine tabs corresponding to the major types of documents including:
- Database
- Medical progress notes
- Consultations
- Mental Health Reports
- Dental/Vision
- Chronic clinic sheets/Flow sheets

---

[14] Illinois Department of Corrections Administrative Directive 04.03.100 Offender Medical Records.
[15] Illinois Department of Human Services website as found at http://www.dhs.state.il.us/page.aspx?item=40657.

- Medications
- Laboratory and X-ray reports
- Miscellaneous

The medical records at NRC are not maintained in accordance with the IDOC's AD on medical records. Many inmates housed at NRC do not have a green binder medical record. Those inmates at NRC who do have a green backed medical record have a record that is not maintained in accordance with AD requirements. Most files are loose paperwork in a manila folder or are loose paperwork placed in no particular order in a green binder. A significant number of files are merely an intake packet and any other medical record documents stapled together without any binder. The filing that occurs consists of placing medical record documents in a binder or stapling to a packet in no particular order. Documents are not separated into the pertinent section of a green binder. This situation has gone on for so long that this irregular and unacceptable medical record practice is institutionalized and accepted as normal.

For persons housed at NRC for extended periods and frequently seen for repeated treatments at UIC or John Stroger Hospital, their records become so disorganized that it is extremely difficult to find documents in the record. We noted on mortality reviews that two records of inmates who had been housed at NRC were missing medical record documents.  We note that the IDOC response to the First Court Expert's report stated that, "The IDOC disagrees that recommendations voicing preference for the manner in which record-keeping and administrative duties are performed rise to the level of constitutional obligations."[16] We disagree with this assertion. Not only does the manner of maintaining medical records violate the IDOC AD, but it also violates existing guidelines of the Illinois Department of Human Services. Also, significant risk of harm can arise when a medical record file is disorganized and fails to include all documents, as clinical staff may be unable to locate important documents. We note some problems in the specialty care section of this report whereby recommendations of consultants were not noted, possibly due to disorganized medical records and failure to provide consultation reports to clinical staff. We evaluated several patients who had large charts. These charts are unacceptable for routine use for clinical care. That clinical medical leadership has not objected to the state of these records reflects negatively on medical leadership.

The records process begins at intake. On each day of intake, a medical record clerk obtains the list of the number of arriving inmates and staples together a medical record packet for every inmate expected to arrive at NRC. Mental health and dental each have their own packets. The medical packets contain the sheets that are used in the intake process, including:

- A medical history form filled out by nursing
- A physical examination form filled out by a provider
- A problem list
- A progress note

---

[16] Pages 13-14; email letter to Dr. Shansky on 11/3/14 sent by William Barnes representing the IDOC.

- A transfer summary form
- An HIV counseling form
- An influenza vaccination form

A packet is made for each incoming inmate. Inmates who arrive from the Cook County Jail arrive with a packet of limited medical information from the jail that includes their medication. This information is attached to the packet for the corresponding inmate. Mental health and dental documents are not initially included with medical documents and are added to the record at a later date. All documents need to be maintained as a unified medical record. After conclusion of intake the packets are brought to medical records and maintained in vertical desk sorters by date. Each sorter contains all the packets for each day after intake. The sorters are kept on top of a file cabinet. The packets are kept in the vertical sorters until a physical examination is done. When the physical examination is done, the packet is placed in a basket. The packet is kept in a basket until the Mantoux skin test for TB is read. Once the Mantoux skin test is read, the intake packet is complete, the staple is removed and the documents are placed loosely in a green binder, not in chronologic order. Patients who are technical parole violators or are on Court Writs have their documents placed in a manila file folder in no chronologic or consistent order. Any subsequent medical record document is merely placed into the green binder in no particular order. Documents are not sorted into the nine types of tabbed document separators and filed into the corresponding tab section. Documents need to be sorted into the nine types of document tab section and within each tab filed in chronologic order. This does not occur until the medical record arrives at the destination IDOC facility. The reason for this was reported as lack of staffing.

The medical records room promotes non-confidential practices and promotes loss of medical record documents. This room is unlocked and the medical records are unattended by official medical record clerks for most of the day. Numerous staff wander into the room at will and take medical record documents without any documentation of what record they are taking or where they are taking it. Charts are not signed out when removed from the file room. Non-medical records staff also re-file medical records. There is no accountability for records removed from the medical records room. Medical record clerks work daytime hours. For the remainder of the day the room is open and staff walks in to obtain records as needed. This violates medical record practices, as unauthorized persons are to be excluded from the medical records storage area on the basis of confidentiality of the medical record. It is the practice at NRC that charts for all clinics (nurse sick call, PA sick call, MD sick call, and nurse treatment call) are pulled by nurses. Mental health staff pulls their own charts. Typically, non-medical record staff are considered unauthorized personnel and are not allowed to take or re-file a medical record without signing out a record. Given these practices, it would not be surprising that there would be a high volume of lost documents and records. While we were not able to investigate the number of lost documents and records, on the last day of our tour we listened to a senior staff in health care searching for a chart of a patient who was transferring, but the chart was lost.

The practices in this medical record program also fail to conform to Illinois Department of Human Services medical record guidelines, which require:

- Medical records are confidential and must be safeguarded against loss or use by unauthorized persons.
- Medical records rooms will be locked after regular work hours.
- The agency must have policies in place regarding the retention and destruction of medical records. For advice on record destruction, public agencies are to contact the Illinois Secretary of State's Illinois State Archives.
- Medical records must be maintained in accordance with accepted medical standards, including:
  - Readily accessible
  - Systematically organized and in chronological order
  - Confidential
  - Safeguarded against loss or use by unauthorized persons
  - Secured by lock when not in use.

We had an initial interview with medical record staff, including the Medical Record Director. We reviewed multiple records. All larger records were disorganized and were not in chronological order. These documents were so difficult to use that use of such a record would significantly prolong patient encounters unless providers failed to review the record appropriately. We believe the latter happens, based on record reviews. On record reviews, labs were often not reviewed during follow-up patient evaluations, consultation reports were not documented as reviewed at subsequent clinical encounters, and prior adverse clinical events were not noted. For several record reviews, we noted missing labs or notes which the records' department brought to us on the following day. These items were not timely filed.

We also noted that consultation reports and hospital discharge summaries are mostly not present in the medical record. Of a sample of 22 consultations and one hospitalization, only 36% of medical records included a report of those consultations. A physician assistant told us that consultation and hospital reports frequently did not make it into the medical record. In the IDOC response to the First Court Expert's report, the IDOC states that they have no control over hospitals and consultants and cannot be responsible for obtaining those reports.[17] Obtaining hospital and consultant reports is sometimes difficult. The IDOC is ultimately responsible to ensure that the reports are obtained. In our own experience in managing correctional programs, we sometimes have had to negotiate with hospitals and consultants but have always been able to obtain a hospital discharge summary and consultation reports of offsite services. The inability to do this is a reflection of the quality of management of Wexford. We note that the Regional Manager for Wexford is an ex-warden and lack of knowledge of how to do this may be an issue.

This medical record system is broken and unacceptable from a clinical medical perspective and violates Illinois Department of Human Services standards and the IDOC AD requirements. To fix

---

[17] Pages 21-23; email letter to Dr. Shansky on 11/3/14 sent by William Barnes representing the IDOC.

this system would require a complete overhaul. In the case of NRC, obtaining an electronic record would be an easier solution than attempting to fix the existing broken system. In any case, the current arrangement is unacceptable.

We confirmed all of the findings in the First Court Expert's report and had additional findings with respect to confidentiality and lack of adherence to the IDOC AD and state regulations. We disagree with the First Court Expert's recommendation that medical records should be maintained in the same manner as in permanent institutions but only for persons who remain in the MSU for greater than two weeks. All patients should have a properly maintained record beginning as soon as they arrive. It is our opinion also that NRC should conform to the IDOC AD on medical records and the Illinois Department of Human Services' requirements for maintaining clinical medical records. This would require that a green backed medical record file be initiated upon arrival at the facility and maintained throughout the stay at NRC. An easier fix to this problem would be to institute an electronic medical record. The First Court Expert also recommended that medical record staffing be sufficient to ensure that medical records are adequately maintained, and we agree with that recommendation. While additional staff has been budgeted, they have not yet been hired. The question as to whether the additional staff will resolve medical record problems identified in this report is not answerable at this time.

## Medical Reception

**Methodology:** To evaluate medical evaluation of newly arriving inmates we toured the medical reception area, observed the medical reception process, interviewed health care staff, reviewed IDOC health record forms, and reviewed 20 health records. Of the 20 records, 10 were selected from a log documenting referrals from the reception nurse to the provider. Ten records were selected from nursing sick call logs and from the list of inmates at NRC greater than 90 days.

### First Court Expert Findings
The previous Court Expert found substantial delays in medical processing of newly arriving inmates. Medical records were disorganized and inhibited the provision of adequate health care. IDOC forms used by nurses and medical providers did not include questions designed to elicit current symptoms (e.g., chest pain, shortness of breath, abdominal pain, etc.) that may indicate serious disease. Approximately 30% of records reviewed found lack of timely follow-up of abnormal labs and chronic diseases. Providers did not document significant medical diagnoses on the problem list.

### Current Findings
NRC's primary mission is to process and classify newly arriving inmates before transfer to other state institutions. In 2017, NRC received 15,942 inmates or approximately 307 a week.[18] Newly arriving inmates transfer from county jails and also arrive as parole violators. On Wednesdays, NRC receives inmate transfers from around the state who are on a writ to appear in Cook

---

[18] When the previous court expert evaluated the institution in 2014, the volume was approximately 500 inmates per week.

County court or inmates requiring medical services in the Northern Illinois area. These inmates are managed as intrasystem transfers and not medical reception inmates.

Our review showed that improvements have taken place with respect to the timeliness of completion of the medical reception process, including labs and provider physical examinations. Nurse and phlebotomy stations are clean and well organized. Medical providers document medical conditions on patient problem lists.

However, we found persistence of problems noted in the previous Court Expert's report as well as identified new problems. These include:

- Medical records are universally poorly organized with loose filing.
- Weight scales are not calibrated and are inaccurate.
- Nurses do not correctly measure visual acuity and do not consistently record results in the medical record.
- Nurses do not consistently record tuberculin skin test results in the medical record.
- Nurses do not change gloves or wash hands between patients.
- HIV opt-out testing is not being consistently performed.
- There is no schedule of sanitation and disinfection activities performed in medical reception. Instead of a system for routine sanitation and disinfection, the level of sanitation at each station is determined by the conscientiousness of individual staff.
- Provider examination rooms were filthy and furniture was in disrepair.
- Examination tables had no paper to provide an infection control barrier between patients.
- The dentist did not change gloves, wash hands, or change light-fixture infection control barriers between patient intake dental screening examinations.
- IDOC medical reception forms do not contain an adequate past medical history section and review of systems (e.g., chest pain, shortness of breath, abdominal pain, blood in stools, etc.) to detect recent or current symptoms of potentially serious medical conditions.
- Medical provider physical examinations are cursory and do not adequately explore the patient's medical history, including a pertinent review of systems, to determine whether a patient's chronic diseases are well or poorly controlled.
- Medical providers do not provide continuity of care with respect to patients' chronic disease medications, either omitting or changing medications (e.g., insulin types) without a clinical indication.
- Nurses transcribing provider medication orders do not initiate a medication administration record (MAR) when they have given the patient medications from stock supply.
- Medical providers do not consistently order chronic disease labs to be available at the initial visit (e.g., HbA1C).
- Medical provider orders (EKG, chest x-ray, blood pressure monitoring, etc.) are not consistently implemented by nurses.
- Medical providers do not timely address abnormal lab tests results.

- Medical providers do not complete the initial chronic disease form when seeing patients for follow-up.

<u>Observation of Medical Reception</u>

Medical reception is conducted in a large room, with inmates moving from station to station to complete each step of the process. The stations where nurses and phlebotomists work are clean and well-organized.[19] Staff had access to gloves and sharps containers.

As inmates begin the process, a phlebotomist collects blood for labs that include serum chemistry, syphilis, and opt-out HIV and hepatitis C antibody testing. Although HIV and hepatitis C testing are supposed to be opt-out, nurses consent inmates for HIV testing, which is an opt-in methodology.[20] Record review showed that HIV testing was not consistently performed even when patients requested HIV testing.[21] January 2018 CQI minutes showed that more than 1500 lab draws were performed that included 1300 hepatitis C tests, but only 278 HIV tests. This suggests that opt-out testing is not working as intended.

After phlebotomy, an RN performs a medical history, tuberculosis symptom screen, height and weight, vital signs, visual acuity, and tuberculin skin test (TST). Typically, there are two to four nurses assigned to this component of medical reception, depending on patient volume and/or nurse availability. Observation showed that the medical reception process went smoothly; however, we noted issues with the accuracy of clinical information. One of the court experts stepped on two different scales and found a 10-pound discrepancy in weight, indicating that the scales are not calibrated. Snellen charts to measure visual acuity are posted on the wall behind each nursing station with a piece of tape placed on the floor at approximately 20 feet away. However, nurses had patients read the Snellen chart sitting in a chair which was approximately 10 feet from the chart and at angle. Nurses also did not measure visual acuity in each eye by having the patient cover one eye at a time. Record review showed that nurses documented visual acuity in only 50% of the records, in most cases documenting 20/20 vision in both eyes which, given our observations, are likely not accurate. We observed that nursing staff did not consistently change gloves or wash hands between each patient.

Staff reads patient tuberculin skin tests (TST) 48-72 hours after administration by going cell to cell in the housing units. We interviewed staff, who reported that sometimes the officer opens up the food port slot to have the inmate stick out his arm for staff to read the TST and other times the inmate holds up his arm in the cell window and staff reads the TST through the window. The correct method of reading TSTs is to palpate the TST site for induration, which cannot be done by looking through a window. Thus, the current practice likely results in inaccurate reading of tuberculin skin tests and missed cases of TB infection. We also found that staff does not consistently document tuberculin skin tests in the health record. We interviewed

---

[19] There is no schedule of disinfection activities for the medical reception area. Nurses we spoke with made it their personal practice to organize and disinfect their work stations prior to seeing patients during medical reception.
[20] Opt-out testing means that testing will be performed unless the patient refuses the test. Opt-in testing means that the patient is offered testing and is performed only upon patient consent.
[21] Medical Reception Patients #1, 5, 19.

a staff person responsible for documenting test results who reported that she does it "if she has time." In several records we found that staff inexplicably documented planting the TST in January 2018 but reading the TST on 12/31/17.[22]

We note that the TST is a labor intensive and human error prone methodology to identify individuals who have tuberculosis infection or disease. Many correctional systems are switching to drawing blood for interferon-gamma release assays (IGRAs), which is more reliable and less error prone. Use of IGRA testing will free up a significant amount of nursing time that can be devoted to other clinical duties. This test would be especially useful at this facility, where officers do not open cell doors, so that nurses can appropriately read the Mantoux skin test.

Following the medical history, nurses immediately refer patients with acute conditions and/or chronic diseases to a medical provider. Staff reported that typically three medical providers are assigned to perform patient physical examinations and develop a treatment plan, including ordering medications. As noted in the previous Court Expert report, on days in which the volume of intakes is high, providers may perform 25 or more physical examinations in three to four hours, which was "unlikely to reflect an appropriate quality standard."[23]

The examination rooms where providers perform examinations were dirty and furniture was in disrepair. Examination tables did not have paper to provide barriers between patients. There is accumulation of mineral deposits on faucets and in sinks, impeding sanitation and infection control.[24] There is no schedule of sanitation and disinfection practices to be carried out in these rooms.

Depending on volume, one or two dentists perform oral screening at reception. We observed one dentist who did not change his gloves or wash his hands between patients, even when he incidentally touched the patient's lips while examining teeth and oral cavity.

IDOC Medical Reception Forms

We note that the IDOC Offender Medical History Past Medical History section of the form is limited with respect to chronic diseases and does not include chronic obstructive pulmonary disease (COPD), thyroid, kidney, liver, or autoimmune diseases, or cancer. The form also does not include a section for review of systems (e.g., chest pain, shortness of breath, abdominal pain, blood in stool, difficulty with urination, etc.) that are typically included in a comprehensive history and physical examination. *This poses a risk that important medical diagnoses or symptoms of serious illness will not be medically evaluated and missed, increasing risk of harm to the patient.* The IDOC Offender Physical Examination form (DOC 0099, Rev. 11/20/12) includes a section for substance abuse, risk factors for blood borne infections (e.g., HIV and HCV), and TB symptoms, but does not include a section for chronic disease review of systems

---

[22] Medical Reception Patients #5, 8.
[23] Lippert Report, p. 9.
[24] NRC has "hard" water (i.e., high mineral content) which causes build-up of mineral deposits in pipes, faucets, and sinks. The institution needs a water-softening system, however, according to custody leadership, there is no funding for it.

(e.g., chest pain, SOB, polyuria, polydipsia, neuropathy, etc.), which contributes to the assessment of disease control.

<u>Medical Provider Examinations</u>

With respect to provider history and physical examinations, we found them to be cursory and lacking in quality. Providers did not consistently elaborate on positive findings noted by the nurse. Providers took no additional medical history of the patient's chronic diseases, including a review of systems (ROS) to assess disease control at the time of admission. In many cases, a medical transfer summary was received by the sending institution, but providers did not document that they reviewed the information and, in some cases, missed important medical diagnoses (e.g., prostate cancer) or medications for high blood pressure (e.g., hydrochlorothiazide).

Providers wrote orders to enroll patients into the chronic disease program in 30 days and assigned patients low bunk/gallery status as clinically indicated. Providers also ordered diagnostic tests (e.g., chest x-ray, EKG) and labs for some chronic diseases (e.g., thyroid, anticoagulation), but did not order HbA1C for any diabetics. Providers usually ordered continuation of each chronic disease medication; however, in some cases they did not continue medications without documenting the clinical rationale for not providing continuity of care. In other cases, ordered medications were not timely received.

A clinical concern is that three patients were being treated for heroin withdrawal at the time of admission, but the provider did not order Clinical Opiate Withdrawal Scale (COWS) monitoring to assess whether the patients' symptoms were improving or worsening, and that may have required changes in medication withdrawal regimens.

Following provider physical examinations, nurses review and note provider orders, including medications. A concern is inconsistency among nurses with how medication orders are noted. Some reception nurses transcribe medication orders onto a medication administration record (MAR) and some do not. Thus, many patients receive medications for which there is no corresponding MAR documenting that they have received the medication. (See Pharmacy and Medication Management).

The following cases are illustrative of concerns noted above.
- This 58-year-old man arrived at NRC on 1/12/18.[25] His medical history includes diabetes, hypertension, asthma, seizures, BPH, prostate cancer, s/p total prostatectomy in 2008, latent TB infection, chronic alcohol abuse, depression, bipolar disorder, and PTSD. The provider did not elaborate on all positives noted on the nurses' medical history form or on the medical transfer form, including asthma, hypertension, alcohol abuse, or prostate cancer. The provider documented that the patient had a total prostatectomy but not prostate cancer. He did not order a HbA1c to assess diabetes control or PSA to assess for possible recurrence of prostate cancer.

---

[25] Medical Reception Patient #4.

- A 43-year-old man arrived at NRC on 1/8/18.[26] His medical history includes hypothyroidism, substance abuse, depression, and right ear surgery with tube placement in 2016. The provider did not document whether the patient still had a right ear tube. The physician ordered levothyroxine for the patient's hypothyroidism but there is no medication administration record that shows the patient received levothyroxine. Thyroid labs showed the patient's hypothyroidism was in poor control (TSH=19.1, normal=0.5-4.5). The physician reviewed the report, but as of 2/1/18 had not increased the patient's thyroid medication.

- A 56-year-old man arrived at NRC on 1/10/18.[27] His medical history includes diabetes, hypertension, hyperlipidemia, mitral valve replacement (MVR) and venous stasis. His medications included coumadin, metformin, metoprolol, losartan, and Pravachol. On the day of arrival, labs showed the patient's INR was therapeutic (INR=2.2, goal=2-3). On 1/18/18, eight days after arrival, a provider performed a physical examination. The provider ordered medications and an EKG. The provider did not order a HbA1C or enroll the patient into the chronic disease program. The EKG was not performed. On 1/25/18, a provider saw the patient for follow-up of MVR and venous stasis. He did not take a history of the patient's diabetes or MVR. He ordered an INR, EKG, and chest x-ray. As of 1/31/18, neither the EKG or chest x-ray had been performed.

- A 69-year-old man arrived at NRC on 1/19/18 following discharge from a hospital for pulmonary embolism.[28] His medical history also included hypertension, atrial fibrillation, hypothyroidism, COPD/asthma, and trigeminal neuralgia. The provider did not elaborate on the patient's recent medical history of atrial fibrillation and pulmonary embolism. The patient's hospital discharge medications included Pradaxa, but the provider changed it to Coumadin without documenting the clinical rationale. On 1/19/18, the patient's INR was subtherapeutic (INR=1.5, goal=2-3). On 1/24/18, a provider reviewed the report but did not increase the patient's Coumadin dosage. Labs also showed the patient was hyponatremic (Na=128, normal=135-146), most likely due to treatment with Trileptal, but as of 1/30/18 a medical provider had not addressed the abnormal lab report. We referred this record to the Nursing Director.

- A 56-year-old man arrived at NRC on 1/16/18.[29] The patient's medical history included diabetes and hypertension. Transfer information from Cook County Jail showed that he was prescribed Glargine Insulin 100 units every night and rapid-acting Insulin Aspart before meals. The physician changed the patient's insulin from long-acting glargine insulin to intermediate acting NPH insulin without documenting a clinical rationale for the change. The patient's blood sugar was 337 upon arrival but the provider did not note this high glucose level or order insulin coverage at that time. Reception labs showed the patient's syphilis test was positive with a titer of 1:2. On 1/27/18, the

---

[26] Medical Reception Patient #8.
[27] Medical Reception Patient #14.
[28] Medical Reception Patient #9.
[29] Medical Reception Patient #6.

physician saw the patient but took no syphilis history, except that the patient denied a history of syphilis. The physician did not stage the patient's syphilis (primary, secondary, latent, or late latent) and treated him with one dose of Bicillin, which would not be adequate treatment for late syphilis.

- This 46-year-old man arrived at NRC on 1/18/18.[30] His medical history includes diabetes and psychiatric history. The provider did not perform a history of the patient's diabetes or perform a diabetes or cardiovascular review of systems (ROS). The provider ordered Metformin, but his MAR showed the patient did not receive Metformin until 1/22/18.

- This 48-year-old man arrived at NRC on 1/11/18.[31] His medical history includes diabetes, myocardial infarction s/p stents in 2015, and high cholesterol. The provider did not perform a diabetes or cardiovascular ROS. The provider ordered medications including metformin, glipizide, Plavix, carvedilol, and gabapentin. There is no MAR showing the patient received keep on person (KOP) medications. Gabapentin was ordered on 1/12/18 but not received until 1/17/18. The provider ordered an EKG that was not performed. The patient consented to an HIV test, but it was not done. The patient's tuberculin skin test result was not documented in the health record.

- This 37-year-old man arrived at NRC on 12/22/17.[32] His medical history includes obesity, hypertension, opioid dependence, and sleep apnea with C-PAP machine. The patient accepted HIV testing, but it was not done. A physician saw the patient and ordered lisinopril, hydrochlorothiazide, and aspirin. There are no MARs in the record showing that he received these medications. On 1/19/18, the physician saw the patient for blood pressure follow-up. He did not complete a chronic disease form. The patient's hypertension was poorly controlled (BP=153/113 mm Hg.) The provider ordered one dose of clonidine 0.2 mg, increased Lisinopril to 20 mg twice daily and ordered blood pressure checks for seven days. The physician did not renew the patient's hydrochlorothiazide. On an unknown date, the patient wrote a health request that he was "supposed to have his blood pressure checked for 7 days….my pressure has been high plus I haven't been called to get it checked."

- This 37-year-old man who arrived at NRC on 12/28/17.[33] His medical history includes heroin use, seizure disorder, asthma, hypertension, multiple injuries secondary to suicide, s/p splenectomy 2004, and left hand infection. His medications included Dilantin, hydrochlorothiazide, enalapril, QVAR inhaler, Neurontin, and doxycycline. There is no documentation that the patient was given medications at medical reception. Five days later, on 1/3/18, the patient received Dilantin, ibuprofen and Robaxin. The provider did not document hypertension on the problem list. At intake, his Dilantin level was subtherapeutic (6.3, normal=10-20), but a provider did not follow-up on this

---

[30] Medical Reception Patient #3.
[31] Medical Reception Patient #1.
[32] Medical Reception Patient #19.
[33] Medical Reception Patient #20.

abnormal report. On 1/24/18, the physician saw the patient and renewed Lisinopril, not hydrochlorothiazide. There are no physician order forms containing medication orders in the record. All medication orders were transcribed from provider progress notes, not physician order forms. On 1/30/18, a provider ordered Dilantin, Lisinopril, and Neurontin, but not hydrochlorothiazide.

- This 36-year-old man arrived at NRC on 1/19/18.[34] His medical history includes injection drug use, HIV infection, anxiety, and depression. The provider did not perform a HIV review of systems or order HIV labs in advance of the patient's chronic disease visit. Although HIV patients are treated by an outside provider, NRC providers should perform an evaluation to determine if the patient has any symptoms or lab test results warranting urgent referral.

In summary, although improvements have been made with respect to timeliness of the medical reception process, there are multiple systemic issues that create an ongoing risk of harm to patients.

## Intrasystem Transfer

### First Court Expert Findings
The previous Court Expert reviewed 10 records of patients detained at NRC for >60 days and found that five patients with chronic diseases had not been enrolled into the chronic disease program.

### Current Findings
Due to its mission as a reception center, NRC does not have a large volume of intrasystem transfer to NRC. Some inmates transfer to NRC to go out to court or to receive medical services in Cook County. Upon arrival, transferring inmates are subject to a process similar to medical reception. We reviewed medical records of five inmates who transferred to NRC and/or had been at the facility for greater than 90 days. Two of five inmates had no medical conditions requiring follow up. One patient with COPD transferred to NRC on 10/19/17 and received a history and physical examination on 10/24/17.[35] The patient was not enrolled into the chronic disease clinic and a provider did not see the patient until 2/1/18. In another record, the patient was timely processed in October 2017. In December 2017, a provider saw the patient for chronic disease management. The provider treated the patient for an exacerbation of asthma, for which the provider ordered prednisone 10 mg for three days; however, a nurse transcribed the order to be given for five days and the patient actually was given the medication for nine days due to a nurse's failure to properly transcribe the order. The provider did not timely see the patient for follow-up.

