---

# Stateville Correctional Center

# 2nd Court Appointed Expert Report

# Lippert v. Godinez

---

Visit Date: February 26, 2018 – March 1, 2018

Prepared by the Medical Investigation Team

Mike Puisis, DO
Jack Raba, MD
Catherine M. Knox RN, MN, CCHP-RN
Jay Shulman, DMD, MSPH

# Table of Contents

**Overview** ................................................................................................................ **2**

**Executive Summary** ............................................................................................. **2**

**Findings** ............................................................................................................... **6**

    Leadership, Staffing, and Custody Functions ............................................................ 6

    Clinic Space, Sanitation, Laboratory, and Support Services ..................................... 9

    Medical Records .................................................................................................... 16

    Intrasystem Transfer ............................................................................................. 17

    Nursing Sick Call ................................................................................................... 19

    Chronic Care .......................................................................................................... 24

    Urgent/Emergent Care .......................................................................................... 38

    Specialty Consultations ......................................................................................... 48

    Infirmary Care ....................................................................................................... 50

    Pharmacy and Medication Administration ............................................................ 55

    Infection Control .................................................................................................... 59

    Dental Program ..................................................................................................... 62

    Internal Monitoring and Quality Improvement ..................................................... 75

**Recommendations** ........................................................................................... **82**

    Leadership, Staffing, and Custody Functions .......................................................... 82

    Clinic Space, Sanitation, Laboratory, and Support Services ................................... 83

    Medical Records .................................................................................................... 83

    Intrasystem Transfer ............................................................................................. 84

    Nursing Sick Call ................................................................................................... 84

    Chronic Care .......................................................................................................... 85

    Urgent/Emergent Care .......................................................................................... 87

    Specialty Consultations ......................................................................................... 87

    Infirmary Care ....................................................................................................... 88

    Pharmacy and Medication Administration ............................................................ 88

    Infection Control .................................................................................................... 89

    Dental Program ..................................................................................................... 90

    Internal Monitoring and Quality Improvement ..................................................... 95

**Appendix A** ....................................................................................................... **97**

**Appendix B** ....................................................................................................... **99**

# Overview

From February 26 to March 1, 2018, the Medical Investigation Team visited the Stateville Correctional Center (SCC) in Joliet, Illinois. This report describes our findings and recommendations. During this visit, we:

- Met with leadership of custody and medical
- Toured the medical services area
- Talked with health care staff
- Reviewed health records and other documents
- Interviewed inmates

We thank the Warden and staff for their assistance and cooperation in conducting the review.

The SCC facility is one of three maximum security prisons in the IDOC. The Warden of SCC is also the Warden at the Northern Reception Center (NRC), a separate facility with a very different mission and needs. SCC opened in 1925 and is plagued by aging infrastructure. There have been attempts to close this aging facility, but political pressure kept the facility open.[1] In 2016, the "Roundhouse," a maximum security complex within SCC, was closed. In our introductory meeting, the Warden told us that several additional units have been closed.

SCC is located on a 2200-acre campus with 33-foot walls surrounding the perimeter. It has a population of 1183. SCC has three galleries on unit X for segregation housing with a capacity of 48. SCC has an infirmary unit of 32 beds. Units B, C, D, and E occupy a structure that is 420 feet long and 52 feet high. Each of these units has five floors, each with a housing "gallery." Inmates on these units are separated by levels of aggression. Dialysis patients are housed in Unit C. Unit E houses inmates with moderate to high aggression. This type of structure, in combination with maximum security classification, makes administration of medication and attendance for medical appointments exceedingly difficult.

The IDOC Agency Medical Director and IDOC Regional Coordinator were present for this tour. The Wexford Regional Manager and Regional Medical Director were not present for our tour.

# Executive Summary

Based on a comparison of conditions as identified in the First Court Expert's report, we find that some conditions appear to have improved by virtue of hiring a permanent Health Care Unit Administrator (HCUA) and improving access to sick call. Most other areas have either not improved or have deteriorated. We find that SCC is not providing adequate medical care to

---

[1] Stateville to Stay Open; Pontiac Prison to Close; Paul Meincke ABC Eyewitness News 5/5/08 as found at http://abc7chicago.com/archive/6123448/.

patients, and that there are systemic issues that present ongoing serious risk of harm to patients that result in preventable morbidity and mortality. The deficiencies that form the basis of this opinion are provided below.

The HCUA position is now filled with a capable full-time administrator. But the Medical Director position is now vacant and the Director of Nurses (DON) is new to the position. All supervisory nurse positions are vacant, resulting in the DON and HCUA having to perform direct line nursing supervision, which detracts from their ability to manage. Staff are still shared with Northern Reception Center (NRC) and the vacancy rate is high (32% including those on leave of absence), resulting in an apparent lack of staffing. A staffing analysis needs to be done and SCC needs its own staff that is not shared with NRC. The prior Medical Director was a surgeon and not appropriately trained in primary care medicine, likely accounting for the preventable morbidity and mortality we identified in record reviews. The lack of appropriately trained physicians was the single most important contributor to preventable morbidity and mortality in our opinion and must be corrected.

Clinic examination rooms were generally clean and appropriately equipped. There were some items in these areas that need to be addressed. Infirmary beds need repair or replacement. All rooms on the infirmary need to be sanitized uniformly and this unit needs pest control to remove cockroaches, flies, and gnats. Negative pressure rooms need to be repaired so they are fully functional and need to be regularly cleaned and inspected. The hemodialysis unit was in deplorable condition from a sanitation and physical plant perspective. This unit should be refurbished and properly sanitized. The inmate kitchen and dining area had birds living in the unit who deposited droppings in the area where inmates eat. This poses a health risk and these birds should be removed from inside the kitchen. The monthly environmental rounds now being performed are an improvement, but these should include the infirmary and hemodialysis unit.

Except for hospital and consultant reports, most documents are filed timely into the medical record. Offsite consultations and hospital records are often unavailable, which adversely affects clinical care. Confidentiality is a problem to a lesser degree than at NRC, but the medical records area needs to be continuously secured. We continue to find problems with use of the excessively large medical records. The problems with the use of the paper record and the clinical problems it causes prompt us to strongly recommend implementation of an electronic medical record.

We found that the intrasystem transfer process has improved since the First Court Expert's report. However, we did find that for approximately 30% of inmates transferring into SCC, their transfer information was incomplete or prescribed care was not continued. We do, however, agree with the First Court Expert's recommendation to initiate quality improvement monitoring of this area of service.

Access to care has significantly improved since the First Court Expert's report and problems identified in that report related to access to care have been resolved. We note, however, that

quality of care of nurses performing nursing sick call exhibit deficiencies that are not currently being monitored by the Continuous Quality Improvement (CQI) program or by nurse supervisory staff. In addition, Licensed Practical Nurses (LPN) continue to perform sick call when this task exceeds the scope of their license.

The chronic care program appears to have deteriorated since the First Court Expert's report based on chart reviews. Physicians appear to be ignorant of currently accepted care guidelines for a number of common medical conditions that adversely affected patients. It is our opinion that this ignorance is related to the defective hiring, credentialing, and privileging process of Wexford. Physicians do not consistently take adequate histories, perform adequate physical examinations, derive adequate assessments, or form appropriate therapeutic treatment plans. The structure of the chronic care management program as described by the First Court Expert contributes to fragmentation of care and this has not been corrected. Evidence of poor chronic illness management is present in record reviews for chronic illness, hospitalization, and mortality reviews. Evidence showed preventable morbidity and mortality that is significant.

With respect to urgent, emergent, and hospital care, first responder bags are not standardized and are inconsistently inspected and maintained. Many ER visits and hospitalizations were preventable and due to inadequate primary care management. With respect to hospitalizations, we identified a preventable stroke and heart attack. We also noted that a metastatic colon cancer may have been prevented or have been identified much earlier with a better result than the metastatic cancer that was identified because of a year delay in performing diagnostic studies. We found these significant problems having reviewed only six records.

Specialty care has not improved compared to the First Court Expert's report. Care at University of Illinois Chicago (UIC) is not timely, yet for patients whose consultative care is delayed, consultation with an alternate service provider is not obtained. We find that this has caused morbidity. Tracking of consultation services is extremely poor and appears inaccurate. We found, for example, that 70% of completed consultations in January of 2017 were dated as completed *before* the referral for the consultation was documented as submitted. It is our opinion that the Wexford collegial review utilization process is a barrier to timely care and should be abandoned. This program has become a patient safety issue.

Medication administration services appear to have deteriorated as compared with the First Expert's report. The current system of medication administration is unsafe and does not ensure that patients receive medication as ordered. Nurses administer medications in an unhygienic manner and fail to document administration at the time medication is administered. There are many errors related to medication administration that the SCC program is aware of. Yet there has been no effort through its CQI program to correct these systemic problems. Also, contract monitoring documents have documented continual violations concerning controlled substance medications, yet no penalties or corrective actions have been taken.

The First Court Expert had no concerns or findings with respect to infection control. We identified multiple findings. These include vermin in patient rooms on the infirmary unit, serious infection control and sanitation issues in the dialysis unit, and birds in the inmate dining room, all of which can promote disease transmission. Negative pressure units on the infirmary used for respiratory isolation in cases of active tuberculosis or other illnesses were not fully functional, cleaned, or regularly serviced. Tuberculosis monitoring was poor. Nurses were not accurately reading Mantoux skin tests. Because the infection control responsibilities were dispersed among several nurses, it is our opinion that a dedicated infection control nurse would be beneficial. This was also a recommendation of the First Court Expert.

The dental program has not changed materially since the First Court Expert Report. Routine treatment is timely; however, it often occurs without a comprehensive oral examination (i.e., intraoral x-rays, a periodontal assessment, and a treatment plan); placing patients at risk of preventable pain and tooth loss. Clinical notes are inadequate and often illegible. Antibiotics and analgesics were often dispensed without a diagnosis having been recorded and post-extraction antibiotics were prescribed without documented evidence of infection. The dental sick call process is disorganized, and it is not possible to determine how long patients wait to be treated, or the failed appointment rate. There is no process for mid-level providers to triage and palliate patients whose sick call request suggests pain or infection. The treatment provided to IDOC inmates remains substantially below accepted professional standards and is not minimally adequate.

While the First Court Expert found the quality improvement program "non-functioning," we found that the HCUA and his staff have initiated CQI activity, although it is nascent and not yet effectively functioning. The annual CQI plan and annual Medical Director Report at SCC are identical to the NRC CQI plan and Medical Director Report. Several requirements of the IDOC administrative directives (AD) are not performed by the CQI committee, including primary source verification of physician credentials and evaluation of 100% of offsite consultations and hospitalizations for quality and appropriateness. The CQI program does no evaluation of the quality of physician or nursing clinical care. Wexford peer reviews do not appear to identify or correct provider's unacceptable care. The CQI committee does not perform sentinel event or mortality reviews even though there was preventable morbidity and mortality that we uncovered in record reviews.

We have several recommendations at the end of this report and address the recommendations of the First Court Expert, most of which we are in agreement with.

# Findings

## Leadership, Staffing, and Custody Functions

**Methodology:** We interviewed leadership of the health program and the Assistant Warden of Programs. We evaluated staffing documents and discussed these with the leadership. We reviewed other selected documents.

### First Court Expert Findings

The First Court Expert found that staffing between NRC and SCC was combined and shared, making adequacy of staffing difficult to assess. Because all staff at SCC are assigned to NRC for part of their work hours, staffing at SCC is unreliable, making SCC out of compliance with policy requirements. Staffing schedules do not account for sickness and vacancies. Management must prioritize staff based on critical needs. Leave of absences and vacancies of state employees were significant. These vacancies are filled by Adjusted Staffing Requests (ASRs), accounting for 40 RN and LPN positions. A single HCUA manages both SCC and NRC and that position was functionally vacant due to prolonged medical leave. The SCC Medical Director was a surgeon who did not provide clinical management of the program.

The First Court Expert recommended that SCC have its own HCUA and staffing allocation, that only primary care trained physicians provide care, and that these physicians be board certified, and that all providers have access to electronic medical references.

### Current Findings

We agree with the First Court Expert's findings, although there have been several changes at SCC. We found additional problems.

- Newly appointed SCC leadership has not had an orientation to their positions and are learning on the job.
- There are no nursing supervisors, so the HCUA and DON act as supervisory nurses, making them less effective in their assigned positions.
- Staffing vacancies and sharing staff with NRC contribute to a perceived lack of staffing. Actual staffing needs have not been determined by way of a staffing plan. A staffing plan, including for providers, should be developed.
- Lack of physician credentialing and granting privileges to physicians to perform care in areas in which they have no training has resulted in preventable morbidity and mortality.
- Contract monitoring fails to adequately monitor for vendor quality of care and overall performance.

There have been some changes since the First Court Expert's report, but we agree with the main conclusions of his findings. SCC now has a dedicated HCUA, which was a recommendation of the First Court Expert. This is an improvement. However, this improvement is negated by the lack of a Medical Director. The Medical Director recently died and was replaced about two

months ago by the recently appointed NRC Medical Director. Two weeks after our visit, however, this physician resigned, leaving SCC without a Medical Director. Staffing is still shared between the two facilities and all staff from SCC goes to NRC on occasion to assist in the reception area on busy days. There has been a very recent increase in staffing at NRC which will reduce the need to send staff from SCC to NRC. However, the degree of staff sharing is not known but is still substantial. We did not find that staff vacancies are filled by ASR positions.

The leadership staff at SCC are all recently appointed. The HCUA has been in his position for about a year. The Director of Nursing (DON) has been in her position for about five months and was a staff nurse at SCC for about five years before taking the DON position. The HCUA and DON were both staff nurses prior to their current positions. The Medical Director was in his position for about two months before he resigned shortly after our visit. He had been with Wexford for two years and over those two years had been a Traveling Medical Director or Medical Director at five different facilities. According to a Wexford document, he was listed as Medical Director simultaneously at both NRC and Sheridan between 2/19/17 to 8/12/17.[2] Overall, this leadership group lacks management experience and is now lacking a Medical Director. However, the HCUA and DON are energetic and willing to learn their assignments.

The IDOC Regional Coordinator for this facility covers 10 facilities, which is a span of control too large to effectively supervise. He and the IDOC Agency Medical Director were present for part of our tour. Neither the Wexford Regional Medical Director nor the Wexford Regional Manager was present for our tour. The Wexford Regional Manager is an ex-warden and we have concerns that a person with criminal justice training will have the skills necessary to manage a clinical medical program.

None of the key leaders indicated receiving specific training for their new roles. All three inherited positions that were vacated and they have been learning on the job. In the case of the HCUA, his predecessor, as described in the First Expert report, was chronically absent and was not performing. He inherited a poorly functioning program. The Director of Nursing inherited the program from a nurse who had performed well. However, the prior DON did not have time before her departure for an orientation for the new DON. The Medical Director had just started in the position as Medical Director when he resigned.

Nursing supervision is significantly deficient. There are two nurse supervisor positions. One supervisor is on leave of absence and the other recently left service, making both positions effectively vacant. The DON and HCUA provide supervision during daytime hours, in addition to their management responsibilities, but there is no evening or night supervision. Having staff work without supervision is not an acceptable situation. The staff is a mixed IDOC/Wexford staff. Dialysis staff is supervised by Naphcare, the dialysis vendor. As with NRC, there are some supervision issues with respect to assignment and discipline when an IDOC employee assigns or supervises a Wexford nurse, or when the Wexford DON assigns or supervises an IDOC employee.

---

[2] Document 42P5643 – IDOC Position History 7-1-2015 to 11-22-2017 Bates #520-548 (Requests 1 & 2).

All three key leaders believe that staffing shortages are their number one problem. All staff at SCC can be shared with NRC. The amount of time SCC staff work at NRC is determined on an ad hoc basis by negotiation and discussion between the NRC and SCC HCUAs. Based on a discussion with the HCUA, the staffing at SCC includes 98 positions with 24 (24%) vacant positions and nine on leave of absence or injured.[3] The effective vacancies total 33 (34%). This extraordinarily high vacancy rate is made worse by having to share staff with NRC, which results in prioritizing assignments to avoid crises as opposed to ensuring that all needed work is done. Despite these staffing deficiencies, there is no staffing plan that addresses actual needs at SCC. The current official Schedule E is not up to date. None of the existing leadership staff has participated in developing the Schedule E or existing staffing pattern at this facility.

Almost all provider notes lack adequate history, physical examination, assessments, and therapeutic plans. We could not determine whether this deficiency was due to practice issues or lack of staffing. The Medical Director's opinion was that an additional physician is needed. The Medical Director has clinical responsibilities in addition to management responsibilities. The annual CQI report for 2016-17 states that providers see approximately 20-30 patients daily.[4] The Medical Director's report in the 2016-17 annual CQI report notes that "Depositions and court appearances for pending litigation are continuing to increase. Due to this, provider's time is divided between depositions and patient care." We add that when NRC intake physicals are backlogged, providers from SCC are sent to NRC to assist. The statistics in the most recent annual CQI 2016-17 report list 14,321 provider contacts, which yields about 18 patients a day per provider without infirmary visits, assistance to NRC, or time needed for litigation concerns, which the prior Medical Director deemed significant. The Medical Director also told us that he has asked for extra time to see patients because the medical record documentation is so poor that it is difficult to determine what the patient's problems are. In a well-functioning prison program with 1200 inmates, three providers are typically adequate. Under current circumstances, particularly with the sharing of staff with NRC, it is not certain whether budgeted staffing is adequate. A staffing analysis is necessary.

Based on record reviews, the quality of physician care, particularly care provided by the recently deceased Medical Director, was substandard. This was a serious problem at this facility. We noted multiple cases of morbidity and harm that occurred as a result of poor care. Two death charts reviewed showed preventable mortality. This, in our opinion, is related to use of physicians without primary care training. The recently departed Medical Director was a surgeon who did not appear to know how to manage many primary care problems, resulting in harm to patients. The credentialing and privileging of physicians is inadequate and places inmates at risk of harm. The prior Medical Director had the worst performance on peer review of all providers at this facility (two of whom were nurse practitioners), yet he was assigned the most complex patients and oversaw clinical care. We were told that assignments of Medical Directors are made by the Wexford Director of Operations, Regional Manager, with input from the Regional Medical Director. The recently resigned SCC Medical Director stated that he

---

[3] Appendix A at the end of this report has the staffing grid for this facility.
[4] Medical Director Annual Summary, Medical Director section of annual 2016-17 CQI presentation.

received his assignment by the Director of Operations. Lay persons do not have the ability to review the qualifications of physicians. Assignment of physicians not trained in primary care to be in charge of primary care at a facility places inmates at risk of harm.

The Assistant Warden of Programs covers both NRC and SCC. According to the HCUA, there are monthly meetings conducted by the Assistant Warden of Programs at which custody impediments can be discussed.

The HCUA monitors the contract by use of a standardized contract monitoring spreadsheet. NRC and SCC are reported as a single facility with respect to contract monitoring. There are three main functions with respect to contract monitoring: bills being paid on time, staffing hours filled, and performance monitoring. With respect to the total number of hours filled, the HCUA lists any hours in excess of the Schedule E that the vendor provides. This is subtracted from the total hours not filled based on the Schedule E. This yields the hours not provided or the total excess hours provided by the vendor in excess of the Schedule E. For the seven months from June 2017 to December 2017, there were 17,681.15 unfilled hours or about 2526 unfilled hours a month or about 14 positions. This accelerated beginning in October 2017, presumably due to the addition of new staff positions which have yet to be filled. Nevertheless, this is a significant amount of unfilled positions.

Performance contract monitoring consists of adherence with both contract requirements and compliance with administrative directives. With respect to administrative directives, the HCUA lists each item of the administrative directives which are not being followed by the vendor. However, this is subjective and does not appear thorough. For the June of 2017 contract monitoring report, as an example, the only medical performance deficiencies reported for SCC were two items related to distribution and documentation of controlled substances. Many ADs do not appear to be followed. As examples, we noted several administrative directives that were not being followed including:

- Failure to file hospital reports in the medical records in three days
- Failure to assess appropriateness and quality of 100% of offsite medical care services
- Failure to perform a one-time primary source verification of physician credentials.

The contract monitoring, in our opinion, fails to identify key failures of the vendor, especially regarding quality of provider care, for which there appears to be virtually no effective monitoring.

## Clinic Space, Sanitation, Laboratory, and Support Services

**Methodology:** Accompanied by a correctional officer and the IDOC Medical Director, the IDOC Regional Coordinator, and the Health Care Unit Supervisor, we inspected the nurse sick call rooms on the housing units, the infirmary, and the main outpatient clinical area which housed medical exams rooms, nurse work areas, an urgent care center, physical therapy, hemodialysis unit, dental clinic, telehealth room, mental health interview rooms, nurse medication

preparation room, medical records department, health care administrative offices, conference room, the inmate cafeteria and dining areas, and the kitchen.

**First Court Expert Findings**

The First Court Expert found the clinical areas at SCC clean, well maintained, and environmentally comfortable. He recommended that designated exam rooms should be made available with appropriate equipment in cell houses B, E, and F to allow sick call to occur with reduced movement demands.

**Current Findings**

We had some different findings with respect to sanitation and equipment maintenance. Our findings included:

- The nurse sick call rooms in the housing units (B, C, D, E, X) are adequately sized and properly equipped. Their location in the housing units maximizes the patient-inmates' access to sick call.
- Five of the nurse sick call rooms in the housing unit have sinks with hot and cold water with hand washing supplies. Housing unit B's nurse room does not have a sink but has sanitizing gel.
- The first aid kits in the correctional officer rooms on the housing units are not regularly inspected and re-supplied. Two kits were inspected; the seal was broken on both and there were no gauze or bandages in the kit.
- The infirmary beds were in unacceptable condition. All of them need to be properly repaired or replaced. The low level of the beds makes it difficult and unsafe for the clinical team to properly examine and transfer patients.
- The cleaning and sanitation of the infirmary rooms must be uniformly done and should not vary based on the ability of the patient to assist the cleaning. Pest control must continue to be addressed in the infirmary.
- The negative pressure units in the infirmary are not regularly inspected or cleaned. The units were not fully functional. These units should have documented inspections on a weekly basis (daily if the room is occupied by a patient in respiratory isolation) and the filters changed on a monthly basis or as needed. The unit should be regularly checked during the environmental rounds and the condition noted in the monthly Medical Safety and Sanitation Report.
- The infirmary porters were verified to have received blood borne disease training and hepatitis A and B vaccinations.
- The physical plant, cleanliness, safety, and sanitation of the hemodialysis unit were unacceptable. The deficiencies and concerns noted in this section and the Infection Control sections must be immediately addressed.
- All medical equipment must be inspected and calibrated no less than annually by a bioengineering team. Only the AED and the UIC lab centrifuges had labels documenting inspections within the previous 12 months.

The main housing unit is a long rectangular building that has been subdivided into four quads, B, C, D, and E. Each of the quads houses approximately 260 inmates (capacity was reported to be 277). Each cell on these quads has two single beds with a toilet and a sink. The doors are barred. Large open showers are located on the second floor. The shower in Quad E was in good repair with no obvious mold. There was a plastic shower chair for use by patient-inmates with ambulation issues. There are no elevators in the housing units. All inmates with ambulation issues are housed on the entry level.

The nurse sick call rooms in Quads B, C, D, E, and in the X (disciplinary segregation and protective custody) building were inspected. The location of the nurse sick call rooms in the housing areas enhances the inmates' access to health care services. The sick call rooms have adequate space. Each has an exam table with disposable paper coverage, a blood pressure and vital sign unit, a temperature taking device, a medication cart, a wall mounted oto-ophthalmoscope, a privacy barrier, and a scale. Four of the five nurse sick call rooms had a sink for hand washing and paper towels. Quad B did not have a sink, but there were sanitizing wipes and gel for hand washing. The ophthalmoscopes in two of the sick call rooms (D, E) were not functional. The medication cart in one room was inspected; it was locked and sealed. The medication cart check list/log with a pill count was properly maintained. Although the floor in B was dirty and the sink in D was crusted with mineral deposits, the nurse sick call rooms were generally clean and organized. In a few rooms there were unprotected paper memos taped on the wall; this is considered a potential fire safety hazard.

The first aid kits in the correctional officers' rooms on Quad D and B were not sealed and did not have any gauze or bandages for emergency use. This was reported to the correctional supervisor.

Although there are locked boxes for sick call requests on the housing areas, inmates reported that they use a signup list on the first floor to request a nurse sick call visit. They are asked not to write their medical concerns on the list. All inmates interviewed stated that they are, almost always, seen by the sick call nurse within 24 hours. In the X facility, inmates have to tell the correctional officer or med nurse to sign them up; they also stated that they were seen on the next day. If the nurse referred them to a physician/physician assistant, there was a two to three day wait unless the problem was deemed urgent.

The infirmary has 32 beds; 26 were occupied during this visit. One of the wings has two beds per room and the other is predominantly single beds. Mentally ill individuals in crisis are housed in a single bed room. Nearly 70% of the current infirmary patients were chronically ill (post-CVA, dementia, encephalopathy, ataxia, paraplegia, difficulty with ambulation etc.), with most needing some level of assistance with activities of daily living.

Almost all of the beds in the infirmary need to be replaced. The infirmary beds are low to the floor and cannot be raised. The head of the beds cannot be elevated. Most of the beds had broken or non-functional railings. There were no electrical beds in the infirmary. One patient with dementia was noted in his bed with nearly half of his body hanging over the edge of the

bed. This is a significant safety risk. The condition of the infirmary beds creates a notable safety risk for staff and patient-inmates. There is no replacement plan for the infirmary beds. The mattresses were generally in good condition; the impervious covers were also either intact or taped. Only one mattress had a tear (across the entire end of the covering). The rooms on the two-bed wing had nurse call devices; a review of four rooms verified that the devices were functional. There are no call devices on the single bed wing.

The infirmary had two negative pressure rooms (124 and 126). Room 124 has two HEPA units; the filters in both units were caked with dust. One unit had 1/12/2016 written in magic marker on its surface; presumably this was the last date of inspection. The second unit was undated, had dusty and dirty intake and outflow vents, and when turned on moved a very limited amount of air. In addition, the ceiling air vent was taped over. There was a single HEPA unit in room 126; there were no dates of inspection on this unit. The filter was covered with dust. The nurses demonstrated how they test the negative pressure in these rooms by placing a sheet of toilet paper over the chuck hole to see if the paper is drawn into the room. The test failed in room 124 and had limited draw in room 126. The experts requested the inspection reports for the HEPA units but the reports, if they exist, were not provided. The facility management staff changed the filters that evening, and the tissue paper test demonstrated the presence of negative pressure on the following day.

Inmate porters sweep and mop the floors of the infirmary rooms two to three times a week. They report that they spray and clean the toilets, sinks, and showers on a regular basis. No printed cleaning schedule was provided. Two infirmary porters were interviewed.[5] They both stated that they had received formal training about their duties and had been vaccinated against hepatitis A and B. The Director of Nursing provided copies of their training curriculum, post-training test and vaccination records that confirmed the information provided by the porters. We did, however, note cockroaches, flies, and gnats on the infirmary unit. The patient rooms in the infirmary varied in degree of cleanliness and sanitation. Rooms in which the occupant participated or primarily did their own cleaning were reasonably clean. Infirmary room 124 was occupied by an individual with dementia; his room was filthy, with debris on the floor. His shower had not been recently cleaned. There were 20 small flies on the wall of the shower. He reportedly would tell the porters not to clean his room. The condition of this room created infection control and health hazards for the entire infirmary. Porters were directed to come in and sanitize this room.

The infirmary tub room in the wing with the two-bed rooms was virtually unusable, having no safety bars and large gaps and cracks in the floor tile. The floor drain does not fully drain. The adjacent shower room was clean with surrounding safety grab bars; however, the ceiling vent and wall towel hooks were completely rusted and thus impossible to sanitize.

The infirmary nurse station was centrally located between the two wings, with access to both hallways. The nurse station was adequately sized and clean. All the chairs in the nurse station

---

[5] Infirmary Patients #5 & 6.

were deteriorating, with torn fabric and cushions; these need to be replaced. There was a single box on an upper shelf that was less than 18 inches from the ceiling and this is considered a fire safety hazard.

The health care unit/clinic's exam rooms, nurse work rooms/offices, urgent care room, physical therapy room, telehealth rooms, mental health interview rooms, and phlebotomy/lab prep room were organized and clean. The large elevated exercise mat in physical therapy, a number of examination tables, and the optometry chair had tears in their outer protective surfaces. One of the provider exam rooms had numerous paperback reference books cluttering the desk and a file cabinet.

