# Mortality Reviews

# 2nd Court Appointed Expert Report

# Lippert v. Godinez

August 2018

**Prepared by Michael Puisis DO**

# Introduction

We reviewed 33 medical records of patients who died. For each death we assigned a designation of preventable, possibly preventable, or not preventable. Parts of five records were missing and we therefore could not determine whether the death was preventable or not. Of the 33 records, 12 were preventable, seven were possibly preventable, nine were not preventable, and five had missing record documents making determination of preventability not possible.

Definitions we use for these designations are as follows:

**Not preventable death** – A death that could not have been prevented or significantly delayed despite identified opportunities for improvement in the medical care.

**Possibly preventable death** – A death wherein opportunities for clinical intervention or errors related to care delivery were identified that MIGHT have prevented or significantly delayed the patient's death.

**Preventable death** – A death wherein opportunities for clinical intervention or errors related to care delivery were identified that WOULD have prevented or significantly delayed the patient's death.

# IDOC Mortality Reviews 2018
## Patient List

Patient #1  Danville; Possibly Preventable.............................................................. 3
Patient #2  Sheridan; Preventable ...................................................................... 4
Patient #3  East Moline; Not Preventable ............................................................ 6
Patient 4  East Moline; Not Preventable ............................................................. 7
Patient 5  East Moline; Not Preventable ............................................................. 7
Patient 6  Decatur; Possibly Preventable........................................................... 8
Patient 7  Dixon; Preventable ........................................................................ 9
Patient #8  Dixon; Possibly Preventable ............................................................ 10
Patient #9  Stateville; Not Preventable............................................................. 12
Patient #10  Stateville; Preventable................................................................ 15
Patient #11  Stateville; Insufficient Chart Information to Determine Preventability.................. 17
Patient #12  Stateville; Insufficient Chart Information to Determine Preventability................. 18
Patient #13  Stateville; Preventable................................................................ 20
Patient #14  Stateville; Not Preventable ............................................................ 23
Patient #15  Dixon; Preventable ..................................................................... 23
Patient #16  Stateville; Insufficient Chart Information to Determine Preventability................ 26
Patient #17  Dixon; Preventable ..................................................................... 27
Patient #18  Dixon; Possibly Preventable ........................................................... 30
Patient #19  Dixon; Preventable ..................................................................... 32
Patient #20  Logan; Not Preventable ................................................................. 34
Patient #21  Menard; Possibly Preventable.......................................................... 36
Patient #22  Menard; Preventable .................................................................... 37
Patient #23   Menard; Possibly Preventable......................................................... 40
Patient #24  Menard; Not Preventable ............................................................... 42
Patient #25  Menard; Preventable .................................................................... 43
Patient #26  Menard; Not Preventable ............................................................... 45
Patient #27  Menard; Preventable .................................................................... 46
Patient #28  Western; Not Preventable .............................................................. 49
Patient #29  Taylorville; Possibly Preventable...................................................... 52
Patient #30  Hill; Preventable ...................................................................... 54
Patient #31  Illinois River; Insufficient Chart Information to Determine Preventability ............ 57
Patient #32  Pinckneyville; Insufficient Chart Information to Determine Preventability............. 58
Patient #33 Robinson; Preventable ................................................................... 60

**Patient #1  Danville**

This patient was 56 years old. Current standards of care recommend colorectal cancer screening beginning at age 50.[1] However, at IDOC annual examinations, the providers only provide an offer of a digital rectal examination with guaiac testing for the purpose of evaluating the prostate and apparently for colorectal cancer screening. Even if the digital rectal examination were done with guaiac testing, this would be inadequate, as an annual colorectal cancer screening will miss more than 90% of colon abnormalities.[2] The patient was offered a digital rectal exam on 1/5/15 but not during 2016.

The patient began losing weight, first documented on 9/30/15 (six pounds based on a 3/9/15 visit compared to the 9/20/15 visit). The patient transferred from WICC to IRCC on 1/16/17 and the weight was 152 pounds, which was an 18-pound weight loss since 3/9/15. The weight loss was unrecognized until 4/21/17, when a doctor documented a 19-pound weight loss. The patient apparently had been losing weight for about a year and a half, but it had been unrecognized.

An abnormal albumin level was present since at least 2/11/16. The alkaline phosphatase was elevated and total protein low on 4/20/17, yet these abnormal labs were never evaluated. On 4/20/17, the patient also had a hemoglobin of 6, which is extremely low. The patient was sent to an ER, where EGD was done 4/22/17 showing gastritis. Colonoscopy was recommended but not done until 6/15/17. In the interim, on 5/17/17 the patient developed unilateral leg swelling but was not evaluated for this. Generally accepted guidelines for unilateral leg swelling include exclusion of leg thrombosis. This was not done and as a result placed the patient at significant risk of harm.

Advanced colon cancer was identified on 6/15/17. Colorectal surgery follow up was recommended in two weeks, but did not occur for a month. In the meantime, the patient was again evaluated for unilateral leg swelling. The doctor presumably thought that the patient might have a deep vein thrombosis, because he ordered a D-dimer test, a test to evaluate for thrombosis. This condition is life threatening, yet the patient was not admitted to a hospital and the D-dimer test was not done. Instead, the doctor only gave diuretics. This was grossly and flagrantly unacceptable.

The patient was admitted to the infirmary for severe edema on 8/3/17. Aside from prescribing a diuretic, there was no attempt to evaluate why the patient had edema. Two days later the patient was admitted to a hospital, where advanced metastatic colon cancer with ascites and anasarca due to the cancer was noted. The patient had malnutrition (consistent with the low albumin), severe ascites, and non-curable colon cancer. The patient was too high a risk to

---

[1] U.S. Preventive Services Task Force colorectal cancer screening as found at https://www.cancer.org/cancer/colon-rectal-cancer/detection-diagnosis-staging/acs-recommendations.
[2] American Cancer Society Recommendations for Colorectal Cancer Early Detection as found at https://www.uspreventiveservicestaskforce.org/Page/Document/RecommendationStatementFinal/colorectal-cancer-screening2#tab.

perform surgery. The patient expired 8/16/17, nine days after admission to the hospital. We identified 49 errors of care from 1/5/15 until his death on 8/17/17. There were 13 episodes when nurses should have referred to a provider but did not. Key deficiencies were lack of colorectal cancer screening; failure to recognize weight loss; failure to timely refer for evaluation of weight loss, anemia, fever, and abdominal pain; and failure to timely refer to exclude deep vein thrombosis in a person with unilateral leg swelling.

The patient was not offered colorectal cancer screening consistent with contemporary standards. **This death was therefore possibly preventable.** The current standard is to perform colorectal cancer screening for early diagnosis and prevention of colon cancer and cancer death. Failure to perform this service results in preventable death. The colonoscopy was not timely.

## Patient #2  Sheridan

This patient was 30 years old. He had repair of a Tetralogy of Fallot[3] as a child. He had a late complication of that pediatric surgery (pulmonic valve regurgitation) and was in the process of medical evaluations for replacement of his pulmonic valve prior to his incarceration. Pulmonic regurgitation gives rise to atrial and ventricular heart arrhythmias with risk of morbidity and mortality. In May of 2015, the patient apparently experienced blood clots resulting in a stroke and was taking anticoagulation for that purpose. The patient became incarcerated in the midst of a work up regarding his valve replacement. While at the Stephenson County Jail in Freeport, Illinois, the patient's cardiologist communicated with the jail on 8/26/15, telling them what work up was remaining prior to valve replacement. The jail continued the work up. An MRI angiography, the final diagnostic study prior to surgery, was scheduled for 12/3/15, but the patient was transferred to the IDOC on 11/5/15.

An NRC physician assistant did an intake physical examination on 11/5/15, but failed to take an adequate history and did not attempt to contact the patient's cardiologist or to obtain old records. Despite the Stephenson County Jail having knowledge of the patient's condition, the IDOC apparently did not know the patient's condition, and other than referring to UIC cardiology, made no attempt to find out the patient's diagnosis. The patient's civilian cardiologist's letter to the Stephenson County Jail was in the patient's IDOC medical record but it is not clear when it arrived in the record or whether it was reviewed. The physician assistant at NRC reception made the wrong diagnosis of aortic stenosis, without supporting evidence. The physician assistant took no history and only relied on the nursing history. The physician assistant examination documented a systolic murmur, when pulmonic regurgitation is a diastolic murmur. Although the physician assistant's note documented that an urgent follow up

---

[3] Tetralogy of Fallot is one of the most common congenital heart conditions. The surgery to repair this anomaly can result, later in life, in abnormalities of the pulmonic valve resulting in incompetence of the pulmonic valve. This can result in dyspnea and other symptoms. Cardiac arrhythmias are common when this occurs. When pulmonic regurgitation occurs as a complication, replacement of the valve may be indicated, as it was in this individual.

with a physician was requested, this did not occur. If the diagnosis was unclear, a prompt echocardiogram should have been done.

The patient transferred to Sheridan on 11/18/15, but the transfer form failed to indicate that the patient had pending surgery. A doctor did not evaluate the patient until 12/10/15, a month later. The doctor documented that the patient was to have balloon valvuloplasty surgery prior to incarceration, but made no attempt to contact the patient's cardiologist. Balloon valvuloplasty is a procedure performed on a stenotic heart valve like aortic stenosis but is not used for pulmonic incompetency. The patient was not scheduled for balloon valvuloplasty. The doctor made no attempt to discover what valve was affected. Without documenting the current status of the patient or the urgency of surgery, the doctor referred the patient to UIC cardiology as a routine visit for evaluation of symptomatic *aortic* stenosis, not pulmonic regurgitation. The valve involved could have been identified by performing echocardiogram at a local hospital which should have been done.

As a civilian, the patient was being managed by a pediatric cardiologist due to the nature of his condition, but the doctor sent the patient to a regular cardiologist. The doctor also did a physical examination documenting an irregular heart rhythm with a murmur, and wrote a differential diagnosis of atrial fibrillation with aortic stenosis. The doctor ordered an EKG. There were two EKGs in the chart, both undated and both with sinus rhythm. The patient did not have atrial fibrillation. The doctor ordered metoprolol without giving a reason. Presumably, it was for aortic stenosis with atrial fibrillation, but the patient did not have either of these conditions. This was a potential problem, because metoprolol can cause atrial conduction abnormalities causing arrhythmias, which this patient was at risk for because of his pulmonic regurgitation. The patient's blood pressure was normal, the patient was not in heart failure, and the patient's pulse was 92. Thus, there was no indication for this medication, but it had potential for significant adverse effects. The doctor did not make an appropriate diagnosis and did not base the diagnosis on sufficient diagnostic information. The Wexford physicians did not contact the patient's civilian cardiologist or read his letter, which was in the medical record. Metoprolol carries a warning for its potential to cause heart block, and increases the potential for conduction disturbances. This patient's pulmonic regurgitation already placed the patient at risk for cardiac arrhythmias, and prescribing metoprolol could make this worse and may have been the cause of his death, which was cardiac arrhythmia.

The patient saw a UIC cardiologist on 1/13/16. The cardiologist at UIC was unable to identify a more specific history than the patient was supposed to have repeat surgery on one of his heart valves. The UIC consultation was by a cardiology fellow, who recommended that the facility obtain records from the treating cardiologist, get an echocardiogram to evaluate which valve was involved, and to schedule a follow up. An echocardiogram was done on 2/9/16 and showed severe pulmonic regurgitation but no aortic stenosis. The echocardiograph cardiologist recommended a stress EKG test, and if poor, referral to cardiovascular surgery for pulmonic valve replacement. Doctors did not order the stress test until 4/25/16, almost three months

later; it was approved on 4/27/16. The Sheridan doctor did not call the UIC cardiologist or the echocardiologist to identify urgency.

On 3/24/16, a doctor saw the patient and noted that the patient had his echocardiogram, but the report was unavailable almost two months after the procedure, so the doctor did not know the results of the echocardiogram. There had also been no attempt to call the patient's civilian cardiologist. The blood pressure was low, at 98/62. Despite the low blood pressure, and the patient complaint of having "near falls," and lack of indication, the doctor continued the metoprolol. The patient's symptoms may also have been due to his pulmonic regurgitation, but the IDOC doctors failed to identify his diagnosis despite the recent evidence on echocardiogram. This was the last in-person evaluation of the patient before he died and there are no further in-person evaluation notes.

There is an autopsy indicating that the patient died on 4/28/16, but there are no antecedent notes for the time period immediately before death, so it is unclear where the patient died or what the circumstances of the death were. The coroner listed the cause of death as cardiac arrhythmia. In our opinion, this was likely due mostly to his pulmonic regurgitation, but also possibly due to use of metoprolol.

**This death was preventable**. A proper history and communication with the patient's civilian cardiologist should have resulted in earlier intervention and valve replacement, which is typically very successful in this condition, particularly in a 30 year old otherwise healthy man. Remarkably, the true diagnosis of the patient was unknown to IDOC medical staff for the entire IDOC incarceration of almost six months, even though the patient's treating cardiologist was collaborative with jail staff at the Stephenson County Jail and even though his letter explaining the treatment plan was in the IDOC file. Also, an echocardiogram identified a critical valve problem but for several months the echocardiogram was not reviewed. As well, the use of metoprolol without clear indication placed the patient at risk of cardiac conduction abnormalities that already affected the patient due to his pulmonic valve disorder. This may have contributed to the patient's arrhythmias, which the coroner said caused his death. The quality of care of physicians was below standard of care with respect to obtaining an accurate history and communicating with a treating physician and with respect to use of metoprolol without a diagnosis or indication. Also, the absence of medical records around the time of death reflects poor medical record keeping or documentation. Over the approximate six months of incarceration in the IDOC, there were 10 errors we identified, principally not following up after consultation, not developing an appropriate treatment plan, and not obtaining an adequate history.

## Patient #3  East Moline

This was a 47-year-old man admitted to IDOC with a history of hypertension. The patient transferred to East Moline on 2/8/17. This patient had significant problems identified over the course of several months, including: anemia (hemoglobin as low as 8.9), persistent cough with

decreased peak expiratory flow rates, increased heart size with possible pericardial effusion, elevated sedimentation rate (69 and 98), elevated C-reactive protein of 43.8 (nl <8), and weight loss. While it is our opinion that hospital referral should have been offered as soon as 10/13/17 (for difficulty breathing, 30 pound weight loss, anemia, elevated sedimentation rate, and globular heart on x-ray suggestive of pericardial effusion), a doctor ultimately offered transfer to the hospital on 10/23/17. The patient refused hospital admission. The patient declined and died at EMCC on 11/3/17. An autopsy was not done.

**This death was not preventable** largely because the patient refused referral to a hospital. However, the there was a significant delay in offering to send the patient to a hospital, and the patient was kept at the facility with evidence of a life-threatening condition on 10/13/17.

## Patient #4  East Moline

This was a 43-year-old with no history of medical problems who had a sudden collapse and died of a pulmonary embolism. **This death was not preventable.**

## Patient #5  East Moline

This was a 75-year-old man who had his reception screening at NRC on 8/8/17. The patient had history of diabetes, hypertension, coronary artery disease, glaucoma, asthma/COPD, sleep apnea, and umbilical hernia. The NRC history was very poor, and though documenting prior cardiac surgery and stent placement, the details were not specified. The patient was on two medications (Brilinta and oxybutynin) for which no indication was given. Although the Brilinta may have been used for the stent, it was not clear, and the date of the stent was beyond the time for which this type of anticoagulant is used.

The patient transferred to East Moline Correctional Center on 8/22/17, and was confused when he arrived. For that reason, he was housed in the health care unit. This apparently was new onset of confusion, as the patient had not been confused at NRC. Despite confusion, the doctor did not order tests to evaluate for this for several days. The patient never had a CT scan, which is often performed for persons with new onset of confusion. On 8/28/17, the patient apparently bit his tongue sufficient to create a large laceration of the tongue, which bled profusely. The patient was on a powerful anticoagulant, which may have contributed to the bleeding. The patient's tongue and lips were swollen, and the patient could not swallow.

The patient was timely sent to a hospital, where the patient died not long after arrival. Doctors judged that the patient had angioedema from being on Lisinopril. The patient should have had an autopsy but did not. It is not clear if the recent confusion was at all related to the cause of death and whether the death may have been due to bleeding rather than angioedema. While the hospital diagnosis was likely, an autopsy should have been performed. **This death was not preventable.**

## Patient #6  Decatur

This patient had known cirrhosis, type 2 diabetes being treated with insulin, hypertension, and a long-standing skin disorder. The skin disorder was such that it caused itching and scratching, and became infected. Doctor-directed treatment of the skin rash failed to resolve the problem over a period of at least eight months. Doctors did not make a definitive diagnosis and did not appear to know what the rash was, yet did not refer the patient to a dermatologist for a definitive diagnosis. At autopsy, the pathologist documented that the patient had diffuse psoriatic-like skin lesions.

The patient also had cirrhosis due to hepatitis C. Though the patient had a high level of fibrosis and appeared to pass from compensated to decompensated liver disease under care of the IDOC, the patient was not documented as having been offered treatment for hepatitis C. Though physicians knew that the patient had cirrhosis, they also did not offer generally accepted care for cirrhosis, such as endoscopy screening for esophageal varices, beta-blocker medication to reduce complications of varices, or screening for hepatocellular carcinoma, which is recommended to be done by ultrasound examination every six months. It is not clear why this patient was not sent to the UIC hepatitis C consultants. Doctors also failed to recognize decreasing HbA1C levels, with episodes of hypoglycemia that was likely due to the patient being on insulin and having advanced liver disease. This placed the patient at risk of significant hypoglycemia.

The patient developed fever, abdominal pain, and hypotension consistent with septic shock, but was not sent to the hospital for evaluation for two days. The hospital record was not in the record for this first hospitalization. The patient returned to the facility and was housed on the infirmary. Apparently based on a second hospital admission, the patient was found to have possible cholecystitis with stones and advanced cirrhosis, making surgery too high-risk. The patient returned to Decatur Correctional Center.

On the day of return, the patient began vomiting blood[4] repeatedly and was hypotensive, indicating shock. Nurses called a physician several times, but the doctor did not send the patient to a hospital until he came into the facility about five hours later. This was grossly and flagrantly unacceptable. The doctor eventually came to the facility and sent the patient to the hospital. Prior to sending the patient to the hospital and during the time the patient was in shock, the doctor obtained a do-not-resuscitate/do-not-intervene status and communicated this to hospital personnel, who then did not attempt interventions. The patient signature on the DNR document was disorganized and unlike the patient's typical signature. The patient died in the hospital not having received aggressive care.

The coroner listed the cause of death as bleeding esophageal varices. **The patient's death was possibly preventable.** If the patient had generally accepted care (including treatment of the

---

[4] Vomiting blood in a person with cirrhosis strongly suggests esophageal varices. When this occurs, immediate hospitalization is indicated. If the patient had been on prophylactic beta blocker medication, this may have been avoided.

hepatitis C, endoscopy surveillance with treatment of esophageal varices, and preventive beta blocker treatment for the varices) early in the course of her disease, her death may have been preventable or delayed. The patient should have been under care of the UIC hepatology group, but was not. Aggressive treatment in the hospital may also have delayed death. The method of obtaining "informed consent" during the time that a patient is in shock should call for an internal review of the IDOC practices of obtaining informed consent.

## Patient #7  Dixon

This patient was a 51-year-old man with history of obesity, hypertension, and high blood lipids. He also was deaf and did not have medical examinations consistently with an interpreter. He was given hearing aids, but these were malfunctioning for periods of time. The patient also had a history of alcoholism and elevated liver function tests, but these were not followed at least since 2014. The patient had minimal elevation of blood glucose levels. Given his significant obesity (as high as 292 pounds), hypertension, and high blood lipids, screening for diabetes would have been good practice. The patient did receive routine metabolic panels, but it was not clear that the glucose tests being done were fasting. In any case, doctors appeared unaware of the risk for diabetes.

