### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DON LIPPERT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No.  10-cv-4603 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| JOHN BALDWIN, et al., | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| Defendants. | ) | |

### FINAL PRETRIAL ORDER

As stated at the pretrial conference on November 28, 2018, the Court hereby enters the following pretrial order:

1.     This is a civil rights action brought under the Eighth and Fourteenth Amendments of the United States Constitution and 28 U.S.C. §§1343, 2201, and 2202 and 42 U.S.C. § 1983 for declaratory and injunctive relief on behalf of a class of all prisoners in the custody of the Illinois Department of Corrections with serious medical or dental needs. The jurisdiction of the court is invoked under28 U.S.C. § 1331 and 28 U.S.C. § 1343. Jurisdiction is not disputed.

2.     The following are attached to and made a part of this Order:

    a.     a statement of uncontested facts (Exhibit 1);

    b.     the parties' statements of contested issues of fact and law (Exhibit 2);

    c.     the parties' schedules of exhibits (Plaintiffs' schedule attached as Exhibit 3; Defendants' schedule attached as Exhibit 4);

    d.     the parties' witness lists (Plaintiffs' list attached as Exhibit 5; Defendants' list attached as Exhibit 6);

    f.     Plaintiffs' list of deposition designations (Exhibit 7); and

g.      the parties' proposed findings of fact and conclusions of law (Plaintiffs'

list attached as Exhibit 8; Defendants' list attached as Exhibit 9).

3.      Non-objected-to exhibits are received in evidence by operation of this Order.

4.      The parties have no motions in limine to present at this time.

5.      Fact discovery closed on May 2, 2018 and all expert discovery has been

completed except for the deposition of Defendants' rebuttal expert, Dr. Owen Murray, which is

scheduled for September 28. Plaintiffs, as they have advised Defendants, anticipate the need to

request certain limited updates of discovery (pursuant to Fed. R. Civ. P. 26(e)) between now and

the date of trial, given that the case is one for injunctive relief.

6.      Trial of this case is expected to take ten (10) days and is scheduled for the weeks

of December 17, 2018 and January 7, 2019.

7.      The trial is non-jury.

8.      This Order will control the course of the trial and may not be amended except by

consent of the parties and the court, or by order of the court to prevent manifest injustice.

9.      Possibility of settlement of this case was considered by the parties.


ENTERED:


12/3/18                                      _____
                                             Jorge L. Alonso
                                             United States District Judge

/s/ Camille E. Bennett                        /s/ Michael Arnold

*Attorney for Plaintiffs*                           *Attorney for Defendant*

Camille E. Bennett                          Michael Arnold
Benjamin S. Wolf                          Christopher Fletcher
Lindsay S. Miller                          Assistant Attorney General
Roger Baldwin Foundation of ACLU, Inc.    General Law Bureau
150 N. Michigan Ave., Ste. 600          100 W. Randolph St., 13th Floor
Chicago, IL 60601                         Chicago, IL 60601

Harold C. Hirshman
Dentons US LLP
233 S. Wacker Dr., Ste. 5900
Chicago, IL 60606

Alan Mills
Elizabeth Mazur
Uptown People's Law Center
4413 N. Sheridan
Chicago, IL 60640

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DON LIPPERT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No.  10-cv-4603 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| JOHN BALDWIN, et al., | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| Defendants. | ) | |

**FINAL PRETRIAL ORDER
EXHIBIT 1—STATEMENT OF UNCONTESTED FACTS**

1.      As of May 31, 2018, IDOC had over 40,000 prisoners in custody at 28 facilities throughout the State of Illinois.

2.      Official capacity Defendant John R. Baldwin is the Director of IDOC.

3.      Since 2010, the Directors or acting Directors of IDOC have been Gladyse Taylor (Acting Director September 2010 – April 2011; June 16, 2015 – August 13, 2015), Salvador Godinez (May 2, 2011- March 2, 2015); Bryan Gleckler (Acting Director March 3, 2015 - March 15, 2015); Donald Stolworthy (Acting Director March 16, 2015 - June 15, 2015), John R. Baldwin (August 14, 2015 - present).

4.      Official capacity Defendant Dr. Steven Meeks is the Chief of Health Services of IDOC, and has been since. (This position was formerly known as "agency Medical Director."),

5.      Since 2010, the agency Medical Directors of IDOC have been Dr. Louis Shicker (2010 - June 2016); Dr. Michael Dempsey (acting) (June 2016 - November 2016), and Dr. Meeks (November 2016 - present).

6.      Official capacity Defendant Bruce Rauner is the Governor of Illinois.

7.      Since 2010, the Governors of Illinois have been Pat Quinn (2010 - 2014) and Bruce Rauner (2015 - present).

8.      In May 2011, IDOC entered into a contract for comprehensive healthcare services with Wexford Health Sources, Inc. The initial term of the contract was five years, with a provision permitting it to be renewed by the parties for up to an additional five years. The 2011 Wexford contract was renewed for one year in April 2016; for one year in April 2017; and for three years in April 2018. The contract cost for the most recent renewal is $672,599,329.00 for three years.

9.      Wexford is a privately-held corporation headquartered in Pittsburgh, Pennsylvania and is a wholly-owned subsidiary of The Bantry Group, also a privately-held corporation.

10.      Pursuant to the 2011 contract, Wexford supplies approximately 65 percent of IDOC healthcare workers statewide. The remaining 35 percent are state employees.

11.      Each of IDOC's 27 prisons has healthcare staff positions, including a Medical Director who is a physician and a Wexford employee, a Health Care Unit Administrator (HCUA) who is a state employee, and other administrative, nursing, and other support staff who may be either Wexford or state employees.

12.      State personnel cannot discipline or terminate Wexford employees. A prison's warden may revoke a Wexford employee's security clearance, prohibiting that employee from entering the prison.

13.      IDOC has an electronic medical records system in place at the two prisons housing women, Logan CC and Decatur CC. The remaining prisons use paper files for all medical records.

14.     Plaintiff Don Lippert is 43 years old and is currently incarcerated at Lawrence CC; he was previously incarcerated at Stateville CC and at Pinckneyville CC. IDOC medical records reflect that Mr. Lippert is a type 1 (insulin-dependent) diabetic and also has diabetic neuropathy and hypertension.

15.     Plaintiff Lewis Rice is 48 years old and is incarcerated at Menard CC. IDOC medical records reflect that Mr. Rice has a medical history that includes headaches, fainting spells, chest pains, right shoulder pain (for which Mr. Rice receives a "double cuff" permit), and GERD (gastroesophageal reflux disease).

16.     Plaintiff Debra Pattison is 54 years old and is incarcerated at Logan CC. IDOC medical records reflect that Ms. Pattison has, in her knee, a complete ACL tear, a partial PCL tear, a meniscal tear, and tricompartmental osteoarthritis, as well as a history of hypertension, type 2 diabetes, asthma, migraines, and possible transient ischemic attacks, inter alia.

17.     Plaintiff Ezell Thomas is 76 years old and is incarcerated at Pontiac CC. IDOC medical records reflect that Mr. Thomas has a history of chronic obstructive pulmonary disease, hypertension, dyslipidemia, anemia, prostate cancer, renal failure, and lung cancer.

18.     Plaintiff Milam Martin is 62 years old and is incarcerated at Big Muddy River CC. Mr. Martin was previously incarcerated at Pontiac CC, Menard CC, Lawrence CC, and Pinckneyville CC. Mr. Martin is identified in IDOC's records as "Milan" Martin. IDOC medical records reflect that Mr. Martin has a medical history that includes chronic bronchitis, hypertension, Bell's palsy, hypercholesterolemia (high cholesterol levels), and partial right lower extremity hemiparesis (weakness of one side of the body). Mr. Martin uses a wheelchair.

19.     On December 19, 2014, by agreement of the parties, the Court appointed Dr. Ronald Shansky as a court-appointed expert in the case pursuant to Federal Rule of Evidence

706. Dr. Shansky delivered a draft report to the parties in August 2014. Plaintiffs submitted comments to Dr. Shansky on the draft report on October 20, 2014, and Defendants submitted comments to Dr. Shansky on the draft report on November 10, 2014. Dr. Shansky issued his Final Report in December 2014.

20.     On December 8, 2017, over the objection of Defendants, the Court appointed Dr. Michael Puisis as a court-appointed expert in the case pursuant to Federal Rule of Evidence 706. Dr. Puisis delivered a draft report to the parties on August 13, 2018.

21.     The parties do not contest jurisdiction or venue.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DON LIPPERT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No.  10-cv-4603 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| JOHN BALDWIN, et al., | ) | Magistrate Susan E. Cox |
| | ) | |
| Defendants. | ) | |

**FINAL PRETRIAL ORDER**
**EXHIBIT 2—AGREED CONTESTED ISSUES OF FACT**

1.     Whether Defendants put Plaintiffs and the class members at substantial risk of serious harm by:

(i)     Failing to provide adequate staffing to meet the medical and dental care needs of the IDOC population;

(ii)     Failing to exercise oversight of the delivery of medical and dental care and of the healthcare vendor;

(iii)     Providing physicians who lack sufficient training and credentials to assess, diagnose, and treat the medical needs of the class members;

(iv)     Failing to ensure that there is a sufficiently robust system of peer/performance review that providers who put patients at risk are timely identified, corrected, or terminated;

(v)     Failing to ensure that IDOC has the power to terminate medical or dental care staff who pose risks to patient safety;

(vi)     Failing to provide safe, confidential, and adequately equipped areas with basic sanitation features in place for physical and dental healthcare encounters;

(vii)     Failing to provide sufficient medical and dental equipment in good repair;

(viii)     Failing to create, maintain, or obtain adequate records of medical and dental treatment, diagnoses, and problems, including by failing to implement an electronic medical records system;

(ix)     Failing to provide adequately staffed and supervised infirmaries for those patients needing infirmary care, and failing to provide safe, adequately equipped rooms and

1

other equipment in those infirmaries to prevent the dissemination of infection and disease and other harms to the sick;

(x)     Failing to conduct adequate medical and dental screening on intake, including failing to review previous medical histories, failing to screen for chronic conditions, and failing to test adequately for infectious diseases;

(xi)    Failing to provide an adequate system for access to care through nursing sick call, and failing to ensure that IDOC patients receive evaluations by health care staff licensed to perform independent assessments;

(xii)   Failing to implement a reliable medication administration system;

(xiii)  Failing to implement current standards of care for assessing and monitoring chronic diseases;

(xiv)   Failing to provide point-of-care access to electronic medical resources;

(xv)    Failing to create a system that ensures that patients who need urgent/emergent care are referred to it;

(xvi)   Failing to implement a system that provides timely access to outside specialty care for patients who need it;

(xvii)  Failing to ensure continuity of care, including through preventable lapses in intrasystem transfer; failing to obtain records of and other information from outside procedures; and failing to assess or follow up with returning patients;

(xviii) Failing to provide skilled nursing care and end-of-life care to patients in need of it;

(xix)   Failing to provide routine dental care and access to dental prosthetics;

(xx)    Failing to assess health history when performing dental procedures;

(xxi)   Failing to provide personnel and institute a system for infection control;

(xxii)  Failing to institute a functional healthcare continuous quality improvement (CQI) program that collects and analyses data and identifies problems and solutions to those problems;

(xxiii) Failing to implement a functional system of mortality review that identifies preventable or possibly preventable death, and takes appropriate corrective action to prevent future harm.

2.      Whether all of the allegations detailed above, if proven true, are systemic.

3.     Whether Defendants also put Plaintiffs and the class at substantial, ongoing risk of serious harm by:

(i)     Failing to perform any analysis of the funding required to meet the physical healthcare needs of the IDOC population and to seek that funding;

(ii)    Failing to hold the healthcare vendor accountable when it does not meet its contractual obligations;

(iii)   Persistently adhering to a contract structure with the healthcare vendor that financially disincentivizes the vendor from referring patients to outside specialty care or procedures, and also permits the vendor to determine who is referred to outside care or procedures;

4.     Whether Defendants are aware of the allegations identified above and, and if these allegations are proven true, have ignored them or failed to take reasonable steps to correct them.

5.     Whether the persistence of these allegations in IDOC medical and dental care, if proven true, also establishes Defendants' deliberate indifference to the serious physical healthcare needs of the IDOC population.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DON LIPPERT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No.  10-cv-4603 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| JOHN BALDWIN, et al., | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| Defendants. | ) | |

**FINAL PRETRIAL ORDER**
**EXHIBIT 3—PLAINTIFFS' AMENDED EXHIBIT LIST**

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 1 | | | 2011 Wexford Contract. | | | |
| 2 | Settlement Discovery 000744 | Settlement Discovery 000776 | | Quality improvement documents. | | |
| 3 | Wexford #12 p. 33 | Wexford #12 p. 40 | Dixon Monthly Primary Medical Service Reports. | | | |
| 4 | Settlement Discovery 000884 | Settlement Discovery 001039 | | Year of 2014 log book for off-site medical treatment. | | |
| 5 | DOC 043401 | DOC 043561 | Wexford Daily Activity Reports for Stateville. | | | |
| 6 | | | Final Report of the Court Appointed Expert (unredacted), no appendices. | | | |
| 7 | | | | Email chain among several re Wexford Issues. Attachment Outstanding Vendor Issues (2).doc. | | |

2

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|----------------------|---------------------------|------------------------|------------------------|
| 8 | | | | Email from Lisa Moss to many re Facility Listing October2012 REVISED. Attachment Facility Listing October2012.doc. | 401: This document does not make plaintiff's claims more or less probable. The document is an email containing the names of medical staff at each correctional facility. The document does not indicate whether there are any inadequacies or delays in treatment. The document merely lists the names of the medical staff at each facility. | 401, 402: This October 2012 email attaching a list of the medical leadership positions at each prison and their occupants is relevant because it shows filled and vacant positions in the past (in year 2 of the current Wexford contract, which is now in year 8), and permits comparison to lists in later years showing whether vacancies have stayed about the same or worsened. Vacancies, especially in medical leadership positions, have been identified by both the First and Second Court-Appointed Experts as a significant problem in IDOC impacting the routine delivery of care and it is also Plaintiffs' contention that the failure to fill State positions or to hold Wexford accountable for failing to fill Wexford positions is evidence of Defendants' deliberate indifference. |
| 9 | IDOC Update 001591 | IDOC Update 001598 | | Emails between Shannis Stock and Louis Shicker re Medical Grievances. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 10 | IDOC Update 000900 | IDOC Update 000900 | | Email from Marna Ross to several re STV. | 403: Although this email indicates that there is inadequate training for healthcare supervisors, the unfair prejudice of this document grossly outweighs its probative value. The document is probative of whether or not there are inadequacies in the training for healthcare unit supervisors. However, the statements made in this email do not indicate whether the inadequacies in training health care supervisors relates to inadequacies in treatment for prisoners. The language used by Marna Ross could be unfairly interpreted by a fact finder that high level officials were aware of inadequate health care treatment for prisoners. | 401, 402: This is a 2014 email from IDOC northern regional healthcare coordinator Marna Ross to her direct superior, IDOC agency medical director (and former official-capacity defendant) Dr. Shicker complaining of Wexford's training and management team at Stateville Correctional Center, one of the largest IDOC prisons. This shows, inter alia, that state employees in responsible positions have been complaining about Wexford for years; nevertheless IDOC continues to renew Wexford's contract, thus it is evidence of deliberate indifference. Defendants' objection is a misuse of FRE 403; a document is not "unfair[ly] prejudicial" simply because it helps establish a fact a party dislikes, and any such concerns are in any event de minimis in a bench trial. |
| 11 | IDOC Update 001581 | IDOC Update 001590 | | Collection of emails involving Louis Shicker's | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | | | | opinions of employees' competency. | | |
| 12 | IDOC Update 001693 | IDOC Update 001704 | | Collection of emails involving Louis Shicker's re Complaint to Vendor and Office of Health Services stat request. | 403: Even though this email indicates existance of deficiencies in health care, the probative value of this email is outweighed by its prejudice to the jury. Although the sender indicates that there are deficiencies at a few correctional facilities, it does not indicate the level or extent of these deficies. The email merely requests a list of the facilities that include backlogs. The email does not indicate whether these backlogs have led to delays in patient care or have caused prisoners injury. The prejudice of the blanket statement that the facilities listed in the email should be included in a report indicating backlogs in healthcare does not reveal the extent of the inefficiencies in each facility. As a result, the email's comments about the prison facilities are overly prejudicial because the email is not | 401, 402: This email (from former agency Medical Director Dr. Shicker) is part of a series of communications relating to an initiative within IDOC in 2015 to hold Wexford accountable for its contractual failures - which ultimately went nowhere. It is evidence both that Defendants knew of backlogs in healthcare services and healthcare vacancies at multiple prisons and that they talked about holding Wexford responsible for these deficiencies (but ultimately did nothing). Defendants' objection is a misuse of FRE 403; a document is not "unfair[ly] prejudicial" simply because it helps establish a fact a party dislikes, and any such concerns are in any event de minimis in a bench trial (Defendants erroneously refer to "prejudice to the jury"). |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | | | | | probative of the level or effect of the backlogs | |
| 13 | | | | Email from Louis Shicker to several re Staffing at Stateville. | | |
| 14 | IDOC Update 001575 | IDOC Update 001575 | | Email chain involving Louis Shicker re Dr. Ahmed - resignation today. | 403: The majority of the statements in this email are relevant. However, extraneous comments made by the author of the email carry a level of unfair prejudice and have the potential to distract the trier of fact. The statements regarding the state of crisis being ordered at Dixon could be admitted, however Marna Ross' comments about her vacation, "oh goody, goody, back to ground zero" , and "R.A.I.S.E the Standard" should be redacted if the exhibit is offered into evidence. | 401, 402: Defendants acknowledge that this email is mostly relevant. As to Ms. Ross's statements about her vacation and "ground zero," like Exhibit 10, *above*, this is a communcation from a highly-placed State employee to the agency Medical Director expressing the depth of her dissatisfaction with Wexford; the colorful language only serves to emphasize the extent of her dissatisfaction. The Court is certainly capable of disregarding any prejudicial features of this, if any. Finally, Defendants misunderstand "R.A.I.S.E the Standard" - this was a Wexford slogan (Dr. Funk is a Wexford employee) which appears in the auto-signature box of many Wexford employee emails. *See, e.g.*, Exhibit 374. |

6

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 15 | IDOC Update 001688 | IDOC Update 001692 | | Emails between Mike Atchison and Louis Shicker re AD requirements / Audit concerns. | | |
| 16 | IDOC Update 001034 | IDOC Update 001051 | | Collection of emails involving Louis Shicker re medical back logs. | | |
| 17 | | | Final Report of the Court Appointed Expert (redacted), with appendices. | | | |
| 18 | RFP#5_Wexford Contracts 000294 | RFP#5_Wexford Contracts 000559 | 2011 Wexford Contract. | | | |
| 19 | | | Prison Health Care: Costs and Quality - PEW Trusts Report. | | | |
| 20 | RFP#5_Utilization Management 000013 | RFP#5_Utilization Management 000019 | Wexford Utilization Management Guidelines. Region: Internal. | | | |
| 21 | RTP#5_Third Party Analyses-Studies-Reports 000001 | RTP#5_Third Party Analyses-Studies-Reports 000120 | NCCHC Resources, Inc. Technical Assistance Report, IDOC Health Services. | | | |
| 22 | RFP#5_Wexford Monitoring_Dixon 000273 | RFP#5_Wexford Monitoring_Dixon 000288 | February 2017 Dixon Healthcare Contract Monthly Performance Monitoring Report. | | | |
| 23 | | | IDOC's response to the August 2014 Confidential | | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | | | Draft Report of Dr. Shansky. | | | |
| 24 | IDOC Update 000016 | IDOC Update 000021 | IDOC AD 04.03.103 effective 2/1/14 re Offender Health Care Services. | | | |
| 25 | | | Excerpts from NCCHC Guidelines for the Management of an Adequate Delivery System. | | | |
| 26 | | | Excerpts from NCCHC Standards for Health Services in Prisons 2014. | | | |
| 27 | | | Cover of Clinical Practice in Correctional Medicine, Second Ed., by Michael Puisis. | | 401: The document should be excluded on relevance grounds because it does not contain any information that makes plaintiff's claims more or less probable. Although the document is the title cover of a treatise by Dr. Puisis (Plaintiff's Expert) this evidence can be elicited by testimony and is unneccessary. The document merely contains a coversheet/title page for a manual/treatise on correctional medicine. The document does not contain any information relating to the standards of care or treatments administered by IDOC. | 401, 201: As Defendants note, this is the title cover of a treatise on correctional medicine authored by the Second Court-Appointed Expert (not "Plaintiffs' Expert," as Defendants would have it). It is relevant to the expertise of Dr. Puisis and the Court can take judicial notice of it. The fact that Defendants dislike the conclusions reached by the Second Court-Appointed Expert and his team does not convert him into "Plaintiffs' Expert." |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 28 | | | John Howard Association 2014 Monitoring Report - Northern Reception and Classification. | | | |
| 29 | | | State Prison Health Care Spending - An Examination - PEW Trusts Report. | | | |
| 30 | | | | Memo from Cindy Hobrock to Louis Shicker re August, 2013 Activity Report. | | |
| 31 | | | | Email from Edwin Bowen to Louis Shicker re Vacancies. | | |
| 32 | | | IDOC Critical Healthcare Vacancies. | | | |
| 33 | | | Declaration of Debra Pattison. | | | |
| 34 | | | May 2017 Stateville Healthcare Contract Monthly Performance Monitoring Report. | | | |
| 35 | Response to Eleventh Motion to Compel 001015 | Response to Eleventh Motion to Compel 001015 | | Spreadsheet of FY15 spending and outstanding payments by facility. | 401: The document appears to have conditional relevance if Plaintiff is able to provide information showing that the expenditures below were in regards to medical treatment. Without substantive evidence in support of this argument, this document bears little evidence on IDOC's ability and provision of | 401, 402: This document was (as is indicated on the document) marked at Exhibit 14 at the deposition of Jared Brunk, the Chief Financial Officer of IDOC. Mr. Brunk testified *inter alia* that it reflected "Healthcare expenditures related to Wexford." (Brunk transcript, 1/31/18pm, 7:6-7.) |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | | | | | adequate treatment to inmates. Without evidence showing what the expenditures listed in the document are in regards to, the document is not probative of the plaintiff's claim. | |
| 36 | Response to Eleventh Motion to Compel 001016 | Response to Eleventh Motion to Compel 001019 | | Spreadsheet of vouchers and remittance descriptions, mostly for Vandalia. | | |
| 37 | | | | Spreadsheet of comprehensive medical, ancillary costs, AIDS/HEP C, dialysis and statewide hospitalization costs for FY10-FY18. | | |
| 38 | | | | Spreadsheet of remittances to vendors. | | |
| 39 | | | | Spreadsheet of invoice amounts, dates and vendors. | | |
| 40 | | | | Spreadsheet of vouchers and remittance descriptions. | | |
| 41 | RTP#5_ESI 0212349 | RTP#5_ESI 0212356 | | Email from Jared Brunk to Louis Shicker, Bryan Gleckler and Gladyse Taylore re increased medical costs. Attachment IDOC FY-15 Revised Budget.pdf. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|----------------------|---------------------------|------------------------|------------------------|
| 42 | | | 2011 Wexford Contract. | | | |
| 43 | Response to Eleventh Motion to Compel 000906 | Response to Eleventh Motion to Compel 000932 | | Facility budget and reconciliation sheets. | | |
| 44 | RTP#5_ESI 0052418 | RTP#5_ESI 0052421 | | Email chain involving Louis Shicker re Hill CC Medical Back log. | | |
| 45 | RTP#5_ESI 0273398 | RTP#5_ESI 0273416 | | Email chain involving Jared Brunk re Complaint to Vendor Forms. Several Notices of complaint to vendor forms attached. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 46 | RTP#5_ESI 0275568 | RTP#5_ESI 0275569 | | Email chain involving Jared Brunk re Wexford Penalties. | 401 and 403: The information in these emails regard whether IDOC has ever levied a penalty against Wexford. Although these emails are probative of plaintiff's claim they do not indicate whether any penalties were actually levied against Wexford. Even further, the emails themselves do not reveal any information that makes plaintiff's claim more or less probable. Even if these documents were found to be relevant, the prejudice of the emails outweighs the probative value. The emails do not indicate whether Wexford was actually fined. However, the implication posed by the email's request implies that there have been problems without Wexford. Without positive information indicating that a penalty was actually levied against Wexford, the emails lack probative value and are more likely to mislead the fact finder into believing | 401, 402: This September 2016 email chain between IDOC CFO Brunk and others shows that the best recollection of the state employees whom he thought might be knowledgeable on this subject was no one could definitively remember whether Wexford had *ever* been penalized for contractual non-performance (and if it had been done, their guess was that it had been done in 2001 or 2003). Defendants acknowledge that this is relevant to Plaintiffs' claim that Defendants have failed to hold Wexford accountable for its violations of the healthcare contract, which supports the claim of deliberate indifference. Since this email chain, like Exhibit 12 discussed *above*, is part of a larger series relating to internal discussions about Wexford's contractual violations and whether to assess penalties available under the contract, to talk about the "prejudice" in an |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|---------------------|--------------------------|------------------------|----------------------|
| | | | | | that IDOC actually levied penalties against Wexford. | "implication" that "there have been problems with[] Wexford" is to try to close the barn door after the cows are gone. There is abundant evidence that Defendants and their employees believed that there were "problems" with Wexford (and that there were such problems. Finally, Defendants seem to be unaware that they have admitted that no penalties had been imposed on Wexford under the 2011 contract, as least as of April 2017 (Defendants' Response to Plaintiffs' First Requests for Admission, no. 4). |
| 47 | Response to Eleventh Motion to Compel 002333 | Response to Eleventh Motion to Compel 002340 | | Spreadsheets involving medical credits. | | |
| 48 | RTP#5_ESI 0096417 | RTP#5_ESI 0096418 | | Email chain involving Jared Brunk and Michael Dempsey re Inpatient and outpatient questions. | | |
| 49 | RTP#5_ESI 0346209 | RTP#5_ESI 0346218 | | Email chain involving Jared Brunk and Edwin Bowen re Job descriptions for Wexford contract monitors. Includes attachments. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 50 | RTP#5_ES I 0129542 | RTP#5_ES I 0129545 | | Email chain involving Jared Brunk, Louis Shicker, Melvin Hinton and others re Appointment to Subcommittee. Attachment 9/15/15 memo from Melvin Hinton to all subcommittee members re Subcommittee on Health Care Contractual Monitoring and Oversight. | | |
| 51 | RTP#5_ES I 0281071 | RTP#5_ES I 0281072 | | Email chain between Jared Brunk and Christa Bull re If I misspoke. | 401: The emails contained in the exhibit and the extraneous comments located in them do not make plaintiff's claim more or less probable. Although there is mention of missing items in the email, it is unclear if the missing items are medical supplies or anything related to the care or treatment of prisoners. Without any verifying information to give this document context, the document lacks relevance and would only lead to confuse the trier of fact about IDOC record keeping. | 401, 402: Plaintiffs acknowledge that the only relevant part of this 2017 email chain is the initial email from IDOC CFO Brunk saying "Shoot me; at least then I wouldn't have to listen to more of Wexford's plans. Thanks." Once again, this shows the extreme dissatisfaction, 5 years from the start of the contract with Wexford, of highly placed IDOC employees with Wexford. (The remainder of the email chain concerns matters related to the closing of the Illinois Youth Center at Kewanee, which was part of the Department of Juvenile Justice and not involved in this case.) |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 52 | Response to Eleventh Motion to Compel 000328 | Response to Eleventh Motion to Compel 000389 | Illinois State Legislature FY 2018 Narrative Statement. | | 401 and 407: The information contained in this document contains evidence of proposed remedial measures for the IDOC healthcare system. Aside from conclusory remarks made in regards to the allegations in the Lippert litigation, the information contained in the document does not make plaintiff's claims more or less probable as they do not indicate whether or not there was any negligence or deficiencies in IDOC healthcare. The evidence of proposed measures within the document are barred under rule 407 if used as evidence of IDOC's failure to provide adequate healthcare. | 401, 402: This document is the Fiscal Year 2018 statement provided by IDOC to the Illinois State Legislature as part of the state budget process; it is signed by the IDOC Director. Among other information communicated to the legislature, the document identifies "Addressing the Health Care Needs of our Population" (p. 7) as a top agency priority, but the budget request (p. 59) contains no request for increased healthcare funding. It thus evidences Defendants' deliberate indifference. Plaintiffs are not sure what "proposed remedial measures" in this budget document are being referred to by Defendants in their objection (there is a summary of this case on p. 2 but it does not on its face contain "proposed remedial measures"). In any event, FRE 407 ("*Subsequent* Remedial Measures") by its terms does not cover "proposed" remedial measures and is |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | | | | | | not applicable (if the "proposed" remedial measures Defendants complain of are in the *Lippert* summary, they have not yet been actualized and are not "subsequent," and in any event this case is not about an "earlier injury or harm," FRE 407 - it seeks prospective relief for ongoing risks of harm). FRE 407 is not applicable here. |
| 53 | Response to Eleventh Motion to Compel 000043 | Response to Eleventh Motion to Compel 000061 | Illinois State Legislature FY 2017 Narrative Statement. | | Same arguments as the above cell. | *See* Plaintiffs' Response as to Exhibit 52, above.  This is the first half of the FY 2017 IDOC statement to the Illinois legislature; the second half of this document was produced separately and is Exhibit 54. |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|---------------------|---------------------------|------------------------|------------------------|
| 54 | Response to Eleventh Motion to Compel 000309 | Response to Eleventh Motion to Compel 000327 | | Attachments to an Illinois State Legislature Narrative Statement. | 401: Although the issue of understaffing is probative of plaintiffs claim, this document does not make the allegation of inadequate staffing more or less probable. The document is a redacted list of IDOC employees that have disabilities. The document does not indicate whether or not these employees were incapable of providing adequate care or if this is an inappropriate number of members to have staffed. If anything, the document has the potential to mislead the fact finder into believing that IDOC staff are not capable of performing healthcare duties appropriately because they may or may not have a disability. The presence of an IDOC employee with a disability on its own does not indicate whether these conditions led IDOC to provide constitutionally inadequate healthcare. | 401, 402: Defendants misunderstand what this document is; as stated in Plaintiffs' Response as to Exhibit 53, this is the second half of the FY 2017 agency statement to the legislature (so Exhibits 53 and 54 together are the FY17 equivalent of Exhibit 52). Once again, Exhibits 53-54 are relevant because, *inter alia*, they identify healthcare in general as a top priority of the Department (Exh. 53 p. 7) but, in this case, include only mental health, not physical healthcare needs, in the budget funding request (Exh. 54 p. 18 "True Needs of the Department"). Again, this is evidence of deliberate indifference towards the physical healthcare needs of the class. |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 55 | RTP#5_ES I 0334676 | RTP#5_ES I 0334679 | | Email from Lindsay Amerson to Jared Brunk re EO Reserves. Attachment 1.25.2015 IDOC FY15 Budget Reductions_Reserves (2).xlsx. | 401: The document discusses the method for IDOC to receive a credit for Wexford services and how the credit is applied against bills for Wexford services. Despite the document relating to the interactions and relationship between IDOC and Wexford, the document does not indicate whether the use or expenditures related to this credit have result in delays or inadequate treatments that support Plaintiff's claims. As a result, the mention that IDOC receives credits for Wexford services is not relevant towards the issue of whether the treatments provided by IDOC through wexford are constitutionally inadequate. | 401, 402: This document is principally relevant as containing a description of how the "hospitalization utilization" credit under the Wexford contract is calculated and used and how much that credit was estimated to be in FY15 (under the 2011 Wexford contract, costs of outside medical services over a certain annual threshold - the "hospital utilization threshold" - are Wexford's financial responsibility, not IDOC's.  Plaintiffs contend that the utilization threshold creates an incentive to Wexford to deny care to the plaintiff class (since Wexford also controls whether members of the class are referred for outside care); this email states that, by the calcuation of IDOC's Chief Financial Officer Mr. Brunk, there was some $5 million in utilization credit coming back to the Department and thus shows that Plaintiffs' belief that Wexford stands to lose significant sums by |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | | | | | | referring class members to outside care is not speculative. It also illustrates interactions between the Department and the Governor's Office of Management and Budget as to IDOC's expenditures. |
| 56 | RTP#5_ES I 0185135 | RTP#5_ES I 0185138 | | Email chain involving Jared Brunk re FY17 Budget Documents. Attachment FY17 and FY18 Concerns.docx. | | |
| 57 | RTP#5_ES I 0184785 | RTP#5_ES I 0184788 | | Email from Jared Brunk to several re FY17 and FY18 Concerns. Attachment FY17 and FY18 Concerns.docx. | | |
| 58 | RTP#5_ES I 0370441 | RTP#5_ES I 0370444 | | Email chain involving Jared Brunk and Andrew Munemoto with no subject. Attachment 426-DOC.xlsx. | | |
| 59 | RTP#5_ES I 0251671 | RTP#5_ES I 0251812 | | Email from Gladyse Taylor to several re Medical Subcommittee #3. Attachments IDOC-Medical RFP V 15.2 Template 1124.docx and Executive Summary - New Contract.docx. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|----------------------|---------------------------|------------------------|------------------------|
| 60 | RTP#5_ESI 0305184 | RTP#5_ESI 0305185 | | Email chain involving Jared Brunk and Alexander Boucher re Pew Survey on Correctional Health Care Spending - Illinois. | 401: This email was sent to Jared Brunk regarding IDOC expenditures on healthcare. Despite the email's mention of IDOC spending on healthcare services provided by Wexford, the email does not make mention of how much IDOC is spending on healthcare and whether these budgetary allocations are causing delays or issues in treating inmates. As a result, the document does not make the Plaintiff's claims more or less probable, and instead, merely mentions that Jared Brunk is assisting with IDOC's review of budget expenditures. | 401, 402: This email relates to the October 2017 Pew Charitable Trusts report about state prison healthcare spending (Exhibit 19, which shows that Illinois ranks in the bottom tier of states in its spending on healthcare services for prisoners and next to last in the per capita number of healthcare workers it provides in its prison system). This email is relevant in that it shows that Pew's information was derived from personnel (in this case, IDOC CFO Brunk) in the individual states and furthermore that Pew consulted those state personnel as to the appropriateness of its descriptions of the prison healthcare services provided. (Mr. Brunk has testified that he also provided the underlying financial and prison staff headcount information to Pew; see Exhibit 61, which is the attachment to Exhibit 60.) Further, this email chain and the |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | | | | | | attached survey response were shared by Mr. Brunk with IDOC agency Medical Director Dr. Meeks and former acting IDOC agency Medical Director Dr. Dempsey. |
| 61 | RTP#5_ESI 0132707 | RTP#5_ESI 0132717 | | Illinois Pew Survey of Correctional Health Care Expenditures. | | |
| 62 | RTP#5_ESI 0178422 | RTP#5_ESI 0178442 | | Email from Tina Jepsen to several re Hill CC Contract Monitoring. Attachment copy of monthly performance report April 2016 Hill CC.xlsx. | | |
| 63 | RTP#5_ESI 0275745 | RTP#5_ESI 0275749 | | Email from Jared Brunk to Andrew Munemoto and Lindsay Amerson re Updated sheets for tomorrow's meeting. Attachments FY17 walk down.pdf and budget explanation.xlsx. | | |
| 64 | | | 2016 State of Illinois Request for Proposal - IDOC Comprehensive Medical and Mental Health Services. | | | |
| 65 | RTP#5_ESI 0086819 | RTP#5_ESI 0086820 | | Email chain involving Charlie Weikel, John Baldwin, Brent Gibson and others re SOW for NRI engagement. | 403 and 407: The document pertains to IDOC plans to restructure its healthcare system and search for additional healthcare providers. The | 401, 402: This email documents a stage of the discussions between a member of the Governor's Office and the National Commission on |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|----------------------|---------------------------|------------------------|------------------------|
| | | | | | remedial measures mentioned in this email cannot be used to show negligence or culpability on the part of IDOC. Even if the judge finds this email admissable under 407, the document's probative value is outweighed by the unfair prejudice of the fact finder hearing that IDOC is looking for other health care providers and plans to restructure its health care system. Similar to the 407 argument, this evidence is likely to prejudice the trier of fact into believing that IDOC is changing its policies because the current health care system is flawed. Further, the email contains little evidence of what policies are causing unsatisfactory healthcare in the opinion of IDOC administrative officials. As a result, the email should not be admitted as either evidence of subsequent remedial measures or as unfairly prejudicial to the fact finder. | Correctional Healthcare as to the scope of work for a project for IDOC that ultimately resulted in the NCCHC Resources, Inc., Technical Assistance Report (Exhibit 6 - to which Defendants did not object).  The 2016 NCCHC report contains a number of criticisms and suggestions for improvement of IDOC healthcare services, a number of which overlap with recommendations made by both the First and Second Court-Appointed Experts.  The course of the discussions about the scope of work is important to know because the NCCHC report addresses a more limited set of topics than the First and Second Court-Appointed Expert reports; this email helps explain why. This email also shows concern and knowledge about problems in IDOC healthcare services on the part of the Office of the Governor.  As to Defendants' FRE 403 and 407 objections, that IDOC |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|----------------------|---------------------------|------------------------|----------------------|
|     |          |          |                      |                           |                        | has been planning to make changes to its healthcare system and has searched for additional providers is an open secret (in the course of the past three years, the Department has issued two healthcare contract Requests for Proposal) and Defendants have not objected to numerous other documents on this list that pertain to that process.  As previously explained, FRE 407 is in any event not pertinent to "plans" for change (it deals with remedial measures that have already been put in place) and it is not applicable to a case seeking prospective relief for future risk (it deals with "measures . . . taken that would have made a *past* injury or harm less likely to occur" (emphasis added).  That Defendants contemplated changes and solicited advice about them, and then failed to make them, is evidence of their deliberate indifference. |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 66 | RTP#5_ES I 0455475 | RTP#5_ES I 0455692 | | Email chain involving Steven Meeks, Kimberly Butler and others re Medical RFP. Attachments comprehensive medical and mental health services RFP.docx and IL DOC vendor questions 2.2.17 (2).docx. | | |
| 67 | RTP#5_ES I 0073017 | RTP#5_ES I 0073017 | | Email chain involving Gladyse Taylor, Georgia Man and others re Meeting. | 401: The information contained in this email lacks relevance because it does not pertain to healthcare standards, treatment, financing, or issues related to services provided by Wexford. The email merely grants the recipient permission to meet with Wexford and reminds them that they do not have the authority to discuss the "RFP" or "contract extensions" | 401, 402: This email concerns the circumstances surrounding the withdrawal of the first Request for Proposal for a comprehensive IDOC healthcare services contract. This RFP contemplated significant changes in certain aspects of IDOC healthcare services (at least some of which were in line with the recommendations of the First Court-Appointed Expert), and there has been conflicting testimony to date as to why it was withdrawn. This email shows the involvement of the Office of the Governor in that withdrawal, and also includes the statement by a high-up member of that Office (Ms. Man was Deputy General Counsel |

24

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | | | | | | and Chief Compliance Officer in the Governor's Office) that this was a "critical RFP and contract for the state . . ." |
| 68 | | | | Spreadsheet of FY15 spending and outstanding payments by facility. | | |
| 69 | | | | Collection of different documents and emails regarding compliance, vacancies and penalties. | | |
| 70 | Response to Eleventh Motion to Compel 000309 | Response to Eleventh Motion to Compel 000309 | | Attachments to an Illinois State Legislature Narrative Statement. | | |
| 71 | Response to Eleventh Motion to Compel 000062 | Response to Eleventh Motion to Compel 000080 | Illinois State Legislature FY 2017 Narrative Statement. | | | |
| 72 | RTP#5_ESI 0065036 | RTP#5_ESI 0065051 | | Email chain involving Charlie Weikel re Wexford Contract Analysis. Attachments violation overview.xlsx and Wexford contract reporting requirements.docx. | | |
| 73 | RTP#5_ESI 0167591 | RTP#5_ESI 0167592 | | Email chain involving Mike Atchison re Governor's Staff Tour. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 74 | RTP#5_ES I 0180666 | RTP#5_ES I 0180666 | | Email chain involving Melvin Hinton, Charlie Weikel, Gladyse Taylor and others re Subcommittee - monitoring and oversight notes. Attachment 9/16/15 Subcommittee on Health Care Contractual Monitoring and Oversight Subcommittee Report. | | |
| 75 | RTP#5_ES I 0182571 | RTP#5_ES I 0182576 | | Email chain involving Melvin Hinton, Charlie Weikel, Gladyse Taylor and others re Subcommittee - monitoring and oversight notes. Attachment 10/25/15 memo from Melvin Hinton to Charlie Weikel re Subcommittee - monitoring and oversight notes email 10/25/15. | | |
| 76 | | | | Email chain involving Charlie Weikel, John Baldwin and Louis Shicker re NCCHC Accreditation. | | |
| 77 | RTP#5_ES I 0180543 | RTP#5_ES I 0180543 | | Email chain involving Charlie Weikel, John Baldwin and others re Please review: SOW - NRI. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 78 | RTP#5_ESI 0606815 | RTP#5_ESI 0606815 | | Meeting minutes from UIC-IDOC collaboration meeting involving Charlie Weikel, Erin Johnson, Camile Lindsay, Steven Meeks, Michael Dempsey and John Baldwin. | | |
| 79 | RTP#5_ESI 0096023 | RTP#5_ESI 0096027 | | Email chain involving Charlie Weikel, Brent Gibson, John Baldwin and others re RFP. Attachment Illinois DOC mental health services initial assessment 2015 initial plan 10.26.15.docx. | 403 & 407: This email is in regards to an evaluation of IDOC correctional medicine by the reviewing organization NCCHC Resources Inc. The NCCHC's report states that the goal of the organization is to evaluate IDOC and make recommendations for improvements in regards to the ongoing Rasho and Lippert litigation. This document does not indicate that there are any current deficiencies in IDOC healthcare. However, this information can potentially prejudice the trier of fact into believing that the presence of the NCCHC presumptively means that IDOC was aware that its current healthcare system was inadequate. As such, the probative value of this evidence in regards to | 401, 402: This document is similar to Exhibit 60 discussed above in that it captures a stage of the discussions relating to the scope of work for the project that ultimately issued in the NCCHC report for IDOC (Exhibit 6) and is relevant for the reasons identified in the response as to Exh. 60. It also shows the involvement and awareness of IDOC Director Baldwin as well as a member of the Governor's office. For the reasons stated above, FRE 407 ("Subsequent Remedial Measures") is not applicable to this case. In addition, any "prejudice" to the Defendants resulting from proof that Defendants were aware of deficiencies in IDOC healthcare is vastly outweighed by the |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | | | | | actual deficiencies in IDOC health care is outweighed by the unfair prejudice carried by the hiring of a consultant to improve IDOC healthcare. Furthermore, this evidence should be barred if it is used as circumstantial evidence to show that IDOC's healthcare system is deficient. | probative value to Plaintiffs' claims of deliberate indifference of any and all evidence that Defendants were aware of problems in IDOC healthcare, sought a review of same and recommendations as to how to make improvements, and have failed to implement them. |
| 80 | RTP#5_ESI 0344460 | RTP#5_ESI 0344469 | | Email chain involving Charlie Weikel, Brent Gibson, LaShonda Hunt and others re IDOC SOW. Attachments Budget narrative for IL DOC 11.23.15.docx, IL letter to NRI for RFP engagement.eml. | 403 & 407: Same argument as the above cell. Although these emails and the attached report relate to health care, the emails and documents do not carry any probative value in determining whether IDOC's health care system is constitutionally inadequate. The emails and report merely indicate and describe the logistics and costs for IDOC's healthcare system to be evaluated by the NRI. The indication that IDOC has hired consultants to | 401, 402:  This email is relevant for the same reasons stated as to Exhibits 60 and 79, and FRE 403 and 407 are inapplicable for the reasons given there also. |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | | | | | evaluate its healthcare system is highly prejudicial and outweighs any probative value in regards to plaintiff's claims. Further, rule 407 bars the admission of this evidence if this document is used as circumstantial evidence of IDOC's culpability and negligence in providing adequate healthcare. | |
| 81 | RTP#5_ESI 0011179 | RTP#5_ESI 0011185 | | Email chain involving Michael Knauer, Jared Brunk, Gladyse Taylor and others re DOC Health RFP. | | |
| 82 | RTP#5_ESI 0159773 | RTP#5_ESI 0159895 | | Email chain involving John Baldwin, Charlie Weikel, Brent Gibson and others re Illinois DOC Health Care Technical Assistance Report. Attachment IDOC full report_final_delivered.pdf. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 83 | RTP#5_ESI 0178957 | RTP#5_ESI 0178959 | | Email chain involving Charlie Weikel, Gladyse Taylor, John Baldwin and others re Information on Incruse Ellipta inhaler. | 403: Although this evidence pertains to the relationship between IDOC and Wexford, these emails contain little probative information regarding actual quality of healthcare provided by Wexford. The emails reference an incident involving an inhaler but do not indicate whether this incident was a failure in delivering medication or just a routine medication supply issue. The emails also discuss penalties for Wexford. The emails do not indicate that any penalties have been assessed against Wexford or if Wexford's actions have actually resulted in penalties towards them. Furthermore, it is also unclear if these penalties are in regards to instances of Wexford providing inadequate medical treatment. Without further information, the mention of penalties lacks context and carries the potential of biasing the fact finder. As a result, the probative | 401, 402: Defendants' description of this email chain mischaracterizes its contents. The first part of the chain relates (as the email plainly states) to an instance of Wexford having unilaterally changed a medication on the formulary without approval from IDOC Office of Health Services, although, as agency Medical Director Shicker points out to Wexford, this is a violation of the contract. This then leads to an internal discussion as to whether, in light of two such "clear" contractual violations, IDOC should proceed with meeting with Wexford to work on a 1-year extension to Wexford's contract. Director Baldwin says nevertheless he has "no issue with moving forward" with this. Finally, there is a discussion between Assistant Director Taylor and Mr. Weikel in the Governor's office of possible increased future |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|----------------------|---------------------------|------------------------|------------------------|
| | | | | | value of the relationship between Wexford and IDOC is outweighed by the prejudicial effect of hearing that IDOC is penalizing Wexford. | penalties for contractual violations of staffing requirements. We know those penalties never came into existence as the current contract does not have them. In sum, this email is highly relevant to Plaintiffs' claim that Defendants (in spite of disparaging Wexford's performance in their internal discussions) fail to hold Wexford accountable (and instead continue to reward it with contract extensions) despite its repeated violations of the contract, showing Defendants' deliberate indifference. There can be no "prejudicial effect" of "hearing that IDOC is penalizing Wexford," as Defendants' objection suggests, since there were (and are) no such penalties. In any event the probative value of this email chain outweighs any embarrassment to Defendants from it. |
| 84 | RTP#5_ESI 0068483 | RTP#5_ESI 0068484 | | Email chain involving Charlie Weikel, John Baldwin, Michael | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|----------------------|---------------------------|------------------------|------------------------|
| | | | | Dempsey and others re Medical check-ins. | | |
| 85 | RTP#5_ESI 0015386 | RTP#5_ESI 0015389 | | Email from Edward Jackson to several re Subcontracting notices - INA and AFSCME. Attachments AFSCME subcontracting1.docx, INA subcontracting1.docx. | | |
| 86 | RTP#5_ESI 0583091 | RTP#5_ESI 0583092 | | Email chain and meeting invitation involving Charlie Weikel, Michael Dempsey, Steven Meeks and others re IDOC and UIC engagement. | | |
| 87 | RFP#5_Wexford Contracts 000560 | RFP#5_Wexford Contracts 000598 | State of Illinois Contract Renewal of Healthcare Services. | | | |
| 88 | | | June 2017 Illinois River Healthcare Contract Monthly Performance Monitoring Report. | | | |
| 89 | Response to Motion to Compel 002341 | Response to Motion to Compel 002470 | IDOC Director's Transition Report. | | | |
| 90 | Response to Motion to Compel 002472 | Response to Motion to Compel 002494 | | PowerPoint presentation re IDOC projects between July 2015 through June 2016. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|---------------------|---------------------------|------------------------|------------------------|
| 91 | RTP#5_ES I 0065946 | RTP#5_ES I 0065947 | | Email chain involving Anthony Galullo, Charlie Weikel and John Baldwin re Wexford contract analysis. | | |
| 92 | RTP#5_ES I 0483023 | RTP#5_ES I 0483024 | | Email chain involving John Baldwin, Louis Shicker and Amber Bolden re Our meeting. | | |
| 93 | RTP#5_ES I 0250142 | RTP#5_ES I 0250142 | | Email chain between Charlie Weikel and John Baldwin re NCCHC accreditation - earlier question. | | |
| 94 | RTP#5_ES I 0623498 | RTP#5_ES I 0623498 | | Email from Louis Shicker to several re vendor staffing and backlogs. | | |
| 95 | RTP#5_ES I 0497425 | RTP#5_ES I 0497427 | | Email chain involving Charlie Weikel, Gladyse Taylor, John Baldwin and others re Information on Incruse Ellipta inhaler. | | |
| 96 | RTP#5_ES I 0409310 | RTP#5_ES I 0409312 | | Email chain involving Jared Brunk, Camile Lindsay, Gladyse Taylor and others re Medical RFP. | | |
| 97 | RTP#5_ES I 0623447 | RTP#5_ES I 0623449 | | Email chain involving Wallace Strow, Michael Dempsey, Lois Lindorff, Kimberly Butler and others re Strow response to reprimand. | | |
| 98 | RTP#5_ES I 0044133 | RTP#5_ES I 0044134 | | Email from Steven Meeks to John Baldwin and others re Strategic plan. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | | | | Attachment OHS Strategic plan.docx. | | |
| 99 | Wexford #12 p. 1 | Wexford #12 p. 8 | Big Muddy River Monthly Primary Medical Service Reports. | | | |
| 100 | RTP#5_ESI 0381031 | RTP#5_ESI 0381032 | | Email from Lisa Prather to Michael Dempsey and Kim Hugo re ??. | | |
| 101 | RTP#5_ESI 0095024 | RTP#5_ESI 0095025 | | Email chain involving Kim Hugo, Michael Dempsey, Kimberly Butler and others re Menard nursing crisis. | | |
| 102 | RTP#5_ESI 0096016 | RTP#5_ESI 0096017 | | Email chain involving Steven Meeks, Kim Hugo, Lawrence Frank and others re Nursing staff Menard CC. | | |
| 103 | RTP#5_ESI 0046529 | RTP#5_ESI 0046530 | | Email chain involving Lisa Prather, Gail Walls and others re HCU minimum staffing. | | |
| 104 | RTP#5_ESI 0421000 | RTP#5_ESI 0421001 | | Email chain involving Cheri Laurent, Kim Hugo and others re Nursing staff at Pinckneyville. | | |
| 105 | RTP#5_ESI 0609558 | RTP#5_ESI 0609559 | | Email chain involving Shannis Stock-Jones, Susan Griffin and others re SWICC ASR LPN hours. | | |
| 106 | RTP#5_ESI 0622044 | RTP#5_ESI 0622046 | | Email chain involving Natalie Northern, Joseph Ssenfuma, Emily Ruskin and others re Sorry. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|---------------------|---------------------------|------------------------|----------------------|
| 107 | RTP#5_ESI 0622761 | RTP#5_ESI 0622762 | | Email from Lorie Smalley to Lisa Johnson and others re Staffing. | | |
| 108 | RTP#5_ESI 0622769 | RTP#5_ESI 0622771 | | Email chain between Joseph Ssenfuma and Jason Orkies re Contract monitoring report september 2017. | | |
| 109 | RTP#5_ESI 0099462 | RTP#5_ESI 0099480 | | Email from Kim Hugo to Steven Meeks re RFP Hill. Several attachments re RFP questions. | | |
| 110 | RTP#5_ESI 0392582 | RTP#5_ESI 0392583 | | Email chain involving Kimberly Butler, John Baldwin and others re Assisted living facility. | | |
| 111 | | | | LinkedIn profile of Andy Munemoto. | | |
| 112 | | | | List of deposition topics. | | |
| 113 | | | | Pages 274-278 of FY2019 State Budget re IDOC. | | |
| 114 | Subpoena to Wexford 10-10-17 Request 12 p. 507 | Subpoena to Wexford 10-10-17 Request 12 p. 519 | State of Illinois Contract Renewal of Healthcare Services. | | | |
| 115 | RTP#5_ESI 0410410 | RTP#5_ESI 0410412 | | Email from Shannis Stock-Jones to several re staffing vacancies/medical backlogs. Attachment staffing vacancies 12.12.16.xls, medical backlogs 12.12.16.xls. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 116 | | | Wexford Provider Handbook: Physicians, Psychiatrists, Dentists, Nurse Practitioners, and Physician Assistants. | | | |
| 117 | Subpoena to Wexford 10-10-17 Request 21 & 44 p. 592 | Subpoena to Wexford 10-10-17 Request 21 & 44 p. 592 | | Spreadsheet from Lawrence CC showing vacancies and waiting lists. | | |
| 118 | Subpoena to Wexford 10-10-17 Request 23 p. 580 | Subpoena to Wexford 10-10-17 Request 23 p. 580 | | Spreadsheet showing weekly MHP backlogs for all facilities over 11/24/17 through 12/15/17. | | |
| 119 | RTP#5_ESI 0132707 | RTP#5_ESI 0132717 | | Pew Institute and Vera Institute of Justice survey of correctional health care expenditures. | | |
| 120 | Subpoena to Wexford 10-10-17 Request 4 p. 3606 | Subpoena to Wexford 10-10-17 Request 4 p. 3619 | | Email from Emily McMaster to several re Peer review for Dr. Khurana by Dr. Sood. Attached peer review. | | |
| 121 | Subpoena to Wexford 10-10-17 Request 5 p. 549 | Subpoena to Wexford 10-10-17 Request 5 p. 549 | | Discipline report for employees 7/1/15 to 11/26/17 for misconduct or performance. | | |
| 122 | RTP#5_ESI 0064473 | RTP#5_ESI 0064479 | | Email from Mary Schantz to several re c16-bmr-005. Attached 9/10/15 memorandum and investigation re Gary | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|----------------------|---------------------------|------------------------|------------------------|
| | | | | Gerst negligence and conduct of individual. | | |
| 123 | RTP#5_ESI 0073927 | RTP#5_ESI 0073946 | | Collection of emails involving several re Sood at Hill. Attachments Dr. Sood email.docx, Dr. Sood correspondence 2016.pdf, Zaya v. Sood.pdf. | 401 and 403: Defendants object to the attachment which includes the Seventh Circuit case where Dr. Sood was a Defendant. | 401, 402: Defendants' objection actually pertains to Exhibit 123, which is an email chain relating to Wexford physician Dr. Sood. This chain begins with Dr. Dempsey, the acting agency Medical Director, stating inter alia that the death review of a certain prisoner at Hill CC who was under Dr. Sood's care was "quite concerning" and that he "want[s] to know why Dr. Sood is back at Hill . . ."; at the end of the chain, Dr. Dempsey is corresponding with IDOC deputy Director Kimberly Butler as to certain chronology relating to Dr. Sood and states "Dr. Sood is involved in another lawsuit Zaya v. Sood. . ." and summarizes the Seventh Circuit decision, which is also attached to the email chain. Since this decision was part of the material Dr. Dempsey was relying on in making his |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|----------------------|----------------------------|------------------------|-----------------------|
| | | | | | | comments and Defendants concede that the email chain is otherwise relevant (and the opinion is briefly summarized in the email in any event), the objection to its relevance is unfounded.  As to Defendants' FRE 403 objection, since the entire email chain is unflattering to Dr. Sood, the possibility of additional prejudice from the opinion itself is de minimis.  Dr. Sood was identified by both the First Court-Appointed Expert and now by the Second Court-Appointed Expert as a physician involved in problematic mortalities; both Court-Appointed Experts identify him as an example of the problems with the training and credentialing of Wexford physicians in IDOC.  That Defendants were independently aware of issues with Dr. Sood (including the Seventh Circuit decision to which Defendants object) is highly relevant to Plaintiffs' claim that Defendants have been |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | | | | | | deliberately indifferent to the problem of medical provider quality and outweighs any claim of prejudice. |
| 124 | RFP#5_Utilization Management 000001 | RFP#5_Utilization Management 000012 | Wexford Utilization Management Policies and Procedures. Region: Internal. | | | |
| 125 | Wexford #18 p. 1 | Wexford #18 p. 60 | Wexford Employee Handbook. | | | |
| 126 | Various | Various | | Various medical records of Debra Pattison. | | |
| 127 | | | | List of names with "Lippert" typed at the top. | 401: Defendants object as this document is not relevant. The list does not make an issue of consequence to the litigation more or less probable than without it. | 401, 402: This list was provided by Ellen Holzman Daley, Chief Procurement Officer for General Services for the State of Illinois, at her deposition; it is the list of persons who were permitted to see the responses to the Requests for Proposal for a comprehensive IDOC healthcare contract (in 2017, there were two responses). The list includes official capacity defendant Dr. Meeks as well as IDOC Assistant Director Taylor and IDOC CFO Brunk, inter alia. This is relevant to show that, at least as to the "technical" part of the |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|----------------------|---------------------------|------------------------|------------------------|
| | | | | | | proposals, which were opened and reviewed, Defendants were not unaware of the contents of these proposals before the RFP was withdrawn (and the current contract with Wexford extended). |
| 128 | | | | "Addendum" created by Katherine Tople. Title IDOC Comprehensive Medical and Mental Health Services. | | |
| 129 | | | | "Notice" created by Darrell R. Marcy. Title IDOC Comprehensive Medical and Mental Health Services. | | |
| 130 | RTP#5_ESI 0596316 | RTP#5_ESI 0596324 | | Email chain involving Lisa Prather, Steven Meeks, and several others re Priority! Dental chairs. | | |
| 131 | RTP#5_ESI 0590462 | RTP#5_ESI 0590462 | | Email from Joseph Ssenfuma to several re Pontiac CC. | | |
| 132 | RTP#5_ESI 0594689 | RTP#5_ESI 0594692 | | Email chain involving Lisa Prather, Kim Hugo, Mary Klein and others re ASR equipment. | | |
| 133 | Various | Various | | Collection of emails involving Sandra Funk, Edwin Bowen, John Baldwin and others re Help, Revised Agency Projects List, and Round Table - Western IL CC. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 134 | RTP#5_ESI 0616080 | RTP#5_ESI 0616080 | | Email chain between Jennifer Clem-Pierce and Jared Brunk re Wexford. | | |
| 135 | RTP#5_ESI 0622127 | RTP#5_ESI 0622128 | | Email chain involving Jared Brunk, Le Chen and Markus Veile re IDOC update/plans for Wexford Payments. | | |
| 136 | RTP#5_ESI 0616186 | RTP#5_ESI 0616187 | | Email chain involving Jared Brunk, Frank Lawrence, Charlotte Scott and others re Dr. Caldwell. | | |
| 137 | RTP#5_ESI 0621718 | RTP#5_ESI 0621718 | | Email from Le Chen to Jared Brunk and others re IDOC update/plans for Wexford payments. | | |
| 138 | RTP#5_ESI 0587784 | RTP#5_ESI 0587787 | | Email chain involving Steven Meeks, Gladyse Taylor, Jared Brunk and others re Medical RFP Q&A. | | |
| 139 | RTP#5_ESI 0621937 | RTP#5_ESI 0621938 | | Email chain involving Jared Brunk, Scott Harry, Andy Munemoto and others re Wexford pending vouchers. | | |
| 140 | Response to Eleventh Motion to Compel 000906 | Response to Eleventh Motion to Compel 000933 | | Facility budget and reconciliation sheets. | | |
| 141 | | | Declaration of Jared Brunk. | | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 142 | Response to Eleventh Motion to Compel 003422 | Response to Eleventh Motion to Compel 003485 | Illinois State Legislature FY 2019 Narrative Statement. | | | |
| 143 | RTP#5_ESI 0057894 | RTP#5_ESI 0057898 | | Email chain involving Tim Lawrence, Jared Brunk, John Baldwin, Bobby Shady and others re 1115 waiver - potential DOC contributions. | | |
| 144 | RTP#5_ESI 0607599 | RTP#5_ESI 0607851 | State of Illinois Department of Corrections Department-Wide Financial Audit for the year ended June 30, 2016 and Compliance Examination for the two years ended June 30, 2016. | | | |
| 145 | RTP#5_ESI 0095234 | RTP#5_ESI 0095272 | | Email from Tracey Williams to several re Gender informed practice assessment (GIPA). Attachment The Gender Informed Practice Assessment (GIPA) Summary of Findings & Recommendations for Logan CC. | | |
| 146 | | | John Howard Association Monitoring Visit to Stateville Northern Reception & Classification Center 2012. | | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|----------------------|---------------------------|------------------------|------------------------|
| 147 | RTP#5_ESI 0277733 | RTP#5_ESI 0277770 | | Email chain involving Louis Shicker, Marna Ross and others re JHA Response Due 2/22/13. Attachment Draft John Howard Association Monitoring Visit to Stateville Northern Reception & Classification Center 2012. | | |
| 148 | RTP#5_ESI 0079641 | RTP#5_ESI 0079774 | | Email from Nicole Wilson to John Baldwin re Final Report. Attachment July 2016 Gender Informed Practice Assessment (GIPA) for Logan CC. | | |
| 149 | | | John Howard Association Special Prison Monitoring Report. Overcrowded, Underresourced, and Ill-Conceived: Logan Correctional Center, 2013/14. | | | |
| 150 | | | John Howard Association Monitoring Visit to Dixon Correctional Center 2013. | | | |
| 151 | | | John Howard Association Monitoring Visit to Stateville Correctional Center 2013. | | | |
| 152 | | | John Howard Association Monitoring Visit to Pontiac Correctional Center 2013. | | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 153 | | | John Howard Association Monitoring Visit to Vandalia Correctional Center 2012. | | | |
| 154 | | | John Howard Association Monitoring Visit to Graham Correctional Center 2013. | | | |
| 155 | RTP#5_ES I 0098770 | RTP#5_ES I 0098797 | | Email from Kimberly Butler to several re JHA Report. Attachment John Howard Association 2016 Prison Monitoring Project Summary and Recommendations Part II. | | |
| 156 | RTP#5_ES I 0098798 | RTP#5_ES I 0098825 | | Email from Kimberly Butler to several re John Howard. Attachment John Howard Association 2016 Prison Monitoring Project Summary and Recommendations Part II. | | |
| 157 | | | | Email chain involving Melvin Hinton, Louis Shicker and others re Draft JHA Dixon Report. Attachment Draft John Howard Association 2013 Monitoring Visit to Dixon Correctional Center. | | |
| 158 | | | | Email from Lori Killam to several re Minutes - Monthly Staff Meeting. Attachment 12/16/14 Programs & Support | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | | | | Services Monthly Staff Meeting minutes. | | |
| G159 | | | | All monthly contract monitoring reports produced by defendants. | Defendants object. This hyperlink does not link to a single exhibit. | Plaintiffs do not understand the nature of this objection. This is a group exhibit of multiple documents. |
| G160 | | | | All CQI reports/minutes produced by defendants. | Defendants object. This hyperlink does not link to a single exhibit. | Plaintiffs do not understand the nature of this objection. This is a group exhibit of multiple documents. |
| G161 | | | [Exhibit number not used] | [Exhibit number not used] | Defendants object. No hyperlink given. | These are the IDOC-produced medical records of one of the named plaintiffs. For all exhibits except the plaintiff medical records (which are voluminous), in the course of preparing for this filling, Plaintiffs had provided Defendants with a flash drive containing an Excel version of this exhibit list together with all the exhibit documents hyperlinked to the Excel spreadsheet. Again, these records are voluminous and are in the possession of Defendants. However, Plaintiffs have now provided Defendants with the documents |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | | | | | | hyperlinked to the Excel list. |
| G162 | | | | All medical records of Don Lippert produced by defendants or obtained from IDOC | Defendants object. No hyperlink given. | These are the IDOC-produced medical records of one of the named plaintiffs. For all exhibits except the plaintiff medical records (which are voluminous), in the course of preparing for this filling, Plaintiffs had provided Defendants with a flash drive containing an Excel version of this exhibit list together with all the exhibit documents hyperlinked to the Excel spreadsheet. Again, these records are voluminous and are in the possession of Defendants. However, Plaintiffs have now provided Defendants with the documents hyperlinked to the Excel list. |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| G163 | | | | All medical records of Milam Martin produced by defendants or obtained from IDOC | Defendants object. No hyperlink given. | These are the IDOC-produced medical records of one of the named plaintiffs. For all exhibits except the plaintiff medical records (which are voluminous), in the course of preparing for this filling, Plaintiffs had provided Defendants with a flash drive containing an Excel version of this exhibit list together with all the exhibit documents hyperlinked to the Excel spreadsheet. Again, these records are voluminous and are in the possession of Defendants. However, Plaintiffs have now provided Defendants with the documents hyperlinked to the Excel list. |
| G164 | | | | All medical records of Debra Pattison produced by defendants or obtained from IDOC | Defendants object. No hyperlink given. | These are the IDOC-produced medical records of one of the named plaintiffs. For all exhibits except the plaintiff medical records (which are voluminous), in the course of preparing for this filling, Plaintiffs had provided Defendants with a flash drive containing an Excel version of this |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|---------------------|--------------------------|------------------------|----------------------|
| | | | | | | exhibit list together with all the exhibit documents hyperlinked to the Excel spreadsheet. Again, these records are voluminous and are in the possession of Defendants. However, Plaintiffs have now provided Defendants with the documents hyperlinked to the Excel list. |
| G165 | | | | All medical records of Lewis Rice produced by defendants or obtained from IDOC | Defendants object. No hyperlink given. | These are the IDOC-produced medical records of one of the named plaintiffs. For all exhibits except the plaintiff medical records (which are voluminous), in the course of preparing for this filling, Plaintiffs had provided Defendants with a flash drive containing an Excel version of this exhibit list together with all the exhibit documents hyperlinked to the Excel spreadsheet. Again, these records are voluminous and are in the possession of Defendants. However, Plaintiffs have now provided Defendants with the documents hyperlinked to the Excel list. |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| G166 | | | | All medical records of Ezell Thomas produced by defendants or obtained from IDOC | Defendants object. No hyperlink given. | These are the IDOC-produced medical records of one of the named plaintiffs. For all exhibits except the plaintiff medical records (which are voluminous), in the course of preparing for this filling, Plaintiffs had provided Defendants with a flash drive containing an Excel version of this exhibit list together with all the exhibit documents hyperlinked to the Excel spreadsheet. Again, these records are voluminous and are in the possession of Defendants. However, Plaintiffs have now provided Defendants with the documents hyperlinked to the Excel list. |
| 167 | RTP#5_ESI 0036999 | RTP#5_ESI 0037004 | | Email chain involving Cheri Laurent, Bryan Gleckler, Louis Shicker and others re Wexford key vacancies. Attachment Illinois Recruitment Activities through 4.1.14 providers.doc. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 168 | Lippert subp. #19 p. 275 | Lippert subp. #19 p. 1123 | | Collection of emails, documents and reports pursuant to request 19 of the 6/12/15 Wexford subpoena, "Documents relating to communications between Wexford and IDOC since July 1, 2012 related to complaints, concerns, problems, or issues related to the provision of healthcare to inmates, including performance or failures of performance under the Wexford/IDOC contract." | | |
| 169 | Subpoena to Wexford 10-10-17 Request 13 p. 9104 | Subpoena to Wexford 10-10-17 Request 13 p. 9203 | Packet 2: Pricing Proposal. IDOC Medical and Mental Health RFP 16-97556 bid by Wexford. | | | |
| 170 | Subpoena to Wexford 10-10-17 Request 13 p. 9204 | Subpoena to Wexford 10-10-17 Request 13 p. 11075 | | Wexford RFP bid schedules D1, D2, D3, D4 and E for each facility for each fiscal year 2018 to 2028. | | |
| 171 | | | 2016 State of Illinois Request for Proposal - IDOC Comprehensive Medical and Mental Health Services. | | | |
| 172 | Subpoena to Wexford 10-10-17 | Subpoena to Wexford 10-10-17 | Packet 1: Specifications / Qualifications / Statement of Work. IDOC Medical and Mental Health RFP | | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | Request 13 p. 12345 | Request 13 p. 13604 | 16-97556 bid by Wexford [excerpts]. | | | |
| 173 | Subpoena to Wexford 10-10-17 Request 13 p. 11328 | Subpoena to Wexford 10-10-17 Request 13 p. 11347 | Packet 3: Offeror's Offer. IDOC Medical and Mental Health RFP 16-97556 bid by Wexford. | | | |
| 174 | RTP#5_U PDATED_ SHICKER RFP 000001 | RTP#5_U PDATED_ SHICKER RFP 000109 | | Draft v.15.2 State of Illinois Request for Proposal. | | |
| 175 | RTP#5_U PDATED_ SHICKER RFP 000110 | RTP#5_U PDATED_ SHICKER RFP 000113 | | PDF titled "New contract - Louis Shicker's comments - meeting results brg." | | |
| 176 | RTP#5_U PDATED_ SHICKER RFP 000116 | RTP#5_U PDATED_ SHICKER RFP 000117 | | PDF titled "Shicker RFP Recommendations." | | |
| 177 | Subpoena to Wexford 10-17-17 Request 12 p. 11585 | Subpoena to Wexford 10-17-17 Request 12 p. 11610 | | Budget schedule Es for each facility 5/1/16 to 4/30/17. | | |
| 178 | RTP#5_ES I 0006569 | RTP#5_ES I 0006598 | | Budget schedule Es for each facility 5/1/17 to 4/30/18. | | |
| 179 | Subpoena to Wexford 10-17-17 Request 12 p. 11611 | Subpoena to Wexford 10-17-17 Request 12 p. 11640 | | Budget schedule Es for each facility 5/1/18 to 4/30/19. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 180 | CONTRA CT 00001 | CONTRA CT 00162 | Contract for Services between Illinois Healthcare and Family Services Illinois Dept. of Corrections and Wexford Health Sources, Inc. 2006-05-001. | | | |
| 181 | CONTRA CT 00163 | CONTRA CT 00165 | Amendment 1 to Contract for Services between Illinois Healthcare and Family Services Illinois Dept. of Corrections and Wexford Health Sources, Inc. 2006-05-001. | | | |
| 182 | CONTRA CT 00166 | CONTRA CT 00166 | Amendment 2 to Contract for Services between Illinois Healthcare and Family Services Illinois Dept. of Corrections and Wexford Health Sources, Inc. 2006-05-001. | | | |
| 183 | CONTRA CT 00199 | CONTRA CT 00240 | Contract Renewal 1 to Contract for Services between Illinois Healthcare and Family Services Illinois Dept. of Corrections and Wexford Health Sources, Inc. 2006-05-001. | | | |
| 184 | CONTRA CT 00241 | CONTRA CT 00280 | Contract Renewal 2 to Contract for Services between Illinois Healthcare and Family Services Illinois Dept. of Corrections and Wexford | | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | | | Health Sources, Inc. 2006-05-001. | | | |
| 185 | CONTRACT 00281 | CONTRACT 00292 | | Contract Obligation documents and signed contract amendment administrative orders. | | |
| 186 | Wexford #11 p. 1 | Wexford #11 p. 12 | State of Illinois Contract Amendment. | | | |
| 187 | RFP#5_Wexford Contracts 000560 | RFP#5_Wexford Contracts 000598 | State of Illinois Contract Renewal of Healthcare Services. | | | |
| 188 | Subpoena to Wexford 10-10-17 Request 12 p. 11285 | Subpoena to Wexford 10-10-17 Request 12 p. 11297 | State of Illinois Contract Renewal of Healthcare Services. | | | |
| 189 | Subpoena to Wexford 10-10-17 Request 12 p. 507 | Subpoena to Wexford 10-10-17 Request 12 p. 519 | State of Illinois Contract Renewal of Healthcare Services. | | | |
| 190 | Subpoena to Wexford 10-10-17 Request 12 p. 498 | Subpoena to Wexford 10-10-17 Request 12 p. 506 | State of Illinois Contract Amendment. | | | |
| 191 | Subpoena to Wexford 10-10-17 Request 12 p. 11298 | Subpoena to Wexford 10-10-17 Request 12 p. 11310 | 2018 State of Illinois Contract Renewal of Healthcare Services. | | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 192 | RFP#5_Wexford Contracts 000001 | RFP#5_Wexford Contracts 000293 | Contract for Services between Illinois Healthcare and Family Services Illinois Dept. of Corrections and Wexford Health Sources, Inc. 2006-05-001. | | | |
| 193 | RFP#5_Wexford Contracts 000294 | RFP#5_Wexford Contracts 000559 | 2011 Contract Between Wexford and IDOC. | | | |
| 194 | Response to Eleventh Motion to Compel 000390 | Response to Eleventh Motion to Compel 000390 | Quarterly Reconciliation Report - Wexford Health Sources - 10/1/15 to 12/31/15 - Stateville RC Correctional Center. | | | |
| 195 | Response to Eleventh Motion to Compel 000391 | Response to Eleventh Motion to Compel 000391 | Quarterly Reconciliation Report - Wexford Health Sources - 10/1/15 to 12/31/15 - Stateville Correctional Center. | | | |
| 196 | Response to Eleventh Motion to Compel 000392 | Response to Eleventh Motion to Compel 000392 | Quarterly Reconciliation Report - Wexford Health Sources - 1/1/16 to 3/31/16 - Stateville RC Correctional Center. | | | |
| 197 | Response to Eleventh Motion to Compel 000392 | Response to Eleventh Motion to Compel 000392 | Quarterly Reconciliation Report - Wexford Health Sources - 1/1/16 to 3/31/16 - Stateville Correctional Center. | | | |
| 198 | Response to Eleventh Motion to Compel 000394 | Response to Eleventh Motion to Compel 000431 | Illinois State Legislature FY 2016 Narrative Statement. | | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|---------------------|---------------------------|------------------------|------------------------|
| 199 | Response to Eleventh Motion to Compel 000431 | Response to Eleventh Motion to Compel 000451 | Illinois State Legislature FY 2015 Narrative Statement. | | | |
| 200 | Response to Eleventh Motion to Compel 000453 | Response to Eleventh Motion to Compel 000473 | Illinois State Legislature FY 2016 Narrative Statement. | | | |
| 201 | Response to Eleventh Motion to Compel 000474 | Response to Eleventh Motion to Compel 000492 | Illinois State Legislature FY 2017 Narrative Statement. | | | |
| 202 | Response to Eleventh Motion to Compel 000512 | Response to Eleventh Motion to Compel 000538 | | Spreadsheets of quarterly payments / reconciliations due to Wexford for each facility for FY 2011. | | |
| 203 | Response to Eleventh Motion to Compel 000539 | Response to Eleventh Motion to Compel 000583 | IDOC Fiscal Year 2011 ISL Narrative. | | | |
| 204 | Response to Eleventh Motion to Compel 000584 | Response to Eleventh Motion to Compel 000613 | | Spreadsheets of quarterly payments / reconciliations due to Wexford for each facility for FY 2012. | | |
| 205 | Response to Eleventh Motion to Compel 000614 | Response to Eleventh Motion to Compel 000684 | IDOC Fiscal Year 2012 ISL Narrative. | | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 206 | Response to Eleventh Motion to Compel 000685 | Response to Eleventh Motion to Compel 000713 | | Spreadsheets of quarterly payments / reconciliations due to Wexford for each facility for FY 2013. | | |
| 207 | Response to Eleventh Motion to Compel 000714 | Response to Eleventh Motion to Compel 000779 | IDOC Fiscal Year 2013 ISL Narrative. | | | |
| 208 | Response to Eleventh Motion to Compel 000780 | Response to Eleventh Motion to Compel 000805 | | Spreadsheets of quarterly payments / reconciliations due to Wexford for each facility for FY 2014. | | |
| 209 | Response to Eleventh Motion to Compel 000806 | Response to Eleventh Motion to Compel 000851 | IDOC Fiscal Year 2014 ISL Narrative. | | | |
| 210 | Response to Eleventh Motion to Compel 000852 | Response to Eleventh Motion to Compel 000877 | | Spreadsheets of quarterly payments / reconciliations due to Wexford for each facility for FY 2015. | | |
| 211 | Response to Eleventh Motion to Compel 000878 | Response to Eleventh Motion to Compel 000905 | | Spreadsheets of quarterly payments / reconciliations due to Wexford for each facility for FY 2016. | | |
| 212 | Response to Eleventh Motion to Compel 000906 | Response to Eleventh Motion to Compel 000933 | | Spreadsheets of quarterly payments / reconciliations due to Wexford for each facility for FY 2017. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 213 | Response to Eleventh Motion to Compel 000934 | Response to Eleventh Motion to Compel 000952 | | Responses to ISL questions for FY 2017. | | |
| 214 | Response to Eleventh Motion to Compel 000953 | Response to Eleventh Motion to Compel 001014 | IDOC Fiscal Year 2018 ISL Narrative. | | | |
| 215 | Response to Eleventh Motion to Compel 001015 | Response to Eleventh Motion to Compel 001019 | | Financial spreadsheets. Filename "High Level All Sites Pymnts vs Inv Q1 to Q4 FY15." | | |
| 216 | Response to Eleventh Motion to Compel 001020 | Response to Eleventh Motion to Compel 002332 | | Various spreadsheets. Filename "IDOC Appropriation 05-1-15 to 7-30-15." | | |
| 217 | Response to Eleventh Motion to Compel 002333 | Response to Eleventh Motion to Compel 002340 | | Various financial spreadsheets. Filename "IL HFS - Summary - CY1-5." | | |
| 218 | | | | Password-protected Excel spreadsheet information regarding bills paid from the IDOC hospital appropriations fund and which were processed for payment between 7/1/09 and 6/30/18. The password for this document is IDOCclaims10_18. This | | |

57

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | | | | is responsive to the Plaintiffs' Eleventh Motion to Compel. | | |
| 219 | | | | Cover email from Kevin Lovellette to Camille Bennett and others attaching password-protected Excel spreadsheet information regarding bills paid from the IDOC hospital appropriations fund and which were processed for payment between 7/1/09 and 6/30/18. | | |
| 220 | | | | Email from John Hayes to Camille Bennett confirming that "the spreadsheet you attached covers all paid hospitalization claims through the time period in the spreadsheet." The spreadsheet refers to the password-protected Excel spreadsheet information regarding bills paid from the IDOC hospital appropriations fund and which were processed for payment between 7/1/09 and 6/30/18 produced on 2/14/18. | | |
| 221 | | | | Excel file of spreadsheets spanning FY10-FY18 | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|---------------------|--------------------------|-----------------------|----------------------|
| | | | | showing medical expenditures. | | |
| 222 | RTP#5_ES I 0285848 | RTP#5_ES I 0285849 | | Email chain between Marna Ross and Louis Shicker re questions and FYI's. | | |
| 223 | RTP#5_ES I 0279438 | RTP#5_ES I 0279454 | | Email from Lisa Moss / Louis Shicker to several re Health Services Quarterly meeting 03-02-11. Attaches 3/2/11 Quarterly Health Services Meeting minutes. | | |
| 224 | RTP#5_ES I 0218301 | RTP#5_ES I 0218339 | | Email from Steven Meeks to several re Sheridan Caseload. Attachment Sheridan updated MD line scheduled appts.xls. | | |
| 225 | RTP#5_ES I 0169997 | RTP#5_ES I 0170005 | | Email from Louis Shicker to several re Mortality conferences. Attachments Mortality Conference Reports July 31 and June 30. | | |
| 226 | RTP#5_ES I 0130886 | RTP#5_ES I 0130886 | | Email chain involving Doug Mote, Victor Calloway, Marna Ross and others re Dr. Obaisi, infirmary admits, medical permits, etc. | | |
| 227 | RTP#5_ES I 0068580 | RTP#5_ES I 0068585 | | Email from Louis Shicker to several re Mortality Reviews. Attachment mortality conference February 5, 2016.docx. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 228 | IDOC Update 001020 | IDOC Update 001021 | | Chain of emails involving Amber Allen, Louis Shicker and others re timeliness of UIC appointments. | | |
| 229 | IDOC Update 000922 | IDOC Update 000923 | | Chain of emails involving Cheri Laurent, Louis Shicker and others re Dental. | | |
| 230 | IDOC Update 000843 | IDOC Update 000858 | | Chain of emails involving Louis Shicker, Juliana Chan, Marna Ross and others re Pontiac - Missing HCV and HIV doses. | | |
| 231 | IDOC Update 003350 | IDOC Update 003352 | | Email chain involving Louis Shicker, Hector Garcia, Cheri Laurent and others re Denials for Stateville CC. | | |
| 232 | RTP#5_ESI 0095723 | RTP#5_ESI 0095724 | | Email chain involving Steven meeks, Lisa Prather, Kelly Moeller and others re Wexford MD hours. | | |
| 233 | RTP#5_ESI 0096355 | RTP#5_ESI 0096361 | | Email from Althea Williams to Lisa Prather, Michael Dempsey and Steven Meeks re Office of Health Services Meeting Minutes 1/20/17. Attachment Office of Health Services 1/20/17 teleconference minutes. | | |
| 234 | RTP#5_ESI 0095934 | RTP#5_ESI 0095937 | | Email from Lois Lindorff to several re Directors | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|----------------------|---------------------------|------------------------|------------------------|
| | | | | report. Attachment Directors report.doc. | | |
| 235 | RTP#5_ES I 0097341 | RTP#5_ES I 0097342 | | Email chain involving Donald Mills, Jackie Mitchell, Walter Nicholson, Steven Meeks, Camile Lindsay and others re Murphy M42534. | | |
| 236 | RTP#5_ES I 0048190 | RTP#5_ES I 0048192 | | Email involving Cindy Hobrock, Mark Williams and Lois Lindorff re Nursing assignments 2017. Attachment 3/8/17 memorandum to nursing staff re nursing assignments. | | |
| 237 | RTP#5_ES I 0381134 | RTP#5_ES I 0381135 | | Email chain involving Joseph Ssenfuma, Michael Dempsey, Melissa Badowski and others re Issues at Pontiac. | | |
| 238 | RTP#5_ES I 0246166 | RTP#5_ES I 0246166 | | Email from Mike Atchison to Gladyse Taylor, Kimberly Butler, Kim Hugo and Edwin Bowen re Western Illinois infirmary conditions. | | |
| 239 | RTP#5_ES I 0245613 | RTP#5_ES I 0245613 | | Email from Lois Lindorff to Cindy Hobrock and Tina Jepsen re Repair. | | |
| 240 | | | | Email chain involving James Reinhart, Theodore Chung, Emily Mattison and others re Epars for IDOC Health Services. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 241 | RTP#5_ESI 0055519 | RTP#5_ESI 0055540 | | Email chain involving Eric Dailey, Jan Bryan, Nick Little and others re Wexford draft language changes. Attachments contract change requests 3-9-11.doc and Exhibit IV Wexford Health Revision #2.doc. | | |
| 242 | | | | Emails from Eric Dailey to Jan Bryan, Bryan Gleckler Pat Frueh re Threshold reconciliation and phone call with Nick Little this morning. Contains handwritten notes. | | |
| 243 | RTP#5_ESI 0257067 | RTP#5_ESI 0257067 | | Email chain involving Kim Hugo, George Penny and others re Infection control nurse. | | |
| 244 | RTP#5_ESI 0107873 | RTP#5_ESI 0107877 | | Email chain involving Cindy Hobrock, Tracey Titus and Brent Gibson re Studies for QI. | | |
| 245 | RTP#5_ESI 0114274 | RTP#5_ESI 0114274 | | Email from Shawn Cates to Clara Charron, Louis Shicker, Lisa Johnson and Cindy Hobrock re Logan infirmary call light system. | | |
| 246 | Subpoena to Wexford 10-10-17 Request 16 p. 550 | Subpoena to Wexford 10-10-17 Request 16 p. 550 | IDOC Facilities Lacking a Permanent Medical Director from 7/1/15 to 11/26/17. | | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 247 | RTP#5_ESI 0319588 | RTP#5_ESI 0319594 | | Email chain involving Le Chen, Jared Brunk, Sam Yi and others re Series 2016-12 Agency Acknowledgment Letter. | | |
| 248 | | | | Illinois Medical Vacancy report with ASR's as of 6/18/18 [sent directly to Dr. Puisis by Nicholas Staley on 6/18/18]. | | |
| 249 | RTP#5_Healthcare Management_IDOC 000064 | RTP#5_Healthcare Management_IDOC 000069 | IDOC AD 04.03.100 effective 9/1/13 re Offender Medical Records. | | | |
| 250 | RTP#5_Healthcare Management_IDOC 000070 | RTP#5_Healthcare Management_IDOC 000070 | IDOC AD 04.03.100 Amendment effective 3/1/14 re Offender Medical Records. | | | |
| 251 | RTP#5_UPDATED_ADs & IDs_IDOC 000376 | RTP#5_UPDATED_ADs & IDs_IDOC 000383 | IDOC AD 04.03.101 effective 6/1/17 re Offender Physical Examination. | | | |
| 252 | RTP#5_Healthcare Management_IDOC 000079 | RTP#5_Healthcare Management_IDOC 000084 | IDOC AD 04.03.102 effective 9/1/02 last amended 1/1/12 re Dental Care for Offenders. | | | |
| 253 | RTP#5_UPDATED_ADs & IDs_IDOC 000384 | RTP#5_UPDATED_ADs & IDs_IDOC 000390 | IDOC AD 04.03.103 effective 6/1/17 re Offender Health Care Services. | | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 254 | RTP#5_Healthcare Management_IDOC 000093 | RTP#5_Healthcare Management_IDOC 000097 | IDOC AD 04.03.104 effective 5/1/13 re Evaluations of Offenders with Gender Identity Disorders. | | | |
| 255 | RTP#5_Healthcare Management_IDOC 000097 | RTP#5_Healthcare Management_IDOC 000101 | IDOC AD 04.03.105 effective 10/1/14 re Chronic Illnesses. | | | |
| 256 | RTP#5_UPDATED_ADs & IDs_IDOC 000390 | RTP#5_UPDATED_ADs & IDs_IDOC 000394 | IDOC AD 04.03.108 effective 9/1/17 re Response to Medical Emergencies. | | | |
| 257 | RTP#5_Healthcare Management_IDOC 000107 | RTP#5_Healthcare Management_IDOC 000109 | IDOC AD 04.03.109 effective 9/1/02 re Living Will. | | | |
| 258 | RTP#5_Healthcare Management_IDOC 000110 | RTP#5_Healthcare Management_IDOC 000115 | IDOC AD 04.03.110 effective 8/1/10 re Control of Medications and Medical Instruments. | | | |
| 259 | RTP#5_Healthcare Management_IDOC 000116 | RTP#5_Healthcare Management_IDOC 000118 | IDOC AD 04.03.111 effective 9/1/02 re Control of Medications and Medical Instruments in Transition Centers. | | | |
| 260 | RTP#5_Healthcare Management_IDOC 000119 | RTP#5_Healthcare Management_IDOC 000121 | IDOC AD 04.03.112 effective 9/1/02 re Offender Medical and Dental Services at Transition Centers. | | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 261 | RTP#5_He althcare Manageme nt_IDOC 000122 | RTP#5_He althcare Manageme nt_IDOC 000128 | IDOC AD 04.03.115 effective 2/1/14 re HIV Disease. | | | |
| 262 | RTP#5_He althcare Manageme nt_IDOC 000129 | RTP#5_He althcare Manageme nt_IDOC 000136 | IDOC AD 04.03.116 effective 9/1/02 re Bloodborne Pathogens. | | | |
| 263 | RTP#5_He althcare Manageme nt_IDOC 000137 | RTP#5_He althcare Manageme nt_IDOC 000140 | IDOC AD 04.03.120 effective 9/1/02 re Offender Infirmary Services. | | | |
| 264 | RTP#5_He althcare Manageme nt_IDOC 000141 | RTP#5_He althcare Manageme nt_IDOC 000143 | IDOC AD 04.03.121 effective 9/1/02 re Treatment Protocols. | | | |
| 265 | RTP#5_He althcare Manageme nt_IDOC 000144 | RTP#5_He althcare Manageme nt_IDOC 000146 | IDOC AD 04.03.123 effective 9/1/12 amended 12/1/13 re Offender Contact Lenses. | | | |
| 266 | RTP#5_He althcare Manageme nt_IDOC 000147 | RTP#5_He althcare Manageme nt_IDOC 000157 | IDOC AD 04.03.125 effective 4/1/07 re Quality Improvement Program. | | | |
| 267 | RTP#5_He althcare Manageme nt_IDOC 000158 | RTP#5_He althcare Manageme nt_IDOC 000160 | IDOC AD 04.03.135 effective 9/1/02 re Employee Use of Health Care Services. | | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 268 | RTP#5_Healthcare Management_IDOC 000161 | RTP#5_Healthcare Management_IDOC 000163 | IDOC AD 04.03.140 effective 9/1/02 re Training and Counseling on Communicable Diseases. | | | |
| 269 | RTP#5_Healthcare Management_IDOC 000164 | RTP#5_Healthcare Management_IDOC 000168 | IDOC AD 05.07.101 effective 11/1/05 re Adult Process. | | | |
| 270 | RTP#5_Healthcare Management_Big Muddy 000117 | RTP#5_Healthcare Management_Big Muddy 000122 | Big Muddy ID 04.03.102 effective 1/1/12 re Dental Care. | | | |
| 271 | RTP#5_Healthcare Management_Big Muddy 000123 | RTP#5_Healthcare Management_Big Muddy 000131 | Big Muddy ID 04.03.103 effective 8/1/15 re Health Care Services for Offenders. | | | |
| 272 | RTP#5_UPDATED_ADs & IDs_Big Muddy 000016 | RTP#5_UPDATED_ADs & IDs_Big Muddy 000021 | Big Muddy ID 04.03.104 effective 12/1/16 re Evaluation of Offenders with Gender Identification Problems. | | | |
| 273 | RTP#5_Healthcare Management_Big Muddy 000138 | RTP#5_Healthcare Management_Big Muddy 000143 | Big Muddy ID 04.03.106 effective 8/1/1 re Hunger Strike or Self Injurious Behavior. | | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 274 | RTP#5_Healthcare Management_Big Muddy 000163 | RTP#5_Healthcare Management_Big Muddy 000167 | Big Muddy ID 04.03.108 effective 4/1/16 re Response to Medical Emergencies. | | | |
| 275 | RTP#5_Healthcare Management_Big Muddy 000168 | RTP#5_Healthcare Management_Big Muddy 000175 | Big Muddy ID 04.03.110 effective 4/1/15 re Control of Medications and Medical Instruments. | | | |
| 276 | RTP#5_Healthcare Management_Big Muddy 000176 | RTP#5_Healthcare Management_Big Muddy 000182 | Big Muddy ID 04.03.115 effective 3/1/15 re HIV Disease. | | | |
| 277 | RTP#5_Healthcare Management_Big Muddy 000183 | RTP#5_Healthcare Management_Big Muddy 000188 | Big Muddy ID 04.03.116 effective 10/1/09 re Bloodborne Pathogens. | | | |
| 278 | RTP#5_Healthcare Management_Big Muddy 000189 | RTP#5_Healthcare Management_Big Muddy 000194 | Big Muddy ID 04.03.120 effective 8/1/08 re Infirmary Services. | | | |
| 279 | RTP#5_Healthcare Management_Big Muddy 000195 | RTP#5_Healthcare Management_Big Muddy 000197 | Big Muddy ID 04.03.121 effective 10/1/13 re Treatment Protocols. | | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 280 | RTP#5_Healthcare Management_Big Muddy 000198 | RTP#5_Healthcare Management_Big Muddy 000207 | Big Muddy ID 04.03.125 effective 5/1/14 re Quality Improvement Programs. | | | |
| 281 | RTP#5_Healthcare Management_Big Muddy 000208 | RTP#5_Healthcare Management_Big Muddy 000209 | Big Muddy ID 04.03.140 effective 10/1/11 re Training and Counseling on Communicable Diseases. | | | |
| 282 | RTP#5_Healthcare Management_Dixon 000088 | RTP#5_Healthcare Management_Dixon 000104 | Dixon ID 04.03.103 effective 8/1/14 re Offender Health Care Services. | | | |
| 283 | RTP#5_Healthcare Management_Dixon 000104 | RTP#5_Healthcare Management_Dixon 000112 | Dixon ID 04.03.104 effective 6/1/13 re Evaluation of Offenders with Gender Identification Disorders. | | | |
| 284 | RTP#5_Healthcare Management_Dixon 000113 | RTP#5_Healthcare Management_Dixon 000122 | Dixon ID 04.03.108 effective 7/1/15 re Response to Medical Emergencies. | | | |
| 285 | RTP#5_Healthcare Management_Dixon 000123 | RTP#5_Healthcare Management_Dixon 000133 | Dixon ID 04.03.110 effective 9/1/11 re Control of Medications and Medical Instruments. | | | |
| 286 | RTP#5_Healthcare Manageme | RTP#5_Healthcare Manageme | Dixon ID 04.03.115 effective 3/1/14 re HIV Disease. | | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | nt_Dixon 000134 | nt_Dixon 000142 | | | | |
| 287 | RTP#5_Healthcare Management_Dixon 000143 | RTP#5_Healthcare Management_Dixon 000151 | Dixon ID 04.03.116 effective 10/1/13 re Bloodborne Pathogens. | | | |
| 288 | RTP#5_Healthcare Management_Dixon 000152 | RTP#5_Healthcare Management_Dixon 000161 | Dixon ID 04.03.120 effective 5/1/14 re Offender Infirmary Services. | | | |
| 289 | IDOC UPDATE 001426 | IDOC UPDATE 001428 | Dixon ID 04.03.121 effective 9/1/15 re Treatment Protocols. | | | |
| 290 | IDOC UPDATE 001220 | IDOC UPDATE 001226 | IL River ID 04.03.102 effective 11/1/15 re Dental Care for Offenders. | | | |
| 291 | IDOC UPDATE 001274 | IDOC UPDATE 001283 | IL River ID 04.03.103 effective 11/1/15 re Offender Health Care Services. | | | |
| 292 | IDOC UPDATE 001306 | IDOC UPDATE 001311 | IL River ID 04.03.108 effective 6/1/15 re Response to Medical Emergencies. | | | |
| 293 | IDOC UPDATE 001356 | IDOC UPDATE 001363 | IL River ID 04.03.115 effective 4/1/14 re HIV Disease. | | | |
| 294 | IDOC UPDATE 001415 | IDOC UPDATE 001422 | IL River ID 04.03.120 effective 11/1/15 re Infirmary Services. | | | |
| 295 | IDOC UPDATE 001435 | IDOC UPDATE 001445 | IL River ID 04.03.125 effective 5/1/13 re Quality Improvement Program. | | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 296 | RTP#5_UPDATED_ADs & IDs_IRCC 000081 | RTP#5_UPDATED_ADs & IDs_IRCC 000089 | IL River ID 04.03.110 effective 7/1/17 re Control of Medications and Medical Instruments. | | | |
| 297 | RTP#5_UPDATED_ADs & IDs_IRCC 000100 | RTP#5_UPDATED_ADs & IDs_IRCC 000109 | IL River ID 04.03.116 effective 10/1/12 re Bloodborne Pathogens. | | | |
| 298 | RTP#5_UPDATED_ADs & IDs_IRCC 000145 | RTP#5_UPDATED_ADs & IDs_IRCC 000150 | IL River ID 04.03.121 effective 10/1/02 re Treatment Protocols. | | | |
| 299 | RTP#5_UPDATED_ADs & IDs_IRCC 000164 | RTP#5_UPDATED_ADs & IDs_IRCC 000168 | IL River ID 04.03.140 effective 10/1/02 re Training and Counseling on Communicable Diseases. | | | |
| 300 | IDOC UPDATE 001074 | IDOC UPDATE 001081 | Lawrence ID 04.03.103 effective 8/1/14 re Offender Health Care Services. | | | |
| 301 | IDOC UPDATE 001096 | IDOC UPDATE 001102 | Lawrence ID 04.03.108 effective 6/1/15 re Response to Medical Emergencies. | | | |
| 302 | IDOC UPDATE 001118 | IDOC UPDATE 001123 | Lawrence ID 04.03.115 effective 3/1/14 re HIV Disease. | | | |
| 303 | IDOC UPDATE 001132 | IDOC UPDATE 001138 | Lawrence ID 04.03.116 effective 4/1/13 re Bloodborne Pathogens. | | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 304 | IDOC UPDATE 001157 | IDOC UPDATE 001161 | Lawrence ID 04.03.121 effective 10/1/15 re Treatment Protocols. | | | |
| 305 | RTP#5_UPDATED_ADs & IDs_Logan 000008 | RTP#5_UPDATED_ADs & IDs_Logan 000015 | Logan ID 04.03.103 effective 7/13/17 re Health Care Services for Offenders. | | | |
| 306 | IDOC UPDATE 001086 | IDOC UPDATE 001091 | Logan ID 04.03.104 effective 5/15/13 re Evaluations of Offenders with Gender Identification Problems. | | | |
| 307 | RTP#5_UPDATED_ADs & IDs_Logan 000016 | RTP#5_UPDATED_ADs & IDs_Logan 000022 | Logan ID 04.03.108 effective 9/5/17 re Response to Medical Emergencies. | | | |
| 308 | RTP#5_Healthcare Management_Logan 000053 | RTP#5_Healthcare Management_Logan 000059 | Logan ID 04.03.110 effective 11/10/11 re Control of Medications / Syringes / Needles / Medical Instruments. | | | |
| 309 | RTP#5_Healthcare Management_Logan 000060 | RTP#5_Healthcare Management_Logan 000066 | Logan ID 04.03.115 effective 8/15/11 re HIV Disease. | | | |
| 310 | RTP#5_Healthcare Management_Logan 000067 | RTP#5_Healthcare Management_Logan 000073 | Logan ID 04.03.116 effective 8/15/10 re Bloodborne Pathogens. | | | |
| 311 | RTP#5_Healthcare Management | RTP#5_Healthcare Management | Logan ID 04.03.120 effective 3/9/16 re | | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|---------------------|---------------------------|------------------------|----------------------|
| | nt_Logan 000074 | nt_Logan 000078 | Offender Infirmary Services. | | | |
| 312 | RTP#5_He althcare Manageme nt_Logan 000079 | RTP#5_He althcare Manageme nt_Logan 000081 | Logan ID 04.03.121 effective 9/9/09 re Treatment Protocols. | | | |
| 313 | RTP#5_U PDATED_ ADs & IDs_Menar d 000001 | RTP#5_U PDATED_ ADs & IDs_Menar d 000013 | Menard ID 04.03.103 effective 5/1/16 re Offender Health Care Services. | | | |
| 314 | RTP#5_U PDATED_ ADs & IDs_Menar d 000014 | RTP#5_U PDATED_ ADs & IDs_Menar d 000019 | Menard ID 04.03.104 effective 5/1/13 re Evaluations of Offenders with Gender Identification Disorders. | | | |
| 315 | RTP#5_U PDATED_ ADs & IDs_Menar d 000029 | RTP#5_U PDATED_ ADs & IDs_Menar d 000037 | Menard ID 04.03.108 effective 4/1/17 re Response to Medical Emergencies. | | | |
| 316 | RTP#5_U PDATED_ ADs & IDs_Menar d 000038 | RTP#5_U PDATED_ ADs & IDs_Menar d 000055 | Menard ID 04.03.110 effective 4/1/17 re Control of Medications and Medical Instruments. | | | |
| 317 | RTP#5_U PDATED_ ADs & IDs_Menar d 000056 | RTP#5_U PDATED_ ADs & IDs_Menar d 000063 | Menard ID 04.03.115 effective 3/1/14 re HIV Disease. | | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|---------------------|---------------------------|------------------------|----------------------|
| 318 | RTP#5_UPDATED_ADs & IDs_Menard 000064 | RTP#5_UPDATED_ADs & IDs_Menard 000073 | Menard ID 04.03.116 effective 9/1/15 re Bloodborne Pathogens. | | | |
| 319 | RTP#5_UPDATED_ADs & IDs_Menard 000074 | RTP#5_UPDATED_ADs & IDs_Menard 000081 | Menard ID 04.03.120 effective 5/1/15 re Offender Infirmary Service. | | | |
| 320 | RTP#5_UPDATED_ADs & IDs_Menard 000082 | RTP#5_UPDATED_ADs & IDs_Menard 000084 | Menard ID 04.03.121 effective 10/1/14 re Treatment Protocols. | | | |
| 321 | RTP#5_UPDATED_ADs & IDs_NRC 000009 | RTP#5_UPDATED_ADs & IDs_NRC 000018 | Stateville ID 04.03.103K3 effective 6/1/17 re Offender Health Care Services. | | | |
| 322 | RTP#5_UPDATED_ADs & IDs_NRC 000027 | RTP#5_UPDATED_ADs & IDs_NRC 000030 | Stateville ID 04.03.104K3 effective 2/1/17 re Evaluation of Offenders with Gender Identification Problems. | | | |
| 323 | RTP#5_UPDATED_ADs & IDs_NRC 000035 | RTP#5_UPDATED_ADs & IDs_NRC 000038 | Stateville ID 04.03.108 effective 9/1/17 re Response to Medical Emergencies. | | | |
| 324 | RTP#5_UPDATED_ADs & IDs_NRC 000051 | RTP#5_UPDATED_ADs & IDs_NRC 000058 | Stateville ID 04.03.110 effective 6/1/17 re Control of Medications and Medical Instruments. | | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 325 | RTP#5_UPDATED_ADs & IDs_NRC 000075 | RTP#5_UPDATED_ADs & IDs_NRC 000082 | Stateville ID 04.03.115 effective 11/1/16 re HIV Disease. | | | |
| 326 | RTP#5_UPDATED_ADs & IDs_NRC 000095 | RTP#5_UPDATED_ADs & IDs_NRC 000100 | Stateville ID 04.03.116 effective 11/1/16 re Bloodborne Pathogens. | | | |
| 327 | RTP#5_UPDATED_ADs & IDs_NRC 000104 | RTP#5_UPDATED_ADs & IDs_NRC 000106 | Stateville ID 04.03.120 effective 2/1/17 re Offender Infirmary Services. | | | |
| 328 | RTP#5_UPDATED_ADs & IDs_NRC 000115 | RTP#5_UPDATED_ADs & IDs_NRC 000118 | Stateville ID 04.03.121K3 effective 4/1/17 re Treatment Protocols. | | | |
| 329 | RTP#5_UPDATED_ADs & IDs_Pontiac 000014 | RTP#5_UPDATED_ADs & IDs_Pontiac 000018 | Pontiac ID 04.03.108 effective 2/1/16 re Response to Medical Emergencies. | | | |
| 330 | RTP#5_UPDATED_ADs & IDs_Pontiac 000019 | RTP#5_UPDATED_ADs & IDs_Pontiac 000034 | Pontiac ID 04.03.110 effective 6/1/15 re Control of Medications and Medical Instruments. | | | |
| 331 | RTP#5_UPDATED_ADs & IDs_Pontiac 000035 | RTP#5_UPDATED_ADs & IDs_Pontiac 000041 | Pontiac ID 04.03.115 effective 3/1/14 re HIV Disease. | | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|----------------------|---------------------------|------------------------|------------------------|
| 332 | RTP#5_UPDATED_ADs & IDs_Pontiac 000042 | RTP#5_UPDATED_ADs & IDs_Pontiac 000050 | Pontiac ID 04.03.116 effective 3/1/14 re Bloodborne Pathogens. | | | |
| 333 | RTP#5_UPDATED_ADs & IDs_Pontiac 000051 | RTP#5_UPDATED_ADs & IDs_Pontiac 000055 | Pontiac ID 04.03.120 effective 3/1/14 re Offender Infirmary Services. | | | |
| 334 | RTP#5_UPDATED_ADs & IDs_Pontiac 000056 | RTP#5_UPDATED_ADs & IDs_Pontiac 000058 | Pontiac ID 04.03.121 effective 3/1/14 re Treatment Protocols. | | | |
| 335 | RTP#5_UPDATED_ADs & IDs_Pontiac 000059 | RTP#5_UPDATED_ADs & IDs_Pontiac 000071 | Pontiac ID 04.03.103 effective 7/1/17 re Offender Health Care Services. | | | |
| 336 | RTP#5_UPDATED_ADs & IDs_Hill 000011 | RTP#5_UPDATED_ADs & IDs_Hill 000018 | Hill ID 04.03.108 effective 10/1/17 re Response to Medical Emergencies. | | | |
| 337 | RTP#5_UPDATED_ADs & IDs_Hill 000019 | RTP#5_UPDATED_ADs & IDs_Hill 000021 | Hill ID 04.03.121 effective 3/1/12 re Treatment Protocols. | | | |
| 338 | RTP#5_UPDATED_Wexford Recon_Big Muddy 000022 | RTP#5_UPDATED_Wexford Recon_Big Muddy 000041 | | Big Muddy signed reconciliations FY16-FY18. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 339 | RTP#5_UPDATED_Wexford Recon_Centralia 000001 | RTP#5_UPDATED_Wexford Recon_Centralia 000012 | | Centralia signed reconciliations FY16-FY18. | | |
| 340 | RTP#5_UPDATED_Wexford Recon_Decatur 000001 | RTP#5_UPDATED_Wexford Recon_Decatur 000012 | | Decatur signed reconciliations FY16-FY18. | | |
| 341 | RTP#5_UPDATED_Wexford Recon_Dixon 000018 | RTP#5_UPDATED_Wexford Recon_Dixon 000024 | | Dixon signed reconciliations FY16-FY17. | | |
| 342 | RTP#5_UPDATED_Wexford Recon_East Moline 000001 | RTP#5_UPDATED_Wexford Recon_East Moline 000013 | | E. Moline signed reconciliations FY16-FY18. | | |
| 343 | RTP#5_UPDATED_Wexford Recon_Graham 000001 | RTP#5_UPDATED_Wexford Recon_Graham 000012 | | Graham signed reconciliations FY16-FY18. | | |
| 344 | RTP#5_UPDATED_Wexford Recon_Hill 000015 | RTP#5_UPDATED_Wexford Recon_Hill 000023 | | Hill signed reconciliations FY16-FY17. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|----------------------|---------------------------|-------------------------|------------------------|
| 345 | RTP#5_UPDATED_Wexford Recon_IRCC 000016 | RTP#5_UPDATED_Wexford Recon_IRCC 000026 | | IL River signed reconciliations FY16-FY18. | | |
| 346 | RTP#5_UPDATED_Wexford Recon_Jacksonville 000001 | RTP#5_UPDATED_Wexford Recon_Jacksonville 000012 | | Jacksonville signed reconciliations FY16-FY18. | | |
| 347 | RTP#5_UPDATED_Wexford Recon_Kewanee 000001 | RTP#5_UPDATED_Wexford Recon_Kewanee 000003 | | Kewanee signed reconciliations FY18. | | |
| 348 | RTP#5_UPDATED_Wexford Recon_Lawrence 000001 | RTP#5_UPDATED_Wexford Recon_Lawrence 000012 | | Lawrence signed reconciliations FY16-FY18. | | |
| 349 | RTP#5_UPDATED_Wexford Recon_Lincoln 000001 | RTP#5_UPDATED_Wexford Recon_Lincoln 000012 | | Lincoln signed reconciliations FY16-FY18. | | |
| 350 | RTP#5_UPDATED_Wexford Recon_Logan 000017 | RTP#5_UPDATED_Wexford Recon_Logan 000027 | | Logan signed reconciliations FY16-FY18. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|----------------------|---------------------------|------------------------|------------------------|
| 351 | RTP#5_UPDATED_Wexford Recon_Menard 000018 | RTP#5_UPDATED_Wexford Recon_Menard 000027 | | Menard signed reconciliations FY16-FY18. | | |
| 352 | RTP#5_UPDATED_Wexford Recon_Pinckneyville 000001 | RTP#5_UPDATED_Wexford Recon_Pinckneyville 000012 | | Pinckneyville signed reconciliations FY16-FY18. | | |
| 353 | RTP#5_UPDATED_Wexford Recon_Pontiac 000027 | RTP#5_UPDATED_Wexford Recon_Pontiac 000053 | | Pontiac signed reconciliations FY16-FY18. | | |
| 354 | RTP#5_UPDATED_Wexford Recon_Robinson 000001 | RTP#5_UPDATED_Wexford Recon_Robinson 000009 | | Robinson signed reconciliations FY16-FY17. | | |
| 355 | RTP#5_UPDATED_Wexford Recon_Shawnee 000001 | RTP#5_UPDATED_Wexford Recon_Shawnee 000012 | | Shawnee signed reconciliations FY16-FY18. | | |
| 356 | RTP#5_UPDATED_Wexford Recon_Sheridan 000001 | RTP#5_UPDATED_Wexford Recon_Sheridan 000013 | | Sheridan signed reconciliations FY16-FY18. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|---------------------|---------------------------|------------------------|----------------------|
| 357 | RTP#5_UPDATED_Wexford Recon_Stateville 000005 | RTP#5_UPDATED_Wexford Recon_Stateville 000028 | | Stateville signed reconciliations FY16-FY18. | | |
| 358 | RTP#5_UPDATED_Wexford Recon_SW ICC 000001 | RTP#5_UPDATED_Wexford Recon_SW ICC 000012 | | SW Illinois signed reconciliations FY16-FY18. | | |
| 359 | RTP#5_UPDATED_Wexford Recon_Taylorville 000001 | RTP#5_UPDATED_Wexford Recon_Taylorville 000012 | | Taylorville signed reconciliations FY16-FY18. | | |
| 360 | RTP#5_UPDATED_Wexford Recon_Vandalia 000001 | RTP#5_UPDATED_Wexford Recon_Vandalia 000013 | | Vandalia signed reconciliations FY16-FY18. | | |
| 361 | RTP#5_UPDATED_Wexford Recon_Vienna 000001 | RTP#5_UPDATED_Wexford Recon_Vienna 000007 | | Vienna signed reconciliations FY16-FY18. | | |
| 362 | RTP#5_UPDATED_Wexford Recon_Western 000001 | RTP#5_UPDATED_Wexford Recon_Western 000010 | | Western signed reconciliations FY16-FY18. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 363 | Subpoena to Wexford 10-17-17 Request 15 p. 11076 | Subpoena to Wexford 10-17-17 Request 15 p. 11080 | | Illinois - Fill Rate History spreadsheets Jan-May 2018. | | |
| 364 | Subpoena to Wexford 10-17-17 Request 11 p. 11269 | Subpoena to Wexford 10-17-17 Request 11 p. 11271 | | Mortality worksheet of Mitchell. | | |
| 365 | Subpoena to Wexford 10-17-17 Request 11 p. 11272 | Subpoena to Wexford 10-17-17 Request 11 p. 11275 | | Mortality worksheet of Eisenberg. | | |
| 366 | Subpoena to Wexford 10-17-17 Request 11 p. 11267 | Subpoena to Wexford 10-17-17 Request 11 p. 11268 | | Mortality worksheet of Varela. | | |
| 367 | Subpoena to Wexford 10-17-17 Request 11 p. 11266 | Subpoena to Wexford 10-17-17 Request 11 p. 11266 | | Morbidity survey report of Varela. | | |
| 368 | Subpoena to Wexford 10-17-17 Request 11 p. 11276 | Subpoena to Wexford 10-17-17 Request 11 p. 11278 | | Mortality worksheet and mobidity survey report of Baggett. | | |
| 369 | Subpoena to Wexford 10-17-17 Request 11 p. 11279 | Subpoena to Wexford 10-17-17 Request 11 p. 11284 | | Mortality worksheet and mobidity survey report of Washington. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 370 | Subpoena to Wexford 10-17-17 Request 5 p. 11556 | Subpoena to Wexford 10-17-17 Request 5 p. 11562 | | Discipline report for Dr. Obaisi. | | |
| 371 | Subpoena to Wexford 10-17-17 Request 5 p. 11573 | Subpoena to Wexford 10-17-17 Request 5 p. 11576 | | Discipline report for Dr. Sood. | | |
| 372 | Subpoena to Wexford 10-17-17 Request 5 p. 11577 | Subpoena to Wexford 10-17-17 Request 5 p. 11584 | | Discipline report for Dr. Trost | | |
| 373 | Subpoena to Wexford 10-17-17 Request 13 p. 12274 | Subpoena to Wexford 10-17-17 Request 13 p. 12305 | | Audited Financial Statements (Proposal Exhibit #4 to Wexford bid). | | |
| 374 | Subpoena to Wexford 10-17-17 Request 29 p. 12306 | Subpoena to Wexford 10-17-17 Request 29 p. 12309 | | Email chain involving Trey Childress, Nick Little, Darius Holmes, Shannis Stock-Jones and others re IDOC Psychiatric Staffing Needs. | 401 and 403:  Defendants object to this document as not relevant because it does make not any issue that is of consequence to the litigation in this case more probable or less probable than without it. | 401, 402:  This email, sent by Deputy Governor Trey Childress to Wexford, is relevant for two reasons. First, it shows awareness of the part of the Office of the Governor that Wexford is violating its contract and that these violations harm the Illinois prison population. Although the violation in question pertains for lack of psychiatric staffing (with resultant mental health backlogs), the |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|----------------------|---------------------------|------------------------|------------------------|
| | | | | | | healthcare contract is comprehensive (that is, it includes both physical and mental health services), so the contract that is being violated is the same contract at issue in this case.  Second, however, it is more evidence that Defendants have disregarded the physical healthcare needs of the IDOC population while paying at least some attention and making some effort to improve mental health.  (Plaintiffs are aware of no such communications from the Office of the Governor chiding Wexford for failing to provide physician staffing), thus reinforcing Plaintiffs' claim that Defendants are deliberately indifferent to the medical and dental needs of IDOC prisoners. Defendants do not explain what their FRE 403 objection is. |
| 375 | DALEY00 0001 | DALEY00 1572 | Packet 2 - Corizon Health Pricing Proposal. | | | |
| 376 | Subpoena to Wexford 10-17-17 | Subpoena to Wexford 10-17-17 | | PDF titled "Medical backlogs 1/8/18." | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | Request 21 p. 9094 | Request 21 p. 9095 | | | | |
| 377 | Subpoena to Wexford 10-17-17 Request 21 p. 9096 | Subpoena to Wexford 10-17-17 Request 21 p. 9097 | | PDF titled "Medical backlogs 3/12/18." | | |
| 378 | Subpoena to Wexford 10-17-17 Request 21 p. 9099 | Subpoena to Wexford 10-17-17 Request 21 p. 9100 | | PDF titled "Medical backlogs 4/9/18." | | |
| 379 | Subpoena to Wexford 10-17-17 Request 21 p. 9102 | Subpoena to Wexford 10-17-17 Request 21 p. 9103 | | PDF titled "Medical backlogs 5/14/18." | | |
| 380 | Subpoena to Wexford 10-17-17 Request 21 p. 9095 | Subpoena to Wexford 10-17-17 Request 21 p. 9095 | | PDF titled "Staffing vacancies 1/8/18." | | |
| 381 | Subpoena to Wexford 10-17-17 Request 21 p. 9098 | Subpoena to Wexford 10-17-17 Request 21 p. 9098 | | PDF titled "Staffing vacancies 3/12/17." | | |
| 382 | Subpoena to Wexford 10-17-17 Request 21 p. 9101 | Subpoena to Wexford 10-17-17 Request 21 p. 9101 | | PDF titled "Staffing vacancies 4/9/18." | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 383 | Subpoena to Wexford 10-17-17 Request 21 p. 9103 | Subpoena to Wexford 10-17-17 Request 21 p. 9103 | | PDF titled "Staffing vacancies 5/14/18." | | |
| 384 | RTP#5_UPDATED_Backlogs & Vacancies 000020 | RTP#5_UPDATED_Backlogs & Vacancies 000035 | | Backlog data tracker 2016-2017. | | |
| 385 | RTP#5_UPDATED_Wexford Docs 000001 | RTP#5_UPDATED_Wexford Docs 000008 | | PDF titled "Lippert Monthly Call Notes" showing backlogs and vacancies. | | |
| 386 | RTP#5_UPDATED_Backlogs & Vacancies 000036 | RTP#5_UPDATED_Backlogs & Vacancies 000053 | | Staffing vacancies tracker 2016-2017. | | |
| 387 | RTP#5_UPDATED_Wexford Recon_Big Muddy 000021 | RTP#5_UPDATED_Wexford Recon_Big Muddy 000021 | | Big Muddy FY18 reconciliation update. | | |
| 388 | RTP#5_UPDATED_Wexford Recon_Dixon 000016 | RTP#5_UPDATED_Wexford Recon_Dixon 000017 | | Dixon FY18 reconciliation update. | | |
| 389 | RTP#5_UPDATED_Wexford | RTP#5_UPDATED_Wexford | | IL River FY18 reconciliation update. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|----------------------|---------------------------|------------------------|------------------------|
| | Recon_IR CC 000015 | Recon_IR CC 000015 | | | | |
| 390 | RTP#5_U PDATED_ Wexford Recon_Po ntiac 000026 | RTP#5_U PDATED_ Wexford Recon_Po ntiac 000026 | | Pontiac FY18 reconciliation update. | | |
| 391 | RTP#5_U PDATED_ Wexford Recon_Sta teville 000003 | RTP#5_U PDATED_ Wexford Recon_Sta teville 000004 | | Stateville FY18 reconciliation update. | | |
| 392 | RTP#5_U PDATED_ Wexford Recon_Hil l 000014 | RTP#5_U PDATED_ Wexford Recon_Hil l 000014 | | Hill FY18 reconciliation update. | | |
| 393 | RTP#5_U PDATED_ Wexford Recon_Lo gan 000016 | RTP#5_U PDATED_ Wexford Recon_Lo gan 000016 | | Logan FY18 reconciliation update. | | |
| 394 | RTP#5_U PDATED_ Wexford Recon_Me nard 000017 | RTP#5_U PDATED_ Wexford Recon_Me nard 000017 | | Menard FY18 reconciliation update. | | |
| 395 | RTP#5_U PDATED_ Backlogs & | RTP#5_U PDATED_ Backlogs & | | Staffing vacancies tracker 2016-2018. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | Vacancies 000001 | Vacancies 000019 | | | | |
| 396 | RTP#5_U PDATED_ Wexford Recon_Big Muddy 000001 | RTP#5_U PDATED_ Wexford Recon_Big Muddy 000020 | | Big Muddy signed reconciliations FY14-FY16. | | |
| 397 | RTP#5_U PDATED_ Wexford Recon_Dix on 000001 | RTP#5_U PDATED_ Wexford Recon_Dix on 000015 | | Dixon signed reconciliations FY14-FY16. | | |
| 398 | RTP#5_U PDATED_ Wexford Recon_Hil l 000001 | RTP#5_U PDATED_ Wexford Recon_Hil l 000013 | | Hill signed reconciliations FY14-FY16. | | |
| 399 | RTP#5_U PDATED_ Wexford Recon_IR CC 000001 | RTP#5_U PDATED_ Wexford Recon_IR CC 000014 | | IL River signed reconciliations FY14-FY16. | | |
| 400 | RTP#5_U PDATED_ Wexford Recon_Lo gan 000001 | RTP#5_U PDATED_ Wexford Recon_Lo gan 000015 | | Logan signed reconciliations FY14-FY16. | | |
| 401 | RTP#5_U PDATED_ Wexford Recon_Me nard 000001 | RTP#5_U PDATED_ Wexford Recon_Me nard 000016 | | Menard signed reconciliations FY14-FY16. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|---------------------|---------------------------|------------------------|------------------------|
| 402 | RTP#5_U PDATED_ Wexford Recon_Po ntiac 000001 | RTP#5_U PDATED_ Wexford Recon_Po ntiac 000025 | | Pontiac signed reconciliations FY14-FY16. | | |
| 403 | RTP#5_U PDATED_ Wexford Recon_Sta teville 000001 | RTP#5_U PDATED_ Wexford Recon_Sta teville 000002 | | Stateville signed reconciliation 1st quarter FY15. | | |
| 404 | RTP#5_U PDATED_ Equipment Upgrades_ NRC 000001 | RTP#5_U PDATED_ Equipment Upgrades_ NRC 000011 | | Adjusted Service Requested (ASRs) for equipment at Stateville/NRC. | | |
| 405 | RTP#5_U PDATED_ Equipment Upgrades 000065 | RTP#5_U PDATED_ Equipment Upgrades 000066 | | Declaration of Michelle Grimsley re upgrade equipment and record retention at Logan. | | |
| 406 | RTP#5_U PDATED_ Wexford Monitoring _NRC 000001 | RTP#5_U PDATED_ Wexford Monitoring _NRC 000002 | | Declaration of Mary Ellen Grennan re contract monitoring reports at NRC. | | |
| 407 | RTP#5_U PDATED_ Budget_N RC 000001 | RTP#5_U PDATED_ Budget_N RC 000001 | | Declaration of Ken Harris re budget analysis records at NRC. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 408 | RTP#5_UPDATED_ Equipment Upgrades_ IRCC 000001 | RTP#5_UPDATED_ Equipment Upgrades_ IRCC 000021 | | Adjusted Service Requested (ASRs) for equipment at IL River. | | |
| 409 | RTP#5_UPDATED_ Budget_IRCC 000001 | RTP#5_UPDATED_ Budget_IRCC 000001 | | Declaration of John E. Smith re budget information at IL River. | | |
| 410 | RTP#5_UPDATED_ OHS QM Reports 000006 | RTP#5_UPDATED_ OHS QM Reports 000013 | Office of Health Services Meeting Minutes 3/3/16. | | | |
| 411 | Subpoena to Wexford 10-10-17 Request 21 & 44 p. 581 | Subpoena to Wexford 10-10-17 Request 21 & 44 p. 608 | | PDFs of spreadsheets for each facility titled "Bi-weekly vacancy backlog report blank." | | |
| 412 | Subpoena to Wexford 10-10-17 Request 21 & 44 p. 623 | Subpoena to Wexford 10-10-17 Request 21 & 44 p. 636 | | Staffing vacancy spreadsheets dated 10/17/16 to 12/11/17. | | |
| 413 | Subpoena to Wexford 10-17-17 Request 3 p. 637 | Subpoena to Wexford 10-17-17 Request 3 p. 857 | | CVs of doctors and dentists (according to PDF filenames, some of these doctors and dentists are from IL River, Pinckneyville, Western IL and Pontiac facilities). | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 414 | RTP#5_UPDATED_Equipment Upgrades 000059 | RTP#5_UPDATED_Equipment Upgrades 000060 | | Declaration of of Kyle (Lynn) Robinson re equipment at Big Muddy. | | |
| 415 | RTP#5_UPDATED_Equipment Upgrades 000061 | RTP#5_UPDATED_Equipment Upgrades 000061 | | Declaration of Amber Allen re equipment at Dixon. | | |
| 416 | RTP#5_UPDATED_Equipment Upgrades 000062 | RTP#5_UPDATED_Equipment Upgrades 000064 | | Invoices for equipment at Pontiac. | | |
| 417 | Subpoena to Wexford 10-10-17 Request 1 p. 520 | Subpoena to Wexford 10-10-17 Request 1 p. 548 | Medical and dental staff employed at IDOC facilities from 7/1/15 to 11/22/17. | | | |
| 418 | Subpoena to Wexford 10-10-17 Response 28 p. 496 | Subpoena to Wexford 10-10-17 Response 28 p. 498 | | Email chain involving Cheri Laurent, Gladyse Taylor, Catherine Larry and others re PEARL. | | |
| 419 | RTP#5_UPDATED_Equipment Upgrades 000001 | RTP#5_UPDATED_Equipment Upgrades 000001 | | Health care equipment upgrade list since June 2016 (facility unknown). | | |
| 420 | RTP#5_UPDATED_Equipment Upgrades 000001 | RTP#5_UPDATED_Equipment Upgrades 000010 | | Adjusted Service Requested (ASRs) for equipment at Stateville/NRC. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 421 | RTP#5_UPDATED_Equipment Upgrades 000011 | RTP#5_UPDATED_Equipment Upgrades 000011 | | PDF titled "Budget analysis & reconciliation for June 2016 to present." | | |
| 422 | RTP#5_UPDATED_Equipment Upgrades 000012 | RTP#5_UPDATED_Equipment Upgrades 000013 | | Adjusted Service Requested (ASRs) for dental equipment at Dixon. | | |
| 423 | RTP#5_UPDATED_Equipment Upgrades 000014 | RTP#5_UPDATED_Equipment Upgrades 000016 | | Adjusted Service Requested (ASRs) for equipment at Big Muddy. | | |
| 424 | RTP#5_UPDATED_Equipment Upgrades 000017 | RTP#5_UPDATED_Equipment Upgrades 000020 | | Adjusted Service Requested (ASRs) and invoices for equipment at Pontiac. | | |
| 425 | RTP#5_UPDATED_Equipment Upgrades 000021 | RTP#5_UPDATED_Equipment Upgrades 000024 | | Adjusted Service Requested (ASRs) for optical equipment at Dixon and equipment at Logan. | | |
| 426 | RTP#5_UPDATED_Equipment Upgrades 000025 | RTP#5_UPDATED_Equipment Upgrades 000056 | | Adjusted Service Requested (ASRs) and invoices for equipment at Pontiac. | | |
| 427 | RTP#5_UPDATED_Equipment Upgrades 000057 | RTP#5_UPDATED_Equipment Upgrades 000057 | | Adjusted Service Requested (ASRs) for optical equipment at Dixon. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 428 | | | Illinois Commission on Criminal Justice and Sentencing Reform - The Prison Letter Report, Adler University. | | 802: Defendants object based on hearsay. | 801: This outside report is offered not for the truth of its contents but as evidence that Defendants were aware of complaints about IDOC healthcare (Defendants received this report). |
| 429 | RTP#5_UPDATED_Equipment Upgrades_IDOC 000001 | RTP#5_UPDATED_Equipment Upgrades_IDOC 000092 | | Spreadsheet titled "ASR Log Redacted." | | |
| 430 | RTP#5_ESI 0578274 | RTP#5_ESI 0578300 | | Email from Jared Brunk to Jennifer Lokaitis re FY16 Budget Summary Workbook. Attachment FY16 summary workbook.xlsx. | | |
| 431 | RTP#5_ESI 0294034 | RTP#5_ESI 0294084 | | Email from Gladyse Taylor to several re Comprehensive Healthcare QA 3/27/17. Attachment Health Care RFP Questions/Answers 2017. | | |
| 432 | RFP Materials 000046 | RFP Materials 000046 | | Illinois - Fill Rate History - Staffing Vacancies and Fill Rates May 2014-Feb 2017. | | |
| 433 | Subpoena to Wexford 10-10-17 Request 5 p. 11534 | Subpoena to Wexford 10-10-17 Request 5 p. 11539 | | Discipline report for Ruth Brown. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|----------------------|---------------------------|------------------------|------------------------|
| 434 | Subpoena to Wexford 10-10-17 Request 5 p. 11549 | Subpoena to Wexford 10-10-17 Request 5 p. 11545 | | Discipline report for Dr. James. | | |
| 435 | RTP#5_ES I 0473211 | RTP#5_ES I 0473212 | | Email from Marna Ross to Louis Shicker re Questions and FYIs. | | |
| 436 | RTP#5_ES I 0394008 | RTP#5_ES I 0394009 | | Email chain involving Laura MacQueen, Robin Rose and others re CQI. | | |
| 437 | | | | Email chain involving Louis Shicker, Stephen Ritz and others re Offender Bahler, Daniel R27604. | | |
| 438 | RTP#5_ES I 0048808 | RTP#5_ES I 0048810 | | Email chain involving Nigel Vinyard, George Penny, Kim Hugo, Steven Meeks, Cindy Hobrock and others re C-PAPs / Medical Equipment. | | |
| 439 | RTP#5_ES I 0048806 | RTP#5_ES I 0048807 | | Email chain involving George Penny, Cindy Hobrock, Steven Meeks and others re C-PAPs / Medical Equipment. | | |
| 440 | RTP#5_ES I 0049806 | RTP#5_ES I 0049809 | | Email from Michael Dempsey to Steven Meeks and Kim Hugo re UIC College of Nursing Meeting Minutes 1/30/17. Attachment UIC College of Nursing Meeting Minutes 1/30/17. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 441 | RTP#5_ESI 0049968 | RTP#5_ESI 0049972 | | Email chain involving Jared Brunk, Louis Shicker, Cindy Hobrock, Natalie Northern and others re HELP! | | |
| 442 | RTP#5_ESI 0052220 | RTP#5_ESI 0052223 | | Email chain involving Jared Brunk, David Gomez, Louis Shicker, Tina Jepsen and others re East Moline and Wexford. | | |
| 443 | RTP#5_ESI 0050820 | RTP#5_ESI 0050822 | | Email chain involving Jason Garnett, Louis Shicker, Mike Atchison and others re Hill CC Medical Back log. | | |
| 444 | RTP#5_ESI 0085489 | RTP#5_ESI 0085490 | | Email from Louis Shicker to Gladyse Taylor, Bryan Gleckler and others re Medical Director Vacancies. | | |
| 445 | RTP#5_ESI 0095486 | RTP#5_ESI 0095486 | | Email chain involving Steven Meeks, Arthur Funk and others re Dr. James. | | |
| 446 | RTP#5_ESI 0095599 | RTP#5_ESI 0095600 | | Email chain between Steven Meeks and Lisa Prather re Diagnosis. | | |
| 447 | | | 2017 Request for Proposal. | | | |
| 448 | RTP#5_ESI 0098877 | RTP#5_ESI 0098878 | | Email chain involving Lisa Prather, Steven Meeks and others re Chronic Clinic Data. | | |
| 449 | RTP#5_ESI 0118711 | RTP#5_ESI 0118717 | | Email chain involving Lisa Prather, Mary | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | | | | Johnson and Louis Shicker re Y90 radiation. | | |
| 450 | RTP#5_ESI 0127411 | RTP#5_ESI 0127412 | | Email chain between Marna Ross and Doug Mote re Adrian Bryant / NRC medical records. | | |
| 451 | RTP#5_ESI 0101731 | RTP#5_ESI 0101735 | | Email chain involving Steven Meeks, Lisa Bishop, Cindy Hobrock, Juliana Chan and others re Dodd K03306. | | |
| 452 | RTP#5_ESI 0101921 | RTP#5_ESI 0101923 | | Email chain involving Steven Meeks, Gail Walls, Lisa Prather, Kim Hugo and others re Donzell Harris. | | |
| 453 | RTP#5_ESI 0042897 | RTP#5_ESI 0042898 | | Email chain between Becky Sudbrink and Louis Shicker re lack of practitioner coverage. | | |
| 454 | RTP#5_ESI 0163285 | RTP#5_ESI 0163288 | | Email chain involving Steven Meeks, Michael Dempsey, Lisa Prather and others re ASR on beds. | | |
| 455 | Response to Eleventh Motion to Compel 000390 | Response to Eleventh Motion to Compel 000393 | | Quarterly Reconciliation Reports for 2Q and 3Q for Stateville and NRC. | | |
| 456 | RTP#5_ESI 0464760 | RTP#5_ESI 0464764 | | Email chain involving Gail Walls, Kim Hugo, Lisa Prather, Steven Meeks and Michael Dempsey re Menard HCU - Admin. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 457 | RTP#5_ESI 0183659 | RTP#5_ESI 0183660 | | Email from Timothy Chamberlain to several re Death summary Caradine (R56618). Attachment 11/21/16 Death Summary of Caradine. | | |
| 458 | RTP#5_ESI 0188147 | RTP#5_ESI 0188184 | | Email from Louis Shicker to Kim Hugo, Cindy Hobrock, Lisa Prather and Joseph Ssenfuma re For your files. Attachments several death reviews and mortality conference reports. | | |
| 459 | RTP#5_ESI 0147069 | RTP#5_ESI 0147092 | | Email from Shellie Yeates to Joseph Ssenfuma re Stateville PBR FY16. Attachment Office of Performance Based Standards FY16 Performance Based Review Report for Stateville and NRC, 10/5/15 - 10/9/15. | | |
| 460 | RTP#5_ESI 0290095 | RTP#5_ESI 0290097 | | Email chain involving Kim Hugo, Joseph Ssenfuma, Mike Atchison and others re Stateville HCU. | | |
| 461 | RTP#5_ESI 0285137 | RTP#5_ESI 0285139 | | Email chain involving Louis Shicker, Cheri Laurent, Roderick Matticks, Cindy Hobrock and others re Dr. Kayira. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 462 | RTP#5_ESI 0173531 | RTP#5_ESI 0173534 | | Email chain involving Dede Short, Michael Dempsey, Sandra Funk, Michael Melvin and others re A10465. | | |
| 463 | RTP#5_ESI 0365710 | RTP#5_ESI 0365712 | | Email chain involving Steven Meeks, Jackie Mitchell, Michael Dempsey and others re CMT assistance for IYC-Joliet. | | |
| 464 | RTP#5_ESI 0185217 | RTP#5_ESI 0185219 | | Email chain involving Cindy Hobrock, Kimberly Smith, Lisa Mincy and others re MD issues. | | |
| 465 | RTP#5_ESI 0052467 | RTP#5_ESI 0052469 | | Email chain involving Jared Brunk, LaShonda Hunt, Christine Brown and others re Medical director hours. | | |
| 466 | RTP#5_ESI 0369899 | RTP#5_ESI 0369901 | | Email chain involving Michael Dempsey, Kim Hugo, Louis Shicker, Phil Martin and others re Notification of death. | | |
| 467 | RTP#5_ESI 0285826 | RTP#5_ESI 0285827 | | Email chain involving Christine Brown, Lisa Prather, Louis Shicker and others re Ortega Angel N33333. | | |
| 468 | RTP#5_ESI 0047598 | RTP#5_ESI 0047599 | | Email chain involving Louis Shicker, Eric Dailey, Bryan Gleckler and others re Vacant Wexford Positions. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 469 | RTP#5_ESI 0592948 | RTP#5_ESI 0592951 | | Email chain involving Joanna Kemmeren, Joseph Ssenfuma, Amber Allen, Kim Hugo and others re Update - reportable incident - Dixon Correctional Center - Offender Transport via ambulance - Hilliard, Wilbur C00287. | | |
| 470 | | | | Email from Louis Shicker to Arthur Funk and others re Offender Bahler, Daniel R27604. | | |
| 471 | RTP#5_ESI 0257008 | RTP#5_ESI 0257010 | | Email chain involving Michael Dempsey, Steven Meeks, Kim Hugo, Tina Jepsen and others re Death review policy - Spurlock M25641 - death at East Moline. | | |
| 472 | | | | Meeting Minutes from Quality Improvement Meeting - NRC [Word document produced without Bates numbers on 3/18/18 via email]. | | |
| 473 | RTP#5_ESI 0073974 | RTP#5_ESI 0073977 | | Email chain involving Michael Dempsey, Kimberly Butler, Thomas Lehman, Joe Ebbitt and others re Sood at Hill. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 474 | RTP#5_ES I 0184180 | RTP#5_ES I 0184187 | | Email chain involving Michael Dempsey, Steven Meeks, Kim Hugo, Lisa Prather and others re Lawrence Correctional Center Concerns. Attachments email Lawrence CC summary of September 2016 infirmary audit, 434 9-28-16 DON ALLender.doc. | | |
| 475 | | | | Extracted pages from "death charts" of Venice Davis R37227 [produced without Bates numbers on 3/7/18 via email]. | | |
| 476 | RTP#5_ES I 0117065 | RTP#5_ES I 0117067 | | Email chain between Lois Lindorff, Louis Shicker and Cindy Hobrock re Scan from a Xerox WorkCentre. Attachment appeal from offender re prosthetic foot held together with tape. | | |
| 477 | RTP#5_ES I 0583462 | RTP#5_ES I 0583464 | | Email chain involving Michael Dempsey, Charlie Weikel, Erin Johnson, Tina Jepsen and others re Requested Information. Attachment 5/12/17 East Moline Correctional Center Weekly Report. | | |
| 478 | | | | Email from Angelia Bruns to Louis Shicker and Lisa Prather re Requested information from PNKCC. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | | | | Attachment June 2015 denials/not approved for Pinckneyville Correctional Center. | | |
| 479 | | | | Email from George Penny to Louis Shicker, Lisa Prather and Nigel Vinyard re four denials. Attachments non-approved medical special service referral requests. | | |
| 480 | | | | Email chain involving Louis Shicker, Lisa Prather, Gail Walls, Annette Rodgers and others re Dr. Trost call lines. Attachment spreadsheet of offenders scheduled at least 3 times before being seen by Dr. Trost. | | |
| 481 | | | | Email from Louis Shicker to Daniel Towne, Marna Ross and Lisa Prather re [no subject]. Attachment RFP sub-committee contract language enhancements upgraded & enforceable target performances. | | |
| 482 | | | | Email from Louis Shicker to Daniel Towne, Marna Ross, Cindy Hobrock and Lisa Prather re [no subject]. Attachment | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | | | | Outcome studies - samples. | | |
| 483 | RTP#5_ES I 0077607 | RTP#5_ES I 0077608 | | Emails between Camile Lindsay, Gladyse Taylor, Jared Brunk and John Baldwin re Wexford RFP. | | |
| 484 | RTP#5_ES I 0583091 | RTP#5_ES I 0583139 | | Emails and meeting reminders involving Michael Dempsey, Charlie Weikel, Erin Johnson and others re IDOC and UIC Engagement. Attachments 3/16/17 OHS Quarterly PowerPoint presentation and OHS strategic plan. | | |
| 485 | RTP#5_ES I 0594383 | RTP#5_ES I 0594384 | | Email chain involving Joseph Ssenfuma, Mary Ellen Grennan, Jackie Hammond and others re Med errors cart H-M. | | |
| 486 | RTP#5_ES I 0622767 | RTP#5_ES I 0622768 | | Emails between Lori Smalley, Lisa Johnson, Angel Wilson, Shelith Hansbro and Kim Hugo re Staffing. | | |
| 487 | | | | Emails between Tina Jepsen, Marna Ross, Louis Shicker and Amber Allen re Ochoa N92393. | | |
| 488 | | | | Emails between Amber Allen and Louis Shicker re Michael Anderson B53225. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 489 | | | | Email chain involving Louis Shicker, Lisa Prather, Arthur Funk and Shannis Stock-Jones re PNCK. | 403: Defendants object to the admission of this document based on the fact any probative value is substantially outweighed by the danger of unfair prejudice to the Defendants. | 401, 402: This July 2015 email chain shows, in heightened degree, internal IDOC dissatisfaction with the care provided by Wexford physicians and responsiveness of Wexford managers to problems identified by IDOC, including the awareness of the agency Medical Director (Shicker) of same and his own dissatisfaction (vividly illustrated). Since Wexford is still in place more than 3 years later, it is evidence of defendants' deliberate indifference. In addition, as further evidence of deliberate indifference, it shows internal IDOC awareness that Dr. Shah, the physician whose care was in question, had made very poor clinical judgments. Dr. Shah is one of the providers identified by the Second Court-Appointed Expert as involved in preventable mortality and, to the best of Plaintiffs' current |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | | | | | | knowledge, is still employed within IDOC. |
| 490 | | | | Email from Angela Crain to Louis Shicker, Lisa Prather, Gail Walls and Nichole Lewis re Offender R29550 | | |
| 491 | | | | Email chain involving Maria Peterson, Louis Shicker, Dede Short and others re Inquiry from the Illinois Department of Corrections. | 401: Defendants object based on relevance as an inquiry with another state's prison system does not make an issue of consequence to this litigation more or less probable than without it. | 401, 402: This January 2015 email chain is relevant not just for the question but especially for the answer: the inquiry from IDOC to certain other state departments is about 2 principal recommendations made in the December 2014 Shansky report: that all physicians be board certified or residency trained in primary care fields, and that LPNs (licensed practical nurses) NOT be permitted to conduct sick call. It is now 4 years later and IDOC has not changed its physician qualification requirements and persists in the use of LPNs, despite the explanation in the Shansky report as to why these changes are essential and despite knowing that other states agree with these requirements; it is |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | | | | | | therefore evidence of deliberate indifference. |
| 492 | | | | Email chain involving Louis Shicker, Lisa Prather, Gail Walls, Annette Rodgers and others re Dr. Trost call lines. | | |
| 493 | | | | Emails between Lisa Prather, Louis Shicker, Cindy Horbrock and Marna Ross re [how long are sites required to retain QI information before destroying?]. | 401 and 403: Defendants object based on relevance as this particular inquiry on document retention does not make an issue of consequence to this litigation more or less probable than without it. Further, any probative value the email may have is substantially outweighed by the danger of unfair prejudice to the Defendants. | 401, 402: This email (between agency Medical Director Shicker and his 3 regional coordinators) shows defendants' cavalier attitude to the maintenance of core system records (both portions of the medical records and quality improvement records). No one in this core group has any idea how long these records need to be kept. It is therefore evidence of deliberate indifference. |
| 494 | | | | Email chain involving Amy Williams, Louis Shicker, Lisa Prather, Christine Brown and others re Update on McMahon B88072. | | |
| 495 | | | | Email chain involving Louis Shicker, Ralph Gauen and others re Enteritis. | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 496 | | | | Email chain involving Lois Lindorff, Louis Shicker and others re Wexford denial of Boost. | | |
| 497 | | | | Email chain involving Lois Lindorff, Ruth Brown, Kayleigh Matus and others re Hill NF request Boost. Attachment NAN Nutritional Supplement Request. | | |
| 498 | | | | Email from Lois Lindorff to Louis Shicker, Marna Ross and others re Wexford denial of Boost. | | |
| 499 | | | | Email chain involving Ruth Brown, Louis Shicker, Lois Lindorff and others re Hill NF request Boost. | | |
| 500 | | | | Email chain involving Cindy Hobrock, Lisa Prather, Marna Ross, Louis Shicker and others re Branch M36257 - Boost. | | |
| 501 | | | Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12, USDOJ Office of Justice Programs Bureau of Justice Statistics. | | 802: Defendants object based on hearsay. | 902(5), 201(b)(2): self-authenticating official publication; court may take judicial notice |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 502 | | | | Letter from Bill Edley, IDOC Chief of Administration to Daniel Conn, Wexford VP and CFO re Notice concerning IDOC staffing issues. Attached Wexford Program Adjustment Computation dated 3/31/06. | | |
| 503 | | | | Letter from Tony Small, IDOC CFO to Daniel Conn, Wexford VP and CFO re Notice concerning IDOC staffing issues, medical director and nursing vacancies. | | |
| 504 | | | | Letter from Eric Dailey, Office of Healthcare Purchasing to Nickolas Little, Wexford VP of Compliance and Business Affairs re ongoing Administrative Directive violations. Attachment spreadsheet of recurring AD violations. | | |
| 505 | RTP#5_ESI 0590641 | RTP#5_ESI 0590643 | | Email chain involving Joseph Ssenfuma, Michael Melvin, Jared Brunk, Steven Meeks and others re Pontiac CC. | | |
| 506 | RPT#5_ESI 0594414 | RPT#5_ESI 0594414 | | Email chain involving Joseph Ssenfuma, Kim Hugo, Miles Sherwin and | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|----------------------|---------------------------|------------------------|------------------------|
| | | | | others re NRC negative pressure rooms. | | |
| 507 | RTP#5_ES I 0595522 | RTP#5_ES I 0595524 | | Email chain involving Victor Calloway, Joseph Ssenfuma, Kim larson and others re MRSA log update. | | |
| 508 | RTP#5_ES I 0215383 | RTP#5_ES I 0215384 | | Email chain involving Amber Allen, Joseph Ssenfuma, Diana Sanders and others re Optometry. | | |
| 509 | RTP#5_ES I 0409353 | RTP#5_ES I 0409354 | | Email chain involving Joseph Ssenfuma, Kimg Hugo, Mary Ellen Grennan and Michael Dempsey re Grant A64188. | | |
| D510 | | | Demonstrative - Aggregate Medical Errors at Dixon April 2015-April 2017 (CQIs). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |
| D511 | | | Demonstrative - Aggregate Medical Errors at Logan January 2013-March 2017 (CQIs). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| D512 | | | Demonstrative - Aggregate Chronic Clinic Backlog at Menard December 2013-April 2018 (CQIs). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |
| D513 | | | Demonstrative - CQI Availability Chart January 2014-February 2018 (CQIs). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |
| D514 | | | Demonstrative - Aggregate Dental Backlogs at Big Muddy January 2013-April 2017 (CQIs). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |
| D515 | | | Demonstrative - Dental Backlogs at Dixon in Weeks August 2015-April 2017 (CQIs). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| D516 | | | Demonstrative - Dental Backlog at Hill September 2015-January 2018 (CQIs). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |
| D517 | | | Demonstrative - Aggregate Dental Backlog at Logan January 2015-March 2017 (CQIs). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |
| D518 | | | Demonstrative - Aggregate Dental Backlog at Menard January 2013-April 2018 (CQIs). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |
| D519 | | | Demonstrative - Aggregate Dental Backlogs at Big Muddy, Menard and Logan January 2013-April 2018 (CQIs). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|---------------------|--------------------------|------------------------|-----------------------|
| D520 | | | Demonstrative - Medication Errors at Big Muddy January 2016- April 2017 (CQIs). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |
| D521 | | | Demonstrative - Medication Errors at Dixon April 2015-April 2017 (CQIs). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |
| D522 | | | Demonstrative - Medication Errors at Hill September 2015-January 2018 (CQIs). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |
| D523 | | | Demonstrative - Medication Errors at Illinois River October 2015-December 2017 (CQIs). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|---------------------|--------------------------|------------------------|----------------------|
| D524 | | | Demonstrative - Medication Errors at Logan March 2015-March 2017 (CQIs). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |
| D525 | | | Demonstrative - Medication Errors at Pontiac April 2013-March 2017 (CQIs). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |
| D526 | | | Demonstrative - MRSA Diagnoses at Big Muddy January 2013-September 2017 (CQIs). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |
| D527 | | | Demonstrative - MRSA Cases at Dixon January 2013-April 2017 (CQIs). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| D528 | | | Demonstrative - MRSA Cases at Hill September 2015-January 2018 (CQIs). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |
| D529 | | | Demonstrative - MRSA Cases at Illinois River July 2014-November 2017 (CQIs). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |
| D530 | | | Demonstrative - MRSA Cases at Logan January 2013-September 2017 (CQIs). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |
| D531 | | | Demonstrative - MRSA Cases at Menard January 2013-April 2018 (CQIs). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| D532 | | | Demonstrative - MRSA Diagnoses at Pontiac April 2013-April 2017 (CQIs). | | 901:  Defendants object based on lack of foundation. | 1006:  these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |
| D533 | | | Demonstrative - Optometry Backlog at Dixon January 2013-April 2017 (CQIs). | | 901:  Defendants object based on lack of foundation. | 1006:  these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |
| D534 | | | Demonstrative - Optometry Backlog at Hill in Weeks September 2015-January 2018 (CQIs). | | 901:  Defendants object based on lack of foundation. | 1006:  these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |
| D535 | | | Demonstrative - Optometry Backlog at Hill September 2015-January 2018 (CQIs). | | 901:  Defendants object based on lack of foundation. | 1006:  these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| D536 | | | Demonstrative - Optometry Backlog at Illinois River October 2015-February 2018 (CQIs). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |
| D537 | | | Demonstrative - Routine Physicals Backlog at HIll September 2015-January 2018 (CQIs). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' continuous quality improvement reports); Plaintiffs will provide a witness to explain method of compilation if required |
| D538 | | | Demonstrative - Non-Shansky Facilities Contract Violations for 2017 (Contract Monitoring). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' contract monitoring reports for the Wexford contract); Plaintiffs will provide a witness to explain method of compilation if required |
| D539 | | | Demonstrative - Comparison of Key Positions Between April-June in 2015 and 2017 (Contract Monitoring). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' contract monitoring reports for the Wexford contract); Plaintiffs will provide a witness to explain method of compilation if required |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| D540 | | | Demonstrative - Shansky Facilities Contract Violations for 2017 (Contract Monitoring). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' contract monitoring reports for the Wexford contract); Plaintiffs will provide a witness to explain method of compilation if required |
| D541 | | | Demonstrative - Vacancy Durations at Dixon (Contract Monitoring). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' contract monitoring reports for the Wexford contract); Plaintiffs will provide a witness to explain method of compilation if required |
| D542 | | | Demonstrative - Vacancy Durations at Hill (Contract Monitoring). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' contract monitoring reports for the Wexford contract); Plaintiffs will provide a witness to explain method of compilation if required |
| D543 | | | Demonstrative - Vacancy Durations at Pontiac (Contract Monitoring). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' contract monitoring reports for the Wexford contract); Plaintiffs will provide a witness to explain method of compilation if required |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| D544 | | | Demonstrative - Vacancy Durations at Stateville (Contract Monitoring). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' contract monitoring reports for the Wexford contract); Plaintiffs will provide a witness to explain method of compilation if required |
| D545 | | | Demonstrative - Vacancy Durations at Menard (Contract Monitoring). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' contract monitoring reports for the Wexford contract); Plaintiffs will provide a witness to explain method of compilation if required |
| D546 | | | Demonstrative - Vacancy Durations at Big Muddy River (Contract Monitoring). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' contract monitoring reports for the Wexford contract); Plaintiffs will provide a witness to explain method of compilation if required |
| D547 | | | Demonstrative - Contract Monitoring Report Availability for 2017 All Facilities (Contract Monitoring). | | 901: Defendants object based on lack of foundation. | 1006: these are charts compiled from voluminous records (Defendants' contract monitoring reports for the Wexford contract); Plaintiffs will provide a witness to explain method of compilation if required |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|-----|----------|----------|----------------------|---------------------------|------------------------|------------------------|
| 548 | | | IDOC's Answers to Plaintiffs' Second Set of Interrogatories. | | | |
| 549 | | | Defendants' Response to Plaintiffs' First Requests for Admission. | | | |
| 550 | | | IDOC's Supplemental Answers to Plaintiffs' Second Set of Interrogatories. | | | |
| 551 | | | Expert Report of Dr. Marc F. Stern. | | | |
| 552 | | | [RESERVED] Final Report of the Second Court-Appointed Expert Dr. Puisis. | | | |
| 553 | | | Notice of Rule 30(b)(6) Deposition. | | | |
| 554 | | | Notice of Rule 30(b)(6) Deposition (Brunk). | | | |
| 555 | | | Notice of Rule 30(b)(6) Deposition (Taylor). | | | |
| 556 | | | Amended Notice of Rule 30(b)(6) Deposition to the Office of the Governor. | | | |
| 557 | | | Subpoena to Testify at a Deposition in a Civil Action (Daley). | | | |
| 558 | | | Amended Notice of Deposition of Cheri Laurent. | | | |
| 559 | | | Notice of Deposition of Dr. Stephen Ritz. | | | |
| 560 | | | | Email from John Howard Association to Louis Shicker re JHA's Report | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | | | | on Stateville Northern Reception & Classification Center | | |
| 561 | | | | Email from John Howard Association to Louis Shicker re JHA's Report on Pontiac Correctional Center | | |
| 562 | | | | Email from John Howard Association to Louis Shicker re Special Report - Overcrowded, Underresourced, and Ill-Conceived: Logan Correctional Center 2013/14 | | |
| 563 | | | | Email from John Howard Association to Louis Shicker re JHA's Report on Dixon Correctional Center | | |
| 564 | | | | Email from John Howard Association to Louis Shicker re JHA's Report on Stateville Correctional Center | | |
| 565 | | | | Email from John Howard Association to Louis Shicker re JHA's Report on Graham Correctional Center | | |
| 566 | | | | Email from John Howard Association to Louis Shicker re JHA's Report on Big Muddy River Correctional Center | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| 567 | | | | Email from John Howard Association to Louis Shicker re JHA's Report on Pontiac Correctional Center | | |
| 568 | | | | Email from John Howard Association to Louis Shicker re JHA's Report on Vandalia Correctional Center | | |
| 569 | | | John Howard Association Monitoring Visit to Big Muddy River Correctional Center 2013. | | | |
| 570 | IDOC UPDATE 002525 | IDOC UPDATE 002525 | | Email chain involving Louis Shicker, John Maki and others re Special Report - Overcrowded, Underresourced, and Ill-Conceived: Logan Correctional Center 2013/14 | | |
| 571 | RTP#5_ESI 0088441 | RTP#5_ESI 0088443 | | Email chain involving Louis Shicker, Joseph Yurkovich and others re Vacancy List Request. Attachment 4/20/15 memo from Louis Shicker to Assistant Director Garnett re current Wexford vacancy situation of Medical Directors, DONs and other key positions | | |
| 572 | RTP#5_ESI 0579871 | RTP#5_ESI 0579874 | | Email chain involving Michael Dempsey, Camile Lindsay, Gail Walls and | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | | | | others re Reportable Incident - Menard Correctional Center - Death of Offender Locke, Leroy K76869 | | |
| 573 | RTP#5_ESI 0570186 | RTP#5_ESI 0570209 | | Email chain involving Gladyse Taylor, Bryan Gleckler, Sean Killian and others re CCA Project - Dashboard. Attachments 141125 Department Template vF(1).pptx; IDOC Transition Report 2014 12 08.docx; DOC Federal Grants - Overview.xls; Overview Information for Transition Team.xlsx | | |
| 574 | | | Unasked Questions, Unintended Consequences: Fifteen Findings and Recommendations of Illinois' Prison Healthcare System. A Special Report by the John Howard Association. | | | |
| G575 | | | | OHS Staffing Spreadsheet Excel files sent directly to Dr. Puisis by Nicholas Staley on 6/18/18. "Dr. Puisis, Per your request, please find attached IDOC staffing spreadsheets for the Northern Region of Illinois. I will be sending | | |

| Ex. | BegBates | EndBates | Title (if available) | Description (if no title) | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|---|---|---|
| | | | | two other emails with the Central and Southern Region spreadsheets. Please also note that these do not include Wexford staffing. I am currently waiting on that documentation from Wexford." | | |
| 576 | | | CV of Ronald Mark Shansky, MD | | | |
| 577 | | | CV of Michael Puisis, MD | | | |
| 578 | | | CV of Catherine M. Knox, MN, RN, CCHP-RN | | | |
| 579 | | | CV of Madeleine LaMarre, MN, FNP-BC | | | |
| 580 | | | CV of John Michael Raba, MD | | | |
| 581 | | | CV of Jay D. Shulman | | | |
| 582 | | | | IDOC FOIA response enclosing photos of Andre Mamon's head at Menard Correctional Center on or around March or April 2018. | | |

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DON LIPPERT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No.  10-cv-4603 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| JOHN BALDWIN, et al., | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| Defendants. | ) | |

**FINAL PRETRIAL ORDER**
**EXHIBIT 4—DEFENDANTS' EXHIBIT LIST**

| Ex. | Bates No. | Date | Description of exhibit | Plaintiffs' Objections | If objection, asserted basis of admissibility |
|---|---|---|---|---|---|
| | | | Any and all of Plaintiffs' Exhibits not objected to by Defendants. | | |
| 1 | RTP#5 UPDATED UIC Nursing Contract 000001-7 | 7/24/2018 | UIC Nursing Contract | | |
| 2 | None. Produced in response to Second Deposition of Jared Brunk | 1/26/2018 | Excel Spreadsheet of Medical Expenditures for IDOC FY2010-FY2018 | Foundation (relies on underlying material not produced; not self-explanatory) | FRE 803(6) |
| 3 | None. Produced in response to Subpoena to Wexford 10-17-17 | 5/2018 | Excel Spreadsheet of Offsite Medical Visits by Inmate for 2017-4/2018. | Foundation (relies on underlying material not produced; not self-explanatory) | FRE 803(6) |
| 4 | Wexford 11641-11984 | 5/23/2018 | Wexford Medical Guidelines for Illinois | | |
| 5 | Wexford 11985-12132 | 5/1/2017 | Wexford Pharmacy Guidelines (Global) | | |
| 6 | Wexford 12133-12168 | 12/19/2016 | Wexford Utilization Management Guidelines (Illinois) | | |
| 7 | Wexford 12169-12234 | 6/29/2017 | Wexford Medical, Psychiatry, and Dental Staff Orientation Program | | |

| Ex. | Bates No. | Date | Description of exhibit | Plaintiffs' Objections | If objection, asserted basis of admissibility |
|---|---|---|---|---|---|
| 8 | RTP#5 UPDATED Treatment Protocols IRCC 000980-1132 | 6/8/2012 | Wexford Pharmacy Policies and Procedures (Illinois) – Attorney Eyes Only Designation can be disregarded | | |
| 9 | None. | 11/3/2014 | IDOC Response to Shanksy Report | | |
| 10 | None. | 9/2018 | Excel Spreadsheet of ASR log for FY2019 | Foundation (relies on underlying material not produced; not self-explanatory) | FRE 803(6) |
| 11 | None. | 8/13/2018 | Rebuttal Report by Dr. Owen Murray to Plaintiffs' Expert Report by Dr. Marc Stern | | |

3

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DON LIPPERT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 10-cv-4603 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| JOHN BALDWIN, et al., | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| Defendants. | ) | |

**FINAL PRETRIAL ORDER**
**EXHIBIT 5—PLAINTIFFS' WITNESS LIST**

**WILL CALL:**

1. **Dr. Marc Stern** (Plaintiffs' expert).

2. **Dr. Michael Puisis** (Second Court-Appointed Expert).

3. **Dr. Jack Raba** (physician; member of Second Court-Appointed Expert's investigative team).

4. **Madie LaMarre** (RN; member of Second Court-Appointed Expert's investigative team).

5. **Dr. Jay Shulman** (dentist; member of Second Court-Appointed Expert's investigative team).

6. **John Baldwin** (Director of Illinois Department of Corrections [IDOC]).

7. **Dr. Steven Meeks** (Agency Medical Director, IDOC).

8. **Gladyse Taylor** (Assistant Director, IDOC).

9. **Jared Brunk** (Chief Financial Officer, IDOC).

10. **Don Lippert** (named plaintiff and class representative; Lawrence Correctional Center).

11. **Debra Pattison** (named plaintiff and class representative; Logan Correctional Center).

1

12.     **Milam Martin** (named plaintiff and class representative; Big Muddy River Correctional Center).

## MAY CALL:

1.      **Catherine M. Knox** (RN; member of Second Court-Appointed Expert's investigative team).

2.      **Dr. Ronald Shansky** (First Court-Appointed Expert).

3.      **Dr. Michael Dempsey** (former acting IDOC agency medical director).

4.      **Trey Childress** (Deputy Governor).

5.      **Lewis Rice** (named plaintiff and class representative; Menard Correctional Center).

6.      **Ezell Thomas** (named plaintiff and class representative; Pontiac Correctional Center).

7.      **Dr. Wallace F. Strow** (IDOC dentist; employed by Wexford Health Sources, Inc.).

8.      **Dr. Jackie Mitchell** (IDOC dentist; employed by state).

9.      **Victoria McCue** (class member; Decatur Correctional Center).

10.     **Afton Ferris** (class member; Logan Correctional Center).

11.     **Andre Mamon** (class member; Menard Correctional Center).

12.     **Ashley Johnson** (class member; Logan Correctional Center).

13.     **Pearl Tuma** (class member; Logan Correctional Center).

14.     **Robert Boyd** (class member; Dixon Correctional Center).

15.     **Eric Langham** (class member; Hill Correctional Center).

16.     **Joseph Ssenfuma** (regional coordinator, northern region, IDOC Office of Health Services).

17.     **Lisa Prather** (regional coordinator, southern region, IDOC Office of Health Services).

18.    **Lisa Johnson** (acting regional coordinator, central region, IDOC Office of Health Services; Health Care Unit Administrator, Logan Correctional Center).

19.    **Kim Hugo** (Agency Medical Coordinator, IDOC).

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DON LIPPERT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No. 10-cv-4603 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| JOHN BALDWIN, et al., | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| Defendants. | ) | |

**FINAL PRETRIAL ORDER**
**EXHIBIT 6—DEFENDANTS' WITNESS LIST**

**WILL CALL**

1.      **Steven Meeks**, M.D., Defendant. As Medical Director for the Office of Health Services of the Illinois Department of Corrections Dr. Meeks will testify regarding the healthcare system in the IDOC.

2.      **James Baldwin,** Defendant. Director of the Illinois Department of Corrections. Mr. Baldwin will testify regarding his role in overseeing the IDOC and his duties involving the provision of healthcare in the IDOC.

3.      **Gladyse Taylor,** Assistant Director of the Illinois Department of Corrections. Ms. Taylor will testify regarding her duties as they relate to the provision of healthcare in the IDOC. Ms. Taylor will also testify as to the RFPs regarding healthcare vendors and Electronic Medical Records.

4.      **Mary Kline,** Health Services Coordinator, Southern Region of the Illinois Department of Corrections. Ms. Kline will testify as to the healthcare provided in the prisons located in the Southern Region.

5.      **Lisa Johnson, Health Services Coordinator,** Central Region of the Illinois Department of Corrections. Ms. Kline will testify as to the healthcare provided in the prisons located in the Central Region.

6.      **Joseph Ssenfuma,** Quality Assurance and Infectious Disease Coordinator; and Health Services Coordinator, Northern Region of the Illinois Department of Corrections. Mr. Ssenfuma will testify as to as to the healthcare provided in the prisons located in the Northern Region. Mr. Ssenfuma will also testify regarding his job duties as Quality Assurance and Infectious Disease Coordinator for IDOC.

7.    **Kimberly Hugo,** Agency Medical Coordinator for the Illinois Department of Corrections. Ms. Hugo will testify as to her role overseeing the provision of healthcare in IDOC.

8.    **Anita Bazile-Sawyer,** Chief of Programs for the Illinois Department of Corrections. Ms. Bazile-Sawyer will testify regarding her role in overseeing the provision of healthcare in IDOC.

9.    **Cheri Laurent,** Vice President of Special Contracts for Wexford. Ms. Laurent will testify regarding her role in assisting the vice president of operations on a day-to-day basis with running the operations under the contract for providing healthcare to the IDOC.

10.    **Stephen Ritz,** Corporate Medical Director, Utilization Management for Wexford. Dr. Ritz will testify as to Wexford's collegial review process in Illinois.

11.    **Elaine Gedman,** Executive Vice President and Chief Administrative Officer for Wexford. Ms. Gedman will testify regarding recruiting efforts by Wexford to fill vacancies in Illinois. Ms. Gedman will also testify regarding Wexford staffing in IDOC facilities, including number of positions and vacancies.

12.    **Dr. Arthur Funk,** Regional Medical Director, Northern Region, for Wexford. Dr. Funk will testify as to regional medical issues, management structure, and the criticisms leveled by Drs. Shansky and Puisis.

13.    **Dr. Rod Matticks,** Regional Director for Wexford. Dr. Matticks will testify as to regional medical issues, management structure, and the criticisms leveled by Drs. Shansky and Puisis.

14.    **Nick Little,** Vice President Strategic Contracting and Compliance for Wexford. Mr. Little will testify as to the contract between Wexford and IDOC, including contract requirements and reconciliation.

15.    **Shannis Stock-Jones,** Vice President of Operations, Illinois, for Wexford. Ms. Stock-Jones will testify as to the current operations of Wexford in Illinois.

16.    **Dr. Tom Lehman,** Corporate Medical Director, Utilization Management & Clinical Services for Wexford. Dr. Lehman will testify as to the oversight of the quality of medical care provided in Illinois.

17.    **TBD, the current medical treaters of the named Plaintiffs.**

18.    **TBD, Dentist for Wexford.**

19.    **Any and all Witnesses on Plaintiffs' witness list not listed here are may call witnesses.**

2

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DON LIPPERT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | No.  10-cv-4603 |
| v. | ) | |
| | ) | Judge Jorge Luis Alonso |
| JOHN BALDWIN, et al., | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| Defendants. | ) | |

**FINAL PRETRIAL ORDER
EXHIBIT 7—PLAINTIFFS' DEPOSITION DESIGNATIONS**

**2015-10-20 Dep. of Nicolette Duffield**

116: 4-24
117: 1-8

**2017-07-25 Dep. of Steven Meeks**

| | | | |
|---|---|---|---|
| 5: 18-20 | 24: 1-24 | 43: 1-24 | 64: 1-19 |
| 7: 13-24 | 25: 1-5; 24 | 44: 1-2; 14-24 | 67: 8-24 |
| 8: 1-24 | 26: 1-18; 22-24 | 45: 1-24 | 68: 1-5 |
| 9: 1-24 | 27: 1-6; 21-24 | 46: 1-24 | 71: 14-21 |
| 10: 1-11 | 28: 1-22 | 47: 1-9; 24 | 72: 17-22 |
| 11: 2-17; 24 | 30: 6-20 | 48: 1-5; 17-24 | 73: 7-24 |
| 12: 1-24 | 31: 2-21 | 49: 1-24 | 74: 1-15 |
| 13: 1-19; 24 | 32: 3-11; 16-20 | 50: 1-24 | 78: 18-24 |
| 14: 1-24 | 33: 1-18 | 51: 1-5; 23-24 | 79: 1-24 |
| 15: 1-24 | 37: 20-24 | 52: 1-3; 7-15 | 80: 1-16 |
| 16: 1; 20-24 | 38: 1-23 | 53: 12-16 | 88: 4-12 |
| 18: 17-24 | 39: 23-24 | 55: 13-19 | 95: 1-10 |
| 20: 12-23 | 40: 1-24 | 60: 7-24 | 98: 19-24 |
| 22: 8-24 | 41: 1-18 | 62: 13-24 | 99: 1 |
| 23: 1-24 | 42: 3-13 | 63: 1-24 | |

**2017-09-19 Dep. of Lisa Prather**

| | | | |
|---|---|---|---|
| 5: 13-25 | 12: 23-25 | 17: 8-22 | 24: 18-24 |
| 6: 1-25 | 13: 1-7 | 19: 13-17 | 25: 1-4; 9-18 |
| 8: 11-16; 21-25 | 14: 6-23 | 20: 4-16 | 26: 16-25 |
| 9: 1-25 | 15: 23-25 | 21: 11-13 | 27: 1-18 |
| 10: 1-13 | 16: 4-15 | 22: 11-14 | 28: 6-16 |

1

| | | | |
|---|---|---|---|
| 41: 10-16; 19-25 | 46: 1-10 | 49: 17-19 | 67: 1-6 |
| 42: 1-9 | 47: 21-25 | 57: 2-19 | 69: 3-10 |
| 45: 22-25 | 48: 1-2 | 66: 7-11; 19-25 | |

**2017-09-28 Dep. of Joseph Ssenfuma**

| | | | |
|---|---|---|---|
| 4: 1-24 | 17: 2-24 | 34: 1 | 73: 18-24 |
| 5: 1-16 | 18: 18-22 | 36: 5-7 | 74: 1-19 |
| 6: 14-17; 24 | 21: 22-24 | 39: 12-16 | 84: 1-3 |
| 7: 19-24 | 22: 1-2 | 42: 1-4; 19-22 | 85: 2-20 |
| 8: 1-10; 24 | 23: 15-24 | 43: 6-14 | 86: 1-5; 16-18; 23-24 |
| 9: 1-24 | 24: 1-23 | 54: 10-12 | 87: 1-5 |
| 10: 3-24 | 29: 1-24 | 63: 11-20 | 95: 19-21 |
| 11: 1-8 | 30: 1-24 | 65: 7-16 | 96: 3-24 |
| 12: 10-20 | 31: 1-9 | 66: 1-24 | 97: 1-5 |
| 13: 2-6; 13-20 | 32: 10-12; 18-24 | 67: 21-24 | 98: 6-9 |
| 16: 5-14 | 33: 1-6; 22-24 | 68: 1-2; 12-16 | 107: 10-21 |

**2018-01-31 Dep. of Jared Brunk**

| | | | |
|---|---|---|---|
| 23: 13-25 | 34: 1-22 | 48: 1-2 | 79: 8-16; 22-25 |
| 24: 1-6; 20-25 | 36: 9-14 | 54: 4-19 | 80: 1-12; 16-18 |
| 25: 1-10 | 37: 8-24 | 74: 6-17 | 83: 19-25 |
| 31: 2-25 | 39: 15-25 | 75: 10-20 | 84: 1-2 |
| 32: 1-4; 15-17; 25 | 40: 1-5 | 76: 2-6; 16-18; 24-25 | |
| 33: 1-8; 19-25 | 47: 21-25 | 77: 1-6 | |

**2018-01-31 30(b)(6) Dep. of Jared Brunk**

| | | | |
|---|---|---|---|
| 5: 12-17 | 24: 1-18 | 42: 1-24 | 86: 1-6; 9-18 |
| 7: 14-25 | 25: 1-17 | 43: 5-25 | 89: 12-23 |
| 8: 1 | 28: 4-14 | 44: 1 | 94: 12-13; 18-25 |
| 18: 13-19 | 35: 23-25 | 70: 18-21 | 95: 1-25 |
| 19: 3; 10-25 | 36: 1-4 | 77: 14-25 | 96: 15-20; 24-25 |
| 20: 1-25 | 37: 14-17 | 78: 1-3 | 97: 1 |
| 21: 1-25 | 40: 17-25 | 79: 12-20 | 101: 1-7 |
| 23: 17-25 | 41: 1; 23-25 | 85: 17-25 | 102: 1-23 |

**2018-02-01 Dep. of Gladyse Taylor**

| | | | |
|---|---|---|---|
| 4: 12-16 | 11: 1-13; 18-20 | 26: 6-9; 21-24 | 34: 18-24 |
| 6: 6-24 | 12: 7-8; 11-14 | 27: 1-12 | 35: 1 |
| 7: 1-24 | 13: 10-15 | 29: 17-24 | 44: 15-17 |
| 8: 23-24 | 15: 4-24 | 30: 1-24 | 49: 21-24 |
| 9: 1-24 | 18: 1-24 | 31: 1; 6-24 | 50: 1-24 |
| 10: 23-24 | 19: 1-7 | 32: 1-2 | 51: 1-24 |

52: 1-4          63: 1-6          69: 1-24
62: 13-24        68: 2-24         70: 1

### 2018-04-04 Dep. of John Baldwin

| | | | |
|---|---|---|---|
| 5: 18-24 | 24: 1-21 | 39: 1-3; 20-24 | 63: 1-21 |
| 6: 1-21 | 25: 1-20 | 40: 1; 9-18 | 65: 2-24 |
| 7: 4-15 | 26: 1-6 | 41: 3-10 | 66: 1-5 |
| 9: 4-24 | 27: 6-19 | 45: 23-24 | 67: 13-24 |
| 10: 1-24 | 28: 19-24 | 46: 1-24 | 68: 1-7 |
| 11: 7-14 | 29: 1-24 | 47: 1-24 | 70: 3-15; 21-24 |
| 14: 4-11 | 30: 1-12 | 48: 1-15 | 71: 1-21 |
| 15: 7-24 | 31: 10-18 | 49: 7-24 | 72: 5-17 |
| 16: 1-22 | 33: 7-18 | 55: 8-19 | 76: 15-23 |
| 17: 6-12; 19-24 | 34: 2-24 | 57: 2-24 | 77: 4; 17-23 |
| 18: 1-24 | 35: 1-24 | 58: 1-7; 14-23 | 83: 5-10 |
| 19: 1; 9-14 | 36: 1-19 | 59: 3; 7-24 | 85: 11-24 |
| 20: 21-23 | 37: 20-24 | 60: 1-13 | 86: 1-21 |
| 22: 8-11 | 37: 20-24 | 61: 1-21 | |
| 23: 16-24 | 38: 3-24 | 62: 1-24 | |

### 2018-04-05 Dep. of Trey Childress

| | | | |
|---|---|---|---|
| 4: 8-9; 13-15 | 9: 8-24 | 19: 20-23 | 35: 1-9 |
| 8: 14-24 | 10: 1-15 | 20: 12-22 | |

### 2018-04-11 Dep. of Kim Hugo

| | | | |
|---|---|---|---|
| 5: 6-9; 15-25 | 19: 1-7 | 38: 1-6 | 59: 17-25 |
| 6: 1-2 | 25: 11-20 | 40: 8-25 | 60: 1-13 |
| 7: 16-25 | 26: 1-25 | 41: 1-13 | 69: 3-25 |
| 8: 1-4; 17-25 | 27: 1-11 | 44: 9-17 | 70: 1; 12-22 |
| 9: 1-25 | 30: 23-25 | 54: 12-19 | |
| 10: 1-12 | 31: 1-2 | 55: 5-25 | |
| 18: 24-25 | 37: 20-25 | 56: 1-7 | |

### 2018-04-19 Dep. of Cheri Laurent

| | | | |
|---|---|---|---|
| 5: 15-24 | 13: 1-22 | 50: 5-13 | 69: 1-10 |
| 6: 1-13 | 43: 5-10; 15-24 | 51: 6-17 | 71: 1-4 |
| 7: 10-22 | 44: 1-24 | 52: 15-24 | 92: 1-11 |
| 8: 2-12; 15-17 | 45: 1-24 | 53: 1-5 | 104: 6-24 |
| 9: 12-18 | 46: 1; 9-15 | 65: 2-24 | 105: 1-22 |
| 10: 4-24 | 47: 4-14 | 66: 1; 15-24 | 106: 3-24 |
| 11: 1-8; 20-24 | 48: 3-5 | 67: 1-4 | 107: 1-8; 19-22 |
| 12: 1-2; 15-24 | 49: 1-21 | 68: 23-24 | 125: 14-17 |

**2018-04-27 30(b)(6) Dep. of Stephen Ritz**

| | | | |
|---|---|---|---|
| 4: 8-12 | 38: 1-13 | 59: 1; 23-24 | 85: 1-2 |
| 8: 10-23 | 39: 13-24 | 60: 1-3 | 90: 17-24 |
| 10: 22-24 | 40: 1-8; 16-24 | 64: 3-24 | 91: 1-17 |
| 11: 1-20 | 41: 1 | 65: 1-24 | 99: 6-24 |
| 15: 20-24 | 42: 1-24 | 66: 1-14 | 100: 1-24 |
| 16: 1-14 | 43: 1-2 | 67: 1-4 | 101: 1-6 |
| 17: 12-16 | 44: 24 | 68: 17-24 | 103: 2-15 |
| 26: 21-24 | 45: 1-2 | 69: 1-5; 10-16 | 114: 20-24 |
| 27: 1-24 | 46: 19-24 | 71: 8-11 | 115: 1-7; 13-20 |
| 28: 1-10 | 47: 1-5; 21-24 | 72: 13-24 | 116: 21-24 |
| 30: 5-15 | 48: 1-2 | 73: 1-15 | 117: 1-24 |
| 34: 1-24 | 55: 15-20 | 76: 19-24 | 125: 13-18 |
| 35: 1-7 | 56: 6-13 | 77: 1-9 | |
| 36: 14-24 | 57: 1-23 | 83: 18-23 | |
| 37: 1-24 | 58: 21-24 | 84: 5-8; 13-24 | |

**2018-05-09 Dep. of Ellen Holzman Daley**

| | | |
|---|---|---|
| 16: 19-24 | 18: 1-24 | 20: 1-23 |
| 17: 1-24 | 19: 1-24 | |

**2018-05-31 Dep. of Jared Brunk**

| | | | |
|---|---|---|---|
| 20: 21-24 | 31: 1-5; 8 | 45: 1-13; 16-18 | 72: 1-5; 17-24 |
| 21: 1-13 | 34: 16-24 | 46: 1-6; 11-12; 16-18 | 73: 3; 15-17; 20-22 |
| 23: 16-20 | 35: 1-21 | 48: 7-24 | 74: 11-20 |
| 24: 5-19 | 36: 1; 12-14 | 49: 1 | 78: 7-24 |
| 25: 1-24 | 40: 16-24 | 60: 15-24 | 79: 1-5; 19-24 |
| 26: 1-2; 10-24 | 41: 1-24 | 66: 19-24 | 80: 1-10; 13-15 |
| 28: 10-24 | 42: 1-24 | 67: 1-23 | 91: 20-24 |
| 29: 1-7; 14-18 | 43: 1-5; 16-18 | 70: 1-9 | 92: 1-3; 8-15 |
| 30: 5-12; 21-24 | 44: 9-24 | 71: 18-24 | 95: 1-6 |

**2018-12-29 Dep. of Salvador Godinez (*Lippert v. Godinez*, No. 13-cv-1434 (N.D. Ill.))**

Page 46

| | | |
|---|---|---|
| 4 | A. | …Now, you know, I haven't seen the recent |
| 5 | | John Howard reports or reports that were out there that |
| 6 | | may have crossed my desk. They may have brought that |
| 7 | | to -- to the reader's attention but not seeing that I |
| 8 | | can't say I recall it, to be very honest with you. |
| 14 | Q. | Did you -- You mentioned John Howard. The |

| | | |
|---|---|---|
| 15 | | reports that they issued, and I've seen a few that |
| 16 | | they've issued regarding Stateville, was it your common |
| 17 | | practice to read the reports that John Howard issued? |
| 18 | A. | I would say yes. |
| 19 | Q. | About how -- Well, I can narrow the |
| 20 | | question. |
| 21 | | Would that apply to the time frame from 2011 |
| 22 | | to 2014? |
| 23 | A. | I would say yes. |
| 24 | Q. | And why would you read those reports? |

Page 47

| | | |
|---|---|---|
| 1 | A. | It's an obvious answer, but it's a report |
| 2 | | about a facility that I'm in charge of that comes under |
| 3 | | me why wouldn't I read that report. |
| 4 | Q. | And if you read about any unsafe living |
| 5 | | conditions in the John Howard report what would you do |
| 6 | | with that information? |
| 7 | A. | I would absolutely wonder whether or not |
| 8 | | before I read that someone had briefed and debriefed |
| 9 | | with that group and taken action and developed a plan |
| 10 | | of action. |
| 11 | | I mean by the time I would get that report |
| 12 | | steps would have already been taken. My only question |
| 13 | | is have those steps been taken. |
| 14 | Q. | And how would you find that out? |
| 15 | A. | Through my chief of public safety would |
| 16 | | bring it down and then being told that, A, there was a |
| 17 | | plan, they had briefed it; they had done A, B, and C |
| 18 | | and because, if I'm not mistaken, there's -- we did |
| 19 | | follow-up reports to those. |
| 20 | Q. | What are those follow-up reports? |
| 21 | | I mean they were done by the department of |
| 22 | | corrections or John Howard? |
| 23 | A. | No. We were following up to the report of |
| 24 | | the John Howard.  We are either contesting what they |

Page 48

| | | |
|---|---|---|
| 1 | | were saying or agreeing with what they were saying and |
| 2 | | developing a plan of action of those that we agreed |
| 3 | | with that action is needed on. |
| 4 | Q. | And those would be written? |
| 5 | A. | I believe so. Yeah. |
| 6 | Q. | Well, were you involved in putting together |

5

7            the follow-up reports?
8   A.       No.
9   Q.       Who was?
10  A.       I would think at the local level the warden
11.          would be and the deputy director of that region.
12  Q.       How do you know that -- Or -- did you
13           ever verify whether anybody did put together any
14           follow-up reports?
15  A.       I wouldn't. My office would.
16  Q.       Who in your office would?
17  A.       Public safety. Chief of operations.
18  Q.       And how would -- Or would they share with
19           you whether or not a follow-up report had been made?
20  A.       Not necessarily unless there was -- I think
21           the only way would be like a disciplinary would be done
22           against somebody for not following up.
23  Q.       And if a problem was identified in the John
24           Howard report and the follow-up report or plan of

Page 49

1            action was then made by your office wat it anybody's
2            job to monitor if the problem was actually getting
3            better
4   A.       Yeah.  Again, chief of operations because
5            he's over the that warden.

## 2016-02-08 Dep. of Wendy Olsen-Foxon (*Williams v. Wexford*, No. 14-cv-327 (N.D. Ill.))

Page 7

13  Q.       Have you been working for IDOC then the
14           last 15 years more or less?
15  A.       17 years.  15 years as a med tech.

Page 71

5   Q.       Do you recall ever saying to
6            Mr. Williams something to the effect of, an inmate
7            has to be pretty much dying before Wexford would
8            do anything to help?
9   A.       I don't recall saying something
10           like that or that.
11  Q.       Would you agree with that statement
12           that I said though?
13  MR. MARUNA: Object.

6

14 THE WITNESS: I don't want to answer that.

15 MR. SWEIS: Counsel, how do you want to

16 handle that?  Are you directing her not to answer?

17 MS. LUTZKE: I'm not directing her not to

18 answer.  She can answer the question if she

19 wants to.

20 THE WITNESS: I would really prefer not

21 to because.

22 BY MR. SWEIS:

23 Q. At least tell me why you wouldn't

24  want to answer the question.

Page 72

1 A. Because I've had too many of my patients

2  pass away because of cheap -- changing -- making

3  things cheap, lowering costs, not getting sent out

4  for three, four months when they have cancer, not

5  being diagnosed until they are stage 4.  That's

6  why.  Lantis being taken away from the diabetics

7  who it's working for.  So there.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DON LIPPERT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 10-cv-4603 |
| | ) | |
| JOHN BALDWIN, et al., | ) | Judge Jorge L. Alonso |
| | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| Defendants. | ) | |

**FINAL PRETRIAL ORDER
EXHIBIT 8—PLAINTIFFS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW (REDACTED)**

## TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................... 1

II.     STAFFING, VACANCIES AND LEADERSHIP ........................................... 15

    A.    Summary and Background ..................................................... 15
    B.    Vacancies ......................................................................... 16
    C.    Leadership Vacancies........................................................... 27
    D.    Other Issues Compounding Staffing and Vacancy Problems ........................................ 32
    E.    Lack of Staffing Analysis........................................................ 34

III.    QUALITY OF PRACTITIONERS.............................................................. 35

IV.     SANITATION, SPACE, EQUIPMENT ....................................................... 38

V.      MEDICAL RECORDS ........................................................................... 42

VI.     MEDICAL RECEPTION (INTAKE)......................................................... 47

VII.    NURSING SICK CALL (ACCESS TO SERVICES) ...................................... 55

VIII.   CHRONIC DISEASE MANAGEMENT ...................................................... 60

IX.     URGENT AND EMERGENT CARE .......................................................... 69

X.      SCHEDULED OFFSITE SERVICES AND OTHER SPECIALTY CARE.................. 72

XI.     INFIRMARY CARE .............................................................................. 81

XII.    MEDICATION ADMINISTRATION.......................................................... 89

XIII.   INFECTION CONTROL (NO RELIABLE SYSTEM FOR OVERSIGHT).................. 94

XIV.    DENTAL PROGRAM............................................................................. 98

XV.     FAILURE TO IMPLEMENT OR FOLLOW QUALITY IMPROVEMENT
        PROGRAMS..................................................................................... 104

XVI.    MORTALITY AND END-OF-LIFE CARE ................................................ 112

XVII.   NAMED PLAINTIFFS' EXPERIENCES.................................................... 116

    A.    The Stern Report ................................................................ 118

B.      The Stern Report: Quality of nursing decision-making and care.................................. 119
C.      The Stern Report: Quality of practitioner decision-making and care .......................... 120
D.      The Stern Report: Errors and problems in continuity of care ..................................... 120
E.      The Stern Report: Errors and problems in non-urgent episodic care.......................... 121
F.      The Stern Report: Errors and problems in urgent and emergent episodic care........... 122
G.      The Stern Report: Errors and problems in chronic disease management ................... 123
H.      The Stern Report: Errors and problems in infirmary care.......................................... 124
I.      The Stern Report: Scheduled offsite services ............................................................ 125
J.      The Stern Report: Dental program .............................................................................. 126
K.      The Stern Report: Errors and problems in medical records ........................................ 126
L.      The Stern Report: Errors and problems with pharmacy and medication
        administration................................................................................................................ 126
M.      The Stern Report: "Capstone" stories ......................................................................... 127
N.      The Stern Report: Other systemic conclusions reached by Dr. Stern ......................... 130

XVIII.  DEFENDANTS' KNOWLEDGE OF SYSTEMIC MEDICAL AND DENTAL CARE
        FAILURES .................................................................................................................... 132

A.      The John Howard Association Reports......................................................................... 132
B.      The 2016 Logan GIPA Report ..................................................................................... 144
C.      The 2016 Adler Report................................................................................................. 145

XIX.    INTERNAL COMPLAINTS ABOUT SYSTEMIC MEDICAL AND DENTAL
        PROBLEMS .................................................................................................................. 146

XX.     AWARENESS OF PROVIDER INCOMPETENCE AND LACK OF WEXFORD
        OVERSIGHT ................................................................................................................ 163

XXI.    FAILURE TO IMPLEMENT THE RECOMMENDATIONS DEFENDANTS
        *ACCEPTED* FROM THE 2014 SHANSKY REPORT ................................................. 174

XXII.   FAILURE TO IMPLEMENT INITIATIVES TO IMPROVE HEALTHCARE  THAT
        DEFENDANTS THEMSELVES HAVE PRIORITIZED ............................................. 185

XXIII.  DEFENDANTS FAIL TO MONITOR THEIR VENDOR OR PENALIZE IT WHEN
        THEY KNOW IT FAILS TO MEET CONTRACT REQUIREMENTS...................... 190

XXIV.   PROPOSED CONCLUSIONS OF LAW .................................................................... 203

A.      Objective Component—Serious Medical Needs And Conditions Causing Harm....... 204
B.      Subjective Component—Deliberate Indifference To Serious Medical Needs And To
        Risk Of Harm Posed By Health Care Deficiencies..................................................... 211
C.      Conclusion.................................................................................................................... 215

## I.     INTRODUCTION

1.      The Illinois Department of Corrections (IDOC) operates 27 prisons throughout the State of Illinois. As of August 31, 2018, these facilities housed 39,709 prisoners, of whom 2,197 were incarcerated in the two women's prisons and the remaining 37,512 in male facilities.

2.      This case was filed in July 2010 by Don Lippert, then a prisoner at Stateville Correctional Center (CC), *pro se* and on his own behalf. [Dkt. 1.] Mr. Lippert, an insulin-dependent diabetic, complained of the healthcare he had received in the Illinois Department of Corrections (IDOC). [*Id*; Dkt. 742-1 ¶ 14.]

3.      In October 2011, court-appointed counsel filed an amended complaint on behalf of Mr. Lippert and a class of prisoners in the Illinois Department of Corrections (IDOC) with physical healthcare needs. [Dkt. 39.]

4.      The Defendants in this case are the Governor of the State of Illinois, the Director of IDOC, and the IDOC Medical Director (sometimes also called "Chief of Health Services"), in their official capacities.

5.      Since 2010, the Directors or acting Directors of IDOC have been Gladyse Taylor (Acting Director September 2010 – April 2011; June 16, 2015 – August 13, 2015); Salvador Godinez (May 2, 2011 – March 2, 2015); Bryan Gleckler (Acting Director March 3, 2015 – March 15, 2015); Donald Stolworthy (Acting Director March 16, 2015 – June 15, 2015); and John R. Baldwin (August 14, 2015 – present).

6.      Since 2010, the agency Medical Directors of IDOC have been Dr. Louis Shicker (2010 – June 2016); Dr. Michael Dempsey (acting) (June 2016 – November 2016), and Dr. Steven Meeks (November 2016 – present).

7.     In December 2013, the parties requested that the Court appoint Dr. Ronald Shansky under Federal Rule of Evidence 706 to investigate and report on IDOC physical healthcare. [1] [Dkt. 240.] At the time, the parties had participated for several months in settlement negotiations under the supervision of the magistrate judge, and believed that "the appointment of an independent expert [would] facilitate a prompt resolution of the putative class claims." [*Id*. ¶ 3.] Among other qualifications, Dr. Shansky had served as the agency Medical Director for IDOC for several years in the 1980s and 1990s. [*Id*. ¶ 5.]

8.     The Agreed Order Appointing Expert provided that Dr. Shansky "will assist the Court in determining whether the Illinois Department of Corrections . . . is providing health care services to the offenders in its custody that meet the minimum constitutional standards of adequacy." [Dkt. 244 ¶ 1a.] It further provided that "[t]he Expert will investigate all relevant components of the health care system except for [those] that relate exclusively to mental health," and that "[i]f systemic deficiencies in IDOC health care are identified by the Expert, he will propose solutions for consideration by the parties and the court." [*Id*.]

9.     Dr. Shansky assembled a team of correctional healthcare experts to assist him in this task: another physician (Dr. Karen Saylor); a nursing expert (Larry Hewitt, R.N.); and a dentist (Karl Meyer, D.D.S.). [Dkt. 339 p. 3.] An additional physician (Dr. Joe Goldenson) assisted Dr. Saylor with the mortality reviews. [*Id*. p. 5.]

10.     Dr. Shansky and his team visited eight IDOC prisons, including three reception centers (Northern Reception Center [NRC], which is IDOC's main reception center; Logan CC, the principal women's prison; and Menard CC), three maximum-security facilities (Stateville CC; Pontiac CC; and Menard), and one prison with a special geriatric unit (Dixon CC). [*Id*. pp. 3-4.]

---

[1] A class action on behalf of IDOC prisoners with mental health needs was already proceeding in the United States District Court for the Central District of Illinois (*Rasho v. Walker*, No. 07-1298-MMM).

Dr. Shansky explained that his team wanted to review facilities with such "special responsibilities" because "[i]t has been our experience that when a system is able to meet constitutional standards at the most challenged institutions, it is very likely to meet constitutional standards at the less challenging facilities. The converse, however, in our experience has not proven to be true." [*Id*. p. 4.]

11.     The Shansky team also visited two medium security prisons, Hill CC and Illinois River CC, and pursued a variety of investigative strategies, which included interviews of staff and inmates, observations of the care provided, review of system-wide policies and procedures and comparison to actual practices, review of meeting minutes, and review of selected medical records, including death records. [*Id*. pp. 5, 251, 288.]

12.     Dr. Shansky delivered a draft report to the parties in August 2014. [Dkt. 742-1 ¶ 19.] After both Plaintiffs and Defendants had submitted comments, Dr. Shansky issued the Final Report of the Court-Appointed Expert (hereafter "Shansky Report" or "First Expert Report") in December 2014. [*Id*.; Dkt. 339.] The Shansky Report is over 400 pages long and consists of (i) an overview of findings with respect to leadership and staffing and fifteen major services; (ii) individual reports on each of the eight facilities visited with more detailed findings in each of these subject areas; and (iii) the mortality reviews. [Dkt. 339.]

13.     The Shansky Report identified a total of fifteen areas of systemic deficiency in IDOC physical healthcare (leadership and staffing, including physician qualifications; clinic space and sanitation; reception processing; intrasystem transfer; medical records; nursing sick call; chronic disease management; medication administration; unscheduled (urgent/emergent) services; scheduled offsite services; infirmaries; infection control; the dental program; mortality reviews; and continuous quality improvement. [Dkt. 339, *passim*.] The overview of findings concludes:

> From the eight site visits, the interviews with staff and inmates, the review of institutional documents, the review of medical records, including death records and mortality reviews, we have concluded that the State of Illinois has been unable to meet minimal constitutional standards with regards to the adequacy of its health care program for the population it serves.

[*Id.* p. 45.] The report offers numerous recommendations as to each of the identified areas of deficiency. [*Id.*, *passim.*]

14.     On March 31, 2015, the magistrate judge reported that the parties were unable to reach a settlement and the settlement referral was closed. [Dkt. 309.] During the period of the Shansky investigation and subsequent settlement negotiations, only limited discovery had taken place. [Dkt. 297 pp. 2-3 (¶ 2(B)).] Thereafter, active discovery resumed, and Plaintiffs filed their motion for class certification on December 8, 2015. [Dkt. 394.] The motion was fully briefed as of April 18, 2016. [Dkt. 469.] On April 28, 2017, the Court certified a class pursuant to Fed. R. Civ. P. 23(b)(2) of "all prisoners in the custody of the Illinois Department of Corrections with serious medical or dental needs." [Dkt. 534.]

15.     In September 2017, citing *inter alia* the passage of time since the Shansky Report,[2] Plaintiffs moved for the reappointment of Dr. Shansky pursuant to FRE 706 to perform an update on his 2014 investigation on medical and dental care within IDOC. [Dkt. 567.] Defendants objected to the reappointment of Dr. Shansky. [*Id.* ¶ 11.] On October 25, 2017, the Court appointed a different expert pursuant to FRE 706, Dr. Michael Puisis. [Dkt. 583; Dkt. 576-1 pp. 8-9; Dkt. 593.] Dr. Puisis was appointed over Defendants' objection, although Defendants had initially raised Dr. Puisis as an alternative to Dr. Shansky. [Dkt. 576-1 pp. 8-9.]

---

[2] Plaintiffs also asserted that Defendants had been unable to produce a properly informed Fed. R. Civ. P. 30(b)(6) witness as to what, if anything had changed in the delivery of medical and dental care within IDOC since the issuance of the Shansky Report. [Dkt. 567 ¶¶ 4-6, 9.]

4

16.     Like Dr. Shansky, Dr. Puisis had served as an agency Medical Director for IDOC. [*Id.*]

17.     The order appointing Dr. Puisis, entered on December 8, 2017, directed him to "investigate the IDOC [medical and dental] care system as it currently exists and determine whether any of the systemic deficiencies identified by the first court-appointed expert in this matter, Dr. Ronald Shansky, and set forth in the Final Report of the Court-Appointed Expert issued in December 2014 [ ] currently exist within IDOC." [Dkt. 593 ¶ 1(a).] The order further directed Dr. Puisis to report on any additional systemic deficiencies within IDOC medical or dental care should he identify any such additional deficiencies, but to "focus primarily on the deficiencies within IDOC health care reported in the Shansky Final Report." [*Id.*]

18.     Dr. Puisis also assembled a team of correctional healthcare experts to assist him in this task, the members of which were entirely different from the members of the Shansky team: a physician, Dr. Jack Raba MD; two nursing experts, Madie LaMarre MN, FNP-BC, and Catherine Knox MN, RN, CCHP-RN; and a dentist, Jay Shulman DMD, MSPH (hereafter, the "Puisis team" or "Second Expert team.") [Puisis SR[3] p. 2.] The Second Expert team reviewed system-wide documents such as Administrative Directives, policies, and other documents such as budgets, staffing documents, quality improvement meeting minutes, and reports as well as a sample of health records, including death records. [*Id.* pp. 2-3.] The Puisis team also interviewed key players within IDOC (including Wexford personnel) and performed site visits at five of the eight prisons

---

[3] Throughout this document, "Puisis SR" refers to the Second Court-Appointed Expert Team's Statewide Summary Report Including Review of Statewide Leadership and Overview of Major Services. Other sections of the report collection include facility-specific reports (Logan ("Puisis LOG"), Stateville ("Puisis STA"), Dixon ("Puisis DIX"), Menard ("Puisis MEN"), Northern Reception and Classification Center ("Puisis NRC"); Mortality Reviews ("Puisis MR"); and patient death records ("Puisis MR Patients"). These sections are described in more detail in ¶ 16, *infra*. All sections were filed with the Court on November 14, Dkt. 767.

previously reviewed by the Shansky team, namely the three reception centers (NRC; Logan CC; and Menard CC), two of the three maximum-security facilities (Stateville CC and Menard), and Dixon CC. [*Id.* p. 5.] The Puisis team had the option of performing site visits to the remaining three prisons visited by the Shansky team, but concluded after visiting the five prisons listed that further visits were not necessary, as they would not substantially change their conclusions as to the state of medical and dental care in IDOC. [Tr. T. Puisis.]

19. Dr. Puisis delivered an interim report to the parties on the team's likely conclusions on May 8, 2018, after site visits to four prisons (NRC; Stateville; Logan; and Dixon). [Tr. T. Puisis; Dkt. 718 ¶ 8.] As summarized by Defendants in an early June filing, Dr. Puisis reported at that meeting that "the overall medical care provided at the IDOC facilities he visited had deteriorated since Dr. Shanksy visited them, and that the IDOC health care system still had systemic deficiencies." [Dkt. 718 ¶ 9.] The draft Puisis team report was delivered to the parties for comment on August 13, 2018. After both Plaintiffs and Defendants had submitted comments, Dr. Puisis issued the Final Report of the Second Court-Appointed Expert (hereafter "Puisis Report" or "Second Expert Report") on October 15, 2018. The Puisis Report is approximately 1200 pages long and consists of (i) a Statewide Summary Report including key findings, a review of statewide medical operations, a statewide overview of major services, and recommendations; (ii) individual reports on each of the five facilities visited with more detailed findings as to those prisons; and (iii) the mortality reviews. [Dkt. 767.]

20. The Puisis team noted some improvements in a handful of areas (some improvements in nursing sick call; improvements in some aspects of intake procedures and intrasystem transfer; and modest improvements at some sites in space and sanitation). In general, however, the Puisis team concluded that, as to the fifteen areas of systemic deficiency reported by

the Shansky team in 2014, IDOC healthcare was either no better or in fact worse in 2018. [Puisis SR, *passim*.] The first of the Report's "Key Findings" states:

> Overall, the health program is not significantly improved since the First Court Expert's report. Based on record reviews, we found that clinical care was extremely poor and resulted in preventable morbidity and mortality that appeared worse than that uncovered by the First Court Expert.

[Puisis SR p. 9.] The Second Expert Report also criticizes certain additional areas that were not extensively addressed by the First Expert Report (such as the organizational structure of IDOC healthcare and its subordination to custody control), or were not found wanting by the First Expert Report (medication administration). [*Id.* pp. 13-21, 79-84.]

21.     In addition to the conditions described and expert opinions offered in the Shansky and Puisis Reports, during the course of this case, Defendants and their healthcare contractor, Wexford Health Sources, Inc. ("Wexford") have produced thousands of pages of reports, manuals, directives, and other non-email documents, and over 500,000 pages of emails.[4] Some of the documentation collected in discovery dates back to the mid-2000s. Plaintiffs took two dozen depositions of Defendants and Wexford, including twelve Fed.R.Civ.P. 30(b)(6) depositions. Finally, Plaintiffs have proffered a report by correctional healthcare expert Dr. Marc Stern, the former agency healthcare director for the State of Washington Department of Corrections, which analyzes the medical records and care provided to the five named plaintiffs still in IDOC custody as of summer 2018, using an analytic framework derived from the Shansky Report. [P551[5].] As a rebuttal expert to Dr. Stern, Defendants proffered Dr. Owen Murray of Texas. Defendants offered no expert testimony or report to rebut either the Shansky Report or the Puisis Report.

---

[4] At least half and maybe as many as 2/3rds of the emails are duplicates. Defendants produced more than 90% of the emails in pdf format, making de-duplication (and an accurate count of duplicates) difficult.
[5] References to Plaintiffs' Trial Exhibits have a prefix of "P" (for Plaintiffs) and "G" (for Group). References to Defendants' Trial Exhibits have a prefix of D (for Defendants).

22.     Among the discovery documents produced by Defendants was a report they had commissioned as to their healthcare services, which was issued in July 2016—midway between the 2014 Shansky Report and the 2018 Puisis Report. [P21.] This report was prepared by a branch of the National Commission on Correctional Health Care (NCCHC) known as NCCHC Resources, Inc. or NRI, to "assess operational policies and practices for five selected prisons within the Illinois correctional system" and "recommend how the state may transform the system of delivering health care to inmates . . ." [P21 p. 1.] ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████ [P65; P21, *passim*.] The NRI team performed site visits to five IDOC prisons in April/May 2016—Menard CC; Pontiac CC; Logan CC; Stateville CC; and Dixon CC. [P21 p. 5.] The report states that the NRI reviewed health care operations at each of the five sites. [*Id.* p. 6.]

23.     The principal business of NCCHC is accrediting correctional healthcare programs, and its business model depends on receiving annual fees from accredited facilities. [Tr. T. Puisis, Stern.] The NRI Report notes multiple "operational challenges [in IDOC] identified by the NRI team that are having a significant impact on the ability to provide timely and constitutionally adequate health care." [P21 pp. 4-9.]

24.     In addition, in 2016 and again in 2017, Defendants put out Requests for Proposal (RFPs) for a new comprehensive healthcare contract for IDOC. [P64; P447.] Both RFPs were withdrawn without a new contract being awarded, but the 2017 RFP was withdrawn after two complete proposals had been submitted, one by the current vendor Wexford Health Sources, Inc. and another by Corizon Health (a/k/a Corizon LLC), another private for-profit vendor. The two

RFPs and related correspondence were produced by Defendants, and Plaintiffs obtained the responses to the 2017 RFP in discovery from Wexford and the State Procurement Office. The purpose of Defendants in issuing the RFPs was to provide constitutional healthcare to the Illinois prison population. [Tr. T. Taylor.]

25. Since May 2011, Wexford Health Sources, Inc., has been providing healthcare personnel and services at all IDOC prisons. Prior to the 2011 contract, Wexford had a 2005 contract to provide services at most though not all IDOC facilities, and Wexford has been providing services to IDOC since 1992. [P172.]

26. The 2011 contract had a five-year initial term and could be renewed thereafter for not more than another five years. [P18 § 1.2.] In 2016, IDOC renewed the contract for one year; in 2017, it did the same; in 2018, it renewed the contract for a further three years, bringing it to the end of the total possible ten-year term. Each renewal has been memorialized in a short document which contains some limited modifications to the original 2011 contract. [P87; P114; P191.]

27. Wexford is privately-held, for profit corporation (a closely held corporation) organized under the laws of the State of Pennsylvania and headquartered in Pittsburgh, Pennsylvania. Wexford is a wholly-owned subsidiary of The Bantry Group, also a closely-held, for-profit corporation organized under the laws of the State of Florida.

28. Throughout IDOC, as of 2018, Wexford provides some 65% of the healthcare workers; the remaining 35% are state employees.

29. The state "side" of the system is headed up by the agency Medical Director or Chief of Health Services (currently Dr. Meeks). Three "regional" medical coordinators (one each for the northern, central, and southern regions of Illinois) and an agency medical coordinator report to Dr.

Meeks; none of these is a physician. Each prison also has a Health Care Unit Administrator (HCUA) who is a state employee.

30.     Currently, dialysis services are provided at three facilities by NaphCare. University of Illinois at Chicago provides laboratory services statewide and statewide management of HIV and hepatitis C patients with anti-viral medication via telemedicine. Wexford Health Sources provides the remaining medical, dental, vision, and pharmacy services. [Puisis SR p. 13.]

31.     On the Wexford "side," by contract, Wexford is supposed to provide each prison with a physician "Medical Director." Some prisons also have staff physicians as well; most of these are also Wexford employees, as are the vast majority of the dentists, physician assistants, nurse practitioners, and Directors of Nursing (DONs) throughout IDOC. The remaining healthcare employees—RNs, LPNs, physical therapists, dental hygienists, radiology technicians, and others—may be either Wexford or state employees. In 2017, Defendants determined to reorganize RN staffing so that either Wexford RNs or state RNs would be clustered at any given prison (rather than having a combination of the two). Nevertheless, healthcare personnel at each of the IDOC prisons remains composed of both state and Wexford employees.

32.     Wexford is solely responsible for discipline and termination of its employees. No state employee, including the IDOC Director or the agency Medical Director, can fire or direct the firing of a Wexford employee.

33.     Each IDOC prison provides basic healthcare services. Theoretically, each prison has at least one physician on site, as well as nursing staff, dental staff, and other medical support staff. Samples for basic screenings (blood, urine, etc.) are taken at each prison and sent off-site for analysis; most prisons also have medical x-ray equipment (the x-rays are also sent for off-site reading). Basic dental services (x-rays, extractions) are also provided on site, although some

prisons do not have dental hygienists and thus do not provide routine cleanings to their population. Access to medical services is provided via nurse "sick call," for which prisoners are typically charged a $5 "co-pay." Prisoners with certain "chronic" healthcare problems especially prevalent among prison populations—Hepatitis C, diabetes, asthma/COPD, hypertension/cardiac, and HIV/AIDS—are enrolled in "chronic clinics" and seen at regular intervals. All IDOC prisons also contain an infirmary. The "intake" centers (reception and classification centers) also perform initial healthcare screenings of each prisoner entering IDOC. All prisoners are supposed to receive a periodic physical examination (every five years for those under 30, every three years for those under 40, every two years for those 40 or older), as well as a dental check-up every two years. [P251 § II(F)(1)(b); P252 § II(F)(3)(a).] Some prisons also provide dialysis services.

34.     Emergency treatment, hospitalization, specialty consultations, and all but the simplest surgical procedures must be obtained outside IDOC. IDOC has an agreement with the University of Illinois medical center (UIC) for UIC to provide a certain amount of free care to IDOC in the form of 216 inpatient hospital admissions and 2160 outpatient visits each year. Only prisoners from Stateville CC/NRC, Dixon CC, Pontiac CC, and Sheridan CC may participate in this program.

35.     Under the Wexford contract, Wexford is responsible for the cost of all outside consultations and services, including hospital services,[6] with the following exceptions: (i) it is not responsible for the costs of UIC consultations or admissions up to the "free" care threshold of 216 inpatient hospital admissions and 2160 outpatient visits; and (b) it is only responsible for the costs of all other outside consultations and services if, on an annual basis, they exceed a certain threshold

---

[6] Wexford must "[p]rocess and pay claims for all: (a) inpatient hospital services; (b) outpatient hospital services; (c) hospital emergency room care services; and (d) non-institutional provider services. [P18 § 2.2.1.5.]

set out in the contract, the "Annual Hospitalization Utilization Threshold." [P18, §§ 2.2.3.7; 3.1.2; 3.1.2.1.] The Annual Hospitalization Utilization Threshold is a relatively low amount—in contract year 1 (2011), it was $5,855,442; in contract year 10 (2021), it will be $7,552,971. [*Id.*, §§ 3.1.2.1; 3.3.] Assuming 40,000 prisoners in IDOC custody, in contract year 8 (2018), the set amount ($7,264,237) comes to a little over $180 per prisoner. Costs assessed against the threshold are based on the "billed rate" and not on the (lower) rate that the State actually pays.

36.     Wexford's principal obligation under the 2011 contract is to provide staff. A substantial part of the contract consists of staffing schedules and "Schedule Es," which are schedules for each prison of the types of staff positions Wexford is to fill, how many hours of service as to each of these positions Wexford is to fill on a weekly basis, the hourly rate to be paid by IDOC as to each of these positions, and the days and times during the week during which the services are to be provided.[7] Over time, these schedules have been modified by ASRs (adjusted service requests) and by provisions in the contract renewals. Wexford is also responsible for purchasing healthcare supplies and equipment, subject to reimbursement by IDOC.

37.     During the period of the 2011 contract, Wexford has never provided all of the staff it is supposed to provide per the contract. During the period from January 2017 to April 2018, for instance, the "fill rate" (the percentage of staff hours Wexford is obliged to provide under the current staffing obligations), was never higher than 88.2% and dropped as low as 79.7%. [P363.] In April 2018 it stood at 81%. [*Id.*]

38.     Wexford's other principal responsibilities under the contract are to comply with IDOC Administrative Directives; to maintain proper records and treatment plans; to pay subcontractors on time; and to provide reports as requested by IDOC.

---

[7] *E.g.*, the schedules may provide that there is to be a physician assistant/nurse practitioner Monday-Friday, 8am-4pm, at a particular prison, for which IDOC will pay Wexford $[x] per hour.

39.     Certain aspects of Wexford's performance are tracked by IDOC on a facility-by-facility basis in a "monthly contract monitoring" report. As described in the Puisis Report:

> The HCUA is the only IDOC staff that is specifically assigned for formal contract monitoring. HCUAs are provided a spreadsheet to use for this purpose. There are five performance targets that are assessed. The performance targets are:
>
> - Whether all hours in the contract are fulfilled
> - Whether all bills have been paid timely
> - Whether there has been any Court finding of deliberate indifference
> - Whether administrative directives have been complied with
> - Whether Wexford met provisions of the contract.

[Puisis SR p. 17.] There is no review of clinical care included in this reporting. [*Id.*] For many years, these reports have found that Wexford has failed to provide IDOC with the personnel required under the contract.

40.     Both the NRI Report (the IDOC-commissioned study) and the Puisis Report note basic problems with the overall organizational structure of the IDOC healthcare system. The NRI report states, "[e]ffective management of a system with many complexities starts with good leadership. . ." [P21 at 000007.] It notes as among the "operational challenges identified by the NRI team that are having a significant impact on the ability to provide timely and constitutionally adequate health care":

**1. Lines of authority that appear neither well-delineated nor effective**

.  .  . A variety of factors contribute to the lack of effective oversight and accountability within each facility:

> a) State employees attempting to monitor and supervise vendor employees without direct line authority to counsel or discipline
>
> b) Vendor site managers focusing solely on vendor employees . . .

The flawed lines of authority significantly contribute to the operational inconsistencies, lack of accountability, and ineffective oversight . . .

**2. Unclear method for staffing of state and vendor personnel**

> This unusual staffing plan is difficult to cleanly and clearly define; it presents many gaps in communication and functions, starting at the top levels of administration and running down the staffing levels. . .
>
> It is not considered best practice to have multiple levels of internal management among key players, such as mental health directors and health care managers. In the current structure, the medical and dental staff report to the health care unit administrator (HCUA), who then reports to the assistant warden of programs . . . This assistant warden thus takes on the role of spokesperson for the clinical areas of the operation. Assistant wardens generally lack appropriate clinical or health care experience or education. . . .

[P21 at 000008.] The Puisis Report states:

> Currently, the IDOC medical program table of organization is not organized on a medical model. Governance of the IDOC medical program is subordinated to custody leadership on a statewide level and at the facility level. The health authority[8] is the Chief of Programs and Support Services, and is an ex-warden. . .

[Puisis SR p. 13.]

> The Wexford staff are supervised by Wexford employees who are not under supervision of the HCUA. . .

[*Id.* p. 15.]

41. Prisoners have a higher incidence of health needs than the general population.

42. The Bureau of Justice Statistics of the U.S. Department of Justice reports that almost half of state and federal prisoners and jail inmates have had a chronic medical condition, compared to 31% of the general population. [P501 at 3 (Table 1).][9] Over 30% of prisoners had high blood pressure/hypertension; almost 10% had heart-related problems; and almost 15% had asthma. [*Id.*] Over 24% of prisoners had multiple chronic conditions. [*Id.* at 8 (Table 4).]

---

[8] [Footnote in original:] A health authority is a person responsible for health care services. This person arranges for all levels of health care and ensures that all levels of service are provided, and that care is accessible, timely, and of good quality.

[9] "Chronic conditions" include cancer, high blood pressure, stroke-related problems, diabetes, heart-related problems, kidney-related problems, arthritis, asthma, and cirrhosis of the liver. [P501 at 1.]

43. While 4.8% of the general population reported having had an infectious disease, 21% of prisoners reported having had one. [*Id*. at 3 (Table 1).] Incidences of tuberculosis or hepatitis B or C respectively were some 10 and 15 times higher among prisoners than in the general population. [*Id.*]

44. As of IDOC's most recent annual report, for fiscal year 2017, 56% of prisoners were African-American, compared to 14.6% of the general population of Illinois based on U.S. Census data.

45. 1% of IDOC prisoners were college graduates. 1% had completed only sixth grade. 39% had not completed high school.

46. An October 2017 report from the Pew Charitable Trusts on state prison health care across the country reported that the State of Illinois ranks in the bottom tier of states in the amount it spends on prison health care (both medical and mental health care). In FY 2015, Illinois spent $3,619 per prisoner on health care; the 49-state median (49 states had supplied data) was $5,720. The highest-spending state was California, at $19,796 per prisoner. [P19 p. 8 (Figure 2).]

47. Illinois has one of the most crowded prison systems in the United States.

## II. STAFFING, VACANCIES AND LEADERSHIP

### A. Summary and Background

48. The systemic deficiencies of IDOC physical healthcare start at the most basic level: the number of people available to provide medical and dental care. Illinois also ranks in the bottom tier of states in the number of healthcare positions per prisoner. This is coupled with chronic, long-standing vacancies in healthcare positions, including critical health leadership positions, as catalogued by the First and Second Experts, the IDOC-commissioned NRI Report, and Defendants' own internal documents. Administrative demands placed by the vendor Wexford on

its employees further reduce the number of worker hours available to meet prisoner healthcare needs. Defendants have performed no analysis to determine how many staff they actually need to provide care for their prisoner population.

49.     Even fully staffed, IDOC would have fewer prison healthcare workers than most other states in the U.S. The October 2017 report from the Pew Charitable Trusts on state prison health care reported that, of the 43 states that submitted usable data, in FY 2015 Illinois ranked second-to-last among the states in the number of health professional FTEs (full time equivalents) per 1,000. At 19.1 FTEs per 1000 prisoners, Illinois barely outranked Oklahoma, at 18.6, and was far below the 43-state median of 40.1 FTEs per 1000. [P19 pp. 101-02, Table C.7.]

50.     Although IDOC has added mental health staff positions since FY 2015, the number of physical healthcare staff positions has remained (virtually) unchanged. [P18 at 000381-409 (Schedule Es/Annual Hours); P179 (Schedule Es/Annual Hours).] The Second Court-Appointed Expert reported that, even with the population decline in IDOC between 2015 and 2018, Illinois would still rank in the bottom 10 states in its number of healthcare staff per prisoner. [Puisis SR p. 28 n. 61.]

**B.     Vacancies**

51.     IDOC's low per capita healthcare staff numbers are coupled a long history of vacancies in existing positions. Internal documents reflect that Wexford was hired in part to help solve IDOC's staffing problems, but Wexford has not solved the problem. [P468.]

52.     In 2014, the First Expert singled out vacancies as a critical issue affecting access to medical and dental care in IDOC. One of the first recommendations of the Shansky Report was that "IDOC . . .develop and implement a plan which addresses facility-specific critical staffing

needs by number and key positions and a process to expedite hiring of staff when the critical level has been breached." [Dkt. 339 p. 10.]

53.     In 2016, the IDOC-commissioned NRI Report also concluded that, among the multiple IDOC "operational challenges . . . that are having a significant impact on the ability to provide timely and constitutionally adequate health care" were "[n]umerous staff vacancies and leaves of absence." [P21 p. 9.]

54.     In 2018, the Puisis Report states:

. . . [V]acancy rates were higher than noted in the First Court Expert's report. *Staff vacancy rates are very high*.

[Puisis SR p. 9; emphasis added.]

55.     The Second Expert Report calculated that "Wexford has an 18% vacancy rate for its 718.6 employees and IDOC had a 29% vacancy rate for its 401 employees. These are very high vacancy rates and compound a very low staffing level, making staffing a critical problem statewide. This was confirmed by HCUAs at sites we visited." [*Id.* p. 28.] Further:

We compared facility staffing for mutually visited facilities. In 2014, the First Court Expert determined that for the five facilities we visited there were 303.41 budgeted positions, an 18% vacancy rate, and 25 staff per 1000 inmates.

****

For the same five sites we visited, there were 405.05 budgeted positions. There were 99 vacancies. This is a very large vacancy rate which makes it difficult to effectively operate a health program. Four of the five facilities we visited had unacceptable vacancy rates. We note several key differences in the staffing differences between 2014 and 2018. The population in the five facilities we reviewed decreased by 2177 (18%). The number of positions increased by 101.64 (33%). The staff per 1000 inmates increased by 16 (64%). But the vacancy rate increased by from 18% to 23.5%, a 30% increase.

[*Id.* pp. 28-29.]

56.     The Puisis team found that nursing shortages are especially high:

> Four of five facilities we visited had significant vacancy rates, as high as 42%, which are mostly nursing staff. Almost every HCUA told us that there were insufficient nursing staff. This was confirmed in the deposition of the Agency Medical Coordinator, who noted that over the past several years there have been nursing shortages at SCC, Pontiac, Decatur, Graham, Southwestern, and MCC.[10]

[*Id.* p. 29.]

57.     IDOC internal documents have been reporting vacancies for years. Until recently, Defendants' data collection methods have made it difficult to assemble a system-wide overview of vacancies. Information collected at the facility level was not aggregated into a system-wide report, and state and Wexford vacancies were—and still are—reported separately. However, based upon the facility-level contract monitoring reports, which catalog Wexford vacancies, certain long-running vacancies can be tracked as far back as 2005 for the eight prisons visited in 2014 by the Shansky team and Big Muddy River CC.[11] [G159, *passim.*]

58.     On July 7, 2005, a physician position at Pontiac became vacant. On September 1, 2006, the Medical Director position at Hill became vacant, followed by the Medical Records Director position on December 1.

59.     On June 27, 2007, the Nursing Supervisor position at Pontiac was vacated. It was filled again on August 31, after being open for sixty-five days. On July 1, an LPN position, and office coordinator position, the Nursing Supervisor position, and the Director of Nursing positions at Menard all became vacant. On July 27, a PA/NP position at Hill was also vacated.

60.     On January 1, 2008, an LPN position at Hill became vacant. On March 31, the Medical Director vacancy was filled after 577 days. The position was vacated again on October 7. On April 18, the Director of Nursing position became vacant. It was filled on June 30, after a

---

[10] [Footnote in original:] Deposition of Kim Hugo, Agency Medical Coordinator pp. 25-31, April 11, 2018.
[11] Defendants did not produce complete, system-wide sets of contract monitoring reports to Plaintiffs except for certain (not all) months in 2017.

seventy-three-day vacancy, but it was vacated again on September 1. On April 24, the Medical Records Director vacancy was filled after being open for 510 days. It was also vacated a second time on June 20, after being filled for only fifty-six days.

61.     On January 4, the Nursing Supervisor position at Pontiac became vacant again, after being filled for three months. On May 8, an RN position was also vacated, followed by the Director of Nursing position on June 28.

62.     On October 1, the Medical Director position at Menard became vacant. It remained vacant for sixty days before being filled on November 20.

63.     On January 1, 2009, The Medical position at Menard was vacated again. It was filled on September 30 after 272 days. On May 31, the Director of Nursing position was also filled after a 700-day vacancy which started in July, 2007.

64.     On January 8, the Director of Nursing position at Pontiac was filled after a 129-day vacancy. The vacant NP/PA position was also filled on April 1 after a 614-day vacancy. The Medical Director position was filled on June 22, after a 367-day vacancy. The vacant LPN position was filled on September 30, after 638 days. The Medical Director position was filled the same day, after a 358-day vacancy.

65.     On March 30, the Nursing Supervisor vacancy at Pontiac was filled after being open for 451 days, but the position was vacated again on July 10. On May 31, the Director of Nursing vacancy was also filled after 337 days. On June 6, a PA/NP position became vacant. A dental hygienist position also became vacant on December 1. It was filled on December 31.

66.     On January 1, 2010, the Medical Director position at Menard was vacated after being filled for only three months. It was filled again on January 31, was vacated a second time on September 1, and was filled again on September 31. On September 1, a dental hygienist position

and the Director of Nursing position also became vacant. The dental hygienist position was filled on December 31 after 121 days.

67.     On June 1, the Director of Nursing position at Pontiac was vacated after being filled for just over a year. It was filled again on July 1. The position was vacated two more times in 2010, on September 1 and November 1, and remained open for a month each time. The vacant PA/NP position was filled on August 31 after a 451-day vacancy. The Nursing Supervisor vacancy was also filled on November 30 after 508 days.

68.     On January 1, 2011, a PA/NP position was again vacated. It was filled on January 31. On August 1, the Medical Records Director position, Nursing Supervisor position, and a dentist position were all vacated. The Medical Records Director vacancy was filled on August 31, the Nursing Supervisor position was filled on November 30 after a 121-day vacancy, and the dentist positon was filled on December 31 after a 152-day vacancy.

69.     On May 1, the physical therapist position at Dixon was vacated. On May 15, a staff assistant position was vacated. The physical therapist position at Big Muddy was also vacated on May 15.

70.     On May 31, the Director of Nursing, Nursing Supervisor, and vacant LPN and office coordinator positions at Menard were filled. The Director of Nursing position had been vacant for 272 days. The Nursing Supervisor, LPN, and office coordinator positions had been vacant for 1430 days, since May, 2007. On December 1, the Medical Director position and a dentist position were both vacated.

71.     On January 1, 2012, an RN position at Menard became vacant. It was filled on January 31. On the same day, the vacant dentist position was filled after being vacant for sixty-one days. On September 1, a PA/NP position was vacated. It was filled on November 30 after a

20

ninety-day vacancy. On October 1, a dentist position became vacant again. It was filled on October 31. On November 30, the Medical Director position was filled after being vacant for a year to the day.

72.     On November 1, both the Medical Records Director and Nursing Supervisor positions at Pontiac became vacant. Both were filled on November 30.

73.     On January 31, 2013, the vacant staff assistant position at Dixon was filled after being open for 627 days, since May, 2011. On April 14, the Nursing Supervisor position at Stateville became vacant. On April 16, the optometrist position and a dental assistant position at the same facility were also vacated.

74.     On January 1, 2014, an RN position at Stateville became vacant. On March 31, the vacant optometrist and Nursing Supervisor positions were both filled after being open for 349 days and 351 days respectively. On July 13, the Medical Director position was vacated. On December 15, a dentist position was also vacated.

75.     On March 18 the physical therapist assistant position at Big Muddy became vacant. It was filled on May 31, seventy-four days later. The physical therapist position was filled on the same day. It had been vacant for 1141 days, since May, 2011. On August 14, the Director of Nursing position was vacated.

76.     On March 27, the Nursing Supervisor position at Pontiac became vacant. The recreational therapist position also became vacant on November 5. On September 1, both the recreational therapist position and the staff assistant position at Dixon became vacant.

77.     On September 9, a physician position at Menard was vacated. On October 31, the vacant physical therapist position and physical therapist assistant position were both filled. Both positions had been vacant since 1998. However, two more vacancies for a physical therapist and

physical therapist assistant opened up the very next day. An RN position also became vacant on December 12.

78.     On January 30, 2015, the Director of Nursing vacancy at Big Muddy was filled after 170 days. On July 1, the position was again vacated. It was filled for the second time on August 31.

79.     On February 10, an RN position at Hill became vacant. It was filled on May 31 after being open for 110 days. An LPN position also became vacant on February 15 and was filled on April 30 after seventy-four days. On June 30, a PA/NP position was again vacated, followed by an RN position on September 15. On November 1, the Director of Nursing, physical therapist, and physical therapist assistant positions were all vacated.

80.     On February 23, the Medical Records Director position at Pontiac became vacant. It was filled on July 31 after 158 days. On the same day, the Nursing Supervisor position was filled after a 491-day vacancy. On December 14, an LPN position became vacant.

81.     On March 15, the Medical Director position at Dixon was vacated. It was filled on June 30 after being empty for 107 days. On May 31, a CNA position became vacant. It was filled on Jun 30. On July 21, a PA/NP position as vacated and was filled on November 30. The physical therapist vacancy was filled on the same day after being vacant for 1674 days, since May, 2011.

82.     On April 15, an LPN position at Stateville was vacated. On July 30, the Medical Records Director position also became vacant. On September 30, the dental assistant vacancy was filled, followed by the dentist vacancy on November 30. The positions had been vacant for 897 days and 350 days respectively.

83.     On May 1, a PA/NP position at Menard became vacant. It was filled on July 31. On May 31, the RN vacancy was also filled after being open for 170 days. On August 31, an RN

position again became vacant. It was filled ninety-one days later on November 30. The optometrist position was vacated on December 16.

84.     On January 1, 2016, a CNA position at Stateville became vacant. A second CNA position was vacated on May 1. One of the positions was filled on July 31. On June 11, the optometrist position became vacant. It was filled on October 30 after being open for 141 days. On June 30, the vacant LPN position and Medical Records Director positions were filled after being open for 442 days and 336 days respectively. However, another LPN vacancy opened up on November 1.

85.     On February 28, an RN position at Dixon was vacated, followed by the optometrist position on May 6, the Nursing Supervisor position on June 4, and an LPN position on June 30. On July 31, the recreational therapist position and a staff assistant position, which had both been vacant for 699 days, since September, 2014, were filled. Those positions both became vacant again two months later on September 30. A physician position was also vacated that day.

86.     On March 31, the optometrist position at Menard was filled after being open for 106 days. On May 1, the Medical Records Director position and a staff assistant position were both vacated. They were filled again ninety-one days later, on July 31. On November 1, a PA/NP position became vacant. On December 31, the physical therapist assistant vacancy was filled. It had been open for 791 days, since November, 2014.

87.     On April 1, an LPN position was vacated at Big Muddy. It was filled on November 30 after 243 days. On November 14, an RN position became vacant.

88.     On April 30, the vacant LPN position and recreational therapist position at Pontiac were filled after vacancies of 138 days and 542 days respectively. However, the recreational therapist position was vacated again a month later, on May 30. The Director of Nursing position

23

was also vacated the same day. Two LPN positions became vacant on July 13 and August 1. One of them was filled on September 30. A CNA position was also vacated on December 1.

89.     On May 30, the vacant LPN position at Hill was filled after a 211-day vacancy. However, another LPN position opened up the very next day.

90.     On January 1, 2017, an LPN position at Big Muddy was vacated. It was filled again on January 31. The Director of Nursing position became vacant on June 15 and was filled on July 31. The vacant RN position, which had been open for 228 days, was filled June 30.

91.     On January 1, the Director of Nursing position at Hill also became vacant. It was filled on May 31 after a 150-day vacancy. On July 16, a radiology tech position was vacated. It was filled on December 31 after a vacancy of 168 days. The physical therapist vacancy, which had been open for 699 days, since November, 2015, was filled on September 30. On December 31, the vacant LPN, PA/NP, physical therapist assistant, and RN positions were filled after vacancies of 579, 915, 791, and 838 days respectively.

92.     On January 1, the optometrist position at Pontiac was vacated. It was filled again on February 1. On the same day, a physician position, which had been vacant for 4227, since July, 2005, was filled. On February 28, the CNA vacancy was filled after being open for 89 days, the recreational therapist vacancy was filled after 274 days, and the Director of Nursing vacancy was also filled after 274 days. On May 1, the recreational therapist position was vacated again. It was filled for a second time on December 31, this time after a 244-day vacancy. On August 31, an RN position that had been vacant since May, 2008 was filled after 3402 days. On December 31, the vacant LPN position was also filled after 536 days.

93.     On February 28, an LPN position at Menard was vacated, followed by a physical therapist assistant position on March 1, and the Medical Director position on March 16. The

physical therapist assistant position was filled on March 31, as was a PA/NP vacancy that had been open for 150 days. The Medical Director position was filled August 31 after 168 days. The LPN position was filled September 30 after 214 days. Additionally, the physical therapist position vacated in November, 2014 was filled on July 31 after 1003 days, and the physician vacancy, which had been open since September, 2014, was filled after 1124 days.

94.     On February 28, the vacant staff assistant position was Dixon was filled after a 151-day vacancy. The optometrist position was filled the same day after a vacancy of 298 days. On May 12, the Medical Director position became vacant. It was filled again on July 31 after eighty days. It was vacated a second time on September 1, only a month later, and filled again on September 30. The radiology tech position, which had been vacant 575 days since February, 2016, was filled on August 31. On December 31, the vacant LPN, physician, recreational therapist and Nursing Supervisor positions were filled after vacancies of 549 days, 479 days, 457 days, and 575 days respectively.

95.     On April 1, the Medical Records Director position at Stateville was vacated. It was filled on April 30, vacated again on June 1, filled a second time on June 30, vacated again on August 1, and filled a third time on August 31. A pharmacy tech position became vacant on July 31 and was filled on November 30 after a 122-day vacancy. A CNA position became vacant on December 1, as did the Nursing Supervisor position. Both positions were filled on December 31, along with a second vacant CNA position, which had been open 730 days, an LPN position, which had been open for 425 days, and RN position, which had been open for 1460 days, and the Medical Director position, which had been open for 1267 days, since July, 2014.

96.     Staffing shortages significantly impede the delivery of medical and dental services within IDOC.

97.     The Second Expert Report provides examples of the problems faced at particular

sites. At Dixon CC, it reports:

> There are 93.8 health care employees. There are 19 (20%) vacancies. Three staff are
> on long-term leave of absence. If these are added to the vacancies, the effective
> vacancy rate is 23%. This is a significant vacancy rate and contributes to an
> inadequate program. More than half of the state vacancies (52%) are RN positions.
> There are more RN vacancies now than there were in 2014 . . .
>
> . . . The infirmary unit is understaffed with nurses and nursing assistants. The
> geriatric unit on the third floor has people who should be on the infirmary and require
> a higher level of nursing care than is now being provided. These units attract elderly
> patients from all IDOC facilities, yet these units have insufficient staff to provide
> care at a necessary level based on our review of services on that unit. Inmates provide
> considerable assistance on these units. Services that require health trained personnel
> are either not provided or are provided at a level inadequate for the designed purpose
> of these units.

[Puisis DIX p. 9.] At Stateville CC, the Puisis Report observes:

> All three key leaders believe that staffing shortages are their number one problem.
> All staff at SCC can be shared with NRC. The amount of time SCC staff work at
> NRC is determined on an ad hoc basis by negotiation and discussion between the
> NRC and SCC HCUAs.[12] Based on a discussion with the HCUA, the staffing at SCC
> includes 98 positions with 24 (24%) vacant positions and nine on leave of absence
> or injured. The effective vacancies total 33 (34%). This extraordinarily high vacancy
> rate is made worse by having to share staff with NRC, which results in prioritizing
> assignments to avoid crises as opposed to ensuring that all needed work is done. . .

[Puisis STA p. 8.]

98.     Two different IDOC data sets—one showing Wexford vacancies, the other showing

state vacancies—from June 2018 show system-wide vacancy rates even higher than those reported

in the Second Expert Report.

---

[12] Back in 2014, the First Expert team had described problems caused by the shared staff between these two
large IDOC facilities. Because Stateville and NRC are considered a single facility for staffing purposes,
they share a nursing staff, who are shuttled between the two facilities. Stateville nurses are sent to NRC to
assist with intake and to fill in for nurses who call in sick. "As a result, Stateville is chronically out of
compliance with established policy for the timely completion of sick call, periodic physical examinations,
chronic illness clinics and timely administration of medication." [Dkt. 339 p. 52.] In 2014 as in 2018, the
nursing vacancy rate was also very high.

99.    On June 18, 2018, IDOC reported that, of 759 positions currently required of Wexford under the contract (including Amended Service Requests [ASRs]), 122 were vacant—16 percent. When employees on leaves of absence were added (30), the percentage of staff required by the contract but not on site rose to 20 percent, or one-fifth of the contractually-required workforce. [P248 (provided to Dr. Puisis).][13]

100.    In the same month (June 2018) IDOC also reported that, of some 414 State healthcare positions, 118 were vacant, and 28 others were held by employees on some form of leave. Thus some 28 percent of State positions were vacant, and with leaves of absence, the total percentage of State-provided workers not actually on site to provide healthcare or healthcare unit services was close to one-third of the total.[14]

C.    **Leadership Vacancies**

101.    In 2014, the First Expert team found that "[l]eadership is a problem at virtually all the facilities we visited." The reported leadership issues included many vacant leadership positions. [Dkt. 339 p. 6.]

102.    "Without a strong and effective leadership team," the Shansky Report stated, "a program is much less able to identify the causes of systemic problems and to effectively address those problems by implementing appropriate targeted improvement strategies." [Dkt. 339, pp. 5-6.]

---

[13] Without rounding, the numbers were: 758.767; 121.593; 30.15. These counts exclude the Elgin Treatment Facility (also reported in the document) and "Travelling Medical Directors."

[14] These counts exclude positions dedicated solely to mental health services. [The Wexford and State numbers from these documents cannot be aggregated to illustrate the total number of medical and dental care workers missing from the system because the contractually-required Wexford employees include a substantial number of mental health workers, and these were not separately identified on the June 18 data run.]

103.    Defendants have been and are unable to maintain complete leadership teams at their critical institutions.

104.    From July 1, 2015 to November 26, 2017, for example, there were (in total) 5,089 days during which a total of 19 IDOC prisons had no permanent Medical Director (although the Wexford contract requires a Wexford-supplied Medical Director at every prison). [P246.]

105.    Danville CC had no permanent Medical Director for 425 days during this period; Hill CC was without a permanent Medical Director for 510 days; Lawrence CC lacked one for 482 days; Southwestern CC for 753 days; and NRC—the major IDOC intake center—for 348 days. These are some—but not all—of the longest gaps in permanent Medical Director coverage during the 29-month period between July 2015 and late November 2017. [*Id.*] Since there are 27 facilities total in the IDOC prison system, this also means that **70 percent** of the prisons lacked permanent Medical Directors for at least some period during these 29 months. [*Id.*]

106.    At the time of the Puisis team investigation in 2018, they found that, "[o]f the 26 Medical Directors statewide, 8.5 (33%) are vacant. *This is an enormous vacancy rate for this key leadership position.*" [Puisis SR p. 20; emphasis added.] Further, "Of the 78 leadership positions (Medical Director, DON, and HCUA) at the 26 facilities, 16.5 (21%) are vacant. . ." [*Id.* p. 21.]

107.    Overall, the Puisis team found that, compared to 2014, "physician leadership" at the five facilities visited "is worse." [*Id.* p. 12.] The Second Expert Report observes that "Physician staffing in IDOC is very poor. The Vice President of Operations for Wexford could not remember the last time there was a full physician staff. . ." [*Id.* p. 26.]

108.    Between July 1, 2015 and November 26, 2017, on twenty-two (22) percent of the total days during which Wexford was to supply permanent Medical Directors, there were no

permanent Medical Directors in place; the Second Expert team deemed this "an unacceptable vacancy rate." [*Id.*; P246.]

109.     In addition to vacancies of Medical Directors, the Second Expert team noted that all five facilities they had visited were also missing a staff physician. [Puisis SR p. 27.]

110.     The Second Expert team was also critical of Wexford's partial solution to physician vacancies, the "Travelling Medical Directors":

> Because of vacancies, physicians are moved from site to site as "Traveling Medical Directors." One of the facilities we investigated, NRC, had a Traveling Medical Director. This individual did not participate meaningfully in quality improvement, did not show any evidence of oversight of the medical program, and had clinical issues.

[*Id.* pp. 26-27.]

111.     In 2018 as in 2014, the Court-appointed experts found that vacancies in some leadership positions put additional burdens on the staff in positions that are filled; staff are overworked and spread thin.

112.     Stateville CC provided one set of examples. In 2014, the Shansky team found a leadership vacuum at Stateville CC exacerbating "overwhelming access problems" and stemming in part from the fact that Stateville and NRC shared a single Health Care Unit Administrator (HCUA) who was also "chronically absent and takes extended Leaves of Absence." [Dkt. 339 p. 53.] The resulting leadership vacuum contributed to the "underdevelopment of the Stateville health care program" and the "fail[ure] to identify or develop a strategy that address the overwhelming access problems" at the institution. [*Id.*]

113.     In 2018, the Puisis team found that, although the Shansky recommendation that Stateville have a dedicated HCUA had been implemented, that "improvement is negated by the

lack of a Medical Director . . ." [Puisis STA p. 6.] The Medical Director had died; was then

replaced by the NRC Medical Director, who then resigned. [*Id.* pp. 6-7.] In addition:

> Nursing supervision is significantly deficient. There are two nurse supervisor
> positions. One supervisor is on leave of absence and the other recently left service,
> making both positions effectively vacant. . . [T]here is no evening or night
> supervision. Having staff work without supervision is *not an acceptable situation*. .
> .

[Puisis STA p. 7; emphasis added.]

114.    At Dixon CC, in the view of the Second Expert team, leadership vacancies had

unquestionably caused harm:

> The frequent changes and lack of primary care trained physicians appears to have
> continued since the First Court Expert's report. . . . [The] lack of qualified physicians
> has resulted in a significant absence of quality of medical leadership and physician
> coverage. Based on chart reviews and death reviews we performed, we identified
> preventable morbidity and mortality, which will be described later in this report. The
> lack of adequate and qualified physician coverage is causing harm and is the single
> most important factor in preventable morbidity and mortality in our opinion.

[Puisis DIX pp. 8.]

115.    Finally, by 2018, the gaps in leadership noted by the Shansky team at the facility

level had spread to the Office of Health Services as well. The Puisis Report states:

> Two of three of the Regional Coordinator positions are currently vacant and filled
> on an acting basis by HCUAs who are still responsible for managing their facility.
> While an HCUA filling in as a Regional Coordinator on short-term basis is
> reasonable, longer than 60-90 days is likely to result in reduced effectiveness at the
> HCUA's home facility…

[Puisis SR p. 15.]

116.    As with vacancies generally, IDOC internal documents catalog the issues of

leadership team vacancies over the years. In March 2014, Dr. Shicker emailed IDOC's CFO and

its general counsel, *inter alia*:

> I just want to report to you that so far Wexford has made no head way in filling the
> following key positions:

1.     Medical Director at Dixon
2.     Staff Physician at Dixon
3.     NP at Dixon
4.     Medical Director at Lincoln
5.     NP at Logan [ ]
6.     Medical Director at Robinson
7.     Medical Director at Vienna
8.     Medical Director at Illinois River
9.     NP at Vienna
10.    NP at E Moline
11.    NP at Danville

In addition the Medical Director at Sheridan is not working out and will need to either be terminated or changed to a staff physician AND the Medical Director at NRC will likely be terminated soon.

Any advice on how we proceed with their inability to fill these vacancies—it is affecting medical care. Thank[] you.

[P167 at 0037001-2.]

117.    In notes for a July 31st 2015 "Cases Discussed at Mortality Conference," Dr. Shicker also commented on a death at Dixon CC:

The main areas of concern with the care of this offender surround approach to certain medical conditions and appropriate work up for those conditions. . . The site providers. . . did not look into the condition to see if there was an underlying problem. . .There was no ultrasound or CT done. In addition his diagnosis of Hepatitis C does not appear to have followed the work up recommended by IDOC guidelines . . . **Comment**: This case represents some of the problems Dixon has had by not having a steady Medical Director.

118.    In 2016, Defendants started to require a monthly report from Wexford that catalogued vacancies in key positions; this report is discussed on a monthly call among key IDOC and Wexford staff which is known as the "Lippert call."

119.    In May 2018, the list of Wexford vacancies in the "Lippert call" report, in what Dr. Shicker had described as "key positions," was as follows:

1.     Medical Director at Kewanee
2.     Medical Director at NRC (Northern Reception Center)

3.     Medical Director at Pinckneyville
4.     Medical Director at Pontiac
5.     Medical Director at Vandalia
6.     Medical Director at Vienna
7.     Medical Director at Western Illinois
8.     Staff physician at Dixon (.20)
9.     Staff physician at Menard
10.     PA or NP at East Moline (.40)
11.     PA or NP at Lawrence (.55)
12.     PA or NP at Menard
13.     PA or NP at NRC (.50)
14.     PA or NP at Pontiac (.25)
15.     PA or NP at Murphysboro (.40)
16.     Dentists at Menard (2.00)
17.     Dentist at Robinson

[P383.]

### D.     Other Issues Compounding Staffing and Vacancy Problems

120.     A variety of other issues compound the core healthcare staffing and vacancy problems in IDOC.

121.     If staff are Wexford employees, they may also be tasked with significant administrative responsibilities that diminish the time they spend on core healthcare functions.

122.     At Pontiac, the Shansky team reported that "the Director of Nursing also functions as the medical contractor site manager" which "leaves little time for her to actively function as a Director of Nursing." [Dkt. 339 p. 179.] At Illinois River Correctional Center (IRCC), the HCUA was on extended leave, and the Medical Director position was vacant. [*Id.* p. 252.] The Director of Nursing held the responsibilities of the missing HCUA, and was also Wexford's designated site manager, all of which "substantially take away from her ability to focus on and manage the needs of the health care unit." [*Id.* p. 254.] "With the additional absence of both the Medical Director and clinical hours, there appear to be significant delays with regard to chronic care visits and other clinical assessments. It does not appear that there is adequate clinical oversight." [*Id.* p. 253.] The

lack of clinical oversight contributed to "several highly problematic cases . . . that resulted in actual harm to patients." [*Id.* p. 252.]

123. The Puisis team also observed that state staff may have more responsibilities than they have time to perform them. At Logan, the HCUA "similar to the First Court Expert findings, has too many responsibilities. She is the HCUA . . ., is filling in as the IDOC Central Regional Coordinator, is the [Logan] Continuous Quality Improvement Coordinator, covers as the infection control nurse[,] and also provides some nurse supervision. It is not possible to effectively manage all these responsibilities." [Puisis LOG p. 6.] "The staff physician position has not been filled for some time. . . The failure to fill the physician position . . . overburdens the Medical Director . . ." [Puisis LOG p. 7.] At Dixon, the HCUA, while capable, "lacks nursing supervisors and a consistent Medical Director, and therefore the program still does not have adequate medical leadership . . . The HCUA serves as the CQI coordinator, supervisor of medical records, infection control coordinator, and act as a supervisory nurse . . .One person is incapable of effectively performing in all these roles." [Puisis DIX p. 7.]

124. A further problem in IDOC healthcare staffing is the rate of chronic absence and sick leave. This was noted in the Shansky Report, and also in the IDOC-commissioned NRI Report. [Dkt. 339 p. 6; P21 at 000009.] According to NRI, the challenge of "staff vacancies and leaves of absence" was connected to additional problems, specifically recruitment: "Recruiting qualified health care professionals, already challenging, becomes more so when the environment includes low morale . . . and lack of effective leadership." [P21 at 000009.]

125. "While the reason for the number of employees on leave of absence was not evident," the NRI Report observed, "it is an issue that must be seriously examined as it also has had a negative impact on the health care operation." [*Id.*]

126. Finally, the Second Expert Report notes that the problems of leadership vacancies are compounded by a high rate of turnover:

> Of 33 physicians listed on a 9/19/14 report by Wexford, only 18 (54%) are still working three and a half years later. The inability of Wexford to hire and *retain* qualified physicians is a serious problem . . . There has been no formal analysis of this that we could find.

[Puisis SR p. 27; emphasis in original.]

### E. Lack of Staffing Analysis

127. In 2014, one of the first recommendations of the Shansky Report was that "IDOC [must] develop and implement a plan which addresses facility-specific critical staffing needs by number and key positions and a process to expedite hiring of staff when the critical level has been breached." [Dkt. 339 p. 10.]

128. The Puisis Report states:

> The IDOC does not have a staffing plan that is sufficient to implement IDOC policies and procedures. The staffing plan does not incorporate a staff relief factor.

> Custody staffing has also not been analyzed to determine if there are sufficient custody staff to permit adequate medical care.

[Puisis SR p. 9.]

129. The Second Court-Appointed Expert that current staffing is not based on any analysis or, if it was, the sources of that analysis could not be determined:

> The Wexford component of staffing is memorialized in a contract document called a Schedule E. Based on interviews with senior leadership of Wexford and IDOC, we could not determine who is responsible for developing staffing levels found in the Schedule E. . . . it is our opinion that the Schedule E does not reflect actual staffing need, as it does not appear based on any staffing analysis we could identify after discussions with health leadership who we thought would be responsible for this document.

> No one we spoke with has responsibility for determining if total staff (state and Wexford) is adequate. . . .

34

[*Id.* p. 30.]

130.    At Stateville CC, where an "extraordinarily high vacancy rate is made worse by having to share staff with NRC," the Second Expert team found that "[d]espite these staffing deficiencies, there is no staffing plan that addresses actual needs at SCC. The current official Schedule E is not up to date. None of the existing leadership staff has participated in developing the Schedule E or existing staffing pattern at this facility." [Puisis STA p. 8.]

131.    At Dixon CC, the Puisis team concluded that, due to the needs of the infirmary and geriatric populations there, "there are insufficient numbers of budgeted positions in the nursing categories even if vacancies were filled." [Puisis DIX p. 9.]

132.    At Logan CC, the Puisis team reported that "There were 10 pregnant women at LCC at the time of the Experts' visit. The charts of four currently pregnant women were reviewed. Two have very high-risk pregnancies . . ."; "[i]n summary, the provider staffing is not adequate to provide the volume of clinical work at this large women's facility and reception center. In the absence of the OB-GYN provider, there are no providers trained to provide prenatal care." [Puisis LOG p. 68.]

### III.    QUALITY OF PRACTITIONERS

133.    The next critical systemic issue identified by the First Expert and Second Expert and their teams was the poor quality of healthcare practitioners in IDOC—in the particular, the poor quality of doctors, who were often facility Medical Directors responsible for the medical programs at each prison.

134.    The Shansky Report "found clinician quality to be highly variable. . ." [Dkt. 339 p. 6.] Facilities were often staffed by clinicians who were "underqualified to practice the type of medicine required of the position," *i.e.*, primary care. "[T]here have been a disproportionate

number of preventable negative outcomes related to primary care services provided by non-primary care trained physicians." [*Id*. p. 9.]

135.    "The vendor, Wexford, fails to hire properly credentialed and privileged physicians. This appears to be a major factor in preventable morbidity and mortality, and significantly increases risk of harm to patients within the IDOC. This results from ineffective governance." [Puisis SR p. 10.] Further:

> Credentialing information provided by Wexford shows that only six (20%) of the physicians are board certified in a primary care field. Because physicians typically work alone in these facilities, experience alone is no guarantee that performance will improve to be consistent with current standards of care. We document multiple preventable deaths in the mortality review section of this report. It is our opinion that poorly credentialed physicians contribute significantly to those preventable deaths.

[*Id.* p. 22.]

136.    ". . . [T]he only review of credentials is to verify that the doctor has a license, and that their training, board certification, or disciplinary history is not part of credentialing review." [*Id.* p. 21 citing testimony of Ssenfuma.] In the 1980's, IDOC incorporated a standard from the Joint Commission on Accreditation of Healthcare Organizations (JCAHO) into their administrative directives requiring that all physicians have one-time primary source verification of their credentials (a requirement to verify training). The requirement remains in the AD but no such verification now takes place. [*Id.* p. 26.]

137.    The First and Second Expert Reports cite numerous examples of cases in which the quality of clinical care was poor and resulted in avoidable harm to patients. At Menard CC, the Shansky Report noted: "None of the physicians is trained in a primary care field. The Medical Director is a general surgeon who has no prior correctional health care experience and is also new to the facility. The two additional physicians were trained in ophthalmology and general surgery,

36

respectively." [Dkt. 339 p. 330.] The report described one case in which "failure to identify and appropriately manage a common primary care condition (diabetic foot ulcer) lead to actual harm to the patient (amputation)." [*Id.*]

138.    "As an example" of poor physician quality, the Puisis Report states:

. . . [W]e noted one physician at [Stateville CC] who was a surgeon and not primary care trained who, for six months, was following an infirmary patient who had dementia. His entire note for 19 consecutive patient evaluations consisted of the statement, "No specific complaint, no change, dementia, continue same care."

The patient was ultimately hospitalized for a cardiopulmonary condition but because the doctor failed to evaluate the hospital record it wasn't clear why the patient was hospitalized. Ultimately, the patient developed metastatic colon cancer not diagnosed until the patient had advanced disease. For almost a year following hospitalization, the doctor wrote the following note repeatedly, "No specific complaint, no change, dementia, post colectomy for metastatic ca [cancer]. Continue same care."

This repeated note was written during a time when the patient experienced falling repeatedly, developed incontinence, developed pustular otitis, and severe malnutrition and dehydration. . .

[Puisis SR pp. 40-41.]

139.    Wexford does not even require a typed cv from its practitioners for the file—many are handwritten [e.g., P413 pp. 39, 47, 57, 104, 125, 196, 220.]

140.    In 2014, the Shansky team identified a physician practicing at Hill CC—the Medical Director there—as particularly problematic. Two deaths that had occurred at Hill were described as "extremely problematic, [involving] avoidable delays in diagnosis and treatment . . ." [Dkt. 339 p. 289.] As to one case, the Report summarizes:

The lapses in care in this case are multiple and disturbing. This patient presented with massive splenegomaly back in January 2013. While liver disease can cause enlargement of the spleen, there are only a few conditions that cause this degree of enlargement, with malignancy being the most common cause. It took four months to obtain the first appropriate imaging test . . . When that test suggested the need for more detailed imaging by CT scan, that recommendation was ignored . . . . Even when the patient presented as clinically unstable with severe hypoxia, the doctor did

37

not send the patient out until he was pressed to do so. In our opinion, this can only be construed as deliberate indifference.

[*Id.* p. 322.] In the other case, the Report states:

The blatant disregard for this patient's obvious symptoms of serious illness is stunning. The lapses in care are so numerous and egregious it is hard to know where to start. Perhaps at the onset of symptoms, which took three months to finally result in a visit with the physician? But alas, at that visit and multiple visits to follow, the doctor either disregarded or failed to recognize the constellation of symptoms that were highly indicative of malignancy. . . . In any event, despite the patient's repeated earnest cries for help, including several instances wherein he was essentially stating "I think I have cancer," his symptoms were brushed off by the doctor until the repeated presentation of this dying man could no longer be ignored.

[*Id.* p. 320.]

141.    Four years later, the Puisis team found this physician still practicing in IDOC, and involved in one of the twelve preventable deaths identified by the Second Expert. [Puisis MR pp. 54-57.] This physician's training was in radiology. [*Id.*]

142.

In a review of 33 death records, we found 276 episodes of care with inadequate history; 249 episodes of inadequate examination; and 228 episodes in which a therapeutic plan was inadequate. . . [T]his . . . is a problem of physician quality.

[Puisis SR p. 41.] As of the time of the Second Expert team's visit to NRC in February 2018, this doctor was the recently appointed "travelling" Medical Director of NRC, IDOC's largest intake facility. [Puisis NRC p. 9.]

## IV.    SANITATION, SPACE, EQUIPMENT

143.    In 2014, the Shansky team found that "[c]linic space, sanitation and equipment are problematic" at all but one of the facilities they visited. [Dkt. 339 p. 10.] "There were examples at each facility of either no identified clinic space to poorly equipped clinic space that provides no patient privacy . . .." [*Id.* p. 17.] Medical areas were ill-equipped (SCC, DCC, PCC, MCC), lacking privacy (SCC, DCC, PCC, MCC) or appropriated for other purposes (NRC). [*Id.* pp. 10-12, 96,

214.] At Pontiac Correctional Center, the "exam rooms" in each cell house are "mostly converted bathrooms and storage rooms [with] old and dilapidated equipment . . .." [*Id.* p. 175.] At Menard, "the South Lower cell house sick call room had no sink for hand washing." "Much of the [dental] equipment was old, corroded, and badly worn. . . . Non-functional equipment was not out of the norm." [*Id.* pp. 39, 334.] At PCC, inmates performed janitorial duties with "no orientation to the health care unit or proper cleaning and sanitation procedures, blood-borne pathogen training or communicable disease training." [*Id.* pp. 179-80.] At IRCC, there was no clinic space in the unit that houses inmates in segregation. [*Id.* p. 11.]

144.     The problems of ill-equipped space and aging equipment were compounded by repeated lapses in sanitary procedures. "In regard to sanitation," states the First Expert Report, "there are issues across the system. . . . [E]xamination tables and stools, infirmary mattresses and stretchers [had] cracked and torn impervious outer coatings which do not allow for the items to be properly cleaned . . . In each instance, there had been no work order submitted to repair the item and no request submitted for purchase of new items." Further, "[Many] facilities are not using a paper barrier . . . on the examination tables, nor was there evidence of wiping down the examination table with a sanitizing liquid/spray between patients . . . ."; "Across all sites, infirmary linens were not been appropriately laundered and sanitized . . . ." [Dkt. 339 at 12, 35.]

145.     The same problems were found in dental procedure areas: at the NRC intake dental exam, the Report notes, "[a]rea disinfection and clinician hygiene between patients was very poor. . ."; "[Dental area c]abinetry and countertops were usually badly worn, corroded or rusted, broken and not up to contemporary standards for disinfection"; "In several institutions, proper [dental] sterilization flow was not in place." [Dkt. 339 pp. 38-40.]

146.   In 2018, the Second Expert team found similar conditions. "Sanitation, maintenance, and equipping health care units is not standardized. Many clinical areas are inadequately sanitized." [Puisis SR p. 10.] Further:

> The experts inspected the physical plants and equipment in the medical care areas at the NRC, SCC, Dixon, LCC, and MCC. Overall, we found problems with nurse sick call rooms, infirmary spaces, and examination rooms in all facilities we visited. The dialysis unit at SCC is inadequate and needs renovation. . .

[*Id.* p. 33.] Conditions at NRC were particularly problematic:

> NRC has established nurse sick call rooms on the first floor of each of the three tiered cell houses. These rooms are also used by providers to perform intake physical examinations that were deferred during the intake process. Nurses commonly do sick call interviews cell by cell through closed [cell] doors, moving some patients to the sick call rooms, which have a few plastic chairs or four bolted metal chairs with shackles. The sick call rooms do not have examination tables or desks, and all clinical equipment is carried in during sick call session. Not all rooms have sinks or soap and paper towels. The sinks were dirty and the floors poorly scrubbed. In this condition, these rooms are unacceptable for the performance of nurse sick call or provider intake physical examinations.

[*Id.* p. 33.] At Dixon CC:

> Dixon primarily provides nurse sick call in two dedicated and two part-time rooms in the centralized health care unit (HCU). . . One nurse sick call room in the HCU had two desks and two exam tables; this room lacked any auditory and visual privacy. The other three rooms did not have examination tables. Only two of the four rooms had sinks. . . .

[*Id.*] Logan CC has space deficiencies: " . . .[T]here were times when there were not enough exam rooms to meet the nurse sick call needs of the women at LCC," [*Id.* p. 34] and at Menard CC:

> . . . Some rooms were well maintained, others had cracked and peeling paint, uncovered electrical outlets and ceiling vents, boxes cluttering the exam area, and records and supplies stacked on exam tables during clinical sessions. One of the exam areas did not have a sink. Not all of the areas were properly equipped; some lacked oto-ophthalmoscopes, oximeters, peak flow testing mouthpieces, blood sugar testing devices, automated external defibrillators, and other supplies. One of the exam rooms in the East cell house was cramped by the presence of correctional items, including three large file cabinets, water damaged cardboard boxes, and an ancient refrigerator with a totally rusted door. . .

40

[*Id.*]

147.    Equipment upgrade request paperwork produced by Defendants likewise shows a system unable to provide for safety and sanitation, with a cumbersome process causing extended delays for even modest items. A request from Illinois River CC for three medication carts says: "The carts currently in use are worn out. Maintenance has fixed them as many times as they can be fixed. We have multiple worker compensation claims over the accidents that have happened using the old carts. . . ." [P408 at 000001]; at Stateville: "The dental department Siemens Sirona x-ray machine tube has blown out. Three weeks prior the x-ray unit stopped exposing x-ray film. . . . The x-ray machine was manufactured in May 2000. The tube head for this machine is no longer available. . ."; "We have two (2) dental drills that are over 20 years old and unable to be repaired. . ." [P404 at 000005, 000010]; at Dixon, a request for a dental vacuum and pump states, "Vacuum is down to one that is operable and is almost 30 years old. . ." [P422 at 000012]; At Big Muddy River, a request for a dental autoclave: "The Autoclave—is not working. The unit stopped working again within months of being repaired. The unit has been sent out for repair 3 times in the last 12 months . . . The Autoclave is required to sterilize dental equipment . . ." [P423 at 000015.]

148.    Finally, there is the request for purchase of "one (1) Phillips Headstart AED battery" requested because "The AED [ ] at Logan is in need of a new battery—the old one is not holding at charge. . . . The AED is a critical life-saving piece of medical equipment that must be functioning 24/7." This request, at a cost of $234.00, is dated 12/29/16; had to be first approved by Wexford; is then approved by the correctional center on 1/11/17; and finally approved by IDOC CFO Jared Brunk on 1/23/17. [P425.]

149.    The consensus that supplies and facilities are a significant problem in IDOC includes not just the First and Second Expert teams but also the 2016 NRI review team. Among

41

the "operational challenges" noted in the IDOC-commissioned NRI report "that are having a significant impact on the ability to provide timely and constitutionally adequate health care," the report cites "**Apparent lack of basic supplies and adequate facilities for health care**," at the five prisons visited by the NRI team. [P21 at 000009; emphasis in original.] As one example, the report observes:

> On a related note, at one facility, signs in the bathrooms cautioned staff to be sparing in their use of paper towels as there was no extra supply. This raises concern about the potential for infection control issues if staff members cannot properly wash and dry their hands.

[*Id.* at 000010.]

## V.     MEDICAL RECORDS

150.     A complete and usable record-keeping system is essential to adequate healthcare. As explained by Plaintiffs' expert Dr. Marc Stern:

> Health professionals must record all significant health care information about a patient in a medical record. The medical record is the primary tool for the multitude of health professionals caring for a patient to communicate with one another. The record must be complete and clear so that each user of the record can easily and accurately determine what is already known about the patient and what care has already been delivered to the patient. To be complete, all care givers must document all significant information, and all this documentation must actually be in the record. These are fundamental and universal principles for the provision of health care. If the medical record is not complete and clear, health care providers make decisions and provide care in a vacuum, resulting in errors. . . In the absence of a complete and clear medical record there cannot be safe patient care.

[P551 pp. 27-28.]

151.     The 2011 Wexford contract requires complete, accurate, and legible records: "2.2.3.13 **Medical Records**: Vendor shall keep complete and accurate medical records for all offenders." "2.2.3.13.2 Vendor shall ensure that medical records are complete and . . . contain accurate legible entries . . ." [P18 at 000303.] IDOC healthcare records do not meet these basic requirements.

42

152.    In 2014, the Shansky team found that "[t]he quality of the medical records was poor at most of the facilities we visited." [Dkt. 339 p. 15.] "In many instances, important information was missing from the health records, such as the MARs [Medication Administration Records] from the last several months. There were blanks on the MARs at virtually every facility." [*Id.*] Due to "disorganized and dysfunctional" recordkeeping, clinicians are ill-informed and therefore "less able to make the appropriate clinical decisions." [*Id.* p. 16.]

153.    Further, due to the use of handwritten notes, "most notes contained very little information with respect to symptom histories . . . physical exams or medical decision making," and "the handwriting of one or more providers was so illegible that it rendered the notes all but useless to anyone other than the author." [*Id.*]

154.    Some facilities had additional record-keeping problems. At NRC, "nothing was properly filed no matter how long the patients were housed there." [*Id.*] The facility used a "drop file" procedure, meaning that "documents are not fastened chronologically in specific sections; instead each document is placed loosely between the cardboard covers," making it likely that important information will not be located. The lack of logging and tracking exacerbated the problem. [*Id.* pp. 99-100.]

155.    At Dixon CC, records "were overstuffed and in dire need of thinning," creating "an obstacle to the efficient delivery of care." The First Expert team found that "current reports and MARs are often missing," and "found piles of MARs dating back for months in the medical records department," making it nearly impossible to monitor medication compliance. [*Id.* p. 134.] Illinois River CC had similar recordkeeping issues. [*Id.* p. 256.]

43

156. At Logan CC, the Shansky team "encountered large piles of loose filing stacked in the inside cover of most charts." [*Id.* pp. 16, 211.] "Drop filing is used in the infirmary, even for the chronic admissions, thus rendering the charts in nearly complete disarray." [*Id.* p. 231.]

157. Four years later, in 2018, the Puisis team noted one improvement: "[Logan CC] has corrected the problems with drop filing." [Puisis SR p. 37.] However:

> With that exception, *there has been no improvement*. We found *several additional significant problems*. These include:
>
> - With the exception of MCC, charts are so large that they frequently come apart, making the record extremely difficult to use. This promotes loss of documents.
> - Record rooms are too small to accommodate all records. Therefore, additional storage space is necessary, making finding an older document extremely cumbersome.
> - Record rooms are not secure and therefore violate administrative directives and fail to follow Illinois Department of Human Services guidelines on protection of the medical record.
> - There is not a standardized tracking system in place to sign out a record.
> - Any staff member can access the records room and pull and re-file records. This promotes loss of records and does not safeguard confidentiality or use by unauthorized persons.
> - Access to a medical record for use during clinical encounters is not universal.
> - Data for use in quality improvement is obtained manually. This makes measurement of health care processes extremely cumbersome.
> - We noted inability of the IDOC to find all documents in mortality records sent to us.
> - Records of on-site dialysis are maintained separately from the IDOC medical records and the medical record fails to contain updated information about what is occurring in dialysis.

[Puisis SR pp. 37-38; emphasis added.]

158. As had been true in 2014, in 2018 the Second Expert team found the worst problems with record filing and record maintenance at NRC, the principal IDOC intake facility:

> The NRC record room was the worst of all facilities. Everyone had access to the record room. Any staff member could pull and refile records they used. Paper documents were not in a pressboard folder and sometimes were merely stapled together or in piles. When a pile of record documents was removed from the room, there was no indication where the record was. In chart reviews we conducted, it appeared that many documents were missing.

[Puisis SR p. 39.]

159.    The paper record system in place throughout most of IDOC is impractical for a system of its size and population, and causes obvious, well-known, and recurring problems. As the Puisis Report explains:

> A correctional health program generates large volumes of paper. Infirmaries, mental health units, the health request process, and administration of medication are hospital-like with respect to the volume of paperwork that is generated. As a result, inmates who remain incarcerated for a long period of time generate massive paper medical records. Three problems ensue. One problem is that there is no place to store all the paper record volumes so that they are easily accessible. A second problem is that the paper record documents come apart, making use of the record extremely cumbersome. The third problem is that the current volume of documents often does not contain all documents necessary to provide care. This can result in physicians acting without complete information about the patient. This is particularly true because of the frequency of changes in physician staff.
>
> Almost all inmates with chronic illness or with mental health problems have multiple volume files, easily in the thousands of pages per inmate. Record rooms in the prison facilities do not have the capacity to store all volumes of the record. As a result, most of the volumes of records are placed in storage someplace on the grounds . . . The most current volume of a record often does not contain a key test result, consultation report, hospital summary, or diagnostic test result that is necessary to understand the progress of the patient. . . [C]lerks have to go to the storage unit to find the document. This delay is not workable if a provider is with the patient. . . .
>
> Also, the paper medical records frequently come apart. All paper documents are two-hole punched and held together by a plastic binding clip. The plastic clip is glued to a pressboard binder that is used for covers of the record. . . The thinning process is standardized except for when to initiate the thinning process. . . By IDOC rules, certain documents are carried forward to the current volume. The carry-forward documents often do not include critical test reports, consultation reports, or other clinical information that is critical to understanding the patient's diagnosis or therapeutic plan. . .

[Puisis SR pp. 38-39.]

160.    Among the problems exacerbated by a paper record system are lapses in continuity of care during intrasystem transfers [Dkt. 339 pp. 14-15, 55, 99, 180-81, 254-56], as well as problems in continuity of care when patients are sent to outside providers and then returned to the

prison: "The inability to obtain consultation reports and hospital reports appears to be a long-standing system wide problem. This is a significant patient safety issue." [Puisis SR p. 10.] In sum:

> The paper medical record system creates significant barriers to delivery of safe health care, including inaccessibility of prior reports and prior diagnostic tests. The current paper medication administration records are inconsistently filled out, filed, or able to be viewed by clinicians. The paper record also makes monitoring health care processes exceedingly difficult. An electronic medical record is needed.

[Puisis SR p. 10.]

161.     Defendants' rebuttal expert Dr. Owen Murray, responding to Dr. Stern, opined that most of the problems identified by Dr. Stern would be solved by the implementation of an electronic medical record:

> The paper health record system currently used by IDOC has inherent flaws as is common with all paper record systems. Our reviewers were consistent in their agreement with Dr. Stern regarding the impact on healthcare process that are created by the use of a paper record system. Dr. Stern's report is replete with his concerns regarding missing encounter dates and times, required fields being empty, signatures and credentials being illegible, appointment scheduling, and what at times appears to be missing clinical information. These are all common maladies associated with the use of a paper health record. . .

[D11 p. 2.] The Texas prison system, for which Dr. Murray works, had put an electronic medical records system in place in 1999, within a period of 18 months.

162.     The need for an electronic medical record is not news to IDOC. Defendants have intended for many years to replace their paper healthcare record system. The 2011 Wexford contract required the implementation of EMR throughout IDOC. [P18 at 000374-76 (§ 7.7.4).]

163.     The project was abandoned for unexplained reasons after EMR had been put in place at the two women's prisons (Logan CC and Decatur CC). However, even at those two prisons, record-keeping problems persist:

> The record was incompletely implemented; the electronic medication administration record was not implemented . . . [In addition, at Logan CC], there were some serious problems with the electronic record. This record defaults vital signs from the last

vital signs obtained. The record will automatically present vitals in a note from months previous if no more recent vital signs were done. This is dangerous and should be stopped, as it is a patient safety issue.

[Puisis SR p. 38.]

## VI.    MEDICAL RECEPTION (INTAKE)

164.    Healthcare services in IDOC begin at the system's reception and classification centers, which process arriving prisoners. By far the largest of these is NRC (Northern Reception Center), which at the time of the Puisis team's visit in early 2018 received 307 new prisoners each week. [Puisis NRC p. 2.] By contrast, Menard CC, the men's reception and classification facility for the southern region, received 86 new prisoners each *month* in spring 2018. [Puisis MEN p. 20.]

165.    Both the Shansky team and the Puisis team visited three of the four IDOC reception and classification centers—NRC, Menard CC, and Logan CC (the principal women's prison, which also serves as the women's intake center).[15]

166.    "[T]he medical reception process is designed to identify acute and chronic medical problems along with acute and chronic mental health problems, as well as any potential communicable diseases and any other special needs." [Dkt. 339 p. 12.]:

> The purpose of doing a comprehensive medical intake is not just to identify the needs but to insure that those needs are appropriately addressed. [P]roblems [may arise] with both the identification and the follow through . . . When either type of problem occurs, this creates an avoidable liability for the patient.

In other words, it exposes the patient to an unnecessary risk of harm. [*Id.* pp. 12-13.]

167.    In 2014, the First Expert team found both kinds of problems—both of identifying needs and of follow-through. [*Id.*]

---

[15] The fourth reception and classification center is Graham CC, which serves as the men's intake center for the central region.

168.   Intake procedures regularly failed to identify even routine medical and dental problems or identify them timely, and that there were long delays in healthcare intake processing, especially at NRC.

169.   At NRC, it could take over a month to process patients through reception. [*Id.* p. 13.]

170.   The intake forms in use failed "to elicit [information] regarding current symptoms *as is standard in most systems.*" [*Id.*; emphasis added.] Further, there was "no process to insure that TB test results, blood test results and any other tests are integrated along with the history and physical into a problem list and plan for each problem." [*Id.* pp. 13, 96.]

171.   Dental screening was deficient as well: "[E]gregious deficiencies were observed at the NRC during the [dental] screening exam. . . ." [*Id.* p. 38.]

172.   Medical records were "dysfunctional," making it difficult for clinicians "to utilize and identify available clinical information" and thereby respond in a "clinically appropriate" manner. [*Id.* p. 13.]

173.   At NRC and Logan CC, patients from Cook County Jail did not arrive with medical records, hampering the reception process. The facility received "only an emailed list of medications from Cook County Jail for inmates being transferred, but no other records," and even this was "not typically available to the staff at the time of the intake screening or physical exam." [*Id.* pp. 96, 214-15.]

174.   Chronic care was neglected: "We looked at a random sample of 10 charts of patients who were detained at [NRC] for *more than 60 days*. Five of the 10 patients had chronic health issues, yet *none had been enrolled in the chronic care program or had his chronic disease intake evaluation . . ..*" [*Id.* p. 99; emphasis added.]

175.    Finally, at all three facilities, the Shansky team's record review found numerous examples of failure to follow up on patients who entered with serious issues indicated in their test results or medical histories. [*Id.* pp. 98, 334-35, 215-16.]

176.    In 2018, as to NRC specifically, the Second Expert team found that healthcare intake had worsened over the four years since the First Expert team's review:

> Based on a comparison of conditions as identified in the First Court Expert's Report, we find that conditions appear to have deteriorated. We find that NRC is not providing adequate medical care to patients. *There are systemic issues that present ongoing serious risk of harm to patients and result in preventable morbidity that could also result in mortality.*

[Puisis NRC p. 3; emphasis added.]

177.    As to the intake process system-wide, there were multiple issues. Although the Puisis team found non-systemic improvements in intake timing (improvements in "the timeliness of completion of the medical reception process at some facilities (NRC and Logan) but not uniformly [] (Menard CC)," substantial issues remained:

> The reception process does not ensure a thorough initial medical evaluation that will correctly identify all of a patient's problems in order to develop an appropriate therapeutic plan. Follow up of abnormal findings was inconsistent. Laboratory tests and other studies needed for an initial evaluation of a patient's chronic illnesses are inconsistently obtained.

[Puisis SR p. 10.] Further:

> Visual acuity testing is inaccurately performed and yields inaccurate results. Staff incorrectly read Tuberculin skin tests and inconsistently record results in the health record. HIV opt-out testing is inconsistently performed. Intake evaluations uniformly lack adequate history, and physical examinations are cursory. Providers do not consistently perform adequate assessments or order labs tests necessary to determine the patient's disease control. Providers often omit or change a patient's medications upon arrival without clinical indication. Nurses do not consistently initiate a medication administration record when giving patients stock medication in the reception area. Provider medical reception orders are inconsistently carried out. Provider follow up of abnormal reception laboratory tests is not consistently and timely performed.

[Puisis NRC p. 4.]

178.     The defects in the intake forms themselves noted in 2014 by the First Expert team

remained unaddressed:

> The IDOC Offender Medical History form is limited with respect to chronic diseases
> and does not include COPD, thyroid, kidney, liver, autoimmune diseases, or cancer.
> Importantly, as noted in the previous Court Expert report, the form also does not
> include a section for review of systems (e.g., chest pain, shortness of breath,
> abdominal pain, blood in stool, difficulty with urination, etc.) that are typically
> included in a comprehensive history and physical examination. This poses a risk that
> important medical diagnoses or symptoms of serious illness will be missed . . .

[Puisis SR p. 44.] Further, HIV testing, contrary to CDC recommendation, is (due to AD

requirements), effectively "opt-in," meaning that people who should be tested are not.

179.     As to medications:

> Clinicians usually ordered medications on the day of arrival; however, in some cases
> they did not provide continuity of care with respect to patients' chronic disease
> medications, either omitting or changing medications (e.g., insulin types) without
> documenting a clinical indication. Medication Administration Records (MARs) did
> not consistently reflect that the patients received the medications.

[*Id.* pp. 44-45.]

180.     The finding as to dental intake remained the same:

> The dental program has not changed materially since the First Expert's Report. It
> represents a substantial departure from accepted professional treatment standards
> and is not minimally adequate.

[Puisis NRC p. 6.]

181.     Chronic care also remained deficient. The Second Expert team found that NRC

fails to evaluate individuals with chronic illnesses timely; and that medical providers did not timely

address abnormal lab test results and did not complete the initial chronic disease form when seeing

patients at the first follow-up visit. [Puisis SR pp. 44-45.]

182.     Notes and record-keeping are deficient and problem lists are incomplete; diabetic care "fails to provide basic screening tests and vaccines that are recommended in [IDOC guidelines]; and "there are unacceptable delays in obtaining specialty consultations and diagnostic tests," plus "[p]atients with problems which appeared to be beyond the expertise of NRC providers were not referred for specialty care." [Puisis NRC p. 41] "We could only estimate the number of persons with chronic illness who are not tracked, but it *appears to be more than the majority of patients.*" [*Id.* p. 42; emphasis added.]

> Because patients with chronic illness are not tracked, many are not followed for their chronic illness even when they remain at the facility for extended periods of time. The provider notes for patients with chronic illness are deficient. They lack adequate history, reasons for modifying treatment plans, and have inadequate physical examinations. Diabetes care, in particular, is not provided consistent with contemporary standards of care. There were significant gaps on medication records, making it appear that inmates do not receive ordered medications for their chronic illnesses. Patients with problems beyond the expertise of NRC providers were not referred for appropriate consultation.

[*Id.* p. 5.]

> The care of diabetics was uniquely problematic. Without regard to the level of control or other needs of the patient, all insulin-requiring diabetics have their community or previous facility insulin types and dosages changed to twice a day NPH dosing accompanied by twice a day capillary blood glucose (CBG) testing.[16] Because patients have individual needs, this one-size-fits-all protocol has risks of deterioration of diabetes control and disrupts the continuity of care. Microalbumin-creatinine ratio, lipid profile, and HbA1C are not consistently drawn at the first provider visit as directed in the IDOC Office of Health Services Diabetes Treatment Guidelines (March 2016). Only one of the five diabetic charts reviewed had a HbA1C lab done, one had an order for this test, and three did not have an order or results in the chart.

[*Id.* p. 43.]

183.     Defendants themselves, in the course of their reviews of compliance with Administrative Directives, have documented failures in chronic care. In May 2016, NRC's

---

[16] [Footnote in original:] These are point of care finger stick blood glucose tests that civilian diabetics perform themselves but in correctional facilities are often performed by nurses.

external IDOC review found it "Non-Compliant" with Administrative Directive 04.05.105. The findings included the following: "In 100% of the sample reviewed, Hepatitis C Clinic was not held every six months in June and December"; "In 100% of the sample reviewed, General Medicine [clinic] was not held every six months in May and November"; "In 100% of the sample reviewed, Hypertension Clinic was not held every six months in March/April and September/October"; "In 62% of the sample reviewed, the Diabetes Clinics were not held every four months in April, August, and December." [P459.]

184. Finally, follow-up, including referral to outside providers, remained problematic. Among the cases illustrating this issue in the Second Expert Report were the following:

> This patient was admitted to NRC on 11/30/17. Physical exam on admission noted, "c/o pain in right great toe with discoloration." MD note: Right big toe ulcer with foul smell, surrounding erythema. The problem list noted: Diabetic R big toe ulcer, dime size, black x two months. Diagnoses: Diabetes, HTN, hyperlipidemia, renal insufficiency. MD ordered daily dressing changes, Rocephin 500mg/D. Intake lab: Syphilis/RPR 1:128. No dressing change log was found in medical. There is documentation that this patient's black toe was not evaluated or dressed as ordered until 12/5/17, when RN noted "in pain" and sent the patient to MD for evaluation. The right big toe was black with foul smell and erythema. He was sent to St. Joseph Hospital, was diagnosed as having right toe gangrene with abscess, his toe was amputated, he received treatment for sepsis, and he was discharged to NRC on 12/22/17 on IV antibiotics. On 12/22/17, he was admitted to the infirmary. The RN admission noted: IV antibiotics, UIC podiatry and vascular clinic referrals in one to two weeks. The MD infirmary admission note was written on 1/2/18, 11 days after admission. Post-hospitalization: Right big toe abscess/gangrene with sepsis, PICC line on IV antibiotics, angiography showed PVD, Meds Glipizide, Metformin, Lisinopril. On 12/5/17, RN note, "seen by MD, CPM." On 1/7/18, RN: red, swelling bottom of foot. 1/10/18, MD noted CPM [continue present management], but there was no physical exam. On 1/22/18, laboratory tests showed WBC 6.4, creatinine 0.87, RPR 1:64. On 1/27/18, five weeks after returning from a complicated hospitalization, the surgical (probably vascular) consultation was still pending and the podiatry appointment had not been scheduled. On 1/29/18, treatment for latent syphilis was finally ordered.

> The pre-hospitalization care at NRC was deficient. The intake provider should have directly sent this diabetic with a black, foul smelling ulcer on his toe to the ED for emergency consultation and assessment for gangrene and osteomyelitis. NRC's failure to change dressings and re-evaluate the ulcer for seven days after reception

minimized any opportunity to prevent amputation. The delay in transferring this patient to the ED contributed to the development of sepsis and jeopardized his life. The intake lab test identified syphilis; treatment should have been started during the seven days prior to hospitalization. Upon return to NRC, his abnormal syphilis test was not flagged for treatment and he was not treated until 1/29/18 (five weeks after his return from the hospital). The abnormal lab should have been quickly identified and treatment initiated immediately after his admission to the infirmary on 12/22/17. The infirmary physician clearly neglected to review the patient's previous test results upon admission to the infirmary. During his infirmary stay, the provider never once commented on the status of the amputation wound site nor documented an examination of his feet. As a post-hospital return, the physician should have been initially writing progress notes at least three times a week. Provider notes were only written weekly. His post-hospital course was neglectful. Five-and-a half weeks after his return to NRC, he still had not been seen by a podiatrist and a vascular surgeon as recommended on 12/22/17. During his infirmary stay, the provider never commented on the control of the patient's diabetes. HbA1C, microalbumin-creatinine ratio, retinal screening, and an examination of the other foot was not documented in the progress notes. Pneumococcal vaccination was not offered or administered. At every stage of this patient's care the standards of care in the community were not followed.

[Puisis NRC pp. 59-60.]

Another patient had a history of pancreas and kidney transplants but the reason for these transplants was never identified or documented in the medical record. History of the patient's illness was substandard. This patient had several consultations but because the reports were not available in the medical records, the providers at NRC failed to understand what the patient's clinical condition was and also failed to understand the status of the patient's conditions. We also could not determine the status of this patient because of lack of consultant reports. This places the patient at risk of harm. Because consultant reports are not filed in the medical record, when this patient transfers, subsequent providers will not understand how to care for this patient, who will be at risk of harm. The patient also had a hemoglobin of 12.7 on 10/5/17, which dropped to 8.9 on 12/21/17. This significant drop in hemoglobin was unnoticed and was not being monitored; it indicated a significant risk to the patient yet was unnoticed. The patient also was being treated for high blood lipids but was not being monitored for this condition.

We also note that in review of these records, the organization of the medical records was so poor that it was extremely difficult to discover what was happening to the patient. This was similar to the finding of the First Court Expert. Papers were merely placed in a folder, not sorted by type of document or placed in chronologic order. For larger records, examination of the record was so difficult that use of the record for routine care in a busy clinic would not be possible.

[Puisis NRC pp. 55-56.]

53

185.     While receipt of records had in some places improved, what was *done* with the

information was still deficient and resulted in avoidable harm.

> Record review showed that county jails forwarded medical transfer information that
> was available to health care staff at the time of arrival. However, NRC providers
> did not document that they reviewed the information and, in some cases, missed
> important medical diagnoses (e.g., prostate cancer, pancreatic cancer, pulmonic
> valve regurgitation) or medications for high blood pressure (e.g.,
> hydrochlorothiazide). One such error resulted in death.
>
> We noted two cases in mortality reviews that included significant problems with
> failing to review transfer information or to take an adequate history. In one case, a
> provider failed to take an adequate history of a patient in the midst of getting valve
> replacement for a congenital anomaly.[17] The provider made the wrong diagnosis,
> failed to contact the patient's civilian doctor, and even failed to read a letter in the
> IDOC medical record from the patient's civilian doctor. As a result of this failure,
> the patient's planned surgery was never done, his condition was unrecognized in
> IDOC for six months, and the patient died from complications of his heart condition
> without having obtained surgery. Another patient from Logan was at Cook County
> Jail and was sent to Stroger Hospital for a pancreatic mass. A biopsy was non-
> diagnostic but the mass was strongly suggestive of pancreatic cancer and follow up
> was recommended.[18] The doctor at Logan presumed that the patient had a benign
> pancreatic mass and no follow up was initiated for five months. Pain medication
> history was also not taken and the patient was placed on inadequate doses of pain
> medication and suffered in pain over the last five months of her life.

[Puisis SR pp. 42-43.]

186.     The failures in medical reception are intertwined with other systemic deficiencies,

some (such as problems with medication administration) not found in the First Expert's review.

187.     "NRC has inadequate staffing. There is a 42% vacancy rate, which is

extraordinarily high." [Puisis NRC p. 3.] Due to inadequate security staffing and lockdowns, sick

call requests cannot be submitted confidentially; they are also not collected regularly, and "are not

triaged within 24 hours and nurses do not indicate the urgency of follow up evaluations." [Puisis

NRC p. 4.]

---

[17] [Footnote in original:] Mortality Review Patient #2.
[18] [Footnote in original:] Mortality Review Patient #20.

188.    "Medication administration is impaired because of lack of sufficient cooperation by security staff, which appears to be due to insufficient custody staff. Nurses do not administer medication consistent with accepted nursing practice. Administration is not hygienic. Nurses do not appropriately confirm the identity of the patient receiving medication. Doors are not opened for medication administration and nurses pass medication through cracks in the door and do not adequately visualize patients to confirm their identity. Nurses do not document on the medication administration records at the time they administer the medication to the patient. . . The nursing medication room is dirty, cluttered and disorganized." [Puisis NRC p. 5.]

189.    At Logan CC and at NRC, there were problems with equipment, supplies, and sanitation: Logan lacked a microscope to diagnose vaginal infections; at NRC, scales were not calibrated; eye exams take place 10 feet from the chart rather than 20; mineral deposits from the water causes buildup that makes "disinfection difficult, if not impossible." In general, "Exam tables did not have paper to use as a barrier between patients and there was no schedule of sanitation and disinfection activities. Exam rooms were dirty and in some cases filthy." [Puisis SR p. 43.]

## VII.    NURSING SICK CALL (ACCESS TO SERVICES)

190.    Access to prison healthcare services, even for many urgent/emergent needs, occurs through "sick call." To access sick call, prisoners must submit written requests, which are collected (sometimes by custodial staff) and reviewed by healthcare staff; at some facilities they may also sign up on a sick call log. With some exceptions, prisoners in IDOC must pay a $5 co-pay to access sick call.

191.    The IDOC-commissioned NRI report states that "access to care is the essential baseline feature of any effective . . . health care system"; prisoners "must be able to gain timely

access to those professionals who are legally, ethically, and morally responsible for their overall well-being." [P21 at 000007.]

192.    In 2014, Dr. Shansky's team found that "[n]ursing sick call ranges from problematic to significantly broken throughout the system, in that one or more of the elements required of a professional sick call encounter are missing." [Dkt. 339 p. 16.] These elements included the availability of sick call request slips and a confidential means to submit them; private and appropriately equipped clinical spaces; execution of sick call by registered nurses and in accord with the policies and procedures of the IDOC Office of Health Services; attention to "all of a patient's complaints, or, at a minimum, prioritizing the complaints"; and an effective tracking system [*Id.* pp. 16-17.]

193.    The First Expert Report also criticized IDOC's practice of having sick call carried out by staff who were not registered nurses, because only RNs are trained and certified to provide the kind of "independent assessment" that is required at sick call. This "increases the potential for harm to the patients as well as legal liability for the State." [*Id.* p. 8.] "At every facility, a sick call process has been established which allows for non-registered nurses to conduct sick call . . .." Such a practice produces "a significantly reduced likelihood of an appropriate diagnosis and an appropriate plan and this increases the potential for harm to the patients." [*Id.* p. 17.] Dr. Shansky observed that LPNs lack appropriate training to perform independent assessments, and only RNs are permitted to so under the Illinois Nurse Practice Act. [*Id.* p. 17.]

194.    At DCC, "it was difficult to impossible to evaluate sick call because a Sick Call Log has not been developed or maintained." [*Id.* pp. 18, 134.] Sick call requests slips were processed in a way that subjected them to multiple breaches of confidentiality before they arrived in the hands of medical personnel. [*Id.* p. 135.] Once medical staff reviewed a sick call request slip

and scheduled the patient for a visit, the original slip was destroyed, making it impossible to know whether the request was reviewed and the inmate evaluated in the appropriate time frame. [*Id.* pp 134-35.] At the medical visit, "medical staff only permit[] a patient to voice one concern at an encounter despite multiple concerns listed on the sick call request." [*Id.* p. 18.] Finally, security staff "frequently and arbitrarily" cancelled sick call encounters, impeding access to care and delaying treatment. [*Id.*]

195.    At PCC, a Correctional Medical Technician (CMT)—who might be an LPN or a certified EMT, but not an RN—toured each cell house daily. "Inmates voice their complaints to the CMT through either an open cell-front barred door or a solid door." The CMT could then "immediately refer the inmate to the physician or mid-level provider, refer the inmate for nurse sick call or use an approved Office of Health Services treatment protocol to treat the inmate." [*Id.* p. 181.] Since inmates remained in their cells, they did not receive physical exams, and vital signs were not always taken. Dr. Shansky found that these practices violated the Illinois Nurse Practice Act and that "access to health care is delayed due to inappropriate assessment." [*Id.*]

196.    At LCC, nursing sick call was particularly problematic in X-House, which housed reception, segregation, and maximum security inmates. In response to requests slips, an LPN or RN went to an inmate's cell and spoke to them through a solid metal door, compromising the patient's confidentiality and precluding a physical examination. "No appropriate assessment and corresponding appropriate examination is conducted." [*Id.* pp. 216-17.] Dr. Shansky observed similar problems for prisoners in segregation at IRCC. [*Id.* p. 256.]

197.    The Second Expert team was similarly critical: "Overall, we find that IDOC lacks an adequate system for access to care through nursing sick call, creating a systemic risk of harm

to patients. The findings at NRC were particularly egregious, in part due to lockdown of the population 24 hours a day, and warrants immediate attention." [Puisis SR p. 48.]

198.    In addition to irregularities in access to nursing sick call throughout the facilities reviewed by the Second Expert team, the Second Expert Report, like the First Expert Report, was critical of the fact that LPNs are not used within the scope of practice during sick call. "*Thus, some IDOC patients do not receive evaluations by health care staff licensed to perform independent assessments. This increases the risk of harm to patients.*" [Puisis SR pp. 49; emphasis in original.]

199.    "In addition," the Puisis team observes, "we found that nurse to provider referrals are not made when clinically indicated, and when made are not timely performed." [*Id.*]

200.    Problems noted elsewhere with physical space (for examination and confidentiality), sanitation and equipment, and record-keeping also rendered access to care via sick call problematic in the view of the Second Expert team. [Puisis SR pp. 48-51.]

201.    At specific facilities, the Second Expert team noted additional issues, as follows:

Dixon CC

Other problems identified by the First Court Expert remain and there are new problems. Sick call requests are still not filed in the medical record. Nurse documentation is inconsistent or absent, and did not consistently give an indication of the assessment or plan of care. Quality review of nurse performance is not done. Medical records are not available in X house; patients there are seen without a medical record. Provider follow up on nurse referrals was not timely. Segregation inmates only have access to sick call once a week. We noted that care of dental patients with pain have their pain addressed inconsistently by medical staff until a dentist can evaluate the patient. This process should be standardized so that pain is timely addressed.

[Puisis DIX p. 4.]

Stateville CC

Problems with sick call identified in the First Court Expert's report that are still evidenced include:

- Nurses do not adequately assess or document evaluation of inmate health complaints.
- Inmates who were referred from nurse sick call were not seen or not seen timely by providers. Providers failed to follow up at intended intervals and treatment orders were not completed.

In addition, we had several additional findings:

- LPNs continue to be assigned to conduct sick call even though the stated practice at SCC is to assign RNs.
- Security practices in segregation do not provide sufficient privacy for patients during the sick call encounter.
- Nurses do not refer patients to providers in accordance with IDOC Treatment Protocols and do not document the urgency of the referral (e.g., urgent, routine).

[Puisis STA p. 20.]

202. At Logan, the Second Expert team found ongoing problems with timely access to care, as well as failure to comply with Illinois law by permitting LPNs to perform assessments which is out of the scope of their licensure and increases the risk of harm to patients. [Puisis LOG pp. 18-20.] In addition, some patients who need a medical diagnosis are evaluated only by a nurse and not by a provider, resulting in, among other issues, medications being ordered without a diagnosis having been made. In some cases there was also no record that the medications had been received. [Puisis LOG pp. 20-21.]

203. At NRC, "In summary," the Puisis Report states:

. . . the basic components of a system to access health care are not in place and patients do not have timely access to care for their serious medical needs. The practice of 24 hour lockdown is a serious obstacle to access to care. Inmates do not have the means to timely and confidentially submit their health requests. When submitted, staff does not timely respond. Patients are seen by CMT/LPNs who are not licensed to perform independent assessments, and therefore exceed their scope of practice whenever they perform independent assessments. Patients are not examined in a clinical setting with adequate lighting, equipment, supplies, and access to handwashing. Finally, nurse to provider referrals are not made when clinically indicated, and when made, they are not timely.

[Puisis NRC p. 40.] There were also overlapping problems of lack of staff and lack of competent staff. In one example given, the report states:

> This 37-year-old man arrived at NRC on 12/22/17. His medical history includes obesity, sleep apnea, hypertension, and opioid dependence. The patient submitted an undated piece of paper that said, "Blood in stools, please help." An unknown person wrote "refused" without date, signature and credentials. On 1/17/18, an RN saw the patient for constipation. The patient reported that on 1/16/18 that his stools were dark red and soft. The problem started in November 2017. The RN noted that he was being seen by GI and was previously scheduled for colonoscopy. The patients pulse was rapid (pulse=114/minute). The nurse documented a plan to refer the patient to the doctor if symptoms persisted for three days. On 1/19/18, a physician saw the patient for follow-up of his blood pressure (BP=153/113 mm Hg). The physician did not address the patient's complaint of blood in his stools. We referred this record to the Director of Nurses for follow-up with the provider.

[*Id.*]

204.    Finally, at Menard CC, the Second Expert team found ongoing problems of use of LPNs, inadequate assessments and evaluations; failure to use the patient's medical record. In addition, providers did not see patients referred from sick call timely, as in the following instances:

> Referrals to providers were appropriately generated for each of the 15 sick call encounters reviewed, but only three were seen within 48 hours. One patient was referred after being seen for smoke inhalation; he was not seen by a provider for 11 days. Another was seen by the nurse for epigastric pain. The provider was called and ordered medication and follow up in the chronic care clinic. His next chronic care appointment was five months in the future. Another patient was seen by a nurse after having a seizure. The nurse practitioner was contacted and directed that the patient be seen the next day. The expected appointment did not take place and was never re-scheduled. One patient complained of a possible ankle fracture. The nurse contacted a provider by telephone, who ordered x-rays of the ankle, a splint, and a lay-in. The patient had a severe sprain and was not seen by a provider for two weeks. Patients such as these are at risk of deterioration when medical attention is untimely . . .

[Puisis MEN p. 25.]

## VIII.   CHRONIC DISEASE MANAGEMENT

205.    Chronic disease management is a critical part of prison healthcare because of the high rates of chronic illness in prisoner populations. [P501.] In addition to the problems in chronic

60

disease care observed by both the Shansky and Puisis teams in IDOC intake, both the First and Second Court Experts concluded that routine management of chronic illness throughout IDOC put prisoners at risk.

206.    The First Expert team identified multiple problems with chronic disease management. "With regard to policy," the Shansky Report states, "the most important and overarching problem is a 'cookie cutter' approach to chronic disease management [which] dictates that all patients are. . . arbitrarily seen only three times a year regardless of how well or poorly" their disease is controlled. This "only makes sense (and is safe) if patients' diseases are in good control. If not, then patients are exposed to the cumulative organ damage caused by inadequately controlled chronic disease." [Dkt. 339 p. 19.]

207.    The result was a careless and risky approach to managing life-threatening conditions: "At every facility we visited, we encountered cases of patients with poorly controlled chronic disease going month without any active management of their disease process." "[W]e noted multiple instances in which patients experienced medication discontinuity for a variety of reasons, yet this went unrecognized and [] unaddressed . . .." [Dkt. 339 pp. 19, 23.]

208.    Defendants' policies and protocols for specific diseases also put prisoners at needless risk, in the Shansky team's view. "[T]here is no IDOC Treatment Guideline for HIV, there is only the Wexford Health HIV AIDS infection Control Policy, which does not require that facility providers follow the HIV patients . . .. [T]hese patients were managed solely . . . via telemedicine . . .." [Dkt. 339 pp. 19-20.] "The HIV virus readily develops resistance mutations when medications are not taken exactly as prescribed. . . . We encountered numerous examples of patients going for days, weeks or months without their medications . . . and these treatment interruptions went unnoticed by the local providers." [*Id*. p. 20.] Similarly:

> With regard to the management of pulmonary disease, the treatment guideline is seriously deficient, in that it only addresses the treatment of asthma and not of other obstructive lung diseases such as COPD and chronic bronchitis, which are common and important causes of morbidity and mortality in the U.S., and the treatment of which differs in important ways from the treatment of asthma.

[Dkt. 339 p. 20.]

209.    As to diabetes, the First Expert team found fundamental failures to acknowledge the difference between Type 1 and Type 2 diabetes, as well as failures to recognize the need for individualized approaches to management of insulin regimes. [*Id*. p. 21.] These treatment policy gaps were exacerbated by the lack appropriate medical training the Shansky team noted for many facility providers.

210.    In 2016, the IDOC-commissioned NRI Report articulated the same criticism as to the overall management of the chronic care schedule in IDOC as had the Shansky Report:

> The chronic care clinic schedule is based on the calendar, but it should be provider driven and based on clinical need. The mandatory schedule has historically resulted in the providers defaulting to the month that is identified for each chronic condition. This system has been shown to create the following problems:
>
> i.      Providers tend to not order a chronic care follow-up visit based on patient needs; rather, they use the calendar schedule to dictate the timing and frequency of follow-up.
> ii.     Providers address only one chronic condition at a time, even when multiple chronic conditions are present. . . This results in fragmented chronic care and unnecessary patient escort.
> iii.    The calendar schedule leads to waste of resources. . . .

[P21 at 000012.]

211.    In 2018, the Second Expert team found the same triad of problems with chronic care identified by the First Expert still present in IDOC, namely (i) poor management of scheduling; (ii) deficient guidelines for disease management; and (iii) physicians who could not be relied upon to manage the common chronic diseases of a prison population.

212.    Like the Shansky Report and the NRI Report, the Puisis Report criticized the

inflexible chronic clinic schedule for creating patient hazards:

> The chronic disease system promotes fragmentation of care and fails to adequately address all of a patient's problems from the perspective of the patient. Patient problems are lost to follow up or are not addressed in the context of a patient's complement of diseases.
>
> ****
>
> Four years ago, the First Court Expert found that most of the IDOC chronic care clinics addressed only a single disease and were conducted every four to six months. We found chronic care clinic schedules were unchanged. . . The schedule for these clinics is inflexible and not based on the degree of control of a patient's illness.
>
> Failure to manage patients based on the degree of control of their illness has the potential to harm patients, as patients are evaluated on a fixed schedule irrespective of the degree of control of their illness. Therefore, persons who need greater attention because their disease is poorly controlled may not receive it.

[Puisis SR pp. 10, 53.]

213.    The inflexibility in chronic clinic scheduling was not just "inefficient, wasteful, and

potentially harmful," in the Puisis team's view, but creates the following additional risks for

patients:

> The practice of seeing patients in disease specific chronic illness clinics encourages providers to ignore the implications of any one disease on another disease and to ignore the multitude of drug-drug interactions that exist in the practice of medicine. Many chronic illnesses are clinically interrelated. Metabolic syndrome, for example, is a condition that consists of obesity, diabetes, high blood lipids, and hypertension. Yet in the IDOC, each of these diseases (diabetes, high blood lipids, and hypertension) may be evaluated in a separate chronic clinic. In the IDOC, these disease specific clinics also do not include documentation that the provider evaluating the patient is aware of the patient's other clinical conditions. Each individual illness is documented on a separate medical record document, which makes it impossible to obtain a unified perspective with respect to therapeutic treatment planning. . .

[Puisis DIX p. 29.]

214.    As noted four years earlier by the First Expert, in 2018 IDOC chronic care still fails

to address some chronic conditions at all:

> A single chronic disease clinic (General Medicine Clinic) is used as a vehicle to
> manage all diseases other than disease specific chronic illness clinics. But we found
> that there are many diseases that are not managed in IDOC chronic clinics and
> therefore are unmonitored. This included patients with cirrhosis, cancer, heart
> failure, substance abuse, and rheumatoid arthritis as examples. . . .

> Also, some diseases are monitored in a clinic that is inappropriate for their
> condition. As an example, chronic obstructive pulmonary disease (COPD) is a
> common respiratory condition affecting about five percent of the population and is
> the third-ranked cause of death in the United States.[19] IDOC treats COPD in the
> asthma clinic and utilizes identical forms and nomenclature for control and
> management as if COPD were the same disease as asthma. They are not the same
> disease . . . The First Court Expert commented on this but there has been no
> modification to guidelines, forms, or management practices . . .

[Puisis SR p. 54.]

215.    As the First Expert had likewise found in 2014, in 2018 the Puisis team found IDOC

chronic care guidelines to be out of date:

> The chronic care disease guidelines need to be updated. Alternatively, contemporary
> existing guidelines by major specialty organizations should be used in lieu of IDOC-
> specific chronic care guidelines. These specialty organization guidelines are
> periodically updated and are based on latest scientific evidence. For the Office of
> Health Services to attempt to duplicate these guidelines is unrealistic.

> The Administrative Directive for periodic examination[20] is inconsistent with current
> standards of preventive care.[21] Inmates are therefore not offered all preventive
> services that are typically offered to individuals in the community. The most
> important missed preventive care is colorectal cancer screening in individuals over
> 50 years of age.

[Puisis SR pp. 10-11.]

---

[19] [Footnote in original:] UpToDate, Chronic obstructive pulmonary disease: Definition, clinical manifestations, diagnosis, and staging.

[20] [Footnote in original:] Offender Physical Examination; Illinois Department of Corrections Administrative Directive 04.03.101.

[21] [Footnote in original:] As exemplified by the US Preventive Services Task Force Recommendations.

216.    As to specific chronic conditions, the Second Expert team noted problems with the management of Hepatitis C (only 3% "of the nearly 10,500 hepatitis C patients incarcerated in the IDOC between 2010 and 2016 were offered and received" the currently available "short-course regimens of medications that result in a high percentage of cures"; currently only 10 patients were receiving the therapy); diabetes ("The care of many diabetics was found to be flawed and put patients at risk for hypo and hyperglycemia, and ultimately for end organ damage"; the "system wide failure of the providers to differentiate treatment differences between type I or type II diabetes and the IDOC universal practice of treating all diabetics on insulin with the same regimen of medications" puts patients at risk); patients on anti-coagulation therapy ("[p]atients on Vitamin K antagonist anticoagulation medication (warfarin) were rarely well controlled"); and overall with the management of prescribed medications ("failure of the chronic care providers to routinely monitor patient compliance with prescribed medication put the patient at notable risk for overprescribing and needlessly increasing medications dosages") and monitoring of weight loss ("[w]eight loss in correctional settings is an ominous sign"). [Puisis SR pp. 54-55.]

217.    In the Menard report, the Second Expert team explained in further detail the many flaws they found in the management of Hepatitis C within IDOC:

> When treatment of hepatitis C is deferred and when there is active virus present, there is a risk of ongoing harm to the patient and ongoing monitoring of liver disease is recommended.[22] Yet, except for continuing to obtain an APRI level, providers in hepatitis C clinic do not monitor for cirrhosis or its complications or other possible complications of hepatitis C infection. When patients develop cirrhosis, it is recommended that they receive a baseline EGD to screen for varices and every-six-month ultrasound or CT scan screening to evaluate for hepatocellular cirrhosis. This is seldom done, even when patients have significantly elevated APRI levels. We note that in four death reviews of patients at various facilities who died of complications of hepatitis C, the patients were not monitored with EGD, ultrasound or for their

---

[22] [Footnote in original:] HCV Guidance: Recommendations for Testing, Managing, and Treating Hepatitis C; Last Updated May 24, 2018, American Association for the Study of Liver Diseases and Infectious Diseases Society of America as found at https://www.hcvguidelines.org/sites/default/files/full-guidance-pdf/HCVGuidance_May_24_2018a.pdf.

ascites.[23] One example at MCC was a patient who had APRI levels indicative of cirrhosis as early as 2012, but the patient failed to receive endoscopy until August of 2015.[24] The patient did not have screening for hepatocellular carcinoma until May of 2015. At that time, a liver mass was found on a CT scan but was not timely worked up. . . The patient ultimately died of complications of his cirrhosis (hepatocellular carcinoma) without ever having a diagnosis of the liver mass . . .

[Puisis MEN pp. 29-30.]

218. These unsound practices were further compounded, in the Second Expert team's view, by a barrier to treatment created by Wexford utilization management:

> The IDOC hepatitis C guideline states that workup of all hepatitis C positive patients, including the decision to refer to the UIC Liver Telemedicine Clinic, will be the sole responsibility of the IDOC providers at each individual IDOC facility.[25] This does not occur, as Wexford has inserted an additional utilization barrier into this process. When the APRI is elevated above 1.0 or above 0.7 with low platelet counts or albumin, facility physicians are to refer patients to a Wexford corporate internist who makes the decision on whether to refer the patient to UIC.
>
> ****
>
> Based on mortality records and on case reviews we performed, it appears that referral to the Wexford corporate hepatitis C internist is significantly delayed. . .

[Puisis MEN p. 30.]

219. Taken together, the Puisis team found that these barriers to care created low treatment numbers and risky delays in treatment:

> In April 2018, 134 men were on the Hepatitis Report maintained by the chronic care nurse. Only one (0.7%) had completed hepatitis C treatment. This is consistent with statewide data that shows that approximately 2.9 patients are treated per facility per year.[26] Another 12 (9.0%) were in the process of being worked up. Even though IDOC guidelines[27] mandate testing of HCV viral load on all patients, 17 (12%) of the 134 hepatitis C patients have not yet had their HCV RNA viral load tested. 87.3% of the hepatitis C patients have not yet had a fibroscan performed, even though the IDOC Hepatitis C Guidelines mandate that all patients have fibroscans done as part

---

[23] [Footnote in original:] Patients #6, 12, 23, and 28 in Mortality Reviews.

[24] [Footnote in original:] Patient #23 Mortality Reviews.

[25] [Footnote in original:] Hepatitis C Guidelines, December 2017.

[26] [Footnote in original:] Data we received from UIC is that for the three years 2015 through 2017 inclusive, 227 patients were treated for hepatitis C. This is approximately 2.9 patients per facility per year.

[27] [Footnote in original:] Hepatitis C Guidelines December 2017.

of their initial evaluation. IDOC restricts HCV treatment to patients with APRI score greater than or equal to 1.0 or with APRI scores between 0.7 and 0.99 with additional abnormal labs and high risk conditions, or advanced liver disease. This threshold limits the number of patients who are eligible for treatment. The process of accessing UIC also has considerable barriers. These barriers limit the numbers of patients treated and cause unnecessary delays in treatment that harm patients.

[Puisis MEN p. 31.]

220.    The Puisis team's Menard CC report also details basic problems with IDOC management of heart disease and diabetes, in particular as to appropriate medication management:

The primary and secondary prevention of arteriosclerotic cardiovascular disease (ASCVD) provided was not in alignment with current national and IDOC standards. The providers did not even once calculate patients' 10-year ASCVD risk score, which would have assisted them in determining the proper preventive medication and dosage. Patients were prescribed low intensity HMG-CoA reductase medications (statins) when high-intensity statins at higher dosages were indicated. Non-statin anti-hyperlipidemia (niacin, gemfibrozil) were prescribed without any documented clinical justification; these categories of medication have limited impact on the prevention or progression of cardiovascular disease. The providers concomitantly order 70/30 insulin and sliding scale short acting insulin before meals. The simultaneous use of these two types of short acting insulin puts diabetic patients at risk for hypoglycemic attacks. . .

[*Id.* p. 32.]

221.    Finally, the Second Expert team noted that IDOC fails to provide "a number of nationally recommended preventive and screening interventions that are designed to prevent certain chronic illnesses," including pneumococcal and meningococcal vaccines, and colon cancer screenings whose lack "is resulting in preventable deaths and avoidable morbidity in the IDOC."

[Puisis SR p. 57.]

222.    As with other aspects of physical healthcare within IDOC, problems of provider quality—including ability to recognize medical needs—and record-keeping and record management vexed chronic clinic care, in the view of the Second Expert team. At Logan CC, they noted:

The care provided to a number of patients with chronic illnesses had deficiencies. The providers did not consistently document the rationale for clinical decisions, including the selection of medications, changes in medications, and modification of medication dosages. It was difficult to understand the reasoning for the treatment regimens that were being provided to some patients. Some patients needed specialty consultation but did not receive it. Consultants recommended additional diagnostic studies for a patient but there was no documentation in the medical record that these tests were ordered and there was no documented clinical rationale for not proceeding with the recommendations. Some patients were treated with medications without appropriate indication. . . .

[Puisis LOG pp. 57-58.]

223. At Stateville CC, the Second Expert team likewise found deficiencies in the record and in clinical judgment in chronic care cases:

The providers' documentation in the medical record was extremely brief, commonly illegible, and seldom contained pertinent clinical information needed to clarify and understand the state of a patient's chronic illness or justify a change in the treatment plan. The experts found it extremely difficult to track the status of a patient's chronic illness and to comprehend the reasons for a modification of treatment. . .

Most of the chronic care patients had completed problem lists. However, four (31%) of the 13 charts reviewed were found to be missing important diagnoses on the problem, list including hypertension, hepatitis C, amputated thumb post human bite, and diabetic foot ulcer. . .

[Puisis STA p. 27.]

224. Further at Stateville CC, the Puisis team found that "[a]ll 13 (100%) of the patient records had problems identified in the provision of care." [*Id.* p. 28.] These included failure to follow IDOC's own chronic care guideline for asthma; a patient who was prescribed a statin dose "inadequate" for his "level of cardiovascular risk," and was also "given a diagnosis of hepatitis C, yet there were no tests done to support this diagnosis"; a diabetic patient for whom "CBG logs from October 2017 through January 2018 documented elevated glucose levels that were not consistent with the control indicated by the HbA1Cs; this important clinical discrepancy was not discussed at any of the diabetes clinics. This indicates that the diabetes chronic care providers are

not regularly, if at all, reviewing the CBG tests or the MARs during the clinic sessions"; and an

epileptic patient

> . . . with uncontrolled seizures and multiple repeat sub-therapeutic Dilantin levels [who] was not being adequately treated. Physicians initially doubted that he was having seizures, then failed to expeditiously switch him from KOP to Watch-Take administration after repeated nursing notes documented non-compliance with his KOP medications. The four-month delay in changing the mode of medication administration jeopardized this patient's health. Even after Watch-Take medications were finally initiated, the drug level was not therapeutic, but no clinical action was taken (increased dose or new medication) . . .

[Puisis STA pp. 28-33.]

225.    In the view of the Second Expert team, "The poor training and qualifications of

physicians was the most important deficiency that resulted in significant morbidity and mortality

with respect to managing chronic illness:

> The deficiencies . . . included not understanding how to diagnose or manage certain chronic illnesses, failure to timely or appropriately manage patients whose disease was not well controlled, failure to monitor key tests or other variables with respect to disease management, failure to identify or properly manage red-flag or other critical abnormalities involving chronic illness, failure to consistently document the rationale for clinical decisions and diagnoses in the chronic care patient progress notes, failure to document adequate histories, physical examinations or therapeutic treatment plans, failure to incorporate specialty recommendations with respect to management of chronic illness into a unified therapeutic treatment plan, failure to refer for specialty care when indicated, and failure to monitor medication management is a safe manner. . .

[Puisis SR p. 52.]

## IX.    URGENT AND EMERGENT CARE

226.    The First Expert team found that nurses and clinicians failed to identify when

patients required emergency room services and/or hospitalization; that patients were not

appropriately assessed upon return from the emergency department or hospital, and that records

of offsite care were not obtained, and that there were lapses in patient follow-up by a primary care clinician once the patient returned to the prison.

227.    One example came from Menard CC, "a 63-year-old man . . . died on 2/11/14 of complications following several cardiac arrests. . . . He was found to have hypertension in 2011, but blood pressure checks were discontinued by the MD . . . . He was not started on medication." When he "presented with chest pain, shortness of breath, and hypertension" in September 2013, [h]e was given a dose of clonidine and placed in the infirmary . . . No ECG was ordered. In fact, no other work-up or treatment was ordered." In January 2014, he again presented with shortness of breath and chest pain; he was treated with antibiotics. After admission to the infirmary, he was finally sent to a hospital ER, where he "was admitted with [congestive heart failure] and subsequently suffered several cardiac arrests and ultimately died." "It is not appropriate to treat a hypertensive urgency in a prison infirmary," the Expert Report states. "[T]he patient should have been sent to the outside [hospital] back in September when he initially presented with these symptoms. It is likely that his cardiac condition would have been recognized then . . . thereby substantially reducing his risk of death." [Dkt. 339 at 364-65.]

228.    In 2018, the Puisis team stated:

> Our findings are unchanged from those of the First Court Expert. Among charts reviewed . . . we found numerous instances of incomplete nursing assessments and failure to contact a higher-level clinician,[28] patients returning without records from the offsite provider,[29] failure to assess patients upon their return from offsite care,[30] and lack of appropriate follow up by the primary care provider.

[Puisis SR p. 60.] Further:

---

[28] [Footnote in original:] Dixon Urgent/Emergent Patients #1-3; MCC Urgent/Emergent Patient #1; Sick Call Patients #1-2; Specialty Consultations and Hospitalization Patient #6.

[29] [Footnote in original:] SCC Urgent/Emergent Patient #1; DCC Urgent/Emergent Patient #2; MCC Urgent/Emergent Patient #1; Specialty Consultations and Hospitalization Patients #6-9.

[30] [Footnote in original:] SCC Urgent/Emergent Patients #1-3; DCC Urgent/Emergent Patients #2-3.

The review of 33 deaths corroborates the findings from the review of records of patients seen for urgent or emergent conditions. Errors made in urgent/emergent services provided to patients who later died included the failure by nurses to refer to a higher-level clinician,[31] failure to recognize patient instability and the need for hospitalization,[32] patients who were returned to the facility for whom the record of offsite care was never obtained or reviewed,[33] and patients who did not receive adequate follow up and implementation of recommendations.

[*Id.* pp. 61-62.]

229.    At Menard CC, the Second Expert team found:

. . . [T]he deficiencies in Urgent/Emergent Care were similar in frequency and type to those reported by the First Court Appointed Expert. These include absence of important information from the hospital, inadequate assessments by nursing staff, untimely physician follow up, and failure to monitor or intervene. We found many additional deficiencies, including inappropriate denials of care by the Wexford utilization physician, failure to review or complete recommendations of consultants, ignorance of the status or therapeutic plan recommended by consultants, and failure to follow up on abnormal test results. Several episodes of care were grossly and flagrantly unacceptable, sufficient to typically result in peer review of the clinician caring for the patient.

[Puisis MEN p. 51.] Similarly, the Dixon CC report summarizes multiple cases of patients who should have been sent to the ER but were not; who returned from the hospital but did not have the relevant reports reviewed; and other life-threatening (or life-ending) failures. [Puisis DIX pp. 47-58.] The care of some of these patients is described by the Puisis Report as constituting "incomprehensible practice" [*id.* p. 53] or "grossly and flagrantly unacceptable" [*id.* pp. 52, 54, 57]. Similar issues of incomplete or inaccurate diagnoses, failure to acknowledge urgent/emergent problems, inaccurate documentation, and failure to attend to information that was available in documentation, were observed at Logan CC and Stateville CC as well. [Puisis LOG pp. 24-29; Puisis STA pp. 39-48.] As to six records of hospitalization reviewed at Stateville, the report notes:

We noted clinical management problems in all six records reviewed, including significant preventable or possibly preventable harm and risk of harm to patients

---

[31] [Footnote in original:] *See* Mortality Review Patients #1, 7, 14, 15, 18, 23, 25 and 30.

[32] [Footnote in original:] *See* Mortality Review Patients #7-9, 13, 17-19, 21-23, 25, 28-29, 32-33.

[33] [Footnote in original:] *See* Mortality Review Patients #6, 9, 17, 21, 28.

> who had delayed hospitalization, delayed specialty care, or lack of primary care of their underlying medical conditions. The lack of appropriate treatment of their underlying medical conditions resulted in deterioration and harm (myocardial infarction, stroke, and colon cancer) that was preventable if their conditions were treated appropriately. There appears to be a significant knowledge and practice deficit with respect to managing primary care problems . . .

[*Id.* p. 42.]

230.    Finally, at NRC, the lack of a tracking log for patients sent for urgent/emergent services meant that it was impossible even to assess those services. [Puisis NRC p. 51.]

## X.    SCHEDULED OFFSITE SERVICES AND OTHER SPECIALTY CARE

231.    Specialty care is needed when a patient requires a special service or consultation that is unavailable at the facility.

232.    In IDOC, specialty care is subject to Wexford "utilization management." The Wexford utilization management process requires a facility Medical Director who believes a specialty consultation or service is needed to consult with a Wexford corporate physician located in Pittsburgh in a process referred to as "collegial review." The Second Expert Report describes the Puisis team's observations of "collegial review" as follows:

> The collegial review is a phone conference call attended by a utilization physician in Pittsburgh, the facility Medical Director, and the scheduling clerk from the facility.. . .
>
> We listened in on one of these collegial review conference calls and spoke to staff about the calls at other sites. The calls are brief. . . The call we witnessed had no clinical collegial discussion . . .

[Puisis SR p. 63.]

233.    The collegial review calls are "brief" because the Wexford corporate physician who is assigned to Illinois typically reviews some 200 cases each week. He has limited documentation on each case. The "collegial review" can result in approval of the request; denial of the request; or a requirement that more information be supplied to support the request. If the request is denied, an

72

"alternate treatment plan" for care that can be provided within the facility's capacities is required

(e.g., an analgesic and exercise instead of orthopedic surgery).

234.   Typically the specialty services which are the subject of utilization management

review are offsite services, but certain on-site procedures and non-formulary medications or

products must also be approved by Wexford utilization management.

235.   In 2014, the First Expert Team catalogued a litany of problems in specialty services:

> During our review of records, we found *breakdowns in almost every area*, starting with delays in identification of the need for the offsite services, delays in obtaining an authorization number, delays in being able to schedule an appointment timely, delays in obtaining offsite paperwork, and delays or the absence of any follow-up visit with the patient.

[Dkt. 339 at 29; emphasis added.]

236.   Four years later, the Second Expert team found no positive change in scheduled

offsite services: "There was no improvement since the First Court Expert's report." [Puisis SR p.

63.]

237.   Like the Shansky team, the Puisis team found problems with extended delays in

obtaining needed care, coupled with the absence of any timetables according to which care was to

be obtained:

> The IDOC-Wexford contract has no specifications with respect to timeliness of specialty care. There is no administrative directive (AD) on specialty care, including timeliness of care. AD 04.03.103 Offender Health Care Services describes the requirements of obtaining specialty care. With the exception of a requirement that the vendor Utilization Management Unit will review all referrals within five working days, there are no timelines associated with obtaining specialty care. None of the facilities tracked timeliness of specialty consultations. Dixon did perform a one-time study of timeliness of UIC consultations, which showed significant delays.

[*Id.* p. 64.]

238.   According to the Puisis team, the "one-time study" performed at Dixon CC, in April

2017, showed that "[t]he *average* time to see a consultant was as follows:

- 239 days for gastroenterology
- 225 days for rheumatology
- 187 days for urology
- 179 days for neurology
- 175 days for orthopedic surgery
- 172 days for radiology
- 147 days for oncology
- 137 days for pain clinic
- 134 days for endocrinology
- 133 days for infectious disease
- 100 days for cardiology

[Puisis DIX p. 60.]

239.    Similarly, at Stateville CC, the Puisis team found long delays in obtaining offsite procedures, including, "for the 55 gastroenterology consults *completed* in 2016 and 2017," an average time from referral to consultation of approximately 6 months. [Puisis STA p. 49; emphasis in original.] "We note that since the referral dates are not accurately stated, these delays may be even longer. Some of these delays were for diagnostic studies which would result in harm if not timely accomplished." [*Id.*]

240.    The Puisis team found that, as with other areas of IDOC healthcare, record-keeping was poor, making evaluation of the timeliness of referrals and services difficult:

> Each site had a tracking log detailing the benchmark dates of specialty care. None of the tracking logs was complete and some were inaccurate. Tracking logs were similar but not standardized. These tracking logs were under Wexford management . . . At [Menard] CC, 44% of referrals in 2017 did not have a referral date documented on the tracking log and only 53% had the date the appointment was completed documented. . . at [Stateville] CC for a period in January of 2017, 60 consultations were documented as being completed before the referral was made. . . .

[Puisis SR p. 64.] In addition, over a three-month period at Stateville CC, "22 (7%) of 321 collegial reviews were documented as occurring *before* the date of referral. This is not possible . . ." [Puisis STA p. 49.]

74

241.    Deficiencies in specialty care records also impaired the provision of healthcare and created patient safety risks, in the view of the Puisis team:

> Medical records we reviewed did not consistently contain documentation of all benchmark events including referral, collegial review, alternate treatment plans, appointment, or follow up . . .
>
> We also noted that a significant number of consultations occur without evidence of a report.[34] The IDOC refers patients to consultants and to hospitals, but when those consultations and hospitalizations are completed, the IDOC does not obtain a report of the consultation or hospitalization in a significant number of these referrals. This is a patient safety risk. When a report is not present, the providers will be unaware of other recommended testing or consultations, and will be unaware of the consultant or hospital findings that have a significant impact on therapeutic plans.

[Puisis SR pp. 64-65.]

242.    The Second Expert team reported Defendants' explanation as to why records of outside procedures were not routinely obtained—namely, that IDOC does not control outside providers—but based upon their own experience, the team members did not accept that explanation as valid. IDOC or its vendor have agreements with the outside providers and, in the Puisis team's view, obtaining reports should be part of the contractual understanding:

> . . . [T]he IDOC has taken a position that they have no control over consultants or outside hospitals, and therefore obtaining a report is beyond the IDOC's control. . . This is a serious problem. In our experience managing contract medical services and a county-managed health program, we have always been able to negotiate with consultants and hospitals timely access to consultant and hospital reports. We view this as a failure of the vendor to perform . . .

[Puisis SR pp. 66-67.]

243.    At NRC, the Puisis team's record review revealed not just poor documentation throughout the process, but also a pattern of failing to implement the recommendations of outside consultants which also posed risks to patients, in the team's view:

---

[34] [Footnote in original:] As an example, on 33 mortality review records, there were 137 episodes when records were unavailable from offsite specialty care or hospital care. This included both specialty consultation reports and hospital discharge summaries.

We also looked at specialty care follow-up to assess whether providers are carrying out the consultant's recommendations or documenting why they did not follow the recommendation. We found that specialty care is poorly documented in the medical record despite being required by the IDOC ADs. We reviewed seven patients who had 22 consultations and one hospitalization. Of the 22 consultations we found only 14 (63%) referral forms, only three (14%) collegial reviews, and only nine (41%) approvals in the medical record. Of the 22 consultations that occurred, only eight (36%) included a formal consultant report. Some consultations had a few brief lines written on the referral form giving recommendations, but these did not include information about the status of the patient and did not include a report of the evaluation. Particularly problematic was that 19 recommendations of consultants were not reviewed or carried out. Given that there were 19 recommendations not carried out in seven patients, there is a serious problem with clinical follow up of specialty appointments that represents a significant risk of harm to patients. These represent underutilization or not conducting necessary specialty care.

[Puisis NRC p. 53.]

244.    The Second Expert team also concluded that there was a widespread pattern of underutilization of specialty services which contributed to patient harm and mortality:

A major but unmonitored problem with specialty care is underutilization. The First Court Expert found the same problem and described it as delays in perceiving a need for the service. This can occur when physicians are unaware that a specialty procedure or consultation is necessary or when the utilization process is so restrictive that providers fail to refer because they feel that it will not be approved. We were unable to specifically identify the cause in the IDOC but have definitively identified that it occurs. On the 33 death records reviewed, we noted 95 instances when a procedure should have been requested but was not, and 81 instances where specialty consultations should have been requested but were not. This is a large number of unrecognized specialty care referral in just 33 patients and demonstrates significant underutilization. . . We view this deficiency as a result of improperly trained physicians and a learned process of not requesting care. This lack of referral places patients at risk of harm and has caused preventable morbidity and mortality. *This is a systemic problem that appears at all facilities we investigated. . . .*

[Puisis SR pp. 64-65; emphasis added.]

245.    As with many other problems throughout IDOC healthcare, the Second Expert team targeted poor physician quality as a root cause which, in the case of specialty care, combined with the utilization management process to create underutilization:

A significant problem with [collegial review] is [Medical Director training] . . . [T]here are many Medical Directors who have not been trained on when to appropriately refer for consultation. We found this problem repeatedly in record reviews. . .

Patients are not consistently referred for specialty care when it is warranted. We view this as a problem of hiring unqualified physicians and as a problem of the utilization process itself.

[Puisis SR pp. 10, 63.]

246.　Among the many examples of harm from underutilization due to physician failure to refer was a case from Logan CC of a woman with history of mitral valve heart disease and clusters of blisters on her feet:

. . . [T]his patient again developed blisters on her feet on 1/11/18. Initially, a doctor ordered Diflucan, an antifungal agent, and metronidazole by phone order, without evaluation. The blisters worsened and eventually on 2/8/18 a doctor diagnosed "foot rot" between the toes. Vinegar soaks, metronidazole, Keflex, and fluconazole were ordered. None of these antibiotics or antifungal agents is typically used for initial treatment of skin and soft tissue infections which, in a prison, need to cover for MRSA.

A doctor continued to treat the patient with multiple antibiotics and Diflucan, an anti-fungal agent, for over three months. During our tour we evaluated the patient, who had necrotic black tissue covering the webs between all the toes of her foot. We were told that the HCUA pressured the Medical Director to obtain an infectious disease consultation, which is scheduled for 5/1/18. The providers have not debrided the necrotic tissue, which needs to be removed until healthy tissue is present. The depth of the ulcerations on the feet has not been determined. If, after debridement, the wound probes to bone, then evaluation for osteomyelitis needs to be initiated. The patient should be treated with antibiotics appropriate for the type of infection and we agree with the infectious disease consultation, which should have been initiated earlier in the course of the infection and was only initiated at the urging of the HCUA.

[Puisis LOG pp. 35-36.]

247.　Based on their investigation, the Second Expert team was sharply critical of the utilization management/collegial review process as a barrier to patient care and a patient safety

77

hazard. Categorically, they stated that "The collegial review process of accessing specialty care is a patient safety hazard and should be abandoned until patient safety is ensured." [Puisis SR p. 10.]

248.    A sample of records at one prison illustrated multiple hazards from failures to refer which the Expert Team attributed to the collegial review process:

> . . . [T]his process should be abandoned to protect patient safety. In our limited chart reviews [at Logan CC], we identified four denials in a single patient for necessary care for multiple sclerosis without any documented collegial discussion of alternative plans, a delayed diagnosis of colon cancer that likely resulted in unnecessary spread of the colon cancer, failure to send a patient with necrotic foot lesions to a podiatrist or to thoroughly evaluate for osteomyelitis, failure to evaluate a diabetic patient with a draining ulcer over the tibia for MRI, bone biopsy, or infectious disease consultation to evaluate for osteomyelitis, and a failure to obtain pulmonary function testing in a patient with COPD.

[Puisis LOG pp. 32-33.] The Puisis team also reported that providers at Logan "were generally critical of the utilization management program that served as a barrier to timely care." [Puisis LOG p. 57.]

249.    IDOC internal documents likewise reflect difficult-to-understand denials of outside services by Wexford utilization management, many of which were protested by facility healthcare staff. Wexford utilization management denied:

- an orthopedic evaluation for a patient who had a "metallic screw progressively protruding through the skin" [P487];

- a surgery for a patient who had injured his finger with subsequent "purulent drainage and recurrent infections because it would not heal" [P488];

- surgery for a patient who had a staph infection and "multiple draining areas on his right & left butt cheek as well as his coccyx . . . for several months" ("THIS OFFENDER NEEDS SURGICAL INTERVENTION," wrote the nursing supervisor who reported this to Dr. Shicker and others. "Please help he needs to be seen ASAP . . .") [P490];

- a colonoscopy that had been requested by UIC for a patient in their care in the HCV clinic [P451];

- a surgical consult for a patient with a "large disfiguring lipoma to back at head at neck—currently 16cm x 11cm and approximately 4 ½ cm in depth. Area is getting larger, pushing head forward, causing discomfort and mental issues" [P478];

- a surgical consult for a patient with a "large, firm keloid to right jaw 3 ½ cm x 3 ½ cm . . .Has drainage seeping around area. Prior drainage was foul smelling and purulent" [P478]; and

- an IV Venofer (iron sucrose) infusion recommended by a hematologist for a patient with severe anemia. [P479.]

In addition, in early 2015, the medical director at Sheridan appealed a utilization management denial for "Boost" for a quadriplegic experiencing "skin breakdowns and multiple decub ulcers [bedsores]." [P500.] "Dr. James feels this patient needs the Boost to increase his protein intake via supplemental nutrition [f]or better wound healing," the email stated. The response from Wexford's Dr. Ritz was to deny it again: "Does not meet medical necessity . . ." [*Id.*] Later the same year, the staff at Hill were also denied Boost for a patient ("This is non-approved, per Dr. Ritz as there is no evidence of inability to tolerate oral intake"). [P499.] "I'm not sure who they have been talking to," wrote the Hill HCUA to Shicker and others, "but this offender has not been able to keep solids down for a week. . . He is terminal, losing weight, BP is 90/60." [P496.] She subsequently reported to Dr. Shicker and the Hill DON: "Update—today he was sent out to urologist and he ended up in ER for IV fluid rehydration." [P499.]

250. Finally, a January 2016 email from the HCUA at Hill CC forwards the record of a utilization management denial from Dr. Ritz to Shicker and Hobrock. The record states: "11/24/15 COD BETWEEN DR. RITZ AND DR. SOOD ABOUT A PROSTHETIC REPAIR. REPAIR NOT APPROVED. DOES NOT MEET CRITERIA FOR REPAIR." The email from HCUA Lindsdorff to Shicker/Hobrock says: ". . . we were advised during CQI that he was going to be put

back in collegial review and yet he has not. *This offender's prosthetic foot is held together with tape*. He needs a new foot." [P476; emphasis added.]

251.    The Second Expert team also concluded that the IDOC/UIC agreement which provides for a certain amount of "free" specialty care for patients from certain prisons is independently responsible for harmful delays in care:

> A special situation exists with respect to use of UIC for consultant care. Years ago, UIC negotiated to provide IDOC with a certain amount of free care . . . For a variety of reasons, these specialty consultations are delayed. At Dixon, consultations to UIC average six months to complete and range from 100 days for a cardiology consultation to 239 days for a gastroenterology consultation. These delays have resulted in morbidity and mortality, and place the patients at significant risk of harm. There is no process in practice to assess whether a patient's condition needs earlier attention. Because the cost of UIC is free and the cost of alternate care is a cost borne by Wexford, there is significant incentive to send patients to UIC even if it results in delayed care.

[Puisis SR p. 67.]

> . . . Waiting for unacceptable time periods for free care when care needs to be performed more timely has harmed patients.

[Puisis SR p. 10.]

252.    A study from Dixon CC, one of the prisons that participates in the UIC program, assumed time frames for "urgent consults" of one week and "non-urgent consults" of eight weeks. "None of these averages meet contract requirements," the Puisis team noted, "and probably most patients require an earlier appointment." [Puisis DIX p. 60.] "We note in the mortality review section that there were six death records from DCC reviewed and all six were preventable. Many were related to lack of access to timely specialty care or other higher level services." [Puisis DIX p. 60 n. 72.]

253.    Finally, the Puisis team also found a failure to recognize and address the need for more urgent consultations when appointments could not be timely scheduled: "There did not

appear to be any effort to reschedule important consults to other centers so that timely care could

be obtained. We were told that past due appointments are managed by Wexford and discussed at

collegial reviews. We did not see evidence of this. . ." [Puisis STA p. 49.]

254.    In summary, the Second Expert team concluded as to IDOC specialty care:

> Based on multiple record reviews, including mortality reviews, we have identified
> considerable morbidity and mortality associated with untimely or lack of referral for
> higher level of care. In review of 33 deaths, we found 93 episodes of care when a
> patient should have been referred to a hospital. Many of these delayed or failed
> hospital admissions contributed to patient death. . . .

[Puisis SR p. 68.]

## XI.    INFIRMARY CARE

255.    In 2014, the First Expert team found multiple problems with care in the system's

infirmaries:

> Our review of infirmary care revealed deficiencies with regard to policy, practice
> and physical plant issues. In terms of policy, perhaps the most glaring is the lack of
> a description of the scope of services that can safely be provided in the infirmary
> setting. . .

[Dkt. 339 p. 32.]

256.    Many infirmary patients should not have been in prison infirmaries at all:

> We encountered numerous examples of patients who were admitted to the infirmary
> with potentially or actually unstable conditions which should have been referred to
> a higher level of care (i.e., outside hospital). In several instances, this resulted in
> actual harm to the patients.

One case was a patient at Illinois River CC who had rapidly progressing paralysis, but was kept in

the infirmary for two weeks despite his requests to be sent to a hospital. When he finally was

transferred to a hospital ER, he was diagnosed with leukemia of the spine "and is now permanently

wheelchair bound." [*Id.* pp. 32-33.]

257.     Among the physical plant problems noted by the First Expert were that infirmary beds may be in solid door cells with only a small window and no sight line to a nurses' station or anyone watching. Despite this, some infirmaries have no call system in place. "In the [Menard] infirmary," the Shansky team noted, "patients are padlocked in their rooms and life/safety issues are a concern. . . . [T]here is no nurse call system." [*Id.* p. 353.]

258.     In 2018, the Second Expert team found the deficiencies in infirmary care noted by the First Expert team unaddressed, starting with the lack of appropriate policy:

> The Offender Infirmary Services administrative directive [is] dated 9/1/2002. . . It has not been modified since the First Court Expert's visit. There are still no written policies that provide guidance to the IDOC clinical staff on which conditions or level of instability exceed the capabilities of the infirmaries and should be promptly referred to a hospital. . .

[Puisis SR p. 69-70.]

259.     As in 2014, in 2018 the Puisis team found the infirmaries housing high need patients who, in their judgment, were not appropriately placed in such a setting:

> At the time of the Experts' site visits, a high percentage of the patients in the infirmaries were physically and/or mentally impaired patients with dementia, traumatic brain injuries, advanced cardiovascular disease, and cerebrovascular disease. Many were incontinent of bladder and bowel and needed partial or full assistance with activities of daily living (ADLs), including toiletry, feeding, bathing, dressing, and transfers in and out of beds and chairs. This was especially true of the Dixon facility which includes a special mission of housing geriatric patients. . .

[*Id.* p. 70.]

260.     Specifically at Dixon CC, the team noted:

> Nine of the individuals in the infirmary were designated as requiring assistance with activities of daily living (seven partial assistance, two with total care); thus 50% of the infirmary patient population were unable to fully care for themselves. Included in this non-independent group were individuals with metastatic cancer, dementia with contracted limbs, post CVA, advanced multiple sclerosis, and dementia. The RN on duty stated that all nine would be permanently housed in a skilled nursing facility if they were not incarcerated.

[Puisis DIX p. 66.]

261.    However, Dixon is not the only IDOC prison with severely compromised and geriatric patients in its infirmary. A list of Stateville infirmary patients from June 2016 (15 total) included three with dementia (two unable to walk, one of whom also had "no English"); one who had had a craniotomy with brain mass removal; three with cancer (lung; liver/pancreatic; prostate/bladder); one with seizures/shunt; and two with congestive heart failure (CHF)/cardiomyopathy. They ranged in age from 50 to 79 years old. [P460.]

262.    Likewise, the Second Expert team described the following patient in the infirmary at Menard CC:

> The next patient is a 79-year-old with metastatic prostate cancer on heavy analgesia who was intermittently confused and had difficulty ambulating, who suffered a torn urethral meatus that was reported to have occurred when the patient (or another person) stepped on the tubing of the catheter that was dangling and laid on the floor. This could have been prevented with proper nursing management of the tube and bag. This patient is dying; there is no documentation that he has been considered for compassionate release from the IDOC. There is no documentation that this patient had ever been previously screened for colon cancer[35] during times prior to his metastatic cancer . . .

[Puisis MEN p. 66.]

263.    As to deficiencies in physical plant and equipment in 2018, the Puisis team catalogued the following at the sites they visited:

NRC:

> NRC opened a 12-bed medical infirmary in 2016. The nursing station is in a converted storage closet with no sink, no electrical outlets, no phone, no computer, and only one desk for two to three nurses. . . . The monitoring panel in one of the two negative pressure isolation rooms was not operational. Even though the majority of the patients housed in the medical infirmary were chronically ill, and had clinical issues including frailty, disability, ambulation deficits, inability to provide self-care, or bladder or bowel incontinence, there were no adjustable hospital beds with safety rails in the infirmary. Many of the mattresses had torn covers and could not be properly sanitized. One patient with urinary incontinence had an uncovered porous

---

[35] [Footnote in original:] USPSTF Colon Cancer Screening 2016.

foam egg crate cushion in lieu of a mattress that was odiferous, dirty, and could not be cleaned and sanitized. The weekly supply of clean linens was insufficient to meet the needs of the infirmary patient population of incontinent, diapered patient-inmates who frequently soil their sheets. The medical infirmary rooms were shabby and unacceptably dirty.

[Puisis SR p. 34.]

Stateville CC:

The SCC infirmary's nursing station's design does not allow direct line of sight of any of the 32 patient-inmate beds. Functional nurse call devices were in all of the two-bed rooms but not in the single bed medical rooms. The HEPA filters and negative pressure units in both the isolation rooms were non-functional; its filters and vents were clogged with dust. . . The head and leg sections [of the beds] could not be raised or lowered, beds had broken wire springs, and safety railings were broken [creating a] safety hazard for the staff and patients. The tub room had large cracks in the floor and no safety grab bars, rendering it unusable. The rooms were inadequately cleaned. . . . Elderly, physically and mentally impaired individuals who were unable to assist with cleaning their rooms had unacceptably dirty rooms. Only a single room [was] adequately clean. Flies, gnats, and cockroaches were noted in patient rooms and in the corridor.

[*Id.* pp. 34-35.]

Dixon CC:

Dixon's [HCU's] second and third floors contain the infirmary, ADA housing unit, and the geriatric housing unit. The building's two elevators were broken; one had been disabled for a long time and the other had become non-operational on the day before the expert's visit. . . . Most of the infirmary beds were functional, second-hand hospital beds . . . However, one patient with dementia had a broken bed with a middle section that sagged nearly to the floor. . . The ADA and geriatric units have fixed metal frame beds without adjustable sections with metal wire mattress supports. The wire mattress supports were commonly broken and replaced with strips of sagging tied bed sheets. . . . Peeling paint, cracked wall plaster, rusted, dusty vents, and poorly ventilated showers were noted on both floors. As throughout the entire health care building, floor tiles are cracked and loose; this is major safety hazard for staff and the at-high-risk-for-fall patient population.

[*Id.* p. 35.]

Menard CC:

Overall, the infirmary was clean and in good repair [but the] heavy doors to the patient rooms are kept locked with individual padlocks. This is a safety hazard

because emergency evacuation of the infirmary would be significantly delayed due to correctional staff having to open each of the padlocks. These padlocked rooms are also a safety hazard because there are no nurse call devices in any of the infirmary rooms; patients who are able to ambulate have to bang on the doors to get medical attention. Patients unable to ambulate have to call for help. The nurse station is in an enclosed room that is not within sight or sound of the patient rooms. Twenty three of the 26 beds were low, fixed-position metal beds without safety railings or adjustable heights and head and leg sections. . . One patient with risk for falls slept on a mattress on the floor because there were no available beds with safety railings. [The anterooms to the] isolation rooms were cluttered and had overflowing waste bins. The shower room used by the infirmary's chronically and acutely ill patients did not have safety grab bars; the ceiling vent in the shower rooms was clogged with lint and dirt.

[*Id.* pp. 35-36.]

264. Internal IDOC reports show similar issues. In a January 2017 Office of Health Services meeting, the assistant warden at Big Muddy River CC is reported to have said: "The beds in our institution are not acceptable. We put in ASRs and we were denied by Wexford without any explanation. Offenders/patients are getting bed sores because we don't have bedding supplies." [P233 at 0096357.]

265. In addition, the Second Expert team, in the infirmary context as elsewhere, found that the lack of competency of the physicians was dangerous—especially so given the fragility of the infirmary populations. The records created by these providers were deficient:

With the exception of [Logan CC], the provider infirmary admission notes contained very limited history of the reason for admission, the diagnosis, any differential diagnoses, and only brief diagnostic and treatment plans. . . .[T]he provider progress notes were commonly illegible. . . Other than limited notes about the illness that prompted the infirmary admission, there was virtually no documentation or clinical updates about any of the patients' other chronic illnesses . . . The provider progress notes during one [Stateville CC's] infirmary patient's seven month admission never commented, even once, on the status or control of his seizure disorder. . . The lack of informative, comprehensive provider notes that legibly addressed both the acute and chronic needs and illnesses of each infirmary patient put the health and safety of infirmary patients at risk. . .

[Puisis SR pp. 71-72.]

266.     In the Stateville CC report, the Second Expert team explained the problem caused by poor records in greater detail:

> The provider notes on the audited charts were extremely brief, commonly illegible, and contained little clinical information. The lack of comprehensive provider notes made it difficult to understand the patients' current conditions and progress or deterioration. This created barriers to the delivery of adequate care for the nursing staff and providers who cover the unit when the infirmary provider is off duty. The quality and continuity of care provided in the infirmary did not meet the community standard of care.[36]

[Puisis STA p. 53.]

267.     In addition, in the opinion of the Second Expert team, the physicians did not appropriately evaluate and refer out patients whose needs exceeded the capacities of IDOC infirmary care:

> . . . [B]ased on record reviews, the current complement of Wexford physicians does not appear to appreciate when patients are unstable and require hospitalization. This places patients at significant risk of harm. . . .

[Puisis SR p. 70.]

> . . . There were multiple instances when the infirmary (and sick call and chronic care) providers failed to consult specialists when there were clear indications that clinical advice and assistance was needed. The infirmary providers either lacked the knowledge and competence to recognize that they needed clinical assistance or they were reluctant to seek outside consultation due to institutional culture and practice. . .

[*Id.* p. 75.]

Two of several examples, both Logan CC patients, are illustrative:

> [A] patient in the [Logan CC] infirmary with blackened toes due to frost bite was treated with an array of antibiotics but was not immediately referred to a podiatrist as is the standard of care in the community. Only after two months in the infirmary,

---

[36] [Footnote in original:] We refer also to Mortality Review Patient #9 for another example of this. Over six months on the infirmary, a doctor wrote notes 19 times that stated, "No specific complaint, no change, dementia, continue same care" despite the patient having multiple falls and being hospitalized for heart failure. Then over a nine-month period, the same doctor wrote 30 notes stating, "No specific complaint. No change. Dementia, post colectomy for metastatic ca [cancer]. Continue same care." This was grossly and flagrantly unacceptable evaluation for a person with significant illness.

when her right large toe became gangrenous was she referred to a podiatrist. The podiatrist arranged for the toe to be surgically amputated. Immediate referral for podiatric consultation when the patient was admitted to the infirmary could potentially have prevented the need for the amputation.

Another patient in the LCC infirmary had a history of recurrent DVT with pulmonary emboli and a chronic draining lower extremity leg ulcer. During her infirmary stay, the patient was treated with five different antibiotics in six different, confusing combinations. The working diagnosis appears to have been osteomyelitis but this was never noted in the provider's treatment plan. . . . A definite workup for osteomyelitis . . . was never ordered. . . [T]his patient should have been hospitalized for definite diagnostic tests and intensive treatment. The failure to solicit specialty consultation during this patient's six month stay in the LCC infirmary without resolution of her draining leg ulcer and the inexplicable combinations of antibiotics and antifungal agents reflected poor understanding of this patient's possible diagnoses, and was incompetent.

[*Id.* pp. 76-77.]

268.    At Dixon CC, the Second Expert team reported this troubling case:

The next patient is an elderly patient with long standing dementia, history of pica,[37] hypertension, upper and lower extremity contractures, and deep decubiti ulcers. He was thought to have Picks Disease (frontotemporal dementia). He has been housed in the infirmary for a number of years. The infirmary record reveals daily vital signs and nursing notes. He requires total care (feeding via gastric tube, bathing, diapers). His limbs are fully contracted, he remains in a fixed fetal position. He was observed being transferred to a tub by the CNA and a hospice worker. He has chronic decubitus ulcers (pressure sores) over his coccyx and left gluteus. These ulcers have required antibiotic treatment on at least two occasions in the past year (September 2017 and October 2017). The wounds are now emitting a foul-smelling discharge and one was noted as deeply tunneling toward bone. The nurses write no less than daily progress notes. On 3/15/18, the nurses noted that the coccyx ulcer was foul smelling and on 3/20/18 the nurse wrote that one of the ulcers had a putrid smell and was tunneling. She requested a consult from the infirmary provider. On 3/21/18, the provider saw the patient, advised continued local wound care, and submitted a referral request to the wound care clinic at CGH Hospital in Sterling, IL. This was the only note written by the provider between 3/15/18 through 4/3/18. A single provider note in nearly three weeks for this permanent resident of the infirmary with an infective decubitus ulcer is not in compliance with the IDOC Offender Infirmary Services guidelines.[38] The extreme contractures and the recurrent pressure sores in this patient are strong indications that the past and current level of care in the DCC infirmary does not meet the community standard of care. Contractures are

---

[37] [Footnote in original:] Pica is an eating disorder typically defined as persistent eating of nonnutritive substances.

[38] [Footnote in original:] Reference IDOC Policy 04.03.120 Offender Infirmary Services.

preventable with ongoing physical therapy; decubitus ulcers are preventable with frequent repositioning of the patient in beds or wheel chair. The manifestation of these findings in this long-term patient indicates that the DCC infirmary is not able to provide a level of care that is expected to be provided in skilled nursing facilities. Once the patient started to develop contractures, he should have been transferred to a facility in the IDOC or in the community that could have provided the needed preventive care.

[Puisis DIX pp. 69-70.]

269. Overall findings as to the inadequacy of IDOC infirmary conditions and services were repeated for Menard CC:

The level of nursing staffing, the type and quality of the beds, and the diligence of the infirmary provider are not adequate to provide the level of care needed by patients who require skilled nursing services and monitoring of complicated conditions.

[Puisis MEN p. 63.]

270. In general, the Second Expert team emphasized that the problem of infirmary use within IDOC is coupled with the related problem of the housing of aging prisoners. At Dixon CC, they noted that the cases of patients discussed as well as the "other mentally and physically impaired patients have clinical and nursing care needs that cannot be adequately met in IDOC infirmaries." [Puisis SR p. 71.] Further:

We note that the IDOC acknowledges a lack of appropriate housing for the infirm and disabled elderly prisoners. . .

[Puisis DIX p. 66.]

It was apparent that the IDOC is aware of the need for additional skilled nursing care facilities and geriatric care housing but has not taken action to address this problem. . . .

Housing of the elderly and disabled is inadequate. The IDOC needs to perform an assessment of its geriatric and disabled population to determine housing needs for this population…

[Puisis SR pp. 71, 11.]

271.    At Big Muddy River Correctional Center, the prisoners call the care given in the infirmary not "health care" but "death care." [Tr. T. Martin.]

## XII.    MEDICATION ADMINISTRATION

272.    In 2014, the Shansky team found limited problems in IDOC medication administration. This was not true in 2018, when the Puisis team performed its investigation and concluded that there were "pervasive and systemic issues":

> The methods of preparing and administering medications is not standardized across the system. There are pervasive and systemic issues with respect to administration of medication that place inmates at risk of harm. When these occur, there is no system to identify or correct the systemic problem.

[Puisis SR p. 11.]

273.    The First Expert team did identify problems with medication continuity for chronic care patients and delays in medication administration at NRC due to need for custody staff presence.

274.    The Second Expert team found medication administration problems that were many and widespread: "We have additional findings that evidenced a far worse situation from the First Court Expert's report. We found systemic medication administration practices that are unsafe and not consistent with community standards at every facility visited." [*Id.* p. 79.]

275.    These problems, in the Puisis team's view were due to "minimal direction and guidance about how medications are ordered and administered"; prescription processes that did not conform to Illinois state law; orders that were "incomplete and documentation in the chart did not indicate the reason or intended goal of treatment"; "orders which had not been transcribed onto the MAR [medication administration record] or that were transcribed late"; and "instances of nurses overwriting new orders over old orders on the MARS at every facility." "This is alteration of a legal record and should be ceased immediately." [*Id.* pp. 80-81.]

89

276.    In addition, the Puisis team found method and process problems with medication administration at each of the five prisons they reviewed:

> At all the facilities we visited, the process for medication administration was fraught with problems. None of the methods used to administer medication ensure that the *five rights* of medication administration are observed. These are the *right patient*, the *right medication*, the *right dose*, the *right route,* and the *right time*. . .

[*Id.* p. 81; emphasis in original.] These problems were coupled with others, in particular lack of hand hygiene, and not accounting for missing inmates or arranging to administer the dose later.

[*Id.* p. 82.]

277.    The Second Expert team catalogued specific deficiencies at each of the facilities, starting with NRC, where:

- At medical reception, nurses administer medications to patients from a stock supply, but do not consistently initiate a medication administration record (MAR) and document that medications were administered to the patient.
- Medical records do not contain physician order forms for all ordered medications. [39]
- The nursing medication room is dirty, cluttered, and disorganized. There is no schedule of sanitation and disinfection activities.
- Nurses transfer medications from a properly labeled pharmacy dispensed blister pack into a small white envelope that is not properly labeled.
- To prepare medications, nurses do not consistently compare the MAR against the medication blister pack to ensure that the medication matches the physician order; instead, nurses use white envelopes that are not properly labeled.
- The white envelopes are repeatedly used and not hygienic.
- Inmates are not requested to present their identification badges at the time of medication administration. [40]
- Nurses pass medications to patients through a crack in the cell door, not the food ports.
- Inmates do not have cups to fill with water to take their medications.

---

[39] [Footnote in original:] Physicians write medication orders in two places: a physical examination form or progress note, and a physician order form that is used to fax the order to the pharmacy. We found that some records contained the medication order only on the progress note and there was no physician order form. It is unclear whether the physician did not write the order on the physician order form or whether it was not filed in the medical record.

[40] [Footnote in original:] There are typically two inmates to a cell. Inmate ID badges are posted in the window of the cell rather than the inmate presenting his ID to a nurse.

- Neither officers nor nurses perform oral cavity checks.
- If inmates are out of cell at the time of medication administration there is no procedure to go back later to administer the medication, even if it is a once a day medication.
- Nurses do not document administration of medications onto a MAR at the time they are administered.
- BosWell Pharmacy prints MARs for the following month for any prescription written by the 15th of the month, requiring nurses to handwrite MARs for all medications orders from the 16th to the end of the month, creating an enormous nursing workload and increasing the risk of transcription errors.
- Review of multiple MARs show numerous blank spaces, demonstrating that nurses do not document the administration status of each medication dose.
- Monthly pharmacy/CQI audits throughout 2017 show pervasive and systemic medication issues, including blanks on MARs, administering medications beyond stop dates, and pharmacy and nursing medication errors.
- Health care leadership has not developed or implemented an effective corrective action plan to address the systemic medication issues.

[Puisis NRC pp. 62-63.]

278.   The Second Expert team noted that the facility's own CQI findings documented

many of these failings repeatedly:

Continuous Quality Improvement (CQI) Minutes and audits performed in 2017 show systemic and pervasive problems with pharmacy and medication administration at NRC.[41] These include:

- Pharmacy dispensing errors
- Medication carts that are not clean
- Nurses preparing medications using medication envelopes (with incomplete and incorrect information) instead of using the MAR, which is the legal order for the medication, using the wrong envelope
- Failure to transcribe medication orders onto the MAR
- Medication blister packs not matching the MAR
- Missing medications
- Nurses not documenting on MARs following medication administration
- Nurses not documenting medication order stop dates onto the MAR and administering medications beyond stop dates
- Shortages of sharps, insulin, and tramadol

---

[41] [Footnote in original:] NRC Annual CQI Report 2016-2017.

- Open insulin and Tubersol vials with no documented opening and expiration dates
- Lack of timely tracking and response to medication errors

[Puisis NRC p. 67.] Despite this documentation of problems, the Puisis team found that NRC's CQI reporting underestimated the extent of the medication errors: "The 2016-2017 Annual CQI report showed that pharmacy made 14 errors and nursing staff made 66 errors during the review period. However, with respect to nursing performance, this is a gross underestimation of errors when failure to document medication administration is included as an error of omission." [*Id.*]

279.    At Dixon CC, the Second Expert team found that "[m]edication administration has apparently deteriorated since the First Court Expert report":

> Medication administration at DCC is problematic and relies on outdated practices that are no longer considered safe from patient harm. These problem areas include:
>
> - Handwritten and incomplete orders
> - Inconsistent documentation by providers in the progress notes about the decision to order medication and clinical rationale
> - Handwritten transcription of orders to the MAR
> - Late transcription of orders
> - Pre-pouring medication
> - Use of unsanitary envelopes to administer medications in the Special Treatment Center[42] (STC)
> - Not having the MAR available during medication administration in STC
> - Not documenting administration of medication at the time it is given.
>
> Chronic disease patients are not monitored to ensure continuity in treatment. Their compliance with prescribed treatment is not assessed. Prescription end dates do not coincide with chronic clinic appointments and require patients to request renewals via sick call.

[Puisis DIX pp. 72-73.]

280.    The Puisis team found particularly severe problems in the Dixon special treatment unit, where:

---

[42] [Footnote in original:] This is a mental health unit at the DCC.

. . . [o]nly 37% of the MARs selected for review were complete. Documentation of doses given, refused, or not available was missing from five of eight charts reviewed. This is extremely poor performance and calls into question the accuracy of the MARs. Contemporaneous charting on the MAR at the time of administration is considered the nursing standard of practice. DCC does not meet this standard of professional performance.

[Puisis DIX p. 77.]

281.    At Logan CC, the Second Expert team actually witnessed unsanitary medication administration practices as well as a nurse giving the wrong medications to a patient (who refused them, saying they were not her medications) due, in the team's view, to incomplete identification practices and failure to have the MAR to hand. [Puisis LOG pp. 39-40.]

282.    As to medical reception at Logan CC, the Second Expert team found: "[I]in 10 of 10 health records reviewed to assess the medical reception process, all records were missing some MARs, including January and February 2018. In addition, several patient MAR's showed that they did not receive chronic disease medications, sometimes for months." [Puisis LOG p. 40.] Examples included:

- An HIV patient who arrived in 10/18/17. That patient's December 2017 MAR showed that she did not receive HIV medications. There was no January 2018 MAR in the record.

- A patient with hypothyroidism and hypertension arrived on 2/2/18. On 2/3/18, a provider ordered the patient's medications. Her February 2018 MAR does not show that the patient received levothyroxine or Lisinopril. As of 4/23/18, there was no March 2018 MAR scanned into the record.

[*Id.* pp. 41-41.]

283.    At Menard CC, in addition to the inadequate and potentially hazardous practices observed at all sites, the Second Expert team found that:

None of the MARs reviewed contained the signatures and initials of nurses who administered medication. This practice violates MCC's own policy and procedure and demonstrates lack of supervision and oversight failure. We asked the HCUA if a signature sheet was maintained and were told that at one time a signature sheet

was kept but that it was not up to date. Therefore, it was not possible to identify any of the nurses who administered medication in the health record of a patient.

[Puisis MEN p. 70.]

284.    As with other systemic problems noted by the two expert teams, the problems of medication administration overlap with other deficiencies in the system, for instance, the chronic care program and the problem of the medical record system: "We found many examples," the Puisis Report states, "of patients whose ordered medications were never provided, were delayed starting, and were stopped because the patient had not been seen by a provider to renew medication. . . [A]ppointments for chronic care are not scheduled to take place prior to expiration of chronic disease medication orders. As a result, providers often reorder medications without seeing the patient to conduct a clinical evaluation to determine whether the treatment plan should be continued or changed, based upon the how well the patient's chronic disease is controlled." Moreover, although "[f]acility policy and procedures direct that the MAR be available with the medical record at the time of a chronic care provider visit. However, we saw no evidence that current MARs were available at the time a patient saw a provider. We also saw no evidence that providers review the MAR . . ." [Puisis SR p. 83.]

## XIII.   INFECTION CONTROL (NO RELIABLE SYSTEM FOR OVERSIGHT)

285.    "Infection control," the Second Expert report states,

. . . is an essential element of an adequate health care system. The inmate population has a high prevalence of communicable and infectious diseases. Because of the high prevalence of communicable diseases, a highly functioning infection control program must be in place to identify, track, and assist in management of these illnesses.

[Puisis SR p. 84.] In addition to higher rates of tuberculosis, HIV infection, and hepatitis C in the incarcerated population, "[t]he burden of sexually transmitted disease, MRSA, and scabies are also typically higher in prison systems." [*Id.*] Further:

Conditions of confinement promote the spread of disease because of environmental conditions within the prisons. Inmates are housed in close quarters. . . [W]e spoke about how crowded the IDOC prisons are. The overcrowded conditions, particularly in antiquated facilities, promote transmission of multiple types of infections and contagious diseases. . . .

[*Id.*]

286.    In 2014, the First Expert team concluded that, "Infection control is a moving target across the system . . . ." "There is *not . . . any IDOC oversight and management of a system-wide infection control program*." [Dkt. 339 at 35-36; emphasis added.]

287.    The Shansky team found a lack of responsible personnel designated for infection control responsibilities; lack of training as to infection control procedures; failure to wash infirmary bed linens at temperatures adequate to destroy germs; and failures to sanitize medical and dental equipment and provide clear surfaces for patient exams.

288.    In 2018, the Puisis team found:

The systemic issues described in the First Court Expert Report still occur today. While there has been some improvement in the use of paper barriers on examination tables, little else has changed with regard to the infection control program.

[Puisis SR pp. 85-86.]

289.    Among the problems observed by the Second Expert team were: lack of designated personnel responsible for infection control, although "The IDOC has had numerous recent outbreaks of contagious and infectious diseases," including scabies and histoplasmosis;[43] lack of schedules for routine sanitation and disinfection of health care areas; and multiple other problems already discussed (insects in the Stateville infirmary; bird droppings in the Stateville kitchen/dining area; faulty negative pressure rooms in infirmaries; and rusted, broken, or otherwise

---

[43] In 2015, Taylorville CC also had an outbreak of enteritis. [P495.]

deteriorated health care equipment). Facility CQI reports documented these problems, the Puisis team noted, even while they remain unfixed. [*Id.* pp. 85-88.]

290.    Further infection hazards catalogued by the Second Expert team included:

- The tuberculosis (TB) prevention and control program in IDOC is not effective.
- Negative pressure isolation rooms were either not functional or the monitor was not working at three of the five sites we visited.
- For hepatitis C, UIC has no role in managing hepatitis C patients before referral and after antiviral treatment and has no role in screening for these diseases. . . IDOC facility providers are responsible for that care but do not appear to know how to provide it.
- All five of the facilities visited report cases of culture positive *Methicillin-resistant Staphylococcus Aureus* MRSA) as is required by IDOC. However, only MCC tracks all skin and soft tissue infections . . .
- [T]here is no trending or analysis of infection control data.
- We found numerous examples of poor infection control practices on the part of health care professionals.
- [The] assignment of untrained and unvaccinated inmates to clean and sanitize health care areas exposes these inmates as well as patients receiving care to several infectious diseases with potentially serious health consequences, and is deliberately reckless.
- Water temperatures were not hot enough to effectively sanitize laundry from the infirmary at any facility we visited.[44]

[Puisis SR pp. 87-90.]

291.    The Second Expert team also noted risks associated with screening practices common illnesses of incarceration populations including HIV, hepatitis C, and tuberculosis. [*Id.* pp. 89.]

292.    Overall, the Puisis team concluded that, "There is no active infection control program. Infection control practices lack guidance from a physician with expertise in infection control practices. This is evident in HIV testing, tuberculosis screening, and analysis of surveillance practices." [*Id.* p. 11.]

---

[44] [Footnote in original:] This is a violation of Department A.D 05.02.140, which requires a temperature of 165 degrees for washing linens.

293.    Finally, the Second Expert team documented a host of specific infection control hazards at each site visited, as follows:

Dixon CC

- The floors and surfaces in the health care building, particularly the second and third floor, are dirty or have deteriorated to the extent that they are a medium for transmission of infectious disease.
- Inmate porters are allowed to work in the infirmary without being trained in proper cleaning procedures and personal protection.

[Puisis DIX p. 78.]

Logan CC

- A number of the safety and sanitation deficiencies in the physical plant at LCC that have been reported, some repeatedly, since July 2017, including mold/mildew on ceilings and walls, failure to change ice machine filters, missing cold and hot water showers knobs, sinks that do not drain, infestations, and non-functional toilets in the housing areas. These problems constitute patient and staff safety, and infection control risks for patient-inmates and correctional and medical staff.
- There is no one formally assigned at LCC to the tasks of infection control.
- The three infirmary porters who were interviewed and whose medical records were reviewed had no documentation that they received the hepatitis B vaccination series or had been trained about blood borne pathogens prior to starting to provide sanitation services.
- The infirmary porters at LCC are not offered hepatitis A vaccination even though they will be cleaning the patient rooms and bathing areas where they will have a probability of the contact with fecal waste. . .

[Puisis LOG p. 43.] In addition:

Inmate porters perform sanitation duties. There is no schedule of routine clinic sanitation, and disinfection activities are not consistently performed in clinical areas. During this site visit, the pharmacy floors and countertops were dirty. . . . The Wexford staff assistant who is responsible for the training of infirmary porters also was unable to provide documentation that the three porters had been trained or vaccinated. All infirmary porters must be trained and fully vaccinated prior to being assigned to duties in the infirmary, where there is higher risk of exposure to pathogens and a more frequent and higher degree of sanitation is needed.

[Puisis LOG p. 44.]

Stateville CC

Many infection control challenges and hazards were observed during our site visit at the facility. These are detailed in the section of this report on Clinic Space and Sanitation [including non-functional] Airborne Infection Isolation (AII) rooms [and] the practices of the hemodialysis program . . . Finally, a lack of barrier protection on reusable surfaces was observed throughout the health care areas. Fabric covered chairs and tables were torn and sometimes repaired with duct tape, paper covers were not available in one of the provider exam rooms, and patient care equipment was rusted and could not be cleaned. Environmental controls to prevent transmission of infection are inadequate and risk harm to patients cared for at SCC.

[Puisis STA pp. 60-61.]

## XIV. DENTAL PROGRAM

294. The First Expert team concluded that IDOC dental care was comprehensively deficient. "[R]ecords at each institution," concluded the First Expert Report, "revealed that routine care was almost always provided without a comprehensive examination, a treatment plan, a documented periodontal assessment, a documented soft tissue examination, and without [diagnostic imaging]. . . .As such, there is no real system in place to provide routine [dental care]." [Dkt. 339 p. 38.]

295. The lack of routine dental care was coupled with painful delays in access to dental procedures. The Wexford contract requires that "Vendor shall respond to dental emergencies within 24 hours," "evaluations must be provided within 14 days after the offender's request for routine care treatment" and "[u]rgent-painful cavities . . . must be treated within three (3) business days," but the Shansky team found that these time frames were routinely disregarded. "The lag time between an Inmate Request Form for pain and alleviation of the pain was unacceptable. It often took *four or more days* for urgent care patients to be seen. . . ." [Dkt. 339 p. 38; emphasis added.]

296. In 2018, the Second Expert team found:

Overall, the dental program has not improved since the First Expert Report. Dental care continues to be below accepted professional standards and is not minimally adequate. Examinations are inadequate and routine care is provided without intraoral x-rays, a documented periodontal assessment, and a treatment plan. Periodontal disease is rarely diagnosed and treated.

There is no system wide capital replacement plan for dental equipment. As examples the panoramic x-rays taken at the R&C centers are inadequate and the x-ray devices are outdated.

IDOC has no dentist on the Medical Director's staff and the clinical oversight of the dental program is inadequate.

Dental staffing is insufficient to provide adequate and timely care.

[Puisis SR pp. 11-12.]

297.    The deficiencies found by the Puisis team included:

Staffing shortages, vacancies, and failures to provide dental hygienists creating delays in care

Facilities and equipment that have deteriorated since the First Court Expert's Report

Overall sanitation, sterilization, and safety that have deteriorated since the First Expert's Report, primarily due to inadequate hand sanitation at NRC and [Menard] CC.

Routine care is inadequate and is provided without adequate x-rays, periodontal assessment, and documented oral hygiene instruction and a sequenced treatment plan.

The biennial examination, as currently performed, is of little clinical value.

Access to prosthetics and onsite or offsite oral surgery are routed through an unqualified reviewer: Dr. Karanbir Sandhu who is a part-time Wexford employee and is not specialist in prosthodontics or any other aspect of dentistry.

Initial intake examinations that are inadequate and fail to include appropriate head, neck, and soft tissue assessments. The examination is by no means "complete" because it is too brief and not informed by intraoral x-rays, documented periodontal probing, and a consistently performed oral cancer screening. The deficiencies of this examination are particularly problematic, since it is used to classify treatment needs and determine treatment priority.

Urgent care was generally untimely, the record of the encounter is not properly, consistently completed in SOAP format, and the health history is not updated

Policies, procedures, and program management are inadequate

Documenting the health history of medically compromised patients remains inadequate. The health history form is too limited and omits conditions relevant to dental care, for example, anticoagulant therapy. There is insufficient room on the form for information. Health histories were not filled out or updated at the last visit in most charts.

There was no documented periodontal assessment and request for follow-up for diabetics, which is particularly problematic given the relationship between periodontal disease and diabetes

CQI studies were limited in scope and follow up with corrective action plans was lacking

Dentists (unlike other practitioners) are not routinely peer reviewed. When they are, dental peer review as implemented by Wexford is poorly designed and does not therefore determine clinical quality

[*Id.* pp. 103-17.]

298.    A sampling of these problems catalogued at the five sites visited by the Second Expert team echo the universal problems throughout IDOC healthcare.

299.    At Stateville CC, the Second Expert Report notes:

Dr. Orenstein's clinical progress notes are extremely difficult to read at best, and indecipherable at worst.

Documenting the health history of medically compromised patients has deteriorated since the First Court Expert's Report.

[Puisis STA pp. 71, 73.]

300.    Also at Stateville, the Second Expert Report found that the practice of completing a comprehensive dental examination on arriving prisoners, reported to be taking place in the NRI Report in 2016, was not occurring in 2018. [Puisis STA p. 66.]

301.    At Menard CC, the Second Expert Report notes:

. . .[S]taffing has deteriorated materially since the First Expert's Report.

We concur with the First Court Expert's findings with respect to the inadequacy of the dental facilities and equipment. Moreover, they have not improved materially. . .

Sanitation, safety, and sterilization have deteriorated since the First Court Expert's Report. . . [W]e observed inadequate hand sanitation by the dentist between initial examination patients . . .

Of 12 patients who were scheduled for extractions, the wait time ranged from seven to 41 days, with a median of 26 days . . . Of the 11 who were prescribed antibiotics, all but one (91%) waited more than 10 days. This is problematic, since the tooth should be extracted within the therapeutic window of the antibiotic, which for these patients was 10 days.

Dental sick call has deteriorated since the First Court Expert's Report. We concur with the findings of First Court Expert that dental sick call for urgent care issues is often untimely and the sick call triage system for dental problems is inadequate. . .

. . . based on monthly dental reports from May 2017 to April 2018, [t]he wait time for fillings is more than 60 weeks (15 months),[45] higher than it has been since May 2017. Moreover, with only one dentist available, the backlog will continue to grow. . . .

[Puisis MEN pp. 76, 77, 82-85.]

302.    At NRC, the Second Expert Report notes:

Dental sanitation, safety, and sterilization have deteriorated since the First Expert's Report . . .

The sterilization area is in a small cluttered room contiguous with the dental clinic. Because the room has inadequate counter space, it is difficult to configure the area to accommodate sterilization flow from dirty to sterilized to storage (as noted by the First Expert). The ultrasonic cleaner sits between the sink and the autoclave. As noted by the First Court Expert, safety glasses were not always worn by patients and warning signs were not posted where x-rays were being taken.[46]

---

[45] [Footnote in original:] The First Court Expert reported that the routine care wait list was approximately nine months long (see *supra*), which shows that the MCC dental program has deteriorated markedly since then.

[46] [Footnote in original:] Occupational Safety and Health Standards—Toxic and Hazardous substances. 29 CFR 1910.1096(e)(3)(i). "Each radiation area shall be conspicuously posted with a sign or signs bearing the radiation caution symbol and the words, CAUTION RADIATION AREA". Emphasis in original.

. . . While [the dentist's] gloved hands did not always touch the patient, in approximately half the exams we observed, they touched the patient's face, lips, or mouth. He did not change gloves between patients consistently. In fact, there were several instances where he examined a patient wearing the gloves he used to touch a previous patient's mouth or face. He did not wash hands between patients because the exam room had no sink. [47]

\*\*\*\*

Our nursing expert observed the dentist perform initial exams on 2/1/18 and reported that he did not change gloves between patients. ***In fact, he did not have a box of gloves in the room***.

The Dental Sick Call Log from 10/3/17 through 1/22/18 contained 228 entries, approximately 90 percent of which stated pain or conditions that more likely than not were associated with pain. The median time from request to ***scheduled appointment***[48] was two days. . .

Among inmates whose request suggested a painful condition, one waited eight days, two waited seven days, seven waited six days, and nine waited five days to be scheduled. This is ***not*** time to treatment, which cannot be determined from the available data and is likely to be longer if patients are rescheduled.

There is no triage process . . .

[Puisis NRC pp. 70, 72, 77, 80; emphasis in original.]

303.    At Dixon CC, the Second Expert Report notes:

Comprehensive care has not improved materially since the First Court Expert's Report and remains inadequate. . .

Of 12 records reviewed, none had a periodontal assessment documented. All but one had the treatment plan that consisted only of charting dental problems (primarily decay) with no mention of periodontal disease. In fact, the standard instrument pack for an examination contains a mirror and an explorer but lacks a periodontal probe.[49] . . .

[Puisis DIX p. 86.]

---

[47] [Footnote in original:] Centers for Disease Control and Prevention. *Summary of Infection Prevention Practices in Dental Settings: Basic Expectations for Safe Care*. Atlanta, GA: Centers for Disease Control and Prevention, US Dept. of Health and Human Services; October 2016, p.7.

[48] [Footnote in original:] Since appointments were often rescheduled, the actual wait time for treatment for those inmates was longer.

[49] [Footnote in original:] This is consistent with the dental program's indifference to periodontal disease.

304.     And finally at Logan CC, which is both a women's prison and the women's intake center, the Second Expert Report notes:

> [At intake] [t]he dentist does not perform a thorough soft tissue examination.[50] For example, he does not visualize the lateral and posterior regions of the tongue,[51] a site of squamous cell carcinoma. This is especially important at LCC, since "[s]uspect lesions in females younger than the age of 50 years, with no history of alcohol or tobacco use, have a greater risk of malignant potential and often behave more aggressively. Lesions in this population of patients must be treated [and *a fortiori*, diagnosed] very quickly and aggressively."[52] Performing a thorough soft tissue examination is critical at the initial examination, since unless the inmate requests care within two years, her next exam will be biennial.[53]

[Puisis LOG p. 76.]

305.     In a November 2016 email chain including Dempsey and Meeks, at that time the new agency Medical Director] it was reported that Hill CC dental staff were "very concerned" by a patient at Hill demanding to be sent to a periodontist "since they have not had a hygienist for twenty years. . . The Dentist also advised that he has over 1800 patients and does not have time to do cleanings. Again the brushes we provide are inadequate and we do not provide Dental hygiene services at many of the facilities. This issue will continue to plague the Illinois Department of Corrections because it is systematic deliberate indifference . . ." "You bring up a good point," responded Dr. Dempsey. "I will forward this to Dr. Meeks. . . " [P463.]

---

[50] [Footnote in original:] Stefanac SJ. ("Evaluation of head and neck structures for evidence of tissue abnormalities or lesions constitutes an important part of a comprehensive examination."), p. 12. See also Shulman JD, Gonzales CK. Epidemiology / Biology of Oral Cancer. In Cappelli DP, Mosley C, eds. Prevention in Clinical Oral Health Care. Elsevier (2008) ("Regular, thorough intraoral and extraoral examination by **a** dental professional is the most effective technique for early detection and prevention of most oral cancers. […]") p. 41.

[51] [Footnote in original:] Shulman and Gonzales, p. 31, Figure 3.7. This is generally done by holding the anterior portion of the tongue with 2x2 gauze and reflecting the tongue with a mouth mirror. This is a professional standard for an oral examination.

[52] [Footnote in original:] Shulman and Gonzales, p. 41.

[53] [Footnote in original:] This deficiency is compounded by the fact that dentists do not document soft tissue examinations at biennial exams. See section on Comprehensive Care, *supra*.

## XV.    FAILURE TO IMPLEMENT OR FOLLOW QUALITY IMPROVEMENT PROGRAMS

306.    The IDOC-commissioned NRI Report states, "two critical attributes of a health care system that provides constitutionally adequate health care are quality and consistency. To provide appropriate, clinically necessary care, the system must be proactively administered, managed, tracked, analyzed, and adjusted . . ." [P21 at 000007.]

307.    In healthcare systems, including prison healthcare systems, the essential tracking and analysis that is required for administration, management, and adjustment is done by quality assurance or "continuous quality improvement" (CQI) programs. Effective performance review of staff, especially physicians and other high-level providers, is also part of quality assurance.

308.    The First Expert team found that IDOC's CQI programs were completely ineffective. "A well-run quality improvement program looks at or reviews every major service provided at least annually," the First Expert team wrote. [Dkt. 339 p. 43.] "We were unable to find, in *any* of the eight institutions we reviewed, documentation of such measurement." "In *none* of the eight sets of minutes that we reviewed did we find *anything remotely related to efforts to improve the quality* of the program." [*Id.* p. 44; emphasis added.]

309.    The Shansky team found that these deficiencies afflicted IDOC dental CQI as well. "Most dental programs had no studies, assessments or subsequent improvements in place." [*Id.* p. 39.]

310.    As to performance review ("peer review") of high-level providers, the First Expert team also found that ineffective, since it consisted of Wexford physicians reviewing other Wexford physicians. The Shansky Report opined that there is an inherent conflict of interest in corporate employed physicians reviewing the work of corporate employed physicians, because a termination decision is an expense to the corporation. [Dkt. 339 p. 9.]

311. In 2018, the Second Expert team also found quality assurance programs throughout IDOC ineffective. The Puisis Report states:

> The quality improvement program operates on a legacy system of principles that no one any longer understands or effectively implements. *No one in the IDOC has experience or knowledge of contemporary quality improvement methodology and practice. The quality program is ineffective statewide.*

[Puisis SR p. 11; emphasis added.]

312. As of April 2017, internal IDOC emails showed that, in fact, the only CQI manual that could be located dated back to 1998, and there were few copies believed to be extant.

313. Among other defects, the Second Expert team observed that the CQI program had no method "to identify problems for study" and "does not associate identified problems with systemic processes" so that corrective action could be taken. [Puisis SR p. 11.] Further, the data tracking needed for an effective CQI program was not in place: "Data for quality improvement is obtained by manually counting events. Logs tracking processes of care are either not maintained or maintained in a manner that the data is not easily useable." [*Id.*]

314. Finally, in the opinion of the Puisis team, IDOC's CQI program also failed to use any standards by which to measure quality, and failed to evaluate clinical quality, "which contributes to preventable morbidity and mortality." [*Id.* p. 118.] Additional weaknesses included:

> None of the facilities investigated had anyone who had expertise or knowledge of CQI methodology or implementation. CQI coordinators at NRC, SCC, and MCC are medical records personnel. None had any experience or training in CQI and had no knowledge of how to implement a CQI program. They were named CQI coordinators apparently because they could manage the paperwork requirements . . .
>
> None of the facilities had a reasonable CQI plan. . .
>
> None of the facilities had a Medical Director who participated meaningfully in CQI work. . .

Quality of physician care was not included in any CQI studies. . . Mortality review is not performed.

All facilities had difficulty in identification of their key problems . . .

Many "studies" were in areas that would be expected to yield good results. These were meaningless studies, as there was no effort to improve the program; instead, a study was designed so that it yielded a good result.

[*Id.* pp. 118-20.]

315. Specific findings at some of the sites visited by the Second Expert team showed additional problems rendering CQI ineffectual.

316. At NRC, the Puisis Reports state, "We identified new findings which include the following:

- The "Traveling Medical Director" provides no leadership for the CQI effort.
- No one in NRC leadership is familiar with current CQI methodology, study design, or data collection. . .
- The CQI coordinator has no training in CQI, does not understand how to perform or lead CQI work, and is so busy that CQI work is a low priority.
- The NRC CQI plan is generic and does not detail a year-ahead view of their CQI work. This is not a plan. The NRC and SCC CQI plans and Medical Director's reports are identical, indicating that these facilities are not yet performing their own quality improvement.
- NRC is not compliant with multiple requirements of their CQI AD, including:
  - o NRC does not maintain a CQI manual onsite.
  - o NRC does not monitor whether Wexford performs primary source verification of its physicians working at NRC.
  - o NRC does not monitor offsite medical care for quality.
  - o NRC does not perform the number of studies in accordance with requirements of the CQI AD.
  - o There are no studies that review the quality of medical care.
- NRC fails to use data in a manner that identifies problems.
- Data presented in several studies appeared unreliable.
- The CQI report presents statistical data which has little value from a quality perspective.
- Half of the six studies NRC chose to perform were in areas where there were no problems, thus yielding 100% audit results. While it is useful to know areas that are working well, there were so many problem areas that attention should be given to problem prone areas.

106

- The annual CQI report repeatedly documents errors in medication administration yet there was no attempt to discover why this was occurring.
- Wexford's physician and physician assistant peer review differs significantly in comparison with our record reviews. We question its reliability.

[Puisis NRC pp. 85-86.]

317.    The team further found that, based on the 2017 annual CQI minutes dated September 26, 2017, the studies performed to meet the requirement of IDOC's Administrative Directive on CQI showed basic lack of understanding of what a quality assurance program is supposed to achieve. "None of the outcome studies performed included an acceptable clinical outcome. . . This demonstrates a lack of understanding of the meaning of outcome studies." [Puisis NRC p. 88.] In addition: "Two comments [in 2017 CQI minutes] were related to failure of nurses to adequately document on the MAR and failure to appropriately administer medications. These types of medication errors were reported almost every month, as recorded in the annual CQI report. Despite statistically describing the problem, there were no studies or analyses to determine a root cause of why so many errors are being made. This is poor CQI. . ." [Puisis NRC p. 91.]

318.    Similarly, at Dixon CC:

Monthly CQI meeting minutes contain very little information. Most of the statistical data provided has no bearing on quality improvement. For example, while listing the number of persons seen in NP, physician, and nursing sick call is useful administratively, it gives no measure of the quality of those visits and gives no information as to whether there is a problem with these processes. The same could be said of most of the statistical information provided in this report. . .

[Puisis DIX p. 96.] Further, "CQI Minutes and the 2016 Annual Report show that communicable disease data is collected and reported [but there] is minimal to no discussion of the meaningfulness of the data reported. . ." [*Id.* pp. 78-79.]

319. Finally, as to analysis of physician quality at Dixon CC, "The CQI program appears to make no effort to evaluate the clinical quality of care. We heard complaints from IDOC custody and IDOC health care leadership about the poor quality of physician care. We agree that physician quality is poor, based on mortality reviews and chart reviews. Yet there was no evidence of the CQI program monitoring for this." [*Id.* p. 97.]

320. At Stateville CC, the Puisis team found:

The CQI program at SCC was ineffective for the following reasons:

- The Annual CQI Plan has no goals or objectives related to problems areas at the facility.
- The Annual CQI Plan is a generic plan which is a word-for-word duplicate of the plan used at NRC, even though NRC and SCC are different facilities with different missions. The Annual CQI Plan failed to identify the upcoming year's agenda of CQI work.
- Credential *and privilege* reviews of physicians are performed by nurses who do not have the capacity to review physician privileges.
- Review of credentials fails to include one-time primary source verification. The CQI coordinator and HCUA did not understand what primary source verification meant even though it is an administrative directive requirement.
- The Governing Body of the CQI committee consists of the Warden, an ex-warden, and the Agency Medical Director. Health trained staff are underrepresented on the CQI Governing Body.
- The CQI studies do not investigate quality of care or appropriateness of care even when this is required by administrative directives, for example with respect to offsite services.
- The leadership does not appear to understand the difference between outcome and process studies. Outcome studies were not based on a clinical outcome and most outcome studies appeared to be performance measures instead of outcome studies.
- Mortality review is not performed. Instead, a death summary is done by a physician involved in provision of care. This summary fails to include a critical review of the death and does not identify problems in order to prevent further mortality. Though we have found preventable deaths in our death reviews, there is no evidence that the system is attempting to identify problems so that these deaths can be prevented.
- Infection control data appears inaccurate.
- The Medical Director summary in the annual CQI report from NRC is an identical word-for-word duplicate of the Medical Director summary from SCC with the exception of a single sentence about NCCHC accreditation,

108

which NRC is not engaged in. These are different facilities with different missions and should have a different summary by the Medical Director.

- While the concept of internal audits is sound and potentially useful, five of six audits did not include the reported findings. Also, these audits only focus on process issues and should also include quality of care.

The purpose of SCC CQI was not to identify and solve problems in order to improve care. . . .

[Puisis STA pp. 76-77.]

321. As to the IDOC dental quality improvement program, the Second Expert team found that CQI remained non-functional despite marginal improvements: "The dental CQI program has improved marginally since the First Court Expert's Report but remains inadequate." [Puisis SR p. 116.] Some of the inadequacies identified were:

CQI studies were limited in scope and follow up with corrective action plans was lacking. For example, the 2016-2017 SCC CQI Report described study of compliance with the charting at the initial examinations at NRC. Among the findings from the NRC charts were that 62% had no charting of pathology, with the remainder having only a partial charting. . . However, we were not provided with any corrective action plans.

The [Logan] CC 2017 Annual Governing Body Report described a quality improvement study on "[t]he time frames for dentures start to finish including healing. Is it within 3 months?" There were neither recommendations nor a planned follow up. The study was, at best, trivial. *Given the inadequacy of the clinical aspects of the dental program described in this report, a 'study' of how long it takes to fabricate a denture ignores far more relevant issues, such as inadequate health histories, inadequate diagnosis of periodontal disease, and failure to use intraoral x-rays.*

[*Id.*; emphasis added.]

322. In addition, the Second Expert team found there is a systemic lack of reliable clinical oversight and peer review processes for medical professionals. "Peer review is a means to monitor the quality of physician and other provider care, and thereby protects patient safety," but "Wexford and the IDOC fail to monitor physician care in a manner that protects patient safety." [*Id.* pp. 10, 23.]

109

323.    All IDOC Medical Directors, and virtually all staff physicians and dentists, are Wexford employees. For physicians, including Medical Directors, the peer review process consists of Wexford doctors reviewing other Wexford doctors. Defendants do not receive the Wexford peer reviews; they only receive a notification of the review that does not state the results.

324.    Thus, "[t]he only monitoring of clinical performance of the physicians is Wexford peer review, in which Wexford physicians monitor other Wexford physicians. Many of these physicians are unqualified to practice primary care medicine. We found that these peer reviews are ineffective . . ." [*Id.* p. 18.]:

> The first type of peer review which is performed by Wexford is a structured questionnaire performed by one Wexford physician on another Wexford physician. We noted at one facility that a general surgeon performed the peer review of the primary care work of a nuclear radiologist. It is our opinion that this type of performance evaluation is defective and unlikely to result in meaningful evaluation, as neither doctor is adequately trained to practice primary care and would not be able to know when care was adequate.
>
> Also, the peer review that is done is so poor that it is unlikely to identify problems. The Wexford peer review consists of a review of 10 single episodes of care for five areas of service. For each of these areas of service there are a series of questions ranging from 10 to 15. Some of the questions are not relevant to clinical quality, such as:
>
> - Is the handwriting legible?
> - Is the signature with professional designation legible?
> - Is the patient enrolled in all relevant clinics?
> - Are all medications written on a script?
> - Does the clinic include pertinent vital signs?

[*Id.* pp. 23-24.]

325.    The Second Expert team further noted that a second type of "peer review" typically done in the community "when a member of the medical staff may have committed a serious gross or flagrantly unacceptable error or exhibits a serious character or behavior problem" and may need

to be evaluated for reduction of privileges or referral to a medical board, does not appear to be performed in IDOC at all. [*Id.* p. 23.]

326. For Wexford-employed dentists, there is no regular peer review process at all, although such review is a recommendation of NCCHC.

327. Likewise, the Puisis Report notes, "There is no meaningful monitoring of nurse quality of care." [*Id.* p. 10.]

328. Finally, in 2018, the Puisis team found that Defendants' mortality review process remained ineffective and inadequate.

329. The Second Expert team reported that IDOC claimed that the regional coordinators perform mortality review, but the team was never provided copies of these reviews. In any event, "[t]hese reviews, if done, are insufficient as mortality review." "The Regional Coordinators are nurses and would not be able to effectively review physician care or identify it if was adequate or inadequate." Further: "Wexford does not perform mortality review; instead, it performs a death summary, which is a non-critical summary of the death. This is done by the Medical Director of the site who is often the same doctor who cared for the patient and who often was responsible for the incompetent care." [*Id.* p. 102.]

330. As of January 2017, IDOC did not even have its own policy on mortality reviews. [P471.]

331. In 2016, the IDOC-commissioned NRI Report also recommended that IDOC "[d]evelop and use a robust continuous quality improvement program to thoroughly review and analyze operational process concerns identified in this report." [P21 000013.]

## XVI.  MORTALITY AND END-OF-LIFE CARE

332.    As part of their review of IDOC medical care, both the First and the Second Expert teams reviewed deaths within IDOC.

333.    In 2014, the First Expert team reviewed 52% of the non-violent deaths in IDOC from January 1, 2013 to June 1, 2014, plus two additional deaths from 2010. They applied an analytic taxonomy developed in *Plata v. Brown*, which sets out 14 different categories of "lapses in care": a lapse of care is when "a clinician has committed a *significant departure from the standard of care* that a reasonable and *competent clinician would not have committed* under the same or similar circumstances." These categories include "failure to recognize "clinical 'red flags'"; "failure to identify and appropriately react to abnormal test results"; "[p]racticing outside the scope of one's professional capacity"; "[d]elay or failure in emergency response." [Dkt. 339 pp. 42, 376, 402.]

334.    The Shansky team found "one or more significant lapses in care in 60% of the cases" they reviewed. "This is an unacceptably high rate of deviations from the standard of care." Further, of the cases with "significant lapses," 89% "had more than 1 lapses." [Dkt. 339 p. 376.]

335.    The First Expert Report also criticized the procedure used by the State Defendants to review deaths, which in most cases permitted Wexford doctors to review the deaths that had occurred on their own watch, without any oversight by the State Defendants. In most of these cases, this system had failed to identify any problems at all. [Dkt 339 at 42-43.]

336.    Like the Shansky team, in 2018 the Puisis team found significant problems in their review of mortalities. The Second Expert Report states:

> There were 174 deaths in 2016 and 2017. We intended to review 89 death records but because of time limitations we were only able to review 33 (19%) deaths from 12 facilities, which is a sample of 46% of the IDO facilities. Eleven of 33 deaths were preventable. Eight of 33 were possibly preventable. Nineteen (58%) of the 33

deaths reviewed were either preventable or possibly preventable. This is an extraordinary number of preventable or possibly preventable deaths and speaks to the ongoing serious harm to patients from care in the IDOC. We do not assert that this sample can be extrapolated to the entire population. However, even if there were only 19 preventable or possibly preventable deaths out of the 174 deaths that would be 11% of the deaths, which is still a very high number. Our findings confirmed the First Court Expert's report that none of the death summaries identified any problems. All of the death summaries were performed by physicians who were responsible for care of the patient and failed to identify any problems, even when grossly and flagrantly unacceptable care was provided.

We reviewed two years of care as documented in the health record for most of the 33 deaths. . . *We identified 1757 errors in care.*

[Puisis SR p. 93-94; emphasis added.]

337.   A "preventable death" according to the Second Expert team was "[a] death wherein opportunities for clinical intervention or errors related to care delivery were identified that WOULD have prevented or significantly delayed the patient's death." [Puisis MR p. 1.] A "possibly preventable death" was "[a] death wherein opportunities for clinical intervention or errors related to care delivery were identified that MIGHT have prevented or significantly delayed the patient's death. [*Id.*]

338.   In addition to the deaths that the Puisis team determined to be preventable or possibly preventable, there were five additional deaths out of the 33 reviewed as to which they could not make a determination about preventability because the record-keeping was so inadequate. [Puisis MR pp. 1.]

339.   The preventable deaths assessed by the Second Expert team included:

A 24-year-old with mental illness swallowed two plastic sporks (combination spoon and fork) that was witnessed by a correctional officer. A doctor did not evaluate the patient but ordered an x-ray, which would not likely show the ingested plastic item. The x-rays were normal. About two and a half months later, a nurse practitioner evaluated the patient. The NP failed to recognize a 33-pound weight loss, but the patient did tell the NP that he had swallowed a spork a long time ago and needed it removed. The NP made an assessment that the patient had an ingested spork but took no action. The patient remained untreated and eventually lost 54 pounds and

had repeated episodes of abdominal pain with an inability to eat without pain, nausea, and diarrhea. Eventually the patient was found unresponsive, was sent to a hospital, and died. On autopsy, the two swallowed sporks were found having caused esophageal perforation, which was the cause of death.

A 51-year-old had headache, complaint of fever, and vomiting. Treatment for this condition was infirmary admission, IV fluid, and intravenous antibiotics for presumed pharyngitis. These signs were inconsistent with pharyngitis. The patient continued to vomit, yet continued to be managed for pharyngitis. The provider ordered labs on the second infirmary day that were not done. Later, on the second day on the infirmary, the patient developed altered mental status and hypothermia, and was not responding. These are red-flag signs. The patient was not sent to a hospital despite signs of acute sepsis. No laboratory tests had yet been done after two days of infirmary housing. On the third infirmary day, the patient was found on the floor and would open his eyes only to severe stimulus. He was not sent to a hospital until he was found unresponsive and in shock (BP 68/palpable). The patient died in the hospital; there was no autopsy.

Another patient had hepatitis C and cirrhosis evident as early as June of 2012, yet facility providers failed to list cirrhosis as a problem and did not monitor the patient for this condition. Doctors did not initially order tests typically ordered for cirrhosis (EGD to screen for varices and ultrasound to screen for hepatocellular carcinoma) and the patient was not monitored for ascites. In May of 2015, the patient eventually received an ultrasound, which showed a liver mass. A CT scan later that month confirmed a liver mass. The patient was referred for interventional radiology for a biopsy in August 2015, but this was denied by Wexford UM and instead an MRI was recommended. The reason was unclear, as a biopsy was indicated. An MRI was done in October but a biopsy was never done. The patient developed hypoxemia (oxygen saturation of 79%) with hypotension (96/64) and the patient was admitted to the infirmary, but should have been admitted to a hospital. The day following admission to the infirmary the patient developed fever, but no action was taken. The patient had massive ascites, fever, hypotension, and hypoxemia, yet was kept on the infirmary. The following day the patient again developed hypotension (88/60) and hypoxemia (84%) on four liters of oxygen and was sent to a hospital, where he died. The delay in transfer to a hospital contributed to his death. He also never had a biopsy of his liver mass and therefore never had a diagnosis.

[Puisis SR pp. 95-96, 98.]

340.    The deaths reviewed by the Second Expert team reflect the systemic failures observed by the team throughout their review of IDOC care. [Puisis MR, *passim.*] These failures included: failure to hospitalize patients in need of hospital care; failure to provide skilled nursing care; failure to order tests or properly examine the patient; delays in obtaining treatment

recommended by a consultant; outside reports missing from the medical record; medication errors and failed chronic clinic evaluations; failure to evaluate plain symptoms of disease; and inappropriate prescriptions with no monitoring of side-effects. [Puisis MR pp. 10-15, 17, 22, 30, 34, 36-37, 40, 42, 45.]

341.    The Second Expert team assessed the care delivered to some of these patients as "appear[ing] to be indifferent, incompetent, and inhumane," and "neglectful and border[ing] on cruelty," *inter alia*. [Puisis MR pp. 29, 38.]

342.    Like the First Expert team, the Second Expert team concluded that there is no functional mortality review process in IDOC. [Puisis SR pp. 91-92.]

343.    Finally, both the First and the Second Expert teams noted problems with care of the dying and use of informed consent.

344.    "[T]here are *no resources in place to assist health care staff in the care of patients who are dying* or in the management of common end of life symptoms," concluded the Shansky team. "It was obvious that once patients signed DNR (do not resuscitate) orders, they were often no longer treated for even simple reversible illness . . .. Even though DNR is an instruction not to use CPR under circumstances when it is known to be futile, often simple treatment with antibiotics or hydration or suctioning can be effective and diminish suffering." [Dkt. 339 p. 43; emphasis added.]

345.    The Puisis team in turn noted problems with informed consent and the use of palliative sedation in advance of death. [Puisis MR pp. 35, 52.]

346.    Defendants claim that they provide "hospice" or end-of-life care in their facilities. However, despite Illinois law requiring facilities (including public facilities) providing "hospice"

care to be licensed as hospice facilities, and hospice workers also to be licensed, IDOC "hospice" facilities and workers are not licensed pursuant to state law. *See* 210 ILCS 60/1 *et seq.*

347.     Defendants' records reflect that at least two of the patients whose deaths were reviewed by the Second Expert team hoped at least to survive until release. Mortality patient no. 6 (assessed as a possibly preventable death by the Second Expert team), is reported to have told an IDOC nurse in March 2016, "I just wanna live to get out of here." [Puisis MR p. 8; P475.][54] She died less than six months later. Mortality patient no. 8 (also assessed as a possibly preventable death by the Second Expert team), rescinded his DNR 5 days before his death because "he had less than one week until release from prison and wanted to do everything possible to ensure that he would survive to release." [Puisis MR p. 12; P457.]

## XVII.  NAMED PLAINTIFFS' EXPERIENCES

348.     Plaintiff Don Lippert is 43 years old and is currently incarcerated at Lawrence CC; he was previously incarcerated at Stateville CC and at Pinckneyville CC. Mr. Lippert is a type 1 (insulin-dependent) diabetic and also has diabetic neuropathy and hypertension. Since 2010, at Stateville, Pinckneyville, and Lawrence, Mr. Lippert has regularly suffered from delayed dosages, improper dosages, or no dosages of his insulin; failures or refusals to provide him with a diet suitable for managing his diabetes; and failures or refusals to treat collateral effects of his Type 1 diabetes such as cracked and fragile skin and foot pain. Mr. Lippert has also experienced protracted interruptions of other medications he is regularly prescribed for high blood pressure and pain.

---

[54] This patient "developed fever, abdominal pain, and hypotension consistent with septic shock, but was not sent to the hospital for evaluation for two days." [Puisis MR p. 8.] On her return and placement in the prison infirmary, she began vomiting blood repeatedly and was hypotensive, indicating shock," yet she was not sent to a hospital for five hours. [*Id.*] "This was grossly and flagrantly unacceptable," stated the Second Expert team. [*Id.*]

349.     Plaintiff Lewis Rice is 48 years old and is incarcerated at Menard CC. Mr. Rice has a medical history in IDOC that includes headaches, fainting spells, chest pains, right shoulder pain (for which Mr. Rice receives a "double cuff" permit), severe vomiting and constipation, and GERD (gastroesophageal reflux disease). Throughout his spells of headaches and fainting, chest pains, and vomiting, Mr. Rice has never received any diagnosis of the causes of these episodes. Defendants have refused to consider surgery or even an MRI to analyze his persistent right shoulder pain.

350.     Plaintiff Debra Pattison is 54 years old and is incarcerated at Logan CC. Ms. Pattison has, in her knee, a complete ACL tear, a partial PCL tear, a meniscal tear, and tricompartmental osteoarthritis. She also has a history of hypertension, type 2 diabetes, asthma, migraines, and possible transient ischemic attacks while in IDOC custody. An orthopedic consultation obtained in 2012 after Ms. Pattison had severely injured her knee while in IDOC custody recommended knee replacement surgery, but Wexford utilization management has denied this request on multiple occasions. Ms. Pattison can now barely walk.

351.     Plaintiff Ezell Thomas is 76 years old; he was incarcerated at Pontiac CC and is now in custody at Dixon CC. Mr. Thomas has a history of chronic obstructive pulmonary disease, hypertension, dyslipidemia, anemia, prostate cancer, renal failure, and lung cancer while in IDOC custody. On many occasions outside providers to whom Mr. Thomas was sent for diagnosis or management of these medical problems have recommended follow-up appointments within a certain time period, or the performance of diagnostic tests, or the prescription of certain medications, Defendants have failed to schedule Mr. Thomas for these appointments, see to it that the tests were performed, or provide Mr. Thomas with the medications.

352.     Plaintiff Milam Martin is 62 years old and is incarcerated at Big Muddy River CC. Mr. Martin was previously incarcerated at Pontiac CC, Menard CC, Dixon CC, Lawrence CC, and Pinckneyville CC. Mr. Martin is incorrectly identified in IDOC's records as "Milan" Martin. Despite his efforts to have his name corrected, Defendants have refused to correct Mr. Martin's first name throughout his incarceration. Mr. Martin has a medical history in IDOC custody that includes chronic bronchitis, hypertension, Bell's palsy, hypercholesterolemia (high cholesterol levels), and partial right lower extremity hemiparesis (weakness of one side of the body). Mr. Martin uses a wheelchair. Since 2010, Mr. Martin has injured himself falling out of a defective wheelchair issued to him which Defendants had refused to replace and been placed in the infirmary for an extended stay during which he was largely neglected. Mr. Martin also has an injury to his jaw that causes it to fall out of place; at one time he had a plastic mouth brace which he could use while sleeping to secure it, but this was lost by IDOC during one of his prison transfers and dental personnel have refused to replace it. As a consequence, Mr. Martin is forced to use cardboard and Kleenex to try to keep his jaw in place while sleeping so that he does not wake up in pain. Mr. Martin has also experienced such lengthy delays in getting appointments to have teeth that were in need of extraction extracted, that he has on multiple occasions ended up pulling the teeth out himself.

**A.     The Stern Report**

353.     On May 31, 2018, Plaintiffs' expert Dr. Marc F. Stern MD, MPH, issued a report on the adequacy of medical and dental care in IDOC based principally upon the medical records and other information relating to the named plaintiffs in this case. [P551.] He classified the errors and problems he found in the records into eleven categories based upon the analysis made by the First Expert team.

354.    Using the standard of care for medically necessary care in the community, and national standards for correctional care "to the extent that … they provide a guide to what is necessary, but not necessarily sufficient, for safe health care," Dr. Stern made two key findings. [*Id.* p. 3.] First, the errors and problems he discovered fall into a large number, and possibly a majority, of the "essential" categories of a correctional health care system. Second, the errors and problems occur frequently across facilities, therefore, this is not attributable to individual incompetent staff members. [*Id.* p. 3.] Dr. Stern deemed the problems "pervasive, systematic, and symptomatic," of a system that constantly places patients at risk. [*Id.* p. 3.]

**B.    The Stern Report: Quality of nursing decision-making and care**

355.    In the first category, Dr. Stern looked at the quality of nursing decision-making and care. Dr. Stern found that in each case clinical judgment and competency were lacking among the nurses in each of the named plaintiffs' cases. [*Id.* p. 4.]

356.    Mr. Rice saw a nurse presenting symptoms that could indicate a life-threatening medical problem. Instead of contacting a practitioner immediately, the nurse acted independently and made a routine referral which was not complete until five days later. Additionally, the nurse used a poorly designed protocol which requires the nurse to utilize treatments that may lead to life-threatening consequences for certain patients. Furthermore, the nurse ignored instructions within the protocol. [*Id.* p. 4.]

357.    Mr. Lippert saw a LPN for chest pains. The visit took place in the patient's living area. The patient exhibited signs for a heart attack, which require that treatment begin as soon as possible. The exertion required to get into a wheelchair can be dangerous in this situation. The licensed practitioner nurse does not have the requisite training to make the decision to transport a

patient or begin treatment at the bed sign especially without conducting an examination or taking vital signs. The care of Patient 4 was dangerous and put his life at risk. [*Id.* pp. 5-6.]

358.    Dr. Stern found more than 20 other examples of poor quality of nursing decisions and care in the records he reviewed. These findings are consistent with the previous report by Dr. Shansky. [*Id.* p. 6.]

**C.    The Stern Report: Quality of practitioner decision-making and care**

359.    In the second category, Dr. Stern evaluated the quality of practitioner decision making and care. Here, Dr. Stern also found that sound clinical judgment and competency are lacking among the practitioners. [*Id.* p. 6.]

360.    Mr. Lippert takes insulin for his diabetes. Many times, the management of his treatment was not consistent with acceptable and safe medical standards. Prolonged exposure to elevated blood sugar levels increased the patient's risk of neurologic and cardiovascular damage. [*Id.* p. 10.]

361.    Dr. Stern stated he found more than 70 other examples of poor quality practitioner decisions in the records reviewed. His findings are consistent with Dr. Shansky's findings of poor practitioner decision making and poor care. [*Id.* p. 11.]

**D.    The Stern Report: Errors and problems in continuity of care**

362.    In the third category, Dr. Stern looked at errors and problems in continuity of care. Dr. Stern advised that one of the principles of constitutionally adequate correctional health care is that once the patient receive a professional medical judgment, the plan resulting from that judgment must be carried out. Orders may be issued only by duly licensed practitioners. According to the records reviewed, Dr. Stern found that continuity of care is not well maintained at IDOC. [*Id.* p. 11.]

363.    Ms. Pattison complained of shortness of breath. An EKG was ordered but never done. Ms. Pattison had a number of risk factors for heart disease and the EKG was important for ruling out acute heart disease as a cause. She also should have been checked for anemia as a cause. The practitioner should have scheduled a follow up. None was ordered. [*Id.* pp. 11-12.]

364.    Mr. Thomas saw a cardiologist to manage his heart disease. The cardiologist stopped two medications and replaced them with two others. It took 17 days to implement the change when it should have taken one or two days. Mr. Thomas returned to the cardiologist three months later. The practitioner saw him for a follow up and his blood pressure was better but increased the dose. There was no follow-up appointment scheduled. Mr. Thomas's blood pressure was not checked again for another 3 months. [*Id.* pp. 12-13.]

365.    Dr. Stern found more than 55 examples of poor continuity of care in the records. [*Id.* p. 13.]

E.    **The Stern Report: Errors and problems in non-urgent episodic care**

366.    Dr. Stern lists category four as errors and problems in non-urgent episodic care. This category focused on the administrative, policy, and operational aspects or care. Dr. Stern found two problematic aspects at the IDOC facilities. [*Id.* p. 14.]

367.    One example is Mr. Rice, who was scheduled to see a practitioner for chest pain but saw a Certified Medical Technician (CMT) instead. The CMT did not conduct an examination and the patient did not see a practitioner until 18 days after the first appointment. Mr. Rice also went to see a nurse practitioner for a history of vertigo, vomiting, and a headache. The nurse used three different protocols which ignored the convergence of the various symptoms that could indicate a fatal condition. [*Id.* p. 15.]

368.    Another example is Ms. Pattison, who went to a nurse for new onset back pain. The nurse employed the "Back Pain" protocol which is flawed in that it guides the nurse to make a decision based on symptoms they do not collect during examination. It also provides unsafe instructions on how to refer to the patient to the practitioner. The ultimate referral was then ignored. [*Id.* p. 16.]

369.    A final example is Mr. Martin, who was evaluated by a nurse practitioner for cheek and jaw pain for three or four days. The nurse conducted only the protocol and diagnosed the pain as a dental problem. Because the protocol did not call for other examinations, the nurse practitioner could not have ruled out other more serious and urgent problems and placed the patient at risk of harm. [*Id.* p. 16.]

370.    Dr. Stern found 30 other examples of poor quality in non-urgent episodic care in the records that are consistent with Dr. Shansky's findings. [*Id.* p. 17.]

**F.    The Stern Report: Errors and problems in urgent and emergent episodic care**

371.    Dr. Stern's category five looks at errors and problems in urgent and emergent episodic care. In one example, a CMT responded to Mr. Lippert after he was reported unconscious. The CMT took no history or conducted an examination other than touching him and testing his blood sugar. The CMT made a nursing diagnosis without consultation. Without taking into account the patient's elevated blood sugar and high risk for heart disease, the CMT's care was reckless and deliberately dismissive of a serious medical need. [*Id.* p. 17.]

372.    Ms. Pattison slipped in the shower when her knee gave out and pulled her shoulder out and hit her head on the wall. The notes show that the nurse practitioner informed Ms. Pattison that she should not lie about injuries and when they happen, which was "abusive" and not supported by any evidence in the patient's chart. [*Id.* pp. 17-18.]

373.    Mr. Thomas reported shortness of breath and was visited by a CMT. His blood oxygen level was low and the lung sounds were slightly diminished. The CMT prescribed a medication, noted that the Mr. Thomas's lung sounds were clear and reported a higher blood oxygen level. The diagnosis was listed as momentary constriction of the airway due to emphysema. The possible reasons for the shortness of breath were much more extensive than momentary airway constriction and providing treatment as such risked harming the patient and delaying an accurate diagnosis. [*Id.* pp. 18-19.]

374.    Dr. Stern found more than 16 other examples of poor quality urgent or emergent episodic care in the records which was consistent with Dr. Shansky's finding of serious deficiencies. [*Id.* p. 20.]

**G.    The Stern Report: Errors and problems in chronic disease management**

375.    Dr. Stern's sixth category focuses on errors and problems in chronic disease management. This included diseases or conditions that last more than a few months, are not expected to disappear on their own, and are expected to continue to produce problems for the patient, and for which ongoing preventive care can help reduce or prevent those problems. Chronic care is scheduled visits at regular intervals during which complications are addressed and the patient receives preventative care. Dr. Stern concluded that the facilities he reviewed were dysfunctional. [*Id.* p. 20.]

376.    Ms. Pattison suffers from several chronic conditions, including hypertension, diabetes, and asthma. She had a chronic visit for her diabetes in January 2013. Her next visit was not until June 2015. Almost two and half years passed between chronic care visits. Ms. Pattison also has a long history of arthritis of the left knee. In 2012, a surgeon determined that surgery was necessary. Wexford held two meetings and decided to ignore the recommendations without any

explanation. They denied the request for surgery and used an alternative treatment plan. Ms. Pattison made several requests over the next few years for the surgery. Wexford kept pointing to a note from the surgeon saying that patient would expect "limited motion if surgery performed". However, the note was not in the records. In 2016, Ms. Pattison was referred back to a surgeon. IDOC failed to send sufficient medical records with the patient, thus the surgeon was unaware that steroid injections had been used before which worsened the condition. The surgeon injected the Ms. Pattison's knee as a result. The surgeon requested follow up in two months. As of March 2018, no follow up has occurred. Dr. Stern found this care "cruel". [*Id.* pp. 20-23.]

377.    Mr. Thomas has a history of prostate cancer but went almost two and half years, maybe longer without follow up to determine if his cancer returned and required treatment. [*Id.* p. 23.]

378.    Dr. Stern found more than 25 other examples of poor chronic disease management. These findings were consistent with those of Dr. Shansky. [*Id.* p. 24.]

**H.    The Stern Report: Errors and problems in infirmary care**

379.    Dr. Stern labeled category seven as errors and problems in infirmary care. Patients in the infirmary are supposed to receive closer monitoring and more frequent care by doctors and nurses. If their condition worsens, they should be transferred to a hospital. Dr. Stern found the quality of care in the infirmaries to be poor. [*Id.* p. 24.]

380.    Mr. Martin was admitted to the infirmary in May of 2015 complaining of weakness. He had abnormal vital signs. He fell off the toilet later that day due to weakness. The nurses did not measure blood oxygen saturation levels nor did they check for dehydration. The next day, his blood pressure was below level even though the patient has hypertension. This should have prompted an immediate contact with a practitioner but nothing was done. A practitioner visited

Mr. Martin three days later. His blood pressure was at a critically low level which demanded an urgent response. Instead, one of his blood pressure medications was stopped and fluids were increased. Mr. Martin was discharged two days later. His blood pressure was not monitored upon discharge nor were there orders to continue monitoring. His blood pressure went unchecked for half a year. It was then too high because of the discontinued medication. Mr. Martin was exposed to unhealthy blood pressure for months which could damage his cardiovascular system. [*Id.* pp. 24-26.]

381. These findings are consistent with those of Dr. Shansky. [*Id.* p. 26.]

**I.      The Stern Report: Scheduled offsite services**

382. Dr. Stern's category eight looks at scheduled offsite services. Dr. Stern noted that prisons must often send patients to community providers for consultations or tests. In order for the care to be safe, these must be acted upon in a timely manner and the recommendations of the specialists, and test results must be acted upon in a timely manner. This does not happen at IDOC. [*Id.* p. 26.]

383. Mr. Rice was in the infirmary where he developed a cardiac problem. The practitioner recommended he be referred to another practitioner for referral to a cardiologist and maybe fitted for a pacemaker. Mr. Rice never saw a cardiologist. [*Id.* p. 26.]

384. Mr. Thomas was supposed to have a repeat CT scan of his lungs three months after his release from the hospital. The CT scan was not obtained until two years later and only in response to a renewed recommendation. Doctors also ignored a recommendation that Mr. Thomas see a hematologist because of an abnormality suggesting cancer. Nine months passed before Mr. Thomas was seen for follow up. Doctors suggested another follow-up in three to four weeks. The follow-up did not occur for five months. [*Id.* p. 27.]

385.    Dr. Stern found more than 15 other examples of errors dealing with scheduled offsite services and these findings were consistent with Dr. Shansky's. [*Id.* p. 27.]

###    J.    The Stern Report: Dental program

386.    There was insufficient evidence in the named plaintiffs' records for Dr. Stern to form reliable conclusions in category nine. Category nine pertained to the dental program and quality of dental care. [*Id.* p. 27.]

###    K.    The Stern Report: Errors and problems in medical records

387.    Dr. Stern's category ten looks at errors and problems in medical records. The records must be complete and clear so that each caregiver can easily and accurately determine what is known about the care already delivered. Dr. Stern states that if the record is incomplete and unclear, there cannot be safe patient care. The records he reviewed were not complete or clear, and therefore patient care cannot be safe. [*Id.* pp. 27-28.]

388.    Written requests for care are missing from all records reviewed. The Problem Lists in three of the five records were either missing or incomplete. Another had too much information to the point where it was cluttered with repetitive and irrelevant information. Many scribbles were illegible. Overall, Dr. Stern found more than 45 other errors or problems with medical records; his findings are consistent with Dr. Shansky's. [*Id.* pp. 28-29.]

###    L.    The Stern Report: Errors and problems with pharmacy and medication administration

389.    Finally, Dr. Stern's category eleven looks at errors and problems with pharmacy and medication administration. Medication administration must be completed timely and accurately. When a patient refuses a medication dose, the nurse needs to determine if the patient is capable of making such a decision. If so, the refusal must be informed. Even if the refusal is informed, the standard of care requires medical staff to attempt to alieve the concerns or encourage

the patient to accept the medications. A lock-down, a patient no-show, or no reason at all are invalid excuses for failure to administer a medication. Dr. Stern found many examples of failure of the medication delivery system. [*Id.* p. 29.]

390.    Nurses failed to administer six doses of medications for asthma, heart disease, hypertension, and pain for Ms. Pattison. No reasons were given. In February 2017, nurses failed to administer 24 doses of medications. The reason was listed as "did not show". [*Id.* pp. 29-30.]

391.    In November of 2017 nurse failed to administer all morning and evening doses of insulin to Mr. Lippert, 31 doses total due to a lockdown, six evening doses due to the patient not being in his cell, and one evening dose for no given reason. Seven of these failures occurred in one day. Mr. Lippert received no insulin for three days straight. In December, he went four days without insulin and missed 30 doses total. [*Id.* p. 30.]

392.    These findings are consistent with those of Dr. Shansky. [*Id.* p. 30.]

**M.    The Stern Report: "Capstone" stories**

393.    Dr. Stern used two stories to show how multiple errors and problems in the same patient over time compound one another and create significant deficiencies in health care. [*Id.* p. 30.]

394.    Mr. Rice had a history of multiple fractures, alcohol and drug abuse, bradycardia, gastroesophageal reflux disease, major depressive disorder with psychotic features, chronic constipation, and chronic insomnia. On March 10, 2017, he saw a practitioner for constipation and nausea. On March 16, he saw a registered nurse. She noted he had persistent vomiting and signs of dehydration and made an urgent referral to a practitioner. Though he was listed as "urgent," he did not see a practitioner for three days. [*Id.* p. 31.]

395.     On March 19, 2017, Mr. Rice saw a practitioner and his vital signs had deteriorated. He was diagnosed with "vomiting" which is not a diagnosis but a symptom. He was given a single injection and discharged without follow up. [*Id.* p. 31.]

396.     On March 29, 2017, Mr. Rice saw a registered nurse for constipation, nausea, vomiting, and abdominal pain. The nurse referred him to a practitioner. The history of symptoms indicate a serious medical problem, possibly life-threatening. A consultation should have been immediate, instead it was a routine referral. [*Id.* p. 32.]

397.     On April 3, 2017 Mr. Rice saw the practitioner in response to the registered nurse's referral, and reported vomiting every time he ingests food or liquid. He also reported blood in his stools, a sign of internal bleeding unless proved otherwise. The practitioner was concerned about internal bleeding but Mr. Rice refused a rectal exam. The practitioner then ordered a few medications for vomiting and stomach acid, a plain x-ray of the abdomen, and routine blood and stool tests. A follow up appointment was scheduled in a week. Dr. Stern notes Mr. Rice's refusal of the rectal exam was uninformed and the practitioner made no effort to encourage him to have the exam. This was problematic because the patients combined symptoms are evidence of a medical emergency until proven otherwise. If Mr. Rice had a serious bleed, he would have died before it could be controlled. [*Id.* pp. 32-33.]

398.     On April 10, 2017, the Wexford authorities denied the request for an ultrasound. Instead, they implemented an alternative care plan including blood tests and stool tests and a diet change. Still, no diagnosis was made. [*Id.* p. 33.]

399.     On April 12, 2017, Mr. Rice saw the practitioner for a follow-up. His weight had dropped significantly. The practitioner noted that she was waiting on labs and scheduled a follow

up in three weeks. The practitioner should have done an examination in the interim but failed to do so. [*Id.* p. 33.]

400.    On May 16, 2017, the Wexford authorities heard about this case again. They directed a new treatment plan that did not improve upon the previous plan from April 10. [*Id.* pp. 33-34.]

401.    Dr. Stern explains that at this point care for the problem was stopped. There is no further mention of the problem nor an evaluation of Mr. Rice. The errors occurred over a period of months. If the Mr. Rice had a serious medical emergency, it was undiagnosed. Dr. Stern says he was unable to determine if Mr. Rice indeed has or is still developing a serious medical condition. [*Id.* p. 34.]

402.    The second story involves Mr. Thomas, who has a history of heart disease, emphysema, gout, hypertension, and prostate cancer. In 2013, he developed a blood abnormality and a lung abnormality, both of which concerned specialists as to the presence of possible cancer. [*Id.* p. 34.]

403.    On February 1, 2014, Mr. Thomas was discharged from the hospital for internal bleeding. Due to the abnormalities, the doctors recommended that the patient have a CT scan in three months. IDOC ignored the recommendation. A CT occurred on July 14, 2016, two years later. The doctors also recommended a follow up with a blood specialist in three to four weeks. This order was also ignored. [*Id.* p. 34.]

404.    On February 24, 2014 Mr. Thomas saw a different specialist who noted the hematology consultation had not taken place and reminded IDOC of the recommendation. Nothing was scheduled. The patient did not see a hematologist until October 29, 2014, nine months late. [*Id.* p. 35.]On October 29, the hematologist recommended blood tests and a follow up visit in three

to four weeks. This recommendation was also ignored. The follow up somehow occurred April 29, 2015, five months late. Luckily, there was no cancer. [*Id.* p. 35.]

405.    On June 10, 2016, Mr. Thomas saw a lung specialist for his emphysema. The specialist noted the follow up request from December 2013 was never fulfilled and recommended it be done in the next few weeks. Using no evidence, Wexford determined that the lesion was stable and decided to delay any action until the next utilization meeting. Mr. Thomas finally had a chest CT on July 14, 2016, which showed a new shadow in a different location. On August 17, 2016, Mr. Thomas received a more specialized scan which showed suspicions of malignancy. This result requires a practitioner to seek consultation form the pulmonologist urgently. This did not occur. [*Id.* p. 35.]

406.    On September 14, 2016, Mr. Thomas had a regularly scheduled follow up with a pulmonologist for his emphysema. The pulmonologist saw the scan results and planned further work up. On October 25, 2016, the biopsy showed cancer and Mr. Thomas was referred to an oncologist. He was referred for radiation therapy on November 18, 2016. [*Id.* pp. 35-36.]

407.    Dr. Stern found that the delays and mismanagement of the Mr. Thomas's care showed the systems and professionals at IDOC were reckless in this patient's care. [*Id.* p. 36.]

**N.    The Stern Report: Other systemic conclusions reached by Dr. Stern**

408.    Dr. Stern noted he did not have enough information to identify with certainty the underlying causes of unsafe health care conditions in a correctional setting. However, he found there was enough information to identify at least three factors: staffing levels, budget, jurisdictional heterogeneity, and IDOC Central Office oversight. [*Id.* p. 36.]

409.    Under staffing levels, Dr. Stern found that the Monthly Performance Monitoring Reports he reviewed showed there are many position vacancies. This is similar to the findings in

Dr. Shansky's report. The Monitoring Reports also show many required clinical activities are not completed or are backlogged. [*Id.* pp. 36-37.]

410.     For budget, Dr. Stern looked at the Pew report on Prison Health Care Costs and Quality from October 2017, which showed that Illinois was underspent by only seven other states in 2015. [*Id.* p. 37.]

411.     Under jurisdictional heterogeneity, Dr. Stern found the unclear chains of command between Wexford and the state employees problematic. The health care unit administrator at each facility is a state employee, while nurses are a mix of state and Wexford employees. [*Id.* p. 37.] Almost all practitioners and dentists are Wexford employees. Most of the Directors of Nursing are Wexford employees and they cannot fully supervise a state-employed nurse. Dr. Stern inferred then that a state-employed director cannot fully supervise a Wexford-employed nurse. Dr. Stern inferred similar complications in the chain of command for practitioners and heath care unit administrators employed by different employers. Clear chains of command and clear supervisory authority are essential to a safe and well-run healthcare environment. According to Dr. Stern, these are not present in IDOC healthcare. [*Id.* p. 38.]

412.     Under Central Office oversight, Dr. Stern reports that there are weaknesses in the Medical Director's ability to monitor the system. The director is not consistently getting all reports and trends from every facility. The contract with Wexford has tools for monitoring the health system but not a single measure directly measures patient safety. [*Id.* p. 39.]

413.     Dr. Stern concluded that there are serious, systemic deficiencies in IDOC healthcare in the five patient records he examined. Based on his experience, Dr. Shansky's report, and the extent that the five records are representative of a class of individuals at IDOC, Dr. Stern

further concluded that the deficiencies are also prevalent throughout IDOC. The result puts patients at "substantial, regular, and predictable risk of serious harm." [*Id.* p. 39.]

## XVIII. DEFENDANTS' KNOWLEDGE OF SYSTEMIC MEDICAL AND DENTAL CARE FAILURES

### O.     The John Howard Association Reports

414.     Defendants have known for years of the systemic failures in their medical and dental care systems.

415.     Even before the 2014 Shansky Report and the 2016 NRI Reports, Defendants had been notified by other outside reports of complaints about many of the systemic problems within IDOC medical and dental care addressed by the First Expert team and NRI.

416.     The John Howard Association of Illinois ("JHA") is an independent, not-for-profit prison monitoring (or "watchdog") organization founded in 1901 and based in Chicago, Illinois. [https://www.thejha.org.] JHA regularly visits IDOC facilities and issues reports on particular prisons as well as special reports on particular issues within IDOC. In 2015, JHA received a MacArthur Award for Creative and Effective Institutions from the MacArthur Foundation.

417.     Defendants regularly receive JHA's reports prior to public distribution and have an opportunity to comment on them before publication. Defendants' email correspondence obtained in discovery circulates and comments upon many JHA reports.

418.     JHA's 2012 NRC report was forwarded to Dr. Shicker after it had gone through a review process involving the warden and others. [P147 at 0277733-70.] In July 2013, a JHA staff member forwarded the draft of JHA's Dixon CC report to Dixon's warden, Nedra Chandler, stating *inter alia*, "We want the report we publish to be as fair, accurate, and helpful as possible, so your input is invaluable." [P157 p. 2.] The draft was then forwarded to IDOC higher-ups including the

132

Chief of Program and Support Services, who in turn forwarded it to then-agency Medical Director Dr. Shicker. [*Id.* p. 1.]

419.    From 2013 to 2015, emails show that Dr. Shicker received JHA's reports on NRC, Vandalia CC, Pontiac CC, Big Muddy River CC, Graham CC, Stateville, Dixon CC (2013), Graham CC, Logan CC (2014), and NRC and Pontiac CC (2015). [P147; P157.]

420.    Similarly, in February 2017, Chief of Programs Kim Butler forwarded the two parts, in draft, of a JHA omnibus 2016 report to different groups of IDOC higher-ups including Dr. Meeks and Director Baldwin, noting that there was an "opportunity for rebuttal" prior to its publication and reflecting comments she and another had made upon it. [P155 at 0098770; P156 at 0098798.]

421.    The 2012 JHA NRC report (received in draft by Dr. Shicker in February of 2013), highlighted two of the systemic issues later focused on by the Shansky team on its first page, namely staff shortages and intake medical record problems:

> Chronically low healthcare staffing frustrates NRC's ability to provide adequate care, let alone doing so while conducting thorough intake assessments.

> NRC must rely upon inmates self-reporting their mental health and medical conditions because the state lacks a reliable system to pass information between county jails, mental health facilities, and the prison system. . . .

[P146 p. 1.]

422.    As to healthcare staffing at NRC, the 2013 JHA report stated:

> Administrators stated that at the time of the visit, staffing shortages prevented them from conducting separate nurse and Correctional Medical Technician (CMT) sick calls. Stateville and NRC had been in crisis mode for nursing (where staff are pulled from other institutions and nurse pay is elevated to two and a half times normal salary) and nurses had been commonly mandated to work significant overtime.

[*Id.* p.8.]

423.    A footnote added detail about leaves of absences and the Medical Director vacancy:

At the time of the visit, approximately one-fourth of the state healthcare workers at NRC and Stateville were on leave. In addition, NRC had only one of two authorized Wexford physician positions filled for 40 hours a week of coverage. Although authorized for 104 hours of Wexford physician assistant services, NRC had only 80 hours covered [ ] In addition, NRC has 12 hours a week of Wexford dental hygienist coverage and 60 hours a week of Wexford dental assistant coverage (the state dental assistant was on a leave of absence). NRC had been without a Wexford medical director for over a year. Hence, the Wexford regional medical director must facilitate outside consultations. JHA heard reports of inmates waiting months to be seen by outside specialists at the University of Illinois.

[*Id.* p. 8, n. 19.]

424.    As to medical records, the 2013 JHA NRC report noted that transferability of records was essential to prison healthcare, and commented upon IDOC's initiative to implement an electronic medical record:

Best correctional practice calls for continuity of care, including with respect to medication, upon entry into the correctional system, during confinement and transportation, during and after transfer between facilities, and upon release. . .

Despite these standards, inmates' medical and mental health information and medications are rarely provided to NRC from the county jails, and as a result, NRC still primarily relies on selfreporting from the inmates. As JHA noted *in our 2011 NRC report*, the reliance on selfreporting "is a wholly unreliable means to ensure that inmates receive continuity of care and uninterrupted medication and treatment. A minimum standard of care dictates that records and data of inmates' diagnoses, treatment, treatment history and recommendations, and medications should accompany inmates when they arrive at NRC from the county jails and when they leave NRC to go to their destination facilities."

To move away from reliance on self-reporting, JHA continues to recommend that Illinois improve medical records and data collection and sharing to allow greater continuity of care between county and state correctional facilities, and promote the implementation of data-based correctional healthcare policies and planning." JHA is pleased that IDOC appears to be beginning to address this issue. Staff reported to JHA that NRC will be a pilot location to test electronic mental health records. . .

[*Id.* p. 6.]

425.    JHA's Vandalia CC report, also received by Dr. Shicker in 2013, noted "numerous complaints about healthcare treatment and access," and recommended "prioritizing nursing staff hiring at Vandalia." [P153 p. 3.]

426.    The 2013 Vandalia report, like the NRC report, comments upon both staff deficiencies generally and vacancies in healthcare leadership position. According to the report, the Vandalia Director of Nursing position was vacant, and "[r]eportedly, nurse-staffing levels at Vandalia have not been readdressed since the facility was slated for closure and many nurses left in 2004." [P153 pp. 3, 10.]

427.    In dental care at Vandalia, JHA reported that there was "a wait time of two and a half months for extractions, 18 months for fillings, and three months for dentures." [*Id.* p. 11.]

428.    The 2013 JHA Pontiac report received by Dr. Shicker also noted physician vacancies and vacancies in other healthcare staff as well as on dental backlogs, and the likelihood that these were connected to complaints about healthcare access:

> . . . At the time of the visit, Pontiac had only one of the two Wexford authorized physician positions filled for 48 instead of 80 hours per week. This was the same as noted in our 2012 report.
>
> There were 15 of 22 authorized nurse positions filled, leaving the facility with minimum staffing of four nurses for first shift, three for second shift, and only one on the night shift for over 1,900 inmates. There were six of 11 authorized correctional medical technician (CMT) positions filled. Healthcare staff commented that in addition to the challenges of understaffing, they also lack the ability to physically expand the infirmary, which is quite small for accommodating the needs of Pontiac's population.
>
> Pontiac reported 88 hours of dentist coverage per week, an increase from our prior visit; yet at the time of the visit, fillings were backlogged from August 2012.

[P152 p. 13.]

****

135

JHA heard many complaints from inmates regarding medical and mental health care at Pontiac. Inmates commonly reported that sick call requests were not responded to, and that inmates needed to submit multiple requests over several weeks before seeing a nurse. Inmates also complained about medical appointments frequently being canceled. One inmate reported that he is prescribed a medication that is to be taken with food, but he has nothing to eat and had been trying for several months to get this resolved. JHA cannot confirm nor deny the validity of these inmates' reports. However, lapses in care are consistent with medical staff shortages, like those experienced at Pontiac and throughout IDOC.

[*Id.* p. 15]

429.    The 2013 JHA Big Muddy River CC report received by Dr. Shicker observed that

"Dental and eye care backlogs persist at the facility." Specifically:

Administrators reported that additional healthcare staff would be beneficial in order to reduce the backlogs of dental and eye care. Big Muddy had three operational dental chairs, up from two at the time of JHA's 2011 visit. At that time, the facility had substantial backlogs for dental treatment, including 16-weeks for extractions, a year-and-a-half for fillings, and two-years for dentures. Administrators at the most recent visit reported this backlog continues, as Big Muddy continues to receive inmates with poor dental health, and there is no funding for additional dental coverage. . . . In 2011, Big Muddy also had a large backlog of 361 inmates waiting eight to nine months for eye care. During the 2013 visit, administrators reported that there is still a backlog due to the large number of inmates that require such services, with 293 inmates on the waitlist. Facility administrators reported the limited optometrist hours at Big Muddy preclude reduction of the backlog.

430.    The JHA 2013 Graham CC report received by Dr. Shicker commented on

medication issues specific to Graham's status as an intake center as well as general medical records

and healthcare staffing issues relevant the prison as a whole:

. . . JHA received several complaints that inmates were taken off particular medications at intake. IDOC officials responded that such decisions are made solely for medical purposes . . .

JHA received several complaints from inmates about inability to receive particular medications at Graham. Some inmates reported they were told they were being "weaned off" other medications that they had taken successfully, while others reported they were more quickly cut off. . . . JHA is concerned about such complaints and believes this is an area where outside oversight would be helpful to

determine whether medication choices are consistent with both inmate wellbeing and cost containment.

[P154 p. 18.]

****

JHA continues to recommend that IDOC improve medical records, as well as data collection and sharing, to allow greater continuity of care between county and state correctional facilities, and also importantly to promote the implementation of data-based correctional healthcare policies and planning.

[*Id.* pp. 4-5]

****

At the time of the visit in May 2013, administrators reported that critical vacancies included the Director of Nursing (DON), a Psych Administrator, and Health Information Technician. The DON position is particularly important at Graham because of the dialysis unit and the facility's need for oversight of continuity of care with intake through the R&C.

[*Id.* p. 16.]

431.    The JHA 2013 Stateville CC report received by Dr. Shicker commented not just on staffing shortages but also on the need for "corrected staffing" and for system oversight. [P151 p. 4.] It also notes shortages of "basic supplies" as well as continued and medical record problems, and comments on the same problem of overlapping staff for NRC and Stateville that attracted the attention of both the Shansky and Puisis teams. The electronic medical record initiative which JHA had praised is noted to be stalled:

Inmates' healthcare needs overwhelm Stateville where high demand is continually aggravated by insufficient resources, including key staffing vacancies.

[*Id.* p. 1.]

…Stateville has immediate needs. At the time of the visit, Stateville staff reported difficulty obtaining basic supplies, while inmates file more medical grievances than any other category.

****

137

. . . IDOC remains reliant on paper medical records, which makes transmissions of information between facilities and with outside care more difficult.

JHA and IDOC agree that implementing an electronic medical record system is vitally important. However, although the program was intended to be implemented system-wide by now, there are continued delays. . .

[*Id.* p. 3.]

## Recommendations

****

• JHA continues to recommend oversight for the IDOC healthcare system and corrected staffing levels.

• JHA continues to recommend that IDOC improve sharing of medical records to allow greater continuity of care; this is particularly important to facilitate efficient and timely outside specialist care.

[*Id.* p. 4.]

****

At the time of the visit, administrators reported that critical healthcare vacancies included a physician and a dentist, as well as 25 nursing positions and four Correctional Medical Technician (CMT) positions shared with NRC. [ft 20 - At the time of the visit, although authorized for four physicians and four physician assistants, Stateville had just two physicians and three physician assistants. NRC also lacked a medical director and physician assistant, while the NRC Director of Nursing (DON) and nurse supervisors were on leaves of absence…] … Nursing shortages, as observed throughout IDOC's correctional healthcare system, are linked to greater stress and burnout for staff, and increased safety risks and medical errors for patients. *Administrators reported it would be helpful for them to have separate Stateville max and NRC medical staff*, but ideally total staffing would be increased to 72 nursing positions with additional certified nursing assistants for the infirmaries.

[*Id.* pp. 6-7; emphasis added.]

432.    The 2013 Stateville report also reported staff concerns about Wexford restrictions on medications and supplies due to cost, as well as criticisms of the utilization management system:

. . . Staff expressed to JHA that they believe fear of litigation causes many things to go undocumented. They reported that they are discouraged by Wexford administrators from ordering certain medications and supplies due to cost. IDOC officials stated that IDOC staff and supervisory personnel do not discourage the ordering or administering of any necessary medication. Staff reported that basic items such as gloves are rationed, so they will work with just one. IDOC officials deny gloves are rationed. In many cases, staff reported to JHA that they feel that contractor Wexford does not support a physician's or other provider's medical judgments. IDOC officials responded that all decisions are supported within the parameters of a correctional setting, and that whatever is necessary and physically possible is done. JHA will continue to monitor and report on these issues.

At the time of the visit, administrators reported that needed medical equipment and supplies included: (1) record keeping items — computers, a fax machine, a paperless chart system,medical charts, shelving for medical records; (2) necessary infirmary items — hospital beds, mattresses, wheelchairs,23 a blood pressure machine, a portable pulse oxygen meter, IV poles, weight scales, shower chairs; and (3) dental and optometry equipment — a slit lamp, four dental chairs, four lights, four units, two sterilizers, a x-ray developer, a high evacuation system, and an ultrasonic cleaner. . . .

[*Id.* p. 8.] In addition, the 2013 Stateville report documented complaints from prisoners as to access to sick call, medication interruptions, lack of physicians, delayed or cancelled outside appointments, and lockdowns which foreclosed access to healthcare services:

Although Stateville reported 13,352 sick call visits for 2012, some inmates reported that they had not seen healthcare staff because sick call requests were ignored, with reports of no response in more than two months. IDOC officials denied that sick calls are ignored . . . They acknowledged that delays may occur, but stated that emergent cases never wait.

JHA received several complaints from inmates who had transferred into Stateville from other facilities without being reevaluated or getting medications and prescriptions continued. Administrators confirmed that this does at times accidentally occur, which points again to the need for better a better recordkeeping mechanism. Inmates also reported that they are not allowed to submit refill and medical permit requests early enough to ensure continuous treatment at Stateville. IDOC officials explained that often patients must be reevaluated before their prescriptions can be refilled and inmates do not want to wait for this normal procedure. IDOC officials also stated that there are documented cases of inmates claiming to have not been seen who actually were seen. IDOC officials further wished to note that JHA cannot confirm or deny the validity of particular inmates' reports. JHA will continue to monitor such issues and encourages inmates to clearly document their concerns.

139

Inmates reported that physicians are frequently not at the facility and appointments are cancelled. IDOC officials reported that since the visit, daily nurse sick call is now held in the housing units, which should eliminate waits and free up the physicians to see only those requiring physician attention. Outside appointments are also often canceled or delayed. In addition to scheduling issues, lockdowns also cause appointments to be canceled. Stateville had 88 days of lockdown in the prior year. JHA finds the policy of canceling all healthcare appointments due to lockdown untenable and again recommends this be reconsidered.28 In one documented example, a "one week" follow-up appointment actually occurred 12 weeks later and a pending specialist appointment had not occurred in more than four months. Several inmates reported never receiving follow-up appointments with both in-facility staff and specialists. JHA believes that this is also an area where electronic recordkeeping would be helpful.

At the time of the visit, due to the lack of a physician, there was a backlog for the chronic care clinics other than Hepatitis C and HIV clinics, which are provided through Telemed. . .

[*Id.* pp. 8-10.]

433.     Finally, the 2013 JHA Dixon CC report received by Dr. Shicker comments on a broad range of issues later addressed in the First Expert and Second Expert Reports, including the needs of IDOC's geriatric population; medical records; the need for data collection, auditing, and quality assurance analysis; deficiencies in supplies; and delays in dental care, optometry appointments, outside tests and appointments at UIC; and a need for skilled nursing care:

The facility had critical vacancies at the time of the visit including healthcare administrators . . . [P150 p. 1.]

**** 

The increased population and need at Dixon foreshadows a mounting crisis in correctional healthcare. In Illinois and across the country, inmates over 50 represent the fastest growing segment of prisoners. . . About 30 percent of the Dixon population are age 50 or older. [*Id.* p. 2.]

**** 

While Dixon serves as a repository for elderly inmates in IDOC, it is not alone in this responsibility. JHA has observed older inmates throughout the system in

facilities ill-equipped for their care. . . . As it stands, Illinois is ill-prepared to meet this challenge. [*Id.* p. 3.]

… JHA and the experienced correctional leadership at Dixon are in agreement that IDOC also needs to quickly implement electronic medical records . . . [*Id.*]

**\*\*\*\***

JHA also reiterates our recommendation that Illinois implement a permanent, reliable, centralized system for data collection, auditing, and analysis of inmate healthcare services to assist policy makers, legislators and IDOC administrators in the current and future management of correctional healthcare, particularly with special populations such as elderly inmates and inmates with mental illness. [*Id.* p. 5.]

**\*\*\*\***

. . . [A]dministrators reported that expansion of the infirmary for housing inmates requiring skilled nursing would be helpful. [*Id.* p. 6.]

**\*\*\*\***

Administrators also noted equipment needs included new IV pumps, new hospital beds, updated software for pharmacy, computer equipment and electronic medical record software, a new x-ray machine, and dental autoclave. During the 2011 visit, staff noted need for additional costly dental equipment. While urgent dental issues are addressed immediately, there is roughly a 12-week wait period for other dental treatment. Dixon is unable to provide inmates with dental cleanings because the facility does not have sufficient staffing, space, or equipment. With only eight hours of optometrist coverage a week, Dixon also struggles to meet its population's eye care needs, with a current wait time estimate of eight weeks.23 Administrators also reported some delays in chronic clinic care based on lack of physician coverage. There were six week delays for ultrasounds and eight weeks for MRIs and CAT or PET scans. [*Id.* p. 7.]

**\*\*\*\***

Staff and administrators indicated that timely access to medical specialists outside the facility, mostly at the University of Illinois, Chicago (UIC), can be challenging. Most specialty referrals are seen within eight weeks, but Urology and Neurology sometimes take more than 16 weeks. [*Id.* p. 8.]

. . . Dixon healthcare staff explained that inadequate staffing levels put an added strain on the clinical relationship between medical providers and inmates because the demand for medical services far outpaces supply. Consistent with this report, JHA received reports from inmates expressing confusion over their medical

141

conditions or treatment, reflecting a breakdown in the communication between provider and patient . .. [*Id.*]

****

. . . While we cannot verify individual complaints, the volume of reports JHA received regarding delays and lack of access to adequate healthcare are consistent with objective data showing that Dixon is understaffed and under-resourced for tremendous need.. . . [ *Id.* p. 13.]

****

A significant number of Dixon inmates reported instances where lack of timely medical treatment, particularly access to specialty medical care, resulted in medical conditions being exacerbated. In addition to complaints about wait times for specialist appointments, JHA heard reports of inmates being transferred for specialist appointments without appropriate records accompanying them. Some inmates complained of being denied treatment as they approached their release date, having trouble obtaining medical records from the facility, and not receiving appropriate linkages to services on release. Other inmates reported being denied necessary medical procedures, being taken off of medications, not receiving prescribed medications, and being offered other medication because it was cheaper. For example, one man said he had not received his diabetes medicine in the two weeks he had been in intake, while an asthmatic inmate indicated that he was chastised for using his inhaler too much and warned that he would be denied a refill. [*Id.* p. 14.]

****

JHA received several reports from Dixon inmates that the healthcare staff were not changing their gloves between patients. This is consistent with reports from Wexford staff who stated that they must ration supplies including gloves.. . . [*Id.* p. 15.]

434.    The 2013 JHA reports all repeatedly reference JHA's 2012 overview report on IDOC healthcare, titled *Unasked Questions, Unintended Consequences: Fifteen Findings and Recommendations on Illinois' Prison Healthcare System*. In this report, JHA concluded that "healthcare resources and staffing are inadequate to meet minimum standards of care throughout IDOC. In particular, systemic nursing shortages prevent inmates from timely accessing sick call and necessary healthcare services. However, lack of adequate medical staffing and resources in all areas—medical, mental health, dental, vision—threaten serious harm by delaying diagnosis and

treatment and inviting medical error. Inadequate medical staffing levels also contribute to staff burnout and turnover, which, in turn, help perpetuate chronic understaffing throughout IDOC."

435.    Further, the report criticizes the lack of oversight of the vendor and lack of audit functions:

> . . . [T]here is insufficient external oversight of IDOC healthcare services, particularly with respect to services provided under contract by the private vendor, Wexford . . . While administrators in individual IDOC facilities are charged with performing quality improvement reviews and monitoring the delivery of healthcare services, they do not have the resources to perform comprehensive quality control monitoring and financial auditing of services under the Contract. The Office of the Illinois Auditor General, the entity that typically performs such comprehensive public financial audits, does not audit the Wexford contract.

436.    In 2014, JHA issued a "Special Prison Monitoring Report" about Logan CC *titled Overcrowded, Underresourced, and Ill-Conceived: Logan Correctional Center, 2013/14*. [P149.] The minutes of a December 2014 Programs and Support Services meeting reflect that the report was discussed at this meeting and commented upon by IDOC Deputy Director of Programs Shannis Stock. [P158 p. 4.]

437.    Staffing, including in leadership positions, were noted to be ongoing problems in the JHA special Logan report. In the summary at the opening of the "Healthcare" section, the report stated that "Though healthcare staffing has improved somewhat [from JHA's November 2013 site visit], in February 2014 the facility still operated with backlogs for chronic care clinics and annual testing for women," as well as "numerous complaints about medication issues" and issues with obtaining records on intake. [P149 p. 13.] Healthcare overtime had been required, and

> . . .as of November 2013. . . key healthcare leadership positions, including the HCUA, were vacant. The facility was operating with one doctor for 2,000 women. . . .During the February 2014 visit, the facility had gained a HCUA, but still had only one doctor and considerable backlogs. . ." [*Id.* pp. 13-14.]

438.    As to dental care at Logan, the report noted that in November 2013, there was "a two-week backlog for extractions and seven weeks for fillings." [*Id.* p. 14.]

439.    In addition, there were reported problems with medication administration of the same kind reported by the Puisis team in 2018, and with outside specialty and chronic care:

> JHA was concerned by the number of women who reported having medication issues (for example, staff not crushing medications in front of women so they could be sure they were getting the right medication). Also, women did not appear to be receiving appropriate follow-up care (for example, after having outside medical specialist visits). . . Several women who suffered from seizures reported not having clinical care or needed medication adjustments . . .

[*Id.* p. 14.]

440.    In December 2014, Dr. Shicker also wrote to the executive director of JHA with comments on the Logan report, stating in conclusion: "Logan does remain a work in progress. . . . *[W]e have a way to go to where I will be satisfied.*" [IDOC UPDATE 2524-26; emphasis added.]

### P.    The 2016 Logan GIPA Report

441.    Two years after the special JHA Logan CC report, a July 2016 Gender Informed Practice Assessment (GIPA) report from the National Resource Center on Justice-Involved Women [P148] noted, yet again, staffing and access to care problems at Logan, as well as problems with records and consistency in care:

> **Staffing.** At the time of the GIPA, there had not been a full- time Medical Director or physician on staff at Logan for at least one year, and doctors from other prisons provided patchwork coverage during that period. In addition, there had never been a state Director of Nursing at the facility since the transition, and 9 state and contracted nursing positions had remained vacant. Numerous women reported that staff turnover resulted in changing diagnoses/treatment for the same conditions due to conflicting medical opinions, and several reported treatment disruptions after transition to Logan from Dwight, and potentially missing medical records.

> **Access.** Logan has a somewhat "tri-furcated" health care system with private contractors and state employees providing clinical services, and state correctional officers lacking clinical training often serving as "gatekeepers" to care. While IDOC records indicated all emergency and crisis referrals are seen the same day and routine

> medical referrals are seen within 10 days, 80% of the women surveyed expressed
> concerns about medical care and many reported slow responses to medical
> grievances. Assessors identified [ ] Slow, inconsistent follow-up treatment (after
> initial appointments), that may be attributed to low staffing/ high turnover rates
> among health care staff . . . .

[*Id.* p. 7.] Further:

> While IDOC records indicated all emergency and crisis referrals are seen the same
> day and most routine medical referrals are seen within 10 days, 80% of the women
> surveyed expressed concerns about medical care and many reported slow responses
> to medical grievances.

[*Id.* p. 109.] Director Baldwin received a copy of this report on its issuance.

442.    The report notes that, in response to its comments about staff deficiencies, as of
May 2016 Wexford reported that its 23 nurse positions at Logan were filled. [*Id.* p. 108.] This did
not last. As of June 2018, 12 of these nursing position were vacant (and one RN was on leave of
absence). [Illinois Medical Vacancy Report with ASRs, P248 p. 18.]. The Logan staff physician
position was still vacant, having never been filled.

## Q.    The 2016 Adler Report

443.    A February 2016 report of the Illinois Commission on Criminal Justice and
Sentencing Reform, titled "The Prison Letter Report," summarized the results of a survey sent to
prisoners at all of the state prisons by the Institute for Public Safety and Social Justice at Adler
University. [P428 p. 3.] The report was sent to Director Baldwin and others in IDOC. As to health
care, the survey results—as summarized in the report—were characterized by a "prevalent theme"
of "deficient health care and lack of attention to the overall well-being of prisoners":

> The primary complaint was inordinate and sometimes extreme wait times to be seen
> by the medical staff. . .[R]egardless of symptom severity, inmates are seen by a
> medical technician before they are seen by a doctor and an additional screener.
> Because of these long delays . . . only inmates in severe distress, and often those
> who are bleeding or who are at risk of infecting others through communicable
> diseases, are given priority . . . Those who are deemed to be of lower priority often
> go untreated until their condition worsens to require medical treatment.

[*Id.* p. 13.]

## XIX. INTERNAL COMPLAINTS ABOUT SYSTEMIC MEDICAL AND DENTAL PROBLEMS

444.    Defendants and their employees have complained for years among themselves and to their superiors about the problems detailed in the JHA reports, the Shansky Report, the NRI report, and the Puisis Report.

445.    Staffing and vacancies in Wexford positions, and their impact on care, have been a principal internal complaint within IDOC.

446.    In March 2014, Dr. Shicker emailed IDOC's CFO and its general counsel, *inter alia*:

> I just want to report to you that so far Wexford has made no head way in filling the following key positions:
>
> 1.  Medical Director at Dixon
> 2.  Staff Physician at Dixon
> 3.  NP at Dixon
> 4.  Medical Director at Lincoln
> 5.  NP at Logan [ ]
> 6.  Medical Director at Robinson
> 7.  Medical Director at Vienna
> 8.  Medical Director at Illinois River
> 9.  NP at Vienna
> 10. NP at E Moline
> 11. NP at Danville
>
> In addition the Medical Director at Sheridan is not working out and will need to either be terminated or changed to a staff physician AND the Medical Director at NRC will likely be terminated soon.
>
> Any advice on how we proceed with their inability to fill these vacancies—it is affecting medical care. Thank[] you.

[P167 at 0037001-2.]

447.    In April 2015, Dr. Shicker sent "[a]s requested," a memo detailing key vacancies

to the new acting Director, Donald Stolworthy, Assistant Director Jason Garnett, and the agency

Chief of Operations. The memo noted:

> Assistant Director Garnett: Below you will find the current Wexford vacancy situation of Medical Directors, DON's and some other key positions.
>
> 1.    Danville: No Medical Director since the end of last year. Their NP will be going on maternity leave this coming August. . .
> 2.    Dixon: Long term vacant Medical Director position. A candidate — Dr. Chamberlain — has accepted the position but due to current contractual obligations cannot come on board until July. They have hours covered currently by Dr. Bautista who replaced Dr. Wahl who was doing hours albeit inefficiently. They have a good NP and a poor PA. The PA will likely be terminated soon.
> 3.    East Moline: Wexford has never filled a part time PA/NP position
> 4.    IRCC: Long term Medical Director vacancy. Strong NP working there. I will be interviewing a potential candidate in a few weeks.
> 5.    Jacksonville: Medical Director resigned in February
> 6.    Logan: Medical Director states that he will resign this May. Staff physician position open as well
> 7.    Menard: Open staff physician; NP has submitted resignation. We have also had some reliability issues with their Medical Director
> 8.    Robinson: Currently the recently hired Medical Director (Dr. Adams) after a long period of vacancy splits his time between Robinson and Vienna. Dr. Osmundsen has been identified for this position but he will need an extended orientation process that will likely take place at Logan.
> 9.    SWICC: Medical Director on FMLA and we have been told that he will not return. This began approximately a month ago.
> 10.   Vandalia: Dr. Caldwell, Medical Director, will be going on medical leave in June and then return to IDOC only on a prn basis. I interviewed a candidate for this position last Wednesday and he should be able to start the orientation process soon. His name is Dr. Afuwape
> 11.   Vienna - see note on Robinson above # 8
>
> ****
>
> The DON Position at Shawnee is vacant
> Supervising Nurse position at Pontiac
>
> ****
>
> Dental Vacancies (part or fulltime):

1. Stateville
2. Graham
3. Lawrence
4. Menard
5. Shawnee

State HCUA positions vacant:
1. Dixon
2. Shawnee (recent)
3. Pontiac (coming up)
4. Western (recent)
5. Stateville (long term Medical leave which was supposed to be filled with someone else)
6. NRC — was to get their own HCUA and I do not know the status of that position
7. Taylorville
8. Illinois River

448.    In September 2015, a series of emails among IDOC personnel including Defendant Shicker complained, initially, of a staffing crisis at Hill Correctional Center. The discussion then expanded to reveal current staffing crises at almost one-half of the system's twenty-five facilities.

449.    "For the past 3 years," a Hill staff member wrote:

[Hill Medical Director] Dr. Soods vacation time has not been covered.—This vacancy creates numerous audit findings and poses a health and safety threat to our offender population. . . . Current back logs are as followed [sic]: Chronic clinic—back log of 169 offenders, Physicals as of Aug behind 49[.] MD line—as of next Monday 600 offenders are scheduled and waiting to be seen from NSC, chronic clinics, physicals, Seg visits, and follow ups. Dr. Sood offered to work over time at time and half. However Wexford has refused to pay him.

[P16 at 001034.]

450.    "What is the remedy here," wrote IDOC Deputy Director David J. Gomez, "because this backlog is unacceptable. . . . [W]hat does this say about the service/care that is not being provided to the offender population?" [*Id.*]

451.    As the correspondence continued, on September 16, 2015, Defendant Shicker wrote: "Back logs are occurring at sites that do not have their providers. These include:

148

> Dixon
> Hill
> IRCC [Illinois River Correctional Center]
> Jacksonville (getting better)
> Logan
> Menard
> PNK [Pinckneyville] (they are staffed but having some difficulties)
> Taylorville
> Vienna
>
> Backlogs change all the time but to my knowledge these sites are having the most
> problems. I will be at Stateville/NRC tomorrow and see how they are doing.
>
> Decatur—unacceptable dental
> BMR—unacceptable dental
> Western—getting bad.

[*Id.* at 1050.]

452.     In January 2017, new Chief of Health Services Dr. Meeks wrote to Wexford, of

Sheridan CC:

> Please see the attached caseload.
> Total 777 (84 are follow up appointments)
> Of that:
> There are
> -19 diabetics not seen within the required month
> -66 Hep C not seen within the required month
> -2 hypertension not seen within the required month
> 269 are patients on the doc line that are waiting more than 72 hours.
> There has been no doctor visits in seg since Dr. James left.
> How are you going to address this?

[P224 at 218301.]

453.     In May 2017, Dr. Dempsey wrote Charlie Weikel in the Governor's office

forwarding a copy of a "Weekly report" from East Moline CC which showed dental and optometry

backlogs, a nurse practitioner position vacant since October 2016, three vacant LPN positions

(among other problems—"Ceilings continue to leak in MD's office, dental exam room and

Director of Nursings' office. New Ceiling leaks in medical records room, outside sick call room").

149

"FYI," wrote Dempsey. "As you can see Wexford does not have the capacity to fully staff IDOC. This is only one report. There are 26 weekly reports just like this." [P477.]

454. Employees at individual facilities describe problems resulting from staffing and vacancies ranging from inability to complete clinics and sick call, backlogs of referrals, and general frustration.

455. In August 2015, the HCUA at Jacksonville CC wrote to Dr. Shicker describing ongoing problems with chronic clinics and sick call due to lack of a doctor. [P435.]

456. In January 2017, Dixon CC was facing a backlog of over 400 optometry requests and over 150 RN or MD referrals. "[G]rievances are piling up . . .," wrote the HCUA. [P508.]

457. Also in January 2017, Dr. Meeks and others received the following report from the Assistant Warden of Programs at Menard CC:

> As you are all aware nursing staff at Menard is critically low. . . . I have met with most of the staff, most recently the 11-7 nurses, who expressed frustration and concern not only about the amount of mandatory overtime they are being forced to work, but also about the quality of care . . . [T]hey have voiced concern over their physical ability to continually work sequential double shifts up to five times per week. . . Particularly on the back shifts, we barely have the staff to pass meds/insulins, much less attend to the infirmary which houses an average of 18 offenders or respond to emergencies. **Should more than one offender or staff member require immediate medical attention on a back shift, it is very likely we would not have the staff to respond. . .**

[P102 at 0096016; emphasis added.]

458. In March 2017, UIC physician Chan wrote to Dr. Meeks and others, "It seems like no labs or orders had been done as requested lately. What can we do from a UIC perspective to get Menard patients the care they need?" [P452] The subsequent email chain among IDOC employees reflected an intertwined set of problems including "low morale" among the healthcare staff, staff coverage problems, and a depressed chronic clinic nurse. [*Id.*]

459.    In May 2017, OHS declared Pontiac "one of three sites in the state that has critical healthcare needs" in response to a plea from northern region coordinator Ssenfuma to agency Medical Director Dr. Meeks that "I am very concerned that Pontiac CC is close to being in a crisis mode . . . We cannot afford to wait too long for these vital positions to be filled especially, looking at the major law suits the department is dealing with, both medical and mental health." [P505.]

460.    Defendants' employees complained about the condition of the Wexford-maintained medical records: In June 2014, regional coordinator Marna Ross wrote to Wexford's Doug Mote, "I need to talk to you about the deplorable condition of NRC medical records that I worked with today. . ." [P450.]

461.    The agency Medical Director complained about data collection and accuracy: Dr. Meeks, March 2017: "I am reviewing the Chronic Clinic Control data that was submitted for the RFP. The data that I am reviewing looks at whether we have good, fair or poor control in our HTN, asthma, DM and seizure clinics. I am finding that this data in many cases is not accurate, i.e., that numbers don't add up to the totals listed or the percentages do not equal 100% . . ." [P448.]

462.    ███████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████████

463.    Defendants' employees complained about the impact of lockdowns on medical services: In March 2017, at Menard, the regional coordinator (Lisa Prather) was not even sure

what was happening "I have been given conflicting information about the last lockdown and offender movement. One employee at my CQI meeting [said] 'we were not able to see the offenders when they were on lockdown for 1-2 weeks.' . . . Chief Butler did implement the change of medical seeing them after 48 hours. Are they following her rule is difficult to know." [P456.]

464.    In October 2017, the HCUA for Decatur wrote the acting central region coordinator Lisa Johnson and agency medical coordinator Kim Hugo, among others:

> I am allocated for 10 state RN's. At one point, we were allocated for 12 RN's, it is unclear when that allocation was decreased. I believe it was around the time the allocation for the DON [director of nursing] disappeared.
>
> I currently have 7 RN's on payroll. Right now, 3 are on LOA. . . . Thus leaving only 4 RN's to cover at this time.
>
> . . . [T]he nurses are [] covering the doctor call line, med lines and infirmary, plus walk-ins, treatments, codes, sick call, telepsych, intakes, etc. Unsafe staffing reports are written by the nurses when they work alone . . .. I have also run into instances when I only have 1 nurse to cover day shift, on those days, the MD will do administrative work as I cannot make the RN cover med line, infirmary and attempt to run a MD call line.

"Everyone is dealing with increased stress and anxiety with the way things have been going for this facility . . .," she concluded. [P486.]

465.    Defendants' employees complained about the infirmary and infection control at NRC: Months before the Puisis team's January/February 2018 site visit to NRC, when they found that there were "multiple deficiencies concerning sanitation and infection control in the infirmary," including that the negative pressure monitor for the two negative pressure rooms was not working, and in one room the vent was taped shut, "disabling the negative pressure capability of that room," in June 2017, northern region coordinator Ssenfuma had reported to the assistant warden that "[we] tested your infirmary negative pressure rooms . . . both rooms do not have negative pressure.

Unfortunately, it has been reported by HCU staff on their weekly checks that these rooms are complaint with the requirement. Please address . ." [Puisis NRC pp. 15, 57-58; P506.]

466.    Defendants' employees complained about the timeliness of UIC appointments: In June 2015, Dixon CC HCUA wrote Dr. Shicker re: "timeliness of UIC appointments" (marked "High" importance):

> I have spent the last two days going through grievances from offenders and the resounding theme is delay in care or indifference. Most of it stems from the inability to get to a specialist once it has been approved. Just late last week Cathy (our Staff Assistant who manages our furloughs) sent to Barb (the UIC scheduler) all of the rest of February and March approvals to secure appointments. The current method that Wexford uses is ineffective. They have not secured appointments for these approved referrals yet, until Barb and Cathy were on the phone and Barb said to send them to her.

> Wexford's method is to communicate with the UIC scheduler without the sites being a part of it. Oftentimes, I am being told, they have incomplete information since the site is not on the phone conference, thus causing more of a delay.

> The process from when a NON medical director makes a referral is:

> NP/PA or Dr. Dominguez makes a referral. Sometimes it may take 1-3 weeks for an appointment to get to medical director to determine if appropriate for collegial (due to provider coverage.) After that it is usually another week until collegial. And then we wait....

> It seems preposterous that it was Barb and Cathy working together that FINALLY got appointments for the rest of the referrals dated from FEBRUARY and then at that time Barb said to send her March too. That is about 4 months JUST to secure an appointment. And then we wait for the anticipated appointment.

> ALL OF THIS IS A SYSTEM FAIL and leaves us in a lurch with a site that already has a lot of problems that I am attempting to clean up, but this is ridiculous.

> Please find out how we can fix this. They should have EIGHT weeks for an appointment, and I am willing to go so far as to say even 10, but MONTHS is unacceptable and is the reason I am buried with grievances.

[P228 at 001020.]

467.    Dr. Shicker's response was:

We have been through this over and over.

They must use local providers when there are significant delays (greater than 8 weeks).

Reserve the UIC for the truly tertiary or where care has already been established. Specialized imaging (CT, MRI, etc) should be done locally if they are taking up spots on the schedule.

[*Id.* at 1021.]

468.   Defendants' employees complained about Wexford utilization management decisions: In July 2015, a nursing supervisor at Menard CC complained to Dr. Shicker about a Wexford utilization management denial for surgery for a patient who had a staph infection and "multiple draining areas on his right & left butt cheek as well as his coccyx . . . for several months": "THIS OFFENDER NEEDS SURGICAL INTERVENTION," she wrote. "Please help he needs to be seen ASAP . . ." [P490.]

469.   In January 2016, the HCUA at Hill CC complained to Dr. Shicker about a Wexford utilization management denial for a prisoner who needed a prosthetic foot repair: "*This offender's prosthetic foot is held together with tape*. He needs a new foot." [P476; emphasis added.]

470.   Defendants' employees complained about the condition of the infirmaries: In June 2016, Mike Atchison, IDOC Chief (Deputy Director) of Operations, reported the following about his visit to the health care unit at Western Illinois CC:

Yesterday at approximately 4pm, while touring the Western Illinois HCU with Chief Bowen, I overheard a nurse report to AWP Ervin that the infirmary rooms, especially the large multi -bed room, was very hot and lacked ventilation. . . .AWP Ervin explained the chiller for the building was not working and hasn't for some time. I then had her open the door to the room, which housed three convalescent offenders, and I entered. The conditions were appalling. The stench of human excrement or other unsanitary conditions was overwhelming and the room was stifling. I saw no fans inside the room, neither small personal nor larger state. The room was in a state of obvious disarray. The offenders were transferred [to] Illinois River today . . . It appeared to simply be neglect.

[P238.]

471.     Defendants received complaints about medication and testing problems: In August 2016, northern region coordinator Ssenfuma reviewed a portion of a medical file for a Pontiac prisoner and noted, among many other deficiencies, that in May 2016, although the patient had been enrolled in both the Asthma and the HTN [hypertension] clinics, "in May 2016 [he] ran out of all chronic medications for Asthma and HTN . . ." [P509.]

472.     In October 2016, one of the UIC physicians involved with treatment for IDOC prisoners wrote the acting agency Medical Director Dr. Dempsey:

> Good Morning,
>
> Just wanted to alert you to a couple of issues at Pontiac. We had an inmate that was hospitalized for PJP recently that was originally supposed to follow- up in June 2016. The nurse reported that he somehow slipped through the cracks... This gentleman was supposed to be initiated on antiretroviral therapy in June. If this had happened, his hospitalization would have been completely preventable.
>
> Also, this facility has been notorious for not having appropriate follow- up labs drawn prior to our clinic visits (per our protocol).
>
> Additionally, we asked for a couple of genotypes to be drawn to initiate therapy and they were never drawn. We constantly bring it to their attention and they state that they are " working" on it but this has been going on for some time.
>
> Hope your last day is going smoothly otherwise!
> Melissa
>
> Melissa Badowski, PharmD, BCPS, AAHIVP
> Clinical Associate Professor, Section of Infectious Diseases Pharmacotherapy HIV- IDOC Telemedicine
> Clinical Specialist University of Illinois at Chicago, College of Pharmacy

[P237.]

473.     In July 2017, an NRC employee wrote to northern region coordinator Ssenfuma: "Here are the errors found in cart H-M. The nurses are not cleaning/organizing their carts and have not been for some time. I was asked to (c & o) a cart because a lot of the guys didn't have meds. I

asked for a list and did not receive one. . . " Ssenfuma in turn wrote to Mary Ellen Grennan at NRC, cc'ing Dr. Meeks and numerous others: "Ms. Grennan, You and the nursing supervisors are already aware of this on-going problem. It has come up so many times in the monthly CQI meetings . . . All we do is talk about issues in the CQI meetings and nothing is being done to correct identified problems. We are dealing with class action lawsuits . . . I need a corrective action plan by COB today." [P485.]

474.    The minutes of a September 2017 CQI meeting at NRC report:

**PHARMACY MAR SAMPLE AUDIT DISCUSSION**

Doses documented as an issue. Everyone agrees on passing meds not being documented.

****

**MEDICATION ERRORS**

Nurses are responsible for accuracy. No excuses. Highlight or **X** the stop date! It's gotten better but still bad. . . .

[P472 pp. 2-3.]

475.    Defendants' employees noted weaknesses in infection control processes: In July 2017, northern region coordinator Ssenfuma wrote to the Wexford DON at Danville: "HI Tammy, Thanks for sending me the MRSA log. . . . Upon review of your MRSA log, it is very obvious that there are serious documentation issues at your site. . . .There is no way you can convince any public health official by just looking at this MRSA Report that you have an infection control system in place . . . because this is very terrible documentation." [P507.]

476.    Defendants complained to Wexford about backlogs and staffing in dental care: In May 2015, Dr. Shicker wrote Wexford:

We have an unacceptable dental situation at a few sites—Shawnee and BMR come to mind. Poor staffing, very long delays. Either you provide the hours or arrange for

156

off-site care. Offenders who have had teeth pulled in the fall are still not getting their dentures for example. Waits for fillings and extractions are simply intolerable."

[P229.]

477.    Defendants received internal complaints about dental care: In a February 2017 email chain that made its way to Dr. Meeks, a dentist (Dr. Mitchell) reported of another, Wexford-employed dentist at NRC:

> I saw Mr. [redacted] in the dental clinic today as an emergency patient. He was complaining of pain on the upper left that was preventing him from eating the last couple of days. An exam and (6) x- rays were taken on Mr. [redacted]. The clinical exam revealed 14 cavities, one tooth that needed to be extracted and two small medicated fill. On 12/ 9/ 2016 Dr. Gamble documented that he had placed medicated fillings in tooth # 14 and 15. The x-rays revealed very large carious lesions under the medicated fill # 15 and a medium size cavity under the medicated fill on # 14. The medicated fills were placed on top of the decay with no evidence that the dentist attempted to remove the decay. The patient advised that he did not even give him an injection to anesthetize him during the ten minute appointment. Today I had to extract tooth # 15. I can't say if the tooth could have been saved but Dr. Gambl[e's] failure to remove the decay did not help the situation. In most cases if the tooth is left open the spread of decay is not as rapid. Dr. Gamble's dental care was equivalent to deliberate indifference, malpractice, and a total disregard for reasonable patient care. Dr. Gamble's dental chart was not documented with any of the cavies I identified during my exam. The cavities were obvious to the naked eye. The tooth that needed to be extracted # 2 has obvious apical abscesses on the x- ray. I have made a recommendation to you regarding a check and balance system to assist this dentist in performing dental services, on the patients at the NRC in a reasonable and acceptable manner. This reckless disregard for basic dental standards needs to be addressed. Dr. Mitchell

[P235.]

478.    Defendants' employees acknowledged weaknesses in their ability to perform CQI: July 2014, regional coordinator Cindy Hobrock wrote personnel at NCCHC:

> As you know we are not good with our studies in the different areas that are required. Could you give me some examples of process and outcomes in the following areas?
>
> I do realize that we need to look at each facility and discuss our problem areas and work towards correct[ing] our problems. Thanks in advance for your help.
>
> Quality Improvement Studies. . . .

157

[P244 at 107875-6.]

479.   Many internal complaints from Defendants and/or their employees touch on multiple problems in medical and dental care—lockdowns, lapses in care, failures in documentation, delays in appointments, and other issues.

480.   In 2014, Dr. Shicker complained of delays of appointments, "horrible" documentation, and delays of care due to lockdown at Stateville. [P470.]

481.   In summer 2016, the Hill CC HCUA complained to her regional coordinator about errors in medication and Wexford staff spending time on paperwork rather than healthcare:

> Hi Cindy and Tina,
> . . . As you witnessed yesterday during COI, Dr. Sood admitted that he was advised the night of occurrence that nurse Rhonda had given a diabetic 2 injections of Glucagon. Dr. Sood as the norm did not share this information with Ruth nor did he direct the nurse to submit a medication error reporting form. On a consistent/ daily basis Dr. Sood and Wexford regional managers has directed the entire HCU staff not to inform the HCUA of problems, mistakes, offenders taking a turn for the worst, etc. I literally will make rounds and the infirmary nurses will not share a word with me.. . .
> …Ruth is nice, but she spent the majority of her time dealing with DR. Soods paychecks (according to him they were never correct) and his paper work- she did his death summary reports, his legal and Grievance responses, any and all reports. Ruth than spent the rest of her time dealing with Wexford corporate work.
> She was never afforded the time to be a DON.

[P239.]

482.   In November 2016, the Lawrence CC assistant warden of programs wrote to Wexford, cc'ing Dr. Dempsey (who passed it along to Dr. Meeks), about a host of HCU problems, including:

> We have very serious concerns regarding the medical care given to offender [x] who passed June 26, 2016. It would appear that little to no care was given, the documentation from the nursing medical staff is abhorrent, and this has been reviewed by OHS. My concern is that if it is this poor with one patient, what is it like with the others.

> There is no DON. This site is too large to go without a manager. . .

> We have no medical director. This is a problem regardless of the site.

[P474.]

483.    In January 2017, a staff member in the Menard Warden's office wrote to Dr. Meeks

about Wexford's failure to provide physician hours according to the contract schedule and a

doctor's refusal to perform certain duties:

> It has just come to my attention that Wexford is regularly fulfilling MD hours on
> weekends and evenings despite the Schedule E depicting two FT positions working
> 8a -4p M - F. This is creating State nurse overtime since they have to be with the
> MD's as they hold call lines. Additionally, call lines can only be run up until a
> specific time in the afternoon, following which workers return to their cellhouses
> and line movement stops. After this point, it is necessary for the MD's to perform
> other duties. However, Dr. Caldwell has given direction to the Wexford Staff
> Assistant that he will not perform jacket reviews, write permit renewals, and he will
> not perform initial physician exams. This leaves many hours that are not productive
> . . .

> My question is can we reject the monthly schedule provided by Wexford as it does
> not meet the tenets of the contract? . . .Your input and direction is appreciated.

A week later, regional coordinator Lisa Prather asked Dr. Meeks: "Not sure if you had the chance

to review the below?" The response: "Not yet? on the pile?" [P232.]

484.    At the end of March 2017, the Hill CC HCUA reported the following in an

"Executive Dashboard Status Report":

> No NP since 6/30/15- back log for physicals and MD sick call (f/u visits, NSC
> referrals, furloughs) . . .
> 1 vacant RN position on Eve and 1 RN on nights
> 1 LPN position vacant -eve shift and another LPN on MLOA
> State staff assoc position vacant- HCUA performing Staff assoc and DON duties
> Radiology tech position vacant
> PT and PTA positions not filled since contract renewal
> DON vacant. Site manager requested since Aug 2016 so that a DON would be able
> to perform DON duties.
> **Vacancies in key areas –unsafe**

159

[P234 at 0095936; emphasis added.] There were backlogs in chronic clinics as well as physicals and MD sick call; dental and infirmary needed new sinks, and the infirmary needed an alarm system. [*Id.* at 0095935-36.]

485.    The minutes of an Office of Health Services teleconference in late January 2017 show southern region healthcare staff reporting the following problems to Dr. Meeks and others:

**Big Muddy, - AW Harrington and Debbie Isaacs HCUA**

Debbie Isaacs: The hospital reports we get from Wexford are not giving us updates. Inmate is being discharged without communication.

Lisa Prather — this in in reference to the report that comes from Wexford, Dr. Meeks has been made aware of the inconsistency of this report, and reliability is lacking.
…
Lisa Prather — One of the largest issues is to plan for discharge in advance, it is truly lacking. Offenders are coming back with needs and we need to have the supplies available for their aftercare. Sometimes they come back without any notice.

Debbie Isaacs — Wexford's DON their availability to do State responsibility (i.e. assisting staff and auditing for their unit). It seems that they do not get the time because the Wexford administration is assigning them their duties. They are responsible for payroll which takes all day, and then they have to spend a half a day doing orders, as well as other issues. It's putting too much work on the HCU Administrators doing Welford's duties.

Dr. Meeks. This was discussed at our last meeting . . .

Debbie Isaacs — Lack of accountability of nursing staff, I have a lot of errors and there is no accountability for lack of performance.

AW Harrington - The beds in our institution are not acceptable. We put in ASR and we were denied by Wexford without any explanation. Offenders/ patients are getting bed sores because we don't have bedding supplies.
. . .
**Centralia — Lisa Krebs and AWP S. Waggoner**

Lisa Krebs — Would like communication to be better with the healthcare unit administrator when offender is being transferred. We have same issues that everyone else if having.

Dr. Meeks — In our last meeting we spoke on this, and we will put together a protocol that is needed . . .

**Lawrence — AW D. Burkhart & Lorie Cunningham**

Lisa Krebs — We continue to have staff vacancies, no medical director and hours are being filled with bizarre times. We have no PA or MP; . . . Optometrist was injured and is out for 2 more months. Lack of these positions be[ing] filled is causing significant issues.

Dr. Meeks — We will take this issue to Wexford. . .

Lisa Krebs - Next issue is staff accountability, our concerns mirror what AW Harrington discussed. . . The staff accountability is problem because the DON is being pulled to different areas. There need to be more training done. There is poor documentation and poor nursing practices. These issues have not been adequately addressed by Wexford, despite our efforts to resolve this ongoing issue. . . .

AW Burkhart — Touched on the staff vacancies, Wexford is not scheduling staff during the normal 8a -4p. M -F times, and is unrealistic. I. E. They wanted to schedule two doctors for 10 hour shifts on a Sunday.. . .

Lisa Krebs — Same as AW Harrington, lack of communication and dodging phone calls and will not send nothing in writing. I can't recall the last time I had a conversation with the regional coordinator.

Dr. Dempsey — Attaching a read receipt on all correspondence, will help making sure that they are in receipt of note. . .

AW Burkhart — Also, having problems with documenting and Wexford nursing staff should be held accountable. Wexford should give progressive disciplinary and when asked to see what was given to employee, I was not able to see what discipline was given. We need to start looking at the negligence practices that's been happening.

**Menard — AW F. Lawrence, HCUA - G. Walls, and K. Mueller, A.A.**

G. Walls — Largest issue is staffing and medical director not being available. Dr. Tro[st] has been leaving early and arriving late, which has been an ongoing problem for the last 2 years. . . The Optometrist is disabled and because of that, a staff assistant has been assigned to him because of his writing. Writing wrong prescriptions. A backlog of seeing patients . . .

Dr. Meeks — Will speak with R. Maddox, Coordinator of the South. . . This is not good. . . .

G. Walls — When we put in our orders for supplies, they are being cut.

…

G. Walls - Death Summaries, we cannot get them until they are approved. I can only go through Dr. Tro[st], and there is a delay.

Dr. Meeks — They have a contract that the time period for a death summary is 72 hours.. . . They have an obligation. (per contract)
. . .
K. Mueller — Also, the nurse staffing issue on the States end. There are outstanding ASR's and becoming unmanageable.
. . .
AW Lawrence — There seems to be a problem with Dr. Caldwell doing chart reviews, chronic clinics. He's coming in at 2: 00 a.m. to fulfill his hours, this makes the healthcare unit not run smoothly. . . .

Dr. Dempsey — Please forward his sign - in sheets, include Dr. Meeks. . .

**Pinckneyville — AW Love, HCUA C. Brown**

C. Brown — My issues are repeat of everything that has been discussed so far. Staff vacancies, psychiatrics. . . The Optometrist is out on LOA. Wexford not only has a problem with hiring, but they will not train their staff….

C. Brown — As far as discipline goes, Wexford is thinking why the warden is not locking them out and wants to put it on IDOC.

Dr. Dempsey — Wexford wants the IDOC to be responsible for their staff's errors, including locking employee out. When it comes to discipline and oversight we have to take an active role.

Dr. Meeks — We have to document, document, and document. The common thing I am hearing that it is no accountability and a lack of disciplinary process. Whenever, a legal issue is involved, Wexford is nowhere to be found . . .
Lisa Prather — The other issue we spoke on is getting ETD, Colonoscopy, and EEG without a consultation, and it is hard to get the procedure done . . .

**Robinson — Warden Raines, AW M. Neese and Phil Martin**

Phil Martin — We also are having problems with the doctor. His schedule has changed and he's working two days per week, one day being a weekend which leads to us readjusting the nursing schedule. . .
DON does a lot of timekeeping, which takes away from her DON duties.

**Shawnee — AWP L. Walker and Karen Smoot HCUA**

Karen Smoot - Our issues mirror the rest of everyone else. Wexford nursing staff is not being held accountable for numerous mistakes. Our DON is leaving today and

assigned to another facility. I will have to contact the regional coordinator for issues. Our staffing levels are down. . .

We have to scan to the refill medications to the doctor and he is billing us on the time he spends writing refills. There have offenders that have gone without medication because he is not expeditious in sending them back.

. . .

**Vienna — AWP D. Luce, Penny George HCUA, and Nigel Vinyard**

Penny George — We do have a medical director position vacant since last year, we have very little coverage, 16 hours a week we acquired. It takes extra manpower when the physician scheduled is lacking, leaving us with audit findings. . . We have problems also with supplies being cut. We have a backlog in optometry backlog; the optometrist is out on medical leave. Treatment plans not being signed by the offender and he/she will need a copy of their medication prescribed. . .

Dr. Meeks thanked all for their participation. We will take these issues to Wexford to get them resolved.

Meeting adjourned

[P233.]

## XX.  AWARENESS OF PROVIDER INCOMPETENCE AND LACK OF WEXFORD OVERSIGHT

486.   That many of the Wexford physicians practicing in IDOC are inadequately trained for the positions they hold and pose risks to the patients in their care, and that Wexford fails to monitor, discipline, or correct these providers, has been known to Defendants for years.

487.   In June 2015, Dr. Shicker emailed Wexford's Regional Medical Director Dr. Matticks about the case of an (unnamed) prisoner at Graham CC with long-term gastric symptoms who had ultimately become unresponsive in the infirmary, was transferred to hospital and "ultimately underwent a total colectomy and is still on the Vent." [P461.] Shicker was dissatisfied with Matticks' reply; "I am not clear whether you think Dr. Kayira approached this appropriately but I strongly think it was not handled well." Matticks' further response—"Thank you. He and I both agree that there is room for improvement in the case . . ."—provoked Shicker to forward the

163

chain to regional nurse Cindy Hobrock with the comment "Review this email chain when you get a chance. I am a bit tired of them not taking serious omissions [in] care seriously enough." [*Id.*]

488.    In June 2017, IDOC regional medical coordinator Joseph Ssenfuma wrote to Dixon CC HCUA Amber Allen, "Thanks Amber, Last Friday I reviewed all the patients that you guys sent out to the hospital after Dr. Varma dropping the ball—numerous times, and noticed **all of them were seriously sick patients**. Keep up the good . . ." [P469 at 0592949; emphasis added.]

489.    One particularly notable case is that of Dr. Sood, who was at one time the Medical Director at Hill CC. In a series of mortality cases reviewed by Dr. Shicker in early 2016, he wrote as to one of Dr. Sood's patients:

> There are two main disturbing aspects in the case of this patient. The first is that Mr. [redacted] had abnormal liver function tests early during his incarceration—yet no workup was undertaken until almost three years into his stay. After he was diagnosed with Hepatitis C appropriate work up to assess eligibility for treament was not undertaken. There was poor communication with Dr. Paul (Wexford Hepatitis C Coordinator). The result was that his disease progressed unchecked . . . I [] *classify this case as a likely avoidable death*. I have discussed this case at length with Wexford executive level physicians. *We agree that Dr. Sood has now made some significant errors in the care of IDOC patients at Hill CC and that he will receive a final warning and likely termination or voluntary resignation*.

[P227 at 0068581; emphasis added]

490.    This was not the only death in which Dr. Shicker faulted Dr. Sood: in a review of the death of [redacted], DOD 10/13/15 for an April 8, 2016 mortality conference, Shicker noted "significant delays in in follow up and finding others to aid in the diagnosis and management of this individual"; ". . .there were too many gaps and delays in [this patient's] care." [P458 at 0188156.]

491.    Over a year later, Dr. Sood came to Dr. Dempsey's attention while Dr. Dempsey was the acting agency Medical Director. In reference to a death review Dr. Dempsey had received, he wrote to Wexford in September 2016: "The review is quite concerning. I would refer you to the

1/4/16 through 1/10/16 chronology. . .” [P473 at 0073977.] He asked for all the death summaries and death reviews for prisoners who had been under Dr. Sood's care at the time of their death.

492.    Later in the chain, deputy director Kimberly Butler asked Dempsey: "So if I'm reading this correctly Dr. Shicker recommended a final warning, possible termination or voluntary resignation? Dr. Sood was moved to Stateville as a result of the allegations . . . Was any action taken by Wexford from the original complaint?" Dempsey responded: "I never got the details of the agreement between Dr. Shicker and Wexford. They tended to be verbal. It is typical for a provider to have trouble at one site to be moved . . ." And at the end of a further exchange, he added:

> I had a conversation with Wexford in early July, voicing my concerns, and was told that Dr. Sood had one more chance. To me, his one more chance has been notification of the most recent lawsuit. . .

[*Id.* at 0073974-77.]

493.    In 2018, the Puisis team reviewed the same death that caught Dr. Dempsey's attention as part of their review of 2016/2017 deaths in IDOC. The Second Expert Report notes significant problems with his care while he was still at Menard CC, notably the failure of the physicians there to investigate and explain why he remained on anticoagulant medications when he also had an IVC filter ("Typically, patients on an IVC filter are not also anticoagulated"), and the failure to address the fact that he was having "breakthrough seizures" despite being on three antiepileptic drugs. [Puisis MR p. 55.] But it was the care of this patient during the last few months of his life, after he had been transferred to Hill CC and was under the supervision of Dr. Sood, that particularly attracted the team's attention. The patient was housed in the infirmary throughout his time at Hill CC, where:

> Over the course of the next two and a half months the patient continued to have unequal pupils, had progressively deteriorating mental status, and became

progressively unable to care for himself. The patient could not walk without support. . . . Over time the patient was unable to communicate effectively, did not consistently respond to questions or commands, became incontinent of urine and feces, did not consistently eat food or drink, and was unable to care for himself. Despite a dramatic deterioration of neurological status in the context of a VP shunt, the patient never had a thorough neurological examination or had an imaging study (CT scan or MRI) of his brain. The deteriorating condition of the patient combined with the lack of physical examination or care by providers for the patient was indifferent, and grossly and flagrantly unacceptable care.

Over time the patient developed bruising, first noted on his elbows but then on his back, thighs, legs, and elbows. Despite being on Coumadin and aspirin and having bruising, the provider did not order an INR to assess whether he had supratherapeutic levels of anticoagulants. . . This is a dangerous sign and calls for immediate action to prevent life-threatening harm. The doctor did not assess why the patient was on aspirin, as he had no clinical indication for this drug. Keeping the patient on both drugs and failure to assess the INR was a life-threatening danger to the patient and grossly and flagrantly unacceptable medical care. . .

[Puisis MR p. 56.] In conclusion, the Second Expert team stated as to this death:

**This patient's death was preventable**. Care for this patient was grossly and flagrantly unacceptable. The death summary was performed by the doctor caring for the patient and no problems were identified. This doctor is a nuclear radiologist and clearly does not have fundamental medical knowledge sufficient to practice general primary care medicine, and should not be allowed to do so. This is a doctor identified on the First Court Expert report as having performed poorly. Yet he continues to practice. . .

[*Id*. p. 57]

494.    In fact, at the time of the Puisis team's 2018 site visit to NRC, Dr. Sood was in place there as a Wexford "Travelling Medical Director."

495.    Another Wexford physician who was the subject of repeated internal complaints was Dr. Obaisi, the Medical Director at Stateville CC.

496.    In his notes for a February 5, 2016 mortality conference on a patient DOD 9/18/15, Dr. Shicker observed:

[The patient] was prescribed Epivir by Dr. Obaisi. It turns out that he never received the epivir (although this is no longer recommended for the treatment of chronic

166

Hepatitis B given the high resistance rate) . . . There are several problematic areas with this case . . .

a) This individual had risk factors for Hepatitis and the first mention we have about Hepatitis testing is over ten years into his incarceration.

b) The approach to treat the chronic Hepatitis B was not up to date (use of epivir)

c) Medications ordered were no[t] obtained or given. . . .There was no communication and no pick up from the MAR that there was a problem. . . .

[P227.]

497.    Dr. Obaisi's lack of up-to-date medical knowledge was not his only failure noted by IDOC personnel. In March 2015, it was reported to regional coordinator Marna Ross and others that the Stateville CC warden was "really frustrated" with Dr. Obaisi over "not completing infirmary admissions, the medical permits, not seeing inmates (rescheduling), etc." [P226.]

498.    In May 2015, it was reported to Dr. Shicker by regional coordinator Marna Ross that "Dr. Obaisi did not come to CQI today as he called in late and would not get there [till] this afternoon," and "Dr. Obaisi has so many depositions that he is not keeping up with his work." [P435.]

499.    Six months later, it was reported to regional coordinator Joseph Ssenfuma, "Dr. Obaisi was told about the Doc review box and seeing the infirmary patients on Saturday. True to form, he ignored them both. The Infirmary Nurses had to do everything but cuff him to get him to go to the infirmary at Stateville." [P436.]

500.    Two of the 19 deaths reviewed by the Second Expert and judged preventable involved Dr. Obaisi. [Puisis MR Patients #10 (pp. 96-106) and #13 (pp. 133-143).]. As to Patient 10, "Providers failed to evaluate [this patient] for peptic ulcer even though the patient had symptoms or signs of this condition (anemia, vomiting, and apparently bloody emesis). The patient's anemia was never properly evaluated . . . Despite potential for ulcer disease and

cardiovascular disease providers kept the patient on non-steroidal medication for years . . ." [Puisis MR p. 17.] Patient 13 "had long standing hypertension. His blood pressure at Stateville was uncontrolled throughout his entire 18 month stay and the system was indifferent to his uncontrolled blood pressure. . ." [Puisis MR p. 22.]

501.    Despite the problems noted by Defendants' personnel with Dr. Obaisi, he practiced at Stateville CC until his sudden death in December 2017.

502.    Another physician still in place within IDOC and involved in what the Second Expert judged to be a preventable death was Dr. Vipin Shah. Defendants themselves had identified him as problematic.

503.    In January 2015, the Pinckneyville HCUA wrote to southern region coordinator Prather about a prisoner who was dying of bladder and prostate cancer: "I am sending you an update on this guy he is at Belleville Memorial Hospital DX: Septic and malnourished I found some issues in his file regarding nursing and Doctor Shah. I feel he should have been sent out sooner and could not find any confirmation of terminal CA . . ." [P494.] Prather forwarded this email to Dr. Shicker. [*Id.*]

504.    In Dr. Shicker's notes for a July 31st 2015 mortality conference, addressing the case of a patient who "came to IDOC with no significant medical problems" but died (age 37) of cardiac arrest, Shicker observed:

**Comment**: There are several areas of concern regarding this case:

1.    There was a lengthy delay in obtaining the EKG and the evaluation of said EKG . . .

2.    Starting a patient on low dose aspirin based solely on this EKG is highly questionable and problematic especially since this offender had mild anemia as well.

3.    Mild anemia of 12.5 in a young male is a red flag and requires a work up to try to determine the cause.

. . .

5.      There were numerous no shows by this individual without getting a signed refusal. . . **I recommend that the Vendor conduct additional peer reviews of Dr. Vipin Shah's work (quarterly for one year) and submit to me. In addition some education and counselling should occur regarding work up of patients with anemia, and abnormal EKG's.**

[P225 at 0169999-70000; emphasis in original.]

505.    Earlier that month, the Pinckneyville HCUA had reported to Dr. Shicker and the regional coordinator on the case of a prisoner who had just been sent to the ER after Dr. Shah had reviewed him the previous day and ordered observation and vitamins, "recheck in 2 weeks": "I have issues with this case and think it may need to be reviewed. The Nurse Practitioner is getting upset in regards to Doctor Shah." "We need to do something," the regional coordinator wrote to Dr. Shicker. "Dr. Shah is doing poorly!" [P467.]

506.    Six months later, at the December 31, 2015 mortality conference, Shicker again reviewed one of Shah's patient deaths: "Mr. [redacted] was diagnosed with a type of cancer that is almost universally fatal . . . The problem with his case, however, is that his initial symptoms were not followed up upon and were, therefore, not worked up adequately. Between July 2014 and March 2015 he lost 36 pounds . . . He was empirically treated for GERD without further follow up. . . .[T]he chance for at least prolonging his life was certainly a possibility. I expect that the Vendor will address this with Dr. Shah . . ." [P458 at 0188162-63.]

507.    Six months later still, Dr. Shah was still a Medical Director, now at Robinson CC, where Shicker found a death potentially "bothersome. This patient has cardiac risk factors . . . With chest pain 10/10 albeit atypical in nature—sharp—I would err on the side of sending this guy out to the ER. Observation in a non-telemetry infirmary is in my opinion inadequate." [P466 at 369899-901.]

508.    The death on which Dr. Shicker was commenting is Puisis Mortality Patient no. 33:

This patient had repeated episodes of acute coronary syndrome and two episodes of atrial fibrillation, each of which should have resulted in hospitalization, which did not occur. The angina was inappropriately treated and was never under control. Cardiac catheterization was not done over three months despite the patient having three episodes of apparent acute coronary syndrome. The atrial fibrillation was never appropriately assessed, and the patient was not anticoagulated despite having atrial fibrillation and acute coronary syndrome on three occasions. The patient's cause of death was listed as coronary atherosclerosis and stroke, both of which were preventable with timely and appropriate treatment. **Therefore, this death was preventable.**

[Puisis MR p. 61; emphasis in original.]

509.   As of September 2018, Dr. Shah was still practicing at Robinson CC. He does not appear on a list of Wexford provider employees disciplined (or terminated) between 7/1/2015 and 11/26/2017 for misconduct or performance. [P121.]

510.   Dr. Trost, the former Menard CC medical director, was involved in two deaths identified by the Second Expert as preventable, and two more deaths identified as possibly preventable deaths, in 2016/2017. [Puisis MR Patients #21 (pp. 269-284), #22 (pp. 285-304), #23 (pp. 305-318), and #27 (pp. 338-351).]

511.   Defendants' employees were complaining of problems with Dr. Trost well before these deaths; he was the subject of a numerous internal complaints about his work performance as well as his clinical judgment.

512.   In January 2015, the Menard HCUA wrote to southern region coordinator Prather "This is a list that medical records put together showing everyone that has been scheduled at least 3 times before being seen by Dr. Trost. We have a problem. . . ." [P480.] The list—of over 60 prisoners—included one with a "[m]ass on left side of head" who was scheduled six times before he was seen; one who had been to nurse sick call for "blood in stool" and had been scheduled 3 times and still had not been seen; one who had been referred for positive Hepatitis C and had been scheduled four times and still had not been seen; and one who had been seen in nurse sick call for

shoulder/testicular pain, a rectal exam, and medication renewal, and had been scheduled 17 times and still had not been seen. [*Id.*]

513.    In January 2015, southern region coordinator Prather wrote Dr. Shicker that it had been reported to her that:

> . . . there are days when Dr. Trost is on-site and does very little work. Gail told Yolande Johnson and me, one day the collegial review scheduler initiated a game with Dr. Trost to get him to complete the collegial review follow-ups. They called the game, "Solve the crime." The lady who schedules would make up a scenario that involved the offenders collegial review health need and Dr. Trost had to instruct what the follow-up needs in collegial were before he was able to solve the crime. Gail said, they were able to get the collegial follow-ups scheduled by playing this game with him.
>
> Dr. Trost is a very likable, personable doctor but he is not interested in doing his work. . .

[P492.]

514.    In December 2016, regional coordinator Lisa Prather wrote Dr. Meeks about a case in which a patient "died on 10/20 or multisystem organ failure related to AIDS. In March he became symptomatic and the physician simply didn't think to HIV test. . . .At some point, we need to discuss the performance of this Medical Director. His name is John Trost. . . .[L]acking in performance, lacking motivation, really doesn't have supervisory skills, calls in or shows up later often . . . Wexford assured Dr. Shicker they were looking for his replacement . . ." [P446.]

515.    In March 2017, Menard HCUA wrote to Meeks and others in March 2017: "Dr. Trost called in today and he had collegial scheduled . . . This happens a lot. Now Dr. Trost won't have a line on Friday afternoon and no li[n]es today. This isn't helping our backlogs. . ." Regional coordinator Lisa Prather observed: "This has been an ongoing problem for a long time. I also noticed in our CQI meeting, he saw and completed 39% of his [medical director sick call] lines for the month of January . . ." [P456 at 0464762-764.]

516.    The first of the two deaths regarded by the Second Expert as definitely preventable in which Dr. Trost was involved was a case of a 46-year-old at Menard CC who died in July 2016 with septic shock due to complications of HIV infection. [Puisis MR pp. 38-39.] Almost a year earlier:

> On 9/5/15, the patient developed altered mental status with fever. He was a 46 year old man who was urinating on himself. The patient did not have an adequate evaluation for alteration of mental status. He was not provided an adequate history or physical examination for his condition. He should have had a CT scan and other diagnostic testing. Instead, the patient was merely monitored on the infirmary with blood tests. The doctor made a diagnosis of fever of unknown origin. This diagnosis presumes that causes of the fever have been ruled out, which had not been done in this case, as little diagnostic evaluation was performed. The patient should have been hospitalized for his condition but was not. Care was grossly and flagrantly unacceptable.
>
> The doctor presumed that the patient had lupus, but the patient did not have immunologic criteria to qualify for this diagnosis. The providers failed to evaluate for HIV, a common condition in this population and one that the patient had risk factor for . . .
>
> Lupus is an uncommon condition in this population as compared to HIV. . . nevertheless, the doctor maintained this diagnosis without searching for more obvious causes of the patient's problem. . .
>
> ****
>
> **This patient's death was preventable.** The patient had multiple risk factors for HIV infection yet was never screened for this infection. The patient had altered mental status for over a year but never had a diagnostic evaluation for this. The patient had low lymphocytes and low white counts since 2013 but was never evaluated adequately for this. The patient had fever but was never properly evaluated for this. The patient's confusion resulted in inability to take care of his hygiene, but the patient was neglected, resulting in a large, unrecognized pressure ulcer and significant unrecognized weight loss. Care was indifferent, neglectful, and grossly and flagrantly unacceptable. Early diagnosis of HIV should have been made and this would have prevented his death. We note that the physician caring for this patient was a surgeon without primary care expertise . . .

[*Id.*; emphasis in original.]

517.     As to the second preventable mortality in which Dr. Trost was involved, the Puisis

team wrote:

> This 48-year-old man had difficult to control blood pressure. For the entire two
> years of record review, the blood pressure was uncontrolled. The blood pressure
> was significantly out of control and as high as 260/130. . .
>
> The patient also had a persistent need for statin treatment which was unrecognized.
> . .
>
> The patient developed symptoms of episodic shortness breath on 2/4/15 and was
> admitted to a hospital. At the hospital, the patient had an echocardiogram that
> showed thickening of the LV and concentric hypertrophy but normal systolic
> function, verifying hypertensive cardiovascular disease. . .
>
> Upon return to Menard, the Medical Director, who was a surgeon, did not refer to
> nephrology or cardiology as recommended . . .
>
> **This patient's death was preventable.** It is our opinion that if the patient's blood
> pressure were controlled he would not have died from hypertensive heart disease. .
> . .

[Puisis MR pp. 46-48; emphasis in original.]

518.     And before the Puisis team had reviewed the case of Mortality Patient 18 (Dennis

Edwards, DOD 1/31/16) and assessed it as a possibly preventable mortality, Dr, Shicker had seen

problems as well: "Mr. [redacted] was a 59 year old male with multiple medical problems . . . He

also had a significant psychiatric illness . . . He began fasting 12/25/15 call[]ing it a religious fast

and lost significant weight over time complicated by bed sores and appearing malnourished . . .

This was a very unfortunate case. There were a few discoveries made during the review that

demonstrated some breakdowns in care and need to be corrected. . . ." [P458 at 0188157.] The

Medical Director in question, at Dixon CC, was involved in three other deaths that the Second

Expert team assessed as "preventable." [Puisis MR Patients #7 (pp. 51-61), #17 (pp. 178-213), and

#19 (pp. 229-245).]

173

## XXI. FAILURE TO IMPLEMENT THE RECOMMENDATIONS DEFENDANTS *ACCEPTED* FROM THE 2014 SHANSKY REPORT

519.     In November 2014, pursuant to the process set out in the Agreed Order Appointing Expert (Dkt. 244, ¶ 5b), Defendants submitted comments to Dr. Shansky on what was then the Confidential Draft Report of the Shansky team. [P23.] Defendants have placed this letter on their exhibit list. [D9.]

520.     In the Barnes letter, Defendants rejected many of the First Expert's recommendations for improving IDOC medical and dental care. However, they also stated that they agreed with and intended to implement (or already had implemented) a considerable number of the recommendations. Four years later, many of the recommendations Defendants accepted have *not* been implemented even though Defendants *accepted them in 2014*.

521.     As to staffing and leadership, the Barnes letter stated:

IDOC believes that it does have adequate staffing and leadership and is committed to these important principles. Nevertheless, in an attempt to make the delivery of health care even better, IDOC has filled a number of the vacancies identified in the Report. . .

522.     The letter cited filled Medical Director positions at two prisons and the acceptance by a candidate of a Medical Director position at a third prison, inter alia. [D9 p. 3.]

523.     Since [October] 2016, the "Lippert Call" reports reflect that there have been continuously no fewer than 4 Medical Director vacancies every month throughout the system; in fact the number has risen. From March of 2017 to December 2017 there were either 6 or 6.5 Medical Director vacancies each month; the number briefly dropped in January 2018 to 5.5 only to rise again to 6.5 vacancies from March through May 2018 (there is no data for February produced). This is coupled with staff physician vacancies ranging from a low of 1.2 FTE (1 month)

to a high of 4 (x months) throughout the same period. In short, the staffing and leadership deficiencies remain in place.

524.    As to administrative duties affecting leadership positions, the Shansky Report recommended that "The Director of Nursing position at all facilities is a full-time position whose time should not be taken away by corporate responsibilities." The Barnes letter stated:

> The IDOC agrees with this requirement and took necessary steps to insure that, if an IDOC facility has a vendor Director of Nursing (DON) who is also designated as the vendor site manager, corporate responsibilities will be limited to 10% of his/her time.

[*Id.* p. 4.] In fact, Wexford administrative responsibilities continue to consume excessive amounts of DON time.

525.    Further as to administrative functions of Wexford employees, the First Expert Report had recommended that "Medical vendor health care staff assigned to leadership positions, such as the director of nursing, supervising nurse or medical records director, will not be assigned corporate duties such as time keeping, payroll or human resources activities." The Barnes letter stated: "The IDOC agrees with this requirement and has effectively managed such situations to insure that health care managers are assigned to appropriate leadership tasks." [*Id.* p. 6.]

526.    In fact, Wexford administrative responsibilities continue to consume excessive amounts of health care managerial time.

527.    As to a staffing needs analysis, the Shansky Report recommended that IDOC "develop and implement a plan which addresses facility-specific critical staffing needs by number and key positions and a process to expedite hiring of staff when the critical level has been breached." As to this recommendation, the Barnes letter stated:

> The IDOC agrees with this recommendation, and is continually assessing critical vacancies and working with its staffing vendor to fill them in an expeditious fashion.

> As noted above, IDOC and its vendor have already filled numerous key vacancies, and are committed to continue to do so in the future. . .

[*Id.* p. 7.]

528.    Four years later, IDOC has performed no staffing analysis, and critical vacancies persist.

529.    As to infection control, the Shansky Report recommended that IDOC "Immediately seek approval, interview and fill the Infection Control Coordinator position." As to this recommendation, the Barnes letter stated: "The Department agrees that the Infection Control Coordinator position should be filled . . ." [*Id.* p. 8.]

530.    Four years later, Defendants have finally hired someone for the Infection Control Coordinator position—but it is one of the OHS regional coordinators who continues to perform that full-time job as well.[55]

531.    As to OHS staffing, the First Expert Report recommended that IDOC "[e]stablish, identify and fill the positions for three regional physicians trained and board certified in primary care who will report to the Agency Medical Director and perform at a minimum peer review clinical evaluations, death reviews, review and evaluate difficult/complicated medical cases, review and assist with medically complicated transfers, attend CQI meetings and one day a week, within their region, evaluate patients. . ." As to this recommendation, the Barnes letter stated: "…While IDOC does not see the need for three additional regional physicians, it recognizes the

---

[55] No one has held this position in the interim. In January 2017, the HCUA at Vienna CC wrote to Dr. Meeks and others: "On 7/28/16 I applied for the Infection Control Nurse, Public Service Administrator . . . . Do you know if they are going to fill this position?" The response, from agency Medical Coordinator Kim Hugo, was: "Back in August, I asked about this as no one in Health Services was aware they had posted it. Evidently Dr. Shicker had requested this at some point. I have not received any more information in regard to filling this position. Sorry!" [P243.]

advantage to hiring one additional physician to work under the direction of the IDOC Medical Director. …" [*Id.* pp. 8-9.]

532.    Four years later, the agency Medical Director still does not have a single physician to assist him.

533.    As to sick call, the First Expert Report had numerous recommendations with which the Barnes letter agreed:

> Shansky: 1. All sick call must take place in a designated area that allows sick call to be conducted in an appropriate space that is properly equipped and provides for patient privacy and confidentiality.
>
> Barnes: • The IDOC agrees with this recommendation.
>
> Shansky: 2. Equipment, mattresses, etc., which have an impervious outer coating must be regularly inspected for integrity and repaired or replaced if it cannot be appropriately cleaned and sufficiently sanitized.
>
> Barnes:• The IDOC agrees with this recommendation.
>
> Shansky: 3. A paper barrier which can be replaced between patients should be used on all examination tables.
>
> Barnes:• The IDOC agrees with this recommendation.
>
> Shansky: 4. Hand washing or sanitizing must be provided in all treatment areas.
>
> Barnes:• The IDOC agrees with this recommendation.

[*Id.* p. 10.]

534.    Four years later, there is still a lack of appropriate private space for sick call encounters, equipment and mattresses are still found worn and torn, paper barriers, while more widely used, are not universal, and hand sanitation remains problematic.

535.    In general, as to clinical space and sanitation, the Barnes letter stated: "[T]he IDOC recognizes the inherent importance of appropriate clinical space and sanitation within its medical system, and agrees with all of the report's recommendations in this section." [*Id.* pp. 9-10.]

536. Four years later, the Puisis team still found widespread deficits in space and sanitation.

537. As to medical reception (intake), the First Expert Report recommended, "A process that insures a clinician reviews all intake data, including laboratory tests, TB screening, history and physical, etc., and develops a problem list and plan for each problem." [*Id.* p. 10.] The Barnes letter stated: "The IDOC agrees with this statement and currently follows this process . . ." [*Id.* p. 11.]

538. The Second Expert team found that Defendants' medical reception process does not comply with this process.

539. As to continuous quality improvement, the Shansky Report recommended: "A quality improvement process that monitors completeness, timeliness and professional performance and is able to intervene in order to implement improvements." The Barnes letter stated: "The IDOC agrees and believes its current QI system accomplishes the suggested task. . . ." [*Id.* p. 11.]

540. Four years later, the Second Expert team still found Defendants' CQI process unable to function so as to "implement improvements."

541. As to medical record-keeping, the Shansky Report recommended that "Problem lists should be kept up to date." The Barnes letter stated: "The IDOC agrees with this recommendation. . ." [*Id.* p. 13.]

542. Problem lists are still not well-maintained or complete.

543. As to reports of outside consultations or hospitalizations, the First Expert Report recommended, "Medical records staff should track receipt of all outside reports and ensure that they are filed timely in the health record." The Barnes letter stated: "The IDOC agrees with this recommendation." [*Id.* p. 14.].

544.    Outside reports are still not regularly obtained or placed in the medical record.

545.    As to access to services, the Shansky Report recommended, "Administration must insure health care activities such as sick call are not routinely cancelled, as this results in an unacceptable delay in health assessment." [*Id.* p. 15.] The Barnes letter stated: "The IDOC agrees with this recommendation."

546.    Four years later the Puisis team found that this was still a serious problem within IDOC healthcare.

547.    As to the medication administration record, the First Expert Report recommended that, "Copies of the current MAR should be available for the provider's review during chronic care clinic." The Barnes letter stated: "The IDOC agrees with this recommendation." [*Id.* p. 19.]

548.    The Puisis team found that there was "no evidence" that this recommendation had been implemented. [Puisis SR p. 83.]

549.    As to tracking of urgent/emergent services, the First Expert Report recommended, "All facilities must track urgent/emergent services through using a logbook maintained by nursing which includes patient identifiers, the time and date, the presenting complaint, the location where the patient is seen, the disposition and when the patient is sent out, the return with the appropriate paperwork, including an emergency room report and appropriate follow up by a clinician." The Barnes letter stated: "The IDOC agrees with this recommendation." [D9 p. 20.]

550.    The Second Expert team found that this recommendation had not been implemented.

551.    As to requests for specialty services, the Shansky Report recommended, "The entire process, beginning with the request for services, must be tracked in a logbook, the fields of which would include date ordered, date of collegial review, date of appointment, date paperwork is

returned and date of follow-up visit with clinician. There should also be a field for approved or not approved, and when not approved, a follow-up visit with the patient regarding the alternate plan of care." The Barnes letter stated: "The IDOC agrees with this recommendation, as a logbook is currently in place for off-site services." [*Id.* p. 24.]

552. The Second Expert team found that this was not true. Tracking logs were not complete and not accurate. [Puisis SR p. 64.]

553. As to utilization management/collegial review timing, the Shansky Report recommended, "Presentation to collegial review by the Medical Director must occur within one week." The Barnes letter stated:

> The IDOC agrees with this recommendation. Presently, if the facility medical director and provider believe there is a need for offsite service, the case is referred to WHS and discussed during weekly collegial review. If approved, an authorization number is generated and returned to the site within 5 working days.

[D9 p. 24.] To the contrary, the Puisis team found that there were still problems with timeliness of collegial review.

554. As to sanitation and bedding, the First Expert Report recommended that IDOC "[d]evelop and implement a plan to insure sufficient quality and quantities of infirmary bedding and linens." The Barnes letter stated: "The IDOC agrees with this recommendation." [*Id.* p. 28.]

555. Four years later, the sanitation and quantity of infirmary linens remains a problem.

556. As to sanitation and bedding, the First Expert Report recommended that IDOC "[d]evelop and implement a plan to aggressively monitor skin infections and boils and work jointly with security and maintenance staff regarding cell house cleaning practices with monthly reporting to the IC/QI-RN, QIC and facility administration as needed." The Barnes letter stated: "Existing policies are already in place. Data is reviewed at QI meetings with the Agency Medical Director in attendance and demonstrates that numbers are decreasing system wide." [*Id.* p. 30.]

557.     In reality, the existing CQI data (which is incomplete and inconsistent between facilities) shows that there has been no decrease in skin infection rates since 2014. [G526-G532.]

558.     As to negative air pressure in infirmary rooms, the First Expert Report recommended that IDOC "[d]evelop and implement a plan to daily monitor and document negative air pressure readings when the room(s) is occupied for respiratory isolation and weekly when not occupied." The Barnes letter stated: "The IDOC agrees with this recommendation, as it reflects current policy." [*Id.* p. 30.]

559.     The Puisis team found that these readings are not properly monitored.

560.     As to the training of inmate "porters" used in healthcare areas, the First Expert Report recommended that IDOC "[d]evelop and implement a training program for health care unit porters which includes training on blood-borne pathogens, infectious and communicable diseases, bodily fluid clean-up, proper cleaning and sanitizing of equipment, infirmary rooms, beds, furniture, toilets and showers." The Barnes letter stated: "The IDOC agrees with this recommendation, and trains its health care porters on the above-mentioned protocols before allowing them to work in health care units. . ." [*Id.* p. 30.]

561.     Four years later, the Second Expert team found that training of inmate "porters" in these hazardous roles was still deficient at three out of the five sites they surveyed.

562.     As to patient care furniture, the First Expert Report recommended that IDOC "[d]evelop and implement a plan to monthly monitor all patient care associated furniture, including infirmary mattresses, to assure the integrity of the protective outer surface with the ability to take out of service and have repaired or replaced as needed." The Barnes letter stated: "The IDOC agrees with this recommendation, as the practice is already in place." [*Id.* p. 31.]

181

563.    In 2018, the Defendants' patient care furniture, especially infirmary beds, are in very poor and often dangerous condition.

564.    As to dental care, the First Expert Report recommended that, "Proper area disinfection and clinician hygiene be implemented." The Barnes letter states: "The IDOC agrees with this recommendation, as proper area disinfection and clinician hygiene is expected of all dental professionals." [*Id.* p. 32.]

565.    The Second Expert team found that disinfection had not improved and clinician hygiene had deteriorated since 2014. [Puisis SR p. 105.]

566.    In addition, as to dental care, the First Expert Report recommended that, "Routine comprehensive care should be provided for through a comprehensive exam and treatment plans." The Barnes letter stated: "The IDOC agrees with this recommendation." [D9 p. 33.]

567.    Four years later, the Second Expert team found that this aspect of care was unchanged and Defendants still fail to provide a comprehensive exam. [Puisis SR p. 106.]

568.    As to dental care, the First Expert Report also recommended that, "That the exam includes radiographs diagnostic for caries, a periodontal assessment, a soft tissue exam and accurate charting of the teeth." The Barnes letter stated: "The IDOC agrees with this recommendation." [D9 p. 33.]

569.    Defendants still fail to provide this. [Puisis SR pp. 106-07.]

570.    As to review of dentists, the Shansky Report recommended that "The IDOC develop a clinically oriented peer review system [for dentists] and that dentists be available to provide these reviews, such that deficiencies in treatment quality or appropriateness can be corrected." The Barnes letter stated: "The NCCHC requires dentists to be peer reviewed on an

annual basis. WHS dentists in IDOC are peer reviewed annually and upon request by the company, in accordance with NCCHC standards. . ." [D9 pp. 34-35.]

571. Wexford dentists were not peer reviewed in 2014 and are not peer reviewed in 2018.

572. As to dental patients with underlying medical issues, the Shansky team recommended that "The IDOC develop a thorough and well-documented health history section in the dental record." The Barnes letter stated: "The IDOC agrees with this recommendation, as it strives to develop a thorough health history for each of its dental patients." [*Id.* p. 35.]

573. Four years later, Defendants have not implemented this recommendation. [Puisis SR p. 115.]

574. Further as to medically compromised dental patients, the First Expert Report recommended "That appropriate medical conditions be red flagged and that medical consultations and precautions be documented in the dental record." The Barnes letter stated:

575. The IDOC agrees with this recommendation. Accordingly, medical conditions/precautions are noted in the patient problem list located as the very first page in every offender's medical chart. [D9 p. 35.]

576. Four years later, this recommendation has not been implemented. Medical problem lists (which are also flawed) are not available for dental procedures.

577. As to dental policies and protocols, the First Expert Report recommended "That IDOC dental policy insures that all institution dental programs have well developed and thorough policy and protocol manuals that address all areas of the dental program. That all dental staff be familiar with these policies and protocols." The Barnes letter stated: "The IDOC agrees with this recommendation." [*Id.* p. 35.]

578.    Four years later, the Second Expert team concluded that the policies and protocols were "inadequate" and not materially improved from 2014. [Puisis SR p. 113.]

579.    The First Expert Report also recommended that there be "An administrative dentist [] to oversee the IDOC dental program as a whole. This person could remain in the field as a part-time practicing dentist." The Barnes letter stated: "The IDOC agrees with this recommendation. . . IDOC has [ ] committed to filling the position of Dental Director which will have a statewide administrative component to its job description." [D9 p. 35.]

580.    Four years later, there is no such position.

581.    The Shansky Report stated that "Dental hygienists should be hired ASAP at Henry Hill CC and Dixon CC." The Barnes letter stated: "The IDOC agrees with this recommendation." [*Id.* pp. 35-36.]

582.    This has not happened.

583.    As to the CQI program, the First Expert Report recommended that "The QI program should monitor timeliness and appropriateness of professional responses." The Barnes letter stated: "The IDOC agrees with this recommendation, and will work to incorporate timeliness and appropriateness of professional responses into its existing CQI process." [*Id.* p. 22.]

584.    As of 2018, this recommendation has not been implemented.

585.    Also as to the CQI program, the First Expert Report recommended that "As an aspect of the QI program, review nursing and clinician performance to improve it." The Barnes letter stated: "The IDOC agrees with this recommendation, noting that it has already been incorporated into its existing CQI process." [*Id.* p. 22.]

586.    The Second Expert team found Defendants' CQI program does not monitor nursing and clinician performance.

## XXII. FAILURE TO IMPLEMENT INITIATIVES TO IMPROVE HEALTHCARE THAT DEFENDANTS THEMSELVES HAVE PRIORITIZED

587.    In addition to their failures to follow through and implement the First Expert Report recommendations that the IDOC accepted back in 2014, Defendants have also failed to carry through on a number of other initiatives they recognized were needed to improve the delivery or oversight of medical and dental care in IDOC.

588.    The most notable failed initiative is an electronic medical record system (or "EMR"). The State Defendants have been planning for years to transition to an electronic medical record system, but have failed to do so.

589.    In August 2009, an internal State email exchange reported:

One issue that IDOC has been working on is the need to move in the direction of an electronic records system. Often, inmates will be transferred but their records do not follow them to a new facility. They need to be completely re-evaluated to determine whether they needs the same treatment that they were receiving in the previous facility. . . Electronic records systems certainly would help this, and make the entire system more up-to-date and reliable.

[P240.]

590.    As noted earlier, the 2011 Wexford contract provided for the development of EMR. [P18 at 000374-76 (§ 7.7.4).] In 2012, for unexplained reasons, the Department instructed Wexford to stop rollout beyond Logan and Decatur. [Tr. T. Taylor; P418.]

591.    In a December 2014 IDOC "Transition Report" prepared after the election of Defendant Rauner and forwarded by Assistant Director Gladyse Taylor, the implementation of Electronic Medical Records by Wexford was still identified as a "High" priority.

592.    In December 2014, the minutes of a Programs and Support Services meeting reflect that Dr. Shicker stated that "EMR is up and running at Decatur and Logan," and that he also assured the attendees that it would "be started at other sites soon." [P158.]

593.    As of today, in 2018, Logan CC and Decatur CC are still the only IDOC prisons with an EMR system.

594.    Defendants have also failed to create and staff positions that they recognized were needed for healthcare system oversight generally and for oversight of Wexford.

595.    This is also a long-acknowledged need. The same August 2009 email chain that discussed EMR also reported that the then IDOC Director—Michael Randle—"would like to see us add a new position," so that in addition to the agency Medical Director, there would also be a "Medical Coordinator," also a physician, who would "oversee the vendor Medical Directors and other medical staff . . ." A subsequent email in the chain said, "The work is really more than 1 person can handle, which is the reason for the 2 proposed positions." [P240.]

596.    In October 2015, as part of the internal analysis of the Wexford contract in preparation for a new Request For Proposal for IDOC healthcare services, Dr. Shicker summarized recommendations of the "RFP Sub-Committee," which included that "Staffing of OHS will need to be enhanced *so that appropriate monitoring can realistically be done*."[P481; emphasis added.]

597.    In summer of 2016, there was an initiative to create positions for "Wexford contract monitors" within IDOC; an email chain among then-agency Medical Director Dr. Dempsey, the IDOC CFO and Chief of Staff, among others included a suggestion from the agency Chief of Staff that there be as many as seven of these (one assigned to each of the three regional coordinators, one assigned to the agency medical coordinator, and one each assigned to the agency Medical Director (Chief Medical Officer), the Chief of Mental Health and the Chief of Psychiatric Services). [P49.]

598.    In 2017, agency Medical Director Dr. Meeks once again proposed (now to Director Baldwin) that there should be a deputy medical director, as well as three regional medical directors and another administrative assistant for OHS. [P98.]

599.    None of these positions were ever created. Dr. Meeks, the agency Medical Director, remains the sole physician responsible for physical healthcare in OHS. The Wexford contract continues to be "monitored" by the monthly monitoring reports generated by the HCUAs.

600.    Defendants have also periodically started initiatives to improve their CQI process which have fallen short.

601.    An important component of a functional CQI process is "outcome studies," which try to assess the quality of care being provided. [Puisis SR pp. 118-19.] In February 2015, Defendants had an initiative to create "outcome studies," based on an email from agency Medical Director Shicker, who described himself as taking a "first stab" at them. "I did not suggest any for dental or mental health," he added, "I am not a dentist o[r] an MHP—I'm barely a doctor!!!" [P482.]

602.    As of 2018, Defendants' CQI process still does not know how to perform "outcome studies," in the judgment of the Second Expert team. [Puisis SR p. 118.]

603.    A functional mortality review process is also an essential component of CQI. [Tr. T. Puisis] In January 2017, the HCUA at East Moline CC expressed confusion about IDOC's death review policy after receiving a copy of a policy from Wexford's Dr. Fisher. In response, Dr. Dempsey wrote: "The Wexford guidelines on deaths is just that. *IDOC needs its own policy on mortality reviews going forward*." [P471; emphasis added.]

604.     As of 2018, Defendants' mortality review process remains inadequate, in the judgment of the Second Expert team. [Puisis SR p. 102.] "The IDOC leadership is unaware that they have preventable deaths." [*Id.*]

605.     In July 2018, Defendants entered into a contract for an analysis of their quality control processes with UIC; the contract has no timelines and no deadlines. [P484; D1.]

606.     Perhaps the most remarkable failed initiative that Defendants have repeatedly articulated, both in internal (non-privileged) communications and in statements to outside stakeholders, is the need to settle this case.

607.     Each year, Defendants submit statements to the Illinois Legislature about IDOC's initiative and priorities—including budget priorities. These are signed by the IDOC Director. Starting with the FY15 report to the Illinois Legislature, Defendants told legislators that the best course would be to settle this case. Describing the process that had led to the appointment of Dr. Shansky and his forthcoming report, the report stated, ". . . while prospective changes in the provision of medical services may come with a sizeable price tag, it is our firm conviction that the State is better-served by proceeding in this collaborative fashion . . .." [P199 at 000434. The FY16 ISL report repeats the same statement. [P198 at 000396.]

608.     In a November 2016 memo to the Governor's Office of Management and Budget, IDOC CFO Jared Brunk wrote:

> It is with great respect that the Illinois Department of Corrections presents to you a list of FY17 and FY18 operational concerns: . . .

**Legal Issues:**

****

***Lippert v. Godinez*, et al., 10 C 4603 (N.D. Ill.)**

. . . . [T]he parties agreed to ask the District Court to appoint an expert under Rule 706 to review the medical care being provided . . . The Court appointed Dr. Shansky as the expert. Dr. Shansky's final report indicated that the Department fails to provide constitutionally adequate medical care and he proposed a myriad of changes to current practices.

Plaintiffs filed their motion for class certification on December 7, 2015. . . . If the motion for class certification is granted, *the Department will need to settle the case and will need to hire staff* including three regional medical directors and QI staff and implement a number of new policies and procedures . . .

[P56; emphasis added.]

609.    In this same vein, the Defendants' FY17 statement to the Legislature as to this case added that " . . . the report and recommendations of the expert were issued in late 2014. While there have been a few bumps in the road toward resolution, since the report was released, and *while prospective changes in the provision of medical services may carry a sizeable price tag, it is our firm conviction that the State is better-served by proceeding in a collaborative fashion* . . . . So, we are focusing again on reaching an agreed settlement in the case." [P201 at 000475; emphasis added.]

610.    ███████████████████████████████████████████████████████
████████████████████████████████████ [P52 at 000329; P142 at 003423.]

611.    Defendants' FY17 statement to the Legislature also states, in response to the question "What are the 5 top programmatic priorities for FY 2017?" as the first priority, **"*Addressing the Health Care Needs of our Population*"**:

The Department is constitutionally mandated to provide adequate levels of health care to all those in our custody. While the Department has taken serious steps in trying to achieve full compliance - increased staffing, policy changes, further improved training - inadequacies in our system still exist. These inadequacies must be overcome with a mix of continued training and development, increased staffing levels, and a robust medical services contract that fully encompasses the needs of the Department . . .

[P201 at 000480.]

612. ███████████████████████████ [P52 at 000334.]

613. ████████████████████████████████████████████

████████████████ [P54 at 000326; P52 at 000386.]

## XXIII. DEFENDANTS FAIL TO MONITOR THEIR VENDOR OR PENALIZE IT WHEN THEY KNOW IT FAILS TO MEET CONTRACT REQUIREMENTS

614. Illinois now pays Wexford well over $200 million per year for prison healthcare services, and the total cost of the contract over ten years will be in excess of $1.6 billion. [P18; P191.]

615. Through the 2011 contract, Defendants have effectively outsourced a majority of their medical and dental care functions—and virtually all clinical decision-making—to their vendor, Wexford. This grant of power over the lives of those in IDOC custody, however, is not coupled with monitoring of most aspects of Wexford's performance, or any efforts to hold it accountable as to even those aspects—such as providing staff—which Defendants do try to monitor.

616. The 2011 contract leaves IDOC with virtually no control over certain important aspects of the healthcare system.

617. The contract leaves Wexford with the ability to block purchases of needed equipment even once they have been approved by the Office of Health Services. In December 2016, the HCUA at Big Muddy River CC was wondering what had happened to the ASR (adjusted service request) for new beds for her infirmary. The answer ultimately turned out to be that Wexford had blocked it: "I signed and sent that ASR . . .," reported Dr. Dempsey. "Wexford can deny the ASR. We have no recourse." [P454.]

618.    The contract also leaves IDOC with no control over Wexford's employees. No matter how bad a doctor—or any Wexford employee—is, Defendants cannot fire him or her. The only direct remedy at IDOC's disposal is to have a facility's warden lock the employee out of the prison. [Tr. T. Meeks.]

619.    In the case of Wexford staff, however, Defendants are unlikely to know in a timely fashion whether a physician or other member of vendor staff is putting patients at risk because Defendants have given themselves no means to monitor Wexford staff performance. Defendants have left the peer review of doctors and other providers—if it is done at all—to Wexford. Defendants do not even receive a copy of these reviews, just a notice that they have been done. [Tr. T. Meeks.] In addition, since IDOC, in the opinion of the Second Expert, does not have a quality assurance program that is capable of identifying clinical failures—including preventable morbidity and mortality—Defendants have provided themselves with no other method to identify clinicians or other staff who are causing harm.

620.    In sum, Defendants have constructed and persisted in a system in which they have little to no knowledge of, and exercise no control over, the performance of two-thirds of the system's healthcare staff. This includes the critical staff—the doctors, dentists, nurse practitioners and physician assistants—who make diagnoses and decisions about course of treatment, and must advocate for any care the prison itself cannot provide.

621.    Defendants have also outsourced virtually all the decision-making about specialty care to the vendor. Vendor Medical Directors must recommend any specialty care, and vendor utilization management makes the decisions. On rare occasions, a denial is appealed to the agency Medical Director, but this is the exception, not the rule. [Tr. T. Meeks.] The CQI process does not analyze these decisions, and IDOC has no other method of assuring that they are made in

accordance with patient interests. As part of his analysis of the Wexford contract back in 2015, as part of his summary of the recommendations of the "RFP Sub-Committee," Dr. Shicker noted:

> The current contract goes into detail about the process of obtaining a consult including the approval and denial process . . . *The problem is that there is no further monitoring after this process and no formal contractual monitoring about denial rates.*

[P481; emphasis added.]

622.　IDOC's lack of oversight of this process—the utilization management/collegial review process—is coupled with a feature of the contract that should mandate oversight of this process, namely, that there are powerful financial incentives built into the contract for Wexford to deny care. Both the "Hospital Utilization Threshold" and the UIC outpatient/inpatient threshold penalize Wexford financially if these thresholds are exceeded in any given contract year. [P18 §§ 2.2.3.7, 3.1.2.]

623.　In addition, as to the "Hospital Utilization Threshold," there is an extra level of penalization that was intentionally built into the contract. The intention of the State in including the hospital utilization threshold in the contract was to create a "penalty" for going over the threshold, and that penalty was enhanced by how the threshold would be calculated. In a series of emails in late March 2011, IDOC and HFS personnel discussed their ongoing negotiations with Wexford about the utilization threshold. The threshold would be calculated using "billed charges, not paid charges"—and "Paid charges is the amount the State pays, which is usually/always some amount less than the billed charge. **This is a change from the present contract**. . ." [P242 p.3; emphasis added.] "The intent of the RFP," the writer explained, " . . . was that a penalty in the form of an adjustment to the monthly payments would be levied if the threshold was crossed and that the adjustment would be equal to the billed charges . . . The intent was not simply to have the

vendor reimburse the State for hospital charges, but to penalize them by making them pay (through the form of an adjustment) more than what the State pays . . ." [*Id.*]

624.    The contract thus incentivizes Wexford to save money. There are no corresponding provisions that incentivize it to provide quality care. [Tr. T. Puisis.]

625.    These features have remained unchanged through the three renewals of the current contract. [P18, P188, P190, P191.]

626.    

627.    Wexford is a for-profit company owned by a small number of individuals—the required disclosures of these individuals in the contract, as of 2011, listed nine people altogether. [P18 at 000334-361.] ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████

628.    Defendants do not know and have not tried to find out how much profit Wexford makes on the healthcare contract. [Tr. T. Brunk.]

629.     Defendants do monitor certain aspects of Wexford's compliance with the 2011 contract through the monthly "contract monitoring reports" prepared by the facility HCUAs. As the Puisis Report notes, these do not concern aspects of clinical performance, and the HCUAs are nurses who "are not able to monitor clinical care of physicians, including appropriateness of referral, chronic care, and infirmary care." [Puisis SR pp. 17-18.] "The contract monitoring on the part of the state is inadequate," in the opinion of the Second Expert team. [*Id*. p. 17.]

630.     Rather than being tied to clinical performance, the "contract monitoring reports" are tied to a series of "Performance Targets" in the contract. These "Performance Targets" require, *inter alia*, "100% compliance with Staffing Schedules" and Schedule Es, "100% compliance" with IDOC Administrative Directives, and "100%" performance of paying subcontractor bills within 60 days. [P18, Exhibit IV at 000466.]

631.     Defendants' monitoring even of these aspects of the contract through the monitoring reports is imperfect. For calendar year 2017, for instance, 14 of IDOC's then-functioning 25 prisons failed to complete reports for at least one month; 11 missed at least two months of reporting; and some prisons were much worse than that: Danville reported only 5 of 12 months; Logan missed 6 months; and Sheridan reported only 3 months out of 12. [Demonstrative P547.]

632.     Although the reports are supposed to track staff hours not provided by Wexford, this data also is not always provided. Nevertheless, the reports catalog thousands of hours of staff time Wexford was supposed to provide each contract year but did not. In addition to the long-running staff vacancies reported in ¶¶ 58-95, above, just from the set of contract monitoring reports provided to Plaintiffs relating to the eight prisons reviewed in 2014 by the First Expert team, the following missing hours can be compiled:

- In 2007, the only contract monitoring reports provided were from Hill (for July-December only, 4161.45 unfilled hours), and Pontiac (for July-August, October-December only, 2914.03 unfilled hours).
- In 2008, the only contract monitoring reports provided were from Pontiac (9385.03 unfilled hours), Logan (for January-May, July-December only, 3026.43 unfilled hours).
- In 2009, the only contract monitoring reports provided were from Pontiac (10,005.25 unfilled hours), Dixon (9853.55 unfilled hours), Hill (for January-September only, 5720.33 unfilled hours), and Logan (for January-September only, 2724.75 unfilled hours).
- In 2010, the only contract monitoring reports provided were from Pontiac (4703.75 unfilled hours), and Menard (for April-June, August-October, and December only, 2545 unfilled hours).
- In 2011, the only contract monitoring reports provided were from Pontiac (for June, July, and September only, 4030.2 unfilled hours), and Menard (for January-May and December only, 2961 unfilled hours).
- In 2012, the only contract monitoring reports provided were from Menard (for January, May, June, and October-December only, 3193.65 unfilled hours), and Pontiac (for January-July, September, and November-December only, 3076.02 unfilled hours), and Illinois River (for June and November only, 1511.08 unfilled hours).
- No contract monitoring reports for the Shansky-reviewed prisons from 2013 were provided.
- In 2014, the only contract monitoring reports provided were from Menard (8053.45 unfilled hours), Hill (for January-September, November-December only, 7899.49 unfilled hours), Pontiac (January-April, June-September, November-December only, 5089.05 unfilled hours), and Stateville (for January-March only, 3154.75 unfilled hours).
- In 2015, the contract monitoring reports provided were from Hill (10,783.57 unfilled hours), Menard (8586.46 unfilled hours), Dixon (for June-December only, 3200 unfilled hours), Stateville (for July-November only, 2842.5 unfilled hours), Pontiac (for February-April and June-July only, 1677.65 unfilled hours), and Logan (for July only, 832.55 unfilled hours).
- In 2016, the contract monitoring reports provided were from Dixon (12,433.02 unfilled hours), Menard (10,719.83 unfilled hours), Hill (January-March, May-December only, 9243.31 unfilled hours), Pontiac (for June-December only, 8222.05 unfilled hours), Stateville (for January-March, May, July, and September-December only, 4830.81 unfilled hours), and Illinois River (for June-August and October-November only, 3967.59 unfilled hours).
- In 2017, the contract monitoring reports provided were from Pontiac (26,474.52 unfilled hours), Dixon (23,330.08 unfilled hours), Hill (12,434.6 unfilled hours), Stateville (8834.35 unfilled hours), Menard (for January-September only, 7860.01 unfilled hours), Illinois River (for January, March, June, and August only, 2120.1 unfilled hours), and Logan (for February only, 1338.5 unfilled hours).

- In 2018, the contract monitoring reports provided were for May-June only, from Pontiac (May-June, 7015.38 unfilled hours), Stateville (for June only, 1649.1 unfilled hours), Hill (1514.55 unfilled hours), Dixon (for May only, 1182.35 unfilled hours),[56] Menard (for June only, 478.45 unfilled hours).

633.    In many cases, the reports also contain comments from the HCUAs. In the December 2017 contract monitoring report for Hill CC, for instance, the HCUA wrote, *inter alia*:

> NP [nurse practitioner]—vacant 2 years this June—Wexford Regional manager not providing sufficient staffing to fulfill AD requirements. Lack of hours for NP and MD creating dangerou[s] and unsafe work environment. Backlog MD sick call, follow up furloughs, physicals, and clinics. Waiting time for [nurse sick call] referrals up to one month.

> ****

> A pattern of non compliance in all areas due to continued staffing deficiencies and lack of accountability. This continued non-compliance has created an unsafe health care environment. Potential legal rammifications are grave concern. Grievances have doubled.

> ****

> [R]econcilation of hours not done since March 2017. Taking up enormous amount of HCUA and BA time to go back and reconcile months later.

[G159.]

634.    The 2011 contract permits "performance adjustments" to be made for failures to comply with the requirements of Exhibit IV, including the requirement of 100% compliance with the staffing schedules. [P18 §§ 3.9-3.9.3.] Other provisions of the contract permit suspension of payment to the vendor for non-performance. [*Id*. §§ 3.8.7, 3.8.9.]

635.    Over the years, Defendants and their employees have repeatedly complained about Wexford's failures and asked what could be done.

---

[56] It is impossible to determine how many Dixon hours were unfilled in June 2018 due to an error on the report.

636.     In March 2006, IDOC sent a letter to Wexford relaying IDOC's "serious concerns . . . with respect to the failure of Wexford Health [ ] to meet the staffing needs of the Correctional Centers covered under the health care contract effective December 17, 2005." [P502.] "[T]he vacancy rate," the letter states, "for key positions at many facilities remains unacceptable." [*Id.*] Two years later, in June 2008, IDOC wrote another letter to the same effect: "[The] Agency Medical Director, has identified ten sites as having critical vacancies . . . [V]acancies for these key positions at the facilities listed above remains unacceptable." [P503.]

637.     In June 2012, the state was writing Wexford again, this time about Administrative Directive violations at Hill and Menard, and the lack of a Menard medical director. [P504.]

638.     Over time, Defendants' employees have asked whether something could be done—specifically, if penalties could be imposed. In August 2015, the HCUA at Jacksonville CC wrote to Dr. Shicker describing ongoing problems with chronic clinics and sick call due to lack of a doctor: "Jacksonville is going to request penalties on Wexford due to low coverage of practitioner hours. Who do we send the letter to- is it to go to you?" Shicker responded, "Even though I cannot institute penalties I have been notifying my supervisors of the severe vacancy problem and the lack of coverage. They must make that call. In all my years here I have never seen a penalty imposed." [P435.]

639.     Charlie Weikel, in the Office of the Governor, sent the following information compiled by another member of the OG to Director Baldwin, as follows:

Charlie,

I attached a spreadsheet with data for the Wexford contract analysis.

Here are some interesting points for the reports/ violations:

1.     Out of the 27 facilities, we have 70 of the 189 monthly reports.

-> Some sheets were inaccessible— this number should be higher if we check in with IDOC.

2. Of the 153 reported violations, 90 (58. 8%) were related to not having enough staff hired/ not having enough people to cover shifts.

3. There were 27 reports of violating administrative directives— which means that IDOC issued policy/ directive and Wexford did not comply.

4. The contract mentions performance metrics multiple times, but these reports lack performance metrics.
   -> Implementing better metrics might be a good first step.

5. There are 8 cases of Wexford not paying the subcontractor, which should result in a $1000 per day/ bill fine.

I think that if we kept digging, more would come up. If you have any ideas on what else I should look into for this, let me know.

Best,
T. J. Galullo

Baldwin's response to Weikel: "Thanks. Good info. Lots to improve upon." [P91.]

640. Defendants have mused for years about holding Wexford accountable. In August 2011, a state employee, Eric Dailey of the Department of Healthcare and Family Services, wrote Shicker and then-IDOC CFO Brian Gleckler: "We are aware that there are vacant healthcare position—vacant Wexford positions, to be precise. Also, HFS desires to hold Wexford accountable . . . I think if we wait any longer, we send the wrong message to Wexford. . . " Shicker responded:

. . . I don't think we can compare the State not filling its vacant positions to the Vendor not filling its obligations. I am deeply embarrassed by the State vacant positions but that is the State's prerogative. The Vendor was hired for a specific purpose and we spent a lot of time discussing accountability . . .[L]ittle progress has been made since May and I fear it will get worse when they take over the four other sites. The reason I harp on vacancies is that *good staffing levels clearly affect overall performance*.

The subsequent emails in the chain, between Dailey and CFO Gleckler, discuss imposing monetary penalties under Section 3.9 of the contract. [P468; emphasis added.]

641. In August 2015, the HCUA at Pinckneyville complained:

Dr. Shah has been missing work related to several lawsuits this has put us behind on what needs done here. Wexford is saying they do not have to make the hours up.

198

They feel we should pay for his court appearances as contract hours. . . I don't feel we should be short hours because Wexford sends him to 10 different prisons and he is sued from multiple sites. . . . The suits will only increase as the denials increase . . .

RTP#5_ESI 52469] As her message made it up the chain, the GC wrote to CFO Brunk, "Legal will be working . . .to hold them more accountable on the medical side of things," with regular "to discuss staffing." "Thanks," replied Brunk. "Whatever is needed from fiscal, just let us know." [P465.]

642.    In September 2015, a sharp email from IDOC Deputy Director David Gomez to Wexford's Cheri Laurent about the consequences of vacancies at Hill CC ("At a minimum this is going to be a facility audit finding but more importantly, what does this say about the service/care that is not being provided to the offender population?") evolved into an internal IDOC discussion, between Gomez, IDOC CFO Brunk, and Dr. Shicker about what to do about it. [P44.] The recommendation from CFO Brunk was to file a vendor complaint form. [*Id.*]

643.    A whole series of forms were subsequently prepared in October (**Danville CC**—"Medical Director Vacancy—Since October 31st, 2014; **Decatur CC**—"Vacancy of Dentist . . ."; **Dixon CC**—"Physician's Assistant Vacancy," coupled with chronic clinic backlogs; **Graham CC**—chronic clinic and physicals backlogs as well as "Vacancy of a Part Time Dentist" and "Physician Assistant on Leave of Absence (No addition[al] coverage provided to make up for this)"; **Hill CC**—chronic clinic and nurse sick call backlogs, "220 Follow Ups are also past due," and "Vacant Nurse Practitioner," "Medical Director (On vacation in August because of being ILL (No coverage what so ever was provided in his absence"; **Illinois River CC**—"Medical Director Vacancy" but here, "Update: This was resolved . . ."; **Logan CC**—"Medical Director Vacancy," "Full Time Nurse Practitioner Vacancy"; **Menard CC**—backlogs in chronic clinic, physicals, dental, optometry, MD call line and MD backlogs; "1 & ½ MD Vacancies," "NP/PA—1 on Leave

of Absence (No backup provided)," "1 Dentist Vacancy"; **Pontiac CC**—"Vacancy of Part Time Nurse Practitioner," "Vacancy of Full Time Dentist"; **Robinson CC**—"Vacancy of Site Medical Director"; etc.)—there were 17 forms in all, also covering **Shawnee CC**, **Southwestern Illinois CC**, **Stateville CC**, **NRC**, **Taylorville CC**, **Vandalia CC**, and **Vienna CC**. [P45.]

644.    In September 2015, Defendants formed a subcommittee which made a serious effort to consider how to review Wexford's performance. [P50.] However, contract monitoring has not changed.

645.    In his October 2015, in his summary of recommendations of the "RFP Sub-Committee," Dr. Shicker observed, "We will need language on how to effectively deal with vacancies . . ." [Exh. 481.]

646.    ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

647.    Despite these intermittent discussions of penalties, Defendants have never penalized Wexford during the course of the 2011 contract. [Tr. T. Brunk.]

648.    ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

649.    Defendants' fiscal management of the Wexford contract actually ends up rewarding Wexford for its failures.

650. Under the 2011 contract, the contract "Schedule Es" for each prison, which includes the amounts to be paid for staff plus population base amount, add up to an annual dollar amount. Wexford is paid in advance for each month, on a facility-by-facility basis. That is, if the contract provides that, for a particular year, Wexford is to be paid $[x] for facility [y], $1/12^{th}$ of $[x] for its contractual obligations at facility [y] is due on the 1st of the previous month. [P18 § 3.1.1.1.]

651. Thereafter, on a quarterly basis, the contract provides that the amounts already paid to Wexford for that quarter are to be "reconciled" on a facility-by-facility basis. [P18 § 3.1.1.2.] The reconciliation process consists of (i) calculating how many staff hours Wexford actually provided at that facility for each month during the quarter, as against the number of hours it was supposed to provide, and multiplying either missing hours, or hours provided over the contract requirements (*e.g.*, as a result of an ASR) by the dollar amounts listed for each position on the Schedule Es, and either subtracting or adding that amount, as applicable, from or to the monthly payment; (ii) multiplying the per capita population amount by the actual population count for the facility for the month in question, and either subtracting or adding that amount, as applicable, from or to the monthly payment; and (iii) calculating the reimbursement due Wexford for any equipment or supply purchases during the month. The resulting amount is either (if more) added to a subsequent payment to Wexford or, (if less than already paid) taken as a credit by the facility against a future payment. [*Id*.; P140; P43; P47; P140; P194-P197; P202; P204; P206; P208; P210-P212; P338-P362; P387-P394; P396-P403; P455.]

652. The reconciliations are supposed to be completed within 60 days of the end of the previous quarter. P18 § 3.1.1.2.]

201

653.     Since Wexford has never in the course of the contract supplied all the staff hours it is supposed to provide, and payment for staff hours is the largest component in the monthly $1/12^{th}$ payments due, if payment is made, Wexford is almost always paid more than it is owed. In addition, under the contract, at best the reconciliations do not happen until 2-3 months after the fact, and they can be delayed for sixty days thereafter. In reality, the reconciliations are often much more delayed than that, enabling Wexford to keep money it has not earned for months or years.

654.     The reconciliations are done at the facility level, and there is no central office auditing of whether they are correct.

655.     In fiscal years 2016 and 2017, the state of Illinois was without a budget due to conflicts between the Governor and the legislature. During that period, Wexford was paid late or not paid at all. The reconciliation process for Wexford bills was suspended by IDOC, so to the extent that it was paid it was able to retain unearned funds for an even more extended period than usual. Wexford also benefited in two additional ways from the budget crisis:

656.     First (and this is always true if payments were more than 90 days past due), it accrued "Prompt Payment Act" interest on the unpaid invoices at a rate of 1% per month (12% annually). If the invoices were unreconciled (as they were during this period), this interest accrued on amounts almost always larger than Wexford was owed. These amounts are not insubstantial— in FY15, Wexford was paid over $520,000.000 in prompt pay interest. [P465.]

657.     Second, during the state budget crisis, Wexford was able to participate in the state "factoring" program, under which the state arranged for lenders to pay unpaid vendors with unpaid state bills as security. Wexford opted to have some (not all) of its unpaid bills entered into the factoring program. It continued to accrue prompt pay interest on the other bills. Under the terms of the factoring contracts, Wexford received 90% or 88% of the amounts due based on the invoices

from the lending company. The lending company in its turn collected the prompt pay interest until the bills were paid. When the lending company was paid, the vendor whose bills had not been paid would receive the 10% or 12% (in Wexford's case) that had it had not previously received, and the factoring company would retain the prompt pay interest.

658.    90% or 88% is higher than the Wexford "fill rate" for employees during most of the relevant period.

659.    The Wexford invoices in question had not gone through the reconciliation process and a special letter required by at least one factoring company and signed by IDOC officials committed the state to pay the full face amount of the invoices without any discounts due to reconciliations. The letter stated that:

> IDOC will take all necessary steps to ensure that full payment of each of the Receivables, together with payment of the interest payable with respect thereto pursuant to the Prompt Payment Act, and without deduction for any offset or other contractual rights against Vendor . . .

[P247 at 0319590.]

660.    Among the consequences of this were that (1) the state paid interest to the factoring company on amounts not actually due, since the invoices had not been reconciled, and (2) when the factoring company was paid by the state and Wexford received the 10% or 12% it had not previously received under the factoring contract, it received excess funds not due to it, since Wexford had never provided 100% of the staff required of it under the contract.

661.    Defendants have no explanation of their long delays in reconciling Wexford payments.

## XXIV. PROPOSED CONCLUSIONS OF LAW

662.     The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain" through "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted).

663.     "To determine if the Eighth Amendment has been violated in the prison medical context, [courts] perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual Defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016), *as amended* (Aug. 25, 2016*), cert. denied,* 137 S. Ct. 1578 (2017); *see also Greeno v. Daley*, 414 F. 3d 645, 653 (7th Cir. 2005). These two steps are commonly known as the "objective" component and the "subjective" component. *Greeno*, 414 F.3d at 653.

664.     The Defendants' conduct satisfies both prongs of the analysis. They have been and continue to be deliberately indifferent to the serious medical needs of the plaintiffs in violation of the Eighth Amendment.

### R.     Objective Component—Serious Medical Needs And Conditions Causing Harm

665.     By definition, all members of the plaintiff class have serious medical or dental needs. [Dkt. 534 (certifying "a class of all prisoners in the custody of the Illinois Department of Corrections with serious medical or dental needs.").] As the Court previously held, the named plaintiffs have specific serious medical needs "that are generally representative of" those suffered by the class. [*Id.* p. 16.]

666.     The gross deficiencies in IDOC's health care system have caused and continue to cause serious and unnecessary harm to the plaintiff class and expose them to the continuous risk of such harm. *See Helling v. McKinney,* 509 U.S. 25, 33 (1993) ("[T]he Eighth Amendment protects against future harms to inmates" and a "remedy for unsafe conditions need not await a tragic event").

667.    The court-appointed experts have both found major deficiencies in every aspect of IDOC's health care system that have harmed and pose a continuous risk of harm to the plaintiff class. The named plaintiffs provide illustrative examples of the injuries result from Defendants' deliberate indifference.

668.    Both the First and Second Court-Appointed Experts found serious inadequacies in the number of medical and dental staff. The Second Expert found that staff vacancies had worsened in the four years since the First Expert Report. In addition, the IDOC-commissioned NRI report concluded that numerous staff vacancies and leaves of absence were among the "operational challenges . . . that are having a significant impact on the ability to provide timely and constitutionally adequate health care" in IDOC. [P21 p. 9.] Both Court-Appointed Experts found that leadership vacancies were especially critical. Understaffing affects virtually every area of care and causes "immense harm to the inmates" with serious medical needs. *Rasho v. Walker*, 07-1298, 2018 WL 2392847, at *8 (C.D. Ill. May 25, 2018).

669.    Both the First and Second Court-Appointed Experts also found serious inadequacies in the quality of medical staff. Both the Shansky team and the Puisis team concluded that the absence of physicians with primary care training resulted in avoidable harm to patients, including mortalities. The Court finds that Defendants' failure to staff their medical program fully with qualified clinicians has caused serious medical harm to the plaintiff class, and subjects them to an unreasonable, ongoing risk of serious medical harm.

670.    Both the First and Second Court-Appointed Experts also found pervasive deficiencies in clinic space, sanitation, and equipment. Space problems ranged designated space being inadequately equipped to designated space providing no privacy or confidentiality during the health care encounter. Some spaces lacked adequate equipment for medical or dental care

encounters. Sanitation was also alarmingly deficient. The concerns included exam tables and other surfaces that were difficult or impossible to keep sterile, peeling paint and cracked tiles, lack of a paper covering on exam tables that can be changed between patients, and failure to regularly clean such surfaces. The IDOC-commissioned NRI report likewise found lack of basic supplies and adequate facilities for health care within IDOC. Even outside the medical context, the Seventh Circuit has recognized that "[a] lack of . . . sanitation can violate the Eighth Amendment" because it is one of "life's necessities." *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006). *See also Wheeler v. Walker,* 303 Fed. Appx. 365, 368 (7th Cir. 2008) (allegations of unsanitary conditions stated an Eighth Amendment claim); *Johnson v. Epps*, 479 Fed. Appx. 583, 590 (5th Cir. 2012) (unsanitary practices in prison barbershop "pose an unreasonable risk of serious damage to [plaintiff's] future health" that is sufficient to state an Eighth Amendment claim). Unsanitary facilities have "the manifest propensity to spread disease" and an "obvious likelihood of injury." *Brown v. Mitchell*, 308 F. Supp. 2d 682, 693 (E.D. Va. 2004). In the case of unsanitary medical spaces, the risk is all the more obvious, because the prisoners who lie down on exam tables are the most likely to have an infectious disease or be especially vulnerable to infection due to illness. The Court finds that Defendants' failure to provide adequate and sanitary clinical spaces and equipment subjects the plaintiff class to an unreasonable, ongoing risk of serious harm.

671.    Both the First and Second Court-Appointed Experts found poor quality medical records in most facilities. In the words of Plaintiffs' expert Dr. Stern, "The medical record is the primary tool for the multitude of health professionals caring for a patient to communicate with one another. The record must be complete and clear so that each user of the record can easily and accurately determine what is already known about the patient and what care has already been delivered to the patient." [P551 p. 27.] Problems included missing Medication Administration

Records (MARs), disorganized filing, and inadequate or illegible clinician notes. The Second Expert team also found access to records during healthcare encounters problematic, and concluded that the paper record system in place in most IDOC facilities exacerbated the system's other problems in delivery of care.

672.     The medical and dental reception process, including and especially Northern Reception Center (NRC), through which most prisoners enter the system, is deficient. The system is meant "to identify acute and chronic medical problems along with acute and chronic mental health problems, as well as any potential communicable diseases and any other special needs." The First Expert team found that "problems with both the identification and follow through" created "potential harm for the patients." [Dkt. 339 pp. 12-13.] The Second Expert team concluded that conditions had worsened at NRC. [Puisis NRC p. 3.] *See Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1201 (M.D. Ala. 2017) ("Failure to identify those who need mental-health services denies them access to necessary treatment, creating a substantial risk of harm to those who remain unidentified.") The Court finds that Defendants' inadequate reception process subjects the plaintiff class to an unreasonable, ongoing risk of serious medical and dental harm.

673.     Access to most prison healthcare services occurs through nursing sick call. Both the First and Second Court-Appointed Experts found that nursing sick call was inadequate in various ways at every institution. Sick call was frequently conducted by LPNs, who do not have the training to perform independent assessments. Problems with physical space, equipment, lack of privacy, and record-keeping compounded other problems. Sick call was arbitrarily cancelled by security staff. Sick call was not adequately logged. Timely access to physicians and other clinicians was lacking. All of these deficiencies contribute to failures in identifying issues, incorrect diagnosis and treatment, and/or treatment delays, subjecting patients to an increased risk of harm.

The Court finds that Defendants' inadequate sick call process subjects the plaintiff class to an unreasonable, ongoing risk of serious medical and dental harm.

674. The Defendants' chronic care program is also inadequate. Both the First and Second Court Experts concluded that routine management of chronic illness throughout IDOC put prisoners at risk Prisoners with chronic conditions are arbitrarily limited to visits on timetables that may not correspond to the level of control of their disease. If a patient's condition is not well controlled, this practice can expose him or her to ongoing damage caused by inadequately controlled chronic disease, which "leads to avoidable morbidity and mortality." [Dkt. 339 p. 19.] The practice of addressing only one chronic condition during a clinic visit caused fragmented and potentially dangerous care. The IDOC-commissioned NRI Report articulated the same criticisms of IDOC's chronic care program. [P21 p. 12.] In addition, the Court-Appointed Experts found the guidelines for disease management deficient. Some common chronic conditions are not addressed at all. Finally, the Second Expert team found that the poor quality of physicians in IDOC exacerbated the other deficiencies in chronic care. The Court finds that Defendants' inadequate care for patients with chronic conditions subjects the plaintiff class to an unreasonable, ongoing risk of serious medical harm.

675. With respect to unscheduled urgent or emergent care, both the First and Second Court-Appointed Experts found breakdowns at virtually every step of the process. Medical personnel failed to identify serious problems that required emergency, off-site treatment or urgent on-site treatment. Patients returned from hospital visits without appropriate documentation of what happened during the visit or what treatment is required. Patients did not receive prompt follow-up visits after they returned from a hospital visit, and did not thereafter receive recommended treatment. All of these issues were exacerbated when medical personnel did not maintain adequate

logs tracking patients through the process. Consequences included preventable morbidity and mortality. The Court finds that Defendants' failure to provide adequate urgent and emergent care subjects the plaintiff class to an unreasonable, ongoing risk of serious medical and dental harm.

676.    Both the First and Second Court-Appointed Experts found similar failures with respect to scheduled, off-site consultations and procedures and other "specialty" care. In the opinion of the Second Expert, the Wexford system of "collegial review" constitutes an ongoing hazard to patient health and safety. Specialty services were underutilized due to the poor quality of practitioners; follow-up on return to the prisons was inadequate. The consequences of the poor specialty care system included preventable deaths. The Court finds that Defendants' inadequate system for patients needing specialty care subjects the plaintiff class to an unreasonable, ongoing risk of serious medical harm.

677.    Both the First and Second Court Experts found serious deficiencies with regard to policy, practice and physical plant issues in IDOC infirmaries. These included "numerous examples of patients who were admitted to the infirmary with potentially or actually unstable conditions which should have been referred to a higher level of care (i.e., outside hospital)." [Dkt. 339 pp. 32-33.] The physical plants and equipment are inadequate and pose risks to medically-compromised patients. Deficiencies in nursing staffing and clinician quality also pose risks to the infirmary patients. The Court finds that Defendants' infirmary conditions and infirmary policies subject the plaintiff class to an unreasonable, ongoing risk of serious medical harm.

678.    The Second Court-Appointed Expert also found serious deficiencies in IDOC medication administration, which appeared to have worsened in the four years since the Shansky Report. Problems in the ordering and administration of medications, incomplete record-keeping, prescription processes that do not conform to state law, and poor hygiene posed pervasive risks to

patients. The Court finds that Defendants' inadequate medication administration processes subject the plaintiff class to an unreasonable, ongoing risk of serious medical harm.

679.     Both the First and Second Court-Appointed Experts found pervasive problems in IDOC infection control. Inadequate staffing of infection control positions and a lack of consistent oversight resulted in multiple deficiencies ranging from poor sanitation of infirmary linens, medical and dental equipment, and many healthcare spaces to failure to track infection data or maintain negative pressure rooms in prison infirmaries. The Second Expert also found that the management of tuberculosis and hepatitis C were inadequate. The Court finds that Defendants' inadequate infection control subjects the plaintiff class to an unreasonable, ongoing risk of serious harm.

680.     Both the First and Second Court-Appointed Expert found comprehensive deficiencies in the dental program. Dental screening at intake was inadequate. There was poor disinfection and clinician hygiene between patients. Routine care did not include important examinations, assessments, and planning. Dental extractions were performed without documented diagnostic reasons. There were inadequate protocols, equipment, staffing, sanitation, and management. Patients suffered unnecessary pain as urgent pain treatment was unacceptably delayed. No peer review system for dentists was in place, and the Second Expert found that staffing had deteriorated. The Court finds that Defendants' inadequate dental program subjects the plaintiff class to an unreasonable, ongoing risk of serious harm.

681.     Both the First and Second Court-Appointed Experts found a seriously deficient continuous quality improvement program (CQI). The deficiencies affected both medical and dental CQI. The quality improvement program had no means to improve quality of healthcare. Both Experts' mortality reviews found high rates of serious lapses in care during the course of deaths,

but the internal mortality review process had identified none of them and was dysfunctional. The CQI program also failed to use any standards by which to measure quality, and failed to evaluate clinicians or clinical quality, which contributes to preventable morbidity and mortality. The Court finds that Defendants' inadequate continuous quality improvement program and mortality review subjects the plaintiff class to an unreasonable, ongoing risk of serious harm.

### S.    Subjective Component—Deliberate Indifference To Serious Medical Needs And To Risk Of Harm Posed By Health Care Deficiencies

682.    The subjective component of the analysis requires a plaintiff to show that Defendants "actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016), as amended (Aug. 25, 2016), *cert. den.*, 137 S. Ct. 1578 (2017). In *Petties,* the court explained that the subjective requirement of deliberate indifference does not require proof of actual intent to harm. *Id.* at 728 ("Rarely if ever will an official declare, 'I knew this would probably harm you, and I did it anyway!' Most cases turn on circumstantial evidence …"). The *Petties* court discussed the many ways that deliberate indifference can be established in individual cases. Many of these also apply here, including continuing in a harmful course of conduct; treatment decisions that constitute a "substantial departure from accepted professional judgment, practice, or standards"; failing to follow an existing protocol; persisting in a course of treatment known to be ineffective; and inexplicable delay in treatment which serves no penological interest. *Id.* 729-30.

683.    "[T]he Eighth Amendment protects prisoners not only from a prison['s] . . . deliberate indifference to a prisoner's current serious health problems, but also from . . . deliberate indifference to conditions posing an unreasonable risk of serious damage to the prisoner's future health." *Henderson v. Sheahan,* 196 F.3d 839, 846-47 (7th Cir. 1999)

684.     "The Seventh Circuit has recognized that systemic deficiencies in a prison's health care facility" may constitute deliberate indifference. *Rasho v. Walker*, 07-1298, 2018 WL 2392847, at *18 (C.D. Ill. May 25, 2018) (citing *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 430-31 (7th Cir. 1989)). Deliberate indifference exists when "there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." *Id.* (quoting *Wellman*, 715 F.2d at 272). Moreover, "a prison official's failure to remedy systemic deficiencies in medical services . . . constitute(s) deliberate indifference to an inmate's medical needs." *Id.* (quoting *Cleveland-Perdue*, 881 F.2d at 431). *See also Coleman v. Wilson*, 912 F. Supp. 1282, 1304 (E.D. Cal. 1995) (finding deliberate indifference where "Defendants have known for years of the gross deficiencies in the provision of mental health care to inmates . . ., and that they have failed to take reasonable steps to avert the obvious risk of harm to mentally ill inmates that flows from the failure to remedy those deficiencies.")

685.     In this case, nearly every aspect of Defendants' medical and dental programs has serious deficiencies that subject inmates to an unreasonable risk of serious harm. At the very latest, the Defendants knew of all of these deficiencies by December 2014, when Dr. Shansky produced his report and made recommendations for addressing the many significant problems he found. Even before that, however, many of these issues had been documented and brought to Defendants' attention. The John Howard Association of Illinois (JHA) reported on the lack of medical staff and a host of other healthcare problems in Illinois prisons. Defendants receive and review these reports. In addition, the 2016 IDOC-commissioned NRI report identified many of the same deficiencies in healthcare found by the First and Second Court-Appointed Experts. Finally, Defendants' own

employees have repeatedly complained of the deficiencies in the healthcare system and the risks it poses.

686.     The Defendants have not reasonably responded to the dangerous inadequacies in their medical system. Even the deficiencies they committed to fix in 2014, after the Shansky Report, have remained unremedied. They have failed to implement their own initiatives to improve IDOC medical and dental care, or to exercise oversight or control of the healthcare vendor although they know that such oversight and control is needed.

687.     As in *Rasho*, "Defendants have been aware of these deficiencies for an unreasonable period of time, and their failure to address these deficiencies amounts to deliberate indifference." *Rasho v. Walker*, No. 07-1298, 2018 WL 2392847, at *20 (C.D. Ill. May 25, 2018), citing *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983).

688.     To the extent that Defendants have taken action on these issues, such action has been wholly insufficient, especially in light of the severe injury already inflicted on the plaintiff class and the ongoing risk of harm to which they are subjected daily. *See Indiana Protection and Advocacy Services Commission v. Commissioner, Indiana Department of Corrections*, 2012 WL 6738517 (S.D. Ind. 2012)( "deliberate indifference to a serious medical need may be manifested by 'woefully inadequate action' as well as no action at all"); *Coleman v. Wilson*, 912 F. Supp. 1282, 1319 (E.D. Cal. 1995) ("patently ineffective gestures purportedly directed towards remedying objectively unconstitutional conditions do not prove a lack of deliberate indifference, they demonstrate it"). Such inadequate responses are not "reasonable measures to abate" identified risks of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 827 (1994).

689.    The Court finds that the Defendants have been aware of staffing deficiencies for an unreasonable period of time, and their failure to address these deficiencies amounts to deliberate indifference.

690.    The Court finds that the Defendants have been aware of deficiencies in provider quality for an unreasonable period of time, and their failure to address these deficiencies amounts to deliberate indifference

691.    The Court finds that the Defendants have been aware of deficiencies in clinic space, sanitation and equipment for an unreasonable period of time, and their failure to address these deficiencies amounts to deliberate indifference.

692.    The Court finds that the Defendants have been aware of deficiencies in medical records for an unreasonable period of time, and their failure to address these deficiencies amounts to deliberate indifference.

693.    The Court finds that the Defendants have been aware of deficiencies in the reception process for an unreasonable period of time, and their failure to address these deficiencies amounts to deliberate indifference.

694.    The Court finds that the Defendants have been aware of deficiencies in nursing sick call for an unreasonable period of time, and their failure to address these deficiencies amounts to deliberate indifference.

695.    The Court finds that the Defendants have been aware of deficiencies in chronic disease management for an unreasonable period of time, and their failure to address these deficiencies amounts to deliberate indifference.

696.    The Court finds that the Defendants have been aware of deficiencies in urgent and emergent care on site and off site for an unreasonable period of time, and their failure to address these deficiencies amounts to deliberate indifference.

697.    The Court finds that the Defendants have been aware of deficiencies in scheduled offsite services and other "specialty" care for an unreasonable period of time, and their failure to address these deficiencies amounts to deliberate indifference.

698.    The Court finds that the Defendants have been aware of deficiencies in infirmary care for an unreasonable period of time, and their failure to address these deficiencies amounts to deliberate indifference.

699.    The Court finds that the Defendants have been aware of deficiencies in infection control for an unreasonable period of time, and their failure to address these deficiencies amounts to deliberate indifference.

700.    The Court finds that the Defendants have been aware of deficiencies in dental care for an unreasonable period of time, and their failure to address these deficiencies amounts to deliberate indifference.

701.    The Court finds that the Defendants have been aware of deficiencies in continuous quality improvement for an unreasonable period of time, and their failure to address these deficiencies amounts to deliberate indifference.

**T.    Conclusion**

702.    Virtually every aspect of the IDOC medical and dental system presents multiple, pervasive deficiencies that have caused serious injury to members of the plaintiff class and subject them to ongoing, substantial risk of harm. The Defendants have been aware of these deficiencies for years, and have been deliberately indifferent to them by failing to take adequate measures to

address them. The Defendants have violated and continue to violate the Eighth Amendment rights

of the plaintiff class.


DATED: November 16, 2018                         Respectfully submitted,

                                                 By: /s/ Camille E. Bennett
                                                 *One of Plaintiffs' attorneys*

Alan Mills                                       Benjamin S. Wolf
Uptown People's Law Center                       Camille E. Bennett
4413 North Sheridan                              Lindsay S. Miller
Chicago, IL 60640                                Roger Baldwin Foundation of ACLU, Inc.
                                                 150 N. Michigan Ave., Ste. 600
                                                 Chicago, IL 60601


Harold C. Hirshman
Dentons US LLP
233 S. Wacker Drive, Ste. 5900
Chicago, IL 60606

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on November 16, 2018, she caused a copy of the above and foregoing **PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (REDACTED)** to be served on all counsel of record via the Court's electronic filing system (CM/ECF):

/s/ Camille E. Bennett

**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DON LIPPERT, *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | No. 10-cv-4603 |
| | ) | |
| v. | ) | Judge Jorge L. Alonso |
| | ) | Magistrate Judge Susan E. Cox |
| JOHN BALDWIN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**FINAL PRETRIAL ORDER**
**<u>EXHIBIT 9—DEFENDANTS' PROPOSED FINDINGS OF FACT</u>**
**<u>AND CONCLUSIONS OF LAW</u>**

## I. Findings Of Fact

### A. Statewide IDOC Summary Report

1. **Leadership:** In regards to health care leadership, the court appointed expert found that "[t]here have been staffing increases, particularly at NRC and SCC…" Statewide, p.10. Overall, "[t]he HCUA leadership staff at all five facilities was very good." Statewide, p. 10. "With respect to facility leadership, administrative supervision by HCUAs at individual facilities has improved since the First Court Expert's visit. The IDOC HCUAs are responsible for administrative operational supervision of each facility. Of the 26 HCUA positions, all but one is now filled. . . HCUAs were all competent and were engaged in solving administrative problems, even though some problems appeared unrecognized. This is one of the most significant and positive advances since the First Court Expert's report and is a strength that the program can build on." Statewide, p. 18.

2. **Statewide Use of UIC Medical Services:** The court appointed expert notes that "[t]he First Court Expert did not address services provided by University of Illinois at Chicago (UIC). UIC provides laboratory services statewide. We found no problems with laboratory services at any facility we visited. UIC also provides HIV and some hepatitis C services via telemedicine statewide. Everyone we spoke with spoke of the high quality of these services. All patients with HIV are scheduled for care by UIC clinicians. The First Court Expert found that coordination of care between UIC and IDOC providers could be improved. We agree, but found that overall when patients are referred, care was of very good quality." Statewide, p. 29.

3. "The UIC medical school correctional program is a significant resource that has potential to provide qualified physicians to the IDOC correctional medical program. The UIC School of Medicine has a subsidiary school of medicine in Rockford which has a significant

2

primary care program. The Southern Illinois School of Medicine is also a potential significant resource which is close to many of the southern Illinois prisons. As we will discuss later in the recommendations, we believe that the UIC program or some combination of state affiliated medical school programs can be the basis for improving physician quality in the IDOC system of care." Statewide, p. 30.

4. **Intrasystem Transfer:** "Overall, we find that the timeliness of medical screening following transfer has improved…" Statewide, p. 44. "At Dixon, the process has improved since the previous Court Expert's report. All transferred inmates are brought to the dispensary upon arrival at DCC. Registered nurses review the transfer summary, take vital signs, and conduct a brief screening interview to identify any immediate medical needs and reconcile prescribed medications so that treatment can be continued. Each inmate receives an individual explanation from the nurse about how to request health care attention for urgent and routine medical needs. The next day these inmates are seen again by nurses, who complete a lengthier interview using the intake screening questions and review the medical record. At this encounter, the nurse ensures the problem list is up to date, completes any screening not done at intake, and identifies any pending referrals or appointments. Inmates who have chronic diseases are enrolled in chronic care clinic, and medication, treatments, and labs are ordered. At this second encounter, the nurse answers any questions and confirms the inmates' understanding of how to request care, procedures to receive KOP and pill line medications, and obtain refills." Statewide, p. 45.

5. **Nursing:** "There was overall compliance with timeliness of nursing admission notes, which were consistently written at the time of admission, and the frequency of nursing progress notes. Nursing progress notes were consistently entered no less than daily even when the policy required only weekly notes." Statewide, p. 68.

3

6.      "Patients admitted to the infirmaries with less complicated conditions (post-op, basic wound care, no assistance with ADL's, etc.) were more likely to be adequately managed." Statewide, p. 73.

6.      **Nursing Sick Call:** "At SCC, access to sick call is through a combination of a written health request and sign-up system. Problems related to the frequency of sick call clinics and custody's failure to escort patients to clinic exam rooms have been resolved. Improvements were noted with the standardization of exam room equipment and supplies, and availability of the medical record at nursing encounters." Statewide, p. 49.

7.      "At Dixon, access to nurse sick call is through a written health request. Problems related to confidentiality of sick call request forms have been resolved through installation of sick call boxes on the housing units." Statewide, p. 49.

8.      "At LCC, our review showed some improvement from the previous Court Expert's report but other issues persist. To access sick call, inmates sign up for sick call on a sheet of paper in the housing unit rather than submitting a written request with the nature of the complaint." Statewide, p. 49.

9.      "At MCC, we found improvement with standardization. Our review found that some of the problems with sick call described in the previous Court Expert's report have been resolved while other problems persisted. Positively, the rooms used by nursing staff to conduct sick call are uniformly equipped and supplied. Many of the exam rooms have a Plexiglas door which ensures auditory privacy during the sick call encounter." Statewide, p. 50.

10.     **Chronic Care:** "We found that the IDOC now uses a UIC HIV chronic care guideline [which is an improvement from the first report]." Statewide, p. 51.

4

11. **Dental Care Orientation Manual for Inmates:** Overall, inmate orientation to dental care has improved since the First Court Expert's Report. While we concur with the First Court Expert that the orientation handbook could benefit from additional information about access to dental care, there was sufficient information provided about sick call in general for inmates to access dental care. Furthermore, dentists provided relevant information during the NRC, LCC, and MCC intake exams. Statewide, p. 110.

12. **Dental Specialists:** "Dental specialty referral has not changed materially since the First Court Expert's Report and remains adequate. We concur with the First Court Expert's findings. In addition, we identified current and additional findings as follows." Statewide, p. 113. "Several prisons have arrangements for local oral surgeons to provide care on site for less complex procedures and transport prisoners to the oral surgeon's practice for complex procedures. Other prisons send all prisoners who require oral surgery care off site. Oral surgery consultations we reviewed were appropriate, and appointments were made timely." Statewide, p. 113.

13. **Dental Extractions:** "Our finding that [Dental] Extraction care is adequate diverges from that of the First Court Expert which suggests that many of the previously identified deficiencies have been remedied. Moreover, we identified current and additional findings as follows." Statewide, p. 109. "With few exceptions, extractions were informed by adequate preoperative x-rays and were accompanied by signed consent forms. However, while the tooth to be extracted was identified, the reason for the extraction was rarely noted. On the other hand, most of the health history forms were not updated**.** Generally, patients with dental infections who were prescribed antibiotics had the tooth extracted timely, that is within the therapeutic window of the antibiotic (i.e., within 10 days – the duration of most of the antibiotic prescriptions)." Statewide, p. 109.

5

### B. Dixon Report

14.     **Leadership:** Dixon has a competent Health Care Unit Administrator Dixon, p.3.

"One significant change is that the State has filled the HCUA position with a very capable person.

She appears to have led changes that have resulted in improvements noted in this report. The

HCUA has been in her position since 2015. This person has provided leadership . . ." Dixon, p. 7.

15.     **Intrasystem Transfer and Sick Call:** "[W]e find that the intrasystem transfer and

sick call processes have improved since the First Court Expert Report . . . " Dixon, p. 2.

16.     **Nurse Sick Call and Intake:** Since the first expert report, Dixon has established a

new intake process where inmate medical needs are being identified and reported by correctional

nurses and healthcare staff. Dixon, p. 3. Nursing sick call and overall access to healthcare has

improved since the first expert report. Dixon, p. 3.

17.     "Boxes have been put in place to receive health care requests and these are picked

up daily. A log has been established. We found that sick call requests were timely triaged. Because

licensed practical nurses (LPNs) work in close proximity and under supervision of an RN, nursing

sick call now conforms to the Illinois Nurse Practice Act requirements. Sick call is no longer done

in the hall."

18.     **Transfer of sick Inmates:** "The previous Court Expert's recommendation [in

regards to reception processing and intrasystem transfer] has been achieved. All transferred

inmates are brought to the dispensary upon arrival at DCC. Nursing staff (RNs) review the transfer

summary, take vital signs, and conduct a brief screening interview to identify any immediate

medical needs and reconcile prescribed medications so that treatment can be continued. Each

inmate receives an individual explanation from the nurse about how to request health care attention

for urgent and routine medical needs. The next day these inmates are seen again by nurses who

complete a lengthier interview using the intake screening questions and review the medical record.

6

At this encounter the nurse checks to make sure the problem list is up to date, completes any screening not done at intake, and identifies any pending referrals or appointments. Inmates who have chronic diseases are enrolled in chronic care clinic, and medication, treatments, and labs are ordered. At this second encounter, the nurse answers any questions and confirms the inmates' understanding of how to request care, procedures to receive KOP and pill line medications, and obtain refills." Dixon, p. 20.

19. **Medication and Medical Equipment:** "Emergency response equipment and supplies [are] available, properly sealed, and maintained. Equipment is regularly checked. Mass casualty drills are performed and are thorough. . ." Dixon, p. 4. Medication rooms were clean, secured, and uncluttered. Medication refrigerators were well maintained. Narcotic counts were accurate. Dixon, p.4.

20. **Clinical Space:** "[C]linical areas were generally clean. The negative pressure room unit was functional and regularly inspected. Medical equipment is mostly regularly inspected." Dixon, p. 3.

21. "The telehealth room used for UIC HIV and hepatitis C care, renal specialty consultation, and telepsychiatry is clean and adequately sized. The telehealth room is not shared with the clinical providers and thus there is no competition for this space." Dixon, p.10

22. "The location of a satellite nurse sick call room in a housing unit of the X building maximizes the segregated patient-inmates' access to sick call." Dixon, p. 10.

23. "The negative pressure unit in the infirmary is regularly inspected. The unit was fully functional. The unit has documented inspections on a weekly basis." Dixon, p.10.

24. "In summary, the medical building was generally clean and organized . . ." Dixon, p. 16.

7

25. **Sanitation:** Monthly safety and sanitation inspections and reports are being done by the health care team at DCC. Dixon, p. 16. "The clinical areas in the medical building and in the X building and the patient rooms in the infirmary, ADA unit, and the geriatric floor were generally clean." Dixon, p. 16.

26. **Medical Records:** "Since the First Court Expert's report, MARs appear now to be timely filed in the medical record. Three additional medical record staff have been added since the First Court Expert's visit in 2014, which has helped in this regard." Dixon, p. 18.

27. **Radiology:** "Radiology services are inspected and current. Access to plain film x-rays is acceptable and turnaround time is good." Dixon, p.5.

28. "The Illinois Emergency Management Agency (IEMA) radiation safety inspections and reports for the radiology units at DCC are current. The active x-ray equipment at DCC was found to be in compliance with the Radiation Protection Act of 1990." Dixon, p. 80.

29. "The access to plain film x-rays at DCC is acceptable." Dixon, p. 80.

30. "The turnaround time for radiologist readings and return of the reports is good." Dixon, p. 80.

31. **Dental Care:** "Dental sterilization, safety, and disinfection has not changed materially since the First Court Expert's Report and remain adequate." Dixon, p. 83-84. "The clinic was neat and clean. Surface disinfection between patients was adequate and instruments were bagged and stored properly." Dixon, p. 83-84. "The clinic was neat and clean. Surface disinfection between patients was adequate and instruments were bagged and stored properly. Dixon, p. 90. "[O]ral surgery consultations with specialists appear to be adequate." Dixon, p. 92.

**C. Logan Report**

8

32. **Leadership:** "We were impressed by the enthusiasm and dedication to improvement of the HCUA and the direction she has provided to the program." – p. 7

33. **Intake Process:** "[W]e found that the physician assistant working in [the intake clinic] performed very well. He was thorough and conscientious, and we were impressed with his work." – p. 3

34. **Clinic Space, Sanitation, and Support Services:** "Overall, the clinical areas at LCC were clean, organized, and well maintained." – p. 16.

35. "The infirmary was clean and organized." – p. 5. "The infirmary beds were all hospital beds in good condition with adjustable heights, heads, and legs. The three crisis room beds were elevated concrete slabs with mattresses. The battery powered nurse call devices located in the infirmary patient rooms were functional.

36. The crisis rooms were located in direct line of sight from the infirmary nursing stations and did not have call devices." – p. 9 "The 15-bed infirmary is located at the opposite end of the medical building from the ambulatory care wing. The nursing station with an adjacent medication/supply/equipment room is located at the beginning of the infirmary corridor. Four patient rooms had two beds per room with a toilet in each two-person room. There were seven single-bed rooms; three of these single person rooms were crisis/negative pressure rooms located directly in front of the nursing station. Relatively new, excellent condition hospital beds with adjustable heights and head and lower extremity sections were in all the single (non-crisis) and two-person rooms. Nurse call devices were mounted on the walls next to each bed in the non-crisis rooms; four were tested and found to be functioning. The infirmary nurse quickly responded to an unannounced activated device." – p. 14.

37.     "The ambulatory care wing of the medical building has a centralized nurse station and five private exam rooms, a telehealth room, an equipment storeroom, a phlebotomy room, and two nurse offices. There is a centralized nursing station in the outpatient clinic area with an open counter, two chairs, computer monitors, and supply cabinets. The station was clean and organized." – p. 10

38.     "The [OB-GYN] exam rooms were generally clean and adequately organized." – p. 11

39.     **Radiology:** "Radiology services are timely and there is no backlog. Access to this service is good. Equipment appears to be in compliance with state regulations." – p. 5. "The Illinois Emergency Management Agency (IEMA) radiation safety inspections and reports for the radiology units at LCC are current. The active x-ray equipment at LCC was found to be in compliance with the Radiation Protection Act of 1990. The access to plain film x-rays at LCC is good. The turnaround time for radiologist readings and return of the reports is good." – p. 45. "It was reported that there is not a waiting list for non-urgent onsite x-rays. Most x-rays are reported to be taken within one to two days after receiving the order. Weekend and holiday requests are completed on the next working day." – p. 45. "In summary, the radiology services at LCC have reasonable access to x-ray services and reasonable turnaround time of radiologist readings and reports." – p. 4

40.     **Infirmary:** "Since the visit of the First Court Expert, LCC has implemented an EMR system that addressed most of the deficiencies related to the poor organization of the former paper medical record and the inability to find clinical information. A nurse call system has been installed adjacent to all the non-crisis infirmary beds. Vital signs are regularly taken." – p. 46. "The

infirmary was clean and organized. . . . Vital signs in the infirmary were regularly taken and recorded." – p. 47.

41.     "With the exception of the crisis rooms, hospital beds with adjustable heights and sections in good condition were universally deployed in all infirmary rooms. The crisis rooms had concrete beds with intact mattresses." – p. 47.

42.     "Nurse call devices were mounted on walls adjacent to each infirmary bed. The system was verified as being operational. Patients demonstrated full understanding of how to activate the nurse call device. There were no nurse call devices in the crisis rooms, but the rooms were in the line of sight and/or sound of the nursing station." – p. 47.

43.     "Review of five current infirmary records with six infirmary admissions verified that each of these patients had nurse admission notes on the day of admission and no less than daily progress notes; most records had notes on each shift, on all patients. Provider admission notes were written on the six admissions within 48 hours and the five chronic patients had progress notes no less than weekly." – p. 48

44.     **Chronic Care:** "An EMR has been implemented at LCC. This addressed the First Court Expert's strong concerns about the legibility of provider notes. LCC now has a single, dedicated nurse to coordinate the chronic care program. Patients assigned to chronic care clinics are regularly seen in these disease specific clinics." – p. 53

45.     "Diabetic patients were found to have HbA1C testing on a regular basis, documented foot exams, urine microalbumin-creatinine ratio testing, and annual eye evaluations by an optometrist." – p. 57

46.     **Dental Program:** "LCC has two full-time dentists, two full-time assistants, and one full-time hygienist. This should be adequate to provide meaningful dental services for LCC's 2000 inmates." – p. 71.

47.     "There was a separate sterilization and laboratory room of adequate size with a large work surface and a large sink to accommodate proper infection control and sterilization." – p. 71.

48.     "Dental facilities and equipment have improved since the First Court Expert's Report and are adequate. We concur with the First Court Expert and note that since then, the loose wires have been secured, the EMR has been implemented, and the dental hygiene area has been completed." – p. 72

49.     "Surface disinfection performed between patients in the clinic was appropriate and protective covers were used on surfaces. Sterilization procedures and instrument flow were adequate. Instruments were properly bagged, sterilized, and stored." – p. 73

50.     "A review of the past two years' sterilization logs showed that autoclaving was accomplished weekly and documented. They utilize a service from Henry Schein called Crostex that does the testing and maintains the results. A spread sheet of the results is available and provided annually." – p. 73

51.     "Dental extraction care has improved since the First Court Expert's Report and is adequate. We concur with the First Court Expert's findings but note that unlike those findings, of 10 records of inmates who had extractions, all extractions were informed by adequate panoramic x-rays. This aspect of the program has improved substantially since the First Expert's Report. All progress notes documented the reason for the extraction. . . . All extractions were accompanied by signed consent forms." – p. 77.

52.     "The dental sick call process has changed since the First Court Expert's Report and is adequate. Consequently, our findings diverge from those of the First Court Expert. Moreover, we found that the SOAP format was used consistently, which represents an improvement in documentation." – p. 79

53.     "We concur with the First Court Expert that oral surgery consultations are adequate." – p. 82.

### D.  Menard Report

54.     **Leadership:** "The HCUA position is filled by a nurse who is competent and well qualified for her position." Menard, p.7.

55.     **Nursing Sick Call and Infection Control:** Minor improvements made in nursing sick call and infection control. Menard, p. 3.

56.     "Patient-inmates interviewed in the cell houses were all knowledgeable about the sick call request procedure. Most stated that they are seen by a nurse within a few days after they place a request in the locked box. If they were referred by the nurse to see a provider, it will take three to four days up to a few weeks before they were seen in a provider sick call." Menard, p. 13.

57.     "Our review found that some of the problems with sick call described in the previous Court Expert's report have been resolved. Most notably, the rooms used by nursing staff to conduct sick call are uniformly equipped with accurate weight scales, an otoscope, blood pressure cuff and stethoscope, peak flow monitor, pulse oximeter, and exam table with paper. Most have sinks to wash hands and those that do not had hand sanitizer available (in two rooms the hand sanitizer was empty). Each exam room had a flyer mounted on the wall reminding nurses to change paper between patients. Wall mounted oto-ophthalmoscopes did not work in most rooms but there

13

were hand-held ophthalmoscopes in all the rooms. Many of the rooms have a plexiglass door which ensures auditory privacy during the sick call encounter." Menard, p. 23.

58.    "In summary, the relocation of all nurse sick calls, provider sick calls, and chronic care clinics to the cell house allows for improved access to primary care services." Menard, p. 7. "Since the First Court Expert's visit, MCC now has properly equipped rooms used to conduct nursing sick call evaluations. All sick requests we reviewed were seen timely, including urgent sick call requests. We verified this in interviews of inmates." Menard, 5. "There is a dedicated full-time nurse assigned to infection control, and important improvements have been made to the program. MCC tracks infectious disease and has the most advanced tracking of persons with infectious disease of all the facilities we have visited." Menard, p.6. "We noted that medication rooms were clean and orderly, and that storage of medication was appropriate." Menard, p. 6.

59.    **Radiology:** "Radiology equipment, inspections, and safety were adequate . . ." Menard, p. 4. "The Illinois Emergency Management Agency (IEMA) radiation safety inspections and reports for the radiology units at MCC are current. The active x-ray equipment at MCC was found to be compliance with the Radiation Protection Act of 1990." Menard, p. 17. "The access to plain film x-rays at MCC is acceptable." Menard, p. 17. "In summary, the radiology services at MCC have reasonable access to x-ray services and reasonable turnaround time of radiologist readings and reports." Menard, p. 18.

60.    **Medical Records:** Paper medical records are used and were thinned to a reasonable size. Menard, p. 18. We confirmed the First Court Expert's finding that medical record volumes are thinned. Whenever a volume reaches two inches in depth, medical record staff thin the volume, and for all charts we reviewed, volumes were thinned to two inches or less. Charts we used for

14

medical record reviews came apart much less frequently than occurred at other sites, but this still occurred. Menard, p. 19.

61. **Chronic Care:** "Patients assigned to chronic care clinics are regularly seen in these clinics." Menard, p. 26.

62. "MCC continues to utilize combination chronic care clinics, which allows some but not all chronic illnesses to be managed in a single clinic session." Menard, p. 26.

63. "A dedicated nurse manager is assigned to assist and coordinate the telehealth clinics. This nurse is present in the exam rooms during all the UIC High Risk/HIV clinic, UIC telemedicine liver clinic, and the renal telehealth clinic appointments. She coordinates the appointments for these three specialty clinics, manages the completion of hepatitis C pre-treatment database, and tracks the clinical status and lab results of the referrals to UIC liver clinic. This telehealth nurse manager maintains clinically useful spread sheets on patients being followed in the High Risk/HIV clinic that tracks the status of the preliminary workup and approval process for hepatitis C patients." Menard, p. 29.

64. **Dental Care:** "[T]he number of authorized dental personnel positions is adequate . . . " Menard, p. 76.

65. "Autoclave log management has improved since the First Court Expert's Report and is adequate." Menard, p. 78.

66. "Oral surgery consultations are adequate." Menard, p. 90.

67. "The dental CQI program, has improved since the First Court Expert's Report and is adequate. We were provided with a summary of two studies. We concur with the First Court Expert's findings that there is an ongoing dental CQI program. Moreover, current and additional findings follow." Menard, p. 90

68. "A study of 50 patients who were on the restoration (filling) list May 2015 to December 2015, with treatment dates ranging from August 2016 until September 2016, found that 94% had successful restorations without need of extraction." Menard, p. 90.

### E. Stateville Report

69. **Leadership Staffing & Custody Functions:** "Based on a comparison of conditions as identified in the First Court Expert's report, we find that some conditions appear to have improved by virtue of hiring a permanent Health Care Unit Administrator (HCUA) and improving access to sick call. . . . The HCUA position is now filled with a capable full time administrator." – pp. 2-3

70. "There has been a very recent increase in staffing at NRC which will reduce the need to send staff from SCC to NRC." – p. 7. "[T]he HCUA and DON are energetic and willing to learn their assignments." – p. 7

71. **Intrasystem Transfer:** "We found that the intrasystem transfer process has improved since the First Court Expert's report." – p. 3

72. **Access to Care:** "Access to care has significantly improved since the First Court Expert's report and problems identified in that report related to access to care have been resolved." – p. 3.

73. **Quality Improvement Program:** "While the First Court Expert found the quality improvement program 'non-functioning,' we found that the HCUA and his staff have initiated CQI activity, although it is nascent and not yet effectively functioning." – p. 5

74. **Clinic Space:** "Clinic examination rooms were generally clean and appropriately equipped." – p. 3

16

75.　"The nurse sick call rooms in the housing units (B, C, D, E, X) are adequately sized and properly equipped. Their location in the housing units maximizes the patient-inmates' access to sick call." – p. 10

76.　"The infirmary porters were verified to have received blood borne disease training and hepatitis A and B vaccinations." – p. 10

77.　"The nurse sick call rooms in Quads B, C, D, E, and in the X (disciplinary and protective custody) building were inspected. The location of the nurse sick call rooms in the housing areas enhances the inmates' access to health care services. The sick call rooms have adequate space. Each has an exam table with disposable paper coverage, a blood pressure and vital sign unit, a temperature taking device, a medication cart, a wall mounted oto-ophthalmoscope, a privacy barrier, and a scale." – p. 11

78.　"The mattresses [of the infirmary beds] were generally in good condition; the impervious covers were also either intact or taped. . . . The rooms on the two-bed wing had nurse call devices; a review of four rooms verified that the devices were functional." – p. 12

79.　"Two infirmary porters were interviewed. They both stated that they had received formal training about their duties and had been vaccinated against hepatitis A and B. The Director of Nursing provided copies of their training curriculum, post-training test and vaccination records that confirmed the information provided by the porters." – p. 12

78.　"The infirmary nurse station was centrally located between the two wings, with access to both hallways. The nurse station was adequately sized and clean." – p. 12

79.     "The health care unit/clinic's exam rooms, nurse work rooms/offices, urgent care room, physical therapy room, telehealth rooms, mental health interview rooms, and phlebotomy/lab prep room were organized and clean." – p. 13

80.     "The optometrist (two days/week) uses the sixth room; it has an optometry chair with a small tear, optometry equipment that is aging but was reported to be fully functional, a functioning ophthalmoscope, and a desk with a chair. The optometry room was clean, neat, and organized." – p. 13

81.     **Environmental Rounds:** "Monthly Medical Safety and Sanitation rounds are being performed and have been reported from September 2017 through February 2018. The format of the Monthly Medical Safety and Sanitation report is notably improved. This report includes: 1) Location, 2) Identification of Standards Not Met, 3) Recommendations for Corrective Action, 4) Follow-Up on Past and Present Discrepancies." – p. 15

82.     **Medical Records:** "Except for hospital and consultant reports, most documents are filed timely into the medical record." – p. 3 "Transfer screening at SCC has improved since 2014." – p. 16

83.     **Nursing Sick Call:** "Our review found that problems with daily access to sick call have been resolved. Since SCC has implemented the sign-up log, patients are seen the next day. Documentation of timeliness and disposition of sick call requests is evident from review of the sick call logs. The rooms used to perform sick call are now adequately equipped. There was also no evidence of security staff failing to escort inmates to sick call as described in the First Court Expert's report." – p. 19

84.     "Inmates appear to be able to access nursing sick call within 24 hours of signing up. None of the inmates interviewed or who agreed to be observed during sick call voiced complaints about the timeliness or responsiveness of nursing sick call." – p. 21

85.     "Nurses see inmates in a sick call room that has been established in each of the cell houses. The nurse brings the inmate's medical record to use during the sick call encounter. The sick call rooms are well lighted, generally clean, and capable of providing patient privacy. Each has an exam table with paper and a wall mounted oto-ophthalmoscope. . . . The space, equipment, and supplies available to conduct sick call are adequate." – p. 21

86.     "We observed three nurses (all RNs) as they were conducting sick call on Monday February 26, 2018. A total of five patients were seen, three of these were in segregation. Each of the nurses' evaluation of the patients' complaints was thorough and appropriate. Nurses correctly used the IDOC treatment protocols and the plans derived for each patient were appropriate." – p. 21

87.     **Pharmacy & Medication Administration:** "We toured the medication room in the clinic and the room behind, where the pharmacy technician works, and where medication is stored until it is needed for administration. These two rooms were clean, uncluttered, well lighted, and kept secure. There is a refrigerator with a thermometer and temperature log that was up to date. We conducted a random count of controlled substances and found it to be accurate." – p. 56

88.     "The interaction between the nurses administering medication and inmates in the cells was outstanding in professionalism and respect." – p. 58

89.     **Infection Control:** "Responsibility for infection control is dispersed amongst several staff nurses, the DON, and HCUA. The HCUA facilitates and monitors sanitation

19

inspections and is diligent in following up on identified concerns until correction has been achieved." – p. 60

90.     **Dental Program:** Regarding the dental team: "Overall, this is a strong team that works well together to create a very busy and smooth-running clinic." – p. 62

"Facilities and equipment are unchanged from the First Court Expert's Report and remain adequate. We concur and note that the previously inoperative ultrasonic unit had been repaired." – p. 63

91.     "Autoclave log maintenance has improved since the First Court Expert's Report and is adequate. Spore testing was performed weekly and documented. No negative results were recorded. Unlike the finding of the First Court Expert, there were no gaps in the sterilization record." – p. 65

92.     **Dental Orientation Handbook:** "Inmate orientation to dental care has not changed substantially since the First Court Expert's Report and we agree with the First Court Expert that it remains adequate. Inmates are informed that they can access health care (including dental care) as part of the SCC intake process. In the alternative, they can submit a specific request for dental care on a form that is collected periodically and delivered to the dental clinic." – p. 71

### F.  Stateville NRC

93.     **Radiology:** "There is no waiting list or backlog for plain x-ray studies at NRC. The turnaround for the radiologist's reading is one to three days. . . . It was reported that 'no shows' are always rescheduled on the next working day." – p. 21

94.     **Medical Reception:** "Our review showed that improvements have taken place with respect to the timeliness of completion of the medical reception process, including labs and

provider physical examinations. Nurse and phlebotomy stations are clean and well organized. Medical providers documents medical conditions on patient problem lists." – p. 28

95.     **Pharmacy & Medication Administration:** "We toured the rooms where pharmacy technicians receive and sort medications. The rooms were clean and well organized. . . . Pharmacy technicians have established an accountability system for stock medications in which nurses sign out a stock medication blister pack for each patient. Narcotics are not stored in these medications rooms." – p. 64

96.     **Dental Program:** "The dental treatment room was disinfected appropriately between patients and protective covers were used on all surfaces. Instruments were properly bagged and sterilized. All hand pieces were sterilized in bags." – p. 72

97.     "Autoclave log maintenance had improved since the First Expert's Report and is adequate. The sterilization log for the past two years was in order. Testing was performed weekly and documented. No negative results were recorded." – p. 73

98.     **Internal Monitoring & Quality Improvement Programs:** "NRC should be credited with having started the CQI process. It is a step forward to have performed these studies." – p. 88

99.     "The annual CQI report contains two useful pharmacy studies. One is a monthly audit of the medication rooms. While we did not verify the accuracy or effectiveness of this study, we do agree with the concept of this study and believe that such audits do promote regular monitoring of the program. The pharmacy also performs a monthly audit of 20 medication administration records (MAR) in (1) Whether the start and stop dates are present on the MAR; (2) Whether the drugs in the cart match the MAR; (3) Whether allergies are listed on the MAR; and (4) Whether there is documentation of all doses given. This is a useful audit." – p. 91-92

### G.  IDOC Mortality Rates Compared to Other States

100.    The sample of patients that Dr. Puisis selected for mortality review cannot be extrapolated to the entire IDOC inmate population. (Puisis Report, Statewide at 91)

101.    IDOC provided Dr. Puisis with 174 death records from 2016-2017.  Dr. Puisis selected 33 records to review from 12 of IDOC's facilities.  (Puisis Report, Statewide at 91).  His report does not refer to any statistical methods or measurable criteria regarding how he selected these 33 records from the total number of records provided to him.  In fact, the report does not contain any explanation regarding how he selected these records.  Dr. Puisis merely described the sample as "excellent" without explaining what constitutes an "excellent" sample.  (whole paragraph is from page 91).

102.    The U.S. Department of Justice (Bureau of Justice Statistics) tracks inmate deaths. For 2014, the latest year of available statistics, The IDOC had the sixth lowest mortality rate (182/100,000 inmates) of the 50 state systems. The average mortality rate of state correctional systems was 275 per 100,000 inmates. (Puisis Report, Statewide at 90)

103.    Rates of mortality in IDOC are significantly below average for all chronic illnesses affecting the elderly. This is in line with IDOC having the seventh lowest percent of persons over age 55 of all state systems." (Puisis Report, Statewide, at 90)

104.    Indiana, Kentucky, and New Jersey all have 55 and older populations less than that of the IDOC yet have mortality rates that are 22%-50% higher than that of the IDOC. (U.S. DOJ , Bureau of Justice Statistics, Mortality in State Prisons, 2001-2014, cited by Dr. Puisis – Statewide at 90)

105.    Of the ten largest prison systems in the country, IDOC has the lowest mortality rate and percentage of the population over 55.  Four of the nine comparator states have a percentage of

55 and older population that is less than 2% greater than the IDOC yet have a mortality rate that is anywhere from 15-23% greater than the IDOC. (U.S. DOJ , Bureau of Justice Statistics, Mortality in State Prisons, 2001-2014, cited by Dr. Puisis – Statewide at 90)

### H. Expected Testimony

106.    In July 2018, IDOC and the University of Illinois executed an agreement that directs the university's College of Nursing Institute for Health Care Innovation to develop a comprehensive quality improvement program so that IDOC will deliver high quality and safe health care reliably to offender patients.  This program will be comprehensive, system-wide and will focus on patient safety, risk management, infection prevention and control, and peer review. It will be based on standards from the National Commission on Correctional Health Care and The Joint Commission and other evidence-based health care practices.   The university's efforts pursuant to this agreement have begun.  (Defs' Ex. – IDOC/U of I agreement; testimony of Dr. Meeks)

107.    IDOC alone spent $2,167,000 on healthcare staff overtime to fill staffing vacancies. And in the past year Wexford spent $6,116,718.81 on overtime and other staffing measures to cover vacancies. (Expected Testimony from Jared Brunk and from Wexford Representative).

108.    The Puisis Report does not recognize that, even with the inclusion of vacancies, the health care staff per 1,000 inmates increased by 33% from 2014 to 2018. The Report also does not provide any comparison of IDOC vacancy rates to those from other state prison systems or from the community. Further, it fails to comment on the national nursing shortage or reflect that over 25% of the hospitals in the country have a Registered Nurse (RN) vacancy rate of greater than 10%.  (Expected Admission of Dr. Puisis)

109. Dr. Puisis has concluded that the current leadership of each HCU he visited is "very good." (Puisis Report, Statewide at 11)

110. IDOC resumed conducting mortality review as of the first week of October 2018. These reviews will include Dr. Meeks, Regional Directors, and Kim Hugo. In the event there are concerns at the weekly mortality review that need to be shared with the medical vendor, IDOC will have a monthly mortality meeting with the vendor. (Testimony of Dr. Steven Meeks)

111. As of October 3, 2018, facilities have been directed to use RNs for sick call, subject to availability of RNs on staff. (Testimony of Dr. Steven Meeks)

112. IDOC currently has a full-time infectious disease coordinator and quality control auditor, Joe Ssenfuma. (Testimony of Dr. Steven Meeks)

### I. Healthcare Spending/Finances

113. IDOC breaks down its total spending on offender health care into five categories: comprehensive medical, ancillary costs, AIDS/HEP C, dialysis, and statewide hospitalization. For Fiscal Year 2010, IDOC spent $124,058,000.00 across all five categories. For Fiscal Year 2011, IDOC spent $135,355,000.00 across all five categories. For Fiscal Year 2012, IDOC spent $129,898,000.00 across all five categories. For Fiscal Year 2013, IDOC spent $128,525,000.00 across all five categories. For Fiscal Year 2014, IDOC spent $146,579,000.00 across all five categories. For Fiscal Year 2015, IDOC spent $155,419,000.00 across all five categories. For Fiscal Year 2016, IDOC spent $160,392,000.00 across all five categories. For Fiscal Year 2017, IDOC spent $203,454,000.00 across all five categories. All dollar amounts have been rounded to the nearest thousand. (Defs' Ex. Re IDOC fiscal expenditures; testimony of Jared Brunk)

114.    IDOC maintains on an ongoing basis a list of adjusted service requests (ASRs) that Wexford staff submit.  An ASR is an amendment to the contract between IDOC and Wexford allowing for expenses to be incurred that overall are not material in value but do represent a technical change from what is currently in the contract.  ASRs are generally used for staffing changes and commodity/equipment request.  (Defs Ex documenting ASRs; testimony of Jared Brunk)

115.    For the most recent full Fiscal Year (2018), Wexford staff submitted 371 ASRs that called for an increase in expenditures.  IDOC approved 253 of these requests.  (Defs Ex documenting ASRs; testimony of Jared Brunk)

116.    Some notable examples of approved requests for staffing changes at various levels were:$60,528.00 for a staff assistant at Menard Correctional Center; $29,465.00 for a medication room assistant at Vienna Correctional Center; $258,440.00 for several staff assistant positions at Stateville Correctional Center; $54,849.60 for a dental assistant at Lincoln Correctional Center; $181,667.20 for a dentist at Menard Correctional Center; $42,390.40 for certified nursing assistants at East Moline Correctional Center; $254,342.40 for certified nursing assistants at Graham Correctional Center; and $254,342.40 for certified nursing assistants at Logan Correctional Center. (Defs Ex documenting ASRs; testimony of Jared Brunk)

117.    Some notable examples of approved commodity/equipment requests were: $8,120 for an x-ray processor at Big Muddy Correctional Center; $4,977.50 for HEP A & B and Tetanus vaccines at Stateville Correctional Center; $10,378.50 for a dental chair at Sheridan Correctional Center; $12,680.00 to repair an x-ray machine at Dixon Correctional Center; $5,126.76 for TB serum and syringes at Pontiac Correctional Center; $6,870.99 for TB serum and syringes at Menard Correctional Center; and $500,000.00 to establish dialysis services at Graham

Correctional Center and Stateville Correctional Center. (Defs Ex documenting ASRs; testimony of Jared Brunk).

        J.  **Utilization Management**

118.    Wexford's utilization management program for IDOC is documented in manual entitled, "Utilization Management Guidelines, Region: Illinois." The guidelines set forth in this manual are substantially followed in practice. Inmate needs regarding offsite medical care are identified in a timely manner, and Wexford follows each inmate patient until his or her need is completely resolved. (Defs Ex Utilization Management Guidelines, Region: Illinois; expected testimony of Wexford representative)

119.    When a site provider and a site medical director agree that there is a need for a non-urgent offsite service, the site medical director present this case during a weekly Collegial Review to a utilization corporate medical director. (Defs Ex Utilization Management Guidelines, Region: Illinois; expected testimony of Wexford representative)

120.    Wexford Health does not require pre-authorization for emergencies. The onsite provider makes the decision to send the patient to the ED without any approval being necessary. After hours, when the provider is not physically onsite, when an emergency occurs, the patient is brought to the medical unit for a nurse assessment. After assessing the patient, the nurse calls the on-call provider to make the final disposition which could include: Sending the patient back to his/her cell, admitting the patient to the infirmary, or sending the patient to an emergency department. If the patient is obviously in severe acute distress, 911 is called prior to a complete nurse assessment or provider call. Wexford Health uses InterQual criteria to assess medical necessity during Collegial Reviews, which standardizes this process. (Defs Ex Utilization Management Guidelines, Region: Illinois; expected testimony of Wexford representative)

121.    If a case is approved, an authorization number is generated and supplied to the site within 5 working days.  During each Collegial, the UM medical director and the site medical director determine the urgency of each approval.  This is relayed to the scheduler at UIC and followed up by the Wexford Health UM department to ensure the patient is seen in a clinically appropriate time frame. (Defs Ex Utilization Management Guidelines, Region: Illinois; expected testimony of Wexford representative)

122.    It is not possible, practical, or necessary for all non-urgent offsite care to occur within 30 days.  For example, Neurologists, Dermatologists, and some other specialists in the community have waiting periods up to 4 months for new patients.  If a medical director determines the consult is of a more urgent nature then Wexford routinely encourages our medical directors to call the specialist to discuss the case to determine if a more timely appointment is available. (Defs Ex Utilization Management Guidelines, Region: Illinois; expected testimony of Wexford representative)

123.    If the site medical director and UM medical director agree on an alternative treatment plan, then that is documented in WexCare and in the chart.  Once that alternative has been tried, the site medical director re-evaluates the patient to see if the alternative was successful.  If not, the case is re-presented in a Collegial Review and in these cases, the original offsite service is usually approved.  If the site medical director disagrees with an alternative treatment plan, there is an appeal process.  Cases that are appealed must be decided within 24 hours.  In these cases, the request for offsite care is reviewed by a different UM medical director.  Historically appeals have a 30-40% rate of overturn in favor of the site medical director. (Defs Ex Utilization Management Guidelines, Region: Illinois; expected testimony of Wexford representative)

124.    Urgent requests for offsite services do not wait for the weekly scheduled collegial discussion.  Site provider call the Corporate UM medical director when an urgent offsite service is considered medically necessary and this process occurs regularly.  Regional Medical Directors can also approve urgent referrals.  These processes ensure that an authorization number is generated so that when the claim is sent by the offsite service provider, it is paid in a timely fashion. (Defs Ex Utilization Management Guidelines, Region: Illinois; expected testimony of Wexford representative)

### K.  Facts Elicited in Depositions

## Laurent Dep 7/12/17

125.    As of July 2017, Wexford was 90% compliant in staffing health care positions in the Illinois Prison System.

29:9-15

126:    Wexford Regional Healthcare Managers are tasked with overseeing medical records at each facility to monitor whether the Medical Records Department is running smoothly and provides a service that is a benefit to the patient and to the staff. As July 2017, regional managers were reporting that the state of medical records have improved.

51:2-24; 52:1

127:    Dental care in facilities greatly improved in 2017. Very significant backlogs and delays in appointments and procedures were reduced by contracting out with a subcontractor of dentists in summer 2016 that came in and helped eliminate the patient backlogs.

61:14-23; 62:1-11

128:     Wexford has made all Wexford administrative, medical, and dental staff aware of the requirement and responsibility to deliver urgent care to inmates within 24 to 48 hours of identifying the inmate's condition and necessary treatment.

62:19-24; 63:1-10

129:     Informal reports on persisting delays and improvements in dental care are provided to Wexford administrators to determine whether Wexford medical and dental staff are meeting the responsibilities and requirements of providing qualifying inmates with urgent care in 24 to 48 hours.

62:19-24; 63:1-10

130:     Since December 2014, there have been physical changes improve clinical spaces at various facilities including, Menard CC, Pontiac CC, Dixon CC, and Stateville CC (particularly Stateville NRC).

127:16-24; 128:1-4.

131:     Wexford Management is actively seeking and examining new ways to improve chronic disease management. Quarterly meetings are held to discuss issues relating to treatment goals and potential solutions.

128:18-24; 129:1-4.

### L.  **Meeks Dep:**

132:     All three regional coordinator positions have been filled for the approximately 8 months that Dr. Meeks has been employed as agency medical director for IDOC.

37:6-19

133:     There is someone at each facility who is responsible for keeping the pertinent infection control statistics.

29

71:22-24 – 72:1-6

134:    There is a monthly safety and sanitation inspection in IDOC facilities.

75:22-24 – 76:1-7

135:    Medical providers have a means to sanitize and wash their hands in all treatment areas.

77:5-9

136:    IDOC's quality improvement process today monitors completeness, timeliness, and professional performance by medical providers.

78:18-24 – 80:5

137:    With respect to transferring inmates, their medical records are transferred in a timely fashion such that they continue to receive whatever medication and treatment they are supposed to be receiving.

78:18-24 – 80:5

138:    IDOC's HIV patients are followed by the University of Illinois Chicago infectious disease team.

85:15-24 – 86:1-17

139:    All IDOC facilities track, through a logbook, urgent/emergent services. Any urgent/emergent assessments are performed by staff appropriately licensed to address the urgent/emergent services necessary.

88:22-24 – 89:1-6

140:    Each IDOC facility has an area designated as an infirmary. Each infirmary is staffed with a registered nurse 24 hours a day, 7 days a week.

91:2-9

M. **Ssenfuma Dep**:

141:    Since the Shansky report, the following changes have been made: (1) NRC now has a healthcare unit administrator and has been separated from Stateville proper; (2) sick call boxes are now provided so that inmates can submit a sick call without security getting involved.

14:23-24 – 15:1-17

142:    Every special medical mission facility has its own healthcare administrator.

28:4-9

143:    In the Stateville, NRC, Sheridan, Pontiac, East Moline, Hill and Dixon facilities, there is a designated, private space to conduct sick call. There are also examination tables in the sick rooms in Stateville and Dixon, which were noted to be lacking examination tables in the Shansky report.

[CITE]

144:    Pontiac has had changes introduced since the Shansky report, and now has private sick call rooms and examination tables. The medical staff does safety and sanitation inspections monthly, and if any issues are noted, they report them to the site administrative staff.

40:1-10 – 41:5-10

145:    A reception evaluation is conducted by nursing and clinician staff on the same day that an inmate arrives at NRC. If an offender arrives at NRC with an acute illness, he is seen by the medical doctor that same day and then sent to the infirmary or the hospital that same day.

53:6-24

31

146:    The facilities at Stateville, NRC, Sheridan, Pontiac, East Moline, Hill and Dixon all have an infirmary. For each infirmary, there is at least one registered nurse 24 hours a day, 7 days a week.

72:7-17

147:    At the Hill and Stateville facilities, there is a call system for each bed in the infirmary.

74:11-15

148:    There is a plan in place through which the facility healthcare administrator conducts a monthly documented safety patient inspection; the report from this inspection is sent to the regional coordinator. 77:7-12

149:    Offenders are regularly reassessed for suitability to handle food within the IDOC facilities. There is a system in place for tracking any offenders afflicted with communicable diseases, and a master log exists which is used to track inmates with transmittable diseases who need to be isolated and treated to avoid infection across the unit or facility.

78:1-24

150:    All offenders that work in healthcare are trained specifically to handle bloodborne pathogens, blood spills, or any contagious bodily fluids. This training is logged and documented and kept in each offender's medical file.

79:5-13

151:    The monthly safety and sanitation report looks at everything concerning infection control, including in the healthcare, dietary, and housing units.

79:14-22

32

152:    There is a designated quality improvement coordinator for every IDOC facility. Each of the major services provided is reviewed every month, and then again at the annual governing body meeting. This review is conducted on the basis of the eight quality performance measures.

83:4-24

153:    The problem of 33-75% of scheduled appointments being cancelled due to lockdowns, staffing issues, etc. has been corrected by policies put in place specifically to address the issue.

91:7-24

154:    Since the Shansky report was completed, the infirmary beds at Pontiac have been replaced, and there is now a sink in the nursing station that can be used for hand washing. Additionally, inmate porters have received training on proper sanitation.

97:6-12; 98:15-18

155:    Since the Shansky report was completed, Stateville has implemented an "open sick call" process through which offenders write their name, number, and housing unit on the sick call sheet, the nurses come pick up the sheets, and the offenders are then seen. This process was implemented to remedy the deficiencies in the Stateville sick call process noted in the Shansky report.

108:9-24; 109:1-5

   **N. Ritz Dep:**

156.    Dr. Ritz opined that roughly more than 75% of treatment referral requests are granted under the collegial review program.

54:19-24; 55:7-9.

33

O. **Hugo Dep:**

157:     Kim Hugo is Medical Coordinator for the Illinois Department of Corrections. This is a position that falls within the chain of command between Dr. Meeks and the regional nurses. p.5.

158:     Ms. Hugo has a work history which includes being a registered nurse in an intensive care unit in an emergency room. P.6.

159:     The Annual Governing Body report is a report that allows the Illinois Department of Corrections' Medical Coordinator to see a snapshot of cqi for a particular IDOC facility. Actions are taken as a result of data that is compiled from this report. P. 8 - 9.

160:     In fact, Dr. Meeks gives instructions as a result of deficiencies that appear within the annual governing body report. P. 12.

161:     The office of Health Services conducts regular conference calls related to the physical and dental health care. Those calls occur on Friday of every week. These calls are staggered, in the sense that the northern region is discussed on the first Friday of the month, the central region is discussed on the second Friday of the month, and on the third Friday the southern region is discussed. P. 13-14.

162:     Registered nurses at a facility are either all state registered nurses or, alternatively, are supplied all by Wexford. P. 15.

163:     Ms. Hugo has referred to the Wexford contract in the past in her work. For instance, she has referred to the Wexford contract concerning the requirement that Wexford provide an ADA van when such a van is otherwise unavailable. P. 20-21.

164:     Concerning Lawrence Correctional Center, Ms. Hugo recalled that a situation arose at Lawrence that required attention from her and Dr. Meeks concerning the transferring of an offender to another facility for specific care. She explained that an offender requiring care from

34

UIC and requiring transfer up north to a more Northern facility, so it was a shorter distance for their health services. she explained that I substantial part of her work on a daily or weekly basis involves issues of Prisoner Transportation for healthcare purposes and that this is something she tries to coordinate on a regular basis within her work. P. 23-24.

165:    Ms. Hugo also explained that the regional coordinators call her and have questions for her or have her relay information to Dr. Meeks. P. 24.

166:    Ms. Hugo explained a number of facilities are currently experiencing nursing shortages. These facilities include: Stateville, Pontiac, Elgin, Decatur, Graham, and Southwestern. These are the facilities that came to her mind. P. 25.

167:    Miss Hugo explained that the caterer and Pontiac have in the past been in crisis mode concerning nursing shortages. That period of time has been within the past two years.    P. 27.

168:    At least from December 2016 through April 2017 there was a continuous nursing crisis at Menard Correctional Center. P. 30-31. There is no longer in nursing crisis at Menard. P. 32. Ms. Hugo did admit that her understanding was Menard was not fully staffed, but that they were no longer in crisis. She did admit that the problem had not been completely solved. P. 32.

169:    There is a nationwide shortage in nurses. Hospitals and Health Service facilities are aggressively recruiting for nurses. P. 38.

170:    Nursing staffing has been a continuous problem since October of 2017 at Pontiac. Ms. Hugo understood that Pontiac had been continuously in crisis mode. P. 40.

171:    Nursing staffing has also been in crisis mode at Decatur since October of 2017, and it has been a continuous problem. P. 44.

172:    IDOC has a monthly call between State personnel and Wexford to discuss Wexford Staffing vacancies, as well as to discuss backlogs. P. 47.

173:    These staffing vacancies discussed have included such positions as physician, nurse practitioner, optometry, and dentist. P. 48.

174:    Ms. Hugo established that new healthcare equipment has been purchased during her time in the position. That equipment she remembered being purchased were new automatic external defibrillators (AEDs). P. 57.

175:    There has been, within IDOC, a Lippert conference call we're Staffing vacancies and backlogs are discussed. Though it can take place less, the call usually takes place monthly.  P. 63.

176:    When asked if she was aware if anyone had taken any action with respect to the criticisms in the Shansky report, Ms. Hugo explained that it was not true that no one had taken any action, and that the Friday calls discuss review of the process of how health care is provided to the offender's and to also improve service to the offenders. P. 65.

177:    Ms. Hugo admits a main issue on her radar is the problem of the aging population within the Illinois Department of Corrections and the need for an assisted living facility. It is, she explained, a nationwide problem and not just a problem within the prison population. Ms. Hugo desires to appropriately place such offenders for medical care that is appropriate and that meets the operational needs of IDOC. P. 71.

## II.  Conclusions Of Law

### A.  Background

178.    The Court has certified a class under Fed. R. Civ. P. 23(b)(2) for injunctive relief. ECF Dkt. No. 534, *generally*. Plaintiffs do not seek monetary damages. The class is defined as all

36

prisoners in the custody of the Illinois Department of Corrections with serious medical or dental needs. *Id.* at 20.

179.     Plaintiffs contend that the Illinois Department of Corrections' medical program has caused them to suffer cruel and unusual punishment in violation of the Eighth Amendment. ECF Dkt. No. 449, *generally*.

### B.  Jurisdiction

180.     Federal jurisdiction in this case arises under 18 U.S.C. § 1331 and 28 U.S.C. § 1343

.

### C.  Plaintiffs' Eighth Amendment Claim

181.     The Supreme Court has confirmed that not every claim by a prisoner that he or she has not received adequate medical treatment constitutes a violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1970) (internal citations and quotation marks omitted). In cases involving an alleged lack of adequate medical care, the Eight Amendment is implicated if prison officials are deliberately indifferent to a known lack of care that results "in pain and suffering which no one suggests would serve any penological purpose." *Id*. at 103.

182.     To determine if a lack of medical care violates the Eighth Amendment, the Court must answer the following questions to determine if the record demonstrates both objective and subjective deliberate indifference: (a) Does the record show an *objective* risk of serious harm to the inmate population? (b) Does the defendant have actual *subjective* knowledge of that serious harm? and (c) Is the defendant subjectively "deliberately indifferent" to that harm? *Farmer*, 511 U.S. at 837; *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (*en banc*).

37

183. In cases alleging systemic violations of the Eighth Amendment, the objective test looks first to whether "systemic deficiencies at the prison's health care facility [have] rendered the medical treatment constitutionally inadequate for all inmates." *Cleveland-Purdue v. Brutsche*, 881 F.2d 427, 430–31 (7th Cir. 1989). In *Wellman v. Faulkner*, the court stated the test as whether "systemic and gross deficiencies in staffing, facilities, equipment, or procedures" are so great that "the inmate population is effectively denied access to adequate medical care." 715 F.3d 269, 272 (7th Cir. 1983) (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)). Isolated instances where particular prisoners do not receive prompt responses to their medical needs do not qualify as systemic deficiencies. *Phillips v. Sheriff of Cook County*, 828 F.3d 541, 554 (7th Cir. 2016) (affirming decertification of class and remanding for individual detainees to present evidence as to whether they were denied constitutional access to dental services).

184. The second question is whether the public official defendants have subjective knowledge that the alleged systemic deficiencies present a substantial risk that prisoners are being denied access to the constitutionally required level of care. *Petties*, 836 F.3d at 728; *Wellman*, 715 F.3d at 272. As noted above, it is not enough for public officials to be generally aware of alleged negligence or contract violations—they must have actual knowledge of an overall failure to deliver medical services that is effectively denying care to the relevant inmate population. *Id*.

185. If plaintiffs show that prison officials are subjectively aware of an objective level of substantial harm arising from a failure to deliver the minimal level of care, then the court must consider whether the public officials are "deliberately indifferent" to that known harm. *Petties*, 836 F.3d at 728. To analyze this question, courts have often described deliberate indifference in the negative, by clarifying what is *not* deliberate indifference. For example, negligence, and even gross negligence, is not deliberate indifference. *Estelle*, 429 U.S. at 105; *Snipes v. DeTella*, 95

F.3d 586, 590. Likewise, medical malpractice—a failure to meet a standard of care—is not deliberate indifference. *Id*.; *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). "Even objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it should be known—is insufficient to make out a claim. *Petties*, 836 F.3d at 728 (citing *Farmer*, 511 U.S. at 836–38).

186.    Establishing deliberate indifference is relatively straightforward when the evidence shows the public officials actually know about the substantial risk and ignore it. *Farmer*, 511 U.S. at 837; *Petties*, 836 F.3d at 729. On the other hand, courts recognize that deliberate indifference is difficult to establish when officials are aware of the risk and take action to remedy it. *Whiting*, 839 F.3d at 662; *Wharton v. Danberg*, 854 F.3d 234, 244 (3d Cir. 2017). There is no deliberate indifference where a doctor provides even minimal treatment based on his or her medical judgment. *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982); *Whiting*, 839 F.3d at 662; *Petties*, 836 F.3d at 729. The Supreme Court has also confirmed that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

187.    To determine whether prison officials' efforts to address a known risk rise to the level of deliberate indifference, courts look to the nature of the effort made.[57] For example, evidence that prison officials have persisted with a course of treatment that they know is ineffective could raise an issue of fact to allow the question to be presented to a jury. *Petties*, 836 F.3d at 726. Examples include where a prison official knew a prisoner faced a serious risk of appendicitis but merely gave the prisoner aspirin and sent him back to his cell, *Sherrod v. Lingle*, 223 F.3d 605,

---

[57] Three dissenting judges in *Petties* noted that where a prisoner receives some care and the dispute is about the quality of that care, there may be a claim for negligence under state law, but not one for constitutional deliberate indifference. 836 F.3d at 735–36.

612 (7th Cir. 2000), or where a prisoner experiencing persistent severe vomiting continued to receive nothing more than antacids for more than three years. *Greeno v. Daily*, 414 F.3d 645, 655 (7th Cir. 2005), or where prison officials needlessly delayed treatment that could have been easily provided or chose an "easier and less efficacious treatment" that they knew to be ineffective. *Petties*, 836 F.3d at 730 (collecting cases).

188.    Furthermore, to establish a right to injunctive relief, a plaintiff must show that a prison official is "knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so; and finally to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future." *Farmer,* 511 U.S. at 846.

189.    Additionally, if constitutional violations are found, "prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." 18 U.S.C. § 3626(A).

190.    Based on the factual record and the applicable law discussed above, the Court concludes that the evidence presented at trial in this matter does not demonstrate that plaintiffs have proven that the Department (and in particular, the three Defendants named in their official capacities, Illinois Governor Bruce Rauner, Director of IDOC John Baldwin, and IDOC's Medical

Director, Dr. Steven Meeks) are deliberately indifferent to plaintiffs' serious medical or dental needs.

191.     As a threshold matter, the objective component for an Eighth Amendment violation does not depend on whether the Department has been negligent, grossly negligent, or that medical professionals working in the prison system have committed malpractice. Rather, the test is whether "systemic deficiencies at the prison's health care facility [have] rendered the medical treatment constitutionally inadequate for all inmates." *Cleveland-Purdue*, 881 F.2d at 430–31; *see also Wellman*, 715 F.3d at 272 (looking to whether systemic deficiencies were so great that "the inmate population is effectively denied access to adequate medical care"). Although the Second Court Appointed Expert ("Court Expert")[58] opined there were several inadequacies with IDOC's medical program, the court finds the Court Expert's analysis flawed.

192.     Mortality rates are a critical benchmark used to evaluate the quality and performance of healthcare systems, and the Court Expert has admitted the sample of patients selected for the Court Expert's mortality review cannot be extrapolated to the entire IDOC inmate population. Second Court Expert's IDOC Summary Report at 91. However, the U.S. Department of Justice (Bureau of Justice Statistics) tracks inmate deaths, and in fact, in 2014, the latest year of available statistics, the IDOC had the sixth lowest mortality rate (182/100,000 inmates) of the 50 state systems. *Id.* at 90. The average mortality rate of state correctional systems was 275 per 100,000 inmates. *Id.* Accordingly, the record does not allow the Court to conclude that IDOC's program has rendered medical treatment "constitutionally inadequate for all inmates" *Cleveland-*

---

[58] "Court Expert" shall refer to the Second Court Appointed Expert (Dr. Mike Puisis) and also shall include the Medical Investigation Team, listed in the draft report as consisting of: Mike Puisis, DO; Jack Raba, MD; Madie LaMarre MN, FNP-BC; Catherine M. Knox RN, MN, CCHP-RN; and Jay Shulman, DMD, MSPH.

*Purdue*, 881 F.2d at 430–31, or have resulted in "the inmate population [being] effectively denied access to adequate medical care," *Wellman*, 715 F.3d at 272.

193.    As to the required level of subjective knowledge of substantial harm, although there is no question that prison officials were aware that the Department faces challenges delivering medical and dental care to the inmate population, there are challenges inherent in delivering medical and dental care in any setting as healthcare delivery is an imperfect process fraught with both system and human error. Errors such as these do not rise to the level of constitutional violations. Moreover, the record does not show that prison officials were aware that any of the alleged failures were resulting in substantial harm to prisoners or were effectively denying medical or dental care to the plaintiff class. Indeed, the Court Expert concluded that "IDOC leadership is unaware that they have preventable deaths." Second Court Expert's IDOC Summary Report at 91.

194.    Most significantly, the Court cannot conclude that prison officials are being deliberately indifferent to the need to deliver adequate medical and dental care to the plaintiff class. The Court notes that the Court Expert's Report found that the health program of IDOC continues to face challenges since the First Court Expert's Report, but is unpersuaded that the Court Expert's findings rise to the level of constitutional violations.

Moreover, based on the record, the Court cannot conclude the Department was aware of a substantial risk and chose to ignore it. The Department has clearly taken action to remedy the deficiencies asserted in the Court Expert's Report. Notably, between 2014 and 2018 the Department has increased the total number of medical related positions within the five facilities reviewed by the Court Expert by thirty-three (33) percent. (Statewide Summary Report, pp. 26-27).  Likewise, medical staff in IDOC per 1000 inmates increased by 33% from 2014 to 2018. Additionally, IDOC and the University of Illinois have executed an agreement that directs the

university's College of Nursing Institute for Health Care Innovation to develop a comprehensive quality improvement program so that IDOC will deliver high quality and safe health care reliably to offender patients. (Defs' Ex. – IDOC/U of I agreement; testimony of Dr. Meeks). Indeed, even the Court Expert noted improvements from the First Court Expert's Report in the areas of (1) leadership; (2) intrasystem transfers; (3) nursing; (4) nursing sick call; (5) chronic care; (6) dental care orientation manuals; (7) dental specialists; and (8) dental extractions. (*See* Statewide Summary Report). Given these facts, Plaintiff have failed to prove Defendants continual disregard of the Plaintiff class' objectively intolerable risk of harm proceeding into the future as is required for an injunction. See *Farmer,* 511 U.S. at 846.

195.    Additionally, the Court concludes that even if constitutional violations were proven, the relief sought by Plaintiffs is not narrowly tailored to the alleged constitutional violations as required by the Prison Litigation Reform Act ("PLRA"). See 18 U.S.C. § 3626(A); *see also Brown v. Plata*, 563 U.S. 493, 539 (2011). The relief requested by Plaintiffs goes far beyond constitutional adequacy and even the community standard.

Dated: November 28, 2018

Respectfully Submitted,

LISA MADIGAN
Attorney General of Illinois

*/s/ Nicholas S. Staley*
NICHOLAS S. STALEY
Assistant Attorney General
General Law Bureau
Office of the Illinois Attorney General
100 West Randolph Street, 13th Floor
Chicago, Illinois 60601
(312) 814-3588
nstaley@atg.state.il.us

*Attorney for Defendants*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on November 28, 2018 he electronically filed the foregoing document with the Clerk of the Court for the Northern District of Illinois by using the CM/ECF system. All participants in the case are registered CM/ECF users who will be served by the CM/ECF system.

*/s/ Nicholas S. Staley*
NICHOLAS S. STALEY