UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DON LIPPERT, et al., | ) |
| | ) |
| Plaintiffs, | ) No. 10-cv-4603 |
| v. | ) |
| | ) Judge Jorge L. Alonso |
| JOHN BALDWIN, et al., | ) Magistrate Judge Susan E. Cox |
| | ) |
| Defendants. | ) |

**JOINT MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT**

Pursuant to Federal Rule of Civil Procedure 23(e)(1), Plaintiffs and Defendants, by their attorneys (collectively, the "Parties"), hereby request that the Court (i) preliminarily approve the Consent Decree attached hereto as Exhibit 1 as a fair, reasonable, and adequate settlement of the class claims in this case; (ii) direct notice of the proposed settlement to the class members in the form attached hereto as Exhibit 2; and (iii) set a date for a fairness hearing on the proposed settlement. In support, the Parties state as follows:

**Summary of the Litigation:**

1. This case was filed in July 2010 by Don Lippert, then a prisoner at Stateville Correctional Center, *pro se* and on his own behalf. Dkt. 1. On October 7, 2011, court-appointed counsel filed an amended complaint on behalf of Mr. Lippert and a class of prisoners in the Illinois Department of Corrections (IDOC) with serious medical conditions. Dkt. 39. (Second Amended Complaint.) The Second Amended Complaint sought certification of a declaratory and injunctive relief class under Rule 23(b)(1) and 23(b)(2). *Id.* ¶¶76-77, 84-85.[1] The Third Amended Complaint,

---

[1] Each of the complaints in this matter also continued to assert damages claims on behalf of Mr. Lippert arising out of the events at Stateville CC of which he had originally complained. Those claims were settled and dismissed in October 2017. Dkt. 581.

1

filed on October 12, 2012 after additional discovery on the class claims, added additional named plaintiffs and refined the class allegations as to the systemic deficiencies in IDOC healthcare. Dkt. 146.

2. Throughout this case, Defendants have denied and continue to deny that the healthcare they provide to Plaintiffs and the class is inadequate.

3. In December 2013, after a series of settlement conferences with Magistrate Judge Martin (Dkt. 200, 205, 207, 224, 232, 234) the Parties sought an order appointing an expert (Dr. Ronald Shansky) pursuant to Federal Rule of Evidence 706 to investigate and report on IDOC physical healthcare. Dkt. 240. Among other qualifications, Dr. Shansky had served as the agency Medical Director for several years in the 1980s and 1990s. *Id*. ¶ 5. The resulting Agreed Order Appointing Expert provided that Dr. Shansky "will assist the Court in determining whether the Illinois Department of Corrections . . . is providing health care services to the offenders in its custody that meet the minimum constitutional standards of adequacy." Dkt. 244 ¶ 1a. It further provided that "[t]he Expert will investigate all relevant components of the health care system except for [those] that relate exclusively to mental health," and that "[i]f systemic deficiencies in IDOC health care are identified by the Expert, he will propose solutions for consideration by the parties and the court." *Id*.

4. Dr. Shansky assembled a team to assist him in this task. *Id*. p. 5. After an investigation that included extensive record review and site visits to eight IDOC prisons, Dr. Shansky delivered a draft report to the Parties for comment in August 2014. Dkt. 742-1 ¶ 19. The Final Report of the Court-Appointed Expert (hereafter "Shansky Report" or "First Expert Report") was issued in December 2014. Dkt. 339. The Shansky Report is over 400 pages long and consists of (i) an overview of findings with respect to leadership and staffing and fifteen major services;

(ii) individual reports on each of the eight facilities visited with more detailed findings in each of these subject areas; and (iii) mortality reviews. *Id*., *passim*. The Shansky Report examined the delivery of medical and dental care in IDOC and concluded that "the State of Illinois has been unable to meet minimal constitutional standards with regards to the adequacy of its health care program for the population it serves." *Id*. p. 45.

