<div style="border:2px solid black">

# Lippert V Jeffreys Consent Decree
# First Report of the Monitor
# November 24, 2019

</div>

**Prepared by:**
**John M. Raba, MD**
**Monitor**

## Table of Contents

I.    Overview ……………………………………….Page 2-3

II.   Executive Summary……………………...............Pages 3-11

III.  Provisions of Consent Decree…………………….Pages 11-48

   1. Health Care General Provisions………………Pages 11-22

   2. Health Care Specific Provisions………………Pages 22-47

   3. Staffing Analysis and Implementation Plan….Pages 47-49

## I.  Overview

The "Lippert v Jeffreys" Consent Decree was approved and signed by Judge Jorge L Alonso on May 9, 2019.   John M. Raba, MD was selected as Monitor for the Consent Decree on March 29, 2019 with his IDOC contract being finalized on April 26, 2019. Provision V.G. of the consent decree states that "Every six months for the first two years and yearly thereafter, Defendants shall provide the Monitor and Plaintiffs with a detailed report containing data and information sufficient to evaluate Defendants' compliance with the Decree and Defendant's progress towards achieving compliance, with the Parties and Monitor agreeing in advance of the first report on the data and information that must be included in such report." From May 20, 2019 through October 18, 2019, the monitor submitted requests on twenty separate dates for forty-three individual reports or categories of documents, data and information. The IDOC attorneys and clinical leadership have supplied the monitor with the majority of the requests with only few requests not yet fully received. On November 2, 2019, the monitor also submitted to the IDOC a more detailed comprehensive request for data and information for each and every provision of the consent decree. This comprehensive request will require a notable commitment of time and resources to compile; this additional data and information will provide a basis for the monitor's second report that will be due in the Spring of 2020.

Since his appointment, the monitor has had regular meetings with IDOC Chief of Health Services (Agency Medical Director) and Deputy Chiefs of Health Services (Deputy Medical Directors) and regular communications with both the Plaintiffs' and Defendants' attorneys.  The monitor interviewed the IDOC Director, the IDOC Deputy Director of Program & Support Services, the IDOC Electronic Health Record project manager, clinical and administrative leadership of medical/dental care vendor (Wexford Correctional Health Services), and the Rasho Consent Decree monitor.

2

The monitor inspected four IDOC correctional facilities, Sheridan CC, Pontiac CC, Robinson CC, and Lawrence CC in August and September, 2019. In advance of these site visits, the monitor was provided with each facility's monthly Quality Improvement Meeting minutes, Safety and Sanitation reports, Primary Medical Service reports, select staff schedules, and 2019 (to date) spread sheets that tracked Mortalities, Offsite Specialty Referrals, Offsite Urgent Care/Emergency Department Referrals, and Hospital Admissions and Discharges. At each site the monitor interviewed and/or questioned the correctional leadership, the health care unit administrator, the facility medical director (one was on leave), the facility nursing leadership, lead dentist, IDOC Regional Health Managers, and Wexford Regional nursing and administrative leadership. During tours of housing unit and clinical services areas, individual nursing staff, dental assistants/hygienists, medication assistants, radiology technicians, and UIC phlebotomists, and correctional officers were asked focused questions. Legal counsel for the health care vendor was present during the tours and interviews of health care vendor employees. Patient-inmates in housing units were interviewed about their access to routine and emergency care and the medication delivery process. Many of the areas in each facility that were used to provide clinical services were inspected.

The findings of this first Monitor report are based on the data reviewed, interviews with leadership, staff, and patient-inmate, and inspections of the clinical spaces and housing units.

Provision V.F. of the Consent Decree allows the monitor to retain three consultants. Two physician consultants and a nurse consultant were selected and referred to the Defendants' Attorneys for approval, respectively, in May and June, 2019. The consultants' contracts with IDOC were approved on October 29, 2019. The future involvement of these highly experienced correctional health experts will expedite and enhance the evaluation of the IDOC's compliance with the Consent Decree and provide valuable input and assistance to the IDOC clinical leadership concerning options for achieving compliance with the wide range of the clinical and administrative provisions in the Consent Decree.

## II. Executive Summary

During the first six months of the Consent Decree the activities of the monitor has been focused on assessing the IDOC medical leadership responsibilities and authority, providing input on the development of the Staffing Analysis and its Implementation Plan, tracking the progress toward the development and

installation of a system wide electronic health record, supporting the initiation of nationally recommended adult cancer and routine health maintenance screening and the provision of adult immunizations, evaluating select health care processes and practices, and expanding the monitor's understanding of the IDOC clinical, administrative, and quality improvement processes.

The Illinois Department of Corrections' clinical, legal, and administrative leadership have been fully cooperative with efforts of the monitor to establish a process to implement the recommendations of the Consent Decree and to identify and improve the overall access to care and the quality of health care services provided to the IDOC patient-population.

The Office of Health Services (OHS) has the responsibility developing system-wide health care policies and overseeing the provision of clinical services provided by the contracted vendor and IDOC employees to all patient-inmates housed in IDOC correctional facilities. The OHS is directed by the Chief of Health Service, a competent and diligent Board Certified physician who has been in this position for less than three years. At the time of the signing of the Consent Decree, sixty-two percent of the twenty-one positions in the OHS were vacant making it virtually impossible for OHS to adequately fulfill its duties. Since May, 2019, two Deputy Chiefs, both Board Certified, and the IDOC Director of Nursing have been hired. All three Regional Health Care Coordinator positions are filled. The Consent Decree monitor team has been providing input to the Chief of Health Services concerning the augmentation of the OHS staffing to include audit teams, information technology staff, mortality reviewers, quality improvement leadership and regional quality improvement coordinators, and infection control leadership and regional infection control coordinators. It is anticipated that enhanced OHS staffing will be included in the final draft of the Staffing Analysis report. Pending the creation and hiring of additional positions, the OHS should consider contracting with independent outside agencies or providers to assist with certain key oversight responsibilities including independent mortality review, development of an enhanced, outcome-focused quality improvement program, and the implementation of audit teams to assist with Consent Decree compliance and quality improvement projects.

During previous correctional health care accreditation surveys, the IDOC had designated a non-clinical correctional administrator as the IDOC "health authority"; the IDOC must formally designate and recognize OHS' Chief of Health Services as the health authority for the IDOC health care program. As the health authority, the Chief of Health Services must have responsibility and provide input

4

for development of health care budgets, staffing levels, the renovation and equipping of health care areas, and the clinical specifications of vendor contracts. In accord with this need for OHS to have control and oversight over health care delivery, the positions of health care unit administrators (HCUA) who manage the health care services in each facility and currently report to the facility's Assistant Warden must be shifted into the organizational table of OHS and administratively report to the IDOC clinical leadership

Since April 2019 the Office of Health Services has lead the effort to prepare a system-wide analysis of the IDOC health care staffing; ongoing input has been provided from the monitor. OHS submitted a preliminary Staffing Analysis (IV.A.1. and 2.) to the monitor on August 8, 2019. The monitor provided additional input concerning the initial Staffing Analysis on August 29, 2019. The monitor has supported two thirty-day extensions delaying the due dates of November 24, 2019 both for the Staffing Analysis and Implementation Plan (IV.B.) The preliminary version of the Staffing Analysis included a significant increase in the number of nursing personnel, additional clinical providers, and support staff that are intended to enhance access to health care and to achieve compliance with the Consent Decree. The delay in the finalization of the Staffing Analysis and Implementation Plan fortuitously allows OHS to fully evaluate the recommendations of the September 2019 "UIC College of Nursing Quality Improvement and Patient Safety Plan for the IDOC Office of Health Services" and incorporate select elements of this report into final Staffing Analysis and Implementation Plan. The final Staffing Analysis and the Implementation Plan dated November 23, 2019 were submitted and received by the monitor of November 24, 2019 and will require careful analysis by the monitor team.

The IDOC contracted (II.B.4) with the Electronic Health Record vendor KaZee Inc. on April 12, 2019 to implement, train staff, and install an upgraded version (Pearl v8) of the Pearl Electronic Health Record in all Illinois Department of Corrections (IDOC) and Illinois Department of Juvenile Justice (IDJJ) facilities. At the time the contract was signed an earlier version of Pearl EHR (v6) was in place at four IDOC facilities that house females (Logan CC, Decatur CC, Elgin Treatment Center, and Joliet Treatment Center). It was reported that all IDOC facilities have been surveyed to determine the estimated number of users, which clinical areas need to be hardwired, and how many devices would be needed. As of September 2019, Pearl v8 had been fully installed and staff trained at three female facilities (Logan CC, Decatur CC, and Elgin Treatment Center). The EHR will be installed in phases with the current timelines indicating that all IDOC facilities will have operational EHRs by May-June 2021 which is ten months ahead of Consent

Decree's deadline of April 2022. The monitor will continue to evaluate the EHR implementation plan to assure that sufficient wiring and devices are available in all clinical areas and in clinical administrative offices. In order to effectively utilize the clinical data in the EHR for quality improvement projects and operation enhancements, the Office of Health Services will need to include sufficient informational technology (IT) staff in the Staffing Analysis who will be dedicated to building and modifying IT programs and screens, placing queries to extract clinical and utilization data, installing clinical prompts, and redesigning electronic forms and dashboards, and other related IT duties.

On October 9, 2019 the IDOC Office of Health Services developed and disseminated to all IDOC facilities instructions and standard operating procedures for the implementation of an immunization program in the IDOC (III.M.a and b). These IDOC immunization guidelines are now fully consistent with the national recommendations of the Center for Disease Control (CDC) and are also aligned with the current immunization guidelines of the Federal Bureau of Prisons. The OHS immunization guidelines provide guidance concerning the indications for the administration of nationally recommended vaccines to patient-inmates in all IDOC facilities. With the implementation of this Immunization Program, patient-inmates in the IDOC will have access to all preventive adult vaccines that are available to non-incarcerated adults. The administration of these immunizations will protect the health of the patient-inmates, the staff, and communities to which individuals will be returning to upon discharge. The monitor will vigilantly track the availability and utilization of these vaccines in all IDOC facilities.

On October 24, 2019 the IDOC Office of Health Services developed and disseminated to all IDOC facilities standard operating procedures for the implementation of a Cancer Screening Program. The cancer screening guidelines were fully consistent with the national recommendations of the US Preventive Services Task Force (USPSTF). The IDOC cancer screening recommendations include guidance on screening for breast cancer, cervical cancer, colon cancer, and prostate cancer. The recommendation in the Consent Decree (III.M.1.c) concerning prostate cancer screening has been appropriately revised in the IDOC Cancer Program and is now fully aligned with current national recommendations. The OHS will also be modifying its Cancer Screening Program to include the national guidelines for lung cancer screening. The OHS is to be commended for implementing this Cancer Screening Program to assure that IDOC's patient population receives the same level of cancer screening that is provided to non-incarcerated adults. The monitor will vigilantly track the offering and provision of cancer screening to all IDOC adults in whom screening

is indicated.

Monthly Quality Improvement (QI) committees (II.B.6.l, II.B.7, II.B.9)   have been established at all IDOC facilities; these committees receive regular reports on utilization statistics and ongoing quality improvement studies. The QI committees throughout the IDOC generally monitor and track the same processes although a few of the facilities have independently initiated additional quality studies. Although the data being gathered has some value, most of the quality improvement projects address process improvements and are not focused on clinical outcomes. The QI committee minutes rarely document if a corrective plan has been initiated and whether the action taken has effectively resolved or improved the problem. The QI committees use different reporting formats that hampers the system's efforts to accurately report on system-wide issues and compare the quality data of different facilities.  The recruitment and hiring of the Quality Improvement Director (III.L.1) is needed to establish an effective, clinical outcome focused quality program in the IDOC. The QI Director will need to re-evaluate the current metrics and indicators being monitored, increase the focus on clinical outcomes, standardize the reporting formats across all IDOC facilities, and develop quality improvement and compliance audit teams.

OHS has a vacant combined Quality Improvement/Infection Control position (OHS Table of Organization April 2019); the scope of responsibility and skill sets required for the leaders of Quality Improvement and Infection Control programs are vastly different and this position must be separated into a fulltime Quality Improvement Director (III.L.1) and a fulltime Communicable Disease and Infection Control Director (III.J.1)

The University of Illinois-Chicago College of Nursing (UIC CON) recently completed an extensive and comprehensive Quality Improvement and Patient Safety Plan (III.L.1) for the IDOC Office of Health Service that outlines many of the steps required to establish an optimally functioning quality improvement program in the IDOC.  It is in the best interests of the IDOC health care system and patient population that strong consideration be given to continue the relationship with UIC CON in order to provide expert advice and assistance to the Quality Improvement Director, to accelerate the implementation of Quality Improvement Program in the IDOC, to staff the audit teams, and to train clinical staff in quality improvement methodology.  This contractual relationship with UIC CON should continue until the infrastructure of the QI Program has been established and implemented and the OHS QI Director has had sufficient time to build internal quality improvement teams.

