# Health Care Monitor
## 2nd Report
## Lippert v. Jeffreys

August 6, 2020

Prepared by Lippert Monitor
Dr. John Raba
Monitor's Consultants
Michael Puisis, D.O.
Ronald Shansky M.D.
Catherine Knox MN, RN, CCHP-RN

## Table of Contents

Overview.................................................................................................................5

Executive Summary ...............................................................................................7

Statewide Issues: Leadership and Organization ................................................. 17

    Leadership Staffing ........................................................................................... 17

Staffing Analysis and Implementation Plan ........................................................ 20

    Staffing Analysis................................................................................................ 21

    Implementation Plan ........................................................................................ 27

    Vendor Relationships........................................................................................ 31

Statewide Internal Monitoring and Quality Improvement.................................... 34

    Audits................................................................................................................ 39

    Performance and Outcome Measure Results .................................................. 41

    Adverse Event and Incident Reporting Systems............................................... 42

    Vendor Monitoring........................................................................................... 43

    Mortality Review .............................................................................................. 44

Medical Records .................................................................................................. 51

Policies and Procedures....................................................................................... 55

    Medical & Dental ............................................................................................. 55

Facility Specific Issues ......................................................................................... 56

Facility Staffing .................................................................................................... 56

    Budgeted Staffing ............................................................................................ 56

    IDOC Staffing ................................................................................................... 61

    Vendor Staffing................................................................................................. 61

    Credentialing of Physicians............................................................................... 61

    Oversight over Medical, Dental, and Nursing Staff .......................................... 66

Operations ........................................................................................................... 68

    Clinical Space .................................................................................................... 68

    Equipment and Supplies................................................................................... 71

    Sanitation ......................................................................................................... 73

2

Onsite Laboratory and Diagnostics ....................................................... 75

Dietary ........................................................................................................ 76

Facility Implementation of Policies and Procedures ............................. 76

Medical and Dental ................................................................................... 76

Intrasystem Transfers ...................................................................................... 77

Medical Reception .......................................................................................... 79

Health Assessments .................................................................................. 81

Nursing Sick Call ............................................................................................. 83

Chronic Care .................................................................................................... 89

Urgent and Emergent Care ............................................................................ 93

Infirmary Care ................................................................................................. 100

Specialty Consultation ................................................................................... 108

Specialty Referral Oversight Review ....................................................... 110

Hospital Care ................................................................................................... 114

Preventive Services ......................................................................................... 114

Influenza Vaccination ............................................................................... 114

Adult Immunizations ................................................................................ 115

Cancer and Routine Health Maintenance Screening ............................ 116

Mammography Screening ......................................................................... 118

Pharmacy and Medication Administration .................................................. 118

Discharge Planning ......................................................................................... 123

Infection Control ............................................................................................. 124

Dental Care ...................................................................................................... 132

Staffing ....................................................................................................... 132

Dental Documentation ............................................................................. 133

Dental Support ........................................................................................... 134

Dental Access ............................................................................................. 134

Dental Intake ............................................................................................. 136

Dental Hygiene .......................................................................................... 136

Comprehensive Dental Care................................................................. 137

Facility Internal Monitoring and Quality Improvement......................................... 137

Audits.................................................................................. 141

Performance and Outcome Measure Results .................................................. 142

Adverse Event and Incident Reporting Systems.............................................. 142

Vendor Monitoring....................................................................... 142

Mortality Review ....................................................................... 143

APPENDIX A ............................................................................. 144

## Overview

The Lippert v Jeffreys Consent Decree was approved and signed by Judge Jorge L. Alonso on May 6, 2019. John M. Raba, MD was selected as the Monitor for the Consent Decree on March 29, 2019 with his IDOC contract finalized on April 26, 2019. Provision V.E. of the Consent Decree states that "Twice yearly, the Monitor will report to the Parties and the Court regarding compliance with the decree." The Monitor's First Report was submitted to the Court on November 24, 2019. The First Report was prepared by the Monitor with limited assistance of the three consultants who were not operationally brought on board until November and December 2019. The Monitor's Second Report was prepared with full input and assistance of the three nationally respected correctional health consultants, Catherine Knox, MN, RN, Michael Puisis, DO, and Ronald Shansky, MD and is now being submitted to the Court.

Since the submission of the Monitor's First Report, the Monitor and the consultants have had regular meetings and conference calls with the Office of Health Services (OHS) leadership including the Chief and Acting Chief of Health Services, the Deputy Chiefs of Health Services, the Director of Nursing (DON), and the Medical Coordinator. Some of the meeting and calls also included a representative of the vendor, Wexford Correctional Health Services. In December, 2019, the monitor team and OHS convened an introductory meeting to collaboratively discuss the provisions of the Consent Decree with the entire OHS leadership and the three Regional Health Coordinators. The monitor team and OHS leadership jointly met with the electronic health record (EHR) vendor to discuss the feasibility of the projected timelines and existing logistical impediments to the installation and implementation of the EHR in all IDOC facilities. The Monitor and OHS also have had communications with the Illinois Department of Corrections (IDOC) information technology (IT) team to verify the status of the installation of the required EHR infrastructure and to identify the responsibilities of various State of Illinois departments in the procurement and replacement of computer equipment and devices. The monitor team has regular communications with both the Defendants' and Plaintiffs' attorneys and had a single meeting with the Wexford Correctional Health Services legal counsel. The Monitor has participated in communications with the University of Illinois Chicago, College of Nursing (UICCON), University of Illinois Chicago (UIC) Medical Center clinical and administrative leadership, and Southern Illinois University (SIU) School of Medicine Office of Correctional Medicine concerning opportunities to solidify or develop relationships and affiliations with IDOC.

The monitor team has had multiple calls with the OHS to receive updates and discuss the IDOC's plans and interventions during this ongoing COVID-19 pandemic. The monitor team has participated in calls with members of the State of Illinois COVID=19 Response taskforce to discuss and provide input on the response to the pandemic in the IDOC. The Monitor also had conference calls with five IDOC facilities about their site-specific COVID-19 preparations and plans and provided written feedback to the OHS on their findings.

The monitor team inspected two IDOC correctional facilities, Logan Correctional Center (Logan CC) and Lincoln CC, in February, 2020. In advance of these visits, the monitor was provided reports, spread sheets, schedules, and committee minutes concerning the clinical activities in the

5

fourth quarter of 2019 at each site. At each facility, correctional leadership, clinical staff and leadership, patient-inmates were interviewed, and the health care areas, clinical equipment, and furniture were inspected. Scheduled inspections to Danville CC and Decatur CC in March 2020 were cancelled due to the COVID-19 restrictions. Future visits to IDOC facilities will resume when pandemic visit restrictions are fully lifted.

The Monitor was recently provided with the semi-annual Defendant report. This report contained a list of Consent Decree provisions that the Defendants judged to be "in compliance" or "imminent compliance". However, the IDOC's self-assessment of compliance was not accompanied by any data or information to support these compliance ratings. Provision V.G. states that "Every six months for the first two years and yearly thereafter, Defendants shall provide the Monitor and Plaintiffs with a detailed report containing data and information sufficient to evaluate Defendants' compliance with the Decree and Defendant's progress towards achieving compliance, with the Parties and Monitor agreeing in advance of the first report on the data and information that must be included in such report." On November 2, 2019 the monitor submitted to the IDOC a draft of detailed and comprehensive suggestions for data, information, and reports for each and every provision of the Consent Decree that would provide the Monitor and Plaintiffs with sufficient ongoing information to assess the IDOC's compliance and progress toward compliance and that should be included in the IDOC semi-annual and annual reports. Parties have not yet met with the Monitor to discuss the Monitor's suggestion for comprehensive data and information. This information and data would have been useful for this report but was not available for use.

With respect to information for this report, since November 2019, the Monitor has submitted nearly seventy individual requests for reports, documents, data, and information. The IDOC attorneys and clinical leadership has provided the vast majority of these individual data requests. In addition to these individual data requests, the Monitor receives quarterly disks that contain reports and spread sheets with each facility's offsite specialty referrals, offsite urgent care/emergency room visits, hospital admissions, mortalities, Quality Improvement Committee minutes, Safety & Sanitation reports, and the vendor's primary medical services reports. The findings of the Monitor's Second Report are based on the data reviewed, interviews with leadership, staff, and patient-inmates, and inspections of the clinical spaces and housing units. The curtailment of site visits during the pandemic limited the monitor team's ability to audit. Clinical care was not thoroughly evaluated. The Monitor has not made many requests for medical records but intends to do so for subsequent reports. These will include medical records of individuals with chronic illness, emergency room visits, hospitalizations, offsite specialty visits and individuals who have died.

Lastly, the format of this report has changed. We have formatted the report based on the clinical services provided by IDOC. This will allow OHS and the IDOC clinical staff to review the report and utilize recommendations in a more effective manner than by presentation of findings listed only by Consent Decree items. We have ensured that for each service area, the appropriate Consent Decree is referenced so that tracking of compliance can be done. Each Consent Decree item may be represented on multiple service area sections.

6

# Executive Summary

*Addresses items II.A;*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**OHS leadership**

The Chief of the OHS has left the IDOC. Dr. Steven Bowman has assumed the role of Acting Chief OHS leaving his Deputy Chief position vacant. A key component of the future ability of the IDOC to become compliant and independent of the Consent Decree will be the strengthening of the OHS so that its leadership team can effectively direct, manage, monitor, and oversee the delivery of health care services and the health of the IDOC population. Since the Monitor's First Report the OHS has created and filled the position of Infectious Control and Disease Coordinator; yet only 40% of OHS positions are filled. IDOC has agreed in principle that the Chief of OHS will oversee the entire medical program statewide and serve as the Responsible Health Authority. However, the IDOC has not provided a table of organization, or position description for the Chief of OHS representing this new arrangement. Although both the 11/23/19 and 6/18/20 Staffing Analyses contain OHS table of organizations listing facility Health Care Unit Administrators (HCUAs) reporting through the Regional Health Coordinators and ultimately to the Chief of Health Services, the official May 2020 table of organization does not represent the HCUAs as reporting to Regional Health Care Coordinators. Official documents do not yet demonstrate that OHS has authority to supervise HCUAs. Policy does not exist which represents the organizational structure from OHS to the facility level. The HCUAs appear to have direct reporting relationship to the Wardens not to the health leadership. The OHS table of organization also does not clarify the reporting or accountability relationships between the OHS clinical leadership and the vendor's regional medical directors, regional and site DONs, regional administrative coordinators, facility clinical staff, nurses, and support staff nor other contracted services including UIC and SIU medical centers, telehealth, and hemodialysis entities.

The Monitor continues to recommend that the Chief of OHS have responsibility for management of the health program including supervision and oversight of facility medical programs through supervision of the HCUAs; development of the budget; establishing staffing levels; recommending clinical space renovations and maintenance; establishing equipment needs; and clinical specifications and oversight of vendor contracts. Clarification of this fundamental change in the health organization will require a communication from the Executive Director to the Wardens and the health care leadership.

**Staffing Analysis**

The IDOC submitted a revised Staffing Analysis on 6/18/20 as the monitor team was finalizing this report and thus has not had time to fully analyze the revised version. This Staffing Analysis replaces the initial Staffing Analysis that was provided to the Monitor on 11/23/19. The revised version recommends the creation of 357 additional positions; sixteen fewer positions were requested in the first revised analysis. The need to bring in additional staffing from the National Guard and Illinois Emergency Management Agency (IEMA) during the COVID-19 pandemic indicates the lack of sufficient staffing to respond to an increase in the demand for health

services.  The 11/23/19 Staffing Analysis documents 225 additional nursing positions.[1] The Staffing Analysis also increases the number of nurse practitioners, physician assistants, dental hygienists, physical therapists, physical therapy assistants, and optometrists. Three information technology (IT) personnel were added to the OHS staff to manage the hardware and software for the electronic medical record, develop data systems to obtain data from the electronic record, to provide accurate reporting of health information, to manage all data for quality programs statewide, to develop support for all 30 facilities in solving electronic medical record problems, to modify electronic record screens, to trouble shoot issues with the electronic record at facilities, and to provide ongoing training at all facilities   Three IT staff will be insufficient to provide these needs.  The revised Staffing Analysis also did not list any positions for the audit teams that are mandated in the Consent Decree. In late May 2020, the Illinois legislature passed the Governor's budget but the revised Staffing Analysis and Implementation Plan do not address whether any of the planned new positions are funded or even if or when any new positions will be added. The IDOC reported in the 11/23/29 Implementation Plan that challenges in the State hiring processes would only allow incremental hiring of vacancies and the proposed additional positions. The incremental hiring will not result in full staffing for almost a decade.  This is unacceptable and it is the position of the Monitor that positions proposed in the revised Staffing Analysis be funded in this fiscal year and employed as quickly as possible.

**Implementation Plan**
The IDOC submitted a revised Implementation Plan on June 12, 2020 as the monitor team was finalizing this report and thus, as with the revised Staffing Analysis, has not had time to fully analyze and provide input to OHS on this revised plan. The plan voices IDOC's commitment to goals addressing and improving multiple important components of the health care program including:
- The designation of the Chief of OHS as the system's health authority,
- Willingness to use an outside vendor to augment OHS staffing, to hire key leadership positions, hopefully university-based, that are difficult to recruit, and to assist with establishment of IDOC's quality improvement program,
- Collaboration with the Illinois Department of Public Health (IDPH) to provide ongoing guidance and consultation concerning infection control,
- Creation within OHS of a dedicated Information Technology Department to maximize the benefit of the electronic health record and provide data to drive quality improvements efforts,
- Systemwide audits of the clinical space and equipment to determine if space and equipment is adequate and whether corrective action based on those audits is necessary,
- The creation of an audit team,
- A survey in collaboration with the Illinois Department of Aging to objectively assess and address the needs of IDOC's increasingly aged and infirm population,
- The addition of over 350 new positions in the IDOC budget, and

---

[1] IDOC lists 248.5 nursing positions but we did not count the 23.3 nurse practitioner positions which we would count with provider positions.  We note that the 6/18/20 Staffing Analysis has 238 additional nursing positions without nurse practitioner positions.  We only recently received the 6/18/20 Staffing Analysis and did not have time to thoroughly integrate the 6/18/20 Staffing analysis into this report and for that reason use the 2019 data.

- Expanded affiliations with academic medical centers.

The Plan also recognizes that health care staffing may change as the EHR is implemented, policies and procedures are rewritten, and new programs and affiliations are developed. The Monitor also concurs that the staffing requirements of the IDOC will need to be reassessed as the program evolves. The IDOC must develop a strategic plan to develop service and consultative affiliations with university based medical centers. However, negotiations with large scale state university systems will require the involvement of the Executive Director of the IDOC and the Governor's office which has not yet occurred.

The Monitor supports IDOC's commitment to these goals however the Consent Decree requires that the Implementation Plan include detailed tasks, timelines, and strategies to fulfill the requirements of the Consent Decree, including the timelines related to the hiring and training of personnel. The IDOC has not provided this detailed plan for how they will implement their goals. The Implementation Plan is therefore incomplete. The Monitor looks forward to meeting with the IDOC to provide input and recommendations concerning the additional specific elements that are required in the Implementation Plan

**Quality Improvement Program**
The IDOC revised Implementation Plan commits to developing a quality improvement program to drive change in its health care system. As detailed in the Monitor's First Report, the UICCON was hired to assess IDOC's current quality program, identify gaps and opportunities in the program, and recommend best practices that would improve the quality and safety of care delivered by the IDOC. Their report, without Monitor input, was delivered to the IDOC in a September 2019 report. Subsequent to their report, the Monitor provided input to UICCON and the OHS concerning the plan. Although the OHS did fill the position of Quality Improvement Coordinator, this individual had limited experience or training in quality improvement but is currently enrolled Institute of Healthcare Institute's Certified Professional in Patient Safety review course. Additional training may be necessary.

Impeded in part by the COVID-19 pandemic, the IDOC has not yet been able to complete a redesign of their quality program. During the 14 months of the Consent Decree the monitor team has noted only minimal modifications in the existing quality assurance program. Multiple components of required Consent Decree provisions including audits, performance and outcome measures, adverse event reporting, vendor monitoring, and mortality committee reviews were contingent on developing a consulting and training relationship with a university-based quality program. An effort to establish a phase II contract with the UICCON has currently stalled. The Monitor recommends that the IDOC continue to pursue the development of a relationship with a State of Illinois public university based program to advance its commitment to develop a quality improvement program that identifies opportunities for improvement and can implement improvement changes. It is the opinion of the Monitor that the creation of such a relationship will require the active support and engagement of the IDOC Executive Director.

**Physician credentialing**
Since the signing of the Consent decree all four new physicians hired by the vendor have been board certified or completed a three year residency (formerly called board eligible) in an adult

9

primary care field of either Internal Medicine or Family Medicine. Currently, eleven (32%) of the physicians lack training in a primary care field and have not completed a three year residency in a primary care field and are thus without credentials satisfactory with respect to the Consent Decree. The Monitor has identified three physicians, without credentials, who should not be privileged to provide primary care in the IDOC. Internal monitoring of physician quality is not being performed. IDOC has not provided the Monitor any evidence of monitoring or peer reviews of any physicians including those who have not completed residencies in adult primary care. The Monitor has not yet initiated medical record reviews to evaluate the other non-credentialed physicians. Also, IDOC clinical leadership has not been informed by the vendor about three current physicians whose licenses are under probation status by the State licensure board. More effort needs to be directed to ensure that all physicians have been adequately trained and credentialed to provide adult primary care to IDOC's complex patient population.

**Electronic Health Record**

As reported in the Monitor's First Report, the IDOC signed a contract with KaZee, Inc. on April 12, 2019 to install an upgraded version (v8) of Pearl®, an electronic health record, in all IDOC and Illinois Department of Juvenile Justice (IDJJ) facilities. This upgraded version has been installed and is operational only in three facilities housing incarcerated females. The Consent Decree mandates that the EHR be installed systemwide by April 2022. The Defendants have notified the Monitor that, due to the COVID-19 pandemic, they anticipate delays in meeting this deadline. In part, the COVID-19 pandemic has been a barrier to the completion of the wiring infrastructure in the facilities; as of April 2020 only eight male facilities had been fully wired.

The Monitor anticipates additional non-Covid-19 delays. The electronic medication administration record (MAR) module has not yet been implemented in the female facilities due to the need to modify and standardize current medication administration processes; these same process changes will be necessary in multiple and likely all male correctional centers. The Monitor has not been able to verify if the initial projection of required devices and equipment has been budgeted, purchased, and readily available for installation. In addition, device and equipment projections were based on existing staff and programs and have not been supplemented to accommodate the additional 357 new positions, 275 vacancies, and programs recommended in the revised Staffing Analysis and Implementation Plan.

Training of staff in the EHR has not been started and can only begin once wiring is completed and devices have been installed. The training capacity necessary for an efficient rollout is currently insufficient in size to meet the needs of the twenty-eight correctional centers that currently do not have the electronic health record. The IDOC plan to create an IT department in the Office of Health Services with dedicated data and information technology staff is strongly supported by the Monitor but is not yet implemented. However, this team is of insufficient size to manage the EHR maintenance and data needs.

**Infection Control and COVID 19 Response**

The IDOC does not have an effective infection control program or adequate infection control staff. The initial appearance of COVID-19 infections in the IDOC resulted in a large outbreak at the Stateville Correctional Center. This prompted a rapid revision of IDOC's existing pandemic policies to address the aggressive COVID-19 spread and urgent intervention from the IDPH, the

Governor's COVID taskforce, the Illinois National Guard, UIC infectious disease specialists, and the Illinois Emergency Management Agency (IEMA) to assist the IDOC in managing the pandemic. After the Stateville outbreak started, IDOC OHS and facility staff have performed admirably and with outside help have been able to contain spread within IDOC.[2] To date, COVID cases in inmates have been identified in only 8 of 30 correctional centers, 2 Impact Incarceration camps, and 5 work camps; only four of which have currently active cases[3]. Three of the sites have had only a single COVID positive case in their incarcerated population. There were 12 deaths at Stateville assigned to COVID, but there has been only a single death presumptively due to COVID-19 infection in the remaining 36 IDOC facilities. The Governor's order to suspend all new admissions into the IDOC, the IDOC decision to halt all intra-system transfers, the development of systemwide employee temperature and symptom screening, assistance with isolation and monitoring by the Illinois National Guard and IEMA, quarantine procedures, provision of PPE for staff and the incarcerated men and women, intense work by all IDOC staff, and lower case rates in southern Illinois have contributed to absence of any inmate COVID-19 cases in 18 of the thirty IDOC's correctional centers. COVID cases have now been identified in every County in the State of Illinois; employees at 18 IDOC correctional centers[4] have tested positive. It is likely that additional correctional centers will ultimately identify positive cases in the inmate population. IDOC must sustain its vigilance, employee screening, containment measures, and preparedness into the future until the COVID-19 pandemic is truly stabilized and, hopefully, contained. OHS has learned much in their work on this pandemic. However, we have asked that a root cause analysis be performed for the Stateville outbreak to identify any structural problems with the IDOC infection control program that may have contributed to this outbreak so that OHS and IDOC can learn how to improve their program.

**Hepatitis C Treatment**
Approximately 5% of the current IDOC population has active Hepatitis C.[5] Between 1,700 and 1,800 Hepatitis C patients are followed in IDOC's Hepatitis C clinics. Less than three percent have completed treatment and only one percent or less are currently receiving treatment for Hepatitis C. In January, 2020 not one of the 136 women with active Hepatitis C infections at Logan CC were receiving or had completed Hepatitis C treatment. There is now effective, short term treatment (8-12 weeks) for Hepatitis C. Hepatitis C can be transmitted between inmates within the IDOC by shared needles and inmate tattoo instruments, and to staff by accidental needle sticks. Treatment of hepatitis C can eliminate the virus and thereby reduce the risk of transmission to others. Treatment cures the infected individuals, interrupts the disease's progression to cirrhosis, prevents other co-morbidities, reduces transmission risk to other inmates and staff, and ultimately improves the public health of the State of Illinois.

---

[2] We note that of six state prison systems of similar size to IDOC, IDOC ranks 3rd of 6th lowest in cases. As of 7/1/20, South Carolina with 32,100 inmates had 255 cases but did not list the number of deaths. Wisconsin with 35,000 inmates had 281 cases but did not list deaths. IDOC with just over 32,000 inmates had 324 cases with 13 deaths. Kentucky with 34,700 inmates had 432 cases and 2 deaths. Colorado with 32,100 inmates had 630 cases and 3 deaths. New Jersey with 32,000 inmates had 2706 cases and 45 deaths.

[3] In addition, all four Transition Centers, Crossroads, Fox Valley, North Lawndale, and Peoria ATCs, where individuals work in the local communities and receive health care in local community settings have had COVID-19 outbreaks. IDOC does not provided direct health care services to these four sites.

[4] In addition, all four Transitions Centers have had employees with COVID-19.

[5] IDOC QI minutes June 2019 (1785 pts, 1.2% in treatment), December 2019 (1712 pts, 0.7% in treatment), and January 2020 (1758 pts, 0.9% in treatment)

The extremely low rate of treatment of Hepatitis C patients incarcerated in the IDOC is unacceptable and represents a significant missed public health opportunity.  A recent Appellate Court ruling overturned a previous court decision that had ordered expanded eligibility for Hepatitis C treatment in the IDOC and stated that "if inmates are not receiving treatment…they could seek relief under the *Lippert* consent decree" [6]  It is the strong recommendation of the *Lippert* Monitor that increased Hepatitis C treatment must be provided to the infected IDOC population. The IDOC has an Interagency Agreement with the UIC Medical Center to direct Hepatitis C treatment.  The IDOC and the UIC telemedicine Hepatitis C program must expeditiously streamline the Hepatitis C eligibility and screening criteria in order to dramatically increase access to the effective, short duration (8-12 week), and cost effective treatment for all incarcerated persons with active Hepatitis C.

**Specialty Referral Process "Collegial Review"**
The IDOC continues to require that all non-emergency referrals for specialty care, diagnostics, testing, imaging, and other procedures be approved by the vendor's offsite physician reviewers prior to appointments being scheduled. This process is known as collegial review.  The Consent Decree requires that the Deputy Chiefs of OHS are to evaluate all non-approved referrals for specialty care.  Annualized IDOC data indicates that vendor reviewers denied or advised alternate treatment plans for 2,124 (10.2%)[7] referrals in 2019.

The IDOC OHS Deputy Chiefs have only been able to review approximately three percent of the denied referrals required by the Consent Decree. It is not clear how many of the approximately 2,000 non-approved referrals would have been reversed but 77%[8] of the denied referrals appealed to the OHS and acted upon were overturned. It is the strong recommendation of the Monitor that forcing the OHS to re-review all required cases would be wasteful of their time.

It is the Monitor's opinion that the vendor's collegial referral process denies access of IDOC's incarcerated population to specialists' opinion and to medically necessary care.  It delays needed consultations, procedures, and testing.  It potentially puts patient-inmate's health at risk.  It consumes an extraordinary amount of physician, HCUA, medical record staff, nurse, Regional Health Coordinator, Agency Medical Director, and Deputy Chief resources.  The Monitor recommended in the First Report that the vendor's specialty consultation and diagnostic referral process be discontinued and replaced by an offsite referral utilization process that enhances access to specialty consultation and diagnostic testing. This recommendation in the Monitor's First Report is now reinforced by the examples of inappropriate denials of specialty referrals, tests, procedures, and clinical equipment listed in Specialty Referral Oversight section of this report. The existing Wexford collegial review referral process should be immediately eliminated.

**Adult Immunizations, Cancer Screening, and Routine Health Maintenance**
In October of 2019 IDOC disseminated standard operating procedures for the implementation of an immunization program and a cancer screening program that are, respectively, in alignment

---

[6] Orr et al v. Shicker, Nos. 19-1380, 19-1387 & 19-1732 argued 11/4/19 and decided 3/23/20 in the United States Court of Appeals for the Seventh Circuit
[7] IDOC QI Committee minutes October-December 2019
[8] Second Court Report Specialty Referral Oversight Review section

with the recommendations of the Center for Disease Control and Prevention and the United States Preventive Services Task Force. In 2020 the IDOC also developed an administrative directive (AD) titled "Immunization Program Implementation" and an immunization and cancer screening data base tracking form. During a February 2020 site visit, the Monitor verified that additional nationally recommended adult vaccines had been approved for use in the IDOC including Pneumococcal 13, Hemophilus Influenza B (HiB), recombinant H. Zoster (shingles), Meningococcal ACWY, and Meningococcal B, Human Papilloma Virus (HPV) and that a more efficient and specific colon cancer screening test (FIT) was now available for use in the IDOC.

The number of individuals who have received the newly available vaccines is, to date, extremely low. Over 7,000 persons incarcerated in the IDOC over 50 years of age are eligible for recombinant Herpes Zoster (Shingrix) vaccination but only 30 have received the vaccine and nearly 900 individuals over 65 year old are potential candidates for the Pneumococcal-13 vaccine but only 7 have received this vaccine.[9] Medical record reviews confirmed that only one of nine eligible persons had been offered one of the newly available vaccines and no eligible men or women had been screened by a nationally recommended colon cancer screening test. Logan CC has received a quantity of HPV vaccines in preparation for a HPV immunization targeting women at risk for cervical cancer; this is applauded by the Monitor. Recommended screenings for lung cancer and abdominal aortic aneurysm (AAA) are also currently not being offered.

The OHS must aggressively implement a systemwide campaign to address the backlog of adult immunizations which have not been administered, screen individuals at risk for cancer and AAA. The OHS must continually monitor and report the number and percentage of eligible patients who are immunized and screened.

**Access to Nurse Sick Call**
The Monitor has observed that the rate of nurse sick call requests in the IDOC was notably low compared to the rates at most adult correctional facilities in the United States. A review of the sick call utilization in December 2019 at five male facilities and one female facility noted, respectively, that only 1.0 % to 2.1% of these facilities' average daily populations were submitting nurse sick call requests on a daily basis compared to an expected rate of 5% for male facilities and 6-7% of female facilities. The State of Illinois General Assembly eliminated co-pay fees for medical and dental services in the Department of Corrections on 1/1/20. At the two IDOC facilities visited in February 2020, a notably increased number of sick call requests were reported and the nurses' capacity to response to these requests was delayed. This increased demand is still less than the rate usually seen in adult correctional facilities in the USA. Co-pays undoubtedly were barriers to utilization and its elimination is applauded.

Sick call access should be monitored at each IDOC facility. If sick call requests received daily are less than 5% of the population or patients' requests cannot be evaluated within 24 hours of receipt, an examination of potential barriers to access should be conducted. This review should include identification and resolution of work assignments, physical space, custodial, and health care practices that cause delays in care. OHS should establish a workload driven staffing standard for nurse sick call and identify the number of RN positions needed to comply with this

---

[9] IDOC August 2019 population data

important aspect of the Consent Decree and incorporate these added positions into the Staffing Analysis.

## Medication Administration

Nursing personnel in four of the six facilities inspected by the Monitor in 2019 and 2020 pre-pour[10] medication and do not document medication administration at the time of medication passage. Both of these practices are widely recognized as unsafe for patients. The rationale for continuing these practices without regard for patient safety include broken medication carts, physical plant issues, and minimizing disruption of facility operations. The failure to resolve these faulty medication practices are delaying implementation of the medication administration component of the electronic health record.

Other identified potential medication safety issues include the inability to obtain an accurate list of medications prescribed to individual patients, the inconsistent availability of the medication administration record (MAR) at provider visits, and the lack of notification to providers when prescriptions need renewal. These problems contribute to errors and omissions in patient care and create the potential for harm.

A standardized process for medication administration that addresses concerns expressed here about medication preparation, documentation on the MAR, and reporting of medication refusals and is consistent with patient safety practices and contemporary standards of care must be implemented statewide. This should be managed as a comprehensive plan of change with clear targets, steps to proceed, timeframes, and outcomes. A process consultant is recommended to facilitate forward progress, streamline methods, and identify problems unforeseen by the leadership group.

## Aging IDOC Population

In the Monitor's First Report, the significant clinical, support and logistical needs of the IDOC's aging population were detailed. As noted in this report, valuable infirmary beds are occupied by elderly, frail, disabled, mentally challenged, and wheel chair bound patient-inmates who have few acute medical needs but require huge amounts of nursing and porter resources to manage their chronic conditions, body fluids, and activities of daily. If non-medically trained civilians walked through the IDOC infirmaries, their initial observation would be "why are these men and women incarcerated when they are so overtly and obviously no longer a danger to society."

On 3/26/20 the Governor of Illinois temporarily suspended all new admissions from local jails. After this order, through attrition, the IDOC population was successfully decreased from approximately 38,000 to 32,400. This enabled its facilities to have increased space to isolate, quarantine, and cohort individuals with or exposed to COVID-19. On 4/6/20 the Governor also granted the IDOC the authority to temporarily furlough vulnerable individuals at risk for COVID-19 virus infection. Based on verbal reports from IDOC this has not resulted in many furloughs. This particular order was primarily intended to release incarcerated men and women

---

[10] Pre-pouring medication means that nurses prepare medications in advance of administration by taking them from an authorized pharmacy container and placing them in an unauthorized container until administration to the patient. Pre-pouring is not an accepted practice and is recognized as unsafe. By transferring medication from a pharmacy approved package into alternate packaging without appropriate labeling, the potential for error is increased.

whose age and physical and mental health conditions predisposed them to heightened morbidity and mortality from the COVID-19 virus infection. This proved to be more difficult to accomplish. The IDOC demographic analysis documented that in August 2019, 7,265 of the individuals (19%) housed in the IDOC were 50 years of age or older with 955 (2.5%) 65 years of age or older.  In May 2020, the IDOC population had decreased to 32,400, however, 7,093 (22%) of the population were 50 years of age or older and 1,108 (3.4%) were 65 years of age or older. The absence of programing and activities, the limited access to physical and occupational therapy, the use of unsafe infirmary beds without functional safety railings and adjustable heights, and moldy, unsanitary bathrooms and showers without slip proof floors and safety grab bars contribute to the health risks for this aging population.

In its June 12, 2020 revised Implementation Plan, IDOC committed to engage the Illinois Department of Aging to perform a needs assessment of all elderly, infirm, disabled, and memory deficient patient-inmates in its system.  The Monitor supports this assessment that will identify the scale and scope of services required to care for IDOC's aged and infirm population and will also identify incarcerated individuals who could be safely discharged from the IDOC back into the community. We encourage that this assessment include whether this population is appropriately housed.  The Monitor estimates that it will take two years to complete this needs assessment.  The IDOC must not wait for the completion of this assessment to address the physical plant and equipment issues that put this patient population at risk and continue to work with the Governor's office, the Parole Board, the judicial system, state legislatures, and inmate advocacy groups to increase the compassionate release of those incarcerated men and women who meet criteria for release.

The Monitor has recently been informed that IDOC is proceeding with construction of a new health facility that will include a number of beds presumably for skilled nursing care.  The Monitor has not received a scope of service that defines the level of care or patient population that will be housed in this facility.  This plan is premature and requires additional input.  If this facility is for the aged population, the IDOC has not completed its assessment of the aged population and appears committed to a number of defined beds without knowing the number of aged individuals who will require various levels of care and what types of housing are necessary.  Other critical questions, not yet addressed, are whether IDOC will be able to release aged individuals to civilian nursing homes and whether IDOC's has a plan to achieve and maintain state certification and licensing standards appropriate for the services being rendered.   Before proceeding with construction on this housing, the Monitor strongly recommends addressing these issues.

**Health Care Space, Physical Plant, and Equipment**
With few exceptions, throughout the IDOC the physical plants that house clinical services have been neglected for a number of years. Many health care units lack sufficient examination rooms to accommodate the simultaneous scheduling of medical and nursing sick calls resulting in delayed access to care and backlogs in service.  Some health care units will need to be totally replaced to adequately address the medical and dental needs of a facility's patient population. Torn upholstery on examination tables and clinical staff furniture which cannot be adequately sanitized has been identified in almost every facility. Nonfunctional negative pressure units have been encountered in a number of infirmary isolation rooms creating a significant risk for the

spread of contagion. Nonoperational oto-ophthalmoscopes, broken or inadequate number of automatic external defibrillators (AEDs), aged and defective infirmary and geriatric beds which lack safety railings and the ability to adjust the heights of head and leg sections, inoperable or absent nurse call devices in infirmaries, peeling paint, and cracked floor tiles have been documented in health care delivery spaces during site inspections.

Each facility does monthly physical plants inspections of housing units and the kitchen but the clinical spaces receive only cursory inspections. Detailed environmental rounds of the clinical areas must be expeditiously implemented. Safety & Sanitation rounds of housing units repeatedly document mold on shower walls, nonfunctional leaking sinks and toilets, broken washers and dryers, absent safety grab bars in shower/toilets, cracked floor tiles and unsafe sidewalks for staff and patients. The physical plants and equipment of the clinical space, the infirmaries, and the housing units create unsafe conditions for staff and incarcerated persons. The Monitor supports the section in the revised Implementation Plan[11] which commits IDOC to survey all facilities to ensure adequate physical space and equipment for care, however the survey must result in funding to expeditiously correct and maintain the physical plant and equipment deficiencies that impact on the health of the IDOC population and the delivery of health care services. The Monitor recommends such a survey be completed by a consulting company which specializes in the capital construction and maintenance of health care programs in correctional facilities.

---

[11] IDOC Implementation Plan June 12, 2020

# Statewide Issues: Leadership and Organization

## Leadership Staffing

***Addresses item II.B.2; II.B.3; III.A.1; III.A.8; III.A.9***

**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**II.B.3.** *IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff.*

**III.A.1** *The Chief of Health Services shall hereafter be board certified in one of the specialties described in paragraph III.A.2, below. The Deputy Chiefs of Health Services shall either be board certified or currently board-eligible in one of the specialties described in paragraph III.A.2, below.*

**III.A.8.** *Within eighteen (18) months of the Effective Date Defendants shall create and fill two state-employed Deputy Chiefs of Health Services positions reporting to the Chief of Health Services to provide additional monitoring and clinical oversight for IDOC health care.*

**III.A.9.** *Within nine (9) months of the Effective Date every facility shall have its own Health Care Unit Administrator ("HCUA"), who is a state employee. If a HCUA position is filled and subsequently becomes vacant Defendants shall not be found non-compliant because of this vacancy for nine (9) months thereafter.*

**OVERALL COMPLIANCE:** Partial Compliance

**FINDINGS:**

Dr. Meeks, the prior Chief of the Office of Health Services (OHS) left service in March of 2020 and was replaced by Dr. Steven Bowman. Dr. Bowman is Board Certified in Emergency Medicine. This leaves one Deputy Chief OHS position vacant. Dr. LaMenta Conway, Board Certified Internal Medicine, is the other Deputy Chief OHS.

In the March 2019 Programs and Support Services table of organization the Chief, OHS was one of 14 direct reports to the Chief of Programs. The Chief's title is Medical Administrator IV, one of the subordinates of the Chief of Program Services. In August 2019, the newly appointed IDOC Director informed the Monitor that the scope of responsibility for the Chief of Program and Support Services was being limited to OHS and a single other entity. In the OHS table of organization[12] and in the position description[13] the Chief OHS only supervises personnel in the OHS and not any individuals at the facility level. Although the draft administrative directive 04.03.A.02 Responsible Health Authority states that the OHS manages health care and oversees all health care units that are in IDOC facilities, neither the table of organization nor the position

---

[12] OHS Table of Organization May 2020
[13] Illinois Department of Central Management Services Position Description for Medical Administrator IV; Chief of Health Services 3/1/20

description of the Chief OHS give any authority to the Chief OHS to supervise HCUAs[14] or to direct how care is to be managed at a facility level. That authority appears to remain vested in individual wardens. The position description of the Chief OHS does not include subordinate direct reports so the only direct supervision responsibilities are evident in the table of organization. In principle, IDOC has agreed that the Chief OHS will oversee the entire medical program statewide. However, the IDOC has not provided a table of organization, or position description for the Chief OHS representing that new arrangement. The current documents do not include an expansion of authority of the Chief OHS. We are uncertain how Wardens view their responsibilities with respect to health care processes in their facilities. We continue to recommend that the Chief OHS has responsibility for management of the health program including supervision and oversight of facility medical programs through supervision of the Health Care Unit Administrators (HCUA); development of the budget; establishing staffing levels; recommending clinical space renovations and maintenance; establishing equipment needs; and clinical specifications of vendor contracts. Because this is a fundamental change in the health organization and affects Wardens, a communication from the Executive Director to Wardens and health care staff should state this change.

The OHS Table of Organization does not clarify the reporting or accountability relationships between the OHS clinical leadership and the vendor's regional medical directors, regional and site DONs, regional administrative coordinators, and site clinical staff, nurses, and support staff nor other contracted services including UIC and SIU medical centers, telehealth, and hemodialysis entities.

Vacancy reports for 2019 and 2020, provided by IDOC, contain no information with respect to OHS staff positions; information about OHS vacancies are gleaned from specifically requested OHS Tables of Organization. We ask that vacancy reports include OHS staff and management staff. In October 2019 we specifically requested a list of HCUA positions. We received a list that showed six (20%) facilities did not have HCUAs[15] The Danville HCUA position had been vacant for three years. The Hill CC HCUA position was listed as vacant because that individual was out on long-term leave. An April 2020 report noted that 5 (17%) of the 29[16] IDOC facilities had vacant HCUA positions. The previously long-standing vacant Danville CC and Hill CC positions have been filled.

The Staffing Analysis[17] listed 22 OHS positions of which 15 were listed as filled. This is a 32% vacancy rate. Also, there were no positions in the Staffing Analysis for the audit function which is required in the Consent Decree.[18] The May 2020 OHS table of organization[19] lists 22

---

[14] The November 2019 and June 18, 2020 OHS table of organization in the IDOC Staffing Analysis listed the HCUAs reporting to the OHS Regional Coordinators however the May 2020 OHS table of organization does not include HCUAs, vendors, or contracted health care services.
[15] East Moline, Elgin Treatment Center, Danville, Southwestern, and NRC all have vacancies. Hill has a HCUA out on extended leave. The Kewanee Life Skills Center HCUA only works part time providing coverage at East Moline as well as her HCUA position.
[16] Pinckneyville HCUA also covers the small Murphysboro facility
[17] Staffing Analysis Illinois Department of Corrections Office of Health Services submitted 6/18/20
[18] Consent Decree II.B.9
[19] May 2020 OHS Table of Organization

positions[20] with six vacancies (27% vacancy rate).  The most recent Implementation Plan of 6/12/20 plans to create a single audit team consisting of four individuals.  As will be discussed in the audit section of this report, this is an insufficient number of staff to conduct audits and to perform mortality reviews.

We were provided with position descriptions for five[21] of the 25 OHS existing positions.  We presume that the Chief of Oral Health position is a dentist but the position description should say that.   We discuss the Quality Improvement and Infection Control Coordinator positions description in those respective sections but do note that they will need additional training for their positions.  Based on the curriculum vitae, the Medical Coordinator is well qualified for that position.

In 2019 OHS established a Nursing Director position, selecting Susan Griffin, a master's prepared nurse to fill the position. Ms. Griffin has extensive experience in correctional health care and was previously the HCUA at Graham. Organizationally, the Director of Nursing (DON) reports to the Medical Coordinator, Janette Candido, as do the Regional Health Services Coordinators. The responsibilities listed on the position description are to develop, monitor and evaluate standards for clinical care and nursing practice and to oversee the development and implementation of programs, policies and procedures that conform to these standards[22]. Ms. Griffin described her daily responsibilities as filling in for vacant HCUA positions, problem solving immediate issues, assisting with initiatives such as immunization guidance, assisting HCUAs with contract monitoring, making sure sites have supplies and equipment and facilitating patient transfers.

The position is considered a full line supervisor; however the table of organization does not depict the DON as having line authority or accountability for nursing practice[23]. According to the staffing analysis 28 of 31 IDOC correctional facilities have a DON. They either report to the HCUA if it is a state funded position or to the contract vendor, if the position is part of the contract allotment. Seven facilities also have nursing supervisors. The statewide ratio is one supervisory nurse to 19 line staff, which too lean for effective change management which will be necessary to bring performance into compliance with the Consent Decree.

The supervisor of nursing staff varies depending upon the funding of the position. Therefore at a single facility registered nurses may report to the HCUA directly if in state funded positions

---

[20] The Quality Improvement/Infection Control Coordinator position was divided into two separate positions: Quality Improvement Coordinator and Infection Control Coordinator.

[21] Chief of Health Services, Deputy Chief, Medical Coordinator, Director of Nursing, Quality Improvement Coordination/ Infection Control Coordinator job descriptions.  The Quality Improvement/Infection Control Coordinator position is for the combined position.   These positions have been separated but separate position descriptions are not yet available.  On June 23, 2020 we received additional position descriptions for five additional positions which we have not had an opportunity to evaluate.

[22]



DON Job
Description.pdf

[23] Staffing Analysis Illinois Department of Corrections Office of Health Services, Lippert Consent Decree 11/23/2019 page 53

while the licensed practical nurses are contract positions and report to the vendor. There is no consistency in how positions are allocated across the state. For example, registered nurses at a facility may be either state or vendor positions. Clarifying the authority of the DON at the state and site levels for nursing practice standards is essential to manage patient care in this fragmented organizational structure.

We recommend the DON report to the Chief of Health Services. Responsibilities of the DON should include primary responsibility for development of statewide policy and procedure for those subjects that are nursing-driven (medication admission, intake screening, nurse sick call, infirmary care etc.), setting performance expectations for registered nurses, licensed practical nurses and nursing assistants, establishing staffing standards, peer review of professional nursing, competency review of nursing support personnel, participates in critical incident and mortality review, establishes nursing quality indicators and monitors nursing quality. In addition, all sites should have one person identified as the Director of Nursing Services accountable to the Statewide DON for clinical practice and quality. Line authority would remain with the HCUA for daily operations.

**RECOMMENDATIONS:**
1. The vacant Deputy Chief position needs to be expeditiously filled
2. The OHS DON needs to report to the Chief of Health Services. Responsibilities of the DON should include primary responsibility for development of statewide policy and procedure for those subjects that are nursing-driven (medication admission, intake screening, nurse sick call, infirmary care etc.), setting performance expectations for registered nurses, licensed practical nurses and nursing assistants, establishing staffing standards, peer review of professional nursing, competency review of nursing support personnel, participates in critical incident and mortality review, establishes nursing quality indicators and monitors nursing quality.
3. Identify a Director of Nursing Services at each facility who is accountable to the Statewide DON for clinical practice and quality. Line authority would remain with the HCUA for daily operations.
4. IDOC will be requested to provide quarterly up-to-date vacancy reports that include OHS and HCUA positions.
5. IDOC should formally document that the Chief OHS is responsible for managing the health program of the IDOC as evidenced by a communication by the Executive Director to the Wardens.

# Staffing Analysis and Implementation Plan

*Addresses items IV.A.1-2; IV.B;*
**IV.A; IV.A.1; and IV.A.2.** *The Defendants, with assistance of the Monitor, shall conduct a staffing analysis and create and implement an Implementation Plan to accomplish the obligations and objectives in this Decree. The Implementation Plan must, at a minimum: (1) Establish, with the assistance of the Monitor, specific tasks, timetables, goals, programs, plans, projects, strategies, and protocols to ensure that Defendants fulfill the requirements of this Decree; and (2) Describe the implementation and timing of the hiring, training and supervision of the personnel necessary to implement the Decree.*

20

**IV.B.** *Within 120 days [July 1, 2019] from the date the Monitor has been selected, the Defendants shall provide the Monitor with the results of their staffing analysis. Within sixty (60) days after submission of the staffing analysis, Defendants shall draft an Implementation Plan. In the event the Monitor disagrees with any provision of the Defendants' proposed Implementation Plan, the matter shall be submitted to the Court for prompt resolution.*

**OVERALL COMPLIANCE:** Partial compliance

**FINDINGS:**
The Monitor recognizes the amount of work the IDOC has dedicated to developing the initial and now the recently received revised Staffing Analysis which will bolster the clinical staffing and enhance access to clinical and preventive services throughout the IDOC. The revised Implementation Plan, only recently received, contains goals committing IDOC to the continued development of the electronic health record, comprehensive policies and procedures, a system wide quality improvement program with audit teams, evaluation of all physical health care spaces, assessment of the needs of the IDOC's aging population, an effective and strengthened Office of Health Services, an Information Technology team dedicated to the support of health care delivery, enhanced access to dental hygienists. optometry services, and physical therapy services, and strengthened affiliations with academic medical centers. Much work remains to be done particularly in modifying staffing levels of the audit and data teams, identifying a strategy of how to hire key staff, and in creating a detailed implementation plan. The Monitor and the consultant team look forward to meeting with IDOC to provide input on the revised Staffing Analysis and to collaborate on the development of the Implementation Plan including timelines.

## Staffing Analysis

The staffing analysis was due on 7/26/19 and the Implementation Plan was due on 9/24/19. The Court granted two 30-day extensions of the Staffing Analysis and Implementation Plan. A draft staffing analysis was submitted to the Monitor 8/8/19. The Monitor returned the document to IDOC with suggestions for revisions on 8/29/19. The IDOC submitted another revised Staffing Analysis and an Implementation Plan on 11/23/19. The Monitor did not consider those documents sufficient. The Monitor made additional recommendations regarding the Staffing Analysis and Implementation Plan at a meeting with IDOC OHS leadership on 12/10/19. The Monitor's team and the OHS senior leadership had extensive discussions as to whether the UIC could provide some of the data management, electronic record training positions, and audit team. This was subsequently discussed with the UICCON but UIC has yet to provide a final proposal but it appears that UICCON will not provide an audit team, data team or electronic record training positions.

The Monitor team had completed this section of the report when the IDOC submitted a revised Implementation Plan on 6/12/20 and a revised Staffing Analysis on 6/18/20. The Monitor team has not had sufficient time to review these documents in depth. In the latest Staffing Analysis, the OHS staffing consisted of 22 positions, seven (32%) of which are now vacant. Five of the 15 filled positions are secretarial or office staff in nature. We have received position descriptions

for only five of the 15 OHS job titles[24] exclusive of the five secretaries and office coordinator positions.   Without position descriptions it is not possible to determine the scope of responsibilities for these positions.

In the 11/23/19 Staffing Analysis, the IDOC added 373 new facility positions, 276 of which were apportioned to Wexford and 97 of which were apportioned to IDOC.[25]   In the 6/18/20 Staffing Analysis, the IDOC reduced total new positions to 357 of which 276 are apportioned to Wexford and 81 of which were apportioned to IDOC.  The revised Staffing Analysis of 6/18/20 is nearly identical to the 11/23/19 Staffing Analysis; minor changes are not explained.[26]  The Monitor and his team will respond to the 6/18/20 Staffing Analysis when we have time to thoroughly review it and discuss with IDOC.

The IDOC has taken a position, detailed in their 11/23/19 Implementation Plan that due to challenges related to the state hiring process the IDOC would not hire all new positions at one time but would have a goal of hiring 88 vacant or new positions annually[27].  They have not amended this position in their 6/18/20 Staffing Analysis.  We have recommended that all positions be funded in the current year's budget and hired as soon as possible.  On a call with the Plaintiffs and Defendants attorneys, the IDOC assured the Monitor that all proposed positions, including those in the Staffing Analysis, can be hired with funding available in the recently passed Illinois State budget.

Furthermore, the IDOC stated in the 11/23/19 Implementation Plan that the timeline for beginning hiring of new positions would result in a start date of new hires of February 2022.[28]  In the revised 6/18/20 Staffing Analysis there are 275 vacant positions and 357 new positions.  The number of vacancies has increased by 40 since 11/23/19.  Six hundred and thirty two positions need to be filled.  If 88 vacant or newly created positions will be filled annually and provided that no staff leave service, it will take seven years to fill all positions.  Because 40

---

[24] We have receive position descriptions for the Chief OHS, Deputy Chief OHS, Chief of Dentistry, Statewide Director of Nursing, and Medical Coordinator.  We received a position description for the combined Infection Control/Quality Improvement Coordinator.  This position has been separated into two positions and the combined position description is inadequate for either position so these two position descriptions need to be separated and rewritten. The Revised Staffing Analysis does contain brief descriptions of the job duties with no listing of required skills, training and experience for the Health Information Officer, Electronic Health Record Administrator, and Health Information Analyst proposed positions.

[25] The staffing analysis described 372.674 positions which we have rounded to 373 positions. 275.674 were apportioned to Wexford and we have rounded that number to 276.

[26] With respect to nursing only, there was no discussion of the rationale for revisions in the revised analysis. There is a net gain of one nursing supervisor and 10 direct care staff. The skill mix changes slightly from 57% direct care staff as RNs in the 2019 analysis to 55% in 2020. LPNs increase from 33 to 34% and certified nurse assistants from 10 to 12% of the staff mix.  It looks as though some errors were corrected (such as the DON at Graham now exists) and certified nurse assistant positions were added or increased at Shawnee, Taylorville, Hill, and Lincoln. In some cases this was accompanied by a reduction in RN positions. Facilities with a net gain in nursing direct care staff are Robinson (4 FTE), Shawnee (2 FTE), Taylorville (3FTE), Jacksonville (2 FTE), Hill (4FTE), Lincoln (4FTE), Southwestern (3 FTE). Facilities with reductions in nurse direct care staff are Vienna (2 RNs), Kewanee (2 RNs), Pontiac (4 FTE), and Elgin (3 FTE).

[27] The IDOC stated, "We will strive to fill the vacant and newly proposed FTE positions over time with a goal of adding approximately 88 staff members annually".  This appears to state that vacant positions will be included in the 88 annual hires indicating that new positions may not be brought on until vacancies are filled.

[28] Illinois Department of Corrections Implementation Plan Lippert Consent Decree submitted 11/23/19

positions have become vacant over the prior six months, it is possible that filling 88 positions a year will result in only vacant positions being filled with no new staff ever added. If the first staff are anticipated to be hired in February, 2022 as stated in the 11/23/19 Implementation Plan, then, based on the hiring process described by the IDOC, full staffing would not occur until 2029 if no one leave service between now and 2029, which by experience is not now occurring. This is not a reasonable goal. The revised 6/18/20 Staffing Analysis does not address when the new positions will be hired. All positions planned for in the Staffing Analysis should be budgeted, authorized for filling and hired as soon as possible.

We provided IDOC multiple comments on the 11/23/19 IDOC Staffing Analysis. The IDOC only partly addressed the Monitor's concerns and did not address these concerns in the analysis.

- The OHS Director of Nursing should be on the same level as the Deputy Chiefs and Medical Coordinator not reporting to the Medical Coordinator. This was not done.
- The HCUAs should report through the Chief OHS and not through the Wardens. This was agreed to but is not evident in policy or table of organization.
- The table of organization should reflect that Wexford staff report through OHS and audit and data positions should be reflected in the table of organization. The table of organization does not show these relationships.
- A "relief factor" be calculated into nurse staffing at facilities but this was not done.
- The facility nurse positions should be broken down by function (infirmary, administration, clinics, infection control, quality improvement, etc.) and by site/shift to determine adequacy of nurse staffing. This was not done.
- Excluding 2 small sites without onsite dental services, ten facilities of 28 IDOC facilities with onsite dental suites do not have a dental hygienist position. IDOC proposed adding positions in the 6/18/20 staffing analysis at seven facilities but NRC, Vienna, and Western still have no hygienist positions. In the Implementation Plan IDOC commits to every facility having dental hygienists to meet facility needs without explanation for how facilities without a hygienist will obtain that service.
- The Monitor asked for the IDOC methodology of determining an appropriate number of physicians, physician assistants and nurse practitioners based on acuity, population, and facility function. This was not provided.
- Optometry services did not appear standardized with some facilities not appearing to have appropriate number of optometry hours. Optometry staffing was increased by 1.6 full time equivalents (FTE) but some of the facilities of concern still had no changes to the optometry hours.
- Excluding four smaller sites, physical therapy services were only provided at 8 of IDOC's 26 large correctional centers in 2019. The 6/18/20 Staffing Analysis proposed adding physical therapy at two additional sites but this will leave sixteen facilities housing nearly twenty thousand men of whom approximately 4,000 are 50 years of age or older without onsite access to physical therapy. The 6/12/20 revised Implementation Plan does commit to evaluating the need for physical therapy services at all twenty-six IDOC facilities with infirmary beds[29].
- We asked for the methodology of determining phlebotomy, medication room assistants, medical record staff, and office staff but did not receive this information.

---

[29] Elgin, JTC, Murphysboro, and Vienna do not have infirmaries

- Some facilities have a Wexford site manager and some do not. What is the role of this positions and does this position have any clinical or operational responsibilities? This question was not addressed. IDOC added 8 site manager positions. We view these positions as not contributory to clinical services at the facility and do not understand the responsibilities of this position.

The audit and data team functions have been discussed with IDOC on multiple occasions including with UICCON. The Monitor is not in agreement with the number of audit and data team members in the most recent IDOC Staffing Analysis and Implementation Plan. However, the IDOC has assured the Monitor that the budget is adequate to hire the agreed upon positions. The IDOC and the Monitor were involved in discussions with UICCON to provide these positions. During those discussions, the group agreed that the audit and data teams needed additional staff. This will be discussed further in the respective Audit and Medical Record sections of this report.

The IDOC, Office of Health Services completed a Staffing Analysis in November 2019. The methodology consisted of three surveys of 30 IDOC facilities. The first survey collected information on service volume (number of acute infirmary patients, number of patients seen on provider lines etc.) and the second survey was an assessment of current staffing with consideration of requests for additional positions. The third survey consisted of additional service volume and acuity data over the past three years. HCUAs were asked what staffing was needed in anticipation of future needs. The OHS leadership team considered these requests and if data was sufficient to support it the positions were included in the staffing proposal. There was no analysis of minimal staffing required by the Consent Decree[30]. No expert consultation was sought.

The resulting recommended staffing increases the nursing program by 225.2 positions. Additional supervisory staff are added making the ratio one supervisor for every 23 employees. Close supervision will be necessary to make the changes required by the Consent Decree.

| November 2019 Nurse Staffing Numbers In Staffing Analysis | | | | | |
|---|---|---|---|---|---|
| | Current Positions | Skill Mix[31] | Proposed Staffing | Skill Mix | Position Changes |
| Total | 779.4 | | 1004.6 | | 225.2 |
| RN | 437.4 | 56% | 548.6 | 55% | 111.2 |
| LPN/CMT | 265 | 34% | 314 | 31% | 49 |
| C.N.A. | 52 | 7% | 101 | 10% | 49 |
| Supervisors | 14 | | 26 | | 12 |

---

[30] Staffing Analysis Illinois Department of Corrections Office of Health Services, Lippert Consent Decree 11/23/2019, page 4.

[31] Skill mix is the grouping of different categories of nursing employees by type. The skill mix for the 437.4 RN positions in row two is 437.4 divided by the total nursing positions of 779.4 which is 56%. There is no standard skill mix but programs that have a higher RN mix have better outcomes. The skill mix can be measured against outcomes to determine if a higher RN ratio may be needed.

| Director of Nursing | 11[32] | | 15 | | 4 |
|---|---|---|---|---|---|

The number of non-supervisory nursing positions for all facilities combined is 25 per 1000 prisoner population[33] (current budgeted staffing is 21:1000). Excluding the specialized treatment facilities, facility staffing varies from a low of 7.2 at Murphysboro to a high of 53.8 at NRC. Staffing richness increases at all facilities except Murphysboro, Sheridan and Logan. The skill mix does not change appreciably.

| Proposed Nursing Positions in Staffing Plan 11/23/19 Staffing Analysis Data | | | | |
|---|---|---|---|---|
| Nursing Line Staff per 1000 ADP of Prisoners | | | | |
| **FACILITY** | **SECURITY LEVEL** | **POPULATION** | **Proposed Non-Supervisory FTE** | **#/1000** |
| **MURPHYSBORO** | MIN | 138 | **1** | **7.2** |
| **ROBINSON** | MIN | 1176 | **15** | **12.8** |
| **SHERIDAN** | MIN/MED | 1558 | **25** | **16.0** |
| **TAYLORVILLE** | MIN | 1067 | **17.4** | **16.3** |
| **PINCKNEYVILLE** | MED | 2121 | **35** | **16.5** |
| **DANVILLE** | MED | 1724 | **29** | **16.8** |
| **ILLINOIS RIVER** | MED | 1770 | **30** | **16.9** |
| **CENTRALIA** | MED | 1281 | **22** | **17.2** |
| **SHAWNEE** | MED | 1682 | **29** | **17.2** |
| **JACKSONVILLE** | MIN | 1133 | **20** | **17.7** |
| **LINCOLN** | MIN | 1007 | **18** | **17.9** |
| **HILL** | MED/MAX | 1698 | **31** | **18.3** |
| **LAWRENCE** | MED | 2166 | **40** | **18.5** |
| **GRAHAM** | MED | 1919 | **37** | **19.3** |
| **VIENNA** | MIN | 1127 | **24** | **21.3** |
| **SOUTHWESTERN** | MIN | 563 | **12.2** | **21.7** |
| **EAST MOLINE** | MIN | 1318 | **29** | **22.0** |
| **WESTERN** | MED | 1533 | **34** | **22.2** |
| **VANDALIA** | MIN | 1222 | **28** | **22.9** |
| **LOGAN** | MULTI (fem) | 1657 | **40** | **24.1** |

[32] For this table we used the 11/23/19 IDOC Staffing Analysis Summary table on page 49 of that document. We note that IDOC included nurse practitioners in its summary of nursing personnel but we do not because typical work of nurse practitioners work is more similar to practitioners than nurses. Also, in the final edit of this report we noted that the summary table lists 11 Directors of Nurses at IDOC facilities. This is the same number used in the 6/18/20 IDOC Staffing Analysis. However, the individual facility staffing tables in those same documents appear to show 28 Directors of Nursing. The Hill facility also had two Director of Nursing positions. We did not have sufficient time to call IDOC to verify the correct number of Directors of Nursing but IDOC should make this correction in a final Staffing Analysis.

[33] Based on a population of 38,000 inmates.

| BIG MUDDY | MED | 1179 | 33 | 28.0 |
|---|---|---|---|---|
| MENARD | MAX | 2213 | 63 | 28.5 |
| DECATUR | MIN (fem) | 549 | 16 | 29.1 |
| DIXON | MED/MAX | 2051 | 76 | 37.1 |
| KEWANEE | MULTI | 274 | 12 | 43.8 |
| STATEVILLE | MAX | 1173 | 60 | 51.2 |
| PONTIAC | MAX | 1165 | 60 | 51.5 |
| NRC | MAX | 1302 | 70 | 53.8 |
| JTC | MULTI | 181 | 28 | 154.7 |
| ELGIN | MULTI (fem) | 27 | 29 | 1074.1 |

Lincoln, which was mentioned earlier, as having insufficient RNs to provide coverage 24 hours a day seven days a week, under the proposed staffing plan would have an additional two RNs. Depending upon the relief factor used, this increase would be sufficient to meet this staffing standard.

The staffing analysis did not identify nursing positions at each facility to be responsible for infection control or quality improvement. These need to be dedicated positions filled with individuals who have these specific areas of expertise. These are not positions that allow personnel to learn on the job. Also not discussed in the staffing analysis is a relief factor or the amount of time needed to continue services while an incumbent is on time off. An adequate relief factor is particularly necessary for any services that are provided seven days a week.

The Monitor has suggested a staffing methodology which incorporates the Illinois Nursing Home Staffing Standards and staffing standards developed for other state correctional systems. These standards should be applied to all infirmaries, housing for the elderly and ADA housing in IDOC facilities. The suggested methodology has been provided to the Director of Nursing and three facilities (Dixon, Logan and Lincoln) have been staffed using it as an example.

We recommend the IDOC continue to refine the staffing analysis by establishing workload standards. An example of a workload standard is one RN can triage and assess 20 sick call requests in an eight hour shift. The number of staff needed is calculated by dividing the average number of sick call requests by 20.

In the discussion of this staffing analysis with OHS on December 12, 2019 we were told that as long as Health Services has so many vacancies it is not necessary to request additional position authority and budget to implement the proposed staffing plan. We recommend that a recruitment task force be established with representation from OHS, Wexford, Human Resources, and the Office of Budget and Management with the explicit mission to reduce the vacancy rate to 12%.

It has been the Monitor's experience that five to seven percent of the population in prison will request sick call each day in systems with functional health care programs. Women's facilities request sick call at the higher end of this range. Illinois prisons have reported sick call numbers in 2019 far below this expected rate. Increased demand after elimination of co-pay brought the number requesting sick call at Lincoln and Logan closer to these expected rates.

26

We recommend reassigning other duties that interrupt nurse sick call, that facilities plan for and staffing the program with capacity to see three to five percent of the population in sick call each day (seven days a week). Another recommendation is to make this an exception measure each facility reports monthly. The suggested measure is: The number of times an LPN was assigned to sick call this month.

## Implementation Plan

The Consent Decree requires that IDOC create an implementation plan that includes: specific tasks, timetables, goals, programs, plans, projects, strategies and protocols to ensure that the requirements of the Consent Decree are fulfilled. The Implementation Plan submitted on 11/23/19 and the revised Implementation Plan submitted on 6/12/20 did not satisfy all requirements of the Consent Decree and was therefore not compliant with the requirement.

The IDOC revised 6/12/20 Implementation Plan sets seven goals for the IDOC medical program including:

1. That enhanced leadership is necessary and that the Chief OHS will be the health authority with HCUA reporting to this person and all health care staff reporting through this person.
2. A goal to implement the electronic medical record and to establish an information technology team to collect and analyze data in the electronic record.
3. A goal to survey all facilities to ensure that there is adequate physical space and equipment.
4. A goal to enhance the Quality Improvement program and to thereby staff an audit team, data team, process improvement staff, and quality improvement consultants
5. A goal to discuss with the Illinois Department of Aging development of a questionnaire to evaluate the healthcare needs of the aged population.
6. A goal to establish an audit function.
7. A goal to strengthen the academic relationships and an announcement of a contract with SIU to provide physicians at four IDOC facilities.

These seven goals are all laudable but do not include sufficient tasks, detailed plans or timetables that inform on how these goals will be accomplished.

The IDOC announced in the Implementation Plan that IDOC will collaborate with the Illinois Department of Health to provide guidance on infection control issues but gives no timetable of when this will occur, what the collaboration would consist of, or how it would be implemented within IDOC.

The IDOC states in its Implementation Plan that IDOC and the Monitor team have initiated a process of policy development. IDOC has sent to the Monitor team 18 draft medical policies. With only approximately a third of medical policies drafted, a significant amount of work remains. Beginning in March 2020, work on policies ceased due to the COVID-19 pandemic. On 5/6/20, the IDOC through the Attorney General sent a letter to Plaintiffs copying the Monitor

27

stating that due to the COVID-19 pandemic, there would be a delay in implementation of a comprehensive set of policies. However, if the COVID-19 pandemic had not occurred, IDOC would not have implemented a comprehensive set of policies at the 7/10/20 deadline. Approximately 40 policies remain to be drafted. Draft policies need to be reviewed by the Monitor team and then completed by IDOC. Completed policies need to be disseminated to all staff. Staff at all 30 facilities need to be trained on the new policies. Even if policy development were to begin again today, it is likely that a comprehensive set of policies would not be implemented until sometime in 2021. The Implementation Plan also needs to address policy dissemination and training. It is also not clear when dental policies will be completed and there is no plan for this.

The Implementation Plan states that it will add over 350 positions but how and when this will be done is not addressed. It is not even stated when or if these positions will be funded.

IDOC did not provide any implementation goal or plan for two essential areas of the Consent Decree: dental services and physician quality. IDOC has not included in their Implementation Plan a goal, strategy or plan for how dental care will be implemented to conform to the Consent Decree. The Chief of Dentistry has not yet been hired. There is no plan for dental policies.[34] Dental care is not even mentioned in the Implementation Plan except to state that IDOC will ensure that every facility will have an appropriate number of dental hygienists. A plan for how to obtain qualified physicians as required by item III.A.2 of the Consent Decree is also not provided. IDOC does state that a contract with SIU will provide physicians for four facilities but an overall strategy for how physician quality will be remedied statewide is not provided; it appears that there isn't a plan for this essential problem. This item has the greatest impact on overall quality of care yet is not addressed satisfactorily. It must be addressed.

There are 12 Consent Decree items required of IDOC with time deadlines.[35] For eight items with expired deadlines, IDOC has completed two items on time[36]. Two of four items with completion timelines in the future are likely to be delayed[37].

Inability to timely hire key leadership staff and other essential highly trained employees impairs the IDOC's ability to both develop and implement its Implementation Plan. The OHS lacks bench strength. Of the 25 OHS positions, five are office and secretarial staff. Of the 20 remaining positions, 14 will be essential in developing the Implementation Plan and

---

[34] Dental Care for Offenders Administrative Directive revised 1/1/2020 was provided to the Monitor on 6/15/20 and is currently under review.

[35] This is given as Appendix A at the end of the report.

[36] One of the two timely items was filling the Infection Control Coordinator positon. This position was initially filled by a combined Infection Control/Quality Improvement position. During the COVID-19 pandemic, the Governor fast tracked approval of an Infection Control Coordinator position which was filled. The person filling that position has no training in infection control and insufficient experience based on the job requirements. This person will be learning on the job and will have to take coursework to obtain adequate training.

[37] The IDOC has advised the Plaintiffs and Monitor that the COVID-19 pandemic will likely delay implementation of policies and implementation of the EMR. A complete set of policies were due 7/10/20 and only approximately 30% were drafted as of 3/1/20 when the COVID-19 pandemic started. It is extremely unlikely that this item would have been timely completed. We also identified barriers aside from COVID-19 that are likely to delay implementation of the electronic record which is discussed in the Medical Records section of the report.

implementing it but of these 14, 5 positions are vacant.  In the 11/23/19 Implementation Plan IDOC estimated that it would take 12 to 18 months to create and fill the audit team positions and between 12 to 24 months to fill the data team positions.  The Implementation Plan does not address whether IDOC has a plan for filling these positions.  The list of tasks needed to develop and implement an adequate plan cannot be accomplished by the number of available OHS staff not even accounting for their level of experience.  The time to hire staff is so long that the Implementation Plan will not begin with a full team for years into the future.

Of critical concern to the Monitor is the need for active participation of OHS, Departmental leadership, and the Governor's office, in advancing the Implementation Plan.  In particular, discussions with universities regarding collaborations and affiliations involve funding that require higher level participation.  Currently, OHS negotiates as a separate department with individual university programs without the leverage that the Executive Director and the Governor's office can apply.

Specific goals mentioned in the 6/12/20 Implementation Plan need details to inform how implementation will occur. Health care services need to be organized on a medical model.  The revised 6/12/20 Implementation Plan states that the Chief OHS will be the health authority, that all HCUAs will report to this individual, and that all health positions will be under an IDOC umbrella under supervision of the Chief OHS.  However, it offers no strategic plan, policies, or details on how the IDOC will revise the organizational structure.  The current May 2020 table of organization still does not reflect these changes but the proposed table of organization in the 6/18/20 Staffing Plan notes that HCUAs report to the OHS Regional Health Coordinators. Lacking position descriptions for several positions and lacking an Implementation Plan that describes the function of OHS it is difficult for the Monitor to ascertain the responsibilities of these positions.[38]  It should be clear what each position will be responsible for within OHS. Policy and direction from the Executive Director should be clear on the new organizational change.  The Executive Director will need to communicate to Wardens and all IDOC staff and vendors on the changed organizational structure and how it will take effect. The IDOC Executive Director will need to officially announce this major change and give direction to Wardens about their responsibilities with regard to the health program at their facilities. This is a critical component of implementation of this important change.

The IDOC has notified the Monitor and Plaintiffs on 4/15/20 and 5/6/20 that due to the COVID-19 crisis implementation of the electronic medical record will not meet the current deadline. However, the Implementation Plan does not discuss how the electronic record will be implemented including initial and ongoing training, maintenance, and configuration issues.  We will discuss this in the medical records section of this report.

The IDOC fails to address their telemedicine services.  Based on limited facility visits, telemedicine equipment and space will not support an adequate telemedicine program in IDOC. There is no plan to address this.

---

[38] These include the Environmental Services Coordinator, the Program Coordinator for HIV, the Public Services Administrator 8N and the Public Services Administrator 4.  Several positions for which we had no position descriptions were described in the Staffing Analysis including the Health Information Technology Coordinator, the Electronic Health Record Administrator, and the Health Information Analyst.

Based on current practice it appears that equipment, medical structures, and physical space assigned for the health program are the responsibility of the Wardens of each facility. Many of the facilities are old. Two facilities were built in the 19th century and many are over 50 years old. We note that physical plant issues supporting medical services at several facilities are significantly deteriorated or substandard and in need of replacement or rehabilitation.[39] In the 11/23/19 Implementation Plan, IDOC acknowledged that insufficient physical space will be a future issue.[40] The OHS should have responsibility for determining the appropriateness of space and design features of clinical space but the Executive Director is ultimately responsible for the funding and deciding who will be in charge of this effort. There is no one we could determine in the IDOC with the authority to define how physical medical structures should be configured or whether rehabilitation or new construction is necessary. The Implementation Plan asserts that audits will determine whether a facility has adequate space and equipment for clinical care. But the Implementation Plan does not address who is authorized to approve funding when physical structures need replacement or repair; when equipment is in need of replacement; or new equipment needs to be purchased. The Implementation Plan needs to address how defective physical space and equipment will be replaced and where the responsibility for this lies.

The IDOC Implementation Plan briefly mentions utilizing University of Illinois College of Nursing (UICCON) as a joint partner in managing quality improvement. Negotiations for these services are incomplete. The delays, in part, are a result of delays in decision making of the University of Illinois leadership. While this relationship is highly desirable, an agreement is not yet certain. A strategy for how this program will be set up is still lacking and as a result specific details are not yet developed.

We are very encouraged by the commitment of IDOC to assess the healthcare needs of the aged population and to seek assistance in this process from the Illinois Department of Aging. However, housing for this population should be a focal point of that survey. There should be a similar commitment and plan to act on findings to suitably house and care for that population. We agree that the first step of this process is a survey. Details of the survey or how it would be conducted were not presented.

In the Staffing Analysis section above we discussed the lack of detail in the Staffing Analysis and Implementation Plan related to the timetable for hiring and some of the concerns of the Monitor related to audit and data teams. The 6/12/20 Implementation Plan needs to clarify its proposal for audits.[41] We do agree with the IDOC that the Staffing Analysis may need to be

---

[39] The entire medical clinic including the infirmary at Lincoln need replacement. The infirmary and housing for disabled and elderly at Dixon needs replacement. There are a lack of clinical examination rooms at Logan and Lincoln. We have been to only a limited number of facilities and suspect these needs are significant.

[40] The IDOC stated on page 6 of the 11/23/19 Implementation Plan, "Another unique challenge to staffing a healthcare unit in a correctional setting is limited space. As our healthcare staff continues to grow, the size of the physical healthcare unit remains the same. IDOC will need to be innovative to ensure that each facility has sufficient treatment space and that each provider has appropriate work space. In an already demanding work environment, lack of space can be an added strain on our staff".

[41] On page two of the Implementation Plan the IDOC states that "the IDOC hopes to create an auditing program to conduct yearly audits of every facility". Later on page 4 of the same document it states, "The [audit] team will be

modified in the future.

The IDOC intends to strengthen academic relationships without providing an overall strategic plan for this effort.  No details of specific plans are provided.  This will be discussed below in the section on vendor relationships.

Because we have only recently received the revised Implementation Plan, we will provide additional comments to IDOC in the future.  Based on the Implementation Plan submitted 6/12/20, much work needs to be done.

## Vendor Relationships

Vendor relationships are an essential component of the IDOC implementation plan.  The IDOC employs approximately 35% of health care staff who are largely nurses.  The HCUAs and OHS personnel are also all IDOC employees.  With those exceptions, almost all other employees are contract employees.

The IDOC has multiple vendor relationships but these relationships are not coordinated in a unified statewide strategic plan.  It is, therefore, not clear how the IDOC intends to provide health services now or going forward.  Because there is no strategic plan, the IDOC appears to initiate vendor relationships not based on strategic statewide planning but on opportunistic availability.  The result is haphazard program development, often passive, that is resulting in parallel program management which is chaotic.

The IDOC is developing piecemeal relationships with SIU and UIC and has an ongoing relationship with Wexford.  New agreements fail to consider existing vendor arrangements which continue despite any new agreement with a university program.  However, to the best of our knowledge there has been no involvement of the IDOC Executive Director in approving or creating a five or ten year plan for the IDOC medical program.  Because there is no executive leadership support on this issue, program changes occur based on the OHS leadership ability to negotiate piecemeal agreements with university based departmental programs who themselves are unable to authorize a relationship.  In these piecemeal negotiations, OHS leadership and lower level university leadership are not authorized to make the agreements that are discussed.  For this reason higher level governance must be included in development of IDOC's strategic plan.  The Governor's office would be extremely helpful in this regard.

The role of Wexford is unclear in the IDOC Implementation Plan.  Wexford provides approximately 65% of healthcare staff, contracts with pharmacy, radiology, outside hospitals, and provides supplies.  Their 2011 contract requires Wexford to oversee medical services and to provide medical direction to health care staff.  Wexford has not accomplished this responsibility. In the new draft policy on the Responsible Health Authority, the Chief OHS is the responsible physician and medical authority for the medical program.  This is a positive change.  Because the IDOC does not have a strategic plan on how the medical program will operate, clinical authority

---

responsible for auditing each facility on a biennial basis".   These two statements are contradictory.  It isn't clear if every facility will be audited every year or every two years.

remains uncertain at the level of the facilities. This is complicated since multiple facilities either have no Medical Director, an unqualified Medical Director, or have a Traveling Medical Director who is a fill-in doctor. These arrangements leave many facilities without clinical leadership except for the Chief OHS.

The IDOC intends to strengthen academic relationships but does not have a strategic plan for how to do this. The UIC College of Medicine provides hepatitis C and HIV care for all IDOC inmates via telemedicine. This program has been in place since 2008. Discussions have been initiated for UIC to provide some primary care services to IDOC but these discussions are preliminary and totally dependent on OHS leadership talking to individual program directors at UIC. These discussions involve a small scope and do not appear to have involvement of the IDOC Director, the UIC Deans, or the Governor's office.

The latest university-based agreement was with Southern Illinois University (SIU) College of Medicine to include primary care services. On December 18, 2019 the IDOC signed an agreement with SIU to provide a three phased panel of services including physician and limited support staffing at four facilities, some telemedicine services at these four facilities, policy and procedure development, mortality review and peer review at these four facilities; and provision of an electronic record for the providers at the four facilities.

While we support a relationship with university based programs, their participation should be integrated into an IDOC statewide strategic plan for how IDOC wants to operate its medical program so it is clear how the component contracts fit within an IDOC framework without legal and operational conflicts of responsibility. The current practice of piecemeal contracts with multiple vendors layered on top of an IDOC state workforce creates conflict, is confusing, and includes multiple patient safety risks with respect to care of patients. The Implementation Plan must include a unified strategic plan for how IDOC intends to operate their medical program.

The SIU agreement requires the SIU Correctional Medical Director to collaborate with the IDOC Medical Director to design peer review, quality assurance, and performance evaluation programs.[42] Yet, the contract with UICCON requires UIC to develop a system-wide quality improvement and peer review plan which is essentially the same responsibility as given to SIU for a selected group of facilities.[43]

The IDOC has a contract with KaZee to provide a system-wide electronic medical record called Pearl®. The University of Illinois provides telemedicine services for all HIV and hepatitis C patients. However, the records for all care provided by UIC are maintained in the UIC electronic

---

[42] The wording is that SIU will "Recruit, hire and onboard one (1) board-certified primary care physician as the SIU SOM Correctional Medicine Chief Medical Director, preferably with direct and extensive correctional health care and/or business or clinical management experience, to work jointly with the DOC Chief Medical Officer (CMO) or the CMO's designee to design peer review, quality assurance and performance evaluation programs." Medical Program Agreement Between Illinois Department of Corrections and The Board of trustees of Southern Illinois University, on Behalf of Its School of Medicine SIU # R-10340 signed 12/18/19

[43] Agreement between The Board of Trustees of the University of Illinois and Illinois Department of Corrections RTP #5_UPDATED_UIC Nursing Contract 000001 signed 7/24/18 states, "The College of Nursing will deliver the following:….. A comprehensive IDOC system-wide quality improvement, patient safety, risk management, infection prevention and control, and peer review plan"; page 5 of 7 of contract.

medical record. A paper copy of each episode of care is transmitted to IDOC and placed in the paper record. The SIU contract includes provision of primary care medical care at four facilities. The contract with SIU states that SIU will use their own electronic record and send a paper copy of the episode of care to the facility. However, because of this, IDOC will have three electronic records being used statewide in addition to the IDOC paper record used at sites without an IDOC electronic medical record.

The Wexford contract requires them to oversee medical services and provide medical direction at facilities.[44] Yet SIU's agreement requires SIU, at facilities where Wexford has a contract, to manage and administer health care programming.[45] These contracts create parallel management systems that will only cause conflict and confusion. Who is in charge of clinical services at these sites, SIU or Wexford? These conflicting arrangements are compounded by apparent use of different medical record systems. Wexford apparently will use the Pearl® system whereas SIU will utilize the SIU record system. Both groups will perform primary care without a prearranged separation. This will certainly result in chaos and increases patient safety risk.

The IDOC is required by the Consent Decree to implement a comprehensive set of health care policies that are to be consistent throughout IDOC and cover all aspects of the health care program.[46] Yet, item d of the phase 3 portion of the SIU agreement requires SIU to develop and implement SIU standard operating procedures and to create a committee to conduct clinical mortality review and peer review.[47] It isn't clear how IDOC can have standardized consistent policies and yet have a different set of policies in sites managed by SIU. It also isn't clear whether the SIU policies, mortality review, and peer review process will be different than the IDOC. Because it is likely that Wexford physicians and SIU physicians working at this site will each have participated in the care of persons who die, who will be responsible for the mortality review? What happens if each entity conducts its own mortality reviews that are different?

Having Wexford and SIU Medical Directors co-existing at the same facility can cause competing directions to nurses over clinical issues that are a patient safety risk. Whose clinical decision is final? Because neither contract specifies which patient cohort each entity is responsible for, there is the potential for patient shifting, internal dumping, and loss of continuity. The contract with SIU requires DOC to be responsible for medication administration and executing physician orders, but apparently Wexford is responsible for pharmaceuticals. Is the SIU doctor responsible

---

[44] Contract between Wexford and IDOC signed 5/6/11. The contract states that Wexford is required to "Provide an IDOC Medical Director to: (a) oversee the medical services for correctional centers, (b) provide medical direction to Vendor and IDOC medical staff.

[45] Medical Program Agreement Between Illinois Department of Corrections and The Board of trustees of Southern Illinois University, on Behalf of Its School of Medicine SIU # R-10340 signed 12/18/19. This agreement states for Logan that SIU has responsibility to "Recruit, hire and onboard one (1) physician as On-Site Medical Director, who is a trained and board certified primary care physician……. to manage and administer health care programming".

[46] Item II.B.8 states, "The implementation of this Decree shall also include the development and implementation, with the assistance of the Monitor, of a comprehensive set of health care policies, within eighteen (18) months of the Preliminary Approval Date. These policies shall be consistent throughout IDOC, and cover all aspects of a Health care program".

[47] "Utilizing National Commission of Correction Health Care (NCCHC) Standards, develop and implement SIU Med/DOC standard operating procedures and accountability and responsibility measures for clinical mortality and /or morbidity reviews and create multi-disciplinary medical committee to conduct peer reviews, including but not limited to, DOC morbidity and mortality reviews".

for adherence to the Wexford formulary?  Who do nurses approach for clinical issues on individual patients, the Wexford or SIU physician?  Who is responsible for after-hours care?  If a Wexford physician sees a patient managed by SIU will the Wexford physician have access to the SIU medical record?  The potential for error when two groups of physicians manage patients using different record systems is significant.  If the SIU physicians request specialty care will they have to go through the Wexford collegial process?  Who will see emergency patients?  This arrangement is fraught with multiple conflicts and potential for patient safety risk issues and misunderstandings that can affect patient care and needs to be designed in a meaningful way that ensures patient safety.

The participation of all vendors needs to be integrated into an overall strategic plan of IDOC consistent with requirements of the Consent Decree.  We very strongly recommend a university based primary care program systemwide at all IDOC facilities.

**RECOMMENDATIONS**:

1. The Executive Director with the Chief OHS need to agree on a strategic plan for the design of the IDOC health services.  They may need to discuss this with the Governor's office.  Our recommendation would be to implement a university-based program.  Discussions with the university-based programs need to be conducted at a higher level to ensure that there will be support for this effort.  The Monitor wishes to meet with the Executive Director and the Governor's office to discuss these matters with respect to requirements of the Consent Decree.
2. After a strategic plan is developed and agreed to, IDOC can flesh out details in their Implementation Plan.
3. Additional nurse manager positions proposed in the staffing analysis should be established because closer supervision will be necessary to make the changes in practice required by the Consent Decree.
4. If a relief factor for posts that deliver services seven days a week has not been included in the Staffing Analysis, it should be calculated, and the analysis revised to include it.
5. Continue to refine the Staffing Analysis to consider recommendations from the Monitor to include dedicated positions for infection control, quality improvement, a relief factor, use of the state nursing home standards for infirmary, ADA and other specialized housing of frail and or elderly inmates, and development of workload standards.

# Statewide Internal Monitoring and Quality Improvement

*Addresses item II.B.2; II.B.6.l; II.B.6.o; III.L.1;*
**II.B.2.**  *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care.  This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*
**II.B.6.l.**  *IDOC agrees to implement changes in the following areas: Effective quality assurance*

34

*review;*

**II.B.6.o.** *IDOC agrees to implement changes in the following areas: Training on patient safety;*
**III.L.1.** *Pursuant to the existing contract between IDOC and the University of Illinois Chicago (UIC) College of Nursing, within fifteen (15) months of the Preliminary Approval Date [April 2020], UIC will advise IDOC on implementation of a comprehensive medical and dental Quality Improvement Program for all IDOC facilities, which program shall be implemented with input from the Monitor.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**
The initial November 23, 2019 IDOC Implementation Plan lacked a comprehensive strategy for how the quality improvement program will be implemented to ensure compliance with the Consent Decree, The revised Implementation Plan[48] voices strong support for the enhancement of the IDOC Quality Improvement program and requires IDOC to hire additional key positions including an audit team, a data team, quality improvement consultants, and process improvement staff. It does not address development of an infrastructure or culture of quality in each facility statewide. The IDOC had a contract with University of Illinois Chicago College of Nursing (UICCON) to evaluate the IDOC quality program and to propose a comprehensive quality improvement program. The Consent Decree requires that UICCON was to perform their analysis and proposal with input from the Monitor. But when UICCON submitted their quality improvement plan[49] in September 2019, the Monitor had not yet met with or had input into the plan. The IDOC Implementation Plan stated the quality program would be enhanced by fulfilling three Consent Decree obligations including an audit function, review of non-residency trained physicians, and development of performance and outcome measures. Aside from mentioning these functions, there was no detail on what these functions would consist of or how they would fit into the IDOC program. Several other requirements of the Consent Decree, however, were not addressed in the Implementation Plan specifically patient safety and an adverse event reporting system. The UICCON initial proposal was not comprehensive enough to satisfy all requirements of the Consent Decree and neither the IDOC Implementation Plan nor the UICCON proposal explained how the quality program would be implemented. The Monitor was unable to obtain a meeting to provide input to UICCON until 1/15/20.

At that 1/15/20 meeting, the Monitor recommended to UICCON that in addition to training and consultative support, that UICCON assist IDOC in direct provision of several of the essential functions related to quality that are required in the Consent Decree. These include auditing IDOC facilities for quality which would include mortality review, developing performance and outcome measures, developing a patient safety program, and developing an adverse event reporting system. UICCON had experience with these functions within the UIC health system. That experience and capacity was absent within IDOC. The Monitor's team also discussed with UIC the possibility of UIC assisting in managing data acquisition from the electronic record for the quality program. The UICCON affiliation with the UIC College of Engineering would have considerable value with respect to data management that was not available within IDOC.

---

[48] June 12, 2020 revised Implementation Plan
[49] Quality Improvement and Patient Safety Plan for the Illinois Department of Corrections Office of Health Services, University of Illinois College of Nursing September 2019.

Current data sources that IDOC uses for their quality program and to demonstrate compliance are manually derived, extremely difficult to obtain, and subject to errors that impede progress towards compliance. Both UICCON staff and the representative from the UIC College of Engineering were excited about the potential project but needed approval from University Deans to proceed.

Inability to hire competent and highly trained professionals is a deterrent in establishing an effective quality improvement program. In their initial Implementation Plan, IDOC asserted their difficulty in hiring new employees stating it would take approximately two years to hire a new employee. Both the initial and revised Implementation Plans stated that it would take an estimated 12 to 24 months to fill the data personnel involved in the quality improvement program. If audit and data positions do not now exist in IDOC, a new position description may be required. New position descriptions need to be approved by the Illinois Department of Central Management Services (CMS) which would delay hiring. Delays due to obtaining a new position description from CMS as well as the onboarding delays typical in IDOC are in the IDOC's own words, "a deterrent for some healthcare professionals."[50] This would be especially true for competent highly trained professionals who would be unwilling to wait an extended period of time to start a new position when so many other opportunities are available. An arrangement with a university-based program would accelerate the hiring process and lend a university name to the project which would enlarge the scope of applicants and enhance the capacity to hire. Difficulties in hiring combined with the difficulty in identifying and finding persons with the expertise required in this project will significantly delay implementation of the Consent Decree and risk hiring staff unqualified for the position. UICCON was very well positioned to assist in all of these functions.

The IDOC has added a statewide Quality Improvement Coordinator position to lead the statewide quality improvement program. This position initially was a combined Quality Improvement/Infection Control Coordinator position but the Monitor recommended separate positions for Infection Control and Quality Improvement. The IDOC agreed to separate these two positions. In their Staffing Analysis[51], the IDOC describes the functions of the Quality Improvement Coordinator as implementing a system-wide quality improvement program, directing functions of the audit teams, monitoring compliance with standards, promoting a culture of safety and collaboration with the health information team to collect and analyze data for quality studies. A nurse was hired to fill the combined Infection Control/Quality Improvement Coordinator position. During the COVID-19 crisis in May of 2020, the IDOC hired an Infection Control Coordinator on an emergency basis thereby hiring separate employees for these two positions. The nurse hired for the initial combined position became the Quality Improvement Coordinator. The initial combined position had a job description combining both Infection Control and Quality Improvement; separate job descriptions are not yet finalized. The position description[52] for the combined position defines the Quality Improvement position essential function as "the statewide Quality Improvement Healthcare Training Program

---

[50] Page 6 of the Illinois Department of Corrections Implementation Plan Lippert Consent Decree
[51] Staffing Analysis Illinois Department of Corrections Office of Health Services; Lippert Consent Decree 11/23/19. Details of the Quality Improvement Coordinator is found on page 6 of the document.
[52] Illinois Department of Central Management Services Position Description, Infection Control/Quality Improvement Healthcare Training Program Coordinator effective 5/1/20

Coordinator". The position description does not require that the person hired have any quality improvement training or experience.[53] Indeed, the person hired for this position has no training or experience in quality improvement but is engaged in obtaining training through the Institute for Healthcare Improvement (IHI). We would also recommend six-sigma green belt training and course work with IHI including both quality improvement and patient safety. Though this person has no prior experience in quality improvement certification from IHI sufficient for a senior quality leader, obtaining a green belt in six sigma and working with UICCON quality teams may be sufficient. The position description is also not synchronized with the goals of IDOC with respect to quality improvement[54] or with duties that will be required of this position.

We recommend that the statewide quality improvement coordinator position description include the following:

- Conduct quarterly OHS quality council meetings and help formulate the statewide quality plan and to monitor progress of facilities statewide;
- Share results of audits with facility staff and ensure that the opportunities for improvement that are identified on the audits result in corrective action plans integrated into the facility quality improvement programs;
- Standardize statewide performance and outcome measures, quality improvement reporting formats, data definitions of metrics used for quality, and reporting formats so that facility performance is able to be compared and judged across facilities statewide;
- Oversee performance and outcome measures by facility which would optimally be displayed on an accessible statewide dashboard;
- Oversee the adverse event monitoring system and assist facilities in identifying opportunities to improve based on that system and integrate corrective action plans into the facility quality programs
- Through audits, performance measures, and other data sources identify systemic factors impairing quality and work with OHS to develop systemic program changes to ameliorate those deficiencies.
- Coordinate physician and nurse work on mortality reviews, obtain mortality review results and ensure facilities have developed corrective action plans to address opportunities for improvement.
- Review quality work of facilities giving feedback to ensure that they are addressing opportunities for improvement and that their annual quality plans are adequate.
- Ensure that professional practice review of physicians, dentists, and nurses is taking place. Ensure that vendor leadership discuss actionable peer reviews for all clinical staff with appropriate OHS leadership and that the actionable items are addressed.

---

[53] The position description states as requirements, "Requires licensure as a Registered Nurse in the State of Illinois. Requires knowledge, skill and mental development equivalent to completion of four years college. Requires three years of progressively responsible professional nursing experience. Requires extensive knowledge of professional nursing theory and practices and of recent developments in the field of nursing. Requires knowledge of pharmacology of commonly prescribed medicines and drugs and their therapeutic and possible adverse reactions. Requires thorough knowledge of methods and techniques utilized in developing educational program. Requires valid, appropriate driver's license and the ability to drive".

[54] These are found on page 6 of the Staffing Analysis

In their quality improvement plan,[55] UICCON described on multiple occasions the need for accurate and reliable data as a prerequisite for effective quality improvement.[56] The Monitor has also noted the lack of standardized data with respect to verification information provided to the Monitor and consultants for monitoring compliance with the Consent Decree. Most data obtained in IDOC is manually derived from record review and reentered onto spreadsheets or Word documents. This is tedious, cumbersome and fails to take advantage of computerized technology. Also, quality improvement studies are significantly impaired because of a lack of data sources. Because quality studies at facilities are performed by clinical staff who manually abstract data from medical records, obtaining data becomes a task that takes time from their clinical duties. For that reason, we seldom find data is effectively used in facility studies. With the advent of the electronic medical record, there is an opportunity for IDOC to capture and analyze data in a manner that will facilitate quality improvement work and progress toward compliance with the Consent Decree. In order to do this, we recommended to IDOC to hire persons with expertise in querying an electronic medical record database to obtain data necessary for quality work and for verifying items of the Consent Decree. These resources must be dedicated to the OHS.

In their initial and updated Implementation Plan, the IDOC describes their plan to create a branch of OHS dedicated to information technology.[57] In their Staffing Analysis, the IDOC stated their goals of implementing standardized processes to obtain system-wide information to improve care; promoting data-driven decision making; and extracting and utilizing data from the electronic health record.[58] The monitor team has promoted these goals in discussions with IDOC. For this purpose IDOC included one administrative position, one data analyst position, and one support person for the electronic medical record. The two positions dedicated to managing data are significantly insufficient for the stated purpose. Our recommendation to IDOC is that a data team would require six positions[59]. The IDOC will be installing an electronic record statewide. With 30 correctional centers plus an additional seven camps statewide, two positions will be inadequate as data requests will be coming from 37 facilities. We note that we have not considered the needs related to the Rasho litigation. Invariably, the mental health program will see the value of data for their reports as well and the positions we deem necessary for the medical program will begin to be used for both mental health and medical creating insufficient staffing. We strongly advise that additional positions be added to the six medical data positions for the purpose of data management for the mental health program. We discuss this further in the Medical Records section of this report.

**RECOMMENDATIONS**:

1. Contract with UIC or another equally qualified university-based entity to provide management assistance with the quality improvement program to include:

---

[55] Quality Improvement and Patient Safety Plan for the Illinois Department of Corrections Office of Health Services, University of Illinois College of Nursing September 2019
[56] There are 224 references to data in this document. Many of these describe current failures to capture accurate data and the need to have data to analyze for effective quality work.
[57] Page 8 of Implementation Plan
[58] Page 5 of Staffing Analysis
[59] This included a process change leader, a process analyst, and four data analyst.

    a. assistance in development of an audit instrument;
    b. hiring of audit teams;
    c. auditing facilities on an annual basis;
    d. provide personnel for a data team to extract data from the electronic medical record for purposes of validating performance;
    e. provide IT staff to assist in maintaining the electronic record and in training staff on an ongoing basis[60];
    f. provide expert system engineering consultation in augmenting quality improvement efforts;
    g. develop and maintain through its data team a performance and outcome dashboard;
    h. develop and implement a standardized adverse event system statewide; and
    i. consultation and training expertise to facilities on how to perform quality improvement.

2. Revise the position description of the statewide Quality Improvement Coordinator.
3. Revise the Implementation Plan and Staffing Plan to address the requirements of the Consent Decree with respect to quality improvement taking into consideration the need for statewide efforts.
4. The current statewide Quality Improvement Coordinator and facility quality improvement coordinators should undergo Institute for Healthcare Improvement Open School training on quality improvement capability and patient safety and undergo six sigma green belt training sufficient for a senior level quality leader.
5. Incorporate additional audit team, data team, quality improvement consultants, and process improvement staff into the Staffing Analysis and the OHS table of organization.

## Audits

***Addresses item II.B.9***

**II.B.9.** *The implementation of this Agreement shall also include the design, with the assistance of the Monitor, of an audit function for IDOC's quality assurance program which provides for independent review of all facilities' quality assurance programs, either by the Office of Health Services or by another disinterested auditor.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

The Consent Decree requires that IDOC implement an audit function which provides an independent review of all facilities. In its initial Implementation Plan, the IDOC planned to create two audit teams each comprised of a provider[61] and a nurse. The revised June 12, 2020 Implementation Plan only recommends a single audit team with a physician, a PA or NP, and 1-2 nurses. There was no description of what the audits instrument would consist of or what the audit process would consist of. The IDOC stated that the audit team would support OHS with mortality review. The staff numbers in both plans for this function are inadequate given the scope of audits. There are approximately 100 deaths a year. Mortality review alone could

---

[60] See the Medical Records section of this report for an explanation of these positions.
[61] Either a physician or an advanced practice provider

occupy most of one full time provider and nurse positions. There are 30 facilities. To expect a comprehensive audit of 30 facilities with reports and completion of 100 mortality reviews is unrealistic.

In our discussions with OHS, the monitor team advised that the audit teams should evaluate individual facility compliance with the Consent Decree based on an instrument developed in conjunction with the Monitor. We proposed that every facility be audited once a year and that in order to effectively do that and to report its findings to the quality committee there would need to be two teams. We recommend that audit teams consist of a team leader, a physician, an advanced practice nurse or physician assistant and two nurses and a part time dental consultant. Each team of 5.5 positions would conduct comprehensive audits of facilities and provide a report. Each team would perform slightly over an audit a month with a report. The reports would include opportunities for improvement. These opportunities for improvement would be given to the facility by the statewide quality improvement coordinator who would ensure that the facility took appropriate corrective action through their quality improvement team. Also, the audit team would perform mortality reviews that would inform OHS regarding actionable physician events and would identify opportunities for improvement that would be referred through the quality improvement coordinator to the facility quality improvement teams with follow up to ensure that corrective actions were being implemented. The audit teams would also follow up on recommendations for corrective action to assess whether the site had made sufficient effort to improve areas of deficiency. If the audit team is insufficiently staffed or if the audit instrument is not comprehensive, the audits will fail to internally monitor efforts to comply with the Consent Decree. If the audit teams are adequately staffed and if the audit instrument is comprehensive, audit results will inform the Monitor and IDOC on its progress, reduce the burden of Monitor audits, and expedite compliance with the Consent Decree.

Work on the audit instrument has not yet begun. While the Monitor has recommended contracting with UICCON to perform this function, the status is uncertain. We have learned that UICCON may not have support of senior UIC officials to engage in this activity. However, we believe that there have been no substantive executive leadership discussions regarding this issue and we believe further discussion by leadership members should occur.

**RECOMMENDATIONS:**
1. IDOC needs to develop and implement an audit function. Based on difficulties in hiring, our strong recommendation is to provide this service through a university-based arrangement.
2. The audit team should consist of a team leader, a physician, a nurse practitioner or physician assistant, and two nurses with a part time dental consultant.
3. Audits should result in a report that lists opportunities for improvement that are addressed through the quality improvement process. Follow up should occur until a problem is satisfactorily resolved.
4. The audit team should conduct mortality review which will be discussed in the mortality review section of this report.
5. The IDOC staffing plan and the OHS table of organization should be revised to include audit, data, medical record support, and quality consultant teams.

## Performance and Outcome Measure Results
*Addresses items II.B.7*
**II.B.7.** *The implementation of this Decree shall include the development and full implementation of a set of health care performance and outcome measures. Defendants and any vendor(s) employed by Defendants shall compile data to facilitate these measurements.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
Performance and outcome measures have not yet been designed, developed or implemented. Our recommendation is that these measures should be standardized so that facilities can be compared and so that one can be certain about what is reported. In order to standardize, the data should be obtained from the electronic record based on a standard data definitions. This work should be centralized so that facility resources are not utilized to manually count data. A dashboard for the entire state should be maintained centrally and be based on standardized data from the laboratory, electronic health record, and other standardized electronic formats. The electronic medical record permits electronic data acquisition but requires staff to perform this task. For this reason, the Monitor recommended that the UIC College of Engineering through the IDOC contract with UICCON develop a data team as described in the Statewide Internal Monitoring and Quality Improvement section above.

The dashboard should include at a minimum:
- Scheduling and show rate effectiveness,
- Timeliness of access,
- Immunization status and rates of immunization,
- Tracking of required items of the Consent Decree,
- Outcome measures for certain conditions (e.g. hemoglobin A1c for diabetes),
- Screening rates for various conditions,
- Medication administration effectiveness and timeliness,
- Staffing and vacancies,
- Tracking and appropriate placement of high risk individuals,
- Preventable hospitalization,

October to December 2019 QI minutes from ten sites[62] reported actions taken to address individual patients whose chronic illnesses were judged to be in "poor control". The action plans were very general and there was no follow-up tracking of individual patient outcomes at subsequent QI meetings. These attempts are very rudimentary but are initial steps in the right direction for the IDOC QI program, but significantly more is required. Aside from asserting intent to use performance and outcome measures, the IDOC has not advanced on this item of the Consent Decree.

**RECOMMENDATIONS**:

---

[62] BMR, Danville, Illinois River, Jacksonville, Lincoln, Logan, Pinckneyville, Pontiac, Taylorville, Western

1. IDOC needs to develop and implement performance and outcome measures. This system should be centralized and based on obtaining data automatically from the electronic record, laboratory, and other sources. Measures should be presented on an electronic dashboard that can be viewed at any workstation in any facility statewide. Based on difficulties in hiring, our strong recommendation is to provide this service through a university-based arrangement.

## Adverse Event and Incident Reporting Systems

*Addresses Items II.B.6.m; II.B.6.n*

**II.B.6.m.** *IDOC agrees to implement changes in the following areas: Preventable adverse event reporting;*

**II.B.6.n.** *IDOC agrees to implement changes in the following areas: Action taken on reported errors (including near misses);*

**OVERALL COMPLIANCE RATING**: Noncompliance

**FINDINGS:**

An adverse event and incident reporting system is a system of reporting errors or critical incidents with an aim of learning from the error and thereby making the system safer for the patient.[63] It is critical that staff feel that reporting errors will not result in discipline and feel that the process of reporting errors results in system improvement and not personal blame. For this reason, anonymous reporting must be an option in such a system.

IDOC has not yet designed or implemented an adverse event reporting system. The only adverse event and incident reporting data in the facility QI minutes are medication errors in which the corrective action is primarily directed at individual nurses or techs and may discourage self-reporting. However, these errors are not reported in a system-wide adverse event reporting system that can aggregate data. There is no expertise in the IDOC to design or create such a program. For that reason, we strongly recommend that UIC be utilized for this purpose.

Third party vendors do offer adverse medical event reporting software. This software is often slanted towards hospital systems. It is possible to design and maintain a homegrown reporting system, although this would require data support. Providing this function on a manual basis would not be effective or sustainable.

This system should be centralized and standardized and linked to the quality improvement efforts. Definitions should be standardized so that an adverse event is not defined differently at each facility. The system should also be centralized so that persistent system-wide occurring adverse events can be identified and corrected. An adverse event reporting system should be managed electronically over a secured internally shared network. There needs to be training on how to use an adverse event reporting system. Also, staff have to be encouraged to use it. To ensure that events will be reported, the ability to report anonymously must be guaranteed. The

---

[63] Adverse event reporting has been well described in the Institute of Medicine's To Err Is Human, Building a Safer Health System

adverse events reported should result in quality analysis to determine if there are systemic causes of error and corrective actions should result from the analysis. These systems need continuous monitoring by both individual facilities and statewide quality teams.

**RECOMMENDATIONS:**

1. IDOC needs to develop an adverse event and incident reporting system. This system should be electronic and centralized. Based on difficulties in hiring, our strong recommendation is to provide this service through a university-based arrangement. IDOC can consider third party software for this purpose.
2. Adverse event reporting needs to have capacity to allow anonymous reports. Staff need to be encouraged to reports errors and believe that report of errors will not result in discipline.
3. Adverse event reporting needs to be supported and maintained by the OHS. Data from this reporting system must be integrated into the quality program.

## Vendor Monitoring

***Addresses II.B.2.***

**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**OVERALL COMPLIANCE RATING**: Noncompliance

**FINDINGS:**

The IDOC has provided limited data[64] or information related to any vendor monitoring. The data provided is not sufficient to evaluate IDOC's monitoring of the vendor. The lack of data includes monitoring of vendor quality issues as well as provider clinical quality, peer reviews[65], monitoring of problematic physicians, action plans, or monitoring of other clinical staff.

The Monitor views this item as linked to comprehensive audits as described in the section on Audits above. Auditing, if comprehensive, monitors all clinical aspects of care and can include staffing vacancies. Because monitoring needs to be an independent view of a vendor, Wexford should not be permitted to perform monitoring.

**RECOMMENDATIONS**:

1. IDOC needs to develop a meaningful vendor monitoring system that monitors quality of care, physician quality, and ability to hire contracted staff against contract requirements. This can be joined with the audit process. Monitoring should be standardized across facilities so comparisons can be made. Based on difficulties in hiring within IDOC, our

---

[64] Some facility quality improvement meeting minutes contain information on vendor staff position vacancies, contracted versus actual hours of service, waiting times for select services, turn-around-time for collegial referral requests. A separate staff vacancy report was provided.
[65] Dentist peer review was performed in 2019

strong recommendation is to provide this service through a university-based arrangement.

## Mortality Review

***Addresses items II.B.6.i; III.M.2;***

**II.B.6.i.** *IDOC agrees to implement changes in the following areas: Morbidity and mortality review with action plans and follow-through;*

**III.M.2.** *Mortality reviews shall identify and refer deficiencies to appropriate IDOC staff, including those involved in the Quality Assurance audit function. If deficiencies are identified, corrective action will be taken. Corrective action will be subject to regular Quality Assurance review.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
IDOC provided a list of deaths for 2019 and 2020. In 2019 there were 96 deaths. The IDOC inmate death list should include whether an autopsy was done and the date of autopsy but it does not. We strongly recommend that an autopsy be performed on all deaths and a cause of death based on the autopsy should be provided for all patients. At the time of the writing of this report, the Monitor team was provided only nine (9%) autopsy reports for the 96 deaths. Seventy one (74%) of 96 deaths on the list provided to us listed a cause of death. All deaths need to include a cause of death. Most deaths lacking a cause of death occurred after October 2019 but one was in June and one in July of 2019. Death certificates should be obtained. IDOC only sent us 17 (18%) of 96 death certificates.

The three IDOC Regional Coordinators who are nurses perform mortality reviews. It is very useful for Regional Coordinators to participate in review of care in the facilities they supervise but having the Regional Coordinators perform these reviews may be more than they can handle. Also, nurses should not draw conclusions about physician care because it is beyond the scope of their license. They should review nursing care and evaluate systemic process issues. Yet the Regional Coordinator role places them in positions of a supervising physician, which is inappropriate for their professional license and training. Because there is no oversight or supervision over physician care nurses have filled the void.

We have recommended that audit teams perform the mortality reviews for facilities that each team covers. We have recommended two audit teams each with five full time equivalent members and one part time member[66]. This permits both nursing and physician clinical care to be appropriately reviewed by an appropriately licensed professional. IDOC in its recently received Implementation Plan has proposed one team with 3-4 members. A single audit team will not be capable of completing audits on all 30 facilities each year and mortality reviews on the approximate 100 deaths. Mortality review needs to involve a physician as well as a nurse. Doctors should review the work of physicians and advanced practice providers and nurses should

---

[66] This would include a physician, an advanced practice nurse or physician assistant, two nurses, and a lead auditor, along with a part time dental auditor. The lead auditor can be a nurse or administrative employee who would be responsible for collating and producing all reports and organizing the team.

review the work of nurses.  Nurses should not review the work of physicians as is now occurring.

The IDOC has provided the Monitor with reviews on 57 (59%) of 96 deaths.  The Monitor team was only able to review 17 of these mortality reviews.  Forty mortality reviews were sent to us on 5/29/20, just after we had completed this section of the report.  We will review the 40 additional mortality reviews in a subsequent report.  None of the mortality review documents were signed so it wasn't possible to determine who performed the review but were told that nurse Regional Coordinators completed the reviews.  The participants of the mortality review should sign the document and indicate all participants of the review.

The mortality reviews consist of three documents.  One document is titled the IDOC Mortality Summary Sheet.  A second document is the Inmate Mortality Report Check List.  A third document is the Taxonomy for Mortality Reviews.  These three documents contain some redundant information, some useful information, and some information that should be changed or eliminated.  Also, additional information should be added.   These three documents should be combined into a single mortality review document instead of having three separate documents.

The IDOC Mortality Summary Sheet provides demographic and clinical history of the patient.  Comments on this sheet include the following.

1.  The age should be placed next to the date of birth.
2.  The time of death should be added next to the date of death.
3.  After the type of death it should be added whether the death was expected or unexpected which is a major factor in mortality review.
4.  The risk factors and history columns should be eliminated as it gives only a limited selection of potential conditions.  Instead, the reviewer should enter all current mental health diagnoses under a heading of Mental Health Diagnoses; all current medical diagnoses under a heading of Medical Diagnoses, and then give a list of all current medications the patient was on under a heading of Current Medications.  The medical and mental health diagnoses should not be in a check box format as there are more medical conditions than could ever be represented by check boxes.  Generally the list of problems should be taken from the problem list and medications from the last current medication administration record or pharmacy list.  If the problem list is not up to date, record review may be necessary to determine the medical problem list.  Problems which are unrecognized or not stated on the problem list should be listed with a comment that they were unrecognized.  Any significant risk factors can be included in the narrative case summary.   A physician should determine the medical diagnoses of the patient.
5.  Whether the death was due to a pre-existing condition is related to the question #3 above and can be eliminated.
6.  We see no purpose to the question about whether the cause of death was due to a condition that developed after admission to IDOC.  We would eliminate this question but are uncertain whether IDOC has a specific purpose in mind for this question.
7.  We also see no purpose to the question about whether the inmate had been receiving treatment for "the medical condition" on admission to the correctional facility as that is what is being evaluated on the review.

45

8. There are three data entry questions all asking the same question: whether the death was accidental, intoxication, suicide or homicide. This question only needs to be asked once.

The second form used by the Regional Coordinators is called the Mortality Report Check List. This is a case summary. All of the demographic information on the top of this form is redundant and can be eliminated if this form is combined with the Summary Sheet form. This should be a second section of the mortality review and should be titled Case Summary. When nurses complete the case summary related to physician care they are unable to make a professional assessment of the physician's care. For this reason, there should be separate reviews of nursing care and provider care. Narrative summaries should go as far back as is necessary related to the cause of death. For example, when an inmate dies of colon cancer, it may be necessary to go back one to two years to determine if colon cancer screening had occurred. Whenever a patient has a mental health condition, a mental health professional should participate in the mortality review and conduct a review of the mental health care of the patient. They should participate in the mortality review.

The third form is the Taxonomy for Mortality Reviews. This form should also be combined with the two previous forms. This form appears to be taken from the California Department of Corrections and Rehabilitation (CDCR) mortality review process that was used by the First Court Expert when reviewing deaths. The taxonomy list is modified by IDOC. This taxonomy list was initially instituted in California while under Receivership. One of its purposes was to eliminate unqualified physicians in a system that was similar to IDOC and had poorly trained physicians. However, using mortality review for that purpose has drawbacks. A punitive approach focuses on assignment of personal responsibility. All of the IDOC categories in their taxonomy list are personal failures to perform. This focus on personal failures has a chilling effect on meaningful participation in quality improvement efforts and discourages staff from participating in remedial quality improvement efforts. While IDOC has a significant credentialing problem resulting in some physicians not having training or experience the solution is effective physician supervision and peer review when necessary. If mortality review is used for the purpose of peer review it will adversely affect quality improvement efforts. In this regard, there is currently no effective peer review program. Nor is there any physician supervision that we can identify. This is a serious problem which needs to be addressed. However, the mortality review process should not become a replacement for peer review and physician supervision.

Since 2017 CDCR stopped using this taxonomy system and we suggest that IDOC do likewise. A pre-determined taxonomy list focusing on personal failure should be replaced by identification of opportunities for improvement that includes any identified clinical practice, systemic process, or other event that may have or could result in harm to the patient. The list of taxonomy items should not be predetermined and listed on the form. The mortality review should result in physician and nurse mortality reviewers meeting and drawing conclusions from their work that result in a list of opportunities for improvement.

The reviewers will identify problems as they appear. At times root cause analysis may be necessary to identify root causes of problems. These opportunities for improvement should be

46

treasured as a way to improve care.  Careful and thoughtful assessment is necessary and training may be necessary for reviewers to identify systemic issues.  When physician reviewers or nurse reviewers identify problems that require peer review they can refer those specific cases to medical or nursing leadership in OHS for appropriate referral for peer review and credentialing modification if indicated.

We recommend that the audit team discuss findings first with the Regional Coordinators to clarify any operational issues at particular facilities that may affect current practice.  The reviewers may also call or otherwise communicate with facility staff to clarify any issue.  A completed report should include a listing of all opportunities for improvement.  After completion of the report, the audit team would refer results to the statewide quality improvement coordinator.  The results should be discussed at a central office morbidity and mortality meeting which can be an offshoot of the quality council meetings.  At this meeting all mortality reviews can be discussed, including recommendations for opportunities for improvement and any needed referrals for peer review or sanction.   OHS leadership can decide when root cause analysis is necessary for a particular problem or when a repetitive problem evidenced on multiple mortality reviews is a statewide systemic issue that requires further investigation or action.

After these discussions the statewide quality coordinator should present findings of the mortality review to facility leadership at their quality meetings.  These discussions should be educational so that facility staff appreciate that based on identification of opportunities for improvement positive changes can be made.  If any corrective actions are necessary, the facility is challenged with the responsibility of studying the problem and identifying solutions and reporting back to the OHS when they have data to show results of their corrective actions.    It is useful to allow facility staff to complete an anonymous mortality review shortly after the death.  Staff may wish to share information that may be a patient safety concern and should have an opportunity to do so.  Participants in identifying patient safety concerns and in assisting in improvement efforts related to identified opportunities for improvement should be commended.

The Wexford physician at the facility where the deaths occurred completes a death summary. For the 96 deaths we were provided 60 (63%) Wexford death summaries.  These summaries only gave a brief announcement of the death with a few brief details but no analysis.  These death summaries are not a substitute for a mortality review.  Typically, summaries were filled out by a physician responsible for care at the facility.  No problems were looked for or identified.

The table below summarizes information received from IDOC deaths.

| Information Provided to Monitor on Deaths | | | | | | | |
|---|---|---|---|---|---|---|---|
| Deaths | Cause of Death Listed | Autopsy Done | Death Certificate Present | IDOC Mortality Summary | IDOC Taxonomy Mortality Review | IDOC Mortality Report Checklist | Wexford Death Summary |
| 96 | 71 | 9 | 17 | 17 | 17 | 16 | 60 |

Only 17 Regional Coordinator mortality reviews had been provided to the Monitor team at the time of the finalization of this report.  In nine of the 17 reviews Regional Coordinators identified

47

problems. We reviewed corresponding quality improvement meeting minutes but could identify no remedial actions taken as a result of identified problems. Although at the Pinkneyville facility, in the two deaths at their facility, they stated that recommendations were made but these recommendations were not documented so it couldn't be determined what action was taken. A summary of Regional Coordinator's identified problems are as follows.

A nurse reviewer documented that a patient[67] from Centralia had weight loss that was not addressed for two months and noted that timelier gastroenterology referral may have been indicated. The quality improvement meeting minutes had no discussion about the case. The Wexford physician summary did not identify any problems

A nurse reviewer documented that another patient[68] from Graham did not have an evaluation by a physician after a code 3 episode of seizures and that the patient should have been sent out sooner than occurred. The quality improvement meeting minutes at Graham list the death as occurring in June but failed to include any discussion. The quality improvement minutes indicated that an autopsy was pending. There was no discussion of the problem identified at subsequent quality improvement minutes.

Another patient[69] died of end-stage AIDS never having been treated for the condition. The Regional Coordinator's review indicated that the patient entered IDOC at NRC in 2017 and apparently refused testing for HIV. Two years later the patient collapsed in his housing unit. He saw a nurse practitioner after sustaining a laceration during his fall. The nurse practitioner tested the patient for HIV and it was positive. Subsequent evaluation with a physician documented that the patient refused treatment. The Wexford mortality summary documented that the patient insisted that he didn't have HIV. The patient had another episode of falling and was ultimately admitted to the infirmary for dehydration and failure to thrive. He was hospitalized and died. The patient did see a UIC HIV physician after the diagnosis. The UIC HIV physician noted that the patient was a very poor historian and that although he denied a mental health history he recommended evaluation for this. This did not appear to occur. The Regional Coordinator documented that there was failure to document a proper discussion with the patient about refusal and the risks of refusing care. We would have evaluated the reception screening record as well. NRC does not perform opt-out HIV testing even though it is their policy. As a result many persons at NRC are not tested for HIV who should be tested. This was not evaluated. We could find no evidence in quality improvement meeting minutes that the identified problem was discussed.

In another patient[70] the Wexford summary reported that a code 3 was called because the patient was having difficulty moving. The doctor noted that after evaluation in the health care unit the patient was transported to a hospital but the patient expired on route in the ambulance. The cause of death was acute myocardial infarction. No problems were identified in the Wexford summary. The Regional Coordinator documented that the patient had elevated glucose and lipids which were identified as early as 2017 but not addressed. The Regional Coordinator also was

---

[67] Patient #1 mortality review
[68] Patient #2 mortality review
[69] Patient #3 mortality review
[70] Patient #4 mortality review

critical of not obtaining vital signs at the site of the code 3. This case was mentioned in the quality improvement minutes stating, "this case and recommendations have been thoroughly discussed with staff". The systemic issue(s) should have been identified and corrected. In this case it is not clear what was communicated to staff, what problem was identified, and what corrective action was taken all of which should have been clearly stated.

In another patient[71] the Regional Coordinator documented that an officer called a nurse who was passing medication to assess an inmate who was drooling and unresponsive. The nurse continued to complete her other duties checking on inmates in crisis cells before attending to the unresponsive patient. When the nurse returned to evaluate the inmate, cardiopulmonary resuscitation was in progress. The quality improvement minutes list the death but included no discussion of the case.

In another patient[72] the Regional Coordinator noted that the patient had prior diagnoses of hypertension, high blood lipids and diabetes for which he was treated. While at a local county jail the patient apparently refused medication. When the patient arrived at Graham the patient was not placed in any chronic illness clinics. Blood pressure was checked and an A1C was ordered but lipid tests were not ordered. Nor was any treatment initiated. About five months after arrival in IDOC the patient expired with a cause of death listed as atherosclerotic heart disease. The autopsy showed a coronary artery occlusion with a plaque consistent with a myocardial infarction. The Regional Coordinator documented that the patient should have been followed in chronic clinics and noted that the emergency response was problematic but the comment was "patient should not have been moved" and it wasn't clear what this meant. We could not find evidence in quality improvement meeting minutes that the case was discussed.

Another patient[73] had a heart attack and was transferred to a local hospital and returned to Menard about a week later. The patient was sent directly back to his housing unit and was not housed on the infirmary. Two days after return from the hospital the patient experienced chest pain. An electrocardiogram was performed that showed acute myocardial infarction. Yet the on call physician sent the patient back to his housing unit. Two days later the patient was brought back to the health care unit again for chest pain and another electrocardiogram showed acute myocardial infarction and the patient was sent to a hospital. The patient had a cardiac stent and returned to the facility. After return to the facility on 5/22/19 the patient was again sent immediately back to his housing unit with a five day follow up. The Regional Coordinator noted that it could not be determined what happened after that. On 7/14/19 the patient died. The Regional Coordinator identified that there was failure to notice a red flag sign, that the patient was sent back to his housing unit despite having an electrocardiogram indicating an acute myocardial infarction, that there was failure to address this abnormal test result, and that the patient should have been sent to the emergency room earlier than occurred. These were all accurate assessments. Yet the quality improvement meeting minutes did not address any of these problems. These issues should have been referred to peer review but based on information we have received there was no physician oversight over this problem and peer review has not occurred.

---

[71] Patient #5 mortality review
[72] Patient #6 mortality review
[73] Patient #7 mortality review

Another patient[74] had a history of hypertension and hepatitis C. The Regional Coordinator identified several problems. The patient had a history of prior myocardial infarction but since being in IDOC had not had an electrocardiogram as a baseline. The Regional Coordinator identified that the patient had chronic obstructive pulmonary disease but had never been seen in a clinic for this problem. The patient had a chest x-ray at one point showing heart failure and a repeat x-ray was recommended but not done. The patient requested to be seen for shortness of breath but was not seen. Eventually a nurse evaluated the patient for his symptoms of shortness of breath and chest pain with diaphoresis and the nurse gave the patient nitroglycerin, aspirin and performed an electrocardiogram but there was no documentation of having spoken with a physician or taking orders for those treatments. The patient autopsy showed enlarged heart, atherosclerosis and pulmonary edema consistent with heart failure. The Regional Coordinator's evaluation would have been improved by a physician review to ascertain whether the record indicated heart failure. The mortality was listed in the quality improvement meeting minutes but there was no discussion of the case; the HCUA was awaiting on a copy of the death certificate. The death was not discussed at subsequent meetings.

In a final Regional Coordinator report, a patient[75] entered IDOC in August 2018 and was transferred to Pinkneyville where he was paroled. Upon leaving the facility he was immediately re-incarcerated and brought back to Pinkneyville. Shortly after re-incarceration the patient was found without pulse. The patient died. On autopsy the patient had an enlarged heart and significant coronary artery disease with an atheromatous plaque suggestive of myocardial infarction. The Regional Coordinator reviewer identified several problems including that a nurse saw the patient who had elevated blood pressure but did not refer to a physician. The patient was described as having laboratory results that for his age and blood pressure warranted aspirin, statin medication and treatment of his blood pressure which had not apparently been done. The quality improvement meeting minutes listed the death but documented that the cause of death was pending and the "the case and recommendations have been thoroughly discussed with staff". We could not verify what was discussed or what recommendations were made.

All of these Regional Coordinator findings were significant and demonstrate an intention to improve services. However, there was no physician involvement in any of these reviews and there was no follow up in quality improvement. In our opinion, in at least four of these cases, referral for peer review should have been considered. Yet we have not been made aware of any peer reviews. Even in these limited reviews, nurses did identify some systemic issues that should have resulted in greater discussion and determination of why these events occurred. That could have resulted in corrective actions to improve. While we are encouraged by these efforts much work remains to be done. We will review these and other deaths for 2019 and compare these reviews with our evaluation. We are encouraged by the Regional Coordinator's efforts. A properly trained audit team can make this process more effective.

**RECOMMENDATIONS**:

---

[74] Patient #8 mortality review
[75] Patient #9 mortality review

1. Provide all death records to the Monitor as they occur.  These should include two years of all aspects of the paper record. The Monitor and his consultants should all have remote access to the electronic record for every site that implements the electronic record.
2. All deaths should include an autopsy.
3. Provide a tracking log of all deaths at least quarterly.  This log should include name, IDOC #, date of death, age, date of incarceration, facility at time of death, category of death, cause of death, whether the death was expected or unexpected, whether an autopsy was done and the date of the autopsy.  The log should also include whether a mortality review has been completed.
4. A mortality review should be performed for each death by an audit team.  The mortality review needs to include data as described in the sections above.  A case summary performed by both a physician and a nurse should be included that summarized the care of the patient for his illness and the care related to the cause of death.  All identified opportunities of improvement need to be included with a disposition of how these will be addressed.  These should be discussed at a quarterly OHS morbidity and mortality meeting.  Directions to the facility quality improvement programs should be given regarding the findings and solutions to the problems should be identified and worked on until there is improvement.  The facility quality improvement meeting minutes need to document what was discussed regarding each death and mortality review and what corrective actions are being taken.
5. The quality improvement discussion regarding mortality review should be educational with a goal towards improving care.
6. Line staff employees should have an opportunity to provide anonymous information regarding events surrounding a death with an aim toward improving patient safety.  A process for this should be established.
7. The quality improvement coordinator and audit teams should conduct follow up with facility quality programs to monitor actions taken to improve care based on information learned from mortality review.


## Medical Records

***Addresses item II.B.4; III.E.3; III.E.4; III.G.3***

**II.B. 4.** *No later than 120 days after the Effective Date of this Decree, IDOC shall have selected an EMR vendor and executed a contract with this vendor for implementation of EMR at all IDOC facilities.  Implementation of EMR shall be completed no later than 36 months after execution of the EMR contract.*

**III.E.3.**  *IDOC shall abandon "drop-filing".*

**III.E.4.** *The medical records staff shall track receipt of offsite medical providers' reports and ensure they are filed in the correct prisoner's medical records.*

**III.G.3.** *IDOC shall use best efforts to obtain emergency reports from offsite services when a prisoner returns to the parent facility or create a record as to why these reports were not obtained.*

**OVERALL COMPLIANCE RATING:**  Partial Compliance

**FINDINGS:**

IDOC signed a contract with KaZee Inc. on April 12, 2019. The contract was signed prior to the due date of September 6, 2019. The electronic medical record is to be implemented within three years of the executed contract which is set for approximately September, 2022. The IDOC has requested a delay in implementation date due to the COVID crisis.

On February 6, 2020, the Monitor and members of his team met with representatives of KaZee, the OHS and IDOC. The monitors were told that the electronic medical record was installed at the female facilities with the exception of the medication administration record function. There were operational and technical issues that had arisen that were impeding progress and delaying the implementation of the medication administration portion of the record. At the Logan Correctional Center we were told that these operational issues related to changing processes so as to avoid pre-pouring medication and with interface issues between the KaZee software and the laptop devices that would be used to document medication administration. Based on our discussion with KaZee, these issues with the medication administration would likely arise at every facility because each facility had unique operational issues related to medication administration that needed to be addressed before the electronic medication record software could be effectively used. This is a concern and is likely to delay implementation.

Also, wiring and device acquisition and installation responsibilities have been removed from the KaZee contract and was assigned to the Illinois Department of Information Technology (DoIT). A representative of the IDOC IT department advised the Monitors that there were scarce resources to complete wiring for this project. We had two concerns. One concern was the finding that the wiring and device installations were based on old practices and previous staffing levels. Wiring and device needs also did not include an expansion of telemedicine services which are likely to occur. There are significant staff vacancies. We have concern that because the staffing analysis and implementation plan are not yet completed and because a full staff is not yet hired the wiring, device and equipment needs are likely to be greater than is currently projected. This was confirmed when we visited Logan Correctional Center where we were told that the device count did not include potential new employees or new practices that might arise. The IDOC IT representative indicated that any additional needs would need to go through the typical state process of requesting the equipment or service and getting in the queue for that product or service. This is a concern and potential cause for delay or inadequate implementation. Furthermore, if IDOC is planning to hire only a limited number of employees a year, equipment needs will extend out for years such that it will be difficult to ensure compliance until staff are hired.

The monitors visited Logan CC and Lincoln CC in late February, 2019. There were issues related to devices and furnishings for devices at the Logan and Lincoln facilities that are discussed in the equipment and supplies section of this report. We also noted that the electronic record had not been integrated into existing work flows. Equipment for obtaining vital signs, including weight, does not automatically transfer to the electronic record so all vital signs are manually re-entered into the electronic record. This should be integrated automatically. The phlebotomy room where blood and other specimens are processed does not have a label printer. Staff are manually labeling specimens by hand based on a printout of laboratory orders. This

increases the probability of error. PEARL® does have capacity to print specimen labels but this has not been set up. Both of these functions would be tasks that would be accomplished by technicians recommended below in the section on data and technician support for the electronic medical record. We consider these items as part of the implementation process for the electronic medical record.

In April of 2020 we received information on wiring completion status. Wiring was described as "done" at nine facilities. 16 sites were described as 90% done. One facility had not yet started and the remainder of facilities were in various stages of completion. No information has been provided on whether devices and furnishings have been procured.

We were given a device and equipment list for all facilities. Several facilities visited had insufficient examination or clinical space. Given that there is anticipated to be increased staff and that there is need for additional clinical space, we anticipate that the device needs have been underestimated. Given that additional equipment and wiring needs will have to be procured in the existing State procurement process which is not currently efficient, it is anticipated that there will be delays and difficulty with implementation of the electronic record.

An update status report on the implementation of the electronic record from January 28. 2020 had a very tight time frame rolling out[76] the five separate regions each over a three month period. Every roll out would have to proceed according to schedule in order to be completed within the three year deadline. This plan does not include additional time to fix operational issues identified at Logan with respect to the electronic medication administration record. More delays can be anticipated. Training of staff on the Pearl® 8 electronic medical record will not begin until the COVID pandemic has adequately stabilized and devices have been installed. The IDOC has asked for a delay in implementation of this record, which is now likely to be significantly delayed.

The go-live plan includes less than necessary training resources which is likely to impair effective roll out of the electronic record. There are no ongoing training resources after the initial roll out. Internal staff are expected to train other employees. In our opinion, this is not an effective training solution. We have recommended that training and maintenance staff be added to the staffing plan or to have UICCON take on this responsibility in their quality contract.

There are three health information positions in the IDOC Staffing Analysis which we consider inadequate. These three positions include a health information coordinator who will coordinate the health information team; a single health information analyst who will manage data needs for the entire OHS and all 37 facilities; and an electronic health record administrator who will provide support statewide for all IDOC health employees. We believe these are an inadequate number of staff for this responsibility. We have given a recommendation with respect to necessary positions to manage data and the electronic record infrastructure. These include:

- An information technology service manager to coordinate network and device needs with KaZee, DoIT, and IDOC.

---

[76] Rolling out or go-live is the actual activation of the electronic record.

- A hardware support team of two technicians to support hardware, peripherals, network communications and data servers used internally for IDOC quality purposes. This team will also handle "Help Desk" calls forwarded by an application support team.
- Three application, training and support technicians. This team serves as an electronic medical record training team for all new staff and updates for existing staff on a statewide basis. This team would also assist in go-live efforts. They would also provide training needs uncovered in quality assessments.
- Two process analysts to lead the data team and collaborate with the quality programs.
- Four data analysts to work on data need for retrieving data for reporting and quality functions. This team would manage an electronic dashboard. The process analysts would be integrated into the quality program. These latter two positions do not include positions to support the mental health program.

The monitors have not had an opportunity to fully examine the screens of the electronic medical record and will do that once we have remote access to the record. We had concerns with the paper forms used in the current IDOC paper record and will want to ensure that the electronic record does not duplicate the deficiencies of the paper version. We will wait until IDOC provides access to the electronic record to review these electronic forms to ensure their adequacy.

During a prior meeting with KaZee and the OHS we asked for remote access to the electronic medical record but have not heard back regarding this. The monitors will need to be afforded access to the electronic record for record review and so that logistically burdensome and costly photocopying of paper or printing of electronic records can be avoided.

The monitors noted that IDOC sent a report in October 2019 that asserts that 30 facilities reported no drop filing. Two facilities (Pinkneyville and NRC) reported backlogs in filing medical record. NRC reported that there was a significant drop in medical record employees and that they "will continue to stress the importance of no 'drop filing' but NRC in desperate need of medical records staff both vendor and state positions". Examination of randomly selected charts in the Medical Records departments of five[77] IDOC facilities inspected by the monitors in 2019 and 2020 where the paper medical record was still in place uncovered no evidence of "drop filing". The results of the "Medical Records on Intrasystem IDOC Transfers" quality project reported by nine facilities[78] revealed that 12 (13%) of the ninety medical record accompanying transfers to another IDOC facility had some documents that were "drop filed".

**RECOMMENDATIONS:**
1. Base the roll out and device needs on expected numbers of employees and expected workflows and not on current employee numbers or existing workflows.

---

[77] Sheridan CC, Pontiac CC, Robinson CC, Lawrence CC, and Lincoln CC
[78] December IDOC Quality Minutes from Danville, East Moline, Graham, Jacksonville, Lincoln, Pontiac, Shawnee, Taylorville, and Western

2. Provide remote access for the Monitor and his Consultants to the electronic medical record at sites where an electronic medical record exists.
3. Modify the Staffing Analysis and Implementation Plan to include staff to manage and support the electronic medical records and data needs with respect to obtaining data for quality and management purposes.
4. Ensure that point-of-care[79] devices are integrated into the electronic medical record.
5. Ensure that label printing of laboratory requisition and other similar devices are integrated into the electronic medical record as part of the implementation of the record.

# Policies and Procedures
## Medical & Dental

***Addresses item II.B.8; III.K.4; III.K.5***

**II.B.8.** *The implementation of this Decree shall also include the development and implementation, with the assistance of the Monitor, of a comprehensive set of health care policies by July 1, 2020. These policies shall be consistent throughout IDOC, and cover all aspects of a health care program.*

**III.K.4.** *IDOC shall implement policies that require routine disinfection of all dental examination areas.*
**III.K.5.** *IDOC shall implement policies regarding proper radiology hygiene including using a lead apron with thyroid collar, and posting radiological hazard signs in the areas where x-rays are taken.*
.
**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:** The Monitor has received 18 administrative directive drafts covering the following topics: patient safety, discharge planning, periodic examinations, offender infirmary services, emergency services, transfer screening services, receiving screening services, health assessment services, non-emergency health service requests, urgent care services, administrative meetings and reports, access to care, responsible health authority, medical autonomy, quality improvement services, chronic care services, mortality review, and scheduled offsite services. The Monitor's team will review the policies, include comments on those policies and return to the IDOC Medical Coordinator.

Since there will need to be approximately 60 medical policies, IDOC has drafted about a third of necessary medical policies. These drafts are not yet completed. This item was to have been completed on 7/1/20. On 5/6/20 IDOC sent a letter to Plaintiffs and the Monitor stating that completion of policies would be delayed because of COVID-19. Much work remains to be done.

---

[79] Point-of-care devices are small devices that provide a diagnostic test locally and which can be used by nursing staff where care is delivered. These devices include glucometers to test blood glucose, or devices to test blood to determine whether anticoagulation (INR) is sufficient. Electronic vital sign machines are similar to point-of-care devices in so far that they can be connected to the electronic medical record and the testing results can be automatically directed to the appropriate place in the electronic medical record.

The IDOC will need to address how policies will be implemented and disseminated. Dental policies have not yet been started.[80]

**RECOMMENDATIONS:**
1. Re-establish a timeline for completion of the comprehensive medical policies.
2. Complete the process of finishing drafts of policies.
3. Finalize the recommended changes to the policies.
4. Develop a plan to implement and disseminate policies.
5. Start the Dental policies

# Facility Specific Issues

# Facility Staffing

## Budgeted Staffing

***Addresses items II.B.2; II.B.3; III.A.10;***

**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**II.B.3.** *IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff.*

**III.A.10.** *Each IDOC facility shall have registered nurses conducting all sick calls. Until IDOC has achieved substantial compliance with nursing provision of the staffing plan, facilities may use licensed practical nurses in sick call, but only with appropriate supervision.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

Since the first Monitor's report, OHS has provided a staffing analysis[81] that included current position allocations, vacancies, and additional positions recommended for each correctional facility as well as for the Office of Health Services. In addition, OHS provided information on vacancies at each site from January 2019 through November 2019.

**Budgeted Nursing Positions**

Nurses are the largest component staffing the health care program within the IDOC. According to OHS staffing analysis there are 797 nursing staff positions in the IDOC, 28 Directors of Nursing and 15 Nursing Supervisors. The number of non-supervisory nursing positions for all facilities combined is 21 per 1000 population. The treatment facilities, JTC and Elgin have the

---

[80] Dental Care for Offender revised 1/1/2020 was received on 6/15/20 as the 2nd Monitor's Report was being finalized and has not yet been fully evaluated.
[81] Staffing Analysis Illinois Department of Corrections Office of Health Services, Lippert Consent Decree 11/23/2019

richest staffing as expected. Facility staffing varies at the other facilities from a low of 7.2 at Murphysboro to a high of 47.7 at Stateville. The staffing variance among the other facilities cannot be fully explained by custody level or population size. Staffing levels appear to be legacies that have been negotiated among various parties and evolved over time. For example, at Lincoln Correctional Center there are only six budgeted RN positions. This is an insufficient number to provide continuous RN coverage as required by the Consent Decree because there is no relief factor (FTE to provide coverage for days off and leave).

| Actual Non-Supervisory Nursing Staff per 1000 ADP of Prisoners | | | | |
|---|---|---|---|---|
| **FACILITY** | **TYPE** | **POPULATION** | **Budgeted Line FTE** | **Nursing Staff per 1000** |
| **MURPHYSBORO** | MIN | 138 | 1.0 | 7.2 |
| **ROBINSON** | MIN | 1176 | 10.0 | 8.5 |
| **DANVILLE** | MED | 1724 | 17.6 | 10.2 |
| **VANDALIA** | MIN | 1222 | 13.0 | 10.6 |
| **TAYLORVILLE** | MIN | 1067 | 11.4 | 10.7 |
| **LAWRENCE** | MED | 2166 | 24.0 | 11.1 |
| **HILL** | MED/MAX | 1698 | 20.0 | 11.8 |
| **ILLINOIS RIVER** | MED | 1770 | 21.0 | 11.9 |
| **PINCKNEYVILLE** | MED | 2121 | 26.4 | 12.4 |
| **SHAWNEE** | MED | 1682 | 21.0 | 12.5 |
| **CENTRALIA** | MED | 1281 | 16.0 | 12.5 |
| **WESTERN** | MED | 1533 | 22.0 | 14.4 |
| **LINCOLN** | MIN | 1007 | 16.0 | 15.9 |
| **VIENNA** | MIN | 1127 | 18.0 | 16.0 |
| **SOUTHWESTERN** | MIN | 563 | 9.0 | 16.0 |
| **SHERIDAN** | MIN/MED | 1558 | 25.0 | 16.0 |
| **GRAHAM** | MED | 1919 | 31.0 | 16.2 |
| **JACKSONVILLE** | MIN | 1133 | 19.0 | 16.8 |
| **EAST MOLINE** | MIN | 1318 | 23.0 | 17.5 |
| **BIG MUDDY** | MED | 1179 | 24.0 | 20.4 |
| **MENARD** | MAX | 2213 | 51.0 | 23.0 |
| **LOGAN** | MULTI (fem) | 1657 | 40.0 | 24.1 |
| **DECATUR** | MIN (fem) | 549 | 14.0 | 25.5 |
| **DIXON** | MED/MAX | 2051 | 60.0 | 29.3 |
| **KEWANEE** | MULTI | 274 | 10.0 | 36.5 |
| **PONTIAC** | MAX | 1165 | 49.0 | 42.1 |
| **NRC** | MAX | 1302 | 58.0 | 44.5 |

| Actual Non-Supervisory Nursing Staff per 1000 ADP of Prisoners | | | | |
|---|---|---|---|---|
| **FACILITY** | **TYPE** | **POPULATION** | **Budgeted Line FTE** | **Nursing Staff per 1000** |
| **STATEVILLE** | MAX | 1173 | 56.0 | 47.7 |
| **JTC** | MULTI | 181 | 22.0 | 121.5 |
| **ELGIN** | MULTI (fem) | 27 | 26.0 | 963.0 |

Of all budgeted line positions 55% are registered nurses, a third are licensed practical nurses (includes CMTs) and seven percent are nursing assistants. However, the skill mix at individual facilities varies widely. Facilities with less than 40% of the total number of line positions allocated as registered nurses include Lawrence, Big Muddy, Western, Lincoln, Pinckneyville, Illinois River, Shawnee, and Hill. All but one, are medium custody facilities. Facilities with high concentrations of registered nurses are all minimums with the exception of JTC.

| Skill Mix | | | | | |
|---|---|---|---|---|---|
| **FACILITY** | **TYPE** | **POPULATION** | **RN** | **LPN/CMT** | **CNA** |
| **LAWRENCE** | MED | 2166 | 29% | 71% | 0% |
| **BIG MUDDY** | MED | 1179 | 33% | 67% | 0% |
| **WESTERN** | MED | 1533 | 36% | 55% | 9% |
| **LINCOLN** | MIN | 1007 | 38% | 63% | 0% |
| **PINCKNEYVILLE** | MED | 2121 | 38% | 62% | 0% |
| **ILLINOIS RIVER** | MED | 1770 | 38% | 57% | 5% |
| **SHAWNEE** | MED | 1682 | 38% | 62% | 0% |
| **HILL** | MED/MAX | 1698 | 40% | 60% | 0% |
| **MENARD** | MAX | 2213 | 49% | 51% | 0% |
| **PONTIAC** | MAX | 1165 | 51% | 37% | 12% |
| **DANVILLE** | MED | 1724 | 51% | 49% | 0% |
| **NRC** | MAX | 1302 | 52% | 38% | 10% |
| **STATEVILLE** | MAX | 1173 | 52% | 38% | 11% |
| **ELGIN** | MULTI (fem) | 27 | 54% | 12% | 35% |
| **LOGAN** | MULTI (fem) | 1657 | 55% | 45% | 0% |
| **EAST MOLINE** | MIN | 1318 | 57% | 26% | 17% |
| **KEWANEE** | MULTI | 274 | 60% | 40% | 0% |
| **GRAHAM** | MED | 1919 | 61% | 19% | 19% |
| **CENTRALIA** | MED | 1281 | 63% | 38% | 0% |
| **DIXON** | MED/MAX | 2051 | 73% | 17% | 10% |
| **SHERIDAN** | MIN/MED | 1558 | 76% | 0% | 24% |
| **JACKSONVILLE** | MIN | 1133 | 79% | 21% | 0% |
| **DECATUR** | MIN (fem) | 549 | 86% | 14% | 0% |
| **VIENNA** | MIN | 1127 | 89% | 11% | 0% |
| **JTC** | MULTI | 181 | 100% | 0% | 0% |
| **MURPHYSBORO** | MIN | 138 | 100% | 0% | 0% |

| Skill Mix | | | | | |
|---|---|---|---|---|---|
| **FACILITY** | **TYPE** | **POPULATION** | **RN** | **LPN/CMT** | **CNA** |
| **ROBINSON** | MIN | 1176 | 100% | 0% | 0% |
| **SOUTHWESTERN** | MIN | 563 | 100% | 0% | 0% |
| **TAYLORVILLE** | MIN | 1067 | 100% | 0% | 0% |
| **VANDALIA** | MIN | 1222 | 100% | 0% | 0% |

We recommend implementing performance and health outcome measures to compare with staff mix and staffing levels. Examples include preventable emergencies, patient falls, acquired infection and so forth.

Budgeted positions listed in the IDOC staffing analysis as state funded were obtained from the Governor's Office of Management and Budget. The contract positions were obtained from the Vendor's Schedule E effective May 2019. However, the Director of Nursing and Regional Health Services Coordinators questioned the accuracy of some of the budgeted positions. For example, the staffing analysis indicates Graham does not have a Director of Nursing position, but we were told that such a position exits. When we visited Logan, we verified the budgeted positions were 22 RNs and 18 LPNs. In addition, five nursing assistants are employed but not listed among budgeted positions. At Lincoln actual staffing matched the number of budgeted positions. We recommend a reconciliation of budgeted and actual positions in the IDOC staffing analysis.

High vacancy rates were identified as a problem in the 2018 Court Expert Report[82]. High vacancy rates continue to be a significant problem at IDOC facilities. The Monitor was provided vacancy data on nursing positions for the months January thru November 2019.  Twenty-three percent of RN and LPN positions were vacant in November 2019. More specifically 43% of all LPN positions were vacant and 14% of the RN positions were vacant. Vacancy rates were lower in January 2019 (RN 9%, LPN 38%, Total Nursing Vacancy Rate = 19%).

The five facilities with the highest vacancy rates (over 20% most months) are Illinois River (reports 50% vacancy rate for nursing positions in October and November, 7 months at 40% vacancy), Hill (8 months greater than 30%), Danville (vacancy rate greater than 30% for 7 of 11 months reported and over 40% in October and November), Shawnee (greater than 20% 8 of 11 months) and Western (greater than 30% 9 of 11 months reported). Notably these are also the medium custody facilities with the lowest budgeted staffing.

Vacancies and turnover of nursing personnel are linked to patient care quality and outcome. Facilities with the highest vacancy rates and most turnover should be carefully monitored to prevent patient harm. We recommend data on the number of nursing personnel by type be tabulated to include the number of positions, the number vacant currently, the number who left employment each calendar year, the number leaving voluntarily each calendar year and the number of positions filled currently.

---

[82] Statewide Summary Report Including Review of Statewide Leadership and Overview of Major Services, Report of the 2nd Court Appointed Expert (October 2018) pages 28-30

When the Monitor visited Logan on February 25-26, 2020, 11 of the 22 RN positions were vacant (50%) and six of 18 LPN positions (33%). High numbers of vacancies require use of overtime to staff essential posts; if there are no volunteers, on duty staff are mandated to work overtime. We reviewed assignment sheets while at Logan and found frequent use of mandatory workers to fill vacant nursing posts. For example 50% of the night shift posts and 21% of the evening shift posts were filled with mandatory workers the week of February 10-16. Vacant RN positions also cause delays in sick call at Logan. As noted in the 2018 Court Expert report reliance on overtime contributes to staff fatigue, increased errors, staff dissatisfaction and turnover as well as higher incidence of poor patient outcomes.[83]

We are not aware of any focused recruitment plan to address vacancies. Traditional nursing positions which are vacant should be reconsidered in light of work that can be performed by other types of personnel. For example, there is no need for nursing staff to conduct Safety and Sanitation Rounds and yet this is a nursing assignment at virtually all IDOC facilities. The Illinois Nursing Workforce Center forecasts ageing out of both the RN and LPN workforce as well as increased demand for community based health care associated with the aging general population[84]. Therefore, nurses will become more difficult to recruit. Consideration should be given to increased use of clerks, administrative staff, assistants, and technicians to carry out tasks that do not require nursing skill.

See Statewide Staffing Analysis and Implementation Plan for further discussion

**RECOMMENDATIONS:**
1. Identify performance and health outcome measures to compare with staff mix and staffing levels to identify desirable staffing ratios and patterns.
2. Reconcile budgeted and actual positions in the IDOC staffing analysis.
3. Establish a database that includes the number of nursing positions by type, the number vacant currently, the number who left employment each calendar year, the number leaving voluntarily each calendar year and the number of positions filled currently.
4. The number of mandatory overtime assignments should be reported to OHS by each facility monthly.
5. Monitor patient care quality and health outcomes more closely at facilities with the most turnover, highest vacancy rates and largest number of mandatory overtime assignments.
6. Increase employment of clerks, administrative staff, assistants, and technicians to carry out tasks that do not require nursing skill but traditionally have been the responsibility of nursing staff.
7. Establish a recruitment task force with representation from OHS, Wexford, Human Resources, and the Office of Budget and Management with the explicit mission to reduce the vacancy rate to 12%.

---

[83] Institute of Medicine (2004) Keeping Patients Safe: Transforming the Work Environment of Nurses. National Academies Press, Washington, D.C., Stanton, M. (2004). Hospital nurse staffing and quality of care. Agency for Healthcare Research and Quality. Research in Action, Issue 14.
[84] Licensed Practical Nurse 2019 Workforce Survey Report (December 11, 2019) and Registered Nurse 2018 Workforce Survey Report (February 13, 2019) Illinois Nursing Workforce Center accessed at http://nursing.illinois.gov/ResearchData.asp

## IDOC Staffing

***Addresses items II.B.2; II.B.3;***

**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**II.B.3.** *IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff.*

**OVERALL COMPLIANCE RATING:** Not rated

**FINDINGS:**
See Statewide Staffing Analysis and Implementation Plan

**RECOMMENDATIONS:** None

## Vendor Staffing

***Addresses items II.B.2; II.B.3;***

**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**II.B.3.** *IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff.*

**OVERALL COMPLIANCE RATING:** Not rated

**FINDINGS:**
See Statewide Staffing Analysis and Implementation Plan

**RECOMMENDATIONS:** None

## Credentialing of Physicians

***Addresses items II.B.6.r; III.A.2-7***

**II.B.6.r.** *IDOC agrees to implement changes in the following areas: That Defendants and the vendor shall timely seek to discipline and, if necessary, seek to terminate their respective health care staff that put patients at risk;*

**III.A.2.** *All physicians providing direct care in the IDOC (whether they are facility medical directors or staff physicians) shall possess either an MD or DO degree and be either board certified in internal medicine, family practice, or emergency medicine, or have successfully completed a residency in internal medicine which is approved by the American Board of Internal Medicine or the American Osteopathic Association, or have successfully completed a residency in family medicine which is approved by the American Board of Family Medicine or the*

*American Osteopathic Association, or have successfully completed a residency in emergency medicine which is approved by the American Board of Emergency Medicine.*

**III.A. 3.** *Physicians currently working in IDOC who do not meet these criteria shall be reviewed by the Monitor and the IDOC Medical Director to determine whether the quality of care they actually provide is consistent with a physician who has the above described credentials and who is practicing in a safe and clinically appropriate manner. If the Monitor and the IDOC Medical Director cannot agree as to the clinical appropriateness of a current IDOC physician, IDOC shall not be found non-compliant because of that vacancy for nine (9) months thereafter*

**III.A.4.** *If a current physician's performance is questionable or potentially problematic, and the Monitor and the IDOC Medical Director believe that education could cure these deficiencies, the IDOC will notify the vendor that said physician may not return to service at any IDOC facility until the physician has taken appropriate CME courses and has the consent of the Monitor and the IDOC Medical Director to return.*

**III.A.5.** *Defendants may hire new physicians who do not meet the credentialing criteria, only after demonstrating to the Monitor that they were unable to find qualified physicians despite a professionally reasonable recruitment effort and only after complying with the provisions of paragraph 6, below.*

**III.A.6-7** *Physician candidates who do not meet the credentialing requirements shall be presented to the Monitor by the Department. The Monitor will screen candidates who do not meet the credentialing criteria after a professionally reasonable recruitment effort fails and determine whether they are qualified. The Monitor will not unreasonably withhold approval of the candidates. The Monitor will present qualified candidates to the IDOC for hiring approval. If the IDOC Medical Director has concerns regarding the rejected candidates, he or she will meet and confer with the Monitor in an attempt to reach a resolution. In instances in which the Monitor rejects all viable candidates for a particular vacancy, the Department will not be found noncompliant because of that vacancy at any time during the next twelve (12) months. The credentialing requirements contained in paragraph 2 above do not apply to physicians employed by universities*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

In mid-August 2019, the Monitor gave the IDOC a list of data that should be provided with respect to required IDOC reports.[85] This data was not completely provided as requested. In our request we asked that IDOC provide a list of all physicians with *primary source verification* of training and any board certification along with a number of other data items[86]. The IDOC did not

---

[85] This is related to item V.G of the Consent Decree titled Review and Evaluation of Data and Information which states, "Every six (6) months for the first two (2) years and yearly thereafter, Defendants shall provide the Monitor and Plaintiffs with a detailed report containing data and information sufficient to evaluate Defendants' compliance with the Decree and Defendants' progress towards achieving compliance, with the Parties and Monitor agreeing in advance of the first report on the data and information that must be included in such report. Defendants will not refuse any request by the Monitor for documents or other information reasonably related to the Monitor's review and evaluation of Defendants' compliance with the Decree."

[86] We requested a table of current physicians in a spreadsheet format with physician name, residency completed, date residency completed, board certification, date of board certification, and primary source verification or an AMA profile in lieu of primary source material. We also asked for all peer reviews including any disciplinary peer review or actions taken with respect to privileges. We asked for current assignment(s) list with hours worked at

62

provide primary source verification of residency and board certification.[87] The IDOC provided a physician roster report[88] and later provided AMA reports for all but one physician. The physician roster report is a vendor self-report without primary source verification so some credentials are not verified except by the word of the vendor. The vendor self-report table lists 16 physicians as having once achieved board certification in a primary care field however only 9 have documentation that their certifications are active, 5 have documentation that their certifications have expired, and 2 are listed as currently board certified but there is no documentation to verify this status. Fifteen of 16 physicians listed as board certified physicians have verification of completion of primary care residencies in the AMA Profile or by documentation from their training sites[89]. One physician is listed as board certified but we were not provided documentation to verify either board certification or completion of a primary care residency. Seven physicians had evidence of completion of residencies in Family Medicine or Internal Medicine but were never board certified. Eleven physicians had not completed an adult primary care residency. In total 23 (68%) of the 34 physicians have completed primary care residencies and 11 (32%) either had done a year of flexible internship or had been trained in a non-primary field and are without credentials satisfactory with respect to the Consent Decree.

We were also provided with AMA profiles for 33 of 34 physicians. Evaluation of these documents requires considerable work to determine credentials. We note that the AMA profiles were occasionally not in agreement with information on the Wexford roster report. The AMA profile only verifies board specialties of the American Board of Medical Specialties (ABMS) which does not include Osteopathic Boards. For this reason, primary source verification was necessary but was not always made available.

We also note that some AMA profiles were old with one as old as 1993 but most within ten years of age. For this reason, the AMA profiles failed to be useful to verify active Illinois medical licenses or Drug Enforcement Agency (DEA) licenses or active sanctions. The AMA profiles only verified that 13 of 34 doctors had an active Illinois medical license and only three of 34 physicians were verified as having an active DEA license. The spreadsheet maintained by Wexford which was produced as data to verify physician credentials was not accompanied by primary source material. If AMA profiles are to be used, they must be current so that licenses and DEA licenses can be verified. If an AMA profile does not verify residency or board certification, primary source material must be provided. Primary source verification material is our preferred option. When primary source verification is used, verification of an active license and DEA license is necessary.

---

[87] Instead the IDOC provided a PDF table of current physicians that provides the site the physician works at but no hours worked, board certification ever obtained, the board expiration date for most physicians, a certification description, "board eligible residency", affirmation whether the doctor required an Educational Commission for Foreign Medical Graduates (ECFMG), the physicians correctional medical experience, any other experience of the physician and a column titled Training. This table is incomplete for many physicians. Primary source information was not provided. Peer review material was not provided.

each site of assignment. We asked also for communication regarding all new physicians without credential requirements of the Consent Decree with their application packet as reviewed by IDOC.

[88] Lippert IDOC Physicians Roster 3.10.20 final submitted to the Monitor by IDOC

[89] One physician had a 1994 American Osteopathic Board of Family Physicians certificate but the AMA Profile notes only a one year flexible internship followed by a 2 year Occupational Medicine residency which is not a primary care residency.

| Licenses and DEA Licenses Verified for 34 Doctors | |
|---|---|
| Illinois Medical License Verified | 13 |
| DEA License Verified | 3 |

The IDOC has not provided data on work assignments, hours of work at each assignment, or monitoring reports of physicians with or without appropriate credentials.  Work assignments and hours of work at each assignment are important due to the use of traveling medical directors and shifting of staff between facilities.  These musical chairs arrangements make it difficult to track where physicians without credentials are working and thus it is difficult to impossible to evaluate their work.  Also, it is necessary to know what coverage each facility has so that we can evaluate whether the coverage is adequate.

Based on a request for disciplinary and peer review information for physicians, we received three documents.[90]  None of these documents involves an adequate review of physician quality.  None of the documents demonstrates that problematic physicians are being monitored for quality of care or for issues involving their license.  None of the documents is useful to verify that IDOC is compliant with items III.A.3 or II.B.6.r of the Consent Decree which requires IDOC to verify that physicians without credentials are practicing in a safe and clinically appropriate manner and to timely seek discipline and if necessary seek to terminate health care staff that put patients at risk.

As examples, on the Wexford disciplinary report only two physicians are listed and their only infraction is unspecified policy violations resulting in written discipline.  However, based on prior record reviews and other available information, we have recommended to discuss with OHS that three physicians, at a minimum, not be allowed to practice in IDOC in accordance with items III.A.3 and II.B.6.r of the Consent Decree.  All three physicians have no primary care training.   None of these three physicians is mentioned on the Wexford discipline report for any clinical sanction or monitoring.  One of the three physicians is listed on the merit review document as being a high performer and without any discipline record or mention of monitoring despite being on probation by the Illinois Department of Financial and Professional Regulation (IDFPR) for a significant clinical practice issue that resulted in harm to a patient.  A second physician we are recommending not practice in IDOC has no performance grade on the Wexford Salary Compensation Calibration Worksheet and is not listed as having any performance or discipline issues despite having provided care that placed multiple patients at risk.  The third physician we are recommending not practice in IDOC, has no disciplinary record.  He has a high rating on his compensation review and is credited with being very productive, willing to work additional hours, aware of job requirements, responsible and mindful of expenditures as his evaluation.  We identified this physician as failing to identify, on multiple occasions, acute

---

[90] A 2018 and a 2019 Wexford Salary Compensation Calibration Worksheet, and a Wexford Physician and PA/NP Employees Disciplined between 1/1/2018 to 5/29/20

64

coronary syndrome on electrocardiograms, failure to properly manage new onset atrial fibrillation and failure to properly treat or immediately refer a patient with ongoing angina and new onset atrial fibrillation to a hospital which may have contributed to the patient's death.

In part due to the COVID-19 pandemic crisis we have not asked for many medical records. As a result, we have not been able to evaluate the 32% of physicians who we are required to review with the IDOC Medical Director with respect to whether they are practicing in a safe and clinically appropriate manner.

The Monitor has not been provided the information requested when new physicians are hired. The Monitor has also not been informed of those physicians with disciplinary actions

Finally, we note that publicly available information from the Illinois Department of Financial and Professional Regulation (IDFPR) describes prior disciplinary actions for nine current Wexford physicians with three of these nine physicians under current disciplinary actions (probation). Some of these nine infractions are not serious disciplinary infractions but some are serious. The three on probation would typically be monitored with respect to the reason for probation. We have not received notification of probation from the IDOC and have not received any monitoring reports that may be associated with these physicians. There is no documentation that OHS is informed about existing providers or applicants who have previous disciplinary action and there is no evidence that providers on probation by IDFPR are currently being monitored.

The Monitor is pleased to report that all four physicians hired in 2019 and 2020 have completed residencies in Internal Medicine or Family Medicine. Board certification and/or completion of a primary care residency must continue to an absolute prerequisite for employment as a physician in an IDOC facility.

**RECOMMENDATIONS**:

1. IDOC needs to provide the following information to us three months prior to the due date of each upcoming Monitor report.
    a. A table of current physicians in a spreadsheet format with physician name, internship or residency completed, date internship or residency completed, board certification, date of board certification, current status of board certification, primary source verification for these credentials, and an AMA profile.
    b. When the AMA profile does not support the credential because their credential is with an Osteopathic Board primary source information must be provided.
    c. All peer reviews including any disciplinary peer review or actions taken with respect to privileges.
    d. Professional performance evaluations for all physicians, nurse practitioners, and physician assistants.
    e. Current assignment(s) list of all physicians with hours worked at each site of assignment averaged for a prior 6 month period.
    f. Notification when a new physician is hired with credentials of the physician as provided to IDOC.

       g.  Any monitoring being provided for any physician, nurse practitioner, physician assistant.

2. We have notified IDOC of three physicians without credentials who are not practicing in a safe and clinically appropriate manner and whose practice should not continue in IDOC. OHS will need to meet with us to discuss these individuals.
3. When AMA profiles are being used to verify credentials, the AMA profile should be current.
4. Current license information and DEA license information needs to be provided.
5. Any sanctions on a license and a report detailing the plan for monitoring should be reported to both OHS and the Monitor

## Oversight over Medical, Dental, and Nursing Staff

*Addresses II.B.6.q; II.B.6.r;*

**II.B.6.q.** *IDOC agrees to implement changes in the following areas: Annual assessment of medical, dental, and nursing staff competency and performance;*

**II.B.6.r.** *IDOC agrees to implement changes in the following areas: That Defendants and the vendor shall timely seek to discipline and, if necessary, seek to terminate their respective health care staff that put patients at risk;*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

Wexford uses the Salary Compensation Calibration Worksheet to document clinical evaluation of medical physicians, nurse practitioners, physician assistants, dental hygienists, and dental assistants. This form is not created for a specific clinical position. There is no evidence that the evaluation is a clinical evaluation or that a professional knowledgeable of the scope of practice of the reviewed practitioner completes the evaluation. The forms state "for official use only, not to be shared with employees". Clinical performance evaluations should be shared with employees; otherwise how are employees to know their deficiencies and improve. This evaluation is also referred to as "merit review". The form has columns to detail employee's name, job title, site of assignment, date of hire, weekly hours, discipline in last 12 months, unspecified performance indicators "not met", rating scale "low to high" for key indicators, and a comment column. The name and title of the reviewer was not documented on any of the vendor's Salary Compensation Calibration Worksheets.

In 2019, 28 vendor physicians currently employed in the IDOC, were evaluated using the Salary Compensation Calibration Worksheet. Two additional physicians were not evaluated. There was no evidence that these evaluations included evaluation of clinical care. Some of the comments in the reviews included "cost effective", "mindful of expenditures", "productive", "needs improvement on handwriting", "recommend salary increase", and "high quality of work". Only two had low ratings on the key performance indicators. Only one provider was noted as being under disciplinary action for an unspecified violation. Another physician was counselled three times in 2019 for unspecified issues concerning performance, documentation, and productivity. Another individual was criticized for misuse of time and unwillingness to accept suggestions about budget/supplies, labs, and offsite referrals. There was no documentation that any of the

66

physicians with negative ratings had been referred for peer review. As noted in the credentialing section of this report, a physician on probation by IDFPR for a serious clinical error, was given high marks on his evaluation with his clinical issues not addressed.

In 2019, Wexford evaluated 32 nurse practitioners (NP) and physician assistants (PA) using the Salary Compensation Calibration Worksheet. Most of the PA/NP evaluations were positive and complementary with a few criticisms about attendance, time management, and attitude issues. Four individuals had received disciplinary actions in the previous 12 months; the only violation noted was "attendance and violation of ADs/IDs". There was no documentation that any of the PA/NPs with negative ratings had been referred for peer review. There was no evidence that clinical care was reviewed.

Dentist peer reviews were completed in August-September 2019 with the results reported in the First Court Report. The dentist peer reviews are expected to be performed annually. The Monitor recommended in the First Court Report that dentists with 4 or more citations or clinically significant citations on the peer reviews should have repeat peer reviews within the next six months until deficiencies are corrected. No data was provided to the Monitor that repeat peer reviews had been performed on the 10 dentists with citations on four or more elements of the 2019 peer reviews

The IDOC Staffing Analysis documents that the IDOC has 11 dental positions in the State budget: two dentists, one dental hygienist, and eight dental assistants. Wexford has approximately 77 dental positions in the budget: 29 dentists, 36 dental assistants, and 12 dental hygienists. Wexford and IDOC use different evaluation formats to evaluate their dental employees even though the employees work in the same organization.

IDOC uses two different State of Illinois Individual Development and Evaluation System forms that are separately designed to evaluate State-employed dental assistants and dental hygienists. The employee has a self-evaluation section and the supervisor rates the performance and the self-evaluation as exceeded, met, and not met, writes summary comments, and discusses the evaluation with each dental assistant and dental hygienist.

The only State-employed dental hygienist was evaluated by a HCUA in May, 2020. All performance expectations were met. The HCUA prepared and reviewed the evaluation with the dental hygienist. Given that the reviewer was not a dental professional there was no critique of the employee's clinical skills and the effectiveness of her treatments. In 2019, Wexford evaluated its 16 dental hygienists using the Salary Compensation Calibration Worksheet. Nearly all of the evaluations indicated that key performance indicators were met; the only two criticisms were attitude problem and an expired CPR training. Only one safety and clinical issue (tool control) was noted on a single evaluation. We could not verify who completed the evaluations. No clinical evaluations were evident.

The IDOC and Wexford dental assistants are also separately evaluated using different evaluation formats. IDOC used the State of Illinois Individual Development and Evaluation System form which is specifically designed to address the duties of a dental assistant. Six state-employed dental assistants were evaluated between August, 2019 and April, 2020 and were found to have

met or exceeded work expectations. In 2019, Wexford evaluated 46 dental assistants using a Salary Compensation Calibration Worksheet without sharing results of the evaluation with the employee. The evaluations noted that approximately ¾ of the dental assistants were rated as meeting the unspecified key performance measures; corrective actions were noted for attitude issues, absenteeism, and tardiness. Based on information available on the evaluation forms there was no assessment of clinical skills.

The annual evaluations focus primarily on administrative and business issues including attendance, productivity, cost effectiveness, and staff attitudes. Although these evaluations have some value for the workplace, they do not satisfy Consent Decree requirements to assess clinical staff competence and performance. With the exception of the dentist evaluations, none the annual performance evaluations for both State and vendor clinical staff would qualify as professional performance evaluations or assessments of the quality of the clinical care provided by the dental hygienists, dental assistants, physicians, physician assistants, and nurse practitioners.

The Monitor did not evaluate the implementation of changes to conduct an annual assessment of the competency and performance of nursing staff. No data was provided nor did IDOC assert that it was in compliance with this aspect of the consent decree.

**RECOMMENDATIONS:**
1. Develop and initiate professional performance evaluations that assess the clinical competency and clinical performance of all clinical staff.
2. Standardize evaluation formats so that all practitioners of the same type are evaluated in the same manner.
3. A professional knowledgeable of the scope of practice and capable of evaluating the clinical care of the professional should perform the evaluation.
4. Clinical professional performance evaluations should be shared with the employee who should sign the review after discussion with the reviewer.

# Operations

## Clinical Space

*Addresses item II.B.2 in part; III.B.1; III.C.2; III.F.1;*
**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*
**III.B.1.** *IDOC shall provide sufficient private and confidential sick-call areas in all of its facilities to accommodate medical evaluations and examinations of all Class members, including during intake, subject to extraordinary operational concerns and security needs of IDOC including, but not limited to, a lockdown.*
**III.C.2.** *IDOC shall provide sufficient private and confidential areas in each of its intake facilities for completion of intake medical evaluations in privacy, subject to extraordinary*

68

*operational concerns and security needs of IDOC including, but not limited to, a lockdown.*
**III.F.1.** *Sick call shall be conducted in only those designated clinical areas that provide for privacy and confidentiality, consistent with the extraordinary operational concerns and security needs of IDOC including, but not limited to a lockdown.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
Since the submission of 1st Court Report by the Monitor, site visits were made to Logan CC and Lincoln CC.   Due to the advent of the COVID pandemic scheduled monitor inspections of Danville CC and Decatur CC were cancelled and additional sites visits postponed.

**Logan Correctional Center (Logan CC)**

Logan CC's Health Care Unit (HCU) is well maintained and clean. With the exception of the Intake Reception Unit in Building 19 and the part-time Physical Therapy room in the Building 6, the HCU provides all medical and dental services for the 1,700 women housed on the campus. The HCU contains a medication room, 15 bed infirmary, a telehealth room, a plain film radiology suite, a clinic with 5-6 examination rooms, a 2 chair dental suite and a dental hygienist room, medical records, storage rooms, and clinical leadership and provider offices.   The infirmary and medical reception areas are described in separate sections of this report.  The infirmary is clean, has functional excellent quality hospital beds with moveable sections, an operational nurse call system, and an open nursing station that allows direct observation into the 5 crisis/negative pressure rooms. Logan has recently remodeled the east wing of housing unit 14 into a twelve bed prenatal and postnatal unit with single bed rooms, a comfortable day room with a shared TV, an exercise treadmill, a dining and activity table, and a group meeting room. The Logan leadership should be commended for creating this safe and supportive unit for pregnant and postpartum women.

There are insufficient examination rooms in the Logan HCU to simultaneously accommodate the current clinical staff that includes a physician, obstetrician, three nurse practitioners, a physician assistant, and several nurses who perform nursing sick call, urgent care services, and other ordered tasks.  The significant increase in sick call demand due to the elimination of co-pays will require additional need for nurse sick call sessions in the HCU.  Filling a currently vacant physician position and the additional Nurse Practitioner/Physician Assistant position recommended in the Staffing Analysis will generate added pressure on the existing exam rooms. If Logan is not able to convert existing HCU space into exam rooms or establish properly equipped satellite nurse sick call examination rooms in housing units, the HCU will need to undergo significant renovation and/or expansion.  The HCU's current patient waiting room is already inadequately sized for the Logan population and results in risks to privacy and confidentiality (e.g. vitals signs are taken in the clinic hallway and patients wait their just outside of exam rooms within potential hearing the communications occurring in the occupied exam room)

**Lincoln Correctional Center (Lincoln CC)**

Lincoln CC's HCU is extremely small and cramped. Men in the waiting area can hear discussions taking place in the adjacent exam rooms. There are only two examination rooms in the health unit. One of the examination rooms is a nurse examination room which is about 60 square feet; this is an inadequate space for an examination room[91]. This room is also used for telemedicine consultations, and for phlebotomy and processing laboratory specimens. There are insufficient examination rooms for the two budgeted providers and the nursing staff. There is no dedicated space for nurses to perform duties such as dressing changes, vital signs, or other ordered nursing tasks in addition to sick call. The optometry clinic is also used for the nurse intake screening histories and physicals for all new admissions and transfers to Lincoln CC. The six bed infirmary is not within sight of the nurse station, lacks a nurse call system, and the beds are so closely positioned that infection control spacing standards are likely violated. The patients in the infirmary must intermittently vacate the infirmary because this is the only space in the HCU where contracted technicians can perform ultrasounds and fibroscans. Only one chair can fit in the dental clinic. The only nursing workspace serves as an infirmary nursing station, medication preparation area, charting area, and work area for all clinical staff.

The Lincoln CC nurse workstation is so cramped that it will not be able to accommodate the computer devices needed for the electronic record. This nursing workspace does not allow the nurses enough space to perform their assignments. Staff told us that they repeatedly accidentally switch off their computers when they re-position their feet under the counter. There is inadequate space for the nursing staff as they work side by side with some staff standing. A single phone has a long cord and is passed around the counter depending on who needs to answer the call. This disrupts work. With the addition of nurses in the new staffing plan this arrangement will worsen. The nursing station is an unsafe work environment; an immediate solution should be developed.

Supply space, equipment storage, and medication room in the Lincoln HCU are as well-organized as is possible but the space is so small that nurse efficiency is negatively impacted. The medication room is only 30-40 square feet allowing limited space for the nurse pill line. Patient-inmates walk through the exam room corridor to the pill line window in the heart of the HCU. During medication administration times, there is a long line and the clinic becomes very crowded with men waiting in the hall immediately adjacent to the nurse and telemedicine room and multiple offices which are within hearing range of inmates waiting in line.

A new clinic should be built as the Lincoln CC HCU is beyond rehabilitation. There is currently insufficient space for the number of simultaneous users. The clinical space is too small for the existing staff and there will be even less clinical space when the new staffing plan is implemented. Lincoln's clinical leadership has a plan to convert and repurpose rooms in the HCU to improve the flow and efficiency of the HCU clinical services; their plan requires limited renovation and should be implemented but will, in no way, address all the clinical space deficiencies of the HCU.

---

[91] Typical examination rooms for males are at least 100 square feet. Female examination rooms typically need to be approximately 120 square feet.

The clinical space and physical plant concerns identified at Logan CC and Lincoln CC are not unique to these two facilities. Monitor inspections in 2019 to Sheridan CC, Pontiac CC, Robinson CC, and Lawrence CC also revealed clinical space deficiencies including insufficient exam rooms, cluttered clinical and storage areas, and safety and privacy issues in clinical spaces. Inadequate or poorly maintained clinical spaces in the IDOC create barriers to access to care, interfere with proper sanitation, decrease staff efficiency, and are impediments to the recruitment and retention of qualified clinical staff.

**RECOMMENDATIONS:**

1. Lincoln CC needs a new clinic structure. The current structure is inadequate for medical care.
2. Lincoln CC leadership should continue with their plan to repurpose some offices in the HCU into clinical exam space while advocating for the replacement of the HCU.
3. The IDOC needs to conduct an analysis of physical structures throughout the state to determine whether there are other medical spaces that need to be built, refurbished, or renovated in order not just to meet the provisions in the Consent Decree but to improve access to care, properly sanitize clinical areas, maximize staff efficiency, and enhance staff recruitment and retention.

## Equipment and Supplies

*Addresses item II.B.6.p; III.B.2; III.I.4;*
**II.B.6. p.** *IDOC agrees to implement changes in the following areas: Adequately equipped infirmaries;*
**III.B.2.** *These areas shall be equipped to fully address prisoner medical needs. The equipment shall be inspected regularly and repaired and replaced as necessary. Each area shall include an examination table, and a barrier on the examination table that can be replaced between prisoners. The areas shall provide hand washing or hand sanitizer.*
**III.I.4.** *All infirmaries shall have necessary access to security staff at all times. (See Infirmary Section)*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**
The clinical spaces at Logan CC and Lincoln CC were generally adequately equipped with EKG units, oxygen tanks on wheels or racks, gurneys, wheelchairs, suction units, sharps containers, medication refrigerators, sinks, soap, paper towels, examination tables, and laboratory centrifuges. Spot checks of some of the equipment identified annual safety inspection labels.

There were a number of equipment, sanitation, and furniture issues noted in one or both of the two facilities inspected in 2020. Both facilities had only one functional AED at the time of the sire visits; Logan's backup AED was awaiting the arrival of a replacement battery and pads. Every IDOC facility should at least two AEDs and stock onsite replacement batteries and pads.

71

Both sites failed to seal their emergency response bags; this creates the risk of arriving at a housing unit without the needed clinical supplies or equipment. Sealing emergency bags also minimizes the nursing time dedicated to inspecting and restocking emergency supplies. Lincoln CC was first facility inspected by the Court Expert in 2018 and the Court Monitor in 2019-2020 that stocked naloxone (Narcan) in the emergency bag. Having the capability to administer naloxone anywhere on expansive IDOC correctional centers without having to transport individuals with opioid overdose to a distant HCU will save lives. Lincoln stocks injectable naloxone in its emergency bags; the monitors strongly recommend that nasal spray naloxone which is easier and safer to administer should replace the injectable product.

Torn upholstery was noted on examination tables and furniture in the clinical areas making it impossible to fully sanitize these surfaces. The clinical leadership at both facilities are or will be reaching to Graham CC which has reupholstering training program and can cost effectively repair or replace the torn covering on examination tables and optometry and dental chairs. Not all clinical examination rooms had functional oto-ophthalmoscopes. Both Logan CC and Lincoln CC have telemedicine capacity that is set up solely for videoconferencing. There is no supplementary equipment (dermatology camera, stethoscope, etc.) that would permit use of the equipment for thorough primary and specialty care evaluations. Logan CC uses a wrist blood pressure cuff in the HCU's clinic area; due to concerns about utilization and accuracy this methodology is not recommended and should not be used in the IDOC The Lincoln infirmary does not have an operational nurse call system; the monitors were advised that a nurse call system was being installed in the infirmary.

The infirmary beds at Logan CC were hospital beds in excellent condition; the beds at Lincoln CC were aged, metal frames beds with limited capability to raise head and foot sections. In the First Court Report it was also reported that many of the infirmary beds in the four facilities[92] toured in 2019 were "aged and in disrepair" and lacked safety railings and the ability to raise head and feet sections. The condition of many infirmary beds in the IDOC pose safety risks for the patient-inmates and interfere with the staff's ability to examine, monitor, and provide treatment at the bedside.

**RECOMMENDATIONS:**

1. IDOC must establish a systemwide detailed standard for equipment that must be available and maintained in each of the different clinical service rooms (examination rooms, telemedicine rooms, urgent care, infirmary, detail suites, specialty rooms, etc.) at all correctional centers.
2. IDOC must implement a systemwide ongoing audit of the clinical equipment and incorporate a following replacement plan to ensure that all sites have functional equipment at all times.
3. The IDOC should focus attention on the condition of infirmary beds in all IDOC facilities and replace defective beds with electrically operated hospital beds with safety railings and the ability to adjust the height of the bed and elevate the health and leg sections as

---

[92] Sheridan CC. Pontiac CC, Robinson CC, Lawrence CC

needed.

## Sanitation

*Addresses item III.J.3*

**III.J.3.** *Facility medical staff shall conduct and document safety and sanitation inspections of the medical areas of the facility on a monthly basis.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

As noted in the First Report to the Court, Safety and Sanitation inspections are performed monthly in all IDOC facilities. The monthly reports generated by the correctional centers have been provided to the monitor. The December 2019 Safety and Sanitation Reports for 28 of 29 facilities (NRC's report was not provided) were reviewed in detail.

The December 2019 Safety and Sanitation reports for the 28 facilities identified a number of physical plant deficiencies including:

| Deficiency | # Facilities | (Percent) |
|---|---|---|
| Missing and cracked floor tiles | 18 | (64%) |
| Broken toilets, sinks, showers | 18 | (64%) |
| Standing water | 16 | (57%) |
| Peeling and cracked paint | 16 | (57%) |
| Mold in showers, ceilings, curtains | 15 | (54%) |
| Missing lights including exit lights | 13 | (46%) |
| Crumbling, cracked walls and ceilings | 12 | (43%) |
| Dirty and rusted vents | 10 | (36%) |
| Broken washers and dryers | 8 | (29%) |

All of these structural and environmental deficiencies have the potential to negatively impact on the health of the inmate population and the staff. Many create obvious risks for infectious diseases and render the facilities unable to effectively clean and sanitize living and work areas. Others including cracked floors, standing water, and leaking ceilings pose significant risks for accidental falls and preventable injuries. Nearly half of the facilities reported missing lights including exit lights which pose both security and safety issues. Many of the deficiencies were also noted in the October and November 2019 reports and some for many more previous months. Once identified, there structural and environmental deficiencies must be expeditiously addressed and repaired; failure to do so puts the health and safety of the institutions at risk.

Only two (Pontiac CC and Sheridan CC) of the reports raised concerns about cracked sidewalks and disintegrating concrete stairs; however, during site visits, the monitors identified two other correctional centers (Logan CC and Lawrence CC) in which the sidewalks were in such poor condition that the safety of inmates and staff were jeopardized and/or the ability of the clinical staff to use medication carts was impaired.

73

As previously reported to the Court, the Safety and Sanitation inspections generally focus on physical plant issues in the housing units and kitchens. Eight of December 2019 inspections were void of any comments about the conditions in the health care units. The vast majority (15/20) of the reports that noted deficiencies in the HCU only addressed physical plant and structural issues (missing floor tiles, dirty vents, leaks into walls, peeling paint). Two facilities (Lawrence CC and Pinckneyville CC) have developed and incorporated separate HCU-specific checklists into their Safety and Sanitation inspections that audit nurse call buttons, refrigerator temperatures, negative pressure units, securing of oxygen tanks, availability of Personal Protective Equipment (PPE), expiration of medications, condition of infirmary mattresses, and the condition of staff furniture. These two HCU-specific inspection check lists are different but contain some overlapping audit items. Neither of these specialized audit tools addresses the presence or functionality of clinical equipment (ECG, AED, oto-ophthalmoscopes, suction unit, peak expiratory flow meter, the condition of the exam tables, the use of paper barriers, handwashing capability, and other issues) or the inspection of satellite clinics in the housing units or the condition and equipment in the radiology, physical therapy, dental, and optometry rooms. These two HCU-specific audits should be used as starting points to develop a standardized IDOC-wide HCU/clinical service focused audit tool for use in all correctional centers.

The monitors have visited six correctional centers (Sheridan, Pontiac, Robinson, Lawrence, Logan, and Lincoln) since the signing of the Consent Decree. During these visits, the monitors verified a number of physical plant deficiencies that had been noted in recent Safety and Sanitation reports but also identified other issues that were not documented in the reports including uncovered garbage bins in clinical rooms, non-operational negative pressure units, cracked and uneven sidewalks, the absence of safety grab bars in some toilets and showers, the lack of non-slip strips in the showers, torn examination table upholstery and defective furniture in clinical areas, unsealed emergency bags, crusted sinks in clinical rooms, and non-functional oto-ophthalmoscopes.

**RECOMMENDATIONS:**

1. The Safety and Sanitation inspections do not but should include a more detailed evaluation of the HCU and all other clinical treatment areas that would include the functioning of medical, dental, and radiology equipment, the condition of gurneys, examination tables, chairs, and infirmary beds, the emergency response bags, functionality of the negative pressure rooms, and the sanitation of all clinical spaces.
2. IDOC OHS should develop a standardized systemwide Health Care Unit/clinical space audit instrument that would focus on all the key safety and sanitation issues in all clinical areas. If the existing Safety and Sanitation rounds are unable to incorporate this more detailed review of the clinical spaces and equipment into its schedule, a separate audit focused on the health care areas should be established.
3. The IDOC must expeditiously address the deficiencies noted in Safety and Sanitation reports prioritizing those work orders that have an impact on preventing disease and injury to inmates and staff.

## Onsite Laboratory and Diagnostics

***Addresses item II.B.6.g;***
**II.B.6. g.** *IDOC agrees to implement changes in the following areas: Timely access to diagnostic services and to appropriate specialty care;*

**OVERALL COMPLIANCE RATING:** Partial compliance

**FINDINGS:**
The monitor team solicited information about offsite and onsite diagnostic testing from staff interviews, facility inspections, and review of logs during site visits to 4 facilities in 2019 and 2 facilities in 2020 and reviewing quality meeting minutes from the 3rd and 4th quarters of 2019 and from the 1st quarter of 2020 at the two most recent site inspections.

IDOC contracts with the University of Illinois Medical Center laboratory for all laboratory testing for all correctional centers in the system. A combination of UIC employed phlebotomists, IDOC phlebotomists, and nursing personnel collect and package the specimens for transport to the UIC labs for testing. Staff at all sites voiced satisfaction with the service provided by UIC labs. The turnaround time for lab results was generally within 24 to 48 hours. COVID-19 testing is being performed by both UIC laboratory and Carle Foundation Hospital in Urbana, IL.

Onsite plain film radiology services are provided onsite in established radiology suites part-time at 20 IDOC correctional centers and fulltime at 3 facilities. Due to physical plant limitation, Lincoln CC contracts with a mobile radiology vendor for part-time x-ray coverage. A review of logs in the onsite radiology suite consistently documented an acceptable 2-3 day turnaround time of x-ray reports read by contracted radiologists in the local community. The onsite radiology equipment are all non-digital requiring onsite developing machines and transportation of the films to the offsite radiologists for reading. All non-contrast studies done onsite are directly ordered by the facility's providers without Wexford approval. Conversion to digital radiology units would eliminate the need to develop films onsite and transport hard copy films offsite and would expedite the radiologist reading and reporting time. Panorex radiology units are located in a corridor within the Logan CC radiology suite and in an unleaded intake exam room at Menard CC. There is no leaded shield to protect the radiology techs who must stretch the cord of the trigger mechanism to create distance between the unit and themselves. The Menard tech must pull the cord into the intake main hallway to take the film. There may be risk of radiation exposure to the techs and inadvertent passers-by in these two facilities. IEMA should be contacted to determine if the techs should be monitored for radiation exposure and if any additional safety measures need to be taken at Logan and Menard.

All complex radiology studies including MRI, CT, and echocardiography must be referred to offsite medical centers. Staff reported that waits for non-urgent offsite radiology studies can be lengthy and extra effort is required to obtain these reports. All offsite complex radiology studies must be approved through the collegial review process which can add to the overall wait times.

Non-digital dental x-ray studies are performed in all IDOC facilities with onsite dental services. The electronic dental record has been installed at Logan and Decatur but digital dental x-ray

75

systems have not yet been implemented.

A contracted ultrasonography vendor provides mobile ultrasonography throughout the IDOC on an as needed basis but generally at least 1-2 times per month. The turnaround time for the ultrasound reports was not identified. All onsite contracted ultrasound procedures require the collegial review and approval of Wexford prior to the study being scheduled. This results in delays in accessing this service.

IDOC has a number of onsite testing modalities that are available at all IDOC facilities including electrocardiograms, pulse oximetry, peak expiratory flow rate, finger stick capillary blood glucose, tuberculosis skin testing (TST), Multistix urine testing, and fecal occult blood test. IDOC should immediately replace their tuberculosis screening methodology from TST to a safer, more efficient, and less resource intensive Interferon-Gamma Release Assays (IGRA) based blood testing. Some sites have the capability to do screening hearing tests performed by nursing personnel.

Logan CC and possibly Decatur CC also perform onsite urine pregnancy tests, fetal stress testing, screening fetal ultrasounds, and cervical colposcopy.

**RECOMMENDATIONS:**

1. All onsite ultrasonography testing should be immediately excluded from the collegial review process.
2. IDOC must begin to convert all of its non-digital radiology units to digital equipment.
3. Replace tuberculosis skin testing (TST) with IGRA blood testing which is more accurate, minimizes the risk of accidental needle sticks, and frees up valuable nurse resources.
4. Contact IEMA to evaluate the need for radiation exposure monitoring badges and the implementation of any additional safety measures for the panorex units at Logan CC and Menard CC

## Dietary
***Addresses item II.B.6.j.***
**II.B.6.j.** *IDOC agrees to implement changes in the following areas: Analysis of nutrition and timing of meals for diabetics and other Class members whose serious medical needs warrant doing so;*

**OVERALL COMPLIANCE RATING:** Not yet rated

**FINDINGS:** This provision has not yet been evaluated

**RECOMMENDATIONS:** None

# Facility Implementation of Policies and Procedures
## Medical and Dental
***Addresses item II.B.8.***

**II.B.8.** *The implementation of this Decree shall also include the development and implementation, with the assistance of the Monitor, of a comprehensive set of health care policies by July 1, 2020. These policies shall be consistent throughout IDOC, and cover all aspects of a health care program.*

**OVERALL COMPLIANCE RATING:** Not yet rated

**FINDINGS:**

Policies are still in the process of being written and reviewed; none have yet been approved and implemented. See Systemwide Medical and Dental Policies

**RECOMMENDATIONS:** None

## Intrasystem Transfers

*Addresses item III.D.1; III.D.2*

**III.D.1.** *With the exception of prisoners housed at Reception and Classification Centers, IDOC shall place prisoners with scheduled offsite medical services on a transfer hold until the service is provided, contingent on security concerns or emergent circumstances including, but not limited to, a lockdown. Transfer from Reception and Classification Centers shall not interfere with offsite services previously scheduled by IDOC.*

**III.D.2.** *When a prisoner is transferred from one facility's infirmary to another facility, the receiving facility shall take the prisoner to the HCU where a medical provider will facilitate continuity of care.*

**OVERALL COMPLIANCE:** Partial Compliance

**FINDINGS:**

The monitors have not yet requested or received data for section III. D.1 to verify that transfer holds are being enacted and honored for all patient-inmates with scheduled offsite medical consultations, procedures, tests, or treatments to ensure that they are not transferred to a another IDOC facility prior to the completion of the offsite appointments.

Although section III. D.2 of the Consent Decree specifically addresses the transfer of patient-inmates housed in an infirmary to another IDOC facility, the monitors believe that it is equally important that IDOC maintains processes to ensure continuity of care for all inmates when they are transferred from one IDOC facility to another IDOC facility. Failure to seamlessly transfer the medical record and the medication administration record with inmates being transferred within the IDOC creates a notable risk for the interruption of needed care.

In 2019 the Office of Health Services initiated a quality measure to monitor and track the flow of clinical information for Intra-IDOC transfers. A review of all December 2019 Quality Improvement minutes revealed that eleven facilities[93] reported on the Medical Record of Intra-IDOC Transfers process. The aggregate results of 118 transfers on these eleven reports were:

---

[93] Danville CC, Decatur CC, East Moline CC, Graham CC, Jacksonville CC, Lincoln CC, Logan CC, Pontiac CC, Shawnee CC, Taylorville CC, Western CC

| | | |
|---|---|---|
| Medical Record Received | 116/118 | 98% |
| Drop-filing noted (Decatur/Logan excluded-EMR) | 12/90 | 13% |
| Health Status Transfer Summary (HSTS)[94] Received | 118/118 | 100% |
| Clinical Information on HSTS | 118/118 | 100% |

The monitors reviewed medical records of five inmates who were transferred in January and February 2019 into each of four IDOC correctional centers[95]. The aggregate results for these 20 transfers were:

| | | |
|---|---|---|
| HSTS Received | 20/20 | 100% |
| Diagnoses on HSTS | 20/20 | 100% |
| Medication on HSTS | 19/20 | 95% |
| RN Completed HSTS report | 13/18 | 72% |
| LPN Completed HSTS report | 5/18 | 28% |
| Receiving Facility Note | 20/20 | 100% |
| RN Completed reception note | 14/17 | 82% |
| LPN Completed reception note | 3/17 | 18% |
| MAR received          (3 on no meds) | 17/17 | 100% |
| Note that MAR/MR reviewed by receiving site | 8/20 | 40% |

The HSTSs on four inmates[96] failed to list serious clinical conditions, including diabetes, glaucoma, hyperlipidemia, and psychiatric disorder.  Serious chronic medications, including metformin, fluphenazine (Prolixin), fenofibrate, carbamazepine and timolol, were not listed on the HSTSs of four individuals[97]; some of these omissions were likely identified by the reception nurses as they reviewed the MAR and the medical record.

During site visits to six correctional facilities since the signing of the Consent Decree, the monitors were consistently informed by nursing staff that all transfers into the facility from other IDOC facilities, whether they were in the transferring facility's infirmary or not, are immediately brought to the HCU for medical review prior to being assigned housing.

As with the discharge summary process, the IDOC has implemented a process to monitor and track the success of intra-IDOC transfers being accompanied by a completed HSTS report and the medical record. The concurrent transfer of the MAR should also be monitored.  Initiating this quality improvement project that regular reports to the facility's Quality Improvement Committee will assist with the timely identification and correction of any breakdown in the transferring of clinical information.  This monitoring and tracking will be needed until the electronic health record is fully operational in all IDOC facilities.

**RECOMMENDATIONS:**

---

[94] DOC  0090 Revised 3/2018
[95] Dixon CC, East Moline CC, Shawnee CC, Taylorville CC
[96] Transfer patients #3, #10, #12, #13
[97] Transfer patients #3, #6, #8, #10

1. The IDOC should augment the scope of the Medical Record Transfer study to include the transfer of the MAR and the tracking of the accuracy of the clinical information (diagnoses, medications) that are entered on the Health Status Transfer Summary .

# Medical Reception

***Addresses Items II.A; II.B.1; II.B.6.a; III.C.1***
**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*
**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*
**II.B.6.a** *IDOC agrees to implement changes in the following areas: Initial intake screening, and initial health care assessment;*
**III.C.1.** *IDOC shall provide sufficient nursing staff and clinicians to complete medical evaluations during the intake process within seven (7) business days after a prisoner is admitted to one of IDOC's Reception and Classification Centers.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

There is no statewide written guideline for medical reception. A policy and procedure has been drafted and provided to the Monitor for review. The Monitor has provided written comments on the draft procedure, but it has not been finalized and implemented. There are no metrics or performance measures for medical reception screening, and it is not discussed or reviewed at CQI meetings.

The Monitor toured Logan Correctional Center, which is responsible for medical reception of women prisoners, on February 25-26, 2020. In walking through the intake area and talking with staff it was apparent that the new routine health maintenance, preventive screening, and immunization initiative was being readied for implementation but not yet operational.

The clinical rooms in medical reception were filthy and cluttered. There were mop heads on the floor in the intake screening and dental office to contain leaks from the ceiling tiles, there was no hot water in the dental office and the upholstery on the dental chair torn. In all rooms the vents were filthy, sinks were dirty and stained and there was a large bin of trash with no cover. The room for physical exams was decorated with material that had collected dust and debris and should be removed.

The Monitor recommends that OHS replace tuberculosis skin testing with IGRA blood testing.[98]

---

[98] QuantiFERON®-TB Gold is a commonly used product.

This change would improve the efficacy of TB screening, reduce risk of accidental needle sticks, and reduce the delay clearing, particularly healthy people, through intake processing.

The OHS staffing analysis[99] did not explicitly define the number of nursing and clinical staff sufficient to complete medical evaluations within seven days of admission. The Monitor has provided feedback to OHS on the staffing analysis. We note clinician vacancies at NRC (Medical Director), Logan (nurse practitioner) and Menard (Medical Director, nurse practitioner) and high nursing vacancies at NRC and Logan[100]. We recommend that a staffing standard be established for medical reception that is workload driven. We also recommend that timeliness completing each step in medical reception be monitored and exceptions reported at CQI for analysis and resolution.

The Monitor reviewed five records of intake screening while at Logan CC and found a complete set of vital signs was obtained for four[101], labs initiated and an immunization history documented in all five and the previous medical record was obtained in the one patient it was appropriate to obtain. All five had a history and physical exam completed within seven days by a provider.

The Monitor toured the intake area during the visit to Logan Correctional Center February 25-26, 2020. The physical plant is unchanged since the 2018 2nd Court Expert report and sufficient to maintain privacy and confidentiality[102]. Privacy and confidentiality of space used for clinical encounters in medical reception should be included in safety and sanitation rounds of the health care program.

No information has been provided to evaluate whether all intake data is reviewed, and a list of medical issues compiled for each prisoner. There is no audit tool that provides a measure of performance for this aspect of the Consent Decree.

In the five intake records reviewed at Logan CC the problem list was developed by the provider after review of intake screening and completing the H & P.

No information has been provided to evaluate whether pertinent findings from intake screening are followed up with appropriate care and treatment. There is no audit tool that provides a measure of performance for this aspect of the Consent Decree.

Of the five intake charts reviewed at Logan CC, none had conditions requiring urgent follow up[103]. Two patients with chronic conditions were enrolled in chronic care clinics and had their initial visit within 30 days. In addition, three charts of pregnant women were reviewed; all were seen by an OB/GYN, prescribed prenatal vitamins screened for STI and HIV, and had HBV status established within 30 days of intake. In one record[104] reviewed the patient was sent to the

[99] Staffing Analysis Illinois Department of Corrections Office of Health Services, Lippert Consent Decree 11/23/2019
[100] Lippert Medical Provider Vacancies 11-18-19 and Lippert Nurse Vacancies 11-18-19
[101] Medical Reception Patient # 2 was the exception.
[102] Logan Correctional Center, 2nd Court Appointed Expert Report, Lippert v. Godinez (April 23-26, 2018)
[103] We do note that a separate review of chronic care records identified several problems with three intake assessments including urgent follow up which are described in the Health Assessments section below.
[104] Pregnant Patient # 1

emergency room shortly after intake and there was no progress note upon her return and no record had been obtained from the emergency room and in another[105] there was a three day lapse in receiving buprenorphine (Subutex) after admission.

The limited review of five intake charts by the monitor during the February 2020 site visit to Logan CC indicated that most components of medical reception were being completed. If this report was solely dedicated to Logan CC's intake process an overall rating of partial compliance would have been given. However, as noted in this section, IDOC needs to develop and implement the systemwide infrastructure (policies, performance metrics, quality improvement audits, physical plant improvements, safety and sanitation inspection, etc.) and demonstrate statewide performance consistent with the policy and procedure to achieve initial compliance.

**RECOMMENDATIONS:**

1. Develop metrics to provide information on the timeliness and thoroughness of medical reception (III. C. 1, 3 & 4). Intake facilities should report their performance results to CQI on a regular basis.
2. Privacy and confidentiality of space used for clinical encounters should be included in safety and sanitation rounds of the health care program. These rounds should also account for inoperable or unsafe equipment and condition of the space, infection control risks and uncleanliness.
3. Finalize the policy and procedure on medical reception and implement it.
4. Develop a clinical audit tool that evaluates the appropriateness, quality, and continuity of health care during medical reception as well as compliance with the policy and procedure. Audit medical reception with this tool (s) at least quarterly until performance is better than 90% on each criteria for three successive quarters.
5. Replace tuberculin skin testing with IGRA blood testing to screen for tuberculosis. This is a simple step to prevent needle stick injuries, frees up staff time, eliminates the need for a patient encounter to read skin test results, and does not include a boosting effect.
6. Develop a staffing standard for medical reception that is workload driven.
7. Fill vacant positions at intake facilities.


## Health Assessments

*Addresses items II.A; II.B.6.a; III.C.3; III.C.4*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.6.a** *IDOC agrees to implement changes in the following areas: Initial intake screening, and initial health care assessment;*

**III.C.3.** *IDOC shall ensure that a clinician or a Registered Nurse reviews all intake data and compiles a list of medical issues for each prisoner.*

**III.C.4.** *If medically indicated, IDOC shall ensure follow up on all pertinent findings from the initial intake screening referenced in C.3. for appropriate care and treatment.*

---

[105] Pregnant Patient # 3

**OVERALL COMPLIANCE RATING:** Not yet fully assessed

**FINDINGS:**
Because of the COVID 19 pandemic the Governor has ordered that jails temporarily are forbidden from transferring detainees to the prison system. This has resulted in a diminished output from reception centers based on the transferring of jail inmates to the prison system.

Despite the absence of intakes for the prior three months, the Monitor had access to record reviews done for patients at three Reception and Classification Centers. The first patient[106] had epilepsy identified while incarcerated in 2016. Her epilepsy was due to a history of brain tumor. The patient refused further work up and signed a refusal of care. The patient also had schizophrenia on her problem list, which may have influenced her decision making. She was paroled in May of 2016 and re-incarcerated on 5/23/19. On an initial history and physical examination, the provider identified that the patient had an episode of illness prior to incarceration that resulted in a comatose state and also had pulmonary embolism in February of 2019. The provider did not take an adequate history for either of these conditions. The patient had not taken her epilepsy medication for about six months and was initially started on Warfarin for her pulmonary embolism, but had not taken the medication in about a month. The patient also reported hepatitis C. The provider diagnoses were seizure disorder, brain tumor, and hepatitis C along with the schizophrenia. Aside from restarting the anti-seizure medication, there was no therapeutic plan that included recent pulmonary embolism and the provider did not have a therapeutic plan to address the history of the brain tumor. This patient should have had an urgent request to send previous records along with an evaluation of the pulmonary embolus via a CT angiogram or pulmonary angiogram, or ventilation perfusion scan to determine if the pulmonary embolism was still present. A viral load for hepatitis C should have also been obtained. An urgent referral to mental health was also in order. Therefore, the health assessment was deficient not only in the history being deficient but also in the development of diagnostic and/or therapeutic plans.

A second patient[107] was 31 years old when incarcerated at the Northern Reception Center on 7/23/19. A nurse documented a blood glucose of 448 with a history of diabetes. A provider did a physical exam on intake but did not document a blood pressure or weight. The provider took no history of the diabetes, including no history of what medication the patient typically used. The provider offered Metformin, 500 mg twice daily with a sliding scale of insulin. The deficiency of historical information is unacceptable. Each problem requires a diagnostic plan along with a therapeutic plan.

The third patient[108] was admitted to Graham Correctional Center on 12/10/19 with a history of being legally blind in the right eye for unspecified reasons. He also had a history of lymphoma and had a colon biopsy for an unknown reason and had a lump removed from his right breast for unspecified reason. The initial provider history and physical examination was performed on 12/19/19 but it did not contain any history relevant to the lymphoma. Along with the colon

---

[106] Health Assessment patient #1
[107] Health Assessment patient #2
[108] Health Assessment patient #3

82

biopsy and the breast lump removal, this patient needed prior records. The patient lacked a diagnostic or therapeutic plan for each of his problems, including lymphoma and the previous surgeries, along with being legally blind in the right eye. These records were unquestionably deficient with regard to the history and the diagnostic and therapeutic plans.

As noted in the Medical Reception section the monitor also reviewed five records of patients who had been admitted to Logan CC in February 2020; all five had a health assessment with history and physical exam completed within seven days by a provider. Three records of pregnant women were reviewed. Of these, only one person was seen by the clinician within seven days of intake[109].

In the future the monitor team will be looking to ensure that the provider's history addresses all the clinically relevant positives in the intake screen. The clinically relevant positives include problem lists, allergies, medications, any acute symptoms, and chronic problems including hospitalizations and other complications. The provider will be expected to follow up on clinically relevant issues identified in the nurse screen in sufficient detail to determine the need for follow-up care, to include a comprehensive history and a relevant physical examination, develop an initial problem list and a diagnostic and therapeutic plan for each relevant problem.

**RECOMMENDATIONS:**
1. Ensure that prior hospitalization records are requested.
2. Perform an adequate history regarding chronic problems and complications, including hospitalizations.
3. Develop an initial problem list along with clinically appropriate diagnostic and therapeutic plans.


# Nursing Sick Call

*Addresses Items II.A; II.B.1; III.A.10; III.E.2; III.F.1; III.F.2;*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**III.A.10.** *Each IDOC facility shall have registered nurses conducting all sick calls. Until IDOC has achieved substantial compliance with nursing provision of the staffing plan, facilities may use licensed practical nurses in sick call, but only with appropriate supervision.*

**III.E.2.** *Lists and treatment plans will be amended pursuant to the order of a clinician only.*

**III.F.1.** *Sick call shall be conducted in only those designated clinical areas that provide for privacy and confidentiality, consistent with the extraordinary operational concerns and security needs of IDOC including, but not limited to a lockdown.*

**III.F.2.** *There shall be no set restrictions on the number of complaints addressed during a*

---

[109] Pregnant Patients # 1 & 3 were the exceptions.

*specific sick call appointment. Medical providers must use their medical judgment to triage and determine which issues should be evaluated and treated first to maximize effective treatment and relieve pain and suffering.*

**OVERALL COMPLIANCE RATING:** Partial compliance

**FINDINGS:**

**Policy and Procedure; Performance Monitoring**

The written guidance for sick call is found in Administrative Directive 04.03.103. The 2nd Court Expert Report cited the policy as insufficient because it lacks direction on "how to implement the sick call program. For example, the policy does not address what sick call request forms are to be used, how they are ordered, which staff is responsible for ensuring that health care request forms are available to inmates, how inmates are to submit their requests to protect confidentiality, etc. The policy does not address where sick call is to be performed, by what level of staff, or the disposition of written health requests (i.e., scanning into the health record)."[110] OHS has drafted a policy and procedure on nursing sick call and forwarded it to the Monitor. Comments will be provided but the policy and procedure has not been finalized and implemented.

The Primary Medical Services Report includes the following information on sick call.

| AVG. DAILY INMATE CENSUS | Total Number of Sick Call Requests Received | Total Number of Sick Call Requests Seen by a Nurse w/i 72 hours of Receipt of Request | Number of Days that Rounds were NOT made to Segregation/Confinement units by Nursing Staff | Number of Weeks that Rounds were NOT made to Segregation/Confinement units by MD, PA or NP | "MD" Referral Backlog (>3 days wait) | Number of Days to Reduce "MD" Referral Backlog |
|---|---|---|---|---|---|---|
| | | | | | | |

Review of these reports found that most sites only provide information on the census and number of requests received. The accuracy of these reported numbers has not been verified to our knowledge. This tool should be revised to reflect the procedural steps contained in the new policy and procedure. Facilities should also report the number of times an LPN was assigned to conduct sick call each month. Clear definitions and expectations should be set forth for data to be reported and verification of accuracy.

In a review of the September 2019 CQI minutes, the Monitor found at 28 of 30 facilities the Medical Director reviewed nursing documentation of sick call encounters. The review tool evaluates whether the documentation of the encounter is complete. Two measures of quality evaluated were the adequacy of the assessment and whether the correct treatment protocol was selected. The Monitor recommends the statewide auditing team assess the validity and reliability of this audit data. When performance is rated as poor there seldom is documentation of a plan for corrective action. These audits do not need to be completed monthly if performance is consistently over 90% on all criteria allowing the Medical Director's time to be redirected to other quality projects.

Several institutions have studied various aspects of the sick call process. These studies have

---

[110] Statewide Summary Report Including Review of Statewide Leadership and Overview of Major Services, Report of the 2nd Court Appointed Expert (October 2018) pages 48-49

included no-show rates, failure to transport to sick call, timeliness of sick call including referrals seen by a provider, and the appropriateness of the referral. Most studies measure conformance with the Administrative Directive or local operating procedure and do not evaluate quality of care provided. None evaluate outcomes or patient satisfaction.

**Nursing Sick Call**

The Monitor's first report found that at two of four facilities visited registered nurses were regularly assigned to conduct nursing sick call. These were Sheridan and Robinson. At Pontiac and Lawrence LPNs were regularly assigned to conduct nursing sick call.  At Logan which was visited February 25-26 the Director of Nursing stated that on occasion an LPN is assigned to conduct sick. Review of three weeks assignment sheets revealed only one LPN was responsible for sick call during that time. LPNs are assigned to conduct sick call on a regular basis at Lincoln Correctional Center. Three weeks of staffing assignments were reviewed (January 27-February 16, 2020), LPNs were assigned sick call 11 of 21 shifts (52%).  A nurse conducts sick call at only two of six facilities visited by the Monitor.

At Lincoln and Logan the nurse assigned sick call also has other responsibilities to include responding to emergencies. Taking care of these other responsibilities means that sick call patients must wait.

The HCUAs at both Logan and Lincoln reported that since fees for sick call requests were eliminated on January 1, 2020 the number of people requesting health care attention has increased. Data from Logan for the first 20 days in February 2020 on the number of sick call requests and the number seen each day indicate that many patients are not being seen or were not seen timely. This prompts patients to put in subsequent requests for health care attention which can inundate the system of timely access.

**Access**

A review of December 2019 Primary Medical Services reports for seven IDOC facilities[111], including Logan CC and Lincoln CC, revealed a median of 1.4% (range 0.3% to 2.1%) of the sites' average daily population requested nurse call services on a daily basis. Based the Monitors' experience, these are surprisingly low nurse sick request rates for adult USA correctional facilities.

---

[111] Primary Medical Service Reports December 2019, Dixon, Hill, Lawrence, Lincoln, Logan, Pinckneyville, Pontiac

| NURSE SICK CALL PRIMARY MEDICAL SERVICES REPORT DECEMBER 2019 | | | | |
|---|---|---|---|---|
| Facility | Population | NSC REQs/MO | NSC REQs/D | % Daily Pop NSC REQs/D |
| DIXON | 2267 | 1160 | 37 | 1.6% |
| HILL | 1687 | 680 | 22 | 1.3% |
| LAWRENCE | 2133 | 366 | 12 | 0.6% |
| LINCOLN | 987 | 95 | 3 | 0.3% |
| LOGAN | 1575 | 1018 | 33 | 2.1% |
| PINCKNEYVILLE | 2018 | 711 | 23 | 1.1% |
| PONTIAC | 1158 | 489 | 16 | 1.4% |
| TOTALS | 11825 | 4519 | 146 | 1.2% |

Access to nursing sick was problematic at both the Logan and Lincoln facilities which were visited by the Monitor February 25 -27, 2020. The HCUAs reported increased numbers of prisoners requesting health care attention via sick call since fees for co-pays were eliminated effective January 1, 2020. Co-pay fees undoubtedly were a barrier to utilization and their elimination is applauded.

The Monitor audited sick call requests at Logan for the period February 1- 20, 2020 and calculated that on average 84 patients submitted requests each day compared to 34 (2.1%) in December 2019, of which 13 were multiple requests. Based upon the Monitor's experience, in a functional health care program, requests for health care attention are submitted by approximately 5-7 % of the population each day (women's facilities average at the high end of the range). Utilization of sick call at Logan in February averaged 5% of the population. At Lincoln, we were told on average, six to seven sick call requests were received each day before January 1, 2020 and at the time of the site visit it was 20 a day. Therefore only 2% of the population is requesting sick call daily at Lincoln in February 2020. There may be other barriers besides co-pays influencing sick call utilization rates but there has been no systematic study or analysis of utilization at either Logan or Lincoln.

The staffing needed to triage and respond to non-emergent requests for health care attention consistent with the Consent Decree was not calculated specifically in the staffing analysis completed by OHS. The staffing plan proposes the addition of 95 registered nurse positions[112]. Undoubtedly some of these positions are needed but there is no information provided to understand how many are necessary to meet the provisions of the Consent Decree.

The Monitor's audit of sick call at Logan also considered whether patients who requested health care attention on February 6, 2020 were seen timely by a nurse. The result was that of 83

---

[112] IDOC Staffing Analysis, Revised 6/18/20

requests received that day, only 10 were seen within the next day which is considered timely access. By February 12, or six days later, only half of the patients requesting health care attention had been seen. This is an unacceptable delay in access. Patients were submitting multiple requests in the hopes of being seen.

Inmates interviewed at both Logan and Lincoln reported increased delays being seen by nurses after submitting requests for health care attention. We suspect access has been compromised at other IDOC facilities, but no data has been provided for the first quarter of 2020 as of this date[113]. It does not appear as though OHS has yet monitored the impact of the legislation's implementation on service demand. Individual HCUAs are attempting to solve the problem of increased demand for sick call ad hoc with some support from the Regional Health Services Coordinator. There was no advance analysis or plan to manage elimination of co-pay fees in a coordinated statewide effort.

At Logan, the nurse assigned to sick call also responds to medical emergencies which requires inmates on sick call to wait until the nurse has time to see them. This practice directly contributes to delays accessing non-emergent health care attention. We also found the nurse assigned to the infirmary was underutilized and if an exam room were co-located in the infirmary, could assist with sick call encounters. At Lincoln, registered nurse positions are insufficient to complete all the work required.

Sick call access should be monitored at each IDOC facility. If requests received daily are less than 5% of the population or patients are not seen within 24 hours of receipt of the request, an examination of potential barriers to access should be conducted with haste. The examination should include identification and resolution of workload factors that cause delays in care as well as resources that are underutilized and could be repurposed to increase access. OHS should establish a workload driven staffing standard for sick call and identify the number of registered nurse positions needed to comply with this aspect of the Consent Decree.

Nurses' treatment of patient complaints is guided by nursing treatment protocols. The Monitor has not evaluated how the treatment protocols were developed, what training nurses receive to use the protocols, how often the protocols are reviewed and revised. The protocols give direction as to clinical signs and symptoms for which a provider must be contacted to obtain further treatment direction.

The nursing treatment protocol for complaints of hearing loss was revised March 2019. The CQI minutes reflect sites studying the accuracy of nurse's use of the treatment protocol as a means of verifying competence. This is a good example of how to document individual proficiency in the skills needed to screen for hearing loss. It does not appear that this was coordinated statewide or that implementation progress has been monitored.

At Logan Correctional Center the Monitor observed two to three inmates sitting on chairs immediately outside the door to the examination room. When the door is ajar, as it is except for an unclothed exam, the inmates waiting outside can hear and see the patient being seen by the

---

[113] June 2, 2020

nurse in the exam room.

At Lincoln Correctional Center the exam room used for nursing sick call opens off the waiting area. Inmates in the waiting area can hear what is being said in the nurse sick call room. The medication administration line is just outside the door to the exam room and compromises privacy and confidentiality even more.

The Monitor's first report found a problem with privacy and confidentiality in the two examination rooms in segregation at Pontiac[114]. The IDOC response to the Monitor's first report was to appropriately remove the video cameras from these exam rooms. The privacy and confidentiality of rooms where clinical encounters take place should be evaluated during safety and sanitation rounds of the health care areas.

IDOC self-assessed substantial compliance with the requirement that there be no restrictions on the number of complaints addressed during a specific sick call appointment[115]. The response to the Monitor's first report states "Agency Medical Director … has participated in multiple meetings with healthcare staff informing them that they may not restrict the number of complaints addressed during sick call. That direction has been provided telephonically, during OHS Quarterly meetings, as well as being reiterated during site visits."[116] The Agency Medical Director left employment with IDOC before this verbal instruction was finalized into any form of permanent written expectation. This requirement should be explicitly stated in the final IDOC policy and procedure on non-emergent health care requests and services. In addition sick call monitoring tools should include this as one of the criteria measured so that compliance with the expectation is sustained.

In the Monitor's evaluation of sick call requests at Logan from February 1-20, 2020 it was clear from the signup sheets that health care attention is sought for any number of complaints and that there were no arbitrary restrictions on the number of health complaints. The average number of complaints per request in this sample of 1, 673 was 1.3. The Primary Medical Services Report should be revised to indicate the number of requests made by the number of patients as partial proof of compliance with this criteria. In addition the audit of documentation of nursing sick call should be revised to include a measure of whether more than one complaint was addressed at the encounter.

**RECOMMENDATIONS:**
1.   Include all aspects related to sick call in the Consent Decree in the policy and procedure for non-emergent health care requests; finalize and implement it.
2.   Revise the Primary Medical Services Report to include the number of times an LPN was assigned to conduct sick call each month, the number of requests and the number of complaints made. Other revision may be necessary once the policy and procedure is finalized. Clarify the expectation that the report is to be completely filled out and provide

---

[114] Lippert v Jeffreys Consent Decree, First Report of the Monitor (November 24, 2019) page 27

[115] Illinois Department of Corrections, Defendants' Reporting Requirement Pursuant to V.G. of the Lippert Consent Decree (May 2020)

[116] Lippert v Jeffreys, 10-cv-4603: IDOC's Response to the Monitor's Initial Report, December 24, 2019, page 3

written definitions or instructions, as necessary. Ultimately this report should be automated and come from the EMR.

3. Assess the validity and reliability of the audit of the documentation of nursing treatment protocols. This audit only needs to be done quarterly if performance on all criteria exceeds 90%. Revise the tool to include a measure of whether more than one complaint was addressed.

4. Sick call access should be monitored at each IDOC facility. If requests received daily are less than 5% of the population or patients are not seen within 24 hours of receipt of the request, an examination of potential barriers to access should be conducted with haste. The examination should include identification and resolution of workload factors that cause delays in care as well as resources that are underutilized and could be repurposed to increase access.

5. OHS should establish a workload driven staffing standard for sick call and identify the number of registered nurse positions needed to comply with this aspect of the Consent Decree. This would also aid in the calculation of space and equipment that is needed for nurse sick call.

6. The privacy and confidentiality of rooms where clinical encounters take place should be evaluated during safety and sanitation rounds of the health care areas.

7. Reassign other duties that interrupt nurse sick call.

## Chronic Care

***Addresses Items II.A; II.B.1; II.B.6.f; III.E.1***

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**II.B.6.f.** *IDOC agrees to implement changes in the following areas: Chronic disease care: diabetes, Chronic Obstructive Pulmonary Disease (COPD), asthma, HCV, HIV/AIDs, hypertension, hyperlipidemia*

**III.E.1.** *IDOC shall maintain a list of prisoners' current medical issues in their medical charts.*

**OVERALL COMPLIANCE RATING: III.E.1** Noncompliance, **III.B.1. & II.B.6.f** Not rated.

**FINDINGS:**

The IDOC's first and second reports to the Monitor contained no information on clinical care items including chronic illness care. We have received no verification that any actions have been taken with respect to implementation of changes to chronic disease care processes. We reviewed only a few medical records to review chronic care quality.

The UICCON proposal on quality improvement noted problems with the chronic care program including that the existing administrative directives don't reflect key elements of the intended

service to be provided and that forms lack adequate structure to capture and communicate data and that processes focus on efficiency but lack effectiveness.[117] We agree with all elements of the UICCON analysis.

Because the IDOC is implementing an electronic medical record, there is little value in reviewing the existing paper forms. Once we have remote access to the electronic medical record the Monitor will review the format of documentation in the electronic record related to chronic care and give feedback to IDOC.

IDOC recently sent to the Monitor a revised chronic illness administrative directive. This draft lacks essential elements of a chronic disease policy. Policy needs to address the following essential elements of chronic disease management and how they would be implemented.

- Identification and evaluation of the illness at intake ensuring timely continuity of treatment of an individual's chronic illness. This would include enrollment into the chronic care program.
- Maintaining a roster of persons with chronic illness and listing all of their diagnoses. This can be used for risk assessment, for statistical purposes in order to understand prevalence of disease in the population and administrative aspects of disease management. A listing of chronic diseases needs to be present in the problem list.
- Scheduling patients for follow up based on the patient's disease status and degree of control.
- Ensuring that disease management is consistent with existing standards of care.
- Ensuring access to specialty services when a chronic illness requires expertise beyond the scope of available practitioners.
- Ensuring that necessary treatments, including medications, are timely available to individuals with chronic illness.

Identification of chronic illness and ensuring continuity of treatment involves identifying every chronic illness at intake and ensuring that necessary treatment of these conditions are continued in the prison. This subject is addressed in IDOC administrative directive 04.03.E.02 Offender Receiving Health Screening which was sent to the Monitor in draft form for our comments.[118] The draft IDOC chronic illness administrative directive[119] requires that a baseline evaluation for chronic illness be performed within 30 days of arrival from a reception center. The provider intake history and physical examination must result in identification of all chronic illnesses, with a thorough history, assessment, and therapeutic plan for each illness. Because of this, we believe that the provider intake history and physical examination be considered the initial chronic illness visit.

Tracking chronic illness, enrolling patients into the chronic care program, documenting chronic illness onto problem lists, standards of care used for chronic illness care, when to refer to specialists, or ensuring continuity of medications are not addressed in IDOC policy. These items

---

[117] Page 41 Quality Improvement and Patient Safety Plan for the Illinois Department of Corrections Office of Health Services, UIC College of Nursing September 2019
[118] This draft policy was provided to us for comments and has not yet been returned. We had multiple comments that have not yet been returned to IDOC.
[119] Administrative Directive 04.03.105 Chronic Illnesses Draft

need to be standardized and described in policy.

Accurate diagnosis and documentation of those diagnoses in a problem list facilitates and supports clinical decision making and promotes quality improvement efforts. Current problem lists are not standardized in IDOC. There are no rules about who can enter a problem onto the problem list or the nomenclature that should be used. For this reason, problem lists are disorganized and contain irrelevant information and data that is not related to a medical problem. Only providers should have authority to enter into the problem list. The problem list should not be used to document vaccinations, degree of control of a disease, schedules of chronic disease, nursing diagnoses, symptoms, or temporary conditions (e.g. common cold or athlete's foot) all of which have been found in IDOC problem lists. Definitions of what is to be included in a problem list need to be identified and the method of documenting on the problem list needs to be memorialized in policy. If the problem list contains only chronic illnesses, relevant surgeries, significant acute injuries and diseases, then it can be used automatically to develop a chronic disease roster. If non-significant conditions are listed on the problem list, IDOC needs to determine how they will develop and maintain a chronic illness roster.

The roster of chronic illness needs to include a list of every patient who has one or more chronic illnesses. Each patient on the list needs to include all of their diagnosed chronic conditions. From a data structure perspective, this may be best arranged in a database or obtained as needed from the electronic medical record problem list. The roster should be able to be used to identify all persons with a particular disease, diabetes or ulcerative colitis for example. The IDOC can use this roster to monitor dates of next appointment, whether required laboratory work has been scheduled, and status and degree of control when applicable, immunization status or any other disease pertinent information. Currently, IDOC chronic illness rosters are not based on a patient's diagnoses. The rosters are based on clinic types a patient is scheduled for which may be unrelated to the patient's diagnosis. An example is that patients with atrial fibrillation are listed as cardiac on chronic disease rosters. Patients with asthma, COPD, and interstitial fibrosis are all listed as asthma/pulmonary on chronic clinic rosters. These rosters do not inform the reader of the diagnoses of the patient rather they inform the reader what clinic the patient must be scheduled for making them not useful for tracking by disease. Also, patients can be listed on multiple chronic clinic rosters if they have more than one disease. For example, a person with hypertension and chronic obstructive lung disease is listed in two clinics, cardiac and asthma/pulmonary, neither of which accurately describe the patient's chronic conditions.

Clinic scheduling for chronic illness is currently complicated and wasteful and is not done from the perspective of the patient. In the draft chronic illness administrative directive sent to us[120], each of eight clinic-types[121] is required to be scheduled on one, four, or six month intervals. These schedules are fixed. A person with multiple different diseases is scheduled for a separate clinic appointment for each of their diseases multiple times a year which can amount to a large number of appointments particularly if their diseases are not in good control. Each appointment is for a separate disease. Specialized clinics are useful when the practitioner has special expertise. For example, the UIC HIV/hepatitis C clinic is a specialized clinic and the physicians conducting the clinic have expertise in managing those conditions. Specialized clinics help the

---

[120] Administrative Directive 04.03.105 Chronic Illnesses Draft
[121] Asthma, cardiac, diabetes, special medicine, hepatitis C, HIV, seizure, and tuberculosis.

patient because they improve care by providing a special expertise to the patient. Primary care clinics are best scheduled so that patients are evaluated for all of their chronic conditions at one time. Specialized clinics should only be used onsite in IDOC when the practitioner has special expertise in a particular condition.

Intervals of scheduling need to be based on the status and degree of control of the patient's conditions with minimal intervals specified. Providers need to update management and integrate therapeutic plans into the overall therapeutic plan for those patients who are seeing a specialist to help manage one of their chronic conditions.

The Monitor has not reviewed the latest version of the chronic illness treatment guidelines. It is our view that it is wasteful for the OHS Chief to write a clinical care guideline for every illness. Instead, we urge IDOC to use contemporary nationally accepted guidelines. When a contemporary guideline does not exist we recommend to use UpToDate®, a nationally accepted reference standard as the clinical guideline. We note that UpToDate® is not available on desktop computers where electronic medical record devices are in use. Instead of writing clinical guidelines for chronic care, the IDOC should write guidelines for minimal expectations for laboratory testing, intervals of follow up, required diagnostic testing, and other process facets of management of common chronic illnesses.

There will be conditions that are best managed by consultation with a specialist; for example dialysis, ulcerative colitis, or any condition that is beyond the training or expertise of the provider. In IDOC this is particularly important because 35% of physicians have not completed a primary care residency and lack training on management of common diseases. Providers need to ensure that care managed in consultation with a specialist is integrated into the overall therapeutic plan for the patient. Because so many physicians lack primary care training, many conditions including even diabetes would require consultation with a specialist. Improvements in credentialing will reduce this need.

Required testing or diagnostic evaluations for common diseases such as diabetes can be memorialized in policy, appendices of policy or in guidelines. This may be helpful for physicians who are unfamiliar with contemporary guidelines or to assist nurses who help physicians prepare patients for their chronic illness appointments. Medication management will be addressed in the pharmacy and medication administration section of this report.

Two diabetic patients[122] at Lincoln CC receiving injectable 70/30 insulin (70% long acting, 30% short acting insulin) were also placed on a sliding scale using short acting Regular insulin that is to be administered when capillary blood glucose reading exceed a certain level. Prescribing two rapid acting insulins of short duration that could potentially be administered at the same time before a meal can be eaten offers no physiological gain and puts the patient at heightened risk for hypoglycemia. The Monitor advised the IDOC to discontinue this practice in the First Court Report. This practice must be discontinued.

We acknowledge that these reports should include medical record reviews for chronic illness

---

[122] Chronic Illness patient #1 and #2

patients to assess the overall effectiveness of care. Our intention is to request copies of patient records several months in advance of our report due date.

**RECOMMENDATIONS:**

1. Finish the chronic illness policy. Ensure that it addresses the essential elements of a chronic disease program as listed above.
2. Use national standards as guidelines instead of writing guidelines for all common health conditions.
3. Make UpToDate® available on all electronic medical record devices in IDOC.
4. Change chronic illness clinic scheduling so that a person is evaluated for all of their chronic illnesses at each chronic illness scheduled visit. The interval of visits should be based on the least controlled disease.
5. The chronic clinic roster needs to be patient based and list all diseases of each patient.
6. Standardize entries onto the problem list consistent with meaningful use standards[123]. Permission to enter problems on a medical problem list should be restricted to physicians, physician assistants, and nurse practitioners. Psychiatrists and licensed mental health professionals should have permission to enter mental health diagnoses. The problem list should include medical and mental health diagnoses.
7. For physicians without appropriate credentials based on Consent Decree requirements, monitoring should be done to ensure that they are capable of managing patients according to contemporary standards. When they are not, patients should be referred to those who can manage the patient or specialty consultation should be sought.
8. Discontinue prescribing sliding scale Regular Insulin with 70/30 insulin for insulin requiring diabetics.

## Urgent and Emergent Care

*Addresses Items II.A; II.B.1; II.B.6.b; III.E.4; III.G.1; III.G.2; III.G.3; III.G.4*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**II.B.6.b.** *IDOC agrees to implement changes in the following areas: Urgent care;*

**III.E.4.** *The medical records staff shall track receipt of offsite medical providers' reports and ensure they are filed in the correct prisoner's medical records.*

**III.G.1.** *Each facility HCUA shall track all emergent/urgent services in a logbook, preferably electronic.*

**III.G.2.** *Appropriate medical staff shall have the obligation to determine whether a situation is urgent or emergent.*

**III.G.3.** *IDOC shall use best efforts to obtain emergency reports from offsite services when a prisoner returns to the parent facility or create a record as to why these reports were not obtained.*

---

[123] Meaningful use is a term that relates to a federal government program to develop a set of standards with respect to how health providers adopt electronic medical records.

**III.G.4.** *Facility medical staff shall ensure that a prisoner is seen by a medical provider or clinician within 48 hours after returning from an offsite emergency service. If the medical provider is not a clinician, the medical provider shall promptly review the offsite documentation, if obtained, with a clinician and the clinician shall implement necessary treatment.*

**OVERALL COMPLIANCE RATING:** Partial compliance

**FINDINGS:**
**Urgent Care**
OHS has drafted a policy and procedure for emergency services and provided it to the Monitor for review. The Monitor has provided comments and recommendations for further revision to OHS. Until then written direction is provided regarding emergency response in Administrative Directive 04.03.108 Response to Medical Emergencies which gives a great deal of discretion to individual facilities to determine the training received, the number, location and contents of emergency equipment and supplies, procedures for response etc. This has led to a checkered pattern of readiness and performance.

The Monitor visited Lincoln CC and Logan LCC in advance of the second Monitor's report. During the tour emergency equipment and response were reviewed. Emergency equipment and supplies were organized, well stocked, properly equipped, and clean. These findings are consistent with the findings reported in the Monitor's first report at four sites visited[124].

We found lack of standardization in equipment and supplies at Lincoln and Logan. The 2nd Court Expert report described lack of standardization in equipment and supplies or maintenance at the five facilities visited in 2018, which except for Logan, differ from the sites visited by the Monitor[125].

The emergency bags at Logan were sealed with tags to indicate all the supplies were in the bag. The emergency bags at Lincoln were not sealed. Three of the facilities the Monitor reported on in the first report had unsealed emergency bags[126]. We recommend that each compartment of the emergency bags be sealed with a numbered tag to indicate that all required items are there and in working condition. The integrity of the seal should be checked daily and documented on the log along with the presence of other equipment, verification of pads and operational battery in the AEDs and sufficient supply of oxygen.

At Lincoln there is only one AED (automatic external defibrillator) which is checked daily. Logan has two AEDs; at the time of the Monitor's site visit only one AED was functional. New pads and a replacement battery had been ordered for the second AED. Every facility needs to have at least one AED that is reserved as a backup for dysfunction of other AEDs. A supply of batteries and pads should be kept on hand so that replacement takes place soon.

---

[124] Lippert v Jeffreys Consent Decree, First Report of the Monitor (November 24, 2019) page 14
[125] Statewide Summary Report Including Review of Statewide Leadership and Overview of Major Services, Report of the 2nd Court Appointed Expert (October 2018) page 62
[126] Lippert v Jeffreys Consent Decree, First Report of the Monitor (November 24, 2019) page 14

Lincoln CC is the only site visited so far that has Naloxone in the emergency equipment which is to be applauded. The Monitor stated in the first report that all IDOC emergency response bags must be stocked with naloxone (Narcan) and Glucagon. We further recommend nasal, rather than injectable naloxone, because it is easier and safer to use in an emergency. Health care staff must have these two drugs to be able to immediately reverse an opioid overdose or an episode of hypoglycemia throughout the campus.

The 2nd Court Expert report states that facilities varied in compliance with the IDOC requirement for emergency response drills[127]. Review of the minutes of CQI meetings held in the fourth quarter of 2019 documents this variance. Emergency response that does not result in a referral to the ED is not tracked on the Emergent Urgent Services log; we are not sure what instruction sites are following to track these onsite urgent care visits. The critiques of drills or actual response to emergencies that were reported in the CQI minutes were brief, not very thorough, and seldom identified areas of needed improvement.

CQI minutes show that some sites have studied provider follow up after off-site care, but it is only to see if the benchmark of being seen within five days was achieved. There is no retrospective review of clinical care received prior to an urgent or emergent event to determine if any of these events could have been avoided. Neither is care provided afterwards reviewed to ensure that a provider acted upon the ED's recommendations timely. A review of the emergent urgent services log reveals incidents of care that should be reviewed clinically. These include multiple ED admissions for the same patient for the same problem or symptom cascade as well as referrals for conditions that are considered best managed in a primary care setting. At a minimum these reviews should be documented in the CQI minutes, findings tracked, and trended and improvement plans developed based upon the results.

**Emergent Urgent Services Log**
OHS has an emergent urgent services log which has been provided to the Monitor for all four quarters of 2019. The fourth quarter emergent urgent services logs were reviewed.

---

[127] Statewide Summary Report Including Review of Statewide Leadership and Overview of Major Services, Report of the 2nd Court Appointed Expert (October 2018) page 62

| Review of the Urgent Emergent Care Log  December 2019 | | | | | |
|---|---|---|---|---|---|
| Facility | Referrals tracked | # Seen | Reason for Referral | Discharge Dx | Report returned from ED |
| BIG MUDDY | 10/5 - 12/31 | 23 | Y | Y | Y |
| CENTRALIA | 10/16 - 12/29 | 4 | Y | Y | Y |
| DANVILLE | 10/1 - 12/31 | 8 | Y | N | N |
| DECATUR | 11/10 - 12/28 | 6 | Y | Y | Y |
| DIXON | 10/1 - 12/28 | 66 | Y | N | Y |
| EAST MOLINE | 10/3 - 12/23 | 17 | Y | Y | Y |
| ELGIN | None reported | 0 | | | |
| GRAHAM | 10/2 - 12/28 | 28 | Y | N | Y |
| HILL | Not updated since 9/29 | | Y | Y | Y |
| ILLINOIS RIVER | 10/4 - 12/31 | 19 | Y | Y | Y |
| JACKSONVILLE | 10/2 - 11/6 | 3 | Y | Y | Y |
| JTC | 11/11 - 12/23 | 7 | Y | Y | Y |
| KEWANEE | 10/13 - 12/24 | 3 | Y | Y | Y |
| LAWRENCE | 10/1 - 12/17 | 16 | Y | Y | Y |
| LINCOLN | 10/8 - 12/28 | 12 | y | Incomplete after 10/8 | Incomplete after 10/8 |
| LOGAN | 10/1 - 12/27 | 31 | Y | Y | Y |
| MENARD | 10/2 -12/31 | 42 | Y | Y | Y |
| MURPHYSBORO | None to report | 0 | | | |
| NRC | 10/4 - 12/26 | 15 | Y | Y | Y |
| PINCKNEYVILLE | 10/17 - 12/25 | 7 | Y | Y | Y |
| PONTIAC | 10/5 - 12/27 | 20 | Y | Y | Y |
| ROBINSON | 10/5 - 12/18 | 13 | Y | Y | Y |
| SHAWNEE | 10/2 - 12/27 | 29 | Y | Incomplete after 10/19 | Incomplete after 10/19 |
| SHERIDAN | 10/3 - 12/13 | 17 | Y | Y | Y |
| SOUTHWESTERN | 11/1 - 12/22 | 5 | Y | Y | Y |
| STATEVILLE | 10/3 - 12/28 | 22 | Y | Y | Y |
| TAYLORVILLE | 10/1 - 12/31 | 20 | Y | Y | Y |
| VANDALIA | 10/7 - 12/30 | 11 | Y | Y | Y |
| VIENNA | 10/4 - 12/31 | 23 | Y | Y | Y |
| WESTERN | 10/3 - 12/7 | 19 | | incomplete | incomplete |

Reports are available for 86% of the sites. The logs were incomplete or out of date at Hill, Lincoln, Shawnee, and Western. There is considerable variance in what is recorded on the emergent urgent services log. For example, the discharge diagnosis is not listed on logs maintained by Danville, Dixon, or Graham.  Ten of 29 sites document the date the patient is seen in follow up for the ED visit by a physician. Elgin or Murphysboro recorded no visits to the ED in the fourth quarter of 2019. The third quarter report was reviewed for these two sites. Elgin does not record when the MD saw the patient in follow up. Murphysboro does not record the discharge diagnosis or date seen for follow up by the physician. Information recorded on the emergent urgent services log needs standardization and some additional information to measure performance in the delivery of emergent urgent services. Staff responsible for maintaining the log need to demonstrate a clear understanding of what is to be recorded, how and by when.

The accuracy of the documentation on the log has not been verified. We compared the documentation on the emergent urgent services log for October and December to the information on ED visits reported in CQI minutes and found discrepancies among this data for

four of the six sites reviewed. We did not compare the log to the Primary Medical Services Report. The log should match the information reported at CQI and on the Primary Services Report for matching time periods.

On closer examination of the logs there is variation in how ED visits are recorded when the patient is admitted to the hospital. Sometimes the date seen by the physician in follow up is after the patient had been discharged from an inpatient admission. In this case the emergent urgent services log should record that the patient was admitted and the column for the date the physician saw the patient left blank. These patients must also be entered on the hospital services log. The hospital log should have the date the patient was seen by the physician for follow up recorded. The Monitor recommends that a column after discharge diagnosis be added to the emergent urgent services log to document the disposition. Documentation choices should include deceased, admitted to (name of hospital), transferred to (name of institution), released (date of release) etc.

The log needs to include all of the elements necessary to monitor performance in delivery and follow up of emergent urgent services. The accuracy of the information documented on the log needs to be verified by an audit of patient records on a quarterly basis with corrective action as necessary until sustained performance is demonstrated.

The information about any emergency response and the emergent urgent services log should be reviewed and updated daily, in real time, not retrospectively. The lack of documentation and incomplete entries indicate that the log is a task with low priority at some sites and may only be looked at monthly at others. We recommend changing to more a proactive use of the information on provision of emergency care. Review of emergency response and any trips to the emergency room should be completed the next day by at least the facility Medical Director and Director of Nursing. The information from the emergent urgent services log can be used in the daily huddle to make decisions about the priority of services, need for communication, and follow through in the care of acute or at-risk patients in the population. We recommend the Director of Nursing be responsible for maintaining the emergent urgent services log. Others who should contribute to the information that goes into the log may be delegated members of the nursing staff (i.e. shift charge nurse) and medical records (receipt of discharge report).

**Obtaining Emergency Reports**

Virtually all sites report that a record from the ED visit is received. The Monitor noted in the first report that this is inconsistent with the findings of the 2018 2nd Court Expert report. From interviews at the sites it was apparent that any paperwork that was received was considered to meet this criterion. The Monitor recommended IDOC establish criteria for what constitutes clinically useful emergency department summaries[128]. Also recommended was to record the date the document was received rather than indicating yes or no on the log.

At Lincoln CC, which the Monitor visited this report period, documentation on the emergent urgent services log ceases after 10/8/2019. From the beginning of 2019 until 10/8/2019 when Lincoln ceased documenting on the log, reports were received on 18 of 40 emergency room

---

[128] Lippert v Jeffreys Consent Decree, First Report of the Monitor (November 24, 2019) page 32

visits (45%). At Logan, which was also visited by the Monitor this period, there were 31 emergency room visits during the fourth quarter. Twenty-five reports were obtained. Two visits to the emergency room are documented as having received no documentation. There were four emergency room visits that have no documentation for whether a report was received. One patient was admitted to the hospital from the emergency room and that log does not document receipt of a report. For these four no record was received. Therefore 80% of the time some form of discharge report is received after the patient returns to Logan CC from the emergency room. The emergent urgent services log could be used as partial evidence of compliance with II. G. 3 if the date the ED report is received and an indication of the nature of the report (i.e. discharge summary) are documented on the log.

The Monitor also recommended in the first report that a column be added to the emergent urgent services log to record the date the patient was seen by a physician in follow up. In this same report the Monitor also established the expectation that all returns from the emergency room be seen for follow up within 48 hours of return to the facility. Referring to the next table 17 of 29 reporting sites (45%) were documenting on the log submitted for the 4th quarter the date patients were seen by a facility physician in follow up after a visit to the emergency room.

The Monitor also calculated the number of days from emergency room discharge to follow up by the physician at the facility. Of 17 facilities reporting this information only Pontiac CC saw the patient in follow up within 48 hours of return to the facility, more than 90% of the time. The following table displays the number of patients seen within 48 hours of return from the emergency room compared to the total who returned. The table also displays the percentage seen within 48 hours, the range of days before a follow up took place and the average days to the follow up appointment.

| Facility | # Seen within 48 hrs by MD of those returned from ED | Percent | Range of days | Average days till follow up |
|---|---|---|---|---|
| DECATUR | 1 of 6 | 17 | 2-14 | 7.5 |
| EAST MOLINE | 13 of 17 | 76 | 0-5 | 1.4 |
| ILLINOIS RIVER | 4 of 12 | 33 | 1-6 | 3.4 |
| JACKSONVILLE | 0 of 3 | 0 | 5 - 10 | 7.5 |
| KEWANEE | 2 of 3 | 66 | 0 -3 | 1.8 |
| LAWRENCE | 9 of 15 | 60 | 0 -21 | 5.6 |
| LOGAN | 7 of 21 | 33 | 1-19 | 5.0 |
| MENARD | 12 of 39 | 31 | 0-60 | 7.5 |
| NRC | 8 of 12 | 66 | 0-10 | 2.3 |
| PONTIAC | 13 of 14 | 93 | 0-4 | 1.0 |
| ROBINSON | 3 of 12 | 25 | 1-12 | 5.7 |
| SHERIDAN | 11 of 17 | 65 | 0-20 | 3.0 |
| SOUTHWESTERN | 2 of 5 | 40 | 1-10 | 3.8 |
| STATEVILLE | 2 of 15 | 13 | 0-24 | 6.0 |
| TAYLORVILLE | 10 of 18 | 56 | 1-16 | 3.0 |
| VANDALIA | 3 of 9 | 33 | 0-32 | 8.0 |
| VIENNA | 12 of 16 | 75 | 1-7 | 2.0 |

*Title: Timeliness of Follow up by Physician After Return From ED*

The Monitor recommends that clarification be provided to each facility and provider that a follow up appointment is to take place within 48 hours of a patient's return from the emergency. Follow up is an encounter with the patient to review the findings and discuss the treatment plan. A review of records without seeing the patient is not sufficient. All sites need to be instructed and followed up to ensure the date the patient was seen by a physician for follow up after return from the emergency room is recorded on the emergent urgent services log.

**RECOMMENDATIONS:**

1. Finalize and implement the policy and procedure on emergency services. Implementation will require additional support and coordination by OHS so that facilities standardize equipment, supplies and so forth. Implementation should proceed and be monitored according to a statewide plan outlining the steps to be taken, persons responsible and timeframes for completion.

2. Each compartment of the emergency bag should be sealed with a numbered tag to indicate that all required items are present and in working condition. The integrity of the seal should be checked daily and documented on the log along with the presence of other equipment, verification of pads and operational battery in the AEDs and sufficient supply of oxygen.

3. Every facility needs to have at least one AED reserved as a backup for dysfunction of other AEDs. A supply of batteries and pads should be kept on hand so that replacement takes place soon.

4. The Monitor stated in the first report that all IDOC emergency response bags must be

stocked with naloxone (Narcan) and Glucagon. We further recommend nasal, rather than injectable naloxone, because it is easier and safer to use in an emergency.

5. Emergency response that does not result in transfer to the emergency room also needs to be tracked on a log. The criteria to be tracked differ from that kept on the emergent urgent services log. Suggested data to track on an emergency response log should include date, time and location of the emergency, the time and name of the first health care responder, the nature of the emergency, the patient's acuity, disposition, and date the response was reviewed by a supervisor.

6. The logs should be used to review emergency response and any trips to the emergency room the next day by at least the facility Medical Director and Director of Nursing to make decisions about the priority of services, need for communication, and follow through in the care of these patients. Use of a daily huddle should be considered as the means to accomplish this.

7. We recommend the Director of Nursing be responsible for maintaining the emergency response and emergent urgent services log. The information on these logs should be reviewed and updated daily, in real time, not retrospectively.

8. Emergency response and the use of emergency room services need to be reviewed clinically. These reviews are for the purpose of identifying opportunities to improve primary care which is known to reduce emergency room use as well as ensure appropriate oversight and follow up care for patients after discharge. At a minimum these reviews should be documented in the CQI minutes, findings tracked, and trended and improvement plans developed based upon the results.

9. Information recorded on the emergent urgent services log needs standardization to include definition of what is considered an acceptable report from the emergency room and the expectation that a date is entered on the log when the report is received and when the patient is seen by the physician. You may consider adding a column that identifies what documentation was received (i.e. patient discharge summary, clinical discharge summary, future appointment, or a prescription). This would be in addition to the date it was received.

10. The Monitor recommends that a column after discharge diagnosis be added to the emergent urgent services log to document the disposition. Documentation choices should include deceased, admitted to (name of hospital), transferred to (name of institution), released (date of release) etc.

11. The accuracy of the information documented on the log needs to be verified by an audit of patient records on a quarterly basis with corrective action as necessary until sustained performance is demonstrated.

12. The Monitor recommends that clarification be provided to each facility and provider that a follow up appointment is to take place within 48 hours of a patient's return from the emergency. Follow up is an encounter with the patient to review the findings and discuss the treatment plan. A review of records without seeing the patient is not sufficient.

# Infirmary Care

***Addresses Items II.A.; II.B.1; II.B.6.k; III.I.1-5***

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois*

*Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**II.B.6.k.** *IDOC agrees to implement changes in the following areas: Appropriate staffing, physical conditions, and scope of services for infirmary care;*

**III.I.1.** *A registered nurse will be readily available whenever an infirmary is occupied in the IDOC system.*

**III.I.2.** *At every facility regularly housing maximum security prisoners, there shall be at least one registered nurse assigned to the infirmary at all times, twenty-four (24) hours a day, seven (7) days a week.*

**III.I.3.** *All facilities shall employ at least one registered nurse on each shift. If a prisoner needs health care that exceeds the IDOC infirmary capabilities, then the prisoner shall be referred to an offsite service provider or a hospital.*

**III.I.4.** *All infirmaries shall have necessary access to security staff at all times.*

**III.I.5.** *All infirmaries and HCUs shall have sufficient and properly sanitized bedding and linens.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

**Access to Services**

The infirmaries at Lincoln and Logan were site visited by the Monitor in advance of this report. At both institutions, the infirmary houses inmates who are not safe to house elsewhere at the facility and thus have long lengths of stay. Examples are persons who sleep with a CPAP machine to ensure that they receive enough oxygen at night, are on dialysis, or have a bleeding disorder. Use of the infirmary to house persons because it is unsafe for them to be housed elsewhere is poor use of limited infirmary beds and may restrict the person from other benefits, such as programming. Housing persons on an infirmary merely because they are disabled is against American for Disabilities Act regulation unless they are receiving medical treatment warranting housing on the unit.[129]

The use of infirmary bed capacity for purposes other than infirmary level care is a pervasive problem in IDOC facilities as evidenced by the statistics reported on utilization. At Kewanee for example, there are only four infirmary beds. In December one patient was considered a permanent infirmary admission and two other beds were filled with persons housed for administrative reasons. That left one bed available for acute or chronic admissions. At Menard seventeen admissions in December were for security reasons and six beds are filled with persons considered permanent admissions. More than half of the infirmary beds at Stateville CC and a third at Dixon are filled with permanent admissions. The impact of long stay admissions is

---

[129] The American for Disabilities Act position is that detention facilities shall not place detainees in medical areas unless they are receiving medical care or treatment. This is noted in The ADA in State and Local Courts, Law Enforcement and Detention Facilities, a power point presentation by Steven E. Gordon, Assistant United States Attorney, Civil Rights Enforcement Coordinator, USAO Eastern District of Virginia; slide 69 of 80 as found at http://www.adainfo.org/sites/default/files/5.2%20Law%20Enforcement_Gordon-1-slide-per-page-handout.pdf

reduced access to infirmary care for acute care and diagnostic procedures. At NRC, the CQI minutes for the last quarter of 2019 reflect discussion about over-riding medical holds if security needed the bed and that persons with scheduled bowel procedures had to complete their preparation in cell because infirmary beds were not available. This practice resulted in procedures that were compromised or delayed because of the failure to adequately prepare the patient.

**Sheltered Living, Intermediate, and Skilled Nursing Care**

At both Logan and Lincoln additional housing units had been designated for elderly and ambulatory impaired persons. These units are physically located adjacent to or nearby the Health Care Unit. Assistance with activities of daily living is provided by inmate orderlies. Health care for these individuals is provided on an outpatient basis. Other than a 0.25 FTE Physical Therapist at Logan, there is no program or organized delivery of services for this population and only limited supervision of the orderlies.

As noted in the 2018 Court Expert's Report IDOC health care and correctional leadership expressed concern about the increasing number of elderly mentally and physically disabled individuals in the IDOC and the infirmaries' capability of caring for this complicated patient population. An assessment of the geriatric and disabled population was recommended to determine housing and programming needs for this population[130]. No such assessment has taken place nor is intended, according to the implementation plan provided by OHS in November 2019[131]. The revised implementation plan provided in June 2020 includes a goal to complete a survey of health care needs of this population but no specific action steps or timelines for completion were included nor was there any indication of what would be done with the results[132]. This survey should include use of a standardized tool appropriate for this population and the data analyzed by persons with expertise with this population. The results should be used to determine appropriate alternatives to incarceration as well as develop and implement programming, staffing and safety standards for those who should remain incarcerated.

Also recommended is an investigation into the reasons for administrative and security housing. Use of infirmary beds should be reserved for medically necessary care. Alternative solutions to security reasons for use of infirmary beds must be sought. Reasons for administrative holds need to be understood.

Finally, infirmary capacity needs to be monitored and managed proactively at the statewide level by OHS. All admissions to infirmary beds should reviewed retrospectively for appropriateness and timeliness. All persons expected to need infirmary placement longer than two weeks should be reviewed prospectively, the long term plan of care reviewed and most appropriate placement (including consideration of parole, commutation, or compassionate release) determined.

**Scope of Services**

We did not evaluate the clinical care of patients assigned to the infirmaries at Logan and Lincoln

---

[130] Statewide Summary Report Including Review of Statewide Leadership and Overview of Major Services, Report of the 2nd Court Appointed Expert (October 2018) pages 11 & 70

[131] Illinois Department of Corrections, Implementation Plan, Lippert Consent Decree, 11/23/19.

[132] Illinois Department of Corrections, Implementation Plan, Lippert Consent Decree, Revised 6/12/20

which were site visited prior to this report. Therefore we did not determine if any of these prisoners needs exceeded the capabilities of the infirmary and should be referred to an offsite provider or hospital (III. I. 3)

**Registered Nurse Staffing**
The Director of Nursing at Logan stated that a registered nurse is assigned to the 15 bed infirmary at all times. During the site visit we observed a registered nurse was assigned to the infirmary. We reviewed the staffing plan and confirmed that a registered nurse position is assigned the infirmary at all times. We also audited three weeks of actual staffing assignments (February 10 – March 1, 2020) and found an RN assigned to the infirmary at all times (III. I. 2). However, because half the registered nurse positions are unfilled, eight of 21 shifts were staffed with mandatory overtime (38%) which is a patient safety risk.

At Lincoln, three weeks of staffing assignments were reviewed. A registered nurse or LPN is assigned to care for the infirmary patients every shift (III. I. 1). When an LPN has this responsibility there is an RN on duty who provides oversight and supervision of care.  At Lincoln there are only a total of six registered nurse positions. This is an insufficient number to provide registered nurse coverage 24 hours a day, seven days a week without use of overtime. Two additional registered nurse positions are identified in the IDOC staffing analysis[133] as needed to provide sufficient coverage. The Monitor agrees with this assessment. These positions should be added and filled now.

Two additional facilities appear to have insufficient registered nurse positions to comply with III. I.1. These are Kewanee which has only six registered nurse positions and Lawrence which has only seven registered nurse positions. With regular days off and other leave time it simply is not possible to provide a registered nurse all shifts, all days of the week without use of overtime. The IDOC staffing analysis increases registered nurse staffing at both locations[134]. These positions should be added and filled now.

Other than the requirements of the Consent Decree there are no standards used to determine the staffing for a particular infirmary. The Monitor has recommended that OHS apply the staffing standards for direct care[135] set forth in Illinois Administrative Code for skilled and intermediate care facilities to all patients receiving infirmary care as well as those in the ADA or sheltered housing units.

**Physician Staffing**
The medical record of Logan CC patient[136] who was admitted to the infirmary, initially for nurse observation and then formally admitted as an acute patient, was reviewed.  An RN note was written at the initiation of observation and again at the time of formal admission. There were five

---

[133] Staffing Analysis Illinois Department of Corrections Office of Health Services, Lippert Consent Decree 11/23/2019 page 27
[134] Ibid pages 13 & 35
[135] Administrative Code, Title 77: Public Health, Chapter 1: Department of Public Health, Subchapter c: Long Term Care Facilities, Part 300 Skilled and Intermediate Care Facilities Code, Section 33.1230 Direct Care Staffing available at http://ilga.gov/commission/jcar/admincode/077/077003000F12300R.html
[136] Logan patient #7

RN notes during the first two days in the infirmary. The physician admission note written by the facility's medical director, the only physician currently assigned at Logan CC, was entered on the same day of formal admission to the infirmary and a second progress was written on the second day. The initial physician note was written at 0235 hours at the provider's home. The physician communicated to the monitor that her other duties commonly force her to write infirmary notes at home hours after she had examined the infirmary patients. Logan CC should expeditiously fill the vacant physician position and staffing analysis recommended additional NP/PA position in order meet the complex medical needs of Logan's nearly 1,700 women and to allow physician infirmary notes to be entered in a timely manner.

**Ancillary and support personnel**

Ten of 29 sites included in the OHS staffing analysis employ nursing assistants (a total of 52 positions) according to the information provided on budgeted positions. The assignments of these positions is unknown. However we did observe at Logan that nursing assistants were assigned to assist the registered nurse in the infirmary.

The State of Illinois has established the standard that all patients receiving skilled nursing or intermediate receive at least a minimum number of hours of care each day, of which 75% can be provided by staff not licensed as nurses. These include physical therapists and aides, activity therapists and aides as well as nursing assistants. The Monitor's nurse consultant has used these standards to evaluate staffing needed at Dixon, Lincoln and Logan and finds them acceptable. The Monitor recommends OHS incorporate these standards into a model to guide direct care staffing for the infirmary as well as those housed on ADA and sheltered housing units.

Staffing the infirmary and the ADA or sheltered living units should be revised based upon the results of the needs assessment discussed in the previous section on access to infirmary, skilled and intermediate care and sheltered housing.

**Appropriate Physical Conditions**

**Logan CC**

The physical layout, space, and equipment at Logan for infirmary care is adequate and unchanged from the description in the 2018 2nd Court Expert report[137]. The 132 bed ADA and Elderly Unit #6 houses women who need assistance with activities of daily living or who have problems with ambulation. These women are routinely assigned lower bunks in multi-person rooms. Inmate helpers are assigned upper bunks. There does not appear to be any organized direction or supervision of the inmate helpers. The showers and toilet rooms in the Unit #6 were in poor repair; the showers had shower chairs and safety grab bars but none of the toilet inspected had safety grab bars. The grounds including sidewalks, stairs, and access roads around this unit and on the entire campus are in much disrepair, making it difficult for women in the ADA unit to go to programs, chapel, visitation etc. The Monitors visited Logan during a snowstorm in February and the women in this building were not allowed to leave it. Many of the women interviewed, complained about how dangerous the sidewalks and roads were even in

---

[137] Logan Correctional Center, 2nd Court Appointed Expert Report, Lippert v. Gonzales, page 9, 46-47

good weather and how it impeded their daily lives. We also interviewed a nursing assistant who had fallen earlier in the day because of a break in the sidewalk. The accommodations for disabled persons at Logan are inadequate and isolating. The campus' physical therapy unit was located off the central day room of the ADA and Elderly Unit; although the PT room has limited therapeutic equipment, its location enhances the access of the Unit #6 patient population to much needed physical therapy services.

**Lincoln CC**
At Lincoln, the infirmary is located in the back of the clinic building. It consists of two crisis rooms (one of which is also the negative pressure isolation unit) and a 6 bed dormitory. A call system was being installed at the time of the site visit. The space in the dormitory is tight and may not meet standards for infection control spacing.  The dormitory is also used for diagnostic procedures and requires that the men assigned to the infirmary must vacate it. This negates the purpose of having an infirmary and is an infection control risk.

There is a single person shower, sink and single commode bathroom adjacent to the infirmary dormitory. The shower-toilet area has a safety grab bar. There are missing floor tiles, missing baseboard, rusted ceiling tiles, and an obvious leak from the base of the shower into the toilet area.  This shower and toilet serve the sickest and most debilitated individuals on the campus and was in the worst shape of any bathroom we saw at the facility. It needs to be repaired and renovated promptly. As it is, it cannot be effectively sanitized and likely would not meet ADA standards.

The nursing station is located down a short hall from the dormitory and across from the crisis bed rooms. This area is also the nurses' work area for the clinic and the medication preparation area. It is extremely crowded and dysfunctional and will be a significant impediment when the EMR is implemented.

**Policy and procedure**
A revised policy and procedure has been drafted by OHS and provided to the Monitor for review.  The Monitor has provided feedback and recommended changes to OHS on the draft policy and procedure. However, until it is finalized written guidance for infirmary care still resides in the Administrative Directive (AD) last updated in 2020[138]. Both the first and second court expert reports criticized the AD for not describing the scope of services provided in the infirmary setting and not giving guidance for clinicians about patient conditions which should be referred a hospital instead of infirmary care[139].

**Performance monitoring and quality improvement**
The Primary Medical Services Report captures infirmary admissions and discharges each month for patients receiving acute and chronic care. No data on length of stay or average daily population is recorded. Information on infirmary utilization may also be included in the facility CQI meeting. In the 4th quarter of 2019 eight facilities reported infirmary utilization in the CQI minutes. The information reported in CQI minutes varies from facility to facility and uses

---

[138] Administrative Directive 04.03.120 Offender Infirmary Services (9/1/2002)
[139] Statewide Summary Report Including Review of Statewide Leadership and Overview of Major Services, Report of the 2nd Court Appointed Expert (October 2018) pages 68-69

different admission categories than the Primary Medical Services Report.

Four facilities reported on CQI studies that involved some aspect of infirmary care. These were Big Muddy, Pinckneyville, Taylorville and Vandalia. Big Muddy repeated the same study each month that quarter. All of the studies looked at whether one or more requirements of the AD or local procedure were followed. If problems were identified it was either incomplete documentation or missing required timeframes. There were no studies concerning quality or outcomes of care. Corrective action planning was minimal. Stateville discussed problems with access to infirmary beds and poor clinical outcomes but did not study or analyze the problem using QI techniques or seek a solution.

Once the policy and procedure is finalized, standardize the statistical report in conformance with definitions of levels of care and establish procedures to conduct retrospective review of admissions and prospective review of admissions longer than two weeks. Revise performance monitoring tools to coincide with the new policy and procedure.

**Programming**
Other than a 0.25 FTE physical therapist at Logan, there is no programming for frail, elderly, or physically disabled persons. The OHS staffing analysis proposed increasing this position to 1.0 FTE. We recommend the addition of physical therapy services at Lincoln. We recommend a needs assessment at all IDOC facilities to develop programming appropriate to this population including access to specialists in geriatric and disability services, placement in alternative facilities and other mechanisms to ensure public safety, such as remote monitoring devices.

**References**
During the six site visits in 2019 and 2020, interviews with providers verified that many of the providers did not have access to nationally recognized online medical reference sources such as UpToDate® which was reported in the past to have been made available by the vendor at all IDOC sites . Two physicians reported that they were not knowledgeable in how to access online references and did not know if the vendor provided access to UpToDate® on their office computers. The provider at Logan CC, one of only two correctional centers with has the electronic health record, stated that she can access online references but only uses a less comprehensive website.

Nurses in the infirmary at Logan did not have any recent reference material available. Typically nurses benefit from having access to references on drugs, labs, nursing procedures, anatomy and physiology, etc. particularly when a nurse is performing a procedure that is new or seldom used and for patient teaching.

**Access to Security**
At Logan, a correctional officer is posted approximately 10 yards from the infirmary and is within sight but not sound of the nurses' station. At Lincoln, the correctional officer is posted at a desk in the clinic facing the waiting area. This officer is readily available to the infirmary as needed. At all six sites visited so far by the Monitor there has been a correctional officer either posted to the infirmary or readily available and posted to the clinic.

**RECOMMENDATIONS:**

1. Investigate reasons for administrative and security housing in the infirmary. Alternative solutions to security reasons for use of infirmary beds must be sought. Reasons for administrative holds need to be understood. The infirmary should not be used for ADA housing unless the patient otherwise would have a medical need to be housed on the infirmary. Use of infirmary beds should be reserved only for medically necessary care.

2. Delineate a plan and timeframe to accomplish the goal to assess the housing, programming, and health care needs of the elderly, mentally and physically disabled persons housed in IDOC facilities. Each individual meeting these criteria should be assessed using a standardized tool appropriate for this population and the data analyzed by persons with expertise with this population. Use the results to determine appropriate alternatives to incarceration as well as develop and implement appropriate housing, programming, staffing and safety standards for those who should remain incarcerated.

3. Infirmary capacity needs to be monitored and managed proactively at the statewide level by OHS. All admissions to infirmary beds should reviewed retrospectively for appropriateness and timeliness. All persons expected to need infirmary placement longer than two weeks should be reviewed prospectively, the long term plan of care reviewed, and most appropriate placement determined (including consideration of parole or commutation or transfer to a more appropriate facility).

4. Reduce mandatory registered nurse overtime to cover infirmary shifts by filling vacant positions or establishing additional positions.

5. Staffing the infirmary and the ADA or sheltered living units should be revised based upon the results of the needs assessment discussed in the previous section on access to infirmary, skilled and intermediate care and sheltered housing. Consider use of the staffing standards for direct care[140] set forth in Illinois Administrative Code for skilled and intermediate care facilities.

6. Repair and renovate the sidewalks, stairs, and access roads at Logan so that women with disabilities are able to move about the institution safely. The infirmary at Lincoln CC is of insufficient size to safely use for care and needs to be replaced.

7. Complete the policy and procedure for infirmary services to include defining the level of services provided and expectations for referral for hospitalization and specialty care.

8. Standardize the utilization data reported on infirmary care to also coincide with the definitions in the new policy and procedure.

9. Revise tools used to monitor performance for delivery of infirmary care to coincide with the new policy and procedure. Set expectations for the frequency of monitoring, reporting results and corrective action.

10. Provide easy access to paper or online reference material for staff assigned to the infirmary.

---

[140] Administrative Code, Title 77: Public Health, Chapter 1: Department of Public Health, Subchapter c: Long Term Care Facilities, Part 300 Skilled and Intermediate Care Facilities Code, Section 33.1230 Direct Care Staffing available at http://ilga.gov/commission/jcar/admincode/077/077003000F12300R.html

# Specialty Consultation

*Addresses Items II.A; II.B.1; II.B.6.e; II.B.6.g; III.E.4; III.H.1-4*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**II.B.6.e.** *IDOC agrees to implement changes in the following areas: Informed care for patients who return to IDOC facilities after being sent to an offsite service provider;*

**II.B.6. g.** *IDOC agrees to implement changes in the following areas: Timely access to diagnostic services and to appropriate specialty care;*

**III.E.4.** *The medical records staff shall track receipt of offsite medical providers' reports and ensure they are filed in the correct prisoner's medical records.*

**III.H.1.** *Medical staff shall make entries in a log, preferably electronic, to track the process for a prisoner to be scheduled to attend an offsite service, including when the appointment was made, the date the appointment is scheduled, when the prisoner was furloughed, and when the prisoner returned to the facility. This log shall be maintained by the HCUA.*

**III.H.2.** *Within three days of receiving the documentation from scheduled offsite services, the documentation will be reviewed by a medical provider. Routine follow-up appointments shall be conducted by facility medical staff no later than five (5) business days after a prisoner's return from an offsite service, and sooner if clinically indicated.*

**III.H.3.** *If a prisoner returns from an offsite visit without any medical documentation created by the offsite personnel, IDOC shall use best efforts to obtain the documentation as soon as possible. If it is not possible to obtain such documentation, staff shall record why it could not be obtained.*

**III.H.4.** *Provided that IDOC receives documentation from offsite clinicians, all medical appointments between a prisoner and an offsite clinician shall be documented in the prisoner's medical record, including any findings and proposed treatments.*


**OVERALL COMPLIANCE RATING:** Noncompliance.


**FINDINGS:**

Item III.H.1 requires that the HCUA is to maintain a tracking log that tracks the offsite referral process. The existing log used for this purpose appears to be a Wexford log used for authorization of payment and not a log used to track referrals for care. Quality improvement meeting minutes at some sites present data that includes the number of referrals with denials, alternative treatment plans and in some cases denials that were referred to the OHS. Other sites do not report this data. Each facility reports different offsite referral data in their quality improvement meeting minutes. We could not verify that the data represented at quality improvement meeting minutes matched data as represented in respective facility's tracking logs. The tracking logs do not include referrals that were denied, resulted in alternate treatment plans, or were referred to OHS. Thus appropriate access to offsite consultation or diagnostic studies could not be assessed. Because of the lack of standardization of reported data, and the deficiencies of the existing tracking logs, we were unable to use data provided to us on tracking

logs to verify that access to specialty care is timely, appropriate, or available to inmates. Tracking logs should be able to be used by the quality improvement teams and the Monitor's team to evaluate access to specialty care.

Tracking logs should be standardized across all facilities. Tracking logs should contain the following items:

- The patient name and IDOC number;
- The original date that a provider referred the patient for a consultation or for offsite testing. This should include all referrals including ones that do not result in a completed offsite consultation or diagnostic study;
- The reason for referral;
- The referral location;
- The date the appointment was made;
- The date the appointment occurred or was not kept (cancelled, not transported, lockdown, refused, etc.);
- If the appointment was canceled, the cancellation should be documented on the log and the re-schedule date needs to be documented. This needs to be done for every cancellation until the appointment occurs. Each cancellation needs to be in the same row for each unique referral;
- The date the facility received the consultant or testing report;
- The date the medical provider reviewed the consultant or testing report;
- The date of the follow up visit with a provider; and
- Delays in advancement of a referral due to the Wexford utilization process should be tracked in their entirety on this log. When Wexford makes a utilization decision and recommends an alternative treatment plan, request for more information, or denial of care, the tracking log should record the date of that decision and the type of utilization decision.

.

We note that insufficient information was available to evaluate whether offsite reports are tracked, obtained timely, or filed in the patient's medical record. At several facilities the Monitor visited, the tracking log documented receipt of a report but the report was not the complete consultant report. We will need to clarify how the IDOC is tracking this process.

**RECOMMENDATIONS:**

1. Create a tracking log which contains information in the list above.
2. The HCUA must maintain the tracking log. The log must be a log maintained for purposes of assessing access to specialty care and must include all referrals.
3. Use quality improvement to study whether patients in need of specialty care are being referred for care; whether patients referred for offsite specialty care have received timely care; and whether diagnostic studies and consultations are being appropriately integrated into the patient's overall therapeutic plan. This should include, as only one example, review of records to see if the follow-up visit with the PCP describes a discussion between the patient and the provider, revolving around the findings at the offsite service and the plan of care.

Specialty Referral Oversight Review

*Addresses III.H.5*

**III.H.5.** *Within six (6) months after the Preliminary Approval Date of this Decree [July 2019]or until Defendants are able to fill both Deputy Chief of Health Services positions, they will make reasonable efforts to contract with an outside provider to conduct oversight review in instances where the medical vendor has denied any recommendations or taken more than five (5) business days to render a decision, including cases in which an alternative treatment plan has been mandated in lieu of the recommendation and cases in which the recommendation has not been accepted and more information is required. If no contract with an outside provider is reached, then the Monitor or his or her consultants shall conduct oversight review in instances where the medical vendor has denied any recommendation or taken more than five (5) business days to render a decision, including cases in which an alternative treatment plan has been mandated in lieu of the recommendation and cases in which the recommendation has not been accepted and more information is required. Once Defendants have filled both Deputy Chief positions, the Deputy Chiefs will replace any outside provider, the Monitor or his or her consultants to conduct oversight review in the instances described in this paragraph. (see Specialty Care Section)*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

III.H.5: Wexford requires that all non-emergency offsite referrals for specialty care, diagnostics, testing, imaging and selected onsite procedures (e.g. ultrasound) be reviewed and approved by Wexford's offsite physician reviewers prior to appointments being scheduled. Wexford's offsite reviewers have regularly scheduled conference calls with facility physicians to discuss and approve referrals. During these calls Wexford's offsite reviewer does not have access to patients' medical records nor do they have the opportunity to interview or examine the involved patients. Wexford's offsite physician reviewers approve, deny, request additional clinical information about the reason for the offsite referral, or offer advice in the form of an alternative treatment plan (ATP). This process is called the "Collegial Review." Since the submission of the First Report of the Monitor on November 23, 2019 there has been no change in this process.

The Consent Decree requires that all non-approved referrals be reviewed by the IDOC Deputy Chiefs or an independent reviewer. However, it was not possible to accurately verify the number of referrals or to determine the number of delays with requests for more information, alternative treatment plans or denials of care.[141] On two occasions, the monitor requested from Wexford

---

[141] The IDOC provided offsite referral data in multiple formats. One source of data is found by laboriously going through every quality improvement meeting and finding the number of referrals which are listed in each facility's report. Collegial Referrals elicited from IDOC QI reports for April to June 2019 and October to December 2019 were reviewed and analyzed. These reports give summary data for total referrals, approvals, ATPs and denials. A second data source is the Wexford Primary Medical Services report. This data contains only the number of referrals and denials but not ATPs. This data was reviewed for the months May through December 2019. The Wexford Primary Medical Services Report data is not identical to the data on the QI Collegial Referral reports. A third source of data is the offsite specialty logs which only capture approved referrals. We spot checked these data sources for four facilities. The numbers of referrals and denials is not the same in every report. For example data as is found in the Wexford Primary Medical Report is not identical to the QI Collegial Referral reports. Lastly, the offsite specialty log, which is supposed to track offsite referrals does not include the date of referral and does not include

2019 aggregate referral data including total referrals, denials, requests for more information, and Alternate Treatment Plans. The vendor provided data to the monitor in May, 2020 which noted that there were 24,128 collegial referrals requested in 2019 which resulted in 22,579 (93.6%) approvals and 1, 549 (6.4%) alternative treatment plans. The vendor reported that 45 ATPs were eventually overturned upon appeal to the OHS; it was unclear if these 45 referrals were also counted as approvals or ATPs. The vendor's data base did not track the time between the date of request to the date of approval or ATP or OHS appealed approvals. Because the various documents provided to us could not be used to determine an accurate number of non-approved referrals, we used the data from quality improvement meeting minutes from October through December 2019, for 30 IDOC facilities [142] that show that 5,122 referrals were submitted during this three month period of time and 520 (10.2%) were either denied, given an Alternative Treatment Plan (ATP), or requested additional information. This annualized to 20,488 annual referrals and 2,124 annual denials or ATPs. Based on this data and the requirement of the Consent Decree approximately 2,000 referrals should be reviewed by Deputy Chiefs or an independent reviewer on an annual basis.

In the summer of 2019, IDOC filled two Deputy Chief positions. These two individuals assumed the responsibility of conducting oversight review of non-approved referrals for offsite specialty services. Because of the volume of non-approved referrals, the Deputy Chiefs are currently only reviewing denials of service that were appealed by the facilities' local clinical leadership but are not reviewing each and every alternative treatment plans or referrals for which additional information is requested.

The Monitor was given OHS data[143] that notes that 217 appeals were forwarded to OHS from January 2019 through May 2020. 114 (53%) denials or ATPs were overturned, 34 ATPs were allowed, and 69 were pending resolution. Not including the "no resolution" category, 77% of the appealed denials and ATPs were overturned and approval granted to proceed as referred. We estimate that only five to seven percent of non-approved referrals required to be reviewed in accordance with the Consent Decree were actually evaluated by OHS. Even this small percentage of OHS oversight reviews place a notable drain on OHS's limited clinical leadership resources.

The monitor reviewed a number of referrals and identified 14 denials or ATPs that were not justified. One patient-inmate[144] had a sudden loss of vision in one eye and was referred to an offsite ophthalmologist. The ophthalmologist identified the patient-inmate had a cataract and a detached retina. A retina specialist advised that he should have the cataract removed in order to properly evaluate any options that might give him a chance to regain his vision. The cataract surgery was denied by the vendor's reviewer. During a monitor's site visit, this individual was interviewed and the site's clinical leadership agreed to re-refer the patient to the ophthalmologist for cataract surgery. This delay may result in permanent loss of vision for this patient.

---

any referral that includes an ATP or denial. This makes the log difficult even impossible to use for purposes of tracking.
[142] Reports were missing from 2 sites
[143] OHS Collegial Appeals reports
[144] Specialty care patient #1

Another patient-inmate[145] had an expanding mass in the region of his shoulder/armpit that was associated with muscle atrophy and diminished shoulder range of motion. Three requests for surgical evaluation were denied for insufficient information; each resulted in an alternative plan. Eventually the patient was referred to a surgeon.  Eleven months passed from the initial request to the scheduled date for surgery. An expanding mass could potentially represent a malignant growth.  This excessive delay caused by the vendor's referral process could have jeopardized the health of this individual.

Two patient-inmates[146] had inflammatory bowel disease that had resulted in removal of portions of their bowels with temporary colostomy and ileostomy[147] placements. Referrals for reversal of the ostomies for both patient-inmates were denied by the vendor's physician reviewer because this surgery is deemed by the vendor to be an elective procedure and thus would not be performed.  Both of these requests were eventually overturned by the OHS Deputy Chiefs.  The appeal of one of these denials was brought to the attention of the OHS due to family complaints. The denials resulted in the ostomy removals being delayed for, respectively, 10 months and 4 months. Prolonging the use of a medically unnecessary ostomy is degrading and causes needless discomfort for the patient, creates a preventable risk of bacterial exposure to other offenders and staff, can result in additional surgical complications, and places additional avoidable burdens on the correctional centers (follow-up visits, provision of supplies).

Another patient-inmate[148] had bilateral cataracts. A cataract in one eye was removed but the vendor denied the request to have the other cataract removed stating that the requested service was not authorized because it did not meet the vendor's guidelines. The facility's optometrist communicated the denial to the patient and printed out a copy of the vendor's guideline, "Management of Cataracts" I.C.3. The patient was advised that the vendor allowed cataracts to be "removed … from one eye only."  The denial was ultimately appealed and overturned by the OHS Deputy Chief four and a half months after the initial referral was submitted for the removal of the second cataract.

Two patient-inmates[149] had abnormal sleep studies, one with an elevated Respiratory Disturbance Index (RDI) >30 events per hour indicating severe apnea and the other with an elevated Epworth Score of 30 indicative of severe excessive day time sleepiness[150]  but the vendor's reviewers denied referrals for CPAP machines for both individuals, recommending "monitor onsite" and "weight loss".  It was not clear what monitoring onsite meant.  One of the patients' denial for a CPAP unit was overturned by the OHS Deputy Chiefs. The recommendation to lose weight for obese patients with sleep apnea is universally advised but virtually not achievable for incarcerated individuals.

---

[145] Specialty care patient #2
[146] Specialty care patients #3 and #4
[147] A colostomy or ileostomy is a procedure to divert the colon to an artificial opening in the abdominal wall to bypass the damaged or repaired part of the colon.  Once the damaged colon has healed the artificial opening is closed and the bowel reattached so that the person can function normally.  When a colostomy is in place the patient must daily clean and maintain the bag that contains the excrement.  Not performing a colostomy closure forces the patient to have bowel movements in this abnormal manner.
[148] Specialty care patient #5
[149] Specialty care patients #6 and #7
[150] We did not have access to the actual sleep study

Three additional individuals [151] had complaints of snoring, shortness of breath in bed, and daytime sleepiness[152]. Two of these patient were told that they stop breathing when asleep. The facility physicians referred the patients for sleep studies which was clinically appropriate but these referrals were denied by the Wexford reviewer who advised only "monitor onsite" and "weight loss".

Three other individuals[153] had one to three hemoccult positive results out of three stool tests. This indicates gastrointestinal bleeding and indicates possible gastrointestinal cancer or other serious gastrointestinal disorder. Requests for gastrointestinal consultation and colonoscopy for all three patients were denied by the vendor's reviewers. One of the patients was over 50 years old and was not approved for a colonoscopy but was recommended to "monitor lab and recheck stool". Another patient had unilateral flank tenderness, a family history of colon cancer, and three positive occult stool tests but the request for consultation and colonoscopy was denied and additional unspecified workup advised. The third patient had three positive occult blood stool tests but the request for consultation and colonoscopy was denied and additional lab tests advised. Standard of care for a person with a positive test for blood in the stool is for endoscopy to rule out the cause of the bleeding. Also, for persons over 50 with a positive screening test for blood in the stool colonoscopy is recommended to rule out cancer.[154] Even a single positive stool blood test out of three separate stool specimens is an indication for colonoscopy in order to evaluate the source of the intestinal bleeding and to rule out colon cancer. The vendor's denials of the clinically indicated endoscopy is not consistent with national and IDOC guidelines and put these patients' health at risk.

A final patient-inmate[155] had a one centimeter brown skin lesion on the face' but the vendor's reviewer denied the request for a dermatology consultation without examining the patient or seeing a photo of the lesion and advised "monitor and document, refer if increased size". Without seeing the lesion, melanoma or other skin cancer could not be excluded.

The process of referral review including conference calls, repeat requests, and appeal processes consumed valuable physician, nurse, medical record, health unit administrator, and OHS time. Significant delays in care occur in many cases that have potential to cause harm to patients. The Monitor continues to feel that the vendor's collegial referral process presents a barrier to the access of IDOC patient-inmates to offsite specialty consultation and testing. It delays needed consultations, procedures, and testing. It potentially puts patient-inmate's health at risk. It diminishes patient quality of life. It consumes an extraordinary amount of physician, HCUA, medical record staff, nurse, Regional Health Coordinator, Agency Medical Director, and Deputy Chief resources. The Monitor again recommends that the vendor's referral process be

---

[151] Specialty care patients #8, #9, and #10
[152] These included an Epworth score of 12, another with mild-borderline moderate excessive daytime sleepiness, and a third with a score of 21 indicating severe excessive daytime sleepiness. Scores of 9-24 indicate possible pathologic sleepiness.
[153] Specialty care patients #11, #12, and #13
[154] The United States Preventive Services Task Force (USPSTF), the American Cancer Society both recommend screening for colon cancer for persons over 50 years of age. When a positive screening test is obtained, standard of care is a colonoscopy to rule out cancer.
[155] Specialty care patient #14

discontinued. This position of the Monitor was noted in the First Court Report and is now reinforced by the examples of inappropriate denials of specialty referrals, tests, procedures, and clinical equipment listed in this section.

The IDOC OHS Deputy Chiefs are only reviewing approximately one percent of the referrals required by the Consent Decree. It is not clear how many of the approximately 2,000 non-approved referrals would have been reversed. Nevertheless, it is the opinion of the Monitor that forcing the OHS to re-review all required cases would be wasteful of their time as opposed to merely eliminating the existing Wexford referral process.

**RECOMMENDATIONS:**
1. It is the recommendation of the Monitor that the current Collegial Review specialty care and diagnostic testing referral process be immediately discontinued.
2. The IDOC must conduct a review of the vendor's policies, practices, and guidelines that affect patient-inmates' access to medically necessary consultation, testing, and procedures and eliminate, with input from the monitor, those guidelines that restrict access to medically necessary clinical services. Examples of current restrictive vendor practices include limiting cataract surgery to only one eye, categorizing ostomy reversal surgery as an elective, and others.

## Hospital Care

*Addresses Items II.A; II.B.1; III.G.4*
**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*
**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*
**III.G.4.** *Facility medical staff shall ensure that a prisoner is seen by a Medical Provider or clinician within 48 hours after returning from an offsite emergency service. If the Medical Provider is not a clinician, the Medical Provider shall promptly review the offsite documentation, if obtained, with a clinician and the clinician shall implement necessary treatment.*

**OVERALL COMPLIANCE RATING:** Not yet rated

**FINDINGS:**
The Monitor had insufficient data to adequately report on this provision.

**RECOMMENDATIONS:** None

## Preventive Services

### Influenza Vaccination
*Addresses items III.M.1.a*

114

**III.M.1.a.** *Defendants or their contracted vendor(s) shall ensure that all prisoners will be offered an annual influenza vaccination*

**OVERALL COMPLIANCE:** Partial Compliance

**FINDINGS**

The monitor continues to be aware that influenza vaccination is offered to the IDOC patient population in all correctional centers. During site visits to six correctional facilities in 2019 and 2020, the monitor reviewed multiple medical records and verified that many patient-inmates had been offered influenza vaccines; it was also noted the refusal rate appeared to quite high. No aggregate data has been provided to allow the monitor to report on specific influenza vaccination rates and refusals.

**RECOMMENDATIONS:**

1. The IDOC should track and report annual influenza vaccination rates and refusals.

## Adult Immunizations

*Addresses items III.M.1.b.*

**III. M.1.b.** *Defendants or their contracted vendor(s) shall ensure that all prisoners with chronic diseases will be offered the required immunizations as established by the Federal Bureau of Prisons.*

**OVERALL COMPLIANCE:** Partial Compliance

**FINDINGS:**

As noted in the First Court Report, in October 2019 the IDOC Office of Health Services disseminated to all IDOC facilities instructions and standing operating procedures for the implementation of an adult immunization program in the IDOC. These guidelines are fully in accord with the Centers for Disease Control and Prevention 2019 recommended adult immunizations.[156] Tetanus-diphtheria, Hepatitis B, Hepatitis A, Pneumococcal 23, influenza vaccines are stocked at each correctional facility. The vaccines that have been made available by the new OHS guidelines must be individually ordered from BosWell pharmacy services by providers for patient-inmates. These orderable vaccines include Human Papilloma Virus (HPV), Meningococcal ACWY, Meningitis B, Pneumococcal 13, Recombinant Herpes Zoster (Shingrix), Hemophilus Influenza B (HIB), MMR, and Varicella immunizations.

BosWell pharmacy provided the monitors with a list all vaccines ordered for individual IDOC inmates from November 1, 2019 through March 31, 2020. In 2020 the IDOC also developed an administrative directive (AD) titled "Immunization Program Implementation" and an immunization and cancer screening data base tracking form. During the first six months after OHS expanded the number of nationally recommended vaccines in the IDOC, three individuals have been administered Hemophilus Influenza B, twelve Meningococcal-ACYW, seven Pneumococcal-13, and thirty Recombinant Herpes Zoster immunizations. One hundred thirty

---

[156] Center for Disease Control and Prevention, Recommended Adult Immunization Schedule for ages 19 years or older, United States, 2019

doses of Human Papilloma Virus vaccines have been ordered and shipped to Logan CC in preparation for an HPV immunization campaign targeting women at risk for cervical cancer. This campaign was postponed due to the COVID-19 pandemic.

Chart reviews were done in February 2020 for three individuals[157] at Logan CC and seven[158] at Lincoln CC each of whom are candidates (age, DM, COPD, Asthma, HIV) for one or more nationally recommended adult immunizations. Only one of nine candidates for had been offered Pneumococcal 23 vaccine, zero of four Pneumococcal 13 vaccine, zero of two HPV vaccine, and zero of one meningococcal ACYW vaccine.

The number of individuals who have received the newly available vaccines is, to date, extremely low.  For example, over 7,000 inmates over 50 years of age are eligible for recombinant Herpes Zoster (Shingrix) vaccination but only 30 have received the vaccine and nearly 900 over 65 year old inmates are candidates for Pneumococcal-13 but only 7 have received this vaccine.[159] The OHS has appropriately expanded access to recommended adult vaccines for the IDOC population but now must develop clear plans and directives on how to effectively ensure that these vaccines are offered to the system's at-risk population. In order to assure that the health of the IDOC patient population is being properly protected, the IDOC needs to track and monitor the administration rates including refusals for all adult immunizations; ideally the EMR will incorporate data points for the offering and administration of all vaccines.

**RECOMMENDATIONS:**
1) The IDOC has promulgated standard operating procedures for a comprehensive adult immunization program and must now develop and implement a process that ensures that all incarcerated individuals are offered nationally recommended age and risk appropriate adult immunizations.  This process will likely include the provision of adult immunizations during annual and bi-annual health assessments, in chronic care clinics, and in special catch-up vaccine campaigns.
2) The IDOC must track and report the administration of all adult immunizations.
3) The Pearl® EMR should incorporate data points and clinical prompts which electronically remind, record, track, and report all adult immunizations offered and administered and the identified clinical indication (age, clinical condition, etc.)
4) The pending HPV vaccination project for all females 26 years of age or younger must be supported and used as a model to promote the delivery of protective adult immunizations throughout the IDOC.

## Cancer and Routine Health Maintenance Screening

*Addresses items II.A; III.M.1.c*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs.  Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

---

[157] Logan CC immunization  patients #3, #4, #5
[158] Lincoln CC immunization patients #1, #2, #5, #6, #7, #9, #10
[159] IDOC August 2019 population data

**III.M.1.c.** *All prisoners ages 50-75 will be offered annual colorectal cancer screening and PSA testing, unless the Department and the Monitor determine that such testing is no longer recommended.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

In October 2019 the IDOC Office of health Services distributed systemwide "Standard Operating Procedures: Cancer Screening" which detailed IDOC Routine Health Maintenance and preventive screening recommendations for breast, cervical, colon, and prostate cancer screening. In 2020 the IDOC also developed a cancer screening (and immunization) data base tracking form. The procedures failed to mention recommendations for lung screening and abdominal aortic aneurysm (AAA) screening.

However during site visits to Logan CC and Lincoln CC in February, 2020 there was no evidence that a nationally recommended testing modality was being used to screen at risk men and women and men for colon cancer. The USPSTF[160] recommends that colon cancer begin at age 50 for asymptomatic, average risk patients. The medical records of two women[161] at Logan CC and six men[162] at Lincoln CC all of whom were between 51 and 70 years old were reviewed. Seven of the eight had documentation that they were offered a rectal exam and a single fecal occult blood test (FOBT) to screen for colon cancer. This method of screening for colon cancer had been discontinued over 15-20 years ago and replaced with other more sensitive and specific screening tests. Three of the seven individuals refused the rectal exam. OHS had investigated recommended options for colon cancer screening and had wisely chosen to use the validated Fecal Immunochemical Test (FIT) that allows patients to individually place a small amount of fecal material in a tube and return it to the clinic for evaluation. An added advantage of the FIT test is that a negative test does not have to be repeated for two years. The monitors were advised that FIT test kits had been procured and were available at both sites but no one knew if they had been yet utilized. The monitors were unable to identify any individual who had been screened for colon cancer with the FIT test.

As noted in the first Court Report, the USPSTF recommends that selective screening for prostate cancer using PSA testing in average risk males 55-69 based on preferences and informed by relevant clinical information and professional judgement. The frequency of screening is not clearly defined. Prostate cancer screening should not be done for men older than 70 or with a life expectancy less than 10 years. Routine annual PSA screening for asymptomatic men and digital prostate palpation via a rectal exam is not a national recommendation.

The USPSTF recommends annual lung cancer with low dose computerized tomography in adults aged 55-80 who have a 30-pack year smoking history and currently are smoking or have quit within the past 15 years. The IDOC patient population has a strong history of tobacco smoking and should be offered lung cancer screening as recommended by the USPSTF. The monitors

---

[160] United States Preventive Services Task Force cancer screening guidelines
[161] Logan cancer screening patients #1, #2
[162] Lincoln cancer screening patients #3, #4, #5, #6, #7, #13

117

have not identified a single patient during the six site visits in 2019-2020 who have been screened for lung cancer. The IDOC has not yet included lung cancer screening in their cancer screening procedures.

The USPSTF also recommends that men between the ages of 65-74 who have ever smoked should have a one-time ultrasound to screen for abdominal aortic aneurysm. The IDOC has not yet added this recommendation to their RHM/Preventive Services guidelines.

**RECOMMENDATIONS:**
1) The IDOC should track and report the rates of cancer and RHM/preventive services screening offered and provided to the inmate population.
2) The IDOC should incorporate all the A and B recommendations of the USPSTF into their RHM/Preventive Services program.
3) The wording of III, M.1.c should be modified so that the PSA testing recommendation is in align with the prostate screening recommendations of the USPTF.

## Mammography Screening
*Addresses items III.M.1.d*
**III.M.1.d.** *All female prisoners age 45 or older will be offered a baseline mammogram screen, then every 24 months thereafter unless more frequent screening is clinically indicated, unless the Department and the Monitor determine that such testing is no longer recommended.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**
Staff interviews and limited chart reviews performed during the February 2020 site visit at the Logan CC female facility revealed that women were being regularly screened for breast and cervical cancer. The Monitor has not identified any data in the Quality Improvement Committee minutes during 2019 that reported on the monitoring of breast and cervical cancer screenings. Larger scale chart reviews will be needed to provide more substantial data on compliance with this provision. IDOC should initiate ongoing data collection of the provision of breast and cervical cancer screening at facilities that house females. This data should reported in the QI Committee minutes at Logan CC, Decatur CC, and Elgin Treatment Center.

**RECOMMENDATIONS:**
1. Monitor and report the offering and provision of breast and cervical cancer screening to the Quality Improvement Committees

# Pharmacy and Medication Administration
*Addresses items II.A;  II.B.1; II.B.6.c; II.B.6.d;*
**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs.  Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*
**II.B.1.**  *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary*

*care*
**II.B.6.c.** *IDOC agrees to implement changes in the following areas: Medication administration records-both for directly administered medications and KOP*
**II.B.6.d.** *IDOC agrees to implement changes in the following areas: Medication refusals;*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

The problems with medication administration and refusals described at length in the 2nd Court Expert report[163] are readily apparent and unchanged at the time of this report. We note that Defendants are upgrading PEARL® at the two women's' facilities which will include documentation of stop dates on the MAR, but these changes have yet to be implemented. Defendants have provided no information with regard to steps taken to come into compliance with II. B. 6. c or d [164]. The staffing plan developed by OHS[165] does not describe how the number of nursing positions to carry out medication treatment orders was determined, and these positions are not delineated in the list of budgeted or proposed positions. A workload driven staffing standard should be established. This measure should reflect accurately the time it takes to administer and document administration of medication safely.
Medication Administration

The Monitor's first report noted that three of four facilities pre-poured medication and documentation of administration was not completed at the time of administration[166]. We observed these same unsafe practices at Logan, but not at Lincoln, which were visited in advance of this report. Thus, four of six facilities visited since the Monitor was appointed administer medication unsafely. Reasons for continuing to practice without regard for patient safety include broken medication carts, physical plant issues, and minimizing disruption with facility operations.

Another opportunity for errors and omissions in patient care is the inability to obtain a medication profile from the pharmacy to use in reconciling the medication administration record (MAR). Instead nursing staff print orders out of Pearl or use the MAR from the current month as verification of a medication list. This is a painstaking and time consuming process which is also subject to errors in verifying medications the patient should receive.

Recent MARs were not in several of the patient health records reviewed while on the site visit to Lincoln and Logan. Providers also reported that the MAR was not available to them when seeing patients during scheduled appointments. Also at Logan, insulin administration is maintained on a separate record and kept in a book with the records of all patients on insulin. Medication

---

[163] Statewide Summary Report Including Review of Statewide Leadership and Overview of Major Services, Report of the 2nd Court Appointed Expert (October 2018) pages 77- 84
[164] Illinois Department of Corrections, Defendants' Reporting Requirement Pursuant to V.G. of the Lippert Consent Decree (May 2020)
[165] Staffing Analysis Illinois Department of Corrections Office of Health Services, Lippert Consent Decree 11/23/2019
[166] Lippert v Jeffreys Consent Decree, First Report of the Monitor (November 24, 2019) pages 14- 15

administration records for any medication, including vaccines, need to be readily available in the patient record so practitioners have all the relevant information to evaluate treatment when seeing patients. We understand the current month's MAR needs to be maintained in the medication area but once the month is over the MAR should be filed or scanned into the patient record within a day or two. The current MAR should be pulled and available along with the record for any scheduled practitioner appointment.

Problems with medication continuity were apparent from our interviews and chart review at Logan and Lincoln. There is no mechanism to track when orders need renewal except for a report only available to the HCUA. If the list is not made available daily, patients run out of medication until the order is renewed, medication dispensed and arrives at the facility several days later. The process for managing non-formulary requests also creates discontinuity in treatment. The lengths of time non-formulary requests are approved for runs independent of the provider order. There is no mechanism to track the date an approval will expire. It is only when a refill is requested that the facility is informed a non-formulary approval must be obtained before the order can be filled. Thus the patient goes without medication until this is accomplished. Patients with long standing histories doing well on non-formulary medication are subjected to repeated gaps in treatment caused by the non-formulary review process.

The CQI reports from the last quarter of 2019 were reviewed. These minutes document that pharmacy inspections and audits of documentation on the MAR are conducted by a regional pharmacy consultant nearly every month. Performance issues most often identified from the audit of the MARs included missing documentation on the MAR and medications on the cart for which there is no corresponding order. Most common issues found on inspection were incomplete documentation on the temperature log for the refrigerator, inventory discrepancies, and expired or unlabeled medications. At some facilities, these problems were reported in the minutes all three months reviewed. The inspection tool and MAR audit are good. However, corrective action is seldom discussed in CQI meetings and when it is, consists of reminding the nursing staff to do the task correctly. There is no tool to observe administration of medication to ensure that nursing staff are performing the procedure correctly and are receiving appropriate support from custody staff.

The CQI minutes also contain information on medication errors, each of which are evaluated using a risk tool and tracked month to month. Some facilities appear to have a culture which supports error reporting, which is applauded. We note that many errors are attributed to administering medication to the wrong patient. The 2nd Court Expert report recommended two-part identification (e.g. use of identification badge and verification of date of birth or institution number) to verify the correct patient eliminates this type of error. There is no discussion of procedural or systemic solutions to the problem of patient identification and no documentation of corrective action except individual counseling. The CQI minutes do not reflect any studies of adverse events (i.e. hypoglycemic episodes) to identify opportunity to improve patient safety and health outcomes.

The 2nd Court Expert report[167] stated that state, local and vendor's written directives on this subject were too general, leading to the dangerous process variations in place currently. We have not yet been provided with revised policy, procedure or administrative directive for pharmacy services or medication administration.

Bringing medication administration practices into conformance with prevailing standards of practice will resolve many of the problems identified in the CQI minutes and significantly reduce the risk of patient harm. Furthermore, the failure to resolve the problems with professional practice just described are delaying implementation of the electronic health record. The factors that contribute to stubborn non-conformance with contemporary practices are many and persistent. Individual HCUAs will not be able to achieve the desired performance single handedly, even with the help of the Regional Coordinators. Only leadership and collaboration between OHS and the director of institutional operations can bring this process into compliance with the Consent Decree. The statewide Director of Nursing should have a prominent role ensuring that professional practice standards are not compromised in the effort to achieve compliance. The problems at IDOC facilities with medication administration are not unique nor insurmountable.

**Medication Refusals**

The monitor has not been able to identify an IDOC administrative directive or vendor Policy & Procedure that identifies the indications for when nurses inform providers that a patient is refusing medication. Unless specified in facility policy and procedure, this determination is left up to individual providers and nursing staff.

The first Monitor's report[168] noted that nursing staff at the four inspected facilities stated that they would inform the provider if a patient refused medications twice or more than twice. However providers stated that they are only occasionally informed when a patient is refusing medication(s) but they were not sure whether the notification was based on the nurses' judgement or the number of refusals triggered notification.

Nursing staff at Logan were adamant that MARs are reviewed every day to identify patients who have missed three consecutive doses of psychotropic medication in order to notify the prescriber of non-adherence. They did not describe any specific standard used to determine when to notify the prescriber of non-adherence with medicine to treat somatic illness or disease. Chart review at both Logan and Lincoln revealed evidence of patterns of non-adherence that were not reported to the prescribing provider. As previously stated, providers reported that the patient's MAR is routinely not available for their review when seeing scheduled patients, so they are unable to address adherence problems except by patient report.

**RECOMMENDATIONS:**

---

[167] Statewide Summary Report Including Review of Statewide Leadership and Overview of Major Services, Report of the 2nd Court Appointed Expert (October 2018) pages 80-81
[168] Lippert v Jeffreys Consent Decree, First Report of the Monitor (November 24, 2019) pages 15 - 16

1. A standardized process for medication administration that addresses concerns about medication preparation, documentation on the MAR, and reporting of medication refusals and is consistent with patient safety practices and contemporary standards of care must be implemented statewide. This should be managed as a comprehensive plan of change with clear targets, steps to proceed, timeframes, and outcomes. A process consultant is recommended to facilitate forward progress, streamline methods, and identify problems unforeseen by the leadership group.

2. Facility operations need to provide sufficient access to inmates, so medications are administered safely, including scheduling sufficient time to perform the task, specialized equipment, and maintenance of physical plant.

3. Establish more detailed operational guidance specifying how medication is prescribed, how and by when treatment is initiated, how medication is to be administered safely and timely, including delineation of support to be provided by the facility, and establish how and by when documentation of medication administration takes place. At a minimum this should include:

    a. Two-part patient identification with the MAR at the time medication is administered.

    b. Timely transcription of medication orders onto the MAR.

    c. Nurses should have the MAR present at all times medication is administered to patients.

    d. Nurses should administer medications to patients directly from pharmacy-dispensed, patient-specific unit dose containers and contemporaneously document administration on the MAR.

4. Develop a workload driven staffing standard to account for the nursing staff necessary to carry out orders for medication treatment.

5. Establish more detailed operational guidance about notification of the prescribing provider of patient non-adherence with medication prescribed for somatic complaints as well as expectations for the prescribers' response to such notification. Typically this guidance will be to notify the prescriber after three consecutive doses or more than four non-consecutive doses in a seven day period of critical medications only. Identification and notification of the prescribing provider should built into the electronic health record function as identified in the IDOC Implementation Plan[169]. Expectations for the provider are to discuss the issue with the patient, collect additional information as necessary (labs, meet with the dietician or nurse etc.), document the discussion in the health record as well as the consideration of change (or not).

6. Eliminate expiration of non-formulary requests once approved.

7. Implement the electronic health record including CPOE (computerized physician order entry) and MAR per the plan for automation. Develop automated reports of patients with medication orders which expire in the next seven days and notification to providers of non-adherence.

8. Document development and implementation of corrective action plans to address results of the pharmacy inspection and MAR audit. Trend medication errors and collate results of root cause analysis to identify causes of medication errors. Include structural, equipment and procedural changes to correct problems rather than reliance on verbal counseling.

---

[169] Illinois Department of Corrections, Implementation Plan, Lippert Consent Decree, page 13

Establish an observational tool to be used by nursing supervisors to monitor compliance with medication administration procedures and include this study on the CQI calendar.

# Discharge Planning

*Addresses Items II.B.5; II.B.6.s; II.B.6.t;*

**II.B.5.** *Continuity of care and medication from the community and back to the community is also important in ensuring adequate health care.*

**II.B.6.s.** *IDOC agrees to implement changes in the following areas: Summarizing essential health information for patient and anticipated community providers; and*

**II.B.6.t.** *IDOC agrees to implement changes in the following areas: Upon release, providing bridge medications for two weeks along with a prescription for two more weeks and the option for one refill, if medically appropriate.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

IDOC Administrative Directive "Discharge Planning" 04.03.E.10 states that "The department shall ensure that Offenders being discharged from IOC care is provided with enough resources for continuous care outside of corrections." The Discharge process includes providing the releasee with a completed Discharge Medical Summary, a two week supply of medication, and a prescription for an additional two weeks of medications with one refill. All individuals being discharge are to be offered HIV counseling and education and a free rapid HIV test.

The monitors reviewed medical records of five inmates who were discharged back to the community in January and February 2020 from each of four IDOC correctional centers[170]. Health Status Summary Reports (HSSR)[171] were completed on all twenty (100%) of the discharged individuals. Registered Nurses completed 70% and Licensed Practical Nurses 30% of the HHSRs. None of the forms had any indication that a provider had reviewed and co-signed the discharge health summaries. 100% of the HSSRs noted diagnoses and 92% of those receiving meds had their medications listed. Nine of the twelve individuals on medication signed Medication Receipt at Discharge forms[172] which confirmed that they had been given a two week supply of medications and a prescription for refills to be filled in the community. A copy of the actual written prescription was provided on only one person. The Medication Receipt Forms for three individuals on medications were not provided in the documents given to the monitors.

Most recent HIV antibody test results were noted on 70% of the HSSRs and TB skin tests results on 85%. The two diabetics[173] had Hemoglobin A1C results on the HSSR but did not have the results of microalbumin/creatinine tests, renal studies, or eye screenings for diabetic retinopathy.

---

[170] Dixon CC, East Moline CC, Shawnee CC, Taylorville CC
[171] DOC 0433, effective 5/2014
[172] DOC 0490, effective 8/2015
[173] Discharge patients #16, #19

The HSSR on the one HIV patient[174] had the most recent HIV Viral Load and CD4 counts. Even though a number of these twenty discharges had chronic illnesses, none of the inmates were given copies of their most recent comprehensive lab reports nor any documentation of immunizations or risk- or age-based health screenings. Five individuals over 50 years[175] did not receive documentation of colon cancer screening. None of three men either over 65 years of age or with an indicated condition[176] received documentation that they had been administered nationally recommended adult pneumococcal vaccines. Two other individuals with Hepatitis C[177] did not have HCV RNA, liver study, or liver fibroscan results noted on the HSSR nor was there any documentation that the Hepatitis C infection was active or inactive, had been treated or not, or whether there were complications (i.e. cirrhosis, esophageal varices, etc.). Three inmates[178] who were 26 years old or younger) did not have documentation on their HSSR that they had received or been offered Human Papilloma Virus vaccinations.

During the monitors' site visits in 2019 and 2020 nursing staff consistently communicated that all inmates being discharged were given Health Status Summary Reports, two weeks of medication, and a prescription for an additional two week supply with one refill. During the February 2020 site visit to Logan CC, the monitor reviewed the medical record of five released individuals and verified that discharge summaries had been completed for five women. The IDOC has an established process to provide men and women being released to the community a summary of their health care conditions and a supply of bridge medications. However the quality and utility of clinical information provided is very limited and should be expanded to include copies of pertinent lab and diagnostic tests, recent chronic care progress notes, and documentation of age-based and risk based screenings and vaccinations. Incorporating provider review of the discharge summary, medications, and needed additional clinical information would improve the continuity of care for discharged patient-inmates.

**RECOMMENDATIONS:**

1. The IDOC should enhance the continuity of care into the community for discharged individuals by providing copies of pertinent diagnostic tests, recent chronic care progress notes, vaccinations, and routine health maintenance screenings to the discharge packet.
2. A copy of the actual prescription with refills should be placed or scanned into the medical record to verify the information on the Medication Receipt at Discharge form.
3. Providers' review of the clinical information being provided to released patient-inmates would add value to discharge process.

# Infection Control

### Addresses items II.A; III.J.1; III.J.2

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the*

---

[174] Discharge patient #8
[175] Discharge patients #5, #8, #16, #19, #20
[176] Discharge patient #8, #16, #20
[177] Discharge patients #11, #20
[178] Discharge patients #1, #12, #15

*availability of necessary services, supports and other resources to meet those needs.*
**III.J.1.** *IDOC shall create and staff a statewide position of Communicable and Infectious Diseases Coordinator. This position shall be filled within fifteen (15) months of the Preliminary Approval of this Decree [June 2020].*
**III.J.2**. *Facility staff shall monitor the negative air pressure in occupied respiratory isolation rooms which shall be documented each day they are occupied by prisoners needing negative pressure. If unoccupied, they shall be monitored once each week. Facility staff shall report such data to the Communicable and Infectious Diseases Coordinator on a monthly basis.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

The IDOC does not have an active or effective infection control program. Few facilities have a dedicated infection control nurse. Until recently, there has been no statewide infection control leadership. Infection control activities documented in quality improvement meeting minutes report some data but without any analysis and without purposeful goals. There is no infectious disease physician consultant who advises IDOC on infection control issues. A UIC infectious disease physician is voluntarily consulting to help the IDOC in the COVID response. The IDOC has indicated in the June 2020 Revised Implementation Plan that it will collaborate with the Illinois Department of Public Health to provide guidance on infection control issues but gives no timetable of when this will occur, what the collaboration would consist of, or how it would be implemented within the IDOC. The Monitor recommends at a minimum this include a part-time physician consultant to give advice on infection control issues and on infection control policy.

With respect to quality improvement meeting minutes, 26 of 30 sites reported the numbers of persons with hepatitis C, HIV and MRSA. A few reported cases of chlamydia and gonorrhea. There was no analysis of data in these reports.

In June 2019[179] a quality improvement audit found that 1785 patients were being followed in the IDOC hepatitis C clinic; 22 (1.2%) were undergoing treatment, 40 (2.2%) had completed treatment, and 337 (18.9%) were deemed ineligible for treatment. A December 2019[180] follow up audit found 1712 patients were being followed in hepatitis C clinic. Only 12 (0.7%) were undergoing treatment; 89 (5.2%) were awaiting treatment; 46 (2.6%) had completed treatment; and 347 (20.3%) were denied treatment based on not qualifying. Ninety seven percent of 1656 patients with hepatitis C were not on treatment. There was no discussion in the analysis of results of the audit about these extremely low rates of treatment. The Quality Improvement committee should investigate whether systemic barriers to treatment exist. Any systemic barriers to treatment need to be corrected. Hepatitis C can be readily transmitted within the IDOC by shared needles, inmate tattoo instruments, and accidental needle sticks. Treatment of hepatitis C can eliminate the virus in treated individuals who will no longer be infectious. This is important because treatment both cures the infected individuals and reduces transmission risk to other inmates and staff, and ultimately improves the public health of the State of Illinois.

Two facilities reported needle stick injuries. Southwestern CC had a needle stick injury but there

---

[179] Quality Improvement Committee Minutes June 2019
[180] Quality Improvement Committee Minutes December 2019

was no discussion regarding why the injury occurred. There was no attempt to prevent further needle stick injuries which is an OSHA requirement. Dixon had two needle stick injuries. This facility discussed attempts to get Wexford to purchase retractable needles that reduced needle stick injuries. We note that in the 2nd Court Expert report of 2018, this facility had reported needle stick injuries in 2017 and at that time mentioned recommending a retractable needle to the vendor. Apparently nothing has been done since 2017 to address this issue despite ongoing needle stick injuries.

In all Quality Improvement meeting minutes there was no discussion of infection control issues with an attempt to improve service or analyze the infection control issues. Contagious disease screening data is not discussed except to report the number of tests that were done. For example, NRC reported that there were 1055 intakes, 625 HIV blood tests done, and 1069 hepatitis C blood tests done in December of 2019. The goal of testing was not stated. There was no report of how many of these tests were positive or why so many inmates refused opt-out HIV testing. Logan, for the same month, reported 130 of 130 inmates accepted a hepatitis C test and 122 of 130 accepted an HIV test. The number coming into intake wasn't mentioned and again there was no mention how many of the tests were positive or whether any action should be taken. Graham does not provide any information on the numbers of persons screened at intake for contagious disease. These data provide little useful or actionable data. Although vaccination is a significant infection control activity, vaccination rates were not discussed at all. In their 2nd Report the IDOC has asserted that they are compliant with item III.M.1. (a) of the Consent Decree which states that all prisoners will be offered an influenza vaccination but offered no data to verify their assertion. We could find no data in quality improvement reports to verify that assertion.

The IDOC uses generic Wexford Infection Control Guidelines as their infection control manual. These guidelines are not specific for IDOC. A few examples are as follows. The guideline is not consistent with IDOC procedures such as HIV testing. The Wexford guideline requires pre-test counseling and a physician order, whereas the IDOC has opt-out testing at intake which does not require pre-test counseling. The guidelines do not address hepatitis C at all, even though it is a significant infection control issue at the facilities. The COVID-19 guidelines in the Wexford guidelines are not consistent with current practices at the facilities or with OHS guidelines and are, in places, inconsistent with CDC guidance[181]. There is no mention of screening for either HIV or hepatitis C in the manual even though it is a part of the IDOC intake process. There is brief mention of vaccination for influenza but not for other diseases. There is no mention of vaccination of staff for hepatitis B which is an OSHA requirement. The sexually transmitted diseases guideline states that it will address syphilis, gonorrhea, and chlamydia but it only covers syphilis not gonorrhea or chlamydia. There is no mention of IDOC procedures for screening for sexually transmitted diseases. There is no mention of defined timeframes for monitoring negative pressure in respiratory isolation rooms. The manual does not represent IDOC procedures or requirements and needs to be made specific to IDOC needs and procedures.

The IDOC does have a blood borne pathogen administrative directive which addresses OSHA requirements for education, hepatitis B testing, and blood borne pathogen exposures. However

---

[181] For example, the guidelines state that cell mates of sick inmates are separated for 48 hours of observation. CDC recommends quarantine for 14 days. IDOC follows CDC guidance.

the directive fails to recommend hepatitis A vaccination for inmate porters and inmate workers. The inmate workers clean infirmary and crisis rooms where body fluid contamination is frequently encountered. The blood borne pathogen administrative directive should be expanded to include hepatitis A vaccine for all inmate workers.

Individual facilities do not all have a dedicated infection control nurse and this position does not appear in the Staffing Analysis as a specific nursing position at any of the IDOC facilities. Until very recently, there was no statewide infection control nurse. This position was filled in 2019 by a combined Quality Improvement/Infection Control Training Coordinator position. In the midst of the COVID-19 pandemic response, the Illinois Department of Public Health recommended to IDOC to hire a fulltime infection control nurse, which the Governor approved. The Infection Control position was filled by an individual who previously worked as a regional coordinator for OHS and then worked for several months as the Quality Improvement/Infection Control Training Coordinator. Based on this individual's curriculum vitae, this employee has no training in infection control. His only work experience in infection control on his job application was eight months as the statewide Quality Improvement/Infection Control Training Coordinator from August 2018 to March of 2019. This individual's training and experience does not qualify for this position. Also, the Infection Control position description does not require that the Infection Control Coordinator have any training in infection control but does require two years of experience in infection control. This position description is appropriate for a facility infection control nurse but not for the statewide coordinator position. This position is responsible for statewide expertise, guidance and leadership in infection and communicable disease control, but IDOC is filling this position as if it were a facility infection control nurse. This position should require:

- Experience in infection control,
- Certification in infection control and prevention through the Certification Board of Infection Control and Epidemiology and maintenance of certification,
- Proficiency with electronic software systems for surveillance and use of an electronic health record and use of electronic surveillance reporting systems,
- Six Sigma green belt certification within 3 years of hire.

The Consent Decree and Wexford's Infection Control Manual direct that all negative pressure rooms are monitored on a defined regular time frame.
All IDOC facilities require testing and documentation of negative pressure units in a log. The Quality Improvement Minutes and Safety and Sanitation Reports for 27 IDOC facilities that have infirmaries were reviewed; documentation of the status of the negative pressure monitoring were reported at 15 facilities and not mentioned at 12 (44%) sites.[182]

Since the signing of the Consent decree, the negative pressure units at six correctional centers have been inspected by the monitors. Monitors assessed the functioning of the units using the tissue paper test technique. Negative pressure units at Robinson and Logan were identified as not functional; while at Lawrence, Lincoln, and Sheridan the negative pressure units were in working order. Robinson was one of the facilities that did not regularly assess and report the

---

[182] Quality Improvement Committee Minutes December 2019

monitoring of negative pressure units[183]. The negative pressure units at Pontiac were not tested. Three of five negative pressure rooms were not functioning when the monitor visited Logan 2/25/20 to 2/26/20 although the logs indicated that the five negative pressure units were operational. Tissue paper testing on 2/26/20 found rooms 156, 164, and 168 were not functioning even though the control panel erroneously indicated that one of the non-functioning units was operational; this heightens the importance of staff doing regular tissue paper testing. The 2018 Court Expert report[184] found that negative pressure rooms were not functional or not monitored at three of five facilities visited.

The methods relied upon to monitor negative pressure isolation rooms are faulty, documentation of monitoring rooms for negative pressure varies widely and is unreliable and the data reporting required by III.J.2. is incomplete and inconsistent. The functioning of the negative pressure rooms is an important component of each facility's infection control program. Monthly Safety and Sanitation inspections; reporting of results to Quality Improvement committees; weekly inspections (when the isolation rooms are not occupied); and daily inspections (when occupied) must continue to be diligently performed to protect the safety and of the each facility's inmates and staff.

Tuberculosis (TB) screening using tuberculosis skin testing (TST) is provided during the intake admission process and during biannual physical examinations and health screening. TB skin testing requires two separate patient encounters. Results require two to three days to obtain. Results require individual interpretation of a test result that is subject to error.[185] The boosting[186] effect may affect TST results. The application of the skin test creates the potential for accidental needle stick. The utilization of TSTs consumes a large amount of valuable nursing time. For these reasons, the IDOC and its vendor should immediately switch to a Food and Drug Administration (FDA) approved interferon-gamma release assay (IGRA) test such as QuantiFERON® TB test. The advantage of these tests is that they are blood tests which can be added to the intake and annual or bi-annual screenings. Testing requires only a single patient encounter. Results are obtainable within 24 hours. The boosting phenomena is not present. Results are gathered from laboratory printouts and are not manually maintained as is done for TST results. Aggregate results can be obtained and more easily manipulated for epidemiologic and tracking purposes and prior test results are more easily located at a remote time. The use of an IGRA test will free up a significant amount of nursing staff resources. IDOC should check with its laboratory vendor regarding sample collection. IGRA specimens must be processed within 8 to 30 hours and IDOC should determine if this is possible at its various locations. It appears that infection control has low priority in the IDOC medical program. The lack of prioritization of infection control was exposed during the COVID-19 pandemic. When the pandemic started, there was no fulltime infection control coordinator, no infectious disease physician consultant, and few nurses assigned to infection control at the facilities. The IDOC

---

[183] Lippert IDOC Monitor First report 11/23/19, page 39
[184] IDOC Summary Report, 2018, page 88
[185] The 2nd Court Expert report details errors in reading Mantoux skin tests at NRC which in part supports this recommendation.
[186] A tuberculin skin test attempts to identify persons with prior tuberculosis infection. Patients who have prior tuberculosis infection can have a diminished immune response over time and may therefore react negatively to a tuberculin skin test. These individuals may require a "booster" test to restore immune response. This is a drawback to tuberculin skin testing.

response to COVID-19 was ad hoc; did not involve reliance on an existing infection control program; and ultimately required outside intervention from the IDPH, UIC, and the Illinois National Guard for support. We recognize that most, if not all, correctional systems could improve the response to COVID-19, however the lack of statewide infection control leadership in the IDOC required the OHS acting Chief of Health Services, Deputy Chief of Health Services, Medical Coordinator, and Quality Improvement Coordinator to re-direct all of their time to COVID-19 activities, including a large COVID-19 outbreak at Stateville and smaller outbreaks at several northern facilities.

The Monitor had calls with five facilities to discuss their COVID-19 preparedness.[187] We learned that every facility had a unique version of a statewide pandemic plan which was based on 2009 and 2016 CDC pandemic response information which was not always appropriate for COVID-19. Each facility had developed unique versions of these plans. These plans lacked standardization with respect to basic processes such as testing, isolation, quarantine, and use of personal protective equipment (PPE). On those calls we pointed out safety risks with several isolation, quarantine, testing, and equipment processes. HCUAs at every site we called, did appear to be knowledgeable about their facility plans but individual facility plans were developed and implemented by local leadership and did not appear to involve local physician participation in developing the details of individual plans or oversight of implementation. It was clear that facilities needed ability to consult with someone with expertise in infection control. There was a notable absence of physician participation in facility level COVID-19 response. In one facility, regular calls with IDPH included the Warden but not any health care staff. In another facility the Warden was writing policy for pandemic management. The OHS clinical leadership engagement and direction to all IDOC facilities accelerated once the crisis response at Stateville became operational.

There was no infectious disease surveillance system in place that could be used to track COVID-19 infections and no experience in statewide infection control surveillance. IDOC obtained assistance from UIC School of Public Health in the design of a COVID surveillance tracking log, which is an Excel spreadsheet. The design of the tracking log was appropriate. However, it was a complex tracking log and data from the 30 individual facilities was not always entered appropriately, resulting in data errors that require remedial data entry before the tracking log can be used. The Monitor has received regular tracking logs through 6/23/20. We were told that the tracking log has not yet been used to generate any reports. The need for data support is evidenced by the failure to effectively track the ongoing outbreak.

The COVID-19 outbreak at Stateville exposed the weaknesses of the IDOC infection control program. Stateville had no dedicated infection control nurse and high staff vacancies. The outbreak gained attention of IDPH because multiple inmates were hospitalized, immediately intubated and threatened to overwhelm local hospital resources. Inmates may not have been monitored as well as they should have been. The IDPH intervened. UIC volunteered with infectious disease consultation. The Governor ordered the Illinois National Guard to assist with monitoring and housing infected inmates. Without this outside support, the outbreak would likely have spread more widely. The National Guard also provided assistance at the Hill and

---

[187] Dixon, Logan, Graham, Menard, Pinckneyville CCs

East Moline facilities.  At a minimum, this was evidence of a lack of staff necessary to monitor patients.

The Governor's executive order suspending all admissions to IDOC from Illinois county jails was also, in part, initiated by persons outside of IDOC.  This step, we believe, immeasurably helped to reduce transmissions statewide.

We have encouraged a detailed root cause analysis of the outbreak at Stateville to determine remedial steps that need to be taken to prevent future outbreaks and to establish appropriate guidance with respect to the infection control program in the Staffing Analysis and Implementation Plan.   The outbreak at Stateville should be considered a learning experience.  The pandemic has not completely resolved.  While new cases have slowed considerably, the actual number of cases is based on symptom-based testing which underrepresents case totals.  The IDOC reports 230 inmate cases on its website as of June 8, 2020.  175 of those cases are at Stateville.  The number of deaths is not reported on the website and as of 6/8/20, the last tracking log we have received (from 5/21/20) shows 12 deaths all at Stateville, although not all of the reported deaths are known to be from COVID-19.

At some point the Executive Director will re-open the IDOC to new admissions.  On 6/10/20 we received a draft memo detailing the IDOC plan for re-opening.  We have not had time to sufficiently review this plan.  However, it does include testing and quarantine of all new arrivals which we agree with.  It does not address custody transportation staff which is critical because these individuals will be in contact with multiple inmates on a daily basis.  Regular testing should be considered for certain custody job classifications.  Also, if there are active cases in a prison, all inmates on the housing unit where a positive case was confirmed should be tested weekly until all are confirmed negative.  Staff should be tested weekly if there are ongoing cases in the community where the prison is located.

We give credit to OHS medical leadership in integrating the outside help they received in a way that limited spread of the infection.  This could have been much worse and for that OHS deserves credit.  Nevertheless, the pandemic exposed the weaknesses of the IDOC infection control program and infection control staffing deficiencies including data support services within OHS.  An infection control program needs to consist of several essential elements including:

- A statewide infection control coordinator who is trained and certified in infection control.
- An infectious disease physician consultant to provide easily accessible expert advice that is beyond the scope of knowledge or expertise of the statewide infection control coordinator.
- Dedicated infection control nurses at every facility, who have received training in infection control.
- An infection control policy, procedure and manual that are specific to IDOC needs.
- A prioritization of infection control as an essential element of the IDOC program.
- Data support to track infectious and contagious diseases.
- A qualified physician staff that can effectively participate in infection control activities at a facility level.

**RECOMMENDATIONS:**

1. Ensure the statewide infection control coordinator obtains and maintains certification in infection prevention and control through the Certification Board of Infection Control and Epidemiology. Requirements of this position should also include proficiency in surveillance software and familiarity with use of an electronic medical record to support surveillance activity. It would be preferable for this person to obtain Lean Six Sigma certification within two years of hire.

2. Hire a part-time infectious disease physician consultant to advise the IDOC on their infection control program as issues arise. Optimally, this physician should be from UIC or from the IDPH. The IDOC can pay for part time use of a position to IDPH or UIC for this arrangement.

3. Perform a root cause analysis of the COVID-19 outbreak at Stateville and identify weaknesses in the infection control program that need improvement. This should be performed in consultation with an infectious disease physician.

4. Ensure that every facility has a dedicated and appropriately trained infection control nurse.

5. Develop infection control policy to establish standardized methods of surveillance and infection control activity.

6. Establish expectations for independent verification of negative pressure in respiratory isolation rooms, monitoring and documentation of the status of negative pressure rooms, reporting to the Infection Control Coordinator and corrective action to be taken when the rooms are not functional.

7. Perform Safety and Sanitation inspections of the infirmary negative pressure units monthly but it is equally crucial that daily or weekly tissue paper testing of the isolation rooms be conducted by the health care staff to verify that these units are always operational.

8. Provide both hepatitis A and hepatitis B vaccinations to inmate workers who have risks of exposure to blood and fecal borne pathogens and to inmate kitchen workers.

9. Replace tuberculosis skin testing (TST) with IGRA blood testing which is more accurate, minimizes the risk of accidental needle sticks, and frees up valuable nurse resources.

10. Work with UIC to streamline Hepatitis C eligibility and screening criteria in order to increase the IDOC inmate access to Hepatitis C treatment

11. Track and report the offering and provision of nationally recommended adult immunizations

12. Ensure that quality improvement activity identifies infection control and prevention opportunities for improvement and takes steps to ensure that improvements occur.

13. Provide data support as described in the Statewide Internal Monitoring and Quality Improvement and Medical Record sections of this report.

131

# Dental Care

## Staffing

***Addresses item II.B.6.q; III.K.9***

**II.B.6.q.** *IDOC agrees to implement changes in the following areas: Annual assessment of medical, dental, and nursing staff competency and performance;*

**III.K.9.** *Within twenty-one (21) months of the Preliminary Approval Date of this Decree [October 2020], IDOC shall establish a peer review system for all dentists and annual performance evaluations of dental assistants.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

Peer reviews for thirty-eight dentists were performed in August and September 2019 and the results were reported in the First Court Report. The dentist peer reviews primarily address process and documentation issues but also audit the adequacy of dental history, the appropriate use of prophylactic antibiotics, and the appropriate ordering of required x-rays and consultations.

Annual evaluations of 17 dental hygienists and 52 dental assistants were completed in 2019; some of these evaluated dental employees are currently no longer working in the IDOC. Wexford dental hygienists and dental assistants are evaluated using the Performance Calibration Worksheet also known as the Salary Compensation Calibration Worksheet; this worksheet focuses primarily on administrative and business issues and do not satisfy Consent Decree requirements to assess clinical staff competence and performance. The Wexford evaluation is not to be shared with the employee.   The IDOC used the State of Illinois Individual Development and Performance System to evaluate state employed dental hygienists (1) and dental assistants (6) in 2019; this form is individualized for each of these positions and must be discussed with each employee. .

With the exception of the dentist evaluations, none the annual performance evaluations for both State and vendor dental staff would qualify as professional performance evaluations or assessments of the quality of the clinical care provided by the dental hygienists and dental assistants.

See Oversight of Nursing, Dental, and Medical Staff section for further details.

**RECOMMENDATIONS:** (Same as noted in Oversight of Nursing, Dental, and Medical Staff section)
1. Develop and initiate professional performance evaluations that assess the clinical competency and clinical performance of all clinical staff.
2. Standardize evaluation formats so that all practitioners of the same type are evaluated in the same manner.
3. A professional knowledgeable of the scope of practice and capable of evaluating the clinical care of the professional should perform the evaluation.
4. Clinical professional performance evaluations should be shared with the employee who

should sign the review after discussion with the reviewer.

## Dental Documentation

***Addresses item III.K.1; III.K.10.c; III.K.11; III.K.12***

**III.K.1.** *All dental personnel shall use the Subjective Objective Assessment Plan ("SOAP") format to document urgent and emergency care.*

**III.K.10.c.** *A prisoner shall consent in writing once for every extraction done at one particular time. In instances where a prisoner lacks decision making capacity the Department will follow the Illinois Health Care Surrogate Act. In the event a prisoner verbally consents to an extraction, but refuses to consent in writing, dental personnel shall contemporaneously document such verbal consent in the prisoner's dental record.*

**III.K.11.** *Each prisoner shall have a documented dental health history section in their dental record.*

**III.K.12.** *Dental personnel shall document in the dental record whenever they identify a patient's dental issue and dental personnel shall provide for proper dental care and treatment.*

**OVERALL COMPLIANCE RATING:** Partial compliance (limited data)

**FINDINGS:**

Analysis of the thirty-eight 2019 dentist peer reviews documented that 5 (13%) of the dentists were not consistently using the Subjective, Objective, Assessment, and Plan (SOAP) format, 4 (11%) did not always obtain consent forms prior to extractions, 3 (8%) did not sign all refusal forms, and 3 (8%) did not have an appropriate x-ray before an extraction. The results of the peer reviews were discussed with each dentist. One dental chart[188] at Logan CC was reviewed. SOAP documentation format was used, consent for extraction signed, type and quantity of anesthesia documented but there was no x-ray in the dental record prior to the extraction of 3 teeth. The dental records of two patients[189] who had extractions in 2020 at Lincoln CC were reviewed; both notes used SOAP format, had signed consents, had pre-extractions x-ray (3 months and 9 months prior), and had the type and dosage of anesthetic documented.

The Monitor has interviewed dentists at six IDOC facilities[190] since the signing of the Consent Decree concerning their standard on how close to the time of an extraction must be an x-ray be performed; their responses varied from one to two years. The Monitor has been unable identify a national standard concerning when dental x-rays must be repeated taken or repeated prior to an extraction in order to protect the health of the patient. Once filled, the IDOC Dental Director must establish the best practice standard for the length of time prior to dental extractions that x-rays are deemed valid and do not need to be repeated.

The records of the dental hygienist were not reviewed.

**RECOMMENDATIONS:**

---

[188] Logan CC Dental patient #1 JR
[189] Lincoln CC Dental patient # 2 and #3
[190] Sheridan, Pontiac, Robinson, Lawrence, Logan, Lincoln correctional centers

1. Identify and establish the best practice standard for the length of time prior to dental extractions that previous x-rays are judged to be adequate to minimize complications and protect the health of the patient-inmate.

## Dental Support

***Addresses items III.K.4-5; III.K.13***

**III.K.4.** *IDOC shall implement policies that require routine disinfection of all dental examination areas.*

**III.K.5.** *IDOC shall implement policies regarding proper radiology hygiene including using a lead apron with thyroid collar, and posting radiological hazard signs in the areas where x-rays are taken.*

**III.K.13.** *IDOC shall conduct annual surveys to evaluate dental equipment and to determine whether the equipment needs to be repaired or replaced. Any equipment identified as needing repair or replacement will be repaired or replaced.*

**OVERALL COMPLIANCE RATING:** Not yet rated

**FINDINGS:**

The Monitor did not evaluate the presence or absence of leaded aprons with thyroid collars in four of the six facilities visited in 2019-2020. Lead thyroid collars were identified in the other two correctional centers[191]. In both facilities the thyroid collar was stored in the radiology suite and not immediately available to the dental team.

During one site visit in 2020, the monitor observed the dental assistant clean and disinfect the dental chair and the proximate equipment between patient encounters. At all six site visits the monitor verified that spore testing of the autoclave was regularly being done with results entered into a log to ensure that dental instruments are being properly sterilized. The December 2019 Quality Improvement Committee minutes documented the results of spore testing at thirteen IDOC facilities; the results indicated fully operational autoclaves.at these reporting sites.

To date the Monitor has not received Administrative Directives on the routine disinfection of all dental examination areas nor a copy of any policy relating to dental radiology hygiene. Documentation also has not yet received that an annual system wide survey of dental equipment was being done.

We note that no dental policies have been provided. We could not determine whether dental policies were adequate with respect to support services.

**RECOMMENDATIONS:**

1. Provide each dental suite with its own leaded thyroid collar.

## Dental Access

***Addresses items II.B.6.h; III.K.2***

---

[191] Robinson CC and Lawrence CC

134

**II.B.6. h.** *IDOC agrees to implement changes in the following areas: Dental care access and preventative dental care;*
**III.K.2.** *Each facility's orientation manual shall include instructions regarding how prisoners can access dental care at that facility*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
The Monitor has not reviewed the facilities' orientation manuals. Interviews with incarcerated individuals at the six visited sites indicated that the men and women were consistently knowledgeable about the established process to access dental and medical services.

Review of the December 2019[192] dental services revealed system wide waiting times reported by the vendor as follows:

|  | Median Waiting Times |
|---|---|
| Dental Fillings | 9 weeks |
| Dental Extractions | 4 weeks |
| Dentures | 9 weeks |
|  | Range of Waiting Times |
| Dental Fillings | 1-95 weeks |
| Dental Extractions | 1-27 weeks |
| Dentures | 1-36 weeks |
|  | Waits ≥ 24 weeks (6 months) |
| Dental Fillings | 8 facilities [193] |
| Dental Extractions | 2 facilities |
| Dentures | 3 facilities |

Review the IDOC QI committee minutes for December 2019[194] revealed similar waiting times as noted in the Primary Medical Services Report but also indicated the number of individuals awaiting services:

| Numbers Waiting for Service | | |
|---|---|---|
|  | Median # Waiting | Range of # Waiting |
| Dental Fillings | 130 patients | 13-381 patients |
| Dental Extractions | 45 patients | 1-142 patients |
| Dentures | 12 patients | 0-44 patients |

---

[192] Wexford Primary Medical Services Report December 2019 (20 sites reported waiting time)
[193] Includes one facility from the 12/2019 QI list that was not reported in the Primary Medical Services Report
[194] IDOC QI Committee Minutes December 2019 (18 sites reported waiting times and/or # on waiting lists)

| Numbers Waiting for Service by Facility | | | |
|---|---|---|---|
| Patients Waiting for Service | >200 | 100-199 | 30-99 |
| Dental Fillings | 4 facilities | 4 facilities | 2 facilities |
| Dental Extractions | 0 facilities | 3 facilities | 6 facilities |
| Dentures | 0 facilities | 0 facilities | 1 facility |

The variance in waiting times and number of individuals waiting for dental services is of concern. Long waits and high volumes of individual awaiting dental services generally reflect inadequate dental staffing either due to unfilled vacancies, unfilled hours, and uncovered vacation or personal or medical leaves. The only corrective action occasionally documented in the QI minutes is to contact vendor about high dental waiting times. The dental needs of incarcerated populations is extensive and, at some IDOC facilities, this need is not being adequately met.

**RECOMMENDATIONS:**
1. IDOC must closely monitor and address the access to basic dental services focusing on facilities with long waiting times and large waiting lists

## Dental Intake
***Addresses items III.K.3***
**III.K.3.** *IDOC shall implement screening dental examinations at the reception centers, which shall include and document an intra- and extra-oral soft tissue examination.*

**OVERALL COMPLIANCE RATING:** Not yet rated

**FINDINGS:**
The Monitor has only visited the Logan CC IDOC Reception & Classification. The Intake dental screening room was poorly maintained with crusted sinks, torn upholstery, and dirty floors. The performance of Intake dental screening was not evaluated.

**RECOMMENDATIONS:** None

## Dental Hygiene
***Addresses III.K.7; III.K.8;***
**III.K.7.** *Dental hygiene care and oral health instructions shall be provided as part of the treatment process.*
**III.K.8.** *Routine and regular dental cleanings shall be provided to all prisoners at every IDOC facility. Cleanings shall take place at least once every two years, or as otherwise medically*

136

*indicated.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
Ten facilities[195] of 28 IDOC facilities with onsite dental suites currently do not have a dental hygienist position. The December 2019 QI Committee minutes listed 4 facilities with over 200 individuals on the waiting list for dental cleanings and four additional facilities with waiting times of 5-6 months for an appointment with the dental hygienist. Dentists at facilities without dental hygienist positions have been directed to do dental cleanings; this could exacerbate the waiting time for patients requiring fillings, extractions, and dentures. IDOC has appropriately proposed adding dental hygienist positions[196] at seven facilities but NRC, Vienna, and Western still will have no hygienist positions. In the revised Implementation Plan[197] IDOC commits to every facility having dental hygienists to meet facility needs without explanation for how facilities without a hygienist will obtain that service. Given the length of time required to create and fill new positions within the State system, it is highly unlikely that many of the IDOC facilities will be able to provide dental cleanings every two years to the entire IDOC population.

**RECOMMENDATIONS:**
1. Hire at least one dental hygienist for each IDOC facility that has dental suites.

### Comprehensive Dental Care
***Addresses item III.K.6; III.K.10.a-b; III.K.12***
**III.K.6.** *Routine comprehensive dental care shall be provided through comprehensive examinations and treatment plans and will be documented in the prisoners' dental charts.*
**III.K.10.a.** *Diagnostic radiographs shall be taken before every extraction.*
**III.K.10.b.** *The diagnosis and reason for extraction shall be fully documented prior to the extraction.*
**III.K.12.** *Dental personnel shall document in the dental record whenever they identify a patient's dental issue and dental personnel shall provide for proper dental care and treatment.*

**OVERALL COMPLIANCE RATING:** Not yet rated

**FINDINGS:**

**RECOMMENDATIONS:** None

# Facility Internal Monitoring and Quality Improvement
***Addresses item II.B.2; II.B.6.l; II.B.6.o; III.L.1;***

---

[195] IDOC revised Staffing Plan 6/18/20, Dixon, East Moline, Graham, Hill, Jacksonville, Lincoln, NRC, Sheridan, Southwestern, Vienna, Western currently do not have dental hygienists
[196] Revised Staffing Analysis 6/18/20
[197] IDOC revised Implementation Plan 6/12/20

**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*
**II.B.6.l.** *IDOC agrees to implement changes in the following areas: Effective quality assurance review;*
**II.B.6.o.** *IDOC agrees to implement changes in the following areas: Training on patient safety;*
**III.L.1.** *Pursuant to the existing contract between IDOC and the University of Illinois Chicago (UIC) College of Nursing, within fifteen (15) months of the Preliminary Approval Date [April 2020], UIC will advise IDOC on implementation of a comprehensive medical and dental Quality Improvement Program for all IDOC facilities, which program shall be implemented with input from the Monitor.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
The Monitor team reviewed the following items from facility quality improvement meeting minutes.

- Volume of outpatient activity
- Trips to emergency rooms
- Infection control
- Medical furloughs
- Dental activity
- Chronic care
- Grievances
- Clinical protocols
- Emergency drills

We reviewed the minutes from the fourth quarter of 2019 from all of the institutions in an effort to analyze what the institutions were actively involved in with regard to quality improvement activities. Our conclusions, therefore, are based on having reviewed 30 plus institutions for the activities involved in improving the quality of care.

We consistently found an absence of activities that were directed to improving the quality of care received at the facilities. Even when studies were performed, they were flawed. As an example, the Big Muddy facility performed a study using hemoglobin A1C as an outcome measure in diabetics. They studied whether an educational program would improve hemoglobin A1C results. The results of the study showed that after education was provided 31% of patients had an improvement in the hemoglobin A1C, which means that the hemoglobin A1C was reduced. Five percent of patients had a hemoglobin A1C that was unchanged and 46% of patients had an increase in their hemoglobin A1C meaning that their status worsened when education was provided. Most patients had worse outcomes when education was provided. This study was a reasonable study topic. It attempted to evaluate the value of current Big Muddy educational efforts to improve diabetic control. However, the outcome was not what would be expected. There was no investigation of the reasons why the Big Muddy diabetic education program resulted in worsening

138

of diabetic control. Only the data was given. It is already well accepted science that diabetic self-management education improves A1C results, reduces hospitalization, lowers long-term diabetic complications, and reduces cost of diabetic care.[198] Why did the Big Muddy educational effort not succeed? Was the study flawed? Was the education less than adequate or was the patient educated about behavior over which the inmate had no control? Was the Big Muddy education meaningful based on conditions in the facility? This study can have value, but it was not thoroughly executed or analyzed in a manner to improve quality of care. Specifically, how could the Big Muddy diabetic education be improved to be consistent with known community standards? One suggestion would be to repeat the study with an aim at identifying why the Big Muddy diabetic educational program failed to improve diabetic control. This would necessitate understanding the basics of diabetic education used in the community to affect quality of care.

Unfortunately, the results were also not broken out by a baseline of good, fair, and poor control of diabetes and therefore what was provided was not able to be analyzed by the baseline degree of control. Nor was there an effort to determine what was particularly effective in changing behaviors with regard to the educational program that was provided. Because conditions in a prison with respect to diabetes self-management relate to lack of patient control of diet, exercise, and self-monitoring, these areas should be included in such an analysis. Therefore, the study was much less useful than it could or should have been if further details were analyzed.

Most of the quality improvement meeting minutes involve presentation of data without associated analysis. Almost but not all facilities describe the volume of outpatient activity including: trips to the ER, mental health services, dental activity, hospitalizations, numbers of persons with reportable infectious disease, and listing of medical furloughs. While these data may have business implications with respect to staffing, they do not provide any information with respect to quality of care.

Data could be used to evaluate a process of care but this does not appear to occur. For example, it would be useful to know the percent of inmates coming into IDOC who are offered and who receive screening tests for hepatitis C or HIV to assess the quality of the intake screening process. Because the current policy is that opt-out testing is to be performed, this data should show that near 100% are tested for hepatitis C and HIV. NRC offers no data at all on the number of persons coming into the facility or the numbers screened. Graham and Logan do not provide the number of new inmates coming into the facility but do provide the number who were offered HIV and hepatitis C testing and the numbers who accepted testing. At Graham approximately 85% of persons offered the tests actually accepted both tests. At Logan 100% accepted a hepatitis C test and 94% accepted the HIV test. These numbers are not compared to the actual numbers of persons who had reception screening so the data doesn't reflect whether all persons who came in were offered testing. Also, there was no analysis as to why persons refused the test or what an acceptable

[198] Powers Margaret, Bardsley Joan, Cypress Marjorie, et al; Diabetes Self-management education and support in Type 2 Diabetes: A Joint Position Statement of the American Diabetes Association, the American Association of Diabetes Educators, and the Academy of Nutrition and Dietetics. The Diabetes Educator volume 43, Number 1, February 2017 as found at
https://journals.sagepub.com/doi/full/10.1177/0145721716689694?casa_token=Ct3pCrZM9-AAAAA%3AMQgMOvP0xW-OB6ghrZ7Q5Y_fY_y_rJ7CXy4lVsACNoy4IFzCaX7wqVIp9U-BM36eMZXBaY7MqrZH

benchmark would be. Because these tests are supposed to be opt-out the opt-out process should be evaluated but was not.

The quality improvement minutes also give data on chronic care. Most facilities list the numbers of persons in chronic care clinics. Some facilities provide a chronic care report that list the percent of patients in good, fair, and poor control by disease as well as the clinical status as being either improved, unchanged, or worsened. However, there was no effort in any of the quality improvement meeting minutes that addressed how the programs were using this data to improve care. There was no commitment to reducing the number of patients with chronic diseases in poor or fair control or increasing the numbers of patient in good control in the minutes reviewed.

Facilities reported grievances categorized by service provided. Grievances are equivalent to customer complaints. Yet there was no effort to analyze the grievances by type of grievance to assess whether the service provided was defective or unsatisfactory.

Some facilities reviewed clinical protocols and assessed whether protocols were appropriately used. Unfortunately, the assessor, usually the Medical Director, did not see this as an educational or quality improvement exercise. Well over 95% were reported as compliant with the protocol, which means that there was no identification of opportunities for improvement. If the person performing the treatment protocol reviews saw this as an educational exercise, the results would not be 99 or 100% compliance because the exercise is to coach the nurses in how to improve their skills in the assessment and examination of non-urgent patient complaints and thus improve access and quality of care.

Many institutions conducted process studies evaluating whether medical records were received when an intrasystem transfer occurred. Unfortunately, the focus was on the condition of the medical records received from other institutions as opposed to a focus on facilitating continuity of care. Therefore, it becomes a study which is concerned about how <u>other</u> institutions are complying with the policy and not on whether continuity of care continued at the receiving institution. This does not facilitate quality improvement at the institution reporting the quality studies.

Programs reported performing chronic care studies that included the baseline visit occurring within 30 days of intake showed that this was compliant overwhelmingly. This is useful as a process but fails to include whether the quality of the baseline evaluation was adequate.

Infection control reports mostly included the number of persons being followed for hepatitis C, the numbers in treatment, with some facilities reporting the total number of hepatitis C treatment provided. As reported in the infection control section of this report, only 1% were being treated and only 2% had ever received treatment. Yet there was no discussion regarding why these numbers were so low and what aspect to the hepatitis C program was responsible for such low treatment numbers. Also, facility differences were not addressed.

The data, in general, was not geared to the individual institutional differences in population or other factors that might affect the data. For instance, dental wait times were several months for procedures including fillings and extractions. However, there was never documented an effort to reduce those wait times or assess whether population size or dentists' hours of work were

responsible for the data. Most quality improvement meeting minutes contain a section on how many specialty referrals were reported and approved.

As discussed in the specialty care section of this report, this section of the quality improvement minutes are not standardized so each site reports differently making the meeting minutes impossible to use for verification of timely access. As discussed in the specialty care section there are four different sources of information on specialty referrals and the data on these reports for the same facility is not equivalent for similar months. Data used to evaluate specialty referrals needs to be standardized across all facilities and used in a manner that permits effective analysis as to whether patients have access to specialty services. That type of data and analysis is not yet evident. The specialty care tracking log should provide that data source. The adequacy of alternative plans of care was not analyzed only listed. Quality of care was not evaluated. Data showing the number of five day follow ups that occur after a scheduled offsite service is a useful process measure which is present in many facility meeting minutes. The percent seen within five days of the offsite service was 100% for most facilities. The five day visit requires the offsite service report to be obtained. The offsite service report must be the formal consultant report to include the evaluation, findings and the plan. There needs to be documentation in the medical record that the findings and plan were shared with the patient. We note that on one of the Monitor's visits to a facility, a tracking list of this measure used comments made by the consultant on the transfer form as evidence of a report. This does not constitute a report. So, while this measure is a useful metric, the data used to measure is not always accurate data and should be standardized and described. Comments on a transfer form does not constitute a report. Also, scheduled offsite services need to be tracked from the progress note where the problem was first presented until the resolution occurs. This should be evident on the specialty care tracking log which can be used as the data source. This should include referrals, utilization reviews, alternative plans of care, and denials. All referrals need to be tracked to the resolution of the referral.

Quality improvement meeting minutes also reported when emergency drills were done. However, there was no critique of the drill and no corresponding opportunities for improvement identified. Overall, the minutes of the 30 plus institutions reviewed lacked any efforts to improve the quality of care. The minutes should be also be viewed as educational for staff not attending the meeting.

**RECOMMENDATIONS:**
1. Train local staff on how to perform quality improvement.
2. Improve statewide data resources to provide every facility with the data necessary to perform adequate quality improvement.
3. Provide mentoring of facility quality programs.

## Audits

***Addresses item II.B.9***
**II.B.9.** *The implementation of this Agreement shall also include the design, with the assistance of the Monitor, of an audit function for IDOC's quality assurance program which provides for independent review of all facilities' quality assurance programs, either by the Office of Health Services or by another disinterested auditor.*

**OVERALL COMPLIANCE RATING:** Noncompliance

141

**FINDINGS:**
The IDOC has not designed or implemented an audit system yet. See Statewide Internal Monitoring and Quality Improvement, Audits section for further details.

**RECOMMENDATIONS:** None

### Performance and Outcome Measure Results
*Addresses items II.B.7*
**II.B.7.** *The implementation of this Decree shall include the development and full implementation of a set of health care performance and outcome measures. Defendants and any vendor(s) employed by Defendants shall compile data to facilitate these measurements.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
The IDOC has not yet designed or implemented comprehensive performance or outcome measures. See Statewide Internal Monitoring and Quality Improvement, Performance and Outcomes Measures section for further details.

**RECOMMENDATIONS:** None

### Adverse Event and Incident Reporting Systems
*Addresses Items II.B.6.m; II.B.6.n*
**II.B.6.m.** *IDOC agrees to implement changes in the following areas: Preventable adverse event reporting;*
**II.B.6.n.** *IDOC agrees to implement changes in the following areas: Action taken on reported errors (including near misses);*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
The IDOC has not designed or implemented an adverse event or incident reporting system yet. The only exception is medication error reporting that does do some root cause analysis and initiates corrective actions. See Statewide Internal Monitoring and Quality Improvement, Adverse Event and Incident Reporting section for further details

**RECOMMENDATIONS:** None

### Vendor Monitoring
*Addresses II.B.2.*
**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and*

142

*contractual structures that incentivize providing adequate medical and dental care.*

**OVERALL COMPLIANCE RATING**:  Noncompliance

**FINDINGS:**
Individual facility vendor monitoring was not evaluated.  See Statewide Internal Monitoring and Quality Improvement, Vendor Monitoring section.

**RECOMMENDATIONS:** None

## Mortality Review

***Addresses items II.B.6.i; III.M.2;***
**II.B.6.i.** *IDOC agrees to implement changes in the following areas: Morbidity and mortality review with action plans and follow-through;*
**III.M.2**. *Mortality reviews shall identify and refer deficiencies to appropriate IDOC staff, including those involved in the Quality Assurance audit function.  If deficiencies are identified, corrective action will be taken.  Corrective action will be subject to regular Quality Assurance review.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
Facilities complete death summaries and are not performing mortality reviews.  As discussed in the statewide mortality review section, mortality review conducted by OHS are typically not reported in quality improvement meeting minutes and the two that were did not include any details of the discussion.  See Statewide Mortality Reviews for further information

**RECOMMENDATIONS:**
　　1.　　See statewide mortality review recommendations.

APPENDIX A

**Lippert Consent Decree Requirements with a Deadline**

| Section of Decree | Provision re: timing | Date (if any) | Substance of provision/requirement | Comments |
|---|---|---|---|---|
| II.B.4 | 120 days after Effective Date | 9/6/2019 | Select an EMR vendor and execute a contract for implementation of EMR at all IDOC facilities | A vendor was hired timely but EMR not yet implemented. |
| III.H.5 | 6 months after Preliminary Approval | 7/10/2019 | Deputy Chief of Health Services will make reasonable efforts to contract with an outside provider to conduct oversight review when medical vendor has denied any recommendation or taken more than 5 business days to decide (otherwise Monitor and consultants conduct review until Deputy Chiefs in place) | Not being done as stipulated. Burden of review is large. Monitor recommends Collegial Review process be eliminated. |
| III.J.1 | 15 months from Preliminary Approval | 4/10/2020 | Create and staff a statewide Communicable and Infectious Diseases Coordinator | Hired an unqualified candidate under duress (during COVID pandemic) who will need to take course work to obtain credentials. Will lack experience for this position and will need mentoring. |
| III.L.1 | 15 months from Preliminary Approval | 4/10/2020 | UIC will advise IDOC on implementation of a comprehensive medical and dental Quality Improvement Program for all IDOC facilities | UICCON submitted their report on 9/19/19 in advance of the deadline. The Monitor did not provide input prior to the submission of this report |
| II.B.8 | 18 months from Preliminary Approval Date | 7/10/2020 | Develop and implement a set of comprehensive health care policies with assistance of Monitor | Only 30% of policies drafted. Final versions not yet done. No plan yet for how training or dissemination will occur. No dental policies are started. |
| III.K.9 | 21 months from Preliminary Approval | 10/10/2020 | Establish a peer review system for all dentists and annual performance evaluations of dental assistants | Have not hired dental director yet and vendor completing peer review of dentists. However it is being done. |
| III.A.9 | 9 months from Effective Date | 2/9/2020 | Every facility must have its own HCUA who is a state employee | 6 positions vacant |

144

| | | | | |
|---|---|---|---|---|
| III.A.8 | 18 months from Effective Date | 11/9/2020 | Create and fill two state-employed Deputy Chiefs of Health Services positions | Two positions were filled but one was promoted to Acting Chief. One position is now vacant. |
| II.B.4 | 36 months after execution of EMR contract | 4/11/22 | EMR implementation should be completed | This is unlikely to be completed on time due to training issues, wiring issues and implementation of the electronic medication administration module. COVID-19 pandemic has also contributed to delay. IDOC has notified of a delay due to COVID-19. |
| IV.B | 120 days after selection of Monitor | 7/26/2019 | Defendants to provide Monitor with results of their staffing analysis | This is not finalized yet and all positions remain unbudgeted and unfilled. Based on IDOC proposed hiring filling positions will take at least 7 years to complete and may take decades. |
| IV.B | 60 days after submission of staffing analysis | 9/24/2019 | Defendants to have drafted an Implementation Plan; Monitor to review | This is not finalized. Goals are mostly in place but strategy, timetables, plans, tasks, programs, protocols are mostly not yet developed. |
| V.G | Every 6 months for the first 2 years; thereafter yearly | 11/9/2019 and 5/9/2020? | Provide Monitor and plaintiffs with a detailed report containing data and information sufficient to evaluate compliance | IDOC has produced reports without agreed upon data and information. Suggestions for data have been submitted by the Monitor. The Monitor and Parties are to meet to further discuss this issue. |