# Health Care Monitor
# 3rd Report
# Lippert v. Jeffreys

February 15, 2021

Prepared by Lippert Monitor
Dr. John Raba
Monitor's Consultants
Michael Puisis, D.O.
Ronald Shansky M.D.
Catherine Knox MN, RN, CCHP-RN

# Table of Contents

Overview ........................................................................................................................................ 4

Executive Summary ...................................................................................................................... 5

Statewide Issues: Leadership and Organization ........................................................................ 13

    Leadership Staffing ................................................................................................................ 13

Staffing Analysis and Implementation Plan ............................................................................. 15

    Staffing Analysis .................................................................................................................... 16

    Implementation Plan ............................................................................................................. 19

    Vendor Relationships ............................................................................................................ 22

Statewide Internal Monitoring and Quality Improvement ........................................................ 24

    Audits ..................................................................................................................................... 27

    Performance and Outcome Measure Results ......................................................................... 28

    Adverse Event and Incident Reporting Systems ................................................................... 29

    Vendor Monitoring ................................................................................................................ 29

    Mortality Review ................................................................................................................... 30

Medical Records ......................................................................................................................... 32

Policies and Procedures .............................................................................................................. 34

    Medical & Dental .................................................................................................................. 34

Facility Specific Issues ............................................................................................................... 35

Facility Staffing .......................................................................................................................... 35

    Budgeted Staffing .................................................................................................................. 35

    IDOC Staffing ....................................................................................................................... 41

    Vendor Staffing ..................................................................................................................... 41

    Credentialing of Physicians ................................................................................................... 41

    Oversight over Medical, Dental, and Nursing Staff ............................................................. 46

Operations ................................................................................................................................... 49

    Clinical Space ........................................................................................................................ 49

    Equipment and Supplies ........................................................................................................ 50

    Sanitation ............................................................................................................................... 51

    Onsite Laboratory and Diagnostics ...................................................................................... 53

    Dietary ................................................................................................................................... 54

Facility Implementation of Policies and Procedures ................................................................. 54

    Medical and Dental ............................................................................................................... 54

Intrasystem Transfers .................................................................................................................. 54

Medical Reception ........................................................................................... 57

    Health Assessments .................................................................................. 61

Nursing Sick Call .......................................................................................... 68

Chronic Care ................................................................................................. 77

Urgent and Emergent Care............................................................................ 85

Infirmary Care ............................................................................................... 91

Specialty Consultation .................................................................................. 99

    Specialty Referral Oversight Review ....................................................... 105

Hospital Care ............................................................................................... 111

Preventive Services ..................................................................................... 113

    Influenza Vaccinations ............................................................................ 113

    Adult Immunizations ............................................................................... 114

    Cancer and Routine Health Maintenance Screening ............................... 117

    Mammography Screening ........................................................................ 119

Pharmacy and Medication Administration .................................................. 120

Discharge Planning ..................................................................................... 127

Infection Control ......................................................................................... 131

Dental Care .................................................................................................. 145

    Staffing .................................................................................................... 145

    Dental Documentation ............................................................................. 147

    Dental Support......................................................................................... 148

    Dental Intake ........................................................................................... 150

    Dental Hygiene........................................................................................ 151

    Comprehensive Dental Care.................................................................... 152

Facility Internal Monitoring and Quality Improvement ............................. 152

    Audits ...................................................................................................... 154

    Performance and Outcome Measure Results ........................................... 155

    Adverse Event and Incident Reporting Systems ..................................... 155

    Vendor Monitoring.................................................................................. 155

    Mortality Review..................................................................................... 156

    APPENDIX A .......................................................................................... 157

    APPENDIX B .......................................................................................... 164

# Overview

This 3rd Report of the Lippert Medical Monitor comes at a time during which a pandemic is affecting the Illinois Department of Corrections (IDOC). Currently there have been over 10,000 cases in the IDOC nearing a third of the IDOC population. The COVID-19 death toll is approaching 90. Because of the pandemic, the Monitor tours of facilities were cancelled. It is anticipated that tours can resume in the next quarter or two.

Because of the pandemic, access to meet or call IDOC leadership has been limited. The Monitor has participated in 10 calls scheduled by IDOC since the August report. Those calls included calls with the UIC providers who provide hepatitis C care; three calls with SIU regarding the quality improvement program; a call with a representative with Illinois Department of Public Health (IDPH); a call with the SIU physician who conducted the Stateville outbreak investigation; and the remainder of the calls with OHS staff. OHS was on all calls as was the attorney for Defendants. The Attorney General was on several calls. These were insufficient calls to comprehensively inform the Monitor but the Monitor cooperated fully with the request of IDOC to limit access due to the pandemic because of the need of senior staff to attend to pandemic concerns.

The Monitor received a semi-annual Defendant's report on 11/30/20. This report was similar to the June, 2020 report. The November, 2020 report contained a list of 28 Consent Decree provisions that the Defendants judged to be "in compliance" and five Consent Decree provisions that IDOC judged to be in "imminent compliance". However, the IDOC's self-assessment of compliance was not accompanied by any data or information to support these compliance ratings.

Provision V.G. states that "Every six months for the first two years and yearly thereafter, Defendants shall provide the Monitor and Plaintiffs with a detailed report containing data and information sufficient to evaluate Defendants' compliance with the Decree and Defendant's progress towards achieving compliance, with the Parties and Monitor agreeing in advance of the first report on the data and information that must be included in such report."

On 11/2/19 the monitor submitted to the IDOC a draft of detailed and comprehensive suggestions for data, information, and reports for each and every provision of the Consent Decree that would provide the Monitor and Plaintiffs with sufficient ongoing information to assess the IDOC's compliance and progress toward compliance and that should be included in the IDOC semi-annual and annual reports. The Monitor had a meeting with IDOC in December of 2019 and an item of discussion was the Monitor's draft of a list of data and information that the Monitor would need for his reports and would also satisfy item V.G. The IDOC did not take any action on this list provided by the Monitor in December of 2019.

While an agreement on data and information was to have occurred before the first report. The IDOC has submitted three reports and the list of data and information is still not agreed to. The Monitor was in the process of finishing his 2nd Report and had to make over a hundred requests for data for that report. As a result, on 7/21/20, the Monitor sent IDOC a spreadsheet listing documents and data the Monitor would need for his next report. This list would also serve as the

list of data and information that the IDOC should use in its reports. The Monitor asked for a meeting to discuss. IDOC scheduled this meeting on 10/14/20. At that meeting IDOC and the Monitor discussed specific details of the request by the Monitor. IDOC and the Monitor agreed to work on changes requested by IDOC.

The Monitor sent a revised document consistent with changes requested by IDOC on 12/7/20 and a follow up meeting on this document was conducted on 1/7/21 but still did not result in IDOC agreeing to send the data. We ask parties to come to agreement on this document which was to have been completed a year and a half ago. This discussion is still ongoing. The Monitor asks that IDOC send the data it is capable of sending from the list requested by the Monitor three months is advance of the next Monitor's report due date because asking individually for every data item is very time consuming. The Monitor realizes that there will be many data items specially requested for each report, but agreeing upon a base data and information set will result in less requests and will result in timelier reports.

With respect to information for this report, the IDOC agreed to send death charts. Thirty six charts have been sent to the Monitor. This was very helpful. The IDOC did provide the Monitor two compact discs with quality improvement minutes, safety and sanitation reports, data on hospitalizations, offsite encounters, and mortality data. For other data, the Monitor has sent requests for data individually and has received 110 emails based on individual requests. The requests span from 8/5/20 to 1/30/20.

The findings of the Monitor's 3rd Report are based on the data reviewed, interviews with senior leadership, and multiple record reviews[1]. The death records provided information necessary to evaluate chronic care, specialty care, hospital care, urgent care, and infirmary care. Clinical care was thoroughly evaluated.

This report includes four appendices. The first is a letter the Monitor sent to the IDOC in response to their request for a response to their June 2020 Staffing Analysis and Implementation Plan. The second is a table of Consent Decree provision items that have a deadline and their status. The third appendix contains 21 mortality reviews in a format that the Monitor suggests IDOC adopt as a mortality review format. The fourth is the Monitor's evaluation of the beginning of the Stateville COVID-19 outbreak with opportunities for improvement. These reviews will be described in the mortality review section of this report. Appendix A and B are attached to this report and Appendix C and D are included as separate documents. All record reviews are referred to anonymously in the report. A patient identifier table will be made available upon request to the parties.

# Executive Summary

*Addresses items II.A;*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the*

---

[1] The Monitor reviewed 46 records of intake evaluations, eight records of intrasystem transfers, four sick call evaluations from East Moline, 25 records of discharges from IDOC, and 29 death records.

*availability of necessary services, supports and other resources to meet those needs.*

Since our last report, the COVID-19 pandemic has consumed almost all of the time of IDOC senior staff[2]. While the Monitor believes that IDOC could have made more progress on the Consent Decree had all OHS and the quality staff been hired, the OHS senior staff did what was called for under the circumstances and attended to the pandemic the best they could with what resources were available. We do want to acknowledge all of the IDOC staff from top to bottom in what must have been a very intense and stressful situation. The Monitor and his team respect and acknowledge the entire IDOC team for their efforts during this very trying pandemic. The Monitor understands the current limitations in providing information and it is the Monitor's desire that the report focused on areas of review that will assist the IDOC in future corrective actions fully acknowledging the limitations of IDOC to address these during this recent crisis.

**OHS leadership**
A key component of the future ability of the IDOC to become compliant and independent of the Consent Decree will be the strengthening of the OHS so that its leadership team can effectively direct, manage, monitor, and oversee the delivery of health care services and the health of the IDOC population. The OHS has approval from Central Management Services for their new table of organization which reorganizes the medical program. While the IDOC has told the Monitor that the Chief of the OHS is the health authority and in charge of the medical program, the Monitor is still uncertain of the details of the organizational structure from the level of the facility medical leadership on through to the Chief of the OHS and including vendors as reported in a table of organization. The Monitor needs to study the recently approved table of organization and discuss changes with IDOC before commenting on the proposed table of organization. The IDOC has recently hired a Chief of Dental Services, but no other OHS staff have been hired. Position descriptions are not all complete.

**Staffing Analysis**
The Staffing Analysis has not yet been approved by the Court and thereby has not yet been made enforceable as part of the Consent Decree. The IDOC is therefore not allocating or hiring positions based on the Staffing Analysis of 6/18/20 because it is not yet approved by the Court. It stated that it is hiring based on prioritized need until the Court approves the Staffing Analysis. Considerably less staff have been hired than what the IDOC proposed in the 6/18/20 Staffing Analysis despite IDOC having determined the numbers and types of positions in the 6/18/20 staffing analysis. The Monitor had 25 comments on the analysis. The back and forth on the staffing analysis has proceeded slowly and has considerably delayed forward movement on hiring positions that IDOC has determined are necessary. While these discussions are ongoing, the IDOC should hire, as soon as possible, the positions that IDOC put forward in the Staffing Analysis because these needed positions were established by their own leadership. This amounted to approximately 350 positions. The discussion on the remainder of the items can continue.

The IDOC has stated in its November 2020 report the Southern Illinois University (SIU) will partner with IDOC to enhance the IDOC quality improvement program. It is not yet clear

---

[2] See letters of 4/15/20 and 5/6/20 from the Attorney General's counsel on impact of COVID-19 on operations within IDOC.

whether this SIU arrangement will result in hiring staff for the audit, data, and quality programs that were part of the University of Illinois Chicago plan for quality improvement. If SIU will provide these staff it will reduce the number of staff that IDOC has to hire.

**Implementation Plan**

While the Staffing Analysis is still unfinished, the Implementation Plan is less complete than the Staffing Analysis. In prior reports and in multiple discussions, the Monitor has communicated his recommendations on the Implementation Plan. The IDOC has been unable to complete this requirement. The Monitor understands the difficulties that the COVID-19 pandemic has presented with respect to completion of this project. However, even before the pandemic started the IDOC had not created an implementation plan satisfactory to the requirements of the Consent Decree. The Monitor notes that the IDOC lacks the internal resources to complete this task and needs help as this requirement is a year and a half overdue.

**Quality Improvement Program**

The IDOC had planned to work with UIC College of Nursing in establishing their quality program but that arrangement did not work out. IDOC is in discussions with SIU to assist in this project but these discussions are in preliminary stages and have not yet resulted in a complete scope of services or staffing proposal. The quality improvement program was to have been implemented in March of 2020. None of the downstream programs (audits, performance measurement, adverse event reporting, or mortality reviews) have been developed or initiated. The Monitor is very supportive of the plan to partner with SIU. It is the Monitor's recommendation that this plan have the full support of the Executive Director and has the funding necessary to execute this project. The Monitor will provide whatever input is needed to assist the IDOC in implementing this project.

**Physician credentialing**

IDOC has not hired any new physicians since the last Monitor's report. Three of 27 facilities do not have Medical Directors. It is the Monitor's opinion that there is a shortage of physicians. Physician shortages were evident in mortality record reviews; harm resulted to patients from lack of physician coverage in a few of these reviews. Currently, nine (29%) of 31 physicians do not have credentials required by the Consent Decree. On 6/12/20 the Monitor notified IDOC of three physicians who should not be allowed to practice in IDOC in accordance with items III.A.3 and II.B.6.r of the Consent Decree. As of this report, one of the three physicians has retired[3] but no action has been taken on the other two physicians. The mortality reviews continue to show that physicians judged to be practicing in an unsafe manner continue to do so and this contributes to continued mortality. To the credit of IDOC, all six physicians hired since the advent of the Consent Decree have been Board Certified in a primary care field or have completed a three residency in a primary care field.

**Electronic Health Record**

IDOC has cancelled its contract with KaZee for the electronic medical record and has asked SIU to assist in procuring a new electronic record. An RFP has not been released. IDOC will likely not be able to implement an electronic record on the timeline required by the Consent Decree.

---

[3] This physician lost his license due to failure to adhere to requirements of the Illinois Department of Financial and Professional Regulation probation agreement.

The IDOC has not informed the Monitor of any further plans regarding the electronic record. For these reasons, this item has moved to a noncompliance status.

Despite that compliance rating, the Monitor is encouraged that SIU will be assisting IDOC in this effort. The Monitor does emphasize the importance of data team support in implementation of this record in order to verify compliance with the Consent Decree. Due to the variability in data needs, it is unlikely to be able to get an electronic medical record vendor to supply all data needs. An internal data team is necessary. This section of the Monitor's 2nd Report gives detail on staff positions the Monitor recommends to support the electronic record. In preparation for the eventual procurement of an electronic medical record, IDOC reported that is has nearly completed the wiring and associated infrastructure at all IDOC facilities.

**Infection Control**
Infection control issues over the past year were dominated by COVID-19 issues and consumed the already extended resources of the Office of Health Services. Approximately one-third of the IDOC's incarcerated population has been infected with COVID-19 and the number of COVID related deaths is steadily approaching triple digits. While few if any correctional institutions in the USA were fully prepared for the gravity of this pandemic, COVID-19 exposed the gaps in the IDOC's infection control infrastructure and program including the lack of a permanent infectious disease physician consultant, a trained statewide infection control nurse, assigned and dedicated infection control nurses at each IDOC facility, an IDOC specific infection control manual, and a data team with resources to effectively maintain surveillance and treatment data. Time was needed to develop protocols concerning identification of infected individuals, monitoring of cases, isolation, quarantine, and contact tracing, surveillance and outbreak mitigation testing of both the incarcerated population and employees which resulted in heightened transmission of COVID-19 into twenty-nine of IDOC's thirty correctional centers[4] with subsequent morbidity and mortality

**Hepatitis C Treatment**
The Monitor worked with UIC and IDOC to revise and streamline the protocol for enrollment into Hepatitis C treatment with UIC. At any point in time during 2019-2020 only 1.3% of the 1,180 to 1,656 incarcerated individuals with active Hepatitis C were receiving highly curative HCV treatment. IDOC must set a goal of treating all incarcerated persons with active HCV with the next 3-5 years which would cure infected individuals, reduce and possibly eliminate the risk of transmission to other inmates and staff, and ultimately improve the public health of the State of Illinois. This would require a tripling or quadrupling of annual HCV treatments. UIC Telehealth has indicated that they have capacity to treat more individuals for hepatitis C than are currently being sent from IDOC[5]. There is no reason why HCV cannot be eliminated in the IDOC.

**Specialty Referral Process "Collegial Review"**
There has been no change in the specialty care process. Specialty referrals appeared to have decreased dramatically recently apparently due to COVID-19 restrictions. However, the

---

[4] Elgin Treatment Center, with a census of 16 inmates, is the only facility that has not had a single positive COVID-19 case. Eighteen employees who work at this facility have tested positive
[5] Hepatitis C Clinic data: IDOC CQI minutes 6/1/19, 12/1/19, 6/1/20, 9/1/20, and Wexford data 1/1/20, 12/2120

tracking log was examined for the time period before the pandemic and remains inaccurate. Although IDOC asserts compliance on five provisions[6] related to specialty care, they offer no data or information to support that assertion. The Monitor finds significant problems with all of these provisions as described in the report. None are compliant. There remain significant deficiencies with access of inmates to appropriate specialty care including:

- Failure of utilization reviewers to approve referrals consistent with standard of care;
- Significant clinical findings are unnoticed or ignored by providers resulting in not obtaining consultation;
- Physicians without primary care training apparently unaware of standard of care in managing a condition resulting in failure to refer to a specialist;
- Delays in care due to utilization and scheduling processes; and
- Failures in following up on consultant's recommendations.

The Monitor's recommendation to study the specialty referral process through the quality improvement program was not acted on. Clinical record reviews show considerable morbidity and mortality due to lack of access and delayed access to specialty care.[7] The Monitor continues to advocate that this process be abandoned on the basis of patient safety. This is particularly important because 27% of physicians lack primary care training and fail to know how to manage some of the medical conditions of patients.

**Adult Immunizations, Cancer Screening, and Routine Health Maintenance**
The Monitor has provided preliminary input to IDOC on a draft immunization and cancer screening procedure. IDOC has begun ordering nationally recommended vaccines[8] that were not previously available. The IDOC designed and implemented a human papilloma vaccine campaign at the two female facilities vaccinating 88 at-risk women which will decrease the risk of cervical cancer in this vaccinated cohort. Twenty facilities have ordered the Recombinant Herpes Zoster (Shingles) vaccine for 575 individuals over the age of fifty. However, an effective systemwide immunization program and cancer screening program has not yet been fully implemented. IDOC is unable to provide the number or percent of eligible inmates who are vaccinated or who receive cancer screening. The Monitor can obtain data on how much vaccine is ordered[9] but IDOC has not provided data to verify the total number of patients that actually receive vaccination. The Monitor advises the IDOC to include tracking of vaccinations and preventive cancer screening in their new electronic medical record.

**Access to Nurse Sick Call**
OHS should establish a workload driven staffing standard for nurse sick call and identify the number of RN positions needed to comply with this important aspect of the Consent Decree and incorporate these added positions into the Staffing Analysis. Only registered nurses are licensed to perform sick call but licensed practical nurses are assigned to conduct sick call with regularity.

---

[6] Provisions III.E.4, III.H.1, III.H.2, III.H.3, and III.H.4
[7] See mortality reviews for examples.
[8] Pneumococcal-13, Haemophilus influenzae B (HIB), meningococcal ACWY, human papilloma virus, and recombinant herpes zoster (shingles) vaccines.
[9] While some orders are for individuals, other vaccines are ordered to stock.

The number of vacant registered nurse positions statewide had increased to 24% by December 2020 compared to 14% in November 2019[10].

The Monitor's 2nd Report discussed the state's elimination of co-pay and the increase in the volume of sick call requests. Prior to its elimination the numbers of daily requests reported by Illinois prisons was far below the expected rate of five to seven percent of the population that systems with functional health care programs experience[11]. The percentage of population making requests for health care attention increased at all but five sites in 2020. However only Stateville, Vienna, and Elgin report daily numbers that approach the expected rate of 5-7% of population.

The Monitor's 2nd report recommended an examination of potential barriers to access be conducted given the low rate of requests for sick call with the identification and resolution of workload factors that cause delays in care as well as resources that are underutilized and could be repurposed to increase access[12]. This review should include identification and resolution of work assignments, physical space, custodial, and health care practices that cause delays in care. Even though elimination of copay appears to have resulted in a small increase in requests for health care, the rates remain very low at the majority of IDOC facilities indicating that there are additional barriers to health care. The Monitor continues to recommend that this area be reviewed as recommended previously.

We found a number of systemic clinical issues with nursing sick call including not acting on abnormal vital signs or other abnormal signs and symptoms, implementing treatment without documenting an assessment using the protocol, and failing to identify other factors pertinent to the patient's presenting complaint. The Monitor recommends revisions to the nursing treatment protocols as well as more meaningful clinical supervision of nursing practice and clinical supervision by supervising nurses.

**Medication Administration**

No changes or improvements were identified in the Monitor's 3rd report in the medication administration and medication refusals. The practices of pre-pour[13] and non-contemporaneous documentation continue as pervasive risks to patient safety. None of the recommendations in the Monitor's 2nd report were acted upon. The failure to set standards for safe medication practices was found to be contributory to poor patient care in several of the records reviewed by the Monitor for this report. Medication errors include transcription errors, duplicate dosing, failure to administer critical life-saving medication, administering medication without and order or after it had been discontinued or changed, and discontinuity of treatment. Medication records are not available to clinicians for review in advance of or at the time of scheduled appointments and contributed to under-treatment and mistreatment of patients with significant disease.

---

[10] IDOC_December2020_Staffing, Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6,2020 page 59

[11] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020 page 26.

[12] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020 page 89.

[13] Pre-pouring medication means that nurses prepare medications in advance of administration by taking them from an authorized pharmacy container and placing them in an unauthorized container until administration to the patient. Pre-pouring is not an accepted practice and is recognized as unsafe. By transferring medication from a pharmacy approved package into alternate packaging without appropriate labeling, the potential for error is increased.

Two additional areas of concern were identified from our chart review. One is to ensure that dispensing pharmacists are able to effectively communicate with prescribing providers about risk of adverse medication reactions and to suggest alternative medications. The other concern is the lack of clinical pharmacy expertise to assist primary care providers in the care of complex patients. We recommend OHS evaluate the need for clinical pharmacy expertise and to include clinical pharmacists in the Staffing Analysis.

**Aging IDOC Population and Infirmary Care**
The Monitor's 2nd report acknowledged that the revised Implementation Plan provided on 6/12/20 committed IDOC to engage the Illinois Department of Aging to perform a needs assessment of all elderly, infirm, disabled, and memory deficient patient-inmates in its system. There has been no progress since the last report in completion of this needs assessment. Further, the Monitor was just informed that the IDOC is revising its plans for the new higher-level care facility in Joliet, Illinois which was to include 52 medical beds, the purpose for which was undefined and is now being re-evaluated.

Statistical data and reports from the IDOC website indicate nearly 22% of the prison population are 50 years of age or older as of June 2020. In August of 2019, this population comprised 19% of the population in IDOC prisons. Within this group there are over 1,000 persons 65 years of age or older[14]. In the chart review of deaths in 2020 the Monitor found patients whose needs for care exceeded the capabilities of the facility, particularly skilled nursing, geriatric, hospice, and palliative care. The Monitor continues to ask the question why are these men and women incarcerated when they are so overtly and obviously no longer a danger to society.

We also found patients who should have been hospitalized rather than admitted to the infirmary and patients cared for in the infirmary when there was no physician present to direct the patient's care. The types of patient problems that can be cared for in the infirmary has not been defined. Nor has the IDOC defined when specialty referral or hospitalization needs to be provided as opposed to housing on the infirmary.

The Monitor made ten recommendations in the 2nd Report but found that little action has been taken or progress made by IDOC to enact any of the recommendations The Monitor finds that patients are languishing in the infirmaries in IDOC.

**Health Care Space, Physical Plant, and Equipment**
The Monitor has not been able to visits sites and inspect physical plant due to the COVID-19 pandemic.   In its 6/12/20 Implementation Plan, IDOC stated that it would ensure that there is adequate physical space and equipment for clinical care and would ensure this by way of annual audits.  IDOC has drafted a monthly survey checklist which the Monitor is reviewing.  IDOC has not communicated any other progress in this area.

The Monitor recommended that IDOC conduct an analysis of physical structures throughout the state to determine whether there are medical spaces that need to be built, refurbished, or renovated in order to meet provisions in the Consent Decree.  This has not yet been done.

---

[14] Illinois Department of Corrections, Inmates 50 Years of Age and Older on June 30, 2020 obtained at FY20 50+ Fact Sheet.pdf (illinois.gov).

**Clinical Care**

Clinical care was reviewed through record reviews.  Twenty nine mortality records, 46 reception records, eight intrasystem transfer records, and 25 records of persons discharged were reviewed. Appendix C to this report contains mortality review records.  All record reviews show systemic problems with quality of care and preventable and possibly preventable mortality.  Obtaining qualified physicians is essential to remedy this deficiency.  The Monitor also documents systemic opportunities for improvement in the mortality reviews that can be a focus for early quality efforts and that can contribute to reduction in preventable mortality.

# Statewide Issues: Leadership and Organization

**Leadership Staffing**

*Addresses item II.B.2; II.B.3; III.A.1; III.A.8; III.A.9*

**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**II.B.3.** *IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff.*

**III.A.1** *The Chief of Health Services shall hereafter be board certified in one of the specialties described in paragraph III.A.2, below. The Deputy Chiefs of Health Services shall either be board certified or currently board-eligible in one of the specialties described in paragraph III.A.2, below.*

**III.A.8.** *Within eighteen (18) months of the Effective Date Defendants shall create and fill two state-employed Deputy Chiefs of Health Services positions reporting to the Chief of Health Services to provide additional monitoring and clinical oversight for IDOC health care.*

**III.A.9.** *Within nine (9) months of the Effective Date every facility shall have its own Health Care Unit Administrator ("HCUA"), who is a state employee. If a HCUA position is filled and subsequently becomes vacant Defendants shall not be found non-compliant because of this vacancy for nine (9) months thereafter.*

**OVERALL COMPLIANCE:** Partial Compliance

**FINDINGS:**

The Monitor's last report listed five recommendations for this section. Recommendations one through four are not addressed and recommendation five was partly addressed. The fifth recommendation was that IDOC should formally document that the Chief OHS is responsible for managing the health program of the IDOC as evidenced by a communication by the Executive Director to the Wardens communicating this new relationship. While the Executive Director has not made a formal announcement, IDOC has approved a table of organization in which health care unit administrators (HCUAs) report through a clinical matrix to the Regional Coordinators to the OHS Director of Nursing, who reports to the Medical Coordinator. This table of organizations has just been approved by Central Management Services (CMS). The Monitor just received this approved table of organization on 2/2/21. The Monitor and his team do not understand what reporting through a clinical matrix means and need further discussion and explanation from the IDOC before commenting on this. That discussion and explanation cannot be reasonably accomplished without delaying the report further so it will be discussed in the next report.

The other four recommendations not accomplished include the following. One of the Deputy Chief positions is vacant. The prior Chief of the Office of Health Services (OHS) left service in March of 2020 and was replaced by one of the Deputy Chiefs who is board certified in Emergency Medicine. This leaves one Deputy Chief OHS position vacant. While the Monitor will discuss the recent table of organization in the future with OHS, prior discussions with OHS have included that the table of organization be organized along functional lines of authority.

This would include the following.
1. With the exception of the Chief OHS, who reports to a deputy director, all medical staff report to medical supervision and not through custody, (e.g. the Warden).
2. That physicians and other providers report through physician leadership ultimately reporting to the clinical direction of the Chief OHS.
3. That nursing staff report through a facility Director of Nursing at each facility who, for clinical issues reports to the statewide OHS Director of Nursing.
4. That administrative staff at the facility (HCUAs) report to OHS administrative leadership (Regional Coordinators) who report to the senior OHS administrator (Medical Coordinator)
5. That the OHS DON, OHS Medical Coordinator, Deputy Chiefs, and OHS Dental Director report to the Chief OHS.

This type of arrangement is functional because it aligns the clinical or operational functions of staff with appropriate supervision.

The newest proposed table of organization of 2/2/21 still has facility Directors of Nursing reporting to administrators (HCUAs) who report to administrators (Regional Coordinators) who report to a nurse (statewide DON) who reports to an administrator (Medical Coordinator).  This will detract from appropriate supervision.

It isn't clear who physicians or other providers report to.  There is no evidence that this group has supervision that is clinically meaningful or effective.

The 2/2/21 table of organization has an apparent connection from HCUAs to Regional Coordinators via a "clinical supervision (Matrix)" which is unclear.  This arrangement needs to ensure that Wardens are not supervisory to clinical staff.  Also, IDOC has a mixed vendor and state staff and the table of organization does not represent how these different employees are integrated into functional lines of authority and supervision.

The IDOC has informed the Monitor that four (13%) of facilities effectively did not have HCUAs.[15]  This is an improvement from April of 2020 when five HCUA positions were vacant.

The May 2020 table of organization listed 16 (73%) of 22 OHS positions were filled.  If secretarial and office coordinator positions are eliminated, 12 (71%) of 17 positions are filled.  OHS position vacancies have not been updated since the May 2020 table of organization.

The latest complete OHS table of organization is embedded in the 6/18/20 Staffing Analysis.  This table of organization was changed from the table of organization in May of 2020.  The table of organization does not have a position title for one of the position entries labeled a Public

---

[15] Joliet Treatment Center has a vacant HCUA which is covered by the vendor site manager.  The NRC HCUA is temporarily assigned as the statewide Infection Control Coordinator and five individuals split supervisory duties.  Centralia's HCUA is on leave with the Warden, Assistant Warden, an office assistant and the vendor Regional Manager sharing supervisory duties.  Shawnee HCUA is vacant with the Assistant Warden and the vendor Regional Manager sharing supervisory duties.

Service Administrator. We believe this to be an Environmental Services Coordinator but the table of organization should clearly state the position title.

Position descriptions for OHS staff are still incomplete. Job descriptions are still lacking for the Regional Coordinators, Health Information Officer, Electronic Health Record Administrator, Health Information Analyst, Infection Control Coordinator and Quality Improvement Coordinator. The actual responsibilities within the health program of the Environmental Services Coordinator and the Environmental Services Program Director are not clear. The job descriptions do not clarify the confusion.

**RECOMMENDATIONS:**
1. The vacant Deputy Chief position needs to be expeditiously filled
2. The OHS DON needs to report to the Chief of Health Services. Responsibilities of the DON should include primary responsibility for development of statewide policy and procedure for those subjects that are nursing-driven (medication admission, intake screening, nurse sick call, infirmary care etc.), setting performance expectations for registered nurses, licensed practical nurses and nursing assistants, establishing staffing standards, peer review of professional nursing, competency review of nursing support personnel, participates in critical incident and mortality review, establishes nursing quality indicators and monitors nursing quality.
3. Identify a Director of Nursing Services at each facility who is accountable to the Statewide DON for clinical practice and quality. Line authority would remain with the HCUA for daily operations.
4. IDOC is requested to provide quarterly up-to-date vacancy reports that include OHS and HCUA positions.
5. IDOC should formally document that the Chief OHS is responsible for managing the health program of the IDOC as evidenced by a communication by the Executive Director to the Wardens communicating this new relationship.

# Staffing Analysis and Implementation Plan

*Addresses items IV.A.1-2; IV.B;*

**IV.A; IV.A.1; and IV.A.2.** *The Defendants, with assistance of the Monitor, shall conduct a staffing analysis and create and implement an Implementation Plan to accomplish the obligations and objectives in this Decree. The Implementation Plan must, at a minimum: (1) Establish, with the assistance of the Monitor, specific tasks, timetables, goals, programs, plans, projects, strategies, and protocols to ensure that Defendants fulfill the requirements of this Decree; and (2) Describe the implementation and timing of the hiring, training and supervision of the personnel necessary to implement the Decree.*

**IV.B.** *Within 120 days [July 1, 2019] from the date the Monitor has been selected, the Defendants shall provide the Monitor with the results of their staffing analysis. Within sixty (60) days after submission of the staffing analysis, Defendants shall draft an Implementation Plan. In the event the Monitor disagrees with any provision of the Defendants' proposed Implementation Plan, the matter shall be submitted to the Court for prompt resolution.*

**OVERALL COMPLIANCE:** Partial compliance

**FINDINGS:**

The Monitor made five recommendations in this section of his last report. These have not been acted on by IDOC.

The first recommendation was for the Executive Director and Chief OHS to agree on a strategic plan for the design of the IDOC health services. After the strategic plan was developed the recommendation was that the Executive Director and Chief OHS meet with the Governor's office to get support for the plan and then follow up with university-based programs to negotiate a strategy forward. While the IDOC is desirous of a relationship with a university-based program, it has not yet articulated what that relationship would look like and has no written plans with respect to a university-based relationship. Its actions are not aligned with a strategy of addressing the Consent Decree in its entirety. The reason that the Monitor recommended involving the Governor's office in a discussion of IDOC strategy was that a relationship with a university-based program is not a simple matter and would need higher-level lobbying and support. The Monitor asked to meet with the Executive Director and the Governor's office to discuss these matters with respect to requirements of the Consent Decree. This recommendation was not acted on by IDOC. The Monitor's consultant asked the IDOC with respect to this recommendation whether any action was taken. The IDOC informed the Monitor's consultant that the Executive Director and the prior Chief OHS had discussions with UIC in 2017 and 2018 on the issue of quality improvement. The IDOC also stated that SIU has agreed to provide unspecified services with respect to quality improvement and possibly infection control. The IDOC concluded that the Consent Decree does not require involvement of the Governor's office. The Monitor had four other recommendations in this section in the last report. The Monitor has received no information from IDOC in the Bi-Annual Report of November 2020 or elsewhere related to any of the remaining four recommendations.

**Staffing Analysis**

The Staffing Analysis was not addressed in the IDOC November, 2020 Bi-Annual Report. The Staffing Analysis was due on 7/26/19 and the Implementation Plan was due on 9/24/19. The Court granted two 30-day extensions of the Staffing Analysis and Implementation Plan. Since those extensions, the IDOC has submitted two Staffing Analysis and Implementation Plan documents. It was the Monitor's opinion that neither of these two documents were fully adequate. The IDOC submitted their last Staffing Analysis on 6/18/20. The Monitor commented on that document in the Monitor's 2nd Report. Plaintiffs informed the Monitor in October that IDOC was awaiting the Monitor's comments on the Staffing Analysis [of 6/18/20] and Implementation Plan [of 6/12/20] and that is why no action on their part had been taken. For that reason, on 11/1/20 the Monitor submitted a letter via email to re-iterate to IDOC the Monitor's position on the Implementation Plan and Staffing Analysis that was first presented in the Monitor's 2nd Report.[16]

The Monitor's letter documented 25 comments on the Staffing Analysis that IDOC has not responded to. A key concern was the delay in filling positions and that lack of filling positions was affecting multiple areas of the Consent Decree and making it difficult to develop the

---

[16] This letter is attached as an appendix to this report.

Implementation Plan especially with respect to the failure to bring on board the data teams, audit teams, QI consultants, IT personnel and process improvement personnel. The Monitor recommended that these positions be hired immediately. Yet, despite IDOC telling the Monitor in several meetings that the IDOC budget has sufficient funding to hire all positions, key positions remained unfilled. If the funding is present to hire all positions then all positions should be in the process of being filled, particularly those for OHS.

Another area of concern was that the Staffing Analysis had no analysis of staffing need to accommodate vacations, time off, and 24 hour coverage (i.e. relief factor).[17] The Monitor asked IDOC to provide a standardized methodology of determining position needs in all areas of service. There was no analysis, for example, with respect to physical therapy, dental hygienists, physicians, non-physician providers, or optometry. All areas of service need to have a methodology of analysis determining staffing need. The Staffing Analysis also does not sufficiently address recruiting, particularly for difficult to recruit positions, for example physicians.

Though the Implementation Plan describes an audit team, there is no evidence that there is any staffing for an audit team including if this team is a contract service. Staffing for information technology and data teams, and quality improvement consultants is not accounted for in the Staffing Analysis at levels discussed with UIC even though some of these positions are mentioned in the Implementation Plan.

In their November 2020 Bi-Annual Report, IDOC stated that they have hired more than 200 medical staff since the 2nd Court report. On 12/14/20, the Monitor received a site-by site listing of 141 of 200 newly hired positions that had been filled between 6/1/20 and 11/30/20 by the IDOC vendor.[18] The new vendor hires included 3 DONs, 2 RN Supervisors, 43 RNs, 40 LPNs, 27 CNAs, 5 physicians, 4 PA/NPs, 3 dentists, 1 dental hygienist, and 1 medical record director. The data on the State (IDOC) hires during this timeframe was not provided to the Monitor. The Monitor was encouraged that the vendor and IDOC were able to continue to recruit and hire clinical staff, especially nursing personnel, during the COVID-19 pandemic

At the end of December 2020, the Monitor received a previously requested staffing update. A comparison of the 6/18/20 Staffing Analysis data and the 12/15/20 staffing update is shown in the two tables below.

| All Facility Correctional Center Totals 6/18/20 Staffing Analysis | | | | |
|---|---|---|---|---|
| | Allocated/ Budgeted | Vacant | Recommended Additions | Total Staffing |
| State Positions | 415 | 103 | 81 | 496 |
| Wexford Positions | 794 | 172 | 276 | 1070 |
| All Facility Totals | 1209 | 275 | 357 | 1566 |

The December 2020 staffing data provided by IDOC is shown in the table below.

[17] The Monitor notes that the use of a relief factor was discussed in the Staffing Plan and Operating Costs for the Joliet Treatment Center, dated November 29, 2018 prepared by HOK in association with Pulitzer/Bogard & Associates, LLC. The relief factor of 1.76 was used for each 7 day post (page 18).

[18] Wexford Health – IDOC Medical New Hires from 6/1/20 to 11/30/20, received by Monitor on 12/14/20

| Statewide Staffing Totals | | | | |
|---|---|---|---|---|
| | Allocated\ Budgeted | Vacant | Recommended Additions | Total Staffing |
| State Positions | 420 | 104 | 79 | 499 |
| Wexford Positions | 862 | 175 | 225 | 1087 |
| All Facility Totals | 1282 | 279 | 304 | 1586 |

In reviewing these two tables, the Monitor is unable to verify from the data whether the new employees were hired into existing vacant positions or newly created positions that had been recommended in the 6/18/20 Staffing Analysis. As noted above there appears to be only 73 newly allocated positions[19] in the 12/15/20 staffing update so it is speculated that the majority (63.5%) of the new employees were hired into existing vacant positions. IDOC has communicated that newly allocated positions have been created to fill perceived staffing needs and are not based on recommended positions in the Staffing Analysis. The IDOC provided no explanation attached to the December 2020 staffing data to explain or justify the 73 newly allocated positions nor whether the 53 recommended positions that were deleted from the 6/18/20 Staffing Analysis had been moved into allocated slots or just eliminated. The Monitor is therefore unable to verify how many positions recommended in the 6/18/20 Staffing Analysis have been hired.

In discussions with IDOC the Monitor was previously told that allocated positions were equivalent to budgeted positions and that allocated positions are all able to be posted. The data provided to us appears to show that in December, 2020, 304 recommended positions in the Staffing Analysis are not yet allocated which, based on information provided by IDOC, means that they are not able to be hired. It therefore appears that IDOC is only allocating or budgeting a fraction of the recommended positions in line with their December 2019 Implementation Plan of adding approximately 88 staff annually. The IDOC previously commented to the Monitor that all recommended positions in the Staffing Analysis can be immediately hired. But it is clear that recommended and needed additional staff are not being hired.

The Monitor remains extremely concerned about immediate needs of the Office of Health Services (OHS). The COVID-19 pandemic exposed critical weaknesses in OHS and in the health program. Lack of appropriately trained infection control staff in facilities, lack of appropriately trained data management personnel, lack of quality medical leadership at the facility level, and lack of nursing personnel all contributed to an inconsistently effective response to the pandemic. As mentioned in our last report, at the initial outbreak at Stateville there were insufficient nursing staff to monitor patients. Because of the lack of support infrastructure and staffing, senior OHS leadership had to reprioritize and abandoned their usual responsibilities and dedicated almost their entire work hours to management of the pandemic.[20] Lack of infection control expertise was immediately apparent causing IDOC to depend on University of Illinois and Illinois Department of Public Health for guidance at a macro level but leaving individual facilities without properly trained infection control nurses or Medical Directors. With respect to the effect of COVID-19 on progress of the Consent Decree, even the Attorney General notified

---

[19] Also, allocated positions do not imply that these positions were actually hired.
[20] See 050620 OHS schedules re. COVID Exhibit to COVID Letter to Plaintiffs which describes the schedules of OHS senior staff. This portrays the need to manage the pandemic without any infection control staff.

the Monitor in two letters[21] that progress on multiple items of the Consent Decree would be paused due to staffing issues related to COVID-19. In the April letter the Attorney General's counsel noted that seven areas of the Consent Decree would be impacted for an extended time period. [22] Many of the services paused involved staffing and included:

- Providing enough trained clinical staff and oversight by qualified professionals and administrative staff,
- Appropriate staffing on the infirmaries,
- All work on policies,
- Having registered nurses performing sick call, and
- Oversight over Wexford's denials of referrals for specialty care.

In these letters, IDOC acknowledged the significant disruption that the COVID-19 pandemic was causing. Meetings with the Monitor were slowed down to accommodate the excessive workload of senior OHS staff. It was even difficult to get time from OHS senior leadership for updates on the pandemic.

However, it is the Monitor's opinion that clinical work and much of the administrative work, including on the Consent Decree, could have continued were it not for IDOC and OHS being so short staffed, particularly in key areas. For this reason we strongly support immediate hiring of appropriately trained physicians, assigning dedicated trained nurses to infection control duties, hiring of nursing staff, and prompt hiring of the data, IT, audit and quality teams to augment OHS staffing so that usual health care and Consent Decree requirements can be continued. IDOC is planning stronger collaboration with SIU. There should be no reason why SIU cannot immediately hire the proposed staffing which was in the UIC plan for the quality improvement implementation.

The IDOC Staffing Analysis lacks analysis as to whether the list of recommended positions is appropriate; lacks key positions, and does not include needed positions in several areas of service and therefore is deficient. This item warrants continued partial compliance.

**Implementation Plan**

Two years into the Consent Decree and approximately 15 months after the Implementation Plan was due, IDOC has not yet completed an Implementation Plan to implement the Consent Decree. The 6/12/20 IDOC Implementation Plan fails to detail how the 95 items of the Consent Decree will be implemented. The IDOC Implementation Plan lists some goals related to some items of the Consent Decree but the *specific tasks, timetables, goals, programs, plans, projects, strategies, and protocols* are not established.

---

[21] 4/15/20 letter from Nicholas Staley to Harold Hirschman Re: COVID-19 and IDOC's obligations under the Consent Decree and 5/6/20 letter from Nicholas Staley to Harold Hirschman Re: COVID-19 and IDOC's obligations under the Consent Decree.
[22] The Attorney General Counsel stated that this pause would extend to a time in the future when the World Health Organization no longer considers COVID-19 a pandemic. This may well extend out another year or longer. The declaration of the World Health Organization also had little bearing on the conditions and situations in the State of Illinois.

The 6/12/20 Implementation Plan consisted only of multiple statements which were goals but not plans. Most of these appeared to be aspirational; some were in process of being addressed. These included:

- IDOC recognized the benefit of having an enhanced leadership structure and stated that the Chief OHS will be the health authority of the medical program.
- An electronic medical record will be implemented.
- A set of policies and procedures will be developed.
- Audits will be conducted to determine whether all facilities have adequate physical space and equipment.
- There would be an enhanced quality improvement program to include an audit team, data team, quality consultants, and process improvement staff.
- There would be the ability to extract data from the electronic record for use by the quality teams and to verify compliance with the Consent Decree.
- IDOC would survey the aged population to determine housing and other needs of this population are met.
- The audit function would be responsible for conducting mortality review, peer reviews, and sentinel event reviews.
- IDOC stated that staffing recommendations were evolving and needs would depend on requirements found after implementation of the policies. They ensured that there would be sufficient dental hygienists, physical therapy, and optometry services.
- IDOC would strengthen academic relationships and was implementing an existing contract with SIU to provide physician services at four IDOC facilities.
- IDPH will collaborate with IDOC to provide guidance on infection control issues.
- An information technology department will be initiated.
- An audit function will be developed that will audit each facility every other year, perform mortality reviews, and preventable adverse event evaluations to identify opportunities for improvement that will be referred to facilities for corrective action.

The Consent Decree requires that specific tasks, goals, timetables, programs, plans, projects, strategies, and protocols need to be provided. None of this information is provided for any of the goals listed above. Thorough details of the staff necessary to implement these goals were also not provided. How these goals are related to items of the Consent Decree were not provided. As well, the timing of hiring, training, and supervision of personnel necessary to implement these goals needs to be included. The IDOC Implementation Plan did not fulfill the requirements of the Consent Decree.

IDOC has not provided any implementation goals or plans for two essential areas of the Consent Decree: items K.1-13 dental program and item A.2.physician credentials.

Since the COVID-19 pandemic started in March of 2020, communication with IDOC and the Monitor has been limited to conference calls. There have been no specific calls related to the Implementation Plan. As of January 2021, there has been no modification of the 6/12/20 Implementation Plan and no indication from IDOC that any modifications will occur.

IDOC did not specifically address the Implementation Plan in its November 2020 Bi-Annual Report. Aside from the November, 2020 Bi-Annual Report stating that IDOC was strengthening the academic relationship with SIU, we have received no information to verify that anything has been done to further the IDOC's stated initial goals as described in the 6/12/20 Implementation Plan and, in fact, some items have regressed. The development of the electronic record has stopped and the contract with the medical record vendor cancelled. The work on policies has stopped completely with only a fraction of drafts completed. The development of an audit instrument or audit team has not advanced, even on a conceptual level. The quality improvement initiative is starting with a new group of consultants from SIU but the Monitor has been provided limited information to date on their plans. There has been no progress on other goals described in the 6/12/20 Implementation Plan. The IDOC's view, in part, is that the COVID-19 pandemic has impacted progress on the Implementation Plan.[23] It is our contention that the impact of the COVID-19 pandemic has exposed and exacerbated an already existing staffing and high level staffing deficiency which would be ameliorated by hiring key staff promptly, which has not been done. In addition, failure of senior level IDOC executive leadership to decide on a strategic plan for provision of health care within IDOC and to gain the support of the Governor's office appears to be a major barrier to progress. This could have been accomplished despite the COVID-19 pandemic.

There are 12 Consent Decree items required of IDOC with time deadlines.[24] Eleven of those items have expired deadlines. Nine of eleven items are not completed as of January of 2021[25]. Two of these nine items reverted from compliance to noncompliance or partial compliance: a contract for an electronic medical record was dissolved before implementation (now noncompliant) and one of the two Deputy Chiefs hired became the Chief of OHS and has been vacant for nine months (now partially compliant). The one remaining item (implementation of the electronic record) whose deadline is in 2022, is unlikely to be completed because IDOC has no existing contract for an electronic record.[26] Given that there is no plan for the electronic record it is extremely unlikely to be implemented within 17 months from now. The IDOC has submitted two documents serving as Implementation Plans, neither of which are consistent with requirements of the Consent Decree. If the 6/12/20 Implementation Plan is the final Implementation Plan, the Monitor will prepare a statement of disagreements to send to the parties. If IDOC is continuing work on the Implementation Plan, the Monitor offers to assist

---

[23] See Nicholas Staley letter to Camille Bennett on a Dispute Resolution dated 8/21/20 and copied to the Monitor.
[24] This is given as Appendix B at the end of the report.
[25] These are as follows: 1) The EMR contract due 9/6/19 was revoked and there is no replacement. 2) By 7/10/19 Deputy Chiefs are to review all non-approved consultations to specialists but this is not occurring as stipulated in the Consent Decree. 3) By 4/10/20 IDOC was to have implemented a quality improvement program with input from the Monitor; this program has not yet been implemented. 4) By 7/10/20 policies were to have been implemented but only 15 draft policies are completed and none are yet implemented. 5) By 2/9/20 all facilities are to have HCUAs but four facilities still do not have an HCUA. 6) By 11/9/20 IDOC was to have 2 Deputy Chiefs hired. For the past 9 months one Deputy Chief position has been vacant due to Dr. Bowman assuming the Chief OHS position. 7) By 7/26/19 IDOC was to have a staffing analysis completed. The Monitor deems the last version of 6/18/20 to be inadequate. 8) By 9/24/19 the IDOC was to have an Implementation Plan. Two versions of an Implementation Plan have been submitted, neither of which conforms to requirements of the Consent Decree. 9) By 11/9/19 IDOC is to produce a detailed report containing data and information sufficient to evaluate compliance. Though the IDOC has produced two Bi-Annual Reports, they contain no data or information to evaluate compliance.
[26] We have asked but have not received an update on what medical record will be used and any documents indicating what the plans are for the electronic record.

more intensively to complete this item as its delay is significantly impeding progress of the Consent Decree.

Because of the significant delay, incomplete detail, failure to identify how all items of the Consent Decree will be implemented, and failure to include multiple Consent Decree items in the Implementation Plan, this item is noncompliant. We have combined the Staffing Analysis and Implementation Plan in this part of our report and have given a partial compliance rating to the combined section.

**Vendor Relationships**

The IDOC does not have a strategy for how to manage its health program and there is no document that provides a strategy for how IDOC intends to use vendors. Without an implementation plan that includes a strategy for moving forward, vendor relationships are being initiated in an opportunistic and reactive manner without an apparent coherent strategy.

Since the Monitor's last report, the ongoing relationship with UIC with respect to the quality improvement initiative has ended. Significant work had been accomplished with UIC with respect to a plan for implementing quality improvement, management of the electronic record, obtaining data from the electronic record, auditing, and development of the safety and adverse event reporting systems.

When the IDOC relationship with UIC ended, the IDOC failed to communicate whether any projects recommended in the UIC College of Nursing report would be continued. IDOC indicated in its November 2020 Bi-Annual Report that SIU would partner with IDOC to implement a quality improvement program. The November Bi-Annual Report description of SIU's involvement was limited and appeared to demonstrate less involvement than what was being discussed with UIC[27]. In their November, 2020 Bi-Annual Report, IDOC stated that the relationship with SIU "continues to develop". Because IDOC is unable to provide any specific details and because on a conference call, the arrangements with SIU were described as preliminary, it is unclear to the Monitor if the arrangements with SIU were part of an overall strategic plan for quality improvement.

The initial plan for SIU was to provide medical providers at four IDOC facilities. This ultimately resulted in a contract for provision of specified medical services.[28] This contract which indicated that both SIU and the current vendor would perform the overlapping same duties at four IDOC facilities was not undertaken as written. The Monitor was subsequently advised

---

[27] The November 2020 Bi-Annual Report described SIU involvement as follows: "will include at least one audit team, assistance with mortality review, and development of an audit function for the Department". This was significantly less than what was being discussed with UIC which included two audit teams including team leader, physician, NP or PA, two nurses and a dental consultant; IT and data support teams to include an information technology manager with two technicians for hardware support and three application, training and support technicians; two data process lead analysts and four data analysts to retrieve data from the record; and CQI consultants and support staff

[28] Medical Program Agreement Between Illinois Department of Corrections and The Board of Trustees of Southern Illinois University on Behalf of Its School of Medicine Regarding Medical Program Services to Persons In The Custody of The Illinois Department of Corrections signed 12/18/19 by Rob Jeffreys, Director of IDOC.

that the SIU physicians are not providing clinical services but are assisting with the development of the quality improvement activities. The Monitor has not received an official statement regarding the status of the contract with SIU or the status of the SIU provision of physicians. In a conference call on 12/1/20, the IDOC stated that there were contract issues with SIU physicians working in the same facilities managed by Wexford but that the contract with SIU would pivot to other assignments, including the quality improvement program. This process of pivoting to alternative contract specifications is in the beginning phase and a written plan is not yet in place.

Further demonstration of the lack of a coherent strategy for its medical program is the IDOC contract with Wexford. In May of 2021, approximately four to five months from issuance of this report, the contract with Wexford is required to end and no further renewals of that contract are permissible. Parts of that existing contract require careful scrutiny and review, particularly with respect to physician recruitment, physician quality, utilization management, quality improvement, and overall quality of care. The Monitor strongly recommends alternative solutions to obtaining qualified physicians at a level required by the Consent Decree; alternative utilization management; and a quality program that focuses on improving health outcomes for the population. The Monitor understands that the IDOC may wish to keep certain strategic plans confidential. However, there is no evidence provided to the Monitor by IDOC that there is a plan for how to address the expiration of the Wexford contract. The IDOC notified the Monitor that it was exploring its options. This is a major comprehensive medical contract that includes all IDOC facilities. To be still "exploring options" within five months of expiration of the contract is highly problematic and presents significant concerns about the ability of IDOC to expeditiously and seamlessly transition the health care delivery to the incarcerated patient population without disruption. The Monitor continues to recommend solutions that include university-based programs. However, such a solution is not one that can be managed without higher level involvement.

The IDOC has also notified the Monitor that it canceled its contract with the electronic medical record vendor but it was unable to provide additional specific information regarding its future plans.[29] The IDOC is exploring options for an alternative.

The Monitor is aware of his responsibility to assist IDOC in creation and implementation of the Implementation Plan and in implementing the quality program which he is eager to do. The scope of the changes necessary to create an effective Implementation Plan were the basis of the Monitor's request to meet with the Executive Director, the Chief OHS and a representative of the Governor's office. The IDOC has not yet facilitated this meeting. Instead, a piecemeal and reactive strategy is in place which the Monitor believes will not be effective and will result in significant delays in bringing this Consent Decree to a conclusion. The Monitor continues to recommend a series of higher level meetings to promote a solution.

The participation of all vendors needs to be integrated into an overall strategic plan of IDOC consistent with requirements of the Consent Decree.

**RECOMMENDATIONS**:

---

[29] 11/25/20 letter from Kelly Presley notifying of the termination of the contract with KaZee.

1. The Executive Director with the Chief OHS need to agree on a strategic plan for the design of the IDOC health services. They may need to discuss this with the Governor's office. Our recommendation would be to implement a university-based program. Discussions with the university-based programs need to be conducted at a higher level to ensure that there will be support for this effort. The Monitor wishes to meet with the Executive Director and the Governor's office to discuss these matters with respect to requirements of the Consent Decree.
2. After a strategic plan is developed and agreed to, IDOC can flesh out details in their Implementation Plan.
3. Additional nurse manager positions proposed in the staffing analysis should be established because closer supervision will be necessary to make the changes in practice required by the Consent Decree.
4. If a relief factor for posts that deliver services seven days a week has not been included in the Staffing Analysis, it should be calculated. The staffing analysis needs to be revised to include it.
5. Continue to refine the Staffing Analysis to consider recommendations from the Monitor to include dedicated positions for infection control, quality improvement, a relief factor, use of the state nursing home standards for infirmary, ADA and other specialized housing of frail and or elderly inmates, and development of workload standards.
6. Continue to refine the Staffing Analysis to ensure that health care needs of the IDOC incarcerated population are adequately provided including nurse and provider sick call, chronic care, urgent care, specialty consultation, dental care and cleaning, optometry care, and physical therapy.
7. Given the significant delay in completing the Implementation Plan, the Monitor offers to increase participation in development of that Implementation Plan if IDOC desires. The Monitor suggests a working group comprised of IDOC, SIU and the Monitor to work intensively on this plan.

# Statewide Internal Monitoring and Quality Improvement

*Addresses item II.B.2; II.B.6.l; II.B.6.o; III.L.1;*
*II.B.2. IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*
*II.B.6.l. IDOC agrees to implement changes in the following areas: Effective quality assurance review;*
*II.B.6.o. IDOC agrees to implement changes in the following areas: Training on patient safety;*
*III.L.1. Pursuant to the existing contract between IDOC and the University of Illinois Chicago (UIC) College of Nursing, within fifteen (15) months of the Preliminary Approval Date [April 2020], UIC will advise IDOC on implementation of a comprehensive medical and dental Quality Improvement Program for all IDOC facilities, which program shall be implemented with input from the Monitor.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

The Monitor gave five recommendations in the last report. With respect to the Monitor's first recommendation, IDOC has stated that SIU will lead the quality improvement program, but a written plan is not yet in place. The Monitor has no data to verify that IDOC has acted on items a-i of the first recommendation. We have no information to verify that recommendations two through five were acted on.

The Consent Decree was signed in December of 2018. Item III.L.1 requires that within 15 months of the preliminary approval date, UIC would advise IDOC on implementation of a comprehensive quality improvement program and that the program be implemented with input from the Monitor. UIC submitted their report in September of 2019 and the Monitor received the report in October of 2019. The Monitor notified IDOC that implementation was to occur with input from the Monitor who had yet to meet with UIC before the report became public. The first time when UIC was able to meet with the Monitor was 1/15/20.

In two consecutive Bi-Annual reports[30], IDOC announced compliance with item III.L.1 of the Consent Decree without any evidence supporting that assertion and before a Quality Improvement Plan had even been implemented which is an essential requirement of item III.L.1.

In a series of subsequent meetings from January to March of 2020, UIC, IDOC and the Monitor met to discuss the quality improvement implementation plan and produced several draft plans and pro forma budgets which were modifications of UIC's implementation recommendations in their report. These changes were made based on input from the Monitor. [31] This included staffing needs for IDOC to support the quality requirements of the Consent Decree.

A key barrier to implementation of the quality improvement program, based on discussions of the Monitor with UIC and IDOC, was lack of staff to conduct training, conduct audits, conduct mortality review, and manage the quality effort for a statewide system. There was also a severe shortage of data resources to obtain the data needed for reporting trends towards compliance. Currently, data is manually collected and is non-standardized. The IDOC continues to be unable to obtain coherent standardized data for verification of this Consent Decree. The IDOC remains unable to produce data verifying its assertions in its Bi-Annual Reports and continues to allege compliance and imminent compliance without any data to verify these assertions. Compliance cannot be verified by merely asserting compliance which is the current practice of IDOC in its Bi-Annual Reports. Deficiencies of data resources in all aspects of the IDOC system are obvious and were noted by the IDOC senior leaders during the COVID-19 response and in discussions related to item V.G. related to data to be present in IDOC Bi-Annual Reports.

IDOC announced in the 5/29/20 Bi-Annual Report that UIC had not provided a proposal to implement the Quality Improvement Plan and IDOC was unable to wait any longer and was in

---

[30] Bi-Annual Reports of May 2020 and November 2020.
[31] The UIC 2019 Report was modified by UIC in their 2/12/20 and 3/26/20 proposals and 3/26/20 proforma budget which included input from the Monitor. These documents were stated as revisions of their proposal based on input from the Monitor.

discussions "with other outside programs to assist in development of our QI program". The Monitor received no further information on the quality program until four months later on 10/7/20 when the Monitor was advised in a conference call that IDOC was planning to have SIU implement their quality program. The Monitor asked for a meeting with SIU. Three subsequent conference calls were arranged, each approximately a month apart. In those calls, the Monitor learned that SIU was still engaged in a gap analysis. The Monitor and his consultant suggested that SIU review the UIC draft proposals. Much work had been accomplished in development of these documents and it is the Monitor's opinion that these documents formed the basis for a reasonable quality improvement program. It is not known whether the UIC revised proposal is being considered. The Monitor also suggested a work group or regular meetings with SIU so that the Monitor could have input into development of the QI program. The IDOC did not believe a work group or regular meetings were necessary and preferred to arrange meetings when appropriate. SIU is still in preliminary phases of evaluation of the project. They have provided a draft mortality review procedure. The Monitor has given preliminary verbal comments and will provide written comments at a later date. SIU informed the Monitor that with assistance from other SIU experts it was providing input on the clinical and operational data criteria that should be included in the RFP for the new electronic medical record vendor and is developing preliminary options on the composition of the audit, information technology, and quality teams. But to date, IDOC has not provided an outline of what SIU will be responsible for, how the program would be structured, or the staffing of their proposed program. The IDOC did state that it had plans on how it intended to collect information and was developing plans for partnering with multiple departments within SIU to further the project along. Details of those plans were not made available to the Monitor.

The Monitor is currently not being informed regarding details of the status of this project or what is being planned. Except for a draft mortality review policy no documents regarding this project have been provided. Because there is no information available to assess, the Monitor can only state that SIU and IDOC are in discussions on a quality improvement program. Because a quality improvement plan was to have been implemented by April of 2020 and because a quality improvement plan is still not evident, this item is noncompliant. Although the IDOC asserted compliance for item III.L.1 in the November 2020 Bi-Annual Report, there is no evidence of implementation of a UIC proposal for a quality improvement program and no evidence regarding what plan will be used for implementation of a quality program.

**RECOMMENDATIONS**:

1. Contract with SIU or another equally qualified university-based entity to provide management assistance with the quality improvement program to include:
   a. assistance in development of an audit instrument;
   b. hiring of audit teams;
   c. auditing facilities on an annual basis;
   d. provide personnel for a data team to extract data from the electronic medical record for purposes of validating performance;
   e. provide IT staff to assist in maintaining the electronic record and in training staff on an ongoing basis[32];

---

[32] See the Medical Records section of this report for an explanation of these positions.

      f.   provide expert system engineering consultation in augmenting quality improvement efforts;

      g.  develop and maintain through its data team a performance and outcome dashboard;

      h.  develop and implement a standardized adverse event system statewide; and

      i.   consultation and training expertise to facilities on how to perform quality improvement.

2. Revise the position description of the statewide Quality Improvement Coordinator.

3. Revise the Implementation Plan and Staffing Plan to address the requirements of the Consent Decree with respect to quality improvement taking into consideration the need for statewide efforts.

4. The current statewide Quality Improvement Coordinator and facility quality improvement coordinators should undergo Institute for Healthcare Improvement Open School training on quality improvement capability and patient safety and undergo six sigma green belt training sufficient for a senior level quality leader.

5. Incorporate additional audit team, data team, quality improvement consultants, and process improvement staff into the Staffing Analysis and the OHS table of organization.

6. The Monitor strongly suggests a working group that includes the Monitor and his consultants, IDOC and SIU in developing the quality program.

7. Utilize concepts of the UIC draft quality program in new quality proposals including:

      a.  An OHS statewide quality committee to oversee quality statewide.

      b.  Audit teams that audit facilities once a year and identify opportunities for improvement that form the corrective action items for facility quality teams.

      c.  Mortality review teams embedded in audit teams.

      d.  Data and information technology teams that work centrally and support the electronic record and obtain data for statewide quality efforts.

      e.  Process improvement staff[33] who work statewide to solve systemic issues, improve quality, improve processes, and reduce cost.

      f.  Quality improvement consultants who train facility staff and mentor them in their quality projects.


**Audits**

*Addresses item II.B.9*

**II.B.9.**   *The implementation of this Agreement shall also include the design, with the assistance of the Monitor, of an audit function for IDOC's quality assurance program which provides for independent review of all facilities' quality assurance programs, either by the Office of Health Services or by another disinterested auditor.*

**OVERALL COMPLIANCE RATING:**  Noncompliance

**FINDINGS:**

The Monitor has no information to indicate that IDOC has undertaken any of the five recommendations from this section of the prior report.

The audit function is not yet developed and the Monitor does not have evidence of plans for this

---

[33] System engineers

except in its November Bi-Annual Report which states that SIU has agreed to partner with IDOC to implement a quality improvement program to include an audit function. SIU provided a Quality Management Draft Proposal which indicated that SIU has completed 5% of a task to develop and recommend to IDOC an initial compliance survey instrument. This instrument has not been discussed or provided to the Monitor who has had no input into this instrument.

None of the recommendations of the Monitor have been acted on and there is no evidence that an adequate audit instrument has been developed. For that reason this item is rated noncompliant.

**RECOMMENDATIONS:**
1. IDOC needs to develop and implement an audit function. Based on difficulties in hiring, our strong recommendation is to provide this service through a university-based arrangement.
2. Two audit teams should each consist of a team leader, a physician, a nurse practitioner or physician assistant, and two nurses with a part time dental consultant.
3. Audits should result in a report that lists opportunities for improvement that are addressed through the quality improvement process. Follow up should occur until a problem is satisfactorily resolved.
4. The audit team should conduct mortality review.
5. The IDOC staffing plan and the OHS table of organization should be revised to include audit, data, medical record support, and quality consultant teams.

**Performance and Outcome Measure Results**

*Addresses items II.B.7*
**II.B.7.** *The implementation of this Decree shall include the development and full implementation of a set of health care performance and outcome measures. Defendants and any vendor(s) employed by Defendants shall compile data to facilitate these measurements.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
IDOC has provided no evidence of development of performance or outcome measures. The Quality Management Draft Proposal documents that SIU has completed 25% of work associated with development of a sample centralized quality improvement dashboard. This work has not been provided to the Monitor and the Monitor has not had any input into development of this work product.

In the Monitor's last report, the Monitor suggested that the dashboard should include at a minimum:
- Scheduling and show rate effectiveness,
- Timeliness of access,
- Immunization status and rates of immunization,
- Tracking of required items of the Consent Decree,
- Outcome measures for certain conditions (e.g. hemoglobin A1c for diabetes),
- Screening rates for various conditions,

- Medication administration effectiveness and timeliness,
- Staffing and vacancies,
- Tracking and appropriate placement of high risk individuals,
- Preventable hospitalization,

Without evidence of work product on a dashboard, this item remains noncompliant.

**RECOMMENDATIONS**:

1. IDOC needs to develop and implement performance and outcome measures. This system should be centralized and based on obtaining data automatically from the electronic record, laboratory, and other sources. Measures should be presented on an electronic dashboard that can be viewed at any workstation in any facility statewide. Based on difficulties in hiring, our strong recommendation is to provide this service through a university-based arrangement.

### Adverse Event and Incident Reporting Systems

***Addresses Items II.B.6.m; II.B.6.n***
**II.B.6.m.** *IDOC agrees to implement changes in the following areas: Preventable adverse event reporting;*
**II.B.6.n.** *IDOC agrees to implement changes in the following areas: Action taken on reported errors (including near misses);*

**OVERALL COMPLIANCE RATING**: Noncompliance

**FINDINGS:**

IDOC has not yet designed or implemented an adverse event reporting system. The Monitor's 2nd Report gives details of an adverse event system. There is no evidence that any recommendations from the Monitor's 2nd Report have been instituted. This item remains noncompliant.

**RECOMMENDATIONS:**
1. IDOC needs to develop an adverse event and incident reporting system. This system should be electronic and centralized. Based on difficulties in hiring, our strong recommendation is to provide this service through a university-based arrangement. IDOC can consider third party software for this purpose.
2. Adverse event reporting needs to have capacity to allow anonymous reports. Staff need to be encouraged to reports errors and believe that report of errors will not result in discipline.
3. Adverse event reporting needs to be supported and maintained by the OHS. Data from this reporting system must be integrated into the quality program.

### Vendor Monitoring

***Addresses II.B.2.***

**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**OVERALL COMPLIANCE RATING**: Noncompliance

**FINDINGS:**
There has been no change in this item since the Monitor's last report. The IDOC has provided limited data[34] or information related to vendor monitoring. The data provided is not sufficient to evaluate IDOC's monitoring of the vendor. The lack of data includes monitoring of vendor quality issues as well as provider clinical quality, peer reviews[35], monitoring of problematic physicians, action plans, or monitoring of other clinical staff.

The Monitor views this item as linked to comprehensive audits as described in the section on Audits above. Auditing, if comprehensive, monitors all clinical aspects of care and can include staffing vacancies. Because monitoring needs to be an independent view of a vendor, Wexford should not be permitted to perform monitoring.

**RECOMMENDATIONS**:
1. IDOC needs to develop a meaningful vendor monitoring system that monitors quality of care, physician quality, and ability to hire contracted staff against contract requirements. This can be joined with the audit process. Monitoring should be standardized across facilities so comparisons can be made. Based on difficulties in hiring within IDOC, our strong recommendation is to provide this service through a university-based arrangement.

**Mortality Review**

*Addresses items II.B.6.i; III.M.2;*
**II.B.6.i.** *IDOC agrees to implement changes in the following areas: Morbidity and mortality review with action plans and follow-through;*
**III.M.2.** *Mortality reviews shall identify and refer deficiencies to appropriate IDOC staff, including those involved in the Quality Assurance audit function. If deficiencies are identified, corrective action will be taken. Corrective action will be subject to regular Quality Assurance review.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
On 12/16/20, IDOC provided a draft list of deaths for 2020 that did not include all of the

---

[34] Some facility quality improvement meeting minutes contain information on vendor staff position vacancies, contracted versus actual hours of service, waiting times for select services, turn-around-time for collegial referral requests. A separate staff vacancy report was provided.
[35] Dentist peer review was performed in 2019

December deaths.  There were 148 deaths in approximately 11.5 months.  79 (53%) of the 148 deaths did not have a cause of death listed.  Only two of the deaths on this list recorded COVID-19 as the cause of death.  However, on 11/17/20, IDOC sent the Monitor an email describing 35 deaths due to COVID-19.  On 12/17/20 the IDOC updated the COVID-19 death list to 57 individuals; thus 57 (39%) of deaths are due to COVID-19.  The mortality list provided on 12/16/20 does not record whether an autopsy has been done and only a few autopsies were included in mortality records sent to the monitor.  There were 96 reported deaths in 2019.  2020 deaths for 11.5 months exceeded 2019 deaths by 52 or a 54% increase in the number of deaths.  This number will be higher as only a part of December is included in this data.  The excess deaths will likely be from COVID-19.  The Monitor expects COVID-19 deaths to rise.

None of the 148 deaths included a mortality review.  The vendor provides a death summary which is mostly a death announcement with a variable amount of details but has no critical analysis and no recommendations for improvement.  IDOC sent a very brief draft mortality review procedure developed by SIU which was just received.  The Monitor verbally provided preliminary comments and will give more input after this document is fully reviewed.

IDOC sent to the Monitor 36 medical records of persons who died.  The Monitor has reviewed 29 of the 36 death records provided to us.  These death reviews will be discussed in various sections of this report.  Of the 29 deaths reviewed, the Monitor was able to write up 21 in the format of a mortality review.  These mortality reviews give guidance on identification of opportunities for improvement that can give guidance to IDOC.   The Monitor gave preventability designations to these 21 mortality reviews.  Four were preventable, seven were possibly preventable and 10 were not preventable.  This demonstrates that the clinical care being provided is resulting in significant mortality.


**RECOMMENDATIONS**:

1. Provide all death records to the Monitor as they occur.  These should include two years of all aspects of the paper record. The Monitor and his consultants should all have remote access to the electronic record for every site that implements the electronic record.
2. All deaths should include an autopsy.
3. Provide a tracking log of all deaths at least quarterly.  This log should include name, IDOC #, date of death, age, date of incarceration, facility at time of death, category of death, cause of death, whether the death was expected or unexpected, whether an autopsy was done and the date of the autopsy.  The log should also include whether a mortality review has been completed.
4. A mortality review should be performed for each death by an audit team.  The mortality review needs to include at a minimum:
   a. Date of review
   b. Patient name
   c. IDOC number
   d. Date of death
   e. Age and date of birth

    f.   Facility at the time of death

    g.   Place of death (e.g. hospital, infirmary, etc.)

    h.   Category of death (natural, homicide, suicide, etc.)

    i.   Expected or unexpected death

    j.   Cause of death

    k.   Mental health diagnoses

    l.   Medical diagnoses

    m.   IDOC problem list

    n.   Medications at facility at the time of death

    o.   Case summary[36] that includes both nursing and physician input that includes a summary of the care of the patient for their illnesses and care related to the cause of death or care that needs to be highlighted to identify opportunities for improvement.

    p.   Autopsy diagnosis

    q.   Opportunities for improvement and recommendations for corrective action

    r.   Identified opportunities for improvement need to be evaluated by the OHS quality committee.  That committee needs to assign responsibility for corrective action either to the facility quality committee or to an OHS responsible party.  The OHS quality committee should monitor progress on resolution of the corrective action until it is completed.  The facility quality improvement meeting minutes need to document their progress in resolving corrective action.

5. The quality improvement discussion regarding mortality review should be educational with a goal towards improving care.

6. Line staff employees should have an opportunity to provide anonymous information regarding events surrounding a death with an aim toward improving patient safety.  A process for this should be established.

**7.** The quality improvement coordinator and audit teams should conduct follow up with facility quality programs to monitor actions taken to improve care based on information learned from mortality review.


# Medical Records

***Addresses item II.B.4; III.E.3; III.E.4; III.G.3***

**II.B. 4.**  *No later than 120 days after the Effective Date of this Decree, IDOC shall have selected an EMR vendor and executed a contract with this vendor for implementation of EMR at all IDOC facilities.  Implementation of EMR shall be completed no later than 36 months after execution of the EMR contract.*

**III.E.3.**  *IDOC shall abandon "drop-filing".*

**III.E.4.** *The medical records staff shall track receipt of offsite medical providers' reports and ensure they are filed in the correct prisoner's medical records.*

**III.G.3.** *IDOC shall use best efforts to obtain emergency reports from offsite services when a prisoner returns to the parent facility or create a record as to why these reports were not obtained.*

---

[36] For deaths that involve suicide

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

The second recommendation in this section was completed. Remote access to the electronic record was provided to the Monitor and consultants although this electronic medical record is being cancelled. There is no evidence that the IDOC acted on any of the remaining four recommendations.

In its May 2020 Bi-Annual Report IDOC announced that wiring for the electronic record was suspended due to the COVID-19 pandemic. In its November 2020 Bi-Annual Report, IDOC announced that the contract with KaZee was "partially terminated". The contract with KaZee will remain in place at the Logan, Decatur and Elgin Treatment Center but IDOC is exploring partnerships with SIU and other state agencies to "facilitate this endeavor". The IDOC has provide no additional information.

A December 2020 update on wiring shows that wiring is completed at all facilities except Sheridan, which is yet to have wiring started, and Stateville, which is 50% completed.

IDOC provided data on drop filing showing that eight facilities still using drop filing with one facility, Western, not reporting.

Because the IDOC no longer has a contract for an electronic record, this item reverts to a noncompliant status.

**RECOMMENDATIONS:**
1. Base the roll out and device needs on expected numbers of employees and expected workflows and not on current employee numbers or existing workflows.
2. Provide remote access for the Monitor and his Consultants to the electronic medical record at sites where an electronic medical record exists.
3. Modify the Staffing Analysis and Implementation Plan to include staff to manage and support the electronic medical records and data needs with respect to obtaining data for quality and management purposes.
4. Ensure that point-of-care[37] devices are integrated into the electronic medical record.
5. Ensure that label printing of laboratory requisition and other similar devices are integrated into the electronic medical record as part of the implementation of the record.
6. Ensure that the new electronic medical record has the capability to track and report clinical and operations data that needed to assess IDOC's compliance with the Consent Decree and data that is vital to IDOC's ongoing efforts to track and improve the delivery of quality care.

---

[37] Point-of-care devices are small devices that provide a diagnostic test locally and which can be used by nursing or provider staff where care is delivered. These devices include glucometers to test blood glucose, or devices to test blood to determine whether anticoagulation (INR) is sufficient. Electronic vital sign machines are similar to point-of-care devices in so far that they can be connected to the electronic medical record and the testing results can be automatically directed to the appropriate place in the electronic medical record.

# Policies and Procedures

**Medical & Dental**

*Addresses item II.B.8; III.K.4; III.K.5*

**II.B.8.** *The implementation of this Decree shall also include the development and implementation, with the assistance of the Monitor, of a comprehensive set of health care policies by July 1, 2020. These policies shall be consistent throughout IDOC, and cover all aspects of a health care program.*

**III.K.4.** *IDOC shall implement policies that require routine disinfection of all dental examination areas.*
**III.K.5.** *IDOC shall implement policies regarding proper radiology hygiene including using a lead apron with thyroid collar, and posting radiological hazard signs in the areas where x-rays are taken.*
.
**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:** None of the five recommendations of the Monitor in the last report has been undertaken or completed. The Monitor has received, commented on, and returned 15 policy drafts covering the following topics:
1. Access to Care,
2. Responsible Health Authority,
3. Medical Autonomy,
4. Administrative Meetings and Reports,
5. Quality Improvement Program,
6. Patient Safety,
7. Emergency Services and Response Plan,
8. Receiving Screening,
9. Transfer Screening,
10. Health Assessments,
11. Non-Urgent Health Care Requests and Services,
12. Discharge Planning,
13. Periodic Examination,
14. Urgent Care Services, and
15. Offender Infirmary Services.

IDOC sent a draft mortality review policy developed by SIU on 1/4/21, a chronic care policy, and a draft immunization policy on 1/19/21. The Monitor will fully review these policies and send comments after completion of this report.

Since there will need to be at least 60 medical policies, IDOC has drafted about 25% of necessary medical policies. These drafts are not yet completed and there are no completed policies to date. This item was to have been completed on 7/1/20. On 5/6/20 IDOC sent a letter to Plaintiffs and the Monitor stating that completion of policies would be delayed because of COVID-19. Much work remains to be done. The IDOC will need to address how policies will

be implemented and disseminated. Dental policies have not yet been started.[38]

**RECOMMENDATIONS:**
1. Re-establish a timeline for completion of the comprehensive medical policies.
2. Complete the process of finishing drafts of policies.
3. Finalize the recommended changes to the policies.
4. Develop a plan to implement and disseminate policies.
5. Start the Dental policies

# Facility Specific Issues

# Facility Staffing

**Budgeted Staffing**

***Addresses items II.B.2; II.B.3; III.A.10;***
**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*
**II.B.3.** *IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff.*
**III.A.10.** *Each IDOC facility shall have registered nurses conducting all sick calls. Until IDOC has achieved substantial compliance with nursing provision of the staffing plan, facilities may use licensed practical nurses in sick call, but only with appropriate supervision.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
**Budgeted Physician and Non-Nursing Positions**
The Monitor has included his letter[39] to IDOC on the Staffing Analysis as an Appendix A to this report. In that letter the Monitor described his comments on staffing deficiencies in multiple areas including dental hygienists, dentists, optometrists, physical therapists and physicians. The Monitor also commented on staffing for the audit teams, data team and IT support for the medical record in Appendix A as well as in the Monitor's 2nd Report. The IDOC has not fully responded yet to these concerns.

Review of the 12/15/20 staffing update showed that since the 11/23/19 Staffing Analysis, IDOC has added a limited number of allocated clinical positions.[40] The Monitor has communicated

---

[38] Dental Care for Offender revised 1/1/2020 was received on 6/15/20 as the 2nd Monitor's Report was being finalized and has not yet been fully evaluated.
[39] Letter to IDOC in Response to the 6/18/20 Staffing Analysis and 6/12/20 Implementation Plan in Appendix A of this report.
[40] IDOC has added one dental hygienist, one dentist, zero physical therapists, zero physical therapy assistants, zero optometrists, zero physicians, and 1.4 physician assistants or nurse practitioners.

support for increasing dental hygienist, physical therapist, and physical therapy assistant services throughout IDOC. Medical record reviews done for this report show that infirmary and chronic care notes are inadequate. The Monitor is concerned that insufficient physician staffing may be contributing to this problem. Both the Staffing Analyses and the staffing update have recommended increasing physician assistants and nurse practitioners positions but these recommended increased positions have not been hired. The Monitor believes that the increased numbers of physician assistant and nurse practitioner positions need to be hired to free up the physicians to focus on more complicated chronically and acutely ill individuals and those housed in the IDOC's twenty-six infirmaries. Currently eight correctional facilities with sizable populations and/or complex care services do not have physician assistant or nurse practitioner staffing.[41] The COVID-19 pandemic has exacerbated existing waiting times for dental and optometry services and will require additional staffing to provide reasonable and timely access to these backlogged services.

**Budgeted Nursing Positions**

According to information provided to the Monitor,[42] IDOC has allocated 813 direct care positions in nursing services,[43] 29 Directors of Nursing and 16 Nursing Supervisors. The ratio of supervisors to direct care employees is 1:18 which is too broad to result in effective supervision. The information sent by the IDOC indicates that 14 additional supervisory staff are recommended which would bring the span of control to one supervisor for every 16 employees. This is closer to the span of control needed to implement the changes in nursing practice and services needed to implement the Consent Decree. The Monitor recommends that IDOC allot the 14 recommended supervisory positions.

The number of direct care nursing positions for all facilities combined is 26 per 1000 population.[44] Staff positions allocated are slightly higher in December 2020 compared to November 2019, primarily because the population has decreased in the last year.[45] Staffing ratios are the highest at the smallest facilities with special treatment or programming missions.[46] Facility staffing varies at the other facilities from a low of 9.6 at Murphysboro to a high of 54.3 at NRC.

The staffing variance among the other facilities cannot be fully explained by custody level or population size. Facilities with staffing ratios less than the mean of 26 per 1,000 prisoners are shaded in the following table. Of the allocated direct care positions 55% are registered nurses, 35% are licensed practical nurses (includes CMTs) and 10% percent are nursing assistants.

---

[41] Centralia, Decatur, JTC, Robinson, Sheridan, Southwestern, Taylorville, and Vandalia.
[42] Corrected Nurse Staffing IDOC December 2020_Staffing received 1/26/2021.
[43] Direct care positions include registered nurses, licensed practical nurses, CMTs, and certified nursing assistants. The Monitor understands that CMTs must be licensed as practical nurses and so these two positions categories are treated as one for the purpose of evaluating staffing adequacy.
[44] The ratio of direct care positions in November 2019 was 21 for every 1,000 prisoners per the Staffing Analysis Illinois Department of Corrections Office of Health Services, Lippert Consent Decree 11/23/2019.
[45] Average daily population as reported on the Primary Medical Services Report for November 2019 and December 2020.
[46] Kewanee, JTC and Elgin

However, the skill mix[47] at individual facilities varies widely. In the column headed Actual Skill Mix 12-2020, RN, the facilities with registered nurses comprising less than 50% of the direct care staff are also highlighted. The Monitor recommends further analysis of staffing adequacy, especially at medium or maximum custody facilities with low staffing ratios and low percentages of registered nurses in the skill mix. This analysis should consider quality patient care parameters (numbers of emergencies, patient falls, acquired infection etc.), risk management information (deaths, grievances, errors etc.), time taken to fill vacant positions and retention in registered nurse positions as well as compliance with items III.A.10, III.I.1, III.I.2 and III.I.3 of the Consent Decree.

| DIRECT CARE NURSING POSITIONS ALLOTED 12/2020 PER 1000 PRISONERS & SKILL MIX | | | | | | |
|---|---|---|---|---|---|---|
| **FACILITY** | **TYPE** | **Actual Total Direct Care 12-2020** | | **Actual Skill Mix 12-2020** | | |
| | | # | #/1000 | **RN** | **LPN/CMT** | **C.N.A.** |
| **MURPHYSBORO** | **MIN** | **1.0** | **9.6** | 100% | 0% | 0% |
| **DANVILLE** | **MED** | **17.6** | **11.6** | 51% | 49% | 0% |
| **LAWRENCE** | **MED** | **24.0** | **13.0** | **29%** | 71% | 0% |
| **TAYLORVILLE** | **MIN** | **11.4** | **14.4** | 100% | 0% | 0% |
| **WESTERN** | **MED** | **22.0** | **14.5** | **36%** | 55% | 9% |
| **CENTRALIA** | **MED** | **18.0** | **15.0** | 67% | 33% | 0% |
| **ROBINSON** | **MIN** | **11.0** | **15.4** | 100% | 0% | 0% |
| **SHAWNEE** | **MED** | **21.0** | **17.0** | **38%** | 62% | 0% |
| **HILL** | **MED/MAX** | **27.0** | **17.5** | **37%** | 56% | 7% |
| **ILLINOIS RIVER** | **MED** | **28.0** | **19.1** | **36%** | 43% | 21% |
| **SHERIDAN** | **MIN/MED** | **25.0** | **19.1** | 76% | 0% | 24% |
| **SOUTHWESTERN** | **MIN** | **9.0** | **20.7** | 100% | 0% | 0% |
| **PINCKNEYVILLE** | **MED** | **34.4** | **21.6** | **35%** | 48% | 17% |
| **BIG MUDDY** | **MED** | **24.0** | **21.9** | **33%** | 67% | 0% |
| **GRAHAM** | **MED** | **33.0** | **22.2** | 58% | 24% | 18% |
| **EAST MOLINE** | **MIN** | **23.0** | **23.0** | 57% | 26% | 17% |
| **MENARD** | MAX | 57.0 | 26.3 | **44%** | 46% | 11% |
| **VIENNA** | MIN | 20.0 | 27.9 | 80% | 20% | 0% |
| **VANDALIA** | MIN | 16.0 | 28.4 | 81% | 19% | 0% |
| **DIXON** | MED/MAX | 62.0 | 30.2 | 71% | 16% | 13% |
| **LINCOLN** | MIN | 20.0 | 31.1 | **30%** | 50% | 20% |
| **JACKSONVILLE** | MIN | 19.0 | 32.7 | 79% | 21% | 0% |

---

[47] Skill mix refers to the proportion of the total for direct care staff are one type of personnel. For example, the skill mix for the 448 RN positions divided by the total direct care nursing positions of 813 which is 55%. There is no standard skill mix but services with a higher RN mix have better outcomes. The skill mix can be measured against outcomes to determine if a higher RN ratio may be needed.

| DIRECT CARE NURSING POSITIONS ALLOTED 12/2020 PER 1000 PRISONERS & SKILL MIX | | | | | | |
|---|---|---|---|---|---|---|
| **FACILITY** | **TYPE** | **Actual Total Direct Care 12-2020** | | **Actual Skill Mix 12-2020** | | |
| | | # | #/1000 | RN | LPN/CMT | C.N.A. |
| **LOGAN** | MULTI (fem) | 46.0 | 40.4 | **48%** | 39% | 13% |
| **PONTIAC** | MAX | 53.0 | 47.0 | **47%** | 42% | 11% |
| **DECATUR** | MIN (fem) | 17.0 | 47.6 | 71% | 29% | 0% |
| **STATEVILLE** | MAX | 56.0 | 51.0 | 52% | 38% | 11% |
| **NRC** | MAX | 60.0 | 54.3 | 53% | 37% | 10% |
| **KEWANEE** | MULTI | 10.0 | 59.9 | 60% | 40% | 0% |
| **JTC** | MULTI | 26.0 | 124.4 | 85% | 0% | 15% |
| **ELGIN** | MULTI (fem) | 22.0 | 1375.0 | 64% | 14% | 23% |
| **TOTAL** | | 813 | 26.4 | 55% | 35% | 10% |

High vacancy rates have been identified as a problem since at least 2018.[48] High vacancy rates continue to be a significant problem at IDOC facilities. The Monitor evaluated vacancies reported in December 2020 by the IDOC[49]. Vacancies among registered nurse allocated positions rose from 9% in November 2019 to 24% in December 2020. Vacancies among registered nurses increased at 20 of 28 facilities that provided this information. Vacancies for registered nurses exceed 25% at 12 of 28 facilities reporting.

Vacancies for CMTs were not provided in November 2019 so a year to year comparison cannot be made at this time. However vacancy rates for this group of staff exceed 25% at 11 of 24 facilities which have CMTs/LPNs. There are seven facilities with vacancy rates exceeding 25% for both registered nurses and LPNs/CMTs. These are highlighted on the following table. Facilities with half or more of the allocated positions vacant are indicated with larger bold font.

| Nurse Vacancy Rates in November 2019 and December 2020 | | | | |
|---|---|---|---|---|
| Facility | RN 2019 | RN 2020 | LPN 2019 | LPN/CMT 2020 |
| | % VACANT | % VACANT | % VACANT | % VACANT |
| BIG MUDDY | 13% | 38% | 13% | 19% |
| CENTRALIA | 0% | 17% | - | 17% |
| DANVILLE | 44% | **56%** | 54% | **53%** |

[48] Statewide Summary Report Including Review of Statewide Leadership and Overview of Major Services, Report of the 2nd Court Appointed Expert (October 2018) pages 28-30
[49] Corrected Nurse Staffing IDOC_December2020_Staffing received 1/26/2021.

| Nurse Vacancy Rates in November 2019 and December 2020 | | | | |
|---|---|---|---|---|
| Facility | RN 2019 | RN 2020 | LPN 2019 | LPN/CMT 2020 |
| | % VACANT | % VACANT | % VACANT | % VACANT |
| DECATUR | 0% | 8% | 50% | 20% |
| DIXON | 0% | 16% | 40% | 10% |
| EAST MOLINE | 0% | 8% | 33% | 0% |
| ELGIN | 0% | 14% | 67% | 0% |
| GRAHAM | 0% | 32% | - | 25% |
| HILL | 25% | **50%** | 33% | 27% |
| ILLINOIS RIVER | 63% | 20% | 42% | 33% |
| JACKSONVILLE | 0% | 0% | 25% | 0% |
| JTC* | - | 23% | - | - |
| KEWANEE | 0.8% | 0% | 0% | 0% |
| LAWRENCE | 29% | 14% | 18% | 18% |
| LINCOLN | 17% | 0% | 20% | 40% |
| LOGAN | 36% | **64%** | 17% | 11% |
| MENARD | 0% | 32% | 50% | **58%** |
| MURPHYSBORO* | - | 0% | - | - |
| NRC | 0% | 16% | 39% | 45% |
| PINCKNEYVILLE | 30% | **67%** | 17% | 12% |
| PONTIAC | 0% | 28% | 100% | 27% |
| ROBINSON | 10% | 27% | - | - |
| SHAWNEE | 25% | **50%** | 15% | 31% |
| SHERIDAN | 0% | 32% | - | - |
| SOUTHWESTERN | 22% | 22% | - | - |
| STATEVILLE | 17% | 24% | 50% | **50%** |
| TAYLORVILLE | 12% | 12% | - | - |
| VANDALIA | 0% | 8% | - | 0% |
| VIENNA | 0% | 6% | 50% | 25% |
| WESTERN | 38% | 25% | 33% | 42% |
| TOTALS | 9% | 24% | 30% | 29% |

The vacancy rates are relevant in that actual staff available to provide nursing services is far less than the number of allocated positions. Harm to patients is highly likely in facilities with less than 50% of the allocated positions filled. Undoubtedly some of these vacancies reflect decisions made by nurses during the pandemic including the availability of greater pay and other benefits provided by health care organizations competing for personnel during this time of high demand as well as concerns about personal safety by becoming infected with the virus not contained and transmission highly likely in crowded correctional facilities. The Monitor appreciates the gravity

of having to rely upon the National Guard and interim agency personnel to assist during the pandemic.

Vacancies and turnover of nursing personnel are linked to patient care quality and outcome. Facilities with the highest vacancy rates and most turnover should be carefully monitored to prevent patient harm. The Monitor recommended in the 2nd report[50] data on the number of nursing personnel by type be tabulated to include the number of positions, the number vacant currently, the number who left employment each calendar year, the number leaving voluntarily each calendar year and the number of positions filled currently. The IDOC does not yet keep this information. The Monitor continues to recommend they do so.

The Monitor also suggested[51] that a recruitment task force be established with representation from OHS, Wexford, Human Resources, and the Office of Budget and Management with the explicit mission to reduce the vacancy rate among nursing positions to 12%. The challenges in recruitment are even greater now when vacancy rates are also high. The Monitor will ask that IDOC and their vendor provide greater detail about recruitment and retention progress in the interim.

In the 2nd report the Monitor commented that the staffing analysis[52] did not identify nursing positions at each facility to be responsible for infection control or quality improvement. These positions have yet to be identified and filled with individuals with the required training and expertise. If the IDOC is to move forward in any substantive way on the Consent Decree these positions need to be filled.  The Monitor requests that IDOC develop position descriptions which list the training and experience needed to fill these two types of positions and provide them for review and comment by the Monitor.


**RECOMMENDATIONS:**
1. Identify performance and health outcome measures to compare with staff mix and staffing levels to identify desirable staffing ratios and patterns.
2. Reconcile budgeted and actual positions in the IDOC staffing analysis.
3. Establish a database that includes the number of nursing positions by type, the number vacant currently, the number who left employment each calendar year, the number leaving voluntarily each calendar year and the number of positions filled currently.
4. The number of mandatory overtime assignments should be reported to OHS by each facility monthly.
5. Monitor patient care quality and health outcomes more closely at facilities with the most turnover, highest vacancy rates and largest number of mandatory overtime assignments.
6. Increase employment of clerks, administrative staff, assistants, and technicians to carry out tasks that do not require nursing skill but traditionally have been the responsibility of nursing staff.
7. Establish a recruitment task force with representation from OHS, Wexford, Human Resources, and the Office of Budget and Management with the explicit mission to reduce

---

[50] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 59.
[51] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 26.
[52] Ibid

the vacancy rate to 12%.

8. Increase dental hygiene and physical therapy services throughout the IDOC.
9. Provide physician assistant and nurse practitioner staffing at all IDOC facilities where physicians are assigned.
10. Evaluate need for additional physician staffing.

## IDOC Staffing

*Addresses items II.B.2; II.B.3;*
**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*
**II.B.3.** *IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff.*

**OVERALL COMPLIANCE RATING:** Not rated

**FINDINGS:**
See Statewide Staffing Analysis and Implementation Plan

**RECOMMENDATIONS:** None

## Vendor Staffing

*Addresses items II.B.2; II.B.3;*
**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*
**II.B.3.** *IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff.*

**OVERALL COMPLIANCE RATING:** Not rated

**FINDINGS:**
See Statewide Staffing Analysis and Implementation Plan

**RECOMMENDATIONS:** None

## Credentialing of Physicians

*Addresses items II.B.6.r; III.A.2-7*

**II.B.6.r.** *IDOC agrees to implement changes in the following areas: That Defendants and the vendor shall timely seek to discipline and, if necessary, seek to terminate their respective health care staff that put patients at risk;*

**III.A.2.** *All physicians providing direct care in the IDOC (whether they are facility medical directors or staff physicians) shall possess either an MD or DO degree and be either board certified in internal medicine, family practice, or emergency medicine, or have successfully completed a residency in internal medicine which is approved by the American Board of Internal Medicine or the American Osteopathic Association, or have successfully completed a residency in family medicine which is approved by the American Board of Family Medicine or the American Osteopathic Association, or have successfully completed a residency in emergency medicine which is approved by the American Board of Emergency Medicine.*

**III.A. 3.** *Physicians currently working in IDOC who do not meet these criteria shall be reviewed by the Monitor and the IDOC Medical Director to determine whether the quality of care they actually provide is consistent with a physician who has the above described credentials and who is practicing in a safe and clinically appropriate manner. If the Monitor and the IDOC Medical Director cannot agree as to the clinical appropriateness of a current IDOC physician, IDOC shall not be found non-compliant because of that vacancy for nine (9) months thereafter*

**III.A.4.** *If a current physician's performance is questionable or potentially problematic, and the Monitor and the IDOC Medical Director believe that education could cure these deficiencies, the IDOC will notify the vendor that said physician may not return to service at any IDOC facility until the physician has taken appropriate CME courses and has the consent of the Monitor and the IDOC Medical Director to return.*

**III.A.5.** *Defendants may hire new physicians who do not meet the credentialing criteria, only after demonstrating to the Monitor that they were unable to find qualified physicians despite a professionally reasonable recruitment effort and only after complying with the provisions of paragraph 6, below.*

**III.A.6-7** *Physician candidates who do not meet the credentialing requirements shall be presented to the Monitor by the Department. The Monitor will screen candidates who do not meet the credentialing criteria after a professionally reasonable recruitment effort fails and determine whether they are qualified. The Monitor will not unreasonably withhold approval of the candidates. The Monitor will present qualified candidates to the IDOC for hiring approval. If the IDOC Medical Director has concerns regarding the rejected candidates, he or she will meet and confer with the Monitor in an attempt to reach a resolution. In instances in which the Monitor rejects all viable candidates for a particular vacancy, the Department will not be found noncompliant because of that vacancy at any time during the next twelve (12) months. The credentialing requirements contained in paragraph 2 above do not apply to physicians employed by universities*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

Four recommendations in the last report in this section asked for credential and physician information to be sent to the Monitor three months in advance of the next report. This information had to be re-requested by the Monitor. As in the past some of information provided was incomplete. The inability to obtain requested information delays and for some items

prevents an adequate evaluation of physician credentialing and staffing.[53]

Information requested in the last report that was not received included the following.

    1.   Updated AMA profiles for all physicians that are current.[54]

---

[53] The following is a detailed list of requests for data.
In the last report, the Monitor asked that 3 months prior to the report that IDOC send information necessary to evaluate credentials and physician staffing. This was not sent. The Monitor then asked for additional information necessary to verify staffing and primary care training status only. On 10/5/20 the Monitor sent a request for an updated version of the Wexford physician credential spreadsheet. This arrived on 10/12/20 but it was not accurate.

On 11/10/20 the Monitor asked for a credentials packet for a doctor who was listed as a new physician. The Monitor was told that the doctor was not hired by Wexford because of a security issue.

On 11/10/20 the Monitor also asked for credentialing information for three SIU physicians including an obstetrician. Three physicians, (an obstetrician, and two other physicians) were SIU staff but the Monitor was told that these physicians were not providing care in IDOC. The obstetrician hired for Logan and Decatur was not providing care and was only reviewing protocols. IDOC had initiated a contract for this physician to work at Logan when Wexford already had a contract to provide care at this facility and the physician could not see patients. The credential information was not sent.

On 11/10/20 the Monitor asked for a list of current providers by site to include the hours worked per week at each site they worked at. On 12/2/20 IDOC sent a list of physicians but did not include the hours worked at each site. Each physician was listed as working at only one site which is unlikely given information gained from record reviews. Some physicians were listed as working 0 hours which the Monitor was told indicated that they were "as needed" physicians but the hours worked were not listed. On 12/8/20 a 2nd list was sent that updated the 12/2/20 list that had two less providers who left service. This list did not provide the hours-worked information either. Moreover, the lists sent 12/2/20 and 12/8/20 had discrepancies from the spreadsheet sent on 10/12/20. There were three physicians on the spreadsheet sent on 10/12/20 who were not on the list sent 12/8/20. There were four physicians on the list sent 12/8/20 who were not on the spreadsheet sent 10/12/20.

On 12/10/20 the Monitor notified IDOC that four physicians on their 11/25/20 list were not on the Wexford list sent 10/12/20. The Monitor asked for clarification. The Monitor asked for the credentials for these four physicians. The Monitor also noted that two physicians on the Wexford credential spreadsheet sent 10/12/20 were not on the list sent 11/25/20. The Monitor also asked for the hours worked for five doctor who were listed as being 0 full time equivalent which indicated "as needed" physicians. The Monitor also asked for the credentials packets for the four new physicians on the 11/25/20 list who were not on the list sent 10/12/20. The Monitor asked for an updated credential spreadsheet. On 12/10/20 the IDOC said it forwarded the request to Wexford.

On 12/24/20 the IDOC sent an updated spreadsheet of physicians and credential packets for four physicians. The updated spreadsheet of physicians did not include hours worked at each facility they worked at.

[54] Credentials are typically updated every two years although the time period may vary slightly. This is because someone's credentials may change, specifically they may not maintain board certification, they may not continue their DEA license, or they may sustain a sanction from a hospital or medical board. For this reason, professional license credentials must be periodically reviewed. IDOC physician credentials do not appear to be updated periodically. Updating a credential can be performed by using an AMA profile or primary care verification. For the August 2020 Monitor 2nd Report there were 31 physicians for whom the Monitor was provided 25 AMA profiles. Only one of the AMA profiles was dated from within 2 years of the 2nd Report. The earliest was dated March of 2004. It appears that these reports are obtained only once without updates. For the current 3rd Report no new AMA reports were provided except for the four new physicians hired, and no current licensing, DEA, or sanction status was provided. For the four new physicians primary source verification was provided but two of these physicians had no DEA number. There was no verification for many physicians of a current license, DEA number, or no sanctions.

2. Peer reviews including any disciplinary peer review or actions taken with respect to privileges.
3. Professional performance evaluations for all physicians, nurse practitioners, and physician assistants.[55]
4. Current assignment(s) list of all physicians with hours worked at each site of assignment averaged for a prior 6 month period.
5. Notification when a new physician is hired with credentials of the physician as provided to IDOC.
6. Any monitoring being provided for any physician, nurse practitioner, physician assistant.
7. Current license information and DEA license information.
8. Any sanctions on a license and a report detailing the plan for monitoring.
9. The date internship or residency was completed, date of board certification, and inconsistent provision of current status of board certification.

The information received does not permit a complete up-to-date verification of credentials, work assignments, or monitoring of physician practice.

There are currently 31 physicians. Nine (29%) physicians do not have credentials required by the Consent Decree in item III.A.2. 22 physicians have credentials with primary care training. It is not possible to verify whether all physicians are working full or part time and where each physician is working. Active licenses, DEA licensure, and sanction status cannot be verified for most physicians as the AMA profiles are dated and license look up has not been performed. The table below gives the numbers of physicians with their status based on requirements of the Consent Decree.

| | 8/1/20 | 8/1/20 | 1/1/21 | 1/1/21 |
|---|---|---|---|---|
| STATUS | # | % | # | % |
| Active and Current Board Certification | 11 | 32.3 | 12 | 39% |
| Completed Primary Care Residency or Board Certification Expired | 12* | 35.3 | 10** | 32# |
| Did Not Complete a Primary Care Residency | 11 | 32.3 | 9 | 29% |
| Totals | 34 | | 31 | |

*Three physicians in this group once had board certification but have not maintained board certification status
** Three physicians in this group once had board certification but have not maintained board certification status

The number of physicians has been reduced by three since our last report. Seven physicians[56] have left service since May of 2020 and four new physicians have been hired. The departing physicians include six of seven with primary care training, four of whom were board certified. Appropriately trained staff are leaving in greater numbers than poorly trained physicians. Three of the new physicians are locum tenens[57] status and are board certified in a primary care field. All new physicians hired since the advent of the Consent Decree have been Board Certified and/or have completed a three year residency in a primary care field.

---

[55] The Monitor was notified by IDOC that provider evaluations normally performed by the vendor in April were not done this year due to the pandemic.

[56] This is a 21% turnover.
[57] Locum tenens is a fill in doctor provided by a staffing agency on contract with the vendor. These are not employees of the vendor or IDOC.

Excluding Elgin Treatment Center, Kewanee, and Murphysboro, there are 27 major IDOC facilities. IDOC documents verified that only 24 of these 27 facilities have medical directors.[58] These three facilities are being covered by the medical directors who already have fulltime assignments at other IDOC facilities. There are five traveling Medical Directors, four of whom have no assigned hours and work "as needed". It is unclear to the Monitor why these "Traveling Medical Directors" have not been assigned to provide care at the three IDOC correctional centers that currently have Medical Director vacancies.

In addition to the five traveling Medical Directors, there are two physicians who are not "traveling medical directors" who also only work "as needed" and have no assigned hours. None of these seven physicians has any hours assigned on a regular basis. In total there are six of 31 physicians who only work "as needed". Since we requested, but have not received any documentation of hours worked at each facility, it is not possible to determine if these "as needed" physicians are working at all. There have been three reassignments since the last report. Also, the Monitor does not understand the purpose of the designation traveling medical director. Why doesn't the vendor assign "traveling medical directors" to facilities without medical directors?

As with the last report, no information was provided to ensure that all physicians have a current and up-to-date license and DEA registration and have no change to their license status with the Illinois Department of Professional and Financial Regulation.

On 6/12/20 the Monitor notified IDOC on a conference call that three physicians should not be allowed to practice in IDOC in accordance with items III.A.3 and II.B.6.r of the Consent Decree. No action was taken and on 9/28/20 the Monitor sent a memo with substantial information detailing why the Monitor had strongly communicated that these physicians should be removed. No action was taken. On 12/1/20, on a conference call to discuss this issue, the Monitor learned that no action had been taken. IDOC told the Monitor that they would discuss the Monitor's findings internally and also discuss the issue with the vendor but gave no firm date when or whether action would be taken on any of the physicians. As of this report no action was taken with respect to these physicians. We discovered that one of the physicians who the Monitor recommended be removed has recently had his license made permanently inactive by the Illinois Department of Financial and Professional Regulation.[59]

Based on record reviews, physician quality is still poor. There are still physicians who practice in an unsafe and clinically inappropriate manner who should not be allowed to do so. The Implementation Plan has no plans or strategies to correct this.

**RECOMMENDATIONS**:

---

[58] Lawrence, Taylorville, Vienna do not have a medical director

[59] This physician had his license placed on probation on 9/8/19 related to a lawsuit for failure to properly diagnose hypovolemia. A condition of that probation was to take a Special Purpose Examination (SPEX). The physician did not timely fulfill that obligation and the Board made his license permanently inactive and made his controlled substance license inoperative.

1. IDOC needs to provide the following information to us three months prior to the due date of each upcoming Monitor report.
   a. A table of current physicians in a spreadsheet format with physician name, internship or residency completed, date internship or residency completed, board certification, date of board certification, current status of board certification, primary source verification for these credentials, and an AMA profile.
   b. When the AMA profile does not support the physician's credentials because the credentials are with an Osteopathic Board primary source information must be provided.
   c. All peer reviews including any disciplinary peer review or actions taken with respect to privileges.
   d. Professional performance annual evaluations for all physicians, nurse practitioners, and physician assistants.
   e. Current assignment(s) list of all physicians with hours worked at each site of assignment averaged for a prior 6 month period.
   f. Notification when a new physician is hired with credentials of the physician as provided to IDOC.
   g. Any monitoring being provided for any physician, nurse practitioner, physician assistant.
2. We have notified IDOC of two physicians without credentials who are not practicing in a safe and clinically appropriate manner and whose practice should not continue in IDOC. OHS will need to take action on these individuals in accordance with the Consent Decree.
3. When AMA profiles are being used to verify credentials, the AMA profile should be current.
4. Current license information and DEA license information needs to be provided.
5. Any sanctions on a license and a report detailing the plan for monitoring should be reported to both OHS and the Monitor
6. IDOC's health care vendor should continue to hire only physicians who are Board Certified and/or have completed a three residency in a primary care field.

**Oversight over Medical, Dental, and Nursing Staff**

*Addresses II.B.6.q; II.B.6.r;*
**II.B.6.q.** *IDOC agrees to implement changes in the following areas: Annual assessment of medical, dental, and nursing staff competency and performance;*
**II.B.6.r.** *IDOC agrees to implement changes in the following areas: That Defendants and the vendor shall timely seek to discipline and, if necessary, seek to terminate their respective health care staff that put patients at risk;*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

The Monitor's 2nd Report listed four recommendations. The IDOC has provided no information that these recommendations were acted on. IDOC has made no modifications to the processes and forms used to evaluate the clinical competency and performance of medical, nursing, and dental staff. On 12/15/20, the IDOC sent annual dentist peer review assessments to the Monitor. The IDOC has not provided the Monitor with annual evaluations for the vendor's physicians, physician assistants, nurse practitioners, dental hygienists or dental assistants or the annual evaluations of the State employed dentists, dental hygienist, and dental assistants.

As noted in the Monitor's 2nd Report, Wexford used a Salary Compensation Calibration Worksheet in response to the Monitor's request for the annual assessments of the competency and performance of medical physicians, nurse practitioners, physician assistants, dental hygienists, and dental assistants in its employment. This form is a generic tool that is not created for specific clinical positions. It focuses on administrative issues. There was no evidence that clinical care was assessed. There was no evidence that any of providers had an adequate clinical evaluation. The Salary Compensation Calibration Worksheet states "for official use only, not to be shared with employees" The Monitor recommended that provider evaluations be developed that are position specific, are standardized, are focused on clinical competency and performance, and the results are shared with the provider. This was not done.

The Monitor was advised that, due to the pandemic, the vendor was not able to complete evaluations in 2020 on any of the physicians, nurse practitioners, physician assistants, dental hygienists, and dental assistants in its employment.

In August to November 2020, the 29 vendor dentists performed peer reviews on each other. The same standardized seventeen category assessment tool that was used in 2019 was used for these evaluations. The Monitor has found this tool unacceptable. Over half of the performance categories focused on administrative and documentation tasks. The tool does evaluate some useful clinical issues including performing an oral x-ray prior to dental extractions, adherence to national standards for prophylactic antibiotic use, documentation of anesthetic dosage and delivery, and ordering of appropriate diagnostic procedures. None assessed post procedure complications or negative outcomes.

Ten dental charts were reviewed for each dentist being peer reviewed. Compliance of 95%-100% was recorded on eight of the 17 categories[60]. Another three categories were judged by the dentist reviewer to be 90%-93% compliant.[61] If high levels of compliance are documented in these categories on future peer reviews, consideration should be given to either deleting or only intermittently reviewing these aspects of care. Categories with the highest rate of non-compliance included: 24% failure to discuss results of peer review with dentist being evaluated, 18% dental notes illegible, 15% failure to perform x-rays prior to dental extraction, 14% failure to document review of overall health history, 12% date and time of visit, and 8% not following the national standard for use of prophylactic antibiotics. The implementation of an electronic

---

[60] Dentist Peer Reviews 2020: >95% compliance in the following areas: adequate history of current problem, treatment plan documented, appropriate diagnostic procedures ordered, appropriately timely consultations, dentist signature on note, biannual exam current, refusals signed and witnessed, consent signed and witnessed.
[61] Dentist Peer reviews 2020: 90%-93% compliance: anesthesia dose and delivery method, prophylactic antibiotic given per national standards, patient education documented

dental record would address a number of metrics on the audit tool including date and time of visit, dentist signature, legibility and possibly accuracy of dental notes, documentation of patient education, and documentation of the treatment plan allowing the peer review to increasingly focus on the quality of the dental care provided.

| Overall Rating of Dentist on 2020 Dentist Peer Reviews | | |
|---|---|---|
| Excellent | Good | Fair |
| 15 (54%) | 11 (39%) | 1 (3.5%) |

The Office of Health Services recently hired a Chief of Dental Services who could provide valuable input on the revision of the peer review tool and incorporate categories that evaluate clinical outcomes, post- procedure complications, and access to dental care.

The Monitor noted that there appeared to be reviewer variation on what constituted compliance with performing x-rays prior to dental extractions[62] and ensuring that dentists and reviewers are fully knowledgeable about the national standard for prophylactic antibiotics. An independent review of dental care should be used to avoid bias.[63] The Monitor did note in mortality reviews that a dentist identified an intraoral lesion in a patient[64] and documented twice that a 2nd opinion or referral was indicated but never done. The patient had a squamous cell carcinoma diagnosis that was delayed for almost three months and found serendipitously while attending an ENT consultation for a different reason. The record was not being evaluated for dental concerns.

The IDOC staffing update[65] documents that the IDOC has 10 dental positions in the State budget: one dentist, one dental hygienist, and eight dental assistants. Wexford has approximately 79.15 FTE dental positions in the budget: 32.75 dentists, 34.55 dental assistants, and 11.85 dental hygienists. IDOC uses a different evaluation format to evaluate their dental employees even though the IDOC and vendor dental employees work in the same organization. A standardized dental evaluation methodology should be used.

As noted in the Monitor's 2nd Report, IDOC uses two different State of Illinois Individual Development and Evaluation System forms that are separately designed to evaluate State-employed dental assistants and dental hygienists. The employee has a self-evaluation section and the supervisor rates the performance and the self-evaluation as exceeded, met, and not met, writes summary comments, and discusses the evaluation with each dental assistant and dental hygienist. Based on the assessment categories on the State evaluation forms there was no assessment of State dental hygienist and dental assistant clinical skills. In 2019, the sole State employed dental hygienist was evaluated by the health care unit administrator who had no

---

[62] Monitor's interviews with dentists during 2020 site visits and conference call with vendor dentist in 2020
[63] Death summaries completed by the providers who cared for the patient who died have never identified any problems. Peer reviews performed by vendor providers in the October 2018 2nd Court Monitor Report seldom identified performance issues. Both the 2014 and 2018 dentists working for Court Experts found significant problems with dentists. Since so many of these dental performance evaluations are rated excellent, it is worth having an independent review.
[64] Mortality review patient #7
[65] IDOC Staffing Update 12/15/20

dental training or skills. The Monitor was not provided with any of the State of Illinois Development and Evaluation System forms that were completed in 2020.

As noted in the Monitor's 2nd Report, the annual evaluations focus primarily on administrative and business issues including attendance, productivity, cost effectiveness, and staff attitudes. Although these evaluations have some value for the workplace, they do not satisfy Consent Decree requirements to assess clinical staff competence and performance. With the exception of parts of the dentist evaluations, none the annual performance evaluations for both State and vendor clinical staff would qualify as professional performance evaluations or assessments of the quality of the clinical care provided by the dental hygienists, dental assistants, physicians, physician assistants, and nurse practitioners.

The Monitor did not receive any reports that performed an annual assessment of the competency and performance of nursing staff. No data was provided nor did IDOC assert that it was in compliance with this aspect of the consent decree.

**RECOMMENDATIONS:**
1. Develop and initiate professional performance evaluations that assess the clinical competency and clinical performance of all clinical staff.
2. Standardize evaluation formats so that all practitioners of the same type are evaluated in the same manner.
3. An independent professional knowledgeable of the scope of practice and capable of evaluating the clinical care of the professional should perform the evaluation.
4. Clinical professional performance evaluations should be shared with the employee who should sign the review after discussion with the reviewer.
5. Involve the Chief of Dental Services and the SIU audit teams in the re-assessment of the existing dentist, dental hygienist, and dental assistant annual evaluations so as to include metrics that evaluate the quality of dental care and clinical skills of the dental team.
6. The Chief of Dental Services should establish clear guidelines concerning antibiotic prophylaxis for dental procedures and obtaining x-rays prior to dental procedures to ensure use of x-rays meet existing dental standards of care.

# Operations

**Clinical Space**

***Addresses item II.B.2 in part; III.B.1; III.C.2; III.F.1;***
**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*
**III.B.1.** *IDOC shall provide sufficient private and confidential sick-call areas in all of its facilities to accommodate medical evaluations and examinations of all Class members, including during intake, subject to extraordinary operational concerns and security needs of*

*IDOC including, but not limited to, a lockdown.*
**III.C.2.** *IDOC shall provide sufficient private and confidential areas in each of its intake facilities for completion of intake medical evaluations in privacy, subject to extraordinary operational concerns and security needs of IDOC including, but not limited to, a lockdown.*
**III.F.1.** *Sick call shall be conducted in only those designated clinical areas that provide for privacy and confidentiality, consistent with the extraordinary operational concerns and security needs of IDOC including, but not limited to a lockdown.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
Due to the COVID-19 pandemic, the Monitor did not visit any sites and has nothing to report with respect to specific facility space issues. The IDOC had informed the Monitor that previous plans for the new Joliet Treatment Center with planned medical beds is being reconsidered and that the basic plans could change. No further information has been received. Lastly, IDOC has not provided any information regarding its intention to survey all facilities to ensure there is adequate space and equipment.[66]

**RECOMMENDATIONS:**

1. Lincoln CC needs a new clinic structure. The current structure is inadequate for medical care.
2. Lincoln CC leadership should continue with their plan to repurpose some offices in the HCU into clinical exam space while advocating for the replacement of the HCU.
3. The IDOC needs to conduct an analysis of physical structures throughout the state to determine whether there are other medical spaces that need to be built, refurbished, or renovated in order not just to meet the provisions in the Consent Decree but to improve access to care, properly sanitize clinical areas, maximize staff efficiency, and enhance staff recruitment and retention.

**Equipment and Supplies**

*Addresses item II.B.6.p; III.B.2; III.I.4;*
**II.B.6. p.** *IDOC agrees to implement changes in the following areas: Adequately equipped infirmaries;*
**III.B.2.** *These areas shall be equipped to fully address prisoner medical needs. The equipment shall be inspected regularly and repaired and replaced as necessary. Each area shall include an examination table, and a barrier on the examination table that can be replaced between prisoners. The areas shall provide hand washing or hand sanitizer.*
**III.I.4.** *All infirmaries shall have necessary access to security staff at all times. (See Infirmary Section)*

**OVERALL COMPLIANCE RATING:** Partial Compliance

---

[66] IDOC Lippert Implementation Plan 6/12/20 in Structural Components section.

**FINDINGS:**

> The Monitor has not visited sites due to the COVID-19 pandemic. The IDOC sent the Monitor a Monthly Inspection Checklist and Equipment Survey. The Monitor will provide comments on this document and return to IDOC. The IDOC does not yet have a standardized equipment list required for each facility including for the infirmary.

**RECOMMENDATIONS:**

1. IDOC must establish a systemwide detailed standard for equipment that must be available and maintained in each of the different clinical service rooms (examination rooms, telemedicine rooms, urgent care, infirmary, detail suites, specialty rooms, etc.) at all correctional centers.
2. IDOC must implement a systemwide ongoing audit of the clinical equipment and incorporate a following replacement plan to ensure that all sites have functional equipment at all times.
3. The IDOC should focus attention on the condition of infirmary beds in all IDOC facilities and replace defective beds with electrically operated hospital beds with safety railings and the ability to adjust the height of the bed and elevate the health and leg sections as needed.

**Sanitation**
***Addresses item III.J.3***
**III.J.3.** *Facility medical staff shall conduct and document safety and sanitation inspections of the medical areas of the facility on a monthly basis.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

The Defendants' did not assess their compliance with this item of the Consent Decree. Results and or reports of monthly Safety and Sanitation inspection reports have been provided to the Monitor on a quarterly basis by nearly all facilities. Some type of safety and sanitation inspection is conducted each month at the IDOC facilities. The monthly reports generated by the correctional centers are provided to the monitor. The first three quarters of Safety and Sanitation Reports for 28 of 29[67] facilities were reviewed. There is great variation in what is reported and most do not contain the detail necessary to evaluate the safety and sanitation of the medical areas.

Physical plant deficiencies identified with the same prevalence as sited in the Monitor's 2nd Report[68] include:

> Missing and cracked floor tiles
> Broken toilets, sinks, showers
> Standing water
> Peeling and cracked paint

---

[67] Reports from NRC and Lincoln were not provided.
[68] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020 page 73.

Mold in showers, ceilings, curtains
Missing lights including exit lights
Crumbling, cracked walls and ceilings
Dirty and rusted vents
Broken washers and dryers

We mention these again because all of these structural and environmental deficiencies have the potential to negatively impact the health of the inmate population and the staff. Many create obvious risks for infectious diseases and render the facilities unable to effectively clean and sanitize living and work areas. Others including cracked floors, standing water, and leaking ceilings pose significant risks for accidental falls and preventable injuries. Nearly half of the facilities reported missing lights including exit lights which pose both security and safety issues. Some deficiencies are listed month after month. Failure to address and repair these structural and environmental deficiencies puts the health and safety of all people at the institution at risk.

As previously reported to the Court, the Safety and Sanitation inspections generally focus on physical plant issues and do not inspect the health care areas with sufficient rigor. The vast majority (19/28) of the reports use the same criteria for health care areas as any other part of the facility. For example, the Safety and Sanitation review from Kewanee only asks the inspector to determine if the areas are in good, fair, or poor condition and to make a comment. Three facilities[69] comment on the integrity of mattress and coverings for dental chairs and examination tables. There is variation in findings depending upon who does the inspection. For example, at Jacksonville, the integrity of mattresses was marked Not Applicable from January through March 2020. Mattresses have been marked as cracked each month since April 2020. This is a patient safety hazard for transmission of communicable disease and should be an expected part of the inspection and when found deficient, corrected expeditiously. Four facilities[70] use inspection forms that audit items more specific to the types of sanitation and safety issues that are unique in health care delivery. None of these specialized audit tools addresses the presence or functionality of clinical equipment[71] or the inspection of satellite clinics in the housing units or the condition and equipment in the radiology, physical therapy, dental, dialysis, and optometry rooms. The Monitor was provided with a copy of a draft monthly inspection survey[72] intended to standardize a more clinically focused audit tool for use in the health care areas at all correctional centers. The Monitor has not yet provided feedback to OHS.

The Monitor's team has not visited any correctional centers since February 2020 because of the pandemic however previous site visits[73] verified a number of physical plant deficiencies that have been noted in Safety and Sanitation reports reviewed for this report. We also identified other issues that were not documented in the reports including uncovered garbage bins in clinical rooms, non-operational negative pressure units, cracked and uneven sidewalks, the absence of safety grab bars in some toilets and showers, the lack of non-slip strips in the showers, torn

---

[69] East Moline, Jacksonville, and Kewanee.
[70] Pinckneyville, Lawrence, Graham and Southwestern.
[71] Electrocardiogram, automated external defibrillators, oto-ophthalmoscopes, suction unit, peak expiratory flow meter, the condition of examination tables, the use of paper barriers, handwashing capability, and other issues.
[72] Monthly Inspection Checklist and Equipment Survey: Overview for Medical Inspectors provided by IDOC.
[73] Sheridan, Pontiac, Robinson, Lawrence, Logan, and Lincoln

examination table upholstery and defective furniture in clinical areas, unsealed emergency bags, crusted sinks in clinical rooms, and non-functional oto-ophthalmoscopes.

**RECOMMENDATIONS:**

1. The Safety and Sanitation inspections do not but should include a more detailed evaluation of the HCU and all other clinical treatment areas that would include the functioning of medical, dental, and radiology equipment, the condition of gurneys, examination tables, chairs, and infirmary beds, the emergency response bags, functionality of the negative pressure rooms, and the sanitation of all clinical spaces.
2. IDOC OHS should develop a standardized systemwide Health Care Unit/clinical space audit instrument that would focus on all the key safety and sanitation issues in all clinical areas. If the existing Safety and Sanitation rounds are unable to incorporate this more detailed review of the clinical spaces and equipment into its schedule, a separate audit focused on the health care areas should be established.
3. The IDOC must expeditiously address the deficiencies noted in Safety and Sanitation reports prioritizing those work orders that have an impact on preventing disease and injury to inmates and staff.

**Onsite Laboratory and Diagnostics**

*Addresses item II.B.6.g;*
**II.B.6. g.** *IDOC agrees to implement changes in the following areas: Timely access to diagnostic services and to appropriate specialty care;*

**OVERALL COMPLIANCE RATING:** Partial compliance

**FINDINGS:**
The IDOC did not provide data or information that addresses the Monitor's recommendations for this section.

The IDOC began to institute colorectal cancer screening using a point-of-care Fecal Immunochemical Test (FIT). The Monitor has requested but not received any data on the number of at-risk men and women who have been screened with this improved modality. IDOC should initiate an electronic tracking log for colon cancer screening including:
- The patient name,
- Patient number,
- Date of birth,
- Indication for screening,
- Result,
- Date result communicated to patient,
- For abnormal test results,
  - o Date of referral for endoscopy,
  - o The date endoscopy was done, and
  - o The result of the endoscopy.

**RECOMMENDATIONS:**

1. All onsite ultrasonography testing should be immediately excluded from the collegial review process.
2. IDOC must begin to convert all of its non-digital radiology units to digital equipment.
3. Replace tuberculosis skin testing (TST) with IGRA blood testing which is more accurate, minimizes the risk of accidental needle sticks, and frees up valuable nurse resources.
4. Contact IEMA to evaluate the need for radiation exposure monitoring badges and the implementation of any additional safety measures for the panorex units at Logan CC and Menard CC
5. Create a log to track the results of point-of-care colorectal cancer screening and report this data on a regular basis to the facility's CQI committee meeting.

**Dietary**

***Addresses item II.B.6.j.***
**II.B.6.j.**  *IDOC agrees to implement changes in the following areas: Analysis of nutrition and timing of meals for diabetics and other Class members whose serious medical needs warrant doing so;*

**OVERALL COMPLIANCE RATING:** Not yet rated

**FINDINGS:** This provision has not yet been evaluated

**RECOMMENDATIONS:** None

# Facility Implementation of Policies and Procedures

**Medical and Dental**

***Addresses item II.B.8.***
**II.B.8.**  *The implementation of this Decree shall also include the development and implementation, with the assistance of the Monitor, of a comprehensive set of health care policies by July 1, 2020.  These policies shall be consistent throughout IDOC, and cover all aspects of a health care program.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
Policies are still in the process of being written and reviewed; none have yet been approved or implemented.   Because no policies have been implemented this item warrants a noncompliance rating.  See Systemwide Medical and Dental Policies

**RECOMMENDATIONS:** None

# Intrasystem Transfers
***Addresses item III.D.1; III.D.2***

**III.D.1.** *With the exception of prisoners housed at Reception and Classification Centers, IDOC shall place prisoners with scheduled offsite medical services on a transfer hold until the service is provided, contingent on security concerns or emergent circumstances including, but not limited to, a lockdown. Transfer from Reception and Classification Centers shall not interfere with offsite services previously scheduled by IDOC.*

**III.D.2.** *When a prisoner is transferred from one facility's infirmary to another facility, the receiving facility shall take the prisoner to the HCU where a medical provider will facilitate continuity of care.*

**OVERALL COMPLIANCE:** Partial Compliance

**FINDINGS:**

The IDOC asserts compliance with III. D. 1 without providing any evidence to support the assertion. The monitors have requested but not received data for section III. D.1 of the Consent Decree and therefore are unable to verify that transfer holds are being enacted and honored for all persons with scheduled offsite medical consultations, procedures, tests, or treatments to ensure that they are not transferred to a another IDOC facility prior to the completion of the offsite appointment.

With regard to III.D.2 it is apparent that when prisoners are transferred, they are evaluated by health care staff at the receiving facility in order to facilitate continuity of care. However, the Monitor finds that persons are transferred without having expected evaluations completed and that information which should be provided to the receiving facility is missing or inaccurate. Failure to seamlessly transfer complete and relevant information about the patient along with the medical record and medication administration record (MAR) creates a notable risk for the interruption of needed care.

One patient whose chart the Monitor reviewed was transferred from Dixon to NRC in December 2019. There was no transfer summary when the patient was returned to Dixon from NRC later that month. The patient, an asthmatic, was having an exacerbation of asthma while at NRC as indicated by the frequency with which nebulization treatments were documented. The patient was not seen upon return to Dixon and did not receive inhalers or other medication that were needed to control his asthma[74]. Another patient with sickle cell disease was transferred from NRC to Shawnee in May 2019 without having ordered labs drawn or enrollment in Chronic Care Clinic. A registered nurse at Shawnee reviewed the patient's intake record but failed to note that he had sickle cell disease; that ordered labs were not completed; and did not refer him to the Chronic Care Clinic[75]. A third patient was transferred from NRC to Centralia in August 2019. The transfer summary only states that the patient gave a subjective report of injury to the right knee from a motor vehicle accident, without description of any current limitations on physical activity. It does not mention an altercation with injury to the knee that resulted in an evaluation at the emergency room six weeks earlier. This patient also had abnormal lab results which needed follow up – this is not noted on the transfer summary. The nurse at the receiving facility did not examine the patient even though he complained of bilateral knee pain. The history of this complaint is not documented until three days later at nurse sick call. On examination the patient

---

[74] Mortality review patient #2
[75] Mortality review patient #10

walked with a limp and had obvious surgical repair of the right knee. He was referred to a physician who ordered a low bunk, cane as needed and a slow walk pass. The abnormal labs were not followed up[76].

In addition to reviewing the medical records of persons who died in 2020, the Monitor requested and received 10 transfer records from six sites. Findings were similar to the examples from review of the death records. One patient had eyeglasses which were not noted on the sending facility summary[77] and another had a rash and had been referred to see a physician; this pending appointment was not listed on the transfer summary and he was lost to follow up when transferred to the receiving facility,[78] a third patient did not receive a tuberculin skin test before leaving the intake facility and this omission was not picked up by the receiving facility.[79]

In the 2nd Monitor's report, areas of improvement needed with regard to intersystem transfers were completion of the Heath Status Transfer Report, completion of a progress note summarizing findings and actions by the receiving facility and a progress note that both the chart and the MAR were reviewed by the receiving facility. We did not receive any information from the IDOC indicating corrective action taken to improve the accuracy of the intrasystem transfer process to better ensure continuity of patient care.

The Monitor was provided with a draft of policy and procedure for intrasytem transfers and returned it to OHS with comments and suggested revisions in August 2020. The draft included the related requirements of the Consent Decree but needed to be more specific procedurally. We have received no further version of this draft.

The IDOC also has a tool to audit transfers of the medical record. It is specifically focused on whether the complete chart is sent, that it is in the proper order, has no drop filing and contains a Health Status Transfer Summary. This tool is serving its purpose to ensure that filing is up to date and the complete record is transferred but it does not evaluate whether the Health Status Transfer Summary is thorough and accurate. The Monitor has also noted variability in how individual sites have documented information on the intra-system audit tool. This lack of uniform data hampers the ability of the Monitor and the IDOC to compare the systemwide compliance with the transfer process that ensures uninterrupted continuity of care to the IDOC patient population.

Transfers were halted in the spring because of the COVID-19 pandemic therefore only four facilities[80] reported results of audits on the transfer of medical records in the third quarter of 2020. Transfers resumed at the end of the summer so audit of this process should be more prevalent by now. The 2nd report recommended that this tool be expanded to include whether the MAR was transferred concurrently, and the accuracy of the clinical information (diagnoses and medications) entered on the Health Status Transfer Summary. We continue this recommendation.

---

[76] Mortality review patient #21
[77] Intrasystem transfer patient #7
[78] Intrasystem transfer patient #4
[79] Mortality review record #2
[80] Decatur, Logan, Shawnee, Taylorville and Western

**RECOMMENDATIONS:**

1.    Finish the policy and procedure and ensure that the means and methods to carry out III.D. 1 & 2 are detailed, develop performance measures, and monitor performance to document compliance with the Consent Decree. The procedure should also define what steps the sending facility is to take in documenting pending referrals, identifying tasks not yet completed, reconciliation of medication lists, and detailing current medical and mental health problems. The procedure needs to do the same with regard to specifying the receiving facility's obligation to verify the transfer information, examine the patient and document actions taken to continue ongoing care and address new problems.

2.    Augment the scope of the Medical Record Transfer study to include the concurrent transfer of the MAR and evaluate the accuracy of the clinical information (diagnoses and medications) entered on the Health Status Transfer Summary.

3.    Monitor the utilization of the Intra-system Audit tool to verify that the required data is uniformly recorded by all correctional centers.

# Medical Reception

*Addresses Items II.A; II.B.1; II.B.6.a; III.C.1*
**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*
**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*
**II.B.6.a** *IDOC agrees to implement changes in the following areas: Initial intake screening, and initial health care assessment;*
**III.C.1.** *IDOC shall provide sufficient nursing staff and clinicians to complete medical evaluations during the intake process within seven (7) business days after a prisoner is admitted to one of IDOC's Reception and Classification Centers.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

There is no statewide written guideline for medical reception. A draft policy and procedure was provided to the Monitor and returned with written comments in August. There have been no further drafts to review. There are no metrics or performance measures for medical reception screening, and it is not discussed or reviewed at CQI meetings. None of the seven recommendations of the 2nd Report were acted on.

The OHS staffing analysis[81] did not explicitly define the number of nursing and clinical staff sufficient to complete medical evaluations within seven days of admission. The Monitor has recommended that a workload driven staffing standard be developed for medical reception.[82] The Monitor reviewed the staffing information provided by IDOC in December 2020 and noted considerable variation in staffing among the medical reception centers. Please see the table following this paragraph.

| | NRC | Graham | Menard | Logan |
|---|---|---|---|---|
| | 848 intakes/mo | 182 intakes/mo | 69 intakes/mo | 70 intakes/mo |
| **Medical Director** | **1** | **1** | **1** | **1** |
| **Physician** | **1** | | **1** | **1** |
| **NP/PA** | **2.5** *(+1.5)* | **2** *(+1)* | **3** | **4** *(+1)* |
| | | | | |
| **Dental Director** | | | **1** | |
| **Dentist** | **1** *(+0.5)* | **1.6** | **2** | **2** |
| **Dental Assistant** | **1** *(+0.5)* | **2** | **3** | **3** |
| | | | | |
| **Phlebotomist** | **0** | **0.6** | **1** | **1.2** |

Italicized font indicated staffing increases recommended by OHS.

The medical reception process at Logan has additional requirements[83] and those requirements may justify an additional provider. The provider staffing at the intake centers does not appear in line with workloads. The reception volume at NRC is more than twice that of Graham and Menard combined, yet provider staffing is currently[84] 0.5 FTE less than Menard's staffing. Graham has double the number of intakes and two fewer providers than Menard.[85] It is understood that the medical staff at all these facilities have responsibility for the daily care of the entire population housed at the facility not just intakes. Even with the additional recommended positions the workload volume of medical reception does not seem to be reflected in the staffing.

There are variances in dental staffing as well. Each intake requires a dental examination, radiographs, and development of a prioritized treatment plan. Dental staffing at NRC is not sufficient for the average number of intakes and would require the dentist to complete 42 exams a day to avoid backlog. It is unlikely that NRC has the dental staff to complete Medical Reception timely or thoroughly.

Lastly, the variation in phlebotomy staffing stands out. Labs are drawn on virtually every person

---

[81] Revised Staffing Analysis Illinois Department of Corrections Office of Health Services, Lippert Consent Decree 6/18/20
[82] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, pages 80 & 81.
[83] Gynecological examinations and Papanicolaou (Pap smear) tests
[84] This does not count the additional recommended 1.5 provider positions in the Staffing Analysis which has not yet been allocated.
[85] The number of intakes per month was taken from the statistics reported for HIV tests offered new intakes at the September 2020 CQI meeting for Graham, Menard and Logan. NRC has not reported these statistics since March 2020 so intakes from that month were used. There is no other document the Monitor receives that identifies the number of people coming through medical reception.

coming through medical reception. No phlebotomy staff exist or are recommended for NRC. Likely this is considered a nursing task, yet nurse vacancies exceed 15% in all nursing categories.[86] OHS should review the need for phlebotomy staff at NRC. Phlebotomy staffing at Graham should also be reviewed.

The table below lists medical provider vacancies at each of the Reception Centers. The figures in italics represent positions that were noted as vacant in the last report.[87] There are two more medical provider vacancies at these facilities now than before.

| | Clinician Vacancies | | | |
|---|---|---|---|---|
| | **NRC** | **Graham** | **Menard** | **Logan** |
| **Medical Director** | *1\** | 1 | | |
| **Physician** | | | *0.5\** | 1 |
| **NP/PA** | | | | *1\** |

Note: The asterisks indicate positions that were vacant in 2019 and 2020.

Registered nurse vacancies at the Reception Centers have increased significantly since a year ago. Vacancies among LPNs while improved from a year earlier, still exceed 30% with the exception of Logan.[88]

**Percent Vacant Nurse Positions 12/2020**

| | **NRC** | **Graham** | **Menard** | **Logan** |
|---|---|---|---|---|
| | 848 intakes/mo | 182 intakes/mo | 69 intakes/mo | 70 intakes/mo |
| Registered Nurse | 16% | 32% | 32% | 64% |
| Licensed Practical Nurse | 38% | | 33% | 11% |

**Percent Vacant Nurse Positions 11/2019**

| | **NRC** | **Graham** | **Menard** | **Logan** |
|---|---|---|---|---|
| | 848 intakes/mo | 182 intakes/mo | 69 intakes/mo | 70 intakes/mo |
| Registered Nurse | 0% | 0% | 0% | 36% |
| Licensed Practical Nurse | 39% | | 50% | 17% |

The staffing variance and vacancies among medical, dental, and nursing staff suggest that medical evaluations during the intake process are not completed timely. The Monitor recommended in the last report that timeliness completing each step in medical reception be monitored and exceptions reported at CQI for analysis and resolution.[89] This recommendation has not been enacted.

---

[86] RN 16%, LPN 38%, CMT 56%, CNA 17%
[87] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 80.
[88] Lippert Nurse Vacancies 11-18-19, IDOC
[89] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 80.

The Monitor received records of receiving health screening of 45 persons received at the four reception centers in August and September 2020. Findings included inconsistent gathering of vital signs at all four facilities. This included failure to check corrected and uncorrected visual acuity,[90] missing respirations, heart rate or blood pressure, not getting height or weight.[91] Abnormal vital signs such as an irregular heart rate or elevated blood pressure were not rechecked and not referred to the provider for further evaluation.[92] Hearing acuity is not assessed and should be at receiving health screening. Immunization history is routinely not taken or documented as unknown and there is no attempt to obtain this history from public health records or at subsequent patient encounters, such as the initial health assessment and baseline chronic clinic visit. Persons giving history of a medical condition were not asked additional questions to amplify the information nor were records obtained of previous treatment when indicated.[93] The urgency of referral to providers is unclear; there were patients who should have been referred urgently and were not[94] while others were referred but did not need to be seen urgently.[95]

There is little effort to obtain and verify information about medications patients may have been prescribed before incarceration. For example, a patient gave a history of asthma and took medication, but those medications are not listed.[96] Two patients did not receive medications because the county jail did not send the list the patient was on and the intake nurse did not contact the county to verify medication.[97] A patient giving a history of seizure disorder had no documentation of inquiry about medication.[98] Orders and MARs were not provided so the Monitor did not evaluate timeliness to first dose of medication for persons who arrive at Reception Centers.

The Monitor did not evaluate the physical facility for Medical Reception and did not observe receiving health screening since no travel is taking place due to COVID-19. We carry forward our recommendations to improve receiving health screening unchanged from the last report.

**RECOMMENDATIONS:**

1. Develop metrics to provide information on the timeliness and thoroughness of medical reception (III. C. 1, 3 & 4). Intake facilities should report their performance results to CQI on a regular basis.
2. Privacy and confidentiality of space used for clinical encounters should be included in safety and sanitation rounds of the health care program. These rounds should also account for inoperable or unsafe equipment and condition of the space, infection control risks and uncleanliness.
3. Finalize the policy and procedure on medical reception and implement it.

---

[90] Medical reception inmates #s 28, 25, 2, 3, 3, 8, 4, 5, 9, 10, 7, 1, 6, 12, 16,  39, 36, and 40
[91] Medical reception inmates #s 27, 4, 14, and 39
[92] Medical reception inmates #s 1, 2, and 45
[93] Medical reception inmates #s 26, 8, 10, 18, 15, 36, 40, 38, 43, and 26
[94] Medical reception inmates #s 35, 46, 18, 15, 9, 10, and 1
[95] Medical reception inmates #s 33, 37, and 41
[96] Medical reception inmate #42
[97] Medical reception inmates #s 18 and 26
[98] Medical reception inmate #15

4. Develop a clinical audit tool that evaluates the appropriateness, quality, and continuity of health care during medical reception as well as compliance with the policy and procedure. Audit medical reception with this tool (s) at least quarterly until performance is better than 90% on each criteria for three successive quarters.
5. Replace tuberculin skin testing with IGRA blood testing to screen for tuberculosis. This is a simple step to prevent needle stick injuries, frees up staff time, eliminates the need for a patient encounter to read skin test results, and does not include a boosting effect.
6. Develop a staffing standard for medical reception that is workload driven.
7. Fill vacant positions at intake facilities.


**Health Assessments**

*Addresses items II.A; II.B.6.a; III.C.3; III.C.4*
**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*
**II.B.6.a** *IDOC agrees to implement changes in the following areas: Initial intake screening, and initial health care assessment;*
**III.C.3.** *IDOC shall ensure that a clinician or a Registered Nurse reviews all intake data and compiles a list of medical issues for each prisoner.*
**III.C.4.** *If medically indicated, IDOC shall ensure follow up on all pertinent findings from the initial intake screening referenced in C.3. for appropriate care and treatment.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
With respect to recommendations from the Monitor's 2nd Report, the Monitor has received no information that any of the three recommendations were acted on.

The purpose of medical reception is to identify what the patients perceive as their acute and/or chronic needs and to establish all of the patient's medical conditions and medications. The nurses do an initial screening which is part of the patient history, but it is intended only to identify conditions which must be confirmed and elaborated on by the providers. This provider assessment is to develop an initial problem list and assessment of all of the patient's medical conditions with a corresponding clinically indicated diagnostic and therapeutic plan.

The Monitor reviewed the 21 records of persons with a chronic illness from 45 reception records provided to us by IDOC to identify how well this occurs. Of the 21 records reviewed, five (24%) health assessments occurred after the required seven days. The average time to completion was 6 days and the range was 1 to 18 days. There is room for improvement.

The following table lists the results of our audit of 21 records against measures of an effective provider intake health examination.

| Measures of Intake Health Examination | | |
|---|---|---|
| Task | Number | Percent |
| Reviewed Nurse Findings | 6 | 29% |
| Provider History Adequate | 1 | 5% |
| Vitals Signs Done for Assessment | 3[99] | 14% |
| Examination Adequate | 6 | 29% |
| Assessment Adequate | 5 | 24% |
| Problem List Adequate | 6 | 29% |
| Medical Record Requested When Indicated | 0[100] | 0% |
| Therapeutic Plan Adequate | 1 | 5% |
| Laboratory Follow Up Adequate | 3 | 5% |

Multiple nurse findings were ignored including the following. Failing to follow up on nurse histories of asthma,[101] epilepsy and hypertension,[102] seizures and asthma,[103] obesity,[104] failure to identify why the patient was taking a medication,[105] failure to follow up on a patient's catheter use,[106] an abnormal vital sign,[107] failure to identify the reason for being on a medication,[108] abnormal visual acuity,[109] and failure to start or give a rationale for not starting a medication documented by the nurse as used by the patient.[110] A nurse also identified a prednisone allergy, which is not described in medical literature because prednisone is an anti-inflammatory drug used to treat allergic reactions. Yet, the provider did not question this nurse entry and prednisone allergy was entered by the provider in his note and included on the problem list.[111] A nurse also described asthma in one patient but when the provider saw the patient, the provider took no history of asthma instead documenting that the patient had obstructive sleep apnea. The provider made no mention of the asthma although he did prescribe medication for this condition.[112]

The medical histories of the providers were mostly all deficient. The current forms are inappropriate to the task at hand. There is inadequate space to corroborate or refute the screening history elicited by the nursing staff. A single check box and a line of space is available. Whether this is the sole reason for this deficiency is unclear. The history taken by providers is merely to state the disease of the patient but includes no other information. The history should be a narrative of past events and circumstances relevant to the patient's current state of health including hospitalizations, prior treatments, medications used and their effectiveness, major

---

[99] None of the health assessments done by providers included vital signs but when the patient was evaluated the same day as the nurse history, we credited the nurse history vital signs for the provider evaluation.
[100] There were only 9 of the 21 patients who should have had a medical record obtained from their civilian providers.
[101] Medical reception inmate #21,
[102] Medical reception inmate #29
[103] Medical reception inmate 10
[104] Medical reception inmates #s 25, 26, 40, 41, and 17
[105] Medical reception inmate #27
[106] Medical reception inmate #27
[107] Medical reception inmates #s 2, 39, 40, and 41
[108] Medical reception inmate #41
[109] Medical reception inmate #17
[110] Medical reception inmate #18
[111] Medical reception inmate #24
[112] Medical reception inmate #44

diagnostic tests, etc. The IDOC records leave the reader uninformed regarding the patient's medical conditions.

No provider health examinations included vital signs even when the assessment occurred days or weeks after the reception history. Even when a patient had hypertension, the blood pressure was not repeated at a later date assessment. Abnormal vital signs on nursing history forms were also not reviewed. One patient[113] had a pulse of 44 that was unnoticed on the provider's examination. Another patient[114] had a pulse of 118 which was unrecognized at the physical examination. Weeks later, during an episodic examination for an unstated reason the patient had a pulse of 128. The doctor's only history was "doc, my [heart rate] goes up even on the street". The tachycardia was not recorded as a problem and never evaluated.

The physical examinations fail to focus on the evaluation of the patient's stated conditions. A patient[115] with a history of a torn meniscus and ligament tear did not have an examination of the knee to ascertain the current status of his condition. An obese patient with markedly elevated triglycerides (455) and a liver function abnormality (ALT 72) did not have palpation of the liver to assess for fatty liver. A patient[116] had paraplegia from a gunshot wound. The neurologic examination and extremity examination consisted of the statement, "weak but does have little movement". This is not an adequate neurologic examination. Multiple patients,[117] documented as having prior hepatitis from hepatitis C infection or another liver condition did not have palpation of the liver. A patient[118] with a large foot ulcer from peripheral vascular disease did not have the pulses of his feet palpated. Patients[119] with asthma failed to have peak expiratory flow rate testing. A patient[120] with history of carotid artery stenosis did not have his carotid artery auscultated. One patient[121] had a reactive syphilis test but it was unnoticed at the physical examination. A nurse practitioner performed an episodic follow up of the test a month after reception but that did not include an examination of his genitalia or rectum to ascertain if he had active lesions.

Provider assessments failed to identify all of the patient's medical conditions identified on the screening. This included a patient[122] on whom a doctor's examination documented psoriasis but the assessment failed to include psoriasis and failed to refer the patient to chronic clinic for this problem. A patient[123] with chronic active hepatitis was not identified because the laboratory tests weren't reviewed. A patient[124] had a positive test for syphilis but it wasn't noted in the assessment or in the problem list. A patient[125] had abnormal blood tests and obesity which

---

[113] Medical reception inmate #40
[114] Medical reception inmate #39
[115] Medical reception inmate #21
[116] Medical reception inmate #27
[117] Medical reception inmates #s 29, 23, 2, and 7
[118] Medical reception inmate #40
[119] Medical reception inmates #s 41, 42, and 43
[120] Medical reception inmate #46
[121] Medical reception inmate #24
[122] Medical reception inmate #21
[123] Medical reception inmate #23
[124] Medical reception inmate #24
[125] Medical reception inmate #25

weren't included in the assessment. Another patient[126] gave a history at intake screening of hypertension but was not taking any medication. The blood pressure was normal. The provider repeated the statement "hypertension" in his history without any other related history or explanation. The blood pressure was not repeated in the provider examination. Hypertension wasn't listed in the assessment but was on the problem list and the provider enrolled the patient in the hypertension clinic. It doesn't appear that the patient had hypertension.

The problem list is poorly maintained. As noted in the chronic care section, the problem list is not under physician direction. Based on comparison of hand writing, it appears that nurses complete the intake problem list based on the intake screening. It also appears that staff use the problem list for a variety of functions for which it is not intended including, listing chronic care enrollment, completion of examinations, nursing assessments, etc. Problem list entries vary by facility based on individual inclination for how the list is to be used. There should be statewide standardized procedures for who can enter into a problem list, what an acceptable entry is, and when entries must be made. Until that is done the problem list is likely to remain inappropriate, incomplete, and ineffective.

Nine patients should have had their medical record obtained but none did. This is no improvement since the last report. Examples of this included a patient[127] who had a history of a recent torn meniscus and anterior cruciate ligament who had a recent orthopedic evaluation requesting an MRI test. Another patient[128] had paraplegia and was on iron supplements and Neurontin without an explanation why these medications were being used. The provider merely continued the medication without documenting a rationale for their use. Another patient[129] was described as having heart surgery; the provider described a stent. The record should have been obtained to determine the extent of the heart disease and precise treatment rendered. Another patient[130] had a prior pulmonary embolism and deep vein thrombosis of both legs. The reasons for the deep vein thrombosis were unclear. The patient also had a leg wound and it was not certain if the patient had a work up for this condition. The prior records should have been obtained to clarify the patient's status. Another patient[131] gave a nurse a history of asthma, but the provider documented obstructive sleep apnea. The patient had normal BMI and did not appear to have any risk for obstructive sleep apnea. The provider treated the patient with a CPAP but should have obtained records to verify the patient's condition. Another patient[132] was described as having "narrowing of blood vessels in neck" but also had history of "reconstruction" of jaw, neck, and intestine. It wasn't clear if the reconstruction was connected to the narrowed neck vessels. The uncertainty should have resulted in asking for his old records.

Medical therapeutic plans were not aligned with patient problems. Typical medical documentation is that for every problem there is a history, objective findings based on the problems, an assessment for every problem and for every assessment a therapeutic plan. Yet in IDOC this medical record format is not used. Not every problem has a therapeutic plan. Mostly,

[126] Medical reception inmate #27
[127] Medical reception inmate #21
[128] Medical reception inmate #27
[129] Medical reception inmate #28
[130] Medical reception inmate #40
[131] Medical reception inmate #44
[132] Medical reception inmate #46

providers only write medication orders, do not associate medications with a problem, and do not include in the plan non-medication needs. This was evident in the intake evaluations. One patient[133] had hypertension listed as a problem on the problem list but had no medications ordered and no plan. Another patient[134] had laboratory tests demonstrating hepatitis C with chronic active hepatitis but there was no plan for this. Another patient[135] had a positive syphilis test but the intake examination failed to identify the syphilis test and had no plan for this. Another patient[136] had elevated triglycerides for which Lopid (gemfibrizol) was prescribed when this is not currently recommended for his level of triglycerides. He had laboratory tests and obesity suggestive of non-alcoholic fatty liver but did not have diagnostic tests to evaluate for this condition. Another patient[137] had hypertension and leg edema. The doctor ordered a diuretic (furosemide) presumably for the leg edema even though the patient was already on a diuretic (HCTZ) without having made a diagnosis of leg edema. An echocardiogram should have been ordered to evaluate for heart failure but was not. Also the patient had obesity, elevated triglycerides, and hypertension and should have been screened for diabetes but was not. Another young patient[138] with paraplegia from a gunshot wound used urinary catheters for voiding because of his paralysis. He also had a coccyx ulcer and anemia. There was no ordered plan for management of the coccyx wound, catheter supply replacement, accommodation due to his paraplegia, or work up of the anemia. Though enrolled in hypertension chronic clinic there was no evidence of hypertension. For another patient[139] with prior cardiac stents and on aspirin the provider did not document starting aspirin or a statin drug in the intake note.[140] Another patient[141] had documented hypertension, epilepsy and hepatitis C without a documented plan for these conditions.[142] Several patients[143] had tachycardia for which there was no plan. Patients[144] with hepatitis C did not have vaccination for hepatitis A and B or counseling for avoidance of behaviors that would worsen their hepatitis. A patient[145] with a history of seizures and asthma had no history for these conditions and did not include a therapeutic plan for these conditions. A patient[146] did not have his laboratory tests reviewed. Multiple abnormalities were unnoticed that should have resulted in follow up tests. A patient[147] who smoked cigarettes, had a pulse of 44, a leg ulcer suggestive of peripheral vascular disease, and was diagnosed with neuropathy without evidence for this on physical examination was inappropriately started on a narcotic without indication, should have been started on a statin but was not, should have had a Doppler test to

[133] Medical reception inmate #21

[134] Medical reception inmate #23

[135] Medical reception inmate #24

[136] Medical reception inmate #25

[137] Medical reception inmate # 26

[138] Medical reception inmate #27

[139] Medical reception inmate #28

[140] This patient had a subsequent chronic clinic note in a different section of the medical record for the same date that recorded prescribing aspirin but not his statin. The intake assessment note should have qualified as an initial chronic clinic note instead of forcing providers to document on multiple forms as it is wasteful of time and ineffective documentation.

[141] Medical reception inmate # 29

[142] This patient also was seen in chronic clinic and had a plan in the chronic clinic note not documented in the intake note. This is extremely wasteful of provider time and resulted in documentation appearing deficient.

[143] Medical reception inmates #s 2, 39, and 41

[144] Medical reception inmate #2

[145] Medical reception inmate #10

[146] Medical reception inmate #39

[147] Medical reception inmate #40

evaluate for arterial patency in his legs, should have had an EKG to identify if his bradycardia was associated with an arrhythmia, and should have been counseled to stop smoking because of his medical conditions. None of this was ordered. The provider examining this patient is a physician without appropriate credentials who has been recommended to not be allowed privileges to perform primary care in IDOC. Another patient[148] had hypertension and the provider ordered ibuprofen without explaining why. The FDA warns that ibuprofen should be used with caution in persons with hypertension. The same patient should have had an A1c test to screen for diabetes because of an elevated glucose on screening laboratory tests. Another patient[149] diagnosed with intermittent asthma without any PEFR or history was not treated with a beta agonist medication. Another patient[150] had elevated glucose on intake blood tests but was not screened for diabetes.

Intake provider examinations are often done the day of intake. When this occurs the laboratory blood tests which are drawn the day of intake are not consistently followed up with a note modifying the problem list and chronic clinic enrollment. When the intake laboratory tests are available when the intake examinations are done, the test results were typically not reviewed in the examination note.

We did also note that for some patients an intake examination form was filled out and on the same day an initial chronic illness form was filled out. This appears to satisfy an administrative need to fill out a form as verification of completion of a task but is clinically wasteful of provider time, results in disjointed medical record documentation, and can result in ineffective and erroneous tracking of clinical care. If the intake examination is being used for the initial chronic illness encounter, which is appropriate, just document on the intake form that it is being used for that purpose; don't make providers write duplicate forms for the same encounter.

These deficiencies related to the intake history and examination should result in a process mapping of the intake process to ensure that procedures are standardized statewide, to ensure that patients are protected, and to ensure that all patient conditions are identified, every patient every problem results in an examination, an assessment, and a therapeutic plan.

The importance of obtaining old records and reviewing intake laboratory results is illustrated by a patient[151] who died and whose record was reviewed by the Monitor. This individual had been incarcerated in IDOC from 2014 to 2018. Shortly before he was released in 2018, he had a blood count that demonstrated elevated bilirubin and macrocytic anemia. His serum protein was borderline. Had the abnormal laboratory findings from the prior incarceration been available to the provider at the initial health assessment they would have informed the plan of care. At the most recent incarceration, laboratory findings of elevated serum protein were unnoticed. The combination of failure to obtain prior medical records and reviewing current laboratory tests resulted in never identifying this person's medical condition. The patient ultimately died and during the hospitalization when he died, they were working the patient up for multiple myeloma which might have been diagnosed earlier if timely review of his laboratory tests had occurred.

---

[148] Medical reception inmate #41
[149] Medical reception inmate #43
[150] Medical reception inmate #44
[151] Mortality review patient #21

Another patient[152] arrived at IDOC and had a colostomy; the intake history does not document how long ago since this surgery was completed. He was under the care of an oncologist and had finished a course of chemotherapy. There is no documentation of attempts to fill out the specifics of his treatment or recommended plan of care. No effort was made to obtain records of prior treatment. This patient also had chronic obstructive pulmonary disease and again no attempt was made to amplify on treatment prior to incarceration or obtain recommendations for ongoing care.

Another patient demonstrated failure to establish a patient's medical condition at intake to ensure continuity of care. A 26 year old man[153] who was homeless as a civilian had sickle cell anemia and a mental health disorder. On 5/9/19 the patient was received at IDOC for incarceration. A nurse documented that the patient had sickle disease but a physician assistant seeing the patient after the nurse screening documented sickle disease but took no history related to his sickle disease. The physician assistant plan was to order a blood count and sickle test but the patient was not seen in chronic care clinic and no intake blood tests were present in the medical record even though they were apparently ordered. After transfer to another correctional center the patient remained untreated. The patient told a psychiatrist that he wanted treatment for his sickle disease but didn't want to pay the $5 to access care. Ultimately the patient died of complications of his sickle cell disease.

In the future the monitor team will be looking to ensure that the provider's history addresses all the clinically relevant positives in the intake screen. The clinically relevant positives include problem lists, allergies, medications, any acute symptoms, and chronic problems including hospitalizations and other complications. The provider will be expected to follow up on clinically relevant issues identified in the nurse screen in sufficient detail to determine the need for follow-up care, to include a comprehensive history and a relevant physical examination, develop an initial problem list and a diagnostic and therapeutic plan for each relevant problem.

**RECOMMENDATIONS:**
1. Ensure that prior records are requested as needed.
2. Perform an adequate history regarding chronic problems and complications, including hospitalizations.
3. Develop an initial problem list along with clinically appropriate diagnostic and therapeutic plans.
4. Perform a process mapping of the intake process in order to develop adequate intake procedures that ensure:
   a. All nurse identified positives are evaluated by providers,
   b. All medical problems are identified and entered onto a problems list,
   c. All medical problems identified include an adequate history, focused physical examination, assessment and therapeutic plan,
   d. All intake laboratory tests are evaluated as part of the intake process, and
   e. Patients are enrolled in chronic clinic for all of their chronic medical conditions.

---

[152] Mortality review patient #1
[153] Mortality review patient #10

# Nursing Sick Call

*Addresses Items II.A; II.B.1; III.A.10; III.E.2; III.F.1; III.F.2;*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**III.A.10.** *Each IDOC facility shall have registered nurses conducting all sick calls. Until IDOC has achieved substantial compliance with nursing provision of the staffing plan, facilities may use licensed practical nurses in sick call, but only with appropriate supervision.*

**III.E.2.** *Lists and treatment plans will be amended pursuant to the order of a clinician only.*

**III.F.1.** *Sick call shall be conducted in only those designated clinical areas that provide for privacy and confidentiality, consistent with the extraordinary operational concerns and security needs of IDOC including, but not limited to a lockdown.*

**III.F.2.** *There shall be no set restrictions on the number of complaints addressed during a specific sick call appointment. Medical providers must use their medical judgment to triage and determine which issues should be evaluated and treated first to maximize effective treatment and relieve pain and suffering.*

**OVERALL COMPLIANCE RATING:** Partial compliance

**FINDINGS:**

IDOC asserted compliance with item III.F.2 listed above but provided no evidence of compliance.[154] The Monitor made seven recommendations in the 2nd report.[155] It appears that one part of one recommendation has been acted upon; clarification that the section pertaining to sick call in the Primary Medical Services Report be completely filled out.

Information that was used to evaluate Nursing Sick Call included the CQI documents and the Primary Medical Services Report that is provided on a quarterly basis and the report on staffing as of December 2020. We also reviewed documentation of nurse sick call in the health records we have been provided in response to our requests. Finally the Monitor's nursing consultant discussed nurse sick call with the OHS Director of Nursing on two occasions.[156]

**Policy and Procedure; Performance Monitoring**

OHS completed a draft of a policy and procedure on nursing sick call. It was provided to the Monitor in the spring of 2020. The Monitor returned comments and suggested revisions in August. No further drafts of this policy and procedure have been made available for review.

---

[154] Illinois Department of Corrections, Defendants' Reporting Requirement Pursuant to V.G. of the Lippert Consent Decree (November 2020).

[155] Health Care Monitor 2nd Report Lippert v. Jeffreys, 8/6/20 pages 88-89.

[156] October 1, 2020 telephone call about documentation of requests for sick call and the log used to track sick call encounters and disposition. January 26, 2021 telephone call about the review completed by nurse sick call encounters by the facility Medical Director and training of nurses in the COVID-19 screening protocol.

Until then, written guidance for sick call is found in Administrative Directive 04.03.103. It has previously been described as lacking sufficient direction on "how to implement the sick call program."[157] An important policy issue that needs to be addressed is the manner in which requests for sick call are retained. Written health care requests must be filed or scanned in the individual's health care record. With "open sick call" incarcerated persons put their name on a list to be seen. The list does not contain any information about the nature of the complaint. These lists need to be maintained so that the date an individual's request was made can be verified.

IDOC monitors the performance of nursing sick call in three ways:
1. The Primary Medical Services Report,
2. The facility Medical Director chart review of nursing sick call documentation, and
3. CQI studies of various aspects of sick call.

Each of these is discussed and suggestions for improvement made in the following paragraphs.

*Primary Medical Services Report*: The Monitor commented in the 2nd Report that very few facilities provide more than just the facility census and number of requests received for the month. It appears that OHS has clarified the expectation that all fields in this report be completed. Reviewing the October 2020 Primary Medical Services Reports 24 of the 30 sites reported not only census and the number of requests received that month but also the number seen by a nurse within 72 hours of receipt of the request. Twelve of 30 sites reported a backlog of persons waiting longer than three days to be seen by a nurse for a sick call issue.[158] The current NCCHC standard for timeliness in responding to health care requests is within 24 hours of receipt of the request.[159] The metric currently used by OHS is no longer the current standard of timeliness for response to requests for health care attention. Eight sites reported a backlog of patients to be seen by a provider more than 3 days after a referral from nurse sick call. It is unclear if this field is being filled in only when there is a backlog or if sites choose whether to report this metric. Based upon the information provided by IDOC access to sick call is not timely.

The accuracy of the numbers reported on the Primary Medical Services Report have not been verified to our knowledge. For example, Vandalia reports seeing more patients on sick call than the number of requests received. It may be that these are urgent walk-in requests rather than sick call requests. We suggested in the 2nd report each of these data fields be clearly defined.[160] We also recommend in the last report having facilities report the number of times a LPN was assigned to conduct sick call each month in partial fulfillment of III.A.10.[161] With this report, the Monitor also recommends OHS modify the criteria for timeliness of the nurse seeing the patient from 72 hours to 24 hours to bring the performance measure into line with the current standard of the NCCHC.

[157] Health Care Monitor 2nd Report Lippert v. Jeffreys, 8/6/20 page 84.
[158] These are Hill, Illinois River, Jacksonville, Kewanee, Lawrence, Logan, Menard, Shawnee, Sheridan, Vienna, and Western
[159] National Commission on Correctional Health Care, Standards for Health Services in Prisons 2018, E-07 Nonemergency Health Care Requests and Services.
[160] Health Care Monitor 2nd Report Lippert v. Jeffreys, 8/6/20 page 84.
[161] Ibid

*Medical Director audit of nurses' use of treatment protocol:* In the last report the Monitor observed that the majority of facilities reported the results of this audit at the CQI meeting. The primary focus of the tool is documentation completeness with only two clinical measures.[162] The Monitor has recommended the statewide auditing team assess the validity and reliability of this audit data. The strength of this tool in monitoring the clinical appropriateness of nursing sick call could be improved by defining sample selection to at risk patients and adding questions related to assessment and clinical decision making.

*Focused CQI studies of the sick call process:* CQI was postponed for several months this spring and summer because of the need to address the COVID-19 pandemic. There were a few institutions[163] that studied the sick call process during months when CQI was allowed. These studies were confined to whether the forms were dated and signed and timeliness of sick call including referrals seen by a provider. There were no studies evaluating quality of care provided, outcomes or patient satisfaction.

**Nursing Sick Call**

The Monitor's chart review[164] found evidence that LPNs continue to be assigned to nurse sick call. We were not provided with the requested assignment sheets or other documentation to quantify how often LPNs are given this assignment. As discussed in the Monitor's 2nd report the registered nurses needed to triage and respond to non-emergent requests for health care attention consistent with the Consent Decree was not calculated specifically in the staffing analysis completed by OHS.[165] Registered nurse vacancy rates undoubtedly contribute to the continued use of LPNs to perform sick call. The Monitor's evaluation of allotted registered nurse positions that were vacant statewide in December 2020 was 24% compared to 14% in November 2019.[166] Another contributing factor which was discussed in the second report is that registered nurses are assigned other duties that interrupt completion of sick call. These include responding to emergencies and other intermittent requests. The Monitor recommended that IDOC revise the Primary Medical Services Report to include the number of times an LPN was assigned to conduct sick call each month and assign duties that interrupt the nurse doing sick call to someone else.[167] However the Primary Medical Services Report has not been revised to include a column reporting the number of times an LPN was assigned to sick call. The Monitor is aware of efforts to employ certified nursing assistants to take some of the workload away from registered nurses that does not require licensure. The implementation plan does not address how or establish any goal for when compliance with III.A.10 will be achieved.[168]

---

[162] Health Care Monitor 2nd Report Lippert v. Jeffreys, 8/6/20 page 84.
[163] Big Muddy studied whether referrals from sick call were seen timely, Graham studied whether nurses saw patients in sick call within 24 hours and whether the forms were dated and stamped, Hill and IRCC studied whether referrals were seen timely by providers.
[164] For example mortality review patient #3 was seen for sick call 14 times in 2019; seven were completed by LPNs.
[165] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6,2020 page 86.
[166] IDOC_December2020_Staffing, Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6,2020 page 59
[167] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020 pages 27, 87-89.
[168] Final Revised Lippert Implementation Plan 6/12/20

The Monitor's 2nd report discussed the state's elimination of co-pay and the increase in the volume of sick call requests. Prior to its elimination the numbers of requests reported by Illinois prisons was far below the expected rate of five to seven percent of the population each day that systems with functional health care programs experience.[169] The following table compares the percent of population requesting sick call daily at each of the sites in October 2019 and 2020.[170] The percentage of population making requests for health care attention increased at all but five

| Percent of Population Requesting Sick Call Daily | | |
| --- | --- | --- |
| **Facility** | **October 2019** | **October 2020** |
| ELGIN | 4.78% | 9.07% |
| VIENNA | 5.89% | 6.62% |
| STATEVILLE | 4.14% | 4.90% |
| JACKSONVILLE | 1.05% | 4.03% |
| DECATUR | 1.30% | 3.83% |
| ILLINOIS RIVER | 1.42% | 3.75% |
| GRAHAM | 2.09% | 3.24% |
| PONTIAC | 1.44% | 3.12% |
| KEWANEE | 1.46% | 2.82% |
| SOUTHWESTERN | 1.68% | 2.74% |
| SHAWNEE | 1.79% | 2.41% |
| ROBINSON | 0.95% | 2.38% |
| LOGAN | 2.06% | 1.99% |
| DIXON | 2.07% | 1.84% |
| PINCKNEYVILLE | 0.88% | 1.82% |
| VANDALIA | 0.70% | 1.80% |
| CENTRALIA | 0.73% | 1.64% |
| HILL | 0.73% | 1.59% |
| SHERIDAN | 0.69% | 1.50% |
| BIG MUDDY | 0.53% | 1.20% |
| EAST MOLINE | NA | 1.17% |
| DANVILLE | 0.38% | 1.15% |
| LAWRENCE | 0.59% | 1.08% |
| LINCOLN | 0.37% | 1.03% |
| TAYLORVILLE | 0.33% | 0.89% |
| MURPHYSBORO | 0.52% | 0.74% |
| NRC | 1.46% | 0.71% |
| MENARD | 0.38% | 0.62% |
| JTC | 1.02% | 0.62% |
| WESTERN | 0.55% | 0.49% |

sites in 2020 (these are highlighted). However only Stateville, Vienna, and Elgin report numbers that approach the expected rate of 5-7% of population.

---

[169] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020 page 26.
[170] Primary Medical Services Reports for October 2019 and October 2020

An example of how important eliminating the barrier of copay can be for some people, one patient whose chart was reviewed in preparation for this report had sickle cell disease and was not enrolled at intake in a program of regular follow up for this chronic disease. He told a psychiatrist six weeks after intake that he would like to be treated for the disease but did not want to see medical because of the $5.00 copay that was in effect at that time. The psychiatrist, as well as other health care professionals who saw the man subsequently, never enrolled him in chronic clinic and his sickle disease went untreated throughout his incarceration.[171]

The Monitor's 2nd report recommended that an examination of potential barriers to access should be conducted given the low rate of requests for sick call with the identification and resolution of workload factors that cause delays in care as well as resources that are underutilized and could be repurposed to increase access.[172]  Even though elimination of copay appears to have resulted in a small increase in requests for health care, the rates remain very low at the majority of IDOC facilities indicating that there are additional barriers to health care.  The Monitor continues to recommend that this area be reviewed as recommended previously.

Although we did not visit any facilities to evaluate the adequacy of physical space, equipment, and privacy to conduct sick call it has been discussed in both previous reports of the Monitor. The Monitor recommended the privacy and confidentiality of rooms where clinical encounters take place be evaluated during safety and sanitation rounds of the health care areas.[173] There is no evidence the IDOC has incorporated this review into safety and sanitation rounds. Doing so will be an important component in demonstrating compliance with III.F.1. The IDOC Implementation Plan called for an annual survey all facilities to ensure there is adequate physical space and equipment for clinical care.[174] The Monitor looks forward to receiving the results of this survey annually as outlined in the plan.

Nurses' treatment of patient complaints is guided by 65 nursing treatment protocols. The protocols give direction as to the assessment and treatment of minor conditions as well as clinical signs and symptoms for which a provider must be contacted to obtain further treatment direction. The treatment protocols provided to the Monitor have an effective date of 9/2002.  Each facility Medical Director is responsible for training the nurses at the facility in the use of the protocols, nurses attest by signature when they are knowledgeable in the use of the protocols and the Medical Director periodically audits nursing documentation of the protocols and gives feedback to the nursing staff.[175]  There is no standardized curricula including methods to demonstrate competence in nurses' use of the protocols.

The Monitor has recommended the OHS Director of Nursing reduce the number of nursing treatment protocols. The protocols now are identified largely by medical diagnosis or medical condition (i.e. hemorrhoids, contusion, scabies, seborrhea etc.) which cannot be determined until the patient has been examined. The Monitor recommends replacing diagnosis-based protocols with symptom-based protocols organized by physical systems only for the most common

[171] Mortality review patient #10
[172] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020 page 89.
[173] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020 page 87-89.
[174] Final Revised Lippert Implementation Plan 6/12/20
[175] Interview with IDOC Director of Nursing 1/26/2021

presenting symptoms (i.e. upper respiratory symptoms would include symptoms of allergic rhinitis, asthma, upper respiratory infection) and a few protocols for emergency response (i.e. chest pain, anaphylaxis, hypoglycemia, etc.). Except for emergency treatment protocols, they focus only on those most commonly occurring conditions for which there is a nurse intervention. Conditions which must be addressed by a higher level clinician are eliminated and those patients scheduled directly with an appropriately credentialed provider (e.g. jaundice, testicular pain, breast lump[176], etc.). Each protocol should guide the nurse in considering the etiology and the various diagnoses suggested by the symptoms and then delineate what symptoms the nurse can treat and when to confer or schedule the patient with a provider.  These steps would increase the likelihood that the nurse has decision support that is pertinent to the patient's problem and focus their expertise on the most common conditions that nurses can offer an intervention for.

The Monitor found that nurses use the protocol for nonspecific discomfort frequently which provides little guidance. It appears to be a mechanism to treat patients who have pain but does not assist in the identification of the underlying condition. One patient[177] was seen six times between the end of February through mid-April for complaints of hip pain. The nurses used the nonspecific discomfort protocol each time to provide analgesic medication. The protocol provides no direction in what parameters to assess except vital signs and pain scale. This patient eventually was hospitalized and died of bone cancer. This is an example of how the protocol can be a disservice to initiating definitive care.[178] The Monitor at first thought the nurse had selected the wrong protocol but then realized that there was no protocol for the assessment of musculoskeletal conditions except back pain and fractures/dislocation/sprain, neither of which applied to this patient's presenting problem of hip pain.[179] The protocol for nonspecific discomfort should be discarded.

While there are sick call encounters where nurses have documented assessment and actions consistent with the guidance provided by the treatment protocol, the Monitor has observed several practices among nurses use of treatment protocol that are troubling. The first of these is not following the protocol. The most frequent failure is not taking or acting upon abnormal vital signs.[180] The most egregious of these was the patient[181] discussed in the last paragraph. This individual had elevated blood pressure on nine occasions in nurse sick call that was either unrecognized, not treated or not referred to a provider. The patient also had a 50 pound weight loss the year before he died. Only once did a nurse recognize as part of sick call, the weight loss and refer the patient.[182] Another patient[183] had elevated blood pressure taken by nurses seven times over a two year period and the nurses did not consult with or notify a provider. One of

---

[176] These are three protocols currently among those in use by IDOC that instruct the nurse to have the patient seen by a provider. There is no need for a nursing assessment and there are no interventions the nurse can offer. These are patients who should be seen promptly by a provider.

[177] Mortality review patient #3

[178] The patient was referred and seen by a provider twice, each time after three sick call encounters for the same problem. See also mortality review patient #21 for use of the nonspecific discomfort protocol for a musculoskeletal condition.

[179] A protocol for assessment of musculoskeletal conditions would eliminate the need for two existing protocol.

[180] Medical reception patient #s 3, 28 and East Moline sick call patient #1

[181] Mortality review patient #3

[182] The patient was referred but it was ever addressed by a provider.

[183] Mortality review patient #9

these took place on 12/4/19 when an LPN saw the patient because he could barely walk to chow.[184]  The patient's blood pressure and heart rate was elevated (158/100, 93) but the referral to a provider did not indicate this was a concern. Another patient[185] was seen for symptoms of a cold and was assessed by a nurse as having a fever of 100.2, a heart rate of 122 and oxygenation of 91%. The patient was given an analgesic and cough medicine even though the protocol clearly states that urgent physician consultation should be sought if oxygenation is less than 92%. The patient was also wheezing and short of breath both symptoms listed as calling for urgent physician consultation. Other failures to not follow the protocol include not getting a thorough history or symptom description,[186] an EKG when seeing a patient for chest pain[187] or peak flow when indicated, on patients with shortness of breath[188], not referring in the presence of a symptom the protocol states should be referred[189] and treating patients with medication not on the protocol or treating without an assessment.[190]

The Monitor also observed in chart review that nurses sometimes use a progress note or an injury report rather than document an assessment using an appropriate protocol. One patient was seen and treated for dry skin.[191]  The encounter is documented on a progress note rather than the treatment protocol for dry skin. Another patient[192] was seen for injuries after falling out of bed. He had a laceration on the side of his head and under his eye. The assessment and treatment is documented on an injury report rather than the treatment protocol for lacerations. A few days later he was seen urgently for pain in his stomach and the assessment is documented in a progress note rather than using the protocol for abdominal pain. A third patient was seen for a nosebleed and the nurse documented this encounter in the progress notes rather than use the treatment protocol for  nosebleed-epistaxis and another had documentation of treatment for "jock itch" in the progress notes rather than documenting an assessment using the treatment protocol for this condition.[193]  The purpose of the nursing treatment protocols is to guide nurses in the assessment of a patient's condition. When nurses assess patients without using a treatment protocol the assessment is less specific and can omit important parameters that need to be considered in the patient's care particularly directions for referral to a higher level provider. While injury reports may be necessary documentation for risk management purposes, the clinical evaluation should be documented using the appropriate nursing protocol.

There were several charts where the Monitor noted that the nursing assessment of the patient's condition failed to identify pertinent factors such as seeing a patient for a headache that the patient attributes to not receiving medication prescribed for hypertension or that a scheduled provider follow up appointment is two weeks overdue, that a patient has not been enrolled in chronic clinic for management of sickle cell disease, or a patient's condition has been

---

[184] The patient had no recent or acute injury, so this was not the appropriate protocol to use.
[185] Mortality review patient #6
[186] Mortality review patient #s 6 and 3
[187] Medical reception patient #18 and mortality review patient #10
[188] Mortality review patient #6
[189] Mortality review patient #18
[190] Mortality review patient #27
[191] Mortality review patient #27
[192] Mortality review patient #10
[193] Mortality review patient 21 and medical reception patient 21

unimproved for longer than the patient reports.[194]

Finally there were two patients who were ill and in the infirmary, when nurses used a protocol to treat a symptom. The first of these patients[195] was admitted to the infirmary after several weeks of feeling ill with a respiratory infection, shortness of breath and chest pain. The patient developed nausea and vomiting the second day after admission. A nurse treated the patient with Pepto-Bismol and antacids per protocol but did not document a history and examination using the protocol. The nurse did not appreciate this patient's history of gastrointestinal complaints and the significant amount of weight he had lost. The nurse did not contact the physician about this change in the patient's condition. This patient was diagnosed with widespread and diffuse metastatic cancer a month later. This was an important symptom development and should have been incorporated in the patient's plan of care by the physician. The other patient [196]was in the infirmary while receiving palliative care for a squamous cell carcinoma of mouth that had metastasized throughout the head and neck. A nurse treated the patient for indigestion and heartburn after he had finished a feeding via a gastrostomy tube, documenting the assessment and treatment on the protocol for indigestion/heartburn. The physician was not contacted about the change in the patient's condition. This patient's airway became obstructed later that same day and he was hospitalized on order of an on-call physician and died there 12 days later. Nursing treatment protocols should not be used when patients are in the infirmary. All care needs to be directed by the treating physician. Nursing protocols are appropriate for use in the outpatient setting because they are intended to treat conditions the patient would otherwise take care of themselves or seek a physician's care for. In an inpatient setting any new symptom must be evaluated in the context of the patient's entire condition and this consideration exceeds the training and scope of practice of registered nurses and should be referred to the physician.

IDOC self-assessed substantial compliance with III.F.2, the requirement that there be no restrictions on the number of complaints addressed during a specific sick call appointment.[197] In the 2nd report the Monitor noted that that the IDOC response to the Monitor's first report states "Agency Medical Director … has participated in multiple meetings with healthcare staff informing them that they may not restrict the number of complaints addressed during sick call. That direction has been provided telephonically, during OHS Quarterly meetings, as well as being reiterated during site visits."[198] However this verbal instruction has not been finalized into any form of permanent written expectation. As noted in the Monitor's 2nd report this requirement should be explicitly stated in the final IDOC policy and procedure on non-emergent health care requests and services which has yet to be finished. In addition sick call monitoring tools should include this as one of the criteria measured so that compliance with the expectation is sustained.[199]

In the Monitor's review for this report we did not see instances of patients presenting at sick call with more than one complaint. There was evidence nurses' using two treatment protocols, but

---

[194] Medical reception patient #28 and mortality review patient #s 3, 10, and 6
[195] Mortality review patient #18
[196] Mortality review patient # 7
[197] Illinois Department of Corrections, Defendants' Reporting Requirement Pursuant to V.G. of the Lippert Consent Decree (November 2020)
[198] Lippert v Jeffreys, 10-cv-4603: IDOC's Response to the Monitor's Initial Report, December 24, 2019, page 3
[199] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020 page 88.

these appear to be instances where the patient's presenting complaint was not adequately addressed by the first treatment protocol, so a second one was used as well. For example, a nurse saw one patient for chest pain and documented findings using the chest pain protocol and also documented on the protocol for shortness of breath.[200] Another patient was seen for a complaint of chest pain and when the nurse determined that it was not chest pain but rather an injury to his ribs from playing basketball, used a second treatment protocol for fractures etc. A third patient[201] was treated for a urinary tract infection and cold symptoms using two separate corresponding treatment protocol. The Monitor recommends that the patient statement of why they want to be seen is documented as the first entry on the treatment protocol. The Monitor also recommends that the Medical Director not audit sick call. Instead, an audit by nursing supervisory personnel should be expanded to include a measure of whether more than one complaint was addressed at the encounter. These would be methods to provide evidence of compliance with III.F.2.

The Monitor continues recommendations made in earlier reports and added two additional recommendations.

## RECOMMENDATIONS:
1.  Include all aspects related to sick call in the Consent Decree in the policy and procedure for non-emergent health care requests; finalize and implement it. The policy and procedure should establish the expectation that patients are seen for sick call within 24 hours of receiving the request.
2.  Revise the Primary Medical Services Report to include the number of times an LPN was assigned to conduct sick call each month, the number of requests and the number of complaints made. Revise the column that reports the number of requests seen by a nurse from 72 hours to 24 hours of receipt of the request. Other revision may be necessary once the policy and procedure is finalized. Clarify the expectation that the report is to be completely filled out and provide written definitions or instructions, as necessary. Ultimately this report should be automated and come from the EMR.
3.  Assess the validity and reliability of the audit of the documentation of nursing treatment protocols. This audit only needs to be done quarterly if performance on all criteria exceeds 90%. Revise the tool to include a measure of whether more than one complaint was addressed.
4.  Sick call access should be monitored at each IDOC facility. If requests received daily are less than 5% of the population or patients are not seen within 24 hours of receipt of the request, an examination of potential barriers to access should be conducted. The examination should include identification and resolution of workload factors that cause delays in care as well as resources that are underutilized and could be repurposed to increase access.
5.  OHS should establish a workload driven staffing standard for sick call and identify the number of registered nurse positions needed to comply with this aspect of the Consent Decree. This would also aid in the calculation of space and equipment that is needed for

---

[200] Mortality review patient #18 unfortunately this patient did not have a self-limiting condition for which the interventions on either protocol were effective. The patient had the condition for at least 10 months and should have seen a specialist.
[201] Mortality review patient #24

nurse sick call.
6. The privacy and confidentiality of rooms where clinical encounters take place should be evaluated during safety and sanitation rounds of the health care areas and annually as cited in the IDOC's Implementation Plan.
7. Reassign other duties that interrupt nurse sick call.
8. Reduce the number of nursing treatment protocols as discussed in this section. Eliminate the use of nursing treatment protocols in the infirmary as soon as possible.
9. Document the patient's presenting complaint(s) in their own words as the initial entry on the nursing treatment protocol.

# Chronic Care

*Addresses Items II.A; II.B.1; II.B.6.f; III.E.1*
**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*
**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*
**II.B.6.f.** *IDOC agrees to implement changes in the following areas: Chronic disease care: diabetes, Chronic Obstructive Pulmonary Disease (COPD), asthma, HCV, HIV/AIDs, hypertension, hyperlipidemia*
**III.E.1.** *IDOC shall maintain a list of prisoners' current medical issues in their medical charts.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
Based on record reviews and on information available to us, IDOC has not acted on any of the eight recommendations in the Monitor's 2nd Report. We have received no verification in Bi-Annual Reports or otherwise that any actions have been taken with respect to implementation of changes to chronic disease care processes. With respect to improving physician quality, the IDOC's May 2020 Bi-Annual report to the Monitor announced that SIU would provide physicians at four IDOC sites. Then in the November 2020 Bi-Annual Report, IDOC announced that SIU would not be providing physician services.

The IDOC, in its May and November Bi-Annual Reports IDOC stated that it is compliant with Item III.E.1 of the Consent Decree that requires that IDOC shall maintain a list of a prisoner's current medical problems in the medical record. The IDOC provided no verification as to how they determined compliance. We can confirm, based on record reviews, that this item is not compliant. Problem lists are not consistently accurate and contain many irrelevant entries.[202] In record reviews, physicians are often unaware of the full panel of patient diseases and in some cases one can only learn the full panel of diseases by reading consultant's reports.

---

[202] See the mortality reviews in the attached appendix which gives examples of problem lists which contain irrelevant material and gives examples of problem lists which are inaccurate.

Based on medical record reviews and lack of progress in developing a chronic care program this item not compliant. The existing model of chronic care delivery is not centered on care from the perspective of the patient and does not focus on identifying and treating all of a patient's diseases in a coordinated and timely fashion so that the patient has a satisfactory outcome. A patient-focused perspective needs to be created.

IDOC has sent a draft chronic care policy. The Monitor is collecting comments from his consultants and will provide the policy with comments back to IDOC. In its policy revision the IDOC needs to reconstruct its chronic care program using the following principles.

1. Identification and evaluation of all illness must occur at intake and ensure timely continuity of treatment of an individual's chronic illness. This will include enrollment into the chronic care program.
2. Maintain a roster of persons with chronic illness and list of all of diagnoses on the roster. This can be used for risk assessment, for statistical purposes in order to understand prevalence of disease in the population and administrative aspects of disease management. An accurate listing of all chronic diseases needs to be present in the problem list which must be maintained by providers.
3. The concept of separate clinics for separate diseases must be discontinued.
4. *Each* chronic clinic visit needs to address *every* medical condition of the patient with the exception of specialty clinics such as UIC Telehealth HIV visits, hepatitis C, and TB prophylaxis visits. Clinic evaluations need to include an appropriate history, examination, assessment and updated plan for every disease of the patient.
5. National standards should be used as chronic care clinical guidelines.
6. Patient scheduling intervals must not be fixed or based on specific diseases. Scheduling should be based on the most poorly controlled chronic condition and based on the urgency of the degree of control with patients seen as early as is needed but no later than three months out.
7. Credentialing of physicians needs to accelerate so that all physicians are knowledgeable in primary care.
8. Management needs to support chronic clinic activity to a greater extent than is now done to include.
   o Improved clinic space so that every clinic is adequately sized and equipped.
   o There must be widespread availability of Up-To-Date® at workstations in every clinical examination room and nursing station.
   o Because of the remoteness of facilities, providers need access to quick curbside electronic consults with a wide variety of specialty consultants to solve clinical problems.
   o Due to the number of medication issues identified in record reviews, addition of several pharmacists to assist in medication management is needed.[203] This can be performed via telemedicine.
9. When a provider does not understand how to care for a patient's condition the provider

---

[203] This is similar to what UIC does for HIV care for telemedicine. Before the HIV patient is evaluated by a physician, a pharmacist evaluates the patient's medication profile and discusses the findings with the physician. This is useful to avoid drug-drug interactions, ensures that the patient medication profile is appropriate and safe, and assists in special situations such as managing medications for geriatric populations.

must refer the patient to a specialist who knows how to care for the patient's condition.

10. Chronic care management should move to a team approach. A dedicated chronic care team should include providers, a dedicated chronic care nurse, the on-site and off-site schedulers, and a pharmacist.
11. The team needs to meet in daily huddles to discuss hospitalizations or emergency room visits, urgent nursing evaluations or treatments (e.g. nebulization), problem patients that have arisen over the prior 24 hours as well as any scheduling changes to be aware about for the upcoming day. Daily huddles should be brief (e.g. 15 minutes).
12. A weekly huddle should be conducted with the same team to discuss chronic care patients in poor control and strategies to address their problems, recent hospitalizations, all specialty consultations over the past week to discuss therapeutic plans, specialty consultation that are upcoming, medication issues, and any other chronic care problems. Weekly huddles should be somewhat longer (1/2 to 1 hour). Huddles should be considered an integral part of chronic care and should be staffed as such.

The Monitor is encouraged by indications in the quality improvement minutes that some facilities are noting if poorly controlled chronic care individuals have received a corrective action plan. However, the elements of the corrective action plan are not documented and there is no evidence in subsequent CQI minutes of the impact of the plan.[204] One facility selectively identifies a cohort of chronic clinic patients whose condition is deemed to be deteriorating and tracks whether these patients are given accelerated follow-up appointments in two months or less. Eighteen (62.1%) of the twenty-nine patients studied were seen within two months. However this is only a process study and did not document the details of any corrective action plan or if the patients' clinical condition had improved or further deteriorated. If this type of study was modified to focus on whether the corrective action plan and the clinical outcome were effective, it could be used as a nascent model for improvement of quality of chronic care.[205]

Based on death record reviews, we find that these fundamental aspects of chronic disease management are not now present in IDOC. We identified multiple systemic opportunities for improvement in the record reviews including the following which include only a few selections of the identified deficiencies.

_Problem lists do not conform to the actual list of patient problems._ Of 21 deaths charts reviewed, three records did not have a problem list, three records had an accurate problem list but 15 records did not have an accurate problem list. There are no rules related to problem lists. Anyone can use the problem list to make multiple different types of entries including the following which we quote from existing problem lists: "psych hex", "abnormal eyelashes", "multiple chronic illness clinic", "low bunk", "no black box secondary to wrist deformity", "wire frames", "2 year PE done", "General Medicine", and "Chart reviewed upon intake @ Sheriden". These entries are not medical problems. The problem list needs to be a _provider developed_ reliable list of medical problems that a patient has. Nurses use this list to communicate the patient's existing medical conditions to outside hospitals. New providers unfamiliar with a patient use the list to quickly understand the panel of diseases that a patient has. Because there are multiple providers, including coverage doctors, the problem list must be accurate to protect

---

[204] Facility CQI minutes 3rd quarter 2020
[205] Facility CQI minutes 3rd quarter August 2020 Vandalia CC

patient safety.

*Medical Directors without experience in managing a particular chronic illness of a patient are not referring to a higher level provider or to a specialist if the Medical Director is unfamiliar with management of the condition.* A patient[206] had chronic obstructive lung disease (COPD). Providers did not manage his care based on contemporary standards of care. He had no pulmonary function testing, no staging of his COPD, no pulmonary rehabilitation, though on long-term oxygen therapy he had no evaluation of the effectiveness of his oxygen therapy, no vaccination update, and was on 20 mg prednisone for 2 years *continuously* without monitoring. The doctor did not appear to know how to manage the patient's condition. During a hospitalization for exacerbation of COPD, the hospital recommended a pulmonary consultation but this was denied by the vendor. He died due to his COPD. The same patient[207] was denied colostomy reversal and developed diversion colitis[208] which was ignored by the onsite physician because, it appeared that he didn't know how to care for it. The hospital making this diagnosis recommended a referral back to a gastroenterologist but this referral was not requested. In another case[209] a patient had elevated serum protein and macrocytic anemia[210] for his entire one year incarceration but the doctor did not know how to evaluate these conditions. This doctor did not have primary care training. The doctor should have referred the patient to a hematologist. Instead, the patient deteriorated and ultimately died while at a hospital that had begun working the patient up for multiple myeloma. Another patient[211] had multiple problems requiring specialty care including:

- Need for colonoscopy due to weight loss, abdominal discomfort and anemia in 74 year old;
- Oncology consultation due to a 2.5 cm renal complex mass;
- Cardiology consultation due to symptomatic bradycardia (rate 42) in a 74 year old with multiple cardiac risk factors;
- Ophthalmology consultation for cataracts; and
- Urology consultation for phimosis.

None of these referrals occurred.

This patient also had appointments for endocrinology for hyperparathyroidism; urology for incontinence for a year; surgery for parathyroidectomy and a hernia which were all significantly delayed.

A 64 year old patient[212] fell off a top bunk and was suspected to have a seizure. Instead of

---

[206] Mortality review patient #1
[207] Mortality review patient #1
[208] Diversion colitis is an inflammatory condition that occurs when a section of the bowel is bypassed due to surgery. A colostomy results in a section of the bowel that becomes unused and this section becomes involved because the fecal stream is diverted. The first line of treatment is to reconnect the bowel.
[209] Mortality review patient #21
[210] Normally these conditions are managed or at least diagnostically worked up by primary care physicians. In this patient's case, the physician did not notice the elevated protein as a problem and did not know how to work up a macrocytic anemia. These errors resulted ultimately in the patient's death likely from multiple myeloma.
[211] Mortality review patient #4
[212] Mortality review patient #9

referring the patient for an evaluation (either neurologist or CT brain with EEG) nothing was done and the patient wasn't seen for this in chronic care clinic. About a year later the patient had another apparent seizure and died. The cause of death wasn't determined.

*The forms used for chronic care are not appropriate. They are intended to be used as all-purpose chronic care documentation forms but are very narrowly focused to address only four diseases.* None of the 21 mortality records reviewed included appropriate or thorough documentation on any of the chronic care forms that addressed all of the patient's medical conditions. The IDOC requires providers to use a limited number of forms on which to document their notes. These forms are a barrier to documentation of an appropriate note largely because the forms have multiple check box sections that only address a limited number of chronic illnesses.

*Exacerbations of chronic illness, abnormal vital signs, episodic visits for the chronic condition or for other reasons, specialty consultations, and laboratory test results that have occurred since the last chronic clinic are not reviewed in chronic clinic.*
One patient[213] was hospitalized for COPD without acknowledgement of the hospitalization at subsequent chronic illness clinic. Another patient[214] had poorly controlled asthma. After a hospital admission the patient continued to experience problems. Two months after hospitalization, the patient was evaluated in chronic clinic but the doctor failed to note that the patient had been hospitalized or had exacerbations. The patient had also had 27 exacerbations of his asthma requiring nebulization therapy. None of these resulted in a chronic clinic evaluation and none were noted when the patient was evaluated in chronic clinic. One patient[215] had 11 episodes of elevated blood pressure during provider encounters which were unrecognized at chronic illness visits and did not result in modification of blood pressure medication. Another patient[216] had systolic blood pressure greater than 150 on 30 occasions over the course of 16 months without increase of medication except for furosemide which was being used for another purpose. The patient ultimately died of stroke. The same patient had 37 significant problems (weight loss, significant symptomatic bradycardia, emergency hypercalcemia requiring hospitalization, development of a complex adrenal mass that may have been a carcinoma) between chronic clinic visits that were not identified or addressed at chronic clinic visits. A 69 year old[217] had hypertension and high blood lipids. Over the course of two years he had elevations of blood pressure twenty times without action being taken in chronic clinic to increase blood pressure medication. In one chronic clinic the provider wrote regarding a blood pressure of 150/91 that, "all previous blood pressures have been WNL [within normal limits] but today it is elevated". The patient also had intermittent tachycardia which was also ignored in chronic clinic visits.

*Patients are not followed in chronic clinics for all of their chronic illnesses. Patients with cancer are not followed at all in chronic care resulting in fragmented and episodic care.*

---

[213] Mortality review patient #1
[214] Mortality review patient #2
[215] Mortality review patient #3
[216] Mortality review patient #4
[217] Mortality review patient #9

One patient[218] had colon cancer with colostomy, a lung nodule, and diversion colitis which were never followed up on in chronic clinic. These conditions were not monitored at all. Another patient[219] had 11 chronic conditions but was followed in chronic clinic for only three (high blood lipids, hypothyroidism, and hypertension). A nurse saw the patient for low grade fever (100.2), tachycardia (122), hypoxia (O2 saturation 91%) with cough and wheezing which the patient stated he had for a week. The same day the patient was evaluated in chronic care but only for hypertension and high blood lipids. The patient eventually was diagnosed with an infection of his prosthetic heart valve. Another patient[220] who developed a lesion on his cheek which ultimately was diagnosed as cancer had significant delays in diagnosis and treatment. Though this patient had an identified lesion in June of 2019 and a diagnosis in August of 2019 he was never enrolled in chronic clinic until his death in February of 2020. His care was fragmented and delayed which contributed to his death. Another patient[221] had a diagnosis of gastric lymphoma. Because of the utilization process it took eight months from the time symptoms began until treatment was initiated. The patient was never enrolled in chronic clinic for his cancer and treatment was episodic and disjointed. The patient died of his cancer. Another 27 year old[222] described sickle cell disease when he entered NRC in May of 2019. He was never enrolled in chronic clinic and was never evaluated for his sickle cell disease. He did tell a psychiatrist that he wanted to be treated for his sickle disease but said he did not want to spend the $5 necessary to see a health provider.[223] He ultimately died of complications of his sickle disease. Another patient[224] had eosinophilic colitis requiring high dose steroid medication. His diagnosis was delayed three years by not referring to a specialist. Moreover, once diagnosed the condition was not monitored in chronic clinic visits. Though the high dose prednisone worsened his diabetic control, there was no mention of the prednisone dosing in diabetic clinic visits. His diabetic control was poor throughout treatment with steroids. Another patient[225] had elevated serum protein and macrocytic anemia for approximately a year. He was inadequately worked up for these but they were never diagnosed and he was not seen in chronic care clinics. He ultimately died while being worked up for multiple myeloma, a conditions that the elevated protein and macrocytic anemia suggested.

_Communication between providers, nurses and other staff related to chronic care management is not apparent._ One patient [226] had incontinence over a year in general population yet there was no evaluation of this during his chronic care visits and no instructions documented in chronic care visits to nurses with respect to how to care for his problem. Another patient[227] had exacerbations of COPD and was given nebulization on multiple occasions but no notification of this was given to the provider and these exacerbations were unnoticed.

---

[218] Mortality review patient #1
[219] Mortality review patient #6
[220] Mortality review patient #7
[221] Mortality review patient #8
[222] Mortality review patient #10
[223] The IDOC does not have a payment requirement for chronic care and the patient was misinformed. However, there was no attempt to correct this misunderstanding and the patient failed to be seen in chronic care ever for his sickle condition.
[224] Mortality review patient #12
[225] Mortality review patient #21
[226] Mortality review patient #4
[227] Mortality review patient #1

*Clinic appointments are not scheduled based on the degree of control.*  One patient[228] was hospitalized for asthma and had four exacerbations yet was not scheduled for an earlier chronic clinic.  Another patient[229]  had deteriorating diabetic control from 7.2 in March of 2018 to 10 on November, 2019 yet did not have his chronic clinic intervals decreased to obtain better management.  Another patient[230] had extremely out of control diabetes with A1c levels of 13.2 on 2/28/19; 14.9 on 4/19/19 and 12.1on 7/31/19 yet did not have a diabetes chronic clinic scheduled earlier to adjust medication.  During this time the patient was on steroid medication for another reason but the effect on his diabetes wasn't noted.

*Polypharmacy, including for elderly patients is not addressed.*  One patient[231]  had prescriptions for multiple steroid inhalers, multiple beta agonist inhalers, and montelukast for which both trade and generic names were used.  Neither providers nor the patient appeared to know which medications the patient was on at any particular time.  A 74 year old patient[232] was on 20 medications that he was responsible for taking himself yet had cataracts and repeated confusion and no one ever discussed his medications with him to ensure he could safely take his medications.

*Geriatric specific issues are not addressed in IDOC.*  One patient[233] a 74 year old patient previously mentioned above had cataracts, confusion, and fell twice.  After one fall he sustained multiple rib fractures that were initially misdiagnosed.   The patient never had a cognitive assessment or discussion about whether he could take his medication accurately.  He also had systolic hypertension which was poorly controlled.  The patient did not have access to a gerontologist and there was no attempt in chronic clinics to evaluate for these problems. This patient should have been assessed for some type of assisted living arrangement but was unsafely housed in general population.  Another 75 year old patient[234] developed encephalomalacia[235] and began acting bizarre after a series of hospitalizations.  He was housed on the infirmary but the physician failed to evaluate or appropriately manage his bizarre behavior which resulted in incontinence and urinating on himself and in his room on the floor.  His cognitive disorder was not addressed.  He needed specialized housing because his needs were not managed well on the infirmary.  He also would have benefited from a gerontology consultation.  An 80 year old man[236] with hypertension, peptic ulcer disease, and diabetes developed confusion during an episode of hypoxemia for which he was hospitalized.  He was diagnosed with a deep vein thrombosis at the hospital.  After return to the prison he was not evaluated for his confusion and had no assessment of his cognitive status.  He remained in general population.

*Providers do not review medications in an effective or meaningful manner.*

---

[228] Mortality review patient #2
[229] Mortality review patient #4
[230] Mortality review patient #12
[231] Mortality review patient #2
[232] Mortality review patient #4
[233] Mortality review patient #4
[234] Mortality review patient #6
[235] A softening of the brain resulting from infection or strokes that can result in altered mental status.
[236] Mortality review patient #11

One patient[237] was on Ultram (tramadol) for a year without discussion of pain at chronic clinic visits to determine if a narcotic was necessary. Long term prescription of narcotic medication without monitoring is not responsible practice. This patient also had COPD and the narcotic may have been responsible for respiratory depression affecting his COPD. The patient was >65 years old. Another patient[238] had asthma. He was placed on two steroid inhalers without anyone recognizing this. He also failed to receive one of his controller medications for eight months without anyone recognizing this. Another patient[239] was started on the wrong dose of diuretic on transfer from Cook County Jail. Providers also failed to start his anticoagulant being used for stroke prevention due to atrial fibrillation. A physician thought the patient was receiving these medications when the patient was not. Later, a doctor communicated the wrong medications to a cardiology consultant which resulted in misunderstanding the patient's medication profile. At a chronic clinic visit the doctor noted that the patient was receiving the anticoagulant when this was inaccurate. The doctor at the chronic clinic also stopped a medication used in heart failure due to a misreading of Cook County Jail transfer notes. The missing anticoagulant wasn't noted as being missed until the patient was hospitalized about four months after incarceration. This same patient was also started on rifampin for tuberculosis prophylaxis despite having significantly elevated bilirubin. This placed the patient at risk for a serious adverse reaction.

_Providers do not utilize usual standards of care in managing chronic illness._ One patient[240] had elevated cholesterol. He had a 38% 10-year risk of heart disease or stroke for which high intensity statin is recommended. He was only on a low-moderate intensity statin. This is a widespread systemic problem. Multiple patients with COPD did not have their COPD managed based on current standard.[241] A patient[242] with likely heart failure failed to receive a baseline echocardiogram. A patient[243] with colostomy did not have a colostomy reversal when the colostomy resulted in an adverse condition. Another 64 year old patient[244] had hypertension and high blood lipids. His 10 year risk for heart disease or stroke was 34% and current standard of care is aspirin and moderate to high intensity statin. He was never placed on aspirin and was on a low intensity statin which was stopped due to muscle pain which was never appropriately worked up. Another 66 year old patient[245] was seen in chronic clinic twice having a diagnosis of deep vein thrombosis for which warfarin was prescribed. He was seen in two chronic clinics and the deep vein thrombosis was not addressed. The patient had been on the warfarin for over two years when the current recommended treatment for his condition was only six months of the anticoagulant. A doctor noticed this in an episodic visit for another reason and stopped the warfarin. The patient was on an unnecessary medication with significant adverse risk for a year and a half.

---

[237] Mortality review patient #1
[238] Mortality review patient #2
[239] Mortality review patient #5
[240] Mortality review patient #4
[241] Several important deficiencies are: 1) no one receives a pulmonary function test, a basic test typically performed on all patients with COPD. 2) Patients with COPD who are severely short of breath and hypoxemic, are inconsistently tested to determine whether they need continuous oxygen therapy and if on continuous oxygen are not assessed regarding effectiveness. 3) Patients with COPD who are short of breath are not evaluated for heart failure even when they show signs of this condition.
[242] Mortality review patient #6
[243] Mortality review patient #1
[244] Mortality review patient #9
[245] Mortality review patient #19

The mortality reviews performed for this report show that chronic care must improve because the lack of an adequate chronic care program is resulting in preventable patient death.

**RECOMMENDATIONS:**
1. Finish the chronic illness policy. Ensure that it addresses the essential elements of a chronic disease program as listed above.
2. Use national standards as guidelines for care instead of writing guidelines for all common health conditions.
3. Make UpToDate® available on all electronic medical record devices in IDOC.
4. Support for chronic disease management needs to improve as soon as possible.
5. Change chronic illness clinic scheduling so that a person is evaluated for all of their chronic illnesses at each chronic illness scheduled visit. The interval of visits should be based on the least controlled disease and as early as clinically necessary.
6. The chronic clinic roster needs to list all diseases of each patient.
7. Standardize procedures for entries onto the problem list. Permission to enter problems on a medical problem list should be restricted to physicians, physician assistants, and nurse practitioners. Psychiatrists and licensed mental health professionals should have permission to enter mental health diagnoses. The problem list should include medical and mental health diagnoses.
8. For physicians without appropriate credentials based on Consent Decree requirements, monitoring should be done to ensure that they are capable of managing patients according to contemporary standards. When they are not, patients should be referred to those who can manage the patient or specialty consultation should be sought.
9. Discontinue prescribing sliding scale Regular Insulin with 70/30 insulin for insulin requiring diabetics.
10. A team approach to chronic care needs to be instituted. Daily and weekly huddles need to be instituted to improve communication amongst staff. Huddles should include nursing, schedulers, and a pharmacist.
11. The lack of physicians with appropriate credentials is resulting in significant harm to patients. The Monitor recommends an arrangement with a university-based program to include onsite and telemedicine physician support.

# Urgent and Emergent Care

*Addresses Items II.A; II.B.1; II.B.6.b; III.E.4; III.G.1; III.G.2; III.G.3; III.G.4*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**II.B.6.b.** *IDOC agrees to implement changes in the following areas: Urgent care;*

**III.E.4.** *The medical records staff shall track receipt of offsite medical providers' reports and ensure they are filed in the correct prisoner's medical records.*

**III.G.1.** *Each facility HCUA shall track all emergent/urgent services in a logbook, preferably*

*electronic.*
**III.G.2.** *Appropriate medical staff shall have the obligation to determine whether a situation is urgent or emergent.*
**III.G.3.** *IDOC shall use best efforts to obtain emergency reports from offsite services when a prisoner returns to the parent facility or create a record as to why these reports were not obtained.*
**III.G.4.** *Facility medical staff shall ensure that a prisoner is seen by a medical provider or clinician within 48 hours after returning from an offsite emergency service. If the medical provider is not a clinician, the medical provider shall promptly review the offsite documentation, if obtained, with a clinician and the clinician shall implement necessary treatment.*

**OVERALL COMPLIANCE RATING:** Partial compliance

**FINDINGS:**

The IDOC reports compliance with items III.G.1 and III.G.3.[246]

**III.G.1 Emergent/urgent services logbook.**

The Monitor agrees IDOC facilities maintain an electronic log however it provides incomplete and unreliable information about emergent/urgent services.

The log only records patients needing emergent/urgent services at an off-site emergency room. It does not record emergent/urgent episodes of care that are provided onsite. The emergent/urgent services log for the third quarter of 2020 was reviewed; two sites provided no log at all[247] and only 17 facilities fill out the log completely. Sometimes information recorded on the log is inaccurate. For example, three facilities record the discharge diagnosis as the same as the reason for referral.[248] This means that the discharge summary is not reviewed to provide accurate information about the diagnoses made by emergency personnel who treated the patient. Also the log is sometimes incomplete. For example, patients listed on the hospital log as being admitted from the hospital emergency department are not recorded on the emergent/urgent services log[249]. As recommended in the 2nd Monitor's report,[250] a column after discharge diagnosis should be added to the log to record the disposition. Documentation choices should include deceased, admitted to (name of hospital), transferred to (name of institution), released (date of release) etc. Lastly, facilities vary in how information is recorded. For example rather than recording the date a patient was seen in follow up one facility simply records "yes" or "no."[251]

The lack of documentation and incomplete entries indicate that the log is a task with low priority at some sites and may only be looked at monthly at others. We recommend changing to more a

[246] Illinois Department of Corrections, Defendants' Reporting Requirements Pursuant to V.G. of the Lippert Consent Decree, November 2020, page 2
[247] NRC and Lincoln
[248] Southwestern, Big Muddy, and Hill
[249] East Moline, Mortality review patients #9 and #3
[250] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 97.
[251] Kewanee

proactive use of the information on provision of emergency care. The information from the emergent/urgent services log can be used in the daily huddle to make decisions about the priority of services, need for communication, and follow through in the care of acute or at-risk patients in the population. We recommend the Director of Nursing be responsible for monitoring the completion of the emergent urgent services log. Others who should contribute to the information that goes into the log may be delegated members of the nursing staff (i.e. shift charge nurse) and medical records (receipt of discharge report).

The findings related to the emergent/urgent services log are unchanged from those contained in the Monitors 2nd Report.[252] For compliance with III.G.1 each facility must record information on the emergent/urgent services log. In addition, information recorded on the log must be standardized for all facilities. Staff responsible for maintaining the log need to demonstrate a clear understanding of what is to be recorded, how and by when. The accuracy of the information documented on the log needs to be verified by an audit of patient records on a quarterly basis with corrective action as necessary until sustained performance is demonstrated. Finally additional information needs to be added to the log to record the outcome of the service provided.

### III.G.3 Best effort to obtain emergency report or document reason report not obtained.
### III.E.4 Track receipt of offsite reports and ensure filing in the patient's medical record.

Virtually all facilities report on the emergent/urgent services log whether records with the results of the visit to the emergency room were obtained. The Monitor knows from interviews at facilities prior to the 1st report that if any paperwork at all is received, this criteria is considered as having been met.[253] Further there is no documentation on the log or otherwise provided that "*records why a report was not obtained*." There were several patients whose chart was reviewed that were without a report from an offsite emergency service or documentation of efforts to obtain the record.[254] The Monitor disagrees with IDOC's conclusion that compliance with III.G.3 is demonstrated.

The Monitor continues to recommend that IDOC establish criteria for what constitutes clinically useful emergency department summaries. Also recommended is to record the date the document was received rather than indicating yes or no on the log. These recommendations have been made since the Monitor's 1st report[255] but have not yet been acted upon by the IDOC.

### III.G.4 Physician follow up after emergent/urgent services.

Reports from the emergency room or urgent care visit inform the responsible provider about the diagnostic findings and recommendations for subsequent care. III.G.4 requires all persons returning from the emergency room be seen for follow up within 48 hours of return to the facility. The purpose of the follow up appointment is to review the findings, ensure continuity of care, and discuss the treatment plan with the patient. A review of records without seeing the

---

[252] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, pages 95-96.
[253] Lippert v Jeffreys Consent Decree, First Report of the Monitor (November 24, 2019) page 32.
[254] Mortality review patients #s 11, 12, 7, 21, 3, and 2
[255] Lippert v Jeffreys Consent Decree, First Report of the Monitor (November 24, 2019) page 32

patient is not sufficient. The date the patient was seen by a physician following emergent/urgent services has been added to the log but only 17 of 30 facilities record this information on the log.

Review of the emergent/urgent services log finds that the IDOC has not yet acted upon the requirement that patients be seen by a physician within 48 hours of return. The table following this paragraph depicts the extent and timeliness of physician follow up appointments after receiving emergent/urgent services.[256] Urgent care logs reviewed at several facilities demonstrate that the number of persons not seen by a physician at all after receiving emergent/urgent services is quite high.[257] However there were seven facilities which recorded a patient visit for every person who received emergent/urgent services.[258] Of these, only two sites recorded these visits within 48 hours of return.[259] At six facilities less than half of these encounters take place within 48 hours.[260]

| Timeliness of Follow up by Physician After Return From ED | | | | | | |
|---|---|---|---|---|---|---|
| Facility | # Not seen by a physician after return from ED | Percent not seen by MD | # Seen within 48 hrs by MD of those returned from ED | Percent seen wi 48 hrs | Range of days till follow up | Average days till follow up |
| STATEVILLE | 24 | 56% | 7 | 16% | 0-12 | 4.0 |
| LAWRENCE | 2 | 25% | 3 | 38% | 0-35 | 7.5 |
| ROBINSON | 3 | 25% | 12 | 100% | 0-2 | 1.0 |
| EAST MOLINE | 5 | 19% | 11 | 41% | 1-11 | 3.0 |
| TAYLORVILLE | 6 | 13% | 30 | 63% | 0-5 | 2.0 |
| SHERIDAN | 1 | 11% | 4 | 44% | 0-17 | 4.0 |
| BIG MUDDY | 1 | 8% | 11 | 92% | 0.2 | 2 |
| LOGAN | 1 | 7% | 9 | 60% | 0-3 | 1.5 |
| DIXON | 7 | 5% | 55 | 43% | 0-26 | 5.0 |
| MENARD | 1 | 3% | 30 | 97% | 0-3 | 0.0 |
| ILLINOIS RIVER | 0 | 0% | 4 | 44% | 0-6 | 1.7 |
| SOUTHWESTERN | 0 | 0% | 5 | 63% | 0-3 | 1.6 |
| VIENNA | 0 | 0% | 7 | 64% | 1-6 | 2.0 |
| VANDALIA | 0 | 0% | 6 | 67% | 0-5 | 2.0 |
| DECATUR | 0 | 0% | 8 | 80% | 0-3 | 1.0 |
| ELGIN | 0 | 0% | 6 | 100% | 0-1 | 1.0 |
| MURPHYSBORO | 0 | 0% | 1 | 100% | 0-2 | 1.0 |

All sites need to be instructed to record the date the patient was seen by a physician for follow up on the emergent urgent services log. The emergent/urgent services log could be used as partial evidence of compliance with II. G. 3 if the date the hospital emergency department report is received and the type of document (i.e. discharge summary) is recorded on the log. If the

[256] IDOC Third Quarter 2020 Emergent/Urgent Care logs
[257] Stateville (56%), Robinson (25%), Lawrence (25%), and East Moline (19%)
[258] Illinois River, Southwestern, Vienna, Decatur, Elgin, and Murphysboro
[259] Elgin and Murphysboro.
[260] Stateville, Lawrence, East Moline, Dixon, Illinois River, and Sheridan

emergency department record does not return with the patient efforts to obtain the report should also be recorded on the log. The accuracy of the information on the log would have to be verified by periodic chart audit such as the emergent services audit tool used now.[261]

There is no retrospective review of clinical care received prior to an urgent or emergent event to determine if any of these events could have been avoided. Neither is care provided afterwards reviewed to ensure that a provider acted upon the emergency department's recommendations timely. We found numerous examples among the charts reviewed for this report of poor patient care either preceding a medical emergency or failure to act upon information received from after an episode of emergent/urgent service delivery.[262] A review of the emergent urgent services log reveals incidents of care that should be reviewed clinically. These include multiple emergency department admissions for the same patient for the same problem or symptom cascade as well as referrals for conditions that are considered best managed in a primary care setting. At a minimum these reviews should be documented in the CQI minutes, findings tracked, and trended and improvement plans developed based upon the results.

**II.B.6.b. Changes to Urgent Care and III.G.2. Appropriate medical staff shall have the obligation to determine whether a situation is urgent or emergent.**

OHS has drafted a policy and procedure for emergency services and response as well as urgent care services. The Monitor provided comments and recommendations for further revision to OHS in August, including those made above. The Monitor has not received any further drafts or been provided a final version of these policies. Until then written direction regarding emergency response in Administrative Directive 04.03.108 Response to Medical Emergencies gives a great deal of discretion to individual facilities to determine the training received, the number, location and contents of emergency equipment and supplies, procedures for response etc. This has led to a checkered pattern of readiness and performance.[263]

Review of the minutes of CQI meetings held in the first three quarters of 2020 documents this variance. The critiques of drills or actual response to emergencies that were reported in the CQI minutes were brief, not very thorough, and seldom identified areas of needed improvement. The criteria for evaluation appear limited to timeliness of response and whether the equipment was brought to the site. These evaluations do not consider whether the equipment was operable, clinical judgement, skill or teamwork of the actual response, or documentation.

Chart review by the monitor found significant problems in the delivery of emergent/urgent care including failure by correctional officers to initiate CPR while awaiting medical staff to arrive, inoperable equipment, incomplete clinical evaluation, poor clinical judgement, incomplete information provided to the ED on transfer and limited or no documentation of the emergency response[264]. There were repeated examples in charts reviewed of episodes of care where medical staff failed to recognize a patient in extremis and did not seek offsite emergent care timely.[265]

---

[261] The Emergency Services Audit Tool needs to be revised to reflect III.G 1-4
[262] Examples include mortality review patients #s 21, 2, 18, 1, and 14 etc.
[263] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6,2020 pages 94-95
[264] Mortality review patients #s 24, 2, 22, 9, 18, and 21
[265] Mortality review patients #s 20, 19, 11, 13, 14, and 17,

The Monitor renews recommendations for emergent/urgent care made in the first two reports.

**RECOMMENDATIONS:**

1. Finalize and implement the policy and procedure on emergency services. Implementation will require additional support and coordination by OHS so that facilities standardize equipment, supplies and so forth. Implementation should proceed and be monitored according to a statewide plan outlining the steps to be taken, persons responsible and timeframes for completion.

2. Emergency response that does not result in transfer to the emergency room also needs to be tracked on a log. The criteria to be tracked differ from that kept on the emergent/urgent services log. Suggested data to track on an emergency response log should include date, time and location of the emergency, the time and name of the first health care responder, the nature of the emergency, the patient's acuity, disposition, and date the response was reviewed by a supervisor.

3. Information recorded on the emergent/urgent services log needs standardization to include definition of what is considered an acceptable report from the emergency room and the expectation that a date is entered on the log when the report is received and when the patient is seen by the physician. Consideration should be given to adding a column that identifies what documentation was received (i.e. patient discharge summary, clinical discharge summary, future appointment, or a prescription). This would be in addition to the date it was received.

4. The Monitor recommends that a column after discharge diagnosis be added to the Emergent/urgent services log to document the disposition. Documentation choices should include deceased, admitted to (name of hospital), transferred to (name of institution), released (date of release) etc.

5. The accuracy of the information documented on the log needs to be verified by an audit of patient records on a quarterly basis with corrective action as necessary until sustained performance is demonstrated.

6. The logs should be used to review emergency response and any trips to the emergency room the next day at least in a daily huddle to make decisions about the priority of services, need for communication, and follow through in the care of these patients. If a daily huddle is not initiated, a different method of review of daily emergency response events and emergency hospital trips are reviewed.

7. The Director of Nursing should be responsible for monitoring the completion of the emergency response and emergent urgent services log. The information on these logs should be reviewed and updated daily, in real time, not retrospectively.

8. Each compartment of the emergency bag should be sealed with a numbered tag to indicate that all required items are present and in working condition. The integrity of the seal should be checked daily and documented on the log along with the presence of other equipment, verification of pads and operational battery in the AEDs and sufficient supply of oxygen.

9. Every facility needs to have at least one AED reserved as a backup for dysfunction of other AEDs. A supply of batteries and pads should be kept on hand so that replacement takes place soon.

10. The Monitor stated in the first report that all IDOC emergency response bags must be

stocked with naloxone (Narcan) and Glucagon.  We further recommend nasal, rather than injectable naloxone, because it is easier and safer to use in an emergency.

11. Emergency response and the use of emergency room services need to be reviewed clinically. These reviews are for the purpose of identifying opportunities to improve primary care which is known to reduce emergency room use as well as ensure appropriate oversight and follow up care for patients after discharge. At a minimum these reviews should be documented in the CQI minutes, findings tracked, and trended and improvement plans developed based upon the results. The Emergency Services Audit Tool needs to be revised to reflect III.G 1-4

12. Schedule a follow up appointment to take place within 48 hours of a patient's return from offsite emergency services.  Follow up is an encounter with the patient to review the findings and discuss the treatment plan. A review of records without seeing the patient is not sufficient.

# Infirmary Care

***Addresses Items II.A.; II.B.1; II.B.6.k; III.I.1-5***

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs.  Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.**  *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**II.B.6.k.**  *IDOC agrees to implement changes in the following areas: Appropriate staffing, physical conditions, and scope of services for infirmary care;*

**III.I.1.** *A registered nurse will be readily available whenever an infirmary is occupied in the IDOC system.*

**III.I.2.** *At every facility regularly housing maximum security prisoners, there shall be at least one registered nurse assigned to the infirmary at all times, twenty-four (24) hours a day, seven (7) days a week.*

**III.I.3.** *All facilities shall employ at least one registered nurse on each shift.  If a prisoner needs health care that exceeds the IDOC infirmary capabilities, then the prisoner shall be referred to an offsite service provider or a hospital.*

**III.I.4.** *All infirmaries shall have necessary access to security staff at all times.*

**III.I.5.** *All infirmaries and HCUs shall have sufficient and properly sanitized bedding and linens.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**
The Defendants contend compliance with III.I.1. and III.I.3 which address registered nurse staffing and imminent compliance with III.I.2 which requires a nurse assigned to the infirmary at all times at facilities housing maximum security prisoners. Defendants provide no evidence to

support their assertion of compliance.[266]

The Monitor made ten recommendations in the 2nd Report to address compliance with items in the Consent Decree listed above. No information has been provided other than what is included in the June 2020 Implementation Plan[267] regarding actions taken or progress made by IDOC to enact any of the recommendations made in the 2nd report.

**Policy and procedure**

A revised policy and procedure has been drafted by OHS and provided to the Monitor for review.  The Monitor has provided feedback and recommended changes to OHS on the draft policy and procedure in August. Until it is finalized, written guidance for infirmary care still resides in the Administrative Directive (AD) last updated in 2002.[268] Both the first and second court expert reports criticized the AD for not describing the scope of services provided in the infirmary setting and not giving guidance for clinicians about patient conditions which should be referred a hospital instead of infirmary care.[269]  The Monitor agrees these are weaknesses of the current written directive.

**Access to Services**

The primary medical services report and CQI committee meeting minutes were reviewed for this report. The primary medical services report provides information on the number of patients admitted to and discharged from the infirmary for either acute or chronic care each month. The report does not identify admissions for administrative or security reasons. The report does not include information on length of stay so it is not possible to determine the number of persons housed permanently in the infirmary. Infirmary services were a regular topic reviewed at the CQI meetings at only eight of 26 sites with infirmaries. The information reported in CQI minutes varies from facility to facility and uses different admission categories than the Primary Medical Services Report.

Inappropriate use of infirmary beds for purposes other than infirmary level care was discussed previously in the 2nd report.  These are persons who do not need infirmary care, but who have conditions that make it unsafe to house them elsewhere in the facility. This practice continues as evidenced by utilization data discussed at the CQI meetings.  For example, the 15 bed infirmary at Logan CC has six persons housed for administrative reasons thereby reducing infirmary capacity 40%[270]. At Menard eight persons were housed in the 24 bed infirmary for security purposes, reducing capacity by a third[271]. The September 2020 CQI minutes submitted by Stateville reflect a discussion initiated by the Medical Director about moving administrative holds out of the infirmary to create more capacity. Half of the infirmary beds at Dixon, East

---

[266] Illinois Department of Corrections, Defendants' Reporting Requirement Pursuant to V.G. of the Lippert Consent Decree (undated) (not paginated).
[267] Needs assessment of the elderly and disabled as found in the Illinois Department of Corrections, Implementation Plan, Lippert Consent Decree, Revised 6/12/20 pages 5-6.
[268] Administrative Directive 04.03.120 Offender Infirmary Services (9/1/2002)
[269] Statewide Summary Report Including Review of Statewide Leadership and Overview of Major Services, Report of the 2nd Court Appointed Expert (October 2018) pages 68-69
[270] Logan CC CQI minutes September 2020.
[271] Menard CC CQI minutes September 2020.

Moline, and Jacksonville and a quarter of the infirmary beds at Menard[272] are filled with permanent admissions. Long stay admissions reduce the capacity of infirmaries to provide acute care and preparation for diagnostic and surgical procedures.

We recommend an investigation into the reasons for administrative and security housing. Use of infirmary beds should be reserved only for medically necessary care.  Alternative solutions to security reasons for use of infirmary beds must be sought. Reasons for administrative holds need to be understood before a plan to address their use can be developed.

At the present time there is no mechanism to evaluate access to the infirmary care. Infirmary capacity needs to be monitored and managed proactively at the statewide level by OHS. All admissions to infirmary beds should be reviewed retrospectively for appropriateness and timeliness. All persons expected to need infirmary placement longer than two weeks should be reviewed prospectively, the long term plan of care reviewed, and most appropriate placement (including consideration of parole, commutation, or compassionate release) determined.

Statistical data and reports from the IDOC website indicate nearly 22% of the prison population are 50 years of age or older as of June 2020. Of these, over 1,000 persons are 65 years of age or older.[273]  The 2nd Court Appointed Expert recommended in 2018, an assessment of the geriatric and disabled population to determine housing and programming needs for this population.[274] The revised implementation plan provided in June 2020 states that IDOC has begun to discuss with Illinois Department of Aging (IDOA) an assessment of the needs of elderly and infirm persons housed in IDOC facilities. The assessment is to guide development of action steps to provide appropriate resources, programming, and housing for those with disabilities or those needing  assistance with activities of daily living.[275] We recommend the needs assessment include consideration of access to specialists in geriatric, disability and rehabilitative services, placement in alternative facilities and other mechanisms to ensure public safety, such as remote monitoring devices.  Staffing the infirmary and the ADA or sheltered living units should be revised based upon the results of the needs assessment. The Monitor has not been included in any further discussion and no other information has been provided by IDOC about such a survey.

The IDOC is planning a new higher-level care facility in Joliet, Illinois.  While the IDOC has stated that this facility is not a hospital, they have stated that this facility will be an in-patient treatment center for mostly mental health but some medical patients.  This facility will include 156 mental health and 52 medical beds.  Medical beds are intended for persons with a medical condition that would require placement prior to, or after completing therapy or who require medical services not requiring admission to a full-service hospital facility. This new medical resource is not discussed in the implementation plan or in the revised staffing analysis. There is no policy, procedure or other written document that clearly defines the role that distinguishes utilization of these beds from those of the other institution infirmaries in providing inpatient care.

---

[272] September 2020 CQI minutes submitted by Dixon CC, East Moline CC, Jacksonville CC, and Menard CC.
[273] Illinois Department of Corrections, Inmates 50 Years of Age and Older on June 30, 2020 obtained at FY20 50+ Fact Sheet.pdf (illinois.gov).
[274] Statewide Summary Report Including Review of Statewide Leadership and Overview of Major Services, Report of the 2nd Court Appointed Expert (October 2018) pages 11 & 70
[275] Illinois Department of Corrections, Implementation Plan, Lippert Consent Decree, Revised 6/12/20 page 5-6.

We suggest this utilization of the new beds at Joliet be defined in the yet to be finalized policy and procedure on infirmary care.[276]

In preparation for a conference call with the Joliet project manager, on 1/13/21the Monitor sent a list of questions about the planned scope of services for the medical surgery beds at the renovated Joliet Treatment Center (JTC) including types of beds (med-surgery, infirmary, rehabilitation, skilled nursing), ambulatory services including outpatient procedures, specialty consultation visits, and primary care services, short term versus long term care, staffing and service relationship with academic or private medical centers, and proposed funding. On 1/21/21, IDOC advised the Monitor that IDOC is reassessing the scope of services and the structure of the facility could potentially change, particularly concerning the provision of medical services. It was communicated that plans for the renovated JTC will be reviewed in the next few weeks.

**Scope of Services**
The Monitor reviewed 29 records of persons in custody of IDOC who died in 2020. Of these several received infirmary care in the 12 months before death. In this review we found patients who should have been hospitalized rather than admitted to the infirmary. We also found patients whose needs for care exceeded the capabilities of the facility, particularly skilled nursing, geriatric, hospice and palliative care.

There were several areas of improvement that were consistently identified regarding the timeliness, appropriateness, and quality of care in the records of infirmary care reviewed. These are summarized here. More detail about the care of individual patients from whose care these problem areas were identified are in the mortality record reviews attached as an appendix to this report.[277]

_Lack of meaningful and expected communication_ with patients, from nurses to providers, between nurses, and from providers to nurses. Examples include nurses did not inform providers when patients had new symptoms or abnormal vital signs, nurses did not communicate with each other about schedules for dressing changes or position changes, providers did not delineate orders for patient care that were inclusive of diet, future procedures, assistance with ADLs etc.

_Patient plans of care do not detail the expected course of care or anticipate unintended effects of treatment or define signs of a worsening condition._ Examples include a patient with stomach cancer who was losing weight had no orders to be weighed, track what was being eaten, or obtain nutritional consultation. There were no orders to address side effects of chemotherapy once this was initiated and there were no instructions for action if the patient's condition worsened. Another patient was prescribed an opiate for pain control, but the provider did not anticipate the common side effect of constipation until the patient complained three days later.

---

[276] Limited information about this facility has been provided to the Monitor. The Monitor was given a 3 page question and answer information sheet about this facility titled "Joliet Facility QA August 2020". IDOC has stated that it has not yet finalized plans for this facility and has not yet determined the purpose of this facility.
[277] In the appendix see mortality review patients #8, #1, #14, #7, #25, #6, and #18

*Plans for care and monitoring are not modified in relation to change in patient condition.*
Examples include nearly all provider encounters took place as weekly rounds regardless of the patient's condition, patients discharged from the hospital were placed in the infirmary without going through the readmission assessment and development of the plan of care, when patients returned from off-site specialty consults or hospitalization they were not seen promptly by a provider.

*Medications and treatment orders are not reconciled when the patient transitioned from one provider to another.* Examples include medication orders were missed when patients returned to the infirmary after hospitalization, the hospital had to contact the infirmary to obtain information about medications when a patent was hospitalized, and dressing changes were not done per the schedule recommended by the wound care clinic. Several patients had discharge recommendations for special diets (soft mechanical, low salt, cardiac) that were not implemented upon placement in the infirmary; these patients were placed on regular diets or diet as tolerated.

*Providers fail to take a history or examine patients upon return from hospitalization, off-site procedures or when informed of new or worsening symptoms.* Examples include starting a patient on Cymbalta (duloxetine) for degenerative disc disease without an examination based upon an x-ray only; initiating orders for Lisinopril, an antihypertensive agent, based upon blood pressure readings only, with no history or exam; not examining a patient in pain; not addressing the reason a patient is vomiting.

*Providers fail to take appropriate action* in response to signs and symptoms. Examples include a patient who returned from the hospital had an oxygen saturation of 88% and fever of 104.5° should have been re-hospitalized, not ordering labs to follow up on a problem previously identified such as hypercalcemia, anemia, or renal injury; and not hospitalizing an elderly patient with heart failure and history of heart disease presenting with likely symptoms of pneumonia.

*Nurses fail to advocate for patients' wellbeing.* Examples include not informing the provider when a patient refuses chemotherapy and attempting to eliminate problems contributing to the patient's refusal, not getting an oxygen dependent patient portable oxygen to ambulate in the hallway, not addressing an acute complaint of abdominal pain, telling a patient with significant cardiovascular disease and shortness of breath that he will have to talk to mental health when he complained twice about difficulty sleeping.

*Nurses fail to assess patients to identify change in condition.* Examples include not assessing a patient for difficulty breathing when they request a nebulizer treatment an hour before it is scheduled, giving pain medication without inquiring about nature, duration or location of pain, not measuring expiratory capacity of the lungs before and after nebulization, not staying with a patient after having a seizure while awaiting emergency transport to the hospital.

*Nurses fail to act upon abnormal signs and symptoms.* Examples include not contacting a provider when a patient has a fever of 104°F, an oxygen saturation of 88% and respirations of 28; not reporting symptoms of difficulty breathing and abnormal vital signs to a provider over four days and not until the roommate signaled the patient was in distress, not contacting a provider after a patient fall and not taking steps to reduce risk of falling again.

_Delays and omissions in care._ Examples include a patient with disseminated cancer of the head and neck needed pain medication but it took four days from the order for the first dose to be administered, that same patient only had one of 11 discharge medications ordered upon admission to the infirmary, not completing wound care and other nursing tasks as ordered.

_Providers do not manage all of the patient's chronic illnesses_. In none of the death records reviewed did providers address all of the patient's medical conditions when the provider performed periodic assessments of the patient on the infirmary. This resulted in episodic care and neglect of many conditions while patients were on the infirmary.

**Registered Nurse Staffing**

The Monitor requested but did not receive documentation from IDOC to evaluate registered nurse staffing of the infirmary at each facility from September 1-30, 2020. IDOC did provide a list of allocated positions with vacancies dated 12/15/20. Review of this information indicates at least five facilities which would have difficulty meeting III. I. 1 and III.I.3 of the Consent Decree that at least one registered nurse be employed on each shift and be readily available whenever the infirmary is occupied. The minimum number of FTE to cover 1 post seven days a week on all shifts is 5.29.[278] Big Muddy, Danville, Hill, Pinckneyville and Shawnee each have five or fewer registered nurse positions filled. Hill had only five registered nurse positions filled at the time of the 12/15/20 update; so as a facility that houses maximum security prisoners would not meet III.I. 2 of the Consent Decree which requires a registered nurse be assigned to the infirmary at all times. Certainly, overtime is used to staff these requirements, however excessive use of overtime contributes to fatigue and errors in patient care. It also contributes to job dissatisfaction which in turn leads to resignations. At Danville, Hill and Shawnee fifty percent of the registered nurse positions were vacant. At Pinckneyville two-thirds of the registered nurse positions are vacant. IDOC has also not provided detailed information about the use of temporary contracted registered nurses to fill gaps in RN coverage of infirmaries.

In the second report we identified three facilities which did not have enough registered nurse positions allocated to meet the staffing requirements of the Consent Decree. These were Kewanee, Lawrence, and Lincoln.[279] IDOC has identified the need to add positions at Lincoln and Lawrence but has yet to do so.[280] These positions should be added and filled now.

**Physician Staffing**

There are insufficient physician staff to ensure that patients on infirmary units are properly managed. Of the 17 facilities with 12 or more infirmary beds, thirteen sites had only a single allocated physician position and two of these did not have any allocated physician assistant or nurse practitioner positions. The providers' infirmary notes were frequently identified as being inadequate. This could be explained by a lack of provider skill or diligence but a contributing factor is the workload placed on a facility's sole physician including physician sick call, chronic care clinics, onsite urgent care, visits with individuals returning from offsite specialty, emergency room, and hospital care, audits of nurse sick call, participation in quality

---

[278] Using a post relief factor of 1.76
[279] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 103.
[280] Staffing Update – 12/15/2020

improvement committee meetings, completion of death summaries, and after hours call.

On reviews of death records, one patient[281] was housed at a facility without physician coverage. In part this resulted in lack of attention to coordination of specialty consultations which resulted in significant delays in treating his head and neck cancer that contributed to his death. For multiple infirmary admissions, there were no physician admission notes. For one admission, the physician admission note was blank except for a hand-written statement saying "provider no longer on site and cannot complete note". In another infirmary admission, there was no physician directed orders and care was not physician directed. Another patient[282] had a significantly delayed diagnosis of cancer such that it was widely metastatic at the time of diagnosis. The patient was evaluated by multiple coverage physicians. While on the infirmary as a hospice patient, there was no physician to direct care during his hospice stay on the infirmary including for pain management. Another patient[283] died of COVID-19. He had been housed on the infirmary after release from a hospital after diagnosis of his COVID-19 infection. While on the infirmary the patient deteriorated. After a physician infirmary admission note, there was no follow up of the patient for six days despite the patient being in critical condition. The patient returned to the hospital in shock and died in the hospital. It appeared that there was no physician available to see the patient.

**Ancillary and support personnel**

Sixteen facilities employ nursing assistants in December 2020 compared to only ten facilities a year ago. The staffing analysis recommends adding 43 additional nursing assistants statewide.[284] The assignments of each of these specific positions is unknown. This type of employee is appropriate to provide care needed by patients in the infirmary.

Physical therapy services continue to be offered at only eight IDOC facilities.[285] The Revised Staffing Analyses provided by IDOC dated 6/18/20 and 11/23/19 and the 12/15/20 staffing update recommended creating physical therapist (PT) and physical therapy assistant (PTA) positions at NRC and Graham CC but the positions at NRC and Graham have not yet been allocated. The 12/15/20 staffing update as well as the November 2019 and June 2020 Staffing Analyses recommended increased PT and/or PTA coverage at seven of the eight sites with existing physical therapy services but none of these recommended changes have not yet been allocated.

However, 18 correctional facilities with infirmaries offer no access to physical therapy on-site. These 18 facilities house over 17,000 people of whom approximately 3,500 are 50 or more years of age.[286] The Implementation Plan submitted in June 2020 committed to evaluating the need for physical therapy services at each institution with an infirmary[287] but there is no indication from IDOC that this has taken place.

---

[281] Mortality review patient #7
[282] Mortality review patient #18
[283] Mortality review patient #14
[284] Lippert IDOC Nursing Vacancy Rates November 2019
[285] Physical Therapy services are currently provided at Big Muddy, Dixon, Hill, Lawrence, Logan, Menard, Pinckneyville, and Stateville.
[286] October 2020 census data provided to the Monitor by IDOC.
[287] Illinois Department of Corrections, Implementation Plan, Lippert Consent Decree, Revised 6/12/20 page 6

**Performance monitoring and quality improvement**

CQI studies concerning infirmary services were reported by several of the facilities. All of the studies looked at whether one or more requirements of the Administrative Directive or local procedure were followed. If problems were identified, it was either incomplete documentation or missing required timeframes. There were no studies concerning quality, appropriateness, or outcomes of care. Corrective action planning was minimal.

We recommend revising the information contained in the primary medical services report to include average daily population and average length of stay for acute and chronic admissions, the number of patients in the infirmary for more than two weeks, and the number housed in the infirmary for reasons other than delivery of health care. Another recommendation is to conduct retrospective review of all admissions and prospective review of any admissions likely to exceed two weeks. All performance monitoring tools will need to be revised to coincide with the new policy and procedure.

**References**

In many of the mortality reviews, providers caring for patients on the infirmary and off the infirmary did not always know how to manage patients, failed to understand drug-drug interactions, etc. For this reason the Monitor continues to recommend that all providers have access to UpToDate® an online medical reference which was reported in the past to have been made available by the vendor at all IDOC sites .

At prior site visits nurses also did not have any recent reference material available. Typically nurses benefit from having access to references on drugs, labs, nursing procedures, anatomy and physiology, etc. particularly when a nurse is performing a procedure that is new or seldom used and for patient teaching.

**RECOMMENDATIONS:**

1. Investigate the reasons for administration and security housing in the infirmary. Alternative solutions to security reasons for use of infirmary beds must be sought. Reasons for administrative holds need to be understood. The infirmary should not be used for ADA housing unless the patient otherwise would have a medical need to be housed on the infirmary. Use of infirmary beds should be reserved only for medically necessary care.
2. Complete the assessment of the elderly, mentally and physically disabled persons housed in IDOC facilities as stated in the implementation plan. Each person meeting these criteria should be assessed using a standardized tool appropriate for this population and the data analyzed by persons with expertise with this area of service. Use the results to determine appropriate alternatives to incarceration as well as develop and implement appropriate housing, programming, staffing and safety standards for those who should remain incarcerated.
3. Evaluate the need for physical therapy services at each institution with an infirmary as described in the implementation plan.
4. Evaluate the work load of the physicians at each facility to ensure that the physician coverage is adequate to meet the needs of the infirmaries which house the sickest

individuals at the correctional centers.

5. Clarify the scope of medical services that will be provided at the renovated Joliet Treatment Center.
6. Define the criteria for referral to the 52 medical beds and the scope of service to be provided at the new Joliet Treatment Facility. This should be in policy and procedure and in the Implementation Plan. Clearly define the role and distinguish utilization of these beds from those of the other institutional infirmaries in providing inpatient care.
7. Complete the policy and procedure for infirmary services to include defining the scope of services provided and expectations for referral when a patient's need exceeds the capability of infirmary care.
8. Infirmary capacity needs to be monitored and managed proactively at the statewide level by OHS. All admission to infirmary beds should be reviewed retrospectively for appropriateness and timeliness. All persons expected to need infirmary placement longer than two weeks should be reviewed prospectively, the long term plan of care reviewed, and most appropriate placement determined (including consideration of parole or commutation or transfer to a more appropriate facility).
9. Reduce mandatory registered nurse overtime to cover infirmary shifts by filling vacant positions or establishing additional positions.
10. Staffing the infirmary and the ADA or sheltered living units should be revised based upon the results of the needs assessment discussed in the previous section on access to infirmary, skilled and intermediate care and sheltered housing. Consider use of the staffing standards for direct care[288] set forth in Illinois Administrative Code for skilled and intermediate care facilities.
11. Revise the information contained in the primary medical services report to coincide with the definitions in the new policy and procedure and include average daily population and average length of stay for acute and chronic admissions, the number of patients in the infirmary for more than two weeks, and the number housed in the infirmary for reasons other than delivery of health care.
12. Revise tools used to monitor performance for delivery of infirmary care to coincide with the new policy and procedure. Set expectations for the frequency of monitoring, reporting results, and corrective action.
13. Provide Up-To-Date® for staff assigned to the infirmary.
14. Make physical plant repairs and renovation to sidewalks, stairs, and access roads so that persons with disabilities are able to move about the institution safely as the Monitor previously observed at Logan CC. The infirmary at Lincoln CC is of insufficient size to safely use for care and needs to be replaced.
15. Evaluate physician staffing to ensure infirmary services are adequately provided.

# Specialty Consultation
*Addresses Items II.A; II.B.1; II.B.6.e; II.B.6.g; III.E.4; III.H.1-4*
**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class*

---

[288] Administrative Code, Title 77: Public Health, Chapter 1: Department of Public Health, Subchapter c: Long Term Care Facilities, Part 300 Skilled and Intermediate Care Facilities Code, Section 33.1230 Direct Care Staffing available at http://ilga.gov/commission/jcar/admincode/077/077003000F12300R.html

*Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**II.B.6.e.** *IDOC agrees to implement changes in the following areas: Informed care for patients who return to IDOC facilities after being sent to an offsite service provider;*

**II.B.6. g.** *IDOC agrees to implement changes in the following areas: Timely access to diagnostic services and to appropriate specialty care;*

**III.E.4.** *The medical records staff shall track receipt of offsite medical providers' reports and ensure they are filed in the correct prisoner's medical records.*

**III.H.1.** *Medical staff shall make entries in a log, preferably electronic, to track the process for a prisoner to be scheduled to attend an offsite service, including when the appointment was made, the date the appointment is scheduled, when the prisoner was furloughed, and when the prisoner returned to the facility. This log shall be maintained by the HCUA.*

**III.H.2.** *Within three days of receiving the documentation from scheduled offsite services, the documentation will be reviewed by a medical provider. Routine follow-up appointments shall be conducted by facility medical staff no later than five (5) business days after a prisoner's return from an offsite service, and sooner if clinically indicated.*

**III.H.3.** *If a prisoner returns from an offsite visit without any medical documentation created by the offsite personnel, IDOC shall use best efforts to obtain the documentation as soon as possible. If it is not possible to obtain such documentation, staff shall record why it could not be obtained.*

**III.H.4.** *Provided that IDOC receives documentation from offsite clinicians, all medical appointments between a prisoner and an offsite clinician shall be documented in the prisoner's medical record, including any findings and proposed treatments.*

**OVERALL COMPLIANCE RATING:** Noncompliance.

**FINDINGS:**

The recommendations from the last report have not been completely addressed.

The IDOC May and November Bi-Annual Reports assert compliance on Item III.E.4 that requires that IDOC tracks receipt of offsite consultant reports and ensure that these are in the medical record. This assertion of compliance was made without any evidence to support the assertion. Tracking receipt of consultant reports is not specifically tracked. Only two facilities[289] track that the patient returned from an offsite visit with documentation. However, the documentation received is likely not a report which is a typed report and does not typically return the same day as the consultation. A report needs to be defined as a written report by the consultant. Tracking of receipt of this typed report from the consultant needs to be tracked by the date it is received. Typically medical records or the scheduling clerk perform this duty. The IDOC specialty tracking log has a column that tracks "site MD review date" without definition of what this means. It is unclear when an actual report is received. In reviewing records, the Monitor repeatedly found that on multiple occasions, the vendor referral form, which may or

---

[289] Western CC and Vienna CC

may not be in the medical record, has a few comments by the consultant. This does not constitute a report. It appears, based on record review that receipt of the referral form with consultant comments on it is counted as having received a consultant's report. The specialty care tracking logs do not include whether the consultant report was received and that they are filed in the medical record.

IDOC in its May and November 2020 Bi-Annual Reports asserts compliance with item III.H.1 without providing any evidence to support that assertion. However, the Monitor has determined that the specialty tracking logs are not accurately maintained. Facility specialty logs mostly do not track referrals which are denied or that have alternative treatment plans.[290] This needs to be done. In mortality reviews the Monitor has identified errors in the tracking logs with respect to specialty care.[291]

Item II.H.2 of the Consent Decree requires that IDOC medical providers are to review the documentation of offsite services in three days and within five days a routine follow up with the patient to review the consultation findings. The IDOC asserts compliance with this provision without providing any evidence to confirm their assertion. This item requires tracking of two dates: the date of review of the consultation documentation and the date of the follow up appointment. The tracking logs are not standardized and facilities track this in a variety of ways. Six facilities[292] did not track the date the provider reviewed the consultant documentation. One facility was tracking receipt of the report but not review by the provider. Nine facilities[293] were not tracking the appointment date of the provider with the patient. Twelve other facilities were only documenting "yes" that a provider reviewed documentation with the patient but did not include a date. The Monitor did not check to see if the timelines were within the expected timeframe. It is important to standardize the process and ensure that all sites are capturing the expected data in the way OHS wants data to be captured and that the data is consistent with the requirements of the Consent Decree. This provision needs to track the date that a provider reviews the consultation *report* and the date that the provider reviews the report with the patient to update the plan and communicate the plan to the patient.

IDOC has also asserted compliance for item III.H.3. This item was addressed in the Urgent and Emergent section of this report.

IDOC asserted compliance with item III.H.4 which requires that when IDOC received a consultant report that providers documented a discussion with the patient regarding the specialty consultation findings or recommendations with a discussion about the change in therapeutic plan. As discussed in item III.H.2 above, IDOC is not accurately tracking receipt of reports or follow up visits with providers. Documentation of a discussion with the patient in the medical record to discuss finding and changes to the therapeutic plan are tracked in most cases by a "yes" response with only some facilities using a date. There are no follow up audits to determine if the provider actually has a meaningful discussion with the patient about the consultation. The Monitor

---

[290] On review of three Q3 Offsite Care Scheduling Tracking Logs the Monitor only noted BMR as documenting a denial.
[291] Mortality review patient #7
[292] Big Muddy River, Centralia, Dixon, Hill , Pinkneyville, and Western
[293] Big Muddy River, Danville, Dixon, IRCC, Lawrence, Pinkneyville, Shawnee, Sheridan, and Western

evaluated many medical records and seldom finds that a meaningful discussion with the patient is documented.  In one disturbing case [294] a patient had an invasive squamous cell head and neck cancer diagnosed on 6/24/19 but a provider did not document a discussion of the cancer with the patient until 9/11/19.  In another case, a patient with a gastric lymphoma had multiple consultant visits and hospitalizations but the provider failed to document any discussions with the patients about the consultations, hospitalization, or changes to the therapeutic plan.[295]

Tracking logs should be standardized across all facilities.  Tracking logs should contain the following columns:

1. The original date that a provider referred the patient for a consultation or for offsite care.  This should include all referrals including ones that do not result in a completed offsite consultation or diagnostic study.
2. The patient name;
3. IDOC number;
4. The reason for referral;
5. The referral location;
6. Date of the collegial response;
7. Was referral approved Yes or No (ATPs should be considered a No response);
8. Date appointment was arranged;
9. The scheduled date of the appointment;
10. The date the appointment occurred or reason the appointment did not occur (e.g. cancelled, not transported, lockdown, refused, etc.)
11. Rescheduled date;
12. The date the facility received the consultant or testing report;
13. The date the medical provider reviewed the consultant or testing report; and
14. The date of the follow up visit with a facility provider

Delays in advancement of a referral due to the Wexford utilization process should be tracked in their entirety on this log.  When Wexford makes a utilization decision and recommends an alternative treatment plan, request for more information or denial of care, the tracking log should record the date of that decision and the type of utilization decision.

The Monitor recommends periodic audits to determine if provider follow up visits with patients demonstrate that effective communication with a patient has occurred regarding the results of the consultation and the modification to the treatment plan.  On multiple record reviews the Monitor found multiple problems with specialty care referral including the following.

*The vendor failed to approve a procedure or consultation which is established as standard of care in the community.* One patient[296] had a colostomy after colon cancer surgery that the vendor refused to reverse citing that the procedure was elective and unnecessary.  The patient developed a complication of the colostomy the treatment of which was reversal of the colostomy.  The procedure was still not done.  The patient ultimately developed a complication of having the

---

[294] Mortality review patient #7
[295] Mortality review patient #8
[296] Mortality review patient #1

colostomy that contributed to his death. A patient[297] had difficulty seeing and had cataracts but was not referred for cataract surgery because he did not fit the vendor criteria for cataract surgery. A patient[298] had COPD which was poorly managed and a hospitalist recommended referral to a pulmonologist which was denied without explanation.

*A significant finding was not noticed or ignored by providers resulting in the patient not obtaining timely evaluation or not obtaining evaluation at all which may have harmed the patient.*

A patient[299] had a 3 by 2.5 cm complex mass in the left kidney identified on a CT scan suspicious for neoplasia which was never recognized by providers; the patient was never referred for this lesion. The same patient had pulse of 42 and 48 with prior arrhythmia and symptoms but was not referred to a cardiologist for this problem. Another patient[300] experienced what a provider thought might be a seizure when the patient fell off his bunk. The patient was never referred for a CT scan, EEG or neurology appointment. A patient[301] had stomach pain on admission to IDOC in March of 2018 which the intake provider ascribed to a peptic ulcer. No diagnostic evaluation of this was provided. The patient continued to have stomach pains for over a year and a half without diagnostic evaluation for this. An abnormal chest x-ray was present in August of 2018 and given a 90 pack year history of smoking in a 57 year old man warranted a CT scan of the chest which was not done. The patient continued to have stomach pains and chest pains and eventually began losing weight which was first noticeable based on medical record documentation in July of 2019. The patient continued to have chest and stomach pains, lost weight, and eventually developed vomiting. It was not until the patient was extremely ill that he was admitted to a hospital in December of 2019 when metastatic pancreatic cancer was diagnosed. The patient had lost 50 pounds at the time of diagnosis. His diagnosis was delayed well over a year and a half. Another patient[302] had hip pain with an abnormal blood test[303] that suggested metastatic disease to bone. The patient was seen multiple times by nurses and providers. None of the provider evaluations resulted in a referral for appropriate diagnostic testing (e.g. CT scan). As a result the patient's cancer was undetected for ten months. The delay may have contributed to his death.

*A physician failed to have sufficient primary care knowledge to understand that a patient needed to be referred to a consultant or for a procedure or the provider failed to refer for the appropriate procedure or consultant.*

A patient[304] had a prior incarceration in IDOC during which he had a macrocytic anemia and borderline elevated protein level. Months after parole, he was re-incarcerated. His old records were not reviewed, but intake tests showed an elevated serum protein which warranted a protein electrophoresis to evaluate for multiple myeloma. He was re-incarcerated in June of 2019. For

---

[297] Mortality review patient #4
[298] Mortality review patient #1
[299] Mortality review patient #4
[300] Mortality review patient #9
[301] Mortality review patient #18
[302] Mortality review patient #3
[303] This patient had an elevated alkaline phosphatase test which can indicate bony metastases. The blood test was unnoticed.
[304] Mortality review patient #21

six months the abnormal test was not noticed. Then the patient was sent to a hospital for chest pain in December of 2019 and testing showed the macrocytic anemia. The doctor did not know how to work this condition up, misdiagnosed the problem as iron deficiency anemia and ordered transfusions which are inadvisable for macrocytic anemia. The patient started developing symptoms (nose bleeds, fever, and abnormal renal function) that were consistent with myeloma. Eventually, in April of 2020 the doctor sent the patient to the hospital for another transfusion but on arrival to the emergency room the patient went into respiratory failure and was transferred to a reference hospital where a workup was initiated for multiple myeloma. The patient died of complications likely from multiple myeloma without ever being referred for a workup for ten months.

Another patient[305] had abdominal pain beginning 6/3/19. After multiple nursing visits and provider visits, the patient finally on 7/31/19 was identified with anemia, weight loss, fecal occult blood test positive, with abdominal pain. Instead of sending the patient for endoscopy, the physician sent the patient for a CT scan which identified a gastric mass but delayed diagnosis. Then instead of referring for endoscopy so a biopsy and diagnosis could be made the provider sent the patient for a routine gastroenterology consultation which again delayed diagnosis. The patient did not have a diagnostic endoscopy until 10/31/19 when a gastric lymphoma was diagnosed almost five months after the patient had first symptoms.

*The specialty care process resulted in delay in obtaining specialty care that harmed the patient.*
A patient[306] was noted by a dentist to have a lesion on his inner cheek mucosa and on 4/2/19 documented that a 2nd opinion was indicated but not done. The patient had multiple subsequent visits but did not have a biopsy of the lesion until 6/26/19. The biopsy showed squamous cell carcinoma. The patient did not initiate treatment for this cancer until January of 2020 at which time the tumor was no longer resectable. A patient[307] mentioned previously was diagnosed with a gastric lymphoma but the recommendation of the GI consultant on 10/31/19 to refer the patient to oncology and oncology surgery failed to occur timely. A series of scheduling errors occurred. The patient's cancer, whose diagnosis was delayed by five months had his chemotherapy delayed another ten weeks until 1/10/20. The delays contributed to the patient's ultimate death of the lymphoma. A patient[308] previously mentioned had a biopsy which showed squamous cell carcinoma of his cheek. There was no full time physician at the facility and the patient was lost to follow up for approximately six months after which the cancer was no longer able to be resected.

*Failure to timely refer patients for specialty care.*

Another patient[309] was following with an endocrinologist for hyperparathyroidism. He was repeatedly late for endocrinology appointments. One appointment was late by four months; another recommended appointment was late by 10.5 months. This same patient had incontinence for a year resulting in wetting himself and wearing diapers, yet was not sent to a urologist for a

---

[305] Mortality review patient #8
[306] Mortality review patient #7
[307] Mortality review patient #8
[308] Mortality review patient #7
[309] Mortality review patient #4

year.  The same patient had a painful scrotal hernia in 2018 that was not repaired until March of 2019.

*Primary care physicians failed to follow up on specialty care recommendations.*

A patient[310] saw a cardiologist who recommended increasing furosemide but this recommendation was not reviewed and not attended to.  This same patient had recommendations by the endocrinologist that were not timely attended to.  This same patient had a recommendation by a urologist for cystoscopy which was unnoticed.  A 74 year old patient[311] had anemia, history of rectal bleeding but was never referred for a colonoscopy despite an urologist recommending a colonoscopy during a consultation for another matter.  Another patient[312] was transferred to IDOC from Cook County Jail where he had recently been hospitalized with a discharge recommendation for a liver ultrasound for abnormal liver function tests.  This recommendation was on the transfer paperwork but the patient was never referred for this test.

.
**RECOMMENDATIONS:**

1. Create a tracking log which contains information in the list above.
2. The HCUA must maintain the tracking log. The log must be a log maintained for purposes of assessing access to specialty care and must include all referrals.
3. Use quality improvement to study whether patients in need of specialty care are being referred for care; whether patients referred for offsite specialty care have received timely care; and whether diagnostic studies and consultations are being appropriately integrated into the patient's overall therapeutic plan.   This should include, as only one example, review of records to see if the follow-up visit with the primary care provider describes a discussion between the patient and the provider, revolving around the findings at the offsite service and the plan of care.
4. A root cause analysis of specialty care needs to be promptly performed to determine why the specialty care referral process is resulting in considerable morbidity and mortality.  In the meantime, the Monitor recommends discontinuing the "collegial review" process due to adverse patient safety concerns.

**Specialty Referral Oversight Review**

*Addresses III.H.5*

**III.H.5.** *Within six (6) months after the Preliminary Approval Date of this Decree [July 2019]or until Defendants are able to fill both Deputy Chief of Health Services positions, they will make reasonable efforts to contract with an outside provider to conduct oversight review in instances where the medical vendor has denied any recommendations or taken more than five (5) business days to render a decision, including cases in which an alternative treatment plan has been mandated in lieu of the recommendation and cases in which the recommendation has not been*

---

[310] Mortality review patient #4
[311] Mortality review patient #4
[312] Mortality review patient #5

*accepted and more information is required. If no contract with an outside provider is reached, then the Monitor or his or her consultants shall conduct oversight review in instances where the medical vendor has denied any recommendation or taken more than five (5) business days to render a decision, including cases in which an alternative treatment plan has been mandated in lieu of the recommendation and cases in which the recommendation has not been accepted and more information is required. Once Defendants have filled both Deputy Chief positions, the Deputy Chiefs will replace any outside provider, the Monitor or his or her consultants to conduct oversight review in the instances described in this paragraph. (see Specialty Care Section)*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

As noted in the Monitor's 2nd Report, the medical vendor requires that all non-emergency offsite referrals for specialty care, diagnostics, testing, imaging and selected onsite procedures (e.g. ultrasound) be reviewed and approved by the vendor's offsite physician reviewers prior to appointments being scheduled. The vendor's offsite utilization physicians have regularly scheduled conference calls with facility physicians to discuss and approve referrals. During these calls Wexford's offsite utilization physician does not have access to patients' medical records nor do they have the opportunity to interview or examine the involved patients. The offsite physician reviewers approve, deny, request additional clinical information about the reason for the offsite referral, or offer advice in the form of an alternative treatment plan (ATP). This process is called the "collegial review." Since the submission of the 1st Monitor Report there has been no change in this process.

The Monitor recommended in his 2nd Report that the collegial review process be discontinued and that the OHS review the vendor's policies, practices, and guidelines that affect patient-inmates' access to medically necessary consultation, testing, and procedures and eliminate, with input from the monitor, those guidelines that restrict access to medically necessary clinical services. To date the collegial review process remains unchanged and no information has been provided to the Monitor that the vendor's referral guidelines have been reviewed by IDOC or modified.

Following the Monitor's 2nd Report the IDOC said it would discuss temporarily suspending the collegial review process with the vendor. A meeting with the vendor eventually occurred in November or December 2020 but no decision was made. IDOC has communicated to the Monitor and Plaintiff's counsel that there were concerns about the impact on correctional officer staffing if all offsite referrals are automatically approved. IDOC reported that its concerns about staffing shortages were increased when the employee COVID-19 testing protocols were rolled out in all IDOC facilities. [313]

In the Monitor's 2nd Report, the monitor described the absence of data showing an accurate number of referrals, denials and ATPs.[314] The Monitor had to utilize a combination of the

---

[313] Written communications between IDOC and Plaintiffs' legal counsel and conference calls between OHS and the monitor. September 2020 to December 2020. Protocol guided, expanded, regular testing of employees for COVID-19 was initiated in October 2020 and continues to the present time.
[314] Second Court Report of the Monitor, Specialty Referral Oversight review III.H.5

Wexford 2019 calendar year aggregate referral data and a manual audit of three months of collegial review data from late 2019 quality improvement meeting minutes to calculate an estimate of these events.[315] The Monitor ascertained that IDOC providers generated approximately 20,000 and 24,000 annual referrals which resulted in between 1,500 (6.4%) and 2,000 (10.2%) denials or ATPs by the collegial review process. For this report, the vendor's fiscal year data for 2018-2019 in the Primary Medical Services Report documented 19,275 referrals with 1,852 (9.6%) denials or ATPs.[316]  Additional referral data was gathered from January 2020 through October 2020 which annualized to 16,096 referrals and 976 (6.1%) denials.[317] Based on these data sources, the Monitor estimates that approximately 1,500 annual denials will occur over the next 1-2 years using the existing collegial review process. These numbers will increase if the IDOC population returns to pre-COVID-19 levels.

The Consent Decree requires that all non-approved referrals be reviewed by the IDOC Deputy Chiefs or an independent reviewer. In the summer of 2019, IDOC filled two Deputy Chief positions who were tasked with the responsibility of conducting oversight review of all non-approved referrals for offsite specialty services.  Because of the volume of non-approved referrals and their other significant clinical leadership responsibilities, the Deputy Chiefs only reviewed denials of services or ATPs that were appealed by the facilities' clinical leadership. The onus of the referral oversight increased on March 27, 2020 when the Chief of Health Services resigned and one of the two Deputy Chiefs was appointed to be the Acting Chief. This leadership change coincided the initial COVID-19 outbreaks in the IDOC placing a staggering and unexpected administrative burden on the Acting Chief and the Deputy Chief.  For the last ten months the single Deputy Chief has continued to review only those denials and ATPs that were appealed to OHS.  Because review of non-approved referrals is occurring to only a limited extent, this item remains in partial compliance.

The Monitor has been provided with OHS data[318] from January 2019 through December 2020 that tracks the collegial review denials or ATPs that have been appealed to OHS. In these 24 months 264 appeals were forwarded from IDOC correctional centers; 149 (56%) denials or ATPs were overturned, 37 (14%) ATPs were allowed, and 78 (30%) were pending resolution. Excluding the "no resolution" category, 80% of the appealed denials and ATPs were overturned and approval granted to proceed as referred. The Monitor calculated that only 6.2% of all non-approved referrals required to be reviewed in accordance with the Consent Decree were actually evaluated by OHS in 2019-2020. Even this small percentage of OHS oversight reviews places a notable drain on OHS's limited clinical leadership resources.

In the Monitor's 2nd Report, he identified a number of denials and ATPs that were inappropriate, delayed access to needed treatment or diagnostic testing, and jeopardized the

[315] Wexford 2019 Aggregate Referral data report and IDOC CQI minutes from October through December 2019
[316] Wexford Primary Medical Services Report Fiscal May 2018- April 2019 data
[317] Wexford Primary Medical Services Report January 2020 through October 2020. From March 2020 to the present time the IDOC has been in the midst of the COVID-19 pandemic.  New admissions from local jails were discontinued from March through August 2020; early discharges from IDOC were approved.  The IDOC census decreased from approximately 36,000 to 31,000. The volume of referrals notably dropped as all elective offsite referrals were postponed. The annualized referral and denials were subsequently lower. As the census again increases the referrals will likely increase.
[318] OHS Collegial Appeals spread sheet 1/21/19 – 12/4/20

health and/or quality of life of IDOC's incarcerated persons. The Monitor strongly feels that these unjustified denials and ATPs provided more than ample evidence to warrant the recommendation to eliminate the collegial review process. The mortality reviews in appendix C demonstrate numerous lack of referrals that contributed to mortality. The Monitor notes additional denials and ATPs that support the deficiencies in the current utilization process.

One patient[319] was evaluated by the optometrist and found to have a cataract that warranted referral for extraction. The denial by the vendor's utilization physician stated that the cataract did not meet the vendor's criteria for extraction. The denial was overturned after appeal to OHS. Another patient[320] with blurred vision bilaterally and constant light sensitivity with gradual changes was evaluated by optometry and found to have bilateral cataracts. The patient had fallen and sustained injuries that possibly could have been prevented with cataract surgery. He was told by the optometrist that he would not be referred for cataract surgery because he did not meet Wexford's cataract criterion. The HCUA at another IDOC facility[321] contacted OHS about concerns that the facility's optometrist was not referring individuals for cataract surgery due the Wexford guidelines. The facility's optometrist stated he was adhering to the Wexford guidelines even though he acknowledged that they did not meet the standard of care in community. OHS advised the optometrist that IDOC will follow the community standard for cataract surgery. This information is very disturbing to the Monitor. This clinician felt compelled to follow the vendor's clinical guidelines even though he believed that they did not meet the standard of care in the community. There may be other providers in the IDOC who have compromised their level of care and are knowingly practicing in the IDOC beneath the standard of care that they would provide in the community[322].

Another patient[323] had a partial colectomy and colostomy prior to incarceration for colon cancer. Based on the recommendation of the surgeon of record to reverse the temporary colostomy that had been in place for nine months, a referral was submitted for collegial review. The vendor's reviewer denied the request with a response that colostomy reversal was an elective procedure. The vendor's criteria for colostomy reversal is not in accord with the standard of care in the community. Eight months after incarceration, an oncologist recommended a colonoscopy which was negative for metastatic or recurrent colon cancer but did find diversion colitis, an inflammatory bowel condition that was caused by the diversion of the normal fecal stream by the colostomy and is treated by surgery to reverse the colostomy. The reversal surgery recommended by the gastroenterology specialist was never performed. In 2020, recurrent bleeding and a hematoma occurred around the ostomy site which had now been in place for three years, significant anemia developed, the patient was hospitalized and died. The previous denial of the request to reverse the colostomy contributed to the patient's death

---

[319] Specialty referral patient #1

[320] Mortality review patient #4

[321] As found in the October 2020 CQI minutes from Dixon CC

[322] The Monitor is also aware of other clinical practices in the IDOC that were identified in the Expert's 2018 Report and during Consent Decree related site visits to IDOC facilities that were beneath the national standards of care. Examples included outdated screening standards for prostate cancer and colon cancer. During interviews, providers acknowledged that these cancer screenings were not consistent with national standards of care but they were continuing to follow the system's existing inferior practice guidelines. The OHS has since revised the cancer screening guidelines which are now aligned with national standards of care.

[323] Mortality review patient #1

As noted in the Monitor's 2nd Report[324] concerning another colostomy reversal denial, prolonging the use of a medically unnecessary ostomy is degrading, causes needless discomfort for the patient, creates a preventable risk of bacterial exposure to other offenders and staff, can result in additional surgical complications, and places additional avoidable burdens on the correctional centers (follow-up visits, provision of supplies). This patient may not have died if the colostomy had been reversed when initially requested.

Another patient[325] with strong family history of colon cancer (father, uncle, grandfather) was referred for colonoscopy. Three fecal occult blood tests (FOBT) were negative. The vendor's reviewer denied the request stating that colonoscopy was not indicated in a patient with negative FOBTs. The ages that colon cancer was diagnosed in the family members and a history of underlying clinical conditions with high risk for familial colon cancer were not noted in the collegial review. The US Multi-Society Task Force for Colorectal Cancer Screening recommends colonoscopy screening for individuals with a first-degree relative who has had colon cancer before the age of 60 years of age or two first-degree family members with colorectal cancer at any age.[326] Without the ages and additional clinical information about the family members with colorectal cancer, it would be in the best interest of the patient and would be consistent with national recommendations to screen this individual with a colonoscopy. FOBT testing is also not the recommended screening test for individuals at high risk for colorectal cancer.

The hospital discharge summary of a patient[327] with severe COPD on chronic oxygen recommended referral to a pulmonologist for management of his complicated chronic respiratory disease. The referral for pulmonary specialist consultation and ongoing management was denied without recommendation of an alternate treatment plan. Review of the medical record indicated that the facility provider was not managing and monitoring the COPD based on the standard of care. The patient was continued on long term oral steroid medication, had no pulmonary function testing, and was not being monitored for the effectiveness of his long-term oxygen therapy which is not standard of care for COPD; the long-term steroid use had the risk of significant medication side effects. The patient died in respiratory failure with other notable co-morbidities. Consultation with a pulmonary specialist was indicated and had been inappropriately denied.

Another patient[328] with an abnormal Epworth score[329] was referred for an onsite sleep study but was denied by the vendor's reviewer because it was not indicated based on the information received. The reviewer didn't comment on whether there was a report of observed stoppages of breathing while the individual was asleep.

---

[324] Second Court Report. Specialty Referral Oversight Review III.H.5, August 2020
[325] Specialty referral patient #2
[326] US Multi-Society Task Force on Colorectal Cancer Screening 2020
[327] Mortality review patient #1
[328] Specialty referral patient #3
[329] An Epworth score is a scoring of daytime sleepiness which may indicate sleep apnea syndrome.

Another patient[330] with uncontrolled diabetes was prescribed a treatment regimen that included three diabetic oral agents, a high dosage (90 units) of 70/30 insulin administered more frequently than recommended (three injections per day while recommended frequency is twice a day), and a sliding scale of regular insulin that should not be given to a patient on 70/30 insulin which already contains regular insulin. His capillary blood glucoses ranged from 300 to over 400 mg/dl. The treating provider was clearly not competent or comfortable in managing complicated diabetes mellitus and appropriately referred the patient to an endocrinologist for consultation in management of this individual's uncontrolled diabetes. The vendor's collegial reviewer denied the referral to an endocrinologist and advised a review of patient commissary food purchases and additional lab tests. Three months later the patient was still receiving the same potentially deleterious combination of diabetic medication and had not yet been approved for the endocrinology consultation. This delay in approving the much needed endocrinology appointment is putting this patient's health and potentially his life at risk.

As noted in the Monitor's 2nd Report, the process of referral review including conference calls, repeat requests, and appeal processes consumed valuable physician, nurse, medical record, health unit administrator, and OHS time. Significant delays in care occur in many cases that have potential to cause harm to patients. The Monitor continues to feel that the vendor's collegial referral process presents a barrier to the access of IDOC patient-inmates to offsite specialty consultation and testing. It delays needed consultations, procedures, and testing. It potentially puts patient-inmate's health at risk. It diminishes patient quality of life. It consumes an extraordinary amount of physician, HCUA, medical record staff, nurse, Regional Health Coordinator, Agency Medical Director, and Deputy Chief resources. The Monitor again recommends that the vendor's referral process be discontinued. This position of the Monitor was noted in the 1st and 2nd Reports and is now again reinforced by the examples of inappropriate denials of specialty referrals, tests, and procedures listed in this section.

The IDOC OHS Deputy Chiefs are only reviewing approximately 6.2% of the referrals that are denied or that have ATPs as required by the Consent Decree. It is not clear how many of the approximately 3,000 non-approved referrals in 2019-2020 would have been reversed. Nevertheless, it is the opinion of the Monitor that forcing the OHS to re-review all required cases would be wasteful of their time as opposed to merely eliminating the existing Wexford referral process.

**RECOMMENDATIONS:**
1. It is the recommendation of the Monitor that the current collegial review specialty care and diagnostic testing referral process be immediately discontinued.
2. The IDOC must conduct a review of the vendor's policies, practices, and guidelines that affect patient-inmates' access to medically necessary consultation, testing, and procedures and eliminate, with input from the monitor, those guidelines that restrict access to medically necessary clinical services. Examples of current restrictive vendor practices include limiting cataract surgery to only one eye, categorizing ostomy reversal surgery as an elective, and others.

---

[330] Specialty referral patient #4

# Hospital Care

*Addresses Items II.A; II.B.1; III.G.4*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**III.G.4.** *Facility medical staff shall ensure that a prisoner is seen by a Medical Provider or clinician within 48 hours after returning from an offsite emergency service. If the Medical Provider is not a clinician, the Medical Provider shall promptly review the offsite documentation, if obtained, with a clinician and the clinician shall implement necessary treatment.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

Items II.A, II.B.1, and III.G.4 all require access to specialists and hospitals as necessary. Access to specialty care and hospital care are largely determined by Wexford's utilization process and the quality of physicians who make judgments about when patients need to be admitted to a hospital. The utilization process and the judgment of physicians is not working to provide a safe and effective health program as evidenced in the Monitor's mortality reviews. Hospital physicians often provide recommendations to modify the therapeutic plan. Providers at the prison need to review these recommendations and take action on the recommendation. IDOC provides no evidence to justify compliance for these three items. The Monitor's mortality reviews demonstrate that the current practices warrant a noncompliance rating.

There were multiple areas with opportunities for improvement related to hospitalization that are reviewed below. More detail about the care of individual patients can be obtained in the mortality record reviews attached as an appendix to this report.

*Access to hospital care was delayed or not provided.* A 67 year old patient[331] with heart failure developed fever, tachycardia, and shortness of breath and his hospitalization was delayed for two days. The patient died during this hospitalization. A 75 year-old[332] with aortic valve replacement, sick sinus syndrome, left ventricular dysfunction, and a pacemaker developed cough, low grade fever, tachycardia and hypoxemia but was not referred to a provider by a nurse. Three days later the patient had difficulty breathing but again was not referred by a nurse to a provider. Three days later a physician assistant saw the patient. The patient was wheezing but had no diagnosis of asthma or COPD. Without taking any vital signs the physician assistant diagnosed bronchitis which was based on virtually no clinical data. Ten days later, the patient was short of breath and a doctor obtained a chest x-ray that showed pleural effusion and a pulmonary infiltrate but the doctor did not timely order other tests. The doctor started high dose

---

[331] Mortality review patient #5
[332] Mortality review patient #6

prednisone and an antibiotic without a specific diagnosis. The patient spent five days on the infirmary without a physician evaluation and was ultimately sent to a hospital when he was severely compromised (oxygen saturation 76%, pulse 142, respiratory rate 48). This patient ultimately died of a fungal infection. Five patients with COVID-19 had significant hypoxemia but were not timely admitted to a hospital.[333]

*Some patients needed hospitalization or skilled nursing placement but instead were placed on the infirmary.*
Multiple patients[334] were housed on the infirmary but had clinical nursing needs that exceeded the capacity of current infirmary units. These patients should have been transferred to a skilled nursing unit. Discussion of this issue is also found in the infirmary section of this report.

*Patients return from the hospital but are not timely evaluated or hospital follow up did not properly continue the recommended hospital plan of care.* One patient[335] was hospitalized for asthma but not evaluated by a physician for a month. Another patient[336] with lymphoma was released from the hospital but the facility physician failed to consider or start orders for specialized diet, or monitoring as recommended by the hospital. Another patient[337] with a head and neck cancer received specialized instructions for feeding, device care, and other monitoring instructions that were not acted on.

*A patient's condition deteriorates resulting in hospitalization that is preventable due to chronic care management that is not timely or effective.* One patient[338] had hyperparathyroidism that causes elevated calcium. Despite this underlying problem a physician ordered TUMS (calcium carbonate) and a diuretic[339] both of which worsened his hypercalcemia and placed the patient at risk. The patient developed critical hypercalcemia which had been unrecognized at the facility until a UIC consultant notified the facility. The patient's two subsequent hospitalizations were unnecessary and preventable. Another patient,[340] had elevated protein and macrocytic anemia for approximately a year that was never worked up[341]. Though the physician didn't know how to work up these common primary care problems, the physician did not refer the patient to a hematologist. Ultimately, the patient developed complications and died in a hospital. The hospital was in process of working the patient up for multiple myeloma which would have been identified earlier if the elevated protein had been properly evaluated.

The mortality review appendix documents that many of these cases resulted in potentially preventable death. Most of the deficiencies relate to the quality and training of physicians and

---

[333] Mortality review patients #s 13, 14, 16, 17, and 11
[334] Mortality review patients #s 6, 7, 8, and 18
[335] Mortality review patient #2
[336] Mortality review patient #8
[337] Mortality review patient #7
[338] Mortality review patient #4
[339] TUMS is calcium carbonate that will raise serum calcium when used. The diuretic used was hydrochlorothiazide which reduces the ability of the kidney to excrete calcium resulting in elevated blood calcium levels.
[340] Mortality review patient #21
[341] Typically the early evaluation of elevated protein and a macrocytic anemia are conducted by primary care physicians. When a provider doesn't know how to evaluate these problems, referral is indicated which was not done.

possible to utilization barriers for hospitalization.  It is imperative for physician quality to be corrected.

**RECOMMENDATIONS:**
1. Providers must continue orders promptly after hospitalization or document why recommendations will not be continued.  Immediately upon return from hospitalization, nurses must consult with providers regarding recommended hospital orders.  Within 2 days a provider must revise the therapeutic plan of the patient consistent with the hospital findings and recommendations.  The provider must discuss the revised plan and how it will be implemented with the patient.
2. As part of the audit system, IDOC needs to evaluate whether the process of chronic care management results in preventable hospitalization.  If systemic problems are identified these should be corrected through the quality improvement programs.
3. The statewide quality unit should perform a process analysis to determine why hospitalization is delayed for patients found in mortality reviews.  Problems identified need to be corrected through the quality improvement program.

# Preventive Services

*Addresses items III.M.1.a-d*
**III.M.1.a.** *Defendants or their contracted vendor(s) shall ensure that all prisoners will be offered an annual influenza vaccination.*
**III. M.1.b.** *Defendants or their contracted vendor(s) shall ensure that all prisoners with chronic diseases will be offered the required immunizations as established by the Federal Bureau of Prisons.*
**III.M.1.c.** *All prisoners ages 50-75 will be offered annual colorectal cancer screening and PSA testing, unless the Department and the Monitor determine that such testing is no longer recommended.*
**III.M.1.d.** *All female prisoners age 45 or older will be offered a baseline mammogram screen, then every 24 months thereafter unless more frequent screening is clinically indicated, unless the Department and the Monitor determine that such testing is no longer recommended.*

**Influenza Vaccinations**

**III.M.1.a** *Defendants or their contracted vendor(s) shall ensure that all prisoners will be offered an annual influenza vaccination*

**Overall compliance: Partial Compliance**

**Findings:**
As reported in the 2nd Court Report the monitor continues to be aware that influenza vaccination is offered to the IDOC patient population in all correctional centers. On 12/23/20, IDOC reported that a total of two thousand sixteen ten-shot vials (20,160 vaccines) of influenza vaccine had been shipped in September 2020 to all facilities in the IDOC[342]. The quantity of vaccinations per site varied from 10 at Elgin Treatment Center to 2,000 at NRC and 2,650 at Menard CC with a

---

[342] Flu Vaccine Shipped to IDOC facilities in September 2020 by Wexford Health

median of 600 flu vaccines per site. The Monitor previously reviewed multiple medical records from the 1st and 2nd quarter of 2020 and verified that many but not all patient-inmates had documentation that they had been offered influenza vaccines; it was again noted that refusal rate was quite high. Review of CQI minutes for September 2020[343] identified only two of the thirty IDOC facilities had reported data on influenza vaccination rates; Kewanee reported that seventy-seven individuals had received the flu shot and Elgin noted that seventeen patient-inmates had received the flu vaccine and twelve had refused the flu vaccine. No aggregate data has been provided to allow the monitor to report on systemwide influenza vaccination rates and refusals.

**Recommendations:**
1. IDOC should track and report annual influenza vaccination rates and refusals by site.
2. IDOC should institute an annual health information campaign to educate the incarcerated population about the health benefits of the annual influenza vaccine and the COVID-19 vaccine.

**Adult Immunizations**

**III.M.1.b** *Defendants or their contracted vendor(s) shall ensure that all prisoners with chronic diseases will be offered the required immunizations as established by the Federal Bureau of Prisons.*

**Overall Compliance:** Partial compliance

**Findings:**
As noted in the First and Second Court Reports, in October 2019 the IDOC Office of Health Services disseminated to all IDOC facilities instructions and standing operating procedures for the implementation of an adult immunization program in the IDOC. In January 2021 the IDOC drafted an Immunization and Cancer/Preventive Screening Programs Administrative Directive providing increased guidance on the processes for identification of immunization history, completion of database, ordering of recommended vaccinations, and administration and documentation of offered and accepted immunizations during intake screening at Reception & Classification Centers, upon arrival at parent facilities, in chronic clinics, and during periodic physical examinations. The revised clinical guidelines are in accord with the Centers for Disease Control and Prevention 2020 recommended adult immunizations.[344] The revised Administrative Directive mandates the reporting of immunizations offered, administered, and refused to the facility Monthly Quality Improvement meeting and to the Monthly Communicable Disease, Immunization, and Cancer Screening Report. Upon request of IDOC the Monitor did provide input on the clinical components of this revised Administrative Directive.

In previous calls with IDOC clinical leadership team, the Monitor has discussed with IDOC that the management of the Immunization Program be placed under the control of Nursing with each facility's Infection Control nurse or a dedicated Adult Immunization nurse directing, monitoring, tracking, administration of recommended adult immunizations based on standing orders

---

[343] September 2020 CQI Minutes
[344] Center for Disease Control and Prevention, Recommended Adult Immunization Schedule for ages 19 years or older, United States, 2020

approved by IDOC clinical leaders; this is a common practice throughout the USA for influenza and recently for COVID-19 immunization. Decatur CC has initiated a vaccination program managed by a designated RN.[345] Nursing staff have been trained. Reviews of Decatur CC's female population were reported to have been performed to identify existing need of preventive vaccines based on age and diagnoses. Placing the Immunization Program under the umbrella of Nurse leadership offers IDOC the best option for successfully providing recommended adult immunizations to the IDOC population which will prevent morbidity and even mortality within the prison system and ultimately in the communities of Illinois.

Tetanus-diphtheria, Hepatitis B, Hepatitis A, Pneumococcal 23, influenza vaccines are reported to be routinely stocked at each correctional facility. Newly available immunizations can be ordered for patient-specific distribution from Boswell Pharmacy. The Monitor did note that stock supplies of Human Papilloma Virus (HPV) and Pneumococcal 13 vaccines had also been filled at Logan CC.[346] Individually orderable vaccines include Human Papilloma Virus (HPV), Meningococcal ACWY, Meningitis B, Pneumococcal 13, Pneumococcal-23, Recombinant Herpes Zoster (Shingrix), Haemophilus influenzae B (HIB), MMR, and Varicella immunizations.

The IDOC has provided the Monitor with lists noting vaccines ordered from Boswell Pharmacy[347] for individual IDOC inmates from November 1, 2019 through December 22, 2020. During the thirteen months after OHS expanded the number of nationally recommended vaccines in the IDOC, three individuals have been administered Haemophilus influenza B, seventeen Meningococcal-ACWY, eight Pneumococcal-13, 154 Pneumococcal-23, one hundred-thirty HPV[348], and five hundred seventy-five Recombinant Herpes Zoster immunizations. In addition one hundred sixty doses of Human Papilloma Virus vaccines had been ordered and shipped as stock to Logan CC in preparation for an HPV immunization campaign targeting women at risk for cervical cancer. This HPV campaign at Logan CC was initially delayed due to the COVID-19 pandemic but was initiated in June 2020. Logan CC also has received a stock order of 150 Pneumococcal 13 vaccines. In addition to individual orders for Pneumococcal-23 vaccines, one thousand fifty-six stock doses of Pneumococooal-23 were distributed to 27 correctional centers and 3 camps.

The number of individuals who have received the newly available vaccines is increasing but still remains low. Approximately 800 over-65 year old inmates and approximately 300 HIV patients are candidates for Pneumococcal-13 but only 8 individuals have received this vaccine; only 9 of the 30 facilities have ordered Pneumococcal-13 vaccine. Only 17 individuals have received Meningococcal ACYW but this two-shot series is recommended for the approximately 300 HIV-infected individuals in the IDOC.

---

[345] Decatur CC Continuous Quality Improvement Minutes September 2020
[346] IDOC's contracted pharmaceutical vendor Boswell vaccine order list 11/1/19-12/22/20
[347] IDOC's contracted pharmaceutical vendor Boswell vaccine order list 11/1/19-12/22/20
[348] Boswell 8/1/20-12/20/20 HPV individual vaccination orders for Decatur Female facility and Logan CC 6/3/20-12/22/20 HPV Vaccine tracking spread sheet (received from IDOC 1/26/21) 130 women at these two sites have received 1,2 or 3 shots of the three vaccines series.

Over 6,000 inmates over 50 years of age are eligible for recombinant Herpes Zoster (Shingrix) vaccination; 575 have received the vaccine. To date, 20 of the IDOC 30 correctional centers have ordered Shingrix. Although only 9.6% of the eligible candidates for this two-shot series have been vaccinated, this is a solid start to protect IDOC's elderly population from "shingles".
At any one time an estimated 100-150 females 26 years old or younger and eligible to receive the cervical cancer preventing Human Papilloma Virus (HPV) vaccine series are housed at Decatur CC and Logan CC. 54 women (7 at Decatur CC and 47 at Logan CC completed the three-dose series in 2020 and another 38 have started the series and are awaiting their 2nd and 3rd shots. These two facilities planned and implemented catch-up HPV vaccination campaigns that were highly successful and should serve as templates for provisions of nationally recommended adult immunizations throughout the IDOC.

| HPV Vaccination Campaigns | | | |
|---|---|---|---|
| | Logan CC | Decatur CC | Total |
| Completed 3-shot HPV series | 47 | 7 | 54 |
| 3rd shot pending | 1 | 20 | 21 |
| 2nd shot pending | 0 | 17 | 17 |
| Total of series-completed or in process | 48 | 44 | 92 |
| Refused after receiving one shot | 0 | N/A | |
| Refused after receiving two shots | 1 | N/A | |
| Paroled after one shot | 9 | N/A | |
| Paroled after two shots | 26 | N/A | |
| Transferred after two shots | 2 | N/A | |
| Total individuals started HPV series | 86 | 44 | 130 |
| Refused series | 17 | N/A | |
| Paroled prior to initiation of series | 7 | N/A | |
| No data reported | 1 | N/A | |
| Total offered HPV series | 111 | 44 | 155 |

HPV vaccination is also recommended for men 26 years of age or younger to prevent penile cancer and transmission to HPV to their sexual partners; but not a single male correctional facility has ordered the HPV vaccine.

The OHS has appropriately expanded access to nationally recommended adult vaccines for the IDOC population and there is evidence that the medical providers at some IDOC correctional centers are beginning to order these vaccinations for their patient populations. The new Administrative Directive provides increasing guidelines on the processes and procedure to ensure that recommended immunizations are offered to eligible at-risk candidates.
The Monitor has strongly advised IDOC to develop nurse managed and standing order-based immunization programs at each facility to maximize the effectiveness of the provision of adult immunizations to IDOC's at-risk individuals. The IDOC population is still notably under vaccinated for many CDC recommended adult immunizations. IDOC must ratchet up the pace of vaccine administration to provide adequate protection for the incarcerated population. The development of a vaccination program directed by nursing staff has the best potential to effectively coordinate the catch-up and ongoing vaccination of incarcerated persons in the IDOC. In order to ensure that the health of the IDOC patient population is being properly protected, as directed in the revised Administrative Directive, the IDOC needs to track and monitor the administration rates including refusals for all adult immunizations; ideally the EMR will

incorporate data points for the offering, administration, refusals and reporting of all adult vaccinations.

**Recommendations:**
1. The IDOC has promulgated standard operating procedures for a comprehensive adult immunization program and must now implement processes that ensures that all patient-inmates are offered nationally recommended age and risk appropriate adult immunizations. This process will include the provision of immunizations at the various clinical encounters noted in the revised January 2021 Administrative Directive but also in special catch-up vaccine campaigns.
2. The Immunization Program should be placed under the administrative umbrella of nursing leadership and managed by each facility's infection control nurse or a dedicated immunization nurse using approved standing orders to administer recommended adult immunizations.
3. The IDOC must track and report the offering, administration, and refusal of all adult immunizations, and the percentage of eligible individuals who are offered and received recommended adult immunizations to the CQI committees at each site.
4. The new EMR vendor should incorporate data points and clinical prompts which electronically remind, record, track, and report all adult immunizations offered and administered and the identified clinical indication (age, clinical condition, etc.)
5. The HPV vaccination campaigns at Decatur and Logan CCs should serve as the model for the delivery of nationally recommended adult vaccinations in the IDOC.

**Cancer and Routine Health Maintenance Screening**

**III.M.1.c.** *All prisoners ages 50-75 will be offered annual colorectal cancer screening and PSA testing, unless the Department and the Monitor determine that such testing is no longer recommended.*

**OVERALL COMPLIANCE RATING:** Partial compliance

**FINDINGS:**

In October 2019 the IDOC Office of Health Services distributed systemwide "Standard Operating Procedures: Cancer Screening" which detailed IDOC Routine Health Maintenance and preventive screening recommendations for breast, cervical, colon, and prostate cancer. In January 2021 the OHS and IDOC drafted the Immunization and Cancer/Preventive Screening Programs Administrative Directive appropriately adding lung cancer and Abdominal Aortic Aneurysm (AAA) screening that had not been included in the 2019 guidelines and providing increased guidance on gathering and documenting the inmate's prior cancer and routine health maintenance screening history, ordering the recommended screenings during intake screening at Reception & Classification Centers, and reviewing the need for cancer and routine health maintenance (RHM) screenings upon arrival at parent facilities and during sick call appointments, chronic clinic visits, and annual (and bi-annual) physical exams.

The United States Preventive Services Task Force (USPSTF)[349] and the IDOC 2021 guidelines[350] recommend that colon cancer begin at age 45 for asymptomatic, average risk patients. As noted in the 2nd Court Report during site visits to Lincoln CC and Logan CC in February 2020 there was no evidence that a nationally recommended testing modality was being used to screen at risk men and women and men for colon cancer. Seven of the eight medical records of individuals 50 years of age and older had documentation that they were offered a rectal exam and a single fecal occult blood test (FOBT) to screen for colon cancer. This method of screening for colon cancer had been discontinued over 15-20 years ago and replaced with other more sensitive and specific screening tests. Both the 2019 and 2021 IDOC colon cancer screening guidelines recommend Fecal Immunochemical Testing (FIT) which is a nationally recommended modality to screen average risk individuals for colon cancer. A single point-of care FIT test kit was shown to the Monitor during the February 2020 visit to Lincoln CC but the staff were not sure if new screening modality had been initiated.

IDOC has communicated to the Monitor that the point-of-care FIT screening kits are to be used for colon cancer screening. The Monitor has requested data on FIT point-of-care colon cancer screenings at all IDOC sites including tests offered, performed, results (positive or negative), and date positive tests referred for colonoscopy.[351] As of January 27, 2021, no data on FIT screening has been provided to the Monitor. Without data on the implementation of a nationally recommended colon cancer screening and evidence that this screening is being offered on an annual basis to all eligible incarcerated persons, IDOC is not currently in full compliance with this provision.

As noted in the first and second Court Reports, the USPSTF recommends that selective screening for prostate cancer using PSA testing in average risk males 55-69 of age be based on preferences and informed by relevant clinical information and professional judgement. The frequency of screening is not clearly defined. Prostate cancer screening should not be done for men 70 years of age or older or with a life expectancy less than 10 years. Routine annual PSA screening for asymptomatic men and digital prostate palpation via a rectal exam is not a national recommendation. OHS's 2019 and the revised 2021 prostate cancer screening guidelines are fully aligned with the USPSTF standards.

**RECOMMENDATIONS:**
1. The IDOC should track and report the rates of cancer and Routine Health Maintenance preventive services screenings including colon cancer, lung cancer, and abdominal aortic aneurysm screenings offered, performed, and refused and report these results to the facility CQI committees.
2. The IDOC should track and report on the percentage of eligible men and women who are current with all nationally recommended cancer and routine health maintenance screening standards.

---

[349] United States Preventive Services Task Force cancer screening guidelines 2020. Age for colon cancer has been lowered to 45 years of age B Recommendation, Colon cancer screening from 50-75 years of age remained as an A recommendation.
[350] OHS Standard Operating Procedures: Cancer Screening October 24, 2019 and Administrative Directive IDOC Immunization and cancer/preventive Screening Program, January 2021 draft
[351] FIT test data requested on 10/27/20 but as of 1/27/21 no data has been provided

3. The IDOC should continue to incorporate all the A and B recommendations of the USPSTF into the RHM/Preventive Services program.
4. The wording of III,M,Lc. in the Consent Decree should be modified so that the PSA testing recommendation is in align with the prostate screening recommendations of the USPTF. PSA testing is now recommended for men ages 55-69 and colon cancer screening is now recommended for ages 45-75.

**Mammography Screening**

*Addresses items III.M.1.d*
**III.M.1.d.** *All female prisoners age 45 or older will be offered a baseline mammogram screen, then every 24 months thereafter unless more frequent screening is clinically indicated, unless the Department and the Monitor determine that such testing is no longer recommended.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

**Breast and Cervical Cancer Screening**
As reported in the 2nd Court Report staff interviews and limited chart reviews performed during the February 2020 site visit at the Logan CC female facility revealed that women were being regularly screened for breast and cervical cancer. The Monitor has not identified any data in the Quality Improvement Committee minutes during 2020 that reported on the monitoring of breast and cervical cancer screenings. IDOC provided the Monitor with data about the total number of mammograms, PAP smears, and colposcopies performed from January through September 2020.[352]

| Women's Health Screenings and Procedures | |
|---|---|
| January to September 2020 | |
| Decatur CC and Logan CC combined | |
| Mammograms | 134 |
| PAP Smears | 601 |
| Colposcopy | 28 |

While these data report numbers screened, they do not indicate whether all women who should be screened are screened. Normal mammograms are to be repeated every 2 years on women between 50 and 75 years of age; normal PAP smears are done every 3-5 years in females between 21 and 65 years of age based on age and negative HPV cultures. Abnormal mammograms and PAP smears would require more frequent imaging and testing. On any given day the two female institutions house approximately 250 women who are candidates for mammography screening every 2 years which would suggest that the annual number of mammograms should be around 125 mammograms per year. 1300 women are between the ages of 30 and 75 years and are candidates for PAP tests every 3-5 years, this would predict that 300-450 cervical cancer screening would need to be done annually. However these are crude

[352] Women's Health Screening Data provided to Monitor by IDOC in a November 23, 2020 email

estimates that do reflect the turnover rates in these two facilities, the numbers of new admissions, and the volume of abnormal screening tests that require additional studies. IDOC needs to track these two cancer screening modalities based on the percentage of eligible women who are offered, received, and refused testing within the established timeframes. This data should be reported to the CQI committees and corrective action taken as indicated. Although mammograms and PAP tests are being performed at both female institutions, appropriate data and tracking to assure that all eligible women are being testing in accord with nationally cancer screening standards. This is currently not being done by the IDOC.

**RECOMMENDATIONS:**
1. Monitor and report the offering and provision of breast and cervical cancer screening to the Quality Improvement Committees
2. Report Women's health data based on the percentage of eligible incarcerated women who receive breast and cervical cancer screenings within the established national USPSTF guidelines.

# Pharmacy and Medication Administration

*Addresses items II.A; II.B.1; II.B.6.c; II.B.6.d;*
**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*
**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*
**II.B.6.c.** *IDOC agrees to implement changes in the following areas: Medication administration records-both for directly administered medications and KOP*
**II.B.6.d.** *IDOC agrees to implement changes in the following areas: Medication refusals;*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

The problems with medication administration and refusals described in the Monitor's 2nd report[353] are unchanged. The 2nd report included nine recommendations intended to assist the IDOC to achieve compliance with the Consent Decree. Defendants provided no information with regard to steps taken to address the Monitor's recommendations or to otherwise come into compliance with II. B. 6. c or d.[354] The most immediate actions the IDOC needs to take are as follows:

1. Engage a process consultant to facilitate a statewide plan to standardize medication administration which addresses concerns about medication preparation, documentation

---

[353] Health Care Monitor 2nd Report Lippert v Jeffreys (August 6, 2020) pages 118-123
[354] Illinois Department of Corrections, Defendants' Reporting Requirement Pursuant to V.G. of the Lippert Consent Decree (November 2020)

on the MAR, and reporting of medication refusals and is consistent with patient safety practices and contemporary standards of care.

2. Establish more detailed operational guidance (administrative directive or policy and procedure) specifying how medication is prescribed, how and by when treatment is initiated, how medication is to be administered safely and timely, including delineation of support to be provided by the facility, and establish how and by when documentation of medication administration takes place. At a minimum this should include:
   a. Two-part patient identification with the MAR at the time medication is administered.
   b. Timely transcription of medication orders onto the MAR.
   c. Nurses should have the MAR present at all times medication is administered to patients.
   d. Nurses should administer medications to patients directly from pharmacy-dispensed, patient-specific unit dose containers and contemporaneously document administration on the MAR.
   e. Instructions for notification of the prescribing provider when the patient did not adhere to the medication regime and expectations for the prescribers' response to such notification.
3. Develop a workload driven staffing standard for medication administration. The revised staffing analysis developed by OHS, dated 6/18/2020 describes a methodology that included the number of patients receiving medical medications at a facility as one of the factors considered in determining staffing needed.[355] However, the volume of patients on medication is insufficient because it does not reflect accurately the time it takes to administer medication without pre-pouring and contemporaneous documentation of administration of medication. Further, the staffing analysis does not delineate how many or what kind of staff are used to administer medication.

**Medication Administration**

Since the 1st report the Monitor has recommended that facilities cease the practices of charting medication administration either before or after medication line and pre-pouring medication in advance of administration.[356]   Medication errors that took place in the first three quarters of 2020 resulting from these practices include charting medication as given when the patient is not on the premises,[357] documenting on the incorrect MAR, administering the wrong medication, and continuing to administer medication that has been changed or discontinued.[358]

IDOC provided information to the monitor in advance of the 3rd report which indicates that two thirds of the facilities continue to pre-pour medication. See the table following this paragraph. These are primarily medium or maximum custody facilities.

[355] Staffing Analysis Illinois Department of Corrections Office of Health Services, Lippert Consent Decree 6/18/2020
[356] Lippert v Jeffreys Consent Decree, First Report of the Monitor (November 24, 2019) page 15
[357] Mortality review patient #8
[358] BMCC CQI minutes June 2020, Danville CC CQI minutes August 2020, Dixon CC CQI minutes June and July 2020, Graham CC CQI minutes May and June 2020, Hill CC CQI minutes April 2020, Sheridan CC CQI minutes September 2020.

| Facilities Reporting Pre-Pouring Medication | | | | |
|---|---|---|---|---|
| **FACILITY** | **Location** | **TYPE** | **POPULATION** | **Pre-Pour Medication** |
| PONTIAC | Pontiac | MAX | 1165 | Yes |
| STATEVILLE | Joliet | MAX | 1173 | Yes |
| NRC | Joliet | MAX/Intake | 1302 | Yes |
| MENARD | Menard | MAX/Intake | 2213 | Yes |
| BIG MUDDY RIVER | Ina | MED | 1179 | Yes |
| CENTRALIA | Centralia | MED | 1281 | Yes |
| SHAWNEE | Vienna | MED | 1682 | Yes |
| DANVILLE | Danville | MED | 1724 | Yes |
| ILLINOIS RIVER | | MED | 1770 | Yes |
| LAWRENCE | Sumner | MED | 2166 | Yes |
| GRAHAM | Hillsboro | MED/Intake | 1919 | Yes |
| HILL | Galesburg | MED/MAX | 1698 | Yes |
| DIXON | Dixon | MED/MAX | 2051 | Yes |
| SOUTHWESTERN | East St.Louis | MIN | 563 | Yes |
| ROBINSON | Robinson | MIN | 1176 | Yes |
| EAST MOLINE | East Moline | MIN | 1318 | Yes |
| JTC | Joliet | MULTI | 181 | Yes |
| KEWANEE | Kewanee | MULTI | 274 | Yes |
| LOGAN | Lincoln | MULTI (fem)/Intake | 1657 | Yes |
| PINCKNEYVILLE | Pinckneyville | MED | 2121 | No |
| MURPHYSBORO | Murphysboro | MIN | 138 | No |
| LINCOLN | Lincoln | MIN | 1007 | No |
| TAYLORVILLE | Taylorville | MIN | 1067 | No |
| VIENNA | Vienna | MIN | 1127 | No |
| JACKSONVILLE | Jacksonville | MIN | 1133 | No |
| VANDALIA | Vandalia | MIN | 1222 | No |
| DECATUR | Decatur | MIN (fem) | 549 | No |
| SHERIDAN | Sheridan | MIN/MED | 1558 | No |
| ELGIN | Elgin | MULTI | 27 | No |
| WESTERN | Mt. Sterling | MED | 1533 | |

IDOC medium and maximum custody facilities are not unique or distinct from hundreds of other similar facilities in the U.S. which administer medication directly from a patient-specific pharmacy package and document administration simultaneously on the MAR. The Monitor is aware that there are barriers and obstacles within IDOC to achieving safer medication administration practices, but they must be resolved. That is the reason we recommended IDOC engage the services of a process consultant now.

The Monitor's 2nd Report discussed the pharmacy inspection and audit of MARs completed by the regional pharmacy consultant. We note that in 2020 these were curtailed due to the pandemic. For those months when inspections did take place, the most common issues found on inspection of the medication area at facilities was incomplete documentation on the temperature log for the refrigerator and expired or unlabeled medications. The performance issue most often

identified from the audit was missing documentation on the MAR. This finding is consistent with our review of charts.[359]

The CQI minutes also contain information on medication errors, each of which are evaluated using a risk tool. The most commonly reported error is transcription of the order to the MAR. Transcription errors reported or observed this report period include incomplete transcription of orders upon admission to the infirmary after release from the hospital, incorrect dose, not transcribing the order, transcribing to the wrong MAR.[360] A factor that contributes to this problem is writing orders elsewhere in the patient's chart rather than on the order form itself. An electronic record with automated order entry eliminates transcription, and thus this type of error, entirely. Other serious errors reported in the CQI minutes and found during record review include administration of glipizide, an anti-diabetic medication and Maxide (hydrochlorothiaziede/triamterene) for hypertension while also receiving these medications as Keep on Person,[361] failure to administer anticoagulant medication,[362] administering medication without an order[363] and administering medication after it was discontinued or changed.[364] The CQI minutes reflect no discussion of procedural or systemic solutions to problems with medication management and no documentation of corrective action except staff reminders and individual counseling.

Problems with medication continuity were also apparent from our review of death charts. One patient[365] returned from the hospital where he was treated for an exacerbation of asthma in 2018. The on-call physician ordered Alvesco (ciclesonide), a steroid inhaler which was never provided to the patient. In December 2018, the patient's order for Xopenex (levalbutamol), a rescue inhaler expired, as well as an order for AirDuo (fluticasone/salmeterol), a controller inhaler. The patient was not seen, or new orders obtained. Another patient[366] was a diabetic whose order for glipizide expired 7/21/18 and a new order was not obtained until 10/18/18. Even though he was seen in chronic clinic on 8/14/18 the expired order was not addressed. A third patient[367] did not pick up KOP medication, duloxetine, for six months; eventually he was put on nurse administered dosing but still had periods of medication discontinuity upon order expiration.

The problems at IDOC facilities with medication administration are complex but they are not unique nor insurmountable. Individual facility variation with regard to medication management is unacceptable. In addition to hiring a process consultant, we also recommended IDOC establish more detailed operational guidance specifying how medication is prescribed, how and by when treatment is initiated, how medication is to be administered safely and timely, including

---

[359] Mortality review patient #1, mortality review patient #7, mortality review patient #9, mortality review patient #2, and mortality review patient #4
[360] Mortality review patient #7, mortality review patient #6, BMCC CQI minutes June 2020, Danville CC CQI minutes July and September CQI minutes 2020, Dixon CC January, March, July, and September CQI minutes…etc.
[361] Mortality review patient #27
[362] IRCC CQI minutes January 2020
[363] Graham CC CQI minutes May 2020
[364] Elgin CQI minutes January 2020, Graham CC CQI minutes May and June 2020, Sheridan CC CQI minutes September 2020.
[365] Mortality review patient #2
[366] Mortality review patient #27
[367] Mortality review patient #6

delineation of support to be provided by the facility, and establish how and by when documentation of medication administration takes place. The statewide Director of Nursing and Regional Medical Coordinators should be primarily responsible for developing standardized expectations and directions for medication management in collaboration with correctional leadership.

**Medication Refusals**

The monitor has not been able to identify an IDOC administrative directive or vendor Policy & Procedure that identifies when nurses are to inform providers that a patient is refusing medication. Unless specified in facility policy and procedure, this determination is left up to individual providers and nursing staff. There also were no internal or external studies of adherence with somatic medication or how refusals are addressed.

From chart review it is apparent that medication records are not reviewed by providers or adherence summarized prior to important patient-provider encounters such as chronic clinic or infirmary rounds. One patient,[368] age 65 had suffered a stroke in January 2018 and was seen regularly in chronic clinics for diabetes and hypertension and was prescribed eight medications. From review of the MARs it appears that the patient was not adherent taking anticoagulant, anti-diabetic and anti-hypertensive medications. In April 2019 he submitted a request to have all his medications on medication line because he didn't know how to take them. He was seen in clinic five times during this time and his adherence to the prescribed medication regime was not reviewed or discussed. Lack of adherence became progressively worse so that by January 2020 he was refusing many doses of all three types of medication. No provider was notified nor was adherence addressed at the last clinic visit on 3/3/20. Another patient[369] was on an asthma medication intended for daily use but failed to pick it up from January 2018 until the order expired in August 2018. His provider was not notified, and no nursing staff followed up to find out why he was non-adherent. He experienced as asthma exacerbation and was hospitalized in July 2018. He did not pick up several other asthma medications ordered after this time and the provider was not notified. Review of the MAR indicates that this patient may not have had any asthma controller medication and may not have had any rescue inhaler medication left from his last fill on 12/4/19 on the day he died. Both these patients would have benefited from a review and reconciliation of their medications, the opportunity to have questions answered and to confirm that they understood the prescribed medication regime.

In the 2nd Monitor's Report we recommended that the parameters for notification of providers when patients miss or refuse prescribed medication should be established in statewide written directive. We continue to make this recommendation. At a minimum, patients with prescriptions for treatment of acute or chronic conditions should have medication adherence reviewed in advance or the most recent MAR should be with the chart at the time of any provider appointment. Written guidance should also set forth the expectations for prescribing clinicians' response to address patterns of non-adherence.

---

[368] Mortality review patient #27
[369] Mortality review patient #2

After reviewing medical records for this report the Monitor is concerned about the lack of meaningful participation by pharmacists in identifying problems with medications being prescribed and in consulting with physicians to achieve more effective treatment.

Every prescription written is reviewed by a pharmacist before the medication is dispensed. The reason for this review is to evaluate the prescription to determine if it is a properly written order, the order is safe (appropriate dose, duration, method of administration etc.), and then to evaluate the appropriateness of the order in relation to other medications the patient is receiving. This is a standard practice of any pharmacist when dispensing drugs based upon prescriptions. The Monitor reviewed a number of charts of patients whose prescriptions should have prompted action by the dispensing pharmacist to notify and confer with the prescribing provider and it does not appear this safety step was taken. One patient[370] was 67 when he was received for incarceration in 2017. He had COPD and was prescribed 10-20 mg of prednisone for more than 15 continuous months. The patient was also prescribed tramadol for over two years. Both these drugs have risks for adverse reaction when used over long periods of time. There was no evidence that the prescribing provider was contacted by the dispensing pharmacist to discuss the risk of adverse reaction and to suggest alternative medication. Another patient [371]was prescribed two different steroid inhalers from August through December 2018. There was no documentation or other indication the dispensing pharmacist notified the prescribing provider of the duplicate prescriptions. Another patient[372] was prescribed three different steroid creams of different strengths. Again there was no indication that the dispensing pharmacy notified the prescriber requesting clarification of what appear to be duplicate preparations. The Monitor recommends OHS review these patients' care with the vendor and pharmacy subcontractor to determine the opportunities for improvement in identifying potential for adverse medication reactions and other aspects of patient safety in prescribing and dispensing medication.

Other patients were identified whose care would have benefited from the advice and consultation with a clinical pharmacist. There were two elderly patients among the charts reviewed who were on 20 or more medications. One individual[373] was being treated with medication for hypertension, diabetes, high blood lipids and asthma. This patient had tachycardia, elevated blood pressure, hypoxemia, evidence of heart failure, tachycardia and an EKG with symptoms which were not addressed. The patient was prescribed allopurinol for gout without evidence of gout. This patient had 22 medications prescribed. A clinical pharmacist would have been able to simplify the patient's medication regime and would have suggested more effective medication for the patient's conditions. The other patient was 76 years old[374] and was taking 20 different medications. His chronic care diagnoses included hypertension, hyperlipidemia, diabetes, and thyroid disorder. Prescribed medications could have been again simplified by a clinical pharmacist consulting with the treating provider and more effective medications could have been recommended than the ones he was taking. The clinical pharmacist may also have noted the effect two medications were contributing to increased calcium blood levels and recommended alternatives that did not put the patient at risk of hypercalcemia.

---

[370] Death chart Patient 1
[371] Death chart Patient 2
[372] Death chart Patient 20
[373] Ibid
[374] Death chart Patient 4

A fourth elderly patient[375] had heart failure, an automatic defibrillator, coronary artery disease with prior bypass surgery, diabetes, history of atrial flutter, hypertension, high blood lipids, microalbuminuria, and bilateral cataracts. Several errors were made by providers in prescribing medication that had been recommended by the hospital which treated him just prior to his incarceration with IDOC. These would have been quickly identified by a clinical pharmacist with access to the patient's hospital records and brought to the attention of the treating provider. The patient was later started on a medication that has adverse warnings for patients with liver disease in spite of elevated liver function test results. A clinical pharmacist would have been another pair of eyes on the patient and likely would have raised the concern for adverse effects with the provider.

The HIV clinic has incorporated clinical pharmacists into the chronic care of this patient population at the IDOC.  Thus IDOC already has experience with clinical pharmacists and should use this experience to build out clinical pharmacy to address other complex patients.  The Monitor recommends that OHS evaluate the need for clinical pharmacy and include the results of that evaluation in the Staffing Analysis and Implementation Plan.

## RECOMMENDATIONS:

**The recommendations from the Monitor's 2nd report are unchanged as follows:**

1. A standardized process for medication administration that addresses concerns about medication preparation, documentation on the MAR, and reporting of medication refusals and is consistent with patient safety practices and contemporary standards of care must be implemented statewide. This should be managed as a comprehensive plan of change with clear targets, steps to proceed, timeframes, and outcomes. A process consultant is recommended to facilitate forward progress, streamline methods, and identify problems unforeseen by the leadership group.
2. Facility operations need to provide sufficient access to inmates, so medications are administered safely, including scheduling sufficient time to perform the task, specialized equipment, and maintenance of physical plant.
3. Establish more detailed operational guidance specifying how medication is prescribed, how and by when treatment is initiated, how medication is to be administered safely and timely, including delineation of support to be provided by the facility, and establish how and by when documentation of medication administration takes place. At a minimum this should include:
   a. Two-part patient identification with the MAR at the time medication is administered.
   b. Timely transcription of medication orders onto the MAR.
   c. Nurses should have the MAR present at all times medication is administered to patients.
   d. Nurses should administer medications to patients directly from pharmacy-dispensed, patient-specific unit dose containers and contemporaneously document administration on the MAR.

---

[375] Death chart Patient 5

4. Develop a workload driven staffing standard to account for the nursing staff necessary to carry out orders for medication treatment.
5. Establish more detailed operational guidance about notification of the prescribing provider of patient non-adherence with medication prescribed for somatic complaints as well as expectations for the prescribers' response to such notification. Typically this guidance will be to notify the prescriber after three consecutive doses or more than four non-consecutive doses in a seven day period of critical medications only. Identification and notification of the prescribing provider should be built into the electronic health record function as identified in the IDOC Implementation Plan.[376] Expectations for the provider are to discuss the issue with the patient, collect additional information as necessary (labs, meet with the dietician or nurse etc.), document the discussion in the health record as well as the consideration of change (or not).
6. Eliminate expiration of non-formulary requests once approved.
7. Implement the electronic health record including CPOE (computerized physician order entry) and MAR per the plan for automation. Develop automated reports of patients with medication orders which expire in the next seven days and notification to providers of non-adherence.
8. Document development and implementation of corrective action plans to address results of the pharmacy inspection and MAR audit. Trend medication errors and collate results of root cause analysis to identify causes of medication errors. Include structural, equipment and procedural changes to correct problems rather than reliance on reminders at staff meetings and verbal counseling. Establish an observational tool to be used by nursing supervisors to monitor compliance with medication administration procedures and include this study on the CQI calendar.

# Discharge Planning

*Addresses Items II.B.5; II.B.6.s; II.B.6.t;*
**II.B.5.** *Continuity of care and medication from the community and back to the community is also important in ensuring adequate health care.*
**II.B.6.s.** *IDOC agrees to implement changes in the following areas: Summarizing essential health information for patient and anticipated community providers; and*
**II.B.6.t.** *IDOC agrees to implement changes in the following areas: Upon release, providing bridge medications for two weeks along with a prescription for two more weeks and the option for one refill, if medically appropriate.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

The IDOC reports that it has achieved compliance with II. B. 6. t of the Consent Decree which states that persons being released from IDOC will receive two weeks of medication along with a prescription for two more weeks and the option for one refill, if medically appropriate.[377] No

---

[376] Illinois Department of Corrections, Implementation Plan, Lippert Consent Decree, page 13
[377] Illinois Department of Corrections, Defendants' Reporting Requirement Pursuant to V. G. of the Lippert Consent Decree, November 2020, page 1

information or other documentation was provided to support the conclusion that compliance has been achieved.

The Monitor reviewed medical records of 25 persons who were discharged back to the community between June and September 2020 from five IDOC correctional centers.[378] Eighteen individuals were on medication at the time of release but only four were documented as receiving two weeks of medication and a prescription for two more weeks with the option of one refill, as stipulated in the Consent Decree. There was no documentation as to the reason for variation. Seven persons received from 14 days to 40 days of medication but no prescription or option for a refill.[379] One person received a one month quantity of Remeron, an antidepressant which is also used to alleviate insomnia, without any documentation on the discharge summary of the reason for the use of this medication.[380] Three persons were released with prescriptions only[381] which meant that they would have to go to a pharmacy to have the script filled before they could receive the next dose. Two persons were released with the medications that remained from the last fill.[382] Finally five persons were released without a supply of medications and no prescription.[383] As stated earlier, no documentation was included to indicate this was intentional (i.e. a clinical decision) or an omission. If a person was released with a supply of medication, there was a signed receipt. There was not always documentation of receipt of a prescription.

With regard to II.B.6.t the policy and procedure for discharge medication is still a draft and actual practice does not conform to the Consent Decree. The variation and lack of clinical oversight for which medications are provided and the amount supplied is frankly concerning.

The Monitor received a draft policy and procedure from the IDOC entitled 04.03.E.10 Discharge Planning which states that "The department shall ensure that Offenders being discharged from IDOC care is provided with enough resources for continuous care outside of corrections." The Discharge process includes providing the releasee with a completed Discharge Medical Summary, a two week supply of medication, and a prescription for an additional two weeks of medications with one refill. All individuals being discharged are to be offered HIV counseling and education and a free rapid HIV test. The Monitor provided feedback on the draft policy and procedure to the IDOC in August. The IDOC policy and procedure on discharge planning has yet to be finalized.

The IDOC has a Discharge Medical Summary that lists the person's current medical conditions, significant labs or x-ray findings, results of HIV testing, tuberculin skin test results, current medications, allergies, past surgery, ongoing treatment, and scheduled outside appointments. Of 22 persons who had a medical or mental health condition and were receiving treatment only 10 had a completed Discharge Medical Summary included in the discharge records that were provided. Although this form was effective in 2014 it appears to be selectively used to document a person's condition and treatment at the time of discharge.

---

[378] Danville CC, Decatur CC, Lawrence CC, Pinckneyville CC, and Pontiac CC
[379] Discharge patients #s 7, 20, 25, 24, 23, and 10
[380] Discharge patient #19
[381] Discharge patients #s 23, 14, and 11
[382] Discharge patients #s 12 and , 6
[383] Discharge patients #s 22, 13, 17, 25 (released with mental health medication but without Keppra, Mobic or Singular), and 24 (released with MH medications but no medication for HTN)

Discharge Medical Summaries were completed at Decatur and Pinckneyville two to four months in advance of the release date.  This is a poor practice because the person's condition and treatment may have changed in the interim.[384]  This is probably what happened with one person who received Remeron[385] on release when there was no corresponding diagnosis, and the medication was not listed on the Discharge Medical Summary. The summary had been written in May and the release was not until July.

The Discharge Medical Summaries were written by registered nurses at Decatur and Lawrence and LPNs at Pinckneyville. The Monitor found many omissions in documentation on the Discharge Medical Summaries. Three persons should have had the most recent lab and other diagnostic results listed, one was a patient taking Dilantin for seizures,[386] the other was a patient followed for hepatitis C infection[387] and the third had abnormal results 10 days earlier.[388]  Two patients had medical conditions listed but not the mental health conditions they were being treated for[389] and a third discharge summary just lists "psych history."[390]  Virtually no information was provided about vaccination status except the date of the most recent one for influenza. One person had received the first vaccine for shingles recently however the discharge summary did not include this information nor the recommendation for a second dose and the timeframe it should be accomplished within.[391]  HIV testing appears to be routinely offered as part of discharge planning however this testing is usually done two or more months before release and so does not have much utility as a measure of an individual's current infection status when released. HIV test results were included with the discharge documentation in 20 of 25 charts reviewed. The date of the most recent tuberculin skin test was also included in the discharge information. However results were recorded as simply negative and instead should be documented as the size of the induration in millimeters. The Discharge Medical Summary does not indicate documentation of provider review.

Even though six of these twenty-five discharges had chronic illnesses, the status and control and most recent chronic care clinic results (including comprehensive lab results) were not on the Medical Discharge Summary or documented as included in the discharge information. Neither was there any documentation of immunizations or risk- or age-based health screenings.[392]  Four individuals over 50 years[393] did not receive documentation of colon cancer screening. Six persons[394] who were 26 years old or younger did not have documentation they had received or been offered Human Papilloma Virus vaccinations.

---

[384] Discharge patients #s 11, 7 and 9 (were released with medication that differed from the medications listed on the discharge summary).
[385] Discharge patient #19
[386] Discharge patient #16
[387] Discharge patient #9 was ineligible for treatment only because length of stay was too short. Should have had HCV RNA, liver study, or liver fibroscan results included as well as medical history with the discharge summary.
[388] Discharge patient #22 (abnormal lipids and decreased white blood count)
[389] Discharge patients #s 7 and 17
[390] Discharge patient #17
[391] Discharge patient #20
[392] Discharge patients #s 24, 6, 20, 8, 11, and 16
[393] Discharge patients #s 24, 4, 20, and 7
[394] Discharge patients #s 25, 23, 12, 11, 15, and 17

There were only four referrals for ongoing care in the community; these were for mental health or substance abuse treatment. One person with HCV was determined not eligible for treatment during incarceration only because of length of stay. This individual should have had a referral and an appointment in the community documented on the Discharge Medical Summary. If follow up for HCV in the community is automatic these arrangements still need to be documented on the Discharge Medical Summary.

At Lawrence CC a pre-printed worksheet documented discharge planning and identifies needs for continuity of care upon release. The worksheet has a place for physician and psychiatry signature and the entry of information into the Offender Tracking System (OTS) about release needs. Documentation of pre-release planning ensures that health services is notified of imminent releases in time to prepare the most current information, ensure that necessary appointments get taken care of in advance of release and that referrals are made, as necessary. The form could be improved to document separate review by both mental health and medical clinicians and adding some other details but use of the pre-release planning form should be included in the policy and procedure that is now in draft.

If there is a separate process for discharge planning for persons with mental health conditions this needs to be made clear in policy, procedure, and practice. Since many persons treated for mental health conditions are also treated for medical conditions there needs to be an established process to ensure that the needs of individuals at the time of release are addressed comprehensively.

The IDOC has an established process to provide men and women being released to the community a summary of their health care conditions consistent with II.B.6.s. However the Discharge Medical Summaries give incomplete and inaccurate information about the person and their needs for ongoing medical care. Documentation should also include when copies of pertinent lab and diagnostic tests, recent chronic care progress notes, and documentation of age-based and risk based screenings and vaccinations have been provided to the person. Finally, there needs to be evidence of provider participation in the preparation of the discharge summary, determination of discharge medications, and needed additional clinical information.

**RECOMMENDATIONS:**

1. Initiate a review to determine why the practices for supplying medication and prescriptions vary from the Consent Decree. Pertinent questions to ask include who determines what medications are provided at discharge, how are discharge prescriptions obtained, who is involved in preparing medications for discharge and how do they go about this task. There needs to be better evidence that the clinician's responsible for the person's medical and mental health care determine what medications the patient receives upon release and they provide a prescription for an additional two weeks and determine if a two week refill is medically appropriate.

2. Implement use of the pre-discharge planning worksheet that was used at Lawrence CC and incorporate it into the policy and procedure. If planning for continuity of care will be necessary, use of this worksheet should initiate a referral to the responsible medical and mental health clinician to review the patient chart and see the person as necessary to make determinations about medical and referrals to the community.

3. All releases should have a Discharge Medical Summary completed no more than a day or two before release. The Discharge Medical Summary should provide a thorough and accurate summary of the person's current condition and need for ongoing care.
4. Finish the policy and procedure for discharge and incorporate what was learned from completing the first recommendation and include use of the discharge planning worksheet.
5. Enhance continuity of care into the community for discharged individuals by providing copies of pertinent diagnostic tests, recent chronic care progress notes, vaccinations, and routine health maintenance screenings to the discharge packet. When these are included it should be so noted on the Discharge Medical Summary.
6. A copy of the actual prescription with refills should be placed or scanned into the medical record to verify the information on the Medication Receipt at Discharge form.

# Infection Control

***Addresses items II.A; III.J.1; III.J.2***

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**III.J.1.** *IDOC shall create and staff a statewide position of Communicable and Infectious Diseases Coordinator. This position shall be filled within fifteen (15) months of the Preliminary Approval of this Decree [June 2020].*

**III.J.2.** *Facility staff shall monitor the negative air pressure in occupied respiratory isolation rooms which shall be documented each day they are occupied by prisoners needing negative pressure. If unoccupied, they shall be monitored once each week. Facility staff shall report such data to the Communicable and Infectious Diseases Coordinator on a monthly basis.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

The Monitor's last report cited thirteen recommendations in the Infection Control section. The IDOC has addressed one recommendation and partially addressed two recommendations. Ten recommendations have not yet been addressed. The status concerning these recommendations are noted sequentially in the subsequent paragraphs. The Monitor raised this item from noncompliance to partial compliance based on improvements in the Hepatitis C (HCV) guideline and on the drafting of an immunization guideline.

The IDOC reported in May 2020 that the position of Communicable and Infectious Disease Coordinator had been filled, however the Monitor was recently informed that this individual is only in an "acting" role. This individual previously worked as an OHS regional supervisor and, subsequently, as the system's Quality Improvement/Infection Control Coordinator but did not have certified training in infection control. To date the Monitor's recommendation that this individual obtain training and certification by the Certification Board of Infection Control and Epidemiology has not yet been accomplished or reported. More recent information received from the IDOC indicates that this individual is officially the Healthcare Unit Administrator at NRC,

temporarily assigned to the position of "acting" Infection Control Coordinator position.[395] This individual does not have sufficient training and experience to qualify for this infection control and infectious diseases position.

In the 2nd report the Monitor recommended revising the position description of the Infection Control Coordinator to require experience in infection control, certification in infection control and prevention through the Certification Board of Infection Control and Epidemiology and maintenance of certification, proficiency with electronic software systems for surveillance and use of an electronic health record and use of electronic surveillance reporting systems, and attain six Sigma green belt certification within 3 years of hire. We continue to make this recommendation.

When the COVID-19 pandemic started, IDOC experienced an outbreak at Stateville.  Due to the disruption of local hospital resources, the IDPH began providing guidance to IDOC on COVID-19 issues.  For this purpose, an IDPH physician who is responsible for congregate settings with respect to COVID-19 dedicated part of her time to guide IDOC on issues related to isolation; employee and inmate testing; and other COVID-19 related concerns. A permanent and formalized relationship of this nature to guide IDOC in its entire spectrum of infection control responsibilities, and not just with respect to COVID-19, is something the Monitor recommended in his 2nd Report and continues to strongly recommend.

The IDOC indicated in the June 2020 Revised Implementation Plan that it will collaborate with the Illinois Department of Public Health to provide guidance on infection control policy including immunization, screening, and other public health matters; the June 2020 Implementation Plan gave no timetable of when this will occur, what the collaboration would consist of, or how it would be implemented within the IDOC. In the November 2020 Bi-Annual Report, the IDOC stated that it had partnered with SIU for infectious disease guidance in a Court ordered assessment of the initial COVID outbreak in the IDOC. IDOC stated that SIU's infectious disease expert can be an ongoing resource for the Department (IDOC).  Aside from the current COVID consultation the Monitor has received no information about SIU or IDPH's involvement in other infection control matters. The Monitor is very supportive of IDOC's efforts to develop partnerships with IDPH and academic institutions in the State of Illinois.  The Monitor recommends at a minimum this include a dedicated and permanent part-time physician consultant to give advice and expert consultation on infection control issues and on infection control policy.

According to the most recent staffing information[396] there are no titled infectious disease nurses identified at any institution and CQI minutes also do not identify attendance by an infection control nurse. Infection control nurse positions do not appear in the Staffing Analysis at any of the IDOC facilities.[397]

The IDOC does not yet have an infection control policy and the vendor infection control plan is

---

[395] Facilities Healthcare Unit Administrators by Region received December 24, 2020
[396] Staffing Update – 12/15/2020
[397] Staffing Analysis Illinois Department of Corrections Office of Health Services, Lippert Consent Decree 6/18/2020

not written from the perspective of IDOC. Standardized methods of surveillance and infection control activity are not yet apparent.

Item III.J.2 in the Consent Decree directs that all negative pressure rooms are monitored on a defined regular time frame. All IDOC facilities require testing and documentation of negative pressure units in a log. The IDOC is tracking the functionality of negative pressure units in many but not all of the 26 facilities that have infirmaries.[398] Review of the September 2020 CQI minutes and Safety & Sanitation reports revealed that eight (32%) of the 26 infirmaries did not report the ongoing monitoring of the negative pressure units. Of the seventeen facilities that reported on their negative pressure units, only one unit[399] was found to be non-functional. When documented, the reporting of the negative pressure monitoring was generally noted in the CQI minutes but in two of the facilities the functionality of negative pressure was also noted in the Safety & Sanitation Reports. Although recommended in the 2nd Report most CQI minutes did not specifically verify if the infirmary nurses were performing daily or weekly tissue testing and panel correlation to assure that these units were always operational. A review of Safety & Sanitation inspection forms[400] identified only one facility[401] that was using a checklist for the health care unit that specifically noted the need to inspect the negative pressure units.

IDOC indicated they are within six months of being compliant with the III. J. 2[402] (negative pressure room monitoring) but have not provided the Monitor with a plan to achieve compliance nor a method that documents compliance. We previously found that the methods relied upon to monitor negative pressure isolation rooms are not standardized, documentation of monitoring rooms for negative pressure varies widely and is unreliable and the data reporting required by III.J.2. is incomplete and inconsistent. The Monitor has received no information to indicate this has changed. In order to demonstrate compliance with III. J. 2 we recommend that the Infection Control Coordinator establish a reporting log that is submitted monthly with the other Lippert reports by each facility that shows the status of each negative pressure room (occupied or not), the type of check that was done, the correlation of the tissue test with the control panel (if one exists), the date and person completing the check and the result. The reliability of the information on the log will then have to be verified by inspection at the facility.

The IDOC does have a blood borne pathogen administrative directive which addresses OSHA requirements for education, hepatitis B testing, and blood borne pathogen exposures. The Monitor recommended in the 2nd report that it be expanded to include vaccinating inmate workers for hepatitis A and B. The IDOC recently sent the Monitor an administrative directive on immunization.[403] That document does not specifically address inmate workers.

The Monitor discussed at some length in the 2nd report the advantages to the IDOC of making the switch to a Food and Drug Administration (FDA) approved interferon-gamma release assay (IGRA) test such as QuantiFERON® TB test to screen for tuberculosis infection. The IDOC has

[398] Quality Improvement Minutes and Safety and Sanitation Reports September 2020
[399] Southwestern CC
[400] Safety & Sanitation Reports July-September 2020
[401] Lawrence CC   S&S HCU checklist: "Log for Respiratory Isolation rooms check of negative pressure"
[402] Lippert Bi-Annual Report November 2020
[403] Administrative Directive Illinois Department of Corrections Immunization and Cancer/Preventive Screening Programs

not responded to this recommendation and from chart review it is clear that the tuberculin skin testing continues to be the method used. Of intake charts reviewed from the months of August and September tuberculin skin tests were not completed 40% of the time, primarily because the result was not read. The Monitor continues to make this recommendation to the IDOC.

As recommended in the 2nd Court Report, the IDOC in conjunction with UIC Telehealth and the Monitor did revise the hepatitis C (HCV) Screening and Treatment Guidelines[404] to increase the eligibility for treatment of a number of HCV infected individuals. However, as of January 2021, the revised guidelines have not yet been disseminated and implemented throughout the IDOC. These revised guidelines must be immediately shared and implemented with the clinical teams at all IDOC facilities.

A table representing an audit of HCV treatment comparing June to September of 2020 is shown below.

| HCV Treatment: June vs. September 2020 | | | | | |
|---|---|---|---|---|---|
| | Total HCV | Undergoing Treatment | Pending Treatment | Completed Treatment | Not on Treatment and Not Yet Completed Treatment |
| **June 2020** | 1447 | 17 (1.2%) | 100 (7.6%) | 73 (5%) | 1374 (95%) |
| **September 2020** | 1274 | 25 (1.9%) | 122 (9.6%) | 66 (5.1%) | 1205 (94.6%) |

As noted in this table only 1.2% to 2.1% percentage of Hepatitis C patients housed in the IDOC in June 2020 and September 2020 were receiving treatment at any one time.[405] This data shows the percentages of patients on treatment at any one time over the last two years, during which time the number of untreated hepatitis C individuals in the IDOC ranged from 1,180 to 1,656 with only and an average of only 1.3% of active cases receiving treatment at any point in time.[406] In June and September 2020, approximately 98% of active HCV patients in the IDOC were not on treatment.[407] UIC HCV Telehealth program data reported that eighty-two individuals incarcerated in the IDOC received treatment in 2019 and ninety-eight individuals incarcerated in the IDOC received treatment for HCV in the first eleven months of 2020; this annualizes to 107 patients treated in 2020.

As in previous reports there was no discussion in the quality improvement minutes about the continued low rates of HCV treatment.in the IDOC. The total number of incarcerated individuals enrolled in the HCV clinic has decreased from 1758 in January 2020 to 1274 in September 2020; this is likely consistent with the decreased IDOC census due to the restriction in admissions and early releases during the COVID 19 pandemic but may be due to decreased testing.

---

[404] Hepatis C Screening and treatment Guidelines September 2020

[405] IDOC June and September 2020 CQI minutes Hepatitis C Clinic data

[406]Review of CQI minutes, Hepatitis C clinic data: Percentage of untreated HCV individuals receiving treatment at anytime 6/1/19 (1.3%), 12/1/19 (0.7%), 1/1/2020 (1.0%). 6/1/20 (1.2%), and 9/1/20 (2.1%)

[407] The untreated/not completed treatment patients included 25 currently undergoing treatment, 122 pending treatment (uncertain if they will be offered treatment), 1080 either not yet processed or deemed ineligible by old guidelines. Excluded for this number were 66 who had already completed treatment and 3 who refused treatment. The refusals of treatment are not on this table.

There is variability across correctional facilities in the IDOC with respect to treatment of HCV. The number of HCV patients treated in 2020 at individual sites ranged from zero to eleven. Six facilities[408] treated no patients and an additional seven facilities[409] treated only one patient in 2020. The size of the facility did not correlate with the number of treated HCV patients. In September 2020, Decatur, a female facility with a census of 357 and 55 patients with HCV treated 6 patients for HCV compared with Logan, a much larger female facility with a census of 1140 and 81 patients with HCV that treated only one patient. The reasons for this site-to-site variability needs to be analyzed by the quality improvement committees and IDOC quality improvement leadership. The Quality Improvement committee should investigate whether systemic or operational barriers to treatment exist. Any systemic barriers to treatment need to be corrected.

In February 2019, the US District Court[410] ruled that based on a January 2019 HCV Protocol, individuals with fibrosis levels of greater than or equal to two (along with a few other eligibility criteria) should be referred to the UIC HCV Telehealth program for treatment. In March 2020, the US Court of Appeals ruled that the Lippert Monitor would hence forth monitor HCV therapy as part of the Consent Decree.[411] Prior to January 2019, the IDOC was only referring HCV patients to UIC who had fibrosis levels of F3 and F4. In 2018 UIC reported that zero of 79 patients treated in 2018 had fibrosis levels of F2 or less while in 2019 the number with fibrosis levels of F2 increased to 19 (23%) of the 82 individuals treated. In the first eleven months of 2020, 37 (38%) of the 98 treated patients had fibrosis levels of F2. UIC data also documented that from 2018 to 2020 only 4 patients with fibrosis levels of F0-F1 have been treated.

The Federal Bureau of Prisons stated that "all sentenced inmates with chronic HCV are eligible for consideration for treatment. Certain cases are at higher risk for complications or disease progression and may require more urgent consideration for treatment."[412] The Monitor concurs with the need to prioritize HCV patients and agrees that IDOC patient-inmates with fibrosis levels of F2-F4 should be given priority for HCV treatment. The monitor is also encouraged by the increasing treatment of HCV patient with fibrosis of F2 but the IDOC continues to miss opportunities to treat and cure individuals with fibrosis levels of F0 and F1 before they advance to more serious levels of liver scarring and cirrhosis. F0-F1 level patients rarely require ultrasound and esophagogastroduodenoscopy (EGD) testing that can add months to the screening process for HCV patients with F2-F4 liver fibrosis levels.[413] IDOC should immediately begin to refer individuals with fibrosis F0-F1 to fill available treatment slots while F2-F4 cases are completing additional evaluations. UIC HCV Telehealth specialists have stated that they are willing to accept and evaluate referrals with all levels of fibrosis.

As recommended in the 2nd Court Report, the IDOC in conjunction with UIC Telehealth and the

---

[408] Murphysboro, NRC, Pinckneyville, and Taylorville, JTC and Elgin
[409] Danville, Graham, Logan, Pontiac, Stateville, Vandalia, and Vienna
[410] Orr v Elyea, United States District Court, Central District of Illinois February 4, 2019
[411] Orr v Shicker, United States Court of Appeals , March 23, 2020
[412] Management of Chronic Hepatitis C Virus (HCV) Infection, Federal Bureau of Prisons, Clinical Guide Guidance, August 2018
[413] The Monitor notes that typical delays in getting specialty services in IDOC act as a barrier for many conditions; see the section on Specialty Care in this report.

Monitor did revise the Hepatitis C (HCV) Screening and Treatment Guidelines[414] to address potential barriers to access HCV therapy and to increase the eligibility for treatment of a number of HCV infected individuals. Revised guidelines were finalized to include the following:

- decreasing the length of sentence requirement before someone could be treated to six months from one year,
- the removal or modification of select laboratory tests restrictions,
- the elimination of antiquated mental health and substance abuse restrictive criteria,
- recommendation to refer individuals to UIC while EGD appointments are pending,
- the designation of an infection control nurse at each facility to initiate a HCV database for all HCV positive inmates,
- a statewide infection control nurse weekly review of the database with UIC Telehealth specialty team, and
- screening all offenders at the Reception Centers for HCV-antibody testing followed by HCV-RNA testing if antibody is positive.[415]

However, as of January 2021, the revised guidelines have not yet been disseminated and implemented throughout the IDOC. These revised guidelines must be immediately shared and implemented with the clinical teams at all IDOC facilities.

The monitor is hopeful that the statewide database will enable IDOC clinical leadership to continually assess the number of higher priority HCV patients that are being treated and the percentage that are not being treated and to determine the number of unutilized UIC Telehealth appointments that could be filled by F0-F1 patients before these individuals develop liver fibrosis and cirrhosis.

Treatment of HCV can eliminate the virus in individuals who then will no longer be infectious. HCV can be readily transmitted within the IDOC by shared needles, inmate tattoo instruments, and accidental needle sticks. This is important because treatment both cures the infected individuals and reduces transmission risk to other inmates and staff, and ultimately improves the public health of the State of Illinois. IDOC should establish a goal to significantly increase the number of HCV infection cases treated annually. IDOC should set a goal to have treated everyone with HCV over the next three-five years; this would require a tripling or quadrupling of annual HCV treatments. There is no reason why HCV cannot be eliminated in the IDOC.

With respect to immunization, the Monitor's 2nd Report's recommendation that IDOC track and report the provision of nationally recommended adult immunizations has not been fully acted upon and will be discussed in the Adult Immunizations section (III.M.1.b).

With respect to quality improvement, infection control activities documented in quality improvement meeting minutes report on some data but did not document any analysis or purposeful goals. With respect to quality improvement meeting minutes, 28 sites provided CQI

---

[414] Hepatitis C Screening and treatment Guidelines September 2020 revisions finalized in January 2021
[415] Revised Summary of changes to the Hepatitis C Guidelines, September 2020 which stated "All offenders shall be screened at the Reception Centers for HCV-antibody testing followed by HCV-RNA testing if antibody positive." This appears to be a change form the previous practice of offering 'opt-out" HCV testing at the R & Cs.

minutes for September 2020. Of those, 23 sites reported the numbers of persons with HCV, HIV and MRSA.  Only Menard reported other types of skin and soft tissue infections. Only nine sites reported cases of chlamydia and gonorrhea.  Only seven sites reported in their CQI minutes persons tested or with COVID-19 symptoms.

Data is difficult to obtain and share within the IDOC medical program and infection control data is particularly affected.  The data reporting of COVID-19 data has been an example.  OHS has no specific data support personnel.  OHS has modified its data formats for COVID-19 a number of times since the beginning of the pandemic.  Previously, the Monitor was told that the Medical Coordinator, a high level position administrative position, was responsible for maintaining data. During conference calls with OHS staff, the Monitor sometimes has questions about data and discovers that OHS does maintain some data files but when the data is requested, the Monitor receives files for a period of time but then receipt of files stop.  IDOC recently shared a new spreadsheet of COVID-19 data with the Monitor that includes weekly testing including deaths for both employees and incarcerated persons. This additional database more readily allows for the recognition of trends.  But the Monitor has only received this file once.  The information that has been continuously available to the Monitor is the IDOC public website, maintained by custody which cannot be used for trending or analysis without creation of a separate spreadsheet.

Standardized data collection used by all facilities for the purpose of surveillance for infection control is not currently described in policy or procedure.  Reported data is defined by each facility which results in considerable variability.  OHS must promptly begin hiring data staff as recommended in the medical records section of this report.  A shared drive needs to be supported for use by OHS so that shared statewide data can be managed.  The Monitor should have access to statistical data shared internally that is used for surveillance and quality purposes.

There is great variation in what information is reported in the Quality Improvement meeting minutes and no analysis of infection control issues.  In the 2nd Monitor's report we discussed the disparity among intake sites in how infectious disease screening results are reported. The problem continues; NRC has not reported these statistics since March 2020. Graham which did not report intake communicable testing results at all has since begun reporting.  Previous data reported by NRC showed that many inmates refused opt-out HIV testing. This refusal rate has not been discussed at any of the CQI meetings held at NRC. Only seven sites present COVID-19 data on testing or isolation at the CQI meetings and there is no discussion of data from contact tracing or disease surveillance. Although vaccination is a significant infection control activity, vaccination rates are not discussed at all.  In their 3rd Report the IDOC has asserted that they are compliant with item III.M.1. (a) of the Consent Decree which states that all prisoners will be offered an influenza vaccination but offered no data to verify their assertion.  We could find no data in quality improvement reports to verify that assertion. We have been provided with data from the pharmacy which indicates vaccines has been procured by sites but there is very limited[416] or no evidence provided by IDOC of who was offered or how many people have been vaccinated.

In the last report we commented that the IDOC uses the Wexford Infection Control Guidelines

---

[416] September CQI minutes: Kewanee and Elgin Treatment Center reported the number of flu vaccines offered and administered

which are very generic and not specific for IDOC. An IDOC specific Infection Control Plan has not yet been produced. The IDOC sent to the Monitor revised guidelines for HCV treatment[417] and an administrative directive on immunization and cancer preventive screening programs[418]. The Monitor has provided comments in the development of these important revisions. The Infectious Disease Coordinator should establish a plan to continue the development of written guidance that is specific to the IDOC in all infectious and communicable disease topics.

## COVID-19

As recommended and subsequently Court ordered, IDOC arranged for an Infectious Disease specialist (SIU Springfield) to evaluate the initial COVID-19 outbreak at Stateville CC. However the report solely addressed the IDOC subsequent response to the outbreak and did not perform the recommended root cause analysis that could have identified opportunities that might have mitigated the morbidity and mortality of this outbreak and provided guidance to IDOC's ongoing efforts to prevent, manage, and monitor outbreaks. We have attached Appendix D to this report that reviewed the timeline and medical records during the beginning of the outbreak. The appendix identified opportunities for improvement that could be learned from the outbreak.

At the time of the submission of the Monitor's 2nd Court Report, the COVID-19 pandemic was confined to nine IDOC facilities and had appeared to have stabilized in 6 of these sites.[419] New admissions to IDOC had just recently resumed. Twenty-one IDOC facilities had not had a single case of COVID-19 in their incarcerated populations. At this same time, twenty-seven of the 30 IDOC facilities had employees who had tested positive for COVID-19 in the community; employee cases preceded inmate cases and outbreaks in nearly every facility. Although all employees were being screened for symptoms and elevated temperature at the prison entrances, few if any employees had been turned way by the screening procedure. It was well understood that an estimated 30-40% of all COVID-19 infections in the USA were completely asymptomatic and afebrile. Given that IDOC's incarcerated population was essentially living in enclosed island with limited movement, no new admissions, and no visitations, as the rates of COVID-19 increased in the local communities, infected employees were or soon would be the vectors of spread into the facilities and to the incarcerated population. The Monitor's focus during this time period was to recommend testing and subsequently vaccination.

## COVID-19 Testing of Employees and Incarcerated Persons

Because most facilities had populations that exceeded their rated capacity, identifying quarantine and isolation space was exceedingly difficult and socially distancing was virtually impossible. Except for East Moline CC and Stateville CC where tents were set up, isolation and quarantine space consisted of reshuffling inmates in existing housing in the most optimal arrangement that could be identified. However, there was no good way to isolate and quarantine and for that reason, the Monitor recommended release of as many inmates as possible. The IDOC was unable to release inmates in any appreciable numbers. The only remaining way to protect

---

[417] IDOC Hepatitis C Screening and Treatment Guidelines changes from Jan 2019 to September 2020 Protocol and Screening and Treatment Hepatitis C Guidelines September 2020.
[418] Administrative Directive Illinois Department of Corrections: Immunization and Cancer/Preventive Screening Programs
[419] IDOC COVID-19 Response Website

inmates under these circumstances was to use testing. Because employees were the vectors of transmission into facilities the Monitor began with that recommendation.

The timeline of testing recommendations is as follows.

- In the 8/6/20 2nd Court Report the Monitor recommended "staff should be tested weekly if there are ongoing cases in the community where the prison is located."
- On 8/10/20, admissions to IDOC from local jails were resumed. IDOC implemented procedures to test, isolate, and quarantine all new admissions.
- On an 8/13/20 conference call with the IDOC the Monitor communicated that asymptomatic employees posed the greatest risk of bringing COVID-19 into the correctional facilities and transmitting the infection to the inmate population. The Monitor strongly recommended that IDOC begin to test employees on a regular basis.
- On 8/19/20, the Monitor sent a letter to the Parties stating that all staff should expeditiously begin to be regularly tested with testing frequency modified based on the rate of transmission in the community. This was not done. By early September 2020, all 30 facilities had now experienced positive employee cases and 18 facilities had positive cases in its incarcerated population with new surges in nine facilities.
- On 9/5/20, the Monitor wrote another communication to the Parties stating that "all existing efforts of the Parties to collaborate with the State of Illinois to implement employee testing…be accelerated."
- On 9/11/20, a letter was sent to the Parties in response to IDOC's initiation of an employee contact tracing[420] protocol; the Monitor again recommended routine COVID-19 testing of employees regardless of symptoms or contact with a COVID-19 case. In addition, the Monitor recommended additional testing of inmates as they had no reasonable way to protect themselves within an environment without potential for social distancing.
- On a 9/17/20 conference call, IDOC discussed with the Monitor the initiation of a pilot program to routinely test employees at a select number of facilities including facilities with high-risk populations, the few remaining sites with zero COVID-19 inmate cases, and sites currently with no active COVID-19 cases. IDOC did not commit to a specific number of sites in this project.
- IDOC initiated pilot testing programs at Kewanee[421] on 11/3/20 and Robinson[422] on 11/8/20.
- On 11/11/20, during a Court hearing , the Monitor communicated that in the prior two weeks there were increasing employee COVID-19 cases in all thirty facilities and inmate cases in twenty facilities with double and triple digit surges of inmates cases in fourteen sites. The Monitor stated that IDOC should immediately initiate employee testing at all facilities and not wait for the pilots to be completed.
- On 12/3/10 OHS stated that they were planning to roll out testing of all employees and incarcerated persons prioritizing facilities with higher current rates of infection or large numbers of high-risk offenders. The Monitor requested that IDOC develop a concrete timeline for the systemwide rollout. The IDPH representative on the call voiced support

---

[420] While the Monitor recommended screening all employees. This initial employee test program by IDOC was to only test employees who were in contact with a positive COVID-19 case. Hence the term contact tracing.
[421] This was initially only employee testing but was modified to include inmate testing.
[422] The Robinson pilot included both inmates and employees.

for treating IDOC as long term care[423] facilities and utilizing the same testing guidelines as in place for nursing homes.[424]

- On 12/7/20 there was another conference call between Parties and the Monitor. The Monitor communicated that during the prior week there had been new COVID-19 positive employee cases in 29 of the 30 correctional centers with double digit increases in 11 facilities and there also were double and triple digit increases of inmates testing positive for COVID-19. The Monitor stated that time was being lost and IDOC needed to implement a rapid, expedited rollout of outbreak mitigation to all facilities. IDOC committed to sending out the rollout plan by the end of this week.

- On 12/12/20 IDOC sent out a seven week timeline that would implement surveillance testing and/or outbreak mitigation testing in all sites; IDOC accelerated this timeline to six weeks on 12/14/20. IDOC reported that the rollout was adhered to and as of January 14, 2021 all IDOC facilities were actively screening all employees and incarcerated individuals. Since the 12/8/20 initiation of the expanded roll out until 1/23/21, 961 employees and 4,660 inmates have tested positive for COVID-19 testing.

It took three to four months from the time the Monitor recommended extensive testing of employees until it was initiated. When the Monitor advised IDOC in August 2020 to initiate employee surveillance testing, only ten facilities had identified COVID-19 cases in the incarcerated population and only five had experienced double digit outbreaks of COVID-19. Whether due to supply chain issues, logistical and procurement barriers, staffing concerns, and inadequate administration support for the clinical leaders, there was a four month delay before universal employee testing (and inmate testing) was enacted systemwide. By December 2020 COVID-19 had entered and established itself in twenty-nine of the thirty correctional centers with twenty-seven facilities having major outbreaks. Twenty-two sites have now had over 200 COVID-19 positive inmate cases and eight had experienced over 450 cases.

While the Monitor recommended universal repetitive employee screening as early as 8/6/20, it became clear that the employee screening would not start soon because the issue of testing became a dispute resolution matter. Because of the delay, on 9/11/20 the Monitor recommended testing inmates routinely as a way to protect inmates because of the virtual impossibility of socially distancing in a prison and the delay in testing employees. The gubernatorial order placing a moratorium on transfers from local jails to IDOC was lifted on 7/27/20 and inmates actually started being sent to IDOC on 8/10/20. At that time new inmates were screened for COVID-19 at intake but no other screening of inmates was taking place except for inmates with symptoms or in those who had significant exposure including those involved in outbreaks. Routine inmate and employee screening protocols were piloted at two facilities[425] in November 2020 and began to roll out at other facilities on 12/8/20. As of 1/14/21 the IDOC had implemented system wide testing of employees and inmates. Approximately 32% of the IDOC entire population has tested positive for COVID-19 compared to approximately 9% of the Illinois civilian population which is approximately 3.5 times higher rate of infection as the

---

[423] Equivalent to nursing homes
[424] CDC nursing home guidance defines a single case as an outbreak. When one case is detected the entire facility is tested and retested regularly, based on discussion with local health officials, until there are no cases. Health care personnel are considered part of the nursing home environment.
[425] Robinson and Kewanee

Illinois civilian population. This infection rate likely substantially underestimates true cases because of the likelihood of asymptomatic acquisition of the infection.[426]

Since the initiation of systemwide COVID-19 testing in the first week of December 2020 through 2/9/21, 1,328 employees and 5,379 incarcerated persons have tested positive for COVID-19. The vast majority of these positive cases were asymptomatic. The daily number of active[427] employee cases peaked on 12/29/20 with 389 cases and has steadily decreased to 142 on 2/9/21 with 8 facilities reporting zero new cases in the previous week and the other 22 facilities all reporting less than 5 new cases in the past week. Active cases in the incarcerated population peaked on 1/3/21 with 2,166 infections and has now decreased to 282 active cases on 2/9/21 with 16 correctional centers reporting zero new cases in the last week, 11 centers with 5 or fewer new cases, and only three facilities with thirteen or more cases.[428] Daily hospitalization censuses of incarcerated persons has decreased from twenty-eight inpatients with eight on ventilators on 1/14/21 to six inpatients on 2/8/21 with three requiring ventilator support. However, during this timeframe, there were an additional 28 patient-inmate COVID-19 deaths.

Although the reasons for the decrease in both employee and patient-inmate COVID-19 positive infections is likely multifactorial, the IDOC decision to initiate widespread testing of both employees and the inmate population which lead to heightened isolation and quarantine restrictions and less entry into the correctional centers by asymptomatic employees undoubtedly has played a role in the steady decrease in the numbers of infected staff and incarcerated persons. The Monitor can only speculate how many positive COVID-19 cases in the incarcerated men and women could have been prevented and subsequent morbidity and mortality avoided if the expanded testing had been initiated months earlier when there were multiple IDOC facilities with zero or few identified COVID-19 cases.

**COVID-19 Vaccination**
COVID-19 vaccination is also part of a dispute resolution. On December 7, 2020, the Monitor recommended that IDOC should prepare to expeditiously vaccinate all health care workers and prioritized correctional staff and at-risk incarcerated persons as is recommended for nursing homes. In a December 20, 2020 letter to the Plaintiffs' attorneys, the Defendants' legal counsel communicated that the IDOC health care providers are in priority 1a of the IDPH's COVID-19 Vaccination Plan and would be vaccinated under the local health department plans for all health care workers. The IDOC has confirmed that health workers in IDOC were vaccinated beginning in late December and early January. The schedule of vaccination for the rest of the staff and offenders was still being determined. On 1/3/20, the Monitor wrote to the Parties supporting all efforts to expeditiously vaccinate IDOC staff and incarcerated population. The Monitor recommended that certain segments of the IDOC population should be treated the same as residents of long term care facilities (nursing homes). A review of the fifty-seven offender

---

[426] Antibody testing could reveal the true prevalence of infection within IDOC. The Monitor does not recommend this although it would be a useful epidemiologic indicator to provide useful information to study transmission within IDOC. Antibody testing should be instituted only if recommended by IDPH.
[427] Active is considered the first two weeks after testing positive
[428] Danville (13), Pnckeneyville (27), and BMR (28)

COVID-19 deaths in the IDOC[429] from 3/25/20 through 12/15/20 revealed that twenty-eight (49%) of these deaths occurred in individuals 65 years of age or older even though only 3.4% of the IDOC population is 65 years of age or older. Fifty-three (93.9%) of the 57 deaths were individuals 50 years of age or older; yet only 21% of the incarcerated population is 50 years of age or older.

It is the Monitor's recommendation that the priority groups for COVID-19 vaccination should be;
1. Health care staff
2. Inmate porters, hospice workers, and other inmate workers who integral components of the health care team
3. Correctional officers who are assigned to the Health Care Unit and other medical areas, special housing units (geriatric, ADA, infirmary), offsite transportation, and supervision of porters and workers assigned to health care areas.
4. Incarcerated individuals 50 years of age and older, starting with those over 65 years of age and older.
5. Incarcerated patient-inmates with significant and/or multiple co-morbidities.

The State of Illinois and IDPH have designated health care workers and nursing home residents as the highest priority for COVID-19 vaccinations and multiple nursing homes staff and residents have already received the vaccinations. COVID-19 vaccinations began to be offered to IDOC health care workers in all facilities at the end of December 2020. Local public health departments provided the vaccines which were administered at the public health department in some regions and at the IDOC facilities in others. The initial report on the rate of acceptance of the vaccination by health care workers in the IDOC was disappointing: 1,231 health care workers were offered the initial vaccination shot and only 403 (33%) accepted the vaccine.[430] This data may be somewhat incomplete and needs to be carefully monitored.[431] Staff and incarcerated education must be accelerated, address individual concerns, and be repeated.

High risk incarcerated individuals and inmate workers and correctional officers assigned to health care areas were excluded by IDOC from the first wave of vaccinations. Defendants' legal counsel has communicated that inmates are in priority 1b for vaccination failing to acknowledge that within the IDOC population are sub-populations who are the equivalent of nursing home residents and at grave risk for COVID-19 morbidity and mortality. IDOC has told the Monitor that COVID-19 vaccination for the incarcerated populations and correctional staff will likely begin to be available in mid-February with all facilities completing the first vaccination by March 9, 2020.[432] The IDOC has assured the Monitor that incarcerated individuals who refuse

---

[429] IDOC Adult Institution Inmate Deaths Calendar Year 2020- Draft

[430] Communication from IDOC legal team of 1/27/21 HCW immunization data

[431] IDOC voiced concerns that data HCWs receiving the vaccine offsite at local public health departments may be incompletely reported.

[432] Communication from IDOC Legal team on 2/9/21: The National Guard will be administering COVID-19 immunizations to facility staff and incarcerated individuals tentatively beginning with a test run on 2/17/21 at East Moline CC then proceeding to the initiation of a rollout schedule starting on 2/22/21 at Menard CC and Dixon CC with all facilities having received the first round of vaccines by 3/9/21. IDOC anticipates that each facility will complete the first vaccinations vaccinations in one day.

or are initially reluctant to be vaccinated will be offered ongoing opportunities to receive the COVID-19 vaccination

It also must be noted that most IDOC facilities are in rural and semi-rural regions of Illinois. Data on IDOC COVID-19 hospitalizations in the third week of January 2021 reported 20-25 daily hospitalizations with 7-8 individuals on ventilators. Daily hospitalization censuses of incarcerated persons has decreased to 6 inpatients on 2/8/21 with 3 requiring ventilator support. However, during this timeframe, there were an additional 28 patient-inmate deaths. These hospitalizations are placing a significant burden on smaller rural hospitals.

The COVID-19 pandemic exposed the weaknesses of the IDOC infection control program including nurse staffing deficiencies, infection control staffing deficiencies, data support staffing, and an absence of experience in management in infectious outbreak. The OHS responded by having senior leadership fill the void and work more diligently, devoting nearly all of their efforts to COVID-19. Infectious disease advice from UIC and IDPH was voluntary. The support from Illinois Emergency Management Agency (IEMA) and the Illinois National Guard was ordered by the Governor. The Monitor and all his consultants have nothing but respect and admiration for the efforts of the IDOC OHS staff during this pandemic. But it is the Monitor's opinion that the response to the pandemic would have been timelier, more effective, more complete, and could have included better oversight if the recommended staffing, and an infection control program and data management program had been in place. A more effective response would have reduced infections and deaths. The Monitor is more convinced now than before the pandemic of its recommendations with respect to data support and infection control.

As stated in the Monitor's 2nd Report the IDOC infection control program needs to consist of several essential elements including:
1. A statewide infection control coordinator who is trained and certified in infection control.
2. An infectious disease physician consultant to provide easily accessible expert advice that is beyond the scope of knowledge or expertise of the statewide infection control coordinator.
3. Dedicated infection control nurses at every facility, who have received training in infection control.
4. An infection control policy, procedure and manual that are specific to IDOC needs.
5. A prioritization of infection control as an essential element of the IDOC program.
6. Data support to track infectious and contagious diseases.
7. A qualified physician staff that can effectively participate in infection control activities at a facility level.


**RECOMMENDATIONS:**

1. Ensure the statewide infection control coordinator obtains and maintains certification in infection prevention and control through the Certification Board of Infection Control and Epidemiology. Requirements of this position should also include proficiency in surveillance software and familiarity with use of an electronic medical record to support surveillance activity. It would be preferable for this person to

obtain Lean Six Sigma certification within two years of hire.

2. Hire or contract with an infectious disease physician consultant to advise the IDOC on their infection control program as issues arise. Optimally, this physician should be from an academic institution or from the IDPH.

3. Expeditiously implement a COVID-19 vaccination program that initially focuses on all health care staff, inmate porters and hospice worker assigned to health care units, infirmaries, geriatric housing units, ADA units, and other special housing units, incarcerated persons 50 years of age and older starting with the most elderly, patient-inmates with high-risk medical co-morbidities, and correctional officers assigned to health care areas and special housing units. As soon as the COVID-19 vaccine supply increases all correctional staff and employees and all inmates should be offered the vaccine.

4. Ensure that every facility has a dedicated and appropriately trained infection control nurse.

5. Develop infection control policy to establish standardized methods of surveillance and infection control activity.

6. Establish expectations for independent verification of negative pressure in respiratory isolation rooms, monitoring and documentation of the status of negative pressure rooms, reporting to the Infection Control Coordinator and corrective action to be taken when the rooms are not functional.

7. Perform Safety and Sanitation inspections of the infirmary negative pressure units monthly but it is equally crucial that daily or weekly tissue paper testing of the isolation rooms be conducted by the health care staff to verify that these units are always operational.

8. Provide both hepatitis A and hepatitis B vaccinations to inmate workers who have risks of exposure to blood and fecal borne pathogens and to inmate kitchen workers.

9. Replace tuberculosis skin testing (TST) with IGRA blood testing, which is more accurate, minimizes the risk of accidental needle sticks, and frees up valuable nurse resources.

10. Increase access to HCV treatment by implementing the revised Screening and Treatment Hepatitis C Guidelines September 2020 that streamlined HCV eligibility and screening criteria.

11. Increase access to HCV treatment for individuals with F0 and F1 fibrosis levels.

12. Establish a quality metric that significantly increases the annual number of HCV treatments that would result in the total elimination of HCV within the next 3-5 years.

13. Track and provide detailed reports on the offering and provision of nationally recommended adult immunizations at each site.

14. Ensure that quality improvement activity identifies infection control and prevention opportunities for improvement and takes steps to ensure that improvements occur.

15. Provide data support as described in the Statewide Internal Monitoring and Quality Improvement and Medical record sections.

16. Expeditiously offer COVID-19 vaccinations to all incarcerated individuals and staff at all IDOC facilities.

17. Track and report data by facilities for health care workers, non-health care employees, and incarcerated individuals on the number of COVID-19 vaccines

offered, the number administered, the number refused, and the number who have completed a vaccine series.

18. Continue COVID-19 testing of employees and incarcerated individuals based on intervals determined in conjunction with IDPH.

# Dental Care

**Staffing**

*Addresses item II.B.6.q; III.K.9*

**II.B.6.q.** *IDOC agrees to implement changes in the following areas: Annual assessment of medical, dental, and nursing staff competency and performance;*

**III.K.9.** *Within twenty-one (21) months of the Preliminary Approval Date of this Decree [October 2020], IDOC shall establish a peer review system for all dentists and annual performance evaluations of dental assistants.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

As also noted in more detail in the Dental Access section II.B.6.h, the COVID-19 pandemic has had a significant impact on the provision of dental care throughout all facilities in the IDOC. Increased backlogs and waiting times for dental care now exist throughout the IDOC. Due to infection control precautions dental services were limited to examinations, screenings, prescription of medication, and emergency procedures. It appears to the Monitor that some sites have been able to modestly expand the range of services in the last few months in part due to IDOC's aggressive testing and mitigation efforts.

Twenty-eight IDOC correctional centers have onsite dental suites and services.[433] Dentist positions range from 0.25 FTE to 3.0 FTE at different sites. Only the three facilities with small average daily censuses have less than a fulltime onsite dentist.[434] Three of the four intake centers have the highest number of dental positions with 1.5 or more dental positions; however NRC which has the largest intake volume has only 1.0 allocated dentist position.[435] A total of ten IDOC facilities have over 1.0 FTE dentist positions. As of December 2020, there were a cumulative 4.8 FTE dentist vacancies at six IDOC facilities with three facilities now having no filled dentist positions.[436] The Monitor has received no information on how dental coverage is being provided at these three sites. IDOC has recommended an additional 2.3 FTE dentist positions be hired to augment dental staffing throughout the system, including an additional 0.5 FTE dentist position at NRC

---

[433] Two small IDOC correctional centers, Elgin and Murphysboro do not have onsite dental services.
[434] Three facilities with smaller populations have only parttime dentist coverage: Kewanee 0.25, JTC 0.5, and Decatur 0.75.
[435] IDOC Staffing Update, 12/15/20: Dentist FTE allocated positions are Intake Centers: Graham 1.6, Logan 2.0, Menard 3.0, and NRC 1.0
[436] IDOC Staffing Update 12/15/20. FTE Dentist vacancies: Centralia 1.05, Dixon 0.2, Jacksonville 1.0, JTC .05, Lawrence 0.5, Logan 2.0. There are no dentists currently at Centralia, Jacksonville, and Logan.

Peer reviews for twenty-nine dentists were performed from August to November 2020. The dentist peer reviews primarily address process and documentation issues but also audit the adequacy of dental history, the appropriate use of prophylactic antibiotics, and the appropriate ordering of required x-rays and consultations. Evaluations by dental peers in the same system has the risk of lacking objectivity. IDOC and its vendor should consider having an independent dentist performed the annual dentist peer reviews. This can be accomplished in the audit process, which is a required provision of the Consent Decree.

Annual evaluations of dental hygienists and dental assistants were completed in 2019; but no evaluations for these two dental positions were provided in 2020. As noted in the Second Court Report, Wexford dental hygienists and dental assistants are evaluated using the Performance Calibration Worksheet also known as the Salary Compensation Calibration Worksheet; this worksheet focuses primarily on administrative and business issues and does not satisfy Consent Decree requirements to assess clinical staff competence and performance. The Wexford evaluation is not to be shared with the employee. It was communicated to the Monitor that due to the pandemic, evaluations of dental hygienists and dental assistants were not performed in 2020.

The IDOC used the State of Illinois Individual Development and Performance System to evaluate state employed dental hygienists (1) and dental assistants (6) in 2019; this form is individualized for each of these positions and must be discussed with each employee. Evaluations of the State dental hygienist and dental assistants for 2020 have not been provided to the Monitor.

With the exception of a few sections of the dentist peer reviews, none of the annual performance evaluations for both State and vendor dental staff would qualify as professional performance evaluations or assessments of the quality of the clinical care provided by the dentists, dental hygienists, and dental assistants.

See Oversight of Nursing, Dental, and Medical Staff section for further details.

**RECOMMENDATIONS:** (Same as noted in Oversight of Nursing, Dental, and Medical Staff section)
1. Develop and initiate professional performance evaluations that assess the clinical competency and clinical performance of all clinical staff.
2. Standardize evaluation formats so that all practitioners of the same type are evaluated in the same manner.
3. Engage an independent professional knowledgeable of the scope of practice and capable of evaluating the clinical care of the professional to perform the annual evaluations of dentists and dental hygienists.
4. Share clinical professional performance evaluations with the employee who should sign the review after discussion with the reviewer.

**Dental Documentation**

*Addresses item III.K.1; III.K.10.c; III.K.11; III.K.12*

**III.K.1.** *All dental personnel shall use the Subjective Objective Assessment Plan ("SOAP") format to document urgent and emergency care.*

**III.K.10.c.** *A prisoner shall consent in writing once for every extraction done at one particular time. In instances where a prisoner lacks decision making capacity the Department will follow the Illinois Health Care Surrogate Act. In the event a prisoner verbally consents to an extraction, but refuses to consent in writing, dental personnel shall contemporaneously document such verbal consent in the prisoner's dental record.*

**III.K.11.** *Each prisoner shall have a documented dental health history section in their dental record.*

**III.K.12.** *Dental personnel shall document in the dental record whenever they identify a patient's dental issue and dental personnel shall provide for proper dental care and treatment.*

**OVERALL COMPLIANCE RATING:** Partial compliance (data limited to peer reviews)

**FINDINGS:**

Due to the safety precautions required during the pandemic, the Monitor team was not able to visit IDOC facilities and inspect dental records of individuals treated by dentists and dental hygienists.

Analysis of twenty-nine 2020 dentist peer reviews documented that 47 (18%) of 266 dental notes written by 10 (35%) of the dentists were not consistently using the Subjective, Objective, Assessment, and Plan (SOAP) format. Four (3%) of 120 individuals having dental extractions treated by two of the 29 dentists did not include a consent form in their dental chart. Sixty-five (100%) of patients refusing care signed a refusal form. Twenty-two (15%) of 148 patients having extractions involving six dentists (21%) were judged as not having an appropriate x-ray before the extraction. Two hundred seventy-four (100%) of the charts were recorded as having current bi-annual dental exams. Two hundred sixty-five (98%) of 270 charts were noted as having an adequate history of the patient's current dental problem.

As noted in the Monitor's 2nd Report, the Monitor had in-person interviews with IDOC dentists during site visits in 2019 and pre-pandemic 2020 and also one phone interview after the onset of the pandemic in 2020. The Monitor also had one phone interview with a dentist after the onset of the pandemic in 2020. The dental staff communicated varying timeframes concerning their standards on how long prior to a dental extraction that dental x-rays should be taken. Their recommendations ranged from a maximum of one to two years pre-extraction.

The Monitor also continues to be unable to identify a national standard concerning when dental x-rays must be repeated taken or repeated prior to an extraction in order to protect the health of the patient and minimize the risk of post-extraction complications. The newly hired OHS Chief of Dental Services must establish the best practice standard for the length of time prior to dental extractions that x-rays are deemed valid and do not need to be repeated.

**RECOMMENDATIONS:**

1. Identify and establish the best practice standard for the length of time prior to dental extractions that previous x-rays are judged to be adequate to minimize complications and protect the health of the patient-inmate.

**Dental Support**

*Addresses items III.K.4-5; III.K.13*

**III.K.4.** *IDOC shall implement policies that require routine disinfection of all dental examination areas.*

**III.K.5.** *IDOC shall implement policies regarding proper radiology hygiene including using a lead apron with thyroid collar, and posting radiological hazard signs in the areas where x-rays are taken.*

**III.K.13.** *IDOC shall conduct annual surveys to evaluate dental equipment and to determine whether the equipment needs to be repaired or replaced. Any equipment identified as needing repair or replacement will be repaired or replaced.*

**OVERALL COMPLIANCE RATING:** Not yet rated

**FINDINGS:**

The Monitor was provided with the Dental Care for Offenders administrative directive[437] but this policy did not address the routine disinfection of all dental examination areas, the use of lead aprons with thyroid collars, or the posting of radiological hazard signs in the areas where x-rays retaken. During site visits in 2019 the Monitor verified the presence of lead aprons with thyroid collars at two facilities.[438] However the thyroid collars were stored in the HCU's radiology suite and not immediately available to the dental team.

Review of June 2020 CQI meeting minutes verified that all eighteen IDOC facilities reporting that month on the sterilization of the dental equipment were regularly using and tracking spore testing to confirm that their autoclaves were effectively sterilizing dental equipment.[439] The effectiveness of equipment sterilization should be reported on a regular basis for all sites with dental services.

To date the Monitor has not received Administrative Directives on the routine disinfection of all dental examination areas nor a copy of any policy relating to dental radiology hygiene. Documentation also has not yet received information that an annual system wide survey of dental equipment was being done.

---

[437] IDOC Administrative Directive 04.03.102 Dental Care for Offenders Effective Date 1/1/2020
[438] Robinson CC and Lawrence CC 2019 site inspections
[439] June 2020 CQI meeting minutes; Decatur, Dixon, Graham, IRCC, Jacksonville, JTC, Kewanee, Lincoln, Logan, Menard, NRC, Pinckneyville, Shawnee, Sheridan, Southwestern, Stateville, Taylorivlle, Vandalia

**RECOMMENDATIONS:**
1. Provide each dental suite with its own leaded thyroid collar.
2. Report regularly to CQI committee on the effectiveness of the dental equipment sterilization at all facilities with dental suites
3. Perform an annual survey of dental equipment, furniture, and space

**Dental Access**

*Addresses items II.B.6.h; III.K.2*

**II.B.6. h.** *IDOC agrees to implement changes in the following areas: Dental care access and preventative dental care;*

**III.K.2.** *Each facility's orientation manual shall include instructions regarding how prisoners can access dental care at that facility*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

The pandemic has had a significant impact on the provision of dental care throughout all facilities in the IDOC. Beginning in April 2020 to the present time, the implementation of infection control measures to prevent the transmission of COVID-19, dental services and procedures with the risk of splashing or aerosolizing saliva and other oral and upper respiratory fluids forced the dental program to provide only emergency dental care. Dental cleanings, fillings, and complicated extractions were discontinued. Only simple extractions, oral exams, diagnostic evaluations, and the prescription of required medication were performed by the IDOC dental staff. It appears from the dental data provided that once PPE was readily available and local outbreaks mitigated, some facilities were allowed to provide more but still limited dental services. The number of dental encounters decreased from approximately 113,000 in fiscal year 2019 to an annualized 63,000 in calendar year 2020.[440] Some of this decrease was due to the stoppage of new admissions to the IDOC Reception & Classification from April to August 2020. Review of the monthly dental encounters noted a sudden drop in encounters beginning in March and April 2020 that has not normalized as of October 2020. It must also be remembered that there were lengthy waits to access to dental care that existed in a number of IDOC facilities prior to the pandemic.

Review of the October 2020[441] dental services in twenty facilities revealed system wide waiting times reported by the vendor as follows:

| Range of Waiting Times | |
|---|---|
| Dental Fillings | 10-163 weeks |
| Dental Extractions | 10-52 weeks |
| Facilities with waiting times > 30 weeks | |
| Dental Fillings | 14 facilities |

---

[440] Wexford Primary Medical Services Reports May 2019 through October 2020
[441] Wexford Primary Medical Services Report October 2020

| Dental Extractions | 5 facilities |
|---|---|
| **Range of patients waiting > 13 weeks** | |
| 59-402 dental patients | |

 The dental needs of incarcerated populations are extensive and, at this time due to the pandemic, these needs cannot be adequately met. Once the pandemic is stabilized and the employees and incarcerated population is vaccinated, IDOC will need to develop a plan to aggressively prioritize and address this backlog of dental care.

To date the Monitor has not reviewed the facilities' orientation manuals.  As noted in the Second Court Report interviews with incarcerated individuals at the four sites visited in 2019 and two sites visited prior to the outbreak of the pandemic in 2020 indicated that the men and women were knowledgeable about the established process to access dental and medical services.

**RECOMMENDATIONS:**
1. Continue to provide emergency dental services and those basic dental services that can be safely provided during the pandemic.
2. Initiate planning on how to prioritize and address the large backlog of dental care that has resulted from the safety precautions and restrictions that were required during the COVID-19 pandemic.


**Dental Intake**
*Addresses items III.K.3*
**III.K.3.** *IDOC shall implement screening dental examinations at the reception centers, which shall include and document an intra- and extra-oral soft tissue examination.*

**OVERALL COMPLIANCE RATING:** Not yet rated

**FINDINGS:**

As noted in the Medical Reception section II.B.56.a, a review of dental staffing at intake centers indicated variation in the level of dental staff that would likely impact on the timeliness of completion of the dental component of intake screening on new admissions to the IDOC.  Each intake requires a dental examination, radiographs, and development of a prioritized treatment plan. Dental staffing at NRC is not sufficient for the average number of intakes and would require the dentist to complete 42 exams a day to avoid backlog. It is unlikely that NRC currently has the dental staff to complete Medical Reception timely or thoroughly.

The Monitor has not been able to inspect any IDOC Reception & Classification Centers since COVID-19 pandemic started in March 2020. Once the Monitor team can visit IDOC without presenting a risk to the staff, incarcerated men and women, and themselves, this and other aspects of the Dental Care section of the Consent Decree will be addressed.

**RECOMMENDATIONS:**

1. Increase the FTE allocation of dentists at NRC, IDOC's busiest Reception & Classification Center.

**Dental Hygiene**

*Addresses III.K.7; III.K.8;*

**III.K.7.** *Dental hygiene care and oral health instructions shall be provided as part of the treatment process.*

**III.K.8.** *Routine and regular dental cleanings shall be provided to all prisoners at every IDOC facility. Cleanings shall take place at least once every two years, or as otherwise medically indicated.*

**OVERALL COMPLIANCE RATING:** Noncompliance (exacerbated by pandemic)

**FINDINGS:**

The COVID-19 pandemic has significantly impacted on the provision of dental hygiene care and dental cleanings throughout the IDOC. Due to appropriate COVID-19 infection control precautions, dental cleanings were discontinued in April 2020.

At the time of the Monitor's 1st and 2nd Reports[442] ten facilities of 28 IDOC facilities with onsite dental suites currently did not have a dental hygienist position[443]. Since the filing of the Monitor's 2nd Report, a dental hygienist position has been allocated and filled at Hill CC, leaving nine (32%) facilities of the twenty-eight IDOC sites with dental suites without a dental hygienist.[444] The 12/15/20 staffing update recommended the creation of new dental hygienist positions at six facilities that currently do not have dental hygienist staff.[445] Three of these recommended additional hygienist positions had previously been recommended in the initial Staffing Analysis in 2019.[446] The monitor recommended in both prior Reports that all 28 IDOC facilities with dental suites should have a dental hygienist on the dental team.

Eleven facilities with dental hygienist staffing reported in the September 2020 QI Committee minutes that due to pandemic safety restrictions zero dental cleanings had been done that month. The median number of individuals on waiting lists for dental cleanings was 242 and three of the four sites that reported waiting times had waits of 1 year or longer for cleanings. One facility[447] without dental hygienist staffing reported 215 individuals were on a waiting list for cleanings.

---

[442] First Court Report 11/24/19 and Second Court Report 8/6/2020
[443] IDOC Revised Staffing Analysis 6/18/20: Facilities without a dental hygienist position: Dixon, East Moline, Graham, Hill, Jacksonville, Lincoln, NRC, Sheridan, Southwestern, Vienna, and Western.
[444] IDOC Staffing Update 12/15/20
[445] IDOC Staffing Update 12/15/20 recommended the creation of dental hygienist positions at six additional facilities: Dixon, East Moline, Graham, Jacksonville, Lincoln, and Sheridan.
[446] IDOC Staffing Analysis 11/23/19 recommended creating dental hygienist positions at Dixon, Jacksonville, and Lincoln which have not yet been allocated. Hill CC was the only site at which a dental hygiene position had been recommend and had actually been hired.
[447]Jacksonville CC September 2020 CQI meeting minutes

Another facility,[448] also lacking onsite dental hygiene staff, noted many grievances about the lack of access to dental hygienist services.

As noted in the Monitor's 2nd Report dentists at facilities without dental hygienist positions have been directed to do dental cleanings; this would exacerbate the waiting time for patients requiring fillings, extractions, and dentures. IDOC has appropriately proposed adding dental hygienist positions at six facilities that currently lack this service, but this would still leave NRC, Vienna, and Western without dental hygiene staffing.

In the revised Implementation Plan[449] IDOC committed to every facility having dental hygienists to meet facility needs without explanation for how facilities without a hygienist will obtain that service. Given the length of time required to create and fill new positions within the State system, it is highly unlikely that many of the IDOC facilities will be able to provide dental cleanings at a minimum of every two years to the IDOC population for a number of years.

**RECOMMENDATIONS:**
   1. Hire at least one dental hygienist for each IDOC facility that has a dental suite.

**Comprehensive Dental Care**

*Addresses item III.K.6; III.K.10.a-b; III.K.12*
**III.K.6.** *Routine comprehensive dental care shall be provided through comprehensive examinations and treatment plans and will be documented in the prisoners' dental charts.*
**III.K.10.a.** *Diagnostic radiographs shall be taken before every extraction.*
**III.K.10.b.** *The diagnosis and reason for extraction shall be fully documented prior to the extraction.*
**III.K.12.** *Dental personnel shall document in the dental record whenever they identify a patient's dental issue and dental personnel shall provide for proper dental care and treatment.*

**OVERALL COMPLIANCE RATING:** Not yet rated

**FINDINGS:**

**RECOMMENDATIONS:** None

# Facility Internal Monitoring and Quality Improvement
*Addresses item II.B.2; II.B.6.l; II.B.6.o; III.L.1;*
**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action*

---

[448] Dixon CC September CQI meeting minutes
[449] IDOC revised Implementation Plan 6/12/20

*plans, effective peer review, and as to any vendor, effective contractual oversight and*
*contractual structures that incentivize providing adequate medical and dental care.*
**II.B.6.l.** *IDOC agrees to implement changes in the following areas: Effective quality assurance*
*review;*
**II.B.6.o.** *IDOC agrees to implement changes in the following areas: Training on patient safety;*
**III.L.1.** *Pursuant to the existing contract between IDOC and the University of Illinois*
*Chicago (UIC) College of Nursing, within fifteen (15) months of the Preliminary Approval*
*Date [April 2020], UIC will advise IDOC on implementation of a comprehensive medical and*
*dental Quality Improvement Program for all IDOC facilities, which program shall be*
*implemented with input from the Monitor.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

There has been no change in quality improvement efforts based on our review of the meeting
minutes. We find very limited quality work that involves identification and correcting a problem.
Problems are rarely identified. When a problem is identified it is rarely studied. In one facility a
problem was identified but the solution may not have promoted inmate health. This occurred at
Stateville when a problem with backlogs in physical therapy occurred and a study was initiated.
The meeting minutes announced, "the reduction in physical therapy referrals has improved his
backlog". What wasn't clear is if the reduction in referrals was a good thing. Did it improve
patient health? Was the reduction in referrals intended? Were patients who needed physical
therapy receiving therapy?

Most of the quality improvement meeting minutes involve presentation of data without associated
analysis. Almost all facilities describe the volume of outpatient activity including: trips to the ER,
mental health services, dental activity, hospitalizations, numbers of persons with reportable
infectious disease, and listing of medical furloughs. Even when statistics present problems, they
are unrecognized and not addressed. At every facility, statistics on hepatitis C are announced.
Large numbers of positive patients with hepatitis C are reported; few to none are on treatment. No
one ever asks why there should be so many patients with the infection but so few people treated.
One facility reported its specialty requests. One patient had two of four stools positive for blood.
The document reported that the patient had intermittent blood in the stool for years yet had never
had a colonoscopy. There was no discussion why a colonoscopy had never been done in a person
with long-standing rectal bleeding and whether this was a systemic issue.

Most quality studies are non-clinical compliance monitoring. A study of transfers is used at
multiple facilities. The key variable is whether the form is filled out correctly and whether the
signature is legible. Invariably, these studies show 100% compliance.

Health requests studies involving review of treatment protocols are performed at multiple facilities
and invariably result in 100% scores. The quality of care is not carefully assessed. At one facility
which was in the midst of a COVID-19 outbreak, three sick call slips were evaluated and scored
as 100% compliant. One inmate[450], being seen on 8/31/20, for an unstated reason had virtually no

---

[450] Sick call from CQI meeting patient #2

history documented in the medical record sheet present in the quality meeting minutes. The patient had fever of 101.4. While there was a COVID-19 outbreak at this facility, there was no documentation of masking, isolating or testing the inmate. No orders were given and the patient wasn't referred. In fact, the patient was tested and was positive, but the nurse note did not document any testing, isolation, masking or referral so it wasn't clear in the nurse note what the plan was for the patient. Another inmate[451] on 8/22/20 was seen for constipation but had a blood pressure of 160/96 which is elevated. The patient was given milk of magnesia. The elevated blood pressure wasn't even noticed. Another patient[452] was seen on 8/15/20 for complaint of chest congestion for a few days. This is consistent with COVID-19 and the patient should have had a more detailed history and tested for COVID-19. Vital signs was normal but no history was taken with respect to COVID-19 symptoms and the patient wasn't tested. Nine days later, this patient tested positive for COVID-19 after an "exposure". This should have resulted in re-training of nurses performing health request evaluation to mask, isolate, and test all persons with any symptom of COVID-19. Symptoms of COVID-19 should have been reviewed with all nurses. All three nurse evaluations were scored as 100% compliant when there were opportunities for improvement on each of these encounters.

Deaths are announced but there is no critical analysis to identify opportunities for improvement.

Remarkably, despite a raging COVID-19 pandemic, facilities with outbreaks had no discussion of COVID-19 in their meeting minutes. A few institutions reported COVID-19 cases but there was no analysis. One couldn't tell from most meeting minutes that many of these facilities were in the midst of a COVID-19 outbreak within IDOC.

Until facilities learn to identify and acknowledge real problems, the quality of care will not improve.

**RECOMMENDATIONS:**
1. Train local staff on how to perform quality improvement.
2. Focus on identification of problems and opportunities for improvement as a driver for quality improvement.
3. Improve statewide data resources to provide every facility with the data necessary to perform adequate quality improvement.
4. Provide mentoring of facility quality programs.

**Audits**
*Addresses item II.B.9*
**II.B.9.** *The implementation of this Agreement shall also include the design, with the assistance of the Monitor, of an audit function for IDOC's quality assurance program which provides for independent review of all facilities' quality assurance programs, either by the Office of Health Services or by another disinterested auditor.*

**OVERALL COMPLIANCE RATING:** Noncompliance

---

[451] Sick call from CQI meeting patient #1
[452] Sick call from CQI meeting patient #3

**FINDINGS:**

The IDOC has not designed or implemented an audit system yet.

**RECOMMENDATIONS:** None

**Performance and Outcome Measure Results**

*Addresses items II.B.7*

**II.B.7.** *The implementation of this Decree shall include the development and full implementation of a set of health care performance and outcome measures. Defendants and any vendor(s) employed by Defendants shall compile data to facilitate these measurements.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

The IDOC has not yet designed or implemented comprehensive performance or outcome measures.

**RECOMMENDATIONS:** None

**Adverse Event and Incident Reporting Systems**

*Addresses Items II.B.6.m; II.B.6.n*

**II.B.6.m.** *IDOC agrees to implement changes in the following areas: Preventable adverse event reporting;*

**II.B.6.n.** *IDOC agrees to implement changes in the following areas: Action taken on reported errors (including near misses);*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

The IDOC has not designed or implemented an adverse event or incident reporting system yet. In the past, the only exception is medication error reporting that does do some root cause analysis and initiates corrective actions. However, a system-wide adverse event reporting system is not in place.

**RECOMMENDATIONS:** None

**Vendor Monitoring**

*Addresses II.B.2.*

**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

The Monitor has not received any individual facility monitoring reports. Some facilities list vendor vacancies at the facility in quality improvement meeting minutes. But there is no evaluation or monitoring of vendor provision of care.

**RECOMMENDATIONS:** None


**Mortality Review**
*Addresses items II.B.6.i; III.M.2;*
**II.B.6.i.** *IDOC agrees to implement changes in the following areas: Morbidity and mortality review with action plans and follow-through;*
**III.M.2**. *Mortality reviews shall identify and refer deficiencies to appropriate IDOC staff, including those involved in the Quality Assurance audit function. If deficiencies are identified, corrective action will be taken. Corrective action will be subject to regular Quality Assurance review.*


**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
We have not received any mortality reviews for 2020. It appears that no one, including facilities, are performing mortality reviews. There are no meaningful review of deaths to identify opportunities for improvement.

**RECOMMENDATIONS:**
1. Develop an effective and meaningful mortality review process.

October 28, 2020
***VIA EMAIL***

Kelly Pressley
Illinois Department of Correction

Based on a dispute resolution meeting, Plaintiffs informed the Monitor that IDOC was awaiting our comments on the Staffing Plan and Implementation Plan. The Monitor believes that the Second Report contained information regarding our thoughts on the Staffing Analysis and Implementation Plan. At our recent call the Monitor stated that we would reiterate the opinions described in the Second Report and confirm that these are our conclusions based on the IDOC Staffing Analysis of 6/18/20 and Implementation Plan of 6/12/20. The following is a summary of comments on the most recent Staffing Analysis and Implementation Plan. The Monitor retains the right to modify the comments below based on any additional information and data.

Staffing Analysis

Areas of the staffing analysis that need to be addressed by IDOC:

1. A standardized methodology of analyzing workload should be developed to determine position needs. Although there were some workload standards used to determine nursing staffing, it was not done for all IDOC's varying sites and services including nursing assignments, dental, clinical providers, optometry, physical therapy

2. It has been the Monitor's position that all positions need to be allocated in the current year's budget. In a recent call with OHS and IDOC, the Monitor was advised that allocated positions are the equivalent of budgeted positions and that all allocated positions can be immediately hired.

3. The Monitor has been advised that State budget has sufficient funds to hire all vacant positions and the newly recommended positions in the 6/18/20 staffing analysis. With the exception of the newly created positions of Quality Improvement Director and Infection Control Coordinator, virtually all the newly recommended positions have not yet been allocated. The Staffing Analysis and the Implementation Plan needs to state which positions and when all newly recommended positions will be allocated.

4. Multiple key consulting positions (audit teams, quality improvement consultants, process improvement staff, and information technology data teams) are not allocated. Three IT tech positions are listed in the Staffing Analysis but there are no quality improvement consultants, process improvement staff, or audit team positions listed in the Staffing Analysis. These positions must be incorporated into the Staffing Analysis and the Implementation Plan needs to describe how and when these positions will be allocated and hired.

5. The Monitor remains concerned that lack of the delay in filling positions is affecting multiple areas of the Consent Decree and is making it difficult to develop and implement the Implementation Plan. This is particularly true for OHS and consulting positions (QI consultants, audit teams, process improvement, and data and other IT personnel). These

key positions should be filled immediately. All remaining vacant and unfilled allocated positions need to be filled as soon as possible.

6. The Monitor has recommended that a recruitment task force be established with an explicit goal of reducing the vacancy rate to less than 12%. This is described in the 2nd Report.

7. The Monitor has recommended that methodology for staffing infirmaries include perspectives from skilled nursing and nursing home experience as appropriate for the patient panel and acuity of each infirmary.

8. The Staffing Analysis contains has no positions dedicated to an audit team. In the Implementation Plan the IDOC notes that either OHS or another disinterested auditor will perform this function but IDOC stated that it plans to hire staff to manage the audit process. In the Implementation Plan, IDOC proposed a single team of three to four individuals to perform this function which would entail auditing all facilities, performing mortality reviews, perform preventable adverse event auditing, and identify from these opportunities for improvement. The Monitor recommended that the Staffing Analysis contain 5.5 members for each of two teams (11 total positions). Each team would consist of a team leader, a physician, a nurse practitioner or physician assistant, two nurses, and a half time dentist. The Monitor also has communicated that a single audit team could be hired in the first year and the second team in the next year.

9. As stated in the 2nd Report, the Monitor disagrees with the number of Information Technology members the IDOC proposes in its Staffing Analysis. IDOC, in its staffing analysis, states it will provide a Health Information Technology Coordinator, an Electronic Health Record Administrator, and a Health Information Analyst. In 2nd Report the Monitor recommended that IDOC hire 12 individuals. The responsibilities for these individuals are outlined in the section on Medical Records.

10. The OHS Director of Nursing should be on the same level as the Deputy Chiefs and Medical Coordinator not reporting to the Medical Coordinator.

11. The HCUAs should report through the Chief OHS and not through the Wardens. This was agreed to but is not evident in policy or table of organization.

12. The table of organization should reflect that Wexford staff report through OHS and audit, quality improvement, process improvement, and data positions should be reflected in the table of organization. The table of organization does not show these relationships.

13. A "relief factor" needs to be calculated into nurse staffing at facilities.

14. The facility nurse positions should be broken down by function (infirmary, administration, clinics, infection control, quality improvement, etc.) and by site/shift to determine adequacy of nurse staffing to ensure that there are sufficient nurses based on assignment.

15. Excluding 2 small sites without onsite dental services, ten facilities of 28 IDOC facilities with onsite dental suites currently do not have a dental hygienist position. IDOC proposed adding dental hygienist positions in the 6/18/20 staffing analysis at seven of the ten facilities but NRC, Vienna, and Western still have no hygienist positions. In the Implementation Plan IDOC commits to every facility having dental hygienists to meet facility needs without explanation for how facilities without a hygienist will obtain that service.

16. The 6/18/20 Staffing Analysis augments dentist staffing at five facilities but the

methodology used to determine dentist staffing has not yet been provided to the Monitor. For example, Vandalia (1,222) population will have 1.5 FTE dentists while Dixon (2,051) population and Hill (1,698 population) will have only 1.0 FTE dentists. The Monitor understands that the number of dental chairs may currently be a limiting factor at some IDOC facilities.

17. The Monitor asked for the IDOC methodology of determining an appropriate number of physicians, physician assistants and nurse practitioners based on acuity, population, and facility function.  This was not yet been provided.

18. Optometry services did not appear standardized with some facilities not appearing to have appropriate number of optometry hours.  Optometrists per 1000 patient-inmates at maximum security facilities varied from 0.07 at NRC and 0.17 at Pontiac to 0.38 at Menard, at medium facilities from 0.07 at Centralia and Danville to 0.23 at Lawrence, and at minimum sites from 0.075 at Lincoln to 0.21 at Robinson.  The 6/18/20 Staffing Analysis increased Optometry staffing by 1.6 full time equivalents (FTE) but some of the facilities of concern still had no changes to the optometry hours and had lengthy waiting times and backlogs.

19. Excluding four smaller sites, physical therapy services were only provided at 8 of IDOC's 26 large correctional centers in 2019. The 6/18/20 Staffing Analysis proposed adding physical therapy at two additional sites but this will leave sixteen facilities housing nearly twenty thousand men of whom approximately 4,000 are 50 years of age or older without onsite access to physical therapy. The 6/12/20 revised Implementation Plan does commit to evaluating the need for physical therapy services at all twenty-six IDOC facilities with infirmary beds[453], but as of yet the Monitor has not received any information related to this evaluation.

20. The 6/18/20 Staffing Analysis appropriately recommends increased physician staffing at three facilities and additional NP/PA staffing at twenty-one facilities; however, four sites (Southwestern, Robinson, Decatur, and JTC) still will have an NP/PA position. The Monitor strongly advises that all of these sites have at least one NP/PA.

21. Joliet Treatment Center is being renovated to accommodate a number of medical beds and services. The Monitor has been advised that the renovation of JTC will be completed in late 2020 or early 2021.  To date the Monitor has not been informed of the expanded scope of clinical services at JTC but the IDOC has agreed to arrange a call between the JTC project manager and the Monitor in the near future.   A contracted consultant has projected that the renovated JTC will need a large number of additional clinical positions: however, 6/18/20 the Staffing Analysis only recommends eight additional positions at JTC. The Staffing Analysis needs to be modified to reflect the any additional positions required to support the expanded services at JTC.

22. The Monitor has asked for the methodology of determining phlebotomy, medication room assistants, medical record staff, and office staff but has not yet received this information.

23. Some facilities have a Wexford site manager and some do not.  What is the role of this positions and does this position have any clinical or operational responsibilities? This question was not addressed in the Staffing Analysis.  IDOC added 8 site manager positions.  The Monitor views these positions as not contributory to clinical services at the facility and do not understand the responsibilities of this position.

---

[453] Elgin, JTC, Murphysboro, and Vienna do not have infirmaries

24. The Monitor has requested for job descriptions for all positions and has received most position descriptions for only the Office of Health Services.
25. Quality improvement consultant and process improvement positions that had been discussed with UIC and mentioned in the 6/12/20 Implementation Plan are not included in the Staffing Analysis.  If these positions will be contract consultant positions, the IDOC, as of yet, has not mentioned who will hire these individuals.

Implementation Plan

With respect to the Implementation Plan, in my report I acknowledge and agree with the seven goals that the IDOC described in their 6/12/20 Implementation Plan.  However, those goals lack any tasks, detailed plans or timetables that inform how these goals will be accomplished or who will perform these goals.  It is difficult to comment on a plan that only consists of goals without a plan for how to enact those goals.  For that reason, it will be difficult to comment on a plan until the plan is completed.

The Monitor has the following comments on the IDOC 6/12/20 Implementation Plan;

1. As discussed in 2nd report, the Implementation Plan does not include a plan for dental care except to increase hygienists and ensure that dental equipment is surveyed.  The Implementation Plan needs to include its plan to implement improvements to the dental program.
2. As discussed in 2nd Report, there is also no plan for addressing physician quality or how IDOC will obtain qualified physicians with the exception of the agreement with SIU to provide physicians at four facilities.  The role of SIU at these four sites remains unclear as the contract with Wexford is still in place and at our only meeting with SIU and IDOC, it wasn't clear whether the Wexford Medical Director or the SIU physician would be in charge and whether SIU would participate in all clinical activities.   At the remaining IDOC facilities the Implementation Plan does not address how qualified physicians will be provided at the remaining sites.
3. Training on and implementation of policies or a timetable for completion of policies is not addressed in the Implementation Plan.  In a letter from Nicholas Staley to Harold Hirshman on May 6. 2020, IDOC stated that policy development would be delayed until the World Health Organization no longer considers COVID-19 a pandemic.  This could be a year or longer into the future which is an unrealistic delay to continue policy development.  Since the IDOC can hire all the allocated staff, necessary staff should be hired to permit the development of policies to move forward.
4. IDOC acknowledges in the Implementation Plan that the Chief of the Office of Health Services will be the Health Authority yet provides no formal acknowledgement of this and no current administrative directive or IDOC table of organization which establishes this.  Because this is a change from prior practice, it is not clear how this will be implemented.  This should be addressed in the Implementation Plan.
5. Telemedicine services will be key to enhancing access to qualified physicians including specialists within IDOC but telemedicine equipment, physical locations of

equipment, and procedures for telemedicine are not addressed.

6. E-consultation would provide valuable and likely cost-effective clinical advice and guidance to the clinical providers in the IDOC. This needs to be addressed in an Implementation Plan.

7. The 6/12/20 Implementation Plan stated that the IDOC is exploring expanding UIC's involvement in "….the provision of Hepatitis C…services." The IDOC needs to develop and include a comprehensive plan to increase access to Hepatitis C treatment for the IDOC population.

8. IDOC Implementation Plan noted that the functions of the audit team includes assuring that all data elements will be in the medical record and compiling and providing data to verify compliance with the Consent Decree and that the IT team will have the training and equipment to extract data from the EMR and provide data for the QI program and to verify compliance with the Consent Decree. However the EMR has been significantly delayed, the IT team will not be hired for 12-24 months, and the no timeline for hiring the audit team(s) has been presented to the Monitor. IDOC must expeditiously develop an interim plan to gather data needed to verify compliance with the Consent Decree until the audit and the IT team are fully operational.

9. The Consent Decree required that UICCON is to advise IDOC on implementation of a comprehensive quality improvement plan with input from the Monitor. IDOC accepted a final quality improvement plan from UIC without input from the Monitor. After the plan was submitted, the Monitor team met with UICCON to give input. This occurred at meetings with OHS and UIC. UIC was in process of revising their plan when arrangements between UIC and IDOC ended. The Implementation Plan stated that IDOC was developing a phase 2 quality program giving only a general outline that did not entirely match discussions that had occurred between UIC, IDOC and the Monitor. Specifically, audit team size was different, relationships between data teams and the quality and process teams were not described. The different quality and process consultants (engineering consultants and quality training consultants) were not described. The interactions between an OHS quality improvement team and facility quality improvement teams were not fully discussed. The audit team duties were quite extensive and would likely not be able to be performed by one or possibly two audit teams. Some of the team's described duties and tasks will need to be assigned to the data team and the quality and process improvement consultants and staff. These issues need to be clarified and details of this program need to be augmented in the Implementation Plan.

10. IDOC suggested in the Implementation Plan that SIU may assume the role that UIC was discussing taking responsibility for, with respect to quality improvement. For these reasons, the Monitor is requesting more information with respect to the IDOC relationship with SIU and look forward to meeting with the SIU representatives responsible for the quality improvement project as soon as possible and before an agreement is expanded and a proposal finalized.

11. The IDOC does not address statewide quality improvement efforts to coordinate facility quality improvement efforts. While there is a statewide quality improvement coordinator, the responsibilities and role of this person and the responsibility of statewide quality efforts is not evident in the implementation plan. These issues were

discussed OHS at prior meetings (with UICCON) but agreements at those meeting were not present in the Implementation Plan.

12. In the Implementation Plan, IDOC stated a goal of performing an equipment and physical space survey but IDOC has not provided details of how this will be done. IDOC indicated that they would survey all physical spaces and equipment statewide. The Monitor would like to discuss with IDOC how this will be done prior to performance of this survey so that they can provide input on what should be evaluated and who should perform this audit. The Implementation Plan also needs to include a timeline for the survey and how and when it will implement recommendations of this survey in order to improve deficient clinical spaces and equipment needs.

13. The Implementation Plan states IDOC is working with the Illinois Department of Aging to perform a survey of the elderly in order to develop a basis for obtaining appropriate resources, programming, and housing for the aged who may be disabled or need assistance with activities of daily living. The Monitor asks that prior to initiation of any survey that the Monitor has an opportunity to weigh in and evaluate the proposed survey and any plans based on information gained in that survey. The Implementation Plan also needs to include how it will implement recommendations of this survey.

14. In the Implementation Plan, IDOC stated that it would collaborate with the Illinois Department of Public Health (IDPH) to provide guidance to IDOC on infection control matters. Specific details of this arrangement were not stated. The Monitor asks to be provided with any specific details of these arrangements. These details need to be included in the Implementation Plan. The Monitor will also ask to meet with the representative of IDPH who is planning future coordination on guidance to IDOC.

15. The Implementation Plan needs to describe how quickly vacant and newly created positions will be hired. As stated in the 2nd comment in the Staffing Analysis section, key positions need to be hired immediately.

16. The Implementation Plan states a desire to improve academic relationships. The Monitor agrees with this goal. If SIU is to replace UIC with respect to the quality improvement program, audit teams and data teams, these plans should be included in the IDOC Implementation Plan. As noted above the Monitor is looking forward to the proposed meeting with the SIU representative who is responsible for negotiating and developing this service.

17. IDOC has stated that the COVID-19 pandemic will delay implementation of seven Consent Decree items. It is opinion of the Monitor that prompt hiring of staff, especially of OHS and key positions, will allow implementation of the Consent Decree to proceed. For that reason, staff should be promptly hired in order that implementation of the Consent Decree can proceed.

We look forward to further discussions on the Staffing Analysis and Implementation Plan.

Sincerely,

Jack Raba, MD
Medical Monitor
Lippert v Jeffreys Consent Decree

# APPENDIX B

## Lippert Consent Decree Requirements with a Deadline

| Section of Decree | Provision re: timing | Date (if any) | Substance of provision/requirement | Comments | Completed on Time |
|---|---|---|---|---|---|
| II.B.4 | 120 days after Effective Date | 9/6/2019 | Select an EMR vendor and execute a contract for implementation of EMR at all IDOC facilities | The EMR contract has been dissolved without implementation of the record. IDOC has not provided us with any plan for a replacement. This is now noncompliant with Consent Decree. | No |
| III.H.5 | 6 months after Preliminary Approval | 7/10/2019 | Deputy Chief of Health Services will make reasonable efforts to contract with an outside provider to conduct oversight review when medical vendor has denied any recommendation or taken more than 5 business days to decide (otherwise Monitor and consultants conduct review until Deputy Chiefs in place) | Not being done as stipulated. Burden of review is large. Monitor recommends Collegial Review process be eliminated. IDOC states inability to complete this task due to COVID-19 pandemic. | No |
| III.J.1 | 15 months from Preliminary Approval | 4/10/2020 | Create and staff a statewide Communicable and Infectious Diseases Coordinator | Hired an unqualified candidate under duress (during COVID pandemic) who will need to take course work to obtain credentials. This person is also temporarily assigned and is the HCUA of NRC | Yes |
| III.L.1 | 15 months from Preliminary Approval | 4/10/2020 | UIC will advise IDOC on implementation of a comprehensive medical and dental Quality Improvement Program for all IDOC facilities which program shall be implemented with input from the Monitor | UICCON submitted their report on 9/19/19 in advance of the deadline. The Monitor did not provide input prior to the submission of this report. Proposal with UIC for implementation was not completed. SIU is just starting and without definite plans. Slightly | No |

| | | | | worse status since last Report | |
|---|---|---|---|---|---|
| II.B.8 | 18 months from Preliminary Approval Date | 7/10/2020 | Develop and implement a set of comprehensive health care policies with assistance of Monitor | Only 30% of policies drafted. Final versions not yet done. No plan yet for how training or dissemination will occur. No dental policies are started. No change since last report. | No |
| III.K.9 | 21 months from Preliminary Approval | 10/10/2020 | Establish a peer review system for all dentists and annual performance evaluations of dental assistants | Dental peer review is being done. | Yes |
| III.A.9 | 9 months from Effective Date | 2/9/2020 | Every facility must have its own HCUA who is a state employee | No evidence that all HCUAs are hired. | No |
| III.A.8 | 18 months from Effective Date | 11/9/2020 | Create and fill two state-employed Deputy Chiefs of Health Services positions | One positions is still vacant and this item is now partially compliant | No |
| II.B.4 | 36 months after execution of EMR contract | 4/11/22 | EMR implementation should be completed | This is unlikely to be completed on time due to termination of contract with medical record vendor and no solution regarding a replacement. | |
| IV.B | 120 days after selection of Monitor | 7/26/2019 | Defendants to provide Monitor with results of their staffing analysis | This is not finalized yet. Written response given to IDOC. Have not been provided with staffing and vacancy numbers that have been requested. | No |
| IV.B | 60 days after submission of staffing analysis | 9/24/2019 | Defendants to have drafted an Implementation Plan; Monitor to review | This is not finalized. Goals are mostly in place but strategy, timetables, plans, tasks, programs, protocols are mostly not yet developed. No work, to our knowledge, done on this since last report. | No |
| V.G | Every 6 months for | 11/9/2019 and 5/9/2020? | Provide Monitor and plaintiffs with a detailed | IDOC has produced reports without | No |

| | the first 2 years; thereafter yearly | | report containing data and information sufficient to evaluate compliance | agreed upon data and information. Monitor and IDOC have met and discussed but this is still not agreed upon. | |
|---|---|---|---|---|---|

# APPENDIX C

# MORTALITY REVIEWS
**Appended to the 3rd Report of the Lippert Monitor**
**February 15, 2020**

## Table of Contents

Introduction ................................................................................................................. 3

PATIENT 1    POSSIBLY PREVENTABLE ........................................................... 4

PATIENT 2    PREVENTABLE ................................................................................ 13

PATIENT 3    POSSIBLY PREVENTABLE ........................................................... 23

PATIENT 4    POSSIBLY PREVENTABLE ........................................................... 28

PATIENT 5    POSSIBLY PREVENTABLE ........................................................... 38

PATIENT 6    PREVENTABLE ................................................................................ 45

PATIENT 7    POSSIBLY PREVENTABLE ........................................................... 57

PATIENT 8    PREVENTABLE ................................................................................ 65

PATIENT 9    POSSIBLY PREVENTABLE ........................................................... 72

PATIENT 10   NOT PREVENTABLE ...................................................................... 77

PATIENT 11   NOT PREVENTABLE ...................................................................... 82

PATIENT 12   NOT PREVENTABLE ...................................................................... 86

PATIENT 13   NOT PREVENTABLE ...................................................................... 90

PATIENT 14   NOT PREVENTABLE ...................................................................... 94

PATIENT 15   NOT PREVENTABLE ...................................................................... 99

PATIENT 16   NOT PREVENTABLE ...................................................................... 102

PATIENT 17   NOT PREVENTABLE ...................................................................... 105

PATIENT 18   PREVENTABLE ................................................................................ 109

PATIENT 19   NOT PREVENTABLE ...................................................................... 118

PATIENT 20   NOT PREVENTABLE ...................................................................... 122

PATIENT 21   POSSIBLY PREVENTABLE ........................................................... 130

**Introduction**

These 21 mortality reviews are presented in the format of a typical mortality review. We add an exception by indicating a designation of preventability. This document defines preventable as an unexpected death that is likely to have been prevented or substantially ameliorated, had appropriate steps been taken. A possibly preventable death is a death that might have been prevented or substantially ameliorated, had appropriate steps been taken. This gives a sense of the extent of serious problems with clinical care within the system. As the quality of physician care improves this designation can be eliminated to focus on identifying deficiencies or opportunities for improvement. We characterize COVID-19 deaths as not preventable because of the current uncertainty of clinical outcomes.

The reviews leave all headings of a typical review but leave names and numbers blank to keep this review anonymous. Mental health information is left blank because the IDOC does not use a unified medical record which is a problem in itself as mental health conditions can be important for all staff to know. For the same reason, psychotropic medication is absent.

**PATIENT 1   POSSIBLY PREVENTABLE**

**DATE OF REVIEW**:

**PATIENT:**

**DOC #:**

**DATE OF DEATH:**  1/29/20

**AGE:**  69 years old

**DATE OF INCARCERATION:**   6/22/17

**SITE AT TIME OF DEATH**:  Shawnee Correctional Center

**PLACE OF DEATH:** Deaconess Hospital in Evansville Indiana

**CATEGORY OF DEATH:**    Natural

**EXPECTED OR UNEXPECTED:**  Unexpected

**CAUSE OF DEATH:**  Not determined

**MENTAL HEALTH DIAGNOSES:**

**MEDICAL DIAGNOSES:**
   1. History of bladder cancer
   2. History of colorectal cancer, post resection and with colostomy
   3. Chronic obstructive pulmonary disease (COPD)
   4. Hypertension

**IDOC Problem List**
   1. No known allergy
   2. Urinary Bladder Cancer, post-resection, radiation, and chemotherapy
   3. Colorectal cancer, post-resection, colostomy, chemotherapy last treatment 1/17
   4. COPD
   5. +PPD
   6. Flu vaccine
   7. Maxillary and mandibular complete dentures

**MEDICATIONS AT FACILITY BEFORE TRANSFERRED TO HOSPITAL WHERE HE DIED:**
   1. Tramadol 100 mg BID

2. Omeprazole 20 mg daily
3. Prednisone 20 mg daily
4. Sucralfate 1 gram QID
5. Guaifenesin 1 tab QID
6. Albuterol nebulization every 4 hours as needed
7. Ipratropium-albuterol nebulization every 4 hours as needed
8. Duloxetine 30 mg daily
9. Ipratropium inhaler BID
10. Lisinopril 10 mg daily
11. Fluticasone-salmeterol inhaler 1 puff daily (started 12/8/19)

**CASE SUMMARY**

This man entered IDOC at age 67 on 6/22/17 at NRC. Upon arrival the patient had a colostomy from a post-partial colectomy for colorectal cancer. He had finished a course of chemotherapy and was still under care of an oncologist but follow up with an oncologist was not scheduled at NRC. The intake history was very poor, not identifying needed follow up for his cancers or documenting prior care for his COPD. The length of time he had a colostomy was not documented. The patient was started on tramadol 100 mg BID without stating a reason why this pain medication was needed. He was also started on continuous oxygen therapy with a concentrator, mometasone-formoterol inhaler, and Atrovent inhaler. The plan for reversal of the colostomy was not documented. The patient lived on the infirmary permanently because he was on continuous oxygen therapy.

The patient was evaluated four times for chronic care from 2018 through 2020 (1/24/18; 7/26/18; 1/30/19; and 7/8/19). The first three of these visits were only for COPD and the last visit was for COPD and hypertension. Management of COPD at these chronic care visits failed to include:

- Assessment of disease severity and status including monitoring for cough, breathlessness, sputum, activity limitations, medication use, exacerbations, and oxygen needs.
- Failure to ever obtain a baseline pulmonary function testing or blood gas.
- Assessment for other associated diseases (e.g. heart failure).
- Pulmonary rehabilitation including exercise.
- Vaccination update (especially influenza, pneumococcal, and pertussis).
- Lung cancer screening.
- The chronic care visits did not document management of the person's COPD based on contemporary standards.
- Typical history and management of COPD was difficult to document as the form used for "pulmonary" chronic clinic is based on asthma not COPD. Providers documented COPD care as if the patient had asthma. The problem list and chronic care notes failed to confirm date of diagnosis or reason for colectomy or document the therapeutic plan of the oncologist.

This consistent lack of management expertise regarding COPD was compounded by failures to manage his disease based on acceptable current standards including:

- The patient was maintained on continuous 10-20 mg of prednisone for over 15 months. Continuous prednisone use is not currently recommended in treatment of COPD as the risks are greater than the benefits. Amongst other adverse reactions of prednisone is that prednisone can cause bleeding which likely contributed to the large hematoma that developed at the time of this patient's death.
- The patient was prescribed Tramadol for at least two years on a continuous as-needed basis. The patient used the Tramadol regularly. Tramadol carries a black boxed[1] FDA warning for serious, life-threatening, or fatal respiratory depression. Besides the addiction potential, the respiratory depression ability may have contributed considerably to the patient's poor COPD control.
- The patient was not monitored for adverse effects of continuous prednisone use.
- The patient was not treated with inhaled corticosteroids until the last month of life.
- Oxygen saturation levels were infrequently obtained, and the effectiveness of his continuous oxygen use was therefore not consistently monitored.
- Because the doctor at this facility did not show competence in managing the patient's COPD referral was indicated. Based on a hospitalist's recommendation, the patient was referred to a pulmonologist, but this referral was denied by the vendor.
- Failure to manage this patient's COPD may have contributed to the patient's poor status that appeared to contribute to his death of respiratory failure.

The patient had surgery with colectomy and placement of colostomy for his colon cancer apparently in January of 2017. Facility physicians never identified this history accurately and the details of his cancer were not identified in the medical record. The patient was incarcerated in June of 2017 and after transfer to Shawnee a doctor referred the patient on 12/12/17 for colostomy reversal based on a recommendation of the patient's prior surgeon which was appropriate but was denied by the vendor with a statement that colostomy reversal is elective. This is not consistent with contemporary standard of care. The doctor at this facility was also not following up on the patient's cancer care during chronic care clinics. The patient's cancer was only monitored episodically. In December 2017, the UM scheduling clerk sent records to the patient's oncologist and documented that a CT scan should be done the upcoming spring. In February of 2018, about eight months after incarceration, a doctor documented speaking with an oncologist who recommended a CT scan and colonoscopy for follow up. In March 2018, the CT scan showed no evidence of metastatic cancer. A lung nodule was noted with a recommendation for follow up CT scan in 3-6 months.

---

[1] On its website at https://www.fda.gov/drugs/prescription-drug-advertising/drug-advertising-glossary-terms, the Food and Drug Administration (FDA) has the following definition of boxed warnings: "Drugs that have special problems, particularly ones that may lead to death or serious injury, may have this warning information displayed within a box in the prescribing information. This is often referred to as a "boxed" or "black box" warning."

The colonoscopy was not done until May of 2018 about a year after incarceration. The colonoscopy showed diversion colitis[2] which is an inflammatory complication of the colostomy. Despite this adverse effect of the colostomy, there was no effort to reverse the colostomy. Notably, surgical re-anastomosis is the treatment of choice to correct diversion colitis[3] which is recommended to be done early in the course of this condition. The gastroenterologist recommended colostomy reversal. This was not done and there was no follow up with the gastroenterologist for the colitis and the doctor failed to address this condition at subsequent chronic care visits. On 7/11/18 a doctor noticed redness around the colostomy, yet no action was taken. On 8/13/18 the colostomy bag was leaking yet no action was taken. On 11/23/18 a nurse documented that the stoma was red with an abrasion and red blood coming from the stoma. The following day the patient experienced bleeding from the stoma of the colostomy and was sent to the hospital but a source of the bleeding was not determined.

On 3/15/19 the patient was admitted to a hospital for exacerbation of COPD. A chest x-ray showed a faint infiltrate in the left base.

On March 19, the patient was discharged from the hospital and placed back in the infirmary. There was no admission note by either the nurse or physician. The patient was not discharged from the infirmary when he was sent to the hospital four days earlier. On return to the infirmary he had labored respirations and use of accessory muscles and was given treatment with albuterol although no orders had yet been obtained. The nurse did not reassess the patient as a new admission and did not establish a nursing care plan. The daily graphic sheet indicated that his diet was as tolerated, activity was at his choice, O2 at 2.5 liters/min. and that he has a colostomy. No instructions were given about supplies for care of the colostomy.

The provider gave a verbal order for Augmentin, doxycycline, and prednisone and to continue other medications as ordered before hospitalization. The provider saw the patient the next day. The doctor wrote that the patient had rescinded his DNR in May and it would need to be reviewed with the patient. He referred the patient for a follow up visit with a pulmonologist in two weeks as recommended by the hospital. This follow up consult was later denied by the vendor without any explanation or alternative treatment plan. The doctor at this facility did not manage the patient based on standard of care and referral to a pulmonologist was therefore appropriate and indicated.

The nurse's note on the patient's condition documented once or twice a day every day was "S; no complaints O: resting in bed. A & O x 4. Respirations even and unlabored. O2 on 2.5 by nasal

---

[2] Up-To-Date states that "Diversion colitis or diversion proctitis is a non-specific inflammatory disorder that occurs in segments of the colon and rectum that are diverted from the fecal stream by surgery (e.g. creation of a loop colostomy or an end colostomy with closure of the distal colon segment". The patient's colostomy was causing this condition and therefore the colostomy needed to be closed.

[3] Up-To-Date also states that re-anastomosis is uniformly curative within three months. Early re-anastomosis is preferred because with delay in reestablishment of bowel continuity, symptoms become more frequent and severe, and there is progressive decrease in capacity and involution of the defunctionalized anorectum.

canula. Self-care for colostomy. No acute distress. P: Continue non-acute care." The notes only varied if the patient had a request. The physician made rounds and documented on the patient's condition every seven days. The documentation of the physician encounter with the patient was similarly repetitive. With the exception of one chronic care encounter, there were no regularly scheduled re-assessments of the patient's condition, no treatment goals were established and there was no evaluation of the patient's status in relation to the treatment goals by either the physician or nursing staff.

On 5/28/19 the patient complained of severe low back pain that aggravated his COPD. The physician diagnosed degenerative disc disease and ordered blood and urine tests and a lumbar spine x-ray. He prescribed Ultram 100 mg for a month and Tylenol #3 every 6 hours for a week. Yet the patient was already on Ultram. Six days later the physician noted the hemoglobin was 11.6 but took no action. On 6/12/19 a nurse practitioner reviewed the x-rays which showed degenerative disc disease and started Cymbalta for 8 months.

On 6/28/2019 a nurse practitioner saw the patient because of elevated blood pressure readings. No history was taken, and no examination was completed. Lisinopril was ordered. The nurse practitioner also ordered 100 mg Ultram twice a day as needed for back pain for 90 days. The patient had been on Ultram twice a day for the last 12 months. Ultram has a boxed warning for life-threatening respiratory depression and addiction to opioids. It should be used with caution with elderly older than 65. There was no monitoring of this scheduled drug during this time period.

Nurses attempted to contact the provider on 9/21/19 that the patient was wheezing and using accessory muscles. The provider was not reached until the next day. The provider saw the patient three days later during weekly rounds and the patient complained about shortness of breath with exertion. Vital signs were not noted. The doctor took no history of the recent problems with breathing and took no additional action. The examination was documented as "same PE" and the assessment was stable COPD, even though the patient was complaining of new episodes of difficulty breathing.

In October 2019 there are repeated episodes documented in the nurses' notes of the patient wheezing with diminished lung sounds during a nebulization treatment. At no time did nurses take peak flow measurements which are an important indicator of the capacity to move air in and out of the lungs.

On 11/3/19, the patient told the nurse that he wanted to walk more about the unit in preparation for his release. When he walked, he had to go without oxygen which made him short of breath. The nurse told him to write to a certain staff member to ask for a portable oxygen tank. The nurse should have facilitated the patient's request to increase his activity instead of putting him off. Activity, such as walking should have been addressed in the nursing plan of care and was not. The nurse failed to advocate for the patient and created a barrier to his wellbeing that was unnecessary.

On 12/23/19, the patient complained to the doctor doing rounds of increased coughing with sputum. No other history was taken. The lungs had poor air entry and crackles. Other than listening to his lungs and taking vital signs there was no examination of the patient. The doctor prescribed guaifenesin. The provider did not review the patient's medications, note the episodes of wheezing, get a peak flow measurement, order any diagnostic tests, and did not give any instructions to nursing staff in monitoring the patient's condition. At 4 pm on 12/29/19 the patient asked for a nebulization treatment. The nurse would not give a treatment for another hour based on the order. The nurse did not document vital signs or assess the status of the patient. The order was albuterol by nebulizer every four hours as needed. PRN medications are to be documented on the back of the MAR with the time, initials of the person administering, the route, reason, and result. None of this documentation was present for the nebulizer treatments after 12/25/19 although the front of the MAR shows that he was receiving these at least daily.

On 1/1/20 the patient asked the nurse for Ultram stating that his stomach hurt. This was a new symptom. The nurse did not take a history or examine the patient. The Ultram had been continuously prescribed as early as 2018 for low back pain. The nurse should have alerted the physician to this new complaint and relayed the history of the problem and results of the examination. The patient requested additional pain medication on 1/4/20. The nurse documented that it was for "generalized pain" but did not inquire further about the nature, location or duration of the pain or examine the patient. On 1/5/20 a nurse practitioner reviewed the patient's chart and noted that the order for Ultram would expire soon and that the patient was on long term opiate use. The nurse practitioner wrote a new order for Ultram for 90 days. The patient was not examined, and no history was taken describing his current condition or the reason for the medication. This is inappropriate prescription of a controlled substance. This was compounded by the potential for respiratory depression which was dangerous given the patient's COPD.

On 1/9/20 at 7:35 pm the patient complained that he could not breathe and that his abdomen next to the colostomy was painful, feeling like he was being stabbed. The patient was unable to complete a sentence. The abdomen was distended. The oxygen saturation was 87.1% pulse 124, respiratory rate 28 and the patient had expiratory wheezing. The nurse gave the patient a breathing treatment. The nurse did not attend to the abdominal symptoms. The oxygen saturation improved to 95% after a breathing treatment with pulse 101 and respiratory rate 20. The nurse did not contact the physician for 20 minutes; at this point the patient insisted "this isn't getting better at all. You have to do something". The physician ordered Pepto-Bismol and to continue monitoring. Fifteen minutes later the physician was contacted again because the patient reported that he was feeling like he was going to throw up. At this point the patient was finally ordered to the hospital.

At the hospital doctors obtained a history that the patient had abdominal pain of a week duration. A CT scan showed a large acute hematoma in the area of the colostomy extending along the right lateral abdominal wall with extension into the anterior and lateral para-renal space and pericolic gutter and into the pelvis. The muscular portions were 10 by 4 by 10 cm. In addition the abdominal wall bleeding resulted in significant anemia. The patient developed respiratory distress and required intubation. The intubation required two attempts; it was thought that the patient aspirated gastric contents. Because of the abdominal wall bleeding and respiratory

distress the patient was transferred to a larger regional hospital for sepsis, COPD, respiratory infection, and hematoma of the abdominal wall with anemia and hypotension. The patient was admitted to the reference hospital on 1/10/20 and died at the reference hospital on 1/29/20 of septic shock with aspiration pneumonia, hypoxic respiratory failure, and the abdominal hematoma. The hospital initial history was that the patient had abdominal pain for 1-2 weeks prior to admission. There was difficulty in extubating the patient.

The large hematoma that caused a significant anemia may have contributed to the patient's death. Notably, the patient was on long-term steroid medication which may have contributed to the patient's bleeding. An autopsy was not available, and it was not clear if the diversion colitis was still present or contributory to the patient's bleed or whether the bleeding contributed to the patient's death. Failure to manage the patient's COPD appropriately may have contributed to this patient's death.

**PRELIMINARY AUTOPSY DIAGNOSIS:**
1. Not yet available

**FINAL AUTOPSY REPORT:** Not yet available

**OPPORTUNITIES FOR IMPROVEMENT AND RECOMMENDATIONS FOR CORRECTIVE ACTION:**

1. The history of the patient's diseases were not obtained at NRC and the NRC physician did not establish an appropriate treatment plan for the patient's recent treatment of colon cancer or for his COPD. This NRC physician has no primary care training and is not properly credentialed based on requirements of the Consent Decree. This failure is a reason that appropriate credentialing is important as the physician failed to appropriately establish a clinically appropriate treatment plan for the patient. The doctor should have consulted an oncologist. IDOC needs to obtain physicians with primary care training.
2. This case identifies multiple problems with the chronic disease program. These include:
   a. Doctors without primary care training did not appear to understand how to care for the patient's common conditions, specifically in this case, COPD, and colon cancer. The NRC doctor and the doctor at Shawnee, both are physicians without primary care training. Hiring doctors without primary care training causes harm to patients as is seen in this case. Hiring physicians trained in primary care is a management responsibility and needs to be addressed by management.
   b. Forms used for chronic illness are seldom pertinent to the conditions of the patient. Only 8 chronic clinics (asthma/pulmonary; diabetes; hypertension/cardiac; hepatitis C; seizure; HIV; general medicine; and TB) exist and forms for these are used for all chronic clinics. But these forms are inappropriate for most patient conditions. In this patient's case, the asthma chronic clinic form was used but the patient had COPD. The doctor did not modify his note to be appropriate for COPD but merely filled out the form for "asthma" even though the patient did not have this disease. These forms should be abandoned as currently used. One recommendation is to perform a root cause

analysis of chronic care documentation to identify a clinically appropriate way to document care of patients with chronic disease.

c. This patient had colon cancer, COPD, and hypertension but at chronic clinics all of his diseases were not addressed. The colon cancer was never addressed as part of the chronic care program resulting in untimely and lack of follow up. His COPD was addressed as if it were asthma and was inconsistent with contemporary standards. The chronic disease program should be re-designed so that all diseases of a patient are evaluated at every chronic care clinic. Each documented medical problem should include appropriate history, physical examination, assessment, and plan for each disease. This is not currently happening. This can be addressed in policy, but re-training is also indicated.

d. The management of COPD is not consistent with standard of care. Re-training needs to occur.

e. Patients with COPD should have a baseline pulmonary function test and follow up testing as indicated.

f. Long-term steroid use is not recommended for COPD. This likely exacerbated bleeding problems associated with his diversion colitis and with bleeding from his stoma resulting in the hematoma that contributed to his decline. This adverse drug reaction was not identified apparently but should be identified as a contributor to the patient's decline even though it may not have been a primary cause of death. Retraining is indicated and peer review for this physician is indicated. The pharmacy should have alerted the facility to this potential for adverse reaction.

g. The patient should not have been on continuous tramadol. Tramadol is a narcotic with a black boxed warning for respiratory depression and addiction and the respiratory depression likely adversely affected his COPD. Long-term narcotic use is not recommended. There was no monitoring of the long-term use of a narcotic with its adverse potential for this patient.

h. The patient's cancer was not managed as a chronic condition and was ignored for long periods of time and was not adequately followed up.

i. A revised procedure for maintaining problem lists needs to be developed and at each chronic clinic physicians need to review and update problem lists.

3. The patient had a colostomy for more than two and a half years. His colostomy reversal which is the standard of care was denied by the vendor. He had bleeding problems from the colostomy and on colonoscopy had diversion colitis, a condition that occurs in persons with ostomies. The recommended treatment for diversion colitis is colostomy closure which a gastroenterologist recommended. Initial colostomy reversal was denied by the vendor and the doctor did not subsequently refer the patient for this procedure. A pulmonary referral was also denied. These two referral denials contributed to the end-conditions that resulted in the patient's ultimate death. The collegial review process should be abandoned. In this case, without collegial review this patient would have been referred for colostomy closure and to pulmonary and may have survived.

4. The patient lived on the infirmary for apparently most of his incarceration. The rationale for infirmary housing was not clear. Interactions between the patient and nurse lacked a

clinical focus.  A therapeutic treatment plan was not evident despite the patient being on a higher level of care.

5.    This patient's death was possibly preventable.

**PATIENT 2   PREVENTABLE**

**DATE OF REVIEW**:

**PATIENT:**

**DOC #:**

**DATE OF DEATH:** 1/21/20

**AGE:** 38

**DATE OF INCARCERATION:**   Not Available

**SITE AT TIME OF DEATH**:  Dixon Correctional Center

**PLACE OF DEATH:** Foyer of the patient's housing unit.  Death pronounced at local hospital.

**CATEGORY OF DEATH:**   Natural

**EXPECTED OR UNEXPECTED:**  Unexpected

**CAUSE OF DEATH:**  Asthma

**MENTAL HEALTH DIAGNOSES:**  Not available

**MEDICAL DIAGNOSES:**
1.      Asthma

**IDOC PROBLEM LIST:** Not Available

**MEDICATIONS AT FACILITY AT TIME OF DEATH:**
Pharmacy entries on medication administration record:
1. Triamcinolone nasal inhaler; 2 sprays in each nostril every morning KOP.
2. Levalbuterol inhaler 45 mcg; 1-2 puffs by mouth 4 times a day as needed KOP.
3. Prednisone 20 mg tab- take 2 ½ tablets [50 mg] by mouth daily x 5 days at beginning of each month KOP.
4. Montelukast 10 mg; 1 tablet by mouth at bedtime KOP.
5. Fluticasone-Salmeterol inhaler; 1 puff twice a day KOP.
6. Guaifenesin 200 mg tablet; 2 tablets 3 times a day KOP.
7. Loratadine 10 mg; 1 tablet daily KOP.
8. Ipratropium-albuterol by nebulization as needed 4 times a day DOT.
Nurse entries on medication administration record:

1. A hand-written nurse MAR entry stating: "Prednisone 40 mg dly [presumably daily] x 5 day in lieu of prednisone 30 mg for the month of January".

**CASE SUMMARY**

This patient died 1/21/20 from asthma, He was 38 years old.

He was seen only twice for chronic care; once 1/19/18 and a second time 9/19/18. On neither occasion was an adequate history taken. Status was not documented on the second visit. There were no chronic clinic visits in 2019 or in January of 2020. None of the chronic clinics established asthma symptom frequency, number of exacerbations, quantity of rescue inhaler use, accuracy of inhaler use, or current medications since the last visit. These are essential elements of standard asthma care. Providers did not even document hospitalizations since the last visit.

Rescue medications are medications used for immediate symptom relief of asthma and used when symptoms occur. Controller medications are used at specified intervals (typically twice a day) to maintain control of asthma. They are not to be used for symptom relief. This patient was prescribed five different inhalers each of which has a generic and trade name. Nurses and providers may use either the generic or trade name. This resulted in as many as ten different descriptions of inhalers were used in the record and MAR. Often, nurse hand-written entries replaced pharmacy type-written entries on MARs. This is confusing to staff and patients. All entries need to be in a standardized format. When medications are changed or initiated, the patient should be given instruction on how to use the new medication and inhaler use should be periodically reviewed with the patient. This did not occur based on documentation. At one point the patient was on two steroid inhalers, one of which was a combination with a long-acting beta agonist. Staff were unaware of the duplicate prescriptions for the entire three months. This represents uninformed prescribing. In this case it appeared that both the patient and staff were uninformed of what medications the patient was actually taking. This is a serious deficiency. Another possibility is that staff was unaware that these medications were of the same class which is a different problem. These issues speak to significant pharmacy issues that, in part, contributed to this patient's death. Unsafe medication practices characterize this patient's care.

At a 1/19/18 chronic clinic visit, the nurse practitioner stopped the fluticasone/salmeterol inhaler which had been prescribed as a substitute for budesonide/formoterol[4] which the patient was taking as a civilian. Budesonide/formoterol and fluticasone/salmeterol are combination steroid

---

[4]For all drugs there is a generic name and a trade name. The official pharmacy for IDOC uses the generic name on pharmacy produced MARs. The medical record documentation sometimes uses trade names and sometimes uses generic names. This is very confusing. Nurses hand-write many entries on MARs after a physician verbal order and use the MAR until a formal pharmacy typed copy is provided. However, in many cases, nurses use the hand-written MAR for months on end. Nurses sometimes use generic names but often use trade names. There is no established procedure for use of MARs and entries on MARs. The significant patient safety issue is that a provider, who may be unaware of the trade vs generic name distinction, may be confused as to what medications a patient is taking. For purposes of this record review, only generic names are used so as to be less confusing. Determining medication use in this record was daunting.

inhalers and long acting beta agonist drugs. Steroid inhaler medications are preferred controller medications. Using a combination steroid inhaler and long acting beta agonist are acceptable treatments. Instead, the nurse practitioner ordered a different controller medication, montelukast (a leukotriene inhibitor which is a pill) and a rescue inhaler, levalbuterol. This is a less optimal regimen and follow up was indicated to determine if the medication change was effective. This did not occur. Baseline spirometry is recommended for all persons with asthma but is never performed in IDOC. Spirometry should have been ordered to establish a status of the patient's disease particularly as this patient was often not in control. The nurse practitioner ordered a follow up chronic clinic visit in July.

The July chronic clinic visit did not occur. Any patient with more than intermittent asthma should be on a controller medication. This person had a physician order for montelukast from January until August 2018 but medication administration records show that the patient failed to receive any of this ordered medication until it expired 8/31/18. This eight month period of not receiving medication was unnoticed by any staff, including providers. It appeared that there was no process in place to refill keep-on-person (KOP) medications. When the patient failed to refill an ordered medication there was no feedback from nursing to providers that the patient was not obtaining refills of medication for the entire eight month period.

Given that the patient was now only on a rescue inhaler and not receiving his controller medication, on 5/2/18 a nurse saw the patient for a "cold". The patient had cough and achy feeling and said that his cough was helped by using the levalbuterol inhaler at night. This indicated poor control of his asthma. The nurse did not obtain a peak expiratory flow rate (PEFR)[5], take any history of the asthma and did not refer the patient to a provider to assess the asthma. Cough is an established symptom of asthma and even though his symptoms may have been related to asthma and not a cold, the nurse failed to evaluate for asthma.

Within 2 months on 7/12/18 the patient had an asthma exacerbation and was sent to an emergency room. The patient was discharged from the hospital on levalbuterol, montelukast tablets and budesonide/formoterol (a combination steroid and long-acting beta agonist) inhaler but at the facility, the combination inhaler (budesonide/formoterol) was not continued. Instead, on arrival back at the jail the on-call doctor started the patient on a tapering dose of prednisone and ciclesonide a different steroid inhaler than the one the hospital recommended (budesonide-formoterol). This would have been acceptable except the patient did not receive the ciclesonide inhaler ordered by the IDOC physician. Many of the MARs are handwritten to address immediate orders. However, the MARs that are handwritten mostly do not include the prescriber's name and often do not include adequate prescribing information so the trail of this medication order could not be determined.

---

[5] This is a test with a handheld device that allows a clinician to determine the ability of the patient to force air out of the lungs which gives a measurable way to determine the status of the patient's asthma. This test should be used when examining a person for asthma.

The day following hospitalization, the patient saw a doctor and the patient asked for the budesonide/formoterol inhaler which the hospital recommended. The doctor did not initiate the budesonide/formoterol and did not explain why. The doctor only renewed the levalbuterol. Also, the doctor did not review the MAR and note that the patient had not been receiving the montelukast since January or that the on-call doctor the day before had started ciclesonide which the patient had also not received. The patient was not receiving ordered or recommended medication and the doctor failed to be aware of this or take action.

On 7/14/18 the Medical Director ordered ciclesonide inhaler by phone for two months. This medication had already been started by the same doctor on 7/12/18. The patient did not receive this medication.

On 7/20/18 the prednisone recommended at the hospital expired. A doctor ordered a different steroid inhaler (fluticasone-salmeterol) which the patient did not receive until 7/25/18. On 7/21/18, the patient was not receiving ordered montelukast or ciclesonide and became short of breath and a nurse saw the patient. The nurse obtained an order for nebulization therapy for 6 months as needed. Treating patients in lieu of providing ordered medication is inappropriate.

Despite that the patient was recently discharged from the hospital, a doctor should have seen the patient, but no referral was made and the phone-consult with a doctor did not result in a follow up. During July, the patient was not receiving one of his medications (montelukast), had not received one of his ordered inhalers (ciclesonide) and had another medication (fluticasone-salmeterol) that was ordered 7/20 but was not received until 7/25. The fluticasone-salmeterol was a new medication but there was no evidence that anyone discussed with the patient how to use this new inhaler.

In August, the patient had not receive any ordered KOP inhalers yet required four urgent nebulization treatments. Nursing did not document several of these urgent nebulization treatments in the medical record as a progress note but only as a treatment given on the MAR. Urgent nebulization treatments should be documented on a progress note with vital signs included. These urgent treatments did not result in follow ups with providers to modify medication orders.

On 9/18/18 the patient experienced shortness of breath and was seen by a nurse. The patient had audible wheezing. The nurse noted that the patient's rescue inhaler would not be available until October. The nurse gave the patient a nebulization treatment and referred the patient to a physician the following day.

The following day, 9/19/18, a provider saw the patient in follow up of the nurse referral but performed this visit as a chronic illness clinic visit. This was the last chronic clinic visit for this patient. The doctor took virtually no history of recent events, including the symptom history of recent events leading to the nursing visit of the day before. The doctor did not review medications or patient symptoms and ordered ciclesonide and levalbuterol. A MAR for September notes that the doctor who saw the patient on this date also ordered fluticasone-salmeterol which is similar to ciclesonide except that the fluticasone-salmeterol contains both a

steroid inhaler and a long acting beta agonist. The patient was thus on two steroid inhalers, without providers being aware. It is uncertain whether the physician understood what he was prescribing or just made a mistake. Furthermore these were new medications and there was no documentation of instructing the patient on how to use these inhalers. The use of two steroid inhalers simultaneously compounded potential for adverse reactions to the patient. Also, these were not rescue medications and it was unclear if anyone explained the use of the medication to the patient. This is uninformed prescribing. The patient received the fluticasone-salmeterol and ciclesonide on 9/21/18.

In October, November, and December 2018 the patient again received two steroid inhalers and his rescue inhaler (levalbuterol). But the levalbuterol expired in December without anyone realizing it and without a physician visit.

The fluticasone-salmeterol inhaler also expired in December and in January the patient stopped receiving two steroid inhalers, but a doctor still did not see the patient. No one appeared aware of this expiration. Now the patient was on one steroid inhaler (no longer receiving duplicate therapy) that was a controller medication but did not have a rescue inhaler.

In January and March but not in February the patient received ciclesonide and levalbuterol. The patient again received ciclesonide and levalbuterol in May and July but not in April and June. These are metered dose inhalers which have a certain number of expected doses of medication. Each inhaler can have a different number of doses. This is not tracked, and it is difficult to determine whether the delivery of medication corresponds to the expected doses in the metered inhaler. For example, most controller inhalers will last for two to three months but sometimes controller inhalers are delivered to the patient monthly making it appear that the patient may be using the controller medication for rescue use. A standardized approach to inhaler use should be developed.

On July 9th, a nurse documented giving the patient a nebulization treatment but did not write a note and did not refer the patient to a provider. Eight days later on 7/17/19 the patient again needed nebulization therapy and a nurse referred the patient to a doctor who sent the patient to a hospital. This was the first physician or mid-level provider visit for almost a year (9/19/18). At the hospital, the patient was given intravenous steroid and referred back to the prison from the emergency department.

When the patient returned from the hospital, a doctor did not see the patient. No new medication was started post hospitalization. The patient continued to experience symptoms and he received nebulization therapy on 7/18/19, 7/21/19, 7/25/19, and four times on 7/30/19. On 7/30/19 a nurse practitioner ordered levalbuterol inhaler by phone. Notably, there were no nursing notes for any of the nebulization treatments even though they were the equivalent of onsite emergency treatments. Neither the nurse practitioner nor any of the nurses who administered nebulization therapy scheduled a physician follow up and the patient, experiencing exacerbation of his asthma, was not evaluated by a provider.

Finally on 8/13/19 the patient experienced shortness of breath and a nurse saw the patient and referred to a doctor who saw the patient that day. This was the first provider visit since hospitalization about a month ago. The doctor ordered prednisone for seven days and parenteral solumedrol as a one-time dose. The doctor stopped ciclesonide and ordered fluticasone-salmeterol and ordered a follow up in 3-4 weeks. The patient did not receive the steroid inhaler (fluticasone-salmeterol) for over 2 weeks (8/30/19). After this doctor visit the patient received prednisone for a week but then had no medication until he received a rescue inhaler (levalbuterol) on 8/29/19 and fluticasone-salmeterol on 8/30/19. Notably, the levalbuterol prescription expired after the 8/29/19 inhaler was delivered.

On 9/3/19 the patient developed shortness of breath and a nurse gave the patient a nebulization treatment and called a physician on-call who ordered intramuscular solumedrol, a steroid medication. There was no physician follow up but on 9/11/19 a physician ordered prednisone 50 mg daily for the first five days of every month, and montelukast. The montelukast was not received until 9/23/19 almost two weeks later. The prescription for prednisone the first five days of every month has no clinical basis as it was treating asthma unrelated to symptoms. This is an ineffective manner of prescribing.

On 9/18/19 a nurse practitioner saw the patient who still had wheezing but felt better. The nurse practitioner ordered a chest x-ray and an as-needed follow up. The nurse practitioner noted that the patient still had some of his inhaler left, however, medications were not thoroughly reviewed. Five days later on 9/23/19 the patient had another exacerbation of asthma with wheezing and received two nebulization treatments before a nurse practitioner saw the patient. The nurse practitioner ordered parenteral solumedrol and another nebulization treatment. The patient was placed on 23 hour observation.

The patient was not seen the following day on the infirmary and discharged from infirmary observation without being seen by a doctor. The patient received three more nebulization treatments that day. A patient still in exacerbation with uncontrolled asthma was discharged from infirmary care without review by a provider.

Three days later on 9/27/19 a nurse practitioner saw the patient for infirmary follow up. Little history was taken. The patient now had fluticasone-salmeterol (controller) and levalbuterol (rescue) inhalers and had just received montelukast pills (controller medication).

A doctor saw the patient again on 10/28/19. The patient said he was doing well. The doctor discussed the prescription for five days of prednisone on the first five days of every month. There appeared to be no clinical reason for giving prednisone for the first five days of every month as it was not associated with symptoms. The patient was not seen again by a physician.

In October 2019, the patient did not receive any medication including montelukast tablets and needed two nebulization treatments.

The patient received montelukast (controller) and levalbuterol (rescue) on 11/4/19 but the montelukast was a week late. On 11/21/19 the patient had wheezing, and a nurse gave the patient

a nebulization treatment. The nurse called a doctor who ordered solumedrol by phone and a tapering pack of prednisone. No follow up was ordered.

On 12/4/19 the patient transferred to Stateville-NRC on a writ and apparently transferred back on 12/15/19. At Stateville, the patient apparently received nebulization therapy 11 times with only one note by a nurse on 12/13/19. On that day, the patient said his inhaler was not working and he had audible wheezing and the nurse gave a nebulization treatment but did not refer to a doctor to assess his medication. It did not appear that the patient received any medication at NRC except nebulization therapy.

After return to Dixon, the patient did not receive any ordered inhalers or montelukast. The last rescue inhaler was given at Dixon on 12/4/19 before the patient transferred to Stateville NRC. The patient had been clearly out of control at Stateville NRC because of the number of nebulization treatments he received there. Yet on return to Dixon a physician did not see the patient. There was no transfer form when the patient returned to Dixon.

The patient was not seen on return to Dixon until 1/5/20 when a nurse saw the patient because he was short of breath. The nurse documented that the patient was on levalbuterol, fluticasone-salmeterol and montelukast. These were KOP and the nurse did not document verifying that the patient actually had received these KOP medications. The nurse stated that the patient was using levalbuterol and fluticasone-salmeterol consistent with MAR records that show that montelukast was often not delivered to the patient. The nurse administered a nebulization treatment and notified a doctor who ordered solumedrol IM and prednisone for five days. No follow up was ordered.

The last delivery of montelukast and levalbuterol were on 12/4/19 and fluticasone-salmeterol on 11/27/19. On 1/21/20 the patient was found in respiratory distress and officers were in process of transporting him to the health unit when the patient collapsed. Nurses were called. Officers did not apparently initiate CPR and nurses did not document anything regarding the incident, so it was unclear when CPR was started. The patient was declared dead at the hospital.

**DATE OF AUTOPSY:** 4/22/20

**PRELIMINARY AUTOPSY DIAGNOSIS:** Acute asthma exacerbation

**FINAL AUTOPSY REPORT:** Microscopic sections of lung showed congestion; submucosal chronic inflammation around bronchioles; smooth muscle hyperplasia; goblet cell metaplasia; excess mucus in 3 bronchioles. There was pulmonary vascular congestion. The death was attributed to acute exacerbation of asthma.

**OPPORTUNITIES FOR IMPROVEMENT AND RECOMMENDATIONS FOR CORRECTIVE ACTION:**
1. The patient failed to have regular chronic care follow up. The patient had only two chronic clinics for his asthma; 1/19/18 and 9/19/18. He had no chronic illness clinics

during 2019. A root cause should be developed to determine why this person with severe asthma was not evaluated in chronic care.

2. There was inadequate communication between nursing and providers with respect to exacerbations that occurred. Nurses would give urgent nebulization therapy, sometimes not even documenting their care and providers mostly appeared unaware of these episodes. This process is not operating clinically appropriately. Procedures for nebulization therapy needs to be standardized. All nebulization treatments need to be documented in the medical record as well on the MAR. The program should consider daily huddles in which anyone receiving any type of emergency care is discussed with respect to follow up needs.

3. The patient's medication management was very poor. It was difficult to identify at any one time what medication the patient was taking.

   a. For eight months in 2018 the patient did not receive ordered montelukast.

   b. Doctor visits were infrequent, and doctors did not check whether the patient's inhalers had medication during visits.

   c. From August through December of 2018 the patient had prescriptions for two different steroid inhalers which increased the risk of adverse reactions and side effects. This was not realized by providers. The pharmacy should have alerted the physician.

   d. Over the two years of record review there was no documentation of anyone instructing the patient on correct use of medication even though the inhaler types, especially the steroid inhalers, were occasionally changed. This is a responsibility of the pharmacy and the health staff.

   e. Over the last month of life (the patient died 1/21/20) the patient did not have montelukast tablets (controller medication). He last received his rescue inhaler on 12/4/20 which may or may not have had medication in it on 1/21/20. He last received fluticasone salmeterol inhaler (controller medication) on 11/27/19 which also may or may not have had medication in it.

   f. On multiple occasions, providers appeared unaware of what medication the patient was actually receiving and taking. One has to ask, how can the MAR record that the patient had not received montelukast for 8 months without anyone knowing or investigating?

   g. A doctor ordered five days of prednisone on the first five days of every month. The prescription is unrelated to the patient's symptoms and may result in using steroid medication when the patient is asymptomatic and not having it when the patient is symptomatic. This prescription was of uncertain value and may have harmed the patient.

   h. The patient transferred to Stateville-NRC 12/4/19. The return date was not clear. A transfer summary receiving the patient on 12/4/19 was in the record but the transfer summary back to Dixon was not available in the record. It is not clear if the patient had medications after the transfer from NRC back to Dixon or even if the patient had his medications with him on transfer. It also is not clear if the patient ever had a transfer evaluation at Dixon when he returned.

   i. There appeared to be problems with choice of medications possibly based on formulary requirements. The result was a cacophony of prescriptions. Providers

and nurses failed to document consistent knowledge of the current medications of the patient and consistently failed to take history of the medications used by the patient.

j. Controller and rescue inhaler prescriptions often took days to weeks to deliver to the patient. Due to the immediate need for asthma patients to have these medications they need to be in stock so that patients can be immediately given the medication from stock.

k. All of these problems should result in a root cause analysis of pharmacy practices to ensure that safe medication processes are in place. The current system is unsafe as exemplified in this patient.

4. On multiple occasions provider follow-up failed to occur. This demonstrated a pervasive lack of access to care and pervasive lack of monitoring of a serious medical condition.

a. Chronic illness clinics failed to occur as needed. During the last year of life, there were no chronic asthma clinics and provider visits were only episodic occurring only sometimes after acute exacerbations. The patient did not have timely or appropriate access to a physician based on his condition.

b. After hospitalization on 7/17/19 the patient was not evaluated by a provider for a month.

c. A nurse practitioner placed the patient on 23 hour observation on 9/23/19 but the patient was not seen when discharged for 4 days. The patient should have been seen on discharge to determine if it was safe to discharge from observation.

d. On 11/21/19 a doctor gave a phone order for prednisone for an exacerbation of asthma and asked for a follow up appointment which did not occur.

e. The patient sustained at least 16 exacerbations of his asthma at Dixon for which he received nebulization therapy for which there was not a nursing note and for which there was no follow up by a provider. When a nurse evaluates a patient for an emergent or urgent nebulization treatment, the nurse should obtain vital signs, PEFR, and document any findings in a note. Providers should follow up on these emergency visits.

f. The patient had 11 nebulization treatments between 12/7/19 and 12/17/19 apparently at NRC without nursing notes documenting the condition of the patient. It appeared that the patient was deteriorating and not receiving care as there was no provider follow up of these multiple nebulization treatments. There was no provider visit during his stay at Stateville NRC despite the patient apparently requiring 11 urgent nebulization treatments.

g. A nurse saw the patient on 1/5/20 at Dixon for shortness of breath and prednisone was ordered by phone by a physician along with solumedrol. There was no provider follow up after this acute exacerbation. The patient had yet to be seen by a provider after return from Stateville NRC sometime in mid-December. It was not clear if the patient had all of his medications. The patient should have been seen after this acute exacerbation. The patient died about 2 weeks after this episode.

h. These deficiencies warrant a root cause analysis of the chronic care program and how patients with serious medical conditions are monitored and managed.

5. The CDC believes that asthma deaths are largely preventable[6] with early treatment, supportive efforts, and patient education. The medical record fails to document adequate education. There were many episodes of failed follow up, missed medications, lack of follow up, medication errors, and lack of appropriate access to a provider. It is impossible to determine the rate of use of inhalers, particularly rescue inhalers. There were many opportunities for improvement evident in care of this patient. This asthma death was likely preventable. A root cause analysis of asthma care at IDOC facilities should result from this death.

6. There was no documentation of the timeline related to the final nursing interactions with the patient when the patient died. There is no documentation by nursing of their participation in CPR. Officer incident reports only state "CPR started" without any timeline or description of who participated in CPR. It is not even clear if officers assisted the man down and start CPR if indicated. This is a serious deficiency and there is no documentation of the effectiveness of the CPR and medical assistance. A root cause analysis of this episode of resuscitation should be performed. Since there is no policy or procedure on emergencies that include CPR, one should be developed.

7. There was no mortality review for this patient. Mortality review needs to be done.

8. This patient's death was likely preventable.

---

[6] Asthma as the Underlying Cause of Death; Centers for Disease Control and Prevention as found at https://www.cdc.gov/asthma/asthma_stats/asthma_underlying_death.html

**PATIENT 3   POSSIBLY PREVENTABLE**

**DATE OF REVIEW**:

**PATIENT:**

**DOC #:**

**DATE OF DEATH:**  3/5/20

**AGE:** 45

**DATE OF INCARCERATION:**  Unknown

**SITE AT TIME OF DEATH**:  Shawnee Correctional Center

**PLACE OF DEATH:** Infirmary at Shawnee

**CATEGORY OF DEATH:**   Natural

**EXPECTED OR UNEXPECTED:**  Expected

**CAUSE OF DEATH:**  Death certificate lists bone cancer with metastasis to lung.

Based on record review the patient had cancer of unknown primary metastatic to bone.

**MENTAL HEALTH DIAGNOSES:**  Bipolar disorder

**MEDICAL DIAGNOSES:**
  1. Hypothyroidism
  2. Cancer unknown primary metastatic to bone
  3. Hypertension

**IDOC PROBLEM LIST:**
  1. NKA
  2. Hx of ETOH abuse
  3. Hx of Drug abuse
  4. Fx Rt forearm S/P ORIF
  5. Psych Hx
  6. Current[7]

---

[7] We list problems as listed on the problem list.  "Current" was a term listed multiple times on the problem list, but the meaning is unknown.  There is no standardized system of entry into the problem list, but a standardized system is needed.

23

7. Bipolar D/O
8. Annual PPD
9. DNR status

**MEDICATIONS AT FACILITY IN MONTH BEFORE DEATH:**

Nurse MAR entries are handwritten; medications included:
1. "Ativan 0.5 mg 1 po Q $6^0$ PRN x 2 weeks".
2. "Give 0.3 ml morphine sulfate 20 mg/ml po Q $6^0$ PRN x 2 weeks".
3. "Morphine ER 60 mg po Q$12^0$ x 2wks".
4. "gabapentin 60 mg po TID x 30 days".
5. "synthroid 50 mcg po QD x 8 mos".
6. "IBU 200 mg po 1-2 tabs TID PRN".
7. "Nasal spray 2 squirts PRN".
8. "Colace 1 tab po QD".
9. "Boost 1 can po TID x 2 wks".

**CASE SUMMARY**

This inmate was 46 years old. He had bipolar disorder and no known documented medical conditions except hypothyroidism. Over a year, the patient had eleven separate episodes of elevated blood pressure, two of which occurred during doctor encounters. On only one occasion was the elevation recognized. In that visit the doctor did not treat the patient. The same doctor saw the patient about two weeks later and the blood pressure was again elevated (160/104) and yet the patient was not treated. The patient appeared to have unrecognized hypertension which was never identified over a year.

This patient was seen six times by nurses for hip pain over almost two months before nurses referred to a doctor. Though the patient complained consistently about left hip pain, when the doctor saw the patient, he did not evaluate the patient for his hip pain. He did not take a very good history and interpreted the patient's pain as back pain. A lumbar x-ray was done which showed osteoarthritis. The doctor attributed the pain to back osteoarthritis and treated the patient with non-steroidal medication. No further diagnostic testing was documented although a metabolic panel was ordered along with a lithium level and a thyroid study.

This test was collected and reported on 5/13/19 and showed an alkaline phosphatase of 132, which is elevated and higher than prior tests. This test can indicate bony damage[8] and it should have been considered given the patient's complaint of hip and leg pain. The doctor signed this test as reviewed.

The patient continued to have pain. There were three more health requests for leg pain. The patient was limping at one of these visits and had a 20 pound weight loss (the weight was

---

[8] This test would have been elevated in bony metastases, which the patient had.

documented) which was unnoticed. After the third visit the nurse referred to a provider. A nurse practitioner saw the patient, documented a pulse of 121 and the weight of 157. The patient told the nurse practitioner that he was losing weight. Remarkably the nurse practitioner did not address the tachycardia and took no action with respect to the patient complaint of 20 pound weight loss. The nurse practitioner did not perform an adequate history or physical examination and ordered no lab or other diagnostic tests. The only order was for a slow walk pass. This failure to evaluate a red-flag complaint warrants a peer review or counseling.

Two weeks later the nurse practitioner discussed the case, apparently with a psychiatrist, and described "lumbago sciatica" and started Neurontin for 8 months.

Within a week the patient placed another health request. The patient said he could not walk. A weight that was taken showed a 25-30 pound weight loss, but it was not recognized by the nurse.

Fifteen days later an LPN evaluated a sick call request when the patient asked for a bottom bunk. The LPN response was cynical. The nurse did not evaluate the patient but wrote, "I/M [name] was sitting on top bunk laughing and stated he didn't need to come to HCU and would sign a refusal". This was the 13th complaint related to his hip and leg pain.

A nurse performing a Mantoux skin test documented a weight of 143.8 which was over a 30 pound weight loss. The weight loss was unnoticed.

A nurse practitioner eventually did give the patient a low bunk pass and based on a chart review only increased the Neurontin and started a Medrol dose pack.

Eventually, after 14 nurse evaluations and five provider evaluations of his hip and leg pain, and after complaining of inability to walk and losing weight, an Assistant Warden placed the patient on the infirmary for "security housing" because he couldn't walk to the dining hall. After four days a doctor saw the patient and without performing an examination except to note that the patient was ambulatory, the doctor discharged the patient from the unit after talking to the Assistant Warden. This was an extremely cynical note warranting peer review. It was callous professional behavior.

A week later a nurse practitioner wrote that there was no need to see the patient for a 6 week follow up.

The patient placed two more health requests, one for lotion to rub on his painful leg and another for back pain. An LPN saw the patient on both occasions. On the later LPN visit, the LPN noted the weight which was a 30-40 pound weight loss. The nurse referred the patient urgently, but the referral did not occur. Two weeks later a scheduled physician sick call did not occur due to "time constraints". Four days later the patient was found with nausea and vomiting and significantly abnormal vitals with orthostatic changes. The patient weighed 125 pounds which was approximately a 50 pound weight loss. The patient was hospitalized.

At the hospital, the patient was diagnosed with multiple pulmonary nodules and multiple bony lesions in the scapula, both femurs and in the left hip. The patient was diagnosed with metastatic cancer. The doctor at the hospital was organizing a transfer to Barnes Jewish Hospital and the patient was accepted. However, the patient was apparently sent back to the prison where he was housed on the infirmary. Outpatient work up included a CT scan, bone scan and PET scan. After these tests, the patient was sent to an oncologist. From the initial hospitalization until the oncology consultation almost two months passed.

The infirmary records at Shawnee after the hospitalization and during the work up were not made available. On 2/28/20, the patient was transferred to Shawnee as a hospice patient. He died on 3/5/20.

There was no mortality review, but a vendor death summary failed to identify any problems and failed to note the time period to recognition of his condition.

**PRELIMINARY AUTOPSY DIAGNOSIS:** No autopsy report available.

**FINAL AUTOPSY REPORT:** No autopsy report available.

**OPPORTUNITIES FOR IMPROVEMENT AND RECOMMENDATIONS FOR CORRECTIVE ACTION:**

1. On eleven occasions, two of which with a physician, the patient had elevated blood pressure that was either unrecognized, not treated or not referred to a provider. This is a systemic issue. There is systemic failure to act on abnormal vital signs. A root cause analysis should be done to identify reasons for this and undertake corrective action.
2. On five occasions LPNs performed assessments without discussing findings with a RN or referring to a provider as required by the nurse practice act. Two of those episodes are described below.
   a. On one occasion, the patient had abnormal vitals (pulse 110, BP 144/86, and weight 147, a 25-30 pound weight loss) and the patient said he could not walk. Remarkably, the LPN noted the weight loss but despite the red-flag findings did not discuss findings with a RN or refer to a provider and did not consult a RN with her findings as required by law.
   b. On another encounter the LPN obtained elevated blood pressure but took no action. There was no discussion with an RN and no referral to a provider.
   The Consent Decree requires that RNs evaluate health requests.
3. Nurses saw the patient 14 times for hip, back or leg pain and yet only two referrals to providers were made. There is no evaluation of the clinical appropriateness of sick call processes. A root cause should be initiated to determine why nursing sick call processes fail to address patient complaints.
4. Multiple provider deficiencies were noted including:

a. Providers on multiple occasions failed to take an adequate history. On one of these episodes, the patient had complained to a nurse of hip pain on six consecutive occasions over almost two months. When the doctor saw the patient, the history taken by the doctor was poor and presumed that the patient had lumbar back pain. The history was inconsistent with six prior nursing notes. A root cause should be performed to determine why this occurred.

b. On another occasion the patient complained to a nurse practitioner about pain in his hip and weight loss. The nurse practitioner evaluated neither complaint adequately. The history and examinations were clinically inappropriate for the complaint of the patient.

c. A doctor failed to examine a patient placed on the infirmary by custody because he could not walk to the dining hall. The doctor did not take a clinically acceptable history or perform a clinically acceptable examination of the patient's complaint. This episode should result in a peer review.

Because of these errors, the patient's cancer diagnosis was delayed for ten months. While the primary cancer was not identified, bony metastases indicates a five year survival of approximately 5%.

5. After the diagnosis of cancer, instead of permitting transfer to Barnes Jewish Hospital, an outpatient work up was initiated, delaying an oncology visit for two months. This could have been accomplished in a hospital in a week. The IDOC should evaluate the vendor's policy on hospitalization.

6. An abnormal alkaline phosphatase test was signed as reviewed but no action taken. This test is sometimes elevated in persons with bony metastases which this patient had. A root cause analysis should be done to determine why an abnormal blood test was not properly evaluated.

7. A nurse performing a TB skin test recorded a weight which was a 20 pound weight loss which was unrecognized. Unrecognized weight loss is a systemic problem within IDOC. A root cause analysis should be undertaken to determine why this occurs so often.

8. These problems should result in peer reviews of two providers: one nurse practitioner and a physician. One of the physicians does not have primary care training as required by the Consent Decree and should be removed from service.

**PATIENT 4   POSSIBLY PREVENTABLE**

**DATE OF REVIEW**:

**PATIENT:**

**DOC #:**

**DATE OF DEATH:**  2/3/20

**AGE:** 76

**DATE OF INCARCERATION:**   Unknown

**SITE AT TIME OF DEATH:**  Dixon Correctional Center

**PLACE OF DEATH:** St. Anthony Hospital

**CATEGORY OF DEATH:**   Natural

**EXPECTED OR UNEXPECTED:**  Unexpected

**CAUSE OF DEATH:**

**MENTAL HEALTH DIAGNOSES:**

**MEDICAL DIAGNOSES:**
1. Hypertension
2. High blood lipids
3. Diabetes
4. Prior prostate removal for prostate cancer
5. Hyperparathyroidism

**IDOC Problem List**
1. Abnormal eye lashes
2. Hypertension
3. Hyperlipidemia
4. Impaired fasting glucose
5. NKA
6. Mild diabetes
7. Multiple chronic illness clinic (hypertension and diabetes)
8. Low bunk
9. No Black Box secondary to wrist deformity

10. Post prostatectomy for prostate cancer
11. Hypercalcemia secondary to hyperparathyroidism

## MEDICATIONS AT FACILITY BEFORE TRANSFERRED TO HOSPITAL WHERE HE DIED:

Medication administration records for February and March were not made available. For January 2020, the last month with medication records, the patient was on the following medications on 1/31/20.

Pharmacy entries on the medication administration records:
1. Novolin insulin; inject 20 units SQ twice a day DOT.
2. Novolin insulin; inject SUBQ per sliding scale protocol[9] twice a day DOT.
3. Acetaminophen 325 mg tab take 2 tablets by mouth three times a day KOP.
4. Aspirin EC 81 mg tab Take 1 tablet by mouth every evening KOP.
5. Docusate Sod 100 mg CAP Take 1 capsule by mouth twice a day KOP.
6. Hydralazine 25 mg tab Take 1 tablet by mouth twice a day KOP. Noted to be stopped on 1/7/20.
7. Hydrochlorothiazide 25 mg Tab Take 1 tablet by mouth every morning KOP.
8. Lisinopril 20 mg Tab Take 1 tablet by mouth daily KOP.
9. Metformin 500 mg Tab Take 1 ½ tablet by mouth twice a day KOP.
10. Methocarbamol 500 mg Tab Take 1 tablet by mouth every evening KOP.
11. Moisturizing lotion Dawn Mist No Pump Apply to affected area twice a day for 1 month KOP.
12. Tolnaftate 14 gram 1% cream; Apply to rash every day as needed KOP.
13. Tolnaftate 45 gram 1% powder; Use as directed everyday KOP.
14. Vitamin A&D (113 gm) ointment; apply to affected area every day as needed for 1 month KOP.
15. Vitamin B-12 1000 mcg tablet; Take 1 tablet by mouth daily KOP.
16. Muscle rub (35 gram) cream; apply to affected areas every day as needed for 1 month KOP.
17. Nifedipine ER 50 mg tablet; take 1 tablet by mouth daily KOP.
18. Novolin N; Inject 20 units SQ twice a day DOT. A nurse overwrote this pharmacy order and instead of 20 wrote 22.
19. Omeprazole DR 20 mg capsule; take 1 capsule by mouth daily KOP.
20. Simvastatin 20 mg Tablet; take 1 tablet by mouth daily KOP.

Nurse hand-written entries on the medication administration records:
1. Novolin N 22 units SQ BID.

---

[9] The pharmacy does not provide the protocol and does not specifically describe the dosage of medication. A protocol for sliding scale that applies to all patients is dangerous as it does not account for specific patient clinical needs.

2.    "Hydralazine 50 BID". This was started on 1/7/20 as a substitute for the hydralazine in number 6 above.  The order does not fulfill typical pharmacy requirements to give the exact dose or manner of administration.

## CASE SUMMARY

This patient was a 74 year old man with diabetes, hypertension, and hyperparathyroidism.  He had prior prostatectomy for prostate cancer.  For the two years of record review, his chronic disease management was extremely poor.

The patient had blood pressures elevated (systolic > 150) on 30 occasions from 8/2018 to 1/2020 yet the medication was not increased, except for occasional use of furosemide, which was intermittently used for reasons other than hypertension.  Also the patient had a 38% risk for heart disease or stroke, and was recommended to take a high intensity statin, yet the patient was only on simvastatin, a low-moderate intensity statin.  The patient appeared to have died of stroke and better management might have prevented the stroke.

Also the diabetes management was poor resulting in increased A1c levels from beginning to end of the two year period (A1c of 7.2 on 3/14/18 and A1c of 10 on 11/20/19) of record review indicating deterioration of his diabetes.  Despite worsening care, the clinic intervals were not reduced so as to monitor the disease more closely.

On 8/18/18, a nurse practitioner saw the patient for hypertension, diabetes, and hyperparathyroidism.  The nurse practitioner checked a box that there was no change in the medical history which was remarkable because since the last clinic the patient had experienced multiple problems including:
- Unexplained and unnoticed weight loss.
- Altered mental status (fogginess). He also complained of getting confused particularly when taking his medication.  He stated he was not taking the 1/2 pill of metformin thereby reducing his dose.
- Balance problems.
- Incontinence.
- A fall that resulted in rib fractures that were interpreted by a physician as old fractures.
- An EKG showing marked sinus arrhythmia with left ventricular hypertrophy (LVH).
- Six episodes of elevated blood pressure.  The elevations of blood pressure were significant.  At UIC his blood pressure was 190/90 and his stress test was cancelled.  He also had elevated pressures of 192/84 and 182/92. Notably a physician ordered BID blood pressure checks for a month and the blood pressure was elevated on 18 occasions, yet this was not identified even though the flow sheet was next to the chronic clinic visit in the medical record.
- The patient also had a pulse of 48 which had been unnoticed and unevaluated.
- The nurse practitioner took a history of the patient getting winded going to chow hall and requested meal delivery.

None of these issues were addressed. The patient had asked for a wheelchair cushion but the reason for being on the wheelchair was not identified. The A1c was listed as 7.9 and the calcium was 11.9. The weight was 146 which was a six pound weight loss since his last visit and at least in total, a 13 pound weight loss. Yet no history were taken for these abnormalities. The examination did not include a neurological examination despite the patient complaint about cognitive issues. Whether this was due to the hypercalcemia was not addressed despite the calcium being elevated. The nurse practitioner did not list medications accurately. The nurse practitioner stated the patient was on vitamin D, aspirin, lisinopril, metformin, nifedipine, oxybutynin, simvastatin and B12 but the patient was also on other medications including furosemide, hydralazine, HCTZ, famotidine, and TUMS. Being on TUMS and HCTZ with hypercalcemia should have been a red flag alert[10]. The furosemide and hydralazine had been started on the recommendation of UIC. The nurse practitioner failed to review medications with the patient.

The nurse practitioner documented the hyperparathyroidism control and status as fair, yet the nurse practitioner documented a calcium of 11.9 which is borderline for moderate hypercalcemia. The nurse practitioner also failed to note that many of the patient's complaints were likely related to hypercalcemia including the mental confusion, muscle pain, anorexia [with potential weight loss]. The nurse practitioner also failed to ask about other symptoms of hypercalcemia and failed to update the therapeutic plan of this disease which was that the patient was to be evaluated for parathyroidectomy. The patient's hyperparathyroidism was not in control and the surgery was delayed but the nurse practitioner did not update the plan. A repeat calcium was indicated as it was elevated and a follow up should have been ordered. The medications were changed to DOT because of the patient's confusion but the nurse practitioner did nothing to determine the cause of the confusion which was likely the hypercalcemia. The nurse practitioner ordered another wheelchair cushion and ordered meals to be delivered. The patient should have been placed on the infirmary until his confusion was diagnosed. The patient was also not evaluated for nephropathy or neuropathy. The nurse practitioner failed to review any endocrine notes. This was an uninformed and poor chronic illness visit.

On 12/7/18 a nurse practitioner saw the patient for chronic clinic for hypertension, diabetes, and hyperparathyroidism. The nurse practitioner checked the box stating "no change in medical history" though since the last visit the patient had multiple issues including:
- Emergency hypercalcemia crises necessitating two emergency room visits and urgent treatment with medication[11].

---

[10] TUMS is calcium carbonate which increases calcium levels. HCTZ reduces calcium excretion in the kidney. The failure to note this placed the patient at risk since the patient was already having confusion, a sign of hypercalcemia.

[11] The patient's hyperparathyroidism was causing elevated serum calcium (hypercalcemia) which can be dangerous. The serum calcium was not well monitored, and the patient had symptoms of hypercalcemia (constipation and confusion). A doctor ordered TUMS for abdominal pain which worsened the hypercalcemia. An elevated calcium level was unnoticed. Eventually, the patient had a critical calcium level that a UIC endocrinologist recommended medicine for. If the medicine was unavailable, hospitalization was recommended. The patient was hospitalized and eventually started on the medication to lower serum calcium. After the patient had surgery to remove the parathyroid gland, a follow up with endocrinology was recommended. This consultation was delayed for four months and the

- The patient developed a phimosis[12].
- The patient had more confusion and unexplained weight loss.
- The patient had UIC endocrinology visits for his hyperparathyroidism and had a dobutamine stress test as pre-op for his parathyroidectomy procedure that was planned which were not commented on.
- The patient had multiple complaints that might have been related to hyperparathyroidism including abdominal pain, confusion, and constipation. The nurse practitioner did not note the current calcium regimen or the management of the hyperparathyroidism despite the critical hypercalcemia that had occurred. He did not even review the endocrinologist's note from 9/24/18.
- The blood pressure was elevated on at least 5 episodes since his last visit, but these were unrecognized or not documented. Medication was not adjusted.
- The patient was seen by cardiology on 10/4/18 with a recommendation to increase furosemide but this not was not reviewed and apparently the nurse practitioner was unaware of the recommendation. Even though the patient was on Lasix the nurse practitioner failed to recognize the new dosage.
- The weight was 125 on 9/14/18 which was about a 30+ pound weight loss over a year and the nurse practitioner did not notice it.
- The patient was also having incontinence which was not addressed.

Despite these pertinent problems the nurse practitioner documented "Pt offers no clinic related concerns". The A1c was documented as 7.3. The phimosis with fungal infection is related to diabetes but this was unrecognized and not re-evaluated. This nurse practitioner did not know how to manage hyperparathyroidism and should not have been managing this patient's hyperparathyroidism in chronic clinic. Medications were renewed with no changes, but current medications were not documented. The patient was not evaluated for neuropathy and was not evaluated for nephropathy. Vaccinations were not updated. The nurse practitioner failed to review any endocrinology notes.

On 4/8/19, a nurse practitioner conducted chronic clinic for hypertension, diabetes, and hyperparathyroidism and checked a box stating "no change in medical history" though since the last visit the patient:
- Had an episode of tingling in his leg suggesting neuropathy.
- Had surgery consultation for a hernia repair.
- Had a CT of the abdomen that noted a 3 by 2.5 cm complex mass in the left kidney that was suspicious for neoplasia which was unidentified. This warranted referral to a nephrologist or oncologist.

---

medicine to lower calcium which should have been stopped after the surgery was continued for four months until the endocrinologist recommended to stop the medication. In the interim the patient developed hypocalcemia.

[12] This is a condition where the foreskin of an uncircumcised male cannot be drawn back. These can become infected with yeast particularly in diabetic patients.

• The patient was almost 4 months late for an endocrinology visit which was not identified by the nurse practitioner. Related to the hyperparathyroidism, the latest calcium was 7.5 which was documented as chronic but is low[13]. The nurse practitioner should have commented on it as it may have meant that the patient was not taking sufficient calcium supplementation. Also the nurse practitioner did not document review of the endocrine notes. The nurse practitioner did not document knowledge of what the therapeutic plan for the hyperparathyroidism was, although the nurse practitioner did document that the patient had a hyperparathyroidectomy. The nurse practitioner did not appear to understand how to manage the patient's hyperparathyroidism and should have consulted with a physician. This was particularly true because the patient was not getting to see the endocrinologist timely.

• The patient had a CEA of 5 which was abnormal. This indicated possible malignancy or other causes yet was unnoticed.

• The patient also had 5 episodes of elevated blood pressure including an episode at UIC with a general surgeon when the pressure was over 180/90s, and one taken by a nurse of 208/110. The nurse practitioner was not even aware of these and took no action to increase blood pressure medication.

• The patient had incontinence for unexplained reason and the nurse practitioner failed to document a therapeutic plan for the incontinence. The nurse practitioner also took no history of this problem which had been ongoing for over a year.

• The patient had anemia (HGB 11.5 on 12/10/18) but it was not identified; the patient should have been evaluated for colon cancer.

With respect to the patient's diabetes, the nurse practitioner noted that the patient's A1c was 9.2 and the nurse practitioner increased the metformin to 750 mg BID. Since the blood sugar had significantly deteriorated since the last visit a sooner follow up was indicated but the nurse practitioner ordered a 4 month follow up. The patient was not evaluated for neuropathy or nephropathy and vaccinations were not updated. This chronic disease clinic was very poor, and the nurse practitioner failed to develop an acceptable therapeutic plan.

On the 8/18/19 chronic clinic visit, a nurse filled out most of the chronic illness visit form which was signed by a doctor. The patient was seen for diabetes, hypertension, GERD, and hyperparathyroidism. The note stated that the medical history was unchanged since the last visit despite the patient having seen the ENT doctor and endocrinology. The reports were not reviewed. The patient had been referred to urology, but this was not mentioned. The patient had an A1c of 9.6 but there was no documentation of increasing medication. The medications were not listed. There was no history of the patient's multiple illnesses. The patient was not evaluated for nephropathy or neuropathy even though having had prior symptoms of neuropathy- tingling. Vaccinations were not updated. The therapeutic plan for the hyperparathyroidism was not documented. The calcium was not documented. The patient had a recent elevated blood

---

[13] The patient had his parathyroid gland removed. Now the patient had low calcium and needed supplementation, but the nurse practitioner was inattentive to this. This was of greater concern since the patient did not have timely referral to his endocrinologist who could have given better direction.

pressure that was not noted. The patient remained on the same blood pressure regimen despite prior elevations in blood pressure. This doctor also failed to note the anemia, abnormal CEA (test for colon cancer) and abnormal CT scan indicating a possible renal tumor.

At the 12/2019 chronic clinic visit, a nurse filled out about half of the chronic illness note. There was no history documented despite since the last chronic clinic the patient had:

- Severe incontinence and finally saw the urologist who recommended a cystoscopy which was not noted.
- The NPH had been increased about 3 months earlier due to out of control blood sugar but this was not noted. Also, the patient had a 520 blood sugar in October, but it was not noted.
- The patient had rectal bleeding in October which was not worked up. A colonoscopy was indicated but not even considered. No work up occurred despite the patient having anemia.
- The patient had a pulse of 42 on a prior examination in October. The patient had a prior pulse of 48 and bradycardia on an EKG as well as significant sinus arrhythmia. None of these abnormalities were noted. Because the bradycardia was not noticed at the time of occurrence the patient should have probably been referred to a cardiologist or a Holter monitor should have been considered.
- The patient had fallen in late September, but it was not noted. This may have been related to symptoms related to his bradycardia, but a thorough history was not taken. Yet at this time the doctor failed to even note that it occurred.
- The patient had prior phimosis, yet it was not evaluated at this visit.

The doctor basically failed to update any of the abnormalities that had occurred since the last visit. At this visit the nurse documented an A1c of 10 and the doctor increased NPH to 20 units BID. The doctor did not assess for neuropathy, even though the patient had prior symptoms for neuropathy.

These five chronic clinics failed to demonstrate the provider's ability to monitor or manage the patient's multiple conditions and new problems. This was a failure of the chronic clinic program. In addition, there were multiple problems in the care of this patient. These included:

- The patient was referred for a 6 month follow up to endocrinology on 11/7/17 but this did not occur until 9/21/18 about 10.5 months later.
- The patient was referred for parathyroidectomy (removal of the parathyroid gland) on 11/7/17 but this did not occur until December of 2018. In the interim the patient had two hospitalizations for hypercalcemia a side effect of hyperparathyroidism. These placed the patient at risk of harm.
- The patient was 74 years old and did not yet have a colonoscopy. Twice in September of 2018 doctors saw the patient, once with weight loss and once for abdominal discomfort and constipation. On 12/6/18 a doctor noted that the patient had a family history of an uncle with colon cancer and a sister with polyps. On 12/10/18 the patient developed anemia (HGB 11.5 with normal value 13.2-18). On 12/7/19 an urologist saw the patient for incontinence and noted that the patient was overdue for a colonoscopy and

recommended referral to GI for this procedure. The patient had also had episodes of bloody stool. The patient was not referred for colonoscopy. There was evidence of collection of stool for stool guaiac on 8/13/18 but these results were not in the medical record. This patient should have been referred for colonoscopy but was not.

- The patient's calcium was not being monitored in chronic clinic and was not monitored otherwise resulting in uncontrolled hypercalcemia with repeated symptoms of extremely high serum calcium including abdominal pain, constipation, confusion, anorexia, and excessive urination.
- The patient had unexplained weight loss which was never evaluated. Typical diagnostic studies for this condition were not ordered.
- The patient had extremely low heart rate for a 74 year old (42 and 48) which were not evaluated at the time they occurred. This placed the patient at significant risk. He should have been referred to a cardiologist for evaluation.
- The patient had multiple abnormal labs that were not documented as reviewed and not addressed including:
  - A CEA of 5 (normal is less than 3).
  - Multiple elevated calcium levels. UIC actually called the prison on a critical calcium level unnoticed at the facility.
  - A mild anemia (HGB 11.5 (normal is 13.2-18)) which for this individual was significant because of rectal bleeding and needed work up.
- The patient was referred for endocrinology follow up in a month but was sent 4 months late.
- The patient had severe and continual incontinence at least since beginning in June of 2018 but was not referred to urology until July of 2019. In the interim the patient was wetting his bed, soiling his clothes, and using multiple diapers a day. This was degrading. Ultimately, the patient was offered a Foley catheter for the problem instead of the urology referral. The patient should also have received some accommodation for his condition but did not. The lack of concern was striking.
- The patient had two falls; one resulting in broken ribs which was incorrectly diagnosed. The patient's confusion may have resulted in the falls but was also not evaluated. The lack of care for his geriatric conditions speaks to the need for a gerontologist at the Dixon facility and for consultation on a statewide basis. Also, the patient has systolic hypertension a condition frequently seen in the elderly. Yet his blood pressure was not properly managed. The patient had phimosis noted in September of 2018, a complication related to the foreskin of uncircumcised males but was never referred to urology for correction of this condition. The patient's phimosis became infected repeatedly.
- The patient was referred for a painful scrotal hernia apparently sometime earlier than 2018 but did not see the surgeon for an evaluation until 2/15/19. The patient was re-referred 1/22/19 but had repeatedly asked about his hernia surgery in earlier appointments and his hernia was mentioned in multiple prior notes. The hernia was not repaired until 3/21/19.
- The patient had a CT scan on 3/18/19 which showed a 3 by 2.5 cm renal complex mass in the left kidney. A neoplastic etiology could not be excluded. Follow up of this mass was not documented.

- The patient was in segregation where an apparent standard procedure is to crush and float medication. The patient refused to take the crush and float medication. The issue was for TUMS, an antacid, to be crushed. This is inappropriate practice as crush and float should not be initiated for custody reasons.
- Nurses filled out much of the chronic illness form for a physician on two occasions and these forms failed to include any history of the patient's progress since the last clinic.
- The patient had trouble seeing but was not sent for cataract surgery because he did not fit vendor criteria for cataracts.
- The patient who 76 years old was on 20 different medications, six of which were ointments. These medications were KOP, but the patient had repeated episodes of confusion. Though the patient was elderly and had known cognitive disorder (possibly from hypercalcemia) he was not evaluated for a cognitive disorder and he was allowed to manage a panel of 20 medications. This was unsafe.

This patient's presentation at the time of death was of a stroke. He had left sided weakness with a facial droop, slurred speech, and flaccid left upper and lower extremity. After transfer to a hospital on 1/30/20 the patient died on 2/3/20. The lack of appropriate care of his blood pressure and diabetes makes this death possibly preventable.

**PRELIMINARY AUTOPSY DIAGNOSIS:**

**FINAL AUTOPSY REPORT:**

**OPPORTUNITIES FOR IMPROVEMENT AND RECOMMENDATIONS FOR CORRECTIVE ACTION:**

1. This death record demonstrates a pervasive systemic problem with chronic care management. A root cause analysis needs to be done to determine the following:
   a. The problem lists do not identify all of the patient's problems. The root cause should include why the problem list is not accurate or appropriate.
   b. Why all of the patient's medical problems are not followed in chronic illness clinic.
   c. Why significant findings (renal mass on CT scan) are lost to follow up and nothing is done.
   d. Why referrals (cataract surgery, endocrinology, general surgery, colonoscopy, and urology) are either denied or not timely. Access to specialty care is not safe or clinically appropriate.
   e. Why providers do not appear to be aware of the medications being taken by the patient. And why medication management is not part of the chronic care program.
   f. Why interval visits to specialists are not reviewed during chronic care encounters.
   g. Why chronic illness management does not follow standard of care.
   h. Why significant abnormalities occurring between chronic clinic visits (arrhythmias, weight loss, major cognitive issues, falls, incontinence, abnormal vital signs, etc.) are unrecognized at chronic clinic appointments.

      i.   Why abnormal test results are not noted.

2. This root cause analysis needs to result in changes to policy, procedure, and practice.  The root cause needs to include analysis as to whether denial of care is related to intentional barriers to care to reduce cost.

3. This 76 year old was on twenty medications all KOP.  He had confusion intermittently.  He did not appear able to manage his own medication.  Medication management for the elderly should be evaluated in a root cause analysis to ensure that patient safety is ensured.

4. A root cause analysis on care of the elderly needs to be done.  From that analysis, policy and procedure should standardize care of the elderly, including evaluation, cognitive assessment, appropriate housing, and accommodation for special needs.  It should determine how the elderly obtain geriatric care and assessment by providers experienced in geriatric care.

**PATIENT 5   POSSIBLY PREVENTABLE**

**DATE OF REVIEW**:

**PATIENT:**

**DOC #:**

**DATE OF DEATH:**  2/2/20

**AGE:** 67

**DATE OF INCARCERATION:**  Unknown

**SITE AT TIME OF DEATH**:  Vandalia Correctional Center

**PLACE OF DEATH:** Fayette County Hospital Emergency Room

**CATEGORY OF DEATH:**   Natural

**EXPECTED OR UNEXPECTED:**  Unexpected

**CAUSE OF DEATH:**  Coronary artery atherosclerosis contributed to by cardiomyopathy and congestive heart failure.

**MENTAL HEALTH DIAGNOSES:**

**MEDICAL DIAGNOSES:**

1.  Type 2 diabetes
2.  Hypertension
3.  Microalbuminuria
4.  Coronary artery disease; post CABG 2004
5.  Systolic heart failure EF 10-15%
6.  ACID defibrillator
7.  Paroxysmal atrial fibrillation
8.  Stroke with residual L weakness
9.  Hyperlipidemia
10. Bilateral cataracts
11. Weight loss

**IDOC Problem List**
1.  No known allergies

2. Insulin dependent diabetes mellitus
3. Hypertension
4. Coronary artery disease post CABG
5. Atrial fibrillation/atrial flutter
6. Congestive heart failure with defibrillator
7. Old stroke with residual left sided weakness
8. L shoulder tendinitis
9. Prior history of syphilis
10. Substance abuse

**MEDICATIONS AT FACILITY BEFORE TRANSFERRED TO HOSPITAL WHERE HE DIED:**

Pharmacy entries on medication administration record:
1. Acetaminophen 325 mg tab; take 1-2 tablets by mouth twice a day as needed.
2. Atorvastatin 40 mg tablet; take 1 tablet by mouth at bedtime.
3. Bumetanide 2 mg tablet; take 1 tablet by mouth daily.
4. Digoxin 125 mcg tablets; take 1 table by mouth daily.
5. Lantus insulin; inject 24 units SQ at bedtime.
6. Lisinopril 2.5 mg tab; take 1 tablet by mouth daily.
7. Magnesium oxide 400 mg tab; take 1 tablet by mouth daily.
8. Novolin R; use per sliding scale twice a day 0-150= 0U; 151-200 = 2U; 201-250=4U; 251-300 =6U; 301-350=8U; 351-400=10U; >400 call MD.
9. Rifampin 300 mg cap; take 2 capsule by mouth daily.
10. Spironolactone 25 mg tab; take 1 tablet by mouth daily.

Nurse entries on medication administration record:
1. "RSSI SQ BID; 151-200 = 2 u; 201-250 = 4 u; 251-300 = 6 u; 301-350 = 8 u; 351-400 =10 u; >401 call MD".

**CASE SUMMARY**

This patient was received at NRC from Cook County Jail after hospitalization at Stroger Hospital. The patient had heart failure, an automatic defibrillator, coronary artery disease with prior bypass surgery, diabetes, history of atrial flutter, hypertension, high blood lipids, microalbuminuria, and bilateral cataracts. The heart failure was severe with a 10-15% ejection fraction.[14] The patient was significantly impaired. His medications were atorvastatin, digoxin, bumetanide, insulin, metoprolol, rivaroxaban, and spironolactone. Aspirin was stopped because he was on rivaroxaban. There was recommendation from Stroger Hospital to obtain a liver ultrasound and interrogation of the pacemaker as an outpatient to evaluate liver function test abnormalities.

---

[14] The ejection fraction is the percent of one's blood that is pumped out of the heart chambers with a contraction. In a normal person this percent ranges from 55-70%.

A series of errors occurred that contributed to this patient's death.

When the patient arrived at NRC, the physician assistant performing the evaluation documented that the patient had atrial fibrillation and was on an anticoagulant, but the physician assistant did not document ordering an anticoagulant and this medication was never started. This was a serious medication error as it placed the patient at risk of stroke. Bumetanide, a powerful diuretic used in advanced heart failure, was also mistakenly prescribed at half the dose recommended by the Stroger Hospital physicians. This would have a significant effect on the course of his disease. A chest x-ray was ordered by the physician assistant but there was no formal report for the x-ray, but a handwritten report showed moderate cardiomegaly with clear lungs. The patient was admitted to the infirmary.

A doctor at NRC saw the patient on three occasions on the infirmary but failed to evaluate medications, did not review the medication administration records and did not monitor the disease process carefully. The patient was not receiving rivaroxaban, an anticoagulant, and was receiving only half the dose of bumetanide, a potent diuretic of critical importance in the treatment of heart failure without recognition. The latter error contributed to a deterioration of his heart failure. When the patient arrived at NRC his weight was 170 pounds. Within about three weeks, the patient's heart failure worsened at NRC due in part to the inattention of a doctor. The Monitor has notified IDOC that this physician practices in an unsafe and clinically inappropriate manner. Upon discharge from NRC, the patient had gained 13 pounds over less than a month and had worsening symptoms. The sudden weight gain was likely from heart failure and accumulation of fluids.

The patient was transferred to Vandalia on 11/23/19. The transfer form was not accurately filled out. Several conditions were not listed. Because of the errors in identifying prescribed medications from Stroger Hospital, these errors continued to Vandalia. However, the doctor at Vandalia did not carefully review the Cermak and Stroger Hospital records either and thereby failed to correct these medication errors. The errors on this transfer document suggests that a root cause analysis of the transfer process should be performed to prevent this kind of problem from happening again.

The doctor at Vandalia documented belief that the patient was taking rivaroxaban for his atrial fibrillation, but the patient was not prescribed this medication. One has to ask, how a doctor could document that a patient was on a medication but was actually not receiving that medication. Physicians need to review the MAR in the context of evaluating patient, but this apparently did not occur, and the patient continued to not receive a medication that the doctor believed the patient was receiving.

The error of not prescribing the dose of bumetanide he was taking at the time he was received at IDOC could have been resolved by a careful review of the Cermak and Stroger Hospital records and the MAR. Why did this not occur? This should be asked in a root cause analysis.

The patient started having increasing symptoms including waking up short of breath. The doctor stopped metoprolol, a drug known to improve survival in persons with heart failure, stating that it had been discontinued by a cardiologist at Stroger, but this was inaccurate. The discharge summaries from both Stroger Hospital and Cermak included metoprolol as a recommended

medication. This may have harmed the patient because metoprolol is known to improve survival in persons with heart failure and is a standard of heart failure care. The doctor noted that the patient had lost nine pounds over a time period starting with arrival at Vandalia, but the patient had actually gained four pounds since admission to IDOC. Additional and not less treatment was indicated. The failure to monitor weights is a major systemic problem in IDOC and failures to do so are evident in multiple record reviews and should be studied with a root cause analysis. The patient's A1c was 9.1 and the patient had edema. The doctor made an appropriate decision to keep the patient on the infirmary but changed the status to "chronic".

The patient began developing an irregular heartbeat, indicating that his atrial fibrillation may have returned. This was noted by the doctor during two of the clinic visits. Atrial fibrillation can worsen heart failure by reduction in cardiac output. The staff did not simultaneously perform EKGs when the irregular pulse findings were identified.

A cardiologist saw the patient in late December, about a month after arrival at Vandalia. The communication with the cardiologist contained four errors about the medication being taken by the patient. These errors included:

1. The patient was taking bumetanide 2 mg daily, but the cardiologist was told that the patient was taking the medication twice a day. The twice a day dosing was the recommended dosing of Stroger Hospital and Cermak but was not what the patient was receiving.
2. The patient was not receiving rivaroxaban, an anticoagulant, for his atrial fibrillation but the doctor was made to understand that the patient was receiving 15 mg of rivaroxaban daily. Notably, Stroger and Cermak both had recommended rivaroxaban at 20 mg daily.
3. The patient was taking Lisinopril at the prison, but the cardiologist was not told this.
4. The cardiologist documented that the patient was taking 0.25 mg of digoxin when the patient was actually receiving 0.125.

These errors might have affected the doctor's opinion of the patient's condition. A root cause analysis of communication with consultants needs to be done to eliminate these types of serious errors.

For over two months none of the medication administration records (MARs) were printed pharmacy MARs. They were all hand-written MARs initiated by nurses that had incomplete information related to the prescription. It is unclear whether any of these MAR transcriptions by nurses caused the medication errors described above because none of the actual physician orders were in the medical record, which is a separate problem. The process of producing a MAR needs to be studied to eliminate these serious problems so that medication errors are reduced.

The doctor at Vandalia started rifampin on this patient for TB prophylaxis despite the patient having elevated bilirubin (2.4, 2.7, and 3.5 on three different tests- normal values are 0-1.2) and elevated alkaline phosphatase which indicated liver abnormality. Stroger Hospital had recommended obtaining a liver ultrasound, but this test was not done while at IDOC. This patient had impaired liver function and should only have been given rifampin when medically indicated and with monitoring of other liver function tests (AST and ALT) *prior* to initiation of therapy and then every two weeks after treatment started. Given the patient's condition, it was not prudent to start rifampin and it would eventually probably harm the patient.

In late January at Vandalia, the patient developed fever (100.7), tachycardia (110), shortness of breath, edema, irregular heart rate, cough, and had gained 13 pounds. This was likely indicative of exacerbation of his heart failure and might have indicated pneumonia. The doctor noted worsening of heart failure, but the fever also suggested possible pneumonia. Given the patient's underlying conditions[15], prompt referral to a hospital was indicated. Instead, the doctor did not obtain an urgent EKG, ordered a chest x-ray *in a week*, did not order urgent laboratory testing (metabolic panel, CBC, troponin, BNP), and only increased spironolactone minimally. The doctor actually discontinued Lisinopril; a medication known to increase survival in persons with heart failure without documenting a rationale. This likely harmed the patient. This patient should have been hospitalized; instead, little was done to help, and more was done to harm the patient. The physician did not recognize how ill the patient was.

Two days later, at midnight, a nurse called a doctor on call because the patient had shortness of breath. The vitals were not alarming (pulse 100, respirations 18, blood pressure 116/78, oxygen saturation 99%) but the doctor started furosemide at 40 mg twice a day for two days and held the bumetanide. Bumetanide is a powerful diuretic. One mg of bumetanide is equivalent to 40 mg of furosemide. Because the patient was on 2 mg of bumetanide it was equivalent to 80 mg of furosemide. The doctor was therefore, not changing the effective dose. However, bumetanide is thought to have better bioavailability and is preferred for advanced heart failure for that reason. No rationale was given for the change. This may have harmed the patient. A higher dose of diuretic was needed, and the patient needed hospitalization for better monitoring. Instead the doctor was one by one removing medicines used for heart failure and failed to seek higher level care.

That morning at 8:45 am, a nurse saw the patient who had an irregular pulse of 114 with edema. At 11:45 am the patient was short of breath, with pulse of 116 and respiratory rate of 24 and the patient was transferred to a hospital.

The hospital recognized that the patient was not receiving ordered rivaroxaban. The patient was in process of being transferred to a higher level hospital when he sustained cardiac arrest and died.

All of these errors occurred over a brief period of time. The patient was admitted to IDOC on 10/28/19 and died on 2/2/20, a period of only three months. This seriously ill patient was not well managed at two IDOC facilities.

The coroner's report ascribed the death to underlying coronary artery disease (the patient had no evidence of an acute myocardial infarction), cardiomyopathy, and congestive heart failure. This death was possibly preventable due to multiple medication errors and clinical errors. His heart failure was very severe, and his prognosis was poor but the errors did contribute to the worsening

---

[15] A pneumonia severity index is a scale that can be used to assess whether a community acquired pneumonia warrants hospitalization or can be safely managed as an outpatient. This patient was 67 years old, male, with heart failure, cerebrovascular disease (prior stroke) and apparent chronic liver disease (had a recommended liver ultrasound recommended which was not done) and his pneumonia severity index was 87 if the patient had no liver disease and 107 if liver disease was present which is likely. A score of 107 on the pneumonia severity index warranted hospitalization.

of his condition.  The doctors caring for him did not have credentials required under the Consent Decree.

**PRELIMINARY AUTOPSY DIAGNOSIS:**

**FINAL AUTOPSY REPORT:**  Death attributed to coronary artery atherosclerosis.  Ischemic cardiomyopathy and congestive heart failure are interpreted as contributory to the cause of death.

**OPPORTUNITIES FOR IMPROVEMENT AND RECOMMENDATIONS FOR CORRECTIVE ACTION:**

1. A root cause analysis needs to be done to determine how two medications were inaccurately prescribed and why recommendations of Stroger Hospital physicians for ultrasound and pacemaker interrogation were missed.  There was a failure to establish a sound medical therapeutic plan based on transfer documents that resulted in deterioration of the patient's condition.  The failure to continue the patient's usual medication regimen placed the patient at significant risk of harm.  The root cause analysis should be done to determine if policy and procedure is appropriate or if there are other reasons (physician credentialing, process issues, etc.) that may have been responsible.

2. Evaluation of why physician infirmary care was substandard at NRC should be performed.  The physician failed to appreciate the patient's therapeutic plan at Cook County Jail and failed to appreciate signs of the patient's deterioration.  The IDOC should consider how it evaluates provider care.

3. The intrasystem transfer form was inaccurately filled out and failure of NRC to correctly identify the patient's ordered medication resulted in failure to protect the patient.  A root cause of this process should be done to inform policy and procedure development.

4. The doctor at Vandalia believed the patient to be on rivaroxaban, an anticoagulant.  Then the doctor stopped metoprolol, believing that a doctor at Stroger Hospital had stopped the medication, when this appeared to be inaccurate.  A root cause analysis should be done to determine how these medication errors occurred.  Doctors should evaluate patients with knowledge of their medication which is evidenced by a medication administration record.  The results of this analysis should inform procedures for how physicians evaluate a patient's therapeutic plan.

5. The root cause analysis mentioned for items related to medication use should be expanded to determine how the medications the patient was supposedly taking were inaccurately reported to a cardiology consultant.

6. The root cause analysis for medication use should expand to include evaluation as to why so many hand-written medication administration records are in use.  These have great potential for error and are an unsafe practice.  This root cause should result in development of a standardized medication administration record process that is safe and ensures an accurate medication administration record.

7. The root cause analysis for medication use should be expanded to include evaluation of how someone with a significant risk of adverse reaction (elevated bilirubin indicating potential liver disease) was started on rifampin, a drug with medical adverse warnings with respect to use in person with liver disease.

8. The patient with significant morbidities deteriorated but was not promptly referred to a hospital.  A root cause analysis needs to be performed to develop better guidance and procedures for when to timely send patients to a hospital.

**PATIENT 6   PREVENTABLE**

**DATE OF REVIEW**:

**PATIENT:**

**DOC #:**
**DATE OF DEATH:** 3/4/20

**AGE:** 75

**DATE OF INCARCERATION:**

**SITE AT TIME OF DEATH**:  Graham Correctional Center

**PLACE OF DEATH:** Infirmary unit at Graham

**CATEGORY OF DEATH:**   Natural

**EXPECTED OR UNEXPECTED:**  Expected

**CAUSE OF DEATH:**  Aspiration pneumonia contributed by atherosclerotic and valvular heart disease.

**MENTAL HEALTH DIAGNOSES:**

**MEDICAL DIAGNOSES IN 2018:**
1. Coronary artery disease with prior CABG and stents
2. Post aortic valve replacement
3. Sick sinus syndrome
4. Cardiac resynchronization defibrillator
5. Carotid stenosis
6. Hypertension
7. History of deep vein thrombosis
8. Hypothyroidism
9. LV dysfunction
10. Hyperlipidemia
11. Peripheral vascular disease

**IDOC Problem List**
1. NKDA
2. History of smoking
3. Hypertension

4. 2003 back surgery
5. 2005 heart stents
6. History of R hand fracture
7. Wire frames
8. Increased lipids / endocrine
9. Depression

## MEDICATIONS AT FACILITY ON DAY OF DEATH:

Pharmacy entries on medication administration record:
None

Nurse entries on medication administration record:
1. "Plavix 75 mg po daily".
2. "Scopolamine 1 mg/3 days patch.  Place patch onto the skin [every] three days PRN for secretions/congestion x 1 month".
3. "Atropine 1% ophthalmic solution [one to two] gtts [drops] under tongue [every] four hrs PRN for secretions x 1 month".
4. "Compazine 10 mg po TID with meals".
5. "Cymbalta 30 mg po daily x 1 month".
6. "Colace 100 mg po BID x 3 months".
7. "Benadryl 25 mg po TID PRN".
8. "Eliquis 5 mg po BID".
9. "Tylenol 500 mg po 1-2 tabs PRN TID".
10. "Alvesco 160 mcg inhaler 1 puff daily".

## CASE SUMMARY

A problem list from December of 2017 was inaccurate and failed to include the patient's actual list of problems.

At the first medical chronic care clinic only three (hyperlipidemia, hypothyroidism, and hypertension) of the patient's 11 medical problems were addressed. The patient's other problems were not addressed at this or other chronic care clinics. This appears related to chronic disease clinic only addressing the most common medical conditions.  At the first chronic clinic, the TSH (10.7) was high and hypothyroidism were listed as in fair control without any explanation.  The MAR for 6/2018 was not present in the record sent to us and the chronic clinic note was not clear if the levothyroxine was increased or if the prescribed statin drug was a renewal or was just started.  A discussion with the patient of medication management was not present in the chronic care note.  The patient was obese with an elevated triglyceride level and had coronary artery disease and diabetes screening would have been appropriate.  There was virtually no history of the patient's other multiple medical conditions.   Vaccinations were not updated. The forms used for chronic care do not support an appropriate evaluation.  The therapeutic plan for all of the patient's medical conditions was not stated.  Triglycerides that were ordered were 341 which is very high but was not addressed.

Other chronic clinics were similar to this first clinic. It was not apparent at any chronic illness clinic that all of the patient's medical conditions were evaluated. Even when the patient was seen in a chronic clinic visit, elevated blood pressure was not always addressed by increasing medication. The patient had elevated blood pressure in four chronic clinic visits, three other provider visits and one nursing visit but was not addressed. This is a common occurrence in IDOC. Elevated vital signs are often not addressed. The patient had persistently elevated triglyceride levels as high as 400 (normal <150) which were not addressed.

On 10/21/19 a physician assistant saw the patient for a chronic care clinic but only addressed hypertension and high blood lipids; no other problems were addressed. Although the triglycerides were elevated (275) this elevation was not addressed. Although the blood pressure was elevated (149/70) it was listed as in good control which was inaccurate as 149/70 is not a goal blood pressure. None of the other medical problems were addressed.

A nurse saw the patient at 12:35 pm the same day as the chronic care clinic on 10/21/19 and the patient complained of cough, sweats, and wheezing; his temperature was 100.2, pulse of 122, oxygen saturation of 91%. This combination of symptoms, particularly given the lists of medical problems of the patient, indicated a potentially serious problem warranting prompt referral, hospitalization or consultation which did not occur. This also calls into question whether the physician assistant actually conducted a thorough history or physical examination in the chronic clinic visit of the same day because the physician assistant examination was likely around the same time as the nurse evaluation at noon and was basically normal. The nurse gave the patient ibuprofen and cough syrup and told the patient to return if symptoms worsened. The patient had significant symptoms and three abnormal vital signs, yet the nurse did not consult a provider or refer to a higher level of care.

Another nurse saw the patient on 11/2/19 and took a history of three days of difficulty breathing. The patient had symptoms related to difficulty breathing for over two weeks. The vital signs were normal, and the oxygen saturation was 99%. The nurse documented lung sounds as "tight to auscultation". Though the IDOC policy based on the formatted protocol form recommended urgent MD consultation for shortness of breath the nurse did not refer the patient to a physician and gave the patient over-the-counter antihistamine without consulting or referring to a provider.

On 11/5/19 a nurse saw the patient for shortness of breath. The patient had wheezing. The oxygen saturation was 93% with peak expiratory flow rates[16] (PEFRs) of 150, 150, and 200 but the patient had no history of asthma or COPD. The patient had left ventricular (LV) dysfunction which may have progressed to heart failure. The nurse scheduled the patient to see a physician assistant and the patient was seen the same day. The physician assistant noted congestion and shortness of breath. The history was poor and limited. No vital signs were taken despite significant symptoms in a person with a significant panel of diseases. The patient had wheezing on exam. With very little history, the physician assistant diagnosed acute bronchitis (without taking vital signs, obtaining labs, an EKG or a chest x-ray) and treated the patient with

---

[16] Peak expiratory flow rates are tests measuring the ability for forcefully expel air over one second. It is used to assess asthma. In this case the nurse apparently thought the patient had asthma because he was wheezing but the wheezing was likely due to another pulmonary condition with fluid accumulating in the lung.

amoxicillin for 10 days 40 mg of prednisone for 5 days, Alvesco inhaler, and breathing treatments with albuterol every 8 hours for 3 days. No laboratory tests were ordered but a 10 day follow up was ordered. Given that the patient had a history of left ventricular(LV) dysfunction and valve replacement, this was an unacceptable clinical evaluation. Wheezing in a patient without history of asthma or COPD and with a history of valve replacement should prompt immediate chest x-ray and lab tests and possibly a CT scan. Failure to monitor the patient consistently for anything other than his hypertension, high blood lipids and hypothyroidism in chronic clinic appeared to make his other illnesses, including left ventricular (LV) dysfunction and prosthetic valve, unmonitored and unrecognized as problems. Nine days later, on 11/14/19, the same physician assistant saw the patient again and wrote that the patient had a history of bronchitis which is not accurate. Bronchitis was a new diagnosis, inaccurately made. He wrote that the bronchitis was resolved. The vitals were normal. The physician assistant did not order follow up.

The following day, on 11/15/19, at 5:40 am a nurse saw the patient for shortness of breath, pale, and labored breathing using "accessory muscles". The temperature was 100.2 with oxygen saturation of 92%. The nurse called a doctor who ordered albuterol nebulization, prednisone 60 mg stat, oxygen until the patient reached 95% and infirmary housing. The patient had no history of COPD or asthma but had left ventricular (LV) dysfunction with possible heart failure, a prosthetic heart valve and multiple other conditions. His symptoms with low grade fever for two weeks warranted a chest x-ray, CT scan, and blood tests; instead, this doctor presumed that the patient had COPD which had never been established.

Later on the same day, the doctor ordered a chest x-ray to be done. The chest x-ray request had a history documenting difficulty breathing and decreased oxygen saturations. Subsequently, the report of the radiologist noted right pleural effusion with right lower lobe consolidation. The doctor documented his reading of this film as pneumonia with pleural effusion. This x-ray reading with difficulty breathing and hypoxia in a patient without history of COPD warranted prompt hospitalization. This did not occur.

It was a Friday and follow up was unlikely to occur until Monday making infirmary admission unsafe. Also, giving prednisone, a potent immune suppressant, should have been done cautiously in a patient with fever. Though the doctor was treating the patient as if he had COPD, infection should have been considered but the doctor failed to timely evaluate the patient for his condition.

The nursing admission note was written at 10:15 am on 11/15/2019. The nursing care plan was care of a patient with shortness of breath. The plan provided no instructions for monitoring hydration, monitoring medication effectiveness or side effects, assessment of the patient's lungs, or frequency of vital signs, including peak flow monitoring and evaluation of fatigue associated with shortness of breath and air hunger.

The doctor wrote an admission note to the infirmary at 1:15 pm on the Friday of admission. He documented a history of cough and shortness of breath of short duration and fever for a day even though the patient had these symptoms documented in the medical record for over three weeks. The patient had lost 16 pounds since 8/2/19 but the weight loss was unrecognized. The history was otherwise very brief as was the examination which noted orientation x 3, a symmetric chest,

with crackles and diminished breath sounds. That was the entire exam. The only other conditions that the doctor noted were atherosclerotic heart disease with a pacemaker and hyperlipidemia. The condition was documented as "slightly unstable" and the diagnosis was pneumonia with effusion. The doctor had apparently reviewed the chest x-ray before sending it for a radiologist's reading. He started an antibiotic for ten days and ordered albuterol inhaler for five days with oxygen supplementation. He also ordered a CBC. A patient with a pneumonia and effusion with underlying significant cerebrovascular disease, valvular heart disease, atherosclerotic heart disease and possible heart failure should be admitted to a hospital particularly on a weekend when the patient would not be seen for several days and when laboratory tests would be unavailable for several days. An effusion should have been promptly drained and examined as to the cause of the effusion. The doctor appeared unaware of the patient's multitude diagnoses. This was a significant clinical lapse in judgment. This was a Friday (11/15/19) and to leave a patient with this panel of conditions on the infirmary over a weekend was unsafe and clinically inadequate.

Over the next five days the patient's condition remained essentially the same; his oxygen saturation did not exceed 95% except once. He remained tachycardic. Nurses did not report abnormal vital signs or continued symptoms of difficulty breathing to the provider over the next four days. On the fourth day the patient complained twice of difficulty sleeping and both times was told by nurses that he would have to talk it over with mental health providers. Nurses should have seen this as a symptom of his medical condition and not as a mental health issue. This symptom should have been reported to the physician responsible for his care. The afternoon of 11/19/19 the patient's roommate reported that the patient was in distress. The patient had labored breathing and appeared cyanotic to the nurse despite being on oxygen. His pulse was 142, blood pressure 189/100, respirations 48 and oxygen saturation 76%. The provider was contacted and ordered the patient sent to the hospital by ambulance. Notably, the doctor had not seen the patient for the four days of infirmary housing except for the admission note. This was neglectful and professionally irresponsible physician behavior as this patient was seriously ill and needed daily attention.

The patient was discharged from the hospital with fungal infection of a heart valve with a fungal disseminated blood infection and his pacemaker had to be removed due to the possibility of causing the infection. There was a large fungal growth in the right ventricle which was removed. The right lower lobe pneumonia was complicated by a parapneumonic effusion[17]. The patient also developed acute kidney injury. When the pacemaker was removed there was a pocket of pus (100mL) which was drained. On discharge the patient was to receive 6 weeks of two anti-fungal medications. Multiple follow up appointments were recommended including ophthalmology, infectious disease, and cardiology. A specific appointment with a cardiovascular consultant was made for 3/16/20. A wound vac[18] was to be maintained at 125mm/hg suction and the dressing

---

[17] A collection of fluid in the lining of the lung due to an infection, cancer, or other source.

[18] A wound vac is a drainage system with a tube inserted into a body cavity to drain blood or other fluid from the source.

changed three times a week. The patient was noted to need an echocardiogram at the end of antimicrobial treatment. Weekly blood tests (CBC and CMP) were recommended; results were to be faxed to the hospital.

Upon return to Graham on 12/5/19, the patient's pulse was 120 and oxygen saturation was 82%. These return vital signs warranted return to the hospital, but the patient was not immediately evaluated by a physician. The nursing admission note indicates that fluid was to be restricted for two days and that the patient needed two people to assist with movement. The patient was at risk of skin breakdown, infection, was weak and was unable to care for himself but there was no plan documented for how these concerns were to be addressed in nursing care. The nursing plan of care also did not include instructions for care and maintenance of the PICC line or wound vac. It does appear that the patient went without the wound vac on for about 12 hours after arrival at the facility (which increases chance of infection) and that the dressing on the chest wound should have been changed a day earlier. The PICC line appears to have been cared for appropriately even though there were no orders. Treatments such as dressing changes, application of the wound vac and flushing the PICC line should have been ordered, these treatments should be identified in a plan of care and their completion scheduled and documented on a flow sheet or the MAR.


The day after admission to the infirmary a doctor evaluated the patient. He documented only sepsis, pneumonia with effusion, acute respiratory failure, and chronic kidney disease as problems. He failed to identify the main problems of the patient including the fungal endocarditis, fungal blood infection, with fungal abscess, need to remove the pacemaker, and need for antifungal treatment. He also did not document the other patient problems which had not been followed previously at the facility. More importantly, the doctor failed to document the therapeutic plan designed at the hospital including monitoring of the wound vac, follow up appointments with ophthalmology, cardiology and infectious disease or follow up echocardiogram. The doctor failed to document all of the patient's problems including a therapeutic plan for all of the patient's problems.

On 12/9/19 blood tests returned that were abnormal. There was no evidence of evaluation of these tests as the doctor had not evaluated the patient since his admission examination on 12/6/19. On 12/9/19 a nurse documented communicating with SIU cardiology who stated that the patient was to have followed up with the wound center which was apparently unrecognized by nurses or the doctor who had not been evaluating this seriously ill patient on a daily basis. At 11:30 am, the wound center called and recommended sending the patient to the St John emergency room for evaluation. The nurse told the doctor who agreed.

When seen in the emergency room, the patient was immediately hospitalized. He was hospitalized for approximately 6 weeks and discharged on 1/21/20 for recurrent heart valve vegetation, multiple heart valve abnormalities and signs of heart failure. Echo showed an ejection fraction of 23% indicating very poor heart function. The patient needed valve replacement, but a cardiothoracic surgeon stated that the patient would have to complete treatment for the fungal infection before valve replacement could be considered. The aortic valve needed replacement as the biosynthetic valve was degenerated by the fungal infection. The patient developed a side-effect on one of his medications and it was discontinued. Discharge

recommendations included multiple medications, follow up with interventional cardiology, infectious disease, and the wound center. Discharge instructions for the wound vac included continuous suction, (if off for 2 hours there is risk of infection) and if more than 150 ml of blood in cannister in < 4 hours shut VAC off and go to ER. DO NOT take vac into shower. There was to be follow up with the wound center in a week. Verbal orders were obtained from the physician for all medications included in the discharge summary. The physician also elected to continue a previous order for ipratropium-albuterol by nebulization daily for 7 months which was inappropriate for the patient's diagnoses. The physician did not order the follow up appointments, the blood work, a cardiac diet, deep breathing, rest or hydration monitoring, or care of the PICC line.

The nursing admission note documents the hospital discharge recommendations for medications, weekly labs, care of the wound vac and PICC line[19] but failed to note recommendations for a cardiac diet, deep breathing, rest, and hydration. There was no identification of nursing problems or a plan of care documented on the admission note or progress note.

A doctor wrote an infirmary admission note. His note failed to capture what transpired at the hospital. He mentioned nothing about pending appointments, the disintegration of the aortic valve, or therapeutic plan as documented on the hospital notes. His only examination was "alert and oriented x 3; chest clear at present; Good S1 & S2". The heart exam was doubtful because the patient had multiple heart valve vegetations[20] and very likely had murmurs. The only documented orders on the admission note were for vitals every 8 hours, a regular diet and activity as tolerated, and all meds as ordered at the hospital. The doctor did not evaluate the patient's ability to perform activities of daily living. He gave no instructions for the PICC line or wound vac. No laboratory orders or monitoring orders were given or understood to be in place.

From the beginning of this infirmary admission the patient had wheezing bilaterally with productive cough. Shortly after admission a nurse noted that the patient vomited morning medication. This occurred on several other occasions and a nurse without consulting a physician changed two of his medications to evening administration.

There were several errors and omissions in nursing care during this infirmary admission. The patient should have had the wound vac dressing changed on 1/24/20 and there was no documentation this was done. There was no progress note documentation assessing the patient's condition from 4 am on 1/24/20 until 6:30 pm on 1/26/20. Both these notes are because the patient vomited. The patient with a new symptom should have been monitored more closely. The wound vac dressing was not changed until 9 pm on 1/28/20, four days later than it should have taken place. Inexplicitly it was changed again the following morning at 8:10 am. Instructions were to change the dressing three times a week. The patient was to have the PICC line dressing changed on 1/29/20 but he was hospitalized before this completed. The patient was only

---

[20] Vegetations are bacterial or fungal growths on a heart valve. Because these growths interfere with blood flow and cause turbulence, they cause abnormal sounds called murmurs.

reminded to deep breathe once during the eight days in the infirmary. Vital signs were not documented every shift as ordered by the admitting physician.

The doctor did not evaluate this extremely ill patient for six days. On the day the doctor finally saw the patient a nurse noted that the patient was wheezing and had vomited after eating. The doctor took no history except noting that the patient had vomited and felt weak. The examination was very brief, and the only assessment was fungal blood infection with colonization of heart valves. There was no assessment of the abnormal blood tests done the day before and the doctor did not make any assessment whether one of the anti-fungal medications was responsible for the vomiting and abnormal liver function test. The doctor appeared unable to understand or create a therapeutic plan for the patient. The following day the patient experienced a seizure, and a nurse called the doctor who transferred the patient to a hospital.

The patient was discharged from the hospital on 2/7/20. During the previous infirmary admission the patient's PICC line became infected and was replaced at the hospital. The infected PICC line resulted in a blood infection resulting in the hospitalization. The patient was also diagnosed with encephalomalacia, acute kidney injury, hypoxia, a subclavian thrombosis, and aortic valve endocarditis but was not a candidate for surgery. The patient also had elevated liver function and an ultrasound was consistent with cirrhosis and ascites. The patient wanted to be DNR but wanted other treatments to continue. He was discharged on multiple medications. Atorvastatin and aspirin were stopped. Routine PICC line care (flushing after administration of medication and weekly dressing change using aseptic technique), weekly CBC, CMP, and CPK tests were recommended as well as a cardiac/low cholesterol diet limited to 2 grams of sodium and a follow up appointment with an infectious disease consultant in five weeks.

The nurse's admission note on Friday 2/7/20 at 5:30 pm indicates the provider was notified of the patient's return to the institution and received verbal orders for the discharge medications, weekly labs and PICC line dressing changes. The patient was described as weak, with wheezing in the left lung. Oxygen saturation and weight were not obtained. The nurse failed to note the hospital recommendations for a low salt/low cholesterol diet and indicated the patient was able to care for his daily activities. The nurse did not evaluate the patient's ability to care for himself nor was his mental status assessed. The patient had encephalomalacia[21] and appeared to be acting bizarre. He urinated on himself and on the floor. He asked a nurse to place his penis in a urinal to urinate, but the nurse refused. The nurse should not have assumed the patient's request was inappropriate given recent diagnoses in the hospital of encephalomalacia, which can result in cognitive disorder.

Several laboratory tests were done which were abnormal (BUN 37; calcium 8.3; albumin 2.7; alkaline phosphatase 236; HGB 10.3).   On 2/14/20, a memo to the patient documented that these labs were "found to be normal or stable".  It was signed by the doctor.

---

[21] Encephalomalacia is softening of the brain after brain injury or stroke.  This can result in cognitive disorder that may have been present in this patient.

The doctor did not write an infirmary admission note for three days after arrival at the institution. The only history was "returns for medications to hospital where he was treated for sepsis". There was no other history. The only examination was "alert and oriented x 3. Chest clear. Good S1 & S2 [without] murmurs". There was no evaluation of the patient's cognitive status even though the patient was acting bizarre. The doctor failed to note additional diagnoses of DVT of the subclavian vein, encephalomalacia, and cirrhosis. He ordered no labs and only stated that all medications from the hospital were ordered. There were no orders regarding care of the patient with respect to activity of daily living including recent documentation of incontinence. The doctor should have clearly specified orders for care of the patient. Three days earlier, a nurse documented that the patient had edema of his hands, but this was not noted by the doctor. The doctor did not document knowledge of the recommended therapeutic plan for this patient. This doctor was practicing in an unsafe and clinically inappropriate manner.

During this infirmary admission the patient had four blood tests with abnormalities. The doctor authored memos advising the patient that his laboratory studies were normal.

On 2/19/20 a nurse notified the doctor that the inmate pulled his PICC (intravenous) line out and the doctor ordered the patient to the hospital for a new PICC line. The following day the PICC line was still out, the patient had not been sent to a hospital for a replacement, and the patient was not receiving his antimicrobial medication. The doctor again ordered a new PICC line which he had ordered the previous day. The patient was not sent for his PICC line until 2/21/20 about 4 days after it was pulled out. The patient was to receive one of his antibiotics until 2/21/20 but the PICC line was not in place until 2/21/20. The MAR documented that the patient missed his antibiotic infusion 2/18/20-2/19/20. The entry on 2/20/20 was illegible and it was not clear if the patient received medication. There was no documentation in the record with the physician about this miss of a critical medication.

There was no meaningful nursing assessment of the patient's condition from 2/14/20 until the evening of 2/21/20. Most documentation during this interim referred to the PICC line. There was no evaluation for pitting edema, no assessment of hydration or nutrition, or skin integrity. While vital signs were taken daily, the provider was not contacted or informed when they were abnormal. His blood pressure was low beginning 2/16/20 and no comment was made of this or tachycardia and bradycardia until 2/21/20. There was no description of efforts to assist the patient with grooming, other ADLs, or activity. Finally a nurse contacted the provider 2/21/20 to report that the patient was not eating and refusing medication. The patient's vital signs were 98.3°F, heart rate 59, blood pressure 81/50 and oxygen saturation 98%. No respiratory rate was documented. The provider ordered intravenous fluids and wanted the patient's blood pressure monitored to ensure it stabilized and to send the patient to the hospital if it did not. Two hours later after receiving 500 cc of IV fluid the patient's blood pressure remained low and the provider ordered transport to the hospital.


The patient was hospitalized for three days and returned from the hospital on 2/24/20 with a home hospice recommendation.

The nurse's infirmary admitting note described the patient as mobility limited and incontinent. He was wheezing and had a cough and left upper extremity edema. Orders were received for

morphine every 2 hours as necessary for pain or dyspnea, scopolamine patch as necessary for congestion and control of secretions, atropine as necessary to control secretions, lorazepam as necessary for anxiety and oxygen at 2 liters as necessary for comfort. There was no explicit plan for what the patient's comfort care consisted of. There was no documentation of a plan to maintain skin integrity, no plan for assisting the patient with bowel or bladder hygiene, bathing, distraction, visits with family, friends, or clergy.

The patient was seen, and progress notes documented at least twice a day by nursing staff. These notes depict the patient's progressively failing condition. He was offered food and fluids, provided clean bedding after incontinence, placed in a boat on the floor to prevent falling from bed and repositioned regularly. He received medications to manage symptoms which primarily were agitation.


The doctor did not write an infirmary admission note until the patient had been on the infirmary for three days. He admitted the patient as a chronic admission. He had not evaluated the patient since 2/10/20. His only history was, "Patient discharged from hospital because of his terminal status and patient had signed DNR papers". He wrote, "not talking and not responding much to anything. His legs and face are edematous. He is sedated". Though the patient was a hospice patient, the doctor did not document what the hospice therapeutic plan consisted of. There was no status assessment of the patient, and no effort to ensure that the patient was comfortably and humanely cared for during hospice care on the infirmary. The only assessment was terminal status, due to sepsis, heart failure, and malnutrition changes. There was no plan for this patient. The doctor gave verbal orders for some of his medications. He documented no orders with respect to comfort care or assessment of any of the patient's lab results or comfort care issues. The doctor give a verbal order for morphine 20 mg, scopolamine patch, atropine, and lorazepam 2 mg q 4 hours which had been recommended by the hospice program at the hospital.

The patient was not seen by the provider after admission to the infirmary on 2/25/2020. He died in his room nine days later on 3/4/2020 without the doctor ever having documented a reasonable therapeutic plan.

A death summary by the doctor who cared for the patient documented that the patient was placed on the infirmary for pneumonia and placed on antibiotics. The summary stated that instead of improving the patient worsened and was sent to the emergency room and found to have fungemia. The summary said that on return to the infirmary instead of getting better the inmate got worse and was readmitted to the hospital. The report stated that specialists talked to the patient and stopped care with the patient returning to the infirmary where he died. A critical review of the death was not present, and no problems were identified. A mortality review was not performed.

**PRELIMINARY AUTOPSY DIAGNOSIS:**

**FINAL AUTOPSY REPORT:** Aspiration pneumonia, severe atherosclerosis with prior five bypass grafts, myocardial scarring, and multiple other findings including:
    1.     Bronchitis

2.     Adhesion of bilateral lungs
3.     Prior prosthetic aortic valve with calcifications
4.     Severe aortic atherosclerosis
5.     Passive congestion of the liver
6.     Dilation of gallbladder
7.     Splenitis
8.     Cerebral edema
9.     Cerebral artery atherosclerosis
10.    Past left cerebral infarct
11.    Sclerosis of right kidney
12.    Severe atrophy of the thyroid gland

## OPPORTUNITIES FOR IMPROVEMENT AND RECOMMENDATIONS FOR CORRECTIVE ACTION:

1. The problem lists in IDOC are typically inaccurate. A plan for ensuring that an accurate problem list should be initiated. This should probably be connected to a systemic analysis of the chronic care program. Problem list maintenance needs to be incorporated into the policy and procedure on chronic care.
2. The patient had at least 11 significant medical conditions but was followed for only three in chronic care visits. A root cause analysis of the chronic care program needs to occur to establish improved policy and procedure for chronic care.
3. Abnormal blood tests, abnormal vital signs, weight loss, and red-flag symptoms were consistently ignored or not addressed by nurses and physicians. This is a systemic problem within IDOC. A root cause analysis of this practice should be conducted to determine procedures to correct these deficiencies.
4. On 11/5/19, a physician assistant made a diagnosis without consideration of the full panel of diseases of the patient, without taking an adequate history, completing an adequate physical examination and without appropriate diagnostic testing. The treatment plan was based on insufficient clinical evidence. This should result in peer review and counseling with the physician assistant.
5. On 11/15/19, a physician failed to adequately evaluate the patient for his stated complaint, failed to appreciate the seriousness of pneumonia with pleural effusion which had been diagnosed, failed to order appropriate testing for a seriously ill patient, and failed to appropriately refer to a higher level of care for a serious illness. This physician also performed considerably below standard of care throughout the patient's incarceration such that it was unsafe and clinically inappropriate. This physician does not have credentials required by the Consent Decree in item III.A.2 and is not practicing in a safe and clinically appropriate manner as required by the Consent Decree in item III.A.3 and should be removed. [22]

---

[22] We note that this physician was placed on probation by the Illinois Department of Professional Regulation for failure to properly diagnose hypovolemia. Recently, on 12/31/20 his license was permanently made inactive due to failure to take a required SPEX test which is a multiple choice examination of current knowledge requisite for

6. Nurses repeatedly identified critical vital signs or findings on the infirmary but did not consistently notify a provider. Providers did not appear to review nursing infirmary vital signs or notes.

7. After discharge from the initial hospitalization and even after discharge from subsequent hospitalizations, the patient was inappropriately housed on the infirmary unit. The patient needed skilled nursing care and more frequent and attentive physician care which apparently were not available at Graham. The patient should have been sent to a skilled nursing facility. A root cause analysis should be done to determine the levels of care which can be addressed on the infirmary unit with a procedure for placement of persons needing skilled nursing at an alternate site for care.

8. The physician failed to write orders consistent with the needs of the patient on the infirmary. This included nutritional support, monitoring of the patient's condition, activity of daily living concerns, aids to impairment, device monitoring, dressing changes, comfort issues for hospice, etc. This is a systemic issue seen at multiple IDOC facilities. A root cause analysis should be done to determine its cause. That analysis should inform the revisions to infirmary policy and procedure.

9. Nursing care on the infirmary was inconsistent with the needs of the patient. In part, this was based on physician apparent indifference to the care of the patient. However, infirmary nursing care should include a patient care plan which is a systemic deficiency in IDOC. A root cause analysis should be performed to evaluate reasons for this and to establish procedures for nursing care on the infirmary that should inform policy and procedure.

10. The care of this patient was not professionally appropriate. He clearly had a cognitive disorder, during his last infirmary stays, and had behavior that was abnormal which was unrecognized resulting in inattentive treatment. Hospice care was also inattentive. The IDOC needs to address this significant issue promptly.

---

general undifferentiated practice of medicine which was a requirement of his probation status. There are several other physicians like this practitioner who should be removed.

**PATIENT 7   POSSIBLY PREVENTABLE**

**DATE OF REVIEW**:

**PATIENT:**

**DOC #:**

**DATE OF DEATH:** 2/16/20

**AGE:** 49

**DATE OF INCARCERATION:** Not Known

**SITE AT TIME OF DEATH:** Danville Correctional Center.

**PLACE OF DEATH:** Carle Hospital

**CATEGORY OF DEATH:** Natural

**EXPECTED OR UNEXPECTED:** Expected

**CAUSE OF DEATH:** Squamous cell cancer of head and neck

**MENTAL HEALTH DIAGNOSES:**

**MEDICAL DIAGNOSES:**
1. Squamous cell carcinoma of mouth

**IDOC Problem List**
1. Penicillin allergy
2. Tobacco abuse
3. Mild obesity
4. ETOH abuse
5. Cannabis abuse
6. Head injury as child
7. Astigmatism both eyes

**MEDICATIONS AT FACILITY BEFORE TRANSFERRED TO HOSPITAL WHERE HE DIED:**
No entries by pharmacy

Nurse entries on medication administration record for last month of life:

1. "Glucerna 1.5 RTH 0.08-1.5 gm Kcal/mL; take 80 ml/hr by feeding tube route feeds – continuous 1.5 @ goal rate of 80mL/hr continuously nocturnally". Administration not recorded.

## CASE SUMMARY

This patient was a 46 year old man housed at Danville who was noted on a dental biennial examination on 4/2/19 to have a mass on his left cheek that appeared to be a cheek bite. Initially the dentist documented that he would obtain a second opinion but this never occurred. The dentist saw the patient again on 4/12/19 when the mass appeared infected and an antibiotic was prescribed. The dentist saw the patient 4/19/19; and said he would follow up in two weeks, but that appointment did not occur until 6/19/19 when the dentist said that the lesion was ulcerated and that if not better by the next visit, he would refer to an oral surgeon. He again ordered clindamycin. The referral to an oral surgeon never was made.

In the meantime, the patient was referred for an audiogram on 1/23/19 for hearing loss. The audiogram did not occur until 4/11/19 and the audiologist documented that the left eardrum was not moving and there might be left middle ear dysfunction and recommended referral to an ENT specialist. The ENT specialty referral was approved by the vendor on 4/18/19 but did not occur until 6/24/19. A physician assistant to the ENT specialist saw the patient and initially thought that the hearing issue might be related to a middle ear effusion and initially recommended to the patient that a myringotomy and tympanostomy tube placement[23] was needed, but then after seeing a lesion on the patient's cheek she thought that the patient might have a lesion in the nasopharynx related to the mass on the cheek. The physician assistant wrote that there might be "more than just fluid going on in that ear" and that there might be a cancerous lesion. The physician assistant advised that the patient might need a biopsy of the nasopharynx but that this could be discussed later with the surgeon. She did a biopsy of the cheek lesion which two days later on 6/26/19 showed invasive squamous cell carcinoma. On 6/26/19 the physician assistant documented contacting Danville by phone and spoke to a nurse telling the nurse that the patient had cancer and needed a CT scan before returning to see the ENT specialist for follow up which should be scheduled. The report of this call came from the ENT consultant's report, not documentation in the Danville medical record. There was no documentation in the Danville medical record of this call.

The patient saw the dentist 6/26/29 and the patient told the dentist about the biopsy and the dentist told the patient that the doctor at Danville would follow up.

On 7/10/19 the ENT clinic faxed documentation of their phone calls with Danville informing them of the needed CT scan and follow up appointment and the biopsy results.

On 7/10/19 the dentist wrote that he reviewed a pathology report and that the patient had invasive squamous cell carcinoma and he spoke with the physician covering[24] at Danville who said that

---

[23] This is cutting the tympanic membrane and insertion of a tube to drain fluid. This procedure is often performed on children with severe middle ear infections.

[24] There did not appear to be an assigned physician at Danville only a coverage physician.

the scheduling clerk would follow up with recommended treatment. A day later the doctor did a chart review and noted that a CT scan was ordered but the follow up with the ENT surgeon was not made. The CT scan was approved by the vendor as a routine and was not done until 8/16/19, almost two months after the biopsy. This test should have been an urgent test, not routine.

The dentist wrote on 7/22/19 that the doctor at Danville would let the patient know about the biopsy results and on 7/23/19 the dentist wrote that he spoke with the doctor who would definitely follow up on the cancer. However, by 8/6/19 the dentist saw the patient who inquired about the biopsy result and the dentist told the patient for the first time since the 6/24/19 biopsy that he had squamous cell cancer which would be treated by the medical doctor and not the dentist. The dentist documented that he would inform the doctor that he told the patient about his cancer. The dentist told the patient he would be treated by an oncologist.

On 8/16/19 a CT scan showed a 2.4 lymph note that was probably malignant with probable malignancy of the left cheek with suggestion of tonsillar abscess.

The doctor at Danville did a chart review on 8/22/19 and ordered a first available clinic and he saw the patient on 9/11/19. This was the first physician visit since the 6/26/19 diagnosis of cancer and the first physician visit with the patient in 2019. The doctor documented that the patient had trouble eating and told the patient that a PET scan and ENT consultant follow up were ordered. The specialty tracking log documented that a PET scan was approved on 9/12/19 but was never scheduled. There was no referral to ENT noted on the tracking log.

Unfortunately, the doctor appeared to misread the ENT recommendations. While the ENT physician assistant thought that a myringotomy and tube placement might be needed if fluid was identified, she ultimately realized that the patient might have a cancer and did a biopsy. She asked that a CT scan with follow up with the ENT surgeon be done, but this was not recognized by the Danville doctor who misread the note and failed to call to clarify. The doctor recognized that the patient had invasive cancer because he had the biopsy report but thought that the ENT follow up was for myringotomy and tube placement when it was for follow up of the cancer[25]. This was a serious judgment error on the part of the physician. The ENT follow up was therefore never scheduled or referred. The 9/12/19 vendor approval document for the PET scan documented that the PET scan would be done, and Danville would wait to hear from the ENT consultant regarding whether the myringotomy was needed, presumably thinking that this procedure was related to the cancer. The PET scan was ordered as a routine but not scheduled at this time. There was a vendor approval on 9/24/19 for an ENT evaluation after a biopsy showing invasive cancer, [three months after the biopsy] but this referral was not on the tracking log and never occurred. Neither the facility physician nor the vendor utilization physician carefully reviewed the consultation report to identify the recommended therapeutic plan. As a result the patient became lost to follow up. It appeared that the Danville physician was a coverage physician and was infrequently at the site.

---

[25] Myringotomy and tube placement is treatment for complications of a middle ear infection. It is not part of treatment for head and neck cancer. This should have been recognized and discussed with the consultant.

On 10/25/19 a nurse practitioner saw the patient but there was no history, no examination and the nurse practitioner informed the patient that a PET scan was scheduled which was not accurate. On 11/13/19 the doctor saw the patient but did not take any history or examine the patient. He told the patient that the PET scan and work up were pending, not realizing that neither of those statements were accurate. The doctor was uninformed regarding the status of the patient's care and did not bother to look into the delay or coordinate with the scheduling clerk. On 11/21/19 the doctor reviewed laboratory tests and discussed these with the patient. One of the laboratory tests indicated the LDH was elevated which can be elevated in certain malignancies. The doctor told the patient that the oncology and PET scan were pending when, again, this was inaccurate. The doctor again failed to check regarding the status of the delay. It was already five months since the diagnosis and the follow up had not yet occurred, but this did not raise a concern enough to investigate the reason for the delay. On 12/5/19 the doctor discussed the case with a vendor utilization management doctor and they together decided to wait to send the patient to ENT for tympanoplasty and tube placement until the PET scan was done not realizing that neither had been scheduled and that tympanoplasty and tube placement were never recommended and not needed. This uninformed utilization process is a reason enough to abandon this wasteful process which delays necessary care.

On 12/27/19 a nurse saw the patient for a hearing screening, but the patient refused the visit saying that his hearing was the least of his concerns. The patient asked the nurse to evaluate his face lesion. The cancer had eroded through his cheek to his skin and the patient had a bandage on his face. The nurse removed the bandage and bloody fluid dripped uncontrollably such that the nurse placed a pressure dressing on the wound. This had not yet been noticed by providers. From the date of diagnosis of the cancer and for six months, providers had not documented a thorough examination of the patient. Two days later, the patient complained to a LPN that his face was swelling, and he felt like a rope was around his neck choking him and that he had to eat like a baby because he could not fully open his mouth. The LPN consulted a RN who called a Medical Director at another IDOC facility who recommended to send the patient to the hospital.

At the hospital, a consultant wrote that the patient's history dated back to June when he was evaluated for hearing loss. He had a lesion on his buccal mucosa that had been there for over a year. In June he had a biopsy diagnostic for squamous cell carcinoma at least 2.3 mm in depth. A CT scan was done in August. The note said "unfortunately, the patient was lost to follow up and did not report until he presented to the emergency department on 12/29/19 with increasing swelling and pain with trismus reducing food intake". A repeat CT scan showed increased tumor extension with cortical erosion in extension into the buccal space and lateral extension into the face and into multiple lymph nodes. At this point the patient was not a surgical candidate and he was referred for evaluation for radiation therapy. The patient had lost weight, but he was not sure how much. The patient now had an ulcerating oozing lesion on his face with an indurated mass from right jaw to the collar bone area with marked pain when he opened his mouth. There was hardened tissue from the left inside cheek to the left corner of the mouth. There was an ulcerating tumor on the left cheek extending through the skin. This was all remarkably unnoticed by all providers based on documentation in the medical record at Danville. The consultant documented that the patient would be a candidate for palliative radiotherapy and would seek a medical oncology opinion. The patient now had disseminated cancer and had a facial abscess with hypercalcemia from malignancy. The tumor was not resectable any longer. Two doctors at

the hospital documented in their notes that the patient had not had follow up since his initial diagnosis. One doctor commented that the patient needed extensive radiation therapy but the "patient is incarcerated and planning for procedure will be difficult as outpatient".

The patient was discharged from the hospital on 1/3/20 but although there were some hospital records a discharge summary was not present in the Danville medical record and the precise instructions for follow up were not clear. The patient did receive a gastrostomy tube for feeding as the patient was not able to eat because of the cancer in his mouth. Because of widespread metastases, only palliative treatment was offered. The metastases included multiple bony areas, lungs and hilar nodes.

The patient was admitted to the infirmary at Danville. There was no infirmary physician admission note except "provider no longer on site and cannot complete note". There were no orders for this infirmary admission in the medical record. The nurse transcribed verbal orders from the physician to include Lidocaine topical 2% mucosal TID, Ultram 100 mg BID PRN, Robaxin BID PRN, Clindamycin TID x 5 days and Tylenol ES TID PRN. There were no orders for care of the patient's wounds, diet, the feeding tube, monitoring instructions for nurses, laboratory tests (even though the patient had hypercalcemia in the hospital) or parameters for contacting a provider. No laboratory monitoring was done from 1/3/20 to 1/21/20 while in the infirmary.

A nurse practitioner saw the patient three days after admission but did not order labs or document what the therapeutic plan was only "continue current plans per MD orders". There were only the telephone orders for medication but no plan of care.

The only nursing care documented is on 1/3/20 to monitor the effects of cancer and make pain medication available. Nurses documented changing dressings but were not explicit as to which dressing (neck or gastronomy tube). The patient's nutritional intake was not monitored. These activities should be tracked on a flow sheet according to a plan indicating the frequency of each activity. On 1/7/20 the nurse noted discolored drainage at the site of the gastronomy tube and documented that the physician assessed the wound and ordered a culture. There was no documentation by the physician of an exam nor was there an order for the culture. That same day the physician was contacted by an RN about pain management and the MD indicated that he would review it the next day. There was no documentation that this took place.

Another call was made to the physician on 1/9/20 and a telephone order for hydrocodone for pain was received but according to the progress notes, the first dose was not available until 8 pm on 1/12/20. The patient did not experience relief from the first dose of this medication. The physician was contacted and gave the direction that if the pain level got out of control to contact him for a possible send out to the emergency room. For five consecutive days the patient experienced pain of 7 out of 10 and was never examined by a medical provider. The delay of four days to the first dose of pain medication is unconscionable.

The patient was put on a soft diet on admission to the infirmary but on 1/12/20 requested a liquid diet "because it will be easier for me". The nurse documented that dietary was notified however there was no order. The change in diet is not recorded on the daily graphic sheet nor was the

patient's intake monitored. On 1/13/20 a nurse practitioner saw the patient again, ordered no laboratory studies and wrote to "continue current treatment plan" when there was no plan documented in the medical record. The nurse practitioner did not address the delay to first dose of pain medication, assess the patient for pain, or address the patient's request for a liquid diet or his state of nutrition. The patient was also taking opiates for pain control, a side effect of which is constipation. The plan of care did not anticipate and provide measures to alleviate this symptom until three days later.

Instructions from the off-site specialist on 1/16/20 were to flush the gastronomy tube twice a day with tap water and to change the dressing around the feeding tube daily. There was no documentation that the tube was flushed, or the dressing changed from 1/17/20 until his hospitalization on 1/21/20. Nurse progress notes on 1/20/20 indicate that new dressing instructions were received after the patient was seen by the specialist. What these instructions were, is not indicated in either the progress notes, on an order or in a plan of care. Management of pain, frequency in changing and type of dressings, evaluation and prevention of skin breakdown, prevention of constipation and improving caloric and electrolyte status through nutrition should all have been detailed in the care plan for this patient.

The patient went for chemotherapy on 1/21/20 and was admitted to the hospital from the infusion center apparently for atrial fibrillation, infection of the necrotic tumor, hypercalcemia, acute kidney injury, hypokalemia, hypomagnesemia, anemia, trismus, jaw abscess, non-sustained ventricular tachycardia, and pleural effusion. He left the hospital on 2/7/20 on multiple medications including continuous Glucerna tube feedings, Tylenol #3, oxycodone, a tapering dexamethasone dosing, famotidine, furosemide, gabapentin, glargine insulin, viscous lidocaine, metoprolol tizanidine, and trazadone.

When he arrived back at the facility there was no physician, so the only admission notes are those completed by a nurse. After this hospitalization, the only physician order in the medical record was for Glucerna (the order was also incomplete). The MAR for February only documents Glucerna. The nurse documented that a doctor gave a telephone order for all hospital medications and feeding tube orders, but these were not in the medical record provided to the Monitor. A physician did not see the patient during this infirmary admission. There was no nursing plan of care for this patient who was clearly more debilitated than the last infirmary admission. In addition to comments made regarding the last infirmary admission, the plan of care should have included more detailed instructions for monitoring of vital signs and symptoms including measures for pain control, assistance with activities of daily living, and supportive care.

On 2/8/20 the patient was having difficulty breathing and an on-call provider sent the patient to the hospital. There were no further progress notes. The patient died on 2/20/20 and it was not clear if the patient ever returned to the facility from the hospital[26].

---

[26] The mortality list documents that the patient died in Carle Hospital.

After both hospitalizations, the patient was admitted to the infirmary, but the infirmary admission form was not completed by a physician. No one documented review of the hospital record and it appeared that follow up appointments for chemotherapy and radiation were handled by the scheduling clerk.

**PRELIMINARY AUTOPSY DIAGNOSIS:** Unavailable

**FINAL AUTOPSY REPORT:** Unavailable

**OPPORTUNITIES FOR IMPROVEMENT AND RECOMMENDATIONS FOR CORRECTIVE ACTION:**

1. There were numerous problems with scheduling this patient for his care. These included:

    a. Failure to timely refer for a serious medical condition when clinically indicated.

    b. Failure to follow up on consultation reports.

    c. Failure to communicate appropriately with the consultant.

    d. Failure of the corporate utilization management program to facilitate timely and appropriate specialty care.

    e. Specialty referrals were not present on the tracking log and it appeared that only approved appointments are followed in the tracking log.

    f. With respect to actual referrals, there were only four referrals in the medical record and only two were filled out by a provider. One of the four referrals never took place. Of the four referrals, there were two that had vendor approvals and three were on the offsite tracking log. However specialists recommended 15 appointments between 4/11/19 and 2/10/20 but only two had an associated referral and both of those referrals were filled out by a scheduling clerk. Of those 15 appointments referred by specialists only five had a vendor approval in the medical record. Of the 15 appointments, only six were on the tracking logs. The medical record verified that five occurred and an additional nine others indicate the patient left for appointments on the scheduled day but there was no verification of what occurred. Only two of the 15 appointments had an associated report of the consultant. In none of the 15 appointments did a provider document review of the report and document in the record what had occurred and how the treatment plan would be modified. In one of the 15 a provider noted the findings of the consultant about two months after the consultation took place but failed to document knowledge of the consultant's recommendations. This broken system contributed to this person's death. Clearly, not having a full time provider was a problem but this broken system needs a root cause analysis to determine how to improve inmate access to specialty care.

A root cause analysis should be performed of specialty care to identify reasons for these deficiencies. This needs to result in modification of policy and procedure to correct deficiencies. The Monitor continues to recommend abandonment of the "collegial review" process as it is a barrier to timely care.

2. The patient had two hospitalizations. After both hospitalizations, the patient was admitted to the infirmary, but the infirmary admission form was not completed as there was no available physician. No one documented review of the hospital record and it appeared that follow up appointments for chemotherapy and radiation were handled by the scheduling clerk. This lack of physician coverage is unacceptable, dangerous and must be remedied.

3. This death was possibly preventable. Earlier treatment of the patient's cancer could have resulted in survival.

**PATIENT 8   PREVENTABLE**

**DATE OF REVIEW**:

**PATIENT:**

**DOC #:**

**DATE OF DEATH:** 3/18/20

**AGE:** 62

**DATE OF INCARCERATION:** Unknown

**SITE AT TIME OF DEATH:** Shawnee Correctional Center

**PLACE OF DEATH:** Infirmary at Shawnee

**CATEGORY OF DEATH:** Natural

**EXPECTED OR UNEXPECTED:** Expected

**CAUSE OF DEATH:** Large B cell lymphoma of stomach[27]

**MENTAL HEALTH DIAGNOSES:**

**MEDICAL DIAGNOSES:**
1.   Large B cell lymphoma

**IDOC Problem List**
1.   None provided

**MEDICATIONS AT FACILITY BEFORE DEATH:**
Medication administration records not provided after September 2019.

**CASE SUMMARY**

This patient was incarcerated on 9/11/18 and eventually transferred to Shawnee.  Beginning on 6/3/19 the patient developed abdominal pain and saw nurses twice.  At the first physician visit more than two weeks later, the doctor ordered an abdominal x-ray, a low yield diagnostic test,

---

[27] We note that IDOC lists cardiorespiratory failure, adenocarcinoma with metastasis to the lung as the cause of death in its mortality list.  This diagnosis was based on the pathological diagnosis of his cancer.

and a blood count which showed mild anemia (hemoglobin 13). The doctor documented that the blood count was normal which it was not. No action was taken except to give Pepto-Bismol. Abdominal pain in a 62 year old with anemia warrants endoscopy. But this was not done.

Two more nursing evaluations occurred for abdominal pain and at a third nurse evaluation the patient refused a nurse visit saying something was wrong with his intestines and he needed to see a doctor. A nurse practitioner then reviewed labs on 7/5/19 and repeated the blood count. The patient initially refused the blood test and again on 7/16/19 the doctor documented that the prior blood count was normal when it showed mild anemia. The patient continued to have abdominal pain and on 7/31/19 a nurse practitioner noted weight loss and obtained fecal occult blood tests. On 8/7/19 a nurse practitioner documented positive occult blood in the stool, weight loss, and abdominal pain and referred the patient to the doctor.

On 8/12/19 the doctor noted a weight loss of 27 pounds and documented early satiety[28] and weight loss and wrote "R/O malignancy". But instead of ordering endoscopy, which is the recommended test, he ordered a plain x-ray, a repeat blood count and referred for a routine CT. Gastrointestinal blood loss, particularly with early satiety calls for an upper endoscopy as soon as possible. The repeat blood tests returned on 8/15/19 confirmed anemia (hemoglobin 9.6) which indicated significant blood loss over six weeks. The CT scan was ordered as a routine test instead of urgent and was not done until 8/29/19 and showed a mass in the stomach suggestive of cancer. The doctor referred the patient routinely to a gastroenterologist. The patient should have been referred for an endoscopy urgently. A consultation would delay the endoscopy. The patient continued to lose weight.

The GI consultant did not see the patient until 10/3/19. The GI consultant recommended an upper and lower endoscopy but the IDOC physician made these referrals routine not urgent. The endoscopy took place on 10/31/19 and showed a large circumferential tumor in the esophagus and in the entire antrum of the stomach causing obstruction. The tumor was an aggressive lymphoma and needed prompt treatment. On 11/5/19 the gastroenterologist saw the patient in follow up and recommended an oncology and oncology surgery appointment. The gastroenterologist set up an appointment for these referrals but there were no referral documents in the medical records and the doctor did not document any understanding of what was being scheduled. On 11/18/19 the cancer center called the facility and spoke with the scheduling clerk and asked to have the patient sent for an iron infusion because of anemia which the clerk scheduled for 11/26/19.

A large B cell lymphoma was diagnosed 10/31/19 but as of 11/25/19 the physician at the facility was unaware of this diagnosis even though the scheduling clerk was scheduling oncology recommended appointments. The physician was completely uninformed of the diagnosis or therapeutic plan based on documentation in the record.

On 12/2/20 the scheduling clerk wrote referrals and scheduled an echocardiogram, an indwelling catheter for chemotherapy infusion, and a PET scan. The echocardiogram was done but the

---

[28] Early satiety is a feeling of having a full stomach having eaten only a small amount of food. It is a potential warning for an upper gastrointestinal malignancy.

catheter and PET scan, although scheduled, were never completed.  On 12/3/19, the patient felt weak and like blacking out.  A blood test was done showing anemia and the patient was sent to a hospital for transfusion.  At the hospital, a doctor noted that the patient did not know his medications, did not know what kind of cancer he had or what the treatment plan was.  This reflects the documentation in the record that the physician had not had any discussions with the patient about his therapeutic plan.  Discharge instructions included a follow up oncology appointment on 12/27/19, soft mechanical diet, levofloxacin, omeprazole, sucralfate with meals, Fibercon, Colace, ferrous sulfate with meals and polyethylene glycol. The patient's weight at the time of discharge was 164 pounds. The patient's intake weight in 2018 was 215 pounds.

Upon release from the hospital on 12/6/20 the patient was placed in the infirmary as a chronic admit by nursing. The nursing admission note included vital signs without weight; his skin was described as grey and eyes drawn. There was no examination. Mobility was noted as assistance with activity as tolerated and his nursing care problem was alteration in comfort. A telephone order was received from the physician for a non-acute plan of care, continue all medications and order medications from the cancer center. The patient was put on a regular diet rather than the soft mechanical diet recommended by the hospital. The patient had a stricture of the esophagus making it difficult for food to pass to the stomach. There was no plan to monitor for skin breakdown, manage side effects of chemotherapy, weight monitoring or intake and output of food and liquids. Omeprazole, which reduces acid in the stomach was recommended to be taken before meals by the hospital but at the infirmary was ordered at 6 am and 6 pm without regard for the time meals are taken. The same with ferrous sulfate; it was to be taken with meals but was instead offered at 6am and 6pm.

On 12/18/19 the patient ran a fever (100.4°F) had oxygen saturation of 89% with a cough and diminished lung sounds but the nurse did not inform the provider. The following day the provider was contacted because the patient's blood pressure was low, and his condition had not improved. The provider ordered IV fluids and labs but when the patient failed to improve, he was sent to the hospital. The patient's weight was 157 pounds, a loss of seven pounds in two weeks. The hospital assessment was that the patient had acute blood loss anemia (hemoglobin of 6.6) from the lymphoma and was transfused 2 units of blood.

Twenty-four hours later the patient returned from the hospital and was placed in the infirmary. There were no new admission notes; the patient's return was treated as one continuous infirmary stay. The patient should have been discharged from the infirmary on 12/19/19 and readmitted on 12/20/19 after returning from the hospital. The provider did see the patient the day of return to the facility. Aside from noting that the patient had a transfusion, (laboratory results were hemoglobin 8.3 and WBC 20.3), and that a workup with oncology was scheduled, there was no information and no examination. The doctor did not update the status of the treatment plan with the Venofer[29] infusion or oncology.  There was no nursing assessment or revision of the nursing care plan.

---

[29] Venofer is iron given by intravenous infusion as a way to treat iron deficiency anemia.

The patient started vomiting 12/24/19. A provider was contacted and ordered Phenergan on 12/26/19 and 12/27/19 but did not examine the patient. On 12/29/19 the patient was ordered to take nothing but ice chips by mouth until the next morning. A doctor made rounds on 12/31/19; the encounter was very brief. The note stated no new complaints, requesting Phenergan IM. The assessment was "stable" and there was no change in therapy. This was a patient who had cancer, was just hospitalized for loss of blood associated with the cancer and had nausea and vomiting for seven days. This was the first encounter with a physician who should have examined the patient and taken steps to evaluate the reason for nausea and vomiting, evaluate the patient's hemodynamic and nutritional status and modified the plan of care accordingly.

1/3/20 was the first time anyone talked to the patient about changing position to prevent skin breakdown. Nurses' inconsistently charted the patient's position to ensure that he did not stay in one position too long. There was no nursing plan to offer position change or activity to the patient or to assess the patient's skin integrity periodically. The patient should have been on a special mattress to prevent skin breakdown. Nurses only intervention was to remind the patient to change position and ultimately change the dressing of wounds that developed when skin breakdown occurs.

The first time a dressing was mentioned was five days later 1/8/20 when the nurse's note documented that the patient had a Duoderm dressing on his right hip covering a 2 cm wound. There was no schedule for dressing changes and the nursing plan of care was not revised to include dressing changes and intervention to prevent further skin breakdown. The physician was not informed of the change in the patient's condition. On 1/7/20 the provider's objective note was "emaciated otherwise unremarkable. Bed ridden". No examination of the patient was completed. The only mention of the decubiti by the physician was on 2/4/20 when 2 small areas on the hip were noted but there was no description of the wound to indicate that it was examined.

A day later drainage from the wound was purulent and MRSA was cultured. The patient was not placed on an antibiotic appropriate for treatment of MRSA. The doctor never ordered a specialized mattress or gave any orders for wound management or other interventions to prevent further deterioration of the ulcer.

By 1/7/20, the doctor had become aware of the patient's diagnosis and on that day had a discussion with the patient about his "terminal cancer" and pursued whether the patient wanted to have do-not-resuscitate status. This discussion occurred before the patient had even had an evaluation by the oncologist to determine a therapeutic plan for the cancer. This was unprofessional as the patient had not yet had an opportunity to be evaluated by a professional with expertise in his disease.

It was not until the oncologist saw the patient on 1/10/20 that chemotherapy was ordered, about seven months after symptoms developed. The complete oncology note was not present in the medical record. After this consultation, the doctor did not document review of the patient's therapeutic plan or the findings of the oncologist and appeared to have no knowledge of the therapeutic plan.

On 1/20/20 the patient apparently received the first dose of chemotherapy. The trip for chemotherapy required he be up in a wheelchair ready to go at 6 am. This is six weeks after the patient has been essentially bedridden. He was short of breath with minimal exertion. The patient had significant anemia requiring transfusion which was done the following day. While the specialty tracking log documented that the doctor evaluated the patient on 1/22/20 and discussed the recent consultation with the patient, the only note by the doctor after the chemotherapy was that the patient was "doing OK" and asked to be moved to a room with a TV. The doctor did not document knowledge of the status of the patient, did not document the transfusion the day before, did not obtain another blood count to see if the anemia was improved, did not ask the patient about his recent chemotherapy or symptoms from it, and documented no knowledge of the patient's therapeutic plan or recent treatment. The doctor ordered no follow up labs and showed no concern about the recent need for transfusion. This is uninformed monitoring of specialty consultation and does not warrant adequate post-specialty evaluation which the tracking log documented as done.

The patient fell while at his second chemotherapy appointment on 1/27/20 injuring his lip. At the next physician rounds a week later on 2/4/20 the patient indicated he did not want to go to his outside appointments as the trip was "too long and tiring". The physician documented that the patient was emaciated but did not even take a weight. Weights were not being monitored regularly as part of the plan of care. The doctor failed to examine the patient, conduct a nutritional survey, and determine caloric need or intake. The doctor noted emaciation without any plan to ensure the patient was receiving adequate nutrition.

The patient was housed on the infirmary beginning in November of 2019 and lost weight continuously because his stomach cancer made eating difficult. He weighed 215 pounds at intake in 2018 and on 1/20/20 he weighed 133 pounds, an 82 pound weight loss. Regular weights were not scheduled by nursing staff. Because he had an obstructive gastric cancer, he frequently vomited and needed a specialized diet. But the doctor wrote no orders for care of the patient while in the infirmary, failed to address the weight loss and made no attempt to assess the patient's nutritional status. The patient probably needed parenteral nutritional support but except for ordering boost on 1/7/20 no nutritional augmentation was completed, and the doctor made no clinical evaluation of the patient.

The patient was repeatedly incontinent of urine and stool beginning 1/13/20 which was unrecognized by the doctor. The physician did not examine the patient, take a history of the patient's episodes of incontinence, or order diagnostic work to identify if it could be treated. Nursing staff changed the patient when incontinent but did not take measures to prevent it. These measures could have included for example, a bedside commode or offering assistance with toileting at frequent intervals. There was no plan or effort to assist the patient to maintain bowel and bladder control for as long as possible.

 After the first chemotherapy, the patient refused further care on 2/10/20. He told a nurse, "I don't want to go to chemo anymore. It's too far. I'm going home in 2 months. Then I will go to a good hospital". The physician was not contacted when the patient refused this important

procedure to discuss the refusal. Later when the physician became aware of the patient's refusal during rounds the physician did not address the patient's reluctance to continue chemotherapy. The patient's complaint that it was too tiring was legitimate and the physician should have taken steps to see if chemotherapy could be conducted in a way that was less fatiguing for the patient. It would have been appropriate to have consulted with the oncologist to consider alternatives which may have included inpatient treatment. The oncologist was not contacted to discuss the refusal. No efforts were made to address the patient's fatigue and reluctance to travel to the oncology center. The patient was not given the information upon which to make an informed refusal of chemotherapy.

It was not until 15 days later, when a nurse inquired of the physician whether the preventive antibiotics for immune suppression were necessary since the patient was not receiving chemotherapy anymore, that these medications were discontinued. The physician had not developed a hospice plan of care and did not anticipate what the patient's needs for comfort care might be. There were no orders for nutritional support, pain, or other symptom relief. The nursing plan of care was equally without detail for skin care, toileting, grooming or social/emotional support. Planning for his expected release in April appears to have been minimal for an individual with treatable cancer.

The patient had stomach cramping and blood was noted on his sheets beginning 3/11. The patient requested Pepto-Bismol or Tylenol. A verbal order for Pepto-Bismol was obtained and a nurse used a treatment protocol for non-specific discomfort to give the patient Tylenol. It is extremely inappropriate for a nurse to use a treatment protocol to provide pain medication in a patient with new onset symptoms who has cancer and is essentially bedridden. The physician did not examine the patient despite new onset of pain and bleeding until regular weekly rounds on 3/17. The patient died the next day on 3/18/20.

**PRELIMINARY AUTOPSY DIAGNOSIS:** Not Available

**FINAL AUTOPSY REPORT:** Not Available

**OPPORTUNITIES FOR IMPROVEMENT AND RECOMMENDATIONS FOR CORRECTIVE ACTION:**

1. There were significant problems with specialty care including:
   a. At the first visit for abdominal pain, the doctor made an error of judgment. The patient had a 27 pound weight loss, early satiety, abdominal pain, and a guaiac positive stool. An elective CT scan was not an appropriate choice. The patient should have referred for endoscopy so that a biopsy could be performed.
   b. The doctor appeared to not be engaged in directing or managing specialty referrals resulting in the patient being lost to follow up.
   c. The doctor did not timely refer for endoscopy.

    d. After endoscopy was done confirming cancer, coordination with specialists was delayed and the patient did not start receiving chemotherapy until about eight months after symptoms began.

    e. The physician made no effort to facilitate treatment of this patient's cancer.

    f. The physician was ill-informed of specialists' recommendations and was disengaged from the therapeutic plan for the patient.

    g. These deficiencies warrant review of this physician's clinical work. Care was unsafe and clinically inappropriate. As well, a root cause analysis of specialty referral should be done system-wide to result in a clinically appropriate and safe process of specialty referral. Until that is done, the Monitor continues to recommend abandonment of the "collegial review" specialty referral process.

2. The doctor entered into a discussion about "terminal cancer" before the patient had an evaluation with an oncologist which was unprofessional, especially since lymphomas are treatable cancers.

3. The patient's weight loss was not identified early and was not monitored through his incarceration including on the infirmary. This is a repeated systemic deficiency for which a root cause analysis should be performed.

4. Care on the infirmary was not good. A root cause analysis should be performed to result in defining the criteria for admission to infirmary care, expectations of care on the infirmary, and indications for referral to higher level skilled nursing care. The results of this analysis should inform policy and procedures expected on this unit for physician and nursing personnel.

5. This patient had a treatable lymphoma with a reasonable chance of survival early in his disease. His death was possibly preventable with timely and appropriate care.

**PATIENT 9   POSSIBLY PREVENTABLE**

**DATE OF REVIEW**:

**PATIENT:**

**DOC #:**

**DATE OF DEATH:**  2/4/20

**AGE:** 64

**DATE OF INCARCERATION:**   Unknown

**SITE AT TIME OF DEATH**:  Lawrence Correctional Center

**PLACE OF DEATH:** Patient housing unit at Lawrence Correctional Center

**CATEGORY OF DEATH:**   Natural

**EXPECTED OR UNEXPECTED:**  Unexpected

**CAUSE OF DEATH:**  Not officially determined

**MENTAL HEALTH DIAGNOSES:**

**MEDICAL DIAGNOSES:**
1. Hypertension
2. High blood lipids

**IDOC PROBLEM LIST ENTRIES**
1. NKDA
2. Hypertension
3. Abnormal labs
4. HTN CC done
5. HTN CC done
6. Cardiac CC done
7. Cardiac CC done
8. 2 year PE done
9. Annual HTN clinic good/stable
10. HTN clinic done good/stable
11. HTN clinic done
12. HTN clinic done

13. HTN clinic done

**MEDICATIONS AT FACILITY BEFORE DEATH:**

Note that medication administration records were not made available from June of 2019 until the patient's death in February of 2020. So medications are listed from June of 2019.

Pharmacy entries on medication administration record:

1. Acetaminophen 500 mg tablet; take 2 tablets by mouth at noon. KOP vs DOT not specified.
2. Amlodipine BES 10 mg tablet; take 1 tablet by mouth daily. KOP vs DOT not specified.
3. Gabapentin 300 mg capsule; take 1 capsule by mouth twice a day, open and float DOT. This was discontinued on 6/3/19 and replaced with a new MAR written by a nurse.
4. Hydrochlorothiazide 25 mg tablet; take 1 tablet by mouth daily. KOP vs DOT not specified.
5. Lisinopril 5 mg tablet; take 1 tablet by mouth daily. KOP vs DOT not specified.
6. Meloxicam 15 mg tablet; take 1 tablet by mouth twice a day. KOP vs DOT not specified.
7. Nasacort allergy (10.8 mL) 55 MCG spray; place 1 spray in each nostril daily. KOP vs DOT not specified.
8. Paroxetine 30 mg tablet; take one tablet by mouth at bedtime. KOP vs DOT not specified.
9. Simvastatin 20 mg table; take 1 tablet by mouth at bedtime. KOP vs DOT not specified.

Nurse entries on medication administration record:

1. "Neurontin 600 mg po BID x 12 mo". Note that this medication is the same as gabapentin. Note the difference in completeness of the entry.

**CASE SUMMARY**

This patient's problem list is notable for multiple entries that are not medical problems, and it was unclear what these entries meant. This is a system-wide problem in IDOC.

The patient was 69 years old. His blood pressure was not well controlled and not well managed. From 2/11/18 to 2/4/20 the patient was evaluated seven times by nurses; once by a provider in chronic clinic; and 12 times by providers in clinic with elevated blood pressures. Nurses did not consult or notify a provider about the abnormal blood pressures and providers took no action regarding the elevated blood pressures. In the one hypertension chronic clinic, the blood pressure was 150/91 and the nurse practitioner documented that "all previous blood pressures have been WNL [within normal limits] but today it is elevated". This was inaccurate as the patient had frequent elevated blood pressure readings prior to the clinic. Ignoring of abnormal vital signs is common practice in IDOC and was present for this individual. It definitely affected management of the patient's hypertension. Additional medication was indicated. The patient had mild tachycardia five times in the eight months before his death with no action being taken. The abnormality was unnoticed.

The patient's abnormal blood lipids and cardiovascular prevention were not well managed. On 10/9/19 the patient's 10 year risk for heart disease or stroke was 34% based on the most recent

lipid values and blood pressure at the 9/5/19 hypertension chronic clinic. Recommendations for a person with this risk called for aspirin use and moderate to high intensity statin medication. The patient was never on aspirin and was on low intensity instead of the recommended moderate to high intensity statin. On 8/23/19 a nurse practitioner stopped simvastatin because the patient had leg pain which appeared difficult to differentiate from the patient's typical arthralgias. There was no specific history or examination for muscle pain[30]. The nurse practitioner started the patient on niacin, a drug that is more useful in increasing HDL-cholesterol than in reducing LDL-cholesterol and is not recommended as a single agent to reduce risk for stroke or cardiovascular events.

On 10/3/18 a nurse documented that the patient fell off a top bunk and injured his shoulder for which a doctor saw the patient the same day. The patient complained of a sleep disorder stating that he "jumps during sleep and falls off the bed onto the floor. The doctor documented that the patient denied a seizure disorder and made an assessment of a rapid eye movement (REM) sleep disorder and referred the patient to a psychiatrist. If a seizure was suspected the patient should have been referred for an electroencephalogram (EEG), brain imaging (CT scan or MRI) and a neurology referral as the patient had an unusual presentation. Instead, the doctor ordered shoulder and knee x-rays and referred to a psychiatrist. The x-ray of the knee showed a chronically appearing slightly displaced patella fracture, but no referral was made to an orthopedic surgeon. The patient had persistent knee pain and eventually was given a cane.

The patient had been evaluated for a variety of joint complaints including shoulder, arm, back, and knee pain. After his fall from the bunk bed, he had an x-ray demonstrating tricompartmental osteoarthritis of his right knee with a chronic looking displaced avulsion fracture of the patella that cause pain. There was no referral to an orthopedic surgeon.

On 5/1/19 a nurse practitioner saw the patient because his legs buckled due to pain. The nurse practitioner treated the patient with a cane, gabapentin for a year, and follow up in six weeks for a diagnosis of neuropathy. Neuropathy was diagnosed without a thorough history or neurological examination being performed. About six weeks later, a nurse practitioner saw the patient again who said that the gabapentin helped the pain, so the nurse practitioner doubled the dose for a year. A thorough neurologic examination had not been performed and there was no basis for the diagnosis that was documented in the record. Another six weeks later a nurse practitioner saw the patient for hip pain and increased the gabapentin to 900 mg twice a day for neuropathy despite there being no documentation of a history or physical examination providing evidence for neuropathy.

---

[30] Myopathy from statins is not uncommon and before stopping the medication several steps should be taken. Hypothyroidism and low vitamin D levels should be checked before stopping the medication. A different statin can be tried because the metabolism of simvastatin (the statin prescribed to this patient) is metabolized in a manner that can result in increased muscle symptoms. The amlodipine also affects metabolism and in combination with simvastatin can result in more myopathy. When symptoms develop a creatinine kinase blood test is useful to assess whether there is muscle damage. A statin-associated muscle symptoms (SAMS) scoring check is useful to assess whether the muscle pain could be related to the statin medication. None of these were done for this patient.

On 2/2/20 at 10:10 am the patient experienced dizziness and a nurse noted that the patient's left side was "slow to move". This is consistent with stroke. The nurse took the vital signs three times, and the pulse was consistently elevated at 122, 123, and 127 and the blood pressure was elevated at 143/94. The patient was able to bear weight to transfer to a wheelchair and was able to smile, stick out his tongue and grip equally. The nurse spoke with a nurse practitioner but the content of the conversation with the nurse practitioner was not documented. The patient appeared to have a stroke and had abnormal vital signs. An EKG was not done, and an immediate provider evaluation should have taken place. The nurse attributed the symptoms to not having eaten breakfast or lunch. The blood sugar was 133 indicating that the patient was not hypoglycemic. No action was taken.

At 5:33 am on 2/4/20, two days later a nurse responded emergently to the inmate who was having a seizure in his housing unit. The patient stopped seizing and was post ictal for about 30 seconds when the inmate began seizing again and then went into cardiac arrest. CPR was initiated but the patient died. An autopsy was not documented as being done.

**PRELIMINARY AUTOPSY DIAGNOSIS:** Not available

**FINAL AUTOPSY REPORT:** Not available.

**OPPORTUNITIES FOR IMPROVEMENT AND RECOMMENDATIONS FOR CORRECTIVE ACTION:**

1. A root cause analysis needs to be done of the chronic care program to include how medical problems are identified, how the problem list is maintained, how patients are enrolled in chronic care and how continuity of chronic care is monitored. To write completion of chronic care clinics on the problem list is a misuse of the problem list.
2. The IDOC has a system-wide problem of failure to address abnormal vital signs. A root cause analysis of the problem needs to be done to result in policy and procedure that address what is done when vital signs are abnormal. This is especially important for persons with hypertension as multiple patient have been seen on record reviews with hypertension whose medication is not adjusted when elevated blood pressure is noted.
3. System-wide training should be conducted on primary and secondary cardiovascular prevention. The American College of Cardiology cholesterol calculator should be available in all clinics so that appropriate anti-lipid therapy can be instituted.
4. Up-To-Date should be available in all clinic examination rooms so that providers can access information.
5. Training should be done on muscle pain in persons on statin therapy. The current practice is not up to date.
6. Training should be instituted on proper use of aspirin in cardiovascular prevention.
7. Further investigation should be conducted to determine why this patient who had a possible seizure did not receive an EEG and CT scan which is standard of care. This can be part of a root cause analysis of the specialty care referral system which appears to be a barrier to obtaining specialty care.

8. A root cause analysis of specialty care should be done to determine why someone with a displaced patella fracture was not referred to an orthopedic surgeon.  This may have caused long-term harm to the patient.

9. The patient was being treated for neuropathy without evidence of neuropathy.  In this case, the provider was a physician assistant which calls for a review of physician assistant monitoring at this site.

10. Two days before this patient's death, the patient had symptoms of what appeared to be a stroke.  A proper evaluation was not done.  A physician should have evaluated the patient.  A root cause should be done to determine why this did not happen.

11. If this patient died of stroke or a central nervous system disorder, the death was possibly preventable because there was an early indication for further diagnostic evaluation of the apparent seizure and possible stroke which did not occur.

**PATIENT 10 NOT PREVENTABLE**

**DATE OF REVIEW**:

**PATIENT:**

**DOC #:**
**DATE OF DEATH:** 1/16/20

**AGE:** 27

**DATE OF INCARCERATION:** Unknown

**SITE AT TIME OF DEATH:** Shawnee Correctional Center

**PLACE OF DEATH:** Deaconess Hospital

**CATEGORY OF DEATH:** Natural

**EXPECTED OR UNEXPECTED:** Unexpected

**CAUSE OF DEATH:** Pulmonary embolism

**MENTAL HEALTH DIAGNOSES:**

**MEDICAL DIAGNOSES:**
1. Sickle cell anemia.

**IDOC PROBLEM LIST:** None available

**MEDICATIONS AT FACILITY BEFORE TRANSFERRED TO HOSPITAL WHERE HE DIED:**
On no medications

**CASE SUMMARY**

This 26 year old man was homeless and as a civilian had been diagnosed with sickle cell anemia. There was a hospital record from when he was a civilian detailing two hospital admissions. One was in January of 2017 when the patient was evaluated for dizziness. A hemoglobin at that emergency room visit showed anemia with target cells and a high reticulocyte percent supporting a sickle disease diagnosis. In September 2018, the patient had been ejected from a shelter and was found on the roadside by police lying in vomit. At the hospital he again had anemia and

high reticulocytes with high bilirubin.  His spleen was enlarged but there were no acute findings.  He was diagnosed with cyclical vomiting.  The etiology of the vomiting was not identified.

On 5/9/19 the patient was received at NRC for incarceration.  A nurse documented that the patient had sickle disease and although a physician assistant seeing the patient after the nurse screening documented sickle disease, he took no history related to the patient's sickle disease.  The physician assistant plan was to order a blood count and sickle test, but the patient did not appear to have been enrolled in chronic care and no intake blood tests were present in the medical record, even though they were apparently ordered.

On 5/23/19 the patient had an intake assessment after transfer to Shawnee Correctional Center and the LPN documented on the intake interview note that the patient had sickle cell anemia.  A subsequent intake chart screen by an RN at 3 am on 5/24/19 documented that a chronic illness nurse was notified but the nurse failed to check any box verifying that the patient had a chronic illness.  The patient was never seen in chronic clinic for sickle disease and appeared lost to follow up.

A medical records clerk requested old medical records from two sources and wrote that the doctor would review the records on receipt.  One record from a hospital in Rockford, Illinois was received on 6/14/19 and described that the patient had a prior history of sickle disease and experienced dizziness possibly related to substance use.  The patient had nausea and vomiting.  There was a positive drug screen for cannabinoids.  The blood count showed microcytic anemia with target cells and high reticulocyte present consistent with his sickle disease. Another emergency room encounter dated 9/1/18 documented an evaluation for vomiting.  In this episode the patient had been recently rejected from a shelter and was found on the roadside lying in his vomit.  The patient had abdominal pain and vomiting.  His blood count again was consistent with sickle disease.  A CT of the abdomen showed mild splenomegaly but no acute findings.  The splenomegaly was likely due to his sickle disease.  The discharge diagnosis was "cyclical vomiting"[31].  These reports were signed as reviewed on 6/24/19.  Even though a doctor signed these reports as reviewed, the doctor did not evaluate the patient for sickle disease or follow up on the vomiting.

Though nurses at both NRC and Shawnee documented that the patient had sickle disease the patient was not evaluated in chronic clinic for that condition.  On 6/20/19 a psychiatrist documented that the patient "would like treatment for sickle cell but does not want to put in to see medical due to the $5.  We discussed that this is his choice as an adult deciding his own priorities".  It appeared that the patient was not enrolled in chronic care and was being charged for management of his chronic illness or misunderstood the IDOC rules on chronic care which could have been corrected by the psychiatrist communicating the patient's concern to the medical team or the psychiatrist correcting the inmate's false understanding of sick call.  The failure of the patient to seek care may have been a monetary issue or a mental health issue but the medical and mental health programs did not facilitate access of the patient to care which was possibly

---

[31] From UpToDate, cyclical vomiting is a syndrome characterized by stereotypical bouts of vomiting with intervening periods of normal or baseline health.  There is no characteristic etiology for this.  There is an association with chronic cannabis use.

made more problematic due to the patient having a mental health condition. The patient was never seen for his sickle disease, never treated for it although apparently symptomatic for this condition and had no testing for that condition. Though old hospital records demonstrated a vomiting condition the patient was not followed up for this problem either even though this record was signed as reviewed by the physician at Shawnee.

The patient subsequently experienced two injuries. One was on 10/14/19 when he was elbowed in the chest playing ball. A nurse saw the patient, did not refer to a provider and gave the patient a cold pack. Then on 11/4/19 the patient fell off his bunk bed sustaining a laceration above his eye. An LPN cleaned the laceration, applied bacitracin, and gave the patient ibuprofen but did not refer the patient to either a RN or a provider. LPNs are not permitted by state regulation to perform independent assessments. A doctor did not review the injury report for a month and took no action. On 11/6/19, two days after the injury, a mental health professional saw the patient in a private and confidential interview. The patient reported he was not feeling well and that he had fallen off his bunk bed gashing his forehead and that since the injury had nausea and "kidney pain" and "he has been throwing up and urinating more frequently than usual". The mental health professional did not refer the patient to a medical provider despite the patient having serious symptoms. The patient was later seen on 12/3/19 in a group session but the mental health professional documented no problems. The patient had a parole date for early April of 2020.

The patient was not evaluated again until a nurse saw the patient two months later on 1/13/20 for abdominal pain. The nurse identified a large abdominal mass. The patient said that the mass had "gotten bigger" lately. The nurse documented that the patient gave a history of vomiting, which apparently the patient had been doing since the injury occurred two months ago.

The initial hospitalization was to a small community hospital where the patient described upper and lower abdominal pain with nausea and vomiting. There was a left lower quadrant abdominal swelling. A CT scan showed a consolidated opacity in the left lower lobe and small left pleural effusion. There was a large lesion in the left lower abdominal cavity that was 15 by 16 by 28 cm in size which is about 6 by 12 inches. The source of the lesion was uncertain.

The patient was transferred to a regional hospital for higher level surgical management of the abdominal mass. The regional hospital repeated the CT scan twice. An MRI was also done which showed that there was no visible spleen and that the mass appeared to be a cystic mass originating from the spleen and due to injury or a cystic mass from the spleen and consisting of broken down blood. The patient had significant anemia (hemoglobin 7.2) and elevated white count (WBC 19.1) consistent with significant blood loss and possible infection. A second interventional CT scan was done to attempt drainage. The mass was drained and initially produced 500 mL of chylous-like fluid was produced which on gram stain showed a gram positive cocci. The following morning the patient became acutely short of breath and hypoxic and was transferred to the ICU and was intubated. Within a short period of time the patient experienced cardiac arrest and died. An autopsy was done at the hospital. The discharge summary described that the autopsy showed that a saddle embolism was present and was the immediate cause of death.

The death summary completed by the physician who was responsible for care of the patient merely reported the death. It stated that prior civilian records regarding his sickle disease were not able to be obtained and stated that the patient's history was "significant for self-related sickle cell anemia". This implied that the patient stated sickle cell anemia but did not have it. It is the physician's responsibility to evaluate the patient and verify whether objective findings warrant a diagnosis. And three ER visits were "for minor complaints" and failed to state that these records verified sickle disease. Remarkably, the summary stated that the patient was "not in any chronic clinics and not on medications when he came to Shawnee" even though he was responsible for evaluating the patient based on his history of sickle cell disease. No problems were identified, and the physician took no responsibility for not caring for the patient's sickle disease. The summary documented that the cause of death was not the result of a pre-existing condition which is likely not accurate.

The autopsy was performed at the hospital where the patient died. The autopsy confirmed that a large splenic abscess and pulmonary thromboembolism caused the patient's death. Persons with sickle cell disease have a three times greater risk of pulmonary embolism than those without sickle disease. Sickle cell disease can result in splenic infarction which can result in splenic abscess. Treatment of sickle disease can reduce splenic infarction. The lack of treatment of this patient's sickle disease may have contributed to the patient's splenic abscess and his pulmonary embolism. Moreover, prior CT scans showed an enlarged spleen, which also is related to sickle cell anemia. The patient's prior injury in November may have resulted in injury to the patient's spleen resulting in a splenic rupture. There was no physician evaluation after this injury. In combination, the failure to provide intervention and monitoring after the injury and management of the patient's sickle disease may have contributed to this person's death.

## PRELIMINARY AUTOPSY DIAGNOSIS:

## FINAL AUTOPSY REPORT:

The cause of death was pulmonary thromboembolism complicating a splenic abscess.

Findings included:
1. Pulmonary thromboembolism complicating a splenic abscess.
   a. Splenic abscess.
   b. History of sickle disease.
   c. Emboli in many small arterioles of the lungs.
   d. Dilation of the right ventricle of the heart.
   e. Splenic abscess, approximately 1000 ml of purulent fluid.
   f. Early bronchopneumonia of the left lower lobe.
2. Hypertensive cardiovascular disease:
   a. Cardiomegaly, weight 530 grams, with left ventricular hypertrophy.
   b. Nephrosclerosis.
3. In-custody: history of illness occurring while in-custody.

## OPPORTUNITIES FOR IMPROVEMENT AND RECOMMENDATIONS FOR CORRECTIVE ACTION:

1. The patient died of a potential complication of sickle disease, yet his illness was not being managed in the chronic disease clinic program and the patient never received treatment for sickle cell anemia during his entire incarceration. The patient was incarcerated for approximately eight months yet had no laboratory tests for his sickle disease, he never saw a physician for sickle cell disease despite being symptomatic and complaining to mental health professionals about his condition. A root cause analysis of enrollment into chronic disease clinic should be performed. This patient had a condition, it was identified at intake, but the patient was not followed by physicians for his chronic condition. Why did enrollment in chronic clinic not occur? The analysis should consider several factors.
   a. The patient told a psychiatrist at Shawnee that he wanted treatment of his sickle disease but did not want to pay $5 to do so.
   b. Was the patient aware of procedures that he did not have to pay for chronic care management?
   c. Was the psychiatrist aware of this?
   d. Why didn't the system facilitate enrollment in a service that it presumably offers?
   e. Did the mental health condition of the patient affect enrollment and if so, how can that be avoided?
   f. A doctor at Shawnee signed as reviewed old hospital records of the patient showing a vomiting condition and verifying sickle disease. Why did that review not result in enrollment in the chronic disease program? This physician has, on other record reviews, been found to be practicing in an unsafe and clinically inappropriate manner and this was another episode of unsafe practice.
2. The intrasystem transfer process between NRC and Shawnee failed to ensure continuity of care of the patient's medical conditions, specifically sickle disease. This is a problem that warrants root cause analysis of the intrasystem transfer process.
3. The patient experienced two injuries at Shawnee. In one the patient was elbowed in the chest while exercising. In the other the patient fell off his bunk. The second injury occurred approximately two months before the patient's death involving a possible internal bleed from an injury. This second injury was evaluated by an LPN who is not licensed to perform independent assessments. The LPN did not refer the patient and a physician never evaluated the patient after falling off a bunk bed. In a private interview with a mental health professional after the injury the patient complained of nausea and "kidney pain" with vomiting. Why was this patient not referred for a medical evaluation by a physician? A root cause analysis of medical care of mental health patients should be performed to ensure that these patients have appropriate access to medical care.
4. This death was not obviously preventable, but it is possible that, given the lack of an appropriate evaluation after an injury that may have been related to the ultimate death of the patient as well as the lack of management of his sickle disease, this was a possibly preventable death.

**PATIENT 11 NOT PREVENTABLE**

**DATE OF REVIEW**:

**PATIENT:**

**DOC #:**

**DATE OF DEATH:** 4/18/20

**AGE:** 80

**DATE OF INCARCERATION:** Not known

**SITE AT TIME OF DEATH:** Stateville Correctional Center

**PLACE OF DEATH:** St. Joseph's Medical Center

**CATEGORY OF DEATH:** Natural

**EXPECTED OR UNEXPECTED:** Unexpected

**CAUSE OF DEATH:** COVID-19 infection

**MENTAL HEALTH DIAGNOSES:**

**MEDICAL DIAGNOSES:**

1. Stage 3 chronic kidney disease likely from diabetes
2. Type 2 diabetes mellitus
3. Hypertension
4. Diabetic retinopathy
5. Diabetic neuropathy
6. Peripheral vascular disease
7. Cataracts
8. History of posterior vitreous detachment
9. History of bleeding gastric ulcer
10. COVID-19

**IDOC PROBLEM LIST**
Problem list not available.   Chronic clinic note lists only diabetes and hypertension.

**MEDICATIONS AT FACILITY BEFORE TRANSFERRED TO HOSPITAL WHERE HE DIED:**

Pharmacy entries on medication administration record for month of February 2020:
1. Amlodipine BES 10 mg tablet; take 1 tablet by mouth daily.  Watch take.
2. Docusate Sodium 100 mg capsule; take 1 capsule by mouth every morning. Watch take.
3. Ferrous sulfate 325 mg tablet; take 1 tablet by mouth every morning.  Watch take.
4. Folic Acid 1 mg tablet; take 1 tablet by mouth every morning. Watch take.
5. Metoprolol tartrate 50 mg tablet; take 1 tablet by mouth twice a day. Watch take.

Nurse entries on medication administration records for month of February 2020:
1. "APAP 500 mg #2 BID PRN". Not indicated whether KOP or DOT.
2. "Methocarbamol 750 mg #1 BID PRN". Not indicated whether KOP or DOT.
3. "Robaxin 750 mg po BID x 3 m". Not indicated whether KOP or DOT
4. "Tylenol 1000 mg BID x 3 months"> Not indicated whether KOP or DOT and is the same medication as APAP in #1 above.
5. "Coumadin 3 mg PO QHS x 1 year". Not indicated whether KOP or DOT
6. "Prilosec 40 mg PO QD x 1 yr". Not indicated whether KOP or DOT.
7. "Tab.A.Vite PO QAM x 1 yr". Not indicated whether KOP or DOT
8. "70/30 Insulin 18 units SQ QAM x 6 mo".
9. "70/30 insulin 6 units SQ QHS x 6 mo".
10. "Regular insulin SQ s/s BID 201-250 1 u; 251-300 2 u; 301-350 3u; 351-400 4 u; 401-450 5u; >451 call MD x 1yr".

**CASE SUMMARY**

This 80 year old man with multiple medical conditions including hypertension, a gastric ulcer, diabetes, and multiple complications of his diabetes including neuropathy, chronic kidney disease, and retinopathy.  In early January 2020, the patient became confused, was febrile and hypoxic (oxygen saturation of 84%) and had elevated blood pressure and pulse.  The patient was hospitalized but the report of that hospitalization was unavailable.  A doctor seeing the patient on 1/16/20 after the hospitalization started warfarin stating in his note that a deep vein thrombosis was diagnosed at the hospital.  The doctor made no comment about the patient's prior confusion, febrile illness or hypoxia but noting the absence of a hospital report asked for medical records staff to obtain it.  After the 1/16/20 visit, there was no follow up of this hospitalization.  The patient continued to be housed in general population.  There was no evaluation of his cognitive ability.

Transfer forms in the medical record document that the patient went to UIC on three occasions for specialty consultation in 2020.  On 2/14/20 the patient went to UIC ophthalmology for evaluation of his diabetic retinopathy.  On 2/21/20 the patient went to GEC imaging at UIC.  On 3/3/20 the patient went to UIC again for follow up with a nephrologist.  The blood pressure at that visit was 180/92; the nephrologist recommended blood pressure control to less than 150/90 and gave recommendations for additional medication.   The nephrologist was not made aware that the patient was being treated with warfarin for a DVT.

The specialty tracking log for the 1st quarter of 2020 documents only two appointments completed in February: one on 2/14/20 to GEC imaging and a 2nd on 3/3/20 to nephrology. The specialty tracking log for Stateville documented that a doctor had reviewed the 2/14/20 and 3/3/20 consults with the patient on 2/17/20 and 3/5/20 respectively. Based on progress notes in the medical record there was no evidence of follow up of the 2/14/20 visit. A physician did review the 3/3/20 consult but did not document a discussion with the patient about the consultation. As well, there was no follow up for the DVT after the 1/16/20 physician visit.

On 3/24/20 at 8:53 am the patient was brought to the health unit for fever. This was noticed because the patient had hypoglycemia earlier and was given glucagon. When given glucagon the nurse obtained a temperature of 103. The patient was given Tylenol. A doctor saw the patient. The patient denied shortness of breath. However, the oxygen saturation was 90%. A follow up temperature was 102. An influenza test was obtained and was negative. The doctor recommended that the patient drink fluids and ordered monitoring the patient for every shift for two days. There was no documentation of the patient being isolated or tested for COVID-19 even though there was ongoing community spread at this time.

At 8:30 pm on 3/24/20 a nurse documented fever of 104. The LPN seeing the patient documented that the patient was not eating or drinking. The LPN asked the inmate's cellmate about cough and the cellmate said that the patient was coughing on and off. The LPN wrote that the inmate had change in consciousness and could follow directions and answer questions but could not walk with a steady gait and that the cellmate said, "he's been different all day" but appeared to be "nodding off". The assessment of the LPN was alteration in mental status. Despite this, the LPN did not promptly call a physician or RN; instead, writing "continue to monitor wait for assessment from RN + doctor".

On 3/24/20 at 11:50 pm a RN saw the patient who said to the nurse "You doing surgery?" The nurse did a straight catheter without an order for this procedure and there was no urine output. His temperature was 99.8, BP 125/75, pulse 63 and oxygen saturation 87%. The nurse assessed "Possible UTI" and the nurse plan was to "continue to monitor. Notify MD with VS [vital signs] and get instructions". At 12:15 am on 3/25/20 the nurse documented speaking with a physician who ordered the patient sent to the hospital. At this point the oxygen saturation was 80%. The patient was intubated the following day at the hospital and by 3/27/20 was documented as having a poor prognosis. The patient died on 4/18/20.


**PRELIMINARY AUTOPSY DIAGNOSIS:** Not available.

**FINAL AUTOPSY REPORT:** Not available.

**OPPORTUNITIES FOR IMPROVEMENT AND RECOMMENDATIONS FOR CORRECTIVE ACTION:**

1. The specialty log is inaccurately maintained. There was an apparent specialty visit documented on a transfer form for which there was no referral, no documentation on the

84

tracking log and no progress note documenting what occurred.  Follow up of specialty care visits are inaccurately documented on the tracking log.  Maintenance of the tracking log should be added to the root cause analysis of specialty care mentioned in other mortality reviews.

2.  A copy of the hospital report of 1/13/20 was not in the medical record.  The doctor documented that the patient had a deep vein thrombosis which resulted in treatment with warfarin, an anticoagulant.  Because the patient had a serious gastrointestinal bleed due to an ulcer previously, use of the anticoagulant placed the patient at risk.  Without reviewing the report from the hospital, the doctor started the patient on warfarin without assessing the risk in this patient with a prior gastrointestinal bleed.   Lack of obtaining hospital and consultation reports is a systemic problem within IDOC and needs to be corrected by management.

3.  A doctor saw the patient on 3/24/20 at about 8:30 am during a time when community transmission of COVID-19 was known to be occurring.  Yet when the patient had fever and hypoxia, the doctor failed to isolate or test for COVID-19.  This was a significant lapse in care and reflects lack of appropriate procedures and awareness of symptoms and signs that warrant isolation and testing.  Preparedness for the pandemic was lacking at this facility.   Providers and nurses should have been instructed on procedures for isolation and testing at this point in the pandemic, but this did not occur.  This resulted in a delay of almost a day, which may have contributed to the patient's death and did result in exposure of other inmates to potential infection.

4.  On 3/24/20 at 8:30 pm an LPN evaluated the patient and obtained a temperature of 104 with coughing, altered mental status, inability to walk, and "nodding off".  This red flag presentation represents a serious danger to the patient yet was not immediately addressed.  The patient was not isolated, immediately tested for COVID-19, or sent to a hospital.  This supports immediate hiring of sufficient RN staff so that LPNs are not in a position of independently assessing patients.  This resulted in a delay that may have contributed to the ultimate death of the patient and reflects on the poor preparation at this site.

**PATIENT 12 NOT PREVENTABLE**

**DATE OF REVIEW**:

**PATIENT:**

**DOC #:**

**DATE OF DEATH:** 4/13/20

**AGE:** 44

**DATE OF INCARCERATION:**

**SITE AT TIME OF DEATH:** Stateville Correctional Center

**PLACE OF DEATH:** St. Joseph Hospital

**CATEGORY OF DEATH:** Natural

**EXPECTED OR UNEXPECTED:** Unexpected

**CAUSE OF DEATH:** COVID 19

**MENTAL HEALTH DIAGNOSES:**

**MEDICAL DIAGNOSES:**
1. Eosinophilic colitis
2. Hypertension
3. Type 2 diabetes
4. Diabetic neuropathy
5. COVID-19

**IDOC PROBLEM LIST:**
Not available.   Problems listed on chronic illness visits include the following:
1. Diabetes
2. General Medicine (presumably hyperlipidemia)
3. Diabetic neuropathy

**MEDICATIONS AT FACILITY BEFORE TRANSFERRED TO HOSPITAL WHERE HE DIED:**
Last medication administration records from December 2019
<u>Pharmacy entries on medication administration record:</u>

1. Novolin R (10ML) 100U/ML INJ; inject 6 units SQ twice a day. Did not list whether KOP or DOT.
2. Simvastatin 20 MG tablet; take 1 ½ tablets by mouth at bedtime. Did not list whether KOP or DOT.
3. Atenolol 25 mg tablet; take 1 tablet by mouth daily. Did not list whether KOP or DOT.
4. Budesonide EC 3 mg/24 hour capsule; take 3 capsules by mouth daily x 30 days **Pack 4** Watch take. 12/17/29 to 1/15/20
5. Budesonide EC 3 mg/24 hour capsule; take 1 capsule by mouth daily x 30 days**Pack 3** Watch take. 11/17/19 to 12/16/19.
6. Lantus (10 ml) 100/ml injection; inject 60 units SQ at bedtime.
7. Nortriptyline 50 mg capsule; take 1 capsule by mouth at bedtime **Pack 2**.
8. Novolin R (10 ml) 100 U/ml injection; per sliding scale twice a day. [note the sliding scale was not indicated]

Nurse entries on medication administration record
1. "Pamelor 50 mg po QHS"; did not list whether KOP or DOT.
2. "Budesonide 3 mg po QD x 30 days; 9/16/19 to 12/16/19"; did not list whether KOP or DOT.
3. "Imodium 2 mg po BID x 90 days"; did not list whether KOP or DOT.
4. "glucose tabs #1 PRN (1-2/month)"; did not list whether KOP or DOT.
5. "Regular insulin 6 units SQ BID x 1 year".
6. "Regular insulin s/s SQ BID; 201-250- 2u; 251-300- 4u; 301-350-6 u; 351-400 8u; 401-450-10u; >450-12u call MD."
7. "Lantus insulin 60 units SQ hs x 1year."


**CASE SUMMARY**

This 44 year old with a history of hypertension, diabetes, and apparent diabetic neuropathy was seen in chronic clinic only twice in 2018 and was never seen in 2019. His A1c was 7.3 on 4/20/18, deteriorated to 13.2 on 2/28/19 and worsened to 14.9 on 4/10/19; and improved to only 12.1 (still very poor control) on 7/31/19; improved to 8.2 on 11/20/19 but deteriorated to 10.8 on 3/16/20. 10.8 is very poor diabetic control. This deterioration and very poor control occurred during a time period when the patient was not seen in chronic care clinic so only episodic efforts to manage his diabetes took place. This occurred during a time when the patient was on a high potency steroid for eosinophilic colitis. Steroid medication is known to worsen diabetic control. No monitoring for this occurred. During this time period the microalbumin was elevated indicative of diabetic nephropathy but was not treated. There was no evidence or examination verifying diabetic neuropathy. The patient also had three years of long-standing diarrhea, yet at chronic clinic evaluations there was no mention of this.

On 12/27/18 a colonoscopy was approved for a three year history of diarrhea. The colonoscopy was not performed until 4/2/19. The left colon showed focal colitis. The biopsy report showed eosinophilic colitis but was never obtained by the Stateville physician. The patient did not see the gastroenterologist in follow up until 6/17/19. The gastroenterologist stated that the biopsy result showed eosinophilic colitis and recommended budesonide, a potent steroid medication. The gastroenterologist recommended three months of budesonide with follow up colonoscopy in

three months. A hand-written referral form with comments by the consultant gave recommendations for medications. It was received presumably on the day of the consult but was not signed as reviewed until 9/13/19. A report of the visit was not received until 8/30/19 and was not dated when it was reviewed. On 6/30/19 a nurse saw the patient who complained of not having seen the doctor after his visit to UIC. A physician assistant saw the patient on 7/2/19 and noted that the patient had eosinophilic colitis. The physician assistant noted that a colonoscopy was recommended in three months and referred the patient for follow colonoscopy 7/2/19. But instead of colonoscopy the patient was referred for a gastroenterology clinic which visit did not occur until 12/9/19. Since steroids can make diabetes worse, it would be important to especially monitor the patient's diabetes while on a steroid medication, but the patient was not being seen in chronic clinic and his diabetes was not managed in other physician visits. At this visit on 12/9/19, the gastroenterologist recommended a colonoscopy in the next two weeks. The colonoscopy was originally recommended for September but by December it had not yet occurred. The patient still had symptoms of his disease. Although the gastroenterologist who saw the patient on 12/9/19 recommended colonoscopy in two weeks, it did not occur until 2/19/20, almost 10 weeks later. The gastroenterologist also recommended stopping the budesonide. This was a significant delay in initially obtaining a test and significant delays in follow up which resulted in extension of the steroid medication which resulted in worsened diabetes control, placing the patient at risk.

On 4/23/19 a doctor took a history of difficulty swallowing. The patient described intermittent inability to swallow solids but was able to swallow liquids. The doctor referred the patient for a CT of the neck, but this was denied on 5/2/19 by the vendor with an alternative treatment plan "to treat onsite". This was not expanded on with details regarding what treatment onsite meant.

An undated and unsigned note on a nurse protocol around March of 2020, based on the sequence of notes in the PDF file of the medical record, documented a couple days of cough and fever. Temperature was 100.8 with pulse 119 and oxygen saturation[32] of 94%.

The nurse who performed the evaluation gave the patient cough tablets, Tylenol and an antihistamine. The patient was not isolated, masked, or tested for COVID-19.[33] Despite vital signs warranting hospitalization, the patient was not even referred to a physician.

---

[32] Oxygen saturation is performed using a small handheld device inserted over a finger that uses spectrophotometry to measure color changes from hemoglobin to assess the amount of oxygen in the blood. UpToDate recommends that any person with an oxygen saturation <94% have an in person evaluation. We agree with that assessment. Because of the impossibility of isolation and difficulty in getting tests at this time, it is our opinion that hospitalization was warranted. When seen, UpToDate recommends a clinical evaluation of the patient's degree of dyspnea which is more closely related to developing acute respiratory distress syndrome and mortality. We note that the IDOC guidance for transfer to a hospital is now set at 92% which the Monitor believes is too low but with close monitoring may be acceptable. The Monitor, however, is not convinced that monitoring at the facilities is adequate.

[33] At this time diabetes was a known COVID-19 risk factor and his symptoms were consistent with COVID-19. Because of the risk to other patients, this patient should have been masked, isolated, and tested.

A subsequent physician note on 3/26/20 at 10:30 am documented that the patient had a temperature over 101 the day before and was sick for a week with fever and shortness of breath. The patient had oxygen saturation of 83% and temperature of 100.2. The doctor sent the patient to a hospital. A hospital report was not in the medical record. The patient died on 4/13/20 in the hospital.

**PRELIMINARY AUTOPSY DIAGNOSIS:** Not available

**FINAL AUTOPSY REPORT:** Not available

**OPPORTUNITIES FOR IMPROVEMENT AND RECOMMENDATIONS FOR CORRECTIVE ACTION:**

1. Chronic disease care for this patient was virtually non-existent. He was not seen in 2019. His eosinophilic colitis was not followed in chronic disease clinic. His diabetic neuropathy and nephropathy was not followed in chronic disease clinic. This is a systemic problem and should be part of a root cause analysis of the chronic disease program to result in establishing standardized policy and procedure for chronic care and in ensuring that appropriately credentialed physicians are available to evaluate and treat patients.

2. The patient had chronic diarrhea for three years before consultation with a gastroenterologist occurred. After it occurred physicians failed to monitor the recommendations of the gastroenterologist and recommended procedures (colonoscopy) were significantly delayed. A work-up and treatment that should have taken a few months took over a year to complete. The patient was not followed in chronic illness clinic or elsewhere for this condition (eosinophilic colitis) and the worsening diabetes, due to the steroid medication used to treat this disease, was not managed, resulting in worsening of his diabetes and placing the patient at risk. A doctor referred a patient for a CT scan for difficulty swallowing but this referral was denied without a clinically appropriate rationale. These problems with specialty referral should be part of a systemic root cause analysis of specialty care referral statewide to result in revised policies and procedures that ensure safe and clinically appropriate specialty care.

3. The patient had symptoms of COVID-19 which were unrecognized by a nurse. The patient was also not immediately isolated, tested for COVID-19, and not referred to a hospital despite symptoms and vital signs warranting referral to a hospital. This evidences lack of preparation and awareness and demonstrated inappropriate procedures to deal with COVID-19 that undoubtedly promoted spread within the facility.

**PATIENT 13 NOT PREVENTABLE**

**DATE OF REVIEW**:

**PATIENT:**

**DOC #:**

**DATE OF DEATH:** 4/20/20

**AGE:** 70

**DATE OF INCARCERATION:**

**SITE AT TIME OF DEATH**: Stateville Correctional Center

**PLACE OF DEATH:** Stateville Health Care Unit

**CATEGORY OF DEATH:** Natural

**EXPECTED OR UNEXPECTED:** Unexpected

**CAUSE OF DEATH:** COVID-19

**MENTAL HEALTH DIAGNOSES:**

**MEDICAL DIAGNOSES:**
1. Type 2 diabetes
2. Hypertension
3. Hyperlipidemia
4. COVID-19

**IDOC PROBLEM LIST:**
No problem list was in the record provided. The chronic clinic from 1/29/19 documented diabetes and high blood lipids.

**MEDICATIONS AT FACILITY BEFORE TRANSFERRED TO HOSPITAL WHERE HE DIED:**
Pharmacy entries on medication administration records:
1. Simvastatin 20 mg tablet; take 1 tablet by mouth at bedtime; not indicated if KOP or DOT.
2. Therapeutic shampoo (473 ML) 0.50% SHA; use weekly as directed; not indicated if KOP or DOT.
3. Lisinopril 5 mg tablet; take 1 tablet by mouth daily; not indicated whether KOP or DOT.

4. Metformin 500 mg tablet; take 1 tablet by mouth three times a day; not indicated whether DOT or KOP.
5. Muscle Rub (35 gm) cream; apply to affected areas every day; not indicated whether KOP or DOT.
6. Naproxen 500 mg tablet; take 1 tablet by mouth twice a day; not indicated whether DOT or KOP.
7. Novolin (10 ml) 100U/ml injection; inject 20 units SQ every morning and 40 units SQ every evening.
8. Aspirin 81 mg chewable; chew 1 tablet by mouth daily; not indicated whether KOP or DOT.
9. Calcium antacid 500 mg chewable; chew 2 tablets by mouth twice a day; not indicated whether KOP or DOT.
10. Citalopram 40 mg tablet; take one tablet by mouth at bedtime; not indicated whether KOP or DOT.
11. Dicyclomine 20 mg tablet; take 1 tablet by mouth three times a day as needed; not indicate whether KOP or DOT.
12. Glimepiride 4 mg tablet; take 1 tablet by mouth daily; not indicated whether DOT or KOP.
13. Glucose raspberry chew; chew 1 tablet by mouth as directed as needed (1-2 bottles /mo) not indicated whether KOP or DOT.

Nurse entries on medication administration records
1. "Celexa 40 mg po QHS x 6 months"; not indicated if KOP or DOT.
2. "NPH insulin 25 units SQ Q am". Note this was a different dosing than documented on the pharmacy entry. This inconsistency endured from January through March 2020.
3. "NPH insulin 40 units SQ Q hs".

**CASE SUMMARY**

The medication list above is from the medication administration records. From January through March 2020, MARs written by nurses shows different orders for insulin (NPH 25 units in the morning) when compared to a pharmacy initiated MAR (Novolin[34] N 20 units in the morning). Based on the two MARs it was not possible to tell which one was accurate. The nurse-written MAR was being used to document medication administration. If a doctor had changed the order, the pharmacy should have been informed. The pharmacy MAR had no documentation that this order wasn't current. The patient was on Lisinopril apparently for microalbumin, but this problem was not clearly documented as a problem in chronic clinic list.

A nurse saw this patient on 3/21/20 for body aches and feeling congested. The nurse used an upper respiratory infection protocol. The oxygen saturation was 98% with temperature 98.9.

---

[34] Novolin N is NPH insulin but the pharmacy and nurses wrote the name differently. The morning doses were different but unnoticed.

The nurse gave the patient Tylenol but did not refer the patient. Though the patient had symptoms consistent with COVID, the nurse did not refer for a COVID test [which had limited availability at the time], did not isolate the patient, did not mask the patient, and did not refer to a provider so that the patient could be referred for testing.[35]

On 3/26/20 a nurse again saw the patient using an upper respiratory infection protocol for symptoms of feeling tired, difficulty eating, cough, runny nose, shortness of breath, and fatigue. The temperature was 98.2, blood pressure 118/64, and oxygen saturation of 88% rising to 92% on another test. Remarkably, though the patient had symptoms of COVID-19, the nurse did not mask, isolate, or test the patient. But the nurse did refer to a provider in the health unit that day. However the doctor did not see the patient until the next day. The patient had dyspnea and low oxygen saturation and should have been admitted to a hospital promptly.

On 3/27/20 a doctor saw the patient at 7 pm. The respiratory rate was 24 and the oxygen saturation was 80% with a fever of 101.8. The oxygen saturation improved to 92% on 4 liters of oxygen. The doctor took a history of fever for 11 days with cough, runny nose, body aches, and shortness of breath for four days. The plan was to continue oxygen for two hours and then ween off to room air. The doctor did not document isolation or masking. At 8:35 pm a nurse saw the patient. The temperature was 101.7 with blood pressure of 92/53 and oxygen saturation of 84% on 6 liters of oxygen. The doctor ordered the patient to a hospital.

On 4/25/20 the patient was returned to the prison as a hospice patient. Before ambulance medics could place the inmate into a bed the patient experienced cardiac arrest and died.

**PRELIMINARY AUTOPSY DIAGNOSIS:** Not available

**FINAL AUTOPSY REPORT:** Not available

**OPPORTUNITIES FOR IMPROVEMENT AND RECOMMENDATIONS FOR CORRECTIVE ACTION:**

1. The medication administration records for three months demonstrate different orders for insulin for pharmacy versus nurse medication administration record entries. The pharmacy should be the "gold standard" for medication the patient is on. The pharmacy initiated MAR was not documented as not current. A root cause analysis of medication management should include discrepancies between pharmacy and nurse medication administration records and result in a standardized procedure for maintaining accurate medication administration records.
2. This patient was being treated for protein in his urine but this was not documented as a problem in the chart. A problem list was not in the record.

---

[35] At this time, despite limited testing supplies, patients should still have been masked, isolated, and monitored.

3. On 3/21/20 the patient had symptoms of COVID-19 which were unrecognized by a nurse. The patient was also not immediately isolated or tested for COVID-19. This resulted in spread of COVID-19 within the facility.

4. On 3/26/20 the patient had symptoms of COVID-19 which were unrecognized by a nurse. The patient was also not immediately isolated, tested for COVID-19, and not referred to a hospital despite symptoms and vital signs warranting referral to a hospital. This evidences lack of preparation and awareness and demonstrated inappropriate procedures to deal with COVID-19 that undoubtedly promoted spread within the facility. The referral to the doctor did not occur as directed by the nurse.

5. A doctor seeing the patient with obvious symptoms of COVID-19 and with life-threatening vital signs (dyspneic with oxygen saturation of 80% and fever 101.8) did not immediately send the patient to a hospital. This placed the patient at significant risk. The failure to mask or isolate the patient immediately placed others at risk for transmission of COVID-19. These errors evidence lack of preparation and awareness and demonstrated inappropriate procedures to deal with COVID-19 that undoubtedly promoted spread within the facility. These errors in management of transmissible disease should be part of a root cause analysis to prevent spread of the pandemic at other institutions.

6. Given the uncertainty involved with early treatment of COVID-19 it is difficult to conclude that earlier admission would have prevented the death. It is certain that the patient should have been masked, isolated, and tested immediately when symptoms were known.

**PATIENT 14 NOT PREVENTABLE**

**DATE OF REVIEW**:

**PATIENT:**

**DOC #:**

**DATE OF DEATH:** 4/20/20

**AGE:** 58

**DATE OF INCARCERATION:** Unknown

**SITE AT TIME OF DEATH:** Stateville Correctional Center

**PLACE OF DEATH:** Silver Cross Hospital

**CATEGORY OF DEATH:** Natural

**EXPECTED OR UNEXPECTED:** Unexpected

**CAUSE OF DEATH:** COVID-19

**MENTAL HEALTH DIAGNOSES:**

**MEDICAL DIAGNOSES:**
1. Non-Hodgkins lymphoma
2. Anemia
3. History of gastric ulcer
4. Diabetes
5. Post ventral hernia repair
6. Pulmonary embolism bilateral on long term anticoagulation
7. COVID-19

**IDOC PROBLEM LIST:**
There was no problem list in the record given to the Monitor. Based on three chronic clinic notes during 2019 the patient had only the following condition being followed in chronic disease clinics:

1. Diabetes

**MEDICATIONS AT FACILITY BEFORE DEATH:**
Pharmacy entries on the medication administration record the month of death:

None

<u>Nurse entries on the medication administration record the month of death:</u>
1. "xopenex HFA [2] puffs QID PRN x 2 months PRN". No indication whether KOP or DOT.
2. "Tylenol #3 1po BID x 90 days". No indication whether KOP or DOT.
3. "Trazadone 150 mg po Q HS x 35 days". No indication whether KOP or DOT.
4. "Neurontin 1200 mg po BID x 90 days". No indication whether KOP or DOT.
5. "Metformin 500 mg 1 po BID x 90 days". No indication whether KOP or DOT.
6. "Coumadin 11 mg po Q HS x 90 days". No indication whether KOP or DOT.
7. "Lantus insulin 12 units SQ in am @ 9 am x 90 days".
8. "Regular insulin SQ BID per sliding scale BID x 90 days: 201-250=2u; 251-300= 4u; 301-350=6u; 351-400=8u; 401-450=10u; >450=12u call MD".
9. "oxygen via NC 4 L". No timeframe given
10. "oxygen via nc PRN at 2L for SPO2 <92% till off isolation on 4/2/20".
11. "Azithromycin 250 mg tab; give [2] tabs on day #1 then azithromycin 250 daily x 4 days".

## CASE SUMMARY

This was a 58 year old man with a significant history of non-Hodgkin's lymphoma that was in apparent recent remission. He had diabetes, anemia, a prior gastric ulcer, diabetes, and previous bilateral pulmonary emboli related to his malignancy for which he was on long-term anticoagulation. He was being followed in chronic clinic only for his diabetes. He was being seen episodically and erratically for his other conditions. About a quarter of the time over two years, his anticoagulation was not in control. Because of the poor follow up of persons on anticoagulation in chronic disease clinic IDOC should shift to direct oral anti-coagulant (DOAC) medications as failure to monitor warfarin appears to be a systemic problem. The non-Hodgkin's lymphoma was not being followed except by consultants. There was no evidence in the medical record provided to the Monitor of chronic care visits in 2018. In 2019, the patient was seen in April, August, and December. The patient was seen only for diabetes. The only medication mentioned by the doctor was Lantus insulin and regular insulin. The doctor appeared unaware that the patient was on metformin. The notes were mostly illegible, and little was written. Beginning in July of 2019 the patient's A1c decreased to 5.6 then decreasing to 5.4 in November of 2019. The doctor appeared unaware and wrote that control was "good". Because this was a low A1c and the patient was on two medications, this was unsafe medication management and medication should have been decreased particularly at his age. This was very poor, disorganized, unsafe and clinically inappropriate chronic disease care.

The medication administration records were written by nurses in non-standardized format that is unsafe. The pharmacy should produce the medication administration records except for single doses until a pharmacy label can be provided.

On 3/28/20 a nurse saw the patient for symptoms of a cold for 5 days. The patient had lymphoma, pulmonary emboli, diabetes and was therefore very high risk. The temperature was 99.9, pulse 109 and oxygen saturation 94%. A thorough history was not taken. The nurse did not refer the patient, did not mask the patient, did not refer the patient for COVID-19 testing and

gave the patient Tylenol and sent him back to his housing unit. This was inappropriate at this juncture and evidenced lack of proper procedure for managing potential COVID-19 cases and promoted spread of this infection.

The following day a physician sent the patient to a hospital. An emergency reporting form documented that the patient had cough, fever (102), respiratory rate of 28 with oxygen saturation of 91% with shortness of breath. The patient was not tested until hospitalized, so it is likely that the patient was actively transmitting infection prior to hospitalization.

Because the local hospital was filled, the hospital was on diversion and the patient was sent to a hospital in Morris, Illinois. The patient spent two days in the hospital and the oxygen saturation improved to 95-98% and the patient was deemed stable and discharged with recommendation to continue quarantine. The patient developed mild chronic kidney disease (GFR of 44) as noted in the hospital record.

The patient was sent back to Stateville on 4/1/20. A doctor saw the patient on return from the hospital. The patient's temperature was 104.5 and the oxygen saturation was 88%. This warranted immediate return to the hospital. Instead the doctor ordered an antibiotic for four days, oxygen and a beta agonist inhaler. This was a very poor clinical decision and placed the patient at significant risk of harm. Treating the patient with an antibiotic when the patient had COVID-19 may have been precautionary, but most likely the hypoxia was due to COVID-19 and the patient needed respiratory support, not an antibiotic as antibiotics are not effective against viruses.

The next day, 4/2/20 the patient had fever of 101.4 with oxygen saturation of 94% on 1.5 liters of oxygen. A doctor saw the patient but still did not send the patient to a hospital.

On 4/3/20 neither a nurse nor a doctor documented a note evidencing seeing the patient.

On 4/4/20 the patient had oxygen saturation of 85% on room air. The nurse did not notify a physician and a physician did not see the patient that day. Later the patient had oxygen saturation of 85% on 4 liters of oxygen. The patient should have been immediately sent to the hospital. The nurse documented that the doctor would be notified but there was no evidence of this occurring. The patient had a temperature of 104 with respiratory rate of 28 with oxygen saturation of 88% on 2 liters. The nurse documented increasing oxygen to 4 liters. Even though the patient's condition was clearly deteriorating the nurse did not contact a provider.

The next evening the patient had oxygen saturation of 86% and blood pressure of 93/72 consistent with shock. The nurse failed to recognize that this was a life threatening presentation and took no action.

On day six after admission to the infirmary, the patient was short of breath and weak. The nurse described the patient as able to respond to his name but unable to follow commands. His blood pressure was 81/40 and respiratory rate was 22 with pulse of 129 and oxygen saturation of 79%

on 4 liters of oxygen.  It was only at this point that the nurse called a doctor who ordered the patient sent to a hospital.

The patient died 14 days later in the hospital.  This patient should have been hospitalized rather than placed in the infirmary initially. The patient's altered renal function was not followed up diagnostically. The patient's condition deteriorated over a six day period. Nurses did not contact the physician about the patient's abnormal vital signs or symptoms of deterioration until the patient was gravely ill. No physician saw the patient after admission to the infirmary.

**PRELIMINARY AUTOPSY DIAGNOSIS:**  Not available

**FINAL AUTOPSY REPORT:** Not available

**OPPORTUNITIES FOR IMPROVEMENT AND RECOMMENDATIONS FOR CORRECTIVE ACTION:**

1. This patient was not documented as ever being seen for his non-Hodgkin's lymphoma, pulmonary embolism, anticoagulation, anemia, or gastric ulcer in his chronic illness clinics even though he was on medication for some of these conditions.  The root cause analysis of chronic illness clinic should include why patients are not being followed for all of their chronic illnesses in chronic disease clinics.
2. The management of his anticoagulation was episodic and disconnected to regular chronic disease clinics.  Because of this DOAC medications should be used for patient safety reasons.
3. The doctor, during chronic disease clinics for diabetes, failed to be aware that the patient was on metformin along with insulin and did not appear to realize that a hemoglobin A1c of 5.4 was potentially dangerous on the medication levels provided to this patient.  A root cause analysis of the chronic care program should attempt to determine why this occurs and provide corrective action as this is dangerous and unsafe for patients.
4. Nurse written medication administration records are non-standardized and are unsafe for patients.  A root cause analysis of the medication process should be done to determine a standardized method of ensuring that medication administration records are produced by the pharmacy.
5. On 3/28/20 the nurse failed to recognize COVID-19 symptoms and failed to isolate and mask the patient.  This evidences lack of preparation and awareness and demonstrated inappropriate procedures to deal with COVID-19 that undoubtedly promoted spread within the facility.  Training should occur to prevent this in the future.
6. When the patient returned to the prison from Morris Hospital, the patient was critically ill and should have immediately returned to the hospital.  The physician made a critical error that placed the patient at life-threatening risk.  A peer review should be conducted.
7. The patient spent six days on the infirmary, but a physician only saw the patient for the first two days.  The patient was critically ill through all of the infirmary stay yet was not receiving care appropriate for his condition.  The nurses documented a status consistent with a critically ill patient and a patient in shock the final two days of the infirmary admission.  The patient

appeared to be abandoned by physicians.  Management should perform an analysis to determine if they have provided adequate staffing levels.  A peer review should also be done.

**PATIENT 15 NOT PREVENTABLE**

**DATE OF REVIEW**:

**PATIENT:**

**DOC #:**

**DATE OF DEATH:**  4/7/20

**AGE:** 67

**DATE OF INCARCERATION:**   Unknown

**SITE AT TIME OF DEATH**: Stateville

**PLACE OF DEATH:** St. John's Medical Center

**CATEGORY OF DEATH:**   Natural

**EXPECTED OR UNEXPECTED:**  Unexpected

**CAUSE OF DEATH:**  COVID-19

**MENTAL HEALTH DIAGNOSES:**

**MEDICAL DIAGNOSES:**
1. Asthma
2. Hypertension
3. Type 2 diabetes
4. Hyperlipidemia

**IDOC PROBLEM LIST:**
None in record sent to Monitor.  The following is based on chronic illness records.
1. Hypertension
2. Diabetes

**MEDICATIONS AT FACILITY BEFORE TRANSFERRED TO HOSPITAL WHERE HE DIED:**

The last medication administration record received was from September of 2020.
Pharmacy entries on medication administration record:
1. Aspirin 81 mg chewable; chew 1 tablet by mouth daily.  Not indicated whether KOP or DOT.

2. Furosemide 40 mg tablet; take 1 tablet by mouth at bedtime. Not indicated whether KOP or DOT.
3. Lisinopril 40 mg tablet; take 1 tablet by mouth daily. Not indicated whether KOP or DOT.
4. Metformin 500 mg tablet; take 1 tablet by mouth daily. Not indicated whether KOP or DOT.
5. Minerin (454 gram) cream; apply every day. Not indicated whether KOP or DOT.
6. Moisturizing Lotion (Lucky) No Pump Lot; apply to affected areas as directed (1 bottle /month). Not indicated whether KOP or DOT.

Nurse entries on medication administration record:
1. "70/30 insulin 45'n' SQ Q am".
2. "70/30 insulin 35 'n' SQ Q pm".

## CASE SUMMARY

The 67 year old was evaluated 8 times in chronic clinic over two years. These clinics address only some diseases and not all of the patient's conditions. The goal blood pressure used for hypertension in IDOC appears higher than the currently accepted standard of 140 systolic. This patient had systolic blood pressures of 140, 147, and 162 which were considered good control in this person with diabetes and did not result in medication adjustment. The patient had a blood pressure at one visit that was 162/84 and it was retaken and was 145/78 which was apparently considered good control as no adjustment was made. These are not appropriate goal blood pressures especially for a person with diabetes. The patient had elevated microalbumin and was appropriately on Lisinopril. Though the patient had diabetes for over 20 years, there was no assessment for neuropathy. The patient had an examination by an optometrist but did not appear to have been examined for retinopathy. On the optometry examination, the optometrist listed hypertension but not diabetes as medical problems. The chronic illness notes were mostly illegible and did not appear to include vaccinations or foot examinations.

On 3/31/20 a nurse saw the patient for difficulty urinating. The patient had fever (102) and the oxygen saturation was 75%. The nurse masked the patient and referred the patient to the health unit. At the health unit the pulse was 123; blood pressure 147/106; temperature 101 and oxygen saturation of 93% on 2 liters of oxygen. The patient was sent to the hospital where the patient died, apparently of COVID-19.

## PRELIMINARY AUTOPSY DIAGNOSIS:

## FINAL AUTOPSY REPORT:

## OPPORTUNITIES FOR IMPROVEMENT AND RECOMMENDATIONS FOR CORRECTIVE ACTION:

1. Goal blood pressures are somewhat dependent on the underlying conditions of the patient. In this patient the goal blood pressure was inappropriate for his condition and should have been lower than what was being used. In a root cause analysis of chronic clinic process, how to take blood pressure and goal blood pressures should be evaluated.

2. The patient did not receive standard of care for persons with diabetes.  Specifically, the evidence for vaccinations, foot examinations, eye examinations, and assessment for neuropathy were not evident.  The illegibility of the note was also an issue.

**PATIENT 16 NOT PREVENTABLE**

**DATE OF REVIEW**:

**PATIENT:**

**DOC #:**

**DATE OF DEATH:** 4/9/20

**AGE:** 78

**DATE OF INCARCERATION:** Unknown

**SITE AT TIME OF DEATH:** Stateville

**PLACE OF DEATH:** St. Joseph Medical Center

**CATEGORY OF DEATH:** Natural

**EXPECTED OR UNEXPECTED:** Unexpected

**CAUSE OF DEATH:** COVID-19

**MENTAL HEALTH DIAGNOSES:**

**MEDICAL DIAGNOSES:**
1. Type 2 diabetes
2. Hypertension
3. High blood lipids
4. Prostatic hypertrophy
5. 'COVID-19

**IDOC PROBLEM LIST:**
No problem list in record provided. List obtained from chronic care notes.
1. Diabetes
2. Hypertension
3. High blood lipids
4. Prostatic hypertrophy

**MEDICATIONS AT FACILITY BEFORE TRANSFERRED TO HOSPITAL WHERE HE DIED:**

Pharmacy entries on medication administration record:

1. Simvastatin 10 mg tab; take 1 tablet by mouth at bedtime.  No indication whether DOT or KOP.
2. Novolin R (10 ml) 100U/ml injection; inject SubQ per sliding scale protocol.  Protocol not provided.
3. Novolin (10 ml) 70/30 injection; inject 15 unites SubQ at bedtime.
4. Moisturizing lotion fresh scent no pump; apply every day.  No indication whether DOT or KOP.
5. Therapeutic Shampoo (437 ml) 0.5% shampoo; use weekly.  No indication whether DOT or KOP.
6. Verapamil ER 240 mg tablet; take 1 tablet by mouth daily.  No indication whether DOT or KOP.
7. Lisinopril 2.5 mg tablet; take 1 tablet by mouth daily. No indication whether DOT or KOP.
8. Glucose Raspberry Chew; chew 1 tablet by mouth as needed (1-2 bottles/month).  No indication whether DOT or KOP.
9. Glimepiride 4 mg tablet; take 1 tablet by mouth daily.  No indication whether DOT or KOP.
10. Finasteride 5 mg tablet; take 1 tablet by mouth daily.  No indication whether DOT or KOP.
11. Docusate sodium 100 mg capsule; take 1 capsule by mouth twice a day.  No indication whether DOT or KOP.
12. Aspirin 81 mg chewable; Chew 1 tablet by mouth daily. No indication whether DOT or KOP.

Nurse entries on medication administration record

1. "70/30 insulin 15 units SQ QHS".
2. "Regular insulin S/S SQ QHS; 201-250 =2u; 251-300=4u; 301-350= 6u; 351-400=8u; 401-450=10u; >450=12 units & call MD".


**CASE SUMMARY**

This 78 year old patient had diabetes, hypertension, and prostatic hypertrophy.  On 3/26/20 at 3 am an LPN saw the patient for new back pain.  He complained of weakness and pain and when he sat up was "shaky" and "unstable in a sitting position".  The temperature was 100.8 and the oxygen saturation was 89%.  The LPN did not take a thorough history and the nursing assessment was generalized weakness.  The patient was not isolated or tested and the nurse plan was to speak with the doctor in the morning "about how to proceed".  The patient should have been immediately masked, isolated, and tested for COVID-19.  Because the oxygen saturation was low, the patient should have been sent to a hospital.

The following day on 3/27/20 at 11 am a physician assistant saw the patient and noted that the temperature was 97.5 but the oxygen saturation was 88%.  The physician assistant documented productive cough since 3/11/20 after a visit with his brother who worked at a hospital.  The patient had poor appetite and diarrhea.  The patient's skin was tenting, and the assessment was dehydration and weakness with type 2 diabetes.  The plan was to test for COVID-19, oxygen, IV fluids, an influenza test, and call one of the doctors.  The patient was not specifically isolated or masked.  The physician assistant initially wrote to send the patient to the emergency room but scratched this out.  The test was done on this date and was positive.

Two hours later at 1 pm the physician assistant wrote a brief note documenting that the patient had rales in his lungs, that he spoke with the Medical Director and the patient was sent to a hospital where he died on 4/9/20.

**PRELIMINARY AUTOPSY DIAGNOSIS:**

**FINAL AUTOPSY REPORT:**

**OPPORTUNITIES FOR IMPROVEMENT AND RECOMMENDATIONS FOR CORRECTIVE ACTION:**

1. LPNs consistent with the Consent Decree should not be performing independent assessments. In this case, the nurse should have masked, isolated, and arranged for testing for COVID-19. This evidences lack of preparation and awareness and demonstrated inappropriate procedures to deal with COVID-19 that undoubtedly promoted spread within the facility. Training should occur to prevent this in the future.
2. The physician assistant seeing the patient also seemed unaware of a procedure for COVID-19, demonstrating lack of preparation. The patient should have been immediately masked and isolated. This did not initially occur. This reflects on the facility Medical Director involvement in oversight of staff.

**PATIENT 17**       **NOT PREVENTABLE**

**DATE OF REVIEW**:

**PATIENT:**

**DOC #:**

**DATE OF DEATH:** 4/15/20

**AGE:** 57

**DATE OF INCARCERATION:**   Unknown

**SITE AT TIME OF DEATH:**  Stateville

**PLACE OF DEATH:** St. Joseph Medical Center

**CATEGORY OF DEATH:**   Natural

**EXPECTED OR UNEXPECTED:**  Unexpected

**CAUSE OF DEATH:**  COVID-19

**MENTAL HEALTH DIAGNOSES:**

**MEDICAL DIAGNOSES:**
1. Coronary artery disease
2. Prior coronary artery stents (2) in 2016
3. Prior carotid endarterectomy L
4. Hypertension
5. Hyperlipidemia
6. COVID-19

**IDOC PROBLEM LIST:**
Based on chronic illness records as no problem list in record.
1. Hypertension

**MEDICATIONS AT FACILITY BEFORE TRANSFERRED TO HOSPITAL WHERE HE DIED:**

Pharmacy entries on medication administration record:
1. Simvastatin 20 mg tablet; take 1 tablet by mouth at bedtime.  Did not indicate whether KOP or DOT.

2. Methocarbamol 750 mg tablet; take 2 tablets by mouth twice a day. Did not indicate KOP or DOT.
3. Loratadine 10 mg tablet; take 1 tablet by mouth daily. Did not indicate whether KOP or DOT.
4. Clopidogrel 75 mg tablet; take 1 tablet by mouth daily. Did not indicate whether KOP or DOT.
5. Aspirin 325 mg tablet; take 1 tablet by mouth daily. Did not indicate whether KOP or DOT.
6. Amlodipine BES 10 mg tablet; take 1 tablet by mouth daily. Did not indicate whether KOP or DOT.
7. Acetaminophen 500 mg tablet; take 2 tablet by mouth twice a day. Did not indicate whether KOP or DOT.

Nurse entries on medication administration record:
1. "Plavix 75 mg [1]po Q am; Watch take".
2. "Triamcinolone 0.1% cream AAA BID PRN". Not indicated whether KOP or DOT.

## CASE SUMMARY

The patient was evaluated four times in chronic clinic over two years. All of the patient's problems were not listed at each clinic. Hypertension was listed at each clinic, but documentation did not verify that any of the other patient conditions were addressed. In part, the illegibility and extreme brevity of the note did not inform well. The history of the patient's coronary artery disease, carotid artery disease, or stents was not taken so it was not clear at any clinic, what the progress was. The chronic clinic forms did not promote understanding of the progress of the patient's condition. Medication management was not addressed. On 10/10/19 the blood pressure was 146/86 but was listed as good control. This is not a good goal for blood pressure. All of the patient's diseases need to be addressed in the history, examination, assessment, and therapeutic plan but did not occur for this patient.

On 3/23/20 at 9 AM a nurse saw the patient for nausea and documented on a nurse protocol sheet that the patient had cough, chills, and diarrhea for a week. The patient was concerned about COVID saying he was having emotional stress from "this virus". The blood pressure was 92/68 and temperature 99.8 with pulse of 96. An oxygen saturation was not taken. Though the patient had a history of high blood pressure and now had hypotension the nurse did not call a physician and gave the patient Pepto-Bismol and CTM. Though the patient had red-flag symptoms consistent with COVID-19 and mentioned this to the nurse, the nurse failed to consider this diagnosis. The patient's symptoms were consistent with COVID-19, yet the patient was not masked, isolated, and tested for COVID-19. This was likely to result in greater transmission of the virus.

On 3/25/20 a doctor saw the patient at 11:05 am for 10 days of cough, nausea, dizziness, and fever. The BP was 128/86 with pulse 117, temp 100.6 and oxygen saturation of 87%. The doctor noted no sore throat and no stuffy nose. The patient said he had not been able to eat or keep fluids down for days and was short of breath. The doctor repeated a temperature, and it was 100. The doctor obtained a negative FOBT and a negative flu test and diagnosed viral syndrome and ordered a COVID test, IV fluid and oxygen. Zofran was given. The COVID test was subsequently positive. Because of symptoms consistent with COVID-19 and an oxygen

saturation of 87%, this patient should have been sent to a hospital but was not. It was unclear if the patient was isolated.

On 3/25/20 at 6:10 pm a doctor noted that the patient had received 2 liters of IV fluid. The patient had oxygen saturation of 90-91% on 2 liters of oxygen. The doctor's plan was to keep the patient on the health care unit on oxygen and continue IV fluid. He ordered vital signs every two hours, but the medical record did not document completion of these vital signs. The patient needed to be isolated and it was not clear that this was done. The patient should have been transferred to a hospital as the doctor did not have the support (immediate imaging, diagnostic, and laboratory) to monitor the patient.

On 3/26/20 at 12:30 am a nurse saw the patient whose BP was 121/77 with pulse of 108 and fever of 101. The nurse gave the patient Tylenol and continued fluid and oxygen. The nurse documented oxygen saturation of 89% and increased oxygen to 4 liters but did not call a doctor. The patient had red-flag vital signs and the nurse should have called a doctor. This is a systemic problem within IDOC. The patient should have been admitted to a hospital.

At 3/26/20 at 6 am a nurse documented that the patient had oxygen saturation of 92% on 4 liters with temp 97.5, pulse 92. A respiratory rate was not taken. At 8:30 am a doctor saw the patient who had oxygen saturation of 88% on room air and was "still coughing and nauseated". The patient had rales. The doctor finally sent the patient to the hospital.

At the hospital, the history was that the patient had 10-12 days of feeling sick with shortness of breath, cough, loss of appetite, nausea, vomiting and diarrhea. The doctor noted that the patient was coming from Stateville where two people had been diagnosed with COVID. The patient had oxygen saturation of 84% on room air and needed 15 liters on a specialized oxygen administration unit, the pulse was 146, temperature 101.5 and blood pressure 210/117. The initial chest film showed scattered areas with confluent sites of ground glass opacity bilaterally highly suspicious for multifocal pneumonia. The patient required intubation on arrival. The patient died on 4/15/20.

**PRELIMINARY AUTOPSY DIAGNOSIS:** Not available

**FINAL AUTOPSY REPORT:** Not available

**OPPORTUNITIES FOR IMPROVEMENT AND RECOMMENDATIONS FOR CORRECTIVE ACTION:**

1. A root cause analysis of the chronic disease program should be undertaken to ensure that at each clinic every problem is addressed with a history, examination, assessment, and plan.
2. A nurse failed to recognize symptoms of COVID-19 resulting in failure to act clinically appropriately to isolate and properly refer a patient with symptoms of COVID-19. This undoubtedly resulted in risk of transmission of the virus.
3. A root cause analysis of management of vital signs should be done to establish procedures for addressing abnormal vital signs.
4. A doctor saw the patient twice and kept the patient on the health unit with vital signs that placed the patient at risk of harm. The patient should have been transferred to a hospital at

the first physician visit and demonstrates a need for benchmark vital signs (especially oxygen saturation) that warrant hospitalization.  This may have contributed to the deterioration of the patient.

**PATIENT 18 PREVENTABLE**

**DATE OF REVIEW**:

**PATIENT:**

**DOC #:**

**DATE OF DEATH:** 1/11/20

**AGE:** 57

**DATE OF INCARCERATION:**  3/22/18

**SITE AT TIME OF DEATH**:  Sheridan

**PLACE OF DEATH:** Valley West Hospital

**CATEGORY OF DEATH:**   Natural

**EXPECTED OR UNEXPECTED:**  Expected

**CAUSE OF DEATH:**  Metastatic Cancer

**MENTAL HEALTH DIAGNOSES:**

**MEDICAL DIAGNOSES:**
None identified in IDOC
1.     Poorly differentiated metastatic cancer

**IDOC PROBLEM LIST:** Though the patient was admitted on 3/22/18 the problem list was not started until 4/5/18.
1. NKDA
2. R/O PUD [peptic ulcer disease]
3. Substance abuse
4. Chart reviewed upon intake @ Sheridan
5. Last Physical 4/5/18
6. Physical completed at Sheridan
7. Problem list reviewed and updated
8. Liver CA [with] mets to lung and esophagus
9. Lg tumor L lung near heart

**MEDICATIONS AT FACILITY BEFORE TRANSFERRED TO HOSPITAL WHERE HE DIED:**

Nurse entries on medication administration record:
1. "Eucerin cream sss qd x 3 mo"; KOP or DOT not indicated.
2. "Colace 100 mg po BID x 3 mo"; KOP or DOT not indicated.
3. "Ativan 1 mg po BID prn x 1 mo"; KOP or DOT not indicated
4. "Fentanyl 75 mg[word illegible] [1] patch Q 3rd day x 30 days".
5. "Morphine 15 mg po Q 4[hours] PRN pain x 30 days".
6. "Ativan 2 mg PO or IM Q 6 [hours] PRN anxiety x 5 days".
7. "Alb nebs Q 4[hours] PRN x 2 weeks".

## CASE SUMMARY

The patient was admitted to NRC on 3/22/18. At that time only a peptic ulcer was listed as a problem. The patient was transferred on 4/9/18 from NRC to Sheridan. The transfer summary listed "R/O PUD" or rule out peptic ulcer disease as the only diagnosis. This was not a diagnosis and if NRC thought that a peptic ulcer was a consideration, an endoscopy should have been ordered to determine whether the patient had a peptic ulcer. The patient was never evaluated for peptic ulcer.

The patient presented with significant complaints for over a year and a half that were never worked up. There were multiple failures to adequately evaluate the patient's complaints such that one could watch the natural history of the patient's cancer evolve over time without intervention.

- On 5/2/18 the patient stated he had a history of stomach ulcer and requested a colonoscopy. The nurse practitioner scheduled an appointment to evaluate the patient.
- On 5/8/18 a nurse practitioner saw the patient who gave a history of epigastric pain since age 18 that caused him to "double over" with nausea. The patient said Prilosec helped but he had never been checked for an ulcer. The nurse practitioner ordered an H pylori test but did not order an endoscopy which was indicated.
- On 5/23/18 the patient complained again of epigastric pain. The H pylori test was negative. The nurse practitioner only ordered Prilosec but did not order endoscopy. This should have been done. There was no follow up.
- On 8/14/18 a doctor ordered a chest x-ray in evaluation of a positive tuberculosis skin test.
- On 8/15/18 an x-ray showed opacity along the left heart border indicating a possible infiltrate in the left upper lobe. Underlying COPD was documented by the radiologist. There was not timely follow up of this abnormal x-ray. Given the history of 90 pack year of smoking, a CT scan was indicated because the patient was over 55 and had a significant history of smoking and had an abnormal x-ray without fever. [36] On 9/4/18 a

---

[36] The US Preventive Services Task Force recommends (B recommendation) annual screening for lung cancer with low-dose CT scan in adults 55-80 who have a 30 pack year smoking history even if they are not currently smoking. This man had a 90 pack year history of smoking, had an *abnormal symptom* of chest pain and had an *abnormal chest x-ray*. Chest x-rays are not recommended to screen for lung cancer. A comparison of chest x-ray with CT scan

doctor saw the patient who assessed COPD and ordered inhalers for "severe COPD" but did not order pulmonary function testing or other imaging. Another chest x-ray was ordered in one month. Follow up in six weeks was ordered but did not occur. The patient was not enrolled in chronic clinic.

- On 10/3/18 despite no clinical note, another x-ray was done as a follow up. The x-ray documented significant decrease in lung opacity with a faint residual density. A follow up x-ray was recommended.

- On 10/9/18 a different provider saw the patient for shortness of breath. The patient had a long history of smoking. The blood pressure was 145/85. Labs were checked. The cholesterol was 212, HDL 45, and LDL 141. The ten year risk of cardiovascular disease or stroke was 16.4% and aspirin, a moderate-high intensity statin and blood pressure medication are indicated. The doctor started aspirin, a low intensity statin and a blood pressure medication. The doctor noted wheezing and scheduled the patient for chronic illness clinic and advised the patient to exercise. A CT scan was indicated but not done. The shortness of breath was not addressed. There was no evidence that the patient was ever seen in chronic clinic as there were no chronic clinic notes in the medical record sent to the Monitor.

- On 11/29/18 a doctor saw the patient in follow up of the 8/14/18 positive tuberculosis skin test. The doctor ordered another x-ray, but the x-ray was not completed.

- On 1/8/19 a nurse saw the patient for recurrent epigastric pain radiating to his chest. The nurse took a history of blood on the toilet paper, so the patient had abdominal pain with rectal bleeding. The patient said the pain increased if he didn't eat. His weight was 235. Endoscopy was indicated. The patient said, "I'm scared I have an ulcer". The nurse referred the patient to a physician for persistent epigastric pain. Epigastric and chest pain in a patient with rectal bleeding warrants a CT scan and endoscopy promptly. Neither was done. The weight at this clinic was the maximum weight for this patient who consistently lost weight after this point.

- On 1/11/19 a doctor saw the patient for "yet another c/o reflux and ineffective prilosec". The patient's complaint of abdominal pain was presumed to be reflux without having performed a diagnostic evaluation. The history was very brief and not complete. The doctor ordered antacids for 2 months and continued Prilosec. The patient now had abdominal pain for about 8 months. The doctor's reaction in presuming a diagnosis before an adequate diagnostic evaluation was done was unprofessional. The patient had eight months of abdominal pain yet received no diagnostic intervention. Endoscopy and CT scan were indicated. After this visit the patient was evaluated twice in chronic clinic but his "reflux" disease was not addressed except that the patient asked for a refill of the omeprazole in the 10/4/19 clinic visit.

- In March 2019 medications were renewed but there was no associated note. There were no chronic clinic visits for this patient.

- On 6/27/19 a doctor re-ordered a chest x-ray, and it was completed the same day. The doctor did not see the patient. The x-ray showed stable scarring in the left lung.

showed a significant mortality benefit utilizing CT scanning vs. routine radiograph and CT scan is significantly more sensitive in screening for cancer. In this case, CT scan was clearly indicated.

- On 7/2/19 a doctor noted that the x-ray report was unavailable and rescheduled an appointment with the report.
- On 7/11/19 the weight was 222 or a 13 pound weight loss over about 6 months. A different doctor saw the patient for follow up of the x-ray and noted the results. The doctor did not ask the patient about his chest pain and took no history. There was no physical examination. CT scan and endoscopy were indicated yet not done.
- On 10/14/19 a nurse saw the patient for chest pain and shortness of breath which was documented on two separate protocol forms. The nurse documented that the patient had these symptoms for a month, but the patient actually had chest pain for at least ten months. The patient said cold air "takes his breath away". The patient had shortness of breath and gave a history of smoking. The patient had coughing. The peak flow was 150. The nurse documented notifying the doctor, but no action was taken. The nurse instructed the patient on use of his inhaler that had been prescribed for presumptive COPD. The weight was 220 pounds or a 15 pound weight loss that was unrecognized. The patient should have received a CT scan and or a pulmonary consultation.
- On 10/18/19 a doctor saw the patient after an allergic reaction which had resolved. The doctor noted that the patient complained of difficulty breathing. The doctor took no history except that the patient was having difficulty breathing and had coughing. The doctor documented no rhonchi and rales and diagnosed URI. No action was taken except to order antihistamine. The weight was 212 which was a 23 pound weight loss which was unnoticed over nine months. Persistent cough, shortness of breath and weight loss warranted a CT scan, yet it was not done.
- On 10/28/19 a nurse saw the patient for an upper respiratory infection. The patient complained of cough for about a month. The patient weighed 210 which was a 25 pound weight loss which was unnoticed. The patient's cough was documented as productive of green sputum which according to the written protocol instructed the nurse to contact a physician. The nurse did not follow the protocol and instead gave the patient cough tablets and advised drinking water.

- On 11/8/19 a doctor saw the patient for follow up of the prior allergic reaction. The weight was 211 which was a 24 pound weight loss which was unnoticed. The doctor noted that the patient had coughing for "2-3 weeks" and documented a history of smoking 2 packs of cigarettes a day for 45 years. The doctor documented that the patient was afebrile. The patient had shallow inspirations and reduced expiratory effort and the doctor presumed these were due to emphysema. The doctor ordered a chest x-ray and diagnosed bronchitis. Chest x-ray has low sensitivity for lung cancer. The patient had weight loss, cough, smoking history, and difficulty breathing. CT scan was indicated but not done. On 11/12/19 a nurse saw the patient for shortness of breath and coughing. The nurse notified a doctor who the nurse documented as at the patient's bedside, but the doctor took no action and documented no note. There were no orders and no follow up ordered.
- The chest x-ray was done on 11/13/19 and showed an increased opacity in the left upper lobe representing possible pneumonia with haziness in the perihilar region indicating possible lymphadenopathy. A CT scan was recommended by the radiologist but not done.

112

- On 11/13/19 a doctor admitted the patient to the infirmary for pneumonia and started clindamycin. The doctor noted that the patient was afebrile and except for cough and no fever, there was no history. Lack of fever is inconsistent with the diagnosis of pneumonia. The nurse had previously documented a weight of 208 or a 27 pound weight loss which was unrecognized. The doctor did not order a CT scan or any laboratory tests that might have confirmed either pneumonia or another diagnosis. This physician lacks credentials required in item III.A.2 of the Consent Decree and action has been recommended with respect to III.A.3 of the Consent Decree. No action has been taken to date.
- A doctor saw the patient on 11/15/19 and noted that the patient had coughing without fever and an abnormal x-ray. The doctor stopped the clindamycin because the patient developed a rash on the clindamycin. This allergic reaction is not listed on the problem list or any subsequent medication administration record. The doctor ordered a CBC and sputum culture. The doctor started Augmentin. CT scan was indicated but not done.
- The patient remained on the infirmary and had continued coughing sometimes with production of blood stained sputum and wheezing. Oxygen saturation was 94% on 11/16/19 and 11/19/19 and the physician was not contacted. On 11/17/19 the patient reported that he vomited during the night. Later that day a nurse gave Pepto-Bismol and antacids for the patient per protocol but did not document a history and examination using the protocol. The nurse also did not contact the physician about this change in the patient's condition.

- On 11/18/19 a physician assistant saw the patent on rounds but did not address recent GI issues or other symptoms documented the previous three days and continued the plan of care unchanged. On 11/19/19 the patient complained to a nurse of stomach pain with vomiting after eating. The patient complained repeatedly about this to several nurses. A doctor saw the patient on 11/20/19 and noted cough and chest pain but did not ask about the vomiting. The doctor ordered another chest x-ray. Endoscopy and CT scan were indicated but not done.
- On 11/20/19 the chest x-ray showed a diffuse reticular nodular opacity over the lingual and left upper lobe that the radiologist said could be pneumonia or a neoplasm. A CT scan was recommended by the radiologist but was not done.
- On 11/21/19 and 11/22/19 the patient continued to complain to nurses about vomiting but this had still not been evaluated by a provider.
- On 11/22/19 a doctor saw the patient and documented that a repeat chest x-ray was done 2 days ago and "did not show much improvement". The doctor quoted the x-ray report excluding comments suggesting neoplasm. The doctor diagnosed pneumonia and ordered another antibiotic and a repeat chest x-ray in a week.
- The infirmary notes were missing from 11/25/19 until the patient was admitted to the hospital on 12/13/19.
- The patient was admitted to a small local hospital on 12/13/19. The admission note documented that the patient presented to the emergency room with intractable vomiting and weight loss. An initial screening CT scan that showed multiple masses in the lung, pancreas, liver, esophagus which suggested metastatic cancer. An endoscopy was planned for intractable vomiting when the patient became hypoxic for which he was

transferred to a reference hospital. Transfer was initially attempted at UIC but no beds were available, so the patient was transferred to a reference hospital in Kishwaukee for pulmonary critical care. At the reference hospital further diagnostic studies confirmed widespread and diffuse metastatic disease of the liver, pancreas, lung, lymph nodes, and esophagus. A long history of smoking was confirmed with the patient quitting just prior to incarceration. The primary was thought to be from the pancreas. The hospital documented a 50 pound weight loss. Due to the widespread dissemination hospice care was recommended.

- The patient appeared to arrive back at the facility on 12/31/19 because there are entries on the medication administration record that he received medication on that day. However, there was no infirmary admission note for that day. The first notes in the medical record start on 1/2/20. It appears that some progress notes are missing or that the patient was not evaluated for two days.

- On 1/2/20 a physician assistant wrote an urgent referral for "patient specific care management" equipment stating the patient had recently been diagnosed with cancer and returned from the hospital with care plan requirements for a bedside commode, shower chair, bed alarms and a special air mattress. There was no evidence that these comfort items were provided. That the physician assistant requested these items as a referral instead of an order is evidence of the barrier of obtaining necessary equipment for hospice care. A CNA documented that the patient was given a urinal and provided toileting assistance when asked. A bedside commode is first documented on 1/8/20 after the patient had been found after falling on the floor three times. The special air mattress was not documented as provided until 1/10/20.

- The patient was mostly attended to by nurse assistants who would assist him to the toilet. The patient had persistent pain. On 1/4/20 the patient asked a nurse if he was going to get better. The nurse wrote that the inmate was educated on his diagnosis and situation. A provider never had this discussion with the patient and no provider saw the patient on the infirmary to manage pain or comfort care. A physician assistant saw the patient twice on the infirmary over an eight day period but never directed or oversaw the patient's care. There was no physician or provider direction of care.

- On 1/8/20 the patient was taken to see the oncologist. The oncologist ordered IV morphine apparently, but a doctor did not evaluate the patient or document an evaluation of the oncology report or recommendation which was not in the medical record provided to the Monitor.

- A physician assistant finally saw the patient on 1/9/20 and noted that the patient was scheduled for a follow up appointment with pain clinic. The physician assistant did not discuss the patient's pain with the patient. There was no onsite evaluation of the patient's pain by a provider. It was not even clear what the oncologist's recommendation was regarding pain management.

- On 1/10/20 at 10:50 am, the health care unit administrator documented calling the vendor regional medical director by phone and discussed an upcoming pain clinic appointment on 1/13/20 in DeKalb. The regional medical director ordered cancellation of this visit as the patient was unstable and weak. The health care unit administrator documented that the regional medical director ordered "pain control" and "close monitoring" but no

114

physician or provider evaluated the patient's pain for modification, and it wasn't clear what "pain control" meant. Other orders included fall precautions including documentation that "the side rails are up and the head of the bed elevated". No such documentation took place with regularity. No physician orders were present in the medical record sent to the Monitor.

- At 9:15 pm on 1/10/20 a nurse documented contacting a physician because the orders were that that patient was to be sent out if the oxygen saturation could not be maintained >90% and the oxygen saturation was only 91% and the nurse was concerned regarding next possible steps. The pulse was 128. The nurse documented that the doctor "encourages comfort measures" but the "comfort measures" were not specified. Providers had apparently not provided hospice orders that addressed comfort or adequate pain management. Orders were not available in the record sent to the Monitor. At 11:05 pm the patient had pulse of 137 and oxygen saturation of 87% and a nurse called the Director of Nursing who apparently directed the nurse to call the on-call physician who ordered the patient sent to an outside hospital. The nurse notified a Major and the Director of Nursing and the patient was sent to a local hospital. At 4:20 am a nurse at the hospital indicated that the ER physician wanted to move the patient to a palliative care setting and the Sheridan nurse responded that the inmate had "DNR status". The nurse documented that the hospital nurse said that the ER doctor said that was moot. Apparently, the ER doctor wanted appropriate care for the patient wherever it was and if the prison was unable to provide end-of-life care then he recommended a palliative care facility, as admission to a hospital for palliative care was not appropriate. The Sheridan nurse told the hospital nurse that she was not authorized to approve palliative care placement and the hospital nurse asked for the person authorized to give that approval and the Sheridan nurse gave the Warden's number to the nurse. The Sheridan nurse told the hospital nurse that she would arrange for the Warden to call the hospital directly. This was the last progress note in the record. The mortality list documents that the patient died at the hospital the following day.

The death summary merely announced the death but had no critical analysis and included no recommendations.

**PRELIMINARY AUTOPSY DIAGNOSIS:**

**FINAL AUTOPSY REPORT:** Metastatic cancer. The cancer was poorly differentiated. There was metastatic cancer nodules in the liver, pancreas, para-aortic and cervical lymph nodes, lungs, hilar lymph nodes and mediastinal soft tissue.

**OPPORTUNITIES FOR IMPROVEMENT AND RECOMMENDATIONS FOR CORRECTIVE ACTION:**

1. At NRC the diagnosis of peptic ulcer was unconfirmed. The patient should have had endoscopy ordered but this was not done. A root cause analysis of intake should be conducted to develop a procedure for establishing diagnoses that are uncertain.

2. The patient had abdominal pain from May of 2018 to December of 2019 without ever having a diagnostic evaluation of the source of his pain. The patient had an abnormal chest x-ray dating from August of 2018, with symptoms of chest pain or shortness of breath that, because of his smoking history should have resulted in a CT scan. At least 11 provider evaluations over a year and a half should have resulted in diagnostic testing (endoscopy and/or CT scan of the chest) which were not done. This lack of evaluation resulted in the patient having disseminated widespread cancer being diagnosed at a hospital despite having symptoms for 20 months at the facility. A root cause analysis of the specialty care process should be undertaken to understand and correct why providers do not refer patients for necessary diagnostic evaluations when indicated.

3. There did not appear to be a consistent provider at this facility during this time period and multiple providers appeared to be covering. The lack of physician staffing affected care. Physician staffing needs attention.

4. One physician who made poor clinical decisions is a physician recommended by the Monitor for removal based on item III.A.3 of the Consent Decree. This physician continues to provide unsafe and clinically inappropriate care.

5. The patient had diagnoses of COPD, hypertension, high blood lipids, and stomach ulcer made by physicians. The stomach ulcer was never diagnosed with an endoscopy which is standard of care. The patient was evaluated in chronic care twice on 4/3/19 and 10/4/19 for hypertension, hyperlipidemia, and reflux disease. In neither clinic did the provider ask the patient about symptoms related to his reflux disease. The COPD was not addressed in either of these chronic illness clinic visits. Even though the patient was treated for and had significant ongoing symptoms that might be related to reflux the patient never had a diagnostic test to verify this diagnosis. Weight loss was evident beginning in July of 2019 but remained unnoticed for the remainder of the patient's life. The patient also had abnormal blood pressure readings, oxygenation measures and new symptoms that were not reported to providers by nurses and should have been. A root cause analysis should be undertaken to determine how abnormal vital signs remain unnoticed within IDOC. That root cause analysis should inform policy and procedure so that this deficiency can be corrected.

6. The patient was treated by a nurse on 10/28/19 who did not refer the patient per the nursing treatment protocol. This nurse's practice and the proper use of the treatment protocols needs to be peer reviewed. After the patient was placed in the infirmary another nurse initiated treatment of the patient's nausea and vomiting per a nursing treatment protocol without documenting a history or assessment using the protocol. When patients are in the infirmary new symptoms or complaints should be addressed by the responsible physician and not by nursing treatment protocol. This needs to be addressed in the policy and procedure for infirmary care. Medications are entered on medication administration records by nurses in handwritten fashion. All medications need to be entered by a pharmacy. Short-term changes in medication can be entered by nursing but these must be verified with a pharmacy label within a day. The pharmacy must be aware of all medications used by the patient.

7. The patient was admitted to the infirmary at Sheridan after discharge from a hospital with untreatable metastatic cancer. He was designated as hospice but was not provided with equipment recommended by the hospital to make his end-of-life more comfortable. Providers did not evaluate the patient with respect to end-of-life issues and nurses lacked direction for

end-of-life care.  Ultimately, this hospice patient was returned to a hospital because of inability of the facility to manage his care.  The patient was not a hospital patient and the hospital wanted to refer the patient to a palliative center, yet this was not done.  The Warden was asked to intervene on the clinical issue of where the patient was to be housed when the medical program was responsible.  A root cause analysis should be done to develop criteria for infirmary admissions, procedures for referral to skilled nursing care, end-of-life care processes, equipment and supplies necessary to manage complex patients on the infirmary.  Results of this root cause analysis need to be incorporated into policy and procedure and implemented in a standardized manner at all facilities.

**PATIENT 19 NOT PREVENTABLE**

**DATE OF REVIEW**:

**PATIENT:**

**DOC #:**

**DATE OF DEATH:** 4/5/20

**AGE:** 66

**DATE OF INCARCERATION:** Unknown

**SITE AT TIME OF DEATH:** Stateville

**PLACE OF DEATH:** Morris Hospital

**CATEGORY OF DEATH:** Natural

**EXPECTED OR UNEXPECTED:** Unexpected

**CAUSE OF DEATH:** COVID-19

**MENTAL HEALTH DIAGNOSES:**

**MEDICAL DIAGNOSES:**
1. Hypertension
2. Prostatic hypertrophy
3. High blood lipids
4. Prior DVT
5. Allergic rhinitis
6. COVID-19

**IDOC PROBLEM LIST:**
A problem list was not present in the medical record sent to the Monitor. This list was obtained from conditions the patient was being follow for in chronic clinics.
1. Hypertension
2. Prostatic hypertrophy
3. High blood lipids

**MEDICATIONS AT FACILITY BEFORE TRANSFERRED TO HOSPITAL WHERE HE DIED:**

1. Triamcinolone (15 gram) 0.1% cream; apply to affected areas every day to twice a day as needed.  Not indicated whether KOP or DOT.
2. Tamsulosin 0.4 mg capsule; take 2 capsules by mouth daily.  Not indicated whether DOT or KOP.
3. Oxybutynin 5 mg tablet; take 1 tablet by mouth daily. Not indicated whether DOT or KOP.
4. Montelukast 10 mg tablet; take 1 tablet by mouth daily. Not indicated whether DOT or KOP.
5. Metoprolol Tartrate 50 mg tablet; take 1 tablet by mouth daily.  Not indicated whether DOT or KOP.
6. Meclizine 25 mg chew; Chew 1 tablet by mouth twice a day.  Not indicated whether DOT or KOP.
7. Loratadine 10 mg tablet; take 1 tablet by mouth twice a day.  Not indicated whether DOT or KOP.
8. Lisinopril 10 mg tablet; take 1 tablet by mouth daily.  Not indicated whether DOT or KOP.
9. Hydrochlorothiazide 25 mg tablet; take 1 tablet by mouth daily.  Not indicated whether DOT or KOP.
10. Calcium antacid 500 mg chew; chew 2 tablets by mouth at bedtime.  Not indicated whether DOT or KOP.
11. Atorvastatin 40 mg tablet; take 1 tablet by mouth at bedtime.  Not indicated whether DOT or KOP.

Nurse entries to medication administration record:

1. "Tramadol 50 mg po QHS". Not indicated whether DOT or KOP

**CASE SUMMARY**

This patient was 66 years old who was not followed well in chronic clinic.  The patient had chronic clinics 4/29/19, 5/8/19, 10/16/19, and 11/21/19.  At the 5/8/19 clinic a provider wrote that the patient had a deep vein thrombosis in 2017 and was on warfarin for this.  On 9/11/19 a doctor saw the patient episodically not in chronic clinic and noted that the patient had been on warfarin since 2017 for a deep vein thrombosis.  Treatment of this condition is indicated typically for only 6 months.  The doctor appropriately stopped the medication on 5/8/19 but the patient had been on an unnecessary anticoagulant with risk of significant bleeding without any monitoring for a year and a half.  During 2018 and until September of 2019 the patient received only 14 (66%) of 21 expected INR tests to monitor coagulation levels.  Of these, 14 tests only ten demonstrated appropriate anticoagulation.  The INR[37] was not assessed at the 4/29/19 or 5/8/19 chronic clinic.  This problem was not being managed in chronic care.  On 9/11/19 a doctor started montelukast apparently for allergic rhinitis.  The patient remained on this medication for over a year without any monitoring of his allergic rhinitis in chronic clinics or elsewhere.

---

[37] Patients on anticoagulation with warfarin are tested typically monthly with an INR test.  Medication is adjusted for goal INRs higher or lower than expected.

On 3/24/20 the patient complained to a nurse of 2-3 days of a cold with sneezing, cough, nausea, congestion, and runny nose. The temp was 99.1, pulse 107, RR 16 and BP 112/84. An oxygen saturation test was not performed. The nurse did not refer to a provider and only gave the inmate Tylenol, cough tablets, and CTM with instructions to return if symptoms worsen. A COVID test was not done, the patient was not masked or isolated. This was at the beginning of the COVID pandemic, but the nurse appeared unaware of symptoms of COVID or what to do in the event of encountering these symptoms.

On 3/27/20 a nurse saw the patient, who complained of headache and asked for Tylenol. The only vital sign the nurse took was a temperature of 98.7. An oxygen saturation was not taken. There was no time on this note. Though headache is a COVID symptom it was not recognized as such and the patient was not isolated, masked or tested.

On 3/27/20 at 5:30 pm a doctor saw the patient who reported fever for six days with productive cough. The patient was not short of breath but had diarrhea for three days and had vomiting. The doctor documented that prior temperatures starting 3/23/20 were: 100, 100.7, 100.4, and 100.6. If the patient had fever since 3/23/20, four days ago, why had the patient not been isolated, masked and tested for COVID-19? Moreover, where were the medical record notes that should have documented these abnormal vital signs? The vital signs on this visit were BP 94/61, P 94, oxygen saturation 94.1%, temperature 99.2 and respirations 16. The doctor diagnosed a "flu syndrome" with diarrhea and dehydration. A COVID test was ordered; IV fluid was ordered with peptobismol and tylenol. Remarkably, the patient wasn't masked, and no isolation was ordered. The blood pressure was low, particularly since the patient had hypertension. This patient should have been sent to a hospital.

On 3/28/20 a nurse saw the patient at 4:15 pm who complained "I can't breathe. I have diarrhea". The temp was 102.2, BP 120/60 and oxygen saturation 90%. He said he had diarrhea for five days. A doctor was notified, and the nurse applied oxygen 2 liter by nasal cannula, but the patient was not masked, isolated, or hospitalized. An oxygen saturation of 90% is low and typically would result in hospitalization. At 4:50 pm the nurse notified a doctor that the temperature was 102.4. At 5:30 pm a nurse called the doctor again and said that there was no improvement, and the doctor sent the patient to a hospital. The local hospital was on diversion due to large numbers of COVID cases from the prison and the patient was sent to Morris Hospital where the patient died on 4/5/20.


**PRELIMINARY AUTOPSY DIAGNOSIS:** Not available

**FINAL AUTOPSY REPORT:** Not available

**OPPORTUNITIES FOR IMPROVEMENT AND RECOMMENDATIONS FOR CORRECTIVE ACTION:**

1. A root cause analysis should be conducted to determine why all medical conditions are not followed in chronic care clinics. In this case a patient was on warfarin but there was no evidence of being followed for anticoagulation and doctors lost track of the patient being on the medication, why it was needed and for how long it was needed.
2. A doctor started montelukast for an allergic rhinitis and it was continued for about a year and a half without any follow up or management of the condition. Doctors presumably were unaware of the diagnosis. A problem list was not in the record, so it was not clear what medical conditions the doctors were aware of. The root cause mentioned in item 1 above should include this type of case as well.
3. Pharmacy should indicate for all prescriptions whether medication is to be delivered DOT or KOP. This is not done, and it appears that nurses make this up on their own.
4. A nurse failed to recognize COVID-symptoms on 3/24/29 resulting in probable transmission within the facility. This reflects on the lack of preparedness for this pandemic and indicates that the infection control section within IDOC needs to be improved.
5. Abnormal vital signs were documented by a physician but there was no evidence in the medical record of these abnormal vital signs being taken. This should be evaluated. All medical record encounters should be documented in the medical record.
6. On 3/27/20 a nurse saw a patient with COVID-19 symptoms but did not document masking or isolating the patient. This should have been done and reflects on lack of preparedness for the pandemic and for the need for an infection control section within IDOC.
7. On 3/27/20 a doctor ordered a COVID-19 test for a person with COVID-19 symptoms but did not isolate or mask the patient. This should have been done and reflects on lack of preparedness for the pandemic and for the need for an infection control section within IDOC.
8. On 3/28/20 the patient had oxygen saturation of 90% but the doctor did not promptly send the patient to a hospital. Benchmarks for transfer to a hospital could be improved so that indications for hospitalization were clear.

**PATIENT 20          NOT PREVENTABLE**

**DATE OF REVIEW**:

**PATIENT:**

**DOC #:**

**DATE OF DEATH:** 3/29/20

**AGE:** 59

**DATE OF INCARCERATION:**  Not known

**SITE AT TIME OF DEATH:**  Stateville Correctional Center

**PLACE OF DEATH:** St Joseph Health Center

**CATEGORY OF DEATH:**  Natural

**EXPECTED OR UNEXPECTED:**  Unexpected

**CAUSE OF DEATH:**  COVID-19

**MENTAL HEALTH DIAGNOSES:**

**MEDICAL DIAGNOSES:**
1. Chronic obstructive lung disease
2. Type 2 diabetes
3. Hypertension
4. High blood lipids
5. Right heart enlargement
6. Microalbuminuria

**IDOC PROBLEM LIST:**
There was no problem list in the medical record provided to the Monitor.  Problems were obtained from the chronic disease clinic notes.
   1. Hypertension
   2. Diabetes
   3. High blood lipids
   4. Asthma

**MEDICATIONS AT FACILITY BEFORE TRANSFERRED TO HOSPITAL WHERE HE DIED:**

<u>Pharmacy entries on medication administration record:</u>

1. Xopenex HFA 45 mcg aerosol; inhale 2 puffs by mouth four times a day as needed "return empty container" (1/6 weeks).  Not indicated if KOP or DOT.
2. Triamcinolone (80 gm) 0.1% ointment; apply twice a day  *80 grams/month*. Not indicated if KOP or DOT.
3. Therapeutic shampoo (473 ml) 0.50% shampoo; apply weekly.  Not indicated if KOP or DOT.
4. Simvastatin 10 mg tablet; take 1 tablet by mouth daily.  Not indicated if KOP or DOT.
5. Novolin R (10ml) 100U/ml injection; per sliding scale twice a day.  Sliding scale not described.
6. Novolin (10 ml) 70/30 injection; inject 65 units SubQ every morning and 69 units SubQ every evening.
7. Montelukast 10 mg tablet; take 1 tablet by mouth daily.  Not indicated if KOP or DOT.
8. Milk of magnesia 400mg/5ml suspension; take 30 ml by mouth every day as needed.
9. Metformin 1000 mg tablet; take 1 tablet by mouth twice a day.  Not indicated if KOP or DOT.
10. Lisinopril 40mg tablet; take 1 tablet by mouth daily.  Not indicated if KOP or DOT.
11. Incruse ellipta 62.5 mcg aerosol; inhale 1 puff by mouth daily *return empty container*.  Not indicated if KOP or DOT.
12. Hydrocortisone (28gm) 2.5% cream; apply to affected areas twice a day as needed. Not indicated if KOP or DOT.
13. Hydrocortisone (28gm) 1% cream; apply to affected area every day.  Not indicated if KOP or DOT.[38]
14. Glucose raspberry chew; chew tablets as directed as needed (1-2 bottles/month).
15. Fiber-Lax 625 mg tablet; take 3 tablets by mouth twice a day.  Not indicated if KOP or DOT.
16. Docusate sodium 100 mg capsule; take 1 capsule by mouth twice a day.  Not indicated if KOP or DOT.
17. Diphenhydramine 50 mg capsule; take 1 capsule by mouth every morning.  Not indicated if KOP or DOT.[39]
18. Calcium antacid 500mg chew; chew 2 tablets by mouth twice a day.  Not indicated if KOP or DOT.
19. Aspirin 81mg chew; chew 1 tablet by mouth daily.  Not indicated if KOP or DOT.
20. Alvesco 160mcg aerosol; inhale 1 puff by mouth daily.  Not indicated if KOP or DOT.
21. Allopurinol 100mg tablet; take 2 tablets by mouth daily **pack 2**.  Not indicated if KOP or DOT.

---

[38] Note that there were two different prescriptions for the same steroid cream of different strengths, but it wasn't clear which one was accurate.  Neither demonstrated that the medication was provided.  A third steroid ointment was on the MAR, triamcinolone.  It was not clear which medication the patient actually received or should have received.

[39] This was also in the nurse entries on a different medication administration record for the same month, but the pharmacy used the generic name, and the nurse used the trade name making it appear as a different prescription. Neither record demonstrated that the patient received the medication.

22. Acetaminophen 325 mg tablet; take 4 tablets by mouth three times a day as needed. Not indicated if KOP or DOT.

Nurse entries on medication administration record:
1. "Magnesium citrate 1bottle once weekly x 90 days".
2. "Benadryl 50 mg po Q am x 2 weeks". Not indicated if KOP or DOT.
3. "Alvesco 1 puff po Q am" . Not indicated if KOP or DOT. Also, notably this is an inhaler, but the nurse wrote to administer "po" or as an oral medication.
4. "Methocarbamol 500 mg #2 BID". Not indicated if KOP or DOT or what route of administration was to be used.
5. "Regular Insulin SQ S/S BID; 201-250- 2u; 251-300- 4u; 301-350-6 u; 351-400 8u; 401-450-10u; >450-12u call MD."
6. "70/30 Insulin SQ QHS 60 "u" SQ Q HS x 1 yr".
7. "70/30 insulin SQ QHS 65 "U" SQ Q am x 1 yr".


**CASE SUMMARY**

This 59 year old man was followed very poorly in chronic care clinic. He was evaluated on 4/19/18 for hypertension and diabetes. There were five words of history which were illegible except for the word obese. The A1c was 12.2 which was very high, but the doctor made no effort to determine why the blood sugar was so high. The blood pressure was 126/78 but was listed as poor control but was good control. Alternatively, the diabetes, which was in very poor control didn't have the status documented. The patient's COPD was not addressed. Insulin was increased but the interval of the next clinic appointment was not made sooner. Though the patient had COPD the patient had not had a pulmonary function test which should be done for all patients with COPD.

On 7/24/18 a doctor saw the patient in chronic clinic for asthma, but the patient did not have asthma. The patient had COPD but the formatted questions on the form are for asthma and not for COPD. The patient had other conditions including diabetes, but the diabetes and other conditions were not addressed. The patient had a fast heart rate (111), but this was not addressed. This was important because in the recent past the patient had an accelerated junctional tachycardia. This should have been investigated. The doctor did not determine whether the patient might have had heart failure. An echocardiogram, pulmonary function test and arterial blood gas should have been obtained. The history and physical examination were illegible. Though there were only a couple lines of history the patient had the following problems since his last chronic clinic appointment which should have been documented in the history but were not:

- The patient developed edema of his feet. This indicated possible heart failure or may have been related to medication. Neither was investigated. The patient warranted an echocardiogram.
- The patient had an episode of wheezing and was diagnosed with bronchitis.
- The patient had an EKG that showed accelerated junctional rhythm, but no one determined if the patient was symptomatic which is important to know for this rhythm.
- The patient was placed on a tapering steroid dose for presumable exacerbation of COPD.
- The patient had asked to discuss his insulin on 7/10/18 which was not done.

- Two days after this clinic another doctor noted a hemoglobin A1c of 11.8 and said that the patient needed to be seen in the diabetes chronic clinic.

On 8/30/18 a doctor saw the patient for diabetic clinic only. Past finger-stick capillary blood glucose levels were not reviewed. The note was mostly illegible, but the doctor did write in the history section that the patient had no problems with no urgent care since the last clinic. The blood pressure was 147/75 which is elevated but the doctor did not increase blood pressure medication apparently because the patient was being seen in diabetic clinic and not hypertension clinic. Despite documenting no problems, since the last clinic the patient was seen for the following problems:

- The patient experienced dizziness stating this had been going on for a while. The nurse seeing the patient documented that the patient had imbalance, eyelid fluttering and blurry vision. A doctor saw the patient for this on 8/10/18 but did not address the problem of dizziness. This was important because the patient had an accelerated junctional rhythm. The patient should have been referred to a cardiologist for consideration for additional testing.
- The patient had an elevated blood pressure of 153/75 on 8/10/18.
- A physician assistant saw the patient for a knee injury and the blood pressure was 150/81 and oxygen saturation 92%.
- The patient had a minimal elevation of blood pressure of 142/80 on 8/28/18. These elevations are of concern since at the chronic clinic visit the blood pressure was again elevated but was not addressed.

On 1/10/19 the doctor saw the patient for asthma, hypertension, and diabetic clinics. The blood pressure was initially 145/71 and 121/77 on a second reading. The patient had a pulse of 116 which is elevated but was not addressed and, as mentioned, was of concern because of the patient's recent accelerated junctional arrhythmia. The patient had prior episodes of tachycardia which were also ignored. The doctor wrote that the patient had no problems. However, since the last visit the patient experienced the following problems:

- On 9/8/18 experienced shortness of breath when walking. The patient had tachycardia (102). The nurse referred to a doctor.
- A physician assistant saw the patient for chest congestion with wheezing but did not evaluate the patient for this complaint.
- The patient had elevated blood pressure on an encounter with a nurse and elevated pulse again in an encounter with a physician assistant.

On 4/11/19 a doctor saw the patient for asthma, hypertension, and diabetic clinics. The patient had one elevated blood pressure 152/81 with a second blood pressure of 135/78 but the pulse was 110 which is elevated. The patient had persistent elevated pulse for a year with a prior abnormal EKG, and symptoms of dizziness and imbalance which had never been evaluated. The doctor wrote that the patient had no new problems even though since the last clinic the patient experienced the following:

- On 2/11/19 the patient experienced difficulty breathing with blood pressure 148/76 and oxygen saturation of 67%. The patient had wheezing. An EKG, chest x-ray, and labs

were not ordered. A doctor did see the patient and treated him with nebulization that improved the oxygen saturation. But no diagnostic testing was ordered. Later this day the patient had oxygen saturation of 85% with BP 150/80 and pulse of 114. Later oxygen saturations were 86% with pulse 111 and later still oxygen saturation 73% with pulse 124; later still the oxygen saturation was 77%; temperature 100.4 but still no referral to a provider; later still the oxygen saturation was 80% but the nurse wrote to continue the plan of care. These abnormal oxygen saturation levels warranted prompt hospitalization.

- On 2/13/19 a doctor wrote a late infirmary admission note that the patient had shortness of breath with wheezing. Antibiotics and prednisone were ordered. Over two days the patient received multiple nebulization treatments and was discharged even though the oxygen saturation was still low (between 79-88%).
- On 2/26/29 the patient was seen for congestion. The blood pressure was 160/78 but the nurse did not refer to a physician.
- On 3/12/19 the patient had oxygen saturation of 88% on room air with pulse of 108.

At the 4/11/19 chronic clinic the patient should have been evaluated for continuous oxygen therapy which was not done. The patient should have had an echocardiogram and pulmonary function testing, referral to a cardiologist for evaluation of a symptomatic junctional rhythm and had blood pressure medication increased. Since no one at this facility appeared to know how to manage the patient, he should have been referred to a pulmonologist.

On 7/5/19 a doctor saw the patient for asthma clinic even though the patient did not have asthma. The questions were geared for asthma and not COPD which the patient had. The pulse continued to be elevated (109) and blood pressure 142/81. The patient had elevated blood pressure for at least a year without increased medication. The asthma was documented as moderate persistent and in fair control. Since these designations are used for asthma, they made no sense with respect to COPD. The doctor wrote that the patient had no new problems but occasional shortness of breath. However, since the last visit the patient experienced the following:

- The patient had difficulty walking to chow but was denied a meal-in permit.
- He had elevated BP once and elevated pulse four times which were all unnoticed.
- The patient experienced a fall.

The elevated pulse was consistent for more than a year yet was still not addressed. Again, the patient should have had an echocardiogram and pulmonary function testing, referral to a cardiologist for evaluation of a symptomatic junctional rhythm and had blood pressure medication increased. None of these were done.

On 8/6/19 a doctor saw the patient for diabetic chronic care. The blood pressure was documented as 149/74 and even though elevated was not addressed at this clinic. The doctor wrote that the patient had no problems since the last clinic despite the patient having had the following:

- An x-ray showing cardiomegaly with left ventricular prominence.
- Complained of hand joints swelling and had tachycardia.

The A1c was 8.5 indicating improved diabetic control but there was continued tachycardia. Again, the patient should have had an echocardiogram and pulmonary function testing, referral to a cardiologist for evaluation of a symptomatic junctional rhythm and had blood pressure medication increased.

On 10/8/19 the patient had a hypertension chronic clinic. The pulse was 107; tachycardia was present well over a year without investigation. The doctor wrote that there were no problems except since the last clinic the following had occurred:
- The patient had three episodes of elevated blood pressure and three episodes of tachycardia which were not investigated.
- The patient had hand swelling and had tests done that were abnormal (CRP 21.3 with normal <3 and sed rate 12 with normal <10). No action was taken on these abnormalities.
- A doctor had started allopurinol for gout even though the patient had a normal uric acid level (7.5) off any medication. This medication should had been stopped.

Despite the continued elevation of blood pressure, medication was not adjusted and other abnormalities were not addressed.

On 12/10/19 a doctor saw the patient in diabetic clinic. The A1c deteriorated to 9.2. The pulse was 106 so the patient had tachycardia for almost two years without anyone noticing. The doctor described no new problems even though since the last clinic the following episodes occurred:
- The patient had tachycardia twice which were both unnoticed.
- A physician assistant saw the patient for exacerbation of COPD and started a tapering steroid dose and Augmentin. The patient had an oxygen saturation of 90%.

The tachycardia was again ignored. The patient had yet to obtain tests for diabetes complications including an annual eye examination and monofilament test for neuropathy. Failure to obtain these tests were unnoticed. The microalbumin was abnormal but the patient was not identified as having this condition. He was on an ace inhibitor. The doctor did not address any of the patient's other issues particularly related to his COPD and cardiac arrhythmia.

On 1/9/20 the patient was seen in asthma clinic. The patient had tachycardia of 105 which is abnormally high. The questions on the formatted clinic document were all for asthma. The doctor wrote that the "asthma" was mild persistent which is a designation for asthma but not COPD. The doctor wrote that the "asthma" was in good control and that the patient had no problems even though the following had occurred since the last visit:
- The patient had an EKG showing sinus tachycardia with incomplete right bundle branch block and possible right ventricular hypertrophy. No one addressed this EKG.
- The patient experienced shortness of breath and dyspnea on exertion. Though an oxygen saturation was not done, it should have been. A chest x-ray was ordered.
- The patient had tachycardia twice and elevated blood pressure once.

The doctor failed to appropriately address the patient's COPD. Again, the patient should have had an echocardiogram and pulmonary function testing, referral to a cardiologist for evaluation

of a symptomatic junctional rhythm and had blood pressure medication increased.  None of these were done.

On 3/27/20 at 10:50 pm a CMT saw the patient on a "code 3" for dizziness.  The temperature was 103.  The CMT gave the patient Tylenol.  The patient should have been referred to a RN or provider.  An EKG was indicated.  More importantly, because of COVID-19 the patient should have been masked, isolated, tested for COVID-19 and had an oxygen saturation done.  None of these were done.  Later at 2 am the temperature was rechecked and was 100.

On 3/28/20 a nurse saw the patient at 8:50 am with 102.6 fever, pulse 126, BP 140/98 and oxygen saturation of 83%.  The nurse notified a doctor and orders were "to follow".  There were no written orders in the medical record and there is no evidence of any orders being given.  The nurse did start oxygen.  This was inappropriate clinical care.  The patient should have been isolated, masked, tested for COVID-19 and sent to a hospital due to a dangerously low oxygen saturation.

On 3/28/20 at 9:30 am a nurse started a physician note documenting vital signs of temperature 102.2, pulse 125, BP 135/98 and oxygen saturation of 66% on room air and 95% on 25 liters of oxygen.  The doctor wrote no note.  This patient should have been immediately masked, put on oxygen, and sent to a hospital.  Instead, nothing happened for an hour and a half.  At 11 am a nurse documented temperature of 99.8, pulse 115, oxygen saturation of 95% on 2 liters of oxygen.  The patient was transferred to St. Joe's hospital.

The hospital admission note history documented that the patient had a 4-5 day history of chills, fever, and cough.  The doctor noted, "He was sent here with high probability of needing intubation on arrival".  The doctor also noted, "This patient is presenting in the setting of a COVID-19 outbreak at State[ville] many positives and is a presumptively positive patient".  The initial chest film showed hazy abnormal alveolar consolidation bilaterally most likely due to multifocal pneumonia.  The patient died the following day at St. Joseph's Medical Center.

We note that this patient had no colorectal screening over two years and only one influenza vaccination over the two years with no other vaccinations.

**PRELIMINARY AUTOPSY DIAGNOSIS:**

**FINAL AUTOPSY REPORT:**

**OPPORTUNITIES FOR IMPROVEMENT AND RECOMMENDATIONS FOR CORRECTIVE ACTION:**

1. The chronic care clinic fails to address all of the patient's chronic illnesses.  The patient received episodic care for some of his conditions. This patient had problems (tachycardia, elevated blood pressure, hypoxemia possibly needing continuous oxygen therapy, evidence of heart failure not evaluated, tachycardia and an EKG with symptoms) which were not addressed.  The patient had allopurinol started for a condition (gout) for which

there was no evidence the patient had. The patient failed to receive colorectal cancer screening and did not receive all indicated immunizations. A root cause analysis should be performed to identify why all problems are not evaluated.

2. The current chronic care forms should be eliminated or significantly revised. COPD is not asthma and use of the asthma form for COPD fails to address the needs of those with COPD.

3. Persons with COPD need pulmonary function testing and occasionally need evaluation for continuous oxygen therapy. This does not now occur. Patients with possible heart failure need echocardiograms. Persons with symptomatic arrhythmia need cardiology referral and possibly other evaluations. These did not occur for this patient. A root cause analysis should be performed to determine why persons needing specialty consultation or diagnostic testing do not receive it. Procedures need to be put into place to ensure that this occurs.

4. A CMT performed an independent assessment which was inappropriate. RNs need to perform independent assessments according to the Consent Decree.

5. The patient had fever on 3/27/20 but was not isolated, masked or tested for COVID-19 and did not have an oxygen saturation test. This should have been done and reflects on lack of preparedness for the pandemic and for the need for an infection control section within IDOC.

6. The patient had oxygen saturation of 83% but was not sent to a hospital for two hours. This delay placed the patient at significant risk. About a half hour after the oxygen saturation of 83% the patient had a saturation of 66%. Immediate transfer was indicated. The hospital indicated that the patient had symptoms for five days. These were apparently unrecognized at the facility. This reflects on lack of preparedness for the pandemic and for the need for an infection control section within IDOC.

7. Medications entered onto the medication administration record by nurses used different names than the names used by the pharmacy. This is a patient safety risk. The pharmacy needs to assume responsibility for entry of all prescriptions onto the medication administration record.

8. The patient was on 22 medications. He was 59 years old. His medications should have been simplified.

9. The pharmacy and nursing need to enter whether medication is to be given KOP or DOT.

10. The patient was on a low intensity statin yet had a 33% ten year cardiovascular and stroke risk. A high intensity statin was indicated. This is a systemic issue. A root cause analysis should be done to determine why so many patients are not on an appropriate statin dose.

**PATIENT 21 POSSIBLY PREVENTABLE**

**DATE OF REVIEW**:

**PATIENT:**

**DOC #:**

**DATE OF DEATH:** 4/9/20

**AGE:** 58

**DATE OF INCARCERATION:** 10/3/14

**SITE AT TIME OF DEATH:** Centralia

**PLACE OF DEATH:** St. Mary's Hospital Centralia

**CATEGORY OF DEATH:** Natural

**EXPECTED OR UNEXPECTED:** Unexpected

**CAUSE OF DEATH:** Subdural hematoma likely caused by multiple myeloma or underlying blood disorder

**MENTAL HEALTH DIAGNOSES:**
1. Codeine
2. Depression
3. PTSD
4. Problem list current

**MEDICAL DIAGNOSES:**
1. Macrocytic anemia
2. Elevated serum protein
3. Hypertension
4. Sinus arrhythmia
5. Thrombocytopenia
6. Hyperbilirubinemia

**IDOC PROBLEM LIST:**
1. Codeine
2. R forearm ORIF
3. Food Handler approved
4. Problem list updated

5. PE done
6. May use pumice stone weekly x 1 mo
7. Pumice stone 1x week x 6 mo
8. PE done: hx polysubs abuse; hx ORID rt forearm 1994; mild dyslipidemia
9. Health care planning is not indicated upon release from Dixon
10. HIV test accepted negative
11. Anemia dx 1/31/20

**MEDICATIONS AT FACILITY BEFORE TRANSFERRED TO HOSPITAL WHERE HE DIED:**

Nurse entries on medication administration record:
1. "Ferrous sulfate 325 mg po BID." Did not indicate KOP or DOT.

**CASE SUMMARY**

This 58 year old man was incarcerated in 2014. The patient was re-incarcerated in 2019. All of the patient's problems as listed in the mortality review problem list were unrecognized at NRC and Centralia and were not worked up appropriately or treated.

He had a history of using alcohol. During the first incarceration, prior to discharge the patient had a blood count that demonstrated elevated bilirubin and macrocytic anemia. His serum protein was borderline in 2018. These were unrecognized during his first incarceration and the abnormal labs of the first incarceration were not identified when the patient was re-incarcerated.

When the patient was re-incarcerated in June of 2019 the intake initial blood tests showed that the patient had elevated serum protein. This was never evaluated or noted throughout the entire incarceration. This was a failure of intake screening. The patient also had mildly elevated liver function tests. Shortly after incarceration on 6/17/19 the patient had an altercation and injured his right upper eyelid. The patient was sent to a local hospital. The report from the hospital was not in the medical record. It is not clear if blood tests were done at the hospital.

On 8/2/19 the patient was transferred to Centralia and the transfer form did not identify that there was elevated serum protein or that in a recent incarceration the patient had macrocytic anemia. The transfer form listed no problems.

The patient had elevated blood pressure on multiple occasions during incarceration without anyone noticing.
- 145/98 on 6/17/19
- 177/98 on 12/10/19
- 158/95 on 12/11/19
- 140/81 on 12/13/19
- 170/101 on 2/6/20
- 140/82 on 2/6/20
- 160/93 on 3/25/20
- 164/92 on 3/30/20

- 140/80 on 4/2/20
- 166/89 on 4/3/20

No action was taken for any of these abnormal blood pressures and the patient was not treated or diagnosed with hypertension.  This patient had hypertension for months that was unrecognized.

On 12/10/19 the patient developed chest pain.  The patient was sent to a hospital.  The patient had a sinus arrhythmia with T wave abnormality.  A blood count at the hospital showed macrocytic anemia (hemoglobin 8.9 with MCV 102).  A serum protein was not done.  The creatinine was elevated (1.55) and blood pressure was high.  The blood pressure was 183/118 in the hospital.  The patient was only seen in the emergency department.  Myocardial infarction was excluded, and the hospital recommended following up on the high blood pressure and anemia.

Presumably because the patient had a single normal blood pressure on return from the hospital no follow up occurred for the hypertension.  Within two days of return from the hospital, on 12/13/19 the patient experienced cough, fever (103) and had a bloody nose.  A nurse called a doctor who ordered an antibiotic without ever examining the patient and without any diagnostic studies.  This is not appropriate practice but occurs commonly throughout IDOC.  Providers who make diagnostic decisions should base those decisions on a face-to-face examination except under very temporary and unusual situations.  The patient was sent to the infirmary, but a nurse discharged the patient the following day without consulting a physician.

On 12/16/19 a doctor saw the patient in follow up of the hospitalization and infirmary visit. The patient's fever had resolved, and the doctor diagnosed a "fever of unknown origin"[40].  The doctor ordered another blood count.  On 12/30/19 the doctor saw the patient in follow up of the blood count.  Macrocytic anemia was again evident.  The doctor's assessment was to rule out iron deficiency anemia and additional blood tests were ordered.  These tests returned on 1/9/20 and did not confirm iron deficiency anemia and a hematology consult was indicated because the doctor did not know how to evaluate the anemia.[41]  A better trained physician would have done additional tests related to the elevated serum protein.[42]  For an untrained physician, an appropriate course of action would have been to refer to a hematologist.  That did not occur.

---

[40] A fever of unknown origin is a fever of three weeks duration with no cause after adequate investigation.  This patient had fever of one day and no investigation occurred regarding the cause.  This was another example of this doctor's lack of knowledge.

[41] The patient had normal iron in his blood (105 with normal levels 50-180); a ferritin of 222 and % transferrin saturation of 46.  Typically iron deficiency anemia is diagnosed when ferritin is < 30 and % transferrin saturation is <19% which this patient did not have.  Also, the doctor checked the folate and B12 levels.  These are two common causes of macrocytic anemia.  But both the serum folate and B12 were normal.  This patient did not have iron deficiency anemia or the common causes of macrocytic anemia and did not have obvious stigmata of cirrhosis or alcoholism and the next step was a hematology consult for consideration of bone marrow.

[42] The patient had unrecognized elevated serum protein for at least 6 months and several tests should have been done.  The patient needed a test to determine the subtypes of protein.  This test called a serum protein electrophoresis should have been done at intake.  The elevated serum protein can be caused by multiple myeloma or a precursor to

On 1/31/20 the doctor reviewed the laboratory results and concluded that the patient needed a blood transfusion. The utilization management doctor approved this transfusion for a macrocytic anemia and the patient was transfused. If utilization review is truly a collegial review, the utilization physician would have questioned a transfusion for macrocytic anemia, as transfusion for macrocytic anemia are typically inadvisable.

On 2/12/20 iron studies, folate, and B12 tests were repeated but again did not confirm iron deficiency anemia and showed normal B12 and folate. A repeat blood count was done on 3/5/20 that showed persistent macrocytic anemia (hemoglobin 7.7 with MCV 105.9) not improved after transfusion. On this test the platelets were minimally depressed (147).

The patient started getting nose bleeds. The first one occurred on 3/5/20. When the doctor saw the patient at that visit, he diagnosed nosebleed and iron deficiency anemia and ordered iron supplements for six months. Since the patient did not have iron deficiency anemia, the iron supplements were unlikely to help and could possibly harm the patient.

The patient had another nosebleed on 3/23/20 and the doctor saw the patient on 3/25/20. The nosebleed had resolved. The doctor ordered another blood count. At this visit the blood pressure was 160/93 but it was unnoticed or ignored by the doctor.

On 3/30/20 the doctor saw the patient. Although the blood pressure was 164/92, the blood pressure was unnoticed or ignored. The recent blood count showed hemoglobin of 7.1 and the doctor appeared stumped. He noted that the patient had a head injury in 2014 and that this may have resulted in the recurrent nasal bleeding and the doctor ordered a skull x-ray. The doctor noted jaundice. The doctor also ordered another blood transfusion. This doctor was trained in orthopedic surgery and lacked primary care training and was making multiple errors of basic medicine including:

- Failure to perform a protein electrophoresis on an elevated serum protein.
- Failure to properly diagnose macrocytic anemia.
- Transfusing a patient with macrocytic anemia without clear indication.
- Failing to treat the patient's obvious hypertension.
- Failure to order liver function tests and evaluate for cirrhosis in a patient with macrocytic anemia and apparent jaundice.
- Failure to refer to a hematologist because he did not understand the etiology of the patient's anemia.

The patient initially refused the transfusion. The skull x-rays ordered were normal. On 4/2/20 the patient developed shortness of breath and saw a nurse. The patient told the nurse he was now agreeable to have the transfusion and the nurse referred the patient to the doctor.

that condition. The failures to make a diagnosis were fundamental to this case and exhibit a lack of primary care knowledge and failure to refer to a specialist when that knowledge is not present.

A coverage doctor saw the patient on 4/3/20. The blood pressure was elevated (166/93), the patient had jaundice and the doctor remarkably diagnosed sickle cell anemia even though the patient had no history of this condition. The doctor referred the patient to an emergency room for the transfusion.

When the patient arrived in the emergency room for the transfusion other tests were done showing renal failure, macrocytic anemia, elevated serum protein, low platelets, high uric acid, respiratory failure, and hypertensive emergency. The patient was transferred to a major reference hospital in St. Louis where a markedly elevated serum protein resulted in initiation of a workup for malignancy including multiple myeloma. The patient underwent a CT scan that showed a large subdural hematoma with midline shift of the brain and herniation of the brain. There was an acute on chronic subdural that was quite large. The patient died on 4/9/20. The patient's underlying disease was likely myeloma, a blood malignancy that may have resulted in platelet abnormalities which caused bleeding as seen in his repeated nose bleeds. The bleeding abnormalities likely resulted in the brain bleed which caused his death.

The hospital course as documented in the St. Louis University Hospital stated:

> Upon arrival he was noted to be anemic, in acute renal failure and significantly hyponatremic. He was also noted to have markedly elevated protein gap and was being worked up for possible infectious and malignant causes including multiple myeloma. This workup is currently pending.

The coroner in St. Louis did not perform an autopsy but because of the subdural listed the cause of death as a closed head injury despite the patient not having a prior injury since June of 2019 about 10 months ago. It appears likely that the patient had a bleeding disorder related to an underlying multiple myeloma.
.
**PRELIMINARY AUTOPSY DIAGNOSIS:** Autopsy not performed. The coroner gave a cause of death as closed head injury

**FINAL AUTOPSY REPORT:**

**OPPORTUNITIES FOR IMPROVEMENT AND RECOMMENDATIONS FOR CORRECTIVE ACTION:**

1. This patient had hypertension that was unrecognized throughout his incarceration and was never treated. On multiple occasions the patient presented to a physician with abnormal blood pressure that was either ignored or unnoticed. A root cause analysis should be done to determine why providers appear to ignore or not notice abnormal vital signs. After the analysis, corrective action should be taken.
2. The patient had an elevated serum protein for his entire incarceration that was ignored or unnoticed. When the patient was seen at St. Louis University Hospital, they believed that this might be multiple myeloma, but the patient died before workup was completed. The

failure to initiate this workup as an outpatient in June of 2019 may have resulted in the patient's death in April of 2020. The patient also had an abnormal renal function noted during a December 2019 hospital visit. This was unnoticed. This also can be related to multiple myeloma. A root cause analysis of why abnormal labs are often ignored or unnoticed should be undertaken and corrective action taken to ensure that abnormal labs are evaluated timely.

3. The physician was unable to make a diagnosis of the anemia yet failed to timely refer to a hematologist. A root cause analysis should be undertaken to determine the cause of failure to refer as this is a systemic and widespread problem in IDOC.

4. The patient had a macrocytic anemia, yet the doctor erroneously pursued a diagnosis of iron deficiency anemia including to recommend transfusion twice. The doctor failed to evaluate an abnormal serum protein, failed to appropriately diagnose or treat common hypertension, and failed to properly refer the patient to a hematologist when he was unable to establish a diagnosis for the patient's anemia. The physician lacked primary care training and based on item III.A.3 of the Consent Decree should not be practicing in IDOC as his practice is unsafe and clinically appropriate.

5. The physician ordered antibiotics by phone for a fever, cough, and a bloody nose without any diagnostic studies or evaluation. Ordering antibiotics by phone without confirmation of a diagnosis is a common practice in IDOC. This should be evaluated, and practice standards should be established. Patients should be evaluated for a diagnosis before treatment is ordered. This may result in sending some patients to an emergency room. In this case, if the patient had myeloma, this may have been an expression of that illness.

**Lippert Monitor 3rd Report**
**APPENDIX D**
**February 15, 2021**
ANALYSIS OF COVID-19 AT STATEVILLE

The COVID-19 pandemic has been a unique infection control challenge to the IDOC over the past year. There were a number of lessons to be learned from the outbreak at the Stateville facility beginning in March of 2020. In his 2nd Report, the Monitor stated that the pandemic exposed the weaknesses in the IDOC infection control program. IDOC was unprepared for this outbreak and did not have an infection control program or an effective plan in place when the outbreak started. The outbreak at Stateville overwhelmed IDOC's capacity to respond and outside assistance from multiple agencies was necessary as IDOC was unable to manage the outbreak on its own.

The IDOC response to this outbreak was reactive. The Illinois Department of Public Health (IDPH) inserted itself into the operational management of the Stateville outbreak when there was a significant disruption of access to hospitals in the Joliet area due to multiple inmates being hospitalized. In response to this event, the IDOC OHS was dedicated full time to COVID-19; IDPH and UIC intervened to expand testing and provide other assistance; and the Governor called in the National Guard to help until the outbreak at Stateville was quelled. In his 2nd report the Monitor identified deficiencies that were leading to harm to inmates and added recommendations that could be used to prevent other outbreaks from occurring. The Monitor maintains his opinion that there are weaknesses in the IDOC infection control program and augments recommendations in this appendix

After this outbreak, Parties agreed to a Court ordered evaluation of the COVID-19 outbreak at Stateville to 1) investigate the COVID-19 outbreak from March through May and 2) produce a written report to analyze the initial management and subsequent actions to address COVID-19 at Stateville. This report was produced by Dr. Vidya Sundareshan, an infectious disease physician from Southern Illinois University. She did not visit the facility. She performed interviews and reviewed documents but did not review medical records. Only two of 26 documents reviewed were in place prior to the outbreak at Stateville so the analysis was of procedures put into place after the outbreak but the methodology did not include review of conditions that existed at the time the outbreak occurred. Because of this, it is the Monitor's opinion that opportunities to identify improvements in the IDOC infection control program were not all uncovered. The Monitor includes the following timeline of events and subsequent recommendations to ensure that the opportunities for improvement evident in the Stateville outbreak are not lost. The timeline below is followed by reviews of records of seven of the 12 inmates who died.

<u>COVID-19 Timeline of Outbreak at Stateville</u>

- 8/1/18: 2nd Court Expert recommends hiring statewide Infection Control Coordinator and an infectious disease doctor consultant[1] who works for IDOC to advise on infection

---

[1] The 2nd Court Expert's Report recommended, "The IDOC should negotiate with the Illinois Department of Public Health for IDOC to fund and maintain an infectious disease-trained physician and infection control coordinator who would jointly work with IDPH and IDOC and would coordinate, advise, and lead the infection control program in

control issues.  These recommendations were not acted on a year and a half later when the COVID-19 pandemic started.  A statewide Infection Control Coordinator was hired after the Stateville outbreak occurred.  An infectious disease physician consultant is still not hired

- 8/1/18:  The 2nd Court Expert recommended data systems with capable staff who can obtain and analyze data and monitor care.[2]
- 11/1/19:  A November, 2019 IDOC Staffing Analysis showed that at the Stateville facility there were 14 nursing[3] vacancies and one physician vacancy.  IDOC recommended 5 additional nurse[4] positions and 3 provider[5] positions.  This is a total staffing deficiency of 19 nursing and 4 provider positions.  This is based on a total staff of 64 nursing and 6 provider positions or staffing deficiency of 29% of expected nursing staff and 66% of expected provider positions.  Notably the June, 2020 Staffing Analysis showed a deterioration in staffing.  Two additional RNs were vacant and for uncertain reasons, the IDOC decreased recommended physician and mid-level provider positions each by one position.  This staffing deficiency significantly affected the ability of Stateville to properly monitor patients.
- 1/20/20: 1st COVID-19 case in USA.
- 1/24/20:  1st COVID-19 case in Illinois.
- 3/13/20: Plaintiff letter to IDOC sharing information learned about appropriate responses to COVID-19 from national correctional experts.
- 3/13/20:  IDOC Stateville Pandemic Plan issued.  This document was based on influenza-like-illness and not consistent with CDC guidance on COVID-19.[6]  A COVID-19 specific plan should have been written by an infectious disease physician and disseminated to all facilities instead of having each facility write their own procedures as there was no one at the facilities who could reasonably do this.  IDOC did not have an infectious disease expert on staff.
- 3/16/20: Monitor sends email to IDOC urging that IDPH provide testing material[7] to IDOC to prevent spread of virus.

---

the IDOC. This can be pursued as an interagency agreement. The infection control coordinator should be a person with a master's training in public health nursing."

[2] Recommendation 11 of the Key Recommendations was as follows:  "The IDOC medical program needs to be able to effectively self-monitor all aspects of the medical care program.  This will require knowledge of quality improvement methodology, data systems to obtain the necessary information to analyze and monitor care, and capable staff who can provider leadership"

[3] 5 CMT, 1 CNA, 3 LPN, and 5 RN positions.

[4] 1 nurse supervisor and 4 RN positions.

[5] 1 physician and 2 physician assistants.

[6] There are numerous examples of inaccurate guidance because it was not based on COVID-19 including: 1) "germs can spread through the air up to three feet", 2) the communicable period is 6 days and greatest in first two days, 3) isolation for suspicious cases was 4 days then said to be 10 days later in the document- both are inaccurate, 4) refers to an infection control committee which doesn't exist at Stateville, 5) quarantine was for 10 days then later the document states that separate cell mates of sick persons for 48 hours which is inaccurate quarantine guidance 6) quarantine persons can sleep 3 feet apart, 7) symptoms were listed only as cough, sore throat or shortness of breath which are not the complete list of symptoms, 8) testing guidance was not given except that only rapid testing will be done and sent to the local hospital- rapid testing was not yet available.

[7]  The Monitor stated, "The Court Appointed monitoring team is concerned that men and women with fever and symptoms who are currently incarcerated and those being newly admitted to the IDOC are not being tested for

- 3/20/20:  IDOC promulgated its first COVID-19 directive.  This directive advised that chronic care and medication administration continue, suspension of certain health care encounters, those with respiratory complaints[8] were to be masked and moved immediately for evaluation.  Those with fever were to be isolated and appropriate units quarantined.[9]  Symptomatic patients were to be tested for influenza A and B.  Only those with symptoms and negative for influenza A and B were to be tested for COVID-19. Staff working with isolated inmates were to wear personal protective equipment.  Each facility was responsible to designate a space on every housing unit for a medical evaluation.  Each facility was responsible to designate a triage area and an area for routine medical services.  Transfers were to be minimized.  No details were provided on screening, what symptoms qualified someone to be tested, testing or management guidance.  Each facility was to develop its own isolation procedures.  Stateville, however, did not, early in the outbreak, have a designated isolation space and did not appropriately mask, evaluate, isolate, test, or refer persons with COVID-19 symptoms.  Isolation occurred in place meaning the inmate remained in his cell and was not moved to special isolation housing. The implementation by each individual facility meant that the guidelines were uniquely interpreted.  At Stateville the guidelines were ineffectively implemented.  Due to limited OHS staffing there was little oversight from OHS.  The vendor Regional Medical Directors did not appear to play any role in oversight.
- 3/21/20:  1st COVID-19 test performed at Stateville.  It was positive.
- 3/21/20:  1st[10] and 2nd patients[11] who ultimately died of COVID-19[12] develop symptoms at Stateville.  They were not initially tested or isolated though symptomatic.  Nurses did not recognize symptoms as COVID-19 symptoms.  One patient was not documented as tested at the facility; it appeared that he was tested at the hospital.  He was not isolated or tested for an indeterminate number of days because the date was not included on the first note documenting symptoms.  The second patient was symptomatic for six days without

---

COVID-19.  It is our understanding that Illinois Department of Public Health has not been able to facilitate IDOC's access to the COVID-19 tests for this vulnerable population who are housed in its high-risk congregate living settings. We strongly believe that testing is imperative to allow the IDOC to implement proper containment and prevention measures to reduce the spread of this pandemic. As availability to the COVID-19 test kits increases, we urge the IDPH to provide the IDOC with unimpeded and ample access to COVID-19 testing in order to protect both the staff and patient-inmates in the prison system and to prevent the spread of this pandemic virus to non-incarcerated communities of Illinois.

[8] The IDOC directive did not list the respiratory complaints requiring masking.  It also did not list COVID-19 symptoms other than stating "respiratory complaints".  This failure to list symptoms left nurses, in particular, without dependable guidance to identify a possible COVID-19 suspect. .  On mortality reviews we found multiple instances of persons not being masked with COVID-19 symptoms.  This resulted in multiple patients with COVID-19 not being isolated and capable therefore of transmitting the infection within the facility.

[9] At the beginning of the outbreak there was no designated area for isolation and patients were isolated in place.

[10] 12 patients are documented as having died of COVID-19 from the beginning of the pandemic until 5/3/20.  One of these patients probably died with COVID-19 from other causes.  If all eleven other patient records were evaluated, this timeline would probably be filled with more symptomatic cases early in the timeline before the National Guard arrived.

[11] One of these patients had an undated nursing note and so the date of symptoms was estimated by way of patient history timeline of symptoms between the nurse and doctor who subsequently saw the patient.

[12] 13 people died of COVID-19 at Stateville as of 11/18/20.  We have only received medical records for seven of those deaths.  We did not include the other six patients in this timeline but their date of positive test results indicate that they were likely hospitalized in this early time period.

- isolation or testing.  He was not tested until 3/27/20 the date of hospitalization.  There was no evidence he was tested at the facility.
- 3/23/20: 3rd patient who ultimately died of COVID-19 developed symptoms at Stateville.  His symptoms were not initially recognized as being COVID-19 and he was not isolated.  He was tested on 3/25/20 at the facility.  There was no clear documentation of isolation and the patient was symptomatic for at least three days before being sent to the hospital.
- 3/24/20: 4th patient who ultimately died of COVID-19 developed symptoms at Stateville.  His COVID-19 symptoms were not recognized initially and he was not isolated.  He was symptomatic at least two days without isolation before transfer to the hospital but he was probably symptomatic for a longer period of time because when hospitalized he was in extremis and immediately intubated.  There was no documentation he was tested at the facility.  He was tested the date of hospitalization on 3/25/20.
- 3/24/20:  Letter from Monitor to IDOC recommending depopulation as can be safely done, limit transfers between facilities and quarantine after transfer, screening all staff on entry, moratorium on visitation, screen all new inmates with a COVID-19 test and quarantine for 14 days.
- 3/25/20: A letter from the Attorney General announced quarantine of all transfers into IDOC custody with 14 day quarantine.
- 3/25/20:  By this date only 14 COVID-19 tests had been done at Stateville.[13]  Two of these people died.  Testing supplies were limited.
- 3/26/20: Governor suspended admissions to IDOC from all Illinois County Jails.
- 3/26/20: 5th patient who ultimately died of COVID-19 had symptoms of COVID-19 at Stateville.  A nurse did not recognize his initial symptoms as COVID-19 and he was not isolated or tested.  He was tested on 3/27/20 the day of transfer to the hospital.
- 3/26/20: IDOC issued first procedure for isolation and quarantine of suspected COVID-19 patients.  This included symptom screening of intakes with 14 day quarantine.  Only symptomatic inmates were to be tested (for influenza A and B and COVID-19 if negative for influenza).  The only symptoms assessed were fever, chills, cough, and difficulty breathing.  This guidance should have included any symptom of COVID-19 known at that time.  There was no asymptomatic testing or testing of persons who had exposure to COVID-19.
- 3/27/20:  By this date, based on an IDOC tracking log only 33 patients had been tested six of whom eventually died.  Though a 3/26/20 OHS guideline of the day before was to isolate all symptomatic persons, Stateville was isolating persons in place[14] and not in separate housing.
- 3/27/20:  The IDOC Chief OHS left service and was replace with an Acting Chief.
- 3/28/20: 6th patient who ultimately died of COVID-19 developed symptoms at Stateville.  His symptoms were not initially recognized as COVID-19 and he was not isolated or tested when initially symptomatic.  There is no evidence he was tested at the prison.  His test was on 3/30/20 the day after being sent to the hospital.  He spent two days, at a minimum, with symptoms of COVID-19 and not isolated before transfer to the hospital.

---

[13] This data was obtained from a spreadsheet of testing data provided by IDOC.  Due to lack of testing availability, there were likely many more cases because there was no isolation, there was likely asymptomatic cases with spread, and only very ill patients appeared to be coming to the attention of staff.

[14] This effectively was not isolation.  Many cells of inmates have bars and do not have a solid door.

- 3/28 and 3/29/20: Monitor and consultant participate in calls with IDPH, OHS leadership and custody leadership at Stateville because a large number of Stateville inmates had been transferred to local hospitals and were overwhelming ICU and other beds in local hospitals in Joliet, Illinois. On this call, the Monitor learned that there was lack of isolation and quarantine space and procedures, Monitor was told that infected and symptomatic inmates were housed in place, insufficient staff were available to monitor patients, staff were not monitoring suspect cases timely or appropriately resulting in people being sent to the hospital and immediately intubated. Custody leadership was asked if they could assist in monitoring inmates and they said no due to union issues. It was recommended to IDPH to recommend that the Governor send in the National Guard. Testing was difficult to obtain and UIC and IDPH promised help. By this date an IDOC tracking spreadsheet indicated that 37 people had been tested. Of these, seven would die. Joliet hospitals had to divert patients because Stateville patients had filled up their ICUs.
- 3/30/20: EYEWITNESS News channel 7 ran story, "Illinois Prisoners sick with COVID-19 "overwhelm" Joliet Hospital". The St. Joseph Hospital Medical Director said that they had been overwhelmed by inmates infected with COVID-19. He said, "This is a disaster". The article stated, "On Monday, 17 inmates infected with the virus were taken to the hospital for treatment. There are nine prisoners currently on ventilators in the intensive care unit at Saint Joseph". The Medical Director at the hospital described the hospital as "maxed out on staff".
- 3/31/20: 7th patient who ultimately died of COVID-19 developed symptoms at Stateville. The patient was transferred to the hospital the day of identification of symptoms of fever, cough, and hypoxemia and was tested at the hospital on 4/2/20.
- 3/31/20: OHS personal protective equipment (PPE) guidance sent to Monitor.
- 4/2/20: Governor activates 30 National Guard medical personnel to assist in response to COVID-19 at Stateville. Operations of the National Guard began at Stateville on 4/4/20.
- 4/3/20: Revised recommendations for IDOC employees. This guidance gave specific recommendation for screening all employees on entry into IDOC facilities and periodic monitoring, mask requirement while on duty, rules for employees suspect or known to have COVID-19
- 4/6/20: Governor's executive order suspending furlough rule that allowed IDOC to temporarily release high risk inmates for the duration of the gubernatorial disaster proclamation.
- 4/8/20: By this date, only 222 inmates at Stateville had been tested. Of these, 126 (57%) were positive; 89 (40%) were negative; and 7 (3%) were inconclusive. This reflects that insufficient testing was being done as the positivity rate was well over 50%. Of these 222 inmates 11 inmates died.
- 04/09/20: Monitor conference calls with five sites on their COVID-19 preparation began. These calls were scheduled over a week.[15] These calls demonstrated that staff were insufficiently prepared for isolation, quarantine and testing.
- 4/10/20: IDOC sends Monitor individual facility COVID-19 plans. These plans were all based on dated influenza-like-illness procedures that were not appropriate for COVID-19.

---

[15] These calls revealed a non-standardized system of instituting isolation, quarantine and testing procedures. They also revealed deficient isolation and quarantine procedures. A method of statewide communication of clinical procedures did not appear in place. A mechanism to communicate centrally directed guidance did not yet appear in place.

- 4/15/20:  Attorney General sends letter stating that due to COVID-19 obligations under the Consent Decree will be impacted.
- 4/15/20: IDOC produced a housing isolation and quarantine plan for Stateville and Sheridan about three weeks after the outbreak started.  Notably the Stateville Pandemic Plan of 3/13/20 did not include this housing isolation and quarantine plan.
- 5/3/20:  Eleven persons from Stateville died from COVID-19 as of this date during the outbreak that affected more than two hundred inmates causing dozens of hospital admissions.
- 5/5/20:  The Warden at Stateville issued a revised pandemic plan[16] that gave guidance on cleaning, screening of staff and visitors, disinfection, personal protective equipment use, screening procedures, and rudiments of isolation and quarantine procedures.  This was not a comprehensive medical plan.

The IDOC provided seven medical records of persons who died during this early outbreak.  Six of these records are reviewed below.  Another is reviewed in the mortality review appendix.  The reviews were as follows.

One patient[17] had body aches and congestion on 3/21/20.  On that date, a nurse evaluated the patient using an upper respiratory infection protocol but did not consider COVID-19.  The upper respiratory infection protocol did not include specific symptoms of COVID-19.  The nurse did not mask or quarantine the patient.  Temperature and oxygen saturation were normal.  Any patient with respiratory symptoms should have been masked, tested for COVID-19 and isolated.  This indicated lack of updated protocols for COVID-19.  Training should have been instituted early on with nursing and physician staff on symptoms of COVID-19.  Five days later, on 3/26/20 another nurse evaluated the patient for upper respiratory symptoms of feeling tired, cough, runny nose, shortness of breath, and fatigue.  The patient was afebrile but the oxygen saturation was 88%.  This patient should have been sent to a hospital immediately.  The nurse failed to mask the patient and did not isolate the patient.  The failure to recognize symptoms was a repetitive occurrence that undoubtedly resulted in spread of infection and delayed treatment.  The patient was likely infected and was sent back to his housing unit with a next day appointment with a doctor.  The doctor didn't see the patient until 7 pm the next day.  At that time the patient's respiratory rate was 24, with an oxygen saturation of 80% and fever of 101.8.  This patient should have been immediately sent to a hospital but the doctor ordered to continue oxygen and assess the patient in two hours.  The doctor failed to act on a red-flag presentation.  Two hours later the patient had hypotension with blood pressure of 92/53, temperature 101.7 and oxygen saturation of 84% on 6 liters of oxygen.  The patient was sent to a hospital being intubated shortly after arrival and remained hospitalized until 4/20/20 when the family agreed to end intervention.  The patient was sent back to Stateville infirmary as a hospice patient.  Immediately after transfer to his bed on the infirmary the patient expired on 4/20/20.  This patient was symptomatic for at least five days before transfer to the hospital.  In the meantime, he was likely spreading infection to others.

---

[16] Illinois Department of Corrections Procedural Bulletin PB 04.03.116 Pandemic Plan effective 4/1/20 revised 5/5/20.  This was a procedure to prevent spread of viral infections to visitors, employees and offenders.
[17] Mortality review patient #13

Another patient[18] was evaluated by a nurse who didn't date the note. The patient complained of a couple of days of cough and fever. No other history was taken. The temperature was 100.8, pulse 119 and oxygen saturation 94%. The nurse did not mask, isolate, refer the patient for testing, or refer to a provider all of which should have been done. The nurse treated the patient with cough tablets, Tylenol and an antihistamine. Under a prompt question "dyspnea" on the form the nurse documented "N/A" or not applicable. At this juncture the patient should probably have been sent to a hospital. Nurse training on COVID-19 symptoms needed to be done. A doctor saw the patient on 3/26/20 and documented a fever of 101 the day before. The doctor wrote that the patient said he had been sick for a week with fever and shortness of breath. The oxygen was 83% with a temperature of 100.2. The patient was wheezing. The doctor sent the patient to a hospital where he died 4/15/20. Based on history, this patient was also symptomatic and unrecognized for about a week.

Another patient[19] experienced hypoglycemia during insulin administration and a nurse checked the vital signs. The temperature was 102. The nurse sent the patient to the health unit. The oxygen saturation was 90% which is low. The doctor should have considered sending the patient to a hospital. The doctor did not isolate the patient or order a mask; instead only ordering fluids and monitoring temperature every shift. The temperature wasn't checked the next shift but a LPN saw the patient at 8:30 pm. The patient was still being housed in his cell with a cellmate. The temperature was 104 and the cellmate said that the patient was coughing. The patient was weak. The nurse noted change of consciousness stating:

> "can follow directions and answer questions. Cannot walk with steady gait. Cellmate says he's been different all day. Can hold conversations w/ staff appears to keep nodding off. Cellmate says did not eat or drink much today. Offered fluids to drink with meds. I/M doesn't want to drink much water".

The LPN assessed altered mental status. The nurse did not immediately refer for a higher level evaluation even though the patient had altered consciousness. The LPN apparently referred the patient to an RN but that evaluation didn't occur for three hours despite the patient having a red-flag presentation. When the RN saw the patient, the patient asked the nurse if she was doing surgery on him. He appeared delirious. The nurse presumed that because the patient couldn't urinate that he had a urinary tract infection and without a physician order, performed an invasive straight catheter procedure which produced no urine. The oxygen saturation was 87%. The nurse documented notifying a doctor to get instructions. The doctor called back and the patient was sent to a hospital. The oxygen saturation had decreased to 80%. Nurses again missed an opportunity for an early referral. Red-flag COVID-19 symptoms were missed. A patient with COVID-19 symptoms was not masked or isolated for an unknown period of time.

Another patient[20] saw a nurse for a symptom of a cold for five days. The patient had lymphoma, chronic kidney disease, hypertension and diabetes, all risks for COVID-19 morbidity and mortality. The temperature was 99.9 with pulse 109 and oxygen saturation of 94%. A thorough history was not taken. The patient warranted isolation and immediate testing and should

---

[18] Mortality review patient #12
[19] Mortality review patient #11
[20] Mortality review patient #14

probably have been transferred to a hospital based on his underlying morbidities. Instead, the nurse gave the patient Tylenol and sent the patient back to his housing unit without mask or isolation. This would lead to potential for transmission. The following day without any documentation in the record the patient was sent to St. Joseph's Hospital but due to overflow the patient was diverted to Morris Hospital. He remained at Morris Hospital for two days and was discharged. At the hospital, the oxygen saturation improved on room air but the renal function was noted to not be good (GFR 44). On return to the prison, a doctor saw the patient and the temperature was 104.5 and oxygen saturation was 88%. This patient should have been sent back to the hospital immediately. Instead, the doctor ordered an antibiotic, oxygen, and an inhaler but did not order laboratory studies. Antibiotics are ineffective treatment for COVID-19 unless a superimposed bacterial infection is identified. However, the doctor performed no testing to make that determination and it appeared that the doctor was treating COVID-19 with an antibiotic, which is not recommended.

The patient was placed on the infirmary unit. No laboratory tests were done despite the patient having new onset altered renal function at the hospital. The following day the oxygen saturation improved to 91%. In the evening the patient had fever of 101.4 with 94% oxygen saturation on oxygen. The following day the patient wasn't evaluated by a nurse or physician despite being on the infirmary unit. The following day the patient had oxygen saturation of 85% on room air with elevated blood pressure 155/87. An hour later the oxygen saturation was 85% on 4 liters of oxygen. The nurse did not call a doctor. This patient should have been immediately sent to the hospital but there was no doctor on the unit and the nurse failed to refer to a provider. Later, at 5:50 pm the temperature was 104 with respiratory rate of 28 with oxygen saturation of 88%. The nurse did not call a provider. The patient should have been admitted to a hospital due to a red flag presentation. The next evening the patient had an oxygen saturation of 86% with blood pressure 93/72 consistent with near-shock values. The nurse failed to recognize that this was a life threatening presentation and took no action. The next afternoon, the patient was short of breath and weak. The nurse described the patient able to respond to his name but unable to follow commands. Blood pressure was 81/40 and respiratory rate 22 with pulse of 129 and oxygen saturation of 79% on 4 liters of oxygen. The nurse called a doctor finally who sent the patient to a hospital. A doctor hadn't seen the patient on the infirmary for the past five days despite being critically ill. Nurses made repeated judgment errors as did physicians. Physicians weren't available to care for a critically ill patient. The patient died 14 days later in the hospital.

Another patient[21] saw an LPN on 3/26/20 at 3 am for back pain and said he was shaky and was described as unstable in a sitting position. The patient had fever (100.8) and the oxygen saturation was 89%. The LPN did not take a thorough history and the nurse assessment was generalized weakness. The LPN should have referred immediately to a RN or provider. Instead the LPN documented that the doctor would be contacted in the morning for how to proceed. LPNs should not be conducting independent nursing assessments. There was a failure to recognize that someone with fever, low oxygen saturation, and weakness needs to be immediately isolated, tested for COVID-19 and referred to a provider. In this case hospitalization was indicated but not done. The following day on 3/27/20 at 11 am a physician assistant evaluated the patient, who was 78 years old and had diabetes, gave a history of productive cough for five days with diarrhea and had oxygen saturation of 88%. The physician

---

[21] Mortality review patient #16

assistant initially wrote to send the patient to a hospital but scratched that order out. A couple hours later the physician assistant called a doctor who sent the patient to the hospital.

Another patient[22] saw a nurse on 3/23/20 for nausea, cough, chills, and diarrhea for a week. The patient was concerned about COVID-19. The patient who had history of cardiac disease and *hypertension*, had a blood pressure of ten days of cough, nausea, dizziness, and fever. The oxygen saturation wasn't checked. Though the patient had symptoms consistent with COVID-19 with hypotension the nurse didn't call a physician, didn't put a mask on the patient and didn't isolate the patient. These were all significant errors. Two days later, on 3/25/20 at 11:05 am, a doctor saw the patient with complaints of ten days of cough, nausea, dizziness, and fever. The pulse was 117 and temperature 100.6 with oxygen saturation of 87%. The patient was unable to eat or keep fluids down and was short of breath. The doctor did order a COVID-19 test and IV fluid but diagnosed viral syndrome, didn't mask the patient or isolate the patient. This patient's presentation warranted hospitalization which was not done. About seven hours later, at 6:10 pm, the doctor documented that the patient had an oxygen saturation of 90% on oxygen. The doctor's plan was to keep the patient on the health unit on oxygen. Though the doctor ordered vital signs, these were not present in the medical record. There was also no documentation of isolation of the patient. Lab tests weren't ordered but were indicated. The next day early in the morning the patient had a fever of 101 and the oxygen saturation was 89%. The nurse didn't call a doctor but increased oxygen without a physician order. Later that morning a doctor saw the patient who had oxygen saturation of 88% on room air and was still coughing and nauseated. The patient had abnormal breath sounds and the doctor sent the patient to a hospital. The patient was intubated shortly after admission to the hospital and died on 4/15/20 almost three weeks later at the hospital.

The Monitor notes that the SIU report made two statements about hospitalizations during this outbreak that require comment. These statements were:

> "Offenders that needed hospitalization were rapidly recognized and sent to the hospital."
>
> *and*
>
> "People that were sick were sent for higher level care as they needed".

These statement might not have been made if record reviews were done instead of just communicating with IDOC staff. Based on the Monitor's record reviews, as noted above, transfers to the hospital were not timely and may have affected outcomes. The SIU report also mentions that

> "the facility looked at the cause of deaths for the 12 people reported to have died from COVID-19. There were significantly older and with other morbidities".

The Monitor notes that critical evaluation of deaths is not currently performed in IDOC. The statement that the facility looked at the cause of death should be qualified therefore to note that

---

[22] Mortality review patient #17

none of the COVID-19 deaths were critically evaluated to the Monitor's knowledge.  It is important to learn the opportunities for improvement that are evident in these death records.

The SIU report also documents,

> "Offenders were screened three times a day.  For them, a pulse ox along with temperature screening was performed."

Patients were not properly screened early in the course of the pandemic as documented in the mortality reviews performed by the Monitor.  Patients were not documented as screened three times a day based on record reviews.  Also, based on CQI reports, as late as June, 2020 nurses at one IDOC facility, were still not recognizing COVID-19 symptoms when screening patients for upper respiratory symptoms and appropriately masking, isolating, and referring for testing.[23] The SIU report also described isolation procedures that were not in place until after the outbreak was well underway.  The report also described a rapid testing system that was not in place at the time this outbreak started.  The report appears to imply that testing resources were adequate. Testing resources were not available to IDOC at the outset of the pandemic and the lack of testing became a point of ongoing discussion between the Monitor and IDOC throughout the pandemic.  This is not to discount the SIU report but to point out that there were opportunities for improvement that can be identified from this outbreak that will improve the IDOC medical program and will help to reduce the probability of such an event from happening again.  Also, once the IDPH became involved, additional resources were forthcoming including increased access to testing, assistance from the National Guard for staffing and establishing isolation, and guidance and help from UIC for data and infectious disease consultation.

---

[23] These were three inmates identified from records for a CQI audit done in June of 2020 at East Moline.

Inmate # M54945 was seen on 8/31/20 using the Offender Symptom Checklist for Coronavirus. There is virtually no history documented and the patient reported no subjective symptoms. His temperature however was 101.4 which according to the pre-printed plan should have prompted immediate notification of the physician. The notes do not indicate that any actions were taken to mask, isolate or test the patient for COVID-19. Later this patient did have a positive test for COVID-19 but this is not documented on the form. It is not clear what the nurse's plan of care was for the patient. The expectations of nurses with regard to referral, testing, masking and isolation at this point in the pandemic were unclear.

Inmate K52133 was seen 8/15/20 for complaint of chest congestion for a few days.  Vital signs were normal but no history was taken with respect to COVID-19 symptoms or possible exposure. The nurse gave the patient cold tablets. It doesn't appear that the nurse was suspicious that it could possibly be COVID-19 even though the patient had upper respiratory symptoms. The patient was given no instructions on masking, was not quarantined and not tested. Nine days later, this patient tested positive for COVID-19 after an "exposure".

Inmate R23640 was seen 8/23/20 using the Offender Symptom Checklist for Coronavirus. He complained of cold symptoms, cough, fever and chills and was a confirmed contact of a COVID positive person (cellmate). He was given cold tablets. The patient was given no instructions on masking, was not quarantined and not tested.

Many key problems and opportunities for improvement can be identified from the Stateville COVID-19 outbreak which we list below with recommendations for making improvements.

1. Preparations for the pandemic did not begin until after the pandemic was well underway. The Monitor attributes this to an absence of infection control expertise within IDOC. Stateville did not have any infection control leadership on a statewide or facility specific basis when this pandemic began. Expertise was obtained ad hoc from outside agencies offering help. IDOC continues to need an infectious disease physician consultant on a permanent basis. IDOC should obtain this assistance from IDPH or one of the universities through a memorandum. IDOC can fund a position at either a university or with IDPH and the infectious disease consultant can work as a consultant to IDOC while maintaining connection to IDPH or a university medical program. An infectious disease physician from IDPH has been providing considerable guidance to IDOC during the pandemic. This relationship should be formalized. The Monitor recommends that IDOC fund an IDPH position that would be assigned to IDOC for the purpose of providing guidance, assisting with surveillance and design of data resources. The Monitor continues to recommend filling the statewide Infection Control Coordinator position with an individual with appropriate qualifications and experience.[24] The Monitor continues to recommend that every facility have a full time infection control nurse.
2. IDOC does not have an effective current system of quickly communicating clinical directions statewide. IDOC needs to develop a mechanism for system-wide communication on urgent clinical items.
3. IDOC did not hire staff consistent with their three staffing plan versions and there were insufficient staff at Stateville to effectively monitor patients resulting in a need to use LPNs to perform independent assessments and for the Governor to order the National Guard to assist monitoring affected inmates. At the beginning of this outbreak, Stateville had vacancies in 19 (30%) of 64 nursing positions and four (66%) of six provider positions. IDOC should hire staff as recommended in their draft Staffing Analysis as quickly as possible.
4. There was no protocol in place for when to send a patient to a hospital based on clinical parameters. Six of the seven death records indicate that the patients were severely ill when hospitalized some requiring immediate intubation. Early in this outbreak, physicians were not admitting patients to a hospital until they were near intubation status. To the best of our knowledge, to date, there is still no written guideline on when to send patients to a hospital although IDOC has given verbal guidance. These should be promulgated.
5. Through March 2020, Stateville did not monitor, mask, or evaluate patients with symptoms or with known COVID-19 appropriately. The reason for this is likely the lack of infection control capacity within IDOC to promulgate appropriate guidance and lack of staffing. The Offender Symptom Checklist for Coronavirus was initiated in June of

---

[24] The qualifications for the Infectious Disease Coordinator should include experience in infection control, certification in infection control and prevention through the Certification Board of Infection Control and Epidemiology and maintenance of certification, proficiency with electronic software systems for surveillance and use of an electronic health record and use of electronic surveillance reporting systems and attain six Sigma green belt certification within 3 years of hire.

2020.  The Monitor has two comments: 1) the Monitor recommends that all patients with symptoms be evaluated by a provider the same day and be isolated, and 2) dyspnea needs to be included as a symptom.  Dyspnea is a key sign of deterioration and everyone should be keyed in on this symptom as deterioration of dyspnea is a benchmark for poor outcome and needs to result in prompt hospitalization.   Even when large numbers of persons require symptom monitoring, the results, including vital signs need to be documented in the medical record.

6. Nursing protocols in place at the beginning of the pandemic (specifically the upper respiratory tract infection protocol) did not consider COVID-19.  Nurses did not appear to understand what COVID-19 symptoms were and failed to identify them in sick call encounters or associate upper respiratory symptoms with COVID-19.  Training was indicated.  The Monitor is unaware of training that may have occurred.  It is important that IDOC have a mechanism to institute system-wide training on short notice for both providers and nursing.

7. There was lack of physician leadership at Stateville on clinical matters resulting in significant errors of judgment in determining when to transfer to hospitals and the guidance provided to nurses.  Quality of physician care needs to improve and needs to be monitored.  The Monitor notes that it is difficult for a Medical Director to provide leadership when four of six provider positions are vacant.

8. There was and continues to be a lack of central office support including resources to manage data. Obtaining data personnel is critical but through the course of this pandemic, data provided to the Monitor was not easy to understand and presented in a manner that did not facilitate decision making.  Data personnel, as recommended in the Monitor's Report should be hired.

9. One critically ill patient was on the infirmary for five days without a physician evaluation.  When time permits the reasons for this should be determined.  Was this a staffing issue or clinical failure?  This should not happen again.

10. Testing material was not readily available within IDOC at the beginning of the pandemic and appeared to be lacking later in the pandemic.  Early on, this may have been due to shortages of testing material.  There also was no specific guidance for testing initially, possibly, in part, due to lack of testing material.  While the hesitancy to test may have been related to lack of testing material or staff to perform the tests, lack of testing did contribute to unnecessary spread.  Early on, when testing material was lacking, protocols should have been put into place to send patients to a hospital earlier in the course of their disease to determine if they were infected.  IDOC needed to be stronger advocates for testing as testing was the only mechanism to control spread since social distancing for this virus was extremely difficult to impossible to attain at Stateville.