# Health Care Monitor
# 4th Report
# Lippert v. Jeffreys

September 16, 2021

Prepared by Lippert Monitor
Dr. John Raba
Monitor's Consultants
Michael Puisis, D.O.
Ronald Shansky M.D.
Catherine Knox MN, RN, CCHP-RN

# Table of Contents

Overview .................................................................................................................... 5

Executive Summary ..................................................................................................... 5

Statewide Issues: Leadership and Organization ......................................................... 18

    Leadership Staffing ................................................................................................ 18

Staffing Analysis and Implementation Plan ............................................................... 21

    Staffing Analysis ................................................................................................... 21

    Implementation Plan ............................................................................................. 27

    Vendor Relationships ............................................................................................ 30

Statewide Internal Monitoring and Quality Improvement .......................................... 32

    Audits ................................................................................................................... 39

    Performance and Outcome Measure Results .......................................................... 43

    Adverse Event and Incident Reporting Systems ..................................................... 49

    Vendor Monitoring ............................................................................................... 49

    Mortality Review ................................................................................................... 50

Medical Records ......................................................................................................... 52

Policies and Procedures .............................................................................................. 54

    Medical & Dental .................................................................................................. 54

Facility Specific Issues ............................................................................................... 56

Facility Staffing .......................................................................................................... 56

    Budgeted Staffing .................................................................................................. 56

    IDOC Staffing ...................................................................................................... 62

    Vendor Staffing .................................................................................................... 63

    Credentialing of Physicians ................................................................................... 63

    Oversight over Medical, Dental, and Nursing Staff ................................................ 68

Operations .................................................................................................................. 71

    Clinical Space ....................................................................................................... 71

    Equipment and Supplies ........................................................................................ 73

    Sanitation ............................................................................................................. 74

    Onsite Laboratory and Diagnostics ....................................................................... 77

    Dietary ................................................................................................................. 78

Facility Implementation of Policies and Procedures ................................................... 89

    Medical and Dental ............................................................................................... 89

Intrasystem Transfers ................................................................................................. 90

Medical Reception ........................................................................................................ 92

    Health Assessments ................................................................................................. 97

Nursing Sick Call .......................................................................................................... 100

Chronic Care ................................................................................................................. 109

Urgent and Emergent Care ........................................................................................... 114

Infirmary Care ............................................................................................................... 120

Specialty Consultation .................................................................................................. 136

    Specialty Referral Oversight Review ...................................................................... 140

Hospital Care ................................................................................................................. 145

Preventive Services ....................................................................................................... 146

    Influenza Vaccinations ........................................................................................... 146

    Adult Immunizations .............................................................................................. 147

    Cancer and Routine Health Maintenance Screening ............................................. 153

    Mammography Screening ....................................................................................... 155

Pharmacy and Medication Administration ................................................................... 157

Discharge Planning ....................................................................................................... 164

Infection Control ........................................................................................................... 166

Dental Care .................................................................................................................... 185

    Staffing ................................................................................................................... 185

    Dental Documentation ........................................................................................... 187

    Dental Support ....................................................................................................... 189

    Dental Intake .......................................................................................................... 193

    Dental Hygiene ...................................................................................................... 193

    Comprehensive Dental Care .................................................................................. 195

Facility Internal Monitoring and Quality Improvement ............................................... 196

    Audits ..................................................................................................................... 197

    Performance and Outcome Measure Results ......................................................... 198

    Adverse Event and Incident Reporting Systems ................................................... 198

    Vendor Monitoring ................................................................................................ 198

    Mortality Review .................................................................................................... 199

    APPENDIX A ......................................................................................................... 200

    APPENDIX B ......................................................................................................... 202

    APPENDIX C ......................................................................................................... 210

    APPENDIX D ......................................................................................................... 213

APPENDIX E ................................................................................................................... 237

APPENDIX F ................................................................................................................... 240

# Overview

This 4th Report of the Lippert Medical Monitor comes at a time when the COVID-19 pandemic is still affecting the Illinois Department of Corrections (IDOC). Currently there have been over 11,000 cases in the IDOC over a third of the IDOC population. The COVID-19 death toll is approaching 90. The fully vaccinated and masked Monitor team was able to tour at the Shawnee facility on 7/21/21 to 7/23/21.

With respect to information for this report, the findings of the Monitor's 4th Report are based on the data provided, interviews with senior leadership, a visit to the Shawnee facility, and multiple record reviews.

This report includes six appendices. Appendix A contains staffing changes from the first Staffing Analysis in November of 2019 to the most recent Staffing Analysis in August of 2021. Appendix B is a narrative that accompanied a suggested Implementation Plan provided to IDOC from the Monitor in January of 2020. Appendix C is an email of 6/3/21 to IDOC counsel on their recent Implementation Plan submission. Appendix D is a 6/24/21 list of recommendations from the Monitor's 3rd report that the Monitor suggested be incorporated into the Implementation Plan. Appendix E is an email to IDOC counsel regarding use of the Monitor's recommendations in the IDOC Implementation Plan. Appendix F is a list of suggested performance and outcome measures provided in response to performance measures developed by IDOC.

# Executive Summary

*Addresses items II.A;*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

In the Monitor's 3rd Report, the Monitor gave 235 recommendations, some with multiple sub-recommendations, all with the intent of helping IDOC to become compliant. IDOC has not responded in writing or formally addressed these recommendations. The Monitor has also provided 25 separate comments/recommendations regarding the Staffing Analysis.[1] The Monitor combines all of these recommendations in this report. Of 235 recommendations in the Monitor's last report the IDOC has fully or partially addressed 11 (4%)[2]. The recommendations

---

[1] These were in an email to IDOC on 10/28/20. There were 25 comments with recommendations but only two were addressed.

[2] 1) They partly addressed recommendation 1 in the Staffing Analysis and Implementation section by arranging a call with the Executive Director and a counsel for the Governor's office. However, OHS and the Executive Director have not confirmed that they have a clear indication of the design of their health program with respect to an Implementation Plan. 2). They have partly addressed recommendation 1 in the Statewide Internal Monitoring and Quality Improvement section by arranging for SIU to manage quality improvement. 3) They have addressed recommendation 2 in the Audit section by agreeing to hire the recommended staff for the audit team, though these teams have not yet been hired. 4) They have only minimally addressed recommendation 1 of the Performance and Outcome Measures by proposing a list of performance and outcome measures. This list needs considerable work and is far from complete. 5) They did address recommendation 2 in the Medical Record section by providing

that were addressed have been on matters that the Monitor has repeatedly emphasized on calls or for which Plaintiffs have initiated the dispute resolution process. This is in line with the Monitor's opinion that IDOC does not yet have a comprehensive plan to address this Consent Decree; instead, it seems to primarily respond to crises and threats of legal action.

The Monitor recommended that IDOC use the Monitor's recommendations[3] as a basis to develop their Implementation Plan and to attain compliance.

**Data and Information**
IDOC has an obligation to produce reports bi-annually for the first two years and annually thereafter with the Parties and the Monitor ***"agreeing in advance of the first report on the data and information that must be included in such report"***. This agreement on data and information for IDOC's reports is called out in the V.G. provision of the Consent Decree. IDOC included no data or information to verify their assertions of compliance over the past two years, covering four IDOC Bi-Annual Reports.

The IDOC's last Bi-Annual report in May of 2021 asserts compliance or imminent compliance on 35 (37%) of 95 provisions without any accompanying data or information to verify their assertions. The Monitor agrees with only one of these assertions of compliance.[4]

IDOC has not assumed responsibility for the requirement to include data and information in their reports. To assist, the Monitor gave IDOC three detailed lists with suggestions for data and information[5] and had a couple meetings and a few conference calls over almost two years. Yet, IDOC has not agreed to a final list for their V.G. requirement. When IDOC receives a list from the Monitor, they review the list and desire to negotiate items off the list that they believe can't be currently provided or that they believe are not required by the Consent Decree. The Monitor has attempted to reword requests or to modify requests to be acceptable to IDOC but there still remain 24 of 99 items that IDOC has issues with.

IDOC has described the Monitor's suggested document list to satisfy the V.G. Consent Decree requirement and for the Monitor's reports as a "big ask". The data IDOC currently provides in quality improvement meetings and existing tracking logs has little relevance with respect to evaluation of IDOC's compliance with the Consent Decree. The Consent Decree requires IDOC to make changes necessary to become compliant with the Consent Decree. Because those changes have not yet taken place, it is not surprising that IDOC is unable to provide information

---

remote access to the Logan electronic record. 6) They partly addressed recommendation 6 in the Facility Staffing section by increasing the numbers of clerical and technician staff but because a workload analysis was not done it is unknown whether this is effective. 7) They addressed recommendation 2 in the Credentialing section. After a year of notice they have released the two poorly credentialed physicians who were practicing in an unsafe and inadequate manner. 8) They are adhering to recommendation 6 in the Credentialing section by only adding qualified physicians. 9) They have addressed recommendation 4 in the Specialty section by discontinuing "collegial review". 10) They did enact recommendation 3 in the Infection Control section to expeditiously implement a COVID-19 vaccination program. 11) They did begin to implement recommendation 10 in the Infection Control section to increase access to HCV treatment, though the effectiveness of this remains to be seen.
[3] There are now more recommendations as the Monitor included recommendations given in response to the Staffing Analysis and with respect to newly discovered pharmacy issues and dietary issues.
[4] That the Chief OHS be Board Certified.
[5] November of 2019, December 7, 2020, and May 27, 2021

resulting from those changes. To IDOC, making these changes is daunting. Yet, IDOC must begin the task of making operational changes necessary to obtain these data if it is to improve. Initially, IDOC may not be able to provide all requested data. But to attain compliance they will need to establish an effective operational and data monitoring system. The Monitor has attempted to provide IDOC, by way of recommendations in his reports with a means to effectively obtain and track data. However, IDOC has not responded formally to the Monitor's recommendations. IDOC has also limited the Monitor's ability to give input on the Implementation Plan including regarding data processes which has delayed progress.

The recommendations of the Monitor and IDOC's positions on what they will or will not provide related to the V.G. requirement have not changed much over two years. The lists the Monitor developed from October of 2020 through May of 2021 request virtually the same documents. Repeated meetings over two years and several negotiations have not resulted in meaningful progress. The V.G. issue should be resolved before the Court.

The Consent Decree also requires that the Monitor produce reports twice annually regarding Defendant's compliance with the Consent Decree and states that these reports "shall include information necessary to evaluate Defendants' compliance or non-compliance with terms of the Decree". The Decree also states that "Defendants will not refuse any request by the Monitor for documents or other information reasonably related to the Monitor's review and evaluation of Defendant's compliance with the Decree". IDOC has not provided the Monitor all documents and information requested for the 2nd, 3rd and 4th reports.

For his 1st Report, the Monitor asked for data and information by sending individual emails to IDOC counsel and tracking receipt of documents received. This was tedious and sometimes required repeat requests. A few documents were never sent without explanation. When the Monitor assembled his consultant team, this practice was determined by the team to be impractical given there would be four separate individuals with different data needs and sometimes requesting the same information. So, the Monitor group collated data and information needs into a single document request that the Monitor sent to IDOC on 7/21/20 in preparation for his 2nd Report. Additional needs would be requested by email. The Monitor offered to clarify this request in a call if IDOC desired. IDOC did not respond to this request with production of documents.

On 12/17/20 the Monitor sent another request for data and information for his upcoming 3rd report. IDOC responded to this request on 1/15/21 stating that they would disregard the Monitor's request for data and information on a collated document request and would focus on finalizing agreement on the V.G. matter inferring that the Monitor's request for information for his reports is dependent on the V.G. requests. This is inconsistent with requirements of the Consent Decree. While the Monitor believes that the data and information the IDOC uses in its reports should be almost the same as documents the Monitor requires for his reports, that does not give IDOC permission to negotiate with the Monitor what information the Monitor can request for his reports which is what IDOC is now doing. The Monitor has asked for a single collated document request to be honored and sent no later than two months prior to each report and for individual documents needed aside from the collated document request to be sent based on individual email requests.

7

Another issue related to document requests for the Monitor's reports is that IDOC has refused to provide certain documents stating that the requests are outside the boundaries of the Consent Decree.[6]  IDOC sees their role as defining what is or is not appropriate for review with respect to verifying compliance with the Consent Decree when this is the Monitor's responsibility.

The current status is that IDOC is disregarding the Monitor's collated document request.  The IDOC has merged the Monitor's requests for information and data for his reports with the V.G. document list.  This has allowed IDOC to negotiate items it will provide the Monitor for his reports.  The IDOC should answer why they are refusing the Monitor reasonable requests for data and information for evaluation of IDOC's compliance.  The IDOC's refusal to provide the data in the collated request affects negatively the Monitor's ability to perform his duties.

**OHS leadership**

A key component of the future ability of the IDOC to become compliant and independent of the Consent Decree will be the strengthening of the OHS so that its leadership team can effectively direct, manage, monitor, and oversee the delivery of health care services and the health of the IDOC population.  While the IDOC has told the Monitor that the Chief of the OHS is the health authority and in charge of the medical program, actual practice shows otherwise.  The Warden at Shawnee appointed a Deputy Warden to be an acting Health Care Unit Administrator (HCUA).  Wardens still appoint quality improvement coordinators for the medical program.  The Wardens have to give permission for HCUAs to participate in quality improvement training.  The Chief OHS must, in a formal table of organization and in practice, be authorized to hire, fire, and manage all health care personnel.  This is not currently occurring.

No new OHS staff have been hired since the last report.  Position descriptions are not all complete.

**Staffing Analysis**

On 8/17/21 Defendants submitted their final Staffing Analysis to parties.  From the first Staffing Analysis to the latest, the total positions have decreased by three positions. Twenty-seven less staff are working now as compared to when the first Staffing Analysis was submitted 16 months ago and the vacancy rate remains very high.  Multiple changes to individual positions have occurred from the first to most recent staffing analysis which have resulted in a staffing mix that has less training and skill levels.  IDOC has stated that they have accepted the vast majority of the Monitor's recommendations which is not accurate.  Details are in the body of the report. Southern Illinois University (SIU) will hire the audit team consistent with the Monitor's recommendation but details of the quality, data and information technology staff remains uncertain.  Record reviews have revealed additional need for pharmacy consultants.  The initial investigation of dietary practices has revealed a complete absence of dietary consultation which needs to be added to the staffing plan.  Currently only 19 of the 28 facilities with dental suites have onsite dental hygienists. For the last five Staffing Analyses IDOC has recommended new dental hygiene positions at six additional sites and augmented dental hygiene staff at 10 facilities.  To date, only one site has actually hired any of these recommended additional dental

---

[6] For example, the commissary list, emergency response log, provider peer reviews and disciplinary actions, and data on turnover of staff in IDOC facilities.

hygienist positions   The Staffing Analysis is far from settled.  IDOC has not pursued a workload staffing assessment.  IDOC has not considered the Implementation Plan with respect to the Staffing Analysis and has not yet completed an Implementation Plan.  The delay in hiring staff pending the continual two-year-long effort to obtain a Staffing Analysis is only delaying progress.  Because the vacancy rate is so high, IDOC should immediately begin hiring staff in their analysis and should be required to develop a workload analysis or hire a consultant to do so.

**Implementation Plan**

The Consent Decree requires the Monitor to assist and provide input to IDOC in development of the Implementation Plan.  The requirement of counsels for IDOC and the Attorney General that nothing in the Implementation Plan exceed requirements of the Consent Decree has resulted in a legalistic methodology for determining what appropriate medical care consists of.  The Monitor and OHS have limited discussions about the Implementation Plan and no discussions independent of the counsels.  It appears that counsel for IDOC is writing this implementation plan[7] consulting and collaborating with OHS.

IDOC submitted two Implementation Plans that were not plans.  On 5/12/21 IDOC submitted as its 3rd draft Implementation Plan, an identical technical assistance document the Monitor had provided to IDOC in November of 2019.  Meaningful discussion on the Implementation Plan did not begin until June of 2021 after Plaintiff counsel had filed a motion to enforce.  Subsequent calls took place in July 2021.  Although OHS senior staff were on the calls, discussion was mostly between the Monitor and his team and the IDOC counsel and counsel for the Attorney General.  Discussion was not focused on development of a clinical operational Implementation Plan.  Instead, it focused on whether suggestions of the Monitor in the 2019 document were or were not specifically called out in the Consent Decree and which suggestions of the Monitor were able to be done by IDOC.

On the 7/12/21 call, IDOC Counsel stated that recent recommendations[8] of the Monitor for inclusion in a 2021 version of an Implementation Plan were more than required and exceeded the obligations of the Consent Decree.  The Attorney General Counsel added that the Consent Decree was not put together to make an optimal system and that because the Implementation Plan will become a legal document, it must only include what is minimally necessary.  Defendants' Counsel added that the OHS team would not be permitted to agree to something that exceeds the Consent Decree or allows the Monitor to exceed his responsibility.  These views demonstrate a lack of knowledge and experience in what is necessary to implement an

---

[7] When asked on a conference call if he was writing the Implementation Plan, the Chief OHS did not directly answer and counsel for IDOC intervened to state that this was a collaborative process.   The two Implementation Plans IDOC has submitted are not Implementation Plans but brief narratives of goals or progress.  No one has confirmed who is writing the Implementation Plan.  On another call, the Monitor was informed that IDOC counsel takes notes on the Monitor's suggestions and reviews them with OHS leadership before submitting a final comment.

[8] Because two years had passed since the Monitor gave technical assistance on the Implementation Plan, the Monitor included all recommendations from his 3rd Report for consideration to address in the Implementation Plan.  The IDOC counsel insisted on initially focusing only on recommendations made in 2019 which were not intended to address all provisions of the Consent Decree.  Because IDOC has not produced an Implementation Plan for two years, the Monitor is concerned that at this point, focusing only on a start-up plan will result in significant delay to progress.

operationally effective medical program. These comments were made while OHS senior staff were on the call sending a message on what was acceptable for them to discuss.

A discussion of the Implementation Plan which is a clinical and operational document instead became a legal negotiation of what IDOC and the Attorney General believed is consistent with their interpretation of what needs to be done to obtain compliance with the Consent Decree. This has not permitted input or assistance from the Monitor; sent a message to OHS staff about what they were permitted to engage in; and has not resulted in an effective Implementation Plan. It also creates a barrier that does not facilitate assistance and input from the Monitor. The IDOC has not hired or assigned a project manager to the task of developing an Implementation Plan. It appears that IDOC is willing to let the Monitor develop a plan for them but only if they can reject any of the Monitor's suggestions. If this doesn't change, the Implementation Plan will continue to remain unfinished for the foreseeable future.

The process for the Monitor to have any contact with any IDOC or SIU staff requires IDOC counsel to arrange all meetings and calls; decide who participates on the call, and to determine the duration of the meeting or call. When the purpose of a meeting is for input or assistance from the Monitor, it would optimal if the Monitor was able to schedule and arrange his own calls and meetings and to direct the meeting agenda and discussion. The Monitor has significant concerns whether input and assistance will be possible under the current conditions. Moreover, having attorneys making decisions on whether a clinical or operational recommendation is or is not appropriate in the design of a medical program is retarding progress.

**Quality Improvement Program**
The Consent Decree requires the Monitor to assist and provide input to IDOC in creation and implementation of the quality assurance plan and audit function. The Monitor has not been able to give effective input on these items. The Monitor is not clear about the details of the OHS and SIU quality plan or audit function.

IDOC has agreed to the number of audit team staff recommended by the Monitor and has an arrangement with a university-based program to manage the quality improvement effort, but assistance and input beyond that has been extremely limited. Though IDOC believes it is compliant with implementation of their quality improvement program, the Monitor is not aware of what the plan will actually consist of. Shortly after IDOC developed an agreement with SIU to manage their quality improvement program, on 1/5/21, the Monitor asked for a working group with SIU and OHS to develop the quality program. IDOC told the Monitor on a call with OHS senior staff and SIU that a working group between the Monitor and SIU was unnecessary and that IDOC Counsel would schedule meetings when appropriate. This has not resulted in meaningful input or assistance from the Monitor and development of the quality program is being developed without that input. Calls that have occurred consist mostly of updates of what SIU is planning but have allowed only limited time for input from the Monitor. Aside from staffing for the audit team, the Monitor has not been fully informed about details of what is being planned for the audit function or the quality program and learns details of quality improvement plans after they have been developed. There has been no meaningful discussion about the audit

function with SIU, even though they have stated in December of 2020 that they had completed 5% of work on an audit function[9].

The Monitor team would be able to more effectively provide input and assistance if they could directly schedule meetings with SIU and OHS staff.

**Electronic Health Record**

IDOC was required to have a contract with an electronic medical record (EMR) vendor on 9/6/19. IDOC signed a contract with a medical record vendor on 4/12/19 but subsequently cancelled that contract. IDOC has mostly completed wiring of its facilities in preparation for the EMR but wiring was slowed down by inability to work during the COVID pandemic. IDOC has asked SIU to assist in procuring a new electronic record. A request for proposal (RFP) has not yet been released. The IDOC has not informed the Monitor of any further plans regarding the electronic record including what will be in the RFP.

The Consent Decree requires that implementation of the EMR is to be completed three years from the date of the executed contract for the EMR but IDOC does not now have an executed contract for an EMR. If the original contract date of 4/12/19 is used for completed implementation of the EMR, a record should be fully implemented by 4/12/22 which is improbable. If the new EMR contract execution date is used as the baseline to begin implementation of the EMR and given that the Consent Decree allows three years to implement the EMR, full implementation of an EMR is not likely for several years. For these reasons, this item has moved to a noncompliance status.

The Monitor stresses the importance of data team support in implementation of this record in order to verify compliance with the Consent Decree and to staff a help desk when staff encounter problems with the medical record. Because the Monitor has been limited with respect to contact with SIU, there is uncertainty regarding how the electronic medical record will be implemented including getting data out of the electronic record. IDOC needs to allow the Monitor to conduct meetings with SIU.

**Policies**

Policies were to have been completed 7/1/20 but are not even a third completed. Around March of 2020 IDOC stopped work completely on policies due to the COVID-19 pandemic. In part, the Monitor attributes this to lack of sufficient staff positions and support staff in the OHS. To date, 17 draft policies have been submitted that the Monitor has provided comments on. On 8/11/21 as this report was being edited, IDOC submitted nine additional policies and five revised draft policies. These will be reviewed for the next report. Some draft policies to date have not considered changes that are required by the Consent Decree or that were recommended by the Monitor[10] and appear to continue business-as-usual in IDOC health care practices.

**Physician credentialing**

---

[9] In December of 2020 SIU submitted a draft quality improvement proposal for which the Monitor had no input. In that document, SIU had completed 5% of work on an audit instrument about which the Monitor was uninformed.
[10] These include the quality improvement and, chronic illness policies.

A year after the Monitor began advising IDOC of three physicians without required credentials who were practicing in an unsafe and clinically inappropriate manner the IDOC has released two of these physicians.  One of the physicians had his license permanently suspended by the State of Illinois licensing board before IDOC made a decision on his status.  There are now five fewer physicians practicing and the vendor has been unable to fill all physician positions.  Although IDOC does not provide up to date information on physician hires, all new physicians hired since the approval of the Consent Decree, have been properly credentialed. Six physicians remain who do not have appropriate credentials.  The IDOC Medical Director has not yet established a mechanism to evaluate these physicians who lack credentials but did discuss the OHS' early thinking on the matter and is initiating a process to develop a plan.   The IDOC still does not send the Monitor requested information to fully evaluate credentialing or to evaluate those physicians who are not credentialed.

**Hepatitis C Treatment**
IDOC, with input from UIC Telehealth and the Monitor, finalized and disseminated a revised version of the Hepatitis C Screening and Treatment Guidelines on March,15, 2021 that expanded the eligibility and streamlined the process for the treatment of active Hepatitis C Virus infections. The monthly volume of individuals on Hepatitis C treatment in IDOC more than doubled since the revised guidelines were implemented. This increase in HCV treatment is very encouraging.   If this second quarter 2021 trend of increasing individuals being started on treatment continues and expands, active Hepatitis C could realistically in the not-so-distant future be eliminated in the IDOC. This would have a positive impact on the health of the incarcerated population, eliminate the risk of transmission of Hepatitis C within the IDOC, and ultimately improve the overall health of communities in the State of Illinois.   IDOC must establish steps in the Implementation Plan to significantly increase and monitor the number of HCV infection cases treated annually.  IDOC should also set a goal to have treated everyone with HCV over the next three-five years; this would require a tripling or quadrupling of annual HCV treatments.

**COVID-19 Pandemic**
The first surge of the COVID-19 pandemic was beginning to wane at the time of the last Court Report in mid-February, 2021. The last COVID-19 death of an incarcerated person was on March 28, 2021. Due to the successful provision of COVID vaccination to the inmate population in February to March 2021, continued mitigation and surveillance testing, and established isolation and quarantine protocols for infected and exposed inmates and staff, the number of COVID-19 cases in the inmate population and the staff declined through June 2021. However, in July 2021 with the onset of the delta variant, the number of IDOC staff cases began to rise and shortly thereafter positive tests in the incarcerated population started to increase. As predicted, based on earlier IDOC trends in the pandemic, once there was an increase in the surrounding communities and in the number of positive employee tests, within a few weeks the volume of COVID positive cases in the incarcerated population began to increase.

The vaccination rate of the incarcerated men and women is now estimated to be 73-75% far exceeding the current State of Illinois rate of 58%.[11] However the systemwide COVID-19

---

[11] Health New Illinois, 8/13/21 IDPH reported the "74.2% of eligible candidates for the vaccine in Illinois have received at least one shot and 57.5% are fully vaccinated.

vaccination rate of employees, recently reported as 44%, is woeful. Six IDOC facilities have employee vaccination rates of less than 20%.[12] The Monitor strongly believes that unvaccinated employees are the prime vectors for the reentry of COVID-19 into IDOC facilities putting the incarcerated population again at risk,[13] this time with the more contagious delta variant. The Monitor has consistently advised the IDOC to mandate the vaccination of all employees. On August 4, 2021, Governor Pritzker announced a statewide COVID-19 vaccine mandate for state workers in state prisons and other congregate facilities. The Monitor wholeheartedly supports the Governor's vaccine mandate for all employees in the IDOC system. This will protect IDOC's incarcerated population from further devastation from the ongoing COVID-19 pandemic. The Monitor also strongly recommends that the vaccine mandate include visitors, volunteers, voluntary groups, service groups, subcontractors, and all others who are allowed to enter IDOC correctional centers. With universal vaccination of all who are allowed to enter IDOC, it is hoped that the future COVID -19 death of even a single incarcerated man or woman will be prevented.

**Specialty Consultation and Specialty Referral Process "Collegial Review"**
Recently, IDOC announced that the collegial review process has ended which is a positive development. However, the contract extension with the vendor does not explicitly state that collegial review has been terminated.

IDOC has not acted on any specialty care recommendations in the Monitor's last report[14] except for terminating the "collegial review" process. Since their May 2020 Bi-Annual Report IDOC has continuously asserted compliance with provisions III.E.4., III.H.1., III.H.2., III.H.3., and III.H.4., without providing any data or information to support their assertions. This is in contrast with the Monitor's reports which find this group of items noncompliant since the Monitor's 2nd Report in August of 2020. Record reviews show no improvement in clinical care with respect to specialty care. IDOC has provided no data or information to demonstrate any improvement.

**Adult Immunizations, Cancer Screening, and Routine Health Maintenance**
The OHS has appropriately expanded access to nationally recommended adult vaccines for the IDOC population and there is evidence that the medical providers at some IDOC correctional centers are beginning to order these vaccinations for their patient populations. The Monitor does not yet have a copy of the 2019 standardized procedures for immunization as these are on SharePoint which the Monitor does not have access to. IDOC provided the Monitor a draft Immunization Program Administrative Directive. The Monitor has not been notified that this is

---

[12] Chicago SunTimes 8/8/21 We Can No Longer Wait for Front-line Workers …to Get Vaccine. The six IDOC sites with less than 20% employee COVID-19 vaccination rates were Lawrence (7%), Vienna (9%), Vandalia (10%), Pontiac (14%), and Robinson (18%).
[13] It is estimated that approximately 7,000-8,000 inmates are currently unvaccinated.
[14] The Monitor gave several recommendations in the Specialty Consultation and Specialty Referral section of the report including: 1) To ensure the tracking log for specialty care is in line with the Monitor's recommendations and is accurate. 2) To perform a root cause analysis of specialty care to determine why significant morbidity and mortality occur related to specialty care problems. 3) To initiate quality improvement studies to determine whether patients in need of specialty care are actually referred; whether specialty care is timely; and whether recommended plans of the consultant or diagnostic study findings are integrated into the therapeutic plans at the prison. 4) To conduct a review of the vendor's policies, practices, and guidelines to ensure that these do not restrict access to medically necessary clinical services such as limiting cataract surgery to one eye, categorizing ostomy reversal surgery as elective, etc.

a final document and the Monitor has not yet provided comments on the operational procedures. While the Monitor is unaware of what the 2019 standardized procedure is, current immunization practices at IDOC facilities vary considerably and immunizations are not effectively provided as needed. Based on the volume of adult immunizations that have been ordered and the results of chart reviews by the Monitor, the IDOC population is still under-vaccinated for many CDC recommended adult immunizations.[15] IDOC must ratchet up the pace of vaccine administration to provide adequate protection for the incarcerated population and establish databases[16] to track the percentage of eligible individuals who are fully immunized for each nationally recommended vaccine. The development of a vaccination program directed by nursing staff has the best potential to effectively coordinate the catch-up and ongoing vaccination of incarcerated persons in the IDOC.

In January 2021, OHS developed a draft Immunization and Cancer/Preventive Screening Programs Administrative Directive that appropriately provided guidance on screening for breast cancer, cervical cancer, colon cancer, lung cancer and prostate cancers that was in alignment with the recommendations of the United States Preventive Services Task Force. This administrative directive is not yet completed and there is no evidence of its implementation. Although a small number of record reviews[17] show that incoming inmates do receive PAP smears and mammograms as indicated, IDOC provides only the numbers of PAP smears and mammograms that have been performed but has not provided data about the percentage of eligible women who are offered these screening tests and the percentage who receive these tests at nationally recommended intervals. IDOC has not provided any data that screening for colon, lung, and prostate cancer is being regularly and appropriately offered to the population incarcerated in the IDOC.[18] Chart reviews by the Monitor at the recent inspection of a male facility also failed to identify any eligible men who had been screened for any cancer.[19] Because IDOC has no data to verify its compliance, IDOC continues to be noncompliant with the provision to screen eligible men and women for colon cancer.

**Access to Nurse Sick Call**
Elimination of copay appears to have resulted in a small increase in requests for health care however the request rate remains very low indicating there are additional barriers to access health care. The Monitor has recommended since the 2nd Report that IDOC identify and resolve factors that contribute to low request rates. Registered nurses are not assigned to conduct sick call consistently as required by the Consent Decree. The number of positions needed to complete sick call has never been explicitly factored into the Staffing Analysis and there is as yet no plan

---

[15] Boswell Pharmacy vaccine orders 11/1/19-6/15/21, chart reviews from IDOC Reception & Classification Centers in 2021, charts audits at Shawnee CC site visit 6/21-23/21

[16] The reporting and tracking of number of females receiving Human Papilloma Virus (HPV) vaccination is a solid first step in monitoring the provision of this infection and cancer preventing vaccine in eligible women at Decatur CC and Logan CC. These two sites now need to report on the percentage of eligible females who start and complete the 3 shot series.

[17] The Monitor reviewed ten records from Logan CC. All ten women had PAP smears as clinically indicated. Only two women were in need of mammograms and both women received the test.

[18] Consent Decree provision III.M.c that "all prisoners ages 50-75 will be offered … annual PSA screening" is not in accord with current USPSTF standards that recommends that eligible men will be informed about the pros and cons of PSA screening and should only be tested if they express a preference for testing.

[19] Shawnee CC site visit 6/21-23/21 Providers interviewed communicated that they are still offering digital rectal exam for prostate screening; this has not been nationally recommended as a screening test for many years.

to achieve compliance with III.A.10. The data and methods used by IDOC to monitor sick call as well as the data provided to the Monitor relative to sick call is fragmented, incomplete and not reliable. There has been no response to the suggestions from the Monitor to revise the nursing treatment protocols. The IDOC has not completed an annual inventory of space and equipment to determine if there is adequate privacy and confidentiality during sick call encounters as discussed in the June 2020 version of the Implementation Plan.

Our review of records for this report period found the same issues with practice that were discussed in the 3rd Report. These include not acting on abnormal vital signs or other abnormal signs and symptoms, implementing treatment without documenting an assessment using the protocol, and failing to identify other factors pertinent to the patient's presenting complaint.

**Medication Administration**
IDOC has not responded to the Monitor's concerns about the lack of communication between the pharmacy and providers about risk of adverse medication reactions and to suggest alternative medications. We observe the same problem this reporting period of medications being prescribed that carry risk of addiction or adverse reactions being dispensed without evidence of pharmacy oversight. We also found patients with complex treatment needs who should have the involvement of a clinical pharmacist. We suggested expanding the model used by the HIV clinic that UIC already provides the IDOC. There has been no response to this suggestion.

No changes or improvements were identified this report period in medication administration and medication refusals. The practices of pre-pour[20] and non-contemporaneous documentation continue as pervasive risks to patient safety. Medication records are not available to clinicians for review in advance of or at the time of scheduled appointments. The failure to address these poor practices contributed to under-treatment and mistreatment of patients with significant disease whose charts were reviewed this reporting period. Medication services are complex with many steps and collaboration required among health care personnel as well as significant coordination with security staff. That is the reason the Monitor has recommended IDOC engage the services of a process consultant and utilize a process improvement methodology. At this point IDOC has no plan to address compliance with II.B.6 c or d. The Defendants have not responded to or is there evidence of efforts to address any of the Monitor's recommendations concerning medication administration and refusals.

**Aging IDOC Population and Infirmary Care**
Though IDOC committed to engage the Illinois Department of Aging to perform a needs assessment of all elderly, infirm, disabled, and memory deficient patient-inmates in its system there has been no progress on this commitment. IDOC has not provided a recent update on the status of the new Joliet, Illinois facility.

Record reviews show that patients are still kept on the infirmary who should be hospitalized drawing attention to a lack of policy on the infirmary that includes scope of services for this unit.

---

[20] Pre-pouring medication means that nurses prepare medications in advance of administration by taking them from an authorized pharmacy container and placing them in an unauthorized container until administration to the patient. Pre-pouring is not an accepted practice and is recognized as unsafe. By transferring medication from a pharmacy approved package into alternate packaging without appropriate labeling, the potential for error is increased.

The record reviews also found elderly patients who receive inappropriate assessment, evaluations, and therapy with respect to multiple problems including:

- Evaluations and management after a patient fall.
- Dementia
- Inappropriate housing after exhibiting problems with memory, dementia, or physical disabilities
- Lack of access to gerontologists
- Lack of nutritional evaluations even when elderly individuals exhibit signs of malnutrition.

Long-term housing of elderly patients with dementia, severe disability, or end-stage chronic illness continues to occur without a statewide plan for management of this population. Finally, infirmary beds continue to be used for administrative or security purposes. Infirmary capacity is reduced when it is used to provide long term housing for frail or elderly persons, and for administrative or security purposes. This means that patients needing infirmary care are inappropriately housed in general population. Governor Pritzker recently signed House Bill 3665, the Joe Coleman Medical Release Act, that allows discretionary early release of prisoners who are terminally ill OR medically incapacitated to a Medicaid-eligible long term care facility.[21] This bill will help to facilitate the discharge of incarcerated individuals with terminal illnesses and permanent disabilities to appropriate long term care facilities in the community.

There are 16 correctional facilities with infirmaries that offer no access to physical therapy on-site. The Implementation Plan submitted in June 2020 committed to evaluating the need for physical therapy services at each institution with an infirmary[22] but there is no indication from IDOC that this has taken place. The IDOC has provided no data to support its claim of compliance with the requirement for access to security staff (III.I.4). The staffing analysis did not identify the number of registered nurses required to comply with III.I.1, 2 or 3. No data was provided by IDOC to verify that this requirement has been met. None of the recommendations made by the Monitor to achieve compliance with this aspect of the Consent Decree have been addressed by IDOC.

**Health Care Space, Physical Plant, and Equipment**
In the June 2020 Implementation Plan, IDOC committed to perform a systemwide audit of the clinical and health care spaces to ensure there is adequate space with privacy and confidentiality for the delivery of health care services to the incarcerated population [23] This survey of all facilities is needed but has not yet been done. The Monitor strongly supports a thorough assessment of the physical space used for health care services and creation of corrective action plans to address space deficiencies. The completion of this systemwide audit is necessary for the IDOC to attain partial compliance of this provision.

IDOC sent the Monitor a proposed draft Monthly Health Care Inspection and Equipment Survey[24] that is intended to facilitate the evaluation of sanitation, condition of physical structures, selected furnishings, equipment, and practices in the HCUs and other medical areas.

---

[21] Joe Coleman Medical Release Act Illinois House Bill 3665 August 20, 2021
[22] Illinois Department of Corrections, Implementation Plan, Lippert Consent Decree, Revised 6/12/20 page 6
[23] IDOC Lippert Implementation Plan 6/12/20 in Structural Components section.
[24] This was sent 10/21/20

There is space to document recommendations for identified problems. This draft audit is not associated with a policy and is not included in the Implementation Plan.

Currently, the monthly Safety and Sanitation reports vary from facility to facility and only thirteen of the thirty facilities actually audit even a very limited number of key structural, privacy, safety concerns, equipment, infirmary beds, negative pressure rooms, and furniture in the health care areas. Identified problems are not consistently fixed. The Monitor also recently tested another medical area inspection tool during a recent site visit to Shawnee CC and once the results of this pilot are assessed, the Monitor will provide feedback to OHS on its draft Monthly Health Care Inspection Checklist and Equipment Survey.

It is also of importance to the protection and maintenance of the health of the incarcerated population that detailed inspections be performed monthly of the housing units, showers, toilets, stairs, walkways, washers and dryers, ventilation systems, lighting, pest control, and cleaning. Deficiencies noted in the housing units must also be quickly repaired.

**Clinical Care**
Clinical care was reviewed through record reviews. Only 29% of death records were sent to the Monitor. Many of these related to COVID-19 deaths. Fifty-four medical records were reviewed for this report. No significant improvement in clinical care has occurred; quality of care remains poor.

17

# Statewide Issues: Leadership and Organization

**Leadership Staffing**

*Addresses item II.B.2; II.B.3; III.A.1; III.A.8; III.A.9*

**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**II.B.3.** *IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff.*

**III.A.1** *The Chief of Health Services shall hereafter be board certified in one of the specialties described in paragraph III.A.2, below. The Deputy Chiefs of Health Services shall either be board certified or currently board-eligible in one of the specialties described in paragraph III.A.2, below.*

**III.A.8.** *Within eighteen (18) months of the Effective Date Defendants shall create and fill two state-employed Deputy Chiefs of Health Services positions reporting to the Chief of Health Services to provide additional monitoring and clinical oversight for IDOC health care.*

**III.A.9.** *Within nine (9) months of the Effective Date every facility shall have its own Health Care Unit Administrator ("HCUA"), who is a state employee. If a HCUA position is filled and subsequently becomes vacant Defendants shall not be found non-compliant because of this vacancy for nine (9) months thereafter.*

**OVERALL COMPLIANCE:** Partial Compliance

**FINDINGS:**

The IDOC asserts compliance for provisions III.A.8. when only one of two Deputy Chiefs of Health Service positions is filled.

The Monitor's last two reports listed five recommendations for this section. Recommendations one through four were not addressed and there has been no changes with respect to recommendation five. The fifth recommendation was that IDOC should formally document that the Chief OHS is responsible for managing the health program of the IDOC as evidenced by a communication by the Executive Director to the Wardens communicating this new relationship. IDOC told the Monitor that the Executive Director has made a formal announcement about this change but this formal announcement has not been made available to the Monitor. IDOC has approved a table of organization in which HCUAs report through a "clinical matrix" to the Regional Coordinators to the OHS Director of Nursing, who reports to the Medical Coordinator. However, the "clinical matrix" is unclear and appears to allow business-as-usual in which the Wardens are supervisory to clinical staff at the facility level. Also, IDOC has a mixed vendor and state staff and the table of organization does not represent how these different employees are integrated into functional lines of authority and supervision.

This table of organizations has been approved by Central Management Services (CMS). This

table of organization does not ensure that the Chief OHS has authority and responsibility for supervision of all health employees. The fifth recommendation was therefore not accomplished as explained below.

The position description of the HCUA describes that the HCUA reports to the Assistant Warden of Programs, which is a custody position. Clinical supervision is provided by the Regional Manager. The Monitor disagrees with OHS supervision of HCUAs only for clinical purposes as "administrative purposes" is subject to interpretation and administrative decisions will affect clinical care. In the IDOC's response to the Monitor's 3rd Report, the IDOC states that "the HCUAs report to the Office of Health Services for clinical issues and to the Wardens for operational concerns". The Monitor understands the importance of the HCUA collaborating and working closely with the Assistant Warden for Programs concerning interfaces between health care delivery and correctional operations. It is not necessary for the HCUA to report to security to make this collaboration effective. However, in reality, the HCUA's current reporting status means that Wardens directly control medical operational issues at the facility level.

At our recent visit to Shawnee, there was no HCUA. The Warden and not the Chief OHS appointed the acting HCUA. The person the Warden appointed was the Assistant Warden of Programs, who has no clinical administrative experience. So, a deputy Warden was running the health program. Also, the Warden had appointed the Quality Improvement Coordinator which is inappropriate. The statewide Quality Improvement Coordinator stated on a conference call that she was approaching Wardens to get approval to send HCUAs to a State of Illinois lean, six-sigma quality improvement training. This decision should be made by the Chief OHS not Wardens. All of these operational and personnel matters indicate that custody still exerts control of the medical program because the Warden has responsibility of supervision, hiring and firing and authority to manage employees under his direction. In addition, in a correctional facility, administrative duties include multiple areas of operations that impact medical care including medication administration and scheduling which, if controlled by custody can adversely affect health services. Counsel for the IDOC stated that the rationale for this arrangement was that the HCUA was required to fill out Safety and Sanitation reports, that the HCUA is third level in chain of command to the Warden making it easier to communicate medical issues with the Warden, and the Assistant Warden is responsible for approving time off requests. None of these require that the Warden supervise the HCUA. The authority of the Warden to supervise the HCUA in any manner, to appoint the quality improvement coordinator, to appoint, hire and fire the HCUA, to manage training of the HCUA and appointment of a custody person to be the HCUA is all evidence that the Warden has authority to affect medical operations and autonomy. It is evident that the Chief OHS is still not fully in charge of the medical program. It still appears that Wardens have significant control over the medical program. Warden supervision of medical staff needs to end to have a properly functioning health program. The table of organization needs to be organized along functional lines of authority which align clinical and operational functions of medical staff under medical supervision.

It isn't clear who physicians or other providers report to. There is no evidence that this group has supervision that is clinically meaningful or effective.

Three (10%) facilities did not have HCUAs.[25] This is an improvement from November of 2020 when four HCUA positions were vacant.

The May 2020 table of organization listed 17 (77%) of 22 OHS positions were filled. The Chief of Dentistry and a Public Health Education Associate have been hired since the last report.

The latest table of organization does not have a position title for one of the position entries labeled a Public Service Administrator. We believe this to be an Environmental Services Coordinator but the table of organization should clearly state the position title.

Position descriptions for OHS staff are still incomplete. Formal job descriptions are still lacking for the Regional Coordinators, Health Information Officer, Electronic Health Record Administrator, Health Information Analyst, and Quality Improvement Coordinator.[26] The actual responsibilities within the health program of the Environmental Services Coordinator and the Environmental Services Program Director are not clear. The job descriptions do not clarify the confusion.

**RECOMMENDATIONS:**
1. The vacant Deputy Chief position needs to be expeditiously filled
2. The OHS DON needs to report to the Chief of Health Services. Responsibilities of the DON should include primary responsibility for development of statewide policy and procedure for those subjects that are nursing-driven (medication admission, intake screening, nurse sick call, infirmary care etc.), setting performance expectations for registered nurses, licensed practical nurses and nursing assistants, establishing staffing standards, peer review of professional nursing, competency review of nursing support personnel, participates in critical incident and mortality review, establishes nursing quality indicators and monitors nursing quality.
3. Identify a Director of Nursing Services at each facility who is accountable to the Statewide DON for clinical practice and quality. Line authority would remain with the HCUA for daily operations.
4. IDOC is requested to provide quarterly up-to-date vacancy reports that include OHS and HCUA positions.
5. IDOC should formally document that the Chief OHS is responsible for managing the health program of the IDOC as evidenced by a communication by the Executive Director to the Wardens communicating this new relationship. This responsibility needs to include authority to hire, fire, and appoint replacements for all medical personnel within the health program. With the exception of the Chief OHS, who reports to a deputy director, all medical staff report to medical supervision and not through custody, (e.g., the Warden). A table of organization should reflect these changes.
6. Physicians and other providers need to report through physician leadership ultimately reporting to the clinical direction of the Chief OHS.

---

[25] Shawnee remains vacant since the last report with the Assistant Warden acting in the HCUA role. The NRC HCUA remains since the last report temporarily assigned as the statewide Infection Control Coordinator and five individuals split supervisory duties. The Dixon HCUA is newly vacant.

[26] The Staffing Analysis of 7/7/21 does contain a narrative description for the duties of the Health Information Coordinator, Electronic Health Record Administrator, and the Health Information Analyst. These narratives do not constitute full job descriptions

7. Nursing staff need to report through a facility Director of Nursing at each facility who, for clinical issues, reports to the statewide OHS Director of Nursing.
8. HCUAs need to report for all matters (clinical and operational) to OHS administrative leadership (Regional Coordinators) who report to the senior OHS administrator (Medical Coordinator)
9. The OHS DON, OHS Medical Coordinator, Deputy Chiefs, and OHS Dental Director should report to the Chief OHS.
10. OHS needs to further augment its leadership and support staff to address the provisions of the Consent Decree and to adequately fulfil its responsibilities as IDOC's health authority

# Staffing Analysis and Implementation Plan

**Addresses items IV.A.1-2; IV.B;**

**IV.A; IV.A.1; and IV.A.2.** *The Defendants, with assistance of the Monitor, shall conduct a staffing analysis and create and implement an Implementation Plan to accomplish the obligations and objectives in this Decree. The Implementation Plan must, at a minimum: (1) Establish, with the assistance of the Monitor, specific tasks, timetables, goals, programs, plans, projects, strategies, and protocols to ensure that Defendants fulfill the requirements of this Decree; and (2) Describe the implementation and timing of the hiring, training and supervision of the personnel necessary to implement the Decree.*

**IV.B.** *Within 120 days [July 1, 2019] from the date the Monitor has been selected, the Defendants shall provide the Monitor with the results of their staffing analysis. Within sixty (60) days after submission of the staffing analysis, Defendants shall draft an Implementation Plan. In the event the Monitor disagrees with any provision of the Defendants' proposed Implementation Plan, the matter shall be submitted to the Court for prompt resolution.*

**OVERALL COMPLIANCE:** Partial compliance

**FINDINGS:**

The Monitor made seven recommendations in this section of his last report. IDOC has not enacted these recommendations but did partly address the first recommendation by scheduling a conference call separately with the Executive Director and representative of the Governor's office.

The Monitor recommended in the 3rd Report that given the major changes that need to occur, the Executive Director with the Chief OHS need to agree on a strategic plan for the design of the IDOC health services and that they might need to discuss this with the Governor's office. IDOC has provided no evidence that this has been accomplished.

**Staffing Analysis**

On 8/17/21 Defendants submitted a final Staffing Analysis to parties and to the Monitor. The IDOC had submitted draft Staffing Analyses on 11/23/19; 6/18/20; 5/3/21; and 7/7/21 with a final Staffing Analysis submitted on 8/17/21. The Monitor has provided comments and recommendations on the draft versions of the Staffing Analyses since 2019. The IDOC has not

responded, by way of written explanation in the Staffing Analysis or elsewhere, to the Monitor's comments or recommendations and the 8/17//21 Staffing Analysis also contains no explanation regarding the Monitor's recommendations. Though the IDOC has stated that the "vast majority" of the Monitor's recommendations have been accepted, most have not been enacted and the Staffing Analyses as a group do not provide any discussion of the Monitor's recommendations.

Though the Staffing Analysis is meant to be associated with the Implementation Plan, IDOC has not derived their Staffing Analysis based on the Implementation Plan. The IDOC has also not utilized a meaningful methodology to determine staffing. They conducted two surveys; one of nursing tasks and another opinion survey of HCUAs about how many staff they thought they needed. In neither case did IDOC describe how they came up with their staffing numbers. The Monitor has disagreements in a number of areas.

There is a total of three less positions from the November 2019 to the August 2021 Staffing Analysis. Yet there were multiple position readjustments none of which are explained in any of the Staffing Analyses. In aggregate these position readjustments resulted in a decrease in more skilled positions (physician, nurse practitioner, registered nurse, dental assistant, radiology technician, optometrist and physical therapist) and an increase in less skilled positions (licensed practical nurse, certified nurse assistant, office coordinator, and staff assistant). From the November 2019 Staffing Analysis to the August 2021 Staffing Analysis there was an increase of 24.4 office staff, a decrease of registered nurses of 11 positions but an increase of 11 licensed practical nurses and 25 nursing assistants. Despite the Monitor's recommendation to increase physical therapy, physicians, optometrists, and dental hygienists this was not done. From the November 2019 to the August 2021 Staffing Analysis there are 11 fewer physicians, three less physician assistants, two less optometrists, and 1.5 less physical therapists. Though dental hygienists increased by 1.25 there are still only 22 allocated and recommended dental hygienists for all 26 major facilities and multiple smaller facilities; less than recommended by the Monitor. The position differences from the November 2019 Staffing Analysis to the August 2021 Staffing Analysis are shown in a table in Appendix A.

The gross staffing changes from the first 2019 Staffing Analysis to the submitted Staffing Analysis in August 2021 are shown in the table below. The number of net total positions decreased by three positions. There are 27 fewer staff working in 2021 as compared to 2019. Although IDOC states that all positions can immediately be hired, net hiring is actually negative since 2019. The hiring process is ineffective.

| | | | Position Differences from 1st Staffing Analysis to August 2021 Staffing Analysis | | | |
|---|---|---|---|---|---|---|
| Staffing Analysis Version | Allocated/ Budgeted Positions* | Vacant Positions | Working Staff ** | Percent Increase of Working Staff from 2019 | Remaining Recommended Positions in Staffing Analysis *** | Total = Allocated + Recommended |
| Nov-19 | 1210 | 236 | 974 | | 373 | 1583 |
| Jun-20 | 1209 | 275 | 934 | | 357 | 1566 |
| May-21 | 1277 | 282 | 995 | 2% | 308 | 1584 |
| Jul-21 | 1277 | 282 | 995 | 2% | 308 | 1584 |
| Aug-21 | 1293 | 346 | 947 | -3% | 287 | 1580 |

\* These are positions that are able to be hired

\*\*Working staff = allocated positions - vacant positions

\*\*\*These are the positions recommended in the Staffing Analysis. As allocated positions increase, the number of recommended positions should correspondingly decrease unless the number of positions was changed in the Staffing Analysis. Also, though IDOC has stated that all recommended positions could be hired immediately, they are actually allocating approximately 11% of newly recommended positions a year. Despite allocating positions net hiring is net negative yielding a higher vacancy rate.

In addition to these positions, the IDOC has a contract with SIU which will be discussed in the section on vendors below. The July 2021 Staffing Analysis states that SIU will provide 12.25 staff for the audit teams. IDOC inserted a table of organization for the entire SIU Quality Management program into the fourth draft Staffing Analysis, but only included staffing for the audit teams. None of the other quality staff are included in the fourth draft Staffing Analysis. We were told by SIU at our recent visit to Shawnee that the precise staffing for the Quality Management program is not yet decided.

The Office of Health Services positions are listed separate from the 1584 facility staff positions and the 12.25 SIU audit team positions. There are 22 OHS positions, five of which are vacant.

The Monitor requested job descriptions of each of the 39 facility staff positions and the 16 non-clerical OHS positions. To date, the Monitor has not received any facility job descriptions except for the HCUA and has not received all OHS job descriptions.

In the email that contained the fourth draft Staffing Analysis, Counsel for Defendants stated that "This version includes changes based on your most recent recommendations." Based on the Monitor's reading of the Staffing Analysis, the document made changes based on only three recommendations of the Monitor listed below. However, none of these changes were explained. IDOC changes consistent with the Monitor's recommendations include the following.

- An audit team managed by SIU to monitor performance was included in the Staffing Analysis. However, none of the remainder of the quality improvement staff are in the Staffing Analysis. SIU has not yet determined what staff will be hired for the remainder of the program.

- Dental hygienists were increased but only by 1.5 FTE[27] to 22.5 positions for the 30 facilities. This was an increase but does not appear to address the need and is not in line with recommendations of the Monitor.
- The vendor site manager positions were eliminated which is in line with the Monitor's recommendation.

Numerous recommendations of the Monitor have not been addressed. The following numbered items are a condensed version of the Monitor recommendations that IDOC has not addressed.

1. **All key recommended positions need to be immediately hired and others should be hired as soon as possible.** This has not been done. Fewer staff are working in August 2021 than were working in November of 2019. Though IDOC has stated that all recommended staff can be immediately hired they have not hired recommended positions,

2. **A recruitment task force needs to be established to reduce the vacancy rate to less than 12 percent.** This hasn't been done and hiring remains extremely problematic. From a net hiring perspective, the IDOC has gone backwards. The vacancy rate in the August 2021 Staffing Analysis has increased 47% from the November 2019 Staffing Analysis and the number of working staff has decreased by 27. In their first draft Implementation Plan almost two years ago, IDOC described the difficulties they anticipated with respect to hiring. Yet, nothing has been done to improve the hiring process.

3. **A standardized methodology for analyzing workload should be developed to determine and standardize position needs for every position**. **This includes staffing infirmaries based on skilled nursing and nursing home experience; optometry services; physical therapy services; dental hygienists; and physicians all of which appear understaffed. The Monitor has had significant concerns about insufficient numbers of physicians, nurse practitioners, physician assistants, dental hygienists, optometrists, and physical therapists**. IDOC said in a February 2021 call that they did not have the ability to complete a workload analysis. Through five Staffing Analyses and over 18 months, the IDOC did not attempt a workload analysis or attempt to find someone who could do this for them.[28] This could have been performed over the past two years. No explanation was provided in the Staffing Analysis about whether this would be done. It was the Monitor's opinion that physicians, mid-level providers, dentists, optometrists and physical therapists needed to be increased. The Monitor asked

---

[27] From 21 to 22.5 dental hygiene positions.

[28] In its Staffing Analyses, the IDOC stated that its methodology to determine staffing was to obtain a survey of 11 nursing only tasks and then to survey the HCUAs to estimate how many nurses it would take to perform those tasks. Population size, actual timing or estimation of timing of the task, Consent Decree requirement, and relief factor were not considered. Tasks other than 11 selected nursing tasks were not evaluated meaning physician, physical therapy, optometry, dental, dental hygiene, etc. were not evaluated. A proper workload analysis would consider the expected workload given Consent Decree requirements, the time it takes to appropriately complete tasks based on expert opinion of a practitioner in the same field, the population of inmates and the population with conditions requiring treatment, and a relief factor that would account for coverage during employee time off. The IDOC themselves acknowledge in the 7/7/21 Staffing Analysis that the population of IDOC had dropped from 39,000 in 2019 to 29,000 in 2021. Although, this number is likely to increase again post COVID when local jails again begin transferring inmates to IDOC, this number would likely affect a workload analysis. Yet IDOC was unable to make that calculation, instead stating "we may need to periodically reevaluate our staffing needs and make amendments to this document as necessary". That reevaluation would require a workload analysis which IDOC has stated it is not capable of performing.

that the Staffing Analysis include the methodology for determining the numbers of these practitioners. This has not been done. Despite the Monitor's recommendation for increased physicians, IDOC had decreased the number of physicians by 11 from the initial 2019 Staffing Analysis and decreased the number of nurse practitioners/physician assistants by three. The number of dental hygienists was increased by only 1.25; still leaving many facilities without sufficient dental hygienists. Optometrists were decreased by 2 appearing to leave facilities without adequate coverage. Physical therapists were decreased by 1.5 positions. The IDOC offered no explanation for these changes in the fourth draft Staffing Analysis.

4. **Key consulting positions (in the quality program and data team) were not included in the Staffing Analysis and this should be done.** IDOC has a contract with SIU to provide unspecified services[29] but the entirety of this plan was not evident in the Staffing Analysis so it isn't clear what will be provided. A table of organization for the SIU quality team was included in the Staffing Analysis but SIU has indicated that those positions may be changed. IDOC did include the numbers of the audit team component of the quality improvement program but has not included the SIU positions that will comprise the quality improvement program, consultants, and information technology support staff, or other services that SIU will be providing.

5. **Hire additional information technology and data team consulting staff consistent with recommendations in the Monitor's 2nd Report**. SIU has a draft staffing plan but the Staffing Analysis did not confirm what will be provided with respect to the data and information technology team.

6. **The Table of Organization must reflect a medical program with functional lines of authority of all medical staff (including vendors) through the Chief OHS. Wardens must not supervise medical staff. This must include the Chief OHS authority to hire and fire all medical staff.** While IDOC believes this has been done, the Monitor does not agree. The Wardens still have substantial control over health staff in their facilities and the clinical operation of the health care program. Relationships with vendors is not clear. This is a fundamental disagreement that has been addressed in the Leadership Staffing section above.

7. **Add a relief factor[30] to staffing numbers**. This has not been done.

8. **Facility positions should be officially titled by responsibility (quality improvement coordinator, infection control nurse, etc.) and label nursing positions by assignment so that workload can be properly assigned.** This has not been done. Lacking specific position types, the Monitor cannot know how IDOC will utilize the staff in its staffing plan and whether each site will have an infection control nurse or a quality improvement coordinator for example.

9. **The Staffing Analysis needs to be augmented to include expected workload at the proposed Joliet Treatment Center**. This has not been done. This facility was not

---

[29] The contract with SIU was originally signed in December of 2019 and was to provide medical providers at four IDOC facilities. Several other responsibilities were included in this contract most of which involved the four IDOC facilities. However, due to legal issues and the way in which the contract was written, IDOC was unable to execute this contract as written. A contract amendment signed by IDOC on 5/26/21 increased the dollar amount of the contract but contained no deliverables so it is unclear what SIU will be responsible for from a contract perspective.
[30] A relief factor accounts for the additional staff that are needed to ensure that coverage occurs for time off, vacations etc. This can be as much as 1.6 to 1.8 times the number of staff needed to cover assignments on a typical day.

discussed at all in the fourth draft Staffing Analysis. The status of this planned facility is uncertain.

10. **The Monitor asked for all position descriptions** but has still not received multiple position descriptions.

11. **The OHS Director of Nursing should be on the same level as the Deputy Chiefs and Medical Coordinator reporting to the Chief of Health Services not to the Medical Coordinator.** This has not been done.

Based on new findings the Monitor adds two recommendations.

1. **Perform a workload analysis to inform the hiring of dieticians sufficient to address needs in IDOC.** This is a new recommendation. There are currently no dieticians working within IDOC. Dieticians are necessary to evaluate the nutritional adequacy of diets on an ongoing basis. For this purpose, dieticians should be on staff of IDOC. Also, from a clinical perspective, patients with diabetes and possible malnutrition or other dietary disorders need access to consultation with a dietician.[31] This does not occur in the IDOC. Dieticians need to be hired to provide ongoing analysis of IDOC menus. The clinical dietician can be either provided by hiring full time staff or by using telemedicine. The precise number should be determined by a workload analysis. This is covered in more depth in the section on Dietary later in this report.

2. **Perform a workload analysis to inform hiring of clinical pharmacists to provide support for safe and effective medication therapy.** This is a new recommendation. In record reviews, the Monitor has found consistent errors in prescribing medication (e.g., multiple prescriptions for the same type of medication, long-term use of prednisone and narcotics without indication, polypharmacy in the elderly, etc.) that were ongoing and inappropriate. The Monitor suggests use of a clinical pharmacist to review certain prescriptions and categories of medications (e.g., asthma and diabetes medications) and report suggestions back to the prescribing provides and to act as a consultant on cases where prescriptions are of questionable benefit. This should be done proactively by a clinical pharmacist instead of having providers ask for help because it appears that providers are often unaware of their questionable prescribing practices.

In summary, the Staffing Analysis has been delayed for almost two years. Five Staffing Analyses have been provided with a net change of three less total positions with multiple specific changes that increased low skilled staff at the expense of high skilled staff. A workload analysis has not been used to develop staffing needs. Positions that the Monitor believes are understaffed, have been decreased. No explanation has been provided to address the Monitor's concerns or to explain the rationale for changes that IDOC has made. Over two years, IDOC has net negative hiring demonstrating a broken hiring process. Because an Implementation Plan is not yet developed, it isn't clear what impact a completed Implementation Plan will have on staffing. This is not addressed. It is also not clear how the submitted Staffing Analysis permits IDOC to adequately execute its Implementation Plan. IDOC has submitted its Staffing Analysis without yet knowing what their Implementation Plan will consist of. While a Staffing Analysis has been provided, there are sufficient deficiencies to warrant only a partial compliance rating.

---

[31] See the section on Dietary for an explanation.

The Monitor agrees with the IDOC that the Staffing Analysis will need revision over time, especially as programs of the Implementation Plan are put into place and especially after IDOC acquires the capacity to adequately assess workload.  Two new areas of concern (dieticians and clinical pharmacists) are addressed in this report. As this document is submitted to the Court, the Monitor would advise that IDOC be required to complete a workload analysis within a year to address staffing deficiencies and account for any changes implicit in the Implementation Plan that will eventually be submitted.

**Implementation Plan**

There has been little progress with respect to the Implementation Plan.  Nearly two years after it was due, IDOC has not yet submitted a final Implementation Plan and has made very limited forward progress on the Consent Decree.  Without a plan to guide its efforts, IDOC's actions lack focus and strategic direction.  Some of IDOC's efforts to implement the Consent Decree appear to propelled by dispute resolution issues and crises.

The IDOC submitted two earlier draft Implementation Plans to the Monitor, one on 11/23/19 and another on 6/12/20, neither of which was responsive to requirements of the Consent Decree. These were not plans.  Instead, these documents focused on assertions of compliance, without provision of any evidence, which was irrelevant, in any case, to an Implementation Plan.  The 6/12/20 submission more than the 11/23/19 submission provided some goals that addressed provisions of the Consent Decree but neither document provided timetables, plans, specific tasks, programs, projects or strategies on how to establish an effective medical program that would satisfy provisions of the Consent Decree.

After the 6/12/20 Implementation Plan submission, no further action was taken with respect to the Implementation Plan until, on 5/12/21, IDOC submitted to the Monitor, a third draft Implementation Plan[32] that was ***identical*** to a document the Monitor had provided to IDOC in January 2020 as technical assistance with respect to an initial first two-year workplan.  There were no changes to the document over the 15 months since IDOC has had the document.  Over those 15 months, IDOC had not engaged the Monitor in development of the Implementation Plan, sought no input from the Monitor with respect to its Implementation Plan and has not produced an Implementation Plan.  Nothing in this third draft Implementation Plan of 5/12/21 was written by IDOC except for the comments and assertions that an item suggested by the Monitor exceeded the requirements of the Consent Decree or that the item would be difficult to perform.

The January 2020 technical assistance document, developed by the Monitor, contained 83 recommendations on a spreadsheet with timelines and with space for a responsible person. An accompanying narrative[33] was included that explained the spreadsheet and was a suggestion for how IDOC might explain their Implementation Plan.  Only those elements deemed essential for an initial year or two were included in the workplan.  This workplan consisted mostly of infrastructure items such as implementing an electronic record, hiring staff, performing analyses of clinic space and equipment and constructing adequate clinic space, performing a survey of the aged to determine the needs related to housing and medical programming for this group, and

---

[32] This is available upon request by any one of the parties or the Court.
[33] Attached in Appendix B

developing a table of organization of OHS so that medical leadership could take responsibility for the medical program. Of the 83 items in the Monitor's recommended initial workplan, 73 should have been completed by 6/15/21. The Monitor assesses that of those 73 items, only three (4%) were completed. The IDOC has not developed a comprehensive Implementation Plan as required by the Consent Decree and further has not accomplished infrastructure items that the Monitor believes essential to progress toward compliance with the Consent Decree. The Monitor anticipated and stated that this workplan, once accomplished, would require a second workplan to address individual items of the Consent Decree.

The Monitor viewed all 83 items in the technical assistance workplan as important operational tasks that needed to be accomplished to obtain an adequate medical program. IDOC did not agree[34]. On forty of 83 items IDOC did not agree in part or in whole with the recommendation and of these 40, 24 (29%) were deemed unacceptable to IDOC. When IDOC disagreed, they did not suggest an alternative. Thus, IDOC disagreed with about half of the recommended items that needed to be in an initial infrastructure workplan. Without proposing its own implementation plan, the IDOC, with this submission, focused attention on the Monitor, critiquing the Monitor's input instead of providing its own plan as if the Monitor was responsible for the Implementation Plan.

The Monitor responded to IDOC Counsel in an email letter on 6/3/21[35] about the Implementation Plan submission. Subsequently on 6/8/21 Plaintiffs filed a motion to enforce that, in part, asked for Court intervention regarding the absence of a filed Staffing Analysis and Implementation Plan. Then, on 6/15/21 a call was conducted regarding the Monitor's letter and the Staffing Analysis and Implementation Plan. IDOC participants included IDOC counsel, a representative from the Attorney General's office and a few members of OHS. Although several OHS staff were on the call, the IDOC participation was limited mostly to the attorneys. IDOC proposed more intensive meetings to come to agreement on the Implementation Plan. The Monitor agreed to meet further with IDOC to assist them in development of their Implementation Plan. The Monitor was asked to agree to a delay in the Implementation Plan which was a decision that the Monitor declined to be involved with.

In preparation for a follow up meeting, the Monitor sent to IDOC a compilation of his 235 recommendations[36] in the Monitor's 3rd report. In the email,[37] the Monitor suggested that these be included in a revised Implementation Plan because two years had passed and the 235 recommendations represented accumulated opinions on how IDOC could obtain compliance with all sections of the Consent Decree. This in combination with the initial draft technical assistance document provided to IDOC in January of 2020 were the Monitor's input for a starting point.

In that email of 6/21/21 the Monitor also stressed the need for increased and improved communication between the Monitor's team and members of OHS and IDOC vendors to

---

[34] The IDOC submission included color coding of each row of the spreadsheet. Twenty-four of the 83 items recommended by the Monitor were colored red meaning that the items were "problematic". This was understood as something IDOC would not agree to. Sixteen were yellow meaning the item needed further explanation and also subject to eventual disagreement or elimination. Five items were green meaning IDOC believed it had accomplished the item. And 38 were white meaning that IDOC had no issue with the item. Thus, approximately half of the items were either not agreed to or possibly not agreed to.

[35] Attached as Appendix C

[36] Attached as Appendix D

[37] Attached as Appendix E

facilitate this process because most discussions regarding the Implementation Plans were with the Defendant's attorneys and not OHS clinical or operational staff. Aside from some participation from the Chief OHS, none of the other OHS staff were active participants in discussions on the Implementation Plan with IDOC.

IDOC scheduled a follow up meeting on the Implementation Plan on 7/12/21. IDOC counsel acknowledged that the list of recommendations sent by the Monitor were useful and helpful but the list exceeded what was required by the Consent Decree and that IDOC wanted to focus on the Monitor's January 2020 technical assistance workplan. When the Monitor brought up that the Implementation Plan should be developed by OHS leadership staff and the Monitor and less discussion with attorneys, IDOC counsel insisted that she would not allow the IDOC team to agree with something that exceeds the Consent Decree or allow the Monitor to exceed his responsibility. The Attorney General's counsel added that the Consent Decree was not put together to make an optimal system. He continued to say that the Implementation Plan would become a legal document and that if broadened beyond what was necessary based on the Consent Decree it created legal problems. Active participants in this meeting were mostly IDOC counsel, the Attorney General's counsel, and the Monitor team.

On 7/20/21 there was another conference call. The Monitor and IDOC discussed more than a third of the items on the 1/20/20 technical assistance workplan provided to the IDOC by the Monitor. Again, attorneys were the predominant participants for IDOC with the Chief OHS also participating.

These discussions are ongoing as this report is being written and the IDOC has not yet submitted a completed plan. It is the Monitor's opinion that a medical implementation plan is a working project plan that should be crafted by IDOC medical operational staff with collaborative input from the Monitor. The IDOC does not have a project manager and IDOC counsel has acted as the leader of crafting this document. Instead of a plan developed by OHS operational staff with the Monitor, it has become a negotiation between the Monitor and Defendant attorneys on whether input recommendations of the Monitor exceed requirements of the Consent Decree. Most of the negotiation is with attorneys and not with clinical staff. This results in less meaningful discussion with OHS and SIU leadership about how to effectively implement the Consent Decree and will delay progress on an effective implementation.

In summary, IDOC has not produced an Implementation Plan. Actions taken to satisfy the Consent Decree, including the Implementation Plan, are propelled by Plaintiff attorney dispute resolution actions or crises. As a result, the IDOC is moving forward reactively without guidance of a strategy[38]. The goal of the Defendant attorneys to protect their client is creating an environment where open discussion with the clinical staff on the Implementation Plan has not occurred. The effort to restrict an Implementation Plan to only what attorneys feel is within the bounds of the Consent Decree runs the risk of failing to include medical or operational issues which are beyond the understanding of the attorneys representing Defendants as being necessary components of creating a functional medical operation. The Monitor is not optimistic with respect to completion of a reasonable and thorough Implementation Plan. For that reason, this section remains non-compliant.

---

[38] The Monitor recommends review of the Adult Immunization section of this report for an example of how the lack of an implementation plan has affected the roll out of the immunization program in IDOC.

**Vendor Relationships**

The IDOC does not have a written strategy for how it intends to use vendors going forward. Without an implementation plan that includes a strategy for use of vendors, vendor relationships appear to be initiated in an opportunistic and reactive manner without an apparent coherent strategy.

After the relationship with University of Illinois Chicago College of Nursing (UICCON) ended in March of 2020, IDOC announced in a conference call on 10/7/20 that it was planning to meet with SIU to fulfill some of the responsibilities that UIC had intended to fill. No details were provided. The November 2020 IDOC Bi-Annual Report stated that the relationship with SIU continued to develop and that SIU had agreed to partner with IDOC to implement an enhanced quality improvement program and audit program but IDOC provided no details. The IDOC also announced that the SIU Division of Infectious Disease would be an ongoing resource for the Department without providing any details. IDOC already had a contract with SIU[39] for provision of physician and other services at four IDOC facilities[40] and the contract amendment did not cancel those deliverables or institute new deliverables. This 12/18/19 contract with SIU did not include statewide quality improvement responsibilities or auditing. A contract amendment with SIU was signed by IDOC on 5/28/21 but this amendment had no deliverables. IDOC has not provided written details of the extent of responsibilities of SIU.

The prior plans to have SIU provide physician services at four IDOC facilities are no longer active. IDOC has provided no information with respect to comments in their November 2020 Bi-Annual Report regarding use of SIU Division of Infectious Disease for consultations. Infectious Disease consultation for infection control purposes is thus uncertain. The SIU table of organization provided in the IDOC July 2021 Staffing Analysis has some positions that lack job descriptions and the role of all positions is unclear. A narrative describing the quality program would be helpful. During the Shawnee visit, a representative from SIU indicated that positions in their budget may change as a fixed plan isn't completed. Given this uncertainty, the Monitor needs greater access to SIU for the purposes of providing input *prior to* completion of programs and policies and to understand progress being made in the quality and other programs that SIU is involved with.

IDOC has no plans for how it will provide physician services in the future and appears to be proceeding without a plan. Wexford has continuously been unable to fill physician positions. On 6/4/21 IDOC entered into a 90-day emergency contract extension with Wexford. IDOC has

---

[39] Medical Program Agreement between SIU and IDOC signed by IDOC on 12/18/19

[40] In the November 2020 Bi-Annual Report IDOC states, "Initially the Department planned to contract with SIU to provide medical providers in four IDOC facilities: Logan, Pinckneyville, Vienna and Shawnee. However, the Monitor was harshly critical of this plan. Accordingly, SIU SOM is working with DOC to achieve other Consent Decree objectives". This IDOC statement is simply not accurate. The Monitor pointed out to IDOC and SIU that IDOC had signed contracts with two vendors with both contracts for the same responsibilities. This would lead to clinical conflict and potentially unsafe conditions for patients. If both Wexford and SIU had Medical Directors at the same sites, which Medical Director would be in charge. This confusion was a potential patient safety risk. To blame the Monitor for an IDOC contract error is inappropriate and a failure to take responsibility for its actions. The Monitor continues to strongly recommend use of university-based programs to supply physician services.

stated that this contract eliminates the collegial review process but the Monitor cannot find evidence of this in the contract. The contract does not address physician hiring and retention based on requirements of the Consent Decree. The contract requires that only Medical Directors must have completed a residency in internal medicine, family practice or emergency medicine. All physicians, not just Medical Directors, are required to have this training. The contract also stated that current physicians are not subject to this requirement. This is inaccurate based on our interpretation of the Consent Decree. On 7/30/21, IDOC renewed the contract with Wexford for another year with no changes in contract terms. IDOC still has no plans for long-term provision of medical services including physician services which remain inadequate.

Neither the Wexford contract nor the SIU contract references the Lippert Consent Decree but should require adherence to Consent Decree requirements.

The IDOC has informed the Monitor that a medical RFP is still being drafted. The Monitor has not seen the RFP including whether it will ensure that physician services are consistent with Consent Decree requirements. Physician services should be covered in the Implementation Plan and in any contracts related to medical care.

**RECOMMENDATIONS:**

1. The Executive Director with the Chief OHS need to agree on a strategic plan for the design of the IDOC health services. They may need to discuss this with the Governor's office. Our recommendation would be to implement a university-based program.
2. After a strategic plan is developed and agreed to, IDOC can flesh out details in their Implementation Plan.
3. Additional nurse manager positions proposed in the staffing analysis should be established because closer supervision will be necessary to make the changes in practice required by the Consent Decree.
4. Add a relief factor for all staff.
5. Continue to refine the Staffing Analysis to consider recommendations from the Monitor to include dedicated positions for infection control, quality improvement, a relief factor, use of the state nursing home standards for infirmary, ADA and other specialized housing of frail and or elderly inmates, and development of workload standards.
6. Continue to refine the Staffing Analysis to ensure that health care needs of the IDOC incarcerated population are adequately provided including nurse and provider sick call, chronic care, urgent care, specialty consultation, dental care and cleaning, optometry care, and physical therapy.
7. Given the significant delay in completing the Implementation Plan, the Monitor recommends that the Monitor's participation in providing assistance and input be based on the Monitor's agenda for that assistance and not on the IDOC counsel's agenda. The Monitor recommends a working group comprised of OHS, SIU, and the Monitor to work intensively on this plan.
8. If IDOC is unable to hire positions unless their plan is approved by the Court then IDOC should submit its current staffing analysis so that the Court can approve it so that positions can be hired. If this is done, the Monitor recommends that part of the Court's approval of this plan should include that IDOC develop appropriate methodologies, with

input from the Monitor in order to ensure that adequate staffing needs are in place in all areas of service. These methodologies need to address and staffing changes that will become necessary given Implementation Plan changes. This should be done in the ensuing year. If IDOC is able to hire positions then all positions soon be hired as soon as possible with more expedited hiring of OHS staff.

9. Vendor contracts should conform and require adherence to requirements of the Consent Decree.

10. A recruitment task force needs to be established to reduce the vacancy rate to less than 12 percent.

11. A standardized methodology for analyzing workload should be developed to determine and standardize position needs for every position. This includes staffing infirmaries based on skilled nursing and nursing home experience; optometry services; physical therapy services; dental hygienists; and physicians all of which appear understaffed. The Monitor has had significant concerns about insufficient numbers of physicians, nurse practitioners, physician assistants, dental hygienists, optometrists, and physical therapists. A workload analysis needs to inform the hiring of dieticians sufficient to address needs in IDOC and clinical pharmacists to provide support for safe and effective medication therapy.

12. Hire additional information technology and data team consulting staff consistent with recommendations in the Monitor's 2nd Report.

13. Key consulting positions (in the quality program and data team) were not included in the Staffing Analysis and this should be done. The IDOC staffing plan and the OHS table of organization should be revised to include data, medical record support, and quality consultant teams.

14. Facility positions should be officially titled by responsibility (quality improvement coordinator, infection control nurse, etc.) and label nursing positions by assignment so that workload can be properly assigned.

15. The Staffing Analysis needs to be augmented to include expected workload at the proposed Joliet Treatment Center.

16. All state, vendor and contract position descriptions for OHS and facility positions need to be provided

17. The OHS Director of Nursing should be on the same level as the Deputy Chiefs and Medical Coordinator reporting to the Chief of Health Services not to the Medical Coordinator.

# Statewide Internal Monitoring and Quality Improvement

***Addresses item II.B.2; II.B.6.l; II.B.6.o; III.L.1;***

**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**II.B.6.l.** *IDOC agrees to implement changes in the following areas: Effective quality assurance review;*

**II.B.6.o.** *IDOC agrees to implement changes in the following areas: Training on patient safety;*
**III.L.1.** *Pursuant to the existing contract between IDOC and the University of Illinois Chicago (UIC) College of Nursing, within fifteen (15) months of the Preliminary Approval Date [April 2020], UIC will advise IDOC on implementation of a comprehensive medical and dental Quality Improvement Program for all IDOC facilities, which program shall be implemented with input from the Monitor.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**
IDOC asserts compliance with provision III.L.1 of the Consent Decree and has done so for almost two years over four consecutive IDOC Bi-Annual Reports even though 1) the University of Illinois College of Nursing (UICCON) Quality Improvement and Patient Safety Plan was delivered without input from the Monitor, 2) a UICCON quality plan was not revised after input from the Monitor and there is no evidence provided as to what quality plan is being used, 3) the input from the Monitor has been limited by IDOC counsel and occurs mostly after IDOC has developed a plan, and 4) the quality improvement program has not been implemented. IDOC has now engaged SIU to assist in the quality program. SIU has not submitted a detailed quality plan. Draft IDOC Implementation Plans and IDOC's May 2021 Bi-Annual Report do not include detailed information regarding how the quality improvement program will work yet IDOC has asserted compliance with its implementation of this program.

The Monitor gave seven recommendations in the last report. IDOC has partially addressed the first recommendation. IDOC has a contract with SIU but the deliverables are not present in the contract so as of June, 2021 it is not entirely clear to the Monitor precisely what SIU is responsible for. However, IDOC states that the contract will include management of the quality improvement program. Recommendation three was also partially addressed. The 5/3/21 Staffing Analysis includes positions for an SIU audit team. It also includes a table of organization of the Quality Management and Operational Excellence program but aside from the audit teams, IDOC has not committed the remaining positions in the SIU table of organization into the Staffing Analysis and SIU has confirmed that, aside from the audit team, the remaining positions in the quality team are subject to change. We have received no information to verify that any of the remaining recommendations were carried out. In recommendation six[41] of the last report, the Monitor recommended a working group with SIU in the development of this program. IDOC would not permit this based on a meeting on 1/5/21.

Because IDOC does not have an Implementation Plan and because IDOC has denied the Monitor's request for a working group, IDOC's plans for quality improvement can only be learned from conference calls and documents sent to the Monitor. It is the Monitor's opinion that calls with SIU did not afford opportunity for input and have been mostly incomplete status updates. This has reduced ability of the Monitor to give input, created uncertainty regarding the progress of the program, and impaired communication.

IDOC arranged for a series of six hour-long conference calls with SIU on a variety of topics

---

[41] This recommendation states, "The Monitor strongly suggests a working group that includes the Monitor and his consultants, IDOC, and SIU in developing a quality program.

including quality improvement as described below. These calls were initiated because in a 10/7/20 conference call on dispute resolution issues, the Monitor asked whether IDOC had any plans for the quality program given that University of Illinois Chicago had declined to participate. UIC ended their participation in March or April of 2020 but there was no follow up communication on this from IDOC to the Monitor. IDOC stated that they were planning to meet with SIU to lead their quality program. The Monitor asked to meet with SIU.

On 11/6/20 IDOC scheduled the first conference call with SIU and SIU announced that they would be working with IDOC on quality improvement. SIU had hired a quality expert who said she was reviewing the Consent Decree and developing a plan. This quality expert does not appear to have continued employment with SIU and is no longer present on calls with SIU. IDOC had already met with SIU to develop priorities. The SIU quality expert stated that priorities had to come from IDOC. IDOC, in turn, indicated that they wanted SIU to take the lead on this project. There was no discussion by IDOC or SIU regarding input and assistance from the Monitor. IDOC did not have a written plan that included quality improvement. This 11/6/20 call with IDOC and SIU was an update from IDOC and SIU on the preliminary status of their work but did not include an opportunity for input from the Monitor.

On 12/10/20 IDOC scheduled a second conference call with SIU. A couple days before the meeting, IDOC sent the Monitor a quality management draft proposal. This proposal listed 16 tasks to be accomplished by either SIU or IDOC with a percent completion. SIU did not discuss the document with the Monitor before producing it and it lacked detail. SIU stated it was performing a gap analysis based on National Commission on Correctional Health Care (NCCHC) standards which apparently was the basis of their proposal.[42] The Consent Decree or input from the Monitor was not mentioned in the SIU proposal. The proposal did not address all items required in the Consent Decree and it wasn't clear if SIU had thoroughly reviewed the previous work completed by UIC and the Monitor. There has been no further revision of this proposal. The meeting did not provide sufficient opportunity to learn details of what SIU was engaged in and there was little opportunity for the Monitor to provide input. The Monitor asked for regular meetings with SIU and IDOC said it would study when meetings could be arranged.

IDOC scheduled a third call on 1/5/21. IDOC counsel initiated the discussion on the conference call and stated that SIU was providing assistance on a number of fronts including mortality review and quality improvement. The Monitor team complained about lack of input and asked for a working group with SIU to provide input on their quality plan. IDOC counsel said that a working group was unnecessary and that IDOC would set up meetings "when appropriate". In the opinion of the Monitor, the manner of IDOC control of when the Monitor can communicate with SIU and the form of communication significantly limits the ability of the Monitor to provide input. The Monitor recounted to IDOC counsel the history with UIC when the Monitor did not have input until after UIC had completed their plan. The Monitor did not want a repeat of that experience which was already beginning to occur with SIU. The Monitor wanted input before a plan was developed not after it was created. IDOC gave reassurances that progress was being made, that they were identifying positions and plans for partnerships with a variety of SIU

---

[42] The NCCHC standard differs from the requirements of the Consent Decree specifically, it does not require an audit function (C.D. II.B.9) and it does not require a set of performance and outcome measurements (C.D. II.B.7). It also is not related to Consent Decree requirements and therefore makes no comments about Monitors.

departments and that there was work on mortality review. Specific details of these plans were not provided and there was no written document describing these plans. IDOC did not agree with or permit the Monitor's request or approach for how to provide input to SIU.

IDOC scheduled a fourth call with SIU on 2/2/21. This meeting was a status update. During the call, SIU gave an overview of their involvement to date. The list of SIU involvement included developing the following:

1. Significant work on the electronic medical record procurement,
2. A structure and budget for their QI program,
3. A mortality review process, and
4. Chronic clinic protocols which SIU anticipated would be completed by the end of the month.

The details of these items were not thoroughly discussed. The Monitor had not yet had any input on mortality review or the quality program yet SIU stated they already had a draft proposal for a QI program which they were getting approval for from their Dean. The remaining time of this conference call was dedicated to a brief status update on the planned SIU chronic illness protocols. SIU said they were working with faculty at SIU to redesign the chronic care program.

IDOC scheduled another meeting with SIU on 3/1/21. In preparation for this meeting, on 2/25/21 IDOC sent the Monitor two documents.

1. A chronic disease policy with clinical guidelines for multiple sclerosis, seizure disorder, and tuberculosis, and
2. A draft table of organization for the quality management program with position descriptions for some of the positions including audit physician, quality specialist, senior quality specialist, and organizational quality coordinator.

For this scheduled hour-long meeting, the IDOC anticipated discussion of their chronic disease policies on multiple sclerosis, seizure disorder, and tuberculosis; the structure of their quality program as depicted in a draft table of organization; and the detailed eight-page mortality review revised policy sent to the Monitor on 2/15/21. None of these items was able to be discussed in any meaningful manner including meaningful input from the Monitor.

The table of organization for the quality program sent by IDOC described ten[43] position types but only four position descriptions were provided. These position descriptions give little indication of what these positions are responsible for or what qualifications are required. SIU has indicated that aside from the audit team, other positions in the quality program may be changed. The audit team physician position description is described as 90% administration which is inconsistent with the Monitor's view of requirements of an audit physician which includes significant amount of record review and analysis. This program is still evolving and has not yet been clearly described. Additional input from the Monitor is needed and improved communication needs to occur. The discussion at this meeting was superficial and not even sufficient to give a status update.

---

[43] Director of Quality Management, Senior Quality Specialist, Statistician Specialist, Organizational Quality Coordinator, Quality Specialist, Program Coordinator, Physician, Registered Nurse, Advanced Practice Nurse or Physician Assistant, Dentist

One of the Monitor's consultants sent an email to the IDOC CQI coordinator asking for a call with her to discuss several areas related to facility CQI. IDOC counsel requires to be copied on any email to IDOC staff and this was done. Because IDOC Counsel schedules all meetings, instead of scheduling a meeting with the CQI coordinator alone, IDOC counsel scheduled a meeting with seven IDOC individuals: IDOC counsel, an IDOC office coordinator, Chief OHS, head of the SIU correctional program, the IDOC Infection Control Coordinator, the IDOC Medical Coordinator, and the Quality Improvement Coordinator. On 5/5/21 at 1:45 pm IDOC counsel sent three documents to the Monitor team that "might be useful" for the following day's 11 am meeting. The three documents included a revised administrative directive on Quality Improvement dated May of 2019, a template for an Annual Governing Body report that had been updated 2/17/21, and a spreadsheet of 68 performance measures with definitions that was not dated. [44] There was no explanation regarding what two[45] of these documents were or their intended use and the Monitor's team had not seen these documents previously.

On 5/6/21 the call was held. The Monitor learned that the May 2019 administrative directive was the current Administrative Directive[46] and therefore the current guidance to staff did not address Consent Decree requirements. The IDOC plan for a revised Annual Governing Body Report[47] appeared to be a continuation of existing IDOC quality improvement practices in a more efficient format. The QI Coordinator also stated that the administrative directive requirement to perform 13 annual studies was still in place. This meant that a new CQI program was not yet planned for the facilities. Lack of standardized data was discussed and the IDOC acknowledged that data, including from the 360 system[48], is sometimes inaccurate. No one offered any explanation for how this would be corrected. The IDOC Administrative Directive on Quality Improvement requires monthly review of critical incidents. When asked where these critical incident reviews are to be found, the Infection Control Coordinator answered stating that there is always a discussion of these incidents but that the minutes don't describe what is actually discussed. A definition of an incident review was asked for but not provided. The IDOC QI Coordinator said that a new QI manual was needed but there was no timetable to complete one. This informational call for the Monitor reinforced that the process of CQI at the facility level was unchanged except for an intent to improve monitoring.

At this meeting, the Quality Improvement Coordinator brought up a State of Illinois program

---

[44] Notably, the Monitor has requested documents be routinely provided to the Monitor before our reports as well as to be included in IDOC reports as specified in provision V.G. of the Consent Decree. IDOC counsel has not done this. Instead, IDOC counsel has been engaged in continuous negotiation since the beginning of the Consent Decree over what items should be provided. All three of these documents would have already been sent to the Monitor. Instead, they were received in an ad hoc and untimely manner. If the Monitor had not asked for this meeting, the Monitor team would likely not have received these documents even though, the Monitor's routine document request would have required them to be sent.

[45] The Annual Governing Body report format and the performance measures worksheet.

[46] The Monitor had asked for Administrative Directives on 12/16/19 but has not received them. Also, administrative directives have been requested in his document request list since the beginning of the V.G document request negotiations in July of 2020. The only administrative directives received to date are administrative directives on Dental Care, Offender Health Care Services, and the Quality Improvement, which was sent in relation to this conference call.

[47] This was one of the three documents sent to the Monitor team the day before which had been updated on 2/17/21.

[48] The 360 system is the custody database which is used as a source of medical data.

called Rapid Results[49]. This program is a statewide initiative to train in six sigma methodologies. The Quality Improvement Coordinator said she was communicating with wardens to include each facility HCUA in Rapid Results training. If the Chief OHS truly supervises medical staff, she would not have to ask permission of any warden to ensure that a medical staff member could or could not attend this training. This in another contributory piece of evidence that the Chief of OHS does not control medical staff.

On 5/13/21 another meeting was scheduled by IDOC with SIU. SIU indicated that they were working with the SIU College of Engineering on a partnership with respect to training on 6-sigma. SIU also indicated that they were working with Research Electronic Data Capture (REDCap)[50] on data collection for the purposes of quality improvement. IDOC has not provided details of how these organizations would be integrated into the quality program and the Monitor had not yet been able to provide input on these plans.

Finally, in May of 2021 IDOC submitted its latest Bi-Annual report. In this report, IDOC again announced compliance with item III.L.1 of the Consent Decree without evidence supporting that assertion, before a Quality Improvement Plan had even been developed or implemented which is an essential requirement of item III.L.1, and without sufficient input on the program from the Monitor. The Monitor disagrees with IDOC's assertion of compliance. IDOC is far from compliance on this provision. The May 2021 IDOC Bi-Annual Report stated that the relationship with SIU continued to develop and SIU had taken "affirmative steps to assist IDOC in creating an enhanced quality improvement program". The Bi-Annual report also stated that "steps include engagement with the SIU College of Engineering to assist the Department in making process improvements" though details of this have not been provided to the Monitor and based on discussions with SIU College of Engineering representatives during a visit to Shawnee, there is no plan to have SIU provide on-the-ground engineering assistance. Although, the Bi-Annual Report states that a draft organizational chart "provides for the hiring of 11 positions related specifically to Quality Management", based on a discussion with a SIU representative during the Shawnee visit, aside from the audit team, positions being hired for the program are not yet certain.

The 5/13/21 meeting with SIU was the last meeting on quality or with SIU. Hour-long conference calls were conducted 12/10/20; 1/5/21; 2/2/21; 3/1/21; 5/6/21; and 5/13/21. These meetings were mostly updates on progress but offered little opportunity for assistance or input. No other meetings have been scheduled by IDOC counsel. This process is ineffective for the Monitor to provide input or learn what IDOC or SIU are planning or doing with respect to quality improvement.

In summary, IDOC has a contract amendment with SIU but the deliverables are not included in the contract. IDOC has provided no information that any new quality programs have been

---

[49] Information on this program can be found at
https://www2.illinois.gov/sites/RapidResultSummit/Pages/About.aspx
[50] REDCap is the Research Electronic Data Capture program in the SIU School of Medicine. This is a secure web application for building and managing online surveys and databases. This information was obtained from the website https://www.siumed.edu/ccr/redcap-research-electronic-data-capture.htmlhttps://www.siumed.edu/ccr/redcap-research-electronic-data-capture.html

initiated.  IDOC states that SIU will provide quality improvement services, but the only positions verified in the IDOC Staffing Analysis that will be provided by SIU are the audit team and a quality plan has not yet been provided.  Planned initiatives of SIU are not completely understood or described in writing to the Monitor.  The Monitor does not have sufficient access to SIU or with OHS to provide input or to learn ongoing progress in the quality program.  IDOC is therefore developing their quality program without sufficient input from the Monitor and it appears that IDOC does not want the Monitor's input.  The Monitor is hearing about plans for quality projects after they are developed. The Monitor supports and is encouraged by the participation of SIU in the quality program and hopefully also in providing physician support. SIU's participation warrants a partial compliance rating.  However, the Monitor cautions IDOC on restricting Monitor access to IDOC and SIU staff with respect to input.  This restriction is inconsistent with the requirement of the Consent Decree[51] and places the program at risk for re-work if projects fail to receive timely input.

**RECOMMENDATIONS**:

1. IDOC needs to permit the Monitor to determine the manner of how assistance and input is provided to IDOC including the agenda, the schedule, and attendees.  IDOC counsel should not be responsible for controlling the schedule, manner of meeting, or attendees of meetings the Monitor needs in order to provide input or assistance on the quality improvement program or Implementation Plan. The Monitor has recommended and continues to recommend a working group for this purpose.
2. The quality program implementation plan needs to include assistance and input from the Monitor to include:
   a. Structure of the statewide and facility level quality programs including quality committees at both the State and facility level.
   b. Development of an audit instrument;
   c. Hiring of audit teams and development of the audit instrument;
   d. Implementation of the audit function;
   e. Implementation of integrating audit findings into the quality program;
   f. Determining the need and hire personnel for a data team to extract data from the electronic medical record and other sources for purposes of validating performance.  Staffing recommendations are found in the Monitor's 2nd Report in the Medical Records section.
   g. Include expert system engineering consultation in augmenting quality improvement efforts;
   h. Develop and maintain through its data team a performance and outcome dashboard;
   i. Develop and implement a standardized adverse event system statewide; and
   j. Implement consultation and training expertise to facilities on how to perform quality improvement.
3. Revise the position description of the statewide Quality Improvement Coordinator.

---

[51] "UIC will advise IDOC on implementation of a comprehensive medical and dental Quality Improvement Program for all IDOC facilities, ***which program shall be implemented with input from the Monitor***" [Monitor's emphasis]. Item III.L.1.

4. Revise the Implementation Plan and Staffing Plan to address the requirements of the Consent Decree with respect to quality improvement taking into consideration the need for statewide efforts.
5. The current statewide Quality Improvement Coordinator and facility quality improvement coordinators should undergo Institute for Healthcare Improvement Open School training on quality improvement capability and patient safety and undergo six sigma green belt training sufficient for a senior level quality leader.
6. Incorporate data team, quality improvement consultants, and process improvement staff into the Staffing Analysis and the OHS table of organization.
7. Utilize concepts of the UIC draft quality program in new quality proposals including:
    a. An OHS statewide quality committee to oversee quality statewide.
    b. Audit teams to audit facilities once a year and identify opportunities for improvement that form the corrective action items for facility quality teams.
    c. Mortality review teams embedded in audit teams.
    d. Data and information technology teams that work centrally and support the electronic record and obtain data for statewide quality efforts.
    e. Inclusion of process improvement staff (system engineers) who work statewide to solve systemic issues, improve quality, improve processes, and reduce cost.
    f. Quality improvement consultants who train facility staff and mentor them in their quality projects.
8. Dental Director to work with QI to determine adverse reporting, audit instrument, process improvement, outcome and performance measures, and quality improvement reporting requirements for the dental program.

**Audits**
*Addresses item II.B.9*
**II.B.9.** *The implementation of this Agreement shall also include the design, with the assistance of the Monitor, of an audit function for IDOC's quality assurance program which provides for independent review of all facilities' quality assurance programs, either by the Office of Health Services or by another disinterested auditor.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

IDOC has partly addressed two of five recommendations of the last report and has fully addressed one recommendation. SIU will assume responsibility for the audit function. The IDOC July 2021 Staffing Analysis includes the audit team staff. SIU audit teams will consist of staff recommended by the Monitor. SIU stated that they will soon be posting audit staff positions. However, only two of six of the position types have position descriptions. The Monitor has concerns about the position description of the physician on the audit team. SIU perceives this as 90% administrative responsibility. The Monitor views this position as requiring significant direct auditing, record review, and clinical evaluation of the medical program and not administrative tasks. The Monitor has concurred with SIU that each FTE physician position could be shared by two 0.5 FTE physicians. The Quality Specialist position description is a generic position description identical to the one used for the quality improvement organizational

excellence unit and performance management unit. The duties of the audit quality specialist are distinct and different from the other two positions. No position descriptions for the program coordinator, dentist, advance practice nurse or registered nurse were provided. On 12/7/20 SIU produced a Quality Management Draft Proposal which indicated that SIU has completed 5% of a task to develop and recommend to IDOC an initial compliance survey instrument. This instrument has not been discussed or provided to the Monitor who has had no opportunity to assist in development of his instrument. There has been no follow up provided to the Monitor of progress on this item. In its May 2021 Bi-Annual report, IDOC asserts "imminent compliance" with item II.B.9, but so little has been done on this process that only minimal partial compliance is warranted. The IDOC provides no evidence or information to support their assertion. Also, the Monitor has asked for but has not been provided an opportunity for assisting or providing input into the audit function.

In the Monitor's initial technical assistance implementation workplan provided to the IDOC in January of 2020 which IDOC is now using as its Implementation Plan, the following 11 items were related to the audit process.

1. OHS, QI program, and Monitors to develop audit instrument.
2. Determine the scope of work for the audit team and number of team members.
3. Hire the audit team.
4. Audit team to train with Monitor on site visits.
5. OHS and audit team to develop a contract monitoring instrument based on audit, performance and outcome measures, staffing, and adherence to Consent Decree.
6. Audit team to deliver contract monitoring reports to Monitor and OHS leadership; obtain feedback; and take any necessary corrective action.
7. Develop infection control monitoring elements to be part of safety and sanitation audits.
8. Develop safety and sanitation audit instrument that include survey of all clinical spaces, equipment, supplies, etc.
9. Test safety and sanitation audit instrument that include survey of all clinical spaces, equipment, supplies, etc.
10. Develop with QI audit team audit questions necessary to demonstrate compliance with items III.K.1-13.[52]  Consider and determine who is to perform dental audits.
11. Dental Director to work with QI to determine adverse reporting, audit instrument, process improvement, outcome and performance measures, and quality improvement reporting requirements for the dental program.

IDOC had not acted on these recommendations for over a year and a half when they sent the Monitor's technical assistance document back to the Monitor as their Implementation Plan and indicated an intent to eliminate about a third to half of the 83 items in the technical assistance document.[53]  None of the workplan items related to audits have been entirely accomplished. IDOC wanted to eliminate items four and six above. Item four, which was for the Monitor to train the audit team, included a comment by IDOC that the recommendation was not required by the consent decree. Item six, which concerned contract monitoring reports, had no comment by IDOC but it was deemed not acceptable. IDOC had concerns about item five, the development of a contract monitoring tool, stating that they didn't want to agree to specifics "before we have a

---

[52] Lippert Consent Decree; II.K.1-13 Dental Program
[53] These discussions are ongoing as this report is being written.

vendor". IDOC asserted that they had already accomplished item eight above which was inaccurate. IDOC sent an environmental audit to the Monitor without obtaining any input from the Monitor prior to its development. The Monitor team sent a recommended version of an environmental audit back to IDOC. The Monitor has yet to receive comments back. During the recent Shawnee visit the Monitor tested this audit at the facility and invited the IDOC sanitation person to join but the Monitor did not hear back and he did not join. That part of the audit instrument is not yet completed in the Monitor's perspective.

The Monitor's interpretation of the Consent Decree is that the audit process is to be an independent evaluation of the status of progress of the IDOC. Independent audits are a typical monitoring strategy. Independent audits demonstrate self-management when they honestly reflect the status of clinical processes and clinical care and result in corrective actions that improve care. Typically, an independent and reliable audit process is an exit strategy in consent agreements. All deficiencies are not removed, but the jurisdiction demonstrates capability to identify and correct its problems.

IDOC has 30 facilities. The Monitor anticipated that audit teams would audit each facility annually. Audit deficiencies would be forwarded through a statewide quality committee back to each respective facility for corrective action. There would need to be training so that facilities would become capable of corrective actions. Larger systemic problems would be forwarded to a statewide quality committee for referral to a systemic process change group that would undertake systemic process change when indicated.

SIU and IDOC have no experience in auditing or monitoring correctional medical programs and training is needed. If the Monitor trains the audit team and has confidence that its results are reliable, it is a path forward to compliance as the Monitor could rely on audit team results to rate each facility and only perform a final review when the audit team determines compliance has been achieved. If this confidence is lacking then the Monitor will need to evaluate each facility individually for compliance. Given that the Monitor is permitted only ten days annually at facilities, only 2 facilities per year could be evaluated. Given that it typically takes multiple visits to attain compliance, the process of verifying compliance could take decades. The most reasonable method forward, therefore, is to institute an independent audit team that can evaluate each facility annually.

To assist in developing the audit process the Monitor requested a working group with SIU to develop the instruments for this project. DOC counsel refused to allow a working group on this project instead insisting on scheduling meetings "when needed". Defendant's attorneys have inserted themselves as persistent interpreters of the appropriateness of Monitor recommendations for achieving compliance with the Consent Decree during meetings with OHS and SIU.

Much of the time spent together between IDOC and the Monitor on the Implementation Plan, including the audit items, has been consumed with negotiating between IDOC counsel, the Attorney General counsel and the Monitor and his team whether a medical operational process is specifically delineated in the Consent Decree or not. IDOC, has expressed concern that because an item is not specifically called out in the Consent Decree, it should not be included in an Implementation Plan, including for audits, because it will then become a legal requirement. This

has been a long-standing discussion between the Monitor and Defendants' counsels. If everything in the Implementation Plan needs to be found in the Consent Decree, there would be no need for an Implementation Plan as the Consent Decree would delineate everything that needs to be done. The purpose of the Implementation Plan is to operationalize the *specifics necessary to provide adequate medical care* consistent with the Consent Decree and therefore must include clinical and programmatic details that are not found in the Consent Decree itself.

The Consent Decree requires that the audit instrument be developed with assistance from the Monitor and that it provides for "independent review" by OHS or another *disinterested* auditor. IDOC has inserted their interpretation of the Consent Decree into many discussions the Monitor has with OHS or SIU. This forces the Monitor to engage in a legal discussion when a clinical operational discussion is required. Very little, if any, time has been spent developing an actual audit instrument. An independent audit review process will not be attained as long as Defendant's counsels continue to intrude into or prevent discussions of clinical operational detail. The Monitor must be able to rely on these audits as independent, reliable, consistent and in line with the Monitor's experience and practice of auditing. This is a process used in other jurisdictions engaged in consent agreements and has been used in past consent decrees[54].

In summary, IDOC has placed staff for the audit team in the Staffing Analysis in line with the Monitor's recommendations. SIU is named to manage the audit team. SIU has begun development of the audit process without involvement of the Monitor and IDOC is not permitting involvement of the Monitor based on the Monitor's recommendation. The Monitor is unaware of what work has been accomplished, to date, on the audit process. The physician auditor position description of SIU is not in line with the Monitor's perspective on requirements for this position. IDOC's concern about the Monitor exceeding legal boundaries of the Consent Decree is interfering with the Monitor's responsibilities to provide assistance in development of an independent audit process. This provision is found partially compliant. The Monitor has concerns about whether it will be possible to assist in this process and whether an *independent* audit function will be achieved.

**RECOMMENDATIONS:**
1. Implementation of the audit function needs to include:
   a. OHS, SIU, and Monitors to develop audit instrument.
   b. Determine the scope of work for the audit team.
   c. Hire the audit team.
   d. Audit team to train with Monitor on site visits.
   e. OHS, audit team, and Monitor to develop a contract monitoring instrument based on audit, performance and outcome measures, staffing, and adherence to Consent Decree.
   f. Audit team to deliver contract monitoring reports to Monitor and OHS leadership; obtain feedback; and take any necessary corrective action.

---

[54] Georgia and Florida had audit functions as exit practices in their Consent Decrees. Florida established an independent audit function. Georgia's audit function was internal. Neither is as robust as during their exit from their litigation. California uses an auditing process from the Inspector General's office. Multiple jail including Miami, Albuquerque, and New Orleans have established collaborative auditing processes in conjunction with monitors.

    g.  Develop infection control monitoring elements to be part of safety and sanitation audits.

    h.  Develop safety and sanitation audit instrument that include survey of all clinical spaces, equipment, supplies, etc.

    i.  Test safety and sanitation audit instrument that include survey of all clinical spaces, equipment, supplies, etc.

    j.  Develop questions necessary to demonstrate compliance with dental program items III.K.1-13. Consider and determine who is to perform dental audits.

    k.  Include mortality review and vendor monitoring as part of audit team responsibility.

    l.  Integrate performance and outcome measures and adverse event monitoring into audit results.

2. Audits should result in a report that lists opportunities for improvement that are addressed through the quality improvement process. Follow up should occur until a problem is satisfactorily resolved.

**Performance and Outcome Measure Results**

*Addresses items II.B.7*
**II.B.7.**   *The implementation of this Decree shall include the development and full implementation of a set of health care performance and outcome measures. Defendants and any vendor(s) employed by Defendants shall compile data to facilitate these measurements.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
IDOC draft policy on quality improvement does not address performance and outcome measures and how they are integrated into the CQI program.

The 12/7/20 Quality Management Draft Proposal submitted by SIU states that SIU has completed 25% of work associated with development of a sample centralized quality improvement dashboard without providing the Monitor any information regarding this dashboard. On 5/5/21 IDOC sent to the Monitor a performance measures spreadsheet the afternoon before a meeting with SIU. There was no time to discuss this during the conference call and no time to review it before the meeting. This spreadsheet contained 68 items and was titled performance measures spreadsheet that the Monitor was told was developed by HCUAs with regional coordinators. It wasn't clear if there was physician input. Much work remains to be done on these performance measures. The IDOC Medical Director asked for the Monitor's comments on this document and this report and the accompanying appendix are partly responsive to that request. Additional discussion is needed.

In the last two Monitor Reports ten recommendations were given for inclusion on a dashboard at a minimum. Of these ten items, five were not present on the 5/5/21 dashboard submitted to the Monitor by IDOC. Four were only partly included and only one was included. All ten should be included on the dashboard.

The IDOC performance measure spreadsheet mostly replicates current data presentations in quality improvement meeting minutes and primary medical service reports which provide data that are irrelevant to existing IDOC barriers to Consent Decree compliance and are not actionable.[55] At this juncture in the evolution of IDOC's medical program, a dashboard should focus on major problems of the organization that are impairing progress towards compliance with the Consent Decree. Most of the performance measures presented in the IDOC dashboard do not focus on existing or priority problems, including problems identified by the Monitor in reports, or on issues that impair IDOC from movement forward. For that reason, most of the performance measures are irrelevant to forward progress. As an initial dashboard, every measure should address a major IDOC problem or be a major contributor to an adequate medical program.

Because there is no Implementation Plan, how this dashboard will be implemented is unknown. To date, IDOC has no staff dedicated to obtaining data and no standardized system of data acquisition. Data is non-standardized and IDOC acknowledges that data is sometimes inaccurate.[56] The performance measures sent to the Monitor by IDOC include no explanation on how data is obtained or what equipment, staff and supplies are need to obtain the data. The Implementation Plan needs to identify appropriate staff, responsible project owners, equipment and resources, steps necessary to establish the dashboard and timetables for dashboard measures to ensure success. The absence of an Implementation Plan for this item characterizes the status of IDOC's progress on the Implementation Plan which is to proceed without a detailed plan or to utilize existing defective processes to move forward.

Performance measures need to be placed in the context of the larger quality improvement plan which includes the auditing system, mortality review, an adverse event reporting system, and a plan for quality improvement at the facility level. IDOC has not explained how this dashboard will be integrated into the quality improvement program.

The IDOC dashboard has three mortality items: 1) the number of unexpected deaths; 2) the number of mortality reviews done; and 3) the number of mortality reviews completed within 7 days of death.

Unexpected death is an indicator frequently used in hospitals as a mechanism to select records for mortality review. "Unexpected" is difficult to define and subject to interpretation. The Agency for Healthcare Research and Quality prefers to use death in a low-mortality diagnostic related group as a quality indicator.[57] But this measure is also hospital related. IDOC has not explained how this measure is actionable data and unexpected deaths are not a measure currently used by IDOC in any manner so it isn't clear how this measure is useful or will be used by IDOC. Instead of reporting unexpected deaths, the Monitor suggests reporting opportunities for

---

[55] By actionable, the Monitor means that the measure guides the reader to something that should be done. For example, a performance measure for hepatitis C could be the number of persons with hepatitis C in the denominator with a numerator of the number of persons treated for hepatitis C. The reader would know that the organization's goal is to treat all patients with hepatitis C and the measure gives the reader a sense of the progress.

[56] On a call an OHS staff stated that information obtained through the 360 program is sometimes inaccurate.

[57] See technical specifications at
https://www.qualityindicators.ahrq.gov/Downloads/Modules/PSI/V50/TechSpecs/PSI_02_Death_in_Low-Mortality_Diagnosis_Related_Groups_(DRGs).pdf

improvement identified in mortality review. This would propel the program to identify and solve problems in their mortality reviews. In the mortality reviews associated with the 3rd Report, the Monitor found that all deaths, whether expected or unexpected, had an average of 8.3 opportunities for improvement for each death. Reasonable measures, could be:

1. The number of opportunities for improvement identified on each death;
2. How many opportunities for improvement resulted in quality improvement efforts; and
3. How many opportunities for improvement resulted in a change in a health care process?

The measure listing the number of mortality reviews done has little use from the perspective of the Monitor because the Monitor has recommended that all deaths should result in mortality review by the audit team. Also, because the Monitor recommends that the audit team perform mortality reviews tracking whether a mortality review was done is unrelated to facility personnel. These measures were developed by HCUAs and regional administrators and it appears that these measures imply that facility Medical Directors will perform the mortality review which is the current practice and which is ineffective and not recommended by the Monitor. We also note that the SIU draft mortality policy describes a process in which not all deaths are reviewed; only those determined necessary by the Agency Medical Director. This appears inconsistent with this measure. The performance measures should be consistent with policy. Lastly, a seven-day timeline to complete a mortality review is aggressive. Also, if the audit team performs the mortality review, what is the value in tracking a seven-day completion of mortality reviews on a dashboard for facility staff to review if these are done by an audit team?

The Monitor agrees with tracking immunizations which is one of the IDOC measures. This IDOC measure on immunization requires a sophisticated data management team. This is why the Monitor has recommended a data team to obtain data from the electronic medical record. Because the Implementation Plan does not include how the dashboard will be implemented, this item, like others, is likely to result in non-standardized, inaccurate information given the current IDOC practices. IDOC does not explain how it would identify the number of inmates who require immunization[58]. Identifying who is required to be immunized would require an assessment of all inmates based on age, risk, and chronic condition and comparing that information to American Committee on Immunization Practices guidelines. Because these measures were developed by HCUAs, the Monitor is concerned that current practices would be employed which consist of recording only vaccinations given and not using a denominator of vaccinations needed. The Monitor is concerned that this measure would lead to inaccurate or incomplete data presentations. The same could be said of IDOC measures for cancer screenings. The Monitor agrees with this measure but IDOC has not included in its Implementation Plan how the data will be obtained.

Dental care is only minimally addressed and needs to be augmented.

Multiple measures were similar to existing IDOC quality improvement data that doesn't give an actionable measure and will have limited, if any, use in a dashboard. The following measures are examples.

---

[58] This measure has in the numerator the "number of offenders who completed "*required*" immunizations in the specified period. The denominator is the average daily population.

- Hepatitis C cases diagnosed
- HIV cases diagnosed
- Number of offenders with routine healthcare cheeked
- Medical diets
- Offsite hospital admissions
- Offsite emergency room visits
- Offsite specialty consults
- Number of dental treatment plans
- Ranking of nurse protocols used
- Number of terminally ill patients in a specified period
- Number of nurse protocols used in a specified period

Without more information, these data alone give no indication whether performance was good, poor, needs correction, or is adequate. These data also will give no indication to staff if anything needs to be done or if the data presented represents progress toward a systemic goal or elimination of a systemic problem. For example, if Stateville had 50 hospital admissions versus 30 hospital admissions in a month would that indicate that care was appropriate, inadequate or that an improvement needs to occur? The data alone are not associated with a goal and therefore do not suggest an action. These are the data types that currently are used in IDOC quality minutes. Dashboards should be set up with measures that matter and reveal trends in data for which action may need to be taken to reach a goal.

Other measures on the IDOC dashboard are administrative issues that are worth tracking administratively but are not high priority items to track on an outcome and performance dashboard meant to address the Consent Decree. These include the following.

- Adjudicated lawsuits in favor of the offender
- Number of health staff that completed orientation
- Number of operation staff who passed education evaluation
- Number of healthcare staff who passed education evaluation
- Number of health care staff with a lapsed license

Other measures are so infrequent in IDOC that they would seldom elicit an action. When these events occur, they are alarm-events that must be immediately addressed by infection control and should be on an infection control report but not on a dashboard. Their frequency doesn't warrant monthly attention of all staff on a dashboard, unless their incidence dramatically increased. These include:

- Active TB cases diagnosed
- TB test conversions
- Staff TB conversions

Other items that do not appear to be major priorities or items that need monitoring on a monthly basis by all staff include:

46

- Laboratory errors,
- Radiology errors,
- Inmate injuries,

It is not clear what is meant by laboratory and radiology errors.  UIC is the laboratory vendor and the Monitor is unaware of significant errors by UIC laboratory.  It is not even clear how IDOC would know when UIC makes an error.   The Monitor has no evidence that there are significant errors made by radiologists reading x-ray films.  If by these errors, IDOC means that a laboratory specimen wasn't drawn or an x-ray wasn't performed then these should be addressed by the access to care measure which the Monitor presents in Appendix F.  Inmate injuries, based on record reviews, do not appear to be a major cause of harm in IDOC and the rationale for including this on a dashboard is not clear.

Clinical care measures are limited and need to be increased.  These will present problems because many clinical problems require that a disease status or condition be accurately described which is inconsistently done in IDOC.  As an example, for asthma, one IDOC measure calculates the number of inmates with "poorly controlled asthma" multiplied by the number of months offenders have poorly controlled asthma.  "Poorly controlled" is undefined and the term is not found in nationally recognized asthma classification systems. [59]  This will likely result in inaccurate data because the definition of "poorly controlled" will be interpreted differently by different facilities.  IDOC physicians also do not use standardized classification of asthma status even though chronic care forms have standardized classification.  Also, persons with COPD are frequently treated and seen as if they had asthma which will cause confusion.  In an asthma death reviewed for the 3rd report, a patient, who had mostly continuous severe asthma was classified as having intermittent asthma with good control when he actually had severe asthma.  For an asthma death reviewed for this report, an inmate was classified as having mild persistent asthma in good control in initial chronic clinics.  But as the patient deteriorated two subsequent chronic clinics classified him as improved with intermittent asthma in good control which is better controlled asthma than mild persistent.  The patient actually had severe asthma for over a year and was classified with mild intermittent asthma about six weeks before his death.  The severity of his asthma was largely unrecognized.   Both patients had other chronic clinics in which their asthma status wasn't even described.  Both patients died from severe uncontrolled asthma and would not be represented on the dashboard because their records did not show "poorly controlled" asthma.  Before some of these clinical measures are used there will need to be significant staff training.

Before developing performance measures, IDOC needs to first develop its implementation plan to determine how the dashboard will be used, and how to integrate performance measures into the quality improvement program particularly using the audit function.  IDOC then needs to determine how it will obtain the data that will be needed to populate the dashboard.  Then it will need to determine how the dashboard will be presented to staff and how it intends staff to use the dashboard.  Many of the dashboard items need to be revised based on priorities of what the key problems are in IDOC.  IDOC may need to implement the dashboard in stages with a limited

---

[59] The National Heart Lung and Blood Institute uses a classification that is nationally accepted to include mild intermittent, mild persistent, moderate persistent, and severe asthma classes.

dashboard initially until more sophisticated data resources are available.

For three consecutive reports, the Monitor suggested that the dashboard should include, at a minimum, the following dashboard items:
1. Scheduling and show rate effectiveness and timeliness of access,
2. Immunization status and rates of immunization,
3. Tracking of required items of the Consent Decree,
4. Outcome measures for certain conditions (e.g., hemoglobin A1c for diabetes),
5. Screening rates for various conditions,
6. Medication administration effectiveness and timeliness,
7. Staffing and vacancies,
8. Tracking and appropriate placement of high-risk individuals,
9. Preventable hospitalization,

The Monitor attaches appendix F which is a list of recommended performance measures that includes suggestions for the above ten measures.

In summary, the IDOC sent the Monitor a set of performance measures but they are based on presenting data, (which are similar to existing quality improvement data and primary medical service reports), which are disconnected from major problems, are not actionable, and are irrelevant to forward progress in the Consent Decree or in establishing an adequate medical program. Because there is no Implementation Plan, IDOC provides no information on how these measures will be implemented or whether additional data or personnel resources will be necessary to effectively implement these performance measures. Although a set of performance measures was submitted, these measures are far from adequate, are not integrated into the quality program, and are not described in the Implementation Plan in a manner that ensures success. For that reason, a continued noncompliance is warranted. The Monitor believes improvement of these measures should be developed further in a working group on quality improvement.

**RECOMMENDATIONS**:

1. The performance and outcome measures should be centralized and based on obtaining data automatically from the electronic record, laboratory, and other sources. Measures should be presented on an electronic dashboard that can be viewed at any workstation in any facility statewide.
2. Performance and outcome measures should be used by facilities as a guide to their performance and to inform the quality program of necessary improvements.
3. Include performance measures in the Implementation Plan which should include:
   a. Who will maintain this dashboard?
   b. How will data be displayed to staff and how OHS intends staff to use the dashboard?
   c. Development of a glossary of definitions including
      i. A narrative definition of the metric
      ii. Numerator and denominator
      iii. How the metric is calculated
      iv. The data source

        v.   Reporting frequency
        vi.  A goal.
    d.  How will measures be integrated into the quality program.
4.  Include this provision in a quality improvement work group.

**Adverse Event and Incident Reporting Systems**

***Addresses Items II.B.6.m; II.B.6.n***
**II.B.6.m.** *IDOC agrees to implement changes in the following areas: Preventable adverse event reporting;*
**II.B.6.n.** *IDOC agrees to implement changes in the following areas: Action taken on reported errors (including near misses);*

**OVERALL COMPLIANCE RATING**: Noncompliance

**FINDINGS:**

IDOC has not yet designed or implemented an adverse event reporting system. There is no evidence that any recommendations from the Monitor's 2nd Report have been instituted. This item remains noncompliant.

**RECOMMENDATIONS:**
1. IDOC needs to develop an adverse event and incident reporting system. This system should be electronic and centralized. This can be through 3rd party software or internally developed through the quality committee using the internal data team.
2. Adverse event reporting needs to have capacity to allow anonymous reports. Staff need to be encouraged to reports errors and believe that report of errors will not result in discipline.
3. Adverse event reporting needs to be supported and maintained by the OHS. Data from this reporting system must be integrated into the quality program.
4. Implementation of the adverse event reporting system should be integrated into a quality improvement work group.

**Vendor Monitoring**

***Addresses II.B.2.***
**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**OVERALL COMPLIANCE RATING**: Noncompliance

**FINDINGS:**
There has been no change in this item since the Monitor's last report. The IDOC has provided

limited data[60] or information related to vendor monitoring.  The data provided is not sufficient to evaluate IDOC's monitoring of the vendor. The lack of data includes monitoring of vendor quality issues as well as provider clinical quality, peer reviews, monitoring of problematic physicians, action plans, or monitoring of other clinical staff.

The Monitor views this item as linked to comprehensive audits as described in the section on Audits above.  Auditing, if comprehensive, monitors all clinical aspects of care and can include staffing vacancies.  Because monitoring needs to be an independent view of a vendor, the medical vendor should not be permitted to perform monitoring of itself.

**RECOMMENDATIONS**:
1. IDOC needs to develop a meaningful vendor monitoring system that monitors quality of care, physician quality, and ability to hire contracted staff against contract requirements. This can be joined with the audit process.  Monitoring should be standardized across facilities so comparisons can be made.  The Monitor's recommendation is to provide this service through the audit team.

**Mortality Review**

***Addresses items II.B.6.i; III.M.2;***
**II.B.6.i.**  *IDOC agrees to implement changes in the following areas: Morbidity and mortality review with action plans and follow-through;*
**III.M.2.** *Mortality reviews shall identify and refer deficiencies to appropriate IDOC staff, including those involved in the Quality Assurance audit function.  If deficiencies are identified, corrective action will be taken.  Corrective action will be subject to regular Quality Assurance review.*

**OVERALL COMPLIANCE RATING:**  Noncompliance

**FINDINGS:**
The Monitor made seven recommendations in his 3rd report.  Three recommendations were partly complied with but four were not addressed at all.  The Monitor received some but not all death records as requested.  A tracking log was provided but did not contain all information requested. Only a few autopsies were provided.

The Monitor has requested a list of deaths and a copy of all death records as they occur.  On 6/15/21 IDOC sent a list of 2021 deaths through 5/28/21.  Multiple items were not included on the list of deaths as requested including: date of incarceration, cause of death (only 40% of deaths had a cause of death), autopsy done Y/N, and date of autopsy, and mortality review done Y/N.  There were 68 deaths in 2021 on the 6/15/21 mortality list.  Of these 68 deaths, IDOC has sent only 20 (29%) medical records.  The lack of death records impairs the ability of the Monitor to effectively monitor health care.  An additional record was sent of a person who died in 2021 but that person was not on the mortality list.  Four additional records were sent for persons who

---

[60] Some facility quality improvement meeting minutes contain information on vendor staff position vacancies, contracted versus actual hours of service, waiting times for select services, turn-around-time for collegial referral requests.  A separate staff vacancy report was provided.

died in 2020. None of the 68 deaths included a mortality review. A mortality review process has not yet been initiated. IDOC does not track autopsies as requested and the Monitor has only received a few autopsies. For autopsies not received, the Monitor doesn't know whether the autopsy was performed and is not yet available or was not done.

At 1:45 pm on 1/4/21 IDOC sent to the Monitor a five-page draft SIU mortality review policy and asked for the Monitor's input on a call that IDOC scheduled with SIU for the following day on 1/5/21 at 10 am. The document was not received with sufficient time to develop input. IDOC was asking for input after the document had already been produced. Given the agenda of the meeting on 1/6/21, the document was not discussed.

In a meeting on 2/2/21, a representative from SIU said that the mortality review process was dropped down a bit on their priority list and that they were doing research with other departments of corrections regarding mortality review not having had any meaningful discussions yet with the Monitor on mortality review. On 2/15/21 IDOC sent the Monitor a draft revised detailed eight-page mortality review policy developed on 2/11/21 for discussion at a 3/1/21 scheduled meeting. The Monitor reviewed the document and, on 2/25/21, the Monitor sent to IDOC and SIU three documents related to the mortality review draft policy.
1. Their policy on mortality review with 41 comments,
2. A process map of how we perceived the mortality review program as integrated within the CQI program, and
3. A word document describing components of a suggested mortality review process and the process map.

The Monitor had significant differences with the 2/11/21 draft mortality policy. As of the writing of this report in late-July, there has been no written response from IDOC or meaningful feedback on the mortality review documents sent by the Monitor to IDOC.

In summary, IDOC does not send medical records of all persons who have died. They have not acted on all of the Monitor's recommendations. A mortality review policy is not completed. Mortality reviews are not being done. The Monitor has not yet had a meaningful discussion with OHS or SIU on the mortality review policy. This item remains noncompliant.

**RECOMMENDATIONS**:

1. Provide all death records to the Monitor as they occur. These should include two years of all aspects of the paper record. The Monitor and his consultants should all have remote access to the electronic record for every site that implements the electronic record.
2. All deaths should include an autopsy.
3. Provide a tracking log of all deaths at least quarterly. This log should include name, IDOC #, date of death, age, date of incarceration, facility at time of death, category of death, cause of death, whether the death was expected or unexpected, whether an autopsy was done and the date of the autopsy. The log should also include whether a mortality review has been completed.

4. A mortality review should be performed for each death by an audit team. The mortality review needs to include at a minimum:
   a. Date of review
   b. Patient name
   c. IDOC number
   d. Date of death
   e. Age and date of birth
   f. Facility at the time of death
   g. Place of death (e.g., hospital, infirmary, etc.)
   h. Category of death (natural, homicide, suicide, etc.)
   i. Expected or unexpected death
   j. Cause of death
   k. Mental health diagnoses
   l. Medical diagnoses
   m. IDOC problem list
   n. Medications at facility at the time of death
   o. Case summary[61] that includes both nursing and physician input that includes a summary of the care of the patient for their illnesses and care related to the cause of death or care that needs to be highlighted to identify opportunities for improvement.
   p. Autopsy diagnosis
   q. Documentation of opportunities for improvement and recommendations for corrective action when appropriate
   r. Identified opportunities for improvement need to be evaluated by the OHS quality committee. That committee needs to decide if corrective action and what corrective action is appropriate and assign responsibility for corrective action either to the facility quality committee or to an OHS responsible party. The OHS quality committee should monitor progress on resolution of the corrective action until it is completed. The facility quality improvement meeting minutes need to document their progress in resolving corrective action.

5. The quality improvement discussion regarding mortality review should be educational with a goal towards improving care.

6. Line staff employees should have an opportunity to provide anonymous information regarding events surrounding a death with an aim toward improving patient safety. A process for this should be established.

7. The quality improvement coordinator and audit teams should conduct follow up with facility quality programs to monitor actions taken to improve care based on information learned from mortality review.

# Medical Records

***Addresses item II.B.4; III.E.3; III.E.4; III.G.3***
**II.B. 4.** *No later than 120 days after the Effective Date of this Decree, IDOC shall have selected an EMR vendor and executed a contract with this vendor for implementation of EMR at all*

---

[61] For deaths that involve suicide

*IDOC facilities. Implementation of EMR shall be completed no later than 36 months after execution of the EMR contract.*

**III.E.3.** *IDOC shall abandon "drop-filing".*

**III.E.4.** *The medical records staff shall track receipt of offsite medical providers' reports and ensure they are filed in the correct prisoner's medical records.*

**III.G.3.** *IDOC shall use best efforts to obtain emergency reports from offsite services when a prisoner returns to the parent facility or create a record as to why these reports were not obtained.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

None of the recommendations in the Monitor's 3rd Report were enacted.

An update on wiring has not been provided since December 2020 which showed that wiring is completed at all facilities except Sheridan, which had yet to have wiring started, and Stateville, which is 50% completed.

IDOC has not provided recent data on drop filing.

IDOC no longer has a contract for an electronic record. A request for proposal for the electronic medical record is in the IDOC procurement department awaiting final approval.

Based on discussions with IDOC regional staff during a prior visit to Logan CC, the device count that was done at Logan did not include a count for the future number of employees or future needs based on changes due to the Implementation Plan. The Monitor has recently requested but not yet received a device count so whether an appropriate number of devices will be obtained to support an electronic medical record with the future state number of employees is unknown.

IDOC has provided Staffing Analyses that include the addition of three OHS positions that will be focused on electronic medical record operations and data gathering.[62] SIU School of Medicine Office of Correctional Medicine has also included three positions[63] in its Quality Management & Operational Excellence program to assist IDOC gather and analyze its clinical data using the REDCap data system associated with SIU School of Medicine. None of these six staff have yet been hired. It is not yet clear to the Monitor what type of staff will be hired or how these two IT teams will collaborate on implementing, developing, and maintaining IDOC's EHR and data gathering and analysis system.

**RECOMMENDATIONS:**

1. Base the roll out and device needs on expected numbers of employees and expected workflows and not on current employee numbers or existing workflows.

---

[62] Health Information Technology Coordinator, Electronic Health Record Administrator, and Health Information Analyst. Staffing Analysis 7/7/21

[63] Senior Quality Specialist (data engineer), and two Statistician Specialists, SIUOCM QMOE Table of Organization, 5/13/21

2. Modify the Staffing Analysis and Implementation Plan to include staff to manage and support the electronic medical records including initial and ongoing training for users and a help desk function.
3. Ensure that point-of-care[64] devices are integrated into the electronic medical record.
4. Ensure that label printing of laboratory requisition and other similar devices are integrated into the electronic medical record as part of the implementation of the record.
5. Ensure that the new electronic medical record has the capability to track and report clinical and operations data that needed to assess IDOC's compliance with the Consent Decree and data that is vital to IDOC's ongoing efforts to track and improve the delivery of quality care.

# Policies and Procedures

**Medical & Dental**

*Addresses item II.B.8; III.K.4; III.K.5*

**II.B.8.** *The implementation of this Decree shall also include the development and implementation, with the assistance of the Monitor, of a comprehensive set of health care policies by July 1, 2020. These policies shall be consistent throughout IDOC, and cover all aspects of a health care program.*

**III.K.4.** *IDOC shall implement policies that require routine disinfection of all dental examination areas.*
**III.K.5.** *IDOC shall implement policies regarding proper radiology hygiene including using a lead apron with thyroid collar, and posting radiological hazard signs in the areas where x-rays are taken.*
.

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:** None of the five recommendations of the Monitor in the last report has been undertaken or completed. The Monitor has received, commented on, and returned 17 policy drafts covering the following topics:
1. Access to Care,
2. Responsible Health Authority,
3. Medical Autonomy,
4. Administrative Meetings and Reports,
5. Quality Improvement Program,
6. Patient Safety,
7. Emergency Services and Response Plan,
8. Receiving Screening,

---

[64] Point-of-care devices are small devices that provide a diagnostic test locally and which can be used by nursing or provider staff where care is delivered. These devices include glucometers to test blood glucose, or devices to test blood to determine whether anticoagulation (INR) is sufficient. Electronic vital sign machines are similar to point-of-care devices in so far that they can be connected to the electronic medical record and the testing results can be automatically directed to the appropriate place in the electronic medical record.

9.  Transfer Screening,
10. Health Assessments,
11. Non-Urgent Health Care Requests and Services,
12. Discharge Planning,
13. Periodic Examination,
14. Urgent Care Services, and
15. Offender Infirmary Services.
16. Chronic Care
17. Mortality Review

The mortality review policy was written by SIU but should be as an IDOC policy so the formatting should be IDOC's.   The Monitor has not received final drafts yet.[65]  Until recently, IDOC has not produced any policies since the COVID pandemic started. This process was completely stalled and is just beginning to restart.

Since there will need to be at least 60 medical policies, IDOC has drafted about 25% of necessary medical policies.  These drafts are not yet completed and there are no completed policies to date.  This item was to have been completed on 7/1/20.  On 5/6/20 IDOC sent a letter to Plaintiffs and the Monitor stating that completion of policies would be delayed because of COVID-19.  Much work remains to be done and progress on policies has been slow.

Of concern in the early draft policies is that IDOC has not considered requirements of the Consent Decree[66] or recommendations of the Monitor in his reports.[67]  This results in a business-as-usual practice which demonstrates that very little is changed from prior practices.   For example, the quality improvement policy did not include how the audit program, mortality review process, or performance dashboard will be integrated into the quality improvement program.  No mention was made of SIU even though IDOC told the Monitor that SIU would be managing the quality program.  Policies should describe the changed procedures that will ensure compliance with the Consent Decree.

The IDOC will need to address how policies will be implemented and disseminated.  Development and implementation of policies is not included in the Implementation Plan. Dental policies have not yet been started.[68]

Though requested, IDOC has never sent to the Monitor all administrative directives related to healthcare. An IDOC memo dated 10/9/19 states that the Standard Operating Procedure, which was to provide guidelines for health care staff for the Immunization Program, was available through SharePoint, an internal IDOC server to which the Monitor and his team do not have access.  The IDOC needs to send all administrative directives, policies, and guidelines to the

---

[65] As final editing was being done on this report, IDOC sent the Monitor 5 policies reviewed by the Monitor and revised by IDOC along with nine new policy drafts.  These will be discussed in the next report.

[66] For example, in the Quality Improvement policy

[67] For example, in the chronic disease policy or by virtue of the Wardens still being responsible for ensuring medical operational direction and control.

[68] Dental Care for Offender revised 1/1/2020 was received on 6/15/20 as the 2nd Monitor's Report was being finalized and has not yet been fully evaluated.  This policy was revised prior to Dr. Austin becoming the Dental Director and we have recently communicated to IDOC about having Dr. Austin review this document.

Monitor as they are developed. The IDOC should give remote access to the Monitor and his consultants to SharePoint to access policies, guidelines, administrative directives and other official IDOC documents related to the medical program.

**RECOMMENDATIONS:**
1. Re-establish a timeline for completion of the comprehensive medical policies and include this in the Implementation Plan.
2. Complete the process of finishing drafts of policies.
3. Finalize the recommended changes to the policies.
4. Develop a plan to implement and disseminate policies. Include this in the Implementation Plan.
5. Start the Dental policies.
6. Ensure that policies describe changes necessary for compliance with the Consent Decree.
7. Provide to the Monitor all administrative directives, policies, and guidelines.
8. Provide the Monitor and his team access to SharePoint and any other internal shared server that contains policies, administrative directives, or guidelines.

# Facility Specific Issues

# Facility Staffing

**Budgeted Staffing**

*Addresses items II.B.2; II.B.3; III.A.10;*
**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*
**II.B.3.** *IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff.*
**III.A.10.** *Each IDOC facility shall have registered nurses conducting all sick calls. Until IDOC has achieved substantial compliance with nursing provision of the staffing plan, facilities may use licensed practical nurses in sick call, but only with appropriate supervision.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
**Budgeted Physician and Non-Nursing Positions**
IDOC has just submitted its final Staffing Analysis in August of 2021. There are less staff working at the time the August 2021 Staffing Analysis than when the first draft Staffing Analysis was submitted in November of 2019. The Monitor notes that staffing deficiencies identified in prior IDOC Staffing Analyses continue to be present in multiple areas including dental hygienists, dentists, optometrists, physical therapists and physicians. In some areas the

deficiencies have worsened.[69]  The Staffing Analysis section of this report addresses these issues.

**Budgeted Nursing Positions**

According to information provided most recently to the Monitor,[70] IDOC has allocated 820.4 direct care nursing positions,[71] an increase of six positions since the 3rd report[72].  There was no narrative description for recommended positions or changes to allocated positions. The methodology for determining necessary nurse staffing appears to rely upon the opinions and experience of managers and does not include any workload driven measures.

The Monitor recommended in the last report further analysis of staffing adequacy especially at medium or maximum custody facilities with low staffing ratios and low percentages of registered nurses in the skill mix[73]. It was suggested the analysis include quality patient care parameters (numbers of emergencies, patient falls, acquired infection etc.), risk management information (deaths, grievances, errors etc.), time taken to fill vacant positions and retention in registered nurse positions as well as compliance with items III.A.10, III.I.1, III.I.2 and III.I.3 of the Consent Decree. There is no evidence that such methods were employed to determine recommendations for the August 2021 staffing analysis.

There are a total of 43 supervisory positions[74].  The ratio of supervisors to direct care employees is 1:19. which is too broad to result in effective supervision. An additional 15 supervisory staff are recommended in the August 19, 2021 staffing analysis which would bring the ratio to one supervisor for every 17 employees. This is closer to the span of control needed to implement the changes in nursing practice and services needed to implement the Consent Decree.  The Monitor recommends that IDOC allocate and hire the 15 recommended supervisory positions.

Decreases in the IDOC prisoner population have increased the ratio of positions allocated per 1,000 prisoners since November 2019. [75] [76]  Staffing ratios are the highest at the smallest facilities with special treatment or programming missions.[77] Facility staffing ratios vary at the other facilities from a low of 12.8 at Danville to a high of 66 at NRC. The staffing variance among these facilities cannot be explained by custody level or population size.  The 15 facilities with staffing ratios less

---

[69] Appendix A lists the changes in staffing from the first draft Staffing Analysis to the final submitted Staffing Analysis from August of 2021.  Inspection of that table show that many positions that the Monitor recommended to be increased were actually decreased from 2019 to 2021 including optometrists, physical therapists, and physicians.
[70] August 19 2021 Staffing Analysis.
[71] Direct care positions include registered nurses, licensed practical nurses, CMTs, and certified nursing assistants. The Monitor understands that CMTs must be licensed as practical nurses and so these two positions categories are treated as one for the purpose of evaluating staffing adequacy.
[72] Health Care Monitor 3[nd] Report, Lippert v. Jeffreys, February 15, 2021, page 36.
[73] Health Care Monitor 3rd Report, Lippert v. Jeffreys, February 15, 2021, page 37.
[74] Supervisory positions include the Director of Nursing and Nursing Supervisors.
[75] The ratio of direct care positions in November 2019 was 21 for every 1,000 prisoners per the Staffing Analysis Illinois Department of Corrections Office of Health Services, Lippert Consent Decree 11/23/2019.  The Monitor's 3rd Report documented the ratio had increased to 26 direct care positions per 1000 population (page 36).
[76] Average daily population as reported in the IDOC Quarterly Report July 2021.pdf (illinois.gov) is 11,000 fewer than the ADP reported in the first staffing analysis dated 11/23/2019.
[77] Kewanee, JTC and Elgin.

than the mean of 30 per 1,000 prisoners are shaded in the following table.

| DIRECT CARE NURSING POSITIONS ALLOTED AND RECOMMENDED IN AUGUST 2021 | | | | | | | |
|---|---|---|---|---|---|---|---|
| FACILITY | TOTAL Direct Care Staff Proposed 8-2021 | | Actual Total Direct Care 8-2021 | | Actual Skill Mix 8-2021 | | |
| | # | #/1000 population | # | #/1000 population | RN | LPN/CMT | C.N.A. |
| DANVILLE | 29.0 | 21.0 | 17.6 | 12.8 | 51% | 49% | 0% |
| WESTERN | 34.0 | 22.6 | 22.0 | 14.6 | 36% | 55% | 9% |
| MURPHYSBORO | 1.0 | 14.7 | 1.0 | 14.7 | 100% | 0% | 0% |
| HILL | 35.0 | 22.9 | 25.0 | 16.3 | 32% | 60% | 8% |
| TAYLORVILLE | 20.4 | 31.5 | 11.4 | 17.6 | 100% | 0% | 0% |
| LAWRENCE | 40.0 | 23.8 | 30.0 | 17.9 | 23% | 57% | 20% |
| CENTRALIA | 24.0 | 24.1 | 18.0 | 18.1 | 67% | 33% | 0% |
| SHAWNEE | 31.0 | 27.4 | 21.0 | 18.6 | 38% | 62% | 0% |
| ILLINOIS RIVER | 30.0 | 20.9 | 28.0 | 19.5 | 36% | 43% | 21% |
| BIG MUDDY | 33.0 | 29.3 | 24.0 | 21.3 | 33% | 67% | 0% |
| GRAHAM | 39.0 | 26.8 | 33.0 | 22.6 | 58% | 24% | 18% |
| PINCKNEYVILLE | 37.0 | 26.7 | 32.4 | 23.4 | 31% | 51% | 19% |
| SHERIDAN | 25.0 | 25.9 | 25.0 | 25.9 | 76% | 0% | 24% |
| MENARD | 71.0 | 33.2 | 59.0 | 27.6 | 46% | 44% | 10% |
| ROBINSON | 19.0 | 40.5 | 14.0 | 29.9 | 100% | 0% | 0% |
| DIXON | 76.0 | 42.6 | 62.0 | 34.7 | 71% | 16% | 13% |
| EAST MOLINE | 29.0 | 46.8 | 23.0 | 37.1 | 57% | 26% | 17% |
| VIENNA | 22.0 | 42.2 | 20.0 | 38.4 | 80% | 20% | 0% |
| LINCOLN | 22.0 | 44.4 | 20.0 | 40.3 | 30% | 50% | 20% |
| PONTIAC | 60.0 | 52.1 | 53.0 | 46.0 | 47% | 42% | 11% |
| SOUTHWESTERN | 15.0 | 78.9 | 9.0 | 47.4 | 100% | 0% | 0% |
| LOGAN | 46.0 | 48.0 | 46.0 | 48.0 | 48% | 39% | 13% |
| VANDALIA | 25.0 | 76.7 | 16.0 | 49.1 | 81% | 19% | 0% |
| JACKSONVILLE | 22.0 | 59.0 | 19.0 | 50.9 | 79% | 21% | 0% |
| STATEVILLE | 60.0 | 59.1 | 56.0 | 55.2 | 52% | 38% | 11% |
| DECATUR | 17.0 | 64.6 | 17.0 | 64.6 | 71% | 29% | 0% |
| NRC | 70.0 | 77.3 | 60.0 | 66.3 | 53% | 37% | 10% |
| KEWANEE | 10.0 | 101.0 | 10.0 | 101.0 | 60% | 40% | 0% |
| JTC | 29.0 | 133.6 | 26.0 | 119.8 | 85% | 0% | 15% |
| ELGIN | 22.0 | 1157.9 | 22.0 | 1157.9 | 64% | 14% | 23% |
| Total | 993.4 | 37.0 | 820.4 | 30.6 | 55% | 34% | 11% |

Of the allocated direct care positions 55% are registered nurses, 34% are licensed practical nurses (includes CMTs) and 11% percent are nursing assistants. This is essentially unchanged since the

3rd report[78]. The skill mix[79] at individual facilities varies widely. In the column headed Actual Skill Mix 8-2021 the facilities with registered nurses comprising less than 50% of the direct care staff are also highlighted. Seven of these facilities also have lower overall staffing ratios than the median. The August 2021 Staffing Analysis recommends an additional 28 positions be added to the allotment at the seven facilities with the lowest ratio of RNs and the lowest overall nurse staffing but there is no analysis as described above. The Monitor recommends approving these recommended additions to the allotment as an immediate priority. As additional positions are identified "as necessary" future analyses needs to include quantitative methodology to determine more precise staffing changes.

High vacancy rates among nursing personnel have been identified as a problem since at least 2018.[80] The Monitor's evaluation of vacancies for the 4th report found vacancy rates have exacerbated with the COVID pandemic.[81] See the following table.

---

[78] The skill mix was reported as 55% registered nurses, 34% licensed practical nurses (includes CMTs) and 9% percent nursing assistants in Health Care Monitor 3[nd] Report, Lippert v. Jeffreys, February 15, 2021, page 36.

[79] Skill mix refers to the proportion of the total direct care staff for each type of personnel. For example, the skill mixes for the 447 RN positions divided by the total direct care nursing positions of 814 which is 55%. There is no standard skill mix but programs staffed with a higher RN mix have better outcomes. The skill mix can be measured against outcomes to determine if a higher RN ratio may be needed.

[80] Statewide Summary Report Including Review of Statewide Leadership and Overview of Major Services, Report of the 2nd Court Appointed Expert (October 2018) pages 28-30.

[81] August 19, 2021 Staffing Analysis.

| Nurse Vacancy Rates in November 2019, December 2020, May 2021 and August 2021 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Facility | RN November 2019 | RN December 2020 | RN May 2021 | RN Vacant 8 2021 | | LPN November 2019 | LPN/CMT December 2020 | LPN/CMT May 2021 | LPNVacant 8 2021 |
| | % VACANT | % VACANT | % VACANT | % VACANT | | % VACANT | % VACANT | % VACANT | % VACANT |
| BIG MUDDY | 13% | 38% | 38% | **50%** | | 13% | 19% | 19% | 38% |
| CENTRALIA | 0% | 17% | 50% | 8% | | - | 17% | 17% | 17% |
| DANVILLE | 44% | 56% | 33% | 44% | | 54% | 53% | 42% | **65%** |
| DECATUR | 0% | 8% | 17% | 8% | | 50% | 20% | 40% | **60%** |
| DIXON | 0% | 16% | 14% | 16% | | 40% | 10% | 10% | 10% |
| EAST MOLINE | 0% | 8% | 8% | 8% | | 33% | 0% | 0% | 0% |
| ELGIN | 0% | 14% | 14% | 7% | | 67% | 0% | 33% | **67%** |
| GRAHAM | 0% | 32% | 5% | 32% | | - | 25% | 13% | **50%** |
| HILL | 25% | 50% | 63% | **50%** | | 33% | 27% | 13% | 7% |
| ILLINOIS RIVER | 63% | 20% | 40% | **60%** | | 42% | 33% | 25% | **83%** |
| JACKSONVILLE | 0% | 0% | 0% | 0% | | 25% | 0% | 0% | 25% |
| JTC | - | 23% | 18% | 45% | | - | - | - | - |
| KEWANEE | 0.80% | 0% | 0% | 0% | | 0% | 0% | 0% | 0% |
| LAWRENCE | 29% | 14% | 14% | 43% | | 18% | 18% | 18% | 18% |
| LINCOLN | 17% | 0% | 33% | **50%** | | 20% | 40% | 40% | 40% |
| LOGAN | 36% | 64% | 50% | **68%** | | 17% | 11% | 44% | 39% |
| MENARD | 0% | 32% | 30% | 26% | | 50% | 58% | 65% | **83%** |
| MURPHYSBORO | - | 0% | 0% | 0% | | - | - | - | - |
| NRC | 0% | 16% | 16% | 16% | | 39% | 45% | 45% | **55%** |
| PINCKNEYVILLE | 30% | 67% | 60% | **60%** | | 17% | 12% | 18% | 49% |
| PONTIAC | 0% | 28% | 32% | 32% | | 100% | 27% | 36% | **50%** |
| ROBINSON | 10% | 27% | 29% | 36% | | - | - | - | - |
| SHAWNEE | 25% | 50% | 50% | **50%** | | 15% | 31% | 31% | 38% |
| SHERIDAN | 0% | 32% | 32% | 26% | | - | - | - | - |
| SOUTHWESTERN | 22% | 22% | 22% | 22% | | - | - | - | - |
| STATEVILLE | 17% | 24% | 38% | 48% | | 50% | 50% | 43% | **71%** |
| TAYLORVILLE | 12% | 12% | 12% | 12% | | - | - | - | - |
| VANDALIA | 0% | 8% | 8% | 8% | | - | 0% | 0% | 0% |
| VIENNA | 0% | 6% | 6% | 6% | | 50% | 25% | 75% | 25% |
| WESTERN | 38% | 25% | 25% | **53%** | | 33% | 42% | 42% | **58%** |
| TOTALS | 9% | 24% | 24% | 29% | | 30% | 29% | 32% | 45% |

Vacancies among allocated registered nurse positions rose from 9% in 2019 to 29% in 2021. Vacancies for registered nurses exceed 25% (shaded) at more than half of the 30 IDOC facilities. Facilities with RNs employed by the state had lower vacancy rates[82]. Vacancy rates exceed 25% (shaded) at 16 of 24 facilities which employ CMTs/LPNs. There are 12 facilities (names shaded) with vacancy rates exceeding 25% for both registered nurses and LPNs/CMTs. Facilities with vacancies exceeding 50% for either RNs or LPN/CMTs are indicated with larger bold font.

---

[82] Of 14 facilities with state employed RNs only four have vacancies greater than 25%. At 16 facilities with RNs employed by the vendor 13 have vacancies in excess of 25%.

Typically, vacant shifts are covered by "as needed or PRN" staff, voluntary overtime, mandatory overtime, managers working the shift and use of agency personnel.

Vacancies and turnover of nursing personnel are linked to patient care quality and outcome. We stated in the last Monitor's report that facilities with the highest vacancy rates and most turnover should be carefully monitored to prevent patient harm.[83] The Monitor recommended in the 2nd report[84] data on the number of nursing personnel by type be tabulated to include the number of positions, the number vacant currently, the number who left employment each calendar year, the number leaving voluntarily each calendar year and the number of positions filled currently. We also recommended reporting the number of mandatory overtime shifts used each month.[85] The IDOC does not report this information. The Monitor continues to recommend they do so. The vendor provided this data for nursing positions at Shawnee Correctional Center in conjunction with the site visit that took place June 21-23, 2021.

The Monitor has also suggested that a recruitment task force be established with representation from OHS, Wexford, Human Resources, and the Office of Budget and Management with the explicit mission to reduce the vacancy rate among nursing positions to 12%. It does not appear that this suggestion has been implemented despite its appearance in the last two reports[86]. No metrics to evaluate progress recruiting were shared with the Monitor except the number of vacancies reported at each site. Additional metrics suggested include: the number and outcome of recruitment activities, time from inquiry to first contact, and time from job offer to start date.

The monitor's nursing consultant asked to discuss vacancies[87] reported in the May 2021 staffing analysis with the OHS Director of Nursing and Regional Health Services Coordinators but this was not accomplished in time to be considered for this report. We do note that the IDOC website now features a video recruiting nurses to work for the IDOC. We also learned during the site visit to Shawnee Correctional Center that the Director of Nursing participates in a regular meeting with the IDOC Deputy Director regarding staffing vacancies. The Department and the vendor also contract with nurse staffing agencies to supplement the "as needed or PRN" pool of intermittent nursing staff. We also spoke with the person responsible for the vendor's recruitment and learned that six recruiters are dedicated to the state of Illinois and that weekly meetings take place to collaborate on recruitment efforts. The vendor uses a wide variety of strategies to reach out to potential recruits via social media and other venues commonly used in healthcare recruitment[88].

The Monitor's input since the first draft of the Staffing Analysis has included the recommendation that positions at each facility be identified as responsible for infection control and quality improvement[89]. The Monitor requested in the 3rd report that IDOC develop the position descriptions for these two types of positions, listing the training and experience needed

---

[83] Health Care Monitor 3rd Report, Lippert v. Jeffreys, February 15, 2021, page 40.
[84] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 59.
[85] Health Care Monitor 3rd Report, Lippert v. Jeffreys, February 15, 2021, page 40.
[86] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 26.
[87] Email from Catherine Knox to Susan Griffin dated 6/1/2021 and 6/10/2021.
[88] Telephone meeting 6/29/2021 with Elaine Gedman, Executive Vice President & Chief Administrative Officer, Recruiting Department, Wexford Health Sources.
[89] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 23.

and provide them to the Monitor for review and comment. These recommendations concerning the staffing needed for infection control and quality improvement at each facility has been ignored by the IDOC.  If the IDOC is to move forward in any substantive way on the Consent Decree these positions need to be established and filled with individuals who have requisite training and expertise.

**RECOMMENDATIONS:**

1. Identify performance and health outcome measures to compare with staff mix and staffing levels to identify desirable staffing ratios and patterns. Measures to evaluate staffing adequacy include quality patient care parameters (numbers of emergencies, patient falls, acquired infection etc.), risk management information (deaths, grievances, errors etc.), time taken to fill vacant positions and retention in registered nurse positions as well as compliance with items III.A.10, III.I.1, III.I.2 and III.I.3 of the Consent Decree.
2. Allocate and hire the recommended Director of Nursing and Nurse Supervisor positions to increase accountability for performance improvement.
3. As an immediate priority allocate and hire the recommended addition of positions at the facilities with the lowest ratio of RNs and the lowest overall nurse staffing.[90]
4. Establish a database that includes the number of nursing positions by type, the number vacant currently, the number who left employment each calendar year, the number leaving voluntarily each calendar year and the number of positions filled currently.
5. The number of mandatory overtime assignments should be reported to OHS by each facility monthly.
6. Monitor patient care quality and health outcomes more closely at facilities with the most turnover, highest vacancy rates and largest number of mandatory overtime assignments.
7. Establish a recruitment task force with representation from OHS, Wexford, Human Resources, and the Office of Budget and Management with the explicit mission to reduce the vacancy rate to 12%. To evaluate progress recruiting suggested metrics include: the number and outcome of recruitment activities, time from inquiry to first contact, and time from job offer to start date.
8. Establish positions at each facility responsible for Infection Control and Quality Improvement. Develop job descriptions that define the training and experience necessary for each position and provide them to the Monitor for input before finalization.

**IDOC Staffing**

*Addresses items II.B.2; II.B.3;*
**II.B.2.**  *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care.  This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*
**II.B.3.**  *IDOC must also provide enough trained clinical staff, adequate facilities, and oversight*

---

[90] These facilities are Western, Hill, Lawrence, Shawnee, Illinois River, Big Muddy, and Pinkneyville.

*by qualified professionals, as well as sufficient administrative staff.*

**OVERALL COMPLIANCE RATING:** Not rated

**FINDINGS:**
See Statewide Staffing Analysis and Implementation Plan

**RECOMMENDATIONS:** None

**Vendor Staffing**

*Addresses items II.B.2; II.B.3;*
**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*
**II.B.3.** *IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff.*

**OVERALL COMPLIANCE RATING:** Not rated

**FINDINGS:**
See Statewide Staffing Analysis and Implementation Plan

**RECOMMENDATIONS:** None

**Credentialing of Physicians**

*Addresses items II.B.6.r; III.A.2-7*
**II.B.6.r.** *IDOC agrees to implement changes in the following areas: That Defendants and the vendor shall timely seek to discipline and, if necessary, seek to terminate their respective health care staff that put patients at risk;*
**III.A.2.** *All physicians providing direct care in the IDOC (whether they are facility medical directors or staff physicians) shall possess either an MD or DO degree and be either board certified in internal medicine, family practice, or emergency medicine, or have successfully completed a residency in internal medicine which is approved by the American Board of Internal Medicine or the American Osteopathic Association, or have successfully completed a residency in family medicine which is approved by the American Board of Family Medicine or the American Osteopathic Association, or have successfully completed a residency in emergency medicine which is approved by the American Board of Emergency Medicine.*
**III.A. 3.** *Physicians currently working in IDOC who do not meet these criteria shall be reviewed by the Monitor and the IDOC Medical Director to determine whether the quality of care they actually provide is consistent with a physician who has the above described credentials and who is practicing in a safe and clinically appropriate manner. If the Monitor and the IDOC*

*Medical Director cannot agree as to the clinical appropriateness of a current IDOC physician, IDOC shall not be found non-compliant because of that vacancy for nine (9) months thereafter*

**III.A.4.** *If a current physician's performance is questionable or potentially problematic, and the Monitor and the IDOC Medical Director believe that education could cure these deficiencies, the IDOC will notify the vendor that said physician may not return to service at any IDOC facility until the physician has taken appropriate CME courses and has the consent of the Monitor and the IDOC Medical Director to return.*

**III.A.5.** *Defendants may hire new physicians who do not meet the credentialing criteria, only after demonstrating to the Monitor that they were unable to find qualified physicians despite a professionally reasonable recruitment effort and only after complying with the provisions of paragraph 6, below.*

**III.A.6-7** *Physician candidates who do not meet the credentialing requirements shall be presented to the Monitor by the Department. The Monitor will screen candidates who do not meet the credentialing criteria after a professionally reasonable recruitment effort fails and determine whether they are qualified. The Monitor will not unreasonably withhold approval of the candidates. The Monitor will present qualified candidates to the IDOC for hiring approval. If the IDOC Medical Director has concerns regarding the rejected candidates, he or she will meet and confer with the Monitor in an attempt to reach a resolution. In instances in which the Monitor rejects all viable candidates for a particular vacancy, the Department will not be found noncompliant because of that vacancy at any time during the next twelve (12) months. The credentialing requirements contained in paragraph 2 above do not apply to physicians employed by universities*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

The first four recommendations in the last report in this section asked for credential and physician information to be sent to the Monitor three months in advance of the next report. Most of that requested information was not sent. On 6/1/21 IDOC sent a spreadsheet list of physicians stating their credential status but failed to include most of the information requested. The inability to obtain requested information prevents an adequate evaluation of physician credentialing and staffing

The Monitor still does not receive all information requested related to ability to evaluate physician care as these data requests are ignored. This includes the following.

1. Updated AMA profiles for all physicians that are current.[91]

---

[91] Credentials are typically updated every two years although the time period may vary slightly. This is because someone's credentials may change, specifically they may not maintain board certification, they may not continue their DEA license, or they may sustain a sanction from a hospital or medical board. For this reason, professional license credentials must be periodically reviewed. IDOC physician credentials do not appear to be updated periodically. Updating a credential can be performed by using an AMA profile or primary care verification. For the August 2020 Monitor 2nd Report there were 31 physicians for whom the Monitor was provided 25 AMA profiles. Only one of the AMA profiles was dated from within 2 years of the 2nd Report. The earliest was dated March of 2004. It appears that these reports are obtained only once without updates. For the current 3rd Report no new AMA reports were provided except for the four new physicians hired, and no current licensing, DEA, or sanction status was provided. For the four new physicians primary source verification was provided but two of these physicians

2. Peer reviews including any disciplinary peer review or actions taken with respect to privileges.
3. Professional performance evaluations for all physicians, nurse practitioners, and physician assistants.[92]
4. Current assignment(s) list of all physicians with hours worked at each site of assignment averaged for a prior 6-month period.
5. Notification when a new physician is hired with credentials of the physician as provided to IDOC.
6. Any monitoring being provided for any physician, nurse practitioner, physician assistant.
7. Current license information and DEA license information.
8. Any sanctions on a license and a report detailing the plan for monitoring.
9. The date internship or residency was completed, date of board certification, and inconsistent provision of current status of board certification.
10. Documents, including certificates, verifying completion from medical schools, internship, residency programs, and national certifying Boards.

The lack of information received prevents a complete up-to-date verification of credentials and is a barrier to evaluation of physicians to assess whether their work is safe and clinically appropriate.

For the physicians who do not have credentials required by the Consent Decree the lack of information received from IDOC makes it extremely difficult to evaluate where these physicians are practicing so their care can be reviewed. The Monitor has asked IDOC for the provider's name, facility name, hours worked per week at that facility, and title (e.g., staff physician, Medical Director, "traveling medical director") at that facility for every physician. Though requested, IDOC has never provided this information. Because the vendor moves physicians around to multiple facilities, knowing where physicians work is necessary to evaluate the care they provide. Also, the principal manner of evaluation of physicians for the Monitor is record review. The Monitor has requested all death records as they occur. For 2021 record until 5/28/21 IDOC has sent only 29% of death records. Also, several physicians write illegibly. In particular, their signatures are mostly illegible. The Monitor has asked for but has not yet received a sign-sheet, on which the typed name of each provider appears below their signature. This would allow the Monitor to determine who is evaluating the patient when performing record reviews. A signature sheet has been requested. The IDOC initially said that neither the vendor nor the pharmacy has such a sheet. A second request was made to IDOC on 4/28/21 to create such a list but there has been no response yet. A small stamp with a provider's name and title can also be used for all documentation in the medical record.

While IDOC has not sent primary source information for all physicians, their spreadsheet provided 6/1/21 lists 29 physicians. Three of the physicians on the list have left service; 26 physicians are thus currently working in IDOC. Of these 26 physicians, six lack credentials

---

had no DEA number. There was no verification for many physicians of a current license, DEA number, or no sanctions.

[92] The Monitor was notified by IDOC that provider evaluations normally performed by the vendor in April were not done this year due to the pandemic.

required by the Consent Decree based on the spreadsheet. It is not possible to verify whether all physicians are working full or part time and where each physician is working. Actual status is anecdotal or based on the spreadsheet the IDOC sends as no primary source information is sent despite being requested. Active licenses, DEA licensure, and sanction status cannot be verified for most physicians as the AMA profiles are dated and license look up has not been performed. The table below gives the numbers of physicians with their status based on requirements of the Consent Decree.

| | 8/1/20 | 8/1/20 | 1/1/21 | 1/1/21 | 6/1/21 | 6/1/21 |
|---|---|---|---|---|---|---|
| STATUS | # | % | # | % | # | % |
| Active and Current Board Certification | 11 | 32.3% | 12 | 39% | 12 | 46% |
| Completed Primary Care Residency or Board Certification Expired | 12* | 35.3% | 10** | 32% | 8 | 31% |
| Did Not Complete a Primary Care Residency | 11 | 32.3% | 9 | 29% | 6 | 23% |
| Totals | 34 | | 31 | | 26 | |

*Three physicians in this group once had board certification but have not maintained board certification status
** Three physicians in this group once had board certification but have not maintained board certification status

The number of physicians has been reduced by five (16% reduction) since our last report. The number of physicians lacking appropriate credentials has decreased but although the vendor has only hired physicians with the required credentials since the Consent Decree was signed[93], they have not been able to retain qualified physicians. The Monitor asked for but has not received information on the hours of work of each physician at every facility they work at. Some of the 26 physicians may be part time or "as needed" workers. The lack of information makes it impossible to adequately evaluate provider staffing.

The IDOC does not provide the assignments of all physicians so it isn't possible to determine whether every site has a Medical Director. Anecdotally, the Monitor is aware of physicians covering multiple facilities and record reviews demonstrate absence of Medical Directors

As with the last report, no information was provided to ensure that all physicians have a current and up-to-date license and DEA registration and have no change to their license status with the Illinois Department of Professional and Financial Regulation.

Over a year ago, the Monitor informed IDOC of concerns regarding three physicians. A written communications of these concerns was then sent to IDOC in September of 2020. These physicians were mentioned on subsequent calls with IDOC. The State licensing board permanently suspended one of these physicians' license before action was taken and the vendor ended employment of the remaining two in late July of 2021.

Provision III.A.3. requires the Monitor to review with the IDOC Medical Director all physicians who do not meet credential criteria. The Monitor had a conference call with IDOC on 6/29/21 to discuss this. The Monitor primarily uses record review to establish whether the physician is

---

[93] All 11 physicians hired by the vendor since the Consent decree have been Board Certified or completed a 3-year residency in a primary care filed. Only 5 of these newly hired physicians are still working with IDOC as of 6/2/21. An additional 4 physicians with required credentials who were working in IDOC before the Consent Decree are no longer employed in IDOC.

practicing in a safe and clinically appropriate manner. The IDOC Medical Director stated he was drafting a plan for how to perform his evaluation on non-credentialed physicians that might include looking at

- Credentials
- Ongoing continuing medical education
- Clinical hours
- How many nurse practitioners and physician assistants the practitioner supervises
- Backlogs
- Mortality reviews

The IDOC Medical Director's method of review is not yet established and the Monitor will assist him in any way to move forward. Some of these items such as clinical hours and backlogs may not give an appropriate view of clinical work. Especially since current physician staffing is lower than needed, the quality of clinical work may deteriorate the more patients the provider sees. Backlogs and hours worked are not correlated directly with quality of clinical care. The Monitor will continue to review mortality records but has been hampered by lack of mortality records, lack of verification of physician signatures, and lack of knowledge about where physicians are assigned to work. All of these items have been requested but have not been received as requested.

Based on record reviews, physician quality is still poor. There are still physicians who practice in an unsafe and clinically inappropriate manner who should not be allowed to do so. The Monitor has not been provided with any information that the Implementation Plan has plans or strategies to correct this.

**RECOMMENDATIONS**:

1. IDOC needs to routinely provide the following information to us three months prior to the due date of each upcoming Monitor report.
    a. A table of current physicians in a spreadsheet format with physician name, internship or residency completed, date internship or residency completed, board certification, date of board certification, current status of board certification, primary source verification for these credentials, and an AMA profile.
    b. When the AMA profile does not support the physician's credentials because the credentials are with an Osteopathic Board primary source information must be provided.
    c. All peer reviews including any disciplinary peer review or actions taken with respect to privileges.
    d. Professional performance annual evaluations for all physicians, nurse practitioners, and physician assistants.
    e. Current assignment(s) list of all physicians with hours worked at each site of assignment averaged for a prior 6-month period.
    f. Notification when a new physician is hired with credentials of the physician as provided to IDOC.
    g. Any monitoring being provided for any physician, nurse practitioner, physician assistant.

2. When AMA profiles are being used to verify credentials, the AMA profile should be current.
3. Current license information and DEA license information needs to be provided.
4. Any sanctions on a license and a report detailing the plan for monitoring should be reported to both OHS and the Monitor
5. IDOC's health care vendor should continue to hire only physicians who are Board Certified and/or have completed a residency in a primary care field.
6. All physicians need to be required to use a stamp that contains their name which needs to be used for all of their notes and orders so that their medical record entry can be verified as theirs.

## Oversight over Medical, Dental, and Nursing Staff

*Addresses II.B.6.q; II.B.6.r;*

**II.B.6.q.** *IDOC agrees to implement changes in the following areas: Annual assessment of medical, dental, and nursing staff competency and performance;*

**II.B.6.r.** *IDOC agrees to implement changes in the following areas: That Defendants and the vendor shall timely seek to discipline and, if necessary, seek to terminate their respective health care staff that put patients at risk;*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

The Monitor's 3rd Report listed six recommendations. The IDOC has provided no information that these recommendations were acted on. IDOC has not communicated any modifications to the processes and forms used to evaluate the clinical competency and performance of medical, nursing, and dental staff. On 12/15/20, the IDOC last sent annual dentist peer review assessments to the Monitor. Dentist peer reviews were performed annually between August and October 2019 and between August and November 2020. These dentist peer reviews were provided to the Monitor and were discussed in the 2nd and the 3rd Court Reports. Given that dentist peer reviews are performed in the late Summer through the end of the Fall, these reviews will not be available to the Monitor for this report but will reported in the 5th Court Report. The IDOC has not provided the Monitor with annual evaluations for the vendor's physicians, physician assistants, nurse practitioners, dental hygienists or dental assistants or the annual evaluations of the State employed dentists, dental hygienist, and dental assistants in both 2020 and 2021

The vendor contract[94] stipulates that the vendor will participate in "physician peer review program…to ensure compliance with accepted professional standards of performance…. which includes charts reviews of … Onsite Medical Director, Staff Physicians, Nurse Practitioners, Physician Assistants, …[and] Dentists." The "review…should cover… physician sick call, chronic care clinics, lab/x-ray utilization as they related to disease work up, infirmary

---

[94] State of Illinois Contract with Wexford Health Sources, Inc May 2021, 90 Day Emergency Contract. page 8 and page 82

admissions, and case reviews." Although requested, to date, the Monitor has not received any peer view evaluations for the onsite medical directors, staff physicians, nurse practitioners, and physician assistants since the signing of the Consent Decree. As noted, the Monitor has received Dentist peer reviews in 2019 and 2020.

As noted in the Monitor's 2nd and 3rd Reports, Wexford provided a Salary Compensation Calibration Worksheet in response to the Monitor's request for the annual assessments of the competency and performance of medical physicians, nurse practitioners, physician assistants, dental hygienists, and dental assistants in its employment. This form is a generic tool that is not created for specific clinical positions. It focuses on administrative issues. There was no evidence provided that clinical care was assessed by chart audits. The Salary Compensation Calibration Worksheet states "for official use only, not to be shared with employees" The Monitor recommended that provider evaluations be developed that are position specific, are standardized, are focused on clinical competency and performance, and the results are shared with the provider. No information has been provided to the Monitor that this has been done.

The Monitor was advised that, due to the pandemic, the vendor was not able to complete evaluations in 2020 on any of the physicians, nurse practitioners, physician assistants, dental hygienists, and dental assistants in its employment. The Monitor has also not received any evaluations of physicians, physician assistants, dental hygienists, and dental assistants in 2021. IDOC has not communicated whether the evaluations of these positions were or were not performed in 2021 or, as in 2020, the peer reviews of these individuals were again postponed due to the administrative burden of the ongoing COVID-19 pandemic.

Dentist peer reviews done by dental colleagues in the IDOC utilized the same standardized assessment tool 2019 and 2020. The Monitor has found that the assessment tool utilized to review the tool not fully adequate. Over half of the performance categories focused on administrative and documentation tasks. As noted in the 3rd Court Report, the tool did evaluate some useful clinical issues including performing an oral x-ray prior to dental extractions, adherence to national standards for prophylactic antibiotic use, documentation of anesthetic dosage and delivery, and ordering of appropriate diagnostic procedures. Dentists were found to be over 90% compliant in 11 of the 17 categories. The Monitor advised that if high compliance continues to be noted on these 11 categories, consideration should be given to either deleting or only intermittently reviewing these aspects of care. The future implementation of an electronic dental record would address a number of metrics on the current dentist audit tool including date and time of the visit, the dentist's signature, legibility and possibly accuracy of the dental notes, the documentation of patient education and the documentation of the treatment plans allowing the peer review to increasingly focus on the quality of the dental care provided.

The Monitor noted that there appeared to be dentist reviewer variation on what constituted compliance with performing x-rays prior to dental extractions and ensuring that dentists and reviewers are fully knowledgeable about the national standard for prophylactic antibiotics. The Monitor also recommended that an independent review of dental care should be used to avoid the potential bias that exists when the reviewer is a co-worker in the same system

The Office of Health Services has hired a Chief of Dental Services who could provide valuable input on the revision of the peer review tool and incorporate categories that evaluate clinical outcomes, post- procedure complications, and access to dental care.

IDOC uses a different evaluation format to evaluate the small number of State-employed dental employees even though the IDOC and vendor dental employees work in the same organization. A standardized dental evaluation methodology should be used.

As noted in the Monitor's 2nd Report, IDOC uses two different State of Illinois Individual Development and Evaluation System forms that are separately designed to evaluate State-employed dental assistants and dental hygienists. The employee has a self-evaluation section and the supervisor rates the performance and the self-evaluation as exceeded, met, and not met, writes summary comments, and discusses the evaluation with each dental assistant and dental hygienist.  Based on the assessment categories on the State evaluation forms there was no assessment of State dental hygienist and dental assistant clinical skills. In 2019, the sole State employed dental hygienist was evaluated by the health care unit administrator who had no dental training or skills. The Monitor was not provided with any of the State of Illinois Development and Evaluation System forms that were completed in 2020 or in 2021.

As previously reported, both the State and the vendor annual evaluations of medical and dental staff focus primarily on administrative and business issues including attendance, productivity, cost effectiveness, and staff attitudes. Although these evaluations have some value for the workplace, they do not satisfy Consent Decree requirements to assess clinical staff competence and performance.  With the exception of parts of the dentist evaluations, none of the annual performance evaluations for both State and vendor clinical staff would qualify as professional performance evaluations or assessments of the quality of the clinical care provided by the dental hygienists, dental assistants, physicians, physician assistants, and nurse practitioners.

OHS has not provided any information pertaining to the assessment of nursing competency and performance other than the medical director review of treatment protocols.  Twenty hours of continuing education is required every two years for renewal of registered nurse and LPN license. Licensure itself is considered verification that continuing education has taken place by the IDOC and the vendor and therefore no records of continuing educational units (CEUs) is kept. The vendor does require that nurses complete one hour of training each month from its in-service program, Corr Educator, and provides a yearly calendar of suggested training. However, this requirement is not enforced until staffing levels return to pre-pandemic levels.[95] While at Shawnee Correctional Center June 21-23 the Monitor learned from the vendor that performance reviews were also not completed due to COVID[96]. The IDOC provided no self-assessment of performance related to II.B.6.q. in its Bi-Annual Report provided in May 2021.

**RECOMMENDATIONS:**

---

[95] Email from Cheri Laurent, Interim Vice President Operations, Wexford Health Sources to Catherine Knox, 6/30/2021.
[96] Interview June 21, 2021 with Yolande Johnson at Shawnee Correctional Center.

1. Develop and initiate professional performance evaluations that assess the clinical competency and clinical performance of all clinical staff.
2. Standardize evaluation formats so that all practitioners of the same type are evaluated in the same manner.
3. An independent professional knowledgeable of the scope of practice and capable of evaluating the clinical care of the professional should perform the evaluation.
4. Clinical professional performance evaluations should be shared with the employee who should sign the review after discussion with the reviewer.
5. Involve the Chief of Dental Services and the SIU audit teams in the re-assessment of the existing dentist, dental hygienist, and dental assistant annual evaluations so as to include metrics that evaluate the quality of dental care and clinical skills of the dental team.
6. The Chief of Dental Services should establish clear guidelines concerning: antibiotic prophylaxis for dental procedures and obtaining x-rays prior to dental extractions to ensure the utilization of x-rays meets existing dental standards of care. These guidelines would also allow for more objectivity in the dentists' peer review evaluations.
7. An independent review of dentist care should be used to avoid the potential bias and lack of objectivity when the reviewer is a co-worker in the same system.
8. Annual peer reviews of the onsite Medical Director, staff physicians, nurse practitioners, and physician assistants should be provided to the Monitor.

# Operations

**Clinical Space**

*Addresses item II.B.2 in part; III.B.1; III.C.2; III.F.1;*
**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*
**III.B.1.** *IDOC shall provide sufficient private and confidential sick-call areas in all of its facilities to accommodate medical evaluations and examinations of all Class members, including during intake, subject to extraordinary operational concerns and security needs of IDOC including, but not limited to, a lockdown.*
**III.C.2.** *IDOC shall provide sufficient private and confidential areas in each of its intake facilities for completion of intake medical evaluations in privacy, subject to extraordinary operational concerns and security needs of IDOC including, but not limited to, a lockdown.*
**III.F.1.** *Sick call shall be conducted in only those designated clinical areas that provide for privacy and confidentiality, consistent with the extraordinary operational concerns and security needs of IDOC including, but not limited to a lockdown.*

**OVERALL COMPLIANCE RATING Non Compliance**

**FINDINGS:**

The Monitor visited Shawnee CC in June 2021[97]; this was the first site inspection since the start of the pandemic in March of 2020.  The Health Care Unit was generally clean and in good repair. The treatment rooms and interview rooms were of adequate size that allowed audio and visual privacy.  A privacy curtain allowed for enhanced visual privacy as was needed.  Overall space and size of the HCU was generally sufficient to meet the needs of the 1,142 men housed at this facility.  Areas that require additional space include the following.

1. The shared nursing and provider office in the infirmary is cramped to the point of being non-functional. Security staff currently occupy the nursing station counter which should be reconverted to its original intended use as a nursing station.
2. Clinic nurses use a table in the breakroom to document notes and do other paper work.  A more private and professional workspace should be identified for the nursing staff.
3. The inmate waiting room is small for a facility with a population over 1000 inmates.  Flow is currently restricted due the COVID precautions but this space will need to expanded as restrictions loosen.
4. Twice a day the waiting room is used as the insulin line where finger sticks are performed and insulin injected.  This congests the waiting space and lacks adequate visual and audio privacy.  This practice has to be improved.

As noted in the 3rd Court report, the IDOC had informed the Monitor that previous plans for the new Joliet Treatment Center with planned medical beds is being reconsidered and that the basic plans could change.  No further information has been received.

In its June 2020 Implementation Plan, IDOC committed to perform a systemwide audit of the clinical and health care spaces to ensure there is adequate space and equipment for delivery of health care services to the incarcerated population [98]  This survey of all facilities is much needed but has not yet been done. The Monitor strongly supports the need to perform a thorough assessment of the physical space used for health care services and create corrective action plans to address space deficiencies.   The completion of the this systemwide audit is necessary for the IDOC to attain partial compliance of this provision.

**RECOMMENDATIONS:**

1. Lincoln CC needs a new clinic structure.  The current structure is inadequate for medical care.
2. Lincoln CC leadership should continue with their plan to repurpose some offices in the HCU into clinical exam space while advocating for the replacement of the HCU.
3. Shawnee CC leadership needs to evaluate and address the space deficiencies including the limited size of the inmate waiting room, the cramped nursing office in the infirmary, the use of the HCU waiting room for the insulin line, and the need for a profession workspace for the clinic nurses.
4. The IDOC needs to conduct an analysis of physical structures throughout the state to

---

[97] Shawnee CC site visit 6/21-23/21
[98] IDOC Lippert Implementation Plan 6/12/20 in Structural Components section.

determine whether there are other medical spaces that need to be built, refurbished, or renovated in order not just to meet the provisions in the Consent Decree but to improve access to care, properly sanitize clinical areas, maximize staff efficiency, and enhance staff recruitment and retention.

## Equipment and Supplies

*Addresses item II.B.6.p; III.B.2; III.I.4;*

**II.B.6. p.** *IDOC agrees to implement changes in the following areas: Adequately equipped infirmaries;*

**II.B.2.** *These areas shall be equipped to fully address prisoner medical needs. The equipment shall be inspected regularly and repaired and replaced as necessary. Each area shall include an examination table, and a barrier on the examination table that can be replaced between prisoners. The areas shall provide hand washing or hand sanitizer.*

**III.I.4.** *All infirmaries shall have necessary access to security staff at all times. (See Infirmary Section)*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

The IDOC has sent the Monitor a draft of a Monthly Health Care Inspection Checklist and Equipment Survey tool. The Monitor will provide comments on this document and return to IDOC.

The IDOC does not yet have a standardized equipment list required for each facility including for the infirmary. Shawnee CC provided the Monitor with its 2020 DOC Annual Certification of Inventory sheets but this inventory did not include small clinical equipment, did not indicate what equipment should have been in each room, and did not identify the functionality of the equipment. See Safety and Sanitation section below for additional details.

**RECOMMENDATIONS:**

1. IDOC must establish a systemwide detailed standard for equipment that must be available and maintained in each of the different clinical service rooms (examination rooms, telemedicine rooms, urgent care, infirmary, detail suites, specialty rooms, etc.) at all correctional centers.
2. IDOC must implement a systemwide ongoing audit of the clinical equipment and incorporate a following replacement plan to ensure that all sites have functional equipment at all times.
3. The IDOC should focus attention on the condition of infirmary beds in all IDOC facilities and replace defective beds with electrically operated hospital beds with safety railings and the ability to adjust the height of the bed and elevate the health and leg sections as needed.
4. IDOC should develop and implement a monthly inspection checklist focused on the condition of the physical space, furniture, and the presence and functionality of equipment including negative pressure units in the Health Care Unit and any other

clinical spaces including satellite nurse and provider sick call rooms, intake screening areas, etc.

**Sanitation**
***Addresses item III.J.3***
**III.J.3.** *Facility medical staff shall conduct and document safety and sanitation inspections of the medical areas of the facility on a monthly basis.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
Results and/or reports of monthly Safety and Sanitation inspection reports have been provided to the Monitor on a quarterly basis for nearly all facilities. Some type of safety and sanitation inspection is conducted each month at the IDOC facilities. The existing Safety and Sanitation inspection reports appear to be the only process in place to not only evaluate the physical plant, plumbing, lighting, ventilation, and cleanliness of the housing units, kitchen, cafeteria, and laundry but also the physical conditions and the function and condition of a limited number of equipment, furniture, and processes in the medical areas.  For this report the Safety and Sanitation reports for the first quarter of 2021 from 26 IDOC facilities were reviewed. As reported in the 3rd Court Report there continues to be notable variation in what is reported and most Safety and Sanitation Reports do not contain the detail necessary to adequately evaluate the space, equipment, safety, and sanitation of the medical areas.

Physical plant deficiencies in the housing units and service areas were identified with similar prevalence as cited in the Monitor's 2nd and 3rd Report[99] including the following:

> Missing and cracked floor tiles in housing and health care units
> Broken toilets, sinks, showers (one facility had 61 malfunctioning toilets in March 2021[100])
> Peeling and cracked paint
> Lack of safety grab bars in toilets and showers
> Lack of non-slip surfaces in showers and on stairs
> Mold in showers, ceilings, shower curtains
> Missing lights including exit lights
> Crumbling, cracked walls and ceilings
> Dirty and rusted vents
> Leaking ceilings
> Broken washers and dryers
> Presence of pests and insects

As noted in previous Court Reports, these structural and environmental deficiencies have the potential to negatively impact the health of the inmate population and the staff.  Many create obvious risks for infectious diseases and render the facilities unable to effectively clean and sanitize living and work areas.  Others including cracked floors, and leaking ceilings pose

---

[99] Health Care Monitor 2nd and 3rd Reports Lippert v. Jeffreys, August 6, 2020 and February 15, 2021
[100] Safety & Sanitation Reports, February and March 202, Centralia CC

significant risks for accidental falls and preventable injuries. Nearly half of the facilities reported missing lights including exit lights which pose both security and safety issues. Some deficiencies are listed month after month. Failure to address and repair these structural and environmental deficiencies puts the health and safety of all people at the institution at risk.

As also previously reported to the Court, the Safety and Sanitation inspections generally focus on physical plant issues and do not inspect the health care areas with sufficient rigor. Only eight [101] of the twenty-six facilities included a separate checklist for the Health Care Units (HCU) but these seven site-specific reports are not standardized and assess varying and very limited aspects of the medical care areas and equipment. The other facilities generally only inspected the condition of the physical plant in the HCUs and rarely assessed the condition, functionality, or adequacy of the clinical space, equipment, furniture, and supplies. The following clinical space, equipment, furniture, and supplies inspection elements were reported in the February and March 2021 Safety and Sanitation Reports. Some of these audited items were guided by site-specific HCU checklists and at other sites[102] were reported in narrative format based on the discretion of the inspector.

| Clinical Elements of Monthly Inspections of Medical Areas/HCUs | |
|---|---|
| **Aspect Inspected** | **IDOC Facility** |
| **Condition of Infirmary Mattresses** | **East Moline\*, Jacksonville, Kewanee, Lawrence, Lincoln, Pinckneyville** |
| **Condition of Upholstery in HCU** | **Jacksonville, Pinckneyville** |
| **Condition of Infirmary Beds** | **Hill\*** |
| **Function of Infirm. Call Devices** | **Graham, Sheridan\*, Southwestern** |
| **Defibrillator Charged** | **Graham, Southwestern** |
| **Adequate Oxygen Tank Levels** | **Graham, Southwestern** |
| **O2 Tanks Secured** | **Lawrence, Pinckneyville, Shawnee** |
| **Expiration of Meds inspected** | **Kewanee, Pinckneyville** |
| **Biowaste Storage appropriate** | **Shawnee** |
| **Sharps Containers** | **Taylorville\*** |
| **Negative Pressure Units**[103] | **Lawrence, Southwestern, Taylorville\*** |
| **HEPA filters** | **Graham** |
| **Suction Machine** | **Graham, Southwestern** |

**\* Sites without a specific HCU checklist**

Only 12 of the 26 Safety and Sanitation reports evaluated some, albeit only a few, issues that were directly related to medical cares and the delivery of health care related services. The other 14 reports did not assess or report on any health care conditions, equipment, or processes. The integrity of the infirmary mattresses and the repair of the infirmary beds have been criticized in previous reports but only 6 sites commented on this infection control issue. Only seven facilities

---

[101] Graham CC, Jacksonville CC, Kewanee CC, Lawrence CC, Lincoln CC, Pinckneyville CC, Shawnee CC, Southwestern CC have separate checklists for the HCU.

[102] East Moline CC, Hill CC, Sheridan CC, and Taylorville CC reported on some clinical-related issues in the medical areas but did not have a HCU checklist.

[103] Functionality of negative pressure units are also reported in the monthly CQI minutes of 18 of the 26 facilities with infirmaries. The IDOC's draft Month Health Care Inspection Checklist and Equipment Survey has included the monthly audit of negation pressure units. This survey tool has not yet been implemented.

commented on the condition and functionality of only a very limited number of clinical equipment.

As noted above, eight facilities use Safety and Sanitation inspection forms that audit items more specific to the types of sanitation, safety, and equipment issues that are unique in health care delivery. These specialized audit tools address only a limited number of the presence or functionality of clinical equipment[104].and does not inspect satellite clinics in the housing units or the condition and equipment in the radiology, physical therapy, dental, dialysis, and optometry rooms The IDOC contracts with a biomedical firm[105] to annually inspect the functionality of the most but not all of the clinical equipment in the medical areas; however, monthly evaluation of clinical equipment is needed to assure that equipment is always continually functional so as to meet the ongoing needs of the IDOC patient population.

The Monitor was provided with a copy of a draft IDOC monthly inspection survey[106] intended to standardize a more clinically focused audit tool for use in the health care areas at all correctional centers. This draft is an expanded audit tool of clinical space, equipment, furniture, and processes in medical areas both in the HCU and in satellite areas. However, not every clinical area[107] is audited. Medical and dental equipment are not all included in the audit. The Monitor also recently tested another medical area inspection tool during a recent site visit to Shawnee CC and once the results of this pilot is assessed, the Monitor will provide feedback to OHS on its draft Monthly Health Care Inspection Checklist and Equipment Survey.

During the Monitor's recent visit to Shawnee CC the Monitor's team noted the lack of safety grab bars in the toilets and showers of the housing units, lack of non-slip surfaces in showers and on stairs, and windows in cells that could not be opened in this non-airconditioned facility. The facility has begun to renovate showers adding non-slip surfaces and easier to clean walls and floors and to repair non-slip surfaces on the stairs in the housing units. During other visits[108] the Monitor has identified a number of physical plant deficiencies noted in Safety and Sanitation reports and noted in previous reports. Also other issues that were not documented in the previous Safety and Sanitation reports have been identified and detailed in prior Court reports including uncovered garbage bins in clinical rooms, non-operational negative pressure units, cracked and uneven sidewalks, the absence of safety grab bars in some toilets and showers, the lack of non-slip strips in the showers, torn examination table upholstery and defective furniture in clinical areas, unsealed emergency bags, crusted sinks in clinical rooms, and non-functional oto-ophthalmoscopes.

It is hoped that, once finalized, the IDOC Health Care Inspection Checklist and Equipment Survey will thoroughly evaluate on a monthly basis the physical condition, furniture, equipment, and practices in the HCUs and other medical areas and result in expeditious repair and correction

---

[104] The existing HCU checklists do not assess electrocardiograms machine, oto-ophthalmoscopes, emergency bags, peak expiratory flow meters, nebulization machines and other equipment and only a few inspect and report on the condition of examination tables, the use of paper barriers, handwashing capability, and other issues.
[105] ClinTech Corporation, Herrin, Illinois
[106] Monthly Inspection Checklist and Equipment Survey: Overview for Medical Inspectors provided by IDOC.
[107] The survey did not include dental areas, nursing stations and the general health unit, telemedicine rooms, optometry, specialty rooms, radiology, etc.
[108] Sheridan, Pontiac, Robinson, Lawrence, Logan, and Lincoln

of any noted deficiencies. It is also important that detailed monthly inspections of the housing units, showers, toilets, stairs, walkways, washers and dryers, ventilation systems, lighting, pest control, and sanitation be performed to the protect and maintain the health of the incarcerated population. Deficiencies noted in the housing units must also be quickly repaired.

**RECOMMENDATIONS:**

1. The Safety and Sanitation inspections do not but should include a more detailed evaluation of the HCU and all other clinical treatment areas that would include the functioning of medical, dental, and radiology equipment, the condition of gurneys, examination tables, chairs, and infirmary beds, the emergency response bags, functionality of the negative pressure rooms, and the sanitation of all clinical spaces.
2. IDOC OHS should finalize with the input of the Monitor their draft of standardized systemwide Health Care Unit/clinical space audit instrument that would focus on all the key safety and sanitation issues in all clinical areas. If the existing Safety and Sanitation rounds are unable to incorporate this more detailed review of the clinical spaces and equipment into its schedule, a separate audit focused on the health care areas should be established.
3. The IDOC must expeditiously address and track the deficiencies noted in Safety and Sanitation reports prioritizing those work orders that have an impact on preventing disease and injury to inmates and staff.
4. Also see recommendation #4 in the above Equipment and Supplies section.
5. The Implementation Plan should include a plan to develop safety, sanitation, equipment and clinical space audits that include a reporting system that is standardized across all facilities.

**Onsite Laboratory and Diagnostics**

*Addresses item II.B.6.g;*
**II.B.6. g.** *IDOC agrees to implement changes in the following areas: Timely access to diagnostic services and to appropriate specialty care;*

**OVERALL COMPLIANCE RATING:** Partial compliance

**FINDINGS:**
The IDOC did not provide data or information that addresses the Monitor's recommendations for this section.

The IDOC began to institute colorectal cancer screening using a point-of-care Fecal Immunochemical Test (FIT). The Monitor has requested but not received any data on the number of at-risk men and women who have been screened with this improved modality. IDOC should initiate an electronic tracking log for colon cancer screening including:

- The patient name,
- Patient number,
- Date of birth,

- Indication for screening,
- Result,
- Date result communicated to patient,
- For abnormal test results,
    - Date of referral for endoscopy,
    - The date endoscopy was done, and
    - The result of the endoscopy.

**RECOMMENDATIONS:**

1. All onsite ultrasonography testing should be immediately excluded from the collegial review process.
2. IDOC must begin to convert all of its non-digital radiology units to digital equipment.
3. Replace tuberculosis skin testing (TST) with IGRA blood testing which is more accurate, minimizes the risk of accidental needle sticks, and frees up valuable nurse resources.
4. Contact IEMA to evaluate the need for radiation exposure monitoring badges and the implementation of any additional safety measures for the panorex units at Logan CC and Menard CC
5. Create a log to track the results of point-of-care colorectal cancer screening and report this data on a regular basis to the facility's CQI committee meeting.

**Dietary**

***Addresses item II.B.6.j.***
**II.B.6.j.** *IDOC agrees to implement changes in the following areas: Analysis of nutrition and timing of meals for diabetics and other Class members whose serious medical needs warrant doing so;*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:** IDOC medical administrative directives do not address the nutrition or timing of meals for those persons with medical conditions in need of nutritional support.

There are two types of diets. One is a general diet for all inmates; the other is a therapeutic diet which is only provided when specifically ordered by providers. Since persons on therapeutic diets must have physician orders, the degree to which physicians are attentive to dietary needs determines who gets a therapeutic diet. In record reviews, we have noted clear indications for medical diets for which we find no orders.

The general diet master menu was created in 2016. The statewide diet manager said that the IDOC therapeutic diet manual was written 21 years ago which was the last time that the nutritional contents of the diets in the therapeutic manual were evaluated. The last time a statewide dietician was employed was two years ago. One of the facilities had a dietician as the food services administrator but that person retired in June and was the last dietician to work in IDOC. The statewide dietary manager stated that the current therapeutic diet manual was reviewed by the previous Chief of Health Services a few years back. The previous Chief of

Health services was not a dietician. In 2019, the IDOC asked a dietician at SIU to evaluate the therapeutic diets. The SIU dietician stated in an interview that no nutritional analysis of the medical therapeutic diets occurred.

In 2020, the same dietician from SIU reviewed the master menu for the general diets for general population from which facility dietary managers create actual menus. The SIU review did not analyze actual meals provided at individual facilities. Analysis of the statewide dietary master menu was performed using software to calculate nutrient content. Diets, as served, at institutions have not been evaluated. The Monitor asked for but has not received the report of the SIU dietician that contained that nutritional analysis.

Almost all inmates in IDOC receive a general diet. A small, select portion of inmates receive a therapeutic diet which requires a physician order.[109] Both the therapeutic diets and the general diets are based on master menu plans. Facility food managers use a statewide master menu plan to create an actual menu. The SIU dietician who evaluated the master menus for the general diet was impressed by the variety of menus on the general diet master menus. Individual food service managers implement the master menu based on availability of commodities and ingredients at their individual discretion. Food commodities are chosen from a list of the food service vendor, AJ Kellner.

There is a statewide diet manager and every facility has a diet manager. These individuals have responsibility for creating the daily menu plans for their facility. The statewide diet manager told me that he was unaware of any contact between facility diet managers and dieticians as there are no dieticians on staff in IDOC. The diet managers have a variety of educational backgrounds. Some have degrees in food service management, some have experience in food service and the remainder have on-the-job training. These facility food service managers select from the commodity list choices that fit the master menu plan. On any given day, the actual menus at various facilities will vary depending on the selections of the diet manager. The facility diet managers do not have access to standardized software in implementing substitutions in the master menu plan. There is no assessment to determine if the choices of the diet managers at individual facilities are appropriate selections to fit the master menu plan. There is no ongoing evaluation of individual facility menus except when the statewide diet manager goes to the facility and checks the menus. Meals are not evaluated by a dietician.

For the general diet, a registered dietician at SIU, performed an analysis of the master menu plan using the Food and Drug Administration Dietary Guidelines for Americans as a basis for nutritional needs. The analysis utilized nutrition software which requires input of a brand name for a particular product[110] or exchange options[111] to determine nutrient contents. That analysis was performed without knowing the precise commodities used. Some estimation was needed to

---

[109] As an example, we asked for lists of persons on therapeutic diets at five facilities. We received two lists. Stateville (population 1,017) had 30 persons on therapeutic diets and Shawnee (population 1,111) had 9.

[110] For example, green beans can be Green Giant, Del Monte, or Libby's, each of which may have varying nutrient values and sodium contents.

[111] When a brand name is unavailable, the nutritionist used a generic substitute based on a best guess of what the product was. This had potential, admitted by the nutritionist, to mis-estimate sodium and sugar or other additive nutrients that are added to particular products. For example, of multiple canned green bean varieties, there will be a variety of sodium and sugar contents.

determine nutritional content.  Also, the meals were not analyzed with respect to determining precise sodium content, fat, protein or carbohydrate content.  The statewide diet manager told me that the diet was 2800 calories but did not know the protein, carbohydrate, fat or sodium contents of the meals.  The statewide diet manager also did not know the breakdown of saturated versus unsaturated fats, percent of whole grain products used but noted that the general diet contains two fruit and three vegetable portions a day.  According to the diet manager, four servings of vegetables and fruit per week are fresh but when fresh products are used, they are not documented as fresh in the facility menu plans.   The Department is moving to more frozen vegetables but lacks refrigeration resources so this transition is not widespread. The statewide diet manager did not know whether the canned fruit, which appears to be the majority of product used for fruit, contains added sugar but the diet manager at Shawnee told us that the canned fruit did contain sugar.

The therapeutic diets are not analyzed.  The diet manager told me that a therapeutic diet manual is about 150 pages long but the therapeutic diet manual sent to me is 29 pages and only includes a one-day example for three therapeutic diets.  Apparently, the therapeutic diet manual used by the diet manager is different from the official therapeutic diet manual sent to me by IDOC.  The diet manager stated that analysis of the therapeutic diets occurred 21 years ago by the dietician who then wrote the older manual.  In an interview, the SIU dietician confirmed that she had not performed an analysis of therapeutic diets.  However, the SIU dietician wrote a letter on 11/1/19 that "this document [the 29-page manual] has been reviewed and updated on September 30,2019 by a registered dietician at Southern Illinois University School of Medicine.  With the recommended updates, this document is approved as meeting NCCHC *Standard for Health Services in Prisons* definition and industry standard requirements for medical diets".  This letter was confusing with respect to understanding what analysis was completed on the therapeutic diets.  The Monitor asked for a second interview with the SIU dietician but this was not permitted.  An email response was provided instead but the issue of which therapeutic diet manual is official, which therapeutic diet manual is used by diet managers, and how diet managers develop actual meals based on a therapeutic diet order is unclear.

The Monitor has requested a therapeutic diet order form and a list of therapeutic diets from five facilities.  Lists of therapeutic diets from three of the five requested facilities have not been received.   The diet order form has 12 specific diets[112] on it.  Neither the therapeutic diet order form nor the two lists of therapeutic diets received match the therapeutic diets discussed in the therapeutic diet manual.  It is unclear how diet managers create meals based on the therapeutic diet orders as there are no directions for how to do this.  The therapeutic diet manual discusses pregnancy nutrition recommending increased protein, vitamins, minerals, fiber and fluid but the order form does not include a pregnancy diet and Logan's therapeutic diet list was not sent to the Monitor.  The only diets on the therapeutic diet order form that are discussed in the therapeutic diet manual are the broken jaw, clear liquid, and full liquid.  These discussions included a recommended list of foods and a sample menu. What the nutritional content of these therapeutic diets is unknown.

---

[112] 1) Clear liquids; 2) Full liquids; 3) Medical/Dental Soft; 4) Hepatic; 5) Low cholesterol/Low fat; 6) No added salt 4 gram; 7) Six small feedings; 8) High protein, high calorie; 9) Broken Jaw (pureed); 10) Low concentrated sweets; 11) Low concentrated sweets/HS snack; Renal diets specifying grams of protein, sodium, potassium, and phosphorus and fluid restrictions.

The lists of persons on therapeutic diets were requested from Logan, Menard, Stateville, Shawnee and Graham but IDOC sent lists only from Shawnee and Stateville. Shawnee has 11 patients on therapeutic diets. Stateville had 34. Shawnee had 10 low concentrated sweet diets, three of which included a snack. Stateville had no low concentrated sweet diets. This implies that not all diabetics receive a diet without added sugar. Also, Stateville had 26 diets labeled therapeutic diet which is not a diet on the order form. What a therapeutic diet is, is unclear. Both the Stateville and Shawnee therapeutic diet lists had diets which are not present on the therapeutic diet order form and are not in the therapeutic diet manual. These included:

- Renal diet one oz of extra egg or meat for breakfast, two extra meat w/lunch; snack bag daily maximum one serving of peanut butter per day
- No fish
- No pasta, no lentils
- Lactose intolerant; no milk, no dairy; no chocolate, no peanut butter; no eggs
- Vegetarian diet
- No dairy/ no seafood

None of these diets were discussed in the therapeutic diet manual and presumably the diet manager, who is not a dietician constructs these without guidance.

Persons with hypertension are not apparently placed on a low sodium diet and the sodium content of the general diet is unknown. Persons with coronary artery disease are not on a low saturated fat diet and the saturated fat content of the general diet is unknown. Almost all diabetics receive the general IDOC diet[113] which is a one-size-fits-all diet consisting of 2800 calories. Though the SIU dietician determined that the general diet meets FDA standards for American adults, the statewide diet manager said that component portions (fats, carbohydrates, protein and sodium) are unknown. A few persons with diabetes are ordered a low concentrated sweets (LCS) diet which substitutes the syrup in canned fruit with a different liquid. Diabetic snacks must be ordered but at Shawnee only three diabetic snacks were ordered and only one was ordered at Stateville which apparently means that persons with type 1 diabetes do not receive snacks. Carbohydrate or sugar content of specific foods are not listed so persons with diabetes are left to their own resources to determine carbohydrate contents and according to inmates the Monitor spoke with, they do not know how to determine carbohydrate contents of food which is an essential way that persons with diabetes control their blood sugar. The dietician from SIU does occasional ad hoc consultations with select pregnant females with diabetes who are seen at the SIU hospital and says that she gives general guidance about what food types contain carbohydrates and about which food types are likely to contain carbohydrates. Since there are no dieticians in the IDOC, inmates have no access to dietary consultation. The Monitor spoke with a group of inmates with diabetes who universally complained about lack of access to nutritional counseling. While the diets served in IDOC may contain appropriate portions of carbohydrates, protein and fats, the inmates have no appreciation of what is in their diet.

---

[113] This is based on interviews with a group of diabetic patients at Shawnee, the therapeutic diet lists at Shawnee and Stateville, and discussions with the statewide dietary manager and dietary manager at Shawnee.

The American Diabetes Association (ADA)[114] recommends that every person with diabetes receive medical nutrition therapy as a component of diabetes care. The ADA distinguishes between type 1 and type 2 diabetes and their recommendations include:

- That persons with diabetes have an individualized therapeutic diabetes plan[115] at diagnosis and as needed especially during times of changing health status.
- That persons with diabetes should receive education optimally by a registered dietician/nutritionist.[116]
- That persons with diabetes who are overweight should be referred to an intensive lifestyle intervention program.

The ADA also sets goals for nutrition therapy as follows:

- Promote healthful eating patterns specifically to:
  - Improve A1c, blood pressure and cholesterol levels
  - Achieve and maintain body weight goals
  - Delay and prevent complications of diabetes
- Address individual needs based on personal and cultural preferences
- Maintain the pleasure of eating
- To provide the individual with diabetes with practical tools for day-to-day meal planning

The ADA also gives recommendations for type 1 and 2 diabetes in pregnancy[117] which, with respect to nutrition, emphasize development of an individualized medical nutrition therapy plan developed in conjunction with a registered dietician/nutritionist that promotes adequate calorie intake to promote appropriate weight gain based on Institute of Medicine guidelines[118]

There is no evidence based on discussions with persons with diabetes[119] or based on medical record reviews that any of these standards or goals exist within IDOC. There appears to be more attention to pregnant females with diabetes based on the discussion with the SIU dietician. Five inmates with diabetes at Shawnee Correctional Center were in agreement on the following points:

1. Persons with diabetes or any other medical condition get the same meals as everyone else.

---

[114] Evert A, Dennison M, et al; Nutrition Therapy for Adults With Diabetes or Prediabetes: A Consensus Report; Diabetes Care 2019 May; 42(5): 731-754. as found at https://doi.org/10.2337/dci19-0014
[115] The ADA recommends three to six encounters during the first six months of diagnosis with subsequent annual encounters and additional encounters as needed.
[116] During an interview with the SIU dietician, Defendant's counsel interrupted and advised the dietician not to answer a question about what information a person in the community would receive from a dietician with respect to diabetes. It is appropriate to obtain information on an expectation for dietician counseling that is expected for persons with diabetes. The dietician responded regardless stating that counseling about what food groups affect carbohydrate intake and stated that this was the same information given to incarcerated pregnant women (presumably at Logan) that she had counseled. This is noted because the Monitor and Monitor's consultants are permitted private conversations with staff, including vendor staff. Defendant's Counsel attends all interviews sometimes as an active participant. This can change the interview and we ask that this stop.
[117] Management of Diabetes in Pregnancy: Standards of Medical Care in Diabetes -2020 in Diabetes Care January 2020; 43 (Supplement 1): S183-S192 as found at https://care.diabetesjournals.org/content/43/Supplement_1/S183
[118] Institute of Medicine and National Research Council: Weight Gain During Pregnancy: Reexamining the Guidelines. Washington D.C. National Academies Press, 2009
[119] A discussion was conducted with five persons with diabetes at Shawnee Correctional Center on 6/21/21.

2. There is an absence of fresh vegetables on the menus. When vegetables are provided, they are canned.[120]
3. Salads are absent except for lettuce.
4. Meals are mostly carbohydrates.[121]  In this regard, all five of the inmates stated that they had gained weight since incarceration.
5. Commissary choices do not include choices for persons with diabetes.
6. None felt they could modify the carbohydrate content of the meals if they chose to do so as they were unsure of the source of carbohydrates in their meals[122]
7. No education was provided related to nutrition and diabetes

For persons with diabetes and other inmates with medical conditions, there is no evidence that expert dietician counseling occurs.  The absence of dieticians in the IDOC is a barrier to adequate analysis of nutrition of meals and commissary and to counseling that is typically provided to persons with special dietary needs.

Nutritional needs of the elderly are notably problematic in this regard.  Changes in albumin and prealbumin especially in the context of weight loss are often used to define malnutrition.  The Academy of Nutrition and Dietetics and the American Society for Parenteral and Enteral Nutrition (A.S.P.E.N.) have developed a standardized definition of malnutrition for all adults in all settings.[123]  This definition is amenable for use in a correction living situation.  Two or more of the following characteristics is recommended for diagnosis:

- Insufficient energy intake[124]
- Weight loss
- Loss of muscle mass
- Loss of subcutaneous fat
- Localized or generalized fluid accumulation that may sometimes mask weight loss
- Diminished functional status as measured by hand-grip strength.[125]

The degree of weight loss is consistent with the severity of malnutrition.  Weight loss with inflammatory factors including abnormalities of albumin or prealbumin are often indicative of malnutrition related to a chronic disease.  It is recommended in ambulatory settings that physicians in concert with a qualified nutritional professional assess the characteristics of the

---

[120] Frozen and canned vegetables can contain equivalent nutrient content as fresh, but depending on the product used, sodium content may be greater.
[121] There is no data to demonstrate that this opinion is correct but it is the perception of the diabetics I spoke with. At a minimum, it is evidence of the lack of nutritional counseling at the facility I visited.
[122] Combined with number 4 above, this demonstrates the lack of understanding of what the meal is actually composed of with respect to nutrient sources.  This verifies a general lack of dietary education.
[123] White, JV; Guenter P; et al Consensus Statement: Academy of Nutrition and Dietetics and American Society for Parenteral and Enteral Nutrition: Characteristics Recommended for the Identification and Documentation of Adult Malnutrition (Undernutrition).  Journal of Parenteral and Enteral Nutrition, Volume 36 Number 3 May 2012 PP 275-283 as found at https://dietitiansondemand.com/wp-content/uploads/2017/09/ASPEN-AND-2012-Consensus-Statement-Regarding-Malnutrition-Diagnosis-1.pdf

[124] Energy intake is defined based on the intake of food and nutrients based on energy requirements of the individual
[125] Grip strength is measured with a standardized device called a dynamometer which is often used in occupational therapy programs

patient and when malnutrition is identified, a plan is developed to address nutrition deficits. In IDOC we have not yet identified, in record reviews, that any patient receives a nutritional assessment even when their medical condition warrants nutritional evaluation including for malnutrition. Record reviews revealed patients with likely malnutrition never being treated for their malnutrition. The IDOC does not have access to a licensed dietician for nutritional assessments and providers do not perform nutritional assessments even when patients are clearly malnourished.

We give the following examples.

A 73-year-old man[126] with multiple problems was hospitalized for esophagitis and hyperkalemia. The patient had experienced confusion and appeared to have early dementia which was never worked up. At the hospital, protein calorie malnutrition was diagnosed. Laboratory tests at the Robinson facility showed low albumin consistent with that diagnosis. This diagnosis was ignored and never worked up or treated. His mental status problems were never worked up and may have contributed to his malnutrition.

A 75-year-old patient[127] had a serious illness for which he was hospitalized multiple times. For the last four months of life the patient had laboratory values indicative of possible malnutrition yet the patient never had a nutritional evaluation and the provider failed to address the likely malnutrition. During one hospital admission, the patient was diagnosed with malnutrition. Still, there was no nutritional evaluation or treatment of the patient on return to the facility.

Another 63-year-old patient[128] had gastric lymphoma diagnosed in November of 2019. In late 2018 the patient weighted 215 pounds. When the cancer was diagnosed, the weight was 178 pounds. In early December the albumin was 1.98[129] indicating possible malnutrition. The patient developed vomiting from his cancer and the albumin decreased to 1.34. Although boost, a nutritional supplement was ordered, there was no formal evaluation of the patient's nutritional status. By January the patient's weight was 125 pounds. Although on 1/8/20 the nurse documented that the patient was "at risk for impaired nutrition", no evaluation of his nutritional status was done and the patient wasn't referred to a dietician. In February there was documentation that the patient was emaciated yet still no nutritional evaluation was conducted. The patient died in March without ever having a nutritional evaluation despite losing over 100 pounds.

Another 53-year-old patient[130] had chronic kidney disease with elevated phosphorus level, low albumin and anemia. There was no evaluation by providers with respect what the patient was eating with respect to his metabolic profile that indicated possible malnutrition.

Another 46-year-old patient[131] had significant weight loss based on documented weights in the

---

[126] Mortality review patient #1
[127] Dietary patient #1
[128] Dietary patient #2
[129] Normally the albumin is 3-4.5. Low albumin suggests malnutrition which was likely given the patient's inability to eat without vomiting.
[130] Dietary patient #3
[131] Dietary patient #4

medical record. Despite the weight loss, there was no evaluation for the weight loss and moreover no nutritional evaluation of the patient. This patient couldn't walk without pain to the point where an Assistant Warden placed the patient on the infirmary unit because he could walk to chow hall. Despite not being able to walk to chow hall and despite losing considerable weight, there was no nutritional evaluation of the patient. Even after metastatic cancer was diagnosed, the patient failed to receive any nutritional evaluation.

Another 76-year-old patient[132] had diabetes, hyperthyroidism, hyperparathyroidism, and hypertension. The patient was losing weight and complained about it to nurses and providers. The patient was also having episodes of confusion. Providers failed to evaluate the patient for his confusion and did not evaluate the weight loss or perform a nutritional analysis. Despite the weight loss in the context of diabetes there was no nutritional analysis of what the patient was eating. Providers never evaluated the nutritional needs of the patient with respect to his diabetes. Despite poorly controlled diabetes and weight loss there was no evidence in chronic clinics of any nutritional analysis by the provider and no referral to a dietician.

Another 67-years-old man[133] had diabetes, heart failure, atrial fibrillation requiring anticoagulation, sick sinus syndrome requiring a pacemaker, hypertension and chronic kidney disease. The patient weighed 178 pounds on 12/12/17 and gradually lost weight until on 2/12/20 he weighed only 150 pounds. In February of 2020 custody brought to the attention of medical that the patient was unable to function in general population. The patient was subsequently diagnosed with dementia. Though the patient's lab results indicated probable malnutrition in the context of dementia, medical staff never performed a nutritional assessment or ensured that the patient was receiving appropriate nutrition. Though the patient had diabetes there was no evidence of nutritional counseling or of a dietary assessment.

Another 77-year-old patient[134] had treated renal and lung cancers with advanced COPD and had lost weight for six months. After the patient complained of weight loss and asked for a high protein diet, a nurse practitioner ordered a high protein diet. No nutritional evaluation took place despite the nurse practitioner documenting a 25-pound weight loss. In December of 2020 the patient developed another lung mass that was likely carcinoma. On 1/9/21 the patient saw the nurse practitioner for follow up of the weight loss. The patient complained again of weight loss and requested nutritional supplement. The patient had, based on weights in the medical record, had lost 28 pounds over two years. The nurse practitioner ordered weekly weights but did no laboratory evaluation and did not refer to a dietician for evaluation. In March 2021 a nurse saw the patient who complained about difficulty eating due to his breathing. The nurse recommended a pureed diet and boost supplement and referred the patient to a nurse practitioner who took no history of the problems eating, did not evaluate the problems eating and took no action. There was no effort to ensure the patient received an adequate caloric diet. The patient should have been referred to a dietician. About a month later the patient died without ever receiving a nutritional assessment.

---

[132] Dietary patient #5
[133] Dietary patient #6
[134] Mortality review patient #9

Another 82-year-old patient[135] had dementia, arthritis, high cholesterol, gastric reflux, hypothyroidism, and chronic obstructive lung disease. The patient had continued weight loss and despite the dementia, providers failed to ever evaluate what the patient was eating and whether the patient's weight loss was associated with malnutrition. The patient had multiple falls. On several occasions the patient asked a nurse for candy or cookies. On one visit a nurse documented the patient ate 20% of one of his meals. Despite asking staff for cookies and candy and having weight loss, the patient was never evaluated for malnutrition or referred to a dietician. Eventually the patient died of small bowel obstruction due to an abdominal mass never having had a nutritional analysis.

Another 78-year-old patient[136] had hypertension, prior back surgery, and prior partial lung removal for unspecified reasons. Beginning in September of 2020 the patient began losing weight which was unrecognized. In November of 2020 the patient had significantly abnormal albumin (1.6) suggestive of malnutrition for which the patient should have been evaluated since he also had weight loss. Both the low albumin and weight loss were unrecognized but the patient was hospitalized and was diagnosed with metastatic cancer. At the hospital the patient was diagnosed with malnutrition. The patient was emaciated upon return from the hospital and was sent to the infirmary but was unable to express himself, was incontinent and confused. Upon return there was no order with respect to the patient's diet. Apparently, the patient was on a regular diet. The patient died shortly after return from the hospital. The patient had six months of weight loss resulting in emaciation without a nutritional evaluation or dietician consultation.

The timing of meals varies and is under control of wardens at each facility. The hour of breakfast, for example, ranges from 2:30 am to eight am with most facilities having breakfast at four to four-thirty am. The medical administrative directives give no direction with respect to the timing of meals and insulin administration. At Shawnee, we were told that insulin is given within a half hour of meals. The group of five inmates with diabetes confirmed that meals are coordinated with insulin but the coordination of insulin with meals is uncertain at other facilities particularly with earlier breakfast times. When meal times fluctuate there is risk for hypoglycemia. The timing of meals is important especially when short acting insulins are given due to the risk of hypoglycemia.

According to the statewide dietary manager inmate participation in meals is extremely low especially for breakfast because inmates do not want to get up at the hour breakfast is served. The timing of meals may be a reason for lack of participation in meals. Menard maximum security, for example, serves breakfast at 3 am to 4 am and serves lunch at 8 am to 9 am with dinner at 3 pm to 5 pm. Of 32[137] facility meal times 20 serve meals earlier than 5 am. The earliest time breakfast is at Stateville at 2:30 am. Based on the Monitor consultant's experience, facilities that serve extremely early breakfast result in very low participation rates of receiving morning insulin. This is because patients don't take insulin because they don't want to get up at that hour to eat. This results in alterations of blood sugar levels and subsequent reliance on commissary items which typically are less healthy than meals.

---

[135] Mortality review patient #15
[136] Mortality review patient #5
[137] Menard separates medium from maximum security classifications and Graham serves meals for general population at a different time than the Graham Reception and Classification Center.

If a 3 am breakfast is an impediment to large segments of inmates eating that meal, why isn't the meal time changed? Because some facilities have breakfast between 5 to 6:30, a later breakfast does not appear to be a security issue. Not eating breakfast if morning short acting insulin is given is not safe. Not taking morning insulin is also not good therapy. Timing of meals is also likely an issue for the elderly especially if getting to the meal requires walking in the dark. We have reviewed records of elderly or disabled patients who have a difficult time getting to the chow hall but no one, except custody, in these record reviews noticed this absence from meals. In these limited case reviews, the medical program did not provide any nutritional evaluation of these individuals. There is no consideration of the elderly or disabled with respect to timing of meals. However, the IDOC needs to consider the timing of meals and its impact on persons with diabetes and other medical conditions including the elderly and those with movement disabilities.

The dietary manager indicated that the amount of food prepared is typically less than what would be necessary if everyone consumed the expected meal. This gap is significant. The amount of food prepared is modified based on expected meal participation. The dietary manager indicated that managers know which foods are likely to result in meal attendance. Despite this, there has been no analysis by IDOC regarding which foods aren't eaten and why they might not be eaten.

This necessarily brings up the issue of commissary food and snacks. The commissary food was not included in the one analysis the IDOC performed of the general diet. Not to include the commissary in a nutritional analysis misses a major component of inmates' diet. The IDOC refused to provide the commissary list to the Monitor.[138] We disagree with the rationale for this refusal. The commissary is an IDOC controlled function and commissary food is an integral part of inmate nutrition. The IDOC argues that commissary food items are not called out in the Consent Decree and therefore not subject to review. When asked if any analysis of nutritional content of commissary items had been performed by IDOC, the IDOC dietary manager said no, yet stated that the amount of commissary food and snacks purchased are "astronomical". He even pointed out that often diabetic evening snacks are sometimes cancelled because inmates order so much commissary that a prescribed snack is deemed unnecessary. Coupled with the comment that meal participation is extremely low, this is of concern and leads to the potential that food options or meal timing may disincentivize attending at chow hall meals and encourage commissary use. If commissary options are more likely unhealthy, the process of feeding inmates may be incentivizing unhealthy food options. If the IDOC profits from commissary use

---

[138] The Defendant's counsel wrote to the Monitor, "After discussing this issue internally, we have come to the determination that those items available in the commissary fall outside the scope of the consent decree. Indeed, Plaintiffs' claims stem from allegations that they are denied adequate medical and dental care in violation of their Eighth and Fourteenth Amendment rights. *See* Consent Decree, Introduction and Background. While section II.B.6.j of the decree states that "IDOC agrees to implement changes in the nutrition and timing of meals for diabetics and other Class members whose serious medical needs warrant doing so," our position is that this relates only to those meals that are provided to class members on a specified schedule, not items that might be available at commissary, which has no relation to medical or dental care. As such, we do not believe this information is relevant to your monitoring duties. If you would like to discuss this issue further, we would be happy to make ourselves available. Thank you."

and pays for chow hall meals, there may be perverse economic factors in discouraging chow hall meals and encouraging commissary use as well. The statewide diet manager's comment that diabetic snacks are occasionally withheld due to inmate use of commissary contradicts the IDOC position that commissary items have "no relation to medical or dental care". Commissary needs to be considered an important contributor to inmate nutrition for better or worse. The extent to which that contribution is ignored, a potentially harmful or helpful adjunct is ignored. We are not advocating elimination of the commissary. Even when unhealthy choices are included in the commissary, its role in the nutrition of inmates should be considered in the totality of inmate nutrition and certainly diabetic options should be available on the commissary.

In conclusion, positive findings included that the master menu of the general diet had significant variety. An SIU registered dietician performed an analysis of the statewide general diet master menu which was done consistent with the Food and Drug Administration Dietary Guidelines for American which is an appropriate basis. The description of this evaluation sounded appropriate as described in an interview with an SIU dietician. We have asked for but have not been provided that report yet. Lastly, some facilities have gardens that produce fresh produce which is used for meals. We applaud this effort and encourage its expansion as it gives productive work options to inmates that promotes healthy eating options.

However, appropriate diet and nutrition for inmates has serious deficiencies. We find that there is no policy or procedure governing nutrition. The general diets as served at the facilities are not analyzed for nutritional content. There has been no nutritional analysis of the therapeutic diet master menus or of the actual therapeutic meals. The therapeutic diet manual is not up to date as it does not describe all therapeutic diets. This manual should be revised to include all therapeutic diets and all diets should undergo nutritional analysis. Menus on the therapeutic diet list do not conform to the therapeutic order form. There is an absence of registered dietician/nutrition consultation at all facilities. Diet managers and physicians need access to dietician consultations. Dieticians should regularly review the diet master menus, menus at facilities, and actual menus at facilities for nutritional quality of both the general diet and therapeutic diets. Record reviews show there is a complete absence of access of inmates to dietary consultation for diabetes control, malnutrition evaluation or other medical dietician concerns. Nutrition concerns are not addressed in chronic disease management. Timing of meals appears to promote non participation in meals and is therefore a barrier to appropriate nutrition and diabetes management. Commissary is ignored as a medical dietary concern but is a significant contributor to the inmate diets. The IDOC appears to ignore behavioral factors, food palatability, timing of meals with respect to the nutrition of inmates. Lack of participation in meals may save money and increased commissary use may earn money for IDOC which can be viewed as disincentivizing proper nutrition of inmates. These deficiencies in combination make this item noncompliant.

**RECOMMENDATIONS:**
1. The percentage of fat, protein, carbohydrates and sodium in diets should be calculated and documented for all master menus.
2. Inmates should have access to information on food components in their meals so that those inmates who must choose components based on their medical conditions can do so.

This is especially true for diabetics but is also true for those with hypertension and high blood lipids.

3. A registered nutritionist/dietician should be on staff of IDOC to supervise dietary analysis to ensure that all meals contain acceptable nutrients and components based on the latest version of the Food and Drug Administration Dietary Guidelines for Americans.

4. Diet managers at facilities need supervision by and consultation access to a registered nutritionist/dietician.

5. Physicians and inmates with conditions requiring nutritional expertise must have access to a registered nutritionist/dietician for consultation on these needs. These consultations need to be documented in the medical record. Policy, procedure and practice should be modified to ensure this occurs.

6. Access to dietician/nutritionists can be by telemedicine or in person via hiring registered nutritionists/dieticians.

7. The therapeutic diet manual should be rewritten to include all therapeutic diets so, in its entirety including master menus, it is contemporary.

8. Mealtimes should be adjusted reasonably so as not to be a barrier to participation in meals.

9. The commissary food and snack panels must be evaluated and adjusted to include healthy choices appropriate for all inmates including those with diabetes.

10. The extremely low participation in eating meals and astronomical use of commissary should be studied to evaluate how to improve consumption of healthy food. IDOC should analyze timing of meals, behavior, recipes, and preparation factors that may be resulting in the extremely low participation in meals.[139] Reasonable adjustments should be made to encourage healthy dietary patterns. This must be done in a manner that permits both a secure environment and nutritious meals that are eaten.

11. Policy, procedure, and practice should be established to ensure persons with diabetes have access to a registered nutritionist/dietician consistent with American Diabetes Association guidelines.

12. Policy, procedure and practice for all chronic care conditions should include evaluation of diet and access to appropriate referral to a registered dietician/nutritionist when indicated.

# Facility Implementation of Policies and Procedures

**Medical and Dental**

***Addresses item II.B.8.***

**II.B.8.** *The implementation of this Decree shall also include the development and implementation, with the assistance of the Monitor, of a comprehensive set of health care policies by July 1, 2020. These policies shall be consistent throughout IDOC, and cover all aspects of a health care program.*

---

[139] An example of how this was done, albeit for schoolchildren, is the Centers for Disease Control School Health Guidelines to Promote Healthy Eating and Physical Activity found in Morbidity and Mortality Weekly Report Sept 16, 2011 as found at https://www.cdc.gov/healthyschools/npao/pdf/mmwr-school-health-guidelines.pdf. This document shows how behavior, food preparation and presentation promoted healthy eating.

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
Policies are still in the process of being written and reviewed; none have yet been approved or implemented.   Because no policies have been implemented this item warrants a noncompliance rating.  See Systemwide Medical and Dental Policies

**RECOMMENDATIONS:** None

## Intrasystem Transfers
*Addresses item III.D.1; III.D.2*
**III.D.1.**  *With the exception of prisoners housed at Reception and Classification Centers, IDOC shall place prisoners with scheduled offsite medical services on a transfer hold until the service is provided, contingent on security concerns or emergent circumstances including, but not limited to, a lockdown. Transfer from Reception and Classification Centers shall not interfere with offsite services previously scheduled by IDOC.*
**III.D.2.**  *When a prisoner is transferred from one facility's infirmary to another facility, the receiving facility shall take the prisoner to the HCU where a medical provider will facilitate continuity of care.*

**OVERALL COMPLIANCE:** Partial Compliance

**FINDINGS:**
The IDOC continues to assert compliance with III. D. 1 but provides no evidence to support the assertion. Further, the IDOC has not established policy and procedure that directs the health care program to place a transfer hold on prisoners with scheduled offsite medical services. The Monitor was provided with a draft of policy and procedure for intrasystem transfers and returned it to OHS with comments and suggested revisions in August 2020. We have received no further version of this draft. Completion of the policy and procedure on intrasystem transfers was one of three recommendations in the Monitor's last report. The IDOC has not responded to these recommendations and provided no documentation to indicate they were implemented.

The IDOC also asserts compliance with III.D.2 that transferred prisoners are evaluated by health care staff at the receiving facility to facilitate continuity of care.  The Monitor agrees that prisoners are evaluated by the receiving facility upon transfer but does not find that continuity of care was facilitated.  The records reviewed indicate that persons are transferred before expected evaluations completed and that information which should be provided to the receiving facility is missing or inaccurate. Failure to seamlessly transfer complete and relevant information about the patient along with the medical record and medication administration record (MAR) creates a notable risk for the interruption of needed care.

While on site at Shawnee CC the Monitor reviewed charts of four patients who had transferred. The Monitor also reviewed charts that were provided by IDOC of some patients who died during this report period, five of whom had documentation of transfers. Findings were the same as

reported by the Monitor previously.[140] Patients are transferred before needed evaluations are completed. For example, one patient[141] had been seen urgently three days before transfer for mid-sternal pain and had been referred to but not yet been seen by a physician. Even though both an RN and a physician at the receiving facility documented that the chart was reviewed both failed to note the urgent visit three days and the pending provider referral. This patient was seen urgently for respiratory distress and chest pain four days after the transfer and hospitalized a day later. At the hospital he was diagnosed with acute respiratory failure, and acute on chronic heart failure. Another patient[142] had just been approved for an ENT consult but was transferred for disciplinary reasons. The receiving facility never acknowledged the outstanding ENT referral and medically necessary treatment of the patient was delayed.

Another finding from chart review is that the information provided by the sending facility frequently is inaccurate or incomplete. For example, two patients[143] did not have essential medications started after arrival at the receiving facility. Another patient[144] had been diagnosed with degenerative osteoarthritis of the knee and had been given an elastic brace and a quad cane. When transferred the knee brace was not sent with the patient, and it took 13 days to provide another one.  This patient was transferred again five months later and the sending facility did not list cirrhosis of the liver diagnosed three months earlier or the plan for follow up on the transfer summary.

During the COVID-19 pandemic, transfers were halted.  Transfers were resumed early in 2021. The CQI minutes were reviewed for the fourth quarter of 2020 and first quarter of 2021. Only four facilities[145] reported transfer audits and of those, only two reported the results of the transfer audit and no opportunities for improvement were discussed.  While IDOC does attempt to self-monitor the transfer of the health record and completion of the transfer summary the tool does not address continuity of care as called out in III.D.2. The Monitor has recommended that this tool be expanded[146] to include the accuracy of the clinical information (diagnoses and medications) entered on the Health Status Transfer Summary, whether the MAR was transferred concurrently, and that care was continued without interruption (medications, pending appointments and completion of referrals).

**RECOMMENDATIONS:**

1. Finish the policy and procedure and ensure that the means and methods to carry out III.D. 1 & 2 are detailed, develop performance measures, and monitor performance to document

---

[140] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 78, Health Care Monitor 3rd Report, Lippert v. Jeffreys, February 15, 2021, page 56.
[141] Mortality review patient #1
[142] Mortality review patient #2
[143] Mortality review patient #3.  He did not have gabapentin, glipizide, sodium bicarbonate, Vitamin D-3, cyanocobalamin, famotidine, and Lantus started for two weeks after arrival at Jacksonville CC. Mortality review patient #2 did not have orders to continue prednisone tablets, alvesco, incruse ellipta, and xopenex inhalers for four days after arrival at Menard CC.
[144] Mortality review patient #4
[145] Decatur, Big Muddy, Lincoln, and Taylorville
[146] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page78-79, Health Care Monitor 3rd Report, Lippert v. Jeffreys, February 15, 2021, page 57.

compliance with the Consent Decree. The procedure should also define what steps the sending facility is to take in documenting pending referrals, identifying tasks not yet completed, reconciliation of medication lists, and detailing current medical and mental health problems. The procedure needs to do the same with regard to specifying the receiving facility's obligation to verify the transfer information, examine the patient and document actions taken to continue ongoing care and address new problems.

2.      Augment the scope of the Medical Record Transfer study to include the concurrent transfer of the MAR, evaluate the accuracy of the clinical information (diagnoses and medications) entered on the Health Status Transfer Summary and whether there is any discontinuity in the plan of care.

# Medical Reception

*Addresses Items II.A; II.B.1; II.B.6.a; III.C.1*
**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*
**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*
**II.B.6.a** *IDOC agrees to implement changes in the following areas: Initial intake screening, and initial health care assessment*
**III.C.1.** *IDOC shall provide sufficient nursing staff and clinicians to complete medical evaluations during the intake process within seven (7) business days after a prisoner is admitted to one of IDOC's Reception and Classification Centers.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

There has been little to no change with regard to medical reception since the Monitor was appointed. Neither do Defendants claim compliance with any of the items listed above. Written comments on a draft policy and procedure were last provided by the Monitor in August 2020. There has been no further work submitted for the Monitor's review.[147] There are no metrics or performance measures for medical reception screening, and it is not discussed or reviewed at CQI meetings. None of the seven recommendations made in the last two Monitor's reports from have been acted on. We note that intake volume reported during the time period covered by this report is half of the volume identified in the last report. [148]

---

[147] On 8/11/21 IDOC sent the Monitor a revised Receiving Screening policy but it was received after this section was written so it will be addressed in the next report.
[148] The last Monitor's report used intakes reported in the September 2020 CQI minutes. NRC reported 848 intakes, Graham 182, Menard 69, and Logan 70.

The most recent staffing analysis from IDOC[149] still does not define the number of nursing and clinical staff sufficient to complete medical evaluations within seven days of admission. Indeed, chart review showed that these evaluations are completed at intervals longer than seven days at two of the three intake sites that provided charts for review[150]. The Monitor has recommended since the beginning of discussions concerning the Staffing Analysis that a workload driven staffing standard be developed for medical reception.[151] The Monitor has also recommended since the 2nd report that timeliness completing each step in medical reception be monitored and exceptions reported at CQI for analysis and resolution.[152] This recommendation has not been enacted.

The considerable variation in staffing among the medical reception centers that was noted by the Monitor in the 3rd report is unchanged in the July 2021 staffing analysis.[153] OHS has not sufficiently accounted for the staffing necessary to accomplish the work associated with new intakes. Please see the table following this paragraph.

| | NRC | Graham | Menard | Logan |
|---|---|---|---|---|
| | 449 intakes/mo | 77 intakes/mo | 70 intakes/mo | 33 intakes/mo |
| | | | | |
| Medical Director (On-Site) | 1 | 1 | 1 | 1 |
| Physician | 1 | - | 1 | 1 *(+1)* |
| Physician Assistant/NP | 2.5 *(+1.5)* | 2 *(+1)* | 3 | 4 |
| | | | | |
| Dental Director | - | - | 1 | - |
| Dentist | 1.6 | 1.6 | 2 | 2 |
| Dental Assistant | 1 *(+0.5)* | 2 | 3 | 3 |
| | | | | |
| Phlebotomist | - | 0.6 | 1 | 1.2 |

Italicized font indicates additional budgeted positions.

Graham and Menard each average less than 100 intakes a month. Graham has four providers and Menard five as listed in the Staffing Analysis. NRC which has a monthly average intake volume five-fold greater than that of the other facilities has only one more provider than Menard and only two more than Graham. It is understood that the medical staff have responsibility for the daily care of the entire population housed at the facility not just intakes. Even considering this, the workload volume of medical reception is not reflected in the provider staffing of these facilities. Initial health assessments completed at NRC are not as thorough as those completed by

---

[149] Revised Staffing Analysis Illinois Department of Corrections Office of Health Services, Lippert Consent Decree 7/7/2021.
[150] NRC was the only site completing the initial health assessment within seven days. The average number of days to complete the initial health assessment at Graham CC was 18 and at Menard CC it was eight.
[151] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, pages 80 & 81; Health Care Monitor 3rd Report pages 58 & 61.
[152] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 80; Health Care Monitor 3rd Report, page 59.
[153] The IDOC submitted a Staffing Analysis to the parties dated 8/19/21 which was after this part of the report was written. Discussion related to the Staffing Analysis and vacancies in this part of the report refer to the information provided in the Staffing Analysis dated 7/7/21.

93

the other intake facilities and there are delays in the identification of health care needs as a result. The Monitor notes that an additional physician is budgeted at Logan that was previously recommended as a physician assistant/NP. [154] We concur with this change increasing the number of physicians to two, in addition to the site Medical Director.

The dental staffing at NRC has been increased by 0.6 FTE since the December 2020 staffing data provided by IDOC. However, the same staffing disparity is noted at NRC with the number of positions identical to or less than the number of positions at the other sites, yet the intake volume at NRC is much greater.

The variation in phlebotomy staffing noted in the last report also was not addressed in the revised July 2021 Staffing Analysis. No phlebotomy staff exist or are budgeted for NRC, yet labs are drawn on virtually every person coming through medical reception. In 11 of 12 charts received from NRC labs were not available for review by the provider at the time of the physical exam. Labs were not available in three of nine charts reviewed from Graham. The effectiveness and accuracy of health assessments is greatly compromised by not having laboratory data available at the time of the encounter.

Vacancies are a significant factor at the intake facilities. Vacancies among medical and nursing staff exceed 12 % at three of four intake facilities. Dental staff vacancies exceed 12 % at two of four intake facilities[155]. Having the staffing to keep up with workload volume needs to be seen as a mission critical factor in maintaining maintain the accuracy and quality of medical reception and the initial health assessment.

| | Vacancies as a Percent of Allocated Positions | | | |
| --- | --- | --- | --- | --- |
| | NRC | Graham | Menard | Logan |
| Medical Staff | 22% | 20% | 10% | 17% |
| Dental Staff | 0% | 0% | 14% | 33% |
| Nursing Staff | 27% | 9% | 44% | 43% |

An example of a labor-saving process change that has been suggested by the Monitor in previous reports is replacing the more time consuming and less accurate use of the tuberculin skin test to screen for tuberculosis with the IGRA blood test. [156] To the Monitor's knowledge no steps have

---

[154] IDOC December 2020 Staffing document.
[155] Revised Staffing Analysis Illinois Department of Corrections Office of Health Services, Lippert Consent Decree 7/7/2021. The more recent Staffing Analysis dated 8/19/21 shows a higher vacancy rate generally, however a detailed review of vacancies specifically at the intake facilities was not completed.
[156] The tuberculin skin test is an intradermal injection of purified protein derivative applied to the forearm. Two to three days later the site of the injection must be inspected and palpated to determine if there is a reaction indicating possible infection. It requires skill in properly injecting the material and in assessing the results. Two encounters are necessary. In contrast the IGRA consists of taking a sample of blood and could take place at the same time other routine labs are drawn. The laboratory must be equipped to run the test and the sample must be delivered timely.

been taken by IDOC to explore the workload savings, improved accuracy and safety enhancements that could be achieved by this simple change in process.

Medical reception easily lends itself to word load driven staffing metrics since it is comprised of a series of discrete tasks such as taking vital signs, conducting vision screening, taking an intake history, obtaining blood for laboratory analysis, conducting a physical exam, etc. The average amount of time to accomplish each task can be determined either by expert opinion or time analysis. This information combined with the average number of intakes received at a facility and the hours that are available for personnel to perform these tasks then determine the number of personnel needed to complete medical reception timely.

The Monitor reviewed records of 31 persons received at the three of the four reception centers in April and May 2021. Findings included inconsistent gathering of vital signs at all facilities including failure to check corrected and uncorrected visual acuity.[157] Abnormal vital signs such as an irregular heart rate or elevated blood pressure were not rechecked and/or not referred to the provider for urgent evaluation.[158] Hearing acuity is not assessed at receiving health screening and should be. Persons giving history of a medical condition were not asked additional questions to amplify the information nor were records obtained of previous treatment when indicated.[159] The urgency of referral to providers is unclear; there were patients who should have been referred urgently and were not.[160]

There is little effort to obtain and verify information about medications patients may have been prescribed before incarceration. For example, one patient gave a history of having had three heart attacks with two stents placed and an episode of deep vein thrombosis. He did not indicate that he was taking any medication and no effort was made to ascertain if he had been on medication previously (which is highly likely) and if so, what those medications were.[161] On the majority of intake medical histories reviewed, the nurse indicated that the information was obtained only by report of the inmate and transfer records from the sending jail were not reviewed. Bridge orders were appropriately obtained in several instances but the first dose received was more than 24 hours later, resulting in discontinuity of care[162]

No receiving facilities were visited during the time covered by this report, so the physical facility, space or equipment devoted to intake screening was not observed. Intake screening also was not observed. The Monitor's review consisted of the review of medical records, documents, and correspondence.

The Monitor has said that "The cornerstone of the delivery of timely and necessary health care

---

One study in a jail in Texas showed that the labor costs associated with IGRA blood testing were four-fold less than the tuberculin skin test. See Cost analysis of tuberculin skin test and the QuantiFERON-TB Gold In-tube test for tuberculosis screening in a correctional setting in Dallas, Texas, USA - PubMed (nih.gov)

[157] Medical reception patient #s 1, 2, 3, 4, 5, 6, and 7
[158] Medical reception patient #s 2, 8, 9, 10, 11, and 12
[159] Medical reception patient #s 2, 3, 5, 6, 7, 10, 11, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, and 23
[160] Medical reception patient #s 2, 5, 11, 12, 18, 19, and 21
[161] Medical reception patient # 2
[162] Medical reception patient #s 6, 7, and 24

services in correctional facilities is reception screening."[163] Its purpose in prisons is to identify, treat and ensure the appropriate care and housing of persons with acute and chronic medical and mental health conditions as well as establishing and carrying out plans to achieve and maintain individual health during incarceration and upon return to the community.[164] Because medical reception is a discrete set of steps, it lends itself easily to process mapping and corrective action to bring performance into conformance with the Consent Decree. Changes to medical reception only effect four facilities and are therefore a less complicated change process to operationalize. It is curious that Defendants have taken no steps to bring medical reception into conformance with the Consent Decree.[165]

With no demonstrated change or proof of improved performance the rating of non-compliance for medical reception remains. Recommendations of the Monitor to achieve an adequate medical reception process that will *ensure access* to appropriate levels of primary, secondary and tertiary care have been made since the 2nd report and are listed below unchanged.

**RECOMMENDATIONS:**

1. Develop a staffing standard for medical reception that is workload driven.
2. Fill vacant positions at intake facilities.
3. Finalize the policy and procedure on medical reception and implement it.
4. Replace tuberculin skin testing with IGRA blood testing to screen for tuberculosis. This is a simple step to prevent needle stick injuries, frees up staff time, eliminates the need for a patient encounter to read skin test results, and does not include a boosting effect.
5. Develop metrics to provide information on the timeliness and thoroughness of medical reception (III. C. 1, 3 & 4). Intake facilities should report their performance results to CQI on a regular basis.
6. Privacy and confidentiality of space used for clinical encounters should be included in safety and sanitation rounds of the health care program. These rounds should also account for inoperable or unsafe equipment and condition of the space, infection control risks and uncleanliness.
7. Develop a clinical audit tool that evaluates the appropriateness, quality, and continuity of health care during medical reception as well as compliance with the policy and procedure. Audit medical reception with this tool (s) at least quarterly until performance is better than 90% on each criteria for three successive quarters.

---

[163] Raba, J. (2006) Intake Screening and Periodic Health Evaluations. In M. Puisis (Ed.), Clinical Practice in correctional medicine. Page 42. Philadelphia: Mosby Elsevier
[164] Ibid, page 46.
[165] An implementation plan for medical reception would include defining the workload measures and staffing needed to complete medical reception, mapping out the steps of the desired medication reception process, establishing policy and procedure, establishing the performance metrics, obtaining necessary equipment and supplies, creating or revising forms, securing qualified staffing, informing and training staff to complete procedures and report performance metrics correctly, implement revised medical reception process, evaluate the revised process and adjust processes and/or resources to bring into correction, and measure performance regularly to sustain corrections.

**Health Assessments**

*Addresses items II.A; II.B.6.a; III.C.3; III.C.4*
**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*
**II.B.6.a** *IDOC agrees to implement changes in the following areas: Initial intake screening, and initial health care assessment;*
**III.C.3.** *IDOC shall ensure that a clinician or a Registered Nurse reviews all intake data and compiles a list of medical issues for each prisoner.*
**III.C.4.** *If medically indicated, IDOC shall ensure follow up on all pertinent findings from the initial intake screening referenced in C.3. for appropriate care and treatment.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
IDOC has asserted compliance with provision III.C.4. since their first Bi-Annual Report in November of 2019 without providing any evidence to support their assertion. Record reviews continue to show that follow up of patient problems is not consistently performed. Problem lists often appear to be entered by nursing staff who make entries on the problem list of items that are not problems and are often irrelevant to a medical problem list. Providers continue to inconsistently follow up on all of the patient's problems. At the conclusion of intake, many patients do not have all of their problems identified or addressed with a plan. The design of the intake process and assignment of responsibilities contributes to this problem. There is no evidence in the Implementation Plan of a plan to remedy this.

With respect to recommendations from the Monitor's 3rd Report, the Monitor has received no information that any of the four recommendations were acted on.

Existing policy guidance for health assessments is governed by administrative directive 04.03.10.1, Offender Physical Examination. By this policy and existing practice, medical reception is a two-stage process divided into a nurse screening and history and a provider physical examination. Because providers are not required to take a history of the patient's chronic illnesses, the medical history lacks detail and does not include important milestones or markers of chronic illness[166] that would typically be obtained by a provider. This fails to establish the baseline condition of the patient including past medical treatment of their conditions. By design, the provider intake physical examination form has no place to document a history. This extends into chronic care. Record reviews demonstrates that medical interval histories are rarely documented in chronic care clinics. The chronic care form promotes lack of histories by having a check box stating, "Is the medical history unchanged since last clinic".

---

[166] For example, when important tests are done such as echocardiograms, cardiac catheterizations, or CT scans. Markers such as civilian baseline A1c levels for diabetes, baseline blood pressure for hypertension, or baseline weight for heart failure are never obtained. Civilian medication histories are virtually never obtained particularly medication adherence and changes in medications. Recent therapeutic plans are rarely included in the history of the patient.

This is mostly checked "yes" even when patients have had significant changes to their chronic illness. There is no space on either the physical examination form or chronic care form to document a medical history. IDOC has designed forms and practice so that medical history is discouraged from being obtained. It is not surprising that few medical histories are actually obtained by providers.

For the most part the only history taken in medical reception is by the nurse. Providers are to review the nursing history and there is a check box on the physical examination form verifying that the history was reviewed. This is not consistently done. Moreover, nurse findings such as abnormal vital signs or other objective findings are often ignored or not commented on. The end result is that the medical assessment portion of the medical reception process is concluded without a clear understanding of the conditions or medical history of the patient. In death reviews, this failure to identify patient conditions and develop an appropriate treatment plan at intake has resulted in unnecessary and preventable death.[167]

Existing policy for intake physical examinations does not require that providers identify all chronic and acute problems of the patient or establish a plan for every problem. The physical examination administrative directive only requires a physical examination at intake and not development of an assessment and therapeutic plan. The physical examination form has a space for documentation of assessment and plan but the "assessment" section is 6 lines of 4 inches each and the "plan" has two and a half lines of 4 inches each. Neither of these is sufficient to document an assessment and plan for a complex patient. Moreover, there is no guidance of what is to be included in either the assessment or plan sections in the physical examination form. The assessment section should include all acute and chronic medical problems and interpretive comments regarding the current status of those conditions. The plan should include medications, diagnostic testing, follow up, and referrals, necessary to manage each medical condition. The assessment done by the provider should inform filling in the problem list but this is seldom done by providers. Instead, nurses often fill out the problem list with items that are not medical problems. This results in irrelevant and confusing problem lists. Assessments do not consistently include all of the patient's acute and chronic problems and the combination of assessment and plan often does not detail a reasonable therapeutic plan that can be expected at the prison.

The Monitor reviewed the 12 records of persons, most with a chronic illness, from NRC and Graham. All seven of the assessments from NRC were timely and all five of the assessments from Graham were late, occurring about two and a half weeks from reception.

The following table lists the results of our audit of 12 records[168] against measures of an effective provider intake health examination.

---

[167] See 3rd Report mortality reviews patients #1, 5,
[168] Medical reception patient #s 2, 6, 7, 8, 10, 12, 14, 15, 16, 21, 23, and 24

| Audit of Intake Health Examinations | | |
|---|---|---|
| Task | Number | Percent |
| Reviewed Nurse Findings | 1 | 8% |
| Provider History Adequate | 0 | 0% |
| Vital Signs Done for Physical Examination | 0 | 0% |
| Examination Adequate | 4 | 33% |
| Assessment Adequte | 3 | 25% |
| Problem List Adequate | 5 | 41% |
| Medical Provider Requested When Indicated* | 0 | 0% |
| Therapeutic Plan Adequate | 2 | 17% |
| COVID Symptom Screening | 11 | 92% |
| COVID Test in Record | 2 | 17% |

\* There were only 2 patients who should have had a medical record obtained from their civilian providers.

The Implementation Plan should include a re-design of the medical reception process[169] so that the work of nurses and providers is integrated to result in a thorough evaluation of every patient to establish a complete inventory of their chronic and acute illnesses. For each condition there should be an assessment describing the status of the patient's condition with a therapeutic plan. Currently, nurses and providers appear to work in silos each performing expected tasks but not integrating their work with other staff or with the patient. Providers continue to ignore nurse findings and fail to take an adequate history. An example was for two patients[170] at Graham, a nurse documented that the patients had 20/200 visual acuity in both eyes. This qualifies as legally blind. On both occasions the provider failed to follow up with a history, did not recheck the visual acuity and did not refer to an optometrist. Patients with elevated blood pressure were not rechecked to assess for hypertension and vital signs of the nurse were ignored. Nurses at Graham and occasionally at NRC asked and answered on the intake form whether the patient had evidence of vaccination for 10 different conditions. At Graham all five patients had every vaccination box checked "no" meaning that there was no history of ever receiving vaccinations for ten different conditions. The purpose of this task is unknown as providers rarely followed up to order vaccination for required vaccinations.

While 11 of 12 patients had symptom screening for COVID documented as done, only two of 12 were tested for COVID upon entry into IDOC. Three patients had received COVID vaccination in local jails prior to transfer to IDOC but seven patients refused COVID vaccination and for two patients there was no evidence of offering vaccination. In all patients, the provider did not review COVID status with patients or ask those patients who refused vaccination whether they would reconsider. This should have been done and was a lost opportunity for an urgent public health intervention during an ongoing pandemic.

The current dental administrative directive 04.03.102 requires that all patients are to receive a complete dental examination which is to include charting of the status and treatment needs of the

---

[169] See the immunization section of this report for an example of how the lack of an implementation plan has affected immunizations in the intake setting.
[170] Medical reception patient #s 15 and 16

patient. Dental intake evaluations are documented with a stamp that states, "R & C Exam, Panx, oral hygiene instructions given" and a dental graphic sheet. The graphic sheet has a box to document the screening date and dental pathology. These are inconsistently filled out and when filled out did not clearly establish a dental plan going forward that included a scheduled appointment to address the dental pathology. No patient records reviewed had a proposed scheduled dental therapeutic plan based on intake screening documented in the record. It appeared that the only task the dentist is to perform is to identify pathology leaving follow up to someone else. There are three boxes for scheduling; schedule immediately; schedule routine at receiving facility; and schedule immediately at receiving facility. Many persons with dental pathology were listed as "schedule routinely at receiving facility" without documenting what needed to be done for the patient or when the patient should be evaluated. Because policy does not guide how dental scheduling is performed, it apparently is left up to each facility to follow up on dental issues.

**RECOMMENDATIONS:**
1. Ensure that prior records are requested as needed.
2. Providers must perform an adequate history regarding chronic problems and complications, including hospitalizations. This should include a past medical history for all conditions with chronic disease markers, documentation of the most recent civilian therapeutic plan, and medication history.
3. Providers must develop an initial problem list along with clinically appropriate assessments, and diagnostic and therapeutic plans for each listed problem.
4. As part of the Implementation Plan, re-design the medical reception process in order to develop adequate intake procedures that ensure:
   a. All nurse identified positives are evaluated by providers,
   b. All medical problems are identified and entered onto a problems list by providers,
   c. For every medical problem ensure that providers document an adequate history, focused physical examination, assessment and therapeutic plan,
   d. All intake laboratory tests are evaluated by providers as part of the intake process, and
   e. Patients are enrolled in chronic clinic for all of their chronic medical conditions.
5. Immunization history should be designed into the reception screening process and by protocol or physician review, immunizations should be updated and vaccines provided based on the Advisory Committee on Immunization Practice (ACIP) guidelines.
6. The dental intake screening process should be clarified in policy to include establishment of a dental therapeutic plan and how it is to be scheduled. The follow up dental appointment should be scheduled.

# Nursing Sick Call
*Addresses Items II.A; II.B.1; III.A.10; III.E.2; III.F.1; III.F.2;*
**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**III.A.10.** *Each IDOC facility shall have registered nurses conducting all sick calls. Until IDOC has achieved substantial compliance with nursing provision of the staffing plan, facilities may use licensed practical nurses in sick call, but only with appropriate supervision.*

**III.E.2.** *Lists and treatment plans will be amended pursuant to the order of a clinician only.*

**III.F.1.** *Sick call shall be conducted in only those designated clinical areas that provide for privacy and confidentiality, consistent with the extraordinary operational concerns and security needs of IDOC including, but not limited to a lockdown.*

**III.F.2.** *There shall be no set restrictions on the number of complaints addressed during a specific sick call appointment. Medical providers must use their medical judgment to triage and determine which issues should be evaluated and treated first to maximize effective treatment and relieve pain and suffering.*

**OVERALL COMPLIANCE RATING:** Partial compliance

**FINDINGS:**

IDOC asserts compliance with item III.F.2 that there be no restrictions on the number of complaints addressed during a specific sick call appointment but provided no evidence to support this conclusion.[171] The Monitor made nine recommendations in the 3rd report.[172] In May 2021 the Monitor's nurse consultant requested a meeting with the IDOC Director of Nursing to discuss any steps taken to address these recommendations, but this meeting never took place.[173]

Information that was used to evaluate Nursing Sick Call for this report included the CQI documents and the Primary Medical Services Report that is provided on a quarterly basis and the staffing analysis dated 8/17/21. We also reviewed documentation of nurse sick call in the health records the Monitor has been provided in response to requests and during the site visit to Shawnee Correctional Center in June 2021.

**Policy and Procedure; Performance Monitoring**

The Monitor returned comments and suggested revisions to OHS on the first draft of a policy and procedure for nursing sick call in August 2020. No further drafts of this policy and procedure have been made available for review.[174] Until then, written guidance for sick call is found in Administrative Directive 04.03.103. It has previously been described as lacking sufficient direction on "how to implement the sick call program." [175]

IDOC monitors the performance of nursing sick call in three ways:
  1. The Primary Medical Services Report,

---

[171] Illinois Department of Corrections, Defendants' Reporting Requirement Pursuant to V.G. of the Lippert Consent Decree (May 2021), page 2.
[172] Health Care Monitor 3rd Report Lippert v. Jeffreys, 8/6/20 pages 76-77.
[173] Email to Susan Griffin dated May 26, 2021 and a follow up request on June 10, 2021.
[174] On 8/11/21 IDOC sent a revision to the Non-Urgent Health Requests and Services administrative directive but this section had already been written. This revision will be addressed in the next Monitor Report.
[175] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020 page 84.

2. The facility Medical Director chart review of nursing sick call documentation, and
3. CQI studies of various aspects of sick call.

Each of these is discussed and suggestions for improvement made in the following paragraphs.

*Primary Medical Services Report*: The Primary Medical Services Report concerning Sick Call list the following information to be provided by each facility monthly:

- Average daily inmate census,
- Total number of sick call requests received,
- Total number of sick call requests seen by a nurse within 72 hours of receipt of request,
- "MD" referral backlog (more than 3 days wait), and Number of days to reduce "MD" backlog.

For the 4th quarter of 2020 and 1st quarter of 2021 all facilities reported the average daily inmate population and the number of sick call requests received. With this information it is possible to compare the number of inmates requesting health care attention to a norm that is consistent with the Monitor's experience with access in functional correctional health care systems. The table below compares the percent of population requesting sick call daily at each of the sites in October 2019 before the elimination of co-pay and the most recent reporting month March 2021. [176] The percentage of population making requests for health care attention has increased since 2019 at half of the facilities (those shaded in grey on the table). However only Vienna CC reports numbers that are within the expected rate of 5-7% of population.[177]

Even though elimination of copay appears to have resulted in a small increase in requests for health care, the rates remain very low at the majority of IDOC facilities indicating that there are additional barriers to health care. The Monitor has recommended since the 2nd report that an examination of potential barriers to access be conducted given the low rate of requests for sick call. This examination would also identify and resolve factors that cause delays in care as well as resources that are underutilized and could be repurposed to increase access.[178] The Monitor continues to recommend that this area be reviewed as recommended previously.

---

[176] Primary Medical Services Reports for October 2019 and March 2021.
[177] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020 page 26.
[178] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020 page 89, Health Care Monitor 3rd Report Lippert v. Jeffreys, February 15, 2021 page 76.

| Percent of Population Requesting Sick Call Daily | | |
|---|---|---|
| **Facility** | **Oct-19** | **Mar-21** |
| BIG MUDDY | 0.5% | 1.4% |
| CENTRALIA | 0.7% | 1.6% |
| DANVILLE | 0.4% | 1.3% |
| DECATUR | 1.3% | 3.3% |
| DIXON | 2.1% | 2.0% |
| EAST MOLINE | - | 1.5% |
| ELGIN | 9.1% | 4.5% |
| GRAHAM | 2.1% | 3.4% |
| HILL | 0.7% | 1.9% |
| ILLINOIS RIVER | 1.4% | 3.3% |
| JACKSONVILLE | 1.1% | 2.3% |
| JTC | 1.0% | 1.3% |
| KEWANEE | 1.5% | 1.4% |
| LAWRENCE | 0.6% | 1.1% |
| LINCOLN | 0.4% | 1.2% |
| LOGAN | 2.1% | 2.6% |
| MENARD | 0.4% | 0.6% |
| MURPHYSBORO | 0.5% | 1.0% |
| NRC | 1.5% | 1.4% |
| PINCKNEYVILLE | 0.9% | 1.7% |
| PONTIAC | 1.4% | 1.9% |
| ROBINSON | 1.0% | 1.6% |
| SHAWNEE | 1.8% | 2.0% |
| SHERIDAN | 0.7% | 1.8% |
| SOUTHWESTERN | 1.7% | 3.8% |
| STATEVILLE | 4.1% | 3.1% |
| TAYLORVILLE | 0.3% | 0.4% |
| VANDALIA | 0.7% | 1.4% |
| VIENNA | 5.9% | 7.2% |
| WESTERN | 0.6% | 0.6% |

All but two sites report the number of sick call requests seen by a nurse within 72 hours of receipt of the request. Eight of the 28 reporting sites show delays longer than three days to be seen by a nurse for a sick call issue.[179] The metric currently used by OHS is no longer the current standard of timeliness for response to requests for health care attention. The current NCCHC standard for timeliness in responding to health care requests is within 24 hours of receipt of the request.[180] Nine sites reported an "MD" referral backlog of more than 3 days wait. It appears that this column and

---

[179] These are Elgin, Hill, Illinois River, Kewanee, Shawnee, Sheridan, Vienna, and Western.
[180] National Commission on Correctional Health Care, Standards for Health Services in Prisons 2018, E-07 Nonemergency Health Care Requests and Services.

the next indicating the number of days to reduce "MD" backlog are optional reporting categories in that many sites simply left these fields blank.

The accuracy of the numbers reported on the Primary Medical Services Report have not been verified to our knowledge. Furthermore, during the site visit to Shawnee the Primary Services Report was discussed in more detail with representatives of the health care vendor. The Monitor came to understand from this discussion that little to no direction has been provided to the sites about how the report is to be completed and what each of the data fields mean. It is unclear what OHS does with the information provided in the report.[181] We have suggested since the 2nd report each of the data fields in the Primary Medical Services Report be clearly defined. We have also recommended several revisions and additions to this report to provide data to confirm performance consistent with the Consent Decree. These recommendations are to report the number of times a LPN was assigned to conduct sick call each month and modifying the criteria for timeliness of the nurse seeing the patient from 72 hours to 24 hours to be consistent with the NCCHC standard. Finally, the accuracy and completeness of information contained in the Primary Medical Services Report needs to be verified by periodic monitoring and audit.[182]

_Medical Director audit of nurses' use of treatment protocol:_ Administrative Directive 04.03.125 Quality Improvement requires the facility Medical Director to audit the documentation of two sick call encounters completed by each person assigned this task each month. The majority of facilities reported at the CQI meeting that this was completed, and some summarize the results. Corrective action is seldom reported and appears to rely on feedback to the nurses. The Monitor has recommended the statewide auditing team assess the validity and reliability of this audit data. The strength of this tool in monitoring the clinical appropriateness of nursing sick call could be improved by defining sample selection to focus on "at risk" patients and adding questions related to the quality of assessment and clinical decision making.[183]

_Focused CQI studies of the sick call process:_ Nine institutions[184] reported studying some aspect of the sick call process during the first quarter of 2021. These studies included timeliness in responding to requests and seeing patients referred to the MD or dentist, whether patients were seen or referred correctly, if documentation was done correctly and whether any patients experienced negative outcomes from delays in care. One study reported no findings. Four studies had performance results less than 90%[185] but only two reported corrective actions.[186] Sample size was adequate in all but two studies.[187] No studies have been done to evaluate whether inmates can be seen and treated for more than one complaint to evaluate compliance with III.F.2.

Nursing Sick Call
We were not provided with the requested assignment sheets or other documentation to quantify how often LPNs are given this assignment. The Monitor reviewed documentation of sick call in

---

[181] Meeting with Yolande Johnson Regional Manager and Cheri Laurent Interim Vice President Operations, Monday June 21, 2021 at Shawnee CC.
[182] Health Care Monitor 3rd Report Lippert v. Jeffreys, February 15, 2021 page 76.
[183] Ibid
[184] Big Muddy, Danville, Jacksonville, Lincoln, Logan, Pinkneyville, Southwestern, Taylorville, and Vandalia.
[185] Taylorville, Logan, Jacksonville and Danville.
[186] Logan and Jacksonville.
[187] Jacksonville and Southwestern

the death charts provided during this report period, records included with the CQI minutes and records reviewed while visiting Shawnee Correctional Center in June 2021.

At Shawnee CC four of eight registered nurse positions were vacant at the time of the site visit. Sick call was being performed by an agency nurse on a long-term contract. She had been trained in the performance of sick call and use of the treatment protocols by observing another nurse. Of six nursing sick call encounters documented in charts reviewed while on site at Shawnee, three were completed by an LPN. Only one encounter was documented by an RN and in the remaining two the credential of the individual was not indicated. One inmate[188] whose chart was provided this report period was seen at sick call 37 times the last two years of his life. LPNs documented 12 of these 37 encounters. Another patient[189] was seen in sick call 19 times in the last two years of his life and 11 of these encounters were documented by LPNs. By observation and chart review it is clear that LPNs continue to provide sick call. Registered nurse vacancy rates undoubtedly contribute to the continued use of LPNs to perform sick call.

The Monitor has recommended that IDOC identify the duties which interrupt or compete with the time a registered nurse needs to complete sick call. These duties should be reassigned if they do not require a RN to do them. We were provided with no information to indicate that this recommendation was acted upon. The Monitor has also recommended that a workload driven staffing measure be calculated and used to determine the number of registered nurses needed to triage and respond to non-emergent health care requests consistent with the Consent Decree. [190] This calculation has not been included in any of the staffing analyses completed by OHS.[191] The implementation plan does not establish any goal for how or when compliance with III.A.10 will be achieved.[192]

The Monitor has recommended evaluation of the privacy and confidentiality of rooms where clinical encounters take place during safety and sanitation rounds of the health care areas.[193] There is no evidence the IDOC has incorporated this review into safety and sanitation rounds. The Monitor drafted a safety and sanitation survey tool that includes these items and piloted it at the site visit to Shawnee. See discussion of clinical space, equipment and supplies and sanitation earlier in this report. The IDOC Implementation Plan called for an annual survey of all facilities to ensure there is adequate physical space and equipment for clinical care.[194] Demonstrating via the annual audit and monthly safety and sanitation rounds that sick call encounters are private and confidential and that the space, equipment, and supplies are sufficient is essential to achieving compliance with III.F.1.

The examination rooms used for nurse sick call at Shawnee CC were of adequate size and furnished appropriately. Patient encounters were auditorily private. Equipment used for an examination is

---

[188] Mortality review patient #2
[189] Mortality review patient #5
[190] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020 pages 27, 87-89.
[191] Staffing Analysis Illinois Department of Corrections Office of Health Services, Lippert Consent Decree, 11/13/2019, Revised 6/18/2020, Revised 5/3/2020, Revised 7/7/ 2021, Revised 8/17/2021.
[192] Final Revised Lippert Implementation Plan 6/12/20
[193] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020 page 87-89, Health Care Monitor 3rd Report Lippert v. Jeffreys, February 15, 2021 page 77.
[194] Final Revised Lippert Implementation Plan 6/12/20

shared among all providers and is checked out from the nursing station. Nurses do not have access to on-line resources for reference or patient education available in the area used for sick call. Paper handouts with information for patients are available as needed.

The last Monitor's report discussed the use of nursing treatment protocols at length[195]. Recommendations were to reduce the number of protocols, eliminate the nursing treatment protocol for non-specific discomfort and eliminate the use of protocols when patients are in the infirmary and supposedly under closer physician supervision. The Monitor's nurse consultant discussed the use of nursing protocols with the IDOC Director of Nursing on 1/22/21. She indicated that OHS was in the process of reviewing the protocols and was open to additional input from the Monitoring team. The Monitor's nurse consultant provided more detailed information and advice in an email sent February 17, 2021. The revised nursing treatment protocols have not been provided to the Monitor at the time this report was written. We are unaware of any steps taken to address the Monitor's concerns.

The Monitor still finds the use of the protocol for nonspecific discomfort very problematic. It appears to be a mechanism to treat patients who have pain but does not assist in the identification of the underlying condition. One patient[196] was seen 13 times for pain on the right side of his torso involving the chest, armpit, lower back, and flank over a period of 14 months. The nurses used the nonspecific discomfort protocol each time to provide analgesic medication. The protocol provides no direction in what parameters to assess except vital signs and pain scale. This patient eventually was hospitalized and diagnosed with metastatic cancer. This is an example of how the protocol can be a disservice to initiating definitive care.[197] The protocol for non-specific discomfort is frequently used when another protocol providing more guidance would have been clinically more appropriate. Examples include one patient who was seen at Shawnee for pain in the right quadrant of the lower back using the protocol for non-specific pain when it would have been more appropriate to use the protocol for urinary tract infection. Another patient was seen for diarrhea and the protocol for non-specific discomfort was used rather than the protocol for diarrhea.[198] The same patient complained of chest pain two months later and the protocol for non-specific discomfort was used rather than the chest pain protocol. The 62 protocols included with the CQI minutes from NRC for the first quarter of 2021 were reviewed. The protocol for non-specific discomfort was used 15 times (24%). The majority of these were for musculoskeletal issues for which there is no protocol. [199] The protocol for nonspecific discomfort should be discarded.

Other practices in the use of nursing protocols that were described as problematic in the Monitor's 3rd report were still prevalent among records reviewed for this report. The first of these is not following the protocol. The most frequent failure is not taking or acting upon abnormal vital signs.[200] Other failures to not follow the protocol include not getting a thorough history, symptom

---

[195] Health Care Monitor 3rd Report Lippert v. Jeffreys, February 15, 2021 pages 72-75.

[196] Mortality review patient # 5

[197] This patient was not referred to a physician for 13 months even though he had abnormal vital signs on repeated sick call encounters. The patient was not seen by a physician for more than a month after this referral. He was hospitalized eight days after this physician visit and died six days later.

[198] Mortality review patient #1.

[199] The Monitor's nurse consultant has recommended that a protocol to evaluate musculoskeletal complaints be developed. Email to Susan Griffin dated February 17, 2021.

[200] Mortality review patient #s 1, 3, 5, 6, 7, 8,

description or examination,[201] not getting diagnostics on patients [202], and not referring in the presence of a symptom the protocol states should be referred. [203]

Another problematic area was that nurses sometimes use a progress note or an injury report rather than document an assessment using an appropriate protocol. One patient was seen and treated repeatedly for shortness of breath.[204] Many of these encounters were documented on a progress note rather than the treatment protocol for shortness of breath. These encounters do not document a history or examination consistent with the protocol for shortness of breath and the patient was not referred to a provider when he should have been. Another patient[205] was seen because he was requesting slow walk and lay in permits because of shortness of breath. The nurse did not examine the patient and did not refer the patient to be seen for this problem. A progress note was written instead. The purpose of the nursing treatment protocols is to guide nurses in the assessment of a patient's condition. When nurses assess patients without using a treatment protocol the assessment is less specific and can omit important parameters that need to be considered in the patient's care particularly directions for referral to a higher-level provider.

There were several charts where the Monitor noted that the nursing assessment of the patient's condition failed to identify pertinent factors such as seeing a patient for shortness of breath[206] but not noting that medications for his respiratory condition had not been renewed or another patient who had shortness of breath with an abnormal chest x-ray two months earlier[207] or a patient with a six week history of non-productive cough and an unexplained 20 pound weight loss.[208] Another patient[209] had been hospitalized and treated for COVID in December 2020. The patient had been started on prophylactic anticoagulation at the hospital which had been held because of side effects. Six weeks later then fell and twisted his knee, and his leg was immobilized. Two weeks later he was seen by a nurse for significant swelling and loss of feeling in the lower extremities, pulse and blood pressure were elevated. The nurse failed to appreciate that the patient was at risk of deep vein thrombosis and pulmonary embolus and did not refer the patient to be evaluated by a physician urgently.  Another patient was seen for an upper respiratory infection and the nurse failed to appreciate his allergy to Motrin and provided this medication to him which made his underlying condition of nasal polyps worse. [210] The failure to identify factors in the overall patient's care that contribute to the current reason for seeking sick call was discussed in previous reports by the Monitor.

It is still the practice for patients in the infirmary to be treated by nurses using protocols rather than having their care managed by a physician.[211] One example was a patient who had COPD

---

[201] Mortality review patient #s 1, 5, 10, and 11
[202] Mortality review patient #s 2 and 12
[203] Mortality review patient #s 2, 3, 5, 11, 13, and 14
[204] Mortality review patient # 2
[205] Mortality review patient #5
[206] Mortality review patient #2
[207] Mortality review patient #6
[208] Mortality review patient #10
[209] Mortality review patient #8
[210] Mortality review patient #2
[211] See page 75 of the Monitor's 3rd report where this problem is described with the recommendation that the practice of treating patients in the infirmary with nursing protocols cease.

and was treated for a chronic sore throat, hemoptysis and low oxygenation (92%) using the treatment protocol for an upper respiratory infection instead of contacting the provider. [212] Another patient was in the infirmary following hospitalization for treatment of heart failure. At this hospitalization it was also noted that he had sarcoidosis which was untreated and likely contributing to his shortness of breath. He had recommendations for pulmonary and cardiology follow up. A nurse treated the patient in the infirmary ten days after hospital discharge using the protocol for shortness of breath. This patient was tachycardic and had rapid respirations, he also had an oxygenation level of 92% when talking and could not complete a sentence. This was a life-threatening presentation, and a provider should have been contacted. [213] Nursing treatment protocols should not be used when patients are in the infirmary. All care needs to be directed by the treating physician. Nursing protocols are appropriate for use in the outpatient setting because they are intended to treat conditions the patient would otherwise take care of themselves or seek a physician's care for. In an inpatient setting any new symptom or change in condition must be evaluated in the context of the patient's entire condition. This consideration exceeds the training and scope of practice of registered nurses and should be made by a physician.

IDOC self-assessed substantial compliance with III.F.2 that there be no restrictions on the number of complaints addressed during a specific sick call appointment. [214] The IDOC has explained that the "Agency Medical Director ... has participated in multiple meetings with healthcare staff informing them that they may not restrict the number of complaints addressed during sick call. That direction has been provided telephonically, during OHS Quarterly meetings, as well as being reiterated during site visits." [215] However this verbal instruction has not been finalized into any form of permanent written expectation. The Monitor has indicated that this requirement should be explicitly stated in IDOC policy and procedure on non-emergent health care requests and services which has not been completed. Because the Agency Medical Director states that something is to be done, does not ensure that it is indeed done. IDOC should audit and obtain data to verify that the Agency Medical Director's instructions have been followed. Sick call monitoring tools should include this as one of the criteria measured so that compliance with the expectation is sustained. [216]

In the Monitor's review of records for this report we do see evidence of patients being treated with two nursing protocols, but it is not clear if this is because the problem required evaluation with two protocols (for example one for cough and another for headache) or that the patient has made more than one complaint. Nurses do not document in the patients' own words why the patient has requested to be seen at sick call, the request slips are not retained in the chart and if a sign-up sheet is used, the complaint is not written down for reasons of confidentiality. There is simply no way of knowing what complaints the patient had to cause them to request sick call attention. The Monitor has recommended that the patient statement of why they want to be seen is documented as the first entry on the treatment protocol. The Monitor also recommends that the Medical Director not audit sick call. Instead, an audit by nursing supervisory personnel should be expanded to include a measure of whether more than one complaint was addressed at the encounter. [217] These

[212] Nursing Sick Call patient #1

[213] Mortality review patient # 6

[214] Illinois Department of Corrections, Defendants' Reporting Requirement Pursuant to V.G. of the Lippert Consent Decree (May 2021), page 2.

[215] Lippert v Jeffreys, 10-cv-4603: IDOC's Response to the Monitor's Initial Report, December 24, 2019, page 3

[216] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020 page 88, Health Care Monitor 3rd Report Lippert v. Jeffreys, February 15, 2021 page 75.

[217] Health Care Monitor 3rd Report Lippert v. Jeffreys, February 15, 2021 page 76.

would be methods to provide evidence of compliance with III.F.2.

The Monitor restates the recommendations made in earlier reports.

**RECOMMENDATIONS:**
1. Include all aspects related to sick call in the Consent Decree in the policy and procedure for non-emergent health care requests; finalize and implement it. The policy and procedure should establish the expectation that patients are seen for sick call within 24 hours of receiving the request.
2. Revise the Primary Medical Services Report to include the number of times an LPN was assigned to conduct sick call each month, the number of requests and the number of complaints made. Revise the column that reports the number of requests seen by a nurse from 72 hours to 24 hours of receipt of the request. Other revision may be necessary once the policy and procedure are finalized. Clarify the expectation that the report is to be completely filled out and provide written definitions or instructions, as necessary. Ultimately this report should be automated and come from the EMR.
3. Assess the validity and reliability of the audit of the documentation of nursing treatment protocols. This audit only needs to be done quarterly if performance on all criteria exceeds 90%. Revise the tool to include a measure of whether more than one complaint was addressed.
4. Sick call access should be monitored at each IDOC facility. If requests received daily are less than 5% of the population or patients are not seen within 24 hours of receipt of the request, an examination of potential barriers (failure to move individuals to nurse sick call, failure to document refusals in person at the HCU, insufficient nurse staff, etc.) to access should be conducted. The examination should include identification and resolution of workload factors that cause delays in care as well as resources that are underutilized and could be repurposed to increase access.
5. OHS should establish a workload driven staffing standard for sick call and identify the number of registered nurse positions needed to comply with this aspect of the Consent Decree. This would also aid in the calculation of space and equipment that is needed for nurse sick call.
6. The privacy and confidentiality of rooms where clinical encounters take place should be evaluated during safety and sanitation rounds of the health care areas and annually as cited in the IDOC's Implementation Plan.
7. Reassign other duties that interrupt nurse sick call.
8. Reduce the number of nursing treatment protocols as per previous advice. Eliminate the use of nursing treatment protocols in the infirmary as soon as possible as well as the protocol for non-specific discomfort.
9. Document the patient's presenting complaint(s) in their own words as the initial entry on the nursing treatment protocol.

# Chronic Care
***Addresses Items II.A; II.B.1; II.B.6.f; III.E.1***
**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class*

*Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*
**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*
**II.B.6.f.** *IDOC agrees to implement changes in the following areas: Chronic disease care: diabetes, Chronic Obstructive Pulmonary Disease (COPD), asthma, HCV, HIV/AIDs, hypertension, hyperlipidemia*
**III.E.1.** *IDOC shall maintain a list of prisoners' current medical issues in their medical charts.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

IDOC asserts compliance with provision III.E.1. since their first report in November of 2019 never having provided any evidence to verify their compliance. The Monitor has consistently stated in mortality reviews and continues to find in record reviews that the problem lists that are present are inaccurate and filled with irrelevant material. Many medical conditions are not tracked at all and patients are often not followed for their chronic illnesses. During a recent visit to an IDOC facility, seven of eleven medical records reviewed by one member of the Monitor team had incomplete problem lists.[218] Serious diagnoses missing on the problem lists included penile cancer, diabetes, CPAP machine, hypothyroidism (2 charts), iliac vein stent, and new onset seizure disorder. One medical record entirely lacked a problem list; the patient's diagnoses were hypertension, new onset diabetes, and a history of blood in stool. Since the 2nd Report, the Monitor has recommended that only medical providers be allowed to enter problems on the problem list. IDOC has not responded to those recommendations and has drafted a policy contrary to that recommendation. A draft Immunization and Cancer/Preventive Screening administrative directive directs nurses "initiate the Offender Problem List, DOC 0088 with Allergies, Acute and Chronic Illnesses and significant medical history". The medical provider is to review, amend and finalize the problem list. This is existing practice and does not result in a reliable problem list. The Monitor continues to recommend that only physicians, physician assistants, nurse practitioners be permitted to enter a problem onto a problem list.

IDOC has provided no evidence that they have enacted any of the recommendations in the Monitor's 3rd report. The Implementation Plan does not address chronic care.

In the 3rd Report, the Monitor gave IDOC 12 principles that should guide a new policy. IDOC has provided no evidence that there has been progress on acting on any of these principles. The Monitor reviewed and returned a chronic disease administrative directive back to IDOC on 4/15/21with multiple comments. IDOC has not yet completed its chronic care policy.[219]

The Monitor reiterates the 12 principles upon which to construct the chronic care program:
    1. Identification and evaluation of all illness must occur at intake and ensure timely

---

[218] Shawnee CC site visit June 21-23, 2021 1
[219] The IDOC returned the chronic care policy to the Monitor on 8/11/21 after this section of the report had been completed. The returned policy will be addressed in the next report.

continuity of treatment of an individual's chronic illness. This will include enrollment into the chronic care program.

2. Maintain a roster of persons with chronic illness and list of all of diagnoses on the roster. This can be used for risk assessment, for statistical purposes in order to understand prevalence of disease in the population and administrative aspects of disease management. An accurate listing of all chronic diseases needs to be present in the problem list which must be maintained by providers.

3. The concept of separate clinics for separate diseases must be discontinued.

4. *Each* chronic clinic visit needs to address *every* medical condition of the patient with the exception of specialty clinics such as UIC Telehealth HIV visits, hepatitis C, and TB prophylaxis visits. Clinic evaluations need to include an appropriate history, examination, assessment and updated plan for every disease of the patient.

5. National standards should be used as chronic care clinical guidelines.

6. Patient scheduling intervals must not be fixed or based on specific diseases. Scheduling should be based on the most poorly controlled chronic condition and based on the urgency of the degree of control with patients seen as early as is needed but no later than three months out.

7. Credentialing of physicians needs to accelerate so that all physicians are knowledgeable in primary care.

8. Management needs to support chronic clinic activity to a greater extent than is now done to include.
   o Improved clinic space so that every clinic is adequately sized and equipped.
   o There must be widespread availability of Up-To-Date® at workstations in every clinical examination room and nursing station.
   o Because of the remoteness of facilities, providers need access to quick curbside electronic consults with a wide variety of specialty consultants to solve clinical problems.
   o Due to the number of medication issues identified in record reviews, addition of several pharmacists to assist in medication management is needed.[220] This can be performed via telemedicine.

9. When a provider does not understand how to care for a patient's condition the provider must refer the patient to a specialist who knows how to care for the patient's condition.

10. Chronic care management should move to a team approach. A dedicated chronic care team should include providers, a dedicated chronic care nurse, and the on-site and off-site schedulers.,

11. The team needs to meet in daily huddles to discuss hospitalizations or emergency room visits, urgent nursing evaluations or treatments (e.g., nebulization), problem patients that have arisen over the prior 24 hours as well as any scheduling changes to be aware about for the upcoming day. Daily huddles should be brief (e.g., 15-30 minutes).

12. A weekly huddle should be conducted with the same team to discuss chronic care patients

---

[220] This is similar to what UIC does for HIV care for telemedicine. Before the HIV patient is evaluated by a physician, a pharmacist evaluates the patient's medication profile and discusses the findings with the physician. This is useful to avoid drug-drug interactions, ensures that the patient medication profile is appropriate and safe, and assists in special situations such as managing medications for geriatric populations. This type of service would be extremely beneficial for several categories of patients including: 1) diabetes, 2) asthma, 3) COPD, 4) narcotic use, 5) warfarin, 6) patients on more than 8 medications, and 7) any patient with memory deficits or any stage of dementia.

in poor control and strategies to address their problems, recent hospitalizations, all specialty consultations over the past week to discuss therapeutic plans, specialty consultation that are upcoming, medication issues, and any other chronic care problems. Weekly huddles should be somewhat longer (1 hour). Huddles should be considered an integral part of chronic care and should be staffed as such. Weekly huddles should include pharmacists who can participate via telemedicine.

One of the Monitor's principles is a recommendation to use existing national guidelines instead of writing their own clinical guidelines. Instead of acting on this recommendation IDOC asked SIU to review and revise eight chronic care clinical guidelines. On 2/25/21, IDOC sent the Monitor chronic clinic draft guidelines for three diseases: multiple sclerosis, seizures, and tuberculosis. In that document, SIU stated that they used a standardized format based on using best practices from multiple state's department of corrections policies and protocols yet they did not solicit the opinion of the Monitor.

National guidelines for common chronic illnesses are freely available and of excellent quality. Clinical practice nationwide is typically based on national guidelines. National guidelines are periodically updated. It is challenging to update self-developed chronic clinic guidelines and they tend to mirror national guidelines anyway. When national guidelines are not available, Up-To-Date® should be available to provide clinical guidance.

The SIU multiple sclerosis guideline is detailed and clinically appropriate. However, based on record reviews, IDOC physicians have not demonstrated ability to manage this disease appropriately. Typically, neurologists manage this disease. To expect IDOC physicians to manage this disease is unlikely to result in appropriate care. Any guideline on multiple sclerosis should include referral to and management by a neurologist which this guideline does not include. The same principle applies to any uncommon disease. Those diseases for which the IDOC physician lacks training and experience should be referred to a consultant for management with the IDOC physician using recommendations of the consultant except when contraindicated for a bone fide clinical reason. The model for this is the UIC hepatitis C/HIV telemedicine program. Multiple other complex diseases should be managed in this manner. IDOC chronic care guidelines should focus on the process of how IDOC standardizes, supports and manages patients with chronic illness.

IDOC submitted a revised UIC hepatitis C protocol. These guidelines were reported to have been disseminated to all IDOC health care facilities and there was subsequently an increased number of HCV patients treated in the second quarter of 2021. Many facilities, however, still treated virtually no cases. This will be discussed in the infection control section of this report.

The Monitor has recommended in all three previous Court Reports that IDOC should discontinue the use of sliding scale short and rapid acting Regular insulin in insulin-requiring diabetics who have been prescribed 70/30 insulin[221]. This practice puts individuals on 70/30 insulin at risk for medication-provoked hypoglycemic episodes and is not recommended by diabetologists. IDOC

---

[221] 70/30 insulin include 2 types of insulin; 70% long acting and 30% fast acting insulins. Adding sliding scale fast acting regular insulin to the dosage of fast acting insulin already in 70/30 insulin puts diabetics at risk for severe hypoglycemia.

should immediately discontinue the unjustifiable combination of the sliding scale regular insulin with 70/30 insulin. During the recent site visit,[222] 4 of the 5 diabetics on 70/30 insulin were also prescribed sliding scale supplemental regular insulin. These four diabetics had been frequently administered an additional 2-12 units of rapid-acting insulin at the same time they were about to receive 8-18 units of rapid-acting insulin in their 70/30 combination insulin. Properly managed diabetics would have had their morning or evening dosage of 70/30 insulin adjusted to treat frequent elevations of capillary blood glucose noted before breakfast and/or dinner; none of the four diabetics had their 70/30 dose increased in the previous 2-3 months. These patients are not being properly managed.

In summary, there has been no change with respect to chronic disease management in IDOC facilities. A policy is not yet complete. IDOC has solicited assistance from SIU but should promote discussion between SIU and the Monitor for assistance to develop a more effective approach to improvement of the chronic illness program. Record reviews show no improvement in the clinical care of patients with chronic disease. Though care of patients with HIV and hepatitis C is of excellent quality once referred, care of patients with chronic disease through the IDOC chronic care clinic program is extremely poor. Recommendations and examples from prior reports should be reviewed. This item remains noncompliant.

**RECOMMENDATIONS:**
1. Finish the chronic illness policy. Ensure that it addresses the essential principles of a chronic disease program as listed above.
2. Use national standards as guidelines for care instead of writing guidelines for all common health conditions.
3. Make UpToDate® available on all electronic medical record devices in IDOC.
4. Support for chronic disease management needs to improve as soon as possible.
5. Change chronic illness clinic scheduling so that a person is evaluated for all of their chronic illnesses at each chronic illness scheduled visit. The interval of visits should be based on the least controlled disease and as early as clinically necessary.
6. The chronic clinic roster needs to list all diseases of each patient.
7. Standardize procedures for entries onto the problem list. Permission to enter problems on a medical problem list should be restricted to physicians, physician assistants, and nurse practitioners. Psychiatrists and licensed mental health professionals should have permission to enter mental health diagnoses. The problem list should include medical and mental health diagnoses.
8. For physicians without appropriate credentials based on Consent Decree requirements, monitoring should be done to ensure that they are capable of managing patients according to contemporary standards.
9. When any provider does not know specifically how to manage a patient's condition, the provider should refer the patient to an appropriate specialist for management consultation, including for gerontology.
10. Discontinue prescribing sliding scale Regular Insulin with 70/30 insulin for insulin requiring diabetics.

---

[222] Shawnee CC 6/21-23/21

11. A team approach to chronic care needs to be instituted. Daily and weekly huddles need to be instituted to improve communication amongst staff. Huddles should include nursing, schedulers, and a pharmacist.
12. The lack of physicians with appropriate credentials is resulting in significant harm to patients. The Monitor recommends an arrangement with a university-based program to include onsite and telemedicine physician support.

# Urgent and Emergent Care

*Addresses Items II.A; II.B.1; II.B.6.b; III.E.4; III.G.1; III.G.2; III.G.3; III.G.4*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**II.B.6.b.** *IDOC agrees to implement changes in the following areas: Urgent care;*

**III.E.4.** *The medical records staff shall track receipt of offsite medical providers' reports and ensure they are filed in the correct prisoner's medical records.*

**III.G.1.** *Each facility HCUA shall track all emergent/urgent services in a logbook, preferably electronic.*

**III.G.2.** *Appropriate medical staff shall have the obligation to determine whether a situation is urgent or emergent.*

**III.G.3.** *IDOC shall use best efforts to obtain emergency reports from offsite services when a prisoner returns to the parent facility or create a record as to why these reports were not obtained.*

**III.G.4.** *Facility medical staff shall ensure that a prisoner is seen by a medical provider or clinician within 48 hours after returning from an offsite emergency service. If the medical provider is not a clinician, the medical provider shall promptly review the offsite documentation, if obtained, with a clinician and the clinician shall implement necessary treatment.*

**OVERALL COMPLIANCE RATING:** Partial compliance

**FINDINGS:**

The IDOC reports compliance with items III. E.4, III.G.1 and III.G.3.[223] The Monitor does not agree with IDOC's assertions of compliance with these three items.

**III.G.1 Emergent/urgent services logbook.**

The Monitor agrees IDOC facilities maintain an electronic log however it provides incomplete and unreliable information about emergent/urgent services. The log does not include all urgent/emergent services provided. Specifically, emergencies or urgent care requests that are

---

[223] Illinois Department of Corrections, Defendants' Reporting Requirements Pursuant to V.G. of the Lippert Consent Decree, May 2021, page 2

treated on site are not tracked on a log. The Monitor's review of records indicates that onsite emergency care is deficient, that assessment and care is inappropriate, serious conditions are not recognized as such and definitive care is delayed when medically necessary. We recommended in both the 2nd and 3rd report that a log be established of these encounters and suggested the specific items to be included on the log.[224] To date IDOC has not responded to or implemented this recommendation.

It appears that recording of urgent emergent services on the log is optional. In the first quarter of 2021 one site provided no log at all [225] and two sites have not updated the log to list any urgent ED referrals during the first quarter even though the CQI minutes report emergencies sent to the ED during the same period. [226] Only 15 of 30 facilities fill the log out completely.

Information recorded on the log is also inaccurate and incomplete. For example, we noted in the last report that at some facilities the reason for referral and the discharge diagnosis are identical. The discharge diagnosis should be taken off of the discharge summary and is more specific than the reason for referral. These practices continue based upon review of the reports.[227] Finally we recommend a column after discharge diagnosis be added to the log to record the disposition. Documentation choices should include deceased, admitted to (name of hospital), transferred to (name of institution), released (date of release) etc. [228]

IDOC needs to establish the requirement that emergency response and referral to the emergency room are logged. IDOC also needs to audit the information on the log to verify that it is complete and reliable. [229]

We have recommended using the log to monitor emergency care more proactively.[230] The information from the emergent/urgent services log can be used in a daily huddle to make decisions about the priority of services, need for communication, and follow through in the care of acute or at-risk patients in the population. We recommend the Director of Nursing be responsible for monitoring the completion of the emergent urgent services log. Others who should contribute to the information that goes into the log may be delegated members of the nursing staff (i.e., shift charge nurse) and medical records (receipt of discharge report).

For compliance with III.G.1 each facility must record information on the emergent/urgent services log. In addition, information recorded on the log must be standardized for all facilities. Staff responsible for maintaining the log need to demonstrate a clear understanding of what is

---

[224] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 100, Health Care Monitor 3rd Report, Lippert v. Jeffreys, February 15, 2021, page 90
[225] Menard
[226] Dixon has not updated the log since 11/28/2020 although CQI report a total of 67 ED visits the first quarter of 2021. Jacksonville has not updated the log since 12/27/2020 although CQI minutes reflect eight emergencies taken to the ED in the first quarter of 2021. In addition Pickneyville has not updated the log since 11/20/2020 but ED visits are not documented in CQI minutes.
[227] Lippert off site services logs provided for the first quarter of 2021.
[228] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 100, Health Care Monitor 3rd Report, Lippert v. Jeffreys, February 15, 2021, page 90.
[229] Ibid
[230] Ibid

to be recorded, how and by when. The accuracy of the information documented on the log needs to be verified by an audit of patient records on a quarterly basis with corrective action as necessary until sustained performance is demonstrated. Finally additional information needs to be added to the log as described here and in the recommendations.

**III.G.3 Best effort to obtain emergency report or document reason report not obtained. III.E.4 Track receipt of offsite reports and ensure filing in the patient's medical record.**

Of 20 facilities which do record whether a discharge report was provided, none specify what type of document was received.[231] We know that staff indicate on the log that a report from the emergency visit was received when it was simply the summary given to the patient. Patient discharge summaries do not meet the requirement of III.G.3. We have recommended that IDOC define what is considered an acceptable report from the emergency room. We have also recommended that in order to meet the requirements of III. E.4 the date the report is received be entered on the log rather than simply recording "Yes" or "No".[232] Further there is no documentation on the log or otherwise provided that "*records why a report was not obtained*." Expectations for this documentation of effort have not been outlined nor has any data been provided to support the IDOC's assertion of compliance with III. E. 4. The Monitor's chart review found examples of patients whose offsite emergency room record was not obtained or documentation of efforts to obtain the record.[233] The Monitor disagrees with IDOC's conclusion that compliance with III.G.3 and III. E. 4 has been demonstrated.

**III.G.4 Physician follow up after emergent/urgent services.**

III.G.4 requires all persons returning from the emergency room be seen for follow up by a clinician within 48 hours of return to the facility. The purpose of the follow up appointment is to review the findings from the emergency encounter, ensure continuity of care, and discuss the treatment plan with the patient. A review of records without seeing the patient is not sufficient.

The date the patient was seen by a physician following emergent/urgent services has been added to the log but only 14 of 30 facilities provided this information the first quarter 2021.[234] All sites need to record the date the patient was seen by a clinician for follow up on the emergent urgent services log.

Even though reporting is very incomplete, it is evident that IDOC has not yet acted upon the requirement that patients be seen by a clinician within 48 hours of return from the emergency

---

[231] Facilities which do not log whether a report of the visit was obtained include Danville, JTC, Shawnee, Stateville and Western. The other 20 sites document a "yes" or "No" to indicate if a report was received.

[232] Lippert v Jeffreys Consent Decree, First Report of the Monitor (November 24, 2019) page 32, Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 100, Health Care Monitor 3rd Report, Lippert v. Jeffreys, February 15, 2021, page 90.

[233] Mortality review patient #s 11 and 13

[234] Elgin did not appear to have any ED visits the first quarter as verified by the CQI minutes. Murphysboro had an ED visit, but the patient was transferred to Pinkneyville which does not provide information ED visits. Menard, Dixon, Jacksonville and Pinkneyville provided no information or appear to have stopped documenting on ED visits on the log.

room. The table following this paragraph depicts the extent and timeliness of physician follow up appointments after patients receive emergent/urgent offsite services.[235]

| III. G. 4. Clinician Followup of Patients After Receiving Offsite Emergent  Service  1st Quarter 2021 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Facility | # Seen | # Seen by MD | Percent seen for follow up by MD | # Seen within 48 hrs by MD of those returned from ED | Percent Seen within 48 Hours | Range of days | Average days till follow up |
| TAYLORVILLE | 17 | 11 | 65% | 5 | 29% | 0-11 | 3 |
| LAWRENCE | 45 | 43 | 96% | 11 | 30% | 1-22 | 5 |
| SOUTHWESTERN | 3 | 3 | 100% | 1 | 33% | 1-4 | 3 |
| EAST MOLINE | 10 | 8 | 80% | 4 | 44% | 0-3 | 2 |
| VIENNA | 11 | 11 | 100% | 5 | 45% | 0-11 | 4 |
| KEWANEE | 2 | 1 | 50% | 1 | 50% | 2 | 2 |
| ROBINSON | 6 | 5 | 83% | 3 | 60% | 0-3 | 2 |
| ILLINOIS RIVER | 8 | 7 | 88% | 5 | 63% | 1-4 | 2 |
| SHERIDAN | 23 | 22 | 96% | 15 | 65% | 0-8 | 1 |
| VANDALIA | 6 | 5 | 83% | 4 | 67% | 0-5 | 2 |
| LOGAN | 7 | 7 | 100% | 4 | 67% | 0-3 | 2 |
| BIG MUDDY | 32 | 31 | 97% | 14 | 78% | 0-30 | 3 |
| DECATUR | 5 | 5 | 100% | 4 | 80% | 0-3 | 1 |
| LINCOLN | 7 | 7 | 100% | 6 | 86% | 0-3 | 1 |

Only five reporting facilities meet an acceptable performance standard[236] for being seen by a clinician after offsite emergency service. None of the reporting facilities meet an acceptable performance standard for the 48 hour follow up visit.

**II.B.6.b. Changes to Urgent Care and III.G.2. Appropriate medical staff shall have the obligation to determine whether a situation is urgent or emergent.**

<u>Standards of Performance</u>
OHS has drafted a policy and procedure for emergency services and response as well as urgent care services. The Monitor provided comments and recommendations for further revision to OHS in August 2020. The Monitor has not received any further drafts or been provided a final version of these policies. Until then written direction regarding emergency response in Administrative Directive 04.03.108 Response to Medical Emergencies gives a great deal of discretion to individual facilities to determine the training received, the number, location and contents of emergency equipment and supplies, procedures for response etc. Based upon our site visits to facilities so far this has led to a checkered pattern of readiness and performance.[237]

Review of the minutes of CQI meetings held in the first quarter of 2021 documents this variance. While many facilities had postponed emergency response drills due to COVID precautions, Pinkneyville and Vienna continued to report that drills were taking place. The critiques of drills reported in the CQI minutes are brief and not very thorough. The only improvement noted was the need to use new forms (DOC0391 Urgent Care).

---

[235] IDOC First Quarter 2021 Emergent/Urgent Care logs
[236] An acceptable performance standard for emergency service follow up is 95% or greater.
[237]  Health Care Montor 1st Report, Lippert v. Jeffreys, November 24, 2019, page 14; Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6,2020 pages 94-95.

Emergency Equipment and Supplies

The end of July 2021 the Monitor received from IDOC various forms and checklists related to urgent emergent services from 17 of 30 facilities.[238] These provide more evidence of the variance among facilities in the equipment, supplies and monitoring of readiness to provide urgent emergent services. For example, mobile emergency equipment is checked each shift at Taylorville and Sheridan, daily at Lincoln and Illinois River and weekly at Western, Menard, Logan and Decatur. These variations exist in the frequency for checking the crash cart as well as the emergency equipment. There also is variation in how complete the equipment check is. For example, some sites simply ask that the number oxygen tanks be verified, others ask how many tanks are full and empty, still others ask for the fill and pressure as well as status of tubing with instructions about when to replace. Finally, the drugs available in the emergency bags and crash carts vary significantly. Some facilities list as few as two drugs in the emergency supply[239] while others [240] have as many as 17 drugs accounted for among the emergency supplies. Stateville, Menard and Graham list no drugs as available in the emergency equipment which must have been an oversight in the material forwarded to the Monitor. Only eight facilities listed naloxone as one of the drugs available in the emergency supplies and only one of the eight noted that it was in spray rather than injectable form.[241] The Monitor has recommended since the 1st report that naloxone be included among emergency drugs available in the response equipment and since the 2nd report that this the nasal spray rather than injectable form. [242]

Standardization of emergency equipment and supplies and procedures for verification that equipment is ready for use was recommended by the 2nd Court Expert Report in 2018 and included among the recommendations in the Monitor's 2nd and 3rd reports.[243] The IDOC has yet to have acted on these recommendations.

Performance Monitoring and Improvement

Emergency drills were postponed by all but two facilities during much of the last reporting period. Two institutions conducted an internal audit of compliance with the Administrative Directive Medical Emergencies during the first quarter of 2021. [244] The criteria for evaluation of emergency services appear limited to whether the required drills take place, timeliness of response, whether the equipment was brought to the site and the proper reports are completed. These evaluations do not consider whether the equipment was operable, clinical judgement, skill or teamwork of the actual response, or documentation. The accuracy of the information on the urgent emergent services log is not verified by periodic chart audit. There also is no retrospective review of clinical care received prior to an urgent or emergent event to determine if any of these events could have

---

[238] Danville, Decatur, East Moline, Graham, Hill, Illinois River, Jacksonville, Lincoln, Logan, Menard, Pinkneyville, Shawnee, Sheridan, Southwestern, Stateville, Taylorville, and Western.

[239] Logan, Southwestern and Taylorville.

[240] Pinkneyville, Shawnee. Western has 16 different drugs.

[241] East Moline, Hill, Illinois River, Lincoln, Pinkneyville, Sheridan, and Western. Shawnee has naloxone in nasal spray form.

[242] Health Care Montor 1st Report, Lippert v. Jeffreys, November 24, 2019, page 14; Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020 page 100.

[243] Report of the 2nd Court Appointed Monitor, October 2018, page 135; Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020 page 99; Health Care Monitor 3rd Report, Lippert v. Jeffreys, February 15, 2021, page 90.

[244] Hill CC February 2021 CQI minutes, Western CC February 2021 CQI minutes.

been avoided. Neither is care provided after the emergency reviewed to ensure that a provider acted upon the emergency department's recommendations timely.

A review of the emergent urgent services log reveals incidents of care that should be reviewed clinically. These include multiple emergency department admissions for the same patient for the same problem or symptom cascade as well as referrals for conditions that are considered best managed in a primary care setting. At a minimum these reviews should be documented in the CQI minutes, findings tracked, and trended and improvement plans developed based upon the results. We found numerous examples among the charts reviewed for this report of poor patient care either preceding a medical emergency or failure to act upon information received from after an episode of emergent/urgent service delivery.[245]

Chart review by the monitor found significant problems in the delivery of emergent/urgent care including incomplete clinical evaluation, poor clinical judgement, incomplete information provided to the ED on transfer and limited or no documentation of the emergency response[246]. There were repeated examples in charts reviewed of episodes of care where medical staff failed to recognize a patient in extremis and did not seek offsite emergent care timely.[247]

The Monitor renews recommendations for emergent/urgent care made in the first three reports.

**RECOMMENDATIONS:**
1. Finalize and implement the policy and procedure on emergency services. Implementation will require additional support and coordination by OHS so that facilities standardize equipment, supplies and so forth. Implementation should proceed and be monitored according to a statewide plan outlining the steps to be taken, persons responsible and timeframes for completion.
2. Emergency response that does not result in transfer to the emergency room also needs to be tracked on a log. The criteria to be tracked differ from that kept on the emergent/urgent services log. Suggested data to track on an emergency response log should include date, time and location of the emergency, the time and name of the first health care responder, the nature of the emergency, the patient's acuity, disposition, and date the response was reviewed by a supervisor.
3. Information recorded on the emergent/urgent services log needs standardization to include definition of what is considered an acceptable report from the emergency room and the expectation that a date is entered on the log when the report is received and when the patient is seen by the physician. Consideration should be given to adding a column that identifies what documentation was received (i.e., patient discharge summary, clinical discharge summary, future appointment, or a prescription). This would be in addition to the date it was received.
4. The Monitor recommends that a column after discharge diagnosis be added to the Emergent/urgent services log to document the disposition. Documentation choices should include deceased, admitted to (name of hospital), transferred to (name of institution), released (date of release) etc.

---

[245] Mortality review patient #s 1, 2, 5, 6, 8, 11, and 16.
[246] Mortality review patient #s 2, 5, 8, 11, 13, 14, and 16. Shawnee site visit patient #s 1 and 2
[247] Mortality review patient #s 4, 5, 6, 8, and 9

5. The accuracy of the information documented on the log needs to be verified by an audit of patient records on a quarterly basis with corrective action as necessary until sustained performance is demonstrated.

6. The logs should be used to review emergency response and any trips to the emergency room the next day at least in a daily huddle to make decisions about the priority of services, need for communication, and follow through in the care of these patients. If a daily huddle is not initiated, a different method of review of daily emergency response events and emergency hospital trips are reviewed.

7. The Director of Nursing should be responsible for monitoring the completion of the emergency response and emergent urgent services log. The information on these logs should be reviewed and updated daily, in real time, not retrospectively.

8. Each compartment of the emergency bag should be sealed with a numbered tag to indicate that all required items are present and in working condition. The integrity of the seal should be checked daily and documented on the log along with the presence of other equipment, verification of pads and operational battery in the AEDs and sufficient supply of oxygen.

9. Every facility needs to have at least one AED reserved as a backup for dysfunction of other AEDs. A supply of batteries and pads should be kept on hand so that replacement takes place soon.

10. The Monitor stated in the first report that all IDOC emergency response bags must be stocked with naloxone (Narcan) and Glucagon. We further recommend nasal, rather than injectable naloxone, because it is easier and safer to use in an emergency.

11. Emergency response and the use of emergency room services need to be reviewed clinically. These reviews are for the purpose of identifying opportunities to improve primary care which is known to reduce emergency room use as well as ensure appropriate oversight and follow up care for patients after discharge. At a minimum these reviews should be documented in the CQI minutes, findings tracked, and trended and improvement plans developed based upon the results. The Emergency Services Audit Tool needs to be revised to reflect III.G 1-4.

12. Schedule a follow up appointment to take place within 48 hours of a patient's return from offsite emergency services or hospitalization. Follow up is an encounter with the patient to review the findings and discuss the treatment plan. A review of records without seeing the patient is not sufficient.

# Infirmary Care

***Addresses Items II.A.; II.B.1; II.B.6.k; III.I.1-5***

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**II.B.6.k.** *IDOC agrees to implement changes in the following areas: Appropriate staffing, physical conditions, and scope of services for infirmary care;*

**III.I.1.** *A registered nurse will be readily available whenever an infirmary is occupied in the IDOC system.*

**III.I.2.** *At every facility regularly housing maximum security prisoners, there shall be at least one registered nurse assigned to the infirmary at all times, twenty-four (24) hours a day, seven (7) days a week.*

**III.I.3.** *All facilities shall employ at least one registered nurse on each shift. If a prisoner needs health care that exceeds the IDOC infirmary capabilities, then the prisoner shall be referred to an offsite service provider or a hospital.*

**III.I.4.** *All infirmaries shall have necessary access to security staff at all times.*

**III.I.5.** *All infirmaries and HCUs shall have sufficient and properly sanitized bedding and linens.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

The Defendants continue to report compliance with III.I.1. the availability of a registered nurse whenever the infirmary is occupied and III.I.3 that prisoners will be referred to a hospital or offsite provider when their needs for health care exceed infirmary capabilities. [248] Defendants have never provided any evidence to support this assertion of compliance. Defendants have reported *imminent* compliance since May 2020 with III.I.2 which requires a nurse be assigned to the infirmary at all times at facilities housing maximum security prisoners. [249] No information has been provided to the Monitor that substantiates this claim of imminent compliance.

The Monitor made fifteen recommendations in the 3rd Report to achieve compliance with items related to infirmary care in the Consent Decree. [250] No response or other information has been provided by the IDOC about any of the Monitor's recommendations, except mentioning an intent to complete a needs assessment of the elderly and disabled in the Implementation Plan provided 6/12/20. [251] No steps have been taken as yet complete this needs assessment.

**Policy and Procedure**

A revised policy and procedure was drafted by OHS and submitted to the Monitor for review. In August 2020, the Monitor provided input on the draft. No further drafts of the policy and procedure have been made available to the Monitor for review and comment.

Therefore, the Administrative Directive (AD) on Infirmary Care, last updated in 2002, provides the only guidance for this service. [252] The Administrative Directive is not in conformance with the Consent Decree and has been criticized because it does not describe the scope of services provided in the infirmary setting or give clinicians guidance about patient conditions which

---

[248] Illinois Department of Corrections, Defendants' Reporting Requirement Pursuant to V.G. of the Lippert Consent Decree (undated) page 3.

[249] Illinois Department of Corrections, Defendants' Reporting Requirement Pursuant to V.G. of the Lippert Consent Decree (undated) (unpaginated).

[250] Health Care Monitor 3nd Report Lippert v Jeffreys (February 15, 2021) pages 98-99.

[251] Needs assessment of the elderly and disabled as found in the Illinois Department of Corrections, Implementation Plan, Lippert Consent Decree, Revised 6/12/20 pages 5-6.

[252] Administrative Directive 04.03.120 Offender Infirmary Services (9/1/2002)

should be referred a hospital.[253]

We reviewed the care of many patients in the infirmary for this report. Performance of staff responsible for providing infirmary care is directed primarily at compliance with the tasks outlined in the AD[254] not the patient's clinical needs. This is reinforced by the fact that performance monitoring is almost exclusively devoted to measuring compliance with the AD and not quality or patient outcomes.

**Access to Services**

The primary medical services report provides information on the number of patients admitted to and discharged from the infirmary for either acute or chronic care each month. The report does not identify admissions for administrative or other reasons. The report also does not include information on length of stay, so it is not possible to determine the number of persons housed permanently in the infirmary. However, infirmary services were a regular topic reviewed at the CQI meetings at ten of 26 sites with infirmaries. The information reported in CQI minutes varies from facility to facility and uses different admission categories than the primary medical services report (these terms include security hold, administrative hold, permanent housing, and housing only). The variance in reporting diminishes the value of the primary medical services report and clearly demonstrates the lack of definition for the scope of infirmary services across the state.

Inappropriate use of infirmary beds has been discussed in previous reports.[255] This practice continues as evidenced by utilization data discussed at CQI meetings. For example, Logan CQI minutes reported in February 2021 that nine persons were administratively housed in the 15-bed infirmary and in March 2021 six persons were housed for administrative reasons. The capacity of the infirmary at Logan to provide medically necessary services was reduced by more than half in February and by 36% in March. We have recommended that the reasons for administrative and security housing be reviewed, and alternatives sought so that infirmary beds are reserved for medically necessary care[256]. IDOC has not acted upon this recommendation or implemented an alternative.

Access to infirmary care is required by II.B.1[257] but there is no mechanism to ascertain that this is so. The CQI minutes at Dixon for March 2021 reflect a discussion about the infirmary being continuously full of patients who are permanent and require assisted living help. Similarly, six of the eight infirmary beds at Jacksonville were used for permanent housing in January 2021; while reduced to three beds in March 2021, this still represents 35% of the infirmary capacity. In the first quarter of 2021 more than half the admissions to the infirmaries at NRC and Stateville were for patients with chronic problems. These long stay admissions reduce the capacity of infirmaries to provide acute care and preparation for diagnostic and surgical procedures. We have

---

[253] Statewide Summary Report Including Review of Statewide Leadership and Overview of Major Services, Report of the 2nd Court Appointed Expert (October 2018) pages 68-69; Health Care Monitor 3nd Report Lippert v Jeffreys (February 15, 2021) page 92.

[254] For example, the timeframe for completion of the physician admitting note or frequency of provider rounds.

[255] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 101; Health Care Monitor 3nd Report Lippert v Jeffreys (February 15, 2021) page 92.

[256] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 107; Health Care Monitor 3nd Report Lippert v Jeffreys (February 15, 2021) page 98.

[257] II.B.1. *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care.*

recommended for a year now, that infirmary capacity be monitored and managed at the statewide level by OHS[258]. This includes retrospective review for appropriateness and timeliness of services, as well as prospective review of all persons expected to need more than two weeks of infirmary care. The IDOC has not acted upon this recommendation or implemented an alternative.

Statistical data and reports from the IDOC website indicate nearly 22.1% of the prison population are 50 years of age or older as of December 2020. Of these, over 1,000 persons are 65 years of age or older.[259] The 2nd Court Appointed Expert recommended in 2018, an assessment of the geriatric and disabled population to determine housing and programming needs for this population.[260] Although such an assessment is stated as an intention in the revised implementation plan provided by the IDOC in June 2020 nothing other than initial discussion with the Illinois Department of Aging (IDOA) has taken place since.[261]

No further information has been provided since January 21, 2021[262] about the scope of services and structure of the new facility planned for Joliet, Illinois that was originally to have included 52 new medical beds and a clinic. If this new facility is expected to provide medical care, in any capacity, this has not been defined and is not included in the implementation plan or staffing analysis provided by IDOC to the Monitor.

**Scope of Services**

The 3rd report detailed many areas of concern about the scope, timeliness, and quality of infirmary care provided that were identified from the review of records. The same is true for this report; there has been no change. Infirmary care has not improved and continues to be a significant contributor to avoidable patient harm.

Problems with infirmary care listed in the 3rd report included:
- Not admitting to the infirmary care when clinically indicated.
- Providing infirmary care when hospitalization was indicated instead.
- Lack of meaningful and expected communication with patients, from nurses to providers, between nurses, and from providers to nurses.
- Patient plans of care do not detail the expected course of care or anticipate unintended effects of treatment or define signs of a worsening condition.
- Plans for care and monitoring are not modified in relation to change in patient condition.
- Medications and treatment orders are not reconciled when the patient transitioned from one provider to another.
- Providers fail to take a history or examine patients upon return from hospitalization, off-site procedures or when informed of new or worsening symptoms.

---

[258] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 107; Health Care Monitor 3rd Report Lippert v Jeffreys (February 15, 2021) page 99.
[259] Illinois Department of Corrections, Inmates 50 Years of Age and Older on December 31, 2020 obtained at CY20 50+ Fact Sheet.pdf (illinois.gov)
[260] Statewide Summary Report Including Review of Statewide Leadership and Overview of Major Services, Report of the 2nd Court Appointed Expert (October 2018) pages 11 & 70
[261] Illinois Department of Corrections, Implementation Plan, Lippert Consent Decree, Revised 6/12/20 page 5-6.
[262] Health Care Monitor 3rd Report Lippert v Jeffreys (February 15, 2021) page 93-94.

- Providers fail to take appropriate action in response to signs and symptoms.
- Nurses fail to advocate for patients' wellbeing.
- Nurses fail to assess patients to identify change in condition.
- Nurses fail to act upon abnormal signs and symptoms.
- Delays and omissions in care.
- Providers do not manage all of the patient's chronic illnesses.

Of three infirmary patients whose medical records were reviewed at Shawnee Correctional Center two had problem lists that were incomplete. One individual was returned to the institution after a two month hospitalization for pneumonia which was noted on the problem list, however his hearing deficit, macular degeneration, head injury due to MVA, and prostatectomy were not listed.[263] Another individual was in the infirmary to recover from biopsy of an anal polyp completed 6/16/21; the problem list was not updated with the procedure or conclusions from the biopsy and a previous history of squamous cell cancer of the foreskin is also not listed.[264] None of these three patients, who were acute infirmary admits, were seen by the physician promptly and none included a physical exam of the patient.[265]

Orders for admission to the infirmary did not include clinical criteria for contacting the physician to notify of a change in the patient's condition and there were no specific orders for wound care or to prevent skin breakdown. One patient with dementia, required assistance with ambulation but had no orders for fall prevention or physical exercise.[266] Two patients had recommendations for specialty consultations that were not acted upon based on documentation in the record.[267]

Physician rounds were documented with a very brief note, did not include an exam or directed recent history and only addressed patient self-report and current complaint. The frequency of rounds occurs as required by Administrative Directive, not patient acuity. Nursing documentation is similarly brief.

The Monitor also reviewed the records of 18 persons who died while in IDOC custody during this report period. The following are excerpts from five records of persons whose infirmary care was problematic.

> The first patient[268] was admitted to the infirmary at Hill CC on Monday 11/2/2020 after discharge from the hospital where he was diagnosed with metastasized cancer and had elected end of life comfort care. The hospital discharge summary stated that he used a walker, was on a soft mechanical diet and had orders for medication to treat anxiety and discomfort, pain, and nausea. On arrival the nurse noted the patient could not be

---

[263] Shawnee site visit patient #3
[264] Shawnee site visit patient #4
[265] Shawnee site visit patient #3, 4, and 5
[266] Shawnee site visit patient #3
[267] Shawnee site visit patient #4 on May 21 recommended by the UIC HIV provider to see cardiology/pulmonology to address shortness of breath and dyspnea on exertion. Shawnee site visit patient # 3 was placed in the infirmary on 3/29/21 after release from hospitalization with referrals from the hospital for urology and cardiology.
[268] Mortality review patient #5

understood, had fallen soon after arrival, was incontinent and confused. In spite of his confusion the nurse instructed the patient that he must ask for help to use the toilet. The plan of care written by the physician did not address how this emaciated, confused, helpless man was to be fed or give specific instructions to prevent aspiration. Towards the end of life, he received four liters of oxygen although the order was for only two liters. There are gaps in documentation of 10 or more hours on each of the three days he was in the infirmary before his death.

The next patient[269] was placed in the infirmary at Lawrence CC Sunday afternoon 12/27/2020 after being sent to the emergency room that morning for elevated heart rate and decreased oxygen saturation (88%). He had received a positive COVID test on 12/19/2020. The emergency room discharged him with diagnoses of pneumonia due to COVID, hypokalemia and dehydration. Recommendations included seeing his primary care provider the next day and repeat CMP. The provider was contacted and gave orders to admit to the infirmary, continue orders from the hospital and to encourage fluids. The order to encourage fluids did not get transcribed onto the MAR until two days later and was not acted upon for three days after admission. There is no documentation as to what fluids were encouraged or taken throughout his stay in the infirmary.

A nurse practitioner (NP) saw the patient morning of the next day but did not have the records from the emergency room visit. The NP was not clear about the patient's diagnosis and ordered an antibiotic for treatment of bacterial pneumonia rather than understanding the lung changes were due to COVID. This was an uninformed and incorrect clinical decision that was not rescinded when the records were reviewed by the NP later that same day.

The patient was tachycardic and had low oxygen saturation on admission to the infirmary. From that afternoon through the next day his condition worsened, and he had a fever, but no one contacted a provider to report these changes. He did receive a cold tablet with acetaminophen the second evening although the reason is not documented. The third day on the infirmary the NP saw the patient and documented a change of mental status; he had continued fever, tachycardia, and oxygen desaturation. Although it was clear the patient required more robust clinical support, he was not hospitalized. Instead, infirmary care was continued. If there was any further decline in the patient's vital signs or change in mental status the physician was to be contacted for a possible send out. Vital signs were ordered twice a shift but there is no documentation that these took place more than once per shift. And although his vital signs were abnormal and need for oxygen increased over the next two days nurses did not contact the physician until the afternoon of 1/1/21 when his temperature spiked to 103.1, heart rate was 138 and oxygen saturation was 86 on *three* liters of O2. This patient was in a compromised condition on admission to the infirmary and only after a steady decline over a period of four days was

---

[269] Mortality review patient #17

hospitalization finally ordered. the patient died on 1/9/2021 from complications of COVID infection.

The next patient[270] was an 82-year-old housed in the infirmary at Dixon CC as a chronic patient. He was described repeatedly as pleasant and alert but confused or as oriented only to person and place. Practitioners frequently used the diagnosis of dementia for this patient but there was no evidence that this condition was determined by an appropriately qualified practitioner. There are no mental status assessments documented and no evaluation of his cognitive ability. There was no effort made to determine if an underlying treatable medical condition was causing his symptoms of confusion. The patient's confusion and forgetfulness should have been addressed in his plan of care but were not.

He was seen in general medicine chronic clinic for gastroesophageal reflux disease, hyperlipidemia, chronic obstructive pulmonary disease, and hypothyroid disease. The nurse practitioner seeing him for chronic clinic in September 2020 noted a significant weight loss the last six months however no action was taken and the plan of care for him while in the infirmary went unchanged. There were no instructions given to encourage eating, no orders for diet enhancement and no effective follow up to determine the cause of the patient's weight loss. Documentation on the daily flow sheets show the patient rarely ate 100% of his meal and sometimes as little as 20%. While the patient asked practitioners and nurses on the infirmary repeatedly for candy, bread, or cookies no one identified the patient's loss of weight, which six months later totaled 24 pounds. These requests for food were ignored. These staff observed the patient taking food from others and instead of inquiring further as to the reason or cause planned to monitor the patient more closely to prevent stealing.

In 2019 it is documented that the patient suffered several falls and had degenerative disc disease. He fell again in June 2020 and again in August 2020. An x ray completed in June 2020 showed moderate osteoarthritis of the right hip with degenerative disease or avascular necrosis. Cross sectional follow-up imaging was recommended. This was never done. While the patient's care plan did include the statement "fall risk", the precautions to prevent falls was never specified. Neither was the patient referred to physical therapy, considered for devices increase the stability of his gait or other measures taken to address the problem.

At 10 pm on 2/24/2021 the patient complained that his stomach hurt "real bad" and asked to go to the hospital. There was no documentation of his condition in the previous eleven hours. The nurse who responded to his complaint palpated a round mass in the abdomen and notified the physician. The directions were to continue monitoring and contact the physician again if symptoms increase. There is no documentation by the physician about the patient after this notification by the nurse. The physician should have acted more promptly especially since the patient had a preexisting abdominal hernia and his

---

[270] Mortality review patient #15

cognitive condition reduced his ability to communicate symptoms precisely. The patient was not sent to the hospital until the next morning where he was diagnosed with a bowel obstruction. The hospital, with input from the facility physician, determined that the patient would not benefit from surgery, and he returned to Dixon for end-of-life care.

The next patient[271] was admitted to the infirmary at Jacksonville four times and experienced three hospitalizations in a period of three months related to an ileus and eventual small bowel obstruction and subsequently died from end stage liver disease. The first time he was admitted to the infirmary as an acute patient. At the time of admission, the patient had experienced sudden onset of abdominal pain approximately 39 hours earlier. He had been on observation in the infirmary for 21 hours. He had pain, abnormal vital signs including low grade temperature, and vomiting that worsened. The doctor did not document an examination of the patient's abdomen and did not take a history to account for the cascading symptoms. The treatment plan was to provide intravenous fluid, medication for nausea and pain. Basic blood work had been ordered earlier in the day and sent for analysis. This patient had an acute abdomen and needed examination and definitive treatment emergently. It was inappropriate to admit the patient for observation and supportive care in the infirmary.

The patient was eventually hospitalized nearly three days after onset of acute abdominal pain. Clinicians at the hospital diagnosed possible SBO, non-occlusive portal vein thrombosis with cirrhosis and non-bleeding esophageal varices. After five days hospitalization he was discharged and returned to the infirmary but after only 6.5 hours was returned to the hospital with abdominal distention, abnormal vital signs, difficulty breathing and low oxygen saturation. After three more days in the hospital the patient was discharged and admitted to the infirmary on acute status. Six hours after returning to infirmary care the patient complained that he felt awful and could not breathe. Indeed, the patient was hypoxemic (O2 was 87-88%). The nurse did not contact the physician about the patient's hypoxemia but instead initiated oxygen via nasal canula at 2 liters. The order for supplemental oxygen was finally obtained five hours later. However, the oxygen was increased to three liters later that day with no corresponding order ever obtained. The nursing admission note was not written for 24 hours after the patient was placed in the infirmary. The provider did not see the patient for three days after discharge from the hospital and admission to the infirmary. The admitting physician note did not document assessment of the patient's oxygenation or whether the patient was adequately medicated for pain. The plan did not delineate the expected course for convalescence of the patient's bowel obstruction or his other diagnoses or any specific indices indicating the need to contact the provider urgently.

The patient was in the infirmary for 14 days. During this time, the physician rounded every two or three days but failed to address the patient's ongoing symptoms and conditions. For example, lab results showed anemia which the provider did not comment on. The fact that the patient had a splenic embolism while hospitalized was not noted and

---

[271] Mortality review patient #4

the length of time he would need anticoagulant medication was not addressed. Elevated blood pressure readings were not reviewed, and the patient was not examined for injuries after a fall. The patient continued to experience symptoms of abdominal discomfort, difficulty breathing, weakness, peripheral edema, and bruising. No diagnostic work was ordered other than initial lab and radiographs to monitor the patient's condition over the course of an allegedly resolving ileus.  There was no plan to address the patient's nutritional status, weakness, or mobility limitations.

Nurses did not monitor any specific parameters with regard to the patient's resolving ileus.  There was no specific accounting or plan to monitor fluid and electrolyte balance, hydration, elimination, nutritional support (he had lost approximately 20 pounds before the initial hospitalization), pain control, symptom management or support for activities of daily living. The patient fell once during this time but there is no description of the fall, no documentation of an assessment of injuries and no plan put in place to prevent falls. Eventually the patient developed abdominal cramping, increased bowel activity and hypotension. As this patient's condition changed it was not brought to the urgent attention of the physician for 10 hours. When the doctor was notified, it was that the patient felt dizzy and that his blood pressure was running low (there is no documentation what the nurse meant by "low"), the doctor only ordered an orthostatic blood pressure check without indicating any urgency. The orthostatic blood pressure (97/63 lying, 90/61 sitting, 89/53 standing) was not reported for one and a half hours. The doctor did not see the patient for another two hours at which time the patient was dyspneic, diaphoretic, tachypneic and had a respiratory rate of 44.  Only then, did the doctor send the patient to an emergency room.

The final time the patient was admitted to the infirmary was six weeks later. At the hospital he was treated surgically for small bowel perforation which was complicated by development of a fistula with leakage from the small bowel and portal vein thrombosis with pulmonary emboli that could not be treated because of gastrointestinal bleeding. He elected to be "DNR" and was discharged from the hospital for comfort care. He was seen daily by the physician and monitored closely by the nursing staff over the next three days before his death. One area of concern with care during this infirmary stay was the failure to anticipate the patient's skin breakdown with decubiti developing on the coccyx within 24 hours of admission. No orders were given for an eggshell or alternating pressure mattress and while skin care is mentioned in the nursing admit note, no specifics are given as to measures taken to prevent breakdown. Once the ulcers appeared, the plan of care was not modified to include dressing and wound care.

The skin breakdown was no doubt accelerated by the fact that the patient was very restless and in distress, tossing and turning in bed through the first night. The physician did write an order for one dose of Ativan, to treat the patient's anxiety and restlessness. However, the effectiveness was not evaluated, and further doses not made available for another 48 hours.  In the meantime, the patient's breakthrough pain was addressed with tablets of Tylenol # 3 which were crushed and fed to the patient. The physician never

128

evaluated the efficacy of the patient's pain management despite documentation by nursing staff that he "hurt so bad", "hurt all over" and that the patient was restless and agitated.

There were no orders for care of the ileostomy or dressing changes, care of the PICC line, and once the urinary catheter is inserted, its care and monitoring. Neither the physician or nursing staff acknowledged or addressed instructions the hospital gave that ingestion of fluids were to be restricted immediately before and after meals. Infirmary care for this patient was desultory at best.

The next patient[272] was seen for shortness of breath with elevated pulse and respiratory rate. His oxygenation was 91% on room air and he was using accessory muscles to breath. The nurse called the physician who ordered a Xopenex inhaler, chest x-ray, supplemental oxygen and 23-hour observation in the infirmary at East Moline CC. This individual had a pre-existing diagnosis of sarcoidosis, had been hospitalized six months earlier for COVID infection, requiring a ventilator during this inpatient stay, and had an abnormal chest x-ray with ground glass infiltrates in both lungs six weeks previously. This patient should have been admitted to the hospital for definitive care and treatment rather than for observation in the infirmary. Twenty hours later his condition had deteriorated further, and he was finally sent to the hospital.

The patient was discharged back to the institution after four days with recommendations for cardiology and pulmonary consults. The next day the physician reviewed records from the hospital and noted the recommended consults. While the physician saw the patient, he did not examine him and took no history to follow up or amplify findings from hospitalization including referrals to cardiology or pulmonary. Medications ordered by the hospital were continued and included Lasix 40 mg, levofloxacin 750 mg, metoprolol 50 bid, prednisone 40 mg for 7 days tapering over a month, and a Xopenex inhaler. The provider also ordered labs for the following week but did not order any follow up clinical visit. The patient was discharged from infirmary care and transferred to 14-day post hospital quarantine for possible COVID exposure. He should have been followed more closely.

Six days later the patient was seen for shortness of breath which was worse lying down. He also had a dry cough, wheezing and rapid respiratory rate. His oxygenation was 95% but dropped to 92% when talking and could not complete sentences. A half hour later the patient said he felt better but his pulse was still elevated and oxygenation as low as 92%. The nurse recommended he elevate his head when lying down. Eleven hours later the patient was again seen for shortness of breath. He was coughing and could not take a deep breath. The nurse did not check his oxygen saturation, but his heart rate was 133 and respirations were 22. Both nurses failed to act when the patient's symptoms were serious. When the nurse in the second encounter assessed the patient 11 hours later, the earlier episode of shortness of breath with orthopnea was not considered. It was not for another

---

[272] Mortality review patient #6

five hours before the patient was sent the patient to the hospital in respiratory distress, with symptoms of shock.

The following two excerpts are examples of persons who should have received infirmary care and did not.

This patient[273] had diagnoses of asthma, chronic obstructive pulmonary disease, hypertension, and sarcoidosis with obstructive sleep apnea. He had been seen one month previously by a pulmonologist for his lung conditions and had made several recommendations none of which had been implemented at least partly due to delays in being seen in follow up by the facility physician. He tested positive for COVID and the next day was sent to the emergency room. Upon return to Lawrence CC the patient was not placed in infirmary care but on Unit #6, presumably a unit housing COVID positive persons but it is not clear what isolation precautions were in place.

The facility physician documented the patient's condition upon return from the emergency room including that the patient was hypotensive that morning with a subsequent blood pressure of 100/64. Neither the physician or the nurse also documenting his return to the facility from the emergency room documented vital signs. Other than changing the dose of two medications, no orders were given for monitoring the patient's course of illness. The patient's pre-existing lung conditions should have prompted at least daily monitoring while experiencing COVID infection[274].  The patient's condition was not monitored by nursing staff at all after returning to Lawrence CC. He was seen once by a nurse practitioner who inexplicitly started him on antibiotics when none had been recommended or were indicated.  Thirty-six hours later he was returned to the hospital because of oxygen desaturation[275].  The patient received outpatient care when inpatient services were required. He should have been transferred to another facility that could provide an appropriate level of service.

The next patient[276] had asthma since childhood and also had nasal polyps removed in 2013. He was seen urgently on 2/24/2019 at Pontiac CC for difficulty breathing with expiratory wheezing, rapid pulse, and respiration, with an oxygen saturation of 93%. He had been complaining of difficulty breathing with a cough and cold in the month before this episode and it was not clear that he had his inhalers.  After a nebulization treatment he had a peak expiratory flow rate of 40. The on-call physician ordered a stat dose of prednisone and if oxygen saturation not improved, another nebulization treatment given. After the second nebulization the patient's peak flow rate was 180 and oxygen saturation 95% with a heart rate of 112. The on-call physician cleared the patient to return to his cell. This patient should have been admitted to the infirmary and followed up the next day by a provider.

---

[273] Mortality review patient #11
[274] See the letter from the pulmonologist dated 3/1/21.
[275] Mortality review patient #11 had oxygen saturation of 78% according to the transfer documentation.
[276] Mortality review patient #2

**Registered Nurse Staffing**

The Monitor requested nurse assignment sheets to evaluate registered nurse staffing of the infirmary at each facility, but these were not provided. Review of the revised Staffing Analysis[277] indicates at least nine facilities cannot comply III. I.1 and III.I.3 of the Consent Decree without use of overtime or registered nurses employed "as needed"[278]. These facilities are Big Muddy, Danville, Hill, Illinois River, Lawrence, Lincoln, Pinckneyville, Shawnee and Western. For example, Shawnee Correctional Center has eight registered nurse positions on the Wexford Schedule E with only four of these positions filled.[279] During each of the days we visited Shawnee Correctional Center[280] the registered nurse on duty in the infirmary was working a double shift and at least one of these was a mandatory assignment. The assignment sheet we were provided for the day before our visit shows two nurses each working 12 hours (8 hours regular time & 4 hours on overtime) to cover the 24-hour period.[281] The regional administrator was interviewed about staffing and indicated that nurses are mandated to work extra shifts on average five times a week.[282] We also understand that nurses have been employed on long term contracts through nurse staffing agencies to fill vacant posts. Use of overtime, "as needed", and long-term agency staff are considered temporary or interim measures to staff infirmaries; they are not substitutes for experienced, seasoned registered nurses. The use of these measures also contributes to job dissatisfaction which in turn leads to resignations.

**Physician Staffing**

There are insufficient physician staff to ensure that patients on infirmary units are properly managed. Of the 18 facilities with 10 or more infirmary beds, thirteen sites had only a single allocated physician position and one of these did not have any allocated physician assistant or nurse practitioner positions. Two of these 18 facilities did not have any permanent physician staffing and two sites had no physician assistants or nurse practitioners due to vacancies.[283] The providers' infirmary notes were frequently described as being inadequate. Progress notes that comprehensively outlined a patient's current status and a clear plan of action were totally lacking. This could be explained by a lack of provider skill or diligence, but a contributing factor is the workload placed on a facility's sole physician including physician sick call, chronic care clinics, onsite urgent care, visits with individuals returning from offsite specialty, emergency room, and hospital care, audits of nurse sick call, participation in quality improvement committee meetings, completion of death summaries, and after hours call.

**Ancillary and Support Personnel**

Sixteen facilities employ nursing assistants according to the August 19, 2021, Staffing Analysis with plans to add another 43 of these positions. Twenty-one of the IDOC facilities would

---

[277] August 19, 2021

[278] The minimum number of FTEs to cover 1 post seven days a week on all shifts is 5.29 using a post relief factor of 1.76

[279] August 19, 2021, Staffing Analysis page 42.

[280] June 21-23, 2021

[281] Wexford Health Sources Daily Nursing Assignments dated 6/20/2021.

[282] Interview with Yolande Johnson, June 21,2021

[283] August 19, 2021 Staffing Analysis: Centralia and Lawrence lacked permanent physician coverage due to vacancies. Centralia did not have any allocated PA/NP positions and Lawrence and East Moline lacked PA/NP staffing due to vacancies.

employ nursing assistants according to this analysis. Without a quantitative analysis of work to be performed by these personnel it is not possible to determine with any certainty whether all of these nursing assistants will be needed. However, this type of employee is appropriate to provide care in the infirmary under the direction and supervision of a registered nurse.

Physical therapy services continue to be offered at only eight IDOC facilities.[284] The Revised Staffing Analyses provided by IDOC dated 6/18/20, 11/23/19, 7/7/2021, and 8/19/21 as well as the 12/15/20 staffing update recommended creating physical therapist (PT) and physical therapy assistant (PTA) positions at NRC and Graham CC but the positions have yet to be allocated and hired. The 12/15/20 staffing update as well as the November 2019, June 2020, July 2021, and August 2021 IDOC Staffing Analyses have recommended increased PT and/or PTA coverage at six of the eight sites with existing physical therapy services but none of these recommended changes have yet taken place.[285]

However, there are 16 correctional facilities with infirmaries that offer no access or are not projected to offer to physical therapy on-site. These 16 facilities have 167 infirmary beds and house 13,254[286] men of whom approximately 2600 are 50 or more years of age.[287] The Implementation Plan submitted in June 2020 committed to evaluating the need for physical therapy services at each institution with an infirmary[288] but there is no indication from IDOC that this has taken place. IDOC indicated that backlogs for physical therapy were considered in arriving at the number of recommended positions. Backlog is not sufficient in that it only represents persons currently referred for a scarce service; it does not indicate the number of people who need physical therapy but have not been referred. Even if IDOC hires all the allocated and recommended physical therapy positions, there would still be six large facilities with 85 infirmary beds and housing over 7,500 incarcerated persons on a daily basis that would not have onsite physical therapy services.[289] The Monitor has strongly recommended focusing initially on the physical therapy staff necessary to provide services at facilities with populations of 900 or more.

**Performance Monitoring and Quality Improvement**

Performance monitoring of compliance with the Administrative Directive for infirmary services was reported by seven facilities the first quarter of 2021.[290] Five of these were internal audits and two were reported as CQI studies. Where noncompliance was identified there was no discussion at the CQI meeting analyzing causes of poor performance or of plans for improvement. In some cases, a corrective action plan is indicated but the CQI minutes include no elaboration. Two

---

[284] Physical Therapy services are currently provided at Big Muddy, Dixon, Hill, Lawrence, Logan, Menard, Pinckneyville, and Stateville.

[285] Augmented physical therapist and/or physical therapy assistant staffing has been repeatedly recommended in Staffing Analyses at Dixon, Hill, Lawrence, Menard, Pinckneyville, and Stateville.

[286] August 19, 2021 Staffing Analysis which included average daily population count.

[287] [287] Illinois Department of Corrections, Inmates 50 Years of Age and Older on December 31, 2020 obtained at CY20 50+ Fact Sheet.pdf (illinois.gov) documents that 22% of the IDOC population was 50 years of age or older.

[288] Illinois Department of Corrections, Implementation Plan, Lippert Consent Decree, Revised 6/12/20 page 6

[289] Centralia (1022 pop) 18 infirmary beds, Danville (1412 pop) 15 beds, IRCC (1493 pop), 15 beds, Pontiac (1130 pop) 12 beds, Sheridan (983 pop) 10 beds, and Western (1476 pop) 15 beds.

[290] Hill, Graham, Decatur, Lawrence, Shawnee, Stateville, and Vandalia.

facilities studied whether patients readmitted to the infirmary could have been avoided[291]. In neither study were areas of improvement identified.

In the last report we recommended revising the information contained in the primary medical services report to include average daily population and average length of stay for acute and chronic admissions, the number of patients in the infirmary for more than two weeks, and the number housed in the infirmary for reasons other than delivery of health care. The IDOC has not implemented this recommendation or implemented an alternative means to monitor performance and utilization of the infirmary. Once the new policy and procedure has been completed all existing internal audit and other performance monitoring tools will need revision.

**References**
In many of the mortality reviews, providers caring for patients on the infirmary and off the infirmary did not always know how to manage patients, failed to understand drug-drug interactions, etc. For this reason, the Monitor continues to recommend that all providers have access to UpToDate® an online medical reference which was reported in the past to have been made available by the vendor at all IDOC sites.

**Physical Plant at Shawnee Correctional Center**
The building housing the infirmary is all one level and readily accessible for people with disabilities. The 15-bed infirmary is located adjacent to the clinic. There are three single rooms, two of which serve as negative pressure rooms when needed. These rooms are directly across from a large area with counter and desk. This area is used by the correctional officers posted to the infirmary. The other three rooms house four beds each (these are referred to as A, B, and C wards).

The shower and bath were newly tiled and very well kept. One of the four person wards was inspected. There is a private room with toilet in each ward. The one inspected was well kept and functional. These toilet rooms should have grab bars installed. There is one sink with counter in the ward which had hot and cold water. An insulated chest with ice was available in each patient room and one, upon inspection, was inappropriately used to keep beverages cold. Other food stuffs were kept by individuals on top of storage lockers. There was an accumulation of personal property and food in the patient rooms. Mattresses inspected were noted to have some tears and cracks. While on site at Shawnee we observed new mattresses being delivered and were told all mattresses are being replaced. Linens are changed upon patient request and as often as necessary. Hospital beds were manually operated but functional and clean. Window screens were dirty, but the window was operable. See the infection control section regarding the negative pressure rooms.

The four men in C-Ward were interviewed. Of these, three are permanently housed in the infirmary. One man is wheelchair dependent and unable to care for himself in general population; two others are elderly, cognitively impaired and disabled. The fourth man was in the infirmary to recover from a surgical procedure and required access to a sitz bath.

---

[291] Big Muddy and Jacksonville. Note: at Big Muddy the sample included only four patients and at Jacksonville only one patient met criteria for inclusion in the sample.

The nurse is stationed in an exceedingly small office that also houses medication, a refrigerator, lab equipment and supplies. There is a desk with one computer station and the medical records for infirmary patients are kept here. Narcotic and sharps counts were accurate, and the sharps container was not overfull. There is a refrigerator that stores medicine and upon inspection we found personal food kept by nursing staff. The freezer compartment needed to be defrosted. A temperature log is kept, and temperatures logged were within range.

When the physician or mental health staff are on the infirmary, they use this room as well. Some relatively recent reference texts are available in this room. This space is not adequate in size. Other space will need to be configured for health care staff working on the infirmary. It appears that the space the officer now uses was intended originally as a nursing station. The Monitor suggests the health care staff use this space as a nursing station and find a suitable alternative location for the correctional officer post.

**Access to Security Staff in the Infirmary**
At Shawnee Correctional Center a correctional officer is posted in the infirmary and is within sight and sound of the patient rooms. Assistance provided by the officer was apparent during the time spent in the infirmary.  There is a call bell by each of the patient beds to summon assistance. The call bells we tried during the tour of the infirmary were not within reach of bedridden patients. We were told the rooms had been recently painted and the pull cords had not been put back in place. These were corrected at the time it was noticed. This is the seventh infirmary visited by the Monitor and each have had access to security staff consistent with III.I.4.

In summary, Defendants are partially complaint with the requirements of the Consent Decree related to infirmary care. Compliance with the requirement for access to security staff (III.I.4) has been evident at each of the sites visited by the Monitor thus far. Compliance with the requirement for nurse coverage of the infirmary has not been established. However, it is clear that IDOC and the vendor rely on mandatory overtime to staff registered nurses and high vacancy rates persist (24%).[292]  None of the recommendations made by the Monitor to achieve compliance with this aspect of the Consent Decree have been addressed by IDOC. Patient care in the infirmary can at best be described as perfunctory without appropriate clinical focus on patients' needs.

**RECOMMENDATIONS**[293]**:**
1. Investigate the reasons for administration and security housing in the infirmary. Alternative solutions to security reasons for use of infirmary beds must be sought. Reasons for administrative holds need to be understood.  The infirmary should not be used for ADA housing unless the patient otherwise would have a medical need to be housed on the infirmary.  Use of infirmary beds should be reserved only for medically necessary care.

---

[292] Registered nurse positions reported as vacant in the August 19 2021 staffing analysis are 29% of all RN positions. Vacancies greater than 10-12% are associated with poorer patient outcomes in the literature on hospital services.
[293] These recommendations are essentially the same as those made in the 2nd and 3rd reports of the Monitor. Minor revisions have been made to clarify or simplify recommendations. None of the recommendations made by the Monitor have been acted upon by IDOC.

2. Complete the assessment of the elderly, mentally and physically disabled persons housed in IDOC facilities as stated in the implementation plan. Each person meeting these criteria should be assessed using a standardized tool appropriate for this population and the data analyzed by persons with expertise with this area of service. Use the results to determine appropriate alternatives to incarceration as well as develop and implement appropriate housing, programming, staffing and safety standards for those who should remain incarcerated.

3. Evaluate the need for physical therapy services at each institution with an infirmary as described in the implementation plan. The Monitor continues to recommend that physical therapy services be provided at all facilities with infirmaries that house over 900 incarcerated persons.

4. Evaluate the workload of the physicians at each facility to ensure that the physician coverage is adequate to meet the needs of the infirmaries which house the sickest individuals at the correctional centers.

5. Clarify the scope of medical services that will be provided at the renovated Joliet Treatment Center. If this facility will have a medical focus, then admission criteria, scope of services and so forth should be described in the policy and procedure for infirmary services.

6. Complete the policy and procedure for infirmary services to include defining the scope of services provided and expectations for referral when a patient's need exceeds the capability of infirmary care.

7. Infirmary capacity needs to be monitored and managed proactively at the statewide level by OHS. All admission to infirmary beds should be reviewed retrospectively for appropriateness and timeliness. All persons expected to need infirmary placement longer than two weeks should be reviewed prospectively, the long term plan of care reviewed, and most appropriate placement determined (including consideration of parole or commutation or transfer to a more appropriate facility).This recommendation aligns with recently signed Joe Coleman Medical Release Act that allows discretionary early release of prisoners who are terminally ill OR medically incapacitated to a Medicaid-eligible long term care facility. [294]

8. Reduce mandatory registered nurse overtime to cover infirmary shifts by filling vacant positions or establishing additional positions.

9. A methodology should be established for staffing infirmaries which includes perspectives from skilled nursing and nursing home experience as appropriate for the patient panel of each infirmary.

10. Revise the information contained in the primary medical services report to coincide with the definitions in the new policy and procedure and include average daily population and average length of stay by type of admission, the number of patients in the infirmary for more than two weeks, and the number housed in the infirmary for reasons other than delivery of health care.

11. Revise tools used to monitor performance for delivery of infirmary care to coincide with the new policy and procedure. Set expectations for the frequency of monitoring, reporting results, and corrective action.

12. Provide Up-To-Date® for staff assigned to the infirmary.

---

[294] Joe Coleman Medical Release Act Illinois House Bill 3665 August 20, 2021

13. Make physical plant repairs or renovate sidewalks, stairs, and access roads so that persons with disabilities are able to move about institution grounds safely. Replace the infirmary at Lincoln CC and reevaluate allocation of space in the infirmary for the nursing station at Shawnee CC. Complete the annual survey of all facilities to ensure there is adequate physical space as described in the Implementation Plan.[295]

# Specialty Consultation

***Addresses Items II.A; II.B.1; II.B.6.e; II.B.6.g; III.E.4; III.H.1-4***

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**II.B.6.e.** *IDOC agrees to implement changes in the following areas: Informed care for patients who return to IDOC facilities after being sent to an offsite service provider;*

**II.B.6. g.** *IDOC agrees to implement changes in the following areas: Timely access to diagnostic services and to appropriate specialty care;*

**III.E.4.** *The medical records staff shall track receipt of offsite medical providers' reports and ensure they are filed in the correct prisoner's medical records.*

**III.H.1.** *Medical staff shall make entries in a log, preferably electronic, to track the process for a prisoner to be scheduled to attend an offsite service, including when the appointment was made, the date the appointment is scheduled, when the prisoner was furloughed, and when the prisoner returned to the facility. This log shall be maintained by the HCUA.*

**III.H.2.** *Within three days of receiving the documentation from scheduled offsite services, the documentation will be reviewed by a medical provider. Routine follow-up appointments shall be conducted by facility medical staff no later than five (5) business days after a prisoner's return from an offsite service, and sooner if clinically indicated.*

**III.H.3.** *If a prisoner returns from an offsite visit without any medical documentation created by the offsite personnel, IDOC shall use best efforts to obtain the documentation as soon as possible. If it is not possible to obtain such documentation, staff shall record why it could not be obtained.*

**III.H.4.** *Provided that IDOC receives documentation from offsite clinicians, all medical appointments between a prisoner and an offsite clinician shall be documented in the prisoner's medical record, including any findings and proposed treatments.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

This section remains noncompliant for the reasons described below.

The recommendations from the last report have not been addressed with the exception of discontinuing collegial review.

---

[295] Illinois Department of Corrections Implementation Plan, Lippert Consent Decree dated 6/12/2020.

Since their May 2020 Bi-Annual Report and for three reports IDOC has continuously asserted compliance with provisions III.E.4., III.H.1., III.H.2., III.H.3., and III.H.4., without providing any data or information to support their assertion. This is in contrast with the Monitor's reports which find this group of items noncompliant since the Monitor's 2nd Report in August of 2020.

The Monitor's 1st Report in November of 2019 gave partial compliance to III.H.1. merely because a log was present. This log was not standardized across facilities and in subsequent reports the Monitor described that the logs appeared inaccurate and during subsequent site visits and document reviews, these logs were indeed found to be inaccurate which moved this item to noncompliance. The Monitor discussed this in his 2nd and 3rd Reports but IDOC has never addressed any of the Monitor's comments or recommendations to correct the tracking log. The IDOC has not even acknowledged reviewing the Monitor's comments and recommendations.

The Monitor also found provision III.H.2. partially compliant in his 1st Report because IDOC reported that 83% of facilities reported that 95% of individuals returning from offsite consultation were seen within five days. However, in subsequent reports, the Monitor found this data unreliable and inaccurate because some facilities did not track the date the provider reviewed the consultant report, some facilities did not track the appointment date with the provider, multiple facilities were tracking that a provider reviewed the consult report but did not give a date. More importantly, on record reviews, the Monitor consistently found that provider reviews of reports were superficial, did not result in a meaningful discussion with the patient, and did not consistently consider the recommendations of the consultant. As well, some of the five-day follow ups occurred without reports and therefore did not contain an informed discussion of what occurred with the consultant. As a result, this item moved to noncompliance.

The Monitor had not rated provisions III.E.4., III.H.3, and III.H.4 in his 1st Report and has given noncompliance rating to these provisions in the 2nd and 3rd reports. Those reports can be reviewed for the Monitor's opinion on these provisions. The IDOC has never provided the basis for their assertions of compliance.

Recently, IDOC stated that the collegial review process has been eliminated. Although the contracts with the vendor do not confirm this, the vendor has sent a memo to staff indicated that the collegial review process has ended. This should not absolve IDOC from maintaining a tracking log. Tracking logs should be standardized across all facilities. Provided that the collegial review process is indeed terminated, tracking logs should contain the following information:
1. The original date that a provider referred the patient for a consultation or for offsite care. This should include all referrals including ones that do not result in a completed offsite consultation or diagnostic study.
2. The patient name;
3. IDOC number;
4. The reason for referral;
5. The referral location;
6. Date and content of any discussion with a utilization reviewer, including advice on whether to continue with the referral.

7. Date appointment was arranged;
8. The scheduled date of the appointment;
9. The date the appointment occurred or reason the appointment did not occur (e.g., cancelled, not transported, lockdown, refused, etc.)
10. Rescheduled date;
11. The date the facility received the consultant or testing report;
12. The date the medical provider reviewed the consultant or testing report; and
13. The date of the follow up visit with a facility provider

In addition, physicians must document any review they have with a vendor utilization physician in the medical record. The Monitor recommends that the audit process include determining if provider follow up visits with patients demonstrate that effective communication with a patient has occurred regarding the results of the consultation and the modification to the treatment plan.

In the 3rd Report, the Monitor listed multiple problems identified on record reviews. These included:

1. A significant finding was not noticed or ignored by providers resulting in the patient not obtaining timely evaluation or not obtaining evaluation at all which may have harmed the patient.
2. A physician failed to have sufficient primary care knowledge to understand that a patient needed to be referred to a consultant or for a procedure or the provider failed to refer for the appropriate procedure or consultant.
3. The specialty care process resulted in delay in obtaining specialty care that harmed the patient.
4. Failure to timely refer patients for specialty care.
5. Primary care physicians failed to follow up on specialty care recommendations.

IDOC has not provided any information that these problems have been corrected or that they have been addressed in any way. Record reviews since the last report continue to show similar problems with specialty care.

Examples of recent record reviews include the following. One patient[296] had severe asthma with nasal polyposis. His asthma was poorly controlled and the polyposis was treated with repeated bursts of steroids. It is recommended that if a single course of steroids does not resolve the polyposis, referral to a specialist (ear nose and throat specialist) is indicated. This did not initially occur but after months of symptoms, the patient eventually was referred to an ENT specialist by an IRCC physician on 2/11/20 which referral was approved, but the patient was transferred to Menard and the referral did not occur. The IRCC log does not include this referral and the patient was lost to follow up at Menard.

The polyps were causing the patient severe shortness of breath and air hunger, and were blocking his nasal passages making it excruciatingly difficult for the patient to breathe which he repeatedly mentioned to medical staff. Four months after the original referral, on 6/10/20, a nurse practitioner noticed that the patient had an outstanding ENT referral and was lost to follow

---

[296] Mortality review patient #2

up and notified medical records to schedule the appointment as a priority. This also did not occur as ordered. Despite requesting a priority, the patient was not seen until 9/16/20, seven months after referral and three months after a "priority" referral. The ENT consultant recommended a CT scan, tapering dose of steroids, steroid nasal spray, and follow up after the CT scan to discuss surgical removal of the polyps and or use of biologic medications. The CT scan was done on 9/24/20 but the follow up appointment did not occur as recommended and a referral wasn't made until 12/7/20 two months after the CT scan because the physician did not follow up the patient after the CT consultation. Tracking logs for this patient confirmed that tracking is not done accurately or effectively. The IRCC log did not contain the referral. The 1st quarter Menard log lists the referral but under the column "if not seen why" it stated that the ENT office was called 4/2/20 but a date for the appointment was not specified. The 2nd quarter tracking log contained no information about this patient. The 3rd quarter log contained information only about a request for a CT scan. The 4th quarter 2020 tracking log has three entries for this patient. One is for the 2/11/20 appointment which was eventually made on 6/30/20 for a 9/16/20 appointment which was completed. This appeared to be a late entry. An appointment for a CT scan was made 9/18/20, scheduled on 10/6/20 and was completed on 12/1/20. And a referral to ENT that was requested urgently on 12/7/20 was not scheduled until 12/28/20 for a 2/1/21 appointment. The tracking log does not list this request as urgent. The tracking log documents that after the 9/16/20 appointment with an ENT specialist a physician reviewed the consult. On this date the physician did not document an encounter with the patient. He noted the recommendations but took no action to reschedule an appointment. The patient was uninformed of this plan because the provider only reviewed the record without seeing the patient. These tracking logs are inaccurate, are not maintained to be current, do not reflect provider orders, and are not standardized. The patient continued to have severe symptoms of difficulty breathing and was repeatedly treated with steroids which appeared to have caused significant weight gain and deterioration of his diabetes. Finally, on 12/7/20 a physician discovered the delay and wrote a referral as an urgent "ASAP" to ENT which was months after the ENT specialist asked to see the patient. The patient died on 1/28/21 from complications of asthma including nasal polyposis which remained definitively untreated for at least two years and though recommended to have urgent referrals was treated as a routine matter. The emergent referral request hadn't been addressed for almost two months when the patient died. This death was preventable.

Another patient[297] had a prior history of bullous emphysema and developed right sided chest pains at least since June of 2019. He had never had a pulmonary function test and though a CT scan would have been indicated given his symptoms and known conditions (elderly smoker, bullous CPOD with chest pain and changes to his condition)[298] he did not receive one. The patient continued to have chest pain for 18 months with only plain film radiographs done which showed limited inspiratory effort but no findings. Given his conditions and history of smoking a CT scan was indicated. As well, there was no resolution of the patient's problems. The chest

---

[297] Mortality review patient #5

[298] The United States Preventive Services Task Force recommends lung cancer screening with low-dose CT scan for adults aged 50 to 80 years who have a 20 pack-year smoking history and currently smoke or have quit within the past 15 years. Also, CT is recommended for individuals with COPD and a change in status or when cancer is suspected because plain radiographs are not sensitive for picking up cancer. This patient was a smoker, had COPD with weight loss, chest pain and shortness of breath and should have had a CT scan of the chest.

pain continued with the shortness of breath which was accompanied by weight loss, all these findings were unrecognized or ignored. After two more months of these symptoms the patient became emaciated, developed jaundice, became incontinent and hadn't been eating for a couple weeks when he was finally admitted to a hospital where he was diagnosed with metastatic cancer in lung and liver of unknown primary. This patient had chest pain for 20 months with three months of shortness of breath and over 25-pound weight loss and needed referral for CT scan and PFT much earlier in the evolution of his disease. Diagnostic testing did not occur until the patient was near death.

**RECOMMENDATIONS:**

1. Create a tracking log which contains information in the list in the report above.
2. Despite termination of collegial review, the HCUA must maintain the tracking log. The log must be a log maintained for purposes of assessing access to specialty care and must include all referrals with the information specified in the report above.
3. Use quality improvement to study whether patients in need of specialty care are being referred for care; whether patients referred for offsite specialty care have received timely care; and whether diagnostic studies and consultations are being appropriately integrated into the patient's overall therapeutic plan. This should include, as only one example, review of records to see if the follow-up visit with the primary care provider describes a discussion between the patient and the provider, revolving around the findings at the offsite service and the plan of care.
4. A root cause analysis of specialty care needs to be promptly performed to determine why the specialty care referral process is resulting in considerable morbidity and mortality.

## <u>Specialty Referral Oversight Review</u>

### *Addresses III.H.5*

**III.H.5.** *Within six (6) months after the Preliminary Approval Date of this Decree [July 2019]or until Defendants are able to fill both Deputy Chief of Health Services positions, they will make reasonable efforts to contract with an outside provider to conduct oversight review in instances where the medical vendor has denied any recommendations or taken more than five (5) business days to render a decision, including cases in which an alternative treatment plan has been mandated in lieu of the recommendation and cases in which the recommendation has not been accepted and more information is required. If no contract with an outside provider is reached, then the Monitor or his or her consultants shall conduct oversight review in instances where the medical vendor has denied any recommendation or taken more than five (5) business days to render a decision, including cases in which an alternative treatment plan has been mandated in lieu of the recommendation and cases in which the recommendation has not been accepted and more information is required. Once Defendants have filled both Deputy Chief positions, the Deputy Chiefs will replace any outside provider, the Monitor or his or her consultants to conduct oversight review in the instances described in this paragraph. (see Specialty Care Section)*

**OVERALL COMPLIANCE RATING:** Substantial Compliance

**FINDINGS:**

As noted in the Monitor's previous Court Reports, the medical vendor requires that all non-emergency offsite referrals for specialty care, diagnostics, testing, imaging and selected onsite procedures (e.g., ultrasound) be reviewed and approved by the vendor's offsite physician reviewers prior to appointments being scheduled. The vendor's offsite utilization physicians had regularly scheduled conference calls with facility physicians to discuss and approve referrals. During these calls Wexford's offsite utilization physician does not have access to patients' medical records nor do they have the opportunity to interview or examine the involved patients. The offsite physician reviewers approve, deny, request additional clinical information about the reason for the offsite referral, or offer advice in the form of an alternative treatment plan (ATP). This process is called the "collegial review." Since the submission of the 1st Monitor Report there has been no change in this process.

The Monitor provided documentation in all three prior Court Reports that the collegial review created a barrier to the access of IDOC's incarcerated persons to specialty consultation, diagnostics tests, and procedures. The Monitor recommended in all three reports that the vendor's collegial review process be discontinued. The Monitor has also recommended that OHS review the vendor's policies, practices, and guidelines that affect patient-inmates' access to medically necessary consultation, testing, and procedures and eliminate, with input from the monitor, those guidelines that restrict access to medically necessary clinical services.[299]

From October 2020 through March 2021, the vendor reported that 316 (3.8%) of 8,390 referrals generated from IDOC physicians had been denied or given alternate treatment plans.[300]

Following the Monitor's 2nd Report the IDOC said it would discuss temporarily suspending the collegial review process with the vendor. A meeting with the vendor eventually occurred in November or December 2020 but no decision was made.[301] In the late Spring, early Summer IDOC communicated to the Monitor that a Request for Proposals (RFP) was being developed to solicit bids from vendors and that the collegial review process would not be included in the RFP.

Pending posting of the RFP, IDOC executed a ninety-day emergency contract extension with the vendor to provide health care services from May 1, 2021 through July 30, 2021.[302] This contract contained no specific language that continued the current "collegial review" process or allowed or required vendor approval or denial of provider referrals for offsite or onsite specialty, diagnostic, or procedural services. This contract was subsequently amended to continue the emergency contract with Wexford Health Sources through July 30, 2022.[303] IDOC

---

[299] Examples of vendor guidelines and practices that needed to be reviewed by OHS and eliminated include the vendor's non-approval of non-emergency colostomy reversals because it was an elective procedure, limiting cataract surgery to one eye only, requiring an upfront payment of a fee for dentures.

[300] Wexford Primary Medical Services reports October 2020 – March 2021

[301] OHS-Monitor Conference Call minutes 11/23/20. "IDOC/Wexford have not suspended or put the Collegial Review process on temporary hold….this issue is on the table but
there is no commitment as of yet."

[302] State of Illinois Contract IDOC #021-426DOC-CENTO-B-22190 (Wexford Health Services, Inc. 90 day Emergency Contract Extension. May 1-July 30, 2021)

[303] State of Illinois Contract Amendment IDOC with Wexford Health Care Services, Inc., Revised completion date: July 31, 2022.

communicated to the Monitor that as of May 1, 2021 the vendor's "collegial review" process has been terminated.

The vendor also subcontracts with a radiology entity to perform onsite mammography, ultrasonography, and liver fibroscans. Referrals for the ultrasonography diagnostic tests currently require vendor review and approval via the "collegial review" process. With the termination of the "collegial review" process, the vendor's review and approval or denial of provider orders for onsite ultrasounds must also eliminated. There is no language in the vendor's contract extensions that prohibits the continuation of collegial review including for onsite ultrasonography.

During the Monitor's 6/21/21 to 6/23/21 site visit, the IDOC facility's Medical Director communicated that there has been no recent denials or ATPs but he had not received any formal communication about a change in the collegial review process.[304] On June 25, 2021, the vendor sent a memo to all Wexford health staff notifying them that the collegial review process in Illinois had been terminated.[305]  The memo stated in part,

- The Illinois DOC Medical Special Services Referral and Report forms will continue to be submitted to the UM Department for generation of an authorization for claims processing purposes
- The Illinois DOC Medical Special Services Referral and Report forms must still contain a summary of the clinical information to support the referral request for auditing and quality purposes

The memo also communicated that the vendor's utilization management (UM) department and physicians will still be available for peer-to-peer case discussion at the request of the site Medical Director at the previously scheduled collegial call times or via cell with the UM Medical Director.

The Monitor has no problem with the completion of the Special Services Referral and Report form for the purpose of processing claims, auditing, and quality nor with the ability of facility Medical Directors to voluntarily contact more expert clinicians for clinical advice. However if the summary of clinical information on the Special Services Referral and Report form result in the administrative denials of specialty consultation, diagnostic tests, and procedures and/or the peer-to-peer clinical case discussions with the vendor's utilization management physicians become mandatory calls that result in the denial of requested services then the vendor has created a sub rosa duplication of the now terminated "collegial review" process and this will be strongly objected to by the Monitor and, hopefully, the IDOC.  As discussed in the above section on specialty care, IDOC and the vendor must continue the tracking system that monitors specialty care including any denials of referrals based on the clinical summaries or the purportedly voluntary peer-to-peer clinical discussions.

---

[304] Shawnee CC site visit 6/21-23/21
[305] Wexford Heath Sources, Inc Memo to All Wexford Health Illinois Staff from Dr. Ritz Chief Medical Officer, Ms. Cheri Laurent, VP of Illinois Operations 6/25/21

The Consent Decree also requires that all non-approved referrals be reviewed by the IDOC Deputy Chiefs or an independent reviewer. In the summer of 2019, IDOC filled two Deputy Chief positions who were tasked with the responsibility of conducting oversight review of all non-approved referrals for offsite specialty services. Because of the volume of non-approved referrals and their other significant clinical leadership responsibilities, the Deputy Chiefs only reviewed denials of services or ATPs that were appealed by the facilities' clinical leadership.

As previously reported, the time-consuming burden of the referral oversight increased on March 27, 2020 when the Chief of Health Services resigned and one of the two Deputy Chiefs was appointed to be the Chief. This leadership change coincided the initial COVID-19 outbreaks in the IDOC placing a staggering and unexpected administrative burden on the Chief and the sole Deputy Chief. This vacant Deputy Chief position had not been filled as of the writing of this report. With the vacancy of one of Deputy Chief position, the single Deputy Chief has been able to review only the limited number denials and ATPs that were appealed to OHS.

In the fourth quarter of 2020 and the first quarter of 2021, there were 316 vendor denials or ATPs[306] of provider referrals for specialty consultation, diagnostic testing, and procedures. Only 23 (7.3%) of these 316 denials and ATPs were reviewed by the OHS.[307] Six (26%) of the 23 denials were overturned and 17 (74%) were pending resolution. Even this small percentage of OHS oversight reviews placed a notable drain on OHS's limited clinical leadership resources.

In the 2nd and 3rd Court Reports[308], the Monitor identified a number of denials and ATPs that were inappropriate, delayed access to needed treatment or diagnostic testing, and jeopardized the health and/or quality of life of IDOC's incarcerated persons. The Monitor strongly feels that these unjustified denials and ATPs provided more than ample evidence to warrant the recommendation to eliminate the collegial review process. The 3rd Report's mortality reviews demonstrate numerous lack of referrals that contributed to mortality.[309]

As noted in the Monitor's three Reports, the process of referral review including conference calls, repeat requests, and appeal processes consumed valuable physician, nurse, medical record, health unit administrator, and OHS time. Significant delays in care occur in many cases that have potential to cause harm to patients. The Monitor continues to feel that the vendor's collegial referral process presents a barrier to the access of IDOC patient-inmates to offsite specialty consultation and testing. It delays needed consultations, procedures, and testing. It potentially puts patient-inmate's health at risk. It diminishes patient quality of life. It consumes an extraordinary amount of physician, HCUA, medical record staff, nurse, Regional Health Coordinator, Agency Medical Director, and Deputy Chief resources.

The Monitor recommended in each of three previous Court Reports that the vendor's referral process be discontinued. The Monitor fully supports the decision of the IDOC to terminate the

---

[306] Wexford Primary Medical Services reports October 2020 through March 2021.
[307] OHS Collegial Appeals spread sheets 10/7/20-11/25/20 and 12/7/20-4/21/21
[308] 2nd Court Report 7/6/20 and 3rd Court Report 2/15/21
[309] Third Court Report of the Health Care Monitor

existing collegial review referral process. The elimination of this process will increase the access of IDOC's patient population to needed offsite specialty consultation, offsite and onsite diagnostic testing, and offsite procedures and has the potential to decrease morbidity and mortality for IDOC's patient-inmates. The discontinuation of the existing referral process will free up valuable health care staff resources at IDOC facilities and for the already stretched clinical leadership at the OHS.

The termination of the medical vendor's clinical referral process makes this provision moot as there is no longer a collegial review process to review. A substantial compliance rating is given not because IDOC Deputy Chiefs have adhered to requirements of the Consent Decree but because the collegial review process has ended and review of a terminated process is moot.

However, the IDOC must continue to monitor the medical vendor's involvement in the referral process to assure that the clinical information on the Special Care Referral and Report form and the voluntary peer-to-peer clinical discussion between the facility Medical Directors does not create a "shadow" collegial review process that results in denials or delays in access to specialty consultation, diagnostic testing, and procedures for the IDOC patient population. If a de facto "collegial review' process emerges, IDOC must immediately have the vendor cease and decrease with such a process. The Monitor has recommended in the section above that a root cause analysis be performed on specialty referral and the Monitor continues this recommendation. The audit process and mortality review process should still evaluate the effectiveness of specialty care and whether needed specialty referrals are occurring and if not to discover and correct the cause of lack of referral.

**RECOMMENDATIONS:**

1. The Monitor fully supports the IDOC decision to terminate the current collegial review specialty care and diagnostic testing referral process.
2. The termination of the collegial review must also pertain to referrals for subcontracted onsite ultrasonography services.
3. IDOC must immediately develop a tracking system to ensure that the vendor's demand for a summary of clinical information on the Special Services Referral and Report form does not result in administrative denials of providers' referrals for specialty consultation, diagnostic testing, and procedures.
4. IDOC must also simultaneously develop a tracking system to ensure that the peer-to-peer clinical discussions are truly at the volition of the facility Medical Directors and do not become regular mandatory calls with the vendor's utilization management physicians that result in denials or restrictive alternate treatment plans.
5. The IDOC must conduct a review of the vendor's policies, practices, and guidelines that affect patient-inmates' access to medically necessary consultation, testing, and procedures and eliminate, with input from the monitor, those guidelines that restrict access to medically necessary clinical services. Examples of current restrictive vendor practices include limiting cataract surgery to only one eye, categorizing ostomy reversal surgery as an elective, and others.

# Hospital Care

**Addresses Items II.A; II.B.1; III.G.4**

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**III.G.4.** *Facility medical staff shall ensure that a prisoner is seen by a Medical Provider or clinician within 48 hours after returning from an offsite emergency service. If the Medical Provider is not a clinician, the Medical Provider shall promptly review the offsite documentation, if obtained, with a clinician and the clinician shall implement necessary treatment.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

Items II.A, II.B.1, and III.G.4 all require access to specialists and hospitals as necessary. The judgment of physicians with respect to sending patients for specialty referral and hospitalization is still not working to provide a safe and effective health program as evidenced in the Monitor's mortality reviews. Hospital physicians often provide recommendations to modify the therapeutic plan. Providers at the prison need to review these recommendations and take action on the recommendation. This is frequently not done.

IDOC provides no evidence to justify compliance for these three items. The Monitor's mortality reviews for this period demonstrate that the current practices warrant a noncompliance rating.

Based on record reviews, the following problems remain.

- Access to hospital care is delayed or not provided.
- Some patients need hospitalization or skilled nursing but are instead housed on the infirmary.
- Patients return from the hospital but are not timely evaluated or hospital follow up did not properly continue the recommended hospital plan of care.
- A patient's condition deteriorates resulting in hospitalization that is preventable due to chronic care management that is not timely or effective.

Record reviews show no improvement in care. Most of the deficiencies relate to the quality and training of physicians and possible to utilization barriers for hospitalization. It is imperative for physician quality to be corrected.

**RECOMMENDATIONS:**

1. Providers must continue orders promptly after hospitalization or document why recommendations will not be continued. Immediately upon return from hospitalization, nurses must consult with providers regarding recommended hospital orders. Within 2

days a provider must revise the therapeutic plan of the patient consistent with the hospital findings and recommendations. The provider must discuss the revised plan and how it will be implemented with the patient.

2. As part of the audit system, IDOC needs to evaluate whether the process of chronic care management results in preventable hospitalization. If systemic problems are identified these should be corrected through the quality improvement programs.

3. The statewide quality unit should perform a process analysis to determine why hospitalization is delayed for patients found in mortality reviews. Problems identified need to be corrected through the quality improvement program.

# Preventive Services

### *Addresses items III.M.1.a-d*

**III.M.1.a.** *Defendants or their contracted vendor(s) shall ensure that all prisoners will be offered an annual influenza vaccination.*

**III. M.1.b.** *Defendants or their contracted vendor(s) shall ensure that all prisoners with chronic diseases will be offered the required immunizations as established by the Federal Bureau of Prisons.*

**III.M.1.c.** *All prisoners ages 50-75 will be offered annual colorectal cancer screening and PSA testing, unless the Department and the Monitor determine that such testing is no longer recommended.*

**III.M.1.d.** *All female prisoners age 45 or older will be offered a baseline mammogram screen, then every 24 months thereafter unless more frequent screening is clinically indicated, unless the Department and the Monitor determine that such testing is no longer recommended.*

**Influenza Vaccinations**

**III.M.1.a** *Defendants or their contracted vendor(s) shall ensure that all prisoners will be offered an annual influenza vaccination*

**Overall compliance:** Partial Compliance

**Findings:**

As reported in the 3rd Court Report the Monitor continues to be aware that influenza vaccination is offered to the IDOC patient population in all correctional centers. On 12/23/20, IDOC reported that a total of 20,160[310] influenza vaccines had been shipped in September 2020 to IDOC facilities[311]. Review of CQI minutes for October and November 2020[312] identified only six[313] of the thirty IDOC facilities had reported data on influenza vaccination rates. Data gathered manually by the Monitor from the six reporting sites revealed that 4,009 incarcerated persons were offered the influenza vaccine, 1,725 (43%) accepted the shot, and 2,285 (57%) refused. IDOC reports no systemwide aggregate data to the Monitor on vaccination rates or refusals.

---

[310] 2,016 ten-shot vials in total were shipped.
[311] Flu Vaccine Shipped to IDOC facilities in September 2020 by Wexford Health
[312] October and November 2020 CQI Minutes for 29 of 30 facilities were reviewed.
[313] Elgin, JTC, Kewanee, Lincoln, Shawnee, Vienna, Western

Previous review of multiple medical records at a number of facilities verified that many but not all patient-inmates had documentation on the medical record database page that they had been offered influenza vaccines and that the refusal rate was quite high.

**Recommendations:**
1. IDOC must track and report annual influenza vaccination rates and refusals by site.
2. IDOC should institute an annual health information campaign to educate the incarcerated population about the health benefits of the annual influenza vaccine and the COVID-19 vaccine.

**Adult Immunizations**

**III.M.1.b** *Defendants or their contracted vendor(s) shall ensure that all prisoners with chronic diseases will be offered the required immunizations as established by the Federal Bureau of Prisons.*

**Overall Compliance:** Partial compliance

**Findings:**
As noted in the previous three Court Reports, in October 2019 the IDOC Office of Health Services disseminated to all IDOC facilities instructions and standing operating procedures for the implementation of an adult immunization program in the IDOC. The Monitor has never received these standard operating procedures from IDOC. These are located on SharePoint an internal IDOC server. The Monitor does not have access to SharePoint. Also previously reported, in January 2021 the IDOC submitted to the Monitor a draft administrative directive on Immunization and Cancer/Preventive Screening Programs for review and comment. The Monitor has given input on the clinical components. The Monitor has not provided comments to IDOC on the procedures in this document. A final signed administrative directive has not been sent to the Monitor. The Staffing Analysis does not specify staff for this planned effort. Neither does the Implementation Plan address how this administrative directive is to be put into place. Actual practice does not yet evidence that vaccinations are administered as directed by this draft administrative directive. The current practices are so varied that they do not appear to follow a standardized procedure either. Nevertheless, the Monitor would like to compare current practices to the existing standardized procedure. Because the Monitor has not received the standard operating procedure it is not clear if there are clear directions guiding immunization practice.

Prior to creating the draft immunization administration directive, IDOC modified the intake history and physical examination forms to include immunization. On 3/6/20, prior to the development of the draft policy, some facilities introduced a new version of the intake screening form DOC 0092. This history form contains an immunization history for 10 vaccines. There are check boxes for meningitis and pneumococcal vaccines but these do not distinguish between meningococcal B and ACWY or pneumococcal 13 and 23. On the same date, a new DOC 0099 Offender Physical Examination form was introduced that includes a formatted box stating that the provider has reviewed the vaccines listed with the patient and allows for a checkbox to order vaccines. IDOC has not provided to the Monitor a finalized policy that guides staff on use of these forms and there is considerable variation between facilities and between staff at the same

facility with respect to use of these forms. These forms are not used at Graham or Logan but are used at NRC and Menard. Graham still uses the 2012 Offender Physical Examination form and Logan's EMR has no formatted space for vaccination status in the Offender Physical Examination form and, based on record reviews, providers do not review the nurse vaccination history. Logan also uses a self-report questionnaire in which a patient can fill out a form requesting to be vaccinated for one of ten vaccines. This questionnaire is not described in the new IDOC vaccination policy. The vaccines listed on the DOC 0092 and DOC 0099 are not identical to vaccines recommended in the 2021 draft immunization administrative directive. The DOC 0092 and DOC 0099 include varicella which is not recommended by IDOC in their administrative directive and the meningitis and pneumococcal vaccines are not specified by vaccine type. The new administrative directive requires that nursing staff update the Database form in the record. This form does not include the vaccines recommended in the new administrative directive or that are present on the new DOC 0092 Offender Patient History form. The Database form lists diphtheria/tetanus, MMR, polio, hepatitis B, influenza, and pneumococcal only. Logan and NRC medical reception records sent to us did not contain a database and it was uncertain whether or when this database is initiated or even whether it is used at those facilities.

Because there is no finalized policy to guide practice, there is considerable variation in filling out the immunization section of the new intake form. Review of 24 medical reception records show that an immunization history is routinely not taken or documented as unknown or is incomplete. For example, one individual had all vaccines marked "no" yet a note elsewhere on the intake screening form notes that the person is due for a hepatitis A vaccine.[314] Another individual, aged 42, had all immunizations (including for shingles, pneumococcal and meningitis) marked as "yes" but no immunization dates are recorded.[315] On one patient[316], a nurse documented "yes" that the patient had received all ten vaccines including shingles which is indicated only for those over age 50 but the patient was only 47-years-old. Later for this same patient, who was documented previously as having received a hepatitis A and B vaccine, a provider offered the patient both vaccines. For five patient-records[317] reviewed from NRC, when nurses documented all vaccines as "no" providers failed to provide vaccination education, review immunization history with the patient, or offer vaccination when indicated. On two patients[318] at NRC, the vaccination history was not filled in at all implying that vaccination history is optional. At Graham, all five patients[319] reviewed had "no" documented for all vaccinations on the nurse history. None of the providers provided vaccination education, discussed vaccination history with the patient, or offered vaccination. One inmate[320] at Logan checked boxes on a self-report questionnaire asking to receive hepatitis A, hepatitis B, measles, mumps, and rubella, and tetanus vaccines subsequently had a nurse history that she already had hepatitis A and B. The subsequent physical examination did not address the patient's request or include review of the history with the patient to clarify vaccination status. No subsequent vaccination action was taken

---

[314] Medical reception patient #6
[315] Medical reception patient #13
[316] Medical reception patient #25
[317] Medical reception patient #s 6, 7, 8, 23, and 24.
[318] Medical reception patient #s 10 and 21
[319] Medical reception patient #s 2, 12, 14, 15, and 16
[320] Medical reception patient #26

for this patient.  Two other patients[321] at Logan requested tetanus vaccination on the self-report questionnaire but their requests were not addressed in the provider physical examination nor was there evidence of having their tetanus vaccine updated or discussed.

The immunization history, as performed, is unreliable. There is no documented attempt to obtain this history from public health records or at subsequent patient encounters, such as the initial health assessment and baseline chronic clinic visit. Individuals are unlikely to remember all of their vaccination history.  IDPH has instituted I-CARE[322] for that purpose.  This State of Illinois registry of vaccinations needs to be used by IDOC to verify vaccination status.

The IDOC has partially implemented new intake forms for the history and physical examination without any policy guidance.  This has resulted in variation in practice, lack of standardization, and an ineffective vaccination program.  This demonstrates the absence of an Implementation Plan.  Vaccination practice is proceeding with considerable variation and is left up to each facility or individual staff member to figure out how to conduct this program.  An effective Implementation Plan would standardize the process, create effective policy, ensure appropriate forms were in place with staff training on use of the forms, assign specific personnel and ensure there were sufficient staff to carry out the policy, ensure sufficient supplies were present where they need to be, train staff on the policy and use of equipment, supplies, and documentation, ensure that tracking mechanisms are effective and in place, establish timelines for implementation and ensure that all facilities have implemented appropriately, and to reflect on an ongoing basis as to the effectiveness of the implementation.  None of this occurred for this process.

Operationally, the draft administrative directive could be improved and the Monitor will provide written comments.  The revised *clinical* guidelines in the administrative directive are in accord with the Centers for Disease Control and Prevention 2020 recommended adult immunizations.[323] The administrative directive provides guidance on the processes for identification of immunization history, completion of database, ordering of recommended vaccinations, and administration and documentation of offered and accepted immunizations during intake screening at Reception & Classification Centers, upon arrival at parent facilities, in chronic clinics, and during periodic physical examinations.  The draft administrative directive also mandates the reporting of immunizations offered, administered, and refused to the facility Monthly Quality Improvement meeting and to the Monthly Communicable Disease, Immunization, and Cancer Screening Report.  However, because there is no Implementation Plan, there is considerable uncertainty regarding how this administrative directive will be effectively implemented.  To date there is little evidence that this draft policy has yet resulted in any changes in practice.  Staff unreliably fill out the immunization history at intake, providers at intake do not participate in the vaccination effort, and vaccine supplies vary considerably from

---

[321] Medical reception patient #s 27 and 28

[322] The IDOC website at https://dph.illinois.gov/topics-services/prevention-wellness/immunization/icare states the following.  "I-CARE, or Illinois Comprehensive Automated Immunization Registry Exchange is a web-based immunization record-sharing application developed by the Illinois Department of Health (IDPH).  The application allows public and private healthcare providers to share the immunization records of Illinois residents with other physicians statewide".

[323] Center for Disease Control and Prevention, Recommended Adult Immunization Schedule for ages 19 years or older, United States, 2020

site to site. Vaccination reporting data has not yet appeared in quality improvement minutes reviewed for this report and medical record reviews do not indicate that staff are practicing according to policy requirements. The intent of this policy is appropriate. But, based on the vaccination rates and vaccination data provided by IDOC, the current system, as designed, is not getting the intended results and IDOC needs to design an Implementation Plan that includes vaccination so that this policy can be effectively implemented. The Implementation Plan needs to include vaccination. The plan for vaccination needs to include access to I-CARE so that vaccination history can be verified for all incoming inmates. Vaccination therapeutic plans should be based on the vaccination history obtained from I-CARE.

The Monitor has discussed with IDOC that the management of the Immunization Program be placed under the control of nursing with each facility's Infection Control nurse or a dedicated adult immunization nurse directing, monitoring, tracking, administration of recommended adult immunizations based on standing orders approved by IDOC clinical leaders; this is a common practice throughout the USA for influenza and recently for COVID-19 immunization. Decatur CC has initiated a vaccination program managed by a designated registered nurse.[324] Nursing staff have been trained. Reviews of Decatur CC's female population were reported to have been performed to identify existing need of preventive vaccines based on age and diagnoses. Placing the immunization program under the umbrella of nurse leadership offers IDOC the best option for successfully providing recommended adult immunizations to the IDOC population which will prevent morbidity and even mortality within the prison system and ultimately in the communities of Illinois. Immunization practices need to be standardized and implemented system-wide and not at the discretion of individual facilities. Given that vaccination error can result in harm,[325] training must precede vaccination roll out programs. The CDC has numerous instructional self-study programs. "You Call the Shots"[326] is a web-based CDC series of instructional modules that explain latest recommendations for vaccine use that can be a helpful training tool for nurses or providers assigned to take a history or evaluate persons for vaccination.

IDOC has not provided data on vaccine administration. The only data IDOC provides to the Monitor regarding vaccines is pharmacy dispensing data but this data is inappropriate to verify vaccine administration. Based on dispensing data[327], five vaccines[328] are reported to be routinely stocked at each correctional facility. Logan CC also stocks 2 additional vaccines[329]. Providers can order newly available immunizations for specific patients from Boswell Pharmacy. Ten vaccines[330] are available for providers to order on a patient specific basis.

Since the beginning of the Consent Decree, IDOC has not reported vaccinations given or vaccination rates; it only provides lists of dispensed stock and individually ordered patient-

---

[324] Decatur CC Continuous Quality Improvement Minutes September 2020
[325] For example, giving varicella vaccine to a pregnant woman or giving certain vaccines to immunocompromised persons.
[326] As found at https://www.cdc.gov/vaccines/ed/youcalltheshots.html
[327] IDOC's contracted pharmaceutical vendor Boswell vaccine order list 11/1/19-12/22/20
[328] Tetanus-diphtheria (TD), hepatitis B, hepatitis A, pneumococcal 23, and influenza.
[329] Human papilloma vaccine (HPV) and pneumococcal 13
[330] HPV, meningococcal ACWY, meningitis B, pneumococcal 13, pneumococcal-23, recombinant herpes zoster (RZV), haemophilus influenzae B (HIB), measles, mumps rubella (MMR), and varicella immunizations

specific vaccines[331] ordered from Boswell Pharmacy.[332] During the 20 months after OHS expanded the number of nationally recommended vaccines in the IDOC, limited numbers of vaccines[333] have been ordered demonstrating delayed implementation of vaccination of inmate-patients.  Data on the quantity of stock and individual vaccine orders dispensed by the pharmacy vendor does not reflect the number of individuals who actually receive the ordered vaccinations. The Boswell pharmacy data suggests that increasing numbers of vaccines are ordered, but the only information available is dispensing information and this does not verify vaccine administration. Data is also lacking on individuals who have been previously been vaccinated, and those who have been offered vaccination but refused.  With the exception of HPV vaccination program at Logan CC and Decatur CC, IDOC has been unable to provide data to verify the number of individuals vaccinated; this is especially true for vaccines that require a series of 2-3 shots[334]. Still, even based on dispensing data there are indications that vaccination offering rates may be low. Approximately 800 over-65-year-old inmates and approximately 300 HIV patients are candidates for pneumococcal-13 but only 21 doses have been individually ordered; and only 11[335] of the 30 facilities have ordered the pneumococcal-13 vaccine.  Only 32 individuals at six different facilities[336] have been offered meningococcal ACYW vaccination but this initial two-shot series is recommended for approximately 300 HIV-infected individuals in the IDOC.

During the Monitor's recent visit to an IDOC facility[337]. Only two (13%) of 15 men with age-based or clinical indications had been offered pneumococcal-23 vaccination or had documentation of previous pneumococcal-23 vaccination.   Zero (0%) of seven individuals with age or clinical indications had been offered the pneumococcal-13 vaccine. The single individual with clinical indication for meningococcal AWYW vaccination was not offered this vaccine or had documentation in the medical record of having previously received this immunization.

Over 6,000 men and women over 50 years of age are eligible for the two-shot RZV vaccination; only 1,042 vaccines have been ordered. To date, 24[338] of the IDOC 30 correctional centers have ordered the RZV vaccine. If all 1,042 ordered RZV vaccine doses are administered only between 8% and 17% of the eligible candidates would be fully or partially vaccinated.  During a recent

---

[331] Stock medication is a general supply of vaccine and is not an order for a specific patient.  Patient-specific vaccines are orders for a specific patient.  Patient specific orders are more likely to indicate that a patient has received the vaccine but only documentation of administration can confirm this.

[332] IDOC's contracted pharmaceutical vendor Boswell vaccine order list 11/1/19-6/15/21

[333] IDOC facilities have ordered the following doses of patient specific vaccines:  three HIB, 32 meningococcal-ACWY, 21 pneumococcal-13, 187 pneumococcal-23, 153 HPV[333], and 1042 RZV.  In addition, a total of 373 doses of HPV vaccine and 150 pneumococcal 13 doses have been ordered and shipped as stock to Logan CC during the past twenty months. An additional 1395 stock doses of pneumocooccal-23 were distributed to 27 correctional centers and 3 camps since November 11, 2019

[334] CDC Recommended Adult Immunization Schedule 2020: Meningococcal ACWY, HPV, recombinant Herpes Zoster (Shingrix), HiB require multiple doses

[335] Dixon, Danville, Graham, Hill, IRCC, Lawrence, Lincoln, Logan (stock supply), NRC, Stateville, and Vandalia.

[336] Danville, East Moline, Graham, Hill/Greene, Sheridan, and Stateville.

[337] Shawnee CC 6/21-23/2021

[338] Recombinant Herpes Zoster vaccine (RZV) has **not** been ordered at JTC, Lincoln, NRC, Sheridan, Southwest, and Taylorville in the 20 months that this vaccine has been made available in the IDOC.

site visit,[339] the medical record databases of all fourteen men (0%) 50 years of age or older had no documentation that the RZV vaccine had been offered, administered, or refused.

At any one time an estimated 100-150 females eligible to receive the cervical cancer preventing HPV vaccine series are housed at Decatur CC and Logan CC. From January through September of 2020, 54 women (seven at Decatur CC and 47 at Logan CC) completed the three-dose series and another 38 have started the series and were awaiting their 2nd and 3rd shots. These two facilities planned and implemented catch-up HPV vaccination campaigns that were highly successful and should serve as templates for provisions of nationally recommended adult immunizations throughout the IDOC. IDOC communicated to the Monitor that from October 2020 through June 2021 that Decatur CC administered 58 additional HPV vaccinations and Logan CC has started another 35 eligible women on the HPV vaccine series.[340]

HPV vaccination is also recommended for men 26 years of age or younger to prevent penile cancer and transmission to HPV to their sexual partners; but, to date, not a single male correctional facility has ordered the HPV vaccine.

The OHS has appropriately expanded access to nationally recommended adult vaccines for the IDOC population and there is evidence that the medical providers at some IDOC correctional centers are beginning to order these vaccinations for their patient populations. The new draft Administrative Directive provides increasing guidelines on the processes and procedure to ensure that recommended immunizations are offered to eligible at-risk candidates.
The Monitor has strongly advised IDOC to develop nurse managed and standing order-based immunization programs at each facility to maximize the effectiveness of the provision of adult immunizations to IDOC's at-risk individuals. The IDOC population is still notably under vaccinated for many CDC recommended adult immunizations. IDOC must ratchet up the pace of vaccine administration to provide adequate protection for the incarcerated population. The development of a vaccination program directed by nursing staff has the best potential to effectively coordinate the catch-up and ongoing vaccination of incarcerated persons in the IDOC. In order to ensure that the health of the IDOC patient population is being properly protected, as directed in the revised Administrative Directive, the IDOC needs to track and monitor the percentage of individuals who are fully immunized for each recommended vaccine and the ongoing administration rates including refusals for all adult immunizations; ideally the EMR will incorporate data points for the offering, administration, refusals and reporting of all adult vaccinations. Until then, the infection control program should develop a manual tracking system. The incomplete roll-out of the vaccination program demonstrates the need for including vaccination in the Implementation Plan required under this Consent Decree.

**Recommendations:**
1. The vaccination program must be addressed in the Implementation Plan. This program should be rolled out with standardized practices, staffing, equipment, supplies, and training. Timetables should be established for key benchmarks. Responsible persons should be assigned for tasks.

---

[339] Shawnee CC 6/21-23/21
[340] IDOC emails to Monitor 8/4/2021 with HPV data from Decatur CC and Logan CC

2. The IDOC has promulgated standard operating procedures for a comprehensive adult immunization program and must continue to implement processes that ensures that all patient-inmates are offered nationally recommended age and risk appropriate adult immunizations. This process will include the provision of immunizations at the various clinical encounters noted in the revised January 2021 Administrative Directive but also in special catch-up vaccine campaigns.

3. The Immunization Program should be placed under the administrative umbrella of nursing leadership and managed by each facility's infection control nurse or a dedicated immunization nurse using approved standing orders to administer recommended adult immunizations.

4. The IDOC must track and report the percentage of fully vaccinated incarcerated individuals for each nationally recommended vaccine, the ongoing offering, administration, and refusal of all adult immunizations, and the percentage of eligible individuals who are offered and received recommended adult immunizations to the CQI committees at each site.

5. The new EMR vendor should incorporate data points and clinical prompts which electronically remind, record, track, and report all adult immunizations offered and administered and the identified clinical indication (age, clinical condition, etc.)

6. The HPV vaccination campaigns at Decatur and Logan CCs should serve as the model for the delivery of nationally recommended adult vaccinations in the IDOC.

7. HPV must be offered to all incarcerated men 26 years of age or younger.

## Cancer and Routine Health Maintenance Screening

**III.M.1.c.** *All prisoners ages 50-75 will be offered annual colorectal cancer screening and PSA testing, unless the Department and the Monitor determine that such testing is no longer recommended.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

In October 2019 the IDOC Office of Health Services distributed systemwide "Standard Operating Procedures: Cancer Screening" which detailed IDOC Routine Health Maintenance and preventive screening recommendations for breast, cervical, colon, and prostate cancer. In January 2021 the OHS and IDOC submitted a draft Immunization and Cancer/Preventive Screening Programs Administrative Directive appropriately adding lung cancer and Abdominal Aortic Aneurysm (AAA) screening that had not been included in the 2019 guidelines and providing increased guidance on gathering and documenting the inmate's prior cancer and routine health maintenance screening history, ordering the recommended screenings during intake screening at Reception & Classification Centers, and reviewing the need for cancer and routine health maintenance (RHM) screenings upon arrival at parent facilities and during sick call appointments, chronic clinic visits, and annual (and bi-annual) physical exams.

Review of intake records for this report show that preventive cancer screening is not currently performed following the 2021 draft cancer screening administrative directive. Practice varies considerably by facility. Cancer screening is not initiated during reception screening nor is it updated during annual physical examinations. Cancer history is not obtained during intake screening nor is cancer screening initiated during the provider physical examination except for cervical and breast cancer screening for females which is initiated by providers at the Logan CC. Quality Improvement meeting minutes do not report cancer screenings that are offered,

administered or refused. The draft administrative directive needs to be completed and properly implemented. Cancer screening needs to be included in the Implementation Plan so that this administrative directive is properly implemented.

The United States Preventive Services Task Force (USPSTF)[341] and the IDOC 2021 guidelines[342] recommend that colon cancer begin at age 45 for asymptomatic, average risk patients. As noted in the 2nd Court Report during site visits to Lincoln CC and Logan CC in February 2020 and again at Shawnee CC in 2021 there was no evidence that nationally recommended screening tests[343] are used by IDOC or that IDOC is using its own guideline[344] to screen for colorectal cancer. Both the 2019 and 2021 IDOC colon cancer screening guidelines recommend Fecal Immunochemical Testing (FIT) which is a nationally recommended modality to screen average risk individuals for colon cancer. During the most recent site visit[345] zero (0%) of twelve men 50 years of age or older and zero (0%) of fourteen men 45 years of age older (recently revised age criteria) had documentation in the medical record that they had been offered a recommended screening test for colon cancer. The medical staff at this site were not aware that FIT testing had been recommended by the OHS as the current preferred test for colon cancer screening. One provider stated that he was doing digital rectal exam with a single hemoccult test to screen for colon cancer; this method of screening for colon cancer was discontinued 15-20 years ago. The other provider stated that he would use three hemoccult card testing methodology to screen for colon cancer; this is nationally approved screening test if a highly sensitive guaiac test is used, but is less sensitive and less specific and is not recommended by the IDOC Administrative Directive[346].

IDOC has communicated to the Monitor that the point-of-care FIT screening kits are to be used for colon cancer screening. The Monitor has requested data on FIT colon cancer screenings at all IDOC sites including tests offered, performed, results (positive or negative), and date positive tests referred for colonoscopy.[347] As of July 2021, no data on FIT screening has been provided to the Monitor. Without data on the implementation of a nationally recommended colon cancer screening and evidence that this screening is being offered on an annual basis to all eligible incarcerated persons, IDOC continues to be noncompliant with this provision.

As noted in the three previous Court Reports, the USPSTF recommends that selective screening for prostate cancer using PSA testing in average risk males 55-69 of age be based on patient

---

[341] United States Preventive Services Task Force cancer screening guidelines 2020. Age for colon cancer has been lowered to 45 years of age B Recommendation, Colon cancer screening from 50-75 years of age remained as an A recommendation.

[342] OHS Standard Operating Procedures: Cancer Screening October 24, 2019 and Administrative Directive IDOC Immunization and cancer/preventive Screening Program, January 2021 draft

[343] The USPSTF recommends one of the following six screening tests: 1) High-sensitivity guaiac fecal occult blood test (HSgFOBT) or fecal immunochemical test (FIT) every year; 2) Stool DNA-FIT every 1 to 3 years; 3) Computed tomography colonography every 5 years; 4) Flexible sigmoidoscopy every 5 years; 5) Flexible sigmoidoscopy every 10 years + annual FIT; 6) Colonoscopy screening every 10 years

[344] Fecal Immunochemical Test (FIT)

[345] Shawnee CC 6/21-23/2021

[346] Administrative Directive IDOC Immunization and Cancer/Preventive Screening, January 2021

[347] FIT test data requested on 10/27/20 but as of 6/15/21 no data has been provided

preferences and that patients be provided with relevant clinical information by their provider about the pros and cons of PSA screening. The frequency of screening is not clearly defined. Prostate cancer screening should not be done for men 70 years of age or older or with a life expectancy less than 10 years. Routine annual PSA screening for asymptomatic men and digital prostate palpation via a rectal exam is not a national recommendation. OHS's 2019 and the revised 2021 prostate cancer screening guidelines are fully aligned with the USPSTF standards. Interviews with the two providers at the recently visits IDOC facility[348] revealed that the providers were still offering the digital rectal exam as the screening test for prostate cancer; this is not recommended by the United State Preventive Services Task Force or in the IDOC administrative directive.[349]

During the most recent site visit the Monitor was informed by the facility provider that ling screening and abdominal aortic aneurysm was not being offered at this site.

**RECOMMENDATIONS:**

1. The IDOC should track and report the rates of cancer and Routine Health Maintenance preventive services screenings including colon cancer, lung cancer, and abdominal aortic aneurysm screenings offered, performed, and refused and report these results to the facility CQI committees.
2. The IDOC should track and report on the percentage of eligible men and women who are current with all nationally recommended cancer and routine health maintenance screening standards.
3. The IDOC should continue to incorporate all the A and B recommendations of the USPSTF into the RHM/Preventive Services program.
4. The IDOC should provide ongoing education to providers on the nationally recommended preventive screening standards.
5. The wording of III.M.1.(c) in the Consent Decree should be modified so that the PSA testing recommendation is in align with the prostate screening recommendations of the USPTF.  PSA testing is now recommended to be discussed with men ages 55-69 and colon cancer screening is now recommended for ages 45-75.
6. The preventive cancer screening program needs to be included in the Implementation Plan so that IDOC's administrative directive is properly implemented.

**Mammography Screening**

***Addresses items III.M.1.d***
**III.M.1.d.** *All female prisoners age 45 or older will be offered a baseline mammogram screen, then every 24 months thereafter unless more frequent screening is clinically indicated, unless the Department and the Monitor determine that such testing is no longer recommended.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

---

[348] Shawnee CC 6/21-23/21
[349] Administrative Directive IDOC Immunization and Cancer/Preventive Screening draft January 2021

**Breast and Cervical Cancer Screening**

As reported in the 2nd Court Report staff interviews and limited chart reviews performed during the February 2020 site visit at the Logan CC female facility revealed that women were being regularly screened for breast and cervical cancer. Recent medical reception record reviews of ten records provided by IDOC from Logan showed that all ten women were screen with a PAP smear and two of two women who needed mammography were screened.

However, the Monitor has not identified any data in the Quality Improvement Committee minutes during 2020 and 2021 that reported on the monitoring of breast and cervical cancer screenings. As noted in the 3rd Court Report, IDOC provided the Monitor with data about the total number of mammograms, PAP smears, and colposcopies performed from January through September 2020.[350] No additional updated data about the provision of breast and cervical cancer screening has been provided to the Monitor.

As previously discussed in the 3rd Court Report, the 2020 data reports the numbers of screening tests performed; they do not indicate whether all women who should be screened are screened. Normal mammograms are to be repeated every 2 years on women between 50 and 75 years of age; normal PAP smears are done every 3-5 years in females between 21 and 65 years of age based on age and negative HPV cultures. Abnormal mammograms and PAP smears would require more frequent imaging and testing. On any given day in 2021 the two female institutions house approximately 225 women [351]who are candidates for mammography screening every 2 years which would suggest that the annual number of mammograms should be around 110 mammograms per year. 1170 women[352] are between the ages of 30 and 75 years and are candidates for PAP tests every 3-5 years, this would predict that 250-400 cervical cancer screenings would need to be done annually. However, these are crude estimates that do not reflect the turnover rates in these two facilities, the numbers of new admissions, and the volume of abnormal screening tests that require additional studies. IDOC needs to track these two cancer screening modalities based on the percentage of eligible women who are offered, received, and refused testing within the established timeframes. This data should be reported to the CQI committees and corrective action taken as indicated. Although mammograms and PAP tests are being performed at both female institutions, appropriate data and tracking to assure that all eligible women are being testing in accord with nationally cancer screening standards. This is currently not being done by the IDOC.

**RECOMMENDATIONS:**
1. Monitor and report the offering and provision of breast and cervical cancer screening to the Quality Improvement Committees
2. Report Women's health data based on the percentage of eligible incarcerated women who receive breast and cervical cancer screenings within the established national USPSTF guidelines.

---

[350] Women's Health Screening Data provided to Monitor by IDOC in a November 23, 2020 email
[351] 18.5% of the IDOC female population
[352] 96% of the IDOC female population

# Pharmacy and Medication Administration

*Addresses items II.A; II.B.1; II.B.6.c; II.B.6.d;*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care.*

**II.B.6.c.** *IDOC agrees to implement changes in the following areas: Medication administration records-both for directly administered medications and KOP.*

**II.B.6.d.** *IDOC agrees to implement changes in the following areas: Medication refusals;*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

The problems with medication administration and refusals described since the Second Court Appointed Expert Report in 2018 have not been addressed. [353] Recommendations made in the several Court Monitor reports since then have been intended to assist the IDOC to achieve compliance with the Consent Decree. The Defendants have not responded to or taken steps to address any of the Monitor's recommendations. Defendants have provided almost no information with regard to compliance with II. B. 6. c or d.[354] OHS only very recently sent drafts of two policies concerning medication administration and control of pharmaceuticals.[355] These will be commented on briefly here and will be discussed in more detail in the Monitor's 5th report. The Implementation Plan has not addressed how compliance with II. B. 6. c or d will be achieved.[356] The Monitor has suggested that the Implementation Plan address improvements to medication administration and refusals via a process improvement project with SIU, OHS and the Monitor.[357]

The immediate steps the Monitor[358] recommended were to:

1. Engage a process consultant to facilitate a statewide plan to standardize medication administration which addresses concerns about medication preparation, documentation on the MAR, and reporting of medication refusals and is consistent with patient safety practices and contemporary standards of care.

---

[353] Report of the 2nd Court Appointed Expert, Lippert v. Godinez October 2018, Lippert v Jeffreys Consent Decree, First Report of the Monitor (November 24, 2019) page 14-16, Health Care Monitor 2nd Report Lippert v Jeffreys (August 6, 2020) pages 118-123, Health Care Monitor 3rd Report Lippert v Jeffreys (February 15, 2021) pages 120 - 127.

[354] Illinois Department of Corrections, Defendants' Reporting Requirement Pursuant to V.G. of the Lippert Consent Decree (May 2021).

[355] These drafts were received in August 2021 as this report was being written.

[356] Final Revised Lippert Implementation Plan 6/12/2020,

[357] Memo from the Monitor to Kelly Presley dated June 3, 2021

[358] Health Care Monitor 3rd Report Lippert v Jeffreys (February 15, 2021) pages 120 -121.

157

2. Use the results of the process improvement project to establish more detailed operational guidance to include at a minimum:

    a. Two-part patient identification with the MAR at the time medication is administered.

    b. Timely transcription of medication orders onto the MAR.

    c. Having the MAR present at all times medication is administered to patients.

    d. Administering medications directly from pharmacy-dispensed, patient-specific unit dose containers and contemporaneously document administration on the MAR.

3. Develop a workload driven staffing standard based upon the changed process for medication administration.

None of these three immediate steps have been initiated by the Defendants. The Monitor looks forward to seeing this input incorporated into subsequent drafts of the Implementation Plan.

**Medication Administration**

Since the 1st report the Monitor has recommended that facilities cease the practices of charting medication administration either before or after medication line and pre-pouring medication in advance of administration.[359]   Medication errors that took place as a result of continuing these practices are documented in the discussion of medication errors at facility CQI meetings and include documenting on the incorrect MAR, administering to the wrong patient, administering the wrong medication, administering the wrong dose and failing to document on the MAR.[360] Citing these in the Monitor's report is to illustrate the consequences of pre-pouring and not charting contemporaneously on patient safety not to fault the reporting of errors.

We noted in the 3rd Report that two thirds of all facilities were pre-pouring. The IDOC did not provide this information to the Monitor for the 4th Report. The Monitor has no reason to believe the prevalence of this practice is any less. The Monitor found that nurses pre-pour medication at Shawnee CC during our site visit in June 2021.

As stated earlier, the Monitor received a draft administrative directive on medication services in August 2021. As drafted, it prescribes minimal change in practice and no standardization or operational guidance. Notably the draft allows for pre-pouring of medication when medications are to be delivered to the cell front. It also allows medication to be documented up to an hour after administration rather than at the time of administration. This policy basically continues business as usual rather than changes as called for by II.6.c. The changes to comply with II.6.c are those recommended by the 2nd Court Appointed Expert in the absence of any other specific guidance in the Consent Decree.

---

[359] Lippert v Jeffreys Consent Decree, First Report of the Monitor (November 24, 2019) page 15, Health Care Monitor 2nd Report Lippert v Jeffreys (August 6, 2020) page 122, Health Care Monitor 3rd Report Lippert v Jeffreys (February 15, 2021) page 126.

[360] CQI minutes Danville February 2021, Hill January, February and March 2021, Illinois River January, February and March 2021, Lincoln January 2021, Logan March 2021, and Stateville March 2021.

Further, the draft administrative directive calls for the person administering medication to check the "six rights"[361] but provides no detail as to how this "check" is completed. For example, no detail is given about how to check that it is the "right person". We have recommended two-part patient identification with the pharmacy generated MAR at the time medication is administered.[362] None of the other six rights are possible to verify when medication is pre-poured since the medication being given has been separated from the pharmacy generated patient specific package of medication.

The Monitor is aware that there are barriers and obstacles within IDOC to achieving safer medication administration practices, but they must be resolved. Medication administration is a complex process that involves many steps and coordination between health care personnel and security staff. That is the reason we recommended IDOC engage the services of a process consultant and utilize a process improvement methodology. There is nothing so unique about IDOC's medium and maximum custody facilities to distinguish them from hundreds of other similar facilities in the U.S. which administer medication directly from a patient-specific pharmacy package and document administration simultaneously on the MAR.

The monthly pharmacy inspections and audits of MARs were reinitiated at most facilities in 2021. The most common issues found on inspection of the medication area at facilities was incomplete documentation on the temperature log for the refrigerator and expired or unlabeled medications. The performance issue most often identified from the audit was missing documentation on the MAR and transcription errors and omissions. This finding is consistent with our review of charts for this report. The CQI minutes reflect no discussion of procedural or systemic solutions to problems with medication management and very little indication of corrective action. Improvements that would greatly increase patient safety by eliminating transcription error include computerized provider order entry (CPOE), pharmacy generated MARS and prescription labels and administering medication from the patient specific packaging as dispensed by the pharmacy. Each of these improvements also save the time it takes nursing staff to complete transcription.

Members of the Monitor's team had the opportunity to meet[363] with the Pharmacy Director at Wexford and the Client Relations Manager for Boswell, the pharmacy subcontractor. When asked about whether the inspections address pre-pouring and timeliness of documentation the response by the Pharmacy Director was that they do not look at issues regarding nursing practice but limit their review to medication storage and use. There is no evaluation of nursing practice in administering medication against any set of published standards or performance expectations. This needs to be addressed as part of the process improvement project and ultimately be included in the CQI program.

Problems as described in the 3rd Report with medication timeliness and continuity were apparent from our review of death charts for this report. These include patients whose orders were not transmitted to the pharmacy timely, KOP medications that were ordered but never picked by the patient, DOT medications that were not administered, and prescriptions that were not filled or

---

[361] These rights are that it is the right patient, right dose, right route, right time, right medication, and right documentation.
[362] Health Care Monitor 3rd Report Lippert v Jeffreys (February 15, 2021) page 126.
[363] M. Puisis and C. Knox on Tuesday June 22, 2021 at 10 am while at Shawnee Correctional Center.

refilled timely.[364]  One of these was a patient[365] who had asthma since childhood and a co-occurring polyposis. In the 12 months before death, he was prescribed three inhalers.[366] The medication administration records indicate that he went without these medications for long periods of time. For example, the Alvesco inhaler was not provided for a period of 74 days when it should have been provided at 60 days. At the same time the patient had limited access to his rescue inhaler. In addition, he was treated episodically for exacerbation of both conditions. This included nine prescriptions for prednisone. He never received one of these prescriptions and six times he did not receive the first dose for three or more days later.[367] Only twice was the first dose of this medication given timely to treat an urgent care situation.[368]

The problems with medication administration at IDOC facilities are complex but they are not unique nor insurmountable. Individual facility variation with regard to medication management is unacceptable. This is the reason the Monitor has recommended hiring a process consultant to map out the process and facilitate stakeholder efforts to correct unsafe practices and streamline effort so that medication administration is not only timely but safely administered. The process improvement project would also produce the detailed operational guidance that the Monitor recommends[369] specifying how medication is prescribed, how and by when treatment is initiated, how medication is to be administered safely and timely, including delineation of support to be provided by the facility, and establish how and by when documentation of medication administration takes place. The statewide Director of Nursing and Regional Medical Coordinators should be primarily responsible for developing standardized expectations and directions for medication management in collaboration with correctional leadership.

**Medication Refusals**

OHS recently provided a draft administrative directive on Medication Service which attempts to address medication refusals and non-adherence. Until this document there were no written guidelines concerning this topic. The Monitor has recommended since the 2nd Report that the parameters for notification of providers when patients miss or refuse prescribed medication should be established in statewide written directive. The most recent draft administrative directive defines which medication types are to be monitored and specifies that nursing staff are to monitor adherence weekly. However, it does not define non-adherence thus leaving the determination up to individual nursing staff. The Monitor has recommended that non-adherence be defined as after three consecutive refused doses or more than four non-consecutive doses in a seven-day period.[370]

At a minimum, the provider should have the most recent MAR to review at the time of any provider appointment. In the absence of this the provider should have a summary of medication adherence provided in advance of the appointment. This expectation is not included in the recent draft administrative directive. We also recommended that written guidance should also set forth the

---

[364] Mortality review patient #s 3, 7, 10, 11, 14, and 17
[365] Mortality review patient #2
[366] Two were controller medications and one was a rescue inhaler.
[367] Twice the first dose was given six days later, once the first dose was five days later and once was four days later.
[368] The standard of care for medication timeliness is 24 hours or less from the time the order was given until the first dose is administered.
[369] Health Care Monitor 3rd Report Lippert v Jeffreys (February 15, 2021) pages 121-122.
[370] Health Care Monitor 3rd Report Lippert v Jeffreys (February 15, 2021) page 127.

expectations for prescribing clinicians' response to address patterns of non-adherence. The recent draft states that providers are expected to discuss the importance of taking prescribed medication with patients and risks of non-adherence, but it does not set parameters as to when this is to take place.

There were no internal or external studies of adherence with somatic medication or how refusals are addressed in the CQI minutes that were reviewed.[371] From chart review it is apparent that medication records are not reviewed by providers or adherence summarized prior to important patient-provider encounters such as chronic clinic or infirmary rounds.[372] For example one patient,[373] was a 55-year-old who was seen in chronic clinic for hypertension. He was prescribed 12.5 mg of hydrochlorothiazide daily which he took himself as a KOP. The medication administration records show that he went for a period of 65 days having received only 30 tablets, next a period of 46 days having received only 30 tablets, and a third consecutive period of 40 days having received only 30 tablets. When he was seen by a physician for renewal of permits his blood pressure was high (160/120). The provider did not review the medication administration record to evaluate the degree of non-adherence and did not order a follow up appointment earlier than the next chronic care visit. Two months later a provider discontinued the hydrochlorothiazide and ordered another medication presumably to better control the hypertension. The provider did not see the patient when changing these medications, so the patient did not receive an explanation and agree to the change. The patient attempted twice to communicate that the medication he was receiving was wrong but was not scheduled to see a provider. Nurses tried to explain what the new prescription was, but the patient was ultimately unconvinced to accept it. Seventy days later the patient was seen by the provider. The patient said he had run out of hydrochlorothiazide and wanted the prescription renewed and the new medication stopped.

Sometimes providers respond to non-adherence in a manner that does not demonstrate an effort to adjust the plan of care to achieve the therapeutic aim or help the patient be more adherent. For example, one patient [374] was being treated for heart failure and Lasix was among the medications prescribed. He also had polio and used a wheelchair. He was refusing to take the Lasix. He told the provider it was because it made him urinate too much and it was difficult to use the bathroom. The provider stopped the Lasix without substituting any other drug or follow up. Another patient[375], had poorly controlled diabetes, hypertension, chronic kidney disease and vitamin B12 deficiency. He also had multiple amputations on the foot, and it was ulcerated and being debrided. The patient was not taking the insulin that was prescribed because it hurt to walk to the Health Care Unit. The doctor's response was to advise the patient to cooperate more with his diabetes care. No adjustment was made to the plan of care. The patient had a reasonable complaint about difficulty walking and it was interfering with management of his diabetes. The standard of care

---

[371] First quarter 2021 CQI minutes submitted by facilities. The CQI minutes from Vandalia CC report a study of the follow up by mental health after consecutive medication refusals in January 2021. No similar study of refusals of other critical medications (for example medications to treat HIV disease) was reported.
[372] Mortality review patients 2, 11, and 14
[373] Mortality review patient # 5
[374] Mortality review patient #1
[375] Mortality review patient # 3

would have been to off-load[376] the patient; instead, the patient was kept in general population and made to walk with a diabetic foot ulcer.

In the 3rd Report the Monitor voiced concern about the lack of meaningful participation by the pharmacy in identifying problems with medications being prescribed and in consulting with physicians to achieve more effective treatment. For the 4th Report Monitor reviewed a number of charts of patients whose prescriptions should have prompted action by the dispensing pharmacist to notify and confer with the prescribing provider and it does not appear this safety step was taken. This included three patients who had prescriptions for tramadol, a narcotic medication, written for extended periods of time and sometimes without an indication.[377] This drug has risk for adverse reaction when used over long periods of time. One of these was a patient on 12 other medications increasing the likelihood of duplicate therapy and drug-drug interaction. There was no evidence that the prescribing provider was contacted by the dispensing pharmacist to discuss the risk of adverse reaction and to suggest alternative medication. Inappropriate use of tramadol was discussed in the 3rd Report as well.[378]

Another patient was on two aspirin medications and was also receiving ibuprofen putting him at risk for gastrointestinal bleeding.[379] Another patient was prescribed pulse treatment with prednisone the first five days of every month; a therapy for which there is no literature to support its use.[380] This patient was also prescribed mesalamine, a drug used to treat inflammatory bowel disease, but there is no documentation that he was being followed medically for this condition. Several patients were on medications without any documentation of the indication.[381] Another patient was prescribed ondansetron for a year with no indication and no monitoring. This patient was on 15 medications in addition to the ondansetron.[382] All of these patients would have benefited from pharmacy oversight and provider consultation.

Given these concerns the Monitor's team asked Wexford's Pharmacy Director and the Client Relations Manager for Boswell how prescriptions are reviewed before dispensing and consulting with providers. We learned that the dispensing pharmacist fills from a copy of the written order after screening for interactions and contraindications. The indication or rationale for the drug is not a required part of the order and the pharmacist does not have access to the patient's medical record. When asked about the identification of issues such as long-term use of opiates or steroids the Pharmacy Director stated that if someone at the facility brings the issue to their attention, they can provide advice. When asked if the pharmacy looks at patients on multiple medications to provide recommendations the response was that there was no standard process. Automation of provider orders and pharmacy consultation would greatly enhance patient safety and improve treatment appropriateness.

---

[376] It is recommended that patients with diabetic foot ulcers are kept off their feet or "off loaded". In practice this would mean placing the patient in a walking boot and housing the patient on an infirmary unit with crutches to prevent the patient from walking on the foot. Care of this patient was contrary to standard of care.
[377] Mortality review patient # 1 on tramadol for 18 months; mortality review patient #3 on tramadol for 12 months; mortality review patient #12 on tramadol for 7 months.
[378] Health Care Monitor 3rd Report Lippert v Jeffreys (February 15, 2021) page 125.
[379] Mortality review patient #13
[380] Mortality review patient #9
[381] Mortality review patient #s 1, 9, 10, 11, 12, and 17
[382] Mortality review patient #11

The Monitor commented in the 3rd Report that the HIV clinic has incorporated clinical pharmacists into the chronic care of this patient population at the IDOC and should use this experience to build out clinical pharmacy to address other complex patients. The Monitor recommended that OHS evaluate the need for clinical pharmacy and include the results of that evaluation in the Staffing Analysis and Implementation Plan.[383] There is no evidence that IDOC considered this recommendation, and no clinical pharmacy consultation was built into the staffing analysis.[384]

**RECOMMENDATIONS:**

**The following are the same recommendations as the Monitor's 2nd and 3rd report with the addition of clinical pharmacy consultation.**

1. A standardized process for medication administration that addresses concerns about medication preparation, documentation on the MAR, and reporting of medication refusals and is consistent with patient safety practices and contemporary standards of care must be implemented statewide. This should be managed as a comprehensive plan of change with clear targets, steps to proceed, timeframes, and outcomes. A process consultant is recommended to facilitate forward progress, streamline methods, and identify problems unforeseen by the leadership group.
2. Facility operations need to provide sufficient access to inmates, so medications are administered safely, including scheduling sufficient time to perform the task, specialized equipment, and maintenance of physical plant.
3. Establish more detailed operational guidance specifying how medication is prescribed, how and by when treatment is initiated, how medication is to be administered safely and timely, including delineation of support to be provided by the facility, and establish how and by when documentation of medication administration takes place. At a minimum this should include:
   a. Two-part patient identification with the MAR at the time medication is administered.
   b. Timely transcription of medication orders onto the MAR.
   c. Nurses should have the MAR present at all times medication is administered to patients.
   d. Nurses should administer medications to patients directly from pharmacy-dispensed, patient-specific unit dose containers and contemporaneously document administration on the MAR.
4. Develop a workload driven staffing standard to account for the nursing staff necessary to carry out orders for medication treatment.
5. Establish more detailed operational guidance about notification of the prescribing provider of patient non-adherence with medication prescribed for somatic complaints as well as expectations for the prescribers' response to such notification. Typically, this guidance will be to notify the prescriber after three consecutive doses or more than four non-consecutive doses in a seven-day period of critical medications only. Identification and

---

[383] Health Care Monitor 3rd Report Lippert v Jeffreys (February 15, 2021) page 126.
[384] Staffing Analysis, Illinois Department of Corrections Office of Health Services, Lippert Consent decree, 8/17/21

163

notification of the prescribing provider should be built into the electronic health record. Expectations for the provider are to discuss the issue with the patient, collect additional information as necessary (labs, meet with the dietician or nurse etc.), document the discussion in the health record as well as the consideration of change (or not).

6. Eliminate expiration of non-formulary requests once approved.
7. Implement the electronic health record including CPOE (computerized physician order entry) and MAR. Develop automated reports of patients with medication orders which expire in the next seven days and notification to providers of non-adherence.
8. Build on existing experience with clinical pharmacy personnel in the HIV clinics to expand access to clinical pharmacy for other chronic conditions, including chronic pain.
9. Document development and implementation of corrective action plans to address results of the pharmacy inspection and MAR audit. Trend medication errors and collate results of root cause analysis to identify causes of medication errors. Include structural, equipment and procedural changes to correct problems rather than reliance on reminders at staff meetings and verbal counseling. Establish an observational tool to be used by nursing supervisors to monitor compliance with medication administration procedures and include this study on the CQI calendar.

# Discharge Planning

*Addresses Items II.B.5; II.B.6.s; II.B.6.t;*

**II.B.5.**   *Continuity of care and medication from the community and back to the community is also important in ensuring adequate health care.*

**II.B.6.s.**   *IDOC agrees to implement changes in the following areas: Summarizing essential health information for patient and anticipated community providers; and*

**II.B.6.t.**   *IDOC agrees to implement changes in the following areas: Upon release, providing bridge medications for two weeks along with a prescription for two more weeks and the option for one refill, if medically appropriate.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

The IDOC asserts compliance with II. B. 6. t of the Consent Decree which states that persons being released from IDOC will receive two weeks of medication along with a prescription for two more weeks and the option for one refill, if medically appropriate.[385]  No information or other documentation was provided to support the assertion that compliance has been achieved. No information was provided in the Bi-Annual IDOC report concerning II. B. 5 or II. B. 6.s.

Policy and practices of the IDOC with regard to discharge planning for the purposes of continuity of medical upon return to the community is unchanged since the 3rd report by the Monitor.[386]  To summarize here, the IDOC has yet to finalize policy and procedure for discharge

---

[385] Illinois Department of Corrections, Defendants' Reporting Requirement Pursuant to V. G. of the Lippert Consent Decree, May 2021, pg.1
[386] Health Care Monitor 3nd Report Lippert v Jeffreys (February 15, 2021) pages 127-131.

planning. There was wide variation in the actual practices of medication continuity, the discharge medical summaries are incomplete or inaccurate, little to no information is provided about tuberculosis screening, vaccination status or risk- or age-based health screenings, and the status and control of chronic disease and information from the most recent chronic disease clinic was not documented as included in the discharge information. There is little to no evidence of provider involvement (physician, nurse practitioner, or physician's assistant) in discharge planning or clinical review of need for medical referral. HIV testing is offered before release.

The Monitor reviewed medical records of eight persons who were discharged back to the community from the Shawnee Correctional Center in April 2021. A discharge plan and medical summary was documented in the health record of seven individuals. Five individuals were taking medication at the time of the release. All but one received a 30-day supply of medication rather than, as stated in the Consent Decree, "two weeks of medication along with a prescription for two more weeks and the option for one refill, if medically appropriate." [387] One individual received a month's supply of omeprazole but there was no information on the discharge medical summary or on the problem list to indicate the medical reason (presumably gastroesophageal reflux or GERD). [388] Another patient was provided three different inhalers for asthma at the time of release although he only had an order for one. [389] This was an undetected medical error. [390]

Most of the discharge medical summaries completed at Shawnee CC were within a few days of release. [391] The Monitor's 3rd report found discharge medical summaries completed a month or more in advance at other facilities. [392] The Monitor identified this as a poor practice. No information has been provided by IDOC to indicate this practice has changed.

Five of these eight discharged individuals had chronic illnesses; however, the status and control and most recent chronic care clinic results (including comprehensive lab results) were not on the medical discharge summary or documented as included in the discharge information except for one. [393] Two patients diagnosed with HIV had evidence of referrals for ongoing care documented in the health record.[394] Other individuals with needs for ongoing care were to arrange for their own follow up in the community. [395] One patient who is a diabetic was to check his blood glucose twice daily and adjust the dose of insulin accordingly. There was no documentation in the record that supplies for blood glucose monitoring were provided at the time of discharge nor was there any documentation that he knew how to do this.

The Monitor recommended in the 3rd report that a pre-release planning form used at Lawrence CC be adopted at all facilities because it documents physician and psychiatry review of needs for

---

[387] Discharge planning patient #s 1, 2, 3, and 4
[388] Discharge planning patient #4
[389] Discharge planning patient #5
[390] The provider discontinued orders for two inhalers which were not transcribed by nurses onto the medication record.
[391] Discharge planning patient #s 1 and 2 had the discharge medical summary completed more than three weeks prior to release.
[392] Decatur and Pinckneyville
[393] Discharge planning patient #1
[394] Discharge planning patient #s 1 and 3
[395] Discharge planning patient #s 2, 3, 6, and 7

continuity of care upon release. [396]  There was no evidence this form is used in the discharge planning process at Shawnee and therefore no reason to believe that it has been adopted elsewhere.

Individuals being released from IDOC who have medication orders do receive a supply of medication at the time of release; however actual practice is not consistent with the language of the Consent Decree. It is also the practice of IDOC to summarize health information for the patient; however, the information is often inaccurate and incomplete. Information provided and the supply of medication and other needed items at discharge is sloppy and haphazard. There is no clinical oversight for continuity of care at discharge.

**RECOMMENDATIONSFROM the 3rd Report:**

1. Initiate a review to determine why the practices for supplying medication and prescriptions vary from the Consent Decree. Pertinent questions to ask include who determines what medications are provided at discharge, how are discharge prescriptions obtained, who is involved in preparing medications for discharge and how do they go about this task. There needs to be better evidence that the clinician's responsible for the person's medical and mental health care determine what medications the patient receives upon release, and they provide a prescription for an additional two weeks and determine if a two-week refill is medically appropriate.
2. Implement use of the pre-discharge planning worksheet that was used at Lawrence CC and incorporate it into the policy and procedure. If planning for continuity of care will be necessary, use of this worksheet should initiate a referral to the responsible medical and mental health clinician to review the patient chart and see the person as necessary to make determinations about medical and referrals to the community.
3. All releases should have a Discharge Medical Summary completed no more than a day or two before release. The Discharge Medical Summary should provide a thorough and accurate summary of the person's current condition and need for ongoing care.
4. Finish the policy and procedure for discharge planning. Incorporate what was learned from completing the first recommendation and use of the discharge planning worksheet.
5. Enhance continuity of care into the community for discharged individuals by providing copies of pertinent diagnostic tests, recent chronic care progress notes, vaccinations, and routine health maintenance screenings in the discharge packet. When these are included, it should be so noted on the Discharge Medical Summary.
6. A copy of the actual prescription with refills should be placed or scanned into the medical record to verify the information on the Medication Receipt at Discharge form.

# Infection Control

*Addresses items II.A; III.J.1; III.J.2*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class*

---

[396] Health Care Monitor 3nd Report Lippert v Jeffreys (February 15, 2021) page 130. The Monitor also suggested some revisions to improve the form.

*Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*
**II.B.3.** *IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff.*
**III.J.1.** *IDOC shall create and staff a statewide position of Communicable and Infectious Diseases Coordinator. This position shall be filled within fifteen (15) months of the Preliminary Approval of this Decree [June 2020].*
**III.J.2**. *Facility staff shall monitor the negative air pressure in occupied respiratory isolation rooms which shall be documented each day they are occupied by prisoners needing negative pressure. If unoccupied, they shall be monitored once each week. Facility staff shall report such data to the Communicable and Infectious Diseases Coordinator on a monthly basis.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**
In his 3rd Report, the Monitor recommended seven essential elements of an infection control program. These included:
1. A statewide infection control coordinator who is trained and certified in infection control.
2. An infectious disease physician consultant to provide easily accessible expert advice that is beyond the scope of knowledge or expertise of the statewide infection control coordinator.
3. Dedicated infection control nurses at every facility, who have received training in infection control.
4. An infection control policy, procedure and manual that are specific to IDOC needs.
5. A prioritization of infection control as an essential element of the IDOC program.
6. Data support to track infectious and contagious diseases.
7. A qualified physician staff that can effectively participate in infection control activities at a facility level.

None of these has been accomplished and IDOC has provided no information on these items including in their recent Bi-Annual Report. Little progress has been made. The IDOC still has no Implementation Plan and no plans for implementing an infection control program so achievements are occurring haphazardly. Achievements that have been accomplished since the last report have been driven by the dispute resolution process and crises including those generated by the COVID pandemic and are not part of a coordinated plan. The IDOC has developed an informal relationship with a public health physician at IDPH during the COVID-19 pandemic but this relationship is predominantly focused on COVID-19 issues.

Though the IDOC population declined by approximately 28%[397] since the COVID-19 pandemic started, as of 8/23/21, 10,998 inmates have been infected with COVID-19 which is approximately 33% of the inmate population as opposed to approximately a 12% Illinois civilian

---

[397] The Monitor does not have accurate up-to-date data on this. The Monitor uses a 2019 population of 39,000 and a current population of 28,000 or an 11,000 reduction in population which calculates to a 28% decline.

infection rate on the same date.[398]  This is demonstration of the difficulty of containing a virus in congregate settings.  Inmates were thus 2.75 times more likely than Illinois civilians to be infected with COVID-19.  It is the Monitor's belief that the lack of an effective infection control program that did not timely test or isolate inmates, and crowded conditions of confinement contributed to this data.  Based on the best estimates of deaths,[399] IDOC inmates have at least a 1.67 times higher death rate than the civilian Illinois population which, based on record reviews, appears to be caused by delayed monitoring and response to COVID-19 infections within IDOC facilities.  Inmates did not fare as well as civilians with respect to COVID-19 likely due to conditions of confinement and to lack of infection prevention preparedness and clinical care.  With the outside assistance of the Illinois Emergency Management Agency (IEMA) and the Illinois National Guard, a very effective vaccination effort for inmates was implemented resulting in over 70% vaccination rate of inmates yet the employee vaccination rate of approximately 44% lags the average Illinois vaccination rate of approximately 59%.  The lagging employee vaccination rate is of considerable concern given the Delta variant.  The Monitor supports Governor Pritzker's executive order[400] which mandates state employees in congregate settings, including in IDOC, to receive a first dose of vaccination by 9/5/21 and be fully vaccinated within 30 days of their first dose.  The Monitor has not yet been informed of the implementation of this order.  With significant assistance from IDPH, UIC, IEMA, and the Illinois National Guard, IDOC has improved its COVID response over the past 6 months.

However, IDOC still does not demonstrate that it has an effective independent infection control program to address future infection control challenges.

The Monitor's 3rd Report cited 18 recommendations in the Infection Control section.  The IDOC has addressed four recommendations and partially addressed three recommendations.  Eleven recommendations have not yet been addressed.  The status concerning these recommendations are noted sequentially in the subsequent paragraphs.  The Monitor continues to rate Infection Control as partial compliance based on the revision and implementation of the Hepatitis C Screening and Treatment Guidelines March 2021, the development of a professional relationship with IDPH in the management of COVID-19 related issues, the ongoing management of COVID-19 surveillance and mitigation testing, and the systemwide COVID-19 vaccination rollout.

Recommendation one
The IDOC reported in May 2020 that the position of Communicable and Infectious Disease

---

[398] This is based on the IDOC COVID-19 inmate cases as reported at https://www2.illinois.gov/idoc/facilities/Pages/Covid19Response.aspx   and the COVID-19 civilian cases of 1,492,582 as reported on the IDPH website at https://www.dph.illinois.gov/covid19 and the population of Illinois of population 12,671821 as reported by the US census bureau as found at https://www.census.gov/quickfacts/IL
[399] As of 8/23/21 Illinois civilian deaths were 23,761 based on the IDPH website at https://www.dph.illinois.gov/covid19.  As of March of 2021, the John Howard Association reported 88 deaths from March of 2020 to March of 2021.   These data yield an inmate death rate of 314 per 100,000 versus an Illinois civilian COVID death rate of 187 per 100,000.  However, because the inmate deaths were only reported to March, the inmate death rate may be under-reported.
[400] COVID-19 Executive Order No.87

Coordinator had been filled; therefore asserting compliance with III.J. [401] The Monitor does not agree that IDOC has fulfilled its obligation for III.J. because the individual does not have sufficient training and experience to qualify for the infection control and infectious diseases position as required by Section II.B.3 of the Consent Decree which states that "IDOC must also provide enough trained clinical staff …".[402] The individual filling the position of Communicable and Infectious Disease Coordinator has no training in infection control and only eight months relevant work experience. The Monitor has advised the IDOC [403] that the position requirements should include:

- Experience in infection control,
- Certification in infection control and prevention through the Certification Board of Infection Control and Epidemiology and maintenance of certification,
- Proficiency with electronic software systems for surveillance and use of an electronic health record and use of electronic surveillance reporting systems,
- Six Sigma green belt certification within 3 years of hire.

The Monitor advised the IDOC in the 3rd report that the incumbent individual should at least obtain certification by the Certification Board of Infection Control and Epidemiology. [404] This certification has not been accomplished or reported.

Recommendation two

The Monitor's 2nd report also recommended IDOC formalize a relationship with Illinois Department of Public Health (IDPH) or a university to provide infectious disease physician guidance on the spectrum of infection control responsibilities the IDOC has including immunization, screening, and other public health matters. [405] The IDOC indicated in the June 2020 Revised Implementation Plan that it would develop such a relationship with IDPH but gave no timetable or steps to be taken to achieve this goal. As noted above IDOC has a working relationship with a public health physician in IDPH but this relationship is exclusively focused on advice and guidance on COVID-19 issues. In the November 2020 Bi-Annual Report, the IDOC stated that it had partnered with SIU for infectious disease guidance in a Court ordered assessment of the initial COVID outbreak in the IDOC and since then indicated that SIU's infectious disease expert can be an ongoing resource for the Department (IDOC).  In the May 2021 Bi-Annual Report the IDOC identifies no steps taken to develop a relationship with IDPH except for issues concerning COVID and is silent about SIU's role in providing guidance on infectious diseases. In the most recent dialogue with IDOC about the Implementation Plan[406] the Monitor stressed the need to have a document that describes the relationship with either IDPH or a university for consultation and guidance concerning infection control.

Recommendation three and sixteen

---

[401] Illinois Department of Corrections, Defendants' Reporting Requirement Pursuant to V.G. of the Lippert Consent Decree (undated) page 4.
[402] Page 5
[403] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020, page 127.
[404] Health Care Monitor 3rd Report Lippert v. Jeffreys, February 15, 2021, page 131.
[405] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020, page 131.
[406] July 28, 2021, telephone meeting between the Monitor and IDOC concerning the development of an Implementation Plan.

In the 3rd Court Report, the Monitor gave recommendations for COVID-19 vaccination.[407]  On 1/3/21 and 1/14/21, the Monitor again wrote to the Parties supporting all efforts to expeditiously vaccinate IDOC staff and incarcerated population.[408] IDOC decided not to fully follow this recommendation and initially offered COVID-19 vaccinations only to IDOC health care workers in all facilities beginning at the end of December 2020 and continuing until late January 2021. The initial report on the rate of acceptance of the vaccination by health care workers in the IDOC was disappointing; 1,231 health care workers were offered the initial vaccination shot and only 403 (33%) accepted the vaccine.[409]

Pursuant to calls with IDOC and the Monitor, IDOC presented a timeline during which correctional staff and incarcerated men and women would be administered COVID vaccines at every IDOC facility. An educational video promoting the benefits of the vaccines was shown throughout the IDOC and OHS did training for peer educators in various facilities. A survey of staff and the incarcerated population indicated that 18,779 (67%) of the incarcerated population but only 4289 (35%) of the 12,200 employees expressed willingness to receive the COVID-19 vaccination.[410]  During a two-week period from February 17, 2021 through March 10, 2021, vaccines provided by local health departments and administered by National Guard and IEMA staff were offered to employees[411] and inmates at 35 IDOC facilities, transitions centers, and the correctional academy.

IDOC reported that over 19,000 (68-69%) of the incarcerated population accepted the vaccine and recently communicated that an additional 1,180 inmates have been vaccinated since 7/30/21, potentially raising the incarcerated vaccination to 73%-75% which exceeds the State of Illinois' current 59% fully vaccinated rate.[412]  Even though 7-8,000 incarcerated men and women are still not vaccinated, this is an impressive accomplishment that provides, at least temporarily,  an umbrella of protection for incarcerated population in the IDOC facilities.

The Chicago Sun Times reported that as of late July 2021, only 44% of IDOC staff were fully vaccinated with two correctional sites having single digit vaccination rates, three between 10% and 20%, six in the 20%'s, 10 in the 30%'s, five in the 40%'s, three in the 50%'s, and just four in the 60%'s.[413] The employee vaccination rates are disturbing because employees were the main

---

[407] Expeditiously implement a COVID-19 vaccination program that initially focuses on all health care staff, inmate porters and hospice worker assigned to health care units, infirmaries, geriatric housing units, ADA units, and other special housing units, incarcerated persons 50 years of age and older starting with the most elderly, patient-inmates with high-risk medical co-morbidities, and correctional officers assigned to health care areas and special housing units. As soon as the COVID-19 vaccine supply increases all correctional staff and employees and all inmates should be offered the vaccine.
[408] Letter to the Parties from the Monitor 1/3/21 and 1/14/21
[409] Communication from IDOC legal team of 1/27/21 HCW immunization data
[410] IDOC communication to Monitor 2/10/21
[411] Employees included all correctional staff and also any health care worker who had not previously received the vaccine
[412] IDPH reports that 58.7% of the Illinois population over 12 years is fully vaccinated and 75.8% have received at least one dose of vaccine as of 8/23/21 as found at http://www.dph.illinois.gov/covid19/vaccinedata?county=Illinois. This number changes daily.
[413] Chicago Sun Times 8/8/21 We Can No Longer Wait for Front-line Workers …to Get Vaccine.  The six sites with less than 20% employee OOVID-19 vaccination rates were Lawrence (7%), Vienna (9%), Vandalia (10%), Pontiac

vector for the entry of COVID-19 into the IDOC in 2020 and 2021 and will clearly continue to heavily contribute to the persistent spread of COVID-19 variants into the IDOC.

IDOC's ongoing mitigation strategy of masking, isolation and COVID-19 testing[414] included 297,935 employee tests and 682,781 patient-inmate tests performed since the start of the pandemic. These measures were not completely effective in aborting the spread of COVID-19 within IDOC facilities.[415] The high patient-inmate vaccination rate accelerated the decrease in the number of positive cases, the hospitalization for COVID infections, and COVID-related mortality.in the IDOC population. From early-mid February 2021 until early June 2021 the number of active COVID cases in the inmate population continued to steadily drop. On 3/3/21 there were 196 active COVID cases in the IDOC inmate population; by 6/28/21 this number had decreased to 4 cases. The last COVID-related mortality of an incarcerated person in the IDOC occurred on 3/28/21.

However, with the emergence of the COVID-19 delta variant, the number of active employee cases and facilities with new employee positive tests began to rise, increasing from 25 employee cases in 2 facilities on 6/28/21 to 157 employee cases in 24 of the 30 IDOC centers on 8/10/21. Based on earlier IDOC trends in the pandemic, once there was an increase in the number of positive employee tests, within a few weeks, the number of COVID positive cases in the incarcerated population began to increase. On 6/28/21 there were only 4 active inmate cases in only 2 facilities but by 8/10/21 inmate cases rose to 68 active cases in 9 IDOC facilities.

| IDOC Active COVID-19 Cases | | |
|---|---|---|
| | Employee cases and # of sites* with employee cases | Inmate cases and # of sites* with inmate cases |
| 6/28/21 | 25 (2 sites) | 4 (1 site) |
| 7/12/21 | 34 (12 sites) | 7 (5 sites) |
| 7/26/21 | 82 (16 sites) | 11(6 sites) |
| 8/2/21 | 157 (22 sites) | 22 (3 sites) |
| 8/10/21 | 124 (24 sites) | 68 (9 sites) |

* Sites with new positive cases since previous date

As noted in the 3rd Court report, it is widely accepted that employees were the prime vectors for the entry of COVID-19 into IDOC facilities during the pandemic. A recent IDOC pilot study at a single facility in the Southern Region tested asymptomatic vaccinated and unvaccinated staff for COVID-19. Sixteen positive COVID-19 tests were detected; 85% of these positive tests were in unvaccinated employees. Both the Monitor and IDOC clinical leadership concurred that

---

(14%), and Robinson (18%). The Monitor had asked for but had not received vaccination data and learned this from a newspaper instead of from IDOC.

[414] Reditus COVID-19 testing schedule for all IDOC facilities, June 2021.

[415] IDOC Website: Facilities COVID-19 Response 8/18/21

asymptomatic unvaccinated employees are again most likely the predominant cause of the recent surge in COVID-19 cases in the IDOC incarcerated population[416]  The Monitor is hopeful that the Governor's executive order mandating vaccines for IDOC employees will further curtail spread of COVID-19 within IDOC.

On 4/12/21 the Monitor was informed that a pilot visitation program would soon begin at one IDOC site and that some onsite volunteer groups would resume activity in the near future.[417] There was no plan to require visitors or volunteer groups to be vaccinated or tested prior to entry into the facility. The Monitor strongly recommended that these groups should be vaccinated or have had recent negative testing prior to being allowed into the institution.

On 4/17/21, the Monitor wrote a letter to the Parties strongly recommending that IDOC mandate proof of current COVID-19 vaccination before allowing staff, visitors, volunteers, or other service groups to enter IDOC facilities.[418] This letter was sent before the more contagious COVID-19 delta variant became the predominant strain in the United States. The IDOC decided not to mandate COVID vaccination for visitors and outside groups to enter IDOC facilities implementing a hybrid plan that only allows contact visitation if both the incarcerated person and visitors were vaccinated.

The Monitor has also repeatedly recommended to the IDOC that all health care and non-health care staff be mandated to be vaccinated against COVID-19.[419] IDOC had chosen not to mandate that staff receive vaccination against COVID-19. The unacceptably low aggregate vaccination rate for IDOC staff continues to put the IDOC inmate population at significant risk for COVID-19 exposure and infection along with the additional risk of morbidity and mortality. Allowing visitors, volunteers, and service groups to be unvaccinated promotes entry of COVID-19 into IDOC facilities and adds an additional layer of risk to the inmate population.

On August 4, 2021, Governor Pritzker issued a statewide COVID-19 vaccine mandate for state workers in state prisons and other facilities as Illinois sees an increase in cases due to the contagious delta variant. The Governor called on unions representing state workers to negotiate the vaccine mandate which becomes effective on October 4, 2021.[420]

The Monitor strongly supports the governor's vaccine mandate which will protect the IDOC incarcerated population from further devastation from the ongoing COVID-19 pandemic. The monitor also recommends that the vaccine mandate include all visitors, volunteers, service groups, and subcontractors before they are allowed to enter IDOC facilities.   National experts have repeatedly stated that COVID deaths are preventable. Eighty-eight incarcerated persons in the IDOC have already died of COVID-19 or COVID-related complications.  With universal vaccination of all who are allowed to enter IDOC, it is hoped that the future COVID -19 death of even a single incarcerated man or woman will be prevented.

---

[416] OHS-Monitor Conference Call 8/12/21
[417] OHS-Monitor Conference Call 4/12/21
[418] Letter to the Parties by Monitor 4/17/21
[419] Defendants' Attorneys-Monitor conference call 2/11/21, Letter to Parties from Monitor 4/17/21, other communications
[420] Chicago Sun Times, 8/5/21 page 1, Some state staff also required to get vaccine in bid to beat virus.

Recommendation four

In none of the Staffing Analyses submitted thus far has IDOC identified positions designated for infection control at the institutions. [421] This is in spite of recommendations from the Monitor to do so since the 2nd report. [422]

Recommendation five

The IDOC has not issued a comprehensive infection control policy. The Monitor has been provided with Infection Control Guidelines issued by the vendor in 2020. We commented in the 2nd report that these were generic guidelines and not specific to the policies and practices of the IDOC. [423] IDOC has issued guidance in the form of memos concerning COVID, treatment of HCV and immunizations but these have yet to be incorporated into a policy manual with procedures and performance expectations for implementation. Review of infection control information reported at CQI meetings indicate variation in practice such as what are considered reportable conditions, tuberculosis screening and preventive treatment, and resources for infection control.

Recommendation six and seven

Item III.J.2 in the Consent Decree directs that all negative pressure rooms are monitored regularly and that the monitoring results are reported monthly to the Communicable and Infectious Disease Coordinator. The IDOC asserted beginning in November 2019 that it was within six months of compliance with this requirement.[424] Twenty-six IDOC facilities[425] have infirmaries with negative pressure rooms, however only 18 or 19 facilities regularly report in their CQI meeting minutes on the status of negative pressure rooms, The reporting is quite limited and generally does not comment on the test used, the correlation of the tissue test with the control panel, and the room number. Six sites have not reported on the functionality of the negative pressure units even once in the last nine months and three sites intermittently do not report negative pressure testing information[426]  In order to demonstrate compliance with III. J. 2 the Monitor recommends that the Infection Control Coordinator establish a reporting log that is submitted with the other Lippert reports by each facility that shows the status of each negative pressure room (occupied or not), the type of check that was done, the correlation of the tissue test with the control panel (if one exists), the date and person completing the check and the result. The reliability of the information on the log will then have to be verified by inspection at the facility.[427] This requirement is neither complex or resource demanding and would have been accomplished by now if IDOC had an implementation plan and a functional infection control program.

---

[421] Staffing Analysis Illinois Department of Corrections Office of Health Services, Lippert Consent Decree 7/7/2021
[422] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020, page 131.
[423] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020, page 126.
[424] Illinois Department of Corrections Implementation Plan, Lippert Consent Decree, November 2019, page 5.
[425] Elgin, Joliet Treatment Center, Murphysboro, and Vienna CC do not have infirmaries or negative pressure rooms.
[426] CQI minutes June, 2020, September, 2020, December, 2020, and March, 2021:  Danville CC, Decatur CC, East Moline CC, NRC, Pinckneyville CC, Shawnee CC did not even once report the functionality of the negative pressure units in these CQI minutes.  Lincoln CC, Stateville CC, Western CC, Taylorville CC did not report once or twice in this timeframe.  Taylorville CC did report in March 2021 that the negative pressure tested "failed".
[427] This recommendation was first made in the Health Care Monitor 3rd Report Lippert v. Jeffreys, February 15, 2021, page 133.

Recommendation eight
IDOC has not addressed the Monitor's recommendation that inmate workers be immunized for hepatitis A[428]. The IDOC administrative directive on blood borne pathogens should be expanded to include vaccination for hepatitis A for inmate workers. During the Shawnee visit two inmate porters stated that they had been vaccinated with hepatitis B but this could not be verified. Whether other inmate porters are vaccinated for hepatitis B could not be verified. IDOC has provided no information that inmate workers have been vaccinated for hepatitis A or B and the Monitor has insufficient information to verify vaccination of inmate workers.

Recommendation nine
The Monitor has discussed at length and recommended for more than a year that IDOC use an interferon-gamma release assay (IGRA) test such as QuantiFERON® TB to screen for tuberculosis infection[429]. The IDOC has not yet responded to this recommendation. The Monitor continues to make this recommendation to the IDOC. See previous reports for an elaboration on the reasons for the recommendation.

Recommendation ten
The Monitor has previously recommended that the Hepatitis C Screening and Treatment Guidelines from September 2020 be finalized and implemented to increase access to HCV treatment in the IDOC. This section includes data provided by IDOC through March 2021; additional data provided to the Monitor during the June 2021 site inspection at Shawnee CC, and data from UIC.[430] The UIC data will be discussed at the end this section.

The Monitor has noted that an unacceptably low percentage of men and women incarcerated in the IDOC with active HCV infections were being offered treatment for Hepatitis C. A number of restrictive administrative and clinical eligibility, and testing processes were identified as significant barriers to access to HCV treatment.

A table representing an audit[431] of HCV treatment is shown below and represents the low numbers of persons under treatment.

---

[428] This recommendation was first made in the Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020, page 126.
[429] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020, pages 128 & 131. Health Care Monitor 3rd Report Lippert v. Jeffreys, February 15, 2021, pages 133 – 4 & 144.
[430] This data was sent from the UIC Hepatitis C program on 8/10/21.
[431] IDOC CQI Minutes

| HCV Treatment Based on Monthly CQI Minutes June 2020 to March 2021 | | | |
|---|---|---|---|
| Date | Active HCV Clinic Patients | Undergoing Treatment | Not on Treatment |
| Jun-20 | 1374 | 17 (1.2%) | 1357 (93.8%) |
| Sep-20 | 1205 | 25 (2.1%) | 1180 (92.6%) |
| Dec-20 | 1217 | 15 (1.2%) | 1202 (94.9%) |
| Mar-21 | 1015 | 20 (2%) | 995 (98%) |

As noted in the above table only 1.2 to 2.2% of active hepatitis C[432] patients in the IDOC between June 2020 and March 2021 were undergoing treatment.[433]

This data is consistent with data over the last two years, during which time only 1.2% of active cases received treatment at any point in time.[434] From June 2020 through March 2021 an average of 94.8% of active HCV patients in the IDOC were not on treatment.[435] The UIC HCV telehealth program data reported that 82 individuals incarcerated in the IDOC in 2019 and 98 individuals in 2020 received HCV treatment. Additional UIC Telehealth data identified that 29 incarcerated individuals had been treated in the 1st quarter of 2021. This projects that 116 individuals would potentially be treated in 2021.

| UIC HEPATITIS C TREATMENT DATA | |
|---|---|
| Feb 2018 through March 2021 | |
| Year | Number Treated |
| 2018 | 79 |
| 2019 | 82 |
| 2020 | 98 |
| 2021 | 29* |

*this is only through 3/26/21 and annualizes to 116 per year

As documented in previous reports there was no discussion in the quality improvement minutes about the continued low rates of HCV treatment.in the IDOC. The total number of incarcerated individuals enrolled in the HCV clinic has decreased from 1,785 in June 2019 to 1,056 in March

---

[432] Number of individuals on treatment divided by the total # of denied/ineligible, pending treatment/work-up in progress, and currently on treatment.
[433] IDOC June, September, December 2020 and March 2021 CQI minutes Hepatitis C Clinic data
[434] Review of CQI minutes, Hepatitis C clinic data: Percentage of untreated HCV individuals receiving treatment on the following dates 6/1/19 (1.3%), 12/1/19 (0.7%), 1/1/2020 (1.0%). 6/1/20 (1.2%), 9/1/20 (2.1%), 12/1/20 (1.2%), 3/1/21 (1.9%)
[435] The untreated included those pending treatment (uncertain if they will be offered treatment) and either not yet in process or deemed ineligible by old guidelines. Excluded for this number were individuals on or having completed treatment, and the small number who refused treatment. The refusals of treatment are not noted on this table.

2021. This is likely consistent with the decreased IDOC census due to the restriction in admissions and early releases during the COVID 19 pandemic.

IDOC facilities currently have an average of 33.7 HCV patients in hepatitis C clinics with a range from one to 80 patients per facility.[436] As previously reported in the Monitor's 3rd Report, there continues to be considerable variability across correctional facilities in the IDOC with respect to treatment of HCV. Data from March 2021[437] showed a range of zero to five individuals on active treatment at IDOC facilities and only 10[438] of the 30 IDOC facilities having individuals currently on treatment. UIC Telehealth HCV treatment data documented that 14 of the 30 IDOC correctional centers did not treat a single HCV patient from January to March 2021.[439] The size of the facility did not correlate with the number of treated HCV patients. In March 2021, Decatur, a female facility with a census of 251 and 38 patients with HCV treated 4 patients for HCV compared with Graham, a facility with 1472 inmates, 80 of whom had HCV but with no patients on treatment. The reasons for this site-to-site variability needs to be analyzed by the quality improvement committees and IDOC quality improvement leadership. The Quality Improvement program should investigate whether systemic or operational barriers to treatment exist. Any systemic barriers to treatment need to be corrected.

As recommended in the 2nd and 3rd Court Reports, the IDOC in conjunction with UIC Telehealth and the Monitor revised the Hepatitis C Screening and Treatment Guidelines to address potential barriers to access HCV therapy and to increase the eligibility for treatment of a number of HCV infected individuals[440]. An unnecessary administrative step in the approval process requiring an offsite vendor physician review prior to forwarding individuals eligible for HCV treatment to UIC Telehealth was eliminated expediting referrals for treatment to the UIC telehealth HCV specialists.

The Hepatitis C Screening and Treatment Guidelines were revised in January 2021 and then finalized in March 2021. The revised guidelines were disseminated to facilities on March 15, 2021. During the site visit to Shawnee CC[441], the first site visit by the Monitor team since the start of the COVID pandemic, it was reported[442] that, at Shawnee, the HCV initial workup now starts at the time of admission to the facility and is generally completed in 3-4 weeks. Onsite

---

[437] March 2021 CQI minutes
[437] March 2021 CQI minutes
[438] March 2021 CQI minutes; only Decatur, Jacksonville, Lawrence, Lincoln, Logan, Pontiac, Robinson, Shawnee, Sheridan, and Western had HCV patients on active treatment.
[439] UIC Telehealth HCV treated patients' data January 1- March 26, 2021; BMR, Centralia, East Moline, Elgin, Hill, JTC, Kewanee, Murphysboro, NRC, Pinckneyville, Stateville, Taylorville, Vienna, and Vandalia had not treated a single HCV patient in the first three months of 2021
[440] Hepatitis C Screening and Treatment Guidelines September 2020 revisions drafted in January 2021 and finalized in March 2021. Changes included: remaining sentence eligibility decreased from 12 months to 6 months , removal or modification of certain lab test restriction, elimination of antiquated and restrictive mental health and substance abuse criteria, routinely screening all new IDOC admissions at R&C centers for HCV-antibody followed by HCVRNA testing if antibody is reactive, designation of an infection control nurse at each facility to initiate and track a HCV database for all HCV patients, a statewide infection control nurse to review HCV database weekly with the UIC Telehealth specialty team.
[441] Shawnee CC  6/21-23/2021
[442] Interview with Shawnee CC infection control nurse

fibroscan studies are then scheduled. Once the full workup is finished the individual is directly referred to UIC Telehealth and no longer has to be reviewed and approved by the vendor's offsite HCV reviewer.

For the last 3 ½ years a total of 12 men at Shawnee CC had been treated for Hepatitis C. In the second week of June 2021, twenty-two (49%) of the facility's forty-five untreated hepatitis C patients were started by UIC Telehealth on treatment.

This increase in the number and percentage of active HCV patients started on treatment at Shawnee CC is not typically seen throughout all IDOC facilities. The Monitor recently received updated Hepatitis C treatment data from UIC Telehealth. The table below compares the number of men and women with active HCV who were started on treatment in the first and second quarters of 2021.

| Hepatitis C Treated Patients by IDOC Facility* | | |
|---|---|---|
| Facility | 1//1/21 to 3/26/21 | 3/27/21 to 6/18/21 |
| BMR | 0 | 0 |
| Centralia | 0 | 9 |
| Danville | 2 | 0 |
| Decatur | 1 | 5 |
| Dixon | 1 | 5 |
| East Moline | 0 | 0 |
| Graham | 1 | 1 |
| Hill | 0 | 0 |
| IRCC | 1 | 0 |
| Jacksonville | 3 | 3 |
| Joliet TC | 0 | 0 |
| Kewanee | 0 | 0 |
| Lawrence | 1 | 0 |
| Lincoln | 2 | 4 |
| Logan | 1 | 1 |
| Menard | 6 | 4 |
| Murphysboro | 0 | 0 |
| NRC | 0 | 0 |
| Pinkneyville | 0 | 0 |
| Pontiac | 1 | 0 |
| Robinson | 1 | 0 |
| Shawnee | 1 | 22 |
| Sheridan | 4 | 10 |
| Southwestern | 1 | 0 |
| Stateville | 0 | 1 |
| Taylorville | 0 | 0 |
| Vienna | 0 | 0 |
| Western | 2 | 0 |
| Total | 29 | 66 |

\* based on IDOC email of 8/10/21 and UIC Telehealth hepatitis C treatment data from 2018 through 6/18/21

The number of individuals on HCV treatment in IDOC more than doubled since the revised Hepatitis C Screening and Treatment Guidelines were implemented on 3/15/21. The 44 individuals treated in the second quarter of 2021 were the highest number of HCV treatments provided in any quarter in the last 30 months.[443]   A single correctional facility accounted for 33% of the HCV treatments and only five facilities accounted for the increased numbers of treated. Eleven facilities did not treat any Hepatitis C patients so far in 2021. Despite the disparities from facility to facility, this increase in HCV treatment is nevertheless encouraging. IDOC must continue to monitor the volume and rates of HCV treatments and address any systemic barriers that persist in individual facilities.

As noted in previous reports, treatment of HCV can eliminate the virus in individuals who then will no longer be infectious. HCV can be readily transmitted within the IDOC by shared needles, inmate tattoo instruments, and accidental needle sticks. This is important because treatment both cures the infected individuals and reduces transmission risk to other inmates and staff. IDOC should establish a goal in the Implementation Plan to significantly increase and monitor the number of HCV infection cases treated annually. As noted in the 3rd Court Report IDOC should also set a goal to have treated everyone with HCV over the next three-five years; this would require a tripling or quadrupling of annual HCV treatments.

If this second quarter 2021 trend of increasing individuals being started on treatment continues and expands, active HCV could realistically in the not-so-distant future be eliminated in the IDOC. This would have a positive impact on the health of the incarcerated population, eliminate the risk of transmission of HCV within the IDOC, and ultimately improve the overall health of communities in the State of Illinois.

<u>Recommendation eleven</u>
The Monitor has repeatedly recommended that HCV patients with lower levels of liver fibrosis (F0/F1 fibrosis scores) should be offered treatment before not after liver scarring and cirrhosis have developed. The vast majority (67%) of Individuals with untreated active HCV in the IDOC have been systematically deemed ineligible because their fibrosis scores were too low. This is a classic example of penny wise and pound foolish. Although HCV treatment is not inexpensive, the cost of treating and managing HCV patients with advanced liver cirrhosis is staggeringly expensive and more costly than the curative treatment.

---

[443] The Monitor only has received UIC Telehealth treatment data form February 2018 through June 2021.

| Fibrosis Levels 2018 to Feb 2021* | | | | |
|---|---|---|---|---|
| Fibrosis Level | F0/F1 | F2 | F3 | F4 |
| Number | 1071 | 299 | 98 | 131 |
| Percent | 67.0% | 18.7% | 6.1% | 8.2% |

F3-4 is consistent with cirrhosis. F2 is possible cirrhosis. F0-F1 are not yet cirrhosis. Prior to January 2019, the IDOC was only referring HCV patients to UIC who had fibrosis levels of F3 and F4. In 2018 UIC reported that zero of 79 patients treated in 2018 had fibrosis levels of F2 or less. The revised Hepatitis C Guideline January 2019 increased access to HCV treatment by expanding the fibrosis score to include F2, F3, and F4. Subsequently, in 2019 the number of HCV treated patients with fibrosis levels of F2 increased to 19 (23%) of the 82 individuals treated. In 2020, 37 (38%) of the 98 treated patients had fibrosis levels of F2. In the first three months of 2021 five (28%) of the twenty-nine HCV patients treated had F2 fibrosis scores.

Prior to January 2019, the IDOC was only referring HCV patients to UIC who had cirrhosis or end-stage liver disease. UIC reported that none of 79 patients treated in 2018 had fibrosis levels of F2 or less. The revised Hepatitis C Guideline January 2019[444] increased access to HCV treatment by expanding the fibrosis score to include F2, F3, and F4. Subsequently, in 2019 the number of HCV treated patients with fibrosis levels of F2 increased to 19 (23%) of the 82 individuals treated. In 2020, 37 (38%) of the 98 treated patients had fibrosis levels of F2. In the first three months of 2021 five (28%) of the 29 HCV patients treated had F2 fibrosis scores.

As noted in the 3rd Court Report the Monitor is encouraged by the increasing treatment of HCV patients with fibrosis of F2 but the IDOC continues to miss opportunities to treat and cure individuals with fibrosis levels of F0 and F1 before they advance to more serious levels of liver scarring and cirrhosis. Review of UIC Telehealth data documented that from 2018 to 2021 only 9 (5.0%) of the 178 treated individuals with fibrosis levels of F0-F1 had been treated. Review of the vendor's 2018-February 2021 fibroscan data documented that 20 IDOC HCV patients' fibroscan levels had worsened from F0/F1 to a higher level of liver scarring (F2, F3, F4) upon repeat testing during this 26-month period. This progression might have been prevented if HCV treatment had been provided.

Patients with F4 disease typically require ultrasound and esophagogastroduodenoscopy (EGD) to screen for hepatocellular carcinoma. Ultrasound and EGD are sometimes also required for F3 disease. These tests can prolong or delay initiation of HCV therapy particularly in the IDOC system.[445] F0-F1 level patients rarely require ultrasound or EGD testing. IDOC should immediately treat all patients with higher levels of fibrosis starting with F4 and proceeding down to F2 and then begin to refer individuals with fibrosis F0-F1 to fill available treatment slots while

---

[445] The Monitor notes that typical delays in getting specialty services in IDOC act as a barrier for many conditions; see the section on Specialty Care in this report.

[445] The Monitor notes that typical delays in getting specialty services in IDOC act as a barrier for many conditions; see the section on Specialty Care in this report.

F2-F4 cases are completing additional evaluations. UIC HCV Telehealth specialists have stated that they are willing to accept and evaluate referrals with all levels of fibrosis.

One HCV patient[446] with an F0/F1 fibroscan level was seen in the Shawnee CC HCV Clinic on 2/25/21. He had been deemed not eligible for treatment based on the old HCV treatment guidelines, and was given a 6-month follow-up appointment, When the revised HCV treatment guidelines[447] were implemented, the patient was directly referred UIC Telehealth and HCV medication were prescribed, and treatment was initiated in June 2021.

The Monitor is hopeful that the statewide database will enable IDOC clinical leadership to continually assess the number of higher priority HCV patients that are being treated and the percentage that are not being treated and to determine the number of unutilized UIC Telehealth appointments that could be filled by F0-F1 patients before these individuals develop liver fibrosis and cirrhosis.

| HCV Treated Patients Who Had Fibroscan Scores 2017 to June 2021* | | | | | |
|---|---|---|---|---|---|
| Year | F0/F1 | F2 | F3 | F4 | Total |
| 2017 | 0 | 0 | 1 | 1 | 2 |
| 2018 | 1 | 0 | 26 | 48 | 75 |
| 2019 | 3 | 35 | 25 | 19 | 82 |
| 2020 | 2 | 36 | 23 | 37 | 98 |
| 2021 to 3/26/21 | 1 | 5 | 5 | 17 | 28 |
| 2021 3/27/21 to 6/18/21 | 37 | 18 | 6 | 5 | 66 |
| | 44 (12.5%) | 94 (26.8%) | 86 (24.5%) | 127 (36.1%) | 351 |

*Data obtained from UIC Telehealth

The data noted in the above table indicates that IDOC and UIC Telehealth have begun to actively refer and offer treatment to active Hepatitis C with all levels of fibrosis. More than six times the number of individuals with F0/F1 (no or minimal scarring) fibrosis scores were treated in the 2nd quarter of 2021 than in the previous nine quarters.

If this second quarter 2021 trend of treating individuals in all categories of fibrosis levels continues and expands, active HCV could realistically in the not-so-distant future be eliminated in the IDOC. This would have a positive impact on the health of the incarcerated population, eliminate the risk of transmission of HCV within the IDOC, and ultimately improve the overall health of communities in the State of Illinois.

Recommendation twelve

---

[446] Hepatitis C patient #1
[447] Hepatitis C Screening and Treatment Guidelines March 2021

In recommendation 12 in the Monitor's 3rd Report, the Monitor recommended establishing a quality metric that measures treatment of HCV on an annual basis. On 5/5/2 IDOC submitted to the Monitor a group of performance measures for a dashboard. There was only one measure for HCV but that measure does not measure HCV treatment; it merely documents the number of new cases of HCV diagnosed in the prior period. This is not actionable data and does not address the recommendation to develop a quality metric that measures whether hepatitis C treatments are increasing. The Monitor suggests to IDOC a metric that contains the number of HCV patients treated over a specified time period in the numerator and the total number of untreated HCV patients over the same time period in the denominator. The number of untreated HCV patients can be separately tracked on a dashboard that would permit staff to see whether the number decreases consistently over time.

Recommendation thirteen
The Monitor recommended tracking and giving reports on immunizations that are administered. In its list of performance measures IDOC included a measure to track the number of inmates who completed required immunizations in a specified period. IDOC did not define what "required" means. This is a complex metric but IDOC did not provide any details of how this information will be obtained. IDOC has by this performance measure asserted it will address this recommendation but a plan for its implementation is not provided. See Preventive Services section, III.M.1.b. Adult Immunizations

Recommendation fourteen
The Monitor recommended that quality improvement minutes document identification of infection control opportunities for improvement and demonstrate whether corrective action has taken place. IDOC infection control reports in quality improvement meeting minutes present data that is not actionable and without any analysis. Quality improvement meeting minutes do not include descriptions of opportunities for improvement, identification of problems in infection control or prevention, or actions taken, based on data presented, that result in an improved program

Recommendation fifteen
In recommendation 15 the Monitor recommends IDOC provide the data support to allow for tracking of infection control activity. Though IDOC has committed to a data team, neither the staffing analysis, SIU's quality improvement table of organization, or IDOC's Implementation Plan verify a confirmed plan for how a data team will be constructed or operate. IDOC has not provided information on precisely how data support will be provided.

Recommendation seventeen
The Monitor has requested and recommended that IDOC track and report data by facility for health care workers, non-health care employees, and incarcerated individuals on the number of COVID-19 vaccines offered, the number administered, the number refused, and the number who have completed a vaccine series.

To date, the IDOC has only provided limited information on the vaccination of IDOC and vendor employees. The monitor has primarily received combined data co-mingling health care and correctional staff in the number of employees who have accepted the COVID-19 vaccine. Data

on the percentage of vaccinated staff has not been reported to the Monitor on a facility-by-facility basis. IDOC has verbally reported that approximately 68-70% of incarcerated persons have accepted vaccinations. However, this data also has not been broken down by facility. Recently, as previously noted in the COVID section of Infection Control, IDOC informed the Monitor that an additional 1,180 incarcerated men and women have accepted COVID-19 vaccination; this data was also not broken down by facility.

IDOC has communicated to the Monitor that approximately 40% of employees working in IDOC facilities are vaccinated. IDOC has never reported to the Monitor this data on a facility-by-facility basis nor have the vaccination rates for correctional and health care employees been separately reported. This low overall employee vaccination rate continually puts the IDOC incarcerated population at risk for COVID-19 exposure. The Monitor acquired the most detailed employee COVID-19 vaccination rates not from the IDOC but in a recent edition of the Chicago Sun Times which reported that 44% of IDOC employees were vaccinated with some of the data broken down by facility.[448] The Monitor fails to understand the unwillingness of IDOC to communicate employee vaccination rates by facility to the Monitor, yet this information was made available to the media. As stated above, the Monitor strongly supports the decision of the Governor to mandate that state employees including prison staff receive COVID-19 vaccination by October 4, 2021 and recommends that the mandate also includes volunteers, voluntary and service groups, contracted and subcontracted individuals, and visitors who are allowed to enter IDOC facilities.

Recommendation eighteen
The Monitor has recommended that IDOC continue COVID-19 testing of employees and incarcerated individuals based on intervals determined in conjunction with IDPH. Expanded universal testing of asymptomatic employees and inmates for COVID testing was instituted in the first week of December 2020 with the advice of IDPH and following Consent Decree dispute resolution activities. As COVID-19 vaccinations became available to IDOC employees and incarcerated persons, IDOC in consultation with IDPH has continued to perform ongoing surveillance testing on unvaccinated employees and inmates along with mitigation testing of symptomatic inmates and contacts of individuals with positive tests. IDOC should continue to consult with IDPH or other Infectious Disease specialist concerning the ongoing scope of COVID-19 testing in the IDOC including on whether to screen vaccinated individuals for "break through" asymptomatic infections.

**RECOMMENDATIONS:**

1. Ensure the statewide infection control coordinator obtains and maintains certification in infection prevention and control through the Certification Board of Infection Control and Epidemiology. Requirements of this position should also include proficiency in surveillance software and familiarity with use of an electronic medical record to support surveillance activity. It would be preferable for this person to obtain Lean Six Sigma certification within two years of hire.
2. Hire or contract with an infectious disease physician consultant to advise the IDOC on their infection control program as issues arise. Optimally, this physician should be from

---

[448] Chicago Sun Times, 8/5/21 page 1, Some state staff also required to get vaccine in bid to beat virus.

an academic institution or from the IDPH.

3. Maintain the COVID-19 vaccination program that provides systemwide education on the value of COVID-19 vaccination and offers initial and ongoing vaccination for men and women incarcerated in the IDOC.

4. Implement the Governor's mandate for all IDOC employees to receive the COVID-19 vaccination. All contractors, volunteers, and service groups who enter IDOC facilities should be required to have proof of COVID-19 vaccination.

5. Track and report data by facilities for health care workers, non-health care employees, and incarcerated individuals on the number of COVID-19 vaccines offered, the number administered, the number refused, and the number who have completed a vaccine series.

6. Continue COVID-19 surveillance testing of employees and incarcerated individuals with the scope and intervals of testing determined in conjunction with IDPH.

7. Ensure that every facility has a dedicated and appropriately trained infection control nurse.

8. Develop infection control policy to establish standardized methods of surveillance and infection control activity.

9. Establish expectations for independent verification of negative pressure in respiratory isolation rooms, monitoring and documentation of the status of negative pressure rooms, reporting to the Infection Control Coordinator and corrective action to be taken when the rooms are not functional.

10. Perform Safety and Sanitation inspections of the infirmary negative pressure units monthly but it is equally crucial that daily or weekly tissue paper testing of the isolation rooms be conducted by the health care staff to verify that these units are always operational.

11. Provide both hepatitis A and hepatitis B vaccinations to inmate workers who have risks of exposure to blood and fecal borne pathogens and to inmate kitchen workers.

12. Replace tuberculosis skin testing (TST) with IGRA blood testing, which is more accurate, minimizes the risk of accidental needle sticks, and frees up valuable nurse resources.

13. Continue to monitor and report access to HCV treatment as outlined in the revised Screening and Treatment Hepatitis C Guidelines March 2021 that streamlined HCV eligibility and screening criteria.

14. Continue to ensure access to HCV treatment for individuals with F0 and F1 fibrosis levels.

15. Establish a quality metric that significantly increases the annual number of HCV treatments that would result in the total elimination of HCV within the next 3-5 years.

16. Track and provide detailed reports on the offering and provision of nationally recommended adult immunizations including the percentage of eligible candidates who have been offered and received the required immunizations at each site.

17. Ensure that quality improvement activity identifies infection control and prevention opportunities for improvement and takes steps to ensure that improvements occur.

18. Provide data support as described in the Statewide Internal Monitoring and Quality Improvement and Medical record sections.

# Dental Care

**Staffing**

*Addresses item II.B.6.q; III.K.9*

**II.B.6.q.** *IDOC agrees to implement changes in the following areas: Annual assessment of medical, dental, and nursing staff competency and performance;*

**III.K.9.** *Within twenty-one (21) months of the Preliminary Approval Date of this Decree [October 2020], IDOC shall establish a peer review system for all dentists and annual performance evaluations of dental assistants.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

As also noted in more detail in the Dental Access section II.B.6.h, and previously discussed in the 2nd and 3rd Court Reports the COVID-19 pandemic that first hit IDOC in March 2020 has had a significant impact on the provision of dental care throughout all facilities in the IDOC. Increased backlogs and waiting times for dental care continue to exist throughout the IDOC. Due to infection control precautions dental services were limited to examinations, screenings, prescription of medication, and emergency procedures during the first year of the pandemic. It was communicated to the Monitor that some sites have been able to modestly expand the range of services in the last few months due to IDOC's COVID-19 testing and mitigation efforts and the procurement of PPE and oral suction devices. (see Dental Access section below)

Twenty-eight IDOC correctional centers continue to have onsite dental suites and services.[449] Dentist positions range from 0.25 FTE to 2.0 FTE at different sites. Only four facilities have less than a fulltime onsite dentist; three of these sites have small daily censuses.[450] Pontiac CC is the only large IDOC facility with less than 1.0 FTE dentist. Four intake centers now have four of the five highest dentist staffing levels in the IDOC.[451] Twenty-four of the 28 IDOC facilities with onsite dental suites have 1.0 FTE or more dentist positions. As of July, 2021 there were a cumulative 5.25 FTE dentist vacancies at six IDOC facilities with three facilities now having no filled dentist positions.[452] The Monitor has received no information on how dental coverage is being provided at these three sites. IDOC has recommended an additional 1.8 FTE dentist positions be hired to augment dental staffing throughout the system.[453]

Review of the dentist staffing levels throughout the IDOC reveals some inconsistencies[454]. Pontiac CC, a maximum-security facility with a population of 1130, has only 0.6 FTE dentist

---

[449] Two small IDOC correctional centers, Elgin and Murphysboro do not have onsite dental services.
[450] Three facilities with smaller populations have only parttime dentist coverage: Kewanee 0.25, JTC 0.5, and Decatur 0.75. Pontiac CC, a maximum security facility, with a population of 967 has only 0.6 FTE dentist staffing. However, the 7/7/21 Staffing Analysis recommends that Decatur CC (251 ADC) dentist staffing be increased from 0.75 FTE to 1.0 FTE..
[451] IDOC Staffing Update, 7/7/21: Dentist FTE allocated positions at Intake Centers: Graham 1.6, Logan 2.0, Menard 3.0, and NRC 1.6. Stateville CC has 2.0 FTE dentist positions.
[452] IDOC Staffing Analysis 7/7/21. FTE Dentist vacancies: Centralia 1.05, Dixon 0.5, Jacksonville 1.0, Lawrence 0.5, Logan 2.0. There are no permanently assigned dentists currently at Centralia, Jacksonville, and Logan.
[453] Staffing Analysis 7/7/21
[454] Staffing Analysis 7/7/21

coverage with no additional recommended dentist positions, while Decatur CC (251 population), Southwestern CC (209 population), and Vandalia CC (333 population) each have 1.0 FTE allocated dentists. The Monitor understands that some of these smaller facilities have experienced notable drops in census during the pandemic that may increase over time. Pinckneyville CC (population 1355) currently has 1.2 FTE dentist positions but also has been repeatedly recommended to have another 1.05 FTE. There is no explanation provided on why Pontiac CC has a relatively low dentist coverage and Pinckneyville CC, a medium security facility, will have the highest dentist staffing in the IDOC.

As noted in the 3rd Court Report, peer reviews for twenty-nine dentists were last performed from August to November 2020. These dentist peer reviews primarily addressed process and documentation issues but also audited the adequacy of dental history, the appropriate use of prophylactic antibiotics, and the appropriate ordering of required x-rays and consultations. Dentist peer reviews were previously performed annually in 2019 and 2020 between the months of August and November.[455] Peer reviews for 2021 have not yet provided to the Monitor and likely have not yet been performed.   Dentist peer reviews are done by fellow dentists working in the IDOC system and thus have the risk of lacking objectivity.  As recommended in previously reports, IDOC and its vendor should consider having an independent dentist perform the annual dentist peer reviews.  This can be accomplished in the audit process, which is a required provision of the Consent Decree.

Annual evaluations of dental hygienists and dental assistants were completed in 2019; but no evaluations for these two dental positions were provided to Monitor in 2020 and 2021 As noted in the 2nd and 3rd Court Reports, Wexford dental hygienists and dental assistants are evaluated using the Performance Calibration Worksheet also known as the Salary Compensation Calibration Worksheet; this worksheet focuses primarily on administrative and business issues and did not satisfy Consent Decree requirements to assess clinical staff competence and performance. The Wexford evaluation is not allowed to be shared with the employee. It was communicated to the Monitor that due to the pandemic, evaluations of dental hygienists and dental assistants were not performed in 2020 and the Monitor has not been provided with 2021 evaluations.

The IDOC used the State of Illinois Individual Development and Performance System to evaluate state employed dental hygienists (1) and dental assistants (6) in 2019; this form is individualized for each of these positions and must be discussed with each employee. Evaluations of the State dental hygienist and dental assistants for 2020 and 2021 have not been provided to the Monitor.

With the exception of a few sections of the dentist peer reviews, none of the annual performance evaluations for both State and vendor dental staff qualify as professional performance evaluations or assessments of the quality of the clinical care provided by the dentists, dental hygienists, and dental assistants.

See Oversight of Nursing, Dental, and Medical Staff section for further details.

---

[455] Dentist Peer Reviews Performed August - September in 2019 and August-November in 2020.

**RECOMMENDATIONS:** (Same as noted in Oversight of Nursing, Dental, and Medical Staff section)

1. Develop and initiate professional performance evaluations that assess the clinical competency and clinical performance of all clinical staff.
2. Standardize evaluation formats so that all practitioners of the same type are evaluated in the same manner.
3. Engage an independent professional knowledgeable of the scope of practice and capable of evaluating the clinical care of the professional to perform the annual evaluations of dentists and dental hygienists.
4. Share clinical professional performance evaluations with the employee who should sign the review after discussion with the reviewer.
5. Evaluate the dentist staffing at each of the IDOC facilities with onsite dental services to ensure that the FTE dentist staffing is in accord with each facility's average daily census and dental care needs of its incarcerated population.

**Dental Documentation**

*Addresses item III.K.1; III.K.10.c; III.K.11; III.K.12*

**III.K.1.** *All dental personnel shall use the Subjective Objective Assessment Plan ("SOAP") format to document urgent and emergency care.*

**III.K.10.c.** *A prisoner shall consent in writing once for every extraction done at one particular time. In instances where a prisoner lacks decision making capacity the Department will follow the Illinois Health Care Surrogate Act. In the event a prisoner verbally consents to an extraction, but refuses to consent in writing, dental personnel shall contemporaneously document such verbal consent in the prisoner's dental record.*

**III.K.11.** *Each prisoner shall have a documented dental health history section in their dental record.*

**III.K.12.** *Dental personnel shall document in the dental record whenever they identify a patient's dental issue and dental personnel shall provide for proper dental care and treatment.*

**OVERALL COMPLIANCE RATING:** Partial compliance (data mostly limited to peer reviews)

**FINDINGS:**

Due to the safety precautions required during the COVID-19 pandemic, the Monitor team was not able to visit any IDOC facilities from March 2020 to mid-June 2021 and did not inspect any dental records. The first site visit since the onset of the pandemic occurred in June, 2021.[456]

A single chart review of a dental patient[457] during the June 2021 site revealed the SOAP format was used, the dosage and injection site of the anesthetic was noted, a signed consent was

---

[456] Shawnee CC, 6/21-23/21
[457] Shawnee CC, Dental patient #1, dental extraction.

completed, and the dental x-ray seven months prior to the extraction noted "deep decay".[458] This dental note was comprehensive and documented all key aspects of the care provided.

Previously reported analysis of the 2020 dentist peer reviews documented that 18% of dental notes were not consistently using the Subjective, Objective, Assessment, and Plan (SOAP) format, 3% of dental extractions did not include a consent form in their dental chart, 100% of patients refusing care signed a refusal form, 15% were judged as not having an appropriate x-ray before the extraction, 100% of the charts were recorded as having current bi-annual dental exams, and 98% charts were noted as having an adequate history of the patient's current dental problem. 14 (48%) of the 29 dentists were found to have a least one notation of a deficiency and 5 (17%) had three or more deficiencies cited.[459] Peer reviews for 2021 have not yet been completed.

As noted in the Monitor's 2nd and 3rd Court Reports, the Monitor had in-person interviews with IDOC dentists during site visits in 2019 and in pre-pandemic 2020, and one phone interview after the onset of the pandemic in 2020.[460] On 4/27/21, the newly hired OHS Dental Chief was interviewed about a number systemwide issues in the provision of dental care in the IDOC[461]. The Monitor interviewed the dentist during the recent site visit in 2021.[462] These interviews with the dental staff all revealed varying timeframes concerning the individual dentists' standards on how long prior to a dental extraction that dental x-rays should be taken. Their recommendations ranged from a maximum of one to two years pre-extraction. Their communications also included that dental x-rays were not needed if a tooth was loose or if an abnormal film was documented in the last 1-2 years.

The Monitor was also unable to identify a national standard concerning when dental x-rays must be repeated taken or repeated prior to an extraction in order to protect the health of the patient and minimize the risk of post-extraction complications. The newly hired OHS Chief of Dental Services must establish the best practice standard for the length of time prior to dental extractions that x-rays are deemed valid and do not need to be repeated.

There was also variation in what dentists perceived to be the nationally accepted guidelines when prophylactic antibiotics are given pre-dental procedures.[463]

---

[458] Dentist stated that the 7 month old dental x-ray that showed dental decay did not need to be repeated just prior to the dental extraction.

[459] Vendor Dental Peer Reviews August-November 2020.

[460] 11/30/20 Conference call with staff dentist Dr. Aldridge concerning general aspects of the dental care provided in the IDOC

[461] 4/27/21 Conference call with OHS Dental Chief, Dr. Russell Austin. Topics included dental policy updates, increased waiting times for dental services during the pandemic, dental staff COVID-19 vaccination rates, dental suite ventilation, need for dental hygienists at sites with dental services, assessment of the adequacy of dental spaces and physical plants, opportunities to improve the professional objectivity and upgrade the clinical assessment components of the annual reviews of the dentist, dental hygienists, and dental assistants, the need to clarify the criteria for taking x-rays prior to extractions and the indications for prescribing antibiotics pre-dental procedures, and the need to have all dental sites report results of spore testing to monthly CQI meeting.

[462] Shawnee CC 6/21/21

[463] Wexford Peer Review Form for Dentists. Peer review item #8 "Are prophylactic antibiotics given per nationally accepted guidelines"

**RECOMMENDATIONS:**
1. Identify and establish the best practice standard for the length of time prior to dental extractions that previous x-rays are judged to be adequate to minimize complications and protect the health of the patient-inmate.
2. Identify, establish, and disseminate the national guidelines for the use of prophylactic antibiotics pre-dental procedures.

**Dental Support**

*Addresses items III.K.4-5; III.K.13*

**III.K.4.** *IDOC shall implement policies that require routine disinfection of all dental examination areas.*
**III.K.5.** *IDOC shall implement policies regarding proper radiology hygiene including using a lead apron with thyroid collar, and posting radiological hazard signs in the areas where x-rays are taken.*

**III.K.13.** *IDOC shall conduct annual surveys to evaluate dental equipment and to determine whether the equipment needs to be repaired or replaced. Any equipment identified as needing repair or replacement will be repaired or replaced.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**
The Monitor was provided with the Dental Care for Offenders administrative directive[464] but this policy did not address the routine disinfection of all dental examination areas, the use of lead aprons with thyroid collars, or the posting of radiological hazard signs in the areas where x-rays are taken. During the 2021 site visit[465], there was an "X-ray" sign at the entrance to the panorex unit in the dental suite. During site visits in 2019 and 2021[466] the Monitor verified the presence of lead aprons with thyroid collars at all three facilities that were evaluated for this provision. However, at the 2019 site visits the thyroid collars were stored in the health care unit radiology suite and not immediately available to the dental team. During the 2021 site visit a thyroid collar leaded apron in good condition was appropriately kept in the dental suite and was readily available to protect dental patient-inmates receiving dental and oral surgery x-rays.

Review of March 2021 CQI meeting minutes verified that 17 of the 28 IDOC facilities with onsite dental services reported that sterilization of the dental equipment using spore testing was regularly performed to confirm that their autoclaves were effectively sterilizing dental

---

[464] IDOC Administrative Directive 04.03.102 Dental Care for Offenders Effective Date 1/1/2020
[465] Shawnee CC 6/21-23/2021
[466] Robinson CC and Lawrence CC 2019 site inspections, Shawnee CC 2021 site inspection

equipment.[467] Spore testing at ten additional correctional centers with dental services did not report this important infection control measure in the CQI minutes;[468] seven of these ten non-reporting facilities had not reported on spore testing in CQI minutes reviewed since June 2020[469]. Shawnee CC's autoclave was broken from September 2020 through January 2021, during that time the dental staff transported used instruments for sterilization to nearby Vienna CC, a site that does not report spore testing results.  A new autoclave was provided to Shawnee CC in January 2021.  One site[470] reported that their autoclave was broken but no information was provided in the CQI report to explain how dental instruments were being sterilized pending repair or replacement of the autoclave. The effectiveness of dental equipment and instrument sterilization must be performed, monitored, and reported on a regular basis for all sites with dental services.  This same recommendation was made by the Monitor in the 3rd Court Report; as of yet no action has been taken to address this potentially serious infection control deficiency.

To date the Monitor has not received Administrative Directives on the routine disinfection of all dental examination areas nor a copy of any policy relating to dental radiology hygiene.  Documentation also has not yet received information that an annual system wide survey of dental equipment was being done.

IDOC has yet to conduct a survey or space or equipment including for dental care.  It is the Monitor's opinion that the lack of dental hygiene and dental services may be related to a lack of dental chairs and equipment at multiple sites.  This type of survey is foundational to a safe and functional dental program.

**RECOMMENDATIONS:**

1. Provide each dental suite with its own leaded thyroid collar.
2. Report regularly to CQI committee on the effectiveness of the dental equipment sterilization at all facilities with dental suites
3. Perform an annual survey of dental equipment, furniture, and space.  List the number of dental chairs at each facility.  The equipment (including dental chairs) and space inventory must be made available to the Monitor when it is completed.

**Dental Access**

---

[467] March CQI meeting minutes; Decatur, Dixon, East Moline, Graham, IRCC, JTC, Kewanee, Lincoln, Logan, Menard, NRC, Pinckneyville, Shawnee, Sheridan, Southwestern, Western reported that spore testing was being performed and that the autoclaves were functional.

[468] March CQI minutes: BMR, Centralia, Danville, Jacksonville, Lawrence, Lawrence, Pontiac, Robinson, Stateville, Vandalia, Vienna did not report the results of spore testing by the dental team

[469] CQI Minutes for June 2020, September 2020, December 2020, March 2021: BMR, Centralia, Danville, Lawrence, Pontiac, Robinson, and Vienna did not report results of spore testing in these for sets of CQI minutes over an nie month period.   Jacksonville, Stateville, and Vandalia reported these results at least in one CQI minutes since June 2020.

[470] March CQI minutes:  Taylorville CC reported that their autoclave was broken.

*Addresses items II.B.6.h; III.K.2*

**II.B.6. h.** *IDOC agrees to implement changes in the following areas: Dental care access and preventative dental care;*
**III.K.2.** *Each facility's orientation manual shall include instructions regarding how prisoners can access dental care at that facility*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

The pandemic has had a significant impact on the provision of dental care throughout all facilities in the IDOC. Beginning in April 2020 to the present time, the implementation of infection control measures to prevent the transmission of COVID-19, dental services and procedures with the risk of splashing or aerosolizing saliva and other oral and upper respiratory fluids forced the dental program to provide only emergency dental care. Dental cleanings, fillings, and complicated extractions were discontinued.  Only simple extractions, oral exams, diagnostic evaluations, and the prescription of required medication were performed by the IDOC dental staff. It appears from the dental data provided that once personal protective equipment (PPE) was readily available, the inmate population increasingly vaccinated, oral suction units installed around some dental chairs, and local outbreaks mitigated, some facilities were allowed to provide more but still limited dental services. The newly hired Dental Chief communicated in April 2021 that dental services had been resumed at a number of sites.[471] The number of dental encounters decreased from approximately 112,993 in 2019 to 60,923 in 2020, and annualized to 60,608.in 2021.[472]  Some of this decrease was due to the decreased inmate population in 2020 and 2021. Review of the monthly dental encounters noted a sudden drop in encounters beginning in March and April 2020 that has not normalized as of March 2021.  It must also be remembered that there were lengthy waits to access to dental care that existed in a number of IDOC facilities prior to the pandemic. With the recent spread of the COVID-19 delta variant, it is likely that restricted access to dental services will again be negatively impacted.

Review of the March 2021[473] dental services in twenty-four facilities revealed system-wide waiting times and backlogs reported by the vendor as follows:

---

[471] 4/27/21 Conference Call with Dental Chief, Dr. R. Austin
[472] Wexford Primary Medical Services Reports May 2019 through March 2021
[473] Wexford Primary Medical Services Report March 2021.  Waiting times are for patients given an appointment. Backlogs are the patients on a waiting list >13 days to be given a future appointment

| Range of Waiting Times | |
|---|---|
| Dental Fillings | 1 to 185 weeks |
| Dental Extractions | 1 to 59 weeks |
| **Facilities with Waiting Times > 30 Weeks** | |
| Dental Fillings | 16 Facilities |
| Dental Extractions | 4 Facilities |
| **Range of Backlog Patients Waiting > 13 Weeks to Be Placed On the Waiting List (14 facilities)** | |
| Range 6 to 377 dental patients with 11 of 14 sites with > 100 backlogged dental patients | |

The dental needs of incarcerated populations are extensive and, at this time due to the pandemic, these needs cannot be adequately met. Once the pandemic is fully stabilized and the employees and incarcerated population are predominantly vaccinated, IDOC will need to develop a plan to aggressively prioritize and address these lengthy waiting times and hefty backlogs for dental care.

To date the Monitor has not reviewed the facilities' orientation manuals. As noted in the second and third Court Reports, interviews with incarcerated individuals at sites visited in 2019 and 2020 indicated that the men and women were knowledgeable about the established process to access dental and medical services. Again in 2021[474], interviews of patient-inmates at the single site visit, revealed that they understood the process to request dental services.

The Centers for Disease Control (CDC) provides guidance for dental personnel during the COVID-19 pandemic.[475] State-wide, IDOC should disseminate and follow these guidelines to ensure safe dental care.

**RECOMMENDATIONS:**
1. Continue to provide emergency dental services and those basic dental services that can be safely provided during the ongoing COVID-19 pandemic.
2. Disseminate and follow CDC infection prevention guidelines including for dental care.
3. Initiate planning on how to prioritize and address the large backlog of dental care that has resulted from the safety precautions and restrictions that are required during the COVID-19 pandemic.

---

[474] Shawnee CC  6/21-23/21
[475] Guidance for Dental Settings; Interim Infection Prevention and Control Guidance for Dental Settings During the Coronavirus Disease 2019 (COVID-19) Pandemic; CDC updated 12/4/20 as found at https://www.cdc.gov/coronavirus/2019-ncov/hcp/dental-settings.html

**Dental Intake**

*Addresses items III.K.3*

**III.K.3.** *IDOC shall implement screening dental examinations at the reception centers, which shall include and document an intra- and extra-oral soft tissue examination.*

**OVERALL COMPLIANCE RATING:** Not yet rated

**FINDINGS:**

In the 3rd Court Report[476], the Monitor noted that the dentist staffing at NRC, the intake facility with by far the largest number of new admissions, was not sufficient to adequately screen both new intakes and address the dental needs of those already housed in the facility. OHS had recommended since November 23. 2019 in three previous Staffing Analyses and a Staffing Update that the NRC dentist staffing be augmented by 0.5 FTE.[477] After this 19 month delay the Monitor is pleased to note in IDOC's July 7, 2021 Staffing Analysis that NRC had increased the dentist staffing to 1.6 FTE.

The Monitor has not yet been able to inspect any IDOC Reception & Classification Centers since COVID-19 pandemic started in March 2020. The Monitor team only recently visited the first IDOC facility[478] in the last 15 months and will be arranging a site visit to an intake center in the near future as long as the Monitor inspections and COVID-19 variants do not present a risk to the staff, incarcerated men and women, and the Monitor team. Once intake centers begin to be inspected this and other aspects of the Dental Care section of the Consent Decree will be addressed.

**RECOMMENDATIONS:**

1. Evaluate the FTE allocation of dentists at NRC and the other intake centers to ensure that dental screening in the Reception & Classification Centers can be performed thoroughly and timely.

**Dental Hygiene**

*Addresses III.K.7; III.K.8;*

**III.K.7.** *Dental hygiene care and oral health instructions shall be provided as part of the treatment process.*

**III.K.8.** *Routine and regular dental cleanings shall be provided to all prisoners at every IDOC facility. Cleanings shall take place at least once every two years, or as otherwise medically indicated.*

**OVERALL COMPLIANCE RATING:** Noncompliance (exacerbated by pandemic**)**

---

[476] Third Court Report of the Health care Monitor 2/15/21
[477] Staffing Analyses: 11/23/19, 6/18/20, 5/3/21 and Staffing Update 12/15/20 all recommended that the 1.0 FTE dentist at NRC be increased to 1.5FTe.
[478] Shawnee CC site visit 6/21-23/21

**FINDINGS:**

The COVID-19 pandemic has significantly impacted the provision of dental hygiene care and dental cleanings throughout the IDOC. Due to appropriate COVID-19 infection control precautions, dental cleanings were discontinued in April 2020 and have only begun to be resumed in the first quarter of 2021.

At the time of the Monitor's 1st and 2nd Reports[479] ten facilities of 28 IDOC facilities with onsite dental suites did not have a dental hygienist position[480]. IDOC submitted a Staffing Analysis in later 2020 that had filled a dental hygienist position at one of the facilities that had lacked dental hygiene services.[481] Since that time no additional dental hygienists have been hired to staff any of the nine correctional centers that continue to not have dental hygiene staffing. The last staffing analyses or staffing update have recommended the creation of new dental hygienist positions at six facilities that currently do not have dental hygienist staff.[482] Three of these recommended additional hygienist positions had previously been recommended in the initial Staffing Analysis in 2019.[483] To date none of the six sites with recommended positions have hired dental hygienist positions. The monitor recommended in all three prior Reports that all 28 IDOC facilities with dental suites should have a dental hygienist on the dental team.

The four staffing analyses and one staffing update beginning on November 29, 2019 have also recommended augmentation of dental hygiene hours at eight facilities[484] that already had onsite dental hygiene services. To date none of these additional FTE dental hygienist hours have been hired.

Eleven facilities with dental hygienist staffing reported in the September 2020 QI Committee minutes that due to pandemic safety restrictions zero dental cleanings had been done that month. Seven months later a review of March 2021 CQI minutes revealed that 13 sites with onsite dental hygiene services had not performed a single dental cleaning. Only 4 sites reported to have done any dental cleanings.[485] Four of five sites that reported waiting times for dental cleanings had waits greater than one year; one of these four had a waiting time of two years for dental cleaning. The median number of individuals on the waiting list at ten reporting sites was 170 with a range of 13 to 669 incarcerated men and women. Not one of the nine sites without onsite dental hygienist staff reported even a single dental cleaning done by a dentist.[486]

---

[479] First Court Report 11/24/19 and Second Court Report 8/6/2020
[480] IDOC Revised Staffing Analysis 6/18/20: Facilities without a dental hygienist position: Dixon, East Moline, Graham, Hill, Jacksonville, Lincoln, NRC, Sheridan, Vienna, and Western.
[481] IDOC Staffing Update 12/15/2020, Hill CC had hired a dental hygienist just prior to this update.
[482] IDOC Staffing Update 12/15/20 and Staffing Analyses 5/3/22021, 7/7/2021 have recommended the creation of dental hygienist positions at six additional facilities: Dixon, East Moline, Graham, Jacksonville, Lincoln, and Sheridan,
[483] IDOC Staffing Analysis 11/23/19 recommended creating dental hygienist positions at Dixon, Jacksonville, and Lincoln which have not yet been allocated. Hill CC was the only site at which a dental hygiene position had been recommended and had actually been hired.
[484] Additional FTE dental hygienist staffing has been recommended at Centralia, IRCC, Logan, Pinckneyville, Southwest, Taylorville, Vandalia and Decatur.
[485] March 2021 CQI minutes Hill, IRCC, JTC, and Kewanee provided reported a total of 51 cleanings.
[486] March 2021 CQI minutes

As noted in the Monitor's 2nd and 3rd Court Reports, dentists at facilities without dental hygienist positions have been directed to do dental cleanings; this would exacerbate the waiting time for patients requiring fillings, extractions, and dentures.[487] IDOC has appropriately proposed adding dental hygienist positions at six facilities that currently lack this service, but this would still leave NRC, Vienna, and Western without dental hygiene staffing.

In the revised Implementation Plan[488] IDOC committed to every facility having dental hygienists to meet facility needs. The four Staffing Analyses and one staffing update have recommended the hiring of dental hygienists at seven IDOC facilities that lacked dental hygiene services and the augmentation of staffing at eight additional sites with existing dental hygiene positions. The Monitor acknowledges that the COVID-19 pandemic has contributed to the delay in hiring dental hygiene staff but all the added dental hygiene positions were recommended prior to the onset of the pandemic additions. Twenty months have now passed and only one of the fifteen facilities has received any additional dental hygiene staffing. Given the length of time required to create and fill new positions within the State system, it is highly unlikely that many of the IDOC facilities will be able to provide dental cleanings at a minimum of every two years to the IDOC population for a number of years.

IDOC has also committed to but not yet provided a survey of space and equipment at all of their facilities. Lack of dental chairs in multiple facilities may be a driver of lack of access to dental hygienists.

**RECOMMENDATIONS:**
1. Hire at least one dental hygienist for each IDOC facility that has a dental suite.
2. Evaluate whether every facility has sufficient dental chairs to accommodate a working dental hygienist.

**Comprehensive Dental Care**

*Addresses item III.K.6; III.K.10.a-b; III.K.12*
**III.K.6.** *Routine comprehensive dental care shall be provided through comprehensive examinations and treatment plans and will be documented in the prisoners' dental charts.*
**III.K.10.a.** *Diagnostic radiographs shall be taken before every extraction.*
**III.K.10.b.** *The diagnosis and reason for extraction shall be fully documented prior to the extraction.*
**III.K.12.** *Dental personnel shall document in the dental record whenever they identify a patient's dental issue and dental personnel shall provide for proper dental care and treatment.*

**OVERALL COMPLIANCE RATING:** Partial compliance

---

[487] Conference call 4/27/21: The OHS Dental Chief concurred that dentist appointments should not be used to perform dental cleanings that would best be done by dental hygienists.
[488] IDOC revised Implementation Plan 6/12/20

**FINDINGS:** See Dental Documentation section

**RECOMMENDATIONS:** See Dental Documentation section

# Facility Internal Monitoring and Quality Improvement

*Addresses item II.B.2; II.B.6.l; II.B.6.o; III.L.1;*

**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**II.B.6.l.** *IDOC agrees to implement changes in the following areas: Effective quality assurance review;*

**II.B.6.o.** *IDOC agrees to implement changes in the following areas: Training on patient safety;*

**III.L.1.** *Pursuant to the existing contract between IDOC and the University of Illinois Chicago (UIC) College of Nursing, within fifteen (15) months of the Preliminary Approval Date [April 2020], UIC will advise IDOC on implementation of a comprehensive medical and dental Quality Improvement Program for all IDOC facilities, which program shall be implemented with input from the Monitor.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

There has been no change in quality improvement efforts based on our review of the meeting minutes. Based on meeting minutes, many studies were not done due to the COVID pandemic. Prior reports can be reviewed for existing problems which have not been resolved. A final implementation plan is not yet submitted and IDOC has not provided any plans to the Monitor for improvement of facility quality improvement. The quality improvement policy is still not completed so the existing administrative directive is still in place.[489] The statewide quality improvement coordinator believed that facilities are performing the required 13 quality studies annually which is not verified based on inspection of quality improvement minutes. IDOC has still not developed a methodology for obtaining accurate data for quality purposes. IDOC is working on an Annual Governing Body Report which is a summary report of performance measures which is still in a draft document form. Meaningful discussion of this document with the Monitor has not occurred. IDOC policy and practice shows no evidence of the new relationship with SIU or integration of the audit program, mortality review, performance measures, adverse event monitoring, or statewide quality program with the facility quality programs. This is evident by lack of an Implementation Plan for quality improvement. The Monitor's input since the first draft of the Staffing Analysis has included the recommendation that positions at each facility be identified as responsible for quality improvement[490]. The

---

[489] IDOC sent a revised quality improvement policy to the Monitor on 8/11/21 after this section was written. This revision will be addressed in the next report.

[490] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 23.

Monitor requested in the 3rd report that IDOC develop the position description for the quality improvement coordinator position, listing the training and experience needed and provide them to the Monitor for review and comment. These recommendations concerning the staffing needed for quality improvement at each facility has been ignored by the IDOC. If the IDOC is to move forward in any substantive way on the Consent Decree these positions need to be established at each facility and filled with individuals who have requisite training and expertise.

During a visit to Shawnee the Monitor learned that the Wardens still appoint the quality improvement coordinator. At Shawnee a prior Warden had appointed the head of medical records to be quality improvement coordinator but that person has no experience or knowledge of quality improvement methodology. The statewide quality coordinator stated that she was attempting to get Wardens to permit HCUAs to attend Rapid Results[491] training. The Chief OHS should be authorized to permit this. This shows that the Wardens, in fact, manage the health programs at the facility level.

In summary, there has been no meaningful change with respect to quality improvement at the facility level. This items remains noncompliant.

**RECOMMENDATIONS:**
1. Train local staff on how to perform quality improvement. Rapid Results training may be one source
2. Focus on identification of problems and opportunities for improvement as a driver for quality improvement.
3. Improve statewide data resources to provide every facility with the data necessary to perform adequate quality improvement.
4. Provide mentoring of facility quality programs.

**Audits**
*Addresses item II.B.9*
**II.B.9.** *The implementation of this Agreement shall also include the design, with the assistance of the Monitor, of an audit function for IDOC's quality assurance program which provides for independent review of all facilities' quality assurance programs, either by the Office of Health Services or by another disinterested auditor.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
The IDOC has not designed or implemented an audit system yet. SIU has been contracted to hire the audit teams and has recommended the composition of the two audit teams. These audit tams will not be hired until sometime in 2022. (See Statewide QI section)

---

[491] Rapid Results is a program that the State of Illinois is operating for State employees to provide some training is lean six sigma methodology in order to identify, analyze, and eliminate waste by correcting root cause problems. A program of this kind may have benefit if widespread training was provided to IDOC leadership at each facility.

**RECOMMENDATIONS:** None

**Performance and Outcome Measure Results**

*Addresses items II.B.7*
**II.B.7.** *The implementation of this Decree shall include the development and full implementation of a set of health care performance and outcome measures. Defendants and any vendor(s) employed by Defendants shall compile data to facilitate these measurements.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
The IDOC has not yet implemented comprehensive performance or outcome measures.

**RECOMMENDATIONS:** None

**Adverse Event and Incident Reporting Systems**
*Addresses Items II.B.6.m; II.B.6.n*
**II.B.6.m.** *IDOC agrees to implement changes in the following areas: Preventable adverse event reporting;*
**II.B.6.n.** *IDOC agrees to implement changes in the following areas: Action taken on reported errors (including near misses);*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
The IDOC has not designed or implemented an adverse event or incident reporting system yet. In the past, the only exception is medication error reporting that does do some root cause analysis and initiates corrective actions. However, a system-wide adverse event reporting system is not in place.
**RECOMMENDATIONS:** None

**Vendor Monitoring**
*Addresses II.B.2.*
**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
The Monitor has not received any individual facility monitoring reports. Some facilities list vendor vacancies at the facility in quality improvement meeting minutes. But there is no evaluation or monitoring of vendor provision of care.

**RECOMMENDATIONS:** None

**Mortality Review**
***Addresses items II.B.6.i; III.M.2;***
**II.B.6.i.** *IDOC agrees to implement changes in the following areas: Morbidity and mortality review with action plans and follow-through;*
**III.M.2**. *Mortality reviews shall identify and refer deficiencies to appropriate IDOC staff, including those involved in the Quality Assurance audit function. If deficiencies are identified, corrective action will be taken. Corrective action will be subject to regular Quality Assurance review.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
We have not received any mortality reviews for 2021. It appears that no one, including facilities, are performing mortality reviews. There are no meaningful reviews of deaths to identify opportunities for improvement.

**RECOMMENDATIONS:**
    1.   Develop an effective and meaningful mortality review process.

## APPENDIX A

Position Differences from 2019 Staffing Analysis to Final August 2021 Staffing Analysis by Position Type

| | 2019 | | | 2021 | | | |
|---|---|---|---|---|---|---|---|
| Position Name | IDOC Positions | Wexford Positions | Total 2019 Positions | IDOC Positions | Wexford Positions | Total 2021 Positions | Difference 2019 to 2021 |
| HCUA | 30 | | 30 | 29 | | 29 | -1 |
| Health Information Administrator | 1 | | 1 | 2 | | 2 | 1 |
| Health Information Associate | 13 | | 13 | 11 | | 11 | -2 |
| Health Information Tech | 2 | | 2 | 1 | | 1 | -1 |
| Assistant Medical Director | | 1 | 1 | | | | -1 |
| Medical Director | | 28.8 | 28.8 | | 27.29 | 27.29 | -1.51 |
| Physician | | 17.4 | 17.4 | | 6.175 | 6.175 | -11.225 |
| NP/ PA | | 49.9 | 49.9 | | 48.5 | 48.5 | -1.4 |
| Gynecologist | | 1.06 | 1.06 | | 1.06 | 1.06 | 0 |
| Director of Nursing | 14 | 17 | 31 | 13 | 17 | 30 | -1 |
| Assistant DON | | 1 | 1 | | | | -1 |
| Nursing Supervisor | 15 | 11 | 26 | 16 | 13 | 29 | 3 |
| Admin Assistant | 3 | | 3 | 1 | | 1 | -2 |
| Registered Nurse | 300 | 248.6 | 548.6 | 296 | 243.4 | 539.4 | -9.2 |
| CMT | 68 | | 68 | 68 | | 68 | 0 |
| LPN | 6 | 246 | 252 | | 263 | 263 | 11 |
| CNA | | 101 | 101 | | 126 | 126 | 25 |
| Pharmacy Tech | 4 | | 4 | 3 | | 3 | -1 |
| Medication Room assistant | | 41.6 | 41.6 | | 40.6 | 40.6 | -1 |
| Medical Room assistant | | 0.5 | 0.5 | | | | -0.5 |
| Dental Director | | | | | 2 | 2 | 2 |
| Dentist | 2 | 33.1 | 35.1 | 1 | 33.15 | 34.15 | -0.95 |
| Dental hygienist | 2 | 19 | 21 | 2 | 20.25 | 22.25 | 1.25 |
| Dental Assistant | 8 | 37.9 | 45.9 | 8 | 36.9 | 44.9 | -1 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Dental office assistant | 1 | | 1 | | | | -1 |
| Site Manager | | 7 | 7 | | | | -7 |
| Assistant Site Manager | | 2 | 2 | | | | -2 |
| Med Records Director | 1 | 26 | 27 | 1 | 24 | 25 | -2 |
| Medical Records Clerk | | 73.6 | 73.6 | | 54 | 54 | -19.6 |
| Corrections Clerk | 1 | | 1 | 1 | | 1 | 0 |
| Office coordinator | 6 | 2 | 8 | 16 | 16 | 32 | 24 |
| Office Associate | 30 | | 30 | 19 | | 19 | -16.1 |
| Office Assistant | 14 | | 14 | 13 | | 13 | -1 |
| Staff Assistant | | 40.6 | 40.6 | | 61.6 | 61.6 | 21 |
| Physician Specialist | 1 | | 1 | | | | -1 |
| Mammography tech | | 0.4 | 0.4 | | | | -0.4 |
| Radiology Technician | | 14.585 | 14.585 | | 10.245 | 10.245 | -4.34 |
| Optometrist | | 8.545 | 8.545 | | 6.611 | 6.611 | -1.934 |
| Physical Therapist | | 6.1 | 6.1 | | 4.55 | 4.55 | -1.55 |
| Physical Therapy Assistant | | 9.7 | 9.7 | | 10.7 | 10.7 | 1 |
| Phlebotomist | | 14.3 | 14.3 | | 12.5 | 12.5 | -1.8 |
| Health Educator | | 1 | 1 | | | | -1 |
| | 522 | 1060.69 | 1582.69 | 501 | 1078.531 | 1579.531 | |

**APPENDIX B**

Sample Narrative Provided to IDOC by the Monitor as Suggestion to Use with January 2020
Monitor Suggested Implementation Plan
Illinois Department of Corrections
Implementation Plan
Lippert Consent Decree

EXECUTIVE SUMMARY

This implementation plan is submitted by the IDOC after discussions with the Monitor and provides a roadmap for the first several years of the Lippert Consent Decree. This plan will describe a quality improvement approach to delivery of medical and dental care in the IDOC. A philosophy of quality improvement will permeate operational processes and define how the IDOC implements changes and improves to achieve a state of compliance.

One of the initial efforts is development of an effective leadership structure for Office of Health Services (OHS) which will result in a medical health authority and table of organization that will facilitate medical governance of the IDOC correctional health care program. This initial phase will also include development of structural components of the health care program. These include development of an electronic medical record; ensuring that sufficient devices and networking capacity are available to handle networking needs required to operate the electronic record and any telemedicine needs; ensure that equipment, devices and software are adequate to utilize electronic medication administration tools in an effective manner; development of a comprehensive set of policies and procedures; and perform audits to determine whether adequate physical clinical space and equipment is available at all facilities and to take corrective action based on those audits.

Another initial effort is the development of the IDOC Quality Improvement program. This program will be the driver of health care improvement including a focus on clinical and operational issues addressed in the Consent Decree. The University of Illinois, College of Nursing (UIC CON) has completed an initial assessment of the IDOC's existing quality improvement efforts; OHS is in discussions on a Phase 2 implementation plan that will be an integral component of the implementation plan. OHS is currently negotiating with UIC CON to provide transition staffing for several key components of the Quality Improvement program. These include an audit team, data team, quality improvement consultants, and process improvement staff. OHS has also begun discussion with UIC CON to provide expertise in other areas required by the Consent Decree including an infection control coordinator and access to an infectious disease consultant for the infection control program. It is anticipated that an agreement with UCI CON will be reached.

A third initial effort is to perform an assessment of the aged population housed in IDOC facilities to assess whether appropriate housing and care is being provided. IDOC will seek assistance from the Illinois Department of Aging to develop a means to survey and assess the needs of our aged inmate population. Based on the findings IDOC will assess its capacity to care for this population and develop options to address gaps identified by the analysis.

This implementation plan also includes a staffing plan that adds 372 positions. Changes have been made to the OHS table of organization[492] and to the request for new positions based on the Monitor's input. The IDOC and the Monitor agree that the estimate of staffing needs has been calculated before implementation of revised policies and practices that may have an impact on staffing. For this reason, the IDOC recommends that the staffing analysis be repeated in two years. IDOC has also initiated discussions with UIC College of Medicine regarding the possibility of having them augment physician coverage with appropriately credentialed physicians. These discussions are ongoing. The IDOC also has signed a contract with the SIU School of Medicine for them to provide physician staffing at four southern correctional facilities. OHS, and SIU are testing this project and are hopeful it can expand and assist the IDOC in improving the physician complement within IDOC.

In summary, this implementation plan focuses on the establishment of system-wide policy and operational requirements. Staff will need to be trained on new policy initiatives and the new policies will need to be implemented. The IDOC hopes to conclude a contract with UIC CON to hire amongst others an audit team, data team, and quality improvement consultants. This process operated through UIC CON is premised on creating an auditing program which audits every facility once a year with a follow up report that will identify deficiencies. The program is also responsible for conducting mortality reviews, peer reviews and sentinel event reviews. These audits and reviews along with incident reporting, and performance and outcome measures displayed on a dashboard will identify deficiencies that become the source of quality improvement activity at individual facilities. The UIC CON consultant teams will mentor facility staff to initiate and complete improvement projects that correspond to identified deficiencies. The audits and reviews along with performance and outcome measures will be incorporated in the IDOC's annual reports that will measure and account for the system's performance. Once the audit team and results on the dashboard indicate that a facility is in compliance, IDOC will notify the Monitor who can perform a site visit and confirm whether or not there is agreement on compliance. This method creates a mechanism so that the IDOC is able to self-monitor and maintain sustainability beyond the timeframe of the Consent Decree. In the following sections we give details of each of the components contained in this overview section.

OFFICE OF HEALTH SERVICES (OHS)

The IDOC intends that the Chief of the Office of Health Services, who is a physician, will be the health authority of the medical program of the IDOC. All Health Care Unit Administrators will report through this individual. OHS will incorporate leadership positions under an IDOC umbrella regardless of vendor arrangements. The Chief of OHS will be responsible for oversight and managing all aspects of health operations including policy, staffing including contractual staff; and will be the final health authority with respect to clinical decisions and clinical operations. The table of organization[493] reflects this organizational structure and lists all positions in this office. The table of organization will also identify when a position is hired through the UIC CON.

---

[492] Included as an appendix
[493] Attached as appendix X

The OHS staff is expanded considerably. The UIC CON will be used to augment OHS staff in key areas that are difficult for IDOC to recruit. The UIC CON, possibly in collaboration with the Illinois Department of Public Health, will provide an Infection Control Coordinator who will function as part of the OHS staff. The benefit of this arrangement is that UIC CON can also provide an infectious disease consultant on a part time basis to provide consultation on infection control matters and advise the IDOC with respect to infection control policy on immunization, screening, and other public health matters. Other additions to OHS staff will be discussed in the Quality Improvement section of this plan.

It will be the responsibility of the OHS to provide the leadership to develop policy, train staff on new policy, implement new programs, and monitor and report on care delivery and vendor performance. The new policies, developed in collaboration with the Monitor, will provide the framework of practices that will guide provision of clinical care for all IDOC facilities.

STRUCTURAL COMPONENTS

Implementation of the electronic medical record at all sites is a critical component of the IDOC strategy. Based on a discussion with the Monitor, OHS will perform a follow up device and networking analysis to ensure that there are sufficient devices and electronic equipment for proposed clinical needs and that there is sufficient line capacity and bandwidth to conduct expanded telemedicine services for primary and specialty care which the IDOC desires.
As the electronic record is being implemented, IDOC intends to manage this process so that the electronic record performs as expected and that IDOC can obtain data from the record for our management purposes. We intend to have UIC CON provide a data team consisting of a lead process analyst and at least four data analysts. These individuals will have sufficient software training that will enable them to modify screens in the electronic medical record to accommodate IDOC needs, extract data from the electronic record, and provide data in a useable format to populate a dashboard and to provide data for use in quality programs and to verify compliance with the Consent Decree. This electronic data will provide information necessary to produce annual reports as required in the Consent Decree.

OHS's Medical Coordinator has already initiated, in collaboration with one of the Monitor's consultants, a process to develop an adequate set of policies and procedures. Several drafts are in progress. These policies will cover all National Commission on Correctional Health Care (NCCHC) standards. As drafts of these policies are completed, they will be circulated to the OHS leadership, IDOC officials, and the Monitor's staff for comments prior to completion. Going forward, these crucial documents form the guidelines for practice and become the standard for measurement and accountability for performance.

Once the data team is hired, IDOC will evaluate the electronic medication administration process to ensure that it functions adequately in all facility settings within IDOC and delivers sufficient data to verify aggregate and individual receipt of medication.

As required by the Consent Decree IDOC will survey all facilities to ensure there is adequate physical space and equipment for clinical care. This includes fixed and mobile equipment, dental equipment, and clinic space. This survey will be part of annual audits of every facility

and will be memorialized in reports that are sent to Plaintiffs and the Monitor. IDOC is committed to making clinical space and equipment adequate but are uncertain, at this point, the extent of deficiencies that require correction.

IDOC also intends to perform a survey of the aged. The State of Illinois requires that all persons entering a nursing home have a determination of need performed that determines the participant's level of need and their disabilities. OHS will informally consult with the Illinois Department of Aging to learn how determination of need surveys can be most effectively performed. All inmates over age 50 will be surveyed in order to determine the aggregate need of this population for specialized placement. This needs assessment will form the basis for the development of action steps to provide appropriate resources, programming, and housing for those with disabilities or needing assistance with activities of daily living. The analysis and development of the action plan will be performed in consultation with the Monitor.

QUALITY IMPROVEMENT

Quality improvement is a main component of the medical program in the IDOC. Based on a requirement of the Consent Decree, the IDOC has contracted with UIC CON for advice on implementation of its quality improvement program. We are in now in discussions on a phase 2 program that will include ongoing participation of UIC CON in our quality improvement program. The Monitor has participated in these discussions and provided feedback to IDOC and UIC about the development of CQI program. These components of the CQI program are described below.

The Consent Decree requires IDOC to provide an audit function for the IDOC quality assurance program which provides for independent review of all facilities' quality assurance programs, either by the Office of Health Service or by another disinterested auditor.[494] IDOC is in discussions with UIC CON to hire staff and manage this audit process under supervision of the OHS. Two teams of auditors will be established, each consisting of a lead auditor, a physician, a mid-level provider, and 1-2 nurses. The two teams will respectively cover northern and southern facilities and be responsible for auditing each facility on an annual basis producing a report as the outcome of their audits. The Monitor, UIC CON and OHS will collaborate on an audit instrument. The Monitors, who have substantial experience auditing health care in correctional settings, have offered their assistance to train the auditors hired by UIC CON on use of the instrument at multiple facilities. Audits will include a survey of clinical space, supplies, equipment for dental and medical services; a structured audit of all components of health care delivery which will include most components of the Consent Decree. The audit teams will also be responsible for performing mortality review and preventable adverse event evaluations which are also requirements of the Consent Decree. Deficiencies and opportunities for improvement that are identified on these audits and reviews will be referred to the respective facility quality improvement program for corrective action.

Deficiencies identified in audits, performance and outcome measures, and incident reports will form the initial basis for improvement efforts. UIC CON will provide training and mentoring of our facility and regional staff on CQI methodology and practice. They will use the repertoire of

---

[494] Lippert v Baldwin Consent Decree item II.B.9

CQI techniques and can leverage considerable expertise on multiple levels to help IDOC. Both on-site, virtual, and on-demand electronic modules are anticipated to be used. Facility CQI coordinators will be trained in methodologies and techniques commonly used in the CQI field. The UIC CON team will provide leadership and front-line team training that will assist facility leaders and workers in improvement methodologies.

UIC CON will provide a data team consisting of a lead analyst and four data analysts. This team will immediately work to perform several key functions including:

- Modification of screens in the electronic record to fully conform to IDOC clinical and data needs.
- Make modification with the software vendor to the electronic record at the request of IDOC so that all data elements needed to verify the Consent Decree are present in the medical record.
- Extract and analyze data from the electronic record and place that data in a format useable by IDOC for purposes of verifying compliance with the Consent Decree and supporting quality improvement projects.
- Collaborating with Monitors and OHS to implement a dashboard based on performance and outcome measures. Development of performance and outcome measures are required by the Consent Decree. This effort will enable the IDOC to measure the system's performance and display these metrics to all staff.
- Provide data to audit teams in order to verify the degree of compliance on certain measures with the Consent Decree.
- Assist the OHS and quality teams on other data and project needs.

UIC CON will also provide a qualified individual[495] to be a process change leader. This individual will be a liaison between the University of Illinois engineering colleges, the data team and the IDOC quality programs in identifying system wide deficiencies and coordinating process improvement projects. The projects will be prioritized by the Chief of the OHS based on needs deemed critical as performance improvement efforts related to the Consent Decree. This arrangement will leverage considerable expertise in assisting IDOC in their improvement efforts. This will require arrangements with UIC colleges of engineering which will be facilitated by UIC CON.

UIC CON, the OHS, and the Monitor will develop performance and outcome measures as required in the Consent Decree. The data to evaluate performance with regard to each measure will be obtained from electronic medical record data elements. These measures will be standardized metrics that can be used to measure performance in key clinical processes and clinical outcome measures. The data for each measure will populate an electronic dashboard which will be available to staff at all facilities. This dashboard will give staff an opportunity to view their compliance on selected items. This dashboard will assist staff in improvement efforts in multiple areas related to deficiencies related to the Consent Decree.

The quality program will utilize the IDOC intranet to host a preventable adverse (clinical incident) reporting system. Such a system is required in the Consent Decree. This information

---

[495] Industrial engineer, Masters in Public Health with QI training, Masters prepared nurse with QI experience, or RN with significant QI experience

will be used by the facility quality teams to identify problems and to take corrective action as needed.

The use of continuous data from the dashboard, the audits and reviews that identify needed correction coupled with expert consultation to facility leaders to improve performance will bring about the changes that will produce compliance with the Consent Decree. This structure and process also builds IDOC's capacity to self-monitor and continue to address problems that need improvement well after compliance with the Consent Decree has been accomplished.

IDOC has also asked UIC CON to provide an infection control coordinator in the phase 2 proposal. This position is required in the Consent Decree. The challenges of obtaining expert guidance in Infection Control are such that the Monitor has advised, and OHS concurs, that in addition, a part time infectious disease consultant be utilized to make recommendations to IDOC on policies, screening measures, infection control, and public health measures and consult on complex infection control problems.

AGED POPULATION

Approximately 20% of inmates in IDOC are over 50 years of age. This population has considerably greater health needs and has presented difficulties with respect to housing, particularly at Dixon. The IDOC has plans to add 50 medical beds to a proposed mental health hospital for purposes of housing elderly patients. However, there is uncertainty with respect to the scope of need for this population. For that reason, IDOC has had preliminary discussions with the Illinois Department of Aging (IDOA) to develop a survey questionnaire based on the IDOA determination of need survey that is required of all persons entering a nursing home. The IDOC would conduct this survey with input from the Monitor. Such a survey would give a prevalence of the numbers of elderly who have disabilities, memory deficits or other assistance needs that would provide data for a subsequent plan on how to best provide for these individuals. IDOC is committed to appropriate housing for the infirmed aged including those with memory deficits, disabilities, and in need of assistance with activities of daily living.

STAFFING

The Consent Decree requires that IDOC conduct a staffing analysis which will be integrated into an implementation plan. Both the staffing analysis and implementation plan are to be completed with the assistance of the Monitor. The IDOC produced its staffing plan on 11/23/19 and had a number of discussions with the Monitor which resulted in several revisions to both documents. This process has delayed completion of these documents.

The IDOC will add [????? number of staff] to its budget request for the next fiscal year based on its staffing analysis. Positions have been added in multiple position categories based on IDOC internal position analysis. Subsequent to the Monitor's review of the analysis, the IDOC will accept the recommendations of the Monitor to ensure the following:
- That every facility will have an appropriately qualified nurse assigned exclusively to infection control.

- That every facility will have an appropriately qualified individual assigned exclusively to CQI.
- That an IDOC Director of Nursing will be at a level equivalent to the Deputy Chiefs and Medical Coordinator in the IDOC table of organization.
- That health care unit administrators report through the Chief, OHS in the table of organization.
- That vendors are included in the OHS table of organization for the purpose of showing lines of clinical and operational authority within the health program.
- That every facility will include equal access to dental hygienists based on need.
- That all those facilities with infirmaries be evaluated for need for physical therapy services.
- That inmates at all facilities will have equal access to an optometrist.

IDOC agrees with the Monitor that because new policies and practices are anticipated, a precise staffing plan cannot be determined at this time. For that reason, IDOC proposes to repeat the staffing analysis after policies and procedures are implemented and facilities have had time to assess how workloads have changed. Because of the time it will take to develop policies and procedures, train and implement it is anticipated that the second staffing analysis will take place in 2023.

The IDOC plans to insert a funding request into its next fiscal year budget to fund [????] positions identified in the current staffing plan. Understandably, there is concern that IDOC will be asking for a considerable number of positions at a time when the IDOC medical program has approximately a 20% vacancy rate. IDOC expects to fill vacancies to a rate similar to industry standards. There are a variety of reasons for the high vacancy rate, some of which result from an extremely cumbersome state hiring process. In an attempt to remedy this situation, the IDOC will establish a task force on hiring. Vendors, OHS, IDOC personnel and budget staff will be asked to participate. Union leadership and the Illinois Central Management Services (CMS) will also be invited to participate. The goal of this task force is to describe the current hiring difficulties and ascertain what reasonable measures can be taken to expedite the hiring process for open health care and dental positions to the satisfaction of the Court. The expectation is to identify the extent to which salary, hiring practices, existing contract language or other factors are barriers to hiring staff. OHS will identify measures that will reduce the time to hire and intend to use time to hire as a performance measure on its dashboard.

IDOC also recognizes that its arrangements with UIC CON and the SIU School of Medicine will have an impact on staffing in critical areas of need. These initiatives have been discussed with the Monitor who has approved and endorses these arrangements. Discussions with UIC CON will reduce staff that would otherwise need to be initially provided in the OHS. IDOC has an existing contract with the SIU School of Medicine to provide physician services at four of our facilities and has ongoing discussions with SIU to expand services. IDOC also has been having ongoing discussions with the UIC College of Medicine with respect to their participation in providing physician services. It is IDOC's perspective that collaboration with university based medical programs will significantly promote improved physician care in IDOC facilities and we are committed to that effort.

This concludes IDOC's implementation plan. It is the IDOC position that this plan is consistent with the requirements of the Consent Decree and is a satisfactory step in compliance with item IV.A and B of the Consent Decree.

Two appendices are attached. One is a spreadsheet that provides each specific item IDOC will address with a goal, assigned responsible party, proposed start date, proposed end date, the actual date completed, and with a percent completed. The spreadsheet will assist leadership and others to get a quick look at IDOC's progress on the implementation plan. This sheet is subject to modification if items are added. A second attachment is IDOC's staffing analysis listing all positions, vacancies and recommended new positions.

**APPENDIX C**

June 3, 2021

Kelly Presley
Chief Public Safety Legal Counsel
Illinois Department of Corrections

*Via email*

Dear Ms. Presley,

The Monitor has reviewed the IDOC Draft Implementation Plan sent by email on May 12, 2021. The IDOC Implementation Plan is identical to the technical assistance spreadsheet provided to the IDOC as a proposed first-year workplan on January 21, 2020. The IDOC draft has made no changes to the document over these 15 months and this is first feedback that IDOC has provided to the Monitor.

The Monitor is not responsible to develop an Implementation Plan; that responsibility resides with IDOC. However, the Monitor is willing to re-engage with IDOC concerning this document.

There are 11 items on the Monitor's January 2020 technical assistance document that include a current comment from IDOC that the item is either not required by the Consent Decree or is not part of the litigation. It is the Monitor's opinion that all of the items on the January 2020 document are necessary to develop an adequate medical program.

Also, there are 12 items from the January 2020 document with a current comment from IDOC that the item is unclear, vague, or not understood. The Monitor is willing to meet with the IDOC to clarify any item in the prior technical assistance document.

IDOC commented that five of the 83 items of the 2020 technical assistance workplan have been accomplished. Two of these items will need to be discussed.
1. IDOC asserted that it has developed a mechanism with the vendor to remove unqualified physicians. The Monitor is aware that, after a number of months, IDOC has agreed to communicate to the vendor that two physicians need to be removed. However, the mechanism that is guiding this process has not yet been communicated to the Monitor.
2. IDOC has provided the Monitor with a draft of a safety and sanitation audit instrument that includes a survey of all clinical space. The Monitor will be testing an environmental audit of the health care spaces during an upcoming site visit and will shortly thereafter be providing feedback concerning IDOC's draft audit instrument.

IDOC's Draft Implementation Plan does not include an overview narrative but would benefit from such an explanatory executive summary that accompanied the technical assistance spreadsheet sent to IDOC. The original timelines for accomplishing specific items have not been modified in the current IDOC document and almost all items are overdue. New timelines, responsible parties, etc. all need to be updated. Please see the attached narrative document sent to IDOC on January 21, 2020 that accompanied the technical assistance Implementation Plan

work plan. Although the January 21, 2020 narrative document is outdated it may serve a starting point for IDOC's Implementation Plan narrative.

There are other items that have not been updated since this spreadsheet was given to IDOC a year and a half ago. For example, the Implementation Plan still refers to UIC College of Nursing and makes no mention of SIU. This current Implementation Plan, as is, is inadequate and unacceptable until the outdated features are modified to be contemporaneous and specific timelines and responsible parties have been included. A narrative summary would add value to the understanding of the intent and goals of the Implementation Plan.

In order to make the document contemporaneous, the Monitor and consultant team are willing to meet with IDOC to discuss each of the main areas of the narrative plan and refresh and revise the spreadsheet items in the current document. It would be helpful if a work group was established including OHS, SIU and the Monitor team with a goal to discuss and modify the main areas of the draft Implementation Plan. All components of the existing spreadsheet should be discussed. The key areas are as follows:

1. OHS governance of health program
2. Development and implementation of EMR
3. Development of Quality Program
   a. Audit function
   b. Data teams
      i. Dashboards
   c. Quality consultant's training
      i. Patient Safety program
   d. Process improvement
4. Surveys of existing conditions
   a. Aged population survey of needs
   b. Survey of existing health care facilities at correctional centers
   c. Survey of equipment and supplies at all facilities
   d. Survey of devices necessary for electronic record
5. Policy and procedure timetables
   a. Training for new policies
6. Vendor or collaborative relationships
   a. Infection control and IDPH
   b. SIU and Quality
   c. Medical Vendor plan
   d. Specialty Referral Process
7. Staffing
   a. Hiring of positions recommended in the staffing analysis
   b. Evaluation of adequacy of staffing plan
8. Dental Care policy and infrastructure requirements
9. Process to assess physicians who do not have credentials and remove if necessary.

There are numerous other areas of service (medication management, scheduling, chronic care, intake, intrasystem transfer, discharge planning, specialty referrals, infection control, cancer

screening, adult immunization, hepatitis C, etc.) that should properly be included in an Implementation Plan based on Consent Decree requirements. The technical assistance document provided in January 2020 did not include many of these Consent Decree requirements because it was felt that an initial Implementation Plan that encompassed infrastructure components was necessary before initiating action in other areas of the Consent Decree. Although IDOC must address infrastructure components (physical components and organizational components), given that the Consent Decree has now been in place for over 2 years, other key processes of care must be included in this Implementation Plan. The Monitor also understands the Implementation Plan will need to be revisited and revised every few years to be consistent with requirements of the Consent Decree.

Respectfully,

JR

**APPENDIX D**

**Third Court Report**                                                                                     **6/24/21**
**Compilation of Monitor's Recommendations**

**Leadership and Organization Recommendations**
1.   The vacant Deputy Chief position needs to be expeditiously filled
2.   The OHS DON needs to report to the Chief of Health Services. Responsibilities of the
     DON should include primary responsibility for development of statewide policy and
     procedure for those subjects that are nursing-driven (medication admission, intake
     screening, nurse sick call, infirmary care etc.), setting performance expectations for
     registered nurses, licensed practical nurses and nursing assistants, establishing staffing
     standards, peer review of professional nursing, competency review of nursing support
     personnel, participates in critical incident and mortality review, establishes nursing
     quality indicators and monitors nursing quality.
3.   Identify a Director of Nursing Services at each facility who is accountable to the
     Statewide DON for clinical practice and quality. Line authority would remain with the
     HCUA for daily operations.
4.   IDOC is requested to provide quarterly up-to-date vacancy reports that include OHS and
     HCUA positions.
5.   IDOC should formally document that the Chief OHS is responsible for managing the
     health program of the IDOC as evidenced by a communication by the Executive Director
     to the Wardens communicating this new relationship.

In the body of the text of the report the following recommendations were provided to supplement
recommendation number 5.

This would include the following.
1.   With the exception of the Chief OHS, who reports to a deputy director, all medical staff
     report to medical supervision and not through custody, (e.g. the Warden).
2.   That physicians and other providers report through physician leadership ultimately
     reporting to the clinical direction of the Chief OHS.
3.   That nursing staff report through a facility Director of Nursing at each facility who, for
     clinical issues reports to the statewide OHS Director of Nursing.
4.   That administrative staff at the facility (HCUAs) report to OHS administrative leadership
     (Regional Coordinators) who report to the senior OHS administrator (Medical
     Coordinator)
5.   That the OHS DON, OHS Medical Coordinator, Deputy Chiefs, and OHS Dental
     Director report to the Chief OHS.

**Staffing Analysis and Implementation Plan Recommendations**

1.   The Executive Director with the Chief OHS need to agree on a strategic plan for the
     design of the IDOC health services.  They may need to discuss this with the Governor's
     office.  Our recommendation would be to implement a university-based program.
     Discussions with the university-based programs need to be conducted at a higher level to

213

ensure that there will be support for this effort. The Monitor wishes to meet with the Executive Director and the Governor's office to discuss these matters with respect to requirements of the Consent Decree.

2. After a strategic plan is developed and agreed to, IDOC can flesh out details in their Implementation Plan.

3. Additional nurse manager positions proposed in the staffing analysis should be established because closer supervision will be necessary to make the changes in practice required by the Consent Decree.

4. If a relief factor for posts that deliver services seven days a week has not been included in the Staffing Analysis, it should be calculated. The staffing analysis needs to be revised to include it.

5. Continue to refine the Staffing Analysis to consider recommendations from the Monitor to include dedicated positions for infection control, quality improvement, a relief factor, use of the state nursing home standards for infirmary, ADA and other specialized housing of frail and or elderly inmates, and development of workload standards.

6. Continue to refine the Staffing Analysis to ensure that health care needs of the IDOC incarcerated population are adequately provided including nurse and provider sick call, chronic care, urgent care, specialty consultation, dental care and cleaning, optometry care, and physical therapy.

7. Given the significant delay in completing the Implementation Plan, the Monitor offers to increase participation in development of that Implementation Plan if IDOC desires. The Monitor suggests a working group comprised of IDOC, SIU and the Monitor to work intensively on this plan.

With respect to recommendation 1 above, the 3rd report narrative states the following. The Monitor strongly recommends alternative solutions to obtaining qualified physicians at a level required by the Consent Decree; alternative utilization management; and a quality program that focuses on improving health outcomes for the population……. The Monitor continues to recommend solutions that include university-based programs. However, such a solution is not one that can be managed without higher level involvement.

With respect to Staffing Analysis recommendations 5 and 6, in the body of the 3rd report narrative the Monitor stressed the following.

- If the funding is present to hire all positions, then **all** positions should be in the process of being filled, particularly those for OHS.
- It is the Monitor's opinion that clinical work and much of the administrative work, including on the Consent Decree, could have continued were it not for IDOC and OHS being so short staffed, particularly in key areas. For this reason, we strongly support immediate hiring of appropriately trained physicians, assigning dedicated trained nurses to infection control duties, hiring of nursing staff, and prompt hiring of the data, IT, audit and quality teams to augment OHS staffing so that usual health care and Consent Decree requirements can be continued. IDOC is planning stronger collaboration with SIU. There should be no reason why SIU cannot immediately hire the proposed staffing which was in the UIC plan for the quality improvement implementation.

214

**Statewide Internal Monitoring and Quality Improvement Recommendations**

1. Contract with SIU or another equally qualified university-based entity to provide management assistance with the quality improvement program to include:
   a. assistance in development of an audit instrument;
   b. hiring of audit teams;
   c. auditing facilities on an annual basis;
   d. provide personnel for a data team to extract data from the electronic medical record for purposes of validating performance;
   e. provide IT staff to assist in maintaining the electronic record and in training staff on an ongoing basis[496];
   f. provide expert system engineering consultation in augmenting quality improvement efforts;
   g. develop and maintain through its data team a performance and outcome dashboard;
   h. develop and implement a standardized adverse event system statewide; and
   i. consultation and training expertise to facilities on how to perform quality improvement.
2. Revise the position description of the statewide Quality Improvement Coordinator.
3. Revise the Implementation Plan and Staffing Plan to address the requirements of the Consent Decree with respect to quality improvement taking into consideration the need for statewide efforts.
4. The current statewide Quality Improvement Coordinator and facility quality improvement coordinators should undergo Institute for Healthcare Improvement Open School training on quality improvement capability and patient safety and undergo six sigma green belt training sufficient for a senior level quality leader.
5. Incorporate additional audit team, data team, quality improvement consultants, and process improvement staff into the Staffing Analysis and the OHS table of organization.
6. The Monitor strongly suggests a working group that includes the Monitor and his consultants, IDOC and SIU in developing the quality program.
7. Utilize concepts of the UIC draft quality program in new quality proposals including:
   a. An OHS statewide quality committee to oversee quality statewide.
   b. Audit teams that audit facilities once a year and identify opportunities for improvement that form the corrective action items for facility quality teams.
   c. Mortality review teams embedded in audit teams.
   d. Data and information technology teams that work centrally and support the electronic record and obtain data for statewide quality efforts.
   e. Process improvement staff[497] who work statewide to solve systemic issues, improve quality, improve processes, and reduce cost.
   f. Quality improvement consultants who train facility staff and mentor them in their quality projects.

---

[496] See the Medical Records section of this report for an explanation of these positions.
[497] System engineers

**Audits Recommendations**

1. IDOC needs to develop and implement an audit function. Based on difficulties in hiring, our strong recommendation is to provide this service through a university-based arrangement.
2. Two audit teams should each consist of a team leader, a physician, a nurse practitioner or physician assistant, and two nurses with a part time dental consultant.
3. Audits should result in a report that lists opportunities for improvement that are addressed through the quality improvement process. Follow up should occur until a problem is satisfactorily resolved.
4. The audit team should conduct mortality review.
5. The IDOC staffing plan and the OHS table of organization should be revised to include audit, data, medical record support, and quality consultant teams.


**Performance and Outcome Measures Recommendations**

1. IDOC needs to develop and implement performance and outcome measures. This system should be centralized and based on obtaining data automatically from the electronic record, laboratory, and other sources. Measures should be presented on an electronic dashboard that can be viewed at any workstation in any facility statewide. Based on difficulties in hiring, our strong recommendation is to provide this service through a university-based arrangement.

**Adverse Event and Incident Reporting Systems Recommendations**

1. IDOC needs to develop an adverse event and incident reporting system. This system should be electronic and centralized. Based on difficulties in hiring, our strong recommendation is to provide this service through a university-based arrangement. IDOC can consider third party software for this purpose.
2. Adverse event reporting needs to have capacity to allow anonymous reports. Staff need to be encouraged to reports errors and believe that report of errors will not result in discipline.
3. Adverse event reporting needs to be supported and maintained by the OHS. Data from this reporting system must be integrated into the quality program.

**Vendor Monitoring Recommendations**

1. IDOC needs to develop a meaningful vendor monitoring system that monitors quality of care, physician quality, and ability to hire contracted staff against contract requirements. This can be joined with the audit process. Monitoring should be standardized across facilities so comparisons can be made. Based on difficulties in hiring within IDOC, our strong recommendation is to provide this service through a university-based arrangement.

**Mortality Review Recommendations**

1. Provide all death records to the Monitor as they occur. These should include two years of all aspects of the paper record. The Monitor and his consultants should all have remote access to the electronic record for every site that implements the electronic record.
2. All deaths should include an autopsy.
3. Provide a tracking log of all deaths at least quarterly. This log should include name, IDOC #, date of death, age, date of incarceration, facility at time of death, category of death, cause of death, whether the death was expected or unexpected, whether an autopsy was done and the date of the autopsy. The log should also include whether a mortality review has been completed.
4. A mortality review should be performed for each death by an audit team. The mortality review needs to include at a minimum:
    a. Date of review
    b. Patient name
    c. IDOC number
    d. Date of death
    e. Age and date of birth
    f. Facility at the time of death
    g. Place of death (e.g., hospital, infirmary, etc.)
    h. Category of death (natural, homicide, suicide, etc.)
    i. Expected or unexpected death
    j. Cause of death
    k. Mental health diagnoses
    l. Medical diagnoses
    m. IDOC problem list
    n. Medications at facility at the time of death
    o. Case summary[498] that includes both nursing and physician input that includes a summary of the care of the patient for their illnesses and care related to the cause of death or care that needs to be highlighted to identify opportunities for improvement.
    p. Autopsy diagnosis
    q. Opportunities for improvement and recommendations for corrective action
    r. Identified opportunities for improvement need to be evaluated by the OHS quality committee. That committee needs to assign responsibility for corrective action either to the facility quality committee or to an OHS responsible party. The OHS quality committee should monitor progress on resolution of the corrective action until it is completed. The facility quality improvement meeting minutes need to document their progress in resolving corrective action.
5. The quality improvement discussion regarding mortality review should be educational with a goal towards improving care.
6. Line staff employees should have an opportunity to provide anonymous information regarding events surrounding a death with an aim toward improving patient safety. A process for this should be established.

---

[498] For deaths that involve suicide

7. The quality improvement coordinator and audit teams should conduct follow up with facility quality programs to monitor actions taken to improve care based on information learned from mortality review.

## Medical Records Recommendations

1. Base the roll out and device needs on expected numbers of employees and expected workflows and not on current employee numbers or existing workflows.
2. Provide remote access for the Monitor and his Consultants to the electronic medical record at sites where an electronic medical record exists.
3. Modify the Staffing Analysis and Implementation Plan to include staff to manage and support the electronic medical records and data needs with respect to obtaining data for quality and management purposes.
4. Ensure that point-of-care[499] devices are integrated into the electronic medical record.
5. Ensure that label printing of laboratory requisition and other similar devices are integrated into the electronic medical record as part of the implementation of the record.
6. Ensure that the new electronic medical record has the capability to track and report clinical and operations data that needed to assess IDOC's compliance with the Consent Decree and data that is vital to IDOC's ongoing efforts to track and improve the delivery of quality care.

## Policies and Procedures Recommendations
1. Re-establish a timeline for completion of the comprehensive medical policies.
2. Complete the process of finishing drafts of policies.
3. Finalize the recommended changes to the policies.
4. Develop a plan to implement and disseminate policies.
5. Start the Dental policies

## Facility Staffing Recommendations
1. Identify performance and health outcome measures to compare with staff mix and staffing levels to identify desirable staffing ratios and patterns.
2. Reconcile budgeted and actual positions in the IDOC staffing analysis.
3. Establish a database that includes the number of nursing positions by type, the number vacant currently, the number who left employment each calendar year, the number leaving voluntarily each calendar year and the number of positions filled currently.
4. The number of mandatory overtime assignments should be reported to OHS by each facility monthly.
5. Monitor patient care quality and health outcomes more closely at facilities with the most turnover, highest vacancy rates and largest number of mandatory overtime assignments.

---

[499] Point-of-care devices are small devices that provide a diagnostic test locally and which can be used by nursing or provider staff where care is delivered. These devices include glucometers to test blood glucose, or devices to test blood to determine whether anticoagulation (INR) is sufficient. Electronic vital sign machines are similar to point-of-care devices in so far that they can be connected to the electronic medical record and the testing results can be automatically directed to the appropriate place in the electronic medical record.

6. Increase employment of clerks, administrative staff, assistants, and technicians to carry out tasks that do not require nursing skill but traditionally have been the responsibility of nursing staff.
7. Establish a recruitment task force with representation from OHS, Wexford, Human Resources, and the Office of Budget and Management with the explicit mission to reduce the vacancy rate to 12%.
8. Increase dental hygiene and physical therapy services throughout the IDOC.
9. Provide physician assistant and nurse practitioner staffing at all IDOC facilities where physicians are assigned.
10. Evaluate need for additional physician staffing.

## Credentialing Recommendations

1. IDOC needs to provide the following information to us three months prior to the due date of each upcoming Monitor report.
   a. A table of current physicians in a spreadsheet format with physician name, internship or residency completed, date internship or residency completed, board certification, date of board certification, current status of board certification, primary source verification for these credentials, and an AMA profile.
   b. When the AMA profile does not support the physician's credentials because the credentials are with an Osteopathic Board primary source information must be provided.
   c. All peer reviews including any disciplinary peer review or actions taken with respect to privileges.
   d. Professional performance annual evaluations for all physicians, nurse practitioners, and physician assistants.
   e. Current assignment(s) list of all physicians with hours worked at each site of assignment averaged for a prior 6-month period.
   f. Notification when a new physician is hired with credentials of the physician as provided to IDOC.
   g. Any monitoring being provided for any physician, nurse practitioner, physician assistant.
2. We have notified IDOC of two physicians without credentials who are not practicing in a safe and clinically appropriate manner and whose practice should not continue in IDOC. OHS will need to take action on these individuals in accordance with the Consent Decree.
3. When AMA profiles are being used to verify credentials, the AMA profile should be current.
4. Current license information and DEA license information needs to be provided.
5. Any sanctions on a license and a report detailing the plan for monitoring should be reported to both OHS and the Monitor
6. IDOC's health care vendor should continue to hire only physicians who are Board Certified and/or have completed a three residency in a primary care field.

**Oversight over Medical, Dental, and Nursing Staff Recommendations**

1. Develop and initiate professional performance evaluations that assess the clinical competency and clinical performance of all clinical staff.
2. Standardize evaluation formats so that all practitioners of the same type are evaluated in the same manner.
3. An independent professional knowledgeable of the scope of practice and capable of evaluating the clinical care of the professional should perform the evaluation.
4. Clinical professional performance evaluations should be shared with the employee who should sign the review after discussion with the reviewer.
5. Involve the Chief of Dental Services and the SIU audit teams in the re-assessment of the existing dentist, dental hygienist, and dental assistant annual evaluations so as to include metrics that evaluate the quality of dental care and clinical skills of the dental team.
6. The Chief of Dental Services should establish clear guidelines concerning antibiotic prophylaxis for dental procedures and obtaining x-rays prior to dental procedures to ensure use of x-rays meet existing dental standards of care.

**Clinical Space Recommendations**

1. Lincoln CC needs a new clinic structure. The current structure is inadequate for medical care.
2. Lincoln CC leadership should continue with their plan to repurpose some offices in the HCU into clinical exam space while advocating for the replacement of the HCU.
3. The IDOC needs to conduct an analysis of physical structures throughout the state to determine whether there are other medical spaces that need to be built, refurbished, or renovated in order not just to meet the provisions in the Consent Decree but to improve access to care, properly sanitize clinical areas, maximize staff efficiency, and enhance staff recruitment and retention.

**Equipment and Supply Recommendations**

1. IDOC must establish a systemwide detailed standard for equipment that must be available and maintained in each of the different clinical service rooms (examination rooms, telemedicine rooms, urgent care, infirmary, detail suites, specialty rooms, etc.) at all correctional centers.
2. IDOC must implement a systemwide ongoing audit of the clinical equipment and incorporate a following replacement plan to ensure that all sites have functional equipment at all times.
3. The IDOC should focus attention on the condition of infirmary beds in all IDOC facilities and replace defective beds with electrically operated hospital beds with safety railings and the ability to adjust the height of the bed and elevate the health and leg sections as needed.

The Monitor notes that the number 2 recommendation for audit of clinical equipment needs to include verification of calibration, inspection, and repair of equipment by an authorized medical biotechnician.

**Sanitation Recommendations**

1. The Safety and Sanitation inspections do not but should include a more detailed evaluation of the HCU and all other clinical treatment areas that would include the functioning of medical, dental, and radiology equipment, the condition of gurneys, examination tables, chairs, and infirmary beds, the emergency response bags, functionality of the negative pressure rooms, and the sanitation of all clinical spaces.
2. IDOC OHS should develop a standardized systemwide Health Care Unit/clinical space audit instrument that would focus on all the key safety and sanitation issues in all clinical areas.   If the existing Safety and Sanitation rounds are unable to incorporate this more detailed review of the clinical spaces and equipment into its schedule, a separate audit focused on the health care areas should be established.
3. The IDOC must expeditiously address the deficiencies noted in Safety and Sanitation reports prioritizing those work orders that have an impact on preventing disease and injury to inmates and staff.

**Onsite Laboratory and Diagnostics Recommendations**
1. All onsite ultrasonography testing should be immediately excluded from the collegial review process.
2. IDOC must begin to convert all of its non-digital radiology units to digital equipment.
3. Replace tuberculosis skin testing (TST) with IGRA blood testing which is more accurate, minimizes the risk of accidental needle sticks, and frees up valuable nurse resources.
4. Contact IEMA to evaluate the need for radiation exposure monitoring badges and the implementation of any additional safety measures for the panorex units at Logan CC and Menard CC
5. Create a log to track the results of point-of-care colorectal cancer screening and report this data on a regular basis to the facility's CQI committee meeting.

**Intrasystem Transfer Recommendations**

1. Finish the policy and procedure and ensure that the means and methods to carry out III.D. 1 & 2 are detailed, develop performance measures, and monitor performance to document compliance with the Consent Decree. The procedure should also define what steps the sending facility is to take in documenting pending referrals, identifying tasks not yet completed, reconciliation of medication lists, and detailing current medical and mental health problems. The procedure needs to do the same with regard to specifying the receiving facility's obligation to verify the transfer information, examine the patient and document actions taken to continue ongoing care and address new problems.

2. Augment the scope of the Medical Record Transfer study to include the concurrent transfer of the MAR and evaluate the accuracy of the clinical information (diagnoses and medications) entered on the Health Status Transfer Summary.
3. Monitor the utilization of the Intra-system Audit tool to verify that the required data is uniformly recorded by all correctional centers.

**Medical Reception Recommendations**

1. Develop metrics to provide information on the timeliness and thoroughness of medical

reception (III. C. 1, 3 & 4). Intake facilities should report their performance results to CQI on a regular basis.

2. Privacy and confidentiality of space used for clinical encounters should be included in safety and sanitation rounds of the health care program. These rounds should also account for inoperable or unsafe equipment and condition of the space, infection control risks and uncleanliness.

3. Finalize the policy and procedure on medical reception and implement it.

4. Develop a clinical audit tool that evaluates the appropriateness, quality, and continuity of health care during medical reception as well as compliance with the policy and procedure. Audit medical reception with this tool (s) at least quarterly until performance is better than 90% on each criteria for three successive quarters.

5. Replace tuberculin skin testing with IGRA blood testing to screen for tuberculosis. This is a simple step to prevent needle stick injuries, frees up staff time, eliminates the need for a patient encounter to read skin test results, and does not include a boosting effect.

6. Develop a staffing standard for medical reception that is workload driven.

7. Fill vacant positions at intake facilities.

**Health Assessment Recommendations**

1. Ensure that prior records are requested as needed.

2. Perform an adequate history regarding chronic problems and complications, including hospitalizations.

3. Develop an initial problem list along with clinically appropriate diagnostic and therapeutic plans.

4. Perform a process mapping of the intake process in order to develop adequate intake procedures that ensure:

    a. All nurse identified positives are evaluated by providers,

    b. All medical problems are identified and entered onto a problems list,

    c. All medical problems identified include an adequate history, focused physical examination, assessment and therapeutic plan,

    d. All intake laboratory tests are evaluated as part of the intake process, and

    e. Patients are enrolled in chronic clinic for all of their chronic medical conditions.

**Nursing Sick Call Recommendations**

1. Include all aspects related to sick call in the Consent Decree in the policy and procedure for non-emergent health care requests; finalize and implement it. The policy and procedure should establish the expectation that patients are seen for sick call within 24 hours of receiving the request.

2. Revise the Primary Medical Services Report to include the number of times an LPN was assigned to conduct sick call each month, the number of requests and the number of complaints made. Revise the column that reports the number of requests seen by a nurse from 72 hours to 24 hours of receipt of the request. Other revisions may be necessary once the policy and procedure is finalized. Clarify the expectation that the report is to be completely filled out and provide written definitions or instructions, as necessary. Ultimately this report should be automated and come from the EMR.

3. Assess the validity and reliability of the audit of the documentation of nursing treatment protocols. This audit only needs to be done quarterly if performance on all criteria

exceeds 90%. Revise the tool to include a measure of whether more than one complaint was addressed.

4. Sick call access should be monitored at each IDOC facility. If requests received daily are less than 5% of the population or patients are not seen within 24 hours of receipt of the request, an examination of potential barriers to access should be conducted. The examination should include identification and resolution of workload factors that cause delays in care as well as resources that are underutilized and could be repurposed to increase access.

5. OHS should establish a workload driven staffing standard for sick call and identify the number of registered nurse positions needed to comply with this aspect of the Consent Decree. This would also aid in the calculation of space and equipment that is needed for nurse sick call.

6. The privacy and confidentiality of rooms where clinical encounters take place should be evaluated during safety and sanitation rounds of the health care areas and annually as cited in the IDOC's Implementation Plan.

7. Reassign other duties that interrupt nurse sick call.

8. Reduce the number of nursing treatment protocols as discussed in this section. Eliminate the use of nursing treatment protocols in the infirmary as soon as possible.

9. Document the patient's presenting complaint(s) in their own words as the initial entry on the nursing treatment protocol.

**Chronic Care Recommendations**

1. Finish the chronic illness policy. Ensure that it addresses the essential elements of a chronic disease program as listed above.

2. Use national standards as guidelines for care instead of writing guidelines for all common health conditions.

3. Make UpToDate® available on all electronic medical record devices in IDOC.

4. Support for chronic disease management needs to improve as soon as possible.

5. Change chronic illness clinic scheduling so that a person is evaluated for all of their chronic illnesses at each chronic illness scheduled visit. The interval of visits should be based on the least controlled disease and as early as clinically necessary.

6. The chronic clinic roster needs to list all diseases of each patient.

7. Standardize procedures for entries onto the problem list. Permission to enter problems on a medical problem list should be restricted to physicians, physician assistants, and nurse practitioners. Psychiatrists and licensed mental health professionals should have permission to enter mental health diagnoses. The problem list should include medical and mental health diagnoses.

8. For physicians without appropriate credentials based on Consent Decree requirements, monitoring should be done to ensure that they are capable of managing patients according to contemporary standards. When they are not, patients should be referred to those who can manage the patient or specialty consultation should be sought.

9. Discontinue prescribing sliding scale Regular Insulin with 70/30 insulin for insulin requiring diabetics.

10. A team approach to chronic care needs to be instituted. Daily and weekly huddles need to be instituted to improve communication amongst staff. Huddles should include nursing, schedulers, and a pharmacist.
11. The lack of physicians with appropriate credentials is resulting in significant harm to patients. The Monitor recommends an arrangement with a university-based program to include onsite and telemedicine physician support.

The narrative of the 3rd Report provides principles of a chronic care program that should be included in the IDOC program.

1. Identification and evaluation of all illness must occur at intake and ensure timely continuity of treatment of an individual's chronic illness. This will include enrollment into the chronic care program.
2. Maintain a roster of persons with chronic illness and list of all of diagnoses on the roster. This can be used for risk assessment, for statistical purposes in order to understand prevalence of disease in the population and administrative aspects of disease management. An accurate listing of all chronic diseases needs to be present in the problem list which must be maintained by providers.
3. The concept of separate clinics for separate diseases must be discontinued.
4. *Each* chronic clinic visit needs to address *every* medical condition of the patient with the exception of specialty clinics such as UIC Telehealth HIV visits, hepatitis C, and TB prophylaxis visits. Clinic evaluations need to include an appropriate history, examination, assessment and updated plan for every disease of the patient.
5. National standards should be used as chronic care clinical guidelines.
6. Patient scheduling intervals must not be fixed or based on specific diseases. Scheduling should be based on the most poorly controlled chronic condition and based on the urgency of the degree of control with patients seen as early as is needed but no later than three months out.
7. Credentialing of physicians needs to accelerate so that all physicians are knowledgeable in primary care.
8. Management needs to support chronic clinic activity to a greater extent than is now done to include.
   o Improved clinic space so that every clinic is adequately sized and equipped.
   o There must be widespread availability of Up-To-Date® at workstations in every clinical examination room and nursing station.
   o Because of the remoteness of facilities, providers need access to quick curbside electronic consults with a wide variety of specialty consultants to solve clinical problems.
   o Due to the number of medication issues identified in record reviews, addition of several pharmacists to assist in medication management is needed.[500] This can be performed via telemedicine.
9. When a provider does not understand how to care for a patient's condition the provider

---

[500] This is similar to what UIC does for HIV care for telemedicine. Before the HIV patient is evaluated by a physician, a pharmacist evaluates the patient's medication profile and discusses the findings with the physician. This is useful to avoid drug-drug interactions, ensures that the patient medication profile is appropriate and safe, and assists in special situations such as managing medications for geriatric populations.

must refer the patient to a specialist who knows how to care for the patient's condition.

10. Chronic care management should move to a team approach. A dedicated chronic care team should include providers, a dedicated chronic care nurse, the on-site and off-site schedulers, and a pharmacist.

11. The team needs to meet in daily huddles to discuss hospitalizations or emergency room visits, urgent nursing evaluations or treatments (e.g., nebulization), problem patients that have arisen over the prior 24 hours as well as any scheduling changes to be aware about for the upcoming day. Daily huddles should be brief (e.g., 15 minutes).

12. A weekly huddle should be conducted with the same team to discuss chronic care patients in poor control and strategies to address their problems, recent hospitalizations, all specialty consultations over the past week to discuss therapeutic plans, specialty consultation that are upcoming, medication issues, and any other chronic care problems. Weekly huddles should be somewhat longer (1/2 to 1 hour). Huddles should be considered an integral part of chronic care and should be staffed as such.

## Urgent and Emergent Care Recommendations

1. Finalize and implement the policy and procedure on emergency services. Implementation will require additional support and coordination by OHS so that facilities standardize equipment, supplies and so forth. Implementation should proceed and be monitored according to a statewide plan outlining the steps to be taken, persons responsible and timeframes for completion.

2. Emergency response that does not result in transfer to the emergency room also needs to be tracked on a log. The criteria to be tracked differ from that kept on the emergent/urgent services log. Suggested data to track on an emergency response log should include date, time and location of the emergency, the time and name of the first health care responder, the nature of the emergency, the patient's acuity, disposition, and date the response was reviewed by a supervisor.

3. Information recorded on the emergent/urgent services log needs standardization to include definition of what is considered an acceptable report from the emergency room and the expectation that a date is entered on the log when the report is received and when the patient is seen by the physician. Consideration should be given to adding a column that identifies what documentation was received (i.e., patient discharge summary, clinical discharge summary, future appointment, or a prescription). This would be in addition to the date it was received.

4. The Monitor recommends that a column after discharge diagnosis be added to the Emergent/urgent services log to document the disposition. Documentation choices should include deceased, admitted to (name of hospital), transferred to (name of institution), released (date of release) etc.

5. The accuracy of the information documented on the log needs to be verified by an audit of patient records on a quarterly basis with corrective action as necessary until sustained performance is demonstrated.

6. The logs should be used to review emergency response and any trips to the emergency room the next day at least in a daily huddle to make decisions about the priority of services, need for communication, and follow through in the care of these patients. If a daily huddle is not initiated, a different method of review of daily emergency response

events and emergency hospital trips are reviewed.

7. The Director of Nursing should be responsible for monitoring the completion of the emergency response and emergent urgent services log. The information on these logs should be reviewed and updated daily, in real time, not retrospectively.

8. Each compartment of the emergency bag should be sealed with a numbered tag to indicate that all required items are present and in working condition. The integrity of the seal should be checked daily and documented on the log along with the presence of other equipment, verification of pads and operational battery in the AEDs and sufficient supply of oxygen.

9. Every facility needs to have at least one AED reserved as a backup for dysfunction of other AEDs. A supply of batteries and pads should be kept on hand so that replacement takes place soon.

10. The Monitor stated in the first report that all IDOC emergency response bags must be stocked with naloxone (Narcan) and Glucagon. We further recommend nasal, rather than injectable naloxone, because it is easier and safer to use in an emergency.

11. Emergency response and the use of emergency room services need to be reviewed clinically. These reviews are for the purpose of identifying opportunities to improve primary care which is known to reduce emergency room use as well as ensure appropriate oversight and follow up care for patients after discharge. At a minimum these reviews should be documented in the CQI minutes, findings tracked, and trended and improvement plans developed based upon the results. The Emergency Services Audit Tool needs to be revised to reflect III.G 1-4

12. Schedule a follow up appointment to take place within 48 hours of a patient's return from offsite emergency services. Follow up is an encounter with the patient to review the findings and discuss the treatment plan. A review of records without seeing the patient is not sufficient.

**Infirmary Care Recommendations**

1. Investigate the reasons for administration and security housing in the infirmary. Alternative solutions to security reasons for use of infirmary beds must be sought. Reasons for administrative holds need to be understood. The infirmary should not be used for ADA housing unless the patient otherwise would have a medical need to be housed on the infirmary. Use of infirmary beds should be reserved only for medically necessary care.

2. Complete the assessment of the elderly, mentally and physically disabled persons housed in IDOC facilities as stated in the implementation plan. Each person meeting these criteria should be assessed using a standardized tool appropriate for this population and the data analyzed by persons with expertise with this area of service. Use the results to determine appropriate alternatives to incarceration as well as develop and implement appropriate housing, programming, staffing and safety standards for those who should remain incarcerated.

3. Evaluate the need for physical therapy services at each institution with an infirmary as described in the implementation plan.

4. Evaluate the work load of the physicians at each facility to ensure that the physician coverage is adequate to meet the needs of the infirmaries which house the sickest individuals at the correctional centers.

5. Clarify the scope of medical services that will be provided at the renovated Joliet Treatment Center.

6. Define the criteria for referral to the 52 medical beds and the scope of service to be provided at the new Joliet Treatment Facility. This should be in policy and procedure and in the Implementation Plan. Clearly define the role and distinguish utilization of these beds from those of the other institutional infirmaries in providing inpatient care.

7. Complete the policy and procedure for infirmary services to include defining the scope of services provided and expectations for referral when a patient's need exceeds the capability of infirmary care.

8. Infirmary capacity needs to be monitored and managed proactively at the statewide level by OHS. All admission to infirmary beds should be reviewed retrospectively for appropriateness and timeliness. All persons expected to need infirmary placement longer than two weeks should be reviewed prospectively, the long-term plan of care reviewed, and most appropriate placement determined (including consideration of parole or commutation or transfer to a more appropriate facility).

9. Reduce mandatory registered nurse overtime to cover infirmary shifts by filling vacant positions or establishing additional positions.

10. Staffing the infirmary and the ADA or sheltered living units should be revised based upon the results of the needs assessment discussed in the previous section on access to infirmary, skilled and intermediate care and sheltered housing. Consider use of the staffing standards for direct care[501] set forth in Illinois Administrative Code for skilled and intermediate care facilities.

11. Revise the information contained in the primary medical services report to coincide with the definitions in the new policy and procedure and include average daily population and average length of stay for acute and chronic admissions, the number of patients in the infirmary for more than two weeks, and the number housed in the infirmary for reasons other than delivery of health care.

12. Revise tools used to monitor performance for delivery of infirmary care to coincide with the new policy and procedure. Set expectations for the frequency of monitoring, reporting results, and corrective action.

13. Provide Up-To-Date® for staff assigned to the infirmary.

14. Make physical plant repairs and renovation to sidewalks, stairs, and access roads so that persons with disabilities are able to move about the institution safely as the Monitor previously observed at Logan CC. The infirmary at Lincoln CC is of insufficient size to safely use for care and needs to be replaced.

15. Evaluate physician staffing to ensure infirmary services are adequately provided.


**Specialty Consultation Recommendations**
1. Create a tracking log which contains information in the list above.
2. The HCUA must maintain the tracking log. The log must be a log maintained for purposes of assessing access to specialty care and must include all referrals.
3. Use quality improvement to study whether patients in need of specialty care are being

---

[501] Administrative Code, Title 77: Public Health, Chapter 1: Department of Public Health, Subchapter c: Long Term Care Facilities, Part 300 Skilled and Intermediate Care Facilities Code, Section 33.1230 Direct Care Staffing available at http://ilga.gov/commission/jcar/admincode/077/077003000F12300R.html

referred for care; whether patients referred for offsite specialty care have received timely care; and whether diagnostic studies and consultations are being appropriately integrated into the patient's overall therapeutic plan. This should include, as only one example, review of records to see if the follow-up visit with the primary care provider describes a discussion between the patient and the provider, revolving around the findings at the offsite service and the plan of care.

4. A root cause analysis of specialty care needs to be promptly performed to determine why the specialty care referral process is resulting in considerable morbidity and mortality. In the meantime, the Monitor recommends discontinuing the "collegial review" process due to adverse patient safety concerns.

The tracking log information mentioned in item 1 included the following. If pre-approval of referrals is no longer occurring, this would need modification.

1. The original date that a provider referred the patient for a consultation or for offsite care. This should include all referrals including ones that do not result in a completed offsite consultation or diagnostic study.
2. The patient name;
3. IDOC number;
4. The reason for referral;
5. The referral location;
6. Date of the collegial response;
7. Was referral approved Yes or No (ATPs should be considered a No response);
8. Date appointment was arranged;
9. The scheduled date of the appointment;
10. The date the appointment occurred or reason the appointment did not occur (e.g., cancelled, not transported, lockdown, refused, etc.)
11. Rescheduled date;
12. The date the facility received the consultant or testing report;
13. The date the medical provider reviewed the consultant or testing report; and
14. The date of the follow up visit with a facility provider

**Specialty Referral Recommendations**

1. It is the recommendation of the Monitor that the current collegial review specialty care and diagnostic testing referral process be immediately discontinued.
2. The IDOC must conduct a review of the vendor's policies, practices, and guidelines that affect patient-inmates' access to medically necessary consultation, testing, and procedures and eliminate, with input from the monitor, those guidelines that restrict access to medically necessary clinical services. Examples of current restrictive vendor practices include limiting cataract surgery to only one eye, categorizing ostomy reversal surgery as an elective, and others.

**Hospital Care Recommendations**

1. Providers must continue orders promptly after hospitalization or document why recommendations will not be continued. Immediately upon return from hospitalization, nurses must consult with providers regarding recommended hospital orders. Within 2

days a provider must revise the therapeutic plan of the patient consistent with the hospital findings and recommendations. The provider must discuss the revised plan and how it will be implemented with the patient.

2. As part of the audit system, IDOC needs to evaluate whether the process of chronic care management results in preventable hospitalization. If systemic problems are identified these should be corrected through the quality improvement programs.

3. The statewide quality unit should perform a process analysis to determine why hospitalization is delayed for patients found in mortality reviews. Problems identified need to be corrected through the quality improvement program.

## Influenza Vaccination Recommendations

1. IDOC should track and report annual influenza vaccination rates and refusals by site.

2. IDOC should institute an annual health information campaign to educate the incarcerated population about the health benefits of the annual influenza vaccine and the COVID-19 vaccine.

## Adult Immunization Recommendations

1. The IDOC has promulgated standard operating procedures for a comprehensive adult immunization program and must now implement processes that ensures that all patient-inmates are offered nationally recommended age and risk appropriate adult immunizations. This process will include the provision of immunizations at the various clinical encounters noted in the revised January 2021 Administrative Directive but also in special catch-up vaccine campaigns.

2. The Immunization Program should be placed under the administrative umbrella of nursing leadership and managed by each facility's infection control nurse or a dedicated immunization nurse using approved standing orders to administer recommended adult immunizations.

3. The IDOC must track and report the offering, administration, and refusal of all adult immunizations, and the percentage of eligible individuals who are offered and received recommended adult immunizations to the CQI committees at each site.

4. The new EMR vendor should incorporate data points and clinical prompts which electronically remind, record, track, and report all adult immunizations offered and administered and the identified clinical indication (age, clinical condition, etc.)

5. The HPV vaccination campaigns at Decatur and Logan CCs should serve as the model for the delivery of nationally recommended adult vaccinations in the IDOC.

## Cancer and Routine Health Maintenance Screening Recommendations

1. The IDOC should track and report the rates of cancer and Routine Health Maintenance preventive services screenings including colon cancer, lung cancer, and abdominal aortic aneurysm screenings offered, performed, and refused and report these results to the facility CQI committees.

2. The IDOC should track and report on the percentage of eligible men and women who are current with all nationally recommended cancer and routine health maintenance screening standards.

3. The IDOC should continue to incorporate all the A and B recommendations of the USPSTF into the RHM/Preventive Services program.
4. The wording of III,M,Lc. in the Consent Decree should be modified so that the PSA testing recommendation is in align with the prostate screening recommendations of the USPTF. PSA testing is now recommended for men ages 55-69 and colon cancer screening is now recommended for ages 45-75.

**Mammography Screening Recommendations**
1. Monitor and report the offering and provision of breast and cervical cancer screening to the Quality Improvement Committees
2. Report Women's health data based on the percentage of eligible incarcerated women who receive breast and cervical cancer screenings within the established national USPSTF guidelines.

**Pharmacy and Medication Recommendations**

1. A standardized process for medication administration that addresses concerns about medication preparation, documentation on the MAR, and reporting of medication refusals and is consistent with patient safety practices and contemporary standards of care must be implemented statewide. This should be managed as a comprehensive plan of change with clear targets, steps to proceed, timeframes, and outcomes. A process consultant is recommended to facilitate forward progress, streamline methods, and identify problems unforeseen by the leadership group.
2. Facility operations need to provide sufficient access to inmates, so medications are administered safely, including scheduling sufficient time to perform the task, specialized equipment, and maintenance of physical plant.
3. Establish more detailed operational guidance specifying how medication is prescribed, how and by when treatment is initiated, how medication is to be administered safely and timely, including delineation of support to be provided by the facility, and establish how and by when documentation of medication administration takes place. At a minimum this should include:
   a. Two-part patient identification with the MAR at the time medication is administered.
   b. Timely transcription of medication orders onto the MAR.
   c. Nurses should have the MAR present at all times medication is administered to patients.
   d. Nurses should administer medications to patients directly from pharmacy-dispensed, patient-specific unit dose containers and contemporaneously document administration on the MAR.
4. Develop a workload driven staffing standard to account for the nursing staff necessary to carry out orders for medication treatment.
5. Establish more detailed operational guidance about notification of the prescribing provider of patient non-adherence with medication prescribed for somatic complaints as well as expectations for the prescribers' response to such notification. Typically, this guidance will be to notify the prescriber after three consecutive doses or more than four non-

consecutive doses in a seven-day period of critical medications only. Identification and notification of the prescribing provider should be built into the electronic health record function as identified in the IDOC Implementation Plan.[502] Expectations for the provider are to discuss the issue with the patient, collect additional information as necessary (labs, meet with the dietician or nurse etc.), document the discussion in the health record as well as the consideration of change (or not).

6. Eliminate expiration of non-formulary requests once approved.
7. Implement the electronic health record including CPOE (computerized physician order entry) and MAR per the plan for automation. Develop automated reports of patients with medication orders which expire in the next seven days and notification to providers of non-adherence.
8. Document development and implementation of corrective action plans to address results of the pharmacy inspection and MAR audit. Trend medication errors and collate results of root cause analysis to identify causes of medication errors. Include structural, equipment and procedural changes to correct problems rather than reliance on reminders at staff meetings and verbal counseling. Establish an observational tool to be used by nursing supervisors to monitor compliance with medication administration procedures and include this study on the CQI calendar.

The narrative of the 3rd Report describes the most immediate actions that need to be taken including the following.

1. Engage a process consultant to facilitate a statewide plan to standardize medication administration which addresses concerns about medication preparation, documentation on the MAR, and reporting of medication refusals and is consistent with patient safety practices and contemporary standards of care.

2. Establish more detailed operational guidance (administrative directive or policy and procedure) specifying how medication is prescribed, how and by when treatment is initiated, how medication is to be administered safely and timely, including delineation of support to be provided by the facility, and establish how and by when documentation of medication administration takes place. At a minimum this should include:
    i. Two-part patient identification with the MAR at the time medication is administered.
    ii. Timely transcription of medication orders onto the MAR.
    iii. Nurses should have the MAR present at all times medication is administered to patients.
    iv. Nurses should administer medications to patients directly from pharmacy-dispensed, patient-specific unit dose containers and contemporaneously document administration on the MAR.
    v. Instructions for notification of the prescribing provider when the patient did not adhere to the medication regime and expectations for the prescribers' response to such notification.
3. Develop a workload driven staffing standard for medication administration. The revised staffing analysis developed by OHS, dated 6/18/2020 describes a methodology that included the number of patients receiving medical medications at a facility as one of the

---

[502] Illinois Department of Corrections, Implementation Plan, Lippert Consent Decree, page 13

factors considered in determining staffing needed.[503] However, the volume of patients on medication is insufficient because it does not reflect accurately the time it takes to administer medication without pre-pouring and contemporaneous documentation of administration of medication. Further, the staffing analysis does not delineate how many or what kind of staff are used to administer medication.

**Discharge Planning Recommendations**

1. Initiate a review to determine why the practices for supplying medication and prescriptions vary from the Consent Decree. Pertinent questions to ask include who determines what medications are provided at discharge, how are discharge prescriptions obtained, who is involved in preparing medications for discharge and how do they go about this task. There needs to be better evidence that the clinician's responsible for the person's medical and mental health care determine what medications the patient receives upon release and they provide a prescription for an additional two weeks and determine if a two-week refill is medically appropriate.
2. Implement use of the pre-discharge planning worksheet that was used at Lawrence CC and incorporate it into the policy and procedure. If planning for continuity of care will be necessary, use of this worksheet should initiate a referral to the responsible medical and mental health clinician to review the patient chart and see the person as necessary to make determinations about medical and referrals to the community.
3. All releases should have a Discharge Medical Summary completed no more than a day or two before release. The Discharge Medical Summary should provide a thorough and accurate summary of the person's current condition and need for ongoing care.
4. Finish the policy and procedure for discharge and incorporate what was learned from completing the first recommendation and include use of the discharge planning worksheet.
5. Enhance continuity of care into the community for discharged individuals by providing copies of pertinent diagnostic tests, recent chronic care progress notes, vaccinations, and routine health maintenance screenings to the discharge packet. When these are included, it should be so noted on the Discharge Medical Summary.
6. A copy of the actual prescription with refills should be placed or scanned into the medical record to verify the information on the Medication Receipt at Discharge form.

**Infection Control Recommendations**

1. Ensure the statewide infection control coordinator obtains and maintains certification in infection prevention and control through the Certification Board of Infection Control and Epidemiology. Requirements of this position should also include proficiency in surveillance software and familiarity with use of an electronic medical record to support surveillance activity. It would be preferable for this person to obtain Lean Six Sigma certification within two years of hire.

---

[503] Staffing Analysis Illinois Department of Corrections Office of Health Services, Lippert Consent Decree 6/18/2020

2. Hire or contract with an infectious disease physician consultant to advise the IDOC on their infection control program as issues arise. Optimally, this physician should be from an academic institution or from the IDPH.

3. Expeditiously implement a COVID-19 vaccination program that initially focuses on all health care staff, inmate porters and hospice worker assigned to health care units, infirmaries, geriatric housing units, ADA units, and other special housing units, incarcerated persons 50 years of age and older starting with the most elderly, patient-inmates with high-risk medical co-morbidities, and correctional officers assigned to health care areas and special housing units. As soon as the COVID-19 vaccine supply increases all correctional staff and employees and all inmates should be offered the vaccine.

4. Ensure that every facility has a dedicated and appropriately trained infection control nurse.

5. Develop infection control policy to establish standardized methods of surveillance and infection control activity.

6. Establish expectations for independent verification of negative pressure in respiratory isolation rooms, monitoring and documentation of the status of negative pressure rooms, reporting to the Infection Control Coordinator and corrective action to be taken when the rooms are not functional.

7. Perform Safety and Sanitation inspections of the infirmary negative pressure units monthly but it is equally crucial that daily or weekly tissue paper testing of the isolation rooms be conducted by the health care staff to verify that these units are always operational.

8. Provide both hepatitis A and hepatitis B vaccinations to inmate workers who have risks of exposure to blood and fecal borne pathogens and to inmate kitchen workers.

9. Replace tuberculosis skin testing (TST) with IGRA blood testing, which is more accurate, minimizes the risk of accidental needle sticks, and frees up valuable nurse resources.

10. Increase access to HCV treatment by implementing the revised Screening and Treatment Hepatitis C Guidelines September 2020 that streamlined HCV eligibility and screening criteria.

11. Increase access to HCV treatment for individuals with F0 and F1 fibrosis levels.

12. Establish a quality metric that significantly increases the annual number of HCV treatments that would result in the total elimination of HCV within the next 3-5 years.

13. Track and provide detailed reports on the offering and provision of nationally recommended adult immunizations at each site.

14. Ensure that quality improvement activity identifies infection control and prevention opportunities for improvement and takes steps to ensure that improvements occur.

15. Provide data support as described in the Statewide Internal Monitoring and Quality Improvement and Medical record sections.

16. Expeditiously offer COVID-19 vaccinations to all incarcerated individuals and staff at all IDOC facilities.

17. Track and report data by facilities for health care workers, non-health care employees, and incarcerated individuals on the number of COVID-19 vaccines offered, the number administered, the number refused, and the number who have

completed a vaccine series.

18. Continue COVID-19 testing of employees and incarcerated individuals based on intervals determined in conjunction with IDPH.

## Dental Care Recommendations

1. Develop and initiate professional performance evaluations that assess the clinical competency and clinical performance of all clinical staff.
2. Standardize evaluation formats so that all practitioners of the same type are evaluated in the same manner.
3. Engage an independent professional knowledgeable of the scope of practice and capable of evaluating the clinical care of the professional to perform the annual evaluations of dentists and dental hygienists.
4. Share clinical professional performance evaluations with the employee who should sign the review after discussion with the reviewer.

## Dental Documentation Recommendations

1. Identify and establish the best practice standard for the length of time prior to dental extractions that previous x-rays are judged to be adequate to minimize complications and protect the health of the patient-inmate.

## Dental Support Recommendations

1. Provide each dental suite with its own leaded thyroid collar.
2. Report regularly to CQI committee on the effectiveness of the dental equipment sterilization at all facilities with dental suites
3. Perform an annual survey of dental equipment, furniture, and space

## Dental Access Recommendations

1. Continue to provide emergency dental services and those basic dental services that can be safely provided during the pandemic.
2. Initiate planning on how to prioritize and address the large backlog of dental care that has resulted from the safety precautions and restrictions that were required during the COVID-19 pandemic.

## Dental Intake Recommendations

Increase the FTE allocation of dentists at NRC, IDOC's busiest Reception & Classification Center.

## Dental Hygiene Recommendations

1. Hire at least one dental hygienist for each IDOC facility that has a dental suite.

## Facility Internal Monitoring and Quality Improvement Recommendations

1. Train local staff on how to perform quality improvement.
2. Focus on identification of problems and opportunities for improvement as a driver for quality improvement.

3. Improve statewide data resources to provide every facility with the data necessary to perform adequate quality improvement.
4. Provide mentoring of facility quality programs.

**Facility Mortality Review Recommendations**
1. Develop an effective and meaningful mortality review process.

**<u>APPENDIX E</u>**

Gmail - Compilation of Monitor's Recommendations in 3rd Court ...          https://mail.google.com/mail/u/0?ik=a64cd46b21&view=pt&searc...

 Gmail                                               Michael Puisis <mpuisis@gmail.com>

## Compilation of Monitor's Recommendations in 3rd Court Report

Jack Raba <jraba@healthmanagement.com>                                   Sun, Jun 27, 2021 at 1:07 PM
To: "Presley, Kelly D." <Kelly.D.Presley@illinois.gov>
Cc: "mpuisis@gmail.com" <mpuisis@gmail.com>, Catherine M Knox <cmknoxllc@msn.com>

Ms. Presley/Kelly:

Please find attached a compilation of all of the Monitor's recommendations from the 3rd Court
Report. These can be used together with the Implementation work plan provided to IDOC in
November of 2019 that was used as IDOC's recent draft Implementation Plan. There are a total
of 229 recommendations. Since these recommendations were given as a means to progress
toward compliance with the Consent Decree, this may be the best current basis for forming a
current Implementation Plan. This list of recommendations, which forms the Monitor's input
regarding what needs to be in a current implementation plan is based on our latest ongoing
evaluation of the program status as of our last report, In the Implementation Plan, each of
these recommendations should include:

1. A time to completion
2. A responsible owner
3. Percent completed

Because IDOC is responsible for the Implementation Plan, these recommendations can be accepted or
rejected but the recommendations would serve as the Monitor's input . The Implementation Plan is
designed for the next year to two years. After that time and as items are accomplished, the plan
would change and would need revision.

The Monitor team is willing to assist OHS (and SIU as needed) work on how to do this, ways to craft
an implementation document, and to answer any questions about these recommendations or how
they might fit into the Implementation Plan. To facilitate communication on any work on the
Implementation Plan, communication between OHS (and SIU) and the Monitor team may need to be
streamlined so that members of the Monitor team and OHS (or SIU staff) can intermittently and
directly contact each other between scheduled calls with defined timeframes. Facilitated access will
enhance communication, minimize delays in development of the plan, and may expedite
IDOC's progress in finalizing the Implementation Plan. After an introductory meeting, OHS will need
time to do work to flesh out its plan, so sequential meetings over a short timeframe will probably not
be productive.

As raised during our recent conference call, the Monitor communicated that the Implementation Plan
is approximately two years late. The Monitor will not be formally requesting a delay in the due date
for the plan but will communicate to the Plaintiffs' attorneys that a notable amount of work is still
needed to adequately complete the Implementation Plan. As previously communicated the Monitor
team is very willing to provide input and assist IDOC in completion of this responsibility.

Before scheduling a large meeting, it would be more productive to have a brief introductory meeting
with Dr. Bowman and you to discuss the ongoing process and logistics of scheduling work meetings on

the Implementation Plan. We already have a meeting this Tuesday 6/29 from 10AM-11AM to discuss assessment of non-credentialed physicians; could we carve out some during this hour or immediately afterwards to discuss the approach to the work sessions. Thank you  Jack Raba

 **Jack Raba, MD**
Principal | Chicago, IL
Direct: (312) 600-6750 | Mobile: (312) 933-4003
www.healthmanagement.com

The information contained in this e-mail, including any attachments, is confidential and intended solely for the named recipient(s) and may be subject to protection under federal and state laws. If you are not the intended recipient, please inform the sender immediately by reply e-mail that the message was sent in error and delete the message. Thank you.

**Lippert IDOC Implem Plan Recommendations From 3rd Report.docx**
68K

## APPENDIX F

The Monitor gives examples of performance and outcome measures that might be useful. These are given without definitions for data elements. All measures are facility specific and track all measures for each facility separately.

1. Timeliness of access and scheduling and show rate effectiveness. [504] This item should be tracked separately for each type of appointment (offsite consultation, nurse sick call, dental, phlebotomy, chronic care, etc.) with an expected timeliness for each appointment type. Timeliness is evidenced by showing up for appointments which are tracked by the various types of appointments. The schedule is made in advance and a patient is recorded as a show or no show. Separately, the system can track the reason for no shows (custody failed to bring, no transportation vehicle, court, another conflicting appointment, etc.)
2. Medical and dental backlogs.[505]
3. Number and proportion of death reviews with opportunities for improvement identified on mortality review.
4. Number and proportion of death reviews with opportunities for improvement identified on mortality review that inform new or existing QI initiatives.
5. Number and proportion of opportunities for improvement that resulted in a changed process of care.
6. Number and proportion of opportunities for improvement from mortality review referred to facility QI committees that resulted in a corrected problem as determined by statewide QI committee.
7. Number and proportion of health requests evaluated by a RN.
8. Appointments cancelled due to custody
9. Number of doses of medication administered as ordered.
10. Number of newly ordered medications with first dose received within 24 hours.
11. Medical Director hours onsite per month by facility.
12. Additional physician hours (separate from Medical Director) onsite per month
13. Vacancy rate by facility. Subcategories by position type should be obtained.
14. Time-to-hire an employee in days based on date of receipt of application to start date.
15. Number of printed complete offsite consultant and testing reports obtained within five days in the numerator and number of offsite consultant and testing referrals in the denominator for the specified period.
16. Immunization provided based on Centers for Disease Control's Advisory Committee on

---

[504] This can be defined as a combination of the following. 1) nurse face-to-face evaluation within 24 hours; 2) urgent physician referral within 24 hours; 3) routine referral to a physician within 14 calendar days; 4) episodic care as ordered: 5) chronic care as ordered with minimums specified in policy; 6) urgent specialty care as ordered; 7) high priority specialty care within 14 days; 8) medium priority specialty care within 45 days; 9) routine specialty care within 3 months; 10) patients discharged from a community hospital or IDOC infirmary seen by primary care provider within five calendar days; 11) laboratory appointments completed per provider order; 12) radiology appointment completed per provider order; 13) medical reception health assessment within 7 days; 14) medical transfer evaluations seen within five days for persons with chronic illness ; 15) medical transfer evaluations seen within 30 days for low risk persons without chronic illness; 16) telemedicine appointments seen as scheduled by provider; 17) dental health requests without pain or complaint of infection evaluated within 3 days; 18) dental requests with pain or complaint of infection seen within 24 hours; and 19) dental appointments seen as ordered. These measures can be tracked separately but combined for an overall score.
[505] This should include backlogs for the scope of services. Backlogs are appointments with scheduled appointment after the due date or with a due date that has passed.

Immunization Practices (ACIP) recommendation[506]

17. Number and proportion of persons with diabetes who received expected interventions.[507]

18. Number and percent of persons with diabetes who are at goal (< 7)

19. Number and percent of persons with diabetes with A1c >7 and <9

20. Number and percent of persons with diabetes with A1c >9

21. Number and percent of persons with diabetes with A1c >9 who are given a treatment plan and who improve their A1c in the next 3 months.

22. Number and percent of persons with diabetes on insulin who miss morning insulin.[508]

23. Number and percent of persons with hypertension with blood pressure at goal (140/90 and 130/80 for those with high cardiovascular risk)[509]

24. Number and percent of persons with asthma [NOT COPD] who receive 2 or less short acting beta agonist inhalers within the last 6 months.

25. Number and percent of persons with any persistent asthma level who are on inhaled corticosteroids.[510]

26. Number of persons treated with nebulization therapy by a nurse who have physician follow up within 5 days.

27. Number and percent of persons with COPD and any pulse oximeter reading of <90 who have evaluation for continuous oxygen therapy. [511]

28. Number and percent of persons with hepatitis C who remain untreated. Hepatitis C treated patients in the numerator and total hepatitis C patients in the denominator.

29. Number and percent of total persons with hepatitis C who completed treatment over the past month.

30. Number and percent of persons with cirrhosis who have baseline endoscopy.

31. Number and percent of persons with cirrhosis who have ultrasound or CT scan to screen for hepatocellular carcinoma within the past 6 months.

32. Number and percent of persons with HIV with undetectable viral load.

33. Number and percent of persons with cirrhosis who are prescribed a beta blocker in the numerator and number of persons with cirrhosis in the denominator.

34. Number and percent of persons on warfarin with INR within therapeutic range within past 30 days. No INR available is scored 0.

35. Appropriate placement of high-risk patients.[512]

---

[506] This should include at a minimum 1) Tdap/Td; 2) hepatitis B; 3) pneumococcal; 4) varicella; 5) zoster; 6) annual influenza:

[507] These include 1) annual diabetic retinal evaluation with a trained optometrist or ophthalmologist; 2) annual urine for microalbumin unless patient known to have nephropathy with positive tests resulting in use of ace inhibitor; 3) annual assessment for neuropathy with microfilament, tuning fork, and examination; 4) initial and periodic lipid evaluation and treatment based on American College of Cardiology guidelines; 5) visual inspection of feet at every chronic clinic appointment to include assessment for claudication; 6) annual serum creatinine; 6) referral to nephrologist for creatinine >2; 7) A1c every 3 months when not at goal and no later than every 6 months.

[508] If this number is consistently near 0, this measure should be discontinued.

[509] This measure requires strict definition. Many inmates have repeated elevated blood pressures between chronic care visits but if at the chronic care visit the blood pressure is normal or near normal no action is taken. What blood pressure is used needs to be defined.

[510] We note that virtually no providers adhere to national standards of assessing intermittent, persistent and severe asthma or do it accurately. While this is a good performance measure, significant training would be required.

[511] This may be a difficult measure to perform.

[512] This is an item that would be a future measure because IDOC does not have a system yet for this. The aged and individuals with certain diseases need specialized housing and often do not receive it. Based on the medical

36. Safety and sanitation findings corrected in numerator over safety and sanitation finding in the last safety and sanitation report.

37. Number of cancer screenings completed in the numerator divided by the number of cancer screenings that should have been done.[513]

38. Number and percent with a dietician consultation in the numerator and persons with albumin <3, weight loss > or equal to 15 pounds, dementia, or diabetes in the denominator.

39. Number of dental x-rays for extraction in the numerator and number of dental extractions in the denominator.

40. Number of completed dental prophylaxis in numerator divided by the average daily population on a monthly basis.[514]

41. Number of dental fillings in numerator divided by the number of extractions.[515]

42. Should be measures on dental access but timeliness benchmarks need to be determined with the IDOC Dental Director.

43. Number of dental evaluations that do not include a procedure in the numerator with the number of dental appointments in the denominator for a specified period.

44. Number of dental appointments for pain or other patient initiated urgent dental issues in numerator divided by number of dental appointments with procedures in the denominator.

45. Number of patients who have a physician/clinical pharmacist review of medications in numerator and number of patients on 10 or more medications in the denominator.

46. Number of patients who have a physician encounter after a consultation within 5 days with a complete report and with a meaningful update of the therapeutic treatment plan in the numerator and number of patients who go offsite for consultation or diagnostic testing in the denominator.[516]

47. Percentage of community hospitalizations during a reporting period that were linked to a previous hospitalization for the same patient with no more than 30 days between the two episodes of care.

48. Number and percent of persons with cancer whose diagnosis was made during late-stage disease in numerator and number of persons with cancer under treatment in the denominator.

49. Rate of potentially avoidable hospitalizations per 1000 patients per year based on a rolling 6 months of data. Potentially avoidable hospitalizations determined using Agency for Healthcare Research and Quality (AHRQ) prevention quality indicators adjusted for corrections as developed in conjunction with Monitors. This list would include admissions for cellulitis, bacterial pneumonia, short-term and long-term complications of diabetes, uncontrolled diabetes, lower extremity amputation among patients with

---

conditions, disabilities, cognitive function, etc. is the housing for individuals appropriate.? While this item is future state, it is an important item to plan for.

[513] This will require sophisticated data queries when a medical record system is available. Once the queries are developed, this can be an automatically generated number. The cancer screenings that should be done are found in the A and B recommendations of the Agency for Healthcare Quality and Research recommendations.

[514] The goal for low-risk patients is once a year but more frequently for all other patients. Typically, a 6 month cleaning is recommended. Notably, the expectation is that most IDOC inmates are not low risk so this number should be greater than 1/6.

[515] This number gives an indication whether restoration is attempted.

[516] This item requires record review and may be an audit item performed when the electronic record is started.

diabetes, urinary tract infections, dehydration, angina without procedure, hypertension, adult asthma, chronic obstructive pulmonary disease, congestive heart failure, perforated appendix, sepsis, and cancer diagnosed as a late stage.

50. Number of Monitor provisions designated compliant, partially compliant and noncompliant

51. Number of audit team findings by facility.  This would be started post audit start up.