**Defendants' Response to the Monitor's Fourth Report**
**Pursuant to Section V.E. of the Lippert Consent Decree**

## I. Introduction

Defendants continue to work towards compliance with the obligations outlined in the *Lippert* consent decree. The Department has experienced major achievements since the last monitoring report that include the elimination of collegial review, the expansion of Hepatitis C treatment and a partnership with Southern Illinois University's School of Medicine (SIU). The ongoing impact of the COVID-19 pandemic and the Department's vaccination efforts took time away from specific Decree requirements, but undoubtedly will have a profound impact on the medical and dental care provided to individuals in custody. In addition, the Defendants will continue to work collaboratively with the Monitor while ensuring the obligations under the consent decree are not unilaterally expanded beyond the Decree.

## II. Attorney Involvement

Throughout the Monitor's Fourth Report, he expresses repeated frustration with IDOC counsel and counsel for the Office of the Attorney General. However, section V.G. of the Decree provides that both the Department and vendor staff may have attorneys present during meetings or conversations with the Monitor and/or his consultants.

The parties agreed that the Decree would establish legal limitations. "Accordingly, the parties stipulate and the Court finds that this Decree complies in all respects with the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626(a)." Dkt. 1238, p. 4. The PLRA limits injunctive relief by requiring that the prospective relief in any civil action extend no further than necessary to correct the violation of the federal right. Finally, the PLRA requires that the proposed relief is the least intrusive means necessary to correct the violation of the federal right. The Monitor spends a great deal of this report indicating frustration with counsel for the Illinois Department of Corrections (IDOC) and the Office of the Attorney General. However, counsel for the Defendants are only advocating for their client and ensuring oversight is limited to matters outlined in the Decree.

### A. Meetings

The Monitor's Report indicates dissatisfaction with counsel for the Department scheduling meetings with Department staff and vendors. Counsel for the Department has never refused to schedule a meeting, excluded anyone from participation in a meeting or limited the Monitor's conversation with anyone with respect to the Decree. Counsel for IDOC has limited the Monitor's discussions with employees that clearly fall outside of the Decree.

For example, a separate class action in the Central District of Illinois concerns the mental healthcare provided by the Department to individuals in its custody. *See Rasho v. Walker, et al.,* No. 07-cv-01298. *Rasho* is monitored by another court and has its own court-appointed monitor. Despite this separation, the Monitor has attempted to

1

incorporate the Department's *Rasho* obligations into the Implementation Plan. Even after being reminded that IDOC's mental health obligations are under the jurisdiction of another court, with its own court-appointed monitor, the Monitor was unwavering in his request. There is no legitimate argument that can be made to suggest that the Department's mental health obligations are governed by the *Lippert* Consent Decree. As such, counsel did advise that conversations regarding the Department's *Rasho* obligations could not continue. On another occasion, the Monitor insisted on reviewing the Department's commissary options. Again, attorneys for the Department and the Attorney General's Office reminded him that commissary options have nothing to do with the medical and dental care provided to individuals in custody and thus are not permitted for discussion.

### B. Implementation Plan

Suggesting that the Implementation Plan is nothing more than a clinical and operational document oversimplifies its significance. While the document certainly will guide the clinical operations of the Department's medical program, the document also creates legally binding obligations for which Defendants must comply. The Decree specifically states, "[t]he Implementation Plan, and all amendments or updates thereto, shall be incorporated into, and become enforceable *as part of this Decree.*" Dkt 1238, IV.C at 18. The Monitor is correct, attorneys should not weigh on purely clinical matters, and they have not. However, when the Monitor's recommendations create more stringent legal obligations than the Decree, attorneys are permitted to appropriately advise their clients.

### III. Staffing Analysis

The Monitor insists that the most recent version of the staffing analysis is insufficient, but does not suggest that the 286.9 medical staff positions the Department has committed to adding are insufficient to meet the needs of IDOC's significantly reduced population. Instead, the Monitor critiques the rationale behind the numbers without evaluating the proposed additional staff in conjunction to the thirty percent decrease in the Department's incarcerated population over the last eighteen months. The Monitor urges the Court to reject Department's immediate efforts to hire staff in order to perform another long-term analysis.

The Monitor claims "IDOC said in a February 2021 call that they did not have the ability to complete a workload analysis. Through five Staffing Analyses and over 18 months, the IDOC did not attempt a workload analysis or attempt to find someone who could do this for them." Report at 24. The Department's efforts clearly indicate a workload analysis was conducted. Instead, the Department reported an inability to conduct *the specific* analysis the Monitor requested. Further, Defendants attempted to consult an outside entity to assist in their efforts to finalize the staffing analysis. That partnership was unsuccessful because the Department does not track the data necessary to examine certain factors outlined in the Monitor's proposed workload analysis. This information was shared with Monitor in February. In February 2021, the Monitor was fully supportive

of the Department immediately finalizing the staffing analysis in order to begin to hire the new medical staff.

The Department did in fact engage in a workload analysis and that analysis considered specific requirements outlined in the Decree. A review of the Monitor's first report confirms a workload analysis was done. The Monitor's First semi-annual Report, reported that from April 2019 on, the IDOC Office of Health Services had been engaged in preparing "a system-wide analysis of the IDOC health care staffing" with "ongoing input from the Monitor." Dkt. 1276 at 5.

As early as the second draft of the staffing analysis, tendered to the Monitor in late 2019, and in every draft thereafter, the Department has dedicated an entire section to explaining the methodology behind the staffing numbers. Starting on page 2 of the staffing analysis, the Department outlines its efforts to conduct a workload analysis "The initial portion of the staffing analysis consisted of two surveys administered to each facility Health Care Unit Administrator (HCUA). The first survey sought comparative information regarding 11 specific nursing tasks. A sample showing data collected from Dixon Correctional Facility in June 2019 is provided below."

**Facility Name: Dixon Correctional Center**

| Date | 6/3 | 6/4 | 6/5 | 6/6 | 6/7 | 6/8 | 6/9 | 6/10 | 6/11 | 12 | 6/13 | 6/14 | 6/15 | 6/16 | Total | Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| # of patients on medical pass line | 979 | 988 | 981 | 981 | 983 | 991 | 994 | 1007 | 986 | 982 | 983 | 976 | 994 | 998 | 13823 | 987 |
| # of Acute infirmary patients | 2 | 4 | 2 | 2 | 2 | 5 | 4 | 5 | 3 | 3 | 9 | 6 | 7 | 12 | 66 | 5 |
| # of total/partial care patients | 2 | 2 | 1 | 2 | 2 | 4 | 4 | 4 | 4 | 1 | 17 | 16 | 4 | 4 | 67 | 5 |
| # of patients seen on provider lines | 30 | 46 | 51 | 65 | 42 | 18 | 51 | 36 | 50 | 45 | 50 | 52 | 38 | 3 | 577 | 41 |
| # of new intakes from county jails | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| # of Labs drawn by nursing staff | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 3 | 0 | 1 | 7 | 1 |
| # of nurse sick calls seen daily | 34 | 14 | 34 | 38 | 27 | 10 | 23 | 32 | 27 | 36 | 31 | 46 | 16 | 19 | 387 | 28 |
| # of Nurse contacts in Seg | 60 | 63 | 63 | 62 | 65 | 12 | 10 | 80 | 47 | 10 | 70 | 73 | 66 | 184 | 865 | 62 |
| # of Discharges | 2 | 1 | 1 | 5 | 4 | 1 | 1 | 1 | 2 | 2 | 2 | 1 | 1 | 1 | 25 | 2 |
| # of emergency unscheduled furloughs | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 1 | 3 | 0 | 9 | 1 |
| # of patients treated at satellite facility (RN/Provider lines: Bldg 113) | 0 | 83 | 0 | 49 | 35 | 33 | 30 | 37 | 41 | 38 | 52 | 6 | 51 | 35 | 490 | 35 |

The second survey consisted of an assessment of the current staffing levels, requests for additional positions and the justification for those positions.

