# Ex. 1

**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| Lennisha Reed and Lenn Reed Jr., as co-Administrators of the Estate of Lenn Reed Sr., | |
| Plaintiffs, | Case No. _____ |
| v. | |
| Wexford Health Sources, Inc., Vipin Shah, Faiyaz Ahmed, and Stephen Ritz, | JURY TRIAL DEMANDED |
| Defendants. | |

## COMPLAINT

Plaintiffs Lennisha Reed and Lenn Reed Jr., as co-Administrators of the Estate of Lenn Reed Sr., by and through their attorneys, Loevy & Loevy, bring this action pursuant to 42 U.S.C. § 1983 and the laws of the State of Illinois against Defendants Wexford Health Sources, Inc., Vipin Shah, Faiyaz Ahmed, and Stephen Ritz, and state as follows:

### Jurisdiction and Venue

1.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

2.     Venue is proper under 28 U.S.C. § 1391(b). On information and belief, one or more Defendants reside in this judicial district, and a substantial portion of the events giving rise to the claims asserted herein occurred within this district.

### Parties

3.     Lennisha Reed is the daughter of Lenn Reed Sr., the decedent in this case.  She is co-Administrator of Estate of Lenn Reed Sr. She lives in this district.

4.     Lenn Reed Jr. is the son of Lenn Reed Sr., the decedent in this case.   He is co-Administrator of Estate of Lenn Reed Sr.  He lives in this district.

5.      At all times relevant to the events at issue in this case, the decedent, Lenn Reed Sr., was in the custody of the Illinois Department of Corrections ("IDOC"), and was incarcerated at the Lawrence Correctional Center ("Lawrence").

6.      Defendant Wexford Health Sources, Inc. ("Wexford") is a corporation headquartered in Pennsylvania transacting business in Illinois. Wexford, pursuant to a contract with the state of Illinois, is a healthcare provider for IDOC prisons throughout the State. At all times relevant to the events at issue in this case, Wexford was responsible for the implementation, oversight, and supervision of policies and practices at Lawrence and the IDOC generally. As an agent of IDOC, Wexford was at all times relevant to the events at issue in this case acting under color of law by and through its lawful agents, including the individual Defendants and other unknown healthcare employees at Lawrence.

7.      At all times relevant to his involvement in this case, Defendant Vipin Shah was a physician working for Wexford at Lawrence. Defendant Shah is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Shah was acting under color of law and within the scope of his employment with Wexford.

8.      At all times relevant to his involvement in this case, Defendant Faiyaz Ahmed was a physician working for Wexford at Lawrence. Defendant Ahmed is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Ahmed was acting under color of law and within the scope of his employment with Wexford.

9.      At all times relevant to his involvement in this case, Defendant Stephen Ritz was a corporate physician for Wexford in Pittsburgh, Pennsylvania.  Defendant Ritz is sued here in his individual capacity. At all times relevant to the events at issue in this case, Defendant Ritz was acting under color of law and within the scope of his employment with Wexford.

**Allegations**

10.     On February 8, 2018, Lenn Reed Sr., an otherwise healthy 40-year-old who had reported no meaningful health issues for years, began complaining to Wexford medical staff at Lawrence that he was suffering from digestive problems.  Medical personnel first treated this as a case of indigestion, prescribing him antacid and heartburn tablets.

11.     Those measures did not solve the problem.  On February 21, 2018, Mr. Reed returned to the prison infirmary complaining with constipation.  Staff reported Mr. Reed telling that the problem "keeps happening," or words to that effect, and that he was in pain.

12.     He was next seen by Wexford medical staff in the infirmary at Lawrence on March 22.  Again he reported constipation and bloating; he was prescribed Simethicone, a drug designed to relieve gas pressure in the stomach and intestines.  On this visit medical staff recorded Mr. Reed's weight at 211 pounds.  This was a significant weight loss; when he had last been measured, in May 2017, Mr. Reed had weighed 236 pounds.  Wexford medical staff did not note the change, however, and took no further action to evaluate Mr. Reed.

13.     Mr. Reed returned on April 12.  He weighed 209 pounds, and he reported persistent abdominal pain that worsened when he had bowel movements.  Wexford staff recorded in their observations that Mr. Reed "has a lot of anxiety about something being wrong with him."  Mr. Reed's pain was significant enough that medical staff provided him with a long-term prescription for Ibuprofen, along with additional antacids and Simethicone.  Wexford staff made no effort to diagnose him, however, and instead simply assessed Mr. Reed as having "abdominal discomfort."  Staff also ordered an x-ray of his abdomen and instructed Mr. Reed to come back in three weeks.

