# Exhibit 1

Monitor's Comments on Lippert IDOC 4.40.22 Implementation Plan  0510022.docx

| Main document changes and comments |
| --- |

| Page 1: Commented [A1] | Author |
| --- | --- |

The first 47 tasks in this Implementation Plan concern policies and procedures.  Yet there are no tasks describing who writes the policies, how policies are developed, how they are reviewed, how they are implemented and what training is provided.  Also, if a policy requires additional staff, equipment or supplies there are no tasks to evaluate these needs and obtain necessary additions to achieve compliance.  The Implementation Plan lists 46 specific areas of policy content to be developed. These are simply **restatements of the Consent Decree** without any other description of how the policy will be carried out.  Policies should be based on the requirements of an adequate medical program and not restatements of the Consent Decree.  Each of the Monitor's reports have provided specific recommendations for policy content consistent with the Consent Decree and NCCHC standards. Yet most of this advice has not been incorporated into the plans for development of policy in the Implementation Plan.

IDOC should task themselves to develop a minimum list of policies needed based on the 60 standards of the NCCHC. In addition  policies will be needed to address items not covered in the NCCHC standards (for example pharmacy and diagnostic processes usually require additional policies).  The Monitor estimates 90 policies may be needed.  Each policy does not need to be a separate task in the Implementation Plan.  The Monitor is willing to confer with IDOC and give input into a list of policies. Obviously, IDOC will need to create new policies as new operational features are introduced and IDOC should have an implementation task for how that will happen.  For example, if a process analysis of medication administration results in a recommendation to change practice, a new procedure should be written.

| Page 1: Commented [A2R1] | Author |
| --- | --- |

Optimally Task 45 " A full set of health care policies,  including the policies already mentioned (change to mentioned below), will be written and implemented."  should be the first task in the P&P section. The policies should not only conform to NCCHC Standards but also include relevant elements in the Consent Decree and other court orders.  The Process for Accomplishing the Task is repetitive for all  45 policies: and includes 4 steps/subtasks; all of which could have been solely included under #45. It would then have been more transparent to divide or group the 45 policies into 3-4 **subtasks** with separate timelines for writing and adding the completed policies in the Administrative Directives. As now  written all 45 policies do not have to be written until October 2022, making it difficult or impossible for the Monitor to monitor compliance with this section until that due date . Listing each of the 45 actual policies as individual tasks among the total 103 tasks in this version of the Implementation Plan is misleading and would suggest that IDOC has complied with 44% of the Plan by just writing policies.

| Page 1: Commented [A3R1] | Author |
| --- | --- |

Based on the experience of the Monitor in this Consent Decree , the review and input of the Monitor is needed to assure that policies are designed to actually improve the care provided in the IDOC and enhance the continuity of care for intrasystem transfers, returning from offsite care (ED, hospitals, consultations) and re-entry back into the community.   The Policy and Procedure section does not include the requirement of the Monitor's input on drafted policies.

| Page 1: Commented [A4] | Author |
| --- | --- |

The responsible parties are the same 10 groups or individuals.  These groups cannot reasonably write and manage all the policies that need attention, given their other assignments.  1) A single person needs to be identified to manage the process of policy development and to assist in the actual writing of the policies.  The Monitor has recommended a project manager for this.  The other responsible parties listed in the Implementation Plan consist of subject matter experts or are key decision makers who participate but are not responsible for the actual crafting of the policy document. 2) The timeline of October of 2022 is extremely unrealistic.  It has been three years since the Consent Decree was signed and there are no completed policies.  How can IDOC finish and implement 90 policies in five months, especially relying solely on existing staff!  3) The responsibility for writing the policy needs

to be subject matter experts in the leadership group and when time considerations make policy writing unrealistic, persons should be hired to assist in the actual writing of these documents and the subject matter experts can review that work product. 4) Implementation of the policy, training on the policy, and obtaining any additional equipment, staffing, or supplies necessary to implement the policy need to be addressed in tasks.

| Page 1: Commented [A5R4] | Author |
|---|---|

Task 2 and task 46 are duplicative. Both are policies which require the health care vendor comply with IDOC healthcare policies. Task 46 also mentions auditing compliance with IDOC policies. This duplicates task 49 which is development of a plan for compliance audits. Duplications in tasks 2, 46 and 49 should be eliminated.

| Page 1: Commented [A6] | Author |
|---|---|

Virtually all of the policy tasks as well as the description of the process for accomplishing the task include this statement that a Standard Operating Procedure for the best, recommended process for complying with policy will be outlined. The IDOC intends to leave it to facility operations to determine procedures to carry out each policy directive. This simply continues what IDOC does now and has proven to be an ineffective mechanism to bring about change necessary to achieve the requirements of the consent decree. The Implementation Plan needs to include tasks to standardize procedures for each policy needing procedural direction.

| Page 1: Commented [A7] | Author |
|---|---|

This is should also be stated in the contract with the vendor.

| Page 4: Commented [A8] | Author |
|---|---|

Almost all policies should have procedures. Also, the procedures should be standardized. The way this is written appears to allow for options on how to perform. The current practice of allowing each facility to create their own procedure will result in the chaotic nature that exists today.

| Page 4: Commented [A9R8] | Author |
|---|---|

See the earlier comment made in relation to task 1.

| Page 13: Commented [A10] | Author |
|---|---|

The Safety and Sanitation inspections review more than the medical areas, in fact at many sites these inspections, only briefly if at all, comment on medical spaces. All some elements of the S&S reports do identify potential infection control issues, most focus on inmate ( and staff) safety and sanitation deficits in housing unit and food preparation areas which impacts on the health of the institution. Confining the S&S reports to medical areas will not adequately protect the health and safety of the inmate population.

| Page 13: Commented [A11] | Author |
|---|---|

A separate policy to require dentists to write in the SOAP format is unusual. Documentation requirements should be in a medical record policy and should apply to all staff. Because IDOC has included as Implementation Tasks individual policies, almost all of which are restatements of the Consent Decree, the 46 policies in this Implementation Plan do not contain all the policies necessary for an adequate medical program and give a distorted picture of what policies should be developed. There is no organization with respect to these policies and it appears to be an attempt to limit the implementation plan to only the statements in the Consent Decree and not to how to operate an adequate medical program. In this sense IDOC is attempting to set limits on what an adequate medical program is by the limitations of what is stated in the Consent Decree. This policy task is a restatement of Consent Decree provision K.1. which states, "All dental personnel shall use the Subjective Objective Assessment Plan ("SOAP") format to document urgent and emergent care". This item can be a procedural element in a larger medical records policy. These types of tasks may give IDOC the satisfaction of feeling that only Consent Decree statements can be addressed by the Monitor, but it distorts the process of attempting to establish an adequate medical program which needs to be done to satisfy the Consent Decree.

| Page 16: Commented [A12] | Author |
|---|---|

This policy is a significant regression from the prior commitment by IDOC for audits as stated in the 6/12/20 Implementation Plan of the IDOC which stated that 1) independent audits will occur (which is required by the

Consent Decree); 2) an audit team of a physician mid-level provider, and 1-2 nurses would perform audits; and 3) OHS would collaborate with the Monitor to develop the audit instrument (which is required by the Consent Decree). None of these statements are reflected as tasks in the 4/20/22 Implementation Plan nor are they scheduled to occur as described in this policy and in tasks 48, 49, 51, 85, and 86.  The Monitor learned of this regressive audit process when reading this Implementation Plan and in a discussion with the Consultant.  There has been no input into this new audit process.  The Consultant was asked what input she received from the Monitor and the Consultant stated she read the Consent Decree and part of the Monitor's 4th report.  Counsel for the IDOC added that the Consultant received input by way of IDOC staff informing the Consultant of the Monitor's opinions. There has been no substantive input of the Monitor into the 4/20/22 Implementation Plan.  Instead of having an SIU audit team perform the audit, the IDOC compliance unit will perform audits against policies and facility staff will perform the quality audits of their own work.  **These are not independent auditors!**  The proposed Implementation Plan is also not consistent with IDOC's narrative on implementation that accompanied the spreadsheet and which represents an earlier agreement with the Monitor.

The Monitor previously provided 19 steps for audits in the example Implementation Plan provided to the Court in January 2022.  Almost none of these are part of the current IDOC tasks related to auditing.  These include: 1)hiring a doctor, mid-level provider, and 2 nurses **to perform audits**; 2)development of procedures for how audits will be performed; 3) develop a document list necessary for auditing; 4) Develop a report format for audit reports; 5) develop data requirements used in audits; 6) establish methodologies for acquiring data; 7) develop with Monitor a methodology for record selection to be used in audits; 8) develop the audit instrument [Consent Decree requires the input of the Monitor]; 9) audit team would train with the Monitor on use of the instrument; 10) Co-joint audits with the Monitor; 11) develop methodology to integrate mortality review into audit reports; 12) develop methodology to incorporate performance and outcome dashboard and adverse event findings into audit reports; 13) develop methodology of reporting results to the OHS CQI committee; 14) develop additional data for vendor monitoring; 15) train facility HCUAs and leadership on expectations for audit visit; 16) develop methodology for statewide CQI to review audit reports and assign corrective actions to facilities; 17) develop methodology for tracking audit finding by facility; 18) develop methodology for referral to peer review; and 19) develop mechanism to provide oversight using audits and other quality measures.  **None of these 19 tasks recommended by the Monitor have been incorporated into the IDOC plan.**  Instead, IDOC has regressed to a process that has been in place prior to the Consent Decree and was the type of auditing that occurred that apparently found unconstitutional care adequate.  IDOC has reverted to business-as-usual.  This is a regression that will ensure a biased and ineffective audit program.  IDOC should consider incorporating the Monitor's 19 recommended tasks.

| Page 17: Commented [A13] | Author |
| --- | --- |

The Consent Decree requires, "development and full implementation of a set of health care performance and outcome measurements...and shall compile data to facilitate these measurements".  In a call with the Consultant it was clear that the Consultant used the same meaning of a performance or outcome measure as the Monitor.  The example used  by the Consultant was the number of persons with protein in their urine who were on an ACE inhibitor or ARB.   This is a recommended practice that is universally accepted and would be an acceptable outcome measure.

Yet this group of tasks (48-53) does not provide plans for development of a similar set of these performance and outcome measures nor does the plan show how the data to facilitate those measurements will be obtained. Instead, the tasks involve how audits will be performed, that a disease management guideline will be developed, and that guidelines for vaccination and cancer screening will be developed.

Moreover, performance and outcome measures are *routinely* performed to identify trends in performance so that improvements can be made.  As an example, the California Department of Corrections uses a dashboard (found at https://cchcs.ca.gov/wp-content/uploads/sites/60/QM/Public-Dashboard-2022-01.pdf )
 to display performance and outcome measures on a *monthly basis*.  These data are automatically obtained by the California department of corrections central office.  Instead, the tasks in the IDOC Implementation Plan appear to limit use of performance measurements to audits which ostensibly are occurring annually and are manually derived by auditors, in some cases by the very people being audited.  This is unacceptable.  IDOC has no tasks to

obtain the data used to populate the performance and outcome measure dataset. There is no task to provide a glossary that defines each measure and how the data is captured in a standardized methodology so that facilities can be compared one to another. There is no task to display the data in a way that informs the facilities of their performance, and the dispay of the data is not routine but is only annually obtained. This is inconsistent with effective performance and outcome measures.

Performance and outcome measures should inform the facilities of all aspects of health care that affect the Consent Decree and this needs to include operations. For that reason, IDOC should include tasks to develop operational measures. Currently IDOC has no plans to develop such measures. For example, the Monitor has suggested the following measures to monitor on a monthly basis that directly address IDOC's capacity to attain compliance. These include: 1) Number and proportion of health requests evaluated by an RN. 2) Number of doses of medication administered as ordered. 3) Vacancy rate by facility. 4) Time-to-hire an employee in days based on date of receipt of an application to start date. 5) number and percent of death reviews that identify opportunities for improvement and the number of opportunities for improvement identified.

About a year ago, IDOC sent the Monitor a list of performance and outcome measures developed by SIU. The Monitor had some suggestions and produced in the 4th Report, an appendix with a list of suggested performance and outcome measures. No action was taken and no further performance and outcome measures were provided. The tasks in this section do not continue the work of SIU and do not result in a performance and outcome dashboard that was presumed to be a work task of SIU. This Implementation Plan does not appear to have considered any tasks suggested by the Monitor for development or use of performance and outcome measures.

The Monitor suggests that the IDOC review the six tasks in the Monitor's example Implementation Plan and Appendix F in the 4th report. The healthcare performance and outcome measures should result in a dashboard and should include measures that encompass clinical, policy, and operational issues that are current barriers to compliance.

---

| Page 17: Commented [A14] | Author |
|---|---|

The Monitor is uncertain how this measure addresses performance and outcome measures. It appears that this task is associated with the audit process. The audit process described here is managed by the IDOC compliance unit which is not an appropriate unit for conducting audits for the purposes of verifying compliance with the consent decree. The comment in task 46 gives the 20 tasks that the Monitor suggested for the audit process. The SIU audit team should perform the audits. If they are unwilling then another independent auditor should be found. It appears that in this task performance and outcome indicators are being used as the methodology for audits. This would not be consistent with the Monitor's prior input to IDOC and deserves greater discussion.

| Page 17: Commented [A15] | Author |
|---|---|

This task to ensure compliance with policies has no understandable relationship to performance and outcome measures. It would be reasonable in a vendor monitoring section. The Process for Accomplishing the Task column indicates that this is part of the audit process but the task does not state how performance and outcome measures are related to the audit. Presumably, audit questions are the performance measures but as an audit these would only be done annually and therefore would be ineffective performance and outcome measures.

| Page 17: Commented [A16] | Author |
|---|---|

As an audit measure this is inconsistent with requirements of the Consent Decree which require auditing to be by an independent or disinterested auditor.

| Page 17: Commented [A17] | Author |
|---|---|

The Monitor is unsure how this related to performance and outcome measures. This task should be re-written for clarity. How will performance and outcome measures be developed? That said, if IDOC wants to develop disease management guidelines, they should be aware that writing disease management guidelines will take **considerable** time and IDOC does not have staff to do this reasonably well. To re-write national standards for even the common

diseases will be difficult and will likely be inaccurate.  Also, since national standards are updated regularly, IDOC would basically have to have several people continually updating standards.  The Monitor suggests using existing national standards where they exist and otherwise to use UpToDate as the standard and to make UpToDate available in all clinical examination rooms and areas.

| Page 18: Commented [A18] | Author |
| --- | --- |

 It isn't clear how this relates to performance and outcome measures.  It presumes that outcome measures already exist but there are no tasks to create performance or outcome measures.  This presumes that facilities will be audited against existing outcome measures (for which there is no task to develop them) by the compliance unit. **These clinical audits will be performed by facility staff.**  IDOC is reverting to their existing practice of having facility staff perform quality of care evaluations. The staffing analysis has not allocated clinical staff to the facilities to perform quality outcome studies. Current staff are not qualified or capable to perform quality audits. Audit recommendations by the Monitor were provided in previous comments on task 46. IDOC previously planed to hire, via SIU, two audit teams each comprised of a physician, mid-level providers and nurses to perform these quality outcome studies. The current Implementation Plan has now abandoned this plan and has no tasks relevant to capturing clinical performance and quality outcome measures.

| Page 18: Commented [A19] | Author |
| --- | --- |

This makes the indicators an arbitrary and ad hoc decision.  It is unclear how this will occur.  Performance and outcome measures should be standardized across all facilities and performed on a routine basis (e.g. monthly) so that facilities can compare performance and identify trends that accelerate improvement.

| Page 18: Commented [A20] | Author |
| --- | --- |

As written, it is not clear how or whether this is related to performance and outcome measures.  If the vaccination rate, consistent with CDC guidelines, is a performance measure, then IDOC fails to include a task for how they will accomplish this goal.

If this task is a task to appropriately vaccinate all inmates, then, In agreement with IDOC, preventive screening guidelines should be from USPSTF and vaccination guidelines should be from CDC.  A procedure for vaccination and preventive screening using the USPSTF for preventive screening and CDC for vaccination should be developed and updated based on updates by USPSTF and CDC.  How this is to be used as a performance and outcome measure is not provided.

| Page 18: Commented [A21R20] | Author |
| --- | --- |

It is not necessary for IDOC to develop their own guidelines (see previous comments on task 50 about disease management guidelines).

| Page 18: Commented [A22R20] | Author |
| --- | --- |

In addition to the comments above, the parties responsible do not include the Infectious Disease Coordinator who should have primary responsibility for all guidance concerning immunizations.  The task also does not anticipate collaboration with IDPH as indicated in the narrative to the Implementation Plan. Immunization goals and objectives should be shared with IDPH and the agency may provide a source of funding for immunizations that are important to public health. Furthermore tasks relative to immunization should be included in the section on Infection Control in the Implementation plan. Additional tasks should include the timeframe and activities involved in annual influenza vaccine campaigns as well as reporting the number and percentage of population reached with vaccination.

| Page 19: Commented [A23] | Author |
| --- | --- |

This is unrelated to performance and outcome measures.  Furthermore, IDOC, by contract, should require the vendor to use IDOC's policies and therefore, this item is unnecessary.   Allowing the vendor to use its policies will only cause operational chaos, and will permit parallel policies for the same process which will confuse staff.

| Page 19: Commented [A24R23] | Author |
| --- | --- |

Tasks 2, 46 & 49 state that IDOC policy will require the healthcare vendor comply with IDOC healthcare policies therefore the vendor should have not have their own guidelines concerning these subject areas. This task is unnecessary.

| Page 19: Commented [A25R23] | Author |
|---|---|

IDOC would allow the vendor to have policies relative to human resources but the vendor should have none of their own policies concerning the delivery of healthcare in IDOC.

| Page 19: Commented [A26R23] | Author |
|---|---|

This should be in a section on monitoring the vendors. It is assumed that this is deemed necessary to correct the internal practices of previous vendors that restricted access to care: including only single issue per sick call, denial of colostomy reversal because it was an elective procedure, performing cataract surgery on only one eye even if the other eye also had a significant cataract, seemingly requiring weight loss before CPAP would be ordered, and others. This reflects previous poor monitoring of a vendor's performance and practices

| Page 19: Commented [A27] | Author |
|---|---|

The Monitor has made multiple staffing recommendations that have not been acted or have not been implemented and should be included in tasks. In addition to hiring project managers for the Implementation Plan, policies, and for implementation of the electronic record, the document of 7/15/21 that included the recommendations of the Monitor to the 7/7/21 IDOC Staffing Analysis should be responded to with a task to address staffing deficiencies identified in the Monitor's recommendations.

| Page 19: Commented [A28] | Author |
|---|---|

The implementation plan does not address executive leadership positions except those specifically called out in the Consent Decree. OHS has indicated that it has need for additional executive leadership positions as evidenced by the appointment of a Dental Director and Director of Nursing. However the Implementation Plan includes no tasks to assess these needs and establish positions or contracts to accomplish this. The Monitor has made a number of recommendations about additional positions needed in OHS to accomplish the changes that will be required to operate a healthcare program that meets constitutional requirements. None of these recommendations have been included in the Implementation Plan or staffing analysis.

| Page 19: Commented [A29] | Author |
|---|---|

This restatement of the Consent Decree is not a task and is unnecessary.

| Page 19: Commented [A30] | Author |
|---|---|

This is a significant regression. IDOC committed at least a year earlier to have this group actually perform the audits. Indeed, in the narrative accompanying this spreadsheet, submitted 4/20/22, IDOC states, "A team of auditors will be established, ideally consisting of a physician, a mid-level provider, 1-2 nurses and a team of quality specialists. The team will be responsible for auditing each facility and producing a report of their findings". This plan is now regressed to have the IDOC compliance unit and facility staff perform audits and the audit team to only monitor results obtained by the IDOC compliance and vendor facility staff. This is inconsistent with the Consent Decree requirement of an independent audit.

| Page 19: Commented [A31R30] | Author |
|---|---|

It is defined in the Plan how the SIU Quality team will monitor clinical outcomes on the facilities. Although previously communicated there is no mention in the Implementation Plan of the SIU's utilization of the redcap data analytic tool to do this monitoring. The flow of clinical information to SIU from IDOC needs to stated in the Plan. It appears that SIU will be responsible for performing reviews of IDOC's Mortality & Morbidity nor how detailed these reviews will be; nor what the scope of the reviews will be. The Monitor is encouraged that SIU involvement has the potential to perform objective reviews of the medical records of individuals who die in the IDOC.

| Page 19: Commented [A32R30] | Author |
|---|---|

The Implementation Plan should note that the "findings and recommendations" will also be shared with Monitor. To date the Monitor has been not provided with disciplinary actions given to the vendor's providers. It is the Monitor's strong opinion that this failure has resulted in poorly performing physicians continuing to work in IDOC facilities.

| Page 19: Commented [A33] | Author |
|---|---|

This is simply a restatement of the Consent Decree? What is accomplished by these two positions? The expectations of what will be achieved by the two Deputies should be stated as tasks in the Implementation Plan.

| Page 19: Commented [A34] | Author |
|---|---|

This position is filled with an unqualified person. This person is a Health Care Unit Administrator filling in as an Infection Control Coordinator. This position should be filled with a person with certification in infection control and prevention through the Certification Board of Infection Control and Epidemiology with maintenance certification, experience in infection control, and use of electronic surveillance reporting systems. IDOC should establish a position description with the appropriate qualifications for infection control and then hire someone qualified as required by IIB.1. of the Consent Decree.

| Page 19: Commented [A35R34] | Author |
|---|---|

This Implementation Plan does provide details of the scope on scope or staffing of a systemwide Infection Control Program.

| Page 19: Commented [A36] | Author |
|---|---|

This is not complete as this position is filled by a person with another position.

| Page 20: Commented [A37] | Author |
|---|---|

The four tasks 58-61 are re-statements of the Consent Decree (almost verbatim) and are therefore useless tasks. Currently, IDOC has 9-10 Medical Director vacancies and the vendor is and has been unable for years to hire qualified physicians. **IDOC has no tasks related to hiring qualified physicians.** In the 6/12/20 narrative Implementation Plan, IDOC stated that they had a plan to hire four SIU physicians to staff four facilities. This was aborted and currently IDOC has no plans for how to hire qualified physicians despite a 33% vacancy rate in medical directors. IDOC has regressed since the beginning of the Consent Decree and over three years has never developed a plan to hire qualified physicians. **IDOC must develop a task to hire qualified physicians instead of restating the Consent Decree requirements.**

| Page 20: Commented [A38R37] | Author |
|---|---|

III. A. 5. states that Defendants may present for the Monitor's review new physicians who do not meet the credentialling criteria, only after demonstrating that they were unable to find qualified physicians despite a professionally reasonable recruitment effort. The Implementation Plan omits the important requirement that it must demonstrate a professionally reasonable recruitment effort before unqualified candidates can be presented to the Monitor for consideration. The Implementation Plan includes no tasks that define a recruitment plan for physicians much less criteria for one that is professionally reasonable.

| Page 20: Commented [A39] | Author |
|---|---|

The Implementation Plan includes no tasks for the OHS medical director and monitor to review current physicians without qualifications.

| Page 20: Commented [A40] | Author |
|---|---|

While the Consent Decree does state that that the Monitor will screen candidates who do not meet credentialing criteria to determine if they are qualified to provide medical care and if so, to recommend to IDOC their hiring. However the task vastly minimizes the expectations of IDOC to conduct a professionally reasonable recruitment effort and demonstrate that despite this effort they could not recruit qualified physicians. Only when the IDOC demonstrates this and recruits candidates for consideration is the Monitor required to do anything. Tasks need to be added to the Implementation Plan that describe how IDOC will fulfill the requirements of III. A. 5 and 6.

