# Health Care Monitor
# 5th Report
# Lippert v. Jeffreys

June 22, 2022

Prepared by Lippert Monitor
Dr. John Raba
Monitor's Consultants
Michael Puisis, D.O.
Ronald Shansky M.D.
Catherine Knox MN, RN, CCHP-RN

# Table of Contents

Executive Summary ........................................................................................................................4

Statewide Issues: Leadership and Organization ........................................................................16

    Leadership Staffing ..............................................................................................................16

Staffing Analysis and Implementation Plan .............................................................................19

    Staffing Analysis..................................................................................................................20

    Implementation Plan ...........................................................................................................21

    Vendor Relationships ..........................................................................................................24

Statewide Internal Monitoring and Quality Improvement ......................................................25

    Audits ..................................................................................................................................30

    Performance and Outcome Measure Results ......................................................................33

    Adverse Event and Incident Reporting Systems .................................................................34

    Vendor Monitoring .............................................................................................................36

    Mortality Review .................................................................................................................37

Medical Records .......................................................................................................................43

Policies and Procedures ...........................................................................................................45

    Medical & Dental ................................................................................................................45

Facility Specific Issues ............................................................................................................47

Facility Staffing .......................................................................................................................47

    Budgeted Staffing ...............................................................................................................47

    IDOC Staffing .....................................................................................................................53

    Vendor Staffing...................................................................................................................53

    Credentialing of Physicians ................................................................................................54

    Oversight over Medical, Dental, and Nursing Staff ...........................................................59

    Nursing Staff .......................................................................................................................62

Operations ................................................................................................................................64

    Clinical Space .....................................................................................................................64

    Equipment and Supplies .....................................................................................................65

    Sanitation ............................................................................................................................66

    Onsite Laboratory and Diagnostics....................................................................................68

    Dietary.................................................................................................................................69

Facility Implementation of Policies and Procedures ...............................................................71

    Medical and Dental ............................................................................................................71

Intrasystem Transfers ..............................................................................................................72

Medical Reception ...............................................................................................................75
   Health Assessments ......................................................................................................81
Nursing Sick Call................................................................................................................83
Chronic Care .......................................................................................................................91
Urgent and Emergent Care ..................................................................................................95
Infirmary Care ..................................................................................................................105
Specialty Consultation ......................................................................................................118
   Specialty Referral Oversight Review ..........................................................................122
Hospital Care ....................................................................................................................123
Preventive Services...........................................................................................................125
   Influenza Vaccinations ................................................................................................125
   Adult Immunizations ...................................................................................................127
   Cancer and Routine Health Maintenance Screening ...................................................132
   Mammography Screening ............................................................................................137
Pharmacy and Medication Administration ........................................................................139
Discharge Planning............................................................................................................149
Infection Control................................................................................................................152
Dental Care .......................................................................................................................168
   Staffing.........................................................................................................................168
   Dental Documentation .................................................................................................170
   Dental Support .............................................................................................................172
   Dental Intake ...............................................................................................................175
   Dental Hygiene ............................................................................................................175
   Comprehensive Dental Care ........................................................................................177
Facility Internal Monitoring and Quality Improvement ....................................................178
   Audits...........................................................................................................................181
   Performance and Outcome Measure Results ...............................................................182
   Adverse Event and Incident Reporting Systems.........................................................182
   Vendor Monitoring ......................................................................................................183
   Mortality Review .........................................................................................................183
   APPENDIX A ...............................................................................................................185
   APPENDIX B ...............................................................................................................188

# Executive Summary

*Addresses items II.A;*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs.  Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

There is a wide gap between what IDOC believes it has accomplished and the findings of the Monitor.  The Monitor is concerned that this lack of acknowledgement of poor performance will be a barrier to forward progress.  IDOC asserts substantial compliance on 30 provisions of the Consent Decree while the Monitor agrees with only three of these assertions[1].  This gap is very concerning.

IDOC continues to fail to provide the evidence supporting their asserted compliance.  Moreover, IDOC asserts that substantial compliance of a single facility warrants a substantial compliance score.[2] The Consent Decree is clear that substantial compliance requires systemic compliance and non-serious violations.[3]

**Data and Information**

The Monitor did not receive data requested from IDOC to verify compliance with the Consent Decree.  The Monitor's document request for this report was sent 1/21/2022 and included 113 items. The Monitor requested delivery by mid-March 2022. IDOC was also requested to inform the Monitor if the information was not available.  IDOC provided information responsive to only 21 of the items requested (18.5%).  For example, the Monitor was provided with the list and contact information for all of the HCUAs and if the position was vacant information on the individual acting in the position.  An updated roster of allocated and vacant positions for each facility was also provided. There were 55 items requested for which the IDOC provided no information. Neither did IDOC inform the Monitor that the information was not available (49%). Examples include a copy of the handbook provided persons in custody, blank copies of forms used in the health record, and updated Administrative Directives. There were 32 items on the January document request for which IDOC provided some information, but it was incomplete. For example, the credentialing information for physicians was incomplete in terms of the documents sent and also did not include all physicians. Missing information had to be requested over and over again.  In the absence of receiving any information by March the Monitor modified the request to narrow the scope of information requested for nine items.  The majority of this information was not received until June and even then, was in eight of nine instances, incomplete. For example, logs of dental cleanings completed were received from only three of

---

[1] III.A.1., that the Chief of Health Services shall be board certified; III.A.8. and that IDOC shall fill two Deputy Chiefs of Health Services positions, and III.A.5.   Provision III.A.5. to conduct oversight over specialty referrals is no longer applicable as collegial review is no longer part of the referral process.

[2] Page 1 of the June, 2022 Defendants' Reporting Requirement Pursuant to V.G. of the Lippert Consent Decree.

[3] Definition of substantial compliance in the Consent Decree in I.C.16., states, " 'Substantial Compliance' occurs when Defendants perform the Decree's essential material components even in the absence of strict compliance with the exact terms of the Decree.  Substantial compliance shall refer to ***instances in which any violations are minor or occasional and are neither systemic nor serious***.  Substantial Compliance can be found for obligations imposed under this Decree either state-wide or at specific facilities".

six facilities requested and not until the first of June. The other three sites simply did not respond to the request. To summarize over 80% of the information requested from IDOC by the Monitor for preparation of the 5th report was not provided, incomplete, or non-responsive.

**OHS leadership**
There have been no changes, since the last report, with respect to functional lines of authority within the IDOC medical program. The 5/30/22 Implementation Plan continues to authorize the Wardens and facility management to appoint or hire quality improvement coordinators. There have been no changes to the organizational structure that IDOC has made the Monitor aware of.

**Staffing Analysis**
IDOC has submitted their final staffing analysis without adjusting for staffing needs required in the Implementation Plan. IDOC has added at least 290 positions which they have agreed to post, but, they have not committed to hiring these staff as soon as possible. Failure to hire employees has made staffing worse than in 2019 when the Consent Decree started. Despite the addition of budgeted staff, there are actually 110 less staff working at the time of this report compared to 2019. The vacancy rate is 49%. There is no plan on how to improve hiring. IDOC has ignored many of the Monitor's criticisms and recommendations related to the Staffing Analysis and has not hired many staff recommended by the Monitor.

**Implementation Plan**
The Implementation Plan is over two years late and as a result a Court hearing is pending. IDOC has hired a consultant to assist in development of the Implementation Plan. The consultant is under instructions to only include in the Implementation Plan tasks that are specifically verbatim called out in the Consent Decree. IDOC thereby disregards programs recommended by the Monitor, like an infection control program, that is not called out in the Consent Decree but is an essential component of any large correctional health program. This principle of limiting its implementation plan to IDOC's interpretation of the Consent Decree fails to consider, for example, all of the general requirements of the Consent Decree that IDOC provide appropriate primary, secondary, and tertiary care and adequate facilities, monitoring, and performance measurements. This narrow interpretation of IDOCs obligations under the Consent Decree has resulted in a revised plan that fails to consider programmatic elements that are essential for an adequate correctional medical program.

IDOC's recent 5/30/22 Implementation Plan included virtually no input from the Monitor. Multiple tasks developed over two years based on input from the Monitor have been eliminated in its recent Implementation Plan. Few tasks in the 5/30/22 Implementation Plan can be shown to be meaningfully consistent with input or recommendations of the Monitor. Over two years, IDOC has demonstrated an unwillingness to accept recommendations of the Monitor that provide a meaningful path toward compliance with the Consent Decree. Instead, IDOC has produced an Implementation Plan that recreates their existing program.

**Quality Improvement Program**
For two consecutive reports, communication with Southern Illinois University and the Monitor has been extremely limited. The Monitor has not been able to provide effective input and learns about plans after they have been initiated. The Monitor remains uncertain about how the quality

improvement program will be structured.[4]   IDOC asserts substantial compliance with seven provisions[5] of the Consent Decree related to quality improvement without providing any evidence supporting compliance.  IDOC makes these assertions of compliance without even presenting a reasonable plan[6] to implement these provisions and without any evidence that the tasks they are asserting compliance for have even been implemented.

IDOC has abandoned prior commitments to an independent audit function, to develop an audit instrument with the Monitor, and to develop performance and outcome measures.  IDOC has not discussed their two implementation tasks on adverse event reporting with the Monitor and they appear no different than the practice that currently exists.  The Monitor has had one hour-long conference call with SIU since the last report during which a mortality review template was discussed.  The Monitor gave some suggestions for improvement of the template.  A final version was sent back to the Monitor.  The Monitor has concerns use of this template will fail to identify deficiencies as required by the Consent Decree.  Follow up discussion with SIU on this work product has not occurred.  The Monitor was told that the mortality review committee will initiate its work in June of 2022.   The quality improvement program is not being implemented with assistance and input of the Monitor which is required by the Consent Decree.

**Electronic Health Record**
IDOC was required to have a contract with an electronic medical record (EMR) vendor on 9/6/19. IDOC signed a contract with a medical record vendor on 4/12/19 but subsequently cancelled that contract.  The latest version of the Implementation Plan lists a date of March of 2022 for release of a request for proposal (RFP) but no date has been provided for completion of a contract.  IDOC projects August of 2025 as the date for full implementation of the electronic medical record.

IDOC has declined the recommendations of the Monitor to hire a project manager for the electronic record and data analysts to manage data for the electronic record.  IDOC will use "canned" reports provided by the electronic medical record vendor.  The Monitor remains concerned that IDOC will not effectively implement the electronic medical record or be able to provide data sufficient to verify compliance with the Consent Decree.

**Policies**
Since the last report no progress has been made with respect to development of a comprehensive set of health care policies.  A comprehensive set of policies was due to be completed by 7/1/20 but not a single policy has been completed and implemented.  On 2/25/22, one of the Monitor's team sent IDOC an email documenting the status of the 25 pending policies but received no

---

[4] The Monitor briefly reviewed a draft Quality Improvement Plan FY 2023 that was inserted as an appendix to the recent May 2022 IDOC annual report but this draft plan has not been discussed with IDOC or SIU and the Monitor has questions about how the program will operate.  The Monitor learned about this plan only after receiving the IDOC annual report.

[5] III.L.1., II.B.6.i., II.B.6.l., II.B.6.m., II.B.6.n., II.B.6.o., and II.B.9.

[6] The latest two versions of the Implementation Plan (4/20/22 and 5/30/22) presented newly designed quality improvement programs, including the audit function, that the Monitor was unaware of and were not discussed with the Monitor.  IDOC did include in its recent annual report, an appendix consisting of a draft quality improvement plan.  This also has not yet been presented to the Monitor by IDOC for discussion.  This Monitor knew of this draft plan upon receiving the IDOC annual report which was received mid-June 2022.

reply.  The Monitor has received no further information from IDOC about the status of pending policies.  IDOC has declined the recommendation of the Monitor to hire a project manager for policy development.  The latest version of the Implementation Plan lists February of 2023 as the date when a comprehensive set of policies will be completed but the Monitor has concerns about the capacity of IDOC to complete this task.

**Physician credentialing**
The Monitor utilizes the vendor's training and credentials spread sheet and the receipt of documents in the credentials packet to ascertain and verify the qualifications, medical school education, years of residency training, and board certification status of newly hired physicians. The Monitor requests credentialing information for the biannual reports which is not routinely provided and has to be repeatedly requested by the Monitor.  The materials received commonly lack the physician's AMA profile and have missing certificates and documents.[7] After repeated requests by the Monitor, the vendor only recently began to list the expiration dates for DEA registration. The expiration dates of State of Illinois physician licenses are not listed on the vendor's spread sheet and are not provided to the Monitor. The IDOC still does not send the Monitor requested information to fully evaluate credentialing or to evaluate those physicians who are not credentialed. IDOC does not inform the Monitor when a new physician is hired or a physician leaves employment interfering with the Monitor's ability to timely monitor the qualifications of newly hired physicians and assess the adequacy of access to care in the IDOC. The Monitor recently requested and received an updated facility provider staffing list and was surprised to note that three physicians assigned to provide clinical services in the IDOC were not listed on the vendor credentials spread sheet and whose credentials packets had not been provided to the Monitor.

Since the signing of the Consent Decree, all new physicians hired have been board certified or completed a residency in Internal Medicine, Family Medicine, of Emergency Medicine and the number of physicians who have not completed a residency in one of the required clinical fields has decreased from ten in May 2020 to three. IDOC has difficulty in recruiting and retaining physicians with the required training and qualifications. Since the 4th Report on 9/16/21, IDOC has lost five properly credentialled physicians and two non-credentialed physicians.

The OHS has not yet established an internal mechanism to evaluate physicians who lack required training and credentials. To date, evaluations of medical records, primarily mortality charts, by the Monitor has provided the clinical information used to determine if non-credentialled physicians are practicing in a safe and clinically appropriate manner.

**Physician Staffing**
IDOC does not send requested information on physician hours worked.  IDOC has 35.215 full time equivalent (FTE) budgeted physician positions but states that only 26 physicians are currently working.  This is a 26% vacancy rate.  Since some of the 26 physicians are part time, and the hours these physicians work is unknown IDOC may have less that 26 FTE working physicians and a much higher vacancy rate.  The 26 physicians are the lowest number of

---

[7] Three physician's credentials packets and spread currently lack AMA profiles and four who are listed as board certified have not provided their board certification certificates.

physicians since the advent of the Consent Decree in September 2019. Seven physicians[8] have left employment in IDOC within the last 7-8 months. This shortage of physicians has resulted in five physicians serving as facility medical directors of more than one facility. Eight medical directors of one or more facilities are also providing some level of backup clinical coverage at one or more other facilities. One physician is assigned as the medical director at four different facilities housing 4,711 inmates and proving backup coverage at two other centers which house 1,585 incarcerated persons. Seventeen physicians are assigned to provide backup and on-call services. The actual time physicians spend at the various sites of assignment is not provided to the Monitor. This shortage of physicians has created an access to care and quality of care crisis at multiple facilities and needs to be urgently addressed. IDOC needs to more effectively recruit and retain qualified physicians and should again consider contracting with locum tenens physicians and temporary physician agencies. Ultimately IDOC may need to expand their affiliations with academic medical centers to include hiring of physicians. A prior agreement with SIU to provide physician services at four IDOC facilities has been abandoned. IDOC has no tasks in its Implementation Plan to obtain qualified physicians.

**Hepatitis C Treatment**

IDOC revised its Hepatitis C Screening and Treatment Guidelines in March 2021 expanding eligibility for treatment and facilitating referral to UIC hepatitis C telehealth specialty clinic. By June 2021, the number of incarcerated persons with active hepatitis C receiving treatment began to increase. In the 42 months from 2018 to May 2021, prior to the revisions of the guidelines, two hundred eighty-eight patient-inmates received hepatitis C treatment. In the 12 months following the implementation of the new guidelines, two hundred eighty-two individuals have been treated for hepatitis C.[9] The calculated monthly hepatitis C treatment rate increased from 6.9 patients per month in treatment to 23.5 patients per month receiving the twelve week course of curative oral medication; this is 340% increase in the monthly provision of hepatitis C treatment in the IDOC. If this rate of hepatitis C treatment is maintained, it is feasible that IDOC will have essentially eliminated hepatitis C in the Illinois prison system within the next three years.[10] The eradication of hepatitis C in the IDOC would be a significant accomplishment for IDOC's infection control program and would have a positive impact on the present and future health of the incarcerated population, would eliminate the risk of transmission of hepatitis C with the IDOC, and would improve the overall health of communities in the State of Illinois.

**COVID-19 Pandemic**

At the time of the last Court Report[11] the surge of the COVID-19 infections due to the delta variant was still spreading in IDOC facilities. The last mortality in the incarcerated population likely due to the delta variant occurred in September, 2021. Beginning in December 2021 with the arrival of the omicron variant there was a large spike in COVID-19 cases in persons incarcerated in the IDOC. As with previous surges during the pandemic, the increased cases in inmates were preceded by a rise of positive cases in facility employees who are considered to be

---

[8] This includes five physicians who are either board certified or ones who completed a residency in a primary care field.
[9] UIC Telehealth Hepatitis C treatment logs 2/16/18 to June 14, 2022
[10] December 2021 CQI minutes Hepatitis C clinic rosters: IDOC currently houses approximately 800-850 individual with untreated active Hepatitis C. It is also understood that there will be new admissions continuously entering the IDOC with untreated hepatitis C
[11] 4th Court Report of the Medical Monitor, Lippert V Jeffreys, September 16, 2021

the prime vectors bringing COVID into IDOC facilities. There were one, possibly two, inmate mortalities in early 2022 due to the omicron variant.[12] The omicron surge generated a large volume of positive tests in the incarcerated population but resulted in few hospitalizations. The spread of an omicron subvariant in May-June 2022 again caused increases in positive tests in the IDOC population. However, there have been no patient-inmate hospitalizations due to COVID-19 infection since February 2022.

IDOC wisely established a consultative relationship with the Illinois Department of Public Health to assist with decisions to implement policies and practices and to manage the repeated surges of COVID-19 variants. The actions taken included an ongoing systemwide vaccination program for inmates and staff, universal masking, isolation and quarantine procedures, regular surveillance COVID-19 testing for both incarcerated persons and employees, collaboration with the National Guard and IEMA to augment staffing and assist with onsite vaccination, and development of contracts with private COVID testing entities to do surveillance tests and laboratory testing. Although the COVID vaccination rate for employees woefully lagged behind the acceptance rates by the incarcerated population, the rates for both incarcerated men and women and employees are now 75%. The Governor's statewide COVID vaccination mandate for state workers and contractors in state prisons and congregate living facilities was instrumental in increasing the employee vaccination rate in the IDOC.[13] The IDOC imposed a vaccine for all contractors, visitors, and volunteers in order to enter IDOC facilities in January 2022.[14] Both vaccine mandates were encouraged and supported by the Monitor and further impedes the entry of COVID-19 into the high risk congregate housing of the IDOC. All of the above actions initiated by IDOC and the Governor's office have contributed to preventing hospitalizations and deaths COVID infection in the incarcerated population and prison employees.

IDOC has been awarded a significant grant to enhance pandemic staffing, plan for future pandemics, and strength IDOC's infection control efforts.[15] This grant will enable IDOC to be better prepared to manage current and future expected and unexpected pandemics and outbreaks that would put the IDOC population at risk. The Office of Health Services' Chief of Health Services has been appointed to a CDC advisory group to identify best practices in the management of the COVID-19 and future pandemics in correctional settings. The participation of OHS leadership in this advisory group will benefit IDOC's efforts to improve infection control and other public health issues in the IDOC.

**Specialty Consultation and Specialty Referral Process**
IDOC no longer asserts compliance for provisions III.E.4., or III.H.3-4., but continues to assert compliance with III.H.1-2. No evidence is provided for this compliance except a tracking log which is not standardized, contains no dates for the review of a consultation report by a medical provider. The tracking logs do not appear to be accurate based on record reviews. Medical records also fail to document that providers actually review reports that are documented as reviewed on the tracking log. This can be seen in mortality reviews in Appendix B. Mortality

---

[12] OHS-Monitor conference call 3/17/22
[13] 8/2/21 Governor issues vaccine mandate for state workers and contractors in state prisons and other congregate living facilities
[14] OHS-Monitor Conference Call, 2/24/22
[15] Department of Justice/CDC grant

reviews continue to show untimely referrals; disorganized follow up of consultations; and lack of integration of consultation recommendations into the patient's therapeutic plan.

Record reviews show no improvement in clinical care with respect to specialty care. IDOC has provided no data or information to demonstrate any improvement.

**Adult Immunizations, Cancer Screening, and Routine Health Maintenance**
The Monitor has requested data on persons who have been offered, refused, or accepted immunization but has received no data. The only mechanism for the Monitor to judge immunization rates is to review shipments of vaccine to IDOC facilities and to perform chart reviews neither of which give an accurate representation of actual immunization rates on a statewide basis. Over two years ago the OHS expanded the availability of vaccine supplies in the IDOC of all adult immunizations recommended by the CDC for all adults in the United States. IDOC developed a draft Immunization, Cancer/Preventive Screening Recommendations administrative directive in January 2021 that was in alignment with the national recommendations of the CDC and the United States Preventive Services Taskforce (USPSTF).[16] It was reported that there is an updated immunization policy that has not yet been shared with the Monitor.

IDOC does not maintain any systemwide, facility by facility data on the number and percentage of eligible patients offered, accepted or refused for each vaccine that is indicated. No facility reports adult immunization data in their CQI committee minutes.[17] Review of the immunization orders filled by the IDOC pharmacy[18] provides some inferential data that some medical providers at some facilities are beginning to order some nationally recommended adult immunizations. However, data on ordering does not mean that the vaccines were actually administered. The two female facilities have established HPV vaccine programs to vaccinate all women 26 years old younger and upon request of the Monitor have provided data on the administration of this cancer preventing vaccine.[19] The current immunization practices at IDOC facilities vary considerably and nationally recommended immunizations are not consistently provided to eligible patients.[20] This is consistent with failure to implement a standardized vaccination procedure. Based on the volume of adult immunizations that have been ordered and the results of chart reviews by the Monitor, the IDOC population is still under-vaccinated for many CDC recommended adult immunizations. IDOC must accelerate the pace of vaccine

---

[16] CDC Recommended Adult Immunization Schedule 2021 and USPSTF A and B Recommendations 2022

[17] During 2021 flu season a handful of facilities reported on the provision of influenza vaccines

[18] Boswell Pharmacy vaccine orders 11/1/19 – 2/1/22 revealed 28 of the 30 sites ordered pneumococcal-23 vaccines, 27 of 30 ordered RZV, 23 of 30 ordered peumoccocal-13 vaccines but in extremely small quantities that could not meet the needs of the IDOC, 9 of 30, 8 of 30 ordered meningococcal ACYW vaccines but all sites have HIV patients for whom this vaccine is indicated, 4 0f 30 sites ordered hepatitis B in very limited quantities, 2 of 30 sites ordered hepatitis A vaccines for only 2pts, and only 1 of 27 male facilities ordered HPV vaccine for males under 26y of age.

[19] The reporting and tracking of number of females receiving Human Papilloma Virus (HPV) vaccination is a solid first step in monitoring the provision of this infection and cancer preventing vaccine in eligible women at Decatur CC and Logan CC. These two sites now need to report on the percentage of eligible females who start and complete the 3 shot series.

[20] Chart reviews from East Moline CC, Jacksonville CC, Pinckneyville CC, Robinson CC, Shawnee CC, and Vandalia CC revealed inconsistent offering of RZV and pneumococcal-13 at all sites and there was no evidence that pneumococcal-13 vaccine was offered to high-risk patients at any site.

administration to provide adequate protection for the incarcerated population and track and report the percentage of eligible individuals who are fully immunized for each nationally recommended vaccine. The development of a vaccination program directed by nursing staff utilizing approved treatment guidelines has the best potential to effectively coordinate the catch-up and ongoing vaccination of incarcerated persons in the IDOC. Without systemwide accurate data IDOC will not be able to verify compliance with the administration of nationally recommended adult immunizations to eligible incarcerated men and women.

The draft Immunization and Cancer/Preventive Screening Programs administrative directive appropriately provided guidance on screening for breast, cervical, colon, lung and prostate cancers that was in alignment with the recommendations of the United States Preventive Services Task Force. But this draft administrative directive appears to have not been fully implemented. Record reviews from the women's facilities at Logan CC and Decatur CC[21] and data on the numbers of mammograms and PAP smears performed over a nine month period[22] indicate that many incarcerated females are offered PAP smears and mammograms. IDOC only provided the gross numbers of PAP smears and mammograms that have been performed but has not provided data about the percentage of eligible women who are offered these screening tests and the percentage who receive these tests at nationally recommended intervals.

For the first time the Monitor identified data on the provision of colon cancer screening in the CQI committee minutes of one of IDOC's 30 facilities.[23] In addition, medical records of individuals eligible for colorectal cancer screening from seven facilities documented that only 22% had been offered a nationally recommended screening test for colon cancer. Five of the seven facilities audited did not offer colorectal screening or offered an ineffective outdated test. Twenty-seven were offered a digital rectal exam with a single stool guaiac test as a combined screening for colorectal cancer and prostate cancer; this modality of screening for prostate cancer and colon cancer was discontinued 15-20 years ago.

Current recommendations are that persons 50-80 years old with a history of 20 pack years of smoking are candidates for annual low dose CT screening for lung cancer and individuals with advanced liver fibrosis or cirrhosis should be screened every six months for hepatic cell carcinoma (HCC). No data was provided on the provision of lung and liver cancer screening in the IDOC.

Lung, colorectal, and liver cancers are the three leadings causes of cancer mortality in the IDOC For the first time there is limited data from three[24] of IDOC's 30 sites that colorectal cancer screening using a nationally recommended testing method is being performed in some sites

There is no data that lung and liver screenings are being done. Although the data can be

---

[21] 10 records from Decatur CC and 8 records from Logan CC revealed that 17/18 (94%) women had received a mammogram in the last two years and 15 (84%) of 18 women were offered PAP screening, one refused, 3(17%) had no documentation in the documents provided that PAP tests had been offered in the previous 3 years.

[22] IDOC communication on number of mammograms and PAP tests done from October 2020 to June 2021

[23] Logan CC October, November, and December 2021 CQI minutes listed the number of monthly colon-rectal screenings offered, completed, and refused. The notes failed to identify the type of Test utilized and whether the 4 abnormal tests resulted in a referral for additional diagnostic testing.

[24] Decatur CC, Logan CC, and East Moline CC

improved, breast and cervical cancer screening is being regularly offered and done at both
female facilities.

**Access to Nurse Sick Call**

IDOC asserts compliance with III.F.2 of the Consent Decree which requires that there be no
limitation on the number of complaints addressed in a single sick call encounter. The basis for
this conclusion is that the Agency Medical Director has said it is so.[25] IDOC provides no proof of
practice that the directive has been implemented. There is no policy and procedure and no
monitoring to ensure the verbal direction of the Medical Director has been followed. The
Monitor does not doubt that the verbal direction was given but that is not sufficient to establish
compliance.

No progress has been made improving access to primary care via sick call. Numerous reports
that were reviewed for this report document delays in timely access to primary care via nurse
sick call.  Primary reasons for these delays are vacancies and restricted movement to prevent
transmission of COVID.

There is no plan to achieve compliance with III.A.10. of the Consent Decree which requires
registered nurses to conduct sick call. Forty-nine percent of budgeted registered nurse positions
are vacant. This is up from 29% vacant in 2021.[26] The IDOC implementation plan only calls for
regular meetings to review progress hiring, a practice that has been in place for more than a year
now.[27]

The Monitor has grave concerns with the treatment protocols used by nurses to address patient
medical complaints that are well documented in the last three reports. There is no indication,
based upon charts reviewed for this report, that any steps have been taken by IDOC to protect
patients from harm resulting from misuse of the treatment protocols.

The data and methods used by IDOC to monitor sick call as well as the data provided to the
Monitor relative to sick call is fragmented, incomplete and not reliable. The IDOC still has not
inventoried the space and equipment needed to provide privacy and confidentiality during sick
call encounters[28] and record review for this report indicates that some of these encounters take
place cell side.

**Medication Administration**

IDOC states that it is compliant with II.B.6.c of the Consent Decree that it changed medication
administration records both for directly administered medications and KOP.  They report that
SIU has assembled a team that has observed medication administration at two facilities and
distributed a survey. However, these activities have not resulted in any findings, changes, or

[25] Lippert v Jeffreys, 10-cv-4603: IDOC's Response to the Monitor's Initial Report, December 24, 2019, page 3.
[26] Health Care Monitor 4th Report, Lippert v. Jeffreys, September 16, 2021, page 60.
[27] IDOC draft implementation plan dated 5/30/2022 tasks 68 and 69. Health Care Monitor 4th Report, Lippert v.
Jeffreys, September 16, 2021, page 61.
[28] Defendants' draft implementation plan dated June 2020.

improvements to date. Further the project taken on by SIU is not reflected in IDOCs most recent implementation plan.[29]

A pharmacist has been hired by SIU, which the Monitor is hopeful will bring necessary expertise to the table in solving the significant problems there are with the system for medication administration and prescribing practices. We continue to suggest expanding the model used by the HIV clinic to increase the participation of clinical pharmacists in patient care.

Meanwhile practices of pre-pour[30] and non-contemporaneous documentation continue as pervasive risks to patient safety. Neither have any steps been taken to improve notification of providers when patients refuse medication and the expectations of providers to address the issue with the patient.[31] The failure to address poor practices in medication management contributed to under-treatment and mistreatment of patients with significant disease whose charts were reviewed this reporting period.

**Aging IDOC Population and Infirmary Care**

In the most recent versions of the Defendant's draft implementation plan the Department has reneged on previous commitments that would have addressed problems previously identified in the Monitor's reports with infirmary care and the needs of the elderly, disabled or infirm for safe and appropriate housing, programming and care.

Record reviews show patient care that appeared consistent with neglect and abuse. Infirmary beds are used inappropriately for security purposes. Infirmaries are not staffed or equipped to care for patients who have needs for skilled care. We also reviewed care of patients who should have been hospitalized but were instead kept on the infirmary. The Department has not defined the scope of infirmary services available, and patients have been harmed by lack of these written directives. Notably of 25 records reviewed for this report, five patients with dementia had 15 falls and eight medical patients had 13 falls. Injuries sustained during falls included a hip fracture, a femur fracture, and an ankle fracture. Numerous minor injuries were sustained. These falls were out of beds, in showers, while toileting and during transfers.[32] The plan of care sometimes included "fall precautions" but what these were was never stated.

Problems with services for the aged population, specifically those with cognitive disabilities, identified by the Monitor's record review in addition to the problems with infirmary care generally include:
1. Custody placement of persons with cognitive disorders in the infirmary results in

---

[29] An earlier version of the implementation plan (12/30/2021) specifically called out a process improvement project for medication administration which has been deleted from subsequent drafts of the implementation plan.

[30] Pre-pouring medication means that nurses prepare medications in advance of administration by taking them from an authorized pharmacy container and placing them in an unauthorized container until administration to the patient. Pre-pouring is not an accepted practice and is recognized as unsafe. By transferring medication from a pharmacy approved package into alternate packaging without appropriate labeling, the potential for error is increased.

[31] The Defendant's draft implementation plan dated 5/30/2022 merely commits to the task of writing policies on documentation in the medication administration record and the documentation of refusals. There are no tasks that represent any intent to significantly reduce risk of patient harm.

[32] Mortality review patients 2, 3, 4, 5, 6, 10, 13, 15, 19, 20, 22, 23, 24.

isolation and confinement that may contribute to decline in mental and physical health.[33]

2. Patients with cognitive deficiencies and apparent dementia never had a cognitive evaluation to guide subsequent care and went without periodic monitoring.[34]

3. Patients with dementia signed documents for "do not resuscitate status" or living wills when they clearly were not of sound mind and could not willfully and voluntarily do so.[35]

4. Patients with dementia were subject to custody punishment for behavior inherent to their dementia.[36]

5. Patients with dementia were not well treated and, in several cases, appeared mistreated, neglected, or abused. This included not being given sufficient fluid for hydration, not helping with eating, not monitoring the patient's nutrition, and providing insufficient supervision for the patients in order to prevent harm to the patient.[37]

Long-term housing of elderly patients with dementia, severe disability, or end-stage chronic illness continues to occur without a statewide plan for management of this population. Infirmary capacity is reduced when it is used to provide long term housing for frail or elderly persons resulting in patients needing infirmary care who are inappropriately housed in general population. House Bill 3665, the Joe Coleman Medical Release Act, allows discretionary early release of prisoners who are terminally ill OR medically incapacitated to a Medicaid-eligible long term care facility.[38] The Department has provided no information in response to the Monitor's requests for a progress report on releases according to this bill.

Physical therapy positions have been added by IDOC since the last report, however actual manpower has only increased by six hours a week at the time of this report. There are still 13,000 individuals in IDOC custody at facilities with infirmaries with no access to physical therapy. Lack of physical therapy was identified as problematic in the care of five of the 25 death records reviewed. Lack of physician availability is apparent in reported CQI studies and in several charts reviewed.[39]

Information on the status of the new Joliet, Illinois facility is limited. The scope of services has not been defined and planning for it is not included in the Implementation Plan or Staffing Analysis.[40] No information has been provided by IDOC to support its claim of compliance with III.I.4 of the Consent Decree regarding the availability of security staff in the infirmary or III.I.5 for sufficient and properly sanitized bedding and linens.

**Health Care Space, Physical Plant, and Equipment**
In the June 2020 Implementation Plan, IDOC committed to perform a systemwide audit of the clinical and health care spaces to ensure there is adequate space with privacy and confidentiality

---

[33] Mortality review patients 3, 10, 21.
[34] Mortality review patients 2, 3, 19, 21, 23, 24.
[35] Mortality review patients 2, 4.
[36] Mortality review patient 2.
[37] Mortality review patients 2, 3, 4, 21, 23, 24.
[38] Joe Coleman Medical Release Act Illinois House Bill 3665 August 20, 2021
[39] Mortality review patients 3, 14, 15.
[40] OHS-Monitor Monthly Conference Call, 4/28/22

for the delivery of health care services to the incarcerated population [41]  This survey of all facilities is needed but has not yet been done.

IDOC has not yet standardized or monitored equipment in IDOC though it has tasks in the Implementation Plan to do so.  Over a year ago, IDOC sent the Monitor a proposed draft Monthly Health Care Inspection and Equipment Survey[42] that was intended to facilitate the evaluation of sanitation, condition of physical structures, selected furnishings, equipment, and practices in the HCUs and other medical areas.  This instrument was never completed and surveys of monthly inspections of equipment have not been initiated.  The most recent Implementation Plan does include tasks to standardize equipment in the facilities.

There has been no change to monthly Safety and Sanitation reports which continue to vary in format and content from facility to facility.   The Implementation Plan of December 2021 committed to a tool to inspect health care units and equipment and to test this tool with the Monitor but that task has been eliminated.

Since the last report there has been no verifiable changes with respect to clinical space, supplies or equipment.

**Clinical Care**
Clinical care was reviewed through mortality record reviews.  No significant improvement in clinical care has occurred; quality of care remains poor.

IDOC provided 60 comments on the mortality reviews in Appendix B.  None of the comments resulted in changes of the assessment or recommendations  of the Monitor.  Three factual errors identified in those comments were corrected in this document.  The Monitor did not agree with the remaining 57 comments.  Some comments were factually incorrect.  Most comments attempted to justify the performance of staff and did not appear intended to identify opportunities for improvement which is the purpose of these reviews.

---

[41] IDOC Lippert Implementation Plan 6/12/20 in Structural Components section.
[42] This was sent 10/21/20

# Statewide Issues: Leadership and Organization

**Leadership Staffing**

*Addresses item II.B.2; II.B.3; III.A.1; III.A.8; III.A.9*

**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**II.B.3.** *IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff.*

**III.A.1** *The Chief of Health Services shall hereafter be board certified in one of the specialties described in paragraph III.A.2, below. The Deputy Chiefs of Health Services shall either be board certified or currently board-eligible in one of the specialties described in paragraph III.A.2, below.*

**III.A.8.** *Within eighteen (18) months of the Effective Date Defendants shall create and fill two state-employed Deputy Chiefs of Health Services positions reporting to the Chief of Health Services to provide additional monitoring and clinical oversight for IDOC health care.*

**III.A.9.** *Within nine (9) months of the Effective Date every facility shall have its own Health Care Unit Administrator ("HCUA"), who is a state employee. If a HCUA position is filled and subsequently becomes vacant Defendants shall not be found non-compliant because of this vacancy for nine (9) months thereafter.*

**OVERALL COMPLIANCE:** Partial Compliance

**FINDINGS:**

The Monitor requested the following data and information to verify compliance with these provisions.

- Request 4.b. **Response to Monitor's letter in response to IDOC Staffing Analysis.** This was not provided
- Request 5.b. **Any documents regarding a SIU or other academic center proposal with respect to quality improvement or other services including staffing.** This was not provided.
- Request 5.c.ix. **Any data or information to update work on the quality improvement program including vendor monitoring.** This was not provided.
- Request 13. **Table of organization of OHS in relation to all parts of the organization responsible for health care services including all vendors with incumbent names.** Monitor has the May 2021 table of organization of OHS but this does not show the relationship to the entire organization.
- Request 14. **Table of organization of vendor and contracted health care services with incumbent names to evaluate vacancies.** IDOC provided the vendor statewide leadership table of organization.
- Request 15. **Table of organization of each facility including both state and vendor**

**employees.** Only the vendor tables of organization for each facility were provided and incumbent name was not included so vacancies could not be determined. The table of organization for state employees at the facilities was not provided.

- Request 16. **Updated position descriptions for statewide infection control and statewide quality improvement coordinators**. These were not provided.
- Request 17. **Position descriptions of regional coordinators**. These were not provided.
- Request 21. **List of HCUAs with contact information.** This was provided.
- Request 26. **Vendor monitoring reports statewide and for each facility.** None were provided.

The 4/20/22 Implementation Plan includes tasks 54, 55, 64, 67, 68, 69, and 92 which are related to this section.

- Task 54 is a statement that the Chief of Health Services shall be board certified in a specialty named in the decree.
- Task 55 is to hire executive leadership staff to oversee the quality team for SIU.
- Task 56 is a statement to fill two Deputy Chiefs of Health Services.
- Task 57 is to hire a coordinator to oversee the Infection Control Program.
- Task 64 is to hire a consultant to support the implementation plan.
- Task 67 is to develop partnerships with universities to augment staff outlined in the staffing analysis.
- Task 68 is to create a draft IDOC/OHS organizational chart to clarify reporting and supervisory relationship between OHS leadership to facility HCUA.
- Task 69 is to create an OHS to vendor organizational chart. This will illustrate the relationship between OHS and vendor staff.
- Task 92 is a goal to ensure that any vendor contract requires vendors to comply with all court orders, policies, and procedures.

Tasks 54, 56, 57, and 92 are restatements of the Consent Decree without associated plans. A board-certified Chief OHS has been hired over a year ago fulfilling provision III.A.1. Two Deputy Chiefs OHS have already been hired fulfilling III.A.8. There is no purpose to include these tasks in the Implementation Plan. Tasks 57 is to hire a system-wide infection control coordinator but the person hired is unqualified for the position. Task 92 is a restatement of the Consent Decree without any associated tasks to indicate how it will be implemented.

With respect to task 64, IDOC needs a project manager not a consultant who has already been hired. The task does not define what this person will do. Moreover, the process for accomplishing the task states that the person is hired to support the implementation of the electronic record and goes on to say that additional staff "needed for operationalizing the implementation plan have been hired in Quality and a dietician has been hired". These later elements, while possibly useful, are irrelevant to the task.

Task 67 is a goal that is not actionable. IDOC should describe what positions they will hire and what the position will be responsible for.

The table of organization described in tasks 68 already exists. It does not ensure that a clear line

of supervision exists. Both task 68 and 69 need to show that there is a medical authority with clear lines of authority throughout the organization.

The tables of organization that were provided still demonstrate a hybrid medical program without clear lines of clinical or administrative authority. Approximately one third of facility employees are state staff. Fourteen facilities have a significant number of state staff. None of the tables of organization show lines of authority integrating state and vendor staff. All physicians are hired by the vendor. But the vendor table of organization does not show a clear line of supervision for physicians. The vendor table of organization shows that the three vendor regional Medical Directors report to the Vice President of Operations. Facility physicians appear to be supervised by the vendor Regional Managers. There is no clinical line of supervision to vendor physicians. At Dixon, vendor licensed practical nurses and certified nurse assistants report to a vendor supervisory nurse but the state registered nurses report to a state supervisory nurse. This hybrid system is dysfunctional as there is not a unified clinical structure with clear clinical lines of authority. In the previous report, the Monitor has explained the problems with supervision of the HCUAs by Wardens extensively. Nothing has changed.

Twenty-four (80%) of 30 HCUAs positions are filled. A 20% vacancy rate of these key positions is unacceptably high.

IDOC has offered no evidence of effective monitoring of the vendor. Occasionally, quality improvement minutes mention vendor staffing issues but there is no evidence that this results in any corrective action. IDOC provided no data and information to verify that IDOC is providing oversight over clinical care or contract oversight. Apparently, there is no monitoring of the vendor. IDOC provided no evidence of supervision or oversight over physicians. Record reviews support ongoing physician clinical inadequacies.

The Monitor has recommended that IDOC needs to augment OHS staff. The IDOC has provided no information related to augmenting the OHS staff. Leadership staff continue to manage the COVID pandemic issues and still do not have time to engage in the implementation of the Consent Decree which has been considerably delayed.

Position descriptions for OHS staff are still incomplete. Formal job descriptions are still lacking for the Regional Coordinators, Health Information Officer, Electronic Health Record Administrator, Health Information Analyst, and Quality Improvement Coordinator.[43] The actual responsibilities within the health program of the Environmental Services Coordinator and the Environmental Services Program Director are not clear. The job descriptions do not clarify the confusion.

**RECOMMENDATIONS:**
1. The OHS DON needs to report to the Chief of Health Services. Responsibilities of the DON should include primary responsibility for development of statewide policy and procedure for those subjects that are nursing-driven (medication admission, intake

---

[43] The Staffing Analysis of 7/7/21 does contain a narrative description for the duties of the Health Information Coordinator, Electronic Health Record Administrator, and the Health Information Analyst. These narratives do not constitute full job descriptions

screening, nurse sick call, infirmary care etc.), setting performance expectations for registered nurses, licensed practical nurses and nursing assistants, establishing staffing standards, peer review of professional nursing, competency review of nursing support personnel, participates in critical incident and mortality review, establishes nursing quality indicators and monitors nursing quality.

2. Identify a Director of Nursing Services at each facility who is accountable to the Statewide DON for clinical practice and quality. Line authority would remain with the HCUA for daily operations.

3. IDOC is requested to provide quarterly up-to-date vacancy reports that include OHS and HCUA positions.

4. IDOC should formally document that the Chief OHS is responsible for managing the health program of the IDOC as evidenced by a communication by the Executive Director to the Wardens communicating this new relationship. This responsibility needs to include authority to hire, fire, and appoint replacements for all medical personnel within the health program. With the exception of the Chief OHS, who reports to a deputy director, all medical staff report to medical supervision and not through custody, (e.g., the Warden). A table of organization should reflect these changes.

5. Physicians and other providers need to report through physician leadership ultimately reporting to the clinical direction of the Chief OHS.

6. Nursing staff need to report through a facility Director of Nursing at each facility who, for clinical issues, reports to the statewide OHS Director of Nursing.

7. HCUAs need to report for all matters (clinical and operational) to OHS administrative leadership (Regional Coordinators) who report to the senior OHS administrator (Medical Coordinator)

8. The OHS DON, OHS Medical Coordinator, Deputy Chiefs, and OHS Dental Director should report to the Chief OHS.

9. OHS needs to further augment its leadership and support staff to address the provisions of the Consent Decree and to adequately fulfil its responsibilities as IDOC's health authority.

# Staffing Analysis and Implementation Plan

***Addresses items IV.A.1-2; IV.B;***

**IV.A; IV.A.1; and IV.A.2.** *The Defendants, with assistance of the Monitor, shall conduct a staffing analysis and create and implement an Implementation Plan to accomplish the obligations and objectives in this Decree. The Implementation Plan must, at a minimum: (1) Establish, with the assistance of the Monitor, specific tasks, timetables, goals, programs, plans, projects, strategies, and protocols to ensure that Defendants fulfill the requirements of this Decree; and (2) Describe the implementation and timing of the hiring, training and supervision of the personnel necessary to implement the Decree.*

**IV.B.** *Within 120 days [July 1, 2019] from the date the Monitor has been selected, the Defendants shall provide the Monitor with the results of their staffing analysis. Within sixty (60) days after submission of the staffing analysis, Defendants shall draft an Implementation Plan. In the event the Monitor disagrees with any provision of the Defendants' proposed Implementation Plan, the matter shall be submitted to the Court for prompt resolution.*

**OVERALL COMPLIANCE:** Partial compliance

**FINDINGS:**

**Staffing Analysis**

The Staffing Analysis was initially due 8/17/19.  The IDOC submitted to the Court a final Staffing Analysis on 7/7/21.  Subsequent to that submission, the Monitor submitted written disagreements with the IDOC Staffing Analysis to Parties on 7/16/21[44].  The Monitor requested a response[45] to the Monitor's disagreements with the Staffing Analysis but IDOC was nonresponsive to that request and it is unclear the extent to which IDOC has modified staffing based on those recommendations.

Though the Staffing Analysis is meant to be associated with the Implementation Plan, IDOC has not derived their Staffing Analysis based on the Implementation Plan.  No evidence was provided that implementation plans for certain areas include staffing to support the task.  The IDOC has also not utilized a meaningful methodology to determine staffing.

For the first time, IDOC has allocated and budgeted all recommended positions in the staffing analysis but has not committed to hire all staff as soon as possible.  Since 2019, IDOC has lost 110 staff despite increasing positions in the staffing analysis.  As shown in the table below, there is a net 11% decrease in working staff since 2019.  IDOC is unable to hire and retain staff.  The IDOC has a 46% vacancy rate, which is astronomical.  This reflects IDOC now budgeting for all positions in their staffing analysis.  The IDOC staffing analysis since 2019 included approximately the same number of positions.  The Monitor has recommended over multiple reports that IDOC develop a recruitment task force with IDOC, CMS, and the vendor.  This has not been done and IDOC has been unable to hire staff.

| Staffing Analysis Version | Allocated / Budgeted Positions* | Vacant Positions | Vacancy rate | Working Staff ** | Percent Increase of Working Staff from 2019 | Recommended Positions in Staffing Analysis*** | Total Positions |
|---|---|---|---|---|---|---|---|
| Nov-19 | 1210 | 236 | 20% | 974 | | 373 | 1583 |
| Jun-20 | 1209 | 275 | 23% | 934 | | 357 | 1566 |
| May-21 | 1277 | 282 | 22% | 995 | 2% | 308 | 1584 |
| Jul-21 | 1277 | 282 | 22% | 995 | 2% | 308 | 1584 |
| Mar-22 | 1591 | 727 | 46% | 864 | -11% | 0 | 1591 |

*These are positions that are able to be hired
**Working staff = total staff - (vacant +recommended).  This is 1 off due to rounding
***These are the positions recommended in the Staffing Analysis.  As allocated positions increase, the number of recommended should correspondingly decrease unless the number of positions was changed in the Staffing

In summary, the Staffing Analysis has been delayed for over two years.  Six Staffing Analyses

---

[44] The document was sent 7/16/21 to IDOC and it counsel and listed 19 disagreements.  The IDOC did not respond to the disagreements.
[45] Document request 4.b. of data and information request of the Monitor to IDOC.

have been provided with a net change of 8 additional positions with multiple changes that increased low skilled staff at the expense of high skilled staff. A workload analysis has not been used to develop staffing needs. No formal explanation has been provided to address the Monitor's concerns or to explain the rationale for changes that IDOC has made. IDOC has not responded to the Monitor's concerns about key position deficiencies[46].

It is not clear how the submitted Staffing Analysis permits IDOC to adequately execute its Implementation Plan. While a Staffing Analysis has been provided, there are sufficient deficiencies to warrant only a partial compliance rating. The Monitor agrees with the IDOC that the Staffing Analysis will need revision over time, especially as programs of the Implementation Plan are put into place and especially after IDOC acquires the capacity to adequately assess workload. As this document is submitted to the Court, the Monitor would advise that IDOC be required to complete a workload analysis within a year to address staffing deficiencies and account for any changes implicit in the Implementation Plan that will eventually be submitted. It should also be required to hire the staff recommended by the Monitor or show how it will fulfill those functions otherwise. For all of these reasons, the Staffing Analysis remains partially compliant.

**Implementation Plan**

The Implementation Plan was initially due 9/24/19 but was not proposed to the Court until 12/30/21. The Monitor's disagreements with the Implementation Plan, as required by the Consent Decree, were submitted to the Court in January, 2022.

The Consent Decree requires that

> The Implementation Plan must, at a minimum:
>
> 1. Establish, ***with the assistance of the Monitor,*** specific tasks, timetables, goals, programs, plans, projects, strategies and protocols to ensure that Defendants fulfill the requirements of this Decree; and
> 2. Describe the implementation and timing of the hiring, training and supervision of the personnel necessary to implement the Decree

The IDOC Implementation Plan has not completed these requirements of the Consent Decree and the plan was submitted over two years late.

Due to the delay in development of an Implementation Plan, the Court held a hearing on 3/16/22. The Court gave directions for IDOC to submit a revised Implementation Plan on 4/20/22 to Plaintiffs' counsel and the Monitor, for the Monitor to respond to Defendants with any

---

[46] The Monitor recommended to hire sufficient physical therapists, optometrists, and dental hygienists; project managers for essential projects which OHS was incapable of managing (policies, implementation plan, electronic medical record, aged and infirm evaluation, and workload analysis); hiring a dietician(s); and assigning specific staff for quality improvement and infection control coordinators at the facility level. SIU has posted a dietician position and notified the Monitor that a pharmacist has accepted a position of clinical pharmacist. The Monitor has not been advised of hiring for other positions. IDOC did state that a consultant was hired who would be the project manager for the electronic record and implementation plan but that consultant confirmed that she is not hired to be project manager for the implementation plan or electronic medical record.

disagreements to that plan by 5/10/22 and then for IDOC to submit a revised plan to the Court by 5/31/22. A June hearing was scheduled to resolve the matter.

The Monitor and IDOC have had discussions about the Implementation Plan since 2019. Based on discussion with the Monitor, IDOC made substantial commitments on ways to implement the Consent Decree. IDOC introduced a consultant at the December Court hearing and indicated that she was tasked to revise the Implementation Plan consistent with the Court's direction. The new versions of the Implementation Plan submitted on 4/20/22 and on 5/30/22 include no input from the Monitor and significantly regressed by ***eliminating 57 of the tasks or goals agreed to by IDOC and the Monitor as evidenced in the 12/30/21 Implementation Plan[47]. Other tasks have been significantly modified and tasks the Monitor has insisted are essential components of a correctional medical program have been ignored***. The Monitor views the current version of the Implementation Plan as a regression and a loss of several years of collaboration between the Monitor and OHS.

After reviewing the submission of the 4/20/22 Implementation Plan, the Monitor had an hour and a half conference call with IDOC and their consultant to clarify their plan. The consultant told the Monitor that she had been given directions to re-write an Implementation Plan that consisted only of tasks that are specifically called out in the Consent Decree. IDOC views the Implementation Plan as requiring creation of a task only if a verbatim statement is present in the Consent Decree. This interpretation obviously ignores the general requirements provisions, as for example, requirements that IDOC provide appropriate primary, secondary, and tertiary care and adequate facilities, monitoring, and performance measurements. This narrow interpretation of IDOCs obligations under the Consent Decree has resulted in a revised plan that fails to consider programmatic elements that are essential for an adequate medical program.

Input from the Monitor was not evident in the plan provided in April 2022. When the IDOC consultant was asked, on the conference call, what input the consultant had received from the Monitor when writing the new Implementation Plan, she replied that she read the Consent Decree and part of the Monitor's last report. Counsel for IDOC interrupted the consultant and added that "IDOC" had provided the Monitor's opinions and input to the consultant. It is inappropriate for IDOC to speak on behalf of the Monitor but that is what has happened.

In the May 2022 version of the Implementation Plan, in addition to eliminating multiple tasks, IDOC also modified multiple tasks so that they are no longer consistent with the Monitor's prior input. Two examples are given.

1. The audit function has been significantly modified. The newest version is not an independent process because it includes auditing by the IDOC Compliance Unit which performs the existing auditing process and has not been shown to be effective in either identifying or changing defective practices. Also, the clinical audit function is based on apparent narrow disease management criteria which do not address the entire scope of clinical care. IDOC previously committed to developing the audit instrument with the Monitor but has now eliminated that task. Instead, SIU will develop clinical audit indicators which change annually and have never been discussed with the Monitor. For clinical care, the SIU audit team will only temporarily conduct these audits until IDOC staff are trained to conduct them. The audit function, therefore, incompletely audits

---

[47] These 57 eliminated items are found in Appendix A

against Consent Decree requirements, is no longer independent, and does not utilize the Monitor's input.

2. The evaluation of the aged and infirm with subsequent development of plans for appropriate programming, medical care, and housing has been significantly modified. IDOC will no longer obtain a gerontologist consultant to survey the elderly population to identify their medical and housing needs. Instead, existing staff will be surveyed for their opinions on the needs of the elderly and existing problem lists will be used to identify cognitive or functional impairments.    Current staff have not identified needs of the elderly in the past, and it is unlikely they will do so in the future.  An external consultant needs to be engaged to design and carry out this evaluation.  IDOC's plan eliminates a report of survey findings that describes the population in terms of numbers and impairments, existing housing and classification issues, medical needs, medical process issues identified from record reviews, and recommendations to correct these deficiencies. The current plan eliminated keys areas of input by the Monitor over a period of several years that had been accepted by IDOC previously.

In addition to eliminating and modifying prior agreed to goals or tasks, IDOC continues to fail to include some necessary tasks in a typical correctional medical program.  One example of this is establishment of an infection control program.  IDOC does not believe that an infection control program is necessary to be compliant with the Consent Decree, because the Consent Decree does not state verbatim that IDOC must establish an infection control program[48] even though an infection control program is an essential element of any correctional medical program[49].

Finally, the implementation plan fails to include specific tasks, timetables, goals, programs, plans, projects, strategies and protocols to ensure that Defendants fulfill the requirements of this Decree. There were 105 tasks in the 4/20/22 Implementation Plan. Fifty-seven (54%) were restatements of the Consent Decree without direction on how the Consent Decree restatement would be implemented.  Forty-seven of 105 (45%) tasks consist of writing policies which substitutes the promise of writing a policy for previous commitment for a task on a particular improvement project.  Most of the policy tasks were mere restatements of parts of the Consent Decree, many of which would not typically be subject of a separate policy statement.  In none of these policies is there any commitment to defining procedures to accomplish the policy statement.  In many cases, the existing procedures are inadequate, but IDOC does not address how existing practices will be modified to conform to requirements of the Consent Decree. For these reasons, tasks to write 47 policies does not describe what IDOC will change to create compliance with the Consent Decree.

The latest version of the Implementation Plan is not much different from existing practices which have been demonstrated to be ineffective in establishing an adequate medical program.  Many tasks or goals previously agreed to by IDOC based on Monitor input have been eliminated. Several tasks have been significantly modified so that they are no longer consistent with the Monitor's input.  IDOC refuses to insert some tasks that are necessary for an adequate medical

---

[48] The IDOC consultant specifically stated this in the conference call on 5/4/22.
[49] The National Commission on Correctional Health Care standards from 2018 state as an essential standard, "There is a comprehensive institutional program that includes surveillance, prevention and control of communicable disease".

program. Because of these findings, the latest version of the Implementation Plan's contribution to the staffing and implementation plan is noncompliant.

**Vendor Relationships**

The Implementation Plan has a task to secure a healthcare vendor. IDOC has not provided information of what details the RFP will contain with respect to securing physician services, oversight, monitoring, or even whether the RFP will include a requirement to adhere to requirements of the Consent Decree.

The IDOC has an Implementation Plan task to monitor the contracts for medical vendors and to take appropriate corrective actions. Aside from stating that goal, IDOC provided no plans for that goal. Existing monitoring of the medical vendor is virtually non-existent and IDOC has provided no data to demonstrate effective oversight. This includes business and clinical oversight. There are currently nine facilities without medical directors and at least one facility Medical Director is performing very poorly creating unsafe conditions for patients. The vendor provides no internal monitoring of its own staff, and IDOC provides no oversight over the vendor, leaving facilities apparently alone to monitor themselves. IDOC has not indicated how future monitoring will be different from past ineffective monitoring.

The prior plans to have SIU provide physician services at four IDOC facilities are no longer active. Neither the staffing analysis nor the Implementation Plan provide information with respect to obtaining improved physician services. The current vendor is unable to supply sufficient physicians but IDOC has no plan to obtain appropriate physicians except to continue current plans.

**RECOMMENDATIONS:**

1. The Executive Director with the Chief OHS need to agree on a strategic plan for the design of the IDOC health services. They may need to discuss this with the Governor's office. Our recommendation would be to implement a university-based program.
2. After a strategic plan is developed and agreed to, IDOC can flesh out details in their Implementation Plan.
3. Additional nurse manager positions proposed in the staffing analysis should be established because closer supervision will be necessary to make the changes in practice required by the Consent Decree.
4. Add a relief factor for all staff.
5. Continue to refine the Staffing Analysis to consider recommendations from the Monitor to include dedicated positions for infection control, quality improvement, a relief factor, use of the state nursing home standards for infirmary, ADA and other specialized housing of frail and or elderly inmates, and development of workload standards.
6. Continue to refine the Staffing Analysis to ensure that health care needs of the IDOC incarcerated population are adequately provided including nurse and provider sick call, chronic care, urgent care, specialty consultation, dental care and cleaning, optometry care, and physical therapy.
7. Given the significant delay in completing the Implementation Plan, the Monitor

recommends that the Monitor's participation in providing assistance and input be based on the Monitor's agenda for that assistance and not on the IDOC counsel's agenda. The Monitor recommends a working group comprised of OHS, SIU, and the Monitor to work intensively on this plan.

8. IDOC needs to hire positions in their staffing analysis as soon as possible.

9. Vendor contracts should conform and require adherence to requirements of the Consent Decree.

10. A recruitment task force needs to be established to reduce the vacancy rate to less than 12 percent.

11. A standardized methodology for analyzing workload should be developed to determine and standardize position needs for every position. This includes staffing infirmaries based on skilled nursing and nursing home experience; optometry services; physical therapy services; dental hygienists; and physicians all of which appear understaffed. The Monitor has had significant concerns about insufficient numbers of physicians, nurse practitioners, physician assistants, dental hygienists, optometrists, and physical therapists. A workload analysis needs to inform the hiring of dieticians sufficient to address needs in IDOC and clinical pharmacists to provide support for safe and effective medication therapy.

12. Hire additional information technology and data team consulting staff consistent with recommendations in the Monitor's 2nd Report.

13. Key consulting positions (in the quality program and data team) were not included in the Staffing Analysis and this should be done. The IDOC staffing plan and the OHS table of organization should be revised to include data, medical record support, and quality consultant teams.

14. Facility positions should be officially titled by responsibility (quality improvement coordinator, infection control nurse, etc.) and label nursing positions by assignment so that workload can be properly assigned.

15. The Staffing Analysis needs to be augmented to include expected workload at the proposed Joliet Treatment Center.

16. All state, vendor and contract position descriptions for OHS and facility positions need to be provided

17. The OHS Director of Nursing should be on the same level as the Deputy Chiefs and Medical Coordinator reporting to the Chief of Health Services not to the Medical Coordinator.

18. IDOC should respond to the Monitor's recommendations on staffing.

19. IDOC needs to consider all of the Monitor's recommendations for the Implementation Plan and respond why they do not believe they are necessary.

20. IDOC needs to permit the Monitor to provide input as required by the Consent Decree.

# Statewide Internal Monitoring and Quality Improvement

***Addresses item II.B.2; II.B.6.l; II.B.6.o; III.L.1;***

**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action*

*plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*
**II.B.6.l.** *IDOC agrees to implement changes in the following areas: Effective quality assurance review;*
**II.B.6.o.** *IDOC agrees to implement changes in the following areas: Training on patient safety;*
**III.L.1.** *Pursuant to the existing contract between IDOC and the University of Illinois Chicago (UIC) College of Nursing, within fifteen (15) months of the Preliminary Approval Date [April 2020], UIC will advise IDOC on implementation of a comprehensive medical and dental Quality Improvement Program for all IDOC facilities, which program shall be implemented with input from the Monitor.*

**OVERALL COMPLIANCE RATING:**  Partial Compliance

**FINDINGS:**

The Monitor had asked for the following data and information for these provisions.

1. Request 5a: **Any documents representing new arrangements with SIU or other academic centers**. The Monitor received an email 1/5/22 stating that SIU school of engineering would be performing a survey of all facilities on medication administration and would visit selected sites to make an initial assessment,

2. Request 5.b. **Any documents regarding SIU or other academic center proposal with respect to quality improvement or other services.**  Received a survey questionnaire of medication administration (1/5/22), mortality review and dental performance review templates (2/22/22), a mortality review process map (5/4/22), a peer review flow sheet (5/4/22), and a revised mortality review template on 5/19/22.

3. Request 5.c. **Any update on the quality improvement program including statewide quality, facility quality, audit function, performance and outcome measures, adverse event reporting, patient safety, and process improvement, mortality review, vendor monitoring, data management.**  The Monitor received no information. The Monitor does receive and review the minutes of CQI meetings in the quarterly submission. However, these are not representative of updated quality improvement practice.

4. Request 5.e. **Update on filled staff by SIU**.  The Monitor received CVs of a clinical pharmacist (5/19/22), the Director of Quality Improvement for SIU (2/22/22), and a nurse hired as a quality specialist (12/17/21).

5. Request 5.f. **Any new plans by SIU to hire process engineers, quality improvement staff, clinical pharmacist, project managers, other non-support staff**.  The Monitor received job descriptions for a clinical pharmacist, physician auditor, administrative assistant audit team, nurse quality specialists, organizational quality coordinator, quality RN trainer, and two clinical practice data analysts.  The Monitor has been informed that a Director of Quality Improvement for SIU, a pharmacist and a nurse quality specialist have been hired.

A policy on quality improvement has not yet been finalized.  The draft policy sent to the Monitor was returned to IDOC with comments on 2/25/22.  A final policy is not yet completed and there has not been a discussion about the policy with IDOC or SIU.  As stated in the prior report, this draft policy fails to describe how the quality program will include required elements of the Consent Decree.

SIU has hired two individuals for the quality program: a director of quality improvement who has a Masters in Environmental Health and Safety and a graduate certificate in psychiatric epidemiology and a quality specialist who recently worked as a quality technician in private industry. The Monitor has yet to meet either individual.

The IDOC has still not hired a replacement for the IDOC statewide quality improvement coordinator nor has IDOC revised the job description for this position. Tasks to do this have been eliminated from the Implementation Plan.

The Monitor is uninformed about progress in quality improvement. Information about quality projects is not provided until after initiatives are started. All communication on quality improvement is channeled through IDOC counsel. This attorney-managed, after-the-fact communication prevents input from the Monitor until after the initiative is started and is not in compliance with III. L. 1. of the Consent Decree. The Monitor has not met with any of the key hires in SIU's program or had the opportunity since the last report to discuss the progress on implementation of the CQI program with SIU.

The Monitor was informed by email from IDOC counsel in January of a plan to evaluate the medication process at several facilities. The Monitor was told that several meetings between IDOC and SIU and between SIU and the Shawnee facility had been conducted and a survey was designed to develop understanding of the medication administration process within IDOC. As part of this process SIU planned to visit several facilities to examine the medication administration process. IDOC counsel sent the survey to the Monitor on 1/5/22 and the Monitor gave four pages of comments. The Monitor was not shown the final medication administration survey or any further work product on this project. While the Monitor believes this process is a good idea, participation and input from the Monitor would assist SIU in being more effective. The Monitor has not met with the group visiting the facility(s) and has received no further information. This project was not included in the latest versions of the Implementation Plan and its status is uncertain.

There has been a single meeting with SIU since the last report. This hour-long meeting was to discuss a mortality review template. The Monitor gave preliminary comments on the document which had just been received two days earlier. IDOC sent the Monitor a revised document a few months later, but there has been no further discussion on the topic.

The 4/20/22 Implementation Plan eliminated tasks to develop a job description for an IDOC Quality Improvement Coordinator and to hire someone for this position. Also eliminated was a task for the Agency Medical Director to appoint facility quality improvement coordinators. The 5/31/22 Implementation Plan directs that the Warden and the management team of each facility would "appoint or hire" the facility CQI coordinator. This is not different from current arrangements and continues the practice of Warden involvement in health care operations. The 4/20/22 and 5/31/22 Implementation Plans also eliminate four process improvement projects including performing analyses of medication administration, sick call, access to specialty care, and chronic care delivery. SIU has already started the medication administration analysis, and why it is not included in the 5/30/22 Implementation Plan is uncertain. These changes are a regression and show less commitment of IDOC to attain compliance with the Consent Decree.

The 5/30/22 Implementation Plan includes 17 tasks involving quality improvement but many are new and were developed without any discussion or input from the Monitor. One task (53) to establish a procedure for vaccination was irrelevant to quality improvement. Another task (64) was a rephrasing of the Consent Decree requirement on physician credentials and also was irrelevant to quality inprovement. Six tasks[50] involved the audit function which will be discussed in the next section of the report. The Monitor disagrees with these tasks, has had no meaningful input or discussion with IDOC or SIU about these tasks, and believes these tasks will not result in a meaningful and independent audit process which will measure compliance against the requirements of the Consent Decree. Three tasks[51]appear to be no different that existing practices and the Monitor remains unclear about what changes will occur in these tasks that will bring IDOC into compliance with the Consent Decree. Six remaining tasks[52] are all reasonable goals, but the tasks are not all clearly described or understood and therefore, the Monitor cannot agree with the tasks as stated and will need to discuss further with SIU. Nine of the tasks[53] were new tasks. The Monitor has not had prior meaningful discussions on these topics nor had prior input been provided. These were key tasks of the Implementation Plan, particularly establishing the audit function that was significantly modified from prior commitments.

These 17 implementation plan tasks for quality improvement have not been meaningully discussed with the Monitor and did not all have input from the Monitor. Because most of these tasks are poorly understood, the Monitor will need to meet with SIU to discuss these tasks.

Based on abandonment of a prior agreement on an audit process, the elimination of development of performance and outcome measures, lack of a clear task for adverse event reporting and patient safety, and lack of understanding of the mortality review program, IDOC's quality program has regressed. The Monitor will meet with SIU to discuss their plan. This item remains in partial compliance.

**RECOMMENDATIONS**:

---

[50] 49, 50, 51, 52, 57, and 58

[51] Task #55 is to create a process to report med errors and medical incidents. This process already exists and the task does not indicate how it will be different from the existing task. This task also will be a paper task which will be ineffective. Task #56 is a task to have monthly facility quality improvement meetings. The task is unclear regarding how this is different than existing quality improvement meetings. Task #59 describes that facility physicians will produce a mortality summary for all deaths. This is a current practice which is ineffective. The task does not describe how this task will change the current practice to more effectively bring IDOC into compliance with the Consent Decree.

[52] Task #48 describes development of a quality improvement plan which appears reasonable. There has been no prior discussion with IDOC or SIU about this goal and no opportunity to have input or to discuss what was being planned. Task #54 is to develop a systems leadership council which is also something that the Monitor has recommended. Unfortunately, the Monitor was not made aware of the details of this plan. Task # 60 is a task to develop a mortality review committee but the details of how this will work are unclear. SIU should have had a discussion with the Monitor on how they intend to make this committee function. Task #61 is to develop a peer review process. Again, the details of this are unclear and should have been discussed in advance. Task #62 is to develop "formal process revision" but details of how SIU will conduct these has not been discussed. SIU should meet with the Monitor to describe the proposed process. Task #63 is to develop training in "quality, audit techniques, data quality, and analysis, and process-revision". The Monitor has concerns about facility staff performing audits with respect to the auditing process and is unaware of SIU's plans for the training and will need to meet with SIU on their plans.

[53] 48, 49, 50, 51, 52, 54, 58, 59, and 60

1. ***IDOC needs to permit the Monitor to determine the manner of how assistance and input is provided to IDOC including the agenda, the schedule, and attendees. IDOC counsel should not be responsible for controlling the schedule, manner of meeting, or attendees of meetings the Monitor needs in order to provide input or assistance on the quality improvement program or Implementation Plan. The Monitor has recommended and continues to recommend a working group for this purpose***.

2. The quality program implementation plan needs to include assistance and input from the Monitor to include:
   a. Structure of the statewide and facility level quality programs including quality committees at both the State and facility level.
   b. Development of an audit instrument;
   c. Hiring of audit teams and development of the audit instrument;
   d. Implementation of the audit function;
   e. Implementation of integrating audit findings into the quality program;
   f. Determining the need and hire personnel for a data team to extract data from the electronic medical record and other sources for purposes of validating performance. Staffing recommendations are found in the Monitor's 2nd Report in the Medical Records section.
   g. Include expert system engineering consultation in augmenting quality improvement efforts;
   h. Develop and maintain through its data team a performance and outcome dashboard;
   i. Develop and implement a standardized adverse event system statewide; and
   j. Implement consultation and training expertise to facilities on how to perform quality improvement.

3. Revise the position description of the statewide Quality Improvement Coordinator.

4. Revise the Implementation Plan and Staffing Plan to address the requirements of the Consent Decree with respect to quality improvement taking into consideration the need for statewide efforts.

5. The current statewide Quality Improvement Coordinator and facility quality improvement coordinators should undergo Institute for Healthcare Improvement Open School training on quality improvement capability and patient safety and undergo six sigma green belt training sufficient for a senior level quality leader.

6. Incorporate data team, quality improvement consultants, and process improvement staff into the Staffing Analysis and the OHS table of organization.

7. Utilize concepts of the UIC draft quality program in new quality proposals including:
   a. An OHS statewide quality committee to oversee quality statewide.
   b. Audit teams to audit facilities once a year and identify opportunities for improvement that form the corrective action items for facility quality teams.
   c. Mortality review teams embedded in audit teams.
   d. Data and information technology teams that work centrally and support the electronic record and obtain data for statewide quality efforts.
   e. Inclusion of process improvement staff (system engineers) who work statewide to solve systemic issues, improve quality, improve processes, and reduce cost.

f.  Quality improvement consultants who train facility staff and mentor them in their quality projects.

8.  Dental Director to work with QI to determine adverse reporting, audit instrument, process improvement, outcome and performance measures, and quality improvement reporting requirements for the dental program.

**Audits**
*Addresses item II.B.9*
**II.B.9.**  *The implementation of this Agreement shall also include the design, with the assistance of the Monitor, of an audit function for IDOC's quality assurance program which provides for independent review of all facilities' quality assurance programs, either by the Office of Health Services or by another disinterested auditor.*

**OVERALL COMPLIANCE RATING:**  Noncompliance

**FINDINGS:**

The Monitor asked for the following information with respect to this report.

1.  Request 5.c.iii.  **Any data or information to update work on the quality improvement program including the audit function.**  *Nothing was provided.*
2.  Request 5.f. iv.  **Any new plans for SIU or other academic center to hire quality improvement staff.**  A link was sent to postings for audit team members without any explanation of how these individuals fit into the audit process.
3.  Request 23.  **Any audits related to the Consent Decree item II.B.9.**  No information was provided.  To the best information the Monitor has, no audits have yet been performed so there would be no available information.

IDOC previously sent the Monitor a draft of a quality improvement policy which did not include any reference to the audit program which is integrally related to the quality improvement program. The policy was returned to IDOC with comments in February, 2022 but the Monitor has not had any further response from IDOC with respect to changes to the policy or its implementation.

The Monitor learned about a significant change in the plan for quality improvement from the 4/20/22 IDOC Implementation Plan.  That plan restructured the audit program with implications for the quality improvement program.  The Monitor had no input into the change as required by the Consent Decree and only learned about it after reading the revised Implementation Plan.

Since  at least June of 2020[54] IDOC has committed to an audit process with a team of independent auditors responsible for auditing facilities annually.  This early commitment was reaffirmed in the

---

[54] In the 6/12/20 Implementation Plan (page 4), IDOC stated, "IDOC is prepared to hire staff to manage the audit process. **A team of auditors will be established, ideally consisting of a physician, a mid-level provider, and 1-2 nurses.  The team will be responsible for auditing each facility on a biennial basis producing a report of their findings.  OHS will collaborate with the Monitors and the audit team to develop an audit instrument.  The audit team will also be responsible for performing mortality review and preventable adverse event evaluations.  Deficiencies and opportunities for improvement, identified by the audits, will be referred to the respective facility's quality improvement program for corrective action.  Deficiencies identified in audits, performance and outcome measures, and incident reports will form the initial basis for quality improvement efforts**".

May 2021 bi-annual report[55]. This was to include independent auditors from SIU auditing facilities, producing reports and identifying corrective actions for facility CQI programs to undertake. The Monitor was to collaborate on development of an audit instrument. This agreed-to process was dramatically changed with the submission of the 4/20/22 IDOC Implementation Plan. The entire process as described in the 4/20/22 plan was not well understood by the Monitor or his consultants. The Court had directed IDOC to make the IDOC's consultant available to the Monitor and on 5/4/22 an hour-and-a-half call took place with most of the time dedicated to IDOC's explaining their changes to the Implemantion Plan including for the audit process. There was no time during this call for the Monitor to give input. SIU was not invited to participate on the call. The day prior to the meeting, IDOC sent the Monitor a newly designed process map overview of the quality program which gave little time for review of the document.

The 4/20/22 Implementation Plan states that a SIU clinical quality group will design and oversee quality audits which are performed by "facility champions". Details of who performs the audits were not defined in the 4/20/22 Implementation Plan or in the process-map of the quality improvement program sent on 5/3/22. The process map defined that the SIU clinical quality group would "oversee" the audit. The clinical quality group would evaluate and validate findings and determine if corrective action is necessary. If a corrective action was needed it would be assigned to the facility by the clinical quality group. This was a dramatic change as SIU would no longer perform the audits and development of an audit instrument was eliminated. Instead of an audit instrument developed with the Monitor, IDOC substituted "clinical quality indicators" chosen by SIU as a methodology for performing audits. These will not address the entire scope of clinical care and are unacceptable as an audit instrument. In the final 5/30/22 Implementation Plan, IDOC modified the process and stated that the SIU audit team will conduct these audits until IDOC staff are trained to conduct them.

The 4/20/22 and 5/30/22 versions of the Implementation Plan describe a second auditor, the IDOC healthcare compliance unit.[56] According to the quality improvement process flow map provided on 5/3/22, the healthcare compliance unit will design a compliance audit, create benchmarks for compliance, oversee the audit, and assign corrective action plans to facilities who don't meet compliance with policies. They will also monitor corrective action plans they assign and monitor grievances. The methodology for these audits has not yet been shared with the Monitor. The healthcare compliance unit is part of the existing IDOC compliance unit that already performs external reviews of facilities. Previously, a Regional IDOC nurses or someone similar would perform the medical parts of these audits for the compliance unit. The compliance unit has hired a nurse as their medical compliance administrator. Her curriculum vitae gives her responsibilities

---

[55] In the May 2021 semi-annual report IDOC stated that it was imminently compliant with an independent audit function. On page eight of that report, IDOC stated that audits would be performed by two audit teams which were **"perfectly aligned with the Monitor's recommendations in his second report". In that 2nd report, the Monitor recommended that the audit teams audit facilities once a year based on an audit instrument developed in conjunction with the Monitor. Each of two audit teams would consist of a physician, mid-level provider, and 1-2 nurses and a part time dentist. Each audit would result in a report that would include mortality reviews relevant to each facility for that period. These reports would form OHS regarding opportunities for improvement that would be funneled to the facility CQI committee who would follow up on corrective actions.**
[56] This is the existing external auditing team that has been conducting performance-based audits on all IDOC facilities including their health programs for years. This unit is controlled by custody.

in her current position as "developing and implementing policy affecting standards of care, ethics, and licensing requirements for health and mental health services statewide". She will conduct audits of administrative directives and will direct development and implementation of systemic monitoring and assessment of processes related to standards of care. Her prior responsibilities included being an assistant warden at Elgin Treatment Center, a HCUA at Pontiac, and a Director of Nursing at Pontiac. IDOC is required by the Consent Decree to develop, with assistance of the Monitor, a comprehensive set of health care policies which is to cover all aspects of the health care program. This is the first the Monitor has learned that the Compliance Unit will direct development of policies for IDOC and then audit against those policies. This is inconsistent with the Consent Decree as the Monitor is to assist in the process of developing policies and in development of an audit instrument.

This new process is a dramatic departure from prior commitments of IDOC and prior agreements with the Monitor specifically: 1) to have an *independent* group perform the audits; 2) include a physician, mid-level provider and nurse on the audit team; 3) develop the audit instrument with the Monitor; and 4) auditors would train with the Monitor. None of this will now happen and the new process was developed without input from the Monitor which is required.

This dramatic change has undone two years of IDOC commitment to an external independent audit team performing audits.

The new plan nearly replicates the existing system of auditing with some minor modifications. The Compliance Unit already designs and performs external audits of the IDOC medical program against administrative directives and had done so for many years and this type of auditing has produced the system that currently exists. This will not be an independent audit by a disinterested auditor. Facilities currently audit their own clinical care. The one difference in the clinical audit is that SIU will utilize clinical outcome measures as the audit instrument and will temporarily conduct audits until sometime in the future when facility staff will conduct the audits. In its May 2021 semi-annual report, the IDOC stated that it was imminently compliant with an independent audit function and that audits would be performed by two audit teams which were "**perfectly aligned with the Monitor's recommendations in his second report**". The 5/30/22 Implementation Plan is not perfectly aligned with the Monitor's recommendations. The Monitor's 2nd report was clear in stating, "if the audit instrument is not comprehensive, the audits will fail to internally monitor efforts to comply with the Consent Decree".[57] Unfortunately, IDOC has done what the Monitor warned in 2020 would happen.

The Monitor's opinion is that this process as recently re-designed is neither independent or different than the process that currently exists. The audit process is being designed without Monitor input. For all these reasons, this provision is noncompliant.

**RECOMMENDATIONS:**
1. Implementation of the audit function needs to include:
   a. OHS, SIU, and Monitors to develop audit instrument.
   b. Determine the scope of work for the audit team.

---

[57] Page 40 Monitor's 2nd report, 8/6/20.

    c.  Hire the audit team.

    d.  Audit team to train with Monitor on site visits.

    e.  OHS, the audit team, and the Monitor need to develop a contract monitoring instrument based on audit, performance and outcome measures, staffing, and adherence to Consent Decree.

    f.  Audit team to deliver contract monitoring reports to Monitor and OHS leadership; obtain feedback; and take any necessary corrective action.

    g.  Develop infection control monitoring elements to be part of safety and sanitation audits.

    h.  Develop safety and sanitation audit instrument that include survey of all clinical spaces, equipment, supplies, etc.

    i.  Test safety and sanitation audit instrument that include survey of all clinical spaces, equipment, supplies, etc.

    j.  Develop questions necessary to demonstrate compliance with dental program items III.K.1-13.  Consider and determine who is to perform dental audits.

    k.  Include mortality review and vendor monitoring as part of audit team responsibility.

    l.  Integrate performance and outcome measures and adverse event monitoring into audit results.

2.  Audits should result in a report that lists opportunities for improvement that are addressed through the quality improvement process.  Follow up should occur until a problem is satisfactorily resolved.

**Performance and Outcome Measure Results**

***Addresses items II.B.7***

**II.B.7.**  *The implementation of this Decree shall include the development and full implementation of a set of health care performance and outcome measures.  Defendants and any vendor(s) employed by Defendants shall compile data to facilitate these measurements.*

**OVERALL COMPLIANCE RATING:**  Noncompliance

**FINDINGS:**

The Monitor asked for the following information with respect to this report.

1.  Request 5.c.iv.  **Any data or information to update work on the quality improvement program including performance and outcome measures.**  No information was received.

2.  Request 24. **Any documentation of progress in development of performance and outcome measures.**  No information was received.

On 5/5/21, IDOC sent the Monitor a sample of performance and outcome measures.  The IDOC asked for the Monitor's comments which were provided in the 4th report including an appendix of measures that could be considered.  The Monitor received no further information on this effort.  The 12/30/21 version of the Implementation Plan included one task for performance and outcome measures which was that OHS would develop and implement performance and outcome measures and would have a team lead by a data manager develop data collection methodology to acquire the data for these measures.  No further discussion occurred and IDOC has not provided

33

any further updates on the performance and outcome measures.

In the 4/20/22 Implementation Plan, IDOC eliminated the prior commitment to produce a set of performance and outcome measures and to create a centralized quality improvement dashboard. There were five tasks in this Implementation Plan under a heading of "performance and outcome measures", but none of them addressed performance and outcome measures. IDOC has not solicited or accepted input from the Monitor on this issue. In a subsequent call on 5/4/22, the consultant to IDOC stated that IDOC would use national guidelines to develop outcome measures that facilities would use to audit themselves as described in task #51 of their 4/20/22 Implementation Plan. The final Implementation Plan of 5/31/22 has no tasks to develop or implement a set of performance and outcome measures. However, IDOC appears to propose as an Implementation Plan task to develop outcome measures that will form clinical indicators in the audit process. This will not be satisfactory as an audit and is not consistent with development and full implementation of a set of health care performance and outcome measures.

It appears that IDOC has abandoned implementation of a set of performance and outcome measures and a dashboard to represent facility performance on these measures. Because no progress has been made and with IDOC now eliminating its commitment to performance and outcome measures, this provision remains noncompliant.

**RECOMMENDATIONS**:

1. The performance and outcome measures should be centralized and based on obtaining data automatically from the electronic record, laboratory, and other sources. Measures should be presented on an electronic dashboard that can be viewed at any workstation in any facility statewide.
2. Performance and outcome measures should be used by facilities as a guide to their performance and to inform the quality program of necessary improvements.
3. Include performance measures in the Implementation Plan which should include:
   a. Who will maintain this dashboard?
   b. How will data be displayed to staff and how OHS intends staff to use the dashboard?
   c. Development of a glossary of definitions including
      i. A narrative definition of the metric
      ii. Numerator and denominator
      iii. How the metric is calculated
      iv. The data source
      v. Reporting frequency
      vi. A goal.
   d. How will measures be integrated into the quality program.
4. Include this provision in a quality improvement work group.

**Adverse Event and Incident Reporting Systems**

*Addresses Items II.B.6.m; II.B.6.n*

**II.B.6.m.** *IDOC agrees to implement changes in the following areas: Preventable adverse event reporting;*

**II.B.6.n.** *IDOC agrees to implement changes in the following areas: Action taken on reported errors (including near misses);*

**OVERALL COMPLIANCE RATING**: Noncompliance

**FINDINGS:**

The Monitor asked for the following information with respect to this report.
1. Request 5.c.v., **Any data or information to update work on the quality improvement program including adverse event reporting**. No information was received.
2. Request 25. **Any documentation of progress toward an adverse event reporting system.** No information was received.

None of the four recommendations from the last report were accomplished.

There were three tasks in the 12/30/21 Implementation Plan on adverse event reporting and patient safety. These were tasks 32, 33, and 34. These included tasks to develop an adverse event reporting system, to analyze the data in an adverse event reporting system, and to use data from adverse event reporting to create a patient safety program.

The Monitor had four differences with this task including:
1. The IDOC would not commit to obtaining necessary software to track adverse events. If the software was not obtained IDOC should plan for how to develop such software. To manage this with a paper process would be extremely difficult.
2. IDOC did not assign a person with sufficient data management skills to manage, collect and present the data.
3. There needs to be a task to review and categorize adverse events by type of event.
4. IDOC should consider establishing a patient safety committee to address results of findings.

In the 4/20/22 Implementation Plan, IDOC eliminated these tasks and substituted two tasks. Task 18 in the 4/20/22 Implementation Plan is to "develop a policy about the requirement of reporting adverse events, medication errors and potentially ineffective processes that require streamlining or error-proofing". Task 83 is to "create a process to report med errors and medical incidents". The process describing this is to create a centralized document for reporting incidents such as medication errors and falls. Both of these tasks merely restate the Consent Decree but do not describe how they will do this. Aside from centralizing data collection of adverse events, these tasks merely describe the existing processes in place without describing what will be different in order to come into compliance with the Consent Decree. The Consent Decree requires that IDOC implement changes in preventable adverse event reporting. This is not accomplished with these two tasks. There were no changes with respect to adverse event reporting in the 5/31/22 Implementation Plan.

All of the 12/30/21 tasks were eliminated in the 4/20/22 Implementation Plan and the four additional Monitor recommendations were also not considered. The two tasks in the 4/20/22

Implementation Plan merely replicate existing processes and offer no change from what currently exists. IDOC is not implementing any changes in preventable adverse event reporting that will be effective in making an adverse event reporting system work. For that reason, this provision remains noncompliant.

**RECOMMENDATIONS:**
1. IDOC needs to develop an adverse event and incident reporting system. This system should be electronic and centralized. This can be through 3rd party software or internally developed through the quality committee using the internal data team.
2. Adverse event reporting needs to have capacity to allow anonymous reports. Staff need to be encouraged to reports errors and believe that report of errors will not result in discipline.
3. Adverse event reporting needs to be supported and maintained by the OHS. Data from this reporting system must be integrated into the quality program.
4. Implementation of the adverse event reporting system should be integrated into a quality improvement work group.

**Vendor Monitoring**

*Addresses II.B.2.*
**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**OVERALL COMPLIANCE RATING**: Noncompliance

**FINDINGS:**
The Monitor asked for the following information with respect to this report.
1. Request 5.c.viii. **Any data or information to update on the quality improvement program including vendor monitoring.** Nothing was received.
2. Request 26. **Any vendor monitoring reports statewide and for each facility.** None provided

The lack of data related to vendor monitoring includes monitoring of peer review or contractual monitoring.

Task 92 of the 4/20/22 Implementation Plan has a task that states the IDOC leadership will ensure that the vendor contract complies with all Court orders, policy and procedures of IDOC. This task rephrases the Consent Decree and there are no tasks that delineate how this will be done. Task 53 states that OHS leadership will review vendor policies to verify that they are in agreement with IDOC's policies. The vendor's policies are not utilized so it isn't clear what the purpose of this task is. Task 48 states that the compliance team will monitor the vendor contract. The compliance team plans to audit every facility against administrative directives but already does this. It is unclear what changes will occur to bring IDOC into compliance with the Consent Decree.

IDOC has provided no monitoring reports on the vendor and there is no evidence of any monitoring reports being done. Because there has been no progress on this issue, this item remains noncompliant.

**RECOMMENDATIONS**:
1. IDOC needs to develop a meaningful vendor monitoring system that monitors quality of care, physician quality, and ability to hire contracted staff against contract requirements. This can be joined with the audit process. Monitoring should be standardized across facilities so comparisons can be made. The Monitor's recommendation is to provide this service through the audit team.

**Mortality Review**

*Addresses items II.B.6.i; III.M.2;*
**II.B.6.i.** *IDOC agrees to implement changes in the following areas: Morbidity and mortality review with action plans and follow-through;*
**III.M.2.** *Mortality reviews shall identify and refer deficiencies to appropriate IDOC staff, including those involved in the Quality Assurance audit function. If deficiencies are identified, corrective action will be taken. Corrective action will be subject to regular Quality Assurance review.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**
The Monitor asked for the following information with respect to this report.
1. Request 27: **Asked to receive quarterly a mortality list with data including name, IDOC #, date of death, date of birth, age, date of incarceration, facility at time of death, category of death, autopsy done with date, mortality review completed.** Received one list of deaths up to 12/19/21 without information about autopsy, mortality review date, or date of incarceration. COVID information was unclear. Some cause of deaths included COVID when IDOC did not indicate COVID as a cause of death and some cause of deaths did not include COVID but IDOC indicated they died of COVID.
2. Request 28: **Asked for copies of OHS mortality meeting minutes to date.** None were provided.
3. Request 29: **Asked for vendor death summaries**. A few were provided but were mixed in with a 600-page pdf making it difficult to find them and impossible to use effectively.
4. Request 30: **Asked for copies of IDOC mortality reviews including check list, taxonomy, and autopsy reports as they occur**. None were provided.
5. Request 31. **Asked for autopsies as they occur.** Very few were provided.
6. Request 32. **Asked for copy of death record for 2 years of record as deaths occur.** Only 30 received.

The information received, based on the Monitor's request, verifies that IDOC does not yet track deaths well, does not perform mortality reviews, does not obtain or track autopsies, and does not obtain a copy of the death records in a standardized manner. There is no evidence that vendor mortality review summaries are used. The Monitor received only 30 death records for the six-month period of the report. Some of these included only six months of the record. A tracking log was requested quarterly but was only sent once before this report and does not contain all information requested. This log contained deaths until December of 2021. An updated log was

not received.  Over the past five years, through 2021, there were 573 cumulative deaths with cause of death listed for 463 (80%) of deaths.  Only 59 (48%) of 124 deaths on the 2021 log had a cause of death.  Unknown causes of deaths are present in every year.

IDOC had three tasks in their 4/20/22 Implementation Plans related to mortality review (tasks 13, 87, and 88).  The 5/30/22 version of the Implementation Plan had tasks that were identical.  In task 13, IDOC will write a policy on mortality review which was initiated over a year ago and remains incomplete.  In task 87, IDOC states facility medical staff will review and summarize all deaths.  This is an existing process which is ineffective and identifies no problems or corrective actions.  Task 88 concerns establishment of a mortality review committee to discuss all deaths.  This SIU committee will consist of physicians, mid-level providers, nurses and other allied medical practitioners.  Someone unspecified will assign a member of the group to review each death.  This presumably can be a physician, mid-level provider, nurse or an allied health practitioner.  The reviewer will use the facility mortality summary and complete the Mortality Template and then discuss findings with the committee who will decide whether the death was preventable and whether something could or should have been done in the course of delivering care.  The policy and procedure for how this work will be integrated into the quality program is still incomplete.  The template is inadequate with respect to identification of problems which is a requirement of the Consent Decree.  Further discussion with SIU is necessary.

The two mortality review topics discussed with IDOC since the last report (mortality review template and collaboration with SIU on mortality review) were not included as tasks in the Implementation Plan.  That which IDOC is actually planning and doing is not present in the Implementation Plan but needs to be.

The following are the data on deaths since 2017 as provided by IDOC.

| Annual Deaths IDOC 2017 to 2021 | | | | | |
|---|---|---|---|---|---|
| Year | 2017 | 2018 | 2019 | 2020 | 2021 |
| Deaths | 104 | 83 | 94 | 168 | 122 |
| Cause of Death Stated * | 100 | 80 | 86 | 138 | 59 |
| COVID related | | | | 70 | 22 |
| Deaths not COVID | 104 | 83 | 94 | 98 | 100 |

* The casuse of death reported by IDOC significantly under reported COVID-19 deaths, which were estimated by the Monitor based on having COVID - 19 infection and a cause of death likely to be from COVID-19

Of the 80% with a listed cause of death, the top five causes of death are listed below.  COVID deaths only occurred in two years, 2020 and 2021.  COVID was the leading cause of death in each of those years.  COVID deaths were not well tracked.  When COVID was the cause of death it was separately listed but this did not consistently agree with the cause of death provided on the mortality list.

| Top 5 Causes of Death IDOC 2017-2021 | |
|---|---:|
| Cancer | 100 |
| Heart disease | 93 |
| COVID | 92 |
| Serious infection including sepsis | 34 |
| Suicide | 22 |

Over the five years, there were 15 deaths due to end-stage liver disease and five death due to primary liver cancer. These deaths are potentially preventable with early treatment for hepatitis C. On average, there were 20 cancer deaths a year The cancer deaths are the number one cause of death in IDOC over the five years of data reviewed. In the death reviews completed by the Monitor, cancer deaths were all in cancers that were diagnosed late-stage. Many could have been diagnosed earlier and were thereby possibly preventable deaths. Cancer care is not good, largely because of failure to conduct preventive cancer screening, failure to timely diagnose the cancer, and failure to effectively coordinate follow up care.

SIU is beginning implementation of a mortality review process. As the mortality review process is evolving the Monitor's involvement is after-the-fact. The Monitor was given a mortality review template and a process flow-map of the mortality review process after the documents were designed and without having given input. A process flow-map of the mortality review process was provided without any prior or subsequent discussion. The Monitor had one hour-long conference call, that included the SIU Executive Director of Correctional Medicine, since the last report. The mortality review template was provided to the Monitor without explanation two days before the meeting. Some preliminary comments were provided to IDOC and the template was amended. The Monitor remains uncertain of how the process will be designed to work.

Based on information provided by IDOC, the current process is that SIU will assign someone[58] to perform a mortality review using a mortality review template. Recently, IDOC informed the Monitor that five physicians in the Department of General Internal Medicine, including the chair of the Department will perform the reviews. Information regarding the extent of the medical record that will be given to the reviewers is unknown.

The Consent Decree calls out specific requirements for mortality review stating, "Mortality reviews shall identify and refer deficiencies to appropriate IDOC staff, including those involved in the Quality Assurance audit function. If deficiencies are identified, corrective action will be taken. Corrective action will be subject to regular Quality Assurance review". This implies identification of deficiencies.

It is unclear to the Monitor how the template will be used to identify deficiencies. The template that will be used is a collection of 52 yes/no or closed-ended check-the-box questions. Four additional responses are text entries. Most of the questions are demographic or descriptive in nature. Binary and check-box questions are quantitative in nature, are fixed and immutable, and will not lead to identification of all systemic or non-systemic deficiencies. The template includes

---

[58] It is unclear if this is a physician, nurse, or a clerk.

nine "check-box" categories that comprise the only reference to deficiencies. Thereby, only the nine deficiency types will be identified. While the mortality template is an excellent way to obtain data on deaths that can be used as a quantitative research tool, it is not a good tool to identify deficiencies or to evaluate processes of care. Deficiencies are where you find them and are difficult to categorize as each death is an interaction of a patient with a unique panel of disease issues which interact with a specific health care organization. Identification of deficiencies in this context is more amenable to a process analysis similar to a modified failure mode and effects analysis[59] (FMEA) because each death will represent a different set of circumstances. In this approach, each death is reviewed individually identifying unique process failures, clinical failures, and support failures that contributed to the death or are patient safety risks in this unique individual with a unique set of circumstances. The failures and safety risks are eliminated with corrective actions. This type of analysis is in line with requirements of the Consent Decree.

As constructed, the template will not identify all deficiencies. As an example, in the first two deaths the Monitor reviewed for this report, there were 27 opportunities for improvement[60] identified. None of the 27 opportunities for improvement identified by the Monitor were on the list of nine deficiencies in the IDOC mortality review template. Some of these included significant problems such as the following.

1. On multiple occasions, providers evaluated patients without taking an adequate history or performing an adequate physical examination. Not a single evaluation took place for which an adequate history or examination was performed. The vendor should institute an expectation and instruction on how to perform an adequate history and physical examination and should be identifying these problems in order to take corrective action. No supervision was apparent.

2. Laboratory tests were repeatedly ordered but not done at this facility. This problem should be addressed in the quality improvement program.

3. The patient was started on a drug (Sinemet) without any history or examination which is unsafe care. The IDOC should discuss what oversight the vendor provides for its physicians.

4. The patient was not provided an ordered diet for a couple months. It is not clear how long his diet was missed.

5. The EKG machine was not working calling into question whether routine inspections of equipment occur. The quality program should have results of checks of equipment. This should have been monitored and corrected.

6. OHS needs to work with custody leadership to ensure that persons with cognitive disorders are not subjected to custody punishment for behavior that is related to their cognitive disorder. Patients with dementia should not be placed on segregation status. Training needs to be instituted for all professional and custody staff on how to properly manage aggressive patients with dementia. In all cases these types of patients are not to be punished for their behavior.

7. OHS should initiate a root cause analysis of use of indwelling catheters in elderly patients on infirmary units. Use of indwelling catheters should be consistent with contemporary

---

[59] A qualitative method of analysis that identifies safety risks in a process and identifies potential solutions to correct the risk.

[60] This is a term frequently used in quality improvement as a substitute for a "deficiency".

standard.  The indication of indwelling bladder catheter in this patient was not clear and unstated.

8. OHS needs to perform an analysis of how to care for patients with dementia and to establish rules for transfer to a higher level of care or for nursing home care.  Use of typical housing for patients with dementia needs review as it may exacerbate their cognitive problem.

9. Review of hospital records was not apparent in the medical record.  The vendor should review care by its providers to ensure that provider review all hospital records and recommendations and document review of these and modify therapeutic plans accordingly.

If the mortality review template is actually used as the form to accomplish a mortality review most deficiencies and patient safety risks will not be identified.  IDOC's new process does not show how that will be done.

In summary, IDOC has initiated a mortality review process without sufficient input from the Monitor.  The process will include having a group of SIU physicians use the mortality review template on a sample of records selected by the Chief OHS in the near future. The IDOC has not included this described process in the Implementation Plan including the process for capturing and analysis of data obtained.  The mortality review process is vague on how deficiencies will be identified and the template used for mortality review will not capture deficiencies as identified by the Monitor in recently reviewed records.  Identified non-systemic deficiencies will be referred to facility quality committees to address and monitor.  But facility quality programs currently have no staff trained or capable of doing this and have other assigned duties that limit their ability to correct process problems.  The current process does not describe how facility staff will be trained or how they will have the time to perform these duties.

The Monitor is encouraged by SIU's involvement but needs more contact with them.  Given what has been designed, the process is likely to be iterative and the Monitor expects it to change as more experience is gained.  The basic concept should be to find problems wherever they occur with the aim of improving quality of care.   That is not in evidence in the current data collection mortality review format.  The short-term metrics should be to complete meaningful reviews and identify opportunities for improvement on each review.  Medium-term objectives should be a benchmark proportion of opportunities for improvement that inform new or existing quality improvement projects.  Long-term objectives should be to measure change in outcomes based on improvements made in quality improvement projects to include mortality rate, unnecessary hospitalization, improved performance, and rates of bad outcomes (e.g., sepsis, late-stage cancer, etc.).[61]  The Monitor suggests that SIU include a nurse and pharmacist in the initial mortality reviewers.  Mortality reviews should not be assigned to a single person but to a group of individuals each with a different professional perspective.  The Monitor suggests a provider, a

---

[61] These goals are proposed by Jeanne Huddleston, MD, Associate Professor of Medicine and Chair of Morbidity & Mortality Council at Mayo Clinic as described in the slide show Putting Mortality Review to Work -The Enormous Pay Off.  See also Jeanne Huddleston, MD, Daniel Diedrich, MD, Gail Kinsey, RN, Mark Enzler, MD, and Dennis Manning MD; Learning from Every Death, Special Article, Journal of Patient Safety March 2014 can be found and downloaded at https://www.researchgate.net/profile/Jeanne-Huddleston/publication/260270862_Learning_From_Every_Death/links/5b3691404585150d23e5028c/Learning-From-Every-Death.pdf?origin=publication_detail

nurse and a pharmacist. Use of a pharmacist is currently recommended due to the broken and dysfunctional medication ordering and administration processes. Use of the pharmacist can be confined to those patients on polypharmacy or those with medication issues as identified by the nurse or physician reviewers. The Monitor also suggests that the SIU reviewers and the Monitor review the same records to compare notes. There will be a multitude of aspects of correctional practice that the SIU reviewers will be unaware of and the collaboration will enhance SIU's ability to understand internal aspects of the program which they may be unfamiliar with.

The mortality review policy is not completed. It is still unclear how mortality review will be conducted, how deficiencies will be identified, how corrective actions will be undertaken, and how identified problems will be integrated into the quality program. These are essential requirements of the Consent Decree. SIU is working on a data collection template that will be used to obtain data and information. This data collection process has not yet been implemented. Currently, mortality review is not being performed and the process for completing mortality review is not described in policy or procedure. The process that IDOC is contemplating is not evident in the current Implementation Plan. The Monitor strongly suggests that SIU begin using the template in an iterative way and to collaborate with the Monitor team in developing a reasonable mortality review process that can inform quality improvement projects to improve outcomes. The Monitor will meet with SIU to discuss mortality review in the near future.

Appendix B contains the mortality reviews completed by the Monitor. Each review has multiple opportunities for improvement that contain recommendations to improve care.

**RECOMMENDATIONS**:

1. Provide all death records to the Monitor as they occur. These should include two years of all aspects of the paper record. The Monitor and his consultants should all have remote access to the electronic record for every site that implements the electronic record.
2. All deaths should include an autopsy.
3. Provide a tracking log of all deaths at least quarterly. This log should include name, IDOC #, date of death, age, date of incarceration, facility at time of death, category of death, cause of death, whether the death was expected or unexpected, whether an autopsy was done and the date of the autopsy. The log should also include whether a mortality review has been completed.
4. A mortality review should be performed for each death by an audit team. The mortality review needs to include at a minimum:
   a. Date of review
   b. Patient name
   c. IDOC number
   d. Date of death
   e. Age and date of birth
   f. Facility at the time of death
   g. Place of death (e.g., hospital, infirmary, etc.)
   h. Category of death (natural, homicide, suicide, etc.)
   i. Expected or unexpected death

j.  Cause of death
k.  Mental health diagnoses
l.  Medical diagnoses
m.  IDOC problem list
n.  Medications at facility at the time of death
o.  Case summary[62] that includes both nursing and physician input that includes a summary of the care of the patient for their illnesses and care related to the cause of death or care that needs to be highlighted to identify opportunities for improvement.
p.  Autopsy diagnosis
q.  Documentation of opportunities for improvement and recommendations for corrective action when appropriate
r.  Identified opportunities for improvement need to be evaluated by the OHS quality committee.  That committee needs to decide if corrective action and what corrective action is appropriate and assign responsibility for corrective action either to the facility quality committee or to an OHS responsible party.  The OHS quality committee should monitor progress on resolution of the corrective action until it is completed.  The facility quality improvement meeting minutes need to document their progress in resolving corrective action.

5.  The quality improvement discussion regarding mortality review should be educational with a goal towards improving care.
6.  Line staff employees should have an opportunity to provide anonymous information regarding events surrounding a death with an aim toward improving patient safety.  A process for this should be established.
7.  The quality improvement coordinator and audit teams should conduct follow up with facility quality programs to monitor actions taken to improve care based on information learned from mortality review.
8.  SIU should begin using the mortality review template in an iterative manner to initiate mortality review.
9.  The opportunity for improvement section should be open ended to include findings in the record.  These should be captured as data elements if possible.
10. A nurse and a pharmacist should be added to the group of SIU physicians who will complete the template.  The pharmacist should be utilized on patients with polypharmacy or on patients determined by the physicians or nurses who have pharmacy issues.
11. SIU and the Monitor should establish a working group on quality to include mortality review.


# Medical Records

*Addresses item II.B.4; III.E.3; III.E.4; III.G.3*

**II.B. 4.**  *No later than 120 days after the Effective Date of this Decree, IDOC shall have selected an EMR vendor and executed a contract with this vendor for implementation of EMR at all IDOC facilities.  Implementation of EMR shall be completed no later than 36 months after execution of the EMR contract.*

---

[62] For deaths that involve suicide

**III.E.3.** *IDOC shall abandon "drop-filing".*
**III.E.4.** *The medical records staff shall track receipt of offsite medical providers' reports and ensure they are filed in the correct prisoner's medical records.*
**III.G.3.** *IDOC shall use best efforts to obtain emergency reports from offsite services when a prisoner returns to the parent facility or create a record as to why these reports were not obtained.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
The Monitor asked for the following information with respect to this report.

1. Request 6. **Any documents or summary of plans for a new electronic record.** No documents received.

Approximately two and a half years after IDOC was to have a contract with a medical record vendor, IDOC still does not yet have a contract for an electronic medical record. IDOC states in a revised Implementation Plan on 4/20/22 that a contract would be signed in the near future and the electronic medical record will be fully implemented by August of 2025.

IDOC has provided no evidence that "drop-filing" has been eliminated. Information regarding tracking of receipt of offsite medical providers' reports was asked for but not received. The Monitor has no information to review this item

Though IDOC has indicated that they have a project manager[63] for implementation of the electronic record, the consultant IDOC said was the project manager for the electronic record did not confirm that her role is project manager for implementation of the electronic record. The contract for the consultant also does not include being project manager for implementation of the electronic medical record. The Monitor still maintains that a project manager is needed. Task 99 of their 4/20/22 Implementation Plan states that an implementation team will be hired and IDOC would "consider" a consulting company to do this. It is not clear if the implementation team includes a project manager.

IDOC has three tasks in the 4/20/22 Implementation Plan related to the paper medical record (tasks 28, 29, and 44). All three are related to development of policies on paper medical record organization and documentation. Two of the three policies are restatements of the Consent Decree. There are no policies mentioned about the electronic record and if policies for the medical record are to be written, IDOC should write policies for the electronic record which will be operational in a few years.

There are 11 tasks (tasks 94-105) associated with the electronic medical record. The Monitor made comments to the Implementation Plan and returned them to IDOC. One disagreement is with IDOC's approach in obtaining data. Data will be essential for compliance with the Consent Decree. IDOC's plan to use only "canned" reports from the electronic record is likely to be insufficient. The Monitor still strongly recommends hiring data analysts to obtain data

---

[63] Defendants' Response Brief Concerning Resolution of the Monitor's Disagreements with Defendants' Proposed Implementation Plan filed 3/8/22. Defendants state, "Defendants have hired Dr. Jane Leonardson, an expert in correctional medicine and EHR implementation, to assist with *Lippert* compliance. Dr. Leonardson will serve as the project manager for the Implementation Plan objectives and the EHR implementation."

and to manage information[64].

Based on the significant delay in implementation of the electronic record and the problems with the Implementation Plan to effectively implement the electronic record, this provision remains noncompliant.

**RECOMMENDATIONS:**
1. Base the roll out and device needs on expected numbers of employees and expected workflows and not on current employee numbers or existing workflows.
2. Modify the Staffing Analysis and Implementation Plan to include staff to manage and support the electronic medical records including initial and ongoing training for users and a help desk function.
3. Ensure that point-of-care[65] devices are integrated into the electronic medical record.
4. Ensure that label printing of laboratory requisition and other similar devices are integrated into the electronic medical record as part of the implementation of the record.
5. Ensure that the new electronic medical record has the capability to track and report clinical and operations data that is needed to assess IDOC's compliance with the Consent Decree and data that is vital to IDOC's ongoing efforts to track and improve the delivery of quality care.

# Policies and Procedures
**Medical & Dental**

*Addresses item II.B.8; III.K.4; III.K.5*

**II.B.8.** *The implementation of this Decree shall also include the development and implementation, with the assistance of the Monitor, of a comprehensive set of health care policies by July 1, 2020. These policies shall be consistent throughout IDOC, and cover all aspects of a health care program.*

**III.K.4.** *IDOC shall implement policies that require routine disinfection of all dental examination areas.*
**III.K.5.** *IDOC shall implement policies regarding proper radiology hygiene including using a lead apron with thyroid collar, and posting radiological hazard signs in the areas where x-rays are taken.*
.
**OVERALL COMPLIANCE RATING:** Partial Compliance

---

[64] As an example, on 2/24/22, IDOC stated that the Illinois Comprehensive Automated Immunization Registry Exchange (I-CARE) system (the state of Illinois web-based immunization record-sharing system) could not be used by IDOC because of IDOC could not develop a system to obtain the data. This type of task is should be doable between state agencies.

[65] Point-of-care devices are small devices that provide a diagnostic test locally and which can be used by nursing or provider staff where care is delivered. These devices include glucometers to test blood glucose, or devices to test blood to determine whether anticoagulation (INR) is sufficient. Electronic vital sign machines are similar to point-of-care devices in so far that they can be connected to the electronic medical record and the testing results can be automatically directed to the appropriate place in the electronic medical record.

**FINDINGS:**

The Monitor asked for the following information with respect to this report.

- Approved and finalized policies for medical and dental programs. None were sent.

IDOC was to have a set of comprehensive health care policies within 18 months of preliminary approval of the Consent Decree. Almost two years after this due date, IDOC still does not have a comprehensive set of policies.

The Monitor sent to IDOC four previously reviewed draft policies with additional comments. The Monitor has also returned to IDOC 21 draft policies with an initial set of comments. IDOC has not notified the Monitor of any completed policies. *IDOC sent no draft policies to the Monitor since the last report*. A total of 25 draft policies have been completed.

The Implementation Plan submitted to the Court on 12/30/21 commits to development of medical and dental policies but does not outline a plan or preliminary steps for how this will be done. In the 12/30/21 Implementation Plan IDOC says that policies will be completed by September of 2022, which does not appear feasible as there isn't a single completed policy that has been implemented. This appears aggressive given current progress. The Monitor provided seven disagreements/comments on the policy items in the IDOC Implementation Plan which was submitted to the Court. In addition, the Monitor had made multiple comments on how to accelerate progress on policies in prior reports.

IDOC significantly changed their strategy in the 4/20/22 Implementation Plan. In that plan, 45 (43%) of 105 tasks are tasks to write very specific policies. Virtually all of these tasks are re-statements of the Consent Decree. For example, task 39 in their 4/20/22 Implementation Plan is "A policy shall be written which requires that dental notes use SOAP format to document urgent and emergent care", which is a virtual quotation of the Consent Decree. Many of these statements in the Consent Decree are for items that would normally be a procedural step included in a more general policy. For example, a medical record policy might have a procedural section that would include the single sentence in this policy. To have a single policy for this one concept is wasteful, particularly at a time when IDOC doesn't have a single policy implemented.

IDOC did have task 45 which is to develop a full set of healthcare policies, including all 45 policies mentioned in the Implementation Plan. The process for accomplishing that task stated that the Medical and Deputy Medical Directors would appoint work groups to review standards and then write the policies. No information was provided whether this was initiated.

The Monitor recommended that IDOC hire a project manager to oversee development of policies because there is no evidence that IDOC has the capacity to complete their policies. Previously, the COVID-19 pandemic was used to excuse the tardiness of completion of policies. If IDOC has sufficient staff to write the policies, they should complete them. If they don't, they should obtain help to do so.

In summary, IDOC has not completed a comprehensive set of its policies. The Monitor has not been notified of implementation of any policies. The IDOC will need to address how policies

will be implemented and disseminated. Implementation of policies should be included in the Implementation Plan. Based on what IDOC has completed to date, a partial compliance is warranted.

**RECOMMENDATIONS:**
1. Re-establish a timeline for completion of the comprehensive medical policies and include this in the Implementation Plan.
2. Complete the process of finishing drafts of policies.
3. Finalize the recommended changes to the policies.
4. Develop a plan to implement and disseminate policies. Include this in the Implementation Plan.
5. Start the Dental policies.
6. Ensure that policies describe changes necessary for compliance with the Consent Decree.
7. Provide to the Monitor all administrative directives, policies, and guidelines.
8. Provide the Monitor and his team access to SharePoint and any other internal shared server that contains policies, administrative directives, or guidelines.
9. Improve medical record organization, particularly the specialty consults and hospital records.
10. Hire a full-time project manager to oversee development of policies and procedures.

# Facility Specific Issues

# Facility Staffing

**Budgeted Staffing**

*Addresses items II.B.2; II.B.3; III.A.10;*
**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*
**II.B.3.** *IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff.*
**III.A.10.** *Each IDOC facility shall have registered nurses conducting all sick calls. Until IDOC has achieved substantial compliance with nursing provision of the staffing plan, facilities may use licensed practical nurses in sick call, but only with appropriate supervision.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
**Budgeted Physician and Non-Nursing Positions**
IDOC has just submitted its final Staffing Analysis in August of 2021. There are less staff working at the time the August 2021 Staffing Analysis than when the first draft Staffing Analysis was submitted in November of 2019. The Monitor notes that staffing deficiencies identified in prior IDOC Staffing Analyses continue to be present in multiple areas including dental

hygienists, dentists, optometrists, physical therapists and physicians. In some areas the deficiencies have worsened.[66] The Staffing Analysis section of this report addresses these issues.

**Budgeted Nursing Positions**

Information Requested by the Monitor to evaluate nurse staffing[67] included:

- A list of each allocated position for each facility and OHS by position type with vacancies. This list should include positions at each facility by type of position to include "filled" and "vacant" positions and "positions recommended"/ "newly budgeted positions" in the most recent staffing analysis.[68]
- Documentation for nursing of who was assigned to complete sick call, cover the infirmary, and complete intake screening during the four week period requested.[69]
- Nursing personnel at each site assigned the duties of Infection Control, Chronic Care, Quality Improvement listing their names, certification (RN, LPN), percentage of time assigned to the duties of these positions.[70]
- Roster of nursing personnel by name, credential, license or certificate number, date of hire and work location. [71]
- A turnover report should include the following information delineated by RN, LPN/CMT and CNA/MA: 1) Total positions by type of personnel. 2) The number of personnel by type who left employment. 3) The number of personnel by type who left voluntarily. [72]

According to information provided most recently to the Monitor, IDOC has allocated all of the direct care nursing positions recommended in the Staffing Analysis dated 8/19/2021. [73] This is an increase of 176 allocated positions compared to positions that were allocated in August 2021. Compared to positions allocated in 2019, the nursing workforce has increased by 235 positions. Of these, 101 are RNs, 74 are LPNs and 60 are certified nursing assistants.

Of all the allocated direct care positions in the March staffing update, 54% are registered nurses, 33% are licensed practical nurses (includes CMTs) and 13% percent are nursing assistants. See the table on the following page for this breakdown of the direct care workforce. The skill mix at individual facilities varies widely. [74] Compared to staffing proposed in 2019, the IDOC has

---

[66] Appendix A lists the changes in staffing from the first draft Staffing Analysis to the final submitted Staffing Analysis from August of 2021. Inspection of that table show that many positions that the Monitor recommended to be increased were actually decreased from 2019 to 2021 including optometrists, physical therapists, and physicians.
[67] 1/19/2022 Monitor's document request Items 8, 9, 40 and 43.
[68] IDOC provided this referred to as a staffing update dated 3/21/2022.
[69] IDOC provided assignment rosters from Big Muddy, Dixon, Pontiac and Stateville.
[70] The vendor provided information on nurses responsible for chronic care only. No information was provided by IDOC regarding state employed nurses.
[71] The vendor provided this information for their nursing positions. No information was provided by IDOC regarding state employed nurses.
[72] The vendor provided this information for their nursing positions. No information was provided by IDOC regarding state employed nurses.
[73] IDOC Staffing as of 3/21/2022.
[74] Skill mix refers to the proportion of the total direct care staff for each type of personnel. For example, the skill mixes for the 539 RN positions divided by the total direct care nursing positions of 1005.4 is 54%. There is no

reduced the percentage of workforce that are registered nurses and increased the percentage of certified nursing assistants.[75]

| Direct Care Positions Allocated as of March 2022 in Order of Least to Most Staff Per Population | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| FACILITY | TYPE | Region | Population 2/28/2022 | Allocated Direct Care Nursing Positions as of 3-2022 | | Actual Skill Mix 8-2021 | Skill Mix 3-2022 | | | 2022 positions/1000 using 2019 population |
| | | | | # positions | # positions/1000 population | C.N.A. | RN | LPN/CMT | C.N.A. | |
| CENTRALIA | MED | Southern | 1244.0 | 24.0 | 19 | 0% | 67% | 33% | 0% | |
| DANVILLE | MED | Central | 1454.0 | 29.0 | 20 | 0% | 34% | 45% | 21% | |
| ILLINOIS RIVER | MED/MAX | Central | 1478.0 | 30.0 | 20 | 21% | 40% | 40% | 20% | |
| TAYLORVILLE | MIN | Central | 981.0 | 20.4 | 21 | 0% | 61% | 25% | 15% | |
| GRAHAM | MED/Intake | Central | 1846.0 | 39.0 | 21 | 18% | 64% | 21% | 15% | |
| HILL | MED | Central | 1628.0 | 35.0 | 21 | 8% | 40% | 43% | 17% | |
| WESTERN | MED | Central | 1556.0 | 34.0 | 22 | 9% | 32% | 50% | 18% | |
| SHERIDAN | MED | Nothern | 1129.0 | 25.0 | 22 | 24% | 76% | 0% | 24% | |
| BIG MUDDY | MED | Southern | 1317.0 | 33.0 | 25 | 0% | 33% | 48% | 18% | |
| SHAWNEE | MED | Southern | 1230.0 | 31.0 | 25 | 0% | 39% | 42% | 19% | |
| ROBINSON | MIN | Southern | 724.0 | 19.0 | 26 | 0% | 74% | 26% | 0% | |
| LINCOLN | MIN | Central | 724.0 | 22.0 | 30 | 20% | 36% | 45% | 18% | |
| MENARD | MAX/MED/Intake | Southern | 2011.0 | 71.0 | 35 | 10% | 55% | 37% | 8% | |
| LOGAN | MULTI (fem)/ Intake | Central | 916.0 | 46.0 | 50 | 13% | 48% | 39% | 13% | |
| JACKSONVILLE | MIN | Central | 427.0 | 22.0 | 52 | 0% | 73% | 27% | 0% | |
| DIXON | MED | Nothern | 1404.0 | 76.0 | 54 | 13% | 66% | 16% | 18% | |
| PINCKNEYVILLE | MED | Southern | 642.0 | 37.0 | 58 | 19% | 38% | 46% | 16% | |
| VIENNA | MIN | Southern | 378.0 | 22.0 | 58 | 0% | 73% | 27% | 0% | |
| KEWANEE | MULTI TX | Nothern | 162.0 | 10.0 | 62 | 0% | 60% | 40% | 0% | |
| PONTIAC | MAX/MED | Nothern | 938.0 | 60.0 | 64 | 11% | 48% | 42% | 10% | |
| DECATUR | MIN (fem) | Central | 262.0 | 17.0 | 65 | 0% | 71% | 29% | 0% | |
| STATEVILLE | MAX | Nothern | 864.0 | 60.0 | 69 | 11% | 55% | 35% | 10% | |
| NRC | MAX/MIN/Intake | Nothern | 944.0 | 70.0 | 74 | 10% | 57% | 34% | 9% | |
| SOUTHWESTERN | MIN | Southern | 196.0 | 15.0 | 77 | 0% | 60% | 40% | 0% | |
| EAST MOLINE | MIN | Nothern | 362.0 | 29.0 | 80 | 17% | 59% | 21% | 21% | |
| LAWRENCE | MED | Southern | 494.0 | 40.0 | 81 | 20% | 33% | 53% | 15% | |
| VANDALIA | MIN | Southern | 319.0 | 28.0 | 88 | 0% | 68% | 32% | 0% | |
| JTC | MULTI TX | Nothern | 215.0 | 29.0 | 135 | 15% | 86% | 0% | 14% | |
| MURPHYSBORO | MIN | Southern | 39.0 | 10.0 | 256 | 0% | 10% | 0% | 0% | |
| ELGIN | MULTI TX | Nothern | 9.0 | 22.0 | 2444 | 23% | 64% | 14% | 23% | |
| Total | | | 25893 | 1005.4 | 39 | 11% | 54% | 33% | 13% | |

The ratio of direct care positions to the incarcerated population is also shown on the table and averages 38 staff for every 1,000 incarcerated persons. This is compared to 2019 when the IDOC staffing proposal gave a ratio of 25 positions for every 1,000 incarcerated persons.[76] The ratio has increased because the IDOC has 12,000 fewer individuals incarcerated in 2022. If the prison population increases to 2019 levels again the direct care positions currently allocated would give

standard skill mix, but programs staffed with a higher RN mix have better outcomes. The skill mix can be measured against outcomes to determine if a higher RN ratio may be needed.

[75] The IDOC Staffing Analysis dated 11/23/2019 proposed a workforce comprised of 57% RNs, 33% LPNs and 10% certified nursing assistants. Per the 3/21/2022 staffing update the workforce is now comprised of 54% RNs, 33% LPNs and 13% certified nursing assistants.

[76] Staffing Analysis, Illinois Department of Corrections, Office of Health Services, Lippert Consent Decree 11/23/2019.

an average ratio of 26 positions for every 1,000 incarcerated persons. The staffing ratio is the richest at the small facilities with special treatment missions.[77] Facility staffing ratios vary at the other facilities from a low of 19 at Centralia to a high of 135 at JTC. The staffing variance among these facilities cannot be explained by custody level or population size.

There are seven facilities with lower staffing ratios than the median which also have less than 50% of the direct care workforce comprised of registered nurses. These facilities are shaded in the table. The Monitor has recommended further analysis especially at the medium or maximum custody facilities with low staffing ratios and low percentages of registered nurses in the skill mix in the last two reports.[78] There is no evidence that IDOC has acted upon this recommendation. To date methods employed to determine necessary nursing positions are based upon the experience and opinion of nursing managers and are not informed by any quantitative or qualitative data.

IDOC also increased the allocation of supervisory positions in nursing by 17.[79] The ratio of supervisors to direct care employees now is one supervisor for every 17 employees. This improved span of control should provide badly needed leadership to implement the changes in nursing practice and service delivery required by the Consent Decree.

Vacancies among nursing positions are a problem noted across the country in all health care settings.[80] Vacancies among allocated nursing positions have increased in each of the last five reports submitted by the Monitor as seen in the following graph. According to the March staffing update 53% of all allocated nursing positions are vacant compared to a vacancy rate of 33% in August 2021. High vacancy rates among nursing personnel have been identified as a problem since at least 2018.[81] In the previous report the Monitor observed that the number of vacancies was exacerbated by the COVID pandemic.[82] Since then vacancies increased because new positions have been allocated and are not yet filled. Setting the new positions aside, vacancies among positions that were allocated previously grew from 33% to 43%.[83]

---

[77] Murphysboro Elgin and JTC.

[78] Health Care Monitor 3rd Report, Lippert v. Jeffreys, February 15, 2021, page 37; Health Care Monitor 4th Report, Lippert v. Jeffreys, September 16, 2021, page 57. It was suggested such an analysis include quality patient care parameters (numbers of emergencies, patient falls, acquired infection etc.), risk management information (deaths, grievances, errors etc.), time taken to fill vacant positions and retention in registered nurse positions as well as compliance with items III.A.10, III.I.1, III.I.2 and III.I.3 of the Consent Decree.

[79] Supervisory positions include the Director of Nursing and Nursing Supervisors. The 3/21/2022 staffing update documents an increase of 14 nursing supervisors and three Directors of Nursing from the positions that were allotted in the 8/19/2021 Staffing Analysis.

[80] Vacancies among registered nurses averaged 17% at the end of 2021 according to a survey of 227 hospitals, an increase of 7% since the year before. Article available at NSI_National_Health_Care_Retention_Report.pdf (nsinursingsolutions.com).

[81] Statewide Summary Report Including Review of Statewide Leadership and Overview of Major Services, Report of the 2nd Court Appointed Expert (October 2018) pages 28-30.

[82] Health Care Monitor 4th Report, Lippert v. Jeffreys, September 16, 2021, page 59.

[83] The March 2022 staffing update was compared to the 8/19/2021 Staffing Analysis. All of the positions allocated since August 2021 were assumed yet to be filled and subtracted from the number of vacancies listed in the March 2022 staffing update. The remaining number of vacancies was compared to the number of vacancies listed in the 8/19/2021 Staffing Analysis. In March 2022 there were 373 vacant nursing positions compared to 288 vacancies in August 2021 which is a loss of 85 nursing personnel.



Thirty five percent of nursing management positions were vacant in August 2021. In March 75% of these positions are vacant. Out of 43 previously allocated nurse manager positions 15 were vacant at the time of the last report. As of March 2022, there are 29 vacancies. Turnover amongst management positions since August 2021 exceeds 50%. With only a quarter of the management positions filled it is not possible to supervise staff much less implement change.

As stated in prior reports from the Monitor, vacancies and turnover of nursing personnel are linked to poor patient care quality and adverse outcomes. Mandatory overtime is also associated with patient care errors and adverse outcomes. Clinical measures recommended by the Monitor to evaluate staffing adequacy include numbers of emergencies, patient falls, acquired infection, deaths, grievances, errors, delays, and omissions in care, etc. The Monitor has also recommended that the number of mandatory overtime shifts worked by nursing personnel be reported by facilities monthly. Facilities with the highest vacancy rates and most turnover should have these parameters closely monitored to prevent patient harm.[84] There is no evidence that IDOC has done this.

The Monitor has suggested that a recruitment task force be established with representation from OHS, Wexford, Human Resources, and the Office of Budget and Management with the explicit mission to reduce the vacancy rate among nursing positions to 12%.[85] The draft Implementation Plan dated 12/30/2021 included tasks for OHS to at least meet with IDOC human resources and CMS to identify processes to facilitate the hiring of health care staff, to participate in recruitment activities, and to hire the staff outlined in the Staffing Analysis.[86] It has been reported to the Monitor that the Chief of Health Services and other OHS leaders have begun meeting biweekly with IDOC human resources and CMS to accelerate posting and hiring of allocated State and Wexford positions.

---

[84] Health Care Monitor 3rd Report, Lippert v. Jeffreys, February 15, 2021, page 40; Health Care Monitor 4th Report, Lippert v. Jeffreys, September 16, 2021, page 61.

[85] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 26, Health Care Monitor 3rd Report, Lippert v. Jeffreys, February 15, 2021, page 40; Health Care Monitor 4th Report, Lippert v. Jeffreys, September 16, 2021, page 61. If 12% is not realistic at this time, another reduction goal should be set.

[86] 12/30/2021 Defendants Implementation Plan, tasks 2-4.

The most recent draft of the Implementation Plan does not commit to these three tasks and relies instead on "business as usual" routine meetings to simply discuss recruitment and post vacant positions.[87] This is alarming given the increasing rate of vacant positions, lack of headway with retention particularly among nurse managers, and high turnover rates.

The Monitor's input since the first draft of the Staffing Analysis has included the recommendation that positions at each facility be identified as responsible for infection control and quality improvement.[88] The Defendants Implementation Plan dated 12/30/2021 included a task to revise existing policy so that the Agency Medical Director or designee will assign facility healthcare specific positions including facility quality improvement coordinators.[89] This commitment is rescinded in the current version of Defendants Implementation Plan.[90] The consultant told the Monitor she was instructed to write an Implementation Plan that included only those items that were specifically included in the Consent Decree.[91] Since these positions are not specifically called for the Consent Decree they have been deleted. The Monitor disagrees with this interpretation of the content to be included in the implementation plan and considers these positions essential if IDOC is to move forward in any substantive way on the Consent Decree.

**RECOMMENDATIONS:**

1. Develop a recruitment plan with the explicit mission to reduce the rate of vacancies. Responsible parties include OHS, Wexford, Human Resources, and the Office of Budget and Management. The recruitment plan needs to include clearly defined benchmarks to monitor progress toward specific objectives set out in the plan. In addition to vacancy, turnover and retention rates suggested metrics to evaluate progress include: the number and outcome of recruitment activities, time from inquiry to first contact, and time from job offer to start date.
2. A first recruitment priority should be to recruit and hire into vacant Director of Nursing and Nurse Supervisor positions to increase accountability for performance improvement.
3. Prioritize recruitment of nursing positions at the facilities with the lowest ratio of RNs and the lowest actual nurse staffing.
4. The number of mandatory overtime assignments should be reported to OHS by each facility monthly.
5. Monitor patient care quality and health outcomes more closely at facilities with the most turnover, highest vacancy rates and largest number of mandatory overtime assignments.
6. Develop job descriptions that define the training and experience necessary for each position and provide them to the Monitor for input before finalization. Establish positions at each facility responsible for Infection Control and Quality Improvement.
7. Establish a database that includes the number of nursing positions by type, the number vacant currently, the number who left employment each calendar year, the number leaving voluntarily each calendar year and the number of positions filled currently.

---

[87] 4/20/2022 Defendants Implementation Plan, tasks 62, 65 and 66.
[88] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 23; Health Care Monitor 3rd Report, Lippert v. Jeffreys, February 15, 2021, page 40; Health Care Monitor 4th Report, Lippert v. Jeffreys, September 16, 2021, page 61-62.
[89] 12/30/2021 Defendants' Implementation Plan, task 4.
[90] Defendants' Implementation Plan dated 4/20/2022.
[91] Meeting with OHS and the consultant on 5/4/2022.

8. Identify performance and health outcome measures to compare with staff mix and staffing levels to identify desirable staffing ratios and patterns. Measures to evaluate staffing adequacy include quality patient care parameters (numbers of emergencies, patient falls, acquired infection etc.), risk management information (deaths, grievances, errors etc.), time taken to fill vacant positions and retention in registered nurse positions as well as compliance with items III.A.10, III.I.1, III.I.2 and III.I.3 of the Consent Decree.

## IDOC Staffing

***Addresses items II.B.2; II.B.3;***
**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*
**II.B.3.** *IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff.*

**OVERALL COMPLIANCE RATING:** Not rated

**FINDINGS:**
See Statewide Staffing Analysis and Implementation Plan

**RECOMMENDATIONS:** None

## Vendor Staffing

***Addresses items II.B.2; II.B.3;***
**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*
**II.B.3.** *IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff.*

**OVERALL COMPLIANCE RATING:** Not rated

**FINDINGS:**
See Statewide Staffing Analysis and Implementation Plan

**RECOMMENDATIONS:** None

**Credentialing of Physicians**

*Addresses items II.B.6.r; III.A.2-7*

**II.B.6.r.** *IDOC agrees to implement changes in the following areas: That Defendants and the vendor shall timely seek to discipline and, if necessary, seek to terminate their respective health care staff that put patients at risk;*

**III.A.2.** *All physicians providing direct care in the IDOC (whether they are facility medical directors or staff physicians) shall possess either an MD or DO degree and be either board certified in internal medicine, family practice, or emergency medicine, or have successfully completed a residency in internal medicine which is approved by the American Board of Internal Medicine or the American Osteopathic Association, or have successfully completed a residency in family medicine which is approved by the American Board of Family Medicine or the American Osteopathic Association, or have successfully completed a residency in emergency medicine which is approved by the American Board of Emergency Medicine.*

**III.A.3.** *Physicians currently working in IDOC who do not meet these criteria shall be reviewed by the Monitor and the IDOC Medical Director to determine whether the quality of care they actually provide is consistent with a physician who has the above described credentials and who is practicing in a safe and clinically appropriate manner. If the Monitor and the IDOC Medical Director cannot agree as to the clinical appropriateness of a current IDOC physician, IDOC shall not be found non-compliant because of that vacancy for nine (9) months thereafter*

**III.A.4.** *If a current physician's performance is questionable or potentially problematic, and the Monitor and the IDOC Medical Director believe that education could cure these deficiencies, the IDOC will notify the vendor that said physician may not return to service at any IDOC facility until the physician has taken appropriate CME courses and has the consent of the Monitor and the IDOC Medical Director to return.*

**III.A.5.** *Defendants may hire new physicians who do not meet the credentialing criteria, only after demonstrating to the Monitor that they were unable to find qualified physicians despite a professionally reasonable recruitment effort and only after complying with the provisions of paragraph 6, below.*

**III.A.6-7** *Physician candidates who do not meet the credentialing requirements shall be presented to the Monitor by the Department. The Monitor will screen candidates who do not meet the credentialing criteria after a professionally reasonable recruitment effort fails and determine whether they are qualified. The Monitor will not unreasonably withhold approval of the candidates. The Monitor will present qualified candidates to the IDOC for hiring approval. If the IDOC Medical Director has concerns regarding the rejected candidates, he or she will meet and confer with the Monitor in an attempt to reach a resolution. In instances in which the Monitor rejects all viable candidates for a particular vacancy, the Department will not be found noncompliant because of that vacancy at any time during the next twelve (12) months. The credentialing requirements contained in paragraph 2 above do not apply to physicians employed by universities*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**
Since the initiation of the Consent Decree, IDOC has only hired physicians with board certification in Internal Medicine, Family Medicine, or Emergency Medicine or a primary care

field or have successfully completed a residency in Internal Medicine, Family Medicine or Emergency Medicine. The Monitor has requested the training and credential packets be automatically sent to the Monitor three months in advance of the next report. To date IDOC has only provided the vendor training and credentials spread sheets upon request by the Monitor. Only recently has the vendor's credential spread sheet included the expiration dates of physicians' DEA licenses. The inability to obtain requested information prevents an adequate evaluation of physician credentialing and staffing

The Monitor still does not receive all information requested related to ability to evaluate physician care. This information requested and required includes the following:

1. Updated AMA profiles for all physicians that are current.[92]
2. Peer reviews including any disciplinary peer review or actions taken with respect to privileges.
3. Professional performance evaluations for all physicians, nurse practitioners, and physician assistants.[93]
4. Current assignment(s) list of all physicians with hours worked at each site of assignment averaged for a prior 6-month period.
5. Notification when a new physician is hired with credentials of the physician as provided to IDOC.
6. Any monitoring being provided for any physician, nurse practitioner, physician assistant.
7. Current license information and DEA license information.
8. Any sanctions on a license and a report detailing the plan for monitoring.
9. The date internship or residency was completed, date of board certification, and consistent provision of current status of board certification.
10. Documents, including certificates, verifying completion from medical schools, internship, residency programs, and national certifying Boards.

The lack of information received prevents a complete up-to-date verification of credentials and is a barrier to evaluation of physicians to assess whether their work is safe and clinically appropriate.

For the physicians who do not have credentials required by the Consent Decree the lack of information received from IDOC makes it extremely difficult to evaluate where these physicians are practicing so their care can be reviewed. The Monitor has asked IDOC for the provider's name, facility name, hours worked per week at that facility, and title (e.g., staff physician, Medical Director, "traveling medical director") at that facility for every physician. Though

---

[92] Credentials are typically updated every two years although the time period may vary slightly. This is because someone's credentials may change, specifically they may not maintain board certification, they may not continue their DEA license, or they may sustain a sanction from a hospital or medical board. For this reason, professional license credentials must be periodically reviewed. IDOC physician credentials do not appear to be updated periodically. Updating a credential can be performed by using an AMA profile or primary care verification. The training and credentials packets for three new physicians hired in 2022 did not have AMA profiles. It also appears that these reports are obtained only once without updates. Current licenses have not been provided for any of the 26 current physicians. DEA licenses have now been provided for all 26 current physicians. No sanction status reports have been provided. Four current physicians list as board certified

[93] The Monitor has not received from IDOC medical provider evaluations and peer reviews in 2020 and 2021.

requested, IDOC has never provided this information.  Because the vendor moves physicians around to multiple facilities, knowing where physicians work is necessary to evaluate the care they provide.   Also, the principal manner of evaluation of physicians for the Monitor is record review.  The Monitor has requested all death records as they occur.  For the 4th and 5th Court Reports only approximately 25-30% of the required morality records have been provided to the Monitor. Also, several physicians write illegibly.  In particular, their signatures are mostly illegible.  The Monitor has asked for but has not yet received a sign-sheet, on which the typed name of each provider appears below their signature.  This is a common practice in health care systems and centers that do not have electronic medical records and would allow the Monitor to determine who is evaluating the patient when performing record reviews.  Two unsuccessful requests have been made for provider signature sheets.  The IDOC has communicated that neither the vendor nor the pharmacy has such a sheet.  The Monitor has recommended that small stamp with a provider's name and title could also be used for all documentation in the paper medical record.

IDOC currently has only twenty-six physicians; this matches lowest number of physicians working in IDOC since the Consent Decree was signed.  The recent vendor training and credentials spreadsheet and document packets lack AMA profiles for three physicians and board certification certificates for four physicians who are listed as board certified. The State of Illinois physician license expiration dates were not provided for any of the 26 physicians.  DEA registration expiration dates were provided for all 26 physicians. Twenty-three (89%) of the twenty-six physicians are either board certified or have completed a residency in Internal Medicine, Family Medicine, or Emergency Medicine. Three physicians lack the credentials required by the Consent Decree; this is fewest number of non-board certified or non-residency trained physicians since the Consent Decree was signed.[94] Comparison of physician staffing assignments provided to the Monitor on 6/6/22 identified three additional physicians assigned to provide clinical services in IDOC facilities but are not listed on the vendor training and credentials spreadsheet and whose credentials packets have not been provided to the Monitor.[95] IDOC's failure to notify the Monitor when new physicians are hired or assigned to provide health care services in the IDOC has repeatedly occurred and is barrier to the Monitor's responsibility to monitor the quality of care provided to the incarcerated population. Seven physicians have left employment with IDOC since the 4th Court report in September 2021; the monitor was not notified of any of these departures and only identified this decrease in staffing after requesting an updated staffing report from the IDOC.   IDOC has not notified the Monitor when physicians are no longer employed; this has to be corrected to allow the Monitor to assure that the access to care is timely in all IDOC facilities.  A recommendation to notify the Monitor when a physician leaves employment in the IDOC has been added to this section's recommendation list.

It is not possible to verify whether all physicians are working full or part time and where each

---

[94] 5/27/20 Vendor Training and Credentials spreadsheet listed 10 physicians who lacked board certification or completion of a residency in Internal Medicine, Family Medicine, or Emergency Medicine.
[95] Two physicians are Wexford Regional supervising physicians. One is the acting medical director of East Moline CC and is providing backup coverage of Dixon CC and Kewanee CC; the other is temporarily providing backup coverage of Menard CC and Vienna CC. The third physician is not known to the Monitor and is listed as the medical director at Taylorville CC. Information and documents about the training and credentials of this three physicians needs to be shared with the Monitor.

physician is working. Actual status is anecdotal or based on the spreadsheet the IDOC sends as no primary source information is sent despite being requested. Active licenses and sanction status cannot be verified for most physicians as the AMA profiles are outdated and license look up has not been performed. The table below gives the numbers of physicians with their status based on requirements of the Consent Decree.

| Physician Traning and Credentials | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Status | 6/1/21 | | 11/1/21 | | 3/29/22 | | 6/6/22 | |
| | # | % | # | % | # | % | # | % |
| Active, Currebnt Board Certification | 12 | 46% | 15 | 50% | 16 | 50% | 14 | 54% |
| Completed Primary Care Residency or Board Certification Expired | 8 | 31% | 10* | 33% | 11** | 34% | 9*** | 35% |
| Did Not Complete a Primary Care Residency | 6 | 23% | 5 | 17% | 5 | 16% | 3 | 12% |
| Totals | 26 | | 30 | | 32 | | 26 | |
| * Four physicians in this group once had board certification but have not maintained board certification | | | | | | | | |
| ** Four physicians in this group once had board certification but have not maintained board certification status | | | | | | | | |
| *** Two physicians in this group once had board certification but have not maintained board certification status | | | | | | | | |

The number of physicians has been reduced by six (19% reduction) since our last report. The number of physicians lacking appropriate credentials has decreased but although the vendor has only hired physicians with the required credentials since the Consent Decree was signed[96], they have not been able to retain qualified physicians. The Monitor asked for but has not received information on the hours of work of each physician at every facility they work at. Some of the 26 physicians may be part time or "as needed" workers. The lack of information makes it impossible to adequately evaluate provider staffing.

The IDOC provided the facility assignments of physicians on 6/6/22. Due the shortage of physicians, five physicians are serving as medical directors of more than one site. One physician is assigned as medical director at four IDOC facilities and backup coverage of two additional sites; these six facilities house 6,246 patient-inmates. A total of eight medical directors of one or more facilities are also currently assigned to provide backup coverage at one or more other facilities. IDOC again has not provided the number of physician hours or percent time that physicians are assigned to provide care at multiple facilities. The shortage of physicians has created an access to care crisis at multiple facilities in the IDOC and must be urgently addressed. IDOC needs to expeditiously recruit qualified and again consider contracting with locum tenens physicians and temporary physician agencies.

Provision III.A.3. requires the Monitor to review with the IDOC Chief of Health Services all

---

[96] All 11 physicians hired by the vendor since the Consent decree have been Board Certified or completed a 3-year residency in a primary care filed. Only 5 of these newly hired physicians are still working with IDOC as of 6/2/21. An additional 4 physicians with required credentials who were working in IDOC before the Consent Decree are no longer employed in IDOC.

physicians who do not meet credential criteria. The Monitor had a conference call with IDOC on 6/29/21 to discuss this. The Monitor primarily uses record review to establish whether the physician is practicing in a safe and clinically appropriate manner. The IDOC Medical Director stated he was drafting a plan for how to perform his evaluation on non-credentialed physicians that might include looking at

- Credentials
- Ongoing continuing medical education
- Clinical hours
- How many nurse practitioners and physician assistants the practitioner supervises
- Backlogs
- Mortality reviews

The IDOC Medical Director's method of review is not yet established and the Monitor will assist him in any way to move forward. Some of these items such as clinical hours and backlogs may not give an appropriate view of clinical work. Especially since current physician staffing is lower than needed, the quality of clinical work may deteriorate the more patients the provider sees. Backlogs and hours worked are not correlated directly with quality of clinical care. The Monitor will continue to review mortality records but has been hampered by lack of mortality records, lack of verification of physician signatures, and lack of knowledge about where physicians are assigned to work. All of these items have been requested but have not been received as requested.

Based on record reviews, physician quality is still poor. There are still physicians who practice in an unsafe and clinically inappropriate manner who should not be allowed to do so. The Monitor has not been provided with any information that the Implementation Plan has plans or strategies to correct this.

**RECOMMENDATIONS**:

1. IDOC needs to routinely provide the following information to us three months prior to the due date of each upcoming Monitor report.
    a. A table of current physicians in a spreadsheet format with physician name, internship or residency completed, date internship or residency completed, board certification, date of board certification, current status of board certification, primary source verification for these credentials, and an AMA profile.
    b. When the AMA profile does not support the physician's credentials because the credentials are with an Osteopathic Board primary source information must be provided.
    c. All peer reviews including any disciplinary peer review or actions taken with respect to privileges.
    d. Professional performance annual evaluations for all physicians, nurse practitioners, and physician assistants.
    e. Current assignment(s) list of all physicians with hours worked at each site of assignment averaged for a prior 6-month period.
    f. Notification when a new physician is hired with credentials of the physician as provided to IDOC.

g.  Notification when a physician leaves employment with the State or the vendor
h.  Any monitoring being provided for any physician, nurse practitioner, physician assistant.

2.  When AMA profiles are being used to verify credentials, the AMA profile should be current.
3.  Current license information and DEA registration information needs to be provided.
4.  Any sanctions on a license and a report detailing the plan for monitoring should be reported to both OHS and the Monitor
5.  IDOC's health care vendor should continue to hire only physicians who are Board Certified and/or have completed a residency in a primary care field.
6.  All physicians need to be required to use a stamp that contains their name which needs to be used for all of their paper medical record notes and orders so that their medical record entry can be verified as theirs. This practice should continue until the EMR is fully installed.
7.  IDOC should vigorously explore opportunities to expand affiliations with academic medical centers in Illinois to include the recruitment and hiring of physicians

### Oversight over Medical, Dental, and Nursing Staff

*Addresses II.B.6.q; II.B.6.r;*

**II.B.6.q.**  *IDOC agrees to implement changes in the following areas: Annual assessment of medical, dental, and nursing staff competency and performance;*
**II.B.6.r.**  *IDOC agrees to implement changes in the following areas: That Defendants and the vendor shall timely seek to discipline and, if necessary, seek to terminate their respective health care staff that put patients at risk;*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

**Medical and Dental Staff**
The Monitor's 4th Report listed eight recommendations. The IDOC has provided no information that these recommendations were acted on.  IDOC has not communicated any modifications to the processes and forms used to evaluate the clinical competency and performance of medical, nursing, and dental staff.

The IDOC has not provided the Monitor in either 2020 and 2021 with annual peer reviews or Salary Compensation Calibration worksheets for the vendor's physicians, physician assistants, and nurse practitioners or the Individual Development and Performance System reports (annual evaluations) of the State employed dental hygienist, and dental assistants in  2021.[97]  The vendor did provide the Monitor with the 2021 Salary Compensation Calibration Worksheet for dental hygienists and dental assistants.

---

[97] State employed dental hygienists and dental assistants were reviewed between August 2019 and May 2020 but since May 2020 through 2021 no further annual Individual Development and Performance System evaluations for State dental hygienists and dental assistants have been provided to the Monitor.

The vendor contract[98] stipulates that the vendor will participate in "physician peer review program…to ensure compliance with accepted professional standards of performance…. which includes charts reviews of … Onsite Medical Director, Staff Physicians, Nurse Practitioners, Physician Assistants, …[and] Dentists." The "review…should cover… physician sick call, chronic care clinics, lab/x-ray utilization as they related to disease work up, infirmary admissions, and case reviews." Although requested, to date, the Monitor has not received any peer view evaluations for the onsite medical directors, staff physicians, nurse practitioners, and physician assistants since the signing of the Consent Decree. The Monitor has received vendor dentist peer reviews in 2019, 2020, and 2021.

As discussed in the Monitor's 2nd, 3rd, and 4th Reports, the vendor provided in 2019 its Salary Compensation Calibration Worksheet in response to the Monitor's request for the annual assessments of the competency and performance of medical physicians, nurse practitioners, physician assistants, dental hygienists, and dental assistants employed by the vendor. This worksheet was not provided in 2020 but has been provided to the Monitor in 2021 but only for dental hygienists and dental assistants. This form is a generic tool that is not created for specific clinical positions. It focuses on administrative issues. There was no evidence provided that clinical care was assessed by chart audits. The vendor Salary Compensation Calibration Worksheet states "for official use only, not to be shared with employees" The Monitor has previously recommended and continues to recommend that provider evaluations be developed that are position specific, are standardized, are focused on clinical competency and performance, and the results are shared with the provider. No information has been provided to the Monitor that this has been done.

The Monitor was advised that, due to the pandemic, the vendor was not able to complete evaluations in 2020 on any of the physicians, nurse practitioners, physician assistants, dental hygienists, and dental assistants in its employment. The Monitor has also not received any evaluations of vendor physicians, physician assistants, and nurse practitioners in 2021. IDOC has not communicated whether the evaluations of these positions were or were not performed in 2021 or, as in 2020, the peer reviews of these individuals were again postponed due to the administrative burden of the ongoing COVID-19 pandemic.

Dentist peer reviews done in 2021 by dental colleagues in the IDOC utilized the same standardized assessment tool as in 2019 and 2020. The Monitor continues to find the assessment tool utilized as not fully adequate. Over half of the performance categories focused on administrative and documentation tasks. As noted in previous Court Reports,[99] the tool does evaluate some useful clinical issues including performing an oral x-ray prior to dental extractions, adherence to national standards for prophylactic antibiotic use, documentation of anesthetic dosage and delivery, and ordering of appropriate consultations and diagnostic procedures. The Monitor noted that there appeared to be dentist reviewer variation on what constituted compliance with performing x-rays prior to dental extractions and ensuring that dentists and reviewers are fully knowledgeable about the national standard for prophylactic

---

[98]State of Illinois Contract with Wexford Health Sources, Inc May 2021, 90 Day Emergency Contract. page 8 and page 82
[99] 3rd and 4th Court Reports

antibiotics. The criteria for compliance or non-compliance with these two clinically important audit items are not defined and result in potential inconsistency in both dental performance and reviewer assessment of dental care. Although 97.9% of the ninety-seven encounters that peer reviewers deemed had procedures requiring formal patient consent had documentation of signed consent forms, it was unclear whether the consent forms were signed only for invasive procedures (e.g., dental extractions) or also for general dental care. The indication for signed consent forms is not addressed on the audit tool or in the Dental Care of Offenders administrative directive.[100] The indications for signed consent form prior to dental services need to be clarified.

The 2021 Dentist Peer Review evaluated approximately ten dental records[101] for each of the vendor's twenty-seven dentists. Dental records were found to be over 90% compliant in twelve [102] of the 17 audit categories. Two additional audit items were judged to be over 85% compliant.[103] The Monitor continues to advise that if high compliance continues to be noted in audit categories, consideration should be given to either deleting or less frequently reviewing these aspects of care. The future implementation of an electronic dental record would address a number of metrics on the current dentist audit tool including date and time of the visit,[104] the dentist's signature, legibility[105] and accuracy and legibility of the dental notes, the documentation of patient education,[106] and the documentation of the treatment plans allowing the peer review to increasingly focus on the quality of the dental care provided.

Although twenty-six (96%) of the dentists were overall rated as good, excellent/good, or excellent; one dentist had negative citations on seven different audit items, another dentist had negative assessments on six audit items, and a third on five audit items. The Chief of Dental Services should consider focusing attention on dentists with a higher number of negatively rated audit items. Six (22.2%) of the 27 dentists had at least one criticism for failure to appropriately order dental films prior to performing dental extractions on a cumulative total of twelve patients, five (13.8%) of 27 failed to provide or document that oral health education had been provided on a total of 13 different patient encounters, five dentists (13.8%) failed to either use the SOAPE documentation format or write a thorough, legible note on a total of eleven encounters, and five (13.8%) dentists failed to review a patient's overall health record during at least one encounter on a total of twenty-nine patient visits.

As reported in the 4th Court Report, the Chief of Dental Services should work with the vendor to evaluate and revise the peer review tool and incorporate categories that evaluate clinical

---

[100] Dental Care for Offenders, IDOC Administrative Directive 04.03.102, Effective date 1/1/2020
[101] 266 dental records were reviewed. There were a number of blank or non-applicable entries that resulted in a varying denominator for many of the categories.

[102] ≥90% compliance: adequate history of current dental problem, SOAPE format of documentation used/accurate/legible, date/time of encounter documented, appropriate x-rays done, anesthetic/dose/delivery method documented, prophylactic antibiotic prescribed per national standards, appropriate diagnostic procedures ordered, appropriate/timely consultations ordered, dental records are thorough/accurate/legible, dentist signed note, refusals signed and witnessed, consent signed and witnessed.
[103] 85-89% compliance: treatment plan documented, review discussed with reviewed dentist
[104] 11.1% (3/27) of the dentists had at least one encounter that lacked a date and time on a total of 19 charts
[105] 7.4% of the dentists were found to have some illegible documentation
[106] 13.8% (5/27) of dentists failed to document patient education on a total of 19 dental charts

61

outcomes, post- procedure complications, and access to dental care. The Monitor also recommended that an independent review of dental care would avoid the potential bias that exists when the reviewer is a co-worker or colleague of the provider being reviewed.

IDOC uses a different evaluation format titled the State of Illinois Individual Development and Performance System report to evaluate the small number of State-employed dental employees[107] even though the IDOC and vendor dental employees work in the same organization and are expected to perform the same duties. A standardized dental evaluation methodology should be used for all dental hygienists and dental assistants.

As previously noted in the Monitor's 2nd Report, IDOC uses two different State of Illinois Individual Development and Performance System forms that are separately designed to evaluate State-employed dental assistants and dental hygienists. The employee has a self-evaluation section and the supervisor rates the performance and the self-evaluation as exceeded, met, and not met, writes summary comments, and discusses the evaluation with each dental assistant and dental hygienist. Based on the assessment categories on the State evaluation forms there was no assessment of State dental hygienist and dental assistant clinical skills. In 2019, the sole State employed dental hygienist was evaluated by the health care unit administrator who had no dental training or skills. The Monitor was not provided with any of the State of Illinois Development and Evaluation System forms in 2020 or in 2021. No information has been provided to the Monitor that the process to annually evaluate the performance of State of Illinois dental hygienists and dental assistants has been modified.

As previously reported, both the State and the vendor annual evaluations of medical and dental staff focus primarily on administrative and business issues including attendance, productivity, cost effectiveness, and staff attitudes. Although these evaluations have some value for the workplace, they do not satisfy Consent Decree requirements to assess clinical staff competence and performance. With the exception of parts of the dentist evaluations, none of the annual performance evaluations[108] for both State and vendor clinical staff would qualify as professional performance evaluations or assessments of the quality of the clinical care provided by the dental hygienists, dental assistants, physicians, physician assistants, and nurse practitioners.

**Nursing Staff**
The Monitor requested and received job descriptions for several nursing positions including the facility director of nursing, nursing supervisor, correctional nurse II (lead worker), correctional nurse I, and correctional medical technician (licensed practical nurse). The Monitor has not received descriptions of comparable jobs employed by the Vendor. At this point the Monitor has no critique of these position descriptions except to note that there are no explicit expectations of annual assessment of competency as required by II.B.6.q. Orienting new employees and in-service education is included in the position descriptions of the facility director of nursing and nursing supervisor.

---

[107] State of Illinois has eleven allocated dental positions in the IDOC: 2 dental hygienists, 8 dental assistants, and 1 dentist I. This dentist I position is assigned to Stateville CC and has been vacant for the duration of the Consent Decree.
[108] If peer reviews or other clinical performance evaluations are done on vendor physicians, physician assistants, or nurse practitioners; these have not been provided to the Monitor since the signing of the Consent Decree.

The Defendants Implementation Plan dated 4/20/2022 includes one task (20) to develop a policy describing the requirement for annual competency assessment and outlining of the recommended process to comply with the policy. The Implementation Plan provides no additional understanding of what will be included in the assessment, how it will be accomplished, identification of resources needed or how the assessment will be documented and recorded. Nor does the plan identify steps to remediate problems identified with competency (such as coaching, training, skill practice) other than referral to peer review. The previous version of the implementation plan was silent on the requirement for annual competency assessment.

The Monitor also asked for and received a sample of training records of nursing staff from Big Muddy, Dixon, Graham, Menard, Pontiac and Stateville. Nearly all training was stopped from March through October 2020 with social distancing limitations thereafter. It appears that all the selected facilities, except Graham, re-initiated training in 2021. Only Big Muddy listed staff training accomplished via Core Educator, the vendor's online training program. This listing included seven nursing staff who are each recorded as having completed new employee orientation. Other clinically related training is recorded for five of the nursing staff whose records were provided.

Otherwise, the records demonstrate that training provided is predominately IDOC cycle training and the review of nursing sick call treatment protocols, both required annually. Clinical training appears to rely upon reading of material or viewing a video and then signing a memo that acknowledges knowledge of the material. For example, at Dixon, training is recorded as having been provided on the application of mental health restraints. The training consisted of reading a memo from the Assistant Warden of Programs on instructions related to restraint for mental health and signing the training record. No training except the possible exception of basic life support for healthcare providers require any demonstration of competency. The training records do not document any type of competency assessment of nursing personnel.

The Monitor also asked for any documentation of credential verification. A list was received from the vendor that allowed the Monitor to verify nursing staff credentials. However, no such information was provided by IDOC for nurses employed by the state. It would appear that there is no standard statewide practice with regard to maintaining credential verification of nursing personnel.

Recommendation six was modified. Two recommendations have been added.

**RECOMMENDATIONS:**
1. Develop and initiate professional performance evaluations that assess the clinical competency and clinical performance of all clinical staff.
2. Standardize evaluation formats so that all practitioners of the same type are evaluated in the same manner.
3. An independent professional knowledgeable of the scope of practice and capable of evaluating the clinical care of the professional should perform the evaluation.
4. Clinical professional performance evaluations should be shared with the employee who should sign the review after discussion with the reviewer.

5. Involve the Chief of Dental Services and the SIU audit teams in the re-assessment of the existing dentist, dental hygienist, and dental assistant annual evaluations so as to include metrics that evaluate the quality of dental care and clinical skills of the dental team.

6. The Chief of Dental Services should establish clear guidelines concerning: antibiotic prophylaxis for dental procedures, obtaining x-rays prior to dental extractions to ensure the utilization of x-rays meets existing dental standards of care, and for signed consent forms prior to dental care. These guidelines would also allow for more objectivity in the dentists' peer review evaluations.

7. An independent review of dentist care should be used to avoid the potential bias and lack of objectivity when the reviewer is a co-worker or colleague in the same system.

8. Annual peer reviews not Salary Compensation Calibration of the onsite Medical Director, staff physicians, nurse practitioners, and physician assistants should be provided to the Monitor.

9. Add more detail to item 20 of the 5/30/22 Implementation Plan including what the scope of the assessment will be, how assessments will be accomplished, identification of resources needed, how the assessment will be documented and recorded and the steps taken when competency is not demonstrated.

10. Establish by policy and procedure and implement standardized practices for credential verification.

## Operations

**Clinical Space**

***Addresses item II.B.2 in part; III.B.1; III.C.2; III.F.1;***

**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**III.B.1.** *IDOC shall provide sufficient private and confidential sick-call areas in all of its facilities to accommodate medical evaluations and examinations of all Class members, including during intake, subject to extraordinary operational concerns and security needs of IDOC including, but not limited to, a lockdown.*

**III.C.2.** *IDOC shall provide sufficient private and confidential areas in each of its intake facilities for completion of intake medical evaluations in privacy, subject to extraordinary operational concerns and security needs of IDOC including, but not limited to, a lockdown.*

**III.F.1.** *Sick call shall be conducted in only those designated clinical areas that provide for privacy and confidentiality, consistent with the extraordinary operational concerns and security needs of IDOC including, but not limited to a lockdown.*

**OVERALL COMPLIANCE RATING Non Compliance**

**FINDINGS:**

The Monitor did not visit any IDOC facilities this report period.

Limited information has been provided since January 2021[109] about the scope of services and structure of the new facility planned for Joliet, Illinois that was originally to have included 50-52 new medical beds and a clinic. This new facility is expected to provide medical care, but the scope of services has not been fully defined and is not included in the implementation plan or staffing analysis provided by IDOC to the Monitor.

Since June 2020 the IDOC has stated a commitment to perform a systemwide audit of the clinical and health care spaces to ensure there is adequate space and equipment for delivery of health care services to the incarcerated population, including privacy during health care encounters. [110] This survey of all facilities is much needed but has not yet been done. The Monitor strongly supports the need to perform a thorough assessment of the physical space used for health care services and create corrective action plans to address space deficiencies. The completion of this systemwide audit is necessary for the IDOC to attain partial compliance of this provision.

**RECOMMENDATIONS:**

1. Lincoln CC needs a new clinic structure. The current structure is inadequate for medical care.
2. Lincoln CC leadership should continue with their plan to repurpose some offices in the HCU into clinical exam space while advocating for the replacement of the HCU.
3. Shawnee CC leadership needs to evaluate and address the space deficiencies including the limited size of the inmate waiting room, the cramped nursing office in the infirmary, the use of the HCU waiting room for the insulin line, and the need for a profession workspace for the clinic nurses.
4. The IDOC needs to conduct an analysis of physical structures throughout the state to determine whether there are other medical spaces that need to be built, refurbished, or renovated in order not just to meet the provisions in the Consent Decree but to improve access to care, properly sanitize clinical areas, maximize staff efficiency, and enhance staff recruitment and retention.

**Equipment and Supplies**

*Addresses item II.B.6.p; III.B.2; III.I.4;*
**II.B.6. p.** *IDOC agrees to implement changes in the following areas: Adequately equipped infirmaries;*
**III.B.2.** *These areas shall be equipped to fully address prisoner medical needs. The equipment shall be inspected regularly and repaired and replaced as necessary. Each area shall include an examination table, and a barrier on the examination table that can be replaced between prisoners. The areas shall provide hand washing or hand sanitizer.*
**III.I.4.** *All infirmaries shall have necessary access to security staff at all times. (See Infirmary*

---

[109] OHS-Monitor Monthly Conference Call, 4/28/22
[110] IDOC Lippert Implementation Plan 6/12/20 in Structural Components section. See also the 5/30/22 version of the implementation plan, task 73.

*Section)*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**
There has been essentially no change in the status of this item since the Monitor's 4th report. The Monitor provided comments on the draft Health Care Inspection Checklist and Equipment Survey and returned it to IDOC. There has been no further information provided to the Monitor about this tool. The Monitor requested and received a draft of medical equipment by facility in December 2021 and also returned it with comments to IDOC. The Monitor did not receive information in response to any of the other requests for information made for the 5th report. [111]

The IDOC does not yet have a standardized equipment list required for each facility including for the infirmary. The Monitor did comment on the draft of a list of emergency supplies in October 2021.[112] No further information about this draft or any efforts to standardize other equipment has been provided by IDOC. The most recent version of the Defendant's Implementation Plan includes eight tasks to standardize equipment for each of several service areas.[113] The Monitor's recommendation from previous reports remains the same.

**RECOMMENDATIONS:**

1. IDOC must establish a systemwide detailed standard for equipment that must be available and maintained in each of the different clinical service rooms (examination rooms, telemedicine rooms, urgent care, infirmary, detail suites, specialty rooms, etc.) at all correctional centers.
2. IDOC must implement a systemwide ongoing audit of the clinical equipment and incorporate a following replacement plan to ensure that all sites have functional equipment at all times.
3. The IDOC should focus attention on the condition of infirmary beds in all IDOC facilities and replace defective beds with electrically operated hospital beds with safety railings and the ability to adjust the height of the bed and elevate the health and leg sections as needed.
4. IDOC should develop and implement a monthly inspection checklist focused on the condition of the physical space, furniture, and the presence and functionality of equipment including negative pressure units in the Health Care Unit and any other clinical spaces including satellite nurse and provider sick call rooms, intake screening areas, etc.

**Sanitation**
*Addresses item III.J.3*
**III.J.3.** *Facility medical staff shall conduct and document safety and sanitation inspections of the medical areas of the facility on a monthly basis.*

---

[111] Lippert IDOC Document Request for 5th report 01.18.2022, items 55-59, 79, and 109.
[112] Email from Dr. Raba dated 10/14/21.
[113] Defendant's Implementation Plan, Lippert Consent Decree, narrative page 4, tasks 19, 75-80, and 107. The process for completing the task is identical for six of the eight tasks.

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
Results and/or reports of monthly Safety and Sanitation inspection reports have been provided to the Monitor on a quarterly basis for nearly all facilities. Some type of safety and sanitation inspection is conducted most months at the IDOC facilities. The existing Safety and Sanitation inspection reports appear to be the only process in place to not only evaluate the physical plant, plumbing, lighting, ventilation, and cleanliness of the housing units, kitchen, cafeteria, and laundry but also the physical conditions and the function and condition of a limited number of equipment, furniture, and processes in the medical areas.  For this report the Safety and Sanitation reports for the second and third quarter of 2021 from 30 IDOC facilities were reviewed. There continues to be notable variation in what is reported and most Safety and Sanitation Reports do not contain the detail necessary to adequately evaluate the space, equipment, safety, and sanitation of the medical areas.

Physical plant deficiencies in the housing units and service areas were identified with similar prevalence as cited in previous Monitor reports.[114]  IDOC has made no progress on improvements to sanitation or inspections.

The Defendant's draft implementation plan in December 2021 committed to development of a tool to inspect sanitation of clinical spaces and to test the tool with the Monitor at multiple facilities to ensure its accuracy. IDOC also committed to updating the job description for the Environmental Services Coordinator, then posting and filling this position.[115] None of these commitments or tasks are reflected in the most recent version of the implementation plan. Instead IDOC now plans to write a policy on sanitation inspections *with recommendations for procedural compliance.* [116]This essentially leaves sanitation where it is now without any significant change.

**RECOMMENDATIONS:**

1. The Safety and Sanitation inspections do not but should include a more detailed evaluation of the HCU and all other clinical treatment areas that would include the functioning of medical, dental, and radiology equipment, the condition of gurneys, examination tables, chairs, and infirmary beds, the emergency response bags, functionality of the negative pressure rooms, and the sanitation of all clinical spaces.
2. IDOC OHS should finalize with the input of the Monitor their draft of standardized systemwide Health Care Unit/clinical space audit instrument that would focus on all the key safety and sanitation issues in all clinical areas.   If the existing Safety and Sanitation rounds are unable to incorporate this more detailed review of the clinical spaces and equipment into its schedule, a separate audit focused on the health care areas should be established.

---

[114] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020 page 73;  Health Care Monitor 3rd Report, Lippert v. Jeffreys , February 15, 2021 pages 51-52; Health Care Monitor 4th Report, Lippert v. Jeffreys, page 73.
[115] Defendants' Implementation Plan dated 12/30/21, tasks 59-63.
[116] Defendants' Implementation Plan dated 5/30/22, tasks 35, 82-83.

3. The IDOC must expeditiously address and track the deficiencies noted in Safety and Sanitation reports prioritizing those work orders that have an impact on preventing disease and injury to inmates and staff.
4. Also see recommendation #4 in the above Equipment and Supplies section.
5. The Implementation Plan should include a plan to develop safety, sanitation, equipment and clinical space audits that include a reporting system that is standardized across all facilities.

**Onsite Laboratory and Diagnostics**

*Addresses item II.B.6.g;*
**II.B.6. g.** *IDOC agrees to implement changes in the following areas: Timely access to diagnostic services and to appropriate specialty care;*

**OVERALL COMPLIANCE RATING:** Partial compliance

**FINDINGS:**
The IDOC did not provide data or information in response to the Monitor's request for information for the 5th Report. [117]

In October 2021 at the Reception Centers began using the IGRA blood test instead of the tuberculin skin test.[118] The Chief of Health Services has since indicated that the IGRA blood test will be continue to be utilized in IDOC's four Reception Centers.[119] This is responsive to the Monitor's third recommendation in the 4th Report.

The IDOC has also initiated cancer screening with the assistance of additional diagnostics. For a full discussion of this see the subsequent section on Cancer and Routine Health Maintenance Screening. We continue to recommend IDOC initiate an electronic tracking log for colon cancer screening including:
- The patient name,
- Patient number,
- Date of birth,
- Indication for screening,
- Type of testing
- Result,
- Date result communicated to patient,
- For abnormal test results,
    - Date of referral for endoscopy,
    - The date endoscopy was done, and
    - The result of the endoscopy.

---

[117] Lippert IDOC Document Request for 5th report 01.18.2022, items 63 and 64.
[118] This blood test was first recommended by the Monitor in the 2nd report, dated July 2020, pages 79-80.
[119] OHS-Monitor Monthly Conference call 5/19/22.

**RECOMMENDATIONS:**

1. All onsite ultrasonography testing should be immediately excluded from the collegial review process.
2. IDOC must begin to convert all of its non-digital radiology units to digital equipment.
3. Expand tuberculosis skin testing (TST) with IGRA blood testing to all facilities.
4. Contact IEMA to evaluate the need for radiation exposure monitoring badges and the implementation of any additional safety measures for the panorex units at Logan CC and Menard CC.
5. Create a log to track the results of point-of-care colorectal cancer screening and report this data on a regular basis to the facility's CQI committee meeting.

**Dietary**

*Addresses item II.B.6.j.*
**II.B.6.j.** *IDOC agrees to implement changes in the following areas: Analysis of nutrition and timing of meals for diabetics and other Class members whose serious medical needs warrant doing so;*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:** The Monitor requested data and information to inform the evaluation of this provision for purposes of writing this report. This data and information included the following.

- Any new plans for SIU or other academic center to hire dieticians
- Provide each facility's dietary plan including nutritional content. This should include the typical ingredients used and include the name of the consulting nutritionist who signed off on the plan.
- Any documents or data on diet and therapeutic diet analysis.
- Dietician consultant hours provided to IDOC in the last year.
- Commissary list for each facility.
- List of persons on therapeutic diets at Stateville, Menard, Logan, Pinkneyville, and Graham.

Except for an email with a link to a SIU posting of a dietician coordinator none of the information requested was received.

The 12/30/21 Implementation Plan had two tasks related to this provision. One was to consult with a dietitian to complete an analysis of nutrition and timing of meals for selected diseases and to develop a process to initiate dietary counseling. A second task was to consult a dietician to review prescribed medical diets with respect to the nutritional content. Both of these tasks have been eliminated and replaced by a single task in the 4/20/22 Implementation Plan to write a policy outlining the requirement for a dietician to develop menu plans including specific medical diets. This single task is not consistent with the Consent Decree requirement to analyze the nutrition and timing of meals for diabetics and other Class members whose serious medical needs warrant doing so as it does not consider individuals with unique medical and dietary needs who require individual attention.

In the 4/20/22 Implementation Plan the Medical Director will appoint a work group to evaluate standards for the policy and then to write the policy. The policy should be assigned to a person with credentials and competency to write such a policy. In the process section of a task to hire a consultant to "support the implementation plan tasks", IDOC incidentally states that a dietician has been hired. The Monitor has not been informed of this.

On 2/14/22, IDOC counsel sent an email with a link to an SIU posting of a position for a dietician coordinator. The responsibilities of this position have not been provided. The Monitor does not therefore know whether the dietary coordinator will do.

None of the other recommendations in the prior report have been initiated or completed.

Based on record reviews, nutritional counseling and evaluation of dietary needs of persons with medical conditions is still not occurring. There was particular concern about lack of attention to nutritional needs for the elderly and especially those with dementia. Several mortality record reviews showed considerable inattention to dietary needs of persons with dementia that satisfied definitions of mistreatment and neglect. Multiple others with late-stage cancer or dementia were not provided sufficient nutritional evaluation or management.

**RECOMMENDATIONS:**
1. The percentage of fat, protein, carbohydrates and sodium in diets should be calculated and documented for all master menus.
2. Inmates should have access to information on food components in their meals so that those inmates who must choose components based on their medical conditions can do so. This is especially true for diabetics but is also true for those with hypertension and high blood lipids.
3. A registered nutritionist/dietician should be on staff of IDOC to supervise dietary analysis to ensure that all meals contain acceptable nutrients and components based on the latest version of the Food and Drug Administration Dietary Guidelines for Americans.
4. Diet managers at facilities need supervision by and consultation access to a registered nutritionist/dietician.
5. Physicians and inmates with conditions requiring nutritional expertise must have access to a registered nutritionist/dietician for consultation on these needs. These consultations need to be documented in the medical record. Policy, procedure and practice should be modified to ensure this occurs.
6. Access to dietician/nutritionists can be by telemedicine or in person via hiring registered nutritionists/dieticians.
7. The therapeutic diet manual should be rewritten to include all therapeutic diets so, in its entirety including master menus, it is contemporary.
8. Mealtimes should be adjusted reasonably so as not to be a barrier to participation in meals.
9. The commissary food and snack panels must be evaluated and adjusted to include healthy choices appropriate for all inmates including those with diabetes.
10. The extremely low participation in eating meals and astronomical use of commissary should be studied to evaluate how to improve consumption of healthy food. IDOC

should analyze timing of meals, behavior, recipes, and preparation factors that may be resulting in the extremely low participation in meals.[120] Reasonable adjustments should be made to encourage healthy dietary patterns. This must be done in a manner that permits both a secure environment and nutritious meals that are eaten.

11. Policy, procedure, and practice should be established to ensure persons with diabetes have access to a registered nutritionist/dietician consistent with American Diabetes Association guidelines.

12. Policy, procedure and practice for all chronic care conditions should include evaluation of diet and access to appropriate referral to a registered dietician/nutritionist when indicated.

# Facility Implementation of Policies and Procedures

**Medical and Dental**

*Addresses item II.B.8.*

**II.B.8.**   *The implementation of this Decree shall also include the development and implementation, with the assistance of the Monitor, of a comprehensive set of health care policies by July 1, 2020.  These policies shall be consistent throughout IDOC, and cover all aspects of a health care program.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

There were 47 tasks related to policies in the 4/20/22 Implementation Plan.  Almost all of these include writing specific policies.  The tasks are mere re-statements of the Consent Decree.  There are no tasks on how implementation of policies will occur or who will implement the policy.  The "process for accomplishing the task" of task 47 which addresses distribution of policies states that policies will be shared through announcement and distribution at monthly meetings.  This implies that training consists of sharing a policy with staff.  This is a very passive method and is unacceptable.  It will not ensure that employees are properly trained in new policy and procedure.  The Implementation Plan should include specific tasks for how policies are implemented at the level of the facilities.  This should include a standardized methodology for training staff to ensure that all staff are aware of how the procedure of the policy is to be conducted.  Training new staff on policies needs to be included in the standardized methodology.

Policies are still in the process of being written and reviewed; none have yet been approved or implemented.   Because no policies have been implemented this item warrants a noncompliance rating.

**RECOMMENDATIONS:**

1. The Implementation Plan needs to include a task to develop a standardized methodology

---

[120] An example of how this was done, albeit for schoolchildren, is the Centers for Disease Control  School Health Guidelines to Promote Healthy Eating and Physical Activity found in Morbidity and Mortality Weekly Report Sept 16, 2011 as found at https://www.cdc.gov/healthyschools/npao/pdf/mmwr-school-health-guidelines.pdf.  This document shows how behavior, food preparation and presentation promoted healthy eating.

for implementing policies and procedures that ensure that all employees are properly trained for those procedures that they will need to fulfill their job responsibilities.

# Intrasystem Transfers

*Addresses item III.D.1; III.D.2*

**III.D.1.**  *With the exception of prisoners housed at Reception and Classification Centers, IDOC shall place prisoners with scheduled offsite medical services on a transfer hold until the service is provided, contingent on security concerns or emergent circumstances including, but not limited to, a lockdown. Transfer from Reception and Classification Centers shall not interfere with offsite services previously scheduled by IDOC.*

**III.D.2.**  *When a prisoner is transferred from one facility's infirmary to another facility, the receiving facility shall take the prisoner to the HCU where a medical provider will facilitate continuity of care.*

**OVERALL COMPLIANCE:** Partial Compliance

**FINDINGS:**

IDOC has yet to establish policy and procedure that directs the health care program to place a transfer hold on prisoners with scheduled offsite medical services or review by a medical provider when a patient is received on transfer from another facility per III.D.1 and 2 of the Consent Decree. The Monitor was provided with a draft of policy and procedure for intrasystem transfers and returned it to OHS with comments and suggested revisions in August 2020. We have received no further version of this draft.

The 4/20/2022 version of the Defendants' Implementation Plan includes a task (26) to develop a policy for placing medical holds until a scheduled offsite medical service has taken place and another task (27) to develop policy requiring medical review upon arrival of a patient transferred from another facility. These are simply restatements of what is in the Consent Decree. The 12/30/2021 version of the implementation plan also had a task (39) to develop policy for medical holds. However, this earlier version had seven subtasks which included development of guidelines and forms, procedures for transferring facilities to reconcile medications, problem lists, in-house referrals, and coordinate continuity of care, documentation of handoff communication, coordination by OHS of patients with complex care needs, standardized procedures for transfer to ensure care continuity, and development of an audit instrument and education of staff. Clearly the December version of the Defendants Implementation Plan was more robust in envisioning how to achieve compliance with III.D.1 and 2 than what has been included in the April 2022 submission. The April submission has no tasks beyond merely writing policy and making recommendations to facilities for procedural compliance.

The Monitor requested the following information[121] from IDOC to aid in evaluation of compliance with III. D. 1 and 2 for this report:

- List of persons placed on transfer hold over the past 6 months with respect to specialty care. If unavailable, whatever evidence IDOC has to provide evidence that patients

---

[121] Lippert IDOC Document Request for 5th report 01.18.2022, items 66, 68 a., 69 a. and k.

who have specialty appointments are placed on hold and are not transferred until specialty care has been provided.

- Any tool developed by defendants to self-monitor performance of intrasystem transfers.
- Any CQI or performance audits with results of study, analysis, and corrective action for intrasystem transfer.
- Until IDOC develops performance audits send the Monitor transfer-in clinical information on 5 individuals for each of 6 facilities selected by the monitor.

IDOC did not provide any of the information requested. There is no evidence that IDOC complies with II.D.1, the placement of a medical hold when a patient has a scheduled offsite appointment. While there is evidence from record review that a medical provider evaluates transfers when they are received at a facility there is insufficient evidence that continuity of patient care is facilitated by this evaluation.

We reviewed the facility reports that are provided quarterly, in particular the transfer study and CQI meeting minutes. At NRC the Medical Director reported during the CQI meeting feeling rushed to clear patients the morning of transfer and was reassured he should take what time was needed. There was no further inquiry about factors contributing to feeling rushed, attempts to further quantify the problem or discussion of ways to improve the situation. Ten facilities reported results from the transfer study through September 2021. Drop filing was reported in charts received from NRC, Graham and Lawrence and temporary files were being received from intake at Graham.[122] Sheridan reported not being able to keep up with filing in the medical record, particularly COVID test results. Kewanee reported that 50% of the charts received on transfers had incorrect or incomplete information on the Health Status transfer Summary. Taylorville reported that records were arriving late or not at all and that documentation of COVID testing was lacking. There was no discussion of corrective action for any of these findings. Decatur, Lincoln, and Murphysboro reported 100% compliance with documentation requirements for record transfers. While transfer studies were completed by Big Muddy, Danville, and East Moline no results or findings are documented as discussed at CQI meetings.

While IDOC does attempt to self-monitor the transfer of the health record and completion of the transfer summary, the tool does not address continuity of care as called out in III.D.2. The Monitor has recommended that this tool be expanded[123] to include the accuracy of the clinical information (diagnoses and medications) entered on the Health Status Transfer Summary, whether the MAR was transferred concurrently, and that care was continued without interruption (medications, pending appointments and completion of referrals).

Fortunately, seven of the death records reviewed included documentation of intrasystem transfers. Five of the records[124] reviewed either the sending facility did not document, or the receiving facility failed to document on the Health Status Transfer Summary. It appears that documentation on this form is voluntary. A number of different forms are used to document the

---

[122] CQI minutes from Jacksonville and Taylorville.
[123] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, pages 78-79, Health Care Monitor 3rd Report, Lippert v. Jeffreys, February 15, 2021, page 57, Health Care Monitor 4th Report, Lippert v. Jeffreys, September 16, 2021, page 92.
[124] Mortality review patient #s 19, 20, 21, 24 and 25.

patient's condition upon arrival at the receiving facility.[125]  The Monitor recommends that documentation of transfers be standardized and include procedural direction as specified in task 39 of Defendants 12/30/2021 Implementation Plan.

The records reviewed also indicate that persons are transferred before expected evaluations are completed and that information which should be provided to the receiving facility is missing or inaccurate. For example, one transfer was of an 88 year old patient [126] who was not ambulatory and required use of a Hoyer lift. Other information missing on the transfer summary was that he had urinary incontinence and the list of medical problems was incomplete. This patient transferred from the infirmary at IRCC and was placed in the infirmary at Dixon. There should have been an infirmary discharge note provided as well as the plan of care for this infirmary patient. The receiving facility, Dixon, did not complete the Health Status Transfer Summary as the receiving facility. His admission was documented in a pre-formatted progress note instead. Two additional transfer summaries failed to include information about dentures or eyeglasses the patient had in their possession[127] and another did not note that the patient had a referral to optometry and a pending follow up appointment with the primary care provider.[128] This last patient never saw the optometrist and did not see a primary care provider for two months after transfer.

Failure to seamlessly transfer complete and relevant information about the patient along with the medical record and medication administration record (MAR) creates a notable risk for the interruption of needed care. Six of the seven patient records that included documentation of intrasystem transfers experienced discontinuity in their medical care. The 88 year old already included as an example[129] also missed having a scheduled PT/INR completed to monitor anticoagulation scheduled to take place the day of transfer; this was not picked up on by the receiving facility. Another patient[130] had significantly abnormal labs results obtained by the sending facility before transfer which were not received at the receiving facility for more than two months after they had been resulted.  A third patient[131] was a 70 year old with dementia, and a number of chronic medical conditions, who had hearing and visual problems and used a wheelchair. He had a large wound on his thigh, from a burn and was scheduled to be seen in the wound clinic on 9/28/2021. Five days before this specialty appointment he was transferred from IRCC's infirmary to the infirmary at Dixon. The wound clinic appointment was not listed on the Health Status Transfer Summary, and he was never seen for this appointment.  The transfer summary indicated that he had a specialty referral for urology, but this information was not acted upon at the receiving facility. There was no evidence of provider to provider collaboration in handing off this patient's care and he was not seen by a primary care provider for seven days after arriving at Dixon.

Other examples of discontinuity in patient care upon transfer occur because the receiving facility does not note pending appointments or make sufficient effort to continue current orders for

---

[125] These include pre-formatted progress notes for example used for example at Dixon.
[126] Mortality review patient # 21
[127] Mortality review patient #s 11 and 25.
[128] Mortality review patient # 19.
[129] Mortality review patient # 21.
[130] Mortality review patient # 19.
[131] Mortality review patient # 24.

treatment or diagnostics. Examples include an 89 year old[132] who was very frail was transferred from the infirmary at Dixon to the infirmary at Menard with no documentation of any provider involvement to ensure continuity of care. Once received at Menard there was no assessment of the decubitus ulcer he had and no orders to continue changing the duoderm dressing every five days. Mental health follow up recommended on the transfer form was also not acted upon by the receiving facility. This patient was used a wheelchair but there was no documentation why this was needed and no assessment of his ability to transfer from it or to carry out activities of daily living. Four days after transfer to Menard this 89 year old fell in the shower fracturing his hip.

Another patient[133] was being treated for a seizure disorder but went without seizure medication for two days upon transfer from NRC to Pinkneyville. He had a seizure quite likely from missing medication for two days and was placed on the infirmary where he was combative, and the staff were unable to assess the patient. A doctor gave orders to place the patient on the infirmary and gave a phone order for the same dose of Keppra that the patient was on. The doctor discharged the patient from the infirmary the following day without any examination or evaluation.

The Monitor's recommendations are unchanged[134] from the previous report.

**RECOMMENDATIONS:**
1.  Finish the policy and procedure and ensure that the means and methods to carry out III.D. 1 & 2 are detailed, develop performance measures, and monitor performance to document compliance with the Consent Decree. The procedure should also define what steps the sending facility is to take in documenting pending referrals, identifying tasks not yet completed, reconciliation of medication lists, and detailing current medical and mental health problems. The procedure needs to do the same with regard to specifying the receiving facility's obligation to verify the transfer information, examine the patient and document actions taken to continue ongoing care and address new problems.
2.  Augment the scope of the Medical Record Transfer study to include the concurrent transfer of the MAR, evaluate the accuracy of the clinical information (diagnoses and medications) entered on the Health Status Transfer Summary and whether there is any discontinuity in the plan of care.

# Medical Reception

*Addresses Items II.A; II.B.1; II.B.6.a; III.C.1*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

---

[132] Mortality review patient #20.
[133] Mortality review patient # 17.
[134] Health Care Monitor 4th Report, Lippert v. Jeffreys, September 16, 2021, pages 91- 92.

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**II.B.6.a** *IDOC agrees to implement changes in the following areas: Initial intake screening, and initial health care assessment*

**III.C.1.** *IDOC shall provide sufficient nursing staff and clinicians to complete medical evaluations during the intake process within seven (7) business days after a prisoner is admitted to one of IDOC's Reception and Classification Centers.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

The Monitor requested that IDOC provide the following information[135] to evaluate progress made towards compliance with items listed above from the Consent Decree that relate to intake screening and the initial health assessment:

- Handbook provided to persons in custody of IDOC.
- Nurses assigned to complete intake screening over a four-week period.
- Any tool developed by defendants to self-monitor performance of intake screening by nurse.
- Any CQI or performance audits with results of study, analysis, and corrective action for intake screening.
- Until IDOC develops performance audits on these service components, send the Monitor intake charts from 20 new admissions to NRC and 10 new admissions to each of Menard, Logan, and Graham.

None of the requested material was sent. Thus, this evaluation of compliance is based upon review of monthly reports, memos to the Monitor, other documents provided for review and review of the records of persons who died in IDOC custody during the period covered by the 5th Report.

There has been some progress forward in terms of initial intake screening since the Monitor's 4th Report. A second draft of policy on Receiving Screening was received and commented on by the Monitor. The issues raised by the Monitor's comments on the second draft should not be difficult to resolve in the next draft. The Defendant's 12/31/2021 and 4/20/2022 versions of the Implementation Plan have no tasks to train staff to perform receiving screening according to the revised policy and procedure or to monitor implementation of the new process. The revised policy and procedure on reception screening requires revision of forms and may require additional equipment or supplies. These items are not included as tasks in the draft implementation plan.

Other progress made has been a pilot which started in October 2021 at the Reception Centers using the IGRA blood test instead of the tuberculin skin test.[136] The Chief of Health Services has indicated that UIC telehealth consultants are assisting with the evaluation of data from the pilot

---

[135] 1/19/2022 Monitor's document request Items 7, 8, 10, 68 and 69.

[136] This blood test was first recommended by the Monitor in the 2nd report, dated July 2020, pages 79-80.

project.[137]  OHS has communicated to the Monitor that IGRA blood test will be continue to be utilized in IDOC's four Reception Centers.[138] The Monitor continues to support IGRA testing because of increased accuracy, elimination of most human error, minimization of the potential for accidental needle sticks, and decreased labor costs.

Staffing at NRC has also improved. At the time of the last report, the Staffing Analysis was still in draft form.[139] A final Staffing Analysis was submitted 8/17/2021 and included an additional 1.5 FTE physician assistants/nurse practitioners at NRC. The most recent staffing update confirms the addition of these positions and all of the primary care provider positions at NRC are filled.[140]

The variation in phlebotomy staffing noted in the last report has not been addressed by IDOC.[141] No phlebotomy staff have been allocated to NRC, yet they have many more intakes than other facilities which *have* dedicated phlebotomists. We noted in the last report that labs were not available for review by the provider at the time of the physical exam in virtually all charts provided for review.[142] The effectiveness and accuracy of health assessments is greatly compromised by not having laboratory data available at the time of the encounter. The Monitor has been provided with no information to show that this is not still the case.

Additional primary care positions were also added at Graham and Logan. However, these two facilities, as well as Menard, have high vacancy rates among primary care providers.[143] See the table below. Among dentists, both Menard and Logan have only 0.5 FTE dentists employed although Menard is allocated 3 FTE and Logan 2 FTE. Vacancies among nursing positions are high at all Reception Centers.[144] Accounting for additional positions added at NRC, Graham, and Menard there was a net loss in nursing personnel since the last staffing update.[145]

|  | Vacancies as a percentage of allocated positions 3/31/2022 | | | |
|---|---|---|---|---|
|  | NRC | Graham | Menard | Logan |
| Primary care providers | 0% | 25% | 40% | 29% |
| Dental staff (includes assistants and hgienists) | 0% | 35% | 21% | 50% |
| Nursing staff | 49% | 55% | 64% | 50% |

The table below shows that the number of intakes to correctional facilities are significantly less

---

[137] Notes from teleconference with OHS on 3/17/2022.

[138] OHS-Monitor Monthly Conference call 5/19/22

[139] Discussion of staffing in the Monitor's 4th report was based upon a staffing analysis dated 7/7/2021.

[140] Staffing update dated 3/31/2022.

[141] Staffing Analysis dated 8/19/2021

[142] Health Care Monitor 4th Report, September 16, 2021, page 94.

[143] Menard and Logan have no primary care physicians employed as of the 3/31/2022 Staffing Update.

[144] Vacancy rates in 2021 among nurses in hospitals were on average 17%, up 7.1% from the year before. 2022 NSI National Health Care Retention & RN Staffing Report, NSI Solutions, Inc. available at NSI_National_Health_Care_Retention_Report.pdf (nsinursingsolutions.com)

[145] Staffing analysis dated 7/7/2021.

and the average daily population at these facilities is also lower than before the pandemic.[146] With the dramatic reduction in workload associated with the decrease in intakes to IDOC the full effect of these vacancies is not as apparent. OHS has not yet redesigned an improved process for intake screening and assessment as called for in II.B.6.a. of the Consent Decree and has yet to sufficiently accounted for the staffing necessary to accomplish this work. The Monitor also recommends a more robust recruitment program to fill vacant health care positions than is outlined in the 4/20/2022 Implementation Plan.

|  | NRC | Graham | Menard | Logan |
|---|---|---|---|---|
| Ave intakes per month in 2021 | 149 | 20 | 12 | 10 |
| Ave intakes per month in 2020 | 368 | 81 | 13 | 27 |
| Ave intakes per month in 2019 | 935 | 251 | 51 | 112 |

There are currently no metrics or performance measures for receiving screening, and it is not discussed or reviewed at CQI meetings. Metrics apparent in the draft policy and procedure are that receiving screening is to take place no more than four hours after intake to the facility and there are timeframes for appointing the patient for the initial health assessment based upon a prioritization of their health condition. The Monitor has recommended since the 2nd report that timeliness completing each step in medical reception be monitored and exceptions reported at CQI for analysis and resolution.[147] In addition, performance measures for reception screening should include whether the nurse appropriately inquired about, assessed and documented the patient's initial history and condition, accurately determined the priority for appointing the initial health appraisal, whether orders for medication, accommodation and housing were sought appropriately and in time to minimize treatment discontinuity, and whether information from previous health care providers was identified as needed and permission sought to receive it.

As mentioned earlier, records of intakes were requested from Reception Centers, but none were provided by IDOC by the time this section of the report was written. There were four patients among the death charts reviewed whose records included receiving screening. Findings even from this small sample are consistent with the findings found in the 4th report. These include inconsistent gathering of vital signs at all facilities, including failure to check corrected and uncorrected visual acuity.[148] Abnormal vital signs such as an rapid heart rate or elevated blood pressure were not rechecked and/or not referred to the provider for urgent evaluation.[149] Persons giving history of a medical condition were not asked additional questions to amplify the information nor were records obtained of previous treatment when indicated.[150] Hearing acuity also was not assessed at receiving health screening and should be.

One patient should have been referred urgently and was not, another was referred urgently but was not seen for the initial health assessment for six days.[151] On all four of the reception

---

[146] The numbers in this table were calculated using the Prison Admission Data Sets for CY 21, CY 20 and CY 19 available at Prison Admission Data Sets - Reports (illinois.gov).
[147] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 80; Health Care Monitor 3rd Report, February 15, 2021, page 59; Health Care Monitor 4th Report, September 16, 2021, page 96.
[148] Mortality review patient #s 9 and 25.
[149] Medical reception patient #s 9, 17 and 25.
[150] Medical reception patient #s 9, 11, 17 and 25.
[151] Medical reception patient # 9 and 11.

screening tools reviewed, the nurse indicated that the information was obtained only by report of the inmate; either transfer records from the sending jail were not reviewed or no records were sent. One of these was a patient[152] who reported having a seizure disorder whose last seizure had been two days earlier. Records from the sending county jail were in the chart, dated the same day as the admission to IDOC. It appears the nurse did not review these in documenting completion of receiving screening. If so, it would have been clear that the patient had active prescriptions for phenytoin and olanzapine which were not noted in the nurse's referral to the provider. This patient went without medication and suffered a seizure two days later.

With regard to the immunization history, in one record the immunization history was left blank[153], another had the vaccine report from ICARE in the record, but the nurse documented that vaccines were unknown[154], in the other two charts the vaccine history is circled as "no".[155] Vaccines were not documented as ordered or given for any of the four intakes reviewed. One patient explicitly requested vaccination for COVID which was never given.[156] IDOC previously provided a what has been described as a final administrative directive on immunizations, but it does not appear to have been implemented completely at the Reception Centers.[157]

No receiving facilities were visited during the time covered by this report, so the physical facility, space or equipment devoted to intake screening was not observed. We noted that the external review conducted at Graham Correctional Facility in July 2021 found a number of physical plant deficits in the Receiving Unit as well as an accumulation of bird feces on cell window ledges[158] – the latter a known risk for transmission of histoplasmosis. The institution safety and sanitation inspection report for the same month does not mention any of these items but instead lists all areas inspected in Receiving and Classification as "clean".[159] The Monitor has recommended that safety and sanitation rounds should account for infection control risks and uncleanliness, inoperable or unsafe equipment and condition of the space, as well as an evaluation of the privacy and confidentiality of space used for all clinical encounters. This would include the areas used for receiving screening and the initial health assessment.

The Defendants Implementation Plan as submitted 4/20/2022 only commits to two tasks, both of which are to draft a policy and to outline a process recommended to procedurally comply with policy. One of the policies to be developed is to outline the contents of the orientation manual given to patients at intake. The other policy is to outline the requirements of a reliable and safe process for intake screening, to include the dental exam. A previous version of the Implementation plan dated 12/30/2021 committed to revising the orientation manual (not just outlining the contents) and standardizing the protocol for patient treatment at reception centers.

So far, the IDOC has not identified sufficient tasks in the Implementation Plan to account for the

---

[152] Mortality review patient # 17.
[153] Mortality review patient # 17.
[154] Mortality review patient # 25. In fact, ICARE identified that he was due for several vaccines.
[155] Mortality review patients # 9 and 11.
[156] Mortality review patient #25.
[157] Immunization Administrative Directive (Final) 011521
[158] Graham Correctional Center FY 22 External Review page 4.
[159] Memo from Stefanie Howard PSA, HCUA to the Safety and Sanitation Inspector, Graham Correctional Center dated July 19, 2021.

changes necessary to comply with II.B.6.a of the Consent Decree which is to implement changes in initial intake screening, and initial health care assessment and III.C.1. which is to provide sufficient nursing staff and clinicians to complete medical evaluations during the intake process within seven (7) business days after a prisoner is admitted to one of IDOC's Reception and Classification Centers.

The Monitor's recommendations for implementation tasks concerning medical reception are to:
1. map the steps of the desired medical reception process
2. define the workload measures and staffing needed to complete medical reception,
3. establish the performance metrics, and audit criteria,
4. develop policy and procedure to coincide with the process map, metrics, and audit criteria,
5. assess and obtain necessary equipment and supplies,
6. create or revise necessary forms,
7. secure qualified staffing,
8. inform and train staff to complete procedures and report performance metrics correctly,
9. implement revised medical reception process,
10. evaluate the revised process and adjust processes and/or resources to bring into correction, and
11. measure performance regularly to sustain corrections.

Recommendations of the Monitor to achieve an adequate medical reception process that will *ensure access* to appropriate levels of primary, secondary and tertiary care have been revised from previous reports to be more explicit with regard to tasks for the Implementation Plan. The compliance rating for medical reception is changed to partial, based upon receipt of the second draft policy, the increase in positions and the initiation of IGRA testing in screening for tuberculosis infection at Reception Centers.

**RECOMMENDATIONS:**

1. Map out the steps that need to be included in receiving screening to ensure that it identifies, treats, and ensures the appropriate care and housing of persons with acute and chronic medical and mental health conditions as well as establishing and carrying out plans to achieve and maintain individual health during incarceration and upon return to the community.[160]
2. Develop a staffing standard for receiving screening that is workload driven.
3. Develop metrics to provide information on the timeliness and thoroughness of medical reception (III. C. 1, 3 & 4). Reception Centers should report their performance results to CQI on a regular basis.
4. Finalize the policy and procedure on medical reception consistent with the process map and metrics; then implement it.
5. The Monitor acknowledges that IDOC has piloted IGRA testing at Reception Centers since October 2021 and recommends that IDOC adopt by policy that tuberculin skin

---

[160] Raba, J. (2006) Intake Screening and Periodic Health Evaluations. In M. Puisis (Ed.), Clinical Practice in correctional medicine. Page 42. Philadelphia: Mosby Elsevier.

       testing will no longer be relied upon to screen for tuberculosis.

6. Privacy and confidentiality of space used for clinical encounters should be included in safety and sanitation rounds of the health care program. These rounds should also account for inoperable or unsafe equipment and condition of the space, infection control risks and uncleanliness.

7. Develop a clinical audit tool that evaluates the appropriateness, quality, and continuity of health care during medical reception as well as compliance with the policy and procedure. Audit medical reception with this tool (s) at least quarterly until performance is better than 90% on each criteria for three successive quarters.

8. Establish a more robust recruitment plan and fill vacant positions at Reception Centers.

**Health Assessments**

*Addresses items II.A; II.B.6.a; III.C.3; III.C.4*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.6.a** *IDOC agrees to implement changes in the following areas: Initial intake screening, and initial health care assessment;*

**III.C.3.** *IDOC shall ensure that a clinician or a Registered Nurse reviews all intake data and compiles a list of medical issues for each prisoner.*

**III.C.4.** *If medically indicated, IDOC shall ensure follow up on all pertinent findings from the initial intake screening referenced in C.3. for appropriate care and treatment.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

IDOC has asserted compliance with provision III.C.4. since their first Bi-Annual Report in November of 2019 without providing any evidence to support their assertion. No data or information has been provided to verify any of the four provisions of the Consent Decree for this item. The Monitor requested that IDOC send the following data and information for this report.

1. Nurses assigned to complete intake screening over a four-week period.
2. Provider assignments for intake health assessments for a four-week period.
3. Any tools developed to self-monitor intake screening by nurses, intake health assessments by providers, and access to dental intake screening and examination.
4. Any CQI or performance audits on intake screening and intake health assessment and dental intake screening.
5. List of all persons who were received at intake facilities. This was modified to be easier for IDOC to include all new admissions for a 1 to 2-week period for all four reception centers from which the Monitor would select 10 records each from Logan, Menard, Graham, and NRC from the patient list.

IDOC provided none of this data or information and did not inform the Monitor that it did not have the data or information. Lacking any data or information to verify compliance this item remains noncompliant.

With respect to recommendations from the Monitor's 3rd Report, the Monitor has received no information that any of the recommendations were acted on.

IDOC sent the Monitor receiving screening and health assessment policies. These policies include procedures for nurse and physician intake evaluations. The Monitor has returned both policies with comments to IDOC. No further action has been taken and the Monitor has not been advised of the progress of these documents. The Monitor also received from IDOC an immunization administrative directive.[161] This policy was discussed in the last report. IDOC has not provided any further information on this policy and it is unclear if this immunization policy is indeed an IDOC policy or is no longer considered an IDOC policy. IDOC has not advised the Monitor whether any of these policies have been implemented or are in effect. Comments on these policies can be found in the Monitor's 4th report.

The Implementation Plan should include a re-design of the medical reception process so that the work of nurses and providers is integrated to result in a thorough evaluation of every patient to establish a complete inventory of their chronic and acute illnesses. The Implementation Plan that was submitted 12/30/21 does contain a task to develop a standardized protocol for patient treatment in reception centers. Because this task is similar to development of a policy, IDOC should focus on development of a policy with procedure that will describe a standardized process for intake. Development of those policies should re-evaluate the reception process.

In the 4th Report, the Monitor discussed issues with dental reception screening but has not received any new information on dental intake screening.

IDOC currently conducts no reviews of clinical care in intake with respect to medical or dental which is an important aspect of this item. IDOC has provided no plans for reviewing clinical care.

**RECOMMENDATIONS:**
1. Ensure that intake providers request prior records as needed.
2. Providers must perform an adequate history regarding chronic problems and complications, including hospitalizations. This should include a past medical history for all conditions with chronic disease markers, documentation of the most recent civilian therapeutic plan, and medication history.
3. Providers must develop an initial problem list along with clinically appropriate assessments, and diagnostic and therapeutic plans for each listed problem.
4. As part of the Implementation Plan, re-design the medical reception process in order to develop adequate intake procedures that ensure:
   a. All nurse identified positives are evaluated by providers,
   b. All medical problems are identified and entered onto a problems list by providers,
   c. For every medical problem ensure that providers document an adequate history, focused physical examination, assessment and therapeutic plan,
   d. All intake laboratory tests are evaluated by providers as part of the intake process, and

---

[161] Immunization AD (Final) 011521

    e.   Patients are enrolled in chronic clinic for all of their chronic medical conditions.

5.  Immunization history should be designed into the reception screening process and by protocol or physician review, immunizations should be updated and vaccines provided based on the Advisory Committee on Immunization Practice (ACIP) guidelines.

6.  The dental intake screening process should be clarified in policy to include establishment of a dental therapeutic plan and how it is to be scheduled.  The follow up dental appointment should be scheduled.

7.  IDOC needs to develop a mechanism to evaluate clinical care provided during intake by nurses, providers, and dentists.

# Nursing Sick Call

***Addresses Items II.A; II.B.1; III.A.10; III.E.2; III.F.1; III.F.2;***

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs.  Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**III.A.10.** *Each IDOC facility shall have registered nurses conducting all sick calls.  Until IDOC has achieved substantial compliance with nursing provision of the staffing plan, facilities may use licensed practical nurses in sick call, but only with appropriate supervision.*

**III.E.2.** *Lists and treatment plans will be amended pursuant to the order of a clinician only.*

**III.F.1.** *Sick call shall be conducted in only those designated clinical areas that provide for privacy and confidentiality, consistent with the extraordinary operational concerns and security needs of IDOC including, but not limited to a lockdown.*

**III.F.2.** *There shall be no set restrictions on the number of complaints addressed during a specific sick call appointment.  Medical providers must use their medical judgment to triage and determine which issues should be evaluated and treated first to maximize effective treatment and relieve pain and suffering.*

**OVERALL COMPLIANCE RATING:** Partial compliance

**FINDINGS:**

The following information was requested from IDOC to evaluate progress towards compliance with the items of the Consent Decree listed immediately above:

The Monitor requested the following information from IDOC:

- Documentation for nursing of who was assigned to cover the infirmary during the four week period requested.[162]
- List all OHS budgeted positions with vacancies. [163]

---

[162] Monitor's Documentation Request dated 1/18/2022 item 8 which was later modified to the assignment sheets for a one week period in February 2022 from six sites. The Monitor received this information from four sites.
[163] Monitor's Documentation Request dated 1/18/2022 item 19. Received staffing update dated 3.31.22.

- Training records and credential verification of nursing personnel to be selected from the roster.[164]
- Any tool developed by defendants to self-monitor performance of non-urgent health requests (nurse sick call).[165]
- Any CQI or performance audits with results of study, analysis, and corrective action related to non-urgent health requests (nurse sick call).[166]
- Copy of all nursing protocols. [167]
- Primary Medical Services Report of sick call utilization.[168]

Since the 4th report was written IDOC provided a second draft of a policy and procedure[169] to address the availability and operation of sick call at facilities. It includes the relevant sections of the Consent Decree but the guidance it provides is not specific enough to address the problems observed with sick call in the records reviewed for this report. The Monitor has provided comments on this draft to IDOC.

The Defendants' Implementation Plan submitted 4/20/2022 contains two tasks both of which are policies to be written.[170] One that sick call requests will be triaged per NCCHC guidelines and the other that there be no limits on the number of complaints addressed at a single clinical encounter subject to the provider's judgement about urgency needed to address each complaint. These tasks do not state what tasks IDOC intends to accomplish to ensure actual patterns of practice come into compliance with the Consent Decree. The plan does include other tasks related to the physical plant and equipment that will affect sick call.[171]

A prior version of an implementation plan included a process improvement project to improve sick call that included eight subtasks. [172] These subtasks were to identify barriers to access and inefficiencies in the sick call process, prompt encounters with a nurse, methods and practices to fully address patient requests, review and update to nursing protocols, how patient requests are documented in the health record, determining continuing competency of nurses assigned to sick call and establishing tools to monitor performance and quality of sick call. This version of the plan also had several additional tasks concerning staffing, space, and equipment that are relevant to access to care via the sick call process.

For this report six months of CQI minutes were reviewed as well as 25 records of patients who died in 2021. Also reviewed were training credentials, assignment sheets and the staffing update.

---

[164] Monitor's Documentation Request dated 1/18/2022 item 41. Later modified to 6 individuals each from Logan, Graham, NRC, Menard, Dixon, Big Muddy, and Pontiac. Received 3.20.22 from six of eight sites.

[165] Monitor's Documentation Request dated 1/18/2022 item 68. None received.

[166] Monitor's Documentation Request dated 1/18/2022 item 69. Sometimes included with minutes of CQI minutes received quarterly.

[167] Monitor's Documentation Request dated 1/18/2022 item 71. Once received only protocols that have been added or modified need be provided. Protocols were revised last year but have not been provided to the Monitor.

[168] Monitor's Documentation Request dated 1/18/2022 item 73. Not provided.

[169] 06.03.E.07 Non-Urgent Health Requests and Services received from IDOC 8/11/2021.

[170] Defendants' Implementation Plan dated 4/20/2022, tasks 31 and 32.

[171] Defendants' Implementation Plan dated 4/20/2022, tasks 70 and 73.

[172] Defendants' Implementation Plan dated 12/30/21, task 51.

**II. B. 1. Access to an appropriate level of primary care.**

During this report period patients with non-urgent requests for health care attention were not seen timely at sick call. Patients referred by nurses from sick call to a provider have also not been seen timely. Patient access to primary care has been delayed at many IDOC facilities. Some of this is caused by movement restrictions imposed by facilities to reduce transmission of COVID but also is due to vacancies and other staffing shortages. Now that movement within institutions has eased, IDOC is left with the problem of filling vacancies and addressing staffing shortages.

The primary way to access health care attention in the IDOC facilities is by requesting sick call. Once a request is made nursing personnel assigned to sick call review the requests and schedule an evaluation within 24 hours of receipt of the request.[173] The CQI minutes[174] and record reviews reflect that sick call has not been available daily or there are backlogs in seeing patients timely at nine IDOC facilities.[175] One of these, Stateville, documented that nurse rounds for sick call were stopped because of staff shortages.[176] In addition to staff shortages, delays were caused by lockdowns and other measures to limit movement to prevent transmission of COVID.[177]

Eight facilities completed CQI studies to evaluate whether patients referred to a provider from nursing sick call were seen timely.[178] Of these, six facilities reported results indicating that provider encounters were not timely. [179] There were two other studies related to access to primary care during this report period. Jacksonville studied whether nurses referred patients to a provider if they had been seen at nurse sick call three times for the same complaint.[180] Murphysboro studied whether the patient was seen for what the patient was referred to a provider for.[181]

The Primary Medical Services Report has previously been used to monitor access to sick call, but it has not been provided since the first quarter of calendar year 2021. OHS reported that it is working with its vendor to update the Primary Medical Services Report and requested the Monitor's review and comment on the proposed revisions.[182] When this report is implemented it will provide important information on the utilization of sick call services and timeliness of response to these requests.[183] The accuracy and completeness of information contained in the

---

[173] Administrative Directive 04.03.103 Offender Health Care Services, II. F. 6. a-c, effective 1/20/2020.

[174] April 2021- September 2021.

[175] Danville, Graham, Hill, JTC, Logan, Pinkneyville, Pontiac, Shawnee, and Stateville. Reporting information on sick call timeliness has not been required so no assumption can be made that the problem was limited to these nine facilities. See also mortality review patients 6, 8, 14, 15, 25.

[176] August 2021 CQI minutes. Patients were to be scheduled directly with a provider. However, the minutes reflect backlogs of patients waiting to be seen by providers even before daily nurse sick call was stopped.

[177] See CQI minutes from Hill and Menard. Mortality review patients 14 and 15.

[178] The metric for timeliness most often used is seen by a provider within three days. Menard uses 24 hours as their measure of timeliness.

[179] Big Muddy, East Moline, Hill, Menard, Pontiac, and Sheridan.

[180] June 2021 CQI minutes. N = 17. Performance on this measure was 82%. Nurses were reminded to check the medical record for previous requests for the same complaint.

[181] July 2021 CQI minutes. N = 15. Performance was 100%.

[182] Email from Kelly Presley dated October 7, 2021. The Monitor agreed with proposed revisions to the table for Sick Call.

[183] The Monitor was provided with the Primary Service Reports for the month of February 2022. After a brief review it appears that reporting is voluntary given the high number of blank spaces.

Primary Medical Services Report will need to be verified by periodic monitoring and audit.[184]

### III.A.10. Registered nurses shall conduct sick call.

Record review indicated that LPNs continue to be assigned responsibility to conduct sick call.[185] One of the charts reviewed had documentation of 29 sick call encounters, of which 21 were completed by an LPN.[186] There was also no evidence that the LPNs with this responsibility had appropriate supervision. The assignment sheets that were provided also indicate LPNs are assigned responsibility for sick call.[187] Staffing sick call with RNs is improbable with nearly half (46%) of all registered nurse positions are vacant statewide and 19 of 30 facilities have 50% or more of the allocated RN positions vacant.[188]

The draft policy and procedure states that in the absence of a RN it is acceptable to have LPNs assigned this work under supervision of an RN. The Monitor has requested that the language indicate that use of LPNs will be minimized to only occasional assignment to sick call. The policy and procedure doesn't specify how LPNs are to be supervised in performing this work. This will need definition and a method to verify such supervision is taking place.

The Monitor has recommended that IDOC identify the duties which interrupt or compete with the time a registered nurse needs to complete sick call. These duties should be reassigned.[189] The implementation plan provided in December 2021 shows intent to address inefficiencies in the sick call process among other items[190] but this project was eliminated in the April 2022 version of the implementation plan. Neither version of the implementation plan contains any tasks regarding how or by when compliance with III.A.10 will be achieved. The Monitor has recommended that a workload driven staffing measure be calculated and used to determine the number of registered nurses needed to triage and respond to non-emergent health care requests consistent with the Consent Decree.[191] This calculation has not been included in any of the staffing analyses completed by OHS.[192]

Nursing treatment protocols are written plans for medical treatment of a specific symptom or symptom set that includes the parameters to be evaluated, the norms for those parameters and the appropriate response nurses are allowed to take with the patient. They are approved by the Agency Medical Director.[193] All facilities reported review of treatment protocols at least once in the CQI minutes reviewed for this report. The results are usually discussed at the CQI meeting and staff receive this feedback as well. The focus of this audit is documentation completeness. There are only two clinical measures. When the medical director position at a facility is vacant this audit is

---

[184] Health Care Monitor 4th Report Lippert v. Jeffreys, September 16, 2021, page 104.

[185] Mortality review patients 1, 5, 6, 16, 19, 25.

[186] Mortality review patient 7.

[187] Assignment sheets from a week to two weeks in January or February 2022 were provided by four of seven sites requested. These were Big Muddy, Dixon, Pontiac, and Stateville.

[188] Staffing update dated 3.31.22.

[189] An example of a task which doesn't require an RN is monthly safety and sanitation rounds. An example of a task that interrupts a smooth sick call process is being assigned also to respond to emergencies.

[190] Defendants Implementation Plan dated 12.30.21, task 51; Defendants Implementation Plan dated 4.20.22.

[191] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020, pages 27, 87-89.

[192] Staffing Analysis Illinois Department of Corrections Office of Health Services, Lippert Consent Decree, 11/13/2019, Revised 6/18/2020, Revised 5/3/2021, Revised 7/7/ 2021, Revised 8/17/2021.

[193] 04.03.121 Treatment Protocols, effective 9/1/2002.

often not done. The Monitor has recommended the statewide auditing team assess the validity and reliability of this audit data. The strength of this tool in monitoring the clinical appropriateness of nursing sick call could be improved by defining sample selection to focus on "at risk" patients and adding questions related to the quality of assessment and clinical decision making.[194]

There were several CQI studies regarding treatment protocols done electively by specific facilities during this report period. Jacksonville looked at whether visual acuity screening was completed as required in protocols for eye pain and headache.[195] Joliet Treatment Center looked at whether nursing protocols for restraint were filled out completely.[196] Vandalia reported a study considering whether nurses used the appropriate protocol to address the patients' complaint and if patient education was documented.[197]

The CQI minutes report discussions of problems with the use of nursing treatment protocols including lack of training and that when nurses don't use a protocol they are practicing out of scope.[198] We encountered an example of this when a nurse used the protocol for Nonspecific Discomfort to address a patient's complaint of cough and gave him an antihistamine, which is not listed on the protocol.[199] When nurses fail to use a protocol the history and exam are usually incomplete, and the nurse has no guidance in making a disposition. Three additional examples of incomplete nursing sick call encounters and poor decision making were found in chart review.[200]

The frequent misuse of the treatment protocol for Nonspecific Discomfort was evident in charts reviewed during this report period. This protocol provides no direction about the parameters to assess except vital signs and pain. It is simply a shortcut to provide analgesic medication without inquiry into the reason for pain. Guidelines for referral to a provider include two requests for the same problem in the last month, acute, severe discomfort, and abnormal vital signs. The chart review found numerous encounters when a nurse used the Nonspecific Discomfort protocol when there was a more appropriate protocol available.[201] One of these was a 37 year old seen 29 times in the two years of record reviewed. The protocol for Nonspecific Discomfort was used 14 times or almost half of all the sick call encounters before his death.[202]

There were also examples of nurses not referring patients to a provider as instructed in the protocol.[203] One of these was a 74 year old patient with anemia and hypertension who had been complaining of diarrhea for a month. Nurses saw him four times in a two month period using the Nonspecific Discomfort protocol when the protocol for Diarrhea would have provided better

---

[194] Health Care Monitor 3rd Report Lippert v. Jeffreys, February 15, 2021, page 70,
[195] Only 30% of these encounters documented visual acuity screening. N= 29. The corrective action was training by memo.
[196] N=8. 100% compliant. The Monitor has not been provided with a nursing protocol for restraint which brings to question whether facilities are allowed to develop their own protocols independent of the OHS Medical Director.
[197] Appropriate protocol was used. N = 48. 100% compliance. Patient education documented. N = 41. 100% compliant.
[198] Danville, Hill, Menard, and Pontiac CQI minutes. Robinson External Audit FY22.
[199] Mortality patient 6. This was an inappropriate choice of protocol to use as well.
[200] Mortality patients 7, 8, 16
[201] Mortality review patients 5, 6, 7, 8, 11, 25
[202] Mortality review patient 7
[203] Mortality review patients 17, 18, 24

guidance.[204] There were several examples of nurses using the wrong protocol, for example Upper Respiratory Infection to address a complaint of nausea and vomiting.[205]

The Monitor has previously expressed the opinion that nursing treatment protocols should not be used when patients are in the infirmary.[206] From record reviews for this report it is apparent this practice continues. In an inpatient setting all care needs to be directed by the treating physician and any new symptom or change must be evaluated in the context of the patient's entire condition. This consideration exceeds the training and scope of practice of registered nurses and should be made by a physician.

The practice of sick call originates in the military as a scheduled time at which individuals may report sick.[207] Sick call, therefore was designed to address sickness among a relatively heathy population. The nursing treatment protocols are not appropriate for treating patients who are cognitively impaired, frail and elderly, or with complicated pre-existing conditions.  The following are three examples of patients for whom use of the treatment protocols was not appropriate. Two of these patients were in the infirmary and one was in general population.

The first example was 79 years old and diagnosed with dementia five years earlier.[208] Other diagnoses include post stroke, hypertension, history of prostate cancer, right sided paralysis, decubiti, severe contractions of the right hand and arm and one leg. The patient was unable to care for himself, requiring assistance to bathe, transfer, or go to the toilet. He was not able to walk during this entire time and was confined to the bed or wheelchair. A nurse treated him for indigestion by protocol but did not contact the provider even though the protocol indicates this is to be done for patients who have a history of hypertension and cardiovascular disease, which this patient had.  At the next provider rounds three days later, the patient was diagnosed with gastroesophageal reflux disease (GERD).

The second example was a 76-year-old diagnosed with hypertension, HIV, type 2 diabetes, neuropathy, and COPD.[209]  He also had atrial fibrillation, chronic kidney disease, and prostatic hypertrophy. On 10/16/21 he complained of shortness of breath with vomiting. A nurse evaluated the patient using a shortness of breath protocol. A review of the record would have noted that at the time of this complaint the patient had been hospitalized five times in the previous 24 months for congestive heart failure and pulmonary complaints. The nurse did notify a physician of the findings from the exam and albuterol by nebulization was ordered. The possibility of heart failure or even COVID weren't considered.  No follow up was ordered.

The last example was a 70-year-old man with advanced dementia, diabetes, hypertension,

---

[204] Mortality review patient 5

[205] Mortality review patients 8, 19, 25.

[206] Health Care Monitor 3rd Report Lippert v. Jeffreys, February 15, 2021, page 75, Health Care Monitor 4th Report Lippert v. Jeffreys, September 16, 2021, page 109.

[207] Knox, C.; Shelton, S. (2006) Sick Call in Puisis, M. Ed. Clinical Practice in Clinical Medicine, Mosby Elsevier, page 50.

[208] Mortality review patient 2.

[209] Mortality review patient 10.

and glaucoma.[210] He had multiple disabilities including previous traumatic loss of his right eye, poor vision in his left eye, sensorineural hearing loss, and difficulty transferring from a chair to bed. He was housed in the infirmary and needed total assistance. He was treated on multiple occasions using nursing treatment protocols for injuries sustained in falls, a burn to the thigh, a urinary tract infection, musculoskeletal pain, indigestion, constipation, and hypoglycemia without provider oversight and direction.

The Monitor recommends limiting the use of nursing protocols to treat persons who are elderly, those with multiple comorbidities, those who are frail, or those with mental or cognitive impairments. These are patients who need closer monitoring by physicians who are responsible for establishing a comprehensive plan of care. The limitation on the use of protocols with this population could be accomplished in the draft policy and procedure on sick call or in a revision to the administrative directive on treatment protocols.

The Monitor's 3rd report discussed the use of nursing treatment protocols at length.[211] In addition to eliminating use of protocols when patients are in the infirmary, other recommendations were to reduce the number of protocols and to eliminate the nursing treatment protocol for non-specific discomfort. The Monitor understood that the protocols were revised by the IDOC Director of Nursing in 2021. The revised nursing treatment protocols however have not been provided to the Monitor at the time this report was written. We are unaware of any steps taken to address the Monitor's concerns.

### III.F.1. Privacy and confidentiality of sick call conducted in designated clinical areas.

The draft policy and procedure for Non-Urgent Health Care Requests defines the clinical setting for sick call as "an examination or treatment room sufficient to afford privacy and confidentiality during the encounter, appropriately supplied and equipped to address the patient's health care needs. This includes an examination table, barrier protection, and hand washing or sanitizer, and access to the patient's medical record." However, nowhere in the draft policy is there a statement that sick call encounters shall take place in a clinical setting.[212]

The Monitor has recommended evaluation of the privacy and confidentiality of rooms where clinical encounters take place during safety and sanitation rounds of the health care areas.[213] Both versions of the implementation plan include tasks to identify the number of examination rooms needed and to ensure that there is sufficient workspace.[214] However the December version did not address whether the designated clinical areas will provide sufficient privacy and confidentiality. The April version mentions privacy as part of two subtasks in the creation of functional space but does not provide for periodic evaluation and verification of privacy. The Monitor has suggested IDOC could measure compliance with III.F.1. by incorporating these elements into the tool used

---

[210] Mortality review patient 24.

[211] Health Care Monitor 3rd Report Lippert v. Jeffreys, February 15, 2021 pages 72-75.

[212] This statement needs to be added to the draft policy and procedure and was not among the Monitor's previous feedback.

[213] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020 page 87-89, Health Care Monitor 3rd Report Lippert v. Jeffreys, February 15, 2021 page 77, Health Care Monitor 4th Report Lippert v. Jeffreys, September 16, 2021 page 109.

[214] Defendants Implementation Plan dated 12.30.21, tasks 62, 73, 79, 103-110; Defendants Implementation Plan dated 4.20.22, tasks 35 and 70.

to audit the health care areas at each facility.[215]

Documentation reviewed for this report indicates that at least two patients were seen cell side for sick call encounters.[216]  Also the CQI minutes from Stateville document that nurses did sick call rounds, implying cell side encounters, until sick call was halted because of short staffing.[217]

**III.F.2. No restriction on the number of complaints addressed at a single sick call encounter.** The most recent draft policy and procedure IDOC provided for review does state this requirement explicitly. However, it is still a draft document. Previously IDOC has said that the "Agency Medical Director … has participated in multiple meetings with healthcare staff informing them that they may not restrict the number of complaints addressed during sick call. That direction has been provided telephonically, during OHS Quarterly meetings, as well as being reiterated during site visits." [218]  Because the Agency Medical Director states that something is to be done, does not ensure that it is indeed done.  IDOC should audit and obtain data to verify that the Agency Medical Director's instructions have been followed.  Sick call monitoring tools should include this as one of the criteria measured so that compliance with the expectation is sustained.[219]

In the Monitor's review of records for this report we did see evidence of patients being treated with two nursing protocols, but it is not clear if this is because the problem required evaluation with two protocols (for example one for cough and another for headache) or that the patient has made more than one complaint.  Nurses do not always document in the patients' own words why sick call was requested, the request slips are not always retained in the chart and if a sign-up sheet is used, the complaint is not written down for reasons of confidentiality. There is simply no way of knowing what complaints the patient had to cause them to request sick call attention. The Monitor has recommended that the patient statement of why they want to be seen is documented as the first entry on the treatment protocol. The alternative is to include the written request in the health record. Whatever method is selected should be added to the agency policy and procedure on Non-Urgent Health Requests and Services and the Administrative Directive on Treatment Protocols revised accordingly. Finally, a measure of whether more than one complaint was addressed at the encounter should be included in the audit tool for sick call.[220] These would be methods to provide evidence of compliance with III.F.2.

The Monitor has the following recommendations slightly revised from earlier reports to address the requirement for sick call in the Consent Decree.

**RECOMMENDATIONS:**

---

[215] Health Care Monitor 4th Report Lippert v. Jeffreys, September 16, 2021 page 109.
[216] Mortality review patients 6, 16.
[217] August 2021 CQI minutes.
[218] Lippert v Jeffreys, 10-cv-4603: IDOC's Response to the Monitor's Initial Report, December 24, 2019, page 3.
[219] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020, page 88, Health Care Monitor 3rd Report Lippert v. Jeffreys, February 15, 2021, page 75, Health Care Monitor 4th Report Lippert v. Jeffreys, September 16, 2021, page 108.
[220] Health Care Monitor 3rd Report Lippert v. Jeffreys, February 15, 2021, page 76, Health Care Monitor 4th Report Lippert v. Jeffreys, September 16, 2021, page 108-109.
.

1. Address the Monitor's comments on the draft of 06.03.E.07 Non-Urgent Health Requests and Services. Include a statement that sick call encounters shall take place in a clinical setting as described in the definitions.  See also recommendation # 9.

2. Establish a plan and set a goal to achieve substantial compliance with III.A.10. Narrow the circumstances for when an LPN may be assigned to perform sick call and describe how RN supervision is accomplished and documented in the administrative directive.

3. Complete revisions of the Primary Medical Services Report and clarify the expectation that the report is to be completely filled out and provide written definitions or instructions, as necessary.

4. Reassign other duties that interrupt nurse sick call. OHS should establish a workload driven staffing standard for sick call and identify the number of registered nurse positions needed to comply with this aspect of the Consent Decree. This would also aid in the calculation of space and equipment that is needed for nurse sick call.

5. Assess the validity and reliability of the audit of nursing treatment protocols. This audit only needs to be done quarterly if performance on all criteria exceeds 90%. Revise the tool to include more measures related to the quality of the assessment and appropriateness of the nurses' clinical judgement and whether more than one complaint was addressed.

6. Sick call access should be monitored at each IDOC facility. If requests received daily are less than 5% of the population or patients are not seen within 24 hours of receipt of the request, an examination of potential barriers (failure to move individuals to nurse sick call, failure to document refusals in person at the HCU, insufficient nurse staff, etc.) to access should be conducted. The examination should include identification and resolution of workload factors that cause delays in care as well as resources that are underutilized and could be repurposed to increase access.

7. The privacy and confidentiality of rooms where clinical encounters take place should be evaluated during safety and sanitation rounds of the health care areas.

8. Reduce the number of nursing treatment protocols as per previous advice. Eliminate the use of nursing treatment protocols for patients who need close physician monitoring and a comprehensive plan of care including patients in the infirmary, persons who are elderly, those with multiple comorbidities, those who are frail, or those with mental or cognitive impairments. Eliminate the protocol for Non-specific Discomfort.  Establish limitations to the use of nursing treatment protocols in the policy and procedure 06.03.E.07 Non-Urgent Health Requests and Services and revise Administrative Directive 04.03.121 Treatment Protocols.

9. Document the patient's presenting complaint(s) in their own words as the initial entry on the nursing treatment protocol. Add this requirement to the draft policy and procedure on Non-Urgent Health Requests and Services and revise the Administrative Directive on Treatment Protocols accordingly.


# Chronic Care

*Addresses Items II.A; II.B.1; II.B.6.f; III.E.1*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs.  Defendants shall ensure the*

*availability of necessary services, supports and other resources to meet those needs.*
**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*
**II.B.6.f.** *IDOC agrees to implement changes in the following areas: Chronic disease care: diabetes, Chronic Obstructive Pulmonary Disease (COPD), asthma, HCV, HIV/AIDs, hypertension, hyperlipidemia*
**III.E.1.** *IDOC shall maintain a list of prisoners' current medical issues in their medical charts.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
The Monitor asked for the following information with respect to this report.
1. Nurse assignments for chronic care. This was provided.
2. For providers, the documentation of assignments for chronic clinic for a four-week period. This was not provided.
3. Summary tracking data for all scheduled appointments for chronic care. Information provided was non-responsive. A primary service medical report was provided that provided the number of individual who received laboratory, EKG, consultation, radiology, sick call, or pharmaceutical services for the month. Chronic clinic patients were not included. This was not a summary of scheduled appointments showing how many showed up and the reason for missing the appointment.
4. Physician, nurse practitioner, physician assistant assignments for each facility to include provider's name, hours worked at each facility, and title. This was not provided.
5. Any CQI or performance audits with results of the study, analysis, and corrective actions for chronic care actions in response to poor control. This was not provided.
6. Chronic care rosters for each facility. Rosters for only 17 facilities were provided.
7. Chronic care guidelines for each facility. The vendor chronic care guidelines were received.
8. Chronic care backlogs at each facility. This was provided.
9. List of persons on prednisone, warfarin, hydroxyurea, Plavix, methotrexate, chemotherapy, radiation therapy and tumor necrosis factor inhibitors. This was provided.

In their last annual report, IDOC asserted compliance with provision III.E.1. and have done so since their first report in November of 2019 never having provided any evidence to verify their compliance. The Monitor has consistently found in record reviews that the problem lists that are present are inaccurate and filled with irrelevant material. IDOC should provide evidence for this assertion.

IDOC sent to the Monitor a draft policy on chronic diseases and the Monitor has returned the policy with comments but has not received a response and a final policy has not been implemented.

In the 12/30/21 Implementation Plan there were four tasks related to chronic disease care. All of these were reasonable tasks and pertinent to the set of problems that currently exist with respect to chronic care. One task[221] was to train nurses to be chronic care nurses. Three additional

---

[221] Task 8

tasks[222] involve components of a quality project on improving chronic care clinics. These tasks were reasonable and responsive to the deficiencies of the existing chronic care program but were all eliminated in the 4/20/22 version of the Implementation Plan.

The Implementation Plan submitted 4/20/22 contained four tasks. Two tasks are to write policies and two tasks are to write guidelines. One of the policy tasks is to write a policy on chronic care and another policy merely rephrases the Consent Decree. Neither policy task addresses what IDOC intends to accomplish to ensure patterns of practice come into compliance with the Consent Decree. Two of the tasks are to write guidelines; one for immunization of persons with chronic disease and another for disease management guidelines. One guideline rephrases the Consent Decree. Neither guideline addresses what IDOC intends to accomplish to ensure that patterns of practice come into compliance with the Consent Decree. The 4/20/22 Implementation Plan does not include any tasks describing how the chronic care program will change in order to come into compliance with the Consent Decree.

Support for chronic care remains poor. The draft policy for chronic care requires that a RN assists providers for chronic clinics and that a huddle is to occur periodically. Currently, 11 facilities have no chronic care nurse assigned.[223] Nurses are assigned to assist in chronic care at 19 (63%) facilities; seven of these facilities use licensed practical nurses. At only three facilities is the chronic care nurse full time. On average, at the 30 facilities nurses assist in chronic care for 11 hours a week. At the 19 facilities that have chronic care nurses assigned, the average time spent on this assignment is 18 hours a week. There is no evidence that chronic care huddles are taking place. Having a nurse assigned to assist in chronic care facilitates the team approach recommended by the Monitor. The Monitor has recommended that pharmacists, schedulers, and nursing be part of the team approach to managing patients with chronic illness. There has been no movement to develop that approach.

The Monitor requested IDOC provide a chronic care roster. IDOC sent 22 portable document file format (PDFs) files containing chronic care rosters. Five files did not have the name of the facility. Only 17 facilities included a name of the facility. The format for these rosters is not standardized and multiple types of formatting is used. The rosters do not include the actual diseases of the patient only the types of clinics attended which also are not standardized. Instead of listing the disease of the patient, patients are classified by general medical, asthma, high blood lipids, cardiac, hepatitis C, seizures, HIV, and diabetes. Patients are still not seen for all of their diseases at a single clinic session.

Few chronic care notes include an interval history and many fail to include a pertinent examination. Chronic disease clinics address the common disease: hypertension, asthma, epilepsy, diabetes, hepatitis C and high blood lipids. If a person has a different disease than one of these six diseases, the patient may not be followed for that disease. For example, three patients on methotrexate are not found on the chronic illness roster of Lawrence. Over the past four reports and in this fifth report, the record reviews demonstrate little change in chronic care management. There are still numerous deficiencies that result in preventable death and significant morbidity. Record reviews have consistently pointed to repeating problems that are

---

[222] Tasks 50, 52, and 56
[223] Decatur, Dixon, East Moline, Elgin, Graham, Jacksonville, Menard, Pontiac, Sheridan, NRC, Vienna.

systemic. These systemic problems result in bad outcomes, which are evident in the death record reviews. Reading IDOC progress notes will not inform the reader what medical conditions the patient has or what the medical therapeutic plan is. The only way to obtain this information is to read a specialist's note or a hospital discharge summary. With respect to mortality reviews, opportunities for improvement with respect to chronic care include:

- Failure to obtain an adequate history or perform an adequate examination.
- Patients started on medication without a diagnosis.
- Failing to address cancer or dementia as a chronic disease.
- Failure to manage polypharmacy to ensure patient safety.
- Failure to ensure that medication adverse actions are accounted for.
- Failure to coordinate specialty care and recent hospitalization recommendations into the therapeutic plans of the patient.
- Failure to identify and monitor all of the patient's chronic illnesses.
- Failure to address nutritional needs of patients with chronic illness.
- Failure to consider new findings and update the assessment and therapeutic plan or identify new chronic illnesses.
- Treating COPD as if it were asthma.
- Failure to monitor laboratory tests pertinent to the disease or manage significant laboratory abnormalities.
- Patient with a significant chronic illness (hepatitis C) lost to follow up.
- Failure to use medications appropriately.
- Failure to manage or acknowledge severe disabilities in chronic disease clinic.

The Monitor's previous reports give significant detail on recommendations on fixing the chronic illness program and principles for establishing an adequate chronic illness program. The prior reports are still pertinent and the Monitor urges IDOC to review prior reports as they construct their chronic disease program. None of the recommendations in the prior report have been acted on. With respect to recommendation 12 to improve physician coverage, all new physicians now are credentialed in accordance with the Consent Decree requirements. Three non-credentialed physician remains. However, there is a severe physician shortage. Over a third of facilities do not have Medical Directors. The hours worked at each facility was requested but not provided so when a facility only has a coverage physician the Monitor is unaware of how many hours are provided at that facility. A single non-credentialed physician covers four facilities in addition to covering a large facility and a life-skills center. The lack of qualified physicians remains a dangerous situation.

In summary, there is a stated commitment to write a chronic care policy and disease management guidelines but no evidence that any progress has been made or is planned to bring IDOC into compliance with the Consent Decree. A draft policy has been completed but a final policy has not yet been provided and there is no evidence of implementation of a policy. Record reviews show no improvement in the clinical care of patients with chronic disease. These reviews can be examined in the mortality reviews in Appendix A. Though care of patients with HIV and hepatitis C at UIC is of excellent quality once referred, care of patients with chronic disease through the IDOC chronic care clinic program is extremely poor. This item remains noncompliant.

**RECOMMENDATIONS:**
1. Finish the chronic illness policy. Ensure that it addresses the essential principles of a chronic disease program as listed above.
2. Use national standards as guidelines for care instead of writing guidelines for all common health conditions.
3. Make UpToDate® available on all electronic medical record devices in IDOC.
4. Support for chronic disease management needs to improve as soon as possible.
5. Change chronic illness clinic scheduling so that a person is evaluated for all of their chronic illnesses at each chronic illness scheduled visit. The interval of visits should be based on the least controlled disease and as early as clinically necessary.
6. The chronic clinic roster needs to list all diseases of each patient.
7. Standardize procedures for entries onto the problem list. Permission to enter problems on a medical problem list should be restricted to physicians, physician assistants, and nurse practitioners. Psychiatrists and licensed mental health professionals should have permission to enter mental health diagnoses. The problem list should include medical and mental health diagnoses.
8. For physicians without appropriate credentials based on Consent Decree requirements, monitoring should be done to ensure that they are capable of managing patients according to contemporary standards.
9. When any provider does not know specifically how to manage a patient's condition, the provider should refer the patient to an appropriate specialist for management consultation, including for gerontology.
10. Discontinue prescribing sliding scale Regular Insulin with 70/30 insulin for insulin requiring diabetics.
11. A team approach to chronic care needs to be instituted. Daily and weekly huddles need to be instituted to improve communication amongst staff. Huddles should include nursing, schedulers, and a pharmacist.
12. The lack of physicians with appropriate credentials is resulting in significant harm to patients. The Monitor recommends an arrangement with a university-based program to include onsite and telemedicine physician support.


# Urgent and Emergent Care

*Addresses Items II.A; II.B.1; II.B.6.b; III.E.4; III.G.1; III.G.2; III.G.3; III.G.4*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**II.B.6.b.** *IDOC agrees to implement changes in the following areas: Urgent care;*

**III.E.4.** *The medical records staff shall track receipt of offsite medical providers' reports and ensure they are filed in the correct prisoner's medical records.*

**III.G.1.** *Each facility HCUA shall track all emergent/urgent services in a logbook, preferably electronic.*

**III.G.2.** *Appropriate medical staff shall have the obligation to determine whether a situation is*

*urgent or emergent.*
**III.G.3.** *IDOC shall use best efforts to obtain emergency reports from offsite services when a prisoner returns to the parent facility or create a record as to why these reports were not obtained.*
**III.G.4.** *Facility medical staff shall ensure that a prisoner is seen by a medical provider or clinician within 48 hours after returning from an offsite emergency service. If the medical provider is not a clinician, the medical provider shall promptly review the offsite documentation, if obtained, with a clinician and the clinician shall implement necessary treatment.*

**OVERALL COMPLIANCE RATING:** Partial compliance

**FINDINGS:**

Information requested by the Monitor to evaluate compliance with the items listed above from the Consent Decree included:

- QI meeting minutes for each facility for each month.[224]
- List of all emergency medical response bags at each facility. Each list should include the facility, the location of the bag, the contents of the bag including medication, and whether the bag is sealed. [225]
- Documentation from each facility of inspecting the emergency response equipment and supplies.[226]
- Blank copy of the tool used to inspect emergency equipment and supplies.[227]
- Any tool developed by defendants to monitor performance of emergency response. [228]
- Any CQI or performance audits with results of study, analysis, and corrective action regarding emergency response. [229]
- Log of persons seen for an emergency onsite but were not sent to a hospital. [230]
- Documentation of any progress towards standardization of emergency equipment and supplies.[231]

**II.B.6.b. Changes in urgent care.**
The most current version of the Defendants' Implementation Plan includes several tasks related to urgent/emergent services. Four tasks are policies to be written on access to urgent care, evaluation upon return from offsite care, tracking urgent/emergent care in a log, and required

---

[224] Monitor's Documentation Request dated 1/18/2022 item 22. Received quarter 2 and quarter 3 in time to review and include in this section of the report. Quarter 4 was not received until 3/15/2022 and will be considered in the 6th report.
[225] Monitor's Documentation Request dated 1/18/2022 item 57. Not received.
[226] Monitor's Documentation Request dated 1/18/2022 item 58. Not received.
[227] Monitor's Documentation Request dated 1/18/2022 item 59. Received a list of supplies to be included in the emergency bag but did not receive any tool used to inspect emergency response equipment.
[228] Monitor's Documentation Request dated 1/18/2022 item 68. Not received.
[229] Monitor's Documentation Request dated 1/18/2022 item 69. Not received.
[230] Monitor's Documentation Request dated 1/18/2022 item 78. Not received.
[231] Monitor's Documentation Request dated 1/18/2022 item 79. Not received except for the draft of the emergency bag supply list.

Case: 1:10-cv-04603 Document #: 1579 Filed: 08/09/22 Page 97 of 292 PageID #:23572

equipment.[232] Two additional tasks standardize the contents of the emergency response bag and equipment.[233] Given the degree of noncompliance with current Administrative Directives discussed in this section of the report gives evidence that simply writing policies will be insufficient to change performance and sustain it. The Monitor provided feedback on this version of the implementation plan on 5/10/2022 and suggested that a more comprehensive plan for implementation of changes related to urgent emergent services be developed. To this end the monitor has made recommendations to improve urgent emergent services in each report. The 4th report included twelve recommendations.[234]

Changes in urgent and emergent care are minuscule. OHS drafted a policy and procedure for emergency services and response as well as urgent care services. The Monitor provided comments and recommendations for further revision to OHS in August 2020. The Monitor has not received any further drafts or been provided a final version of these policies. In October 2021 IDOC provided the Monitor a list of items to be kept in emergency bags for review and comments.[235] The Monitor responded ten days later with comments.[236] The Monitor is unaware of any further steps taken to standardize the contents of the emergency response bags.

Administrative Directive 04.03.108 Response to Medical Emergencies dated 10/1/2004 governs emergency services at the present time. It gives a great deal of discretion to individual facilities to determine the training received, the number, location and contents of emergency equipment and supplies, procedures for response etc. Based upon our site visits to facilities so far this has led to a checkered pattern of readiness and performance.[237]

Review of the material provided to the Monitor indicates that 13 sites evaluated compliance with the Administrative Directive (AD) for emergency services during this report period.[238] Of these, eight facilities were found compliant with the AD.[239] Of the five facilities considered noncompliant [240] with the AD, the primary reason was the failure to conduct drills as specified. However, at two facilities staff were not trained in emergency response and use of the equipment.[241] Only 18 facilities reported one or more emergency response drills in the CQI

---

[232] Defendants' Implementation Plan dated 4/20/2022 tasks 6, 33, 30, and 19.

[233] Defendants' Implementation Plan dated 4/20/2022 tasks 71 and 72.

[234] Health Care Monitor 4th Report, Lippert v. Jeffreys, September 16, 2021, pages 119-120. At a meeting on 5/4/2022 the consultant who drafted the April version of the implementation plan stated that her directions from IDOC were to write the plan only as stated in the Consent Decree. She did not use the Monitor's reports and recommendations as a reference in drafting the plan.

[235] Email dated October 6, 2021, from Kelly Presley.

[236] Email from Jack Raba dated October 14, 2021.

[237] Health Care Montor 1st Report, Lippert v. Jeffreys, November 24, 2019, page 14; Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, pages 94-95; Health Care Monitor 4th Report, Lippert v. Jeffreys, September 16, 2021, pages 116-119.

[238] CQI minutes from April through September 2021 and FY22 External Review reports from nine facilities (Big Muddy, Hill, Lincoln, Sheridan, Graham, Robinson, Shawnee, Southwestern, and Vienna).

[239] The varied compliance with the AD on emergency services is a significant concern. Emergency service provision is a fundamental aspect of health care in correctional settings. Performance expectations must be set at 100% with no allowance for deviation. Facilities compliant with the AD are Big Muddy, Dixon, East Moline, Lincoln, Menard, Southwestern, and Vienna.

[240] Graham, Hill, Illinois River, Robinson, and Sheridan.

[241] OHS should ensure that staff are trained in emergency response. It is reasonable to expect the vendor to provide the curriculum but OHS should review and ensure it is tailored to the procedures and practices used in IDOC

minutes however, only six include a critique of the response.[242] These critiques primarily focus on the timeliness of response and if the proper equipment was brought. Seldom is there a review of the adequacy and appropriateness of the clinical response.[243] Two sites addressed the availability and use of naloxone. [244] In the last report we noted that only eight facilities listed naloxone as one of the drugs available in the emergency supplies.[245]  There is no evidence that it's availability and proper use has been ensured at all prisons as recommended by the Monitor.[246]

In the 4th report we also described the variation from facility to facility in emergency supplies and equipment as well as how these are monitored for readiness in the event of an emergency. While OHS has provided a draft of the emergency supplies, this has not been finalized. [247] Standardization of emergency equipment does not appear to have been initiated yet. Directions for monitoring readiness of equipment and supplies is included in the draft policy and procedure but documentation of monitoring is not standardized. One of the records reviewed for this report included an episode of chest pain in a 71-year-old man. The responding LPN was unable to get the EKG to work. This was at a facility that does not document equipment readiness monitoring as part of CQI.[248]

### III.G.1 Emergent/urgent services logbook.

IDOC facilities have been provided with an electronic log to list patients who are sent to the emergency room. The Monitor has recommended adding a column after discharge diagnosis to record the disposition. Documentation choices should include deceased, admitted to (name of hospital), transferred to (name of institution), released (date of release) etc. [249]

Seven facilities do not use the log at all.[250] The log includes several columns of information including the date sent, patient name, number, where the patient was sent, the reason, the discharge diagnosis, documentation that a discharge report was returned with the patient, and the date seen by a physician upon return. Of 23 sites that do keep the log only 18 document whether

---

facilities. OHS should consider establishing the emergency scenarios that must be drilled annually to ensure that the topics cover the most common or high risk medical emergencies to be prepared for. A critique tool should be developed and used statewide to guide the evaluation. Consideration should be given to supplementing the tool with the specific things to critique for particular scenarios. For example, the response to ligature is somewhat different than to chest pain.

[242] Southwestern, in particular, conducts drills almost monthly; the variety of emergency scenarios and critique of the response is good.

[243] i.e., Whether the equipment was operable, clinical judgement was appropriate, skill or teamwork of the actual response, or documentation.

[244] Danville and Pinkneyville. See also mortality review patient # 16.

[245] Health Care Monitor 4th Report, Lippert v. Jeffreys, September 16, 2021, page 118.

[246] Health Care Monitor 1st Report, Lippert v. Jeffreys, November 24, 2019, page 14; Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 100; Health Care Monitor 4th Report, Lippert v. Jeffreys, September 16, 2021, page 120.

[247] DOC # Pending Effective 10/01/21 Emergency Bag Supply List received 3/30/2022 in response to the Monitor's Documentation Request dated 1/18/2022 item 59.

[248] Mortality review patient # 1.

[249] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 100, Health Care Monitor 3rd Report, Lippert v. Jeffreys, February 15, 2021, page 90; Health Care Monitor 4th Report, Lippert v. Jeffreys, September 16, 2021, page 119.

[250] Dixon, Elgin, Jacksonville, Lincoln, NRC, Pinkneyville, Western

discharge paperwork was received. Only 14 of the 23 sites note the date the provider saw the patient upon return to the facility. Therefore only 14 of 30 facility health care programs (this is less than half the facilities) log emergent/urgent services data in the logbook provided.

Besides the log being incomplete it is also inaccurate. There were 49 emergent off sites among the 25 records reviewed for this report period. Of these, only 22 appeared on the corresponding ED log. In our review of the logs for this time period there were obvious incorrect dates and identification numbers.[251]

As noted in prior reports there is no log of emergencies or urgent care requests that are treated onsite.[252] The Consent Decree clearly states that each facility HCUA shall track *all* emergent/urgent services in a log, preferably electronic *(emphasis added)*. Recommendation 2 in this section lists the data that should be tracked on a log of emergencies that were resolved on site.[253]

To achieve compliance with III.G.1 IDOC must 1. Establish a log, preferably electronic of all emergent/ urgent episodes of care. 2. Require every facility HCUA complete the log (s) 3. Audit the information on the log to verify that it is complete and reliable.

We also recommend using the log to monitor emergency care more proactively.[254] The information from the emergent/urgent services log can be used in a daily huddle to make decisions about the priority of services, need for communication, and follow through in the care of acute or at-risk patients in the population. We recommend the Director of Nursing be responsible for monitoring the completion of the emergent urgent services log. Others who should contribute to the information that goes into the log may be delegated members of the nursing staff (i.e., shift charge nurse) and medical records (receipt of discharge report).

### III.G.2. Appropriate medical staff shall have the obligation to determine whether a situation is urgent or emergent.

The Administrative Directive states that each shift the Chief Administrative Officer is to designate an emergency response team consisting of three members trained in first aid and CPR. Where available, one member may be a member of the health care staff. What this team does and how it performs is not described in the AD. In urgent and emergent situations, it is essential for one person to clearly be the leader and provide direction to other members of the team. There also should be a clear delineation of when and how that leadership can be assumed by another, for example a more qualified clinician. There was no evidence that these teams are operational nor clear delineation of leadership in any of the records reviewed for this report. While we agree that correctional officers should be prepared to provide first response in medical emergencies,

---

[251] April through September 2021.

[252] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 100, Health Care Monitor 3rd Report, Lippert v. Jeffreys, February 15, 2021, page 90; Health Care Monitor 4th Report, Lippert v. Jeffreys, September 16, 2021, pages 119-120.

[253] This recommendation has been made since the Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 100.

[254] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 100, Health Care Monitor 3rd Report, Lippert v. Jeffreys, February 15, 2021, page 90; Health Care Monitor 4th Report, Lippert v. Jeffreys, September 16, 2021, page 120.

we have not seen evidence that this happens.[255] The Chief Administrative Officer has no qualifications to identify the member of the health care staff to respond to medical emergencies. It should be the sole responsibility of the HCUA to designate the health care staff responsible to for urgent or emergent response.

Nearly every record reviewed during this report period had episodes of emergency care provided to the patient. A primary responsibility of nurses and providers is triage and assessment of the urgency of patient complaints. Failure to recognize the urgency of medical situations was one of the findings of our record review for this report.[256] One of these was a 74-year-old man[257] who had significant weight loss and was being worked up for possible colon cancer. He had been admitted to the infirmary in preparation for a colonoscopy and developed abdominal pain with distention during bowel prep. A nurse advised that this was normal, failing to recognize these were symptoms developing in the context of significant, yet undiagnosed bowel problems, not a healthy adult. The patient was unable to proceed with the colonoscopy and over the course of several days his condition worsened. A provider was contacted during this period and also failed to recognize the significance of the patient's symptoms and gave inappropriate and dangerous orders. On the fourth day of worsening abdominal distention with pain the doctor ordered the patient hospitalized where he was diagnosed with a perforated colon, rectal cancer, and sepsis.

A root cause analysis should be conducted when nurses and/or providers fail to recognize urgent or emergent conditions. Nursing protocols that give directions for referral for acute or urgent symptoms are often not used. General instructions for abnormal vital signs or red-flag symptoms should be developed for nursing staff. On infirmary units, observations from our chart reviews are that nurses do not receive sufficient guidance from providers in the plan of care. This includes not indicating the treatment goal or expectation when orders are written, not indicating the symptom parameters that the provider wants to be notified of and providers do not take a sufficient history or complete exam and treat the symptom rather than the underlying cause of the patient's presenting condition. Peer review should be conducted to determine if providers are appropriately qualified, and their performance meets standards of care. Root cause analysis would help to identify corrective action that would improve nurses' and providers' clinical judgement. Consideration should also be given to the adequacy of staffing and the workload metrics necessary to provide adequate medical care at prison facilities. Inadequate staffing contributes to adverse patient care events such as falls and other injuries, seizures, dehydration, and other emergency episodes as reviewed in records for this report.

We have suggested in prior reports retrospective clinical review of emergent urgent services including multiple emergency department admissions for the same patient for the same problem[258], symptom cascade, and pre-emergent care for conditions that are considered best managed in a primary care setting.[259] At a minimum these reviews should be discussed among

---

[255] Mortality review patient # 17 was found in his cell, on the floor, stiff. No rescue breathing or CPR was initiated until after health care staff arrived. None of the records reviewed provided any evidence of officer involvement in emergency response.

[256] Mortality review patients 5, 10, 21 and 23.

[257] Mortality review patient 5.

[258] Mortality review patients 2, 10, 13, 15, 19, 22, 23.

[259] These conditions include seizures, asthma, substance withdrawal, deep tissue infection, diabetic ketoacidosis, abdominal pain, and chest pain.

providers, opportunities for improvement identified and improvement plans developed. We found numerous examples among the charts reviewed for this report of poor patient care preceding urgent or emergent transfers to a hospital. [260]

Six records included incidents of emergency response that were problematic.[261] A universal practice is narrative charting after the medical emergency has been resolved. An example of the problem with this practice is one incident [262] where there is a discrepancy between the nurse's note and the physician's note that raises concern about the timeliness of the arrival of the ambulance crew. Documentation of an emergency response usually includes a timeline which lists what was done, by whom, with the time and patient response. There were no timelines in the charts reviewed this report period and we could not identify any requirement that this be done. We recommend that a timeline be documented for every Code 3.[263] The timeline should be filed in the patient's health record. Narrative charting by responding health care staff after the emergency is resolved is acceptable if there is a timeline that can be used as reference. Without a timeline, narrative charting is very unreliable and not helpful in the review of the patient's care to identify areas to improve emergency response capability. Other areas of improvement identified are to obtain vital signs and assessments to assess the patient's condition and to repeat these periodically to assess for change.[264] None of the responses reviewed had vital signs or an assessment other than the initial one. It does not appear that interventions such as CPR[265], initiating an intravenous line[266], and naloxone[267] are initiated timely when clinically indicated.

### III.G.3 Best effort to obtain emergency report or document reason report not obtained.
### III.E.4 Track receipt of offsite reports and ensure filing in the patient's medical record.

Of 18 facilities which do record whether a discharge report from the emergency room or hospital was provided, none specify what type of document was received.[268] The facilities consider receipt of the patient discharge instructions or IDOC transfer documents with consultant comments sufficient for compliance with this requirement; however, the Monitor disagrees. These documents do not provide sufficient clinical information to transfer responsibility for care of the patient back to the facility provider. IDOC has indicated in their Implementation Plan an intent to define what acceptable documentation is but no details as to how this task will be accomplished have been

---

[260] Mortality review patients 2, 3, 4, 7, 10, 11, 13, 14, 15, 17, 18, 19, 22.

[261] Mortality review patients 1, 2, 7, 9, 16, 17.

[262] Mortality review patient 9. The nurse's note indicates the ambulance left at 11:30 am and the physician note documents the departure at 12:35 pm.

[263] Each shift someone should be designated the recorder to do the timeline. This person can be a member of the clerical staff, someone in mental health, or support personnel. We suggest keeping paper, clipboard, writing implements and a timepiece with secondhand for the recorder in the emergency bag. This person should *not* be a nurse, nurse practitioner, physician assistant, or physician who, if on site, need to be available to provide clinical care.

[264] Mortality review patients 1, 2, 7, 16.

[265] Mortality review patient 17.

[266] Mortality review patients 1, 2, 7, 16, 17.

[267] Mortality review patient 16.

[268] Facilities which log whether a report of the visit was obtained include Big Muddy, Centralia, Decatur, East Moline, Graham, Hill, Kewanee, Lawrence, Logan, Menard, Murphysboro, Pontiac, Robinson, Sheridan, Southwestern, Stateville, Vandalia, and Vienna. Documentation consists of a "Yes" or "No" to indicate if a report was received.

provided to the Monitor and it is not clear who is assigned to complete this task.[269] Further there is no documentation on the log or otherwise provided that "*records why a report was not obtained*." Expectations for this documentation of effort have not been outlined in any material provided to the Monitor. The Monitor's chart review found many examples of patients whose offsite emergency room record was not obtained nor was there documentation of efforts to obtain the record.[270]

### III.G.4 Provider follow up after emergent/urgent services.

III.G.4 requires all persons returning from the emergency room be seen for follow up by a medical provider or clinician within 48 hours of return to the facility. A medical provider is defined in the Consent Decree as any licensed professional providing medical care to prisoners in IDOC facilities.[271] However NCCHC 2018 standards for accreditation[272] require that patients are seen upon return from hospitalization, urgent care, or the emergency department, not within 48 hours. The purpose of this encounter is to obtain orders and initiate treatment that is recommended. A follow up appointment is scheduled at this return encounter. The purpose of the follow up appointment is to review the findings from the emergency episode, ensure all recommendations for diagnostics, follow up, procedures and treatments are addressed, and the ongoing plan of care discussed with the patient. A review of records by a clinician without seeing the patient is not sufficient.

The date the patient was seen by a provider following emergent/urgent services is part of the log but only 14 of 30 facilities provide this information. They are listed in the table following this paragraph. All sites need to record the date the patient was seen by a provider for follow-up on the emergent urgent services log. Even though reporting is very incomplete, it is evident that IDOC is far from compliant with the requirement of III.G.4. See the following table.[273]

---

[269] Defendants Implementation Plan, 12.30.21 item 102 (2).

[270] Mortality review patients 2, 14, 15, 18, 20, 22, 23.

[271] Consent Decree Lippert v Baldwin 2018, page 3.

[272] National Commission on Correctional Health Care, Standards for Health Services in Prisons, 2018, E-09, page 102.

[273] IDOC 2021 2nd and 3rd quarter Emergent/Urgent Care logs (April – September 2021).

| Facility | # Sent Offsite for Emergency | # Seen by Provider for Followup | Percent seen by Provider for Followup | # Seen by Provider within 48 hours of Return | Percent Seen Within 48 Hours | Range of Days to be Seen | Average days for Provider Follow up |
|---|---|---|---|---|---|---|---|
| **III.G.4. Provider Followup of Patients After Return From Offsite Emergent Service   2nd and 3rd Quarter 2021** | | | | | | | |
| Kewanee | 3 | 3 | 100% | 0 | 0% | 3 - 7 | 5 |
| Illinois River | 29 | 18 | 78% | 3 | 10% | 0 - 52 | 13.2 |
| Lawrence | 81 | 49 | 60% | 11 | 14% | 0- 24 | 4 |
| Stateville | 111 | 38 | 34% | 15 | 14% | 0 - 56 | 9 |
| Murphysboro | 6 | 3 | 50% | 1 | 16% | 2 - 5 | 3 |
| Decatur | 5 | 5 | 100% | 1 | 20% | 1- 6 | 3.6 |
| Vienna | 9 | 9 | 100% | 3 | 33% | 1 - 5 | 3 |
| Logan | 29 | 28 | 97% | 12 | 41% | 0- 18 | 4 |
| Vandalia | 16 | 15 | 94% | 8 | 50% | 0 - 14 | 3 |
| Robinson | 18 | 14 | 78% | 11 | 61% | 0 -7 | 0.5 |
| Sheridan | 18 | 18 | 100% | 14 | 77% | 0 - 3 | 1.5 |
| East Moline | 6 | 6 | 100% | 5 | 83% | 1 - 3 | 1.5 |
| Menard | 92 | 89 | 99% | 88 | 99% | 0 - 51 | 0 |
| Southwestern | 4 | 4 | 100% | 4 | 100% | 0 - 1 | 0.75 |

First, not all patients sent out for an emergent need are even seen by a provider upon return to the facility. There were only two of the reporting facilities that had providers see returning patients within 48 hours for follow-up consistently. [274] One facility noted on the log that a follow-up after an emergency service for a facial fracture was not applicable because of placement in segregation.[275] This is an unacceptable practice and steps should be taken to ensure that others are not similarly placed at risk without follow-up because of segregation status.

The previous version of Defendants' Implementation Plan had a task 102 (4.) to develop workload metrics to meet the requirement to see patients in follow-up within 48 hours but this has been deleted from the most recent version of the plan.[276]  It should be relatively simple to develop this metric. There is ample data to calculate average numbers of patients needing this type of follow-up each month and expert opinion could be used to establish an average amount of time for this encounter. With this, it is possible to calculate how much time is needed to perform this function at each site on a monthly basis.  The Monitor suggests consideration be given to the use of telehealth technology to accomplish this especially on weekends and at smaller facilities with relatively healthy populations.

## CONCLUSION

Steps IDOC has taken to comply with items in the Consent Decree concerning urgent/emergent care are to draft a policy and procedure, draft a list of items to go into the emergency response bags, and provide a logbook to list urgent/emergent episodes of care. Each of these three steps are incomplete.

Review of material provided, and records reviewed for this report period show that urgent/emergent services at several facilities are not compliant with the existing Administrative Directive primarily because practice drills have not been done and staff were not trained.  While a logbook has been provided it is elective whether sites use it. If it is used, data entry is incomplete

---

[274] 95% is the threshold for compliance with the 48 hour requirement for follow-up.

[275] Murphysboro.

[276] Defendants Implementation Plan, 12.30.21 item 102 (4); Defendants Implementation Plan, 4.20.22.

and inaccurate. Not all urgent/emergent episodes of care are listed in the logbook, only those that result in going to the emergency room.

Records reviews reveal poor documentation of the timeline and events taken place in emergency response, patients received poor care prior to the emergency and there were failures to recognize the urgency of the patients' conditions. Reports from emergency care are not always obtained, records that reports were received are not always documented and there is no record of effort to obtain these reports. Patients receiving urgent/emergent care are not seen by a clinician for follow timely after their return to the facility.

The Monitor renews recommendations for emergent/urgent care made in the first four reports. An additional recommendation has been made concerning documentation of a timeline in all Code 3 responses and that health care staff have current training in emergency response.

**RECOMMENDATIONS:**
1. Document the timeline of assessment and interventions in every Code 3 as part of the documentation in the patient's record of care. Narrative charting by responding health care staff after the emergency is resolved is acceptable if there is a timeline that can be used as reference. Any patient seen urgently should have subsequent assessments to evaluate whether the urgent/emergent intervention was effective.
2. Ensure that health care staff have current training in emergency response.
3. Finalize and implement the policy and procedure on emergency services. Implementation will require additional support and coordination by OHS so that facilities standardize equipment, supplies and so forth. Implementation should proceed and be monitored according to a statewide plan outlining the steps to be taken, persons responsible and timeframes for completion.
4. Emergency response that does not result in transfer to the emergency room also needs to be tracked on a log. The criteria to be tracked differ from that kept on the emergent/urgent services log. Suggested data to track on an emergency response log include the date, time and location of the emergency, the time and name of the first health care responder, the nature of the emergency, the patient's acuity, disposition, and date the response was reviewed by a supervisor.
5. Information recorded on the emergent/urgent services log needs standardization to include definition of what is considered an acceptable report from the emergency room and the expectation that a date is entered on the log when the report is received and when the patient is seen by the physician. Consideration should be given to adding a column that identifies what documentation was received (i.e., patient discharge summary, clinical discharge summary, future appointment, or a prescription). This would be in addition to the date it was received.
6. The Monitor recommends that a column after discharge diagnosis be added to the Emergent/urgent services log to document the disposition. Documentation choices should include deceased, admitted to (name of hospital), transferred to (name of institution), released (date of release) etc.
7. The accuracy of the information documented on the log needs to be verified by an audit of patient records on a quarterly basis with corrective action as necessary until sustained performance is demonstrated.

8. The logs should be used to review emergency response and any trips to the emergency room the next day at least in a daily huddle to make decisions about the priority of services, need for communication, and follow through in the care of these patients. If a daily huddle is not initiated, a different method to ensure review of daily emergency response events and emergency hospital trips must be developed.

9. The Director of Nursing should be responsible for monitoring the completion of the emergency response and emergent urgent services log. The information on these logs should be reviewed and updated daily, in real time, not retrospectively.

10. Each compartment of the emergency bag should be sealed with a numbered tag to indicate that all required items are present and in working condition. The integrity of the seal should be checked daily and documented on the log along with the presence of other equipment, verification of pads and operational battery in the AEDs and sufficient supply of oxygen.

11. Every facility needs to have at least one AED reserved as a backup for dysfunction of other AEDs. A supply of batteries and pads should be kept on hand so that replacement takes place soon.

12. The Monitor stated in the first report that all IDOC emergency response bags must be stocked with naloxone (Narcan) and Glucagon. We further recommend nasal, rather than injectable naloxone, because it is easier and safer to use in an emergency.

13. Emergency response and the use of emergency room services need to be reviewed clinically. These reviews are for the purpose of identifying opportunities to improve primary care which is known to reduce emergency room use as well as ensure appropriate oversight and follow up care for patients after discharge. At a minimum these reviews should be documented in the CQI minutes, findings tracked, and trended and improvement plans developed based upon the results. The Emergency Services Audit Tool needs to be revised to reflect III.G 1-4.

14. Schedule a follow up appointment with a provider to take place within 48 hours of a patient's return from offsite emergency services or hospitalization. Follow up is an encounter with the patient to review the findings and discuss the treatment plan. A review of records without seeing the patient is not sufficient.

# Infirmary Care

*Addresses Items II.A.; II.B.1; II.B.6.k; III.I.1-5*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**II.B.6.k.** *IDOC agrees to implement changes in the following areas: Appropriate staffing, physical conditions, and scope of services for infirmary care;*

**III.I.1.** *A registered nurse will be readily available whenever an infirmary is occupied in the IDOC system.*

**III.I.2.** *At every facility regularly housing maximum security prisoners, there shall be at least*

*one registered nurse assigned to the infirmary at all times, twenty-four (24) hours a day, seven (7) days a week.*

**III.I.3.** *All facilities shall employ at least one registered nurse on each shift. If a prisoner needs health care that exceeds the IDOC infirmary capabilities, then the prisoner shall be referred to an offsite service provider or a hospital.*

**III.I.4.** *All infirmaries shall have necessary access to security staff at all times.*

**III.I.5.** *All infirmaries and HCUs shall have sufficient and properly sanitized bedding and linens.*

**OVERALL COMPLIANCE RATING:** Noncompliant

**FINDINGS:**

The Monitor requested the following information from IDOC:

- Documentation for nursing of who was assigned to cover the infirmary during the four week period requested.[277]
- Copy of the procedure for each facility for sanitizing infirmary bedding and linens as well as any drafts not yet finalized. [278]
- For each facility, their list of infirmary patients on a date/dates selected by the Monitor to include the name, age, DOC#, diagnoses, and date of admission to the infirmary.[279]

Information that was only partially responsive to this request was received from IDOC. The Monitor reviewed the records of patients who died during this report period, minutes of meetings, reports, and draft documents.

The Defendants Implementation Plan dated 12/30/2021 addressed all but five of the 13 recommendations made by the Monitor in the 4th Report. [280] [281] While the Monitor disagreed or had additional comments on these items[282], the subsequent revision,[283] ordered by the Court is a significant regression by IDOC in developing a plan that addresses improvements called for by the Consent Decree.[284] The Monitor has provided specific feedback and comments to

---

[277] Monitor's Documentation Request dated 1/18/2022 item 8 which was later modified to the assignment sheets for a one week period in February 2022 from six sites. The Monitor received this information from four sites.

[278] Monitor's Documentation request dated 1/18/2022 item 62. IDOC did not provide this document.

[279] Monitor's Documentation request dated 1/18/2022 item 80. IDOC did not provide this information.

[280] Health Care Monitor 4th Report Lippert v Jeffreys (September 16, 2021) pages 134-136.

[281] Items 64 – 70 describe an approach to evaluating the needs of the aged and infirm in IDOC facilities. Item 71 is an assessment of the needs to provide infirmary services, including the number of beds at each facility. Item 77 is that each facility will be provided equipment that corresponds to a standardized list of equipment that must be available at any site providing infirmary services. Item 72 is setting guidelines and benchmarks related to infirmary care and includes ten areas of focus that correspond to six of the Monitor's recommendations.

[282] Final Monitor Differences with December IDOC Implementation Plan and example dated 1/14/2022.

[283] Defendants Implementation Plan dated 4/20/2022.

[284] The Defendants Implementation Plan dated 4/20/2022 reneges on its prior commitment to engage an expert to survey and assess the needs of the elderly and infirm and to provide recommendations to address deficiencies in housing, programming, and medical care for this population. The revised implementation plan also eliminates establishment of guidelines and performance benchmarks to improve access to quality infirmary care, standardization, and verification that necessary equipment is available, and steps to improve the knowledge and skill of health care personnel to address areas of concern that have been identified. The most recent implementation plan

Defendants on this most recent revision and unacceptable version of the IDOC plan.[285]  In summary by eliminating the use of an expert to assess the needs of the aged and infirm and develop a plan for appropriate housing, programming and health care and eliminating task 72 from the implementation plan, none of the Monitor's recommendations regarding infirmary care are addressed.

**Policy and Procedure**

The draft policy on infirmary care, identifies three levels of acuity acute, sub-acute, and housing. Housing placements are intended for persons who need long term skilled nursing care.  However, based on record reviews, IDOC infirmaries do not provide skilled nursing care.  Skilled nursing care implies a level of support that is not currently available on IDOC infirmaries to include nutritional support, physical therapy, occupational therapy, equipment, and monitoring to treat, manage, observe, and evaluate a patient's care.[286]  IDOC has neither staffing nor support services to provide this level of care.   The IDOC should refer to existing Illinois Administrative Codes to define the scope of services for infirmary services. These include those developed for nursing homes and long term care facilities, hospice, and care for special populations.[287]

At present, the Administrative Directive (AD) on Infirmary Care, last updated in 2002, provides the only guidance for this service.[288] The Administrative Directive is not in conformance with the Consent Decree and does not describe the scope of services provided in the infirmary setting or give clinicians guidance about patient conditions which should be referred a hospital.[289]

**Performance Monitoring and Quality Improvement**

Thirteen of the 30 IDOC facilities reported on compliance with Administrative Directive (AD) 04.03.120 Infirmary Services in the six months from April through September 2021.[290] These were either facility quality improvement studies or internal audits. Six facilities were considered compliant with the AD and seven were not.[291] Areas of non-compliance included not making rounds consistent with the schedule laid out in the AD, not documenting daily vital signs, no admission or discharge note, not signing telephone admission orders timely and temporary

---

includes tasks to write several policies or continue current practices (for example enforcing standards for laundry) without any tasks addressing needed change or implementation steps to facilitate change in practice.

[285] Monitor's Comments on the 4/20/2022 Implementation Plan sent 5/10/2022.

[286] A skilled nursing facility provides skilled nursing care, continuous skilled nursing observations, restorative nursing, and other services, as specified above, under professional direction with frequent medical supervision.  These facilities are provided for patients who need the type of care and treatment required during the post-acute phase of illness or during recurrences of symptoms in long-term illness. Illinois Administrative Code 77. Chapter 1, Subchapter c, Part 300, Section 300.

[287] Based upon the Monitor's review of records for this report Illinois correctional facilities need to have capacity to provide inpatient diagnostic services, pre-operative supervision and monitoring, convalescence from surgery or injury, skilled nursing care and rehabilitative services, custodial care, care for those who have cognitive disorders, palliative care, and hospice.

[288] Administrative Directive 04.03.120 Offender Infirmary Services (9/1/2002).

[289] Statewide Summary Report Including Review of Statewide Leadership and Overview of Major Services, Report of the 2nd Court Appointed Expert (October 2018) pages 68-69; Health Care Monitor 3rd Report Lippert v Jeffreys September 16, 2021) page 92; Health Care Monitor 4th Report Lippert v Jeffreys (September 16, 2021) page 122.

[290] Big Muddy, Danville, East Moline, Graham, Hill, Menard, Lawrence, Shawnee, Sheridan, Taylorville, Vandalia and Western.

[291] Facilities considered non-compliant were Big Muddy, Danville, Hill, Lawrence, Shawnee, Sheridan, and Taylorville.

admissions who stayed in the infirmary longer than 24 hours. Non-compliance did not result in a documented corrective action plan in many instances. Where corrective action was discussed, usual approaches were to audit until improved, having staff sign a memo that they understand the requirements of the AD and training. There was no discussion of the underlying causes of poor performance and no structural improvements. *There were no quality improvement studies of clinical care on the infirmary.*

From our chart review it is apparent that performance of staff responsible for providing infirmary care is directed primarily at compliance with the tasks outlined in the AD[292], not the patient's clinical needs. The fact that performance monitoring is almost exclusively devoted to measuring compliance with the AD and not quality or patient outcomes only reinforces this practice.

**Access to Services**
Access to infirmary care is required by II.B.1[293] but there is no accurate or reliable mechanism to ascertain that this is so. What evidence we do have from review of reports and record review indicates that access to infirmary care is insufficient for the needs of the population.

The Primary Medical Services Reports have previously provided information about infirmary capacity. However, these reports for have not been included in the material received from facilities for the period of time covered by this report (quarters two, three, and four of 2021).[294] At this point there are no other methods in place for IDOC or its vendor to monitor performance in infirmary services contemporaneously.

Since the last report IDOC initiated revisions to the Primary Medical Services Report. The Monitor was asked to comment and made three suggestions: 1. Add columns for average length of stay after the number of acute care discharges and chronic care discharges.2. Add a column after chronic care discharges that gives the number of patients in the infirmary longer than two weeks. 3. Add a column that gives the number of admissions for reasons other than health or mental health care. These suggested changes would begin to address the Monitor's suggestions to manage infirmary utilization.[295]

Infirmary utilization is discussed as a regular part of the facility CQI meeting at only 13 of 26 sites with infirmaries. The information reported in CQI minutes varies from facility to facility and uses different admission categories than the primary medical services report (these terms include security hold, administrative hold, live ins, permanent housing, and housing only). The variance in reporting diminishes the value of these reports and clearly demonstrates the lack of definition in the scope of infirmary services across the state.

Inappropriate use of infirmary beds has been discussed in previous reports.[296] This practice

---

[292] For example, the timeframe for completion of the physician admitting note or frequency of provider rounds.
[293] II.B.1. *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care.*
[294] May 2021 to January 2022 Primary Medical Service Reports provided to the Monitor on 3/30/22 were totally blank and have deleted the table on Infirmary Services.
[295] Health Care Monitor 4th Report Lippert v Jeffreys (September 16, 2021) page 135.
[296] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 101; Health Care Monitor 3nd Report Lippert v Jeffreys (February 15, 2021) page 92; Health Care Monitor 4th Report Lippert v Jeffreys (September 16, 2021) page 122.

continues as evidenced by the utilization data discussed at CQI meetings. At Menard 52% of the infirmary capacity was taken up by security holds from April through September 2021. [297] The July CQI minutes from Menard reflect a discussion that offsite procedures were cancelled because patients could not be admitted to the infirmary to supervise and monitor the patient's preparation. This was because of there were so many security holds.[298] The continued practice of allowing security holds denies access to infirmary care as required by II. B.1 of the Consent Decree.

One of the mortality reviews completed for this report was a man on security hold for more than a year whose care is alarming. This was a man who had been diagnosed with dementia in June 2020 [299], and was placed on a security hold some time prior to September 2020 while incarcerated at Menard.[300] He was 71 years old at the time and considered responsible for his own care. However, this patient needed help with activities of daily living, but this need was never identified and the reason for the security hold was never documented. There were no provider rounds and no plan of care was ever developed.

There also is no documentation in the year of record reviewed that he ever left his cell for anything but appointments and showers. There was no recreation, opportunity for socialization or leisure activity and no meaningful interaction documented over the course of a year of confinement.

By August 2021 he had lost 57 pounds and was noted to not be eating or drinking fluids. Although seen by nursing staff daily and providers episodically, he was never admitted for infirmary care but continued day to day authorized by custody to be on security hold. On September 6, 2021, the patient was found with shallow respirations, was cool to touch and no pulse could be obtained. He was ordered transported to the hospital where he was documented as having severe dehydration and malnourishment with severe hypothermia. He died later that same month.[301]

The IDOC Administrative Directive on Infirmary Services does not address security holds so we asked to review the institutional directive from Menard concerning security holds. We were told that "A security hold maybe housed in the Infirmary for several different reasons:
> 1. A piece of medical equipment that isn't allowed in their assigned housing unit
> 2. Security may place them as a Security hold due to security reasons such as investigative status.
> 3. A security hold may be an individual that can't take care of himself in the housing unit due to memory loss, inability to perform ADLs etc.

---

[297] Monthly CQI minutes were used to tabulate the number of security holds reported each month which averaged 13.4 beds for the six month period or 48% of the 26 bed infirmary.

[298] That month there were 16 security holds reported.

[299] Appendix A, Patient 3.

[300] September 2020 was the date of the first record provided to the Monitor for review of his death which took place a year later.

[301] We recommend that the care of this patient be investigated for potential abuse, to understand why a security hold was used rather than an infirmary admission, and to identify system deficiencies that resulted in such care. Corrective action is urgently needed to prevent this from happening.

*Security holds require a call to the Shift Commander every 24 hours for approval and these individuals are offered nurse sick call daily."[302]

The institutional directive does not explicitly define security hold but does state that temporary placement in the infirmary for housing or non-medical reasons is allowed and shall be limited to no longer than 24 hours, unless approved by the Chief Administrative Officer or designee. [303] It also states that individuals in custody are restricted to their assigned locked rooms unless engaged in a medical supervised activity. [304]

There are no reasons for security to place individuals in the infirmary and we have made that recommendation in the two drafts of policy and procedure provided for review. This patient's care is an example of why this should not be allowed. With regard to the reasons stated in the email for security holds, if an individual is unable to care for themselves in the housing unit medical staff need to evaluate the individual and determine where the patient is best housed and cared for, not security. With regard to equipment that is not allowed on the housing unit this institutional directive essentially places people needing such equipment in conditions more restrictive than solitary confinement and can be addressed in another way.

People whose physical or mental condition requires protective housing or who need long term skilled or intermediate nursing care reduce access to infirmary care for patients who need short convalescence or preoperative preparation. Terms used in the monthly facility reports for these types of patients include permanent housing, live ins, and administrative hold. For this report period from April through September 2021 Logan with an infirmary with a capacity of 15 has averaged 52% of the admissions for the purpose of administrative hold (average 6.5 per month). Menard's "live-ins" account for use of 48% of the infirmary beds (average 12.6). [305] At Dixon persons who are considered "housing only" or permanent housing account for 88% of the infirmary beds (average 24.6).

We have recommended for 18 months that infirmary capacity be monitored and managed at the statewide level by OHS.[306] This includes retrospective review for appropriateness and timeliness of services, as well as prospective review of all persons expected to need more than two weeks of infirmary care. The IDOC indicated an intent to do so in the Implementation Plan provided in December 2021 [307] but this has been abandoned in the most recent version of the plan provided in April 2022. [308] The most recent draft policy and procedure included a requirement that infirmary admissions lasting more than two weeks required approval by OHS. Feedback provided by the monitor was that this was an improvement but the procedure for doing so needed more description.

---

[302] Email from Kelly Presley dated 2/23/2022.
[303] Menard Institutional Directive 04.03.120, effective 11/1/2021 II. E. Definitions, pages 1-2.
[304] Ibid, II. G. Requirements, 14, page 6.
[305] At Menard the use of security holds and "live ins" account for 100% of the infirmary's capacity.
[306] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 107; Health Care Monitor 3nd Report Lippert v Jeffreys (February 15, 2021) page 99; Health Care Monitor 4th Report Lippert v Jeffreys (September 16, 2021) page 135.
[307] Defendant's Implementation Plan 12.30.21, item # 72 (8.b).
[308] Defendant's Implementation Plan 4/20/2022.

Limited information has been provided since January 21, 2021[309] about the scope of services and structure of the new facility planned for Joliet, Illinois that was originally to have included 50-52 new medical beds and a clinic. This new facility is expected to provide medical care, but the scope of services has not been fully defined and is not included in the implementation plan or staffing analysis provided by IDOC to the Monitor.

**Scope of Services**

Mortality reviews for this report continue to show multiple problems with clinical care and support services. The reviews of 25 records provided by IDOC are attached as Appendix A. Each includes a summary of the patient's care with opportunities for improvement identified. Most of these patients experienced infirmary care prior to their death. Problems identified, related to infirmary care, from these reviews include:

1. Provider histories were focused on episodic and urgent issues and failed to address the patient's chronic conditions and serious medical issues. Most of the patient's significant chronic diseases were not addressed in chronic clinic visits either. Even for episodic issues, providers often failed to take a history.[310]
2. Examinations were often inadequate for the patient's stated complaints and problems.[311]
3. Patients were not discharged from the infirmary when admitted to the hospital. Upon return to the facility, they were placed on the infirmary without an assessment or acknowledgement of change in the patient's condition. [312]
4. Hospital reports and consultant reports were missing. When reports were available there was often no documentation that they were reviewed nor was the therapeutic plan modified in accordance with the consultant or hospital's recommendation.[313]
5. Physician Orders for Life Sustaining Treatment (POLST) were often not completed until the patient was near death or were not completed at all. For patients with dementia, this meant that medical care was provided or was not provided without a willfully cognizant adult's consent. This included refusals of care. Patients with dementia need to have a guardian.[314]
6. Beds and mattresses appeared under control of custody and should be the responsibility of medical staff.[315]
7. Patients were not provided sufficient assistance with daily living activity.[316]
8. Patients were not provided physical therapy to prevent deconditioning or contractures.[317]
9. Pain medication was not appropriately managed at end-of-life.[318]

---

[309] OHS-Monitor Monthly Conference Call, 4/28/22
[310] Mortality review patients 2, 3, 4, 11, 14, 15, 22, 23, 24.
[311] Mortality review patients 2, 3, 4, 11, 12, 15, 19, 21, 22, 23, 24.
[312] Mortality review patients 2,4,8,11,13, 20, 23, 24.
[313] Mortality review patients 2, 3, 4, 14, 15, 19, 20, 23, 24.
[314] Mortality review patients 3, 4, 19, 21, 23, 24.
[315] Mortality review patients 11, 15.
[316] Mortality review patients 2, 3, 4, 21, 22, 23, 24.
[317] Mortality review patients 2, 3, 4, 22, 23.
[318] Mortality review patients 4, 11, 12, 14, 19.

10. Nursing assessments were incomplete, the plan portion of the nursing note was also incomplete and varied from nurse to nurse and shift to shift. There was no comprehensive assessment, no goals, or objectives for treatment of the patient, and no plan available to guide daily care. Physicians were not involved in any comprehensive planning for the care of infirmary patients. At times there was a physician order for comfort care but what this comprises was not elucidated. Infirmary care was episodic, sporadic, and reactive rather than preventative, curative, or rehabilitative. [319]

11. Potential adverse drug reactions were not identified. In addition, there were patients who failed to receive ordered medication.[320]

12. The medical conditions of the patient could not be identified by reading progress notes.[321]

13. Infirmary patients had indwelling bladder catheters without a stated indication.[322]

14. Patients failed to have their weight monitored in an effective manner or lost significant weight without acknowledgement or evaluation of weight loss.[323]

15. Patients in need of nutritional assessment, did not have an appropriate nutritional evaluation.[324]

16. Patients on the infirmary did not have access to a dentist consistent with Consent Decree requirements.[325]

17. Staff appeared to make light of patient complaints when their complaints were indicative of serious medical conditions. Staff appeared to lack empathy with the patient.[326]

18. Patients on the infirmary needed skilled nursing level care but were not receiving it.[327]

19. Physician coverage was not always available on the infirmary unit.[328]

20. Palliative care is undefined and appears to be the same as usual care. Palliative care should be defined with appropriate procedures.[329]

21. Of the 25 mortality records reviewed, five patients with dementia had fifteen falls and eight medical patients had 13 falls in IDOC facilities mostly on infirmary units. Injuries sustained during falls included a hip fracture, a femur fracture, and an ankle fracture. Numerous minor injuries were sustained. All falls should be tracked as a patient safety performance measure and specific fall prevention plans should be documented for any patient at fall risk. Though nurses frequently document "fall prevention", no specific instructions are provided, and the existing fall prevention program appears ineffective. Falls should be studied to identify the reason for the fall so as to reduce any bedding, structural, or facility impediments that increase risk of falls. These impediments should be eliminated. Notably, a few falls were falls out of beds drawing attention to the types of beds on the infirmary units, particularly for elderly patients and patients with dementia.

[319] Mortality review patients 2, 3, 4, 15, 21, 22, 23, 24.
[320] Morality review patients 2, 3, 14, 20, 24.
[321] Mortality review patients 2, 4, 15, 22.
[322] Mortality review patients 2, 23.
[323] Mortality review patients 2, 3, 4, 15, 24.
[324] Mortality review patients 2, 3, 4, 12, 14, 24.
[325] Mortality review patient 2.
[326] Mortality review patient 11.
[327] Mortality review patients 2, 3, 4, 15, 23, 24.
[328] Mortality review patients 3,14, 15.
[329] Mortality review patients 19.

> Falls were noted in showers and were also noted with patients apparently transferring who were incapable of doing so. [330]

Statistical data and reports from the IDOC website indicate nearly 22.7% of the prison population are 50 years of age or older as of December 2021. Of these, over 1,000 persons are 65 years of age or older.[331] While the defendants have included an assessment of the housing and programming needs of this population in their Implementation Plan[332] which involves asking leadership staff at each facility to identify these patients and problem lists will be consulted. Chart reviews completed by the Monitor provide ample evidence that facility leadership does not anticipate or plan for the needs of the aged and infirm. The problem lists have shown repeatedly to be wholly lacking in correctly identifying patients' conditions. The Monitor indicated substantial concerns about this approach and made 15 specific recommendations in his feedback to Defendants.[333] Problems with services for the aged population placed in infirmary care, specifically those with cognitive disabilities, identified by the Monitor's record review are in addition to the 21 already identified and include:

1. Persons in custody with cognitive difficulties need placement at a higher level than general population but may not need infirmary care. However, if these higher level placements are not available, these people end up on the infirmary. Custody placement in the infirmary results in isolation and confinement that may contribute to decline in mental and physical health.[334]
2. Patients with dementia were placed on security hold on the infirmary and therefore were not monitored as an infirmary patient. [335]
3. Patients with cognitive deficiencies and apparent dementia never had a cognitive evaluation to establish the nature and diagnosis for the cognitive deficiency to guide subsequent care.[336]
4. Patients with dementia did not have periodic monitoring of this disease as a chronic disease.[337]
5. Patients with dementia signed documents for "do not resuscitate status" or living wills when they clearly were not of sound mind and could not willfully and voluntarily do so.[338]
6. Patients with dementia were subject to custody punishment for behavior inherent to their dementia.[339]
7. Patients with dementia were not well treated and, in several cases, appeared mistreated, neglected, or abused. This included not being given sufficient fluid for hydration, not

---

[330] Mortality review patients 2, 3, 4, 5, 6, 10, 13, 15, 19, 20, 22, 23, 24.
[331] Illinois Department of Corrections, Inmates 50 Years of Age and Older on December 31, 2021; obtained at CY21 50+ Fact Sheet.pdf (illinois.gov).
[332] Defendant's Implementation Plan 4/20/22.
[333] Monitor Comments on Lippert IDOC Implementation Plan of 4/20/22. Email dated 5/10/22.
[334] Mortality review patients 10, 21.
[335] Mortality review patient 3.
[336] Mortality review patients 2, 3, 19, 21, 23, 24.
[337] Mortality review patients 2, 3, 21, 24.
[338] Mortality review patients 2, 4.
[339] Mortality review patient 2.

helping with eating, not monitoring the patient's nutrition, and providing insufficient supervision for the patients in order to prevent harm to the patient.[340]

**Registered Nurse Staffing**

The Monitor requested nurse assignment sheets to evaluate registered nurse staffing of the infirmary at each facility. These were provided by four of six facilities who received the request.[341] However the assignment sheets do not indicate first and last name or licensure, so it was not possible to verify the availability of registered nurses in the infirmary as required by III. I.1 through 3 of the Consent Decree.

The CQI minutes reflect continued concern about the number of nurse vacancies and use of agency contract nurses. Internal audits and CQI studies report noncompliance with nursing responsibilities as outlined in the Administrative Directive for infirmary care to include failure to document nursing admission and discharge notes, daily graphics, and periodic progress notes. Mortality record reviews found similar results and in addition issues with medication administration, failure to provide needed assistance, and incomplete assessments and care plans. Infirmaries are not staffed by enough nursing personnel to provide the level of care that should be expected.

**Physician Staffing**

There are insufficient physician staff to ensure that patients on infirmary units are properly managed. The evidence for this is in the record reviews completed during this report period (see list of problems earlier in this section and footnotes to the corresponding review). The IDOC's own reporting of noncompliance with the AD provides evidence that physician staffing is insufficient to meet requirements for signing orders, writing admission and discharge notes, and rounding. [342] The FY22 External Review for Hill Correctional Center documents that 36% of charts[343] reviewed had no discharge order, 32% had no admission order signed timely after receiving a telephone order, 32% had no admission note, 39% had no discharge note and 71% did not have documentation of provider rounds according to the frequency required in the AD. It was our observation from chart reviews that decisions about the acuity of the patient were made on the basis of the provider's ability to make rounds (and thus comply with the AD) rather than the patient's condition.[344]

**Ancillary and Support Personnel**

The March 2022 staffing update indicates an increase in the FTE allocated for physical therapy services from 7.4 FTE in August 2021 to 15.25 FTE in March 2022.[345] This is an increase of 7.85 FTE statewide. The first physical therapy positions were added at Graham and NRC; now there are 10 sites capable of providing this service compared to eight. There were increases in FTE at six sites which have existing physical therapy positions.[346] The FTE at Big Muddy and

---

[340] Mortality review patients 2, 3, 4, 21, 23, 24.
[341] Big Muddy, Dixon, Pontiac and Stateville.
[342] Minutes of CQI meetings for Q 2 and Q3 2021.
[343] N = 28 Hill Correctional Center, Office of Administrative Directives and Standards, FY 22 External Review, July 19-22, 2021, pages 17-19.
[344] Mortality review patients 11,13, 22, 25.
[345] Staffing Analysis dated 8/19/2021 and the Facility Staffing Update dated 3/21/2022.
[346] Dixon, Hill, Lawrence, Menard, Pinckneyville, and Stateville.

Logan remain the same. However, there are 7.7 FTE physical therapy positions vacant, so actual manpower has only increased by about 6 hours a week at this point.

There are still 10 medium custody facilities with infirmaries and a combined population of 9,000 which do not have physical therapy services. There are eight minimum custody facilities with infirmaries and combined population of 4,000 which do not have physical therapy services. The Implementation Plan submitted December 30, 2021, committed to evaluating the need for physical therapy services at each institution with an infirmary.[347] However this intent did not correspond to a specific task in the Implementation Plan. The revised Implementation Plan submitted 4/20/2022 did the same. No evaluation of the actual needs of the patients for physical therapy services has taken place nor is there a task in the implementation plan to do this. There also is no task to describe how access to physical therapy will be provided.[348]

Physical therapy services were identified as problematic in five of the death records reviewed (see problem # 8 in Scope of Services). Two were patients housed at Graham where a physical therapist and assistant have been allocated but not yet filled. Two were patients housed at Dixon and one was housed at Menard, both of which had the allocation of physical therapy time increased.[349] Menard filled their new FTE, Dixon has not.

The patient[350] housed at Dixon was in his 70s and considered unable to walk, needing assistance with bathing, transfers, and toileting. He was confined to the bed or wheelchair the last three years of his life. When a wheeled walker[351] was obtained for him, he was unable to use it because he could not stand up from contractures of his legs and could not grasp the handlebar because of contractures of his elbow and hand. Other than one progress note describing his inability to use the walker there is no documentation of the contractures or efforts to address this disability. The patient[352] housed at Graham was also in his 70s. He was hospitalized after a fall because of generalized weakness and dehydration. The hospital diagnosed him with pneumonia and respiratory failure. Physical therapy was started by the hospital to address deficits in functional mobility and to reduce fall risk. A skilled nursing facility with access to physical and occupational therapy were among discharge recommendations. These recommendations were neither recognized nor acted upon when he returned to Graham.

The Monitor strongly recommends focusing on filling the vacant physical therapy FTEs, prioritizing initiation of services at Graham and assessing the actual need of patients for access to physical therapy particularly facilities with populations of 900 or more.

**References**

In nearly all of the mortality reviews, providers caring for patients on the infirmary did not always know how to manage patient conditions, failed to understand drug-drug interactions, etc. For this reason, the Monitor continues to recommend that all providers have access to

---

[347] Defendants Implementation Plan, Lippert Consent Decree, 12.30.21 page 6.
[348] Defendants Implementation Plan, Lippert Consent Decree, 4/20/2022 page 6.
[349] Augmented physical therapist and/or physical therapy assistant staffing has been repeatedly recommended in Staffing Analyses at Dixon, Hill, Lawrence, Menard, Pinckneyville, and Stateville.
[350] Mortality patient 2.
[351] Two years before his death.
[352] Mortality patient 4.

UpToDate® an online medical reference, which was reported in the past to have been made available by the vendor at all IDOC sites. An analysis should be completed to identify reasons why the resource is not used, and a plan made to improve access to reference material. Additional decision support material should be considered in the development of the standardized list of equipment to be available in every health care unit. [353]

**Access to Security Staff in the Infirmary**

Compliance with the requirement for access to security staff (III.I.4) has been evident at each of the sites visited by the Monitor thus far.[354] The draft policy and procedure on Infirmary Services includes a requirement that whenever the infirmary is occupied there must be a custody post. However, the FY22 External Review for Hill Correctional Center documents that nursing staff were observed in the infirmary without the presence of security staff. [355] After the policy and procedure is in effect a tool or method to document compliance must be established.

We know from record review that security staff have assisted nursing staff on the infirmary. We have observed that security measures were taken at times when the patient's behavior was a result of a medical problem and should have been addressed as such instead.[356] Also that alternative methods to intervene with elderly, frail, cognitively disordered patients who are combative need be employed to reduce the risk of injury. [357] We suggest that correctional staff be included in the treatment planning process for long term patients and that they receive training along with the health care staff about how to manage behavior resulting from cognitive disorder in safer ways.

In summary, Defendants are noncompliant with the requirements of the Consent Decree related to infirmary care. Compliance with the requirement for nurse coverage and the availability of security assistance in the infirmary have not been established. The definition of scope of services for infirmary care has yet to be developed, the survey of the aged and infirm has not been initiated, and the deficiencies in staffing the infirmary have affected patient safety. Steps have been taken to identify tasks that need done to come into compliance but very few have been initiated and there has been no resulting change in conditions of patient care as of yet. In the Monitor's last report patient care in the infirmary was described as perfunctory without appropriate clinical focus on patients' needs.[358] The patients who died from dehydration and malnutrition, who experienced falls, and other injuries or were allowed to deteriorate without intervention described in this report period is unacceptable.

**RECOMMENDATIONS [359]:**

---

[353] Defendants Implementation Plan, Lippert Consent Decree, 12.30.21 item # 76.

[354] Robinson, Sheridan, Shawnee, Logan, Pontiac, Lincoln, Lawrence.

[355] Hill Correctional Center, Office of Administrative Directives and Standards, FY 22 External Review, July 19-22, 2021, pages 4-5.

[356] Mortality review patient 2.

[357] Mortality review patient 24.

[358] Health Care Monitor 4th Report Lippert v Jeffreys (September 16, 2021) page 134.

[359] These recommendations are essentially the same as those made beginning with the 2nd and 3rd report of the Monitor. Minor revisions have been made to clarify or simplify recommendations. Two additional recommendations have been added at the end. These are to track patient falls from a patient safety perspective and to evaluate access to dental care for long stay infirmary patients.

1. Infirmary beds should be reserved only for medically necessary care. ***Alternative solutions to the use of security holds in the infirmary must be sought.*** Reasons for administrative holds need to be understood. Housing more appropriate to the diverse needs of individuals who incarcerated in the IDOC needs to be provided. The infirmary should only be used to house persons who need 24 hour monitoring and access to nursing and medical care.

2. Complete the assessment of the elderly, mentally and physically disabled persons housed in IDOC facilities as stated in the implementation plan. Each person meeting these criteria should be assessed using a standardized tool appropriate for this population and the data analyzed by persons with expertise with this area of service. Use the results to determine appropriate alternatives to incarceration as well as develop and implement appropriate housing, programming, staffing and safety standards for those who should remain incarcerated.

3. Fill vacant physical therapy FTE and prioritize initiation of this service at Graham. Evaluate the need for physical therapy services at each institution with an infirmary. The Monitor continues to recommend that physical therapy services be provided at all facilities with infirmaries that house over 900 incarcerated persons.

4. Evaluate the workload of the physicians at each facility to ensure that the physician coverage is adequate to meet the needs of the patients requiring infirmary care.

5. Clarify the scope of medical services that will be provided at the renovated Joliet Treatment Center. If this facility will have a medical focus, then admission criteria, scope of services and so forth should be described in the policy and procedure for infirmary services.

6. Complete the policy and procedure for infirmary services to include defining the scope of services provided and expectations for referral when a patient's need exceeds the capability of infirmary care. The IDOC should refer to existing Illinois Administrative Codes to define the scope of services for infirmary services. These include those codes developed for nursing homes and long term care facilities, hospice, and care for special populations including care for those who have cognitive disorders, palliative care, and hospice.

7. Infirmary capacity needs to be monitored and managed proactively at the statewide level by OHS. All admission to infirmary beds should be reviewed retrospectively for appropriateness and timeliness. All persons expected to need infirmary placement longer than two weeks should be reviewed prospectively, the long term plan of care reviewed, and most appropriate placement determined (including consideration of parole or commutation or transfer to a more appropriate facility).This recommendation aligns with recently signed Joe Coleman Medical Release Act that allows discretionary early release of prisoners who are terminally ill OR medically incapacitated to a Medicaid-eligible long term care facility. [360]

8. A methodology should be established for staffing infirmaries which includes perspectives from skilled nursing and nursing home experience as appropriate for the patient panel of each infirmary.

9. Revise the information contained in the primary medical services report to coincide with the definitions in the new policy and procedure and include average daily population and average length of stay by type of admission, the number of patients in the infirmary for

---

[360] Joe Coleman Medical Release Act Illinois House Bill 3665 August 20, 2021.

more than two weeks, and the number housed in the infirmary for reasons other than delivery of health care.

10. Revise tools used to monitor performance for delivery of infirmary care to coincide with the new policy and procedure. Set expectations for the frequency of monitoring, reporting results, and corrective action.

11. An analysis should be completed to identify reasons why Up-To-Date® resource is not used and a plan made to improve access to reference material. Additional decision support material should be considered in the development of the standardized list of equipment to be available in every health care unit.

12. Complete the annual survey of all facilities to ensure there is adequate physical space as described in the Implementation Plan.[361]

13. Begin to track all falls including the name, date and conditions involved with the fall (e.g., fell out of bed, while in shower, transferring to toilet, etc.). Reports of falls should be studied from the perspective of patient safety.

14. It was not clear whether being in the infirmary created a barrier in access to dental services. One infirmary patient[362] was referred for offsite dental hygiene services because no onsite hygiene services were available. This request was denied because the dentist was supposed to provide this service. But the service was never provided. The Monitor suggests a quality improvement study be conducted to evaluate whether patients on the infirmary have access to dental care.

# Specialty Consultation

***Addresses Items II.A; II.B.1; II.B.6.e; II.B.6.g; III.E.4; III.H.1-4***

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**II.B.6.e.** *IDOC agrees to implement changes in the following areas: Informed care for patients who return to IDOC facilities after being sent to an offsite service provider;*

**II.B.6. g.** *IDOC agrees to implement changes in the following areas: Timely access to diagnostic services and to appropriate specialty care;*

**III.E.4.** *The medical records staff shall track receipt of offsite medical providers' reports and ensure they are filed in the correct prisoner's medical records.*

**III.H.1.** *Medical staff shall make entries in a log, preferably electronic, to track the process for a prisoner to be scheduled to attend an offsite service, including when the appointment was made, the date the appointment is scheduled, when the prisoner was furloughed, and when the prisoner returned to the facility. This log shall be maintained by the HCUA.*

**III.H.2.** *Within three days of receiving the documentation from scheduled offsite services, the documentation will be reviewed by a medical provider. Routine follow-up appointments shall*

---

[361] Defendants Implementation Plan, Lippert Consent Decree 12.30.21, items #103-110.
[362] Mortality review patient 2.

*be conducted by facility medical staff no later than five (5) business days after a prisoner's return from an offsite service, and sooner if clinically indicated.*

**III.H.3.** *If a prisoner returns from an offsite visit without any medical documentation created by the offsite personnel, IDOC shall use best efforts to obtain the documentation as soon as possible. If it is not possible to obtain such documentation, staff shall record why it could not be obtained.*

**III.H.4.** *Provided that IDOC receives documentation from offsite clinicians, all medical appointments between a prisoner and an offsite clinician shall be documented in the prisoner's medical record, including any findings and proposed treatments.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**
Since their May 2020 Bi-Annual Report and for three reports IDOC has continuously asserted compliance with provisions III.H.1. and III.H.2., without providing any data or information to support their assertion.

The Monitor asked for the following information with respect to this report.
- Summary tracking data for all scheduled appointments including the scheduled appointment, whether the patient showed up for the appointment or not, and if the patient didn't show the reason for the no-show.
- Specialty tracking log to include date of referral, reason for referral, date appointment made, date appointment occurred, date report was received, date a provider saw patient in follow up.

Most of the off-site tracking logs were sent with quality improvement minutes but the tracking logs were not standardized. The Monitor's last report listed items that should be on the specialty log but no changes were made to the specialty log. IDOC does not track the date the consult report was received or the date the provider met with the patient. IDOC tracking log should include the date of the appointment, the date the facility received the report, the date the provider reviewed the report, and the date the provider met with the patient to discuss the report. The report needs to be the formal consultation report not the transfer form that has consultant comments on it.

The 12/30/21 Implementation Plan includes a single task (task #50) to initiate a process improvement study to improve access to specialty care by use of telemedicine, analysis of whether additional equipment or contracts might improve service, analysis of primary care referral patterns for specialty care, and analysis of timeliness of consultant reports. This task addressed one of the Monitor's recommendation to analyze the specialty referral process.

This reasonable task was eliminated in the 4/20/22 Implementation Plan and replaced by four tasks that are all policies, which all merely rephrase the Consent Decree. They include a policy to provide requirements for monitoring access to primary, secondary, and tertiary care, a policy to outline required access parameters for specialty care and diagnostic services, a policy to outline requirements for receiving patients from offsite services, informing them of care and

carrying out recommended care or an alternative to recommended care, and a policy to track offsite care in a log, report forwarded to clinical staff within 3 days, routine follow up within five days. These tasks do not state what IDOC intends to accomplish to ensure actual patterns of practice come into compliance with the Consent Decree.

The eight recommendations from the last report have not been addressed.

Mortality reviews still show delays and lack of coordination of care with specialists that resulted in significant morbidity and mortality which included the following. Patient 2 had a hospital recommendation for a specialized diet that was not continued on return to the prison. He had no dietician evaluation at the prison. There was no referral for needed physical therapy services. Patient 4 did not have documentation of specialty care reviewed. Coordination of care with the oncologist was poor and oncology reports were not all present in the record. Patient 5 was 74-years-old and had anemia which was not worked up for six months when four guaiac positive stools were present. The patient initially refused a colonoscopy but was not followed up for another six months but died three months later when providers failed to timely identify bowel obstruction due to bowel prep. The patient never received a diagnostic evaluation. Patient 6 was a smoker and 70 years old but failed to receive lung cancer screening. Late-stage lung cancer was eventually diagnosed. Patient 7 had unilateral leg swelling but over four physician visits was not sent for diagnostic evaluation for deep vein thrombosis. The patient died from pulmonary embolism from deep vein thrombosis. Patient 8 had a significant hiatal hernia. His stomach herniated into the chest cavity. The specialty tracking log for this patient had six appointments with inaccurate dates and the sequence of specialty care cannot be determined from the off-site tracking log and consultation reports in the record. The patient died from surgery for this condition but hospital reports were not in the record. Patient 10 had long-standing mitral valve disease and a cardiologist recommended cardiology follow up as an outpatient to evaluate for mitral valve surgery. The hospital recommendation was not review and the patient was not sent for the evaluation. Patient 12 had prostate cancer. He developed unintentional weight loss but a provider referred the patient to the urologist and oncologist who were following the patient for prostate cancer. Both consultants recommended a work up for the unintentional weight loss as the prostate cancer was in remission. The oncology report was not available and a provider didn't see the patient in follow up for three months when the patient requested a nutritional supplement for weight loss. A nurse practitioner ordered boost supplement. Several other provider encounters occurred but another three months passed before a provider saw the patient who had severe throat and mouth pain. A month later a CT scan was done showing a head and neck cancer which caused the patient's death about six months later. The diagnosis was delayed about a year. Patient 13 had cirrhosis from hepatitis C and was referred for treatment by UIC telemedicine but was lost to follow up. UIC asked that the patient's anemia be worked up before treatment but this was unrecognized by IDOC staff and the patient was again lost to follow up. The patient was referred again to UIC for treatment in 2018 but this never happened. The patient wasn't seen again in UIC until March of 2021; UIC started treatment of the hepatitis C but the patient had severe cirrhosis at the time and UIC recommended a hepatologist evaluate the patient but this never occurred. Eventually, the patient died from end-stage liver disease. Patient 14 was a patient with unintentional and unrecognized weight loss which wasn't worked up for months when metastatic cancer was diagnosed. An oncologist saw the patient in follow up and started chemotherapy. The oncologist recommended

Zofran but the patient was given Pepto-Bismol instead.  The oncologist also recommended a drug to increase the white count but the vendor's pharmacy didn't have the medication and the patient didn't receive it for over a week resulting in the oncologist using a second level chemotherapy.  This facility didn't have a physician at the time and nurses did not appear to have a physician to consult with.

The lack of coordination of specialty care has been a problem for the duration of the Consent Decree and has been documented in multiple record reviews including in the mortality reviews in the appendix. IDOC has not provided any information that these problems have been corrected or that they have been addressed in any way.

The off-site tracking log is still not standardized and still does not include the date the off-site report was received, the date the provider reviewed the report, and the date that the provider met with the patient to update the therapeutic plan and discuss the plan with the patient.  The tracking log has not been modified over several reports.  Mortality reviews still show failures to timely refer for diagnostic or specialty care and failures to adequately coordinate specialty care. Because the collegial process was eliminated this item moves to partial compliance but specialty care would otherwise be noncompliant.

**RECOMMENDATIONS:**

1. Create a tracking log which contains information in the list in the report above.
2. Despite termination of collegial review, the HCUA must maintain the tracking log. The log must be a log maintained for purposes of assessing access to specialty care and must include all referrals with the information specified in the report above.
3. Use quality improvement to study whether patients in need of specialty care are being referred for care; whether patients referred for offsite specialty care have received timely care; and whether diagnostic studies and consultations are being appropriately integrated into the patient's overall therapeutic plan.   This should include, as only one example, review of records to see if the follow-up visit with the primary care provider describes a discussion between the patient and the provider, revolving around the findings at the offsite service and the plan of care.
4. A root cause analysis of specialty care needs to be promptly performed to determine why the specialty care referral process is resulting in considerable morbidity and mortality.
5. The vendor's prior methodology of utilization review has institutionalized diagnostic referral practices in a manner that do not contribute to timely evaluation of serious medical conditions.  A re-evaluation of diagnostic efforts for serious conditions needs to occur.
6. IDOC needs to re-train all provider staff on the appropriate algorithm[363] to work up unintentional weight loss.  This will require a critique and abandonment of the current referral practices that result in delayed diagnosis and therapy.
7. A root cause analysis needs to be done to identify why operational practices involving communication with consultants is so defective.  Corrective actions to streamline and

---

[363] This can be found in UpToDate in the section on unintentional weight loss.  Focus needs to be on promptly obtaining diagnostic studies for the area of concern.

reduce errors in communication between consultants and practitioners within IDOC must occur.

8. Until and electronic record is put into place, a root cause analysis of obtaining and filing medical records needs to be done to ensure accuracy of filing of consultant and hospital reports in an orderly, coherent, and chronologic fashion that is readable and facilitates understanding of consultant and hospital episodes of care. The lack of organized specialty and hospital reports in the medical record results in morbidity and mortality.

### **Specialty Referral Oversight Review**

***Addresses III.H.5***

**III.H.5.** *Within six (6) months after the Preliminary Approval Date of this Decree [July 2019]or until Defendants are able to fill both Deputy Chief of Health Services positions, they will make reasonable efforts to contract with an outside provider to conduct oversight review in instances where the medical vendor has denied any recommendations or taken more than five (5) business days to render a decision, including cases in which an alternative treatment plan has been mandated in lieu of the recommendation and cases in which the recommendation has not been accepted and more information is required. If no contract with an outside provider is reached, then the Monitor or his or her consultants shall conduct oversight review in instances where the medical vendor has denied any recommendation or taken more than five (5) business days to render a decision, including cases in which an alternative treatment plan has been mandated in lieu of the recommendation and cases in which the recommendation has not been accepted and more information is required. Once Defendants have filled both Deputy Chief positions, the Deputy Chiefs will replace any outside provider, the Monitor or his or her consultants to conduct oversight review in the instances described in this paragraph. (see Specialty Care Section)*

**OVERALL COMPLIANCE RATING:** Substantial Compliance

**FINDINGS:**

**RECOMMENDATIONS:**

1. The Monitor fully supports the IDOC decision to terminate the current collegial review specialty care and diagnostic testing referral process.
2. The termination of the collegial review must also pertain to referrals for subcontracted onsite ultrasonography services.
3. IDOC must immediately develop a tracking system to ensure that the vendor's demand for a summary of clinical information on the Special Services Referral and Report form does not result in administrative denials of providers' referrals for specialty consultation, diagnostic testing, and procedures.
4. IDOC must also simultaneously develop a tracking system to ensure that the peer-to-peer clinical discussions are truly at the volition of the facility Medical Directors and do not become regular mandatory calls with the vendor's utilization management physicians that result in denials or restrictive alternate treatment plans.
5. The IDOC must conduct a review of the vendor's policies, practices, and guidelines that affect patient-inmates' access to medically necessary consultation, testing, and

procedures and eliminate, with input from the monitor, those guidelines that restrict access to medically necessary clinical services. Examples of current restrictive vendor practices include limiting cataract surgery to only one eye, categorizing ostomy reversal surgery as an elective, and others.

# Hospital Care

*Addresses Items II.A; II.B.1; III.G.4*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care*

**III.G.4.** *Facility medical staff shall ensure that a prisoner is seen by a Medical Provider or clinician within 48 hours after returning from an offsite emergency service. If the Medical Provider is not a clinician, the Medical Provider shall promptly review the offsite documentation, if obtained, with a clinician and the clinician shall implement necessary treatment.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

Items II.A, II.B.1, and III.G.4 all require access to specialists and hospitals as necessary. The judgment of physicians with respect to sending patients for specialty referral and hospitalization is still not working to provide a safe and effective health program as evidenced in the Monitor's mortality reviews. Hospital physicians often provide recommendations but providers at IDOC prisons frequently fail to review these recommendations and modify the therapeutic plan based on the recommendations.

IDOC provides no evidence to justify compliance for these three items. The Monitor's mortality reviews for this period demonstrate that the current practices warrant a noncompliance rating.

Based on record reviews, the following problems remain.

- Access to hospital care is delayed or not provided.
- Some patients need hospitalization or skilled nursing but are instead housed on the infirmary. While IDOC's draft infirmary policy states that skilled nursing care is provided on the IDOC infirmaries, record reviews, including mortality reviews in Appendix A show that this is not occurring.
- Patients return from the hospital but are not timely evaluated or hospital follow up did not properly continue the recommended hospital plan of care.
- A patient's condition deteriorates resulting in hospitalization that is preventable due to chronic care management that is not timely or effective.

Examples of these problems include the following. Patient 10 was sent to a hospital three times for heart failure with a recommendation at the last hospitalization to see a cardiologist for possible mitral valve replacement. This recommendation by the hospital for referral never occurred. The patient developed pneumonia. Given the patient's condition[364], he should have been promptly admitted to a hospital but was kept on the infirmary for nine days. On day five of infirmary care the patient fell and broke three ribs. On day six the patient was in shock (blood pressure 83/64). The patient was finally admitted to a hospital on day nine of infirmary care and was immediately transferred to a tertiary care hospital where he was immediately admitted to the intensive care unit but died two days later. The delayed hospitalization contributed to the patient's death. Patient 13 was on lactulose for hepatic encephalopathy but was not receiving lactulose as ordered and did not have his cirrhosis managed well which resulted in four hospitalizations for encephalopathy and ascites which could have been prevented with better management. Patient 15 was 54 years old and was at Pontiac which did not have consistent physician coverage during this report period. The patient was noted to have a hemoglobin of 6 which is a life-threatening level and called for immediate hospitalization for transfusion and diagnostic evaluation. Instead, the provider seeing the patient ordered iron therapy and a repeat blood count. The patient was subsequently *lost to follow up for a year* when the patient had two provider visits for shortness of breath. The patient now had significant weight loss. A blood count was done and a hemoglobin of 4 was recorded which is a life-threatening valued. The patient was hospitalized and found to have adenocarcinoma of the colon. Post-hospitalization, the patient was referred to UIC oncology but their plan for surgery was not followed and the facility sent the patient to a local hospital for surgical care and back to UIC for follow up of the hospital care. Coordination of hospital and follow up oncology care was disorganized and not physician directed. During the local hospital admission, the patient developed osteomyelitis of the spine. Follow up of the osteomyelitis at the facility after the hospitalization did not occur and when the patient returned to the UIC oncologist, the patient needed immediate re-hospitalization for recurrent osteomyelitis which required surgery. UIC oncology and hospitalists made recommendations that were not all adhered to. These included:

- Requested pathology reports were not sent to the oncologist.
- A PET scan was not done.
- A requested IV line for chemotherapy was not functioning.
- Recommendations to obtain tests and to monitor the osteomyelitis were not done.

After a hospitalization at UIC for the spinal surgery for osteomyelitis the patient returned to the prison[365] but there was little evidence of physician management of his serious condition. The patient developed renal failure, lost significant weight, became incontinent, and had two falls. He should have been admitted to a skilled nursing unit but was instead kept on the infirmary which did not appear to have physician coverage. Nurses appeared to managed the patient's care over the last days of his life without apparent physician oversight.

Due to egregious failure to timely refer patients to a hospital and failure to follow up on hospital recommendations this provision remains noncompliant.

---

[364] Current heart failure with pleural effusions, history of COPD, chronic kidney disease, and dementia, and age 76 years old.
[365] The patient was housed at Pontiac.

**RECOMMENDATIONS:**

1. Providers must continue orders promptly after hospitalization or document why recommendations will not be continued. Immediately upon return from hospitalization, nurses must consult with providers regarding recommended hospital orders. Within 2 days a provider must revise the therapeutic plan of the patient consistent with the hospital findings and recommendations. The provider must discuss the revised plan and how it will be implemented with the patient.
2. As part of the audit system, IDOC needs to evaluate whether the process of chronic care management results in preventable hospitalization. If systemic problems are identified these should be corrected through the quality improvement programs.
3. The statewide quality unit should perform a process analysis to determine why hospitalization is delayed for patients found in mortality reviews. Problems identified need to be corrected through the quality improvement program.

# Preventive Services

*Addresses items III.M.1.a-d*

**III.M.1.a.** *Defendants or their contracted vendor(s) shall ensure that all prisoners will be offered an annual influenza vaccination.*

**III. M.1.b.** *Defendants or their contracted vendor(s) shall ensure that all prisoners with chronic diseases will be offered the required immunizations as established by the Federal Bureau of Prisons.*

**III.M.1.c.** *All prisoners ages 50-75 will be offered annual colorectal cancer screening and PSA testing, unless the Department and the Monitor determine that such testing is no longer recommended.*

**III.M.1.d.** *All female prisoners age 45 or older will be offered a baseline mammogram screen, then every 24 months thereafter unless more frequent screening is clinically indicated, unless the Department and the Monitor determine that such testing is no longer recommended.*

**Influenza Vaccinations**

**III.M.1.a** *Defendants or their contracted vendor(s) shall ensure that all prisoners will be offered an annual influenza vaccination*

**Overall compliance:** Partial Compliance

**Findings:**

The Consent Decree requires that IDOC is to produce an annual report based on data and information sufficient to verify compliance. IDOC asserts compliance with III.M.1.a. but provides no systemic data for verification. Limited data has been gathered by the Monitor concerning the provision of influenza vaccination. IDOC must provide more comprehensive data to demonstrate its compliance but has not done so.

As reported in the 3rd and 4th Court Report the Monitor has been aware that influenza vaccination is offered to the IDOC patient population in all correctional centers. IDOC reported that a total of

20,160[366] influenza vaccines had been shipped in September 2020 to IDOC facilities[367] for administration during the 2020 flu season. The Monitor has not received any data on the volume of influenza vaccines shipped to IDOC for the 2021 flu season. Review of CQI minutes for September, October and November 2021[368] identified that only six[369] of the thirty IDOC facilities had reported some data on influenza vaccination statistics. Two of these six correctional centers[370] reported zero flu shots were offered and one site[371] noted that flu vaccination has been administered in three housing units but the numbers were still being calculated. Data gathered manually by the Monitor from the three sites that documented the administration of the 2021 influenza vaccines revealed that 948 (42%) incarcerated persons of the approximately 2,285 incarcerated persons housed at these sites accepted the influenza vaccine. A Chronic Condition Report from another IDOC facility documented that only 173 (11%) of the 1,608 individuals on this report had been offered the flu vaccine;[372] ninety (52%) of these 173 individuals refused the vaccine. IDOC reported no systemwide aggregate data to the Monitor on vaccinations offered, accepted, or refused.

Review of multiple medical records during previous site visits at a number of facilities verified that many but not all patient-inmates had documentation on the medical record database page that they had been offered influenza vaccines and that the refusal rate was quite high. Review of forty-three medical records for 2021 and 2022 from six correctional centers[373] revealed that twenty-four (56%) had been offered and accepted influenza vaccination, thirteen were offered and refused (30%), and six (14%) had no documentation that they had been offered the flu shots in 2021 or early 2022. Based on previous and current chart reviews, the Monitor does believe that IDOC does annually provide access to influenza vaccination at its correctional facilities. However, after five court reports that documented the lack of data being tracked and reported on an item that has specific language in the Consent Decree, [374] it is difficult for the Monitor to understand why only seven of IDOC's thirty facilities have made any attempt to report data on the delivery of influenza vaccine to the incarcerated population. If seven correctional facilities can manually report on the delivery of influenza vaccination, then all IDOC's facilities can accomplish this task. This failure to gather basic attainable data speaks to the current lack on an established, comprehensive systemwide infection control program.

**Recommendations:**

1. IDOC must track and report annual influenza vaccination rates and refusals by site.

---

[366] 2,016 ten-shot vials in total were shipped.

[367] Flu Vaccine Shipped to IDOC facilities in September 2020 by Wexford Health

[368] September, October, and November 2020 CQI Minutes for 28 of 30 facilities were reviewed.

[369] Hill, Kewanee, Lincoln, Menard, Taylorville, Western

[370] Taylorville, Western

[371] Menard

[372] Chronic Condition Report Pinckneyville CC 3/6/2022. It is unclear if this report accurately records all influenza vaccines offered and refused. Although the report was dated 3/6/22, the dates or even the year that the flu vaccines were offered were not detailed in the report.

[373] East Moline CC, Jacksonville CC, Pinckneyville CC, Robinson CC, Shawnee CC, and Vandalia CC 2021-2022

[374] Lippert v Jeffreys Consent Decree: **III.M.1.a.** *Defendants or their contracted vendor(s) shall ensure that all prisoners will be offered an annual influenza vaccination.*

2. IDOC should institute an annual health information campaign to educate the incarcerated population about the health benefits of the annual influenza vaccine and the COVID-19 vaccine.

**Adult Immunizations**

**III.M.1.b** *Defendants or their contracted vendor(s) shall ensure that all prisoners with chronic diseases will be offered the required immunizations as established by the Federal Bureau of Prisons.*

**Overall Compliance:** Partial compliance

**Findings:**
As noted in the previous four Court Reports, in October 2019 the IDOC Office of Health Services disseminated to all IDOC facilities instructions and standing operating procedures for the implementation of an adult immunization program in the IDOC. In 2020 IDOC provided the Monitor with a draft of the Data Base documentation form which included an Immunization, Screening, and Exams table which listed multiple vaccines, screening lab and diagnostic tests, and cancer screenings with adjacent columns where the dates that the vaccines, tests, and screening were offered and/or completed. The Monitor noted a number of deficiencies[375] in the table and provided input to the IDOC in July and September 2020[376]. To date most of these basic recommendations have not been incorporated into the IDOC Data Base and Medical History forms. Also previously reported, in January 2021 the IDOC submitted to the Monitor a draft administrative directive on Immunization and Cancer/Preventive Screening Programs for review and comment. The Monitor has given input on the clinical components. A final signed administrative directive has not yet been sent to the Monitor.

The Staffing Analysis does not specify staff that would be responsible for this planned effort at the facilities. The latest Implementation Plan[377] states that vaccination and routine health maintenance including cancer screenings will be developed and implemented by June 2022 however the Plan offers scanty information on how these guidelines would be disseminated to staff and no direction on how delivery of vaccines, cancer screenings, and routine health maintenance testing will be monitored, tracked, and reported.

The 4th Report documented a number of examples of notable systemwide gaps and variation in the completion and utilization of intake screening forms including immunizations. Review of medical reception documents from four mortality charts for this Report identified incomplete and inaccurate completion of the immunization histories without any vaccines being offered.[378] To date, IDOC has not provided to the Monitor a finalized policy that standardizes the use of these forms and guides staff on use of these forms and there is considerable variation between facilities and between staff at the same facility with respect to use of these forms.

---

[375] Meningitis vaccine row should be divided into Meningitis ACWY and Meningitis B, Pneumococcal vaccine should be divided into Pneumococcal-23 and Pneumococcal-13 rows. Hemophilus Influenza B (HiB) vaccine, Abdominal Aortic Aneurysm screening, and ASCVD 10 year Screening should be added to the table.
[376] Monitor input on immunization, screening, and exam provided to IDOC 7/7/20 and 9/9/20
[377] Implementation Plan 4/40/22
[378] See Medical Reception section of this 5th Report

As noted in the 4th Report[379] the immunization history, as performed, is not consistently completed and thus is unreliable. There is no documented attempt to obtain this history from public health records or at subsequent patient encounters, such as the initial health assessment and baseline chronic clinic visit. Individuals are unlikely to remember all of their vaccination history. IDPH has instituted I-CARE[380] for that purpose. This State of Illinois registry of vaccinations should be used by IDOC to verify vaccination status on all new admissions to the IDOC. It is unclear if IDOC has formulated plans to use I-CARE.

The IDOC has partially implemented new intake forms for the history and physical examination without having implemented a final vaccination policy and procedure. IDOC provided no evidence of training of staff on the new form and procedure. The 4th Report documented a number of examples, from medical record reviews, of systemic gaps and variation in the completion of intake screening forms including ordering vaccinations. Review of medical reception documents from four mortality charts for this report identified that the new form is being used but practice in completing the form varies. There is incomplete and inaccurate completion of immunization histories without vaccines being offered.[381] This represents ineffective implementation of the form.

The latest version of the Implementation Plan asserts that guidelines for vaccination will be developed but there are no plans or actionable steps for how this will be accomplished. Vaccination practice is proceeding with considerable variation and is left up to each facility or individual staff member to figure out how to conduct this program. An effective Implementation Plan would standardize the process, create effective policy, ensure appropriate forms were in place with staff training on use of the forms, assign specific personnel and ensure there were sufficient staff to carry out the policy, ensure sufficient supplies were present where they need to be, train staff on the policy and use of equipment, supplies, and documentation, ensure that tracking mechanisms are effective and in place, establish timelines for implementation and ensure that all facilities have implemented appropriately, and to reflect on an ongoing basis as to the effectiveness of the implementation. None of this is evident in the Implementation Plan.

The Monitor has repeatedly discussed with IDOC that the management of the Immunization Program be placed under the control of nursing with each facility's Infection Control nurse or a dedicated adult immunization nurse directing, monitoring, tracking, administration of recommended adult immunizations based on standing orders approved by IDOC clinical leaders; this is a common practice throughout the USA for influenza and recently for COVID-19 immunization. Nursing staff at Decatur CC have reportedly been trained in soliciting and documenting vaccine information.[382] Both female facilities, Decatur CC and Logan CC have also implemented Human Papilloma Virus vaccination programs for women twenty-six years of age

---

[379] 4th Medical Monitor Report to the Court, Lippert v Jeffreys 9/16/21
[380] The IDOC website at https://dph.illinois.gov/topics-services/prevention-wellness/immunization/icare states the following. "I-CARE, or Illinois Comprehensive Automated Immunization Registry Exchange is a web-based immunization record-sharing application developed by the Illinois Department of Health (IDPH). The application allows public and private healthcare providers to share the immunization records of Illinois residents with other physicians statewide".
[381] See Medical Reception section of this 5th Report
[382] Decatur CC Continuous Quality Improvement Minutes, September 2020

or younger.  Placing the immunization program under the umbrella of nurse leadership offers IDOC the best option for successfully providing recommended adult immunizations to the IDOC population which will prevent morbidity and even mortality within the prison system and ultimately in the communities of Illinois.

Aside from COVID-19 vaccination statistics[383], IDOC has not provided systemwide data on vaccine administration.  With limited exceptions[384], the only data IDOC provides to the Monitor regarding vaccines is the pharmacy vendor's [385] dispensing data but this data is inadequate to verify actual administration of the vaccines.  Since the Consent Decree was signed, IDOC providers have ordered a number of newly available adult immunizations for individual patients from Boswell Pharmacy.  Currently thirteen vaccines[386] are available for providers to order on a patient-specific basis. Based on IDOC communications and pharmacy vendor dispensing data[387], five of the thirteen available vaccines[388] have also been stocked upon request at many correctional facilities.  In addition to these five vaccines, Logan CC also receives stock orders for human papilloma virus, recombinant zoster, and pneumoccocal-13 vaccines; East Moline, Joliet Treatment Center, Menard CC, Robinson CC, and Taylorville CC also have received stock orders of pneumococcal-13 vaccine, and Decatur CC, Graham CC, Greene, and Sheridan CC have received small stock orders of hepatitis B vaccines.

Since the beginning of the Consent Decree, IDOC has not reported vaccinations given or vaccination rates; it only provides lists of dispensed stock and individually ordered patient-specific vaccines[389] ordered from Boswell Pharmacy.[390] During the 37 months after OHS expanded the number of nationally recommended vaccines in the IDOC, limited, although increasing, numbers of vaccines[391] have been ordered demonstrating slow but steadily increased administration of nationally recommended adult vaccinations for inmate-patients.  The increased numbers of vaccines ordered do not verify vaccine administration. Data on the quantity of stock and individual vaccine orders dispensed by the pharmacy vendor does not reflect the number of individuals who actually receive the ordered vaccinations. The Boswell pharmacy data suggests that increasing numbers of vaccines are ordered, but the only information available is dispensing information and this does not verify vaccine administration. Data is also lacking on individuals who have previously been vaccinated, and those who have been offered vaccination but refused. With the exception of HPV vaccination program at Logan CC and Decatur CC, IDOC has been

---

[383] IDOC has intermittently provided systemwide data on COVID-19 vaccination of the incarcerated population and staff.

[384] Logan CC and Decatur CC have provided data on the administration of HPV vaccines to females 26 years of age or younger.

[385] Boswell Pharmacy Services, Jennerstown, PA

[386] Diphtheria-tetanus, HPV, haemophilus influenzae B (HIB), hepatitis A, hepatitis B, influenza, measles-mumps-rubella (MMR), meningococcal ACWY, meningitis B, pneumococcal 13, pneumococcal-23, recombinant herpes zoster (RZV), and varicella immunizations.

[387] IDOC's contracted pharmaceutical vendor Boswell vaccine order list 11/1/19-2/1/22

[388] Tetanus-diphtheria (TD), hepatitis B, hepatitis A, pneumococcal 23, and influenza.

[389] Stock medication is a general supply of vaccine and is not an order for a specific patient.  Patient-specific vaccines are orders for a specific patient.  Patient specific orders are more likely to indicate that a patient has received the vaccine but only documentation of administration can confirm this.

[390] IDOC's contracted pharmaceutical vendor Boswell vaccine order list 11/1/19-2/1/22

[391] IDOC facilities have ordered the following doses from 11/1/19 through 2/1/22:  3 HiB, 32 meningococcal-ACWY, 262 pneumococcal-13, 2,086 pneumococcal-23, 562 HPV, and 2,686 RZV doses.

unable to provide aggregate data to verify the number of individuals vaccinated; this is especially true for vaccines that require a series of 2-3 shots[392]. Still, based on dispensing data there are indications that vaccinations are becoming more accessible in the IDOC. Accessibility still needs to be improved and IDOC needs to verify actual administration of vaccination.

IDOC houses approximately 1,500 HIV patients, immunocompromised individuals, and elderly (65 years of age or older) who are eligible for pneumococcal-13 vaccination but since this vaccine became available in the IDOC in late 2019, only 262 doses have been individually ordered; and only 21[393] of the 30 facilities have ordered the pneumococcal-13 vaccine.  Only 32 individuals at eight different facilities[394] have been offered meningococcal ACYW vaccination even though this initial two-shot series is recommended for approximately 300 HIV-infected individuals in the IDOC.

Medical records from six IDOC facilities[395] were reviewed by the monitor to assess the delivery of adult immunizations at these six sites. Thirty-six men were eligible for pneumococcal-23 vaccination; twenty-three (64%) were offered the vaccine. Nineteen accepted the vaccine but only fourteen of the nineteen that had documentation on their databases or immunization forms that they had actually received the vaccine. Five individuals who accepted P-23 vaccination lacked documentation on their databases or immunization tables that the vaccine had been administered. Four refused the P-23 vaccine.   Zero (0%) of eighteen individuals with age or clinical indications at these six sites had been offered the pneumococcal-13 vaccine.

Over 6,000 men and women in the IDOC over 50 years of age are eligible for the two-shot recombinant zoster vaccine (RZV) to prevent the occurrence of shingles; 2,686 doses have been ordered from 11/1/19 through 2/1/22. To date, 29 [396] of the IDOC 30 correctional centers have ordered the RZV. If all 2,686 ordered RZV doses have been administered, between 22% and 45%% of the eligible candidates would be fully or partially vaccinated.  The medical databases from six correctional facilities of forty-one patients who were eligible for RZV were reviewed.[397] Only eleven (27%) had documentation in their medical record that the RZV vaccine had been offered, administered, or refused.[398] One individual had RZV ordered, but there was no documentation on the database or immunization table that the vaccine had been administered. Although there has been a notable uptick in the ordering of RZV throughout IDOC, there are still opportunities to improve access to this important vaccine. Once again, the data is inferential and needs to be strengthened to ensure that the IDOC has accurate data on how many men and women are actually offered and received the ordered RZV.

---

[392] CDC Recommended Adult Immunization Schedule 2020: Meningococcal ACWY, HPV, recombinant Herpes Zoster (Shingrix); HiB require multiple doses
[393] Danville, Dixon, East Moline, Graham, Hill, IRCC, Jacksonville, Kewanee, Lawrence, Lincoln, Logan (stock supply), Menard, Murphysboro, NRC, Pontiac, Robinson, Stateville, Vandalia, and Vienna have ordered at least one dose of pneumococal-13 vaccine
[394] BMR, Danville, East Moline, Graham, Greene, Hill, Sheridan, and Stateville have ordered at least one dose of the two dose meningococcal ACYW vaccine series.
[395] East Moline CC, Jacksonville CC, Pinckneyville CC, Robinson CC, Shawnee CC and Vandalia CC
[396] Recombinant Herpes Zoster vaccine (RZV) has **not** been ordered at NRC in the 37 months that this vaccine has been made available in the IDOC.
[397] East Moline CC, Jacksonville CC, Pinckneyville CC, Robinson CC, Shawnee CC and Vandalia CC
[398] One individual had the RZV ordered but there was no documentation on the database or on the immunization tracking form that the vaccine had actually been administered.

As noted in the 4th Court Report, at any one time an estimated 100-150 females eligible to receive the cervical cancer preventing HPV vaccine series are housed at Decatur CC and Logan CC. From January through September of 2020, 54 women (seven at Decatur CC and 47 at Logan CC) completed the three-dose series and another 38 have started the series and were awaiting their 2nd and 3rd shots. IDOC communicated to the Monitor that from October 2020 through June 2021 that Decatur CC administered 58 additional HPV vaccinations and Logan CC has started another 35 eligible women on the HPV vaccine series.[399] Decatur CC also received HPV doses for 15 women between June 17, 2021 and February 1, 2022 with 3 women scheduled for their third and final doses in the series. The method of reporting the HPV vaccinations at the two female facilities is not standardized and makes it difficult to verify the exact number of women who have started HPV vaccination and the exact number who completed the three shot HPV series. However, based on the pharmacy vendor's filled orders, 560 individual and stock orders of HPV vaccine have been delivered to the two female facilities which would theoretically been adequate to fully vaccinated an estimated 186 females. These two facilities planned and implemented catch-up HPV vaccination campaigns that have been successful and should serve as templates for provisions of nationally recommended adult immunizations throughout the IDOC. However, IDOC must continue to improve its data collection processes so that they know and can verify how many eligible women have been offered, refused, started, and completed HPV vaccination.

HPV vaccination is also recommended for men 26 years of age or younger to prevent penile cancer and transmission to HPV to their sexual partners; but, to date, only a single male correctional facility has ordered the HPV vaccine for only one male patient[400].

As noted in the 4th Court Report, OHS has appropriately expanded access to nationally recommended adult vaccines for the IDOC population and there is evidence that the medical providers at some IDOC correctional centers are beginning to order these vaccinations for their patient populations. However, the IDOC population is still under-vaccinated for many CDC-recommended adult immunizations. IDOC needs to develop a policy and procedure to ensure that vaccinations are provided to eligible at-risk candidates.

The Monitor has strongly advised IDOC to develop nurse managed and standing order-based immunization programs at each facility to maximize the effectiveness of the provision of adult immunizations to IDOC's at-risk individuals. IDOC must ratchet up the pace of vaccine administration to provide adequate protection for the incarcerated population. The development of a vaccination program directed by nursing staff has the best potential to effectively coordinate the catch-up and ongoing vaccination of incarcerated persons in the IDOC.

IDOC currently cannot verify vaccination rates because standardized data on vaccination is not gathered and reported. IDOC has proposed that this will be available when the electronic medical record is developed. However, until the electronic medical is implemented, IDOC needs to establish a manual tracking system to record the number and percentage of eligible individuals

---

[399] IDOC emails to Monitor 8/4/2021 with HPV data from Decatur CC and Logan CC
[400] Lincoln CC 6/30/21

offered, administered, and refused nationally recommended adult immunizations. Because of the lack of data verifying vaccine administration, a partial compliance rating is warranted.

**Recommendations:**
1.  The vaccination program must be addressed in the Implementation Plan. This program should be rolled out with standardized practices, staffing, equipment, supplies, and training. Timetables should be established for key benchmarks. Responsible persons should be assigned for tasks.
2.  The IDOC has promulgated standard operating procedures for a comprehensive adult immunization program and must continue to implement processes that ensures that all patient-inmates are offered nationally recommended age and risk appropriate adult immunizations. This process will include the provision of immunizations at the various clinical encounters noted in the revised January 2021 Administrative Directive but also in special catch-up vaccine campaigns.
3.  The Immunization Program should be placed under the administrative umbrella of nursing leadership and managed by each facility's infection control nurse or a dedicated immunization nurse using approved standing orders to administer recommended adult immunizations.
4.  The IDOC must track and report the percentage of fully vaccinated incarcerated individuals for each nationally recommended vaccine and the ongoing offering, administration, and refusal of all adult immunizations, and the percentage of eligible individuals who are offered and received recommended adult immunizations to the CQI committees at each site.
5.  The new EMR vendor should incorporate data points and clinical prompts which electronically remind, record, track, and report all adult immunizations offered and administered and the identified clinical indication (age, clinical condition, etc.)
6.  The HPV vaccination campaigns at Decatur and Logan CCs should serve as the model for the delivery of nationally recommended adult vaccinations in the IDOC.
7.  HPV must be offered to all incarcerated men 26 years of age or younger.
8.  The database and Immunization, Screenings, and Exam tracking table in the medical record must accurately document all vaccinations, screenings, and exams that are administered and performed.

**Cancer and Routine Health Maintenance Screening**
**III.M.1.c.** *All prisoners ages 50-75 will be offered annual colorectal cancer screening and PSA testing, unless the Department and the Monitor determine that such testing is no longer recommended.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**
As noted in the 4th Court Report, in October 2019 the IDOC Office of Health Services distributed systemwide "Standard Operating Procedures: Cancer Screening" which detailed IDOC Routine Health Maintenance and preventive screening recommendations for breast, cervical, colon, and prostate cancer. In January 2021 the OHS and IDOC submitted a draft Immunization and Cancer/Preventive Screening Programs Administrative Directive appropriately adding lung cancer and abdominal aortic aneurysm (AAA) screening that had not been included in the 2019

guidelines and providing increased guidance on gathering and documenting an inmate's prior cancer and routine health maintenance screening history, ordering the recommended screenings during intake screening at Reception & Classification Centers, and reviewing the need for cancer and routine health maintenance (RHM) screenings upon arrival at parent facilities and during sick call appointments, chronic clinic visits, and annual (and bi-annual) physical exams.

Review of medical reception intake records for this report show that preventive cancer screening is not currently performed in accord with the 2021 draft cancer screening administrative directive and there is lack of standardization across the four reception centers. Cancer history is not obtained during intake screening nor is cancer screening initiated during the provider physical examination except for cervical and breast cancer screening for females which is initiated by providers at Logan CC. With exception of colon cancer screening at Logan CC (see next paragraph), quality improvement meeting minutes do not report cancer screenings that are offered, administered, or refused. The draft administrative directive needs to be completed and properly implemented. Cancer screening needs to be included in the Implementation Plan so that this administrative directive is properly implemented.

The United States Preventive Services Task Force (USPSTF)[401] and the IDOC 2021 guidelines[402] recommend that colon cancer begin at age 45 for asymptomatic, average risk patients. Colorectal cancer was the second leading cause of cancer mortality from 2017-2021 among the IDOC incarcerated population[403] and five of the thirteen reported colorectal cancer deaths were under the age of fifty. Review of quality improvement committee minutes from the 3rd and 4th quarters of 2021 identified that only a single IDOC correctional facility, Logan CC, had begun to report the offering of colon-rectal cancer screening on a regular basis (see table below). Logan CC did not report on the type of colorectal cancer screening test that was utilized and whether the four individuals with abnormal tests were referred for additional more definitive diagnostic testing including colonoscopy. The tracking and reporting of colorectal cancer screening started at Logan CC should be replicated throughout the IDOC with data modified to include the type of screening test utilized and the actions taken for individuals with abnormal screening tests.

| Logan CC Colo-Rectal Cancer Screening Data From Quality Improvement Committee Minutes | | | | |
|---|---|---|---|---|
| | Offered | Completed | Abnormal | Refused |
| Oct-21 | 1 | 1 | 0 | 0 |
| Nov-21 | 10 | 8 | 0 | 2 |
| Dec-21 | 40 | 30 | 4 | 5 |
| **Totals** | 51 | 39 | 4 | 7 |

---

[401] United States Preventive Services Task Force cancer screening guidelines 2020. Age for colon cancer has been lowered to 45 years of age (B Recommendation), Colon cancer screening from 50-75 years of age remained as an A recommendation.
[402] OHS Standard Operating Procedures: Cancer Screening October 24, 2019 and Administrative Directive IDOC Immunization and cancer/preventive Screening Program, January 2021 draft
[403] IDOC Mortality spread sheets 2017-2021. This mortality data is incomplete with 99 of the 570 deaths not listing the cause of death

The Monitor reviewed 52 medical records provided by IDOC from seven facilities[404] to assess the compliance with colorectal cancer screening. Fifty of these patients whose records were provided were 45 years of age or older of which forty-six were potentially eligible for colorectal cancer screening. Fifteen (32%) of the forty-six eligible patients were offered a nationally recommended colorectal cancer screening test.[405] All fifteen were screened for colorectal cancer using Fecal Immunochemical Test (FIT); all fifteen were housed in only two of the seven facilities, Decatur CC or East Moline CC. One female at Decatur CC was also screened using three stool guaiac cards, an outdated and less sensitive testing method. One patient at Shawnee CC was screened using a digital rectal exam and single stool guaiac test collected during the digital exam; two individuals at Vandalia CC refused the digital exam and stool guaiac testing. The use of digital rectal exams and a single blood guaiac test obtained during the rectal exam to screen for colorectal cancer was discontinued 15-20 years ago. One male at Jacksonville CC was given "three FIT cards" to gather stool specimens in his cell; it is likely that the provider actually ordered three stool guaiac cards, a colorectal cancer screening methodology that is not recommended by United States Preventive Services Task Force or IDOC's administrative directives.[406] One other facility provided colonoscopy reports on four incarcerated persons but there is no documentation provided whether these were screening colonoscopies or performed for other clinical reasons.[407] This review of the medical records of forty-six individuals[408] who were eligible for colorectal cancer screening found thirty-one (68%) have not been screened for colorectal cancer or were not screened using a nationally recommended screening methodology.

This is first time since the signing of Consent Decree the Monitor has reported being provided or finding any data that IDOC has initiated using a nationally recommended screening test for colorectal cancer. Albeit at only Logan CC, this is also the first time that any of IDOC thirty facilities has started reporting data on the provision of colorectal cancer screening in their facility quality improvement committee minutes. IDOC must continue to develop and report systemwide evidence that nationally recommended colon cancer screening tests are been offered at the recommended intervals to all eligible patient-inmates in all IDOC correctional facilities.

As noted in the four previous Court Reports, the USPSTF recommends that selective screening for prostate cancer using PSA testing in average risk males 55-69 of age be based on patient preferences and that patients be provided with relevant clinical information by their provider about the pros and cons of PSA screening. The frequency of screening is not clearly defined. Prostate cancer screening should not be done for men 70 years of age or older or with a life

---

[404] Decatur CC, East Moline CC, Jacksonville CC, Pinckneyville CC, Robinson CC, Shawnee CC, and Vandalia CC.

[405] The USPSTF recommends one of the following six screening tests:  1) High-sensitivity guaiac fecal occult blood test (HSgFOBT) or fecal immunochemical test (FIT) every year; 2) Stool DNA-FIT every 1 to 3 years; 3) Computed tomography colonography every 5 years; 4) Flexible sigmoidoscopy every 5 years; 5) Flexible sigmoidoscopy every 10 years + annual FIT; 6) Colonoscopy screening every 10 years

[406] IDOC Administrative Directive Immunization and Cancer Preventive Screening Programs, January 2021 recommends annual Fecal Immunochemical Test (FIT) to screen eligible persons for colorectal cancer
[407] Robinson CC
[408] The four colonoscopies performed on individuals at Jacksonville CC were not included in the determination of the percentages of eligible men and women who were screened or not screened for colorectal cancer.

expectancy less than 10 years. Routine annual PSA screening for asymptomatic men and digital prostate palpation via a rectal exam is not a national recommendation. OHS's revised 2021 prostate cancer screening guidelines are fully aligned with the USPSTF standards. Interviews with IDOC providers in June 2021[409] revealed that providers were still offering digital rectal screening (DRE) as a screening test for prostate cancer. The review of 52 medical records provided for the 5th Court Report in 2022[410] documented twenty-seven incarcerated persons who were offered DRE screening as the screening test for prostate cancer; this is not recommended by the United State Preventive Services Task Force or by the IDOC administrative directive.[411] The IDOC must discontinue the utilization of the outdated and ineffective digital rectal examination as a screening test for prostate cancer and the use of a single stool guaiac test gathered at the time of the rectal exam to screen for colorectal cancer.

As also reported in the 4th Court Report, the USPSTF and the IDOC administrative directive recommend a one-time screening with ultrasonography for abdominal aortic aneurysm (AAA) on all males 65-75 years of age who have ever smoked. The Monitor identified, to date, only one male between 65-75 years of age who has been screened for AAA[412] nor has the any additional data been provided by IDOC concerning screening for AAA screening in the IDOC. A review of the databases and medical reception screening medical history forms of 42 incarcerated men at six facilities[413] revealed that information on the use of tobacco was not documented for 18 (43%) of the forty-two men. The lack of documentation on whether an age-eligible male smoked or not is a barrier to IDOC's ability to identify the unmet need for AAA screening.

USPSTF currently recommends annual low dose computerized tomography (CT) screening for early detection of lung cancer for individuals over 50 years of age who have 20 pack year history of tobacco smoking.[414] IDOC's January 2021 Administrative Directive, Immunization and Cancer/Preventive Screening Programs which advised screening of individuals 55-80 years of age with 30 pack year history of tobacco use needs to be updated. To date, the Monitor has not identified or been provided information of a single asymptomatic incarcerated person who has been screened for lung cancer. The provider's decision to determine an individual's risk of lung cancer and eligibility for low dose CT lung screening is hampered by the poor documentation of

---

[409] Shawnee CC 6/21-23/2021

[410] Review of 2021-2022 5-10 medical records at six IDOC facilities revealed that digital rectal exams (DRE) with the collection of single stool guaiac continue to be practiced in the IDOC: East Moline CC: 7 DRE's offered, 4 refused, Jacksonville CC: 10 DRE's offered, 10 refused, Pinckneyville CC: 4 offered, 3 refused, Robinson CC: 3 offered, 1 refused, Shawnee: 1 DRE offered, 0 refused, Vandalia CC: 2 DRE's offered, 2 refused.

[411] Administrative Directive IDOC Immunization and Cancer/Preventive Screening draft January 2021

[412] Medical record reviews during previous site visits to Lincoln, Lawrence, Pontiac, and Robinson identified no individuals who were screened for AAA. Medical record reviews from 2021-2022 from Shawnee CC, East Moline CC, Jacksonville CC, and Pinckneyville CC in 2022 revealed eleven men between the age of 65-75, three had documented use of tobacco, the medical records of seven did not document whether the individual had or had not ever smoked tobacco, and one patient had no history of tobacco use. Only one (Pinckneyville CC) of these ten had been screened for AAA and that individual's chart lack any documentation that he had or had not ever smoked tobacco.

[413] East Moline CC, Jacksonville CC, Pinckneyville CC, Robinson CC, Shawnee CC, and Vandalia CC

[414] USPSTF revised lung cancer screening March 9, 2021. IDOC needs to revise its January 2021 administrative Directive which recommended lung cancer screening for men and women aged 55-80 years who smoked tobacco for 30 pack years. This criteria is now 50-80 years of age with 20 pack years of smoking and who have not quit smoking for 15 years or more.

135

the tobacco use and the number of total pack years in the medical history section of the medical record and the problem list. Besides not having documentation in the chart if an individual ever smoked or not in 43% of the medical records reviewed, only three (18%) of the seventeen charts of individuals who reported that they had ever smoked had documentation of how many packs per days that they smoked tobacco and for how many years they had smoked. The amount and duration of tobacco use is a key piece of health information that should be solicited and documented during the intake screening process.

The current practice in the USA is to do liver ultrasonography every six months in patients with a variety of risk factors for the development of hepatocellular carcinoma including hepatitis C with advanced cirrhosis (F3 and F4 fibrosis).[415] The Monitor has identified no systemwide evidence of this screening being performed on high risk incarcerated persons or data being reported in facility QI minutes. Only two of IDOC's thirty correctional facilities provided data in their Chronic Care Rosters indicating that liver ultrasonography screening is being performed on small numbers of patients with hepatitis C; this data is not presented to the facilities' monthly quality improvement minutes.[416]

Lung cancer, colorectal cancer, and hepatocellular carcinoma are the three leading causes of cancer mortality in the IDOC.[417] These three cancers can be diagnosed and treated at an earlier stage with effective screening programs and can even be prevented or cured if detected in an early or precancerous stage.  IDOC needs to more aggressively develop its cancer/preventive screening program. Effective cancer and routine health maintenance screening in the IDOC for at-risk incarcerated persons has the potential to positively impact on avoidable morbidity and mortality.

IDOC has not yet fully completed or implemented policy and procedure on cancer and other disease screening, has not developed systemwide data tracking for cancer and other disease screening, and provided only limited data to the Monitor related to its cancer and disease screening efforts. However, based on the initiation of reporting colorectal cancer screening in CQI reports by one facility, the verification in the medical records at two facilities that FIT testing is being offered to eligible patients, and the limited establishment of a liver ultrasound screening reminder process for patients with advanced liver fibrosis/cirrhosis to ensure that screening is done every six months, a rating of partial compliance is tentatively assessed.

**RECOMMENDATIONS:**
1.  The IDOC should track and report the rates of cancer and Routine Health Maintenance preventive services screenings including colon cancer, lung cancer, hepatocellular cancer, and abdominal aortic aneurysm screenings offered, performed, and refused and report these results to the facility CQI committees.

---

[415] 2018 Practice Guidelines of the American Association for the Study of Hepatocellular Carcinoma.

[416] Dixon CC chronic care roster listed 8 patients (6 with treated hepatitis C and 2 with "cirrhosis") who were to receive semi-annual liver sonography (US) screening for hepatocellular carcinoma; three had liver US done in 2021 with the next US to be done in early 2022. One other unidentified correctional facility's chronic care roster listed one patient with treated hepatitis C who required every 6 month liver US screening. This data was provided to Monitor on 3/28/22

[417] 2017-2021 IDOC mortality spread sheets.

2. The colorectal cancer screening data table initiated in the last quarter of 2021 at Logan CC and reported to its monthly quality improvement committee is a model for use throughout the IDOC but should be modified to note the type screening utilized and the action taken to make a definitive diagnosis on patients with abnormal screening test results.

3. The IDOC should track and report on the percentage of eligible men and women who are current with all nationally recommended cancer and routine health maintenance screening standards.

4. The IDOC should continue to incorporate all the A and B recommendations of the USPSTF into the RHM/Preventive Services program.

5. The IDOC should provide ongoing education to providers on the nationally recommended preventive screening standards.

6. The wording of III.M.1. (c) in the Consent Decree should be modified so that the PSA testing recommendation is in align with the prostate screening recommendations of the USPTF. PSA testing is now recommended to be discussed with men ages 55-69 and colon cancer screening is now recommended for ages 45-75.

7. IDOC must immediately discontinue the outdated and not recommended use of digital rectal exams with the collection of a single stool guaiac test as screening tests for prostate cancer and colorectal cancer in the IDOC.

8. The preventive cancer screening program needs to be included in the Implementation Plan so that IDOC's administrative directive is properly implemented.

9. IDOC should solicit and accurately document in the medical record an individual's history of tobacco use including the number of years smoked and the number of packs smoked per day.

10. IDOC should update its criteria for lung cancer screening to include individuals 50 years of age or older with 20 pack years of tobacco use who have not stopped smoking for 15 years or more. This revision would align IDOC lung cancer screening criteria with United States Preventive Services Task Force's most current recommendations.

**Mammography Screening**

***Addresses items III.M.1.d***
**III.M.1.d.** *All female prisoners age 45 or older will be offered a baseline mammogram screen, then every 24 months thereafter unless more frequent screening is clinically indicated, unless the Department and the Monitor determine that such testing is no longer recommended.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

**Breast and Cervical Cancer Screening**
Normal mammograms are to be repeated every 2 years on women between 50 and 75 years of age; normal PAP smears are to be done every 3-5 years in females between 21 and 65 years of

age based on age and results of HPV cultures.[418] Abnormal mammograms and PAP smears would require more frequent imaging and testing.

As reported in the 2nd Court Report staff interviews and limited chart reviews performed during the February 2020 site visit at the Logan CC female facility revealed that women were being regularly screened for breast and cervical cancer. In the 4th Court Report, medical reception record reviews of ten records provided by IDOC from Logan showed that all ten women were screened with a PAP smear and two of two women who needed mammography were screened.

As previously discussed in the 3rd and 4th Court Reports, the data of mammogram screenings and PAPs performed in 2020 only reported the volume of screening tests performed; they did not indicate whether all eligible women are screened.

The Monitor has not identified any data in the Quality Improvement Committee minutes during 2020 and 2021 that reported on the monitoring of breast and cervical cancer screenings.[419] IDOC did previously communicate to the Monitor the volume of mammograms and PAP smears performed between January 2020 and September 2020.[420] IDOC again provided the Monitor with women's cancer screening data that was performed between October 2020 and June 2021; however this section of the 4th Report had already been completed by the time this data was received and is accordingly now being reported in this 5th Court Report.

From October 2020 through June 2021 one hundred seventy-six mammography screenings and seven hundred one PAP Smears were completed at the two female facilities.[421] This would annualize to a cumulative 235 mammograms and 935 PAP smears being performed in a twelve month period at Decatur CC and Logan CC.[422] The two female institutions housed approximately 243 women[423] who are candidates for mammography screening every 2 years which would suggest that the minimum annual number of mammograms performed should be approximately 122 mammograms. 1,073 women[424] are between the ages of 21 and 65 years and are potential candidates for PAP tests every 3-5 years, this would conservatively estimate that 215-358 cervical cancer screenings would need to be done annually. The annualized volume of mammogram screenings and PAP smears calculated from the October 2020-June 2021 suggests that IDOC is performing a sufficient number of these screenings. However, these are crude estimates that do not reflect the turnover rates in these two facilities, the numbers of new admissions, the refusals, and the volume of abnormal screening tests that require additional studies.

---

[418] United States Preventive Task Force 2/3/22 and IDOC Draft Administrative Directive January 2021
[419] CQI minutes for the Quarters 1 and 2 of 2022 have not yet been provided to the Monitor
[420] January 2020 to September 2021: 134 mammograms and 601 PAP smears were performed, IDOC email to Monitor 1/23/20
[421] 8/4/2021 Email from IDOC with October 2020-June 2021 number of mammogram screenings, PAPs, colposcopies from Decatur CC and Logan CC.
[422] This data was not included in the 4th Court Report due to its arrival after the Preventive Services section was completed.
[423] IDOC Age Range in Custody on 2/24/2022: 243/1,255 (19%) of the IDOC female population are between of 50 and 75 years of age.
[424] IDOC Age Range in Custody on 2/24/2022: 1,073/1255 (86%) of the IDOC female population are between 21 and 65 years of age and potentially eligible for cervical cancer screening.

Components of eighteen medical records of women between the ages of 50 and 63 housed at Decatur CC and Logan CC were provided to the Monitor to audit breast and cervical cancer screening.[425] Seventeen (94%) of these eighteen females had received mammogram screening within the last two years.[426] Two mammograms which were reported as BIRADS 4-5 [427] were appropriately referred for additional testing and management. Fourteen (78%) of the eighteen women had received PAP screening within the last three years. One (6%) refused her scheduled PAP test, and three (17%) had no documentation in the reports provided that cervical cancer screening had been performed or offered. Thirteen (93%) of the performed fourteen PAP tests were negative (normal). One (7%) of the fourteen was reported as ASCUS[428] and an HPV testing recommended; there was no documentation in the medical record provided that HPV testing was done or a repeat PAP test performed.  Two of the eighteen patients whose medical records were provided were also identified as having menorrhagia (heavy menstrual bleeding): both were appropriately managed with additional laboratory testing, uterine ultrasonography, endometrial biopsies, and treatment.

IDOC needs to track these two cancer screening modalities based on the percentage of eligible women who are offered, received, and refused testing within the established timeframes. This data should be reported to the CQI committees and corrective action taken as indicated.  There is evidence that mammograms and PAP tests are being regularly performed at both female institutions. However, appropriate data and tracking to assure that all eligible women are being testing in accord with nationally cancer screening standards needs to be established. This is currently not being done by the IDOC.

**RECOMMENDATIONS:**
1. Monitor and report the offering, provision, and refusal of breast and cervical cancer screening to the Quality Improvement Committees
2. Report Women's health data based on the percentage of eligible incarcerated women who receive breast and cervical cancer screenings within the established national USPSTF guidelines.
3. Report and track the actions initiated to address abnormal mammograms and PAP smears.

# Pharmacy and Medication Administration

*Addresses items II.A;  II.B.1; II.B.6.c; II.B.6.d;*

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs.  Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

---

[425] Illinois.gov, File Transfer Link, Audit Data, Women's Health data 6/2/2022
[426] One female had a mammogram done in September 2019 that was read as "incomplete" with a breast ultrasound recommended.  The medical record reports provided did not show that an ultrasonography was done or whether a repeat mammogram was performed in the ensuing 33 months
[427] BIRADS 4 "Suspicious for malignancy", BIRAD 5 "High probability of being malignant"
[428] Atypical squamous cells on undetermined significance (ASC-US)

**II.B.1.** *IDOC shall provide access to an appropriate level of primary, secondary, and tertiary care.*

**II.B.6.c.** *IDOC agrees to implement changes in the following areas: Medication administration records-both for directly administered medications and KOP.*

**II.B.6.d.** *IDOC agrees to implement changes in the following areas: Medication refusals;*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

The Monitor requested four items specifically to evaluate pharmacy services. We received a partial response to one item. This was the pharmacy inspection reports and medication administration audits completed by the consulting pharmacist at each facility. We received these reports for 16 of 30 facilities. No information was provided for the other three requests. These requests were:

- A list of all facilities and whether they pre-pour or not.
- Whether medication administration is documented on the medication administration record contemporaneously with administration or issuance.
- Minutes of any pharmacy and therapeutics committee meetings with any discussion documented of formulary, medication error analysis, and utilization patterns. [429]

The Monitor's evaluation of compliance with the items in the Consent Decree listed above consisted of the review of CQI minutes, the pharmacy inspection reports, other documents provided by IDOC, and review of the health record of patients who died that were sent by IDOC to the Monitor during this report period.

The Defendant's most recent version of the Implementation Plan contains four tasks related to management and documentation of medication treatment.[430] These are to:

- Draft policies on the documentation of refused medication with patient counseling and informed decision making, reporting medication errors, and the documentation of medication administration.
- Establish a process for reporting of medication errors.

The Monitor's detailed comments on this version of the plan were provided to Defendants on 5/10/2022. The tasks related to medication management in 4/20/2022 version of the implementation plan simply restate the Consent Decree and are not sufficient to cause the change in practices with regard to medication administration or medication refusal that are well documented as necessary to *provide access to an appropriate level of primary, secondary, and tertiary care.*

The Defendant's previous version (dated 12/30/2021) of an implementation plan[431] included two process improvement projects, one on medication management that listed seven targets and another on chronic disease management that included implementing recommendations for

---

[429] Document Request for Monitor's Lippert Reports Updated 1/19/22, items 92-95.

[430] Defendant's Implementation Plan dated 4/20/2022 tasks 7, 8, 18, and 83.

[431] Defendants Implementation Plan 12.30.21, task 53. Please note that this task is intended to respond to III.M.1 a -c of the Consent Decree. This should be changed to II.B.1 and II.B.6.c. III.M.1.a, b, c refer to preventive care measures.

enhanced medication administration. It also had a more robust plan for implementation of a patient safety program which includes reducing medication errors. The 12/30/21 version of the plan, though needing more work, was much more responsive to the recommendations made by the Monitor regarding medication services than the revised version, written by the consultant rather than OHS, dated 4/20/2022.[432]

SIU has been engaged to evaluate medication management beginning last June when several members of the faculty from SIU toured the Shawnee Correctional Center to observe medication management and administration.[433] The Monitor was informed by IDOC that SIU has also been to Menard Correctional Center for this same purpose.[434] In January 2022 the Monitor was asked to comment on the draft of a survey prepared by SIU to be distributed to all IDOC facilities.[435] The survey is intended to identify areas of the medication process that could be addressed more immediately and to assist in formulating a plan to improve medication administration systemwide. The Monitor provided substantive feedback on the survey instrument but was not provided a copy of the final survey. The Monitor does not know whether it has been distributed or if the results have been analyzed.[436]

In August 2021 the Monitor received two draft policies, one titled Pharmaceutical Services and Medical Instruments [437] and the other Medication Services.[438] General comments on both drafts were made in the 4th report and the Monitor has since provided more detailed feedback to IDOC on the drafts themselves. Both drafts would benefit from the review and expert advice of an experienced pharmacist who is familiar with state and federal law. Neither of the drafts standardize operations and allow facility Chief Administrative Officers to determine operational details for which they do not have the qualifications or responsibility, such as management of controlled substances.

The Monitor was recently provided a job description from the SIU Office of Correctional Medicine for a Director of Pharmacy Standards & Operations who will serve as the subject matter expert in relation to compliance regulations and policies, procedures, protocols, etc., among other duties. The position has been accepted by a pharmacist who has experience in the correctional health care setting.[439] It appears that IDOCs engagement with SIU will bring pharmacy expertise in establishing safe, efficient, and effective pharmacy services at IDOC.

## II. B. 6.c. Medication Administration

We noted in the 3rd Report that two thirds of all facilities were pre-pouring.[440] The IDOC did not provide this information to the Monitor for the 4th and 5th Reports. The Monitor has no reason to believe the prevalence of this practice is any less. There has yet been no directive or other

---

[432] Health Care Monitor 3rd Report Lippert v Jeffreys (February 15, 2021) pages 120 -121, Health Care Monitor 4th Report Lippert v Jeffreys (September 16, 2021) pages 157 -158.
[433] Shawnee Correctional Center was visited by the Monitor June 21 -23, 2021.
[434] Email from Kelly Presley dated March 17, 2022.
[435] Email from Kelly Presley dated January 6, 2022.
[436] As of 5/26/22 at the time this was written.
[437] 06.03.D.01 which would replace 04.03.110 Control of Medications and Medical Instruments.
[438] 06.03.D.02.
[439] Email from Kelly Presley dated 5/19/22 with attachment.
[440] Health Care Monitor 3rd Report Lippert v Jeffreys (February 15, 2021) pages 121 -122.

procedural instruction with regard to timely documentation of medication administered or issued so the practice of documenting patient receipt of medication continues to be problematic.

The draft administrative directive for Medication Services prescribes minimal change in practice and no standardization or operational guidance. Notably the draft allows for pre-pouring of medication when medications are to be delivered to the cell front. It also allows medication to be documented up to an hour after administration rather than at the time of administration. This policy basically continues business as usual rather than the changes as called for by II.6.c. The administrative directive needs to provide detailed operational guidance standardizing how medication is prescribed, how and by when treatment is initiated, how medication is to be administered safely and timely, including delineation of support to be provided by the facility, how and by when documentation of medication administration takes place.[441]

Computerized physician order entry and the electronic interface with the pharmacy vendor needs to be an early area of attention with the transition to an electronic health record. Order processing is one of the most frequent type of medication errors reported. See the following table that tabulates errors by type reported over a six month period.[442]  Order processing errors include transcription errors, not processing the order, not discontinuing an old order, and discontinuing an order in error. Minimizing the number of times the order is handled will reduce these human errors. Until documentation of medication administration can be automated the pharmacy needs to be capable of producing a computer generated label directly from the approved order which is placed on the medication administration record until the new month's MAR arrives. This prevents errors from handwritten transcription of orders. These steps would result in a more timely and accurate method of processing medication orders.

---

[441] Health Care Monitor 3rd Report Lippert v Jeffreys (February 15, 2021) pages 121-122.
[442] Medication errors that were reported in facility CQI minutes or on the Pharmacy Inspection and Medication Record Audit beginning April 2021 through September 2021.

---

**Medication Errors Reported April through September 2021**

1. **Order processing**
       Transcription error (21 reports)
       Order not processed (7 reports)
       Order discontinued in error (3 reports)
       Old order not discontinued (2 reports)
2. **Six Rights**
       Wrong patient (21 reports)
       Wrong dose (18 reports)
       Wrong medication (8 reports)
       Wrong time (6 reports)
3. **Received medication without order or after order expired** (30 reports)
4. **Mental health medications**
       Missed doses and MH not notified (15 reports)
       Bridge order not obtained (4 reports)
       Bridge order expired (3 reports)
5. **Medication administration record**
       Medication not documented as given (45 reports)
       Wrong MAR (2 reports)
       Documented as given but not on the medication cart (2 reports)

---

Most of the other error types are associated with pre-pouring and not using the MAR to check the "six rights" [443] at the time medication is administered or in the case of "Keep on Person" (KOP) medication when it is issued. The Defendants implementation plan from December 2021 addressed the use of two part identification with the MAR, documentation at the time medication is administered and administering directly from pharmacy dispensed, patient specific unit dose containers consistent with recommendations of the Monitor.[444] The implementation plan submitted in April 2022 has none of these areas targeted for improvement.

Chart review completed for this report period found many of the same types of errors as reported in the CQI minutes. As an example, one patient had an order for HIV medication which expired without being noticed. The error was not discovered for a period of ten days and a verbal order was sought.[445] Another patient failed to receive anticonvulsant medications after transfer to another facility and suffered a subsequent seizure.[446] Documentation on the MAR was problematic in several charts. [447] The draft administrative directive for Medication Services provides no direction in how "as needed" medication is to be administered. We found charts where it appeared that "as needed" medication was administered to the patient on a fixed schedule.[448] Instead of a fixed

---

[443] The six rights are the right patient, right dose, right route, right time, right medication, and right documentation.
[444] Defendants Implementation Plan 12.30.21; Health Care Monitor 2nd Report Lippert v Jeffreys (July 6, 2020) page 122.
[445] Mortality review patient 15. Documentation on the MAR indicates the medication was administered from 6/18 through 6/28 without an order in place. See also mortality review patient 14.
[446] Mortality review patient 17
[447] Mortality review patients 11, 14, 15, 25
[448] Mortality review patients 6, 11, 19, 25

schedule nurses should assess patients for symptoms at the time the medication effects are expected to dissipate and determine if another dose of medication is needed.

There were a number of charts reviewed of patients prescribed medications for which they experienced adverse effects or were at risk of an adverse effect and were not monitored. [449] These include as an example, a 76 year old man [450] who was prescribed three drugs which put him at risk of bleeding. He was also on two drugs of the same class and which cause hypotension and risk of falling. Despite repeated recommendations from offsite specialists the patient was continued on these medications. He fell multiple times and was never placed on fall precautions. The last of these falls resulted in the fracture of three ribs.

The CQI minutes and pharmacy inspection reports also denote issues with inventory control. Five facilities of 16 providing information about pharmacy inspections were found noncompliant with the Administrative Directive on Control of Medications and Instruments during this report period.[451] Findings were that inventory was not kept or documented, the Institutional Directive had not been updated, and having excess stock on hand. Other findings were medication stored at the wrong temperature, refrigerator temperatures not taken, count discrepancies, controlled substances unlocked, and missing emergency medications. Finally, outdated medication on hand or in use and the failure to label multidose vials were frequent citations. It is good that these problems are identified, however there is a lack of inquiry into the root cause about why the problems are occurring and development of corrective action that addresses root causes. If corrective action is discussed at all, it most often is training and admonishment to staff with acknowledgement in writing of expectations. Some sites document repeated findings on multiple pharmacy inspections which indicates inadequate or nonexistent problem solving and performance improvement. The CQI program needs to emphasize problem analysis and performance improvement.

### II.B.6.d.  Medication Refusals

The draft administrative directive on Medication Service attempts to address medication refusals and non-adherence. The Monitor has responded to the draft with specific comments and suggested enhancements. Non-adherence has not been defined, and the group of drugs selected for weekly monitoring was unnecessarily broad.  The expectations of the provider in addressing non-adherence did not include an effort to understand the patient's reason for non-adherence and efforts to change the medication regime to make adherence more likely.  The Monitor recommends that non-adherence be defined as after three consecutive refused doses or more than four non-consecutive doses in a seven-day period.[452] The Defendants implementation plan from December included one task to comply with II.B.6.d. which was to build a mechanism to notify providers of non-adherence within the electronic health record.[453] The more recent implementation plan also has a single task to write a policy outlining the requirement for documenting refused medication and for documenting that the patient has received counseling about the potential outcomes of non-

---

[449] Mortality review patients 1, 2, 3, 5, 10, 16, 17, 20, 24

[450] Mortality review patient 10

[451] See CQI minutes for Danville, East Moline, Robinson, and Taylorville. Shawnee FY22 Facility External Audit Report October 25-28, 2021.

[452] Health Care Monitor 3rd Report Lippert v Jeffreys (February 15, 2021) page 127, Health Care Monitor 4th Report Lippert v Jeffreys (September 16, 2021) page 163.

[453] Defendant's Implementation Plan, dated 12.30.21, task 28

compliance to medications.[454] This task focuses solely on documentation and does not address the responsibility of providers to monitor and take steps to increase adherence with prescribed treatment. There is as yet, no plan to communicate with anyone what their responsibilities are for monitoring and addressing nonadherence.

There were no internal or external studies of adherence with somatic medication or how refusals are addressed in the CQI minutes that were reviewed.[455] From chart review it is apparent that medication records are not reviewed by providers or adherence summarized and providers do not address adherence during important patient-provider encounters such as chronic clinic or infirmary rounds.[456] One of the charts reviewed was a 56 year old man with end stage liver disease who did not receive 60% of the ordered doses of lactulose for encephalopathy which resulted in repeat hospitalizations. No attempt was made to discover and correct reasons for his nonadherence.[457]

At a minimum, the provider should have a copy of the most recent MAR to review at the time of any provider appointment. In the absence of this, the provider should have a summary of medication adherence provided in advance of the appointment. This expectation is not included in the recent draft administrative directive. It also is not included in either of the two most recent versions of the implementation plan. Making this happen now would be a simple step to better inform providers and is an example of low hanging fruit in improving patient care.

Additional Concerns about Medication Treatment

The Monitor has voiced concerns since the 3rd report about the lack of meaningful participation by the pharmacy in identifying problems with medications being prescribed and in consulting with prescribers to achieve more effective treatment.[458] In reviewing records for the 5th Report these concerns have been heightened. In the last report we described current practices for review by the dispensing pharmacist and that it was limited by lack of information about the indication or rationale for the drug. Only a generic computer application is used to identify interactions and contraindications. The chart review identified many patients who were on drugs that were of the same class or presented a risk of adverse effects. Yet there was no evidence that these were identified as so by the dispensing pharmacy.[459] Professional medical education also needs to be provided for prescribing providers in geriatric medicine, patient safety in prescribing practices, and pain management. The December implementation plan had an expansion of clinical pharmacy among the list of objectives the process improvement project was to address however no specifics about how it would be accomplished were included.[460] The more recent version of the implementation plan does not include a process improvement project for medication management

---

[454] Defendants Implementation Plan dated 4/20/2022, task 8.

[455] First quarter 2021 CQI minutes submitted by facilities. The CQI minutes from Vandalia CC report a study of the follow up by mental health after consecutive medication refusals in January 2021. No similar study of refusals of other critical medications (for example medications to treat HIV disease) was reported.

[456] Mortality review patients 13, 17, 24

[457] Mortality review patient 13. Many of the missed doses were scheduled at 5 am yet he was in the infirmary. Why was the time of administration not changed and the medication offered later in the morning?

[458] Health Care Monitor 3rd Report Lippert v Jeffreys (February 15, 2021) page 125, Health Care Monitor 4th Report Lippert v Jeffreys (September 16, 2021) page 162.

[459] Mortality review patients 1, 2, 3, 5, 10, 16, 24

[460] Defendant's Implementation Plan dated 12.30.21, task 53 (6 & 7).

and administration nor is there a task to expand clinical pharmacy services.[461] No information has been provided about the function or intent of the program the pharmacist hired by SIU will be responsible for other than the position description. It would seem that with the investment so far in time and personnel from SIU on medication administration that this work would be reflected in the Defendant's Implementation plan and at this point is not.

The 4th report also raised the problem of polypharmacy and reported the vendor's response that there was no process to identify and review patients proactively who are on multiple prescriptions for appropriateness and to provide recommendations to reduce medication burden.[462] In charts reviewed for this report several elderly patients were identified whose care would have benefited from the attention of a consulting pharmacist. One of these was a 79 year old with multiple chronic problems including hypertension, dementia, post stroke with right sided paralysis. This elderly patient was on 12 medications. Based upon the number alone, this is polypharmacy. Two of these medications were tramadol and Ativan which potentiate each other, and both increase fall risk in the elderly. An indication for neither of these drugs was present in the medical record and it was unclear why these medications were being used.[463] Another patient was 89 years old and prescribed 14 medications, mostly KOP, who fell and broke his hip. He was also prescribed warfarin and ibuprofen and had a history of a life-threatening gastrointestinal bleed. The other was a 76 year old prescribed 21 medications, three of which put the patient at risk of bleeding.

There also were an alarming number of patients who were prescribed clinically inappropriate medications.[464] These included unconventional instructions for dosing lactulose, use of Bentyl to treat diarrhea, use of steroids, and long term use of narcotic medications.[465] Requiring that the indication for the medication be noted on the order would be another piece of "low hanging fruit" and would better inform the dispensing pharmacist to identify inappropriate medication orders. Prescriptions were written with no apparent coinciding condition in a number of charts reviewed.[466]

Another practice prevalent among charts reviewed is ordering medications without examining the patient, which is a patient safety risk. The extensive use of covering physicians adds to this risk because they are not familiar with the patient's condition. There were a number of charts reviewed where not examining the patient before prescribing medication was problematic.[467]

Pain management is another area that would benefit from enhanced pharmacy consultation. Chart review found examples of patients likely over medicated for pain, as well as patients whose pain was not well managed.[468] One example was a 49 year old who was diagnosed two days earlier with small lung cancer widely diffused with metastases to the vertebrae and brain and likely

---

[461] Defendants Implementation Plan dated 4/20/2022.
[462] Health Care Monitor 4th Report Lippert v Jeffreys (September 16, 2021) page 162.
[463] Mortality review patient 2
[464] Mortality review patients 4, 5, 10, 11, 13, 17, 18, 20
[465] The use of Tramadol especially among elderly patients as well as the use of prednisone has been noted since the Monitor's 3rd report, see page 125. See also Health Care Monitor 4th Report Lippert v Jeffreys (September 16, 2021) page 162.
[466] Mortality review patients 2, 14, 15, 20
[467] Mortality review patients 1, 2, 3, 4, 11, 12, 15, 18, 20
[468] Mortality review patients 4, 5, 11, 12, 14, 18, 24

metastasis to the liver. He was in "unbearable pain" but only received two thirds of the possible doses of medication prescribed for pain. The provider did change orders in reaction to reports of the patient's condition but there never was a plan that anticipated the patient's pain and the patient never achieved relief from pain.[469]

Patient well-being has also been compromised by delays and failures to supply medications timely. The facility CQI reports reviewed for this report period identify one incident in which a delay by the pharmacy caused a patient to go without two doses of Cardizem, a drug used in the treatment of hypertension and coronary disease.[470] Another facility reported repeated incidents of not receiving medication timely from the pharmacy.[471] A third facility reported discharge medications arriving after the patient had been released.[472] Charts reviewed showed some of the same problems with availability of medication from the pharmacy.[473] One of these was a 46 year old being treated with palliative chemotherapy. When the patient's white count dropped, the pharmacy did not supply the medication prescribed by the oncologist for an extended period. The patient developed profound neutropenia and at the next oncology visit the patient's therapy was changed to a third line chemotherapy.[474] Finally pharmacy inspection reports and CQI minutes document failures to supply EpiPens, nitroglycerin, and sodium bicarbonate for emergency response bags.[475] Inventory failures like these are evidence of systemic problems throughout the pharmacy and medication management system.

The recommendations below have been revised to reflect steps taken by IDOC to acknowledge and initiate a process to address problems with pharmacy and medication services identified in prior reports. However, no tangible outcome has yet been achieved in the direction of compliance with the items in the Consent Decree related to medication services so the compliance designation has not been changed.

**RECOMMENDATIONS:**

1. More tasks need to be added to the implementation plan to describe the changes IDOC will make to come into compliance with the Consent Decree. The April 2022 version of the plan merely restates the language of the Consent Decree and is unacceptable. There are several steps that have been taken to initiate change but none of these are reflected in the plan.
2. Facility operations need to be engaged in the problem solving to ensure that medication is administered safely and within therapeutic timeframes. This includes responsibilities for custody assistance and maintenance of the equipment and the physical plant.
3. Revise the two draft administrative directives on Pharmaceutical Services and Medical Services incorporating the Monitor's comments. These comments include obtaining the

---

[469] Mortality review patient 11.
[470] CQI minutes from Logan (May 2021).
[471] CQI minutes from East Moline (September 2021). At least one delay was attributed to the pharmacy not having enough delivery drivers.
[472] CQI minutes from Taylorville (April 2021).
[473] Mortality review patients 4,14.
[474] The drug prescribed by the oncologist was Granix. The patient went eight days before receiving it.
[475] CQI minutes and pharmacy inspection reports Decatur (January 2022), Danville (January 2022), NRC (June 2021).

input and assistance of a pharmacist familiar with Illinois law and federal regulations in policy development.

> The Monitor acknowledges that the Office of Correctional Medicine at SIU has hired Director of Pharmacy Standards & Operations who will serve as the subject matter expert in relation to compliance regulations and policies, procedures, protocols, etc., among other duties. The Monitor agrees and applauds this decision. However, when this section of the report was written, the person hired to fill the position had not started. Other than the position description the Monitor has been provided no further information about where the position fits within the organizational structure of SIU and any specific responsibilities for improvements to medication management and administration in the IDOC.

It is further recommended that an outline be developed of the topics related to pharmaceutical management that need to be addressed in policy and procedure. Most state correctional systems have more than two directives on this subject. Examples of topics to consider for inclusion are provider orders, monitoring and supporting adherence, inventory control etc. Then establish a timeframe and responsibilities for development, review and finalization of the pharmacy policies and procedures and carry it out.

4. Develop a workload driven staffing standard to account for the nursing staff necessary to carry out orders for medication treatment.

5. Further revise the draft administrative directive pertaining to medication non-adherence and incorporate feedback provided by the Monitor. In particular, non-adherence must be defined. The Monitor has suggested that it be defined as three consecutive doses or more than four non-consecutive doses in a seven-day period of critical medications only.[476] The Monitor also recommended narrowing the group of medications that must be monitored weekly to a smaller group of "critical" medications.[477] The Monitor has suggested that more detailed guidance be included in the administrative directive about expectations for the provider to discuss adherence with the patient, collect additional information as necessary (labs, meet with the dietician or nurse etc.), document the discussion in the health record as well as the consideration of change (or not).

6. Eliminate expiration of non-formulary requests once approved. Investigate other reasons for medication discontinuity and develop solutions to eliminate these.

7. Implement CPOE (computerized physician order entry) and automate the MAR early in the implementation of the electronic health record. Develop automated reports of patients with medication orders which expire in the next seven days and notification to providers of non-adherence.

8. Build on existing experience with clinical pharmacy personnel in the HIV clinics to expand access to clinical pharmacy for other chronic conditions, including chronic pain and geriatric medicine.

---

[476] The Monitor believes this is consistent with the metric used by IDOC currently to monitor adherence with mental health medications. Using one metric for both mental health and somatic medication is advised especially if notification will be automated.

[477] Critical medications are defined as those used to treat HIV, anticoagulation disorders, infection, tuberculosis (active disease and infection). The other medications suggested for monitoring in the draft administrative directive should be monitored monthly, not weekly. Providers should also be able to order closer monitoring for individual patients on medications to ensure that when individual circumstances warrant this it can be accomplished.

9. Document development and implementation of corrective action plans to address results of the pharmacy inspection and MAR audit. Trend medication errors over time and conduct root cause analysis of high frequency, high risk medication errors.  Use these methods to identify causes of medication errors. Provide training on problem solution and performance improvement processes to include structural, equipment and procedural changes to correct problems rather than reliance on reminders at staff meetings and verbal counseling.

10. Establish an observational tool to be used by nursing supervisors to monitor compliance with medication administration procedures and include this study on the CQI calendar.

# Discharge Planning

***Addresses Items II.B.5; II.B.6.s; II.B.6.t;***

**II.B.5.**  *Continuity of care and medication from the community and back to the community is also important in ensuring adequate health care.*

**II.B.6.s.**  *IDOC agrees to implement changes in the following areas: Summarizing essential health information for patient and anticipated community providers; and*

**II.B.6.t.**  *IDOC agrees to implement changes in the following areas: Upon release, providing bridge medications for two weeks along with a prescription for two more weeks and the option for one refill, if medically appropriate.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

The Monitor requested the following from IDOC to evaluate compliance with the Consent Decree regarding discharge planning:

- Any tool developed by defendants to self-monitor performance discharge planning,
- Any CQI or performance audits with results of study, analysis, and corrective action for discharge planning,
- Until IDOC develops performance audits on these service components, send Discharge to Community documents on 5 individuals from 6 facilities selected by the Monitor.

The Monitor also requested IDOC develop a report listing individuals discharged from IDOC with the date they met with the IDOC discharge planner; their problem list including dialysis; the date of discharge; the date of their scheduled civilian appointment; whether they received their Health Status Summary Report; whether they received discharge medications and whether they received a prescription with refills, a copy of relevant lab and diagnostic reports, copy of relevant hospital and ED summaries and specialty consultations, and the database with immunizations and RHM screenings. IDOC reported that it does not currently maintain this information. They were asked to send whatever they track related to discharges. [478]

---

[478] Monitor's document request dated 1/19/2022, items 68, 69 and 96.

In March 2022 the Monitor again requested records for review, specifically five discharge documents of individuals in chronic care clinics from five to six sites from the month of February 2022. Discharge documents were defined as including pre-discharge planning notes, discharge summary, receipt for medication, prescription for refill of medication, any documents accompanying the discharge summary, progress notes by physician or other health care staff related to the discharge.[479]

IDOC did not provide any of the information requested by the monitor before this part of the report was written. IDOC has provided no information at any time since monitoring began to support a claim of compliance with any of the three items from the Consent Decree listed above.

Policy and practices of the IDOC with regard to discharge planning for the purposes of continuity of medical upon return to the community is unchanged since the 3rd report by the Monitor.[480]  To summarize from previous reports, the IDOC has yet to finalize policy and procedure for discharge planning. There is wide variation among facilities in the actual practices of medication continuity, the discharge medical summaries are incomplete or inaccurate, little to no information is provided about tuberculosis screening, vaccination status or risk- or age-based health screenings, and the status and control of chronic disease and information from the most recent chronic disease clinic was not documented as included in the discharge information. There is little to no evidence of provider involvement (physician, nurse practitioner, or physician's assistant) in discharge planning or clinical review of need for medical referral. HIV testing is offered before release.

The Implementation Plan submitted by Defendants on 12/30/2022 includes two tasks.[481] One task was to ensure that all traditional releases receive a medical release summary. This is accomplished by developing a list of information to be provided at the time of release and describes some of these items. The other task is to ensure any appropriate medications are provided at discharge and then repeats the requirements of II. B. 6.t. No detail is provided about how either task will be completed, and implementation will take place. The subsequent version of the Defendants Implementation Plan submitted 4/20/2022 simply states that three policies will be developed and recites II.B.5., II.B.6.s; II.B.6.t.[482]  No further tasks describe how the policies will be implemented, forms developed or revised, needs for equipment, training or other resources evaluated and secured, or progress with implementation monitored.

One of the records the Monitor received from IDOC was for a 50 year old man with extensive metastatic lung cancer including metastases to the bone who received a medical release in July 2021 and returned to his or his parents' home to die a month later.[483] The patient had declined chemotherapy and radiation therapy while in prison; intending to obtain this care when he was released to the community.  On 7/21/21 a discharge medical summary was completed by a nurse which is crowded and messy with information.

[479] Monitor's request dated 3/2/2022.
[480] Health Care Monitor 3nd Report Lippert v Jeffreys (February 15, 2021) pages 127-131; Health Care Monitor 4th Report, September 16, 2021, page 164-166.
[481] Defendants Implementation Plan submitted 12/30/2021, tasks 30 and 31.
[482] Defendants Implementation Plan submitted 4/20/2022, tasks 4, 22, and 23.
[483] Mortality review patient # 11.

There is no evidence that a physician reviewed his needs, established, or contributed to a discharge plan. The patient was released with 12 medications, in quantities sufficient to last two days to sixty days. These medications included 336 tablets of hydrocodone, an opioid pain reliever and 120 tablets of gabapentin, for relief of pain. In contrast the patient received only eight tablets or two days of medication used to control nausea and vomiting. [484] This is because the drug expired two days after his release, so the patient only received what was left on the current order. There was no attempt to discuss the need for a new order with the physician so that the patient could have more of this medication available upon his return to the community. If the patient was going to follow up in the community it would have been more appropriate to have communicated with that provider and make available enough medication to get through to a scheduled appointment.

There also was no inquiry or documentation of assistance establishing his eligibility for medical coverage or a planned follow up appointment for chemotherapy or radiation. There is no documentation of what records were sent with the patient to give to community providers. The discharge summary notes an abnormal lab, but it does not appear that any actual lab reports were provided. It is unclear what the patient understood his needs for follow up care were. This is a patient for whom there should be documentation of a more comprehensive discharge plan and if he refused, evidence of a signed informed refusal. Rather than an example of continuity of care and medication back to the community this patient documentation supports a conclusion that he was "dumped" on the community. There was significant likelihood that he experienced discontinuity in his final palliative care before dying at home on 8/22/21.

The Monitor recommended in the 3rd report that a pre-release planning form used at Lawrence CC be adopted, with some additions and revisions, at all facilities because it documents physician and psychiatry review of needs for continuity of care upon release. [485] This form was not used at the East Moline Correctional Center, where this patient resided and in the absence of any information provided by the IDOC, no reason to believe that it has been adopted elsewhere.

Actual practices in discharge planning by the IDOC is not consistent with the language of the Consent Decree and there is no clinical oversight for continuity of care at discharge. The Monitor's recommendations are the same as those in the 3rd and 4th Reports.

**RECOMMENDATIONS:**

1. Initiate a review to determine why the practices for supplying medication and prescriptions vary from the Consent Decree. Pertinent questions to ask include who determines what medications are provided at discharge, how are discharge prescriptions obtained, who is involved in preparing medications for discharge and how do they go about this task. There needs to be better evidence that the clinician's responsible for the person's medical and mental health care determine what medications the patient receives upon release, and they provide a prescription for an additional two weeks and determine if a two-week refill is medically appropriate.

---

[484] The medication was ondansetron (Zofran).
[485] Health Care Monitor 3[nd] Report Lippert v Jeffreys (February 15, 2021) page 130.

2. Implement use of the pre-discharge planning worksheet that was used at Lawrence CC and incorporate it into the policy and procedure. If planning for continuity of care will be necessary, use of this worksheet should initiate a referral to the responsible medical and mental health clinician to review the patient chart and see the person as necessary to make determinations about medical and referrals to the community.

3. All releases should have a Discharge Medical Summary completed no more than a day or two before release. The Discharge Medical Summary should provide a thorough, accurate, and legible summary of the person's current condition and need for ongoing care.

4. Finish the policy and procedure for discharge planning. Incorporate what was learned from completing the first recommendation and use of the discharge planning worksheet.

5. Enhance continuity of care into the community for discharged individuals by providing copies of pertinent diagnostic tests, recent chronic care progress notes, vaccinations, and routine health maintenance screenings in the discharge packet. When these are included, it should be so noted on the Discharge Medical Summary.

6. A copy of the actual prescription with refills should be placed or scanned into the medical record to verify the information on the Medication Receipt at Discharge form.

# Infection Control

**Addresses items II.A; III.J.1; III.J.2**

**II.A.** *Defendants shall implement sufficient measures, consistent with the needs of Class Members, to provide adequate medical and dental care to those incarcerated in the Illinois Department of Corrections with serious medical or dental needs. Defendants shall ensure the availability of necessary services, supports and other resources to meet those needs.*

**II.B.3.** *IDOC must also provide enough trained clinical staff, adequate facilities, and oversight by qualified professionals, as well as sufficient administrative staff.*

**III.J.1.** *IDOC shall create and staff a statewide position of Communicable and Infectious Diseases Coordinator. This position shall be filled within fifteen (15) months of the Preliminary Approval of this Decree [June 2020].*

**III.J.2**. *Facility staff shall monitor the negative air pressure in occupied respiratory isolation rooms which shall be documented each day they are occupied by prisoners needing negative pressure. If unoccupied, they shall be monitored once each week. Facility staff shall report such data to the Communicable and Infectious Diseases Coordinator on a monthly basis.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

IDOC has not committed to develop a comprehensive systemwide infection control program. During a conference call with IDOC and the IDOC's consultant, the Monitor's team asked why there was no tasks to develop an infection control program. The consultant responded that she was given directions to only include in the Implementation Plan items that were specifically mentioned in the Consent Decree. Because an infection control program was not mentioned in the Consent Decree, she did not include it in the Implementation Plan. Provision II.A. of the Consent Decree requires IDOC to provide necessary services, supports and resources to provide adequate medical care. An infection control is an essential component of any correctional

152

medical program[486] but IDOC fails to provide this service. The Monitor's 3rd and 4th reports give essential components of an infection control program.

The 12/30/21 Implementation Plan had the following tasks associated with an infection control program.

1. Task 7 to provide ongoing training in infection control
2. Task 29 to develop a system for reporting communicable disease infection surveillance reporting in the new electronic record.
3. Task 55 to replace Mantoux skin testing with Interferon-Gamma Release Assays (IGRA) testing.
4. Task 26 to develop a mechanism to track immunizations until an electronic record is developed.
5. Task 27 to track immunization rates, develop or implement an electronic immunization tracking system similar to I-CARE, complete an immunization policy and procedure
6. Task 57 to increase HCV treatment
7. Task 58 to increase HCV treatment to those with low fibrosis levels

The 4/20/22 Implementation Plan eliminated all of the above tasks. Only five tasks are in the 4/20/22 Implementation Plan related to infection control. All are tasks that merely rephrase the Consent Decree. None of the tasks involves establishing a comprehensive infection control program. These tasks are listed below.

1. Task 57 to hire a coordinator to oversee the Infection Control Program.
2. Task 34 write a policy for monitoring negative pressure rooms daily when occupied and weekly when not occupied and report monitoring in a log.
3. Task 80 to monitor the negative pressure logs monthly and if the room not functioning report it.
4. Task 52 to write guidelines for vaccinations to include vaccination for influenza.
5. Task 38 to write a policy on routine disinfection of dental examination areas.

The gaps in care and delays in implementing a functional infection control plan to address the initial waves of the COVID-19 pandemic have been documented in previous court reports.[487] As noted in the Monitor's 4th report, 4-6 weeks prior to each of the surges of COVID-19 infections in the inmate population there has been an increased number of active cases in the IDOC and vendor employees. The spread throughout the inmate population has been considerable. As of 5/24/22, 24,666 inmates and 10,468 staff have been infected with COVID-19 which appears to be approximately a 25-50% inmate infection rate, which is high[488]. Over the past two years of this pandemic, IDOC has had several achievements including:

- A very successful COVID-19 vaccination program for inmates and staff,
- A universal masking program,

---

[486] The National Commission on Correctional Health Care (NCCHC) standard P-B-02 Infectious Disease Prevention and Control is an essential standard. It states, "There is a comprehensive institutional program that includes surveillance, prevention, and control of communicable disease".

[487] Health Care Monitor 2nd, 3rd, and 4th Reports, Infection Control Sections

[488] The rate of infection is difficult to calculate due to turnover of the population. The Monitor estimates that the average length of stay of 1 year.

- A system-wide isolation and quarantine procedure,
- IDOC was awarded a $7 million grant from the Department of Justice/ Centers for Disease Control to enhance pandemic staffing, plan for response to future pandemics, and strengthen IDOC's infection control efforts,
- The Chief of the Office of Health Services has been appointed to a CDC advisory group to identify best practices in the management of the COVID-19 and future pandemics in correctional settings,
- Ongoing surveillance testing and public web-based test result reporting for both staff and inmates created transparent reporting of IDOC infections, and
- Ongoing surveillance testing and public web-based test result reporting for both staff and inmates.  Almost 1.2 million COVID tests have been administered as of 5/24/22

Several State of Illinois achievements included:
- Mandated IDOC staff vaccination,
- Collaboration of Illinois National Guard and IEMA on augmenting staff and assistance with vaccination,
- Governor executive order to close IDOC to transfers,
- Governor executive order to give IDOC ability to release certain inmates,

From the beginning of the pandemic in March, 2020 until the submission the Monitor's 4th Report on September 16, 2021, there were 92 COVID-19-related mortalities.[489]    The successful vaccination program very likely resulted in lower hospitalization and mortality rates in the incarcerated population during the latter part of the pandemic. Despite the 13,145 positive COVID-19 cases in the inmate population and over 5,000 cases in employees since the middle of September 2021, there have been only two, possibly three, additional COVID-19 deaths in the IDOC population.[490]

The inmate population achieved a nearly 70% vaccination rate by April 2021 while the staff acceptance of COVID-19 vaccines was notably lower (36% by April 2021, 44% by July 2021, 46% by October 2021, 65% by December 2021.) It was not until February 2022 that 75% of both the incarcerated population and the staff had been vaccinated. The Monitor strongly supported Governor Pritzker's executive order[491] which mandates state employees in congregate settings, including in IDOC, to receive a first dose of vaccination by 9/5/21 and be fully vaccinated within 30 days of their first dose.  This employee vaccination mandate was a potent incentive that contributed to the increase in the number of employees receiving COVID-19 vaccination and thus diminished the entrance of COVID-19 from the community into IDOC correctional centers. It is clear that employees were primary vectors for entry and exposure of the incarcerated population to different variants of COVID-19.

From mid-March 2022 through the 3rd week of April 2022 during the current subvariant COVID-19 surge, monitoring of the weekly surveillance test results of staff and inmates has shown that there are consistently 10-11 correctional centers with employee positive cases and

---

[489] IDOC Adult Institution Inmate Deaths, Calendar Years 2020, 2021
[490] OHS Communication to Monitor, OHS-Monitor Conference Call 3/17/22
[491] COVID-19 Executive Order No.87

only 2-5 centers with inmates found to have positive COVID-19 test results.  Although the total positive cases during this current surge are low, there is concern that the employees may again bring current or new variants into the IDOC again putting the incarcerated at risk. The Monitor continues to advocate the provision of initial vaccination and boosters to the incarcerated men and women, the continuation of the vaccine mandate for employees, visitors, contractors, and volunteers, the maintenance of the universal masking mandate, and ongoing surveillance testing until the COVID-19 pandemic is fully mitigated and stabilized.

Of nineteen recommendations in the prior report; five have been addressed[492], five have been partially acted upon, and nine have not been addressed. The status concerning these recommendations are noted sequentially in the subsequent paragraphs.

**Recommendation one:  Not addressed**
**IDOC is to develop a comprehensive, systemwide infection control program**.  Because the Consent Decree does not contain a statement that IDOC must initiate an infection control program, IDOC believes that it is an unnecessary component of a correctional healthcare program and refuses to include such a program in its Implementation Plan.  The burden of infection control issues involves immunization, hepatitis C (HCV), and other infectious disease outbreaks as well as tracking these activities with reliable and easily obtainable data.  IDOC is currently unable to do that.  The COVID-19 pandemic must have taught IDOC the importance of an infection control program.  Lack of an infection control program has required the IDOC medical program personnel to dedicate time and effort at a level that prevented IDOC from performing as required by the Consent Decree.[493]  Yet IDOC maintains that such a program is an unnecessary component of a correctional health program.  This is not credible.  IDOC must develop a comprehensive infection control program.  As noted above IDOC has received a significant grant from the Department of Justice/Center for Disease Control (CDC) to enhance pandemic staffing, plan for response to future pandemics, and potentially strengthen IDOC's infection control efforts.  The Monitor hopes that some of these grant resources will be utilized to establish a systemwide, functioning infection control program that would protect the health of the incarcerated population and the IDOC staff. [494]

**Recommendation two:  Not addressed**
**Recommendation two stated that the statewide Communicable and Infectious Disease Coordinator obtain and maintain certification in infection prevention and control through the Board of Infection Control and Epidemiology.**  The IDOC reported in May 2020 that the position of Communicable and Infectious Disease Coordinator had been filled; therefore

---

[492] COVID-19 vaccination and surveillance program, streamlined and monitored access to Hepatitis C treatment and provision of Hepatitis C treatment to all level of liver fibrosis,
[493] Defendants' Response in Opposition to Plaintiffs' Omnibus Motion to Enforce, filed by IDOC on 7/15/21 in which IDOC describes the burden of COVID-19 on their operations.
[494] At a minimum, IDOC should use funds to hire an infectious disease physician who would have dual responsibilities to be the infection control physician for IDOC yet be on staff with IDPH.  This person should guide development of an infection control manual, assist in development of policy, develop surveillance strategies, and lead the infection control program.  IDOC should also use funds to establish an interface with the Illinois Comprehensive Automated Immunization Registry (I-CARE) which would permit IDOC to get baseline data on immunization status of incoming inmates.

asserting compliance with III.J. [495] The Monitor did not concur that IDOC has fulfilled its obligation for III.J. because the individual does not have sufficient training and experience to qualify for the infection control and infectious diseases position as required by Section II.B.3 of the Consent Decree which states that "IDOC must also provide enough trained clinical staff …".[496]

The individual filling the position of Communicable and Infectious Disease Coordinator has no training in infection control and had only eight months relevant work experience at the time of assignment to the Communicable and Infectious Disease Coordinator position. No information has been provided to the Monitor that the individual currently in this position has enrolled in a certified infection control training program. The Monitor has advised the IDOC [497] that the position requirements should include:

- Experience in infection control,
- Certification in infection control and prevention through the Certification Board of Infection Control and Epidemiology and maintenance of certification,
- Proficiency with electronic software systems for surveillance and use of an electronic health record and use of electronic surveillance reporting systems,
- Six Sigma green belt certification within 3 years of hire.

The Monitor advised the IDOC in the 3rd and 4th Reports that the incumbent individual should at least obtain certification by the Certification Board of Infection Control and Epidemiology. [498] This certification has not been accomplished or reported.

**Recommendation three:     Partially addressed**
**Recommendation three recommended that IDOC hire or contract with an infectious disease consultant to advise the infection control program when issues arise. This physician would optimally be from an academic institution or from the IDPH.** The Monitor's 2nd, 3rd, and 4th reports also recommended IDOC formalize a relationship with Illinois Department of Public Health (IDPH) or a university to provide infectious disease physician guidance on the spectrum of infection control responsibilities the IDOC has including immunization, screening, disease prevention, and other public health matters.[499] Due to the COVID-19 pandemic, IDOC has worked closer with IDPH due to circumstances. In the previous communications with IDOC about the Implementation Plan[500] the Monitor stressed the need to have a document that describes the relationship with either IDPH or a university for infectious disease consultation and guidance concerning infection control. To date, the IDOC has not produced any documentation that it has established such a relationship that would be invaluable to the operations of a systemwide infection control program.

**Recommendation four:  Addressed**

---

[495] Illinois Department of Corrections, Defendants' Reporting Requirement Pursuant to V.G. of the Lippert Consent Decree (undated) page 4.
[496] Page 5
[497] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020, page 127.
[498] Health Care Monitor 3rd Report Lippert v. Jeffreys, February 15, 2021, page 131.
[499] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020, page 131.
[500] July 28, 2021, telephone meeting between the Monitor and IDOC concerning the development of an Implementation Plan.

**Recommendation four advised IDOC to maintain the COVID-19 vaccination program, provide education on the value of COVID-19 vaccination, and offer initial and ongoing vaccination of the incarcerated population.** IDOC has conducted a very successful vaccination program in inmates. The vaccination of staff improved over time. Their video and peer education by vaccine ambassadors has been commendable.

As demonstrated in the table below, vaccination of inmates has been extremely successful, in line with civilian rates, and likely resulted in reduced hospitalization and mortality rates during later surges. Further success is necessary in getting booster vaccinations to inmates.

| COVID-19 Vaccination of Incarcerted in IDOC | | | | | |
|---|---|---|---|---|---|
| Date | IDOC Population | # Vaccinated | % Vaccinated | # Boosted | % Boosted |
| Mar-21 | 28,511 | 18,779 | 65% | | |
| Apr-21 | 27,384 | 18,895 | 69% | NA | NA |
| Jul-21 | 27,797 | 19,180 | 69% | NA | NA |
| Oct-21 | 28,230 | 19.795 | 70% | NA | NA |
| Dec-21 | 27,890 | 20,805 | 75% | 12,149 | 58% |
| Feb-22 | 26,696 | 20,221 | 75% | 11,915 | 59% |

**<u>Recommendation five:</u>  Addressed**
**Number five recommended that IDOC should implement the Governor's mandate that all correctional center employees receive COVID-19 vaccination and all contractors, visitors, and volunteers who enter IDOC facilities be required to have proof of COVID-19 vaccination.**

As noted in the 4th report, 4-6 weeks prior to each of the surges of COVID-19 infections in the inmate population the IDOC COVID reporting website[501] noted an increased number of active IDOC employee and vendor COVID-19 cases. It is clear that employees were primary vectors for entry of COVID-19 into the IDOC facilities and exposure of the incarcerated population to different variants of COVID-19. Since mid-March 2022 through the 3rd week of April 2022 during the current Omicron and its subvariant COVID-19 surge, monitoring of the weekly surveillance test results of staff and inmates has shown that there are consistently ten to eleven correctional centers with employee positive cases and only 2-5 centers with inmates found to have positive COVID-19 test results. Although the total positive cases during this current surge are low, there is concern that the employees may again bring current or new variants into the IDOC once again placing the incarcerated at risk.

IDOC initiated COVID-19 vaccination of all health care staff in December 2020 and correctional employees at the same time as inmates in February 2021. The IDOC employees and health care workers accepted COVID-19 vaccination at a significantly lower rate than the IDOC inmate population. On April 12, 2021 the monitor strongly communicated to IDOC that volunteer groups and visitors be vaccinated or have a recent negative test prior to being allowed to enter

---

[501] www2.illinois.gov   IDOC Facilities COVID-19 Response

IDOC institutions. [502] On April 17, 2021, the Monitor again strongly recommended that IDOC mandate proof of current COVID-19 vaccination before allowing staff, visitors, volunteers, voluntary and other groups, etc. to enter IDOC facilities. [503]   On August 4, 2021, Governor Pritzker issued a statewide COVID-19 vaccine mandate for state workers and contractors in state prisons and other facilities as Illinois experienced an increase in cases due to the contagious delta variant. The Governor called on unions representing state workers to negotiate the vaccine mandate which becomes effective on October 4, 2021.[504]

The inmate population achieved a 69% vaccination rate by April 2021 while the staff acceptance of COVID-19 vaccines was notably lower.[505]  It was not until February 2022 that 75% of both the incarcerated population and the staff had been vaccinated.  This employee vaccination mandate was a potent incentive that contributed to the increase in the number of employees receiving COVID-19 vaccination and thus diminished the potential for the transfer of COVID-19 from the community into IDOC correctional centers. IDOC told the Monitor that some unvaccinated employees whose exemption requests were denied or who refused vaccination have been disciplined including suspension without pay.[506] IDOC has not provided any data to the Monitor on the number of employees whose waiver requests were denied or approved or who have been disciplined [507].

| COVID-19 Vaccination of Employees in IDOC | | | | | |
|---|---|---|---|---|---|
| Date | IDOC Employees | # Vaccinated | % Vaccinated | # Boosted | % Boosted |
| Apr-21 | 11,864 | 4,271 | 36% | NA | NA |
| Jul-21 | No information | No Information | 44% | NA | NA |
| Oct-21 | 12,868 | 5,892 | 46% | NA | NA |
| Dec-21 | 12,979 | 8,559 | 65% | 960 | 11% |
| Feb-22 | No information | No Information | 75% | No Information | No information |

On January 2022, nine months after being recommended by the Monitor, IDOC also imposed a mandate that all contractors, visitors, and volunteers be vaccinated in order to enter IDOC facilities.[508]

Until the COVID-19 pandemic is adequately mitigated and stabilized, the Monitor continues to strongly support the Governor's employee vaccine mandate and the continuation of the vaccine mandate for visitors, contractors, service groups, and volunteers which will protect the IDOC incarcerated population from further devastation from the ongoing COVID-19 pandemic.

**Recommendation six:   Partially addressed**

---

[502] Office of Health Services – Monitor conference call on 4/12/2021
[503] Monitor Letter to Defendants' and Plaintiffs' Legal Counsel, 4/17/21
[504] Chicago Sun Times, 8/5/21 page 1, Some state staff also required to get vaccine in bid to beat virus. Executive Order 2021-20 (COVID-19 Executive Order NO. 87) issued 8/26/21
[505] 36% by April 2021, 44% by July 2021, 46% by October 2021, 65% by December 2021
[506] OHS-Monitor Conference Call on 3/17/22
[507] OHS-Monitor Conference Call on 3/17/22
[508] OHS-Monitor Conference call on 2/24/22

**Number six recommended that IDOC track and report data by facility for health care workers, non-health care staff, and incarcerated persons on the number of COVID-19 vaccines offered, administered, refused, and vaccine series completed.** IDOC has intermittently provided the Monitor with updates on the number of employees and incarcerated persons that have been vaccinated (see vaccination tables in recommendations four and five). The vaccination data were usually reported by facility and detailed the number vaccinated to date. A few reports detailed the number of employees to whom the vaccine was offered which allowed refusal rates to be calculated.

The most recent reports also noted, by facility, the current number of employed individuals and the number of incarcerated men or women and the cumulative percentage of vaccinated staff and inmates for each site. Although repeatedly requested by the Monitor, the category of vaccinated employees co-mingles the vaccination data of health care workers and non-health care correctional staff, which makes it impossible to ascertain the vaccine acceptance rate for these two disparate groups of employees who might require different modes of health education and supervision.

<u>Recommendation seven:</u> **Addressed**
**Recommendation seven advised IDOC to continue to continue COVID surveillance testing of employees and incarcerated person with the scope and intervals determined in junction with IDPH.** IDOC was initially hesitant to implement surveillance testing of employees, it has now fully complied with this recommendation. Once IDOC decided to initiate surveillance testing of employees and incarcerated persons in mid-late 2020 through April 19, 2022, 454,307 COVID tests on employees and 1,138,619 tests on IDOC's incarcerated population have been performed. In 2022 from February 2nd through April 19th, 5,542 employee tests and 21,718 tests of the incarcerated have been done. IDOC closely collaborated with its IDPH consulting physician to determine the amount and frequency of staff and inmate testing based on the rates of COVID in the correctional facility and in the surrounding counties that would optimally protect the incarcerated population and the staff and their families. IDOC has complied with this recommendation to date. The Monitor continues to recommend that surveillance testing of staff and inmates continue until the pandemic no longer puts the IDOC population at heightened risk of morbidity and mortality from COVID-19 infection.

The ongoing vaccination and surveillance testing of staff and incarcerated men and women has been invaluable in preventing hospitalizations and deaths in the congregate setting of IDOC's prisons.

<u>Recommendation eight:</u> **Not addressed**
**Recommendation eight recommended that IDOC ensure that every facility has a dedicated and appropriately trained infection control nurse.** Staffing Analyses submitted thus far have not identified positions designated for infection control at the institutions.[509] This is in spite of recommendations from the Monitor to do so since the 2nd report.[510] The 12/30/2021 draft of the Implementation Plan included a task to revise existing policy so that Agency Medical Director or

---

[509] Staffing Analysis Illinois Department of Corrections Office of Health Services, Lippert Consent Decree 11/23/19, 6/18/20, 12/15/20, 5/3/21, 7/7/202, 8/17/21, and 3/12/22
[510] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020, page 131.

designee will assign facility healthcare specific positions which the Monitor would argue included infection control nurses. [511]   However in the most recent version of the Implementation Plan IDOC fails to create a designated infection control nurse position at each facility. [512] The establishment of a designated facility infection control nurse is integral to the successful operation of a comprehensive infection control program.

**Recommendation nine:  Not addressed**
**Recommendation nine recommended the development of an infection control policy to establish standardized methods of surveillance and infection control activities**. IDOC has no policies on infection control. There are no tasks in its Implementation Plan to establish standardized methods of surveillance. The Monitor has been told that IDOC does not track TB skin test results and its tracking of COVID-19 cases has been a challenge.  As demonstrated during the COVID-19 pandemic, surveillance of contagious and infectious disease is an essential component of a correctional medical program and needs to be done.  IDOC has issued guidance in the form of memos concerning COVID, treatment of HCV, and immunizations but these have yet to be incorporated into a policy manual with procedures and performance expectations for implementation. Review of infection control information reported at CQI meetings indicate absence or variation in reporting data including reportable conditions, results of tuberculosis screening, HCV treatment statistics, administration of adult immunization including flu vaccination, negative pressure testing, dental equipment sterilization (spore testing), and other relevant infection control measures. A standardized methodology for surveillance is not present and IDOC has not committed to an infection control policy.

**Recommendation ten and eleven:  Partially addressed**
**Item III.J.2 in the Consent Decree directs that all negative pressure rooms are monitored regularly and that the monitoring results are reported monthly to the Communicable and Infectious Disease Coordinator.** The IDOC asserted beginning in November 2019 that it was within six months of compliance with this requirement.[513] Twenty-six IDOC facilities[514] have infirmaries with negative pressure rooms, however only 18 or 19 facilities regularly report in their CQI meeting minutes on the status of negative pressure rooms. The reporting is quite limited and generally does not comment on the test used, the correlation of the tissue test with the control panel, and the room number. Five sites[515] have not reported on the functionality of the negative pressure units even once in the last eighteen months. In December 2021, eight sites did not report negative pressure testing information[516]   In order to demonstrate compliance with III. J. 2 the Monitor recommends that the Infection Control Coordinator establish a reporting log that is submitted with the other Lippert reports by each facility that shows the status of each negative pressure room (occupied or not), the type of check that was done, the correlation of the tissue test with the control panel (if one exists), the date and person completing the check and the

---

[511] IDOC Implementation Plan: Hiring Process, Task 4., Submitted to the Court on December 30, 2021.
[512] IDOC Implementation Plan submitted to the Court on 4/20/2022.
[513] Illinois Department of Corrections Implementation Plan, Lippert Consent Decree, November 2019, page 5.
[514] Elgin, Joliet Treatment Center, Murphysboro, and Vienna CC do not have infirmaries or negative pressure rooms.
[515] Danville CC, Decatur CC, East Moline CC, NRC, and Pinckneyville CC have not reported monitoring of negative pressure in the last 18 months
[516] CQI minutes December 2021:  Danville CC, Decatur CC, East Moline CC, NRC, Pinckneyville CC, Robinson CC, ands Taylorville CC did not document negative pressure test results in CQI minutes.  CQI minutes from Western CC was not received by the Monitor.

result. These results should be reported in the facility CQI meeting minutes noting any corrective action needed and taken. The reliability of the information on the log will then have to be verified by inspection at the facility.[517] This requirement is neither complex or resource demanding and would have been accomplished by now if IDOC had an implementation plan and a functional infection control program.

All five reports submitted to the Court have documented deficiencies in negative pressure testing and reporting. The functionality of negative pressure rooms is an important component of each facility's infection control program. Weekly testing (when the negative pressure units are not occupied) and daily testing of negative pressures (when occupied) must be diligently performed and reported to protect the safety of each facility's incarcerated persons and staff. The failure of regular monitoring and reporting of the functionality of the negative pressure rooms puts the staff and other patient-inmates in the infirmary at risk of exposure to contagious airborne illnesses. It is inexplicable to the Monitor that the IDOC has not acted on four previous Court reports documenting that a number of facilities are failing to report, regularly if at all, on the operationality of their negative pressure rooms.

### Recommendation twelve:  Not addressed
**IDOC has not addressed the Monitor's recommendation that inmate workers including porters and hospice workers who have ongoing risks of exposure to body fluids be immunized for hepatitis A.[518]**  Currently only hepatitis B vaccination is provided to inmate workers. The IDOC administrative directive on blood borne pathogens should be expanded to include hepatitis A vaccination for inmate workers at risk for fecal-oral transmitted pathogens. Whether inmate porters are vaccinated for hepatitis B could not be verified. Review of systemwide vaccine orders filled by Boswell Pharmacy Services from November 2019 through February 2022 documented that only hepatitis A doses sufficient to immunize 2 individuals and hepatitis B doses sufficient to vaccinate 7 individuals have been filled in the last 27 months.[519] This quantity of hepatitis A and B vaccines are insufficient to meet the needs of the inmate porters let alone to vaccinate incarcerated persons with active liver disease or cirrhosis.   IDOC has provided no information that inmate workers have been vaccinated for hepatitis A or B and the Monitor has insufficient information to verify vaccination of inmate workers.

### Recommendation thirteen: Partially addressed
The Monitor has discussed at length and recommended since the start of the Consent Decree that **IDOC replace tuberculosis skin testing (TST) with interferon-gamma release assay (IGRA)** testing such as QuantiFERON® TB, to screen for tuberculosis infection.[520]  In October 2021, IDOC initiated a pilot study using IGRA testing in lieu of TST at the four Reception & Classification Centers.[521]  As of March 17, 2022, 5,000 IGRA tests have been drawn with 173 abnormal results indicative of latent TB.  No active TB has been detected.  IDOC communicated to the Monitor that the intake centers' staff have been very supportive of the switch to IGRA

---

[517] This recommendation was previously made in the Health Care Monitor 3rd and 4th Reports Lippert v. Jeffreys,

[518] This recommendation has been made in the Health Care Monitor's 2nd, 3rd, and 4th Reports Lippert v. Jeffreys.

[519] Boswell Pharmacy Services filled individual and stock orders 11/1/19-2/1/22

[520] Health Care Monitor 2nd Report Lippert v. Jeffreys, August 6, 2020, pages 128 & 131. Health Care Monitor 3rd Report Lippert v. Jeffreys, February 15, 2021, pages 133 – 4 & 144.

[521] NRC, Logan CC, Menard CC, and Graham CC R & C's

testing. The use of the IGRA blood test in place of the labor intensive TST has been helpful to nurse staffing. IDOC is evaluating the data and cost of IGRA and communicated that it is difficult to fully calculate the indirect cost benefit of using IGRA TB screening. They also communicated that IGRA testing appears to be cost effective. The Monitor provided an article to the IDOC on cost effectiveness of TST versus IGRA in a correctional setting.[522] The Monitor strongly voiced it's support for switching to QuantiFERON for reasons of increased accuracy, elimination of human error in reading the TST, minimization of the potential for accidental needle sticks of staff, and decreased nurse labor costs. The redirection of nursing staff to other nursing duties is especially important in the face of the ongoing shortage of nursing personnel in the IDOC. (See previous reports for an elaboration on the reasons for the recommendation.)

**Recommendation fourteen:  Addressed**
**Recommendation fourteen recommends the continued monitoring and reporting of access to HCV treatment as outlined in the revised Screening and Treatment HCV Guidelines March 2021.**
IDOC does not have a surveillance system to track HCV infection or treatment of the infection system-wide.   Tracking persons in HCV clinic and persons under treatment is provided in quality improvement minutes.  The Monitor used these data and calculated a number of persons remaining untreated.  IDOC revised the Screening and Treatment Hepatitis C Guidelines in March 2021 and Monitor noted an increase in the number of individuals being treated in June 2021.[523]

The following table is based on the Monitor manually counting information provided in IDOC quality improvement meeting minutes.  IDOC does not yet provide this type of surveillance data.

---

[522] Nijhawan A, et al, Cost Analysis of tuberculin skin test and the QuantiFERON-TB Gold In-tube test for tuberculosis screening in a correctional setting in Dallas, Texas, USA. BMC: Infectious Diseases (2016)16:564
[523] Shawnee CC site visit 6/21-23/2021 interview with hepatitis clinic nurse and visit to Shawnee medication room

| Quarterly Status of HCV Treatment[524] | | | |
|---|---|---|---|
| Date | Active HCV Patients[525] | On HCV Treatment | Not on Treatment[526] |
| Jun-20 | 1374 | 17 (1.2%) | 1357 (93.8%) |
| Sep-20 | 1205 | 25 (2.1%) | 1180 (92.6%) |
| Dec-20 | 1217 | 15 (1.2%) | 1202 (94.9%) |
| Mar-21 | 1015 | 20 (2%) | 995 (98%) |
| Jun-21 | 963 | 75 (7.8%) | 889 (92.3%) |
| Sep-21 | 829 | 78 (9.4%) | 751 (91,6%) |
| Dec-21 | 844 | 55 (6.5%) | 789 (93.5%) |

After the revised HCV guidelines in June 2021 were implemented, more patients were treated. The percent of patients treated increased from under 2 percent to over 9 percent. Consistent with treatment trends represented on the graph above, treatment doubled from 2020 compared to 2021as shown in the table below.

| Hepatitis C. Patients Treated via UIC Telehealth Program | |
|---|---|
| Year | # Treated |
| 2018 | 79 |
| 2019 | 82 |
| 2020 | 98 |
| 2021 | 187 |
| 2022 (as of 1/14/22) | 40 |

The increase in treatment in 2021 varied dramatically between facilities. Ten (33%) facilities account for 80% of persons treated. Eleven facilities accounted for only four persons treated. The size of the facility did not correlate with the number of treated HCV patients. Decatur, a female facility with a census of 306 had 22 patients treated for HCV and East Moline with a population of 369 treated 10 individuals for HCV. Pinckneyville with a population of 1,728 and IRCC with a population of 1,653, each had only one patient treated for HCV. The reasons for this site-to-site variability needs to be analyzed by the quality improvement committees and IDOC quality improvement leadership. It is the Monitor's firm opinion that the lack of dedicated

---

[524] This table is a quarterly snapshot of persons under treatment. The on-treatment column shows a point in time number of people on treatment. It does not show total of patient treated which is show in a table below this table.

[525] The number of active HCV patients decreased from 1,374 in June 2020 to 844 in December 2021. This possibly consistent with any combination of a decreased IDOC census due to the restriction in admissions and early releases during the COVID 19 pandemic, possibly due to the steadily increasing number of men and women having completed curative HCV treatment or possibly due to error in data collection or reporting.

[526] The "Not on Treatment" number is determined by subtracting the number who have finished treatment and those currently on treatment from the Total Patients followed in the facility HCV Clinics. The December 2021 untreated patient number may be lower than reported due to nine facilities failing to report "Finished Treatment" patients in the December 2021 QI minutes

infection control nurses at each facility is a significant contributing factor to the failure of many sites to complete the initial evaluation and refer HCV patients for treatment. The quality improvement program and the infection control coordinator should investigate whether systemic or operational barriers to treatment exist. Any systemic barriers to treatment need to be corrected. The facility variation in treatment is shown in the table below.

| Hepatitis C Patients Treated by Facility January 2021 to January 2022 | |
|---|---|
| **Facility** | **# Treated** |
| Shawnee | 43 |
| Sheridan | 36 |
| Decatur | 22 |
| Menard | 17 |
| Dixon | 14 |
| Centralia | 11 |
| Lincoln | 11 |
| Robinson | 11 |
| East Moline | 10 |
| Lawrence | 10 |
| Vandalia | 9 |
| Jacksonville | 6 |
| Graham | 5 |
| Hill | 4 |
| Danville | 3 |
| Logan | 3 |
| Pontiac | 3 |
| Kewanee | 2 |
| Western | 2 |
| IRCC | 1 |
| Pinckneyville | 1 |
| Southwestern | 1 |
| Stateville | 1 |
| Taylorville | 1 |
| BMRCC | 0 |
| Elgin | 0 |
| JTC | 0 |
| Murphysboro | 0 |
| NRC | 0 |
| Vienna | 0 |
| Total | 227 |

IDOC should also set a goal to treat everyone with HCV over the next three-five years; this would require a tripling or quadrupling of annual HCV treatments.

**Recommendation fifteen:  Addressed**

Recommendation fifteen recommended that treatment be provided to HCV patients with all levels (F0-F4) of fibrosis/liver scarring not just those with advanced fibrosis.  Prior to 2019, HCV treatment had been limited in the IDOC to incarcerated persons with more advanced levels (F3, F4) of fibrosis. The Monitor has previously recommended that HCV patients with lower levels of liver fibrosis (F0, F1, F2 fibrosis scores) be offered treatment before, not after, extensive liver scarring and cirrhosis had developed.  HCV treatment is not inexpensive, but delaying curative treatment until the liver has become increasingly cirrhotic is clinically unacceptable and is not cost ineffective.  The treatment and management advanced liver cirrhosis is expensive and significantly more costly than early curative treatment HCV.[527]

IDOC revised its HCV Guidelines in January 2019 and began to refer patients for treatment with fibrosis scores of F2.  The HCV Guidelines were again modified in March 2021 to also allow fibrosis scores of F0 and F1 to be eligible for treatment.

| Treatments Based on Fibroscan Scores | | | | | |
|---|---|---|---|---|---|
| Year | Fibrosis Level 1 or less | Fibrosis level 2 | Fibrosis level 3 | Fibrosis level 4 | Total treated |
| 2017 | 0 | 0 | 1 | 1 | 2 |
| 2018 | 5 | 9 | 18 | 35 | 67 |
| 2019 | 3 | 35 | 25 | 19 | 82 |
| 2020 | 2 | 37 | 23 | 36 | 987 |
| 2021 | 89 | 53 | 14 | 27 | 183[528] |
| 2022[529] | 22 | 11 | 1 | 6 | 40 |

IDOC does not perform surveillance of HCV or its treatment.  IDOC informed the Monitor of an intention to initiate surveillance of HCV, but there is no task in the Implementation Plan to do so.  IDOC needs to develop a disease surveillance[530] program as part of their infection control program.

**Recommendation sixteen:  Not addressed**

In recommendation 12 in the Monitor's 3rd Report, the Monitor recommended establishing a

---

[527] See patient 13 in the Mortality Review appendix.  He had hepatitis C since 2013 and was referred to UIC for treatment in 2017 when he already had developed cirrhosis.  UIC asked for a work up of his anemia prior to treatment which never occurred and the patient was lost to follow up. Eventually, in March of 2021 he went back to UIC who recommended treatment which never was accomplished.  The patient was again lost to follow up and because of his cirrhosis developed intractable ascites, varices and encephalopathy necessitating repeat hospitalizations.

[528] Four fibroscans were unavailable for this year.

[529] This includes data for the first two weeks of 2022

[530] Disease surveillance is the ongoing, systematic collection, analysis and interpretation of health data.  Disease surveillance data is used to determine the need for public health action.

quality metric that measures treatment of HCV on an annual basis. IDOC had committed to performance and outcome measures as late as the 12/30/21 Implementation Plan, but the current Implementation Plan eliminated development of any performance or outcome measures. The Monitor continues to recommend a performance an outcome dashboard. This dashboard should include the number of HCV patients treated over a specified time period in the numerator and the total number of untreated HCV patients over the same time period in the denominator. The number of untreated HCV patients can be separately tracked on a dashboard that would permit staff to see whether the number decreases consistently over time.

**Recommendation seventeen:  Not addressed**
The Monitor recommended tracking and reporting on immunizations that are administered and the percentage of eligible patients that have been offered and accepted or refused nationally recommended adult immunizations. With the exception of a Human Papilloma Vaccination program at the two female facilities[531] that reports how many women twenty-six years of age or younger have received the HPV series, IDOC has not generated any data or reports on the provision of adult immunization. In its prior list of performance measures IDOC committed to tracking the number of individuals who completed immunizations based on their need for immunization. This has been eliminated in the new Implementation Plan which is a step backward.

**Recommendation eighteen:   Not addressed**
The Monitor has recommended that quality improvement minutes document identification of infection control opportunities for improvement and demonstrate whether corrective action has taken place. IDOC infection control reports in quality improvement meeting minutes present data that is not actionable and without any analysis. Quality improvement meeting minutes do not include descriptions of opportunities for improvement, identification of problems in infection control or prevention, or actions taken, based on data presented, that result in an improved program

**Recommendation nineteen:  Not addressed**
In recommendation 19 the Monitor recommends IDOC provide the data support to allow for tracking of infection control activity. IDOC's latest Implementation Plan has no tasks dedicated to obtaining data. That plan states that data will be obtained through "canned" reports but the Monitor is not convinced that IDOC will be capable of obtaining data for this purpose.

The Monitor continues to rate Infection Control as partial compliance based on 1) the revision and implementation of the Hepatitis C Screening and Treatment Guidelines in March 2021; 2) the increased number and percentage of incarcerated individuals with active HCV who are being treated;  3) the continuation of IDOC's relationship with IDPH in the management of COVID-19 related issues, the ongoing management of COVID-19 surveillance and mitigation testing during the various surges; 4) the ongoing systemwide COVID-19 primary and booster vaccination rollout for inmates and staff; and 5) the increased focus, albeit poorly documented and tracked, on the provision of adult (non-COVID) immunizations in the IDOC. However, IDOC still has not demonstrated that it has an effective independent infection control program to address future infection control challenges and refuses to believe that an infection control program is necessary

---

[531] Decatur CC and Logan CC

to gain compliance with the Consent Decree.

**RECOMMENDATIONS:**

1. Develop a comprehensive, systemwide infection control program.
2. Ensure the statewide infection control coordinator obtains and maintains certification in infection prevention and control through the Certification Board of Infection Control and Epidemiology. Requirements of this position should also include proficiency in surveillance software and familiarity with use of an electronic medical record to support surveillance activity. It would be preferable for this person to obtain Lean Six Sigma certification within two years of hire.
3. Hire or contract with an infectious disease physician consultant to advise the IDOC on their infection control program as issues arise. Optimally, this physician should be from an academic institution or from the IDPH.
4. Maintain the COVID-19 vaccination program that provides systemwide education on the value of COVID-19 vaccination and offers initial and ongoing vaccination for men and women incarcerated in the IDOC.
5. Implement the Governor's mandate for all IDOC employees to receive the COVID-19 vaccination. All contractors, volunteers, and service groups who enter IDOC facilities should be required to have proof of COVID-19 vaccination.
6. Track and report data by facilities for health care workers, non-health care employees, and incarcerated individuals on the number of COVID-19 vaccines offered, the number administered, the number refused, and the number who have completed a vaccine series.
7. Continue COVID-19 surveillance testing of employees and incarcerated individuals with the scope and intervals of testing determined in conjunction with IDPH.
8. Ensure that every facility has a dedicated and appropriately trained infection control nurse.
9. Develop infection control policy to establish standardized methods of surveillance and infection control activity.
10. Establish expectations for independent verification of negative pressure in respiratory isolation rooms, monitoring, and documentation of the status of negative pressure rooms, reporting to the Infection Control Coordinator and to the monthly facility quality improvement committee and corrective action to be taken when the rooms are not functional.
11. Perform Safety and Sanitation or regular other inspections of the infirmary negative pressure units monthly and equally crucial daily (when negative pressure rooms are occupied) or otherwise weekly tissue paper testing of the isolation rooms be conducted by the health care staff to verify that these units are always operational.
12. Provide both hepatitis A and hepatitis B vaccinations to inmate workers who have risks of exposure to blood and fecal borne pathogens and to inmate kitchen workers.
13. Replace tuberculosis skin testing (TST) with IGRA blood testing, which is more accurate, minimizes the risk of accidental needle sticks, and frees up valuable nurse resources.
14. Continue to monitor and report access to HCV treatment as outlined in the revised Screening and Treatment Hepatitis C Guidelines March 2021 that streamlined HCV eligibility and screening criteria.

15. Continue to ensure access to HCV treatment for individuals with F0 and F1 fibrosis levels.

16. Establish a quality metric that significantly increases the annual number of HCV treatments that would result in the total elimination of HCV within the next 3-5 years.

17. Track and provide detailed reports on the offering and provision of nationally recommended adult immunizations including the percentage of eligible candidates who have been offered and received the required immunizations at each site.

18. Ensure that quality improvement activity identifies infection control and prevention opportunities for improvement and takes steps to ensure that improvements occur.

19. Provide the data support to allow for tracking of infection control activity.

# Dental Care

**Staffing**

*Addresses item II.B.6.q; III.K.9*

**II.B.6.q.** *IDOC agrees to implement changes in the following areas: Annual assessment of medical, dental, and nursing staff competency and performance;*

**III.K.9.** *Within twenty-one (21) months of the Preliminary Approval Date of this Decree [October 2020], IDOC shall establish a peer review system for all dentists and annual performance evaluations of dental assistants.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

The COVID-19 pandemic that first hit IDOC in March 2020 has had a significant impact on the provision of dental care throughout all facilities in the IDOC. During the first 12-18 months of the pandemic dental services were limited to examinations, screenings, prescription of medication, and emergency procedures. It was communicated to the Monitor that since the Summer of 2021 most sites have been able to expand the range of services due to IDOC's COVID-19 vaccination of the incarcerated population and staff, testing and mitigation efforts, and the utilization of universal masking and the procurement of oral suction devices in the dental suites. (see Dental Access section below), However increased backlogs and waiting times for dental care continue to exist in number of IDOC facilities.

Twenty-eight IDOC correctional centers have onsite dental suites and services.[532] Allocated[533] dentist positions range from 0.25 FTE to 2.25 FTE at twenty-eight different sites.[534] Nine facilities have greater than 1.0 FTE dentist positions.[535]    In March, 2022 there were a cumulative 34.15 FTE dentist budgeted positions in the IDOC; 21.95 (64%) were filled, and 12.2

---

[532] Two small IDOC correctional centers, Elgin and Murphysboro do not have onsite dental services.

[533] Allocated positions are budgeted and approved for posting and hiring.

[534] 3/21/22 IDOC Staffing Update

[535] Allocated dentist staffing greater than 1.0 FTE: Centralia 1.05 (population 1,255), Dixon 1.4 (population 1,413 with large geriatric census), Graham CC 1.6 (intake center, population 1,291), Lawrence CC 1.5 (population 500), Logan CC 2.0 (intake center, population 949), Menard 2.0 (maximum security, intake center, population 2,025), NRC 1.6 (intake center, population 976), Pinckneyville CC 2.25 (population 1,728), Shawnee CC 1.4 (population 1,242), Sheridan CC 1.5 (population 1,116), Stateville CC 2.0 (maximum security, population 1,145), and Vandalia CC 1.5 (population 330).

(36%) were vacant. Five (18%) of IDOC facilities with dental suites do not currently have assigned dentists.[536] These five facilities house 5,280 incarcerated persons. Six other facilities housing 6,653 inmates do not currently have their full FTE dentist staffing. 11,933 incarcerated persons at these eleven IDOC facilities have no dedicated dentist coverage or are understaffed due to dentist vacancies; this puts 44% of IDOC patient-inmates at clear risk for limited if any access to dental services. The Monitor has received no information on how dental coverage is being provided at these five sites.

Review of the dentist staffing levels throughout the IDOC reveals some inconsistencies.[537] Pontiac CC, a maximum-security facility with a population of 937, has only 0.6 FTE allocated dentist coverage. Pontiac is the only maximum IDOC facility with less than 1.0 FTE dentist and needs to have its FTE dentist staff increased. On the other hand, Lawrence CC (500 population) has 1.5 allocated dentist positions, and East Moline CC (369 population), Southwestern CC (204 population), Vandalia CC (330 population) and Vienna (395 population) each have 1.0 FTE allocated dentists. These five facilities have had a notable drop in census over the last two years and may need to have their dentist FTE reassessed.

Annual peer reviews for twenty-seven dentists were performed in 2021.[538] These dentist peer reviews primarily addressed process and documentation issues but also audited the adequacy of dental history, the appropriate use of prophylactic antibiotics, the appropriate ordering of required x-rays, diagnostic tests, and consultations. Peer reviews are done by dentists working in the IDOC system and thus have the risk of lacking objectivity. As recommended in previously reports, IDOC and its vendor should consider having an independent dentist perform the annual dentist peer reviews. This can be accomplished in the audit process, which is a required provision of the Consent Decree.

Annual evaluations of vendor or State employed dental hygienists and dental assistants were not completed in 2020. In 2021 only evaluations of the vendor employed dental hygienists and dental assistants were provided to the Monitor. Vendor dental hygienists and dental assistants are evaluated using the Salary Compensation Calibration Worksheet; this worksheet focuses primarily on administrative and business issues and does not satisfy Consent Decree requirements to assess clinical staff competence and performance. This vendor evaluation is not allowed to be shared with the employee.

The IDOC uses the State of Illinois Individual Development and Performance System to evaluate state employed dental hygienists (2) and dental assistants (8); this form is individualized for each of these positions and must be discussed with each employee. Evaluations of the State dental hygienist and dental assistants for 2020 and 2021 have not been provided to the Monitor.

With the exception of a few sections of the dentist peer reviews, none of the annual performance evaluations for both State and vendor dental staff qualify as professional

---

[536] Danville CC (population 1,451), Dixon CC (population 1,413), Hill CC (population 1,622), Jacksonville CC (population 667), and Robinson CC (population 717)
[537] IDOC Staffing Update 3/21/22
[538] See Oversight of Medical, Dental, and Nursing Staff section of this report for more detailed information

performance evaluations or assessments of the quality of the clinical care provided by the dentists, dental hygienists, and dental assistants.

See Oversight of Nursing, Dental, and Medical Staff section for further details.

**RECOMMENDATIONS:** (Same as noted in Oversight of Nursing, Dental, and Medical Staff section) with two recommendations addressing dental staffing and coverage.

1. Develop and initiate professional performance evaluations that assess the clinical competency and clinical performance of all clinical staff.
2. Standardize evaluation formats so that all practitioners of the same type are evaluated in the same manner.
3. Engage an independent professional knowledgeable of the scope of practice and capable of evaluating the clinical care of the professional to perform the annual evaluations of dentists and dental hygienists.
4. Share clinical professional performance evaluations with the employee who should sign the review after discussion with the reviewer.
5. Evaluate the dentist staffing at each of the IDOC facilities with onsite dental services to ensure that the FTE dentist staffing is in accord with each facility's average daily census and dental care needs of its incarcerated population.
6. Develop arrangements including contracted private dental services to provide emergency and routine dental services to IDOC's patient population until the dentist staffing is fully recruited and hired.

**Dental Documentation**

*Addresses item III.K.1; III.K.10.c; III.K.11; III.K.12*

**III.K.1.** *All dental personnel shall use the Subjective Objective Assessment Plan ("SOAP") format to document urgent and emergency care.*

**III.K.10.c.** *A prisoner shall consent in writing once for every extraction done at one particular time. In instances where a prisoner lacks decision making capacity the Department will follow the Illinois Health Care Surrogate Act. In the event a prisoner verbally consents to an extraction, but refuses to consent in writing, dental personnel shall contemporaneously document such verbal consent in the prisoner's dental record.*

**III.K.11.** *Each prisoner shall have a documented dental health history section in their dental record.*

**III.K.12.** *Dental personnel shall document in the dental record whenever they identify a patient's dental issue and dental personnel shall provide for proper dental care and treatment.*

**OVERALL COMPLIANCE RATING:** Partial compliance

**FINDINGS:**

Due to COVID safety precautions the Monitor team was not able to visit any IDOC facilities since the submission of the 4th Court Report in September, 2021. The monitor has received and

utilized the 2021 dentist peer views reports, dental charts of patients having dental extractions at Pontiac CC, and dental records identified during the review of mortality medical records.

Analysis of the 2021 dentist peer reviews documented that 94% [539] of dental notes audited were consistently using the Subjective, Objective, Assessment, and Plan (SOAP) format, 98% [540] of dental extractions had a signed consent form in their dental chart, 100% [541] of patients refusing care signed a refusal form, 76% of patient records documented that the dentist had reviewed the individuals' overall health history at the time of the encounter, [542] 95% had an adequate history of the current dental problem, 86% had a treatment plan documented at the visit,[543] 91%[544] were judged as having an appropriate x-ray before the extraction, and 100% were assessed as provided prophylactic antibiotic in align with national standards.[545] 12 (44%) of the 27 dentists were found to have a least one notation of a deficiency on at least one audit item and 5 (19%) had three or more deficient audit items cited.[546]

The dental charts of five individuals who had a dental extractions at a single IDOC facility were reviewed by the Monitor to assess the presence of pre-procedure consent forms and appropriate x-rays were taken prior to the extractions.[547] All five had signed consent forms for the extraction. All five had either panorex or bitewing films taken before the procedure. Four x-rays were done within 10 days of the extraction and one was performed 10 months prior to the procedure.

The Monitor was also unable to identify a national standard concerning when dental x-rays must be taken or repeated prior to an extraction in order to protect the health of the patient and minimize the risk of post-extraction complications. The OHS Chief of Dental Services must establish the best practice standard for the length of time prior to dental extractions that x-rays are deemed valid and do not need to be repeated. Without this clarification, it is difficult to assess whether timely x-rays are available for dentist review prior to dental extractions.

There was also variation in what dentists perceived to be the nationally accepted guidelines when prophylactic antibiotics are given pre-dental procedures.[548]

**RECOMMENDATIONS:**

---

[539] Use of SOAP documentation improved from 82% in 2020 to 94% in 2021 peer reviews

[540] Consent forms signed prior to dental extractions improved slightly 97% in 2020 to 98% in 2021 peer reviews

[541] Completion of signed refusals of dental care forms were 100% in both 2020 and 2021

[542] Review of patients' overall health history at the time of the encounter decreased from 86% in 2020 to 76% in 2021 peer review

[543] Documentation of a treatment plan identified in the dental note decreased from 97% in 2020 to 86% in 2021 peer review

[544] Performing appropriate x-rays prior to dental extraction improved from 85% in 2020 to 91% in 2021 peer reviews

[545] Ordering of prophylactic antibiotics were in alignment with national standards improved from 92% in 2020 to 100% in 2021 peer reviews.

[546] Vendor Dentist Peer Reviews October-November 2021.

[547] Pontiac CC Extractions performed in February and March 2022

[548] Wexford Peer Review Form for Dentists. Peer review item #8 "Are prophylactic antibiotics given per nationally accepted guidelines"

1. Identify and establish the best practice standard for the length of time prior to dental extractions that previous x-rays are judged to be adequate to minimize complications and protect the health of the patient-inmate.
2. Identify, establish, and disseminate the national guidelines for the use of prophylactic antibiotics pre-dental procedures.
3. Define the dental services and procedures that require written consent prior to delivery of the dental care.

**Dental Support**

*Addresses items III.K.4-5; III.K.13*

**III.K.4.** *IDOC shall implement policies that require routine disinfection of all dental examination areas.*

**III.K.5.** *IDOC shall implement policies regarding proper radiology hygiene including using a lead apron with thyroid collar, and posting radiological hazard signs in the areas where x-rays are taken.*

**III.K.13.** *IDOC shall conduct annual surveys to evaluate dental equipment and to determine whether the equipment needs to be repaired or replaced. Any equipment identified as needing repair or replacement will be repaired or replaced.*

**OVERALL COMPLIANCE RATING:** Partial Compliance

**FINDINGS:**

The Monitor has been provided with the Dental Care for Offenders administrative directive[549] but this policy did not address the routine disinfection of all dental examination areas, the use of lead aprons with thyroid collars, or the posting of radiological hazard signs in the areas where x-rays are taken. During previous sites [550] the Monitor verified the presence of lead aprons with thyroid collars at all three facilities that were evaluated for this provision. At two of the site visits the thyroid collars were stored in the health care unit radiology suite and not immediately available to the dental team. Due to the pandemic no site visits were done since the 4th Court Report that was submitted in September 2021. The IDOC has not provided the Monitor when any information on a systemwide survey that audits the facility-by-facility presence of lead aprons with thyroid collars, posting of radiological hazard signs, and evaluation of the presence and operational state of dental equipment.

Review of December 2021 CQI meeting minutes verified that 18 of the 28 IDOC facilities with onsite dental services reported that sterilization of the dental equipment using spore testing was regularly performed to confirm that their autoclaves were effectively sterilizing dental

---

[549] IDOC Administrative Directive 04.03.102 Dental Care for Offenders Effective Date 1/1/2020
[550] Robinson CC and Lawrence CC 2019 site inspections, Shawnee CC 2021 site inspection

172

equipment.[551] Spore testing at nine additional correctional centers with dental services did not report on the performance of this important infection control measure in the December 2021 CQI minutes.[552] Six of these nine non-reporting facilities had not reported on spore testing in quarterly CQI minutes since June 2020[553], two additional facilities reported the results on spore testing only once and one other facility reported these results only twice over the last 18 months. The effectiveness of dental equipment and instrument sterilization must be performed, monitored, and reported on a regular basis for all sites with dental services. This same recommendation was made by the Monitor in the 3rd and 4th Court Reports. As of yet, no action has been taken to address this potentially serious infection control deficiency. This indicates the lack of an effective systemwide infection control program in the IDOC.

To date the Monitor has not received Administrative Directives on the routine disinfection of all dental examination areas nor a copy of any policy relating to dental radiology hygiene. The Monitor has not yet received information that an annual system wide survey of dental equipment has been done. Three years have passed since the signing of the Consent Decree and IDOC has yet to conduct an initial, let alone an annual, survey of dental space and equipment. A preliminary dental survey should not be delayed waiting for IDOC to hire consultants to initiate a systemwide assessment of all the clinical spaces and equipment in the IDOC. It is the Monitor's concern that the lack of dental hygiene and dental services may be related to a lack of dental chairs and equipment at multiple sites. This type of survey is foundational to a safe and functional dental program.

**RECOMMENDATIONS:**
1. Provide each dental suite with its own leaded thyroid collar.
2. Report regularly to CQI committee on the effectiveness of the dental equipment sterilization at all facilities with dental suites
3. Perform an annual survey of dental equipment, furniture, and space. List the number of dental chairs at each facility. The equipment (including dental chairs) and space inventory must be made available to the Monitor when it is completed.

**Dental Access**

*Addresses items II.B.6.h; III.K.2*

**II.B.6. h.** *IDOC agrees to implement changes in the following areas: Dental care access and preventative dental care;*
**III.K.2.** *Each facility's orientation manual shall include instructions regarding how prisoners can access dental care at that facility*

---

[551] December 2021 CQI meeting minutes; Centralia, Decatur, Dixon, East Moline, Graham, Hill, IRCC, Jacksonville, JTC, Kewanee, Lincoln, Logan, Menard, Shawnee, Sheridan, Southwestern, Stateville, and Taylorville reported that spore testing was being performed and that the autoclaves were functional.
[552] December 2021 CQI minutes: BMR, Danville, Lawrence, NRC, Pinckneyville, Pontiac, Robinson, Vandalia, Vienna did not report the results of spore testing by the dental team. There was no QI reports provided from Western.
[553] CQI Minutes for June 2020, September 2020, December 2020, March 2021: BMR, Danville, Lawrence, Pontiac, Robinson, and Vienna did not report results of spore testing on six quarterly CQI minutes over an 18 month period. Jacksonville and Vandalia reported spore testing results only once and NRC only twice over the last 18 months.

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

The pandemic has had a significant impact on the provision of dental care throughout all facilities in the IDOC. Beginning in April 2020 to the present time, the implementation of infection control measures to prevent the transmission of COVID-19, dental services and procedures with the risk of splashing or aerosolizing saliva and other oral and upper respiratory fluids forced the dental program to provide only emergency dental care. Dental cleanings, fillings, and complicated extractions were discontinued. It appears from the dental data provided that in April 2021 once personal protective equipment (PPE) was readily available, the inmate population increasingly vaccinated, oral suction units installed around some dental chairs, and local outbreaks mitigated, facilities were allowed to provide more dental services. When the COVID-19 delta variant arose in the late Summer – early Fall of 2021, some restrictions of scope of dental services were again enacted. At the present, most sites are services providing a full range of dental services. Waiting times for dental services notably increased during the pandemic. IDOC has reported that it is chipping away these lengthy waiting times for fillings and extractions.

The dental services sections in the December 2021 CQI minutes[554] provided sufficient data at only nine sites and partial and incomplete data from an additional ten sites to evaluate the dental waiting times and backlogs for dental filings and extractions. Nine sites reported no data on dental waiting times and backlogs.

| Range of Waiting Times (14 sites) | |
|---|---|
| Dental Fillings | 7- 104 weeks |
| Dental Extractions | 3- 22 weeks |
| **Facilities with Waiting Times ≥30 Weeks (9 sites)** | |
| Dental Fillings | 9 Facilities |
| Extractions | 5 Facilities |
| **Range of Backlog Patients Waiting to be Placed on the Waiting List (11 sites)** | |
| Dental Fillings | 0-298 Patients |
| Dental Extractions | 0-100 Patients |

The dental needs of incarcerated populations are extensive and, at this time primarily due to the pandemic but also to staffing shortages, these needs have not been adequately met. Although the severity of the current subvariants appear to have lower morbidity and mortality and IDOC employees and incarcerated population are predominantly vaccinated, IDOC must continue

---

[554] Only nine facilities reported the waiting times and backlogs for both dental fillings and backlogs. Nine facilities did not report any dental waiting times and backlogs. On the remaining ten sites the data that was reported was incomplete, difficult to interpret, and not standardized. Wexford Primary Medical Services Reports for 2021 were incomplete and not utilized. Waiting times are for patients given an appointment. Backlogs are the patients on a waiting list >13 days to be given a future appointment

develop creative plans to aggressively address the lengthy waiting times and hefty backlogs for dental care.

To date the Monitor has not received IDOC existing orientation manuals.  As noted in the previous Court Reports, interviews with incarcerated individuals at sites visited in 2019, 2020, and 2021 indicated that the men and women were knowledgeable about the established process to access dental and medical services. IDOC latest Implementation Plan[555] states that a policy will be written by February 2023 that outlines the contents of orientation material including access to dental care to be given to all patients in the Reception & Classification Centers. The Implementation Plan does not indicate when a new or revised orientation manual will be completed.

**RECOMMENDATIONS:**
1. Continue to provide emergency dental services and those basic dental services that can be safely provided during the ongoing COVID-19 pandemic.
2. Disseminate and follow CDC infection prevention guidelines including for dental care.
3. Initiate planning on how to prioritize and address the large backlog of dental care that has resulted from the safety precautions and restrictions that are required during the COVID-19 pandemic and dental staff shortages.
4. Standardize the data on the waiting time
5. Provide the Monitor with the current and the revised IDOC orientation manual that includes the process to access dental care in the facilities.

**Dental Intake**
*Addresses items III.K.3*
**III.K.3.** *IDOC shall implement screening dental examinations at the reception centers, which shall include and document an intra- and extra-oral soft tissue examination.*

**OVERALL COMPLIANCE RATING:** Not yet rated

**FINDINGS:**

**RECOMMENDATIONS:**
1. Evaluate the FTE allocation of dentists at NRC and the other intake centers to ensure that dental screening in the Reception & Classification Centers can be performed thoroughly and timely.

**Dental Hygiene**
*Addresses III.K.7; III.K.8;*
**III.K.7.** *Dental hygiene care and oral health instructions shall be provided as part of the treatment process.*

---

[555] 5/31/22 Implementation Plan

**III.K.8.** *Routine and regular dental cleanings shall be provided to all prisoners at every IDOC facility. Cleanings shall take place at least once every two years, or as otherwise medically indicated.*

**OVERALL COMPLIANCE RATING:** Noncompliance (exacerbated by pandemic**)**

**FINDINGS:**

The COVID-19 pandemic has significantly impacted the provision of dental hygiene care and dental cleanings throughout the IDOC. Due to appropriate COVID-19 infection control precautions, dental cleanings were discontinued in April 2020 and based on the status of the pandemic in facilities and in the surrounding community dental cleanings were only intermittently provided in 2021. At the present time, IDOC facilities with dental hygienist staff are now providing dental hygiene services.

IDOC directly provided data on the dental cleanings provided at three facilities[556] and seven additional facilities[557] reported dental cleanings in the December 2021 CQI minutes. The number of dental cleanings provided at these ten IDOC facilities was reported to the Monitor.

| Data on Dental Cleanings done in December 2021 | |
| --- | --- |
| Danville | 22 |
| Hill | 36 |
| IRCC | 51 |
| JTC | 12 |
| Logan | 68 |
| Menard | 87 |
| Robinson | 32 |
| Southwestern | 66 |
| Taylorville | 21 |
| Vandalia | 31 |

Based on a 3/21/22 staffing update provided to the Monitor, twenty-five of the 28 IDOC facilities with dental suites now have allocated dental hygienist positions. Three facilities have not been allocated any dental hygienist positions.[558] Eight additional facilities do not currently provide dental hygiene services due to vacant dental hygienist positions.[559] The eleven facilities that currently lack onsite dental hygiene services house 9,950 incarcerated individuals.[560] Thirty-eight percent of the IDOC population now lack access to dental hygiene

---

[556] IRCC, Robinson CC, Vandalia CC
[557] Danville CC, Hill CC, JTC, Logan CC, Menard CC, Southwestern CC, and Taylorville CC
[558] Stateville NRC (population 976), Vienna CC (population 395), and Western CC (1,599) do not have an allocated dental hygienist position.
[559] Decatur (population 306), Dixon (population 1,413), East Moline (population 369), Graham (1,291), Jacksonville (population 617), Lincoln (population 723), Sheridan (1,116), and Stateville (population 1,145)
[560] Census data by IDOC for February 2022

services. An additional three facilities have partial vacancies that will further impact access to dental cleanings.[561]

Review of the December 2021 CQI minutes at the eleven facilities that are currently not staffed by dental hygienists did not report that even a single dental cleaning had been performed. At one facility without a dental hygienist, the vendor directed dentists to perform a dental cleaning.[562] The dentists declined because they did not have the proper equipment to do dental cleanings. The OHS Chief of Oral Health Services has voiced concerns about dentists being asked to do dental cleanings.[563] The Monitor also recommends that dentists at facilities without dental hygienist positions should not be directed to do dental cleanings; this would exacerbate the waiting time for patients requiring fillings, extractions, and dentures.

IDOC has also committed to but not yet performed a survey of space and equipment at all of dental facilities. Lack of dental chairs in multiple facilities may be a driver of lack of access to dental hygienists.

Unless the IDOC and its vendor expeditiously recruits and hires dental hygienists, it is highly unlikely that many of the fourteen IDOC facilities currently lacking full staffing of dental hygienists will be able to comply for a number of years with III.K.8 to provide dental cleanings at a minimum of every two years to the entire IDOC population.

The monitor has now recommended in all five Court Reports that all 28 IDOC facilities with dental suites should have a dental hygienist on the dental team.

**RECOMMENDATIONS:**
1. Hire at least one dental hygienist for each IDOC facility that has a dental suite.
2. Evaluate whether every facility has sufficient dental chairs and equipment to accommodate a working dental hygienist.
3. Expeditiously fill all vacant dental hygiene positions
4. Track and report the number of dental cleanings provided at each site on a monthly basis
5. Report biannually by facility on the number and the percentage of individuals who been offered and received or refused dental cleaning in the last two years

**Comprehensive Dental Care**

*Addresses item III.K.6; III.K.10.a-b; III.K.12*
**III.K.6.** *Routine comprehensive dental care shall be provided through comprehensive examinations and treatment plans and will be documented in the prisoners' dental charts.*
**III.K.10.a.** *Diagnostic radiographs shall be taken before every extraction.*

---

[561] Decatur CC, Logan CC, Pinckneyville CC
[562] Dixon CC, April 2021 CQI minutes
[563] Conference Call 4/17/21 OHS Chief of Oral Health Services indicated that dentist appointments should not be used to perform dental cleanings that would best be done by dental hygienists.

**III.K.10.b.** *The diagnosis and reason for extraction shall be fully documented prior to the extraction.*

**III.K.12.** *Dental personnel shall document in the dental record whenever they identify a patient's dental issue and dental personnel shall provide for proper dental care and treatment.*

**OVERALL COMPLIANCE RATING:** Partial compliance

**FINDINGS:** See Dental Documentation section

**RECOMMENDATIONS:** See Dental Documentation section

# Facility Internal Monitoring and Quality Improvement

*Addresses item II.B.2; II.B.6.l; II.B.6.o; III.L.1;*

**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**II.B.6.l.** *IDOC agrees to implement changes in the following areas: Effective quality assurance review;*

**II.B.6.o.** *IDOC agrees to implement changes in the following areas: Training on patient safety;*

**III.L.1.** *Pursuant to the existing contract between IDOC and the University of Illinois Chicago (UIC) College of Nursing, within fifteen (15) months of the Preliminary Approval Date [April 2020], UIC will advise IDOC on implementation of a comprehensive medical and dental Quality Improvement Program for all IDOC facilities, which program shall be implemented with input from the Monitor.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

Material requested by the Monitor to review facility quality assurance included:

- Any data or information to update work on the facility quality improvement program.
- QI meeting minutes for each facility for each month- as provided currently in IDOC quarterly submissions.
- Any tool developed by defendants to self-monitor performance.
- Any CQI or performance audits with results of study, analysis, and corrective action.[564]

---

[564] Monitor's Documentation Request dated 1/18/2022 items 5.c., 22, 68, and 69. IDOC provided a document labeled "Overview of Quality Improvement" on 5/2022 and a draft Implementation Plan dated 4/20/2022 that both mention facility CQI. IDOC also provided monthly quality improvement meeting minutes for most sites. Minutes from April through September 2021 were reviewed for this report. No tools to monitor performance or audit results were provided. Reports of External Facility Reviews were provided for 9 of 30 facilities.

Most facilities resumed reporting CQI studies by June 2021 after a pause of more than a year brought on by the need to manage through the initial COVID surge. The resumption of CQI brought no change in the quality of analysis or problem identification reported in the minutes of CQI meetings.

A preponderance of studies report on timeliness of care, documentation completion, or compliance with policy and procedure. [565] Examples include whether patients referred to a provider from sick call are seen timely, if vital signs were documented each shift, if notes are signed and dated etc. Studies are also very simple, looking at a single item rather than the context of care provided and whether it was necessary, appropriate, responsive, and comparable to clinical standards of care. For example, one study looked only at whether diabetic eye exams had been accomplished rather than reviewing the overall care of diabetics.[566] This approach to CQI is about monitoring task completion instead of identifying opportunities to improve the quality of patient care.

When problems are identified often there is no plan to improve or solve it. For example, one facility reported that only 8% of the population studied had their biennial dental exam completed. It was stated that this was due to COVID however no plan or goals were set to make up the deficiency.[567] Another facility reported poor clinical outcomes from chronic care visits that had been rescheduled multiple times.[568] Again no discussion of solutions to the problem or plans to improve are included in the minutes.

On those occasions that corrective action is identified the steps taken to improve are known not to be very effective. These include having staff read and sign a memo of understanding, reviewing the issue at a staff meeting, or just re-studying in the future to see if the results change. One study found that documentation of monitoring patients on hunger strike needed improvement. Corrective action was to follow policy, monitor and educate the nursing staff.[569] There was no analysis or attempt to understand factors that may contribute to documentation errors just repeated exhortations to complete the task correctly.

While there are many topics on the CQI agenda in addition to reporting CQI studies however, most simply involve presentation of data without associated analysis or discussion. Almost all facilities describe the volume of outpatient activity including trips to the ER, mental health services, dental activity, hospitalizations, numbers of persons with reportable infectious disease, and listing of medical furloughs. Even when statistics present problems, they are unrecognized and not addressed. For example, the number of individuals offered HIV testing at the time of release is reported by many facilities as well as the number accepting testing. There is never any discussion about the rate of acceptance or whether anything should be done to see if acceptance rates could be improved.[570]

---

[565] These observations and comments are made based upon review of the minutes from CQI meetings.
[566] A review of the overall care of diabetics would include whether there is a recent hemoglobin A1c, if feet were checked for neuropathy, medication continuity and adherence is monitored, labs results were available and acted upon by the clinician, immunizations up to date, etc.
[567] Taylorville, June 2021 CQI minutes.
[568] Hill, June 2021 CQI minutes.
[569] Joliet Treatment Center, CQI minutes for June, July, and August 2021.
[570] Graham for example had no one accept HIV testing upon release for all six months reviewed

Until facilities learn to identify, acknowledge, and correct real problems, the quality of care will not improve. The Monitor's input since the first draft of the Staffing Analysis has included the recommendation that positions at each facility be identified as responsible for quality improvement.[571]   The Monitor requested in the 3rd report that IDOC develop the position description for the quality improvement coordinator position, listing the training and experience needed and provide them to the Monitor for review and comment.[572] IDOC has yet to act upon the recommendations for staffing needed at each facility for quality improvement work.

The draft implementation plan made available to the Monitor in December 2021 included tasks to identify facility quality improvement coordinators, to train them in quality improvement methodology and safety, and to identify sites and teams to pilot the test phase of a quality program. Quality management teams were to be identified at each facility with training provided followed by a targeted statewide rollout.[573]  The Monitor had disagreements and comments on the draft plan which were submitted 1/14/2022 along with an example of tasks for implementation of facility CQI.

The Court directed Defendants to develop an implementation plan that was more satisfactory. IDOC hired a consultant to do this and a new version of a draft implementation plan dated 4/20/2022 was provided to the Monitor for review and comment. This version of the plan for facility CQI simply restates what currently exists, which is not effective.[574] The consultant was asked if the Monitor's previous feedback and suggested tasks for facility quality improvement had been considered in development of the April version of the plan. She replied that she did not and that her instructions were only to write tasks that were explicitly called out in the Consent Decree.[575] Therefore the Monitor has had no input in the plans for implementation of facility quality improvement listed in the April version of the document. On 5/10/2022 the Monitor provided written comments with disagreements and suggested revisions to IDOC on the April version of the implementation plan.

A revised policy on quality improvement was received from IDOC in August 2021. The revision still does not address all of the items required by the Consent Decree and did not describe the role of SIU in managing the quality program. The Monitor has provided this feedback to IDOC.

IDOC has still not developed a methodology for obtaining accurate data for quality purposes. IDOC provided an initial draft of an Annual Governing Body Report which is a summary of performance measures. The Monitor provided a list of 51 possible performance measures as an appendix in the 4th report.[576] There have been no further discussions of this document since it was initially presented by IDOC in May 2021.

Current policy and actual practice show no evidence of the new relationship with SIU or

---

[571] Health Care Monitor 2nd Report, Lippert v. Jeffreys, August 6, 2020, page 23.
[572] Health Care Monitor 3rd Report, Lippert v. Jeffreys, February 15, 2021, page 15.

[573] Defendants' Implementation Plan dated 12/30/2021, tasks 6-8, 42(9 & 11), 43, 48, 49, and 87.
[574] Monitor's comments on the Implementation Plan dated 5/10/2022.
[575] Meeting of the Monitor with the consultant and IDOC on 5/4/2022.
[576] Health Care Monitor 4th Report Lippert v Jeffreys (September 16, 2021) pages 240-243.

integration of the audit program, mortality review, performance measures, adverse event monitoring, or statewide quality program with the facility quality programs. In summary, there has been no meaningful change with respect to quality improvement at the facility level. This items remains noncompliant.

**RECOMMENDATIONS:**
1. Provide leadership and develop the expertise of facility staff to participate in meaningful continuous quality improvement.
2. Establish positions at each facility responsible for the CQI program.
3. Develop the job description for these positions with training and experience qualifications pertinent to leading and managing local CQI processes.
4. Revise the April 2022 version of the Implementation Plan to include tasks regarding facility CQI recommended by the Monitor.
5. Revise the policy on CQI to be consistent with the Consent Decree and the as yet to be finalized Implementation Plan.
6. Train local staff how to perform quality improvement studies including analyses, trending and reporting results and how to achieve meaningful and sustained change.
7. Improve statewide data resources to provide every facility with the data necessary to perform adequate quality improvement.
8. Provide mentoring of facility quality programs.

**Audits**
*Addresses item II.B.9*
**II.B.9.** *The implementation of this Agreement shall also include the design, with the assistance of the Monitor, of an audit function for IDOC's quality assurance program which provides for independent review of all facilities' quality assurance programs, either by the Office of Health Services or by another disinterested auditor.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

The Monitor requested any audits related to the Consent Decree or any performance audits for intrasystem transfer, intake screening, initial health assessments, non-urgent health requests, emergency response, pharmacy services, medication administration, medical refusals, discharge planning, dental care, and chronic care.[577] No information was provided by IDOC in response to this request. This is because the IDOC has yet to put an audit function in place that provides for an *independent* review of any facility. See the Statewide Internal Monitoring and Quality Improvement-Audits section for a fuller discussion of the status of the audit portion of the quality assurance program.

IDOC does have a process for internal and external review of facility compliance with written directives that is completed annually and managed by the Office of Administrative Directive Standards. However, this review does not address all aspects of the health care operation, nor does it consider the quality of care or patient safety. Members of the audit team are conscripted

---

[577] Monitor's Documentation Request dated 1/18/2022 item 69.

from other correctional facilities so is not an independent review by a disinterested auditor.[578] One or two members of each 10-15 person team are health care managers. If corrective action is needed it is predominately having responsible staff read and sign a memo stating understanding of the contents of a particular Administrative Directive and a statement directly from the AD of the performance expectation. There is no evidence of attempts to understand barriers to compliance or discussion of solutions to overcome problems with compliance.

**RECOMMENDATIONS:** None. See Statewide Internal Monitoring and Quality Improvement, Audits.

**Performance and Outcome Measure Results**

*Addresses items II.B.7*
**II.B.7.** *The implementation of this Decree shall include the development and full implementation of a set of health care performance and outcome measures. Defendants and any vendor(s) employed by Defendants shall compile data to facilitate these measurements.*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**
The Monitor requested any documentation of progress in development of performance and outcome measures since the draft of performance measures included as part of an Annual Governing Body report was discussed in May 2021. The Monitor provided a list of 51 possible performance measures as an appendix in the 4th report.[579] There have been no further discussions of this document or any other performance measures since.

The IDOC has not yet implemented comprehensive performance or outcome measures.

**RECOMMENDATIONS:** None. See Statewide Internal Monitoring and Quality Improvement, Performance and Outcome Measure Results.

**Adverse Event and Incident Reporting Systems**
*Addresses Items II.B.6.m; II.B.6.n*
**II.B.6.m.** *IDOC agrees to implement changes in the following areas: Preventable adverse event reporting;*
**II.B.6.n.** *IDOC agrees to implement changes in the following areas: Action taken on reported errors (including near misses);*

**OVERALL COMPLIANCE RATING:** Noncompliance

**FINDINGS:**

---

[578] Reports from nine facility External Reviews completed in FY 22 were provided to the Monitor (Big Muddy, Hill, Lincoln, Sheridan, Graham, Robinson, Shawnee, Southwestern, and Vienna).
[579] Health Care Monitor 4th Report Lippert v Jeffreys (September 16, 2021) pages 240-243.

The IDOC has not designed or implemented an adverse event or incident reporting system yet.[580] The pharmacy vendor does have a process for medication error reporting which includes some root cause analysis. There is evidence of corrective actions initiated by facilities to address medication errors. These are reported in the minutes of Quality Improvement meetings. However, a system-wide adverse event reporting system is not in place.

**RECOMMENDATIONS**: None. See Statewide Internal Monitoring and Quality Improvement, Adverse Event and Incident Reporting Systems.

**Vendor Monitoring**
*Addresses II.B.2.*
**II.B.2.** *IDOC shall require, inter alia, adequate qualified staff, adequate facilities, and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, effective peer review, and as to any vendor, effective contractual oversight and contractual structures that incentivize providing adequate medical and dental care.*

**OVERALL COMPLIANCE RATING**: Noncompliance

**FINDINGS:**
The Monitor has not received any individual facility monitoring reports.[581] Some facilities list vendor vacancies at the facility in quality improvement meeting minutes and occasionally there is some discussion of vendor performance. But there is no standardized evaluation or monitoring of vendor provision of care.

**RECOMMENDATIONS:** None. See Statewide Internal Monitoring and Quality Improvement, Vendor Monitoring.

**Mortality Review**
*Addresses items II.B.6.i; III.M.2;*
**II.B.6.i.** *IDOC agrees to implement changes in the following areas: Morbidity and mortality review with action plans and follow-through;*
**III.M.2.** *Mortality reviews shall identify and refer deficiencies to appropriate IDOC staff, including those involved in the Quality Assurance audit function. If deficiencies are identified, corrective action will be taken. Corrective action will be subject to regular Quality Assurance review.*

**OVERALL COMPLIANCE RATING:** Noncompliance

---

[580] The Monitor requested any documentation of progress toward an adverse event reporting system on 1/18/2022, item 5 c. v. IDOC provided no information in response to this request.

[581] The Monitor requested any vendor monitoring reports for each facility on 1/18/2022, item 26. IDOC provided no information in response to this request.

**FINDINGS:**
We received 55 death summaries written for deaths in 2021. The Monitor is aware of 124 deaths that occurred in CY 21. These death summaries vary in format and detail but basically summarize the patient's health status and course of care. They are not mortality reviews in that there is no reflection on the course of care or identification of opportunities for improvement. No death summaries have been received so far for deaths taking place in 2022. It appears that no one, including facilities, are performing mortality reviews. There are no meaningful reviews of deaths completed by IDOC or its vendors to identify opportunities for improvement.

**RECOMMENDATIONS:** None. See Statewide Internal Monitoring and Quality Improvement, Mortality Review.

# APPENDIX A

List of tasks in the December plan which were based on the Monitor's input that have been eliminated.

1. With assistance of Monitor implement a preventable adverse event reporting system
2. With assistance of Monitor develop a process to analyze and use adverse event reporting data to monitor quality of care.
3. Revise the job description of the Agency Quality Improvement Coordinator.
4. Fill the Agency Quality Improvement Coordinator position.
5. Develop a formal agreement with SIU on the Quality Improvement Program.
6. Create a centralized quality improvement dashboard.
7. Collaborate with Monitor on audit instrument. (narrative)
8. Develop an initial Compliance Survey (audit) Instrument.
9. Conduct annual audits of facilities to identify deficiencies. (narrative)
10. Meet with human resources and CMS to identify a process to facilitate hiring of health care staff.
11. With assistance of Monitor establish a patient safety program.
12. With Monitor develop and implement performance and outcome measures.
13. Develop a standardized protocol for patient treatment at reception centers to ensure chronic conditions are listed on a problem list, providers complete problem lists, medical and dental evaluations are completed, and patients receive a dental and medical treatment plan.
14. Train facility quality improvement coordinators.
15. Initiate process improvement projects on
    o Specialty care
    o Sick call
    o Chronic care
    o Medication administration
16. Increase access to HCV treatment.
17. Increase access to HCV treatment for persons with F0 and F1 fibrosis.
18. Consult with dietician to review prescribed diets and to develop a process for dietary counseling.
19. Make changes to urgent/emergent services consistent with Monitor's recommendations.
20. Develop procedures for intrasystem transfers consistent with Monitor recommendations.
21. Develop safety and sanitation audit instrument with Monitor.
22. Test safety and sanitation instrument with Monitor at multiple sites.
23. Seek assistance of Illinois Department of Aging to develop a survey on the elderly and infirm. (narrative)
24. Develop a survey with IDA to identify number of elderly with disabilities, memory deficits or other needs to form the basis for action steps to correct programming and housing needs. (narrative)
25. Review existing medical classification system for housing elderly and infirm.

26. Assess medical needs of elderly and infirm.
27. Review selection of deaths of elderly and infirm to make recommendations for improved care.
28. Hire consultant to survey medical needs of elderly and infirm.
29. Based on surveys and data reviewed, complete a report of the elderly and infirm population to describe in various functional status cohorts the medical beds or special housing arrangements available for this population, length of sentence, medical risks and conditions, nursing needs, functional capacity and disabilities, and need for specialty care of each group.
30. Commitment to ensure appropriate housing for infirm and elderly.
31. Provide medical recommendations to address deficiencies that impact the elderly and infirm.
32. Survey facility examination rooms to ensure that they are appropriately equipped to address medical needs.
33. Obtain consultant to survey the health care units and other clinical spaces.
34. Develop recommendations to ensure that current and future health care staff have sufficient work space to perform their duties.
35. Develop structural space requirements for each major facility.
36. Replace skin testing with IGRA.
37. Update the job description of the Environmental Services Coordinator.
38. Hire the Environmental Services Coordinator.
39. Assess infirmary needs including the number of infirmary beds per facility.
40. Task 72 which is a detailed group of eight subtasks on improving infirmary care.
41. Develop a mechanism to track physicians who lack training as specified in provision III.A.2., of the Consent Decree.
42. Establish an account with the National Practitioner Data Bank.
43. Develop a mechanism to remove unqualified physicians.
44. Finalize a plan for physician review.
45. Develop and implement a mortality review process to include Monitor recommendations.
46. The Agency Medical Director will assign facility healthcare specific positions including facility quality improvement coordinators.
47. Develop training for new staff on existing policies and procedures.
48. OHS will institute training on new initiatives.
49. Ongoing training to staff on policies, Consent Decree initiatives, Quality Improvement, and process improvement updates.
50. Training to be provided for job specific roles such as infection control and quality improvement coordinators.
51. Provide training to dental staff on items related to Consent Decree.
52. Develop a dental peer review methodology.
53. Develop performance reviews for dental assistants.
54. Identify a project manager for the electronic health record.
55. Identify a mechanism to track immunization and cancer screening until the electronic record is fully implemented.
56. Once electronic record is implemented develop immunization tracking system utilizing I-CARE or similar database, allow nurse to immunize patients under protocol, complete the immunization policy, and train nurses on immunization practices.

57. Hire staff outlined in the Staffing Analysis.

**APPENDIX B**
**MORTALITY REVIEWS**

Patient 1

In 2005 a problem list documented that this patient[582] had psoriasis, hypertension, and arthritis. He also had sensorineural hearing loss in the right ear. He was 70 years-old. On biennial examinations present in the record for 2013 and 2019 guaiac screening was done for colorectal cancer screening which is inadequate as a screening test. On a nurse evaluation on 12/19/19 a nurse documented a blood pressure of 148/98 but did not inform a provider. The patient asked to see a doctor for "neuropathy" in his lower extremities. The nurse referred to a provider but the appointment wasn't for almost a month. When a nurse practitioner (NP) saw the patient for nerve pain, the NP took no history of his complaint, and performed no examination related to his complaint. The assessment was bilateral numbness and the NP ordered vitamin B12, vitamin D, and vitamin C and a lumbar x-ray. Though the blood pressure was elevated (150/78) the NP took no action.

Two months later the NP reviewed the lumbar x-rays that showed degenerative disc disease. At this visit the patient, who was vegetarian, complained that he was only receiving his diet once a day and not for all meals. At this visit the patient had edema of his feet and the NP started a diuretic. The neurologic examination of the lower extremities was documented as "neuro intact", which does not document the findings.

On 3/4/20, the latest dental note showed that none of the dental notes were in a S.O.A.P. format as required by the Consent Decree.

On 4/23/20 the NP ordered a high protein snack with meals because the patient was vegetarian and presumably his diet wasn't being provided which the NP wrote "has caused vitamin deficiency". On 8/5/20 a NP documented receiving a letter from the patient that he wasn't getting his diet as ordered so he re-ordered the diet.

On 10/29/20 the patient complained to a nurse on a health request of numbness in his lower legs. On 11/3/20 a coverage doctor saw the patient and again took insufficient history and did not document a neurologic examination of the lower extremities. He ordered vitamin B12, an iron profile, vitamin D, and follow up after the tests. On 12/9/20 the patient had a positive COVID test. But there were no documented examinations for this. On 12/15/20 a doctor did a record review and noted that the laboratory tests were not yet done and re-ordered the tests. On 12/28/20 a doctor again did a chart review but the laboratory tests were not done and they were re-ordered. Two weeks later, the laboratory tests (B12 level, folate, iron, transferrin, and blood count) were all normal but no one discussed results with the patient. There were no documented evaluations for the patient's COVID.

On 2/4/21 a NP saw the patient documented the patient complaining of "memory issues" and problems spelling since his COVID infection. The NP explained that this was common but took minimal history and performed no physical examination.

---

[582] Patient #1 Mortality Review

In late February, the patient complained to a nurse about leg cramps and spasms. The patient was still on hydrochlorothiazide, which can cause these symptoms, but the nurse didn't document his medications on her note. A NP saw the patient on 3/2/21 for this complaint. The history was not thorough and the NP did not note that the patient was on hydrochlorothiazide which can cause these symptoms. A blood test was ordered. Though the NP's note assessed "muscle spasms, neuropathic pain", there was minimal history taken with respect to the neuropathic pain and no neurological examination was performed. Robaxin was started. On 4/2/21, another NP saw the patient who again complained of leg spasms relating a family history of Parkinsons disease. The Robaxin medication was not helping. Leg spasms are not a typical symptom of Parkinsons disease. Without taking a history and without performing a physical examination the NP diagnosed "possible Parkinsons" and started Sinemet, a medication for Parkinsons disease. This was inappropriate. The patient should have been referred to a neurologist because the NP did not perform an adequate history or physical examination for this condition. This was unsafe.

For two consecutive visits the patient wasn't seen due to security issues. On 4/29/21 a doctor saw the patient and took a history of knee pains when walking down stairs and a tremor that improved with exercise. The doctor stopped the Sinemet and ordered a knee brace. No neurologic examination was performed. The doctor did refer the patient to a neurologist to evaluate for Parkinsons disease but the offsite was denied by the vendor utilization physician who requested a better history and recommended a trial of gabapentin if restless leg was suspected. Referral to a neurologist is reasonable if Parkinsons disease is suspected, particularly if providers perform no history or physical examination.

On 5/20/21 at 9:05 am, a nurse used a chest pain protocol to evaluate a patient. The patient developed chest pain while running. The nurse couldn't get the EKG machine to work. The patient had jaw pain and hypotension (80/52) and the nurse called a doctor who ordered the patient to be moved to the hospital. The nurse did not document when the ambulance arrived or left the facility. The patient was given aspirin and oxygen but no other care was documented. There was no transfer-out form filled out so there was no evidence for when the patient left the facility. The hospital record is incomplete so it was unclear when the patient arrived at the hospital. At the hospital a dissecting aortic aneurysm was diagnosed and the patient died at the hospital.

OPPORTUNITIES FOR IMPROVEMENT
1. On multiple occasions, providers evaluated patients without taking an adequate history or performing an adequate physical examination. Not a single evaluation took place for which an adequate history or examination being performed. The vendor should institute an expectation and instruction on how to perform an adequate history and physical examination and should be identifying these problems in order to take corrective action. No supervision was apparent.
2. Laboratory tests were repeatedly ordered but not done at this facility. This problem should be addressed in the quality improvement program.
3. The patient had symptoms (spasm) that may have been due to hydrochlorothiazide but the medication wasn't reviewed when seeing the patient and this was not evaluated for.

4. The patient was started on a drug (Sinemet) without any history or examination which is unsafe care. The IDOC should discuss what oversight the vendor provides for its physicians.

5. The patient was not provided an ordered diet for a couple months. It is not clear how long his diet was missed.

6. The documentation on a critically ill patient was not thorough. It wasn't even clear when the ambulance took the patient. Urgent care should be documented in a timeline to the time the ambulance takes the patient to a hospital. This did not occur and appears to be frequently missed in IDOC records.

7. The EKG machine was not working calling into question whether routine inspections of equipment occur. The quality program should have results of checks of equipment. This should have been monitored and corrected.

Patient 2

This patient had dementia documented as early as 2016 on the problem list. The Monitor reviewed the record from July of 2019 to July of 2021 so at the beginning of record review the patient had already had dementia for at least three years. During much of the period of record review, the patient was unable to care for himself, requiring assistance to bathe, wash, transfer, or go to the toilet. At the beginning of the record reviewed, the patient was incontinent of stool and had an indwelling Foley catheter. He was not able to walk during this entire time and was bedridden or confined to a wheelchair. A normal conversation with the patient was not documented anywhere in the record that could be found.

A living will stated that the patient "*__being of sound mind, willfully and voluntarily__* make known my desires that my moment of death not be artificially postponed". The "do not resuscitate" document in 2016 had a patient signature that was disorganized and completely illegible. In 2019 an "X" replaced the disorganized signature. Two witnesses signed the document. Both witnesses to the patient signature signed a statement that the declarant was personally known to them and to be of sound mind. The patient had dementia documented when the first document was signed and by the time the last document was signed in 2019, he appeared profoundly demented. The Monitor questions how a person with dementia can willfully and knowingly make such a decision as a living will and how staff can formally attest that a demented patient is of sound mind. There was no effort documented, that could be found, to contact family by either IDOC or the medical staff. The Monitor does not question whether the decision to stop procedures that prolonged life was the right or wrong decision. But the process failed to consider the patient's or the patient's family's wishes and was not an honest decision. The document gave the impression that stopping further medical care was really the wish of the patient when because of the patient's dementia, it was likely the decision of the IDOC.

Intermittently, the patient had episodes where he exhibited anger. These were infrequent episodes. During one of these episodes when the patient was being transferred into bed, the patient swore at the nurse and threw his meal tray at the window of the infirmary room and spit at the window. The nurse documented that the patient was placed on segregation. The IDOC was recently asked what segregation status meant on the infirmary but the Monitor has received no reply to the question. For a person with dementia, this type of outburst should not be ascribed to an intentional behavior and punished but should be recognized as inherent to cognitive decline. To punish someone with segregation for behavior that results from a medical condition shows that custody still exerts control over medical management of patients which should not occur.

The patient had three chronic care visits. These visits failed to address the most serious problems of the patient and except for hypertension addressed none of the patient's problems. One visit was on 11/6/19 when a NP evaluated the patient. Virtually no history was obtained including from nurses caring for the patient. There was no review of nursing records or review of flow sheets. Though the patient had dementia there was no history obtained from nurses or examination of his cognitive status. On the 11/6/19 chronic care visit, the only history obtained was "no concerns". On the 4/10/20 visit, there was no documented history taken except "no concerns". On the 3/23/21 chronic care clinic, there was no history except that the patient had

191

"significant dementia". On none of the three visits was a physical examination documented except on the 3/23/21 visit when the provider wrote "alert[and]chronically confused. See routine exams in charts". However, routine examinations in progress notes did not have thorough examinations. Many had no examinations. Related to the patient's most serious problems, the patient did not have a provider examination of his decubiti, contractures, nutritional status, or mental status even after nurses documented on some of these conditions in their progress notes. These problems and issues were not even acknowledged even though they were amongst the most urgent problems.

Adverse drug effects of prescribed medications can contribute to cognitive impairment and exacerbate dementia.[583] This patient was on 12 medications. This qualifies as polypharmacy. Polypharmacy increases the risk of an adverse drug event and is associated with decreased physical and cognitive capability.[584] This could worsen the patient's dementia. Yet at none of the three chronic disease clinics was there any evaluation of his medications and there was no effort to reduce the medication burden which is recommended as a general rule for the elderly. At the first chronic clinic the patient was noted to be on both tramadol and Ativan. Tramadol is a narcotic and Ativan is a psychoactive drug. Both of these drugs have black box warnings from the Food and Drug Administration. Tramadol is a narcotic and carries a warning for addiction, respiratory depression and risks from concomitant use with benzodiazepines which Ativan is. Ativan has a warning for dependence, addiction, and risk with concomitant use of opioids, which tramadol is considered. Both carry warnings for use in the elderly including for fall risk. An indication for neither of these drugs was present in the medical record and it was unclear why these medications were being used. The tramadol was discontinued in January of 2020. The patient continued on Ativan throughout his incarceration without a stated indication. At none of the chronic disease visits were his medications evaluated. Indications for his medications were not clear. The fall risk for Ativan wasn't considered and did not result in any documented fall precautions for the patient. Whether the Ativan exacerbated the patient's dementia symptoms was unclear but should have been considered.

The patient had post stroke, hypertension, dementia, history of prostate cancer, right sided paralysis, decubiti, severe contractions of the right hand and arm and one leg but none of these conditions were assessed in chronic care clinic visits. The 4/10/20 visit mentions a prior stroke but the patient's severe contractures of his left leg and right arm and hand were not addressed or examined and physical therapy or bedside range of motion was not ordered. The only problem that was assessed was the hypertension. The patient's consistent and gradual weight loss over the two years of record review was not acknowledged in any of his chronic care visits.

Though the patient was described by nurses as conducting "self-care" for range of motion exercises, it did not appear that the patient accomplished range of motion exercises on his own. The patient developed severe contractures. On 8/7/19 a nurse documented that the patient received a wheeled walker and the nurse tried to have the patient stand and walk, but the patient was unable to straighten his legs at the knees and his right elbow and hand were so contracted he could not grab the walker handle. The patient was unable to take a step. This was the only documented nurse or provider note describing the contractures. To have contractures for legs,

---

[583] From UpToDate section on Management of the patient with dementia by Danieal Press updated 12/22/21
[584] From UpToDate section on Drug prescribing for older adults by Paula Aochon updated 4/26/21

hands and arms implies that the patient was without any physical therapy or assistance with range of motion and had prolonged static positioning which causes contractions. A nurse assistant, guided by a physical therapist, could provide bedside therapy which was not occurring. For the remaining two years of incarceration, nurses continued to document that the patient was conducting self-care for range of motion when it was clear that this was not happening. None of the provider notes examined showed any evidence of even acknowledging that the patient had contractures. No orders were given during this time period to ameliorate the contractures.

Care provided to the patient cannot be determined from nursing progress notes. Though the patient was on the infirmary, nursing progress notes were brief and discussed few interventions or care tasks conducted on behalf of the patient except for monitoring of the Foley catheter. Many nursing notes used a formatted note that was constructed like a physician note with examinations of mental status, eyes, heart, circulation, pulses, skin, lungs, abdomen, bladder and wounds. This is a function that needs to be performed by physicians and not nurses. The irony is that providers seldom examined the patient and yet nurses would document a nurse examination daily which was mostly unrelated to the real condition of the patient. For example, the patient had severe contractures, yet the nursing notes seldom mention the contractures though they routinely document normal heart and lung sounds. Nurses wrote these physical examinations, that should be performed by physicians, yet seldom discussed what the nursing plan of care was or whether and how it was executed for that day. The daily nursing progress note incompletely described nursing care for the day and do not describe meaningful evaluation of the patient or describe efforts to address the needs of the patient. Nursing care plans are not present system-wide. Since provider orders were not all in the medical record, it was unclear what care was ordered. Physicians should conduct an examination when they evaluate a patient. Nurses should address the nursing plan of care and examine the patient based on the care plan.

Some of nursing care is documented on flow sheets. There were three different flow sheets in the record: infirmary graphic flow sheets, a generic flow sheet which, for this patient, was used to track changing his Foley catheter, and a wound care flow sheet. The infirmary flow sheets document only whether a nursing staff assisted the patient with a certain task or whether the patient was self-care for the task. What the actual order was or how much time was dedicated to the task are not included. The tasks included bathing, oral hygiene, PM care, diet, bed rest, bed positioning, range of motion exercises, transfers, and walking. The flow sheet does not document contact hours with the patient and there is no indication how long it took to provide the service. Most sheets describe assisting this patient with bathing, oral hygiene, PM care, and transfers but the patient was documented as providing self-care for bed positioning and range of motion exercises and was described as non-ambulatory.

Infirmary flow sheets until 9/12/19 documented that the patient was self-care for all activities, then abruptly, on 9/13/19, all activities were documented as assisted. The nursing and provider progress notes did not describe a clinical change warranting a change in assistance. For a brief period in October of 2019 the assistance included range of motion but then that assistance ended without explanation. Other flowsheets from December 2020 sometimes described assistance with PM care and sometimes self-care for PM care. Range of motion and bed positioning were documented consistently as self-care. There were no physician orders found in the record for

193

these changes. Physician orders for care of the patient were not all in the record and one can only speculate how care was determined.

The patient had an indwelling Foley catheter but the indication for a permanent indwelling Foley catheter was not documented in the record. It appeared that the only reason for the indwelling Foley catheter was staff convenience. Indwelling catheters are more likely to result in urinary tract infections. The patient had several urinary tract infections, one of which resulted in hospitalization. The patient's catheter bag was to be changed every two weeks but was only documented as changed 22 of 26 times on available flow sheets. Flow sheets for changing the catheter were not all available in this record.

The cognitive status of the patient was not evaluated periodically so the degree of dementia was not tracked and was uncertain. During the period of record review nurses mostly documented that the patient was alert and oriented times three which means that the patient knew his name, knew the date, and knew where he was. However, the patient had significant dementia and this documentation appeared consistently inaccurate for the two years of record reviews. It did not appear that nurses knew what oriented times three means and they did not explain precisely what the patient was oriented to. Despite nurses writing this daily, a NP wrote on 2/5/21 that the patient was chronically disoriented. It wasn't clear if providers ever read nursing notes.

Provider progress notes were brief and not focused on the needs or conditions of the patient. Many provider notes merely acknowledge that the patient was there. One provider note, on 1/22/21, typical of many provider notes, consisted of twelve words: " S [subjective]: I'm fine, O [objective]: alert confused per norm, wheelchair bound A [assessment]: dementia P [plan]: CPM [continue present management]". There was virtually no provider examination or evaluation of contractures, decubiti, prior stroke status, worsening or improvement of his dementia, dietary needs, or his nutritional status. At times, when the patient was sleeping, providers would document their note but not return to see the patient when the patient was awake. Having seen the patient, the provider's task appeared completed even if the patient was sleeping. One such note consisted for the following nine words; "S: sleeping, O: no acute concerns, A: dementia, P: CPM [continue present management]". There was no follow up visit when the patient was awake.

The patient lost weight continuously from 2019 but never had a provider evaluation of his nutritional status. Weights were not obtained on the infirmary. At a 11/6/19 chronic clinic the patient weighed 209 pounds. The patient was not weighed regularly except at chronic illness clinics but at those clinics the weight loss was not acknowledged or acted on. At an emergency room visit at a hospital on 2/29/20 the patient weighed 205 pounds. The next weight found in the record was at a chronic clinic on 3/23/21; the weight was 173 pounds. This was a 36-pound weight loss over 16 months which was not even acknowledged. During this time period there were several low albumin tests that indicate possible malnutrition. Yet, no nutritional analysis was performed and no one even commented on whether the patient appeared to have an adequate diet. Providers did not document any evaluation of the patient's diet at either of these chronic clinic visits. The only mention of diet was on 5/22/20 when a provider wrote that the patient was "eating well" and on 8/5/20 when a provider wrote that the patient was "eating OK". Neither of these comments were appropriate clinical evaluation of dietary needs of a demented older

person.  On 9/15/20 a doctor wrote that the patient requested a soft diet stating that the apples were not soft.  The doctor did not examine the patient's mouth to assess the teeth to ascertain why the patient requested a soft diet.  However, diet as documented on the graphic flow sheet in October 2020 was a general diet so no change was made.

After a 1/13/21 hospitalization a soft diet with pureed meat was recommended after a swallow study showed that the patient had aspiration risk from a general diet.  A provider ordered a medical/dental soft diet with pureed meat on 1/16/21.  Graphic sheets from January 2021 showed that the patient was on a soft or mechanical soft diet; whether it included ground meat as recommended wasn't clear.  But by March 2021 graphic sheets showed that the patient was back on a general diet on which he remained throughout his incarceration.  At the 1/13/21 hospital visit, a dietician recommended assistance with meals but there is no evidence that this occurred as assistance with meals was not documented on the graphic sheet.

Because elderly patients often eat less due to dental problems, the patient's teeth should have been evaluated but this was not done.  The patient did not see a dentist throughout the entire two years of record review.  On 4/16/21 a new doctor made a referral to an offsite dental hygienist but this request was denied with a comment by the vendor utilization physician that "if there is not a dental hygienist available it is the responsibility of the onsite dentist to provide hygiene as needed.  Please call me to discuss equipment issues".  If broken equipment was the issue, it is unclear why it wasn't fixed.  The patient saw neither a dental hygienist or a dentist.  The vendor needs to provide adequate numbers of dentists and dental hygienists.  The lack of dental hygienists issues is a known problem in IDOC resolvable by hiring more dental hygienists.

The patient had three hospitalizations during the two years of record review.  On 2/29/20 a nurse evaluated the patient who appeared drowsy and appeared to have left sided facial droop.  He was sent to a hospital.  The albumin at the hospital was 3.1 indicating possible protein calorie malnutrition.  A CT scan of the head was done and showed only brain atrophy consistent with his dementia.  Fall risk prevention was recommended but there was no evidence of this in a therapeutic plan. No acute brain injury was identified and the patient was sent back to the prison.  Upon return the low albumin indicating possible malnutrition was not follow up on and a dietary consultation was not obtained.  The next physician visit after this hospitalization was on 3/3/20 but there was no mention that the patient went to the emergency room and no discussion of hospital findings. The only history was "no chief complaints".  The assessment was stable and urinary tract infection.  Why the provider was unaware of the hospitalization is unknown.

Progress notes in early January of 2021 documented no problems and flow sheets for this time period were not made available.  But, on 1/10/21 the patient suddenly developed significant hypothermia (94.6) with hypotension (90/68) and was sent to a hospital.  The patient was opening his eyes to stimuli but he was not verbally responding.  At the hospital, the patient's symptoms were attributed to a urinary tract infection.  The hospital recognized an eating disorder and identified dysphagia and noted it was chronic which was unrecognized at the prison.  A speech pathologist obtained a swallowing study which showed laryngeal aspiration showing the patient was at risk for aspiration pneumonia.  A special diet was recommended.  No central nervous system acute problems were identified.  The patient was discharged in three days on antibiotics and a soft diet with no bread and peanut butter.  Sips of water were recommended

with food. The albumin in the hospital was 2.9 indicating protein calorie malnutrition complicated by the problem with eating. The speech pathologist noted that the patient needed direct assistance with meals which was not documented as being provided at the facility. Hypothermia can be a result of lack of eating sufficient food and can be seen in elderly persons with failure to thrive.

When the patient returned to the prison, the doctor ordered a mechanical soft diet with pureed meat. No nutritional consultation occurred and no special orders were found for assistance with meals which was recommended by the hospital. Infirmary flow sheets did not indicate whether the patient received assistance with meals. Nursing notes did not document feeding. By 3/23/21 the patient weighed 173 pounds or a 36-pound weight loss over the past 16 months. The weight loss was not commented on. A dietician consultation was not obtained to determine if his prison diet was adequate. Nursing notes do not document how the patient was fed and infirmary flow sheets were not all made available.

After the January 2021 hospitalization, care was continued as usual without addressing recommendations of the hospital or without monitoring the patient's diet or dementia status. On 6/25/21 a nurse documented that the patient was lethargic, had slurred speech and was cool to touch. The patient had a temperature of 93.6 and the doctor ordered the patient hospitalized. The patient was again hypothermic. The diagnosis at the hospital was another urinary tract infection with bacteremia due to the Foley catheter. The dietary problems were again recognized at the hospital and the hospital recommended physical therapy, occupational therapy and speech therapy. The patient was discharged with an indwelling intravenous line for antibiotics. The patient needed follow up with a urologist. During hospitalization, the patient had chronic oropharyngeal dysphagia. Speech therapy was consulted and they recommended a mechanical soft diet with ground meat and sips of water but no peanut butter. Rehabilitation notes recommended a specialized diet and assistance with meals. The patient was evaluated on 7/6/21 upon return from the hospital. The doctor seeing the patient on return documented ordering a mechanical soft diet but infirmary flow sheets did not document the patient received this diet until 7/8/21. The hospital discharge physician orders included a certification that the patient needed post-hospital care and/or rehabilitation in a ***skilled nursing facility***. Apparently, Dixon had accepted the patient back to Dixon relating to the hospital that Dixon was a skilled nursing facility. Dixon does not provide care consistent with skilled nursing care. There was no evidence that assistance was provided to the patient when eating. None of the referrals by the hospital were carried out and it is not even clear that the patient received assistance with meals. The patient died ten days after discharge from the hospital.

Of note was that the patient had severe hypothermia before the last two hospitalizations. The July 2021 hospital record was incomplete and only the discharge paperwork was made available. However, hypothermia at 93 degrees is extremely low and likely in part due to severe malnutrition and lack of eating sufficient to sustain life. One of the patient's medications, Ativan, can cause hypothermia but the side effects of this drug were not monitored. This patient had two hospitalization during which hospital staff recommended dietary changes and assistance with eating. The albumin was low during both hospitalizations and was low when other testing was done at the prison. The patient had significant weight loss. Despite all these signals, a therapeutic plan was not developed to address this except to order a mechanical soft diet.

Assistance with meals was not documented as consistently occurring. The care of the patient did not meet all of the patient's needs. The patient had dementia and could not be expected to state his needs. But this patient had such severe dementia that he could not coherently inform anyone of his needs. But the clinical staff could not develop an appropriate therapeutic plan for the patient. It is clear that clinical staff either did not understand how to care for this elderly patient with dementia or lacked desire to do so.

OPPORTUNITIES FOR IMPROVEMENT

1. The elderly patients in IDOC need access to consultation services from a gerontologist. The number of gerontologists should be determined by the number of individuals who are elderly. This patient needed services of a gerontologist or an internist experienced in geriatric medicine.
2. IDOC needs to complete an analysis of elderly inmates by a physician gerontologist and correctional medicine to determine how to better care for this population.
3. Nurses on the infirmary need to develop nursing care plans consistent with provider orders. The nursing care plan should be documented and available in the record.
4. IDOC needs to review and revise their "do not resuscitate" and "living will" procedures so that persons with dementia are not permitted to give consent to these measures. An independent party or family member needs to be the consenting party for persons with dementia.
5. OHS needs to work with custody leadership to ensure that persons with cognitive disorders are not subjected to custody punishment for behavior that is related to their cognitive disorder. Patients with dementia should not be placed on segregation status. Training needs to be instituted for all professional and custody staff on how to properly manage aggressive patients with dementia. In all cases these types of patients are not to be punished for their behavior.
6. All of the patient's condition need to be addressed in chronic clinics. OHS needs to evaluate why so many chronic conditions fail to be monitored or managed.
7. Multiple, if not most, provider evaluations did not contain an adequate, if any, history and physical examination. The vendor Regional Medical Directors must create an expectation for a thorough focused history and physical examination and, if necessary, train their physicians on how to take a history and perform a focused physical examination and to document these in the record.
8. Nurses for almost the entire two years of record reviews were documenting that the patient, who had dementia, was oriented times three. It did not appear they understood what this means. A supervisory nurse at Dixon should do training on what "oriented time three" means.
9. The daily notes of nurse were written like physician progress notes using a formatted physical examination form typically used by physicians. Nurses examined the heart, lungs, "circulation", pulses, skin, lungs, abdomen, bladder, and mental status on a daily basis. Yet nurses did not describe how the nursing plan of care was conducted. OHS and Dixon should evaluate this nursing progress note and develop an improved means of documenting how nurses carry out the nursing plan of care. The expectation is not for nurses to perform work that should be done by a provider.

10. OHS needs to review nursing practice on infirmaries to ensure that nurses develop a nursing plan of care for each patient that is documented in the medical record and used as a guideline for how to care for the patient.

11. OHS should obtain consultant pharmacy services that assist physicians in managing persons on polypharmacy, identifying persons with potential serious adverse drug reactions that are not recognized, and assisting in identifying optimal medications in elderly patients.

12. Physical therapy services need to be available and provided at every facility. This patient developed contractures which should not have developed if physical therapy and bedside nurse assistant help was available.

13. OHS needs to have dieticians available for evaluation and making recommendations on infirmary units and for other patients in need. This patient lost significant weight and became malnourished apparently to the point of developing hypothermia on two occasion. It did not appear the patients malnourishment was recognized by providers.

14. When physicians see patients in chronic care, the indication for every drug should be established. Medications should be reviewed. Providers should consult with a clinical pharmacist, if necessary, to streamline elderly persons on polypharmacy.

15. The graphic flow sheet and other flow sheets should be reviewed and revised to better document care provided to the patient including who provided the service and contact hours with the patient. Terms on the graphic flow sheet and other flow sheets should be standardized and defined.

16. OHS should initiate a root cause analysis of use of indwelling catheters in elderly patients on infirmary units. Use of indwelling catheters should be consistent with contemporary standard. The indication of indwelling bladder catheter in this patient was not clear and unstated.

17. OHS needs to perform an analysis of how to care for patient with dementia and to establish rules for transfer to a higher level of care or for nursing home care. Use of typical housing for patients with dementia needs review as it may exacerbate their cognitive problem.

18. OHS needs to develop additional mechanisms to track, monitor and address weight and weight loss. This patient lost weight for almost two years without weight loss being identified as a problem requiring modification of the treatment plan. All infirmaries must have a mechanism to take the weight of persons who are in wheelchairs or who have difficulty standing.

19. Elderly patients on infirmaries must have access to a dentist. This person did not have access to a dentist for two years. The vendor denied access to a hygienist and did not provide access to either a dentist or hygienist. Elderly patients who lose weight should be evaluated by a dentist to ensure that the reason for the weight loss is not a result of correctable dental problems.

20. Review of hospital records was not apparent in the medical record. The vendor should review care by its providers to ensure that provider review all hospital records and recommendations and document review of these and modify therapeutic plans accordingly.

Patient 3

Another patient from Menard was 72 years old and according to the problem list his only problem was dementia identified in June of 2020. The record the Monitor received for review begins in September of 2020. Dementia is not viewed as a chronic disease by the vendor and IDOC and for that reason, apparently, he was not seen in chronic disease clinics for his dementia. At some point prior to September of 2020, custody placed this inmate on the infirmary as a security hold probably due to his dementia and inability to function in general population. Thus, custody and not medical was responsible for his infirmary housing which demonstrates a lack of housing for the memory challenged population in IDOC. Because the inmate was a security hold, normal monitoring by medical was not required, and ***there was inadequate medical monitoring and management*** of the patient because he was not officially housed on the infirmary, which was a form of mistreatment, neglect and abuse.[585] When medical staff (both providers and nurses) evaluated the patient periodically, they should have realized that he needed a higher-level care which never happened. Because the patient had dementia and there was no higher-level medical monitoring, the patient became responsible for eating, drinking, and hygiene but because of his dementia he was unable to care for himself and he progressively deteriorated over time. Because the patient was housed as a security hold on the infirmary, he also did not appear to have any mandatory out of cell time and this patient with dementia was housed in the equivalent of solitary confinement with expectations of caring for himself which could have contributed to his cognitive decline.

In November 2020, a nurse noted that the patient was confused and needed redirection to drink. At this point, there was no documented care plan issuing from orders that detailed the expectations for care of the patient. Around this time the patient weighed 165 pounds. The only reliable cognitive assessment in the record was by a mental health staff who noted that the patient was not oriented to place or time, was not engaging socially, had lost executive function, needed to be re-directed because he was easily distracted, and had difficulty with short term memory. The medical providers failed to conduct mental status evaluations, apparently not seeing it as part of their responsibility. Despite the significant dementia, physicians did not provide a therapeutic care plan that described how the patient was to obtain nutrition, fluids, maintain hygiene, etc. It appeared that nurses made ad hoc plans as they went along by default as physicians gave no direction. But because the patient was not an official infirmary patient, there was no tracking of vitals, weight, whether the patient ate, drank, or what his hygiene was.

---

[585] The definitions of neglect and abuse are from the Centers for Disease Control and Prevention Elder Abuse Surveillance: Uniform Definitions and Recommended Core Data Elements as found at https://www.cdc.gov/violenceprevention/pdf/ea_book_revised_2016.pdf. The definition of mistreatment is "Intentional actions that cause harm or create a serious risk of harm, whether or not intended, to a vulnerable elder by a caregiver or other person who stands in a trust relationship to the elder or failure by a caregiver or other person who stands in a trust relationship to the elder or failure by a caregiver to satisfy the elder's basic needs to protect the elder from harm". The definition of neglect is "The failure of a caregiver or fiduciary to provide the goods or services that are necessary to maintain the health or safety of an older individual". Abuse is defined in the CDC document as "The willful infliction of injury, unreasonable confinement, intimidation, or cruel punishment with resulting harm, pain or mental anguish or deprivation by a person, including a caregiver of goods or services that are necessary to avoid physical harm, mental anguish, or mental illness".

Nurses would occasionally document how much the patient ate, but this appeared to be optional and was not regularly performed.

Throughout the entire incarceration the patient remained a security hold on the infirmary. This was an unreasonable confinement that resulted in harm to this patient. There were daily nursing notes but with some exceptions the notes merely documented that the patient remained a security hold and that sick call was offered. This is the procedure similar to segregation status for a person with dementia which was cruel. Routine physician evaluations were not provided at intervals appropriate for the patient; providers saw the patient only when the patient appeared to be sick. It was unconscionable that any professional would allow a person with dementia to be housed in a cell, in the equivalent of solitary-confinement, without assistance with eating, drinking or activities of daily living.[586] Why did nursing or medical staff not transfer the patient to the infirmary for a higher level of care? At any point, nursing or medical staff could have admitted the patient to the infirmary but did not.

On 2/19/21 a nurse noticed a sore on top of the patient's head. A nurse asked the patient if he wanted to be seen on sick call but the patient was "a poor historian, unable to communicate what happened" and had dementia. Why was the patient asked if he needed attention; it should have been understood by the health professionals that the patient was not able to care for himself and had dementia. No action was taken. About two weeks later the patient was found unresponsive on the floor and was transferred to a hospital.

The patient went to a small local hospital and had a CT of his brain showing cerebral atrophy and ischemic changes consistent with his dementia. There was no cause identified for his unresponsiveness. The ER physician thought that the patient might have had a seizure. Though an outpatient electroencephalogram was recommended, this was not done when the patient returned to Menard.

The patient returned to Menard on 3/3/21 and didn't see a provider but a physician wrote a chart review that the patient was seen in the ER for new onset seizures. The patient wasn't examined. The patient should have been admitted to the infirmary due to his dementia and inability to care for himself. Two weeks later on 3/17/21 a nurse documented that the patient was crying and lying on the floor. Another nurse documented that the patient rolled out of bed in his cell and was found on the floor with a small superficial abrasion on his head. The fall did not result in fall prevention strategies to protect the patient. Since the patient was alone in a cell, transfer to a monitored infirmary cell should have been done but did not occur. The nurse called a doctor who prescribed Ativan by phone despite the patient having a recent fall. The rationale for this was not documented but it was not a prudent prescription as the patient had significant confusion and the Ativan would only worsen his confusion. This drug should be used with caution in debilitated elderly patients. In elderly patients there is an increased risk of death associated with

---

[586] The Illinois Adult Protective Services Act appears to require that health professionals report neglect and abuse similar to what is described here to the Illinois Department of Aging. The Act defines actions, similar to what occurred to this patient, violating the Illinois Adult Protective Services Act. Whether this act pertains to correctional environments is a separate issue. The violation of the spirit of the law should prompt IDOC to make appropriate changes to practice.

use and there is a caution for increased risk of fall and the patient had just had a fall. The doctor did not document the benefits of using this medication but the known risks were substantial; use of this medication was more likely to harm the patient especially since there was not a good reason for using the medication. The patient was still living in the health unit on security hold because, apparently, there was nowhere else to house him. Finally, a NP saw the patient on 4/8/21 which was the first provider evaluation since his return from the hospital on 3/3/21. The NP failed to review the hospital record and failed to note their recommendation for an electroencephalogram. The NP renewed the Ativan order without thinking about its purpose or potential harm. There was no physical examination performed and the NP did not document a history or review the record. The patient continued on the Ativan for another month when it expired without renewal.

Five months later, on 8/7/21, a nurse documented that the patient vomited after a shower. At this point the patient weighed 110 pounds which was a 57-pound weight loss since his 3/3/21 hospitalization. The patient was still housed in a cell without assistance with eating and not unsurprisingly he lost weight. On 8/8/21, a NP saw the patient because he hadn't eaten that day but was drinking fluid. The NP noted that the patient was "very thin, poor mentation, mumbles occasionally". The NP did not ask nurses or custody whether or what the patient was eating. The assessment of the NP was that the patient was deconditioned and labs and a chest x-ray were ordered. No monitoring or input, output was ordered. There was no order to assist the patient with eating and no order for special housing to ensure the safety of the inmate. There was no assessment of his nutritional status and no order for a dietician to evaluate his diet. He was left in his cell housing. The BUN test was elevated (26) which indicated that the patient was not drinking sufficient fluid and was dehydrated. An elderly person with dementia who was not eating or drinking sufficient liquid was neglected and placed at risk of harm and was being harmed which constitutes abuse.

A doctor saw the patient on 8/20/21 because a nurse notified him that the patient wasn't eating and nurses were giving the patient sweets and commissary food which he initially ate but then refused. The patient had a hepatitis A antibody indicating that he had a fecal-oral exposure at some time in the past. There was no attempt to place the patient in a higher-level housing more appropriate for the patient's needs. Nursing staff did voluntarily and intermittently begin initiating offers to have the patient eat and drink due to the patient's deteriorating condition. But there was no formal plan to care for the patient, and nursing offers of food appeared as an optional care plan developed ad hoc by individual nurses. This was neglect and abuse of an elderly person. The state of Illinois has a law[587] that requires persons delivering professional services to adults age 60 or older to report suspected abuse of elderly if the adult is not capable of reporting the abuse themselves. Whether this law pertains to the correctional environment is

---

[587] Adult Protective Services Act effective 7/1/13 found at
https://www.ilga.gov/legislation/ilcs/ilcs3.asp?ActID=1452 and its earlier version the Elder Abuse and Neglect Act (Chapter 320 IL CS 20/I et seq) as found at https://www2.illinois.gov/aging/protectionadvocacy/documents/ea-act_book.pdf    Mandatory reporters include: law enforcement, any occupation licensed under Illinois Dental Practice Act, Dietetic and Nutrition Services Practice Act, Medical Practice Act, Nursing Practice Act, Illinois Optometric Practice Act, Pharmacy Practice Act, Illinois Physical Therapy Act, Physician Assistant Practice Act, Podiatric Medical Practice Act

uncertain. However, if the law does not pertain to correctional environments, IDOC should adhere to the principles of this law and institute a similar reporting mechanism whenever there is elder mistreatment, neglect or abuse. The IDOC should consult with the Department of Aging to determine if the law is applicable to IDOC facilities and IDOC should consult with the Department of Aging on how to investigate mistreatment, neglect and abuse and whether the housing of this individual was, in effect, participating in passive neglect. [588]

On 8/21/21 the inmate was found on the floor with a blanket wrapped around his shoulders. Daily nursing notes at this time reflected a person documented as refusing[589] food often found wrapped in his blanket. On 9/1/21, a nurse referred the patient to the physician for further care and treatment options and wrote "awaiting direction from HCUA". The patient was still a security hold being housed in a cell on the health unit. A physician never saw the patient. No further direction from the HCUA was provided although on 8/31/21, a nurse documented that the ADA coordinator was requesting a transfer to Dixon. Why formal transfer to the medical infirmary as an acute patient was not done is reflective of the attitude toward this patient.

On 9/5/21 the patient fell again cutting his eyebrow. The nurse called a doctor who was updated but gave no orders and did not examine the patient. This was unsafe and neglectful and should have been reported. The following day the patient was found without pulse or blood pressure and sent to a hospital. Once at the hospital, they initiated a court appointed guardian as the prison had not yet done this. The hospital records state that the patient arrived from the local correctional center with minimal records and suffered from advanced/end-stage dementia. The patient was resuscitated by re-warming with intravenous fluids. He had renal failure with a BUN of 107 and creatinine of 3.4 from *severe dehydration*. He had neutropenia which was likely due to *severe malnourishment*. The patient needed a central intravenous line to feed the patient. The initial diagnoses were only shock and malnutrition. The malnutrition was ascribed to his advanced dementia. On arrival the patient had a core *temperature in the 70s* which is severe hypothermia; the patient was re-warmed and his cardia rhythm returned. The cause of his hypothermia was lack of nutritional support. While the patient had dementia, the lack of attention to the patient and lack of assistance with eating worsened the patient's condition. To take a patient with dementia and place them in a cell and expect them to eat normally without assistance is testament to the lack of appropriate housing and neglectful care for the elderly which IDOC was responsible for.

In this case, the dementia was end-stage and towards the end of life the patient did not voluntarily accept food. Malnutrition may indicate self-neglect[590]. But when a community-

---

[588] This case appears to fit the category of passive neglect as described in the Illinois Elder Abuse and Neglect Act. Passive neglect is described as, "the caregiver's failure to provide an older adult with life's necessities, including but not limited to food, clothing, shelter or medical care".

[589] The CDC in Elder Abuse Surveillance describes in their definition of self-neglect the following, "The behavior of an elderly person that threatens he/her own health and safety. This behavior generally manifests itself in an older person as a refusal or failure to provide himself/herself with adequate food, water". IDOC perceives refusals in persons with dementia as equivalent to refusals in a normal individual.

[590] Definition from Elder Abuse Surveillance, the CDC document. Self-neglect is an adult's inability due to physical or mental impairment or diminished capacity, to perform essential self-care tasks including – obtaining essential food and medical care. This patient exhibited self-neglect which placed responsibility on IDOC to care for him.

dwelling person has dementia and staff do not take time to feed the patient who cannot feed themselves or offer fluids to avoid dehydration, it is a sign of mistreatment[591] and elder abuse on the part of the care-givers.[592]  An act of omission that results in harm including withholding of necessary food and medical care is used to define elder abuse.[593]  For this patient, medical and custody staff were passive and took no official clinical actions to provide basic necessities and dignity to this man during the last year of his life. Based on the medical record, the patient, with dementia, was placed in what appeared to be the equivalent of solitary confinement with little human contact documented.  The patient lacked executive decision making since he had dementia and IDOC had the responsibility, therefore, to provide care for this man but failed to do so.  IDOC has no policy on care of the elderly with dementia.  This patient was apparently expected to act as a normal inmate with respect to feeding and drinking fluid.  Earlier attention to his needs should have been provided including some social interaction, assistance with feeding, and fluid ingestion, and placement in a setting where his hygiene was cared for, where he was protected from falls and injury, where he had human contact, and where his dignity could be provided during his remaining days.  If provided better care, he may certainly have lived longer.  Instead, he was left alone in a cell, had multiple falls, developed hepatitis A (which is a fecal-oral transmission), was not officially assisted with meals or encouraged to eat or drink, was expected to feed himself despite profound dementia, lost weight until he was cachectic, and deteriorated from malnutrition to the point of becoming severely hypothermic resulting in a cardiac arrest.  This horrific death should result in an internal investigation as to how this type of death never occurs again.  There was no formal nursing care plan.  While patients do die from failure to thrive, based on the medical record this patient appears to have been neglected.

The Wexford death summary's only history was that he was evaluated after a cardiac arrest and died after developing acute renal failure with hyperkalemia and died.  This death summary completely ignores the two years of lack of treatment by vendor staff.

OPPORTUNITIES FOR IMPROVEMENT

1.  IDOC should go through a process of asking the Department of Aging to investigate this case post mortem.  The purpose is to determine whether the care of this elder patient with dementia was neglect and if so, how it can be prevented within IDOC in the future.  The Department of Aging should weigh in on whether the Illinois Elder Abuse and Neglect Act pertains to the Illinois Department of Corrections and whether correctional officials, and professionals working within IDOC must act in accordance with this law.  If the IDOC is subject to this law, a training should be given to all professional staff on how to report elder abuse.  The responsible authority within Department of Aging should

---

[591] The CDC in Elder Abuse Surveillance defines mistreatment as "intentional actions that cause harm or create a serious risk of harm, whether or not intended, to a vulnerable elder by a caregiver or other person who stands in a trust relationship to the elder or failure by a caregiver to satisfy the elder's basic needs to protect the elder from harm".

[592] Elder abuse, self-neglect, and related phenomena, John Halphen in UpToDate last updated 9/13/21.

[593] Elder Abuse Surveillance: Uniform Definitions and Recommended Core Data Elements, National Center for Injury Prevention and Control, Division of Violence Prevention, Centers for Disease Control, Atlanta, Georgia. This

determine if any action should be taken against individuals involved in the care of this person as it appears that multiple professional and probably custodial staff violated the law.

2. Dementia should be considered a chronic illness and followed in chronic disease clinic.

3. The physician involved in managing this patient should be subject to peer review.

4. A root cause analysis should be performed on all security holds on medical units. The purpose of the analysis is to uncover why the person is put on security hold. If security holds are for inability to care for themselves, IDOC should conduct an analysis of how to improve housing for this population or should find solutions including alternate housing placements.

5. A gerontologist is needed to manage elderly inmates and re-training of staff on elderly management is urgently needed.

6. IDOC should initiate surveillance of the elderly population with dementia to understand how this population is currently cared for and housed.

7. IDOC needs to initiate training of its staff system-wide in appropriate treatment of persons with dementia.

Patient 4

This patient was a 71-year-old man. Only six months of records were provided. Records provided begin in February of 2021. The medical history was obtained from consultant notes and hospital reports and could not be determined from IDOC medical records alone because IDOC records contained so little information about the patient. A problem list was not included. The only chronic illness diagnoses documented in the IDOC progress notes or chronic care visits were anemia, prostate cancer, and breast cancer. Yet, the patient had 13 problems including heart failure, high blood lipids, obstructive uropathy, chronic kidney disease, atrial fibrillation, ductal breast cancer on tamoxifen alone, prostate cancer post radiation therapy on chemotherapy, hypertension, prior stroke, prior myocardial infarction, tubular adenoma of colon, post cardiac pacemaker, and prior bleed from radiation cystitis. The few notes that mention prostate cancer did not address the current status of that disease. The note that mentions anemia did not even acknowledge the source of the anemia.[594]   When breast cancer was mentioned in a progress note, there was no evaluation or update of status of that disease. None of the patient's chronic diseases were followed appropriately and providers did not appear to even understand what conditions the patient had. The patient was housed on the infirmary and needed assistance with bathing, PM care, transfers and walking, but it wasn't clear from the record why he was disabled. During a hospitalization, a physical therapist wrote a note that the patient had acute on chronic deconditioning and needed assistance with most activities and recommended a skilled nursing unit post discharge.

For most of the six months, there was no Medical Director at this facility. A physician assistant was mostly managing care. There were three different coverage physicians none of whom saw the patient for an extended period of time. A Medical Director was present during the last month of life. The only physicians managing this patient were the specialist and hospitalists, but once the patient returned to the facility management of the patient's chronic illnesses was not done. There were 33 provider face-to-face patient encounters but all of these were episodic evaluations for problems that arose ad hoc. At none of these provider encounters were any of the chronic disease problems updated or evaluated.

His **only** chronic clinic visit, in the record provided to us, was on 6/2/21 and remarkably documented anemia as his only chronic illness. His other 13 conditions were not acknowledged. There was no history on the chronic care note. The physical examination documented only that there was no murmur and the lungs had no wheezes or crackles. The hemoglobin was listed as 10.3. The assessment was chronic anemia from cancer in fair control and a blood count was ordered. Reading this note leaves the reader completely uniformed and misinformed and is a good example of the problems with the chronic care programs within IDOC. The note gives the impression that the only chronic illness of the patient was anemia. The other chronic illnesses were not monitored in the chronic disease program or in progress notes for his bi-weekly infirmary provider visits. In effect, the patient's other conditions were not monitored at all.

---

[594] The patient had radiation therapy to his prostate and developed radiation damage to his bladder. He also had an indwelling Foley catheter. Because he was on anticoagulants for his atrial fibrillation and because of the Foley and prior cystitis he bled and became anemic. In part, the anemia may also have been due to his multiple chronic diseases. In chronic disease clinics the reasons for his anemia were not stated.

Communication to specialists was not optimal. On 2/10/21 a cardiologist complained that it was "very difficult to determine what medications he was taking and when he was getting them". This is not unlike the Monitor's experience in reviewing records. Medication administration records could be improved. Because the current medication profile and status was not provided to the cardiologist, he was unable to draw a firm conclusion about a care plan.

Except for one specialty visit, specialty reports were not documented as reviewed and understood. The specialty reports were not all in the medical record. With respect to oncology, there was only part of one oncology report in the record so it was somewhat difficult to determine the course of care. Based on that partial note from 3/3/21 the oncologist wrote that the patient had just received cycle 5 of 6 of chemotherapy. A schedule for these chemotherapy sessions could not be found on the specialty care log maintained at the site in the quarter four of 2020 or quarter one of 2021. The partial oncology report that was in the record documented stage 1B ductal breast cancer for which the patient underwent mastectomy and had chemotherapy but the "insurance company" denied further chemotherapy because it hadn't been a year since the surgery. Nevertheless, the breast cancer was not metastatic and no lymph node involvement was identified at diagnosis in August of 2019. The patient remained on tamoxifen for this condition. The patient also had prostate cancer which was stage IIIC with no bony metastases but lymph nodes identified on CT scans. This was not late stage or widely metastatic disease. For this condition the patient was on chemotherapy and had apparently completed cycle 5 of 6 of treatment. This patient did not have late stage or end-stage cancer based on the partial oncology note provided.

On 4/4//21, a coverage doctor saw the patient specifically for DNR status. There was no discussion documented regarding who initiated the DNR status. The DNR form had a box checked for comfort-care only. This was unusual as the patient did not have end-stage malignancy at this point and though the other conditions of the patient were serious they were not imminently, at that point in time, end-stage. The doctor signing the DNR form was a coverage doctor who was seeing the patient for the first time. On 4/9/21, the patient appeared depressed and was refusing meals and had a changed affect. A physician assistant documented referring the patient to mental health. There were no mental health notes in the medical record and no evidence that mental health saw the patient. Shortly after the 4/9/21 visit when the patient appeared depressed, on 4/20/21, the patient told a coverage doctor that he didn't want to go to any outside appointments any more. This physician was unaware of the prior changed affect and apparent depression and did not document a discussion with the patient and had the patient sign a refusal. There was no documentation of what specialty appointment the patient didn't want to go to though the doctor did document that the patient had prostate and breast cancer. This patient was appeared to have depression. No one discussed his refusal in light of his possible depression. The patient did not have an opportunity to discuss the decision with the oncologist. There was no discussion documented as to why he was refusing or what his options were. His prognosis was not discussed. The patient never returned to a specialist.

At this point, the patient had an apparent reasonable prognosis. The oncologist note was incomplete and a prognosis was not evident in the record. The breast cancer was not metastatic and the prostate cancer was possibly in lymph nodes but was not metastatic to bone or other organs based on the partial oncology report in the medical record. Despite the patient having

treatable cancers, providers did not encourage the patient to seek further care. Care to all specialty services was ended.

Beginning in early March 2021 the patient began developing blood in his stool. The following day, on 3/11/21, he fell in the shower after feeling dizzy and appeared dehydrated to a physician assistant. Blood tests were ordered. The physician assistant documented that the oncologist wanted to be called about the blood test and during the call the oncologist recommended sending the patient to the hospital.

At the hospital the patient had multifocal bacterial pneumonia and respiratory failure with oxygen saturation at 80%. The weight at the hospital was 246 pounds. The patient was dehydrated on admission. The patient was transferred to a reference hospital due to the complexity of his care. Notes by the hospital physical therapist recommended continued physical therapy at in a swing bed facility[595] to address deficits and to reduce fall risk. He added, "however, [patient] is a DOC inmate, [patient] will require 24/7 physical assistance for functional mobility and use of a 2 [wheel walker] and continued [physical therapy] intervention". The occupational therapist also recommended a swing bed unit. The discharge diagnoses included pneumonia, heart failure, hypertension, prior stroke, prior myocardial infarction, atrial fibrillation, invasive ductal carcinoma of breast, high blood lipids, sepsis, clostridium difficile colitis, prior gastric ulcer, tubular adenoma of the colon, prostate cancer, post pacemaker and post AV ablation. The discharge summary stated that prior to admission the patient had multiple episodes of bloody diarrhea and a fall which resulted in sending him to the hospital but on admission he was found to be in respiratory failure. The diarrhea resolved in the hospital. The patient developed gross hematuria due to past radiation cystitis and being on anticoagulant for atrial fibrillation. The patient was recommended to follow up with the urologist.

After discharge from the hospital, the patient was housed on the infirmary. On return from the hospital, on 3/22/21, only medications and Foley catheter care were ordered. Though the hospital documented a need for 24/7 assistance, this was not completely provided. There were no orders from a provider for assistance with activity of daily living and nurse graphic flow sheets documented self-care for transfers and walking with a walker. This patient should have been sent to a skilled nursing facility. However, daily graphic sheets documented varying care none of which was ordered by a provider. Sometimes walking and transfer-care was documented as self-care, sometimes assisted, and sometimes assisted as needed with walker. It appeared that the decision was not physician directed but was an optional decision based on the nurse performing the duty. There were no orders for care on the infirmary. More importantly, because providers did not order care, hospital physical and occupational therapy recommendations were not addressed and nurses were left to determine how to manage the patient without physician direction.

The first provider note post-hospitalization was by a physician assistant who did not document review of the hospital discharge summary. His only assessment was history of prostate cancer. He did not acknowledge why the patient had been admitted to the hospital. The only plan was to continue current medication and to follow up as needed. The physician assistant did not acknowledge the therapist recommendation for 24/7 assistance. By not acknowledging the

---

[595] A swing bed unit is a hospital room that can convert from acute care status to a skilled nursing status.

multitude of medical conditions of the patient the physician assistant displayed near complete ignorance of the status of the patient.

Nurses documented, beginning on return from the hospital, that the patient had bloody urine. The patient apparently saw a nephrologist on 3/24/21. This report was not in the medical record. A week later, on 3/31/21, the physician assistant ordered to decrease the anticoagulant, Eliquis, from 5 to 2.5 mg based on a recommendation from the nephrologist. A nurse noted that the 2.5 mg Eliquis wasn't available and wouldn't be able to make the change until the next day. A provider wasn't called. The nurse decided, on her own, to give the patient the 5 mg tab until the medication arrived. Since the anticoagulant was causing the bleeding, it was inappropriate for the nurse to make this decision on her own.

On 4/19/21 the physician assistant evaluated the patient for blood in his urine and called an on-call doctor who recommended an INR and a blood count. The following day, the nurse, apparently without a physician or provider to consult with called the urologist because the Foley catheter was not draining and the thought the patient needed a bladder scan because the Foley was not draining. The urologist recommended sending the patient to the ER. The nurse documented that the patient refused to go to the ER. Later the nurse called an on-call doctor who said that the patient could see a coverage doctor the following day. When the coverage doctor saw the patient, the patient said he wanted to stop all outside appointments. The doctor merely had the patient sign a refusal failing to appreciate the patient's dejection and apparent depression. The patient's state of mind was not considered.

On 4/17/21 the patient developed nausea. The blood pressure, in this patient with hypertension, was 94/56 but no action was taken and nurses did not refer to a provider. By 4/26/21 the patient stopped eating food intermittently and nursing notes frequently documented that the patient didn't eat, but his weight was not tracked. Despite the decline in eating over the last four months of life, providers did not address his nutritional status or order a dietician evaluation. This complaint was ignored by staff. Even if only "comfort care" was provided his nutrition should have been considered and treated. The patient had low albumin in the hospital

Beginning on 4/18/21 the patient developed diarrhea which was never worked up and over the last four months of life the etiology of the diarrhea was not known. Frequently, the patient would complain to nurses of abdominal pain, nausea, and being unable to eat. The reasons for this were never investigated. On 5/7/21 the patient complained of nausea and "heartburn" which was not worked up. Abdominal pain and diarrhea should be worked up. A clostridia difficile test should have been ordered because the patient had this infection in the past.

In late May, on multiple occasions nurses documented that there was blood in the patient's stool but no action was taken. Around this time the diarrhea worsened. Nurses documented that the loose stool was red tinged. When a physician assistant saw the patient for this problem, on 5/28/21, the physician assistant did not order guaiac testing and ordered Bentyl which is indicated for irritable bowel but has no indication for diarrhea. By late June the patient was eating so little that nurses described the patient as gaunt. Despite this there was no provider attempt to evaluate his nutritional status or attempt to find out why the patient was not eating. In early July, because the patient had diarrhea and was incontinent nurses decided to reposition the

patient every two hours to prevent skin breakdown and obtained a verbal order from a physician assistant to do this.

On 5/29/21 the patient developed diarrhea which was unnoticed at the chronic illness visit. On 7/4/21 a nurse documented that the patient again had diarrhea and the nurse documented repositioning the patient to prevent skin breakdown. A provider didn't see the patient. By 7/25/21 the patient continued to have diarrhea for which he had not had a provider evaluation. There was a small buttock decubitus ulcer. The was no apparent physician at this site. On 7/26/21 the patient was incontinent and the buttock wound became contaminated. Finally, after almost two months a physician assistant saw the patient for his diarrhea. The decubitus was not evaluated. A clostridia test was not ordered. Mild dehydration was noted and the physician assistant ordered a liter of normal saline by IV and Bentyl which does not have a FDA indication for diarrhea. A clostridia test should have been ordered. On 7/28/21 a physician wrote a note without seeing the patient. The doctor noted that a nurse told him there were no pressure sores yet the doctor did not examine the patient. On 8/5/21 a doctor did a limited examination. The patient complained of diarrhea but the doctor did nothing to evaluate for this problem. Bentyl was ordered again for diarrhea and the doctor said he would discuss passionate release with superiors. There was no test for clostridia. There was no physician examination despite the patient having ongoing diarrhea.

During this time the patient was repeatedly documented as not eating his meals. Yet there was no evaluation of his nutrition. The patient had repeated low albumin tests; 3.2 on 5/11/21 and 2.5 on 6/25/21 and 7/9/21. These tests indicated likely malnutrition. On 4/28/21 boost was ordered. On the order for boost the weight was documented as 220 pounds which on the order date of 4/28/21 would have meant a 26-pound weight loss since the hospitalization on 3/12/21. Despite this weight loss no nutritional assessment occurred and follow up to ensure that the patient was receiving adequate nutrition did not occur.

On 7/14/21, a physician assistant documented that the patient asked for his pain medication to be increased. The physician assistant took no history and didn't even document where the patient had pain. He increased Tylenol for twice a day to three times a day. This did not help and the patient's complaints of pain increased and on 7/20/21 an on-call doctor ordered tramadol 50 mg every 4 hours for pain. Again, there was no examination or evaluation of the patient and the source of the pain remained unknown.

The diarrhea worsened and on 7/25/21 the patient developed a decubitus ulcer. A nurse not a provider noticed it, and providers did not evaluate the wound. On 7/27/21 a physician assistant evaluated the patient for diarrhea but did not order a guaiac test, and ordered no diagnostic testing. Bentyl was prescribed which does not have an FDA indication for diarrhea. The source of the diarrhea was not sought. The decubitus was not examined.

On 7/28/21 a new physician arrived and wrote his first note documenting that the patient had metastatic breast cancer which was not consistent with oncology notes. The patient had apparent stage IB breast cancer which was not metastatic but the complete report was not in the medical record. This patient did not apparently have clinical end-stage cancers which should have prompted greater investigation into the patient's nausea, lack of desire for food, abdominal pain

and diarrhea all of which pointed to a serious gastrointestinal problem. Apparently after the patient signed the DNR staff stopped all care for the patient except minor issues but this patient did not have a diagnosed end-stage disease from any of his known conditions. All staff just stopped any evaluations of the patient. On 8/12/21, the doctor changed the tramadol to fentanyl and wrote on 8/13/21 that the patient is "at end of life".

The patient's diarrhea worsened with multiple episodes per shift on some days. This complicated care of the decubitus wound which was at risk of becoming infected. The patient was eating very little and no documented effort was made to determine why. Beginning on 8/16/21, the patient's vital signs deteriorated. On 8/16/21 the blood pressure was at shock values of 77/54 with a pulse of 31 and oxygen saturation of 84%. The patient was not sent to a hospital; no evaluation occurred. The following day the pulse was 47 and blood pressure 86/51 with oxygen saturation of 84% but again the patient wasn't sent to a hospital with staff documenting to continue "palliative care". On 8/16/21 the patient asked for more pain medication for pain in his lower abdomen where a physician documented a large immobile mass. Despite this and despite his otherwise reasonable prognosis, the patient was still not sent to a hospital. No further action was taken and on 8/30/21 the patient died.

A partial autopsy was done. At autopsy the patient weighed 169 pounds or a 77-pound weight loss from hospitalization on 3/12/21 until death on 8/30/21 or about five and a half months later. The autopsy was only a gross examination; pathological sections were not performed. The gross examination of the abdomen where the patient was documented as having a large immobile mass only included a gross examination of the small and large intestines which except for the stomach and esophagus were not dissected open. There was no mention of gross metastatic disease and pathological specimens were not completed. The coroner's cause of death was complications of breast adenocarcinoma with evidence of mastectomy and pulmonary edema and congestion. The coroner was told there was clinical history of metastatic breast cancer but the patient, based on the record, did not have evidence of metastatic breast cancer.

OPPORTUNITIES FOR IMPROVEMENT
1. The conditions of the patient could not be determined by reading IDOC progress notes or chronic clinic visit notes. Vendor providers need to improve their management and identification of all of the patient's problems. Providers need to actively manage medical conditions of the patient. This should be done in the redesign of the chronic care program. In the interim, the vendor Regional Medical Directors need to provide sufficient oversight so that patients on infirmary units are protected from harm and have all of their conditions monitored.
2. The patient needed assistance with daily activity for all of his activities of daily living yet this assistance was not ordered and was optionally developed ad hoc by nursing staff.
3. There appeared to be no Medical Director at this facility for most of the time of record review. The vendor must ensure this key position is filled and if not filled reliable physician coverage is provided.
4. Specialty care consultations and hospital reports were not all present in the record and when present were not reviewed. Recommendations of consultants were not documented as reviewed and/or were not acted on. This system-wide deficiency must be corrected.

5. The patient appeared depressed and without evidence of evaluation for his depression, he signed a "do not resuscitate" (DNR) form and stopped attending medical appointments even though, based on specialty notes, he had a treatable cancer. The physician documenting the DNR form did not consider the apparent depression in having the patient sign the form and there was no documented discussion with the patient.

6. The patient had a fall but there were no documented specific fall prevention strategies. A fall prevention procedure should be established that results in specific instructions for specific patients on how falls will be prevented.

7. Dehydration and nutritional status of the patient were not monitored resulting in passive neglect.

8. The hospital recommended skilled nursing care, 24/7 assistance, and physical therapy for the patient, but the medical record documentation is inconsistent with skilled nursing care and the patient did not receive physical therapy. IDOC needs to consider whether they can provide skilled nursing care on their infirmaries and if not transfer patients like this to a skilled nursing facility.

9. Activity of daily living assistance appeared optional and determined on an ad hoc basis by nurses without direction by providers, who appeared uninvolved in decisions on activity of daily living.

10. The patient was not eating meals, had lost a significant amount of weight, had evidence of malnutrition, and yet had no provider intervention to take steps to protect the patient except for ordering boost. This needs oversight and corrective action by IDOC.

11. Management of end-of-life pain was not appropriate and is a systemic problem that should be subject to clinical review by IDOC.

12. The patient had long-standing diarrhea but there was no evaluation of the etiology and the patient was treated with Bentyl which has no FDA indication for diarrhea. Decubiti were not examined. Weight loss was never adequately evaluated. Dehydration was unrecognized.

13. The patient was documented as having metastatic breast cancer but according to the partial oncology report in the record, the patient did not have metastatic breast cancer and the prostate cancer was treatable. The ignorance of the status of the patient's prognosis was significant and resulted in not documenting or explaining to the patient an accurate status of his condition.

Patient 5

This patient was a 74-year-old man who had history of hypertension.  At a chronic clinic for hypertension on 2/5/20, the patient weighed 209 pounds.  The provider ordered a CBC and iron studies.  Apparently, there was a prior CBC which was not in the record sent to us.  The CBC test was returned on 3/10/20 and showed anemia (Hgb 9.9 with low ferritin).  A NP followed up the blood test on 3/13/20 and started iron therapy.  Despite the patient's age and having anemia a colonoscopy was not ordered which is the standard of care for his presentation.

Six months later, on 9/11/20 at a chronic disease clinic, the patient weighed 182 pounds.  The 27-pound weight loss was unrecognized.  The doctor ordered another blood count but continued the aspirin.  Anemia wasn't identified as a problem and no referral for colonoscopy was ordered.  The blood count returned on 9/26/20 and was 10.2.  When a doctor saw the patient on 10/1/20, the doctor documented that the patient didn't want a colonoscopy.  The weight loss was unrecognized and there was no documented discussion with the patient about the reason for the colonoscopy which was to evaluate for possible colon cancer.  A refusal was not obtained.  The doctor ordered guaiac tests.

Four guaiac tests were positive.  The patient signed a refusal for a gastrointestinal specialty appointment.  The reason for referral to the gastroenterologist specialist was not explained to the patient.  The doctor did nothing further except to continue iron therapy.

At the next chronic clinic visit six months later, on 3/24/21, for hypertension, the blood pressure was 155/89 and the weight was 168 pounds, a 41-pound weight loss.  The doctor ordered another iron profile and more guaiac tests but did not order a colonoscopy or discuss with the patient why the test was necessary.  The weight loss was unrecognized and the doctor did not adjust blood pressure medication for the elevated blood pressure.

A month later, on 4/26/21, the weight was 153, a 57-pound weight loss.  The doctor was called and ordered another blood count.  The doctor saw the patient the following day and the patient complained of diarrhea.  No history or examination was performed.  Without history or examination, the doctor ordered clear liquid diet for three days for loose stools and diapers.  The following day blood tests showed significant hypokalemia (potassium 3) and low albumin (2.9) that resulted from his diarrhea and probable malnutrition respectively.  The BUN was 41 showing significant dehydration and based on these tests and his anemia he should have been admitted to a hospital for colonoscopy and treatment of his hypokalemia and dehydration.

On 4/30/21, the patient weighed 149, a 61-pound weight loss but the doctor didn't recognize the weight loss.  The pulse was 110 and the hemoglobin was 8.6 a significant anemia.  The patient should have had prompt colonoscopy perhaps even hospitalized but instead of referring the patient for colonoscopy, the doctor referred the patient for a GI consult which would delay the colonoscopy.  The patient was agreeable for the workup.  The doctor also ordered stool guaiac testing.  The patient was still having uncontrollable diarrhea and needed diapers.  The patient started developing edema that became significant.  The guaiac tests weren't done until 6/18/21 about a month and a half later and were positive for blood in the stool.  Blood tests reported on that day showed significant anemia (hemoglobin 8.5); low potassium (3) due to his persistent

diarrhea; and low albumin (3) due to probable malnutrition. These were not reviewed or acted on.

Because of the diarrhea and being in bed, the patient developed a decubitus ulcer on his coccyx. The patient began being described as weak. A nurse wrote a plan for vital signs every shift, regular diet, activity as tolerated, and to continue his medications. The nursing plan did not even include an order to clean or place a dressing on the decubitus. Though ordered for GI consultation on 4/30/21, the patient didn't see the gastroenterologist until 6/23/21 almost two months later. A prompt colonoscopy should have been done but sending the patient to a gastroenterologist only delayed the colonoscopy. The gastroenterologist recommended a prompt colonoscopy and upper endoscopy, stool tests and blood tests.

On 7/1/21 the patient began bowel preparation for his colonoscopy. After starting the bowel preparation, the patient developed a distended, hard, and painful abdomen. A nurse explained that this was normal for the bowel preparation which is inaccurate. The patient had such severe diarrhea that he had difficulty getting to the bathroom and soiled himself. He was to eat nothing after midnight also in preparation for his test. He also developed a painful and distended abdomen after starting the bowel preparation and was having dark and loose stools. The following morning, at 10:45 am, the patient had trouble getting up. A nurse called a doctor who ordered stat blood tests. The patient was apparently not sent for his colonoscopy. By 6:30 pm the patient had continued severe abdominal pain with abdominal distention and diarrhea that was dark in color and likely bloody. The laboratory test results had returned and showed persistent anemia (hemoglobin 8.4), but significant dehydration (BUN 42), and acute kidney injury (creatinine 1.98). The nurse called the doctor with the laboratory results who remarkably ordered another laxative, lactulose which would only make matters worse. Lactulose is approved for use for severe constipation or hepatic encephalopathy but can result in dehydration, electrolyte abnormalities and abdominal cramping and distention. This doctor was prescribing a medication whose adverse reactions were exactly the problems that the patient was having. This doctor was responsible for this patient's care throughout and should be referred to peer review for unsafe practice. This was dangerous.

The following day on 7/3/21, the patient asked for pain medication because he couldn't eat or even sit up in bed. At 1 pm the patient was still having stomach pain with distention and had soiled himself and had feces on his legs. The nurse called the doctor who ordered the patient sent to a hospital. The patient was admitted directly to the intensive care unit and died on 7/10/21. The hospital report was not in the record. The cause of death was septic shock, perforated colon, and rectal cancer.

OPPORTUNITIES FOR IMPROVEMENT
1. The physician treating this patient should be referred for peer review. His inaction in promptly referring for colonoscopy significantly delayed diagnosis of the rectal cancer. He failed to recognize significant weight loss and failed to monitor a decubitus ulcer. When the patient had a severely painful, distended abdomen in the context of a possible gastrointestinal cancer, he prescribed a laxative that was likely to cause the symptoms the patient already had. This may have resulted in bowel perforation the contributed to the

patient's death.  This was a basic medical judgment issue that was addressed in an unsafe and harmful manner.

2. It took almost a year and a half to finally order the colonoscopy necessary to diagnose the patient's condition.  The vendor and IDOC should initiate training on how to diagnose colorectal cancer and the need for prompt colonoscopy.  It is not clear if the need for colonoscopy was initially discussed with the patient.

3. The vendor should provide training to nurses on bowel preparation for colonoscopy.  A nurse believed that a painful and distended abdomen was normal in bowel preparation.

4. The vendor should provide training on how and when to monitor weight loss.  This is extremely fundamental but is seen in multiple deaths.  Weight loss seldom results in timely diagnostic evaluations.

5. The vendor should train its physicians to timely obtain necessary diagnostic studies.  It appears that it is the vendor's practice to send patients for a consultant evaluation before a colonoscopy is ordered.  This practice delays colonoscopy by weeks or months.  If the vendor believes that its physicians are unable to appropriately refer for colonoscopy, then it should improve its physician cohort.

Patient 6

Only six months of this patient's record were sent.  In December of 2020 the patient developed COVID.  About four months later, on 3/25/21, the patient placed two health requests on the same day "to see someone immediately for this cough I've had for 6 months" and to see someone for weight loss and cough.  The cough preceded his COVID infection.  Because only 6 months of the record was sent, it wasn't clear whether a chest x-ray was done for his COVID infection. When a nurse saw the patient for his cough and weight loss the weight was 130 pounds and the patient had "side pain".  The nurse didn't document how much weight was lost. The nurse gave the patient Chlor-Trimeton, an antiallergy medication which was not on the protocol being used and was therefore out of scope of practice.  The nurse referred the patient to a physician but on 3/31/21 the patient placed another health request for weight loss and cough with left sided pain whenever he coughed.

On 4/9/21 a doctor saw the patient and noted chest pain with coughing and weight loss. However, the doctor documented that compared to last year the patient gained 3 pounds.  The doctor took no action and scheduled no diagnostic tests or follow up.  A complaint of coughing for over six months warrants a radiologic study yet nothing was done.  This was unsafe practice. Also, because the patient was a prior smoker[596] and was 70 years old, he should have had screening for lung cancer which was not done.  His complaint of long-standing cough and weight loss should have resulted in a CT scan of the chest.

On 4/26/21, a nurse using a "non-specific discomfort" protocol evaluated the patient for cough and left sided chest pain.  The pulse was 130 and the blood pressure 137/119 and the weight 132 pounds.  The patient was vomiting and had no taste or smell.  Later that day a licensed practical nurse (LPN) saw the patient and the pulse was 112 and blood pressure 157/100.  The nurse called a doctor who ordered a stat clonidine and to recheck the blood pressure in half an hour.  The patient was placed on the infirmary for 23-hour observation.

At 7 am on 4/28/21, while the patient was on observation on the infirmary, the doctor wrote that the patient was on doctor's sick call line but the patient was on the infirmary and "had [no] problems".  The doctor hadn't taken a history or examined the patient and came to a conclusion that the patient had nothing wrong with him discounting all the prior nurse documentation about abnormal vital signs, including fever, elevated blood pressure and pulse with cough and chest pain.   This was abandonment of professional responsibility and was unsafe practice.

On 4/28/21, at 9:30 am a RN noted cough, weight loss and loss of sense of smell.  The patient had fever of 100.7 and pulse of 128.   The nurse called the physician who ordered a COVID test and an influenza A and B test.  There was no evidence that the patient was isolated as apparently the doctor suspected COVID infection.  This was unsafe practice.

Later, at 2:15 pm a licensed practical nurse (LPN) saw the patient for vomiting, weakness, and being "unsteady".  The blood pressure was 150/92 and the LPN referred the patient to a physician.  Later that day, at 9 pm, a nurse evaluated the patient and documented that the patient

---

[596] This was listed on the problem list but the history by nurses and providers did not document a smoking history which should have been done in someone with long-standing cough.

had a pleural friction rub on both lungs. The patient was described as pale, coughing when breathing, and having an unsteady gait. Later at 9:30 pm, the same RN nurse documented the same vitals as obtained early at 9:30 am and said that the patient said he did not want to be removed from the infirmary. The nurse documented the patient recounting an episode earlier in the day when, "Dr [redacted] walked into the room and looked at him and said I don't know why you are over here, so I'm not gonna see you". The patient thought he had pneumonia. Security then placed the patient on security hold on the infirmary countering the physicians order to discharge the patient. When security has more concern and empathy for a patient than the doctor, it is cause for concern. This doctor was practicing in an unsafe manner and should be evaluated. The patient was monitored through the night and the COVID test was negative.

The patient remained on the infirmary as a security hold. The chest x-ray was done on 4/30/21 but wasn't read by a radiologist until 5/3/21 and showed RUL pneumonitis with right hilar prominence and right hilar prominence. The radiologist recommended a follow up chest film but a CT scan was indicated given the 6 months of symptoms with higher likelihood of cancer.

The physician finally saw the patient on 5/4/21, six days after the security hold was initiated, and admitted the patient to the infirmary. The admission note did not document cough, weight loss, or chest pains and only diagnosed "pneumonia". The doctor prescribed an antibiotic and high-dose prednisone. Prednisone has no approved indication for pneumonia. The patient weighed 124 pounds on admission to the infirmary.

On Saturday 5/8/21 at 8:30 am, the patient was having trouble standing up in order to urinate. The nurse gave the patient a urinal. The nurse called the doctor and the doctor started Flomax. Later that day, the patient still couldn't urinate and the doctor ordered a straight catheterization and a liter of urine was produced. The patient continued to be catheterized.

Beginning on 5/9/21 the patient had tachycardia which was persistent until he died. The pulse was 144 when the doctor next evaluated the patient on 5/10/21. The doctor documented that the patient was now urinating without problem but took no other history than the patient was now urinating and had an increased heart rate. There was no detailed history and no examination. The assessment was "resolved anuria, will address [heart rate and] then determine what steps to take". The doctor ordered an EKG which showed sinus tachycardia. This physician did not understand how to evaluate a person with abnormal vital signs, cough, chest pain and an abnormal x-ray and was practicing in an unsafe manner. No further evaluation of the tachycardia occurred and the doctor never documented a diagnostic assessment for the tachycardia.

The tachycardia remained throughout the entire incarceration. On 5/12/21 the doctor did not review the EKG and though the doctor documented a 12-pound weight loss over 2 weeks, no action was taken. The doctor did not know how to evaluate this patient's complaints and objective findings.

On 5/12/21 the patient vomited everything he ate but two days later, when the doctor saw the patient, he did not evaluate why the patient had vomited. There was no history and no documented examination. The doctor wrote that the lack of smell and taste resulted in a decreased desire to eat which apparently was the rationale for the weight loss. Laboratory tests

216

were ordered and the doctor ordered boost supplement. No nutritional analysis was done. On 5/17/21 the boost was discontinued because it was not approved by the vendor. The patient continued to lose weight and did not have a nutritional assessment.

On 5/19/21 the doctor documented that the patient was afebrile with "stable vitals". Yet, the patient had persistent tachycardia since 5/9/21 with a pulse of 117 on the morning of examination. Both the sedimentation rate and CRP tests were elevated indicating a significant inflammatory response. The doctor ordered a repeat chest x-ray; a CT scan of the chest was indicated given the patient's current status. Failure to recognize continued tachycardia was unsafe.

The chest x-ray wasn't completed until 6/1/21 and the report was dated 6/3/21. The x-ray report noted a right upper lobe opacity and prominent right hilum and recommended a CT scan to rule out malignancy. A doctor saw the patient on 6/9/21 but except for noting decreased appetite and a complaint of constipation, there was no history and no physical examination. Despite continued tachycardia, the doctor wrote "vitals WNL [within normal limits]". The doctor referred the patient for a CT scan as recommended by the radiologist. This doctor continued to be careless. The patient had persistent tachycardia but vitals were documented as stable.

The CT scan was performed on 6/18/21 and showed a right hilar neoplasm with possible endobronchial and lymphatic spread throughout the right upper and middle lobes. There was extensive bone metastatic disease with pathologic fractures of T5, T9, and L1 and possibly the 4th rib with suspected hepatic metastases. The doctor saw the patient on 6/23/21 but the CT scan results were unavailable so no action was taken.

On 6/24/21 the doctor reviewed the CT scan result and referred the patient to an oncologist. The referral was dated five days later that the doctor printed it on 6/24/21. The patient saw an oncologist on 7/7/21 who documented that the patient had a 40-pound weight loss. The oncologist recommended a liver biopsy to determine the pathology of the cancer and also recommended CT scans of the brain, abdomen, pelvis and thoracic spine. An MRI of the brain was done on 7/16/21 and showed small vessel disease and bone metastases in the cervical spine, skull base and calvarium.

On 7/20/21 the doctor documented seeing the patient for a post furlough 5-day visit but he didn't document what the patient was seen for, what occurred at the furlough or what the result of the visit was. These types of post furlough visits are not effective or meaningful yet are counted as a completed post-furlough visit even if the doctor doesn't document what occurred at the furlough.

On 7/20/21 the doctor referred the patient to radiation oncology. On 7/21/21 a liver biopsy showed poorly differentiated cancer. On 7/22/21 a CT of the abdomen showed masses throughout the liver and bones without pathologic fractures. On 7/30/21 an oncologist saw the patient and assessed poorly differentiated stage IV cancer and recommended an EGD to try to determine the primary location of the cancer so more effective chemotherapy could be instituted. The doctor documented that a colonoscopy was scheduled for 9/10/21. On 8/27/21 the oncologist saw the patient who appeared drowsy at the visit. The patient weighed 82 pounds at this visit which was a 54-pound weight loss over six months. The oncologist stated that testing

suggested a primary gastrointestinal cancer possibly from the pancreas. The oncologist noted, in addition, that the patient was unable to care for himself being extremely weak and cachectic and recommended hospice.

On 9/1/21 the doctor saw the patient who was barely audible. The doctor wrote that the oncologist gave a prognosis of less than 3 months. On 9/3/21 the doctor wrote that the patient now weighed 95 pounds. Despite diffuse bone metastases which are typically very painful, the patient had not yet had an evaluation for pain. At this visit, the doctor stated he spoke with the oncology office and they would not be doing follow up and recommended comfort care. The graphic sheets show that the patient was on self-care until 8/31/21, four days after the oncology visit. On 9/1/21 the graphic sheets show that the patient was assisted with all functions. It took an outside physician to identify the dire condition of the patient and respond to it. The doctor stopped all offsite visits apparently even for radiation therapy for his bone metastases without documenting a discussion with the patient. A discussion about radiation therapy for palliative purposes was not considered.

Despite widespread bone metastases, the doctor only asked the patient about pain once and did not evaluate the patient for this despite widespread bone metastases. Early in the course of his disease the patient had numerous complaints of pain. On 7/7/21 the oncologist took a history of intermittent pain in the right chest. On 8/10/21 a gastroenterologist saw the patient prior to a proposed colonoscopy. The consultant documented abdominal pain of moderate intensity occurring several times a week the majority of the day. The patient was on plain Tylenol until 8/25/21 when Ultram was started as an "as needed" basis. On 9/3/21 Ativan was started. A more thorough pain assessment should have been done given the patient's know metastases to bone. The patient died on 9/4/21 having had narcotic pain medication started 9 days before his death from widely disseminated cancer with bone metastases.

OPPORTUNITIES FOR IMPROVEMENT
1. The physician providing services for this patient should undergo peer review and considered for reduction in privileges. Care was incompetent and cruel.
2. The patient was over 70 and was a prior smoker. He should have had preventive lung cancer screening. When he developed a cough, instead of ordering a chest film, a CT scan should have been done.
3. The patient had six months of cough, complained of weight loss, was a smoker, and was over 70. The doctor thought that the patient had pneumonia when these symptoms are highly suggestive for lung cancer. The pattern of the diagnostic evaluations delayed diagnosis.
4. The doctor's care was not competent and was cruel.
   a. Six months of cough, complaint of weight loss, and chest pain in a smoker warranted prompt CT scan but it took almost three months of complaints before a CT scan was done delaying diagnosis.
   b. The doctor repeatedly did not evaluate the patient for his stated complaints.
   c. On 4/9/21, the 70-year-old patient who was a smoker complained of chest pain, 6-month history of cough, and weight loss. The doctor took no history, did no physical examination, and ordered no diagnostic testing or follow up.

d.  The patient had tachycardia (130), elevated blood pressure (137/119) and was vomiting. As the on-call doctor, he ordered only stat clonidine without follow up.

e.  The patient had loss of taste and smell with cough and had fever of 100.7 with pulse of 128. The doctor presumed that the patient had reoccurrence of COVID and ordered a COVID and influenza A and B tests. If the doctor thought that the patient had COVID the patient should have been isolated but was not. These tests indicated an unstable patient but the patient was kept in general population.

f.  When the patient was placed on the infirmary by nursing for observation because of abnormal vitals, the doctor determined that the patient had nothing wrong with him without even examining the patient. The patient had cough, abnormal vitals, and fever. The doctor was quoted as saying, "I don't know why you came over here, so I'm not gonna see you". He discharged the patient from observation. A custody person decided to keep the patient on the infirmary as a security hold. This was cruel and abandonment of physician responsibility to the patient. On a subsequent note, the doctor wrote "questionable if he had a true problem since he was afebrile [with] a normal WBC"

g.  From 5/9/21 until the patient died on 9/4/21 the patient had persistent tachycardia on most days. The doctor ordered an EKG but otherwise did not investigate why the patient had tachycardia and seemed unconcerned are unaware.

h.  On 6/18/21 a CT scan showed disseminated cancer with pathologic fractures of vertebra and possibly a rib with widespread liver metastases in addition to widespread lung cancer. This was likely to be very painful. Yet, the doctor never did a thorough pain assessment and the patient was treated with plain Tylenol until Ultram, a narcotic was started on 8/25/21, ten days before he died. The patient had pain early in his disease but as time went on, appeared to have less documented pain. The patient did describe not having pain to nurses numerous times but a better pain assessment should have been done but the doctor did not do this.

i.  The patient lost over 50 pounds over six months with a widely metastatic cancer. Though the doctor ordered boost supplement on 5/12/21, there was no evaluation or nutritional assessment of the patient. On 5/17/21 the boost was stopped because the vendor didn't approve it. The IDOC should ask the vendor for an explanation as to why they did not approve the boost for this patient.

Patient 7

This 37-year-old obese patient with no known medical conditions had repeated episodes of right foot, ankle, and leg swelling over months which was mostly addressed by nurses. He never had a work up for deep vein thrombosis. The patient was given compression stocking for unilateral ankle and leg swelling. Unilateral leg swelling is strongly suggestive of deep vein thrombosis. Yet, though the patient was seen four times by providers, there was never a history taken to exclude this diagnosis. The patient had at least one risk factor, obesity, but there was no history to exclude other risk factors. On four provider visits for unilateral edema, two included no examination; two documented identification of edema as the only examination. When providers saw the patient for unilateral leg or ankle swelling, they only addressed the patient episodically and ordered symptomatic treatment which in this case was compression stockings for the leg swelling. They did not investigate or evaluate for the cause of the unilateral leg swelling and should have ruled out deep vein thrombosis.

On 1/12/21 a physical therapist was measuring the patient for compression stockings and documented in the record that the right calf was 17 and ¾ inches and the left calf 14 and ¼ inches. Of physical examination findings a difference in calf size is the most useful physical finding to determine a DVT.[597] Three physicians failed to evaluate calf size. A NP saw the patient the day after the physical therapist measured calf size and even though the physical therapy note was written immediately above his note, he did not appreciate the meaning of this finding.

On 5/17/21 a nurse saw the patient who was dizzy and short of breath when walking. The oxygen saturation was 93% which is low. The nurse obtained an EKG and documented there were premature beats and premature ventricular complexes. Despite these serious symptoms and findings, the nurse did not consult a physician but referred for a routine appointment. The following day an emergency response was initiated while the patient was walking. He was brought to the health unit, was talkative and pale but after a short time he had seizure-like activity and experienced cardiac arrest. There was no timeline and although CPR was documented as starting it is not clear when it was started. The emergency medical service removed the patient but it is not clear when they arrived or left. The patient died at the hospital.

An autopsy was not available but the cause of death was listed as deep vein thrombosis and pulmonary embolism.

OPPORTUNITIES FOR IMPROVEMENT
1. One of the physicians who evaluated the patient twice and took no history and only identified edema as the physical examination is a non-credentialed physician who should be subject to peer review.

---

[597] Goodacre S, Sutton AJ, Sampson FC; Meta-analysis: The value of clinical assessment in the diagnosis of deep venous thrombosis. Ann Intern Med. 2005;143(2):129.

2.  Three physicians and a NP saw the patient but no one took an adequate history or even any history and no one completed an adequate physical examination with two providers not performing any physical examination. The vendor should train its physicians how to take a history and perform a physical examination.
3.  The most useful physical finding in evaluation for deep vein thrombosis is unequal calf diameter but a NP either ignored or didn't know that unequal calf size was an important finding.
4.  This patient had risk, signs, and symptoms of deep vein thrombosis and none of the providers were able to make this diagnosis and the patient died a preventable death from deep vein thrombosis and pulmonary embolism.

Patient 8

Only six months of medical record was provided.

The problem list documented asthma, diverticulosis, cardiomegaly, COVID +, benign prostatic hypertrophy, and "cardiac clinic". The meaning of cardiac clinic was unclear as this did not define a problem. One could not determine all the patients problems by only reading IDOC progress notes.

There was only one chronic clinic over the six month, on 4/27/21. The clinic was for asthma and hypertension/cardiac. There was no history. There was no physical examination except vital signs. There was no peak flow expiratory test. Despite no history and no physical examination, the patient was listed in good asthma control. The blood pressure was at goal. None of the other chronic medical conditions were addressed at this chronic clinic or at any other time during the six months. The patient had recently in December of 2020 been hospitalized and was in the ICU for hypoxic respiratory failure, hypercapnia, dysphagia and vomiting and was discharged with diagnoses of COPD, cor pulmonale, chronic kidney disease and a type 4 hiatal hernia. Except for the hiatal hernia, the other diseases, for which the patient was hospitalized, were not on the problem list and were not being managed in chronic clinic. The patient was referred to a surgeon for the hiatal hernia. Notably, the patient was thought to have asthma which was not being monitored but might have been COPD. In a subsequent surgical evaluation, the surgeon noted that the patient had sleep apnea but was not being treated at the correctional center. IDOC needs to ensure that all problems are identified which means that the vendor needs to train its physicians to identify all of the patient's problems and manage them. This is not now being done. Referral dates are not organized chronologically.

During the six months of records provided, the patient was referred for six specialty appointments. All six of the referral dates on the specialty care tracking log were inaccurate comparing the IDOC 7105 referral form date with the referral date on the log. Three of six approval dates were inaccurate on based on comparing the Wexford approval document with the date of approval on the log. Documentation in the record lists the collegial review date which was used for the referral, approval and date appointment was made. There is no policy or procedure on maintaining these logs and no definitions for dates to be tracked. These logs cannot be used to track appointments for purposes of verifying compliance.

The patient had a severe condition in which his stomach had protruded through a hernia in the diaphragm into the chest and his entire stomach was in his chest cavity. This resulted in esophagitis and a motility disorder which placed the patient at risk of aspiration pneumonia and esophageal disease. This disorder was not entered into the problem list. His other conditions including cor pulmonale, which is right sided heart failure, was also not entered into the problem list. The chronic obstructive lung disease was also not present in the problem list but asthma was, and it is unclear whether the prison physicians failed to appropriately diagnose this condition or whether the patient had asthma that ultimately transformed to chronic obstructive lung disease.

Over the six months of care, the patient was seen by a NP once for chronic cough during a COVID lock down. No evaluation occurred but a chest x-ray was ordered. A physician evaluated the patient six times. Once was in follow up of the chest x-ray in which the doctor wrote without any other history that the patient's breathing was "OK". No other history was taken and no examination was documented. The doctor wrote that the x-ray showed no acute changes but the report of the x-ray stated, "bibasilar opacities remain unchanged. No significant overall change. Chronic bibasilar atelectasis and/or scarring. It would be difficult to exclude associated infiltrate." The doctor did not accurately portray the chest x-ray report. The second physician evaluation, on 3/3/21 was when the doctor saw the patient for cough. The doctor noted that the patient had COVID in the past and had history of asthma/COPD. There was no history about the current complaint of coughing and there was no physical examination. The doctor noted that the patient was still on anti-reflux and antacid medications used for his esophagitis. The assessment was only "S/P [status post] COVID+". There was no plan. The remaining four physician visits were for post furlough visits. All four of these visits merely documented that a post furlough visit occurred. The documentation did not include what specialty care the patient received, a synopsis of the report, a discussion with the patient, or how the specialty visit would change the therapeutic plan.

There was no autopsy, no hospital record from the final hospitalization. The record provided gives few details of the last two months of life. On 5/21/21 a nurse wrote that the patient was vomiting and the right side of his face was drooping but on examination by the nurse the face was not drooping. The nurse took no action saying that the patient was scheduled for a surgical visit for his hiatal hernia. That his vomiting was likely due to the hiatal hernia was ignored.

On 5/31/21 the patient placed a health request saying he had been vomiting all day. On 6/1/21 a RN saw the patient using a "non-specific discomfort" protocol for complaints of low back pain and "vomits all the time". There was no history of the vomiting. The nurse provided Tylenol but no referral was made.

On 6/2/21 and 6/4/21 there were DOC 0090 transfer forms in the record but the destination for transfer were not documented on the forms so it wasn't clear where the patient was transferring to. The patient's surgery, according to the specialty care log, was scheduled for 6/7/21 and the specialty care log documents that the 6/7/21 surgery occurred on that date but that the surgery was at Southern Illinois Hospital not Barnes St. Louis Hospital.

The mortality list documents that the patient died on 7/26/21 with a cause of death listed as septic shock, empyema, and pneumonia. The medical record had no autopsy, did not document where the patient was transferred to on 6/2/21 or 6/4/21 and did not document whether the patient was actually sent to Barnes St. Louis for his surgery. There was no hospital report and so it was unclear where the patient died. The IDOC medical record fails to give an accurate portrayal of the patient's conditions and when the specialist and hospital records are absent, it is extremely difficult to understand what happens to the patient.

OPPORTUNITIES FOR IMPROVEMENT
1. Chronic clinic visits do not include appropriate history or physical examinations pertinent to the patient's conditions. Many conditions of the patient are not addressed in chronic

clinics or in episodic care. The IDOC should insist that the vendor train its physicians to properly perform and document a history and physical examination.

2. The specialty log is inaccurate. It appears that there is no standardized procedure for maintaining this log including definitions for date entries. IDOC should develop a standardized procedure for completing these logs. The items included should be an accurate date of referral, the date authorization was obtained, the date the appointment was scheduled and the date the appointment is completed. If the appointment is rescheduled the rescheduled date should be included and well as the date the appointment was finally completed.

3. The patient's cor pulmonale, chronic obstructive lung disease, and severe esophagitis were not monitored.

4. The patient had repeated vomiting but providers did not monitor this symptom which likely resulted from his severe hiatal hernia.

5. The IDOC 0090 Transfer Summary form is used when the patient is sent to a hospital or specialty appointment even though it was designed when being transferred between two IDOC facilities. When used to send someone to a hospital or for a specialty appointment, the form seldom includes where the patient is being sent so it fails to accurately inform the reader of the record about what is transpiring for the patient. A new form should be designed for referrals to hospitals and specialty care appointments. In this case, the patient had Transfer Summary forms completed on 6/2/21 and 6/4/21 but there was no destination on the form. The patient was scheduled to go to Barnes St. Louis for surgery for the hiatal hernia but there is no evidence that he went. The schedule log documented that on 6/7/21 the patient was scheduled for and went to Southern Illinois Hospital for hernia surgery. This process is chaotic and disorganized and needs to be corrected.

6. There were no notes after a nurse saw the patient on 6/1/21 for "vomiting all the time". It is unclear what happened the last two months of the patient's life. There was no hospital record, no documentation in the patient's medical record, and no explanation provided as to what occurred. The patient apparently died in a hospital but there was no hospital report in the medical record. The medical record was uninformative and did not contain all hospital reports.

7. Only six months of medical record was received. It is not clear how long this patient had the hiatal hernia and whether earlier surgery could have prevented his death.

Patient 9

This 62-year-old man was incarcerated at Graham on 12/15/21 at 9:30 am. A nurse obtained a history that the patient had history of "cardiac/HTN" but was on no medications. On top of the intake form the nurse documented Lisinopril verified at a pharmacy. The patient used methamphetamine, marijuana, and alcohol. The nurse documented pitting edema bilaterally. The patient denied any breathing problems. The oxygen saturation was 99%, pulse 121 with BP 124/74. The assessment of the nurse was tachycardia, off medication for nine weeks and bilateral lower extremity edema. Despite the bilateral edema and tachycardia, the nurse did not call a doctor and ordered a routine examination. The nurse documented "no" to placement in general population but did not document where the patient should be housed. The nurse wrote for a low bunk and low gallery assignment. Patients with tachycardia and edema indicate possible heart failure and a physician should have seen the patient promptly or at least the same day.

At 11:40 pm a code 3 was called and a nurse documented that the patient was found sitting in a wheelchair, incontinent of urine and pale with beads of sweat on his forehead. He was taken to the health care unit. The patient was given an aspirin to chew and a nitroglycerin tablet and an electrocardiogram (EKG) was performed. While the electrocardiogram was being performed, the patient began gasping for breath and turned purple and cardiopulmonary resuscitation (CPR) was started. The automated electronic defibrillator (AED) did not advise shock but compressions continued until patient came to and responded. The EKG was completed and 911 called. He was put on oxygen and given a second nitroglycerin. He was "fighting to sit up" when he collapsed and gurgled. CPR was restarted and he regained consciousness within seconds. He collapsed a third time and CPR was started again and another nitroglycerin was placed under his tongue. He did not regain consciousness and emergency medical technicians took him out at 12:35 pm. If the time technicians transported the patient out is accurate, it took an hour for the ambulance to arrive.

The patient was seen in the emergency room at Hillsboro Hospital. He arrived in the emergency room in asystole[598]. The doctor noted that the prehospital rhythm was ventricular fibrillation and that by the time the patient arrived at the hospital he was in asystole. The doctor wrote that he was told that the patient had just gotten off the bus on arrival to Graham CC and he collapsed and CPR was started. Troponin was high (0.11 with normal 0.01-0.03); WBC 17.1. The patient did have ventricular fibrillation in the ER when the doctor evaluated the patient and defibrillation was attempted.

There was no autopsy, cause of death, or mortality review completed for this patient.

OPPORTUNITIES FOR IMPROVEMENT
1. The patient had tachycardia and apparent leg edema which can indicate heart failure. He should have been promptly referred for provider evaluation or at least seen that day instead of referring as a routine.

---

[598] Asystole signifies no cardiac impulse on EKG

2. As with other CPR episodes, a timeline for resuscitation is not kept so that the effectiveness of CPR cannot be evaluated. Any resuscitation effort should include a timeline with precise times that events were started and completed.

Patient 10

Patient 10 was a 76-year-old at the Taylorville facility. His problem list documented hypertension, HIV, type 2 diabetes, neuropathy, and COPD. However, he was seen in chronic care only for diabetes, hypertension, high blood lipids and sometimes for heart failure. He also had atrial fibrillation, chronic kidney disease, and prostatic hypertrophy. As with other patients, his chronic medical conditions could not be identified by only reading IDOC progress notes.

The patient had four chronic disease clinics occurring at fixed times and not based on the degree of control of his conditions. The 1st clinic was documented as being for diabetes. At the 2nd clinic three months later, the patient was seen for diabetes asthma, hypertension, and high blood lipids. At the 3rd clinic, six months later the patient was seen for asthma, high blood lipids, diabetes, hypertension, heart failure, coronary artery disease, and mitral regurgitation. At the 4th clinic, six months later the patient was seen for asthma, diabetes, hypertension, high blood lipids and heart failure. The patient had no chronic clinics for prostatic hypertrophy, chronic kidney disease, diabetic neuropathy, or COPD. His anticoagulation for atrial fibrillation was not monitored.

Between the 2nd and 3rd clinics, the patient had the following incidents occur.
1. He was treated for pneumonia on an outpatient basis;
2. He had an acute exacerbation of COPD and was admitted to the infirmary and treated for pneumonia;
3. He had more than one abnormal chest x-ray showing interstitial opacities;
4. He was admitted to a hospital for pleural effusion with pneumonia, atrial fibrillation, heart failure and had two liters of fluid drained from his pleura (the hospital recommended to stop his aspirin after 30 days because Eliquis was started in addition to clopidogrel);
5. He was admitted a 2nd time to a hospital for heart failure and diagnosed with chronic kidney disease;
6. He was admitted a 3rd time to the hospital for heart failure, mitral regurgitation and diagnosed with diabetic neuropathy and nephropathy and had an INR of 13.3, which is life-threatening, and had a recommendation for follow up with the cardiologist to decide whether a procedure was indicated for his mitral valve; and
7. He had two falls about a month before his next chronic clinic appointment due to dizziness.

At the third clinic none of these issues were discussed or identified. Despite three admissions for heart failure and identification of severe mitral valve dysfunction possibly requiring surgery the condition was not even addressed and the recommendation for cardiology follow up was not mentioned and the patient was never evaluated for mitral valve surgery as recommended. The patient was seen for asthma but actually had COPD and oxygen saturations typically used to monitor that condition were never obtained. The falls were not addressed and there was no plan for how to prevent these. Historical details for each of the patient's conditions were not taken. Absence of taking a history is evident on all IDOC progress notes and chronic disease notes. For example, the patient had COPD but there was no questioning regarding changes in dyspnea, exercise tolerance, need for inhaler use, or sputum production. It isn't clear whether providers

know that these questions should be asked, whether the they don't do it for other reasons, or whether the system is designed not to ask these questions. The format of the chronic disease form makes one believe that the system is designed not to ask these questions but this deficiency should be investigated further as it is a major departure from standard medical practice. Between the 3rd and 4th clinics the patient experienced the following.

1. The patient had another fall and bruised his scalp. The patient wasn't evaluated by a provider.
2. The patient had an episode of confusion but did not have a cognitive evaluation even though he had previously fallen.
3. The patient was seen by an ophthalmologist and had a cataract extracted from his left eye and also had a retinal detachment repaired. The ophthalmologist did not document a diabetic retinal examination.
4. The UIC HIV provider saw the patient and stated that the patient was on tamulosin and terazosin which were the same class of drug and one should be discontinued as it placed the patient at risk for hypotension. Notably the patient had past hypotension that contributed to all three of his recent falls.
5. The patient was hospitalized for weakness. He was seen only in the emergency room and had mild to moderate cerebral atrophy consistent with senescent changes.

At the next chronic clinic, **the patient** asked to be evaluated for Parkinson disease and dementia but this was not done. The doctor failed to note any of the significant clinical incidents that had occurred since the last clinic included the confusion, the fall, and the hospital brain CT scan showing early dementia. The doctor failed to acknowledge the UIC recommendation to stop one of the drugs being used for prostatic hypertrophy which may have contributed to the patient's dizziness and falls. He failed to note the eye surgeries. There was no history regarding cognitive changes even though the patient asked for this evaluation. This was an important aspect of his care that was ignored.

At **none of the chronic clinics was a history taken of any of his conditions at any of his visits.** This was in spite of significant events. The patient was on 21 medications. Two of his medications were of the same class and both could cause hypotension which the patient developed resulting in three falls. Despite UIC recommending to stop one of these drugs in February of 2021, the patient continued these drugs throughout his entire incarceration. Throughout his entire incarceration, the patient remained on aspirin despite a hospital recommendation in July of 2020 to stop it because the patient was on two other anticoagulant drugs. The patient was thus on three drugs that contribute to bleeding (aspirin, clopidogrel, and apixaban). This was dangerous since this patient was a fall risk and actually had several falls which could lead to life-threatening bleeding if on an anticoagulant. UIC recommended decreasing the dose of metformin from 1 gram twice a day to a half gram twice a day because metformin interacted with one of his HIV medications and could cause lactic acidosis. This was recommended in November of 2019 but wasn't recognized and acted on until August of 2020. After the discontinuation in August of 2020, the medication was increased back to a gram twice a day in September of 2021. The 21 medications should have been consolidated and the Monitor continues to recommend addition of clinical pharmacist to assist in medication management, especially of the elderly and those on polypharmacy, which this patient was an example of.

The patient never did have his cardiology follow up to evaluate for mitral valve clipping. He never had a foot examination in the chronic clinics despite being a diabetic and never had an examination for neuropathy despite being diagnosed with this condition. The patient had severe heart failure and while assessed only once for this, the assessment was "stable", yet the patient had atrial fibrillation and a severe dysfunction of his mitral valve and had a 20% ejection fraction and possibly needed mitral valve surgery but the physicians were oblivious to this important fact. His chronic kidney disease wasn't even acknowledged as a problem and his creatinine was not documented as being monitored. This was especially important because metformin can cause a life-threatening lactic acidosis with kidney failure and monitoring for this is important. Vaccinations weren't addressed at any chronic illness clinic. Cancer screening including lung and colon cancer were never discussed.

This patient's mitral regurgitation, COPD, chronic kidney disease, early dementia, and neuropathy were unmonitored. The patient eventually developed shortness of breath with vomiting on 10/16/21 and a nurse evaluated the patient using a shortness of breath protocol. The nurse did not ask if the patient had been vaccinated for COVID. The patient had cough. The oxygen saturation was 88%. The nurse, believing that the patient had asthma obtained peak expiratory flow rates of 250/300/306 and notified a physician who gave a phone order for albuterol by nebulization. The possibility of heart failure or even COVID weren't considered. No follow up was ordered. The provider responding to this erred in that a chest x-ray should have immediately been done along with a COVID test at a minimum. The patient should have therefore been sent to an emergency room but was not.

A nurse saw the patient again for vomiting on 10/20/21. The nurse took a history that the patient vomited every day after morning medline; this had not been noticed before. The blood pressure was 97/56 and oxygen saturation 99%. A physician referral was made and a physician saw the patient on 10/22/21 and noted shortness of breath for 1-2 months with cough. A COVID test wasn't done but the doctor suspected heart failure or exacerbation of COPD and ordered a chest x-ray, a number of laboratory tests including a BNP and admitted the patient to the infirmary. These blood tests were not in the medical record and apparently were not done. The patient had bilateral lung findings (ronchi and crackles) and 3+ bilateral leg edema suggestive of heart failure. The doctor also ordered prednisone 40 mg for seven days, oral amoxicillin (an antibiotic), and Lasix, a diuretic. The chest x-ray showed heart failure with bilateral pleural effusions and a possible infiltrate suggestive of pneumonia on the right lower lobe. This presentation has a pneumonia severity index[599] of class IV with a 9.3% mortality risk and should have been hospitalized but instead was kept on the infirmary. His risk factors were male sex, age of 76, pleural effusions, heart failure, and chronic kidney disease. He remained on the infirmary and on 10/27/21, at 9:50 pm, the patient was "found" on the floor after a fall and had a bruise on his head. His pulse was 38 with a blood pressure of 97/47 lying down and 102/49 standing. Despite the pulse of 38 which was extremely low, the nurse stated that the patient would see the doctor in the morning. This was an error. The patient should have been admitted to a hospital. Notably, at this time the patient was on aspirin (which had been recommended to be discontinued) clopidogrel and apixaban all three of which can cause bleeding.

---

[599] This score is a way to assess severity of pneumonia by giving it a class and risk score that help to determine if hospitalization is indicated. Those with class 1-2 can reasonably be treated as outpatients. Those with class three should either be observed in an ER or hospitalized. Those with class four and five should be hospitalized.

The following morning the doctor ordered rib x-rays which showed three broken ribs and moderate sized pleural effusions. The blood pressure on 10/28/21 at 11:15 pm was 83/54. The patient's pneumonia severity index was higher but still class 4. The doctor ordered ultram, a narcotic pain medication, whose side effects include a Food and Drug Administration black box warning for life-threatening respiratory depression. This drug is to be used in caution in the elderly. The patient received several doses of this drug. The respiratory depression warning should have been heeded as the patient had presumed pneumonia, pleural effusion, and possibly heart failure for which respiratory depression could be life-threatening.

On 10/31/21 at 9 am the patient had jerky eye movements and had a hard time swallowing and the nurse called a doctor who sent the patient to a hospital where on arrival had pleural effusions compressing his lungs, had probable atrial fibrillation, was extremely dehydrated and in renal failure (creatinine 2.51, BUN 85), had oxygen saturation of 89% on five liters of oxygen and was transferred from the local hospital promptly to a hospital with an ICU bed. On arrival at the reference hospital the blood pressure was systolic in the 60s with a BUN of 94 and an INR of 13.3. Within two days the patient went into cardiac arrest and died. The autopsy showed bilateral pneumonia with diffuse consolidation. This patient should have been admitted to a hospital nine days before he actually was and his death was probably preventable.

OPPORTUNITIES FOR IMPROVEMENT
1. The IDOC should hold the vendor responsible for having physicians update the problem list so that it is accurate.
2. Patients are not evaluated for all of their chronic medical conditions and the IDOC should hold the vendor responsible for doing so.
3. Serious interval clinical episodes occur between chronic clinics that are not addressed at chronic disease clinics even when they pertain to chronic diseases. All of the patient's chronic diseases should be identified, tracked and monitored as frequently as needed.
4. The chronic care form should be abandoned and a better format used to document chronic disease monitoring.
5. The patient was on polypharmacy and probably had early dementia and should have had his medications reviewed and streamlined as appropriate. The patient was also on several drugs that had potential drug-drug interactions or adverse reactions that were not addressed. The IDOC should hire a pharmacist(s) to act as a clinical pharmacist to monitor persons with serious disease and on polypharmacy.
6. The patient had multiple falls and had cognitive difficulty but there was no documented fall prevention plan for the patient.
7. The patient had cognitive difficulty and needed either infirmary care or a specialized memory unit care because he had cognitive difficulties making general population housing unsafe.
8. Follow up of specialty care was not appropriately performed. A root cause analysis should be done of the specialty care program to improve safety and timeliness of appointments.
9. Providers appeared to treat the patient's COPD as if it were asthma. The vendor should provide training to its providers on COPD and how it should be managed.

10. Histories were not performed at any chronic illness clinics and are seldom appropriately done for episodic care. Appropriate physical examinations are seldom done. The vendor should be held responsible for performance of their physicians and mid-level providers and create an expectation that providers perform a history and physician examination and train physicians how to do this if they do not know.

11. The patient was confused and asked to have an evaluation for Parkinsons disease. IDOC should hold the vendor accountable and require cognitive evaluations when indicated. A procedure for this should be established.

12. The patient had shortness of breath, cough, and an oxygen saturation of 88%. Instead of sending the patient to a hospital, the nurse seeing the patient called a physician who only ordered albuterol believing that the patient had asthma when the patient had COPD or asthma/COPD. No follow up was ordered by the provider. No x-ray or labs were ordered. This on-call provider evaluation should be reviewed by the vendor with a written report regarding appropriateness and corrective action steps.

13. On 10/20/21 the patient began vomiting and had low blood pressure (97/56) but wasn't seen for two days. When the physician saw the patient, he ordered a chest x-ray and blood tests, parenteral Lasix, high-dose prednisone, and an antibiotic. The doctor presumed the diagnosis of COPD or heart failure and therefore should have started oxygen. The patient had prior pleural effusion on 9/15/21. A pneumonia severity index even without using laboratory results was 96 (male sex, 76 years old, heart failure, pleural effusions 9/15/21 and 10/22/21) and therefore class IV. The patient should have been hospitalized instead of keeping the patient on the infirmary. IDOC practitioners tend to keep patients on the infirmary when they should be hospitalized and the IDOC should require the vendor to provider training on when the hospitalized patients.

14. On 10/22/21 the patient with shortness of breath, cough, and abnormal lung sounds should have had a COVID test done and placed in isolation until proven negative.

15. Lab tests ordered 10/22/21 were not done. This was for an infirmary patient for an acute problem and should have been stat. If laboratory tests could not be obtained the same day the patient should have been hospitalized.

16. A nurse saw the patient at 9:50 pm on 10/27/21 on the infirmary after a fall with a bruise on his head and pulse of 38 with blood pressure of 97/47 and the nurse documented that the doctor was notified and said he would see the patient in the morning. This was an error. The doctor should have admitted the patient to a hospital. This patient had significantly unstable vital signs with known pleural effusion, hypotension, and pneumonia and was very high risk of mortality. The IDOC should evaluate why the vendor does not timely refer patients to the hospital.

17. The patient fell at 9:50 pm on 10/27/21 and a provider examined the patient on 10/28/21 at 9:15 am. Though the patient had bruising, x-rays were not ordered until 4:30 pm. These x-rays were apparently not ordered stat. The x-ray was taken 10/29/21. This x-ray should have been ordered stat due to the potential for harm to the patient from his fall as well as for a follow up of the prior 10/22/21 x-ray showing bilateral pleural effusion and possible pneumonia. The x-rays showed three broken ribs but the x-ray report wasn't available until after the patient was hospitalized. If IDOC keeps patients like this on the infirmary stat laboratory tests and x-rays need to be available.

18. On 10/28/21 at 11:15 pm a nurse obtained a blood pressure of 83/54 indicating probable shock. The nurse did not contact a physician. The IDOC should ask the vendor for its

procedures related to abnormal vital signs and ensure that they are appropriate. The patient should have been sent to a hospital but the nurse took no action.

19. On 10/29/21, the day the x-rays were taken, the doctor ordered a narcotic (ultram) which has a warning regarding respiratory depression. To use this medication with a person with probable pneumonia and COPD, and shock-level blood pressure outside of a hospital was ill-advised. The use of tramadol in IDOC is poorly monitored and the vendor should provide IDOC evidence of it monitors tramadol use. The doctor should be questioned regarding care of this patient.

20. The patient was not admitted to a hospital until he developed jerky movements of his eyelids and arms and had facial edema. When admitted to the hospital, he had heart failure, interstitial lung opacities, anasarca, moderate sized pleural effusions, altered mental status, glucose of 373, BUN 85, creatinine 2.51, abnormal liver functions, oxygen saturation 89% on 5 liters of oxygen. The vendor failed to timely refer this patient to a hospital resulting in a preventable death. The IDOC needs to hold the vendor responsible for failures to timely refer patients to the hospital.

21. This patient, appeared to have dementia yet never had a cognitive assessment and was not protected from falls or other injuries related to persons with cognitive disability.

Patient 11

This patient was 49 years old and was incarcerated at NRC on 11/25/20. He had bilateral inguinal hernias but was not referred for treatment. The patient had anxiety and depression but no other medical conditions were noted.

Beginning at NRC the patient began complaining of back pain. Initially, on 12/21/20, a nurse saw the patient and gave the ibuprofen. On 12/28/20 the patient transferred to EMCC. At EMCC, the patient complained twice of diarrhea on 1/11/21 and 1/24/21 and was treated both times by a nurse with Pepto-Bismol. On1/25//21, a doctor saw the patient for the diarrhea. At that visit, the patient complained of abdominal and groin hernias and intermittent diarrhea helped by Pepto-Bismol. The patient asked for a low bunk. The only examination was to look at the hernias. In the plan, the doctor documented that the patient also complained of low back pain and without any history or examination gave the patient Naproxen for three weeks. No diagnostic testing was done.

On 4/5/21 the patient had a telepsychiatry encounter and had mild tachycardia (113) that was not documented as abnormal.

On 4/28/21 the patient again complained of back pain with any movement along with abdominal discomfort. A nurse, seeing the patient, documented that the patient was already scheduled for a physician sick call. A NP saw the patient on 5/4/21 for the back pain and an ingrown toenail. No history or examination was done for the back pain and the doctor prescribed ibuprofen and Robaxin. Robaxin has an FDA approved use for muscle spasm. Listening to a complaint and treating patients without any examination is extremely common in IDOC.

The following day, the patient complained to a nurse that his back still hurt. He asked to see "a real" doctor stating that he had stomach pain as well. The patient said that the ibuprofen didn't help. The patient was argumentative but the nurse told the patient to take the medicine as directed.

The patient began a series of complaints about back and other pains which were not appropriately addressed.

On 5/8/21, the patient told a nurse he had pain on urination and radicular pain down the left leg. The nurse called a physician who ordered one dose of Toradol by phone without examination and with only the history given over phone.

On 5/9/21a LPN documented that the patient had pain when he walked, saying "it hurts like hell". His pain was abdominal pain. Later the same day the patient told another nurse he still had the pain. That nurse, apparently seeing the patient in his housing unit said he was reclined in bed and appeared relaxed without grimacing with movement. No action was taken.

On 5/10/21 a doctor saw the patient again for abdominal pain and back pain. There was no history except that that the patient had pain. The only examination was that the patient walked slowly and had non-tender reducible right hernia but no left hernia was seen. There was no

examination of the back. The doctor asked for old medical records and placed the patient on the infirmary. The infirmary admission note written immediately after this 5/10/21 sick call visit included no history except that the patient had back and groin pain. The only examination was a statement to see the progress note which included no examination of the back. The plan was ibuprofen, Robaxin, and Tylenol.

Later the same day the patient asked a nurse to be put on sick call to get stronger medication for the pain. The nurse placed the patient on sick call even though the patient was on the infirmary.

On 5/11/21 the patient complained of "a lot of pain". The pain was in the abdomen and went down his leg. No action was taken.

On 5/11/21 the pharmacy called that there is a possible interaction between tramadol, Remeron and trazadone which the patient was taking for mental health purposes. Later that day, a nurse noted that the patient still had pain. The doctor had changed the medication to Tylenol #3 because of the drug-drug interaction. The nurse encouraged the patient to walk.

On 5/12/21 the patient complained to the nurse about pain across his abdomen. The nurse encouraged the patient to increase his fluids and to get up "as tolerated".

On 5/15/21 the patient asked a nurse, "Don't you think I need a scan or something". The nurse documented the patient's pain as 9/10. The nurse wrote, "informed [patient] to attempt some back exercise and encouraged to increase fluids".

Later, on 5/15/21 a nurse documented that the patient had no visible swelling or redness to the back and no swelling or redness to the area of the hernia and added, "when offender lays down hernia disappears [no] acute distress seen at this time". The inmate complained back to the nurse that no one was doing anything about his pain. The nurse wrote that "offender complains about back pain- however sleeps through at the night and throughout the day". The nurse encouraged fluids and rest.

On 5/17/21, the patient felt nauseous and on 5/18/21 a doctor saw the patient for follow up of abdominal pain. The history was that the patient had left groin and back pain. The history was extremely brief. This was the first history of his pain and it was very limited and was only related to the onset of the pain. The doctor noted that the abdominal pain was new and with early satiety and the back pain started 25 days ago when picking up a weight. There was no other history. The examination noted abdominal tenderness with an easily reducible hernia. There was tenderness over the lumbar spine, good leg flexion, normal straight leg raising, and tenderness over the left upper thigh. This very limited history and limited examination resulted in the doctor ordering 60 mg of prednisone tapering over 9 days, continuing Robaxin, and Tylenol #3. There was no indication given for the prednisone which did not appear to have a purpose given the patient's complaints. This visit was the first examination of the patient for his back pain and it was an extremely limited examination.

On 5/21/21, the doctor saw the patient again and documented that the patient felt like he pulled a muscle in his right scapula area. There was no other history. The examination noted that the

patient walked carefully, breath sounds were clear, and the patient had [something illegible] in his thoracic spine area. The doctor ordered a chest x-ray, a blood count, ESR and CRP and added Cymbalta which is an antidepressant. The indication for the Cymbalta was not provided.

On 5/21/21 the doctor noted a potential adverse reaction between Cymbalta and Remeron and stopped the Cymbalta and started gabapentin but the indication was not stated.

On 5/22/21 a nurse documented the back pain as 10+. The nurse recommended stretches and fluids.

On 5/23/21 the patient complained of low back pain radiating down his leg limiting his ability to sleep only to a fetal position posture. Later that day the same nurse wrote, "on multiple times and [patient] is sitting in bed crossed legged and leaning forward watching T.V. without complications".

On 5/25/21 the patient said his stomach and back are hurting and he needed a pain shot. The nurse wrote that the patient was ***"laying on back in bed with left leg crossed over and [left] ankle on [right] knee. [Patient] then rolled over to side and back to his back then raised both legs up and put knees to [abdomen] then back down… [patient] then reported eating a honey bun and a pepsi about 45 [minutes] earlier".*** The nurse advised the patient about eating too much sugar as it would increase his abdominal pain and nausea and encouraged the patient to walk to reduce his back pain and to do back stretches as a way to keep back muscles from cramping. The comment by the nurse was irrelevant to the patient's complaint and the nurse seemed to imply that because the patient could cross his legs, he did not have pain consistent with his complaint.

On 5/25/21 a LPN saw the patient for chest pain which was worse when walking. He had tightness in the chest and shortness of breath. The nurse called a provider who ordered aspirin and sublingual nitroglycerin and a call back with a status update. The nurse called back and there was no change in the patient's condition though the patient felt slightly better. The doctor ordered the patient sent to the hospital.

The patient was seen at a local hospital and transferred to a higher-level hospital in Rockford and discharged on 6/4/2. On admission, the patient was in acute hypoxic respiratory failure. The patient was diagnosed with non-small cell lung cancer with metastases to the brain and bone. The patient had bone metastases to the spine with a compression pathologic fracture of L2 and metastatic disease to five additional vertebrae (T4, T7, T9-10, and T12). He also had malignant pericardial effusion which led to a life-threatening pericardial tamponade[600]and had to be treated with emergent drainage. There were multiple brain metastases, atrial fibrillation, lymph node involvement, a fracture of his clavicle, elevated liver enzymes probably due to liver metastases, and an acute exacerbation of chronic obstructive lung disease with pleural effusions. The patient was discharged with referrals to oncology, radiation oncology, cardiothoracic surgery, and pulmonary medicine and discharged on oxycontin for pain. The patient had a first dose of

---

[600] Pericardial tamponade is a situation where fluid collects in the lining surrounding the heart and compresses the heart impairing the ability of the heart to pump blood. It is a life-threatening condition, treated by draining the fluid around the heart emergently.

chemotherapy in the hospital and had an appointment with radiation oncology for radiation therapy to his brain and bone.

Routine referrals were made for radiation oncology and oncology upon return. Though the referral form documented routine referrals the approvals documented urgent requests for oncology and radiation therapy.

The patient went to his radiation therapy session on 6/7/21. Whole brain radiation was recommended for ten treatments. The patient wanted to wait because he believed he was being discharged in two weeks.

On return to the hospital a pain plan was not in place. About a day and a half after return from the hospital norco 5/325 was prescribed. The patient returned on 6/4/21 but pain medication was given the evening of the 5th, but not on the 6th.

On 6/6/21, the patient complained that the mattress was uncomfortable and a nurse wrote "security notified to see if [patient] can switch beds with possible mattress if available". The Monitor asked IDOC if they could confirm whether there are any rules at any of the facilities requiring medical to get permission to use a hospital bed. There has been no response from IDOC. It appears that custody controls access to medical beds. At the same nurse visit the patient complained of "unbearable pain". The nurse did not call the doctor regarding the pain medication dosage but wrote, "pain meds will be issued per MD order, [patient] requesting to have scheduled instead of PRN [as needed medication]".

The patient complained of pain consistently on most days until he died. The doctor intermittently saw the patient but did not assess the medication record to see whether the patient was receiving medication. The doctor did escalate a fentanyl patch but failed to establish a pain plan over the last two months of the patient's life that relieved the patient's pain. This was made worse by nursing failing to provide the pain medication according to the physician orders. In July the patient was offered only 61 (50%) of 122 doses of Norco. In June, the patient received Norco only 68 (47%) times out of 144 doses. The doctor ordered this medication as 1-2 tablets every 4 hours as needed for pain but nurses only offered it four times a day instead of six, based on the medication administration record.

There were encounters between the nurse and patient the demonstrate the failure to empathize with the patient or to provide medication as ordered. On 6/26/21 the patient again had pain documented by the nurse as 8/10. At 8:40 am, the nurse noted, "Pt requested pain meds. Pt not due for pain RX at this time". The patient actually was due for his pain medication since he had not received a dose since 9:15 pm the evening before and he was due for a dose every four hours. At 8:40 am almost twelve hours had elapsed since the last dose. The patient didn't actually receive pain another dose of the Norco until 10:30 am that day so the patient didn't receive a dose for 12.25 hours when he was to receive it every four hours. Since only four attempts to administer the medication were documented the patient was receiving only two thirds of ordered pain medication.

By 7/9/21 the patient told a nurse that he needed a wheelchair because he couldn't walk. Since the pain medication was ordered every four hours as needed, there should have been some documentation every four hours with respect to his need for pain medication but there was none.

The patient declined chemotherapy and radiation therapy believing he was going to be discharged. On 7/21/21 a discharge medical summary was completed. The patient died at home on 8/22/21.

OPPORTUNITIES FOR IMPROVEMENT
1. The patient first complained of back pain at NRC on 12/21/21. He saw a physician four times and a NP once over the next five months. The first three visits there was no history of his pain except that he had pain and there was no examination. On the 4th visit the doctor took a minimal history and performed a minimal examination. Neither the history nor physical examination could be deemed adequate for his complaint. On the 5th visit, there was no history except to state there was pain and another minimal examination but diagnostic studies (labs and a chest x-ray) were ordered. Providers in IDOC frequently do not take histories or conduct physical examination appropriate for the patient complaint. Providers appear dismissive of complaints and, in this case, prescribed medication without even taking a history or performing a physical examination in order to obtain an accurate diagnosis. Not taking a history or performing a physical examination is bad practice and IDOC needs to require the vendor to address this deficiency which appears system-wide.
2. The patient complained to nurses multiple times about his pain. Sometimes nurses would provide medication based on protocol and sometimes would refer to physicians. However, nurses, on occasion, did not appear to take the patient seriously and made comments that were unrelated to the patient's concerns and complaints which were irrelevant to the patient's concerns and complaints. This displays an attitude toward inmates, which is exemplified by the professional medical staff using the term "offender" frequently when documenting about their patients. The opportunity here is to ensure that staff view all their patients as patients and not as offenders or someone who is trying to fake their illness for other gain.
3. This patient had pain throughout his entire incarceration. For five months, there was no work up of the pain. After extensive metastatic lung cancer was diagnosed including metastases to the bone which is very painful, the pain management was poor and did not provide pain relief. After release from the hospital until the patient was discharged from prison, the patient did not obtain relief from his pain. The nurses were only giving approximately two thirds of the ordered oral pain medication. Once, when the patient asked for pain relief the nurse said it was not time for medication when in fact the nurses were 9 hours late in giving the patient pain medication. Based on this case, nurse supervisory staff should investigate pain management practice at this facility in their quality program to ensure that medication is provided as ordered.

Patient 12

The 12th patient was housed at the Menard facility. A NP evaluated the patient on 6/12/20 for a sore throat. At the nurse visit preceding this practitioner visit the nurse documented a weight of 204 pounds which was a greater than 10% unintentional weight loss. Work up is recommended[601] for a greater than 5% unintentional weight loss. Unintentional weight loss is generally unrecognized in IDOC facilities and diagnostic evaluations for weight loss rarely occur consistent with standards of care. This patient was treated with antibiotics for his sore throat and his weight loss was unrecognized. On 7/7/21 a NP again saw the patient for sore throat. The weight loss at this visit was 37 pounds or 16% of his weight as recorded on 2/5/20. The NP noted the weight loss, described "gaunt appearance" and documented a complaint of sore throat. Though the patient complained of sore throat, the throat was not examined. The NP referred the patient to an oncologist. The evaluation for unintentional weight loss is to evaluate diet and potential eating disorders, to identify any symptoms suggestive of malignancy, and complete a physical examination. If the history or physical examination suggests a diagnosis, a targeted diagnostic evaluation should ensue. In this case, the patient had weight loss and sore throat. Though an examination wasn't done, the sore throat and weight loss should have prompted an ENT evaluation for a possible biopsy; instead, the NP referred to an oncologist. This led to a delay.

The oncologist was already following the patient for prostate cancer with past radiation therapy. When the oncologist saw the patient about three weeks later, the oncologist recommended a work up for unintentional weight loss. This led to a delay in work up of at least a month. The patient also saw a urologist on the same day as the oncologist, also for follow up of prostate cancer and he also recommended work up for unintentional weight loss. Both consultants had an expectation that a primary care provider would know how to work up unintentional weight loss, but the prison provider did not apparently know how to do that. An opportunity for improvement here is to train NPs on what a work up for unintentional weight loss would consist of. All the providers have worked so long in a system with a vendor that has a complex utilization process for referral that they need a refresher on when referral is indicated and how to appropriately refer.

In this case, after the oncology referral nothing happened. Initially, the oncology consultant report was unavailable. There was no follow up for about three months when a NP saw the patient in follow up of a urology appointment. The patient requested a nutritional supplement because of his weight loss. The NP was unaware of the prior weight loss and ordered boost and weekly weights but took no other action. The first weight for this ordered set of weights was taken on 10/17/20 and was 180 which was a 47-pound weight loss or a 21% weight loss. Though the patient showed dramatic unintentional weight loss no action was taken. Having ordered the weights, the provider took no action to follow up, apparently thinking his responsibility was completed when he ordered the weight and boost. Nurses merely took the weights as ordered.

A physician saw the patient on 12/29/21 in follow up of a sore throat and documented no abnormality in the oral cavity. The patient had lost 52 pounds or 23% of his body weight but

---

[601] UpToDate Approach to the patient with unintentional weight loss January 13, 2022

though the weight was taken at this visit, the doctor was unaware of the weight loss. Two days after this visit, the patient complained to a nurse of a sore throat and swollen tongue. The nurse documented that the patient was unable to open his mouth wide enough to visualize the back of the throat and the patient had difficulty talking and swallowing. Considering that two days earlier a physician documented a normal examination speaks to the quality of this physician. The patient was not evaluated by a provider; instead, the nurse received a phone order for a tapering dose of steroids which was an inexplicable therapy for the patient's list of symptoms. IDOC physicians frequently use steroids without clear indication. A subsequent NP visit attributed the oral symptoms to a drug reaction to lisinopril, which, however, would not have caused his 52-pound weight loss.

Another month later, a NP saw the patient for a sore throat and pain in the mouth. The right tonsil was documented as enlarged and there was a right sided lymph node. Acute pharyngitis was diagnosed and antibiotics and prednisone were prescribed. The indication for prednisone was not documented and was unclear. A follow up appointment did not occur. Throughout these provider visits, the weight loss was either unappreciated or ignored. Finally, on 3/2/21, almost nine months after his first symptoms, a CT scan was ordered. An ENT referral for biopsy would have been a more appropriate and focused diagnostic evaluation. The CT referral was "ASAP" but didn't occur for about a month and was done on 3/31/21 showing an asymmetric tonsil consistent with malignancy. An ENT referral was recommended.

The ENT referral didn't take place until 6/28/21 about three months later. A biopsy was taken in the ENT office and confirmed squamous cell carcinoma of the tonsil. When the oncologist saw the patient on 8/3/21, it was determined that the cancer was so widespread that surgery was not an option. The oncologist recommended palliative chemotherapy; placement of an infusion port; referral to radiation oncology for possible treatment; referral to interventional radiology to biopsy a suspicious lung lesion to determine if the cancer had spread to the lung; for the site to send complete biopsy report to the oncologist; and to return to oncology after the interventional radiologist performed a biopsy. Because of anemia a colonoscopy was indicated to determine if there was a concurrent colon or upper gastrointestinal cancer. A swallow evaluation and occupational therapy evaluation were recommended to determine the patient's ability to eat and to determine a nutritional plan.

By November, 17 months after his first symptoms, chemotherapy started and the patient was hospitalized with an adverse reaction to chemotherapy. Not all of the consultations had been completed and provider progress notes did not describe a plan for all of these referrals to occur. It appeared that the medical records clerk was managing referrals and not the providers.

Subsequent to the hospitalization, there was no hospital report so it wasn't clear what occurred at the hospital. A full report was not available in the medical record but based on pieces of notes the patient was found to have disseminated cancer to his lungs, had malnutrition, and based on the infirmary physician note the patient was placed in palliative care. On return, a hospital nurse called a prison nurse and informed her of the patient having decubiti, which were unrecognized by the prison staff upon return. Providers did not perform adequate physical examination, evaluate the patient for pain despite the patient being in "palliative care". On return from the hospital with metastatic head and neck cancer, the patient was not placed on any pain medication

and had all medications discontinued because he was on palliative care. Though clinical staff documented "comfort care" it was not "comforting" when a patient with metastatic head and neck cancer isn't even treated with pain medication. About ten days after return from the hospital, the patient complained of pain to nurses who received a phone order for Tylenol with codeine. The patient died about two weeks after return from the hospital.

This patient had a year delay in diagnosis of his cancer and subsequent delays in coordinating cancer treatment so that the patient really didn't start cancer treatment until a few weeks before he died which was about 18 months from his first symptoms.

OPPORTUNITIES FOR IMPROVEMENT
1. The physician caring for this patient should be someone who would be referred to peer review but he has left service.
2. The patient had dramatic unintentional weight loss ongoing for almost a year before his weight loss was recognized. The IDOC should hold the vendor accountable for obtaining and monitoring weights. Scales on the infirmary should be available at all facilities to obtain a weight in a wheelchair. The vendor should come up with a plan for how this will be done. The corrective action should be written so that it can be monitored. This is a system wide problem.
3. Prednisone appears to be used at this facility and multiple other facilities without an acceptable indication. This patient was treated with prednisone for a sore throat and swollen tonsil. The vendor Regional Medical Directors should conduct a survey on patients on prednisone to determine the indication for each prescription and report back to the statewide quality committee. Other instances identified regarding misuse of prednisone found on record reviews have been patients with back pain without a diagnosis and patients with pneumonia. Training may need to occur.
4. The patient had an abnormal CT scan and because the patient was already an oncology patient for other reasons, a provider sent the patient to the oncologist to work up the abnormal finding but the oncologist recommended a work up. The vendor Regional Medical Directors should perform training on how to initiate an appropriate work up for unintentional weight loss and other for other clinical issues that require specialty care. For decades, the vendor's utilization program has created barriers to timely specialty services and staff need retraining to develop a process of timely specialty care.
5. The patient had significant laboratory abnormalities (hemoglobin 10.3, potassium 3.2, calcium 7.8, platelets 534) that were not evaluated. Why significant laboratory abnormalities are not addressed should be studied in the quality program.
6. This patient lost significant weight and due to his head and neck cancer was unable to chew well. A nutritional consultation was not obtained and IDOC never determined whether the diet they served him was adequate nutritionally. He lost about 100 pounds over 20 months without having a nutritional consult except at hospitals. He needed a nutritional consultation with respect to what he was eating at the prison. He had signs of significant malnutrition.
7. Specialty reports were not organized chronologically and were extremely disorganized.
8. Every aspect of this patient's care including specialty care was significantly delayed prior to his diagnosis and even after the cancer was diagnosed. It is possible that earlier diagnosis could have prevented his death. A root cause analysis of specialty care should

be done system-wide to determine why specialty care is untimely and fails to adequately address patient needs.

9. The patient was on the infirmary and had a decubitus ulcer which was unrecognized at the prison infirmary. The patient had difficulty eating yet failed to get a nutritional evaluation. Pain management was virtually non-existent during his last month of life. IDOC should evaluate infirmary care system-wide to improve process to protect patient safety and humane care of the disabled and dying.

10. The Menard facility shows signs of significant dysfunction. Medical records appear disorganized. Physician care is not good. Specialty services are disorganized and care is not timely.

Patient 13

This patient was a 56-year-old man with history of COPD/ CHF, HTN, cirrhosis secondary to hep C, and BPH. His cirrhosis was complicated by varices, encephalopathy and intractable ascites. His record was very disorganized. Some hospital reports were not in the record. Hospital reports that were in the record were sometimes duplicated and not chronologically filed. Progress notes were not chronologically filed and were disorganized with several months missing. This appears to represent a very disorganized support system. The patient had Hep C since 2013 and was referred for hep C treatment at UIC in 2017 by a vendor hepatitis C physician. At that time UIC asked that prior to initiating treatment a work up of his anemia occur which never happened and the patient was lost to follow up. The patient was again referred back to UIC in 2018 but this never happened and the patient wasn't seen in UIC until March of 2021 when the patient had advanced liver disease. UIC recommended starting Epclusa and follow up with a hepatologist neither of which happened. There was no follow up to UIC. The patient's hepatitis C was not recommended for treatment until the patient had advanced cirrhosis and was near death. The patient developed intractable ascites, encephalopathy, and varices.

The vendor hepatitis C doctor recommended EGD screening for varices and an ultrasound to screen for hepatocellular carcinoma. The EGD showed varices. The ultrasound showed cirrhosis. By November of 2020 the work up for anemia had not occurred except for the EGD and the patient was being treated with iron therapy without a firm diagnosis. A colonoscopy was recommended by UIC but not done.

At chronic disease clinics l2/30/20 there was no history and limited physical examination, no review of laboratory results and no therapeutic plan for the patient's hepatitis C. In February of 2021, the vendor hepatitis C doctor recommended sending the patient to a hepatologist as was recommended by UIC earlier in that month, but this referral was not made. The patient started developing intractable ascites. While the patient was on the infirmary and on oxygen therapy for apparent heart failure and COPD, the nurse was authorized to change oxygen at the nurse's discretion which is out of scope of the nurse practice. On 4/1/21 the oxygen saturation was 86% on three liters of oxygen but the patient wasn't transferred to a hospital. On 4/2/21 the oxygen saturation was 85% on four liters of oxygen with difficulty breathing and the patient was transferred to a hospital. The patient had a large pleural effusion and ascites and had a 6 liters of fluid withdrawn from his abdomen and 2 liter withdrawn from his chest.

The patient had a continued decline with development of encephalopathy. The treatment for this is lactulose. If not used the patient develops altered mental status and develops encephalopathy. This medication is also used as a laxative and it is used by titrating a dosage until a patient develops diarrhea and then to taper the dose down until the patient doesn't have diarrhea. Instead of titrating the dosage, the IDOC physician ordered fixed doses without titrating to diarrhea and then he ordered the medication *after the patient develops confusion* instead of ordering it as a preventive before the patient developed confusion. The patient had four subsequent hospitalizations for encephalopathy and ascites yet the patient was not receiving the lactulose as ordered. He missed 12 of 20 ordered doses of lactulose and missed all five morning doses. The patient was *on the infirmary* yet the medication of this very ill patient was given at

242

five in the morning and the patient didn't wake up to receive the medication. The failure to consistently obtain medication resulted in the repeat hospitalizations. The patient was discharged from a hospital on 10/17/21 and had an indwelling catheter to drain fluid on a daily basis.

On 10/20/21, a doctor obtained a DNR from the patient, who apparently asked for only comfort measures. This formatted choice included transfer to a hospital if indicated. However, on 11/4/21 the patient's blood pressure was 89/49 with pulse of 105. The patient had 4+ edema and hospitalization should have been considered. An on-call provider was called and the nurse documented, "focus on comfort care measures". The patient was not sent to a hospital. Later just after midnight the oxygen saturation was 88% and blood pressure 84/39 but no action was taken. At 3 am the blood pressure was 80/42 with 86% saturation. No action was taken. By 10:40 am the oxygen saturation was 82%. Though the DNR status, obtained only about two weeks earlier stated that the patient would be hospitalized, the patient was not sent to a hospital and not asked if he didn't want care. The patient became unresponsive and died.

OPPORTUNITIES FOR IMPROVEMENT

1. The referral to UIC referral for treatment of hepatitis C was lost to follow up and when UIC did see the patient in 2021, their recommendations (Epclusa and hepatology follow up) were not carried out, so the patient was never treated. This is consistent with a broken specialty care system whose results are failure to get people to their specialty appointments. This is an operational issue and the vendor should be accountable. The patient was not treated for his hepatitis C and died from complications of hepatitis C.

2. This patient was from Graham. The Graham infirmary admission progress note is a formatted note that includes strip searching the inmate on admission. A strip search is not a medical procedure and should not be placed in the order section of a formatted medical note for admission to the infirmary. Custody has its procedures but medical procedures should not include strip searching the inmate. This shows the intrusion of custody rules into the medical program. This form should be discontinued.

3. Hospital reports were not all present and when present were presented in the record in a disorganized manner and not in chronologic order. Progress notes were absent for about 2 months of 2021. The record sent to us was very disorganized especially with respect to specialty and hospital care. Until the electronic record is implemented, IDOC must maintain the paper record in a coherent, chronologic and organized fashion.

4. The patient had one chronic disease clinic for 2020 to 2021 and that clinic was for hypertension. At that clinic the physician assistant didn't address recent recommendations of UIC to refer to hepatology or to treat the patient for Hep C. As well, the physician assistant only addressed hypertension and ignored all other problems of the patient. The chronic disease program still is disorganized and fails to ensure monitoring of all of the patient's chronic disease problems.

5. As represented on one of many August medication administration record documents, a physician ordered a very unorthodox method of using lactulose. The order was to give lactulose only if the patient was confused. Typically, lactulose is given routinely to *prevent* encephalopathy and its use is ineffective in preventing encephalopathy if it is used only after a patient is encephalopathic. Because the order was a fixed dose it wasn't titrated to 2-3 loose stools a day and therefore the patient didn't want the lactulose. This physician has made multiple unsafe decisions and should be subject of peer review.

6. The patient did have multiple refusals of lactulose but most all of the refusals were the early morning dose (5 am) which is an inconvenient time to take medication. Because the patient was

on the infirmary there is no legitimate reason to have a five am medication pass. Lactulose should have been titrated to loose stools which was not done.

7. On one occasion a nurse appeared to be titrating oxygen dosages without orders which is inappropriate.

8. The POLST DNR document was prepared on 10/19/21 and signed the following day and was not obtained until two weeks before the patient died. There was no documented discussion with the patient about the patient's prognosis or wishes and it was unclear whether the patient actually understood what was explained to him as he was just discharged with encephalopathy. There is no evidence that the patient initiated the process. In IDOC, the process of obtaining patient wishes for life sustaining measures is conducted when the patient is under duress. It should be done earlier in the patient's life so that the patient can give more thought to the process. Whenever it is done, a transparent and full discussion should occur with the patient that is documented in the record. In IDOC the patient merely signs a document and it is not transparent what is discussed with the patient or even whether the patient understands what he is signing. This does not give the appearance of a transparent and patient-centered process.

Patient 14

This patient was 46-years old with a history of epilepsy, asthma, hypertension and diabetes. Asthma was not included on the problem list. Despite the family calling IDOC about the patient having gastric pain in October of 2020, little was done to evaluate for this complaint. A physician assistant saw the patient, who at that time had lost 28 pounds since an annual physical five months ago. The physician assistant took no action and failed to recognize the weight loss. The patient was housed at Graham. A subsequent follow up was cancelled because of a provider shortage.

The abdominal pain continued and a nurse saw the patient in late December but the nurse who documented a blood pressure of 164/121, a pulse of 120 and weight of 165, which was a 43-pound weight loss, called a physician[602] who temporarily placed the patient on the infirmary and started metoprolol apparently for the tachycardia which was done without a diagnosis. The physician referred the patient to a gastroenterologist on a routine basis which should have been on an urgent basis. A week later a nurse documented that the patient was vomiting with abdominal pain and a different on-call physician sent the patient to a hospital where extensive metastatic cancer was diagnosed. This cancer diagnosis was delayed at least by four months due to failure to recognize weight loss and failure to evaluate appropriately for gastric pain.

A referral to oncology wasn't written for about two weeks. The patient was evaluated in oncology about a month after the cancer was diagnosed. The oncologist recommended return in a week for palliative chemotherapy. The consultant report was not in the medical record. In February of 2021, the oncologist had recommended Zofran for nausea and vomiting but the order was hand written on a medication administration record by a nurse and was misinterpreted and the nurse instead gave the patient Pepto-Bismol.

Other orders by the oncologist were not carried out and resulted in harm to the patient. The oncologist prescribed chemotherapy that lowered the white count and the white count was to be checked and if the absolute neutrophil count was below a certain number, a medication was to be given to raise the white count. When the white count dropped, a physician assistant ordered the recommended medication but the pharmacy didn't have the medication and the patient didn't receive it for about 8 days. This resulted in the oncologist at the next visit giving the patient a third line chemotherapy because of the inability of the facility to appropriately monitor and provide the appropriate medication. The oncologist wrote in his note, "We have encountered several issues with the correctional facility in regards to checking his blood counts in a timely manner and administering him Granix. … Given the profound neutropenia, the chemotherapy regimen was changed". In a later note the oncologist wrote, "Due to significant neutropenia in spite of dose reduction of irinotecan, not receiving 5FU and issues with the correction facility in obtaining G-CSF in a timely manner, plan to switch regimen". At this time there was no regular physician at Graham and coverage doctors were equally incapable of appropriately managing

---

[602] This incompetent action was by a physician who, shortly after this event, had his license terminated by the State of Illinois medical board for a different matter.

this complex patient. Both of the coverage doctors do not have appropriate credentials and have been mentioned to IDOC as physicians who should have peer review.

Shortly after this episode the patient was hospitalized with severe neutropenia and an infection of his leg with sepsis related to his delayed receipt of recommended medication. Progress notes were missing for about three months. This facility (Graham) had multiple other medical record issues noted with this and other patients including missing consultant reports, disorganized charting, and missing sections of the record.

In June of 2021, the patient was on the infirmary at Graham and was in severe pain as a result of bone metastases. The pain management plan was not clearly documented in the medical record. In mid-June a physician assistant was managing the patient on the infirmary and was uncertain about how to manage the patient's pain and spoke with a pharmacist but this did not result in an improved pain plan. Medication ordered for pain was unavailable through the pharmacy used by the vendor on at least two occasions. [603] There was no regular physician which resulted in a series of miscommunications between the oncologist and the prison about management of pain, a chemotherapy, and antidiarrheal medications none of which were appropriately managed. Eventually on 8/23/21 a nurse wrote that she talked to the oncologist's office to clarify the chemotherapy orders. The patient was last seen by the oncologist on 7/20/21 yet no physician had established the therapeutic plan or communicated and obtained the correct recommendations of the oncologist and documented these in a therapeutic plan.

The patient remained in pain through the remainder of his two and a half months of life without facility providers able to establish effective pain control. With about ten weeks of life left, the doctor began a discussion for compassionate release but didn't know how to do this and about a month after he began this process, he talked to a staff nurse about the process and documented he would "call Springfield to [check] on the process". This should be established in policy and should be initiated at a much earlier time. On 12/15/21 the patient died.

OPPORTUNITIES FOR IMPROVEMENT

1.  The coordination of his care with the oncologist was mishandled by the facility, in part because of a lack of a knowledgeable physician, pharmacy issues, and in part, due to staffing issues. The oncologist's recommended care was never present in a therapeutic plan documented in a Graham progress note. The vendor needs to provide adequate and competent physicians but are not now doing so.
2.  There were multiple pharmacy issues that resulted in the patient not receiving pain medication, ordered chemotherapy, and medication to treat neutropenia. All of these failures harmed the patient. A root cause should be completed to determine why this occurred and if the current pharmacy is capable of timely providing medication.
3.  Pain management on the infirmary was very poor. Providers did not have access to pharmacy assistance necessary to develop an adequate pain plan and the pharmacy did not have ordered pain medication available. The vendor needs to assure that pharmacy services are sufficient to prevent patient harm.

---

[603] This was fentanyl patches which were late in arriving.

4. Providers fail to take appropriate history related to pain and did not appear to know how to manage end-stage cancer pain. The vendor also needs to take action to establish an expectation of taking a history and performing an adequate physical examination with respect to pain control.

5. Nutritional support was non-existent. At all facilities, nutritional support consists of giving boost, a nutritional supplement, but there is no ability to consult a dietician to ensure that the diet is nutritionally adequate. IDOC needs to obtain dietician services.

6. Medical records, especially consultant reports and hospital summaries were disorganized, notes were out of order, some consultant reports were missing, and hospital reports were missing. This contributed to disorganized care and may have resulted in the patient not receiving ordered medication. The vendor should establish a task force to ensure that referrals, authorizations, hospital summaries, and formal consultant reports are timely obtained and filed in the medical record in chronologic order.

7. There was not consistent physician coverage or on-call support resulting in nurses and mid-level providers not having appropriate physician support. The vendor must provide qualified and adequate physician coverage.

8. When a physician attempted compassionate release, a clear policy and procedure was unavailable to inform the physician on the process which, in any case, was started too late to be effective. IDOC should develop a standardized policy and procedure for this process.

Patient 15

A patient, from the Pontiac CC had a problem list documenting only hypertension and sickle trait.  On 2/7/20 the patient weighed 170 pounds.  On 3/24/20 a NP saw the patient and documented a hemoglobin of 6!  This level of hemoglobin is a critical value and warrants immediate transfusion.  Instead, the NP ordered another blood count and iron therapy.  The patient was 54 years old.  At this age, an anemia of that degree warrants transfusion, upper endoscopy and colonoscopy.  None of these were done which was a significant departure from standard of care warranting peer review for this NP.

Several urgent clinic appointments were cancelled due to lockdowns.  This is due, apparently, to custody rules over-ruling medical schedule rules which should be addressed in policy. Medical sick call, particularly for urgent issues should not be cancelled.

The patient was lost to follow up *and a year later* on 3/4/21 a NP saw the patient for shortness of breath.  Only a brief history was taken and the prior hemoglobin of 6 was unrecognized.  An EKG was ordered.  But no other action taken.  On 3/11/21 a NP saw the patient for "heart racing" with activity or coughing.  The pulse was 120 and the weight 156, which was at least a 14-pound weight loss over about a year.  The NP diagnosed chronic obstructive lung disease, tachycardia, dyspnea, weight loss, and history of iron deficiency anemia.  The prior hemoglobin of 6 which is an alarm value did not apparently cause concern.  A chest x-ray and laboratory tests were ordered.  There were no subsequent follow up notes to this clinic session but the patient was hospitalized shortly after this for a hemoglobin of 4 which is extremely low and life threatening.  This patient had a life-threatening anemia for a year without addressing it which implies a very dangerous health program.

At the hospital the patient was diagnosed with an upper extremity deep vein thrombosis, gastrointestinal bleeding and a colonic mass which was found to be adenocarcinoma of the colon.  The patient also was found to have esophageal candidiasis and AIDS.  He was started on multiple medications including an anticoagulant.

Post hospitalization, the patient was referred to UIC oncology on 3/25/21.  At the oncology visit, appointments for a PET scan and for tumor resection in May were made.  Remarkably, on 4/9/21 the patient had a chronic care visit *for which only his hypertension and prostatic hypertrophy were evaluated*.  *His AIDS, esophageal candidiasis, colon cancer and DVT were not even mentioned or monitored in this chronic care visit.*  This is a completely broken chronic care program.  How could this happen?

Instead of returning to UIC hospital for the colon mass resection, the patient somehow ended up in St. Joseph's Medical Center in Bloomington on 5/14/21 where a hemicolectomy was performed with colostomy insertion.  The patient was also noted to have bacteremia and had developed infection (osteomyelitis) of his spine.  It is unclear if this was due to the surgery or another cause.  Six weeks of antibiotics were recommended.  The osteomyelitis was of the L5 and S1 vertebrae.  Intravenous antibiotics were recommended with oncology follow up as soon as possible.  Surgical follow up was also recommended.

On 5/26/21 the patient was admitted to the Pontiac infirmary, post-discharge from the hospital, the doctor documented the hemicolectomy but *appeared to be unaware of the diagnoses of AIDS, esophageal candidiasis, osteomyelitis and bacteremia*. The doctor's note documented the intravenous antibiotics but not the reason for using them. The doctor did not include the osteomyelitis or bacteremia, which were life-threatening conditions, in his assessment. Typically, checking sedimentation rate and C-reactive protein tests periodically as well as for symptoms of back pain are used to monitor osteomyelitis of the spine but this was not done for this patient and based on progress notes, the physician at Pontiac appeared unaware of the patient's osteomyelitis, DVT, or AIDS diagnoses. The progress notes did not include an assessment of these conditions and there was no monitoring for these conditions. The progress notes and the chronic care notes typically consider only the most urgent issue at hand and rarely, if ever, detail all of the patient's problems including the therapeutic plan for each problem. During the six weeks following his hospitalization, the patient had back pain and continued weight loss.

On 6/11/21 the patient went to UIC oncology and placement of a port was recommended for chemotherapy with a return on 6/22/21. The initial PET scan recommended on 3/25/21 *had not been done.*

On 6/23/21, the patient returned to UIC oncology. The oncologist planned to start chemotherapy after the vertebral infection was completed. The *pathology report had not been sent to the oncologist* who had asked for a complete report. The blood pressure was elevated to 178/100 and the oncologist recommended the prison doctor treat his blood pressure.

On 7/1/21 the prison doctor evaluated the patient and noted a weight of 140 (a 30-pound weight loss) and an albumin of 3.1 indicating possible malnutrition but a dietary consultation was not ordered and no action was taken.

In mid-July, 7/16/21, the patient returned to UIC oncology but *the intravenous line recommended by oncology was not functioning and needed revision*. The patient appeared seriously ill to the oncologist who promptly sent the patient to the ER for evaluation. The Pontiac physician had not been monitoring the patient for his osteomyelitis. The oncologist asked the ER physician to obtain an MRI of the spine, and a CT scan of the abdomen, chest and pelvis, and to evaluate the patient for admission to the hospital. The patient was noted to be on an anticoagulant for his DVT which the facility physician was not monitoring. The patient was admitted to the hospital. Notably, on 7/20/21, while the patient was hospitalized, a nurse at the Pontiac infirmary documented that the patient was asleep in one of the infirmary cells, clearly documenting on the wrong patient. A complete hospital discharge summary was not in the medical record. However, piecing together pieces of notes, it appears that the patient needed spinal surgery and fusion to correct continued osteomyelitis which was unmonitored and unrecognized at Pontiac. The patient was discharged on intravenous antibiotics for septicemia and bacteremia. A follow up infectious disease telephone follow up was recommended as well as an oncology follow up in late August and an EMG test in October. Because of the continued osteomyelitis his treatment for colon cancer was being delayed.

The infectious disease doctor recommended weekly CRP, sedimentation rate, CBC, CK and CMP tests and fax the results to the infectious disease doctor. These weekly tests were not in the

medical record sent to the Monitor and it was unclear if they were done. By September, the patient developed renal failure. During this time progress notes of the physician at Pontiac did not document all of the patient's problems and was not monitoring for each of the problems. This gave the appearance of extremely disorganized and uninformed care warranting evaluation of this physician's competence. The patient continued to lose weight and by 9/20/21 the patient had lost almost 40 pounds yet the doctor didn't refer to a dietician and did not develop a plan to supplement his nutrition. The renal failure (creatinine of 3.9) was not addressed by the Pontiac physician.

On 9/28/21 a nurse on the infirmary documented that the patient has urinated on the bed and floor next to the bed and told the nurse that he had trouble getting to the toilet. His clothes were soaked in urine. There was no physician involvement in developing a plan of care. The nurse said she would give the patient diapers. This subsequent incontinence was not acknowledged by the physician and he seemed unaware of the patient's status.

On 9/29/21 a nurse entered the patient's room on the infirmary because the patient had urinated on the bed and needed a complete change of clothing and bedding. The nurse documented that the patient needed two people to assist the patient to a standing position. This had been unrecognized by the physician the day before. The difference between nursing and physician notes was dramatic and showed absence of recognition of that patient's status and warrants a review of the Pontiac physician's competence. The nurse also noted periods of confusion and documented that the patient needed assistance with feeding and was becoming nauseated. Later that day the patient was sent back to the hospital.

CT scans at the hospital showed a large intramuscular hematoma. We note that the patient did not have his anticoagulation monitored and was not on a fall-risk protocol and may have injured himself or had a bleeding problem from lack of monitoring his anticoagulation. The medication administration records and laboratory tests were not in the medical record and it was unclear if they were not done or the medical record keeping is disorganized. The patient had encephalomalacia related to chronic infarcts and a likely cause of his altered mental status. The creatinine was at a dangerous level (11.1) and evidenced lack of monitoring at the facility. The hospital discharge note was not in the medical record. When the patient returned to the prison on 10/9/21 the on-call provider was unfamiliar with the patient and the orders were not documented in the progress notes by the nurse. The following day a nurse documented giving the patient his previously ordered medication; there was no explanation whether there were new medications ordered by the hospital. A provider did not see the patient. Nurses appeared to be attempting to manage the patient without physician oversight. A nurse documented that the patient might benefit from a walker and asked the Director of Nurses for direction. There appeared to be no provider at the facility. A nurse asked custody to approve a hospital bed but it was unclear why this was necessary. The Monitor team asked IDOC whether custody approval was required to obtain a medical bed, but there has been no response. During this time, nurses were calling the Director of Nursing for direction as it appeared that no physician was available. At one point, the Director of Nurses asked a nurse to call the Regional Medical Director of the vendor.

The following day the patient's belongings were found on the floor. A nurse documented that in order to obtain a proper hospital bed, custody had to remove the bed which was bolted to the

floor before a hospital bed could be put in the room and the sergeant had to talk to day shift staff to do this. By 10/15/21, four days from hospital discharge the patient had yet to be evaluated by a physician. He was still on an anticoagulant and was not being monitored by a physician. He did not yet have an appropriate bed. On 10/15/21, the patient fell. The nurse notified the Director of Nursing and finally a doctor form another facility was called who admitted the patient to a hospital.

The patient returned from the hospital five days later. The discharge summary was not present in the record. The day after return from the hospital a doctor saw the patient but did not perform a thorough examination, did not document what occurred at the hospital and wrote only a brief explanation. The only plan was prescription of an anticoagulant and pain medication. The patient apparently died shortly after this but notes documenting the death could not be located.

OPPORTUNITIES FOR IMPROVEMENT

1. Multiple medical records were unavailable in the record sent to us representing an extremely disorganized medical record keeping system. This is especially true for hospital and consultant records, which were often unavailable. The vendor should establish a task force to ensure that consultant reports and hospital records are obtained and that they are placed in the record in chronologic order.
2. There were two providers, (a NP and a physician), who should be referred to peer review for unsafe and clinically inappropriate care that placed patients at risk for harm.
3. The patient had significant anemia (hemoglobin of 6), weight loss, and was 54-years old but was not evaluated for over a year. This is unacceptable. IDOC should direct the vendor to evaluate the critical values procedure and ensure that it is effectively implemented.
4. Urgent medical appointments were cancelled by custody due to lockdowns; this should be unacceptable and speaks to the overbearing custody control of medical operations. IDOC needs to ensure that high risk medical appointments (chronic illness and other serious medical conditions) continue to have appointments during lockdowns.
5. Multiple consultant recommendations were not followed affecting care of the patient. Needed and requested information was not sent to consultants. Consultant reports were not consistently found in the medical record. Recommended tests were not done. Recommended therapy was not consistently carried out. A root cause analysis of why specialty care and follow up of hospital care is so disorganized and unsafe should be conducted with appropriate follow up corrective action.
6. Multiple significant illnesses were not monitored. The disorganized chronic care management resulted in a delay of chemotherapy and from March of 2021 until November of 2021 the patient never received chemotherapy and combined with the incompetence in diagnosis contributed to a nearly two-year delay in treating the patient for his ultimately terminal cancer. The failure to monitor anticoagulation may have resulting in a large abdominal hematoma. The failure to monitor osteomyelitis may have resulted in breakthrough infection with repeat hospitalization. The failure to monitor all of the patient's medical conditions demonstrates a completely broken chronic care program at this facility. The problems identified here should inform the root cause analysis of the chronic care program.

7. The patient's spinal osteomyelitis was not monitored at the facility resulting in recurring infection that was unnoticed and resulted in subsequent surgery and further antibiotic treatment that delayed chemotherapy. This sentinel event should be subject of a root cause analysis by the statewide CQI committee.

8. Doctors were unavailable at Pontiac for a period of time making nurses rely on nursing supervisory staff for advice on management. The vendor needs to be held responsible for failing to provide physician coverage. This was dangerous.

9. Once on the infirmary and with significant weight loss, no dietary consultation or dietary adjustments were made. The patient was incontinent, had decubiti, wasn't able to obtain an appropriate bed, and had falls without appropriate monitoring. Almost every aspect of the infirmary care at this facility requires oversight and improvement. This passive institutional neglect needs to be corrected.

Patient 16

This patient was 41 years old and had schizophrenia and bipolar disorder. She was on multiple psychotropic medications including Geodon, benztropine, Effexor, and diphenhydramine. She had no identified medical conditions and was not followed in chronic clinic. However. over the last year of her life, she had 15 episodes of tachycardia as high as >130. She also had multiple episodes of elevated blood pressure. On none of these occasions was there an evaluation for a potential medical cause of her tachycardia. She did have psychotic episodes that included anxiety, tangential thinking and apparent psychosis that did not appear to result in prompt mental health evaluation. A TSH was done and was normal. An EKG was not in the record. Multiple psychotropics can result in tachycardia and Geodon can result in QT prolongation. Benztropine, diphenhydramine, Geodon, and Effexor can all result in tachycardia. The patient had complained about stomach pain on 7/30/21 and had abnormal vitals (pulse 138, blood pressure 158/114) but was not referred for a provider evaluation. At the time the patient appeared to be having a psychotic episode. The day of death, nurses were called to the patient's housing unit where the patient was experiencing stomach pain, lethargy and had an oxygen saturation of 86%. Vitals were not taken; instead, vitals from the prior health visit were used. The patient experienced cardiac arrest and died. There were several problems.

OPPORTUNITIES FOR IMPROVEMENT
1. Record reviews demonstrate problems with urgent care. On sick call and other urgent evaluation visits, abnormal vital signs appeared to be ignored. Abnormal vital signs are abnormal and need to be acknowledged and evaluated clinically with regards to the cause.
2. Vitals were frequently taken while standing. Taking vitals should be standardized and should be in the seated position with the patient at rest and feet flat on the floor. Also, in one evaluation, custody had the patient cuffed during the evaluation which is inappropriate.
3. Nurses conducted sick call in the inmate's cells which is inappropriate and at times LPNs conducted sick call without apparent RN supervision.
4. Vitals were not consistently taken for all symptomatic complaints. The electronic record used allows vitals to be used that are defaulted from the last time vitals were taken, which may have been one or more weeks previous. This is inappropriate. Any evaluation for a symptomatic complaint needs to include contemporaneous vital signs.
5. The patient had tachycardia (15 episodes) for at least a year without evaluation. The patient also had repeated episodes (7) of elevated blood pressure that were never addressed. Neither the tachycardia nor the elevated blood pressures were evaluated by a medical provider. Though a TSH was done, other evaluations should have occurred. The patient was on four medications that may have been responsible for the tachycardia but there was no evaluation for this and an EKG was never done to differentiate whether the patient had atrial or sinus tachycardia. The Geodon can also cause QT prolongation.
6. The patient had sudden death with abdominal pain. The cause is uncertain but the tachycardia, blood pressure elevations, and abdominal pain should all have been evaluated timely but were not. An EKG should have been done to exclude QT interval prolongation. An autopsy should be done.

Patient 17

This 59-year-old man with history of epilepsy and a mental health disorder had a charge of parole violation and was transferred from Cook County Jail on 6/21/21 on olanzepine and phenytoin 200 BID. On transfer from Cook County Jail, a drug level of phenytoin was therapeutic at 13.6. The NRC intake nurse described the patient having a seizure two days previous but took no other history of the epilepsy. The nurse ordered an urgent medical evaluation which occurred immediately after the nurse saw the patient at 3 pm. The doctor performing the initial examination *took no further history and didn't document the type of seizures, the seizure frequency, the last seizure or the history of medication use*. The doctor did check the "mental status" box on the physical examination as "abnormal" but there was no comment appended to this assessment. There was no therapeutic plan for the epilepsy but the doctor did change the seizure medication to Keppra as there was an order form for Keppra at a low dose, 500 mg BID. The reason for the medication change was not explained. The patient did receive a KOP supply for Keppra on 6/21/21.

On 7/6/21 the patient had a chronic illness clinic but *no history was taken regarding the patient's seizures including what kind of seizures the patient had, the frequency, the medication history, the compliance with medication, or the recent dilantin drug level*. Though the patient had elevated blood pressure (151/94) no action was taken and it appeared unrecognized. The rationale for using Keppra as opposed to his previous medication, Phenytoin, was not discussed.

On 7/9/21 early in the morning (2:30 am) the patient experienced a seizure with subsequent combativeness, restlessness and noncooperation. Due to the patient's combativeness the patient was unable to be evaluated. The patient was sent to a hospital but the hospital record was unavailable and not in the medical record. On return from the hospital a doctor evaluated the patient but did not review what testing or evaluation was done at the hospital. The patient was continued on the same medication but the dosage was increased.

On 7/14/21 *a mental health professional evaluated the patient and took the only history for epilepsy* stating that as a child the patient sustained a bat injury to his head and later was hit with a tire iron to the head subsequent to which he developed seizures. The mental health professional documented that the patient appeared to have an intellectual disability disorder and had disability payments since childhood. The patient had difficulty answering questions and required rephrasing questions in simple terms before the patient could understand the question. The patient described needing help from others in handling his disability payments and money. Despite this information, a cognitive assessment was not done and throughout his incarceration the medical team did not appreciate that he might have an intellectual disability even though he had signs of this on their notes (stating he was a poor historian, documenting a mental status abnormality).

Hepatitis A and C tests were positive and the patient had transaminitis indicating chronic hepatitis C infection. A chronic clinic, for this, occurred on 8/13/21. The APRI was listed as 0.492. There was no indication that a fibroscan was ordered and no action or referral occurred. So as of August of 2021, the IDOC procedure for ordering fibroscans on all persons with hepatitis C is not being done.

The patient transferred to Pinkneyville on 8/24/21 but the MAR shows that the patient did not receive medication after transfer on 8/24/21 or 8/25/21. The patient had a seizure on 8/26/21, quite likely from missing medication for two days, and was placed on the infirmary where he was combative and the staff were unable to assess the patient. A doctor gave orders to place the patient on the infirmary and gave a phone order for the same dose of Keppra that the patient was on. The doctor discharged the patient from the infirmary the following day without any examination or evaluation.

No other interventions occurred when on 11/7/21 the patient was found in his cell on the floor with his arm raised in the air and stiff. The patient missed medication on two mornings beginning three days before his death. The patient had no pulse, respirations, or blood pressure. The patient was transferred to the health unit which took ten minutes. After arrival in the health unit CPR was started. There was no timeline for these events but it appeared that CPR wasn't started at least 10 minutes after the patient was found unresponsive. 911 had been called and when the EMTs arrived the patient was determined to be dead but it did not appear a physician was present at the scene.

OPPORTUNITIES FOR IMPROVEMENT

1. The patient had one known seizures at NRC and two known seizures at Pinkneyville and may have had a seizure the day of his death. The first seizure did not include a Keppra level.
2. The patient did not receive medication for two days after transfer to Pinkneyville and a subtherapeutic drug level may have accounted a seizure two days after arrival at Pinkneyville. A seizure in September may have been accounted for by missing medication doses the morning of, and the evening before the seizure. If the patient had a seizure on the day of his death, he may have had a subtherapeutic level as well as he missed doses on two mornings three days before his death and on the day before his death. These medication issues may have contributed to his death if he died of a seizure. ***The compliance with medication was not addressed by providers for any of these seizures.***
3. The patient had no history of his epilepsy by a medical provider except that he had epilepsy. One provider did note that the patient had a recent seizure but other than that, the type of seizure, the frequency of seizures, the medication history for the seizures, or the compliance with medication were not obtained. This is not standard of care.
4. The patient had his mental status checked by the intake provider as abnormal but there was no further examination or explanation. Subsequently, a mental health provider documented that the patient might have an intellectual disability disorder which may have been due to his prior head trauma as a child. Nurses subsequently described the patient as having behavioral outbursts on several occasions; one on 6/29/21, three times after his seizures when he was combative and unable to be assessed; and again, after having recovering from a seizure when he had a verbal outburst to a nurse. A nurse also described the patient as being a poor historian during a sick call visit. The description of the patient's response indicated a possible cognitive disorder. Despite these clues of a cognitive disorder, the patient had no formal assessment of his cognitive functioning.

This was important because the patient was prescribed Keppra which carries a warning that there are anecdotal reports and observational studies that describe increased agitation and aggression with Keppra that may be problematic in some patients, particularly those who are intellectually disabled and have baseline behavioral problems (see UpToDate drug information on levetiracetam).

5.   The patient had two seizures at Pinkneyville and possibly a third the day of his death. For the first two Pinkneyville seizures, even though the patient was admitted to the infirmary for observation, the provider (who does not have appropriate credentials) did not examine the patient and even though there was a compliance issue with medication, did not discuss this with the patient, did not obtain a therapeutic drug level, and did not consider increasing the medication which may have been appropriate.  Also, because the patient may have had an intellectual disability disorder, levetiracetam may not have been the appropriate drug for him as it is known to result in aggression and agitation in persons with intellectual disability disorder. The care of this provider should be reviewed as he did not even evaluate the patient after his seizures.

6.   The doctor at NRC changed his medication from Phenytoin to Keppra.  Typically, if a medication is working, it is advised not to change the medication.  In this case the medication was changed and the medication had the potential for adverse reactions that could have been unsafe.

Patient 18

This 44-year-old man with a history of a mental illness was initially incarcerated at Menard and transferred to Stateville and then to Lawrence. In an annual physical examination in 2018 at Menard he was found to weigh 236 pounds. At Stateville he weighed 229 pounds but no weight loss was appreciated. His initial weight at Lawrence was 226 pounds in October of 2019.

His weight was not tracked but he developed constipation 1/14/21 and a nurse advised him to drink more water and no other action was taken. He saw a NP on 1/15/21 for severe abdominal pain and constipation and the NP gave him a fleets enema. A week later, the same NP saw the patient but didn't examine the patient or take a history except to note that the enema didn't help. The NP's note seemed to indicate that the patient wasn't providing an accurate history. The NP wrote that the inmate self-administered the enema the prior week and told the nurse on exit from the restroom that the enema had results and that he felt better. He wrote that therefore he did not need to see the patient again and instead ordered another fleets enema and started colace.

Later that day, the patient was brought back to the health unit with vomiting, "possibly coffee ground in nature". The NP ordered an x-ray. Later, he documented reviewing the x-ray and documented no significant findings except some scattered areas with air. The weight was 187 which would have been a 49-pound weight loss since 2018. An x-ray is not an appropriate diagnostic test for vomiting coffee ground material. The patient should have been promptly referred for upper endoscopy. However, the NP plan was to order a half bottle of magnesium citrate (a powerful laxative) daily for a week. This was dangerous as it would delay diagnosis of a potentially life-threatening condition.

A week later, the NP documented reviewing the x-ray report which apparently documented a distal small bowel obstruction. The NP didn't see the patient but documented talking to a coverage doctor who advised sending the patient to a hospital. At the hospital the patient had a bowel obstruction. The NP was negligent and with a 49-pound weight loss, abdominal pain and vomiting should have immediately admitted the patient to the hospital. A peer review should be conducted.

The local hospital referred the patient to a Carle hospital, and then the patient was referred again to a tertiary hospital. The first hospital diagnosed a small bowel obstruction which necessitated the referral to the 2nd hospital. There the patient was found to have a colon obstruction which resulted in a hemicolectomy for apparent colon cancer. The patient worsened and was sent to a 3rd hospital. There, the patient was found to have a leaking anastomosis of the bowel resection, abscesses in the abdomen and pelvis and ultimately was found to have a gastric carcinoma that metastasized to the colon, lymph nodes, omentum, and peritoneum. The patient also had thrombosis of peripheral veins in the legs and was started on Lovenox.

On discharge from the hospital, reports were not timely available apparently nor reviewed. The doctor did not accurately document all diagnoses, medications and the therapeutic plan was not clearly documented in progress notes. Other medical record problems included that there were no laboratory reports or medication administration records in the medical record sent to us. Progress notes did not clearly document the therapeutic plan created by the hospital and the follow up schedule was not clearly documented in provider progress notes. The doctor at

Lawrence did not appear to know that the patient was on Lovenox for thrombosis and was unaware of the expected duration of treatment for this problem. At one point the Lovenox was discontinued when the doctor stated that the patient had no evidence for a pulmonary embolism or deep vein thrombosis.

Care for the patient was poorly coordinated. The oncologist recommended a nutritional consultation which never occurred. Palliative care was recommended by the surgeon but never occurred. The surgeon recommended adjusting an anti-diarrheal medication based on output from the ileostomy which instruction was never documented as acknowledged. The patient was in relatively persistent pain without adjusting or monitoring pain medication. A therapeutic plan for the patient was not thorough and not consistently documented in the record so reading progress notes, one cannot determine the therapeutic plan for the patient.

Beginning on 4/10/21 the patient was on the infirmary but was being managed mostly by licensed practical nurses. Beginning at 2 am LPNs saw the patient five times. The patient was complaining of severe abdominal pain and vomiting which, given the patient's history, could have been intestinal obstruction. The patient had had vomiting as early as 4/6/21. At one of the five visits, at 3:40 am, the LPN called a doctor who recommended a clear liquid diet, an abdominal x-ray, follow up with a NP in the morning and a medication written as "finigren". Vomiting and abdominal pain in a patient suspicious for bowel obstruction should result in prompt hospitalization which was not done. "Finigren" is not known drug approved by the FDA and it is uncertain what the verbal order was for. The order form was not present in the medial record provided to us. The next morning the patient was evaluated by a NP who admitted the patient to a hospital.

At the hospital small bowel obstruction was found and a follow up surgery was done. The patient declined, his sister became his executor and the patient expired on 5/22/21 in the hospital in palliative care.

1. Weight loss was again unrecognized resulting in cancer being identified only after it was widely metastatic.
2. The patient had two episodes where bowel obstruction was missed. Training of staff is indicated on how to evaluate and manage vomiting. Giving a laxative for vomiting is not indicated.
3. The disorganization of consultant care was significant. Specialty care reports were significantly disorganized and it was extremely difficult to track specialty care and providers did not always appear to know the therapeutic plan recommended by specialists and sometimes did not carry out their recommendations.
4. Providers at the facility did not document in progress notes a clear list of the patient's problems, the patient's medications, nor the therapeutic plan for the patient. Inability to understand the problems and therapeutic plan from progress notes is a significant system-wide problem.

Patient 19

This is another case of diagnosis of widely metastatic cancer identified late in the course of the patient's disease. We have identified few cases of cancer on record review that are found sufficiently early for treatment and cure.

This 71-year-old man did not have evidence of any annual cancer screening in the record. Less than 6 months of record was sent but 2 years were requested. The patient was at Lawrence and complained of back pain. A nurse documented that Lawrence did not have a regular provider. However, a NP saw the patient the same day that took virtually no history, performed no examination and ordered a mattress cover, Naprosyn, and follow up in a week. The patient was in a wheelchair but the NP did not determine why the patient was using the wheelchair and weights were not obtained because presumably the patient was in a wheelchair.

Laboratory tests were performed on 7/16/21 but an order or progress note could be not be found indicating an order for these tests. It appears that they were ordered in advance of a chronic disease clinic. However, the tests were reported on 7/18/21 and were significantly abnormal indicating anemia and significantly elevated alkaline phosphatase (hemoglobin 9.1, alkaline phosphatase 463). The patient was transferred to BMRCC 7/20/21. There was no transfer-out note from Lawrence and the BMRCC transfer note did not contain any medications and did not contain acknowledgement of the significantly abnormal laboratory results. The nurse checked a box that the patient had hypertension, high blood lipids, diabetes and seizures. But why he was in a wheelchair was not documented. The laboratory results were not received at BRMCC until 9/29/21 more than two months later.

Shortly after arriving at BMRCC the patient again complained of pain. The transfer form lists a weight of 231 pounds. There was no problem list in his medical record. A doctor saw the patient but the date of his note was illegible. The doctor did note an elevated alkaline phosphatase so, apparently, the doctor was aware of the abnormal laboratory tests done at Lawrence. He ordered repeat laboratory tests including a GGT. These test results were reported on 7/26/21 and showed an alkaline phosphatase of 592, an A1c of 9 and hemoglobin of 9.3 all significantly abnormal. A GGT test was nearly normal meaning that the very high alkaline phosphatase was due to bone resorption and metastatic disease needed to be excluded. This was not documented as appreciated and the patient was not referred for a cancer evaluation or for a primary bone condition.

A doctor saw the patient on 7/27/21 and took only a brief history. The significantly abnormal laboratory tests were not documented as reviewed though they were reported the day before. The assessment was diabetes and low back pain and arthritis. Despite the assessment of low back pain, the back wasn't examined. The patient was in a wheelchair yet it wasn't clear what the condition was that confined him to the wheelchair. The only problems on the problem list were diabetes, low back pain and arthritis. Yet the patient apparently had seizure disorder, diabetes, hypertension, and hyperlipidemia. At this visit, the patient had a weight of 221 pounds which was a 10-pound weight loss since coming to BMRCC. No action was taken.

On 8/5/21, a nurse evaluated the patient using a chest pain protocol but the pain was actually back pain. The weight was documented as 214, indicating a 17-pound weight loss since coming to BMRCC less than two weeks prior to these visits. The nurse called the physician who ordered to place the patient on the infirmary for observation. The physician subsequently admitted the patient to the infirmary but there was no neurologic examination and no examination of the back even though this was the reason for admission to the infirmary.

Two days later on 8/7/21 the patient was seen pouring urine from his urinal over his bedside table. When asked why he was doing this he said, "I thought I was making coffee". He added, "If I was at the VA they would tell you I'm not right. They said I was an invalid". Later he told a nurse that he is old and needs to be taken care of. The nurse believed that the patient was not confused but a cognitive evaluation should have occurred after this episode but did not. The nurse did not bring this to the attention of the physician but the nurse did document what occurred in the progress notes.

Because of the elevated alkaline phosphatase, the doctor ordered an ultrasound which was not an optimal test option. The elevated alkaline phosphatase was from bone and a CT scan of chest, abdomen and pelvis would have more appropriately evaluated for possible metastatic bone disease. The ultrasound was done on 8/10/21 and showed, not unexpectedly, no liver or gall bladder abnormality. The doctor saw the patient on 8/20/21 in follow up and merely re-ordered laboratory tests. A CT scan should have been done.

On 8/24/21 the patient experienced bloody diarrhea which was guaiac positive. The doctor sent the patient to a hospital. A CT scan at the hospital showed mucosal thickening in the cecum with surrounding lymph nodes and an enlarged prostate. Gastroenterology and urology consultations were recommended within two days. They also recommended a total bone scan. The patient was sent back to the prison the same day.

On 8/27/21, a doctor saw the patient and noticed urinary incontinence and ordered diapers and referred the patient to urology and gastroenterology. It would have expedited the work up if the doctor could have ordered an urgent colonoscopy as this would have eliminated the delay in getting a gastroenterology consult that would result in a colonoscopy.

On 8/31/21 the patient went for a GI consultation and the consultant recommended colonoscopy, a total bone scan, and CT scan of the chest were recommended. Of note, when patients are sent out for appointments, a Health Status Transfer Summary form is used to document the movement. This form does not state what appointment the patient is going to. This form was designed for transfers between facilities and is ill-suited for a movement form for offsite specialty care because it does not indicate what specialty appointment the patient is going for and does not give specific information requested by the specialist or needed for the specialist to be informed about the status of the patient. A different form should be used for transportation to specialty appointments.

On 9/7/21, the patient said he wanted to get the colonoscopy done when he was discharged. The patient apparently believed he was being discharged soon. This was deemed a refusal. No one documented checking his discharge date. Besides, the patient appeared, based on his prior

behavior, to have early dementia or a cognitive issue and accepting a refusal under those conditions should not be considered a voluntary and knowledgeable refusal. This patient had a charge of murder/intent to kill yet said he was expected to be discharged on in November of 2022. November of 2022 was more than a year away and delay of diagnosis would certainly result in death. He should have had a cognitive assessment; instead, staff accepted his refusal and took no action not apparently explaining the necessity of a timely diagnosis. Later that day the patient had a fall in the bathroom.

A physician saw the patient on 9/8/21 and wrote a three page note that is undecipherable. There were collegial reviews for bone scan, esophageal ultrasound, CT of the chest and urology consult.

A urologist saw the patient on 9/15/21 and told the patient hat he had likely bladder cancer or prostate cancer and needed cystoscopy and/or transurethral resection of the prostate. The patient believed he was being released in three weeks. After the visit the patient told the doctor that he would get the cystoscopy after discharge and the doctor ordered diapers and ordered a mental health evaluation for competency. There was no evidence that the mental health evaluation occurred.

In the meantime, the patient's condition deteriorated. He had worsening anemia and was sent to an ER for transfusion. The patient continued to be incontinent and told nurses that he was going home which was not rational or accurate. The patient continued to lose weight and by 9/19/21 he weighed 191 pounds or approximately a 40-pound weight loss since coming to BMRCC two months previously. There was no nutritional assessment of the patient. The patient continued to be intermittently incontinent and though he appeared confused based on his behavior there was no follow up of the mental health evaluation. A cognitive assessment could have been performed by medical providers but was not.

A CT scan on 9/21/21 showed diffuse metastases of the spine, ribs, sternum, and both scapula. Bone metastases like this are often seen in prostate cancer. There were nodules in both lungs likely metastatic. There were multiple enlarged lymph nodes compatible with metastatic disease.

The doctor's notes were illegible so care was difficult to discern. Tramadol, a narcotic was ordered on 9/24/21 for two weeks. An oncologist saw the patient on 9/30/21 and documented symptoms for five or six months. The patient refused hospitalization and colonoscopy so the oncologist recommended bone biopsy and barium enema if the patient would agree. On return from the oncologist the patient said he was going to be hospitalized the following week. On 10/1/21 the patient was sent to a hospital for a transfusion but ended up being admitted and agreeably accepted all diagnostic efforts. A colonoscopy was done and showed a fungating partially obstructing mass in the cecum. Biopsies were taken and showed adenocarcinoma. The colon cancer was so widespread, including to liver, lung and bone that surgery was not an option. A prostate biopsy was done and showed adenocarcinoma with high grade metastatic disease. A bilateral orchiectomy and removal of the prostate were recommended. A nephrologist saw the patient for hypokalemia and hypomagnesemia and he recommended nutritional supplement and nutritional care and support which never occurred.

The patient returned from the hospital on 10/9/21 with a recommendation by the hospital for palliative care. The nurse admission note to the infirmary documented a care plan of regular diet, resume medications, vitals every shift, Foley care, activity as tolerated. This was not an appropriate care for this bedridden patient who had widespread bone metastases and had confusion and probably dementia. The doctor wrote an infirmary admission note two days after discharge from the hospital and ordered only Tylenol #3 1-2 tabs PRN for pain despite severe bone metastases and without a history for pain. On 10/12/21 the doctor wrote that the patient denied pain. Yet the same day a nurse documented the patient stating, "it hurts when I move but then it's better". At 8 pm on 10/12/21, a nurse documented increase blood sugar (the value was not documented) and decreased urine output of only 30 cc since 4 pm and the patient was sent to a hospital.

The patient returned from the hospital on 10/16/21 and was admitted to the infirmary. The patient was oriented to self on admission. The patient was on a regular diet with evening snack, had a dressing change to a sacral decubitus, but had no specific pain plan or nutritional plan except regular diet. The doctor's infirmary admission note was dated 10/18/21 but did not expand the nurse care plan and wrote "comfort measures only" yet did not address pain management in this patient with disseminated cancer. It isn't clear what comfort care meant in this context as it appeared that the patient was receiving usual care. Pain was not addressed. On 10/30/21 a nurse documented that when changing the decubitus dressing the patient made noises indicating pain but that when asked he denied pain. This implied possible cognitive issues and the provider should have considered a higher routine pain medication than Tylenol with codeine three times a day. Nurses documented that the patient was confused on several occasions. During his later days the patient was only intermittently weighed and lost weight continuously. On 10/10/21 a weight of 182 was documented. While on the infirmary, weights were mostly not taken "W/C" was written on the graphic flow sheet, presumably that the patient was using a wheelchair and therefore weights couldn't be taken. All infirmaries need to have a way to take a patient's weight despite use of a wheelchair.

The patient died on 11/10/21.

OPPORTUNITIES FOR IMPROVEMENT
1. When patient's come back from a specialty consultation or ER visit, it is seldom clear what occurred based on documentation. The provider post-specialty-visit or post-hospitalization visits need to document what occurred at the hospital and discuss the change in therapeutic plan with the patient. This is a systemic failure in IDOC.
2. The transfer summary form is used when a patient is sent offsite to a specialist or to a hospital but the form does not indicate where the patient is going and does not give the hospital or specialist information which they need to evaluate the patient. This form is the same as the intrasystem transfer form but the form used to transfer patients to specialty care or to a hospital should be revised to more appropriately communicate to specialist or to the hospital.
3. Referral forms, approvals, consultation reports, and ER reports are chaotically and haphazardly placed in the record. Some are duplicates, some are absent, some are not in chronologic order and some are mixed up resulting in a significant barrier to clinicians reviewing specialty notes. This is important in this system, because reading progress

262

notes only, one cannot determine all of the problems or plans for the patient. It is only by reading specialty notes that a full picture of the patient's chronic diseases is available for view. Reading the progress notes alone, one cannot determine what the patient's problems are or what the treatment plan is. This includes chronic disease notes. For this reason, progress notes by providers should be more informative and specialty and hospital reports need to be chronologically organized and need to all be obtained.

4. This patient had cerebral and cerebellar atrophy on CT of his brain with chronic ischemic changes in white matter consistent with dementia. He exhibited behavior consistent with dementia (incontinence, irrational behavior, and belief that he was being discharged when that was not accurate). The patient was referred to mental health for an evaluation because he refused treatment. This never occurred. The medical program needs to institute a formal procedure for identifying and diagnosing dementia and for evaluation for cognitive and memory problems. A gerontologist should be involved in development of this procedure. In this particular case the patient was said to have refused necessary care but this decision was likely affected by dementia. Of note, IDOC has an Implementation Plan to have facility staff screen for dementia. This is likely to result in failure to appropriately identify many persons with this condition.

5. This patient had dementia. The patient "refused" tests which were later accepted. The patient's dementia was not accounted for with respect to giving informed consent. IDOC does not have a procedure for obtaining a POLST[604] which should include timeliness of obtaining a POLST while a person is still of sound mind. Procedures for dementia should include when and how to obtain a guardian status for someone with dementia.

6. This patient likely had dementia and was not reporting pain accurately but did not have an adequate pain assessment despite being on "comfort care". IDOC needs to institute pain procedures for end-of-life care that are humane.

7. Nursing care plans for the infirmary are not evident except in the nursing plan on the nursing infirmary admission form. Physician orders for this patient for end-of-life care were not different from usual care and did not include dietary concerns, comfort care, pain management, etc.

8. The current infirmary administrative directive and the draft infirmary policy do not define comfort care or palliative care. It appears that this care is developed ad hoc depending on the provider and facility and does not appear different than usual care. Palliative care should be defined and a procedure developed for this type of care.

9. Persons in wheelchairs do not have weights taken. Instead, staff document "w/c" presumably meaning that if one is confined to a wheelchair a weight is not required. IDOC needs to install a scale at each facility with capacity to take the weight of patients in wheelchairs.

10. The patient transferred from Lawrence to BMRCC and had very abnormal laboratory tests reported two days before transfer which formally did not arrive at BMRCC for two months. The intrasystem transfer procedure should include how abnormal tests results are identified prior to transfer and how the abnormal results are communicated to the receiving institution.

11. The patient had back pain with abnormal laboratory results for approximately two months prior to a diagnosis. This should be evaluated to determine a root cause of this delay.

---

[604] Physician Orders for Life-Sustaining Treatment is a form that delineates advanced directives of the patient in the event of a life threatening condition. This should be accomplished when the patient is of sound mind.

12. A non-specific discomfort nursing protocol was used for a change of ted hose. In other record reviews, the non-specific discomfort protocol is used inappropriately. This protocol should be abandoned. When the nurse evaluates a patient for a problem for which a specific nurse protocol is unavailable, the nurse should use a progress note for documentation.

Patient 20

This patient was a 89-year-old man who was initially housed at Menard with diagnoses of atrial fibrillation, prior DVT with an IVC filter,[605] prior stroke, asthma, history of prostate cancer post radiation treatment, hypertension, urinary incontinence prior gastrointestinal bleeding and epilepsy. He was transferred to Dixon in late December of 2019. On transfer, Dixon did not complete the transfer-in form but completed an intake questionnaire. The intake questionnaire document did not include all the information present on the transfer-out form. The intake nurse questionnaire from Dixon noted a decubitus ulcer with a duoderm dressing but an order for the dressing was not found and provider progress notes did not document management of this problem so the problem appeared as one entirely managed by nurses. The patient was documented as being in a wheelchair but the reason for use of the wheelchair was not stated. The patient was documented as being incontinent but the reason for incontinence was not documented or addressed. A plan of care for his activities of daily living or need for the wheelchair were not documented and may not have been developed. For someone coming to a facility like Dixon, intended to house frail and disabled elderly, this is very poor documentation of the care needs.

Within four days of arrival to Dixon the patient fell in the shower and fractured his hip notably without a care plan for fall prevention. Records of this hospitalization for the hip fracture were not present in the medical record so it was unclear what the discharge plan was. However, the patient was discharged on Lovenox. Because there was no hospital report and because the progress notes in IDOC seldom describe what occurred in the hospital it is unclear if the anticoagulation was being used for DVT prevention post orthopedic surgery or if the anticoagulation was for started for the patient's atrial fibrillation. The difference would be significant because DVT prevention would be short term anticoagulation whereas anticoagulation for atrial fibrillation would be long-term. On return from the hospital, Dixon staff did not document the rationale for the anticoagulation and prescribed six months of warfarin. It was unclear if the Dixon staff told the hospital that the patient had an IVC filter. Typically, anticoagulation prophylaxis post hip surgery is two to six weeks but anticoagulation prophylaxis post orthopedic surgery may be unnecessary in a patient with an IVC filter. The failure to communicate effectively with the consulting specialist was problematic. Since this patient was a significant fall risk and in fact had just fallen and fractured his hip, he might not have been a candidate for anticoagulation for atrial fibrillation. The continuation of anticoagulation was uninformed. The facility physician should probably have consulted a hematologist on whether the risk of bleed in this 89-year-old was greater than the risk of emboli from atrial fibrillation. The hospital record might have clarified this dilemma.

---

[605] An inferior vena cava (IVC) filter is a screen placed in the inferior vena cava, the large venous blood vessel that returns blood to the heart. It is used in lieu of chemical anticoagulation for persons who are at high risk of bleeding when anticoagulation is used such as in persons who are elderly, at increased risk of falls, or who have dementia or other cognitive disorders.

Post hospitalization the patient was on the infirmary but was discharged to the "3rd floor" which is a unit for housing older persons that does not have an official status governed by policy. At the hospital the patient was noted to have a full thickness buttock wound due to maceration from incontinence which was not being monitored at the facility despite being identified at intake. It was not clear how the decubitus would be monitored on the 3rd floor.  It was also not monitored or identified on a physician or nursing plan of care.   The patient was documented at this time of being unsteady on walking.  There was no fall prevention plan and no plan for activity of daily living for the 3rd floor housing that would prevent further injury.  The doctor discharging the patient performed no evaluation for these items.  Providers at Dixon failed to follow up on the patient's surgical needs.  About six weeks after his surgery, the patient had to ask a nurse when his sutures would be taken out.  A doctor then saw the patient and apparently removed the sutures.  Sutures do not normally remain for six weeks.  The doctor wrote that the patient didn't feel he needed to follow up with the surgeon (despite having likely dementia) so no follow up appointment was made. The physician did not make a professional judgment regarding the need for follow up but apparently left it up to this 89-year-old man.

In the meantime, the patient was on warfarin, an anticoagulant, but was not being monitored for this with regular blood tests (INR) which is standard of care.   About 7 weeks after the procedure, on 2/27/20, a doctor saw the patient for knee pain and with virtually no history and physical examination, the doctor ordered prednisone for five days for osteoarthritis.  Within five days the patient experienced gross hematuria and bloody emesis and was sent to the hospital where an INR of 9.5 was identified signifying that the warfarin (not being monitored) had resulted in a life-threatening gastrointestinal bleed from a Mallory-Weiss tear.  This was all due to careless and substandard management.

Beginning on 5/20/20 a NP initiated a series of four knee injections over the course of the next year and a half with high-dose steroids.  Prior to these injections the patient was seen in his cell for these evaluations though the injections were done in the clinic.  Prior to these injections there was no history or physical examination of the patient and the indication for the injections was knee pain which was not otherwise characterized.  Knee injections without an appropriate history and physical examination is not standard of care.

Chronic care clinics for this patient were substandard.  He came to Dixon in December of 2019 but had only two chronic care visits (July of 2020 and February of 2021).  In neither of these two visits were his problems addressed.  His problems list included atrial fibrillation and history of a stroke but at neither chronic clinic were these problems addressed with respect to their contemporaneous status.  Whether the patient needed anticoagulation or even whether he had atrial fibrillation was not addressed and anticoagulation was discontinued in March 2021 without any further discussion.  The patient did not have an EKG in the record sent to us and during a March 2020 hospitalization the EKG showed normal sinus rhythm so his cardiac status was during the entire period of record review was uncertain. The patient arrived at Dixon in a wheelchair and with a sacral decubitus but no one ever evaluated or documented why the patient needed a wheelchair.  Though the patient had a stroke in the past, there was no physical examination to assess for persistent neurologic deficits post stroke or to assess his functional capacity or whether this was why he used a wheelchair.  He had incontinence but there was no

evaluation for this and no plan for care for his incontinence. As is the usual case, the chronic disease clinic visits do not include history or physical examinations adequate for the patient's problems. This 89-year-old never had a cognitive assessment. Though he was unable to walk and was incontinent, there was no assessment with respect to ability to conduct activities of daily living.

In June of 2020 the patient's anemia post GI bleed had improved and the HGB was normal (13.3) but by December 2020 the patient was again anemic (12.8). There was no attempt to determine why the patient was newly anemic. The anemia worsened and by February of 2021 the HGB was 12.2. The patient had a chronic clinic about a week after this test was reported but the provider appeared oblivious to the problem. Because the patient was 89 years old, the provider seeing the patient should have had a discussion of the risks and benefits of a diagnostic evaluation at his age but this did not occur.

A physical therapist saw the patient for about five visits and documented that there was no change in the patient's inability to move independently. The therapist recommended orthopedic evaluation which was not done. Though the patient had received multiple steroid injections for his knees, x-rays or a physical examination of the knees did not occur. Beginning in August of 2021, medication administration records showed that ibuprofen was started, apparently for his knee pain. Ibuprofen carries a Food and Drug Administration black box warning for potential for serious gastrointestinal bleeding, ulceration, and perforation. This was all the more urgent because the patient already had a prior gastrointestinal life-threatening bleed and this drug should have been used with extreme caution. The recommendation is to use the lowest effective dose and for the shortest duration of time. Since the patient's knee pain was chronic, a higher dose of Tylenol should have been used. If used chronically, the patient or the patient's guardian should have been warned of the risk for fatal bleed. After five months of ibuprofen the patient experienced another episode of abdominal pain with bloody emesis and was transferred to a hospital. There were no further notes but the patient apparently died of a gastrointestinal bleed that was preventable. An autopsy was not performed on this patient.

OPPORTUNITIES FOR IMPROVEMENT

1. The 3rd floor at Dixon is a de facto type of nursing home without any rules or procedures for monitoring or criteria for admission. This unit should be defined and have procedures for the scope of care that can be provided on the unit and the type of monitoring that can be expected.
2. This patient had atrial fibrillation on his problem list. His EKG at the hospital was normal sinus rhythm. He did not have an EKG in the record sent to us and it was unclear if atrial fibrillation had definitively been diagnosed in IDOC. If the patient had paroxysmal atrial fibrillation, he needed his anticoagulation status determined. If doctors didn't know whether or not to anticoagulated, they should have consulted a hematologist.
3. Hospital records weren't present which remains a persistent and pervasive problem. The IDOC needs to hold the vendor responsible for obtaining hospital and consultant reports.
4. The patient was incontinent but the reason for incontinence was never diagnosed.
5. Monitoring of the decubitus by providers was not done.

6. The patient was in a wheelchair, was incontinent, and had a stroke with uncertain ability to perform activities of daily living. The IDOC lacks capacity to evaluate and manage the elderly population. Gerontologists should be available for consultation to IDOC practitioners and should guide IDOC in development of procedures for managing elderly patients with disabilities and age-related conditions.

7. When the patient was on anticoagulation, the anticoagulation was not being monitored. Eliquis was started but then discontinued and replaced by warfarin which requires monitoring. When warfarin was started, the anticoagulation level was not monitored as required. This was dangerous and led to a life-threatening gastrointestinal bleed. IDOC should investigate why monitoring did not occur and report findings to the CQI committee.

8. The patient was receiving repeated knee injections with corticosteroids without having examinations of the knee or an x-ray of the knee to define the status of the knee. The vendor Regional Medical Directors should evaluate why this practice exist and establish some guidelines for their staff with respect to knee injections.

9. The patient had anemia in late 2020 and early 2021 but did not have an evaluation for it. Because the patient was 89, there should have been some discussion about the value in pursuing a diagnostic procedure. In this case the anemia wasn't even noticed.

10. The use of ibuprofen in an 89-year-old man with prior history of Mallory Weiss tear was extremely risky, especially on a long-term basis. It was used for presumed knee pain. But there was no thorough examination of the knees. At some visits for knee pain the knee wasn't examined at all. No radiologic studies of the knee were done. A physical therapist saw the patient and recommended referral to an orthopedic surgeon which did not occur. The provider using long-term nonsteroidal medication in an 89-year-old with prior history of GI bleed should be counseled.

Patient 21

Another patient, was 88 years old and had advanced dementia and was presumably transferred for this reason to Dixon from IRCC. The problem list had 61 entries most of which were irrelevant.[606] Only three of the 61 entries documented a disease. These included asthma/chronic obstructive lung disease (COPD), hypertension, and atrial fibrillation. Chronic conditions mentioned on the data base included asthma, hypertension, benign prostatic hypertrophy, COPD, heart failure and dementia. A disease profile obtained from hospital and consultant records included: chronic kidney disease, chronic lymphedema, heart failure, COPD, atrial fibrillation on anticoagulation, hypertension, high blood lipids, and advanced dementia. The patient was only oriented to person. The patient also had anemia which was never diagnostically evaluated or documented as a problem. The patient's problems could not be identified from physician progress notes and the patient was not monitored for all of his conditions.

The patient arrived at Dixon from IRCC on 9/24/21. The patient's dementia did not result in a care plan to address adequate nutrition, fluid intake or other activities of daily living. After arrival to Dixon, he had signs of dehydration (elevated BUN 51 and hypernatremia 149) but this was not identified at Dixon. There was no effort to ensure that this patient with dementia was drinking sufficient fluid.

There was a referral to UIC podiatry the day that the patient arrived at Dixon for ulcers on two of his toes. This referral was cancelled for unclear reasons. Nurses also documented that the patient had a buttock or L hip decubitus which was covered with a duoderm dressing but over the two and a half-month stay at Dixon, providers did not document examinations of the decubitus.

Nursing care on the infirmary consisted of twice-a-day nursing notes using a formatted nurse infirmary progress note, which did not consistently address the needs of the patient. There was only one occasion when a nurse documented replacement of the duoderm dressing but even then, there was no evaluation of the wound. The patient had a nephrology visit to UIC for chronic kidney disease. The BUN and serum sodium were high (51 & 148) and the nephrologist recommended increasing oral fluid as these values indicate dehydration. Yet this did not result in an order to increase fluid intake that could be found in the medical record. Fluid intake was initially tracked daily and it appeared that the number of times the patient relieved himself was tracked per day. Though as time went on the tracking was done less frequently. Because the patient was profoundly demented, this required nursing assistance. The toe ulcers were not evaluated by providers or nurses. The inmate was incontinent and needed assistance with bathing, oral hygiene, and transferring. However, there were no physician orders directing a plan of care and no documented plan of care was found in the record. The patient never had a cognitive assessment and his ability to perform activities of daily living were not assessed. It wasn't clear how the nursing plan of care was developed and it appeared to be an ad hoc plan devised by nurses as they went along.

The patient was on warfarin for atrial fibrillation but his INR was infrequently monitored. The INR was checked only five times over the 11 weeks of his stay but of the five values, three were

___

[606] PPD given, cardiac clinic, asthma clinic, HTN good control, etc.

supratherapeutic.  One value was 4.2 and a follow up normal INR was obtained a week later.
About a month later an INR of 5.3 was obtained.  This test was reported by phone by the lab at 3
am but the nurse didn't call a provider or check to patient to assess for bleeding instead referred it
to the day nurse to pass on to a NP.  This was dangerous; the nurse should have promptly called
a provider for instructions.  There was a follow up INR two days later that was 3.38 which was
high but a follow up lab for this test was not done.

The patient was not vaccinated for COVID despite having five major risk factors for COVID
complications[607].  Because of his dementia the medical staff had the responsibility to obtain a
guardian for the patient so that needed testing and treatment could be provided.  Patients who are
not cognitively oriented should be vaccinated.  The patient had tested repeatedly negative for
COVID at IRCC but on 11/29/21, about two months after transfer to Dixon, the patient had his
first test for COVID since his September admission to Dixon and it was positive.  So, the patient
was not vaccinated by approximately December 2021 yet was extremely high risk and had
dementia.   The patient did not have an initial oxygen saturation test after becoming COVID +
but was placed in isolation.  He was mostly evaluated twice a day by nurses.  He didn't have an
oxygen saturation documented until late in the day of the 2nd day in isolation and the oxygen
saturation was 92%.  Given the patients extremely high risk, he should have been considered for
hospitalization promptly but was not.  At this time, the patient started eating between 25-50% of
his meals.  The following day the oxygen saturation was not checked.  The following day the
patient had a pulse of 44.  This is extremely low and should have prompted hospitalization.  A
doctor saw the patient on the 4th day of isolation and the oxygen saturation was 82% so the
doctor sent the patient to the small community hospital where the patient received
dexamethasone.  His oxygen saturation was 94% so the hospital discharged the patient with
prescriptions for a Z-pack and 60 mg of prednisone daily for four days.  The patient was
discharged around 1:35 pm.  The doctor wrote orders to keep the oxygen saturation above 90%
but he should have used a benchmark of 94%.  The doctor ordered oxygen saturation twice a
day.  When the patient returned to the prison, the patient was again put in isolation.  By 7:40 pm
on 12/2/21 the patient's oxygen saturation was 84% on nasal canula oxygen.  The patient was not
continuously monitored and at one point took his IV out and bled on his shirt.  Because of his
dementia and lack of ability to cooperate with treatment he should have been immediately sent
back to the hospital but was not.  He repeatedly took his oxygen off and except for 12/3/21 when
the oxygen saturation was 94%, the oxygen saturation was consistently low. A doctor saw the
patient on 12/3/21 and the oxygen saturation was 94%.  But on 12/4/21 the pulse was in the 40s
and the oxygen saturation was in the 70s on 4 liters of oxygen.  These values should all have
resulted in immediate hospitalization but did not.  On 12/5/21 the oxygen saturation was 76%.
The doctor did not evaluate the patient on these days and nurses did not document contacting a
provider.  This was a significant departure from standard of care.  On 12/5/21 when the
saturation was 76% the nurse encouraged the patient to do deep breathing despite the patient
having advanced dementia.  This is a significant departure from standard of care.  The patient
should have been immediately hospitalized.  The patient kept taking his oxygen mask off and
because of the advanced dementia the patient needed higher level care.  Finally, on 12/6/21, a
doctor saw the patient, whose oxygen saturation was 80% on five liters of oxygen.  The doctor
sent the patient to the hospital.  There were no further notes and the patient died of COVID on
12/14/21 at a local hospital.

---

[607] Age, dementia, heart failure, chronic obstructive lung disease, and chronic kidney disease

OPPORTUNITIES FOR IMPROVEMENT

1.  IDOC has no procedures for monitoring for signs of dementia but multiple inmates have dementia and have not had work-ups for this condition. IDOC allows patients with dementia to have decision making powers even when they have lost executive function. Current administrative directives do not address obtaining guardian status for persons with dementia so that decisions about care can be made. In some facilities, inmates with dementia are allowed to refuse care when they appear to not know what they are doing. IDOC needs to develop policy and procedure for screening for dementia and for guardianship in the event of loss of executive function. This inmate did not appear to have a guardian with power of attorney. Staff documented speaking with his son and giving updates on his status, but it was unclear who was authorized to make decisions for this patient. All patients with dementia should have a person with power of attorney to make executive decisions.

2.  This person with dementia had laboratory evidence of dehydration through September and October without clear documentation that he was consistently being offered water. His intake of water was tracked well for two months but in the third month tracking was done only about half the time. Because the dates on the flow sheets were not scanned, it wasn't clear whether this was in IRCC or Dixon. But at Dixon the patient clearly had dehydration. Persons with dementia need care plans to include how they will be fed, toileted and encouraged to drink sufficient water. Dehydration in an elderly person with dementia can be a sign of neglect. For persons with dementia, inputs should be recorded consistently. Care of patients with dementia should be established in policy.

3.  The patient had a decubitus on his buttock but this was not evaluated by providers over the nearly three months at Dixon. This needs to be done. It appeared that only nurses were monitoring the decubitus ulcer.

4.  There was no evidence that a nursing plan of care was developed by way of physician order. What nursing plan of care there was appeared to be ad hoc and therefore subject to the individual nurse. Physicians should write orders to give direction for a nursing plan of care on infirmary units and the nursing plan of care should be documented in the record.

5.  The patient's anticoagulation was not monitored adequately. Because IDOC fails to do this well, they should consider use of direct oral anticoagulants which do not require monitoring. If IDOC continues to use warfarin, then it needs to improve the process of monitoring anticoagulation.

6.  This 89-year-old patient with dementia was not vaccinated for COVID. Guardianship needs to be obtained for persons with dementia so that decisions like vaccination can easily be made. Family should be sought out to have power of attorney. This should be done early in the course of dementia. In any case, this person should have been vaccinated but was not.

7.  This patient was in isolation for being COVID + but was not daily evaluated by a physician even though he had extremely high risk and had unstable vitals. He was positive on 11/29/21. On 12/2/21 the patient was sent to a local ER but sent back after a few hours on steroids and antibiotics. That evening his oxygen saturation was 84% and was as low as 74% and 75% on 12/4/21 and 12/5/21. A doctor did not see the patient on these days. The patient should have been sent back to the hospital on 12/4/21 but was not.

Nurses should have a target critical vital sign for which to call providers and oxygen saturation below 92% with COVID should require a call. A physician should have been called for a pulse of 44. IDOC should establish critical vital signs when providers need to be called.

Patient 22

Another patient was a 54-year-old man housed at Graham who did not have a problem list present in his medical record. He was monitored in chronic care visits only for diabetes and hypertension. His problems were identified from consultant or hospital records and could not be identified from IDOC progress notes. His problems included hypertension, diabetes, end-stage-renal disease requiring dialysis, prior stroke with ischemic changes and weakness in his lower extremities.

He did not have a therapeutic plan to assist him to accommodate his disabilities or to improve his functional capacity for the entire two years of his incarceration. So, he deteriorated and injured himself as a result of these failures. The progress notes and chronic illness clinic notes do not document any attempt to improve his functional status or to plans on how to protect him from risk of injury or falls.

In August of 2019, the patient fell walking down steps and fractured his right tibia and ankle. He needed surgery to correct his compound and displaced fracture. Specific instructions by the orthopedic surgeon to not shower and to keep the dressing and boot in place until follow up with the orthopedic surgeon, were not followed. The staples were not taken out timely. A nurse documented that the patient asked for help in taking a shower but the patient wasn't supposed to be taking a shower due to his wound. The patient developed decubiti and a surgical wound that were not properly attended to by the prison physician. The patient was not taken for recommended appointments for follow up with orthopedic surgery. The patient ultimately developed a necrotic wound on the foot of the leg on the surgically corrected fracture. The wound developed osteomyelitis which was unrecognized. Ultimately, in November about four months after his fracture, the patient was admitted to a hospital where osteomyelitis was diagnosed. The hospitalist wrote that the patient "had since missed all his follow-up appointments for unknown reasons. He said he had been in the boot for too long and it had started causing increased pressure to his heel which is responsible for his current ulcer". The patient needed debridement and long-term antibiotics. The failure to follow hospital recommendations following the fractured leg resulted in the osteomyelitis and ultimately amputation of the leg.

The patient was discharged from this hospitalization on multiple intravenous antibiotics but again was not followed well. The prison doctor never documented a therapeutic plan. The patient's ulcer did not completely heal and a month after the November hospitalization, an orthopedic specialist recommended that the patient see a wound specialist. There were no wound specialist reports in the medical record so presumably this referral did not occur. By February the foot wound again became necrotic, turned black and had drainage. An x-ray, showed loosening of the hardware used to fix the leg fracture or possibly infection. Two days later, the patient was hospitalized and remained in the hospital for about a month and ultimately had a below knee amputation of the right leg that was likely preventable with timely specialty follow up and follow up of recommendations of the orthopedic surgeon.

When the patient returned from the hospital in late March of 2020 when the below knee amputation occurred, follow up appointments records were not consistently found in the medical record and it was not clear whether the patient was receiving specialty follow up. The prison

physician did not document what the therapeutic plan was. Five days after the 3/25/20 discharge from the hospital the patient apparently went to the orthopedic center but there was no documentation or report of this visit. It appeared that the patient was admitted to the hospital during this visit. An above knee amputation was done.

On 4/3/20, the patient returned after above knee amputation. Several weeks after the above knee amputation, a nurse documented drainage from the left leg wound with an odor. The facility physician failed to appropriately monitor the left leg wound. The patient developed fever and the drainage had an odor both signs of infection but the prison doctor took no action except to order Tylenol. Eventually, it appeared obvious to a nurse that the patient had a serious infection and ignoring the prison doctor the nurse wrote that the patient was being sent to an emergency room for debridement "per infectious disease doctor". The nurse made the doctor aware but the doctor appeared completely disengaged in the care of the patient. From the emergency room it appeared that the patient was admitted to the hospital though a complete hospital report was not present in the medical record. Hospital discharge medications and some discharge instructions were in the medical record; the patient was discharged with recommendation for six weeks of antibiotics. Progress notes at Graham did not document what occurred at the hospital. Weekly blood work (CRP, CMP, CBC and vancomycin trough levels) was recommended with results being faxed to the infectious disease consultant. However, the CRP and vancomycin test results were not found in the medical record and appeared to not be done. The patient developed decubitus ulcers on his left leg which persisted for months without the facility providers evaluating for further osteomyelitis. The patient was deconditioned after these multiple surgeries and had a prior stroke with partial paralysis of his lower extremities but the facility physician never referred the patient for physical therapy until an orthotic specialist recommended physical therapy prior to making a prosthesis.

In February of 2021, the left lower leg again developed ulcers on the left heel and lower leg. At this time, it appeared that there was no physician at the facility and a physician assistant was managing care. The left leg wound was draining and didn't heal over a period of months but the facility providers did not again evaluate this diabetic patient for osteomyelitis which should have been done under the circumstances. During this time period, the patient completed his physical therapy sessions that were interrupted by the patient acquiring COVID infection. The therapist documented that the patient had impaired balance making him an increased risk for falls, was unable to perform activity of daily living, had decreased flexibility, abnormal gait, and pain that limited his functional ability. Despite the patient's significant disability, there was no attempt by prison staff to create a plan to assist the patient with respect to special housing or assistance with activities of daily living. Appropriate housing, policies, and procedure need to be provided to protect the disabled elderly from harm.

Another physician began service sometime in July of 2021. This replacement physician attempted to obtain services for the patient to improve conditioning and assess ability to transfer. The physician documented that he would discuss how to obtain assistance for the patient with specialists. The physician documented that the patient was deconditioned and needed to gain strength and asked for a harness to assist with self-care. However, the physician did not have access to expertise; access to a gerontologist would have been extremely useful. Moreover, there was nowhere to house the patient properly. The doctor ordered exercise with an elastic band but

based on evidence in the record this only occurred two times. The doctor attempted to get a physical therapy consult a month before the patient died, but this did not occur. The doctor did not assign a nurse aide to assist the patient with activities of daily living and within a month, in December of 2021, the patient was apparently unaccompanied in a shower and fell again fracturing his femur requiring referral to a tertiary hospital for open reduction surgery to correct the displaced fracture. This was the second fall with fractures for the patient who had yet to have a therapeutic plan for fall prevention, conditioning, and protective housing with nurse aide assistance. At the hospital the patient had ischemic changes on a CT of his brain consistent with old stroke and may have had early dementia. The patient returned to the prison on 12/26/21 but the following day experienced vomiting, fever, and decreased consciousness at 2:30 am. The patient died the following morning in the hospital.

An autopsy was completed 3/1/22. The manner of death was an accident due to the patient fall. The cause of death was aspiration pneumonia complicating recovery from the left femur fracture. Because the death was deemed due to the fall, the death was preventable. Falls are unmonitored in IDOC and fall prevention is not evident in medical records reviewed. Fall prevention needs to be implemented in IDOC.

Medical records for this patient were extremely disorganized. Hospital and consultant reports were inconsistently present in the medical record. Some reports that were found were often in duplicate or triplicate form and were not consistently found in chronologic order. The medical records for specialty care were extremely disorganized and was a significant barrier to following the progress of the patient. Once, the patient went for a specialty follow up but there was no evidence of it in the record. Other times, there was evidence of a visit but no report. Doctors and other providers consistently did not document knowledge of a therapeutic plan for the patient as recommended by the consultants. One doctor would consistently write a plan to "follow all consultant recommendations" without ever clarifying what the consultant recommended. As a result, and consistent with this first hospitalization reviewed, the discharge plan was never stated in a nursing or physician therapeutic plan. Multiple medication administration records during the time when he was to receive antibiotics for osteomyelitis were missing from the record and receipt of medication could not be verified.

The current system of care on the infirmary units is not designed to handle persons who have skilled nursing needs. Persons who require assistance with daily activities do not fare well on IDOC infirmary unit as occurred with this patient. The existing housing and treatment system for elderly patients with dementia, disabilities, or in need of assistance with daily activity can, in several cases on mortality reviews, be considered abuse as defined by the Illinois Adult Protective Services Act and by the Elder Abuse Surveillance document by the Centers for Disease Control.

As with other IDOC facilities there is no provider directed documented plan of care for patients. Provider care on the infirmary for this patient was poor. Nursing care was insufficient based on the level of care needed. Beginning on 5/13/21 until the patient death in December of 2021, graphic sheets consistently report bowel and bladder incontinence. Nursing staff addressed this apparently in an ad hoc manner as this is not addressed by provider or nursing staff with a coordinated plan of care. Wound care was not consistently documented. Consultant

recommendations were not carried out. The patient was described as sleeping or laying down all the time and became deconditioned without any attempt to offer assistance in getting up or exercising. Blood pressure was elevated on multiple occasions but no evidence it was reported to a physician or acted on.

The patient had 8 chronic care visits over the two years of record reviews. On one visit only the 2nd page of the report was present. These documents were found scattered about in various places in the medical record; sometimes mixed with laboratory reports, sometimes with specialty reports, sometimes with flow sheets and not in a sequential orderly format. At none of the chronic care visits was an adequate history taken. Sometimes, no history was taken. Physical examinations were limited. At no chronic clinic visit were all of the patient's problems evaluated. The patient's end-stage-renal-disease was never commented on with any specifics related to status or implications for his diabetes. The only diseases evaluated were diabetes and hypertension. Though the patient had diabetes he never had a retinal examination to evaluate for retinopathy and remarkably, never had an evaluation for diabetic neuropathy. Despite having multiple foot lesions, one of which resulted in amputation of his lower right leg, there was never an evaluation of his lower extremities and when he presented to chronic clinic with foot lesions and diabetes, the diabetic foot was not managed based on standard of care which includes off-loading, ensuring that osteomyelitis was not present, and protecting the foot from development of osteomyelitis. The patient's disability from his stroke was never evaluated in chronic clinic and there was no therapeutic plan to accommodate the patient's disability. The episodes of osteomyelitis with amputation and extended periods with decubitus and leg ulcers in a diabetic were never evaluated in chronic care clinics. These clinic sessions never included history, examination, assessment and a therapeutic plan for each of the patient's medical problems and this needs to be corrected as it is a significant deficiency of chronic care management in IDOC.

OPPORTUNITIES FOR IMPROVEMENT
1. This patient had no problem list in the record sent to the Monitor. All patient's should have a problem list.
2. The patient's problems were not all monitored in chronic clinics or elsewhere.
3. The patient had ambulatory disabilities yet did not have a fall prevention plan nor were accommodations provided that protected the patient. As a result, the patient had two falls and broke two long bones that caused significant harm to the patient. The coroner deemed that the manner of death was accidental related to the fall and subsequent femur fracture and that the cause of death was aspiration pneumonia complicating recovery from the femur fracture. The patients care needs on the infirmary were not addressed and the patient became extremely deconditioned due to extensive bed confinement without opportunities for assisted exercise. IDOC does not have reasonable procedures or practices that protect the elderly from harm. Appropriate housing, policies, and procedure need to be provided to protect the disabled elderly from harm. IDOC needs to hire a gerontologist to direct a survey of elderly to identify ways to prevent harm to the elderly.
4. The Graham facility is extremely disorganized during this time period. It lacks physician coverage, has extremely disorganized medical records, hospital and specialty care reports are not consistently available and operationally, the facility cannot coordinate specialty care effectively. The IDOC should consider sending a task force into this facility to take

corrective actions necessary to make it operationally functional and safe. Currently, it is unsafe.

5. Specialty care coordination was unsafe and resulted in the patient getting two sequential amputations leading to an above knee amputation of the right leg. Follow up of specialty care was extremely poor and resulted in osteomyelitis of both legs. The is a systemic problem and has multiple variables including poor physician oversight, lack of records, specialty clerks managing follow ups and not providers, etc. The vendor has still been unable to obtain specialty reports and is unable to get its physicians to coordinate care. A root cause analysis of the specialty care process with redesign to correct problems is necessary. This issue has resulted in deaths.

6. Care on the infirmary, which is a systemic IDOC problem, is not meant to accommodate persons who need skilled nursing care or assistance with daily living. IDOC needs a systemic solution to care of the elderly with memory deficits, any level of dementia, or who need assistance with activity of daily living.

7. The chronic care program is systemically broken. Providers in IDOC do not know or monitor the patient for all of their problems. The vendor is unable to address this and IDOC must redesign this system so that all of the patients problems are appropriately monitored.

8. Physician coverage at this facility was not good and care especially in 2019 and 2020 was incompetent. On one occasion, a nurse called an infectious disease specialist for advice and the consultant recommended hospitalizing the patient. The vendor contract must include having competent physicians consistent with requirements of the Consent Decree.

Patient 23

Another patient was a 70-year-old man with a problem list documenting only dementia, asthma and hypertension. In 2019 the patient had a syncopal episode and fell in the yard at Dixon. The workup at UIC hospital showed no acute brain injury but there were chronic EEG changes consistent with encephalopathy which were ultimately determined to be due to a concurrent urinary tract infection. Because his problem list was inaccurate, his medical history was obtained from reviewing hospital records and not from the IDOC medical record which did not accurately represent his panel of medical conditions. The UIC history included that he had a history of traumatic brain injury as a child resulting in seizures, difficulty following commands, and altered mental status. He also had a history of diabetes, hypertension, high blood lipids, epilepsy, a prior stroke with L facial droop. The recommendations of the hospital included a fall prevention regimen, a specialized dysphagia diet to avoid aspiration, an exercise program, ensuring appropriate fluid intake and a follow up with neurology. The hospital did not evaluate the extent of the brain injury. The patient was provided a pureed diet without a nutritional analysis. The neurology consultation was not obtained. The exercise program was not initiated. There was no evidence of a fall prevention program. When patient returned to the infirmary from hospitalization, progress notes were continued as if the hospitalization was merely an absence from the infirmary. For any absence longer than a day, an admission note to the infirmary should be completed. The doctor should be required to incorporate the hospital recommendations into a modified therapeutic plan or describe why the hospital recommendations were not completed.

After return to the prison from the University of Illinois hospital on 11/23/19, the patient was oriented only to person but had slurred speech and was described as pleasantly confused.

Typically, an occupational therapist will determine what activities of daily living a patient can effectively and safely perform. Occupational therapists make their determination based on an objective measure of having the patient perform certain activities and testing the patient's ability to perform. Occupational therapists are not used in IDOC. Based on documentation in the medical record, including physician orders, in the medical record, the decision to provide assistance to a patient appears an arbitrary decision made by nurses without physician direction and without any standardized measure of the patients ability to conduct an activity.

The graphic sheets describe whether certain activities on the infirmary are performed with assistance of staff or without assistance of staff. For this patient, on return from UIC in November of 2019, a nurse described the patient as needing total care. Graphic flow sheets were not in the record from November of 2019 until July of 2020 and were present only until August of 2021. These flow sheets document that the patient fluctuated from self-care to partial assistance, back to self-care, and then varying degrees of assistance. There was no evidence in the record of physician orders for assisted or self-care. A treatment plan consistent with hospital recommendations was not documented in the record as part of a nursing or physician plan of care. It appeared that the plan was ad hoc.

Nursing did document in their notes that the patient tolerated a pureed diet but there was no nutritional evaluation to determine if the pureed diet at the prison was adequate for his long-term needs.

At times, this patient had decubiti on his buttock and perianal areas that were not monitored regularly. The patient had a long-term Foley catheter for which an indication was not documented. It appeared that it was for staff convenience. The patient pulled his Foley out on several occasions. Orders from physicians, for insertion of the Foley catheter were not always present. By 12/31/20 nurses documented incontinence of bowel yet there was no plan of care for this. Nurses documented "fall prevention" in their notes, but what specifically was done for fall prevention was not documented so it was unclear what care was actually provided to the patient. Activity of daily living needs appeared to be left to the discretion of nursing to develop but a plan for these needs was not documented in a nursing plan of care. This is typical of IDOC infirmary care. Nurses typically only documented a note once a day, typically in the late evening hours.

On 10/9/21 the patient, who had been increasingly confused over the past two weeks, was noted to have a strong odor and was incontinent. He was sent to the hospital. Despite being on "fall prevention" the patient arrived at the hospital with bruising on his right hip and right rib cage with the hospitalist noting that the patient had frequent falls for which there was no documentation at the prison making it appear that the prison staff were unaware of his injuries. A CT of the brain showed diffuse cerebral atrophy without acute lesions. His documented problems in the hospital were: 1) confusion, 2) superficial bruising of the hip likely from confusion from an unwitnessed fall, 3) bladder outlet obstruction resulting in placement of a suprapubic catheter, 4) urinary tract infection, 5) dementia from traumatic brain injury as a child, 6) diabetes, 7) epilepsy, 8) high blood lipids, 9) hypertension, and 10) stroke with residual L sided weakness.

After return from the hospital the patient had his suprapubic catheter and instructions were to call the urologist in a day, would need a CT scan to confirm safe positioning of the suprapubic tube and would need a catheter exchange in a month. There was no evidence that these recommendations were followed. He was placed on "fall prevention" and a nurse assistant documented that the patient needed assistance with transfers. A nurse then wrote on the progress note plan to assist with activities of daily living. There was no physician order and this confirmed that nurses established a care plan ad hoc without any physician order. About three weeks after the hospitalization, on 11/4/21, an injury report documented a raised lesion on his head presumed to be from a fall. There was no physical examination after this presumed fall. This was the second fall in a month. After an injury from a prior fall was identified during the prior hospitalization, there were no effective steps taken to prevent another fall even though the patient was on "fall prevention". The patient remained confused and incontinent after the presumed fall. The first provider examination after the presumed fall on 11/4/21 was on 11/8/21 when a doctor noted that the patient had been to urology after pulling out his suprapubic catheter. The doctor did not mention the fall or evaluate the patient for that incident. Aside from documenting an injury report, no steps were taken to protect the patient from future falls.

279

On 10/17/21 a nurse noted that the patient was confused and climbing out of his bed. A bed alarm was in place but only one note a day was being written and it wasn't clear if the patient was being monitored. On 10/23/21, a nurse documented that "earlier" the patient had ripped out his suprapubic catheter. There should have been a progress note when this occurred but there was none. "Incontinence care" was the nursing plan but it is not clear what this meant. There were no physician orders and physicians were uninvolved in managing this issue. Two days later, a nurse spoke with a doctor and the nurse documented that the daytime nurse would contact the urologist. The nurse wrote, "ASAP urology" appointment. Except for the discussion with the prison physician, the prison physician was uninvolved with the patient and didn't examine the patient or write any orders. On 10/26/21, a nurse documented that the patient's bladder was distended and documented a plan of notifying a writ order for an appointment with urology. This was all taking place without any physician intervention. That day a NP saw the patient but didn't evaluate the patient and only trimmed his toenails. Later that day, a nurse wrote that the prison doctor gave a phone order to send the patient to an emergency room for urinary retention. The patient returned from the outside hospital at 7:30 pm that day and had a bloody diaper. The hospital record documented that because the patient wasn't sent within 6-8 hours of pulling the catheter out, the tract had closed and an attempt to insert a Foley catheter failed. Follow up with urology in a week was recommended. Nurse progress notes documented that the urine output would be monitored, but graphic flow sheets for this time period weren't available and progress notes did not document urine output. A physician did not evaluate the patient or document urine output. On 11/4/21 a nurse wrote that there was decreased urine output but no objective monitoring was documented in the record. The nurse documented a distended abdomen and a raised bump on the patient's forehead with increased confusion. The doctor was called and said he would be down to see the patient but didn't see the patient that day. The patient was acting bizarre, walking out of the room, pushing his wheelchair from the front of the chair into a corner and had to be assisted to his bed. The doctor didn't see the patient for four days until 11/8/21 and wrote that the patient needed a CT of the kidney and pelvis and then a urethral dilation and reinsertion of the catheter but the dates for these procedures was not noted. The doctor didn't evaluate the head lesion or order fall prevention measures. It appeared that the patient was mostly unmonitored for most of the day. Monitoring urine output was apparently done by noting whether his diaper was wet.

On 11/16/21 a nurse documented that the patient's diaper wasn't wet and the patient was sent to a hospital. There was no hospital report in the medical record and there was no synopsis of what occurred at the hospital in the medical record. The only document available was a physician transfer order from the hospital that recommended hospice care and occupational and physical therapy. Because the prison had never obtained a Physician Orders for Life Sustaining Treatment (POLST) or determined an advanced directive with a family member, the hospital called the patient's sister and obtained a directive to provide no further life sustaining measures. A POLST form was placed in the record on 11/24/21. This should have been done long ago by the prison as the patient had long-standing dementia. The patient returned to the prison and died about a week later. The hospital report was unavailable. A progress note from a nurse on 11/24/21 documented that the patient's daughter gave instructions for no further intervention.

280

The patient was diagnosed with failure to thrive. The patient was on IV antibiotics for a urinary tract infection and the suprapubic catheter was changed.

OPPORTUNITIES FOR IMPROVEMENT

1. The patient had dementia since 2019 yet did not have a POLST until about ten days before he died and the POLST was completed at the hospital. IDOC needs to develop a procedure that directs how and when a POLST is obtained. A POLST should be obtained before an inmate becomes demented. In this case, the inmate had dementia and yet had multiple procedures and vaccination for COVID despite having dementia. The POLST and guardian should be identified so that medical care can continue with appropriate approval.

2. The problems of the patient couldn't be determined by reading IDOC medical record notes. If it were not for specialty and hospital notes, one wouldn't be able to determine the problems of the patient. IDOC must ensure that its physicians monitor and document all of the patient's problems in their notes and that all specialty care and hospital reports are present.

3. The specialty care and hospital care records were extremely disorganized. Some hospital and consultant records weren't present in the IDOC medical record. The vendor must improve the disorganized presentation of consultant and hospital reports in the record to ensure that they are all present and that they are orderly and in chronologic order. This is especially important because the vendor's physician do not document all problems so the specialty and hospital notes are the only way to determine the conditions of the patient.

4. The patient had brain damage from childhood trauma and eventually developed dementia. As the patient progressively deteriorated there was no evidence of physician orders for how to monitor, feed, and care for the patient. It appeared that nurses managed the patient in an ad hoc manner without physician involvement. IDOC needs to establish policy for infirmary care that requires physician orders for monitoring, nurse care, feeding, and when assistance is to be provided. A nursing plan of care must be documented in the record and include all orders for management of the patient.

5. This patient was documented as a fall risk as early as December of 2019. Although "fall precautions" were stated by nurses on multiple occasions, it was unclear what specifically "fall precautions" meant. The patient appeared to be unmonitored for most of the day. The patient had multiple falls bruising himself on a couple of occasions. Yet, after falls, there was no physician evaluation and there was no change in monitoring. IDOC must supervise persons with dementia in a manner that protects them. Management of this person qualifies as neglect and elderly abuse. IDOC should have an internal evaluation of this case, and others, to determine how to appropriately monitor the elderly, especially those with dementia.

6. Nurses appeared to determine, ad hoc, the level of activity of daily living assistance provided to this patient. There was no formal assessment and objective status determination that guides these decisions. IDOC needs to develop a mechanism to

evaluate and determine the level of activity of daily living needs and have a procedure for how these are provided. Documentation of those services needs to be done.

7. This patient had a Foley catheter for years. The indication for the catheter was not present in the medical record but appears to be for convenience of the staff. IDOC needs to do a training of the indications for indwelling bladder catheterization and monitor that staff are adhering to standards of care for catheterization.

8. This patient appeared unmonitored for most of his time on the infirmary. IDOC should document contact time with the patient so it is clear how much time staff spend with the patient including what the time was spent doing.

Patient 24

This patient was a 70-year-old man with advanced dementia, diabetes, hypertension and glaucoma. He had multiple disabilities included previous traumatic loss of his right eye, poor vision in his left eye, sensorineural hearing loss, and difficulty transferring from a chair to bed. He needed total assistance. He was typically confused and mumbled and providers documented inability to understand the patient. The patient was initially housed in the Illinois River Correctional Center (IRCC) infirmary and later transferred to the Dixon CC. As with all IDOC infirmaries, there was no documented therapeutic plan of care for the patient at either IRCC or the Dixon facilities and the orders were not all in the medical record so it was not possible to determine what care was even ordered for the patient. He had consistently elevated blood urea nitrogen (BUN) and intermittent elevated urine specific gravity indicating persistent dehydration. His input and output were not being monitored. What assistance was to be provided to the patient to drink fluids was unclear and notes were infrequent and did not describe all care provided. Though the patient was a significant risk for falls, what prevention measures were being used were not documented in a formal plan of care.

In June of 2021, while at IRCC, progress notes began documenting that the patient was combative. Nurses documented that the inmate fought against assistance with toileting and vital signs. The patient was also described as confused. During these episodes, there was no provider intervention to establish a safe manner of managing this difficult patient. Instead, on one occasion nurses called custody for assistance and custody assisted nursing moving the patient to his bed. Two days later, a supervisory nurse noted that the inmate had arm pain and offered muscle rub to the patient. The source of the pain was not sought and a provider did not examine the patient. During this time the inmate was incontinent and confused. Eventually, after several days a NP evaluated the patient for arm pain and noted edema of the arm and digits but did not seek out the reason for the painful arm. The NP started tramadol for six months which was a drug to be used with caution,[608] especially in the elderly. After two more days the patient was difficult to arouse and was sent to a hospital.

At the hospital, doctors thought that the arm injury was due to a fall. The patient had a swollen arm but an x-ray showed no fracture. The patient was disoriented, but was cooperative. He needed total assistance. The source of the injury was not identified but the patient was started on antibiotics. Based on sequences of notes, it appeared that the injury was subsequent to requests for custody intervention in managing a combative patient with dementia. There was no investigation as to how the patient injured his arm and whether it was related to the episodes of transferring the patient during his combative episodes. This should have been investigated as an excessive use of force.

---

[608] Tramadol is a narcotic. This patient had a prior CT scan showing possible increased intracranial pressure and this drug should be used with caution in those patients. Tramadol should also be used with caution in persons with diabetes due to potential for hypoglycemia and in the elderly due to risk for falls and fractures, especially in elderly with cognitive impairments which this person had. No special precautions were taken and the patient was placed on an extended prescription (6 months) without any monitoring.

About six weeks later, another nurse used a burn protocol to evaluate the patient who was described as dumping noodles on his lap and sustaining a burn injury to his inner thigh. There were quarter sized blisters on his leg that were treated by a nurse. A provider didn't see the patient for about ten days when the wound was described as a 16 by 8-centimeter burn with yellow exudate. Burn injuries are common in patients with dementia[609] and are of concern because they imply that the patient may have been left alone or unsupervised, or possibly subject to neglect or abuse[610]. There was no investigation of this injury.

Several weeks after the burn injury, the patient transferred to Dixon. The transfer-in summary for Dixon was not in the medical record sent to the Monitor and similar to IRCC, a therapeutic plan for the patient was not documented so the plan of care for this patient remained unclear.

There was no physician involvement in the transfer of this patient and no clear provider notes after arrival to Dixon for about five days when a NP documented seeing the patient. The NP described the patient as moaning in pain with a large open wound from the burn on his thigh, draining pus. The NP gave a stat dose of parenteral antibiotics but did not document a thorough plan of care.

The patient continued to push nurses away during attempts to care for the patient but there was no provider involvement in attempting to develop a plan of care to manage this difficult patient nor was there a documented nursing plan of care. Shortly after arrival at Dixon, an authorization claim document was filed in the record asking for a Geri chair[611]. The form documented that the available chairs were broken or being used.

Shortly after arrival at Dixon, a NP completed a chronic disease clinic visit. There was no history taken and the record wasn't reviewed for significant events since the last visit. The patient's dementia was noted but no action was taken to address: 1) the management of the patient on the infirmary regarding activity of living orders; 2) the infirmary care plan or absence of one; or 3) the burn of the patient. The NP seeing the patient documented that the patient had a wound from a burn but it wasn't assessed and no orders were given regarding care of the wound. Medications were not addressed. The patient had been on tramadol, a narcotic, since he sustained the burn at IRCC in June of 2021. This medication has multiple FDA warnings when used in elderly patients.[612] Pain was difficult to evaluate because of the patient's dementia, but no effort was made to do so.

---

[609] Harper RD, Dickson WA, Reducing the Burn Risk to Elderly Persons Living in Residential Care; Burns, 1995 May; 21(3): 205-8

[610] UpToDate Overview of Burn Injuries in Older Patients as of January 11, 2022

[611] Geri chairs are geriatric chairs that are large padded medical reclining chairs on a wheeled base that allow immobile patients an opportunity to get out of bed.

[612] Tramadol has a black box warning for respiratory depression and carries warnings for CNS depression. It has warnings to be used in caution in persons with diabetes due to potential hypoglycemia and to be used with caution in the elderly and to monitor thereby for falls and cognitive impairment. The warning states "consider the use of alternative nonopioid analgesics in these patients". The patient had dementia and yet tramadol continued to be used. The patient was simultaneously described as sluggish, arousable with slurred speech. Consultation with a clinical pharmacist or gerontologist was indicated.

There was no documented plan of care for this patient while on the infirmary yet the patient continued to have slurred speech, was not consistently arousable, was unintelligible, and was intermittently combative or uncooperative with care. A nurse documented that the patient was scheduled for a wound clinic but there is no evidence that this appointment occurred.

About two weeks after arriving at Dixon a nurse documented that the patient began coughing after attempting to eat his meal and was unable to swallow. He was not following directions. An oxygen saturation of 88% was noted and the patient was hospitalized. A full hospital discharge summary was not present in the medical record. Notes that were available documented that the patient choked on a pureed meal and had developed aspiration pneumonia. The records available documented aspiration pneumonia, bacteremia, an open thigh wound, acute kidney injury from dehydration, and dementia. The hospital was not told that the thigh wound was a burn. Due to the advanced dementia, the hospital discussed comfort measures with the prison but these weren't documented.

The prison had never obtained a physician-orders-for-life-sustaining-treatment (POLST)[613] form completed in the IDOC and so the facility did not have advanced directive for this patient. During a hospitalization in late October of 2021, the hospital called a relative and obtained a POLST by phone. When the patient returned to the prison there was no documented treatment plan for the patient and no clear directions for care. The patient was on 17 medications many of which could have discontinued given his status.

There were no comprehensive notes about care of the patient and nursing notes were infrequent. Input and output were not documented and even though the patient had dehydration noted at the hospital and even though the patient had significant dementia there was no documented evidence that the patient was offered sufficient water or that staff were even aware of the need for water in a patient with dementia. Within three days after returning to Dixon the patient developed a pulse of 32 and was sent back to the hospital.

Six days later the patient returned from the hospital with new diagnoses of lethargy, dehydration with hypernatremia, acute kidney injury, an open leg wound and anemia. There was no discharge summary so a complete report of what occurred was unavailable. It wasn't clear what the discharge medications were.

After return from this 2nd hospitalization, there were few nursing or provider notes. One note did document that the patient was on morphine in addition to a fentanyl patch. A medication administration record was not present in the medical record so it wasn't clear what medication the patient was receiving. Since the patient had such severe dementia, there was no communication from the patient but providers had not documented the rationale for the recent high doses of narcotic medication. This appeared to be palliative sedation[614] but because there

---

[613] POLST is a form filled out by a patient giving advanced directive to a physician about end-of-life measure that the patient wishes to have.
[614] Palliative sedation is used at end of life to reduce refractory or severe symptoms. Its aim is to induce decreased awareness and is intended to relieve intolerable suffering. One criticism of this end-of-life is that it can but a measure to hasten death. In this patient's case, he did not appear to have refractory or severe symptoms. He did not have a metastatic cancer. Aside from his three-month-old burn wound, he had no known painful condition. He was

was no plan of care, the rationale for the use of high doses of narcotic were unclear. About two weeks after return from the hospital, the patient developed shallow breathing and died.

The patient's care on the infirmary at both IRCC and Dixon was inadequate and unsafe. This patient with dementia was not obtaining sufficient fluid and became dehydrated while infirmaries at both IRCC and Dixon. The dehydration occurred without providers being aware either by monitoring fluid intake or by blood tests. The patient sustained two injuries while on the IRCC infirmary. Both of these should be investigated for patient safety and for potential neglect and abuse[615]. One of these injuries was a burn from dropping noodles on himself and this should be investigated to determine whether the patient was unsupervised as the patient had severe dementia and a patient with dementia should not be given hot liquids without supervision. The burn was described in a 2nd to 3rd degree burn. This injury should be investigated and the root cause of his injuries should inform patient safety care measures on IDOC infirmaries.[616] The other injury was a soft tissue injury that occurred over several days when nurses sought assistance from security on multiple occasions due to the patient being combative. Both of these incidents reveal significant issues with care of the elderly on infirmary units and draw attention to the possibility of elderly abuse. There was no physician or nursing plan of care at either IRCC or Dixon and monitoring care of patients on these units is not adequate. It did not appear that providers knew how to care for this elderly patient. IDOC should seek services of gerontologists, particularly at facilities with elderly and infirm patients. End of life issues are not timely addressed in IDOC and these should be addressed in policy. A major concern is why is a patient with advanced dementia still incarcerated? This makes no sense from a medical perspective particularly since IDOC shows no ability to care for such people.

The patient was not weighed in a standardized method as weights at both IRCC and Dixon vary considerably and ranged from the low 140s to over 160 and not in an ordered progression. On the occasions when weights were taken close together, the weights had considerable variance[617]. At the hospital on 10/12/21 the patient weighed 141 pounds. Weight taking does not appear

___

uncommunicative but did not express any refractory or severe symptom. Moreover, in the IDOC setting, the narcotic medications were not used in a thoughtful manner and providers did not document its intended use. There was no documented plan of care. Symptoms were not documented. An actual plan to address patient needs was never documented in the record.

[615] The state of Illinois Elder Abuse and Neglect Act of July of 2011 has provisions that require mandatory reporting of any suspected elderly abuse or neglect. Mandatory reporters include all health care professionals including nurses, dentists, physicians, mid-level providers, optometrists, as well as law enforcement officers. We do not know if the law is applicable to the incarcerated setting. If the law is not pertinent to incarcerated settings, the IDOC needs to have procedures that follow Illinois Department of Aging guidelines in monitoring for elderly abuse and neglect. This patient and other cases reviewed for this report show similar patterns consistent with neglect and possible abuse.

[616] An incident report was filed on 9/6/21 for this injury and was described as a self-inflicted injury that occurred in the inmate's cell at approximately 2 pm. Meal times at IRCC are at 3 am; 9:30 am and 4 pm so a 2 pm meal would be unusual. The nurse documenting the injury report also documented the nursing protocol for a burn which was written at 4 pm. If the injury occurred at 2 pm, somehow the patient had access to something hot when he apparently was unsupervised. The patient was quoted as saying, "I dumped my noodles", but a thorough investigation should occur because it appeared that the patient, who had dementia was unsupervised or was burned later and it was reported inaccurately.

[617] For example, the weight on 3/30/20 was 145 pounds but on 4/6/20, only six days later, the patient weighed 160 pounds.

standardized and may be inaccurately taken. The patient never had a dietary consultation and though the patient had advanced dementia, physician progress notes do not monitor his nutritional status or assess the ability of the patient to eat. The fluid intake for the patient was also not monitored. From February of 2020 until September of 2021, laboratory tests[618] indicated dehydration yet providers never documented a concern and it appeared that the patient remained dehydrated for almost two years.

OPPORTUNITIES FOR IMPROVEMENT
1. This patient had advanced dementia, hearing loss, traumatic loss of one eye, and loss of vision in the other eye. Despite this, there was no documented care plan for the patient and it was unclear what care was ordered for the patient except as represented on the nursing graphic flow sheets. These documents appear to be determined and developed ad hoc by nursing staff without physician direction. IDOC states in its draft infirmary policy that infirmary-level-care is a level needing skilled nursing intervention. But skilled nursing intervention and physician oversight consistent with a skilled nursing unit is not what is being provided on the IDOC infirmaries. Given what has been found on record reviews, IDOC needs to revise its infirmary draft to include procedures appropriate for a skilled nursing facility and determine how these services will be provided with the current staffing and support services. Skilled nursing care implies a wide range of support services including physical therapy, dietician services, occupational therapy, etc.
2. This patient had two incidents resulting in harm to patients (a 2nd or 3rd degree burn and an injury to his arm) that resulted in one hospitalization and a long-term poorly managed burn. The IDOC needs to obtain a formal opinion as to whether IDOC must report neglect or abuse as defined by Illinois Adult Protective Services Act. If IDOC is not required to report neglect and abuse within IDOC facilities, then 1) an internal reporting system should be established that uses the definitions of the Illinois Adult Protective Services Act for neglect and abuse and provides a mechanism for anonymous reporting of abuse and neglect, 2) staff should be trained on what neglect and abuse are, 3) IDOC needs to develop a method to investigate reports of neglect and abuse in order to identify staff who need referral for peer review, to identify staffing issues, physical conditions, or housing at an inappropriate level of care that require patients to be transferred to a higher level of care facility and 4) IDOC policies and procedures, including for infirmary care, need to specifically address how the needs of the disabled and elderly, especially with dementia are cared for so as to protect this population from neglect and abuse.
3. IDOC needs to hire gerontologists sufficient to provide consultation on the elderly population.
4. Dixon is used as a facility to send the elderly particularly with dementia and other end-stage problems of the elderly and disabled. Yet it has little capacity to manage this population with respect to staffing, facilities, and equipment. It appears based on record reviews that the elderly and disabled population at Dixon and other IDOC facilities are

---

[618] The patient's blood urea nitrogen (BUN) was consistently elevated on six tests over the two years with values ranging from 29 to 34. Normal high values are 20. This test suggests dehydration and can result from other reasons. But in a person with dementia and a high BUN, providers should have addressed his fluid needs with nursing staff and written orders to ensure he was given adequate fluids. Patients with dementia sometime lack ability to ask for fluids or food. Not to provide this need is a form of neglect and abuse.

neglected and harmed. It is critical that IDOC hire a gerontology expert to review elderly care and give recommendations so to protect the elderly and disabled population. This recommendation has been given before in the Monitor's recommendation for IDOC's implementation plan. To have internal IDOC staff perform this survey would be inappropriate as the current IDOC staff show no ability to even identify the needs of this population.

5. Based on record review including review of orders, physicians are not providing sufficient direction to nurses with respect to managing activity of daily living deficits. This results in falls, extreme inactivity, malnutrition, dehydration, and other symptoms of neglect. A root cause analysis should be done to determine if this is due to lack of training, lack of expectations, support services, or other causes. The analysis needs to result in corrective action.

6. Patients who cannot be managed based on standard of care should be transferred to a higher level of care facility. IDOC draft infirmary policy states that the scope of services will describe what services require a higher level of care. This policy has not yet been implemented. The scope of infirmary services at each facility is to be determined and patients whose needs exceed the scope of services need to be sent to a higher level of care. Under existing circumstances, given this draft policy many of the patients on the infirmary and on the 3rd floor of Dixon should be sent to a long-term care facility because IDOC cannot manage their care. IDOC needs to provide a plan for doing this.

7. IDOC needs to develop mechanisms to monitor nutritional status and dehydration in the elderly. This will require dietary consultation for the elderly, a mechanism to accurately obtain weight, to assess nutritional status, and hydration status. Training by a gerontologist may be helpful in this regard.

8. Infirmaries that house persons with dementia need to develop procedures for managing patients whose behavior is abnormal, because of their cognitive status, that do not involve using normal custody use of force measures. This is similar to a mental health unit in that regard.

9. Infirmary patients who transfer from facility to facility need to have a physician-to-physician communication verbally and in writing regarding all of the problems of the patients and the status of the therapeutic plan. This should not be merely left to nurses.

10. This patient was referred to a wound specialist for a burn on 9/16/21, but there was no evidence that it occurred. The vendor Regional Medical Director should investigate why that referral of an infirmary patient didn't occur.

11. IDOC needs to develop a system to refer patient to occupational therapists to evaluate activities of daily living and ability to eat to provide recommendations on care plans.

12. IDOC needs to develop procedures to timely develop a POLST. They should consider this for all patients with severe disabilities, aging patients before cognitive decline occurs or elderly who are admitted to their infirmary units.

13. The format of nursing notes and the graphic flow sheets should be re-designed so that contact hours with the patient are captured and so that a documented nursing care plan is evident for every patient on the infirmary that addresses all of their needs. This needs to be developed based on provider orders.

14. Hospital and specialty care reports were disorganized, not filed chronologically, and were sometimes missing. Documents were not all present in this medical record. A task force should be established to correct these problems with the paper record.

15. IDOC should establish a standardized method of taking patient weights. Equipment needs to be present at every facility to capture an accurate weight for infirmary patients including those on wheelchairs.

Patient 25

This 45-year-old patient was incarcerated at Menard on 7/21/21. The patient stated he had depression and had a routine mental health referral. He weighed 250 pounds. There was an ICARE[619] report showing that the patient was overdue for measles, mumps, rubella, varicella, Td and hepatitis B vaccinations but the patient wasn't vaccinated for these overdue vaccines. The patient was asked if he had been vaccinated for COVID. Though the patient said he had not been vaccinated, he asked if he could be vaccinated but there was no evidence of vaccination in the record reviewed.

He was transferred to Pinkneyville on 8/4/21. There was a transfer out form from Menard but Pinkneyville did not use a transfer in form instead a progress note intake form was used. There are no standardized forms; facilities are allowed to modify forms or use different forms. On 8/19/21 he transferred to Murphysboro Life Skill Re-entry Center (MLSRC). Pinkneyville did not use a transfer form for this transfer. At MLSRC health request forms were not used and the patient placed health requests on a blank piece of paper. Health request forms should be standardized across all facilities.

The patient had a mental health evaluation on 8/31/21 about a month after incarceration and was started on an antidepressant. The medication records were handwritten and had incomplete information. On 10/15/21 and 10/19/21 the patient complained of back pain and was referred to a provider. The patient had lost ten pounds. When the provider saw the patient, the patient additionally complained of a hernia. Though the patient's complaint included leg and hip pain and difficulty walking up stairs, the doctor attributed the back pain to prior back surgery without examining the patient. The doctor did look at the patients groin and saw a large testicle and ordered an ultrasound. The ultrasound done about three weeks later showed large bowel in the testicle consistent with a hernia.

The patient placed another request complaining of stomach pain saying he was supposed to see a doctor the previous week but the appointment never occurred. On 11/29/21, a nurse passing medication saw him at the request of security for stomach pain. The licensed practical nurse (LPN) evaluating him documented swelling and bruising in his groin. The LPN referred the patient to a physician.

The following day, on 11/30/21, the patient told a mental health staff that he was only getting 4-6 hours of sleep a day due to his pain. That day the patient saw a physician at Pinkneyville for his complaint. The doctor did no examination and failed to notice the 20-pound weight loss over the past three months. The doctor thought there was an umbilical hernia and ordered an umbilical ultrasound. On 12/2/21 a transabdominal ultrasound showed several intrahepatic lesions suggestive of metastatic disease.

On 12/3/21 the patient was placed on crisis watch saying he wanted to harm himself because his mother had recently passed and his children weren't speaking to him. The following day, while on crisis watch, a nurse administering medication noted that the patient was in pain but no action

---

[619] The Illinois Comprehensive Automated Immunization Registry Exchange which is a web-based immunization record sharing application developed by the Illinois Department of Public Health.

was taken.  On 12/6/21 a LPN saw the patient who had a blood pressure of 167/114 but no action was taken[620].  The following day another nurse documented blood pressure of 172/114 but again no action was taken.  A weight was 227 or a 23-pound weight loss.  No action was taken.

On 12/7/21, the abnormal ultrasound was identified and the patient was admitted to the infirmary for weight loss but virtually no history was obtained.  The ultrasound findings were not documented in the physician's note but he did refer the patient for a CT scan of the abdomen, chest and pelvis and ordered tramadol, a narcotic medication, for ten days.  However, the doctor did not perform an evaluation for pain or identify a baseline status of his pain.  The blood pressure was 172/113 but the doctor didn't treat the patient's hypertension.

A NP saw the patient on 12/13/21 and noted that the patient was incontinent of stool but took no history and made no attempt to determine why the patient was incontinent.  The patient complained of pain but the NP took no further history and increased the tramadol to 50-100 mg every 4-6 hours as needed.  On the same day a mental health staff saw the patient and obtained a history that the patient was recently told that he had some type of cancer and only had three months to live.  The mental health staff documented that the patient was found by nurses to have been incontinent of urine and had defecated on himself.  The patient was upset.

On 12/19/21 a nurse documented a self-care deficit.  There were no physician notes documenting the incontinence and no orders for assistance.  Nurses developed plans for assistance on an ad hoc basis, without developing a nursing plan of care, and without directions from or coordination with providers.

By 12/21/21 the patient had difficulty swallowing and couldn't control his bowels.  He told the doctor that he wanted to proceed with a workup for his cancer including a colonoscopy and oncology consultation.  Though there was no report in the medical record, the doctor noted that the CT scan showed extensive metastatic disease to liver, lungs, bones, and spleen.  The doctor ordered boost three times a day but no nutritional consultation was done.  The patient moved his mattress to the floor, but there was no effort to assess what kind of mattress the patient was sleeping on and whether a better bed might have been acceptable.  On 12/24/21 the patient was lying on the mattress on the floor with feces over his hands.  Instead of having the patient cleaned the nurse gave the patient sanitary wipes with "instructions to wipe hands".  The patient threw the wipes aside saying "no thanks". The nurse wrote "Pt refuses to get up off floor to be assisted with cleaning says I'm fine down here you can go on now.  Educated on sanitary hygiene.  Will [continue] to encourage hygiene and sanitation practices".  This patient with end-stage cancer and depression had soiled himself.  Instead of cleaning the patient, the nurse treated the patient as if he were normal and allowed the patient to remain in that condition.  This was not responsible professional behavior.  That afternoon the patient died.

OPPORTUNITIES FOR IMPROVEMENT
1. Blank sheets of paper were used for health requests without space for the date so there would be no way to evaluate timeliness.  The health request form should be standardized across all facilities and should include a date.

---

[620] For most people, a blood pressure over 140/90 is considered abnormal and warrants treatment.

2. Immunization information obtained at intake was not acted on. Training on immunization should include the process for updating vaccinations.

3. The transfer forms were missing at Pinkneyville. The HCUA should describe the process for intrasystem transfer that is in place at Pinkneyville and Pinkneyville should adhere to an expected standardized procedure.

4. Blood pressure was elevated on health request evaluation and during a provider clinic visit but not addressed.

5. Nurses used non-specific discomfort protocols on 8/23/21; 10/15/21; 10/19/21; and 11/29/21 and there was no history or examination.

6. There were multiple provider omissions including failing to address elevated blood pressure on multiple occasions, failing to take a history of the patient's complaint on multiple occasions, failing to perform an examination pertinent to the patient's complaint, failing to note significant weight loss on several occasions, failing to address all of the patient's problems, failing to evaluate the cause of the patient's incontinence.

7. Nurses did not reassess and revise the plan of care as the condition of the patient changed.

8. When the patient who was depressed had fecal soiling of his hands, the nurse did not have the patient cleaned and expected the patient to clean himself. This was inappropriate professional behavior as the patient did not appear to be cognitively normal and should have been treated as such. This professional behavior warrants counseling.

9. This patient was not treated with respect at end-of-life.