---

[34] Medical Reception Patient #10.
[35] Intrasystem Transfer Patient #23.

## Nursing Sick Call

**Methodology:** We evaluated nursing sick call by reviewing IDOC Administrative Directive Offender Health Care Services, (04.03.103K), Wexford Non-Emergency Health Care Requests and Services (P-103), IDOC Treatment Protocols, and the NRC Offender Handbook. We also interviewed health care leadership, staff, and inmates; inspected areas where sick call is conducted; and reviewed tracking logs and health records.

### First Court Expert Findings

The previous Court Expert Report found that there are no logs to track each health request and the corresponding staff response; inmates do not have the ability to confidentially submit health requests; health requests are not filed in the medical record; and there were problems with the quality of health assessments.

### Current Findings

Our review concurred with the findings of the previous Court Expert. We also found that the basic components of a nursing sick call program are not in place. At NRC, patients do not receive timely and adequate access to health care, creating a systemic risk of harm to the NRC population. These problems include:

1. Inmates are not provided approved health request forms to submit health requests; therefore, inmates submit requests on scraps of paper or generic Offender Request forms.
2. Inmates are not provided the opportunity to confidentially submit their health requests on a daily basis.
3. Health care staff does not collect health request forms on a daily basis.
4. Staff does not date, time, and sign when health requests are received.
5. Nurses do not triage patient health requests within 24 hours.
6. Nurses do not document the urgency of the disposition (e.g., urgent, routine).
7. Nurses do not assess patients with symptoms within 24 hours of triage.
8. Nurses do not have medical records available to them when seeing patients.
9. Nurses conduct sick call in inadequately equipped and supplied rooms in housing units without access to a sink for handwashing.
10. Health requests are not consistently filed in the medical record.
11. Correctional Medical Technicians/Licensed Practical Nurses perform sick call, exceeding their scope of practice that prohibits them from performing independent nursing assessments.
12. Nurses do not timely refer patients to providers in accordance with IDOC Treatment Protocols.
13. A Nursing Sick Call Log has been recently implemented and does not track the status of each patient request.
14. IDOC Administrative Directives provide insufficient guidance regarding implementation of Nursing Sick Call.

Information supporting these findings is described below.

Access to Care

Upon arrival to NRC, inmates are provided an orientation manual that states that "inmates are educated regarding the sick call process and provided with a nurse sick call slip (Offender Sick Call/Medical Services Request. STA 0202 Rev 4/2013) they can use to access care. Additional nurse sick call slips are available to offenders from nursing and security staff upon request." The slips are to be picked up twice daily during the morning and evening medication pass.[36] Health requests are to be triaged and seen within 24 hours of receipt and provider referrals in 72 hours or at the next scheduled physician clinic.[37]

However, actual practice shows that inmates are provided two generic Offender Request forms (DOC 0286, Rev. 4/2010) at intake and thereafter are not provided routine access to Medical Services or Offender Request forms. Instead, our review showed that inmates submit their health requests on scraps of paper they have in their possession or borrow from other inmates. Inmates may or may not have pens or pencils to write their health requests. Staff reported that inmates could borrow a pen from another inmate, but an officer commented to a court expert: "Yes, but it will cost them a lunch tray." We interviewed staff who confirmed that inmates are not provided Medical Request forms.

The previous Court Expert Report indicated that inmates were to submit their health requests in locked boxes accessed only by health care staff; however, we did not find that these boxes had been installed in the housing units.[38] Moreover, NRC inmates are locked down 24 hours a day except for four hours per week, and therefore do not have the ability to leave their cells to submit their requests on a daily basis.[39] _Thus, the institutional practice to lock offenders down 24 hours per day is a serious obstacle to access to care._

Instead, inmates submit their health requests by placing slips of paper through the cracks of their cell door. These slips are typically picked up by officers or health care staff; however, anyone walking by a cell door could pick up these health requests, including other inmates (e.g., inmate porters). When officers pick up the forms, some place them in an unsecured, open folder in the housing unit or deliver them to health care staff.[40] It is also possible that officers misplace health requests or otherwise fail to deliver them to health care staff. Nurses also collect health requests during medication pass, but if an inmate is not receiving medication, it is unclear that the inmate would be able to notify a nurse to request a health request form or deliver a completed form to a nurse.

---

[36] Offender Sick Call/Medical Services Request. STA 0202 Rev 4/2013.

[37] The IDOC administrative directive regarding sick call states that "Health care staff shall review offender sick call requests within 24 hours of receipt;" that "When appropriate health care staff will schedule an evaluation within 24 hours of receipt, 72 hours on weekends, or sooner, as clinically indicated;" and when a request results in a referral to a provider, the evaluation will "Take place within 72 hours or upon the next scheduled visit by a primary care physician."

[38] Although the IDOC Regional Medical Coordinator testified that these boxes had been installed in his region, this is not the case at NRC.

[39] We received conflicting information about how much out of cell time NRC inmates were provided. An officer and a nurse stated that they were allowed out of cell once a week for four hours at a time. A Superintendent said they were allowed out of cell twice a week for a total of four to five hours.

[40] However, an officer and nurse reported that not all officers will pick up the forms, as they do not see it as part of their duties.

Once collected, inmate health requests are transported to the medical clinic and placed in an open bin in the main medical clinic. We observed that it is possible for any person walking through the clinic to pick up these health requests, including officers and possibly inmates in the clinic area. Either a registered nurse or CMT/LPN is to triage the health requests within 24 hours to determine the urgency of the request (e.g. emergent, urgent, routine, etc.). *However, nurses/CMTs do not document when the health requests are received or when they are triaged.*

Once triaged, the nurse is to enter each request onto the nurse sick call log which is to be used to schedule patients the next day.[41] However, staff reported that until recently, not all of inmate written requests were retained, addressed, and filed in the medical record. Staff reported that some of the requests were thrown away. For example, staff reported that if a CMT/LPN triaging the request noted the patient had not yet had a physical examination, the request would be thrown away under the assumption that the complaint would be addressed at the time of the physical. Likewise, if the CMT/LPN noted that a provider saw the patient in the last day or two, the request would be thrown away under the assumption that the complaint had been addressed. We were informed that this practice was recently stopped and now all health requests are addressed and filed in the medical record. However, while this practice was in effect, some inmates did not have timely access to care. This was supported by our finding that inmates submitted forms in which wrote that they had submitted multiple requests to have their health need addressed.

Either a registered nurse or CMT/LPN performs sick call. Nurses are to have the health record available to them for a sick call encounter, but during our tour, a nurse reported she was only able to locate three of 10 health records of patients she was scheduled to see. Staff performs sick call in housing unit cells that are not adequately equipped and supplied. The rooms do not have an examination table, exam table paper, chairs and desk for the nurse and patient to sit, or access to a sink for handwashing. Nurses bring some equipment and supplies with them to these rooms, including blood pressure cuff, stethoscope, thermometer, scale, alcohol wipes and some over-the-counter (OTC) medications. However, nurses do not have otoscopes available to examine ears, throat and oral cavity. We inspected a cart used to transport this equipment that was dirty, with tape residue stuck to the cart. *Thus, nurses do not have medical equipment and supplies to perform adequate patient assessments.*

At NRC, both RNs and LPNs perform sick call using Treatment Protocols. In the State of Illinois, LPNs are to practice "under the guidance of a registered professional nurse, or an advanced practice registered nurse, or as directed by a physician assistant, physician…to include *"conducting a focused nursing assessment and contributing to the ongoing assessment of the patient performed by the registered professional nurse."* LPNs may also collaborate in the development and modifications of the RN or APRN's plan of care, implement aspects of the plan of care, participate in health teaching and counseling, and serve as an advocate for the patient by communicating and collaborating with other health service personnel.[42] *However,*

---

[41] We were informed that the log was started in November or December 2017.
[42] Illinois LPN Scope of Practice. Section 55-30.

*Illinois scope of practice does not permit LPN's to perform assessments independent of a registered professional nurse or higher level professional, as is currently being done at NRC. Neither does the scope of practice permit LPNs to perform independent assessments according to protocols.* LPNs do not have the requisite education and training, including physical assessment skills, needed to perform independent assessments.[43] *Thus, some NRC patients do not receive evaluations by health care staff licensed to perform independent assessments. This increases the risk of harm to NRC patients.*

We reviewed the Nursing Sick Call Log for the Month of January 2018.[44] Staff does not completely fill the log out, including the date the request was received and including whether or not a nurse saw the patient. From 1/1/18 to 1/30/18, 282 requests were received, averaging approximately 10 per day. This is an extremely low number given the population of approximately 1400 inmates. On four days, no health service requests were noted as collected, and on seven days, less than five requests were collected. *This is consistent with inmates not having forms to fill out and/or staff not collecting health requests on a daily basis.*

We selected and reviewed 10 health records from entries on the Nursing Sick Call Log for the month of January 2018. In addition, we reviewed health requests found in medical reception records. The following cases are illustrative of problems noted above.

- This 31-year-old man arrived at NRC on 1/3/18.[45] His medical history includes seizure, asthma and bipolar disorder. On 1/25/18, the patient submitted an Offender Request (OR) form for back pain stating "this is the 10th time I have put in. I am almost out of my seizure medications." On 1/26/18, an RN saw the patient and did not assess his back pain, only that he was running out of seizure medications.

- This 20-year-old man arrived at NRC on 12/13/17.[46] His medical history included drug use. On 1/9/18, he submitted an OR form for chest pain with deep breathing, laughing or coughing. "I have put in several slips but haven't gotten a response." On 1/25/18, he was listed on the nursing sick call log. On 1/26/18, an RN assessed the patient using the chest pain protocol. He complained of chest pain seven of 10 in severity. His vital signs were normal. The nurse did not notify a provider in accordance with the IDOC chest pain protocol, but referred the patient to a PA for 2/7/18, approximately 10 days later. This referral time frame is also not consistent with IDOC Administrative Directives for referral to take place in 72 hours.

---

[43] NCCHC defines Qualified Health Care Professionals to include nurses without distinguishing between registered and licensed practical nurses. However, RN and LPN practice must remain within their education, training, and scope of practice for their respective state.

[44] The log has undergone several revisions. At the beginning of 2018 the log included the name and ID number of the patient, complaint, date the request was written, date received, and date seen, treatment protocol used, whether the patient was referred to a provider, and a co-pay assessed. Later the log was changed so that the date the inmate submitted the request was not included, just the date the request was received and the date the patient was seen.

[45] Sick Call Patient #1.

[46] Sick Call Patient #2.

- This 56-year-old man arrived at NRC on 1/10/18.[47] He had a history of diabetes, hypertension, mitral valve replacement, and lower extremity venous stasis. On 1/23/18, the patient was listed on the sick call log for leg wounds. There is no health request form or nursing sick call visit in the health record. On 1/25/18, a provider saw the patient for follow-up of MVR and venous stasis.

- This 37-year-old man arrived at NRC on 11/30/17.[48] His medical history included seizures and anxiety. His medication was gabapentin. On 12/14/17, an RN saw the patient for complaint of not receiving gabapentin for neuropathy after two weeks. BP=145/85 mm hg. The nurse advised the patient that the provider would address his issues. On 12/18/17, the patient submitted a scrap of paper stating, "I was called to sick call yesterday morning but sent back due to crowding. I was told to come back but was never summoned. Please advise as my medication has still not been verified." An unsigned note documented "already seen," without documenting resolution of the complaint. On 1/17/18, he was listed on the sick call log for a rash and on 1/23/18, for possible urinary tract infection (UTI). On 1/23/18, a nurse saw the patient for the rash but did not address the UTI complaint.

- This 38-year-old man arrived at NRC on 1/4/18.[49] His medical history included pulmonary embolism. He was prescribed a blood thinner (Eliquis) since 2016. On 1/14/18, the patient signed a nursing sick call refusal form but there is no health request form in the record. On 1/19/18, the patient submitted a request complaining of having "blood clot cramps." There is no documentation on the form of when it was received or triaged by a nurse. On 1/26/18, a nurse completed a refusal form, stating that the patient refused to sign. On 1/27/18, the patient was scheduled to see the physician, but as of 1/31/18, there is no documentation in the record that the encounter took place.

- This 42-year-old man arrived at NRC on 11/9/17.[50] His medical history includes hepatitis C infection. On 12/13/17, a nurse saw the patient for back pain using the back-pain protocol.[51] The nurse documented no physical examination of any kind, only vital signs. The nurse treated the patient with ibuprofen. On 1/9/18, the patient was listed on the sick call log for dental pain. On 1/10/18, an RN saw the patient using the toothache protocol. The patient complained of exposed nerve pain for four to five months that was 10 of 10 in severity. The patient was afebrile. The exam showed bleeding and swelling. The nurse noted that the patient met the referral criteria for 24-hour referral; however, the nurse did not contact the dentist. The nurse gave the patient ibuprofen 200 mg 1-2 tablets three times daily.

---

[47] Sick Call Patient #4.
[48] Sick Call Patient #6.
[49] Sick Call Patient #7.
[50] Sick Call Patient #8.
[51] The credentials of the staff who assessed the patient are illegible.

- This 37-year-old man arrived at NRC on 12/22/17.[52] His medical history includes obesity, sleep apnea, hypertension, and opioid dependence. The patient submitted an undated piece of paper that said, "Blood in stools, please help." An unknown person wrote "refused" without date, signature and credentials. On 1/17/18, an RN saw the patient for constipation. The patient reported that on 1/16/18 that his stools were dark red and soft. The problem started in November 2017. The RN noted that he was being seen by GI and was previously scheduled for colonoscopy. The patients pulse was rapid (pulse=114/minute). The nurse documented a plan to refer the patient to the doctor if symptoms persisted for three days. On 1/19/18, a physician saw the patient for follow-up of his blood pressure (BP=153/113 mm Hg). The physician did not address the patient's complaint of blood in his stools. We referred this record to the Director of Nurses for follow-up with the provider.

In summary, at NRC the basic components of a system to access health care are not in place and patients do not have timely access to care for their serious medical needs. The practice of 24 hour lockdown is a serious obstacle to access to care. Inmates do not have the means to timely and confidentially submit their health requests. When submitted, staff does not timely respond. Patients are seen by CMT/LPNs who are not licensed to perform independent assessments, and therefore exceed their scope of practice whenever they perform independent assessments. Patients are not examined in a clinical setting with adequate lighting, equipment, supplies, and access to handwashing. Finally, nurse to provider referrals are not made when clinically indicated, and when made, they are not timely.

## Chronic Care

**Methodology:** The medical records of 13 patients with chronic medical illnesses and conditions were reviewed. There was limited opportunity to interview NRC providers due to restrictions imposed by Wexford. The Office of Health Services Chronic Illness Treatment Guidelines dated March 2016 was reviewed as needed.

### First Court Expert Findings
The previous monitor noted that a lower number than expected of individuals were enrolled in chronic care clinics, the chronic care form had not been revised for 12 years, and that not all eligible individuals had their first visit to a chronic care clinic within 30 days of admission to NRC. He noted concern that COPD was not included on the list of chronic care diseases and advised that asthma, COPD, and chronic bronchitis be cared for under a pulmonary disease clinic.

### Current Findings
We agree with all of the findings in the First Court Expert's report. In addition, we found the following problems:

---

[52] Sick Call Patient #9.

- Not all individuals with chronic illnesses are being evaluated in a chronic care clinic within 30 days of admission.
- Provider notes about the status of the chronic conditions, the reasons for modification of treatments, and the pertinent physical examinations are deficient. Quality of care, overall, was poor.
- The diabetic care at NRC fails to provide basic screening tests and vaccines that are recommended in the IDOC Diabetes guidelines (HbA1C, microalbumin-creatinine ratio, pneumococcal vaccination, foot exams). In addition, the guidelines should be revised to include routine screening for diabetic retinopathy and intake testing for HbA1C.
- Problem lists should be universally and accurately completed during the reception screening. Failure to complete the problem list puts the patient at risk for a disruption of care.
- The MARs demonstrated gaps (blanks spaces) in documentation of insulin administration. Insulin refusals are not regularly reported to the providers.
- There are unacceptable delays in obtaining specialty consultations and diagnostic tests.
- Patients with problems which appeared to be beyond the expertise of NRC providers were not referred for specialty care.

NRC has chronic care clinics for asthma, diabetes, hypertension, multiple sclerosis, seizure disorder, sickle cell disease, and tuberculosis. Individuals with human immunodeficiency virus (HIV) and hepatitis C are referred to the UIC infectious disease telemedicine consultation clinic. All other diseases are managed in a general medicine chronic clinic. The admission packets containing clinical information and medications from Cook County Jail or other correctional facilities in Illinois are rapidly reviewed by the NRC providers so that those new admissions with acute or chronic conditions are prioritized and seen more expeditiously during the reception screening.

During intake, a TB skin test is placed, and blood is drawn for HIV, hepatitis C, syphilis, and a basic metabolic panel (glucose, BUN, creatinine, electrolytes), and liver profile. These tests are meant to screen all inmates for potential infectious and certain chronic illnesses. However, if an inmate has a known chronic illness, there is no routine screening testing performed to ascertain the current status of the patient's chronic condition. Providers can ask the phlebotomists to add additional testing for some patients (e.g., HIV viral loads and immunodeficiency panels for HIV patients or International Normalized Ratio (INR) testing for those on anticoagulation). The lack of obtaining routine blood tests useful for determining the status of a patient's chronic illness is a major deficiency, as it delays identification of out-of-control status and delays initiation of a fully informed therapeutic plan. We noted this problem particularly for persons with diabetes, few of whom have a HbA1C test or microalbumin test obtained during the reception process. In part, it is our opinion that this deficiency is related to the order of reception steps. Phlebotomy is the first step of the medical process. The provider examination is typically the last step. If phlebotomy were the last step, then all tests necessary to determine the chronic disease status could be ordered by the examining provider and drawn before the inmate leaves the reception area in addition to the routine screening tests that are performed

on all persons coming through reception. In addition to blood screening, peak expiratory flow rates (PEFR) are measured on asthmatics, capillary blood glucose (CBG) point-of-care testing is done on diabetics, and viral load and immunodeficiency panels drawn for patients with HIV.

All new admissions with any chronic condition are to be seen no less than 30 days after admission to NRC. We were told that nurses performing reception screening record all individuals with chronic illnesses. At the conclusion of intake, a clinic nurse takes all intake paperwork and develops a list of all patients who have chronic illness and inserts newly identified patients onto a chronic illness roster. Because this nurse is so frequently pulled for other assignments, this task is mostly not done, resulting in extremely low numbers of patients enrolled in the chronic care program. Providers evaluating persons with chronic illness can also refer patients for a chronic care follow up. But this system is ineffective. Only nine of the 13 medical records reviewed documented that a chronic care visit had been scheduled or completed in <30 days and one within 60 days. Three of the 13 did not have a chronic care referral or a chronic care visit documented in the medical record.

We could only estimate the number of persons with chronic illness who are not tracked, but it appears to be more than the majority of patients. At NRC, there were 1493 inmates and 188 inmates at MSU, for a total of 1681 inmates on the NRC campus. There were only a total of 60 (4%) inmates on the chronic disease roster. We estimate the number of persons with chronic disease to be approximately 30%. This would mean that an estimated 504 (1681 X 0.3) inmates at NRC can be expected to have a chronic illness. Yet only 60 (12%) of inmates with chronic illness are on the chronic care list. A National Commission on Correctional Health Care study estimated chronic disease prevalence in state prison populations as 3.2% for heart disease, 16.7% for high blood pressure, 2.1% for diabetes, and 7.2% for asthma.[53] These are only for the more common conditions. This also excludes hepatitis C, which is estimated at above 10%. While some patients have multiple chronic illnesses, the rate of all unique individuals with any chronic illness is clearly higher than 4% of the NRC population.

As an example, there were 11 men on the diabetes chronic care list compared to 35 individuals on the list of patient-inmates being administered injectable insulin. This does not even include the many persons on oral diabetic agents. The diabetes chronic care list significantly underestimates the number of diabetics. This is consistent with the findings of the First Court Expert, who identified that not all individuals with chronic illnesses were being enrolled in chronic care clinics. This raises concerns that individuals with significant chronic illnesses could be delayed from receiving needed care or, at worst, could be lost to follow-up while at NRC.

The provider's documentation in the medical record is extremely brief and rarely contains clinical information needed to clarify the state of a patient's chronic illness or justify a change in the treatment plan. The only possible way to try to understand if a chronic condition was uncontrolled or over-controlled is to speculate. This lack of clinical documentation is a

---

[53] The Health Status of Soon-To-Be-Released Inmates, A Report to Congress, Volume 2, National Commission on Correctional Health Care, April 2002 as found as a PDF at https://www.ncchc.org/filebin/Health_Status_vol_2.pdf.

significant barrier to the continuity and quality of care. Because multiple providers see patients, the comprehensiveness of the previous clinical note is key to assuring that care delivered to a patient-inmate is coordinated and seamless.

Many of the charts reviewed had completed problem lists; however, records were reviewed that did not have a problem list and others had a serious chronic illness that was not noted on the problem list. Eight the 12 medical records reviewed had completed problem lists, two problem lists had not been completed, and two were incomplete (serious chronic illness not noted).

The care of diabetics was uniquely problematic. Without regard to the level of control or other needs of the patient, all insulin-requiring diabetics have their community or previous facility insulin types and dosages changed to twice a day NPH dosing accompanied by twice a day capillary blood glucose (CBG) testing.[54] Because patients have individual needs, this one-size-fits-all protocol has risks of deterioration of diabetes control and disrupts the continuity of care. Microalbumin-creatinine ratio, lipid profile, and HbA1C are not consistently drawn at the first provider visit as directed in the IDOC Office of Health Services Diabetes Treatment Guidelines (March 2016). Only one of the five diabetic charts reviewed had a HbA1C lab done, one had an order for this test, and three did not have an order or results in the chart. Pneumococcal vaccine was not being ordered. One of the five diabetics already had been vaccinated but four did not have a history of previously being vaccinated, nor was it ordered by NRC. The providers' notes do not detail their inspection and examination of the feet of the diabetics. On routine diabetic clinic visits, the providers check a box that lower extremity exam was done. Detailed notes about sensation, callouses, or the presence or absence of ulcers or other foot abnormalities are not documented in the medical record. None of the diabetic records reviewed had evidence that a retinal screening for diabetic retinopathy had been recently performed or had been ordered by NRC providers. The IDOC Office of Health Service's Offenders Diabetes Guidelines we received does not include a recommendation for routine retinal screening for diabetics; this is not in alignment with national USA standards of care. We believed that the IDOC Diabetic Chronic Care guideline was missing pages and we asked for but did not receive any further copies.

The medications for some new admissions were not ordered at intake, putting at risk the control of the chronic illness that is being treated. Lab reports are not always in the medical record. Medication administration records (MARs) and specialty consultation reports were not consistently found in the medical record. MARs have blanks where the nursing staff failed to note whether they administered insulin doses or refusals. The provider and nursing notes do not document that insulin refusals are regularly reported to the provider. Intake physical exams are not always done within seven days of admission.[55]

---

[54] These are point of care finger stick blood glucose tests that civilian diabetics perform themselves but in correctional facilities are often performed by nurses.
[55] IDOC Administrative Directive 04.03.101 Offender Physical Examination.

Eleven of 13 (85%) patient records reviewed had problems demonstrating quality of care issues. The following patient care summaries illustrate some of the concerns noted above.

- This patient was admitted to NRC on 1/4/18.[56] Medical and mental health screenings were done on 1/4/18 and dental screening was done on 1/5/18. The medical history included tobacco use, hypertension, and aortic valve replacement. A problem list was completed. Medications included amlodipine, hydrochlorothiazide, and warfarin. During the 26 days he was at NRC, three INRs had been performed. All were in the therapeutic range. His problem list was complete. He was scheduled for a chronic care clinic on 2/3/18. As of 1/29/18, almost a month after reception, his admission physical exam had not yet been performed.

- Another patient was admitted to NRC on 11/17/17.[57] Medical history, physical exam, mental health screening, and dental screening were done on 1/17/18. The patient had diagnoses of pituitary tumor, type 1 diabetes, hypertension, hypercholesterolemia, hypothyroidism, sleep apnea, and a urological problem (note illegible). The problem list was completed. Medications included metoprolol, amlodipine, aspirin, Lisinopril, metformin, insulin, and levothyroxine. A low TSH resulted in his thyroid medication being held. On 11/21/17, he passed out and suffered a forehead contusion which required four sutures; a finger stick CBG test was not done, an electrocardiogram (EKG) was not immediately done, and the provider did not comment on the cause of the syncope. At a chronic care clinic visit on 12/16/17, the provider noted that the patient was missing some medications and his EKG was normal. The same dose of insulin was continued. Depo Testosterone, which has a single FDA indication for hypogonadism, was initiated on 12/29/17 with no explanatory note by a provider. It was not clear what was wrong with the patient. He was next seen by a provider on 1/16/18. His CBG tests in the first two weeks of January 2018 ranged from 200-300 (poor control) and the provider increased the insulin dosage. His CBG tests from 1/17 to 1/30/18 continued to range from 200-300 but there were no further intervention/visit/notes as of 1/30/18.

  In summary, pneumococcal vaccine was not offered, HbA1C was not ordered, detailed foot exam was not done, retinal screening was not ordered. The response to the syncope and the ordering of additional testing were deficient. Although the insulin dosage was increased on 1/16/18, the CBG tests continued to be elevated (200-300) for the next two weeks with no further intervention and adjustment of insulin dosage. The patient was placed on testosterone without a documented indication.