A large space next to the urgent care area had six rooms. There were two provider exam rooms, each with an exam table, sink, paper towels, desk, and two chairs. The exam tables were adjustable; both tables had tears in the upholstery. Only one table had a paper barrier. The room used by the physician assistant was cluttered with 20-25 paper backed reference texts, some outdated, and food sitting on ice was noted in the sink. Two other rooms with correctional computers were used by nurses to track inmate locations for medication passage. One of the nursing rooms was a former exam room with an exam table with untorn impervious upholstery. The fifth room was the phlebotomy/lab prep room. Two centrifuges owned by University of Illinois (UIC) had been inspected in December 2017. There was a taped biohazard box in the lab that had not yet been moved to the nearby biohazard waste room. The optometrist (two days/week) uses the sixth room; it has an optometry chair with a small tear, optometry equipment that is aging but was reported to be fully functional, a functioning ophthalmoscope, and a desk with a chair. The optometry room was clean, neat, and organized.

The urgent care room had two gurneys with intact mattresses and paper barriers. This room had a functional Gomco suction unit, Automatic External Defibrillator (AED), EKG machine, oxygen tanks, nebulizer units, ambu bag, and oto-ophthalmoscopes. The equipment was verified to have been checked daily on the 11 p.m. to 7 a.m. shift. On every shift, the urgent care nurses count and log the narcotics, sharps, and suture quantities. With the exception of the AED, none of the equipment had been recently inspected by a bioengineering vendor. The last bioengineering inspection of the nebulizer was dated 2005. SCC does not have a crash cart; the institution performs basic CPR, applies the AED, and calls 911 for cardiac arrests. This is an acceptable option for responding to codes/cardiac arrests. A plugged-in radio repaired with duct tape was on the treatment counter in the urgent care room; the condition of the radio rendered it unable to be sanitized. The staff was directed to remove the radio from the unit.

Hemodialysis is performed onsite via a contract with Naphcare, Inc. in a four-chair hemodialysis unit. Hemodialysis treatments are performed Tuesday, Thursday, and Sunday on the evening shifts but these sessions appear to continue into the night. A hemodialysis patient on a housing unit told the experts that he is always moved to dialysis sessions. The chairs were in good condition. The dialysis machines were clean but there were indelible stains (likely betadine) on the top of the machines. During sessions when a hepatitis B infected patient is being dialyzed, a hemodialysis chair is not used exclusively by hepatitis B infected patient(s) nor is a dedicated

dialysis technician/RN assigned to these patients. This is not in accord with Center for Disease Control standards.[6]

The hemodialysis room was in deplorable physical condition. The walls and paint were deteriorating and peeling, the floor was dirty and had not been buffed for a lengthy period of time, there was standing water in the water room, a number of unformed boxes were leaning against a wall, and a large, half-filled garbage container lacked a cover. The water room was cluttered and cramped. Half of the water room was used to store deionization tanks, eight of which were unsecured, creating a safety hazard. The door of the refrigerator in the water room was rusted and deteriorating and cannot be effectively sanitized. The storeroom in the hemodialysis room had boxes on the floor and boxes stacked on shelves up to the ceiling. Hemodialysis units have high risk for blood borne contamination. The hemodialysis unit at SCC does not meet the community standards for hemodialysis centers. SCC maintenance staff, the vendor Naphcare, and the correctional health vendor must jointly work to address the physical plant, safety, and infection control issues in the hemodialysis unit.

The kitchen and dining areas were unsanitary and promoted infectious hazards. The inmate dining halls had sparrows flying above the tables and even landing on the cafeteria line serving counters. Bird droppings were noted on walls, the floor, and ceilings. There appeared to be a nest high on a wall in one of the inmate dining areas. The presence of birds and their droppings in the inmate dining and food serving areas exposes the inmates and staff to preventable risk of infection by bacteria, viruses, fungi, and ectoparasites that are known to be associated with birds, their droppings, and their nests.[7] Birds and their droppings in the SCC inmate dining and food serving areas is a health risk for the inmates and staff. The birds must be removed from the dining areas and the droppings cleaned using proper safety precautions. A registered sanitarian must be hired to fully inspect the kitchen and correct these deficiencies.

The tray, utensil, pots, and pan-washing and sterilization machine had been broken for three years. The meat freezer does not have rubber/plastic flaps at the entrance, allowing the temperature to rise above freezing temperatures when meat is being brought in and removed from the freezer. An environmental sanitarian should be brought in the fully inspect the kitchen.

The dish cleaning unit in the main kitchen has been broken for three years. Trays, pots, and pans are washed and dried by hand. It was reported that a new unit has been purchased and will be installed in 2018. The meat freezer in the kitchen does not have rubber flaps at the entrance, resulting in an unsafe rise in freezer temperatures above freezing (as noted on the freezer temperature log) in the early morning when frozen meat is moved to the defrost room. The current cleaning of the trays, pots, utensils, and pans is done manually.

---

[6] Centers for Disease Control and Prevention, *Recommendations for Preventing the Transmission of Infections Among Chronic Dialysis Patients*. MMWR, April 27, 2001/50 (RR05); pp. 1-43 as found at https://www.cdc.gov/mmwr/preview/mmwrhtml/rr5005a1.htm.
[7] We note that IDOC had a histoplasmosis outbreak at the Danville facility thought to be due to bird droppings.

In summary, the First Court Expert made no specific recommendations concerning sanitation and infection control. We have recommendations that are found at the end of this report.

<u>Environmental Rounds</u>
**Methodology:** The HCUA was interviewed and copies of the Monthly Safety & Sanitation Reports (January-May, July-August 2017) and the Medical Safety and Sanitation Reports (September 2017-February 2018) were provided and reviewed.

**First Court Expert Findings**
The First Court Expert did not report on environmental rounds at SCC.

**Current Findings**
- Safety & Sanitation Reports were filed monthly from January through August 2017 (July was not provided). These reports were then replaced by the Monthly Medical Safety and Sanitation Report.
- Monthly Medical Safety and Sanitation rounds are being performed and have been reported from September 2017 through February 2018.
- The format of the Monthly Medical Safety and Sanitation report is notably improved. This report includes: 1) Location, 2) Identification of Standards Not Met, 3) Recommendations for Corrective Action, 4) Follow-up on Past and Present Discrepancies.
- The Health Care Unit, hemodialysis unit, and the infirmary have been reported in the monthly reports as having an ongoing pest control (insects, cockroaches, gnats) issues. Exterminators have been contracted. An exterminator was seen entering the facility on the first day of the experts' visit to SCC.
- Cleaning issues in the infirmary and the health care unit were cited in the report, including the cleaning of dirty vents.
- In January 2018 the hemodialysis unit was noted to be in compliance, but the February 2018 report cited water on the floor, cockroaches, and broken floor tiles that need to be repaired in the hemodialysis unit.
- The Clinic Space, Sanitation, and Infection Control sections in this report noted far more deficiencies in the health care unit, the hemodialysis room, and the infirmary than have been reported in the Monthly Medical Safety and Sanitation Reports. The rounds did note and repair mattresses in the infirmary that were in poor condition.

Monthly environmental rounds are being performed by the health care team at SCC. These rounds have identified concerns, some of which appear to have been corrected or are being addressed. The rounds must focus more attention on the beds in the infirmary, the cleaning and sanitation of the infirmary rooms, the repair of impervious covers of exam tables, chairs and patient mattresses, and the deplorable condition of the hemodialysis unit (water room, floors, walls, safety, and infection control standards).

In summary, the First Court Expert made no specific recommendations concerning sanitation and infection control. We have included recommendations that are found at the end of this report.

## Medical Records

**Methodology:**  We inspected the medical record room and interviewed staff. We also reviewed many medical records and had an opportunity to assess the organization of the medical record document.

**First Court Expert Findings**
The First Court Expert did not provide any findings with respect to medical records at SCC.

**Current Findings**
The medical records program has a Director of Medical Records who is a Registered Health Information Technologist (RHIT), which is appropriate training for this position. There are three IDOC employees and one Wexford employee working in medical records in addition to the Director of Medical Records.

The medical records room appears orderly but is cluttered, with very old carpeting and furnishings. There was insignificant backlog of filing. There is a procedure for filing records and for use of out guides. But these procedures are not always followed. For the most part, medical record staff pull and refile medical records. However, nurses pull some records and we were told that medical records staff re-file only about 80% of medical records. Medical record staff typically are to handle all medical record transactions, especially pulling records and refiling records. This is done in order to ensure confidentiality of the medical record. The medical record room is either occupied by medical record staff or is locked. During daytime hours, the medical record staff does secure the files. Certain staff, during off hours, have keys to the medical records room and can pull and refile records.

While there is no backlog of medical record documents to file, there are a significant number of offsite consultation reports that are not available. Consultation reports from UIC are not filed within three days of the consultation as required by the IDOC administrative directive on medical records. It appears that most reports are filed within three weeks of the consultation. This may account for the provider's lack of knowledge of the clinical status of the patient as represented in the medical record reviews. Some offsite consultants, including St. Joseph's Hospital, do not consistently provide a hospital discharge summary. Several records we reviewed had no information about when a patient was sent offsite and this made it impossible to determine the clinical course of care for these patients. In our discussion with the Medical Director, he stated that he asks the patient what transpired at their consultation visit. This is not a reliable method of understanding what the consultant found. Providers must have a consultation report.

For patients going for consultation at UIC, the program must get a patient release of information for the medical consultation report.[8] This results in a delay of one to three weeks before the consultation report is provided. Since the IDOC providers are required to evaluate the patient within five days of a return from offsite encounters, the providers almost always evaluate the patient without a consultation report. The referral form, which is available, usually has limited comments by the consultant. However, in our review of records, the lack of availability of the consultation report typically meant that the providers were uninformed with respect to the status of the patient. This appeared to create poor continuity of care for patients.

In using the paper records for our record reviews, we noted that many of the records are large documents. When using the record, the plastic binder holding the chart together frequently came apart. This happened repeatedly, and the current Medical Director expressed the same concern. If paper records are to be used, a better system needs to be developed so that the record is a functional and useable document. Records that come apart can result in misplaced or lost documents.

SCC serves as a dialysis facility; however, the dialysis records are maintained separately from the facility medical record. Medical records should be unified. Doctors at SCC are unaware of nephrologist's notes or recommendations or the status of the patient during dialysis because the records are not kept in the medical record.

We found the paper records very difficult to use. It is not possible to evaluate current medication records, as those are not placed in the record until several weeks after they are completed. Because most charts are multiple volumes, key information about patients was often in older volumes. Given the difficulties in using the paper record system, we strongly recommend implementation of an electronic record.  We note that in review of mortality records from SCC we could not make a determination whether the death was preventable in three of seven records reviewed because the medical record was missing documents.  This demonstrates a very broken system of maintaining medical records.

## Intrasystem Transfer

**Methodology:** To evaluate the medical screening of inmates received at SCC as transfers from other Illinois DOC facilities, we interviewed health care staff, toured the urgent care area where transfer screening takes place, reviewed the IDOC health status form, the SCC Operations Policy and Procedure P-118 Transfer Screening, and health records of inmates received at SCC.

**First Court Expert Findings**

---

[8] Typically, when a physician refers a patient to a consultant, the consultant sends a report to the referring physician. Why this does not occur in IDOC is not understandable. In our past experience, when situations like this arise, a discussion with the hospital administrator and hospital medical director have resulted in obtaining records. We view this problem as a failure of the Wexford leadership in conducting appropriate negotiations with the consultants.

The previous Court Expert found in more than half the charts reviewed that the transfer summary was incomplete or missing, inmates with chronic diseases were not referred for chronic care clinic, and vital signs were not recorded or not followed up when abnormal.

**Current Findings**

Transfers to SCC most often take place on Wednesday and average less than 50 per month. Inmates received on transfer are brought to urgent care in the health care area for screening before placement in population. The sending facility documents information about the inmate's health status and treatment on the Health Status Summary Record. This form and the medical record is reviewed by a nurse at SCC upon the inmate's arrival. The nurse also inquires if the inmate is currently receiving treatment or has any other immediate need for medical attention. The nurse then schedules the inmate for subsequent health care (i.e., enrollment in a chronic care clinic, initiation of medications, etc.) as needed. The nurse also provides a verbal explanation and handout about how to access health care at the facility.

SCC does not keep a log, list, or other method to track inmates received on transfer. The medical records department had filed the memos which listed the names of inmates to be received on transfer. Using these memos, the charts of all inmates received in January and February 2018 who were still at SCC as of the date of the site visit were reviewed. A sample of 12 records was obtained. Ten of these inmates had health care requirements that needed continuation at SCC. The transfer process was complete in seven of the 10 charts reviewed of inmates with ongoing health care needs. One transfer summary did not list psychotropic medications that were prescribed, but these were identified by the nurse upon review of the chart and continued.[9] In another, there was no transfer summary for an inmate with diabetes and hypertension. The nurse who reviewed the chart noted his medical history, enrolled him in chronic care and ensured that his medications were continued.[10] In another chart reviewed, an inmate on prescribed psychiatric medications was not scheduled to see a provider urgently and no other attempt was made to continue medication upon his arrival at SCC.[11]

Transfer screening at SCC has improved since 2014. However, the record review performed at this site visit revealed transfer information that was incomplete, or care that was not continued as prescribed for 30% of the inmates requiring continuity of care. Continuity of care upon transfer needs to be more reliable.

The First Court Appointed Monitor recommended, "The intrasystem transfer process needs to be appropriately addressed to effectively insure continuity of care for patients who enter with prior diagnosed problems. This should be monitored by the QI program."[12] CQI minutes and related material from SCC that were provided from January 2017 through December 2017 were reviewed. There were no reports monitoring the continuity of care after intrasystem transfers.

---

[9] Intrasystem Transfer Patient #11.
[10] Intrasystem Transfer Patient #12.
[11] Intrasystem Transfer Patient #10.
[12] Lippert Report, p. 38.

We agree with the First Court Appointed Expert's recommendation. SCC has not implemented the recommendation made by the First Court Appointed Expert in 2014. Inmates are at significant risk of discontinuity in their medical care and treatment resulting from incomplete or inaccurate transfer screening. These deficiencies should be addressed in documented corrective action plans and regular follow-up monitoring done until sustained improvement is demonstrated. We have additional recommendations found at the end of this report.

## Nursing Sick Call

**Methodology:** Nursing sick call was evaluated by reviewing SCC Institutional Directive 04.03.103K Offender Health Care Services, SCC Operations Policies and Procedure P 103 Non-Emergency Health Care Requests and Services, IDOC Treatment Protocols, and the SCC Offender Handbook. We also interviewed the Director of Nursing, nurses, and inmates; observed nurses conducting sick call, inspected the rooms used for sick call, and reviewed tracking logs and health records. The completed sick call log showing the reasons patients requested health care attention for the month of February 2018 was used to select charts to review. Seventeen sick call encounters were selected for chart review.[13]

### First Court Expert Findings

The First Court Appointed Expert found that sick call was available to inmates only a few days each week based upon their housing location. The rooms used by nursing staff were not equipped appropriately. There were delays in accessing sick call because it was not scheduled frequently enough and, at times, because security staff would not escort inmates to the nurse sick call room. Nurses failed to document the dates that sick call requests were received and triaged. Nurses also did not adequately assess or document evaluation of inmate health complaints. Inmates who were referred from nurse sick call were not seen or not seen timely by providers. Providers failed to follow up at intended intervals and treatment orders were not completed.[14] Two recommendations were made:

1. Custody issues should not interfere with timely provision of health care.
2. There should be no such thing as a "no show." Patients should be required to report to health care when scheduled. They may refuse care but only to a health care professional.[15]

### Current Findings

Our review found that problems with daily access to sick call have been resolved. Since SCC has implemented the sign-up log, patients are seen the next day. Documentation of timeliness and disposition of sick call requests is evident from review of the sick call logs. The rooms used to perform sick call are now adequately equipped. There was also no evidence of security staff failing to escort inmates to sick call as described in the First Court Expert's report.

---

[13] Sick Call Patients #1-17. We selected patients whose requests were potentially serious (chest pain, abdominal pain, seizure, vomiting, skin infection, diabetic complications, withdrawal, etc.).
[14] Lippert Report, pp. 9-12.
[15] Lippert Report, p. 38.

Problems with sick call identified in the First Court Expert's report that are still evidenced include:

- Nurses do not adequately assess or document evaluation of inmate health complaints.
- Inmates who were referred from nurse sick call were not seen or not seen timely by providers. Providers failed to follow up at intended intervals and treatment orders were not completed.

In addition, we had several additional findings:

- LPNs continue to be assigned to conduct sick call even though the stated practice at SCC is to assign RNs.
- Security practices in segregation do not provide sufficient privacy for patients during the sick call encounter.
- Nurses do not refer patients to providers in accordance with IDOC Treatment Protocols and do not document the urgency of the referral (e.g., urgent, routine).

When inmates arrive at SCC they are provided an orientation handout that states, "Inmate patients needing to see healthcare must sign up on the sick call call-out logs located within each housing unit. The day after you sign up, you will be called to the sick call room located within each cell house."[16] This information is consistent with SCC Operations Policies and Procedure P 103 Non-Emergency Health Care Requests and Services.[17] We observed this process in several of the housing units. The log is prominently posted in the cell block. Inmates wanting to be seen write their name on the sick call log. The sick call logs are collected at night or early in the morning.

Inmates may also use the Medical Services Request form to request dental, eye and mental health services that are not urgent.[18] The inmate puts the request into a clearly labeled box mounted on the wall in each housing unit. Any requests in the box are picked up by CMTs daily when they make rounds of the cell blocks. These requests are then forwarded to the respective department (dental, mental health, optical, pharmacy) to address. Inmates may also use the sick call sign up log for dental, mental health, optical, or any other issues, and are seen at nursing sick call the next day.

The morning after the sick call lists are collected, nurses conduct sick call using the lists. Anyone who has signed up on the sick call log is seen by a nurse that day. The medical service requests are routed directly to the relevant department (dental, mental health, etc.) if the request is for a routine service such as an exam, medication refill, or supply item.

---

16


Stateville Access to Care Inmate Handout.

17 SCC Operations Policies and Procedures, pp. 4-5.
18 STA 0202 (Rev 4/2103).

The day we observed sick call[19] each of the inmates seen had signed up on the sick call log the day before.[20] Of the 17 charts we reviewed, all documented sick call encounters with inmates who had signed up on the log the day before.[21] Five other inmates interviewed during the site visit confirmed that when they signed up for sick call they were seen the next day.[22] Inmates appear to be able to access nursing sick call within 24 hours of signing up. None of the inmates interviewed or who agreed to be observed during sick call voiced complaints about the timeliness or responsiveness of nursing sick call.

According to the Director of Nursing, only registered nurses (RNs) are assigned to perform sick call on a regular basis. However, LPNs are assigned to sick call if there are not sufficient RNs available. Review of the daily assignment roster for the week of February 12, 2018 showed that RNs were assigned to sick call six of seven days.[23] According to the Director of Nursing, LPNs were assigned sick call on six days in January 2018 and eight days in February 2018. Of 17 sick call encounters reviewed in the chart review, five were completed by LPNs.[24] From these three sources, we conclude that LPNs are relied upon to complete 20 to 30% of sick call encounters. The Illinois scope of practice does not permit LPN's to perform assessments independent of a registered professional nurse or higher level professional, as is currently being done at SCC.[25] There are insufficient RN positions at SCC to conduct sick call. LPNs are assigned to do the work in lieu of available RNs but they are not qualified, and this assignment is not within their lawful scope of practice.

Nurses see inmates in a sick call room that has been established in each of the cell houses. The nurse brings the inmate's medical record to use during the sick call encounter. The sick call rooms are well lighted, generally clean, and capable of providing patient privacy. Each has an exam table with paper and a wall mounted oto-ophthalmoscope. See the description of these rooms in the section of this report on Clinic Space and Sanitation. The space, equipment, and supplies available to conduct sick call are adequate.

We observed three nurses (all RNs) as they were conducting sick call on Monday February 26, 2018. A total of five patients were seen, three of these were in segregation.[26] Each of the nurses' evaluation of the patients' complaints was thorough and appropriate. Nurses correctly used the IDOC treatment protocols and the plans derived for each patient were appropriate. The nursing assessment was pertinent to the complaint in 11 of the 17 charts reviewed (64% compliance). The plan of care was consistent with sound nursing judgement or that specified in the nursing treatment protocol in 12 of 17 charts reviewed (71% compliance). Based upon the

---

[19] Monday February 26, 2018.
[20] Sick Call Patients #17-22.
[21] Sick Call Patients #1-17.
[22] Sick Call Patients #23-27.
[23]



Stateville RN Staffing
for Sick Call.PDF

[24] Sick Call Patients #2, 4, 8, 9 & 12.
[25] Illinois LPN Scope of Practice, Section 55-30.
[26] Sick Call Patients #18-22.

results of the chart review, nursing assessment and planning care could be improved. However, the adequacy of nursing assessments and the plan of care are not monitored by nursing service as part of the peer review or CQI. We recommend that the adequacy of nursing evaluation and planning at sick call be an area of ongoing monitoring, training, and coaching.

The three patients we observed being seen in segregation were provided neither visual nor auditory privacy during the sick call encounter. One, or sometimes two officers, were at the doorway or just inside the room. They interacted with both the nurse and the inmate during the encounter. The officers also interacted with each other and other traffic passing through the corridor. In one case the officer helped the nurse obtain the patient's weight.[27] In another encounter, the officer resisted the nurse's request to remove one patient's arm from the shackles to obtain vital signs.[28] This was finally accomplished when a more senior officer arrived to assist. It is not possible to assess and evaluate inmate health concerns when custody staff intrude and impede the encounter in these ways. Custody staff should stand at a distance from the sick call room so that they can see the encounter but not hear the substance of the interaction. Custody staff should be prepared and available to remove restraints as requested by the nurse to complete the evaluation of a health complaint.

We were told by the Nursing Director that patients referred to the provider from sick call are to be seen within 72 hours unless it is more urgent. Based upon the charts reviewed, nurses do not document urgency when referring to a provider and there is no area on the nursing treatment protocols to indicate urgency. From observation of the nurses conducting sick call it was clear that they do make this determination, it just is not documented. The sick call documentation forms should be revised to indicate if the referral is emergent, urgent, or routine.

There were only two charts that documented an urgent referral from sick call; only one was seen within 24 hours of the referral. There were 13 sick call encounters that were referred non-urgently to a provider. Of these, only three patients were seen within 72 hours of the referral (23% compliance). Patients were not seen timely because either the appointment was scheduled out longer than 72 hours or the appointment did not take place and was rescheduled for a later date. CQI studies were completed to study timeliness of patients seen by providers when referred from sick call in December 2016, and January, March, and June 2017. Performance on this measure was less than 80% in four of five studies reported in the annual CQI report. The actions taken as a result of these studies was to repeat the study four times and, in June 2017, to educate the nurses on sick call procedures. Clearly, problems accessing providers persist if only 23% of the 13 referrals from sick call encounters in February 2018 were seen within 72 hours.

The following are examples from the chart review of problems found with sick call.

---

[27] Sick Call Patient #22.
[28] Sick Call Patient #21.

- The first patient was seen by an LPN in sick call on 2/13/2018 for a complaint of chronic diarrhea.[29] The nurse did not document an adequate assessment of the patient or develop a plan of care per the protocol for diarrhea.[30] From a review of the chart it was clear that the patient had been discharged from the infirmary 19 days earlier after a month long stay for treatment of salmonella. The nurse did not refer the patient to a provider and should have done so urgently.

- Another patient was seen at sick call on 2/8/2018 because he was experiencing shortness of breath at night.[31] The nurse did not assess the patient per the treatment protocol for shortness of breath.[32] The nurse provided no intervention and did not make a referral to a provider for further evaluation. This is a symptom of potentially serious cardiorespiratory disease that should have been more thoroughly assessed by the nurse. The assessment would likely have prompted a provider referral.

- Another patient was seen in sick call on 2/9/18 for a painful lump in his breast.[33] The nurse's assessment prompted referral to a provider. The provider appointment was scheduled to take place four days later but was subsequently cancelled. The appointment was re-scheduled for 2/26/18 but did not take place. This was a delay in care for evaluation of a potentially serious condition. After reviewing the chart, we asked that he be seen, so an appointment was scheduled for 2/28/18.

- Another patient was seen by an LPN on 2/13/18 for a skin rash.[34] The nurse did not assess the patient per the treatment protocol for rash.[35] There was no description of the rash nor did the nurse acknowledge that he had been seen previously for the same condition on 1/6/18 and 1/31/18. The nurse did refer the patient to a provider, but he was not seen promptly. An appointment was originally scheduled for 2/15/18 but did not take place until 2/21/18, or until eight days later.

- Another patient was seen in sick call for a complaint of dizziness on 2/15/2018.[36] The nurse referred the patient to a provider per the treatment protocol for dizziness.[37] The provider appointment was scheduled to take place five days later, on 2/20/18, but he was not seen. It was rescheduled to 3/2/18 or 14 days after the referral. The provider's evaluation of this patient's serious symptom of dizziness was not timely.

---

[29] Sick Call Patient #4.
[30] IDOC Nursing Treatment Protocols, (March 2017), p. 39.
[31] Sick Call Patient #6.
[32] IDOC Nursing Treatment Protocols, (March 2017), pp. 75-76.
[33] Sick Call Patient #7.
[34] Sick Call Patient #9.
[35] IDOC Nursing Treatment Protocols, (March 2017), p. 70.
[36] Sick Call Patient #10.
[37] IDOC Nursing Treatment Protocols, (March 2017), p. 40.

- Another patient complained of chest pain when seen on sick call 2/15/2018.[38] The nurse did not assess for cardiac risk factors per the treatment protocol.[39] The patient's blood pressure was elevated, he was overweight, and being treated for hypertension. The nurse did not confer with a provider per the instructions in the treatment protocol but scheduled him for an appointment four days later. This appointment did not take place until 2/22/2018, or seven days later. The provider documented that the patient had not been taking his medication for hypertension. An EKG done at that appointment revealed an abnormal cardiac rhythm. This patient should have been more thoroughly evaluated by the nurse and the provider notified urgently.

- Another patient was seen in sick call on 2/17/18 because of abdominal pain.[40] He gave a history of GERD and chronic diarrhea. The nurse scheduled the patient to a pre-existing appointment that was to take place 10 days later. It was poor nursing judgement to schedule a patient with this history and symptom presentation to a pre-existing appointment 10 days later.

- Another patient was seen in sick call 2/2/18 for a complaint of chest pain.[41] He was referred to a provider urgently and seen that same day. The provider ordered the patient's blood pressure to be checked twice a day for three days and then he was to be seen by the provider in follow up. None of the six expected blood pressure readings are recorded in the chart. Twice there is documentation that the patient refused to have his blood pressure taken. The other four times there is no documentation that his blood pressure was taken. The patient also was not seen in follow up by the provider. In this case, ordered care was not completed and the patient who was experiencing chest pain was not followed up.

In summary, we concur with the First Court Appointed Expert's recommendation that custody issues should not interfere with timely provision of health care, especially as it pertains to patient privacy in segregation. With the implementation of practices to see all inmates who sign up for sick call the next day, the other recommendation that refusals be seen by health care professionals has been accomplished. We have additional recommendations found at the end of this report.

## Chronic Care

**Methodology:** The medical records of 13 patients with chronic medical illnesses and conditions were reviewed. There was limited opportunity to interview SCC providers due to restrictions imposed by Wexford. The Office of Health Services Chronic Illness Treatment Guidelines dated March 2016 were reviewed as needed.

[38] Sick Call Patient #11.
[39] IDOC Nursing Treatment Protocols, (March 2017), pp. 30-31.
[40] Sick Call Patient #13.
[41] Sick Call Patient #17.

**First Court Expert Findings**

The previous court expert noted that chronic care patients should be scheduled in accord with their degree of disease control, not at the fixed intervals that a specific chronic disease clinic is scheduled. Diabetics' meals should be served on a predictable schedule to facilitate the timely coordination with insulin administration just prior to food consumption; Type 1 diabetics should receive short-acting insulin prior to each meal, not just at breakfast and dinner; HIV patients should also receive primary care provided by SCC providers; and the chronic care nurse should do no less than monthly medication compliance checks with HIV patients.

**Current Findings**

We agree with the findings in the First Court Expert's report. In addition, we identified additional findings and confirmed some of the First Court Expert's findings as follows:

- Problem lists occasionally are incomplete or inaccurate.
- Patients assigned to chronic care clinics are regularly seen in these disease specific clinic sessions.
- The chronic clinic visits contain very limited clinical information, do not indicate that appropriate examinations had been performed, do not document the rationale for clinical decisions and therapy modifications, do not modify treatment to attain generally accepted treatment goals, and do not document the patient's treatment plan.
- Management of chronic illnesses is not in accord with either the Office of Health Services Chronic Illness Treatment Guidelines or national standards of care.
- SCC fails to provide basic screening tests and vaccines that are recommended for diabetics in the IDOC Diabetes treatment guidelines and in national standards of diabetes care.
- Chronic care visits strictly focus on a single specific disease and do not address any other associated clinical problems. As examples, abnormal blood pressure values were not addressed in diabetic clinic. Elevated blood glucose was not addressed in hypertension clinic. Neither one of these clinics addressed hyperlipidemia. Managing each chronic care disease in a silo independent of the patient's other illnesses contributes to delays in modification or initiation of treatment for patients with multiple chronic illnesses and can contribute to increased morbidity.
- All patients over 50 need to be screened at regular intervals for colon cancer. The frequency of screening is based on patient characteristics and on the type of screening method used. The charts of seven 50 years of age or older patients were reviewed; only one had documentation in their medical record that they had been screened for colon cancer.[42]

---

[42] Screening for Colorectal Cancer, US Preventive Services Task Force Recommendation Statement, JAMA June 21, 2016; Volume 315, Number 23 as found at https://www.uspreventiveservicestaskforce.org/Page/Document/UpdateSummaryFinal/colorectal-cancer-screening2?ds=1&s=colon%20cancer.