The patient developed cough, tachycardia, and low blood pressure. The blood pressure had recently been elevated. On 10/27/16, the blood pressure was 160/96 and was 98/62 on 11/11/16. This significant and unanticipated drop in blood pressure went unnoticed. The pulse was 112. Despite the abnormal vitals, the nurse did not refer to a provider. Two days later, a nurse referred the patient to a nurse practitioner for vomiting. The patient was deaf and the nurse assisting the nurse practitioner documented that the patient did not understand the nurse's questions, so the nurse was unable to obtain an accurate history. The nurse practitioner documented that the patient had several days of fever, sore throat, headache, and vomiting. The patient had tachycardia (116). Based on these constellation of symptoms that included fever, unrecognized weight loss, hypotension, tachycardia, and vomiting, the NP diagnosed pharyngitis and dehydration. This was grossly and flagrantly unacceptable and made worse by fact of not having an appropriate translator for this deaf patient. The NP took no history with respect to the vomiting and failed to order any laboratory tests despite the patient not having eaten in four to five days, and having vomiting and dehydration. The NP started an intravenous antibiotic (Ancef) for pharyngitis, which is not typical standard of care. Vomiting and not eating are not associated with pharyngitis and should have resulted in investigation of another diagnosis. Further diagnostic work up was indicated but not done.

The patient was admitted to the infirmary on 11/13/16. A physician saw the patient on 11/14/16, but took no history of the patient's symptoms of vomiting, not eating, or dehydration. The doctor merely continued the same care as the NP, but ordered next day laboratory tests to assess the dehydration. These lab tests were never done. These tests should have been immediately done.

The patient deteriorated. On 11/14/16, the patient became hypothermic, with temperature of 94.9°F with altered mental status. This new red-flag finding was consistent with sepsis and the patient should have been immediately hospitalized or immediately assessed with diagnostic studies, but the doctor failed to address these problems. Later that same day, the patient became unresponsive. An unresponsive patient, with history of vomiting, dehydration, and hypothermia should be immediately hospitalized. No action was taken, which was grossly and flagrantly unacceptable.

On 11/15/16, the patient was found kneeling and lying on the floor. The nurse did not take his vital signs and did not consult a physician. Despite the patient's altered mental status and weakened status, a doctor did not see the patient on the infirmary unit on 11/15/16. Ordered labs were not done. On 11/15/16, the patient was not talking. This level of altered mental status should have resulted in immediate hospitalization. This was grossly and flagrantly unacceptable care.

On 11/16/16, the patient opened his eyes only to stimulus and was unable to feed himself. At 7:53 a.m. on 11/16/16 the patient was still unresponsive, and the blood pressure was 68/palpable. The patient was in shock and the patient was transferred to a hospital. At the hospital, diabetic ketoacidosis was diagnosed, which had been unrecognized at the prison. The patient was severely dehydrated and had significant abnormalities of his liver function. The patient died the day of arrival.

**This death was preventable.** On multiple occasions, he should have been sent to a higher level of care for laboratory testing and better monitoring than was available at the prison. The patient had vomiting, abnormal vital signs for three days, and altered mental status for two days, yet was not appropriately evaluated. The patient had vomiting, hypothermia, tachycardia, lower than normal blood pressure, dehydration, and altered mental status. The failure to admit to a hospital earlier in the course of care was grossly and flagrantly unacceptable practice.

## Patient #8  Dixon

This was a 45-year-old with a history of smoking and mental illness who brought to medical attention a lump on the neck on 2/5/16. A nurse practitioner and then a doctor saw the patient, but the doctor noted that the 2 by 2 centimeter mass was likely a lymph node and ordered a six month follow up. The neck mass was described as hard. A hard 2 cm neck mass should be considered cancer until proven otherwise. The patient was evaluated multiple times, but the hard neck mass was not evaluated for cancer despite that this presentation must exclude cancer. The patient began losing weight on 3/29/16, but it was unnoticed by physicians. A doctor saw the patient again for a neck mass and swollen uvula on 4/29/16, and started antibiotics for a presumed infection. On 5/9/16, a nurse practitioner identified increased throat swelling and ordered a different antibiotic. The patient had lost weight, but it was unnoticed. The patient was repeatedly evaluated by doctors and nurse practitioners and the neck mass increased to a golf ball size, but it was diagnosed as infectious. The patient was finally sent to a

hospital on 5/15/16, three months after initial symptoms, and a CT scan showed a neck mass, likely a tumor. This could have been diagnosed three months earlier.

The patient continued to lose weight and the patient eventually went to UIC for evaluation, but reports were not obtained and doctors at Dixon failed to document the status or progress of the patient's specialty care. Chemotherapy and radiation therapy apparently started in mid-September 2016, about four months after the initial CT scan showing a likely cancer and seven months after identification of the neck mass. During chemotherapy there were no reports and doctors at Dixon failed to document the progress of the patient's therapy.

The patient continued to lose weight, yet even when described as cachectic, the doctor did not perform a nutritional assessment, and failed to determine whether the patient was able to eat or what he could eat, given his cancer. When the oncologist was preparing the patient for chemotherapy, a doctor at Dixon told the patient to "fatten up," without any evaluation with respect to whether the patient was able to eat, or what his nutritional status was. Except for giving Boost, no action was taken until, when hospitalized for chemotherapy, the patient had a gastrostomy tube inserted.

The patient developed pressure ulcers. Repeatedly, doctors failed to evaluate the ulcers. On two occasions, the patient had an irregularly irregular heartbeat. After the first episode, an EKG was not done but should have been done. On the second occasion, a routine EKG was noted showing premature atrial contractions.

In early September, the patient passed out and had hypotension (60/40). This level of blood pressure is compatible with shock. The patient also had altered mental status. Instead of sending the patient to a hospital, the doctor placed the patient on an infirmary for 23-hour observation. The following day, a doctor presumed the patient had a seizure without ordering or having any diagnostic tests (CT brain, EEG, EKG, laboratory tests) to confirm his diagnosis. Instead of ordering diagnostic testing, the doctor released the patient to general population without any plan except to tell the patient to use a wheelchair.

The patient was hospitalized in November for chemotherapy, but after hospitalization a doctor did not document the therapeutic plan of the patient. Three days after release from the hospital the patient was not responding, was lethargic, and was found on the floor. Instead of sending the patient to a hospital or obtaining an immediate EKG, the doctor ordered neuro checks and asked to be called if the patient became unresponsive. Doctors should not wait until someone becomes unresponsive after a potential syncopal episode; they need to send the patient to a hospital or perform immediate tests to determine the cause of the syncope. The following day, a nurse noted that the patient had unequal pupils. A doctor saw the patient, and although noting that the patient experienced a fall, the doctor failed to perform a neurologic examination and did not order an EKG. This was grossly and flagrantly unacceptable care. The following day, the patient was unresponsive and was sent to a hospital. The patient had experienced cardiac arrest and had atrial fibrillation, but died after arrival to the hospital.

There were multiple missing reports from consultants. The patient had first signs of malignancy in February of 2016, but did not have an appropriate diagnostic CT scan until May of 2016. A biopsy was done sometime in May, but there was no report and it was not clear when this occurred. A PET scan was not done until late June 2016. Chemotherapy and radiation therapy did not start until sometime in mid to late September. Treatment was not started until seven months after first symptoms. Treatment at the facility after chemotherapy and radiation therapy were at times grossly and flagrantly unacceptable. The patient had an irregularly irregular pulse and experienced syncope, but was not sent to a hospital. Three weeks later, a doctor ordered a routine EKG, which appeared to show premature atrial contractions. A radiation oncologist recommended that Dixon evaluate the patient's premature atrial contractions, but there was no report to identify what the concern was. The patient was found to be unresponsive and lethargic, and was on the floor. The nurse called a doctor in the evening and the doctor, instead of sending the patient to a hospital, ordered neuro checks and to call him back if the patient was unresponsive. The following day the patient had unequal pupils, yet the doctor still did not admit the patient to a hospital or evaluate the patient for his syncopal episode. The following day, the patient was admitted to a hospital after being found unresponsive. The patient had atrial fibrillation, developed cardiac arrest, and died. Because of the delay in diagnosis, delay in treatment, failure to evaluate multiple potentially life threatening events (unequal pupils, syncope, and altered mental status), **this death was possibly preventable.**

## Patient #9  Stateville

This 79-year-old patient had hypertension, chronic kidney disease, and dementia from an unknown cause. The medical records lacked information to such an extent that it was not possible, on review of the prison records, to determine the status of the patient's conditions at almost any point in his two year stay on the infirmary at Stateville. The only reliable source of documentation was from offsite hospital reports, but these reports were not consistently filed in the medical record. The only partly reliable onsite source of information was from nursing notes.

The patient was apparently a full-time resident of the infirmary since at least 2014. Dating from December of 2013 until June of 2014, the doctor's progress notes, 19 in number, were identical and stated in their entirety, "No specific complaint, no change, dementia, continue same care."

That was the extent of the note which was repeated over and over. There was no effort to monitor the patient for any of his medical conditions until the patient deteriorated and needed to be hospitalized. The nurses were the only health care staff who appeared to be monitoring the patient.

On 6/28/14, the patient was confused, with low oxygen saturation, and was sent to a hospital. The hospital discharge summary was not in the medical record except for an echocardiogram that showed severe left heart dysfunction, an ejection fraction of 30%, and pulmonary

hypertension. This echocardiogram is consistent with significant cardiac and pulmonary disease. When the patient returned from the hospital the patient was on oxygen, but the doctor did not review what had occurred in the hospital, except to note that the patient had a stroke and had respiratory failure. The patient's capacity for performing routine daily activity was not discussed in the patient's therapeutic plan and not addressed. The status of the patient's condition was not described. Despite documenting that the patient had a stroke, the only neurological examination documented was a confusing two word statement which was, "alert, confused," which was unintelligible. None of the findings on the echocardiogram were included in the problem list and none of these findings were followed clinically. The stroke was not clarified, and the status of the patient's neurological status was not established.

After return from the hospital on 7/16/14, the patient started falling in his room. For a year, from 7/24/14 until 7/13/15, the patient fell seven times. Although a doctor ordered x-rays on one occasion, the doctor failed to perform an examination of the patient after any of these falls. There was no documented attempt by the providers to protect the patient, who had a history of stroke and dementia, from injury due to these falls. After return from the hospital on 7/16/14, the patient was on continuous oxygen therapy for unspecified reasons. The doctor eventually documented on 8/27/14 that the patient was doing well without use of CPAP. The doctor discontinued the CPAP and ordered CPAP use "PRN" or as needed. How would a confused demented patient know when to use oxygen? It also appeared that the doctor used the word CPAP when he probably meant BiPAP. CPAP is a device used in sleep apnea but BiPAP is a form of oxygen delivery. There was no evidence that the patient had sleep apnea.

Beginning in July of 2014, after return from the hospital, the doctor again began writing notes that were identical or near identical to previous notes. Many of these were verbatim identical. These notes were similar to the note quoted above. This incompetent documentation continued even when problems occurred, such as a patient fall.

Beginning in May of 2015, nurse documentation revealed that the patient's status was changing. The patient began experiencing diarrhea and became progressively more confused. When nurses called the doctor stating that the patient was confused, the doctor gave a phone order for long-term Ativan, a sedative and anti-anxiety agent. This occurred twice. This drug carries a warning that it may impair mental abilities and must be used cautiously when performing tasks requiring mental alertness. Use in an elderly demented patient with history of falls was bad judgment at best and carries a manufacturers warning to use *extreme caution* when using in patients at risk of falls. The patient was kept on Ativan for over a year despite repeated subsequent falls. This placed the patient in direct risk of harm.

The patient's confusion worsened. On 5/15/15, a nurse described the patient as unresponsive and lethargic. On 5/23/15, the patient was described as walking unsteadily and appearing agitated and confused. The doctor again prescribed Ativan by phone for 30 days without examination of the patient. This was grossly and flagrantly unacceptable care. The patient began complaining of stomach pains and the doctor ordered lab tests by phone twice, which

were not done. Through all of these episodes the doctor continued to write nearly identical notes, which did not represent symptom findings as documented in nursing notes. The doctor never documented a thorough examination of the patient. Most of his examinations were documented as "no change."

By 7/11/15, a nurse described the patient as "very weak" and "declining." On 7/12/15, a nurse documented that the patient was not able to feed himself and was not eating. The doctor was notified but took no action. Later that day the patient was incontinent, and a doctor ordered blood tests, which finally were done. The laboratory called the prison because the labs were of critical value, with hemoglobin of 6. The patient was sent to a hospital.

At the hospital, an intra-abdominal abscess was identified, and a laparotomy was done, and a large invasive colon cancer was identified requiring a partial colectomy with an ileostomy. The cancer was so advanced that it was not able to be resected. Given the patient's dementia, hospice care was recommended.

When the patient returned from the hospital, the doctor continued to write the same notes with nearly identical words from July of 2015 until the patient died in April of 2016. These notes stated, "No specific complaint. No change. Dementia, post colectomy for metastatic ca [cancer]. Continue same care."

The patient did not appear to receive any specialized care or hospice care. The doctor made no attempt to identify whether the patient was in pain or to assess the comfort level of the patient. The patient fell six more times, based on documentation. The doctor's notes were the same even after patient falls and episodes of increased confusion or agitation. Despite repeated falls, the patient was kept on Ativan, which carries a warning to use extreme caution in persons at risk of falls. The doctor ordered no labs to monitor the clinical status of the patient. Nutritional status was not documented as monitored by the physician. Comfort measures were not documented by the doctor as taken. The patient soiled himself frequently and pulled off his colostomy bag and soiled the bed and his clothes. During one of these episodes of fecal accidents, a nurse documented that the patient was combative. The nurse wrote, "need more staff to help change."

The doctor wrote nearly identical notes over 30 times from July of 2015 until April of 2016, giving no updated status of the patient. On 11/23/15, a second doctor was covering the infirmary and diagnosed a pustular otitis media with a tympanic perforation, but on the same day as this episode the doctor wrote his typical identical note without assessing the patient's ear.

In late November 2015, the patient became lethargic and had diarrhea. A nurse called a doctor and the patient was sent to a hospital, where a urinary tract infection was identified. Blood tests at the hospital indicated that the patient was significantly dehydrated (BUN 56), indicating

lack of attention to nutrition and fluid consumption. When the patient returned from the hospital, the same irrelevant, identical notes were written by the doctor.

On 4/18/16, the doctor wrote one of his typical identical, irrelevant notes. The following day, a nurse noted that the patient was diaphoretic, listless, pale, and was lying in bed without sheets or covers, and appeared to be in pain but was unresponsive. After about five hours and three nursing evaluations, the patient was sent to a hospital. Although the hospital discharge summary was not available, the patient died of sepsis. The autopsy describes the body as having dirty finger and toenails and multiple scars on his extremities and back, apparently from scratching himself.

In summary, this patient received insufficient nursing care likely due to lack of staffing. Nurses were the only clinical staff paying attention to the patient and they appeared less than adequately staffed in performing their tasks. This placed the patient at risk from falls, infections, and lack of attention to nutrition. The Medical Director wrote nearly identical notes over two years despite a changing clinical status of the patient. The notes were nearly identical, even before and after hospitalizations. Significant clinical events (falls, ear infections, change in mental status, alteration of bowel habits, etc.) were either ignored or not commented on by the doctor. The patient's actual clinical status, including nutritional status, was not monitored by the doctors at all. The lack of attention to the patient's pain status and comfort measures by the physician were absent despite a recommendation for hospice care by the oncologist. We identified 255 errors in the patient's care over the two years of record review. Many included failure to take adequate history, perform adequate physical examination, and make an appropriate assessment, due to use of identical documented progress notes despite changes in the patient's status. The patient's medical conditions, which included hypertension, chronic kidney disease, dementia, COPD, and eventually colon cancer, were never monitored during physician visits. **Care was negligent. Careful attention to this patient would probably have prolonged his life to a small extent but the death was not preventable**. More important was the lack of humane care by the physician, which was incompetent, and grossly and flagrantly indifferent. The care of this patient also demonstrates the effect of lack of sufficient nurse staffing on the Stateville infirmary.

## Patient #10  Stateville

This 68-year-old inmate from Stateville had hypertension, diabetes, and back pain. He had elevated lipids and carried above a 50% 10-year risk of cardiovascular events or stroke[5] based on American College of Cardiology criteria, yet this was unrecognized for the entire incarceration and the patient remained untreated for this disorder. Blood pressure was not at control (140/90) on six occasions, but doctors failed to adjust medications   Failure to properly

---

[5] The American College of Cardiology and American Heart Association guidelines on lipid therapy recommend that when the 10-year risk of heart disease or stroke is over 7.5% that patients be started on statin medication. A simple calculator for identifying risk is available at http://www.cvriskcalculator.com/.

treat the hypertension and lipid disorder placed the patient at risk of cardiovascular events and stroke.

The patient had back pain and was on ibuprofen, a nonsteroidal medication, for almost the entire period of record review without adequate monitoring. This drug carries two black box[6] warnings; one for increased risk of serious (and potentially fatal) adverse cardiovascular thrombotic events, including fatal MI and stroke, and an increased risk of serious gastrointestinal inflammation, ulceration, bleeding, and perforation (may be fatal). This latter risk is increased in the elderly. The nonsteroidal medication can also exacerbate hypertension or cause renal damage. Despite these serious and significant warnings, doctors routinely and continuously prescribed this medication without considerations of the risk to the patient and without discussing those risks with the patient.

On 4/15/16, the patient experienced an episode of emesis and nausea after awakening. An EKG showed STT wave changes that could be consistent with ischemia. A doctor diagnosed possible nonsteroidal gastritis or angina, both of which were possible in this patient. The doctor did stop the non-steroidal medication and started omeprazole, an anti-ulcer medication, but the doctor did not take action with respect to the potential for angina. The doctor ordered a hemoglobin and it was 10.3, significantly lower that the last hemoglobin of 13.7, yet there was no follow up of this abnormal lab. The patient should have been referred for endoscopy. Also, the doctor stopped the ibuprofen and ordered only a single nitroglycerin tablet, and failed to order anti-anginal medication longer term. Because the patient had such high risk for cardiovascular disease, a stress test or cardiac catheterization should have been done. Yet there was no follow up of this problem. Endoscopy and colonoscopy should also have been done to evaluate the recent anemia and abdominal symptoms.

A different doctor restarted the ibuprofen about two weeks after the episode of 4/15/16 without reviewing the abnormal hemoglobin and without recognizing the black box warnings or the recent dramatic drop in hemoglobin. A week later, the ibuprofen was changed to naproxen, another nonsteroidal medication with the same risks and same black box warnings. Doctors ordered non-steroidal medications six times without consideration of the black box warnings for gastrointestinal bleed, which the patient likely had as manifested by his acute anemia and prior episode of vomiting "black stuff" as early as 2013. The doctors also ignored the potential for cardiovascular thrombotic events with use of non-steroidal medication, likely because they appeared ignorant of the patient's high-risk cardiovascular status. This was likely incompetence.

On 2/5/17, the patient collapsed. CPR was initiated at the facility, but the patient died at the hospital. An EKG done at the facility was consistent with an acute coronary event (MI). A coroner listed the cause of death as atherosclerosis contributed to by gastrointestinal hemorrhage.

---

[6] According to the Food and Drug Administration website at
https://www.fda.gov/downloads/forconsumers/consumerupdates/ucm107976.pdf    boxed warnings appear on a prescription drug's label and are designed to call attention to serious or life threatening risks.