5. Plaintiffs pursued discovery related to class certification and, in December 2015, Plaintiffs filed their proposed Fourth Amended Complaint, incorporating the findings of the Shansky Report, and their motion for class certification. Dkt. 394, 399. On April 28, 2017, the Court granted the motion for class certification, certifying a class pursuant to Fed. R. Civ. P. 23(b)(2) of "all prisoners in the custody of the Illinois Department of Corrections with serious medical or dental needs." Dkt. 534. Full discovery as to the class claims resumed.[2]

6. In September 2017, Plaintiffs moved for the reappointment of Dr. Shansky pursuant to FRE 706 to perform an update of his 2014 investigation on medical and dental care within IDOC. Dkt. 567. Defendants objected to the motion and in particular to the reappointment of Dr. Shansky. Dkt. 580 pp. 1-2. On October 25, 2017, the Court appointed a different expert pursuant to FRE 706, Dr. Michael Puisis. Dkt. 583; Dkt. 593. Like Dr. Shansky, Dr. Puisis had previously served as an agency Medical Director for IDOC.

7. The order appointing Dr. Puisis, entered on December 8, 2017, directed him to "investigate the IDOC [medical and dental] care system as it currently exists and determine whether any of the systemic deficiencies identified by the first court-appointed expert in this matter, Dr. Ronald Shansky, and set forth in the Final Report of the Court-Appointed Expert issued

---

[2] In May 2016, Magistrate Judge Schenkier, sitting in for Judge Martin, limited Plaintiffs to discovery that could be pursued "regardless of the outcome of the class certification motion." Dkt. 474. Plaintiffs were thus limited as to the discovery they could pursue until the certification of the class in April 2017.

3

in December 2014 [ ] currently exist within IDOC." Dkt. 593 ¶ 1(a). The order further directed Dr. Puisis to report on any additional systemic deficiencies within IDOC medical or dental care should he identify any such additional deficiencies, but to "focus primarily on the deficiencies within IDOC health care reported in the Shansky Final Report." *Id*. Like Dr. Shansky, Dr. Puisis assembled a team to assist him in this task. Dkt. 767 p. 2.

8. Like the Shansky team, the Puisis team engaged in extensive record review, interviews of IDOC and Wexford staff, and site visits to five of the eight prisons examined by the Shansky team. Dkt. 767, pp. 3-7. The draft Second Expert report was delivered to the parties for comment on August 13, 2018. After both Plaintiffs and Defendants had submitted comments, Dr. Puisis issued the Final Report of the Second Court-Appointed Expert (hereafter "Puisis Report" or "Second Expert Report") on October 15, 2018. The Puisis Report is approximately 1200 pages long and consists of (i) a Statewide Summary Report including key findings, a review of statewide medical operations, a statewide overview of major services, and recommendations; (ii) individual reports on each of the five facilities visited with more detailed findings as to those prisons; and (iii) the mortality reviews. Dkt. 767. Although the Second Expert team found improvements in certain areas, the Puisis Report also affirmed many of the findings in the First Expert Report.

9. In advance of trial, Plaintiffs also proffered a report by correctional healthcare expert Dr. Marc Stern, the former agency healthcare director for the State of Washington Department of Corrections, analyzing the medical records and care provided to the five named plaintiffs still in IDOC custody as of summer 2018, using an analytic framework derived from the Shansky Report. [P551] As a rebuttal expert to Dr. Stern, Defendants proffered a report from Dr. Owen Murray, a correctional healthcare expert and chief of the Texas prison healthcare system. Dr. Murray produced a report analyzing the medical care of the five named Plaintiffs and offering

criticisms of Dr. Stern's findings. Dr. Murray also provided an explanation of the methodology used in reaching his conclusions.

10. The case was most recently set for two weeks of trial to begin on December 17, 2018. On December 11, 2018, during a break in the final pretrial conference, the Parties reached an agreement to settle this case which is embodied in the Consent Decree attached hereto as Exhibit 1.