The Consent Decree (III.M.2) directs the IDOC to perform mortality reviews to identify any deficiencies in the delivery of care and initiate corrections actions for those aspects that require improvement. Currently the medical director at the facility where the decedent was housed completes a Death Summary which is ultimately forwarded to the Office of Health Services. The monitor reviewed death summaries for fifty-one male patient-inmates who died from January 9, 2019 and September 30, 2019. The summaries provided in varying detail a brief chronology of the decedent's recent clinical history, care, and testing that preceded the death; not all of the summaries noted the presumptive cause or known of death. The death summaries did not critique the timeliness and quality of the care provided by the IDOC. The summaries did not identify any elements of the health care that could be improved and did not note any action plans. The death summaries are not "mortality reviews". It is only very recently that the newly hired Deputy Chiefs reported that a process has been initiated to review selected categories of deaths for the purpose of identifying opportunities to improve the access and quality of care provided to the deceased patient-inmates. It was reported that there is currently a backlog in completing Mortality Reviews and at the date of this report, the monitor has not yet received any mortality reviews. Performing detailed mortality reviews is a resource intensive but vital component of a Quality Improvement Program; the staff assigned to do mortality reviews at the Office of Health Services will likely need to be augmented with additional, possibly independent contracted, physicians and nurses to resolve the current backlog in morality reviews.

The IDOC vendor requires all non-emergency offsite referrals for "specialty care, diagnostics, testing, imaging, and other procedures" (and onsite ultrasounds by a subcontractor) to be reviewed and approved by the vendor's offsite physician reviewers prior to appointments being scheduled. This process is known as the "Collegial Review". Annualized data from a review of April-June 2019 Quality Improvement reports from twenty-six of the thirty IDOC facilities indicated that over 20,000 annual referrals from facility providers are reviewed by the Collegial Review process; over 2,000 (11%) of these requests for specialty consultation and testing were denied, delayed for additional information, or advised of an alternate treatment plan (ATP) by the vendor's physician reviewers who have not examined the patients nor had access to the patient's medical record. The facility providers and clinical administration can appeal to the OHS for a review of denials. Although the Consent Decree (III.H.5) states that all denials, requests for more information, and ATPs are to be reviewed by the Office of Health Services, some of the facilities communicated to the monitor that only denials that are appealed were commonly sent for review to the OHS. The monitor is increasingly

concerned that the Collegial Review process presents a barrier to the access to offsite specialty consultation and tests, delays needed consultations, procedures, and testing, potentially puts patient-inmates' health at risk, and consumes an significant amount of physician, HCUA, medical records staff, Regional Health Coordinator, Agency Medical Director, and Deputy Chief resources. It is the preliminary opinion of the monitor that the Collegial Review should be eliminated and replaced by a selective utilization review process.

The Consent Decree (III.A.3) states that physicians who are not Board Certified (BC) in Internal Medicine, Family Medicine and Emergency Medicine or have not successfully completed a three residency (Board Eligible) in these three clinical fields shall be reviewed to determine whether they are providing a level of care that is consistent with competent BC and BE physicians. The physician credentials spread sheet provided to the monitor on October 14, 2019 revealed that twelve (34%) of the 35 physicians providing primary care in IDOC facilities had not completed a residency in Internal Medicine or Family Medicine (or Emergency Medicine). Seven of these twelve had been trained in non-primary care fields including Anesthesia, General Surgery, Nuclear Medicine/Radiation Therapy, Pediatrics/Neonatology, Surgery, Pathology, and Radiology. Three had only completed rotating general internships and two had not successfully completed their internal medicine residency programs. Methodology is being developed that would objectively determine whether the quality of care provided by these twelve non-Board Certified or non-Board Eligible physicians is safe and clinically appropriate. It is the opinion of the monitor that it is in the best interest of the IDOC patient population that all physicians providing primary care services in the IDOC should have successfully completed residency training programs in adult primary care fields. The only physician hired since the Consent Decree was approved had successfully completed a residency in Internal Medicine. The monitor is very supportive of the Office of Health Services efforts to establish relationships with the primary care training programs at University of Illinois at Chicago Medical Center and the Southern Illinois University School of Medicine that could assist IDOC with delivery of primary care and with future recruitment and retention of physicians with Board Certification or Board Eligibility in Internal Medicine or Family Medicine.

Data sheets provided to the monitor on August 6, 2019 documented that 7,265, nineteen percent (19%) of the IDOC were fifty years of age or older, nearly one thousand (2.6%) were between 65 and 79 years old and 61 were older than eighty years of age. The aging population in the IDOC is placing an increasing burden on the functioning of the correctional facilities and on the correctional health care

system. Men and women with various types of dementia, cerebrovascular accidents (CVA), advanced cancers, cardiovascular disease, and increasing fragility with risk of falls are housed in many of the IDOC facilities. The infirmaries are becoming filled with patient-inmates who are confused, incontinent, and require assistance with the basic activities of daily living including dressing, feeding, bathing, and toileting. The final staffing analysis will include significant augmentation in nursing personnel and support staff; many of whom will be assigned to infirmaries and geriatric units. The health care and correctional resources including staff, physical space, equipment, onsite support services and offsite specialty consultation, diagnostic testing, and hospitalization required to meet the needs of this aging population is staggering and will only increase if there is not a concerted and strategic effort to comprehensively address this situation. It is the position of the monitor that in the short term additional IDOC resources must be directed to properly house and care for this population but in the near future the IDOC must take the lead to create a pathway to discharge those men and women whose mental and medical conditions make them no longer a risk to society to appropriate settings in the community. This effort will need to include the judicial system, parole boards, influential advocacy groups, state legislatures, the governor's office, and other entities. It is also the monitor's position that the IDOC should not attempt to construct large long-length-of-stay skilled nursing or nursing home correctional facilities which would present notable difficulties to meet and maintain state certification standards.

The monitor will be asking the Plaintiffs' and the Defendants' legal counsel to modify three sections of the Consent Decree.

    1) Provision III.M.2.b: "Federal Bureau of Prisons" should be replaced with "Center for Disease Control Adult Immunization Guidelines". The Federal Bureau of Prisons' (FBOP) immunization guidelines are generally aligned with the Center for Disease Control (CDC) guidelines but the FBOP policies are only changed at some length of time after the CDC updates its recommendations.

    2) Provision III M. 2.c: The language on the Prostate Specific Antigen (PSA) testing is no longer consistent with the national guidelines and needs to be modified to be in alignment with the recommendations of the United States Preventive Services Task Force (USPSTF) which now recommends that men between the ages of 55 and 69 years be informed of the potential harms and benefits of the PSA testing and allowed to make an individual decision about their preference. Men should not be screened who do not express a preference for PSA screening. Give that national recommendations will invariably change as more research is performed, it

would be appropriate simply to state that the IDOC will follow USPSTF guidelines about the prostate cancer screening.

3) Provision III.G.4: "Follow Up after Emergency Visit" should be amended to "Follow Up after Emergency Visit and Hospital Discharge". Onsite post Emergency Department visits and post-hospital discharges should both be seen by the onsite physician within 48 hours of the patient-inmates return to the correctional center.

The findings and recommendations of the monitor on a number of the provisions of the Consent Decree are noted in **Section III Provisions of the Consent Decree** (see below). The IDOC's overall compliance on many of the provisions has been listed as "not yet rated" pending the completion of additional site inspections, focused staff interviews, and the identification and review of existing and additional data. The recent hiring of the three experienced correctional health consultants to participate in site visits, provide more detailed analysis of data and findings, and develop additional opportunities and options to address any noted deficiencies will be invaluable to the assessment and rating of the IDOC's compliance with the Consent Decree and will provide the monitor and the IDOC with an expanded range of input on many of the provisions.

# III. Consent Decree Provisions

## HEALTH CARE GENERAL PROVISIONS

### Overall Adequacy of Health Care
**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*
**OVERALL COMPLIANCE RATING: Not yet rated**

General Requirements

### Appropriate Level of Primary, Secondary, and Tertiary Care
**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*
**OVERALL COMPLIANCE RATING: Not yet rated**

### Adequate Staff, Facilities and Adequate Monitoring, Performance Measurement, Peer Review and Contract Oversight
**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing*

*adequate medical and dental care.*
**OVERALL COMPLIANCE RATING: Not yet rated**

## Adequate Staffing Including Administrative Staff and Oversight

**II.B.3.** *IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff.*
**OVERALL COMPLIANCE RATING: Not yet rated**

## Electronic Medical Record

**II.B. 4.** *No later than 120 days after the Effective Date of this Decree, IDOC shall have selected an EMR vendor and executed a contract with this vendor for implementation of EMR at all IDOC facilities. Implementation of EMR shall be completed no later than 36 months after execution of the EMR contract.*

**OVERALL COMPLIANCE RATING:  Partial Compliance**

**FINDINGS:**
The IDOC contracted with KaZee Inc. on April 12, 2019 to implement, train staff, and install an upgraded version (Pearl v8) of the Pearl Electronic Health Record in all Illinois Department of Corrections (IDOC) and Illinois Department of Juvenile Justice (IDJJ) facilities. At the time the contract was signed and earlier version of Pearl HER (v6) was in place at four IDOC facilities that house females (Logan CC, Decatur CC, Elgin Treatment Center, and Joliet Treatment Center).

The monitor had phone interviews with the IDOC EHR Implementation project manager on June 11, 2019 and October 22, 2019 for the purpose of receiving updates on the status of the Pearl v8 implementation.  Monthly Governance Meeting minutes for July and September, 2019 for the EHR project have been provided to the monitor.

As of July, 2019 all of the IDOC facilities had been surveyed to determine which clinical areas needed to be hardwired and how many devices would be needed.  As of September 2019, Pearl v8 had been fully installed and staff trained at three female facilities (Logan CC, Decatur CC, and Elgin Treatment Center).

Spread sheets outlining the timelines for the implementation of EHR the next four consecutive phases (tiers) were provided to the monitor on October 22, 2019.  An additional three facilities are scheduled to go-live in February-March 2020.  The timelines indicate that all IDOC facilities will have operational EHRs by May-June 2021. The timelines were recently modified to move the EHR implementation dates at the three male reception centers (Stateville NRC, Menard CC, and Graham CC) from the start to the end of the project.

If these predicted timelines are meet, the implementation of EHR will be completed approximately 26 months after the execution of the KaZee Inc contract. This would be 10 months ahead of the deadline stipulated in the Consent Decree.

Although the contract states that EHR will run Quality Improvement reports, there was no language in the contract that indicated if the vendor will provide information technology staff to build or modify programs and screens or to place queries that would extract clinical or utilization

information from the EHR, install clinical prompts, or re-design electronic forms, dashboards, etc. It appears that the Office of Health Services (OHS) will need to submit requests or contracts for IT staff that would be dedicated to the supporting the clinical needs of the EHR

**RECOMMENDATIONS**
1) **The Electronic Health Record Implementation schedule will continue to be monitored to assure compliance with the April 2022 implementation deadline in the Consent Decree.**
2) **The implementation plan must be continually monitored to assure the all clinical areas are hardwired and that sufficient devices are installed in all IDOC facilities.**
3) **OHS will need to include IT support staff in the Staffing Analysis to assure that the EHR can be modified in a timely manner to maximize the clinical and quality improvement needs of the IDOC health care system.**

## Continuity of Care and Medication From Community and Back to Community

**II.B.5.** *Continuity of care and medication from the community and back to the community is also important in ensuring adequate health care.*

**OVERALL COMPLIANCE RATING: Not yet rated**

**FINDINGS:**
Nursing and administrative staff at the four facilities inspected in 2019 consistently communicated that all patient-inmates being discharged to the community were given a two supply of their medication (in addition to any Keep-On-Person medication in their possession) and a prescription for an additional two week supply of medication with one refill that could be presented to a pharmacy in their community. The monitor was not provided with any data that documented that individuals being discharged to the community were given the medications and prescriptions.

The staff at one of the four facilities inspected in 2019 informed the monitor that it was the system-wide practice that individuals being discharged back to the community are not given Health Status Summary Reports. If verified, this failure to provide a summary of medical problems and pertinent laboratory reports is a barrier to the continuation of care for an individual being discharged to the community. The monitor was provided with a copy of the Discharge Medical Summary that was reported to be completed and given to all individuals being discharged from IDOC back into the community. Further investigation will be needed to verify is this form is being utilized in all IDOC facilities.

With the exception of the Cook County Department of Corrections/Cermak Health Services, the monitor is not aware of any other jail in the State of Illinois that routinely sends printed clinical information and medication lists with transfers to the IDOC reception centers. (The IDOC health care vendor stations a clerical employee in the administrative office of Cermak Health Services to retrieve clinical summary information on individuals being transferred to the IDOC.)

**RECOMMENDATIONS:**
1) **The monitors will request data and information from IDOC that verifies that**

**medication and prescriptions are provided to individuals being discharged back to the community**
2) **Data requests will made to verify whether Discharge Medical Summary reports are provided to individuals being discharged from the IDOC back to the community..**
3) **The IDOC should collaborate with State of Illinois jails to assure that list of clinical problems and current medications accompany all transfers to the IDOC.**

## Intake Screening and Initial Health Assessments

**II.B.6.a** *IDOC agrees to implement changes in the following areas: Initial intake screening, and initial health care assessment;*
**OVERALL COMPLIANCE RATING: Not yet rated**

## Urgent Care

**II.B.6.b.** *IDOC agrees to implement changes in the following areas: Urgent care;*

**OVERALL COMPLIANCE RATING: Not yet rated**

**FINDINGS:**
The Urgent Care services at the four facilities were briefly visited by the monitor in the 2019. Additional time will be needed to perform a more detailed review of the operational and clinical effectiveness of the provision of urgent care services.