The results of this preliminary analysis were submitted to the Monitor. At the request of the Monitor, the Agency Medical Director and Deputy Chief conducted a third survey to obtain further justification for our staffing requests. A sample of further justification provided from Dixon Correctional Center is provided below.

| Facility Name | Dixon Correctional Center | | |
|---|---|---|---|
| Facility Census | FY2017 | FY2018 | FY2019 |
| | 2393 | 2382 | 2226 |
| Average Clinic Patients/Month | FY2017 | FY2018 | FY2019 |
| HTN | 503 | 483 | 481 |
| DM | 155 | 142 | 166 |
| Seizure | 112 | 115 | 111 |
| Asthma | 271 | 265 | 268 |
| Gen Med | 347 | 362 | 394 |
| High Risk | 27 | 30 | 21 |
| # Patients RN Sick Call Daily | 816 | 1146 | 1168 |
| # Patients Provider Lines | 775 | 699 | 697 |
| # Patients on Medline pass | 412 | 532 | 748 |
| # Labs Drawn by Nursing Staff | 7 | 9 | 10 |
| # Acute Infirmary Admissions | 7 | 3 | 3 |
| Average Daily Infirmary Census | 21 | 21 | 23 |

The OHS leadership critically reviewed the current staffing allocation, newly requested positions and justification provided. As a part of the Department's review, it took into account facility census data, security level and facility-specific processes. The Department also examined each facility's clinical operations data such as backlogs, transfers, clinics, etc. Staffing Analysis at 2-4.

Defendants do not contend that the staffing analysis is flawless, but it does contain a workload analysis. Further, Defendants maintain that 286.9 additional medical staff allocated as a part of the staffing analysis will drastically improve the medical and dental care provided to individuals in Defendants' custody.

## A. Other Material Disagreements

The Monitor suggests that the Department is not working collaboratively with him in finalizing the Implementation Plan, "IDOC has also limited the Monitor's ability to give input on the Implementation Plan including regarding data processes which has delayed progress." Report at 7. For more than two years, Defendants and the Monitor have engaged in ongoing discussions regarding the Implementation Plan. Exhibits 1 through 9 demonstrate that the Monitor has been afforded hours of input into the implementation, including meetings with various vendors.

The Monitor goes on to state that, "[n]o new OHS staff have been hired since the last report." *Id.* at 8. Just 12 pages later, that statement is contradicted when the Monitor

admits "[t]he Chief of Dentistry and a Public Health Education Associate have been hired since the last report." *Id.* at 20.

The Monitor states that the Department has ignored repeated requests for healthcare Administrative Directives. *Id.* at 36. The Department did send the Monitor copies of the requested Administrative Directives. Exhibits 10 and 11 demonstrate IDOC's compliance with the requests. The Department provided the Monitor with copies of its Administrative Directives on at least two separate occasions, at least one occasion was directly responsive to his 12/16/19 request. These exhibits detail that the Department sent healthcare directives, associated directives and even included statutory obligations affecting the provision of healthcare.

The Monitor reports that he "has asked IDOC for the provider's name, facility name, hours worked per week at that facility, and title (e.g., staff physician, Medical Director, "traveling medical director") at that facility for every physician. Though requested, IDOC has never provided this information." *Id.* at 65. Exhibits 12 through 17 show that not only was the Department was responsive to the Monitor's request, but when follow-up information was requested, additional information was also provided.

## IV. OHS Leadership

As with his past reports, the Monitor continues to challenge the organizational structure of the Office of Health Services by insisting the Chief of Health Services does not supervise facility healthcare staff. The Monitor further opines that because healthcare staff must seek approval from facility leadership and not OHS to attend offsite medical training the Chief of OHS does not control medical staff. *Id.* at 37. The Monitor is correct, facility leadership is responsible for approving time-off requests for healthcare staff. The reason for this arrangement is that custody leadership is responsible for ensuring that facility operations run smoothly. Certainly, the Chief of Health Services could not mandate that all healthcare staff attend a training offsite at the same time. The Chief of Health Services is not independently familiar with the work schedules of all healthcare staff; however, facility leadership is familiar. The Chief of Health Services is not independently familiar with offsite medical appointments scheduled for a particular day; however, facility leadership is familiar. The preoccupation with who in the Department is responsible for approving requests for time off or training requests, oversimplifies the intricacies of running a penal institution. The Department's medical program is not comparable to a medical program in the community. The Monitor's suggestion to totally eliminate facility leadership's involvement in healthcare operations would have real consequences to the health and safety of every person who lives and works in an IDOC facility.

The Monitor report describes his visit to Shawnee Correctional Center. During his visit, the Healthcare Unit Administrator as well as the Director of Nursing positions were both vacant. The Monitor notes, "[t]he Warden and not the Chief OHS appointed the acting HCUA. The person the Warden appointed was the Assistant Warden of Programs, who has no clinical administrative experience. So, a deputy Warden was running the

5

health program". *Id.* at 19. What is missing from this analysis is an explanation of what "running the health program" means. Any suggestion that security leadership oversees medical care is incorrect. In fact, during his visit to Shawnee, both the Warden and Assistant Warden of Programs emphatically denied being involved in making healthcare decisions. *See* Exhibits 18 and 19. Instead, when the Assistant Warden of Programs *runs the healthcare unit*, she is responsible for approving time off, ensuring supplies are replenished and guaranteeing other operational mandates are met. *Id.* The Assistant Warden of Programs specifically told the Monitor that she relies on the OHS Regional Manager and the facility Medical Director for all medical decisions. *Id.*

### V. Analysis of Compliance

In various areas throughout his report, the Monitor's assessment of the Department's compliance is based on its adherence to his specific recommendations. For example, in his analysis of Medical Records he determines that Department is noncompliant because "[n]one of the recommendations in the Monitor's 3rd Report were enacted." Report at 103. This is an inappropriate basis to assess compliance. First, the Decree does not require the Department to follow every recommendation made by the Monitor. It is completely plausible that the Department could achieve compliance without specifically adhering to one or more of the Monitor's recommendations. For example, the Monitor's recommendations under "Medical Records" require that the Department "[e]nsure that point-of-care devices are integrated into the electronic medical record" and "ensure that label printing of laboratory requisition and other similar devices are integrated into the electronic medical record as part of the implementation of the record." *Id.* at 54. Neither requirement is mandated by the Decree.

Another example can be found in the Monitor's recommendations regarding "Preventative Services." Section III.M.1. of the Decree requires the Department to offer various immunizations and cancer screenings. It should follow, that substantial compliance is achieved when the Department is able to demonstrate that appropriate immunizations and cancer screenings are consistently offered to individuals in custody. The Monitor's recommendations far exceed that threshold. For influenza, the Monitor demands, "IDOC must track and report annual influenza vaccination rates and refusals by site." *Id.* at 147. For all other vaccines, the Monitor insists, "The IDOC must track and report the percentage of fully vaccinated incarcerated individuals for each nationally recommended vaccine, the ongoing offering, administration, and refusal of all adult immunizations, and the percentage of eligible individuals who are offered and received recommended adult immunizations to the CQI committees at each site." *Id.* at 153. While these recommendations are reasonable, they are not required to achieve substantial compliance. Defendants' compliance should be evaluated based on the Decree, not the Monitor's additional requirements, reasonable or not.