14.     Ordering a conventional x-ray was a cheap option for Wexford medical staff and benefitted Wexford, the for-profit corporation responsible for costs associated with offsite

3

specialty care.  The x-ray machine was located on the prison's grounds, and as such could be administered in-house, by the prison's own medical staff, rather than requiring a more expensive referral to an outside specialist for a more expensive diagnostic procedure like a CT scan or colonoscopy—a cost that would have been borne by Wexford.  Such x-rays, however, are not used to detect colon cancer or other common medical ailments affecting organs like the colon, and predictably Mr. Reed's abdominal x-ray detected little more than that there was "a moderate amount of stool in the colon."  It could not, and did not, provide images that could be used to determine whether or not Mr. Reed might have colon cancer or other serious medical issue.

15.  Mr. Reed came back to the infirmary on May 3.  He had lost even more weight since his mid-April encounter with medical staff. Mr. Reed reported that he suffered continued cramping and abdominal pain, and reported "feeling like he has to go to the bathroom but something is in the way," or words to that effect.  After consulting his useless x-ray, Wexford medical staff "assessed" him with hemorrhoids and constipation, prescribed him suppositories, a school softener, and hemorrhoid cream. Staff took no further action to evaluate or diagnose the cause of Mr. Reed's symptoms, which obviously indicated a serious medical issue.

16.  Mr. Reed returned to the infirmary on June 6.  At this point he weighed 198 pounds—nearly 40 pounds below his typical weight—although Wexford staff once again failed to take account of his significant weight loss.  Mr. Reed reported to staff that he had been taking the medications that they had prescribed, but that he was "still having constipation," and "still feels like there is a blockage up higher in his rectum," or words to that effect.  He also reported "a throbbing pain in the lower part of the rectum as well as abdominal pain."  But Wexford staff took no action to evaluate Mr. Reed's serious medical condition or provide him treatment.

4

Instead, they simply "diagnosed" him with constipation and pain, and doubled his Ibuprofen prescription.

17. Mr. Reed came back to the infirmary on July 2. He now weighed 191 pounds, told medical staff that he "still feels pressure in his rectum," and "a throbbing feeling behind his testicles," or words to that effect. Wexford staff again took no adequate action to evaluate or treat Mr. Reed, and simply "diagnosed" him with "GI/GU [ [Gastrointestinal Tract / Genitourinary Tract] symptoms," prescribing him an antibiotic. Once again, Wexford staff did not note his weight loss and did not attempt to determine what might be causing the symptoms that he was experiencing.

18. Mr. Reed returned to the infirmary on July 16. He now weighed 186 pounds. Once again, he reported that he "still feels like something is blocking his rectum," or words to that effect. He also reported that while the throbbing behind his testicles had improved, he "will still have it if he strains on the toilet." Wexford medical staff once again "diagnosed" him with "GI/GU symptoms." For the first time, they noted his decreased weight. And they finally referred him to see a doctor.

19. Mr. Reed returned to the infirmary on July 26. He weighed 183 pounds. For the first time, he was seen by a doctor, the medical director of Lawrence, Defendant Vipin Shah. Dr. Shah noted the same "GI/GU" symptoms as the medical staff, including "pressure in [Mr. Reed's] stomach"—indeed, as Dr. Shah's notes reflect, Mr. Reed had lost more than 50 pounds since May of 2017, when he weighed 236 pounds. Mr. Reed had also been suffering from some urinary pain, and apparently for this reason Dr. Shah "assessed" him as having prostate cancer.

20. Finally, months after Mr. Reed had presented to the Lawrence medical staff with persistent and unexplained abdominal pain, a CT scan, which is capable of detecting signs of

colon cancer, was ordered for him. Dr. Shah, however, marked his request for the CT scan as non-urgent, despite Dr. Shah's recognition that the CT scan was being requested in light of Mr. Reed's persistent complaints of abdominal pain and his significant weight loss. The request for the CT scan was not received for Wexford's "utilization management" process until a week later, on August 2. The request was approved on August 3 by Dr. Ritz in consultation with Dr. Ahmed, but the scan did not occur for another week, on August 10.