| Page 20: Commented [A41R40] | Author |
|---|---|

This task needs to needs to rewritten inserting "non-credentialed" after qualified

| Page 20: Commented [A42] | Author |
|---|---|

This is a very passive approach to monitoring healthcare providers' performance. How is it that the OHS medical director will learn of problem performance? The methods of identifying problem performance need to be stated as tasks in the Implementation Plan. These tasks also relate to carrying out II.B.3 of the Consent Decree.

| Page 20: Commented [A43R42] | Author |
|---|---|

The Monitor needed informed about disciplinary actions and terminations of providers. This is not currently done nor is stated in the Implementation Plan.

| Page 21: Commented [A44] | Author |
|---|---|

Though the task is to post all positions the percent completion of this task noted in this Implementation Plan shows that only 50% have been posted. This misinformation is business-as-usual. IDOC needs to post all positions.

| Page 21: Commented [A45R44] | Author |
|---|---|

The 3/24/2022 Staffing Update provided to the Monitor by IDOC indicated that all recommended positions have now been moved into Allocated/posted positions. The 50% posting percentage in this Implementation Plan is not in alignment with the 3/24/22 Staffing Update. This needs to clarified

| Page 21: Commented [A46] | Author |
|---|---|

Over three years, IDOC has mostly ignored the Monitor's recommendation on staffing but should consider them. A key recommendation is to perform a workload analysis to develop an appropriate hiring plan which IDOC ignores. The Monitor gives additional staffing recommendations that have been ignored in task 67 and the Monitor suggests that IDOC enact these recommendations.

| Page 21: Commented [A47R46] | Author |
|---|---|

In addition the narrative to the Implementation Plan states that the staffing analysis may be revised based upon the impact of revised policy and EMR implementation. However the Implementation Plan itself includes no task to evaluate the need for a revised staffing analysis or an intent to conduct a staffing analysis after policy and EMR implementation.

| Page 21: Commented [A48R46] | Author |
|---|---|

The Implementation Plan does not address many of the Monitor's recommendations (some have been noted in previous comments) including increased # of physical therapists, physical therapy assistants, dental hygienists, physicians, dedicated nurses (QI, Infection Control, Chronic Care), Faciltiy QI coordinator, and others

| Page 21: Commented [A49] | Author |
|---|---|

IDOC has hired a consultant. The Monitor has been told that Dr. Leonardson will be the project manager for the implementation plan and for the electronic medical record. When asked specifically about this, she said that she would be the equivalent of the Chief Medical Information Officer but was not intending to be project manager for the implementation plan and that IDOC would have to hire other staff to perform those tasks. Her contract lists her responsibilities as advisor on the electronic record, consultant on policies, assistant in examining processes, assistant in developing quality improvement, and as a Court Expert advising IDOC on developing recommendations with respect to complying with the Lippert Consent Decree, testifying in Court, advisor on strategic direction for Lippert, and to provide updates to the Executive Director. It is unlikely that this portfolio will allow Dr. Leonardson to be a project manager for the Implementation Plan. **IDOC should hire full time project managers for the Implementation Plan, development of policies, and for the electronic health record. These should be separate full-time positions.**

| Page 21: Commented [A50] | Author |
|---|---|

No evidence has been provided by IDOC that additional staff have been hired in Quality to operationalize the implementation plan and no information has been provided to indicate the responsibilities of the dietitian or the qualifications and experience of the person hired. At this point the only person alleged to have responsibility to support the implementation plan is the consultant, Dr. Leonardson discussed in the preceding comment. The only tasks that are included in the Implementation Plan to accomplish IV. A. 2 of the consent decree are the qualifications of the Chief of OHS, SIU Quality positions (which are undefined), the Infectious Disease Coordinator and that only appropriately credentialled physicians will be hired. Each of these are called out specifically elsewhere in the Consent Decree. The Implementation Plan does not include sufficient tasks to carry out IV. A. 2 which is to describe the hiring, training and supervision of personnel necessary to implement the Decree. The IDOC should consider the Monitor's recommendations for personnel necessary to implement the changes by the Consent Decree and include these as tasks in the Implementation Plan.

| Page 21: Commented [A51] | Author |
|---|---|

IDOC must include CMS in this mix and include evaluating salaries and benefits as a source of the barrier to hiring. With respect to physicians, IDOC must obtain a vendor who can hire qualified physicians or develop a task to find another way to obtain qualified physicians as this failure is causing significant morbidity and mortality.

| Page 21: Commented [A52R51] | Author |
|---|---|

Other barriers include lengthy timeframes in the hiring process which result in qualified candidates being hired by competing employers. Tasks for recruitment with specific activities, timelines for accomplishment and measures of progress toward goals must be established. IDOC Human Resources needs to be identified as a responsible party rather than just OHS Leadership. This task essentially continues current practice with a resulting 47% vacancy rate. IDOC also needs to include tasks that relate to staff retention with specific goals for retention, retention activities and evaluation of retention success with corrective action or improvement plans to improve retention.

| Page 21: Commented [A53] | Author |
|---|---|

Same comments are made here as in task 65.

| Page 21: Commented [A54] | Author |
|---|---|

This is not an actionable task. Augmenting staff is a wider problem than indicated here.  In July of 2020 in the Monitor's 2nd Report the Monitor recommended hiring two technicians to maintain network issues for the electronic record and to maintain a help desk, 3 training staff to maintain ongoing training needs for new staff and updates, 2 process analysts to perform ongoing process and root cause analyses on an ongoing basis and to supervise data analysts, 4 data analysts with sequel query skills to obtain data from the electronic record and an infectious disease physician to advise the IDOC on their infection control program.  In the Monitor's recommendations to the Staffing Analysis in October of 2020, the Monitor recommended dental hygienists at every facility, augmented dentists, physical therapists at all facilities with infirmary bed, and optometry services at every facility.  In the Monitors response and recommendations to the Staffing Analysis in July of 2021 the Monitor recommended a project manager for the Implementation Plan, 1 or more dieticians based on a workload analysis. In December of 2021 in the Monitors differences with the IDOC Implementation Plan the Monitor recommended a clinical pharmacist to address clinical pharmacy issues.  In January of 2022, the Monitor recommended in a sample Implementation Plan to hire project managers for policies and the electronic record.  None of these positions have been hired.  IDOC commits to hiring these positions at various times but ultimately refrains from action and these staff have not been hired.  Over the past three years, no policies are completed, no mortality reviews are accomplished, the audit plans are regressing and have not started, a net negative number of staff have been hired, no performance or outcome measures have been developed, no quality projects have been initiated, the electronic record is stalled, the Implementation Plan is stalled, and clinical care remains the same as it was in 2018. IDOC should earnestly begin to accept the Monitor's recommendations on hiring staff in order to move towards compliance.

| Page 21: Commented [A55R54] | Author |
|---|---|

The Monitor continues to strongly recommend that IDOC develop affiliations/partnerships with Academic medical centers or Universities to facilitate the recruitment, hiring, and retention of qualified and quality physicians. IDOC

has voiced support/willingness to pursue academic affiliations to upgrade the physician staffing. This has been noted in previous Implementation Plans but is not included in this Plan. There should be a task specifically addressing the recruitment and retention of physicians.

| Page 22: Commented [A56] | Author |
|---|---|

This remains a disagreement between IDOC and the Monitor. The Monitor recommends that IDOC establish an organization where the Medical Director is authorized to supervise and manage the medical program in a clinically appropriate manner. This is still not occurring. By allowing Wardens to supervise, hire, and fire HCUAs, custody has an effect on health care operations that is detrimental. All health care employees need to be under the control of the health authority. IDOC needs to create an organizational chart that supports that principle.

| Page 22: Commented [A57R56] | Author |
|---|---|

There is concern by the Monitor that the absence of any quality measures to track access to care barriers that include failure to move patients to onsite or offsite care, the impact of lockdowns on access to care, and inmate injuries may in no small part may be the result of the supervisory role of the Warden over the Health care Unit Administrators and previously the selection of the facility QA/QI manger/coordinator.

| Page 22: Commented [A58] | Author |
|---|---|

The Monitor has concerns about who the IDOC will hire specifically that the consultant will not be versed in health care construction, design, planning, equipment, and needs. Multiple facilities have physical space challenges. The Monitor has concerns that IDOC will not address these needs. An "appropriate professional" should be defined.

| Page 22: Commented [A59R58] | Author |
|---|---|

Typically correctional facility planning includes a team of experts, rather than a single individual. It is especially important that the consultant have expertise in the design, equipment and operation of health care facilities.

| Page 22: Commented [A60R58] | Author |
|---|---|

Given that IDOC's decision to perform systemwide assessment of the health care delivery space is a once-in-a-generation opportunity. It must be done thoroughly and professionally and in great detail. The recommendations will impact the capability of IDOC to provide an adequate level of health care services and recruit and retain quality health care and support staff for the next 30-50 years. The consultant and the consultant's team must be carefully selected and have the skills and experience to expertly complete this large project. IDOC needs to include the job prerequisites of the consultant so that a fully qualified consultant or firm in hired.

| Page 22: Commented [A61] | Author |
|---|---|

This group includes no expert in geriatrics or care of the elderly. Task 93 utilizes existing staff **at the facilities** to determine needs of this population and to screen medical records for identification of dementia or other disabilities. This assignment requires staff, who currently fail to diagnose or manage dementia properly, to survey the elderly for dementia, memory issues, and needs which they currently appear incapable of recognizing and addressing. This ensures that no changes will be made and the elderly will continue to be placed at significant risk of harm. IDOC needs to obtain advisement from a geriatrician and expert on management of the elderly population as they evaluate functional space.

| Page 22: Commented [A62R61] | Author |
|---|---|

The chart reviews completed by the Monitor provide ample evidence that an internal group of IDOC staff do not have the knowledge or experience to determine programs needed by the population that is incarcerated today or the space and facilities needed to provide such programming. There are numerous examples of problems that went completely unidentified, patients who are inappropriately housed and who are deprived of appropriate programming and medical care.

| Page 22: Commented [A63] | Author |
|---|---|

Housing for persons whose medical needs require specialized housing must be included. There is a dire need for appropriate skilled nursing and supportive housing for the elderly. Persons with dementia, memory issues, or significant disability should not be placed in general population housing that places them at risk of harm. The

Monitor has significant concerns that IDOC is retrenching from a commitment to properly house the elderly with cognitive needs or who are disabled. Task 93 is a retrenchment of the IDOC commitment to care for the elderly.

| Page 22: Commented [A64] | Author |
|---|---|

Currently, Dixon is the only facility designated for elderly housing. Yet it is not designed for that purpose. There is no procedure for appropriately housing the elderly, including those with dementia or severe disability. Based on record reviews, it appears that housing for the elderly is lacking and harm comes to patients who are improperly housed. Housing and caring for the elderly with dementia, memory deficits, and disabilities (including younger persons with severe disabilities) is a striking deficiency that must be corrected.

| Page 22: Commented [A65] | Author |
|---|---|

The Monitor has not evaluated every facility. However, some facilities need new health care units; the Lincoln facility comes to mind. Others, including Pontiac, Stateville, and Menard, are so old that health care operations are impaired due to existing physical plant limitations. The expectation in this task, in the opinion of the Monitor, significantly underestimates that state of physical space within IDOC. IDOC should hire a qualified consultant evaluator and await the evaluation before making comments like this.

| Page 22: Commented [A66] | Author |
|---|---|

This must include a report that the Monitor can review. The Monitor has concerns about this being a transparent process.

| Page 22: Commented [A67R66] | Author |
|---|---|

The monitor has repeatedly recommended to IDOC that the physical plant evaluation includes a much needed assessment of safety and health related needs both in health care units and in housing units including safety grab bars and non-slip surfaces in showers and toilets, ventilation in showers to prevent mold formation , non-slip surfaces on stairs, the condition of floors in clinical, housing, and kitchens, and the condition of sidewalks, steps, ramps and railings used by the incarcerated population to access clinical areas and housing units  and by staff to deliver care in satellite clinical areas and housing units.  In previous Implementation Plans including 12/30/21 Plan , IDOC has committed to the establishment of a patient safety program which included "injury prevention"  and safety initiatives.  The physical plant assessment must include an evaluation of patient and staff safety issues in all facilities.

| Page 22: Commented [A68] | Author |
|---|---|

This again fails to address skilled nursing and housing for the disabled and for persons with dementia or memory or cognitive issues.

| Page 22: Commented [A69R68] | Author |
|---|---|

The focus of this task appears to be the sufficiency of privacy for patient care. IDOC facilities do lack sufficient privacy but that is not all. Physical facilities visited by the Monitor have a number of other physical plant problems that put inmates and staff at risk of harm including uneven, broken walkways, broken porches and entry vestibules,  unsafe staircases and landings, nonfunctional dietary and sanitation space, limitations on movement and activities of daily living for persons with disabilities and significant vermin and other disease transmission hazards.  The structural space requirements for facilities must focus on establishing and meeting fundamental life and safety requirements.

| Page 23: Commented [A70] | Author |
|---|---|

Again the focus is on vital health and safety measures which are broader than those involving provision of patient care.

| Page 23: Commented [A71] | Author |
|---|---|

Some new building is likely to be necessary.  IDOC has decided the outcome before a qualified analysis is performed.

| Page 23: Commented [A72] | Author |
|---|---|

The IDOC has 6 tasks (tasks 71-76) for identifying equipment when a couple tasks would suffice. To identify current deficiencies in equipment, the consultant hired to evaluate clinical space should be an expert in medical construction, renovation, and equipment. This person should include a survey of **all** clinical areas for fixed and portable equipment needs and this task should be incorporated into task 70 and must be performed by a qualified professional. This should include all clinical areas including dental. The aim must be to bring clinical space up to contemporary standards.

| Page 23: Commented [A73R72] | Author |
|---|---|

The tasks are all identical except the equipment purpose differs. These should be combined and the subjects listed a-z etc. This repetitiveness makes the Implementation Plan look longer and more substantive than it really is.

| Page 24: Commented [A74] | Author |
|---|---|

As with the comment for this section above, tasks 71-76 can be two tasks. The first task is to identify need by having a professional evaluator of health care space and equipment perform a survey, identify deficiency, and produce recommendations necessary to bring physical space up to contemporary clinical standards. The second task is listing standardized equipment and requiring that each facility maintain the list. All equipment on the list needs to be serviced including calibration on an appropriate basis. Typically, this is annually. The facility needs to track the date of last servicing or calibration and keep a record of servicing and calibration. Equipment that is broken or defective must be replaced. This includes dental equipment. Reports of that servicing, calibration, and needed repairs needs to be reported to the quality program on an annual basis. This must be monitored by the quality program and should be included in annual independent audits of the program.

| Page 25: Commented [A75] | Author |
|---|---|

See the previous comment in relation to task 73 about an annual inventory and evaluation of equipment functionality. In addition III.K.13 of the consent decree stipulates that dental equipment is to be evaluated annually, therefore IDOC should not make this determination unless evaluation more frequently than annually is necessary.

| Page 25: Commented [A76] | Author |
|---|---|

All three tasks in this section are re-statements of the Consent decree without any task even describing how the restatement would be implemented. 57 of 105 tasks in this plan do the same. Most are policy tasks. IDOC has devoted considerable space in the Implementation Plan merely restating the Consent Decree typically without even giving direction on how the restatement will be accomplished. While developing sanitation methods is critical for a health care operation, performing these three tasks alone would be insufficient. IDOC must develop reasonable tasks to ensure that health care units are clean and regularly sanitized consistent with a contemporary standard for health units. This is not accomplished in the Implementation Plan tasks.

| Page 25: Commented [A77R76] | Author |
|---|---|

In addition to the comments above there is a great deal of confusion among responsible parties for sanitation and infection control. Two of the sanitation tasks identify requirements and monitoring by the Infection Control Coordinator yet the responsible parties identified in the Implementation Plan are limited to the IDOC Environmental Services Coordinator. Both of the Infection Control tasks identify the responsible party as the on-site facility engineers via the Environmental Services Coordinator and have no tasks for which the Infectious Disease Coordinator is responsible. This organizational confusion should be resolved via tasks in the Implementation Plan to define the role and program responsibilities of Environmental Services and Infection Control personnel. It is certain that there will be some overlap in responsibilities and the two programs should have a collaborative relationship however at the present time neither is defined organizationally or in policy.

| Page 26: Commented [A78] | Author |
|---|---|

These 2 tasks also merely restate the Consent Decree as if Infection Control in a correctional health program consists only of monitoring negative pressure rooms and reviewing safety and sanitation reports. When the Consultant was asked why there were no tasks in the Implementation Plan to address implementation of an

Infection Control Program, the Consultant replied that the an infection control program is not mentioned in the Consent Decree so there is no need to place one in the Implementation Plan.

IDOC has had outbreaks of histoplasmosis, scabies, and recently COVID for which they were eminently unprepared. No meaningful or accurate surveillance occurs as evidenced by data produced in the CQI meeting minutes. An **essential** NCCHC standard is Infectious Disease Prevention and Control which states, "There is a **comprehensive** institutional program that includes surveillance, prevention and control of communicable disease". Tasks 80 and 81 fail to ensure that a comprehensive infection control program is present. As tasks to create a comprehensive infection control program, these two tasks are failures. The Monitor has recommended and continues to recommend to IDOC 7 tasks that include: 1) hiring an infectious disease physician to act as a full time advisor and manager of the infection control program; 2) establish a reasonable statewide infection control coordinator position description; 3) establish **facility** infection control position description and hire or designate infection control coordinators for each facility; 4) develop an infection control manual that develops the operational aspects of the infection control program in IDOC; 5) Develop a surveillance report format that sets the requirements for surveillance; 6) work with data staff to establish how data for surveillance will be obtained from the electronic record; and 7) establish statewide infection control meetings with meeting minutes. None of these essential steps have been undertaken. After 3 years, IDOC still does not have an infection control program and as exemplified by the COVID pandemic, its senior leadership is consumed by responding to the pandemic which has impaired its ability to make any progress in this Consent Decree. More than ever, this demonstrates the need for an infection control program as a perquisite of an adequate health program.

| Page 26: Commented [A79] | Author |
| --- | --- |

This is an area where there has been dramatic regression over the past three years. The performance and outcome section above has 6 tasks but it is not clear how they are associated with performance and outcome measures. The quality section has two items (tasks 83 and 84) that are restatements of existing processes that are ineffective and have no tasks that demonstrate how these will be different or result in improvements. Four tasks (85, 86, 87, and 89) describe an existing process as if it is a new program albeit with minor tweaks. These tasks do not positively contribute to advancement of the quality program. There are multiple processes tied to quality improvement in the Consent Decree, including: quality improvement activity, audits, performance and outcome measures, adverse event reporting, patient safety, contract monitoring, and mortality review which are inadequately addressed in this plan.

| Page 26: Commented [A80R79] | Author |
| --- | --- |

The Monitor's example implementation plan provided to the Court in January 2022 included 22 recommended tasks for a quality improvement plan. It appears that most of the Monitor's suggestions for quality have been ignored by IDOC in the development of the 4/20/22 Implementation Plan. Specific suggestions are made for tasks to be added to the Implementation Plan in subsequent comments on this section based upon earlier recommendations.

| Page 27: Commented [A81] | Author |
| --- | --- |

This broad statement is the only task describing responsibilities of this statewide committee. It presumes what this council will do but specific tasks should be created to define the council's responsibilities. 1) The members are not defined. 2) IDOC does not create any task to develop procedures for each of the various quality programs (audits, performance and outcome measures, adverse events, and mortality reviews) and how this committee integrates these into the quality program. 3) There is no task to define how this council is organized including meetings, minutes, etc. 4) The organization of this council is unclear. A policy should be developed to delineate members, who is the leader of this council, how the council integrates the various functions of the quality program and who maintains minutes, etc. 5) There is no task to describe how this council develops process and program analysis skills at the facility level. 6) There is no task for this council or anyone else to develop training of facility staff in CQI methodology. 7) A task should be in place describing how this council communicates decisions internally and to the 30 facilities.

| Page 27: Commented [A82] | Author |
| --- | --- |

This appears to be no different that the processes IDOC currently has in place to file incident reports and to report med errors. Nothing in this task changes current practice which is ineffective in managing errors and incidents. The Consent Decree requires a preventable adverse event reporting system which is not described in any tasks. The Monitor suggests 9 tasks related to adverse event reporting including: 1) develop a procedure for adverse event reporting; 2) develop or purchase adverse event reporting software; 3) hire a process analyst to manage incident reporting and organize reports into actionable tasks; 4) assign a patient safety committee to categorize adverse event reports and prioritize corrective actions, make assignments for process improvement, take action on root cause analysis, and follow up on corrective actions; 5) create a registry of adverse events and categorize them to study their frequency; 6) develop standardized definitions of sentinel and adverse events for purposes of reporting; 7) develop procedures and requirements for how each facility CQI program reports and reviews adverse events; 8) develop a methodology to analyze adverse event reports and to determine whether a systemic problem is present and to take action if a systemic problem is present; and 9) develop a methodology for referral to peer review when indicated. 10) The Consent Decree also requires training on patient safety but there is no associated task for this requirement. Patient safety is associated with adverse event reporting. An additional task might be to integrate patient safety into the adverse event and medication error reporting system. When adverse events are organized and prioritized, those groups of events that result in risk to patient safety should result in the process analyst and clinical patient safety committee developing patient safety measures and train staff on how to enact these. A task should be developed to do this. 11) IDOC should develop a methodology to take patient safety issues and develop alerts to staff on how to avoid the issue from reoccurring. Patient safety deficiencies should be tracked in performance and outcome measures.

| Page 28: Commented [A83] | Author |
| --- | --- |

This is a statement of what already occurs albeit ineffectively. Nothing new is provided in the task or the process that is different than what currently exists which is failing to provide effective quality improvement. In addition to stating that meetings will occur monthly with minutes, the IDOC should have tasks to include: 1) develop a procedure for this committee including how the coordinator is appointed, minutes, and members of the committee; 2) there should be a task to complete a position description for a full-time *facility CQI coordinator* and to define requirements for training of this persons and position requirements for this position; 3) a task should define the structure of the facility CQI program and requirements which can be defined in the CQI policy; 4) each facility should develop a performance improvement plan which includes actions taken to correct audit, mortality review, adverse event reporting and performance and outcome measure findings at their facility; 5) there should be a task to develop methodology for the facility to communicate the performance improvement plan to staff and to engage staff; 6) IDOC should include a task to develop a methodology to communicate information between facility CQI programs and the statewide council; 7) a task for training facility staff on CQI needs to be developed; 8) a process for providing assistance and training to facility personnel engaged in CQI projects should be developed which should include how the facility can obtain appropriate data for their CQI work; and 9) a task to develop procedures for how facilities can develop institutional policies that differ from statewide policies.

| Page 28: Commented [A84R83] | Author |
| --- | --- |

The items to be discussed at monthly QI/QM meetings should not be limited to those identified in this task. There are other key items that should be reported and discussed including access to care backlogs, offering and administration of immunizations, selected age and risk-based routine health maintenance screenings, corrective action plans for uncontrolled chronic illnesses, and number and percentage of HCV patients that are being treated. Corrective action initiated to address deficiencies should be reported with follow-up until deficiency or lack of compliance is corrected.
.

| Page 28: Commented [A85] | Author |
| --- | --- |

This is no difference from what currently occurs via the compliance unit of IDOC. This will not be independent and will not effectively audit the medical programs and is therefore inconsistent with the Consent Decree. IDOC should see task 46 for the Monitor's recommendations on the audit function required by the Consent Decree.

| Page 29: Commented [A86] | Author |
| --- | --- |

This process is contrary to statements in the narrative which assert that SIU will perform the audits. The process described here is no different than what is currently being done which is ineffective and fails to identify any problems. This also does not ensure an independent audit process. As a result, the program has not progressed and has regressed.