- Another patient was admitted to NRC on 11/17/17.[58] A nurse identified a history of type 2 diabetes. A physical examination was done. His medications were insulin, metformin, atorvastatin, aspirin, and Lisinopril. The admission glucose was 240, which is

---

[56] Chronic Care Patient #1.
[57] Chronic Care Patient #2.
[58] Chronic Care Patient #3.

elevated, yet a HbA1C test was not ordered on admission. CBG tests from 11/17/17 to 12/2/17 ranged from 130-339 (mean >200). This indicates poor control of his diabetes. The MAR for insulin administration during these dates had 11 blanks, indicating that the patient did not receive insulin, or the nurse did not document administration of insulin. At a chronic care visit on 12/2/17, the insulin dosage was not increased despite the poor control of his diabetes over the preceding month. The provider ordered a HbA1C and a follow-up clinic in eight weeks. CBG tests from 12/3/17 to 1/30/18 ranged from 126-236 (mean >150), and during this period the MAR for insulin had two blanks and 25 refusals. There was no intervention concerning the insulin refusals or elevated CBG tests. There was no provider visit from 12/2/17 until 1/30/18, the day of our visit.

In summary, there was no problem list, pneumococcal vaccine was not offered/administered, there was no detailed foot exam, retinal screening was not ordered, there was no HbA1C ordered on admission, and there was no referral to a physician for failure to take insulin.

- Another patient came into NRC on 1/19/18.[59] Medical history, physical, and dental screening were done on intake. The diagnoses included: type 2 diabetes, hypertension, asthma, BPH, seizures (not on anti-epileptic medication and no seizure since 2002). There was no problem list in the medical record. The medication list that transferred with the patient from Cook County Jail included glargine and regular insulin, metformin, albuterol/QVAR, atorvastatin, metoprolol, Tamsulosin, amlodipine, enalapril, and pneumococcal 23 vaccine given. A NRC provider switched the patient's insulin to NPH BID with sliding scale regular insulin, and metformin. Laboratory tests included a CBG test of 212, a hepatitis C test reactive, and serum glucose 234. The blood pressure was 136/57. A provider requested a chronic care clinic appointment for 2/17/18. The MAR for insulin from 1/19 to 1/30/18 had two blanks/two refusals, with CBG values ranging from 76-235 (mean>140).

In summary, there was no detailed foot exam, no microalbumin-creatinine ratio, retinal screening was not ordered, and no HBA1C was done on intake. The hepatitis C antibody positive status was not added to the problem list.

- Another patient was admitted to NRC on 11/20/17.[60] The patient was a 58-year-old man. The medical history, physical examination, and mental health screening were done on intake. The diagnoses included: type 2 diabetes, hypertension, asthma, chronic obstructive lung disease (COPD), and carotid stenosis. Carotid stenosis was not on the problem list. Medications included: insulin, Lisinopril, metoprolol, aspirin, and amlodipine; influenza vaccine was given at the Cook County Jail. The admission laboratory tests included: glucose 111. The blood pressure was 161/80, the peak expiratory flow rate (PEFR) was 330. A doctor saw the patient on 12/1/17. The blood

---

[59] Chronic Care Patient #5.
[60] Chronic Care Patient #6.

pressure was 159/78, which is high for a person with diabetes, and the CBG test was 200, which is high. The provider ordered amlodipine as it was not ordered at intake. On 12/5/17, the HbA1C was 7.0. On 12/14/17, at an RN visit the patient was "dizzy" with a blood pressure of 130/84 and a CBG value of 131. On 12/25/17, an RN evaluated the patient who was "dizzy" with blood pressure of 163/94 (elevated) and pulse was 82. On 12/16/17, a provider saw the patient and documented left carotid bruit. An ultrasound had been done at Weiss Hospital and the record from Weiss was requested. The provider started atorvastatin. At the 1/18/18 provider visit, the blood pressure was still elevated at 167/114. The provider administered an immediate single dose of blood pressure medication and increased routine blood pressure medications. On 1/20/18, the patient had "chest discomfort." The blood pressure was 177/105, which is very high. The EKG was negative. A provider only gave a once-only dose of clonidine, which is not an acceptable standard of treating elevated blood pressure. On 1/22/18, the medical record documented that the patient was "Not taking BP meds." On 1/28/18, the blood pressure was 161/88 (which is elevated), but was not addressed. The MAR for insulin 1/1/18 to 1/30/18 had seven blanks and two refusals, with CBG tests ranging from 95-227 (mean >150).

In summary, there was no pneumococcal vaccine offered/administered, blood pressure medication was not started at intake, there was no detailed foot exam, and retinal screening was not ordered. Additional evaluation for dizziness/syncope should have included a thorough history and neurologic examination, and depending on findings, further testing (Holter monitor) might have been indicated. The blood pressure was not controlled and yet providers did not appropriately adjust anti-hypertension medications. This was particularly important since the patient had diabetes and history of carotid artery diseases and was therefore at risk of stroke and other cardiovascular diseases. The carotid ultrasound report from Weiss Hospital requested on 12/16/17 was not yet received as of 1/30/18.

- Another patient was admitted to NRC on 1/23/18.[61] He was a 33-year-old. A medical history and physical examination were done on intake. Diagnoses included: type 2 diabetes, hypertension, and hepatitis C. Hepatitis C was not noted on the problem list. The medication list from Cook County Jail included: Lisinopril, metformin, and glipizide. The CBG was 153, which is high. The blood pressure was 177/94, which is also elevated. The TST was negative. A provider noted that the blood pressure was not controlled and referred the patient to chronic care clinic on 2/13/18. There were no lab reports in the chart.

In summary, there was no pneumococcal vaccine offered/administered, there was no definitive foot exam, no retinal exam ordered/done, and no HbA1C done on intake. The doctor evaluating the patient at intake should have evaluated whether the patient had

---

[61] Chronic Care Patient #7.

taken his blood pressure medication that day and considered adjusting the blood pressure medication.

- Another patient was admitted to NRC on 6/20/17.[62] He was a 29-year-old. Medical history, physical, dental, and mental health screening were done at intake. The diagnoses identified included: ankylosing spondylitis (HBL-27 reactive). A problem list was completed. A follow-up in medicine clinic was ordered. Medications included: prednisone and sulfasalazine. The laboratory tests ordered at intake included: BMP, CMP, liver profile, all of which were normal. Laboratory tests were repeated on 8/8/17, 11/13/17, and 12/27/17, and all tests were normal. At a six-month chronic care clinic visit, a doctor noted that prednisone was decreased to 10mg/d with a follow-up in six months.

  In summary, there was no documentation about presence/absence of symptoms or assessment of functional status with respect to ankylosing spondylitis. Pneumococcal vaccine was not offered/administered even though patient is on prednisone, a chronic immunosuppressive medication. Sulfasalazine does not have an FDA indication for ankylosing spondylitis and prednisone is not recommended for long-term use in ankylosing spondylitis, yet a thorough medication history was not obtained to understand why the patient was taking these medications; it did not appear that the providers understood how to manage ankylosing spondylitis and yet did not refer the patient to a specialist who typically manages this disease. We note that patients with ankylosing spondylitis typically are managed with tumor necrosis factor alpha antagonist medications, which was not offered to this patient.

- Another patient was admitted to NRC on 8/18/17.[63] He was a 49-year-old. Medical history, physical, mental health, and dental screening were done at intake. Diagnoses included: right ankle deformity secondary to a fracture in 2016 and motor vehicle accident in 2017, use of crutches to walk, left total knee replacement, hypertension, and asthma. A problem list was completed. PEFR tests were 200 and 290 and the blood pressure was 154/115, which is elevated. Medications included: amlodipine and albuterol. Intake laboratory tests were normal. On 8/21/17, an x-ray showed a severely fragmented ankle joint with a suggestion of osteomyelitis or Charcot joint. On 8/25/17, a blood count was normal. On 10/14/17 at a chronic care clinic visit, the blood pressure was 157/92 and 136/92, and the amlodipine was increased. The PEFR was 350-400. A repeat blood pressure was ordered in 30 days. On 11/2/17, an orthopedic consult apparently occurred after about two months at NRC, but there was no consultant report in the medical record. On 11/16/17, a CT scan was ordered and approved. There was no evidence that this CT scan was done as there was no return transfer note in chart upon return to NRC. On 12/12/17, a CT/MRI of the ankle was approved. On 12/29/17, the CT/MRI results were noted to be pending. On 1/2/18, an x-ray report showed right ankle

---

[62] Chronic Care Patient #9.
[63] Chronic Care Patient #10.

Charcot joint. Orthopedic recommendations included a fasting blood sugar, HbA1C and testing for lead/heavy metals and a podiatry referral. On 1/3/18, tests recommended by the orthopedic consultant were ordered. On 1/30/18, lead, copper, and heavy metal levels were not done due to cancellation. The patient's uncontrolled blood pressure was appropriately treated on 10/14/17 by increasing anti-hypertensive dose, but an order for repeat blood pressures ordered for mid-November was not done. There were no blood pressure values in the chart for the last three months.

In summary, this patient with severe ankle deformity was not seen by UIC Ortho until more than two months after NRC admission. The CT/MRI as recommended by the orthopedic consultant was not done for two months, and the results were not in the medical record. It is not documented why/who cancelled orthopedics' recommendation to do lead/copper/heavy metal levels to evaluate possible Charcot's joint. Patient has been in NRC for five months without completion of the evaluation of his damaged ankle. The patient had an elevated blood pressure at intake, yet blood pressure medications were not adjusted for about two months.

- Another patient was admitted to NRC on 7/3/17.[64] The patient was a 28-year-old. Medical history, physical, mental health, and dental screening were done at intake. Intake labs were normal. Diagnoses included: spastic paraplegia due to a prior gunshot wound, using crutches to walk, depression, and neurogenic bladder with use of catheters. The problem list was completed. Medications included; pain medication and medications for spasm. On 7/17/17, a urine culture and sensitivity was negative and a blood count was normal. On 8/11/17, the patient had abdominal discomfort. A rectal examination showed soft stool with a negative guaiac test. An abdominal x-ray was negative but suggested a possible ileus. On 8/16/17, a physician assistant note documented a normal white count and BUN test. The physician assistant ordered antacid. On 8/29/17, Imodium was ordered for diarrhea. On 8/31/17, a muscle relaxant and gabapentin were ordered. On 9/14/17, a urinalysis showed 6 WBC's and large leukocyte esterase which suggested infection; an antibiotic (ciprofloxacin) was started for UTI. On 10/21/17, a urine dipstick showed leukocyte esterase 70+. On 1/8/18, the patient fell out of bed and landed on his elbow with development of a new left wrist drop. An x-ray of the spine/elbow was negative for fracture and a support was provided (sling) and a urinalysis was ordered. On 1/10/18, the urine culture showed Klebsiella pneumonia >100,000. On 1/23/18, sensitivities were reviewed by the provider and Bactrim was ordered.

In summary, a provider completed an appropriate evaluation of patient's abdominal discomfort in August 2017. The patient had repeated colonization of his urine but for persons with neurogenic bladder, treatment is generally reserved for those who are symptomatic (fever, foul-smelling urine, incontinence, frequency, or dysuria). Initial management of left elbow trauma/l wrist drop was reasonable but there has been

---

[64] Chronic Care Patient #11.

unacceptably no follow-up as of 22 days post injury/wrist drop and no referral to Neuro/Ortho generated.

- Another patient was admitted to NRC on 12/12/17.[65] Medical history and physical examination were done at intake. Diagnoses included: HIV infection/high CD4, blindness in his right eye, and seizures (not on anti-epileptic meds; providers did not comment/address this serious history). The problem list was complete. Medications included: Genvoya. A viral load showed undetectable HIV, a CD4 716, and hematocrit of 43. On 1/23/18, a UIC Telehealth HIV consultant continued Genvoya, offered an influenza vaccine and scheduled a four month follow up. A MAR from December was not in chart as of 1/30/18, but on 1/11/18 KOP Genvoya was given; the quantity of pills was not listed.

  In summary, the intake provider should have commented on the status of the patient's history/etiology of seizures and determined whether anti-epileptic meds were indicated or not. The HIV care was reasonable. The UIC HIV specialty appointment six weeks post admission was acceptable given the level of viral control documented on intake labs. The MAR should definitely document, as per established practice, the number of HIV pills given to the patient for KOP administration.

- Another patient was admitted to NRC on 11/30/17, and a medical history was done in reception.[66] Diagnoses included: HIV infection and asthma. There was no documentation in the 11/30/17 intake forms about whether the patient was on HIV meds. On 12/1/17, a provider performed a physical examination and ordered daily Bactrim x 30 days. Laboratory results included: VL 95462, CD4 88. No HIV medication was ordered nor was there any documentation about whether the patient was prescribed or taking HIV medication. On 12/6/17, the patient was given Bactrim six tabs KOP even though 30 days of medication was ordered. There was no justification in the chart for this discrepancy. On 1/5/18, a UIC Telehealth HIV consultant noted that the patient stopped HIV meds in October 2017. The HIV consultant ordered Genvoya and TMP/SX (Bactrim)/day. The consultant recommended repeat HIV labs in four weeks/UIC follow-up consult in six weeks. On 1/5/18, the MAR noted that Genvoya #30 KOP and Bactrim #15 KOP were given to the patient.

  In summary, the intake medical history and physical should have clearly documented that the patient had not been taking his HIV meds prior to NRC admission. Laboratory tests reviewed in the 12/1/17 provider note revealed a severely uncontrolled and immunocompromised state, yet the UIC HIV consultation was not obtained until five weeks post admission. This was an unacceptable delay in access to much needed specialty consultation.

---

[65] Chronic Care Patient #12.
[66] Chronic Care Patient #13.

## Urgent/Emergent Care

**Methodology:** We interviewed health care leadership and staff involved in emergency response, toured the medical clinic, assessed the availability and functionality of emergency equipment and supplies, reviewed actual or emergency drills, and CQI reports.

### First Court Expert Findings

The First Court Expert Report noted that NRC had no useful logs to select records of patients being sent out for urgent or emergent conditions. A Nursing Telephone Urgent Care Log tracked only patients that were seen and not all notifications of patients reporting urgent complaints. The Court Expert recommended that NRC conscientiously use paper or electronic log books to document urgent/emergent care.

### Current Findings

We requested but were not provided an urgent care tracking log. We inspected emergency response equipment and found that it was poorly organized and maintained. Health care leadership has not implemented the SCC-NRC Machine/Equipment Check Log Sheet that requires daily checks of the medical unit for sanitation and equipment such as suction, oxygen tanks, automatic external defibrillator (AED), EKG machine, EKG electrodes and paper, backboards, stretchers, biohazardous waste, sharps containers, and trauma bags, etc.

The treatment room where patients with urgent conditions are assessed was dirty and disorganized. Stretchers in the treatment room were torn. Several oxygen tanks were placed into a corner; the one closest to the stretcher was empty.

Two AEDs and emergency response bags were not kept in the same location in the clinic. We inspected the AEDs and found that they were operational, but electrodes had expired in 2016 and in August 2017. Two emergency response bags were found open in the main clinic area on a countertop. We asked staff whether equipment and medications in the response bag were standardized, locked, and routinely inspected and we were informed they were not. A CMT stated that one of the bags was for her personal use and she kept glucagon and a thermometer in her lab coat pocket and not in the bag.

A mass disaster response bag covered in dust was located on top of cabinets in the medication room. The bag was not included on the equipment check log sheet as one of the items that needed to be checked daily.

Emergency events or drills were conducted and critiqued on 11/21/16, 4/11/17, and 5/3/17. A mass casualty drill was conducted on 5/19/17. The critique of the events was extremely limited. The mass casualty drill identified a number of weaknesses for which no corrective action plan was developed or implemented.

No emergency response drills have been conducted in the past eight months, which is not compliant with NCCHC standards.

In summary, we concur with the First Court Experts findings regarding urgent care. In addition, we found that NRC has not developed an adequate emergency response system through the proper maintenance and checking of emergency equipment. Emergency response drills have not been performed timely and they have not meaningfully identified areas for improvement.

## Specialty Consultations

**Methodology:** Interview HCUA. Review offsite tracking logs. Review selected medical records of persons having offsite consultations.

### First Court Expert Findings
The First Court Expert found that specialty care for long-term NRC inmates is delayed. He also identified "problematic" clinical care in several patients who had specialty care. The First Court Expert recommended that NRC institute a tracking system for all scheduled offsite services and begin using logs for this purpose. The First Court Expert recommended that high-level security inmates be held at NRC until their specialty care has concluded.

### Current Findings
We noted that of the seven patients we reviewed, several were being held at NRC while their specialty care was in progress. This was a recommendation of the First Court Expert. However, the lack of a tracking log made it impossible to verify this for a larger sample. There has been no improvement with respect to the other First Court Expert's findings. We identified the following additional findings:

- Medical record documents (referrals, verifications of collegial review, approvals, and consultation reports) were mostly not found in the medical record.
- Only 36% of consultations included a formal report.
- The HCUA who is a nurse evaluated denials of specialty care. This evaluation needs to be by a physician.
- The collegial review process fails to ensure that patients receive timely consultative specialty care.

IDOC policy requirements regarding specialty care are in two separate ADs.[67] The ADs require that all referrals for specialty care are sent to the Facility Medical Director. It is our opinion that these are medical record documents (physician orders) and they should be filed in the medical record. The Facility Medical Director is to make a determination regarding approval or denial of all referrals. If the Facility Medical Director approves the request, it is to be referred to Wexford's utilization management unit in writing or verbally. According to requirements in the ADs, verbal referrals must be documented in the medical record. A Wexford written response is to be made within five days and this response, according to the AD, is to be placed in the medical record. If the referral is denied by the corporate UM reviewer, the denial is to be referred to the HCUA. The HCUA is to "independently" review all denials and decide if the denial is medically appropriate. At NRC, the HCUA is a nurse. A nurse has insufficient training to

---

[67] 04.03.103 Offender Health Care Services and 04.03.125 Quality Improvement Program.

evaluate whether the consultation is medically necessary; a physician should be making this judgment. When the HCUA decides that a referral denied by the Wexford UM reviewer should be approved, the denial is referred to the Agency Medical Director. In this arrangement, the HCUA might agree with Wexford that some denied consults are appropriately denied when the Agency Medical Director might decide otherwise. A physician should review all of the denials. If the patient writes a grievance about a denial, the HCUA is also required to refer to the Agency Medical Director. The Wexford Regional Medical Director for the northern region told us that after a specialty consult it is a requirement that the patient is to be seen in follow up in five days. In the IDOC response to the First Court Expert report, the IDOC stated that when a patient returns to the prison after an offsite visit, the practice in IDOC is to have a physician evaluate the patient within three to five days.[68] In that response, the attorney for the IDOC stated that a three to five day follow up meets constitutional adequacy.

Tracking specialty care is useful to monitor the effectiveness of the specialty care process and to ensure that specialty care consultations are carried out timely. The IDOC agreed[69] with the First Court Expert's recommendation that:

> "The entire process, beginning with the request for services, must be tracked in a logbook, the fields of which would include date ordered, date of collegial review, date of appointment, date paperwork is returned and date of follow-up visit with clinician. There should also be a field for approved or not approved, and when not approved, a follow-up visit with the patient regarding the alternate plan of care."[70]

We agree with the First Court Expert that this manner of tracking specialty care is needed. The IDOC stated, in their response to the First Court Expert's report, that there was a logbook currently in place for offsite services matching the requirements of the First Court Expert. We asked for but did not receive a logbook and were not given a logbook during our tour. In preparation for this visit we asked for a tracking log of onsite and offsite specialty care including the date of referral, date of collegial review, date of service, and the service the patient was referred for.[71] Our visit started Monday 1/29/18. On 1/25/18, we received by email a list of onsite appointments. This list did not contain the date of referral, the date of collegial review, and reason for referral. An offsite specialty list was sent to us by email on 2/1/18, the last day of our tour. We had no internet capability in the facility and were not able to see this document until after we left the facility. We were able to obtain the same list from the IDOC on the second day of our visit. However, the list that Wexford sent and also provided by IDOC only contains the patient name, IDOC number, the destination consultant, the reason for consultation and the date of service. We learned during the SCC visit that the NRC offsite scheduler maintains the type of log we had asked for but had not received. We also asked for but did not receive a list of denials of specialty care.

---

[68] Page 22, email letter to Dr. Shansky on 11/3/14 sent by William Barnes representing the IDOC.
[69] Page 24, email letter to Dr. Shansky on 11/3/14 sent by William Barnes representing the IDOC.
[70] Final Report of the Court Appointed Expert Lippert v. Godinez page 31 of main report.
[71] January 8, 2018 email to the Attorney General's representative.

When we visited SCC we had an opportunity to talk to the scheduling clerk from NRC. She indicated that she used the same spreadsheet as used at SCC. This SCC spreadsheet did not always have an accurate referral date but did contain the collegial date and date of the consultation. Some collegial reviews were documented as occurring before the referral was documented as having occurred. These tracking logs should be standardized so that the information can be used to measure adherence to administrative directive timelines. As well, referrals should be treated as physician orders and should be filed in the medical record as they occur, not after the consultation is completed.

Also, a key component of consultant care is that providers review the consultation report, review the findings of consultants, and evaluate all consultant recommendations including medications changes, further referrals for specialty care, and further recommendations for additional testing. The findings of these reports should be discussed with the patient. At NRC, review of consultation reports is ineffectively done and many consultant recommendations are either not reviewed or not carried out.

We reviewed a number of consultations to determine if the referral, collegial review, and approval were filed in the medical record. We also looked at specialty care follow-up to assess whether providers are carrying out the consultant's recommendations or documenting why they did not follow the recommendation. We found that specialty care is poorly documented in the medical record despite being required by the IDOC ADs. We reviewed seven patients who had 22 consultations and one hospitalization. Of the 22 consultations we found only 14 (63%) referral forms, only three (14%) collegial reviews, and only nine (41%) approvals in the medical record. Of the 22 consultations that occurred, only eight (36%) included a formal consultant report. Some consultations had a few brief lines written on the referral form giving recommendations, but these did not include information about the status of the patient and did not include a report of the evaluation. Particularly problematic was that 19 recommendations of consultants were not reviewed or carried out. Given that there were 19 recommendations not carried out in seven patients, there is a serious problem with clinical follow up of specialty appointments that represents a significant risk of harm to patients. These represent underutilization or not conducting necessary specialty care. The IDOC and Wexford have no current process to study underutilization even though it is a significant problem and patient safety issue. The Wexford collegial review process is so defective that, in our opinion, it is a patient safety issue and is likely causing harm to patients and therefore should be eliminated.

We looked for further evidence that Wexford or IDOC performed any audit or review of specialty care. We noted in the annual CQI report of September 26, 2017 documentation indicating that there were 273 collegial reviews and that 100% of patients who went offsite were seen within five days of the return to the facility. This was the only review of specialty care that we could find in the quality improvement documents provided to us.

Though the quality improvement report documented that 100% of persons were seen within five days of a specialty visit, our findings were different. Of 23 patients (22 consultations and

one hospitalization) we reviewed, only 15 (65%) were seen within five days after the consultation or hospitalization. We found that NRC providers failed to review or act on 19 consultant recommendations. This places patients at significant risk of harm. The report that 100% of patients who went off site being seen in five days misrepresents, in our opinion, the quality of offsite specialty care and fails to identify significant existing deficiencies in this service. In our opinion offsite specialty care is inadequately managed and places the patients at significant risk of harm.

In addition to these findings we noted poor care for six of seven patient records reviewed for specialty care, which is a similar finding of the First Court Expert. These reviews are as follows.

- One patient had lupus nephritis, hypertension, and history of pulmonary embolism.[72] In patients with lupus nephritis and significant amounts of protein in the urine, which this patient had, the blood pressure should be controlled to a level of 130/80. This patient saw providers 11 times when the blood pressure was elevated. On only one occasion did a provider adjust long-term anti-hypertension medication and on two occasions a one-time only dose of medication was given. One-time only doses of medication are not considered appropriate therapy. The lack of blood pressure control was likely to damage the patient's kidney function. Consultants recommended that this patient have laboratory tests monitored, but this was not effectively done. During clinic visits, laboratory tests that were done were not consistently reviewed. The patient had significantly low albumin (1.7) and anemia (HGB 11.7), but these problems were not addressed. These deficiencies placed the patient at risk of harm and may have harmed the patient.

- Another patient had primary sclerosing cholangitis, a condition of uncertain etiology which can lead to severe liver disease, including cirrhosis and hepatocellular carcinoma.[73] Although the patient had abnormal liver function tests and although a consultant recommended a hepatology consultation, the abnormal tests were not reviewed or noted and the referral to hepatology did not occur. This placed the patient at risk of harm. The patient had a cytology examination during a specialized procedure (ERCP) but the results were never checked.

- Another patient had prostate cancer.[74] Providers at NRC never documented the staging and status of the patient's condition. The patient had testicular and groin pain that a consultant felt was due to a vascular condition as opposed to the patient's cancer; consultants also documented peripheral vascular disease as a problem. A recommendation to refer the patient to a vascular specialist was not noticed or referred. The patient's peripheral vascular disease was never identified by NRC providers as a problem.

---

[72] Specialty Care Patient #1.
[73] Specialty Care Patient #2.
[74] Specialty Care Patient #3.

- Another patient had pancreatic cancer and was undergoing chemotherapy.[75] An oncologist noted that the patient had elevated liver function tests and should have an abdominal ultrasound to evaluate potential reasons for this abnormality. Indeed, abnormal liver function tests were available in the NRC record, and though signed as reviewed, nothing was done to evaluate for the abnormality. This patient never had an evaluation of the liver function abnormalities, even though the reason for the abnormal labs may have been related to the patient's cancer. This patient also experienced an episode of loss of consciousness and fell to the floor. The patient had an abnormal pulse (116) and low blood pressure (102/66). The nurse evaluating the patient did not consult a provider and did not refer the patient to a higher level of care for evaluation. This placed the patient at significant risk of harm.

- Another patient had keratoconus, a disabling condition of the cornea which results in a malformed cornea and can result in visual disturbances.[76] At intake, nurses recorded 20/20 visual acuity in both eyes. Several weeks later an optometrist identified 20/200[77] vision in one eye and did not record the visual acuity in the second eye. We noted problems with intake screening of visual acuity and this example demonstrates this problem. The patient was also on Plavix and aspirin, two drugs that can cause serious bleeding as a side effect of the medication. However, the reason for being on these medications was never determined and there was no corresponding problem listed as a reason for being on these medications. The patient had diabetes, hypertension, and high blood lipids but was seen in only one chronic clinic visit over a nine-month period. The patient had abnormal laboratory results (BUN 33; sodium minimally low at 134: WBC 12.5 and hemoglobin 11 indicating anemia). These abnormal laboratory results were not repeated, and providers did not attempt to determine the reason for the abnormalities. Though the patient was diabetic, the patient never received an HbA1C test even though this is required by chronic care guidelines for persons with diabetes. The patient's chronic illnesses were not being monitored or managed.