- Nationally recommended vaccinations for adults are not consistently administered. Pneumococcal, meningococcal, and hepatitis A and B vaccinations were not offered or given as recommended by national age and disease-based guideline.[43]
- Uncontrolled chronic illnesses that appear to be beyond the expertise of the SCC providers are not referred for specialty consultation.
- The chronic care providers do not document any review of the MAR, the capillary blood glucose tests (CBG), and the nursing and provider sick call notes and blood pressure readings when they see patients in the disease-specific chronic care clinics.

Chronic disease visits are conducted separately for each disease. If a person has three diseases, he will be seen in three separate clinics two or three times a year. This dramatically increases the number of visits. SCC has chronic care clinics for asthma (January & July), diabetes (April, August, & December), high risk (March & September), hypertension (March A-L, April M-Z, September A-L, & October M-Z), seizure disorder (February & August), and tuberculosis (January – December). Individuals with Human Immunodeficiency Virus (HIV) are referred to and managed by the UIC Infectious Disease Telehealth Clinic. All other chronic diseases including hepatitis C are managed by the general medicine clinic (May & November). One physician is assigned to staff all the chronic care clinics with backup (vacation, sickness, conference) by the other SCC providers.

The chronic care nurse manually prepares the provider's log-in sheet, noting the reason for the appointment (e.g. asthma clinic, MD sick call, or follow-up, etc.). Medical record staff types and sends this list to all the housing units. This list is used by the correctional officers in the housing units to move men to the health care unit. The chronic care RN hand writes on the list the time in and time out of those seen and those who have to be rescheduled (no show, no provider, refused).

There were 1,700 chronic care visits at SCC in 2015-2016; this number decreased to 1,384 in 2016-2017. There was a drop of 243 hypertension clinic visits. This reason for this drop in total visits was not able to be determined.

In January 2018, the chronic care provider was scheduled for 19 sessions (8 a.m.-2 p.m.); he only was able to staff 17 of these sessions. 400 patients (23.7/session) were scheduled for the month. The 400 patients were not limited to chronic care patients but included provider sick call appointments, add-ons, and 133 asthma chronic care appointments. 282 (71%) of the 400 scheduled patients were actually seen. The provider treated 17 patients per session or approximately 4.7 per hour. Seeing patients every 12 minutes allows limited time for a provider to evaluate chronically ill patients.

---

[43] CDC Recommended Immunization Schedule for Adults 19 years or Older by Medical Conditions or other Indications, 2018 as found at https://www.cdc.gov/vaccines/schedules/downloads/adult/adult-combined-schedule.pdf.

A review of the asthma chronic care clinic statistics for January 2018 showed:

| Scheduled Visits | 133 |
| --- | --- |
| Patients seen | 65 (52%) |
| Patients Already Seen | 4 (3%) |
| Rescheduled | 32 (25%) |
| Other | 31 (22%) |

This data indicates that approximately 55% of all asthma patients scheduled in January 2018 were actually seen on the scheduled visit day or had already been recently seen. It was unclear what the reason for the "Other" category was or whether they were also eventually rescheduled. Some may have refused, others may have been transferred or discharged. The chronic care nurse was not interviewed.

The providers' documentation in the medical record was extremely brief, commonly illegible, and seldom contained pertinent clinical information needed to clarify and understand the state of a patient's chronic illness or justify a change in the treatment plan. The experts found it extremely difficult to track the status of a patient's chronic illness and to comprehend the reasons for a modification of treatment. This lack of clinical documentation is a significant barrier to the continuity and quality of care delivered to the SCC patient population. The experts found no documentation that the chronic care providers had reviewed the MAR (refusals, compliance with prescribed medications), the CBG tests, the nurse and provider sick call notes, and the blood pressure readings taken in the sick call visits when they assessed patients in the disease specific chronic care clinic visits. This failure to review the data and information that had been gathered between chronic care visits contributed to flawed clinical decisions and delays in providing needed care to SCC patient-inmates.

Most of the chronic care patients had completed problem lists. However, four (31%) of the 13 charts reviewed were found to be missing important diagnoses on the problem, list including hypertension, hepatitis C, amputated thumb post human bite, and diabetic foot ulcer. Incomplete problem lists contribute to the failure to adequately monitor and treatment known chronic illnesses.

The care provided to diabetics and patients on chronic anticoagulation, hypertensives, asthma medications, and anti-epileptics was problematic. Diabetics, hypertensives, and patients on warfarin anticoagulation remain uncontrolled for lengthy periods of time, in part because their treatment may only be evaluated in chronic care clinics (two to three times per year) and not as frequently as their condition justifies. Diabetics are not routinely screened for urinary protein and even if they are found to have elevated urine protein, the appropriate medical intervention is not consistently prescribed. Detailed foot and lower extremity sensory exams are not documented in the diabetes chronic care notes. Recommended vaccines are not universally provided to patients whose age or disease warrants such vaccination. Compliance with prescribed medication is important for all chronic illnesses, but the impact of not taking or receiving diabetic, hypertension, anticoagulation, and seizure medications can result in rapid

deterioration and morbidity. There was no documentation in the chronic care provider notes that they were reviewing the MARs or nursing notes to assess compliance with medication and initiating appropriate interventions as needed.

All 13 (100%) of the patient records had problems identified in the provision of care. The following patient summaries highlight the concerns and the findings noted above:

- This is a 42-year-old patient with a problem list noting asthma who was being treated with Xopenex inhaler (beta-agonist), Singulair (Montelukast), and a Medrol Pack (methylprednisolone tabs).[44] He was transferred to SCC from Menard Correctional Center on 6/24/17. His database noted that he had received the pneumococcal-23 vaccine on 5/28/12. His asthma was not evaluated upon arrival at SCC. The RN incorrectly noted that he was taking Albuterol, did not check a PEFR, and referred the patient to the asthma chronic care clinic. Two months later, on 8/24/17, he was seen in the asthma clinic; his PEFR was 500 L/min, he was assessed as stable, and was referred to a January 2018 asthma clinic. Patient was seen again in the asthma clinic on 1/22/18, and his PEFR was 450-500. Although he had a normal exam and his asthma was controlled, the provider noted that he had bronchitis and ordered an oral antibiotic (amoxicillin). At neither asthma clinic visit did the provider note how frequently the patient was using his relief inhaler, or if was waking up at night with cough or whether the patient still had the pack of methylprednisolone that could be immediately taken by the patient in the case of an acute asthma attack. This patient is very stable, and he likely could be taken off Montelukast. At each asthma clinic the provider should be taking a more detailed history concerning any symptoms of bronchospasm and use of inhaler consistent with generally accepted asthma standards of care. The use of antibiotics to treat bronchitis in a stable asthmatic is against the national standard of care and was not indicated in this patient.[45] In summary, the failure to document an adequate history of inhaler use and symptoms indicative of bronchospasm was not in compliance with the Office of Health Services Chronic Disease Treatment Guidelines, Asthma.

- Another patient was a 62-year-old patient whose problem list noted insulin resistant diabetes mellitus (IRDM), hypertension, hyperlipidemia, and aortic arteriosclerosis.[46] His hepatitis C disease was not documented in the problem list. His database noted that he had received the pneumococcal 23 vaccine on 5/23/16 and hepatitis A and B #1 vaccines on 3/26/16. There is no documentation that he received, as required, hepatitis A vaccine #2 or hepatitis B vaccines #2 and #3. During the last 11 months of 2017, he was seen in hypertension clinic two times, in diabetes clinic three times, and semi-annual clinic two times. He also was seen by the optometrist two times. Many of the medical

---

[44] Office of Health Services, Chronic Illness Treatment Guidelines, Asthma, March 2016.
[45] Chronic Care Patient #1.
[46] Chronic Care Patient #2.

provider notes were barely legible. The diabetes and hypertension chronic care notes contained little clinical information and no rationale for modifying or not changing treatment. Between February and December 2017, HbA1Cs were done monthly (in chronological order) 8.7%, 7.9%, 7.8%, 7.8%, 8.1%, 8.2%, 8.2%, 8.2%; none reflected that his diabetes was under control. NPH insulin was increased to 35UAM/20UPM (4/18/17 DM clinic) and again, eight months later at the next DM clinic to 50UAM/25U/PM (12/4/17 DM clinic). If there were any additional modifications in the insulin dosage it was not documented in the provider notes. Ten HbA1Cs were performed in 2017. The national diabetic standards state the HbA1Cs should be tested every three to four months; more frequent testing offers no valid clinical information to the care of diabetes. The providers are not knowledgeable about the recommended frequency of HbA1C testing and the value of this important diabetes test. There was no documentation that this diabetic had a single foot or sensory neuropathy exam in 2017; this does not meet the standard of diabetes care. Simvastatin 10mg was not increased even though this hypertensive, diabetic, elderly male had a >20% 10-year risk of having heart disease or stroke and should have been taking a high intensity statin drug per national standards of care.[47] The SCC providers are not able to calculate this risk because they are not allowed to bring in cell phones and do not have access to electronic references. The statin dose was inadequate for this patient's level of cardiovascular risk. This patient was given a diagnosis of hepatitis C, yet there were no tests done to support this diagnosis. This patient's hepatitis C was not being monitored in accord with national standards. At the two semi-annual clinic visits (6/5/17 and 12/19/17), the patient's hepatitis C was evaluated; no organomegaly, edema, or icterus were identified, and the elevated liver enzyme data were documented in the notes. However, the plan was only to return to clinic in six months; there was no estimate of fibrosis using laboratory tests and no order to do a liver ultrasound or a liver fibroscan to evaluate the stage of fibrosis in order to determine if the patient was a candidate for hepatitis C treatment. Episodes of difficulty breathing, propping his head up in bed to breath, waking up suffocating in October-November 2017, were not being adequately evaluated as of the end of January 2018. The initial provider assessment was sleep apnea, but no additional diagnoses (congestive heart failure (CHF), cardiac arrhythmia, COPD, asthma, coronary artery disease) were considered. There was no documented examination of the patient's heart or lungs and no additional tests were ordered (e.g., chest x-ray, echocardiography, CBC, BMP, EKG, pulmonary function test, sleep studies) to evaluate these repeated symptoms of difficulty breathing. This patient was over 50 years old, but he was not offered a colon cancer screening test during 2017 even though he had two semi-annual clinic visits.

In summary, this patient is not being properly monitored for complications of diabetes, including foot ulcers and sensory neuropathy. HbA1Cs are being ordered at an unjustifiably high frequency, indicating that the providers are not knowledgeable about the utilization of this important diabetic test. His diabetes has not been fully controlled

---

[47] ACC/AHA ASCVD Risk Calculator.

for over a year. His hepatitis C has not been assessed to determine the presence of liver fibrosis (cirrhosis) that would determine if he is a candidate for treatment. He is not being prescribed the proper dosage of a statin that is warranted by his 10-year risk of cardiovascular disease. The providers are not assessing 10-year cardiovascular risk in elderly patients with diabetes, hypertension, and hyperlipidemia. He was prescribed an antibiotic for the treatment of bronchitis. He has not been properly evaluated for his recurrent episodes of difficulty breathing. He is not being screened for colon cancer. The care provided to this patient is not in accord with national standards of care.

- Another patient is a 65-year-old with diabetes mellitus (DM), hypertension, and hyperlipidemia noted on his problem list.[48] The database noted that he had received pneumococcal 23 vaccine on 7/23/16 and had negative PPD on 12/10/16. His medications included NPH insulin 24U/10U, sliding scale regular insulin, Metformin 500mg/d, Lasix 40mg/d, Lisinopril, Simvastatin 40mg/d, Nifedipine 30mg/d, and ASA. He was seen every six months in the diabetes and hypertension clinics. He was seen at UIC Eye Clinic in July 2017 and did not have diabetic retinopathy. His blood pressure was generally at goal. Multiple HbA1Cs between August 2016 and November 2017 indicated excellent control, with all HbA1Cs under 6.0%. However, the CBG logs from October 2017 through January 2018 documented elevated glucose levels that were not consistent with the control indicated by the HbA1Cs; this important clinical discrepancy was not discussed at any of the diabetes clinics. This indicates that the diabetes chronic care providers are not regularly, if at all, reviewing the CBG tests or the MARs during the clinic sessions. Labs done on 3/21/17 reported a microalbumin/creatinine level of 60mg/L (normal range 0-30), but sick call and diabetes clinic providers did not comment on this abnormality and did not order, as is indicated for all diabetics, an ACE inhibitor to prevent further kidney damage. There was no documentation of a detailed foot or distal extremity sensory exam in any of the diabetes clinic notes.

  In summary, there are significant deficiencies (no detailed foot or sensory exam, failure to initiate an ACE inhibitor for proteinuria, no endocrine consultation to evaluate the discrepancy between the HbA1Cs and the finger stick blood glucoses[49]) in the care and screening of this elderly diabetic patient which do meet the ADA standard of care. This 65-year-old was not offered colon cancer screening during 2016-2017; this is not in accord with national age-based standards of care.

- This patient is a 69-year-old whose problem list noted hypertension and hyperlipidemia.[50] His database noted PPD positive 37mm since 2007, and did not note the administration of a pneumococcal vaccine in Volume II. His medications included Lisinopril, Nifedipine, spironolactone, metoprolol, and pravastatin. This patient had

---

[48] Chronic Care Patient #3.

[49] The HbA1C test used at SCC is a point of care test (iSTAT). When there is a question of accuracy of test results, a comparison of a same blood sample should be done at a known reliable laboratory comparing that test result with the iSTAT result. The iSTAT equipment typically needs regular calibration and this may have been not properly done.

[50] Chronic Care Patient #4.

been treated in the past for a positive TB test. He had negative chest x-rays in 2016 and 2017. He is followed in the hypertension clinic, with two visits in 2017. The patient is taking four antihypertensive medications, none of which were at maximum doses. Two of his blood pressure medications retain potassium. It would be safer for this patient if his diuretic was switched to one that did not have the risk of retaining potassium. There was no comment in the provider notes that there was a clinical reason that spironolactone was being prescribed. This hypertensive patient had markedly elevated blood pressure readings at every provider sick call visit (five visits), but perfectly normal blood pressures at the two hypertension clinics. At the 4/4/17 doctor sick call, the provider noted a blood pressure 192/107 but did not comment on the markedly elevated blood pressure and did not modify the blood pressure medication. The hypertension clinic providers made no comment about the elevated blood pressures at the sick call visits, did not document that they reviewed the blood pressures from other visits, or were even knowledgeable of these elevated blood pressures. This 69-year-old had no documentation in his record that he had been screened for colon cancer or had received the pneumococcal 23 vaccine.

In summary, the experts are concerned that chronic care providers do not review the findings or vital signs from other non-chronic care visits. The failure to utilize important clinical information or data from other visits puts the health of patients with chronic illnesses at risk. National age-based standards recommend that patients over 50 years receive colon cancer screening and those over 65 years old be administered both pneumococcal vaccines (13 and 23); there is no evidence that either of these screening and preventive measures were offered to him. The experts are concerned that prescribing of four antihypertensive medications with none at maximal dosage is putting this individual at risk and is not in accord with national standards of care.

- Another patient is 47-year-old whose problem list noted asthma, hypertension, and bilateral knee pain.[51] His database indicated that he received the pneumococcal vaccine on 1/17/16 and a flu shot on 11/30/17. His current medications include Xopenex inhaler, Alvesco 160mg I puff BID, Montelukast 10mg/d, and hydrochlorothiazide 50mg/d. From January 2016 through January 2018 he was seen four times in the asthma clinic, four times in hypertension clinic, and three times in the general medicine clinic. His PEFRs recorded in the asthma clinic were 500 on 1/9/17 and 825 on 7/1/17 and 1/26/18, all reflecting excellent control. At some point Montelukast was properly discontinued. The provider notes did not note any symptoms or any justification for the continuation of the steroid inhaler (Alvesco). The patient had eight normal blood pressure recordings from January 2017 to January 2018. He is taking hydrochlorothiazide 50mg/day. Hydrochlorothiazide 50mg has been known for years not to offer greater blood pressure control benefit than 25mg but has some greater risk for dehydration and hypokalemia. He should be given the lower dosage of hydrochlorothiazide. He had increased frequency of urination in June 2017 that was

---

[51] Chronic Care Patient #5.

clinically suspected to be benign prostatic hypertrophy (BPH), and he was placed on Flomax. The higher dose of the hydrochlorothiazide diuretic may have been contributing to his symptoms and, if decreased, might allow Flomax to be discontinued.

In summary, this patient has been regularly seen in three chronic care clinics. His asthma and hypertension are under good control and he should be monitored to see if any of his asthma medications can be decreased or discontinued. The providers should decrease the blood pressure medication to 25mg for the safety of the patient. The continued prescribing of hydrochlorothiazide 50mg has not been recommended for treatment of blood pressure in the last 15-20 years.

- Another patient is a 36-year-old whose problem list noted seizure disorder.[52] His database was empty. His medication was phenytoin (Dilantin). He was seen in the seizure chronic care clinic five times from February 2016 through February 2018. The patient had a seizure reported on 1/30/16. At the 2/2/16 seizure clinic he was noted to not have his seizure medications Keep-on-Person (KOP). On 4/26/16, he was reported to have had another seizure; the physician wrote that the patient's history was not consistent with a seizure disorder and Dilantin was ordered to be tapered off. Another seizure in his bed was noted by the RN on 7/17/16. On 7/29/16, the MD wrote "doubt seizure;" again the Dilantin level was sub-therapeutic (2.5). The 8/9/16 seizure clinic provider noted that the patient had seizures while sleeping and that the 7/29/16 Dilantin level was 2.5, but did not increase the dosage. The 2/7/17 seizure clinic wrongly stated that the patient's last seizure was on 1/6/16. A repeat Dilantin level was again sub-therapeutic (2.5) and Dilantin dose was increased to 300mg/d. The Dilantin level was again low (<2.5) on 2/23/17. Nursing noted on 3/17/17 that the patient was non-compliant with taking his seizure medications; there were three unused blister packs in his cell. The RN wrote on 4/2/17 that she had the patient take his AM dose in front of her and she recommended Watch-Take medications. Again on 5/18/17, the nurse stated that the patient was not compliant with taking his antiepileptic medication. There were no MD visits for the next two and a half months. The patient missed seizure clinic on 8/1/17 due to a security lockdown. He was seen in the seizure clinic on 8/12/17; the provider did not comment on the repeated nursing concerns of non-compliance and continued KOP Dilantin. A Dilantin level on 8/22/17 was for the fifth time in 20 months sub-therapeutic (<2.5). At 8/24/17 physician sick call, it was noted that the patient had another seizure "last night," and Dilantin was finally changed to Watch-Take medication administration; however, a loading dose was not given. This switch to Watch-Take occurred over four months after nurses had documented his non-compliance with his seizure medications. A repeat Dilantin level was 3.1, still sub-therapeutic, on 9/5/17. The 9/15/17 physician note was not legible. He was seen again in seizure clinic on 2/2/18. The provider again erroneously noted that "no seizures since January 2016," did not comment on the recent sub-therapeutic level, but continued the Watch Take. This provider clearly did not review the previous physician and nursing notes nor the recent

---

[52] Chronic Care Patient #6.

drug level; the Dilantin dose should have been increased or a new medication prescribed.

In summary, this epileptic patient with uncontrolled seizures and multiple repeat sub-therapeutic Dilantin levels was not being adequately treated. Physicians initially doubted that he was having seizures, then failed to expeditiously switch him from KOP to Watch-Take administration after repeated nursing notes documented non-compliance with his KOP medications. The four-month delay in changing the mode of medication administration jeopardized this patient's health. Even after Watch-Take medications were finally initiated, the drug level was not therapeutic, but no clinical action was taken (increased dose or new medication); this was not acceptable care. No repeat Dilantin levels have been tested since the last sub-therapeutic level five months ago. This patient with an unstable seizure disorder will not be followed up until August 2018. This is not acceptable and does not meet the community standard of care.

- Another patient had a problem list noting asthma, Crohn's disease, and hypertension.[53] The database noted a negative PPD on 8/20/17. His medications included hydrochlorothiazide 25mg/d, verapamil 180mg 2 tabs/d, and Delzicol (mesalamine equivalent) 400mg 2 tabs TID. He was seen in the hypertension clinic on 3/20/17 and 9/14/17; his blood pressures in the chronic care clinic and in a number of physician sick calls were well controlled. He was evaluated twice (5/16/17 and 11/21/17) in general medicine chronic care for his Crohn's Disease. The provider stated at both visits that the Crohn's disease was "stable." Labs performed four times during the last 12 months were normal. At the 8/10/17 provider sick call, the patient stated that he not received his Delzicol (Crohn's medication) for a month, he was passing blood in his stool, and his abdomen was benign. The assessment was acute flare-up of Crohn's due to no medications. The pharmacy was contacted, and the medications restarted. Patient was seen again in the provider sick call on 10/31/17, complaining of blood in bowel movement two times; a rectal exam was negative, CBC and FOBT was ordered. A physician note on 12/19/17 was illegible. A referral to GI was approved on 12/27/17, although there was no documentation in any notes that the patient was referred to GI. At physician sick call on 1/9/18, patient again reported that he had occasional blood in his stool and had occasional diarrhea. His abdomen was soft. The GI appointment had been scheduled for 3/8/18. Review of the MAR verified that the patient received his KOP supply of Delzicol in June 2017 and August 2017-January 2018, but not in the month of July 2017.

In summary, the failure to deliver his Crohn's medications in July 2017 triggered a flare-up of his disease which persisted intermittently for the next six months. The presence of blood in the stool can be caused by his inflammatory bowel disease and by other conditions, including cancer of the colon. The patient reported passing blood on 8/10/17, 10/31/17, and 1/9/18. Even though he is at high risk for colon cancer, he was

---

[53] Chronic Care Patient #7.

not scheduled to see GI until seven months after his first reported episode and five months after the second visit for blood in stool. This is an unacceptably long delay and does not meet the community standard of care. He was noted in November 2017 chronic clinic as having "stable" Crohn's disease even though he had had a recent exacerbation in August 2017.

- Another patient is a 51-year-old whose problem list included seizure disorder, hepatitis C, hyperlipidemia, and bipolar disorder.[54] His medications are Procardia (nifedipine) and Lopressor (metoprolol), both medications for hypertension, which is not on the problem list, and Keppra (levetiracetam) 250/d. He is followed in the hypertension and seizure chronic care clinics. He was seen in the seizure clinic four times and in the hypertension clinic two times in the last 13 months. His blood pressure is generally well controlled. His seizures were assessed as stable in 2017, but at his 2/21/18 seizure clinic it was noted that he had a seizure three weeks prior to the visit. There was no comment on the type of seizure or whether the patient was taking his seizure medications. The patient is being administered his seizure medications as Watch-Take. In September-November 2017 and January 2018, the MARs documented that he received 100% of his doses, but from December 17-30, 2017, he was documented as having received only four of the expected 14 doses. This was not commented on during his 2/21/18 seizure clinic visit, but may have been the reason that he had a seizure near the end of January 2018. By just reading the medical record it was very difficult to identify whether the patient had hepatitis C infection, had been treated for hepatitis C, or whether the disease was active. He was not being followed in the general medicine clinic or in sick call for his history of hepatitis C. The patient was interviewed, and he verified that he had been successfully treated in 2006 with Interferon/Ribavirin while in IDOC. Lab tests showed normal liver enzymes/liver studies but a low normal platelet count (125) was reported on 7/17/17. An abdominal ultrasound exam to screen for hepatosplenomegaly, liver fibrosis, and HCC was not performed in 2017. Patients with hepatitis C, especially those with cirrhosis, which can cause low platelet counts, are at increased risk for hepatocellular carcinoma. He was not being regularly screened with liver ultrasounds.

In summary, the problem list for this patient was incomplete, not noting the presence of hypertension nor indicating that hepatitis C had been successfully treated. This placed the patient at risk for disruption of his care and inadequate follow-up of these conditions. It was very difficult to verify the patient's history of hepatitis C, his previous treatment, and his current status. The patient should have a liver ultrasound performed to clarify the degree of liver fibrosis and to help determine whether he needs to be regularly screened for HCC. The medical record does not address why the MAR indicates that seizure medications were not consistently administered in December 2017 and whether this contributed to a seizure that occurred in late January 2018.

---

[54] Chronic Care Patient #8.

- Another patient is a 55-year-old whose problem list noted hepatitis C post-successful treatment, hepatosplenomegaly, low platelets, BPH, and kidney stones.[55] His medications included lactulose, finasteride, Tamsulosin, and betablocker. He was successfully treated (Harvoni) for hepatitis C at UIC Hepatology Clinic in 2014-2015. Between October and December 2017, he had an abdominal US, colonoscopy and esophagoscopy performed at UIC which did not identify liver masses/HCC, removed four colon polyps (repeat colonoscopy in 10 years), and found small esophageal varices for which a beta blocker medication was ordered. The liver ultrasound was repeated in January 2018 and showed no masses. Multiple lab tests in 2016-2017 showed low platelets, normal liver enzymes, normal INR, and intermittent mild elevations of total bilirubin. He has received hepatitis A and B vaccines but there is no documentation in the medical record that he has been administered/offered pneumococcal vaccinations. There are no notes by the providers at SCC concerning his cirrhosis and portal hypertension. The patient is not being followed in the SCC chronic care clinic. There are no notes about his mental and cognitive status even though he is taking lactulose for the treatment of hepatic encephalopathy.

  In summary, this patient was successfully treated while in IDOC for hepatitis C. He also has advanced cirrhosis. He is being followed by the Hepatology Service at UIC. It is not in the best interest of the patient or the institution that this patient is not jointly monitored in the chronic care clinic for his cirrhosis. SCC's clinical team must be continually aware of this patient's baseline status so that they can expeditiously and appropriately respond to any deterioration in his condition.

- Another patient is a 52-year-old whose problem list notes HIV infection and s/p GSW groin in 1986 with blood transfusions.[56] His database shows negative PPDs from 2010 to 2017. His medications include KOP Genvoya. There is no documentation that he has been administered pneumococcal or meningococcal vaccinations or had been screened for colon cancer. He has been seen twice by the UIC HIV telehealth specialists; the UIC ID specialist's notes are in the SCC medical record. On 3/20/17, UIC discontinued Atripla and started Genvoya, and his VL was undetectable on 2/6/17. Repeat labs on 4/15/17 (VL undetectable, CD4 851), 5/4/17 (Cholesterol 153, Hct 39.9), and 6/12/17 (VL undetectable, CD4 670) were good. The UIC HIV specialists assessed his HIV to be in good control on 6/22/17. Repeat labs on 10/3/17 (VL undetectable, CD4 687) again reflected good control. This patient is being regularly managed by the UIC telehealth HIV specialists; his HIV is under good control. There are no notes by the SCC providers about his HIV status or in regards to any of his age-based routine health maintenance needs.

  In summary, this 52-year-old should have been screened for colon cancer, should have documentation that pneumococcal and meningococcal vaccines had been provided, and should have been considered for a statin for prevention of cardiovascular disease. None

---

[55] Chronic Care Patient #9.
[56] Chronic Care Patient #10.

of these indicated interventions or screening have been done and all of these screening and preventive measures are the responsibility of the SCC primary care medical team. He has been at SCC for at least 11 months and he has not had an annual visit or a chronic care visit. SCC must continue to provide the routine health maintenance needs of all patients, even those with a condition that is closely monitored by offsite specialists.

- Another patient is 42-year-old whose problem list noted hypertension, seizure disorder, hyperlipidemia, and HIV infection.[57] His medications include Dulera (mometasone/formoterol) inhaler, Albuterol inhaler, hydrochlorothiazide, Lisinopril 20mg/d, Genvoya, gabapentin, Keppra, atorvastatin, and ASA. He was seen in the hypertension clinic one time, hypertension/seizure clinic one time, HIV Telehealth one time, diabetes clinic one time, diabetes/seizure clinic one time, and asthma clinic one time (refused one time) in 2017. His blood pressure is well controlled on his current regimen. He had two HbA1Cs (6.1 and 6.6), consistent with pre-diabetes on the first test and consistent with diabetes on the second test which was unrecognized. His glucoses ranged between 89 and 132 in 2017. The diabetes care provider encouraged lifestyle modifications to treat presumed pre-diabetes but failed to address the 2nd test which was diagnostic of diabetes. His last seizure was reportedly in early 2017, with no further seizures as of January 2018. He was assessed by the UIC HIV Telehealth Infectious Disease specialists on 6/22/17; his VL was undetectable and CD4 617. Repeat VL undetectable, CD4 624 on 10/3/17. His HIV is well controlled on Genvoya. In January 2018, the Genvoya was switched from DOT/Watch-Take to KOP, but the nursing staff continued to give daily doses for the rest of January, even though the patient had received a KOP supply of 30 tabs on 1/18/18. This created a potential risk for the patient of double dosing. It is unclear why the DOT order in the MAR was not discontinued. At the 7/1/17 asthma clinic, his PEFR was 325, and the patient refused to attend the 2/6/18 asthma session.