**This death was preventable.** Providers failed to evaluate for peptic ulcer even though the patient had symptoms or signs of this condition (anemia, vomiting, and apparently bloody emesis). The patient's anemia was never properly evaluated despite being suggestive of peptic ulcer disease. Despite potential for ulcer disease and cardiovascular disease providers kept the patient on non-steroidal medication for years despite warnings from the manufacturer regarding risk for gastrointestinal bleeding and myocardial infarction. Providers failed to treat the patient for high blood lipids despite significant risk. Providers failed to manage blood pressure to a level considered a goal for diabetics. Lipid therapy and adequate blood pressure control are modifiable risks for cardiovascular disease. When a doctor on 4/15/16 documented that the patient might have had a coronary event there was inadequate follow up. There were signs on EKGs of ischemic cardiovascular disease (changing patterns of STT wave changes) that indicate possible ischemic cardiac disease. There were multiple modifiable factors for cardiovascular disease yet the patient did not receive evaluation for this disease. Although the patient appeared to the provider to have had an angina episode, follow up stress testing or angiography were not done, and the patient was not treated with anti-anginal medication. If earlier interventions in these areas were undertaken the death would have been preventable. We note that appended to the death summary was a Wexford Mortality Review Worksheet in which the Medical Director who participated in care of the patient opined that earlier intervention was not possible and that there was no way to improve patient care. We disagree for the reasons cited above. We noted 50 errors of management in this patient's care.

## Patient #11  Stateville

The records sent for this patient consisted of 20 PDF files which were not in order and were disorganized, making evaluation extremely difficult. This 73-year-old lost about 20 pounds from 2014 to 2015 without anyone noticing or initiating an evaluation. On 10/6/15, the patient developed dysphagia to solid food and a right neck mass was identified. On 10/20/15, an ultrasound showed a likely malignancy. The diagnosis of invasive squamous cell carcinoma of the tongue was not made until 1/8/16, almost three months later.

Few offsite consultation reports were available. Some referral forms were present that had a few scribbled notes by the consultant written on them. The patient started radiation therapy sometime in late February, almost five months after symptoms started. The notes by the SCC doctor were so poor that it could not be determined what the status of the patient was and whether care was appropriate. Most of the doctor's notes stated, "No specific complaint [objective] no change [assessment] throat ca on radiation chemo [plan] continue same care."

This identical note was repeated over and over, giving no update on the status of the patient's chemotherapy or radiation therapy. The patient had hypertension, hyperlipidemia, apparent COPD, and head and neck cancer. Except for the head and neck cancer, none of the physician notes over the last seven months of the patient's life included mention of the patient's other conditions. Almost no notes over the same time period gave an updated status of the head and neck cancer, and the existing therapeutic plan. The patient did not appear to receive care

except by UIC consultants. Since not all of the consultation reports were in the medical record, it was not possible to review whether the therapeutic plan of the oncologists was being carried out. The patient apparently completed chemotherapy and radiation therapy, but a follow-up PET scan was not in the record. The patient had episodes of shortness of breath in July that were not diagnosed. The patient was found unresponsive on the toilet, apparently taken to a hospital, and apparently died. We say apparently because there were no notes documenting what happened to the patient.

The coroner listed the cause of death as hypertensive heart disease. A recent echocardiogram was normal and did not show hypertensive heart disease. The coroner performed an autopsy but the IDOC was unable to find it. The coroner made no mention on the death certificate of the patient's head and neck cancer. This appears to be a mistake.

There were **insufficient medical records to determine if the death was preventable,** as consultation notes were not all available, SCC physician notes were poor, and the autopsy was unavailable. We identified 170 separate errors. Most were combinations of failure to take a history, perform a physical examination, make an assessment, and develop a therapeutic plan. These occurred when the doctor who was the Medical Director wrote notes repeatedly that contained the phrase quoted above. There were multiple errors of not having a medical report available. However, we were unable to determine how many reports were not present, as it appeared that the patient had many more consultations, radiation, and oncology treatments than are documented in the medical record. It was not surprising that there were also multiple episodes of failure to follow up appropriately after a consultation. Because so many consultation reports were not in the record, many more of these were probably also not followed up on. There were few episodes of care documenting review of the consultant's care noting recommendations. Documentation was so poor that it was not possible to determine the course of care for this patient, even to determine whether death was preventable.

## Patient #12  Stateville

This patient was incarcerated at Graham Correctional Center on 8/11/15. The patient was transferred to Western Correctional Center. After the intake evaluation at Graham, there is a gap, and medical records for the next year were missing. The record resumes in August of 2016, when the patient was transferred from Western Correctional Center to NRC for a writ at UIC for treatment of liver cancer. After transfer from Graham to NRC, most physicians treating the patient were from NRC, but in February they were from SCC. It was unclear during this time period where the patient was actually housed. The missing record documents from Graham and Western were compounded by multiple missing record documents from NRC. At NRC, most specialty referrals and specialty reports were not in the record, and it was not possible to determine the course of care based on the available record. Also, there were no progress notes for this patient from 1/20/17 until 2/15/17, almost a month. During this time, the patient had life-critical laboratory results and it was not possible to review care for that period. To give a final opinion on this patient with this chart is not possible because the chart is incomplete. We

had asked for two years of the record but only received one year, and there were missing documents in the record we received. Over the entire period at NRC/SCC, doctors did not document understanding of the therapeutic plan of UIC consultants. Because of the lack of reports in the record, it was not clear what that plan was. Despite providers, on multiple occasions, stating that they were waiting for reports and expressing not knowing what the plan was, these reports were not obtained. This took place between August of 2016 and February of 2017, when the patient died. This does reinforce our opinion about the medical record system at NRC, which is completely broken.

The missing record from Western would be important to review with respect to an opinion on preventability. A UIC consultant documented that hepatocellular carcinoma was identified on CT scan in January of 2016, yet the patient was not referred for treatment until August of 2016. It was unclear if earlier knowledge of the diagnosis was available. A biopsy done in May of 2016 showing apparent hepatocellular carcinoma was requested by UIC multiple times but was never provided. This patient did not apparently have timely evaluation or treatment of his condition and his death may have been delayed or prevented given timely and appropriate care. But we will not make that designation without the ability to review the record, which was not present. Because of these missing medical record documents, **there is insufficient medical records to determine whether this death was preventable.**

Despite being unable to determine whether this death was preventable, we did note significant problems with his care. We noted 40 errors; 15 were related to lack of available reports from consultants, which resulted in at least five episodes of lack of follow up. It was not clear if the patient ever went back to UIC for follow up after treatment of his hepatocellular cancer.

There were four episodes of medication error. In one case the patient was started on spironolactone, but the patient had prior and recent hyperkalemia, which required kayexalate. When the spironolactone[7] was started, monitoring of potassium was not done, although recommended by UIC. This was the first medication error. Almost three months later the patient developed life-critical potassium elevation. This potassium (6.9) was reported by phone by UIC at 5:30 a.m. on 2/11/17, but the patient was not evaluated with an EKG or clinical evaluation, and kayexalate was not given until 2/12/17, in the evening. This was grossly and flagrantly unacceptable practice. The second error was that it was not realized that the patient was still on spironolactone until 2/14/17, when it was stopped. The third error was that the patient had ascites and his diuretics expired and this was not noticed for almost four weeks, at which time the patient had significant ascites and apparent anasarca. The fourth error related to an abnormal laboratory result. At one point, a stat laboratory result was called in from a local hospital. The platelets were 22,000. Thrombocytopenia is characteristic of cirrhosis and no treatment is indicated except to prevent bleeding and to eliminate drugs that may cause

---

[7] Spironolactone is a diuretic medication that can cause elevation of the potassium level. A potassium level above 6.5 is considered critical and life-threatening. Immediate evaluation is indicated, along with an EKG to assess whether immediate intravenous medication needs to be given. In this case, the patient was treated casually and not for a day and a half after notification of the abnormality.

bleeding. The Medical Director, who was a surgeon, receiving the report from a nurse by phone incompetently ordered high dose injected steroids and a three-day course of high dose prednisone, apparently thinking that the patient had immune thrombocytopenia, a different disease. This placed the patient at risk of harm, as the drug was unnecessary and given the patient's, condition placed him at higher risk of bleeding and infection.

The patient developed severe ascites with decompensated cirrhosis. UIC had recommended him to return if this occurred, yet doctors failed to know the therapeutic plan of UIC because reports were unavailable, so the patient was not returned to UIC. Also, the patient was not seen for about six weeks despite having new onset ascites and life-critical laboratory results, including BUN 149, sodium 125, creatinine 3.88, and potassium 6.9. This lack of access to a physician despite life-critical laboratory results was indifferent.

We note that despite UIC diagnosing and treating the patient for hepatocellular carcinoma, the Medical Director at SCC, a surgeon, wrote the death summary and stated that the patient died of cholangiocarcinoma, a cancer of bile ducts. This diagnosis was nowhere present in the medical record and could not have reasonably been presumed based on a review of the medical record. The coroner listed liver cancer, and UIC physicians documented that the patient had hepatocellular carcinoma. Cholangiocarcinoma and hepatocellular carcinoma are different cancers. This inaccuracy was not corrected as apparently no one reviewed the death critically.

## Patient #13  Stateville

This patient was a 38-year-old man with a history of hypertension and on renal dialysis for kidney failure. The reason for being on dialysis was not documented in the medical record and was unclear, but it appeared to be from hypertension. This is a very young age to have kidney failure from high blood pressure, yet the etiology of the renal failure was not documented in the record.

The patient transferred from Graham to Stateville on 9/24/14. The patient was at Stateville 18 months. During that entire 18 months the blood pressure was not controlled. There were 16 episodes of care in the medical record during which a doctor (staff physician or contract nephrologist) saw the patient. At all of these episodes the blood pressure was not at goal and was sometimes significantly elevated. On only three occasions did a doctor modify or increase blood pressure medication. During this time period the patient had only two chronic care visits. The lack of attention to the patient's ongoing high blood pressure was indifferent.

On six occasions, the serum potassium was above 6.7. Three of these values were above seven (7.1, 7.2, and 7.6) and one of the values was extraordinarily high (8.5). All of these values are critical values and require immediate intervention. When the potassium is above 7, the patient is susceptible to cardiac conduction abnormalities (e.g. sinus arrest, idioventricular rhythms, ventricular tachycardia or fibrillation, and asystole) which can cause death. Yet on all of these occasions no actions were taken. On one occasion, when the UIC laboratory called Stateville at

4:00 a.m. for critical potassium level of 8.5, the nurse took no action except to note that the morning nurse would follow up. That did not occur. At 1:30 p.m. that same day, a nurse notified a doctor and the plan was to have the patient followed up the next morning. There was no documentation that this occurred. These were critical values that typically require immediate attention, and the lack of attention to this was grossly and flagrantly unacceptable practice and placed the patient at risk of harm.

Both a vascular surgeon and the nephrologist recommended work up of a murmur. The Stateville doctor referred the patient to cardiology. Wexford denied the cardiology consult but approved an echocardiogram. The patient had an echocardiogram consistent with significant hypertensive heart disease and multiple abnormalities. When the doctor at Stateville saw the patient after this test, the doctor did not review the test or take any action. No one followed up on the murmur or the echocardiogram and the patient never saw a cardiologist. At the same visit the blood pressure was 178/113, but the doctor took no action to improve blood pressure control. The echocardiogram showed cardiac effects of prolonged poorly controlled hypertension. A cardiologist should have been consulted because the Stateville doctor did not review the test or appear to know how to manage the patient's high blood pressure.

The patient was being dialyzed late evenings to early mornings. We do not consider dialysis in the early morning appropriate, particularly when breakfast is also served early morning. Also, when problems occur during dialysis there are no doctors present to evaluate the patient. At about 2:00 a.m. on 1/9/16, the patient was brought by the dialysis nurse to the clinic with nausea, vomiting, profuse sweating, and elevated blood pressure as high as 189/113. This constellation of signs should have prompted a provider evaluation with immediate EKG and laboratory tests or the patient should have been sent to a hospital. Acute coronary syndrome should have been considered. Instead, the patient was given antacids, observed for several hours, and sent back to his housing unit.

On another occasion, the patient had shortness of breath, lightheadedness, fast heart rate (126), weakness, and diaphoresis. An EKG was done and did not have an automated reading on it but appeared to have peaked T waves indicative of possible hyperkalemia. The EKG rate was approximately 145-150. The patient should have been sent to a hospital. Instead, a nurse called a doctor, who ordered a single dose of atenolol and sent the patient back to his housing unit without any follow up. The patient was not evaluated for hyperkalemia. Care was grossly and flagrantly unacceptable.

On another occasion, a doctor saw the patient for not feeling well. The blood pressure was 150/96 and the oxygen saturation was 88%, which suggests significant hypoxemia. These values warrant hospitalization. The doctor referred the patient to the health care unit but there is no documentation in the record that this visit occurred. This placed the patient at risk. There may have been a problem with medical record paper work getting filed.

On another occasion the patient had fever (101.4°F) with elevated blood pressure (170/95) and felt nauseous with chills. The nurse called a doctor, who prescribed Tylenol and an anti-emetic without provider follow up.

All of these cases demonstrate an indifferent attitude to the patient's serious conditions.

On 3/22/16, the patient experienced shortness of breath, elevated blood pressure, elevated pulse, and elevated respirations, and within minutes of being evaluated sustained cardiac arrest and was taken to a hospital, where he was pronounced dead.

The Wexford Mortality Review Worksheet documented that earlier intervention was not possible, there was no way to improve medical care, and the medical response could not be improved.

**This death was preventable**. The coroner listed the cause of death as hypertensive heart disease. The patient had long standing hypertension. His blood pressure at Stateville was uncontrolled throughout his entire 18 month stay and the system was indifferent to his uncontrolled blood pressure. He was seen in chronic clinic for his hypertension only twice, which is not consistent with IDOC guidelines. Approximately 80% of the time, when a doctor saw the patient with elevated blood pressure no action was taken to modify the patient's medication. According to a four-month sample of medication administration records, the patient received only 60% of his medication. The reasons for this were not clear and there was no counseling or history by providers to determine why this was occurring.

The patient was repeatedly placed at risk of arrhythmias due to hyperkalemia. The monthly nephrology checks in dialysis clinic do document the nephrology prescription of Kayexalate, a binding agent for hyperkalemia. But the episodes of extremely high potassium required additional steps to lower the potassium. The lack of concern for extremely high potassium levels was extraordinary and unacceptable, and appears to demonstrate a lack of basic primary care medical knowledge or indifference to the patient's critical need. The patient had an echocardiogram showing significant hypertensive heart disease, but the test was not even reviewed. The providers appeared indifferent to the patient's serious medical condition, which ultimately caused his death. It is our opinion that improved treatment of his high blood pressure would have prevented or significantly delayed his death from hypertensive heart disease. We do note that the patient's phosphorous, BUN, and PTH were repeatedly elevated. Because the dialysis records are not incorporated into the medical record, the course of dialysis care was not clear. Given the continuously elevated blood pressure, high BUN, and phosphorous, it is possible that the patient was not being dialyzed for sufficient time. We would recommend that the IDOC have an outside nephrologist (from UIC) review this case to evaluate the nephrology care to ensure that dialysis treatment times were adequate.

We noted 44 apparent errors in care for this patient. Most (16) related to not addressing out of control hypertension. Twelve errors related to not timely reviewing abnormal labs (high

potassium) and not instituting prompt action for critically elevated potassium levels. Three errors related to not sending the patient to a higher level of care when apparently indicated. Two errors related to the patient not receiving medication, including a survey of several months of medication record indicating that the patient missed 40% of medication doses over four months.

## Patient #14  Stateville

This patient had 33 documented seizures over a four year period or about eight seizures a year. This is not good control. It did not appear that the physician knew how to manage this condition. There was no evidence of an EEG or CT scan, even though these should be done for diagnostic purposes. We only reviewed two years of the record, so these tests may have been done earlier. However, there was no reference to these tests. The doctors did not evaluate for side effects of medication at chronic clinic visits. Failure to control seizures and to know how to monitor this condition is an indication to refer the patient to a neurologist which should have been done.

The patient had a presentation of atypical chest pain with an equivocal EKG, but was not followed up for this. The patient had high blood cholesterol and in 2015 and 2016, his 10-year risk for heart disease or stroke was 26% and 14% respectively. He should have been on a higher dose of statin, but was not. This placed the patient at risk for coronary artery disease.

Shortly after one of the patient's seizures, he became unresponsive. The patient sustained cardiac arrest and died. The coroner listed the cause of death as coronary atherosclerosis, although the autopsy was not available. The patient did not have a myocardial infarction, apparently. Having died from coronary atherosclerosis during a seizure indicates that the seizure may have precipitated an acute coronary event because of the rise in blood pressure and pulse. This is difficult to be certain of and for that reason alone **we determine that this death was not preventable**. However, patients with seizure are at risk for sudden death, a condition known as unexpected death in epilepsy (SUDEP). This condition can have a cardiogenic etiology. It was therefore a significant failure in not referring this patient to a neurologist for accurate diagnosis and management of his epilepsy, because onsite physicians were not able to bring the patient's seizures under control, as evidenced by 33 seizures and inability to obtain control.

We noted 57 errors of management. Most (14) were related to the patient having seizures, with the nurse not consulting a physician. An additional 12 errors were related to not ordering therapeutic drug levels after a seizure.

## Patient #15  Dixon

This patient was a 24-year-old man with severe mental illness. He was incarcerated on 8/12/16. He weighed 207 pounds. In the past he had multiple psychiatric hospitalizations. The patient

became unstable when not on medication and would frequently refuse medications. These refusals apparently did not result in referrals to mental health professionals. According to an administrative review, when this patient did not take his medication he became more psychotic with delusions, paranoia, and hallucinations. These episodes of psychosis resulted in multiple crisis watches, often for self-harm. The self-harm included foreign body ingestion, which on two occasions resulted in hospitalization.

On 7/12/17, a nurse documented that an officer observed the patient swallowing two sporks, which are a plastic combination spoon and fork. The nurse documented that the patient "will have no complication from swallowing a foreign object." The nurse did not refer to a doctor. This was grossly and flagrantly unacceptable care. On 7/13/17, another nurse notified a doctor that the patient had swallowed a spork; the doctor ordered an x-ray but did not evaluate the patient. The x-ray showed no radiopaque foreign body. On 7/16/17, the patient told a nurse that he went on hunger strike "because no one cares about the spork I swallowed." The nurse did not consult a doctor. On 7/24/17, a nurse saw the patient on sick call for stomach pain. The patient requested of the nurse, "Don't put any pressure on my stomach." The nurse assessment was "ineffective coping" and abdominal pain of unknown etiology. The nurse did not refer to a doctor.

On 9/27/17, a psychiatrist saw the patient. The psychiatrist documented that the inmate was frustrated with "what he perceives to be indifferent medical attention." The patient told the psychiatrist that he had swallowed two sporks and was not receiving medical attention. The patient was correct.

On 10/2/17, a nurse practitioner saw the patient, who told the NP that he had swallowed two sporks and wanted them removed. The patient weight was 174 pounds, which was a 33-pound weight loss since his incarceration a year ago; the weight loss was unrecognized. The NP documented a soft abdomen. The patient had also embedded an object in his forearm. The NP ordered an x-ray of the forearm but did not address the ingested spork. The NP assessment included that the patient had a foreign body in his GI tract. To not evaluate for the swallowed spork was grossly and flagrantly unacceptable care.

The patient complained to a licensed clinical professional counselor (LCPC) on 10/12/17 that he had stomach pain and wanted to see the nurse practitioner. He said he was only eating snacks because of stomach pain. There was no referral. This was indifferent.