**Standards for preliminary approval of the settlement:**

11. "The claims . . . of a certified class [ ] may be settled . . . only with the court's approval." Fed. R. Civ. P. 23(e). Any "proposed settlement" of a class's claims requires the Court to evaluate whether notice should be given to the class; for this, Rule 23(e) requires the Court to evaluate whether it "will likely be able" to give final approval to the proposed settlement. Fed. R. Civ. P. 23(e)(1)(B)(i).

12. The overarching question before the Court on final approval will be whether the settlement is "fair, reasonable and adequate," but under the (recently amended) Rule, the Court is also required to consider:

- Whether the class representatives and class counsel adequately represented the class;
- Whether the proposal was negotiated at arm's length; and
- Whether the relief provided for the class is adequate, including "the costs, risks, and delays of trial and appeal"; the terms of any proposed award of attorney's fees, including timing of payment; the terms of the settlement agreement itself; and whether the proposal treats class members equitably relative to each other.[3]

Fed. R. Civ. P. 23(e)(2).

---

[3] An additional consideration in the Rule, namely, "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class member claims" [Fed. R. Civ. P. 23(e)(2)(C)(ii)] is not relevant here as this is not a damages class.

5

13. Similarly, the Seventh Circuit has held that "the general principles" guiding a court's evaluation of a proposed class action settlement are "(1) the strength of the class's case, (2) the complexity and expense of further litigation, (3) the amount of opposition, (4) the reaction of class members to the settlement, (5) the opinion of competent counsel, and (6) the stage of the proceedings and the amount of discovery that was completed." *Martin v. Reid*, 818 F.3d 302, 306 (7th Cir. 2016) (citation omitted). Of these, the third and fourth factors cannot be assessed until the period of notice and objection are complete, but the remaining factors can be preliminarily evaluated now.

**Principal features of the proposed Decree:**

14. Evaluation of whether the settlement is "fair, adequate and reasonable" will turn in the first instance on the provisions of the proposed Consent Decree. (Exh. 1.) Among the most important features of the Decree is that it provides for oversight by a Court-appointed Monitor, who will assist Defendants in several crucial projects required by the Decree (a staffing analysis, creation of an Implementation Plan that will become part of the Decree, and the creation of an audit function for a new quality assurance program, *inter alia*.) (Exh. 1, §§ II(B)(9); IV(A), (B); V(A), (E).) The Monitor will also assess Defendants' compliance with the Decree, and report regularly to the Parties and the Court as to Defendants' progress towards compliance with the requirements of the Decree. (*Id*., § V(E), (J).)

15. The Monitor is to be "an independent and impartial Monitor who is knowledgeable about the management and oversight of correctional medical and dental programs . . ." (Exh. 1, § V(A).) The Parties will, in the first instance, attempt to agree upon a candidate to present to the Court for approval. If the Parties cannot agree, Plaintiffs and Defendants will each present two candidates to the Court, and the Court will choose the Monitor by "whatever process if determines

appropriate." (*Id*., § V(A), (B).) In consideration of the breadth of the Monitor's responsibilities and the issues in this settlement, the Monitor will be able to hire up to three consultants to assist in the work contemplated by the Decree. (*Id.*, § V(F).)

16.     The reforms contemplated by the Decree reflect the fact that the proposed Decree was negotiated against the backdrop of the two Court-Appointed Expert reports and substantial discovery.

17.     The Court-appointed Experts singled out certain critical underlying problems. These problems were: (1) lack of staff and the lack of any well-founded analysis of the number of staff needed to address IDOC's physical healthcare needs; (2) insufficient number of physicians credentialed in the primary care work they perform in IDOC; (3) lack of an electronic healthcare record system; (4) need for substantial change to the "utilization management" system currently in place which determines what outside specialty consultations and care IDOC prisoners receive; and (5) fundamental deficiencies in quality assurance processes, including provider review and mortality review, that would enable the system to identify its problems and correct them. The Decree addresses each of these areas with specific remedial provisions:

- The Decree has general requirements for "adequate qualified staff", sufficient "trained clinical staff [and] sufficient administrative staff" to achieve the overarching goal of "adequate medical and dental care" for the class. (Exh. 1, § II(A), (B)(2)-(3).) In particular, it calls for a staffing analysis to be completed early in the process (within 120 days of the selection of the Monitor), which is to be submitted to the Monitor and incorporated into the Decree's Implementation Plan, which in turn will (*inter alia*) set out "the implementation and timing of the hiring, training and supervision of the personnel necessary to implement the Decree." (Exh. 1, § IV(A)(2), (B).)