The four urgent care centers inspected were generally organized, well stocked, properly equipped, and clean. The emergency response bags were unsealed in three of the four urgent care rooms inspected. At one facility, the general medical supply section of the bag was unsealed but the medication compartment was sealed. All sections of the emergency should be sealed, re-inspected and re-stocked after use, and then resealed.

None of the emergency bags in the four UCs inspected were stocked with Naloxone (Narcan) or Glucagon. All patient inmates will possible opioid overdoses or hypoglycemia must be transported across these four large, expansive campuses to the Health Care Unit's urgent care center for treatment. For clinical staff toting an emergency bag to arrive at a housing unit and not be unable to immediately reverse an opioid overdose or an episode of hypoglycemia puts the patient-inmate's health and even life at risk.

**RECOMMENDATIONS:**
1) **All emergency bags must be sealed, re-inspected and re-stocked after each use, and then resealed.**
2) **All IDOC emergency response bags must be stocked with naloxone (Narcan) and Glucagon**

## Medication Administration

**II.B.6.c.** *IDOC agrees to implement changes in the following areas: Medication administration records-both for directly administered medications and KOP;*

**OVERALL COMPLIANCE RATING: Not yet rated**

**FINDINGS:**
Medication passage was observed in three of the four facilities inspected in 2019. In all three observed medication passages, prefilled/preloaded medications were being administered.

In one facility, the medication was prefilled even though all medications were passed in a single pill line located in the Health Care Unit. In another, nurses stated that prefilling is needed due to physical plant issue (multiple floors, no elevators) that precluded the use of a medication cart.

One facility was only temporarily prefilling meds for patients whose last name began with "R" through "V" because one drawer on the medication care was difficult to open. A work order had reportedly been submitted to repair the drawer.

"Prefilling/preloading" refers to the process of removing medications from patient-specific blister packs or containers and placing the medications in an envelope with the patient's name, medication, and dosage handwritten on the envelope. The practice of prefilling medication heightens the risk of medication errors.

In the two facilities that were continually prefilling medication, the medication passage nurse was also not immediately completing the medication administration record (MAR) as a medication was passed. The MAR was either completed before the pill line was even started or after the nurse returned to the Health Care Unit/nurse work area after medications had been passed in housing units. This is an unsafe medication administration practice and puts the patient at risk for medication errors that could result in under or over dosing).

Nurses in the one facility only prefill/preload controlled substances that are kept in a locked container in the Health Care Unit so that they do not have to bring containers of controlled medications into the housing units.

**RECOMMENDATIONS:**
1) **IDOC and the Vendor nursing leadership should immediately re-evaluate the practice of prefilling/preloading and the failure to simultaneously record medication passage in the MAR.**
2) **The Nurse Consultant whose contract with IDOC was approved on October 29, 2019 will review the practice of prefilling/preloading and non-simultaneous, non-real time documentation in the MAR.**

## Medication Refusals
**II.B.6.d.** *IDOC agrees to implement changes in the following areas: Medication refusals;*

**OVERALL COMPLIANCE RATING: Not yet rated**

**FINDINGS:**
Nursing staff at the four inspected facilities stated that they would inform the provider if a patient refused medications twice or more than twice.

Providers stated that they are occasionally informed when a patient-inmate is refusing medication(s) but they were not sure whether the notification was based on the nurses'

judgement or whether there was a number of refusals that triggered them being notified. The monitor has not been able to identify an IDOC administrative directive or vendor Policy & Procedure that identifies the indications for nurses to inform providers that a patient is refusing medication.

Providers also stated that the MAR is not routinely available when they are seeing patients during chronic illness clinics or provider sick call.

**RECOMMENDATIONS:**
1) **IDOC should develop a standard practice on when providers should be notified that a patient-inmate in refusing medications.**
2) **Whenever possible the MAR should be available for provider review, especially during chronic care clinics.**

## Care of Patients after Offsite Consultation and Offsite Testing
**II.B.6.e.** *IDOC agrees to implement changes in the following areas: Informed care for patients who return to IDOC facilities after being sent to an offsite service provider;*
**OVERALL COMPLIANCE RATING: See III H.2. Follow Up Visit and Report**

## Chronic Disease Care
**II.B.6.f.** *IDOC agrees to implement changes in the following areas: Chronic disease care: diabetes, Chronic Obstructive Pulmonary Disease (COPD), asthma, HCV, HIV/AIDs, hypertension, hyperlipidemia*

**OVERALL COMPLIANCE RATING: Not yet rated**

## Findings:
Three of the hour sites inspected by the monitor in August and September 2019 revealed that some diabetics are prescribed 7030 insulin (combination of 70% long acting and 30% short acting insulin) and are also ordered to have sliding scale dosage of additional short acting insulin based on pre-breakfast and pre-dinner finger stick blood glucose/capillary blood glucose results This practice puts these diabetics at notable potential risk for hypoglycemia.

As noted in II.B.6.l, monitoring the level of control and stability of chronic illnesses (diabetes, hypertension, asthma, hyperlipidemia, and seizure disorder) is a worthwhile activity but there would be added value if any documented interventions were initiated for patient-inmates with poor or worsening control and the QI committee tracked these individuals until their control had improved.

Preliminary data reported in the June 2019 Quality Improvement Committee minutes from 26 of the 30 IDOC facilities indicated that there were 1,785 patient-inmates with active Hepatitis C in the IDOC.(Data from Dixon CC, NRC, Pinckneyville CC and Stateville CC did not report on their Hepatitis C patient population.) Only twenty-two (1%) of the individuals with active Hepatitis C were currently receiving treatment; another 164 (9%) were reported to be awaiting or pending treatment and 40 had finished treatment. The UIC Liver Telemedicine Clinic treats all individuals in the IDOC with Hepatitis C who have been deemed eligible for treatment. The UIC UIC Hepatitis C Guideline were revised in January 2019 to expand the number of Hepatitis C

patient-inmates who qualify for treatment. Although additional data is needed, this data indicates that very few patient-inmates with active Hepatitis C were being treated. If this data is accurate, the UIC and IDOC processes that determine eligibility for treatment of Hepatitis C needs to be expeditiously reassessed so that treatment for this highly curable illness can be appropriately provided to the IDOC patient population.

### Recommendations:
1) **Discontinue use of the combination of 70/30 insulin and sliding scale short acting insulin.**
2) **The current quality project that reports on the control and stability of chronic illnesses should be modified to track and report interventions initiated in patient-inmates with poor control or worsening stability until the status of these individuals had improved.**
3) **Monthly data should be reported identifying the number of Hepatitis C cases in the IDOC, the number being treated, the number pending treatment, the number finished treatment, the number refused treatment, and the number with contraindications to treatment.**
4) **The number of active Hepatitis C patient-inmates who are receiving treatment or whose treatment is pending should be increased. If so needed the UIC and IDOC eligibility processes should be streamlined.**

## Timely Access to Diagnostic Services and Appropriate Specialty Care
**II.B.6. g.** *IDOC agrees to implement changes in the following areas: Timely access to diagnostic services and to appropriate specialty care;*
**OVERALL COMPLIANCE RATING: Not yet rated**

**FINDINGS:** see III.H.5. Review of Specialty Requested Services

## Dental Care Access and Preventive Dental Care
**II.B.6. h.** *IDOC agrees to implement changes in the following areas: Dental care access and preventative dental care;*
**OVERALL COMPLIANCE RATING: Not yet rated**

## Morbidity and Mortality Review
**II.B.6.i.** *IDOC agrees to implement changes in the following areas: Morbidity and mortality review with action plans and follow-through:*

**OVERALL COMPLIANCE RATING: Not yet rated.**

**FINDINGS: See III.M.2**

## Nutrition and Diabetic Diets
**II.B.6.j.** *IDOC agrees to implement changes in the following areas: Analysis of nutrition and timing of meals for diabetics and other Class members whose serious medical needs warrant doing so;*
**OVERALL COMPLIANCE RATING: Not yet rated.**

## Staffing, Physical Conditions and Scope of Services for Infirmary Care

**II.B.6.k.**  *IDOC agrees to implement changes in the following areas: Appropriate staffing, physical conditions, and scope of services for infirmary care;*
**OVERALL COMPLIANCE RATING: Not yet rated**

**Findings:**
(See II.B.6.p, III.J.2, and III.J.3).
The monitor has been advised that there are plans to construct a 200 bed IDOC hospital in the area of Joliet, Illinois. Reportedly 150 beds will be utilized to provide an intensive level of care to seriously mentally ill patient-inmates. The plan for the other fifty beds has not yet been provided to the monitor although there have been indications these beds, consultation rooms, and procedure rooms may be used for the provision of infirmary care, specialty consultation, and outpatient procedures.

**Recommendations:**
  1) **The monitor will request the current projected scope of services that will be provided in the non-mental health beds at the planned IDOC hospital.**

## Quality Assurance Review

**II.B.6.l.**  *IDOC agrees to implement changes in the following areas: Effective quality assurance review;*
**OVERALL COMPLIANCE RATING: Not yet rated**

**FINDINGS:**
Monthly Continuous Quality Improvement (CQ) committee minutes from all IDOC correctional centers were provided to the monitor.  The CQI committee reporting formats differ from facility to facility but with some exceptions the same data is tracked and reported at all the sites. The minutes primarily noted utilization statistics but there were quality assurance measures that were reported including nurse sick call chart audits performed by the facility physician, offsite referrals seen by a physician within 5 days of returning to the facility, medication errors, Boswell pharmacy inspection reports, waiting times for dental and optometry appointments, chronic illnesses' level of control (good, fair, poor, stable improving, worsening) metrics, MRSA tracking logs, and the rate of returned reports after offsite clinical care (specialty consultation, urgent care/emergency department, and hospital discharge).

Although a number of these quality measures gather data that is important to the operations of the facility's health care system; very few generate corrective actions or focus on improving clinical outcomes.  Monitoring the level of control and stability of chronic illnesses (diabetes, hypertension, asthma, hyperlipidemia, and seizure disorder) is a worthwhile activity but there would be added value if documented interventions were initiated and the QI committee tracked those with poor or worsening control until their control had improved.

There are multiple additional quality metrics that could also be tracked and improved by IDOC Quality Improvement programs.  It was somewhat a surprise to the monitor that only one facility (Sheridan CC) was identified as tracking the access to nurse sick call (date sick call request written/entered, date received, date seen, complaint, referred to MD/DDS yes/no/refused). Nurse sick call is a vital component in patient-inmates' access to a facility's health care services.  With a single modification (changing "date seen" to "date no show/reason for no show"), this nurse

sick call tracking log could serve as a model for measuring and reporting the accessibility of a facility's patient population to nurse sick call services.

The OHS has a vacant positon for a combined Quality Improvement/Infection Control Director. The responsibilities and scope of the services for both quality improvement and infection control are extensive; this position must be divided creating separate Quality Improvement and Communicable Disease and Infection Control Directors. The QI Director must then be expeditiously recruited and hired.

The University of Illinois College of Nursing Quality Improvement and Patient Safety Plan report (see provision III. L.1.) contains a number of recommendations concerning the implementation of a comprehensive medical and dental Quality Improvement Program for all IDOC facilities. In order to accelerate the reorganization of the IDOC quality improvement program, consideration should be given to contracting with the UIC CON to assist the IDOC QI Director in developing and implementing a quality improvement program that meets the needs of the IDOC patient-population.

**RECOMMENDATIONS:**
1) **Separate the OHS Quality Improvement/Infection Control position into two separate Director/Coordinator positions (Quality Improvement Director and Communicable Disease and Infection Control Coordinator).**
2) **Recruit and hire the System-wide Quality Improvement Director.**
3) **The QI committee reporting format should be standardized to allow system-wide data to accurately measured and compared.**
4) **IDOC QI program should study and monitor each facility's access to nurse sick call.**
5) **Strong consideration should be given to extending the UIC CON contract or hiring another qualified vendor to assist the IDOC QI Director with the development of an enhanced system-wide quality improvement program.**

## Preventable Adverse Event Reporting
**II.B.6.m.** *IDOC agrees to implement changes in the following areas: Preventable adverse event reporting;*
**OVERALL COMPLIANCE RATING: Not yet rated**

## Incident Reporting System and Sentinel Event Review
**II.B.6.n.** *IDOC agrees to implement changes in the following areas: Action taken on reported errors (including near misses);*
**OVERALL COMPLIANCE RATING: Not yet rated**

## Training of Patient Safety
**II.B.6.o.** *IDOC agrees to implement changes in the following areas: Training on patient safety;*
**OVERALL COMPLIANCE RATING: Not yet rated**

## Infirmary Fixtures and Equipment
**II.B.6. p.** *IDOC agrees to implement changes in the following areas: Adequately equipped infirmaries;*

**OVERALL COMPLIANCE RATING: Not yet rated**

**FINDINGS:**
Infirmary beds in the four facilities inspected in 2019 were aged and in various stages of disrepair. Many of the beds were low to the ground making it difficult for clinical staff to examine and provide treatment at the bedside. Many of the beds lacked functional safety side railings and did not have the ability to raise the head or feet sections.

Future monitor inspections of infirmaries will not only assess the condition of the beds, but also the condition and availability of wheel chairs, safety grab bars and non-slip surfaces in showers and bathrooms, transfer equipment, medical equipment, bedsore prevention equipment and bedding, staff and patient-inmate furniture, nurse call devices, and other equipment and conditions.