The recommendations of the Monitor do more than ensure Defendants' compliance with Decree, they create a standard that far exceeds the limitations of the Prison Litigation Reform Act (PLRA), 18 U.S.C. § 3626(a). While Defendants are

6

committed to providing individuals in custody with quality medical and dental care, Defendants' compliance with the Decree must be limited as required by the PLRA. For example, section III.K.9. of the Decree directs Defendants' obligations with respect to dental peer reviews. "Within twenty-one (21) months of the Preliminary Approval Date of this Decree, IDOC shall establish a peer review system for all dentists and annual performance evaluations of dental assistants." Dkt. 1238, Consent Decree § III.K.9., p. 16. Indeed, Defendants implemented a system for dental peer review well in advance of the deadline imposed by the Decree, thus complying with section III.K.9. However, the Monitor goes above what is outlined in the Decree and the limits of the PLRA when recommending that, "an independent review of dental care should be used to avoid the potential bias that exists when the reviewer is a co-worker in the same system." Report at 69. Surely, every dentist in the community is not reviewed annually by an independent body. Accordingly, no such requirement should be imposed upon the Defendants.

The Decree requires Defendants that perform an "[a]nalysis of nutrition and timing of meals for diabetics and other Class members whose serious medical needs warrant doing so." Dkt. 1238, Consent Decree § II.B.6.j., p. 6. In evaluating Defendants' compliance with their obligations to diabetics, the Monitor also recommends that, consistent with American Diabetes Association (ADA) guidelines, "persons with diabetes have an individualized therapeutic diabetes plan at diagnosis and as needed especially during times of changing health status." Report at 82. Defendants do not disagree that individualized diabetes plans are medically prudent; however, creating those plans concurrent to the diagnosis exceeds Defendants' obligations under the PLRA. Defendants are certainly able to meet their Decree obligations with respect to diabetics by providing an individualized therapeutic diabetes plan within a reasonable time after diagnosis. More concerning is the footnote 115, associated with this recommendation which outlines, "[t]he ADA recommends three to six encounters during the first six months of diagnosis with subsequent annual encounters and additional encounters as needed." *Id.* The Monitor concludes this section by advocating that the Department be required to follow the ADA guidelines. These guidelines far exceed the mandates of the PLRA. The Department's compliance with the Decree must be measured within the confines of the PLRA and not arbitrary standards established by the Monitor.

### A. Partial Compliance

The Monitor's Fourth Report outlines various areas of noncompliance. However, after a closer reading, the narrative section suggests that the Department has achieved partial compliance. As outlined in the Decree, partial compliance

> occurs when the Defendants have achieved less than substantial compliance with all of the components of a particular section of the Decree but have made some progress toward substantial compliance on most of the key components of the section. A partial compliance rating encompasses a wide range of performance by the Defendants. Specifically, a partial compliance rating can signify that the Defendants are nearly in substantial compliance,

7

or it can mean that the Defendants are only slightly above a non-compliance rating.

Dkt. 1238, Consent Decree § I.C.15., p. 3.

Since his Second Report to the Court, the Department has plead with the Monitor to acknowledge the partial compliance rating. Such acknowledgement is ordered by the Decree. However, the Monitor continues to be inconsistent with determinations of partially compliance. Below are various examples where the Department was rated as noncompliant, while the corresponding narrative provides evidence of partial compliance.

In evaluating "Performance and Outcome Measures," the Monitor adjudges the Department as noncompliant while noting varies areas of partial compliance. The narrative section notes that "[i]n the last two Monitor Reports ten recommendations were given for inclusion on a dashboard at a minimum. Of these ten items, five were not present on the 5/5/21 dashboard submitted to the Monitor by IDOC. Four were only partly included and only one was included." Report at 43. It is not clear what could be better evidence of partial compliance than satisfying five out of ten of the Monitor's own recommendations.

The Monitor rates the Department's compliance with "Vendor Monitoring" as noncompliant. This rating is given despite the Monitor's explicit statement that, "[t]he data provided is not sufficient to evaluate IDOC's monitoring of the vendor." *Id.* at 50. The Monitor is not without options when insufficient information exists to rate certain sections. He can simply assign it as "not yet rated." This rating is given to other sections. It is unclear why it was not used here.

The subsection of "Mortality Review" was rated noncompliant, although the narrative section fully supports a finding of partial compliance: "The Monitor made seven recommendations in his Third Report. Three recommendations were partly complied with but four were not addressed at all." *Id.* at 50. This rating of noncompliance is also inconsistent with the Monitor's review of a draft mortality review policy.

On Page 74, the Monitor rates the Department as noncompliant with section III.J.3. of the Decree, which requires that "Facility medical staff shall conduct and document safety and sanitation inspections of the medical areas of the facility on a monthly basis." Dkt. 1238, Consent Decree § III.J.3., p. 15. This rating is contradicted multiple times in the narrative section that first reports, "[r]esults and/or reports of monthly Safety and Sanitation inspection reports have been provided to the Monitor on a quarterly basis for nearly all facilities. Some type of safety and sanitation inspection is conducted each month at the IDOC facilities." Report at 74. This alone is evidence of partial compliance. The Monitor also acknowledges, "[t]he Monitor was provided with a copy of a draft IDOC monthly inspection survey intended to standardize a more clinically focused audit tool for use in the health care areas at all correctional centers. This draft is an expanded audit tool of clinical space, equipment, furniture, and processes in medical

areas both in the HCU and in satellite areas." *Id.* at 76. This is further evidence of partial compliance. It also demonstrates that the Department is making ongoing efforts towards substantial compliance.

Under "Facility Implementation of Policies and Procedures," specifically section II.B.8. of the Decree, the Monitor rates the Department as noncompliant. According to the Monitor, the rationale for this rating is that no policies have been "approved of implemented." *Id.* at 90. However, the Monitor acknowledges that the revised Immunization policy has been approved and distributed. *Id.* at 147. On page 153, he acknowledges that policies regarding cancer screenings were approved and distributed. On page 163, he acknowledges that the Hepatitis C policy has been revised, approved and implemented. Furthermore, while the COVID-19 pandemic affected the Department's ability to meet the deadline for the completion of this obligation as established in the Decree, the Department is clearly making efforts towards compliance. The Monitor consistently acknowledges this partial compliance when he acknowledges receipt and review of several amended IDOC policies. He further reports that he has received additional policies for review for which he has yet to provide comments.

The Monitor rates the Department as noncompliant with various sections of the Decree related to Medical Reception. Specifically, he gives a rating of noncompliant with section III.C.1., which requires that "IDOC shall provide sufficient nursing staff and clinicians to complete medical evaluations during the intake process within seven (7) business days after a prisoner is admitted to one of IDOC's Reception and Classification Centers." Dkt. 1238, Consent Decree § III.C.1., p. 11. A rating of noncompliance is appropriate in this section, only if his chart review reveals that no medical evaluations are taking place within seven (7) business days. However, that is not what his chart review revealed, "[i]ndeed, chart review showed that these evaluations are completed at intervals longer than seven days at two of the three intake sites that provided charts for review." Report at 92. This is clear evidence of partial compliance.