21. The CT scan report was alarming. Its findings were "concerning for malignancy, potentially metastatic or lymphoproliferative disease." It also detected possible (though uncertain) indications of malignancy in the lungs, suggesting the possibility that a cancer had spread outside of the abdomen.

22. Wexford staff received the CT report on August 14. It was obvious that he needed to see an oncologist immediately, and that he should receive a colonoscopy, which is a necessary step in cancer diagnosis. Defendant Stephen Ritz, however, refused to permit the colonoscopy to be performed, insisting instead that only a general oncology evaluative appointment occur. Pursuant to Dr. Ritz's instructions, Dr. Shah referred Mr. Reed to an oncologist—but marked the referral as non-urgent. Mr. Reed was not sent to an oncologist until nearly a month later, on September 12.

23. Mr. Reed saw Dr. Saba, an oncologist at Carle Richland Memorial Hospital in Olny, Illinois, on September 12. During the appointment, Dr. Saba concluded that Mr. Reed's symptoms were "highly concerning and consistent" with cancer. Dr. Shah had ordered blood testing earlier, but Dr. Shah never provided the results to Dr. Saba, who had to re-order them. Dr. Saba also ordered a biopsy of inguinal lymph nodes as "the fastest way to confirm" whether

Mr. Reed had cancer. Dr. Saba ordered all these tests to be conducted quickly and for Mr. Reed to return in three weeks.

24. When Mr. Reed returned to see Dr. Saba on October 3, the test results showed that he was suffering from metastatic adenocarcinoma. Dr. Saba ordered that Mr. Reed undergo a colonoscopy and the placement of an intravenous chemotherapy port "as soon as possible."

25. Dr. Saba assessed Mr. Reed again on October 9 and concluded that his adenocarcinoma was at Stage IV. In a memo to the Wexford doctors Dr. Saba explained,

> This is unfortunately an incurable disease but probably treatable. At this point, we have to move forward with definite diagnosis and I strongly recommend the following . . . hopefully to be done as soon as possible: . . .

Dr. Saba ordered a colonoscopy to confirm the diagnosis, the placement of a port for chemotherapy, and iron supplements. He explained to the Wexford doctors that "I will make him a referral to see a local surgeon [for a colonoscopy and port placement] as soon as possible and hopefully they will approve it through the correction center quickly." Dr. Saba saw Mr. Reed again on October 16, again recommending the colonoscopy and port placement for chemotherapy. At this point Mr. Reed weighed 161 pounds (75 pounds below his normal weight).

26. Defendant Faiyaz Ahmed requested the colonoscopy and port placement through Wexford's utilization management process, but did not mark the services as urgent, as Dr. Saba had indicated was necessary. Wexford's utilization management process is designed to delay treatment for Wexford patients in order to minimize the costs Wexford is forced to pay for offsite services and maximize Wexford's profits from its contract with the IDOC. By not marking the utilization management request for offsite services as "urgent," Dr. Ahmed knew that the request would not be seen by utilization management staff until many days later, as part of their review

7

of all routine requests for offsite care. Dr. Ahmed's failure to make an urgent or emergent referral was an obvious disregard for Mr. Reed's health, as he was left to suffer additional days without the medical evaluations or treatment he so desperately needed for his obviously serious medical condition.

27. On October 29, Dr. Saba saw Mr. Reed again and explained that, with the benefit of iron infusions that Dr. Saba himself had provided, "Lenn is doing well." Despite Defendants' intentional inaction, Mr. Reed, with his chemotherapy port finally installed, was ready for chemotherapy.

28. But Defendants took no action to facilitate Mr. Reed for chemotherapy. Dr. Ahmed requested a referral for a follow-up visit with Dr. Saba on October 25, but again marked the request as non-urgent; the follow-up on that referral would not occur until December 19. And Wexford doctors took no action to initiate the actual administration of chemotherapy. Instead, Dr. Shah, Dr. Ahmed, and Wexford's medical staff allowed Mr. Reed to sit in the prison's infirmary, with no chemotherapy, as his health continued to deteriorate. During this time Dr. Saba tried multiple times to contact these doctors to get Mr. Reed to his clinic and get chemotherapy started. Dr. Shah and Dr. Ahmed, however, made no effort to communicate with Dr. Saba and made no effort to begin Mr. Reed's chemotherapy.