| Page 29: Commented [A87] | Author |
| --- | --- |

This is identical to what currently occurs and doesn't need to be stated as if it is a new task. Facility medical directors write a death summary which fails to identify problems and fails to accurately report the circumstances surrounding the death. This current process is ineffective except to report the death.

| Page 29: Commented [A88R87] | Author |
| --- | --- |

The Monitor has reviewed numerous death summaries prepared by facility medical providers. There is wide variation in the quality and content of the death summaries. The facility death summaries commonly written by the deceased patient's primary provider almost never identify opportunities for improvement. The Implementation Plan needs to add a subtask to train providers in the importance of noting gaps or delays in care that could prevent mortality and morbidity.

| Page 30: Commented [A89] | Author |
| --- | --- |

This task is the only mortality review task and is incomplete. Additional tasks should be added with respect to mortality review to be consistent with the Consent Decree requirement to integrate mortality review with CQI and to ensure that deficiencies are identified and to take corrective actions on those deficiencies. Additional tasks need to include the following. 1) A task should define who is a permanent member of this committee. The current process statement is unclear. 2) The persons reviewing the record should include a physician and a nurse. The methodology for record review should be defined. It appears that a nurse alone can be assigned to perform this review. 3) A procedure should be developed to report deaths to OHS and to track all deaths in a standardized manner. Deaths should be tracked on a list which is reviewed by the statewide quality council. 4) A standardized policy and procedure for death reviews needs to be established. This needs to result in a format for the review, requirements that all deaths reviews need to identify opportunities for improvement, how deficiencies are assigned to facilities for corrective actions and how the quality committee follows up on those corrective actions to ensure they are accomplished. The task needs to integrate mortality review into the quality improvement function as required by the Consent Decree. 5) IDOC needs a task to develop a procedure for promptly scanning the medical record for all deaths which is used by the mortality review group and sent to the Monitor. 6) A methodology for referral to peer review for egregious acts associated with physician responsibility. 7) The mortality review format should be designed and tested with the audit team with input from the Monitor. 8) Design of a standardized mortality review report format should be a task.

| Page 30: Commented [A90] | Author |
| --- | --- |

This is the only task in the Implementation Plan specific to peer review. Item III.K. 9 requires a peer review system for dental staff and task 20 is identified as meeting this requirement which is development of policy to assess competency and performance of medical, dental and nursing staff. Additional tasks are needed in the Implementation Plan that describe the process for identification and referral of staff to peer review, the establishment of a fair process and the standards used to evaluate professional care and clinical decision making, how members will be assigned peer review responsibilities and what qualifications individuals must have to perform peer review, as well as the documentation of the evaluation, assessment, deliberation and decisions made in the peer review process.

| Page 30: Commented [A91R90] | Author |
| --- | --- |

This task does not identify if only SIU providers will be populating peer review panels and needs to assure that any group of peers who will be assigned to review care and decision-making is knowledgeable and independent. Many peer reviewers are evaluating their colleagues and lack the objectivity to accurately identify gaps in care and opportunities to improve care and prevent mortality and morbidity

| Page 30: Commented [A92] | Author |
| --- | --- |

In earlier versions of the Implementation Plan IDOC committed to several process improvement projects including 1) access to specialty care, sick call, chronic care delivery and medication administration (tasks 40 - 43) in the 12/30/21 Implementation Plan. The commitment to these process improvement projects has been deleted in the 4/22/22 version of the Defendant's Implementation Plan. Task 90 is written so that process improvement projects are not initiated until identified as necessary by the SIU quality team, the IDOC Compliance team or OHS Leadership. However these are areas that have already been identified in the Consent Decree as needing change and the problems with current practices have been exhaustively detailed in the Monitor's reports the last three years. IDOC needs to restate its commitment to process change specifically in these areas by adding these back as tasks in the Implementation Plan. These process revisions need to take place in advance of tasks for policy development in these subject areas.

| Page 30: Commented [A93R92] | Author |
|---|---|

The Monitor also has identified and communicated to the IDOC other processes that need to be improved including intake screening, specialty care, routine health maintenance including vaccination and cancer screening, accuracy of problem lists, and onsite urgent and emergent care . As noted above, these process analyses should precede the creation of policies for these high risk, deficient processes.

| Page 30: Commented [A94] | Author |
|---|---|

SIU quality group position descriptions do not include a position that has qualifications to perform this function. There is no one in IDOC or SIU qualified to perform this function.  Engineers from SIU are engaged in an analysis of the medication process but they are not formally listed as part of this program. When on tour several of these engineers stated that they have full time teaching and research positions and would not be acting as line engineers to perform these analyses.  In addition, several other tasks should be done.  In sum, these should include the following.  1) IDOC needs to create a task to hire systems engineering or process analyst personnel to staff this function.  2) A task should be created to develop a methodology for assignment of root cause analysis or process analysis to identified system deficiencies.  3) A task should be created to enact changes based on the process analysis.  Who would be responsible for this and what procedures would occur (for example, develop policy, identify equipment needs for the new process, identify staffing changes necessary to conduct the new plan, etc.).  How would these changes be funded. 4) Develop a methodology for conducting process analysis including having reports that are included with recommendations.  These reports should include whether policy changes, additional staff, equipment or supplies are necessary to implement the changed process.  5) Create a task for training on process change so that facility staff can participate in this process.

| Page 31: Commented [A95] | Author |
|---|---|

This is merely restating the Consent Decree without including any associated tasks.  How IDOC will obtain this data is not included in the Implementation Plan.  Moreover, IDOC has no tasks on how it will obtain data except through "canned reports" from the electronic record.  No one is assigned to manage or obtain data.

| Page 31: Commented [A96R95] | Author |
|---|---|

The data and information required to meet the requirements of VG in the Consent Decree have yet to be agreed to by the Monitor and Parties. There is no task to finalize the data and information that Defendants are to provide in their reports to the Monitor of compliance with the Consent Decree.

| Page 31: Commented [A97R95] | Author |
|---|---|

The detailed reports provided to date have been generally flawed, inaccurate, and claim compliance without any supporting data or information.  A task is needed to direct IDOC to support all assertions of compliance or progress toward compliance with supportive information or data.

| Page 31: Commented [A98] | Author |
|---|---|

We commented  that task 53 should be eliminated and the contract written to require the vendors' compliance with IDOC healthcare policies and directives. Task 92 should be revised to state explicitly that any contract shall require the vendor comply with all court orders, policies and procedures of IDOC.   The vendor by IDOC policy and

contract should NOT be permitted use of their own policies except those related to human resources matters. The persons responsible need to include those responsible for contract procurement.

| Page 31: Commented [A99] | Author |
| --- | --- |

The Consent Decree (II.B.2) requires that IDOC monitors the vendor and provide effective contract oversight. There is no task associated with this. Compliance monitoring is performed by IDOC (see tasks 85). Clinical monitoring is performed by facility (vendor) staff (see task 86). This is not effective monitoring. IDOC needs to include a task related to effective vendor monitoring. The Monitor had recommended the following. 1) Develop a procedure for vendor monitoring to include hiring funded positions. 2) Develop a method to aggregate audit findings combined with staffing efficiency (vacancies vs contracted positions) and ability to maintain contracted credentialed physician staff to summarize vendor monitoring. 3) Develop a format to annually report these aggregate findings. 4) Require a mandatory vendor response to each report to include corrective actions with deadlines. 5) Have the statewide CQI council review this monitoring report and the vendor response and report a summary conclusion to the Executive Director.

| Page 31: Commented [A100R99] | Author |
| --- | --- |

In addition to the above recommendations the contract needs to include liquidated damages for performance deficiencies. If this is not the case in the current procurement, tasks to accomplish this before the next contract award need to be added to the Implementation Plan.

| Page 31: Commented [A101] | Author |
| --- | --- |

This is a significant regression from prior IDOC Implementation Plan documents. As early as the 6/12/20 version of the Implementation Plan IDOC committed to: 1) ensuring appropriate housing for the elderly and infirm; 2) engagement with the Illinois Department of Aging (IDA) to develop a survey to form the basis for understanding need of this population; 3) based on survey results determine need for this group; and 4) perform these tasks in consultation with the Monitor. None of these are to be done. Instead, IDA will not be used for a survey. Instead, the first subtask will consist of using problem lists and findings in records to identify how many patients have dementia or memory disorders. We have found that clinicians currently fail to adequately assess patients and dementia remains significantly underdiagnosed. The first subtask will not effectively survey the elderly population. IDOC has no history of identification of memory problems and this task appears to continue the current inadequate care for this population. Tasks the Monitor recommends include the following. 1) Obtain a consultant to complete a survey of the elderly and infirm to identify those with memory deficits, disabilities, or dementia. The consultant should be an expert on the elderly and can be a gerontologist. 2) Review custody classification rules to determine how the elderly are assigned housing. This should include classification systems for assigning elderly to Dixon. 3) Identify any special housing that currently exists for the elderly to determine the available resources. 4) Identify how the elderly and infirm are currently assigned housing based on their need. 5). Solicit current practices of select medical staff to determine existing issues with housing of the elderly and infirm. 6) Develop the survey instrument used to survey the elderly and disabled. Include in survey review of records of persons surveyed. 7) Review selection of elderly deaths to establish current patterns of care. 8) Based on survey and existing housing arrangements, identify deficiencies in housing elderly. 9). OHS leadership with assistance from the consultant should determine levels of care necessary for the population within IDOC. With the consultant hired to evaluate clinical space (task 70) determine the gaps in housing for elderly and develop a plan to correct the gap. 10) The consultant for this task should produce a report of findings and provide the report to OHS and the Monitor. 11) Work with custody to advise alternate classification system to appropriately house this population. 12) Develop policy changes based on appropriate housing of the elderly and infirm. 13). Meet with Capital Development if any renovation or building is necessary. CD to address approvals and funding for any necessary projects. Timelines for these items need to be developed. Responsible parties need to be identified.

| Page 31: Commented [A102R101] | Author |
| --- | --- |

The Aged and Infirm tasks also 1) fail to address how they will address the programmatic needs of the incarcerated elderly and infirm population, and 2) fail to include a task that addresses the need to utilize compassionate release and the Joe Coleman Medical Disability Act Illinois Home Bill 3665) for early release of aged, infirm, demented, and terminally ill to the community.

| Page 32: Commented [A103] | Author |
|---|---|

Having the vendor responsible for this is a poor practice. The IDOC should have a project manager for implementation of the electronic record. Not doing so risks implementing a record not consistent with requirements of IDOC.

| Page 33: Commented [A104] | Author |
|---|---|

The review and documentation of current processes as well as process design, revision and planning referred to in tasks 101 and 102 is not scheduled to take place until September 2023 which is too late. These tasks need to be initiated soon and standardized practices established in advance of policy development and well in advance of the EHR. Tasks 101 and 102 are similar to task 90. What differentiates these tasks from each other? Why is process design for the EMR not initiated until 2023 after policies for these subjects have already been developed. The Monitor suggests revisiting the timelines for process review and redesign.

| Page 33: Commented [A105] | Author |
|---|---|

IDOC has no tasks to mine data and no staff hired who can do this. The Monitor believes mining data will be essential to gain compliance with the Consent Decree. The IDOC agreed with this, even recently. In their 12/30/21 Implementation Plan proposal, IDOC stated, "the addition of an IT Department to collect, analyze and interpret health care data will better position OHS to use patient data to guide policy and thus improve healthcare outcomes. These individuals will have the expertise to modify EMR user interfaces, generate specific queries, and translate health care information into reports or to populate health system dashboards. This expertise will also allow IDOC to provide data for use in quality improvement programs and to verify compliance with the Consent Decree. This type of data management is crucial to appropriately tracking clinical progress and outcomes". Since this was written only four months ago, IDOC has apparently rejected this proposal which is a regression. IDOC now apparently plans to only used "canned" reports from the electronic record, which the Monitor believes will not provide sufficient data. The Monitor suggests the following. 1) Hire data personnel with expertise in sequel data queries (with engineering or software training and expertise) to do this. These personnel should be hired as soon as possible and so that they can start as the EMR is being implemented. In the 2nd report the Monitor recommended hiring four data analysts for this purpose. Two additional process analysts were recommended to lead this data group and to provide the process analysis as described in task 90. These hires are discussed also in task 67.  2) data personnel need to become familiar with the database of the EMR vendor and learn how to perform data queries consistent with ongoing needs of the OHS and quality programs. IDOC should develop sufficient tasks to do this.

| Page 33: Commented [A106] | Author |
|---|---|

This is discussed in task 102 above. "Canned" reports will be insufficient for this purpose. Some degree of self-initiated queries will be necessary for obtaining data consistent with requirements of the Consent Decree. IDOC has recently regressed from prior positions and now has no tasks associated with obtaining data except through "canned" reports. As well, during the time period before the electronic record is implemented, there is no task or plan to obtain manually derived data necessary for purposes of verifying compliance with the Consent Decree.

| Header and footer changes |
|---|

| Text Box changes |
|---|

| Header and footer text box changes |
|---|

| Footnote changes |
|---|

| Endnote changes |
|---|

# Exhibit 2

| Task # | Task | Process For Accomplishing The Task |
|---|---|---|
| | **POLICIES AND PROCEDURES** | |
| 1 | **A policy shall be written which requires medical autonomy in healthcare decision-making.** | The medical director and his deputy medical directors will appoint a work group to review the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write a policy to reflect that requirement. The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure, where necessary. The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
| 2 | **A policy shall be written which requires the healthcare vendor to comply to the IDOC healthcare policies.** | The medical director and his deputy medical directors will appoint a work group to review the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write a policy to reflect that requirement. The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure, where necessary. The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
| 3 | **A policy shall be written to provide the requirements for monitoring the access to care which is expected for primary, secondary and tertiary care.** | The medical director and his deputy medical directors will appoint a work group to review the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write a policy to reflect that requirement. The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure. The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |

**Commented [A1]:** The first 47 tasks in this Implementation Plan concern policies and procedures. Yet there are no tasks describing who writes the policies, how policies are developed, how they are reviewed, how they are implemented and what training is provided. Also, if a policy requires additional staff, equipment or supplies there are no tasks to evaluate these needs and obtain necessary additions to achieve compliance. The Implementation Plan lists 46 specific areas of policy content to be developed. These are simply **restatements of the Consent Decree** without any other description of how the policy will be carried out. Policies should be based on the requirements of an adequate medical program and not restatements of the Consent Decree. Each of the Monitor's reports have provided specific recommendations for policy content consistent with the Consent Decree and NCCHC standards. Yet most of this advice has not been incorporated into the plans for development of policy in the Implementation ... [1]

**Commented [A2R1]:** Optimally Task 45 " A full set of health care policies, including the policies already mentioned (change to mentioned below), will be written and implemented." should be the first task in the P&P section. The policies should not only conform to NCCHC Standards but also include relevant elements in the Consent Decree and other court orders. The Process for ... [2]

**Commented [A3R1]:** Based on the experience of the Monitor in this Consent Decree , the review and input of the Monitor is needed to assure that policies are designed to actually improve the care provided in the IDOC and enhance the continuity of care for intrasystem transfers, returning from offsite care (ED, hospitals, consultations) and re-entry back into the community. The Policy and Procedure ... [3]

**Commented [A4]:** The responsible parties are some 10 groups or individuals. These groups cannot reasonably write and manage all the policies that need attention, given their other assignments. 1) A single person needs to be identified to manage the process of policy development and to assist in the actual writing of the policies. The Monitor has recommended a project manager for this. The oth ... [4]

**Commented [A5R4]:** Task 2 and task 46 are duplicative. Both are policies which require the health care vendor comply with IDOC healthcare policies. Task 46 also mentions auditing compliance with IDOC policies. This duplicates task 49 which is development of a plan for compliance audits. Duplications in tasks 2, 46 and 49 should be eliminated.

**Commented [A6]:** Virtually all of the policy tasks as well as the description of the process for accomplishing the task include this statement that a Standard Operating Procedure for the best, recommended process for complying with policy will be outlined. The IDOC intends to leave it to facility operations to determine procedures to carry out each policy directive. This simply continues what IDOC ... [5]

**Commented [A7]:** This is should also be stated in the contract with the vendor.

| 4 | A policy shall be written which outlines the requirements for continuity of care and medication from the community and back to the community. | The medical director and his deputy medical directors will appoint a work group to review the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write a policy to reflect that requirement. The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure. The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
| --- | --- | --- |
| 5 | A policy shall be written to outline the requirements of a reliable and safe intake screening process and initial health care assessment. The requirements should include screening dental examinations, with an intraoral soft tissue examination. | The medical director and his deputy medical directors will appoint a work group to review the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write a policy to reflect that requirement. The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure. The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
| 6 | A policy shall be written to outline the requirement for providing a patient in IDOC access to Urgent Care. | The medical director and his deputy medical directors will appoint a work group to review the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write a policy to reflect the outcome that is necessary. The method that is recommended for complying with the policy will be outlined in a Standard Operating Procedure. These documents will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |

| 7 | **A policy shall be written to outline the requirement for documentation of medication administration in a medication administration record.  This will include both KOP medication and dose-by-dose administration.** | The medical director and his deputy medical directors will appoint a work group to review the NCCHC Standards for Health Services in Prison  for guidance on this issue.  They will then write a policy to reflect the outcome that is necessary.  The method that is recommended for complying with the policy will be outlined in a Standard Operating Procedure.  These documents will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
|---|---|---|
| 8 | **A policy shall be written to outline the requirement for documenting refused medication and for documenting that the patient has received counseling about the potential outcomes of non-compliance to medications.** | The medical director and his deputy medical directors will appoint a work group to review the NCCHC Standards for Health Services in Prison  for guidance on this issue.  They will then write a policy to reflect that requirement.  The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure.  The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
| 9 | **A policy shall be written to outline the requirement for receiving patients from offsite services, informing them of the recommended care and of carrying out the recommended care or an acceptable alternative to the recommended care.** | The medical director and his deputy medical directors will appoint a work group to review  the NCCHC Standards for Health Services in Prison  for guidance on this issue.  They will then write a policy to reflect that requirement.  The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure.  The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |

3

| | | |
|---|---|---|
| 10 | **A policy shall be written to outline the requirements for providing Chronic Disease Care (Chronic Clinic). A Standard Operating Procedure will be written to outline the recommended best practice for complying to this policy.** | The medical director and his deputy medical directors will appoint a work group to review the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write a policy to reflect that requirement. The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure. The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
| 11 | **A policy shall be written to outline the required access parameters for specialty care and to diagnostic services.** | The medical director and his deputy medical directors will appoint a work group to review the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write a policy to reflect that requirement. The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure. The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
| 12 | **A policy shall be written to outline required Access to care parameters for dental care.** | The medical director and his deputy medical directors will appoint a work group to review the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write a policy to reflect that requirement. The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure. The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |

**Commented [A8]:** Almost all policies should have procedures. Also, the procedures should be standardized. The way this is written appears to allow for options on how to perform. The current practice of allowing each facility to create their own procedure will result in the chaotic nature that exists today.

**Commented [A9R8]:** See the earlier comment made in relation to task 1.

4

| 13 | A policy shall be written to outline the requirement for  review Mortalities and reported Morbidities in the IDOC patient population and of referring any finding of deficient provider or nursing practice to a peer review process. | The medical director and his deputy medical directors will appoint a work group to review the NCCHC Standards for Health Services in Prison  for guidance on this issue.  They will then write a policy to reflect that requirement.  The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure.  The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
| --- | --- | --- |
| 14 | A policy shall be written to outline the requirement for a dietician to develop menu plans for IDOC patients, including specified medical diets. | The medical director and his deputy medical directors will appoint a work group to review  the NCCHC Standards for Health Services in Prison  for guidance on this issue.  They will then write a policy to reflect that requirement.  The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure.  The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
| 15 | A policy shall be written to specify the medical admission requirements of patients which be housed in infirmaries or specialized housing. | The medical director and his deputy medical directors will appoint a work group to review  the NCCHC Standards for Health Services in Prison  for guidance on this issue.  They will then write a policy to reflect the outcome that is necessary.  The method that is recommended for complying with the policy will be outlined in a Standard Operating Procedure.  These documents will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |

| 16 | A policy shall be written to specify the minimum staffing required for infirmary care settings. | The medical director and his deputy medical directors will appoint a work group to review the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write a policy to reflect that requirement. The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure. The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
| 17 | A policy shall be written which states the requirement of participation in a QI/QM process on facilities. The policy should specify that it is necessary for the facility management team to meet monthly to review various indicators to be specified by the System Leadership Council . These meetings should be documented with minutes and shared with the central IDOC System Leadership Council. The meetings should have a member of the security staff present. | The medical director and his deputy medical directors will appoint a work group to review the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write the policies to reflect that requirement. The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure. The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |

| | | |
|---|---|---|
| 18 | **A policy shall be written about the requirement of reporting adverse events, medication errors and potentially ineffective processes that require streamlining or error-proofing.  There is a requirement for facility staff to have a method of reporting issues that may affect patient safety in order to prevent future adverse events.** | A process for non-punitive reporting of adverse events will be designed by OHS medical leadership using reputable guidance. Facility staff who have observed an adverse event shall complete and submit an Adverse Event Reporting Form (available on the Intranet) to the Health Care Unit Administrator.  The Health Care Unit Administrator shall scan and email the form to the IDOC Director of Nursing and the Director of the Quality Group (SIU).  The Adverse Event will be reviewed by these individuals to discern whether there is a sentinel event or systemic process issues which should be addressed.  If there are either of these, the process in question should be brought to the Clinical Quality Group for formal process revision using an accepted method (Lean, PDSA, etc).  If a new process is recommended, the new process will be written in Policies or Procedures and shared with all health care staff.   The draft policy will be brought to the policy work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
| 19 | **Policies shall be written which will dictate the equipment required in infirmaries, dental operatories, radiology areas, emergency care areas in the facilities', emergency bags and in medical patient examination rooms.** | The medical director and his deputy medical directors will appoint a work group to review standards put forth from the NCCHC Standards for Health Services in Prison for guidance on this issue.  They will then write the policies to reflect that requirement.  The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure.  The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |

7

| | | |
|---|---|---|
| 20 | **A policy shall be written describing the requirement of an assessment of the competency of Dental, Nursing and Medical staff on an annual basis.  A Standard Operating Procedure will be written to outline the recommended best practice for complying to this policy.** | The medical director and his deputy medical directors will appoint a work group to review standards put forth from the NCCHC Standards for Health Services in Prison for guidance on the on this issue.  They will then write the policies to reflect that requirement.  The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure.  The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
| 21 | **A policy shall be written which requires that national guidelines on radiation hygiene are being observed and enforced in all areas where radiologic procedures are being performed, including the radiologic procedures that are performed in dental operatories.** | The medical director and his deputy medical directors will appoint a work group to review standards put forth from the NCCHC Standards for Health Services in Prison and from the guidelines available for radiation hygiene to obtain guidance on this issue.  They will then write the policy to reflect those requirements.  The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure.  The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
| 22 | **A policy shall be written which outlines the requirement that healthcare information be available to a patient at the time of his/her discharge to the community and what that information should be. A Standard Operating Procedure will be written to outline the recommended best practice for complying to this policy.** | The medical director and his deputy medical directors will appoint a work group to review standards put forth from the NCCHC Standards for Health Services in Prison for guidance on this issue.  They will then write the policies to reflect that requirement.  The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure.  The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |

| 23 | **A policy shall be written which outlines the requirement to send a two-week supply of vital medication and a prescription for at least two additional weeks of vital medication with an patient at the time of his discharge from IDOC.** | The medical director and his deputy medical directors will appoint a work group to review standards put forth from the NCCHC Standards for Health Services in Prison for guidance on this issue.  They will then write the policies to reflect that requirement.  The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure.  The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
|---|---|---|
| 24 | **A policy will be written which guides care when a patient is unable to provide consent due to lack of decision-making capacity.** | The medical director and his deputy medical directors will appoint a work group to review standards put forth from the NCCHC Standards for Health Services in Prison for guidance on this issue.  They will then write the policies to reflect that requirement.  The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure.  The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
| 25 | **A policy shall be written which specifies the requirement of physicians working in the IDOC setting to have either an MD or a DO degree with a valid license to practice in the state of Illinois.** | The medical director and his deputy medical directors will appoint a work group to review policy requirements from the NCCHC Standards for Health Services in Prison for guidance on this issue.  They will then write the policies to reflect that requirement.  The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure.  The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |

| 26 | **A policy shall be written outlining the requirement that IDOC place patients with scheduled offsite medical services on a transfer hold until the service is provided, contingent on security concerns or emergent circumstances, including lockdown. This policy excludes reception centers. A Standard Operating Procedure will be written to outline the recommended best practice for complying to this policy.** | The medical director and his deputy medical directors will appoint a work group to review standards put forth from the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write the policies to reflect that requirement. The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure. The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
| --- | --- | --- |
| 27 | **A policy shall be written outline the requirement of a medical review upon the arrival of a patient which has been transferred from another IDOC facility. If the patient is being discharged from an infirmary, that review will be done in person by a provider. A Standard Operating Procedure will be written to outline the recommended best practice for complying to this policy.** | he medical director and his deputy medical directors will appoint a work group to review standards put forth from the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write the policies to reflect the outcome that is necessary. The method that is recommended for complying with the policy will be outlined in a Standard Operating Procedure. These documents will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
| 28 | **A policy shall be written which requires that a problem list containing a list of all patient's current medical issues will be maintained and that this list will be updated by a clinician only. A Standard Operating Procedure will be written to outline the recommended best practice for complying to this policy.** | The medical director and his deputy medical directors will appoint a work group to review standards put forth from the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write the policies to reflect that requirement. The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure. The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |

10

| 29 | A policy shall be written which requires that treatment plans in the medical and dental sections of the chart are amended by a clinician only. | The medical director and his deputy medical directors will appoint a work group to review standards put forth from the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write the policies to reflect that requirement. The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure. The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
|---|---|---|
| 30 | A policy shall be written which requires that offsite care appointments or urgent/emergent care are tracked in a log and that the medical documentation that results from off-site care are included in the record and forwarded for review to the appropriate clinical team member within 3 days. Routine follow-up to offsite services will be conducted by facility medical (clinical) staff within 5 days after the patient returns to the facility. If the documentation from an outside medical appointment is not available within a week of the patient's completed appointment, the documentation should be requested. The request for documentation from outside sources shall be documented either on a log or in the patient's medical record. | The medical director and his deputy medical directors will appoint a work group to review standards put forth from the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write the policies to reflect that requirement. The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure. The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
| 31 | A policy shall be written which requires sick call requests to be triaged by a nurse or provider and processed per national guidelines (NCCHC) A Standard Operating Procedure will be written to outline the recommended best practice for complying to this policy. | The medical director and his deputy medical directors will appoint a work group to review policy requirements from the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write the policies to reflect that requirement. The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure. The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |

11

| 32 | **A policy shall be written which states that there shall not be a limit on the number of medical complaints which can be addressed at a single clinic visit, but that the medical provider may use their medical judgement to triage and determine the order in which and the urgency with which each medical complaint is addressed.** | The medical director and his deputy medical directors will appoint a work group to review policy requirements from the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write the policies to reflect that requirement. The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure. The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
|---|---|---|
| 33 | **A policy shall be written which requires an evaluation by a nurse or a medical provider within 48 hours of return from an offsite emergency visit. If the evaluation is performed by a nurse, the responsible medical provider will be contacted for notification and possible treatment plans. The contact with the medical provider will be documented in nursing notes.** | The medical director and his deputy medical directors will appoint a work group to review standards put forth from the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write the policies to reflect that requirement. The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure. The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
| 34 | **A policy shall be written outlining the requirement for daily monitoring of the negative pressure rooms while they are occupied and the weekly monitoring of the negative pressure rooms when they are not occupied. The policy will state that the monitoring information should be kept in a log and reported to the Infection Control coordinator on a monthly basis.** | The medical director and his deputy medical directors will appoint a work group to review standards put forth from the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write the policies to reflect that requirement. The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure. The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |

| 35 | **A policy shall be written outlining the requirement for all facilities to conduct and document safety and sanitation inspections of the medical areas monthly and to present the findings to the Infection Control coordinator. A Standard Operating Procedure will be written to outline the recommended best practice for complying to this policy.** | The medical director and his deputy medical directors will appoint a work group to review standards put forth from the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write the policies to reflect that requirement. The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure. The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
|---|---|---|
| 36 | **A policy shall be written which requires that dental notes use SOAP format to document urgent and emergent care** | The medical director and his deputy medical directors will appoint a work group to review standards put forth from the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write the policies to reflect that requirement. The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure. The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
| 37 | **A policy shall be written to outline the contents of the orientation materials that are given to patients at the time of intake. These materials will include instructions for accessing care at the facility (specifically dental care).** | The medical director and his deputy medical directors will appoint a work group to review standards put forth from the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write the policies to reflect that requirement. The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure. The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |

**Commented [A10]:** The Safety and Sanitation inspections review more than the medical areas, in fact at many sites these inspections, only briefly if at all, comment on medical spaces. All some elements of the S&S reports do identify potential infection control issues, most focus on inmate ( and staff) safety and sanitation deficits in housing unit and food preparation areas which impacts on the health of the institution. Confining the S&S reports to medical areas will not adequately protect the health and safety of the inmate population.

**Commented [A11]:** A separate policy to require dentists to write in the SOAP format is unusual. Documentation requirements should be in a medical record policy and should apply to all staff. Because IDOC has included as Implementation Tasks individual policies, almost all of which are restatements of the Consent Decree, the 46 policies in this Implementation Plan do not contain all the policies necessary for an adequate medical program and give a distorted picture of what policies should be developed. There is no organization with respect to these policies and it appears to be an attempt to limit the implementation plan to only the statements in the Consent Decree and not to how to operate an adequate medical program. In this sense IDOC is attempting to set limits on what an adequate medical program is by the limitations of what is stated in the Consent Decree. This policy task is a restatement of Consent Decree provision K.1. which states, "All dental personnel shall use the Subjective Objective Assessment Plan ("SOAP") format to document urgent and emergent care". This item can be a procedural element in a larger medical records policy. These types of tasks may give IDOC the satisfaction of feeling that only Consent Decree statements can be addressed by the Monitor, but it distorts the process of attempting to establish an adequate medical program which needs to be done to satisfy the Consent Decree.

| 38 | A policy shall be written which requires routine disinfection of dental examination areas. | The medical director and his deputy medical directors will appoint a work group to review  standards put forth from the NCCHC Standards for Health Services in Prison for guidance on this issue.  They will then write the policies to reflect that requirement.  The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure.  The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
| --- | --- | --- |
| 39 | A policy shall be written which requires radiology departments and any areas that perform radiologic procedures to practice proper radiology hygiene. | The medical director and his deputy medical directors will appoint a work group to review policy requirements from the NCCHC Standards for Health Services in Prison for guidance on this issue.  They will then write the policies to reflect that requirement.  The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure.  The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
| 40 | A policy shall be written which requires that dental care will be provided.  This will consist of comprehensive dental examinations and treatment plans, dental hygiene care and self-care instructions for maintaining a healthy oral cavity and will be documented in the patient's medical chart. | The medical director and his deputy medical directors will appoint a work group to review policy requirements from the NCCHC Standards for Health Services in Prison for guidance on this issue.  They will then write the policies to reflect that requirement.  The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure.  The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |

| | | |
|---|---|---|
| **41** | **A policy shall be written which outlines the allowed schedule for dental cleanings in IDOC. Cleanings should be available to patients at least once every 2 years, or as medically indicated.** | The medical director and his deputy medical directors will appoint a work group to review standards put forth from the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write the policies to reflect that requirement. The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure. The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
| **42** | **A policy shall be written which requires specific consent at the time of a procedure for any surgical or dental procedure performed in the IDOC clinics.** | The medical director and his deputy medical directors will appoint a work group to review standards put forth from the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write the policies to reflect the outcome that is necessary. The method that is recommended for complying with the policy will be outlined in a Standard Operating Procedure. These documents will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |
| **43** | **A policy shall be written requiring that all non-emergent dental extractions are preceded with diagnostic radiographs and that the reason for the extraction is documented in the medical record.** | The medical director and his deputy medical directors will appoint a work group to review standards put forth from the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write the policies to reflect that requirement. The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure. The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. |

| | | | |
|---|---|---|---|
| 44 | **A policy shall be written which lists the chart sections that must be available in all medical charts.** | The medical director and his deputy medical directors will appoint a work group to review standards put forth from the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write the policies to reflect that requirement. The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure. The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. | **Commented [A12]:** This policy is a significant regression from the prior commitment by IDOC for audits as stated in the 6/12/20 Implementation Plan of the IDOC which stated that 1) independent audits will occur (which is required by the Consent Decree); 2) an audit team of a physician mid-level provider, and 1-2 nurses would perform audits; and 3) OHS would collaborate with the Monitor to develop the audit instrument (which is required by the Consent Decree). None of these statements are reflected as tasks in the 4/20/22 Implementation Plan nor are they scheduled to occur as described in this policy and in tasks 48, 49, 51, 85, and 86. The Monitor learned of this regressive audit process when reading this Implementation Plan and in a discussion with the Consultant. There has been no input into this new audit process. The Consultant was asked what input she received from the Monitor and the Consultant stated she read the Consent Decree and part of the Monitor's 4th report. Counsel for the IDOC added that the Consultant received input by way of IDOC staff informing the Consultant of the Monitor's opinions. There has been no substantive input of the Monitor into the 4/20/22 Implementation Plan. Instead of having an SIU audit team perform the audit, the IDOC compliance unit will perform audits against policies and facility staff will perform the quality audits of their own work. **These are not independent auditors!** The proposed Implementation Plan is also not consistent with IDOC's narrative on implementation that accompanied the spreadsheet and which represents an earlier agreement with the Monitor.<br><br>The Monitor previously provided 19 steps for audits in the example Implementation Plan provided to the Court in January 2022. Almost none of these are part of the current IDOC tasks related to auditing. These include: 1)hiring a doctor, mid-level provider, and 2 nurses **to perform audits**; 2)development of procedures for how audits will be performed; 3) develop a document list necessary for auditing; 4) Develop a report format for audit reports; 5) develop data requirements used in audits; 6) establish methodologies for acquiring data; 7) develop with Monitor a methodology for record selection to be used in audits; 8) develop the audit instrument [Consent Decree requires the input of the Monitor]; 9) audit team would train with the Monitor on use of the instrument; 10) Co-joint audits with the Monitor; 11) develop methodology to integrate mortality review into audit reports; 12) develop methodology to incorporate performance and outcome dashboard and adverse event findings into audit reports; 13) develop methodology of reporting results to the OHS CQI committee; 14) develop additional data for vendor monitoring; 15) train facility HCUAs and leadership on expectations for audit visit; 16) develop methodology for statewide CQI to review audit reports and assign corrective actions to facilities; 17) develop methodology for tracking audit finding by facility; 18) develop methodology for referral to peer review; and 19) develop mechanism to provide oversight using audits and other quality measures. **None of these 19 tasks recommended by the Monitor** ... [6] |
| 45 | **A full set of healthcare policies, including the policies already mentioned, will be written and implemented.** | The medical director and his deputy medical directors will appoint a work group to review standards put forth from the NCCHC Standards for Health Services in Prison for guidance on the format and content of required medical policies. They will then write the policies to reflect the requirement being addressed. The method that is recommended for complying with the policy will be outlined in a Standard Operating Procedure. These documents will be brought to the work group for edits, discussion and approval and will then be formatted and added to the medical policies in the Administrative Directives. | |
| 46 | **A policy shall be written which requires compliance to IDOC policies by an entity which is contracted to be involved in the healthcare delivered in the IDOC facilities. The auditing schedule, audit tools, audit methodology and audit pool will be managed by the IDOC Compliance auditors.** | The medical director and his deputy medical directors will appoint a work group to review standards put forth from the NCCHC Standards for Health Services in Prison for guidance on this issue. They will then write the policies to reflect that requirement. The best, recommended process for complying with the policy will be outlined in a Standard Operating Procedure. The draft policy will be brought to the work group for approval and will then be formatted and added to the medical policies in the Administrative Directives. | |

16

| | | | |
|---|---|---|---|
| 47 | **Policies, with updates, when applicable, and Standard Operating Procedures, with updates, when applicable, will be written and distributed to inform facility staff of the policy and the recommended best practices for compliance to the policies . The Policies and Standard Operating Procedures will be posted where facility staff will have access to them for reference.** | Policies and SOPs will be posted in a location which can be accessed by facility staff (Intranet and in a binder at the nurses' station). The new or revised policies and SOPs will be shared with facility staff through announcement and distribution during monthly staff meetings, which are required per AD 01-02-101 on all facilities. These changes or updates will also be announced and shared at the monthly QI/QM meetings with the management team and the warden or the warden's proxy and through supervisory group emails and meetings for all levels and disciplines. | **Commented [A13]:** The Consent Decree requires, "development and full implementation of a set of health care performance and outcome measurements...and shall compile data to facilitate these measurements". In a call with the Consultant it was clear that the Consultant used the same meaning of a performance or outcome measure as the Monitor. The example used by the Consultant was the number of persons with protein in their urine who were on an ACE inhibitor or ARB. This is a recommended practice that is universally accepted and would be an acceptable outcome measure.<br><br>Yet this group of tasks (48-53) does not provide plans for development of a similar set of these performance and outcome measures nor does the plan show how the data to facilitate those measurements will be obtained. Instead, the tasks involve how audits will be performed, that a disease management guideline will be developed, and that guidelines for vaccination and cancer screening will be developed.  ... [7] |
| | **HEALTHCARE PERFORMANCE AND OUTCOME MEASURES** | | |
| 48 | **A Compliance team member with clinical correctional experience will be hired to participate in the general IDOC Compliance team activities, guiding the clinical significance of the audit process, including the indicators, methodology, thresholds and interpretation.** | Complete | **Commented [A14]:** The Monitor is uncertain how this measure addresses performance and outcome measures. It appears that this task is associated with the audit process. The audit process described here is managed by the IDOC compliance unit which is not an appropriate unit for conducting audits for the purposes of verifying compliance with the consent decree. The comment in task 46 gives the 20 tasks that the Monitor suggested for the audit process. The SIU audit team should perform the audits. If they are unwilling then another independent auditor should be found. It appears that in this task performance and  ... [8] |
| 49 | **OHS leadership and IDOC will develop a plan to ensure the compliance of the vendor and other healthcare staff to the policies and directives. These parties will meet to develop a plan for compliance audits and contract monitoring from a quality and outcomes perspective.** | Annually, the IDOC Compliance team will audit the healthcare activities of the vendor to ensure the performance of required facility healthcare activities The results of these audits should be reported and discussed at the monthly facility QI/QM meetings and at System Leadership Council meetings. | **Commented [A15]:** This task to ensure compliance with policies has no understandable relationship to performance and outcome measures. It would be reasonable in a vendor monitoring section. The Process for Accomplishing the Task column indicates that this is part of the audit process but the task does not state how performance and outcome questions are the performance measures but as an audit these would only be done annually and therefore would be ineffective performance and outcome measures.<br><br>**Commented [A16]:** As an audit measure this is inconsistent with requirements of the Consent Decree which require auditing to be by an independent or disinterested auditor. |
| 50 | **Data-driven Disease Management Guidelines(DMGs), which conform with national recommendations, will be developed and implemented. These guidelines will be shared with facility staff and will be posted where they can be readily referred to by facility staff.** | The Disease Management Guidelines will be developed and approved by a workgroup composed of OHS healthcare leadership and their designees. The resultant DMGs will be posted in a location which can be accessed by facility staff (Intranet and in a binder at the nurses' station). Copies of the DMG's will be made by the HCUA and a set given to all providers in the facilities. The new or revised DMGs will be shared with facility staff during monthly staff meetings, which are required per AD 01-02-101 in all facilities. These changes or updates will also be announced and shared at the monthly QI/QM meetings with the management team and the warden or the warden's proxy and through supervisory group emails and meetings for all levels and disciplines. | **Commented [A17]:** The Monitor is unsure how this related to performance and outcome measures. This task should be re-written for clarity. How will performance and outcome measures be developed? That said, if IDOC wants to develop disease management guidelines, they should be aware that writing disease management guidelines will take **considerable** time and IDOC does not have staff to do this reasonably well. To re-write national standards for even the common diseases will be difficult and will likely be inaccurate. Also, since national standards are updated regularly, IDOC would basically have to have several p  ... [9] |

17

| | | | |
|---|---|---|---|
| 51 | Healthcare quality outcomes on each facility will be audited.  The specific indicators, the method for sample selection and the data collection process will be determined by the Clinical Quality team.  The outcomes will be shared with IDOC Compliance , OHS leadership and the monitor. | Annually, the Clinical Quality team (currently SIU) will choose several clinical indicators that apply to prison healthcare.  They will share the indicators that are to be audited and the methodology for the audit with facility leadership. The Clinical Quality team will determine the threshold for achieving compliance with the indicator. The Clinical Quality team will design a standardized audit form for the facilities to use. The audit pool will be chosen by the Clinical Quality team.  The facility will audit the assigned patients in the pool against the indicators chosen by the Clinical Quality team, using the methodology outlined by the Clinical Quality team.  Each facility will share their results with the Clinical Quality team, who will share these results with IDOC Compliance and with OHS leadership.  If a facility is not achieving the threshold set by the Clinical Quality team, the facility leadership will need to write a Corrective Action Plan and to show improvement in the audit.  The results of these audits should be reported and discussed at the monthly facility QI/QM meetings and at the System Leadership Council meetings. | **Commented [A19]:** This makes the indicators an arbitrary and ad hoc decision.  It is unclear how this will occur. Performance and outcome measures should be standardized across all facilities and performed on a routine basis (e.g. monthly) so that facilities can compare performance and identify trends that accelerate improvement.

**Commented [A18]:** It isn't clear how this relates to performance and outcome measures.  It presumes that outcome measures already exist but there are no tasks to create performance or outcome measures.  This presumes that facilities will be audited against existing outcome measures (for which there is no task to develop them) by the compliance unit. **These clinical audits will be performed by facility staff.**  IDOC is reverting to their existing practice of having facility staff perform quality of care evaluations.  The staffing analysis has not allocated clinical staff to the facilities to perform quality outcome studies. Current staff are not qualified or capable to perform quality audits. Audit recommendations by the Monitor were provided in previous comments on task 46. IDOC previously planed to hire, via SIU, two audit teams each comprised of a physician, mid-level providers and nurses to perform these quality outcome studies. The current Implementation Plan has now abandoned this plan and has no tasks relevant to capturing clinical performance and quality outcome measures. |
| 52 | Guidelines for vaccinations and health maintenance (including cancer screening) will be developed and implemented.  The guidelines for immunizations and health maintenance will include the provision of an influenza vaccine for all patients who accept one, the provision of  immunizations recommended by national standards as indicated for patients with underlying chronic conditions or applicable demographics.  The Guidelines for Health Maintenance will include screening exams which are recommended by the USPSTF, the CDC or specialty societies. | The Guidelines  for vaccinations and health maintenance will be developed and approved  by a workgroup composed of OHS healthcare leadership and their designees.  The resultant guidelines will be posted in a location which can be accessed by facility staff  (Intranet and in a binder at the nurses' station).  Copies of the vaccine and health maintenance guidelines will be made by the HCUA and a set given to all providers on the facilities and to nursing staff who participate in ensuring that patients are getting vaccines and health maintenance per protocol.  The new or revised guidelines will be shared with facility staff during monthly staff meetings, which are required per AD 01-02-101 on all facilities.  These changes or updates will also be announced and shared at the monthly QI/QM meetings with the management team and the warden or the warden's proxy and through supervisory group emails and meetings for all levels and disciplines. | **Commented [A20]:** As written, it is not clear how or whether this is related to performance and outcome measures.  If the vaccination rate, consistent with CDC guidelines, is a performance measure, then IDOC fails to include a task for how they will accomplish this goal.

If this task is a task to appropriately vaccinate all inmates, then, in Agreement with IDOC, preventive screening guidelines should be from USPSTF and vaccination guidelines should be from CDC.  A procedure for vaccination and preventive screening using the USPSTF for preventive screening and CDC for vaccination should be developed and updated based on updates by USPSTF and CDC.  How this is to be used as a performance and outcome measure is not provided.

**Commented [A21R20]:** It is not necessary for IDOC to develop their own guidelines (see previous comments on task 50 about disease management guidelines).