- Another patient had a history of pancreas and kidney transplants but the reason for these transplants was never identified or documented in the medical record.[78] History of the patient's illness was substandard. This patient had several consultations but because the reports were not available in the medical records, the providers at NRC failed to understand what the patient's clinical condition was and also failed to understand the status of the patient's conditions. We also could not determine the status of this patient because of lack of consultant reports. This places the patient at risk of harm. Because consultant reports are not filed in the medical record, when this patient transfers, subsequent providers will not understand how to care for this patient, who will be at risk of harm. The patient also had a hemoglobin of 12.7 on 10/5/17, which dropped to 8.9 on 12/21/17. This significant drop in hemoglobin was unnoticed

---

[75] Specialty Care Patient #4.
[76] Specialty Care Patient #5.
[77] 20/200 visual acuity is legal blindness.
[78] Specialty Care Patient #7.

and was not being monitored; it indicated a significant risk to the patient yet was unnoticed. The patient also was being treated for high blood lipids but was not being monitored for this condition.

We also note that in review of these records, the organization of the medical records was so poor that it was extremely difficult to discover what was happening to the patient. This was similar to the finding of the First Court Expert. Papers were merely placed in a folder, not sorted by type of document or placed in chronologic order. For larger records, examination of the record was so difficult that use of the record for routine care in a busy clinic would not be possible.

We were unable to evaluate the First Court Expert's recommendation that persons who require specialty care have that specialty before they leave NRC because of a lack of tracking logs. We agree with this recommendation in principle, particularly when higher level care at UIC is needed, in that it ensures continuity of care.

With respect to findings of the First Expert, we agreed with the findings and recommendations regarding lack of tracking of specialty appointments. Specialty care needs to be tracked. The IDOC agrees with this recommendation as well. Yet the IDOC has not been able to provide evidence that this is done at this facility. The First Expert found two of three charts reviewed showed problems with care. We identified problems with care in six of seven records reviewed. Our review of medical records found similar findings to the First Expert report, including delays in perceiving the need for services, delays in following up abnormal results and problems with follow up. We had an additional finding that the IDOC has no current way to monitor the effectiveness of access to specialty care. In particular, underutilization or the lack of recognition of a necessary referral appears significant. For seven patients reviewed, there were 19 recommendations by consultants that were not carried out or determined to be unnecessary. This should be examined using a root cause analysis to determine why this is happening.

## Infirmary Care

**Methodology:** The clinical space and equipment was inspected, nursing staff schedules reviewed, clinical charts audited, nursing staff interviewed, correctional staff and porters questioned, and patient-inmates interviewed. There was only limited contact with the infirmary physician.

### First Court Expert Findings
The medical infirmary was not operational at the time of the First Court Expert's site inspection. Individuals requiring infirmary level services were housed in the nearby SCC infirmary. The infirmary charts of three of the four NRC patients in the SCC infirmary were found to be inadequate. The provider's notes were consistently illegible to the experts.

### Current Findings

The First Court Expert recommended opening the medical infirmary, which has since been done. We had several new findings, including:

- As recommended in the First Court Expert report, NRC opened the medical infirmary in 2016 and has assigned 24/7 coverage with nurses and correctional staff. However, nurse staffing plans show inconsistent coverage by a RN.
- Provider notes are generally written on at least a weekly basis.
- Infirmary admission notes are not always written by providers within 48 hours of admission.
- There continue to be problems with NRC providing the needed quantity of bed linens to the infirmary. This was also noted in the First Court Expert's report.
- The quality of care provided by the clinicians assigned to the infirmary is inconsistent and often inadequate.
- The provider progress notes lack documentation of the rationale for changes in treatment and fail to develop clear treatment plans and differential diagnoses.
- There is virtually no documentation of the status of patient's chronic illnesses.
- There was no documentation that any pertinent physical examinations were being performed.
- The care of diabetics is deficient.
- In its current state, the level of provider care in the NRC infirmary puts patients at risk.

The medical infirmary has been operational since December 16, 2016. Eleven of the 12 medical beds were occupied at the time of the site visit. Two-thirds of the patients were chronically ill individuals whose fragility, incontinence, and difficulty with ambulation and self-care precluded their assignment to regular housing units. The infirmary was reported to be staffed 24/7 by RNs with assistance of CNAs on most shifts. At the time of our exit from NRC, two nurse schedules for 1/29/18 to 2/4/18 were provided. One schedule had one to two RNs on all shifts assisted by CNAs on almost every shift; the second schedule had one to two RNs on the day shift with CNA coverage on six shifts, one RN on six of seven 3 p.m. to 11 p.m. shifts, and only one RN covering three 11 p.m. to 7 a.m. shifts without any CNA assistance. This lack of staffing is consistent with the lack of staffing at NRC and with the shared staffing between SCC and NRC. It was reported that there is a correctional officer assigned to the infirmary on each shift. During the site visit, one to two correctional officers were stationed in the medical infirmary and the adjoining mental health crisis beds.

There is a nurse call device/buzzer mounted on the wall next to each bed. The buzzers were found to be operational in all rooms that were tested, and the patient-inmates understood how to use this system. There were two negative airflow rooms (A-105-106) but, as noted in the Clinical Space section, the monitoring panel was not operational at the time of the inspection.

There are multiple deficiencies concerning sanitation and infection control in the infirmary and mental health crisis unit. The beds are fixed in a flat position without the capability to raise the head or raise/lower the height of the bed. Even though two-thirds of the 11 individuals housed in the medical infirmary were chronically ill with varying degrees of disability, there were no

adjustable hospital beds in the infirmary. The laundry was providing the infirmary with only 12 clean linen changes per week. The nursing staff reported that this quantity was insufficient to meet the needs of the infirmary patient population (incontinent, diapered elderly patients-inmates frequently soil their sheets) and the nursing staff's repeated requests for an ongoing additional stock of sheets had not been granted. We walked to the laundry and the nursing supervisor asked the laundry correctional officer for doubling of the weekly allotment, and this was verbally approved. This is a patient safety and sanitation issue.

All forms, notes, and reports generated after admission to the infirmary are kept in individual divided binders, with the clinical information placed in tabbed sections. This facilitates the review of the care provided in the infirmary. All care provided at NRC prior to the infirmary admission are in the same drop-filed loose paper arrangement as described in the medical records section of this report. This makes it difficult to assess the care provided prior to infirmary admission. The drop-file records are not all kept in the infirmary. The entire record of the patient needs to be available when the patient is evaluated.

IDOC Administrative Directive 04.03.120 Offender Infirmary Services has several requirements, including: admission to the medical infirmary must be authorized by a provider; nurses must complete admitting notes with vital signs upon admission; and admission notes by the providers are to be documented within 48 hours of admission. A review of four infirmary admissions found that nurse admission notes and vital signs were performed on the day of infirmary admission for all four individuals. Two of the four had provider admission notes written in less than 48 hours and the other two did not meet the timeliness standard, with provider admission notes written 11 days and 10 days post admission.

Acute care patients (rapid onset of symptoms, under treatment for acute illnesses, and post-operative status) are to be seen by a provider no less than three times per week and have daily provider notes. Patients with non-acute illnesses are to have a provider note no less than weekly. There were two patients (one post-operative and one with fluctuating mental status) who should have been initially given acute status, but they only had provider notes once a week.

There was a chronic disease patient who developed an acute serious eye problem and received an appropriately heightened amount of provider attention, including 14 provider notes in a 39-day period. However, the patient's diabetes status, with elevated CBG values, was not commented on once and did not include an adjustment of the patient's insulin. Most of the provider notes contained little, if any, clinical content, limited, if any, rationale for modifying treatment plans, a paucity of differential diagnoses about any set of symptoms, no notes about the control of patient's chronic illnesses, and only very brief, if any, comments about new or changing problems. Usually the only indication of a new concern was a new or changed order unaccompanied by an explanatory provider note. The paucity of the clinical content in the provider's notes would make it virtually impossible for a different NRC provider who was asked to cover the infirmary to understand the treatment plan or status of the patient. This puts the patient at risk. In addition, the provider's notes were very difficult to read and were mostly

illegible. These concerns were also raised in the First Court Expert's report. The nurse progress notes were generally more legible and contained more pertinent information of the condition of the patients.

The following summaries of the infirmary patients' records highlight the concerns noted above.

- This patient was admitted to NRC on 11/30/17.[79]  Physical exam on admission noted, "c/o pain in right great toe with discoloration." MD note: Right big toe ulcer with foul smell, surrounding erythema. The problem list noted: Diabetic R big toe ulcer, dime size, black x two months. Diagnoses: Diabetes, HTN, hyperlipidemia, renal insufficiency. MD ordered daily dressing changes, Rocephin 500mg/D. Intake lab: Syphilis/RPR 1:128. No dressing change log was found in medical. There is documentation that this patient's black toe was not evaluated or dressed as ordered until 12/5/17, when RN noted "in pain" and sent the patient to MD for evaluation. The right big toe was black with foul smell and erythema. He was sent to St. Joseph Hospital, was diagnosed as having right toe gangrene with abscess, his toe was amputated, he received treatment for sepsis, and he was discharged to NRC on 12/22/17 on IV antibiotics. On 12/22/17, he was admitted to the infirmary. The RN admission noted: IV antibiotics, UIC podiatry and vascular clinic referrals in one to two weeks. The MD infirmary admission note was written on 1/2/18, 11 days after admission. Post-hospitalization: Right big toe abscess/gangrene with sepsis, PICC line on IV antibiotics, angiography showed PVD, Meds Glipizide, Metformin, Lisinopril. On 12/5/17, RN note, "seen by MD, CPM." On 1/7/18, RN: red, swelling bottom of foot. 1/10/18, MD noted CPM [continue present management], but there was no physical exam. On 1/22/18, laboratory tests showed WBC 6.4, creatinine 0.87, RPR 1:64. On 1/27/18, five weeks after returning from a complicated hospitalization, the surgical (probably vascular) consultation was still pending and the podiatry appointment had not been scheduled. On 1/29/18, treatment for latent syphilis was finally ordered.

  The pre-hospitalization care at NRC was deficient. The intake provider should have directly sent this diabetic with a black, foul smelling ulcer on his toe to the ED for emergency consultation and assessment for gangrene and osteomyelitis. NRC's failure to change dressings and re-evaluate the ulcer for seven days after reception minimized any opportunity to prevent amputation. The delay in transferring this patient to the ED contributed to the development of sepsis and jeopardized his life. The intake lab test identified syphilis; treatment should have been started during the seven days prior to hospitalization. Upon return to NRC, his abnormal syphilis test was not flagged for treatment and he was not treated until 1/29/18 (five weeks after his return from the hospital). The abnormal lab should have been quickly identified and treatment initiated immediately after his admission to the infirmary on 12/22/17. The infirmary physician clearly neglected to review the patient's previous test results upon admission to the infirmary. During his infirmary stay, the provider never once commented on the status

---

[79] Infirmary Patient #1.

of the amputation wound site nor documented an examination of his feet. As a post-hospital return, the physician should have been initially writing progress notes at least three times a week. Provider notes were only written weekly. His post-hospital course was neglectful. Five-and-a half weeks after his return to NRC, he still had not been seen by a podiatrist and a vascular surgeon as recommended on 12/22/17. During his infirmary stay, the provider never commented on the control of the patient's diabetes. HbA1C, microalbumin-creatinine ratio, retinal screening, and an examination of the other foot was not documented in the progress notes. Pneumococcal vaccination was not offered or administered. At every stage of this patient's care the standards of care in the community were not followed.

- This patient was hospitalized from 11/2 to 11/8/17 for altered mental status, falls, and post-procedure for burr holes.[80, 81] On 11/8/17, he returned to NRC and was admitted to the infirmary. MD admission note on 11/9/17. Diagnoses included type 2 diabetes, incontinence, decubitus ulcer, lymphoma on chemotherapy, and history of DVT, with IVC filter. On 11/28/17, lymphoma chemotherapy was completed. On 12/5/17, retinal vein occlusion was noted, urgent eye referral requested. On 12/7/17, MD called the eye consultant and had the patient's eye appointment moved up. On 12/11/17, the eye consultant recommended anti-VEGF injection, but the patient refused. On 12/15/17, anticoagulation was restarted. On 12/19/17, INR was 1.8, warfarin dose was increased. On 12/26/17, INR was 4.9, on 12/27/17, INR was held. On 1/2/18, INR was 2.1. On 1/18/18, the patient consented to treatment in eye clinic. On 1/20/18, the warfarin dose was increased; the rationale for this increase was not documented. On 1/27/18, INR was 6.6; the warfarin was stopped for three days. On 1/29/18, a repeat INR was ordered.

In summary, this patient with multiple chronic problems developed an eye problem. The infirmary provider appropriately advocated for an urgent eye appointment and helped convince the patient to accept treatment. The patient was successfully treated. Provider wrote 14 progress notes during the patient's 84 days in the infirmary addressing some more acute bladder, eye, and anti-coagulation concerns. However, it is very questionable to restart anticoagulation in a patient with an IVC filter who had a recent subdural hematoma and who was prone to falls. The provider's note did not provide any rationale for this decision. The INR test was performed five times between 12/9/17 and 1/29/18, two of which had results which were elevated. Since returning from the hospital, the provider did not comment about the control of the patient's diabetes, did not order a HbA1C, microalbumin-creatinine ratio, adjust the insulin dosage even though FSBG ranged from 70-273, and did not offer/administer the pneumococcal vaccine.

---

[80] Infirmary Patient #2.
[81] Burr holes are holes drilled through the skull to allow accumulated blood to be evacuated. These are typically done for persons who have subdural hematomas.

- This patient was admitted to NRC on 1/3/18.[82] Diagnoses: alcohol, cocaine, and hallucinogen abuse, Cryptococcal meningitis as a child that required a VP shunt. On 1/9/18, the patient reported that he was beaten by other inmates. On 1/11/18, he reported that he fell out of his upper bunk injuring his ribs, hand, and maybe his head. Mental health reported that he was delusional and grandiose. On 1/19/18, hand and rib x-rays were normal. The patient was placed on watch in the mental health crisis unit. On 1/20/18, he was transferred to a medical infirmary bed for altered mental status. MD note: r/o dementia, hypertension, and bipolar disorder. On 1/22/18, the RN noted that the patient had periods of confusion. On 1/23/18, a doctor noted that the patient was answering questions but had no dementia. On 1/24/18, an RN described the patient as incoherent. On 1/26/18, an RN described the patient as disoriented but pleasant. On 1/28/18, the patient was less confused. On 1/29/18, an RN described the patient as more alert. On 1/30/18, an RN stated that the patient had bruises on his forehead and top of his head.

   In summary, there is no documentation of a neurological exam on this confused and disoriented patient. Fluctuating mental status with transient episodes of confusion and disorientation in a patient with alcohol abuse, recent trauma, and a VP shunt clearly warranted a head imaging study (CT scan) to rule out an intracranial hematoma or increased intracranial pressure. The provider did not note the patient's recent history of trauma, the recent fall from his bed, the bruises on his head, or the VP shunt. It is clear that he did not review the patient's ambulatory medical record. The provider did not even consider these different possibilities. The care of this patient was deficient if not negligent.

- This patient was transferred from Hill Correctional Center.[83] He was admitted to the infirmary on 12/23/17. Diagnoses included recent fractured jaw with intramedullary fixation, insulin resistant diabetes mellitus on NPH, and sliding scale regular insulin. On 12/26/17, an oral surgery consultant rewired his jaw. On 1/2/18, a doctor wrote an infirmary admission note 10 days after admission to infirmary. On 1/10/18, a doctor documented low glucose and glucagon was ordered with a subsequent increase of the glucose to 378. On 1/13/18, a RN noted that the inmate was shaking and unresponsive; the blood sugar was 37 and glucagon and oral glucose were given. On 1/13/18, a doctor ordered that sliding scale insulin be held. On 1/14/18, an RN noted a blood sugar of 34. MD again ordered that sliding scale insulin be held. On 1/16/18, a nurse noted blood glucose of 42 and food was given. On 1/17/18, an RN noted blood glucose of 433 and a doctor was called. On 1/22/18, sliding scale insulin was resumed. On 1/23/18, a doctor decreased sliding scale insulin dosages. A urine test of protein was 150. On 1/24/18, the patient was referred to oral surgery. On 1/25/18, the NPH insulin dosage decreased. On 1/26/18, the NPH dosage increased.

---

[82] Infirmary Patient #3.
[83] Infirmary Patient #4.

In summary, this patient who is on insulin had intermixed episodes of hypo and hyperglycemia. His jaw was wired, and his nutritional intake was entirely liquid. Even though he was using a lower sugar content nutritional supplement, the calorie intake can widely vary. This puts him at risk for surges and drops in his glucose levels. The infirmary provider does not comment on this nor is a treatment plan developed that addresses the risks of giving sliding scale insulin to a patient with a wired jaw and unable to eat normally. Insulin dosages were increased and decreased without the provider commenting on the rational for each change. The provider's note does not comment on whether this patient has Type 1 diabetes mellitus (produces no insulin and is at risk for ketoacidosis) or Type II (produces insulin and is at decreased risk of ketoacidosis). There may be very limited risks of ketoacidosis and regular insulin may not be needed. The lack of a clear plan about caring for this diabetic who temporarily is unable to eat solids has put this patient at serious risk. The urinalysis reported an elevated level of protein. This test was not repeated nor was a microalbumin-creatinine ratio ordered to determine if this patient should be placed on an ACE inhibitor to protect his renal function. No routine labs were drawn. The patient's renal function was not evaluated. HbA1C was not ordered. Pneumococcal vaccine was not offered or administered. The IDOC diabetes guidelines are not being followed.

## Pharmacy and Medication Administration

**Methodology:** We conducted a comprehensive review of pharmacy and medication services from the time a medication order is written until medication is delivered to the patient. We met with health care leadership and staff involved in pharmacy and medication services, toured pharmacy and medication administration areas, observed medication administration, reviewed medication administration records and continuous quality improvement meeting minutes and reports.

### First Court Expert Findings
The First Court Expert Report noted that no security staff was initially available to escort nurses for medication administration. The report also noted that nurses transfer medications from a pharmacy dispensed blister-pack to small white envelopes that nurses use to transport medications to housing units. Officers were supposed to open up food ports so the nurse could administer medications, but this did not take place and medications were passed through a crack in the door. Neither nurses nor correctional staff performed oral cavity checks.

### Current Findings
Our review was consistent with the findings in the First Court Expert report. We found that pharmacy and medication administration practices do not assure the five "Rights" of medication administration: the right patient, the right medication, the right dose, the right route at the right time. Our review noted the following problems:
- At medical reception, nurses administer medications to patients from a stock supply, but do not consistently initiate a medication administration record (MAR) and document that medications were administered to the patient.

- Medical records do not contain physician order forms for all ordered medications.[84]
- The nursing medication room is dirty, cluttered, and disorganized. There is no schedule of sanitation and disinfection activities.
- Nurses transfer medications from a properly labeled pharmacy dispensed blister pack into a small white envelope that is not properly labeled.
- To prepare medications, nurses do not consistently compare the MAR against the medication blister pack to ensure that the medication matches the physician order; instead, nurses use white envelopes that are not properly labeled.
- The white envelopes are repeatedly used and not hygienic.
- Inmates are not requested to present their identification badges at the time of medication administration.[85]
- Nurses pass medications to patients through a crack in the cell door, not the food ports.
- Inmates do not have cups to fill with water to take their medications.
- Neither officers nor nurses perform oral cavity checks.
- If inmates are out of cell at the time of medication administration there is no procedure to go back later to administer the medication, even if it is a once a day medication.
- Nurses do not document administration of medications onto a MAR at the time they are administered.
- BosWell Pharmacy prints MARs for the following month for any prescription written by the 15th of the month, requiring nurses to handwrite MARs for all medications orders from the 16th to the end of the month, creating an enormous nursing workload and increasing the risk of transcription errors.
- Review of multiple MARs show numerous blank spaces, demonstrating that nurses do not document the administration status of each medication dose.
- Monthly pharmacy/CQI audits throughout 2017 show pervasive and systemic medication issues, including blanks on MARs, administering medications beyond stop dates, and pharmacy and nursing medication errors.
- Health care leadership has not developed or implemented an effective corrective action plan to address the systemic medication issues.

Information supporting these findings are noted below.

<u>Pharmacy Services</u>

BosWell Pharmacy Services is a national company that provides medication services to NRC through a "fax and fill" process. BosWell dispenses medications in blister packs that are either patient-specific or for stock supply. We interviewed two pharmacy technicians who reported that for prescriptions faxed to BosWell before 2:30 p.m. each day, medications are received within 24 hours via United Postal Services (UPS). Prescriptions faxed after 2:30 p.m. are

---

[84] Physicians write medication orders in two places: a physical examination form or progress note, and a physician order form that is used to fax the order to the pharmacy. We found that some records contained the medication order only on the progress note and there was no physician order form. It is unclear whether the physician did not write the order on the physician order form or whether it was not filed in the medical record.

[85] There are typically two inmates to a cell. Inmate ID badges are posted in the window of the cell rather than the inmate presenting his ID to a nurse.

received in two days. If medications are urgently needed, staff uses a local pharmacy, Jewel-Osco Pharmacy in Joliet, Illinois.

Transcription and Filling of Medication Orders

We toured the rooms where pharmacy technicians receive and sort medications. The rooms were clean and well organized. However, there is a faucet and sink covered with mineral deposits that impede sanitation and disinfection. Pharmacy technicians have established an accountability system for stock medications in which nurses sign out a stock medication blister pack for each patient. Narcotics are not stored in these medication rooms.

A large volume of prescriptions are generated at medical reception. Providers typically write orders onto a physical examination form as a component of the treatment plan and also onto a physician order form which is to be faxed to the pharmacy. However, we reviewed records in which the provider wrote the medication order only on the physical examination form and not a physician order form. *Since the physician order form is the document faxed to pharmacy, this poses a risk that the medication order will not be faxed to the pharmacy.*

After the provider writes the medication order, a reception nurse reviews it and determines whether it is a Keep on Person (KOP) medication available in stock supply in the medical reception area. If so, the nurse retrieves the medication from stock supply, writes the patient's name on it and delivers it to the patient. The nurse writes the number of tablets given to the patient beside the medication order on the physical examination form and/or physician order form. This enables a BosWell pharmacist to know not to fill the prescription. A concern is that when nurses give the patient stock medications, some nurses transcribe the medication order onto a MAR and document that the medication was administered and some nurses do not. *Therefore, some patients are administered medications for which there is no MAR documenting that the patient received the medications.*

Some medications are not administered to the patient in medical reception because it is not available in stock supply, is a nurse administered medication (e.g., psychotropic), or is non-formulary. Nurses do not transcribe these medication orders onto a MAR at reception. The prescription is forwarded to a pharmacy technician who faxes the order to BosWell. Because a nurse did not create a MAR at reception, if for any reason the medication order is not faxed to BosWell or the medication is not received from BosWell, medication nurses do not know to expect the medication and to follow-up if the medication has not been received.

When a medication delivery arrives from BosWell, a pharmacy technician checks off what medications were received along with corresponding BosWell generated MARs. A pharmacy technician separates KOP medications from Nurse Administered (NA) medications and determines the patient housing locations. Pharmacy technicians write MARs for some KOP medications from the blister pack, not the original provider order. A registered nurse does not review these MARs for accuracy with the original physician order. Medications and MARs are transported to the nursing medication room for storage in medication carts and subsequent administration to patients.

<u>Medication Administration</u>

The nurse's medication room is cramped, disorganized and dirty. Metal shelving used to store medical supplies is rusted with bent shelves. Medication cart surfaces are dirty, with tape residue on carts. The refrigerator containing insulin and other medications was not clean. There is no sanitation schedule for cleaning the room or refrigerator. Narcotics are double-locked.

Because inmates are locked down at NRC, nurses deliver medications cell to cell. We observed nurses preparing medications for administration in the medication room. Nurses compared MARs against medication blister packs to ensure the accuracy of the order and then pop medication out of the blister pack into their gloved hands. Nurses then placed medication(s) into a small white envelope that is labeled with the name of the patient, ID, housing location, and name of the medication. The envelope did not contain order start and stop dates. The same envelope is used repeatedly. Thus, nurses transferred medications from pharmacy dispensed properly labeled containers to improperly labeled containers. Nurses then placed medication envelopes into a clear plastic bag to take to the housing units. Nurses did not transport MARs to the housing unit along with the medications.

We accompanied a nurse escorted by a correctional officer to R unit. Each cell had one or two inmates. For each patient receiving medication, the nurse called out the inmate's name and informed him she had medication. The nurse did not identify the patient by having him state his name and a second identifier (e.g., date of birth, inmate ID number). Instead, the nurse looked at the inmate's identification badge taped to the window. The nurse then passed the medication envelope to the patient through a crack in the door rather than an open food port. The patient took the envelope, poured medication into his hand and passed the envelope back to the nurse through the door crack. Several inmates did not have cups of water to take their medications. The nurse asked patients if they had their juice carton from breakfast to fill with water to take medication. Some did and some did not. Neither the nurse nor the officer attempted to perform oral cavity checks.

The nurse did not document administration of the medication onto the MAR at the time she gave the medication. We asked the nurse what happens if the patient is out of cell when she came to the housing unit, and she replied that the patient would miss his medication for that dose. There is no procedure to determine where the patient is and make arrangements to deliver the medication at a later time, even if the medication is to be taken once daily. We reviewed nursing documentation on multiple MARs and found numerous blank spaces, indicating that nurses did not document the administration status of each dose of medication (e.g., given, refused, etc.).

The process we observed is problematic for several reasons:

- Repeated use of the same envelopes is not hygienic, particularly because they are handled by the patient and returned to the nurse.
- We observed torn envelopes which would allow one or more medications to fall out unnoticed.