In summary, this patient's multiple chronic conditions were managed in silos of five separate chronic care or specialty clinics. This division of care has the potential of disrupting this patient's continuity and comprehensiveness of care. Excluding the UIC HIV Telehealth Clinic, the chronic care notes are extremely brief and provide very limited information on the patient's status or ongoing health care plan. There is no documentation anywhere in the asthma, diabetes, or HIV clinics that he had received or been offered the indicated pneumococcal or meningococcal vaccines. Any one of these three clinics could have provided the vaccine(s), but none of them did. There is no comment or rationale for the prescribing of gabapentin in this patient. There was no mention of peripheral neuropathy or nerve pain in the any of the provider notes. The seizure clinic also did not contain any documentation that gabapentin was being used as an epileptic medication in combination with Keppra. Gabapentin is not a benign medication; the provider notes should clarify why this medication is being prescribed.

---

[57] Chronic Care Patient #11.

The patient appeared to have an A1c test diagnostic of diabetes which appeared unrecognized.

- Another patient is a 46-year-old whose problem list noted deep vein thrombosis (DVT) secondary to GSW right leg (early 1990s) and hyperlipidemia. His database noted negative PPD on 3/9/17.[58] His medications include warfarin and Zocor (simvastatin). He was followed in the chronic care clinic (5/1/17, 11/3/17) in 2017. From 12/20/16 through 2/22/18, 12 INRs were performed to assess the level of anticoagulation; only one (11/8/17, 2.3) was in the therapeutic range. The providers did incrementally increase the warfarin dose from 7.5mg/d to 10mg/d over these 15 months. The latest increase was ordered on 10/1/17, but INRs have continued to be sub-therapeutic in December 2017 and January-February 2018. The MARs revealed 100% patient compliance with warfarin doses from November 2017 through January 2018. In summary, the level of anticoagulation for this patient is suboptimal. The frequency of INR testing and warfarin adjustment should have been accelerated. This patient is at risk for another DVT or thromboembolism. The providers at SCC do not seem to understand the urgency of achieving therapeutic levels of anticoagulation using warfarin. In this clinical environment, the use of newer anticoagulants that do not require INR testing and dose adjustments should be strongly considered. Also, DVT is typically treated for three months. This patient was being treated for over a year. While selected patients require long-term treatment, the rationale for long-term treatment needs to be documented in the record. If the patient was being treated unnecessarily, it places him at significant risk due to the potential adverse effects of warfarin.

- Another patient is a 62-year-old whose problem list noted diabetes and hepatitis C.[59] His database documented pneumococcal 23 vaccination in 2003 and 2011, and hepatitis A and B vaccinations in 2013. His medications include insulin 70/30, metformin 500mg/d, and gabapentin. He was seen in the diabetes clinic seven times and the hepatitis C clinic three times from 12/13/15 and 12/12/17. Over the last two and a half years, this patient's diabetes was never under optimal control, his HbA1C ranged from 7.7-8.7 with a minimum goal of less than 7.0, as in IDOC DM guidelines. His 70/30 insulin has remained at 50U/AM and 30U/PM for a number of months; it was unclear from the notes why and when the insulin dose was decreased from 65U/30U to 58U/30U to 50U/30U. He also takes metformin 500mg/d and on 1/8/18, glipizide 5mg/d was added to his regimen. Urine testing has demonstrated macroproteinuria since 2008 and high microalbumin/creatinine level (1017 mg), yet there is no evidence in the medical record that this patient had been prescribed an ACE inhibitor to minimize the risk of further kidney damage. This diabetic's cardiovascular 10-year risk was 20.2% but he has no documentation in the chart that he is taking a statin medication to decrease his risk of MI or CVA. His blood pressures have never been at goal of <140/90 as required in IDOC guidelines, yet it appears that he is not taking anti-hypertensive medications. There is

---

[58] Chronic Care Patient #12.
[59] Chronic Care Patient #13.

no comment in the chronic care clinic notes that the patient is taking an ACE inhibitor, a statin, or a hypertensive medication. This patient's diabetes is being poorly managed. The rationale for decreasing the insulin dosages was not documented in the progress notes of diabetes clinic. Elevated liver enzymes have been noted at three of the four hepatitis clinic visits. UIC did a liver fibroscan that revealed Stage 4 (advanced cirrhosis) on 11/15/17. A hepatitis C RNA test on 5/31/17 was elevated to 2,775,804. It has been determined that this patient is a candidate for hepatitis C treatment and a referral has been recently made (2/6/18) to Wexford's Dr. Paul for review and approval to treat.

In summary, this patient's diabetes has never been controlled. The treatment plan is unclear from the brief chronic care notes. This patient warrants a referral to endocrinology to establish a plan to optimize the diabetes treatment. It is inexplicable why this at-risk diabetic is not prescribed an ACE inhibitor, a HMG-CoA reductase inhibitor (statin), and a hypertensive medication. This 62-year-old patient should be screened for colon cancer and should have received a pneumococcal 23 vaccine, but there is no documentation in the medical record that these screening and preventive interventions have been done. We also note that referral for treatment for hepatitis C occurred when this patient already had cirrhosis or late-stage disease. This means that this patient will endure long-term risk of cirrhosis, including hepatocellular carcinoma, when earlier treatment may have avoided this complication.

## Urgent/Emergent Care

**Methodology:** We interviewed the Director of Nursing, toured the medical clinic, assessed the availability and functionality of emergency equipment and supplies, reviewed emergency drills, CQI reports, and medical records. Medical records were selected from the list of emergency department (ED) visits in 2017 provided by SCC. This list includes the reason for the ED visit. Records selected for review were those conditions sensitive to ambulatory care, such as seizure, withdrawal, infection, diabetic complications, abdominal pain, chest pain, etc. A total of eight records were reviewed.

### First Court Expert Findings
ER reports were absent in all the medical records reviewed and the care of patients was found to be problematic before the ED visit and after the patient's return to SCC. The First Court Appointed Expert recommended the QI program monitor and report results on the timeliness, appropriateness, and continuity of care of patients sent to the ED.

### Current Findings
SCC provides basic CPR and first aid. Emergency response equipment consists of first responder bags that contain first aid supplies, stethoscope, blood pressure cuff, cervical splint, and a few medications (i.e., glucagon). There are also two large duffel bags that are considered disaster bags. These contain larger quantities of supplies and equipment needed to respond to multiple injuries. The basic first responder bags and the disaster bags are not locked and there is no list

of contents and their location as required by SCC Operations Policies and Procedure.[60] An automatic external defibrillator (AED), ambu bag, portable oxygen, EKG machine, suction, nebulizer, and oto-ophthalmoscopes are available in the urgent care room in the clinic at SCC. The presence and functionality of the first aid equipment is checked daily by the night shift and documented on a log. We checked the AED and oxygen tanks and found both to be functional. First aid kits are in the offices on each of the cell blocks. These are not regularly inspected and re-supplied as required by SCC Institutional Directive.[61] Two kits were inspected; the seal was broken on both and there were no gauze or bandages in the kit.

Training records are maintained and nearly all health care staff are current in CPR. The few who are not current are noted on the record; these are staff on leave. SCC's Institutional Directive and Operations Policy and Procedure require that emergency drills be conducted twice a year on each shift. One of these is to be a mass casualty drill involving multiple people with injuries. The annual CQI report for 2016-17 lists the drills that have taken place. Based upon this list, SCC did not comply with either directive. Only one drill was conducted on the 7 a.m. to 3 p.m. shift, and only one mass casualty drill was completed rather than one on each shift. Also, the description of the mass casualty drill conducted on the night shift 8/23/2017 only involved one injured person, so does not meet the definition of a mass casualty drill. The written critiques of these drills are very brief.

We reviewed the medical record of eight patients sent to the emergency department (ED) in 2017 and found that ED visits were often preventable, information and recommendations from the ED were not obtained, or if it was, not incorporated into the patient's subsequent treatment plan. These findings are detailed in the following paragraphs.

- The first patient has a history of uncontrolled hypertension and end stage renal disease.[62] Documentation of the reason for sending the patient to the hospital emergently on 7/8/17 is very brief - shortness of breath and fluid overload. He was discharged three days later. There is no note summarizing the findings or treatment recommendations from the hospital. No records from the treating hospital were obtained. He was not seen in chronic care clinic following the hospitalization until November. This hospitalization was likely preventable if his chronic disease had been monitored and managed more often than every three to four months. There was no effort to review records from the hospitalization and incorporate this information into the treatment plan.

- The next patient was sent to the ED on 9/18/17 for severe facial swelling and confusion resulting from an assault.[63] His problem list includes quadruple coronary bypass, hypertension, and prostatic hypertrophy. The initial response to the facial injury was timely and appropriate. The ED took x-rays and diagnosed a zygomatic fracture and

---

[60] P112 Emergency Services, June 2017, p. 20.
[61] 04.03.108 K3 Response to Medical Emergencies May 1, 2016.
[62] Urgent/Emergent Patient #1.
[63] Urgent/Emergent Patient #2.

recommended tramadol for three days, twice a day for pain, and referral to an eye specialist. Upon return to SCC the provider made the referral to an eye specialist, but did not order the pain medication or document a rationale for deviating from the recommendation.

- The next patient was hospitalized emergently on 4/4/17 for abdominal pain, blood in stool and weight loss.[64] He is a 66-year-old and has diagnoses of hypertension, chronic obstructive pulmonary disease, GERD, and prostatic hypertrophy. He complained of black stool on 4/2/2017 and a sample was positive for blood. On 4/3/17, he was seen by a provider for skin breakdown on his right hip. The provider did not address the problem of blood in his stool. The provider noted that he should be scheduled for a follow-up appointment in one week for results of biopsies from a GI consult at UIC. No follow up appointment was scheduled. His care before the hospitalization and afterwards is episodic. The outbound note from SCC refers to the patient having had a previous stroke and yet this is not on his problem list. Treatment recommendations from the hospital were not followed and there is no documentation of a rationale for an alternative treatment plan.

- The next patient was sent to the ED on 2/9/2017 for severe anemia with shortness of breath and dizziness.[65] He had been seen at nursing sick call five days earlier for dizziness. He had a history of a gastrointestinal bleed and hypertension. The nurse referred him to a provider urgently on 2/4/2017 because of a rapid pulse (124) and elevated blood pressure (150/72). The provider ordered labs and an EKG. The EKG was not done because it was "broken," and labs were not resulted until 2/8/17. The provider's review of these results prompted the referral to the ED. Upon return from the ED the patient was not seen by a provider in follow up until 2/17/17. Recommendations from the ED were not acknowledged by the provider and there was no documented rationale for deviating from the recommended plan of care. This ED visit would likely have been avoided if the diagnostic labs had been accomplished more quickly and treatment initiated earlier.

- The next patient was sent to the ED on 9/30/17 for intractable low blood pressure.[66] There are no problems listed on the problem list and it has not been updated since 5/17. However, this patient was being seen by the Medical Director for chronic pain. The Medical Director referred the patient to the UIC chronic pain clinic on 8/9/17. The patient was taking clonazepam and lorazepam and reported these as being ineffective in relieving his back pain. The Medical Director documented that the patient was exhibiting drug seeking behavior. The patient asked for renewal of his medications on 8/30/17 and was scheduled to be seen on 9/5/17. He was not seen that day and made another request to have his medications renewed before they expired on 9/16/17. He

---

[64] Urgent/Emergent Patient #3.
[65] Urgent/Emergent Patient #5.
[66] Urgent/Emergent Patient #6.

was seen the day before his medications expired and they were renewed. He was seen again on 9/25/17 for back pain and x-rays were ordered. A Toradol injection was ordered on 9/28/17 and he was admitted to the infirmary when his blood pressure dropped from 137/85 at 6:00 p.m. to 114/71 four hours later. He continued to receive Toradol injections on 9/29/17 and 9/30/17. The patient continued to report significant pain and his blood pressure remained low, so the Medical Director sent him to the ED on 9/30/17. The patient returned from the ED with recommendations for Norco. The nurses contacted the Medical Director, who instructed them not to give the patient Norco and ordered clonazepam and lorazepam instead. The patient did not see a provider in follow up until three days after the ED visit on 9/30/17. This patient was not seen by the UIC pain clinic until 1/24/18. Diagnostic imaging of the lumbar and thoracic spine was recommended as well as trigger point injections for radicular and myofascial pain. Chronic pain or the underlying cause of the chronic pain is still not listed on the problem list. Had this patient's chronic pain been managed the ED visit would have been avoided. The referral to UIC took too long to effectuate.

- The next patient was sent to the ED on 8/22/17 for chest pain.[67] He is 66 years old and his problem list includes Crohn's disease, heart disease, and depression. However, he is not followed in the chronic disease clinic. He was seen for Crohn's disease on 7/25/17, and his blood pressure at that visit is recorded as 91/72. The provider did not remark on this low blood pressure and no additional follow up was ordered. On 8/22/17, he complained of chest pain, and after two hours of monitoring and treatment at SCC he was sent to the ED. At the ED he was diagnosed with esophagitis and GERD. Follow up with cardiology was recommended by the ED. He was not seen following the ED visit until 20 days later. No cardiology referral was made. He was scheduled for an enteroscopy in October 2017 and a follow up appointment for GERD in November 2017. This patient should be followed in a general medicine chronic disease clinic and abnormal vital signs should have been addressed by the provider who saw him in July 2017. In addition, he was not seen timely after returning from the ED and a cardiology referral should have been made.

- The final patient was sent to the ED on 5/4/17 for an acute infection on his right foot.[68] He was diagnosed with insulin dependent diabetes and hepatitis C. He was seen in both the diabetic and hepatitis C chronic disease clinics. He was seen in chronic clinic for diabetes on 12/1/16 and his HbA1C was noted to be 8.2 (poor control). He was seen again on 4/3/17 and his HbA1C was 8.7 (poor control). In February 2017 he was seen for swelling in his legs and a diuretic (Lasix) was ordered. His legs were documented as still swollen when he was seen by providers in March and April. Reduced sensitivity in his feet due to diabetes is documented by the provider who saw him 4/26/17. No changes were made in his treatment, and the frequency of chronic care appointments to manage his diabetes was not increased. This patient with poorly controlled diabetes and

---

[67] Urgent/Emergent Patient #7.
[68] Urgent/Emergent Patient #8.

neuropathy in his feet stubbed his toe on 5/3/17 sufficient to cause loss of a toenail and severe bruising of the foot. He requested health care attention the next day, was admitted to the infirmary and started on IV antibiotics, but later that day was sent to the ED for treatment. Upon his return to SCC, the recommendations from the hospital are noted and implemented. This ED visit was likely preventable if his diabetes had been more closely monitored and his condition treated more rigorously.

We also reviewed six medical records of patients who were hospitalized to assess their care before and after hospitalization. We found that, as with the persons going to the ED, patients returning from in-patient hospitalization do not consistently have a hospital discharge summary. We noted clinical management problems in all six records reviewed, including significant preventable or possibly preventable harm and risk of harm to patients who had delayed hospitalization, delayed specialty care, or lack of primary care of their underlying medical conditions. The lack of appropriate treatment of their underlying medical conditions resulted in deterioration and harm (myocardial infarction, stroke, and colon cancer) that was preventable if their conditions were treated appropriately. There appears to be a significant knowledge and practice deficit with respect to managing primary care problems, which we attribute to the use of a surgeon instead of a doctor trained in primary care. This is a credentialing and privileging problem. We also note that in two cases there appeared to be a lack of documentation of episodes of care immediately preceding hospitalization. All clinical episodes of care need to be documented in the medical record. We give summaries of these cases below.

- The first patient had listed problems including hypertension, asthma, type 2 diabetes, and GERD.[69] The patient had three major risk factors for coronary heart disease (hypertension, diabetes, and high blood lipids), but his high blood lipids were not recognized as a problem by facility physicians. Because this condition was unrecognized, he was not treated with anti-lipid medication, which is a standard of care. Providers saw the patient on 24 occasions, with elevated blood pressure dating from May of 2016 until January of 2017, but the blood pressure medications were only minimally adjusted on only two of the 24 episodes of care. The patient's blood pressure remained uncontrolled over the course of an entire year. Once when seen in hypertension chronic clinic and twice in diabetes clinic, the blood pressure was elevated but the only treatment was to add a diuretic (at only the hypertension clinic visit). Hypertension is a risk factor for stroke and coronary artery disease, and not treating blood pressure to an appropriate goal places the patient at increased risk for coronary events. The diabetes was also not well controlled.

  On two occasions the patient had chest pain with elevated blood pressure. On one occasion the patient had exertional chest pain with blood pressure of 199/128 which constitutes hypertensive urgency. Exertional chest pain suggests acute coronary syndrome which requires an immediate EKG and evaluation. The nurse called a doctor,

---

[69] Hospitalization Patient #2.

but an EKG was not done, and the patient did not receive an evaluation for acute coronary syndrome. The doctor failed to follow generally accepted guidelines or usual standard of care, which should have included evaluation for acute coronary syndrome. On another occasion, a nurse called a doctor because the patient had chest pain with blood pressure of 188/102. The doctor ordered Ativan, nitroglycerin, and a single dose of clonidine, but did not order an EKG or send the patient to an ER. This also failed to follow generally accepted guidelines or usual standard of care to evaluate for acute coronary syndrome. Over the next hour, after this episode of chest pain, an LPN saw the patient four times. During one of those episodes, the patient described chest pain like "someone elbowing me in the chest." Shortly after that, the LPN documented a blood pressure of 204/93, an extremely high blood pressure that in combination with chest pain was a red flag sign. An LPN should not have been making these repeated evaluations, as they are not trained in assessments. As well, the patient did not have timely transfer to a higher level of care.

There were no further notes, but the patient was admitted to a hospital at some time unknown and diagnosed with a heart attack. All care needs to be documented in the medical record, but the episode of care resulting in the transfer was not documented in the medical record. The patient had a stent placed and returned from the hospital on a statin drug. Care for this patient demonstrated a lack of knowledge of primary prevention of heart disease and on treating angina, a common primary care problem. It was similar to care we noted in mortality reviews at a different institution which resulted in death. This heart attack was likely preventable if the blood pressure was treated and if he was placed on a statin drug. Failure of the on-call doctor to admit a patient with typical chest pain and elevated blood pressure placed the patient at significant risk of harm and was grossly and flagrantly unacceptable.

- Another patient with a history of smoking had elevated lipids with cholesterol 232, HDL 54, and LDL cholesterol 153.[70] The standard of care for these laboratory test results is treatment with a statin drug, which was not done. On 12/8/14, the patient had an elevated HbA1C of 6.6, which is diagnostic of diabetes. The standard of care for his diabetes would have been to treat the condition with an oral agent and to attempt weight loss. Diabetes with high lipids raised the risk for stroke and coronary heart disease, and treatment with a lipid drug was indicated. The patient had approximately a 20% 10-year risk for heart disease or stroke, yet remained untreated for high blood lipids or diabetes for years. Dating from 4/12/16, the patient had elevated blood pressure which was also not treated. Elevated blood pressure is also a risk factor for stroke. Thus, the patient had three major treatable risk factors for stroke for which he was not treated, which was significantly below standard of care. On 7/10/17, the patient developed a stroke. The patient was not treated for his elevated blood lipids or diabetes until after return from the hospital. The patient now has right sided weakness and aphasia (difficulty speaking). Care of this patient was grossly and flagrantly

---

[70] Hospitalization Patient #3.

unacceptable. This stroke was preventable if the patient was appropriately treated for his cardiovascular risk factors.

- Another patient had apparent COPD/asthma and obstructive sleep apnea.[71] Tests for these conditions were not evident in the medical record. The patient had no monitoring of his sleep apnea for a year. Also, on review of the current volume of medical records, there was no evidence that the patient had ever had a pulmonary function test, which is recommended as a cornerstone of diagnosis for both COPD and asthma. So, it was not clear that the patient had an accurate diagnosis of his medical condition. For a year, the patient had eight exacerbations of presumed asthma or COPD requiring use of tapering oral steroids. The patient had oxygen saturation at 88% or lower on 10 different occasions despite being on what appeared to be maximal medical therapy (Advair diskus, albuterol nebulization, Singulair, and Xopenex).[72] The standard of care with this level of oxygen saturation in persons with COPD is to obtain an arterial blood gas and assess whether the patient needs continuous oxygen therapy. Despite indications for oxygen therapy, the patient never received an arterial blood gas or evaluation for the need of oxygen therapy and did not receive continuous oxygen therapy. As well, on six occasions the patient had red flag abnormal vital signs signifying possible need for a higher level of care, but was not referred to a hospital or higher level of care, which placed the patient at significant risk of death. These episodes included:

  - On 5/15/17, the patient had productive cough, labored breathing, wheezing, and oxygen saturation of 82%. A doctor admitted the patient to the infirmary but did not obtain a chest x-ray or laboratory tests. An arterial blood gas should have been performed immediately. The patient should have been sent to a hospital because of the significant oxygen desaturation.
  - On 4/18/17, a nurse found an oxygen saturation of 80% with diffuse wheezing. Even though the oxygen saturation improved to 88% after treatment, a provider did not see the patient. This was a critically low oxygen saturation which should have been resulted in immediate hospitalization for further prompt evaluation.
  - A nurse evaluation for oxygen saturation of 86% and hypotension (blood pressure 81/49). The nurse took no action.[73]
  - A nurse evaluation for oxygen saturation of 84% with hypotension (blood pressure 88/41). The nurse took no action.
  - A nurse evaluation for oxygen saturation of 84% and hypotension (blood pressure 85/43). The nurse took no action.
  - A nurse evaluation for oxygen saturation of 86% with hypotension (blood pressure 95/43). The nurse took no action.

---

[71] Hospitalization Patient #4.

[72] An oxygen saturation of 88% is used by Medicare as the threshold for use of continuous oxygen therapy.

[73] Low blood pressure suggests but is not diagnostic of shock. Combined with severely abnormal oxygen saturation, this patient should have been sent immediately to a hospital for diagnosis and evaluation, yet the nurse took no action and did not even consult a physician. The nurse evaluating the patient was an LPN but did not document consulting with a supervising RN, which is required by Illinois nursing regulations when LPNs are involved in assessments.

This patient was eventually admitted to a hospital, but the hospital report was not in the medical record and the prison providers did not document knowledge of what occurred at the hospital or note any hospital recommendations. Providers did not appear to have an accurate diagnosis. If the patient had asthma, he should have been admitted to a hospital on multiple occasions for oxygen desaturation, but was not. If the patient had COPD or overlap syndrome, he should have had an arterial blood gas and considered for continuous oxygen therapy. If the patient had either asthma or COPD, the patient should have had pulmonary function tests. Care for this patient was grossly and flagrantly unacceptable. Providers did not appear to know how to care for this patient's disease and the patient should have been referred to a pulmonologist for better diagnosis and management. The failure to know how to manage this patient placed the patient at risk of harm.

- Another patient was 56 years old and was incarcerated at Graham on 9/15/15 before being transferred to SCC.[74] His initial weight was 213 pounds. Despite being over 50, there was no documented evidence of preventive screening for colorectal cancer, which is a standard of care. Colorectal cancer screening is recommended for all persons over 50 years of age but does not appear to routinely occur in the IDOC. On 11/8/16, a doctor saw the patient for complaint of blood in his stool. The doctor did a digital rectal examination and felt what he thought was a hemorrhoid. The stool was guaiac positive, which indicates blood. The doctor ordered hemorrhoid cream and a three-month follow up. The standard of care for a guaiac positive stool in a 56-year-old man is colonoscopy to rule out colon cancer or another source of the bleeding. On 11/29/16, a doctor ordered fecal occult blood tests and on 12/1/16, the tests were positive. On 1/4/17, a doctor ordered a GI consultation; the weight was 186 pounds, which was a 27-pound weight loss since incarceration. The doctor failed to document recognition of the weight loss and took no history about weight loss. The standard of care is to obtain timely colonoscopy because weight loss and blood per rectum in a 56-year-old requires exclusion of cancer. Instead, the doctor failed to take sufficient history and ordered a routine work up, which was significantly delayed. There is a known delay in getting GI consultation scheduled at UIC. Instead of obtaining this test at another center, the patient was allowed to wait with a condition that should have been evaluated much sooner.

Four months later, on 4/10/17, an annual history and physical examination of this 56-year-old did not include colorectal cancer screening. The GI consultation ordered on 1/4/17 was approved on 1/11/17 but did not occur until 7/7/17, about six months later. The GI consultant recommended colonoscopy and EGD, but this did not occur until 11/27/17, at which time the patient had locally invasive metastatic rectal cancer. The patient was admitted directly to the hospital from colonoscopy and when he returned to the prison with cancer pain, the pain was not addressed. This patient with need of colorectal screening failed to have it offered. The patient had documented weight loss

---

[74] Hospitalization Patient #6.

that was unrecognized for well over a year. When he showed signs of weight loss and bloody stools, it took over a year to obtain a work up for colon cancer. These delays in obtaining specialty care most likely resulted in dissemination and advancement of his colon cancer, which caused harm.

In addition to this event, the patient, who was on psychotropic medication for a mental health condition, developed a hand tremor on only one hand. A doctor diagnosed Parkinsonism without performance of a history or physical examination and started Cogentin, which has no indication for Parkinsonism. This is below standard of care with respect to diagnosis of Parkinsonism. Two weeks later the same doctor, without performing a history or physical examination, ordered Sinemet, a drug used for Parkinsonism. The doctor made the diagnosis without a history or physical examination supporting that diagnosis. Six months later, the patient was referred to a neurologist. The neurology consultation occurred nine months after the referral. When the neurologist saw the patient, he found no evidence of Parkinsonism and recommended tapering the patient off Sinemet. The doctors at SCC did not stop the Sinemet. The doctors at SCC failed to document sufficient history or physical examination to support their diagnosis and failed to follow a neurology recommendation to taper the patient off a possibly unnecessary drug. These two episodes of care for this patient were grossly and flagrantly unacceptable.

- Another patient had a history of gout.[75] He developed swollen joints and had multiple provider encounters for his complaints but did not have thorough history or physical examinations. Providers were treating the patient with bursts of steroids without having established a firm diagnosis of gouty arthritis and without addressing treatment of his uric acid, which is standard of care in treatment of gout. During two episodes of swollen joints, providers aspirated the joint for a joint _culture_ and treated the patient for gout without obtaining an analysis of the joint fluid for crystals, which is the standard of care for diagnosing gout. After initially treating the patient for gout, another provider started treating the patient as if the patient had rheumatoid arthritis without definitively establishing the diagnosis. It appeared that the providers did not understand how to diagnose either gout or rheumatoid arthritis, and the patient should have been referred to a rheumatologist for consultation. The patient developed redness on the front of the thigh encircling to the back of the thigh; the area was swollen. Despite an extensive area of possible infection, the nurse did not consult a physician, but referred the patient for a three-day follow up. Two days later, the patient developed fever to 103.6°F and a doctor started intravenous antibiotics. The following day the patient was sent to a hospital, where extensive debridement was necessary for an abscess. The referral by the nurse to a provider was not timely and most likely resulted in extension of the infection. The management of this patient's swollen joints failed to follow generally accepted guidelines.

---

[75] Hospitalization Patient #1.

- Another patient had a problem list at IDOC including diabetes, hypertension, and HIV infection.[76] Consultant notes indicated that the patient had hypertension, diabetes, dyslipidemia, HIV infection with AIDS, Bell's palsy, lower extremity neuropathy, and chronic thrombocytopenia. The patient was not being followed at IDOC for all of his medical conditions. The patient also had hypertension. The blood pressure goal for persons with diabetes is optimal when below 130/80. This patient had elevated blood pressure (>130/80) on five occasions when seeing a provider between January and May of 2017. On none of these occasions did the provider adjust the blood pressure medication. In May of 2017, the patient developed chest pain and was admitted to the hospital. There was no hospital discharge report in the record, so it was unclear whether the patient sustained a heart attack, but an IDOC doctor mentioned that the patient had coronary artery bypass surgery.