On 10/18/17 the LCPC saw the patient, who again reported that no one was taking care of his medical needs. He complained of vomiting, diarrhea, and weakness and was not eating because he was nauseous. The LCPC documented that he would follow up the next day regarding a sick call request, "given he still had not submitted one per medical." It appeared that the medical program was not going to see the inmate unless he submitted a request. The following day, the patient did not show up for his mental health appointment. The note documented, "He is sick."

On 10/20/17 a nurse saw the patient, who complained of abdominal pain after swallowing sporks months ago. The patient weighed 150 pounds, a 24-pound weight loss over the past month and a 57-pound weight loss since incarceration. The nurse failed to acknowledge the weight loss and appeared unaware that weight loss had occurred. The patient did not complain of black tarry stool or bleeding, but had nausea, diarrhea, and abdominal pain, and it hurt when he ate. The nurse noted pain on palpation in the center of the abdomen. The nurse did not consult a physician. The patient was sent back to his housing unit. This was indifferent, and grossly and flagrantly unacceptable care. The next morning, at morning medication pass, the inmate was found dead in his cell.

On autopsy, the coroner found two sporks in the inmate's duodenum, with deep lacerations of the duodenum and superficial lacerations of the proximal esophagus with blood in the stomach. The death was attributed to a gastrointestinal bleed from lacerations caused by a foreign body.

An IDOC administrative review found no problems with medical care. The report noted that the nurse on 10/20/17 had used the proper nursing protocol and that there was nothing in the nursing assessment indicating an emergency. The review found problems with the inmate not taking his medication and recommended that nursing staff notify a mental health professional if an inmate refused medication on three consecutive days. However, no issues were found with medical.

**This death was preventable.** On four occasions in July, nurses evaluated the patient for a complaint of having swallowed a spork. Only once did a nurse consult a physician. On that occasion, the physician ordered an abdominal x-ray but did not see the patient, and there was no documented follow up of the x-ray. Three months later on 10/2/17, a nurse practitioner saw the patient, who complained of swallowing a spork. The nurse practitioner took no action. Notably, the patient had lost 33 pounds over the past year, which was unrecognized by the nurse practitioner.

The patient complained to a psychiatrist and a licensed counselor that he had swallowed sporks and was not receiving care. This did not result in referrals to a physician.

On the day before his death a nurse saw the patient, who complained of stomach pain, nausea, diarrhea, and inability to eat because of the stomach pain. The nurse did not refer to a doctor. At this point the patient had lost 57 pounds, which was unrecognized by the nurse. The next day the patient died.

The most common features of an ingested foreign body are dysphagia, problems with eating, and regurgitation of ingested food. The patient appeared to have all of these symptoms for months. The patient had weight loss and multiple complaints of inability to eat normally. Pain in the setting of an ingested foreign body suggests perforation and endoscopic evaluation is indicated. The patient complained of pain repeatedly, yet these symptoms were not properly

evaluated in the context of a foreign body ingestion. Endoscopic evaluation is often necessary, even in the setting of negative x-rays. Plastic often does not show up on plain radiographs and failure to locate an object on a plain radiograph does not preclude presence of a foreign body. Since the spork has sharp prongs on the fork end, urgent endoscopy was indicated, but the patient did not see a physician for over three months. In the only nurse practitioner evaluation, the NP did not appropriately refer the patient. The NP also failed to recognize significant weight loss. Care for this severely mentally ill patient was indifferent, and grossly and flagrantly unacceptable.

We noted nine errors in this death review. Eight were related to either nurses or mental health staff not referring to a provider for a serious medical complaint. Two were related to providers not evaluating the patient related to significant complaints. And one related to failure of the nurse practitioner to initiate a work up for an ingested spork that had not been eliminated for over three months.

## Patient #16  Stateville

This was a 54-year-old man with a history of hypertension and asthma. The patient was at Menard. On 8/29/16, while at Menard, pulmonary embolism was diagnosed, and the patient was started on warfarin with a recommendation to continue anticoagulation for six months.

While at Menard, providers failed to treat the patient with a statin drug despite an 8-13% 10-year risk for heart disease or stroke. He also had seven episodes of chest pain while at Menard. Some of these were typical for angina, but for most of these episodes of chest pain the history was inadequate and it could not be determined if it was angina. Nevertheless, providers did not start a statin despite the elevated cardiovascular risk, did not start antianginal medication, and did not refer for possible stress testing.

In late December 2016, the patient was again hospitalized at Chester Memorial Hospital from Menard for respiratory failure. Studies for pulmonary embolism were negative and no DVT was present.

The patient transferred to Stateville on 2/4/17, still on warfarin anticoagulation. On transfer, the patient had a pending sleep study and had diagnoses of hypertension, diabetes, asthma, and pulmonary embolism on anticoagulation. On 2/23/17, a blood count showed anemia (HGB 9.3) and on 3/1/17, a doctor stopped the warfarin. A colonoscopy was ordered but there was no evidence it was ever done. On 4/5/17, the patient asked for a breathing treatment, but the nurse had a dispute with the inmate and no treatment was given. On 5/10/17, the patient developed chest pain and the Medical Director noted that an EKG was normal, but there was no EKG present in the record; it appeared to be missing. On 5/19/17, the patient again experienced chest pain and an EKG showed subendocardial injury. The patient went into cardiac arrest and died. The Medical Director's report documented the cause of death as

subendocardial injury. A death certificate listed the cause of death as pulmonary embolism and documented that an autopsy was done, but the autopsy was not made available to me.

If the EKG apparently done on 5/10/17 was abnormal, the death may have been preventable. The autopsy needs to be obtained. If the patient died from pulmonary embolism, the death was likely not preventable. **The determination of preventability cannot be made pending obtaining the autopsy result and finding the missing EKG**. The missing EKG of 5/10/17 is significant with respect to evaluation of preventability.

We noted 30 errors in this patient's care. Most had to do with failing to make an accurate diagnosis and develop an appropriate therapeutic plan related to not starting statin drugs. This appears to be a systemic issue in IDOC. The evaluation of chest pain was poor. Histories were inadequate, risk factor analysis was not done to determine cardiovascular risk, and management was not consistent with standards of care.

## Patient #17  Dixon

This patient was a mentally ill patient. His problems were not monitored well. The patient had Barrett's esophagus, history of esophageal and duodenal ulcer disease, hepatitis C infection, aortic valve replacement, and mitral valve prolapse noted on the problem list. Heart failure, history of prior atrial flutter, history of thoracic aortic aneurysm, and possibly COPD were not on the problem list and we could not find chronic illness clinics for these illnesses over the two year period of review.

The problem list documented Barrett's esophagus as early as 2002. This disease is an erosive disease of the distal esophagus and has a propensity for malignant transformation. For this reason, surveillance endoscopy is recommended. The timing of surveillance depends on the histology of biopsy specimens, but it is recommended at least every three to five years. There was no evidence that the patient was receiving this surveillance or that it was considered or discussed with the patient. The patient was taking omeprazole to reduce gastric acidity, which is necessary for persons with Barrett's esophagus. During one hospitalization, the patient had a life-threatening bleed from his esophagus and stomach, and hospital physicians noted that the facility had stopped his omeprazole because the patient did not show up for medication on several occasions. This should never occur. The medication records for the relevant month were not present in the medical record. The patient had two episodes of gastrointestinal bleeding since 2014. We reviewed two months of medication administration. During June and July of 2015, the patient refused 30 (25%) of 122 doses. Because he was mentally ill, doctors and mental health staff should have met with the patient to determine why he was not taking the medication. This did not occur.

The patient had a scheduled cardiology visit in March of 2014 which did not occur until May. The patient had follow up gastroenterology appointments after the two serious and life-threatening episodes of GI bleeding. Neither of these follow up gastroenterology visits were

documented as having occurred. We did find a Wexford approval for one of these consults, but could not find evidence that it occurred. The patient had life-threatening hyponatremia as low as 114, but there was no attempt to determine why the patient had hyponatremia. It was likely due to mental health medication, but there was no monitoring for this.

The patient weighed 193 pounds on 6/2/14 but began losing weight. The patient told a doctor that he was losing weight on 9/21/15, but the doctor took no history and did not weigh the patient that visit. On 11/5/15, the patient weighed 145 pounds, which was a 48-pound weight loss over about 17 months, but the patient was being seen for weight gain because he had weighed 133 pounds on 8/5/15. No one acknowledged the dramatic weight loss. When a doctor saw the patient on 11/17/15 and the patient weighed 144 pounds, the doctor documented that the "weight gain not a worry." The weight loss was never worked up. Doctors appeared indifferent to the patient's weight loss.

The patient had mental illness and for uncertain reasons started a fast in late November 2015. The patient weighed 133 pounds on 12/31/15 without any acknowledgement by medical staff of the 60-pound weight loss. A telepsychiatry encounter occurred 1/11/16. The psychiatrist restarted the patient on antipsychotic medication and ordered a follow up the following week, but there were no further psychiatry notes that we could find in the record reviewed and there was no evidence that the patient received the antipsychotic medication. Apparently, the patient refused this medication. Despite the psychologist documenting that the patient was unstable, there was no evidence of further psychiatrist's notes. A request for enforced medication was not initiated until 1/27/16, after the patient had been on his fast for well over a month. There was reference to a request for enforced psychotropic medication on 1/26/16 and a note by a psychologist that the patient was on the infirmary and was being considered for forced feeding, but there were no medical notes or evaluations. On 1/28/16, a psychologist documented that enforced medications were approved.

During more than a month of fasting, there was no blood testing or medical evaluations documented in the medical record. A doctor wrote a note on 1/7/16, and documented that a chaplain should talk to the inmate about his fast. There was one further physician note on 1/8/16 documenting that the doctor told the inmate that he might have to be force fed with a gastric tube. This note was incomplete; the full note was not present in the medical record and there were no further notes from physicians or nurses that we could find in the record we reviewed. There were no further weights documented in progress notes after the weight was documented as 137 pounds during a nurse practitioner evaluation on 12/31/15. The patient weighed 193 pounds on 6/2/14 and had therefore lost 56 pounds, yet this was not acknowledged. At this level of weight loss, blood tests to monitor his electrolytes, liver function tests, and nutritional status were indicated but were not done.

On 1/27/16, stat labs were apparently ordered and sent to a local hospital. These labs indicated severe sepsis, significant dehydration, infection, and included a serum sodium of 150, BUN 89, creatinine 2.12, magnesium 2.8 (1.6-2.3), and WBC 16.7 with a left shift. These laboratory tests

should have resulted in immediate hospitalization. The labs were signed as reviewed on 1/28/16, but the patient apparently was not sent to a hospital, as mental health notes continued to be present in the medical record. The patient was apparently hospitalized on 1/31/16, although there are no medical progress notes present in the medical record that we could find. On 1/31/16, two sets of blood cultures were obtained and subsequently grew gram negative rods; these results were reported 2/1/16. The patient died 1/31/16 in the hospital. We can only infer this because there was an x-ray evaluating an endotracheal tube placement after intubation. There was no hospital report in the medical record. There was no death summary, no death certificate, no autopsy, and no documentation in the medical record that the patient died.

**This death was preventable.** Early and appropriate medical attention to the patient would have prevented his death. As a result of the patient's psychosis, the patient was engaging in a fast that caused dramatic weight loss and eventually cause life-threatening metabolic changes. Despite this medical staff appeared indifferent to his medical conditions. The patient had dramatic loss of weight (60 pounds) dating from August of 2014, yet was not being monitored for this. It was not until the patient began fasting and after the patient had already lost approximately 50 pounds that weight loss was even recognized. During more than a month of not eating, medical staff failed to timely and regularly monitor blood tests to determine the health status of the patient and did not even evaluate the patient. After more than a month of not eating, laboratory tests were done. These tests had life threatening laboratory tests values showing extreme dehydration (sodium 150 and BUN 89), renal failure (creatinine 2.12), and signs of systemic infection (WBC 16.7), which were signed as reviewed on 1/28/16. Yet the patient did not appear to be sent to the hospital for three days. Care appeared to be indifferent, incompetent, and inhumane.

We also note that many medical record documents were not sequentially filed and appeared not to be in chronological order. Many documents appeared to be missing. We asked the Attorney General to check for these documents, but have not received any new documents. The IDOC needs an electronic medical record.

We also noted 35 five errors over the period of record review. The most common (six) were related to lack of hospital records or records being disorganized. There were five medication errors. Two of these were related to a provider prescribing an opioid without even taking a pain history or examining the patient to determine if the patient had pain and whether the pain was severe enough to warrant an opioid. Three were related to not receiving omeprazole, medication for his ulcer. It was not surprising that the patient had two hospitalizations for gastrointestinal bleeding, as he was not receiving/taking the medication, which was not being monitored.

**Patient #18  Dixon**

This Dixon patient was 70 years old. His problem list did not contain all of the patient's medical problems and the patient was not followed in chronic care clinics for many of his problems, including his cardiac arrhythmias, pacemaker functioning, presumed heart failure, cirrhosis, hyperlipidemia, diabetic nephropathy, or anticoagulation. The patient had a mechanical heart valve and was on anticoagulation, but the anticoagulation goal was not noted in the record. If the goal (typical for mechanical valves) was 2.5 to 3.5, then the patient had sub-therapeutic anticoagulation for more than two years. Twenty-one of 27 INRs noted in the record showed an INR of less than 2.5. The patient also had macrocytic anemia that was mistaken for microcytic anemia, which is a serious and fundamental lack of primary care knowledge. The macrocytic anemia, elevated bilirubin, and low platelets were not investigated for over two years. A B12 and folate level was eventually drawn after two years, but a diagnosis was not made. These laboratory results suggested that the patient had alcoholic cirrhosis, which was never identified. The patient also had chronic kidney disease which was unrecognized for over two years. Failure to investigate these abnormalities was grossly unacceptable and demonstrated a lack of primary care knowledge.

The patient had a serious cardiac arrhythmia (atrial fibrillation) with ventricular bradycardia that required a pacemaker. After the pacemaker was inserted, a cardiology follow up was recommended but never occurred. This failure to follow up with cardiology was never noted and neither the pacemaker nor the arrhythmia was monitored in chronic care clinics. Typically, pacemakers require a check which can be done remotely but needs to be done to ensure they are functioning. In 2015, the patient began developing shortness of breath and edema that were attributed to COPD, but the patient was not adequately evaluated for this. Later in 2015, the patient developed chest pain. Doctors evaluating the chest pain failed to take an adequate history and failed to evaluate the pacemaker function.

The patient had a 25% 10-year risk of heart disease and stroke yet was not placed on anti-lipid medication. On 11/30/15, the patient experienced left-sided chest pain that felt like a pulled muscle. The doctor did not initiate anti-anginal medication and failed to note that the patient had failed to keep his cardiology appointment. The complaint was consistent with angina and the patient should have had a higher level of investigation, including evaluation for coronary syndrome. The following day a doctor evaluated the patient for nausea, but failed to take a history of chest pain that may have been associated with the nausea.

On 12/17/15, a doctor saw the patient for chronic care follow up but failed to address the arrhythmia, possible heart failure, or anticoagulation. Abnormal labs indicating chronic kidney disease and possible alcoholic cirrhosis were not evaluated, except to order a B12 and folate level after two years of having a macrocytic anemia. The arrhythmia and pacemaker function were not addressed. The patient's prior chest pain, shortness of breath, and nausea were not addressed.

A doctor saw the patient on 12/22/15 for a hypoglycemic episode (blood glucose 48), orthopnea, leg edema, shortness of breath, and left chest pressure. The doctor ordered a change in insulin and ordered lab tests with a week follow up. A chest x-ray and EKG were not ordered. Although the doctor's assessment was "COPD vs cardiac? Not exertional," the doctor took insufficient history. The patient should have been hospitalized, given his chest pain with symptoms of heart failure or angina.

On 12/29/15, a doctor saw the patient for edema, shortness of breath, and orthopnea. The patient had a heart rate in the 40s and the doctor questioned whether the pacemaker was malfunctioning. The BUN was 42, creatinine 1.77 and BNP 712, indicating renal failure, possible dehydration, and possible heart failure. The elevation of BNP could have been associated with heart failure, renal failure, valvular heart disease, pulmonary hypertension, or coronary artery disease. The doctor diagnosed exacerbation of heart failure and ordered a diuretic change and blood tests. However, given his symptoms and underlying conditions, the standard of care would have been to admit the patient to a hospital.[8] Normal pacemaker functioning would have kept the pulse above a set-point, which typically would be about 70 beats per minute. When the heart rate falls below the set rate, it indicates that the pacemaker is not functioning. Keeping this patient at the prison was grossly and flagrantly unacceptable.

On 12/30/15, a nurse at the prison did a pacemaker check that showed two alerts, one of which was that the ventricular pacing was greater than the expected limit. No action was taken. The patient had a pulse in the 40s, which should not occur with a pacemaker.

On 12/31/15, the patient saw a nurse for a nebulizer treatment and told the nurse, "it's not my lungs, it's my heart." A doctor saw the patient the following day but did not take a thorough history and did not note the prior history of chest pain. The doctor assessed heart failure exacerbation and re-started Aldactone. No chest x-ray was taken, and the pacemaker function was not reviewed after the prior day's pacemaker check.

The following day the patient was found dead in his cell. There was no death assessment, no death certificate, and no autopsy in the medical record. The mortality list documented his cause of death as cardiac arrhythmia.

**This patient's death was possibly preventable.** Although the cause of death was not determined, the death was possibly preventable had the patient been admitted to a hospital. He had multiple conditions that were not followed. He had a pacemaker placed but no follow up with cardiology. Prison doctors were not monitoring the pacemaker. A doctor believed that the pacemaker was malfunctioning and it appeared that it was, since on a couple of occasions the pulse was in the 40s, which is not expected with a functioning pacemaker. At that time, the

---

[8] Heart Failure Society of America guidelines as found at http://www.hfsa.org/heart-failure-guidelines-2/ recommend that patients with suspected heart failure should be hospitalized when they have decrease in renal function, a hemodynamically significant arrhythmia, worsening congestion, comorbid conditions, and a pacemaker with repeated defibrillator firings, all of which this patient had.

patient had chest pain and symptoms of heart failure, yet he was not admitted to the hospital for evaluation. It is likely that his death was preventable if he had been followed by cardiology and if he had been admitted to a hospital for exacerbation of heart failure, bradycardia, pacemaker check, and chest pain.

We identified 62 errors. Twelve were related to failure to follow up on abnormal laboratory results. Twelve errors were related to failure to take an adequate history and twelve errors were related to failure to develop an appropriate treatment plan. Notably, this appeared related to failure to monitor many of the chronic diseases of the patient that were not in the main categories of chronic illness clinics. Providers failed to follow any condition not related to a major disease category. There were also seven episodes of nurses failing to consult a physician for serious illnesses beyond the ability of a nurse to manage.


## Patient #19  Dixon

This 75 year old man had underlying ulcerative colitis. He experienced weight loss and had anemia and yet doctors failed to order a colonoscopy, which is below standard of care and placed the patient at risk of harm. The patient had pancytopenia, and then anemia and thrombocytopenia, but was never worked up for these problems except to order iron studies. This was below standard of care. The patient also experienced weight loss, was underweight, and had low albumin, which indicates malnutrition. Yet there was no evaluation for this.

This patient had a prosthetic leg due to an amputation from a prior episode of osteomyelitis. The prosthetic leg did not fit well, and Wexford did not replace the prosthetic leg but tried to repair it, and the patient was not able to use it due to developing ulcers on the stump. As a result, the patient was confined to a wheelchair.