- The Decree has specific credentialing requirements for the IDOC Chief of Health Services, Deputy Chiefs of Health Services, and *all physicians* providing direct care in IDOC. (Exh. 1, § III(A)(1)-(2).) If such physicians cannot be found for particular vacancies despite "professionally reasonable recruitment efforts," physicians without the required credentials can only

7

- be hired after screening and approval by the Monitor. (Exh. 1, § III(A)(5)-(6).)

- The Decree requires the selection of an electronic medical record (EMR) vendor within 120 days of the Decree Effective Date (the final approval date), and the implementation of EMR at all IDOC facilities no later than 36 months thereafter. (Exh. 1, § II(B)(4).)

- The Decree requires the establishment of an oversight review process independent of the vendor (which currently makes all utilization management decisions) for all such decisions in which outside specialty care has been denied or the decision has not been made in five business days. Ultimately this review will be the responsibility of two new State-employed Deputy Chiefs of Health Services, but until these positions are filled, IDOC must either hire an outside provider to conduct this oversight review or commit this oversight review to the Monitor. (Exh. 1, § III(H)(6).)

- Finally, the Decree has multiple provisions requiring the establishment of quality assurance and related review and audit functions. It requires data collection, "meaningful performance measurements [and] effective peer review," "effective contractual oversight," "[m]orbidity and mortality review with action plans and follow-through," "[a]nnual assessment of medical, dental, and nursing staff competency and performance," "the development and implementation of a set of health care performance and outcome measurements," "the design, with the assistance of the Monitor, of an audit function for IDOC's quality assurance program [providing] for independent review . . ."; and the implementation, within fifteen months of the Preliminary Approval Date, with advice from UIC and input from the Monitor, of "a comprehensive medical and dental Quality Improvement Program." (Exh. 1, §§ II(B)(2), (6)(i),(q), (7), (9); III(L).)

18. The Decree also addresses each of the areas identified by the First and Second Court-Appointed Experts and complained of in Plaintiffs' Third and Fourth Amended Complaints—leadership and staffing, including physician qualifications; clinic space and sanitation; reception processing; intra-system transfer; medical records; nursing sick call; chronic disease management; medication administration; unscheduled (urgent/emergent) services; scheduled offsite services; infirmaries; infection control; the dental program; mortality reviews; and continuous quality improvement. Dkt. 339, *passim*; Dkt. 767, *passim*. (*See* Exh. 1, §§ II(B);

III(A)-(M).) The Decree mandates both certain specific as well as general changes in each of these areas, which will be further addressed by the Implementation Plan.

19. Although many of the changes required by the Decree are tied to the Effective Date (the final approval date) of the settlement, and the timing of others must await the setting of deadlines in the Implementation Plan, because this case has been proceeding for several years already, certain provisions of the Decree would be tied to the Preliminary Approval Date so that these provisions would have an earlier "start date." These include: the development and implementation of a set of comprehensive health care policies (Exh. 1, § II(B)(8)); oversight review of utilization management decisions (*id*., § III(H)(5)); peer review of dentists and performance review of dental assistants (*id*., § III(K)(9)); implementation of the comprehensive continuous quality improvement program (*id*., § III(L)(1)); and the appointment of the Monitor (*id*., § V(A)).