**RECOMMENDATIONS:**
1) **The IDOC should audit the condition of the infirmary beds in all IDOC facilities and replace defective beds with electrically operated hospital beds that have the ability to raise the height of the bed and elevate the head and leg sections as needed. All beds in the infirmary should be equipped with side railings for the prevention of falls.**

## Annual Assessment of Medical, Dental, and Nursing Staff Competency and Performance

**II.B.6.q.** *IDOC agrees to implement changes in the following areas: Annual assessment of medical, dental, and nursing staff competency and performance;*
**OVERALL COMPLIANCE RATING: Not yet rated**

**FINDINGS:**
The IDOC vendor Policy & Procedure M-001 Peer Review Activities states that "peer reviews will be conducted, at a minimum, on an annual basis" and "…will be done for medical practitioners, M.D. or D.O., physician assistants, ARNP's, psychiatrists, and psychologists." Physician, Psychiatrist, Psychologist, and Dentist Peer review worksheets have been developed and are utilized to review various administrative, documentation, and clinical components of the provider's work. The 2019 physician, physician assistant, and ARNP peer reviews have not yet been reviewed by the monitor. The 2019 dentist peer reviews were audited by the monitor (see III K.9)

**RECOMMENDATIONS:**
1) **Medical provider peer reviews will be requested and audited by the monitor team.**

## Effective Disciplinary and Personnel Actions

**II.B.6.r.** *IDOC agrees to implement changes in the following areas: That Defendants and the vendor shall timely seek to discipline and, if necessary, seek to terminate their respective health care staff that put patients at risk;*
**OVERALL COMPLIANCE RATING: Not yet rated**

## Transfer Summary Documents

**II.B.6.s.** *IDOC agrees to implement changes in the following areas: Summarizing essential health*

*information for patient and anticipated community providers; and*

**OVERALL COMPLIANCE RATING: Not yet rated**

**FINDINGS:**
As noted in II.B.5, the staff at one of the four facilities inspected in 2019 informed the monitor that it was the system-wide practice that individuals being discharged back to the community are not given Health Status Summary Reports. If verified, this failure to provide a summary of medical problems and pertinent laboratory reports is a barrier to the continuation of care for an individual being discharged to the community. The monitor was provided with a copy of the Discharge Medical Summary that was reported to be completed and given to all individuals being discharged from IDOC back into the community. Further investigation will be needed to verify if this form is being utilized in all IDOC facilities.

**RECOMMENDATIONS:**
    1) **Data request will made to verify whether Discharge Medical Summary reports are completed and given to individuals being discharged from the IDOC back to the community.**

## Bridge Medication
**II.B.6.t.** *IDOC agrees to implement changes in the following areas: Upon release, providing bridge medications for two weeks along with a prescription for two more weeks and the option for one refill, if medically appropriate.*

**OVERALL COMPLIANCE RATING: Not yet rated**

**FINDINGS:**
Nursing and administrative staff at the four facilities inspected in 2019 consistently communicated that all patient-inmates being discharged to the community were given a two supply of their medication (in addition to any Keep-On-Person medication in their possession) and a prescription for an additional two week supply of medication with one refill that could be presented to a pharmacy in their community. The monitor was not provided with any data that documented that individuals being discharged to the community were given the medications and prescriptions.

**RECOMMENDATIONS:**
    1) **Additional data and documentation will be solicited to verify the provision of the "bridge medication" to individuals being released from all IDOC facilities to the community.**

## Performance and Outcome Measures
**II.B.7.** *The implementation of this Decree shall include the development and full implementation of a set of health care performance and outcome measures. Defendants and any vendor(s) employed by Defendants shall compile data to facilitate these measurements.*
**OVERALL COMPLIANCE RATING: Not yet rated**

**FINDINGS:**
(see II.B.6.l. Quality Assurance Review and III.L.1 Recommendation for Implementation of

Quality Improvement Program)

## Policies and Procedures

**II.B.8.** *The implementation of this Decree shall also include the development and implementation, with the assistance of the Monitor, of a comprehensive set of health care policies by July 1, 2020. These policies shall be consistent throughout IDOC, and cover all aspects of a health care program.*
**OVERALL COMPLIANCE RATING: Not yet rated**

## Audits

**II.B.9.** *The implementation of this Agreement shall also include the design, with the assistance of the Monitor, of an audit function for IDOC's quality assurance program which provides for independent review of all facilities' quality assurance programs, either by the Office of Health Services or by another disinterested auditor.*
**OVERALL COMPLIANCE RATING: Not yet rated**

**Findings:**
It is optimal that no less than two audit teams under the supervision of the IDOC Quality Director and the Office of Health Services be formed to review and audit the quality assurance programs at each of the IDOC facilities. The team would do standardized audits, independent clinical chart reviews, and site inspections. Given the overlapping guidelines and provisions of quality improvement activities, national accreditation standards, and the Consent Decree, a structured audit tool could be developed that allows simultaneous audits of this three entities.

In order to accelerate the reorganization of the IDOC quality improvement program, consideration should be given to contracting with the UIC CON to assist the IDOC QI Director in developing not only a quality improvement program but also staffing audit teams until the QI Director is able to form internal audit teams.

See III.L.1: Recommendation for Implementation of a Quality Improvement Program and II.B.6.L: Quality Assurance Review

**Recommendations;**
   1) **Consideration should be given to continue the contract with UIC College of Nursing to assist with the implementation and auditing function of the IDOC quality program.**

## III. HEALTH CARE SPECIFIC PROVISIONS

### A: Staffing and Leadership

## Chief: Office of Health Services

**III.A.1** *The Chief of Health Services shall hereafter be board certified in one of the specialties described in paragraph III.A.2, below. The Deputy Chiefs of Health Services shall either be board certified or currently board-eligible in one of the specialties described in paragraph III.A.2, below.*

**OVERALL COMPLIANCE RATING: Substantial Compliance**

**FINDINGS:**
The Chief of Health Services is Board Certified in Emergency Medicine; his certification is currently valid through December 31, 2026

One Deputy Chief is Board Certified in Emergency Medicine; his certification is currently valid through December 31, 2023; the other Deputy Chief is Board Certified in Internal Medicine.

## Physician Credentialing
**III.A.2.** *All physicians providing direct care in the IDOC (whether they are facility medical directors or staff physicians) shall possess either an MD or DO degree and be either board certified in internal medicine, family practice, or emergency medicine, or have successfully completed a residency in internal medicine which is approved by the American Board of Internal Medicine or the American Osteopathic Association, or have successfully completed a residency in family medicine which is approved by the American Board of Family Medicine or the American Osteopathic Association, or have successfully completed a residency in emergency medicine which is approved by the American Board of Emergency Medicine.*

**OVERALL COMPLIANCE RATING: Not yet rated**

**FINDINGS:**
Based on the health care vendor's excel spread sheet provided to the monitor on October 14, 2019,  23 (65.7%) of the 35 physicians providing primary care in IDOC facilities were either currently Board Certified or Board Eligible in Internal Medicine or Family Medicine.  13 (57%) of these 23 were currently Board Certified in Internal Medicine or Family Medicine and 10 (43%) had successfully completed a residency in either Internal Medicine or Family Medicine but had not passed the certification examination or had let their certifications expire.  The vendor's credentials packets which are needed to verify internship and residency training and board certification were lacking for 10 physicians; these missing packets have been requested but not yet received.

The only physician hired since the Consent Decree was approved was Board Eligible in Internal Medicine.

It is in the best interest of the IDOC patient population that physicians providing care to this complicated and complex patient population are fully trained in Internal Medicine or Family Medicine.

**RECOMMENDATIONS:**

1) **IDOC and its vendor should aggressively recruit only physicians who are Board Certified or Board Eligible (successfully completed a 3 year residency) in Internal Medicine or Family Medicine to staff the primary care services at IDOC facilities.**

## Failure to Meet Credential Criteria
**III.A. 3.** *Physicians currently working in IDOC who do not meet these criteria shall be reviewed by the Monitor and the IDOC Medical Director to determine whether the quality of care they actually provide is consistent with a physician who has the above described credentials and who is practicing in a safe and*

*clinically appropriate manner. If the Monitor and the IDOC Medical Director cannot agree as to the clinical appropriateness of a current IDOC physician, IDOC shall not be found non-compliant because of that vacancy for nine (9) months thereafter.*

**OVERALL COMPLIANCE RATING: Not yet rated**

**FINDINGS:**
Based on the health care vendor's excel spread sheet provided to the monitor on October 14, 2019, 12 (34%) of the 35 physicians providing primary care in IDOC facilities had not successfully completed a residency in Internal Medicine or Family Medicine.

Seven of these twelve had been trained in non-primary care fields including Anesthesia, General Surgery, Nuclear Medicine/Radiation Therapy, Pediatrics/Neonatology, Surgery, Pathology, and Radiology. Three had only completed rotating general internships. Two had some training in Internal Medicine but had not successfully completed their internal medicine residency programs.

The IDOC has not yet developed a methodology that would objectively determine whether the quality of care provided by these non-primary care trained physicians is safe and clinically appropriate.

**RECOMMENDATIONS: Not yet rated**

1) **A methodology has not yet been but must be developed that would objectively identify whether physicians who are not Board Certified or had not successfully completed a residency program in Internal Medicine or Family Medicine are providing a level of care that is safe and clinically appropriate. The methodology may include detailed reviews of the chronic illness, sick call, infirmary care, urgent care, post-hospital and offsite urgent/ED care, and the provision of routine health maintenance. Mortality and near-miss reviews may also be used to evaluate the care provided by the involved IDOC physicians.**

## Remedial Steps for Failure to Have Physician Credentials

**III.A.4.** *If a current physician's performance is questionable or potentially problematic, and the Monitor and the IDOC Medical Director believe that education could cure these deficiencies, the IDOC will notify the vendor that said physician may not return to service at any IDOC facility until the physician has taken appropriate CME courses and has the consent of the Monitor and the IDOC Medical Director to return.*
**OVERALL COMPLIANCE RATING: Not yet rated**

## New Physician Credentials

**III.A.5.** *Defendants may hire new physicians who do not meet the credentialing criteria, only after demonstrating to the Monitor that they were unable to find qualified physicians despite a professionally reasonable recruitment effort and only after complying with the provisions of paragraph 6, below.*

**OVERALL COMPLIANCE RATING: Not yet rated**

**FINDINGS:**

No new physician candidates who did meet the credentialing criteria have been hired or presented to the monitor since the approval of the Consent Decree.

**RECOMMENDATIONS:**
1) **As also noted in III.A.2, IDOC and its vendor should aggressively recruit only physicians who are Board Certified or Board Eligible (successfully completed a 3 year residency) in Internal Medicine or Family Medicine to provide primary care services in IDOC facilities.**

## Candidates Failure to Meet Credential Requirements

**III.A.6-7** *Physician candidates who do not meet the credentialing requirements shall be presented to the Monitor by the Department. The Monitor will screen candidates who do not meet the credentialing criteria after a professionally reasonable recruitment effort fails and determine whether they are qualified. The Monitor will not unreasonably withhold approval of the candidates. The Monitor will present qualified candidates to the IDOC for hiring approval. If the IDOC Medical Director has concerns regarding the rejected candidates, he or she will meet and confer with the Monitor in an attempt to reach a resolution. In instances in which the Monitor rejects all viable candidates for a particular vacancy, the Department will not be found noncompliant because of that vacancy at any time during the next twelve (12) months. The credentialing requirements contained in paragraph 2 above do not apply to physicians employed by universities.*

**OVERALL COMPLIANCE RATING:  Not yet rated**

**RECOMMENDATIONS:**
1) **As also noted in III.A.2. and III.a.5, IDOC and its vendor should aggressively recruit only physicians who are Board Certified or Board Eligible (successfully completed a 3 year residency) in Internal Medicine or Family Medicine to provide primary care services in IDOC facilities.**

## Deputy Chiefs of Health Services

**III.A.8.** *Within eighteen (18) months of the Effective Date Defendants shall create and fill two state-employed Deputy Chiefs of Health Services positions reporting to the Chief of Health Services to provide additional monitoring and clinical oversight for IDOC health care.*

**OVERALL COMPLIANCE RATING: Substantial Compliance**

**FINDINGS:**

Two Deputy Chiefs of Health Services have been hired and have begun to actively participate in improving the provision, monitoring, and clinical oversight of the health care services in the IDOC.

**RECOMMENDATIONS:**
**None**

25

## Health Care Unit Administrators

**III.A.9.** *Within nine (9) months of the Effective Date every facility shall have its own Health Care Unit Administrator ("HCUA"), who is a state employee. If a HCUA position is filled and subsequently becomes vacant Defendants shall not be found non-compliant because of this vacancy for nine (9) months thereafter.*

**OVERALL COMPLIANCE RATING: Partial Compliance**

**FINDINGS**

Six and one-half months (October 28, 2019) after the Effective Date of the Consent Decree, the monitor received a report detailing the status of Health Care Unit Administrator positions in thirty IDOC facilities. Twenty-five (83.3%) of the thirty IDOC facilities had "its own" HCUA, (One HCUA was assigned to cover Pinckneyville CC (pop.2100) and Murphysboro CC, a small facility (pop. 138) which is 20 miles away.). There were four (13.3%) vacancies (East Moline, Elgin Treatment Center, Danville, and Southwestern) and the HCUA at one facility was on extended medical leave. The Regional Health Coordinator was reported to regularly assist with HCUA duties at two facilities lacking coverage in the Central Region.