Section II.B.6.f. of the Decree outlines that "IDOC agrees to implement changes in the following areas: Chronic disease care: diabetes, Chronic Obstructive Pulmonary Disease (COPD), asthma, HCV, HIV/AIDs, hypertension, hyperlipidemia." The Monitor rates the Department as noncompliant yet pages later, he acknowledges that the "care of patients with HIV and Hepatitis C is of excellent quality...." *Id.* at 113.

## VI.    Collegial Review

Since the Monitor's first report, he has all but demanded the elimination of collegial review. His criticism regarding the program is extensively documented in every report to the Court. In fact, in the Monitor's Third Report to the Court his criticism of collegial review spans nearly five full pages. As a part of his strongest critique, the Monitor opines that the program "delays needed consultations, procedures, and testing. It potentially puts patient-inmate's health at risk. It diminishes patient quality of life. It consumes an extraordinary amount of physician, HCUA, medical record staff, nurse, Regional Health Coordinator, Agency Medical Director, and Deputy Chief resources. The

Monitor again recommends that the vendor's referral process be discontinued." Dkt. 1403 at 110. Now that the Department has eliminated the program, thus improving the patient quality of life, the current report is suddenly silent as to the impact the elimination has on the Department's healthcare system. In stark contrast to his Third Report to the Court, the elimination of collegial review is now so insignificant that it carries no weight in his analysis of specialty consultations, "The recommendations from the last report have not been addressed with the exception of discontinuing collegial review." Report at 136. The Monitor all but suggests that the elimination is somehow a fraud. "There is no language in the vendor's contract extensions that prohibits the continuation of collegial review." *Id.* at 142. However, collegial review was eliminated.

## VII. Conclusion

Until substantial compliance is achieved with every aspect of the Decree, Defendants will continue to work collaboratively with the Monitoring team. However, IDOC requests that the Monitor must recognize partial compliance as outlined within the Decree.

# EXHIBIT 1

| **From:** | Presley, Kelly D. |
|---|---|
| **To:** | Meeks, Steve; Bowman, Steven; Conway, Lamenta; Klein, Mary L.; Johnson, Lisa M.; Jepsen, Tina; Candido, Janette; Griffin, Susan; Hedges, Tonya |
| **Subject:** | In-person Meeting with Lippert Monitoring Team |
| **Start:** | Tuesday, December 10, 2019 11:00:00 AM |
| **End:** | Tuesday, December 10, 2019 4:00:00 PM |
| **Location:** | Chicago |
| **Importance:** | High |

For those of you who are driving into the city for tomorrow's meeting, here are some parking options:

1. 177 N. Wells (Lake and Wells)-$17 for up to 12 hours

2. 20 E. Randolph (Across from Macy's)- $16 for up to 12 hours

3. Spothero or Parkwhiz

# EXHIBIT 2

| | |
|---|---|
| **From:** | Presley, Kelly D. |
| **To:** | Jack Raba |
| **Cc:** | Michael Puisis |
| **Subject:** | RE: Staffing Analysis/Implementation and expanded document request meeting |
| **Date:** | Tuesday, January 14, 2020 12:43:00 PM |

Great. We can meet here at 2pm. There may be 1 Wexford person in attendance. That has not been confirmed, but is a possibility.

Kelly Presley
Deputy Chief Legal Counsel
Illinois Department of Corrections
(312)814-1526 phone
(312)814-3542 fax

**From:** Jack Raba [mailto:jraba@healthmanagement.com]
**Sent:** Wednesday, January 08, 2020 4:06 PM
**To:** Presley, Kelly D.
**Cc:** Michael Puisis
**Subject:** [External] Re: Staffing Analysis/Implementation and expanded document request meeting

Your offices are fine for us- unless you prefer to meet in the HMA offices. Thanks. Jack

Sent from my iPhone

 **HMA** | **Jack Raba, MD**
Principal | Chicago, IL
Direct: 312-600-6750 | Mobile: 312-933-4003
www.healthmanagement.com

The information contained in this email, including any attachments, is confidential and intended solely for the named recipient(s) and may be subject to protection under federal and state laws. If you are not the intended recipient, please inform the sender immediately by reply email that this message was sent in error and delete the message. Thank you.

On Jan 7, 2020, at 8:24 PM, Presley, Kelly D. <Kelly.D.Presley@illinois.gov> wrote:

Great! I proposed 2pm to OHS and that seems to work fine. Just let me know if you would prefer to meet at your office or ours. Thanks

**From:** Jack Raba [mailto:jraba@healthmanagement.com]
**Sent:** Tuesday, January 07, 2020 8:23 PM
**To:** Presley, Kelly D. <Kelly.D.Presley@illinois.gov>
**Cc:** Michael Puisis <mpuisis@gmail.com>
**Subject:** [External] Re: Staffing Analysis/Implementation and expanded document

request meeting

Ms Presley: I am ok with meeting on Thursday 1/16. I am free from 1:30pm on. Let me know what times are good for OHS/you. Thanks. Jack

Sent from my iPhone



**Jack Raba, MD**
Principal | Chicago, IL
Direct: 312-600-6750 | Mobile: 312-933-4003
www.healthmanagement.com

The information contained in this e-mail, including any attachments, is confidential and intended solely for the named recipient(s) and may be subject to protection under federal and state laws. If you are not the intended recipient, please inform the sender immediately by reply e-mail that the message was sent in error and delete the message. Thank you.

On Jan 7, 2020, at 2:04 PM, Jack Raba <jraba@healthmanagement.com> wrote:

Yes. Mike and I can meet with Dr Meeks et al on Weds afternoon 1/15. Thanks. Jack

Sent from my iPhone



**Jack Raba, MD**
Principal | Chicago, IL
Direct: 312-600-6750 | Mobile: 312-933-4003
www.healthmanagement.com

The information contained in this e-mail, including any attachments, is confidential and intended solely for the named recipient(s) and may be subject to protection under federal and state laws. If you are not the intended recipient, please inform the sender immediately by reply e-mail that the message was sent in error and delete the message. Thank you.

On Jan 6, 2020, at 4:51 PM, Presley, Kelly D. <Kelly.D.Presley@illinois.gov> wrote:

Dr. Raba,

Would you be opposed to conducting this meeting in the afternoon of the 15th?

Kelly Presley
Deputy Chief Legal Counsel
Illinois Department of Corrections
(312)814-1526 phone
(312)814-3542 fax

**From:** Jack Raba [mailto:jraba@healthmanagement.com]
**Sent:** Friday, January 03, 2020 6:06 PM
**To:** Presley, Kelly D.
**Subject:** [External] Re: Staffing Analysis/Implementation and expanded document request meeting

It looks like a meeting with UICCON is being scheduled on 1/15 for about the same time? Jack

Sent from my iPhone

 **Jack Raba, MD**
Principal | Chicago, IL
Direct: 312-600-6750 | Mobile: 312-933-4003
www.healthmanagement.com

The information contained in this e-mail, including any attachments, is confidential and intended solely for the named recipient(s) and may be subject to protection under federal and state law. If you are not the intended recipient, please contact the sender immediately by reply e-mail and then delete the message. If this message was sent in error and delete the message. Thank you.