29. On November 13, Mr. Reed suffered an internal bowel obstruction and was sent to outside the prison, the emergency room. The doctors in the emergency room immediately referred Mr. Reed to the surgeon who had installed his chemotherapy port, Dr. Philip Rosett, who in turn consulted Dr. Saba.

30.    Dr. Saba saw Mr. Reed on November 14.  At this point, though Mr. Reed had a chemotherapy port, he had yet to receive any chemotherapy.  Dr. Saba wrote a memo to Dr. Rosett explaining,

> I have been trying to contact the correction facility for the last couple of weeks to try to get him down to the clinic. I was afraid that he is doing very poorly . . . and needs to be stated on systemic chemotherapy as soon as possible. . . .  I was afraid that we have a short window of opportunities to get some treatment and start getting things reversed, otherwise he will be in a position where he won't be able to tolerate any therapy.

Dr. Saba continued,

> His chance to survive is getting less and less.  We still have a window of opportunity to start him on chemotherapy hoping to reverse the process and get his cancer under control, shrink some of his lymph nodes and then things may get better.  I still thing he needs to start his chemotherapy as soon as possible otherwise it will be too late sometime soon and probably within a couple of weeks.

31.    Mr. Reed's condition, however, deteriorated from there.  Because of his tumors he became "acutely paraplegic," unable to feel below his abdomen.  But Dr. Shah and Dr. Ahmed did not arrange for Mr. Reed to receive acute, outside medical care that would improve his condition, and they did not arrange for him to see Dr. Saba for more than a month, on December 19.  On that day, Dr. Saba assessed Mr. Reed's condition as "terminal," and gave Mr. Reed the option of palliative care or chemotherapy.  Mr. Reed chose to continue fighting the disease and requested chemotherapy.

32.    Because of Defendants' intentional delay, Mr. Reed was too weak to receive chemotherapy.  He remained in the infirmary at Lawrence, and was eventually referred out to the hospital for symptoms associated with end-stage colon cancer, where he died on January 9, 2019.

33.    Colon cancer is a progressive disease, meaning that it gets progressively worse over time.  In its earlier stages it is treatable, but as time progresses, treatment is increasingly

9

difficult and less impactful, and death is increasingly likely.  A patient's chance of survival from colon cancer accordingly depend largely on how quickly chemotherapy treatment is started.  It is the universally accepted goal of healthcare providers to minimize the time from the first manifestation of a patient's colon cancer symptoms to the provision of effective cancer treatment, because lost time reduces the efficaciousness of cancer treatment and increases the risk of death.

34.     Wexford, however, has adopted and maintained policies and practices designed to delay the diagnosis and treatment of serious medical conditions, including cancer.  These policies and practices maximize Wexford's profits but increase the risk that Wexford's patients will suffer adverse outcomes, including death.

35.     Among other things, these policies and practices increase the time from the manifestation of cancer symptoms to the provision of cancer treatment, increasing the risk of death to people in prison like Mr. Reed.

36.     Pursuant to Wexford's policies and practices, patients complaining of problems are often seen by nurses—not doctors, who are more expensive to employ—who provide cursory examinations aimed at providing inexpensive care for a patient's immediate symptoms, rather than taking the basically necessary steps  to determine the cause of these symptoms.

37.     Even when conditions are concerning enough that the need for a diagnostic evaluation is self-evident, Wexford discourages referrals to offsite medical providers, for which Wexford directly bears the cost. Every such referral requires approval from staff, including Dr. Ritz, at Wexford's corporate headquarters in Pittsburgh.

38.     Even when offsite specialty care is unavoidable, Wexford's policies intentionally subject offsite care to additional delays.  Wexford has a policy of "Utilization Management" that

10

is explicitly designed to "identify and realize immediate reductions in inmate offsite care costs" by reducing the number of offsite visits. These policies purposely increase delay for both the diagnosis and treatment of problems.

39.     At the outset, the Utilization Management program inserts a delay in the referral process. Pursuant to Wexford's Utilization Management policy, Wexford staff may not refer patients to offsite specialty care until they send a written request to a corporate utilization management physician in Wexford's headquarters in Pittsburgh. This process, in and of itself, generates delays that add up over time, particularly in the case of complex care like cancer that requires multiple specialty referrals over a sustained period.