**Commented [A22R20]:** In addition to the comments above, the parties responsible do not include the Infectious Disease Coordinator who should have primary responsibility for all guidance concerning immunizations.  The task also does not anticipate collaboration with IDPH as indicated in the narrative to the Implementation Plan. Immunization goals and objectives should be shared with IDPH and the agency may provide a source of funding for immunizations that are important to public health. Furthermore tasks relative to immunization should be included in the section on Infection Control in the Implementation plan. Add … [10] |

18

| # | | | Comments |
|---|---|---|---|
| 53 | **OHS leadership will review the healthcare vendor's policies, procedures, disease management guidelines and immunization and health maintenance guidelines to verify that they are in agreement with IDOC's approved healthcare policies and guidelines.  If discrepancies are found, the discrepancies should be resolved to favor following NCCHC guidelines for correctional healthcare and to follow the treatment guidelines put forth by federal authorities such as specialty societies, CDC or the US Preventive Services Task Force.** | OHS leadership will review the healthcare vendor's policies, procedures, disease management guidelines and immunization and health maintenance guidelines to verify that they are in agreement with IDOC's approved healthcare policies and guidelines.  If discrepancies are found, the discrepancies should be resolved to favor following NCCHC guidelines for correctional healthcare and to follow the treatment guidelines put forth by federal authorities such as specialty societies, CDC or the US Preventive Services Task Force. | **Commented [A23]:** This is unrelated to performance and outcome measures.  Furthermore, IDOC, by contract, should require the vendor to use IDOC's policies and therefore, this item is unnecessary.  Allowing the vendor to use its policies will only cause operational chaos, and will permit parallel policies for the same process which will confuse staff.<br><br>**Commented [A24R23]:** Tasks 2, 46 & 49 state that IDOC policy will require the healthcare vendor comply with IDOC healthcare policies therefore the vendor should have not have their own guidelines concerning these subject areas. This task is unnecessary.<br><br>**Commented [A25R23]:** IDOC would allow the vendor to have policies relative to human resources but the vendor should have none of their own policies concerning the delivery of healthcare in IDOC. |
| | **STAFFING AND LEADERSHIP** | | |
| | **EXECUTIVE STAFF** | | |
| 54 | **The Chief of Health Services shall be board certified in a specialty named in the decree.** | Complete | **Commented [A26R23]:** This should be in a section on monitoring the vendors.  It is assumed that this is deemed necessary to correct the internal practices of previous vendors that restricted access to care: including only single issue per sick call, denial of colostomy reversal because it was an elective procedure, performing cataract surgery on one only eye even if the other eye also had a significant cataract, seemingly requiring weight loss before CPA [... [11]] |
| 55 | **Hire executive leadership staff to oversee the Quality Team (SIU)** | SIU will post positions for staffing the leadership positions for the Quality team.  These positions will consist of providers, nurses, data analytics experts and staff with expertise in the accepted methods of process revision (e.g. Lean Six Sigma, PDSA).  When these positions are filled, this group will  monitor clinical outcomes on the facilities. This group will also conduct Mortality and Morbidity Reviews monthly and Peer Review, when indicated.  If a provider or nurse require peer review as a result of the findings of the Mortality and Morbidity review, the Quality group's Peer Review committees will meet to discuss the issue.  The determination of the Peer Review Committee will be communicated with the IDOC medical director for action.  If a systemic process problem is found in any of the clinical outcomes review groups mentioned previously, a root cause analysis will be done and process revision recommendations will be made.  These findings and recommendations will also be shared with the IDOC medical director for action. | **Commented [A27]:** The Monitor has made multiple staffing recommendations that have not been acted or have not been implemented and should be included in tas [... [12]]<br><br>**Commented [A28]:** The implementation plan does not address executive leadership positions except those specifically called out in the Consent Decree. To date [... [13]]<br><br>**Commented [A29]:** This restatement of the Consent Decree is not a task and is unnecessary.<br><br>**Commented [A30]:** This is a significant regression.  IDOC committed at least a year earlier to have this group actually perform the audits.  Indeed, in the narrative accomp [... [14]]<br><br>**Commented [A31R30]:** It is defined in the Plan how the SIU Quality team will monitor clinical outcomes on the facilities. Although previously communicated there is [... [15]]<br><br>**Commented [A32R30]:** The Implementation Plan should note that the "findings and recommendations" will also be shared with Monitor. To date the Monitor has been r [... [16]] |
| 56 | **IDOC shall create and fill two state-employed Deputy Chiefs of Health Services positions reporting to the Chief of Health Services** | Complete | **Commented [A33]:** This is simply a restatement of the Consent Decree? What is accomplished by these two positions? The expectations of what will be achieved [... [17]] |
| 57 | **Hire a coordinator to oversee the Infection Control program.** | Complete | **Commented [A36]:** This is not complete as this position is filled by a person with another position.<br><br>**Commented [A34]:** This position is filled with an unqualified person.  This person is a Health Care Unit Administrator filling in as an Infection Control Coordi [... [18]]<br><br>**Commented [A35R34]:** This Implementation Plan does provide details of the scope on scope or staffing of a systemwide Infection Control Program. |
| | **FACILITY STAFF** | | |

19

| | | | |
|---|---|---|---|
| 58 | **All physicians providing direct care in the IDOC shall possess either an MD or DO degree and be either board certified or board eligible in a named specialty (specified in the decree). If the recruitment effort to hire physicians with these requirements is reasonable, yet ineffective, IDOC may hire physicians without those qualifications, if it is determined that they can provide high-quality care. Physician candidates who do not meet the credentialing requirements mentioned above shall be presented to the Monitor. The Monitor will screen the presented candidates and will determine whether the candidates are qualified. The Monitor will not unreasonably withhold approval of the candidates.** | IDOC and the vendor will state in all job postings for physicians that possession of an MD or DO degree and active state licensure are required for employment within the system. The job descriptions will also state that board certification or eligibility in a primary care specialty are ideal, but not required. If qualified applicants without board certification or eligibility are screened and deemed capable of providing high-quality healthcare in IDOC facilities, they will be presented to the monitor for approval. The monitor will not unreasonably withhold approval for candidates who are capable of providing high-quality healthcare in IDOC facilities. | **Commented [A37]:** The four tasks 58-61 are re-statements of the Consent Decree (almost verbatim) and are therefore useless tasks. Currently, IDOC has 9-10 Medical Director vacancies and the vendor is and has been unable for years to hire qualified physicians. **IDOC has no tasks related to hiring qualified physicians.** In the 6/12/20 narrative Implementation Plan, IDOC stated that they had a plan to hire four SIU physicians to staff four facilities. This was aborted and currently IDOC has no plans for how to hire qualified physicians despite a 33% vacancy rate in medical directors. IDOC has regressed since the beginning of the Consent Decree and over three years has never developed a plan to hire qualified physicians. **IDOC must develop a task to hire qualified physicians instead of restating the Consent Decree requirements.**<br><br>**Commented [A38R37]:** III. A. 5. states that Defendants may present for the Monitor's review new physicians who do not meet the credentialing criteria, only after demonstrating that they were unable to find qualified physicians despite a professionally reasonable recruitment effort. The Implementation Plan omits the important requirement that it must demonstrate a professionally reasonable recruitment effort before unqualified candidates can be presented to the Monitor for consideration. The Implementation Plan includes no tasks that define a recruitment plan for physicians much less criteria for one that is professionally reasonable. |
| 59 | **If physicians currently employed by IDOC do not have these qualifications, the monitor and the IDOC medical director will determine if the quality of care they provide is acceptable.** | All physicians currently employed by IDOC will be screened for having a medical degree, and active license with the state board and for having either board certification or board eligibility in a primary care specialty. Those that do not possess all three will be reviewed by the OHS medical director and the monitor and a determination will be made as to whether the physician is providing an acceptable level of care. | **Commented [A39]:** The Implementation Plan includes no tasks for the OHS medical director and monitor to review current physicians without qualifications.<br><br>**Commented [A40]:** While the Consent Decree does state that that the Monitor will screen candidates who do not meet credentialing criteria to determine if they are qualified to provide medical care and if so, to recommend to IDOC their hiring. This task vastly minimizes the expectations of IDOC to conduct a professionally reasonable recruitment effort and demonstrate that despite this effort they could not recruit qualified physicians. Only when the IDOC demonstrates this and recruits candidates for consideration is the Monitor required to do anything. Tasks need to be added to the Implementation Plan that describe how IDOC will fulfill the requirements of III. A. 5 and 6. |
| 60 | **The Monitor will present qualified candidates to the IDOC for hiring approval.** | The monitor will present candidates for hiring. | **Commented [A41R40]:** This task needs to needs to rewritten inserting "non-credentialed" after qualified |
| 61 | **If a current healthcare provider's performance is questionable or potentially problematic, IDOC will notify the vendor that the provider may not return to service within IDOC until the deficit has been addressed. If the deficit cannot be addressed with education, the provider will be disciplined or terminated.** | The OHS medical director, upon learning of a problem with the healthcare delivery, decisions or behavior of a current healthcare provider, will immediately notify the vendor leadership of the need for investigation and for disallowing that provider to continue to work within IDOC facilities until further notice. Once an investigation of the incident has occurred, the OHS medical director will determine whether the issue can be addressed or has been addressed and make a decision about remedy, return to work or termination. | **Commented [A42]:** This is a very passive approach to monitoring healthcare providers' performance. How is it that the OHS medical director will learn of problem performance? The methods of identifying problem performance need to be stated as tasks in the Implementation Plan. These tasks also relate to carrying out II.B.3 of the Consent Decree.<br><br>**Commented [A43R42]:** The Monitor needed informed about disciplinary actions and terminations of providers. This is not currently done nor is stated in the Implementation Plan. |

20

| 62 | All positions outlined in the Staffing Analysis will be posted, if not already filled. | IDOC HR will post all of the unfilled positions outlined in the Staffing Analysis. As applicants are received, they will be interviewed and hired, if it is determined that they are qualified. Recruitment efforts will continue until all positions are filled. |
| --- | --- | --- |
| | **STAFFING ANALYSIS** | |
| 63 | **Complete Initial Staffing Analysis** | IDOC agrees to hire according to the Staffing Analysis. Changes may be necessary as new programs are brought on line or when an EHR vendor is identified. |
| | **HIRING PROCESS** | |
| 64 | IDOC will hire a consultant to support the Implementation plan tasks. | A consultant will be hired to provide guidance and support on the Implementation of an EHR and the other items in the Implementation plan. Additional staff to support the EHR implementation will be determined when an EHR vendor is selected. (see "EHR IMPLEMENTATION and MAINTENANCE"). Additional staff needed for operationalizing the implementation plan have been hired in Quality and a dietician has been hired. |
| 65 | OHS will meet routinely with IDOC Human resources to review vacancies for health care positions and progress on hiring of health care staff. OHS and human resources staff will identify barriers to hiring into the vacant positions and will strategize to remove the barriers to hiring staff. | OHS leadership is meeting with IDOC HR every two weeks or as needed to discuss the status of the posted positions for the medical department and to discuss barriers to hiring. |
| 66 | OHS will meet routinely with vendor to review vacancies for health care positions and progress on hiring of health care contractual staff. OHS and the vendor will identify barriers to hiring into the vacant positions and will strategize to remove the barriers to hiring staff. | OHS leadership is meeting with the healthcare vendor monthly or as needed to discuss the status of the posted positions for the medical department and to discuss barriers to hiring. |
| 67 | Develop partnerships with universities to augment staff outlined in the staffing analysis | OHS has developed partnerships with universities in several areas of specialty clinic care (HCV, HIV, Gender Identity Disorder), Nutrition and also in the delivery and oversight of Clinical Quality (audits, Mortality and Morbidity and Peer Review) and the implementation of process revision for the purpose of enhancing quality and error-proofing the care that is delivered on the IDOC facilities. |
| , | **CREATE ORGANIZATIONAL CHART** | |

Comments:
- **[A44]:** Though the task is to post all positions the percent completion of this task noted in this Implementation Plan shows that only 50% have been posted. This misinformation is business-as-usual. IDOC needs to post all positions.
- **[A45R44]:** The 3/24/2022 Staffing Update provided to the Monitor by IDOC indicated that all recommended positions have now been moved into Allocated/posted positions. The 50% posting percentage in this Implementation Plan is not in alignment with the 3/24/22 Staffing Update. This needs to clarified
- **[A46]:** Over three years, IDOC has mostly ignored the Monitor's recommendation on staffing but should consider them. A key recommendation is to perform a workload analysis to develop an appropriate hiring plan which IDOC ignores. The Monitor gives additional staffing recommendations that have been ignored in task 67 and the Monitor suggests that IDOC enact these recommendations.
- **[A47R46]:** In addition the narrative to the Implementation Plan states that the staffing analysis may be revised based upon the impact of revised policy and EMR implementation. However the Implementation Plan [19]
- **[A48R46]:** The Implementation Plan does not address many of the Monitor's recommendations (some have been noted in previous comments) including increased # of physical therapists, physical therapy assistants, [20]
- **[A49]:** IDOC has hired a consultant. The Monitor has been told that Dr. Leonardson will be the project manager for the implementation plan and for the electronic medical record. When asked specifically [21]
- **[A50]:** No evidence has been provided by IDOC that additional staff have been hired in Quality to operationalize the implementation plan and no information has been provided to indicate the responsibilities of [22]
- **[A51]:** IDOC must include CMS in this mix and include evaluating salaries and benefits as a source of the barrier to hiring. With respect to physicians, IDOC must obtain a vendor who can hire qualified physicians or [23]
- **[A52R51]:** Other barriers include lengthy timeframes in the hiring process which result in qualified candidates being hired by competing employers. Tasks for recruitment with specific activities, timelines for [24]
- **[A53]:** Same comments are made here as in task 65.
- **[A54]:** This is not an actionable task. Augmenting staff is a wider problem than indicated here. In July of 2020 in the Monitor's 2nd Report the Monitor recommended hiring two technicians to maintain ne [25]
- **[A55R54]:** The Monitor continues to strongly recommend that IDOC develop affiliations/partnerships with Academic medical centers or Universities to facilitate the recruitment, hiring, and [26]

| 68 | Create draft IDOC/OHS organizational chart<br>The organizational chart will clarify the reporting and supervisory relationship between the Office of Health Services leadership to the facility Health Care Unit Administrator. | The reporting structure between OHS and the Office of Health Services leadership will be documented using a tree format. (create a chart) |
|---|---|---|
| 69 | Create OHS to vendor organizational chart<br>The organizational chart will illustrate the relationship between the Office of Health Services leadership and vendor staff | A staff member that is familiar with the reporting structure between OHS and the vendor (and the vendor's staff) will create a document that illustrates the reporting structure using a tree format. |
| | **PHYSICAL PLANT AND EQUIPMENT AND SANITATION** | |
| | **ASSESS, REPAIR AND BUILD** | |
| 70 | **Create a functional space for effective healthcare delivery within IDOC now and in the future.** | Consult with appropriate professionals to assess possible renovations to healthcare delivery areas. |
| | | A focus group of medical and security leadership will convene to discuss security, operational and clinical needs for provision of patient care in IDOC, current and future. The group should determine what programs will be needed and determine which facilities may house these programs or facilities. Determine the requirements of each program from a staffing, physical plant and equipment standpoint. |
| | | The consultant hired as the result of this task would visit and analyze the current spaces where healthcare is delivered and determine what (if any) modifications are needed to provide a safe and medically appropriate healthcare setting. |
| | | Develop an analysis of the physical status of existing health care facilities and other clinical spaces. |
| | | Develop structural space requirements for each facility, in order to provide sufficient private space for current and future patient care. Include the future plans for the projected number of clinical staff when creating these requirements. |

**Commented [A56]:** This remains a disagreement between IDOC and the Monitor. The Monitor recommends that IDOC establish an organization where the Medical Director is authorized to supervise and manage the medical program in a clinically appropriate manner. This is still not occurring. By allowing Wardens to supervise, hire, and fire HCUAs, custody has an effect on health care operations that is detrimental. All health care employees need to be under the control of the health authority. IDOC needs to create an organizational chart that supports that principle.

**Commented [A57R56]:** There is concern by the Monitor that the absence of any quality measures to track access to care barriers that include failure to move patients to onsite or offsite care, the impact of lockdowns on access to care, and inmate injuries may in no small part may be the ... [27]

**Commented [A58]:** The Monitor has concerns about who the IDOC will hire specifically that the consultant will not be versed in health care construction, design, planning, ... [28]

**Commented [A59R58]:** Typically correctional facility planning includes a team of experts, rather than a single individual. It is especially important that the consult ... [29]

**Commented [A60R58]:** Given that IDOC's decision to perform systemwide assessment of the health care delivery space is a once-in-a-generation opportunity. It must ... [30]

**Commented [A61]:** This group includes no expert in geriatrics or care of the elderly. Task 93 utilizes existing staff **at the facilities** to determine needs of this popu ... [31]

**Commented [A62R61]:** The chart reviews completed by the Monitor provide ample evidence that an internal group of IDOC staff do not have the knowledge or experien ... [32]

**Commented [A63]:** Housing for persons whose medical needs require specialized housing must be included. There is a dire need for appropriate skilled nursing and sup ... [33]

**Commented [A64]:** Currently, Dixon is the only facility designated for elderly housing. Yet it is not designed for that purpose. There is no procedure for appropriatel ... [34]

**Commented [A65]:** The Monitor has not evaluated every facility. However, some facilities need new health care units; the Lincoln facility comes to mind. Others, inc ... [35]

**Commented [A66]:** This must include a report that the Monitor can review. The Monitor has concerns about this being a transparent process.

**Commented [A67R66]:** The monitor has repeatedly recommended to IDOC that the physical plant evaluation includes a much needed assessment of safety and he ... [36]

**Commented [A68]:** This again fails to address skilled nursing and housing for the disabled and for persons with dementia or memory or cognitive issues.

**Commented [A69R68]:** The focus of this task appears to be the sufficiency of privacy for patient care. IDOC facilities do lack sufficient privacy but that is not all. Physical f ... [37]

| | | | |
|---|---|---|---|
| | | Create a renovation plan to address the differences between the existing space and functionality which is available and the future structural and functional requirements for each facility, in order to provide a sufficient environment for provision of patient care in IDOC.  Special consideration should be given to providing privacy for patient care, while still allowing custody to protect staff and patients.  The plan will include the repairs which will be needed to ensure the health and safety of the patients housed in IDOC facilities. | **Commented [A70]:** Again the focus is on vital health and safety measures which are broader than those involving provision of patient care. |
| | | | **Commented [A71]:** Some new building is likely to be necessary.  IDOC has decided the outcome before a qualified analysis is performed. |
| | | Obtain budgetary approval to implement the recommendations for renovations. | |
| | | Work with appropriate state partners to the implement recommendations for renovations. | |
| | **EQUIP PATIENT CARE AREAS** | | **Commented [A72]:** The IDOC has 6 tasks (tasks 71-76) for identifying equipment when a couple tasks would suffice. To identify current deficiencies in equipment, the consultant hired to evaluate clinical space should be an expert in medical construction, renovation, and equipment.  This person should include a survey of **all** clinical areas for fixed and portable equipment needs and this task should be incorporated into task 70 and must be performed by a qualified professional.   This should include all clinical areas including dental.  The aim must be to bring clinical space up to contemporary standards. |
| 71 | **Develop a standardized emergency response bag with a list of contents.** | Create a policy that lists the  standardized contents of the emergency response bag and the frequency required for inventory of the emergency response bag. | |
| | | Distribute the policy to facility staff for review. | **Commented [A73R72]:** The tasks are all identical except the equipment purpose differs. These should be combined and the subjects listed a-z etc. This repetitiveness makes the Implementation Plan look longer and more substantive than it really is. |
| | | Determine frequency of a facility assessment for functionality and repair status of the emergency response bag and require a log on each facility to document inspection. | |
| | | Assess which equipment is present and functional and what is needed to fully equip the emergency response bags. | |
| | | Obtain the funding for the necessary equipment from fiscal and order and install the equipment. | |
| 72 | **Develop a standardized emergency response area equipment list.** | Create a policy that ensures each facility has standard emergency medical equipment and that the equipment is listed. | |
| | | Distribute the policy to facility staff for review. | |
| | | Determine frequency of a unit assessment for functionality and repair status of the emergency response equipment and require a log on each facility to document inspection. | |

| | | |
|---|---|---|
| | | Assess which equipment is present and functional and what is needed to fully equip the emergency response areas. |
| | | Obtain the funding for the necessary equipment from fiscal and order and install the equipment. |
| 73 | **Develop a standardized list of equipment to be available in every health care facility** | Create a policy that ensures each facility's healthcare unit has standard medical equipment and that the equipment is listed. |
| | | Distribute the policy to facility staff for review. |
| | | Determine frequency of a facility assessment for functionality and repair status of the healthcare facility's equipment and require a log on each facility to document inspection. |
| | | Assess which equipment is present and functional and what is needed to fully equip the healthcare facility. |
| | | Obtain the funding for the necessary equipment from fiscal and order and install the equipment. |
| 74 | **Develop a standardized list of equipment to be available in every infirmary** | Create a policy that ensures each infirmary has standard medical equipment and that the equipment is listed. |
| | | Distribute the policy to facility staff for review. |
| | | Determine frequency of a facility assessment for functionality and repair status of the infirmary equipment and require a log on each facility to document inspection. |
| | | Assess which equipment is present and functional and what is needed to fully equip the infirmary. |
| | | Obtain the funding for the necessary equipment from fiscal and order and install the equipment. |
| 75 | **Develop a standardized list of equipment to be available in every dental operatory.** | Create a policy that ensures each dental operatory has standard medical equipment and that the equipment is listed. |

**Commented [A74]:** As with the comment for this section above, tasks 71-76 can be two tasks. The first task is to identify need by having a professional evaluator of health care space and equipment perform a survey, identify deficiency, and produce recommendations necessary to bring physical space up to contemporary clinical standards. The second task is listing standardized equipment and requiring that each facility maintain the list. All equipment on the list needs to be serviced including calibration on an appropriate basis. Typically, this is annually. The facility needs to track the date of last servicing or calibration and keep a record of servicing and calibration. Equipment that is broken or defective must be replaced. This includes dental equipment. Reports of that servicing, calibration, and needed repairs needs to be reported to the quality program on an annual basis. This must be monitored by the quality program and should be included in annual independent audits of the program.

24

| | | Create a policy which outlines the requirement for standardized radiation hygiene in dental areas, which is in accordance to national guidelines | |
|---|---|---|---|
| | | Distribute the policy to facility staff for review. | |
| | | Determine frequency of a facility assessment for functionality and repair status of the dental operatory equipment and require a log on each facility to document inspection. | **Commented [A75]:** See the previous comment in relation to task 73 about an annual inventory and evaluation of equipment functionality. In addition III.K.13 of the consent decree stipulates that dental equipment is to be evaluated annually, therefore IDOC should not make this determination unless evaluation more frequently than annually is necessary. |
| | | Assess which equipment is present and functional and what is needed to fully equip the infirmary. | |
| | | Obtain the funding for the necessary equipment from fiscal and order and install the equipment. | |
| 76 | Develop a standardized list of equipment to be available in every radiology area. | Create a policy which outlines the requirement for standardized radiation hygiene in radiology procedure areas, which is in accordance to national guidelines | **Commented [A76]:** All three tasks in this section are re-statements of the Consent decree without any task even describing how the restatement would be implemented. 57 of 105 tasks in this plan do the same. Most are policy tasks. IDOC has devoted considerable space in the Implementation Plan merely restating the Consent Decree typically without even giving direction on how the restatement will be accomplished. While developing sanitation methods is critical for a health care operation, performing these three tasks alone would be insufficient. IDOC must develop reasonable tasks to ensure that health care units are clean and regularly sanitized consistent with a contemporary standard for health units. This is not accomplished in the Implementation Plan tasks. |
| | | Create a policy that ensures each radiologic procedure area has standard medical equipment and that the equipment is listed. | |
| | | Distribute the policy to facility staff for review. | |
| | | Determine frequency of a facility assessment for functionality and repair status of the radiologic procedure area equipment and require a log on each facility to document inspection. | **Commented [A77R76]:** In addition to the comments above there is a great deal of confusion among responsible parties for sanitation and infection control. Two of the sanitation tasks identify requirements and monitoring by the Infection Control Coordinator yet the responsible parties identified in the Implementation Plan are limited to the IDOC Environmental Services Coordinator. Both of the Infection Control tasks identify the responsible party as the on-site facility engineers via the Environmental Services Coordinator and have no tasks for which the Infectious Disease Coordinator is responsible. This organizational confusion should be resolved via tasks in the Implementation Plan to define the role and program responsibilities of Environmental Services and Infection Control personnel. It is certain that there will be some overlap in responsibilities and the two programs should have a collaborative relationship however at the present time neither is defined organizationally or in policy. |
| | | Assess which equipment is present and functional and what is needed to fully equip the infirmary. | |
| | | Obtain the funding for the necessary equipment from fiscal and order and install the equipment. | |
| | **SANITATION** | | |
| 77 | All infirmaries shall have sufficient and properly sanitized bedding and linens. | IDOC leadership will ensure that the standards for laundry services on the facilities are being followed. | |

| 78 | Handwashing or hand sanitation facilities shall be available in all patient-care areas | Functioning hand sanitation in all clinical care areas will be part of the monthly safety and sanitation inspections, which are required and are monitored by the Infection Control coordinator. |
|----|----|----|
| 79 | Examination tables shall have a barrier that can be changed between patients. | Ensuring that examination tables are in good repair and have a barrier that can be replaced between patients will be part of the monthly safety and sanitation inspections, which are required and are monitored by the Infection Control coordinator. |
| | **INFECTION CONTROL** | |
| 80 | The facility staff will monitor the logs presented from the facilities monthly on the negative-pressure isolation rooms. If the rooms are not functioning properly, the coordinator of Infection Control will assist the facility in getting the room repaired. | The Coordinator of Infection Control will create a standardized inspection form for each facility to use in their inspections of the negative-pressure isolation rooms. A staff-member will be assigned at each facility to complete this inspection and to document the inspection weekly (daily when the room is occupied) on the form. The forms will be submitted to the Coordinator of Infection Control for review and archiving. If the negative-pressure isolation rooms are not functioning properly, a repair of the room will be initiated by submission of a facility workorder to the maintenance department. |
| 81 | The facility staff will collect and review the monthly safety and sanitation inspections of the medical areas, which are turned in from every facility monthly. If they show a deficiency, the deficiency will be addressed. | A checklist of expectations for safety and sanitation at the facility level has been created and is available to facility healthcare staff. A facility staff-member will be assigned to complete this inspection and to document the inspection monthly on the form. The forms will be submitted to the Infection Control leadership for inspection and archiving. If there are deficiencies in the safety and sanitation at the inspected facilities, the deficiency will be addressed by the facility administration submitting a work order for the repair to the maintenance department of that facility. |
| | **QUALITY IMPROVEMENT AND COMPLIANCE PLAN** | |

**Commented [A78]:** These 2 tasks also merely restate the Consent Decree as if Infection Control in a correctional health program consists only of monitoring negative pressure rooms and reviewing safety and sanitation reports. When the Consultant was asked why there were no tasks in the Implementation Plan to address implementation of an Infection Control Program, the Consultant replied that the an infection control program is not mentioned in the Consent Decree so there is no need to place one in the Implementation Plan.