- Inmates may refuse one or more of the medications, and if they are similar in appearance (both are a small white pill) the nurse will not know which medication to administer and which not to administer.
- In three cells, the light was not working and it was difficult to see and positively identify the patient.[86]
- Failure to perform oral cavity checks for high risk medications (e.g., narcotic, psychotropic, etc.) increases the risk of drug diversion or non-adherence.
- The failure of the nurse to have the MAR and document administration of medications at the time they are given does not meet standards of nursing practice.

Moreover, while we observed nurses preparing medications using the MAR and medication blister pack, CQI minutes show repeated medication errors because nurses used the medication envelope rather than the MAR to prepare medications. Medication audits and CQI minutes throughout 2017 also show pervasive problems with nurses' failure to document on the MAR for scheduled doses.

Changing Medication Administration Records Over at the End of the Month

At the end of each month, BosWell sends a pre-printed MAR for every prescription continuing into the next month that was written before the 15th of the month. The cutoff date of the 15th means that at the end of each month, nurses must handwrite MARs for all medication orders written from the 16th to the end of the month. This equates to hundreds of MARs and is a huge workload. Handwriting each medication order increases the risk of transcription errors with resulting medication errors.

We observed the impact of this practice during the site visit. On 2/1/18, staff reported that nurses on the evening and night shifts were unable to "flip" or transcribe the MARs to February. Several nurses were hurriedly transcribing the MARs and preparing medications for the morning pass, but stated that they would not be able to finish transcribing the MARs before passing medications. The nurses reported that completing transcription of the new MARs would take place on the evening shift. When we asked the nurses how they would document administration of medications given to patients that morning, they did not have an answer. NRC pharmacy technicians proactively suggested that if the cutoff date for BosWell to send pre-printed MARs was the 27th or 28th of each month, the nursing workload would be dramatically reduced, as well as the risk of transcription and medication errors.

Renewal of Chronic Disease Medications

There is not an effective system for timely renewal of chronic disease medications following arrival. At intake, providers write chronic disease medications for a duration of 30 days and refer the patient to the chronic disease program for follow-up. Nurses reported that they review MARs for expiring chronic disease medication orders to notify the provider. However, as

---

[86] The inmates in these three cells reported that the lights had been out in their cells since they arrived at NRC. In two cases the inmates had been at NRC for over a month, since 12/21/17. We reported the names of these inmates to the Superintendent. The following day we were informed that the inmates had been moved to other cells and that the cells were "condemned."

noted earlier in this report, nurses do not consistently transcribe MARs for chronic disease medications given to patients at intake. Therefore, there will be no MAR in the book to alert nurses that the medication order requires renewal. If the patient's chronic disease appointment is scheduled to take place prior to 30 days, providers can reorder medications to ensure continuity of medications; however, our review showed lapses in medication renewals.

Continuous Quality Improvement (CQI) Minutes and audits performed in 2017 show systemic and pervasive problems with pharmacy and medication administration at NRC.[87] These include:

- Pharmacy dispensing errors
- Medication carts that are not clean
- Nurses preparing medications using medication envelopes (with incomplete and incorrect information) instead of using the MAR, which is the legal order for the medication, using the wrong envelope
- Failure to transcribe medication orders onto the MAR
- Medication blister packs not matching the MAR
- Missing medications
- Nurses not documenting on MARs following medication administration
- Nurses not documenting medication order stop dates onto the MAR and administering medications beyond stop dates
- Shortages of sharps, insulin, and tramadol
- Open insulin and Tubersol vials with no documented opening and expiration dates
- Lack of timely tracking and response to medication errors

The 2016-2017 Annual CQI report showed that pharmacy made 14 errors and nursing staff made 66 errors during the review period. However, with respect to nursing performance, this is a gross underestimation of errors when failure to document medication administration is included as an error of omission. Monthly medication room and MAR audits were performed showing systemic problems with medication discrepancies and documentation on the MARs. Of particular concern is the frequency with which audits showed the medication was not available in the medication cart or medication orders had expired and were not discontinued. However, the CQI report does not include root cause analysis, corrective action taken, and reevaluation of performance to determine if the root causes of the problems were addressed.

In summary, the medication administration system creates a systemic risk of harm to patients at NRC. The conditions of confinement (i.e., 24-hour lockdown) are a major contributor to the systemic risk of harm.

## Infection Control

**Methodology:** We interviewed health care leadership, reviewed the Infection Control Manual and other documents maintained related to communicable diseases and infection control.

---

[87] NRC Annual CQI Report 2016-2017.

**First Court Expert Findings**
The First Court Expert Report noted that there were no budgeted infection control positions and that infection control duties were add-on duties rather than a primary assignment.

**Current Findings**
Our findings are consistent with the First Court Expert's findings. NRC does not have an established infection control program. There is not a budgeted infection control position and infection control duties have not been formally assigned. Leadership reported that a physician assistant has assumed responsibility for submitting case reports to the state health department.

There is no schedule of clinic sanitation and disinfection activities in clinical areas. We found many clinical areas to be dirty and disorganized. Stretchers and chairs were torn and in disrepair, inhibiting infection control. This increases the risk of infection to patients and staff.

As noted earlier in the report, staff reads tuberculin skin tests (TST) through cell windows instead of inmates being escorted to the medical clinic for staff to properly read TSTs by palpating patient arms and documenting the results in the patient's medical record. Medical record review showed that staff does not record TST results in the record. We interviewed a staff member who reported that she records results in the medical record "if she has time."

CQI Minutes and Annual Report shows that staff collects data regarding communicable diseases, including HIV and hepatitis C antibody test results. There is no assessment of HIV, HCV, and TB infection rates among newly arriving inmates. CQI Minutes also report statistics regarding skin infections due to methicillin-resistant staphylococcus aureus (MRSA), but there is no meaningful discussion regarding their significance and whether measures can be taken to reduce the incidence of infection. Data does not include tracking of skin infections due to other pathogens.

As noted earlier in this report, the water supply at NRC is hard, with a high mineral content, causing mineral deposit build-up in pipes, faucets, and sinks throughout the institution. This impedes effective infection control. The institution would benefit from a water softening system, but there is no money in the budget for this expenditure.

In summary, NRC does not have an effective infection control program.

# Dental Program

## Dental: Staffing and Credentialing
**Methodology:** Reviewed staffing documents, interviewed dental staff, reviewed the Dental Sick Call Log and other documents.

**First Court Expert Findings**

- NRC had one full-time dentist, one 20-hour part-time dentist, two full-time assistants, and a full-time dental hygienist.
- One dentist was employed by the IDOC and the rest of the dental staff were Wexford employees.
- CPR training was current on all staff, and all necessary licensing was on file.

**Current Findings**

We concur First Court Expert that CPR training was current and necessary licensing was on file; however, we identified current and additional findings as follows. Staffing has decreased since 2014; there is one full-time dentist and dental assistant who are both Wexford employees.[88] The dentist who was present when the First Court Expert visited NRC was replaced approximately three years ago. There is no dental hygienist.[89] Moreover, the part-time dentist who assists with intake exams is at NRC approximately one-half day, rather than the 20 hours per week in the First Court Expert Report. However, the true staffing is difficult to ascertain because of the free flow of dental personnel between NRC and SCC.

A dentist from SCC assists with intake exams at NRC on Thursday afternoons when it is expected that substantially more examinations will be performed. CPR training is current for dental staff and all necessary licensing is on file; however, the dentist's DEA number is not on file.[90]

There are several impediments to evaluating the adequacy of NRC dental staffing. First, there is no clear delineation of how many hours SCC dental personnel spend at NRC. Even assuming the current staffing is adequate, the one dentist and one dental assistant *officially* assigned to NRC understates the actual staffing, which cannot be determined until we have an accurate accounting of the hours SCC dental personnel spend supporting NRC.

Second, since NRC has only one dentist assigned, when that dentist is ill or is on vacation, is there adequate coverage? The reports provided to us suggest that there was a lapse in coverage in the four-month period for which we reviewed sick call logs ("no Dr. in clinic 8/31/17-9/8/17").[91] Not only did inmates with painful dental conditions have to wait as many as eight days; but given the eight-day backlog, treatment was likely delayed afterwards until the dentist caught up.

---

[88] According to the NRC Staffing Spreadsheet, there is a vacant dental assistant position.

[89] Unless the mission of the dental program has changed markedly since the First Court Expert Report, it is difficult to understand why NRC needed a full-time dental hygienist, since only the small number of MSU inmates are eligible for comprehensive care (that generally includes a cleaning). While the First Court Expert Report noted that there was a full-time dental hygienist at NRC, the position is absent in the current NRC staffing. Oral prophylaxes (cleanings) are performed by the dentist on the small number of MSU prisoners who request them. The dental hygienist said that she does not treat NRC patients but does assist in the intake examination process. Moreover, she stated that she does not provide oral hygiene instruction to inmates at intake.

[90] "N/A" rather than a DEA registration recorded (Training Records NRC – Stateville, p. 10). Since this information was not made available, we did not have the opportunity to find out whether the dentist has a DEA number that is not on file or has no DEA number.

[91] The first entry in the sick call logs provided to us for a request received 9/6/17.

Finally, it is difficult to determine patient waiting time; that is, the time from making a request to receiving care. This will be addressed in the section on Dental Sick Call.

## Dental: Facility and Equipment

**Methodology:** Toured the dental clinic, radiology area, and dental intake area to assess cleanliness, infection control procedures, and equipment functionality. Reviewed the quality of x-rays and compliance with radiologic health regulations. Observed clinical care.

**First Court Expert Findings**

- The clinic consists of a single chair and unit which is over 20 years old and showing wear and tear. Free movement around each unit is acceptable. Provider and assistant have adequate room to work. There are two closet-sized rooms adjacent to the clinic for storage, the dental lab, and for sterilization. Some corrosion, fading, and rust is evident. Cabinetry is similarly old and worn. The compressor is in good condition. Hand instruments are in good condition and adequate. The x-ray unit is old but in good repair. Hand pieces are old, and many are not functioning.
- Overall, the clinic was well enough equipped and the dentist felt all equipment was in good shape and functional. She expressed some difficulty in getting equipment repaired due to a lack of funds and administrative support.
- The Panelipse [panoramic] x-ray units are old but functional.

**Current Findings**

Facilities and equipment have deteriorated since the First Court Expert's Report, particularly the two inadequate panoramic radiograph units in the intake processing area that will be discussed *infra*. However, we identified current and additional findings as follows.

The dental clinic consists of a single chair and unit, and intraoral x-ray device that are approximately 20 years old.[92] All equipment is in working order except for the film processor, which was out of service for at least three years.[93] The dentist stated that it had been repaired recently but necessary chemicals were not on hand. Hand instruments are in good condition and hand pieces are old but functional. The counters are intact and can be disinfected adequately. There is no equipment replacement plan. This is particularly important for the panoramic x-ray devices, which are subject to heavy use due to the high volume of initial exams.

The First Court Expert noted that the equipment was old but serviceable, although many hand pieces were not functioning. Several years after those findings, a dentist reported that repairs were needed on the dental drill ("[w]e are working with 2 right now").[94] At the next meeting, he reported, "[n]eed repairs on drill and equipment. ASR is done. Referred to Ken Harris office

---

[92] We asked for documentation of the age of all dental capital equipment that has yet to be provided.
[93] The dentist did not feel that the lack of an intraoral film processor was a major problem, since in his opinion a panoramic x-ray is sufficient for diagnosing dental decay. This is highly problematic and will be addressed later in this report.
[94] August 15, 2017 NRC Quality Improvement Meeting Minutes, p. 1.

now. Need 2 new and 1 repaired. If all can be repaired, we don't need new."[95] The next month, he reported, "[n]o repairs on drill and equipment. Paperwork redone last Tuesday. It is over $500, so @Springfield level to approve (not Doug or Warden}. Joe making call to Ken Harris to update dental ASR. Less hands involved with ASR' s is needed."[96]

The dentist said that equipment maintenance was currently not a problem and that all his hand pieces had been repaired; however, given the recent problems with untimely repairs, there appears to be a systemic problem.

The two rooms adjacent to the dental treatment area are small and cluttered. There is an unserviceable autoclave on the floor under a counter in the sterilization room. We were informed that it will be disposed of when the appropriate approvals are obtained.

A panoramic x-ray unit is in the radiology area and is operated by the dental assistant. There was a lead apron in the radiology area; however, the dental assistant took a panoramic x-ray on patients who were not wearing an apron. [97]

While protective eyewear is available for patients, it is not used consistently because the dentist felt it was not necessary. [98],[99] There is no sphygmomanometer or stethoscope in the clinic.

## Dental: Sanitation, Safety, and Sterilization

**Methodology:** Reviewed Dental Administrative Directives, toured the dental clinic and dental intake exam area, observed dental treatment room disinfection, interviewed dental staff, and observed initial examinations and patient treatment.

**First Court Expert Findings**
- Appropriate surface disinfection was performed between each patient.

---

[95] September 19, 2017 NRC Quality Improvement Meeting Minutes, p. 2.

[96] October 24, 2017 NRC Quality Improvement Meeting Minutes, p. 2.

[97] Dental Radiographic Examinations: Recommendations for Patient Selection and Limiting Radiation Exposure. American Dental Association and Food and Drug Administration (2012), p. 14. (While radiation exposure from dental radiographs is low, it is the dentist's responsibility to follow the ALARA Principle (As Low as Reasonably Achievable) to minimize the patient's exposure. Dentists should follow good radiologic practice and (*inter alia*), use protective aprons and thyroid collars.)

[98] Guidelines for Infection Control in Dental Health-Care Settings ---2003. MMWR, December 19, 2003/ 52(RR17):1:16; pp. 17-18. ("PPE [personal protective equipment] is designed to protect the skin and the mucous membranes of the eyes, nose, and mouth of DHCP [dental health care provider] from exposure to blood or OPIM [other potentially infectious materials]. Use of rotary dental and surgical instruments (e.g., handpieces or ultrasonic scalers) and air-water syringes creates a visible spray that contains primarily large-particle droplets of water, saliva, blood, microorganisms, and other debris. This spatter travels only a short distance and settles out quickly, landing on the floor, nearby operatory surfaces, DHCP, *or the patient*. The spray also might contain certain aerosols (i.e., particles of respirable size, <10 μm). Aerosols can remain airborne for extended periods and can be inhaled" and "Primary PPE used in oral health-care settings includes gloves, surgical masks, *protective eyewear*, face shields, and protective clothing (e.g., gowns and jackets). All PPE should be removed before DHCP leave patient-care areas (*13*). Reusable PPE (e.g., clinician *or patient protective eyewear* and face shields) [...]"). Emphasis added. Moreover, protective eyewear provides protection against objects or liquids accidentally dropped by the provider.

[99] Why we Take Infection Control Seriously. UIC College of Dentistry. Viewed at https://dentistry.uic.edu/patients/dental-infection-control, viewed February 2, 2018 ("We use personal protective equipment [...] *as well as provide eye protection to patients for all dental procedures*."} Emphasis added.

- Protective covers were utilized on many of the surfaces and most instruments in cabinets were properly bagged and sterilized. The intake examination mirrors were bagged and sterilized in bulk. All hand pieces were sterilized and in bags.
- The sterilization area is in a small closet-like room that is unkempt and cluttered, adjacent to the dental clinic. It has inadequate work space to maintain proper sterilization flow from dirty to sterilized to storage. The ultrasonic cleaner sits between the sink and the autoclave. There was not a biohazard label posted in the sterilization area.[100]
- Safety glasses were not always worn by patients and warning signs were not posted where x-rays were being taken to warn pregnant women of possible radiation hazards.

**Current Findings**

Dental sanitation, safety, and sterilization have deteriorated since the First Expert's Report, primarily due to inadequate hand and surface sanitation by the dentist in the intake area (discussed *infra*). We concur with the findings in the First Court Expert's report. However, we identified current and additional findings as follows.

The dental treatment room was disinfected appropriately between patients and protective covers were used on all surfaces. Instruments were properly bagged and sterilized. All hand pieces were sterilized in bags.

The sterilization area is in a small cluttered room contiguous with the dental clinic. Because the room has inadequate counter space, it is difficult to configure the area to accommodate sterilization flow from dirty to sterilized to storage (as noted by the First Expert). The ultrasonic cleaner sits between the sink and the autoclave. As noted by the First Court Expert, safety glasses were not always worn by patients, and warning signs were not posted where x-rays were being taken. [101]

## Dental: Review Autoclave Log

**Methodology:** Reviewed the last two years of entries in autoclave log, interviewed dental staff, and toured the sterilization area.

**First Court Expert Findings**

- Spore testing was performed weekly and was documented. No negative results were recorded.

**Current Findings**

---

[100] CFR 1901.145(e)(4). "The biological hazard warning shall be used to signify the actual or potential presence of a biohazard and to identify equipment, containers, rooms, materials, experimental animals, or combinations thereof, which contain, or are contaminated with, viable hazardous agents.")

[101] Occupational Safety and Health Standards – Toxic and Hazardous substances. 29 CFR 1910.1096(e)(3)(i). "Each radiation area shall be conspicuously posted with a sign or signs bearing the radiation caution symbol and the words, CAUTION RADIATION AREA". Emphasis in original.

Autoclave log maintenance had improved since the First Expert's Report and is adequate. The sterilization log for the past two years was in order. Testing was performed weekly and documented. No negative results were recorded.

## Dental: Comprehensive Care

**Methodology:** Interviewed dental staff, reviewed randomly selected dental charts of an inmates who received non-urgent care from Daily Dental Reports. Comprehensive, or routine care[102] is non-urgent treatment that should be based on a health history, a thorough intraoral and extraoral examination, a periodontal examination, and a visual and radiographic examination.[103] A sequenced plan (treatment plan) should be generated that maps out the patient's treatment.

**First Court Expert Findings**
- Because of the rapid turnover of inmates, most of the records reviewed were very recent from the transient, short-term population.
- Inmates who received non-urgent care received neither a comprehensive examination (to include examination of the soft tissues, a periodontal assessment, and bitewing or periapical x-rays). Nor was a treatment plan documented and they do not receive oral hygiene care as part of the treatment.
- Oral hygiene instructions were never documented. Restorations were provided from the information from the panoramic radiograph, which is not diagnostic for caries.
- There were many record entries that pain medication and/or antibiotics were provided with no documented examination or diagnosis. Many record entries also were "n/s" (no show) and/or reschedule.[104]

**Current Findings**
Comprehensive care is unchanged from the First Court Expert's Report and remains inadequate; and we concur with the First Court Expert. Moreover, we identified current and additional findings as follows.

While most of NRC inmates are assigned for classification and will be transferred to other facilities within several weeks, approximately 188 in the MSU who are housed at SCC and work at NRC are candidates for comprehensive care at NRC. However, the MSU inmates do not stay long; so, at any given time, there are relatively few dental charts of inmates who have received comprehensive care. Since NRC does not have an electronic health record, identifying inmates who have had comprehensive care was challenging and only one[105] such chart was located.

---

[102] Category III as defined in Administrative Directive 04.03.102.
[103] Stefanac SJ. Information Gathering and Diagnosis Development. In Treatment Planning in Dentistry [electronic resource]. Stefanac SJ and Nesbit SP, eds. Edinburgh; Elsevier Mosby, 2nd Ed. 2007, pp. 12-15, *passim*.
[104] This will be addressed in the discussion of failed appointments in a later section.
[105] Patient #1 had a composite restoration placed based solely on a panoramic x-ray and without a periodontal assessment or a treatment plan. Furthermore, the chart entry was not legible.

Most of the dentist's time is spent doing intake exams, which are scheduled for Monday, Tuesday, Thursday, and Friday, with the remainder of the dentist's time spent providing urgent care for the newly arrived inmates. A small amount of routine care (principally fillings) is provided to the MSU inmates.

Daily Dental Reports from October 2017 through January 18, 2018 document all dental procedures performed and show that most of the procedures were exams and palliative treatments related to urgent care.[106]

Dr. Gambla said that he did not perform a comprehensive examination and produce a treatment plan before providing routine care to MSU inmates because, in his opinion, that is not the mission of his clinic. He said that he bases his routine treatment on the panoramic x-ray from the initial exam and feels that it is sufficient for identifying the problems he treats.[107] In fact, he could not take intraoral radiographs, since the film processor in the clinic was inoperative for three years.

Just as he does not base routine treatment on intraoral x-rays, he stated that does not perform periodontal probing on patients for whom he provides routine care, although there are periodontal probes in the clinic.[108] Failing to perform a periodontal screening using probing is below accepted professional standards and can lead to under diagnosis of periodontal disease, delayed treatment, and preventable tooth loss.[109]

While the primary mission of the NRC dental program is performing intake exams and providing urgent care to a transient population, inmates who receive routine treatment should receive the same standard of care that they would receive at any other IDOC facility. That they do not is highly problematic and subjects these patients to risk of harm.[110]

---

[106] The Daily Dental Report summarizes the treatment provided to each inmate. It records the procedure (exam, filling, extraction, cleaning), as well as whether the procedure was palliative. Moreover, it records whether an analgesic or antibiotic was dispensed.

[107] Dental Radiographic Examinations: Recommendations for Patient Selection and Limiting Radiation Exposure. American Dental Association and U.S. Food and Drug Administration, 2012. Table 1, pp. 5-6. (Dentate or partially dentate adults who are new patients receive an "[i]ndividualized radiographic exam consisting of posterior bitewings with panoramic exam or posterior bitewings and selected periapical images." Furthermore, recall patients should receive posterior bitewing x-rays every 12 to 36 months based on individualized risk for dental caries. With respect to periodontal disease, "[i]maging may consist of, but is not limited to, selected bitewing and/or periapical images of areas where periodontal disease (other than nonspecific gingivitis) can be demonstrated clinically.")

[108] Stefanac SJ. (A panoramic radiograph has insufficient resolution for diagnosing caries and periodontal disease. Intraoral radiographs (e.g., bitewings) and periodontal probing are necessary), p. 17. Also, (Periodontal Screening and Recording (PSR), an early detection system for periodontal disease, advocated by the ADA and the American Academy of Periodontology since 1992, is an accepted professional standard.), pp. 12-14. See American Dental Hygiene Association. Standards for Clinical Dental Hygiene Practice Revised 2016, pp. 6-9. (Periodontal probing is also a standard of practice for dental hygiene.)

[109] Makrides, N. S., Costa, J. N., Hickey, D. J., Woods, P. D., & Bajuscak, R. (2006). Correctional Dental Services. In M. Puisis (Ed.), Clinical practice in Correctional Medicine (2nd ed., pp. 556-564). Philadelphia, PA: Mosby Elsevier, p. 560 (Early diagnosis of periodontal disease is important since the disease is often painless and the prevalence of moderate to severe periodontal disease in correctional populations is high and often not associated with pain).

[110] It is possible that the inadequate comprehensive care reflects insufficient dentist staffing. This should be considered when NRC dental staffing is revisited.

Dental: Intake (Initial) Examination[111]

**Methodology:** Observed the initial examination process; reviewed 20 dental records of inmates that have been screened recently; reviewed Dental Administrative Directive; and reviewed NRC CQI Reports.

The "Initial Examination" is governed by Administrative Directive 04.03.102 (¶II F 2), which states (*inter alia*) that

> Within ten working days after admission to a reception and classification center or to a facility designated by the Director to accept offenders with disabilities for a reception and classification center, each offender shall receive a ***complete dental examination by a dentist***.[112]

**First Court Expert Findings**

- The dental screening [initial] examination is a cursory mirror and direct view examination of the intra-oral structures, a Panelipse [panoramic] radiograph, and a very sketchy health history. The teeth are charted for pathology from the direct examination and from the Panelipse x-ray. One dentist was there to screen over 70 inmates.
- The inmate was standing while being examined. The examiner's hands never entered the oral cavity. The exam was very quickly done, taking about 15 seconds. Lighting was poor. Mirrors came from a bulk package of sterilized mirrors from the NRC dental clinic. The Panelipse x-rays are taken two at a time in the same small room.
- The inmates wear no lead apron protection, nor are there any signs warning of radiation hazard. The radiographs are taken and developed by inmates from the MSU, a satellite of NRC.[113] They also reload the cassettes that hold the film. The films are developed, dated, and labeled with inmate information.

**Current Findings**

While aspects of the intake examination have improved marginally since the First Court Expert's Report, the improvement is more than outweighed by the dentist's inadequate hand sanitation and surface disinfection. Our findings with respect to the inadequacy of the intake examination are consistent with those of the First Court Expert; however, we observed patients examined while seated[114] using improved illumination rather than standing using poor lighting – only a marginal improvement. Unlike the First Court Expert, we did not observe radiographs taken by inmates; however, we did observe that panoramic x-rays were taken on inmates who were not

---

[111] The First Court Expert Report describes the examination performed at intake screening as a "Screening Examination;" however, Administrative Directive 04.03.102 describes it as a "complete dental examination." We use the terminology of the Administrative Directive and refer to the intake or initial dental examination as a complete dental examination.

[113] We did not observe an inmate taking the x-rays. Inmates taking x-rays would be in violation of the Illinois Dental Practice Act.

[113] We did not observe an inmate taking the x-rays. Inmates taking x-rays would be in violation of the Illinois Dental Practice Act.

[114] Dr. Orenstein, an SCC dentist who performs initial examinations, said that both he and the patient stand "because there is not enough time to seat the patient." A hurried dental examination performed on a standing patient is inadequate on its face and below accepted professional standards.

wearing a lead apron with a thyroid collar.[115] The intake examination has not changed materially and remains inadequate. Moreover, we identified current and additional findings as described below.

In 2017, NRC performed intake processing on 15,942 inmates. All inmates have a panoramic x-ray taken and receive a cursory direct-view oral examination that includes a taking scanty health history.[116]

The dental examination area is a small room with two panoramic x-ray devices set approximately four feet apart and two rooms that have non-functional dental chairs and working dental lamps. Neither room has a sink. Patients sit on straight-backed chairs or stand when they are examined.

Of 20 panoramic x-rays from initial exams performed January 23, 2018, nine (45%) were clinically inadequate,[117] characterized by poor contrast (washed out) or the presence of artifacts that interfered with interpretation.[118] The NRC dentist did not see this as an area of concern, since he felt that the films were adequate for his purposes (i.e., the initial exam) and if a film is not adequate, he has it retaken. The inconsistent quality was due to a combination of a failing x-ray unit and film processor, and inadequate operator technique.[119] There was no signage in the radiograph area warning of radiation hazard.[120]

Although Administrative Directive 04.03.102 requires that dentists chart the oral cavity, none of the intake records we reviewed contained such a charting.[121] Furthermore, the diagram for the charting is too small for the charting to be legible and should it be expanded substantially.