  When the patient returned to prison he was admitted to the infirmary. The patient had exertional chest pain and shortness of breath on two occasions on the infirmary which did not result in nurses calling a doctor. The patient told a nurse that he felt "jittery and my breathing is funny," yet a doctor discharged the patient from the infirmary to general population without evaluating the chest pain and shortness of breath. This is below standard of care, particularly in someone with a recent coronary event. A couple days after discharge from the infirmary a nurse charged the patient $5.00 to evaluate an episode for chest pain. The nurse cynically wrote that "I/M arrived in HCU for a CMT chest pain call and was more concerned with asking for a new wheelchair." The nurse did not consult a physician for a complaint of chest pain in a patient with recent coronary artery bypass surgery. On 6/8/17, the patient developed a temperature of 100.2°F with a pulse of 128. Documentation was poor, but it appeared that the patient was eventually sent to a hospital, where pulmonary embolism was diagnosed. The hospital record was not in the medical record. The evaluations by nurses on the infirmary and in general population were significantly deficient, as the patient had critical complaints, yet the patient was not referred to a provider and the nurse did not consult a provider. All episodes of care need to be documented in the medical record. The failure of the provider to evaluate the patient on discharge from the infirmary when the patient had complaints of difficulty breathing was below standard of care. The patient may have had pulmonary embolus when discharged from the infirmary which was unrecognized. This placed the patient at risk of harm.

In summary, we concur with the First Court Appointed Expert's findings that ED and hospital reports were often absent in the medical records reviewed and the care of patients was problematic before the ED and hospital visit and after the patient's return to SCC. We also found that SCC is not following its own written directives regarding the emergency response, first aid equipment and supplies, and the frequency and content of drills.

---

[76] Hospitalization Patient #5.

We agree with the First Court Appointed Expert's recommendation that the QI program monitor and report results on the timeliness, appropriateness, and continuity of care of patients sent to the ED and hospital. The lack of appropriate medical care before and after hospitalization supports our opinion about the lack of appropriately trained physicians in the IDOC. We make additional recommendations found at the end of this report.

## Specialty Consultations

**Methodology:** We interviewed scheduling personnel, reviewed tracking logs, and reviewed medical records of patients who received specialty care. We reviewed care related to consultation requests.

### First Court Expert Findings

The First Court Expert found anecdotal evidence that it takes as long as a month before UIC receives information regarding an approval for a specialty consultation. Nine records were reviewed of patients scheduled for consultations or a procedure. Six of the nine records reviewed demonstrated problems. Problems included no reports and failing to follow recommendations of the consultant.

The First Court Expert recommended that the timeliness of access to specialty services needs to improve and that there needed to be a reliable method of communication between the scheduler and clinician to ensure timeliness of appointments based on urgency of need.

### Current Findings

We found no improvement in specialty services since the First Court Expert's report and noted significant problems in specialty care that caused harm to patients.

The procedure for specialty care is the same at SCC as at NRC. A provider is to write a referral *on the date the referral is requested*. Within five working days, a collegial review is to occur followed by approval and then a scheduled appointment. Of 11 consultations we reviewed with respect to this procedure, all 11 had a collegial review documented in the medical record, but only five of the 11 had this collegial review timely. The contract and administrative directive on specialty care calls for a collegial review in five days. We reviewed 35 consultations to assess whether a consultation report was present. Formal reports were present in the medical record in only 19 times (54%). This is similar to the First Court Expert's finding.

For every consultation, a provider is to see the patient to review the consultation results with the patient within five days. In 10 consultations we reviewed for this purpose, a provider saw the patient after all 10 consultations. The patient was evaluated timely in eight of 10 post-consultation visits. However, the quality of the evaluation was very poor. The provider documentation in the medical record did not give the status of the patient. In none was there a history updating the patient's condition with respect to the consultant's findings. In five of the 10 post-consultation provider visits, the doctor documented that he was seeing the patient for a post-consultation visit but failed to document what occurred at the consultation. On two

post-consultation visits the doctor failed to identify that a biopsy had been done, and these biopsy results were never noted in the IDOC medical record. In two post consultation visits, the consultant's recommendations were not addressed.[77]

The First Court Expert found that there was poor communication between the scheduler and the clinician with respect to scheduling. We agree.

Collegial reviews are not consistently timely. We inspected the tracking log for consultations completed from 1/1/17 to 3/31/17. There were 321 completed consultations during this time period. For 35 (11%) consultations, the collegial review was documented as occurring more than two weeks after the date of referral. We also note that referrals are not placed in the record until the consultation is completed, so doctors will not know from the record whether a referral was requested until after it is completed. Since the referral is a medical record document equivalent to a physician order, it is our opinion that these should be placed in the medical record at the time they are ordered to ensure that all referrals are visible to all providers.

The First Court Expert recommended the need to track specialty care steps to ensure timeliness of scheduled offsite consultations. The logs being used for this purpose do not reliably or accurately track this information. We found the tracking log to be unreliable with respect to ability to track the steps of a specialty consult, including the date of referral, the collegial review, the approval, the scheduled appointment date, and the completed appointment date. For the three-month period of study cited above, 22 (7%) of 321 collegial reviews were documented as occurring *before* the date of referral. This is not possible and suggests that the documented date of referral is not accurately provided or that some entries are post-dated. We reviewed the electronic tracking log for the month of January of 2017. There were 86 completed consultations in this log. Of these, 60 (70%) consultations were documented as being completed *before* the consultation was documented as having been referred. Since we received this document late we were not able to discuss this finding with the scheduling clerk.

The IDOC has an arrangement with UIC in which the IDOC is allowed 216 admissions to the UIC hospital and 2160 consultation visits annually free of charge. The incentive to obtain free care appears to result in some patients not receiving timely care, which causes harm. This is especially true for gastroenterology. For the 55 gastroenterology consults *completed* in 2016 and 2017, the average time from referral to completion of the consult was approximately six months. We note that since the referral dates are not accurately stated, these delays may be even longer. Some of these delays were for diagnostic studies which would result in harm if not timely accomplished.

There did not appear to be any effort to reschedule important consults to other centers so that timely care could be obtained. We were told that past due appointments are managed by Wexford and discussed at collegial reviews. We did not see evidence of this. We noted in the

---

[77] These consultations were from Specialty Care Patient #3 and included consultations from 3/23/16 through 9/8/17 inclusive.

hospital section of this report a case in which a patient with weight loss and bleeding from his rectum was not evaluated in gastroenterology clinic for over six months and did not receive a necessary colonoscopy for an additional four months, at which time an advanced cancer was noted. When any consultation is delayed beyond what is reasonable standard of care for a condition, the consultation should be scheduled with a different consultant. If Wexford is managing these cases, there needs to be evidence in the medical record of how they are doing this. The doctors in the case of this patient with rectal cancer did not appear aware of the delay in care and its urgency, and did not refer to a provider so timelier care could be obtained. There was no evidence in the medical record that Wexford corporate utilization management was following this delay or considering its effect on the patient. There was no evidence that this sentinel event was reviewed by the CQI committee except to list it as a delayed diagnosis.

The offsite scheduling log does not document in all cases whether a referral is to UIC or to a local provider. However, we were told that most referrals for off-site consultation are to UIC. The use of UIC in preference to local providers even when UIC appointments cannot be scheduled timely creates the appearance of saving money instead of protecting the interest of the patient. The offsite consultation process as it currently exists is a patient safety issue. Until it can be corrected, it should be abandoned, and doctors should be allowed to refer directly to consultants until Wexford can ensure patient safety.

Patients with need of specialty care referral were not always referred for care. We noted in the hospital reviews above a patient who should have received pulmonary consultations and pulmonary function tests who did not receive that care. One patient should have been referred to a rheumatologist to evaluate for his arthritis. This underutilization is not monitored by Wexford or IDOC but is a significant problem. We believe that this is another manifestation of the lack of proper credentialing and privileging of physicians.

## Infirmary Care

**Methodology:** The clinic space and equipment in the infirmary were inspected, nursing staff were questioned, clinical charts audited, porters questioned, and patient-inmates interviewed. There was only limited contact with the infirmary physician.

### Fist Court Expert Findings
The First Court Expert recommended that infirmary patients should be seen timely according to policy requirements, and if clinicians choose not to treat patients according to currently accepted recommendations and guidelines, the rationale for these decisions should be articulated in the health record. The expert noted concerns about the frequency, quality, and completeness of documentation.

### Current Findings
We agree with the findings of the First Court Expert concerning timely admission and progress notes, the lack of documented rationale for treatment decisions, and the quality and

completeness of the provider documentation in the infirmary. We identified additional findings and confirmed some of the First Court Expert's findings as follows:

- Admission RN and provider notes were generally written in accord with the established timelines.
- Provider progress notes are consistently written on a weekly basis for chronic infirmary patients. Nurse notes are written daily and commonly provide more useful information on the clinical status of a patient than did provider notes.
- Problem lists were found to be incomplete and even inaccurate.
- Provider notes were consistently illegible, often lacked the rationale for modifications in treatment, failed to list reasonable differential diagnoses, failed to develop clear treatment plans, and rarely documented the status of patients' chronic illnesses.
- The care in the infirmary is episodic and primarily focuses only on acute problems.
- There was little if any documentation that pertinent physical examinations were being performed by the providers.
- The quality of care provided by the providers assigned to the infirmary is inconsistent and often inadequate.
- For records we reviewed, throughout 2017 we found no comprehensive provider notes that updated the status and plan of treatment for all of a patient's problems. Only with the assignment of a new provider in 2018 were some comprehensive provider notes written that provided reasonable, readable, understandable documentation of both the current acute and chronic illnesses of patients.
- The care provided to patients on chronic anticoagulation is poor. The use of warfarin and the subsequent need for frequent INR testing creates logistical barriers that may not be adequately addressed in this correctional setting. The use of newer anticoagulation medications that do not require frequent ongoing measurement of the level of anticoagulation should be strongly considered by the IDOC.
- The condition of the patient beds (non-adjustable heads, inability to raise or lower the height of the beds, non-functional railings) interfered with the ability of the nursing and medical staff to provide proper examinations and perform needed treatments. The physical safety of the nurses who are involved with transferring patients from beds to wheelchairs is also put at risk by not having beds that can be raised or lowered. SCC needs to replace all of the current beds with hospital beds. At least one electrical bed is needed in the infirmary.

The infirmary has two wings; one wing has 11 two-bed rooms and the other, 11 single-bed rooms. The two wings are served by an enclosed central nursing station that has doors that open directly into each adjoining wing. It was reported that the infirmary has 24/7 nurse staffing, with at least one RN on each shift. Correctional officers were noted on both wings during the site visit. Patients are examined in their rooms; there is no examination room on the infirmary. There is no dayroom on the infirmary and TVs are not allowed on the unit. Inmates rarely leave their rooms except for testing/offsite consultations, but those whose physical condition allows have access via a ramp to a recreation yard. There are two negative pressure respiratory isolation rooms; neither of the patients in these rooms were in need of respiratory

isolation. Neither of the negative pressure units were fully functional on the first day of the site visit. A new physician, recently assigned to the infirmary within the last one to two months, makes rounds almost daily.

The infirmary has a capacity of 32 patients. During the site visit, 24 beds were occupied. The majority of patients on the unit had chronic conditions and have had or will have lengthy stays in the infirmary. A large number of the patients are disabled and need assistance with activities of daily living. The infirmary has the appearance of a long-term nursing home. There were functional nurse call devices in all of the 2-bed rooms, but some of the patient-inmates lacked the mental capacity or physical ability to use these devices. The nursing station had no capability of direct visual or audio monitoring of any of the patient rooms. Most of the railings on the beds are not operational. The combination of poor audiovisual monitoring capability, an at-risk-for-fall patient population, and non-functional railings creates a potentially unsafe environment for many men in the infirmary. We noted on a death review that a patient with dementia had 13 falls over a year and a half.[78] Because there were no physical examinations by a physician it wasn't clear if the patient was physically injured. Risk of injury is clearly present on this unit. Only one patient (in restraints) had a correctional officer stationed outside his room for one-on-one observation. A number of the patient-inmates require one-on-one observation due to risk of falls.

IDOC Administrative Directive 04.03.120 Offender Infirmary Services has several requirements, including that nurses must complete admission notes with vital signs on admission and providers must write an admission note within 48 hours of admission. Acute level infirmary patients are to have at least three provider notes per week; chronic patients require only weekly notes. Four infirmary charts of chronic patients were audited (two were long-term patients and their charts had been pared down); the other two had nurse admission notes on the day of admission and provider notes on the next working day. All four of the infirmary charts reviewed had at least weekly provider progress notes and all had daily nursing notes and vital signs measured.

A number of concerns and deficiencies in the care provided to infirmary patients were noted. Two patients had diabetes listed on their problem list, but they were not on diabetic meds and their blood sugars were normal. Neither had HbA1C testing performed to confirm the diagnosis (and control if they indeed had diabetes). None of the provider progress notes ever commented on diabetes for these two individuals. One patient had a single note stating that Wexford replaced his CPAP machine, but sleep apnea was not on his problem list and his medical record and his infirmary chart did not have any provider notes from 2016-2018 addressing sleep apnea or CPAP use. This same patient had a history of significant deep vein thromboses with occlusion of three veins in his abdomen and left leg, yet he was not on blood thinners nor was there a provider comment providing the rationale for not using blood thinners. A patient blacked out on two occasions (blood pressure dropped to 90/60 on second occasion) within a three-week period and was seen three times by a physician without documented neurological or cardiac

---

[78] Mortality Review Patient #9.

exams. He was not assessed or tested for orthostatic hypotension, cardiac arrhythmias, or an atypical seizure. The provider notes contained no clinical information or possible cause for these episodes. The patient was eventually referred to UIC Neurology without a reason for referral; this referral could have been a routine follow-up for patient's seizure disorder. The care of patients on chronic oral anticoagulation therapy (warfarin) is inconsistent. One patient with recurrent DVTs on chronic anticoagulation was well controlled for many months, then the warfarin was discontinued without a justification recorded in the progress note. Another patient on warfarin was not adequately anticoagulated after nine weeks of treatment. INRs, all sub-therapeutic, were measured weekly and the warfarin dose was increased three times; however, the frequency of INR testing and pace of dosage augmentation should have expedited as per standard of care. One infirmary patient with hypertension had elevated blood pressure readings for 11 months but his medications were not increased to achieve control. The provider wrote regular very brief notes with little clinical information that were difficult to read and did not comment on why antihypertensive meds were not increased. It was only after a new provider was assigned to the infirmary that blood pressure meds were increased, and hypertension control achieved.

The provider notes on the audited charts were extremely brief, commonly illegible, and contained little clinical information. The lack of comprehensive provider notes made it difficult to understand the patients' current conditions and progress or deterioration. This created barriers to the delivery of adequate care for the nursing staff and providers who cover the unit when the infirmary provider is off duty. The quality and continuity of care provided in the infirmary did not meet the community standard of care. [79]

The following summaries of infirmary patients' records highlight the findings and concerns noted above.

- This patient is a 53-year-old whose problem list includes DM, recurrent DVT, on chronic anticoagulation, left ankle wound/ulcer, and chronic abdominal wound post-aorto-iliac bypass.[80] Blood sugars were normal and the patient was not on diabetic medication. HbA1C was never performed to confirm the diagnosis. On 1/30/18, the MD wrote that the patient denied a history of diabetes. It is likely that this patient does not have diabetes and this diagnosis should be removed from the problem list. Weekly INRs were performed to measure adequacy of anticoagulation, and warfarin dose was increased four times over nine weeks; all of the INR's were sub-therapeutic (1.1-1.4). Standard of care is to increase the warfarin dose quickly until a therapeutic level is achieved (2.0-3.0) and then decrease the frequency of testing. This patient is still at risk for a recurrent DVT after nine weeks of treatment. UIC specialists ordered warfarin be stopped and the

---

[79] We refer also to Mortality Review Patient #9 for another example of this. Over six months on the infirmary, a doctor wrote notes 19 times that stated, "No specific complaint, no change, dementia, continue same care" despite the patient having multiple falls and being hospitalized for heart failure. Then over a nine-month period, the same doctor wrote 30 notes stating, "No specific complaint. No change. Dementia, post colectomy for metastatic ca [cancer]. Continue same care." This was grossly and flagrantly unacceptable evaluation for a person with significant illness.

[80] Infirmary Patient #1.

anticoagulation switched to injectable low molecular weight heparin before the patient was transferred to UIC for surgical repair of a large post-op abdominal wound. The infirmary provider discontinued the oral warfarin but failed to order the injectable anticoagulation; this put the patient at risk for a clot.

- This patient is a 58-year-old with coronary artery disease post-percutaneous transluminal coronary angioplasty (PTCA), peripheral arterial disease s/p right Iliac artery stent, DVT, diabetes, seizure disorder, neurogenic bladder, and L-S disc disease.[81] He has regular provider notes and daily nursing notes with vital signs. He had a CPAP machine, but sleep apnea was not on the problem list nor was it ever addressed in any provider progress notes. The patient was on seizure medications, which were increased after he reported to UIC Neurology specialists that he had a seizure a few months prior to his visit. The provider notes never commented, even once, during his seven months in the infirmary, about the status or control of his seizure disorder. Even though the patient had a history of massive deep vein thromboses, the infirmary progress notes did not once comment on why this patient was not prescribed anticoagulation medications. There may be a valid reason for not ordering anticoagulants, but the progress notes failed to address this important, even life threatening, issue. The patient was noted to have blacked out on 12/10/17 and again on 12/31/17 (blood pressure dropped to 90/56); MD notes on 12/11/17 only noted that the patient had no complaints and continued present management, and on 12/19/17 stated no change. The patient was not assessed or tested for orthostatic hypotension, cardiac arrhythmias, or an atypical seizure. The provider notes contained no clinical information or possible cause for these episodes and the patient was eventually referred to UIC Neurology without a reason for referral; this referral could have been a routine follow-up for patient's seizure disorder. The patient had another episode on 1/13/18 in which he reported to the RN he might pass out. His blood pressure was again low (90/50). A new provider wrote a comprehensive note on 1/15/18 and referred the patient to Cardiology and Vascular Surgery at UIC. Again, the patient's blood pressure was low, 91/45, and no intervention was ordered by the provider. None of the five provider notes since the second blackout episode in which low blood pressure was recorded documented any consideration that the patient's current treatment included four to five meds that can lower blood pressure and should be pared down.

- This patient has a history of DVT on chronic anticoagulation, s/p total right replacement with joint infection, hypertension, and hyperlipidemia.[82] There was no problem list in the infirmary chart. The INRs were consistently therapeutic in 2017; warfarin was discontinued in August 2017. There was no provider note on the rationale for stopping anticoagulation. During the last third of 2017, swelling of his right knee was noted and antibiotics started with orthopedic consultation. The patient underwent surgical removal of the infected prosthesis and right knee fusion. On hospital return, the patient

---

[81] Infirmary Patient #2.
[82] Infirmary Patient #3.

was readmitted to the infirmary with an RN admission note on 1/26/18, and a physician admission on 1/29/18 (the next working day). The 11 provider notes between 9/18/17 and 1/15/18 contained so little clinical information that it was very difficult to understand the patient's diagnoses and previous surgeries, the reason for the knee joint infection, and the treatment plan. A number of the notes were illegible or so brief as to be uninformative. Unclear progress notes and plans interfere with the provision of quality care and put the health of the patient at risk.

- This 70-year-old patient was admitted to the infirmary on 1/24/17; RN and physician admission notes were on the day of admission.[83] The patient's diagnoses included atherosclerotic heart disease (ASHD), congestive heart failure, hypertension, stroke in 2005 with weakness and inability to walk, and benign prostatic hypertrophy (BPH). Nursing notes were written daily and vital signs taken daily. Provider notes were documented weekly, but they contained little clinical information. Some of the provider notes were totally illegible. The patient's blood pressure readings were repeatedly elevated except for the two times the patient attended the hypertension chronic care clinic, which did not comment on the elevated blood pressures taken in the infirmary and did not increase the hypertension medication. A new infirmary provider assumed care of this patient in January 2018 and noted on 1/1/18 that the blood pressure was not controlled; the hypertension medication dose was increased, and at a follow-up visit on 1/10/18, it was noted that there had been a good response to the increased dose and the blood pressure was controlled. On 2/16/18, the patient voiced a concern about increased urinary frequency, urgency, and hesitancy. The provider ordered a urinalysis (normal) and oxybutynin to treat this problem. It is disturbing that the previous infirmary provider failed to address the elevated blood pressure readings during 2017. The practice of SCC providers not addressing uncontrolled chronic conditions and shifting this responsibility to the single illness chronic care clinics resulted in an unjustifiable delay in treatment for this hypertensive patient who had already suffered a stroke. Elevated blood pressure is a risk factor for stroke. Until January 2018, the provider notes were illegible and created a risk to the health of this infirmary patient.

In summary, the lack of quality, legible, comprehensive provider notes that address both the ongoing acute and chronic needs and illnesses of each infirmary patient puts the health and safety of all infirmary patients at risk. We agree with the recommendations of the First Court Expert and have additional recommendations that are found at the end of this report.

## Pharmacy and Medication Administration

**Methodology:** We reviewed medication services by meeting with the DON. We also toured the medication room and observed nurses as they prepared, administered, and documented medication administered. We reviewed medication administration records, medication room

---

[83] Infirmary Patient #4.

inspection reports, pharmacy reports delivered at the monthly CQI meetings, the Wexford–IDOC contract, Administrative Directives, and SCC operational policies and procedures.

**First Court Expert Findings**

The First Court Appointed Expert made no recommendations in the area of pharmacy/medication administration. The system used, policies, and practices described in that report are unchanged today.

**Current Findings**

The current system to provide patient medication is unsafe and does not assure the five "Rights:" the right patient, the right medication, the right dose, the right route at the right time. The following practices need to be stopped and safer practices and procedures adopted:

- Handwritten orders and transcription of orders to the MAR
- Pre-pouring medication
- Not using the MAR to document administration of medication at the time it is given.

Chronic disease patients are not monitored to ensure continuity in treatment nor is their compliance with prescribed treatment assessed. Prescription end dates do not coincide with chronic clinic appointments and require patients to request renewals via sick call.

In addition, we found that medication errors are documented and reported, but not analyzed to determine root causes or trended to identify problems and improve patient safety. Persistent problems with medication practices are not subject to corrective action or systematic CQI.

<u>Orders and Delivery of Medication</u>

Medications are obtained from BosWell Pharmacy Services, via subcontract with Wexford. Prescriptions are faxed to BosWell and filled in 30-day "blister packs," and then transported to SCC. A pharmacy technician at SCC receives and inventories the medications and then puts them into stock supply or onto the medication cart. Staff reported that when prescriptions are faxed to BosWell before 2:30 p.m. each day, medications are received within 24 hours via United Postal Services (UPS). Prescriptions faxed after 2:30 p.m. are received in two days. If medications are urgently needed, staff uses a local pharmacy, Jewel-Osco Pharmacy in Joliet, Illinois.

We toured the medication room in the clinic and the room behind, where the pharmacy technician works, and where medication is stored until it is needed for administration. These two rooms were clean, uncluttered, well lighted, and kept secure. There is a refrigerator with a thermometer and temperature log that was up to date. We conducted a random count of controlled substances and found it to be accurate. Our observation is that the amount of controlled substances was larger than may be necessary, making accountability time consuming and increasing the chance of error and potential for diversion. We recommend that the responsible pharmacist review and perhaps adjust PAR stock levels for controlled substances.

After the provider writes the medication order, a nurse reviews it and if it is a nurse administered medication, transcribes it onto the patient's medication administration record (MAR). When the medication arrives from BosWell, a pharmacy technician checks off that it was received. The pharmacy technician separates Keep on Person (KOP) medications from Nurse Administered (NA) medications and determines the patient housing locations. Nurse administered medications are transported by the pharmacy technician to the medication room for storage in medication carts and subsequent administration to patients. Pharmacy technicians and/or medical technicians distribute KOP medications directly to inmates in the housing units. They also transcribe the KOP order onto the patient's KOP MAR. This was observed being done using the blister pack, not the original provider order. This practice is not sufficient to identify dispensing errors made by the pharmacy. We recommend that the original order be used when transcribing to the KOP MAR.

Transcription errors are by far the most common type of medication error reported to the SCC CQI committee.[84] These include not transcribing the order onto the MAR, transcribing orders incorrectly, not discontinuing medications on the MAR when ordered, not transcribing orders from one month to the next, or transcribing these incorrectly. While these errors have been reported, there is no documented evidence that this has been identified as a systems problem to be studied and examined for possible improvement.

We also reviewed monthly medication inspection reports completed by a BosWell pharmacist from March 2017 through February 2018. These inspections include verifying MAR documentation using a sample of 20 patients. We found medications not transcribed onto the MAR, medications that have an order to discontinue still being administered, and the medication being administered differing from that transcribed onto the MAR, as examples of problems in the care of individual patients that are documented each month. There is no documentation or other report that medication errors are trended or analyzed to identify systemic sources of error, nor has it been identified as a problem to be addressed by CQI.

The Contract Monitoring Reports provided note continuing violation of the AD concerning control of medications, but no penalty or corrective action is documented. When asked, the HCUA stated that the problem is that nurses do not accurately and completely sign out controlled medications and attributed this to distractions when busy with patient care. The October 2017 Contract Monitoring Report lists this as a violation of ADs and notes the vendor, Wexford, was notified of the problem on 12-14-16. Accountability for controlled substances is a high safety priority and systematic efforts to identify and limit risk of error as well as potential diversion should be in evidence. At SCC there is no documentation of attempts to investigate and revise systems, equipment, or processes to minimize or eliminate this as a source of error.

Medication errors have long been recognized as a substantial area of focus in improving the safety of patient care.[85] Handwritten orders and transcription have been eliminated in many

---

[84] SCC Annual CQI 2016-17, Pharmacy Services.
[85] Institute of Medicine (2000), To Err is Human: Building a Safer Health System. Washington DC: The Academies Press.

correctional health care programs because of error and inefficiency. An obvious solution is to install computerized provider order entry (CPOE) and eliminate transcription by hand using labels generated from the computerized order after it has been reviewed by a pharmacist.[86] Automated dispensing cabinets are being used more often now to record the withdrawal of controlled substances and eliminate handwritten controlled substances logs, such as that which is in use at SCC. Upgrading pharmacy services in this way requires capital expenditure and would only likely happen as a statewide decision made by IDOC. But if these pervasive problems are not identified, discussed, studied, or reported at the facility level, IDOC is without notice that there is a systemic issue that must be addressed statewide.

Medication Administration

Nurses administer medications to inmates in their cell. Medication administration is scheduled to begin at 7:30 a.m. and 7:30 p.m. and is completed within two hours. We observed nurses preparing medications for administration. Nurses compared MARs against medication blister packs to ensure the accuracy of the order and then popped medication out of the blister pack and put it into small while envelopes. Written on the envelopes is the name of the patient, ID, housing location, and names of the medications. The envelopes do not contain order start and stop dates.[87] Nurses then place medication envelopes into a clear plastic bag to take to the housing units. Nurses do not transport MARs to the housing unit along with the medications.

We accompanied a nurse escorted by a correctional officer to R unit. Each cell had one or two inmates. For each patient receiving medication, the nurse called out the inmate's name and informed him she had medication and asked to see his identification card, which includes a recent photo. The nurse then gave the medication envelope to the patient through the cell bars. The patient took the envelope, poured medication into his hand, and passed the envelope back to the nurse. If a patient did not want to take a particular medication he put it back in the envelope before returning it to the nurse. Sometimes the nurse performed an oral cavity check. She indicated that she did this for patients taking mental health medications and any others she had a concern about. We observed an inmate ask if he could take his medication later in the morning because he had an appointment to have lab drawn at the clinic. The nurse indicated that she would return later with his medication. The interaction between the nurses administering medication and inmates in the cells was outstanding in professionalism and respect.

The nurse did not document administration of the medication onto the MAR at the time the medication was given. After the nurse finished administering medications she returned to the clinic and documented on the MAR which medications had been administered using the white envelopes. Medication not taken by inmates was discarded.

Problems with medication administration at SCC include:

---

[86]Patient Safety Network. (2017) Medication Errors, Agency for Healthcare Research and Quality available at https://psnet.ahrq.gov/primers/primer/23/medication-errors.
[87] The SCC Operations Policies and Procedure, p. 128 states that "Medication envelopes will be utilized that will comply with state and federal requirements," but does not specify what those requirements are.

- Repeated use of the same envelopes is a source of transmission for infectious disease because they are handled by the patient and returned to the nurse.
- Nurses do not have a way to verify medication that is not taken. Visual identification is not sufficient.
- The MAR is not available to the nurse at the time medication is administered and therefore is not used as a reference when there is a concern or question at the point of patient care.
- Medication is not documented at the time it is given and contributes to errors and omissions in documentation of patient care.

Renewal of Chronic Disease Medications

Chronic disease medications are provided to patients monthly either as "Keep on Person" (KOP) or each dose is administered by a nurse. The scheduled appointments for chronic disease clinic do not coincide with the end date on medications ordered for chronic disease. Patients are expected to sign up for sick call to request medication renewal before the order expires and is subject to co-pay.[88] Diabetics taking insulin are expected to draw up and administer their own dose. Diabetic inmates complained that those who are newly diagnosed receive no education about their condition or how to administer insulin.[89]

There is no provision or written directive to regularly monitor continuity of medications or compliance with ordered medications as part of the chronic care program. We interviewed one inmate whose chronic disease medication was not provided for a month. It was only reinitiated when he sought care and finally saw a provider.[90] Chronic disease patients are not monitored to ensure continuity in treatment nor is their compliance with prescribed treatment assessed.