In using the wheelchair, the patient developed a pressure ulcer on his coccyx. A thorough assessment of the patient's activities of daily living was not done to determine how to prevent the ulcer and promote healing. The ulcer was first noted on 6/17/16. At the time of first noticing the ulcer, it appeared from the description to be a stage two ulcer with open blisters and wounds surrounded by erythema. The patient initially was not provided adequate pain medication. By 6/24/16, the wound appeared to be infected. Although a nurse practitioner started antibiotics, the NP failed to order any blood tests or radiological tests to assess for underlying osteomyelitis, which is standard of care. Because of frailty and debility, the patient needed housing on a higher level of care. This could possibly have been an infirmary, but the needs were so great that a skilled nursing unit was indicated, yet the patient remained in general population.

The patient continued to lose weight and by 6/27/16 weighed 127 pounds, which was a 15-pound weight loss over two years. Referral to a nutritionist was not done and the doctor did not complete a nutritional assessment. Adequate nutrition is imperative for healing of pressure ulceration, but this patient never had an adequate nutritional assessment. The doctor ordered

blood tests, and these were abnormal (albumin 2.3; hemoglobin 10; platelets 145; and sedimentation rate 60). This suggested possible osteomyelitis and the doctor reviewed these tests, but apparently did not understand the implications of these laboratory tests and took no actions on these abnormal tests. The doctor appeared not to know how to treat this patient's conditions. An MRI was indicated; blood and or bone cultures were indicated, and it appeared that intravenous antibiotics were indicated. Yet, no action was taken. The patient should have had osteomyelitis ruled out and should have been admitted to a hospital as early as 6/30/16. This was not done. Care was grossly and flagrantly unacceptable.

The patient continued to deteriorate. Aside from adding Boost nutritional supplement, no other action was taken. The wound worsened with tunneling, which was described as deep and was indicative of stage 3 ulceration. The wound deteriorated with no change in treatment. There was no referral for debridement. The patient remained in general population housing and apparently was still in his wheelchair. Eventually, on 7/25/17, bone was visible to a nurse. On 8/2/16, a doctor, shortly after a nurse identified visible bone, described the wound as "healthy." Visible bone usually indicates osteomyelitis or significant infection, especially with a sedimentation rate of 60. Yet the patient was still not sent to a hospital. The doctor's description of a wound with visible bone as "healthy" was grossly and flagrantly unacceptable.

By 8/8/16, the patient started developing altered mental status, first with memory loss. The patient was unable to care for himself. On 8/11/16, the patient urinated on himself while having a dressing change. Despite this and despite increasing evidence of sepsis, the patient was kept in general population and not sent to a hospital. Ultimately a roommate told a nurse that the patient had not eaten in two days and had not voided in days. The patient was so dehydrated that an IV line could not be started. The patient was not responsive and was finally admitted to a hospital on 8/13/16, five days after developing alteration of mental status.

At the hospital, the patient had bacteria and fungus growing in his blood thought to be due to his decubitus ulcer. The patient was extremely dehydrated (BUN 92 and sodium 153) and malnourished (albumin 2.7) on admission. In our opinion, the patient's presentation at the hospital was evidence of neglect at the facility in the weeks prior to admission. The patient was discharged from the hospital on 8/19/16 as a hospice patient. The doctor placed the patient on palliative sedation[9] on 8/19/16 without documentation of a discussion with the patient's family about palliative sedation. The patient was not capable of making his own decisions. Criticism of palliative sedation includes that it hastens death and can be perceived as a form or euthanasia. Use of this practice should be done with an open and frank conversation with the patient, which in this case was not documented as being done. In lieu of a discussion with the patient, a discussion with the family is recommended. The IDOC should address this on a statewide basis to ensure ethical standards of practice. The patient died on 8/21/16.

---

[9] Palliative sedation is a measure of last resort used at the end of life to relieve severe and refractory symptoms. It is performed by the administration of sedative medications in monitored settings and is aimed at inducing a state of decreased awareness or absent awareness (unconsciousness). As quoted from Palliative Sedation section in UpToDate, an online medical reference. The typical palliative sedation combination is a narcotic with a benzodiazepine, which is the combination this patient was on.

**This patient's death was preventable**. It appeared that doctors did not know how to manage a decubitus ulcer, which is a primary care problem. This is especially problematic because Dixon houses so many geriatric patients who are susceptible to decubitus ulcers. Care appeared indifferent, neglectful, and incompetent, and on one occasion, grossly and flagrantly unacceptable. It is our opinion that early management and treatment of the decubitus ulcer would have prevented or significantly delayed his death.

We noted 68 errors in management of this patient. There were seven to eight errors each of lack of appropriate history, examination, and development of an appropriate therapeutic plan. There were seven errors of providers not ordering appropriate laboratory testing and nine errors of not ordering imaging or other diagnostic testing. On eight occasions it was our opinion that the patient should have been sent to a higher level of care for management. The ultimate delay in hospitalization was mostly responsible for the patient's death, in our opinion. Keeping an 82-year-old patient with altered mental status, incontinence, and unable to care for himself in general population prison housing challenges the boundaries of what it means to be a professional.

## Patient #20  Logan

This patient was a 62-year-old woman who had a pancreatic mass identified in 2015 while she was in Iowa. She failed to follow up as a civilian. She became incarcerated and was in Cook County Jail; she was hospitalized for a work-up in October of 2016. A large pancreatic mass was identified. A stent was placed in the pancreatic duct. Unfortunately, a biopsy consisted of an inadequate specimen. The patient was discharged with pathology pending. The patient was on 90 mg of morphine a day for pain management. When the patient left the hospital, the diagnosis was likely pancreatic cancer. The patient was scheduled for a follow up with a gastroenterologist at Stroger Hospital when she transferred to Logan.

Instead of completing the diagnostic work-up of the pancreatic mass, the doctor at Logan initially did nothing, believing that the mass was benign despite the hospital documenting that the mass was likely pancreatic cancer. Also, the doctor at Logan dramatically reduced the pain medication from approximately 90 mg of morphine a day (15 mg SR BID and 15 mg IR Q 4 hour as needed) to one Tylenol #3 pill three times a day. The patient suffered pain throughout most of her incarceration with inadequate pain management.

After about a month after arrival at Logan, the doctor obtained a marker test for pancreatic cancer and it was positive. The doctor referred the patient for an ERCP and biopsy. Wexford denied this test; instead, they sent the patient to a gastroenterologist on a routine basis for evaluation. There was no clinical justification for this denial as this served only to delay evaluation. The patient went to the gastroenterologist in on 2/15/17, almost three months after arrival to Logan. The gastroenterologist recommended a biopsy. This did not occur until late April, approximately five months after arrival to Logan. The patient's diagnosis was therefore significantly delayed, largely as a result of the Wexford utilization process.

In addition to the delay in diagnosis, treatment of the patient's pain was indifferent and bordered on cruelty. Pancreatic cancer is known to cause significant pain. When the patient transferred from Cook County Jail to Logan, the patient was on up to 90 mg of morphine a day. A doctor promptly and dramatically decreased the dose of 90 mg of morphine to one Tylenol #3 tablet three times a day. A Tylenol #3 has 30 mg of codeine, which has an equivalency of about 5.5 mg of morphine. Thus, the pain medication reduction was approximately 80%. Based on nursing notes, the patient did not have adequate pain control, yet this was not adequately monitored or addressed by physicians. When the patient saw a gastroenterologist consultant on 3/21/17, the consultant prescribed a fentanyl patch for pain control. This was not authorized by the Logan physician. The patient remained in severe pain. The doctor did not initiate narcotic pain relief for about five months, until just before the patient died. Three days before the patient died, the doctor prescribed palliative sedation using a combination of morphine every two hours with a benzodiazepine every two hours. A criticism of palliative sedation is that it can be perceived as a form of euthanasia[10]. This appears to be a legitimate criticism in this case because of the lack of morphine use or adequate pain management until just before death and because we could find no discussion of palliative sedation with the patient. This raises ethical concerns, particularly because of the lack of pain medication in the preceding five months before the patient died.

We also note in this case significant problems with the medical record. There were multiple episodes of clinical care when identical vital signs were used repeatedly. The medical record software defaults to use of the last recorded vital signs. But it appears to result in nurses and physicians using vital signs from previous encounters even when vital signs are indicated. One episode of using the same vital signs from a previous encounter lasted longer than a week. In one series of episodes, the temperature was listed as 82.7°F, which is a temperature incompatible with life. The patient was documented as having this identical temperature on three separate clinical visits over a period of over a month. No one noticed this unusual temperature. Vital signs should be recorded at the time they are done and only used for the time period of the clinical event when the vital sign is taken. To do otherwise is a significant patient safety concern. This medical record defect needs to be stopped immediately on the basis of patient safety.

While **this patient's death may not have been preventable**, there were serious concerns, including unnecessary delays in consultation care, unacceptable lack of pain management in a patient with an extremely painful condition, and possible inappropriate use of palliative sedation without discussion with the patient. Use of palliative sedation is not governed by policy but was used on patients in three of the 33 deaths we reviewed.[11]  Because of the potential for misuse or perceived misuse, this practice should be strictly regulated within the IDOC.

---

[10] This is described in the article on palliative sedation in UpToDate.
[11] Mortality Review Patients #19, 20, and 28.

We noted 159 errors in the record review over a six month period. Fifty-two were related to the medical record use of dated vital signs and nurses not using appropriate vital signs even when the patient was being evaluated for a new problem. Twenty were related to nurses not consulting a physician for a significant complaint (pain, vomiting, etc.). Eighteen were related to physician therapeutic plans, mostly related to pain management, which appeared significantly below standard of care. The lack of appropriate attention to nutrition, pain management, and fluid and electrolyte management was so poor that during the last month the patient was neglected, resulting in dehydration and electrolyte disturbances from lack of medical attention. The patient should have been sent to a skilled nursing care unit for management because the patient was not receiving appropriate care at the prison.

## Patient #21  Menard

This patient had diabetes, hypertension, and prostate cancer, for which he took hormonal therapy with an oncologist. The patient had a very high risk (as high as 47% 10-year risk of heart disease or stroke) of heart disease, yet was not treated with a statin drug. This happened repeatedly and is a systemic problem in IDOC.

From 3/13/16 until 11/3/16, the patient was evaluated five times for abdominal pain, for which inadequate history and physical examinations took place. Although the patient was losing weight, this was unnoticed. Weight loss with abdominal pain suggests a potentially serious medical condition. On 11/3/16, the patient was sent to an emergency room, where a CT scan showed a large retroperitoneal mass consistent with a lymphoma. The hospital called a Menard physician to advise of this and to recommend follow up. The hospital report was not initially available, and the abdominal mass was not addressed until the patient went for his scheduled oncology appointment for his prostate cancer on 11/21/16. The oncologist noted the abnormal CT scan and recommended a CT guided biopsy and CT scan of the brain ASAP with a three week follow up. This follow up never occurred. Although the biopsy and CT scan of the brain were approved, they were never done. By 12/5/16, a doctor noted that the patient had lost 50 pounds. On 12/29/16, a nurse documented that the patient had 3+ leg edema with a pressure ulcer on his hip and could not walk on his own to the health care unit. The doctor did not admit the patient to the infirmary even though it appeared that the patient was unable to care for himself such that he was developing a pressure ulcer. This was grossly and flagrantly unacceptable care.

The patient appeared lost to follow up until 2/2/17 when security officers complained to a nurse about the patient being unable to care for himself in general population. The patient was admitted to the infirmary by a nurse. The patient was unable to stand on his own without assistance, did not respond appropriately, and did not know what time it was. The following day, a doctor noted that the patient was confused. Nurses noted that the patient was incontinent and appeared delirious as he was talking to people in his cell that were not there. A doctor referred the patient to mental health but did not conduct an evaluation for medical causes of delirium. This was grossly and flagrantly unacceptable care. For five days, the patient

was kept on the infirmary even though he exhibited signs of delirium and should have been immediately hospitalized. By 2/7/17, the patient had become lethargic and confused, yet a doctor who saw the patient did not admit him to a hospital until later in the day when the patient became lethargic with uneven respirations. There were multiple episodes of grossly and flagrantly unacceptable care during the patient's stay on the infirmary. The patient apparently died in the hospital. There was no autopsy or death summary.

**This patient's death was possibly preventable.** The patient had abdominal pain with weight loss for seven months without adequate evaluation, including adequate diagnostic testing. The weight loss was unrecognized. After an abdominal mass was finally identified on a CT scan, a diagnostic work up was not initiated for three months. The patient died without a diagnosis. The recommendation for an urgent evaluation as recommended by an oncologist was not done over the remaining two months of the patient's life. Though the patient appeared unable to care for himself and had developed a pressure ulcer, the patient was kept in general population and not monitored. Almost three months after the abnormal CT scan, the patient was brought to the attention of a nurse by security staff because the patient could not care for himself. The patient was confused, delirious, had significant edema, and had a pressure ulcer. Despite the new onset of confusion, the patient was kept on the infirmary without adequate evaluation until he became lethargic and was breathing abnormally. The patient was sent to the hospital where apparently he died without a diagnosis. Earlier identification of the abdominal mass and timely treatment of the likely lymphoma could possibly have prevented his death. Care for this patient was grossly and flagrantly unacceptable and demonstrated neglect and indifference.

We identified 83 errors in his care. Most were related to failure to take adequate history, perform adequate examinations, and develop adequate therapeutic plans. We noted that on nine occasions the patient had a serious presentation (shortness of breath, confusion, delirium, diarrhea, and inability to care for himself) and yet the nurse did not consult a physician. We identified nine separate occasions when the patient should have been sent to a higher level of care. A few of these related to not being housed on an infirmary unit when the inmate was unable to care for himself. In other cases, the patient should have been immediately transferred to a hospital but was not.

## Patient #22  Menard

This patient was a 46-year-old man with a known history of hypertension, diabetes, and obesity. The annual history and physical evaluation on 7/18/13 identified prior sexually transmitted disease (gonorrhea) and the biannual evaluation on 10/26/15 identified blood transfusions, multiple sexual partners, and prior history of gonorrhea as risk factors. The patient had multiple risk factors for HIV, yet was not offered HIV screening, which is standard of care.[12] That the histories were different on different biannual evaluations was also a problem.

---

[12] Screening for HIV: U.S. Preventive Services Task Force Recommendation Statement; Annals of Internal Medicine Volume 159, Number 1; pp. 51-60; July 2, 2013. This was an A recommendation, which is that there is high certainty that the net benefit is substantial.

The patient then had low white blood count (1.8) with low lymphocytes (0.6) as early as 8/6/13 which were not followed up on. Low lymphocytes should have prompted evaluation, including whether the patient had HIV infection. This was not done.

On 9/5/15, the patient developed altered mental status with fever. He was a 46 year old man who was urinating on himself. The patient did not have an adequate evaluation for alteration of mental status. He was not provided an adequate history or physical examination for his condition. He should have had a CT scan and other diagnostic testing. Instead, the patient was merely monitored on the infirmary with blood tests. The doctor made a diagnosis of fever of unknown origin. This diagnosis presumes that causes of the fever have been ruled out, which had not been done in this case, as little diagnostic evaluation was performed. The patient should have been hospitalized for his condition but was not. Care was grossly and flagrantly unacceptable.

The doctor presumed that the patient had lupus, but the patient did not have immunologic criteria to qualify for this diagnosis. The providers failed to evaluate for HIV, a common condition in this population and one that the patient had risk factor for (multiple sexual partners, prior gonorrhea, transfusions) and blood tests suggestive for (low white blood count with lymphocytopenia).

Lupus is an uncommon condition in this population as compared to HIV. The diagnosis of lupus depends on satisfying multiple clinical and laboratory criteria which often require experienced clinical diagnosis. Typically, a specialty referral is indicated. The patient did not satisfy immunologic laboratory criteria for lupus; nevertheless, the doctor maintained this diagnosis without searching for more obvious causes of the patient's problem. The patient continued to have high sedimentation rate, intermittent fever, weight loss, confusion, and low white blood counts, sometimes including pancytopenia.[13] Despite considering lupus, the doctor did not refer the patient to a rheumatologist for five months. On 2/26/16, a rheumatologist would not accept the patient for referral because the patient did not have immunologic criteria for lupus. Still, the doctor failed to screen the patient for HIV, despite the patient having multiple risk factors and suggestive laboratory and clinical findings. The doctor remained steadfast in maintaining lupus as a possible diagnosis for over a year without obtaining immunological tests required for the diagnosis and without excluding other more common diseases (e.g., HIV). This was grossly and flagrantly unacceptable care.

The patient's mental status deteriorated. From September of 2015 through October of 2016, the patient exhibited altered mental status, but was inadequately evaluated for this and was mostly housed in general population, where he appeared unable to adequately care for himself. His care was neglectful and bordered on cruelty. On 3/15/16, a psychiatrist documented that the patient was incontinent of urine and feces while wearing his clothes and noted delusional

---

[13] Pancytopenia is low white count, low red blood cell count, and low platelets. These are the three cellular components of blood. This is consistent with numerous conditions, many of which are serious and require immediate attention, sometimes including referral to a hematologist for bone marrow biopsy. In this case, an HIV test would have been a first diagnostic step.

thinking. The psychiatrist believed that the patient had psychosis from a medical condition. Yet, doctors did not pursue further evaluation (CT scan or MRI of brain, possibly lumbar puncture, exclusion of infection including HIV, etc.). No diagnostic action was taken except to monitor the patient and obtain routine blood tests. The patient remained intermittently confused, delusional, and delirious for the remainder of his life. The patient had disordered cognitive function for approximately 13 months without having an evaluation for the cause. This was grossly and flagrantly unacceptable care.

About a year after initially suspecting lupus, a rheumatology consult was finally obtained on 9/28/16. The rheumatologist found no obvious systemic complaints to suggest lupus but ordered additional testing. By accident, apparently, the rheumatologist sent with the patient a prescription for methotrexate with the wrong patient's name on it. This was not identified by staff and the patient received methotrexate inappropriately, which has side effects including decreased blood counts, which already affected the patient. The rheumatologist's type written note did not include prescription of methotrexate. This may have harmed the patient, as shortly after this the patient developed sepsis, a possible complication of using methotrexate in an immune compromised patient.

The patient was admitted back to the infirmary in July of 2016 for inability to care for himself. He was weak, incontinent, and unable to perform routine hygiene for himself. He also developed fever on 7/22/16, yet there was little evaluation for the cause of fever except to order a urine test and blood count. The patient was unable to walk without assistance, and mostly lay in bed. He developed a large (6 inch by 6 inch) pressure ulcer which was identified by nurses but not recognized or evaluated by physicians. He lost a significant amount of weight (>50 pounds) yet the weight loss was unrecognized. Eventually, the patient became hypotensive (90/66) and had hypoxemia, and was sent to a hospital, where he was found to be in septic shock due to complications of HIV infection. The patient died in the hospital.

**This patient's death was preventable.** The patient had multiple risk factors for HIV infection yet was never screened for this infection. The patient had altered mental status for over a year but never had a diagnostic evaluation for this. The patient had low lymphocytes and low white counts since 2013 but was never evaluated adequately for this. The patient had fever but was never properly evaluated for this. The patient's confusion resulted in inability to take care of his hygiene, but the patient was neglected, resulting in a large, unrecognized pressure ulcer and significant unrecognized weight loss. Care was indifferent, neglectful, and grossly and flagrantly unacceptable. Early diagnosis of HIV should have been made and this would have prevented his death. We note that the physician caring for this patient was a surgeon without primary care expertise. It is our belief that the doctor's lack of training significantly contributed to this patient's death.

We noted 117 errors in care for this patient in slightly over a year of record review. Most were related to inadequate history, examination, or development of a therapeutic plan. It is our opinion that on 18 occasions the doctor should have sent the patient to a hospital but did not.

We also noted that for long periods of time the patient was housed in general population status when he was confused, incontinent, and unable to care for himself. When he ultimately went to the hospital, he had evidence of neglect including severe malnutrition, significant weight loss, multiple pustular sores, and pressure ulcers that were unrecognized at the facility. His care was grossly and flagrantly unacceptable.