20. Finally, the Decree provides that it will terminate no later than ten years after the final approval date (the Effective Date). (Exh. 1, § IX(B)(5).) The Parties believe that this provision creates a realistic time frame for IDOC to implement and demonstrate it will maintain the extensive reforms contemplated by the Decree, while creating reasonable urgency for the completion of these reforms.

**Other considerations affecting evaluation of the proposed settlement:**

21. Further litigation would only impose risks upon the Parties, and more critically, would only create further delay in implementing changes to IDOC medical and dental care. The First and Second Court Expert Reports highlight the need for changes to IDOC healthcare, and emphasize the urgency of making these changes. The delay required for a trial and possible appeal weigh heavily in favor of settling the case sooner rather than later. Should litigation run its course,

even if Plaintiffs prevailed on all issues, relief for the class would be delayed, at best, for months, and at worst there could be delays of years should Defendants appeal.

22. This case was long-contested and hard-fought. Over the course of several years of litigation, Plaintiffs obtained in discovery thousands of pages of reports, manuals, directives and other non-email documents, over 500,000 pages of emails, and took two dozen depositions of Defendants and Wexford, including twelve depositions pursuant to Rule 30(b)(6). The class representatives themselves have each sat for deposition on two occasions.

23. Plaintiffs' trial exhibit list contains over 580 exhibits, and Plaintiffs' Proposed Findings of Fact and Conclusions of Law are over 200 pages (and 700 paragraphs) long. Dkt. 776. Defendants likewise submitted Proposed Findings of Fact and Conclusions of Law in anticipation of trial. Dkt. 780.

24. The Parties negotiated this settlement after extensive litigation and discovery as to the claims presented by the class, and with the benefit of not one but two reports prepared by different teams of independent experts in correctional healthcare led by the First and Second Court-Appointed Experts. Both Plaintiffs and Defendants also submitted their own experts' evaluations of the care provided to the class representatives. The strengths and weaknesses of the claims and defenses have been well-explored, and the settlement rests on a firm foundation of knowledge on Plaintiffs' part about Defendants' prison healthcare system and how it is organized, managed, staffed, overseen, and funded.

25. The settlement of this case was not collusive. The Parties did not rush to settle this case, and when agreement was finally reached, it was the result of intense and often contentious negotiation. During 2016, 2017, and the first nine months of 2018, the Parties exchanged occasional settlement proposals: Plaintiffs sent one to Defendants in July 2016; Defendants

responded to this in August 2017; Plaintiffs responded in May 2018; Defendants responded in September 2018; and Plaintiffs responded in early October 2018. At the request of Defendants, starting on October 10, 2018 and continuing until October 26, there were a series of three settlement conferences with Magistrate Judge Cox (Dkt. 754, 759, 760); thereafter, there were additional meetings of the Parties during the first half of November; then there were two additional settlement conferences with Judge Cox on December 5 and 10; and a final settlement negotiation took place during a break in the final pretrial conference on December 11. In the period from early October to December 2018 the Parties exchanged at least a dozen (and probably more) drafts before reaching a final agreement on Dec. 11, 2018.

26. As further indication of the lack of any collusion, the Decree was negotiated and finalized by Plaintiffs without any agreement as to an amount of attorney's fees, which remain to be determined. (Exh. 1, § VI(A)-(C).) In addition, except for core challenges to the Decree during its first years (*e.g*., a motion to terminate the Decree), Plaintiffs have agreed to forgo seeking any additional fees, except for work in opposition to core challenges to the settlement itself (i.e., a motion on Defendants' part to terminate the Decree) for thirty months following final approval, with a cap on fees for the period between thirty months until the fourth year after final approval. (Beginning in the fourth year after final approval, there is no longer any limitation on fees Plaintiffs may seek.) (*Id.*, § VI(D).)

27. Since the changes are broad and systemic, they will benefit the class members equally. Taking all circumstances into consideration, it is the opinion of counsel that this settlement is "fair, adequate and reasonable."