The HCUAs manage the health care services at each IDOC correctional facility but they currently report to an Assistant Warden. The HCUA positions should be shifted to be under the authority of the Office of Health Services. It is important that the HCUA work collaboratively with each facility's correctional leadership but they must operationally and administratively report to the system's health care leadership.

During site visits to Sheridan CC, Pontiac CC, Robinson CC, and Lawrence CC in 2019, it was verified that each facility had a full-time HCUA.

**RECOMMENDATIONS:**
1) **In February 2020, nine months after the effective date of the Consent Decree, the monitor will request an updated report on the filled and vacant HCUA positions to assess compliance with this provision.**
2) **The HCUA positions should directly report to the Office of Health Services.**

## Registered Nurse Sick Call

**III.A.10.** *Each IDOC facility shall have registered nurses conducting all sick calls. Until IDOC has achieved substantial compliance with nursing provision of the staffing plan, facilities may use licensed practical nurses in sick call, but only with appropriate supervision.*

**OVERALL COMPLIANCE RATING: Not yet rated**

**FINDINGS:**

Site visits by the monitor to four IDOC facilities (Sheridan CC, Pontiac CC, Robinson CC, Lawrence CC) revealed that only Registered Nurses (RNs) at two (Sheridan CC, Robinson CC) were conducting the nurse sick calls. The other two facilities were using both RNs and Licensed Practical Nurses (LPNs) to provide nurse sick call services.

**RECOMMENDATIONS:**

1) **Additional system-wide data will be solicited to fully assess IDOC's compliance with this provision.**
2) **The Staffing Analysis and Implementation Plan must include a sufficient number of RN positions to assure that nurse sick call is performed by RNs at all IDOC facilities.**

### B. Clinical Space and Sanitation

## Sick Call Areas and Examination Rooms

**III.B.1.** *IDOC shall provide sufficient private and confidential sick-call areas in all of its facilities to accommodate medical evaluations and examinations of all Class members, including during intake, subject to extraordinary operational concerns and security needs of IDOC including, but not limited to, a lockdown.*

**OVERALL COMPLIANCE RATING: Not yet rated**

**FINDINGS:**
One of the four IDOC facilities audited by the monitor in 2019 did not have private and confidential sick-call area examination rooms. Two nurse sick call examination rooms in the South Segregation Unit at Pontiac CC had video cameras mounted in both rooms that allow a full viewing of the patient interview and examinations. Pursuant to communication between the Plaintiffs and Defendants Legal Counsel, the cameras at PCC were removed.

Three of the four facilities audited by the monitor in 2019 did not have sufficient numbers of examination rooms to simultaneously accommodate nurse sick call and clinician sick call and chronic care clinics.

**RECOMMENDATIONS:**
1) **Additional data will be required to evaluate whether there are sufficient private and confidential sick-call areas and examination rooms in all IDOC facilities.**

## Sick Call Area and Examination Room Equipment

**III.B.2.** *These areas shall be equipped to fully address prisoner medical needs. The equipment shall be inspected regularly and repaired and replaced as necessary. Each area shall include an examination table, and a barrier on the examination table that can be replaced between prisoners. The areas shall provide hand washing or hand sanitizer.*

**OVERALL COMPLIANCE RATING: No yet rated**

**FINDINGS:**
Site inspections of the clinical areas at four facilities in 2019 revealed torn upholstery on examination tables and chairs, non-functional oto-ophthalmoscopes, examination room sinks that were crusted with calcium deposits, and absence of paper barriers on the examination tables and gurneys.

**RECOMMENDATIONS:**
1) **Monthly Safety and Sanitation inspections should include the condition and function of all equipment and furniture in the clinical areas of the facility.**

## C: Reception

## Staffing to Complete Intake Evaluations in Seven Days
**III.C.1.** *IDOC shall provide sufficient nursing staff and clinicians to complete medical evaluations during the intake process within seven (7) business days after a prisoner is admitted to one of IDOC's Reception and Classification Centers.*
**OVERALL COMPLIANCE RATING: Not yet rated (evaluation pending site visits to IDOC intake centers)**

## Sufficient Space to Complete Intake Evaluations
**III.C.2.** *IDOC shall provide sufficient private and confidential areas in each of its intake facilities for completion of intake medical evaluations in privacy, subject to extraordinary operational concerns and security needs of IDOC including, but not limited to, a lockdown.*
**OVERALL COMPLIANCE RATING: Not yet rated. (Evaluation pending site visits to IDOC intake centers)**

## Registered Nurse Intake Reviews
**III.C.3.** *IDOC shall ensure that a clinician or a Registered Nurse reviews all intake data and compiles a list of medical issues for each prisoner.*
**OVERALL COMPLIANCE RATING: Not yet rated (Evaluation pending site visits to IDOC intake centers)**

## Follow Up of Intake Findings
**III.C.4.** *If medically indicated, IDOC shall ensure follow up on all pertinent findings from the initial intake screening referenced in C.3. for appropriate care and treatment.*
**OVERALL COMPLIANCE RATING:  Not yet rated (Evaluation pending site visits to IDOC intake centers)**

## D: Intra-system Transfers

## Transfers in Those with Pending Off-Site Services
**III.D.1.**   *With the exception of prisoners housed at Reception and Classification Centers, IDOC shall place prisoners with scheduled offsite medical services on a transfer hold until the service is provided, contingent on security concerns or emergent circumstances including, but not limited to, a lockdown. Transfer from Reception and Classification Centers shall not interfere with offsite services previously scheduled by IDOC.*
**OVERALL COMPLIANCE RATING:  Not yet rated**

## Continuity of Care after Transfer
**III.D.2.**   *When a prisoner is transferred from one facility's infirmary to another facility, the receiving facility shall take the prisoner to the HCU where a medical provider will facilitate continuity of care.*
**OVERALL COMPLIANCE RATING: Not yet rated**

**H: Medical Records**

## Problem Lists in Medical Records
**III.E.1.** *IDOC shall maintain a list of prisoners' current medical issues in their medical charts.*
**OVERALL COMPLIANCE RATING: Not yet rated**

## Treatment Plans
**III.E.2.** *Lists and treatment plans will be amended pursuant to the order of a clinician only.*
**OVERALL COMPLIANCE RATING: Not yet rated**

## Drop Filing
**III.E.3.** *IDOC shall abandon "drop-filing".*

**OVERALL COMPLIANCE RATING: Partial Compliance**

**FINDINGS:**
A site by site audit received by the monitor on October 28, 2019 reported that "drop filing" was not being done in any of the thirty IDOC facilities. However, the report noted that there were significant backlogs in filing at three facilities and administrative measures had been initiated to address these backlogs. The NRC filing backlog was reported to be due to a number of medical record clerk vacancies.

No evidence of "drop filing" was noted during the monitor's 2019 inspections of the Sheridan CC, Pontiac CC, Robinson CC, and Lawrence CC.

**RECOMMENDATIONS:**
    1) **The medical record clerk vacant positions at NRC must to be expeditiously filled.**

## Offsite Medical Reports
**III.E.4.** *The medical records staff shall track receipt of offsite medical providers' reports and ensure they are filed in the correct prisoner's medical records.*

**OVERALL COMPLIANCE RATING: Partial Compliance**

**FINDINGS:**
Medical Record staffs maintain three spread sheets that respectively track all Offsite Specialty and Testing referrals (date of initial referral, date scheduled, date seen, return with consult report, reason for missed appointment) offsite Urgent Care/Emergency Department referrals (referral site, reason for referral, discharge diagnosis, return with discharge summary), and Hospital Inpatient Discharges (date discharged, treating hospital, discharge diagnosis, return with discharge report). The Sheridan CC UM Offsite Scheduling Log also notes whether the date of the site MD review of all patients returning from specialty consultation.

The monitor reviewed the Urgent Care/Emergency Department referral, Hospital Inpatient Discharges, and Offsite Scheduling (Outpatient specialty consultation, ambulatory procedures, treatment and testing) spread sheets for the months of April through June 2019 from twenty-eight IDOC facilities (data not provided for Dixon CC and Pinckneyville CC). During these

three months, there were 502 urgent care/emergency department referrals, 269 hospital discharges, and 5,389 offsite outpatient referrals. Discharge summaries or specialty consultations were reported as re turned on 382 (76%) of the UC/ED returns, 207 (77%) of the hospital discharges, and 4,490 (83%) of the offsite outpatient visits. Of the 28 reporting facilities, sixteen (57%) reported that 100% of their UC/ED discharge summaries were returned; twenty (71%) reported that 100% of their hospital discharges were returned. 16 (57%) reported that 100% of their offsite outpatient consultation reports were returned. These surprisingly high rates of returned discharge summaries and consultation reports were not consistent with the information reported to the Lippert experts during the 2018 site visits to NRC, Stateville CC, Logan CC, Dixon CC, and Menard CC when staff at these five facilities voiced concerns about the lack of returned discharge summaries and consultations from offsite clinical services.

High rates of returned consultation reports, urgent care/emergency department discharge summaries, and hospital discharge reports were also reported on the offsite clinical service spread sheets for Sheridan CC, Pontiac CC, Robinson CC, and Lawrence CC. These spread sheets were reviewed during the monitor's site visits to these four facilities. The monitor's discussions with the facilities' HCUAs, Medical Record Directors, and clinical providers revealed that the return of almost any form of patient information (DOC Form 0254 - even it only noted a return appointment date, patient information sheets, full clinical reports) were counted as a successful returned report. IDOC needs to define what clinical information the system expects and needs from offsite providers, emergency departments, and hospitals in order to provide reasonable continuity of care to the IDOC patient population.

The monitor has not yet audited medical records to verify if returned reports are filed in the patients' medical records.

**RECOMMENDATIONS:**
1) **IDOC must establish criteria for what constitutes clinically useful returned consultation, emergency department, and hospital reports and discharges summaries.**

**F: Nursing Sick Call**

## Sick Call Rooms
**III.F.1.** *Sick call shall be conducted in only those designated clinical areas that provide for privacy and confidentiality, consistent with the extraordinary operational concerns and security needs of IDOC including, but not limited to a lockdown.*

**OVERALL COMPLIANCE RATING: Not yet rated**

**FINDINGS**
(Also see III.B.1) During the monitor's August and September 2019 inspections of four IDOC facilities, all of the nurse and provider sick call examination rooms in three of the facilities (Sheridan CC, Robinson CC, and Lawrence CC) provided for adequate privacy and confidentiality.

Video cameras had been mounted in two nurse sick call examination rooms on the 1st floor of

the Pontiac CC South Segregation housing unit. The cameras provided full viewing of the entire interviewing and clinical examination areas in these rooms. The cameras did not enhance the security of the providers using these rooms and presented the direct risk for privacy and confidentiality violations. Pursuant to communications between Plaintiffs' and Defendants' legal counsels, the cameras at PCC were removed.

In the Pontiac CC Health Care Unit, it was communicated to the monitor that a room with two desks just adjacent to the Urgent Care room was used by two part-time advanced practice providers (nurse practitioners and physician assistants) to examine patients. It was not clarified if two patients were or were treated in this room at the same time.

**RECOMMENDATIONS:**
1) **The cameras in the two nurse sick call examination rooms on the first floor of the Pontiac CC South Segregation housing unit were either to be removed or covered by a moveable curtain when clinical examinations are being performed. The cameras were removed.**
2) **All nurse and provider clinical examination rooms are not to be used to examine two patients simultaneously in the same room.**

## Sick Call Requests
**III.F.2.** *There shall be no set restrictions on the number of complaints addressed during a specific sick call appointment. Medical providers must use their medical judgment to triage and determine which issues should be evaluated and treated first to maximize effective treatment and relieve pain and suffering.*
**OVERALL COMPLIANCE INDICATOR: Not yet rated**

**G: Urgent/Emergent Offsite Services**

## Urgent/Emergent Tracking Log
**III.G.1.** *Each facility HCUA shall track all emergent/urgent services in a log book, preferably electronic.*

**OVERALL COMPLIANCE RATING: Partial Compliance**

**FINDINGS:**
Documents provided to the monitor revealed that twenty-eight of the thirty IDOC facilities are utilizing Urgent/Emergency Department Referral and Hospital Inpatient Discharge spread sheets. The UC/ED and Hospital Inpatient Discharge data sheets for Dixon CC and Pinckneyville CC were not provided. (Also see III.E.4)

**RECOMMENDATIONS:**
1) **The UC/ED tracking logs should be revised to record the date a follow-up provider visit occurred after return to the facility and the date that discharge summary was returned with the patient.**

## Determination of Urgent/Emergent Issues
**III.G.2.** *Appropriate medical staff shall have the obligation to determine whether a situation is*

*urgent or emergent.*
**OVERALL COMPLIANCE RATING: Not yet rated**

## Offsite Medical Reports

**III.G.3.** *IDOC shall use best efforts to obtain <u>emergency reports</u> from offsite services when a prisoner returns to the parent facility or create a record as to why these reports were not obtained.*

**OVERALL COMPLIANCE RATING: Not yet rated**

**FINDINGS:**

Documents provided to the monitor revealed that twenty-eight of the thirty IDOC facilities are utilizing Urgent/Emergency Department Referral and Hospital Inpatient Discharge spread sheets with a column in which the facility is to document "...discharge report returned with patient Y/N". The UC/ED and Hospital Inpatient Discharge data sheets for Dixon CC and Pinckneyville CC were not provided. (Also see III.E.4)

Data from the April through June 2019 UC/ED and Hospital Inpatient Discharge spread sheets from the 28 reporting facilities revealed that discharge summaries were reported as "returned" on 382 (76%) of the 502 UC/ED returns and 207 (77%) of 269 hospital inpatient discharges. Of the 28 reporting facilities, sixteen (57%) reported that 100% of their UC/ED discharge summaries were returned and twenty (71%) reported that 100% of their hospital discharge summaries were returned.