On Jan 3, 2020, at 11:01 AM, Presley, Kelly D. <Kelly.D.Presley@illinois.gov> wrote:

Dr. Raba,

Would January 15th work for yourself and Dr. Puisis? It works for myself as well as Doctors

Meeks, Bowman and Conway. Thanks

Kelly Presley
Deputy Chief Legal Counsel
Illinois Department of Corrections
(312)814-1526 phone
(312)814-3542 fax

**From:** Jack Raba
[mailto:jraba@healthmanagement.com]
**Sent:** Wednesday, January 01, 2020 10:19 PM
**To:** Presley, Kelly D.
**Subject:** [External] Staffing
Analysis/Implementation and expanded document
request meeting

Ms. Presley/Kelly:   In addition to the
meetings that Dr. Meeks is arranging with
Tina Neely/KaZee about the EHR and with
UICCON about the quality plan and phase II
relationship with OHS/IDOC,  would you be
able to set up a meeting with Dr. Meeks, Dr.
Bowman, Dr. LaMenta and Dr. Puisis and me
to address our recommendations/input
about the latest version of the staffing
analysis and the implementation plan.  We
could also discuss at this meeting the
expanded document request that was
previously send to you - the consent decree
states we should meet and agree on the
data and information needed for the
monitor to sufficiently evaluate the IDOC's
compliance with the consent decree.   We
also should begin to have regularly
scheduled  (no less than monthly) meetings
to facilitate communication be between the
monitors and the OHS/IDOC  Thanks.
Jack



Jack Raba, MD
Principal | Chicago, IL
Direct: 312-600-6750 | Mobile: 312-933-4003
www.healthmanagement.com

The information contained in this e-mail, including any attachments, is confidential and intended solely for the named recipient(s) and may be subject to protection under federal and state laws. If you are not the intended recipient, please inform the sender immediately by reply e-mail that the message was sent in error and delete the message. Thank you.

State of Illinois - CONFIDENTIALITY NOTICE:
The information contained in this communication is confidential, may be attorney-client privileged or attorney work product, may constitute inside information or internal deliberative staff communication, and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return e-mail and destroy this communication and all copies thereof, including all attachments. Receipt by an unintended recipient does not waive attorney-client privilege, attorney work product privilege, or any other exemption from disclosure

# EXHIBIT 3

| | |
|---|---|
| **From:** | Presley, Kelly D. |
| **To:** | Meeks, Steve; Bowman, Steven; Conway, Lamenta |
| **Subject:** | Lippert: Staffing Analysis and Implementation Plan Meeting |
| **Start:** | Thursday, January 16, 2020 2:00:00 PM |
| **End:** | Thursday, January 16, 2020 5:00:00 PM |
| **Location:** | Director's Office |

Please note that the meeting will take place in the Director's office.

# EXHIBIT 4

## Staley, Nicholas

| | |
|---|---|
| **Subject:** | Lippert Meeting |
| **Location:** | 180 N. LaSalle, Suite 2305 |
| | |
| **Start:** | Tue 2/11/2020 12:00 PM |
| **End:** | Tue 2/11/2020 2:00 PM |
| **Show Time As:** | Tentative |
| | |
| **Recurrence:** | (none) |
| | |
| **Meeting Status:** | Not yet responded |
| | |
| **Organizer:** | Presley, Kelly D. |

# EXHIBIT 5

## Staley, Nicholas

| | |
|---|---|
| **Subject:** | Lippert Meeting |
| **Location:** | 180 N. LaSalle, Suite 2305 |
| | |
| **Start:** | Thu 3/12/2020 10:00 AM |
| **End:** | Thu 3/12/2020 11:30 AM |
| | |
| **Recurrence:** | (none) |

# EXHIBIT 6

| | |
|---|---|
| **From:** | Presley, Kelly D. |
| **To:** | Staley, Nicholas; Jack Raba |
| **Subject:** | Staffing Analysis and Implementation Plan |
| **Start:** | Thursday, February 11, 2021 10:00:00 AM |
| **End:** | Thursday, February 11, 2021 10:30:00 AM |
| **Location:** | t/c |

1-888-494-4032

Passcode 966-4218-952

# EXHIBIT 7

| | |
|---|---|
| **From:** | Presley, Kelly D. |
| **To:** | Bowman, Steven; Conway, Lamenta; Griffin, Susan; "mpuisis@gmail.com"; Jack Raba |
| **Cc:** | Staley, Nicholas S. |
| **Subject:** | Staffing Analysis/Implementation Plan |
| **Start:** | Tuesday, June 15, 2021 10:30:00 AM |
| **End:** | Tuesday, June 15, 2021 11:30:00 AM |
| **Location:** | t/c |
| **Attachments:** | Lippert IDOC Implementaiton Plan Monitor Response 06032021.docx |
| | Lippert IDOC Implementation plan Exec Summ Example 012120 (3).docx |

1-888-494-4032

Passcode 966-4218-952

# EXHIBIT 8

| | |
|---|---|
| **From:** | Presley, Kelly D. |
| **To:** | Bowman, Steven; Conway, Lamenta; Jack Raba; "mpuisis@gmail.com"; Staley, Nicholas S.; Griffin, Susan |
| **Subject:** | Lippert Meeting: Implementation Plan |
| **Start:** | Monday, July 12, 2021 2:00:00 PM |
| **End:** | Monday, July 12, 2021 3:00:00 PM |
| **Location:** | t/c |

1-888-494-4032

Passcode 966-4218-952

# EXHIBIT 9

| | |
|---|---|
| **From:** | Presley, Kelly D. |
| **To:** | Bowman, Steven; Conway, Lamenta; Staley, Nicholas S.; Griffin, Susan; Jack Raba; "mpuisis@gmail.com" |
| **Cc:** | Austin, Russell J. |
| **Subject:** | Lippert Implementation Plan Meeting |
| **Start:** | Tuesday, July 20, 2021 2:00:00 PM |
| **End:** | Tuesday, July 20, 2021 4:00:00 PM |
| **Location:** | t/c |
| **Attachments:** | Draft Lippert IDOC Implem Plan 1-2y workplan 5-12-21.xlsx |
| | Lippert IDOC Implem Plan Recommendations From 3rd Report.docx |

1-888-494-4032

Passcode 966-4218-952

# EXHIBIT 10

| From: | Presley, Kelly D. |
|---|---|
| To: | Jack Raba |
| Subject: | Healthcare Directives |
| Date: | Monday, January 13, 2020 2:53:00 PM |
| Attachments: | Healthcare DRs and HB 2045.pdf |
| | Non-Healthcare ADs impacting HCU.pdf |
| | Healthcare ADs.pdf |

Dr. Raba,

Please find the attached documents pursuant to your December 16, 2019 request for "Most recent IDOC health care related Administrative Directives."

Kelly Presley
Deputy Chief Legal Counsel
Illinois Department of Corrections
(312)814-1526 phone
(312)814-3542 fax

# EXHIBIT 11

**From:** <u>Presley, Kelly D.</u>
**To:** <u>Jack Raba</u>
**Subject:** **Updated Medical ADs and Forms**
**Date:** **Monday, June 15, 2020 3:29:00 PM**
**Attachments:** <u>403102 2020 1.docx</u>
<u>403103 2020 1.docx</u>
<u>doc0092 rev 3.6.2020.pdf</u>
<u>doc0094 rev 2020 1.pdf</u>
<u>doc0099 rev 3.6.2020.pdf</u>
<u>doc0401 rev 2020 1.pdf</u>
<u>doc0447 rev 2020 1.pdf</u>
<u>doc0490 rev 2020 3.pdf</u>
<u>doc0583.pdf</u>
<u>doc0585 2020 6.pdf</u>

Dr. Raba,

Attached you will find the updated Administrative Directives as well as forms that have been revised since November 2019.