40.     Wexford's Utilization Management policy is designed to avoid outside referrals, even where multiple referrals are necessary. The cost reduction goal of Utilization Management also means that referrals that should occur on an urgent basis are instead treated as routine.

41.     Wexford's Utilization Management practices have resulted in its intended effect—hundreds of patients in IDOC custody have been denied lifesaving, necessary medical care. Court-appointed experts in the *Lippert v. Godinez* class action concluded that "[t]he Wexford system of utilization management is ineffective and for many patients is a barrier to timely care," and noted that "Providers [i.e., doctors within prisons] were generally critical of the utilization management program that served as a barrier to timely care." Wexford was aware of these dangers before Mr. Reed was subjected to the delays intended by Wexford's Utilization Management policy.

42.     The delays created by utilization management are particularly harmful and unnecessary in cancer cases, where weeks of delay accumulate while a corporate physician in Pittsburgh, with virtually no knowledge of any case at hand, second-guesses each referral or

11

request made by a specialist provider. The *Lippert* expert report concluded that this request and approval process was unnecessary and particularly harmful for cancer patients, as Wexford's Utilization Management "process delays access to . . . diagnostic studies and specialty consultations" for cancer patients.

43. At the same time, Wexford has no policies or practices in place for ensuring a continuum of care for cancer either within the company itself or between Wexford's doctors and outside providers. Not only are there no policies or procedures in place for ensuring that cancer is ruled out as a possibility for symptoms that indicate it might exist, but Wexford provides for no system to ensure a patient who has indications of cancer receives an appropriate workup in preparation for treatment. This compounds the delays created by the Utilization Management system.

44. The upshot is that, whereas cancer care workups should take a matter of weeks— and should occur even faster in cases of advanced cancer like Mr. Reed's—Wexford's purposeful policies drag that same process on for months—with each passing day increasing the chance that a patient will die from their disease.

45. Indeed, the *Lippert* expert report identifies numerous cases throughout the IDOC in which the time from cancer symptoms to cancer treatment was intolerably long: on numerous occasions, Wexford medical staff assumed innocent explanations for symptoms that were indicative of cancer; were slow in ordering diagnostic testing even when the possibility of cancer was self-evident; and took months to work up patients for chemotherapy when the same procedures could have occurred in a matter of weeks or even days. The *Lippert* report observes that this lengthening in time from first symptoms to treatment caused numerous people suffering from cancer in the IDOC to die unnecessarily.

12

46. These systemic failures were on display in this case, where repeated inaction and, at best, half-measures extended the time from Mr. Reed's first manifestation of symptoms to his treatment, each one contributing to his death from colon cancer.

47. Constipation and abdominal pain that persist over time and are not relieved by mild over-the-counter treatments are obviously indicative of potential colon cancer. That is particularly so when they are accompanied by weight loss, as Mr. Reed's symptoms were.

48. And indeed, even when medical providers realized that *something* must be wrong and some sort of imaging was required, they ordered an x-ray—a procedure that was demonstrably ineffective for detecting colon cancer, but which was cheaper than other scans that could. This cost-saving measure also lengthened the time before Mr. Reed would receive treatment for his cancer, reducing his chances of survival.

49. When Dr. Shah assessed Mr. Reed in July, Mr. Reed had been experiencing dramatic weight loss, constipation, pain in his bowels, and a "blockage" that made it hard for him to defecate, for five months. These were all classic signs of advanced colon cancer and called for an urgent work-up in order to ensure that Mr. Reed receive treatment in a matter of weeks.

50. Instead, as described above, Dr. Shah, Dr. Ahmed, and Dr. Ritz at Wexford in Pittsburgh, took an unhurried approach that handled many appointments for Mr. Reed as non-urgent; generated numerous delays in pointless approval processes; delayed care, such as a colonoscopy, that would inevitably be called for; and made no effort to coordinate his workup. Indeed, though Wexford purported to ensure that patients like Mr. Reed would receive appropriate care through the Utilization Management process, at no point did Dr. Ritz, who

oversaw Mr. Reed's care from Pittsburgh, intervene to ensure that Mr. Reed's specialty care was provided quickly and that his chemotherapy occurred before it was too late.

51. Dr. Shah and Dr. Ahmed likewise could have intervened to prevent this lethargic delivery of care, but they did not. This, too, contributed to the failure to secure basic chemotherapy for Mr. Reed as months ticked by and his cancer grew.