IDOC has had outbreaks of histoplasmosis, scabies, and recently COVID for which they were eminently unprepared. No meaningful or accurate surveillance occurs as evidenced by data produced in the CQI meeting minutes. An **essential** NCCHC standard is Infectious Disease Prevention and Control which states, "There is a **comprehensive** institutional program that includes surveillance, prevention and control of communicable disease". Tasks 80 and 81 fail to ensure that a comprehensive infection control program is present. As tasks to create a comprehensive infection control program, these two tasks are failures. The Monitor has recommended and continues to recommend to IDOC 7 tasks that include: 1) hiring an infectious disease physician to act as a full time advisor and manager of the infection control program; 2) establish a reasonable statewide infection control coordinator position description; 3) establish **facility** infection control position description and hire or designate infection control coordinators for each facility; 4) develop an infection control manual that develops the operational aspects of the infection con... [38]

**Commented [A79]:** This is an area where there has been dramatic regression over the past three years. The performance and outcome section above has 6 tasks but it is not clear how they are associated with performance and outcome measures. The quality section has two items (tasks 83 and 84) that are restatements of existing processes that are ineffective and have no tasks that demonstrate how these will be different or result in improvements. Four tasks (85, 86, 87, and 89) describe an existing process as if it is a new program albeit with minor tweaks. These tasks do not positively contribute to advancement of the quality program. There are multiple processes tied to quality improvement in the Consent Decree, including: quality improvement activity, audits, performance and outcome measures, adverse event reporting, patient safety, contract monitoring, and mortality review which are inadequately addressed in this plan.

**Commented [A80R79]:** The Monitor's example implementation plan provided to the Court in January 2022 included 22 recommended tasks for a quality improvement plan. It appears that most of the Monitor's suggestions for quality have been ignored by IDOC in the development of the 4/20/22 Implementation Plan. Specific suggestions are made for tasks to be added to the Implementation Plan in subsequent comments on this section based upon earlier recommendations.

26

| 82 | **A systems leadership council will be formed to meet quarterly and review the outcomes of the process audits, quality audits and to discuss a possible remedy for facilities that are not meeting thresholds.** | A council will be formed to meet quarterly to discuss compliance to process requirements and to discuss quality outcomes. Facilities that are not meeting thresholds should be identified and the reasons for this discussed. Staffing vacancies should be documented . This council should consist of the IDOC medical director and his/her deputies, The Director of Nursing, the Dental Director, the Compliance/Audit staff with IDOC, the Quality Group (SIU), Regional administration, nursing and dental. |
| --- | --- | --- |
| 83 | **Create a process to report med errors and medical incidents** | A centralized document that is easily retrievable by facility staff will be made available for reporting incidents such as falls and medication errors. The document will be routed to the nursing director for review and action, if needed, including verifying that an alert has been placed on or in a patient's chart for falls. If an institutional process problem is identified, it should be reported to the Clinical Quality group for consideration of revising the process. When an EHR is available, the document can be available as a desktop application and electronically routed to the nursing director and/or the quality group. |

**Commented [A81]:** This broad statement is the only task describing responsibilities of this statewide committee. It presumes what this council will do but specific tasks should be created to define the council's responsibilities. 1) The members are not defined. 2) IDOC does not create any task to develop procedures for each of the various quality programs (audits, performance and outcome measures, adverse events, and mortality reviews) and how this committee integrates these into the quality program. 3) There is no task to define how this council is organized including meetings, minutes, etc. 4) The organization of this council is unclear. A policy should be developed to delineate members, who is the leader of this council, how the council integrates the various functions of the quality program and who maintains minutes, etc. 5) There is no task to describe how this council develops process and program analysis skills at the facility level. 6) There is no task for this council or anyone else to develop training of facility staff in CQI methodology. 7) A task should be in place describing how this council communicates decisions internally and to the 30 facilities.

**Commented [A82]:** This appears to be no different that the processes IDOC currently has in place to file incident reports and to report med errors. Nothing in this task changes current practice which is ineffective in managing errors and incidents. The Consent Decree requires a preventable adverse event reporting system which is not described in any tasks. The Monitor suggests 9 tasks related to adverse event reporting including: 1) develop a procedure for adverse event reporting; 2) develop or purchase adverse event reporting software; 3) hire a process analyst to manage incident reporting and organize reports into actionable tasks; 4) assign a patient safety committee to categorize adverse event reports and prioritize corrective actions, make assignments for process improvement, take action on root cause analysis, and follow up on corrective actions; 5) create a registry of adverse events and categorize them to study their frequency; 6) develop standardized definitions of sentinel and adverse events for purposes of reporting; 7) develop procedures and requirements for how each facility CQI program reports and reviews adverse events; 8) develop a methodology to analyze adverse event reports and to determine whether a systemic problem is present and to take action if a systemic problem is present; and 9) develop a methodology for referral to peer review when indicated. 10) The Consent Decree also requires training on patient safety but there is no associated task for this requirement. Patient safety is associated with adverse event reporting. An additional task might be to integrate patient safety into the adverse event and medication error reporting system. When adverse events are organized and prioritized, those groups of events that result in risk to patient safety should result in the process analyst and clinical patient safety committee developing patient safety measures and train staff on how to enact these. A task should be developed to do this. 11) IDOC should develop a methodology to take patient safety issues and develop alerts to staff on how to avoid the ... [39]

27

| 84 | Each facility, or cluster of facilities, will conduct QI/QM meetings monthly. | The management team of each facility or cluster of facilities and the warden or his designee should meet monthly as the QI/QM committee to discuss quality items that are determined by the IDOC Healthcare Compliance group and the Clinical Quality group. Minutes should be taken at these meetings, include the attendance, and the minutes should be submitted to IDOC Healthcare Compliance and to the OHS Medical Director. IDOC Healthcare Compliance should design a standardized template for these meetings and share it with all of the QI/QM committees for their use. Items to be discussed should include the results of process audits, no-show rates, a review of any process problems found while conducting a death summary, infection rates (if they are facility-related), incident reports that were filed and the results of quality audits. When a process is identified by facility staff as being inefficient or causing unnecessary risk to patient outcomes, that process should be brought to the attention of the Clinical Quality group for possible process revision. |
| --- | --- | --- |
| 85 | A process for ensuring compliance to accepted standards of prison healthcare, which are outlined in policy and comply with NCCHC standards will be established. | Facility process audits will be conducted as assigned by IDOC Compliance. These audits will be used to monitor compliance to prison healthcare requirements, outlined in policy, such as Access to Care and Intake Screening. The facilities will share their findings at monthly QI/QM meetings. The IDOC Compliance audits will be submitted to IDOC Compliance and to OHS leadership. If the predetermined threshold for each audit is not met, Corrective Action Plans (CAP) should be requested and the facility monitored closely |

**Commented [A83]:** This is a statement of what already occurs albeit ineffectively. Nothing new is provided in the task or the process that is different than what currently exists which is failing to provide effective quality improvement. In addition to stating that meetings will occur monthly with minutes, the IDOC should have tasks to include: 1) develop a procedure for this committee including how the coordinator is appointed, minutes, and members of the committee; 2) there should be a task to complete a position description for a full-time *facility CQI coordinator* and to define requirements for training of this persons and position requirements for this position; 3) a task should define the structure of the facility CQI program and requirements which can be defined in the CQI policy; 4) each facility should develop a performance improvement plan which includes actions taken to correct audit, mortality review, adverse event reporting and performance and outcome measure findings at their facility; 5) there should be a task to develop methodology for the facility to communicate the performance improvement plan to staff and to engage staff; 6) IDOC should include a task to develop a methodology to communicate information between facility CQI programs and the statewide council; 7) a task for training facility staff on CQI needs to be developed; 8) a process for providing assistance and training to facility personnel engaged in CQI projects should be developed which should include how the facility can obtain appropriate data for their CQI work; and 9) a task to develop procedures for how facilities can develop institutional policies that differ from statewide policies.

**Commented [A84R83]:** The items to be discussed at monthly QI/QM meetings should not be limited to those identified in this task. There are other key items that should be reported and discussed including access to care backlogs, offering and administration of immunizations, selected age and risk-based routine health maintenance screenings, corrective action plans for uncontrolled chronic illnesses, and number and percentage of HCV patients that are being treated. Corrective action initiated to address deficiencies should be reported with follow-up until deficiency or lack of compliance is corrected.
.

**Commented [A85]:** This is no difference from what currently occurs via the compliance unit of IDOC. This will not be independent and will not effectively audit the medical programs and is therefore inconsistent with the Consent Decree. IDOC should see task 46 for the Monitor's recommendations on the audit function required by the Consent Decree.

| 86 | **A process for ensuring that an appropriate level of care is being provided to the patients in IDOC will be established.** | DMGs will be developed, implemented and shared with facility staff, who will be instructed to begin using those guidelines immediately. Annually, the Clinical Quality team (currently managed by SIU) will choose clinical quality audit indicators that apply to prison healthcare. thresholds for an acceptable achievement of each measure will be chosen. The list of indicators, the methodology of the audits and the audit pool will be shared with each facility by the Clinical Quality group. Each facility will perform the audit on the pool of patients specified by the Clinical Quality team. The facility will submit their results to the Clinical Quality team, who will compile the findings in a report. The report of the findings will be shared with IDOC Compliance and with OHS leadership. If a unit does not meet the predetermined threshold, the unit will be required to submit a Corrective Action Plan (CAP) and will need to be monitored closely for improvement. |
| --- | --- | --- |
| 87 | **Facility medical staff will review and summarize the care for all patients who die while in custody of IDOC within 2 weeks of the patient's death.** | When a facility is notified that a patient that had been in their care is deceased, a review of the events leading up to the death will be conducted by a medical provider and a death summary will be completed within 2 weeks. If possible, the autopsy report should be reviewed by the medical provider and included with the summary. The summary of findings should be submitted to the Clinical Quality group for review by a team member and discussion at the Mortality and Morbidity committee meeting. If the autopsy is not available within 2 weeks, the entity completing the autopsy should be contacted and the autopsy report requested by the facility administrator. |

**Commented [A86]:** This process is contrary to statements in the narrative which assert that SIU will perform the audits. The process described here is no different than what is currently being done which is ineffective and fails to identify any problems. This also does not ensure an independent audit process. As a result, the program has not progressed and has regressed.

**Commented [A87]:** This is identical to what currently occurs and doesn't need to be stated as if it is a new task. Facility medical directors write a death summary which fails to identify problems and fails to accurately report the circumstances surrounding the death. This current process is ineffective except to report the death.

**Commented [A88R87]:** The Monitor has reviewed numerous death summaries prepared by facility medical providers. There is wide variation in the quality and content of the death summaries. The facility death summaries commonly written by the deceased patient's primary provider almost never identify opportunities for improvement. The Implementation Plan needs to add a subtask to train providers in the importance of noting gaps or delays in care that could prevent mortality and morbidity.

| | | | |
|---|---|---|---|
| 88 | A mortality and morbidity committee will meet monthly to review and discuss all deaths within the IDOC system and any other cases that have been submitted for review by staff who are concerned about a morbidity that has occurred, the actions of a staff member (in regard to patient care)  or a process problem. | A mortality and morbidity committee will be formed and overseen by the Clinical Quality group and will consist of physicians, mid-level practitioners, nurses, and other allied medical practitioners, when indicated.  The chart of each deceased patient who is recently deceased will be obtained and the charts will be assigned to a team member for review.  Attention should be given to preventable death, provider or nurse deficits that require action or peer review and possible intrinsic process problems that need to be addressed.  A decision will be made by the entire group about each patient's death to determine if the death was preventable or whether something could or should have been done (or not done) in the course of delivering care. | **Commented [A89]:** This task is the only mortality review task and is incomplete.  Additional tasks should be added with respect to mortality review to be consistent with the Consent Decree requirement to integrate mortality review with CQI and to ensure that deficiencies are identified and to take corrective actions on those deficiencies.  Additional tasks need to include the following.  1) A task should define who is a permanent member of this committee.  The current process statement is unclear.  2) The persons reviewing the record should include a physician and a nurse. The methodology for record review should be defined.  It appears that a nurse alone can be assigned to perfor... [40] |
| 89 | A peer review process will be established. | The quality group will assign a group of clinical staff (peers) to review any providers or nurses that are put forth for review of their care or decision-making.  A conclusion will be made by the group after review and discussion to determine whether there was a deficiency in the care or decision and if a deficiency is identified, how the deficiency can be prevented in the future. | **Commented [A90]:** This is the only task in the Implementation Plan specific to peer review.  Item III.K. 9 requires a peer review system for dental staff and task 20 is identified as meeting this requirement which is development of policy to assess competency and performance of medical, dental and nursing staff. Additional tasks are needed in the Implementation Plan that describe the process for identification and referral of staff to peer review, the establishment of a fair process ar... [41]  **Commented [A91R90]:** This task does not identify if only SIU providers will be populating peer review panels and needs to assure that any group of peers who will be assigned to review care and decision-making is knowledgeable and independent.  Many peer reviewers are evaluating their colleagues and lack the objectivity to accurately identify gaps in care and opportunities to improve care and prevent mortality and morbidity |
| 90 | Formal process revision will be undertaken, using accepted methodology (such as Lean Six Sigma or another accepted approach to process revision) *when intrinsic process deficiencies are identified.* | The Clinical Quality group will, in the course of healthcare quality audits, mortality and morbidity reviews, or through reported problems from the facility level, identify processes that require streamlining, improvement or revision to decrease variation.  Personnel with the Clinical Quality group, who are trained in the approach to process revision, will perform an analysis of a process, its vulnerabilities and will suggest revisions to the process.  The Clinical Quality group will then measure the change in the desired outcome from the baseline and will follow the control of the new process.  When intrinsic process problems are identified by reviewing the Incident Report, these processes should be reported to the Quality group for consideration of revision. | **Commented [A92]:** In earlier versions of the Implementation Plan IDOC committed to several process improvement projects including 1) access to specialty care, sick call, chronic care delivery and medication administration (tasks 40 - 43) in the 12/30/21 Implementation Plan. The commitment to these process improvement projects has been deleted in the 4/22/22 version of the Defendant's Implementation Plan. Task 90 is written so that process improvement projects are no... [42]  **Commented [A93R92]:** The Monitor also has identified and communicated to the IDOC other processes that need to be improved including intake screening, specialty care, routine health maintenance including vaccination and cancer screening, accuracy of problem lists, and onsite urgent and emergent care . As noted above, these process analyses should precede the creation of policies for these high risk, deficient processes. |
| | **MONITORING AND COMPLIANCE** | | **Commented [A94]:** SIU quality group position descriptions do not include a position that has qualifications to perform this function.  There is no one in IDOC or SIU qualified to perform this function.  Engineers from SIU are engaged in an analysis of the medication process but they are not formally listed as part of this program. When on tour several of these engineers stated that they have full time teaching and research positions and would not be acting as line engineers to perform these analyses. [43] |

30

| # | | | Comments |
|---|---|---|---|
| 91 | **Every 6 months for the first 2 years and yearly thereafter, Defendants will provide the monitor and the plaintiffs with a detailed report containing data and information sufficient to evaluate Defendants' compliance with the Decree and Defendants' progress towards achieving compliance.** | The parties and the Monitor will agree in advance of the first report on the data and information that must be included and a report will be completed and submitted in the timeframe requested. | **Commented [A95]:** This is merely restating the Consent Decree without including any associated tasks. How IDOC will obtain this data is not included in the Implementation Plan. Moreover, IDOC has no tasks on how it will obtain data except through "canned reports" from the electronic record. No one is assigned to manage or obtain data. |
| 92 | **IDOC leadership will ensure that any vendor contract will require vendors to comply with all court orders, policies and procedures of IDOC.** | IDOC leadership will ensure that any vendor contracts implemented going forward will require vendors to comply with all court orders, policies and procedures of IDOC. | **Commented [A96R95]:** The data and information required to meet the requirements of VG in the Consent Decree have yet to be agreed to by the Monitor and Parties. There is no task to finalize the data and information that Defendants are to provide in their reports to the Monitor of compliance with the Consent Decree. |
| | **ADDRESS THE HEALTHCARE NEEDS OF THE AGING AND INFIRM POPULATION** | | **Commented [A97R95]:** The detailed reports provided to date have been generally flawed, inaccurate, and claim compliance without any supporting data or information. A task is needed to direct IDOC to support all assertions of compliance or progress toward compliance with supportive information or data. |
| 93 | **IDOC will plan for and implement the housing and programmatic needs of the aging and infirm patients in IDOC.** | The Aging and Infirm patients housed in IDOC facilities will be identified through a survey of the leadership staff on each facility and using problem lists and the findings in clinic visits to identify patients with significant cognitive impairment or who lack functional capacity for performing ADLs or who lack the ability to provide their own self-care to the degree that they require medical staff assistance. Patients who are perceived as frail or unable to safely live in a general population environment should also be identified by medical staff at the intake process, at any clinic visit, or through security reports of inability to cope or thrive in the GP setting. These patients should be evaluated for special housing. | **Commented [A98]:** We commented that task 53 should be eliminated and the contract written to require the vendors' compliance with IDOC healthcare policies and directives. Task 92 should be revised to state explicitly that any contract shall require the vendor comply with all court orders, policies and procedures of IDOC. The vendor by IDOC policy and contract should NOT be permitted use of their own policies except those related to human resources matters. The persons responsible need to include those responsible for contract procurement. |
| | | Screening for dementia will be performed on appropriate age groups and for those for whom it is medically indicated. It is planned that this screening will occur during the intake evaluation, at annual health maintenance reviews and whenever a patient is referred for screening due to concerns about their cognitive functioning. | **Commented [A99]:** The Consent Decree (II.B.2) requires that IDOC monitors the vendor and provide effective contract oversight. There is no task associated with this. Compliance monitoring is performed by IDOC (see tasks 85). Clinical monitoring is performed by facility (vendor) staff (see task 86). This is not effective monitoring. IDOC needs to include a task related to effective vendor monitoring. The Monitor had recommended the following. 1) De... [44] |
| | | The consultant hired in task 70 to assess the IDOC facilities and plan to formulate a plan to meet the future needs for IDOC medical facilities shall be made aware of the requirements for the staffing and physical plant structures required to care for the Aging and Infirm Patients, and to use the requirements to formulate recommendations and Renovation plans for IDOC facilities. | **Commented [A100R99]:** In addition to the above recommendations the contract needs to include liquidated damages for performance deficiencies. If this is not the case in the current procurement, tasks to accomplish this before the next contract award need to be added to the Implementation Plan. |
| | **EHR IMPLEMENTATION AND MAINTENANCE** | | **Commented [A101]:** This is a significant regression from prior IDOC Implementation Plan documents. As early as the 6/12/20 version of the Implementation Plan IDOC committed to: 1) ensuring appropriate housing for the elderly and infirm; 2) engagement with the Illinois Department of Aging (IDA) to develop a survey to for... [45] |
| 94 | **An RFP will be issued by IDOC stating the requirements of an EHR system for all IDOC facilities** | An RFP for an EHR vendor has been posted, responses have been received. | **Commented [A102R101]:** The Aged and Infirm tasks also 1) fail to address how they will address the programmatic needs of the incarcerated elderly and infirm population, and 2)fail to include a task that addresses the need to utilize compassionate release and the Joe Coleman Medical Disability Act Illinois Home Bill 3665) for early release... [46] |

31

| 95 | The RFP proposals will be evaluated for the ability to provide the functionality required. | The RFP proposals have been received and potential vendors identified. The potential vendors have conducted demonstrations and have responded to a second round of questions. The vendors have been scored based on a uniform set of questions with weighted answers. The scoring results have gone to the procurement department for evaluation and selection of a vendor. The contracting process will then begin. |
|---|---|---|
| 96 | A subject matter expert and consultant will be hired to champion the EHR implementation. | Complete. |
| 97 | The IDOC IT group will document the bandwidth at each facility and ensure that it is adequate to support an EHR. | The IDOC IT group will document the bandwidth at each facility. If upgrades are necessary for an EHR installation, a budget will be approved, and contractors will be hired to bring the bandwidth to the facilities. |
| 98 | Hardware requirements for an EHR implementation will be assessed, planned for, budgeted, purchased and installed. | The hardware needs for the implementation will be assessed by each facility, with the direction of the IDOC IT department in order to prepare for an EHR implementation. This will include items such as PCs, WiFi hot spots, portable devices, telehealth set-ups and peripherals. |
| 99 | An IDOC implementation team will be hired. The characteristics of this team will be guided by the EHR vendor. | Consider hiring a consulting company to assist with this task (need to know the EHR vendor prior to hiring a consulting company). |
| 100 | IT Maintenance staff will be contracted to address the ongoing needs of training new staff, and the support and ongoing configuration of the EHR. | Consider contracting with a university IT department for this support. If this is not feasible, an investigation of companies that supply this kind of support will be undertaken and if that is not productive, these positions will all need to be posted and filled. |

**Commented [A103]:** Having the vendor responsible for this is a poor practice. The IDOC should have a project manager for implementation of the electronic record. Not doing so risks implementing a record not consistent with requirements of IDOC.