We observed Dr. Gambla perform initial examinations. Both he and the patient were seated; with the patient seated in a straight-backed chair. He worked without a dental assistant and did his own recording.[122]

---

[115] Dental Radiographic Examinations: Recommendations for Patient Selection and Limiting Radiation Exposure. American Dental Association and Food and Drug Administration (2012), p. 14. (While radiation exposure from dental radiographs is low, it is the dentist's responsibility to follow the ALARA Principle (As Low as Reasonably Achievable) to minimize the patient's exposure. Dentists should follow good radiologic practice and (inter alia), use protective aprons and thyroid collars.)

[116] The health history taken at the exam (Appendix 3, Fig. 1) is inadequate because it is too abbreviated and omits information necessary for safe dental care.

[117] Dental: Intake (Initial) Examination Patients #1, 2, 3, 8, 9, 11, 12, 14, and 20.

[118] Our findings were confirmed by an SCC Quality Improvement Study in which intake examination charting was compared with the results of clinical examinations performed on the same patients. Of the 21 NRC charts, 62% had no charting of pathology (e.g., "abscessed teeth, teeth that needed extraction, [and] periodontal disease, (+3) mobility in teeth, grossly decayed teeth, impacted wisdom teeth in the maxillary sinus, and numerous visible dental caries"), with the remainder having only a partial charting. Furthermore, "in all the patients reviewed, visible heavy tartar [calculus] was never charted or indicated. The periodontal needs were never indicated" and "the dental radiographs from NRC varied in diagnostic quality"). Stateville Annual CQI 2016-2017_2, p. 32.

[119] We asked to see documentation that the panoramic x-ray devices had been calibrated or inspected by a therapeutic radiological physicist; however, none was produced.

[120] Each radiation area shall be conspicuously posted with a sign or signs bearing the radiation caution symbol and the words, "CAUTION RADIATION AREA". Occupational Safety and Health Standards – Toxic and Hazardous substances. 29 CFR 1910.1096(e)(3)(i). Emphasis in original.

[121] ¶III F (2(b).

He donned gloves, selected mouth mirrors from a bag of sterile mirrors that he opened and placed on a bracket table before the first exam. A standard dental light illuminated the patient's mouth. He reviewed the panoramic x-ray and took a cursory health history. He used one or two mirrors to reflect the cheeks and adjusted the light for optimal illumination. While his gloved hands did not always touch the patient, in approximately half the exams we observed, they touched the patient's face, lips, or mouth. He did not change gloves between patients consistently. In fact, there were several instances where he examined a patient wearing the gloves he used to touch a previous patient's mouth or face. He did not wash hands between patients because the exam room had no sink. [123]

Even when he changed gloves between patients, he used the same (unsheathed) pen to perform his recording; a source of cross-contamination. Similarly, the handles used to position the dental light had no disposable covers and were a source of cross-contamination. Finally, when he reached into the pile of mirrors wearing gloves worn for a previous exam, he ran the risk of contaminating the other mirrors. The dentist performed initial exams the following day, examining at least seven patients without changing gloves.

The dentist did not perform a thorough soft tissue examination.[124] For example, he did not visualize the lateral and posterior regions of the tongue, a potential site of squamous cell carcinoma.[125] Performing a thorough soft tissue examination is critical at the initial exam, since unless the inmate requests care, his next exam will be biennial.[126]

Our nursing expert observed the dentist perform initial exams on 2/1/18 and reported that he did not change gloves between patients. ***In fact, he did not have a box of gloves in the room***.

All dental charts of inmates who receive an initial examination have a stamp that indicates that oral hygiene instructions were provided; however, this did not occur in the examinations we observed.[127] Moreover, the dental program reported 12,477 hygienist contacts at intake in

---

[122] The exam has improved somewhat since the First Court Expert Report: now the lighting comes from a dental operatory light; however, the exam is still grossly inadequate.

[123] Centers for Disease Control and Prevention. *Summary of Infection Prevention Practices in Dental Settings: Basic Expectations for Safe Care*. Atlanta, GA: Centers for Disease Control and Prevention, US Dept. of Health and Human Services; October 2016, p.7.

[124] Stefanac SJ. ("Evaluation of head and neck structures for evidence of tissue abnormalities or lesions constitutes an important part of a comprehensive examination."), p. 12. See also Shulman JD, Gonzales CK. Epidemiology/Biology of Oral Cancer. In Cappelli DP, Mosley C, eds. Prevention in Clinical Oral Health Care. Elsevier (2008) ("Regular, thorough intraoral and extraoral examination by a dental professional is the most effective technique for early detection and prevention of most oral cancers. [...]") p. 41.

[125] This is generally done by holding the anterior portion of the tongue with 2x2 gauze and reflecting the tongue with a mouth mirror. This is a professional standard for an oral examination. National Institute of Dental and Craniofacial Research. Detecting Oral Cancer. A Guide for Health Care Professionals.

[126] This deficiency is compounded by the fact that dentists do not document soft tissue examinations at biennial exams. See section on Comprehensive Care, *supra*.

[127] The 'uniform record system' sponsored by the American Dental Association is the Code on Dental Procedures and Nomenclature. "In August 2000 the CDT Code was designated by the federal government as the national terminology for reporting dental services on claims submitted to third-party payers." Oral hygiene instructions (Dental Procedure Code D1330) "may include instructions for home care. Examples include tooth brushing technique, flossing, the use of special oral hygiene aids." See Dental Procedure Codes, 2015, American Dental Association Dental Procedure Codes, 2015, pp. 1, 16.

2016-2017.[128] The SCC hygienist stated that she assists with the intake exams by charting from the panoramic x-ray or taking x-rays; however, she does not provide oral hygiene instruction. Furthermore, adequate oral hygiene instructions cannot be performed in the time allotted to the initial exam.

## Dental: Extractions

**Methodology:** We reviewed records of inmates that have had extractions, reviewed Daily Dental Reports October 2017 through January 2018, and interviewed the dentist.

**First Court Expert Findings**
- Documentation was poor. For example, none of the records examined had a diagnosis or reason for extraction included as part of the dental record entry.
- Antibiotics were provided to every patient post-operatively who had a dental extraction, even if not indicated.

**Current Findings**

Dental extraction care has not improved materially since the First Court Expert's Report and remains inadequate. Our findings with respect to inadequate documentation are consistent with those of the First Court Expert; however, we note that none of the patients had post-operative antibiotics prescribed. Moreover, we identified current and additional findings as follows.

Only seven patients had teeth extracted between October 2017 and January 18, 2018 as documented in the Daily Dental Reports for that period. Of five records of patients who had extractions, the quality of documentation was poor. None of the records documented the diagnosis of the tooth that was extracted.[129] All extractions were accompanied by a signed consent form that listed the tooth number; however, there was no diagnosis. For consent to be informed, the reason for the procedure must be clearly stated. None had post-operative antibiotics prescribed or dispensed. All patients had recent preoperative x-rays; however, patients #4 and #5 had teeth extracted based on panoramic x-rays that were clinically inadequate because they did not provide a clear view of the entire tooth.[130]

## Dental: Removable Prosthetics

**Methodology:** Reviewed Daily Dental Reports from October 2017 through January 18, 2018 and interviewed dental staff.

---

[128] The dental program consistently includes "hygienist contacts" or "hygienist contacts/intake." See, for example, NRC Annual CQI Report, 2016-2017, 2 (12,477), NRC Monthly Continuous Quality Improvement Meeting, January 16, 2018, 3 (870).

[129] Dr. Gambla said that he knows what the SOAP format is but does not use it.

[130] Extracting a tooth without an adequate preoperative radiograph deprives dentists of the ability to (1) determine that the case is beyond their skill level or unsuitable given the equipment limitations of the clinic, so the patient can be referred to an oral surgeon; (2) assess a potentially difficult procedure so they can adjust the surgical approach accordingly; and (3) ensure that the necessary equipment is available. Furthermore, an adequate pre-operative radiograph can serve as evidence of a potentially life-threatening condition such as a hemangioma.

**First Court Expert Findings**
- A comprehensive examination and treatment plan was never part of the treatment process.
- Periodontal assessment and treatment was not provided in any of the records. Because there is no comprehensive examination, or any treatment plans developed and documented in any of the records, it is almost impossible to ascertain if all necessary care, including operative and/or oral surgery treatment, is completed prior to fabrication of removable partial dentures.

**Current Findings**
We did not locate any records that documented the fabrication of complete or partial dentures. In fact, no dentures were fabricated between October 2017 and January 18, 2018 per the Daily Dental Reports for that period.

## Dental: Sick Call/Treatment Provision

**Methodology:** We interviewed dental staff; reviewed and randomly selected charts of patients listed in the Dental Sick Call Log from 10/3/17 through 1/22/18, reviewed Daily Dental Reports from 10/3/17 through 1/17/18, reviewed records of seven inmates who were seen on sick call, and reviewed recent intake examination records.[131]

**First Court Expert Findings**
- Inmate requests are logged into a large bound ledger indicating complaint, date of request and date of appointment. In none of the progress notes reviewed was mention made of the inmate complaint; the only entry was the provided treatment.
- The average appointment date was seven days from the date of the request. A review of several records revealed that they were often seen later than that due to the high no-show and reschedule rate. Many of the inmates had transferred out of NRC by the time of their appointment.
- Often the treatment was prescribing pain medication or an antibiotic with no documentation as to why they were prescribed. Approximately 50% of requests are complaints of pain, swelling, or toothaches.
- Routine care is accessed from the request form and the inmates are seen within 14 days and treatment started. There is no waiting list and reschedules are seen within 14 days.

**Current Findings**
Our findings are consistent with those of the First Court Expert and we noted no material improvement in dental sick call, which remains inadequate. Moreover, we identified current and additional findings as follows:

Inmates who want to see the dentist (or other health care provider) communicate the request on a piece of piece of paper which they pass through cracks in the cell door since no standard

---

[131] Dental Bates, pp. 40-46.

health care request forms are available.[132] These slips are typically picked up by officers or health care staff or given to nurses at medication pass. Once collected, inmate health requests are transported to the medical clinic and placed in an open bin in the main medical clinic. A more detailed description of the process is in the Sick Call section, *supra*.

Per dental staff, requests for dental care are placed in a basket on a counter across from the dental clinic and are recorded in a log kept in the dental clinic.[133] While the log records the date of request and the date the inmate was scheduled, it does not capture the date the inmate was treated. Consequently, waiting time for treatment cannot be determined without reviewing individual dental charts.

The Dental Sick Call Log from 10/3/17 through 1/22/18 contained 228 entries, approximately 90 percent of which stated pain or conditions that more likely than not were associated with pain. The median time from request to **scheduled appointment**[134] was two days. Requests received Monday through Wednesday had a median schedule time of two days while those received Thursday and Friday had a median of four days.

**Median Time for a Dental Sick Call Appointment**

| Day Request Received | N | Median Wait Time (days) |
|---|---|---|
| Monday | 84 | 2 |
| Tuesday | 35 | 2 |
| Wednesday | 41 | 2 |
| Thursday | 46 | 4 |
| Friday | 22 | 3 |
| Monday-Wednesday | 160 | 2 |
| Thursday-Friday | 68 | 4 |
| All Days | 228 | 2 |

Among inmates whose request suggested a painful condition, one waited eight days, two waited seven days, seven waited six days, and nine waited five days to be scheduled. This is **not** time to treatment, which cannot be determined from the available data and is likely to be longer if patients are rescheduled.

There is no triage process, with routine care provided to inmates other than those in the MSU, who will be transferred shortly. Many inmates who are scheduled do not appear for their appointments.

---

[132] See discussion of Nursing Sick Call earlier in this report.

[133] The First Court Expert noted that the dental sick call requests were recorded in the Offender Request Log; however, this is not done consistently. The dental clinic keeps its own log which contains the inmate's name ID, nature of the request, date received by the dental clinic, and date the patient was scheduled.

[134] Since appointments were often rescheduled, the actual wait time for treatment for those inmates was longer.

There is no process for nurses, when the dentist is not available, to perform a face-to-face examination on a dental patient who states they have pain to identify pain and infection, and provide analgesics and referral to a mid-level or advanced level provider if immediate treatment is necessary.

Dr. Gambla said that when he sees patients with an urgent care need at intake screening, he tells them to submit a request for an appointment and will occasionally dispense antibiotics for patients with a dental abscess.[135] Of five records of these patients, all had inadequate documentation as to the diagnosis for which the antibiotic was dispensed.[136]

## Dental: Orientation Handbook
**Methodology**: Reviewed the Orientation Handbook.

**First Court Expert Findings**
- The NRC is included in the Stateville Offender Orientation Manual. It addresses the orientation screening exam, but in little detail. It states only that the inmate will receive one as soon as possible.
- It explains how to access emergency care but does not explain the requests form system for accessing urgent and routine care. It describes the hours of operation, partial dentures, appointments and cleanings.

**Current Findings**
Inmate orientation to dental care has improved marginally since the First Court Expert's Report. NRC now has its own orientation handbook, so the First Court Expert's findings are moot. However, we identified current and additional findings as follows.

NRC now has its own Orientation Handbook; however, it erroneously states that every reception offender will receive a ***complete*** dental exam at NRC.[137] As discussed supra, the initial examination performed at NRC is in no way a complete exam. Moreover, there is no explanation of the process for accessing urgent and routine dental care.

## Dental: Policies and Procedures
**Methodology:** Reviewed Administrative Directives that deal with the dental program, interviewed dental staff, reviewed dental charts, toured dental clinical areas, and reviewed NRC organizational chart.

**First Court Expert Findings:** None.

**Current Findings**

---

[135] The dental clinic has limited stock of antibiotics and non-narcotic analgesics.

[136] Progress note mentioned that the Patient #3 did not want the problematic tooth extracted, but there is no refusal in the record.

[137] NRC Offender Handbook, April 19, 2017, ¶IV B.

The IDOC dental programs are governed by Administrative Directive 04.03.102 (effective 2012). While the First Court Expert did not include this in the findings (although it was available for review), we nonetheless find that dental policies and procedures are inadequate for reasons stated below.

The NRC dental program is governed by Administrative Directive 04.03.102, amended 1/1/2012. It specifies that within 10 working days after admission to a reception and classification center, offenders shall receive "*a complete dental examination by a dentist*" (¶F2; emphasis added).[138] In addition, the dentist should chart the oral cavity.[139] The priorities are Category I (emergency),[140] Category II (urgent care),[141] Category III (comprehensive/routine care),[142] and Category IV (low-priority care).[143]

While Administrative Directive 04.03.102 mandates a charting of the oral cavity, the tooth diagram on the chart used for charting restorations and missing teeth (Appendix 3, Fig. 4) is too small. Furthermore, in none of the records reviewed was there evidence of its having been used.

The dentist did not have a thorough understanding of the classification priorities and did not have the Administrative Directive in the clinic. He said that he was "oriented to the Administrative Directive by Wexford." To illustrate this, Patient #15 had a tooth that was noted as IIa[144] (see Appendix 3, Fig. 2), yet no disposition was indicated (Appendix 3, Fig. 3).[145] The dentist should either treat the tooth at NRC or indicate on Figure 3 that it should be treated immediately at the receiving institution.

## Dental: Failed Appointments

**Methodology:** Reviewed the Dental Sick Call Log, interviewed dental staff, and reviewed Daily Dental Reports.

**First Court Expert Findings**

---

[138] Administrative Directive notwithstanding, in actual practice, the dentist at NRC performs a screening, not a complete examination (see discussion of comprehensive care *supra*). The NRC initial dental examination we observed contravenes the Administrative Directive. Either this was not noticed or was noticed and ignored in the semi-annual internal audits of the dental program per ¶C. Note that this error is also reflected in the ¶IV B of the NRC Offender Handbook.

[139] And document it in the dental chart (Appendix 3, Fig 4). The dental hygienist said that when she does a charting, it is not based on examining the patient's mouth but from the panoramic x-ray.

[140] Bleeding, pain, and acute infection.

[141] A condition, if left untreated, that would cause bleeding or pain in the immediate future (IIa); an oral infection or oral condition which, if left untreated (IIb), a condition that results in difficulty in chewing (IIc).

[142] A medium to large non-painful carious lesion (IIIa), localized gingival involvement (IIIb), tooth fractures (IIIc), deteriorated temporary, sedative, or intermediate restorations that have deteriorated extensively (IIId) and a broken or ill-fitting prosthetic device (IIIe).

[143] Small carious lesions (IVa), costly restorative procedure (IVb), severe non-functional bite and malocclusion (IVd).

[144] "An oral condition, if left untreated, that would cause bleeding or pain in the immediate future." Administrative Directive, Attachment A.

[145] There are three choices: 1) schedule immediately at R&C, 2) schedule routine exam at receiving institution, and 3) schedule immediately at receiving institution.

- For a randomly selected 23-day period, there were 409 scheduled appointments, of which 165 patients were seen, which is only 40% of those who were scheduled. The remainder were rescheduled, transferred, or no-showed.
- Of the patients who could have been seen (scheduled minus transferred), 43% failed their appointment. The 20% who were transferred reflect the time from when they were logged into the appointment book to when they were scheduled and the understandable high and rapid turnover rate at the NRC.

**Current Findings**

The failed appointment issue has not improved since the First Expert's Report. We concur with the First Court Expert's findings. However, we identified current and additional findings as follows.

The findings in the dental sick call section confirm that failed appointments are a problem; however, because of the disorganized sick call system and inadequate record keeping, it is not possible to accurately determine an actual failed appointment rate. This appears not to be a priority at NRC. For example, while the Dental Report in the January 16, 2018 QI minutes list refusals, no information about failed appointments is provided. Similarly, while the number of refusals is reported in the Dental Department Annual Summary, there is no mention of failed appointments.[146]

## Dental: Care of Medically Compromised Patients

**Methodology:** Reviewed health history form and records from recent initial exams, observed the dentist taking health history at the initial exam, and interviewed the dentist.

**First Court Expert Findings**

- There is no system to identify medically compromised patients and red flag those that may need medical consultation prior to dental procedures. The health history review is cursory from the NRC screening examination.
- The dentist does not routinely take blood pressures on patients with a history of hypertension.

**Current Findings**

Documentation of the health history of medically compromised patients has not changed materially since the First Court Expert's Report and remains inadequate. We concur with the findings in the First Court Expert's report. Moreover, we identified current and additional findings as follows.

The health history (Appendix 3, Figure 1) is too limited and omits conditions relevant to dental care, for example, anticoagulant therapy. There is insufficient room on the form for adding information and the dentist does not routinely update the medical history. Blood pressure is not routinely taken on patients who have a history of hypertension.

---

[146] NCR CQI 2016-2017 Annual Report, part 3, pp. 24-30.

Dental: Specialists
**Methodology:** Interviewed dental staff.

**First Court Expert Findings**

An oral surgeon is utilized by the NRC for oral surgery services. The inmates are scheduled and managed from SCC. More complicated cases, such as facial fractures and those requiring general anesthesia, are referred to Joliet Oral Surgeons, a local group. The information is maintained at SCC.

**Current Findings**

We concur with the findings in the First Court Expert's report. Moreover, we identified current and additional findings as follows. The dentist refers patients who require complex extractions to SCC, which schedules them for oral surgery. Since the details are not maintained at NRC, this issue will be pursued at the SCC visit and will withhold opinions as to the program's adequacy.

Dental: CQI
**Methodology:** We reviewed CQI minutes and reports and interviewed dental staff.

**First Court Expert Findings**

- The dental program contributes monthly statistics to the CQI committee. The NRC participates with the SCC CQI Committee meetings, as part of the entire dental program. These minutes are maintained at SCC.
- No studies were in place for the NRC at the time of this visit. In light of the number of program weaknesses, this is unacceptable.

**Current Findings**

The NRC dental CQI program has not improved materially since the First Court Expert's Report. We concur with the findings in the First Court Expert's report about the inadequacy of CQI studies and note that NRC now has an independent CQI committee. We were not provided with any CQI studies related to the dental program when we were at NRC.[147] With the many deficiencies identified by the First Court Expert and corroborated by this report, the dental program provides a fertile field for studies.

# Internal Monitoring and Quality Improvement

**Methodology:** Interview facility health care leadership and staff involved in quality improvement activities. Review the internal monitoring and quality improvement meeting minutes for the past 12 months.

**First Court Expert Findings**

---

[147] The NRC 2016-2017 CQI Calendar indicated that there was a dental study planned for January 2017. We were subsequently provided with reports of two studies at our SCC visit.

The First Court Expert found that the NRC and SCC quality improvement meetings were conducted as a single meeting, but that there were no NRC QI studies. Because there were no logs (reception, sick call, urgent care, emergency send-out log, and offsite specialty log) there was no data available to examine whether there was a problem. The First Court Expert recommended that the quality improvement program must be re-energized with knowledgeable leadership that has been provided specific training regarding quality improvement philosophy and methodology. The First Court Expert also recommended that the leadership of the continuous quality improvement program must be retrained regarding quality improvement philosophy and methodology, along with study design and data collection.

**Current Findings**

We agree with all findings of the First Court Expert. NRC now has its own CQI program with separate meetings, which is an improvement. The CQI program, however, remains ineffective. The remaining findings of the First Court Expert remain unresolved.

We identified new findings which include the following:
- The "Traveling Medical Director" provides no leadership for the CQI effort.
- No one in NRC leadership is familiar with current CQI methodology, study design, or data collection. The method of improving CQI at NRC as proposed by IDOC has not been effective.[148]
- The CQI coordinator has no training in CQI, does not understand how to perform or lead CQI work, and is so busy that CQI work is a low priority.
- The NRC CQI plan is generic and does not detail a year-ahead view of their CQI work. This is not a plan. The NRC and SCC CQI plans and Medical Director's reports are identical, indicating that these facilities are not yet performing their own quality improvement.
- NRC is not compliant with multiple requirements of their CQI AD, including:
  - NRC does not maintain a CQI manual onsite.
  - NRC does not monitor whether Wexford performs primary source verification of its physicians working at NRC.
  - NRC does not monitor offsite medical care for quality.
  - NRC does not perform the number of studies in accordance with requirements of the CQI AD.
  - There are no studies that review the quality of medical care.
- NRC fails to use data in a manner that identifies problems.
- Data presented in several studies appeared unreliable.
- The CQI report presents statistical data which has little value from a quality perspective.
- Half of the six studies NRC chose to perform were in areas where there were no problems, thus yielding 100% audit results. While it is useful to know areas that are working well, there were so many problem areas that attention should be given to problem prone areas.

---

[148] Page 5 in IDOC comments regarding First Court Expert's report in a letter to Dr. Shansky from William Barnes on 11/3/14.

- The annual CQI report repeatedly documents errors in medication administration yet there was no attempt to discover why this was occurring.
- Wexford's physician and physician assistant peer review differs significantly in comparison with our record reviews. We question its reliability.

The leadership at NRC has not effectively initiated a CQI program. The HCUA started nine months ago and inherited a facility that had not had a full-time and effective HCUA for years. The Medical Director position was vacant for a year before being filled for two months and then vacated again. The current Traveling Medical Director does not provide strong leadership. The HCUA told us that the DON position was vacant for years before being filled in September of 2017. Additionally, because quality improvement work was not being done when the HCUA arrived, she had to start from the beginning. While no quality improvement work was being done at the time of the First Court Expert's report, there has been some progress, but the CQI program is not yet operational or effective.

The IDOC AD requirement is that each facility develops a CQI program that provides "systematic, on-going objective monitoring and evaluation of the quality and appropriateness of offender care."[149] This is not being done. The Chief Administrative Officer is required by the IDOC AD to designate a CQI coordinator to lead that effort. The Warden is the Chief Administrative Officer. The person the Warden designated to be the CQI coordinator was the Director of Medical Records. That person left service sometime last year and the CQI position was vacant. Two months ago, the Warden appointed the newly hired Director of Medical Records to be the CQI coordinator. This person has undergraduate and master's degrees in Health Information Management, but she has no experience or specific training in quality improvement. The lack of knowledgeable leadership recommended in the First Court Expert's report is still not in place. It appears to us that this position is assigned to medical records staff because of the need to have someone organize the paperwork requirements of the CQI committee, including the mandated studies and the meeting minutes. While secretarial and organizational work is important, the main requisite of a CQI coordinator is someone who has the leadership capacity, skill, and expertise to identify problems and provide the leadership to solve the identified problems, and to ensure that the various disciplines are trained and enabled to perform quality improvement work. That is not a skill or expertise of the current CQI coordinator. This coordinator would not be able to train any staff on how to engage in CQI work. She is very well qualified to manage a medical record program but not a CQI program.

Except for attending CQI meetings, the new coordinator has not spent time performing or leading any CQI studies. The time she dedicates to CQI is a few hours a month reviewing data obtained for the CQI reports. Moreover, because the medical records program is in disarray, this person will not be able to dedicate much time to CQI work. She has not read the CQI AD yet and could not answer any questions with respect to the responsibilities of CQI. She did not have a plan of action and was not able to answer questions about how CQI was performed at NRC or how she might lead the CQI effort. The HCUA sat in on the interview with the CQI coordinator

---

[149] Administrative Directive 04.03.125 Quality Improvement Program policy statement.

on CQI activity and the HCUA responded to the questions, as the CQI coordinator did not know the answers.

The IDOC AD requires that the Agency Medical Director develop and maintain a CQI manual which the HCUA is to maintain locally. The HCUA did not have this manual onsite. The AD requires a CQI plan. The NRC CQI plan is present in the annual CQI report. The CQI plan has no specifics and lists only general goals such as improve quality, update programs, maintain standards, ensure patient rights, and work toward complying with NCCHC standards. These general goals do not constitute a CQI plan of action for the upcoming year. The plan does not state what it attempts to study over the upcoming year or discuss the main problems at the facility and how their CQI work will address those problems. The NRC plan is ineffective. It could be recycled year after year without modification and gives no indication of how the CQI program will be engaged in the upcoming year. We also note that the NRC and SCC CQI plans are identical. These are separate facilities and should have different plans. The Medical Director report for NRC is also identical to the SCC report, with the exception that the SCC report includes a sentence about accreditation.