# Infection Control

**Methodology:** We interviewed health care leadership and nursing staff assigned to infection control duties, reviewed the Infection Control Manual, CQI Minutes, and other documents related to communicable diseases and infection control.

**First Court Expert Findings**

The First Court Expert Report noted that a specific nurse had responsibility for compliance with IDOC policy concerning communicable diseases, blood borne pathogens, and compliance with Illinois Department of Public Health reporting requirements as well as the HIV and HCV clinics. Inspection of the health care areas and inquiry about infection control practices resulted in no concerns or recommendations from the First Court Appointed Expert.

**Current Findings**

---

[88] Institutional Directive #04.03.103K3.
[89] Medication Administration Patients #1-2.
[90] Medication Administration Patients #6.

Responsibility for infection control is dispersed amongst several staff nurses, the DON, and HCUA. The HCUA facilitates and monitors sanitation inspections and is diligent in following up on identified concerns until correction has been achieved. He also submits information required for reportable communicable diseases. One staff nurse is assigned responsibility for managing the HCV clinic and another nurse manages the HIV clinic. The DON has oversight responsibility for compliance with infection control procedures and works closely with the HCUA in this regard.

CQI Minutes and the 2016 Annual Report show that communicable disease data is collected and reported monthly. There is minimal to no discussion of the meaningfulness of the data reported. There has been no assessment of TB conversion at SCC to evaluate the risk for transmission of tuberculosis while in the prison. The Centers for Disease Control (CDC) recommends that such a study be conducted periodically to determine risk of transmission, which then guides prevention and surveillance activities specific to the level of risk.[91] CQI minutes also report statistics regarding skin infections due to methicillin-resistant staphylococcus aureus (MRSA). Data does not include tracking of skin infections due to other pathogens. Equipment and instructions for prevention, response, and reporting of occupational exposures were readily available at the facility. Inmates working in the health care area have received training in personal protective equipment and exposure control; they are also vaccinated for hepatitis A and B.

The IDOC Infection Control Manual was reviewed. It was last updated in 2012. While the material in the manual is thoughtful and many resources are provided, some of them are out of date. The manual should be updated at least every two years. An up-to-date and accurate infection control manual is critically important in guiding the work of staff assigned these duties in the absence of dedicated positions for trained infection control staff, as is the case at SCC. The IDOC Nursing Treatment Protocols, revised March 2017, were reviewed and provide guidance to nurses in the care of common infectious diseases and infections such as scabies, urinary infection, rash, pediculosis, chicken pox, and skin infections.

Many infection control challenges and hazards were observed during our site visit at the facility. These are detailed in the section of this report on Clinic Space and Sanitation. In particular, the Airborne Infection Isolation (AII) rooms were not functional, the equipment to manage airflow had not been serviced for years, and these are not inspected as part of the sanitation rounds. Also, the practices of the hemodialysis program do not comply with CDC recommendations to prevent infections, particularly hepatitis B, among chronic hemodialysis patients.[92] Finally, a lack of barrier protection on reusable surfaces was observed throughout the health care areas. Fabric covered chairs and tables were torn and sometimes repaired with duct tape, paper

---

[91] MMWR (2006) Prevention and Control of Tuberculosis in Correctional and Detention Facilities: Recommendations from CDC. 55 (RR09). Centers for Disease Control available at https://www.cdc.gov/mmwr/preview/mmwrhtml/rr5509a1.htm.
[92] MMWR (2001) Recommendations for Preventing Transmission of Infections Among Chronic Hemodialysis Patients. Vol. 50/No. 99-5, Centers for Disease Control. See also Update to the 2001 Hemodialysis Recommendations available at https://www.cdc.gov/dialysis/guidelines/index.html.

covers were not available in one of the provider exam rooms, and patient care equipment was rusted and could not be cleaned. Environmental controls to prevent transmission of infection are inadequate and risk harm to patients cared for at SCC.

Tuberculosis screening is completed annually. Inmates who were previously positive for latent tuberculosis infection are screened using a questionnaire for symptoms of tuberculosis disease and are referred to a provider if symptomatic. All other inmates are screened using a Mantoux skin test. Symptom screening is not completed. We observed nurses reading skin tests while also administering medication at the cell front. The nurse did palpate the inmate's forearm for induration and documented the results contemporaneously on the skin of her hand to be transcribed to the chart after medication rounds were completed. Reading of the TB skin test should be done in a clinical setting with good lighting and a tool to measure induration, such as the nurse sick call rooms in the housing area. Nurses should not read TB skin tests cell side.

Inmates may request HIV testing at any time and it is also offered to inmates just before release from incarceration. Inmates who are infected with HIV are managed as part of the chronic clinic program with oversight from UIC. Currently 11 inmates are being followed at six-month intervals. Inmates may choose to have their medication given to them to keep and take or they may have the nurse administer it to them dose by dose. This later method is offered for those inmates who are concerned about maintaining the privacy of their medical information. Medications are written to coincide with their next scheduled HIV clinic appointment. The nurse managing the clinic draws the patient's blood before the appointment so that the results are available to the provider at the time of the follow-up appointment. Peer educators provide regular sessions on Thursdays for newly diagnosed inmates. They also provide pre-release education.

The inmate porters working in the infirmary had documentation that they had received training on blood borne pathogens in prison, including hepatitis B and HIV, restroom sanitation, and on their job description. The records of two infirmary porters were verified that both had been vaccinated or had immunity to hepatitis A and B.

Hepatitis C (HCV) disease is also managed via the chronic care clinic. IDOC physicians with some assistance from a Wexford infectious disease doctor manage the care of patients with hepatitis C. When an IDOC physician determines that the patient needs treatment of the hepatitis C, the patient is referred to a Wexford infectious disease doctor. When the Wexford infectious disease doctor determines that treatment is indicated the patient is referred via telemedicine for treatment with the UIC hepatitis team. All other hepatitis C care needs (cirrhosis management and screening for hepatocellular carcinoma) are managed by Wexford facility physicians. Forty-nine HCV patients are being followed currently; six have been treated and two have been referred for treatment. According to staff interview, the biggest challenge for HIV and HCV clinics is coordinating scheduling and access to the telemedicine equipment that is shared with the mental health program.

## Dental Program

### Dental: Staffing and Credentialing

**Methodology:** Reviewed staffing documents, interviewed dental staff, reviewed the Dental Sick Call Log and other documents.

**First Court Expert Findings**
- SCC has a dental staff of one full-time dentist, one 20-hour part-time dentist, two full-time assistants, and a full-time hygienist.
- Dr. Mitchell is employed by the IDOC and the rest of the staff are employed by Wexford.
- CPR training is current on all staff, all necessary licensing is on file, and DEA numbers are on file for the dentists.
- The number of dentists and hygienists is adequate to meet the needs of this institution.
- The lone assistant is overworked in a clinic with this number of dentists.
- Overall, this is a strong team that works well together to create a very busy and smooth-running clinic.

**Current Findings**
We agree with the First Court Expert with respect to clinic operations; however, as we noted in our NRC report, it is difficult to assess the adequacy of either NRC's or SCC's dental staffing independently, since personnel move between facilities.

SCC has one full-time dentist (Dr. Orenstein) who serves as Dental Director, two full-time dental assistants, and a full-time dental hygienist[93], who are all Wexford employees. In addition, there are two part-time dentists who are IDOC employees.[94] Dr. Orenstein and the dental hygienist routinely assist NRC with intake dental exams.

### Dental: Facility and Equipment

**Methodology:** Toured dental clinic, radiology area, and dental intake area to assess cleanliness, infection control procedures, and equipment functionality. Reviewed the quality of x-rays and compliance with radiologic health regulations.

**First Court Expert Findings**
- The clinic consists of four chairs and units in a spacious single room area. One unit is dedicated to hygiene care. The dental units were rather new and in good condition. Free movement around each unit was acceptable. Providers and assistants had adequate room to work, and none of the chairs interfered with each other.

---

[93] The Dental Department 2017 Annual Summary reported that, the "dental hygienist from Stateville comes here to assist with intake on Tuesday, Thursday, and Friday." NRC CQI Annual Report, 2016-2017, p. 23. Consequently, the dental hygienist does not contribute a full FTE to SCC.
[94] Each provides care 53 days/year per Don Mills, Health Care Unit Manager.

- The chairs were over 20 years old but were not torn or overly worn and functioned well. Cabinetry was very old and worn. Countertops were broken, corroded, and badly water damaged in one of the corners.
- There was extreme water damage in the cabinet under the sink. Work surfaces were badly pitted and catered from use. Plexiglas was placed over these surfaces to provide a smooth work surface capable of disinfection. The x-ray unit is in good repair and works well. The autoclave is rather new and functions well. The compressor is in good repair. The instrumentation is adequate in quantity and quality. The handpieces are old but well maintained and repaired when necessary.
- The ultrasonic unit was not working. I was told that a request for repair had been submitted.
- There was a separate, large sterilization and laboratory area of adequate size. It had a large work surface and a large sink to accommodate proper infection control and sterilization. Laboratory equipment was in a separate area of this space and did not interfere with sterilization. The staff had a separate small room for office space.

**Current Findings**

Facilities and equipment are unchanged from the First Court Expert's Report and remain adequate. We concur and note that the previously inoperative ultrasonic unit had been repaired. Moreover, we identified current and additional findings as follows.

The clinic is clean, and the chairs are spaced adequately. All equipment is operational. The countertop in the infection control area is cracked and cannot be disinfected properly. The cabinet under the sink shows signs of water damage. Another cracked countertop was covered with plexiglass; however, liquids seep under the plexiglass, creating an environment conducive to bacterial growth. Storage areas are clean and orderly. Antibiotics and analgesics are labeled and accounted for in a log.

There is a laboratory area; however, there is no lathe for model trimming. The dentist said that they send untrimmed casts to the dental laboratory. The infection control area has enough space; however, the sink is in the middle of the area, preventing optimal instrument flow. Despite this, instruments can be disinfected adequately.

## Dental: Sanitation, Safety, and Sterilization

**Methodology:** Reviewed Administrative Directive 04.03.102. Toured dental clinic. Observed dental treatment room disinfection. Interviewed dental staff. Observed screening examinations and patient treatment.

**First Court Expert Findings**

- Surface disinfection was performed between each patient and was thorough and adequate. Proper disinfectants were used. Protective covers were utilized on some surfaces. Unit recycling was thorough and adequate. The clinic was neat, clean, and orderly.

- All instruments were properly bagged, sterilized, and stored. No instruments were maintained in bulk. All handpieces were sterilized and in bags.
- The sterilization procedures were adequate and proper. Flow from dirty to clean to sterilized was improper, as bagging of instruments was done in front of the ultra-sonic unit. Cleaned instruments were passed back over the dirty area. The ultrasonic was not functioning. There was not a biohazard label posted in the sterilization area.
- Safety glasses were not always worn by patients. Eye protection is always necessary.
- There was no warning sign posted where x-rays were taken to warn pregnant women of possible radiation hazards.

**Current Findings**

Sanitation, safety, and sterilization have not changed materially since the First Court Expert's Report. We concur with the First Court Expert; however, we identified current and additional findings as follows.

Surface disinfection between patients was adequate although difficult due to cracked counter surfaces. Instrument sterilization procedures were adequate and proper. Flow from dirty to clean to sterilized was improper, as bagging of instruments was done in front of the ultrasonic unit. Cleaned instruments were passed back over the dirty area. There was not a biohazard label posted in the sterilization area. [95]

Safety glasses were not worn routinely but are worn only when large fillings were being removed. Eye protection is always necessary. [96, 97] There was no warning sign posted where x-rays were taken to warn pregnant women of possible radiation hazards, nor was a lead apron with a thyroid collar used consistently. [98,99] There is documentation that "those aspects of your

---

[95] CFR 1901.145(e)(4). "The biological hazard warning shall be used to signify the actual or potential presence of a biohazard and to identify equipment, containers, rooms, materials, experimental animals, or combinations thereof, which contain, or are contaminated with, viable hazardous agents.")

[96] "We use personal protective equipment […] *as well as provide eye protection to patients for all dental procedures*." "We Take Infection Control Seriously. UIC College of Dentistry. Viewed at https://dentistry.uic.edu/patients/dental-infection-control, February 2, 2018. Emphasis added.

[97] Guidelines for Infection Control in Dental Health-Care Settings ---2003. MMWR, December 19, 2003/ 52(RR17):1:16; pp. 17-18. ("PPE [personal protective equipment] is designed to protect the skin and the mucous membranes of the eyes, nose, and mouth of DHCP [dental health care provider] from exposure to blood or OPIM [other potentially infectious materials]. Use of rotary dental and surgical instruments (e.g., handpieces or ultrasonic scalers) and air-water syringes creates a visible spray that contains primarily large-particle droplets of water, saliva, blood, microorganisms, and other debris. This spatter travels only a short distance and settles out quickly, landing on the floor, nearby operatory surfaces, DHCP, *or the patient*. The spray also might contain certain aerosols (i.e., particles of respirable size, <10 μm). Aerosols can remain airborne for extended periods and can be inhaled" and "Primary PPE used in oral health-care settings includes gloves, surgical masks, *protective eyewear*, face shields, and protective clothing (e.g., gowns and jackets). All PPE should be removed before DHCP leave patient-care areas (*13*). Reusable PPE (e.g., clinician *or patient protective eyewear* and face shields) […]"). Emphasis added. Moreover, protective eyewear protects against objects or liquids accidentally dropped by the provider.

[98] Each radiation area shall be conspicuously posted with a sign or signs bearing the radiation caution symbol and the words, "CAUTION RADIATION AREA". Occupational Safety and Health Standards – Toxic and Hazardous substances. 29 CFR 1910.1096(e)(3)(i). Emphasis in original.

[99] While radiation exposure from dental radiographs is low, it is the dentist's responsibility to follow the ALARA Principle (As Low as Reasonably Achievable) to minimize the patient's exposure. Dentists should follow good radiologic practice and (*inter alia*), use protective aprons and thyroid collars. Dental Radiographic Examinations: Recommendations for Patient Selection and Limiting Radiation Exposure. American Dental Association and Food and Drug Administration (2012), 14.

---

radiation producing equipment and operating procedures reviewed by the inspector were found to follow applicable Illinois radiation protection regulations;" however, neither the equipment's model and serial number(s) nor the operating procedures reviewed were specified.[100]

## Dental: Review Autoclave Log

**Methodology:** Review last two years of entries in autoclave log, interview dental staff, tour sterilization area.

### First Court Expert Findings

- A review of spore testing logs revealed that a "Maxi-test" in office biological indicator system was in use. The incubator was maintained in the sterilization area. The results were logged weekly.
- There was a gap in logged results from the last week of January to the first week in April with no explanation provided. I was assured that the testing was done during this period. It is essential that these logs be accurately maintained over a long period of time.

### Current Findings

Autoclave log maintenance has improved since the First Court Expert's Report and is adequate. Spore testing was performed weekly and documented. No negative results were recorded. Unlike the finding of the First Court Expert, there were no gaps in the sterilization record.

## Dental: Comprehensive Care

Comprehensive or routine care[101] is non-urgent treatment that should be based on a health history, a thorough intraoral and extraoral examination, a periodontal examination, and a visual and radiographic examination.[102] A sequenced plan (treatment plan) should be generated that maps out the patient's treatment.

**Methodology:** Interviewed dental staff, reviewed one dental chart of inmates who received non-urgent care, observed dental treatment, and reviewed Daily Dental Reports.

### First Court Expert Findings

- One of the most basic and essential standards of care in dentistry is that all routine care proceeds from a thorough, well-documented intra and extra-oral examination and a well-developed treatment plan, to include all necessary diagnostic x-rays. A review of 10 records revealed no comprehensive examination was performed in three of the records and very minimal examinations were performed in three others.

---

[100] Letter from Illinois Emergency Management Agency to Walter Nicholson, Assistant Warden, Statesville Correctional Center dated July 21, 2017. CQI 2-16-2017_4. Pdf, p. 7.
[101] Category III as defined in Administrative Directive 04.03.102.
[102] Stefanac SJ. Information Gathering and Diagnosis Development. In Treatment Planning in Dentistry [electronic resource]. Stefanac SJ and Nesbit SP, eds. Edinburgh; Elsevier Mosby, 2nd Ed. 2007, pp. 11-15, *passim*.

- We reviewed 10 dental records of inmates in inactive treatment classified as Category 3 patients. In only four records did a meaningful comprehensive examination precede routine care. No examination of soft tissues or periodontal assessment was part of the treatment process.
- Hygiene care and prophylaxis were inconsistent, provided in six of the 10 patient records. A further review showed that bitewing radiographs were part of the treatment process in eight of the 10 records.
- Oral hygiene instructions (OHI) were not always documented in the dental record as part of the treatment process.
- Restorations were, in two of the 10 patients, provided from the information from the Panorex radiograph. This radiograph is not diagnostic for caries. A periodontal assessment was not done in any of the records.

**Current Findings**

Comprehensive care has not improved materially since the First Court Expert's Report. We concur with the First Court Expert; however, we identified current and additional findings as follows.

Administrative Directive 04.03.102 specifies that "within 10 working days after admission to a reception and classification center [...] each offender shall receive a **complete** dental examination by a dentist" (¶IIF2, emphasis added). However, the NRC does not perform a complete (or comprehensive) examination.

When the inmates arrive at SCC, a comprehensive (routine) examination is not performed and a treatment plan is not produced unless a routine exam is requested by the inmate or the inmate is due for a biennial exam. Consequently, many inmates will not have a comprehensive exam and treatment plan for two years, if at all.[103]

This was not the practice reported by the NCCHC based on a site visit May 16-19, 2016.

> The dentist also completes a **full dental examination** on every newly arrived inmate within one week and provides some oral instruction and written materials on proper oral hygiene and preventive oral education. [...].[104]

---

[103] Since the intake examination performed at NRC is so cursory and does not include bitewing x-rays or a periodontal probing, inmates may be unaware of existing dental disease, so they would not request a routine examination at SCC. Dentate or partially dentate adults who are new patients should receive an "[i]ndividualized radiographic exam consisting of posterior bitewings with panoramic exam or posterior bitewings and selected periapical images." Furthermore, recall patients should receive posterior bitewing x-rays every 12 to 36 months based on individualized risk for dental caries. With respect to periodontal disease, "[i]maging may consist of, but is not limited to, selected bitewing and/or periapical images of areas where periodontal disease (other than nonspecific gingivitis) can be demonstrated clinically." Dental Radiographic Examinations: Recommendations for Patient Selection and Limiting Radiation Exposure. American Dental Association and U.S. Food and Drug Administration, 2012. Table 1, pp. 5-6.

[104] NCCHC Technical Assistance Report, p. 61. This practice was neither described by the First Court Expert nor found by our team. Furthermore, it is not set forth in Administrative Directive 04.03.102. It is, however, consistent with NCCHC Oral Care Standard P-E-06, which, in addition to requiring a screening within seven days of admission, requires that an oral examination be performed by a dentist within 30 days of admission. National Commission on Correctional Health Care, Standards for Health

Of 10 records of inmates who received routine care, all had recent bitewing or periapical x-rays, and none documented a soft tissue exam or periodontal assessment.[105] Four were without a treatment plan.[106] Treatment plans were scanty and not in a prioritized list format. In three records, treatment was not sequential.[107] Oral hygiene instruction was not documented in two records.[108] We found no evidence of extended wait times or backlog of services.

## Dental: Intake (Initial) Examination[109]

**Methodology:** Reviewed 10 dental records of inmates that have received intake (initial) examinations recently. Reviewed Administrative Directive 04.03.102. Reviewed SCC CQI Reports.

**First Court Expert Findings**
- Reviewed 10 inmate dental records that were received from the reception centers within the past 60 days to determine if: 1) screening was performed at the reception center and 2) a panoramic x-ray was taken, to insure the reception and classification policies as stated in Administrative Directive 04.03.102, section F. 2, are being met for the IDOC.

**Current Findings**
The dental intake exam has not changed materially since the First Court Expert's Report and remains inadequate. While the First Court Expert reported aspects of the intake examination *process*, we focused on a clinical measure – the quality of the panoramic radiograph and the adequacy of the charting and treatment plan. This explains our divergent findings. In addition, we identified current and additional findings as follows.

While the First Court Expert reported that "policies as stated in Administrative Directive 04.03.102, section F. 2, are being met for the IDOC", that finding overlooked the most important issue – the inadequacy of the intake examination.

---

Services in Prisons, 2014, p. 81. Emphasis added. See also National Commission on Correctional Health Care, Standards for Health Services in Prisons, 2018, p. 96, ¶6.

[105] Stefanac SJ. (A panoramic radiograph has insufficient resolution for diagnosing caries and periodontal disease. Intraoral radiographs (e.g., bitewings) and periodontal probing are necessary), p. 17. Also, (Periodontal Screening and Recording (PSR), an early detection system for periodontal disease, advocated by the ADA and the American Academy of Periodontology since 1992, is an accepted professional standard.), pp. 12-14. See American Dental Hygiene Association. Standards for Clinical Dental Hygiene Practice Revised 2016, pp. 6-9. (Periodontal probing is also a standard of practice for dental hygiene).

[106] That is, starting with an oral prophylaxis (cleaning) and proceeding with extractions, periodontal treatment, fillings, and prosthetics. Note that question #6 on the Wexford Peer Review Form for Dentists – PR-001C ("Is a plan for care documented?") addresses a treatment plan.

[107] Comprehensive Care Patients #3, 5, 7 and 10.

[108] Comprehensive Care Patients #8 and 9.

[109] The First Court Expert Report describes the examination performed at intake as a "Screening Examination;" however, Administrative Directive 04.03.102 describes it as a "complete dental examination." We use the terminology of the Administrative Directive and refer to the intake or Initial Dental Examination as a complete dental examination.

Of 10 records of inmates who received intake exams at the NRC, one had no dental information[110] and all but two of the remaining records (78%) had a clinically inadequate panoramic x-ray[111] that Dr. Orenstein attributed to the age of the x-ray and film processing units.

"Oral hygiene instructions" was stamped in all the charts. The SCC dental hygienist said that she does not provide OHI at the examinations. Furthermore, the exams occur so quickly, adequate OHI simply cannot be provided by the dentist.

Of the 10 records, only one documented that an initial examination and treatment plan was done.[112] Medical histories were filled out in all the records; however, Intake (Initial) Examination Patient #2 had hypertension noted in the problem list in the medical chart but not in the health history in the dental chart. One patient was noted as Classification IIa;[113] however, a recommended disposition[114] was not indicated. The inadequacies of the NRC intake dental exam were identified in a Quality Improvement Study report that is discussed the Dental Quality Improvement Committee section of our NRC report.

## Dental: Extractions

**Methodology:** Reviewed records of randomly selected inmates that have had extractions selected from Daily Dental Reports October 2017 through January 2018. Interviewed the dentist.

**First Court Expert Findings**

- Reviewed 10 dental records of dental surgical inmates to determine: 1) if recent pre-operative radiographs reflecting the current condition of tooth extracted (that is, showing apices of teeth); 2) the reason for extraction is documented; and 3) there is a signed consent form.
- In four of the 10 records reviewed, the reason for the extraction was not documented.
- In two of the records, a proper diagnostic x-ray was not present. This is a serious omission.
- Record entries are often very difficult to follow. Treatment at times seemed disjointed and lacking in continuity. The time between appointments can be long due to rescheduling associated with failed appointments.

---

[110] Intake (Initial) Examination Patient #6.

[111] The principal problem was inadequate contrast, especially in the middle portion of the face. In addition, several films had the number that links the film to an inmate chart superimposed over tooth roots.

[112] Dental: Intake (Initial) Examination Patient #2. The record noted that it had been reviewed 2/6/18; however, there was no clinical entry.

[113] "An oral condition, if left untreated, that would cause bleeding or pain in the immediate future." Administrative Directive, Attachment A.

[114] There are three choices: 1) schedule immediately at R&C, 2) schedule routine exam at receiving institution, and 3) schedule immediately at receiving institution. Since Classification II is urgent care, the problem should have been dealt with at the NRC or immediately upon arrival at SCC.

- Also, antibiotics were often given after extractions without a documented reason. They seemed to be provided prophylactically. This is not a standard of care. They should be prescribed only when indicated by a well-established diagnosis.

**Current Findings**

Extraction care has improved since the First Court Expert's Report but remains inadequate. We concur with the most of findings in the First Court Expert's report, but note that we found that (of nine charts reviewed) all charts had clinically adequate preoperative x-rays. However, we identified current and additional findings as follows.

We agree with most of the First Court Expert's findings although we found all charts had a signed consent form that identified the tooth number; however, five did not state the diagnosis, that is the reason the tooth was to be extracted.[115] Documentation was poor,[116] with a diagnosis not being reported for three patients.[117] There was no documentation that the health history was updated in four charts.[118] Post-extraction antibiotics were prescribed without documented evidence of infection.[119]

## Dental: Removable Prosthetics

**Methodology:** Reviewed Daily Dental Reports from October 2017 through January 18, 2018. Interviewed dental staff.

**First Court Expert Findings**

- We reviewed dental records of five patients who received completed partial dentures to determine if restorative procedures were completed prior to fabrication of partial dentures. Removable partial denture prosthetics should proceed only after all other treatment recorded on the treatment plan is completed. Continuity of care is important and the periodontal, operative, and oral surgery needs all should be addressed first.
- In only one of five records reviewed on patients receiving removable partial dentures were oral hygiene instructions provided.
- Periodontal assessment was not provided in any of the records, and in only one of five records was a prophylaxis and/or a scaling debridement provided. Because a comprehensive examination was part of only two records and treatment plans were very incomplete, it is almost impossible to ascertain if all necessary care, including operative and/or oral surgery treatment, is completed prior to fabrication of removable partial dentures.

---

[115] Extraction Patients #2, 3, 4, 6, and 7.
[116] For Extractions Patient #1 (Ext #24 7/14/17), chart entries for 9/15/17, 10/4/17, 10/20/17, 11/1/17, 11/15/17, 12/22/17, 12/28/17, and 2/26/18, were illegible. Similarly, the chart of Extraction Patient #5 had several illegible entries.
[117] Extraction Patients #1, 2 (illegible), and 4 (illegible).
[118] Extractions Patients #1, 3, 6, and 7.
[119] Comprehensive Care Patient #1 had teeth extracted 5/4/17 and 5/18/17, and Amoxicillin was prescribed without a documented infection. Similarly, Extraction Patients #3, 5, 7, 8, and 9 had post-extraction Amoxicillin prescribed without a diagnosed infection. Extractions Patient #5's chart contained many illegible entries. The patient returned from having tooth #1 extracted by Joliet Oral Surgeons 9/1/17 and was prescribed Amoxicillin without a diagnosis of infection.

**Current Findings**

Removable prosthetics care is unchanged from the First Court Expert's Report and remains inadequate. We concur with the First Court Expert; however, we identified current and additional findings as follows.

Of six records selected from a list of completed partial dentures, none of the removable partial dentures were fabricated based on a formal treatment plan. None of the charts documented a PSR; however, one chart[120] mentioned periodontal status. Two charts[121] did not document that an oral prophylaxis (cleaning) was performed and one patient[122] had a partial denture impression taken before restorative treatment was complete.

## Dental: Sick Call/Treatment Provision

**Methodology:** Interviewed dental staff. Reviewed Dental Sick Call Log from 10/3/17 through 1/22/18.[123] Reviewed Daily Dental Reports from 10/3/17 through 1/17/18. Reviewed records of seven inmates who were seen on sick call. Reviewed recent intake examination records.

**First Court Expert Findings**

- Inmates access sick call through an inmate request form or via a direct call from a staff member if it is perceived as an emergency, in addition to a "Request Log" that logs inmate request forms.
- An Emergency Log tracks patients seen as "emergency." These inmates are seen the same day as the request. For 2014, thus far, 12 inmates were seen as an emergency. All were toothaches, abscesses, or trauma.
- There is no real triage system in place to evaluate urgent care needs (toothaches, pain, swelling) from the request forms. Of the inmates placed in the Request Log, the average wait for an appointment was about 12 days. This is for all request forms. Of the requests logged in as toothaches, pain, or swelling, the average wait was approximately six to seven days. These inmates should be seen within 24-48 hours.
- In none of the dental records reviewed was the SOAP form used. As a result, treatment was usually provided with little information or detail preceding it. Sick call record entries often did not include clinical observations or diagnosis to justify provided treatment. Little continuity was established.
- In all records, the immediate complaint was addressed. Only emergency care was provided.

**Current Findings**

While some aspects of urgent care have improved since the First Expert's Report, it remains inadequate, and we concur with the First Court Expert's findings. However, we identified current and additional findings as follows.

---

[120] Prosthetics Patient #1. In addition, #1 and #2 were extracted (10/6/16) based on an inadequate and three-year-old panoramic x-ray. There was no consent form and Amoxicillin was prescribed without a documented infection.
[121] Prosthetics Patients #4 and 5.
[122] Prosthetics Patient #6.
[123] Dental Bates 40-46.