## Patient #23  Menard

This patient had APRI[14] scores indicating cirrhosis as early as 2012, but was not referred to UIC hepatology for treatment of the hepatitis C in 2012 or 2013. In 2014 and in January of 2015, the patient signed a refusal for care for hepatitis C, but it was not clear what explanation was given to the patient. When he ultimately was evaluated by UIC in April of 2016, he did not even know that he had advanced liver disease or cirrhosis, but he agreed to treatment of his hepatitis C. It does not appear that effective communication with the patient occurred at Menard.

Though the patient had cirrhosis since 2012, he did not receive a screening upper endoscopy to evaluate for varices until 8/7/15. He also did not receive every six month screening for hepatocellular carcinoma until 5/8/15. These are standard recommendations for patients with cirrhosis. That he ultimately died with likely hepatocellular carcinoma is problematic, as he was improperly screened for this condition.

Despite having cirrhosis at least as early as 2012, the patient did not have appropriate management of his ascites. Edema was evident as early as 10/4/12, when a doctor noted 2+ edema on a chronic clinic evaluation. The doctor did not initiate a diagnostic work up for the edema. On 1/4/15, a nurse practitioner identified bilateral leg edema without taking action except to order Ted hose. A CT scan on 5/28/15 documented ascites, which was not documented as a problem, monitored, or treated. An MRI on 10/22/15 showed large ascites yet this was not identified or monitored as a problem. The MAR shows that Aldactone was started on 11/23/15 but discontinued on 11/30/15. There was no progress note on either date, so the reasoning for these actions was not known. Despite evidence of significant ascites in October 2015, doctors did not monitor this or treat the patient. Doctors did not start a diuretic until 6/22/16 when the patient had tense ascites. It appeared that the providers did not know how to manage cirrhosis with ascites.

Though the patient should have been screened for hepatocellular carcinoma every six months beginning in 2012, the patient was not screened for hepatocellular carcinoma until May of 2015, when an ultrasound showed a mass worrisome for a malignancy which was confirmed on a CT scan later that month. Although the ultrasound and CT scan showed a possible malignancy in May of 2015, the patient was not referred for biopsy until 8/25/15. A Wexford utilization

---

[14] APRI is an AST to Platelet Ratio Index. This score uses common blood tests to estimate the probability of fibrosis and cirrhosis and is used as a means to identify persons with greater degrees of fibrosis. This is currently used for identifying persons at higher need of treatment for their hepatitis C. IDOC does not initiate treatment for hepatitis C until the patient has a fibrosis level nearly equivalent to cirrhosis and the APRI is used as a benchmark for referral.

doctor initially denied the biopsy, instead recommending referral to Dr. Paul, the Wexford hepatitis C doctor. She apparently referred the patient for an MRI, which was done in late October of 2015, showing a wedge shaped fibrotic lesion in the liver. According to a subsequent UIC note, the MRI was to include a liver biopsy, but this did not occur because MCC did not send the ultrasound and CT scan results with the patient. Another liver ultrasound was done on 12/18/15 showing a 2.1 cm liver mass with a recommendation for follow up MRI or CT scan. No action was taken. The patient appeared to have died with or because of possible cancer which was never biopsied for over a year.

On 4/28/16, the patient was referred to UIC for hepatitis C treatment. We believe that the patient should have been referred to UIC in 2012 for treatment, as providers at Menard did not appear to understand the complications of cirrhosis or management of hepatitis C, and treatment options should be explained by a person knowledgeable in treatment of the condition. The UIC consultant documented that biopsy was not done in 2015 because prior ultrasound and CT scans were not provided to the radiologist, and that the patient had a liver lesion suspicious for cancer. The UIC consultant also noted that the patient did not understand that he had complications of liver disease (cirrhosis, varices, and ascites). If the doctors at Menard had not explained the complications of the patient's liver disease to him, what discussion took place with respect to treatment of his hepatitis C? The patient was willing to accept treatment when the UIC doctors discussed treatment with him. Prior to initiating treatment, the UIC doctors recommended a biopsy. This was not documented as done.

The patient was sent for an MRI on 6/22/16, but it was not clear if this was for a biopsy. Upon return to the prison, the patient was noted to have fever (100.4°F), hypotension (96/64), and hypoxemia (oxygen saturation 79%) with tense ascites. The patient had signs of sepsis and should have been admitted to a hospital for paracentesis and blood cultures. Instead, a nurse admitted the patient to the infirmary for observation, but a physician did not examine the patient. This was grossly and flagrantly unacceptable care, as the patient had signs of sepsis.

The following day the patient had fever to 100.8°F with massive ascites. Instead of admitting the patient to a hospital, the doctor only ordered Aldactone 25 mg BID, Lasix 40 BID, and an oral antibiotic (Levaquin) without taking a history and performing only limited examination. This was grossly and flagrantly unacceptable care, as the patient was at risk of death.

The following day the patient again became hypoxic (oxygen saturation 84%), hypotensive (88/60), and had trouble breathing. The doctor sent the patient to a hospital, where he died.

**This death was possibly preventable for the following reasons:**
1. The patient was not screened for complications of cirrhosis for three years. This was the likely cause of death. Hepatocellular cancer screening is recommended every six months for persons with cirrhosis. Screening, early identification of complications, and treatment for these might have prevented or significantly delayed the death.

2. The patient had a liver mass suspicious for cancer identified in May of 2015 but until his death in June of 2016, the mass was not evaluated with a biopsy and remained undiagnosed. The delay in diagnosis of a possible hepatocellular carcinoma likely contributed to his death and earlier diagnosis and treatment might have prevented or significantly delayed the death.

3. The patient developed tense ascites, fever, hypotension, and severe hypoxemia on 6/22/16 and should have been immediately hospitalized. Instead, the patient was placed on the infirmary for observation without any diagnostic testing on the first day. This was grossly and flagrantly unacceptable care and placed the patient at risk for death. On the second day the patient still had fever. Oral antibiotics and routine blood tests were ordered when the patient should have been hospitalized. This delay may have resulted in his death. Care was grossly and flagrantly unacceptable. On the following day a doctor did not evaluate the patient, but the patient was sent to a hospital for extremely unstable vital signs.

4. We note that the patient told a UIC consultant that he was unaware that he had complications of hepatitis C (ascites, varices, cirrhosis). Although the patient signed a refusal for treatment of hepatitis C, it is unclear how hepatitis C treatment was explained to him if he did not even understand that he had cirrhosis. We question whether effective communication occurred. The patient accepted treatment from the UIC consultant but not the providers at Menard. It is our opinion that once cirrhosis was evident in 2012, the patient should have been referred directly to UIC. The current collegial process of using a Wexford doctor as a gateway for therapy and for testing related to cirrhosis clearly caused delays in care (for treatment of hepatitis C and diagnosis of the liver mass) that resulted in his death. Earlier treatment of his hepatitis C would likely have prevented or significantly delayed death.

We noted 56 apparent errors in the care of this patient. Thirteen were related to lack of referral for evaluation for hepatitis C treatment. We question the effectiveness of communication with patients and believe that their hepatitis C treatment decision should be discussed with an expert, not physicians and other providers in IDOC who do not apparently understand how to manage cirrhosis or hepatitis C. Consent and refusal of consent needs to be informed and this requires a physician who understands the treatment and the consequences. There were 17 apparent errors in not obtaining screening tests for cirrhosis (EGD and ultrasound).

## Patient #24  Menard

This 46-year-old man developed abdominal pain. He was evaluated by a nurse on 5/17/17, 5/22/17, and again on 5/31/17. The nurse found no problems, but on 5/31/17 the nurse referred the patient to a physician. The physician saw the patient on 5/31/17. The physician took virtually no history. The doctor documented that the patient had an umbilical hernia and said "it is small. He won't let me touch it or push it back in." Without any other evaluation, the doctor prescribed Tylenol for six months. No diagnostic studies were done. This was not appropriate follow up for a painful condition that was incompletely evaluated.

A month later on 6/30/17, a LPN wrote that her supervisor asked her to evaluate the inmate because his family had called concerned that he needed to see the Medical Director. The LPN did an assessment using a diarrhea protocol stating that the patient had diarrhea four to five times a day with abdominal pain and had lost his appetite. The abdomen appeared rigid and distended to the nurse. The blood pressure was 150/118. The nurse apparently called a doctor, who sent the patient to a local hospital.

At the hospital, an omental/peritoneal mass was identified. A biopsy was performed along with colonoscopy and the patient was discharged on 7/6/17 with a diagnosis of carcinomatosis or disseminated cancer in the abdominal cavity. On 7/10/17, the doctor referred the patient to an oncologist, noting that final pathological reports were pending. During his infirmary stay the patient had repeated pain, but the doctor notes did not address the patient's pain adequately. When the patient went to the oncologist on 7/26/17, inadequate information was sent, and the oncologist did not understand why the patient was being referred. The oncologist asked for a two week follow up with CT scan reports from the hospital, along with additional records.

The patient remained on the infirmary as a chronic admission but was infrequently examined or questioned by doctors regarding his pain, which was complicated by constipation. Physician evaluations included virtually no current history or examination and inadequately addressed pain. Eventually, on 8/9/17 the patient became confused, unable to answer questions and was sent to a hospital where, apparently, he died. There was no autopsy or death summary for this patient.

**This patient's death was not preventable,** yet there were a few problems. The initial evaluation of the patient on 6/30/17 was indifferent. The patient had complained of several weeks of abdominal pain, yet no history was taken, and little examination was performed. To give a patient Tylenol without having a diagnosis is inadequate and indifferent care. No diagnostic tests were ordered.

The patient's pain on the infirmary was inadequately evaluated as evaluations seldom included a history or physical examination. This also was indifferent.

When the patient went to the oncologist, inadequate medical records were sent with the patient, resulting in a failed appointment. Communication with specialists is critical to coordinated care.

We noted 10 apparent errors in care, mostly related to inappropriate therapeutic plans.

## Patient #25  Menard

This 65-year-old patient was recently successfully treated for hepatitis C. During a dental examination, the dentist found an abnormal lesion in his mandibular bone found on x-ray. On

4/14/17, the dentist referred the patient for evaluation. A consultant saw the patient in mid-June and did a biopsy, which on 6/22/17 was positive for B cell lymphoma.

The patient was referred to oncology and after some tests was started on chemotherapy in late August. The chemotherapy regimen was CHOP, which included prednisone and also included rituximab. This regimen can severely depress the white blood cells and platelets, and cause severe life threatening infection. For that reason, the oncologist recommended a drug to increase the white count. This drug, Granix, was to be administered after each episode of chemotherapy. The manufacturer recommends that during the time Granix is used that white counts be checked twice weekly. This was not done at Menard for this patient.

The oncology reports were not all present in the medical record and the blood work done at the oncology office was not typically available to the site. On 11/22/17, the patient received chemotherapy and on return became hypotensive; he went to a local ER and was diagnosed with dehydration. The white count at the hospital was normal.

On 11/26/17, the patient developed a fever to 101.6°F and was too weak to stand up. The nurse did not consult a physician but should have, as fever in a potentially neutropenic patient can represent life-threatening risk. The nurse did place the patient on a special housing unit. Not to call the physician was grossly and flagrantly unacceptable care. The patient should have had immediate white count and/or immediate referral to a hospital for evaluation for infection.

A doctor did not see the patient for two days, until 11/28/17. The patient had fever to 101°F. The patient should have been immediately hospitalized. The patient needed evaluation unavailable at the prison. The patient needed immediate blood cultures, intravenous antibiotics and diagnostic evaluation and monitoring for neutropenic infection. Instead, the doctor ordered an oral antibiotic without identifying a source of infection. The failure to order a white count or hospitalize the patient was grossly and flagrantly unacceptable care in a potentially neutropenic patient on chemotherapy. The doctor also did not check to ensure that the patient had received the Granix medication. We could find no evidence on MARs available in the record that the patient received Granix, significantly increasing the potential for neutropenia.

The following day on 11/29/17, the patient developed hypotension, diarrhea, and felt sick. The doctor stopped blood pressure medication and did order a white blood count, but it was not ordered stat and was never done. Hypotension in the context of neutropenia, especially in someone on prednisone which was part of this patient's chemotherapy, can indicate infection. Failure to immediately check for neutropenia or hospitalize the patient was grossly and flagrantly unacceptable.

On 11/30/17, the doctor noted that the patient had pus coming from his ear and diagnosed otitis externa and changed the oral Levaquin to intravenous Rocephin, another antibiotic. The patient now had an infection and again should have been sent immediately to the hospital. Care was grossly and flagrantly unacceptable.

On 12/1/17, pus was still coming out from the patient's ear and the doctor again did not send the patient immediately to a hospital. The white count was never drawn. Care was grossly and flagrantly unacceptable.

The patient was not seen the following day by a physician which is unacceptable in a potentially neutropenic patient. On 12/3/17, the patient was found unresponsive with blood on his mouth and draining from his penis, with a fever of 101.2°F; and in shock with blood pressure 96/60, pulse 120, and respiration as high as 42. He appeared to be bleeding due to probable loss of platelets likely due to chemotherapy related pancytopenia. The patient was sent to the hospital. The hospital record was unavailable, but the doctor's death summary stated that the patient developed pancytopenia, sepsis, and pneumonia; and died due to sepsis and pancytopenia on 12/12/17.

**This death was preventable**. Timely treatment with Granix would have prevented the neutropenia would have prevented or significantly delayed death. Timely treatment of the neutropenic sepsis would have, at a minimum, have significantly delayed death. The medical record was disorganized, many consultation reports were not in the record, and information was not available. It appeared that coordination with the consultant was poor. The patient was at high risk for neutropenic infection and was to receive a medication, Granix, which it appeared he did not receive. After developing fever, a sign of neutropenic syndrome, the physician response over a three-day period was incompetent, demonstrated failure to properly manage a potentially neutropenic patient, and was grossly and flagrantly unacceptable. We noted 23 apparent errors in medical care. Seven errors involved not ordering timely blood counts to monitor infection. Five involved inappropriate therapeutic plans, mostly involving treatment of a potentially neutropenic patient.

## Patient #26  Menard

This patient was incarcerated in 2008. He died in 2017 when he was 68 years old. He had no medical problems. At annual health evaluations he was not offered colorectal screening, though he did refuse a digital rectal examination, which is inadequate as colorectal screening. He also was not treated for primary prevention with a statin for coronary artery disease for years. In the 2008 reception screening and at every biannual screening dating from 2012 to his death, he had greater than a 7.5% 10-year risk for heart disease and should have been offered statin medication, but was not. This is a systemic issue, as providers under Wexford do not use contemporary risk calculation to determine use of primary prevention for coronary artery disease.

On 3/20/17, a doctor saw the patient for shortness of breath. There was no other history and the doctor did not utilize a full set of vital signs. The only examination was that the patient was very pale with cold hands. The doctor assessed anemia without having a blood count to make that assessment. This was an inadequate evaluation without adequate history or physical examination. The doctor ordered a stat CBC and CMP. Later that day, the doctor wrote that the

labs were normal but that the patient was short of breath. Again, without adequate physical evaluation or history, the doctor ordered a routine chest and abdominal x-rays, and urine test.

The following day a nurse practitioner (NP) noted that the patient had possible pneumonia. The patient had a critical respiratory rate of 38-40 and blood pressure of 152/100. The NP ordered an EKG and sent the patient to a hospital. The hospital was a very small (25-bed) hospital. Atrial fibrillation with heart failure and pleural effusion was diagnosed. The patient had a chest x-ray showing bilateral pleural effusions, possible pneumonia, and compression of the lungs by the pleural effusions. The hospital called the NP, who accepted the patient back to the facility with a plan to order a cardiology follow up. This, in our opinion, was not safe for the patient under these conditions due to the age of the patient, the new onset of the fibrillation, possibility of pneumonia, and significant pleural effusions and heart failure. Given the uncertainty, return to Menard was a poor clinical choice. That decision was made apparently by a nurse practitioner, according to the hospital record.

The patient was admitted to the infirmary. The following day the patient was incontinent of stool and was in shock (86/60), with edema and high respiratory rate (30), and was sent to another hospital.

The patient had myocardial infarction, heart failure, sepsis, ischemic colitis, and developed hospital acquired pneumonia. Due to the heart failure and myocardial infarction, further surgery could not be done. The patient returned to the facility after several weeks at the hospital and died two days after return.

**This patient's death was not preventable**. However, several errors were made. The patient received no colorectal cancer screening, though contemporary standards recommend this for persons over age 50. Since 2012, the patient had a consistent 10-year heart disease risk greater than 7.5% and should have been on a statin. These are systemic problems in IDOC and should be corrected.

The patient's atrial fibrillation likely was responsible for the ischemic colitis. The initial evaluation of the patient by a physician on 3/20/17 was inadequate. The patient had a serious medical complaint (shortness of breath) yet received no history or physical examination adequate for the complaint. Also, this patient should not have been taken back from the hospital on 3/21/17, as his complicated medical condition (new-onset atrial fibrillation, large bilateral pleural effusions, heart failure, possible pneumonia, and age >65) warranted hospitalization.

## Patient #27  Menard

This 48-year-old man had difficult to control blood pressure. For the entire two years of record review, the blood pressure was uncontrolled. The blood pressure was significantly out of control and as high as 260/130. The blood pressure was above 180/120 which is considered a

hypertensive urgency on 15 separate occasions over a two year period. When the patient was evaluated with hypertensive urgency, the evaluations were inappropriate as they did not include evaluations for ongoing end-organ damage.[15]

The patient had HbA1C of 7.3, which was documented as known by a provider on three occasions. This is diagnostic of diabetes, but the doctor did not enroll the patient in chronic care, did not include diabetes as a problem, and did not initiate treatment. It was not clear if the doctor understood that an HbA1C of 7.3 was diagnostic of diabetes.

The patient also had a persistent need for statin treatment which was unrecognized. In 2014, at a chronic clinic visit, we calculated the 10-year heart disease risk was 28%, warranting a moderate to high intensity statin, but no treatment was offered. At a 3/9/16 hypertension chronic clinic, a statin was not recommended. We calculated a 10-year heart disease risk of 47%; the increased risk partly due to the new diabetes which was, however, unrecognized. The untreated hyperlipidemia is a risk for cardiovascular disease.

The patient developed symptoms of episodic shortness breath on 2/4/15 and was admitted to a hospital. At the hospital, the patient had an echocardiogram that showed thickening of the LV and concentric hypertrophy but normal systolic function, verifying hypertensive cardiovascular disease. The patient had a diagnosis at the hospital of hypertensive urgency and hypokalemia, and blood tests were drawn to exclude hyperaldosteronism and pheochromocytoma. The discharge summary included recommendations to follow up with a nephrologist and cardiologist in two weeks to complete a work up for hyperaldosteronism and resistant hypertension. The tests did show an elevated normetanephrine test that suggested pheochromocytoma. This needed to be worked up but was intentionally not done.

Upon return to Menard, the Medical Director, who was a surgeon, did not refer to nephrology or cardiology as recommended and did not undertake an evaluation for pheochromocytoma or hyperaldosteronism. A month later, on 3/6/15, another doctor saw the patient and reviewed the hospital summary, and noted that the hospital referred the patient to nephrology and cardiology. This doctor also noted that the Medical Director made no referral. The doctor did not refer the patient and the patient was never referred.