**Notice to the Class:**

28.     In light of the foregoing, the Parties request that the Court approve notice to the class in the form attached hereto as Exhibit 2. Rule 23 requires that the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal" if it finds that notice is justified by the parties' showing that it will likely be able to approve the settlement. Fed. R. Civ. P. 23(e)(1)(B). Class actions certified under Rule 23(b)(2), if they seek only declaratory and injunctive relief, do not necessarily require notice to the class. *Fontana v. Elrod*, 826 F.2d 729, 731 (7th Cir. 1987). However, given the broad impact of these changes on, and the importance of these issues to, the class members, the Parties believe that widely distributed notice is appropriate here. Plaintiffs have committed initially to pay for the cost of notice to the class up to $10,000. Any costs in excess of $10,000 will be borne by Defendants. (Exh. 1, § VII(B).)

29.     The Parties propose that notice be given to the class in the following manner: (1) IDOC will distribute a paper copy of the Notice (Exh. 2) to each prisoner present in an IDOC facility at the time of distribution of the notice which will be no later than 30 days of preliminary approval, and (2) a copy of the Notice (Exh. 2) will be posted at about the same time in the common areas of each IDOC facility. Although notice, given in this fashion, will be over-inclusive in that it will reach IDOC prisoners who do not currently have serious medical or dental needs, given the fluidity of the class, the Parties believe that this over-inclusiveness is a realistic method to provide notice to the class.

**Fairness hearing:**

30.     Finally, the Parties request that the Court set a date for a fairness hearing so that it may decide whether to give final approval to the settlement. This date should be set after (1) a period during which class members may submit objections to the proposed settlement; and (2) a

further period during which the Parties may submit additional briefing to the Court as to the fairness of the settlement, including responding to objections. The Parties propose the following schedule: objections must be submitted no later than sixty (60) days from the date on which the Court gives preliminary approval to the Decree; memoranda in support of the settlement to be submitted no later than fourteen (14) days thereafter; and a date for a final fairness hearing within seven (7) days after the submission of memoranda.

31. For these reasons, the Parties respectfully request that the Court: (i) give preliminary approval to the settlement of this case contained in the proposed Consent Decree attached hereto as Exhibit 1; (ii) direct notice to the class members of the proposed settlement in the form attached hereto as Exhibit 2; and (iii) set a date for a fairness hearing on the proposed settlement.

DATED: January 3, 2019

Respectfully submitted,

**COUNSEL FOR PLAINTIFFS**

*/s/ Camille E. Bennett*
Camille E. Bennett
Benjamin S. Wolf
Lindsay Miller
Roger Baldwin Foundation of ACLU, Inc.
150 N. Michigan Ave., Ste. 600
Chicago, IL 60601
(312) 201-9740
cbennett@aclu-il.org
bwolf@aclu-il.org
lmiller@aclu-il.org

Harold C. Hirshman
Dentons US LLP
233 S. Wacker Drive, Ste. 5900
Chicago, IL 60606
(312) 876-8025
harold.hirshman@dentons.com

Alan Mills
Elizabeth Mazur
Nicole Schult
Uptown People's Law Center
4413 North Sheridan
Chicago, IL 60640
(773) 769-1411
alan@uplcchicago.org
liz@uplcchicago.org
nicole@uplcchicago.org

**COUNSEL FOR DEFENDANTS**

LISA MADIGAN
Attorney General for the State of Illinois

*/s/ Michael D. Arnold*
Michael D. Arnold
Christopher R. Fletcher
Nicholas Staley
Assistant Attorneys General
Office of the Illinois Attorney General
100 W. Randolph St., 13th Floor
Chicago, IL 60601
(312) 814-3720
marnold@atg.state.il.us
cfletcher@atg.state.il.us
nstaley@atg.state.il.us

## **CERTIFICATE OF SERVICE**

 The undersigned, an attorney, certifies that on January 3, 2019, she caused a copy of the above and foregoing JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT to be served on all counsel of record via the Court's electronic filing system (CM/ECF).

                /s/ Camille E. Bennett