As noted in III.E.4. the relatively high rates of returned discharge summaries (and consultation reports) were not consistent with the information reported to the Lippert experts during the 2018 site visits to NRC, Stateville CC, Logan CC, Dixon CC, and Menard CC during which staff at these five facilities voiced concerns about the lack of timely returned discharge summaries and consultations from offsite clinical services.

The monitor's discussions with the HCUAs, Medical Record Directors, and Clinical providers of the four facilities visited in August and September 2019 revealed that the return of almost any form of patient information (DOC Form 0254 (even it only noted a return appointment date), patient information sheets, full clinical reports) were counted as a successful returned report. IDOC needs to define what clinical information the system expects and needs from offsite providers, emergency departments, and hospitals in order to provide reasonable continuity of care to the IDOC patient population.

The monitor has not yet audited medical records to verify if returned reports are filed in the patients' medical records.

**RECOMMENDATIONS:**
1) **IDOC must establish criteria for what constitutes clinically useful returned consultation, emergency department, and hospital reports and discharges summaries.**

## Follow Up after Emergency Visit

**III.G.4.** *Facility medical staff shall ensure that a prisoner is seen by a Medical Provider or clinician*

*within 48 hours after returning from an offsite emergency service. If the Medical Provider is not a clinician, the Medical Provider shall promptly review the offsite documentation, if obtained, with a clinician and the clinician shall implement necessary treatment.*

**OVERALL COMPLIANCE RATING: Partial Compliance**

**FINDINGS:**
June 2019 Quality Improvement Committee reports from 30 IDOC facilities were reviewed by the monitor. In 24 (80%) of the 30 facilities the Utilization Review section of the QI report listed the percentage of cumulative offsite clinical services (UC/ED, Hospitalization, offsite outpatient consultation, tests, treatments) that had a visit with the facility provider within five days of return to the facility. The percentage of provider visits within five days of return ranged from 16% to 100%. 18 (75%) of the 24 reporting facilities noted that greater than or equal to 97% of the returning patient-inmates had been seen post-return within five days

A limited audit of Quality Improvement Committee minutes and/or medical records at Pontiac CC and Robinson CC reveal that eight of nine patients returning from UC/ED visits were seen within 48 hours or less of their return to the facility. Lawrence CC monthly Quality Improvement minutes for January-March and June-August 2019 stated that all patient-inmates returning from UC/ED, Hospital Discharge, and Offsite outpatient clinical services were seen by a provider within 5 days of return to the facility; this metric does not verify if patient- inmates returning from UC/ED visits or Hospital stays were seen within 48 hours by the facility's providers.

The UC/ED and the Hospital Discharge spread sheets do not document the post-return visit date or whether patients are seen within 48 hours of return by a provider.

**RECOMMENDATIONS:**
1) **The Offsite Urgent Care/Emergency Department Referrals and the Hospital Discharge tracking spread sheets should be modified to include a column documenting the date the report was returned to the facility and the date that the returning patient was evaluated by the site physician. This will enable the IDOC and the monitor to track whether patient-inmates returning from offsite are seen by the facility's providers within 48 hours of return.**
2) **The Consent Decree should be amended to state that all patient-inmates returning from both offsite UC/ED visits _and_ Hospital Inpatient stays should be seen by the facility provider within 48 hours of return.**
3) **As needed medical records will be audited during site visits by the monitor team to verify if UC/ED and Hospital returns are seen within 48 hours by a facility provider.**

**H: Scheduled Offsite Services**

# Offsite Tracking Log

**III.H.1.** *Medical staff shall make entries in a log, preferably electronic, to track the process for a prisoner to be scheduled to attend an offsite service, including when the appointment was made, the date the appointment is scheduled, when the prisoner was furloughed, and when the prisoner returned to the facility. This log shall be maintained by the HCUA.*

**OVERALL COMPLIANCE RATING: Partial Compliance**

**FINDINGS:**
Documents provided to the monitor revealed that twenty-nine of the thirty IDOC facilities are utilizing Offsite Scheduling Referral spread sheets to track referrals to offsite outpatient specialty consultation, testing, procedures and treatment. The Offsite Scheduling spread sheet for Dixon CC was not provided. Although the same format with columns for specialty service & location, date initial referral, date scheduled, date seen, consult report returned-yes/no, reason not seen was being used, there was site-to-site variation on what data was being recorded. Some facilities noted collegial referral denials, some noted "NA" when reports were not returned, some columns were not consistently filled in at some sites, some noted that a report was returned but there wasn't a listing that the patient had been seen. It was a surprise to the monitor that not one Offsite Scheduling referral log documented even a single appointment cancellation due to security issues (no vehicle, correctional officer staffing shortage, facility lockdowns); this could mean that the correctional transportation teams at every IDOC facility are optimally staffed and fully operational or that there is not a practice to document cancellation due to security issues.

**RECOMMENDATIONS:**
1) **The Offsite Specialty Referral tracking spread sheets should be modified to include a column documenting the date the report was returned to the facility and the date that the returning patient was evaluated by the site physician. This will enable the IDOC and the monitor to track the time interval between a patient-inmate's return and the receipt of the consultation or test report and whether patient-inmates returning from offsite are seen by the facility's providers within 5 days of return.**
2) **The Offsite Specialty Referral should also document if appointments are not kept due to security issues.**
3) **There should be standardized completion of the Offsite Specialty Referral tracking spread sheets at all IDOC facilities**

## Follow Up Offsite Visit and Report≤

**III.H.2.** *Within three days of receiving the documentation from scheduled offsite services, the documentation will be reviewed by a medical provider. Routine follow-up appointments shall be conducted by facility medical staff no later than five (5) business days after a prisoner's return from an offsite service, and sooner if clinically indicated.*

**OVERALL COMPLIANCE RATING: Partial Compliance**

**FINDINGS:**
The monitor did not identify any data in the thirty IDOC correctional centers' June, 2019 QI committee minutes that reported or tracked whether "…within three days of receiving the documentation from scheduled offsite services, the documentation will be reviewed by a medical provider." It was reported to the monitor that facilities have not yet started to track this provision.

The percentage of routine follow-up appointments at the facility for patient-inmates returning from all offsite clinical services including Urgent Care/ED, hospital inpatient stays and offsite scheduled consultation and testing were reported in the June 2019 QI Committee minutes at twenty-three of the thirty facilities. Nineteen (83%) of the facilities reported percentages of greater than or equal to

95% of individuals returning from offsite clinical services were seen within 5 days by a facility provider, The percentages ranged from 16% to 100%. Even though these percentages included patient-inmates returning urgent care/ED visits, hospital admissions, and scheduled offsite visits, the vast majority of these offsite care services were generated by visits to scheduled offsite outpatient services.

Sheridan CC's (SCC) Wexford UM Offsite Care Scheduling log has a column that documents the "Site MD Review Date" From May 10-July 3, 2019 twenty-two (69%) of the thirty-two SCC patient-inmates who returned from scheduled offsite services were seen by a facility provider within 5 days of their return; six (19%) were seen ≥6 days after return, and 4 (13%) had not yet been seen after 28 days. The medical charts of two individuals returning from offsite visits to Pontiac CC revealed that both had been seen by the facility physician on the day of their return.

Robinson CC (RCC) has created a separate Offender Off-Site Services Flash Report log to track how many days after returning from a scheduled offsite clinical service that patients are seen by the facility physician. The data in the RCC March and May 2019 QI minutes documented that all thirty-six patients (100%) were seen by a provider in less than or equal to three days after their offsite clinical visit. .

Sheridan CC and Robinson CC were the only two IDOC facilities identified by the monitor that have created a methodology to track the exact date or the specific number of days after return that a follow-up onsite provider occurred. Versions of these two modified Scheduled Offsite Services tracking processes could service as potential models for other IDOC institutions

**RECOMMENDATIONS:**
1) **The Offsite Specialty Referral tracking spread sheets should be modified to include a column documenting the date the report was returned to the facility and the date that the returning patient was evaluated by the site physician. This will enable the IDOC and the monitor to track the time interval between a patient-inmate's return and the receipt of the consultation or test report and whether patient-inmates returning from offsite are seen by the facility's providers within 5 days of return.**
2) **The modified processes used at Sheridan CC and Robison CC to record the date or the actual number of days after return that patient are reviewed by the onsite provider should serve as potential models for IDOC facilities.**

## Failure to Obtain Offsite Report
**III.H.3.** *If a prisoner returns from an offsite visit without any medical documentation created by the offsite personnel, IDOC shall use best efforts to obtain the documentation as soon as possible. If it is not possible to obtain such documentation, staff shall record why it could not be obtained.*
**OVERALL COMPLIANCE RATING: Not yet rated**

## Follow Up of Consultant's Report
**III.H.4.** *Provided that IDOC receives documentation from offsite clinicians, all medical appointments between a prisoner and an offsite clinician shall be documented in the prisoner's medical record, including any findings and proposed treatments.*
**OVERALL COMPLIANCE RATING: Not yet rated**

## Review of Specialty Requested Services

**III.H.5.** *Within six (6) months after the Preliminary Approval Date of this Decree [July 2019]or until Defendants are able to fill both Deputy Chief of Health Services positions, they will make reasonable efforts to contract with an outside provider to conduct oversight review in instances where the medical vendor has denied any recommendations or taken more than five (5) business days to render a decision, including cases in which an alternative treatment plan has been mandated in lieu of the recommendation and cases in which the recommendation has not been accepted and more information is required. If no contract with an outside provider is reached, then the Monitor or his or her consultants shall conduct oversight review in instances where the medical vendor has denied any recommendation or taken more than five (5) business days to render a decision, including cases in which an alternative treatment plan has been mandated in lieu of the recommendation and cases in which the recommendation has not been accepted and more information is required. Once Defendants have filled both Deputy Chief positions, the Deputy Chiefs will replace any outside provider, the Monitor or his or her consultants to conduct oversight review in the instances described in this paragraph.*

**OVERALL COMPLIANCE RATING: Not yet rated**

**FINDINGS:**

The IDOC vendor requires all non-emergency offsite referrals for "specialty care, diagnostics, testing, imaging, and other procedures" (and onsite ultrasounds by a subcontractor) to be reviewed and approved by the vendor's offsite physician reviewers prior to appointments being scheduled. The vendor's physician reviewers may approve, deny, offer advice or alternate treatment plans (ATP), or request the submission of additional clinical information about the reason for the offsite referral. This process is known as the "Collegial Review".

Review of Quality Improvement minutes in April-June 2019 for 26 IDOC facilities (QI reports from Dixon CC, Elgin Treatment Center, NRC, and Vienna CC did not contain any collegial referral data) revealed that 4,812 referrals were submitted during this three months period and 536 were either denied, requested additional information, or were given an Alternate Treatment Plan. This annualized to nearly 20,000 annual collegial referrals and over 2,000 denials or delayed referrals.

A total of fourteen months of Collegial Review data reported between January and August, 2019 in the monthly Quality Improvement committee minutes for Sheridan CC, Pontiac CC, Robinson CC, and Lawrence CC cumulatively noted 921 referrals and 148 (17%) **"denials".** It appears that the "denials" at least two site (Robinson CC, Lawrence CC) also included ATPs and requests for more information. The percentage of "denials" at the four facilities were 8%, 9%, 16%, and 19% for PCC, RCC, SCC, and LCC. The QI minutes at Sheridan CC and Pontiac CC did not always report the additional number of requests for more information and alternate treatment plans (ATPs). Although the Consent Decree states that all denials, requests for more information, and ATPs are to be reviewed by the Office of Health Services, some of the facilities communicated to the monitor that only denials that are appealed were commonly sent for review to the OHS.

The monitor reviewed a spread sheet with the twenty-six Collegial Review denials between April 1, 2019 and October 28, 2019 that were overturned by the OHS. It is incomprehensive to the

monitor that vendor's physician reviewers are able to make reasonable decisions about the appropriateness of referrals without having examined the patient and having access to the medical record. Besides the cases overturned by the OHS physicians, the monitor also noted other referrals that were questionably justified denials.  One example was a denied referral for a CPAP machine for a patient with sleep apnea, nocturnal snoring, and choking and a high Epworth Sleepiness Scare score that indicated excessive daytime sleepiness. The vendor reviewed noted that the patient had a recent sleep study but did not comment on the result and only advised that the patient lose weight.  This was an unacceptable ATP. (RCC April QI report)

The monitor feels that the Collegial Review process presents a barrier to the access of IDOC patient-inmates to offsite specialty consultation and tests, delays needed consultations, procedures, and testing, potentially puts patient-inmates' health at risk, and consumes an extraordinary amount of physician, HCUA, medical records staff, Regional Health Coordinator, Agency Medical Director, and Deputy Chief resources. The monitor recommends that the Collegial Review process be discontinued and replaced by an offsite referral utilization process that enhances access to specialty consultation and diagnostic testing.