Kelly Presley
Deputy Chief Legal Counsel
Illinois Department of Corrections
(312)814-1526 phone
(312)814-3542 fax

# EXHIBIT 12

| | |
|---|---|
| **From:** | Presley, Kelly D. |
| **To:** | Jack Raba |
| **Cc:** | "mpuisis@gmail.com" |
| **Subject:** | RE: Assignment of Physicians, PAs, and NPs |
| **Date:** | Tuesday, May 11, 2021 9:10:00 AM |
| **Attachments:** | Wexford IDOC Physician MedDir PANP 05-07-2021.xls |

Attached is the site assignment of providers as of May 7, 2021. This does not mean a provider worked only at that site designated, it means the majority of the hours a provider works weekly is done at the site indicated. The FTE column indicates the number of hours per week the provider was hired to work for Wexford in Illinois D.O.C. 1.0 FTE equals 40 hours per week. 0.75 FTE equals 30 hours per week. 0.5 FTE equals 20 hours per week, etc. 0.00 FTE means the provider is PRN and does not work a designated number of hours per week, but rather as needed or as available.

Kelly Presley
Chief Public Safety Legal Counsel
Illinois Department of Corrections
312-814-1526

**From:** Jack Raba <jraba@healthmanagement.com>
**Sent:** Monday, April 19, 2021 12:08 PM
**To:** Presley, Kelly D. <Kelly.D.Presley@illinois.gov>
**Cc:** 'mpuisis@gmail.com' <mpuisis@gmail.com>
**Subject:** [External] Assignment of Physicians, PAs, and NPs

Hi Ms. Presley/Kelly: Please send us an updated Wexford "Medical Directors/ Physicians/PANPs" which includes the assigned correctional facility, provider name, position, FTE for all providers. The last version provided was dated 11/23/20. Thanks. Jack

 **Jack Raba, MD**
Principal | Chicago, IL
Direct: (312) 600-6750 | Mobile: (312) 933-4003
www.healthmanagement.com

The information contained in this e-mail, including any attachments, is confidential and intended solely for the named recipient and may be subject to protection under federal and state laws. If you are not the intended recipient, please inform the sender immediately by reply e-mail that this message was sent in error and delete the message. Thank you.

# EXHIBIT 13

| | |
|---|---|
| **From:** | Presley, Kelly D. |
| **To:** | Jack Raba |
| **Cc:** | "mpuisis@gmail.com" |
| **Subject:** | RE: Document Requests |
| **Date:** | Monday, December 14, 2020 2:26:00 PM |
| **Attachments:** | Wexford IDOC Medical New Hires 6-1-2020 to 11-30-2020.pdf |

Jack,

The following document reflects the Wexford numbers as requested in your 4th request. I am still working to obtain the information from the State side. A reminder 0.00 FTE refers to the person being hired as PRN.

Kelly Presley
Chief Public Safety Legal Counsel
Illinois Department of Corrections
312-814-1526

**From:** Jack Raba <jraba@healthmanagement.com>
**Sent:** Monday, December 7, 2020 10:23 AM
**To:** Presley, Kelly D. <Kelly.D.Presley@illinois.gov>
**Cc:** 'mpuisis@gmail.com' <mpuisis@gmail.com>
**Subject:** [External] Document Requests

Good morning Ms. Presley/Kelly:    Please forward us the following document/information requests: 1)Current list of HCUASs by site with vacancies notes and current coverage for vacant HCUA positions.

2)an Update OHS T.O. We did receive one dated May 2020 and then a OHS "Proposed" T.O. dated 6/18/20 (attached to the 6/18/20 Staffing Analysis), 3) An updated list of status of wiring/infrastructure upgrades for the EHR (last update received in August 2020).  4) Details on the 200 additional employees hired noted in the November 2020 IDOC report on progress toward compliance:  Positions by title hired by site, %FTE, date of hiring, IDOC v Wexford employee,  previously allocated or hired as new positions recommended in the sites' staffing analysis. 5) Job Description of the Director of Dentistry and CV if the person has been identified/hired.   Please call me if you have any questions.  Thanks Jack (I will be sending a lengthy list (a word document - not the VG spread sheet that we are working with you to develop but similar) of ongoing reports that the Monitor team will need for the 3rd and subsequent reports pending agreement on the VG Requests.



**Jack Raba, MD**
Principal | Chicago, IL
Direct: 312-600-6750 | Mobile: 312-933-4003
www.healthmanagement.com

The information contained in this e-mail, including any attachments, is confidential and intended solely for the named recipient and may be subject to protection under federal and state laws. If you are not the intended recipient, please notify the sender immediately by reply e-mail that the message was sent in error and delete the message. Thank you.

# EXHIBIT 14

| | |
|---|---|
| **From:** | Presley, Kelly D. |
| **To:** | Jack Raba |
| **Subject:** | RE: IDOC Physician/Provider Data Request Clarification |
| **Date:** | Monday, December 14, 2020 10:02:00 PM |
| **Attachments:** | Wexford IDOC Med Dir Physician PANP 12-14-2020.pdf |

Dr. Raba,

The attached documentation is in response to the 3rd request. Please note Wexford's response regarding key performance indicators.

Typically a Wexford employee performance is reviewed every April to determine indicators met for each employee. However, this was not done in April this year in order to allow Wexford managers to instead focus on activities necessary for the worldwide COVID-19 pandemic. An Employee's performance did however continue to be monitored by their immediate supervisor and disciplinary action taken if necessary.


Kelly Presley
Chief Public Safety Legal Counsel
Illinois Department of Corrections
312-814-1526


**From:** Jack Raba <jraba@healthmanagement.com>
**Sent:** Wednesday, November 11, 2020 11:35 AM
**To:** Presley, Kelly D. <Kelly.D.Presley@illinois.gov>
**Subject:** [External] Re: IDOC Physician/Provider Data Request Clarification


IDOC has provided us with three spread sheets that has current info on Physician and PA/NP staffing - we received all three of these since the Consent Decree has been in place. we would like 1)IDOC Physicians as of Date 11/1/2020 2)IDOC PA/NP as of 11/1/2020 and 3) Wexford Health , 2020 Salary Compensation Calibration Worksheet, PA/NP, Medical Director, Physician (this included provider name, title, site, Last hire, wkly hours, discipline columns, key performance indicators met, and notes). I added in current dates. All three are helpful in verifying provider assignments although I believe that the IDOC runs are likely more current. The Wexford data will also be used for QA, discipline, overall evaluation. Thanks. Jack




Jack Raba, MD
Principal | Chicago, IL
Direct: 312-600-6750 | Mobile: 312-933-4003
www.healthmanagement.com

The information contained in this e-mail, including any attachments, is confidential and intended solely for the named

recipient(s) and may be subject to protection under federal and state laws. If you are not the intended recipient, please inform the sender immediately by reply e-mail that the message was sent in error and delete the message. Thank you

**From:** Presley, Kelly D. <Kelly.D.Presley@illinois.gov>
**Sent:** Tuesday, November 10, 2020 7:06 PM
**To:** Jack Raba
**Subject:** RE: IDOC Physician/Provider Data Request Clarification