52. Defendants' failures and refusals to provide care, and abject inaction, were consistent with Wexford's policies and practices, and abuses that Wexford allowed to flourish, and indeed which it encouraged in order to save money on medical care and thereby increase its profits.

53. Mr. Reed died as a result of these failures.

### COUNT I
### 42 U.S.C. § 1983 – Denial of Medical Care (Eighth Amendment)
### All Defendants

54. Each of the Paragraphs of this Complaint is incorporated herein.

55. In the manner described more fully above, Defendants were aware of Lenn Reed Sr.'s medical needs and the seriousness of his medical needs, and knew the risk of harm to Mr. Reed if he did not receive appropriate medical care. Despite that knowledge, Defendants failed to provide him with proper medical care or access to medical care, in violation of the Eighth Amendment to the United States Constitution.

56. As a result of Defendants' unjustified and unconstitutional conduct, Mr. Reed experienced injuries, including but not limited to pain, suffering, emotional distress, and death.

57. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and/or with reckless indifference to Mr. Reed's rights.

14

58.     Alternatively, Defendants were deliberately indifferent to Mr. Reed's objectively serious medical needs, and their actions were undertaken intentionally, with malice, and/or reckless indifference to Mr. Reed's rights.

59.     Mr. Reed's injuries, including but not limited to pain and suffering, emotional distress, and death were proximately caused by policies and practices of Defendants.

60.     Mr. Reed's injuries were proximately caused by the policies and practices of Defendant Wexford Health Sources, Inc.

61.     At all times relevant to the events at issue in this case, Defendant Wexford contracted with the IDOC to provide healthcare to men housed in IDOC prisons, including Mr. Reed. As the provider of healthcare services, Wexford was responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the provision of medical care to prisoners in IDOC custody.

62.     Prior to the events giving rise to Plaintiff's Complaint, Defendant Wexford had notice of widespread policies and practices by healthcare and correctional staff at Lawrence CC and throughout the IDOC pursuant to which prisoners like Mr. Reed with serious medical needs were routinely denied medical care and access to medical care. It is common within the IDOC to see prisoners with clear symptoms of serious medical needs whose medical records reflect an obvious need for treatment whose medical treatment are routinely delayed or completely ignored by healthcare and correctional employees.  Despite knowledge of these problematic policies and practices, Defendant Wexford did nothing to ensure that prisoners in IDOC received adequate medical care and access to medical care, thereby acting with deliberate indifference.

63.     Specifically, there exist policies or widespread practices in IDOC pursuant to which prisoners receive unconstitutionally inadequate healthcare, including policies and

15

practices pursuant to which: (1) healthcare personnel commonly fail to respond or follow up on complaints by prisoners about their health status; (2) healthcare personnel fail to review relevant medical records as part of a patient's treatment plan; (3) healthcare personnel fail to follow appropriate diagnostic procedures, favoring instead cheaper procedures even if they are demonstrably ineffective; (4) healthcare personnel fail to schedule or approve follow-up appointments deemed appropriate by members of the medical staff; (5) healthcare personnel fail to take action to secure appropriate continuity  of care for complicated and urgent conditions like cancer within the IDOC and other healthcare providers; (6) inadequate levels of health care staffing are maintained; and (7) healthcare personnel fail to refuse to arrange for prisoners to be treated in outside facilities, even when an outside referral is necessary or proper.

64.     These widespread policies and practices were allowed to flourish because Defendant Wexford, which directs the provision of healthcare services within the IDOC, directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct. In this way, Defendant Wexford violated Mr. Reed's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

65.     The above-described practices, so well-settled as to constitute de facto policy within the IDOC, were able to exist and thrive because Defendant Wexford was deliberately indifferent to the problem, thereby effectively ratifying it.

66.     Wexford also acted to violate Mr. Reed's constitutional rights through denials of medical care by persons delegated with final policymaking authority by Defendant Wexford.

16

67.    Mr. Reed's injuries were caused by employees of IDOC and Wexford, including but not limited to the individually named Defendants, who acted pursuant to the foregoing policies and practices in engaging in the misconduct described above.

## COUNT II
### 42 U.S.C. § 1983 – Failure to Intervene (Eighth Amendment)
### All Defendants

68.    Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

69.    In the manner more fully described above, Defendants had reasonable opportunity to prevent the violation of Mr. Reed's constitutional rights as set forth above had they been so inclined, but failed to do so.