32

| | | |
|---|---|---|
| 101 | A group of subject matter experts from IDOC medical will review the current processes, document them, and share best practices, in preparation for an EHR implementation. | A list of the major facility processes as they are currently will be documented. A "best practice" for the process will be mapped and integrated into the plans for a new EHR. |
| 102 | Process design, revision and planning, in conjunction with the EHR vendor's staff is completed for all identified processes used in IDOC healthcare, including medical, nursing, dental, infection control, medication administration and management, administration, phlebotomy and ancillary services, such as radiology, optometry and physical therapy. The creation of "screens", templates, orders, decision support, formulary options, pharmacy interfaces, laboratory interfaces and the interfaces with OMS will all need to be planned and implemented in order to support IDOC policy and the healthcare facility's goals of providing exceptional healthcare. The ability to share information with other state and county entities will need to be discerned, designed and implemented. | Once a vendor is chosen, the SME consultant, the project managers from the EHR vendor and OHS leadership and SMEs from each discipline will work together to create workflows for all the activities that occur in IDOC healthcare. It is expected that the vendor will be able to guide this activity based on prior implementations and knowledge of correctional workflow and requirements. These workflows should support the policies governing the provision of healthcare in IDOC and the data requirements for evaluating compliance with the policies and the requirements for prison healthcare which are outlined in the Standards for Health Services in Prisons. The workflows should also support users in providing the healthcare that is recommended in the disease management guidelines and the health maintenance guidelines. The EHR configuration should be designed with the goal of mining data for the evaluation of the quality of healthcare in IDOC. |
| 103 | An EHR implementation plan is designed in conjunction with the EHR vendor chosen. This will include training requirements, a training plan and how medical information will be made available to the healthcare staff in order to allow continuity of medical care during the cut-over to an EHR. A plan will also be put forth to populate the new EHR with accurate data, especially medications and problems, in order to facilitate the continuity of patient care and the availability of accurate data. | Once an EHR vendor is selected, an implementation plan will be designed. The implementation plan will include training staff, a schedule for facilities to go-live (all at once vs. phased implementation), a plan for inputting or importing current medications into each chart, a plan for inputting a problem list and a plan for providing access to the information in the old chart. The staffing that will be required for IDOC both for implementation and for the ongoing upkeep of an EHR will be clarified and recruited or contracted. Work groups to design EHR workflows and to revise SOPs will be established with the guidance of project managers with the vendor and with IDOC and with the guidance of the SME consultant that has been hired. |
| 104 | Reports will be designed, in conjunction with the EHR vendor, which will automate much of the data required by IDOC, OHS leadership and the Quality Group. | Once the EHR vendor is chosen, the available "canned" reports which will be needed by IDOC for general reporting needs will be selected. If configurable reports are needed, they will be configured and made available to the staff which need them. |
| 105 | EHR Implementation shall be complete | A full implementation of an EHR off of a paper medical record will be completed, including staff training. |

**Commented [A104]:** The review and documentation of current processes as well as process design, revision and planning referred to in tasks 101 and 102 is not scheduled to take place until September 2023 which is too late. These tasks need to be initiated soon and standardized practices established in advance of policy development and well in advance of the EHR. Tasks 101 and 102 are similar to task 90. What differentiates these tasks from each other? Why is process design for the EMR not initiated until 2023 after policies for these subjects have already been developed. The Monitor suggests revisiting the timelines for process review and redesign.

**Commented [A105]:** IDOC has no tasks to mine data and no staff hired who can do this. The Monitor believes mining data will be essential to gain compliance with the Consent Decree. The IDOC agreed with this, even recently. In their 12/30/21 Implementation Plan proposal, IDOC stated, "the addition of an IT Department to collect, analyze and interpret health care data will better position OHS to use patient data to guide policy and thus improve healthcare outcomes. These individuals will have the expertise to modify EMR user interfaces, generate specific queries, and translate health care information into reports or to populate health system dashboards. This expertise will also allow IDOC to provide data for use in quality improvement programs and to verify compliance with the Consent Decree. This type of data management is crucial to appropriately tracking clinical progress and outcomes". Since this was written only four months ago, IDOC has apparently rejected this proposal which is a regression. IDOC now apparently plans to only used "canned" reports from the electronic record, which the Monitor believes will not provide sufficient data. The Monitor suggests the following. 1) Hire data personnel with expertise in sequel data queries (with engineering or software training and expertise) to do this. These personnel should be hired as soon as possible and so that they can start as the EMR is being implemented. In the 2nd report the Monitor recommended hiring four data analysts for this purpose. Two additional process analysts were recommended to lead this data group and to provide the process analysis as described in task 90. These hires are discussed also in task 67. 2) data personnel need to become familiar with the database of the EMR vendor and learn how to perform data queries consistent with ongoing needs of the OHS and quality programs. IDOC should develop sufficient tasks to do this.

**Commented [A106]:** This is discussed in task 102 above. "Canned" reports will be insufficient for this purpose. Some degree of self-initiated queries will be necessary for obtaining data consistent with requirements of the Consent Decree. IDOC has recently regressed from prior positions and now has no tasks associated with obtaining data except through "canned" reports. As well, during the time period before the electronic record is implemented, there is no task or plan to obtain manually derived data necessary for purposes of verifying compliance with the Consent Decree.

The following items are in the Consent Decree but are not addressed specifically in the Defendant's Implementation Plan:

II. B.6.0 – Training on patient safety.

III.A.9- Every facility shall have its own Health Care Unit Administrator and any vacancy will be filled within nine months.

III.A.10 and III. F. 1 – Only registered nurses will conduct sick call. Sick call will take place in a setting that provides privacy and confidentiality.

III. C.4 – There will be follow up for appropriate care and treatment of all pertinent findings from intake screening.

III. E. 3 – "Drop filing" is to be abandoned.

III. H.1 – Content and maintenance of the off site log.

III.I.4 – Infirmary access to security staff at all times.

# Exhibit 3

<pre>
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   DON LIPPERT, et al.,            )
                                     ) Case No. 10-CV-4603
 4                  Plaintiffs,      )
                                     ) MOTION HEARING
 5   vs.                             ) (held telephonically)
                                     )
 6   PARTHA GHOSH, et al.,           ) Chicago, Illinois
                                     ) Date:  October 5, 2021
 7                  Defendants.      ) Time:  9:00 a.m.
     _____

 8
                   TRANSCRIPT OF MOTION HEARING
 9                 HELD TELEPHONICALLY BEFORE
             THE HONORABLE JUDGE JORGE L. ALONSO
10                 UNITED STATES DISTRICT JUDGE
     _____

11
                     A P P E A R A N C E S
12
     For the Plaintiffs:    Harold C. Hirshman, Esq.
13   (appeared              Samantha Reed, Esq.
     telephonically)        Dentons US LLP
14                          233 South Wacker Drive, Suite 5900
                            Chicago, Illinois  60606
15                          312-876-8000
                                  -and-
16                          Camille E. Bennett, Esq.
                            Roger Baldwin Foundation of ACLU, Inc.
17                          150 North Michigan Avenue, Suite 600
                            Chicago, Illinois  60601
18                          312-201-9740
                                  -and-
19                          Nicole R. Schult, Esq.
                            Alan S. Mills, Esq.
20                          Uptown People's Law Center
                            4413 North Sheridan Road
21                          Chicago, Illinois  60640
                            773-769-1411
22

23   (Appearances continued on the next page)

24

25   COURT REPORTER:  Annette M. Montalvo
                      Office:  312-818-6683
</pre>

```
1   APPEARANCES:   (Continued)

2

3   For the Defendants:     Nicholas S. Staley, Esq.
    (appeared               Office of the Illinois Attorney General
4   telephonically)         100 West Randolph Street, 13th Floor
                            Chicago, Illinois  60601
5                           312-814-3953
                                     -and-
6                           Kelly Presley, Esq.
                            Illinois Department of Corrections
7                           100 West Randolph Street, Fourth Floor
                            Chicago, Illinois  60601
8

9

10  ALSO PRESENT: (Appeared telephonically)

11  Dr. John Raba, Medical Monitor

12

13

14

15  Proceedings reported by machine shorthand, transcript produced
    by computer-aided transcription.
16  _____

17  Court Reporter:         Annette M. Montalvo, CSR, RDR, CRR
                            Official Court Reporter
18                          United States Courthouse, Room 1902
                            219 South Dearborn Street
19                          Chicago, Illinois  60604
                            312-818-6683
20

21

22

23

24

25
```

3

1    (Proceedings commenced at 9:07 a.m., in open court, via

2  teleconference, to wit:)

3          THE COURTROOM DEPUTY:  Case 10-CV-4603, *Lippert v.*

4  *Ghosh*.

5          THE COURT:  Good morning, everyone.  This is Judge

6  Alonso.  I am here physically in the courthouse, in the

7  courtroom.  Everyone else is appearing telephonically.

8          Let's have the attorneys identify themselves for the

9  record.  Let's begin with plaintiffs' counsel.

10          Is Ms. Bennett with us?

11          MS. BENNETT:  Yes, Your Honor.  Good morning.

12  Camille Bennett for the plaintiffs.

13          MR. HIRSHMAN:  Harold Hirshman for the plaintiffs.

14          MR. MILLS:  Alan Mills for the plaintiffs.

15          MS. SCHULT:  Nicole Schult for the plaintiffs.

16          MS. REED:  Samantha Reed for the plaintiffs.

17          THE COURT:  And for the defense, is Mr. Staley

18  present?

19          MR. STALEY:  Yes.

20          THE COURT:  Okay.  Anyone else for the defendant?

21    (No response.)

22          THE COURT:  We are here on the motion to enforce.  It

23  is document number 1416 on the docket, and it is fully briefed

24  and then some.  And based upon the latest filing, it appears

25  that there is a new version or a revised version of the

1    implementation plan.  Based on my reading, again, this is

2    plaintiffs' document from October 1, sur reply, and leave to

3    file that is granted, by the way.  I believe that's 1451.

4    That's granted.

5         And according to that filing, it at least suggests

6    that the defendants have submitted an additional version of

7    the plan in mid September.  I know that in their response the

8    defense spoke of 90 more days, 90 days from mid July.  So

9    according to my reading, it looks like that was submitted

10    after the monitor's latest report was drafted.

11         Is that correct, Mr. Staley?

12     (No response.)

13         THE COURT:  Ms. Bennett?  Mr. Hirshman?  Mr. Mills?

14    Is that correct?  Is there a revised submission by the defense

15    that the monitor has, but I don't have a reaction from the

16    monitor yet?

17     (No response.)

18         THE COURT:  Mr. Staley?  Ms. Bennett?

19     (Short pause due to problems with the teleconference

20    connection.)

21         UNIDENTIFIED SPEAKER:  Dr. Raba and Dr. Keith are

22    supposed to be on.  I don't know whether they are.

23         DR. RABA:  We are.  This is Dr. Raba with the medical

24    monitor.  Good morning, Your Honor.

25         THE COURT:  Good morning, Doctor.

1          I apologize about that.  I think we are all back, and

2     apparently everyone can hear me.  I am not sure if you heard

3     what I had said earlier, but I'll repeat it.

4          I was saying that based upon the latest filing and

5     leave to file that sur reply, is granted.  Based on that

6     filing, the filing of October 1, it appears that Dr. Raba has

7     been presented with a revised implementation plan, and I have

8     not yet heard back from the doctor after he received that.

9          Am I correct about that?  I guess I'll ask you,

10    Doctor.

11         DR. RABA:  Yes.

12         THE COURT:  So I am not aware of your response or

13    your reception to that implementation plan.

14         DR. RABA:  As you know, we received that relatively

15    recently, and we have begun to review it, and we'll be getting

16    a verbal response very shortly.

17         We do have some substantial disagreements with the

18    implementation plan and parts of it is moving in the right

19    direction, but I think there is many incomplete elements that

20    are required in the consent decree that are not in the

21    implementation plan at this moment.  And we will put that in

22    writing to you, Your Honor, and to the defendants and

23    plaintiffs.

24         THE COURT:  All right.  Ms. Bennett, Mr. Mills,

25    Mr. Hirshman, what do you suggest at this point, based upon

1    this latest development, as it relates to that area of

2    concern, that alleged breach, the breach involving the staff

3    analysis and, more importantly, the implementation plan?

4           MS. BENNETT:  Your Honor, this is Camille Bennett.

5           We'd ask to wait for the monitoring team to complete

6    their written comments.  And at that point I think it's an

7    open question about process as to whether to continue meeting

8    with the defendants about the implementation plan will be of

9    any value.  The monitoring committee reported in previous

10    reports and thereafter that there's significant process

11    problems with respect to the meetings that have taken place.

12    And Dr. Raba can describe it in more detail.  But the

13    question, I think, is whether extended further meetings will

14    be mutual.  But the most important thing is that we need to

15    have a deadline for the submission of the plan.  If they want

16    to have further meetings, that's fine.  But this is well over

17    two years overdue, and as the Court knows, the decree is time

18    limited.  The time is running.

19           THE COURT:  All right.  Mr. Staley, have the parties

20    conferred?  Have the parties talked about an agreed and

21    reasonable deadline for the submission of the implementation

22    plan?

23           MR. STALEY:  The parties have not, Your Honor.  Where

24    we left off when we filed our response to the motion at issue

25    here, a response, I believe, was dated September -- I'm sorry,

1    July 15.  It was defendants' position that we could have a

2    completed implementation plan within the next 90 days.

3    Obviously, that depends on working with plaintiffs and the

4    monitor to get that comment.

5         I think at this point 90 days would put us out to

6    October 13.  Having a completed version that we are ready to

7    present to the monitor as final, or the Court as final, is

8    really contingent upon when we receive these comments and can

9    meet with the monitor and/or plaintiffs to discuss them.  And

10   with that being up in the air, it is hard to have a concrete

11   date.

12        THE COURT:  Ms. Bennett, what do you suggest?  Or I

13   should ask -- well, I'll ask Ms. Bennett.

14        Ms. Bennett, what do you think?

15        MS. BENNETT:  Your Honor, given that Dr. Raba has

16   indicated that they expect to have the comments very shortly,

17   we think that this should be able to be completed in 30 days,

18   and the plan should be submitted to the Court.  As the Court

19   knows, the decree itself provides for a mechanism for

20   disagreement of the monitor with the plan to be resolved.

21   They are supposed to be presented promptly and resolved by the

22   Court.  So we would suggest, I think, November 10 is the date

23   by which the defendants should be able to submit their plan.

24        THE COURT:  Mr. Staley?

25        MR. STALEY:  I just want to make sure I heard that

1    correctly.  Ms. Bennett, did you say November 10?

2              MS. BENNETT:  Yes, that was our proposal.

3              MR. STALEY:  If we receive the monitor's comments,

4    you know, fairly soon, and are able to meet with him and the

5    schedules match up, that might be possible.  I mean, defendant

6    feels that they are at a bit of a disadvantage here where they

7    have continually been working with the monitor to draft a

8    document that is acceptable, but it has become a bit of a

9    double-edged sword where, obviously, continued discussions

10   take more time.

11             But I think defendants are in a position where once

12   they get the comments from the monitor back and are able to

13   meet with him reasonably soon, we should be prepared to

14   present something within the next month.

15             THE COURT:  Okay.  I will --

16             MS. PRESLEY:  This is Kelly Presley from the

17   Department of Corrections.

18             Would it be possible to suggest that the deadline be

19   30 days after we receive the comments from the monitor?

20             THE COURT:  All right.

21             MS. PRESLEY:  We have no --

22             THE COURT:  Who is speaking?

23             MS. PRESLEY:  I'm sorry, Your Honor.  This is Kelly

24   Presley from the Department of Corrections.

25             It would be my proposal that any deadline for the

1   implementation plan be 30 days after we receive the comments

2   from the monitor, otherwise, we are absolutely guessing as to

3   how much time we'd actually have to meet with the monitor and

4   confer with the Office of Health Services.

5           THE COURT:  Okay.

6           MS. BENNETT:  Your Honor, this is Camille Bennett.

7           THE COURT:  Ms. Bennett.

8           MS. BENNETT:  The plaintiffs -- Your Honor, this is

9   Camille Bennett.

10          Plaintiffs think that is perfectly acceptable, 30

11  days after the comments are received.  Thank you.

12          THE COURT:  All right.  That's the deadline, 30 days

13  after comments.  The latest submission by the monitor.  The

14  defendant is to file the implementation plan as called for by

15  the consent decree, or by November 10, whichever is later, as

16  today is the 5th.

17          Okay.  As I stated, the motion is fully briefed, and

18  then some, and I think that some comments, even though,

19  obviously I'm not going to rule today, based upon these latest

20  developments and this new deadline, I think some comments are

21  in order.  It's clear from the submissions and the monitor's

22  report that the fundamental problem here is the failure of the

23  defense to file an acceptable implementation plan as called

24  for by the consent decree.

25          The consent decree requires an implementation plan

1   that sets out specific tasks, timetables, goals, programs,

2   plans, projects, strategies and protocols, and that describes

3   the implementation and the timing of the hiring, training, and

4   supervision of the personnel necessary to implement the

5   consent decree.

6           And the defense has not submitted an implementation

7   plan that matches that or comes close to meeting that

8   requirement, and it's clear after reading the monitor's report

9   that without it, the department's efforts at compliance and

10  the department's progress is unfocused, it's reactive, it is

11  scattershot.

12          The plaintiffs raise four areas of concern.  Again,

13  the first one involves the analysis and the implementation

14  plan.  I am going to deny the other three, without prejudice,

15  the other three areas, as I want the department focused on the

16  implementation plan.  And I will enter and continue the motion

17  as to concerns and the alleged breach regarding the

18  implementation plan and the staffing analysis.

19          The defendants may well have breached the consent

20  decree in all four areas, but I think it is important at this

21  point not to have the department's attention divided and not

22  to present any excuses for further delay in the case.

23          So, again, I just want to make it clear that I agree

24  with the monitor and the plaintiffs that what has been

25  submitted, what I have seen, is not near good enough and is

1    not sufficient and does constitute a straightforward breach,

2    but I am going to continue the motion as the defendants appear

3    to be attempting to cure that breach and hopefully are in the

4    process of doing that.

5         So I think that it's apparent from the filings and

6    monitor's report, also, that there are issues regarding the

7    defendants' approach to the implementation plan.  And

8    defendants' apparent approach, according to the monitor, is

9    instead of assigning medical personnel to the task of trying

10   to come up with a plan for building a health care system that

11   prevents individuals from falling through the cracks,

12   defendants' approach seems to have been to assign legal

13   personnel to determine which of the monitor's recommendations

14   actually seem sufficiently tailored to preventing a

15   constitutional violation, which of those recommendations is

16   worth implementing.

17        This is not what the defendants agree to in the

18   consent decree.  In the consent decree, the defendants agree

19   to create a plan and to do that with the monitor's assistance.

20   Again, the apparent process here appears to be the opposite.

21   In effect, they appear to be asking the monitor to create a

22   plan for their approval.

23        So we are left with a reactive approach or inaction

24   on behalf of the defendants, and, again, they have agreed to

25   create an implementation plan.  I am going to give them until

1    November 10, or 30 days after the monitor's latest

2    recommendations to do that.  And in terms of the defendants'

3    response, efforts to shift responsibility or even blame to

4    this interaction with the monitor is not well received.

5    Again, it is the defendants' plan, it is the defendants'

6    obligation under the consent decree to come up with that plan,

7    after collaboration and input and assistance from the monitor.

8            So that's what I expect to see going forward.  And,

9    again, I want the department focused.  Their arguments

10   regarding the pandemic, of course, are well founded, and they

11   did an admirable job of taking that on, and that, in part, has

12   led to the delay here.  But we have got to move forward.

13   Again, hopefully the defendants are in the process of curing

14   the breach and I won't find a breach.

15           I will set a court date in mid November, and I will

16   ask the parties to file -- I will set it in early December,

17   the court date, and ask the parties to file at least three

18   days ahead of that hearing a joint status report regarding the

19   latest developments.

20           I will also admonish the defendants to share

21   information freely with the monitor, and again direct the

22   parties to focus their efforts on the implementation plan.

23           Mr. Staley, Ms. Presley, anything else?  I will give

24   you the court date shortly.

25           Anything else today?

1          MR. STALEY:  Nothing from me, Your Honor.

2          MS. PRESLEY:  No, Your Honor.  Thank you.

3          THE COURT:  Ms. Bennett?

4          MS. BENNETT:  No, Your Honor.  Thank you.

5          THE COURT:  All right.  I will await the next filing,

6  the doctor's comments, and the response of the department, and

7  I'll set a court date of December 3 at 9:00, back here.

8          The motion is entered and continued.

9          DR. RABA:  Your Honor, this is Dr. Raba.  Just a

10  final comment, if you would.

11          THE COURT:  Yes.

12          DR. RABA:  The monitor totally concurs, and we

13  believe that if we had better direct and open line of

14  communication with the clinical leadership at OHS and possibly

15  even some of the SIU consultants that the IDOC has hired, that

16  we can really accelerate progress or compliance with this

17  item.  And thank you for mentioning that.

18          THE COURT:  Mr. Staley, anything regarding that?  The

19  communication line between the clinical leadership?

20          MR. STALEY:  I don't believe either the Attorney

21  General's office or IDOC legal has refused any meetings or

22  request to meet by the monitor.  I am not entirely sure what

23  the issue is there.

24          I think I'll let Ms. Presley speak on her efforts,

25  but any request to meet with the Office of Health Services or

1   any sort of vendor has been, at least from my experience, well

2   received from IDOC and they have worked to set those meetings

3   up.

4          DR. RABA:  Your Honor, if I just may.

5          THE COURT:  Yes.

6          DR. RABA:  I just think during those meetings that a

7   significant portion of the communication is with the legal

8   team, not with the clinical team.  We'd like to set meetings

9   up now that focused almost entirely on clinical leadership's

10  talking to each other with the monitor, and I think -- and, of

11  course, the lawyers can always be present, as they are allowed

12  by the consent decree, but I think that the discussion should

13  be between the clinical people about these clinical issues,

14  and that, I think, would help develop a much stronger and

15  accurate implementation plan.

16         THE COURT:  All right.  That makes sense to me, and I

17  will direct Mr. Staley and Ms. Presley to do what they can to

18  facilitate that communication, that direct communication

19  between the monitor and clinical personnel.  And I will --

20         DR. RABA:  Thank you, Your Honor.

21         THE COURT:  -- await the status report, the

22  implementation plan, and talk to everyone on December 3 at

23  9:00.

24         Thanks for your patience this morning with the

25  technical issue.

1          MR. STALEY:  Your Honor?

2          THE COURT:  Yes.  Is that Mr. Hirshman?

3          MR. STALEY:  Your Honor, if I can just get one point

4    of clarification.  It is my understanding that the Court

5    denied the motion except for the portion of the implementation

6    plan, which that portion will be entered and continued; is

7    that correct?

8          THE COURT:  That is correct.  Without prejudice as to

9    the three other grounds that were raised.

10          That's Mr. Staley, for the record, right?

11          MR. STALEY:  Correct.

12          THE COURT:  Okay.  Thank you.

13      (Proceedings concluded at 9:34 a.m.)

14

15

16                              * * * * *

17                    **REPORTER'S CERTIFICATE**

18
         I, ANNETTE M. MONTALVO, do hereby certify that the
19   above and foregoing constitutes a true and accurate transcript
     of my stenographic notes and is a full, true and complete
20   transcript of the proceedings.