Multiple requirements of the IDOC AD on the quality improvement program were not being accomplished at NRC. The AD requires a one-time primary source verification of credentials of licensed staff. NRC could provide no verification that this has occurred for their NRC physician. The annual CQI report verifies license and current DEA license, but this was done in 2016-17 and at that time the physicians listed were different from the current physician. In any case, this is not primary source verification of their credentials. Primary source verification is discussed in detail in the section on physician staffing in the section on Leadership, Staffing and Custody functions.

The IDOC AD requires that there is a monthly 100% review of appropriateness *and quality* of offsite medical care. Quality of care is not investigated at all based on CQI reports. Statistics about the number of referrals offsite is given, but there is no analysis or review with respect to quality. We were told by the HCUA that the Medical Director evaluates all hospitalizations and determines if they are appropriate. The HCUA or DON also send an email to the IDOC regional coordinator notifying them that a patient is going to be hospitalized. When the regional coordinator believes it is necessary, he/she may call the Agency Medical Director to determine whether the admission is appropriate. This process only evaluates hospital necessity. It does not evaluate, for example, the quality of care at NRC to determine if with adequate care the offsite or hospitalization could have been prevented. A mere statistical listing of hospitalizations and offsite consults fails to satisfy, in our opinion, the AD requirement to evaluate quality of care.

CQI studies are summarized in an annual CQI report. Studies performed in the CQI program are organized according to a schedule that is defined in the AD for CQI, which at NRC are memorialized in a calendar such that certain studies are done in certain months. NRC performed six studies in only four of the seven medical program areas required by the AD to be

studied on an annual basis. In the 2017 annual CQI minutes dated September 26, 2017, the studies (excluding mental health and injuries) performed to satisfy the AD included:

1. An outcome study that all laboratory results are received from UIC within 72 hours.
2. An outcome study on sick call that sick call slips are reviewed within 24 hours and treatment protocols are used.
3. A process study of chronic illness clinics that laboratory reports are received, signed, and dated within 24 hours and subsequently filed in the medical record correctly.
4. A process study of non-formulary medication that from the request to delivery of medication be less than four days.
5. An outcome study of whether the baseline clinic for a chronic illness problem is done within 30 days of arrival for all patients.
6. An outcome study of sick call that patients are evaluated at RN sick call and referred as per the AD.

None of the outcome studies performed included an acceptable clinical outcome. Clinical outcomes are end point measures of health status. These might be, for example, mortality, hospitalization, an HbA1C level of 7 or less, or normal blood pressure. An outcome study measures interventions that may affect the studied outcome. An example would be to study the effect of colorectal cancer screening on mortality or the effect of increasing the interval of chronic clinic visits on obtaining a normal blood pressure. The studies performed at NRC were not based on a clinical outcome but on performance measures. This demonstrates a lack of understanding of the meaning of outcome studies.

NRC should be credited with having started the CQI process. It is a step forward to have performed these studies. However, study choice and design is not meant to merely obtain a good audit result but is meant to identify problem prone areas, study them and attempt to improve quality of care. Also, this is a health care organization and there were no studies of clinical outcomes or quality of care. These studies have not yet reached that standard. We also note that one of the First Court Expert's findings is that because of the lack of adequate logs which track services, there is a lack of data available to understand whether a problem existed in any area of service. We agree with that finding. Limited data is available at NRC for use by the CQI program. The CQI studies did not appear to rely on adequate data needed to draw a conclusion with respect to the quality of service.

For studies 1, 3, and 4 listed above, it does not appear that these studies are problems at this facility. It is not unexpected that the results were all 100% or at goal. The First Court Expert report documented, for example, that labs were consistently drawn prior to chronic care. Yet one of the few studies done was to assess whether the lab reports were signed before a chronic care clinic. Notably this was 100%. With many known problems at the facility, why choose items which are known to not be problematic?

Study 2 was a study on whether sick call slips were reviewed within 24 hours and whether protocols were completed. We note in the section on nursing sick call that sick call slips have been destroyed and that sick call slips are not all retained. We question the reliability of data

used in this study based on our findings on the sick call process. Also, item 2 studies only whether a protocol was used, not whether the right protocol was chosen or whether the quality of nursing care was adequate. This study fails to critically address this process. Its value as a CQI study is limited. We could not evaluate item 6 because the methodology and data were not included in the annual CQI report.

Study 5 involved an issue that was brought up in the First Court Expert report and we agree with the concept of this study, which is a study of whether newly arrived patients with chronic illnesses are evaluated in a chronic illness clinic within 30 days.  As described in the section on chronic illness, NRC fails to enroll all inmates with chronic illness and places only approximately 10% of chronic illness patients on their chronic illness roster. This study was listed as an outcome study, which it is not. Enrollment of persons in chronic illness clinic is a process. Since only 10% of persons with chronic illness are identified at intake, only 10% of patients with chronic illness were assessed as to whether they were seen within 30 days. The 90% of patients not on the chronic care roster are more likely to not have chronic care follow up as required by the AD. These factors were not identified. Also, the study merely studies whether a doctor saw the patient but does not monitor if the quality of care of the chronic clinic was adequate. As we note in multiple medical chart reviews in this report, it is our opinion that the quality of chronic care evaluations is poor. This study would have been improved if it had studied the process of enrollment into chronic care, including how patients are identified as having chronic illness, how they are enrolled in the clinic program, and where patients get missed.

There was an absence of review of quality of clinical care of nurses, physicians, and mid-level providers. It is a requirement of the contract with Wexford that peer review is regularly done.[150] We asked for but did not receive Wexford's peer reviews until a month after our tour. The quality of care in all areas of our record reviews showed quality problems. Yet the peer reviews failed to demonstrate quality issues or, when quality issues were identified, there was no apparent corrective action and the results were not reported to the CQI committee.

The peer review of the Traveling Medical Director at NRC was performed by the Medical Director at SCC. The Traveling Medical Director is a nuclear radiologist performing primary care. He was noted by the First Court Expert to have "clinical concerns" and is on a final written warning by Wexford for clinical performance. We also noted significant clinical problems for this physician. Yet this doctor had a peer review performed by a surgeon who was clinically inadequate based on our record reviews including mortality reviews of preventable deaths. The peer review included reviewing 25 intake records. Ninety-six percent of questions reviewed were adequate and the remaining 4% were not applicable. This doctor, for whom we identified multiple problems, was scored as 100% adequate in this review. It is our opinion that this is ineffective peer review.

---

[150] Contract between Illinois Department of Healthcare and Family Services and IDOC and Wexford Health Services; Item 2.2.2.19 Participate in physician peer review program and any audit/peer review conducted by an outside review source to ensure compliance with accepted professional standards of performance, which includes, but not limited to, chart reviews; p. 6 of contract.

The nuclear radiologist Traveling Medical Director reviewed physician assistants at NRC. Sixty-five episodes of care were reviewed, 673 questions were answered, 193 questions were not applicable. Of the remaining 480 questions reviewed, 67 questions (13.9%) were found inadequate. Nevertheless, all 65 episodes of care reviewed were found adequate without further explanation. Two reviews stood out. In one review the doctor documented that six questions were not applicable. Four items were found to be inadequate, including:

- Does the plan of care logically follow the history and physical?
- Does the provider account for all positive responses noted on this screening history?
- Are all fill-in areas completed with appropriate responses?
- Is the signature with professional designation legible?

Only two items were found adequate, including:

- Is the problem list complete with medication allergies?
- Is the handwriting legible?

Yet this episode of care was found adequate. One questions how the signature was illegible but the handwriting legible. More important, based on only having a problem list and legible handwriting, the intake assessment was found adequate. This is a defective review.

In another review, the intake physical examination was deemed adequate because the problem list was complete, the provider accounted for positive responses on the history, and the handwriting was legible. On the same record, the reviewer found that the care plan did not follow the history and physical, the intake form was incompletely filled out, a digital rectal examination was not completed based on patient age, and "yes" responses on the history were not explained. These peer reviews appeared to be done only to provide evidence that a peer review occurred. Based on our record reviews of intake assessments and sick call visits in comparison to results of these peer reviews, we find these peer reviews are not identifying important deficiencies of clinical care.

The First Court Expert opined that lack of leadership was a key factor in a lack of CQI activity. The new leadership group has not yet developed a CQI philosophy or sense of purpose in its CQI work. It is our opinion that the lack of understanding on how to perform CQI work is resulting in supervisory staff appearing to blame staff for bad results when the bad result is a systemic problem unrelated to individual employees. This is a failure of leadership to know how to analyze or correct a problem. We note two comments in CQI minutes:

- "Were 18 med errors last month. Corrective action training was held. AW [name deleted] questioned 'at what point do we take nurses' license? There is a progressive pattern and adverse patient reaction.'"[151]
- With respect to medication errors, a comment was made that "Nurses are responsible for accuracy. No excuses."[152]

---

[151] August 15, 2017 Quality Improvement minutes.
[152] September 19, 2017 Quality Improvement minutes.

These two comments were related to failure of nurses to adequately document on the MAR and failure to appropriately administer medications. These types of medication errors were reported almost every month, as recorded in the annual CQI report. Despite statistically describing the problem, there were no studies or analyses to determine a root cause of why so many errors are being made. This is poor CQI, because employees were held responsible for systemic problems that were likely related to staffing or other process problems that are the responsibility of management. We note, for example, that when nurses administer medication, there is often no support officer. Management has the responsibility to uncover the root cause of the errors and to develop corrective actions to address the systemic issue. Blaming individuals for systemic problems is misguided in our opinion.

We reviewed the last annual CQI meeting report of September 26, 2017. This report consists largely of a report of activity statistics which do not provide useful quality metrics. Tables list the number of provider and nursing encounters without any other variables that would measure the effectiveness or quality of the program. These lists have some usefulness for managers to project staffing needs, but their utility of CQI is limited. NRC does not have performance measures that give an indication of the effectiveness of their programs. Examples of such measures might be:

- Percent of hospital and specialty consultant reports or hospital discharge summaries that are present in the medical record after a consultation or hospitalization.
- The numbers of patients who actually show up for their clinical appointments and the reasons why they do not show up.
- Percent of records sent to destination IDOC facilities which are not properly complete and organized.
- The percent of patients identified with a chronic illness at reception who are found on the chronic care roster.

These types of statistical measures give the program a performance benchmark. We do not see these types of useful measures embedded in the NRC CQI reports.

Another example is the medication report in the annual CQI report of September 19, 2017. This provides a list of the numbers of medication prescriptions for certain types of medications. This type of report is useful for financial management purposes, but it is not useful to assess whether the processes of the pharmacy and medication programs are effective. For example, studies that measure the effectiveness of the medication program might include:

- The number of persons receiving their first dose of medication within 24 hours of a prescription.
- The percent of doses of ordered medication that a patient actually received.
- The number of patients who had disruption of long term medication.

The annual CQI report contains two useful pharmacy studies. One is a monthly audit of the medication rooms. While we did not verify the accuracy or effectiveness of this study, we do

agree with the concept of this study and believe that such audits do promote regular monitoring of the program.

The pharmacy also performs a monthly audit of 20 medication administration records (MAR) in order to assess four items:
1. Whether the start and stop dates are present on the MAR.
2. Whether the drugs in the cart match the MAR.
3. Whether allergies are listed on the MAR.
4. Whether there is documentation of all doses given.

This is a useful audit. We have several comments. Systems that have an electronic medical record can audit 100% of item 4 and perform the audit electronically and more accurately than can be done with paper records. We note that in the annual CQI report, over the course of the year, there was a persistent problem with documentation on the MAR. This persistent problem continued into 2018. Despite this continued identification of this problem, there was no effort in the CQI program to discover why this persistent problem continued. This routine audit continued to identify a problem yet there was no attempt to resolve it.

We also noted in the pharmacy section of this report that many patients do not have a MAR initiated even when they have ordered medication. These significant patient safety problems should be studied in CQI to determine the root cause in order to eliminate the patient safety concern.

Mortality review is part of the CQI program. There were 11 deaths in 2015-16 and only one death in 2016-17. The one death in 2017 included only a death summary and did not include an analysis of the death. This, in our opinion, does not constitute mortality review.

The IDOC requires internal and external reviews of the medical program. We have asked for but have not received the internal and external reviews for NRC.

With respect to the First Court Expert's findings, there is now a CQI program at NRC that is independent of SCC, which is an improvement from the First Expert's report. However, the CQI program is not yet effective and is not performing in a manner that can identify and correct system problems. In part this is a result of not having a CQI leader who understands how to start and maintain a CQI program. The lack of a CQI leader was also a finding of the First Court Expert. Also, though the leadership staff, with the exception of the Medical Director, is eager to learn, they do not have a strong foundation in quality improvement and it will take considerable effort to overcome that deficiency. We believe that the First Court Expert's recommendation to have a full-time quality improvement coordinator is one option to address this problem. Also, we agree with the First Court Expert's finding that without accurate logs and other "structural elements," self-monitoring is impossible to perform. We expand on that finding to state that there is an absence of data useful in self-monitoring. Data used to self-

monitor must be accurate and intentionally maintained for purposes of self-monitoring. The NRC leadership has not yet identified what data is needed and how to use that data to monitor.

In his report, the First Court Expert recommended a full-time quality improvement coordinator at each site. The IDOC stated in its response to this recommendation that the IDOC was committed to improving the CQI process but questioned the need for a full-time CQI coordinator. Since so little has been done to improve CQI and since staffing levels are so low, it is unlikely that staff with other responsibilities are likely to be able to effectively lead the CQI program. Under the circumstances at this facility, we would agree with the recommendation of having a qualified full-time CQI coordinator.

# Recommendations

## Leadership, Staffing, and Custody Functions

**First Court Expert Recommendations**

1. *We agree with the First Court Expert's recommendation to have its own leadership team.* The IDOC has now included a HCUA, Medical Director, and DON in NRC's budget allocation.

2. *We agree with the First Court Expert's recommendation that NRC should have its own staffing grid that precludes use of shared staff. NRC should have sufficient staff to meet its staffing needs. We would add to that recommendation the following:*

   a. *A staffing needs analysis be completed that would be based on current need and to include a relief factor.*

   b. *The analysis needs to be based on realistic workload evaluations that ensure adequate quality of care, including for physician and physician assistants.*

   c. *The staffing at NRC needs to include sufficient clerical staff, a qualified nurse to manage infection control functions, and a qualified quality improvement leader.*

**Additional Recommendations**

3. The Medical Director should be permanently filled with a board certified primary care physician.

4. The use of "Traveling Medical Directors" should not be permitted to contractually fill a Medical Director position. Failure to have a permanent Medical Director should incur contractual penalties. Coverage physicians should be used as necessary but coverage physicians should not constitute a filled Medical Director position.

5. Senior staff at the facility (HCUA, DON, and Medical Director), the IDOC Regional Coordinator, and Agency Medical Director should participate in development of reasonable schedule E and state medical employee staffing documents.

6. A correctional officer staffing analysis should be completed to determine if there are sufficient custody staff to ensure that patients are timely brought for scheduled appointments and that nurses are timely and safely escorted during medication administration.

7. The Wexford Regional Manager should have training in a medical discipline or in medical administration. This should be a contract requirement.

8. An orientation for new health care leadership should be provided so that they are familiar with requirements and responsibilities of their assignments.

9. The facility must have a current staffing document listing all staff.

10. The span of control of the IDOC Regional Coordinator is too large to effectively manage. The span of control should be reduced to increase the onsite time at each facility.

11. Sharing of staff between NRC and SCC should stop.

12. Staffing loads for providers must be reduced so that reasonable time is given to complete a reasonable evaluation of all patients.

13. The physician at this site should not be permitted to provide primary care medical care, as he is a nuclear radiologist, appears unfamiliar with primary care clinical management, and shows repeated clinical concerns. His privileges should be confined to areas for which he has training.

## Clinic Space, Sanitation, Laboratory, and Support Services

### First Court Expert Recommendations

1. There should be a designated exam room in each housing unit appropriately equipped for conducting sick call. *We agree with this recommendation.*

### Additional Recommendations

2. All space used for clinical care must provide privacy, confidentiality, equipment (exam table, oto-ophthalmoscope, handwashing, access to record, light, paper barrier, sanitary equipment, tongue depressors, gloves, and minor equipment), adequate space, and waiting space. This should include segregation areas.
3. There need to be sufficient clinical examination rooms for the number of simultaneous staff (providers, nurses, psychologists, psychiatrists) who need them by shift. There needs to be clinic space for nurses to perform sick call in segregation and in all other areas of service.
4. Clinic examination areas including intake need to be cleaned and sanitized on a regular basis. A sanitation schedule needs to be developed to ensure that this happens.
5. There needs to be an inventory of equipment and a replacement schedule for equipment based on expected life of the equipment.
6. The scheduling system must support the needs of clinical care.
7. Adequate supplies must be available to support the functions of the clinical areas. A standardized system of re-supply must be put into place.
8. There need to be routine environmental rounds.
9. Environmental rounds should include the date, names of participants, findings, and actions taken. The findings should be tracked and monitored by the quality improvement committee.
10. The nurse sick calls rooms on the housing units should be included on the sanitation schedule and equipped with exam tables, desks, chairs, and hand washing and drying supplies.
11. Exam tables in the clinic should have adjustable foot and head sections.
12. Paper memos and announcements currently taped on the walls in the clinical areas should be enclosed in plastic sheaths or removed as a fire safety precaution.
13. Broken clinical and office equipment should be expeditiously repaired or replaced.

## Medical Records

### First Court Expert Recommendations

1. The medical records of patients at NRC who remain beyond two weeks or who are housed at the minimum security unit must be managed in exactly the same manner as

patients at any permanent institution. *We disagree with the First Court Expert's recommendation that a medical record can be initiated after a two-week period. We agree with the IDOC AD and contemporary medical record standards that a permanent medical record be initiated upon arrival at NRC.*

2. Medical records staffing must be adequate to insure that records of patients who stay more than two weeks or who are housed in MSU are maintained in the same manner per DOC policy as records at permanent institutions. *We agree with the First Court Expert's recommendation that medical records staffing be adequate.*

**Additional Recommendations**

3. Mental health and dental records need to be incorporated into the record when the record is first initiated, which should be on the day of arrival. A medical record jacket should be completed at the conclusion of intake screening.

4. Medical records should be maintained in accordance with the IDOC AD on medical records 04.03.100 and in accordance with Illinois Department of Human Services guidelines.

5. The medical record room must be enlarged to accommodate the number of staff and records in use at this facility. The room must be made secure. Unauthorized persons must not be allowed to enter, pull, or re-file medical records.

6. A system needs to be put into place of identifying that a medical record has been pulled and who has the record.

7. Given the disorganization of the medical record and inability to provide access to clinicians to a complete and organized medical record, we strongly recommend that an electronic medical record be installed.

8. Consultation reports and offsite hospital reports must be obtained and filed in the medical record within the time period specified in the IDOC AD on Medical Records. Lacking a consultation report, the providers must promptly communicate with the consultant to identify the result of the consultation, recommended therapeutic plans, new diagnoses, and updated status of the patient.

# Medical Reception

**First Court Expert Recommendations**

1. The policy approach to NRC is inconsistent with the reality of service demands. The assumption that patients have their medical intake completed within a week and then are transferred out is not applicable to a substantial number of patients. Therefore, this philosophy must be changed. This is especially true for patients with chronic diseases or who need scheduled offsite services.

2. The intake assessment by an advanced level clinician must include questions regarding current symptoms and include the development of a problem list and relevant plan.

3. Sufficient resources should be available such that the physical exams can be completed within one week of arrival.

4. NRC must begin conscientiously using logbooks, either paper or electronic, for intake processing.

*We agree with the First Court Expert findings regarding the medical reception process. The exception is that with respect to receiving electronic data from Cook County Jail, we find that printed medical transfer summaries are adequate.*

**Additional Recommendations**

5. Health care leadership should develop and implement a medical reception tracking log that documents completion of all medical reception/intrasystem transfer activities.

6. IDOC should amend medical reception forms to include a comprehensive review of systems (ROS) to identify serious medical conditions.

7. At medical reception, a station should be established so that at the completion of the process, medical records staff initiates a green jacketed medical record for each patient, with documents filed under the correct tab.

8. Examination rooms should be adequately equipped and supplied, including paper for examination tables to provide infection control barriers between patients. Furniture that is torn or in disrepair should be replaced.

9. Staff should change gloves and wash their hands between patients.

10. Perform HIV testing via opt-out methodology, not opt-in methodology, with written consent.

11. Weight scales should be periodically calibrated (e.g., weekly).

12. Nurses should measure uncorrected and corrected visual acuity in each eye and document results in the medical record. If large Snellen charts are used, the nurse should ensure the patient stands the correct distance away from the chart. Consider smaller hand-held Snellen charts.

13. Nurses should correctly read tuberculin skin tests via palpation and measurement of induration. This should be done in a medical setting.[153]

14. Given problems with tuberculin skin testing and inability to track results, TB screening should utilize interferon gamma blood testing as the primary screening test for tuberculosis. The Mantoux skin test is logistically complicated, and its interpretation is prone to human error. Conditions at this facility make it impossible to adequately read the Mantoux skin test.

15. Nurses should timely document tuberculin skin test results in the medical record (e.g., within 24 hours).

16. Providers should document review of medical transfer information sent by county jails.

17. Providers should perform pertinent review of systems and medical history for each chronic disease and/or significant illness.

18. Providers should order CIWA and/or COWS monitoring in accordance with current guidelines for patients withdrawing from alcohol, opiates, or other drugs.

19. Providers should provide continuity of medications unless there is a clinical indication for changing medication regimens (e.g., glargine to NPH insulin, etc.).

---

[153] We give recommendations for the existing program of using Mantoux skin testing but make a strong recommendation to move to interferon gamma blood testing which, in our opinion, would significantly improve the process of screening.

20. Providers should document all significant medical conditions onto the patient's problem list.
21. Nurses should transcribe all medication orders (i.e., KOP and nurse administered) onto a MAR at medical reception and document administration of KOP medications at the time they are administered to the patient.
22. Health care leadership should develop systems to ensure that all physician orders are timely implemented (e.g., EKG, blood pressure monitoring, etc.).
23. Providers should timely follow-up on all abnormal labs.
24. Providers should use a chronic disease form when seeing patients for the first chronic disease appointment within 30 days.
25. Health care leadership should revise medical reception policies and procedures to provide sufficient operational detail to staff to adequately complete each step of the process.
26. Health care leadership should develop and monitor quality indicators related to each step of the medical reception process.

## Intrasystem Transfer

**First Court Expert Recommendations**
1. The intrasystem transfer process must be designed to insure continuity of care for identified problems. *We agree with this recommendation.*

**Additional Recommendations**
2. IDOC should revise its Administrative Directives to create a statewide policy and procedure regarding intrasystem transfers consistent with NCCHC standards.
3. IDOC should include requirements for an Intrasystem Transfer Tracking log to enable staff to track the provision of required services, such as enrollment into the chronic disease program, medication continuity, tuberculin skin testing, and periodic physical examinations.

## Nursing Sick Call

**First Court Expert Recommendations**
1. Officers must be eliminated from the procedures that enable inmates to request health care services; thus, inmates must either place the requests in a lockbox or give them to health care staff.
2. There must be ongoing professional performance review of both nurse sick call and advanced level clinician sick call, which includes feedback on individual cases in order to improve professional performance.
3. NRC must begin conscientiously using logbooks, either paper or electronic, for sick call.
*We agree with these recommendations.*

**Additional Recommendations**

4. Health care staff should ensure that inmates have daily access to medical request forms and writing implements to submit their health requests.
5. Lockable health request form boxes that are accessed only by health care staff should be installed in each inmate housing unit.
6. Inmates must be permitted out of their cells on a daily basis to confidentially submit their health requests into the health request boxes.
7. Health care staff should collect health care request forms seven days per week.
8. Health care staff should legibly date and time receipt of health requests.
9. A registered nurse should triage health requests and document a disposition on the form (e.g., urgent, routine). Nurses should legibly date, time, and sign the form, including credentials.
10. Each health request should be entered onto the sick call log, including the urgency of the disposition.
11. Health requests should be filed chronologically in the medical record.
12. A nurse should schedule patients to be seen in accordance with the urgency of their complaint.
13. Nursing sick call should be conducted in adequately lighted, equipped and supplied rooms with access to a sink for handwashing. This includes a desk and chairs so the nurse and patient can be seated and an examination table, otoscope, scale, etc. Consider installing lockable cabinets to store supplies (e.g., nurse protocol forms, gauze, tape, tongue blades, etc.).
14. Nurses should have the medical record available at the time of the sick call encounter.
15. A registered nurse should perform and document an assessment of each patient in accordance with treatment protocol forms and/or sound nursing judgment.
16. Nurses should refer patients to providers in accordance with the treatment protocol and in accordance with sound nursing judgment.
17. Health care leadership should develop and monitor quality indicators associated with each step of the sick call process.
18. IDOC/Health care leadership should revise policies and procedures to provide sufficient operational detail regarding the sick call process.

## Chronic Care

### First Court Expert Recommendations

1. The policy regarding chronic diseases must be that patients who remain beyond two weeks must have their initial chronic care visit at NRC before a total of 30 days have passed. This is clearly the case routinely for higher security inmates. *We agree with the First Court Expert's recommendation with a comment. It is our opinion that the initial intake evaluation should identify all chronic illnesses and establish an initial therapeutic plan for each patient with chronic illness. Waiting 30 days for this to occur will result in patients not receiving adequate continuity of care. It is our opinion that the initial intake evaluation needs to adequately identify and initiate an adequate therapeutic plan for all patients with chronic illness. We find this does not now occur. We agree that a follow up chronic illness visit should occur within 30 days.*

2. NRC must begin conscientiously using logbooks, either paper or electronic, for the chronic disease program. *We agree with this recommendation. The chronic disease program must have an accurate roster of persons with chronic illness. Our opinion is that this can be most effectively accomplished with an electronic medical record.*

**Additional Recommendations**

3. Patients should be seen in accordance with the degree of control of their diseases, with more poorly controlled patients seen more frequently and well controlled patients seen less frequently.