Inmates are informed that they can access health care (including dental care) as part of the SCC intake process.[124] In the alternative, they can submit a specific request for dental care on a form that is collected periodically and delivered to the dental clinic.

Dr. Orenstein's clinical progress notes are extremely difficult to read at best, and indecipherable at worst. A particularly egregious example of this is in the dental chart of Medically Compromised Patient 1, where the entire page comprising entries from 5/3/17 to 8/14/17 is located. There are many similar entries in this chart (as well as other charts).

Of 10 inmates who sought a dental appointment for painful conditions, one did not have a diagnosis documented,[125] one had the health history updated,[126] and five did not use the SOAP format.[127] Three patients received prescriptions for antibiotics although no infection was documented.[128]

Inmates can enter their names in a Sick Call Request Log. The January 2018 RN Sick Call Log contained 11 entries related to dental care, of which seven charts were available for review. All the inmates were seen by nursing and referred to dental; however, two encounters[129] did not have nursing notes. While most requests were for routine care, three[130] were for painful conditions.[131] Some nursing progress notes mention pain; however, the nursing protocol for toothache/dental pain was not used and analgesics were not dispensed. Patients #1, 5, and 6 were seen by a dentist in five, 15, and six days, respectively.

## Dental: Orientation Handbook
**Method:** Reviewed the Orientation Handbook and related documents.

**First Court Expert Findings**
A review of the "Offender Orientation Manual" for SCC and the NRC revealed that dental care was well represented and the instructions as it relates to access to care is adequate.

**Current Findings**
Inmate orientation to dental care has not changed substantially since the First Court Expert's Report and we agree with the First Court Expert that it remains adequate. Inmates are informed that they can access health care (including dental care) as part of the SCC intake

---

[124] SCC Access to Care document.
[125] Dental Sick Call Patient #1. This patient also had #16 extracted 12/4/17, but a consent form is not present.
[126] Dental Sick Call Patient #5.
[127] Dental Sick Call Patients #1, 2, 4, 8, and 10. Note question #5 on the Wexford Peer Review Form for Dentists – PR-001C ("Is the provider documenting in the SOAP format?").
[128] Dental Sick Call Patients #5 (Amoxicillin 12/12/17), #6 (Amoxicillin 12/22/17), and #7 (Clindamycin 12/19/17).
[129] Dental RN Sick Call Patients #2 and 3.
[130] Dental RN Sick Call Patient #1.
[131] Dental RN Sick Call Patients #1, 5, and 6.

process. In the alternative, they can submit a specific request for dental care on a form that is collected periodically and delivered to the dental clinic. [132]

## Dental: Policies and Procedures

**Methodology:** Reviewed Administrative Directives that deal with the dental program. Interviewed dental staff. Reviewed dental charts. Toured dental clinical areas. Reviewed SCC organizational chart.

**First Court Expert Findings**

- A well-developed policy and procedures manual insures a dental program that is well understood and run with continuity. It addresses all aspects of the dental program to provide consistency of care and management.
- The policy and protocol manual for the dental program at SCC addresses only dental personnel and their duties and responsibilities. It only states that the dental program is responsible to provide dental care to the offender population. No specifics were provided on access to care, provision of care, clinic management, dental services provided, infection control, etc.
- The dental director said that this was developed by administration who thought it was sufficient.

**Current Findings**

Dental policies and procedures have not changed materially since the First Expert's Report and we agree that they are inadequate and should be expanded.

## Dental: Failed Appointments

**Methodology:** Reviewed Dental Sick Call log. Interviewed dental staff. Reviewed Daily Dental Reports.

**First Court Expert Findings**

A review of monthly reports and daily work sheets revealed a failed appointment rate that averaged 40%. This is a very high percentage and reflects a serious problem in getting inmates to the clinic for their appointments. I was told that they shared my concern and were frustrated at the lack of success in addressing this problem. I was told that the reasons for failed appointments included the following: 1) inmates do not get their passes; 2) inmates go to other programs or appointments; 3) inmates go to recreation; 4) inmates go to commissary; and 5) inmates are in lockdown. The percentage does reflect lockdown days, which average about two a month. The problem is compensated for by overscheduling every day. As such, many inmates are seen every day, and a large number also fail to show.

The administrative staff, including the Warden, shared the concern and frustration of the dental staff and want to help them address the problem of failed appointments.

---

[132] Access to Care Document.

**Current Findings**

We concur with the First Court Expert that failed appointments have not improved materially since then and remain inadequate. Moreover, we identified current and additional findings as follows.

The failed appointment rate does not appear to be deemed an important measure by SCC leadership. For example, it did not appear on the six-page October, November, or December Dental Reports[133] as a key metric. Failed appointment rates are not reported by the dental department.

## Dental: Medically Compromised Patients

**Methodology:** Reviewed health history form and records from recent intake exams. Compared the health history in the dental chart to the medical problem list.

**First Court Expert Findings**

A review of six dental records of inmates who were on anticoagulant therapy revealed that three of the records had no health history documentation as part of the dental record. In the other three records, it was documented and red flagged. In all cases of provided dental care to these patients, medical staff was consulted, and anticoagulant therapy precautions were addressed and followed. When asked, the dental providers indicated that they do not routinely take blood pressures on patients with a history of hypertension.

**Current Findings**

Documenting the health history of medically compromised patients has deteriorated since the First Court Expert's Report. We concur with the First Court Expert that documentation of the health history of medically compromised patients was inadequate. Moreover, we identified current and additional findings as follows.

Several patients had chronic conditions important to dental treatment that were on the medical problem list and on the health history in the dental chart.[134] Other patients had problems noted on the medical problem list but not on the health history in the dental chart.[135] There was no documented periodontal assessment nor follow-up for the diabetics, which is particularly problematic given the relationship between periodontal disease and diabetes.[136]

---

[133] CQI Monthly Oct 2017_1.pdf, p. 7; CQI Monthly Nov_2.pdf, pp. 13-18; and CQI Monthly Dec 2017_2, pp. 13-18, respectively.

[134] Medically Compromised Patient #1 (Coumadin). The record reports that Coumadin therapy was (appropriately) stopped for two days before a planned extraction. Patient #10 (Coumadin). Patient #6, 8, and 9 (diabetes).

[135] Medically Compromised Patients #4 and 5 (diabetes); Patients #3 and 7 (Coumadin). Patient #7 received an intake screening 12/15/15 but did not receive a complete examination until his 1/11/18 biennial examination. Patient #3 was taking Warfarin 11/23/16 – 2/20/17 and Coumadin from 2/19/17 – 5/18/17 and 3/22/17 – 6/22/17; yet the health history was not updated, and anticoagulant use was not noted.

[136] See, for example, Herring ME and Shah SK. Periodontal Disease and Control of Diabetes Mellitus. *J Am Osteopath Assoc.* 2006; 106:416–421; Patel MH, Kumar JV, Moss ME. Diabetes and Tooth Loss. *JADA 2013;144(5);478-485* (adults with diabetes are at higher risk of experiencing tooth loss and edentulism than are adults without diabetes); And Teeuw WJ, Gerdes VE, and Loos BG. Effect of Periodontal Treatment on Glycemic Control of Diabetic Patients. Diabetes Care 3 3:421-427, 2010 (periodontal treatment leads to an improvement of glycemic control in type 2 diabetic patients).

Dental: Specialists

**Methodology:** Interviewed dental staff, reviewed CQI documents, and reviewed dental charts of inmates who were seen by an oral surgeon.

**First Court Expert Findings**

Dr. Frederick Craig, an oral surgeon, is available on an as-needed basis, usually once a month, sometimes twice. Dr. Craig is also used by several other IDOC institutions. The dental program also utilizes Joliet Oral Surgeons, a local oral surgery group, for more difficult cases and for general anesthesia. Pathology services are the same as for medical pathology. They give the specimen to the appropriate medical person for processing. All radiographs were current, and all record entries were adequate. The NRC utilizes these services through SCC.

**Current Findings**

Oral surgery consultation has changed substantially since the First Court Expert's Report and is adequate. We concur with the First Court Expert's findings. Questions have been raised about the performance of the onsite oral surgeon and are addressed in the CQI section (*infra*). Dr. Craig has not provided onsite oral surgery services in the past year. SCC has recently located another oral surgeon willing to provide onsite services.

Dental: CQI

**Methodology:** Reviewed CQI minutes and reports. Interviewed dental staff.

**First Court Expert Findings**

The dental program contribution to monthly CQI includes a thorough documentation of dental statistics and productivity numbers. There is an ongoing CQI report for the dental program that seeks to improve the ability of segregation inmates to get to the dental clinic for their appointments. It is a study that looks at the reasons why they are not getting to the clinic. These findings must be used to develop procedures to improve this problem. Consideration should be given to conduct ongoing studies with the NRC.

**Current Findings**

The dental CQI program has improved since the First Court Expert's Report. We agree with the First Court Expert that the dental CQI program should not be limited to reporting data and that studies must be used to drive changes in policy, procedures, and practices. Moreover, we identified current and additional findings as follows.

The SCC Annual CQI Report 2016-2017 mentioned two dental issues. The first was a discussion of the Oral Surgery Study which addressed problems associated with Dr. Craig, an oral surgeon who treats inmates onsite at several IDOC prisons.[137]

---

[137] Stateville Annual CQI 2016-17_1.pdf, p.15. pdf p. 15. Dr. Craig is no longer being referred patients from SCC (although he was still seeing patients at other IDOC prisons) due to "performing the wrong procedure and talked patients out of procedures" (*id.*).

A clinical outcome review of 56 inmates referred to Dr. Craig for onsite oral surgery found that he performed the wrong procedure on one patient; 17 patients were sent offsite for their procedure; several patients were sent to an offsite oral surgeon for the procedure or a complication of the onsite procedure; 10 patients refused when informed of potential complications; and 13 were evaluations, follow-ups, or reschedules.[138] The committee recommended that the issue should continue to be monitored (*id*.). A follow-up study was reported 9/29/17, and another follow-up was planned in six months.[139] Dr. Meeks recommended a Root Cause Analysis be performed on Dr. Craig. NRC AWP Konopka asked if a Peer Review was performed. Dr. Meeks also suggests that Dr. Funk and Mr. Mote monitor Dr. Craig's progress at other institutions. Dr. Funk commented that Dr. Craig is still employed at Pontiac C.C. and a few other facilities. Dr. Craig is performing minimal surgery procedures, keeping patients onsite per Dr. Funk. Doug Mote will investigate further and report findings to Dr. Meek and Dr. Funk (*id.*, p. 15).[140]

The other study focused on compliance with aspects of the Dental Administrative Directive based on dentists' review of dental charts, primarily from NRC.[141] Among the findings from the NRC charts were that 62% had no charting of pathology, with the remainder having only a partial charting.[142] Furthermore, "in all the patients reviewed, visible heavy tartar [calculus] was never charted or indicated. The periodontal needs were never indicated" and "the dental radiographs from NRC varied in diagnostic quality."[143] (*Id*.)

## Internal Monitoring and Quality Improvement

**Methodology:** Interview facility health care leadership and staff involved in CQI activities. Review the internal monitoring and CQI meeting minutes for the past 12 months.

### First Court Expert Findings

The First Court Expert found that there were no CQI meetings since October 2013 (the visit was in February 2014) and no minutes since July of 2013. The minutes contained no narrative, no analysis of the data presented, and no studies. This program was described as "non-functioning." The grievance process was stated to be "non-functioning" because there was no interview of the grievant.

---

[138] Stateville Annual CQI 2016-17_2.pdf, p. 34.

[139] CQI Monthly Oct 2017_3.pdf, pp. 15-20.

[140] We requested of IDOC and Wexford 1) the root cause analysis that Dr. Meeks recommended; 2) any focused peer review that may have been performed on Dr. Craig; 3) any documentation related to Dr. Funk or Mr. Mote's monitoring of Dr. Craig; and 4) any actions taken re Dr. Craig at the other IDOC prisons where he sees patients (e-mail from Dr. Puisis to Nicolas Staley dated 3/9/18). They have yet to be provided.

[141] Specifically, 1) whether a complete dental exam with charting of the oral condition was performed within 10 days of arrival at Reception and Classification Center; 2) whether a diagnostic panoramic radiograph was taken on each inmate; and 3) whether inmates' treatment needs were classified appropriately. Quality Improvement Study. Of 24 charts, 21 were from NRC.

[142] "The missed pathology included abscessed teeth, teeth that needed extraction, [and] periodontal disease, (+3) mobility in teeth, grossly decayed teeth, impacted wisdom teeth, wisdom teeth in the maxillary sinus, and numerous visible dental caries" (*id*.).

[143] Seven of the Panorex x-rays were of poor quality and unable to obtain any diagnostic information, or 33%" (*id*.).

---

The First Court Expert recommended reinvigoration of the CQI program. He recommended professional performance reviews with feedback to the clinician and nurses with respect to the sick call process. He recommended that leadership of the CQI program must be retrained regarding CQI philosophy and methodology along with design and data collection, and that the training include how to study outliers in order to develop targeted improvement strategies.

**Current Findings**

The First Court Expert found that the CQI program was non-functioning. We found that the CQI program was functioning but functioning so poorly that it was effectively non-functioning. We did not evaluate the grievance process because we did not receive the CQI minutes until the Wednesday evening during our tour, too late to evaluate the grievances presented in that report.

The CQI program at SCC was ineffective for the following reasons:
- The Annual CQI Plan has no goals or objectives related to problems areas at the facility.
- The Annual CQI Plan is a generic plan which is a word-for-word duplicate of the plan used at NRC, even though NRC and SCC are different facilities with different missions. The Annual CQI Plan failed to identify the upcoming year's agenda of CQI work.
- Credential *and privilege* reviews of physicians are performed by nurses who do not have the capacity to review physician privileges.
- Review of credentials fails to include one-time primary source verification. The CQI coordinator and HCUA did not understand what primary source verification meant even though it is an administrative directive requirement.
- The Governing Body of the CQI committee consists of the Warden, an ex-warden, and the Agency Medical Director. Health trained staff are underrepresented on the CQI Governing Body.
- The CQI studies do not investigate quality of care or appropriateness of care even when this is required by administrative directives, for example with respect to offsite services.
- The leadership does not appear to understand the difference between outcome and process studies. Outcome studies were not based on a clinical outcome and most outcome studies appeared to be performance measures instead of outcome studies.
- Mortality review is not performed. Instead, a death summary is done by a physician involved in provision of care. This summary fails to include a critical review of the death and does not identify problems in order to prevent further mortality. Though we have found preventable deaths in our death reviews, there is no evidence that the system is attempting to identify problems so that these deaths can be prevented.
- Infection control data appears inaccurate.
- The Medical Director summary in the annual CQI report from NRC is an identical word-for-word duplicate of the Medical Director summary from SCC with the exception of a single sentence about NCCHC accreditation, which NRC is not engaged in. These are different facilities with different missions and should have a different summary by the Medical Director.

- While the concept of internal audits is sound and potentially useful, five of six audits did not include the reported findings. Also, these audits only focus on process issues and should also include quality of care.

The purpose of SCC CQI was not to identify and solve problems in order to improve care. This appears to be a result of lack of leadership. The Director of Medical Records is the CQI Coordinator. She has no training in CQI. She is well trained for her work as a Director of Medical Records but poorly trained for her assignment to be CQI Coordinator. Her knowledge of CQI is to "follow the ADs." She stated that her role as Coordinator is to set the calendar of studies required by the IDOC, to remind staff to complete their studies, and to manage the paper flow. For this purpose, she spends about four hours a month. She is not involved in developing a CQI plan and stated that the Governing Body (the Warden, an ex-warden, and the Agency Medical Director) develops the plan with the IDOC Regional Coordinator. She believes that all studies required by the AD on CQI are completed. She failed to understand the meaning of some of the required studies. There is no method by which SCC identifies problems. None of the other leaders of the medical program have had any training in CQI.

SCC does not maintain a manual of CQI as required by the AD. The Annual CQI Plan is a generic plan that contains no identified problems and has no specific plans for the upcoming year's CQI projects. This is inconsistent with the requirements of the AD.[144] The plans from NRC and SCC were identical even though the institutions have different missions and different sets of problems. The plans do not include an agenda for the past or upcoming year with respect to CQI projects that have been identified from problem prone areas. The summary of the annual CQI meeting failed to discuss the prior year's plan, major findings, or accomplishments based on identification of problems and corrective actions undertaken.

The HCUA and vendor Director of Nursing (both nurses) are responsible for reviewing all professional credentials *and privilege sheets,* but as nurses they are not capable, in our opinion, of reviewing credentials or privileging of the physicians. The CQI AD states that one-time primary source verification is to be done.[145] The CQI AD states that the vendor is to do this. Neither the CQI Coordinator nor the HCUA could tell us what primary source verification meant. There was no evidence that this was done. The CQI plan states that the program reviewed 100% of credentials. Yet for physicians, verification consisted only in verifying that they had a license.

Medical program staff are underrepresented on the Governing Body. The Governing Body of the CQI committee is the Warden, the vendor Regional Manager and the Agency Medical Director. The vendor Regional Manager is an ex-warden with no prior formal training in health care management or in a health care discipline. This means that the controlling votes of the

---

[144] AD 04.03.125 Quality Improvement Program, item II.F.b. states, "Annually develop or update a Quality Improvement Plan based on a program that *identifies problems and opens channels of communication for appropriate resolution of identified concerns.*" [our emphasis]

[145] AD 04.03.125 Quality Improvement Program item II.I.h. states, "A one-time primary source verification shall be conducted by the comprehensive health care vendor for all licensed contractual staff."

Governing Body is a current Warden and an ex-warden who works for the vendor. This is unlikely to result in effective direction for the CQI program and also means that two individuals with criminal justice training control the medical CQI program.

An AD requirement to monitor the quality and appropriateness of offsite care is not being done.[146] The annual report merely lists the number of offsite visits, without any evaluation of appropriateness or quality. We discussed a case of delayed diagnosis of colon cancer in the hospital section of this report. This same patient is mentioned in the December 2017 CQI report as a delayed diagnosis. Yet there was no discussion as to why the diagnosis was delayed and no attempt to remedy the root cause problem to prevent these types of delays in order to prevent morbidity and mortality. The AD requires that all UM denials are monitored to ensure that necessary and appropriate care is provided.[147] This task is assigned to the HCUA, who is a nurse. It is our opinion that a nurse is incapable of determining if physician or other provider referrals for offsite care are necessary or appropriate. This should be done by a physician. We noted that aside from providing the numbers of individuals who obtained offsite services, there was no evidence of any monitoring or evaluation for quality of care or appropriateness. To merely list these visits is not evidence of quality of care or appropriateness.

We asked for but did not timely receive the list of denials of offsite care for SCC and were not able to review these before we ended the tour. However, it is not clear from the CQI data presented that the denials were appropriate. These data merely list the number of events that occurred without any evidence that the quality or appropriateness was evaluated or was adequate.

The section of the annual CQI report on offsite services states that over 95% of individuals are evaluated within five days of their offsite appointment without any evidence that the quality of these evaluations is adequate. As we discuss in the specialty care section, post offsite physician evaluations are not of adequate quality. At some of these visits, doctors did not have the consultant report and in others, the doctor did not document what had occurred at the consultation or during hospitalization. Some recommendations of consultants were not addressed. It is insufficient to merely state that a doctor saw the patient.

The CQI studies included two process studies and four outcome studies. Clinical outcomes are end point measures of health status such as mortality, hospitalization, an HbA1C level of 7 or less, or normal blood pressure. An outcome study measures the effectiveness of interventions based on the ultimate outcome measure. An example would be to study the effect of colorectal cancer screening on colon cancer mortality or the effect of increasing the interval of chronic

---

[146] AD 04.03.125 II.I.2.b Off-Site Offender Care Services item II.I,2. j. states, "A monthly review of the quality and appropriateness of care of 100% of the following cases not to exceed a total of 50 cases in each area shall be conducted by health care staff. A standard comparison and analysis of the current month to the previous month and the current month to the same month one year earlier shall be provided."

[147] AD 04.03.125 Quality Improvement Program item II.I.2.j. Utilization Review states, "A weekly review of 100% of all Utilization Review denials shall be conducted by the Health Care Administrator to ensure offenders are receiving necessary and appropriate care."

clinic visits on obtaining a normal blood pressure. The studies performed at NRC were not based on a clinical outcome, with one exception. SCC studied whether one inmate treated with Harvoni had a sustained virologic response. While this is an outcome, it is not a good study, for two reasons. First, there was only one patient. Secondly, studies have already been done with Harvoni showing its effectiveness with respect to sustained response. This study adds no value to patient care. None of the remaining studies included a clinical outcome. These studies included:

- Whether the pharmacy changed the duration of a non-formulary medication without notice.
- Whether UIC laboratory results were received within 48-72 hours.
- Whether an injury report was signed by a provider.

These are all performance measures and not outcome studies.

None of the individual CQI studies in the annual report evaluated for quality of care. The RN sick call study found that 74% of a sample of nurse sick call appointments was referred timely to a physician. This study did not consider whether the nurse evaluation or physician evaluation was of adequate quality. Also, although the study identifies a problem, it does not investigate causes as to why 26% of patients were not seen timely and did not propose a solution. Half of the patients not seen did not even have a note in the medical record. There was no comment on identification of possible causes for these poor results and no solution except to monitor the providers. A month later this study was repeated, and only 76% of patients referred by a nurse to a provider were seen within 72 hours. The question why this occurred was not answered even though the result was nearly identical to the prior month. The proposed solution was to repeat the study. The study was repeated in March, two months later and 91% of inmates were timely referred. Three months later the study was repeated and only 72% of patient referred by a nurse to a physician were seen within the specified 72 hours. Again, there was no analysis of why this occurred and there was no proposed solution to improvement. This study did not consider the quality of the nurse or physician evaluations. This study was repeated numerous times showing similar poor results without any effort to identify the root cause of the problem or any attempt to seek resolution of the problem.

The laboratory section of the annual CQI report lists the number of phlebotomies done per month. The only important quality metric in this data is the number of re-draws. However, month to month this process seems to be in control. While it is useful to monitor to ensure maintaining control, efforts should be redirected to problem prone areas. We noted that abnormal laboratory tests were often not followed up, patients with abnormal laboratory tests requiring treatment were not followed up, and patients were not always treated. This led to preventable morbidity in two cases (myocardial infarction and stroke). This type of problem should be investigated.

Mortality review is not done. The Medical Director, who may have been responsible for care of patients who die, provides a summary of the death which gives no indication as to whether any problems were identified. This is not a mortality review. It draws no conclusions as to the

quality of care and gives no information as to whether problems exist or improvements are needed. We note that at this facility the physician performing the mortality reviews is a surgeon and does not have the training to adequately perform analysis to determine if care for the primary care problems was adequate.

The data for MRSA do not seem credible. For 2016-2017, only seven persons were treated for MRSA infection at SCC. This does not seem credible, as MRSA is an extremely common infection. In a subsequent email exchange with the HCUA we were told that there was only one positive MRSA culture in 2017, with nine suspected cases. This seems extraordinarily low and may reflect lack of cultures of patients being treated. It would be appropriate for an infection control study to investigate how many patients are currently being treated for this infection at this facility and to investigate whether there is underreporting of this infection.

There were six internal audits done at SCC presented in the annual CQI report. Three of these audits were done on the same day. These audits included:
- Chronic illness clinic is completed in the appropriate month.
- A progress note is completed for all individuals engaging in a hunger strike.
- All inmates have a physical examination as per administrative directive requirements and problem lists are updated.
- A staff signature is present on all admissions to the infirmary. Nurses will complete a nursing admission note and vital signs will be recorded as required.
- The Medical Director reviews the treatment protocols.
- Only a physician discharges a patient from the infirmary.

None of the internal audits reviewed the quality of care. These audits reviewed process items related to administrative directives. These audits are useful to ensure that processes of care are carried out in accordance with requirements. However, they do not assess whether the care provided was of adequate quality. Only one of the six audits included the data and it is therefore unclear whether these audits were actually done. The audit of Offender Infirmary Services noted that in two of 10 files reviewed, a physician, psychiatrist, or dentist did not discharge the patient from the infirmary as required. The remainder of the internal audits did not include any data to verify that the audit had actually been done.

Clinical performance enhancement is a method of periodic evaluation of the clinical performance of individual practitioners. For this purpose, Wexford, as required by their contract with IDOC, performs peer review of its physicians. We were told that Medical Directors perform these reviews for all staff physicians and mid-level providers at their facility and that Medical Directors from another facility perform the review for the Medical Director.

There are four standardized formatted questionnaires used for peer review, which are found in Appendix B. These questionnaires include infirmary, chronic care, sick call, and laboratory/x-ray utilization. There are several questions related to quality of care, particularly related to the plan of care being adequate, but most questions are process related. A single episode of care is used

for each patient and the questionnaire is repeated multiple times for each area of service in which the provider engages.[148]

For the physician assistant at SCC there were two reviews, which consisted of reviews of 15 episodes of care for provider sick call and 10 episodes of care for laboratory/x-ray utilization. In total, 328 questions were asked. 327 (99.69%) were found adequate. One question (0.30%) was inadequate. No problems were identified.

For the staff physician, 341 questions were asked and 338 (99.1%) were adequate. The remaining three questions were not applicable. No problems were identified.

The recent Medical Director had two peer reviews by different physicians. In total, 465 questions were asked. 361 (77.6%) were adequate, 55 (11.8%) were not applicable, and 49 (10.5%) were inadequate. The inadequacies consisted of:
- Failing to write notes
- Failing to document clinical correlation to the complaint
- Failing to document clinically significant findings
- Failing to ensure timely follow up
- Failing to document a targeted physical examination
- Failing to have an appropriate plan of care
- Failing to document patient education.

The clinical performance of the Medical Director, a surgeon, was worse than the physician assistant. In our own record reviews, we found many more inadequacies than were found in these reviews. The Medical Director rarely took an adequate history, rarely performed an adequate physical examination, and seldom included an adequate assessment or plan of care. We identified morbidity and mortality as a result of poor care. Yet the peer reviews purport to demonstrate nearly 100% adequate care. We find these peer reviews less than adequate in describing the extent of problems with quality of care. There are no peer reviews of sentinel events, including death.[149] This fails to protect patients from risk of ongoing harm. We noted in the hospital section of this report multiple instances of harm (myocardial infarction, stroke, delayed diagnosis of colon cancer) that resulted from inadequate care and find that the lack of sentinel event reviews results in increasing the risk of harm to patients. The review of clinical care needs to include sentinel events, including appropriately performed mortality review.

---

[148] An episode of care is a single unique provider-patient visit.

[149] The Joint Commission defines a sentinel event as unanticipated events in a healthcare setting resulting in death or serious physical injury or risk of injury to the patient not related to the natural course of the patient's illness. These events call for immediate investigation and response.
As found at https://www.jointcommission.org/assets/1/6/CAMH_2012_Update2_24_SE.pdf.

# Recommendations

## Leadership, Staffing, and Custody Functions

### First Court Expert Recommendations

1. Stateville requires its own Health Care Unit Administrator position. *We agree with the First Court Expert's recommendation that SCC have its own HCUA. This has been accomplished.*

2. Stateville requires its own staffing allocation specifically to meet the Stateville service demands. *We agree with the First Court Expert's recommendation. We add that in order to ensure the staffing allocation is adequate, a staffing analysis be performed as listed in recommendation 5 below.*

3. Only trained primary care clinicians (Internal Medicine and Family Practice) should be providing primary care to this population. Physicians should be board certified in a primary care field. *We partly agree with the First Court Expert's recommendation. We would find board eligible physicians acceptable at facilities with a low percentage of high acuity patients.[150] Facilities housing complex patients should have a board certified primary care physician.*

4. All health care providers should have access to electronic medical references. *We agree with the First Court Expert's recommendation. We suggest universal access to UpToDate®.[151]*

### Additional Recommendations

5. A staffing plan should be developed that includes appropriate relief factors and that evaluates for expected service requirements.

6. Health care leadership staff need to receive an orientation to their positions that reasonably informs them of the expected assignments.

7. The use of "traveling medical directors" should not be permitted to contractually substitute as filling a Medical Director position. Failure to have a permanent Medical Director should incur contractual penalties. Coverage physicians should be used as necessary, but coverage physicians should not constitute a filled Medical Director position.

8. An additional IDOC Regional Coordinator should be added to reduce the span of control for this individual.

9. Review of physician credentials and privileges needs to be performed by a physician.

10. Privileging of physicians must include verification of residency training for the services expected to be provided. Physicians should not be allowed to be privileged to perform services for which they have no formal training.

---

[150] Board eligible is a physician who has completed training in a residency but has not yet received certification. In this case, board eligible would mean that a physician has successfully completed residency training in internal medicine, family practice or emergency medicine.

[151] UpToDate® is a clinical decision support resource that can be accessed over the Internet or from a dedicated server. It has pharmacy information and clinical decision support for general medical practice.