Notably, the patient had "anxiety attacks" on a number of occasions. On 3/5/14, a doctor noted that the patient was short of breath, which he attributed to anxiety. This was sufficient for the doctor to refer the patient to a psychiatrist. That appointment never occurred. A nurse took a history on 3/27/14 that the patient thought his blood pressure elevations were related to anxiety. The nurse also noted that the patient noticed skipped heart beats. On 4/22/14, the

---

[15] End-organ damage in hypertensive urgent episodes includes neurologic symptoms such as delirium, agitation or visual disturbances; focal symptoms consistent with stroke; hemorrhages of the retina; signs of increased intracranial pressure; chest discomfort consistent with myocardial ischemia or dissection; symptoms of aortic dissection; and symptoms of pulmonary edema. In addition to evaluations for these various symptoms, additional testing is indicated including EKG, chest radiograph, UA, electrolytes including creatinine, cardiac biomarkers, CT or MRI of the brain or chest.

patient told a nurse that he thought his elevated blood pressure was related to stress. On 8/30/14, a doctor noted that the patient had anxiety and referred the patient to a psychiatrist, but this referral did not occur because the patient refused to be seen. On 10/22/14, a doctor documented that the patient had anxiety and referred the patient again to a psychiatrist, which did not occur. On 10/23/15, a doctor assessed anxiety and referred the patient to mental health, which did not occur. We mention these many references to anxiety because this is associated potentially with pheochromocytoma, which hospital laboratory tests in February of 2015 suggested that the patient might have. The referral to nephrology never occurred and the patient was never worked up for this potential secondary cause of hypertension which he may have had.

Also, the patient had long-standing low potassium, which in the context of difficult to control high blood pressure suggests hyperaldosteronism. Hospital physicians recommended work up for this condition as well, but this never occurred. The potassium was low on six separate occasions. The lowest was a level of 3. Despite a low level of potassium, doctors at Menard never worked up the patient for hyperaldosteronism. Toward the end of his life the patient was on spironolactone, a diuretic that tends to increase serum potassium.

On 10/3/16, officers brought the patient to a nurse for unsteady gait and a near fall off his bunk. The nurse referred to a doctor. The patient was a no-show to clinic twice; on the second occasion he was described as refusing care, but we could not find a signed refusal in the record. The patient died about a month after this. The patient was on five drugs in March of 2015, but by November of 2016, the patient was only on three medications: diltiazem, metoprolol, and spironolactone. The patient continued to have significantly elevated blood pressure.

The autopsy found atherosclerotic coronary arteries with 95% occlusion of one of the coronary arteries. The cause of death was arteriosclerotic and hypertensive cardiovascular disease. There were 113 errors we identified in the care of this patient. Most were related to failure to assess a patient with hypertensive urgency[16] and to ensure timely follow up. We noted that on multiple chronic clinic visits for hypertension, the patient should have been referred to a consultant to exclude secondary hypertension.

**This patient's death was preventable.** It is our opinion that if the patient's blood pressure were controlled he would not have died from hypertensive heart disease. Part of this failure was a failure to refer for evaluation of possible secondary hypertension and part was a failure to manage hypertensive medication therapy. He had unrecognized and untreated diabetes for over a year which increased his risk for cardiovascular heart disease. He had high risk for cardiovascular disease and yet was not treated with a statin which increased his risk for

---

[16] When blood pressure is above 180/120, the patient is said to have hypertensive urgency. When this occurs, the provider should evaluate the patient for end-organ damage, and lower the blood pressure below 160/100. This can be done in correctional facilities by observation on the infirmary with frequent checks of blood pressure and modification of blood pressure medications. There should be follow up after this episode to ensure the blood pressure has improved. Tests should be done to assess renal function and evaluation should be done to exclude heart failure.

cardiovascular mortality. He had recognized hypokalemia, but it was not adequately investigated. A hospital recommended referral to a nephrologist to rule out hyperaldosteronism and secondary causes of hypertension, but prison doctors intentionally did not act on this recommendation. A hospital test found elevated normetanephrines and the patient had frequent episodes of anxiety and episodic shortness of breath consistent with possible pheochromocytoma, yet the patient was not referred for work up. Medication administration records were not all in the medical record, but those that were recorded that the patient received his KOP medications. The medication compliance was not frequently addressed. The patient appeared to have symptoms of unsteady gait and a near fall off his bed in November, but was not evaluated and referrals to a doctor did not occur. He was said to have refused a visit, but there was no signed refusal.

## Patient #28  Western

This patient was an 81-year-old man with a history of hepatitis C, diabetes, mild heart failure, prior amputation of the forefoot from osteomyelitis, peripheral vascular disease, and diabetic neuropathy. He was being housed on the infirmary at Western Illinois Correctional Center.

The patient fell off his bed on the infirmary and sustained an open dislocation of the middle finger. The patient was sent to a small local emergency room of a 22-bed hospital where full services were unavailable. The laceration was sutured. However, the dislocation was not corrected. The finger remained swollen, yet an orthopedic referral was not initiated. A doctor referred the patient for an urgent wound evaluation, but this was denied by Wexford. This was grossly and flagrantly unacceptable, as the patient had the equivalent of an open joint injury and it needed to be repaired. By the second week after the injury, the wound was draining pus. By the third week, the patient was unable to flex the finger, and finally the doctor obtained approval from Wexford for orthopedic referral. The patient did not go to the orthopedic doctor until 3/30/15, approximately a month after the injury. The orthopedic doctor wrote "I am uncertain as to why this was not reduced prior to now but at any rate would recommend [the hand surgeon] address this issue." The patient had osteomyelitis and eventually had open reduction and internal fixation of the open dislocation that was now infected. This delay resulted in a non-functional finger. There was no orthopedic follow up after this delayed surgery.

The patient had pancytopenia.[17] This was not properly diagnosed. Yet the patient also had iron deficiency anemia. The hemoglobin was as low as 7.7, which is very low. Iron studies showed that this was iron deficiency anemia. This was evident as early as December of 2014. Even with pancytopenia, iron deficiency anemia should prompt evaluation for colon cancer with

---

[17] Pancytopenia is a condition when all three blood elements are low including red cells, white cells, and platelets. This is a serious condition and typically requires a bone marrow study to determine the cause. This condition can be caused by cirrhosis. On one episode a doctor mentioned that the pancytopenia was caused by cirrhosis. Yet the patient did have iron deficiency anemia. This condition requires investigation as to its cause even when pancytopenia exists. The patient did not receive upper or lower endoscopy to evaluate for this condition.

colonoscopy. Also, because the patient had cirrhosis, the patient should have had upper endoscopy to screen for varices and liver ultrasound to screen for hepatocellular cancer. None of these tests was offered to the patient even though it is a standard of care.

The patient was evaluated four times in hepatitis C clinic (9/9/14, 12/22/14, 6/16/15, and 12/3/15). Despite the patient having cirrhosis at least as early as November of 2014 but probably earlier, cirrhosis was not documented as a problem in the medical record during this time period. We only started review of the record beginning in late 2014. Cirrhosis was not identified as a problem until shortly before he died. The cirrhosis was not managed, including at hepatitis C clinic visits. It is recommended that patients with cirrhosis receive a screening upper endoscopy to rule out varices and semi-annual ultrasound or CT screening for hepatocellular carcinoma. Providers also need to monitor the patient for complications of cirrhosis, including ascites and encephalopathy. The patient did not receive management of any of these conditions.

The patient had cirrhosis and a high level of fibrosis (F4), and was referred for interferon treatment in 2010 but refused interferon. The newer hepatitis C drugs are much safer with significantly less adverse reactions and are better tolerated. The patient should have been offered treatment with the newer hepatitis C drugs as they became available,[18] but was not. A doctor on 6/16/15 documented that the patient was not to be treated because of frailty, anemia, and because the Wexford infectious disease doctor decided that the patient was not a treatment candidate. None of these are contraindications for hepatitis C treatment based on newer agents and the patient should have been referred for treatment.

The patient also developed a diabetic foot ulcer on 12/8/15. Doctors allowed the patient to walk on the foot, failed to probe the wound, did not evaluate footwear, and did not properly evaluate for infection or osteomyelitis. The patient had known neuropathy and peripheral vascular disease and had previously lost his fore foot to amputation with osteomyelitis. In a patient with diabetes and known peripheral vascular disease, an ankle brachial index[19] is indicated, but was not done. The patient never had adequate evaluation to exclude osteomyelitis and was never properly treated for a diabetic foot. The treatment of the foot ulcer was not consistent with current recommendations for a diabetic foot. On 1/13/16, a doctor started an oral antibiotic (clindamycin) and then, based on a wound culture, started Rocephin and clindamycin by intravenous route. Unless the wound is debrided and cleaned, a wound culture is not a useful test. The wound did not improve, and the doctor referred the patient to a wound care specialist, which Wexford denied. This was grossly and flagrantly unacceptable, as the facility doctor did not know how to manage this condition and apparently neither did the Wexford UM doctor. An x-ray and another wound culture were recommended. Within two days of the denial, the patient was admitted to a local hospital for shock (BP 74/35)

---

[18] Newer hepatitis C anti-viral medications became approved by the Food and Drug Administration in 2013 and 2014.

[19] An ankle brachial index (ABI) measures the arterial blood flow to the lower extremity to determine if it is adequate. In a diabetic with a foot ulcer, an ABI gives an indication if surgery is necessary to correct insufficient blood flow, without which diabetic foot ulcers fail to heal.

and lethargy. Even though the patient had low albumin and low vitamin B12, the patient was not evaluated for his nutritional status with pre-albumin or dietary history.

At the hospital, a 2 cm liver mass was noted with ascites. Colitis was diagnosed but a discharge summary could not be located, and it was not clear what the hospital course was. The lack of hospital records affected care of this patient, as the facility physicians did not understand what had occurred to the patient in the hospital and neither did we. At this point, the patient's unmonitored cirrhosis eventually developed into decompensated cirrhosis and the liver mass was consistent with hepatocellular carcinoma, although the hospital records were incomplete. The patient returned to the prison and developed fever, weight loss, diarrhea, and severe edema. The patient developed worsening swelling from the cirrhosis, fevers, decreased mental status, and abdominal pain, and for a time refused hospitalization. However, it appeared that during the time the patient refused hospitalization, his mental status was abnormal, and his decision capacity was unclear. The patient was ultimately hospitalized again and returned with a diagnosis of liver cancer, cirrhosis, and pressure ulcers. The hospital report was again unavailable. The patient was given palliative sedation with Ativan and narcotics, and died. There was no evidence we could find of a thorough explanation of palliative sedation with the patient; nor was there informed consent. This appeared to be an inappropriate use of palliative sedation and gives the appearance of hastening death without the patient being aware. The death summary documented that the patient was diagnosed with liver cancer and had refused treatment, which is not entirely accurate based on our interpretation of the record. An autopsy showed the cause of death to be hypertensive cardiovascular disease and severe stenosis of the LAD. The autopsy, remarkably, did not list cirrhosis or liver cancer even though cirrhosis and a liver mass were evident on radiologic tests from the hospital.

There were numerous problems with the care of this patient. Many problems were related to lack of appropriate referral for consultative services, including timely orthopedic referral, referral for EGD for someone with cirrhosis, referral for biannual ultrasound for evaluation for hepatocellular carcinoma, referral for ABI to evaluate vasculature in a diabetic foot, referral for wound care, referral for nutritional consultation in someone with a healing diabetic foot, and most important, referral for treatment of hepatitis C. We view **this death as not preventable.** However, the basis of the not-preventable was based on the patient probably having dementia which may not have warranted treatment of his hepatitis C. The patient should have been screened for hepatocellular carcinoma and for varices as early as 2014, but since the patient had symptoms of dementia in 2014, the need for treatment of hepatitis C was less certain and it is on this basis that we determine it was not preventable.

We noted 140 errors in care over the two years of record reviews. Most errors were related to the repeated failure to recognize cirrhosis and to thereby screen for esophageal varices and hepatocellular carcinoma, the ultimate cause of the patient's death. There were 13 episodes we identified when the patient was not timely referred to a consultant and four episodes when he was not referred to a hospital for significant deterioration of his medical status. Several of the denials of care by Wexford were grossly and flagrantly unacceptable. We also note that the

physician initiated palliative sedation in a demented patient without fully informed consent of the patient or his family. This had the appearance of hastening death, which may or may not have been the desire of the patient. This practice needs to be evaluated by the IDOC with respect to its ethical and legal implications.

## Patient #29  Taylorville

This was a 66-year-old man with known diabetes and asthma. He was followed in hypertension, diabetes, and asthma chronic clinics. We asked for two years of the patient's record but appeared to receive only one year of record. Nevertheless, the patient was only seen three times for asthma, hypertension, and diabetes. Based on laboratory data, the patient also had diabetic nephropathy and hyperlipidemia. Though these were not documented or followed as problems, the patient did receive treatment, though inadequate, for the hyperlipidemia and was provided an ACE inhibitor.

Based on the January 2014 MAR, the patient was treated with 10 mg simvastatin at least from January 2014 until 3/7/15, when the dose was changed to 20 mg simvastatin. In 2014, the patient had a 10-year risk of heart disease or stroke of 46% (66 years old, diabetic, HTN, smoker, African American) and on 3/4/15 the patient had a 10-year risk of heart disease or stroke of 54%. Yet prior to 2015, the patient was on only 10 mg of simvastatin and after 2015 only 20 mg of simvastatin. His cardiovascular risk called for a high intensity statin, but the patient was only prescribed a low intensity statin. He was not even on a moderate intensity statin. This placed the patient at risk for heart disease.

Persons with diabetes and nephropathy, which this patient had, should have their blood pressure controlled to 130/80. This was not done. Though the patient did not have significantly elevated blood pressure, it was not controlled to 130/80 and medication was not adjusted when it was above that goal. This placed the patient at risk for cardiovascular disease and for further damage to his kidney function.

The patient also had diabetes. The diabetes was very poorly controlled. The HbA1C was 10.4 on 3/21/14 and remained at 10 or above, until it was 9.4 on 7/22/15. The HbA1C declined to 8.4 on 11/25/15, but even this was not good control. During this time, doctors made only minimal changes to improve blood glucose control and the lack of control placed the patient at risk of cardiovascular disease.

Thus, the patient had multiple risk factors for coronary artery disease (age, ex-smoker, high blood lipids, diabetes, and hypertension). His controllable risk factors were not managed well by prison physicians, thus placing the patient at increased risk for cardiovascular mortality.

The patient had asthma. However, the patient did not have evidence of spirometry or pulmonary function tests, which are recommended on all patients with asthma. The patient had several episodes of shortness of breath which were atypical of asthma. Since patients with

diabetes can have asymptomatic or atypical presentations for angina, the shortness of breath should have been considered as a possible angina equivalent. On 1/15/15, a doctor saw the patient in asthma clinic and documented that the patient described shortness of breath. The doctor wrote, "difficult to judge SOB [shortness of breath] etio [etiology] –likely multifactorial, obesity? Sleep apnea?" Indeed, other causes should have been sought. The doctor's acknowledgement that the etiology of the shortness of breath was uncertain required additional diagnostic testing. A stress echocardiogram and pulmonary function test or some equivalents should have been considered. At a minimum, the patient should have had pulmonary function testing at this point but did not. Angina should have been considered especially in light of his diabetes and multiple cardiovascular risk factors but was not.

On 4/21/15, a doctor evaluated the patient for an episode of shortness of breath with exertion. He had no chest pain. An EKG was done, but the tracing was of very poor quality and should have been repeated. It showed non-specific STT wave changes, which can be consistent with angina. However, the quality of the tracing was poor. The patient was not treated for angina; nor was diagnostic testing done for this condition, even though the patient's symptoms were consistent with angina and even though the patient had multiple risk factors. At a minimum, pulmonary function testing and a stress echocardiogram or equivalent tests should have been done.

On 7/13/15, the patient again developed shortness of breath. The doctor wrote, "deteriorating SOB [shortness of breath] but not so sure is asthma contributory." The doctor ordered a chest x-ray, which showed an enlarged heart. But the doctor did not order diagnostic testing (echocardiogram) to determine if the patient had heart failure. Instead, the doctor added Lasix presumably to treat for heart failure without determining if this was the patient's diagnosis. An echocardiogram should have been done.

The patient continued to have shortness of breath and dyspnea on exertion. On 1/28/16, the patient developed chest pain at 4:30 a.m., with an order from a physician to see the patient routinely in physician clinic during working hours. Someone with chest pain should be immediately evaluated, not as a routine. At 9:00 a.m., a physician saw the patient. The blood pressure was 169/94 and the pulse 100. An EKG was done. The doctor documented that there were no acute changes. The EKG in the medical record for this date was a very poor tracing and should have been repeated. One segment appeared to show ST segment elevation in V1-2 but only for one portion. This test should have been repeated, but the existing tracing suggested possible acute coronary syndrome, enough that with the symptoms the patient should have been referred for diagnostic evaluation (e.g. stress testing). The doctor told the patient that *he would need a treadmill test when he was discharged*. This was indifferent care. If the patient needed evaluation of coronary artery disease, it should have been promptly done, as the patient was at very high risk and EKGs seem to suggest this possibility.

Five weeks later on 3/6/16, the patient experienced acute shortness of breath at about 3:00 a.m. The oxygen saturation was 85% and decreased to the 60s. The nurse called an ambulance.

About 40 minutes after the episode started the ambulance arrived but the patient experienced cardiac arrest while transferring to the ambulance. The patient died at the hospital.

The coroner found that the patient died from acute coronary atherosclerosis with a right coronary artery plague that showed rupture and hemorrhage consistent with acute coronary syndrome. The patient also had hypertensive cardiovascular disease and kidney damage. Pulmonary edema was noted.

**This patient's death was possibly preventable.** He had very high risk for coronary artery disease, yet his modifiable risks were not properly treated. His blood pressure was under-treated; his diabetes was never under control and poorly managed; and he was treated with only a low intensity statin when he required a high intensity statin.

In addition, the patient had multiple possible atypical presentations of angina that were unrecognized. During one episode of chest pain, the doctor ordered a routine next day visit instead of sending the patient to an emergency room. At the subsequent day evaluation, the EKG was an inadequate tracing but was nevertheless suspicious for acute coronary syndrome. The doctor recommended that the patient get a stress test on discharge from prison, but he took no immediate action to determine if the patient had angina and did not start anti-anginal medication. This was indifferent to the patient's serious medical need. If angina was suspected enough to recommend treadmill testing on discharge from prison, the doctor should have taken timely action to evaluate for cardiac ischemia and treated the patient presumptively for angina. If the patient was treated appropriately for his cardiovascular risk factors and had appropriate diagnostic evaluation of his angina, his death might have been prevented or significantly delayed.

## Patient #30  Hill

This 43-year-old patient had an incomplete problem list. The problem list documented seizure disorder with a VP shunt,[20] deep vein thrombosis (DVT), and cerebrovascular accident, although there was no clear evidence for a cerebrovascular accident on subsequent notes. The patient was being treated for hypothyroidism, which was not on the problem list. The history of his problems could only be gleaned by piecing together strands from various notes, including hospital discharge summaries. The patient apparently had a serious brain injury in 1993 requiring a ventriculo-peritoneal (VP) shunt and subsequently developed seizures from the injury. Although the patient was described as having hemiparesis on an annual examination in 2012, there was no documented thorough neurological examination in the record that I could find that confirmed this condition. The history of the DVT was never clearly documented, even

---

[20] Normally, cerebrospinal fluid circulates in the ventricles of the brain. Due to injury or congenital abnormalities, there may be defects which cause the cerebrospinal fluid to accumulate, causing excess pressure on the brain. In order to resolve this, a drainage system is created to drain cerebrospinal fluid from the brain to the peritoneal cavity. This ventriculo-peritoneal (VP) shunt is subject to blockage and when a person has a VP shunt, any alteration of mental status should prompt evaluation of the shunt by brain imaging to ensure that excess fluid is not accumulating in the brain.

on chronic illness notes. It was not clear when the DVTs started. The patient appeared to be on life-long anticoagulation, but it was not clear why. Notably, the patient had an inferior vena cava (IVC) filter for his DVT. Typically, patients on an IVC filter are not also anticoagulated. When anticoagulated, the reason why should be clear. One can only speculate as to the reason for the IVC filter and anticoagulation. Persons with severe seizure disorder are prone to injury. In particular, a fall to the head during a seizure while on Coumadin can be life threatening. While this may be why he had an IVC filter, it is not clear why he was still on Coumadin. Also, the patient was on aspirin for an unknown reason. There was no documented reason to be on aspirin, Coumadin, and have an IVC filter. The rationale for these prescriptions was not evident in the medical record or in chronic clinic notes. Keeping someone on Coumadin and aspirin together without indication places this type of patient at life-threatening risk. This evidences incompetence on the part of the surgeon caring for the patient at Menard and the radiologist caring for the patient at Hill.