**RECOMMENDATIONS:**
1) **Aggregate Data of all Collegial Reviews, Denials, Requests for more Information, and Alternate Treatment Plans for 2019 will be requested for all IDOC facilities and, if unavailable, will be gathered by manual review of Quality Improvement Committee minutes.**
2) **Pending the receipt of the aggregate data on Collegial Reviews requested in recommendation one (1), it is the preliminary opinion of the monitor that the Collegial Review process be discontinued.**
3) **It is also the preliminary opinion of the monitor that Collegial Review process should be replaced by offsite referral utilization review that would be used to selectively identify opportunities to assist providers to more effectively determine the need for offsite consultation and testing.**

**H: Infirmary**

## Availability of Registered Nurses on Infirmary
**III.I.1.** *A registered nurse will be readily available whenever an infirmary is occupied in the IDOC system.*
**OVERALL COMPLIANCE RATING: Not yet rated**

## Registered Nurses on Infirmary
**III.I.2.** *At every facility regularly housing maximum security prisoners, there shall be at least one registered nurse assigned to the infirmary at all times, twenty-four (24) hours a day, seven (7) days a week.*
**OVERALL COMPLIANCE RATING: Not yet rated**

## Criteria for Sending to a Hospital or Other Offsite Service
**III.I.3.** *All facilities shall employ at least one registered nurse on each shift.  If a prisoner needs health care that exceeds the IDOC infirmary capabilities, then the prisoner shall be referred to an offsite service provider or a hospital.*

**OVERALL COMPLIANCE RATING: Not yet rated**

## Security Staff on Infirmaries
**III.I.4.** *All infirmaries shall have necessary access to security staff at all times.*
**OVERALL COMPLIANCE RATING: Not yet rated**

## Beddings and Linen on Infirmary
**III.I.5.** *All infirmaries and HCUs shall have sufficient and properly sanitized bedding and linens.*
**OVERALL COMPLIANCE RATING**: **Not yet rated**

## Agreement and Staffing and Implementation Plan
**III.I.6.** *The above requirements of this section (nos. 1-5) shall be implemented according to the guidelines and benchmarks set forth in Defendants' Staffing and Implementation Plan.*
**OVERALL COMPLIANCE RATING: Not yet rated**

**FINDINGS:**
Staffing Analysis and Implementation Plan was submitted to the monitor on November 24, 2019. The Staffing Analysis and Implementation Plan will need to be thoroughly analyzed by the monitoring team. .

**RECOMMENDATIONS:**
   1) **The Staffing Analysis and Implementation Plan was submitted to the monitor on November 24, 2019 and will be analyzed by the monitoring team.**

### J: Infection Control

## Infection Control Coordinator
**III.J.1.** *IDOC shall create and staff a statewide position of Communicable and Infectious Diseases Coordinator. This position shall be filled within fifteen (15) months of the Preliminary Approval of this Decree [June 2020].*
**OVERALL COMPLIANCE RATING: Not yet rated**

**FINDINGS:**
The position of Communicable and Infectious Diseases Coordinator has not yet been created. The position is listed in the OHS table of organization as a combined Infection Control/ Quality Improvement position. The OHS has been advised by the monitor and separately by the UIC College of Nursing Quality Improvement and Patient Safety Plan report that the scope of responsibilities for both the system-wide direction of Infection Control and Quality Improvement are extensive and should not be combined into a single position.

The OHS and the monitor are discussing whether the needs of the IDOC patient population would be best served by integrating this position in the Illinois Department of Public Health (IDPH)

**RECOMMENDATIONS:**
   1) **The existing Infection Control/Quality Improvement position should be separated in two equally important positions. The final Staffing Analysis should include the**

38

creation of the Communicable and Infectious Disease Coordinator.

2) **Meeting between IDOC and IDPH clinical leadership should be scheduled to determine if a collaborative and integrated relationship can be developed between IDOC Communicable and Infectious Disease Coordinator and the IDPH.**

3) **The monitor will monitor the progress toward the hiring of a Communicable and Infectious Disease Coordinator to verify compliance with the June 2020 hiring deadline.**

## Isolation Rooms

**III.J.2.** *Facility staff shall monitor the negative air pressure in occupied respiratory isolation rooms which shall be documented each day they are occupied by prisoners needing negative pressure. If unoccupied, they shall be monitored once each week. Facility staff shall report such data to the Communicable and Infectious Diseases Coordinator on a monthly basis.*

**OVERALL COMPLIANCE RATING: Not yet rated**

**FINDINGS:**
The Safety and Sanitation inspections did not always inspect the Health Care Units. Some sites do a separate more detailed inspected of the health care unit using the vendor's inspection form which does not inspect the negative pressure units. Many but not all of the inspections include an assessment of the functioning of the infirmary negative pressure rooms. When the negative pressure systems were evaluated, the units have been judged to be fully operational.

During August and September 2019 facility visits by the monitor, one facility's (RCC) negative pressure room was demonstrated to be non-functional. The facility's engineers were called and corrected the problem.

The functioning of the infirmary negative pressure isolation rooms are an important part of a facility's inflection control program. Monthly Safety and Sanitation reports and weekly (when the room is occupied) and daily (when occupied) nursing inspections must be diligently done to protect the safety of the facility's staff and patient-inmates.

**RECOMMENDATIONS:**
1) **Infirmary Safety and Sanitation inspections of the infirmary negative pressure units are generally done monthly but it is equally important that infirmary nursing staff do daily or weekly testing of the isolation rooms' negative pressure systems.**

## Safety and Sanitation Inspections

**III.J.3.** *Facility medical staff shall conduct and document safety and sanitation inspections of the medical areas of the facility on a monthly basis.*

**OVERALL COMPLIANCE RATING: Partial Compliance**

**FINDINGS:**
Safety and Sanitation rounds are done monthly in all IDOC facilities. Reports are generated at all sites and have been provided to the monitor.

The Safety and Sanitation inspections primarily focus on the physical plant conditions in the housing units and dietary areas. The level of inspection of the Health Care Unit (HCU) varied from site to site but generally focused their reviews on the HCU's physical plant (floors, plumbing, lighting, walls, ceiling, etc.) and the functionality of the infirmary's negative pressure rooms. Some facilities were noted to do a separate more detailed review of the medical equipment, medication, and supplies in the Health Care Unit. Clinical exam rooms located in housing units were not regularly inspected.

During site visits, the monitor noted safety and sanitation deficiencies and clinical equipment concerns in the health care areas that had not been identified in the Safety and Sanitation reports. These deficiencies included non-operational oto-ophthalmoscopes, absence of paper barriers on the exam tables, torn and frayed upholstery on gurneys, exam tables, and chairs, sinks in exam areas that could not be fully sanitized due to encrusted accumulation of calcium deposits, unsealed emergency response bags, and aged and defective infirmary beds without side-railings.

Assuring that medical equipment and supplies are fully functional and readily available and all clinical surfaces can be effectively sanitized is in the best interest of patient and staff safety. Creating clinical areas that are neat, organized, and professional will enhance the ability of the IDOC to recruit and retain qualified medical personnel.

**RECOMMENDATIONS:**
   1) **The Safety and Sanitation rounds should perform a more detailed evaluation of the HCU including the functioning of medical and dental equipment, the condition of gurneys, exam tables, chairs, and infirmary beds, the emergency response bags, and the overall neatness, cleanliness, and organization of each clinical space. If the Safety and Sanitation team is unable to effectively inspect the clinical spaces, a separate team of clinical personnel should do monthly detailed rounds of clinical areas.**

### K: Dental Program

## Dental SOAP notes
**III.K.1.** *All dental personnel shall use the Subjective Objective Assessment Plan ("SOAP") format to document urgent and emergency care.*
**OVERALL COMPLIANCE RATING: Not yet rated**

## Dental Orientation Manual
**III.K.2.** *Each facility's orientation manual shall include instructions regarding how prisoners can access dental care at that facility.*
**OVERALL COMPLIANCE RATING: Not yet rated**

## Dental Screening Evaluations
**III.K.3.** *IDOC shall implement screening dental examinations at the reception centers, which shall include and document an intra- and extra-oral soft tissue examination.*
**OVERALL COMPLIANCE RATING: Not yet rated**

## Disinfection of Dental Areas
**III.K.4.** *IDOC shall implement policies that require routine disinfection of all dental examination areas.*
**OVERALL COMPLIANCE RATING: Not yet rated**

## Policy on Dental Radiology Hygiene
**III.K.5.** *IDOC shall implement policies regarding proper radiology hygiene including using a lead apron with thyroid collar, and posting radiological hazard signs in the areas where x-rays are taken.*
**OVERALL COMPLIANCE RATING: Not yet rated**

**FINDINGS:**
The dental clinics at Robinson CC and Lawrence CC share a thyroid collar with their facility's general Radiology Suite. This creates a potential barrier to the utilization of the protective thyroid collar when dental x-rays are being taken.

**RECOMMENDATIONS:**
1) **Every IDOC dental clinic should be provided with a dedicated thyroid collar that remains in the dental area.**

## Comprehensive Dental Care
**III.K.6.** *Routine comprehensive dental care shall be provided through comprehensive examinations and treatment plans and will be documented in the prisoners' dental charts.*
**OVERALL COMPLIANCE RATING: Not yet rated**

## Dental Hygiene Care
**III.K.7.** *Dental hygiene care and oral health instructions shall be provided as part of the treatment process.*
**OVERALL COMPLIANCE RATING: Not yet rated**

## Dental Cleanings
**III.K.8.** *Routine and regular dental cleanings shall be provided to all prisoners at every IDOC facility. Cleanings shall take place at least once every two years, or as otherwise medically indicated.*

**OVERALL COMPLIANCE RATING: Not yet rated**

**FINDINGS:**
Excluding Elgin Treatment Center (pop. 44) and Murphysboro (pop. 138) dental hygienists are currently employed in 20 of the 28 IDOC facilities. Eight facilities with populations ranging from 1,007 to 1,588 do not have a dental hygienist onsite. Of the twenty facilities with dental hygienist services, 11 facilities have at least one full-time dental hygienist and 9 have part-time dental hygienist staffing (0.25 to 0.6 FTE).

Given that there are existing notable backlogs and waiting times for dental services (exams, extractions, and fillings) in many IDOC facilities, it is unrealistic to expect that the dentists will be able to address the provision for biannual basic routine dental cleanings for all patient-inmates.

41

In addition to the mandate to provide dental cleanings not less than biannually to all IDOC prisoners, there are significant number of individuals who will require cleanings every 3-6 months including diabetics, immunocompromised patients, the elderly, and those with existing dental and periodontal disease.

**RECOMMENDATIONS:**
1) **Additional Dental Hygienists will need to be hired and assigned to provide dental cleanings at all IDOC facilities.**
2) **The Staffing Analysis needs to evaluate and include recommendations for additional Dental Hygienist positions at select IDOC facilities.**
3) **Data requests will be made to track the provision of biannual dental cleanings**

## Peer Review for Dentists

**III.K.9.** *Within twenty-one (21) months of the Preliminary Approval Date of this Decree [October 2020], IDOC shall establish a peer review system for all dentists and annual performance evaluations of dental assistants.*
**OVERALL COMPLIANCE RATING**: **Partial Compliance**

**FINDINGS:**
On July 16, 2019, Wexford Health issued a notification stating that Dental Peer Reviews for 2019 were to be completed: specific dentists were assigned to peer review specific dentists using a screening tool. Ten dental records of each dentist were to be reviewed for compliance with sixteen criteria using the Dental Peer Review Form PR-001C that was revised on May 24, 2019.

Dental Peer Review Form PR001C of ten dental charts for all 38 dentists and oral surgeons providing dental services in IDOC facilities were completed between July and October 2019.

Copies of the completed dental peer review forms for all 38 dentists and oral surgeons were reviewed by the monitor. Twenty (53%) of dentists were found to be 100% compliant with all applicable aspects of care; 18 (47%) were cited for non-compliance with 1 to 9 of the elements of the review. The citations included failure to document that overall health history was reviewed, illegible notes, no documentation of relevant patient education, lack of a documented treatment plan, lack of proper documentation of anesthetic usage, no dental exam in last 2 years, lack of signed consents/refusals, inadequate history of current dental problem, failure to follow prophylactic antibiotic standards, and appropriate x-rays not taken. Ten (26%) of the dentists had citations on 4-9 elements of the peer review. Results of the peer review being communicated to the reviewed dentist were documented on most but not all of the reviewed dentists.

**RECOMMENDATIONS:**
1) **Continue to perform and trend annual Dental Peer Reviews.**
2) **Communication of the results of the peer review to all reviewed dentists should be documented.**
3) **Develop criteria for dentists with multiple (e.g. 4 or more citations) or clinical significant citations so that these dentists would have repeat peer reviews within 6 months.**

## Diagnostic Radiographs for Extractions

**III.K.10.a.** *Diagnostic radiographs shall be taken before every extraction.*
**OVERALL COMPLIANCE RATING: Not yet evaluated**

**FINDINGS:**
Dentists in the four sites visited in 2019 reported varying standards (one or two years) for of the acceptable interval between dental x-rays and extractions.