Hi Jack,

Do you recall the title of the document that you are referencing? I can't seem to locate anything with that title. Thank you

Kelly Presley
Chief Public Safety Legal Counsel
Illinois Department of Corrections
312-814-1526

**From:** Jack Raba <jraba@healthmanagement.com>
**Sent:** Tuesday, November 10, 2020 12:38 PM
**To:** Presley, Kelly D. <Kelly.D.Presley@illinois.gov>
**Subject:** [External] IDOC Physician/Provider Data Request Clarification

Hi Kelly: This is just an adjunct to the previous email: If there is a current Wexford "salary compensation worksheet" for 2020 please also send this. You provided us with the 2019 report and it was useful in identifying worksites and provider staffing. Thanks. Jack



Jack Raba, MD
Principal | Chicago, IL
Direct: 312-600-6750 | Mobile: 312-933-4003
www.healthmanagement.com

The information contained in this e-mail, including any attachments, is confidential and intended solely for the use of recipient(s) and may be subject to protection under federal and state laws. If you are not the intended recipient, please inform the sender immediately by reply e-mail that the message was sent in error and delete the message. Thank you

State of Illinois - CONFIDENTIALITY NOTICE: The information contained in this communication is confidential, may be attorney-client privileged or attorney work product, may constitute inside information or internal deliberative staff communication, and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return e-mail and destroy this communication and

all copies thereof, including all attachments. Receipt by an unintended recipient does not waive attorney-client privilege, attorney work product privilege, or any other exemption from disclosure.

# EXHIBIT 15

| From: | Presley, Kelly D. |
|---|---|
| To: | Jack Raba |
| Cc: | "mpuisis@gmail.com"; Catherine M Knox; Ronald Shansky; Bowman, Steven |
| Subject: | RE: Physician Coverage in IDOC |
| Date: | Wednesday, June 16, 2021 5:36:00 PM |

Per your request

- Dr. Shah is assigned to **Centralia** and is onsite a minimum of one day per week.
- Dr. Myers is assigned to **Graham** and is onsite a minimum of one day per week.
- Dr. Henze is assigned to **JTC** and will be onsite a minimum of one day per week.
- Dr. Gonzalez is assigned to **Taylorville** and is onsite 40 hours per week.
- Dr. Myers is assigned to **Vienna**  and onsite a minimum of one day per week.
- Dr. Smith is assigned to **Lincoln** and onsite 40 hours per week

- Though a Physician is not required via **Murphysboro** Schedule E, Dr. Myers is the physician assigned to Murphysboro by virtue of Pinckneyville being the parent facility.
- Dr. Henze is the physician assigned to Elgin
- Dr. Rankin is the physician assigned to **Kewanee** and goes onsite one day per week.

Kelly Presley
Chief Public Safety Legal Counsel
Illinois Department of Corrections
312-814-1526
Pronouns: *she, her, hers*

**From:** Jack Raba <jraba@healthmanagement.com>
**Sent:** Tuesday, June 8, 2021 9:49 AM
**To:** Presley, Kelly D. <Kelly.D.Presley@illinois.gov>
**Cc:** 'mpuisis@gmail.com' <mpuisis@gmail.com>; Catherine M Knox <cmknoxllc@msn.com>; Ronald Shansky <ronshanskymd@gmail.com>; Bowman, Steven <Steven.Bowman@Illinois.gov>
**Subject:** [External] Physician Coverage in IDOC

Good morning Ms. Presley/Kelly: Review of Wexford's 5/7/21 Physician/PA/NP roster and the 6/2/1 Physician Credentials List indicated there were no designated physicians assigned to five site: Centralia, Graham, JTC, Taylorville, and Vienna. (Elgin, M-Boro , Kewanee were excluded from this list. Both Kewanee and M-Boro have PA/NP coverged noted).  Please send the names and the hours of weekly service of the physicians who are covering the five noted correctional centers.  Thanks .  Jack Raba



**Jack Raba, MD**
Principal | Chicago, IL
Direct: (312) 600-6750 | Mobile: (312) 933-4003
www.healthmanagement.com

The information contained in this e-mail, including any attachments, is confidential and intended solely for the named recipient and may be subject to protection under federal and state laws. If you are not the intended recipient, please inform the sender immediately by reply e-mail that the message was sent in error and delete the message. Thank you.

# EXHIBIT 16

| **From:** | Presley, Kelly D. |
|---|---|
| **To:** | Jack Raba; "mpuisis@gmail.com"; Bowman, Steven; Conway, Lamenta |
| **Subject:** | Updated Physician List |
| **Date:** | Wednesday, June 2, 2021 1:10:00 PM |
| **Attachments:** | Physicians Credential Report 6.1.21.xlsx |

Good Afternoon,

Per your request on our credentialing call last month, attached is an updated list of Wexford physicians. Additionally, please provide your preference for the next meeting date. The options were June 29th at 10am or July 8th at 11am? Thank you.

Kelly Presley
Chief Public Safety Legal Counsel
Illinois Department of Corrections
312-814-1526

# EXHIBIT 17

| Site | Last Name | First Name | Position | FTE |
|---|---|---|---|---|
| **Wexford Illinois Medical Directors / Physicians / PA-NPs** | | | | |
| **As of 5/7/2021** | | | | |
| IDOC - BIG MUDDY FACILITY | | | PA/NP | 1.00 |
| IDOC - BIG MUDDY FACILITY | | | Medical Director | 1.00 |
| IDOC - DANVILLE FACILITY | | | PA/NP | 0.00 |
| IDOC - DANVILLE FACILITY | | | PA/NP | 1.00 |
| IDOC - DANVILLE FACILITY | | | Medical Director | 1.00 |
| IDOC - DECATUR FACILITY | | | Medical Director | 1.00 |
| IDOC - DECATUR FACILITY | | | Medical Director | 0.00 |
| IDOC - DIXON FACILITY | | | PA/NP | 1.00 |
| IDOC - DIXON FACILITY | | | PA/NP | 1.00 |
| IDOC - DIXON FACILITY | | | PA/NP | 1.00 |
| IDOC - DIXON FACILITY | | | Medical Director | 1.00 |
| IDOC - EAST MOLINE FACILITY | | | Medical Director | 1.00 |
| IDOC - EAST MOLINE FACILITY | | | PA/NP | 0.40 |
| IDOC - EAST MOLINE FACILITY | | | PA/NP | 0.00 |
| IDOC - ELGIN TREATMENT CENTER | | | PA/NP | 1.00 |
| IDOC - GRAHAM FACILITY | | | PA/NP | 1.00 |
| IDOC - GRAHAM FACILITY | | | PA/NP | 1.00 |
| IDOC - HILL CORRECTIONAL FACILITY | | | Medical Director | 0.00 |
| IDOC - HILL CORRECTIONAL FACILITY | | | PA/NP | 1.00 |
| IDOC - IL RIVER CORRECTIONAL FACILITY | | | PA/NP | 1.00 |
| IDOC - IL RIVER CORRECTIONAL FACILITY | | | Medical Director | 1.00 |
| IDOC - MENARD FACILITY | | | Physician | 0.00 |
| IDOC - JACKSONVILLE FACILITY | | | Medical Director | 1.00 |
| IDOC - JACKSONVILLE FACILITY | | | PA/NP | 0.20 |
| IDOC - JACKSONVILLE FACILITY | | | PA/NP | 0.80 |
| IDOC - KEWANEE LSRC FACILITY | | | PA/NP | 0.00 |
| IDOC - LAWRENCE FACILITY | | | PA/NP | 0.55 |
| IDOC - LAWRENCE FACILITY | | | PA/NP | 1.00 |
| IDOC - LAWRENCE FACILITY | | | Medical Director | 1.00 |
| IDOC - LINCOLN FACILITY | | | PA/NP | 0.00 |
| IDOC - LINCOLN FACILITY | | | Medical Director | 1.00 |
| IDOC - LOGAN FACILITY | | | PA/NP | 0.00 |
| IDOC - LOGAN FACILITY | | | PA/NP | 1.00 |
| IDOC - LOGAN FACILITY | | | PA/NP | 1.00 |
| IDOC - LOGAN FACILITY | | | PA/NP | 1.00 |
| IDOC - LOGAN FACILITY | | | Medical Director | 1.00 |
| IDOC - LOGAN FACILITY | | | PA/NP | 1.00 |
| IDOC - MENARD FACILITY | | | PA/NP | 1.00 |
| IDOC - MENARD FACILITY | | | PA/NP | 1.00 |
| IDOC - MENARD FACILITY | | | Physician | 1.00 |
| IDOC - MENARD FACILITY | | | PA/NP | 1.00 |
| IDOC - MENARD FACILITY | | | Medical Director | 1.00 |
| IDOC - MURPHYSBORO LSRC FACILITY | | | PA/NP | 0.40 |
| IDOC - PINCKNEYVILLE FACILITY | | | PA/NP | 1.00 |
| IDOC - PINCKNEYVILLE FACILITY | | | Medical Director | 1.00 |
| IDOC - PONTIAC FACILITY | | | PA/NP | 1.00 |
| IDOC - PONTIAC FACILITY | | | PA/NP | 0.00 |
| IDOC - PONTIAC FACILITY | | | PA/NP | 0.75 |
| IDOC - PONTIAC FACILITY | | | PA/NP | 0.25 |