70.    Defendants' failures to act were intentional, done with malice, and/or done with reckless indifference to Mr. Reed's rights.

71.    As a direct and proximate result of these failures, Mr. Reed's rights were violated and he suffered injuries, including but not limited to emotional distress and death.

72.    Mr. Reed's death was caused by employees of the IDOC and Wexford, including but not limited to the individually named Defendants, who acted pursuant to the policies and practices described more fully above.

## COUNT III – State Law Claim
### Wrongful Death
### All Defendants

73.    Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

74.    In the manner more fully described above, the actions of the Defendants breached the duty of care owed to inmates in their care. They did so by negligently ignoring Mr. Reed's request for medical attention.

75.    Alternatively, the actions of the Defendants were willful and wanton in that they demonstrated an utter indifference to the safety of others. Defendants were conscious that an

17

injury would probably result from the above-described course of action and recklessly disregarded the consequences of those actions.

76. As a direct and proximate result of Defendants' negligence and/or willful and wanton conduct, Mr. Reed suffered injuries, including death.

77. Defendants' actions were undertaken willfully, wantonly, and with reckless indifference or conscious disregard for the safety of others.

78. Defendants' actions proximately caused Mr. Reed great bodily harm and death, as well as great pain and suffering.

79. Plaintiffs Lennisha Reed and Lenn Reed Jr., and all other legally recognized family members, claim damages for the wrongful death of Mr. Reed, and for the loss of his services, protection, care, future income, assistance, society, companionship, comfort, guidance, counsel and advice, and for the mental anguish caused by this loss, as well as for funeral expenses pursuant to 740 ILCS § 180/1, the Illinois Wrongful Death Act.

### COUNT IV – State Law Claim
### Survival Action
### All Defendants

80. Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

81. In the manner more fully described above, the actions of the Defendants breached the duty of care owed to inmates in their care. They did so by ignoring Mr. Reed's request for medical attention.

82. Alternatively, the actions of Defendants were willful and wanton in that they demonstrated an utter indifference to the safety of others. Defendants were conscious that an injury would probably result from the above-described course of action and recklessly disregarded the consequences of those actions.

18

83.     The misconduct described in this Count was undertaken with intentional disregard of Mr. Reed's rights.

84.     As a direct and proximate result of Defendants' negligence and/or willful and wanton conduct, Mr. Reed suffered great conscious pain and suffering prior to his death.

85.     Mr. Reed filed no action during his lifetime, but under the law of the State of Illinois, this action survives and may be asserted by his Estate.

86.     Plaintiffs Lennisha and Lenn Reed Jr., on behalf of the Estate of Lenn Reed Sr., claim damages for the conscious pain and suffering of Mr. Reed, pursuant to 755 ILCS § 5/27-6, commonly referred to as the Illinois Survival Act.

## COUNT V
### Respondeat Superior
### Defendant Wexford

87.     Each of the Paragraphs of this Complaint is incorporated as if restated fully herein.

88.     In committing the acts alleged in the preceding paragraphs, the above-described Defendants were employees, members, and agents of Wexford, acting at all relevant times within the scope of their employment.

89.     Consequently, Defendant Wexford is liable for the actions of its employees acting within the scope of their employment under state law.

90.     Defendant Wexford, as private corporation acting under color of state law, should additionally be held liable under 42 U.S.C. § 1983 for the conduct of its employees acting within the scope of their employment. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 793-95 (7th Cir. 2014).

WHEREFORE, Plaintiffs Lennisha and Lenn Reed Jr., as co-Administrators of the Estate of Lenn Reed Sr., hereby respectfully request that this Court enter a judgment in her

favor and against Defendants Wexford Health Sources, Inc., Vipin Shah, Faiyaz Ahmed, and Stephen Ritz, awarding compensatory damages, punitive damages, attorneys' fees and costs, and any other relief that this Court deems just and appropriate.

## JURY DEMAND

Plaintiffs Lennisha and Lenn Reed Jr. hereby demand a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all issues so triable.

Dated:  October 28, 2020

Respectfully submitted,

/s/ Stephen H. Weil
Stephen H. Weil
Attorney for Plaintiff

Jon Loevy
Sarah Grady
Stephen Weil
LOEVY & LOEVY
311 North Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
weil@loevy.com

20