21          Dated this 8th day of October, 2021.

22   /s/Annette M. Montalvo
     Annette M. Montalvo, CSR, RDR, CRR
23   Official Court Reporter

24

25

# Exhibit 4

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   DON LIPPERT, et al.,           )
                                    )  Case No. 10-CV-4603
 4              Plaintiffs,         )
                                    )  MOTION HEARING
 5   vs.                            )  (held telephonically)
                                    )
 6   PARTHA GHOSH, et al.,          )  Chicago, Illinois
                                    )  Date:  March 16, 2022
 7              Defendants.         )  Time:  11:00 a.m.
     _____

 8
                    TRANSCRIPT OF MOTION HEARING
 9                 HELD TELEPHONICALLY BEFORE
           THE HONORABLE JUDGE JORGE L. ALONSO
10                 UNITED STATES DISTRICT JUDGE
     _____

11
                      A P P E A R A N C E S
12
     For the Plaintiffs:    Harold C. Hirshman, Esq.
13   (appeared              Samantha Reed, Esq.
     telephonically)        Dentons US LLP
14                          233 South Wacker Drive, Suite 5900
                            Chicago, Illinois  60606
15                          312-876-8000
                                 -and-
16                          Camille E. Bennett, Esq.
                            Roger Baldwin Foundation of ACLU, Inc.
17                          150 North Michigan Avenue, Suite 600
                            Chicago, Illinois  60601
18                          312-201-9740
                                 -and-
19                          Nicole R. Schult, Esq.
                            Alan S. Mills, Esq.
20                          Uptown People's Law Center
                            4413 North Sheridan Road
21                          Chicago, Illinois  60640
                            773-769-1411
22

23   (Appearances continued on the next page)

24

25   COURT REPORTER:  Annette M. Montalvo
                      Office:  312-818-6683
```

```
 1    APPEARANCES:   (Continued)

 2

 3    For the Defendants:     Nicholas S. Staley, Esq.
      (appeared               Office of the Illinois Attorney General
 4    telephonically)         100 West Randolph Street, 13th Floor
                              Chicago, Illinois  60601
 5                            312-814-3953
                                      -and-
 6                            Kelly Presley, Esq.
                              Illinois Department of Corrections
 7                            100 West Randolph Street, Fourth Floor
                              Chicago, Illinois  60601
 8

 9

10

11

12

13    Proceedings reported by machine shorthand, transcript produced
      by computer-aided transcription.
14    _____

15    Court Reporter:         Annette M. Montalvo, CSR, RDR, CRR
                              Official Court Reporter
16                            United States Courthouse, Room 1902
                              219 South Dearborn Street
17                            Chicago, Illinois  60604
                              312-818-6683
18

19

20

21

22

23

24

25
```

1    (Proceedings commenced at 11:00 a.m., in open court, via

2  teleconference, to wit:)

3            THE COURTROOM DEPUTY:  Case 10-CV-4603, *Lippert v.*

4  *Ghosh*.

5            THE COURT:  Good morning.  This is Judge Alonso, I am

6  here in the courtroom.  We are proceeding via teleconference

7  this morning.

8            Let's have the attorneys identify themselves for the

9  record.  Let's start with plaintiffs' counsel.

10           MR. HIRSHMAN:  Harold Hirshman.

11           MS. BENNETT:  Camille Bennett.

12           MR. MILLS:  Alan Mills.

13           MS. SCHULT:  Nicole Schult.

14           MS. REED:  Samantha Reed.

15           THE COURT:  And for the defense?

16           MR. STALEY:  Good afternoon, Your Honor.  Nick Staley

17  for the defendants.

18           MS. PRESLEY:  Good morning, Your Honor.  Kelly

19  Presley from the Department of Corrections.

20           THE COURT:  Okay.  Good morning.

21           I ordered briefing, and I reviewed the briefing,

22  1533, 1538, and 1542.  This is briefing regarding the

23  monitor's disagreements with defendants' December 30

24  implementation plan.  That's 1513, on the docket.

25           And, again, just to back up a little bit.  The most

1   relevant section of the consent decree that we are dealing

2   with at this point is section IV, entitled Staffing Analysis

3   and Implementation Plan.  Section IV.A overview says the

4   defendants, with the assistance of the monitor, shall conduct

5   a staffing analysis and create and implement an implementation

6   plan to accomplish the obligations and objectives of the

7   decree.  The implementation plan must, at a minimum, one,

8   establish, with the assistance of the monitor, specific tasks,

9   timetables, goals, programs, plans, projects, strategies and

10  protocols, to ensure that plaintiffs -- sorry that defendants

11  fulfill the requirements of the decree, and, two, describe the

12  implementation and timing of the hiring, training, and

13  supervision of the personnel necessary to implement the

14  decree.

15       Section IV.B says that within 120 days from the date

16  the monitor has been selected, the defendants shall provide

17  monitor with the results of their staffing analysis.  Within

18  60 days after submission of the staffing analysis, defendants

19  shall draft an implementation plan.  In the event the monitor

20  disagrees with any provision of the defendants' proposed

21  implementation plan, the matter shall be submitted to the

22  Court for prompt resolution.  And section C says that that

23  implementation plan and all amendments or updates thereto

24  shall be incorporated into and become enforceable as part of

25  this decree.

1          So that is where we are, and all parties are hoping

2     for prompt resolution regarding these disagreements, which

3     persist.

4          I'll note that it took the defendants more than two

5     years to draft an implementation plan that came close to

6     fitting the definition in section IV.A.1 and 2 of the consent

7     decree.  That happened on December 30, in response to the

8     plaintiffs' motion to enforce the consent decree.

9          After meetings with the monitor, defendants submitted

10    a draft implementation plan, but the monitor disagrees and the

11    monitor submitted a document describing his, quote-unquote,

12    differences with the plan.  In addition to the monitor

13    submitting that document, the monitor submitted an example

14    plan to demonstrate what the defendants' implementation plan

15    should look like.  Generally speaking, it's the monitor's

16    position, and plaintiffs' argue in their briefing, that the

17    implementation plan submitted by the defense is too general,

18    too vague, and, therefore, does not set forth actionable

19    verifiable tasks.  According to plaintiffs, this plan very

20    vaguely refers to exploring issues or developing processes,

21    whereas the monitor's example plan recites specific actions or

22    relatively specific actions to be taken by specific persons.

23         So in one example plaintiffs compare defendants' task

24    number 38 regarding developing comprehensive medical policies,

25    which is a single line item in defendants' plan, with tasks 87

1   through 98 on the monitor's example plan.  So the objectives

2   of developing comprehensive medical policies are essentially

3   the same, but the monitor breaks down the process into 11 more

4   specific tasks.

5          Another example, defendants' plan starts with a

6   staffing section, and in looking at the two plans, the example

7   plan and the defendants' plan, again, the defendants' plan in

8   the staffing sections consists of exploring options or

9   developing them or meeting for review, but there isn't enough

10  detail to make these into actionable tasks that someone can

11  verify have been completed.

12         Comparing that to the example plan's staffing

13  section, the example plan proceeds by way of specific tasks

14  that are oriented by and around an identifiable plan and

15  consists of posting an initial round of positions, developing

16  a workload analysis to assist ongoing needs and adjusting and

17  modifying the staffing plans based on workload analyses and

18  ongoing review of means and practices.

19         So even the monitor's example plan doesn't spell out

20  in great detail exactly what would be required under staffing.

21  It could not.  This, again, is an implementation plan, it is

22  not a script.  So flexibility is important.  But, still, the

23  monitor's example plan provides or is organized around

24  specific tasks, whereas defendants' plan is more of a plan to

25  make a plan by exploring and developing things.  And

1    plaintiffs argue that this issue, this contrast persists

2    throughout the parties' plans.  And I agree with the

3    plaintiff.  According to the plaintiff, because the defendants

4    have failed to provide an implementation plan which is

5    suitable, which is acceptable, I should accept the monitor's

6    example plan in its stead and order that it be incorporated

7    and made enforceable as part of the consent decree.

8          The defendants respond.  In my opinion, they don't

9    offer much in the way of the defense of their plan.  Instead,

10   they argue that the plaintiffs' request, that being the

11   adoption of the monitor's example plan, is not appropriate.

12   According to the defense, adopting that plan goes beyond mere

13   enforcement of the consent decree, so it can only be done if

14   the Court makes findings that the relief satisfies the PLRA,

15   which provides that prospective relief in any civil action

16   with respect to prison conditions shall extend no further than

17   necessary to correct the violation of the federal right and

18   shall not be awarded unless the Court finds that such relief

19   is narrowly drawn, extends no further than necessary to

20   correct the violation of the federal right, and is the least

21   intrusive means necessary to correct the violation of the

22   federal right.

23          Defendants argue that many of the tasks that the

24   monitor sets forth in the example plan go beyond that, goes

25   beyond what is necessary to provide constitutionally adequate

1   medical care under the Eighth Amendment.  So, in the defense's

2   belief, the Court cannot order them to perform these tasks in

3   order to implement the consent decree.

4           To the extent that the defendants suggest that a new

5   round of PLRA findings are necessary to justify every task in

6   the implementation plan, and to the extent that the argument

7   is based on the premise that resolving this dispute over the

8   terms of the implementation plan somehow goes beyond enforcing

9   the consent decree, I do not agree with the defense.  The

10  consent decree requires defendants to draft an implementation

11  plan into specifically -- and it specifically provides that if

12  the monitor disagrees with any provision of the defendants'

13  proposed implementation plan, the matter shall be submitted to

14  the Court for prompt resolution.

15          And that's exactly what we have here.  So we are

16  still well within the bounds of the decree, and we are not

17  going beyond enforcement of the consent decree and imposing

18  any new constraints at this point.  So, obviously, I am aware

19  of *Rasho*, R-a-s-h-o, but I tend to agree with the plaintiffs

20  that it is *Holmes v. Godinez*, which emphasizes that a consent

21  decree is a contract that should be interpreted according to

22  contract principles, that loosely is the guide for us here,

23  not the cases cited by the defense, which are distinguishable.

24          That does not mean that the defendants do not raise

25  some valid points.  That does not mean that the monitor's plan

1   example may not be overreaching in some respects.  Again, the

2   consent decree contemplates that I may have to resolve a

3   dispute over the implementation plan.  It does that without

4   describing any particular standard for doing so, but it is

5   obvious that we should be guided by the applicable

6   constitutional standard since the ongoing denial of

7   constitutionally adequate medical care to inmates who fall

8   through the cracks in the system is what we are attempting to

9   remedy here.

10          So the Eighth Amendment entitles IDOC inmates the

11  medical attention for their serious medical needs, but it does

12  not entitle them, of course, to the best medical care

13  available.  Defendants raise one example.  They point to the

14  monitor taking issue with their refusal to commit to hiring an

15  architectural firm with expertise in health care projects to

16  evaluate physical space instead of committing only to hiring a

17  consultant.

18          So here, in this example, the defendants admit that

19  they have committed in the decree to upgrading their clinical

20  space, but they maintain that the decree does not require them

21  to hire an architect, nor is one necessary to make the reforms

22  needed to provide constitutionally adequate medical care in

23  the Illinois Department of Corrections.

24          So this strikes me as a fair response.  It's not

25  obvious why an architect is necessary to implement the modest

1   facilities reforms concerning clinical space that are

2   envisioned by section II.B of the decree.  Of course, the

3   reply is also fair, as the plaintiffs wonder what the

4   alternative is, as obtaining a consultant doesn't explain what

5   sort of individual this is, what sort of consultant, who can

6   provide the advice that is necessary to implement the reforms

7   of section II.B.

8           So there are disputes, such as the ones that were

9   raised in this example, these examples.  And in order to

10  resolve the issue, again, the decree doesn't tell me how to do

11  that, but it is clear that I need to bring these disputes into

12  focus.  I cannot tell from the present briefing just how far

13  apart the parties are on many issues.  But at this point, at

14  this point I agree with the defendants that the decree does

15  not appear to contemplate or doesn't contemplate that the

16  monitor can simply get fed up with the defendants and draft

17  his own implementation plan.  The decree requires the

18  defendants to draft an implementation plan, and it permits the

19  Court to intervene if the monitor disagrees with any provision

20  of the defendants proposed implementation plan.

21          But it is clear from the decree that it was meant for

22  the defendants to draft the plan.  And from a practical

23  standpoint, this appears to be the optimal starting point.

24  This appears to be the wise way to begin the process.  The

25  best way to ensure or to best ensure that the implementation

1    plan is a reasonable and realistic one is to base it on

2    something that originated with the defendants and go from

3    there.  Again, that's the best way to proceed, working off the

4    defendants' draft as opposed to imposing something that is

5    entirely external onto them.  One way, for example, to ensure

6    that I don't order them to do something that they simply

7    cannot do.

8            So that's the optimal starting point.  And, of

9    course, I can entertain edits based on disagreements to make

10   sure that in form and substance it will ensure that the

11   defendants fulfill the requirements of the decree.  But I

12   believe it makes sense to at least have an implementation plan

13   that is rooted in defendants' own suggestions.  So there's not

14   one way to move forward at this point, and I am open to the

15   parties' suggestions.  Obviously, the plaintiffs are

16   disappointed in not getting the matter resolved right away.

17   And, of course, I have talked about the timeline here and how

18   frustrating this is, and how long everything's taken.  But at

19   this point my idea is to direct the defendants to take another

20   crack at revising the implementation plan.

21           This draft should match the monitor's plan in style

22   and in the level of detail.  The revised plan should be sharp,

23   it should sharpen the plan by setting forth tasks in the form

24   of actionable items.  Something that can be verified and

25   should avoid vaguely exploring options or developing processes

1    that do not do that.

2          Again, in this regard, the form of the example plan

3    should serve as their guide.  So that would be the first step,

4    and I would set a deadline for that.

5          Secondly, once the defendants' newly revised

6    implementation plan is complete, it should be sent to the

7    monitor.  And if there are still disagreements, which is

8    likely, he can edit it as he sees fit.  If he did that on a

9    Microsoft Word redlined document and he could explain why

10   changes are necessary in the comment section or comment

11   bubbles, the monitor should then send that document back to

12   the defendants so that they can reply to the comments.  And

13   then, finally, the defendants should submit the document back

14   to the Court so that I can resolve any remaining disputes.

15         That is my thought regarding how to proceed.

16         MR. HIRSHMAN:  Your Honor, this is Harold Hirshman.

17   Could I make a comment?

18         THE COURT:  Yes.

19         MR. HIRSHMAN:  I, obviously, understand your

20   analysis, but what I don't understand is how we could be here

21   when the defendants submitted their plan in December, several

22   years late, with the full knowledge and understanding of what

23   the plan required.  And Your Honor has found that it is

24   egregiously lacking, and the response is that they should go

25   back and think about what the monitor said.  But the monitor

1    had already told them that in November, again in December, and

2    offered to meet with them.

3           So, in essence, the net of this is that the

4    defendants get yet another chance to do what they were

5    supposed to do at the beginning.  And they haven't explained

6    why we should be in this situation.  Why it is fair to have

7    litigated the issue of a plan, which is facially

8    nonconforming.  And that suggests a breach of good faith.  And

9    Your Honor has accepted the Holmes principle, but it simply

10   isn't sufficient, I believe, to give them another chance

11   because they have had years of other chances and they have

12   squandered them.

13          So I understand Your Honor's mechanism, but there has

14   to be some penalty, as there would be in any contract

15   violation that is as persistent and intentional as this one.

16   And that is what I feel is lacking with respect to your

17   solution.  Respectfully.

18          THE COURT:  Mr. Staley, response?

19          MR. STALEY:  Yes, Your Honor.

20          THE COURT:  Mr. Staley?

21          MR. STALEY:  Yes, Your Honor.

22          We feel that we did provide a more than adequate

23   explanation of the series of events that has taken place over

24   the last two years and why we are here where we're at today.

25   Plaintiffs continually make an issue to the fact that we asked

1   for two extensions for the original deadline of the

2   implementation plan.  We met that second extension, and we

3   provided an implementation plan to the monitor in November of

4   2019.

5         As the Court and plaintiffs know, it is our position

6   that if there were disagreements at that time and they wanted

7   to bring it to the Court's attention, it was their obligation

8   to do so.  In the meanwhile, we continually worked with the

9   monitor to try and draft a plan that was acceptable to all, in

10   the midst of COVID, which I believe the Court has more than

11   enough briefing on to realize the strain and the burden that

12   has been placed on the medical staff and the Office of Health

13   Services, who are the ones that are creating this plan over

14   the last two years.

15         So while we disagree that the *Holmes* case applies, or

16   even if it does, we believe that does not negate the

17   requirements of the PLRA.  Taking *Holmes* into account, I

18   believe we have taken our best efforts to develop a plan that

19   meets the requirements of the decree and ensures that

20   defendants comply with the decree and also ensures that

21   defendants are taking steps and taking actions that they know

22   they can complete and comply with.

23         Respectfully, Your Honor has taken the position that

24   the decree does not give any insight as to how you should

25   resolve any disputes over the implementation plan.  We

1   respectfully disagree.  We believe that is where the PLRA

2   steps in, and those parameters give the Court the guideline to

3   resolve these disputes.

4          THE COURT:  All right.  Mr. Staley, no interest in

5   hashing prior arguments.  Just to be clear, it is my position

6   that the implementation plan is not good enough.  Mr. Staley,

7   are you saying the defense has no interest in going back one

8   more time to see whether these issues can be resolved, as I've

9   suggested?

10         MR. STALEY:  No, Your Honor, that is not what I --

11         THE COURT:  Can the parties get closer together?  It

12  appears that's just where we're at at this point, in terms of

13  looking for the necessary reforms that make the health care

14  system into one where inmates can expect to receive

15  conscientious medical attention for their serious needs.

16  Based upon what is before me at this point, I don't believe

17  that either side's proposal strikes the correct balance.

18         I am hopeful that the next round of submissions will

19  help to finalize the implementation plan, again, with the goal

20  of ensuring that the defendants can make necessary and proper

21  reforms.

22         So, Mr. Staley, is the defense interested in going

23  back to the drawing board, as I've suggested?

24         MR. STALEY:  Yes, we are, Your Honor.

25         THE COURT:  Any suggestions, alternatives to what

1    I've suggested in terms of a procedure?

2           MR. STALEY:  We believe the procedure -- we can agree

3    on the procedure outlined by the Court, and we believe we can

4    have a submission to the monitor within 45 days.

5           THE COURT:  Mr. Hirshman?

6           MR. HIRSHMAN:  Your Honor, I am kind of speechless in

7    the sense that they have had the monitor's comments since the

8    end of December.  It's now the middle of March, and they want

9    another 45 days to decide which of the monitor's proposals

10   Your Honor has outlined are acceptable to them?  With COVID

11   having waned, I don't get it.  I mean, they do not take

12   seriously the commitment they made.

13          I haven't heard any urgency on their part.  It's

14   just, we'll get back to the monitor in 45 days, then the

15   monitor will respond, then we'll come back to you.  It will be

16   July, at the earliest, when we have some kind of potential

17   resolution.  And what happens if what they -- if there's

18   another stalemate?  That is to say, the monitor has said "X,"

19   and they have said not "X."  And they seem to be taking the

20   position that Your Honor is then paralyzed.

21          I think Your Honor can, as in many, many contracts

22   and under Illinois contract law, fill in the gap with a

23   reasonable solution.  But I'm sorry to say, we have to move

24   this, if we're going to get the kind of change that the

25   department is supposedly committed to.  And 45 days is just

1   unconscionably long to file their response to the monitor and

2   the monitor -- and with Your Honor's guidance.

3          THE COURT:  Mr. Hirshman, what do you suggest?  Four

4   weeks takes us to April 13.  What do you suggest going forward

5   from there?  A deadline for the monitor to submit

6   disagreements as I've described?

7          MR. HIRSHMAN:  I mean, frankly, if I had the pen, I

8   would say three weeks, three weeks, and two weeks.

9          MS. PRESLEY:  Your Honor, this is Kelly Presley from

10  the Department of Corrections.  If I can just weigh in very

11  briefly on the request.

12          Part of the reason the department has requested a

13  longer time frame to get back to the monitor, as indicated in

14  our filing, we've recently contracted with our own consultant

15  who's -- one of her primary responsibilities is to assist us

16  in the amendments that are necessary to the implementation

17  plan.  That individual's been our -- has been on staff with

18  the department for approximately two weeks.  So she's getting

19  caught up to speed, and so that's why there was a longer

20  request.  It was not to delay, but it is our hope that in

21  working with another physician who's also a correctional

22  expert and can dedicate the time, per the recommendation of

23  the monitor, to really sit down with us and identify how we

24  can continue to make progress with this consent decree.  We

25  think we will be in a better position to submit a document

1    back to the monitor that he can accept.  And so that was the

2    reason for the longer request, is to give her an opportunity

3    to get caught up to speed and work with us in drafting a

4    document that the monitor can accept and the Court can accept.

5         THE COURT:  Mr. Hirshman, are you aware of said

6    consultant?

7         MR. HIRSHMAN:  Yes.  We learned of the consultant in

8    the filing from last week.  And we noticed the $1.75 million

9    fee that is supposed to be paid to the consultant over three

10   years.  I guess it's sort of -- at one level it is positive,

11   that is to say, that they have called in an expert to help

12   them.  At another level, the question arises how could it

13   conceivably be that they hired this person two weeks ago in

14   the face of the situation they had.  And in my sense, it is an

15   admission that their performance heretofore has been

16   insufficient, but the question of why this expert needs 45

17   days to reconcile their plan with the Court's monitor remains

18   open.  Why should it take 45 days for an expert to look at

19   these two plans and reach some conclusions?  It's just a

20   matter of them then putting it to the Court's monitor.  So I

21   don't see why an expert would need 45 days to look at these

22   two plans and reach some conclusions.

23        THE COURT:  Okay.  I will set April 20 for the

24   revised implementation plan to be submitted by the defendant.

25        May 10 for the monitor to register any disagreements,

1    to send that back to the defense.

2           And then the defense is to respond and submit the

3    document back to the Court by May 31.  And I'm going to set a

4    court date shortly thereafter.  There will be a lot of work to

5    do, I assume, but I will set the short court date to make sure

6    we stay on track.  There won't be any extensions.

7           April 20, May 10, May 31, and a court date in June,

8    of June 9.  June 9 at 11:00.  And we will see if things

9    continue to improve, whether that can be in person, but right

10   now I will set it again for a hearing, a teleconference

11   hearing.

12          MR. HIRSHMAN:  Your Honor, may I make one suggestion?

13   Leaving the schedule exactly as Your Honor had suggested, but

14   ordering that the defendants and their expert meet with the

15   Court's expert when they submit their revised plan.

16          THE COURT:  Ms. Presley, Mr. Staley, any objection to

17   what sounds like a reasonable request?

18          MS. PRESLEY:  The only objection that we have is that

19   our expert resides in Texas and so we would like to allow for

20   her to meet virtually via Zoom or WebEx, but there's no

21   objection to that.

22          THE COURT:  Okay.  So I will direct the defense to

23   make their consultant available, more than available, to

24   schedule and hold a conference with the monitor before

25   submitting its revised plan.

1          MR. MILLS:  Judge, this is Alan Mills.

2          I wasn't clear, and would like to request, if it

3    wasn't clear, that when the defendants submit their revised

4    plan, it be not just to the monitor, but also to the

5    plaintiffs' counsel.

6          THE COURT:  Yes.  That will be the order.

7          All right.  Mr. Hirshman, your idea about the

8    meeting, when does that make sense?  Does that makes sense

9    before, and at what stage are you contemplating that is most

10   optimal?

11         MR. HIRSHMAN:  I would say before they submit their

12   final -- before the April 20 date.  They should know -- I

13   would imagine it would be towards the end, so that they, you

14   know, if they had some things that they were having difficulty

15   with, they could explain it and then, you know, the monitor

16   could take that into his consideration when he responds.

17         THE COURT:  All right.  I will direct --

18         MS. PRESLEY:  Your Honor?

19         THE COURT:  Yes, Ms. Presley.

20         MS. PRESLEY:  I apologize.  Although, you know,

21   neither Mr. Hirshman or I are experts in this matter, I think

22   it would honestly make more sense to meet after we receive the

23   monitor's edits, to see if -- where the disagreement may be.

24   Because I fear that -- and not that we have any problems

25   meeting, but it doesn't really do any good to meet if the

1   monitor hasn't had time to really digest what we submitted,

2   and my experience is that that doesn't happen in two or three

3   days.  They need to take, you know, time to digest and

4   formulate recommendations.  And, in my opinion, those have

5   been the most fruitful meetings between the Office of Health

6   Services and the monitor, is once the monitor's seen what we

7   produced and has been in a position to provide recommendations

8   or areas of compromise.

9          THE COURT:  That makes sense to me.  Obviously, they

10  can speak or meet as often as they want.  The more, the

11  better.  But I'll direct a meeting before the monitor submits

12  his disagreements, which would be before May 10.  It makes

13  sense that the monitor should be able to review and digest the

14  revised draft implementation plan.

15         All right.  The next court date is June 9 at 11:00.

16  Thank you.

17   (Proceedings concluded at 11:42 a.m.)

18                        *  *  *  *  *

19              **REPORTER'S CERTIFICATE**

20         I, ANNETTE M. MONTALVO, do hereby certify that the

21  above and foregoing constitutes a true and accurate transcript
     of my stenographic notes and is a full, true and complete

22  transcript of the proceedings.

23         Dated this 25th day of April, 2022.

24  /s/Annette M. Montalvo
     Annette M. Montalvo, CSR, RDR, CRR

25  Official Court Reporter