4. TB screening should utilize interferon gamma blood testing as the primary screening test for tuberculosis. The Mantoux skin test is logistically complicated, and its interpretation is prone to human error. Conditions at this facility make it impossible to adequately read the Mantoux skin test.

5. All NRC admissions with chronic illness should have laboratory tests performed at intake that are typically used to monitor the status of the patient's illness. As an example, persons with diabetes should have HbA1C drawn during the intake reception process.

6. Repeated failures to receive ordered medication due to refusal or other error need to result in intervention, to include, as necessary, a person to person evaluation by a provider. The timeline of referral to the provider must be dictated by the importance of the medication. For example, failure to take anti-rejection medication should result in a same day referral. Refusal to take insulin should result in a two or three day referral. Timelines for referral should be clear to providers and nurses and delineated in policy.

7. Health care leadership and the quality improvement committee should develop, monitor, and report quality indicators that measure and track the quality of care provided to patients with chronic diseases.

8. The provider progress notes should indicate the clinical status of the patient's condition and the rationale for any modification of treatment.

9. The current use of good and fair ratings of status on the chronic care form should be changed to well controlled, moderately controlled, poorly controlled, or undetermined.

10. The care of diabetes and adherence to existing guidelines should be a focus of the Quality Improvement Committee.

## Urgent/Emergent Care

**First Court Expert Recommendations**

1. NRC must begin conscientiously using logbooks, either paper or electronic, for urgent/emergent care. *We agree with this recommendation.*

**Additional Recommendations**

2. Health care leadership should implement an urgent/emergent care tracking log and monitor it to ensure that it is contemporaneously maintained.

3. The treatment room should be terminally cleaned and disinfected. Equipment in disrepair (e.g., torn stretchers) should be replaced.

4. Emergency equipment, including disaster and emergency response bags, AEDs, oxygen, etc., should be stored together in the main medical clinic.

5. Emergency response bags should be standardized with respect to equipment, supplies and medications. The bag should be secured with a plastic lock. When used, designated staff should replace all used supplies and replace the lock.

6. If emergency response bags contain medications (e.g., glucagon), a sheet is attached to the outside of the bag that notes medications and their expiration dates.

7. Emergency equipment should be checked each shift and noted on the SCC-NRC Machine/Equipment Check Log Sheet.

    a. When checking AEDs, ensure that electrode pads are not expired.

    b. When checking oxygen tanks, record how much oxygen is left and when tanks need to be replaced.

    c. Ensure that oxygen tanks have oxygen tubing and masks readily available.

    d. Ensure that EKG machines have paper.

8. Emergency response drills should be conducted and critiqued quarterly. Scenarios and critiques should be meaningful and identify areas for improvement. Corrective action plans should be implemented and monitored for effectiveness.

## Specialty Consultations

**First Court Expert Recommendations**

1. Patients whose problems require scheduled offsite services who are a higher level of security must have those scheduled while at NRC. *We agree in part with the First Court Expert's recommendation. We believe this recommendation should apply to all patients undergoing specialty care but only for higher level care that requires offsite referrals. Patients with other less critical specialty care appointments (podiatry, optometry, etc.) can have their appointment scheduled prior to transfer so that there is continuity of care.*

2. NRC must begin conscientiously using logbooks, either paper or electronic, for scheduled offsite services. *We agree with the First Court Expert's recommendation but have an addition to this recommendation. The IDOC, not Wexford, should develop a standardized offsite tracking log on an Excel spreadsheet that should be used at all sites. This tracking log should be used to report timeliness of referrals, collegial reviews, approvals, and appointments to the QI committee.*

**Additional Recommendations**

3. Wexford must begin placing specialty care documents, including referrals, verification of collegial review, and approvals into the medical record. Referrals for offsite care should be considered a physician order. The original referral form should be filed in the medical record on the date it was initiated by the provider. This should be done prior to the collegial review. Copies of this form can be used by the scheduler to manage scheduling.

4. The collegial review process should be abandoned. Medical providers should be permitted to send patients to offsite consultants without going through the collegial

review process on the basis of patient safety and inability to timely and effectively arrange ordered consultation care when using the collegial process.

5. Any denial of care needs to be documented in the medical record using documentation of the person who denied care.

6. At follow up provider visits after consultations, the provider should be required to document the results of the consultation, update the status of the patient, and update the treatment plan based on the consultation. If consultant reports are unavailable, the provider should use other communication efforts to discuss with the consultant what occurred at the consultation and document this discussion in the medical record.

7. An IDOC physician should review all denials of care, not the IDOC HCUA, who is a nurse.

8. Medical rounds or a "huddle" on offsite visits should occur every day. This huddle should consist of a meeting including the scheduling clerk with the providers as a group to discuss every patient who went offsite, where the report is, when the report will be obtained, what occurred, what follow up is indicated, and to schedule the patient to see the provider timely. These huddles should include review of the referral form that accompanies the patient which has consultant comments on the form. These huddles can be expanded at a later date to include other aspects of managing critical patients.

9. It is critical that consultation reports are all obtained and placed in the medical record within three days, consistent with the requirements of the IDOC AD on Offender Medical Records 04.03.100.

## Infirmary Care

**First Court Expert Recommendations**
The First Court Expert had no recommendations on infirmary care in the NRC report.

**Current Recommendations**
1. Health care leadership and the quality improvement committee should develop, monitor, and report quality indicators that measure and track provider and nurse adherence to the infirmary policy and the quality of the acute and chronic care provided to infirmary patients.

2. The provider progress notes should indicate the clinical status of the patient's condition and the rationale for any modification of treatment.

3. The quality and quantity of the bedding and linens should be monitored during the sanitation and environmental rounds.

## Pharmacy and Medication Administration

**First Court Expert Recommendations**
1. Medication administration must include a designated officer to escort the nurse and ensure that patients appropriately identify themselves with their ID card, that they bring water in a container so as to ingest the medication, and so that the officer can do a mouth check after ingestion. *We agree with this recommendation.*

**Additional Recommendations**

2. At reception, physicians should document all medication orders onto a physician order form.

3. Nurses noting physician orders should transcribe all medication orders onto a medication administration record (MAR). Nurses should document on the MAR the administration of stock medications to the patient.

4. A schedule of sanitation and disinfection activities should be developed and implemented in all medication rooms.

5. The nurses' medication room must be kept clean and well-organized. Rusting shelves should be replaced.

6. Nurses should not transfer properly labeled and dispensed medications from the pharmacy into improperly labeled medication envelopes.

7. Medication carts should be clean, well-organized, and have adequate supplies to properly administer medications, including medication cups and hand sanitizer.

8. Custody leadership should ensure that sufficient officer escorts are available to escort and assist the nurse with medication administration.

9. Nurses should maintain standards of nursing practice with respect to medication administration, including:

   a. Using two identifiers to identify patients (e.g., ID card and date of birth, etc.).

   b. Washing hands prior to medication administration and using hand-sanitizer between patients.

   c. Comparing the medication blister pack against the medication administration record at the time of medication administration.

   d. Placing medications into disposable medication cups.

   e. Ensuring inmates have access to a cup and water to take medications.

   f. Observing inmates take medications, having the patient step aside and an officer performing oral cavity checks using a small penlight.

   g. Documenting administration of medications onto the MAR at the time of administration.

   h. If inmates are not in the housing unit at the time of medication administration, nurses should arrange for administration of the medication later in the shift.

9. In order for nurses to perform medication administration in accordance with standards of nursing practice as described above, conditions of confinement must permit inmates to come out of their cells to receive administration of medications.

10. The cutoff date for BosWell to print MARs for the following month should be later in the month (e.g., 27th or 28th) to reduce the number of MARs that nurses must transcribe at the end of the month.

11. Health care leadership should develop a system for timely renewal of chronic disease and other essential medications.

12. Health care leadership should revise the policy and procedure for medication administration to provide sufficient operational guidance to administer medications in accordance with accepted standards of nursing practice.

13. Health care leadership should develop, implement, and monitor quality indicators related to pharmacy services and medication administration.

14. Health care leadership should conduct a root cause analysis and develop a corrective action plan with strategies targeting the causes of performance that fall below expectations.

# Infection Control

The First Court Expert Report contained no recommendations regarding infection control. We include our recommendations below.

**Current Recommendations**
1. An infection control position should be established and budgeted.
2. Health care leadership should establish, implement, and monitor a schedule for sanitation and disinfection activities in all areas of the institution.
3. An analysis should be performed of infectious/communicable disease statistics, including prevalence of TB, HIV, and HCV infection among newly arriving inmates.
4. Track and report skin infections due to all pathogens, not just MRSA, including infestations with scabies or body lice.
5. Medical providers should be educated on the evaluation, staging, and treatment of syphilis infection.
6. Pending the hiring of an infection control nurse, document, monitor, and report to the Quality Improvement Committee and facility leadership the training provided by security to the inmate porters who clean and sanitize the clinical areas, including the infirmary patient rooms.
7. Inmate porters are to change gloves and wash their hands after sanitizing infirmary rooms and between sanitizing each patient's bed. Porters are not to leave infirmary rooms without removing gloves.
8. Protective clothing and gear are always to be worn by porters when cleaning body fluid exposed surfaces and walls.
9. All torn and cracked outer protective coverings of infirmary beds, wheel chairs, examination tables, and gurneys are to be repaired or disposed and replaced.

# Dental Program

## Dental: Staffing and Credentialing

The First Court Expert Report concluded that staffing was adequate and had no recommendations with respect to personnel. We found staffing to be inadequate and will be even more inadequate after necessary program changes have been made.

**Current Recommendations**
1. Perform a detailed analysis of the hours SCC dental personnel spend furthering NRC's mission and assign personnel to NRC accordingly.
2. Collect data on patient wait times and failed appointments to inform staffing schedule.

3. While staffing appears to be adequate for current operations, staffing should be re-evaluated if the intake screenings become more thorough and take more time (as we believe they should).

## Dental: Facility and Equipment
**First Court Expert Recommendations**
1. The chair and unit should be considered for replacement in the near future. Hand pieces should be repaired. *We add that there should be a replacement schedule for **all** dental equipment to inform budget preparation.*
2. The examination rooms for the screening exams should be better equipped. Patients should be seated, and lighting should be adequate for the exam. *We note that the lighting has been improved since the First Court Expert Report.*

*We agree with these recommendations.*

**Additional Recommendations**
3. Patients should routinely wear a lead apron with a thyroid collar when dental radiographs are taken.
4. The approval process for repairing dental equipment should be streamlined.
5. All x-ray devices should be inspected periodically by a therapeutic radiological physicist to ensure that patients are not subjected to unnecessary exposure to ionizing radiation.[154]
6. The clinic equipment should include a sphygmomanometer and stethoscope.
7. The panoramic x-ray units should be replaced immediately.

## Dental: Sanitation, Safety, and Sterilization
**First Court Expert Recommendations**
1. That the sterilization area be made neater and every attempt made to correct the sterilization flow. It may mean reconfiguring the space and the storage utilization therein.
2. That safety glasses be provided to patients while they are being treated.
3. That a biohazard warning sign be posted in the sterilization area.
4. A warning sign be posted in the x-ray area to warn of radiation hazards, especially pregnant females.

*We agree with these recommendations.*

**Additional Recommendations**: None.

## Dental: Review Autoclave Log
**First Court Expert Recommendations**: None.

---

[154] 32 Illinois Administrative Code 360 pdf, p. 47. Also, "[r]ecords of machine calibrations and quality assurance checks shall include identification of the x-ray therapy system, radiation measurements, the date the measurements were performed and the signature of the therapeutic radiological physicist who performed the measurements." *Id.*, p. 48.

**Additional Recommendations**: None.

## Dental: Comprehensive Care
**First Court Expert Recommendations**
1. Comprehensive "routine" care be provided only from a well-developed and documented treatment plan.
2. The treatment plan be developed from a thorough, well-documented intra and extra-oral examination, to include a periodontal assessment and detailed examination of all soft tissues.
3. In all cases, appropriate bitewing or periapical x-rays be taken to diagnose caries.
4. Hygiene care be provided as part of the treatment process.
5. That care be provided sequentially, beginning with hygiene services and dental prophylaxis.
6. That oral hygiene instructions be provided and documented.
7. Provide comprehensive, routine care only to the designated, long-term population.

*We agree with these recommendations.*

**Additional Recommendations**: None.

## Dental: Intake (Initial) Examination
**First Court Expert Recommendations**
1. Provide a thorough soft tissue examination. This is the most important part of the screening exam and should include intra-oral palpation and a well-lighted examination of all soft tissue surfaces. *We note that this will require that dentists allocate more time to each screening.*
2. Note pathology seen on the Panelipse radiograph. Do not diagnose small carious lesions from this radiograph.
3. Do not provide comprehensive routine care from this examination. This is a screening examination.
4. Do not take the Panelipse radiograph simultaneously with inmates standing next to each other. This is a direct violation of radiation safety. Provide protective lead apron coverage to the inmate receiving the x-ray. *We add that the apron should have a thyroid collar.*
5. Place signage in the radiograph area warning of radiation hazard.
6. Individually bag and sterilize the mouth mirrors or use disposable mirrors.
7. Wash hands and change gloves between patients. *We agree that gloves should be changed between patients but offer the alternative of using an alcohol-based hand rub before donning gloves.*
8. Take a more thorough health history and "red flag" health issues that require medical attention prior to dental treatment.

*We agree with these recommendations.*

**Additional Recommendations**

9. The health history should be expanded and printed on a separate form.
10. The IDOC should ensure that dentists perform the charting required by Administrative Directive 04.03.102.
11. The portion of the form for charting is too small and should be increased substantially.
12. The panoramic x-ray units should be replaced immediately.
13. Infection control barriers be used on the light and changed between patients.
14. If the dentist does not have an assistant to record, an infection control barrier (i.e., a disposable pen sleeve) should be used on his/her pen.
15. Valid oral hygiene instructions should be provided and if they are not, the dental chart should not record that they have been provided.

## Dental: Extractions

**First Court Expert Recommendations**
1. A diagnosis or a reason for the extraction be included as part of the record entry. This is best accomplished using the SOAP note form at, especially for sick call entries. It would provide much detail that is lacking in most dental entries observed. Too often, the dental record includes only the treatment provided with no evidence as to why that treatment was provided.
2. Provide antibiotics appropriately from a diagnosis and only when indicated.

*We agree with these recommendations.*

**Additional Recommendations**
3. Clinically inadequate preoperative x-rays should not be used for tooth extractions.
4. Consent forms should document the tooth number to be extracted as well as the reason for the extraction.
5. All treatment refusals should be documented to include the reason for the recommended procedure and the consequences of declining the procedure.

## Dental: Removable Prosthetics

**First Court Expert Recommendations**
A comprehensive examination and well developed and documented treatment plan, including bitewing and/or periapical radiographs and periodontal assessment, precede all comprehensive dental care, including removable prosthodontics.
1. That periodontal assessment and treatment be part of the treatment process and that the periodontium be stable before proceeding with impressions.
2. That all operative dentistry and oral surgery as documented in the treatment plan be completed before proceeding with impressions.

*We agree with these recommendations which represent the accepted professional standard for diagnosis and treatment planning.[155]*

**Additional Recommendations:** None.

---

[155] See, for example, Stefanac SJ. pp. 11-15, *passim*.

Dental: Sick Call/Treatment Provision

**First Court Expert Recommendations**

1. Implement the use of the SOAP format for sick call entries.
2. Develop a request/sick call system that insures that inmates complaining of pain/swelling/toothaches are seen by a provider and evaluated within 24-48 hours from receipt of the request.
3. Develop a system such that urgent care complaints (pain, swelling, toothaches) are seen in person for evaluation and triage by the next working day, and that care be provided expeditiously. Otherwise, these inmates are transferred and gone if too much time elapses. This should be a primary mission at NRC.
4. Provide routine comprehensive care to the designated MSU population only.

*We agree with these recommendations.*

**Additional Recommendations**

5. When the dental clinic is closed, or the dentist will not be available for 24 hours, a mid-level provider should perform a face-to-face examination for all inmates submitting a request that states or implies the existence of dental pain within 24 hours.
6. NRC should develop a standard health care request form that is available to all inmates.
7. All health care requests should be time-stamped and logged, and a record of when the inmate was seen by a provider and the disposition should be maintained.

Dental: Orientation Handbook

**First Court Expert Recommendations**

1. Ensure that the orientation manual describes fully and accurately how inmates can access both urgent and routine care via the inmate request form system. *We agree with this recommendation.*

**Additional Recommendations**

2. Modify Administrative Directive 04.03.102, ¶IV B to reflect the fact that every offender at NRC receives a screening exam, and not a "complete dental exam."[156]

Dental: Policies and Procedures

**First Court Expert Recommendations**: None.

**Current Recommendations**

1. The initial examination performed at intake should be in accordance with Administrative Directive 04.03.102 (¶F2), or the Administrative Directive be rewritten to reflect what IDOC decides should be done.
2. All Administrative Directives, policies, and protocols relevant to the dental program should be maintained in the dental clinic and the HCUA should ensure that dental personnel review them initially and after any changes.

---

[156] In most prison systems with which we are familiar, dental screenings are performed at intake and comprehensive examinations are performed typically within 30 days of arrival at the assigned prison.

3. Dental findings classified as Class II at the intake screening exam should be addressed at the NRC or immediately at the receiving institution.

## Dental: Failed Appointments

**First Court Expert Recommendations**

1. Every effort should be made to see inmates complaining of pain or swelling in a timely manner, within 24-48 hours. These inmates need not be scheduled for operative [routine] dentistry. Only palliative care need be provided.
2. A sick call system should be established that can accomplish this goal. Administration should be involved in this project and in assisting the dental program in getting inmates to the clinic or their appointment. The inmate handbook should make it clear who is eligible for routine care.

*We agree with these recommendations.*

**Additional Recommendations**

3. The failed appointment rate should be collected and reported as part of the CQI program with other dental program data.
4. Failed appointments should be a priority emphasis of the CQI program.

## Dental: Care of Medically Compromised Patients

**First Court Expert Recommendations**

1. The medical history section of the dental record be kept up to date and that medical conditions that require special precautions be red flagged to catch the immediate attention of the provider.
2. That blood pressure readings be routinely taken of patients with a history of hypertension, especially prior to any surgical procedure.
3. The health history be addressed and updated on every patient and that consultation with medical be provided and documented when indicated. This issue is serious and needs to be corrected immediately.

*We agree with these recommendations.*

**Additional Recommendations**

4. The health history should be expanded and printed on a separate form.
5. There is not enough room on the chart to accommodate the tooth diagram used for charting restorations and missing teeth. The diagram should be substantially larger.

## Dental: Specialists

No recommendations.

## Dental: CQI

**First Court Expert Recommendations**

1. *The CQI process should be used extensively and continuously to assist in correcting the deficiencies noted in the body of this report. A good starting point would be to focus on*

addressing urgent care needs in a timely and efficient manner. *We agree with this recommendation.*

**Additional Recommendations**

2. The dental CQI program (as well as all other components of the dental program) lacks guidance from a dentist with experience in corrections. This expertise should reside centrally at IDOC and not depend on a Wexford employee or contractor.

# Internal Monitoring and Quality Improvement

**First Court Expert Recommendations**

1. The quality improvement program must be reenergized with knowledgeable leadership that has been provided specific training regarding quality improvement philosophy and methodology.
2. The leadership of the CQI program must be retrained regarding quality improvement philosophy and methodology, along with study design and data collection.
3. Training should include how to study outliers to develop targeted improvement strategies.

*We agree with these recommendations.*

**Additional Recommendations**

4. The NRC quality improvement plan must be a practical year-ahead work plan for the upcoming year to work on and improve identified problems on a priority basis.
5. NRC must develop an effective methodology to review for quality of clinical care at all levels, including nursing and physicians.
6. NRC needs to re-evaluate its use of data. Data must be reliable and must measure processes determined to be essential services.
7. The CQI program at SCC must be separate from the CQI program at NRC. Annual reports must be uniquely developed. Reports used for NRC should not be used for SCC.
8. The Quality Improvement Committee should adhere to AD requirements including:
   a. Review primary source verification of physicians.
   b. Review 100% of offsite clinical events for quality and appropriateness. The review of quality should include whether the quality of care prior to and after the appointment was adequate and appropriate.
   c. Review of 100% of critical incidents including mortality, new or delayed diagnosis, use of isolation, IDPH reportable cases, and all staff evaluations for occupational exposures. This review should not consist of merely listing the number of these events but should be a critical review.
9. Sentinel event reviews and peer review on any non-primary care provider should be conducted by a non-Wexford physician.
10. NRC needs to develop a method of identifying problems with their processes of care.

# Appendix A

## NRC Staffing[157]

| Staff Type | Positions | Vacant | Supervising Authority |
|---|---|---|---|
| HCUA | 1 | 0 | NRC HCUA |
| DON | 1 | 0 | NRC HCUA |
| Nurse Supervisor | 2 | 0 | NRC HCUA |
| Med Room assistant | 1 | 0 | Wexford |
| Office Assistant | 1 | 0 | NRC HCUA |
| Medical Supply | 1 | 0 | NRC HCUA |
| Radiology Technician | 1 | 0 | NRC HCUA |
| CMT (shared SCC and NRC)* | 17 | 11 | SCC HCUA |
| RN | 21 | 5 | NRC HCUA |
| Certified Nurse Assistant | 6 | 5 | Wexford |
| Medical Records Director | 1 | 0 | Wexford |
| Dentist | 1 | 0 | Wexford |
| Dental Assistant | 1 | 0 | Wexford |
| Dental Technician | 1 | 1 | Wexford |
| Medical Director | 1 | 1 | Wexford |
| Staff physician | 1 | 0 | Wexford |
| Physician Assistant | 2 | 0 | Wexford |
| Medical Records staff** | 9 | 6 | Wexford |
| **Total** | **69** | **29** | |

*Five shared CMT staff out of 11 are on Leave of Absence and not working and are considered effectively vacant. These positions are shared between NRC and SCC and have been listed on both NRC and SCC's staffing tables.
**An adjusted service request (ASR) for five additional medical record clerks was just filed but these staff are not yet hired and therefore not listed on the grid provided by the Regional Coordinator.

[157] Based on a staffing grid provided by the IDOC Regional Coordinator via email to Expert on January 30, 2018.

# Appendix B

## Review of Specialty Care[158]

| Type of referral | Referral present | Collegial present | Approval present | Formal report in record | Days to see Pt after consult | # of consultant recommendations not carried out | Recommendations of Consultant not carried out |
|---|---|---|---|---|---|---|---|
| Rheumatology Patient 1 Specialty Care (SC) | 0 | 0 | 0 | 1 | 12 | 2 | Check labs and refer to nephrology |
| Rheumatology Patient 1 SC | 1 | 0 | 0 | 1 | 1 | 3 | Refer to nephrology, GI, and monitor labs |
| Hospitalization Patient 1 SC | | | | | | 6 | Recommended Renal biopsy, transrectal ultrasound, repeat CT scan of abdomen, cystoscopy with bilateral pyelograms, nephrology consult, urology follow up. There no meaningful review of these recommendations and referrals made for nephrology and urology but no collegial review or approval was present. There were no referrals to any of the other investigations. |
| ERCP procedure Patient 2 SC | 1 | 0 | 1 | 1 | 3 | 2 | Follow up cytology results, FU in GI clinic the following week |
| Urology Patient 3 SC | 0 | 0 | 0 | 1 | 19 | 0 | |
| Ultrasound Patient 3 SC | 1 | 0 | 0 | 0 | 9 | 0 | |
| Oncology Patient 3 SC | 0 | 0 | 1 | 0 | 5 | 2 | Vascular surgery, urology |
| CT scan Patient 4 SC | 1 | 1 | 0 | 0 | 10 | 0 | CT scan not reviewed |

[158] This data comes from review of patients 1 through 7.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Oncology Patient 4 SC | 0 | 0 | 0 | 0 | 3 | 1 | No evidence of an ultrasound done as recommended. |
| Oncology Appt. with immediate hospitalization Patient 4 SC | 1 | 0 | 0 | 0 | 15 | | Because there were no reports it was unclear if recommendations were made. |
| Corneal clinic Patient 5 SC | 1 | 0 | 1 | 0 | 1 | | Comments by the consultant on the referral form recommend contact lens clinic ASAP and surgery on the cornea. |
| Contact lens clinic Patient 5 SC | 1 | 0 | 1 | 0 | 6 | 1 | Return to contact lens clinic was recommended on the referral form |
| Corneal surgery Patient 5 SC | 1 | 0 | 1 | 0 | 4 | | |
| Corneal clinic Patient 5 SC | 0 | 0 | 0 | 0 | 3 | | |
| Corneal clinic Patient 5 SC | 1 | 0 | 0 | 1 | 2 | | |
| Corneal clinic Patient 5 SC | 1 | 0 | 1 | 1 | 1 | | |
| Corneal clinic Patient 5 SC | 1 | 0 | 1 | 0 | 1 | 1 | This patient's three month follow up was delayed and occurred only after the patient developed a complication. There was no evidence of a one week follow up at that clinic. |
| Orthopedic Patient 6 SC | 1 | 1 | 1 | 1 | 1 | | |
| Outpatient surgery Patient 6 SC | 1 | 1 | 1 | 1 | 1 | | |
| Transplant Center Patient 7 SC | 0 | 0 | 0 | 0 | 4 | 1 | This consultation documented as having occurred in the medical record. Consultants recommended a hepatology consultation. There was a referral and approval for this but this consultation did not occur. |
| Burn Patient 7 SC | 0 | 0 | 0 | 0 | 4 | | This consultation documented as having occurred in the medical record. |
| Transplant Center Patient 7 Sc | 1 | 0 | 0 | 0 | 12 | | There was documentation in the record that the patient had a transplant clinic visit on 11/6/17 |

|  |  |  |  |  |  |  | and there was a referral for a transplant follow up but there was no other information as to what occurred in the record. If there were recommendations, these were not present. |
|---|---|---|---|---|---|---|---|
| Transplant Center Patient 7 SC | 0 | 0 | 0 | 0 | Not seen |  | There was patient after-care paperwork for a 12/18/17 visit to Rush Presbyterian but there was no other information. If there were recommendations, these were not present. There was no provider follow up of this presumed visit. |
| Totals | 14 | 3 | 9 | 8 |  | 19 |  |

# Appendix C