11. Contract monitoring should include evaluation of quality of care as provided by the vendor.

## Clinic Space, Sanitation, Laboratory, and Support Services

### First Court Expert Recommendations

1. *Designated exam rooms should be made available with appropriate equipment in cell houses B, E, and F to allow sick call to occur with reduced movement demands.* We agree with this recommendation.

### Additional Recommendations

2. The first aid kits in the correctional officer rooms on the housing units should be regularly inspected and re-supplied after each use.
3. The infirmary beds need to be properly repaired or replaced with hospital beds so that the height of the bed can be modified, the head adjusted, and the railings are operational.
4. A quantity of electrical beds that meet the needs of the infirmary patient population should be purchased.
5. Continue to conduct monthly documented safety, sanitation, and infection control inspections/environmental rounds, focusing at a minimum on all health care areas, the infirmary patient rooms including the negative pressure rooms, the hemodialysis unit, and the dietary department, with monthly reporting to the CQI Committee.
6. Pest control must continue to be addressed in the infirmary.
7. The safety and sanitation defects in the infirmary tub room floor must be corrected.
8. The birds in the inmate dining and food serving areas must be removed and the area properly sanitized.
9. A sanitarian should be hired to review sanitation issues including the washing of cooking and eating instruments, the maintenance of required temperatures in the meat freezer, vermin, pests, and other potential environmental sanitation hazards.
10. Develop and implement a plan to daily monitor and document negative air pressure readings when the room(s) is occupied for respiratory isolation, and weekly when not occupied.
11. All medical equipment must have no less than annual documented inspections and calibrations by a bioengineering team. Each individual piece of medical equipment must have a current date of inspection label.

## Medical Records

The First Court Expert had no recommendations.

### Current Recommendations

1. Install an electronic medical record. Include at the point of care access to UpToDate® for all staff.

2. If an electronic medical record is not used, modify or improve the paper record files so that they do not come apart during routine use.
3. Negotiate with local consultants and hospitals to timely obtain consultation and hospital reports, as this is a major patient safety and liability issue.
4. When records from consultants are unavailable, the providers need to communicate with consultants to timely obtain necessary information about the consultation to protect patient safety.
5. Create a unified record that includes nephrology consultations and necessary information about dialysis, including laboratory testing if done.

## Intrasystem Transfer

**First Court Expert Recommendations**
1. The intrasystem transfer process needs to be appropriately addressed to effectively ensure continuity of care for patients who enter with prior diagnosed problems. This should be monitored by the QI program. *We agree with this recommendation.*

**Additional Recommendations**
2. Health care leadership develop and implement a tracking log that documents completion of all intrasystem transfer activities and identifies instances of incomplete transfer information.
3. Written directives of IDOC and Wexford be revised to add responsibility for the sending IDOC facility to accurately complete the Health Status Summary in advance of inmate transfer.[152]

## Nursing Sick Call

**First Court Expert Recommendations**
1. Custody issues should not interfere with the provision of timely health care. *We agree with the First Court Appointed Expert's recommendation that custody issues should not interfere with timely provision of health care, especially as it pertains to patient privacy in segregation.*
2. There should be no such thing as a "no show" in a prison. Patients may refuse care but should be required to report to the health services area when scheduled. *This recommendation has been implemented and all inmates who have signed up for sick call are seen by nursing staff and may refuse the encounter at that time.*

**Additional Recommendations**

---

[152] Documents to be revised include the IDOC-Wexford contract, Wexford Policy and Procedure, p. 118 Transfer Screening, and SCC Operations Policies and Procedure, p. 118 Transfer Screening.

2. IDOC Institutional Directive 04.03.103K Offender Health Care Services be revised to incorporate the procedure and practices for sick call as reflected in the SCC Operations Policy and Procedure P103 Non-Emergency Health Care Requests and Services.

3. Sufficient numbers of RNs need to be employed so that LPNs are not assigned to conduct sick call.

4. RNs should perform and document an assessment of each patient in accordance with treatment protocol forms and/or sound nursing judgement.

5. RNs should refer patients to providers in accordance with the treatment protocol and in accordance with sound nursing judgment. The urgency of the referral should be documented and used to schedule provider appointments.

6. The sick call documentation forms should be revised to indicate if the referral is emergent, urgent, or routine.

7. The adequacy of nursing assessments and the plan of care should be monitored by nursing service as part of the peer review or CQI.

8. Custody staff should stand at a distance from the sick call room in segregation so that they can provide visual security but not hear the substance of the interaction.

9. Custody staff should remove restraints without delay when requested by the nurse to complete the evaluation of a health complaint.

10. Providers should see patients timely according to the urgency of the referral.[153]

11. Health care leadership should develop and monitor quality indicators associated with each step of the sick call process. There should be evidence of steps taken to address areas of improvement needed for performance that does not meet the quality indicators.

## Chronic Care

### First Court Expert Recommendations

1. Patients should be scheduled in accordance with their degree of disease control, with more frequent visits when disease control is poor and less frequent visits for those under good control. This is a statewide policy issue which needs to be corrected.

2. For diabetes clinic:
   a. Meals should be served on a predictable schedule to facilitate the coordination of insulin administration with food consumption.
   b. Type 1 diabetics should have access to physiological insulin replacement with three to four injections per day.

3. For HIV clinic:
   a. Patients with HIV infection should be formally enrolled in the chronic care program just as patients with other diseases are.
   b. Facility clinicians should be providing primary care to this population. This would include actively monitoring this high-risk population for medication compliance, side

---

[153] Emergent referrals should be seen immediately, urgent referrals should be seen the same day and routine referrals seen within 72 hours.

effects, and the primary care complications related to the disease and its treatment, such as hyperlipidemia, diabetes, and cardiovascular disease.

c.  The chronic care nurse should be doing medication compliance checks with HIV patients at least monthly.

d.   Problem lists in the medical record must be incomplete and accurate.

*We agree with these recommendations.*

**Additional Recommendations**

4.  Chronic care provider progress notes must be legible, communicate the rationale for modifications in treatment, list reasonable differential diagnoses, document pertinent physical findings and symptoms, and record clear treatment plans.

5.  The Office of Health Services should use national standards of care for their chronic illness guidelines.  A Chronic Care procedure should specify timelines for clinic intervals and laboratory testing.

6.  Age and gender based routine health maintenance, including cancer screening and immunizations for patients with and without medical conditions, must be provided in accord the United States Preventive Services Task Force (USPSTF) guidelines and other national standards of care.  A and B rated guidelines of the USPSTF should be used for the annual health examination.

7.  Disease specific chronic care clinic visits should end.  Chronic care visits must address all medical conditions of the patient. Strictly focusing on a single specific disease and not addressing other associated clinical problems is not in the best interest of the patient and delays needed interventions.

8.  The chronic care providers must regularly document the review of the MAR, the CBG tests, the nursing and provider sick call notes, and blood pressure readings when they see patients in the disease-specific chronic care clinics.

9.  Nursing or CQI staff should do monthly medication compliance audits on all patients with HIV, diabetes, chronic anticoagulation, seizure disorders, and other chronic illnesses as needed. The results should be communicated to the providers and to the CQI Committee.

10. The IDOC should develop a plan to shift anticoagulation treatments from Vitamin K antagonists (warfarin) to newer types of anticoagulants that do not require frequent ongoing lab testing to determine the adequacy of anticoagulation. The frequent lab testing and medication adjustments are logistically complicated and put patient-inmates at risk for poor outcomes. Utilizing newer anticoagulation medications that do not require frequent ongoing measurement of the level of anticoagulation should be strongly considered by the IDOC.

11. Patients with selected chronic illnesses including diabetes, hypertension, and hyperlipidemia should have the 10-year cardiovascular risk calculated to determine if they require a HMG CoA-reductase inhibitor (statin drug) and the proper dosage to minimize the risk of myocardial infarction, stroke, and other cardiovascular diseases.

## Urgent/Emergent Care

**First Court Expert Recommendations**

1. The urgent/emergent program requires review and feedback both with regard to timeliness, appropriateness, and continuity of care. This should be done by clinical leadership and the QI program. *We agree with this recommendation.*

**Additional Recommendations**

2. Establish a list of supplies and equipment to be included in each of the first response bags and the disaster bags, and to identify where each is located in the bag. This list should be used to resupply any bag after use and to conduct a monthly inventory.

3. Each of the openings in the bag should be sealed with a numbered plastic tag. The integrity of the seal should be checked and documented on the emergency equipment log at the beginning of each shift.

4. Healthcare leadership should review actual practices against the SCC ID # 04.03.108 K3 and the Healthcare Operations Policy and Procedure P112 and identify deviations. Revisions to the written directive should be considered and/or a corrective action plan implemented to bring actual performance into compliance with written directives.[154]

5. Because clinical leadership does not appear to understand when a clinical situation is a problem, the IDOC should engage outside medical consultants to examine the quality of care for sentinel events to give feedback and assist in monitoring the clinical care.

6. When the provider at the facility fails to know what diagnosis the patient is or how to manage the patient's problem, that patient needs to be referred to another provider, possibly a consultant, who does know how to manage the patient's clinical problem. This is a particular problem in the IDOC because of the large number of physicians without primary care training.

## Specialty Consultations

**First Court Expert Recommendations**

1. Scheduled offsite services need to be improved with regard to timeliness of access to these services as well as follow up after the service is provided.

2. There should be a reliable method of communication between the scheduler and the clinicians to ensure that patients who require specialty consultation are scheduled commensurate with the urgency of their need.

*We agree with these recommendations.*

**Additional Recommendations**

3. If the current process of utilization of offsite care is to be used, the IDOC, not the vendor, should develop a standardized offsite tracking log on an Excel spreadsheet that should be used at all sites. This tracking log should be used to report timeliness of collegial reviews, approvals, and appointments to the QI committee.

---

[154] For example, the number of drills required at SCC exceeds that required by NCCHC.

4. Referrals for offsite care should be first documented as a physician order in the medical record. The original referral form should be filed in the medical record on the date it was initiated by the provider. Copies of this form can be used by the scheduler to manage scheduling.

5. Medical providers should be permitted to send patients to offsite consultants without going through the collegial review process on the basis of patient safety.

6. When UIC specialty care is significantly delayed, e.g., gastroenterology, an alternate local consultant should be used to obtain care.

7. Any denial of care needs to be documented *in the medical record* using documentation of the person who denied care.

8. At follow up provider visits after consultations, the provider should be required to document the results of the consultation, update the status of the patient, and update the treatment plan based on the consultation. If consultant reports are unavailable, the provider should use other communication efforts to determine what occurred at the consultation.

## Infirmary Care

**First Court Expert Recommendations**
1. Patients should be seen timely according to policy requirements while in the infirmary.
2. If clinicians choose not to treat patients according to currently accepted recommendations and guidelines, the rationale for these decisions should be articulated in the health record.

*We agree with these recommendations.*

**Additional Recommendations:**
3. Problem lists in the infirmary charts must be complete and accurate.
4. Provider notes must be legible, communicate the rationale for modifications in treatment, list reasonable differential diagnoses, document pertinent physical findings and symptoms, record clear treatment plans, and write regular comprehensive progress notes that update the status of each and every acute and chronic illness.
5. As noted in the Clinic Space section, the infirmary beds need to be properly repaired or replaced with hospital beds so that the height of the bed can be modified, the head adjusted, and the railings are operational. A number of electrical beds should be purchased for the infirmary. The condition of the infirmary beds puts at risk the safety of patient-inmates and staff.

## Pharmacy and Medication Administration

The First Court Appointed Expert made no recommendations concerning pharmacy and medication administration.

**Current Recommendations**
1. Consider reducing the volume of controlled medications in stock.

2. The original order should be used when transcribing the order onto the MAR; the blister card should not be used.

3. Medication should be administered in patient specific, unit dose packaging. The practice of pre-pouring should be eliminated.

4. The MAR should be used by the nurse to verify the medication, dose, and route of administration is correct immediately before giving the medication to the patient. The nurse should consult the MAR before answering any questions or concerns the patient has about the medication.

5. Medication should be documented at the time it is administered.

6. Printers should be provided so MARs can be printed at the facility at the end of the month and when a new order is written.

7. A system for timely renewal of chronic disease and other essential medications should be developed.

8. Nurses should refer any patient who does not receive three consecutive doses of nurse administered medication prescribed for a chronic disease to the treating provider. The treating provider should meet with the patient and determine if treatment should be modified to improve adherence.

9. Patient adherence with KOP medications prescribed to treat chronic disease should be monitored at regular intervals (monthly by nursing and by the provider at each chronic disease visit).

10. Revise the policy and procedure for medication administration to provide sufficient operational guidance to administer medications in accordance with accepted standards of nursing practice.

11. The CQI program should develop, implement, and monitor quality indicators related to pharmacy services and medication administration.

12. Root cause analysis and corrective action plans should be used to target the causes of performance that is below expectations. Corrective action should consider software and mechanical means to improve patient safety, such as computerized provider order entry, use of bar coding, patient specific unit dose packaging, etc.

# Infection Control

### First Court Expert Recommendations

1. The First Court Expert had no specific recommendations for infection control for SCC. However, The First Court Expert recommended that each facility have a specific nurse assigned responsibility for infection control, and because SCC did have such a designated nurse at that time, no recommendations regarding infection control were made. SCC no longer has a single designated nurse assigned to infection control. There were important infection control issues identified during our site visit but no one at SCC had identified that these were issues that needed attention. We concur with the First Court Expert's recommendation that each facility, now including SCC, have a designated infection control nurse responsible for compliance with IDOC policy concerning communicable diseases, blood borne pathogens, and compliance with Illinois Department of Public Health reporting requirements as well as the HIV and HCV clinics.

**Additional Recommendations**

2. SCC should have a designated infection control nurse responsible for compliance with IDOC policy concerning communicable diseases, blood borne pathogens, and compliance with Illinois Department of Public Health reporting requirements as well as the HIV and HCV clinics. This infection control nurse should also be responsible for monitoring and prevention of communicable disease outbreaks.

3. Infections and communicable disease data should be analyzed and discussed as part of the monthly and the annual CQI meetings. This should include discussion of trends, updates from the CDC and review of practices. The risk for transmission of TB infection is one example of a periodic review and analysis that should be done by the infection control program at SCC.

4. Track and report skin infections due to all pathogens, not just MRSA, including infestations with scabies or body lice.

5. Update the IDOC Infection Control Manual now and at least every two years.

6. Airborne Infection Isolation (AII) rooms need to be regularly serviced, inspected by knowledgeable individuals, and monitored regularly. The maintenance of adequate air changes and pressure should be documented on a log specifically as part of the infection control program.

7. Also, the practices of the hemodialysis program need to be brought into compliance immediately with CDC recommendations to prevent infections, particularly hepatitis B, among chronic hemodialysis patients.[155]

# Dental Program

## Dental: Staffing and Credentialing

**First Court Expert Recommendations**

1. Serious consideration should be given to hiring a second dental assistant. The lone assistant has too many duties to perform and the dentists are often left working without an assistant. This recommendation is moot since a second dental assistant has been hired.

2. All surgeries should be performed with an assistant. We agree with this recommendation.

*We agree with these recommendations.*

**Additional Recommendations**

3. NRC and SCC dental staffing should be realigned to reflect the mission of each institution.

---

[155] MMWR (2001) Recommendations for Preventing Transmission of Infections Among Chronic Hemodialysis Patients. Vol. 50/No. 99-5, Centers for Disease Control. See also Update to the 2001 Hemodialysis Recommendations available at https://www.cdc.gov/dialysis/guidelines/index.html.

4. Staffing should be increased to accommodate performing comprehensive dental exams on all prisoners either at intake or within 30 days of arrival from a reception and classification center.

## Dental: Facility and Equipment

**First Court Expert Recommendations**

1. Replace the cabinetry and countertops, as they are very old, worn and irreversibly damaged. Proper infection control is almost impossible on these surfaces. We agree. The countertops should be replaced.

*We agree with this recommendation.*

**Additional Recommendations**

2. Patients wear lead aprons with thyroid collars when dental radiographs are taken.[156]
3. There should be an equipment replacement plan to inform budget preparation.
4. The clinic equipment should include a sphygmomanometer and stethoscope.

## Dental: Sanitation, Safety, and Sterilization

**First Court Expert Recommendations:** None

**Additional Recommendations:** None

## Dental: Review Autoclave Log

**First Court Expert Recommendations**

1. That the sterilization spore testing log be accurately maintained and kept on record indefinitely.
2. That safety glasses be provided to patients while they are treated.
3. That a biohazard warning sign be posted in the sterilization area.
4. A warning sign be posted in the x-ray area to warn of radiation hazards, especially pregnant women.

*We agree with these recommendations.*

**Additional Recommendations:** None

## Dental: Comprehensive Care

**First Court Expert Recommendations**

1. Comprehensive "routine" care should be provided only from a well-developed and documented treatment plan based on a thorough, well-documented intra and extra-oral examination, to include a periodontal assessment and detailed examination of all soft tissues.

---

[156] While radiation exposure from dental radiographs is low, it is the dentist's responsibility to follow the ALARA Principle (As Low as Reasonably Achievable) to minimize the patient's exposure. Dentists should follow good radiologic practice and (*inter alia*), use protective aprons and thyroid collars. Dental Radiographic Examinations: Recommendations for Patient Selection and Limiting Radiation Exposure. American Dental Association and Food and Drug Administration (2012), 14.

2. In all cases, appropriate bitewing or periapical x-rays be taken to diagnose caries.
3. Hygiene care be provided as part of the treatment process.
4. Care be provided sequentially, beginning with hygiene services and dental prophylaxis.
5. That oral hygiene instructions be provided and documented.

*We agree with these recommendations.*

**Additional Recommendations**
6. An examination and sequenced treatment plan should be offered to all inmates within 30 days of transfer from a reception and classification center.
7. IDOC should develop protocols for periodontal diagnosis that include the use of Periodontal Screening and Recording and appropriate radiographs.
8. All routine dental examinations should include a sequenced treatment plan.

## Dental: Intake (Initial) Examination

**First Court Expert Recommendations:** None.

While the First Court Expert found the records in compliance with their evaluation criteria,[157] they did not address the more critical issues relating to the ***quality*** of the screening that are addressed below.

**Current Recommendations**
1. The reason(s) for the inadequate quality of the panoramic x-rays should be investigated immediately and the equipment replaced if necessary.
2. Since there is insufficient time at the screening to provide proper oral hygiene instruction, it should not be stamped in the dental chart.

## Dental: Extractions

**First Court Expert Recommendations**
1. A diagnosis or a reason for the extraction be included as part of the record entry. This is best accomplished through the use of the SOAP note format, especially for sick call entries. We note that this is a peer review evaluation criterion.[158]
2. Proper diagnostic x-rays be available for every surgical procedure.
3. Prescribe antibiotics only as necessary. Prescribing routinely after extractions is not a standard of care. We agree with this recommendation. Antibiotics should be prescribed after an extraction only when justified clinically and the reason for the prescription documented in the record.

*We agree with these recommendations.*

**Additional Recommendations**
4. Consent forms should state the reason for the extraction.

## Dental: Removable Prosthetics

---

[157] Whether screening was performed at the reception center and a panoramic x-ray was taken.
[158] Wexford Peer Review Form for dentists – PR-001C.

**First Court Expert Recommendations**
1. A comprehensive examination and well-developed and documented treatment plan, including bitewing and/or periapical radiographs and periodontal assessment, proceed all comprehensive dental care, including removable prosthodontics.
2. That periodontal assessment and treatment be part of the treatment process and that the periodontium be stable before proceeding with impressions.
3. All operative dentistry and oral surgery as documented in the treatment plan be completed before proceeding with impressions.

*We agree with these recommendations.*

**Additional Recommendations:** None

## Dental: Sick Call/Treatment Provision
**First Court Expert Recommendations**
1. Use the SOAP format for sick call entries. It will assure that the inmate's chief complaint is recorded and addressed, and a thorough focused examination and diagnosis precedes all treatment.
2. Develop a triage system that insures that inmates with urgent care complaints are seen in a timelier manner, 24 to 48 hours.

*We agree with these recommendations.*

**Additional Recommendations**
3. When the dental clinic is closed, or the dentist will not be available for 24 hours, a mid-level provider should perform a face-to-face examination for all inmates submitting a request that states or implies the existence of dental pain.
4. All face-to-face assessments should be documented in nursing progress notes.
5. The nursing protocol for Toothache/Dental Pain should be used where clinically appropriate.
6. All requests for dental care should be time stamped and logged and a record of when the inmate was seen by a provider and the disposition should be maintained.
7. The quality and legibility of dentists' progress notes should be addressed in peer reviews.

## Dental: Orientation Handbook
**First Court Expert Recommendations:** None.

**Additional Recommendations:** Pending - To date we have not received the handbook.

## Dental: Policies and Procedures
**First Court Expert Recommendations**
1. Develop a thorough and detailed Policy and Procedures manual that describes and guides all aspects of the dental program. We agree with this recommendation.

**Additional Recommendations:** None.

## Dental: Failed Appointments
**First Court Expert Recommendations**
1. Work with the institution administration to develop and implement strategies to address this problem.
2. Utilize a vigorous CQI process to address this problem. Use these findings to implement procedures to continually improve this high rate of failed appointments.
*We agree with these recommendations.*

**Additional Recommendations**
3. Require the failed dental appointment rate to be reported to the CQI Committee monthly.

## Dental: Medically Compromised Patients
**First Court Expert Recommendations**
1. The medical history section of the dental record be kept up to date and that medical conditions that require special precautions be red-flagged to catch the immediate attention of the provider.
2. That blood pressure readings be routinely taken on patients with a history of hypertension, especially prior to any surgical procedure.
*We agree with these recommendations.*

**Additional Recommendations:** None.

## Dental: Specialists
**First Court Expert Recommendations:** None.

**Additional Recommendations:** None.

## Dental: CQI
**First Court Expert Recommendations**
1. Because of the number of deficiencies noted in the dental program, a more vigorous CQI program should be implemented to address these deficiencies. From the CQI process, policies and procedures should be established that will continually correct these deficiencies to develop a stronger program. We agree with this recommendation.
2. Include the NRC in this invigorated CQI process. Many areas need to be addressed for improvement at that institution. This recommendation is moot since the NRC has a separate CQI Committee.

**Additional Recommendations**

3. The dental CQI program (as well as all other components of the dental program) lacks guidance from a dentist with experience in corrections. This expertise should reside centrally at IDOC and not from a Wexford employee or contractor. [159]

## Internal Monitoring and Quality Improvement

### First Court Expert Recommendations

1. The CQI program, which should have identified many of these programmatic deficiencies, must be reinvigorated with leadership that has had appropriate training with regard to CQI philosophy and methodology.
2. There should be professional performance reviews with feedback, both for the advanced level clinicians and nurses, with regard to the sick call process.
3. The leadership of the CQI program must be retrained regarding CQI philosophy and methodology, along with study design and data collection.
4. This training should include how to study outliers in order to develop targeted improvement strategies.

*We agree with these recommendations.*

### Additional Recommendations

5. The CQI program needs to develop methods of identification of problems with respect to both process and clinical quality of care.
6. The CQI program at SCC must be separate from the CQI program at NRC. Annual reports must be uniquely developed. Reports used for NRC should not be used for SCC.
7. Primary source verification should be verified by the IDOC in conjunction with their AD on quality improvement. Whenever a new doctor is utilized at the facility for coverage or permanent placement, the primary source verification for that provider should be reviewed by the Agency Medical Director and local leadership to ensure that the candidate has primary care credentials.
8. The Governing Body of the facility with respect to the medical program should have majority representation of persons trained in a medical discipline.
9. Quality of care and appropriateness of care need to be incorporated into the CQI program.
10. Mortality review and sentinel event reviews need to be included in the CQI program.
11. Internal audits should be performed by medical personnel and need to include the data used to draw their conclusions. These should include a quality of care component.
12. Provider peer reviews should increase emphasis on quality of care.

---

[159] Dr. Meeks does not have a dentist on his staff and relies on Dr. Sandhu (a Wexford consultant) for dental advice. He would like a dental director on his staff, since relying on a vendor's employee is problematic. See also Dr. Meeks's 1/19/18 interview by Dr. Michael Puisis ("[Question] Is he [Dr. Meeks] responsible for the dental program? Response: He said yes, he is responsible. But he said this with an expression of frustration. [Question] How does he provide that oversight? Response: Basically, he relies on the Wexford Dental Director for this oversight. He acknowledged that this was not a good arrangement and prefers that he have a Chief of Dentistry who is a state employee and part of his regional team." (*id.* questions #35, 36).

13. External reviewers not associated with the vendor should be used for all mortality reviews, all sentinel event reviews, and peer reviews of all non-primary care trained physicians.

# Appendix A

## SCC Positions

| Position Title | Budgeted positions | Vacant Positions | Leave of Absence | Effective Vacancies | Employer |
|---|---|---|---|---|---|
| Health Care Unit Administrator | 1 | 0 | 0 | 0 | IDOC |
| Medical Director | 1 | 1 | 0 | 0 | Wexford |
| Physician | 1 | 0 | 0 | 0 | Wexford |
| Physician Assistant | 1 | 0 | 0 | 0 | Wexford |
| Medical Record Director | 1 | 0 | 0 | 0 | Wexford |
| Director of Nursing | 1 | 0 | 0 | 0 | Wexford |
| Supervisory Nurse | 2 | 1 | 1 | 2 | Wexford |
| Registered Nurses | 28 | 11 | 1 | 12 | Wexford |
| Licensed Practical Nurses | 12 | 2 | 0 | 2 | Wexford |
| CMT* | 17 | 5 | 6 | 11 | IDOC |
| Certified Nurse Assistant | 6 | 1 | 1 | 2 | Wexford |
| Health Information Associate | 2 | 1 | 0 | 1 | IDOC |
| Office Associate | 3 | 1 | 0 | 1 | IDOC |
| Staff Associate | 3 | 0 | 0 | 0 | Wexford |
| Medical Supply Supervisor | 1 | 0 | 0 | 0 | IDOC |
| Pharmacy Technician | 1 | 0 | 0 | 0 | IDOC |
| Med Room Assistant | 1 | 0 | 0 | 0 | Wexford |
| Assistant Site Manager | 1 | 0 | 0 | 0 | Wexford |
| Dental Director | 1 | 1 | 0 | 1 | IDOC |
| Dentist | 1 | 0 | 0 | 0 | Wexford |

| | | | | | |
|---|---|---|---|---|---|
| Dentist** | 1 | 0 | 0 | 0 | IDOC |
| Dental Assistant | 1 | 0 | 0 | 0 | Wexford |
| Dental Assistant | 1 | 0 | 0 | 0 | IDOC |
| Dental Hygienist | 1 | 0 | 0 | 0 | Wexford |
| Dialysis Registered Nurse | 6 | 0 | 0 | 0 | Naphcare |
| Dialysis Technician | 3 | 0 | 0 | 0 | Naphcare |
| **Totals** | **98** | **24** | **9** | **33** | |

*CMTs are either medical technicians or licensed practical nurses (LPN). All newly hired CMT staff are LPNs.

** IDOC hired dentists work half time and are counted and paid as a full-time position.

# Appendix B

**Provider Peer Review Questions**

The sick call questions were:
1. Was the patient seen within 72 hours?
2. Does the encounter reflect the reason why the referral was made?
3. Is the recorded history comprehensive and relevant for the patient's Chief Complaint?
4. Is a targeted physical exam with pertinent findings documented?
5. Was appropriate and comprehensive testing done?
6. Were laboratory and diagnostic tests documented and addressed?
7. Is the plan of care appropriate and documented?
8. Is pertinent patient education documented?

Laboratory/X-ray Utilization questions were:
1. Was the lab test/x-ray appropriate for diagnosis or clinic?
2. Was the lab test result received within 24 hours and x-ray result received within 72 hours?
3. Was the lab test/x-ray result initialed and dated by a physician within 72 hours of receipt?
4. Were clinically significant findings documented in the progress notes?
5. Was plan, as indicated, carried out?
6. When follow-up care was requested, was this carried out in a timely manner?

Chronic Disease questions include:
1. Is the subjective portion comprehensive for clinic (including interval activity for seizure and asthma clinic)?
2. Does the clinic include pertinent vital signs?
3. Is a targeted physical exam with pertinent findings documented, including OHS chronic clinic requirements?
4. Were relevant laboratory parameters documented and acted upon when indicated?
5. Was treatment appropriate for this visit (including additional referrals, additional testing, medication adjustment, ACE inhibitor use, etc.).
6. Was appropriate education for this encounter documented?
7. Was the level of disease delineated?

Infirmary admissions questions:
1. Is an infirmary admission note completed with diagnosis?
2. Does the admission history and physical as documented adequately described this patient's condition?
3. Is indication for admission and type of admission (chronic vs. acute) clearly specified?
4. Are three weekly visits for acute admissions and weekly visits by an MD documented?

5. Is the plan of care appropriate for admission diagnosis?
6. Is MD response to significant nursing entries evident?
7. Is a discharge note with follow-up care evident?