The patient was seen infrequently for his chronic illness when at Menard. When seen, there was often no history and few meaningful physical examinations. The status and rationale for the continued anticoagulation was not made clear. The patient remained on aspirin and Coumadin with an IVC filter throughout 2015 without explanation. Also, the patient had breakthrough seizures despite being on three antiepileptic drugs. This patient was a very complex patient because of his prior brain injury and VP shunt; and because he had repeated breakthrough seizures on three medications, he should have been managed by a neurologist, but there is no evidence of neurology consultation.

The patient transferred from Menard to Hill on 12/17/15. Before the patient transferred he was living in population and appeared to be able to care for himself. The day of arrival at Hill, the patient had multiple seizures and was evaluated only by a nurse. A doctor gave a phone order for Ativan "for continuous seizure activity" and to "send out if unresponsive to therapy and continuous seizures." The patient apparently continued to have seizures and was sent to a local hospital, intubated, and sent to a regional hospital where an electroencephalogram was performed while in the ICU. The patient demonstrated presumed seizure activity without any waveform on the EEG indicating epileptiform activity. The patient was discharged with diagnoses of seizures and pseudoseizures.[21] The medications were not changed.

When the patient returned to Hill Correctional Center, the patient was admitted to the infirmary. Apparently, the patient was discharged from the hospital with a subclavian central venous line, but this was never noticed by providers at Hill. Nurses did not bring this to the attention of providers, apparently thinking it was necessary and began using the port to draw blood from. This unnecessary intravenous line placed the patient at risk of infection and moreover speaks to a significant lack of examination of the patient. How could a central venous line be unnoticed for three weeks?

---

[21] Pseudoseizures are episodes that resemble seizures but are psychological in origin as they have no origin in abnormal brain activity.

The patient was admitted to the infirmary after the hospitalization for ataxia[22] and frequent seizures. Nurses documented that the patient had ataxic gait. An initial NP infirmary admission note documented that the patient had ataxia and unequal pupils. Unequal pupils are a serious sign of central nervous system disorder and needs to be promptly evaluated. The patient had a CT scan at the local hospital by report before transfer to the reference hospital. Nevertheless, unequal pupils and ataxia in the context of a VP shunt requires immediate imaging studies with CT or MRI. This was not done.

Over the course of the next two and a half months the patient continued to have unequal pupils, had progressively deteriorating mental status, and became progressively unable to care for himself. The patient could not walk without support. Instead of sending the patient to a hospital for an evaluation of why he couldn't walk, the NP ordered that his mattress be placed on the floor. Over time the patient was unable to communicate effectively, did not consistently respond to questions or commands, became incontinent of urine and feces, did not consistently eat food or drink, and was unable to care for himself. Despite a dramatic deterioration of neurological status in the context of a VP shunt, the patient never had a thorough neurological examination or had an imaging study (CT scan or MRI) of his brain. The deteriorating condition of the patient combined with the lack of physical examination or care by providers for the patient was indifferent, and grossly and flagrantly unacceptable care.

Over time the patient developed bruising, first noted on his elbows but then on his back, thighs, legs, and elbows. Despite being on Coumadin and aspirin and having bruising, the provider did not order an INR to assess whether he had supratherapeutic levels of anticoagulants. Supratherapeutic levels of anticoagulation would result in bleeding or bruising. This is a dangerous sign and calls for immediate action to prevent life-threatening harm. The doctor did not assess why the patient was on aspirin, as he had no clinical indication for this drug. Keeping the patient on both drugs and failure to assess the INR was a life-threatening danger to the patient and grossly and flagrantly unacceptable medical care. Eventually the patient began passing frank blood from his urine and stool. The nurse told the doctor, who only ordered ciprofloxacin for a presumed urinary tract infection without evaluating the INR to assess anticoagulation status. This was grossly and flagrantly incompetent care.

During this two month period the patient had a significant deterioration in his mental status and had evidence of bleeding. Despite unequal pupils and ataxia, deterioration of mental status, and bleeding while on anticoagulants, the doctor never performed a thorough history or a thorough neurological examination, including examination of his pupils. The doctor never ordered an INR.

Eventually, the patient became unresponsive and was sent to a hospital. The patient had an INR of 10, which is a life-threatening value. The patient also had a major intracranial bleed as a

---

[22] Ataxia is a non-voluntary lack of coordination of movement that results in gait abnormalities. It is often a sign of central nervous system disorder.

result of the excessive anticoagulation that shifted the brain and caused herniation of the brain, which caused the patient's death. The death was attributed to supratherapeutic anticoagulant levels.

**This patient's death was preventable**. Care for this patient was grossly and flagrantly unacceptable. The death summary was performed by the doctor caring for the patient and no problems were identified. This doctor is a nuclear radiologist and clearly does not have fundamental medical knowledge sufficient to practice general primary care medicine, and should not be allowed to do so. This is a doctor identified on the First Court Expert report as having performed poorly. Yet he continues to practice. Notably, the hospital notes document questioning why the patient was on anticoagulation. The fact that the patient was at Hill for almost three months and providers failed to identify that the patient had a central venous intravenous line was remarkable. Apparently, this device was inadvertently left in the patient when discharged from the hospital in December but no one at Hill even asked why it was necessary. Also, no one at Menard or Hill apparently knew that the patient had an IVC filter. The medical care was indifferent, and grossly and flagrantly unacceptable.

We noted 110 errors in the care of this patient. The most frequent error was the repeated error of failing to identify the medical indication for the use of both aspirin and Coumadin. This was particularly egregious because the patient had an IVC filter, which makes both Coumadin and aspirin unnecessary. On 16 occasions, the patient had serious, even life-threatening presentation, yet nurses failed to consult a physician. Physician history and physical examination were frequently inadequate and, particularly in the latter stages of the patient's life, failed to further investigate obvious conditions such as bruising and altered mental status that would have been obvious to a layman.

## Patient #31  Illinois River

This patient had a history of diabetes, hypertension, and substance use. There were no progress notes in the medical record from 5/27/15 until the patient was diagnosed with squamous cell cancer of the tongue on 9/20/16. This record was incomplete. It was not clear if the patient was not evaluated for a year and a half or whether the record was missing. It appeared that the patient may have been in a transition center, but it was unclear. The initial diagnosis in September of 2016 was squamous cell cancer of the tongue with multiple enlarged metastatic lymph nodes in the neck, and locally invasive cancer. The cancer was stage IV on diagnosis. The patient was admitted to the infirmary after the cancer was diagnosed and died in hospice on 12/2/16.

Based on the record, **it was difficult to determine if the death was preventable or not preventable, as there was a significant part of the record missing.** If the patient was at a transition center and had adequate care and access, then the death would be not preventable. But this is based on speculation. We noted only two errors, both related to lack of medical records.

## Patient #32  Pinckneyville

This patient was admitted to NRC on 12/6/16. The patient had hypertension, heart failure, COPD, diabetes, and idiopathic thrombocytopenic purpura (ITP).[23] The patient was on danazol for his ITP. The patient had his spleen removed due to the ITP. The patient's initial laboratory results show that the patient had chronic kidney disease (creatinine 1.87) and low albumin, indicating possible poor nutrition. The patient was incarcerated approximately five months before he died. The diabetes was poorly controlled during the entire approximate five months of incarceration.

The patient's record of treatment of his ITP was not identified at NRC. Old records were not obtained. His prior treating oncologist was not contacted. It was not clear what his therapeutic plan was. The patient was on danazol for his ITP on transfer from a local jail. This drug has a black box warning with respect to causing thromboembolism, some of which can be fatal, and which ultimately apparently caused this patient's death. This drug also is contraindicated in patients with markedly impaired renal function and is noted to worsen diabetic control. This patient had chronic kidney disease. None of these potential problems were monitored by IDOC physicians.

The patient transferred to Pinckneyville from NRC on 1/4/17 without having had his therapeutic plan verified. Doctors at Pinckneyville were unaware of how to manage his ITP. ITP causes destructions of platelets, a blood element that is involved in clotting. His initial platelets were 60,000. Normal platelets are 150,000 to 450,000. The goal in chronic ITP is to keep platelets above 20,000. When the patient arrived at Pinckneyville he was not on danazol, an off label[24] medication used for ITP that he had been taking. On 1/9/17, the patient placed a health request, complaining that he was not receiving danazol and had not seen a doctor yet for his ITP. He was upset that his medication was discontinued without having spoken to a doctor about this change.

A doctor saw the patient on 1/17/17, and restarted the danazol without noting a review of contraindications which included markedly impaired renal function. The renal function was not monitored, and doctors did not acknowledge the potential for worsening diabetes control from this medication. While the patient's renal function was abnormal, it was not clear if renal function had deteriorated to a level that made the medication dangerous. Yet the doctor did not initially refer the patient to someone expert in managing ITP, like a hematologist.

In early February, a doctor started large doses of prednisone for the ITP. A major problem with this patient is that his prior treatment program was never identified. Typically, initial treatment of ITP is different from treatment of chronic ITP. Initial treatment included steroids and intravenous immune globulin (IVIG). Treatment of chronic disease utilizes splenectomy, which

---

[23] ITP is a disease in which platelets are destroyed, often from unknown reasons. Platelets are necessary to properly clot blood and lack of platelets can result in life-threatening bleeding. This disease is typically managed by a hematologist.

[24] Off label medications are medications not approved by the FDA for the stated purpose. While these medications are often useful, the FDA has not identified sufficient scientific evidence of their value.

this patient already had, and other medications, sometimes in combination with steroids. After the danazol was started, a creatinine was 2.05, a deterioration, and concerning with respect to the potential for complications.

The patient was sent to a local hospital for an injection of IVIG, but at the hospital the patient received no therapy and left with a recommendation to see a hematologist in his office. At some point around this time, a doctor wrote an undated message to apparently the Wexford Regional Medical Director asking, "What should we do?" There was no plan after return to the prison to send the patient to a hematologist.

About a month later, the patient told a nurse "I'm going to die." The nurse had brought the patient to the health care unit because the platelet count was 6,000, a critical value that placed the patient at risk of life-threatening bleeding. A doctor sent the patient to a hospital. The patient was discharged from the emergency room on high dose steroids again with a recommendation to follow up with a hematologist.

After this second hospitalization on 3/23/17, the Pinckneyville physician referred the patient to a hematologist. The patient was evaluated by the hematologist on 3/30/17, but the report was not in the medical record and it was not clear what the hematologist findings were. Brief comments by the hematologist on the referral form recommended prednisone 100 mg daily with a return in two weeks. It was not clear if the hematologist knew that the patient was on danazol because the consultant note was not present. When a doctor followed up after the hematology consult, the doctor did not document what the hematologist's findings were or what the therapeutic plan was.

On 4/5/17, the white count was 23,200, which may have been a result of the use of high dose prednisone, but could also be from infection. No one evaluated this abnormal test. On 4/6/17, the patient developed abdominal pain, had not been eating, and had not been able to have a bowel movement for two days. The patient was referred to a local hospital, but transferred to a tertiary hospital because he had an ischemic bowel with perforation. Ischemic bowel is often caused by thromboembolism, which is one of the complications of danazol. It is unclear whether the hematologist knew that the patient was on danazol and felt it was necessary. Because the patient was so malnourished and weakened he was not a surgical candidate and the patient also declined having an external ostomy placed. As a result, the patient was sent back to the facility with a recommendation for hospice.

The patient returned from the hospital on 4/14/17 and died on 4/19/17. He was scheduled to see the hematologist on 4/18/17, but the ADA van was unavailable and therefore the appointment was rescheduled.

In summary, coordination of this patient's complex medical condition with consultants was extremely poor. For several months, the patient was not referred. When the patient was referred, the consultation report was not available, and it was not clear what the patient's

status was. Because consultant reports are unavailable, **there is insufficient information to assess preventability.**

We identified 20 errors on this record. The most serious ones were never understanding the therapeutic plan for the patient's serious medical condition or whether the danazol was indicated. A side effect of the danazol likely caused the patient's death, but it was not clear whether the hematologist intended the patient to continue this drug. There were six errors in lack of timely referral to a hematologist for management of a life-threatening condition.

## Patient #33 Robinson

This 58-year-old man was at the Robinson Correctional Center and had hypertension and high blood lipids, which were both untreated for eight months of record review. These are both risk factors for heart disease. On 3/16/16, he developed chest pain with atrial fibrillation. The blood pressure was 200/118 and the pulse was 129. The electrocardiogram also showed marked ST depression indicating acute coronary syndrome, a life-threatening event portending a heart attack. The automated reading recommended, "immediate clinical assessment of this individual is strongly advised." He should have been hospitalized immediately for cardiac catheterization and management of his atrial fibrillation. Instead, a nurse evaluated the patient and consulted a doctor, who only ordered 23-hour observation on the infirmary and gave one-time only doses of clonidine and propranolol. This was grossly and flagrantly unacceptable care and placed the patient at risk of death and demonstrated a profound deficit of primary care knowledge.

The following day, a doctor ordered aspirin and statin medication, but failed to refer to a cardiologist and failed to refer for catheterization despite the prior day's EKG result, which was signed as reviewed. Aside from aspirin, anticoagulation due to atrial fibrillation was not considered. These actions placed the patient at risk of death.

The doctor continued to fail to appropriately manage this patient's life-threatening condition. The doctor continued the patient on high doses of non-steroidal medication despite a box warning[25] regarding risk for cardiovascular thrombotic events including myocardial infarction and stroke with use of this drug. The doctor eventually began treatment of the patient's high blood pressure with Norvasc, a drug that carries a warning of increased angina or myocardial infarction in persons with obstructive coronary disease, which the patient appeared to have. Eventually, the patient's family called the HCUA because the patient was having chest pain while walking to the dining hall and could not walk without chest pain. The HCUA wrote that the patient was "not in any distress but complains he is unable to walk to dietary." The HCUA referred routinely to a doctor for an appointment five days later. This was indifferent as the patient's need was urgent not routine.

---

[25] A box warning is the strictest warning put in the label of prescription medication by the Food and Drug Administration when there is reasonable evidence of an association of a serious hazard with the drug.

The patient again developed typical chest pain which was helped by nitroglycerin. An electrocardiogram showed moderate ST depression consistent with ischemia. This is consistent with acute coronary syndrome and the patient should have been transferred immediately to a hospital. Instead, a nurse saw the patient and consulted a doctor, who ordered 23-hour observation but no further treatment. At this point, aside from nitroglycerin, the patient was not on antianginal medication. This was grossly and flagrantly unacceptable and placed the patient at risk of death. This was the second episode of acute coronary syndrome which was inappropriately managed.

The patient was seen after this second electrocardiogram verifying acute coronary syndrome and a doctor referred the patient for an elective stress test. Wexford would not approve the stress test and instead recommended as an alternative plan to refer the patient to a cardiologist. This was done on an elective basis though the patient had an urgent need. The cardiologist saw the patient a month after the referral and recommended a cardiac catheterization "in the near future."

The catheterization was ordered, but a week later the patient again developed chest pain. The electrocardiogram showed atrial fibrillation. Our reading shows ST depression is several leads. Chest pain with recurrent atrial fibrillation and acute coronary syndrome should have resulted in immediate hospitalization for evaluation, catheterization, and consideration for anticoagulation. Instead, a nurse consulted a doctor, who ordered 23-hour observation with a next day electrocardiogram. Six hours later the patient was found unresponsive. Cardiopulmonary resuscitation was started, and the patient transferred to a hospital, where he died.

This patient had repeated episodes of acute coronary syndrome and two episodes of atrial fibrillation, each of which should have resulted in hospitalization, which did not occur. The angina was inappropriately treated and was never under control. Cardiac catheterization was not done over three months despite the patient having three episodes of apparent acute coronary syndrome. The atrial fibrillation was never appropriately assessed, and the patient was not anticoagulated despite having atrial fibrillation and acute coronary syndrome on three occasions. The patient's cause of death was listed as coronary atherosclerosis and stroke, both of which were preventable with timely and appropriate treatment. **Therefore, this death was preventable.**

The death summary noted no problems and noted that earlier intervention was not possible. We strongly disagree.

We noted 46 errors in the care of this patient from the time he was transferred to Robinson on 8/21/15 until his death on 6/10/16. These errors included not taking adequate history, not performing a needed physical examination, and not developing an appropriate treatment plan. Additional errors included not treating elevated blood pressure from August of 2015 until March of 2016 despite continuously elevated blood pressure. Despite being 58 years old, this

patient's 10-year cardiovascular risk was apparently not calculated. The patient had blood in his stool and was 58 years old but was not referred for colorectal screening. He had blood in his stool but was kept on non-steroidal medication without investigation. The patient was also prescribed medication that was likely to harm him (non-steroidal anti-inflammatory drugs and Norvasc) without recognition of the potential for harm. The most serious errors, however, were the failure to immediately hospitalize the patient after repeated episodes of acute coronary syndrome and atrial fibrillation, and lack of awareness and acknowledgement of the seriousness of these conditions.

# IDOC Mortality Error Classification

| Description of Error | Error type | Number having that error |
|---|---|---|
| Apparently did not obtain pertinent history and/or findings from examination. | 1 | 276 |
| Apparently did not make appropriate diagnoses and/or assessments. | 2 | 249 |
| Apparently did not establish and/or develop an appropriate treatment plan for a defined problem or diagnosis which prompted this episode of care (excludes laboratory and/or imaging and procedures and consultations). | 3 | 228 |
| Apparently did not carry out an established plan in a competent and/or timely fashion (e.g. omissions, errors, of technique, unsafe environment). | 4 | 44 |
| Apparently did not appropriately assess or act on changes in clinical/other results. | 5 | 7 |
| Apparently did not provide appropriate personnel and/or resources, including getting hospital reports. | 6 | 87 |
| Apparently did not refer or timely schedule for a procedure that was indicated (other than lab or imaging). | 7 | 95 |
| Apparently did not obtain timely appropriate laboratory tests and/or imaging results. | 8 | 119 |
| Apparently did not develop and initiate appropriate discharge from infirmary or failed to follow up after infirmary or hospital discharge. | 9 | 4 |
| Apparently did not follow up appropriately after consultation or health care visit. | 10 | 45 |
| Apparently did not provide appropriate personnel and/or resources, including getting hospital reports. | 11 | 138 |
| Apparently did not order timely, appropriate specialty consultation. | 12 | 81 |
| Apparently did not follow up on patient's noncompliance. | 13 | 4 |
| Apparently failed to timely refer to a higher level of care including hospitalization, skilled nursing unit, or infirmary. | 14 | 93 |
| Apparently failed to follow up on significant findings. | 15 | 28 |
| Apparently, nurse failed to consult/refer timely to a higher level medical staff (provider). | 16 | 143 |
| Apparently did not develop and initiate appropriate discharge from infirmary or failed to follow up after infirmary or hospital discharge. | 17 | 79 |
| Failed to see a patient with potential serious illness. | 18 | 37 |
| **Total** | | **1757** |