**RECOMMENDATIONS:**
1) **IDOC must identify and establish the best practice standard for the length of time prior to dental extraction that previous x-rays are deemed adequate to minimize complications and protect the health of a patient having a dental extraction.**

## Dental Extractions

**III.K.10.b.** *The diagnosis and reason for extraction shall be fully documented prior to the extraction*
**OVERALL COMPLIANCE RATING: Not yet rated**

## Dental Extraction Consents

**III.K.10.c.** *A prisoner shall consent in writing once for every extraction done at one particular time. In instances where a prisoner lacks decision making capacity the Department will follow the Illinois Health Care Surrogate Act. In the event a prisoner verbally consents to an extraction, but refuses to consent in writing, dental personnel shall contemporaneously document such verbal consent in the prisoner's dental record.*
**OVERALL COMPLIANCE RATING: Not yet rated**

## Dental History

**III.K.11.** *Each prisoner shall have a documented dental health history section in their dental record.*
**OVERALL COMPLIANCE RATING: Not yet rated**

## Dental Medical Record Documentation

**III.K.12.** *Dental personnel shall document in the dental record whenever they identify a patient's dental issue and dental personnel shall provide for proper dental care and treatment.*
**OVERALL COMPLIANCE RATING: Not yet rated**

## Annual Survey of Dental Equipment

**III.K.13.** *IDOC shall conduct annual surveys to evaluate dental equipment and to determine whether the equipment needs to be repaired or replaced. Any equipment identified as needing repair or replacement will be repaired or replaced.*
**OVERALL COMPLIANCE RATING: Not yet rated**

**L: Continuous Quality Improvement**

## UIC Recommendations for Implementation of Quality Improvement Program

**III.L.1.** *Pursuant to the existing contract between IDOC and the University of Illinois Chicago (UIC) College of Nursing, within fifteen (15) months of the Preliminary Approval Date [April 2020], UIC will advise IDOC on implementation of a comprehensive medical and dental Quality Improvement Program for all IDOC facilities, which program shall be implemented with input*

43

*from the Monitor.*

**OVERALL COMPLIANCE RATING: Substantial Compliance**

**FINDINGS:**
The UIC College of Nursing was contracted on July 24, 2018 to "….evaluate the current quality improvement, patient safety, and risk management initiatives and outcomes, and propose a comprehensive quality improvement program that will enable the IDOC to deliver high quality, and safe care reliably to offender patients."

In September 2019, the UIC College of Nursing delivered their comprehensive report, Quality Improvement and Patient Safety Plan, to the IDOC Office of Health Services clinical leadership.

The monitors provided written input about the UIC College of Nursing report to the IDOC Office of Health Services clinical leadership on October 29, 2019. The monitors provided input concerning the OHS span of authority, the OHS table of organization, inclusion of a physician in the quality program, the need for a data support team in the OHS, the number of regional QI consultant positions, the composition and number of audit teams, future control of physician credentialing, the use of independent physician case/medical care/mortality reviewers, the creation of clinical physician peer reviews, need to select meaningful outcome and performance measures, standardization of procedures, development of initial health system goals, creation of a more detailed health unit safety and sanitation checklist, the separation of  QI and Infection Prevention and Control duties into two director positions both reporting to the OHS clinical leadership, the creation of a Quality Council, and the involvement of the correctional staff in QI program.

**RECOMMENDATIONS:**
   2) **IDOC's OHS with input from the monitors will continue to analyze, modify, and implement recommendations in the comprehensive quality improvement, patient safety, and risk management UIC College of Nursing report.**
   3) **Consideration should be given to continue the contract with UIC College of Nursing to assist with the implementation and auditing of the IDOC quality program.**

**M: Miscellaneous Provisions**

# Influenza Vaccinations
**III.M.1.a.** *Defendants or their contracted vendor(s) shall ensure that all prisoners will be offered an annual influenza vaccination.*

**OVERALL COMPLIANCE RATING: Not yet rated**

**Findings:**
The monitor is aware that annual influenza vaccination is offered to the IDOC patient population in all correctional centers. It was reported that the refusal rates of this vaccine are high but no data was reported.

**Recommendation:**
   1) **Influenza vaccination rates should be tracked and reported.**

## Immunizations

**III. M.1.b.** *Defendants or their contracted vendor(s) shall ensure that all prisoners with chronic diseases will be offered the required immunizations as established by the Federal Bureau of Prisons.*

**OVERALL COMPLIANCE RATING: Partial Compliance**

**FINDINGS:**

On October 9, 2019 the IDOC Office of Health Services developed and disseminated to all IDOC facilities instructions and standard operating procedures for the implementation of an immunization program in the IDOC. The immunization guidelines were fully consistent with the national recommendations of the Center for Disease Control (CDC) and are also aligned with the current immunization guidelines of the Federal Bureau of Prisons. The OHS immunization guidelines provide guidance concerning the indication for the administration of nationally recommended vaccines to patient-inmates in all IDOC facilities. The recommendations and guidance for vaccines now include Haemophilus Influenzae B (Hib), Hepatitis A, Recombinant Herpes Zoster (RZV), Human Papillomavirus (HPV), Meningococcal (ACWY), Meningococcal B, Pneumococcal 13, Pneumococcal 23, and Tetanus, Diphtheria, Pertussis (Tdap).

Hepatitis B and Influenza (and Pneumococcal 22, Tdap) vaccines were already available in the IDOC.

With the implementation of this Immunization Program, patient-inmates in the IDOC will have access to all preventive adult vaccines that are available to non-incarcerated adults.

**RECOMMENDATIONS:**
   1) **The monitor will solicit updates from the IDOC on when each of the vaccines in the OHS Immunization Program have become available in IDOC facilities.**
   2) **The monitor will solicit updates from the IDOC on the number of eligible patient-inmates who have been offered and received recommended immunizations.**

## Colorectal Cancer Screening and PSA Testing

**III.M.1.c.** *All prisoners ages 50-75 will be offered annual colorectal cancer screening and PSA testing, unless the Department and the Monitor determine that such testing is no longer recommended.*

**OVERALL COMPLIANCE RATING**: **Partial Compliance**

**FINDINGS:**

On October 24, 2019 the IDOC Office of Health Services developed and disseminated to all IDOC facilities standard operating procedure for the implementation of a Cancer Screening

45

Program. The cancer screening guidelines were fully consistent with the national recommendations of the US Preventive Services Task Force (USPSTF). The IDOC cancer screening recommendations include guidance on screening for breast cancer, cervical cancer, colon cancer, and prostate cancer.

The IDOC and the USPSTF recommend that selective screening for prostate cancer using PSA testing in average-risk men age 55 to 69 based on patient preferences and informed by relevant clinical information and professional judgement.  The frequency of screening is not clearly established. Prostate cancer screening should not be done for men older than 70 or with a life expectancy less than 10 years.

The IDOC cancer screening did not include a recommendation for one-time lung cancer screening (low dose helical CT) in individuals with ≥30 pack year history of smoking who are still smoking or who have quit within the last 15 years who between ages 55 and 74 as recommended by the USPSTF.

**RECOMMENDATIONS:**
1) **Request the Court to modify the wording of III.M.1.c so that the PSA recommendation is in accord with the guidelines for prostate cancer screening of the IDOC Cancer Screening Program and the USPSTF.**
2) **IDOC should add a recommendation in the Cancer Screening Program to provide one-time lung cancer screening to high risk males between the age of 55 and 74.**
3) **IDOC should also add a recommendation to perform a one-time ultrasound screen for Abdominal Aortic Aneurysm (AAA) in males who have ever smoked.**
4) **The monitor will solicit updates from the IDOC on the number of eligible patient-inmates who have been offered and received routine health maintenance screening for cancer and AAA.**

## Mammograms
**III.M.1.d.** *All female prisoners age 45 or older will be offered a baseline mammogram screen, then every 24 months thereafter unless more frequent screening is clinically indicated, unless the Department and the Monitor determine that such testing is no longer recommended.*
**OVERALL COMPLIANCE RATING: Not yet evaluated**

## Mortality Reviews
**III.M.2.** *Mortality reviews shall identify and refer deficiencies to appropriate IDOC staff, including those involved in the Quality Assurance audit function.  If deficiencies are identified, corrective action will be taken.  Corrective action will be subject to regular Quality Assurance review.*

**OVERALL COMPLIANCE RATING: Not yet rated**

**FINDINGS:**
All individuals who expire while in the custody of the IDOC have a Death Summary completed by the treating physician at the IDOC facility where the decedents were housed.

Death summaries for fifty-one male patient-inmates who died from January 9, 2019 and

September 30, 2019 were reviewed by the monitor. The summaries provided a condensed synopsis of the "offender health" and a brief chronology of the decedent's recent clinical history, care, and testing that preceded the death. Many but not all of the summaries noted the presumptive cause of death.

The death summaries did not critique the timeliness and quality of the care provided by the IDOC. The summaries did not identify any elements of the health care that could be improved and did not note any action plans.

Completed death summaries are reportedly sent to the IDOC Regional Health Service Coordinators and then sent to the Office of Health Services for possible physician/Mortality Committee review and/or presentation to the System Quality Improvement Committee.

The newly hired Deputy Chiefs have begun to develop a process to review selected categories of deaths for the purpose of identifying opportunities to have improved the access and quality of care provided to the deceased patient-inmates and throughout the IDOC health system. It was reported that there is currently a backlog in completing Mortality Committee reviews but that a limited number of mortalities have been preliminarily reviewed.

The Monitor requested but has not yet received any Mortality Committee report**s.**

**RECOMMENDATIONS:**
1) **IDOC needs to perform timely and objective reviews of mortalities with the goal of identifying and addressing opportunities to improve the care provided in the IDOC and prevent morbidity and mortality.**
2) **A functional Mortality Review Committee needs to be formed.**
3) **Given the size of the IDOC population and the number of annual mortalities, additional physician resources at the OHS may need to be dedicated to performing detailed mortality reviews using root cause analysis methodology. The death reviews may need to be performed or augmented by independent contracted physicians.**

## IV: STAFFING ANALYSIS AND IMPLEMENTATION PLAN

## Staffing Analysis and Implementation Plan

**IV.A; IV.A.1; and IV.A.2.** *The Defendants, with assistance of the Monitor, shall conduct a staffing analysis and create and implement an Implementation Plan to accomplish the obligations and objectives in this Decree. The Implementation Plan must, at a minimum: (1) Establish, with the assistance of the Monitor, specific tasks, timetables, goals, programs, plans, projects, strategies, and protocols to ensure that Defendants fulfill the requirements of this Decree; and (2) Describe the implementation and timing of the hiring, training and supervision of the personnel necessary to implement the Decree.*

**OVERALL COMPLIANCE RATING: Partial Compliance**

**FINDINGS:**
The Office of Health Services initiated the Staffing Analysis in April 2019. A preliminary working draft was shared with the monitor on May 29, 2019 that included facility by facility

47

current allocated staff positions and vacancies and projected additional staffing required to meet the needs of the IDOC patient population and the provisions of the Consent Decree, This preliminary analysis was prepared by the OHS Agency Medical Director and the Deputy Chief of Health Services in conjunction with the Regional Health Care Coordinators, the DONs, facility Health Care Unit Administrators , and other clinical and administrative staff. A "final" draft was submitted to the monitor on August 8, 2019 with understanding that additional modifications might be forthcoming. The monitor provided written and verbal input concerning staffing analysis on multiple occasions recommending that the OHS staffing needed to be augmented,  the combined Quality Improvement/Infection Control Director position be separated into two positions, IT staff be included to maximize data retrieval, develop new screens, collect quality metrics, etc. the justifications and job descriptions for all additional positions be developed, audit team positions be identified,  and the OHS Table of Organization be modified to reflect that all health care personnel report to the OHS.  A waiver was granted by the Court to extend the Implementation Plan and the finalized Staffing Analysis due dates for 4 weeks. A second waiver was granted to extend the due dates until the end of November 2019.  The Staffing Analysis was submitted to the monitor on November 23, 2019.

**RECOMMENDATIONS:**
1) **The Staffing Analysis and the Implementation Plan were submitted to the monitor on November 23, 2019 and have not yet been analyzed by the monitor team.**

## Deadline for Staffing Plan and Implementation Plan

**IV.B.** *Within 120 days [July 1, 2019] from the date the Monitor has been selected, the Defendants shall provide the Monitor with the results of their staffing analysis.  Within sixty (60) days after submission of the staffing analysis, Defendants shall draft an Implementation Plan.  In the event the Monitor disagrees with any provision of the Defendants' proposed Implementation Plan, the matter shall be submitted to the Court for prompt resolution.*

**OVERALL COMPLIANCE RATING: Partial Compliance**

**FINDINGS:**
A waiver was granted by the Court to extend the deadline for the completion of the Implementation Plan to the end of November, 2019. The Implementation Plan was submitted to the monitor on November 23, 2019 and has yet to be analyzed by the monitoring team.

## Recommendations:
1) **The Staffing Analysis and the Implementation Plan were submitted to the monitor on November 23, 2019 and have not yet been analyzed by the monitor team.**

## Implementation Plan and Consent Decree

**IV.C.** *The Implementation Plan, and all amendments or updates thereto, shall be incorporated into, and become enforceable as part of this Decree.*

**OVERALL COMPLIANCE: Not yet rated**

**FINDINGS:**
The Implementation Plan was submitted to the monitor on November 23, 2019.and will need to be thoroughly analyzed by the monitoring team. .

## Recommendations:
**The Implementation Plan was submitted to the monitor on November 23, 2019 and has not yet been analyzed by the monitor team.**

_____                          November 24, 2019

**John M. Raba, MD**

**Monitor**
**Consent Decree**
**Lippert v Jeffreys**

49