| Wexford Illinois Medical Directors / Physicians / PA-NPs | | | | |
|---|---|---|---|---|
| As of 5/7/2021 | | | | |
| Site | Last Name | First Name | Position | FTE |
| IDOC - PONTIAC FACILITY | | | Medical Director | 1.00 |
| IDOC - PONTIAC FACILITY | | | PA/NP | 0.00 |
| IDOC - ROBINSON FACILITY | | | PA/NP | 0.00 |
| IDOC - ROBINSON FACILITY | | | Medical Director | 1.00 |
| IDOC - SHAWNEE FACILITY | | | Medical Director | 1.00 |
| IDOC - SHAWNEE FACILITY | | | PA/NP | 1.00 |
| IDOC - SHERIDAN FACILITY | | | PA/NP | 0.00 |
| IDOC - SHERIDAN FACILITY | | | PA/NP | 1.00 |
| IDOC - SOUTHWESTERN FACILITY | | | Medical Director | 1.00 |
| IDOC - STATEVILLE CORRECTIONAL FACILITY | | | Physician | 0.00 |
| IDOC - STATEVILLE CORRECTIONAL FACILITY | | | Physician | 1.00 |
| IDOC - STATEVILLE CORRECTIONAL FACILITY | | | PA/NP | 1.00 |
| IDOC - STATEVILLE CORRECTIONAL FACILITY | | | Medical Director | 1.00 |
| IDOC - STATEVILLE CORRECTIONAL FACILITY | | | PA/NP | 0.00 |
| IDOC - STATEVILLE CORRECTIONAL FACILITY | | | PA/NP | 1.00 |
| IDOC - STATEVILLE R&C FACILITY | | | Medical Director | 1.00 |
| IDOC - STATEVILLE R&C FACILITY | | | PA/NP | 1.00 |
| IDOC - STATEVILLE R&C FACILITY | | | PA/NP | 1.00 |
| IDOC - STATEVILLE R&C FACILITY | | | Physician | 1.00 |
| IDOC - STATEVILLE R&C FACILITY | | | PA/NP | 0.50 |
| IDOC - VANDALIA FACILITY | | | Medical Director | 1.00 |
| IDOC - VIENNA FACILITY | | | PA/NP | 1.00 |
| IDOC - WESTERN ILLINOIS FACILITY | | | PA/NP | 1.00 |
| IDOC - WESTERN ILLINOIS FACILITY | | | Medical Director | 1.00 |

# EXHIBIT 18

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DON LIPPERT, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 10-cv-4603 |
| | ) | |
| v. | ) | Honorable Jorge L. Alonso |
| | ) | Judge Presiding |
| J.B. PRITZKER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF ASSISTANT WARDEN LU WALKER

I, Lu Walker, pursuant to 28 U.S.C. 1746(2), state that I have personal knowledge of the facts set forth herein, that I am competent to testify and if called to testify would state as follows:

1.   I am the Assistant Warden of Programs for Shawnee Correctional Center (Shawnee).

2.   I was present at Shawnee on June 21-23, 2021, for the visit of the Lippert Monitor, Dr. Jack Raba, and his consultants, Dr. Mike Puisis and Catherine Knox.

3.   As Assistant Warden of Programs, my responsibilities include oversight of all facility programs as well as facility operations with respect to the healthcare unit.

4.   During their visit, I spoke with the Monitor and his consultants multiple times regarding my duties related to healthcare unit operations.

5.   At no time did I ever say or suggest that I was responsible for running the healthcare unit.

1

6. I am not authorized to make medical decisions nor do I oversee the medical decisions of healthcare staff.

7. I do not have the authority to hire or fire facility staff, including medical staff.

8. I am authorized to approve requests for time off, reorder supplies and manage other operational matters involving healthcare staff. This is the extent of my authorization with respect to oversight of the healthcare unit. I declare under penalty of perjury that the foregoing is true and correct.

Date:

_____
Assistant Warden Lu Walker

2

# EXHIBIT 19

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DON LIPPERT, *et al.*,                    )
                                           )
            Plaintiffs,                    )         No. 10-cv-4603
                                           )
            v.                             )         Honorable Jorge L. Alonso
                                           )         Judge Presiding
J.B. PRITZKER, *et al.*,                   )
                                           )
            Defendants.                    )

## DECLARATION OF WARDEN DANIEL MONTI

I, Daniel Monti, pursuant to 28 U.S.C. 1746(2), state that I have personal knowledge of the facts set forth herein, that I am competent to testify and if called to testify would state as follows:

1.    I am the Warden of Shawnee Correctional Center (Shawnee).

2.    I was present at Shawnee on June 21-23, 2021, for the visit of the Lippert Monitor, Dr. Jack Raba, and his consultants, Dr. Mike Puisis and Catherine Knox.

3.    As Warden, my responsibilities include oversight of all facility operations.

4.    During their visit, I spoke with the Monitor and his consultants multiple times regarding facility operations, including the operations of the healthcare unit.

5.    At no time did I ever say or suggest that Lu Walker, the Assistant Warden of Programs, was responsible for running the healthcare unit.

6.    Assistant Warden Walker is not authorized to make medical decisions.

7.    Assistant Warden Walker is authorized to approve requests for time off,

1

reorder supplies and manage other operational matters involving healthcare staff. This is the extent of her authorization with respect to oversight of the healthcare unit.

8. Neither myself, nor Assistant Warden Walker, have the authority to hire or fire facility staff, including medical staff.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 10/15/21

Warden Daniel Monti

2