**DEFENDANTS' IMPLEMENTATION PLAN**
**LIPPERT CONSENT DECREE**

**EXECUTIVE SUMMARY**[1]

The Illinois Department of Corrections ("IDOC" or "Department"), Office of Health Services ("OHS") and Governor Pritzker recognize the importance of compliance with the Consent Decree entered on May 9, 2019, in *Lippert v. Jeffreys, et al.*, no. 10-cv-04603 (Doc. no. 1238). We are dedicated to seeing the execution of this Implementation Plan to completion. This plan is submitted by the Defendants after discussions with the Monitor and provides a roadmap for our compliance with the Decree. This plan outlines a quality improvement approach to the delivery of medical and dental care. A philosophy of quality improvement will serve as a guide as we implement changes to our health care system. Finally, Defendants submit that this plan may require occasional amendments to accurately reflect future endeavors.

Defendants recognize the significant benefits associated with developing an enhanced leadership structure for OHS. Enhanced leadership includes additional OHS executive level staff, the development of audit teams, a quality improvement team, and increased data assistance. This affords OHS the ability to have more intensive oversight of healthcare staff, conduct more effective vendor monitoring and have the ability to dedicate staff to transforming the Department's quality improvement program.

Accordingly, this task will serve as a primary focus for the Department. Another initial focus of OHS is to institute the following structural components to its health care program:

- System-wide implementation of an Electronic Medical Record ("EMR");

- Development of a comprehensive set of health care policies and ~~procedures~~ that address all the provisions of the Consent Decree;

- Development of an ~~Performance of~~ audits function to ensure compliance with the Consent Decree. ~~policies and procedures~~;

- ~~Review of audit data and design of quality improvement plans~~ IDOC, through the Capital Development Board, will hire a consultant to determine whether adequate physical clinical space and equipment is available at all facilities; and develop an analysis of deficiencies and write a report with findings and recommendations to correct deficiencies and needs. This will include recommendations made by the consultant hired to determine needs of the aged, infirm and disabled. IDOC will use this report to take corrective actions to remedy the deficiencies and needs.

---

[1] For ease of reference, the Monitor's comments are in black font and Defendants' responses are in red font.

---

**Comments (margin):**

**Commented [A1]:** II.B.8 requires development of a comprehensive set of policies. The Monitor interprets comprehensive as addressing all aspects of the Consent Decre.

**Commented [A2R1]:** Acceptable

**Commented [A3]:** II.B.9. requires an audit function of quality programs which programs are to be comprehensive. Policies and procedures are an important aspect of the Consent Decree, but the audit function is more comprehensive in that it also includes clinical care amongst other performance issues (e.g., medication administration).

**Commented [A4R3]:** Acceptable. We have medical policies in development and Disease Management Guidelines which are written and in formatting. These are policies for disease management.

**Commented [A5]:** The review of audit data and design of quality improvement plans have little to do with respect to determination of adequate facilities (physical space and equipment). II.B.2, II.B.3 III.B1-2 and III.K.13 all address space and equipment needs that should be addressed by defining deficiencies and then recommended a corrective action plan to correct those deficiencies. This should be performed by a qualified consultant and not by audit data or design of the quality program.

**Commented [A6R5]:** IDOC is required to ensure that healthcare units have adequate space and equipment. It is not necessary to hire a consultant to complete this task.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. *Doe v. Cook County*, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that this recommendation is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive mean...

**Commented [A7]:** Ensuring adequate physical space and equipment is essential to an adequate medical and dental program and is consistent with the Consent Decree provisions II.B.2, II.B.3 III.B1-2 and III.K.13 . The Consent Decree requires adequate facilities and a person qualified to evaluate physical space and equipment and recommend changes should be ...

**Commented [A8R7]:** The above referenced sections of the Decree do not require a qualified person to conduct an evaluation. Furthermore, this language would violate the Purpose section of the Decree and ("PLRA"), 18 U.S.C. § 3626(a) as it is not the least restrictive means of curing a constitutional violation. Lastly, this implementation plan cannot dictate hiring ...

Develop a quality improvement program to satisfy requirements of the Consent Decree

- Hire sufficient staff to implement this plan;

- Hire a qualified consultant to quantify the numbers of aged, infirmed, and disabled, to determine gradations of need of the population, to identify appropriate housing and management options for this population and to produce a report of findings and recommendations;

- Organize the OHS to effectively implement this plan; and

- Implement an infection control program sufficient to provide surveillance, prevention and control of communicable disease.

- Taking corrective action based on those audits.

IDOC is also dedicated  required  to implement the enhancement of its quality improvement program. This program will drive health care improvement, including a focus on clinical and operational issues identified in the Consent Decree. The University of Illinois ("UIC"), College of Nursing completed an initial assessment of the IDOC's existing quality improvement efforts. IDOC is now collaborating with Southern Illinois University School of Medicine ("SIU") to build on that initial assessment in order to

Page 1

**Commented [A9]:** Development of a quality improvement program is a structural and essential component of the Consent Decree (III.L.1).

**Commented [A10R9]:** Agree

**Commented [A11]:** Sufficient staffing is an essential structural component of the Consent Decree (IV.A).

**Commented [A12R11]:** Agree

**Commented [A13]:** II.A. and II.B.1 and II.B.2. require provision of adequate medical and dental care to those incarcerated with serious medical needs and appropriate level of primary secondary and tertiary care. The population of elderly and infirm lacks access to appropriate medical care and are at risk due to failure to appropriately house them due to medical need and care for them based on their medical needs. Infirmary units fail to address these needs. This is an essential structural component based on numerous record reviews and visits to facilities.

**Commented [A14R13]:** This goes beyond what is required to comply with the Decree.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. *Doe v. Cook County*, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or...

**Commented [A15]:** The Chief OHS still does not have authority to hire/fire all medical employees and does not establish all directions of the medical program. The Chief OHS needs to be authorized to do this to...

**Commented [A16R15]:** Such authority is neither mandated by the Decree nor practicably applied for nearly 500 staff.

**Commented [A17]:** Provision II.A and II.B require sufficient measures consistent with needs to provide adequate medical care to thos with serious medical need. II.B.1 requires IDOC to provide appropriate lev...

**Commented [A18R17]:** Policies have been drafted which outline this.

**Commented [A19]:** This is part of the audit function mentioned above and is discussed in detail in the actual plan.

**Commented [A20R19]:** Agree

**Commented [A21]:** The Consent Decree requires a quality improvement program. III.L.1.

**Commented [A22R21]:** Agree

implement a more productive and efficient quality improvement program. This partnership will provide several key staff positions including an audit team, a data team, quality improvement consultants, and process improvement specialists. SIU is aggressively working to hire people for these key positions.

In addition, IDOC will evaluate the healthcare needs of the aging, infirm, and disabled populations housed in IDOC facilities. IDOC will seek assistance from the Illinois Department of Aging or a qualified consultant to develop a survey to quantify the numbers of these population groups within IDOC, and assess the housing and health care needs of our aging inmate these population.s The consultant will provide IDOC will develop options and recommendations to address the housing and clinical care need gaps identified in the analysis of the survey. IDOC will take appropriate actions to correct gaps in housing and clinical care needs of these populations.

A staffing analysis was conducted through the combined efforts of the OHS leadership team and , the Health Care Unit Administrators ("HCUA") assigned to each facility., and the Monitor. The data positions presented in the staffing analysis represents the IDOC's best estimate of the additional healthcare staff currently necessary to meet IDOC's identified mission and vision to provide "high quality medical care" to men and women in our custody. The analysis does not provide data as to what is minimally required by the Consent Decree or the U.S. Constitution. The staffing levels identified in the analysis are not meant to establish any minimum staffing level for any particular position at any particular facility, or at IDOC in general. The analysis should be viewed with the understanding that the needs of IDOC's healthcare system are dynamic and that modifications of the staffing analysis will be required to accommodate those changes. The staffing analysis proposes to add over 280 positions. However, this analysis was conducted prior to implementing revised policies and practices, as well as an EMR. without an assessment of the capacity of OHS to complete work as required by this Consent Decree, as well as an EMR. It also does not include many of the key recommendations of the Monitor. A full implementation of the updated policies and the EMR will likely impact the staffing needs. In order to address the evolving needs of the system, if IDOC determines it to be necessary, it may revise the staffing analysis as needed.

In summary, this implementation plan focuses on establishing improved system-wide health care policies and operational requirements. Staff will need to be trained on new policy initiatives, and the new policies will need to be implemented. The supplementation of OHS leadership provides increased oversight in various Consent Decree objectives. For example, with the addition of audit teams and quality improvement consultants, the IDOC plans to create an auditing program to conduct annual facility audits and to generate reports identifying deficiencies. The auditing program will also be responsible for conducting mortality reviews and sentinel event reviews. Combining audits and reviews with incident reporting and performance and outcome measures will identify deficiencies that will serve as the source of quality improvement activity at individual facilities. The quality improvement consultants will mentor facility staff and demonstrate how to conduct improvement projects that

**Commented [A23]:** The infirm and disabled are in a similar position to the aged in that they require specialized medical housing and specialized medical care in specialized medical units. Infirmaries do not have capacity to currently provide that care required by provision II.A and II.B.1 and 2..

**Commented [A24R23]:** IDOC objects to the extent this requires an analysis of housing needs (unrelated to medical care), which are not covered under the Decree.

**Commented [A25]:** If the DOA cannot do this a qualified consultant should be hired or contracted.

**Commented [A26R25]:** The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

**Commented [A27]:** To provide this care, IDOC needs to determine how many people have what needs. Patients with dementia and other significant medical disorders are now housed in general population but require alternate housing.

**Commented [A28R27]:** This addition should be limited to healthcare needs as required by the Decree

**Commented [A29]:** This provides more detail to a vague statement. As required by II.A. and II.B.1 and 2, a solution rather than options are necessary to address this population..

**Commented [A30R29]:** The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and ...

**Commented [A31]:** Provision IV.A and IV.A.1-2 require a staffing analysis and Implementation Plan. The staffing analysis performed by IDOC was inadequate because the analysis was not based on actual workload required in the Implementation Plan ...

**Commented [A32R31]:** A staffing plan has been submitted and we expect it to change drastically based on the changes to policies and procedures and EMR implementation.

**Commented [A33R32]:** A workload analysis is not required by the Decree

correspond to identified deficiencies.  This information will be incorporated into an annual report that will measure and account for the system's performance. Once the results indicate that a facility is *in compliance*, IDOC will notify the Monitor who will perform a site visit and confirm whether there is an agreement as to compliance. This

~~Page 2~~

method allows the IDOC to self-monitor and maintain a superior provision of health care far beyond the timeframe of the Consent Decree.

In the following sections, we give details of each of the components contained in this overview section.

## OFFICE OF HEALTH SERVICES ("OHS")

The Chief of the Office of Health Services, a physician, will be the health authority of the medical program. By virtue of that authority, the Chief, OHS will have ultimate hiring and firing authority for all health care staff, make an annual proposal to the Executive Director for an annual health budget for the medical program, play a lead role (consistent with state procurement rules) in selection of medical vendors, and be responsible personally or through designees for administrative management of the health program. All Health Care Unit Administrators will report health care related information through a healthcare chain of command to this individual. OHS will incorporate health care leadership positions under an IDOC umbrella regardless of vendor arrangements. The Chief of OHS will be responsible for oversight and directing all aspects of health care operations. This individual will be the final health authority with respect to clinical decisions and clinical operations.

While the OHS staff has already expanded considerably, an outside vendor will be considered to augment OHS leadership staff in key areas that may be difficult for IDOC to recruit. In addition to adding a full time Infectious Disease Coordinator, IDOC currently will establish an Infection Control program. currently Currently IDOC collaborates with the Illinois Department of Public Health ("IDPH"). This arrangement allows IDPH to provide consultation and guidance with respect to infection control policy on immunization, screening, and other public health matters. IDOC will formalize that relationship to ensure that IDOC has assigned consultation time with and infectious disease physician to help guide and develop their infection control program. If IDPH is unable to provide that service, a university program should be involved. If that is not possible, IDOC should hire an infectious disease physician for this purpose. Other additions to OHS staff will be discussed in the Quality Improvement section of this plan.

## STRUCTURAL COMPONENTS

Implementation of the Electronic Medical Record ("EMR") at all sites is a critical component of the IDOC's compliance with the Consent Decree. With the implementation of a system-wide EMR, the OHS leadership team recognizes the benefit of creating a branch of OHS dedicated to healthcare information technology ("IT"). While neither constitutionally required nor outlined in the Decree, Tthe addition of an IT Department to collect, analyze and interpret health care data will better position will allow OHS to use patient data to guide policy and thus improve healthcare outcomes. adhere to the Consent Decree. These individuals will have the expertise to modify EMR user interfaces, generate specific queries, and translate

**Commented [A34]:** While the Chief of Health Services may be involved with hiring/firing decisions, he does not always have ultimate authority. Requiring ultimate authority would violate union collective bargaining agreements and other state labor laws

**Commented [A35R34]:** While IDOC agrees that the Chief of OHS shall be the ultimate health authority, we disagree that these requirements are necessary to effectuate said authority. While the Chief of Health Services may be involved with hiring/firing decisions, he does not always have ultimate authority. Requiring ultimate authority would violate union collective bargaining agreements, state labor laws and other hiring mandate imposed by other courts, for example, Rutan.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as pa...

**Commented [A36]:** The organization of the IDOC medical program is based on Warden control of individual facility programmatic schedules and employees including the quality improvement coordinators, the HCUA, as well as timing of medications, etc. Without impacting security rules, the medical program should be allowed to fix medication ...

**Commented [A37R36]:** IDOC agrees that OHS should dictate healthcare, however, to suggest that facility decisions can occur without consultation of facility leadership creates potential for security risks. The involvement in facility leadership in some operational decisions does not violate the Decree

**Commented [A38]:** As demonstrated in the COVID pandemic, IDOC was unprepared for the pandemic and work on the Consent Decree came to a standstill for almost two years. There is no question that a functional infection control program is essential in a correctional medical program consistent with Provisions II.A. and II.B.1-2 and IDOC should establi...

**Commented [A39R38]:** As a state agency, the job of IDPH is to provide guidance to the state including agencies) on issues of infection control. IDPH already has a physician dedicated to advising IDOC on issues of infection control. The creation of a formal relationship is redundant and is not necessary to comply with the Decree.

**Commented [A40]:** IDOC is now unable to provide most of the data requested by the Monitor. Provision V.G. of the Consent Decree requires IDOC to provide data and information required to verify compliance and to provide data requested by the Monitor for his reports. IDOC cannot now do this.

**Commented [A41R40]:** Disagree to assessment of compliance VG. Agree to added language regarding EHR

health care information into reports or to populate health system dashboards. This expertise will also allow IDOC to provide data for use in quality improvement programs and to verify compliance with the Consent Decree. The addition of an IT department dedicated solely to OHS is essential for monitoring the processes, encounters, and trends in IDOC's delivery of healthcare. This type of data management is crucial to appropriately tracking clinical progress and outcomes. The IT team will also assist the IDOC and the audit teams in developing and implementing a set of health care performance and outcome measurements. Additionally, the data team will assist IDOC in evaluating the

Page 3

electronic medication administration process to ensure that it functions in all facility settings and delivers sufficient data to verify aggregate and individual receipt of medication. The IT program will ensure that a call center is available to all staff on all shifts for problems with access to or use of the electronic record. The IT program will also ensure that new staff are appropriately trained in use of the EMR related to their work responsibilities before they begin their assignments.

OHS's Medical Coordinator has already initiated, in collaboration with one of the Monitor's consultants, a process to develop an enhanced set of policies and procedures. OHS will hire a project manager to expedite and facilitate this process. Several drafts are in progress. As drafts of these policies are completed, they will be circulated to the OHS leadership, IDOC officials, and the Monitor's staff for comments. Once a policy is completed, the project manager will ensure that training on the policy is provided to all sites. Going forward, these crucial documents will form the guidelines for practice and become the standard for measurement and accountability for performance.

As required by the Consent Decree, IDOC will survey all facilities to ensure there is adequate physical space and equipment for clinical care. This includes fixed and mobile equipment, dental equipment, and clinic space, including special medical housing for the infirm, disabled, and elderly with dementia and memory deficits. This survey will be a part of annual audits performed by the DOA or qualified consultant done at every facility and will be memorialized in reports and provided to the Monitor.

### QUALITY IMPROVEMENT

Quality improvement is a main component of the medical program in the IDOC. To that end, IDOC contracted with UIC's College of Nursing to advise on potential enrichments to our quality improvement program. Going forward, the Department will be working with SIU to build upon the recommendations outlined by UIC and assist the Department in creating a comprehensive quality improvement program.

The Consent Decree requires IDOC to design with assistance from the Monitor to provide an audit function for the quality improvement program which provides for independent review of all facilities' quality assurance programs, either by the Office of Health Services or by another disinterested auditor.[1] IDOC is prepared to secure staff to manage the audit process. A Two teams of auditors will be established, ideally each consisting of a physician, a mid-level provider, 1-2 nurses, a half time dental consultant and a team of quality specialists. The team will be responsible for auditing each facility and producing a report of their findings. OHS will collaborate with with assistance from the Monitors and the audit team will to develop an the audit instrument. The audit team will also be responsible for performing mortality reviews and preventable adverse event evaluations. Deficiencies and opportunities for improvement, identified by the audits, mortality reviews, performance and outcome measures, and adverse event reports will be collated in the audit reports and will be referred to the respective facility's quality improvement program for corrective

---

**Commented [A42]:** These are essential components of an electronic medical record. If IDOC is to adequately implement an EMR as required by II.B.4, a help desk and support services are necessary.

**Commented [A43R42]:** A call center is not required in order to comply with the Decree. The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has ...

**Commented [A44]:** Provision II.B.8 requires development and implementation of a comprehensive ...

**Commented [A45R44]:** IDOC does not need to hire a project manager to draft policies. Finalizing all ...

**Commented [A46]:** Provision IV.A.2 requires training and supervision of personnel necessary to implement ...

**Commented [A47R46]:** IDOC agrees that staff will need to be trained on new policies, but disagrees tha ...

**Commented [A48]:** The population of elderly with dementia, memory deficits, the infirm and disabled ...

**Commented [A49R48]:** This Decree is limited to medical care. Concerns about housing are outside th ...

**Commented [A50]:** The annual audit is not appropriate to determine the need for adequate spac ...

**Commented [A51R50]:** A consultant is not necessary in order for IDOC to meet its obligations under the ...

**Commented [A52]:** IDOC is prepared to initiate audits that have been designed and are being implemented ...

**Commented [A53R52]:** This statement is inaccurate. The Monitors have provided ongoing assistance with ...

**Commented [A54]:** The dental consultant is staffed at .25 and is not a member of the audit team. The ...

**Commented [A55]:** Given 30 facilities, to complete comprehensive audits of thirty facilities requires two ...

**Commented [A56R55]:** Agree

**Commented [A57]:** The Consent Decree requires the Monitor to assist in the design of the audit function

**Commented [A58R57]:** In the last 90 days the Department has requested meetings with the Monitor ...

**Commented [A59]:** Evaluating adverse events is not, in the Monitor's opinion, something that should be ...

**Commented [A60R59]:** The evaluation of adverse events is triggered by findings in M and M and throug ...

**Commented [A61]:** The audit reports should include mortality reviews, performance and outcome ...

**Commented [A62R61]:** Agreed

action. Deficiencies identified in audits, performance, outcome measures and incident reports will form the initial basis for quality improvement efforts. Facility quality improvement coordinators will be trained in methodologies and techniques commonly used in ~~the field~~ quality improvement work. The ~~audit~~ quality improvement program ~~team~~ will ~~have the ability to~~ provide leadership and front-line team training that will ~~assist~~ train facility leaders in ~~improving~~ quality improvement methodologies, and give guidance on how to take corrective actions identified in audits.

[1] Consent Decree § II.B.9.

~~Page 4~~

**Commented [A63]:** This is more specific.

**Commented [A64R63]:** Addressed in policy. SIU to perform this function. As an organization, a quality culture needs to be developed. Each facility should have an employee that handles the details of the quality improvement committee. This is in policy.

**Commented [A65]:** The audit team will be fully occupied in performing audits and mortality reviews and will not have sufficient time to train staff on CQI methodology.

**Commented [A66R65]:** The SIU Quality group includes people who are able to train in quality.

IDOC will hire additional staff to improve obtain data.  The augmented staff will assist in several key functions including: Accurate data is a critical component of quality improvement work.  IDOC will ensure that data requirements as specified in V.G. of the Consent Decree; data needs for auditing; and data to provide the Monitor for his reports as required by the Consent Decree will be obtained from the electronic record or other electronic sources.  IDOC will hire a data team to perform this function.  The data team will do the following:

- Develop screens in the electronic record to fully conform to IDOC clinical and data needs; and to fulfill requirements of the V.G. provision, needs of the audit team, and needs of the Monitor for his reports;

- Work to ensure that all necessary data elements are present in the medical record;

- Extract and compile and analyze data from the electronic record; in useable and acceptable format for the audit team, Monitor (for verification of compliance and his reports), and for supporting quality improvement projects;

- Compile data in a format useable by IDOC for purposes of verifying compliance with the Consent Decree and supporting quality improvement projects;. This item was combined with the above item.

- Develop performance and outcome measures as required by the Consent Decree; and develop a dashboard of those measures utilizing data obtained from the electronic record to monthly show facility progress on these performance and outcome measures;

- Provide data to verify the degree of compliance with requirements of the Consent Decree;

- Assist OHS and quality teams on other data and project needs as needed.

The proposed quality improvement program will create aand manage a a centralized preventable adverse (clinical incident) reporting system. Such a system is required in the Consent Decree. This information, categorized and analyzed centrally, –will be used by –the facility to identify immediately remediate risks problems and by the system-wide quality program to take corrective action as needed. to prevent systemic patient safety risk.

**AGED POPULATION**

---

**Commented [A67]:** This sentence is vague

**Commented [A68]:** "Augmented staff is vague.  The Monitor provides more specific

**Commented [A69R68]:** We agree that data is of the utmost importance and that an EHR will make this possible.

**Commented [A70]:** This gives the basis for obtaining data which is specifically called out in the Consent Decree in provision V.G.

**Commented [A71R70]:** There is no requirement that VG data or audit data must be presented to the Monitor in an electronic format.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further th

**Commented [A72]:** It's important to conform to IDOC clinical and data needs but the Consent Decree requires data as stipulated in the V.G. provision.

**Commented [A73R72]:** While the creations of screens may be ideal, IDOC is able to comply with its obligations under the Decree without this creation. Th

**Commented [A74]:** Provision V.G. of the Consent Decree requires IDOC to provide data and information necessary to evaluate compliance with the Consent

**Commented [A75R74]:** The added language is not a requirement of the Decree. IDOC will have complied with its EHR obligations once an electronic health

**Commented [A76]:** Provision II.B.7. requires development and implementation of a set of performance and outcome measures and to compile

**Commented [A77R76]:** Dashboards are reports that are graphically presented.  The EHR will have a business intelligence overlay that allows for graphic

**Commented [A78]:** Provision II.6.m. requires an adverse event reporting system.  Adverse event reporting is widely used in health care as a means to

**Commented [A79R78]:** This is in the policy.  It contains a reporting contact for SIU team.

**Commented [A80]:** This clause is vague

**Commented [A81]:** Adverse events result in patient safety risks.  An adverse event reporting system can assist in remediating problems immediately and in

**Commented [A82R81]:** Agree

IDOC is committed to ensuring appropriate housing for the ~~aged, infirm, and disabled~~ population~~s~~ including ~~those with memory deficits, disabilities, and those in need of~~ ~~assistance with activities of daily living.~~ Approximately 20% of inmates housed in IDOC are over 50 years of age. This population has considerably greater health needs and presents difficulties with respect to housing. However, there is uncertainty with respect to the scope of need for this population. For that reason, IDOC ~~has engaged~~ ~~in preliminary discussions with the Illinois Department of Aging ("IDOA")~~ will hire a qualified consultant to develop a survey questionnaire based on the ~~Illinois~~ ~~Department of Aging~~ (IDOA) determination of need survey that is required of all ~~persons entering a nursing home.~~ ~~This assessment of needs will~~ result in a report with ~~recommendations to form~~ the basis for the development of action steps to provide appropriate resources, programming, and housing for the aged, infirm, and those with disabilities or those needing assistance with activities of daily living. ~~Such a survey~~The report would also provide guidance on the numbers of elderly who have disabilities, memory deficits or other assistance needs that would provide data for a subsequent plan on how to best provide for these individuals. The analysis and development of the action plan will be performed in consultation with the Monitor.

~~Page 5~~

**Commented [A83]:** This is consistent with provisions II.A. and II.B.1-2 of the Consent Decree. The aged and disabled need to be included in this task..

**Commented [A84R83]:** This is only consistent with the Decree to the extent the aged/disabled have serious medical or dental needs.

**Commented [A85]:** IDOC is not intending to engage IDOA to perform this survey. Their most recent proposal is to utilize leadership staff and findings from clinic visits to identify this population when this same group has shown in record reviews that they are unable to identify or manage dementia, memory issues, or to consistently provide care for this population. A qualified expert is necessary to perform this survey.

**Commented [A86R85]:** Requiring an expert to assess the needs of the IDOC elderly population exceeds what is required to meet our needs. This requirement is premature as options with the Department of Aging have not been exhausted. It is conjecture that the facility staff will unable to identify the needs of the population it already serves.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

**Commented [A87]:** The Decree does not require IDOC to provide care that is identical to a nursing home in order to comply with the Decree

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as pa ...

**Commented [A88]:** A report with recommendations is consistent with the Consent Decree requirement of the Implementation Plan (IV.A.1) to develop specific tasks…..plans, projects, ..to ensure Defendants fulfill the requirements of this Decree. A report incorporates tasks, plans, and projects to fulfill the Consent Decree.

**Commented [A89R88]:** The implementation does not require a report on all objectives in the Decree. Rather the implementation plan serves as the document that tasks, plans and projects.

## STAFFING

The Consent Decree requires that IDOC conduct a staffing analysis that will be integrated into an implementation plan. Both the staffing analysis and implementation plan are to be completed with the assistance of the Monitor. The IDOC finalized its staffing plan in August of 2021. For the staffing analysis, IDOC proposes the addition of more than 275 new staff. Positions have been added in multiple categories based on an IDOC internal analysis. Subsequent to the Monitor's review of the analysis, IDOC will work to ensure the following:

- That every facility will ensure that an appropriate number of dental hygienists are available to meet facility needs;

- That each facility with an infirmary will be evaluated for need for physical therapy services; and

- That inmates at all facilities will have equal access to an optometrist.

Because new policies and practices are anticipated, IDOC will develop a precise staffing plan cannot be determined at this time. For that reason, IDOC proposes to repeat the staffing analysis after policies and procedures are implemented and facilities have had time to assess how workloads have changed. by hiring a consultant to complete a workload analysis to more precisely determine baseline staffing needs and to create a template for how to make future staffing changes using a workload template or algorithm. The workload analysis and template will guide future position additions or subtractions based on changing circumstances. IDOC will ensure sufficient key staff, including physicians are hired as soon as possible. Given that it will take time to develop and implement policies and procedures and train staff as to the modified protocols, it is anticipated that the second staffing analysis will take place in the next 2-3 years.

Presently, IDOC is proposing to add a considerable number of positions. IDOC expects to fill vacancies to a rate similar to industry standards. to attain no more than a 15% vacancy rate for non-critical positions[2]. There are a variety of reasons for the current high vacancy rate, which include a nationwide nursing shortage, the remote location of IDOC facilities and a medically demanding patient population.

## STRENGTHENING ACADEMIC RELATIONSHIPS

To comply with the Consent Decree and achieve our goal of providing high quality medical care, it will be critical to expose more providers to correctional health care as a career option during their training years. Academic relationships provide a pipeline

---

[2] Critical positions are OHS non-clerical staff, HCUAs, Medical Directors, Directors of Nursing, Dentists, Dental Hygienists, Physical Therapists, and Project Management staff which should be filled as soon as possible.

---

**Commented [A90]:** These goals have no actionable items. The Monitor adds an actionable item below which is to develop a workload analysis to determine a precise number of staff needed to implement the Consent Decree as required in IV.A.

**Commented [A91R90]:** IDOC disagrees that there are no actionable items. Additionally IDOC utilized backlog data to determine need

**Commented [A92]:** IDOC is unable to provide a precise staffing analysis because they haven't performed a precise staffing analysis based on workload analysis for all staffing types.

**Commented [A93R92]:** The monitor has provided nothing more than conjecture that IDOC's current staffing analysis does not meet our needs or will be insufficient to comply with the Decree.

**Commented [A94]:** This will give the IDOC a baseline estimate of need and a way to use the consultant's methodology to add staff based on programmatic changes.

**Commented [A95R94]:** The monitor has provided nothing more than conjecture that IDOC's current staffing analysis does not meet our needs or will be insufficient to comply with the Decree.

**Commented [A96]:** IDOC should perform a workload analysis to develop an algorithm for hiring that will help them for current and future staffing which is consistent with the requirement of IV.A of the Consent Decree.

**Commented [A97R96]:** The monitor has provided nothing more than conjecture that IDOC's current staffing analysis does not meet our needs or will be insufficient to comply with the Decree.

**Commented [A98]:** If a workload analysis is not performed, in two to three years, IDOC will repeat the same type of estimate that will not be based on actual need.

**Commented [A99R98]:** This is conjecture

**Commented [A100]:** What is the industry standard IDOC is using? Based on experience in multiple settings, we recommend a 15% vacancy as a maximum for acceptability for non-critical positions. Critical positions should be filled ASAP.

**Commented [A101R100]:** Given the current climate a vacancy rate of 15% exceeds what is happening in the community. https://www.medicaleconomics.com/view/the-crisis-in-healthcare-staffing; See also https://www.aha.org/lettercomment/2022-03-01-aha-provides-information-congress-re-challenges-facing ...

**Commented [A102]:** IDOC should focus on modifiable reasons for the vacancy rate which have previously mentioned ...

**Commented [A103R102]:** The Decree cannot mandate that the Department's hiring goals exceed what is occurring in the community. There is ample evidence ...

for potential employees through early exposure to correctional health care. IDOC is working diligently to develop and expand formal relationships with academic entities. Our current relationships have significantly improved the quality of care delivered within the Department and moved the Department closer toward compliance with the Consent Decree and the attainment of our goal to provide high quality medical care. For example, IDOC has an existing contract with the SIU School of Medicine to provide assistance with our quality improvement efforts, audit and data teams. We

Page 6

continue to explore opportunities for SIU physician services at our facilities. We are also exploring expanding UIC's involvement in both the provision of Hepatitis C and HIV services. Finally, we are building on these partnerships to explore opportunities for expanded telehealth care. It is IDOC's perspective that collaboration with university-based medical programs will significantly promote improved care in IDOC facilities and we are committed to that effort.

R~~ELATIONS WITH MONITOR~~

~~The Consent Decree requires the Monitor to provide input and assistance to IDOC and specifically states in IV.A.:~~

> ~~The Defendants, *with assistance of the Monitor*, shall conduct a staffing analysis and create *and implement* an Implementation Plan to accomplish the obligations and objectives in this Decree.~~

~~To alleviate misunderstanding, input is defined as help, ideas, knowledge, advice or information given to IDOC by the Monitor *prior* to development or initiation of Implementation Plan tasks and *ongoing* help, ideas, knowledge, advice or information occurring during development and implementation of any IDOC effort to make changes called for by the Consent Decree.~~

~~Assistance is defined as contributing, supporting or helping in the effort to complete tasks. Assistance is provided on an ongoing basis, as deemed necessary by the Monitor or as requested by IDOC or its consultants, in the effort to attain compliance with the Consent Decree. Assistance *does not* imply or condone ultimate responsibility for implementation of tasks necessary to comply with the Consent Decree which rests with IDOC.~~

~~Input and assistance of the Monitor shall not unreasonably distract IDOC staff or consultants from their duties; will be evidenced by free and open communication between the Monitor and his consultants with clinical leadership of IDOC and their consultants; and will be arranged and scheduled by the Monitor and his consultants or at the request of the IDOC clinical leadership or their consultants. This communication shall not be controlled or directed by IDOC attorneys.~~

## CONCLUSION

The Illinois Department of Corrections, the Office of Health Services and Governor Pritzker take seriously the obligation to provide quality health care to the individuals in the custody of the IDOC. In keeping with our mission and vision, we commit ourselves to caring for some of the most disadvantaged and vulnerable members of society. While we recognize that there will be many challenges on the road to compliance, we understand the importance of looking critically at the care we deliver. We will work diligently and collaboratively with the Monitor to develop a system for the delivery of healthcare that is safe, effective and respectful of the individuals who are entrusted to our care.

**Commented [A104]:** The Consent Decree directs the Monitor to provide input and assistance to IDOC (II.B.8., II.B.9.,III.A.3-6., III.L.1., IV.B, and V.E.). At the inception of the Consent Decree communication between the Monitor and IDOC clinical leadership and consultants was free and open. Currently the Monitor and his consultants are not able to have communication with any IDOC leadership staff or consultant without having it arranged, with time limits, by IDOC counsel. This has become a barrier to communication and has significantly decreased communication between the Monitor and IDOC leadership staff and their consultants and has resulted in minimal opportunities to provide input or assistance, which now occurs after a project is initiated. Assistance is extremely limited and, in some cases, such as with policies, has not occurred for an extended period. The difficulties, delays, and time restraints related to setting up meetings associated with this process has limited IDOC staff contact with the Monitor and his consultants and is resulting in delays in the goal of attaining compliance with the Consent Decree. The insertion of these definitions is necessary to promote forward progress toward compliance with the Consent Decree.

**Commented [A105R104]:** The consent decree already outlines the obligations of the parties. This is unnecessary. The third paragraph is inconsistent with the language of the Decree which permits counsel to be present when speaking with any staff member. IDOC has , and will continue to, work collaboratively with the Monitor within the confines of the Decree.

Page 7

| Task # | Task | Consent Decree Item Number | Goal | Monitor(s) assigned by Dr. Raba | Responsible Party Assigned by Dr. Bowman | Start | Proposed End Date | Percentage Complete | Completion Date |
|---|---|---|---|---|---|---|---|---|---|
| | **STAFFING** | | | | | | | | |
| 1 | **Complete Initial Staffing Analysis** | IV.A | | | OHS Leadership | | Aug-21 | 100% | |
| 1.a. | IDOC will hire a qualified consultant to perform a workload analysis for *all* staffing needs. The workload analysis will form a baseline staffing need for all position types and the template or algorithm used in the analysis will be utilized to develop changes in staffing needs based on increases or decreases in inmate population or programmatic change. | IV.A, IV.A.2 | | | OHS Leadership, Workload analysis consultant | | ~~March 1 2023~~ | | |
| 1.b. | IDOC will ensure that the requirements of the workload analysis include analysis of all the Monitor's recommendations with respect to staffing. The workload analysis would provide a workload analysis methodology for staffing recommended by the Monitor. | IV.A, IV.A.2, V.E. | | | Workload analysis consultant | | ~~June 2023~~ | | |
| 2 | **Complete hiring of Executive OHS Leadership staff** -SIU will hire ~~audit teams (1 coordinator, 2 physicians, 2 nurse practitioners, 4 RNs, 2 quality specialists, ½ dentist)~~ 3 data team members, an executive director, a director of quality management, an administrative assistant, a quality improvement coordinator, 2 quality improvement specialists, 3 process analysts. IDOC will negotiate with SIU to hire project managers listed below. ~~staff as part of the it's collaboration with IDOC including but not limited to data team, audit team, quality team, and will explore opportunities to hiring additional clinical staff.~~ | IV.A ~~II.B.3.~~, IV.A.2 | | | IDOC Human Resources | Mar-20 | ~~Sep 22~~ Dec 22 | | |
| | IDOC will ~~explore options to identify [and~~ hire ~~additional executive staff to work with OHS (such as a~~ project managers for the following services, ~~or consultants) to manage the implementation plan. Specific areas will include:~~ 1) Full-time Implementation Plan project manager 2) Full-time Electronic Medical Record project manager 3) Full-time Policies and Procedures project manager ~~Analysis of Aging and Infirm Population~~ ~~Physical Plant Assessment~~ | IV.A ~~II.B.3.~~, IV.A.2 | | | OHS Leadership; IDOC Human Resources; | Dec-21 | ~~Jul-22~~October 2022 | | |

Commented [A106]: I DOC does not know how many staff it needs nor does it have a methodology for adding or subtracting staff in the future. Yet the Consent Decree (provisions IV.A. and IV.A.2.) require a staffing analysis must be completed that ensures IDOC can implement the Consent Decree. The current staffing analysis does not ensure (and IDOC admits that in the Staffing section in the narrative of this document) that a precise staffing analysis cannot be determined. A workload analysis is a quantifiable methodology for adding or subtracting staff and can accomplish that task. A qualified person should perform this analysis such that the methodology can …

Commented [A107R106]: IDOC has already conducted and finalized a staffing analysis. It is nothing more than conjecture to suggest that the additional positions outlined in the staffing analysis are not sufficient to meet the needs of the population.

Commented [A108]: The Monitor is required to provide assistance to IDOC in development of a staffing plan (IV.A., IV.A.2, and V.E.) The Monitor provided multiple recommendations to IDOC with respect to staffing. IDOC has ignored many of the …

Commented [A109R108]: Reject as written. IDOC will agree to perform a revised staffing analysis upon implementation of EHR and policies and with new vendor.

Commented [A110]: It isn't clear what this means with respect to specifics of who will be hired and how these staff will be employed to address the Implementation Plan. The Monitor uses the SIU 2022 proposal which was more specific and is in agreement with Monitor …

Commented [A111R110]: IDOC is working with SIU to hire 2 physicians, 2 APNs, 4 RNS, 2 quality specialists. IDOC has also agreed to hire an executive director, a director of quality management, an administrative assistant, a quality improvement coordinator, 2 qualit…

Commented [A112R110]: IDOC only agreed to .25 FTE dentist and did not agree to hire 3 process analysts. Though our partnership with SIU, IDOC has access to process analyst. The Monitor may not dictate who IDOC contracts with.

Commented [A113]: Policies, implementation of the EMR, and implementation of an Implementation Plan are all significantly overdue and are requirements of the Consent Decree. Yet in the latest Implementation Plan, IDOC assigns responsibility to the same group …

Commented [A114R113]: IDOC does not need full-time project managers for the items listed here. Dr. Jane Leonardson has already written dozens of policies and will continue to serve as an expert in EHR and assist with implementation plan objectives.

Commented [A115]: Human Resources should be responsible for establishing the requirements for these positions and for actually hiring the consultant. The Monitor would agree if IDOC arranges for SIU to hire these positions.

Commented [A116R115]: Agree

| # | Task | Code | | Responsible | Date | Status | | | |
|---|---|---|---|---|---|---|---|---|---|
| | OHS will meet routinely with IDOC Human resources, CMS, and the vendor to review monitor time-to-hire and vacancies for health care positions and progress on hiring of health care staff. The group will set a time-to-hire goal and a vacancy goal to measure against. | IV.A, II.B.2, II.B.3., IV.A.2 | | OHS, IDOC Human Resources and Labor Team | Jun-21 | To start October 2022 with quarterly meetingsOngoing | | | |
| | OHS will meet routinely with vendor to review vacancies for health care positions and progress on hiring of health care contractual staff. | IV.A, II.B.2, II.B.3., IV.A.2 | | IDOC and Healthcare Vendor | Jan-17 | Ongoing | | | |
| | OHS will meet with IDOC human resources, the vendor, and CMS to identify process and conduct corrective actions to facilitate the hiring of health care staff. based on established goals. This group will establish and work to improve time-to-hire goals and establish workplans for corrective action for vacancy rates greater than 10% or any vacancies in critical positions (Medical Directors, HCUAs, Directors of Nursing, Dentists, project management staff, and OHS non-support staff). This group will track and report its progress over time as a performance and outcome measure as measured on a dashboard. | IV.A, II.B.2, II.B.3., IV.A.2 | | IDOC Human Resources, Central Management Services, vendor, OHS. | Mar-22 | Until 15% vacancy rate attained | | | |
| | Develop partnerships with universities to augment staff outlined in the staffing analysis. See part two of task 4 below | IV.A | | IDOC Human Resources | Jun-18 | Ongoing | | | |
| 3 | Hire staff outlined in the Staffing Analysis as soon as possible with expedited hiring for key positions (Medical Directors, HCUAs, Directors of Nursing, Dentists, project management staff, and OHS non-support staff). | IV.A, II.B.2, II.B.3., IV.A.2 | | IDOC Human Resources | | Ongoing | | | |
| | SIU will post SIU positions | IV.A, II.B.2, II.B.3., IV.A.2 | | SIU | | Mar-22 | | | |
| | Vendor will post contracted positions | IV.A, II.B.2, II.B.3., IV.A.2 | | Health Care Vendor | | Jan-22 | | | |
| | IDOC HR and facility HR will post IDOC positions | IV.A, II.B.2, II.B.3., IV.A.2 | | IDOC Human Resources | | Jan-22 | | | |
| 4 | Revise existing policy so that Agency Medical Director or designee will assign approve position descriptions (which include qualifications) for facility healthcare specific positions including facility infection control coordinators, chronic care nurses, and quality improvement coordinators. The Agency Medical Director will ultimately be responsible for recommending the hiring and firing for all health care employees through designees. Each facility will have a dedicated infection control coordinator, chronic care nurse, and quality improvement coordinator with Agency Medical Director or designee approving the hiring quality improvement coordinators (see task # 48 below which can be eliminated) | IV.A, II.B.2, II.B.3., IV.A.2 | | IDOC OHS and Chief Compliance Officer | | Jun-22September 2022 January 2023 | | | |
| | IDOC and vendor to participate in ongoing recruitment opportunities to secure sufficient medical and dental staff. IDOC will develop an alternative source of obtaining physicians. IDOC will initiate negotiations with SIU, UIC or other parties (FQHCs, etc.) for arrangements to provide physician staff for any facility with vacant vendor Medical Director or physician for six months or more (without use of a "traveling medical director or coverage doctor arrangement). IDOC will make contract modifications to the vendor contract so that these positions can be filled with alternate physicians and to allow the new physician to be the clinical authority at that facility. | II.B.2, II.B.3, III.A.2, IV.A.2 | | Agency Medical Director and Deputy Chief of Health Services and IDOC Human Resources | | OngoingInitiate October 2022 | | | |
| 5 | Create draft OHS organizational chart, including vendors, to demonstrate OHS reporting structure. The organizational chart will show that the Chief OHS is ultimately responsible directly or through designees for the recommendation of the hiring and firing of all health employees including the HCUA. The organizational chart will clarify the reporting and supervisory relationship between the Office of Health Services leadership to the facility Health Care Unit Administrator. | II.B.3. | | IDOC OHS, Human Resources | Sep-21 | Apr-22March 2023 | | | |

**Comments:**

**Commented [A117]:** IDOC and its vendor have been unable to hire and is failing in several Consent Decree requirements regarding staffing (II.B.2, II.B.3., IV.A., and IV.A.2.) There is a net loss of employees since 2019. The meetings between OHS and human resources needs to have a purpose that moves the IDOC toward compliance. It is our opinion that Central Management Service and the vendor should be added. The group of OHS, human resources, CMS, and the vendor need to determine h...

**Commented [A118R117]:** Meetings with the vendor are covered in the next section. Hiring cannot be expected to exceed the community standard.

**Commented [A119]:** Hiring staff is not at goal and hiring consistent with Consent Decree requirements is significantly not at goal and is not timely (II.B.2.,II.B.3...

**Commented [A120R119]:** A vacancy rate of less than 10% far exceeds the community standard. The Decree does not require this information to tracked on a ...

**Commented [A121]:** Hiring is a critical component of obtaining sufficient staff. Tracking performance is best done by developing performance and outcome ...

**Commented [A122R121]:** The Department does not object to tracking hiring data. However, the consent decree does not require the use of a dashboard to ...

**Commented [A123]:** This item is vague and is not clear what will be done. IDOC should develop plans that are more concrete and have are actionable. Item ...

**Commented [A124R123]:** Disagree that this task is vague. The Decree does not mandate university partnerships and cannot mandate non-party ...

**Commented [A125]:** This is vague but should not exceed community standard

**Commented [A126]:** Assigning positions in IDOC means that a person with another assignment (e.g. medical records supervisor) who may not have the ...

**Commented [A127R126]:** A chronic care nurse is not standard in the community. Also, with an EHR, the ordering of medications, and medical activities or foll...

**Commented [A128R127]:** Med director can only recommend termination. He will not be ultimately responsible as the state of Illinois is still governed by ...

**Commented [A129]:** This task provided by IDOC is no different than existing practice and is not a change. The vendor is under contract to provide physicians b...

**Commented [A130R129]:** IDOC will explore alternatate physician recruitment. IDOC cannot be mandated to contract with an outside entity. These ...

**Commented [A131]:** II.B.3 of the Consent Decree requires enough trained staff with oversight by qualified professionals. The Warden hires, fires and writes the ...

**Commented [A132R131]:** Med director can only recommend termination. He will not be ultimately responsible as the state of Illinois is still governed by ...

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Create draft OHS organizational chart, including vendors, to demonstrate OHS reporting structure<br><br>The organizational chart will illustrate the relationship between the Office of Health Services leadership and vendor staff and the relationship between the HCUA and vendor staff at each facility. The table of organization shall represent supervisory relationships. | II.B.3 | | IDOC OHS, Human Resources and Healthcare vendor | Jun-22 | | |
| **TRAINING OBJECTIVES** | | | | | | | |
| 6 | OHS Leadership to develop new and ongoing training for healthcare staff 1. Facility HCUAs will be responsible for ensuring new staff are trained on existing policies, procedures and processes 2. Through Continuous Quality Improvement meetings, Annual Governing Body Meetings and otherwise as needed, OHS leadership will institute training on new initiatives related to the Lippert Consent Decree, including quality improvement, partner safety initiatives and annual nurse updates | II.B.3 | | OHS, Agency Director of Nursing, Agency Medical Coordinator, SIU and Vendor | Ongoing | | |
| 7 | Provide ongoing training for nurses, physicians, mid-level providers and other staff based on training need and role.Develop written procedures for expectation of training to include: In addition to standard IDOC Cycle training, Health Care specific trainings will include: 1. Administrative Directives, policies and procedures, Procedural training (new policies, new procedural initiatives; and new or modified processes) 2. Lippert Consent Decree initiatives such as vaccination training for nurses using CDC guidance. 2. Quality improvement and Safety training; 1. Process updates (such as medication administration, clinical operations, and infection control)Clinical practice training and updates (e.g., provider training on asthma management, nurse training on vital sign assessment, medication administration, nurse training on use of a point of care device, etc.) 2. Electronic medical record training both initial and ongoing 3. New employee training 4.3. Training procedures shall include the format of training (in-person, video conference, onsite, quarterly meeting, etc.); copies of the new policy or procedure for all attendees; sign-off acknowledgement that training was received; in some cases verification of competence with the training (taking blood pressure, using a point of care device, etc.) | II.B.3, II.B.6.o., IV A.2 | | OHS Quality Control Coordinator , Coordinator , Agency Medical Coordinator, Agency Director of Nursing, Deputy Chiefs, Agency Medical Director, SIU | OngoingJanuary 2023 | | |
| 8 | Have dedicated staff for Train staff for job-specific roles such as infection control nurse, chronic care nurse, or and quality improvement coordinators. | II.B. 3 | | OHS, Agency Director of Nursing, Agency Medical Coordinator, SIU and Vendor | Mar-22 June 2023 | | |
| 8.a. | Hire a training coordinator to track training, coordinate support for the training, and ensure staff training occurs for all relevant staff | II.B.3, II.B.6.o., IV A.2 | | | | | |
| | **SECURE HEALTHCARE VENDOR** | | | | Dates are estimates | | |
| 9 | Ensure RFP and contract is written to obtain sufficient staffing and be consistent with requirements of Consent Decree vis a vis it's policies and procedures and includes the possibility for using physicians from another source in the event the vendor cannot provide sufficient qualified physicians. Draft RFP refer to appropriate agency consulting parties | II.B.2, II.B.3, III.A.2, IV.A.2, V.G. | | IDOC OHS, IDOC Legal, IDOC Fiscal | Jul-21 Feb-22 | | |
| 10 | Send RFP to agency procurement department for review and approval | | | IDOC OHS, IDOC Legal, IDOC Fiscal | Mar-22 | | |

Commented [A133]: IDOC employs about 40% of staff and the vendor employs about 60% of the staff. Staff will at times not take direction from a supervisor in practice must ensure that assigned supervisors have the authority to supervise. II.B.3 requires enough trained staff with oversight by qualified professionals. Due to a hybrid system, oversight is a mixed vendor/IDOC staff does not concur at some facilities.

Commented [A134R133]: Will agree to language that allows HCUA to impact activities on the unit. Will not create a document which implies a co-employer relationship with medical vendor staff

Commented [A135]: This is vague and does not describe how training will be implemented. See task below.

Commented [A136R135]: Response to training tasks outlined below

Commented [A137]: A procedure for training will giv...

Commented [A138R137]: Agree.

Commented [A139]: This training is managed by OF...

Commented [A140R139]: Agree

Commented [A141]: Training on a Lippert initiative ...

Commented [A142R141]: Agree

Commented [A143]: This specialized training should ...

Commented [A144R143]: Agree

Commented [A145]: Procedure for this type of traini...

Commented [A146R145]: Agree

Commented [A147]: This training should be directed ...

Commented [A148R147]: Agree

Commented [A149]: This is specialized technical ...

Commented [A150R149]: EHR training and the ...

Commented [A151]: New employees need a variety ...

Commented [A152R151]: Agree there should be a ...

Commented [A153R151]: Often EHR training ...

Commented [A154]: II.B.3 requires enough trained ...

Commented [A155R154]: A chronic care nurse is n...

Commented [A156]: II.B.3 and IV.A.2 require ...

Commented [A157R156]: IDOC already staffs a ...

Commented [A158]: Items 10 - 15 are the standard ...

Commented [A159R158]: IDOC is aware of ...

Commented [A160]: Provision V.G. requires that ...

Commented [A161R160]: Agree

Commented [A162]: Provision III.A.2. gives credenti...

Commented [A163R162]: IDOC has agreed to expl...

| 11 | Submit BEP Goal Setting form to BEP Compliance Officer<br>Submit Veteran's Business Program (VBP) Goal to Agency Compliance Officer<br>Send RFP to SPO for review and approval | | | | IDOC OHS, IDOC Legal, IDOC Fiscal | Mar-22 | | |
|----|---|---|---|---|---|---|---|---|
| 12 | Post RFP | | | | IDOC OHS, IDOC Legal, IDOC Fiscal | October 22 | | |
| 13 | Public Pre-Bid Conference<br>Review Technical Bid<br>Review and Score Diversity Commitment Submission<br>Send Technical Score to SPO for review and approval<br>Review and score Pricing<br>Send Technical and Pricing Submission for award approval<br>Protest Period of 14 days | | | | IDOC OHS, IDOC Legal, IDOC Fiscal | December 23 | | |

| # | Task | Provisions | | | Responsible | Date | | |
|---|------|-----------|---|---|-------------|------|---|---|
| 14 | Award RFP<br>Negotiate contract specifics | | | | IDOC OHS, IDOC Legal, IDOC Fiscal | ~~Jun-22~~May 23 | | |
| 15 | ~~Draft~~ contract consistent with Consent Decree /sign contract. | II.B.2, II.B.3, II.B.6. r, II.B. 7, III.A.2, III.A.4., III.M.1, IV.A.2, V.G., V.H. | | | IDOC OHS, IDOC Legal, IDOC Fiscal | June 23~~Jul-22~~ | | |
| 16 | Monitor ~~contracts for~~ ~~performance of~~ medical vendor and take appropriate corrective action<br>1. Develop a standardized procedure for contract monitoring ~~of staffing and clinical performance.~~<br>2. Use performance measures of vacancy rate, positions filled compared to contract staffing numbers, and number of days without key personnel (Medical Director, Director of Nursing, supervisory nurses) as a measurement of staffing performance.<br>3. Develop procedure to use annual facility audits in aggregate as measures of clinical performance of the vendor.<br>4. Develop a procedure for collating material from staffing and clinical performance to judge and score performance.<br>~~2~~5. Develop standardized mechanism to notify vendor of results and to implement corrective action ~~3~~<br>6. Develop a plan to track results of the corrective action | II.B.2 | | | Agency Medical Director, Deputy Chiefs, ~~Fiscal, Chief Policy Administrator~~ | ~~Dec 2023~~~~Jul-22~~ | | |
| | ELECTRONIC HEALTH RECORD (EHR)<br>*specifications regarding full implementation will be provided after consulting the new EHR vendor | | | | | | | |
| 17 | Complete facility wiring for EHR | II.B.2., II.B.4 | | | IDOC Telecom staff | Mar-21 | | |
| 18 | Arrange for assigned person in DoIT or hire consultant to annually meet with OHS and to review facilities to determine ~~Explore~~ need for additional wiring, devices or equipment as new staff is onboarded, as equipment requires replacement, or when new programs require additional equipment or wiring. This will result in a brief summary of the review to OHS and director of DoIT. | II.B.2, II.B.3, II.B.4 | | | IDOC Staff, DoIT or consultant | As needed and annually sufficiently prior to budget year end to secure funding, if indicated. | | |
| 19 | Post RFP for EHR<br>Public Pre-Bid Conference<br>Evaluate Bids received<br>Select vendor for HER | II.B.4 | | | IDOC OHS, IDOC Legal, IDOC Fiscal | Nov-21 | May-22 | |
| 20 | Finalize implementation of Electronic Health Record | II.B.4 | | | IDOC OHS and IDOC Human Resources | Jun-23 | | |
| 21 | ~~Identify~~ Hire or reassign a qualified dedicated full-time IT professional as a ~~a~~ project manager for the EHR implementation. | II.B.2, II.B.3, II.B.4 | | | IDOC Telecom staff, ~~Director of DoIT in consultation with OHS Chief~~ | Jun-22 | | |
| 22 | Determine necessary device count for future healthcare staff use of EHR<br>IDOC OHS will identify point of care devices to integrate into EHR system such as glucometers, thermometers, automated blood pressure, pulse oximetry, ultrasound ~~,~~etc. as well as laptops, desktop computers, printers, scanners, and other devices ~~etc.~~necessary to effectively implement the EMR. | II.B.2., II.B.4, III.B.2. | | | IDOC staff, OHS, DoIT | Sep-22 | | |
| 23 | Ensure acquisition of devices for future healthcare staff to operate the EHR 1) OHS and DoIT will develop a written procedure for requesting new devices in the event of new staff exceeding the existing device capacity; 2) reporting of defective or malfunctioning equipment so it can be replaced; 3) or requesting a meeting of DoIT with OHS designee(s) to request equipment needs for new initiatives which cost will be proposed through an expedited (for critical projects) or normal budget process (for routine | II.B.2., II.B.4 III.B.2. | | | EHR Project Manager Chief of Health Services, DoIT, CFO | Aug-23 | | |

Comments:

**Commented [A164]:** IDOC should write the contract so that it is not a barrier for IDOC to implement the Consent Decree otherwise the Consent Decree will be more difficult to implement. For example, if IDOC wants to use physicians from another source absent vendor satisfactorily filling physician positions, the contract language should permit this. Also, the Consent Decree specifically states that the contractual structures incentivize adequate medical care and the vendor contract is to be monitored for that. Contract language should evidence that Consent Decree requirement. Monitoring for this is explained in task 16 below. As well, provision V.G. requires the vendor to comply with court orders and IDOC policy and procedure and this should be called out in the any contract.

**Commented [A165R164]:** Agree that contract will be consistent with the Decree

**Commented [A166]:** Provision II.B.2. of the Consent Decree requires monitoring of health care to include …

**Commented [A167R166]:** Agree.

**Commented [A172]:** There is no evidence that this is completed. The date needs to be revised to coincide …

**Commented [A173R172]:** Disagree that no evidence exists

**Commented [A170]:** The policy person assigned for this should be a position that reports to the Chief OHS …

**Commented [A171R170]:** Our medical policies are being drafted by an expert in correctional medicine.

**Commented [A168]:** The Consent Decree requires meaningful performance measurement including …

**Commented [A169R168]:** This recommendation is unclear with respect to clinical performance measure …

**Commented [A174]:** This statement is vague and is not actionable. We added what we believe is a …

**Commented [A175R174]:** Disagree, IDOC does not need to assign a person from DoIT or hire a consulta …

**Commented [A176]:** Implementation of the electronic record is not trivial. IDOC will need a full time qualifie …

**Commented [A177R176]:** The person that designs or oversees the content of an EHR is not a project …

**Commented [A178]:** The EMR project manager is a technical position that ensures that the vendor delivers …

**Commented [A179R178]:** Disagree that EHR project manager must be a technical position. See comment …

**Commented [A180]:** To effectively implement an EMR (required in provision II.B.4), sufficient equipment mu …

**Commented [A181R180]:** Agree.

**Commented [A182]:** The original statement is vague and not actionable. The three steps added are a …

**Commented [A183R182]:** The parties have agreed that the implementation plan will need to be updated …

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | projects). | | | | | | | | |
| 24 | Provide staff training on the use of the EHR. At least three months prior to "go live" develop a standardized plan that is then applied to each facility. Each facility may have barriers (no space to conduct the training, work schedules that conflict with training schedules, etx.). For that reason each facility will modify the standardized plan based on facility specifics. Employee-specific task training will be the standard (medication nurses receive training on the eMAR, providers receive training on chronic illness documentation, etc.). *training specifics will be outlined with the assistance of the selected EHR vendor in coordination with OHS leadership and the Department of Innovation and Technology (DoIT). Provide initial, end-user specific staff training to include: Medical, dental, and mental health providers, nurses, ancillary staff, facility administrative staff, OHS executive staff and Quality teams. The training plan shall include 1) where the training will occur, 2) ensuring that sufficient space and devices are obtained so that every trainee has a device to use and the space is conducive to a training session, 3) ensuring that prior to beginning training all staff have sufficient computer skills to utilize the operating system, 4) that sufficient time is allocated for training and that those who need more time to learn have an opportunity to do so, 5) that training groups are established (providers, medication nurses, schedulers, etc.) so that training is provided specific for the responsibilities of staff trained, 6) that there is a test requirement that ensures that the staff trained have acquired the skills necessary to effectively use the electronic record. | II.B.3., II.B.4, IV.A.2. | | | EHR Project Manager, EHR Vendor, DoIT and OHS Leadership | | Dec-22 | | |
| 25 | Identify additional resources needed Hire 3 IT professionals to manage a help desk and to provide continuity training for new hires, new EHR features, upgrades, and revisions. IDOC may elect to contract out this service. | II.B.3., II.B.4; III.M., IV.A.2. | | | | | Ongoing June 2023 | | |
| | Finalize and disseminate immunization and routine health maintenance (RHM) and cancer screening policies, procedures, and guidelines using the Center for Disease Control (CDC) adult immunization guidelines and United States Preventive Services Task Force (USPSTF) | II.B.1 | | | | | Sept-2022 | | |
| 26 | Identify and finalize a mechanism to track immunizations and routine health maintenance (RHM) and cancer screening information until EHR is fully implemented. The mechanism will track and report both the volume of specific vaccines offered, administered, and refused per facility and the percentage of eligible patients who have been offered, accepted, and refused specific vaccinations and routine health maintenance/cancer screenings IDOC must implement an interval immunization and RHM/cancer screening tracking system prior to the full implementation of the EHR. | II.B.1.; II.B.2.; II.B.4; III.M.1.a.b.c.d. | | | EHR Project Manager, Agency Medical Coordinator, Agency Director of Nursing, Deputy Chiefs | | Jun-2022 | Jun-22 Feb-2023 | |

**Comments (right margin):**

Commented [A184]: There must be a plan and it should be written and standardized. All employees of the same class should receive the same training

Commented [A185R184]: IDOC cannot agree to such specificity with respect to training until the selection of an EHR vendor. Agree with preparing for training ahead of time. Much training can now occur using video conferencing and sharing one's screen. A computer lab is not necessary. Excellent written materials are necessary because nobody remembers all the information at an EHR training. On the day of go-live, it is great to have at-the-elbow trainers available or super-users that are dedicated to helping the users in person.

Commented [A186R184]: Reputable EHR vendors have processes they use for implementation and training.

Commented [A187]: This gives the details of requirements for the training.

Commented [A188R187]: While IDOC agrees that EHR training will be crucial to implementation, determining training specifics is premature until selection of an EHR vendor. The parties have agreed that the implementation plan will need to be updated occasionally. As such, there is no need for speculative tasks.

Commented [A192]: A contract for the EMR is not finalized. This is only an estimate of a timeline given that the contract will be awarded soon.

Commented [A193R192]: Agree that contract for EHR is not finalized

Commented [A189]: This is vague and not actionable. The suggestions are actionable and measurable. For an EMR to be effective, a help desk to assist users in the event of an outage, loss of password, problems with using the software, etc. is necessary. There are no staff currently assigned for that function. The number of individuals on a call desk can be based on estimates of calls obtained in other similar systems. The number given here is one that IDOC should modify based on

Commented [A190R189]: The parties have agreed that the implementation plan will need to be updated occasionally. As such, there is no need for speculative

Commented [A191]: The parties have agreed that the implementation plan will need to be updated occasionally. As such, there is no need for speculative

Commented [A194]: II.B.1: "IDOC shall provide access to an appropriate level of primary care, ....." Adult immunizations and RHM/cancer screenings are

Commented [A195R194]: Agree. Policy has been written which includes this.

Commented [A196]: II.B.2 "IDOC shall require...and the monitoring of health care by collecting and analyzing data to determine how well the system is

Commented [A197R196]: Agree

| 27 | Once EHR is fully implemented, Ttrack adult immunization and RHM/cancer screening acceptance rates<br>Develop and or implement an interval immunization and RHM/cancer tracking solution using an electronic database (see #26). P, possible solutions for immunization tracking include open source relational database software, the Illinois Comprehensive Automated Immunization Registry I-CARE or similar database.<br>1. Complete immunization policy and procedures revision to include:<br>a. Primary responsibility for the systemwide immunization program will be under the system's Infectious Disease Coordinator<br>b. Designated infection control nurse will coordinate the facility's immunization program and will have dotted line reporting to the system's Infectious Disease Coordinator<br>a.c. Modification that allows nurses, acting under protocol, to immunize patients.<br>d. Annual health evaluation update of immunization and RHM/cancer screening status and offering of necessary immunizations and screenings at chronic care and specialty clinic visits, annual and biannual health visits, and regular vaccination/RHM/cancer screening events.<br>e. Reception and classification centers will solicit and record immunization and RHM/cancer screening status and will offer and track required vaccinations and RHM/cancer screenings as part of the intake admission process.<br>f. Immunization and RHM/cancer screening data will be reported regularly at the monthly facility QI meetings and at the systemwide Quality Council meetings.<br>2. Ensure that the implementation of the electronic health record includes requirements to track and automatically report immunization and RHM/cancer screening data. and present immunization status automatically.<br>3. Select Explore the use of a reputable database to assess immunization and RHM/cancer screening status at intake and update immunizations/RHM/cancer screenings. prior to conclusion of the intake process.<br>4. Institute statewide training of nurses to on safe immunization practices and standard immunization procedures and select RHM/cancer screenings. | II.B.1II.B.4, II.B.2, III.M.1.a.b.c.d. | | | EHR Project Manager and OHS staff, EHR Vendor, Infectious Disease Coordinator | Nov 2022 | Nov-22Nov-22 Interval Tracking Solution; Feb 2023. Electronic Med Record tracking: Jan 2024 | Date of Electronic health record implem. starting in June 2022 |
| 28 | Develop a mechanism to notify providers of instances of medication non-adherence within the EHR.<br>1. Establish policy and standardized procedures to support patient adherence with prescribed medications.<br>a. Define which medications are to be monitored for non-adherence.<br>a. Define the frequency for monitoring medication adherence.<br>b. Determine how providers are notified.<br>c. Define the expectations of providers when notified of non-adherence and steps to be considered to improve adherence including timeframes for action.<br>d. Establish the factors to be addressed in documentation by providers of efforts to address adherence.<br>e. Develop an audit tool or other tracking mechanism to account for the efforts and outcomes in addressing medication non-adherence.<br>f. Inform staff of expectations and methods to address nonadherence and implement policy and procedure.<br>g. Track implementation progress and compliance.<br>2. Establish the process within the E.H.R. to accomplish notification and documentation of provider actions in response to notification of nonadherence.<br>a. Determine how the E.H.R. will distinguish medications that are to be monitored.<br>b. Determine where the information to be monitored resides in the E.H.R. (i.e. MAR).<br>c. Identify the mechanism used to determine the frequency adherence is monitored and the means to identify when provider notification should take place. | II.B.4<br><br>II. B.1<br>II.B.6.d | To support patient adherence with provider recommendations for medication treatment and constructively address the reasons patients are nonadherent. | | 1 a-g. SIU Pharmacist to take the lead establishing clinical, procedural and tracking requirements with assistance from OHS Deputy Chiefs, Agency Infection Control Coordinator, Agency DON & OHS Regionals.<br><br>2 a-g. EHR Project manager, IDOC Department of Planning and Research, SIU Quality. | Sep-22 | Sep-22 March-23 | |

Comments: [A204] Date should be changed to reflect 1 year after EHR implementation; [A19] Both the immunization and routine health maintenance (RHM)/cancer screening are best included in this task. Both need to have a bridge data tracking and reporting process until the electronic health record is fully implemented. At this moment, there isn't an announced start date for a new electronic health record vendor. Based on the late availability/diagnoses of a number of cancer cases in the inmate population, it is vitally important that age and risk-based cancer screening be expeditiously established in the IDOC with data tracking that verifies the provision of cancer screenings. The adult immunization is most appropriately placed under the umbrella of the IDOC's Infectious Disease Coordinator. II.B.2 states "IDOC shall require…adequate qualified staff…." Given the extensive ongoing responsibilities of the provider and nursing staff, each facility needs a designated infection control nurse who would/could assist with the Hepatitis C and HIV UIC telehealth clinics and coordinate the facility's immunization program which would need to effectively run by nurses guided by treatment guidelines and protocols as currently done in many ambulatory health care centers in the USA.; [A199R198] Agree; [A200R199] Change date for a year after implementation of the EHR or when nurse staffing is at 80% or higher.; [A201] Immunizations and RHM/cancer facilities during most clinical encounters to especially at the time of admission to the IDOC. There are…; [A202R201] Agree that immunization and screening tracking is important; [A203R202] This level of detail is not required in order to comply with the Decree. IDOC and EHR vendor should work out logistics and update implantation plan if necessary; [A205] These additions are actionable items to ensure access to an appropriate level of care (II.B.1) which includes steps to support patient adherence (II.B.6.d) with prescribed medication. The…; [A206R205] As in the community, the importance of adherence to medication and importance of medication (and what happens if the medication is not taken) should be explained at appointments.; [A207R205] The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness need-intrusiveness findings. Doe v. Cook County, 798 F.3d; [A208] SIU Correctional Medicine has hired a pharmacist to take the lead on operational policy and practices. This individual is most qualified to take the lead in addressing this problem area.; [A209R208] Agree

| # | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | d. Determine how providers are notified of non-adherence (message, establish a task for chart review or patient appointment).<br>e. Develop documentation template for providers to review nonadherence, meet with the patient to discuss, actions taken to address patient concerns, and education or counseling provided.<br>f. Implement automated methods to monitor and report nonadherence.<br>g. Monitor accuracy and timeliness of automated review and notification processes. | | | | | | | |
| 29 | Develop an system for infection control program which includes:<br>1. Sufficient personnel within OHS who are appropriately qualified in communicable diseases and infection control to provide agency wide direction and to carry out these directions reliably at the facility level. (Agency Medical Director) March-23<br><s>Formalized relationships with a consulting organization (UIC, IDPH or an IDOC employee) to provide physician expert advice and guidance on control of communicable and infectious diseases. (Agency Medical Director) Dec-22</s><br>2. Develop written guidelines on all operational aspects of infection control in facilities (i.e. education, exposure control, vaccination, monitoring and surveillance, prevention and treatment, outbreak investigation, policy enforcement). (Infectious Disease Coordinator) June- 23<br>3. Establish surveillance report format to be used to analyze and report on infection control in CQI meetings at the facility and agency level. (Infectious Disease Coordinator) June-23<br>1. 5. Work with data personnel to develop methodology to acquire data for surveillance reports manually to begin and eventually reporting within the EHR (Infectious Disease Coordinator) June-23 to focus on the following infectious disease entities:<br><s>Human Immunodeficiency Virus</s><br><s>Hepatitis C</s><br><s>Tuberculosis</s><br><s>Methicillin Resistant Staph Aureus (MRSA)</s><br><s>Influenza</s><br><s>COVID-19 and other emerging infectious diseases</s><br>6. Establish reporting methodology to document enforcement of each item in the Consent Decree relating to infection control (III.I.5; III.J.2-3) as well as any called out in written guidelines #3 above. (Infectious Disease Coordinator) June-23<br>7. Establish statewide infection control meetings of infection control personnel. (Infectious Disease Coordinator) March-23 | II.B.5II.B. 2 -3; II.B.5; II.B.8; III.B. 2; III.J.1-3;III.K.4; III.M.1II.B.5 | | | OHS Deputy Chiefs, Agency Medical Coordinator, Agency Director of Nursing | | MarJune-232-22 | |
| 30 | Ensure all traditional releases receive a Medical Discharge Summary<br>1. Process mapping should be used to define the steps necessary to plan for continuity of care upon "traditional" release to the community. These steps include defining the clinician's review of patient needs in preparation for release, need for pre-arranged follow up care, handoff communication, provision of materials and supplies needed to continue care (medication, dressings, etc), availability of records, preventive care, and post release communication.<br>2. Review NCCHC E -10 Discharge Planning and ensure that the process includes identification of patients who need arrangements or referrals for follow up and assistance with application for health insurance.<br>3. Define responsible parties, timeframes and develop tools used to complete each step in discharge planning.<br>3. Develop and implement via policy and procedure that describes the steps of discharge planning, responsible parties, timeframes, and tools, includingDevelop a standardized list of health care information to be provided to all discharges. Information will include: | II.B.5; II. B. 6. S, II.B.6.t | | | OHS Deputy Chiefs, Agency Medical Coordinator, Agency Director of Nursing<br><s>SIU quality should facilitate process mapping the steps of the discharge planning process and design the tools for performance monitoring. EHR</s> | | JunJan-232-22 | |

Comments (margin):

**Commented [A210]:** The changes to this item are to expand the focus from reporting infectious disease to managing an infection control program necessary to achieve II.A. of the Consent Decree to provide necessary services, supports and resources to provide adequate medical care. The Consent Decree has many requirements that are consistent with infection control programs in correctional settings including screening for infectious disease, treatment, vaccination, monitoring etc. This draft of the implementation plan contains several tasks consistent with the Consent Decree requirements concerning infection control

**Commented [A211R210]:** Agree with all of these except that the results should be looked at in the faci

**Commented [A212]:** The Decree requires the appointment of an infectious disease coordinator

**Commented [A213R212]:** The qualifications proposed by the Monitor far exceed the community standard.

**Commented [A214]:** IDOC has consistently maintained that an appropriately qualified member of

**Commented [A227]:** These are additional parts of the Consent Decree that relate to the infection control

**Commented [A228R227]:** Agree

**Commented [A229]:** Each subitem identified the primary person responsible and the estimated

**Commented [A230R229]:** Agree

**Commented [A215]:** IDOC has no physician expertise in infectious diseases or control. IDOC states in their

**Commented [A216R215]:** As a state agency, the job of IDPH is to provide guidance to the state including

**Commented [A217]:** IDOC does not have an updated infection control manual and the one that does exist i

**Commented [A218R217]:** Agree. These policies are being finalized

**Commented [A219]:** There is a great deal of inconsistency among facilities in reporting on infectio

**Commented [A220R219]:** Agree

**Commented [A221]:** Facilities report on infectious disease now but there is little reliability and wide

**Commented [A222R221]:** Agree.

**Commented [A223]:** This item is necessary so that IDOC has the means to account for compliance with

**Commented [A224R223]:** Agree.

**Commented [A225]:** This item is necessary to ensure consistent implementation of the written guidelines

**Commented [A226R225]:** Agree

**Commented [A231]:** Based upon record review discharge planning currently is a rote task completed

**Commented [A232R231]:** It would be more natural to arrange follow up for patients that fall into certain

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Diagnoses and active problem list, current medications, immunizations and screening. summary of recent medical care (clinic and specialist care), copies of pertinent diagnostic and laboratory reports, copies of pertinent specialty consultations, and instructions for follow-up and community health care resources.<br>4. Establish metrics and methods for reporting discharge planning encounters as a proportion of all discharges.<br>5. Establish tools to evaluate the process and outcomes of discharge planning and include in calendar of performance monitoring. | | | | coordinator to identify how to report discharge planning encounters as a proportion of all releases. | | | | |
| 31 | **Ensure appropriate discharge medication is provided at the time of discharge.**<br>All discharges currently receive a 2 week supply of medication and a prescription for an additional 2 weeks of medication with one refill. HIV patients receive a 30 day supply of HIV medication upon discharge.<br>1. Survey each facility to determine:<br>a. Who determines what medications are provided at the time of release.<br>b. How discharge medications are obtained?<br>c. Who prepares medications for discharge and how is the task completed?<br>d. Does a clinician review and determine what medications the patient is to be provided in advance of the release? If so, when does this take place and how is it documented?<br>2. Establish and implement policy and procedure defining the process for clinician review of medications in advance of release, the process for procuring and packaging these medications, the methods used to provide them to the patient and how a two week refill is accomplished.<br>3. Establish methods to account for and document provision of discharge medication and compliance with written directives. | II.B. 6.m t | | | SIU Quality should conduct the survey and analyze results with recommendations to achieve goal of appropriate discharge medication at release. SIU Pharmacist should lead the establishment of policy and procedure using recommendations from survey with input from **OHS Quality Control Coordinator, Deputy Chiefs,** Performance monitoring tool to be developed and implemented by SLC., SIU, IDOC Chief Compliance Officer | Mar-21 Jan-23 | | | |

Commented [A233]: This task is not required by the Decree. The implementation plan may not impose additional obligations on the Department.

Commented [A234]: The Monitor's review of records provides ample evidence that actual practice is not consistent with the assertion that this item has been accomplished. There is no primary care provider review to determine the appropriateness of discharge medication prior to release (IDOC must provide adequate qualified and trained clinical staff to provide adequate health care II. A, II.B. 2 & 3.) . There is wide variation in the amount of medication patients receive when released (including in one instance, an alarmingly large quantity of controlled substance). IDOC does not monitor or report on provision of discharge medication at release. IDOC needs to have a better understanding of actual practices and institute steps to bring actual practice into compliance with the Consent Decree. A method to account for compliance with the Consent Decree must be established and reported per II.B. 3.

Commented [A235R234]: A survey is not necessary to and is drafting updated policies for discharge medications. We will train staff on the policy and audit their compliance. The implementation plan may not create additional obligations for the Department.

| # | Action | Provision | Goal | | Responsible | Date | | |
|---|---|---|---|---|---|---|---|---|
| 32 | **With the assistance of the audit teams and the Monitor, OHS will implement a preventable adverse event reporting system**<br>OHS with SIU will evaluate purchase third party adverse event reporting systems software currently in use in other health care settings. or If IDOC decides not to purchase established off-the-shelf software, it will design its own electronic reporting system to capture any non-conformance to policy, procedure or perceived error or non-conformance. SIU will assist in the implementation of this system. | II.B. 6.m, III.L.1. | To utilize adverse event reporting system to improve quality of care | | OHS Quality Control Coordinator, Deputy Chiefs, SIU, IDOC Chief Compliance Officer | Dec-22 | | |
| | IDOC will assign a full time quality improvement staff or hire (at OHS level not at facility level) to manage adverse event reporting reports and manage the patient safety program. This responsibility will include follow up on immediate remediation of adverse events, classification of all reports by type, organizing the reports systemically to show trends by facility, train staff at facilities on use of the system and on the procedure for making an adverse event report, participating in the quality program in designing patient safety actions based on event reports. | II.B. 6.m, III.L.1. | | | Director of Quality Improvement and Chief OHS | June 2023 | | |
| 33 | **With the assistance of the audit teams and the Monitor, develop and implement a process procedure to analyze and use adverse event reporting to monitor a) remediate the adverse event reported and b) subsequently analyze aggregate reports to prevent patient safety risksquality of care. 1.a. Immediate remediation is tracked to ensure effective remediation occurred (e.g., if a patient experiences a fall in a shower because there is no grab bar, is a grab bar installed to prevent future falls). 1.b. A responsible person in the quality program (see item above) is hired/assigned to classify the adverse event and categorize all events system-wide and collate the data.** 1. Data generated from the adverse event reporting system shall be used to shape safety improvement initiatives. 2. Data will be provided to OHS Quality Improvement and audit teams for review and the team will design a corrective intervention for systemic preventable adverse reports or for facility specific reports when that facility had excessive reports of a similar type. 3. 3.Following staff education, the intervention will be implemented. 4. Audit and data teams will monitor results and re-evaluate the success of the intervention at the conclusion of the designated study period.5. Policy and or processes will be modified to embed the resulting process. | II.B.6.m, III.L.1. | To utilize adverse event reporting system to improve quality of care | | OHS Quality Control Coordinator, Deputy Chiefs, SIU, IDOC Chief Compliance Officer | Dec-22 | | |
| 34 | **With the assistance of the Monitor IDOC will establish patient safety program that incorporates information gleaned from critical events, adverse events, mortality review and audit results**<br>Safety initiatives will include, but are not limited to: infection prevention, injury prevention, and reduction of medication errors. | II.B.6., III.L.1 | To utilize adverse event reporting system to improve quality of care | | Agency Medical Director, Adverse Event Coordinator, Director of Quality Improvement, Quality Improvement CoordinatorDietician | Jun-23 | | |
| 35 | Consult withHire a dietician(s) based on a workload analysis (based on requirements of the Consent Decree) or engage consultant services that will complete an analysis biennially of nutrition and timing of meals at all facilities for diabetic and renal failure patients, and specialized diets for selected disease states such as coronary artery disease, hypertension, hyperlipidemia, stroke, cancer, and other disease states as indicated.the population of | II.B.6.i., IV.A. II.B.2, II.B.3. , IV.A.2 | | | Agency Medical Director, Dietician | Jun-22 | | |

**Comments:**

Commented [A236]: This is not actionable. What if the evaluation results in no action? A system should be purchased or built.

Commented [A237R236]: A system has been outlined and functions through SIU's quality personnel. Having software does not ensure that something is addressed. Software reporting still requires a person to investigate.

Commented [A238R236]: This software is not standard for prison healthcare and is not required to meet Decree objectives.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree": Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

Commented [A239]: The Consent Decree (II.B.6.m.) requires reporting preventable adverse medical events. This might include falls, medication errors, documentation errors, lack of supplies, errors in ...

Commented [A240R239]: This software is not standard for prison healthcare and not required to me...

Commented [A243]: The Director of Quality Improvement and Chief of OHS should decide who to ...

Commented [A244R243]: SIU manages this

Commented [A241]: Managing adverse event reporting will not just "happen". A person has to ...

Commented [A242R241]: SIU has staff for this

Commented [A245]: This should be a written procedure

Commented [A246R245]: Agree

Commented [A247]: The purpose of using an adverse medical event reporting system is to identify, classify ...

Commented [A248R247]: Agree

Commented [A249]: For isolated reports, immediate remediation may be sufficient. When the system CQ ...

Commented [A250R249]: Agree

Commented [A251]: A quality improvement staff assigned or hired to manage the OHS adverse event ...

Commented [A252R251]: Agree

Commented [A253]: These tasks do not require a dedicated individual but can be completed in ...

| # | Action | Ref | | | Responsible | | Date | | |
|---|---|---|---|---|---|---|---|---|---|
| | inmates with chronic illness whose condition is affected by dietary conditions.  The dietician will also provide individual consultation and counseling for individuals who have serious medical needs affected by diet and require such analysis.<br>OHS to consult SIU or other entity to  develop process for dietary counseling | | | | | | | | |
| 36 | Consult with dDietician to will review prescribed medical diets as above and the overall nutritional content of the meals for non-medical diets.<br>OHS to consult SIU, or other entity, to develop process for dietary counseling | II.B.6.j | | | OHS Quality Control Coordinator, Deputy Chiefs, SIU, IDOC Chief Compliance Officer | | Dec-21December 23 | | |
| 37 | With the input of the Monitor, OHS will develop and implement performance and outcome measures.<br>A team comprised of the OHS QI Coordinator, Deputy Chief, SIU, Chief Compliance Officer audit team members, and data staff will identify and prioritize potential develop performance and outcome measures that measure IDOC's compliance with the Consent Decree based on OHS needs.  After defining outcome measures the team lead byThe data manager will query the EHR and/or develop other data collection instruments to collect data. | II.B.2, III.L.1 | | | Deputy Chiefs, Director of Nursing, OHS Quality Control Coordinator, OHS Medical Coordinator | | Sep-22January 2023 | | |
| 37.a. | The data manager will develop a dashboard to display monthly and annual performance and outcome measures by facility and in statewide aggregate.  This dashboard will be available, online, to all IDOC medical employees.  IDOC will develop a standardized mechanism to periodically monitor and analyze systemwide performance and outcome measures | II.B.2, III.L.1 | | | Data manager | | March 2023 | | |

Commented [A254]: This recommendation far exceeds the community standard. Not every diabetic seen in the community has the benefit of consultation with a dietician. Not every individual will require individual consultation. Information regarding healthy dietary habits will be provided to all individuals who require it

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of …

Commented [A256R255]: The Consent Decree requires "analysis of nutrition and timing of meals for diabetics and other class members whose serious medical needs warrant doing so".  This implies a general evaluation of meals for those with any chronic illness …

Commented [A256R255]: This recommendation far exceeds the community standard. Not every diabetic seen in the community has the benefit of consultation with a dietician. Not every individual will require individual consultation. Information regarding healthy …

Commented [A259]: September is almost here and these measures are not yet completed.

Commented [A260R259]: The Monitor was provided with performance and outcome measures on 7/11/22 and invited to meet with SIU to discuss further. To date no availability has been provided by the Monitor

Commented [A257]: The Consent Decree (II.B.7) requires performance and outcome measures.  The Monitor's opinion is that the purpose is to measure processes and outcomes of care that measure progress towards compliance with the Consent Decree.

Commented [A258R257]: The Monitor was provided with performance and outcome measures on 7/11/22 and invited to meet with SIU to discuss further. To date no availability has been provided by the Monitor

Commented [A261]: This task exceeds what is necessary in order to comply with the Decree and relies on outdate technology. The implementation plan may not impose additional obligations on the Department.

Commented [A262]: The purpose of the performance and outcome measures is movement toward compliance.  A dashboard serves that purpose by displaying monthly results so that facility quality programs, the vendor, and OHS can have goals towa…

Commented [A263R262]: Dashboards are old technology.  Real-time data is available using Business intelligence software.  Standardized reports should be created and made available to units.

| 38 | ~~With input from the Monitor,~~ OHS will develop comprehensive medical policies ~~with the assistance of the Monitor~~ to cover all aspects of a health care program. | II.B.8 | Establish a set of standardized operating **procedures to provide ongoing clinical direction to staff for the operation of a health care program in the correctional setting.** | | ~~Agency Medical Coordinator, Chief Compliance Officer~~ | ~~Sep-22~~ December 22 | | |
|---|---|---|---|---|---|---|---|---|
| | ~~Revised P~~olicies will reference existing, widely accepted, correctional health care accreditation standards such as those promulgated by the National Committee on Correctional Health (NCCHC) and the American Correctional Association (ACA). | | | | | | | |
| | 1. Hire project manager or other person solely assigned to manage policy development, ongoing review, and maintenance. (Agency Medical Director) Initiate 9/ 22; ongoing | | | | | | | |
| | 2. Establish an initial list of policies to be developed to address every provision in the Consent Decree as well as every NCCHC accreditation standard. (Project Manager) Completion 10/ 22 | | | | | | | |
| | 3. Establish, with the assistance of the Monitor, the essential elements and criteria that must be addressed in each policy on the list. (Project Manager and Agency Medical Director) Completion 11/22 | | | | | | | |
| | 4. Assign subject matter experts for each policy to be developed from amongst OHS leadership, regional staff, SIU, and vendor staff to draft the initial policy and to make revisions during the review process. (Initially Agency Medical Director or designee) Initiate 11/22 Completion 3/23 | | | | | | | |
| | 5. Establish a process, calendar, and timeframes for the IDOC and Monitor to review and comment on drafts through to finalization. Manage the development of draft policies through to finalization and provide monthly reporting to the Agency Medical Director, Chief Compliance Officer, and the Monitor on progress toward completion.(Project Manager) ) Initiate 11/22 Completion 3/23 | | | | | | | |
| | 6. Establish the document format for every policy. The document format requirements need to include development of a standardized procedure for implementation at the facility level, as well as the elements to be included in tools to evaluate compliance with policy and procedure. (Project Manager) 10/22 | | | | | | | |
| | 7. Identify policy subjects that would benefit from process mapping and arrange facilitation of these with SIU (Project Manager) 11/22 | | | | | | | |
| | 8. Evaluate whether additional resources are needed to implement each policy and procedure and secure the necessary equipment, supplies or personnel to do so. (Subject Matter Expert, Regional Coordinators). Initiate 1/23, Completion 4/23. | | | | | | | |
| | 9. Establish a plan to provide standardized training and centralized reporting of training completion and subject knowledge in the set of comprehensive medical policies and procedures. Plan is to include the initial training of existing staff, orientation of new staff, annual evaluation of staff knowledge and compliance with P & P, and the method to inform staff of revisions to P & Ps. (Project Manager, Training Manager) Initiate 11/22, Implement 4/23, Completion 6/23 | | | | | | | |
| | 10. Establish a methodology for the Agency Medical Director to consider requests for exceptions to specific requirements in policy and procedure and to document any approved deviations. The Agency Medical Director will solicit input from the Monitor in making these determinations. (Agency Medical Director and Project Manager) Initiate 1/23; Completion 6/23 | | | | | | | |
| | 11. Establish the timeframes and expectations for implementation of policies at the facility level. (Project Manager, Agency Medical Director) Initiate 1/23, Completion 6/23. | | | | | | | |
| | ~~2.~~ 12. Develop tools and methodology to measure conformance with each policy and procedure. (Audit Manager) Initiate 3/23, Completion 7/23 | | | | | | | |

**Commented [A264]:** This restates what Consent Decree says in II.B.8. (assistance).

**Commented [A265R264]:** IDOC has accepted ongoing assistance from the Monitor with respect to policies. Healthcare policies and being drafted and implemented. Policies will be provided to Monitor for feedback and can be discussed during monthly meetings between OHS and the Monitor

**Commented [A276]:** The Consent Decree requires IDOC develop a comprehensive set of policies. The Agency Medical Coordinator and Chief Compliance Officer have yet to finalize a single medical policy since monitoring began. It is obvious that they do not have the time or resources to complete the task. The Monitor's advice since the beginning is to devote a project manager to this task. If not a project manager then someone whose sole assignment is to manage the comprehensive set of medical policies including initial development, review and revision, training, and development of the audit tools to measure performance. Ultimately OHS will need to designate someone to manage the policy process, including …

**Commented [A277R276]:** IDOC has a correctional medicine expert physician who has been charged with drafting policies consistent with NCCHC and ACA.

**Commented [A266]:** Taken from II.B.8. and added to ensure that each policy is comprehensive and includes standardized procedures to be implemented at the …

**Commented [A267R266]:** Agree

**Commented [A278]:** Responsible parties are identified in parentheses at the end of each subtask as well as start and finish dates.

**Commented [A279R278]:** IDOC has an expert medical consultant to draft policies consistent with NCCHC and ACA standards and in consultation with …

**Commented [A268]:** The initial list will not be inclusive of all P & P that will need development but it will include all of the major topics. Once the initial set of …

**Commented [A269R268]:** Agree

**Commented [A270]:** The IDOC needs to establish, with the assistance of the Monitor, the fundamental points to be addressed in each policy to provide

**Commented [A271R270]:** Agree, except for the last sentence which is inconsistent with III.B.3 of the Decree which permits clinicians and reistered nurses …

**Commented [A274]:** This addition is necessary because it states the purpose of the specific policies to be developed. The focus here is on the *clinical* …

**Commented [A275R274]:** Disagree that this is necessary to comply with the Decree

**Commented [A272]:** Process mapping is a method used to design more complicated processes that have many contributing parts so that it can be described in …

**Commented [A273R272]:** Agree with definition

| # | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 39 | ~~Develop a policy for medical holds that ensures any patient with a medical hold will not be transferred without a review of the patient's medical needs by the treating facility by health care staff.~~<br>~~1. Develop a standardized procedure for Intrasystems transfer to maintain continuity of care~~<br>~~2. Provide guidelines and updated forms to document appointments and referrals~~<br>~~3. Develop procedures for sending facilities to identify and document referrals and other tasks not yet completed, medications, and updated problem lists prior to transfer.~~<br>~~4. Develop procedures for receiving facilities to include reconciliation of medications, prostheses and durable medical equipment, verification of transfer information and timely continuation of the plan of care.~~<br>~~5. Documentation of physician to physician handoff and nurse to nurse handoff~~<br>~~6. Coordinate transfers should rest with Regional Coordinators, Agency Director of Nursing, and Deputy Chiefs of Health for complex cases.~~<br>~~7.1.    Develop audit instrument and education to healthcare and operations staff~~ | III.D.1 and 2 | | | ~~Facility Medical Staff, Facility Security Staff~~ | ~~Aug-22~~ | | | **Commented [A280]:** We agree with the specifics that are called out as needed in a policy on Medical Holds and Transfers. However if the revisions to item 38 are accepted; then 39 is not necessary as a separate item in the implementation plan. It is a good example of work done in subtask 3 to identify the essential elements that must be covered in a particular policy. The assigned staff for this item are too generic but as is suggested in item 38, subtask 4, a subject matter expert should be identified, (in this example a Regional Coordinator would be a good subject matter expert) who would solicit input as necessary to draft the policy.<br><br>**Commented [A281R280]:** Agree |
| | **QUALITY IMPROVEMENT** | III.L.1 | | | | | | | |
| 40 | Fill IDOC Quality Improvement Coordinator position | ~~IV.A, II.B.2, II.B.3. , IV.A.2~~ | | | OHS and IDOC Human Resources | ~~Sep-22~~ January 2023 | | | **Commented [A282]:** This position has been vacant for several months and is an important position and should be filled soon.<br><br>**Commented [A283R282]:** Agree |
| 41 | **Develop Quality Improvement Partnership**<br>~~Develop a document that describes the detailed responsibilities of SIU with respect to the IDOC medical program including CQI.  Update this document whenever those responsibilities change.  To complete the quality improvement efforts initiated by UIC, IDOC has completed and formal agreement with Southern Illinois University School of Medicine to provide services related to the develop a comprehensive Quality Improvement Program.  Services may include the hiring of quality improvement specialists, audit team members, process engineers, data management and analytic staff, and assistance with the implementation of system-wide quality and safety training.~~ | III.L.1 | III.L.1 | OHS Quality ~~Control~~ Improvement Coordinator, Agency Medical Coordinator, Deputy Chiefs, Agency Medical Director, SIU, IDOC Chief Compliance Officer | Sep-18 | Ongoing | | | **Commented [A284]:** IDOC's initial contract with SIU does not define responsibilities of SIU's current role with respect to CQI.  Neither does the contract amendment.  The term "services may include…." Is vague and does not indicate what SIU will do.  A document describing SIU's full responsibility should be completed and made available.  Because SIU's responsibilities change over time, when those changes occur the change should require a revised document of responsibilities.  The Monitor agrees with SIU's participation but IDOC should be specific about what is being done.<br><br>**Commented [A285R284]:** IDOC has defined responsibilities in the quality manual.  However, this task is not necessary in order to comply with the Decree. The implementation plan may not create new obligations for IDOC.<br><br>The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation. |

| 42 | OHS and SIU, with the assistance of the Monitor will make changes to the existing quality improvement program to one that includes a principal goal of improving care in order to attain compliance with the requirements of the Consent Decree. The changes to the CQI program will be present in the CQI policy: 1. Review all relevant quality management documentation, including but not limited to, standard operating procedures, administrative directives 1. 2. IDOC will finalize Quality Improvement policy, and with assistance from SIU and the monitor develop a new continuous quality improvement manual from IDOC, and develop a training plan to be used for facility staff. Evaluate NCCHC Standards and the Consent Decree objectives as model and perform gap analysis Develop a written plan for the statewide CQI program, as evidenced in policy and procedure, that will utilize the audit function as the principal driver of identifying systemic and other deficiencies whose correction will result in forward progress toward compliance with the Consent Decree. The audit reports, adverse medical event reports, performance and outcome measures, and opportunities for improvement identified in mortality review also contribute to identification of deficiencies whose correction will contribute to forward progress towards compliance. 1. 2. Identify best practices and standards of care recommendations for inclusion in IDOC for updates to Administrative Directives 3. Create a centralized quality improvement dashboard 4.2. Identify best practices performance improvement methodology for continued process and healthcare outcome improvement 5.3. Develop ongoing quality management metrics and measurement instruments 6.4. Develop intervals for policy and metrics review, update, and approval 7.5. Identify pilot sites and appropriate staff for quality management test phase 8.6 Develop initial Compliance Survey Instrument See audit instrument below. 9.7 Disseminate and train staff on updated Administrative Directives See task 7 above | II.B.9., III.L.1 | To ensure that staff are properly trained an adequate CQI program is established | | | | Jun-23 | | |
| 42.a. | Develop an audit process 1) IDOC will use Consent Decree requirements, contemporary clinical nursing standards and physician clinical care standards (e.g. as in UpToDate) as a basis and, with the input and assistance of the Monitor, develop a medical and dental audit instrument. 2) IDOC will conduct an annual independent, onsite, comprehensive audit of each facility. The evaluation will cover all areas of the Consent Decree and include all aspects of clinical care. 3) Procedures for these audits will be developed with assistance of the Monitor to include development of a document list, data that will be evaluated, chart selection, interviews, touring with inspection, and a written report. 4) The audit team will train on audit methodology with Monitor on multiple site visits. 5) IDOC will ensure facilities cooperate and make staff available during audit visits. 6) Audit team will incorporate mortality reviews, performance and outcome dashboard results, adverse event reports, and any other audits into their annual evaluation. 7) A report will be delivered to the facility and system-wide quality committee and that committee will decide on corrective actions, if any, that the facility quality improvement program is to address. 8) The system-wide quality committee will develop a methodology to track | II.B.9. | | | | | | | |

Commented [A286]: This section on quality should
Commented [A287R286]: Agree
Commented [A288]: This phrase is lifted from the
Commented [A289R288]: Its inclusion is not imprope
Commented [A290]: The purpose of the manual is
Commented [A291R290]: Agree. The updated qual
Commented [A292]: The Consent Decree already
Commented [A293R292]: This is addressed in the
Commented [A294]: This is vague and should be
Commented [A295R294]: Agree
Commented [A296]: This is already present in task
Commented [A297R296]: Agree
Commented [A298]: Process improvement is
Commented [A299R298]: Agree that the language i
Commented [A300]: This is redundant of developme
Commented [A301]: This is misplaced in this quality
Commented [A302]: It is unclear what this task
Commented [A303R302]: No objection to the deletic
Commented [A304]: The development of the audit
Commented [A305R304]: Disagree as IDOC's
Commented [A306]: This is an item specifically calle
Commented [A307R306]: Audits are specified and a
Commented [A308]: The latest proposed audit
Commented [A309R308]: The audit process is
Commented [A310]: The Consent Decree requires
Commented [A311R310]: This is NOT required by th
Commented [A312]: The latest Implementation Plan
Commented [A313R312]: The QI program is
Commented [A314]: Procedures for audits should be
Commented [A315R314]: Agree
Commented [A316]: The Monitor and his consultant
Commented [A317R316]: Quality audits are
Commented [A318R316]: Monitoring does not mak
Commented [A319]: The Consent Decree specifical
Commented [A320R319]: Mortality reviews are don
Commented [A321]: Performance and outcome
Commented [A322R321]: Agree. Included in quality
Commented [A323]: Audits of facilities need to resul
Commented [A324R323]: Agree.
Commented [A325]: This is an appropriate action of
Commented [A326R325]: M and M outcomes shou

| # | Task | Provisions | | Responsible | Date | |
|---|---|---|---|---|---|---|
| | corrective actions. 9) IDOC will develop a methodology for referral to peer review for egregious practice issues. 10) IDOC will aggregate audit findings into vendor oversight as represented in an annual report of findings. | | | | | |
| 42.b. | Establish a systems leadership council that meets quarterly whose responsibilities include: 1) Direct CQI activities statewide; 2) Develop an annual quality improvement plan; 3) Meet quarterly and maintain minutes; 4) Review facility audits, performance and outcome measure dashboard, adverse event reports, mortality reviews, and other audits and evaluations and recommend corrective actions to individual facilities based on review of these audits. 5) Be responsible for attending an annual facility CQI meeting (this should be after the annual audit report) to summarize CQI findings with the facility and discuss corrective actions and approve facility annual CQI plan. 6) Standardize data for CQI reporting that facilities use. 7) Statewide CQI team will assign quality specialists to mentor facility CQI coordinators on corrective action assignments. | II.B.3., II.B.9., III.L.1., III.M.2, IV.A.2 | | | | |
| 43 | Identify quality management teams at each facility for targeted roll out (after pilot testing) IDOC will modify its CQI policy to change the current facility CQI programs to be more in line with Consent Decree requirements. 1. See task #4 above with respect to CQI coordinators. 2. Each facility CQI program will develop an annual CQI plan which is based on corrective actions related to its annual audit findings and findings on mortality reviews, summary adverse event reports, its summary of performance and outcome measures, and additional tasks deemed appropriate by the system leadership council. The annual plan will be approved by the Chief OHS and the system-wide CQI System Leadership council. Each facility CQI coordinator will receive appropriate training Institute for Healthcare Improvement (IHI) and/or six sigma training in addition to training provided by SIU. 3. The Quality Management Program will assign a statewide quality specialist to work with the facility CQI coordinator, HCUA, facility Medical Director and Director of Nursing in implementing corrective actions in their annual plan and for mentoring on quality efforts in general. IDOC will continue the practice of maintaining monthly CQI meeting minutes which will be assigned to the CQI coordinator and will be in a standardized format statewide. | II.B.3., II.B.9., III. L.1, IV.A.2 | | Agency Medical Director, Deputy Chiefs, SIU, OHS Quality Improvement Coordinator | Sep-22 Dec 22 | |
| 44 | Develop position descriptions for audit team members | II.B.9., III. L.1 | | SIU | Jun-21 | |
| 45 | Post position descriptions for audit team members | II. B.9., III. L.1 | | SIU | Mar-22 | |
| 46 | Hire Audit Team Members | II.B.9., II.B.2, II.B.3, III.A.2, IV.A.2 III.L.1 | | Agency Medical Director | Mar-22 | |
| | Audit teams will train with the Monitor and consultants in auditing three to four facilities. | II.B.3., II.B.9 | | Monitor and consultants and audit team | February 2023 | |
| 47 | Revise CMS 104 job description for Agency Quality Improvement Coordinator. This is also addressed in task #4. | III.L.1 II.B.2, II.B.3, III.A.2, IV.A.2 | | Agency Medical Director | Mar-22 | |

Commented [A327]: There should be follow up of assigned corrective actions.

Commented [A328R327]: SIU doing this.

Commented [A329]: In uncommon cases, corrective action may include referral of a physician to peer review. This is especially true for unqualified physicians. Audits, especially mortality review components of audits, can contribute to the review of physicians by the IDOC Medical Director's as required in Consent Decree provision III.A.3.

Commented [A330R329]:

Commented [A331]: IDOC conducts vendor oversight which is ineffective. The audit can significantly contribute to vendor oversight as required in II.B.2. of

Commented [A332R331]: Agree that audits can be

Commented [A333]: This annual report is not required

Commented [A334]: This was in the 5/31/22 IDOC

Commented [A335R334]: Agree

Commented [A336]: An annual plan summarizes

Commented [A337R336]: Agree

Commented [A338]: This is consistent with

Commented [A339R338]: Agree

Commented [A340]: Currently this is done by the

Commented [A341R340]: Agree

Commented [A342]: Currently reported data is not

Commented [A343R342]: Agree.

Commented [A344]: This is consistent with training

Commented [A345R344]: Agree

Commented [A346]: It isn't clear what is being rolled

Commented [A347R346]: Agree

Commented [A348]: This focuses on the Consent

Commented [A349R348]: The facilities should

Commented [A350R348]: The System Leadership

Commented [A351]: These can be on-line, easily

Commented [A352R351]: Agree with appropriately

Commented [A353]: This keeps the statewide CQI

Commented [A354R353]: Agree

Commented [A355]: Currently, terms are used in

Commented [A356R355]: Agree

Commented [A357]: Audits are the means to provide

Commented [A358R357]: The Decree does not

Commented [A359]: This date is given because an

Commented [A360R359]: An audit instrument has

| 48 | ~~Appoint facility quality improvement coordinators~~ This is redundant to task #4 above.  See our comments in that task. | III.L.1 | | | OHS Quality Control Coordinator, Deputy Chiefs, SIU | ~~Jun-2~~32 (or when healthcare staffing is at least 70%) | | |
| 49 | Train facility quality improvement coordinators A ~~Training~~ training will include quality improvement methodologies procedure with training curriculum will be developed and implemented for QI coordinators and facility leadership.  The initial focus of training will include initiating and implementing corrective actions based on deficiencies identified by the audit program.  Later training features can include methodologies to identify and report process deficiencies.  Other training can follow incrementally.  See task #44 item 3 above.  Training on patient ~~and~~ safety will initially focus on how to report and remediate adverse events.  Training will focus initially on falls, medication errors, polypharmacy, etc. The procedure and ~~using~~ curriculum will be developed by OHS/SIU using ~~or other~~ information from healthcare quality improvement entities, ~~or~~ correctional health accreditation  organizations, or academic centers. | II.B3; III.L.1, IV.A.2 | | | OHS Quality Control Coordinator, Deputy Chiefs, Agency Director of Nursing, SIU | ~~Jun-22~~ June 2023 | | |

**Commented [A361]:** Training should be incremental. Because audits reports will result in corrective actions, how to correct problems should be an initial focus. Patient safety initially should include encouragement to report and include how to remediate common adverse events such as falls and medication errors and polypharmacy. Additional training can be provided after initial training.

**Commented [A362R361]:** Agree

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 50.a. | Hire or contract for two process analysts to perform necessary process analysis as described below. | II.B.2, II.B.3, III.A.2, IV.A.2; III.L.1, III.M.2. | | Chief OHS, IDOC Human Resources or SIU | May 2023 | | |
| 50.b | Develop procedure for initiating a new process improvement analysis and effort when audits, mortality reviews, adverse event reporting, or performance and outcome data show a serious systemic problem that is a barrier to compliance with the Consent Decree or is a significant patient safety risk. | III.L.1 | | Agency Medical Director, Process Analysts | April 2023 | | |
| 50.c | Revise policy and procedure for completed process analysis when a revised process differs from existing policy. | II.B.8. | | Policy project manager, process analyst | At completion of process analysis | | |
| 50.d | When a process analysis is completed, the process analyst and Medical Coordinator determine any staffing, equipment, or space needs are required beyond existing capacity. Additional needs are forwarded to Chief OHS who will discuss with Executive Director and Budget Director. | II.B.2., II.B.3., IV.A.1, IV.A.2 | | Process Analyst, Medical Coordinator, Chief OHS, IDOC Executive Director and Budget Director | At completion of process analysis | | |
| 50 | Initiate process improvement projects by focusing on key problems related to Consent Decree: medication administration, sick call, improving access to specialty care, improving chronic care delivery. Process analysts will systematically map all steps and procedures of specified processes; analyze input, process, and output using root cause analysis; determine the desired output; make the process more efficient, with fewer errors, and in line with the movement towards compliance with the Consent Decree.<br><br>The process for specialty care should include:<br>1. Analysis of use of telemedicine and e-consult to improve access to specialists.<br>2. Analysis of whether additional equipment (telemedicine) or contracts (with university programs) might improve access to specialty care.<br>3. Analysis of primary care physicians referral patterns for specialty care and utilization of consultant services.<br>Analysis of receipt and timeliness of consultant reports, and whether facility providers reviewed the reports take appropriate action on those reports.<br>Analysis of scheduling and tracking of specialty care to ensure whether scheduling is timely. | III.A.10; III.F.1-2, II.B.2, II.B.3., IV.A.1., IV.A.2. | To improve medication delivery, sick call, chronic care, and reception center intake programs. | SIU, Agency Medical Director OHS Director of Nursing Qualified process analyst | Jun-23 2 | | |
| 51 | This The process improvement for sick call should will address:<br>1. Timely monitoring of access and id identification of barriers to access sick call. Establish standardized process to review and account for addressing access issues.<br>2. Identify inefficiencies in the sick call process and reassign work, revise procedures, or obtain staffing necessary for timely and responsive responses to sick call requests.<br>3. Define and establish the resources necessary to p Promptly achieving a face-to-face encounter with a registered nurse.<br>4. Identify the m Methods and practices needed to fully address patient requests including the how to document the patient's presenting complaint in their own words, including those with multiple requests.<br>5. Review and updates to Revise the use of nursing protocols to include limitations on their use with patients who require close clinician monitoring, elimination of the protocol for Non-Specific Discomfort and design a process for the periodic review and revision of treatment protocols based upon CQI, performance and audit data.<br>1. Review and updates to nursing protocols | II. B.1; II.B.6.f.; III. A. 10; III. F. 2 | | SIU process improvement project leader, Agency Medical Director OHS Director of Nursing<br><br>Additional data collection and analysis resources from SIU, consulting expertise in nursing sick call, | Jun-23 2 | | |

Commented [A363]: Correcting problems is a key feature of the Quality Improvement program. The Implementation Plan (IV.A., IV.A.1-2) requires developing projects that fulfill requirements of the Consent Decree. When a systemic problem exists IDOC as identified in one of the quality efforts, IDOC will need to analyze and fix the systemic problem. IDOC does not now have the ability to perform process analysis. The Monitor recommends hiring these staff and that one of these be a systems engineer and the other a process analyst.

Commented [A364R363]: Process improvement specialists are included in the SIU team. The group is scalable depending on the need. But otherwise agree

Commented [A365]: It may be easier for SIU to hire these positions than IDOC human resources because the position description probably doesn't exist within IDOC and to get a new IDOC position description could take an extended period of time.

Commented [A366R365]: Agree

Commented [A368R367]: Audits and other measurements will identify additional systemic deficiencies. There needs to be a way to correct systemic deficiencies.

Commented [A368R367]: Agree

Commented [A369]: By design, a process analysis can result in a changed process. When this occurs an existing policy or procedure may need to be adjusted.

Commented [A370R369]: Agree

Commented [A371]: A changed process may result in a need for additional or less staffing, additional

Commented [A372R371]: Agree, other staff many b...

Commented [A379]: Unclear who SIU represents bu...

Commented [A380R379]: SIU has a process analyst.

Commented [A373]: This provides more detail with...

Commented [A374R373]: Agree. SIU has experts i...

Commented [A381]: These analyses need to be

Commented [A382R381]: Not clear what the Monito...

Commented [A375]: Many consultations do not

Commented [A376]: Tracking of scheduling is often

Commented [A377R376]: Agree that scheduling

Commented [A378R376]: Unclear as to which chart...

Commented [A383]: The Monitor supports the use o...

Commented [A384R383]: Agree

Commented [A385]: vague

Commented [A386]: vague

Commented [A391]: SIU needs to appoint a dedica...

Commented [A392R391]: IDOC agrees that qualifie...

| | | | | | | |
|---|---|---|---|---|---|---|
| | 5. A review of how patients' requests are documented in the health record.<br>6. Establish a methodology to train registered nurses in the use of treatment protocols and practice clinical judgement with supervision until initial competency is established and the methods to dDetermining Determining the continuing competency of nurses assigned to sick call.<br>7. Establishing tools to monitor performance and quality of sick call.<br>7.8. The results of the process improvement project will be revised policy and procedure for sick call, clear definitions of the staffing and resource requirements needed to conduct sick call, training and supervision of nurses to ensure appropriate clinical assessment and decision making using the nursing protocols, limiting the use of protocols in patient populations requiring monitoring by clinicians, and audit methods to monitor and account for compliance with the Consent Decree, procedures and protocol | | | nursing treatment protocols and evaluation of nursing competency. | | |
| 52 | OHS will reference correctional accreditation standards and best practices such as those provided by NCCHC, ACA, and the Federal Bureau of Prisons (FBOP).  Revisions to chronic clinic practice will also reference evidenced based clinical guidelines.<br>This process improvement for chronic care should address:<br>1. Ensuring that chronic problems  are accurately entered into the medical record problem list by providers.<br>2. Developing of a chronic care roster to track persons with chronic illness.<br>3. Seeing patients for all of their chronic illnesses in a single clinic and addressing all chronic conditions at every clinic.<br>4. Ensuring that adequate history is taken and analysis of why adequate histories are not currently obtained.<br>5. Ensuring that there is an assessment and therapeutic plan for each problem.<br>6. Clinic scheduling will be based on patient's degree of control.<br>7. Ensuring appropriate and timely referral to specialists when management exceeds the experience or knowledge of the provider  and that follow up appointments with specialists are scheduled  and timely.<br>8. That immunizations are routinely tracked updated with use of a reliable immunization tracking mechanism (e.g. I-CARE).<br>That a therapeutic dental plan is made at the conclusion of the intake dental examination.<br>That dental x-rays are digitalized and organized in a picture archiving and communication system (PACS).<br>2. 11. That laboratory tests are documented as reviewed and are ordered when indicated by the patient's condition or as directed by Disease Management Guidelines.<br>12. Provide staff training Ensure that clinical care follows national standards.<br>3. 13. Make access to UpToDate available in all clinic examination rooms.<br>4. 14. Implement recommendations for enhanced Ensure ability of providers to evaluate  medication compliance and current medications at chronic care visits.  administration.<br>15. Make chronic clinic documentation more efficient and supportive of preventive measures (vaccinations, cancer screening, etc.) with implementation of the EHR. Integrate solutions and work flows with EHR<br>5. 16. Intake assessment to conclude with an initial assessment and therapeutic plan for all chronic illnesses. | II.B.1., II.B.6.c | | OHS Quality Control Coordinator , Agency Medical Coordinator, Agency Director of Nursing, Deputy Chiefs, Agency Medical Director, SIU | Dec-22 | |

Commented [A387]: Should include licensed nurses
Commented [A388]: This is vague
Commented [A393]: This recommendation is unclear
Commented [A389]: Policy will be rewritten consiste
Commented [A390]: OHS is not clear on this task
Commented [A394]: The following are tasks
Commented [A395]: The Monitor agrees with this
Commented [A396]: The Monitor agrees with this
Commented [A397]: The Monitor agrees with this
Commented [A398]: This task is not appropriate
Commented [A400R399]: Disagree with this additio
Commented [A401]: Therapeutic plans for each of th
Commented [A402R401]: Not clear on how the
Commented [A403]: The Monitor agrees with this
Commented [A404]: The Monitor agrees with this
Commented [A405]: IDOC lacks a mechanism to tra
Commented [A406R405]: The use of such tracking
Commented [A407]: Dentists should develop a plan
Commented [A408R407]: Agree
Commented [A409]: This exceeds the community
Commented [A410]: With the advent of the electron
Commented [A411R410]: Agree but digital xrays ar
Commented [A412]: This task is not necessary to
Commented [A413]: The process of ordering,
Commented [A414R413]: Agree
Commented [A415]: Rather than developing IDOC-
Commented [A416R415]: Agree when appropriate
Commented [A417]: This valuable resource should
Commented [A418R417]: Not every community
Commented [A419]: Evaluation of medication
Commented [A420R419]: Agree.
Commented [A421]: The design of EMR screens, if
Commented [A422R421]: Agree
Commented [A423]: The initial intake orders all
Commented [A424R423]: Agree
Commented [A425]: All chronic care visits should
Commented [A426R425]: Agree.
Commented [A427R425]: Sometimes the therapeut

| # | Process | Ref | | Responsible | Date | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 53 | The process improvement for medication administration management should will address:<br>1. The use of two-part patient identification with the medication administration record.<br>2. Accurate and timely transcription of [medication administration record]The use of a pharmacy generated label to be placed on the MAR after the script has been profiled by the pharmacist and elimination of hand written orders transcribed onto the MAR.<br>3. Documenting the medication administration record at the time medication is administered.<br>Administration of medication directly from pharmacy-dispensed, patient-specific unit dose containers.<br>4. Development of workflows for medications which are issued to patients to self-administer (KOP) and those administered to patients by a nurse (DOT) to be finalized in standardized statewide policy and procedure.<br>4.5. Elimination of medication discontinuity that occurs as a result of the non-formulary request and prescription renewal processes.<br>5.6. Pharmacy initiated consultation with providers regarding polypharmacy and prescribing patterns.<br>6.7. Expanded use of pharmacists to work with providers in managing chronic conditions, as is done now in the HIV clinic medication . | III.M.1.a, b and c II.A, II. B. 1, II.B.6.c. | | OHS Quality Control Coordinator, SIU Director of Pharmacy Standards & Operations, Deputy Chiefs,& Agency Director of Nursing , SIU | Sep 2223 | | | | |
| 54 | OHS will ensure all routine health maintenance/cancer screenings and adult immunizations, and cancer screenings as respectively recommended by USPSTF (A and B recommendations) and CDC and USPSTF (A and B recommendations) are being offered tofor all at risk patients<br>1. Train healthcare staff on new immunizations and cancer screening policies.<br>2. Develop or implement an interval immunization and cancer screening tracking solution until EHR implementation as described above in task 27.<br>3. Develop mechanism to audit compliance with immunization and cancer screening policies<br>4. Evaluate facilities to determine readiness (equipment, supplies, and staff) to complete cancer screenings.<br>5. OHS will identify the health care staff personnel responsible for screenings.<br>6. OHS will identify barriers to obtaining appointments for offsite screening.<br>7. OHS will establish a method of documenting screenings and immunizations in the medical Record<br>8. OHS will direct all facilities to report routine health maintenance/cancer screenings and adult immunizations data to monthly facility QI meetings and system Quality Council meetings as detailed above in tasks 26 and 27Record. | II.B.1.; II.B.2.; III.J.1 | | Agency Medical Director, IDOC Infectious Disease Coordinator, OHS DON | Nov 2022 | Feb 2023Jun 22 | | | |
| 55 | Replace tuberculosis skin testing (TST) with Interferon-Gamma Release Assays (IGRA) blood testing.<br>1. A trial initiated October 2021 is currently in place at all IDOC R&C facilities using an updated IGRA test with UIC laboratory services provide through the current vendor (Wexford health services). The results of the trial will be evaluated with expansion to the remaining IDOC facilities.IDOC replaced tuberculosis skin testing with updated IGRA blood testing at R & C facilities as of October 0221.<br>2. Establish written guidance for initial and subsequent screening for tuberculosis infection including the frequency, methods, timeframes, responsible parties, and reporting.<br>3. Establish a plan and implement finalized program which replaces TST with IGRA screening for tuberculosis infection statewide.<br>1. Use reporting metrics to monitor progress with implementation and to evaluate the effectiveness of the tuberculosis screening program. | II.B. 3; III.C.1 & 3; III.E.1 | | UIC lab, Agency Infectious Disease Coordinator, Agency Medical Director, Deputy Chiefs, Agency Medical Coordinator, Quality Improvement Coordinator, Infectious Disease Coordinator | Oct 2021 | Apr 2023JunApril23-22 | | | |

**Comments:**

Commented [A428]: The Monitor agrees with the focus and aim of this process improvement project. The change from medication administration to medication management and the Consent Decree numbers are made because subitems 1-7 address the broader subject of improving the effectiveness and safety of treatment with prescribed medications that is called for in II.A. and II. B of the Consent Decree.

Commented [A439]: 9/23 was the completion date used by Defendants in the May 22 draft plan. It is a more realistic date than the one in this draft from 12/21.

Commented [A440R439]: changed

Commented [A429]: This change and the addition of subitem 5 incorporate items from Defendants May 22 draft implementation plan that were more descriptive of changes to be made. See the last paragraph of the narrative on the electronic record and items 7 and 97 of the May 22 draft plan.

Commented [A431]: Transcription of orders onto the MAR is an enormously unsafe practice and also is wasteful of nursing time (when there are not enough filled nurse positions). The goal here is to eliminate handwriting on the MAR with the occasional exception of a 1st dose that can not wait until the pharmacy can fill and deliver ordered medication. This replaces IDOCs task that transcription is accurate and timely because accurate handwritten transcription of orders is an unrealistic, outmoded and dangerous practice and needs to be eliminated.

Commented [A432R431]: Medication dispensing should be done by a med aide whenever possible, to ...

Commented [A437]: This change is to acknowledge the recent addition of this position to the SIU ...

Commented [A438R437]: Agree

Commented [A433]: The ability to dispense stock meds is important and the existence of a stock med ...

Commented [A434R433]: This is not an obligation outlined in the Decree. The implementation plan may ...

Commented [A435]: This comes from a task in IDOCs May version of the implementation plan concerning th ...

Commented [A436R435]: Agree

Commented [A441]: II.B.2 requires that adequate monitoring of health care be accomplished. IDOC ...

Commented [A442R441]: Agree that we need reports but moving away from the dashboard concept.

Commented [A443]: Additions to this task are to identify the steps necessary to move from the trial to ...

Commented [A444R443]: Agree

Commented [A445]: This change simply identifies who is involved in this project more precisely.

Commented [A446R445]: Agree

| # | Task | Ref | | | Responsible | Start | Target/Status | % | Date |
|---|------|-----|---|---|-------------|-------|---------------|---|------|
| 56 | ~~Develop procedures to ensure medical record contains a problem list along with clinically appropriate diagnostic and therapeutic plans 1. Inventory of chronic and acute illnesses and dental conditions listed on a problem list shall be completed by providers. 2. Providers shall work to obtain an adequate medical history regarding chronic problems and complications including hospitalizations. 3. For each condition there should be an assessment describing the status of the patient's condition with a therapeutic plan. The dental assessment should include a therapeutic plan which is scheduled for the patient. 4. Appointments should be made for any recommended follow-up and treatment. 5. Prior records should be requested when relevant to the evaluation of the patient's current condition.6. Results of lab tests must be available for the provider to review and create a treatment plan 7. An immunization history should be taken during medical reception and recommended vaccines provided. I-CARE should be utilized for this purpose to determine current status. 8. A therapeutic plan for dental care should be documented at the conclusion of the intake dental exam and made to begin any recommended dental treatment. 9. Dental x-rays should be digital and entered into a picture archiving and communication system (PACS) to ensure x-rays are available statewide when the EHR is fully implemented.~~ Combined with task # 52 above | | | | Deputy Chiefs, Agency Medical Coordinator, Quality Improvement Coordinator | | Sep-22 | | |
| 57 | Increase access to HCV treatment<br>1] Revise the ~~OHS revised~~ the Hepatitis C treatment protocol following consultation with the monitors and the UIC Hepatitis C Telemedicine Clinic. **~~Revised policy changes include removing the opt out option for Hep C screening, all positives are referred for fibroscan, and all Hep C patients are referred to UIC for evaluation regardless of fibroscan results. The process of referral to Wexford physician~~** ~~for approval was also removed.~~ | II.B.6.f. and g.; III.I..2. | | | Agency Medical Director, IDOC Infectious Disease Coordinator | ~~Mar-2021~~ | ~~Ongoing~~ | 100% | Mar-2022 |
| | **2.Disseminate, educate, and implement the revised Hepatitis C Treatment guidelines at all IDOC facilities.** | II.B.6.f. and g. | | | | Jun-2021 | Mar-2023 for all facilities and thereafter Ongoing | 50% | |
| | **3. Standardize Hepatitis C Clinic monthly facility reporting tables to include a.total HC patients,b. # pts on treatment, c.# pts refused tx, d. # awaiting tx, e.# ineligible for tx. and report HC clinic data to facilities' monthly QI meetings.** | II.B.2 | | | | Nov-2022 | Mar-2023 | 50% | |
| | **4.Review and tabulate on a quarterly basis the UIC HCV telehealth's spread sheet of IDOC HC patients started on treatment. Based on this data identify facilities that are not expeditiously referring active HC patients for treatment.** | II.B.1, II.B.2, II.B.6.f and g | | | | Jan-22 | Mar-2023 and Ongoing | 50% | |
| 58 | Increase access to HCV treatment for individuals with F0 and F1 fibrosis levels | II.B.2; II.B.3; III.B.1-2; III.F.1; III.I.5; III.J.2-3 II.B.6,g. | | | Agency Medical Director, IDOC Infectious Disease Coordinator | Jun 2022 | Mar-23 for all facilities thereafter Ongoing | | |
| 59 | ~~Update job description (CMS-104) for Environmental Services Coordinator~~ | ~~II.B.2; II.B.3; III.B.1-2; III.F.1; III.I.5; III.J.2-3~~ | | | ~~Agency Medical Director or Designee~~ | ~~Feb-22~~ Dec 22 | | | |

Commented [A447]: II.B.6.f. and g. state "IDOC agrees to implement changes in the following areas; f. chronic care and g. timely access to diagnostic services and specialty care " The HCV treatment guidelines were revised to improve access to treatment at UIC HCV telehealth specialty clinic for IDOC patients with active HC. The revisions were made with collaboration between UIC telehealth, OHS, and the Monitor. From 2017 -2021 liver cancer was the 2nd leading cause of cancer death in the IDOC. Many of these deaths could have been prevented with timely treatment of underlying active HC.

Commented [A448R447]: Agree with update HCV DMG and HCV screening for all at intake.

Commented [A449]: II.B.2 states "IDOC shall require ...the monitoring of health care by collecting and analyzing data to determine how well the system is providing care."The existing methodology for reporting each facility's HC clinic patients lacks standardization. This is a barrier to identifying the actual volume of HC patients who are on treatment, have been treated, have refused treatment, are inelligible for treatment. It is currently impossible to accurately identify the # of untreated patients with active HC. Some facilities do not report any HC clinic data; some do not report all key data. It is important to know how many untreated HC patients are in the IDOC.

Commented [A450R449]: Agree that it is important to know these stats, but it is not for the facility QI program to look at. More appropriate for a statewide infection control committee to follow.

Commented [A451]: II.B.6.f and g. state "IDOC agrees to implement changes in ..... f. "chronic care" and g. "timely access to diagnostic services and appropriate specialty care." Based on data provided by UIC there is a wide facility-to-facility variation in the # of HC patients who have received treatment. A number of large facilities with significant volume of active HC patients have referred few if any patients to UIC

Commented [A452R451]: An audit to look at referral rates seems more straightforward and simple.

Commented [A453R451]: Treatment rates may not equate referral rates. If one facility tends to have younger patients (as many minimum security places do), it may have fewer treated, either because their fibrosis is less prominent or because they are going t...

Commented [A454]: The revised March 2021 allow IDOC to refer all active HC patients at all levels of liver fibrosis (F0 to F-4) to the UIC Hepatitis Telehealth clinic.
IDOC must monitor facilities with low referral rates to...

Commented [A455R454]: Agree

Commented [A456]: These are eliminated as tasks since they are merely the steps to achieve task 61. They may be listed as subtasks if IDOC wishes. However both completion dates are past and the Monitor has received no information that indicate the...

Commented [A457R456]: Agree

| 60 | Post position for Environmental Service Coordinator | II.B.2; II.B.3; III.F.1; III.I.5; III.J.2-3 | | OHS and Human Resources | Jan 23Mar-22 | | |
| 61 | Hire Environmental Services Coordinator responsible for ensuring the adequacy and functionality of clinical space and sanitation to deliver adequate health care and ensure patient safety. These responsibilities also include establishing policies, practices, and procedures to identify inmate illness or injury potentially related to environmental factors. The Environmental Services Coordinator develops oversight and reporting systems to identify deficiencies in clinical space and equipment as well as environmental conditions that need correction at the facility as well as identification of systemic issues that are directed to the patient safety and quality improvement committees for review and action. Hire Environmental Services Coordinator | II.B.2; II.B.3; II.B.6.k; II.B.6.p; III.B.1-2; III.C.2; III.F.1; III.I.5; III.J.2-III.J.3; III.K. 4-5; III.K.13III.J.3 | | Agency Medical Director, IDOC Human Relations | Sept 23Sep-22 | | |
| | Develop a standardized safety and sanitation policy detailing procedures for cleaning and sanitizing medical areas and identifying a responsible party at each facility. The policy will also outline necessary training, supplies and equipment to be used. Policy details will address security issues such as lockdowns and safeguarding areas containing medical supplies. *See item 38 for additional steps to be taken in developing and implementing the safety and sanitation policy.* | II.A; III.I.5; III.K. 4 | | Environmental Services Coordinator, Infection Control Coordinator | March-23 | | |
| 62 | Develop safety and sanitation audit-instrument inspection tool that includes surveys of all clinical spaces, equipment, supplies, etc. 1. Test safety and sanitation inspection tool with Monitors at multiple sites to ensure adequacy of the tool. 2. Establish the frequency and calendar for an facility safety and sanitation inspections of all clinical spaces, equipment supplies, etc. 3. Identify who is responsible for performing safety and sanitation inspections and train them to produce reliable results. 4. Audit the reliability of safety and sanitation inspections. OHS will develop a standardized safety and sanitation policy detailing procedures for cleaning and sanitizing medical areas and identifying a responsible party at each facility. The policy will also outline necessary training, supplies and equipment to be used. Policy details will address security issues such as lockdowns and safeguarding areas containing medical supplies | III.J.3.; III.K.13 | | Agency Medical Director, Deputy Chiefs, Partner Organization or AgencyEnvironmental Services Coordinator | Aug-Feb 2322Dec-22 | | |
| | Implement periodic safety and sanitation inspections, using the validated inspection tool, to evaluate the presence, condition, and functionality of clinical space and equipment with a standardized process for reporting results. 1. Establish a method to prioritize the repair or replacement of identified deficiencies that prevent disease or injury. 2. Report the results of safety and sanitation inspections to the responsible party at the facility for corrective action and follow up. 3. Track the progress of corrective action to the OHS Audit Committee. 4. Analyze results of safety and sanitation inspections to identify systemic issues concerning patient safety or that impede the delivery of timely, adequate health care. Report these results to the SLC via the patient safety or audit functions with necessary further action identified. | II.B.6.k; II.B.6.p; III.B.1-2; III.C.2; III.F.1; III.I.5; III.J.2-III.J.3; III.K. 4-5; III.K.13 | | Environmental Services Coordinator; appropriate facility staff | Dec-22 | | |

Commented [A458]: These additions are to define the role of Environmental Services within OHS and IDOC. The Monitor has identified environmental conditions that contribute to injury and illness that are preventable and need to be addressed to prevent harm to the health of incarcerated persons. An example are the multiple falls resulting in fractures or other impairment among frail and elderly patients brought forth as a particular area of concern in the 5th Report, page 112. NCCHC B-04 has a new standard that requires a program of medical surveillance of inmate workers. Policies, procedures and practices necessary to meet this accreditation standard should be assigned to the Environmental Services Coordinator.

Commented [A459R458]: Agree.

Commented [A460]: These are all items in the Consent Decree that relate to Environmental Safety and Sanitation. Steps necessary to comply with these areas of the Decree would logically be the responsibility of the Environmental Services Program which is part of OHS.

Commented [A461R460]: Agree.

Commented [A462]: This task, to develop a policy on safety and sanitation, was originally listed in task 62 which is limited to the development of an audit instrument. This revision simply establishes policy making as a separate step from development of a inspection tool. It is necessary to add since III.I.5 specifically calls for sufficient and *properly* sanitized ...

Commented [A463R462]: Agree.

Commented [A464]: The Defendants draft implementation plan from May had a number of ...

Commented [A465R464]: The Decree does not require IDOC to test its policies/tools with the Monitor

Commented [A470]: III.K.13 explicitly calls for an annual survey of dental equipment. It is added here ...

Commented [A471R470]: Agree

Commented [A466]: This was task 63 and has simply been moved as a subtask of 62. Additional subtasks ...

Commented [A467]: The Decree does not require IDOC to test every tool with the Monitor

Commented [A468]: Specific staff should be identified to do the safety & sanitation inspection and then ...

Commented [A469R468]: Agree.

Commented [A472]: This task is added to *implement* the S & S inspection that is developed in task 62. Th ...

Commented [A473R472]: Agree

Commented [A475]: These are all items in the Consent Decree that concern having adequate clinica ...

Commented [A476R475]: Agree

Commented [A474]: Unclear which committee this refers to

| 63 | ~~Test safety and sanitation audit with Monitors at multiple sites to ensure adequacy of the audit.~~ | II.B.1. | ~~Establish needs of elderly population to ensure that necessary access to services is available system wide~~ | | | ~~Dec-22~~ | | |
|---|---|---|---|---|---|---|---|---|
| | **ANALYSIS OF AGED AND INFIRM** | | | | | | | |
| 64 | Identify and hire qualified consultant to survey the medical needs for ~~the elderly/ and~~ infirmed/disabled persons incarcerated in the IDOC. <br> 1. Determine the data that is appropriate to describing the needs of this population. ~~Nov-22~~ <br> 2. Define scope of review to include 1) determining the population of persons with dementia, memory impairment, aged and in need of supportive housing, severe medical infirmities and disabilities requiring specialized medical housing; 2) describing and quantifying existing services, clinical care, and housing for this population and its appropriateness; 3) providing recommendations and options for adequately addressing needs of this population.  Nov-22 <br> ~~1.~~  3. Determine parties responsible for participation in the project  and set dates and expectations for work product. Dec-22 | II.A; II.B.1-3 | Establish needs of elderly/infirm/ disabled population to ensure that necessary access to services is available system wide | | | ~~Consultant with custody Deputy and selected Wardens identified by IDOC, Regional nurses~~Agency Medical Director or Deputy. | ~~JunOct-22~~December 23 | | |
| 65 | Identify existing IDOC levels of care with corresponding housing and programming arrangements for the aged, infirm and disabled. <br> 1. This includes r~~R~~eview of existing  medical classification system for housing the elderly/ ~~and infirmed/~~disabled. <br> ~~Identify a range of elderly/infirm/disabled populations by functional status within each living arrangement.  For example, general population, protected housing, infirmary, etc. The type of facility (minimum, medium, and maximum security) is to be identified.~~ <br> ~~Describe existing practices to prepare for early parole release of the elderly/infirm/disabled and any expansions of such under the Joe Coleman Medical Disability Act.~~ <br> 2. Identify community resources available to elderly/infirm/disabled incarcerated population, identifying Medicaid available resources and nursing home options for care at the end-stage of life. | | | Elderly/Infirm/Disabled Consultant with Regional Nurses, IDOC custody Deputy and selected Wardens | | | ~~JunOct-22~~ | ~~SepJan-232-22~~ | |
| 66 | Assess medical needs of elderly and infirmed. <br> 1. Convene a focus group of elderly/infirm/disabled persons to identify issues with housing and programming unique to this population and their need for care. <br> 2. Determine process to survey elderly/infirm/disabled persons. Interviews using telemedicine may be an option. This may require sample sized population depending on numbers. <br> 3. Survey to include level of care needed, cognitive survey Montreal Cognitive Assessment (MOCA or other similar survey instrument), clinical risk assessment, intensity of nursing care needed, functional capacity, proximity of facility to specialty services, need for specialty services. <br> 4. Consultation with a survey research group may be indicated. <br> ~~1.~~  5. Perform record reviews of people surveyed.  This may be a sample population of persons in various categories of nursing need and functional status.  Record review is to determine medical needs, number and types of medications, need for specialty care, accommodations provided or needed, and need for nursing care. | | | Elderly/Infirm/Disabled Consultant | | | ~~Oct-22~~Nov- 23 | | |

**Comments:**

Commented [A477]: Qualifications of a consultant for this task include: knowledge of the needs of the elderly/infirm/disabled and their changing abilities with regard to self care and carrying out activities of daily living as they age, knowledge of survey and assessment tools used to determine the needs and abilities of elderly/infirm/disabled persons, experience

Commented [A478R477]: IDOC agrees that meeting the needs of the elderly population may require a varied approach. However, the Decree creates no

Commented [A479]: IDOC's narrative to the implementation plan states that the survey is to develop action steps to provide appropriate resource

Commented [A480R479]: The purpose of the Decree is to ensure that IDOC meets the medical and dental needs of the class. Programming and housing (not

Commented [A483]: OHS is responsible for identifying a consultant with appropriate qualifications to conduct the survey. The consultant cannot hire themselves.

Commented [A484R483]: IDOC agrees that meeting the needs of the elderly population may require a varied approach. However, the Decree creates no

Commented [A481]: These additional tasks (subitems 1-3) are necessary to define the scope of work expected of the consultant in completing the task.

Commented [A482R481]: IDOC agrees that meeting the needs of the elderly population may require a varied approach. However, the Decree creates no

Commented [A485]: Subitems 1-4 are additions from the January example plan. They are necessary to understand how elderly/infirm/disabled individuals are

Commented [A486R485]: IDOC agrees that meeting the needs of the elderly population may require a varied approach. However, the Decree creates no

Commented [A487]: Not within the scope of the Decree

Commented [A488]: To be consistent with the narrative we understand that this includes obtaining information sufficient to identify resources,

Commented [A489R488]: IDOC agrees that meeting the needs of the elderly population may require a varied approach. However, the Decree creates no

Commented [A490]: Items 1-5 are additions from the January example plan and are consistent with IV.A. 1-2 of the Consent Decree to define specific tasks,

Commented [A491R490]: Agree to assess elderly, and infirmed patients to ensure medical and dental needs are being met. Agree that 1-5 provide good

Commented [A492]: It makes more sense to hire an expert in the functionality needed for a nursing home, a SNIF, a cognitive care facility, etc.  It would be a slow

Commented [A493R492]: Agree to assess elderly, and infirmed patients to ensure medical and dental needs are being met. Hiring an expert  is not

| # | Description | | Responsible | Date | | |
|---|---|---|---|---|---|---|
| 67 | ~~Survey~~ Convene a focus group of ~~facility~~ ~~medical~~ staff to better understand medical needs for the elderly and infirmed. | | ~~OHS Leadership, Vendor and~~ Elderly/Infirm/Disabled Consultant | ~~Oct~~Nov-23~~2~~ | | |
| 68 | Review selection of elderly ~~and~~ infirm/disabled deaths over past year in order to make recommendations for improved medical care. | | Elderly/Infirm Consultant | ~~Oct-22~~Jan-23 | | |
| 69 | Based on surveys and data reviewed, complete a report of the elderly ~~and~~/ infirm/disabled population to describe in various functional status cohorts the medical beds or special housing arrangements available for this population ~~as well as the need~~ for these based upon : length of sentence, medical risks and conditions, nursing needs, functional capacity and disabilities, and need for specialty care of each group. ~~Patterns of civilian care are to be used as a template to describe levels of care for a similar but incarcerated population. These are routine medical care, home nurse visit care, adult day care, elderly housing without assistance, assisted living, nursing home, skilled nursing home, and hospice. Develop housing and programming options for each group.~~ | | Elderly/Infirm Consultant, ~~Chief OHS, Custody Deputy~~ with selected Wardens chosen by IDOC | Feb-24~~3~~ | | |
| 70 | Provide ~~medical~~ recommendations to address deficiencies identified in the study that impact the health and physical safety of the elderly ~~and~~/infirmed/disabled to include options for ~~addressing deficiencies in housing these populations and support for each level of care. Develop recommendations for modifications to housing and classification system for elderly/infirm/disabled population to ensure match of housing to functional need. These recommendations may include identification of new or renovated housing for this population. Provide housing recommendations to the Physical Plant Consultant to incorporate into the evaluation of space. Identify and develop additional resources to address needs for equipment, training, specialty consultation in the care of the elderly/infirm/disabled, and at the end-of-life (i.e. geriatrics, guardianship, dementia, medication management, rehabilitation, and activities of daily living). Work with Re-Entry Services and Parole Board to develop process to identify eligible persons and make requests for early medical release. Identify, develop, and implement a plan or policy and standardized procedures to address each recommendation. Develop interim processes for housing until capital improvements occur. Engage CDB in steps necessary to obtain approval and funding for necessary modifications. (IDOC Capital Projects) Initiate Aug-23; Complete July-25~~ . | | Elderly/Infirm Consultant, Deputy Chief OHS with custody Deputy, Physical Plant Consultant. Subtask 6. IDOC Capital Projects | Jun-24~~3~~ | | |
| 71 | ~~Assess infirmary needs including number of infirmary beds per facility~~ | II.B.6.k; II.B.6.p; III.I.1-5 | Consultant, Deputy Chiefs, Agency Director of Nursing and Regional Nurses | Jun-23 | | |

Comments:

**Commented [A494]:** The IDOC used a survey to assess the medication administration system and six months later has yet to provide any meaningful results. The use of a focus group is less time consuming and cumbersome and will provide more comprehensive identification of issues faced by the IDOC system in meeting the needs of this population.

**Commented [A495R494]:** A consultant is not constitutionally required for this task. Additionally, IDOC should be able to dictate how the task is accomplished re: use of a survey

**Commented [A496]:** The purpose of hiring a consultant is precisely to conduct a survey that includes this focus group of medical staff. OHS Leadership and Vendor may participate in the selection of participants and arrangements to conduct the focus group but they do not have primary responsibility for conducting it, the consultant does. OHS Leadership …

**Commented [A497R496]:** IDOC disagrees that a consultant is necessary to meet our obligations under the Decree.

**Commented [A498]:** The purpose of the study is to identify what exists for the care of this population and also *what else is needed* to provide adequate health …

**Commented [A499R498]:** Given the vast differences between civilian care and incarcerated care, civilian care is not an appropriate template. Additionally this …

**Commented [A501]:** The consultant is the person responsible for completing the report. Additions to the task are to provide more specific detail about how the …

**Commented [A502R501]:** A consultant is not necessary to meet our obligations under the Decree. The plain language of the PLRA requires that a "cour…

**Commented [A500]:** Civilian care is not the standard used to establish prison healthcare. These recommendations exceed our obligations under the …

**Commented [A503]:** In subsequent versions of the implementation plan IDOC sought to exclude housing and programmatic needs for the aged/infirm/elderly a…

**Commented [A504R503]:** Falls should be reported as part of the incident reporting and the chart should be labeled (this is in the policy).

**Commented [A505]:** Housing it outside the scope of the decree

**Commented [A506]:** These additions are from the Monitor's example implementation plan provided in January 22, the Monitor's comments on the Decembe…

**Commented [A507R506]:** These recommendations exceed the scope of the Decree

**Commented [A508]:** This task is already part of item 72 and does not need to be a separate and discreet item. See revisions to 72.

**Commented [A509R508]:** Agree

| # | Task | | | | | | |
|---|------|---|---|---|---|---|---|
| 72 | **Set forth guidelines and benchmarks related to infirmary care.** Additional implementation tasks that improve access to quality of care provided in infirmaries include: 1. Identify physical plant repairs or renovations that are necessary for existing infirmaries. Initiate capital requests to fund and complete necessary renovations.<br><br>2. Assess utilization of infirmary beds to include reasons for non-medical admissions, the prevalence, and reasons for lengths of stay longer than 7 days, reasons for readmissions to the infirmary in less than 30 days.<br><br>3. Solicit from facility HCUAs and Medical Directors information and data on backlogs for infirmary care to include procedures that must be completed in-cell, use of alternative placements such as Specialized Housing Unit HU or Residential Treatment Unit RTU, admissions that are delayed due to lack of beds, prolonged hospitalizations due to lack of infirmary capacity. This information could be solicited using focus groups with a skilled facilitator.<br><br>3 4. Define the purpose of infirmary care and the scope of services to be provided in statewide policy based upon the data collected on utilization in 2 & 3.<br><br>5. Determine the number of beds needed to provide the defined scope of service.<br><br>6. Establish the staffing and other resources needed to operate each infirmary according to the scope of service, number, and type of infirmary beds.<br><br>7 6. Define the responsibilities of staff assigned to provide infirmary care, including correctional officers.<br><br>8. 6. Provide staff education to increase capacity to manage emerging areas of concern (aging, dementia, mobility impairment etc.). 7.<br><br>9 7. Assess the equipment and supplies that are needed to provide the scope of services.<br><br>8 10. Develop programmatic methods to manage infirmary services to include:<br>a. Daily huddle or rounds by physician and nurse.<br>b. Utilization review and approval.<br>c. Treatment plans.<br>d. Case management.<br>e. Programming.<br><br>11 9. Establish procedures for infirmary care.<br><br>12 10. Develop reporting requirements and establish tools to monitor performance. | II.B.6.k;<br>II.B.6.p.; III.I.1-4 | | | Physical Plant Consultant, Deputy Chiefs, Agency Director of Nursing and Regional Nurses | Jun Sep-23 | | |
| 73 | Survey facility examination rooms to ensure they are appropriately equipped to address medical needs. | III.B.2 | To ensure that exam rooms are appropriately equipped with the necessary supplies. | | Agency Chief of Health Services or Deputy Chief of Health Services/Agency Director of Nursing/Medical Coordinator/facility healthcare staff | Sep-22 | | |
| 74 | **Develop a standardized emergency response bag with a list of contents.**<br>1. Work with fiscal to procure emergency response bag and contents for each facility<br>2. Develop policy that ensures each facility has identical contents in their emergency response bag<br>3. Educate staff on new emergency response bag policy<br>4. With the assistance of the Monitor and the audit team, develop a process annual audit to ensure emergency response bags contain appropriate items and are securely stored | III.B.2 | To ensure that appropriate emergency equipment is available. | | | Sep-23 Dec 23 | | |

**Comments:**

Commented [A524]: This work needs to be led by the consultant on physical space and equipment. The work of the consultant on elderly/infirm/disabled needs to inform the consultant performing the evaluation of physical space. The infirmary must be available to serve others in addition to the elderly/infirm/disabled population. Typically infirmary capacity needs to be available for patients in need of medical isolation, those who require pre-operative procedures, convalescence after hospitalization, surgery or injury, monitoring of unstable medical or psychiatric conditions, and diagnostic testing or procedures. The numbers and types of patients needing these types of care will not be the focus of the consultant on the aged and infirm. IDOC will need to assess infirmary capacity needed f...

Commented [A525R524]: IDOC agrees that the Decree requires us to ensure appropriate infirmary c...

Commented [A510]: This task is related to the tasks related to the evaluation of the physical facility ...

Commented [A511R510]: Agree that it is redundant ...

Commented [A512]: Subitem 2 only evaluates those who receive infirmary care. Subitem 3 is necessa...

Commented [A513R512]: Agree that an evaluation of the need for infirmary beds should include the patien...

Commented [A514]: The reason for the addition is that NCCHC F-02 (E ) requires the scope of infirmary ...

Commented [A515R514]: Agree. This will be written into policy

Commented [A516]: This should take place as part of the system wide staffing analysis (see earlier items ...

Commented [A517R516]: Agree

Commented [A518]: IDOC needs a way to account for compliance with III.I.1-4, including access to security ...

Commented [A519R518]: Agree

Commented [A520]: This duplicates other items re: evaluation and determination of necessary equipmen...

Commented [A521R520]: Agree that a UR concept would help with managing the infirmary beds. Not su...

Commented [A522]: There should be nurse protocols for what to do to admit a patient, develop nursing PO...

Commented [A523R522]: Agree

Commented [A526]: Item 73 is deleted because it is addressed in revised items 104 and 105a.

Commented [A527R526]: Agree

Commented [A528]: This task needs to have specific people identified as responsible for each part of the ...

Commented [A529R528]: Agree. To be completed by Dec 23

Commented [A530]: An annual audit is not sufficient to ensure emergency response bags contain the ...

Commented [A531R530]: Agree

| 75 | ~~Develop a standardized emergency response equipment list.~~ ~~1. Work with fiscal to procure emergency equipment for each facility~~ ~~2. Develop policy that ensures each facility has identical emergency medical equipment~~ ~~3. Educate staff on new emergency response equipment list policy~~ ~~4.1.  With the assistance of the monitor and the audit team, develop annual audit to ensure emergency equipment is available on site and operational.~~ | ~~III.B.2~~ | ~~To ensure that health care units are appropriately equipped with operational equipment.~~ | | | ~~Sep-22~~ | | |

**Commented [A532]:** Item 75 is deleted because it is addressed in revised item 105a.

**Commented [A533R532]:** Agree

| # | Task | Ref | Purpose | | | Date | | | Comments |
|---|------|-----|---------|---|---|------|---|---|----------|
| 76 | ~~Develop a standardized list of equipment to be available in every health care unit~~ ~~1. Work with fiscal to procure healthcare equipment for each facility~~ ~~2. Develop policy that ensures each facility has the required healthcare unit medical equipment, necessary specialized for populations (women's health, dialysis, etc.)~~ ~~3. Educate staff on new health care unit equipment policy~~ ~~4.1. With the assistance of the Monitor and the audit team, develop annual audit to ensure health care unit equipment is available on site and operational.~~ | ~~II.6.p; III.I; III.B.2~~ | ~~To ensure that facility healthcare units are properly equipped with operational equipment.~~ | | | ~~Sep-22~~ | | | **Commented [A534]:** Item 76 is deleted because it is addressed in revised item 105a. **Commented [A535R534]:** Agree |
| 77 | ~~Develop a standardized list of equipment to be available in every infirmary~~ ~~1. Work with fiscal to procure infirmary equipment for each facility~~ ~~2. Develop policy that ensures each facility has the required infirmary equipment.~~ ~~3. Educate staff on new infirmary equipment policy~~ ~~4.1. With the assistance of the Monitor and the audit team, develop annual audit to ensure infirmary equipment is available on site and operational.~~ | ~~III.B.2~~ | ~~To ensure infirmaries are properly equipped~~ | | | ~~Sep-22~~ | | | **Commented [A536]:** Items 77 is deleted because it is addressed in revised item 105a. **Commented [A537R536]:** Agree |
| 78 | ~~Develop a standardized list of equipment to be available in every dental operatory.~~ ~~1. Work with fiscal to procure dental equipment for each facility~~ ~~2. Develop policy that ensures each facility has the required dental equipment.~~ ~~3. Ensure all facilities should have lead radiation aprons with thyroid collars for patient protection during X-Rays.~~ ~~4. Educate staff on new dental equipment policy~~ ~~5.3. With the assistance of the Monitor and the audit team, develop annual audit to ensure dental equipment is available on site and operational.~~ | ~~II.B.2-3; III.B.1-2~~ | | | | ~~Agency Chief of Health Services or Deputy Chief of Health Services/Agency Director of Nursing/Agency Medical Coordinator/facility healthcare staff/State of Illinois Capital Development Board~~ | ~~Sep-22~~ | | | **Commented [A538]:** Item 78 is deleted because it is addressed in revised item 105a. **Commented [A539R538]:** Agree |
| 79 | ~~Based on the number of expected staff needed to timely perform all requirements of the consent decree, Identify how many examination rooms, and other physical spaces are necessary~~ ~~Then compare this number to number of existing examination rooms and spaces and determine by facility the additional examination rooms or spaces that need to be developed.~~ ~~For projects administered by the Capital Development Board there is an Architect/Engineering firm hired to design the construction. Firms hired for both A/E and construction are competitively procured once the specifications are published, and then overseen by both CDB, who also employs architects and engineers, as well as the Department. Redundant; see task #103- 110 below~~ | | ~~To ensure that the current number of spaces is appropriate based on expected health needs~~ | | | ~~Defendants, monitor and plaintiffs~~ | ~~Sep-22~~ | | | **Commented [A540]:** Redundant; see revised tasks #103- 110 below **Commented [A541R540]:** Agree **Commented [A542]:** The Monitor receives a fraction of data and information requested for his reports. There are differences of opinion with respect to the V.G. provision which can hopefully be settled in a meeting of parties and the Monitor. A better method of transfer of information should be agreed upon. |
| 80 | Defendants, monitor, and plaintiffs ~~develop~~ will meet to settle the meaning of data and information requirements for IDOC reports as stipulated in item V.G. ~~and develop a more effective methodology for transfer of information.~~ | V.G. | | | | Agency Medical Director, Deputy Chiefs | ~~Feb-22~~October 2022 | | | |
| 81 | Develop mechanism to track, by name, physicians who lack required training as specified in Consent Decree III.A.2 | III.A.3-6 | | | | Agency Medical Director, Deputy Chiefs | Ongoing ~~Mar-22~~ | | | **Commented [A543R542]:** IDOC is limited with respect to the state's IT security rules regarding the transfer of confidential information or large data dumps. **Commented [A544]:** This is ostensibly accomplished but IDOC has not informed the Monitor of this mechanism. **Commented [A545R544]:** Disagree the Monitor has been informed |

| 82 | IDOC to establish an account with National Practitioner Data Bank | III.A.2. | | | Agency Medical Director, Deputy Chiefs | ~~Mar-22~~Jan 23 | | | |
| 83 | Develop a mechanism to remove unqualified physicians, ~~dentists, and other health care providers.~~ Recommendations for removal will be based on the following: 1. ~~Evaluation of physician performance 2.~~Utilize mortality reviews of care or other methodologies (#84.2) of IDOC to identify egregious clinical errors that either cause harm or are likely to result in harm to the patient and are inconsistent with adequate medical care. ~~2. Further investigation of problematic physicians~~ ~~3~~2. Confer with the monitor to discuss problematic physicians. 4. ~~at regular intervals to discuss monitoring that has occurred.~~ ~~3.~~Remove or take corrective actions on problematic physicians. | III.A.3-6 | | | Agency Medical Director, Deputy Chiefs , ~~Dental Director, Agency Director of Nursing~~ | Jun-22 | 50% | | |
| 83.a. | Develop a mechanism to remove ~~dentists and other health care~~ providers. 1) Utilize mortality reviews of care or other methodologies of IDOC to identify egregious clinical errors that either cause harm or are likely to result in harm to the patient and are inconsistent with adequate medical care. | II.B.6.r. | | | | | | | |
| 84 | ~~Develop~~ Finalize plan for ~~no less than annual~~ ~~physician~~ review of the clinical services provided by both credentialed and non-credentialed existing physicians and dentists 1. The plan for physician review as codified in policy and/or standard operating procedure should include the elements of care that would be annually reviewed, process for identification and referral of staff to peer review, the establishment of a fair process and the standards used to evaluate professional care and clinical decision making, the qualifications physicians individuals must have to perform peer review, as well as the documentation of the evaluation, assessment, deliberation and decisions made in the review process. 2. The elements of care reviewed should include clinical services provided in sick call, onsite urgent/emergent care, chronic care clinics, infirmary admissions and progress notes, discharge and transfer care, timely and appropriate referrals to specialty care, continuity of care after offsite emergent, hospitalization, and specialty consultation care, intake healthcare services at reception centers including intake health assessments, review of diagnostic tests, mortality and morbidity reviews, annual performance reviews, health care patient grievances, corrective action plans, peer reviews for cause, etc. ~~The review of the physicians should be performed by independent contracted or consulting physicians such as SIU physicians with training in similar fields as the physicians being reviewed (i.e. primary care, specialty physician, dentist, etc.)~~ 3. ~~to include:~~ review of physician peer review, sick call contacts, chronic care clinic contacts, infirmary admission contacts and lab /x-ray reviews, a list of  adverse patient events and associated corrective action plans and associated healthcare grievances and conclusions | II.B.2, II.B.3, II.B.6.m.,n.,q., and r.; III.K .9 | | | Agency Medical Director, Deputy Chiefs, Medical vendor, Dental Director, SIU consultants | ~~Nov-2022~~ Aug-22 Apr-2023 | | | |

**Commented [A546]:** The Monitor separates physicians from other clinicians or nurses because physician removal is governed by provisions III.A.2-4 of the Consent Decree but discipline or termination of others is governed by provision II.B.6.r

**Commented [A547R546]:** The M and M process accounts for that part.

**Commented [A548R546]:** Peer review is an option based on the findings of M and M or on reports sent anonymously to SIU.

**Commented [A549]:** This is the suggestion of the Monitor and is used by the Monitor currently to identify egregious acts.  IDOC has proposed an alternative.

**Commented [A550R549]:** We account for this in M and M.  agree

**Commented [A551]:** Mortality records contain multiple episodes of physician care that can be used to further investigate care.  IDOC can and should use whatever methods of evaluation they deem appropriate but they should give more detail.

**Commented [A552R551]:** Agree

**Commented [A553]:** A regular discussion should occur particularly if there is/are problematic physicians.

**Commented [A554R553]:** Agree

**Commented [A555]:** This is not required by the Decree

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. *Doe v. Cook County*, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

**Commented [A556]:** II.B.6.q states that "IDOC agrees to implement changes ...in the annual assessment of medical, dental, and nursing staff competency and performance." The monitor has requested but never been provided with any reviews of the clinical performance of medical physicians practicing in IDOC. (The vendor has provided some Salary Compensation evaluations that did not address clinical competency. …)

**Commented [A557R556]:** IDOC agrees to establish metrics necessary assess the care being provided in the system. The Decree does not require an independent auditor.

| 85 | Develop peer review process for providers.<br>1.~~Develop policy and forms outlining ~~peer~~ provider review process. The annual peer review forms may contain administrative and process elements but should primarily focus on aspects of clinical care~~<br>2.~~Train ~~independent contracted or consultant~~ staff on provider peer review process~~ | II.B.2-3, III.B.q., III.K.9 | | | Agency Medical Director, Deputy Chiefs, Dental Chief, Vendor | Ongoing | | |
| 86 | OHS to review physician/dentist annual assessments, peer reviews, adverse events, corrective action plans, and other evaluations and make appropriate recommendations for performance improvement, corrective action, and even termination. | II.B.6.q | | | Agency Medical Director, Deputy Chiefs, Dental Chief, Vendor | Jun-22 | | |

**Commented [A558]:** Not required by Decree

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. *Doe v. Cook County*, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of findings under the PLRA does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

**Commented [A559]:** III.B.6. states "IDOC agrees to implement changes in….annual assessment of staff competency and performance." The annual assessments/peer reviews must significantly evaluate pertinent aspects of the quality of the clinical care provided by providers.

**Commented [A560R559]:** Agree

| 87 | Develop and implement an effective mortality review process SIU has completed a preliminary draft of the mortality review process.  Updates that is evidenced by an implemented policy.  The policy will include the following monitor's recommendations: 1. Provide all death records to the Monitor as they occur. 2. All deaths should include an autopsy. 3. Provide a tracking log of all deaths at least quarterly. This log should include name, IDOC #, date of death, age, date of incarceration, facility at time of death, category of death, cause of death, whether the death was expected or unexpected, whether an autopsy was  done and the date of the autopsy. The log should also include whether a mortality review has been completed. 4. A mortality review should be performed for each death by an audit team.  To include a physician and a nurse.  The mortality review needs to include at a minimum: | III.M2.  III.L.1., | To ensure that an adequate mortality review process is in place | OHS Quality Control Coordinator, Deputy Chiefs, Audit Team, SIU | Sep-21 | Jun-22 | | | |
|---|---|---|---|---|---|---|---|---|
| | a. Date of review b. Patient name c. IDOC number d. Date of death e. Age and date of birth f. Facility at the time of death g. Place of death (e.g. hospital, infirmary, etc.) h. Category of death (natural, homicide, suicide, etc.) i. Expected or unexpected death j. Cause of death k. Mental health diagnoses l. Medical diagnoses m. IDOC problem list n. Medications at facility at the time of death o. Case summary that includes both nursing and physician input that includes a summary of the care of the patient for their illnesses and care related to the cause of death or care that needs to be highlighted to identify opportunities for improvement. p. Autopsy diagnosis q. List all deficiencies. Opportunities  (opportunities  for improvement) identified in the mortality review  and review  and  recommendations for corrective action of these deficiencies. | | | | | | | | |
| | r. Identified opportunities for improvement need to be evaluated by the OHS quality committee. That committee needs to assign  responsibility for corrective action either to the facility quality committee or to an OHS responsible party. The OHS quality committee should monitor progress on resolution of the corrective action until it is completed. The facility quality improvement meeting minutes need to document their progress in resolving corrective action. 5. The quality improvement discussion regarding mortality review should be educational with a goal towards improving care. 6. Line staff employees should have an opportunity to provide anonymous information regarding events surrounding a death with an aim toward improving patient safety. A process for this should be established. 7. The quality improvement coordinator and audit teams should conduct follow up with facility quality programs to monitor actions taken to improve care based on information learned from mortality review. IDOC will develop a procedure for referral of a nurse or provider to their respective peer review entity when a mortality review identifies an egregious clinical act by a provider or nurse.  This procedure will be written.  The group of providers performing peer review for an alteration of privileges will be leadership physicians (Chief and Deputy Chiefs) | | | | | | | | |

Commented [A561]: IDOC states that this process is complete but evidence of its completion has not been provided to the Monitor.

Commented [A562R561]: This information was provided to the Monitor in June 2022. Despite two requests the Monitor has provided no availability to meet with SIU

Commented [A573]: This date is past but there is no evidence that this process has been completed.

Commented [A574R573]: IDOC offered to meet with the Monitoring team twice in the last 3 months to discuss the progress with SIU initiatives. The monitor has provided no availability

Commented [A563]: This process should be memorialized in a policy and procedure which is still incomplete.

Commented [A564R563]: Disagree this complete and was provide to the Monitor in June

Commented [A565]: It is critical that a physician and a nurse review physician and nursing care respectively.

Commented [A566R565]: There is a process in place for referring licensed staff to peer review as a result of M and M.  Peer review may include OHS leadership.

Commented [A567]: This is specifically called out in provision III.M.2. of the Consent Decree.

Commented [A568R567]: Agree. Covered in policy

Commented [A569]: This is consistent with provision II.B.6.r.

Commented [A570R569]: Agree. Covered in policy

Commented [A571]: The group reviewing care cannot be existing provider staff who are not independent.

Commented [A572R571]: The Decree has no such prohibition against existing provider staff reviewing one another. The Implementation plan may not create additional obligations

| 87.a. | A morbidity and mortality committee will meet monthly to evaluate deaths reviews and other sentinel events. Actions taken to complete this task will include: | III.M2. III.L.1., | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1. The Chief OHS will chair this group and designate other senior OHS leadership; members (physician, nurse, mid-level provider) of the independent audit team who reviewed the facility; others designated as needed by the Chief OHS. | | | | | | | |
| | 2. The deficiencies or opportunities for improvement identified by reviewers will be evaluated by the mortality review committee who will also review the completed death reviews and any available morality reviews of the Monitor. The Mortality Review Committee will assign corrective actions to the facility; if systemic risk is identified the Chief OHS will decide on a course of action and decide whether a process analysis is needed (this decision should be recorded in the minutes): unsafe patient safety risks that endanger patients are immediately remediated; and egregious care of by a provider or nurse will be referred to the appropriate peer review entity. | | | | | | | |
| | 3. Corrective actions are monitored through completion by the Quality Management Program. The policy on Quality Improvement will define how corrective actions are monitored. | | | | | | | |
| 88 | Hire a Chief of Dental Health Services | | | | IDOC Human Resources, Agency Medical Director | Feb-21 | 100% | Feb- 21 |

**Commented [A575]:** This task is consistent with the 5/31/22 IDOC Implementation Plan. We agree with a morbidity and mortality monthly committee meeting.

**Commented [A576]:** The Chief OHS should provide leadership for this committee.

**Commented [A577R576]:** A peer review means peers, not senior leadership. The chief of OHS does not need to chair M and M either. This has been assigned to and is organized by SIU. Disagree with this

**Commented [A578]:** This is consistent with III.M.2 of the Consent Decree

**Commented [A579R578]:** The opportunities or deficiencies are identified in Mortality and Morbidity and will be passed to the process evaluation and revision experts at SIU for evaluation. Agree

**Commented [A580]:** There should be follow up on assigned corrective actions

**Commented [A581R580]:** Agree. This is in policy and procedure

| # | Task | Ref | | | Responsible | Start | Due | | |
|---|------|-----|---|---|-------------|-------|-----|---|---|
| | ~~Review and identify any language in the vendor's dental policies that impose a potential barrier or a restriction to any aspect of dental care~~ | II.B.6.h, | | | | ~~Sept-22~~ | ~~Apr-2023~~ | | |
| 89 | With input from monitor develop set of comprehensive standardized dental policies and procedures<br><br>1. Provide ~~the drafts of~~ these and other dental policies to the Monitor for input. | II.B.2.; II.B.8, III.K.5 | | | Chief of Dentistry, Agency Medical Director, QI Coordinator, SIU | Jul-2022 | ~~Jul-22~~ Feb-2023 | | |
| 90 | Ensure all facilities should have lead radiation aprons with thyroid collars for patient protection during X-Rays.<br><br>~~Procure sufficient leaded aprons with thyroid collars so that each dental suite has a dedicated thyroid collar that is stored in the dental area.~~<br>See #91 Below . | III.K.13 | | | Chief of Dentistry, Agency Medical Director, QI Coordinator, SIU | Sept-2022 | ~~Jun-22~~ Feb-2023 | | |
| 91 | Create a standardized list of all medical equipment required in each dental operatory in the IDOC and Ddevelop an ~~Develop~~ instrument for annual dental survey of dental equipment at every clinic<br><br>~~1.Contract with a professional evaluator (e.g. Henry Schein) of dental suite equipment to create a standardized list of dental equipment required in all dental operatories in the IDOC.~~<br><br>2.Develop an instrument to perform an initial and thereafter annual survey of presence, functionality, and calibration status (if required) of dental equipment in every IDOC dental suite. A record or log of the dates and findings of annual dental equipment surveys are to be maintained<br><br>3.Dental operatory equipment that is missing, broken, or defective must be replaced. Work orders or fiscal requests must be tracked and regularly reported to the facility QI meeting until repairs are completed or new equipment is installed.<br><br>4. Each dental unit needs to track the last servicing or calibration and keep a record or log of servicing and calibrations which generally should be done at least annually.<br><br>~~5. Each facility's documentation of servicing, calibration, needed repairs and replacements, and the turnaround time of work and purchase orders are be reported annual to the system's Quality Council . The annual independent audit would determine whether this survey of dental equipment was done and whether appropriate action was taken.~~ | III. K.13 II.B.9. | | | Chief of Dentistry, Agency Medical Director, QI Coordinator, SIU, Chief Compliance Officer | Sept-2022 | ~~Sep-22~~ Mar 2023 | | |

**Commented [A582]:** Example; The current vendor's protocols state that incarcerated individuals may be charged for replacement of lost/damaged dentures, if at the discretion of the dentist it is believed that loss/damage was due to the patient's negligence or abuse. It has been communicated to the Monitor that individuals with broken dentures have gone without dentures because they could not afford the cost of replacement. IDOC must review and modify any such restrictions that puts the health of the patient at risk.

**Commented [A583R582]:** This is unnecessary. Per the contract, the vendor is required to follow IDOC's dental policies. IDOC policy will outline rules for replacement dentures

**Commented [A584]:** The Consent Decree calls for comprehensive policies and procedures. IDOC has committed to drafting dental policies on 1. using the S.O.A.P documentation format for dental notes, 2. creation of a dental care orientation manual, 3. disinfection of dental exam areas, 4. proper radiation hygiene (use of protective lead shields), 5. the provision of compressive dental exams, treatment plans, dental hygiene care, dental self-care with documentation in the dental record, 6. provision of dental cleanings every 2 years or more frequently is so needed, 7. specific consents for dental extractions, completion of appropriate dental x-rays prior to non-...

**Commented [A585R584]:** IDOC will draft policies guided by NCCHC and the ACA. IDOC will provide policies to the Monitors for input. Changes will be considered based on Monitor's input. IDOC cannot be...

**Commented [A586]:** Leaded aprons with thyroid collar are used to protect the radiation sensitive thyroid gland. During site visits, the monitor identified facilities with only a single leaded apron thyroid collar that was kept...

**Commented [A587R586]:** Requiring a separate lead apron for the dental suites is not required by the Decree. The Decree simply requires that they are used

**Commented [A588]:** III.K.9 states that "IDOC shall conduct annual surveys to evaluate dental equipment to determine ...equipment that needs to be repaired or replaced." To date, the Monitor has not been provide...

**Commented [A589R588]:** This task is not necessary to meet our obligations outlined in the Decree.

The plain language of the PLRA requires that a "cour...

**Commented [A590]:** II.B.2 states "IDOC shall require ....monitoring of care by collecting and analyzing data to determine how well the system is providing care." Broken or non-functional dental equipment results in...

**Commented [A591R590]:** Agree

**Commented [A592]:** The annual audit will determine if the annual survey was done and whether appropriate actiontaken. But an annual survey of equipment should be performed by a qualified dental equipment...

**Commented [A593R592]:** This is not required by the Decree which allows OHS to audit itself II.B.9

| 92 | Develop with QI audit team audit questions necessary to demonstrate compliance with items III.K.1-13 . Consider and determine who is to perform dental audits.<br><br>1. ~~Audits of the dental provisions in the Consent Decree should be done by independent auditors with backgrounds and training in dental care (i.e dentists and dental hygienists)~~ | II.B.9 | To ensure standardized information is available to inmates regarding access to dental care. | | Chief of Dentistry, Agency Medical Director, QI Coordinator, SIU | ~~Mar 2022~~ | ~~Sep~~ Jun-~~2023~~-22 | | |
| 93 | Review and revise orientation manual for individuals in custody on access to dental care<br><br>1.The facility ~~dental care~~ orientation manual should include information on the dental services provided in the IDOC, directions on how to submit requests for routine and urgent dental care including dental cleanings. ~~and education on dental hygiene and dental self-care.~~ | III.K.2 | To ensure adequate dental quality of care | | Chief of Dentistry, Agency Medical Director, QI Coordinator, SIU | ~~Sept 2022~~ | Jun-~~2023~~2 | | |
| 94 | Develop a standardized protocol for patient treatment at the reception center to ensure:<br><br>1. Panorex x-rays will be performed on all new admissions to the IDOC<br>2. Intake screening dental examinations at the reception centers shall include intra- and extra-oral tissue examination<br>~~1.~~3. Chronic and acute illnesses and dental conditions are listed on a problem list<br>~~2.~~4. Problem lists are completed by providers<br>~~3.~~5. Medical and dental history and physical exams are completed<br>~~4.~~6. Patients receive initial medical and dental treatment plans and timely referrals for evaluation and development of comprehensive medical and dental treatment plans based on acuity. | III.C.1-4, III.K.3 | | | Chief of Dentistry, Agency Medical Director, QI Coordinator, SIU | | ~~Mar-2023~~Dec-22 | | |
| 95 | ~~Develop audit to ensure a comprehensive dental treatment plan is created at the time of the first comprehensive dental visit, unless the initial visit is an emergency~~ See 42.a.1) above which discusses development of an audit. This should be included in that instrument. | II.B.9.; III.K.1-13 | To ensure adequate dental quality of care | | Chief of Dentistry | | ~~Mar 2023~~Jun-22 | | |
| 96 | ~~Develop audit to ensure comprehensive examinations, X rays, oral cancer screening, and appropriate charting occurs prior to dental treatment.~~ See 42.a.1) above which discusses development of an audit. This task can be included in that instrument. | II.B.9.; III.K. 9 | To ensure adequate dental quality of care | | Chief of Dentistry | | ~~Mar-2023~~Nov-20 | | |
| 97 | Ensure ~~healthcare vendor~~IDOC implements a dental annual ~~peer~~ review policy for all dentists | III.K.9 II.B.2.; II.B.3.; II.B.6.r.; V.G | To ensure dentists are practicing in a safe and medically appropriate manner | | Chief of Dentistry, Agency Medical Director and Vendor | | Mar-21 | 100% | |
| | | | | | | | | | |

Commented [A594]: II.B.9. states "The implementation of this Agreement shall also include the design, with the assistance of the Monitor, of an audit function ....which for independent review of all facilities' QA programs, either by OHS or by another disinterested auditor." SIU drafted a dental performance review data tool in March 2022 for which the Monitor provided feedback advising that a dentist should review the dental performance review section. There has been no further information about the dental care audit tool provided to the Monitor.

Commented [A595R594]: This requirement is inconsistent with the Decree and is above community standard. Community dentists do not have somebody come in and decide if they are competent.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not...

Commented [A596]: This is not required by the Decree

Commented [A597]: The dental condition of the new admissions to IDOC is abysmal. The majority of the inmates need a significant amount of dental work; they need orientation in how to access dental services and education on how they can improve their oral health.

Commented [A598R597]: Agree to ensure that Each facility's orientation manual shall include instructions regarding how prisoners can access dental care at that facility.

Commented [A599]: Panorex films are currently part of the dental screening and should be continued. III.K.3 states " ...screening dental examinations at the receptions ...shall include intra- and extra-oral soft tissue examination." It is important the dental screeni...

Commented [A600R599]: Agree

Commented [A601]: The intake evaluation is not the appropriate setting to address a comprehensive treatment plan although urgent matters must be addressed. The patient needs to be timely referred so that a comprehensive therapeutic plan can be ...

Commented [A602R601]: Agree

Commented [A603]: It would best to label this section " annual" reviews not "peer" reviews due to "peer" reviews being used by IDOC to mean providers who being sent to the SIU Clinical Quality Group for investigation of significant concerns about ...

Commented [A604R603]: Agree

| 98 | Develop a dental ~~peer~~ review instrument and methodology including who is to perform the dental peer review<br><br>~~1. Contract with independent consulting dentists to perform annual dentist reviews. See task 84~~ | III.K.9 | To ensure dentists are practicing in a safe and medically appropriate manner | | Chief of Dentistry, Agency Medical Director, Agency Medical Coordinator | ~~2020~~ | Mar 2023 ~~Jun-22~~ | | | | **Commented [A605]:** IDOC has done dentist annual reviews since 2020. The dentists are reviewed by other dentists in the IDOC. This creates a potential risk of pro or con bias and lack objectivity. IDOC should contract with independent consulting dentists possibly from SIU to perform the dentist reviews. It would best to label this section annual reviews not peer reviews due to "peer" reviews being used by IDOC to mean providers who being sent to the SIU Clinical Quality Group for investigation of significant concerns about performance. |
| 99 | Develop **annual** performance reviews for dental assistants **and dental hygienists**<br><br><br><br>1.Develop a standardized performance review tool for IDOC and vendor/contracted dental assistants that evaluates competency of dental assistants in performing their duties including cleaning and sterilization of dental equipment and disinfection of dental operatory surfaces<br><br>2.Develop a standardized performance review tool for IDOC and vendor/contracted dental hygienists that evaluates competency of dental hygienists in performing their duties but primarily focuses on the clinical services delivered by the dental hygienist<br><br>3.Collaborate with SIU Clinical Quality Group in the development of the performance review tools for both dental assistants and dental hygienists.<br><br>4.Performance reviews should be shared with and signed by the dental assistants and dental hygienists, reviewed by the Chief of Dentistry, deficiencies addressed with training and/or corrective actions, and results reported annually to the IDOC Quality Council. | III.K.9 | To ensure dentists are practicing in a safe and medically appropriate manner | | Chief of Dentistry, Agency Medical Director, Agency Medical Coordinator, SIU | ~~Nov-2022~~ | ~~Jun-22~~ Apr-2023 | | | | **Commented [A606R605]:** This is not required by the Decree and inconsistent with community standards.<br><br>The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. *Doe v. Cook County*, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.<br><br>**Commented [A607]:** III.K.9 states "...IDOC shall establish a peer review system for all dentists and annual performance evaluations for dental assistants." Dental hygienists must be added to the dental team that has annual clinical performance evaluations. Currently IDOC-employed and vendor-employed dental assts and hygienists are evaluated using the State's Individual Development and Performance System which touches on some clinical aspects of their duties and is shared/signed by the reviewee . Vendor-employed assts and hygienists are evaluated by a generic Salary Compensation Calibration Worksheet which does not evaluate the performance of clinical ... |
| 100 | Develop **annual and new hire orientation** training for dental staff. Training to include:<br>1.Dental records with comprehensive examinations, X Rays, and treatment plans.<br>Dental records with legible notation if EHR not available. Notes should be standardized using an acceptable dental documentation format or template to include patient medical history and dental examination. (initial and updated).<br>Consent form for extractions (Current X-Ray taken prior to extraction must be present).<br>Dental treatment remarks/complaint form.<br>Dental specialist referral form.<br>Medical services request form.<br>Dental laboratory form if necessary.<br>Patient education and oral hygiene completion form<br>Dental Policies and Procedures<br>Infection Control guidelines<br><br>2.Identify who will provide the training and how the training will be done (in-person, zoom presentation, etc), and where the documentation of training will be maintained.<br><br>3.An annual report covering training of dental staff will be provided to the IDOC Quality Council. | II.B.3<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>II.B.2 | To ensure properly trained dental staff | | Chief of Dentistry, Agency Medical Director, Agency Medical Coordinator, Agency QI Coordinator, SIU, Infectious Disease Coordinator | | Jun-23 ~~2~~ | | | | **Commented [A608R607]:** Agree<br><br>**Commented [A609]:** IDOC needs to list sub-steps that are needed to organize and provide training to all dental staff.<br><br>**Commented [A610R609]:** Agree<br><br>**Commented [A611]:** II.B.2 states "IDOC shall require…. the monitoring of health care by collecting and analyzing data to determine how well the system is providing care." Well trained staff are better staff. The Quality Council needs to track and monitor that all staff are receiving no less than annual training and updates in order for the system to better provide health care ...<br><br>**Commented [A612R611]:** IDOC disagrees that this is an appropriate use of SLC. Dental staff shall participate in all relevant trainings. That information can be maintained at a facility level or with the vendor |

| 101 | See previous tasks on adverse event reporting, audits, quality improvement, and outcomes and performance. It is presumed that dental is to be included in all areas of quality improvement. | | | | Agency Medical Director, Deputy Chiefs, Agency Medical Coordinator, Agency Director of Nursing, Agency QI Coordinator | Mar 2022 | Dec-22 Jun 2023 | | |
|---|---|---|---|---|---|---|---|---|---|
| 102 | Make changes in urgent/emergent services to include:<br>1. Standardize policies and procedure for provision of urgent/emergent services to include expectations for training, demonstrated competency and clinical proficiency in determining the urgent or emergent nature of the response needed, and documentation thereof.<br>2. Train staff to provide urgent/emergent services consistent with policy and procedure, validate staff competency in urgent/emergent care initially and annually thereafter. Track and report of training completion and competency evaluation through the quality improvement process.<br>1. Standardize the clinical and operational review of onsite emergency response episodes as evidenced in policy and procedure.<br>2. Define criteria for acceptable documentation received from offsite services, as well as documentation of effort to obtain such documentation.<br>3. Revise and sStandardize [offsite] [tracking of all onsite and offsite urgent/ emergent services in separate a log books.<br>4.3. Develop workload metrics necessary to ensure that patients are seen and their plan of care reviewed within 48 hours of return from off-site emergency services. | II.B.6.b, III.G.1, III.G.2, III.G.3, III.G.4 | | | Agency Chief of Health Services or Deputy Chief of Health Services/Agency Director of Nursing/Agency Medical Coordinator, Agency Training Coordinator | | Jun-23 | | |

**Commented [A613]:** The draft implementation plan has no tasks to address III. G. 2. the obligation of medical staff to determine whether a situation is urgent or emergent and the respondent care required. The Monitor's reviews have thus far identified substantive deficiencies by IDOC in maintaining readiness, skill proficiency and documentation of urgent/emergent episodes of care. IDOC needs to set performance standards for these in policy and implement them statewide to ensure that patients are provided access to appropriate, timely and responsive urgent/emergent care consistent with II.A., II.B.1., II.B.3 and II.B.6.b.

**Commented [A614R613]:** IDOC is drafting a policy about urgent/emergent services. However, to try to audit whether they were done correctly is vague and subjective.

**Commented [A615]:** This addition is necessary to achieve III.G.3 of the Consent Decree.

**Commented [A616R615]:** Agree

**Commented [A617]:** The use of a separate log is not required by the Decree. IDOC will otherwise continue to track

**Commented [A618]:** The off-site services log does not track urgent/emergent services that are delivered on-site. The Consent Decree requires that *all* these services be tracked. Not just the those delivered off-site. The redline change is to establish a method of tracking all urgent/emergent encounters called for in III.G.1. The information that needs to be included on the urgent/emergent log is listed in recommendation 4 of the Monitor's 5th Report (page 104). The Monitor also recommended changes to the off site services log but its continued use as the sole tracking of urgent/emergent care is not sufficient to comply with III.G.1.

**Commented [A619R618]:** Agree

| | PHYSICAL PLANT | II.B.2 | To provide adequate dental and medical facilities to provide adequate medical and dental care to inmates in IDOC. | | | | |
|---|---|---|---|---|---|---|---|
| 103 | The Capital Development Board in consultation with the Chief OHS will hire a qualified consultant to survey the health care units and other all clinical spaces. The Capital Development Board will hire a consultant qualifiedqualified (in health facility design and operation) to evaluate structural space and equipment relative to a useful life determination. . | II.B.2, II.B.3, III.B.1-2, III.K.13., IV.A.2 | | IDOC Human Resources, Capital Development Board Agency Medical Director | May-22 | Jun-22 1/1/2Fed 233 | |
| 104 | Develop structural space and fixed equipment requirements for all clinical activities necessary to provide adequate medical and dental care. Clinical spaces include all health care units, dental units, intake areas, clinical examination rooms, support spaces necessary to carry out medical functions, infirmaries or other specialized housing for those with severe disabilities, are severely infirm, or have dementia or memory issues and are unable to care for themselves for each major facility. Benchmark requirements consist of a space and equipment typically available In a contemporary health program. | II.B.2, II.B.3, III.B.1-2, III.K.13., IV.A.2 | | Physical Plant Consultant in consultation with Chief OHS and designees. Consultant for survey of aged, infirm and disabled and Monitor | May-22 | Nov-22 Mar 2023May 23 | |
| 105 | Using the requirements in task #104 as a benchmark, dDevelop useful life analysis of physical status of health care unitsmedical and dental space and other clinical medical, dental, support and housing (infirmaries and other housing spaces for infirm, disabled, or persons with dementia spaces (including dental and medical support space) and living space for persons who need medically supervised housing (aged, infirm, and disabled). This analysis would include any physical space or structure that impairs the delivery of care, access to care, or the safety of staff and/or the incarcerated population. The consultant will use the staffing analysis, to estimate current and future needs of staff who may work for IDOC. Use the recommendations of the survey of the aged, infirm and disabled to estimate housing and other needs of this population. The analysis will result in a report with recommendations on how to establish adequate medical and dental clinical and support space as well as adequate specialized infirmary or medical housing for the aged, infirm and disabled who need to live in a medically monitored unit. The recommendation will provide an opinion regarding deficient space whether to rehabilitate existing space or build new space to provide adequate facilities. The analysis and recommendations will be given by facility. Determinations on improvements to physical space will be made in accordance with Defendants obligations under the Decree and do not establish a minimum standard by which to measure compliance | II.B.2, II.B.3, III.B.1-2, III.K.13., IV.A.2 | | Physical Plant Consultant | May-22 | Nov-22 July Aug 2023 | |
| 105.a. | Develop an analysis of all existing fixed and mobile medical and dental equipment typically necessary to equip facilities for the types of services provided at each facility. The analysis will describe whether necessary fixed and mobile equipment is currently available and functional. The meaning of functional will include a useful-life perspective. The analysis will result in a report with recommendations on how to remedy any deficiencies identified. Equipment beyond useful life will be identified in the report. | II.B.2, II.B.3, III.B.1-2, III.K.13., IV.A.2 | | Physical Plant Consultant | | July 2023 May 24 | |
| 106 | Using the staffing analysis, survey work space availability for current and future staff. See items above. | | | Physical Plant Consultant | May-22 | May-23 | |

Commented [A622]: IDOC Human Resources would not be capable of hiring a consultant to evaluate physical space and equipment. This should be done by the Capital Development Board whose line of work involves physical space and capital improvements and would typically hire such a consultant.

Commented [A620]: This task, as written, lacks detail. The detail added is consistent with task 79. Task 79 can be eliminated as it is duplicative. In task #79, IDOC stated, "For projects administered by the Capital Development Board there is an Architect/Engineering firm hired to design the construction. Firms hired for both A/E and construction are competitively procured once the specifications are published, and then overseen by both CDB, who also Employs architects and engineers, as well as the Department". We agree. The Capital Development Board should hire a consultant capable of evaluating whether space and equipment can adequately serve its purpose. This requires someone with expertise in health facility structural

Commented [A621R620]: IDOC is committed to ensuring that patients have adequate resources to receiv

Commented [A623R622]: IDOC should be able to use any appropriate resources at its disposal to conduct s

Commented [A624]: Equipment is necessary to provide adequate medical care as required in

Commented [A625R624]: Agree that an equipment list should be developed for all specialized areas.

Commented [A626]: This adds detail to the task 104 missing from IDOC's version.

Commented [A627R626]: This requirement must be evaluated by what is necessary to remedy an ongoin

Commented [A628]: The consultant needs to understand how care is to be provided and the scope

Commented [A629R628]: Agree

Commented [A630]: Useful life is a standard methodology for determining if a physical space or

Commented [A631R630]: Not sure what user life standard means

Commented [A632]: This incorporates task 106 and 107 from below.

Commented [A633R632]: Agree

Commented [A634]: This refers to tasks 64-70 above which is essential for the task of the physical space

Commented [A635R634]: Agree

Commented [A636]: These comments add detail that is otherwise missing and include tasks 107-8 below.

Commented [A637R636]: Agree

Commented [A638]: This provides detail on how equipment should be evaluated.

Commented [A639R638]: This recommendation is unclear

| 107 | Develop recommendations to ensure that current and future health care staff have sufficient work space to perform their duties. See items above | | | | Physical Plant Consultant | May-22 | May-23 | | |
|---|---|---|---|---|---|---|---|---|---|
| 108 | Develop recommendations to ensure that health care units and clinical spaces are sufficient to meet the medical needs of the population See items above | | | | Physical Plant Consultant | May-22 | May-23 | | |
| 109 | Based on recommendations in the consultant's report, Develop develop a plan to address physical plant and equipment deficiencies identified | II.B.2, II.B.3, III.B.1-2, III.K.13., IV.A.2 | | | CDB, Fiscal and OHS | Oct-23 | Can only be accomplished once deficiencies have been outlined Jul-24May 2023 | | |
| 110 | Work with appropriate sState partners to implement recommendations for sufficient medical and dental work space and equipment for current and future healthcare staffoperations and care for all inmates in need of medical care or medical supervision | II.B.2, II.B.3, III.B.1-2, III.K.13., IV.A.2 | | | CDB | Jul-24 | Jul-25July 2024 will be established once scope of work is completed | | |
| 110.a. | Develop a timeline for completion of any rehabilitation or construction. | II.B.2, II.B.3, III.B.1-2, III.K.13., IV.A.2 | | | CBD | | December 2024will be established once scope of work is completed | | |

**Commented [A640]:** The recommendations should be informed and based on the analysis of facilities and equipment.

**Commented [A641R640]:** This requirement must be evaluated by what is necessary to remedy an ongoing constitutional violation

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

**Commented [A642]:** To synchronize with the budget year, a May 2023 proposal is more appropriate as the budget year is July to June.

**Commented [A643R642]:** Not clear on what monitor means by "To synchronize with the budget year"

**Commented [A644]:** Adds detail that conforms to Consent Decree (provisions II.B.2-3).

**Commented [A645]:** No timeline is associated with completion of the task. A timeline should be included.

**Commented [A646R645]:** Proposed timeline included

## Main document changes and comments

| Page 1: Inserted | Author |
|---|---|

[1]

| Page 1: Inserted | Author |
|---|---|


| Page 1: Inserted | Author |
|---|---|

 that address all the provisions of the Consent Decree
  •

| Page 1: Commented | Author |
|---|---|

II.B.8 requires development of a comprehensive set of policies.  The Monitor interprets comprehensive as addressing all aspects of the Consent Decre.

| Page 1: Commented | Author |
|---|---|

acceptable

| Page 1: Inserted | Author |
|---|---|

Development of an
  •

| Page 1: Deleted | Author |
|---|---|

Performance of
  •

| Page 1: Deleted | Author |
|---|---|

s
  •

| Page 1: Inserted | Author |
|---|---|

function
  •

| Page 1: Inserted | Author |
|---|---|

the Consent Decree.
  •

| Page 1: Deleted | Author |
|---|---|

policies and procedures
  •

| Page 1: Inserted | Author |
|---|---|

;
  •

| Page 1: Deleted | Author |
|---|---|


  •

| Page 1: Commented | Author |
|---|---|

II.B.9. requires an audit function of quality programs which programs are to be comprehensive.  Policies and procedures are an important aspect ot the Consent Decree, but the audit function is more

---

[1] For ease of reference, the Monitor's comments are in black font and Defendants' responses are in red font.

comprehensive in that it also includes clinical care amongst other performance issues (e.g., medication administration).

| Page 1: Commented | Author |
|---|---|

Acceptable. We have medical policies in development and Disease Management Guidelines which are written and in formatting. These are policies for disease management.

| Page 1: Inserted | Author |
|---|---|

- 

| Page 1: Deleted | Author |
|---|---|

Review of audit data and design of quality improvement plans

- 

| Page 1: Commented | Author |
|---|---|

The review of audit data and design of quality improvement plans have little to do with respect to determination of adequate facilities (physical space and equipment). II.B.2, II.B.3 III.B1-2 and III.K.13 all address space and equipment needs that should be addressed by defining deficiencies and then recommended a corrective action plan to correct those deficiencies. This should be performed by a qualified consultant and not by audit data or design of the quality program.

| Page 1: Commented | Author |
|---|---|

IDOC is required to ensure that healthcare units have adequate space and equipment. It is not necessary to hire a consultant to complete this task.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. *Doe v. Cook County*, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 1: Deleted | Author |
|---|---|

- 

| Page 1: Inserted | Author |
|---|---|

IDOC, through the Capital Development Board, will hire a consultant

- 

| Page 1: Inserted | Author |
|---|---|

; anddevelop an analysis of deficiencies and write a report ]

- 

| Page 1: Deleted | Author |
|---|---|

;

- 

| Page 1: Inserted | Author |
|---|---|

 with findings and recommendations to correct deficiencies and needs. This will include recommendations made by the consultant hired to determine needs of the

aged, infirm and disabled. IDOC will use this report to take corrective actions to remedy the deficiencies and needs.

- 

| Page 1: Commented | Author |
|---|---|

Ensuring adequate physical space and equipment is essential to an adequate medical and dental program and is consistent with the Consent Decree provisions II.B.2, II.B.3 III.B1-2 and III.K.13 . The Consent Decree requires adequate facilities and a person qualified to evaluate physical space and equipment and recommend changes should be identified to do this.

| Page 1: Commented | Author |
|---|---|

The above referenced sections of the Decree do not require a qualified person to conduct an evaluation. Furthermore, this language would violate the Purpose section of the Decree and ("PLRA"), 18 U.S.C. § 3626(a) as it is not the least restrictive means of curing a constitutional violation. Lastly, this implementation plan cannot dictate hiring decisions and potentially violate Illinois Procurement Laws

| Page 1: Inserted | Author |
|---|---|

- 

# Develop a quality improvement program to satisfy requirements of the Consent Decree

| Page 2: Commented | Author |
|---|---|

 Development of a quality improvement program is a structural and essential component of the Consent Decree (III.L.1).

| Page 2: Commented | Author |
|---|---|

Agree

| Page 2: Inserted | Author |
|---|---|


# Hire sufficient staff to implement this plan;

- 

| Page 2: Commented | Author |
|---|---|

Sufficient staffing is an essential structural component of the Consent Decree (IV.A).

| Page 2: Commented | Author |
|---|---|

Agree

| Page 2: Inserted | Author |
|---|---|

- 

# Hire a qualified consultant to quantify the numbers of aged, infirmed, and disabled, to determine gradations of need of the population, to identify appropriate housing and management options for this population and to produce a report of findings and recommendations;

- 

| Page 2: Commented | Author |
|---|---|

II.A. and II.B.1 and II.B.2. require provision of adequate medical and dental care to those incarcerated with serious medical needs and appropriate level of primary secondary and tertiary care. The population of elderly and infirm lacks access to appropriate medical care and are at risk due to failure to appropriately house them due to medical need and care for them based on their medical needs. Infirmary units fail to address these needs. This is an essential structural component based on numerous record

reviews and visits to facilities.

| Page 2: Commented | Author |
|---|---|

This goes beyond what is required to comply with the Decree.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. *Doe v. Cook County*, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 2: Inserted | Author |
|---|---|

- 

Organize the OHS to effectively implement this plan;

- 

| Page 2: Commented | Author |
|---|---|

The Chief OHS still does not have authority to hire/fire all medical employees and does not establish all directions of the medical program. The Chief OHS needs to be authorized to do this to effectively implement the Consent Decree

| Page 2: Commented | Author |
|---|---|

Such authority is neither mandated by the Decree nor practicably applied for nearly 500 staff.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. *Doe v. Cook County*, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 2: Inserted | Author |
|---|---|

- 

| Page 2: Deleted | Author |
|---|---|

and

- 

| Page 2: Inserted | Author |
|---|---|

- 

Implement an infection control program sufficient to provide surveillance, prevention and control of communicable disease.

| Page 2: Commented | Author |
|---|---|

Provision II.A and II.B require sufficient measures consistent with needs to provide adequate medical care to thos with serious medical need.  II.B.1 requires IDOC to provide appropriate level of primary, secondary and tertiary care. As evidenced by the COVID pandemic and prior outbreaks of communicable disease within IDOC, this requires an Infection Control program.  The National Commission on Correctional Health Care requires an infection control program as an essential standard. IDOC needs to establish an infection control program.

| Page 2: Commented | Author |
|---|---|

Policies have been drafted which outline this.

| Page 2: Deleted | Author |
|---|---|

Taking corrective action based on those audits.

| Page 2: Commented | Author |
|---|---|

This is part of the audit function mentioned above and is discussed in detail in the actual plan.

| Page 2: Commented | Author |
|---|---|

Agree

| Page 2: Deleted | Author |
|---|---|

| Page 2: Deleted | Author |
|---|---|

dedicated

| Page 2: Inserted | Author |
|---|---|

required

| Page 2: Inserted | Author |
|---|---|

implement

| Page 2: Commented | Author |
|---|---|

The Consent Decree requires a quality improvement program.  III.L.1.

| Page 2: Commented | Author |
|---|---|

Agree

| Page 2: Deleted | Author |
|---|---|

Page 1

| Page 3: Inserted | Author |
|---|---|

, infirm, and disabled

| Page 3: Deleted | Author |
|---|---|

| Page 3: Commented | Author |
|---|---|

The infirm and disabled are in a similar position to the aged in that they require specialized medical housing  and specialized medical care in specialized medical units.  Infirmaries do not have capacity to currently provide that care required by provision II.A and II.B.1 and 2..

| Page 3: Commented | Author |
|---|---|

IDOC objects to the extent this requires an analysis of housing needs (unrelated to medical care), which are not covered under the Decree.

| Page 3: Inserted | Author |
|---|---|

s

| Page 3: Inserted | Author |
|---|---|

or a qualified consultant

| Page 3: Commented | Author |
|---|---|

If the DOA cannot do this a qualified consultant should be hired or contracted.

| Page 3: Commented | Author |
|---|---|

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 3: Inserted | Author |
|---|---|

to quantify the numbers of these population groups within IDOC,

| Page 3: Deleted | Author |
|---|---|

housing and

| Page 3: Inserted | Author |
|---|---|

housing and health care

| Page 3: Deleted | Author |
|---|---|

our aging inmate

| Page 3: Inserted | Author |
|---|---|

these

| Page 3: Inserted | Author |
|---|---|

.s

| Page 3: Commented | Author |
|---|---|

To provide this care, IDOC needs to determine how many people have what needs.  Patients with dementia and other significant medical disorders are now housed in general population but require alternate housing.

| Page 3: Commented | Author |
|---|---|

This addition should be limited to healthcare needs as required by the Decree

| Page 3: Deleted | Author |
|---|---|

.

| Page 3: Inserted | Author |
|---|---|

The consultant will provide

| Page 3: Deleted | Author |
|---|---|

will develop

| Page 3: Inserted | Author |
|---|---|

and recommendations

| Page 3: Deleted | Author |
|---|---|

housing and

| Page 3: Inserted | Author |
|---|---|

housing and clinical care need

| Page 3: Deleted | Author |
|---|---|

analysis of the

| Page 3: Deleted | Author |
|---|---|

.

| Page 3: Inserted | Author |
|---|---|

IDOC will take appropriate actions to correct gaps in housing and clinical care needs of these populations

| Page 3: Commented | Author |
|---|---|

This provides more detail to a vague statement. As required by II.A. and II.B.1 and 2, a solution rather than options are necessary to address this population..

| Page 3: Commented | Author |
|---|---|

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 3: Inserted | Author |
|---|---|

.

| Page 3: Inserted | Author |
|---|---|

| Page 3: Inserted | Author |
|---|---|

and

| Page 3: Deleted | Author |
|---|---|

,

| Page 3: Inserted | Author |
|---|---|

.

| Page 3: Deleted | Author |
|---|---|

, and the Monitor.

| Page 3: Deleted | Author |
|---|---|

data

| Page 3: Inserted | Author |
|---|---|

positions

| Page 3: Deleted | Author |
|---|---|

the

| Page 3: Inserted | Author |
|---|---|

IDOC's

| Page 3: Inserted | Author |
|---|---|

as well as an EMR. without an assessment of the capacity of OHS to complete work as required by this Consent Decree,

| Page 3: Deleted | Author |
|---|---|

as well as an EMR.

| Page 3: Inserted | Author |
|---|---|

It also does not include many of the key recommendations of the Monitor.

| Page 3: Commented | Author |
|---|---|

Provision IV.A and IV.A.1-2 require a staffing analysis and Implementation Plan. The staffing analysis performed by IDOC was inadequate because the analysis was not based on actual workload required in the Implementation Plan and because it did not include or state why it did not include most of the Monitor's recommendations which are based on reasonable staff necessary to Implement this Consent Decree.

| Page 3: Commented | Author |
|---|---|

A staffing plan has been submitted and we expect it to change drastically based on the changes to policies and procedures and EHR implementation.

| Page 3: Commented | Author |
|---|---|

A workload analysis is not required by the Decree

| Page 4: Deleted | Author |
|---|---|

Page 2

| Page 5: Inserted | Author |
|---|---|

By virtue of that authority, the Chief, OHS will have ultimate

| Page 5: Commented | Author |
|---|---|

While the Chief of Health Services may be involved with hiring/firing decisions, he does not always have ultimate authority. Requiring ultimate authority would violate union collective bargaining agreements and other state labor laws

| Page 5: Commented | Author |
|---|---|

While IDOC agrees that the Chief of OHS shall be the ultimate health authority, we disagree that these requirements are necessary to effectuate said authority. While the Chief of Health Services may be involved with hiring/firing decisions, he does not always have ultimate authority. Requiring ultimate authority would violate union collective bargaining agreements, state labor laws and other hiring mandate imposed by other courts, for example, Rutan.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015)

(emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 5: Inserted | Author |
|---|---|

hiring and firing authority for all health care staff, make an annual proposal to the Executive Director for an annual health budget for the medical program, play a lead role (consistent with state procurement rules) in selection of medical vendors, and be responsible personally or through designees for administrative management of the health program.

| Page 5: Commented | Author |
|---|---|

The organization of the IDOC medical program is based on Warden control of individual facility programmatic schedules and employees including the quality improvement coordinators, the HCUA, as well as timing of medications, etc. Without impacting security rules, the medical program should be allowed to fix medication schedules, establish medical schedules and hire, fire, and assign medical employees in order to implement the Implementation Plan as required by IV.A. Current arrangements do not do that.

| Page 5: Commented | Author |
|---|---|

IDOC agrees that OHS should dictate healthcare, however, to suggest that facility decisions can occur without consultation of facility leadership creates potential for security risks. The involvement in facility leadership in some operational decisions does not violate the Decree

| Page 5: Deleted | Author |
|---|---|

currently

| Page 5: Inserted | Author |
|---|---|

currently will establish an Infection Control program.

| Page 5: Deleted | Author |
|---|---|

currently

| Page 5: Inserted | Author |
|---|---|

Currently IDOC

| Page 5: Inserted | Author |
|---|---|

IDOC will formalize that relationship to ensure that IDOC has assigned consultation time with and infectious disease physician to help guide and develop their infection control program. If IDPH is unable to provide that service, a university program should be involved. If that is not possible, IDOC should hire an infectious disease physician for this purpose.

| Page 5: Commented | Author |
|---|---|

As demonstrated in the COVID pandemic, IDOC was unprepared for the pandemic and work on the Consent Decree came to a standstill for almost two years. There is no question that a functional infection control program is essential in a correctional medical program consistent with Provisions II.A. and II.B.1-2 and IDOC should establish one.

| Page 5: Commented | Author |
|---|---|

As a state agency, the job of IDPH is to provide guidance to the state including agencies) on issues of

infection control. IDPH already has a physician dedicated to advising IDOC on issues of infection control. The creation of a formal relationship is redundant and is not necessary to comply with the Decree.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 5: Deleted | Author |
|---|---|

While neither constitutionally required nor outlined in the Decree,

| Page 5: Inserted | Author |
|---|---|

T

| Page 5: Deleted | Author |
|---|---|

t

| Page 5: Deleted | Author |
|---|---|

analyze and interpret

| Page 5: Deleted | Author |
|---|---|

will better position

| Page 5: Inserted | Author |
|---|---|

will allow

| Page 5: Deleted | Author |
|---|---|

use patient data to guide policy and thus improve healthcare outcomes

| Page 5: Inserted | Author |
|---|---|

. adhere to the Consent Decree

| Page 5: Deleted | Author |
|---|---|

.

| Page 5: Commented | Author |
|---|---|

IDOC is now unable to provide most of the data requested by the Monitor.  Provision V.G. of the Consent Decree requires IDOC to provide data and information required to verify compliance and to provide data requested by the Monitor for his reports.  IDOC cannot now do this.

| Page 5: Commented | Author |
|---|---|

Disagree to assessment of compliance VG. Agree to added language regarding EHR

| Page 6: Deleted | Author |
|---|---|

Page 3

| Page 7: Inserted | Author |
|---|---|

   The IT program will ensure that a call center is available to all staff on all shifts for problems with access to or use of the electronic record.  The IT program will also ensure that new staff are appropriately trained in use of the EMR related to their work responsibilities before they begin their assignments.

| Page 7: Commented | Author |
|---|---|

These are essential components of an electronic medical record.  If IDOC is to adequately implement an EMR as required by II.B.4, a help desk and support services are necessary.

| Page 7: Commented | Author |
|---|---|

A call center is not required in order to comply with the Decree. The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 7: Inserted | Author |
|---|---|

OHS will hire a project manager to expedite and facilitate this process

| Page 7: Commented | Author |
|---|---|

Provision II.B.8 requires development and implementation of a comprehensive set of policies.  IDOC has not shown the capacity to perform.  Two years after they were due IDOC has not implemented a single policy.  Drafts of 25 policies have been sent to the Monitor and the Monitor has commented on them but has not yet heard back on any policies.  IDOC does not have sufficient staff to write these policies in the timeline required by the Consent Decree.  This position can be a temporary one but should be hired.  .

| Page 7: Commented | Author |
|---|---|

IDOC does not need to hire a project manager to draft policies. Finalizing all healthcare policies should be concluded in the next 2-3 months and they will be forwarded to the Monitor for review.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 7: Inserted | Author |
|---|---|

.

| Page 7: Inserted | Author |
|---|---|

Once a policy is completed, the project manager will ensure that training on the policy is provided to all sites

| Page 7: Commented | Author |
|---|---|

Provision IV.A.2 requires training and supervision of personnel necessary to implement the Decree. Training is essential for implementation of policies.

| Page 7: Commented | Author |
|---|---|

IDOC agrees that staff will need to be trained on new policies, but disagrees that a project manager is necessary in order to implement this task.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 7: Inserted | Author |
|---|---|

.

| Page 7: Inserted | Author |
|---|---|

| Page 7: Inserted | Author |
|---|---|

. including special medical housing for the infirm, disabled, and elderly with dementia and memory deficits

| Page 7: Commented | Author |
|---|---|

The population of elderly with dementia, memory deficits, the infirm and disabled currently do not now have appropriate housing or care. The infirmary does not have the capacity, equipment, or services necessary to manage all of the elderly, infirm, and disabled with needs for specialized housing.

| Page 7: Commented | Author |
|---|---|

This Decree is limited to medical care. Concerns about housing are outside the scope of the Decree and thus should be omitted from the Implementation Plan.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 7: Deleted | Author |
|---|---|

.

| Page 7: Inserted | Author |
|---|---|

| Page 7: Deleted | Author |
|---|---|

be a part of annual audits

| Page 7: Inserted | Author |
|---|---|

performed by the DOA or qualified consultant

| Page 7: Commented | Author |
|---|---|

The annual audit is not appropriate to determine the need for adequate space and equipment as the

auditors are not qualified for this type of survey. A qualified consultant should be hired to determine the need for space and equipment.

| Page 7: Commented | Author |
|---|---|

A consultant is not necessary in order for IDOC to meet its obligations under the Decree.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 7: Inserted | Author |
|---|---|

to design with assistance from the Monitor

| Page 7: Deleted | Author |
|---|---|

to

| Page 7: Commented | Author |
|---|---|

IDOC is preparing to initiate audits that have been designed and are being implemented without input or assistance from the Monitor. The previously agreed to audit process between the Monitor and IDOC was abandoned and replaced with one designed by an IDOC consultant without input or assistance of the Monitor. Provisions II.B.9.; IV.A.; and V.E. require that the development and implementation of the Implementation Plan requires input and assistance of the Monitor.

| Page 7: Commented | Author |
|---|---|

This statement is inaccurate. The Monitors have provided ongoing assistance with our quality audits. In the last 90 days the Department has requested meetings with the Monitor, on two separate occasions, to update him as to our progress with respect to audits. To date, the Monitor has provided no availability. Additionally, our quality audits are being managed by a state of the art academic institution, including experts in quality.

| Page 7: Deleted | Author |
|---|---|

provide

| Page 7: Deleted | Author |
|---|---|

A

| Page 7: Inserted | Author |
|---|---|

Two

| Page 7: Inserted | Author |
|---|---|

s

| Page 7: Deleted | Author |
|---|---|

ideally

| Page 7: Inserted | Author |
|---|---|

each

| Page 7: Inserted | Author |
|---|---|

, a half time dental consultant

| Page 7: Commented | Author |
|---|---|

The dental consultant is staffed at .25 and is not a member of the audit team. This individual provides oversight to and consultation on dental issues outlined in the Decree

| Page 7: Commented | Author |
|---|---|

Given 30 facilities, to complete comprehensive audits of thirty facilities requires two teams.  This was agreed to by IDOC and is part of SIU's staffing proposal for quality management and should be accepted.

| Page 7: Commented | Author |
|---|---|

Agree

| Page 7: Inserted | Author |
|---|---|



| Page 7: Deleted | Author |
|---|---|

will collaborate with

| Page 7: Inserted | Author |
|---|---|

with assistance from

| Page 7: Deleted | Author |
|---|---|

and the audit team

| Page 7: Inserted | Author |
|---|---|

will

| Page 7: Deleted | Author |
|---|---|

to

| Page 7: Deleted | Author |
|---|---|

an

| Page 7: Inserted | Author |
|---|---|

the

| Page 7: Commented | Author |
|---|---|

The Consent Decree requires the Monitor to assist in the design of the audit function

| Page 7: Commented | Author |
|---|---|

In the last 90 days the Department has requested meetings with the Monitor on two separate occasions to update him as to our progress with respect to audits. To date, the Monitor has provided no availability.

| Page 7: Deleted | Author |
|---|---|

and preventable adverse event evaluations

| Page 7: Commented | Author |
|---|---|

Evaluating adverse events is not, in the Monitor's opinion, something that should be assigned to the audit team auditing 30 facilities and performing mortality reviews is about as much as these teams can handle.

| Page 7: Commented | Author |
|---|---|

The evaluation of adverse events is triggered by findings in M and M and through reports from staff of issues that need to be addressed.  This is in policy.

| Page 7: Inserted | Author |
|---|---|

mortality reviews, performance and outcome measures, and adverse event reports

will be collated in the audit reports and

| Page 7: Deleted | Author |
|---|---|

| Page 7: Commented | Author |
|---|---|

The audit reports should include mortality reviews, performance and outcome measures, and adverse event reports.

| Page 7: Commented | Author |
|---|---|

Agreed

| Page 8: Deleted | Author |
|---|---|

the field

| Page 8: Inserted | Author |
|---|---|

.quality improvement work

| Page 8: Commented | Author |
|---|---|

This is more specific.

| Page 8: Commented | Author |
|---|---|

Addressed in policy. SIU to perform this function. As an organization, a quality culture needs to be developed. Each facility should have an employee that handles the details of the quality improvement committee. This is in policy.

| Page 8: Deleted | Author |
|---|---|

.

| Page 8: Deleted | Author |
|---|---|

audit

| Page 8: Inserted | Author |
|---|---|

quality improvement program

| Page 8: Deleted | Author |
|---|---|

team

| Page 8: Deleted | Author |
|---|---|

have the ability to

| Page 8: Deleted | Author |
|---|---|

assist

| Page 8: Inserted | Author |
|---|---|

train

| Page 8: Deleted | Author |
|---|---|

improving

| Page 8: Inserted | Author |
|---|---|

quality improvement

| Page 8: Inserted | Author |
|---|---|

. and give guidance on how to take corrective actions identified in audits

| Page 8: Deleted | Author |
|---|---|

.

| Page 8: Commented | Author |
|---|---|

The audit team will be fully occupied in performing audits and mortality reviews and will not have sufficient time to train staff on CQI methodology.

| Page 8: Commented | Author |
|---|---|

The SIU Quality group includes people who are able to train in quality.

| Page 8: Deleted | Author |
|---|---|

Page 4

| Page 9: Deleted | Author |
|---|---|

| Page 9: Inserted | Author |
|---|---|

IDOC will hire additional staff to improve obtain data
- 

| Page 9: Deleted | Author |
|---|---|

IDOC will hire additional staff to improve obtain data
- 

| Page 9: Commented | Author |
|---|---|

This sentence is vague

| Page 9: Deleted | Author |
|---|---|

. The augmented staff will assist in several key functions including
- 

| Page 9: Inserted | Author |
|---|---|

.
- 

| Page 9: Commented | Author |
|---|---|

"Augmented staff is vague.  The Monitor provides more specific

| Page 9: Commented | Author |
|---|---|

We agree that data is of the utmost importance and that an EHR will make this possible.

| Page 9: Deleted | Author |
|---|---|

:
- 

| Page 9: Inserted | Author |
|---|---|

 Accurate data is a critical component of quality improvement work.  IDOC will ensure that data requirements as specified in V.G. of the Consent Decree;  data needs for auditing; and data to provide the Monitor for his reports as required by the Consent Decree will be obtained from the electronic record or other electronic sources.  IDOC will hire a data team to perform this function.  The data team will do the following:
-

| Page 9: Commented | Author |
|---|---|

This gives the basis for obtaining data which is specifically called out in the Consent Decree in provision V.G.

| Page 9: Commented | Author |
|---|---|

There is no requirement that VG data or audit data must be presented to the Monitor in an electronic format.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 9: Deleted | Author |
|---|---|

| Page 9: Inserted | Author |
|---|---|

; and to fulfill requirements of the V.G. provision, needs of the audit team, and needs of the Monitor for his reports
- 

| Page 9: Deleted | Author |
|---|---|

;
- 

| Page 9: Commented | Author |
|---|---|

It's important to conform to IDOC clinical and data needs but the Consent Decree requires data as stipulated in the V.G. provision. Screens should be designed for that purpose as well.

| Page 9: Commented | Author |
|---|---|

While the creations of screens may be ideal, IDOC is able to comply with its obligations under the Decree without this creation. This is evidenced by providing documentation to the parties as well as SIU without the use of screens.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 9: Inserted | Author |
|---|---|

and compile
- 

| Page 9: Deleted | Author |
|---|---|

and analyze
-

| Page 9: Inserted | Author |
|---|---|

; in useable and acceptable format for the audit team, Monitor (for verification of compliance and his reports), and for supporting quality improvement projects

- 

| Page 9: Deleted | Author |
|---|---|

;

- 

| Page 9: Commented | Author |
|---|---|

Provision V.G. of the Consent Decree requires IDOC to provide data and information necessary to evaluate compliance with the Consent Decree. Currently IDOC does not provide all requested data to the Monitor. Approximately 19% of requested data is provided. Data is also provided in formats (quality assurance meeting minutes) that is barely useable. This task is vague and detail is added to satisfy Consent Decree requirements.

| Page 9: Commented | Author |
|---|---|

The added language is not a requirement of the Decree. IDOC will have complied with its EHR obligations once an electronic health record has been implemented. There is no requirement that the EHR meet the needs of the monitor or the audit teams.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 9: Deleted | Author |
|---|---|

Compile data in a format useable by IDOC for purposes of verifying compliance with the Consent Decree and supporting quality improvement projects;

| Page 9: Inserted | Author |
|---|---|

. This item was combined with the above item.

| Page 9: Deleted | Author |
|---|---|

| Page 9: Inserted | Author |
|---|---|

; and develop a dashboard of those measures utilizing data obtained from the electronic record to monthly show facility progress on these performance and outcome measures

- 

| Page 9: Deleted | Author |
|---|---|

;

- 

| Page 9: Commented | Author |
|---|---|

Provision II.B.7. requires development and implementation of a set of performance and outcome measures and to compile data to facilitate these measurements. This gives more detail. In the opinion of the Monitor, the performance and outcome measurements should be in the form of a dashboard. While the Consent Decree does not state what shall be done with performance and outcome measurements, their use is typically in a dashboard which can be used to demonstrate progress towards compliance.

| Page 9: Commented | Author |
|---|---|

Dashboards are reports that are graphically presented.  The EHR will have a business intelligence overlay that allows for graphic representation of progress toward goals using standardized reports.  With the advent of software that can be used by lay-people to present data, the use of dashboards, which require an additional interface, have become obsolete.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 9: Inserted | Author |
|---|---|

| Page 9: Deleted | Author |
|---|---|

proposed

| Page 9: Inserted | Author |
|---|---|

 aand manage

| Page 9: Deleted | Author |
|---|---|

a

| Page 9: Deleted | Author |
|---|---|

 a

| Page 9: Inserted | Author |
|---|---|

a centralized

| Page 9: Inserted | Author |
|---|---|

, categorized and analyzed centrally,

| Page 9: Deleted | Author |
|---|---|

| Page 9: Inserted | Author |
|---|---|

| Page 9: Deleted | Author |
|---|---|

| Page 9: Commented | Author |
|---|---|

Provision II.6.m. requires an adverse event reporting system.  Adverse event reporting is widely used in health care as a means to monitor nonconformances.  Software for adverse event reporting is available. If IDOC elects not to purchase software, they should capture data centrally so it can be analyzed by the quality program as a patient safety effort.

| Page 9: Commented | Author |
|---|---|

This is in the policy.  It contains a reporting contact for SIU team.

| Page 9: Deleted | Author |
|---|---|

identify immediately

| Page 9: Inserted | Author |
|---|---|

immediately

| Page 9: Commented | Author |
|---|---|

This clause is vague

| Page 9: Deleted | Author |
|---|---|

remediate

| Page 9: Inserted | Author |
|---|---|

remediate risks

| Page 9: Deleted | Author |
|---|---|

problems

| Page 9: Inserted | Author |
|---|---|

by the system-wide quality program

| Page 9: Deleted | Author |
|---|---|

as needed

| Page 9: Inserted | Author |
|---|---|

. to prevent systemic patient safety risk

| Page 9: Deleted | Author |
|---|---|

.

| Page 9: Commented | Author |
|---|---|

Adverse events result in patient safety risks.  An adverse event reporting system can assist in remediating problems immediately and in identifying safety risk trends and preventing systemic risk by taking corrective actions to reduce risk.

| Page 9: Commented | Author |
|---|---|

Agree

| Page 9: Inserted | Author |
|---|---|

aged,

| Page 9: Inserted | Author |
|---|---|

, and disabled

| Page 9: Deleted | Author |
|---|---|

| Page 9: Commented | Author |
|---|---|

This is consistent with provisions II.A. and II.B.1-2 of the Consent Decree. The aged and disabled need to be included in this task..

| Page 9: Commented | Author |
|---|---|

This is only consistent with the Decree to the extent the aged/disabled have serious medical or dental needs.

| Page 9: Inserted | Author |
|---|---|

s

| Page 9: Deleted | Author |
|---|---|

has engaged in preliminary discussions with the Illinois Department of Aging ("IDOA")

| Page 9: Inserted | Author |
|---|---|

will hire a qualified consultant

| Page 9: Commented | Author |
|---|---|

IDOC is not intending to engage IDOA to perform this survey. Their most recent proposal is to utilize leadership staff and findings from clinic visits to identify this population when this same group has shown in record reviews that they are unable to identify or manage dementia, memory issues, or to consistently provide care for this population. A qualified expert is necessary to perform this survey.

| Page 9: Commented | Author |
|---|---|

Requiring an expert to assess the needs of the IDOC elderly population exceeds what is required to meet our needs. This requirement is premature as options with the Department of Aging have not been exhausted. It is conjecture that the facility staff will unable to identify the needs of the population it already serves.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 9: Deleted | Author |
|---|---|

| Page 9: Inserted | Author |
|---|---|

Illinois Department of Aging (

| Page 9: Inserted | Author |
|---|---|

)

| Page 9: Deleted | Author |
|---|---|

persons entering a nursing home

| Page 9: Commented | Author |
|---|---|

The Decree does not require IDOC to provide care that is identical to a nursing home in order to comply with the Decree

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable

as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 9: Deleted | Author |
|---|---|

This assessment of needs will result in a report with recommendations to form

| Page 9: Inserted | Author |
|---|---|

result in a report with recommendations to

| Page 9: Commented | Author |
|---|---|

A report with recommendations is consistent with the Consent Decree requirement of the Implementation Plan (IV.A.1) to develop specific tasks…..plans, projects, ..to ensure Defendants fulfill the requirements of this Decree. A report incorporates tasks, plans, and projects to fulfill the Consent Decree.

| Page 9: Commented | Author |
|---|---|

The implementation does not require a report on all objectives in the Decree. Rather the implementation plan serves as the document that tasks, plans and projects.

| Page 9: Inserted | Author |
|---|---|

`

| Page 10: Inserted | Author |
|---|---|

the aged, infirm, and

| Page 10: Deleted | Author |
|---|---|

Such a survey

| Page 10: Inserted | Author |
|---|---|

The report

| Page 10: Deleted | Author |
|---|---|

Page 5

| Page 11: Inserted | Author |
|---|---|

an
•

| Page 11: Inserted | Author |
|---|---|

•

| Page 11: Deleted | Author |
|---|---|

. Subsequent to the Monitor's review of the analysis, IDOC will work to ensure the following:

That every facility will ensure that an appropriate number of dental hygienists are available to meet facility needs;

That each facility with an infirmary will be evaluated for need for physical

therapy services; and

That inmates at all facilities will have equal access to an optometrist

- 

| Page 11: Commented | Author |
|---|---|

These goals have no actionable items. The Monitor adds an actionable item below which is to develop a workload analysis to determine a precise number of staff needed to implement the Consent Decree as required in IV.A.

| Page 11: Commented | Author |
|---|---|

IDOC disagrees that there are no actionable items. Additionally IDOC utilized backlog data to determine need

| Page 11: Deleted | Author |
|---|---|

.
- 

| Page 11: Deleted | Author |
|---|---|

Because new policies and practices are anticipated,

| Page 11: Inserted | Author |
|---|---|

IDOC will develop

| Page 11: Deleted | Author |
|---|---|

cannot be determined at this time

| Page 11: Deleted | Author |
|---|---|

For that reason, IDOC proposes to repeat the staffing analysis after policies and procedures are implemented and facilities have had time to assess how workloads have changed.

| Page 11: Commented | Author |
|---|---|

IDOC is unable to provide a precise staffing analysis because they haven't performed a precise staffing analysis based on workload analysis for all staffing types.

| Page 11: Commented | Author |
|---|---|

The monitor has provided nothing more than conjecture that IDOC's current staffing analysis does not meet our needs or will  insufficient to comply with the Decree.

| Page 11: Inserted | Author |
|---|---|

by hiring a consultant to complete a workload analysis to more precisely determine baseline staffing needs and to create a template for how to make future staffing changes using a workload template or algorithm. The workload analysis and template will guide future position additions or subtractions based on changing circumstances.  IDOC will ensure sufficient key staff, including physicians are hired as soon as possible.

| Page 11: Commented | Author |
|---|---|

This will give the IDOC a baseline estimate of need and a way to use the consultant's methodology to add staff based on programmatic changes.

| Page 11: Commented | Author |
|---|---|

The monitor has provided nothing more than conjecture that IDOC's current staffing analysis does not

meet our needs or will be insufficient to comply with the Decree.

| Page 11: Commented | Author |
|---|---|

IDOC should perform a workload analysis to develop an algorithm for hiring that will help them for current and future staffing which is consistent with the requirement of IV.A of the Consent Decree.

| Page 11: Commented | Author |
|---|---|

The monitor has provided nothing more than conjecture that IDOC's current staffing analysis does not meet our needs or will be insufficient to comply with the Decree.

| Page 11: Deleted | Author |
|---|---|

Given that it will take time to develop and implement policies and procedures and train staff as to the modified protocols, it is anticipated that the second staffing analysis will take place in the next 2-3 years

| Page 11: Commented | Author |
|---|---|

If a workload analysis is not performed, in two to three years, IDOC will repeat the same type of estimate that will not be based on actual need.

| Page 11: Commented | Author |
|---|---|

This is conjecture

| Page 11: Deleted | Author |
|---|---|

.

| Page 11: Deleted | Author |
|---|---|

to a rate similar to industry standards

| Page 11: Inserted | Author |
|---|---|

.to

| Page 11: Commented | Author |
|---|---|

What is the industry standard IDOC is using?  Based on experience in multiple settings, we recommend a 15% vacancy as a maximum for acceptability for non-critical positions.  Critical positions should be filled ASAP.

| Page 11: Commented | Author |
|---|---|

Given the current climate a vacancy rate of 15% exceeds what is happening in the community. https://www.medicaleconomics.com/view/the-crisis-in-healthcare-staffing; See also https://www.aha.org/lettercomment/2022-03-01-aha-provides-information-congress-re-challenges-facing-americas-health.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 11: Inserted | Author |
|---|---|

attain no more than a 15% vacancy rate for non-critical positions[1]

---

[1] Critical positions are OHS non-clerical staff, HCUAs, Medical Directors, Directors of Nursing, Dentists,

| Page 11: Deleted | Author |
|---|---|

.

| Page 11: Deleted | Author |
|---|---|

There are a variety of reasons for the current high vacancy rate, which include a nationwide nursing shortage, the remote location of IDOC facilities and a medically demanding patient population

| Page 11: Commented | Author |
|---|---|

IDOC should focus on modifiable reasons for the vacancy rate which can be a defective hiring process which they have previously mentioned and possibly salaries. How will IDOC implement the Consent Decree and hire staff should be the focus in this document.

| Page 11: Commented | Author |
|---|---|

The Decree cannot mandate that the Department's hiring goals exceed what is occurring in the community. There is ample evidence of a staffing shortage for healthcare professionals.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. *Doe v. Cook County*, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 11: Deleted | Author |
|---|---|

.

| Page 11: Deleted | Author |
|---|---|

Page 6

| Page 12: Inserted | Author |
|---|---|

**RELATIONS WITH MONITOR**

| Page 12: Deleted | Author |
|---|---|

**RELATIONS WITH MONITOR**

The Consent Decree requires the Monitor to provide input and assistance to IDOC and specifically states in IV.A.,

> The Defendants, ***with assistance of the Monitor***, shall conduct a staffing analysis and create ***and implement*** an Implementation Plan to accomplish the obligations and objectives in this Decree.

---

Dental Hygienists, Physical Therapists, and Project Management staff which should be filled as soon as possible.

To alleviate misunderstanding, input is defined as help, ideas, knowledge, advice or information given to IDOC by the Monitor *prior* to development or initiation of Implementation Plan tasks and *ongoing* help, ideas, knowledge, advice or information occurring during development and implementation of any IDOC effort to make changes called for by the Consent Decree.

Assistance is defined as contributing, supporting or helping in the effort to complete tasks. Assistance is provided on an ongoing basis, as deemed necessary by the Monitor or as requested by IDOC or its consultants, in the effort to attain compliance with the Consent Decree. Assistance *does not* imply or condone ultimate responsibility for implementation of tasks necessary to comply with the Consent Decree which rests with IDOC.

Input and assistance of the Monitor shall not unreasonably distract IDOC staff or consultants from their duties; will be evidenced by free and open communication between the Monitor and his consultants with clinical leadership of IDOC and their consultants; and will be arranged and scheduled by the Monitor and his consultants or at the request of the IDOC clinical leadership or their consultants. This communication shall not be controlled or directed by IDOC attorneys.

| Page 12: Inserted | Author |
|---|---|

The Consent Decree requires the Monitor to provide input and assistance to IDOC and specifically states in IV.A.,
The Defendants, **with assistance of the Monitor**, shall conduct a staffing analysis and create **and implement** an Implementation Plan to accomplish the obligations and objectives in this Decree.

| Page 12: Inserted | Author |
|---|---|

To alleviate misunderstanding, input is defined as help, ideas, knowledge, advice or information given to IDOC by the Monitor *prior* to development or initiation of Implementation Plan tasks and *ongoing* help, ideas, knowledge, advice or information occurring during development and implementation of any IDOC effort to make changes called for by the Consent Decree.

Assistance is defined as contributing, supporting or helping in the effort to complete tasks. Assistance is provided on an ongoing basis, as deemed necessary by the Monitor or as requested by IDOC or its consultants, in the effort to attain compliance with the Consent Decree. Assistance *does not* imply or condone ultimate responsibility for implementation of tasks necessary to comply with the Consent Decree which rests with IDOC.

Input and assistance of the Monitor shall not unreasonably distract IDOC staff or consultants from their duties; will be evidenced by free and open communication between the Monitor and his consultants with clinical leadership of IDOC and their consultants; and will be arranged and scheduled by the Monitor and his consultants or at the request of the IDOC clinical leadership or their consultants. This communication shall not be controlled or directed by IDOC attorneys.

| Page 12: Commented | Author |
|---|---|

The Consent Decree directs the Monitor to provide input and assistance to IDOC (II.B.8., II.B.9.,III.A.3-6., III.L.1., IV.B, and V.E.). At the inception of the Consent Decree communication between the Monitor and IDOC clinical leadership and consultants  was free and open.  Currently the Monitor and his consultants are not able to have communication with any IDOC leadership staff or consultant without having it arranged, with time limits, by IDOC counsel.  This has become a barrier to communication and has significantly decreased communication between the Monitor and IDOC leadership staff and their consultants and has resulted in minimal opportunities to provide input or assistance, which now occurs after a project is initiated.  Assistance is extremely limited and, in some cases, such as with policies, has not occurred for an extended period.  The difficulties, delays, and time restraints related to setting up meetings associated with this process has limited IDOC staff contact with the Monitor and his consultants and is resulting in delays in the goal of attaining compliance with the Consent Decree.  The insertion of these definitions is necessary to promote forward progress toward compliance with the Consent Decree.

| Page 12: Commented | Author |
|---|---|

The consent decree already outlines the obligations of the parties. This is unnecessary. The third paragraph is inconsistent with the language of the Decree which permits counsel to be present when speaking with any staff member. IDOC has , and will continue to, work collaboratively with the Monitor within the confines of the Decree.

| Page 12: Inserted | Author |
|---|---|

| Page 13: Deleted | Author |
|---|---|

Page 7

| Page 14: Inserted | Author | |
|---|---|---|
| 1.a. | IDOC will hire a qualified consultant to perform a workload analysis for **all** staffing needs.  The workload analysis will form a baseline staffing need for all position types and the template or algorithm used in the analysis will be utilized to develop changes in staffing needs based on increases or decreases in inmate population or programmatic change. | IV.A |
| 1.b. | IDOC will ensure that the requirements of the workload analysis include analysis of all the Monitor's recommendations with respect to staffing.  The workload analysis would provide a workload analysis methodology for staffing recommended by the Monitor. | IV.A V.E. |

| Page 14: Commented | Author |
|---|---|

I DOC does not know how many staff it needs nor does it have a methodology for adding or subtracting staff in the future.  Yet the Consent Decree (provisions IV.A. and IV.A.2.) require a staffing analysis must be completed that ensures IDOC can implement the Consent Decree.  The current staffing analysis does not ensure (and IDOC admits that in the Staffing section in the narrative of this document) that a precise staffing analysis cannot be determined.  A workload analysis is a quantifiable methodology for adding or subtracting staff and can accomplish that task.  A qualified person should perform this analysis such that the methodology can be demonstrated.  This analysis, if appropriately performed, should answer many of the Monitor's concerns and recommendations about staffing and enhance the ability to effectively add staff when appropriate now and into the future.

| Page 14: Commented | Author |
|---|---|

IDOC has already conducted and finalized a staffing analysis. It is nothing more than conjecture to suggest that the additional positions outlined in the staffing analysis are not sufficient to meet the needs of the population. Especially considering the staffing analysis was finalized at a time when the population included nearly 10,000 more individuals in custody than it does now. Additionally a workload analysis is not fruitful at this time, for the above reasons mentioned but also because IDOC has yet to implement revised policies and the EHR.

| Page 14: Deleted | Author |
|---|---|

**March 1 2023**

| Page 14: Commented | Author |
|---|---|

The Monitor is required to provide assistance to IDOC in development of a staffing plan (IV.A., IV.A.2, and V.E.)  The Monitor provided multiple recommendations to IDOC with respect to staffing.  IDOC has ignored many of the Monitor's recommendations and has not hired many staff recommended by the Monitor.  A qualified workplan analysis would establish a quantifiable methodology for addressing Monitor recommendations.

| Page 14: Commented | Author |
|---|---|

Reject as written.  IDOC will agree to perform a revised staffing analysis upon implementation of EHR and policies and with new vendor.

| Page 14: Deleted | Author |
|---|---|

**June 2023**

| Page 14: Deleted | Author |
|---|---|

| Page 14: Inserted | Author |
|---|---|

 audit teams (1 coordinator, 2 physicians, 2 nurse practitioners, 4 RNs, 2 quality specialists, ½ dentist) 3 data team members, an executive director, a director of quality management, an administrative assistant, a quality improvement coordinator, 2 quality improvement specialists, 3 process analysts. IDOC will negotiate with SIU to hire project managers listed below.

| Page 14: Deleted | Author |
|---|---|

staff as part of the it's collaboration with IDOC including but not limited to data team, audit team, quality team, and will explore opportunities to hiring additional clinical staff.

| Page 14: Commented | Author |
|---|---|

It isn't clear what this means with respect to specifics of who will be hired and how these staff will be employed to address the Implementation Plan. The Monitor uses the SIU 2022 proposal which was more specific and is in agreement with Monitor input.

| Page 14: Commented | Author |
|---|---|

IDOC is working with SIU to hire 2 physicians, 2 APNs, 4 RNS, 2 quality specialists. IDOC has also agreed to hire an executive director, a director of quality management, an administrative assistant, a quality improvement coordinator, 2 quality improvement specialists

| Page 14: Commented | Author |
|---|---|

IDOC only agreed to .25 FTE dentist and did not agree to hire 3 process analysts. Though our partnership with SIU, IDOC has access to process analyst. The Monitor may not dictate who IDOC contracts with.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. *Doe v. Cook County*, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 14: Inserted | Author |
|---|---|

**II.B.3. , IV.A.2**

| Page 14: Deleted | Author |
|---|---|

**Sep-22**

| Page 14: Inserted | Author |
|---|---|

**Dec 22**

| Page 14: Inserted | Author |
|---|---|

| Page 14: Deleted | Author |
|---|---|

explore options to identify

| Page 14: Commented | Author |
|---|---|

Policies, implementation of the EMR, and implementation of an Implementation Plan are all significantly overdue and are requirements of the Consent Decree. Yet in the latest Implementation Plan, IDOC assigns responsibility to the same group of OHS leadership for all policies. It states it will assign a work group or specific individuals to write all policies. IDOC has, so far, produced 25 drafts of policies none of which are completed. They now assign to the same individuals the responsibility to do what they have not been able to do after more than three years. Exploring options to hiring is not what IDOC needs. It is obvious that IDOC does not have staff to complete these tasks. Project managers for these overdue items are needed as all three are essential Consent Decree requirements.

| Page 14: Commented | Author |
|---|---|

IDOC does not need full-time project managers for the items listed here. Dr. Jane Leonardson has already written dozens of policies and will continue to serve as an expert in EHR and assist with implementation plan objectives.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. *Doe v. Cook County*, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 14: Deleted | Author |
|---|---|

and

| Page 14: Deleted | Author |
|---|---|

additional executive staff to work with OHS (such as   a

| Page 14: Inserted | Author |
|---|---|

for the following services

| Page 14: Deleted | Author |
|---|---|

, or consultants) to manage the implementation plan. Specific areas will include

| Page 14: Inserted | Author |
|---|---|

1) Full-tiime Implementation Plan
project manager

| Page 14: Deleted | Author |
|---|---|

i

| Page 14: Deleted | Author |
|---|---|

| Page 14: Inserted | Author |
|---|---|

2) Full-time

| Page 14: Deleted | Author |
|---|---|

| Page 14: Inserted | Author |
|---|---|

  project manager
3) Full-time

| Page 14: Inserted | Author |
|---|---|

  project manager

| Page 14: Deleted | Author |
|---|---|

  Analysis of Aging and Infirm Population
Physical Plant Assessment

| Page 14: Inserted | Author |
|---|---|

**II.B.3. , IV.A.2**

| Page 14: Inserted | Author |
|---|---|

**; IDOC Human Resources;**

| Page 14: Commented | Author |
|---|---|

Human Resources should be responsible for establishing the requirements for these positions and for actually hiring the consultant.  The Monitor would agree if IDOC arranges for SIU to hire these positions.

| Page 14: Commented | Author |
|---|---|

Agree

| Page 14: Deleted | Author |
|---|---|

**Jul-22**

| Page 14: Inserted | Author |
|---|---|

**October 2022**

| Page 14: Inserted | Author |
|---|---|

, CMS, and the vendor

| Page 14: Deleted | Author |
|---|---|

review

| Page 14: Inserted | Author |
|---|---|

monitor time-to-hire and

| Page 14: Inserted | Author |
|---|---|

.  The group will set a time-to-hire goal and a vacancy goal to measure

| Page 14: Commented | Author |
|---|---|

IDOC and its vendor have been unable to hire employees and is failing in several Consent Decree requirements regarding staffing (II.B.2, II.B.3., IV.A., and IV.A.2.)  There is a net loss of employees since 2019. The meetings between OHS and human resources needs to have a purpose that moves the IDOC toward compliance.  It is our opinion that Central Management Service and the vendor should be added. The group of OHS, human resources, CMS and the vendor need to determine how to improve hiring and should set goals including time-to-hire and vacancy rate against which they would measure their performance.  Time to hire and vacancy rate should be performance measures.

| Page 14: Commented | Author |
|---|---|

Meetings with the vendor are covered in the next section. Hiring cannot be expected to exceed the community standard.

| Page 14: Inserted | Author |
|---|---|

against.

| Page 14: Inserted | Author |
|---|---|

, II.B.2, II.B.3. , IV.A.2

| Page 14: Inserted | Author |
|---|---|

To start October 2022 with quarterly meetings

| Page 14: Deleted | Author |
|---|---|

Ongoing

| Page 14: Inserted | Author |
|---|---|

, II.B.2, II.B.3. , IV.A.2

| Page 15: Inserted | Author |
|---|---|

, the vendor,

| Page 15: Deleted | Author |
|---|---|

process

| Page 15: Inserted | Author |
|---|---|

and conduct corrective actions

| Page 15: Inserted | Author |
|---|---|

. based on established goals

| Page 15: Deleted | Author |
|---|---|

.

| Page 15: Inserted | Author |
|---|---|

This group will establish and work to improve time-to-hire goals and establish workplans for corrective action for vacancy rates greater than 10% or any vacancies in critical positions (Medical Directors, HCUAs, Directors of Nursing, Dentists, project management staff, and OHS non-support staff)

| Page 15: Commented | Author |
|---|---|

Hiring staff is not at goal and hiring consistent with Consent Decree requirements is significantly not at goal and is not timely (II.B.2.,II.B.3, IV.A., and IV.A.2) The people responsible for hiring must be proactive in taking steps to improve deficient hiring practices. Their corrective actions should be judged against future performance. This must include the vendor and IDOC.

| Page 15: Commented | Author |
|---|---|

A vacancy rate of less than 10% far exceeds the community standard. The Decree does not require this information to tracked on a dashboard. The state has other legal obligations which impact the pace of hiring.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. *Doe v. Cook County*, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 15: Inserted | Author |
|---|---|

. This group will track and report its progress over time as a performance and outcome measure as measured on a dashboard.

| Page 15: Deleted | Author |
|---|---|

over time as a performance and outcome measure as measured on a dashboard.

| Page 15: Commented | Author |
|---|---|

Hiring is a critical component of obtaining sufficient staff. Tracking performance is best done by developing performance and outcome measures which time-to-hire and vacancy rate are. These measures are best tracked on a performance and outcome dashboard.

| Page 15: Commented | Author |
|---|---|

The Department does not object to tracking hiring data. However, the consent decree does not require the use of a dashboard to track this data

| Page 15: Inserted | Author |
|---|---|

, II.B.2, II.B.3. , IV.A.2

| Page 15: Inserted | Author |
|---|---|

, vendor, OHS,

| Page 15: Deleted | Author |
|---|---|

Develop partnerships with universities to augment staff outlined in the staffing analysis

| Page 15: Commented | Author |
|---|---|

This item is vague and its not clear what will be done. IDOC should develop plans that are more concrete and have are actionable. Items that are goals should be excluded.

| Page 15: Commented | Author |
|---|---|

Disagree that this task is vague. The Decree does not mandate university partnerships and cannot mandate non-party participation

| Page 15: Inserted | Author |
|---|---|

.  See part two of task 4 below

| Page 15: Inserted | Author |
|---|---|

 as soon as possible with expedited hiring

| Page 15: Commented | Author |
|---|---|

This is vague but should not exceed community standard

| Page 15: Inserted | Author |
|---|---|

for key positions (Medical Directors, HCUAs, Directors of Nursing, Dentists, project management staff, and OHS non-support staff).

| Page 15: Inserted | Author |
|---|---|

**, II.B.2, II.B.3. , IV.A.2**

| Page 15: Inserted | Author |
|---|---|

**, II.B.2, II.B.3. , IV.A.2**

| Page 15: Inserted | Author |
|---|---|

**, II.B.2, II.B.3. , IV.A.2**

| Page 15: Inserted | Author |
|---|---|

**, II.B.2, II.B.3. , IV.A.2**

| Page 15: Deleted | Author |
|---|---|

**4**

| Page 15: Deleted | Author |
|---|---|

assign

| Page 15: Inserted | Author |
|---|---|

approve position descriptions (which include qualifications) for

| Page 15: Inserted | Author |
|---|---|

infection control coordinators, chronic care nurses, and

| Page 15: Inserted | Author |
|---|---|

.  The Agency Medical Director will ultimately be responsible for recommending  the hiring and firing for all health care employees through designees.  Each facility will have a dedicated infection control coordinator, chronic care nurse, and quality improvement coordinator

| Page 15: Commented | Author |
|---|---|

Assigning positions in IDOC means that a person with another assignment (e.g. medical records supervisor) who may not have the training or time (given other responsibilities) to be assigned the role of a key position..  Instead of assignment, the IDOC needs to hire dedicated infection control and chronic disease nurses and CQI coordinators. Chief OHS should ultimately be responsible for the hiring and firing of health care personnel.  All facilities need a full-time infection control nurse, chronic disease nurse, and quality improvement coordinator with each of these positions requiring qualifications and training.  These positions should be full time not a part time position.

| Page 15: Commented | Author |
|---|---|

A chronic care nurse is not standard in the community.  Also, with an EHR, the ordering of medications, and medical activities or follow up appointments is done by the provider.  Decisions about ordering labs and interval followups should be made by the provider with the DMGs as a guideline.  These decisions should not be determined by a nurse based on a policy requirement.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. *Doe v. Cook County*, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 15: Commented | Author |
|---|---|

Med director can only recommend termination. He will not be ultimately responsible as the state of Illinois is still governed by Shackman, Rutan and various unions

| Page 15: Inserted | Author |
|---|---|

 with Agency Medical Director or designee approving the hiring quality improvement coordinators (see task # 48 below which can be eliminated)

| Page 15: Inserted | Author |
|---|---|

**, II.B.2, II.B.3. , IV.A.2**

| Page 15: Deleted | Author |
|---|---|

**Jun-22September 2022**

| Page 15: Inserted | Author |
|---|---|

**September 2022 January 2023**

| Page 15: Deleted | Author |
|---|---|

IDOC and vendor to participate in ongoing recruitment opportunities to secure sufficient medical  and dental staff

| Page 15: Inserted | Author |
|---|---|

. IDOC will  develop an alternative source of obtaining physicians.  IDOC will initiate negotiations with SIU, UIC or other parties (FQHCs, etc.) for arrangements to provide physician staff for any facility with vacant vendor Medical Director or physician for six months or more (without use of a "traveling medical director or coverage doctor arrangement).  IDOC will make contract modifications to the vendor contract so that these positions can be filled with alternate physicians and to allow the new physician to be the clinical authority at that facility.

| Page 15: Commented | Author |
|---|---|

This task provided by IDOC is no different than existing practice and is not a change.  The vendor is under contract to provide physicians but has been unable to fill all qualified Medical Director and physician positions for years, well before the Consent Decree.  This is a significant risk to patients. Based on Consent Decree provisions II.B.2-3, III.A.2., IV.A. and IV.A.2., IDOC must find a way to obtain qualified physicians.  We suggest one option to obtain qualified physicians (Universities and FQHCs utilize qualified physicians).  Using FQHCs or university physicians requires IDOC to modify its contract with the vendor to permit use of non-vendor physicians but IDOC failed to previously do this when it considered using SIU physicians in four southern facilities.  Raising salaries is another option that the vendor may consider.

| Page 15: Commented | Author |
|---|---|

IDOC will explore alternate physician recruitment. IDOC cannot be mandated to contract with an outside entity. These vacancy timelines have been artitrarily selected and not consistent with the

community standards.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 15: Inserted | Author |
|---|---|

**II.B.2,**

| Page 15: Inserted | Author |
|---|---|

**, III.A.2, IV.A.2**

| Page 15: Deleted | Author |
|---|---|

**OngoingInitiate October 2022**

| Page 15: Inserted | Author |
|---|---|

**Initiate October 2022**

| Page 15: Inserted | Author |
|---|---|

**.  The organizational chart will show that the Chief OHS is ultimately responsible directly or through designees for the recommendation of the  hiring and firing of all health employees including the HCUA.**

| Page 15: Deleted | Author |
|---|---|


| Page 15: Commented | Author |
|---|---|

II.B.3 of the Consent Decree requires enough trained staff with oversight by qualified professionals.  The Warden hires, fires and writes the performance evaluations of the HCUAs.  The Chief OHS should be the health authority and be ultimately responsible for who works in the medical program not the Warden.  It is not clear in the table of organization who employees are supervised by and because IDOC has hybrid staffing (60% vendor 40% IDOC) supervision issues arise that are a barrier to operational effectiveness. If the changes called for in the Consent Decree are to take place the Chief of OHS needs to be able to assign work and hold subordinates accountable to perform work assigned per expectations.  This oversight of employees is required by II.B.3. of the Consent Decree.

| Page 15: Commented | Author |
|---|---|

Med director can only recommend termination. He will not be ultimately responsible as the state of Illinois is still governed by Shackman, Rutan and various unions

| Page 15: Inserted | Author |
|---|---|

**II.B.3.**

| Page 15: Deleted | Author |
|---|---|

**Apr-22**

| Page 15: Inserted | Author |
|---|---|

**March 2023**

| Page 16: Inserted | Author |
|---|---|

and the relationship between the HCUA and vendor staff at each facility

| Page 16: Commented | Author |
|---|---|

IDOC employs about 40% of staff and the vendor employs about 60% of the staff. Staff will at times not take direction from a supervisor from another employer. Contract language and evidence in practice must ensure that assigned supervisors have the authority to supervise. II.B.3. requires enough trained staff with oversight by qualified professionals. Due to a hybrid system, oversight is a mixed vendor/IDOC staff does not occur at some facilities.

| Page 16: Commented | Author |
|---|---|

Will agree to language that allows HCUA to impact activities on the unit. Will not create a document which implies a co-employer relationship with medical vendor staff

| Page 16: Inserted | Author |
|---|---|

. The table of organization shall represent supervisory relationships.

| Page 16: Inserted | Author |
|---|---|

**II.B.3**

| Page 16: Deleted | Author |
|---|---|

**OHS Leadership to develop new and ongoing training for healthcare staff**
**1. Facility HCUAs will be responsible for ensuring new staff are trained on existing policies, procedures and processes** **2.**
**Through Continuous Quality Improvement meetings, Annual Governing Body Meetings and otherwise as needed, OHS leadership will institute training on new initiatives related to the Lippert Consent Decree, including quality improvement, partner safety initiatives and annual nurse updates**

| Page 16: Commented | Author |
|---|---|

This is vague and does not describe how training will be implemented. See task below.

| Page 16: Commented | Author |
|---|---|

Response to training tasks outlined below

| Page 16: Deleted | Author |
|---|---|

**Provide ongoing training for nurses, physicians, mid-level providers and other staff based on training need and role.**
  1.

| Page 16: Inserted | Author |
|---|---|

**Develop written procedures for expectation of training to include:**
  1.

| Page 16: Commented | Author |
|---|---|

A procedure for training will give details on the various training efforts and how training is tracked. Training will be different for the different areas of service (procedural, quality improvement, clinical, electronic record, or new employee training) and the audience for the training will be different. A procedure covering these different types of training should be sufficient..

| Page 16: Commented | Author |
|---|---|

Agree.

| Page 16: Deleted | Author |
|---|---|

In addition to standard IDOC Cycle training, Health Care specific trainings will include:
  1.

| Page 16: Inserted | Author |
|---|---|

1.

| Page 16: Deleted | Author |
|---|---|

Administrative Directives, policies and procedures
1.

| Page 16: Inserted | Author |
|---|---|

; Procedural training (new policies, new procedural initiatives
1.

| Page 16: Deleted | Author |
|---|---|

;
1.

| Page 16: Inserted | Author |
|---|---|

and new or modified processes)
1.

| Page 16: Commented | Author |
|---|---|

This training is managed by OHS with the author or expert on the procedure and can be provided from OHS to HCUAs and facility leadership and then on to staff.

| Page 16: Commented | Author |
|---|---|

Agree

| Page 16: Deleted | Author |
|---|---|

Lippert Consent Decree initiatives such as vaccination training for nurses using CDC guidance;
1.

| Page 16: Commented | Author |
|---|---|

Training on a Lippert initiative should be no different that training on a new procedure. See task #1 above.

| Page 16: Commented | Author |
|---|---|

Agree

| Page 16: Deleted | Author |
|---|---|

| Page 16: Inserted | Author |
|---|---|

training
1.

| Page 16: Commented | Author |
|---|---|

This specialized training should be directed by the Quality Management Program and the Quality Improvement Coordinator at the direction and with approval from OHS.

| Page 16: Commented | Author |
|---|---|

Agree

| Page 16: Deleted | Author |
|---|---|

Process updates (such as medication administration, clinical operations, and infection control
1.

| Page 16: Commented | Author |
|---|---|

Procedure for this type of training is same for item 1 above

| Page 16: Commented | Author |
|---|---|

Agree

| Page 16: Inserted | Author |
|---|---|

)
  1.

| Page 16: Deleted | Author |
|---|---|

  1.

| Page 16: Deleted | Author |
|---|---|

)
  1.

| Page 16: Inserted | Author |
|---|---|

Clinical practice training and updates
  1.

| Page 16: Commented | Author |
|---|---|

This training should be directed by OHS clinical leadership and through facility leadership to pertinent clinical staff.

| Page 16: Commented | Author |
|---|---|

Agree

| Page 16: Inserted | Author |
|---|---|

1. (e.g., provider training on asthma management, nurse training on vital sign assessment, medication administration, nurse training on use of a point of care device, etc.)
Electronic medical record training both
  1.

| Page 16: Commented | Author |
|---|---|

This is specialized technical training that should be performed by IT staff. Initial training should include computer literacy as well as hands-on training with the software in the areas of responsibility for the employee. Updates in software need to include training. New employees need to be trained. Because a significant number of employees will be hired over the next year to two, and because of ongoing training needs, the staff responsible for this training should be hired as full time employees.

| Page 16: Commented | Author |
|---|---|

EHR training and the development of materials for training should be performed by trainers who use the record. Not IT staff

| Page 16: Inserted | Author |
|---|---|

  1. initial and ongoing
New employee training
  1.

| Page 16: Commented | Author |
|---|---|

New employees need a variety of training on policy, procedures, the electronic record, their responsibilities, etc. This is best done in a structured manner done during the first week of employment and directed by the supervisor with the help of other trainers (IT for electronic record training, clinical supervisor for policy and clinical procedures, HCUA or designee on work rules, etc.)

| Page 16: Commented | Author |
|---|---|

Agree there should be a formal onboarding training by job duties. Training within 1 week of hire may not be reasonable.

| Page 16: Commented | Author |
|---|---|

Often EHR training materials are in the form of a written SOP that can be printed, followed and kept as a reference for users to keep.  In-person EHR training is ok for initial training or more complicated updates.

| Page 16: Inserted | Author |
|---|---|

1.
Training procedures shall include the format of training (in-person, video conference, onsite, quarterly meeting, etc.); copies of the new policy or procedure for all attendees; sign-off acknowledgement that training was received; in some cases verification of competence with the training (taking blood pressure, using a point of care device, etc.)

1.

| Page 16: Inserted | Author |
|---|---|

**, II.B.6.o., IV A.2**

| Page 16: Deleted | Author |
|---|---|

**Ongoing**

| Page 16: Inserted | Author |
|---|---|

**January 2023**

| Page 16: Inserted | Author |
|---|---|

Have dedicated staff for

| Page 16: Deleted | Author |
|---|---|

Train staff for job-specific roles such as

| Page 16: Inserted | Author |
|---|---|

nurse

| Page 16: Inserted | Author |
|---|---|

nurse

| Page 16: Deleted | Author |
|---|---|

or

| Page 16: Inserted | Author |
|---|---|

and

| Page 16: Commented | Author |
|---|---|

II.B.3 requires enough trained staff. IDOC suggests continuation of the current practice of using multipurpose nurses to fulfill duties of chronic care and infection control nurses and a person with another full time assignment to be quality improvement coordinator.  This has failed and no changes are provided to demonstrate that continuation of this process will succeed.  The Monitor believes that II.B.3.and IV.A.2. will not be fulfilled unless the chronic care nurse, quality improvement coordinator and infection control coordinator positions are dedicated positions.  These individuals will need further specialized training but the training will not be a substitute for a full-time dedicated position.

| Page 16: Commented | Author |
|---|---|

A chronic care nurse is not standard in the community, otherwise accept

| Page 16: Deleted | Author |
|---|---|

**Mar-22**

| Page 16: Inserted | Author |
|---|---|

**June 2023**

| Page 16: Inserted | Author |
|---|---|

| 8.a. | Hire a training coordinator to track training, coordinate support for the training, and ensure staff training occurs for all relevant staff | II.B.3, IV A.2 |
|---|---|---|

| Page 16: Commented | Author |
|---|---|

II.B.3 and IV.A.2 require effective training to be implemented. Due to the size of IDOC, a single responsible person should be available to organize training activities system wide. Facility training activities can be managed through the HCUA.

| Page 16: Commented | Author |
|---|---|

IDOC already staffs a system-wide training department. Hiring a training coordinator is therefore unnecessary.

| Page 16: Commented | Author |
|---|---|

Items 10 - 15 are the standard steps to procure a vendor. These dates have come and gone without any report from IDOC of progress. Assuming there has been none, IDOC needs to reset the dates throughout this section.

| Page 16: Commented | Author |
|---|---|

The monitor is aware of actions taken towards procuring EHR vendor

| Page 16: Inserted | Author |
|---|---|

Ensure RFP and contract is written to obtain sufficient staffing and be consistent with requirements of Consent Decree vis a vis it's policies and procedures and

| Page 16: Commented | Author |
|---|---|

Provision V.G. requires that "Defendants represent that any vendor contract will require vendors to comply with all court orders, policies and procedures of IDOC". This should be specifically called out in the contract. As comprehensive policies are consistent with requirements of the Consent Decree, this will further movement towards compliance.

| Page 16: Commented | Author |
|---|---|

Agree

| Page 16: Inserted | Author |
|---|---|

includes the possibility for using physicians from another source in the event the vendor cannot provide sufficient qualified physicians.

| Page 16: Commented | Author |
|---|---|

Provision III.A.2. gives credential requirements for hiring physicians. IDOC's vendor is unable to fulfill this requirement and has not filled all its physician positions. IDOC planned to use SIU physicians at four facilities but failed to complete an arrangement with SIU due to the respective contracts with SIU and the vendor each having language that would have created a parallel medical clinical authority at the site. The use of university based physician is an excellent idea and IDOC should modify contract language and the RFP language to allow use of physicians other than vendor physicians which would move IDOC considerably closer to compliance.

| Page 16: Commented | Author |
|---|---|

IDOC has agreed to explore augmenting physician staffing. IDOC cannot be compelled to contract with outside entity

| Page 16: Inserted | Author |
|---|---|

| Page 16: Inserted | Author |
|---|---|

| Page 16: Inserted | Author |
|---|---|

**II.B.2, II.B.3, III.A.2, IV.A.2, V.G.**

| Page 16: Inserted | Author |
|---|---|

**October 22**

| Page 17: Inserted | Author |
|---|---|

**December 23**

| Page 18: Deleted | Author |
|---|---|

**Jun-22**

| Page 18: Inserted | Author |
|---|---|

**May 23**

| Page 18: Inserted | Author |
|---|---|

contract consistent with Consent Decree

| Page 18: Commented | Author |
|---|---|

IDOC should write the contract so that it is not a barrier for IDOC to implement the Consent Decree otherwise the Consent Decree will be more difficult to implement. For example, if IDOC wants to use physicians from another source absent vendor satisfactorily filling physician positions, the contract language should permit this. Also, the Consent Decree specifically states that the contractural structures incentivize adequate medical care and the vendor contract is to be monitored for that. Contract language should evidence that Consent Decree requirement. Monitoring for this is explained in task 16 below. As well, provision V.G. requires the vendor to comply with court orders and IDOC policy and procedure and this should be called out in the any contract.

| Page 18: Deleted | Author |
|---|---|

| Page 18: Commented | Author |
|---|---|

Agree that contract will be consistent with the Decree

| Page 18: Inserted | Author |
|---|---|

.

| Page 18: Inserted | Author |
|---|---|

**II.B.2, II.B.3, II.B.6. r, II.B. 7, III.A.2, III.A.4., III.M.1, IV.A.2, V.G., V.H.**

| Page 18: Inserted | Author |
|---|---|

**June 23**

| Page 18: Deleted | Author |
|---|---|

**Jul-22**

| Page 18: Deleted | Author |
|---|---|

**contracts for**

| Page 18: Inserted | Author |
|---|---|

**performance**

| Page 18: Commented | Author |
|---|---|

Provision II.B.2. of the Consent Decree requires monitoring of health care to include performance measurement, action plans, effective peer review and effective vendor contractual oversight and contract structures that incentivize adequate care. The audit results should, if properly designed, monitor clinical care. The auditors should also evaluate staffing at each facility audited to determine performance in vacancy rate and time to hire. It is the performance and not the contract that are monitored.

| Page 18: Commented | Author |
|---|---|

Agree.

| Page 18: Inserted | Author |
|---|---|

of

| Page 18: Inserted | Author |
|---|---|

| Page 18: Inserted | Author |
|---|---|

of staffing and clinical performance.
**2.** Use performance measures of vacancy rate, positions filled compared to contract staffing numbers, and number of days without key personnel (Medical Director, Director of Nursing, supervisory nurses) as a measurement of staffing performance.
**3.** Develop procedure to use annual facility audits in aggregate as measures of clinical performance of the vendor.
**4.** Develop a procedure for collating material from staffing and clinical performance to judge and score performance.

| Page 18: Deleted | Author |
|---|---|

2

| Page 18: Inserted | Author |
|---|---|

5

| Page 18: Deleted | Author |
|---|---|

.

| Page 18: Commented | Author |
|---|---|

The Consent Decree requires meaningful performance measurement including contractual oversight and contract structures that incentivize providing adequate care (II.B.2). Since adequate care requires adequate staffing and adequate administrative and clinical performance, these performance standards should be present in the contract which can be audited in the comprehensive audits. A staffing schedule that gives contract staffing is the staffing requirement. Time to hire and vacancy rates should be established contract metrics. The staffing requirements should be monitored by determining whether required staff are provided and the extent of failure to provide general and critical positions. The clinical and operational performance should be judged in large part by the audit reports. The combination of these should be considered in the monitoring along with any other issues IDOC deems important to monitoring the vendor.

| Page 18: Commented | Author |
|---|---|

This recommendation is unclear with respect to clinical performance measures. IDOC disagees that staffing is the only measure for clinical performance

| Page 18: Inserted | Author |
|---|---|

| Page 18: Deleted | Author |
|---|---|

3

| Page 18: Inserted | Author |
|---|---|

6

| Page 18: Inserted | Author |
|---|---|

to

| Page 18: Inserted | Author |
|---|---|

| Page 18: Inserted | Author |
|---|---|

**Fiscal,**

| Page 18: Deleted | Author |
|---|---|

**Chief Policy**

| Page 18: Commented | Author |
|---|---|

The policy person assigned for this should be a position that reports to the Chief OHS.  It is our understanding that this position is a custody compliant unit position.

| Page 18: Commented | Author |
|---|---|

Our medical policies are being drafted by an expert in correctional medicine. Auditing performance is a task done in conjunction with SIU, OHS and IDOC compliance. This set up does not violate IDOC's obligations under the Decree

| Page 18: Deleted | Author |
|---|---|

**Administrator**

| Page 18: Inserted | Author |
|---|---|

**Dec 2023**

| Page 18: Deleted | Author |
|---|---|

**Jul-22**

| Page 18: Commented | Author |
|---|---|

There is no evidence that this is completed.  The date needs to be revised to coincide with completion of performance measures and staffing benchmarks.

| Page 18: Commented | Author |
|---|---|

Disagree that no evidence exists

| Page 18: Inserted | Author |
|---|---|

**II.B.2.,**

| Page 18: Inserted | Author |
|---|---|

**Arrange for assigned person in DoIT or hire consultant to annually meet with OHS and to review facilities to determine**

| Page 18: Deleted | Author |
|---|---|

**Explore**

| Page 18: Inserted | Author |
|---|---|

**, devices or equipment**

| Page 18: Inserted | Author |
|---|---|

**, as equipment requires replacement, or when new programs require additional equipment or wiring. This will result in a brief summary of the review to OHS and director of DoIT.**

| Page 18: Commented | Author |
|---|---|

This statement is vague and is not actionable. We added what we believe is a practical and actionable task to fulfill requirements of II.B.4.

| Page 18: Commented | Author |
|---|---|

Disagree, IDOC does not need to assign a person from DoIT or hire a consultant. IDOC already has engeniiers capable of assessing EHR needs. Equipment needs will happen as necessary through IDOC 's CIO's office. An annual report is not required in order to comply with the Decree.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 18: Inserted | Author |
|---|---|

**II.B.2, II.B.3,**

| Page 18: Inserted | Author |
|---|---|

**, DoIT or consultant**

| Page 18: Inserted | Author |
|---|---|

**As needed and annually sufficiently prior to budget year end to secure funding, if indicated.**

| Page 18: Deleted | Author |
|---|---|

**and annually sufficiently prior to budget year end to secure funding, if indicated**

| Page 18: Deleted | Author |
|---|---|

**Identify**

| Page 18: Inserted | Author |
|---|---|

**Hire or reassign a qualified dedicated full-time IT professional as**

| Page 18: Deleted | Author |
|---|---|

**a**

| Page 18: Inserted | Author |
|---|---|

| Page 18: Commented | Author |
|---|---|

Implementation of the electronic record is not trivial. IDOC will need a full time qualified IT professional to ensure that the requirements of IDOC are met by the vendor and the EMR is integrated into IDOC practice based on requirements of IDOC and fulfilling provision II.B.4 of the Consent Decree.

| Page 18: Commented | Author |
|---|---|

The person that designs or oversees the content of an EHR is not a project manager and a project manager is not an IT person. Project managers are a stand-alone skill. Sometimes a project manager has expertise in the area and sometimes not. The vendor will have project managers. IDOC has a project manager. The content of the EHR will be supervised by Dr. Leonardson in a CMIO role. The

implementation will need to be supported by all OHS leaders and their participation will be needed.

| Page 18: Inserted | Author |
|---|---|

**II.B.2, II.B.3,**

| Page 18: Inserted | Author |
|---|---|

**, Director of DoIT in consultation with OHS Chief**

| Page 18: Deleted | Author |
|---|---|

**Director of DoIT in consultation with**

| Page 18: Commented | Author |
|---|---|

The EMR project manager is a technical position that ensures that the vendor delivers a product that meets technical and clinical requirements of IDOC in order to satisfy II.B.4 in accordance with clinical requirements. For that reason the person chosen to be the project manager must satisfy technical qualifications (approved by IDOC telecom and DoIT) and ability to work with clinicians (determined by OHS Chief).

| Page 18: Commented | Author |
|---|---|

Disagree that EHR project manager must be a technical position. See comment above. Remove director of DoIT. DoIT is not a party to this litigation. IDOC has an IT team and a CIO.

| Page 18: Deleted | Author |
|---|---|

,

| Page 18: Inserted | Author |
|---|---|

etc. as well as laptops, desktop computers, printers, scanners, and other devices

| Page 18: Deleted | Author |
|---|---|

etc.

| Page 18: Inserted | Author |
|---|---|

necessary to effectively implement the EMR

| Page 18: Commented | Author |
|---|---|

To effectively implement an EMR (required in provision II.B.4), sufficient equipment must be available. All operational functions must be considered when performing a device count.

| Page 18: Commented | Author |
|---|---|

Agree.

| Page 18: Inserted | Author |
|---|---|

.

| Page 18: Inserted | Author |
|---|---|

**II.B.2.,**

| Page 18: Inserted | Author |
|---|---|

**, III.B.2.**

| Page 18: Inserted | Author |
|---|---|

| Page 18: Commented | Author |
|---|---|

The original statement is vague and not actionable. The three steps added are a process to address device needs for an electronic record system on an ongoing basis so as to effectively implement provisions II.B2., II.B.4., and III.B.2

| Page 18: Commented | Author |
|---|---|

The parties have agreed that the implementation plan will need to be updated occasionally. As such, there is no need for speculative tasks. This task is premature until selection of EHR vendor (the vendor may offer an option for supplying hardware). DoIT is not a party to this litigation.

| Page 18: Inserted | Author |
|---|---|

**1) OHS and DoIT will develop a written procedure for requesting new devices in the event of new staff exceeding the existing device capacity; 2) reporting of defective or malfunctioning equipment so it can be replaced; 3) or requesting a meeting of DoIT with OHS designee(s) to request equipment needs for new initiatives which cost will be proposed through an expedited (for critical projects) or normal budget process (for routine projects).**

| Page 18: Inserted | Author |
|---|---|

**II.B.2.,**

| Page 18: Inserted | Author |
|---|---|

 **III.B.2.**

| Page 19: Inserted | Author |
|---|---|

**. At least three months prior to "go live" develop a standardized plan that is then applied to each facility.  Each facility may have barriers (no space to conduct the training, work schedules that conflict with training schedules, etx.).  For that reason each facility will modify the standardized plan based on facility**

| Page 19: Commented | Author |
|---|---|

There must be a plan and it should be written and standardized. All employees of the same class should receive the same training

| Page 19: Commented | Author |
|---|---|

IDOC cannot agree to such specificity with respect to training until the selection of an EHR vendor. Agree with preparing for training ahead of time.  Much training can now occur using video conferencing and sharing one's screen.  A computer lab is not necessary.  Excellent written materials are necessary because nobody remembers all the information at an EHR training.  On the day of go-live, it is great to have at-the-elbow trainers available or super-users that are dedicated to helping the users in person.

| Page 19: Commented | Author |
|---|---|

Reputable EHR vendors have processes they use for implementation and training.

| Page 19: Inserted | Author |
|---|---|

**specifics. Employee-specific task training will be the standard (medication nurses receive training on the eMAR, providers receive training on chronic illness documentation, etc.)**

| Page 19: Deleted | Author |
|---|---|

| Page 19: Inserted | Author |
|---|---|

.

| Page 19: Inserted | Author |
|---|---|

.  The training plan shall include 1) where the training will occur, 2) ensuring that sufficient space and devices are obtained so that every trainee has a device to use and the space is conducive to a training session, 3) ensuring that prior to beginning training all staff have sufficient computer skills to utilize the operating system, 4) that sufficient time is allocated for training and that those who need more time to learn have an opportunity to do so, 5) that

training groups are established (providers, medication nurses, schedulers, etc.) so that training is provided specific for the responsibilities of staff trained, 6) that there is a test requirement that ensures that the staff trained have acquired the skills necessary to effectively use the electronic record.

| Page 19: Commented | Author |
|---|---|

This gives the details of requirements for the training.

| Page 19: Commented | Author |
|---|---|

While IDOC agrees that EHR training will be crucial to implementation, determining training specifics is premature until selection of an EHR vendor. The parties have agreed that the implementation plan will need to be updated occasionally. As such, there is no need for speculative tasks.

| Page 19: Inserted | Author |
|---|---|

**II.B.3.,**

| Page 19: Inserted | Author |
|---|---|

**, IV.A.2.**

| Page 19: Deleted | Author |
|---|---|

**Identify additional resources needed**

| Page 19: Commented | Author |
|---|---|

This is vague and not actionable. The suggestions are actionable and measurable. For an EMR to be effective, a help desk to assist users in the event of an outage, loss of password, problems with using the software, etc. is necessary. There are no staff currently assigned for that function. The number of individuals on a call desk can be based on estimates of calls obtained in other similar systems. The number given here is one that IDOC should modify based on a reasonable workload analysis.

| Page 19: Commented | Author |
|---|---|

 The parties have agreed that the implementation plan will need to be updated occasionally. As such, there is no need for speculative tasks. This task is premature until selection of EHR vendor

| Page 19: Inserted | Author |
|---|---|

**Hire 3 IT professionals to manage a help desk and**

| Page 19: Inserted | Author |
|---|---|

**. IDOC may elect to contract out this service.**

| Page 19: Commented | Author |
|---|---|

The parties have agreed that the implementation plan will need to be updated occasionally. As such, there is no need for speculative tasks. This task is premature until selection of EHR vendor. The IT needs should be determined in consultation with IDOC IT team, the EHR vendor and OHS. This task is speculative.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 19: Inserted | Author |
|---|---|

**II.B.3.,**

| Page 19: Inserted | Author |
|---|---|

**, IV.A.2.**

| Page 19: Inserted | Author |
|---|---|

June 2023

| Page 19: Commented | Author |
|---|---|

A contract for the EMR is not finalized.  This is only an estimate of a timeline given that the contract will be awarded soon.

| Page 19: Commented | Author |
|---|---|

Agree that contract for EHR is not finalized

| Page 19: Inserted | Author |
|---|---|

| | | |
|---|---|---|
| | **Finalize and disseminate immunization and routine health maintenance (RHM) and cancer screening policespolicies, procedures, and guidelines using the Center for Disease Control (CDC) adult immunization guidelines and United States Preventive Services Task Force (USPSTF)** | **II.B.1** |

| Page 19: Deleted | Author |
|---|---|

**polices**

| Page 19: Commented | Author |
|---|---|

II.B.1; "IDOC shall provide access to an appropriate level of primary care, ….." Adult immunizations and RHM/cancer screenings are an integral component of appropriate primary care in the USA. The CDC adult immunization guidelines and the USPSTF RHM/cancer screening guidelines are the nationally accepted standards for adult immunizations and RHM/cancer screening (not FBOP or specialty societies). These guidelines lead to the prevention of illness and improved health outcomes.

| Page 19: Commented | Author |
|---|---|

Agree.  Policy has been written which includes this.

| Page 19: Inserted | Author |
|---|---|

**and finalize**

| Page 19: Inserted | Author |
|---|---|

**s and routine health maintenance (RHM)  and**

| Page 19: Inserted | Author |
|---|---|

 **The mechanism will track and report both the volume of specific vaccines offered, administered, and refused per facility and the percentage of eligible patients who have been offered, accepted, and refused specific vaccinations and routine health maintenance/cancer screenings  IDOC must implement an interval immunization and RHM/cancer screening tracking system prior to the full implementation of the EHR.**

| Page 19: Commented | Author |
|---|---|

II.B.2 "IDOC shall require...and the monitoring of health care by collecting and analyzing data to determine how well the system is providing care." The current lack of data on immunizations/screenings is a notable barrier to tracking and monitoring access of the incarcerated population to these nationally recommended vaccines and screenings.

| Page 19: Commented | Author |
|---|---|

<span style="color:red">Agree</span>

| Page 19: Inserted | Author |
|---|---|

**II.B.1.; II.B.2.;**

| Page 19: Inserted | Author |
|---|---|

**1.a.b.c.d.**

| Page 19: Inserted | Author |
|---|---|

**Jun-2022**

| Page 19: Deleted | Author |
|---|---|

**Jun-22**

| Page 19: Inserted | Author |
|---|---|

**Feb-2023**

| Page 20: Deleted | Author |
|---|---|

**Once EHR is fully implemented,**

| Page 20: Inserted | Author |
|---|---|

**T**

| Page 20: Deleted | Author |
|---|---|

**t**

| Page 20: Inserted | Author |
|---|---|

**adult**

| Page 20: Inserted | Author |
|---|---|

**and RHM/cancer screening**

| Page 20: Inserted | Author |
|---|---|

and

| Page 20: Deleted | Author |
|---|---|

or

| Page 20: Inserted | Author |
|---|---|

and RHM/cancer

| Page 20: Inserted | Author |
|---|---|

 (see #26.)

| Page 20: Deleted | Author |
|---|---|

,

| Page 20: Inserted | Author |
|---|---|

P

| Page 20: Deleted | Author |
|---|---|

, p

| Page 20: Inserted | Author |
|---|---|

for immunization tracking

| Page 20: Inserted | Author |
|---|---|

.

| Page 20: Inserted | Author |
|---|---|

a. **Primary responsibility for the systemwide immunization program will be under the system's Infectious Disease Coordinator**
**Designated infection control nurse will coordinate the facility's immunization program and will have dotted line reporting to the system's Infectious Disease Coordinator**
    a.

| Page 20: Commented | Author |
|---|---|

Both the immunization and routine health maintenance (RHM)/cancer screening are best included in this task. Both need to have a bridge data tracking and reporting process until the electronic health record is fully implemented.  At this moment, there isn't an announced start date for a new electronic health record vendor. Based on the late presentations/diagnoses of a number of cancer cases in the inmate population, it is vitally important that age and risk-based cancer screening be expeditiously established in the IDOC with  data tracking that verifies the provision of cancer screenings. The adult immunization is most appropriately placed under the umbrella of the IDOC's Infectious Disease Coordinator. II.B.2 states "IDOC shall require….adequate qualified staff…." Given the extensive ongoing responsibilities of the provider and nursing staff, each facility needs a designated infection control nurse who would/could assist with the Hepatitis C and HIV UIC telehealth clinics and coordinate the facility's immunization program which would most effectively run by nurses guided by treatment guidelines and protocols as currently done in many ambulatory health care centers in the USA.

| Page 20: Commented | Author |
|---|---|

Agree

| Page 20: Commented | Author |
|---|---|

Change date for a year after implementation of the EHR or when nurse staffing is at 80% or higher.

| Page 20: Inserted | Author |
|---|---|

a.

| Page 20: Inserted | Author |
|---|---|

 and RHM/cancer screening
    a.

| Page 20: Inserted | Author |
|---|---|

ing
    a.

| Page 20: Deleted | Author |
|---|---|

    a.

| Page 20: Inserted | Author |
|---|---|

 and screenings at chronic care and specialty clinic visits, annual and biannual health visits, and regular vaccination/RHM/cancer screening events.
    a.

| Page 20: Deleted | Author |
|---|---|

.
    a.

| Page 20: Inserted | Author |
|---|---|

    a.
    a. **Reception  and  classification  centers  will  solicit  and  record  immunization  and**

**RHM/cancer screening status and will offer and track required vaccinations and RHM/cancer screenings as part of the intake admission process.**
**Immunization and RHM/cancer screening data will be reported regularly at the monthly facility QI meetings and at the systemwide Quality Council meetings.** .

a.

| Page 20: Commented | Author |
|---|---|

Immunizations and RHM/cancer screening needs to begin immediately in all IDOC facilities during most clinical encounters but especially at the time of admission to the IDOC. There are currently too many missed opportunities for vaccinating and screening at risk men and women. Only offering immunizations and screenings at annual and bi-annual health assessment visits puts the health of many individuals at risk. IDOC needs to track and report the important personal and public health measures of vaccination RHM/cancer screening rates to the facility and system QI programs.

| Page 20: Commented | Author |
|---|---|

Agree that immunization and screening tracking is important

| Page 20: Commented | Author |
|---|---|

This level of detail is not required in order to comply with the Decree. IDOC and EHR vendor should work out logistics and update implantation plan if necessary

| Page 20: Inserted | Author |
|---|---|

a.

| Page 20: Inserted | Author |
|---|---|

and automatically report
1.

| Page 20: Inserted | Author |
|---|---|

and RHM/cancer screening data.
1.

| Page 20: Deleted | Author |
|---|---|

and present immunization status automatically
1.

| Page 20: Inserted | Author |
|---|---|

Select
1.

| Page 20: Deleted | Author |
|---|---|

Explore
1.

| Page 20: Inserted | Author |
|---|---|

and RHM/cancer screening
1.

| Page 20: Inserted | Author |
|---|---|

/RHM/cancer screenings
1.

| Page 20: Deleted | Author |
|---|---|

1.

| Page 20: Deleted | Author |
|---|---|

to
1.

| Page 20: Inserted | Author |
|---|---|

**and select RHM/cancer screenings**.

| Page 20: Deleted | Author |
|---|---|

.

| Page 20: Inserted | Author |
|---|---|

**II.B.1**

| Page 20: Deleted | Author |
|---|---|

**II.B.4**

| Page 20: Inserted | Author |
|---|---|

**, II.B.2, III.M.1.a.b.c.d.**

| Page 20: Inserted | Author |
|---|---|

**, Infectious Disease Coordinator**

| Page 20: Inserted | Author |
|---|---|

**Nov 2022**

| Page 20: Deleted | Author |
|---|---|

**Nov-22Nov-22**

| Page 20: Moved from page 35 (Move #1) | Author |
|---|---|

**Nov-22**

| Page 20: Inserted | Author |
|---|---|

**Interval Tracking Solution;  Feb 2023.      Electronic Med Record tracking; Jan 2024**

| Page 20: Deleted | Author |
|---|---|

**Interval Tracking Solution;  Feb 2023.      Electronic Med Record tracking; Jan 2024**

| Page 20: Commented | Author |
|---|---|

Date should be changed to reflect 1 year after EHR implementation

| Page 20: Deleted | Author |
|---|---|

Date of Electronic health record implem. starting in June -2023

| Page 20: Commented | Author |
|---|---|

These additions are actionable items to ensure access to an appropriate level of care (II.B.1) which includes steps to support patient adherence (II.B.6.d) with prescribed medication.  The task has two primary components. The first is to establish clinical policy and procedural expectations for supporting patient adherence. The second part is to establish the tools to monitor adherence, communicate with providers, and provide the supports to document the provider's efforts to improve patient adherence to recommended treatment.

| Page 20: Commented | Author |
|---|---|

As in the community, the importance of adherence to medication and importance of medication (and what happens if the medication is not taken) should be explained at appointments.  Adherence rates should be noted in CCC appointments and reinforcement of the importance of compliance should be done at all CCC appointments.  An EHR can show compliance to dose-by-dose meds, and can show compliance to picking up KOP meds.  It is not within standards to monitor whether a patient is missing medications between appointments.  The patient has the right to NOT do what is recommendation

| Page 20: Commented | Author |
|---|---|

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 20: Inserted | Author |
|---|---|

    1. Establish policy and standardized procedures to support patient adherence with prescribed medications.
        a. Define which medications are to be monitored for non-adherence.
        a. Define the frequency for monitoring medication adherence.
        a. Determine how providers are notified.
        a. Define the expectations of providers when notified of non-adherence and steps to be considered to improve adherence including timeframes for action.
        a. Establish the factors to be addressed in documentation by providers of efforts to address adherence.
        a. Develop an audit tool or other tracking mechanism to account for the efforts and outcomes in addressing medication non-adherence.
        a. Inform staff of expectations and methods to address nonadherence and implement policy and procedure.
        a. Track implementation progress and compliance.
    1. Establish the process within the E.H.R. to accomplish notification and documentation of provider actions in response to notification of nonadherence.
        a. Determine how the E.H.R. will distinguish medications that are to be monitored.
        a. Determine where the information to be monitored resides in the E.H.R. (i.e. MAR).
        a. Identify the mechanism used to determine the frequency adherence is monitored and the means to identify when provider notification should take place.
        a. Determine how providers are notified of non-adherence (message, establish a task for chart review or patient appointment).
        a. Develop documentation template for providers to review nonadherence, meet with the patient to discuss, actions taken to address patient concerns, and education or counseling provided.
        a. Implement automated methods to monitor and report nonadherence.
        a. Monitor accuracy and timeliness of automated review and notification processes.

| Page 20: Inserted | Author |
|---|---|

## II. B. 1
## II.B.6.d

| Page 20: Inserted | Author |
|---|---|

To support patient adherence with provider recommendations for medication treatment and constructively address the reasons patients are nonadherent.

| Page 20: Inserted | Author |
|---|---|

1 a-g. SIU Pharmacist

| Page 20: Commented | Author |
|---|---|

SIU Correctional Medicine has hired a pharmacist to take the lead on operational policy and practices. This individual is most qualified to take the lead in addressing this problem area.

| Page 20: Commented | Author |
|---|---|

Agree

| Page 20: Inserted | Author |
|---|---|

to take the lead establishing clinical, procedural, and tracking requirements with assistance from

| Page 20: Deleted | Author |
|---|---|

**Agency Infection Control Coordinator,**

| Page 20: Inserted | Author |
|---|---|

Agency DON & OHS Regionals.

2 a–g.

| Page 20: Deleted | Author |
|---|---|

.

| Page 20: Inserted | Author |
|---|---|

**Sep-22**

| Page 20: Deleted | Author |
|---|---|

**Sep-22**

| Page 20: Inserted | Author |
|---|---|

**March-23**

| Page 21: Inserted | Author |
|---|---|

n

| Page 21: Deleted | Author |
|---|---|

**system for**

| Page 21: Inserted | Author |
|---|---|

**program**

| Page 21: Commented | Author |
|---|---|

The changes to this item are to expand the focus from reporting infectious disease to managing an infection control program necessary to achieve II.A. of the Consent Decree to provide necessary services, supports and resources to provide adequate medical care. The Consent Decree has many requirements that are consistent with infection control programs in correctional settings including screening for infectious disease, treatment, vaccination, monitoring etc. This draft of the implementation plan contains several tasks consistent with the Consent Decree requirements concerning infection control however these efforts are pursued as discreet projects rather than as part of a comprehensive program. IDOC has received a grant from the DOJ/CDC to enhance pandemic planning and to strengthen their infection control program; this revision makes that intent actionable.

| Page 21: Commented | Author |
|---|---|

Agree with all of these except that the results should be looked at in the facility QI meetings.  These numbers are suited for examination in an infection control committee that has comparisons and the ability to identify substandard performance.  Outbreaks should be discussed in facility QI meetings, but announcing data that is unrelated to an audit measure and does not have a known benchmark does not lead to valuable action.

| Page 21: Inserted | Author |
|---|---|

**which includes:**

Sufficient personnel within OHS who are appropriately qualified

| Page 21: Commented | Author |
|---|---|

The Decree requires the appointment of an infectious disease coordinator (III.J.1)`. However the person IDOC has in this position now has no qualifications for the position, other than an interest in public health. the Consent Decree requires qualified, trained clinical staff (II.B. 2 & 3). IDOC needs to appoint someone who has the knowledge and expertise to provide leadership and direction in infection control.

| Page 21: Commented | Author |
|---|---|

The qualifications proposed by the Monitor far exceed the community standard. IDPH does not have such stringent requirements for their Deputy Director of Infection Control, nor do other state correctional systems. https://dph.illinois.gov/content/dam/soi/en/web/idph/files/rfp_rfi/attachment-a-job-description-for-critical-vacancies.pdf

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 21: Inserted | Author |
|---|---|

in

| Page 21: Commented | Author |
|---|---|

IDOC has consistently maintained that an appropriately qualified member of OHS is already in this position. See comment above

| Page 21: Inserted | Author |
|---|---|

1. communicable diseases and infection control to provide agency wide direction and to carry out these directions reliably at the facility level. (Agency Medical Director) March-23

Formalized relationships

| Page 21: Deleted | Author |
|---|---|

Formalized relationships

| Page 21: Commented | Author |
|---|---|

IDOC has no physician expertise in infectious diseases or control. IDOC states in their narrative an intention to formalize a relationship with IDPH to ensure IDOC has "assigned consultation time with and infectious disease physician to help guide and develop their infection control program." If IDPH is not available several other possible arrangements are described in the narrative to obtain physician expertise in infectious diseases. This addition to the implementation plan takes IDOC's assertion from the narrative and makes it an actionable item in the implementation plan.

| Page 21: Commented | Author |
|---|---|

As a state agency, the job of IDPH is to provide guidance to the state including agencies) on issues of infection control. IDPH already has a physician dedicated to advising IDOC on issues of infection control. The creation of a formal relationship is redundant and is not necessary to comply with the Decree.
The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round

of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 21: Deleted | Author |
|---|---|

with a consulting organization (UIC, IDPH or an IDOC employee) to provide physician expert advice and guidance on control of communicable and infectious diseases. (Agency Medical Director) Dec-22

| Page 21: Inserted | Author |
|---|---|

with a consulting organization (UIC, IDPH or an IDOC employee) to provide physician expert advice and guidance on control of communicable and infectious diseases. (Agency Medical Director) Dec-22
Develop written guidelines

| Page 21: Commented | Author |
|---|---|

IDOC does not have an updated infection control manual and the one that does exist is outdated and incomplete. Written guidelines for infection control is required by II.B.8 - and is part of a comprehensive set of policies.

| Page 21: Commented | Author |
|---|---|

Agree. These policies are being finalized

| Page 21: Inserted | Author |
|---|---|

1.  on all operational aspects of infection control in facilities (i.e. education, exposure control, vaccination, monitoring and surveillance, prevention and treatment, outbreak investigation, policy enforcement). (Infectious Disease Coordinator) June- 23
Establish surveillance report format

| Page 21: Commented | Author |
|---|---|

There is a great deal of inconsistency among facilities in reporting on infection control.  As such there is very little ability to identify trends in the incidence of disease, identification of potentially serious outbreaks, or disease prevention. Surveillance reporting establishes accountability among facilities for infection control activity, particularly that required by the Decree.

| Page 21: Commented | Author |
|---|---|

Agree

| Page 21: Inserted | Author |
|---|---|

1.  to be used to analyze and report on infection control in CQI meetings at the facility and agency level. (Infectious Disease Coordinator) June-23
5. Work with data personnel to develop methodology to acquire data for surveillance reports

| Page 21: Commented | Author |
|---|---|

Facilities report on infectious disease now but there is little reliability and wide variation among reporting sites. This addition is to standardize manual surveillance reporting and then automate it within the electronic record as it is onboarded.

| Page 21: Commented | Author |
|---|---|

Agree.

| Page 21: Inserted | Author |
|---|---|

manually to begin and eventually

| Page 21: Deleted | Author |
|---|---|

**reporting**

| Page 21: Deleted | Author |
|---|---|

| Page 21: Inserted | Author |
|---|---|

(Infectious Disease Coordinator) June-23

| Page 21: Deleted | Author |
|---|---|

**to focus on the following infectious disease entities:**
Human Immunodeficiency Virus Hepatitis
C
Tuberculosis
*Methicillin Resistant Staph Aureus* (MRSA) Influenza
COVID-19 and other emerging infectious diseases

| Page 21: Inserted | Author |
|---|---|

6. Establish reporting methodology to document enforcement

| Page 21: Commented | Author |
|---|---|

This item is necessary so that IDOC has the means to account for compliance with requirements of the Consent Decree related to infection control.

| Page 21: Commented | Author |
|---|---|

Agree.

| Page 21: Inserted | Author |
|---|---|

of each item in the Consent Decree relating to infection control (III.I.5; III.J.2-3) as well as any called out in written guidelines #3 above. (Infectious Disease Coordinator) June-23
7. Establish statewide infection control meetings

| Page 21: Commented | Author |
|---|---|

This item is necessary to ensure consistent implementation of the written guidelines referred to in item 3. It also serves as a way to train and mentor individuals identified as responsible for infection control at facilities.  Finally, these meetings serve as an avenue to identify emerging trends or concerns and resolve problems proactively.

| Page 21: Commented | Author |
|---|---|

Agree

| Page 21: Inserted | Author |
|---|---|

of infection control personnel. (Infectious Disease Coordinator) March-23

| Page 21: Inserted | Author |
|---|---|

**II.B.5II.B. 2 -3; II.B.5; II.B.8; III.B. 2; III.J.1-3;III.K.4; III.M.1**

| Page 21: Commented | Author |
|---|---|

These are additional parts of the Consent Decree that relate to the infection control program.

| Page 21: Commented | Author |
|---|---|

Agree

| Page 21: Deleted | Author |
|---|---|

**II.B.5**

| Page 21: Commented | Author |
|---|---|

Each subitem identified the primary person responsible and the estimated completion date.

| Page 21: Commented | Author |
|---|---|

Agree

| Page 21: Deleted | Author |
|---|---|

**Mar**

| Page 21: Inserted | Author |
|---|---|

**June-23**

| Page 21: Deleted | Author |
|---|---|

**2-22**

| Page 21: Commented | Author |
|---|---|

Based upon record review discharge planning currently is a rote task completed by nursing and medication room staff. Task completion is inconsistent and does not accomplish continuity of care for persons returning to the community. Primary care providers (who are appropriately qualified and clinically trained to determine needs for continuity of care upon release per II.B. 2 & 3) are seldom asked to consider the patient's needs for medical continuity and to write orders in preparation for release. Discharge planning needs to be more purposeful and focused on the patient's considered need for continuity of care. These revisions are meant to describe how needs for II.B.5 (continuity of care) are determined and these arrangements made. It also establishes by P & P the expectations of staff for providing information (II.B 6.s) and supplies (II.B.6.t) to support continuity of care, and establishes the metrics and tools to document compliance with these items in the Consent Decree.

| Page 21: Commented | Author |
|---|---|

It would be more standard to arrange follow up for patients that fall into certain categories--infirmary patients, pregnant women, dialysis patients, HIV patients or patients who require follow up to Chronic Care within 2 weeks.  Discharge with a copy of a discharge summary and a list of primary care resources is adequate.

| Page 21: Deleted | Author |
|---|---|

| Page 21: Inserted | Author |
|---|---|

1. Process mapping should be used to define the steps necessary to plan for continuity of care upon "traditional" release to the community. These steps include defining the clinician's review of patient needs in preparation for release, need for pre-arranged follow up care, handoff communication, provision of materials and supplies needed to continue care (medication, dressings, etc), availability of records, preventive care, and post release communication.
1. Review NCCHC E -10 Discharge Planning and ensure that the process includes identification of patients who need arrangements or referrals for follow up and assistance with application for health insurance.
1. Define responsible parties, timeframes and develop tools used to complete each step in discharge planning.
3.  Develop and implement via policy and procedure that describes the steps of discharge planning, responsible parties, timeframes, and tools, including

| Page 21: Deleted | Author |
|---|---|

Develop

| Page 21: Inserted | Author |
|---|---|

a

| Page 21: Inserted | Author |
|---|---|

Diagnoses

| Page 21: Inserted | Author |
|---|---|

, copies of pertinent diagnostic and laboratory reports, copies of pertinent specialty consultations,

| Page 21: Inserted | Author |
|---|---|

    4. Establish metrics and methods for reporting discharge planning encounters as a proportion of all discharges.
    4. Establish tools to evaluate the process and outcomes of discharge planning and include in calendar of performance monitoring.

| Page 21: Inserted | Author |
|---|---|

**II. B. 6. S, II.**

| Page 21: Inserted | Author |
|---|---|

SIU quality should facilitate process mapping the steps of the discharge planning process and design the tools for performance monitoring. EHR coordinator to identify how to report discharge planning encounters as a proportion of all releases.

| Page 21: Deleted | Author |
|---|---|

SIU quality should facilitate process mapping the steps of the discharge planning process and design the tools for performance monitoring. EHR coordinator to identify how to report discharge planning encounters as a proportion of all releases.

| Page 21: Commented | Author |
|---|---|

This task is not required by the Decree. The implementation plan may not impose additional obligations on the Department.

| Page 21: Deleted | Author |
|---|---|

**Jun**

| Page 21: Inserted | Author |
|---|---|

**Jan--23**

| Page 21: Deleted | Author |
|---|---|

**2-22**

| Page 22: Inserted | Author |
|---|---|

    1. Survey each facility to determine:
    a. Who determines what medications are provided at the time of release.
    b. How discharge medications are obtained?
    c. Who prepares medications for discharge and how is the task completed?
    d. Does a clinician review and determine what medications the patient is to be provided in advance of the release? If so, when does this take place and how is it documented?
2. Establish and implement policy and procedure defining the process for clinician review of medications in advance of release, the process for procuring and packaging these medications,

the methods used to provide them to the patient and how a two week refill is accomplished.

3. Establish methods to account for and document provision of discharge medication and compliance with written directives.

| Page 22: Deleted | Author |
|---|---|

Survey each facility to determine:
a. Who determines what medications are provided at the time of release.
b. How discharge medications are obtained?
c. Who prepares medications for discharge and how is the task completed?
d. Does a clinician review and determine what medications the patient is to be provided in advance of the release? If so, when does this take place and how is it documented?

| Page 22: Deleted | Author |
|---|---|

| Page 22: Deleted | Author |
|---|---|

**m**

| Page 22: Inserted | Author |
|---|---|

**t**

| Page 22: Deleted | Author |
|---|---|

SIU Quality should conduct the survey and analyze results with recommendations to achieve goal of appropriate discharge medication at release. SIU Pharmacist should lead the establishment of policy and procedure using recommendations from survey with input from

| Page 22: Inserted | Author |
|---|---|

SIU Quality should conduct the survey and analyze results with recommendations to achieve goal of appropriate discharge medication at release. SIU Pharmacist should lead the establishment of policy and procedure using recommendations from survey with input from

| Page 22: Deleted | Author |
|---|---|

**OHS Quality Control Coordinator,**

| Page 22: Inserted | Author |
|---|---|

**.**

| Page 22: Deleted | Author |
|---|---|

**,**

| Page 22: Inserted | Author |
|---|---|

**Performance monitoring tool to be developed and implemented by SLC.**

| Page 22: Deleted | Author |
|---|---|

**,**

| Page 22: Deleted | Author |
|---|---|

**SIU, IDOC Chief Compliance Officer**

| Page 22: Deleted | Author |
|---|---|

## Mar-21

| Page 22: Commented | Author |
|---|---|

The Monitor's review of records provides ample evidence that actual practice is not consistent with the assertion that this item has been accomplished. There is no primary care provider review to determine the appropriateness of discharge medication prior to release (IDOC must provide adequate qualified and trained clinical staff to provide adequate health care II. A, II.B. 2 & 3.) . There is wide variation in the amount of medication patients receive when released (including in one instance, an alarmingly large quantity of controlled substance). IDOC does not monitor or report on provision of discharge medication at release. IDOC needs to have a better understanding of actual practices and institute steps to bring actual practice into compliance with the Consent Decree. A method to account for compliance with the Consent Decree must be established and reported per II.B. 2.

| Page 22: Commented | Author |
|---|---|

A survey is not necessary to comply with the Decree. IDOC has already agreed to and is drafting updated policies for discharge medications. We will train staff on the policy and audit their compliance. The implementation plan may not create additional obligations for the Department.

| Page 22: Inserted | Author |
|---|---|

## Jan-23

| Page 23: Deleted | Author |
|---|---|

evaluate

| Page 23: Commented | Author |
|---|---|

This is not actionable.  What if the evaluation results in no action?  A system should be purchased or built.

| Page 23: Commented | Author |
|---|---|

A system has been outlined and functions through SIU's quality personnel.  Having software does not ensure that something is addressed.  Software reporting still requires a person to investigate.

| Page 23: Commented | Author |
|---|---|

This software is not standard for prison healthcare and is not required to meet Decree objectives.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 23: Inserted | Author |
|---|---|

purchase

| Page 23: Deleted | Author |
|---|---|

systems

| Page 23: Inserted | Author |
|---|---|

software

| Page 23: Inserted | Author |
|---|---|

.  or If IDOC decides not to purchase established off-the-shelf software, it will design its own

electronic reporting system to capture any non-conformance to policy, procedure or perceived error or non-conformance.

| Page 23: Commented | Author |
|---|---|

The Consent Decree (II.B.6.m.) requires reporting preventable adverse medical events. This might include falls, medication errors, documentation errors, lack of supplies, errors in transfer, inappropriate housing, etc. These errors should be systematically recorded, classified, and systemic patterns of errors should be studied to determine the root cause of the error to reduce or eliminate its occurrence.

IDOC currently has a paper incident reporting system and separately manually reports medication errors. Neither classifies or quantifies errors or non-conformances. All adverse events or non-conformances should be reported but this is not now done. To satisfy provision II.B.6.m. of the Consent Decree there needs to be a reporting system. Because current practice is not systemic nor standardized, IDOC should purchase an off-the-shelf product for this purpose because IDOC does not appear now to have the capacity to build one. A manual system has proven to be ineffective. The system used should be able to aggregate adverse medical events by type of event (fall, medication error, documentation error, intrasystem transfer error, scheduling error, etc) and include a mechanism to classify errors.

| Page 23: Commented | Author |
|---|---|

This software is not standard for prison healthcare and not required to meet Decree obligations.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 23: Inserted | Author |
|---|---|

| Page 23: Deleted | Author |
|---|---|

.

| Page 23: Inserted | Author |
|---|---|

| Page 23: Inserted | Author |
|---|---|

, III.L.1.

| Page 23: Inserted | Author |
|---|---|

| | | |
|---|---|---|
| | IDOC will assign a full time quality improvement staff or hire (at OHS level not at facility level) to manage adverse event reporting reports and manage the patient safety program. This responsibility will include follow up on immediate remediation of adverse events, classification of all reports by type, organizing the reports systemically to show trends by facility, train staff at facilities on use of the system and on the procedure for making an adverse event report, participating with the quality program in designing patient safety actions based on event reports. | II.B. 6.r |

| Page 23: Commented | Author |
|---|---|

Managing adverse event reporting will not just "happen". A person has to be assigned to manage, classify, and collate the reports.

| Page 23: Commented | Author |
|---|---|

SIU has staff for this

| Page 23: Commented | Author |
|---|---|

The Director of Quality Improvement and Chief of OHS should decide who to hire for this assignment. Because there are 30 facilities and if the system is used properly, this would be a full time position.

| Page 23: Commented | Author |
|---|---|

SIU manages this

| Page 23: Deleted | Author |
|---|---|

**process**

| Page 23: Inserted | Author |
|---|---|

**procedure**

| Page 23: Commented | Author |
|---|---|

This should be a written procedure

| Page 23: Commented | Author |
|---|---|

Agree

| Page 23: Inserted | Author |
|---|---|



| Page 23: Deleted | Author |
|---|---|

**monitor**

| Page 23: Inserted | Author |
|---|---|

 **a) remediate the adverse event reported and b) subsequently analyze aggregate reports to prevent**

| Page 23: Deleted | Author |
|---|---|



| Page 23: Inserted | Author |
|---|---|

**patient safety risks**

| Page 23: Deleted | Author |
|---|---|

**quality of care**

| Page 23: Inserted | Author |
|---|---|

  1.a. Immediate remediation is tracked to ensure effective remediation occurred (e.g., if a patient experiences a fall in a shower because there is no grab bar, is a grab bar installed to prevent future falls).
1.b. A responsible person in the quality program (see item above) is hired/assigned to classify the adverse event and categorize all events system-wide and collate the data

| Page 23: Deleted | Author |
|---|---|

Immediate

| Page 23: Commented | Author |
|---|---|

The purpose of using an adverse medical event reporting system is to identify, classify and correct preventable adverse medical events in order to prevent patient safety risk

| Page 23: Commented | Author |
|---|---|

Agree

| Page 23: Inserted | Author |
|---|---|

.

| Page 23: Deleted | Author |
|---|---|

| Page 23: Deleted | Author |
|---|---|

| Page 23: Inserted | Author |
|---|---|

.

| Page 23: Deleted | Author |
|---|---|

.

| Page 23: Deleted | Author |
|---|---|

a

| Page 23: Inserted | Author |
|---|---|

 for systemic preventable adverse reports or for facility specific reports when that facility had excessive reports of a similar type

| Page 23: Commented | Author |
|---|---|

For isolated reports, immediate remediation may be sufficient.  When the system CQI program identifies a systemic or facility specific trend of reports, systemic or facility specific action is taken.

| Page 23: Commented | Author |
|---|---|

Agree

| Page 23: Inserted | Author |
|---|---|

.

| Page 23: Deleted | Author |
|---|---|

3.

| Page 23: Inserted | Author |
|---|---|

3.

| Page 23: Inserted | Author |
|---|---|

| Page 23: Inserted | Author |
|---|---|

, III.L.1

| Page 23: Inserted | Author |
|---|---|

, III.L.1

| Page 23: Inserted | Author |
|---|---|

Adverse Event Coordinator,

| Page 23: Deleted | Author |
|---|---|

**Adverse Event Coordinator,**

| Page 23: Commented | Author |
|---|---|

A quality improvement staff assigned or hired to manage the OHS adverse event and patient safety initiative should have sufficient qualifications to understand quality improvement techniques, how to manage the adverse event reporting database, and how to manage patient safety initiatives.

| Page 23: Commented | Author |
|---|---|

Agree

| Page 23: Commented | Author |
|---|---|

These tasks do not require a dedicated individual but can be completed in conjunction with the SIU partnership

| Page 23: Inserted | Author |
|---|---|

**Director of Quality Improvement, Quality Improvement Coordinator**

| Page 23: Deleted | Author |
|---|---|

**Dietician**

| Page 23: Deleted | Author |
|---|---|

**Consult with**

| Page 23: Inserted | Author |
|---|---|

**Hire**

| Page 23: Deleted | Author |
|---|---|

**a**

| Page 23: Inserted | Author |
|---|---|

**(s)**

| Page 23: Deleted | Author |
|---|---|

| Page 23: Inserted | Author |
|---|---|

**based on a workload analysis (based on requirements of the Consent Decree) or engage consultant services**

| Page 23: Inserted | Author |
|---|---|

**biennially**

| Page 23: Deleted | Author |
|---|---|

| Page 23: Inserted | Author |
|---|---|

**at all facilities**

| Page 23: Deleted | Author |
|---|---|

**diabetic and renal failure patients, and specialized diets for selected disease states such as coronary artery disease, hypertension, hyperlipidemia, stroke, cancer, and other disease states as indicated**

| Page 23: Inserted | Author |
|---|---|

**.the population of inmates with chronic illness whose condition is affected by dietary conditions**

| Page 23: Deleted | Author |
|---|---|

.

| Page 23: Inserted | Author |
|---|---|

**The dietician will also provide individual consultation and counseling for individuals who have serious medical needs affected by diet and require such analysis.**

| Page 23: Commented | Author |
|---|---|

This recommendation far exceeds the community standard. Not every diabetic seen in the community has the benefit of consultation with a dietician. Not every individual will require individual consultation. Information regarding healthy dietary habits will be provided to all individuals who require it

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 23: Commented | Author |
|---|---|

The Consent Decree requires "analysis of nutrition and timing of meals for diabetics and other class members whose serious medical needs warrant doing so". This implies a general evaluation of meals for those with any chronic illness as well as counseling and analysis of individuals with special needs. We have noted persons with dementia, swallowing disorders, etc. who have need of an individual evaluation. Also, it is standard of care for all diabetics to have an individualized medical nutrition plan needed to achieve treatment goal. There is not a current practice of referral of any patients with need of nutritional counseling to a dietician so the number of dieticians necessary is unknown. A workload analysis based on a requirements hypothesis should be completed.

| Page 23: Commented | Author |
|---|---|

This recommendation far exceeds the community standard. Not every diabetic seen in the community has the benefit of consultation with a dietician. Not every individual will require individual consultation. Information regarding healthy dietary habits will be provided to all individuals who require it

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 23: Inserted | Author |
|---|---|

**, IV.A, II.B.2, II.B.3. , IV.A.2**

| Page 24: Deleted | Author |
|---|---|

**Consult with d**

| Page 24: Inserted | Author |
|---|---|

**D**

| Page 24: Deleted | Author |
|---|---|

**to**

| Page 24: Inserted | Author |
|---|---|

**will**

| Page 24: Deleted | Author |
|---|---|

**as above**

| Page 24: Deleted | Author |
|---|---|

**Dec-21**

| Page 24: Inserted | Author |
|---|---|

**December 23**

| Page 24: Deleted | Author |
|---|---|

**OHS will develop and implement performance and outcome measures.**
A team comprised of

| Page 24: Deleted | Author |
|---|---|

identify and prioritize potential

| Page 24: Inserted | Author |
|---|---|

develop performance and

| Page 24: Inserted | Author |
|---|---|

that measure IDOC's compliance with the Consent Decree

| Page 24: Commented | Author |
|---|---|

The Consent Decree (II.B.7) requires performance and outcome measures. The Monitor's opinion is that the purpose is to measure processes and outcomes of care that measure progress towards compliance with the Consent Decree.

| Page 24: Commented | Author |
|---|---|

The Monitor was provided with performance and outcome measures on 7/11/22 and invited to meet with SIU to discuss further. To date no availability has been provided by the Monitor

| Page 24: Deleted | Author |
|---|---|

based on  OHS needs

| Page 24: Deleted | Author |
|---|---|

After defining outcome measures the team lead by

| Page 24: Inserted | Author |
|---|---|

The

| Page 24: Inserted | Author |
|---|---|

the

| Page 24: Deleted | Author |
|---|---|

data

| Page 24: Inserted | Author |
|---|---|

, III.L.1

| Page 24: Deleted | Author |
|---|---|

**Sep-22**

| Page 24: Inserted | Author |
|---|---|

January 2023

| Page 24: Commented | Author |
|---|---|

September is almost here and these measures are not yet completed.

| Page 24: Commented | Author |
|---|---|

The Monitor was provided with performance and outcome measures on 7/11/22 and invited to meet with SIU to discuss further. To date no availability has been provided by the Monitor

| Page 24: Inserted | Author |
|---|---|

| 37.a. | The data manager will develop a dashboard to display monthly and annual performance and outcome measures by facility and in statewide aggregate. This dashboard will be available, online, to all IDOC medical employees. IDOC will develop a standardized mechanism to periodically monitor and analyze systemwide performance and outcome measures | II.B.2, |
|---|---|---|

| Page 24: Deleted | Author |
|---|---|

The data manager will develop a dashboard to display monthly and annual performance and outcome measures by facility and in statewide aggregate. This dashboard will be available

| Page 24: Commented | Author |
|---|---|

This task exceeds what is necessary in order to comply with the Decree and relies on outdate technology. The implementation plan may not impose additional obligations on the Department.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 24: Deleted | Author |
|---|---|

, online, to all IDOC medical employees.

| Page 24: Commented | Author |
|---|---|

The purpose of the performance and outcome measures is movement toward compliance. A dashboard serves that purpose by displaying monthly results so that facility quality programs, the vendor, and OHS can have goals toward for compliance and appreciate where performance needs improvement.

| Page 24: Commented | Author |
|---|---|

Dashboards are old technology. Real-time data is available using Business intelligence software. Standardized reports should be created and made available to units.

| Page 25: Deleted | Author |
|---|---|

With input from the Monitor,

| Page 25: Inserted | Author |
|---|---|

with the assistance

| Page 25: Commented | Author |
|---|---|

This restates what Consent Decree says in II.B.8. (assistance).

| Page 25: Commented | Author |
|---|---|

IDOC has accepted ongoing assistance from the Monitor with respect to policies. Healthcare policies and being drafted and implemented. Policies will be provided to Monitor for feedback and can be discussed during monthly meetings between OHS and the Monitor

| Page 25: Inserted | Author |
|---|---|

of the Monitor to cover all aspects of a health care program

| Page 25: Commented | Author |
|---|---|

Taken from II.B.8. and added to ensure that each policy is comprehensive and includes standardized procedures to be implemented at the facility level. Policies that address every provision in the Consent Decree and standardized procedures are necessary to ensure changes are implemented in a timely and consistent manner.

| Page 25: Commented | Author |
|---|---|

Agree

| Page 25: Inserted | Author |
|---|---|

.

| Page 25: Deleted | Author |
|---|---|

Revised

| Page 25: Inserted | Author |
|---|---|

P

| Page 25: Deleted | Author |
|---|---|

p

| Page 25: Inserted | Author |
|---|---|

1. Hire project manager or other person solely assigned to manage policy development, ongoing review, and maintenance. (Agency Medical Director) Initiate 9/ 22; ongoing
Establish an initial list

| Page 25: Commented | Author |
|---|---|

The initial list will not be inclusive of all P & P that will need development but it will include all of the major topics.  Once the initial set of P & P is established subject matter experts should be asked to identify other subjects needing P & P development. We would expect additional P & P necessary in the areas of pharmacy, radiation, lab, infection control, safety and sanitation, dental, and inpatient services. The same process should be used to establish these additional written directives.

| Page 25: Commented | Author |
|---|---|

Agree

| Page 25: Inserted | Author |
|---|---|

2. of policies to be developed to address every provision in the Consent Decree as well as every NCCHC accreditation standard. (Project Manager) Completion 10/ 22
Establish, with the assistance of the Monitor

| Page 25: Commented | Author |
|---|---|

The IDOC needs to establish, with the assistance of the Monitor, the fundamental points to be addressed

in each policy to provide guidance for persons assigned responsibility for drafting policy. For example, the Monitor will insist that any policy addressing maintenance of the Problem List must limit those who can enter problems to prescribing providers only.

| Page 25: Commented | Author |
|---|---|

Agree, except for the last sentence which is inconsistent with III.B.3 of the Decree which permits clinicians and reistered nurses to compile problem lists

| Page 25: Inserted | Author |
|---|---|

2. , the essential elements and criteria that must be addressed in each policy on the list. (Project Manager and Agency Medical Director) Completion 11/22

2. Assign subject matter experts for each policy to be developed from amongst OHS leadership, regional staff, SIU, and vendor staff to draft the initial policy and to make revisions during the review process. (Initially Agency Medical Director or designee) Initiate 11/22 Completion 3/23

2. Establish a process, calendar, and timeframes for the IDOC and Monitor to review and comment on drafts through to finalization. Manage the development of draft policies through to finalization and provide monthly reporting to the Agency Medical Director, Chief Compliance Officer, and the Monitor on progress toward completion.(Project Manager) ) Initiate 11/22 Completion 3/23

2. Establish the document format for every policy. The document format requirements need to include development of a standardized procedure for implementation at the facility level, as well as the elements to be included in tools to evaluate compliance with policy and procedure. (Project Manager) 10/22

Identify policy subjects that would benefit from process mapping
2.

| Page 25: Commented | Author |
|---|---|

Process mapping is a method used to design more complicated processes that have many contributing parts so that it can be described in policy and procedure. As examples, medication administration, specialty care, chronic care and sick call have already been identified in the implementation plan for process mapping.

| Page 25: Commented | Author |
|---|---|

Agree with definition

| Page 25: Inserted | Author |
|---|---|

2. and arrange facilitation of these with SIU. (Project Manager) 11/22

2. Evaluate whether additional resources are needed to implement each policy and procedure and secure the necessary equipment, supplies or personnel to do so. (Subject Matter Expert, Regional Coordinators). Initiate 1/23, Completion 4/23.

2. Establish a plan to provide standardized training and centralized reporting of training completion and subject knowledge in the set of comprehensive medical policies and procedures. Plan is to include the initial training of existing staff, orientation of new staff, annual evaluation of staff knowledge and compliance with P & P, and the method to inform staff of revisions to P & Ps. (Project Manager, Training Manager) Initiate 11/22, Implement 4/23, Completion 6/23

2. Establish a methodology for the Agency Medical Director to consider requests for exceptions to specific requirements in policy and procedure and to document any approved deviations. The Agency Medical Director will solicit input from the Monitor in making these determinations. (Agency Medical Director and Project Manager) Initiate 1/23; Completion 6/23

2. Establish the timeframes and expectations for implementation of policies at the facility level. (Project Manager, Agency Medical Director) Initiate 1/23, Completion 6/23.

12. Develop tools and methodology to measure conformance with each policy and procedure. (Audit Manager) Initiate 3/23, Completion 7/23

| Page 25: Inserted | Author |
|---|---|

**procedures** to provide ongoing clinical direction to staff for the operation of a health care program in the correctional setting.

| Page 25: Commented | Author |
|---|---|

This addition is necessary because it states the purpose of the specific policies to be developed. The focus here is on the *clinical operation* of the program.

| Page 25: Commented | Author |
|---|---|

Disagree that this is necessary to comply with the Decree

| Page 25: Deleted | Author |
|---|---|

**Agency**

| Page 25: Commented | Author |
|---|---|

The Consent Decree requires IDOC develop a comprehensive set of policies. The Agency Medical Coordinator and Chief Compliance Officer have yet to finalize a single medical policy since monitoring began. It is obvious that they do not have the time or resources to complete the task. The Monitor's advice since the beginning is to devote a project manager to this task. If not a project manager then someone whose sole assignment is to manage the comprehensive set of medical policies including initial development, review and revision, training, and development of the audit tools to measure performance. Ultimately OHS will need to designate someone to manage the policy process, including documentation of regular review, revision, implementation, and compliance demonstration for this to be sustained. The subtasks are taken from previous input provided by the Monitor (Example Implementation Plan Jan 2021 items 87-97) as the steps necessary to complete a meaningful and comprehensive set of policies that guide the clinical operation of a health care program. These make the general statement to develop policies, actionable.

| Page 25: Commented | Author |
|---|---|

IDOC has a correctional medicine expert physician who has been charged with drafting policies consistent with NCCHC and ACA standards

| Page 25: Deleted | Author |
|---|---|

**Medical Coordinator, Chief Compliance Officer**

| Page 25: Commented | Author |
|---|---|

Responsible parties are identified in parentheses at the end of each subtask as well as start and finish dates.

| Page 25: Commented | Author |
|---|---|

IDOC has an expert medical consultant to draft policies consistent with NCCHC and ACA standards and in consultation with OHS leadership

| Page 25: Deleted | Author |
|---|---|

**Sep-22**

| Page 25: Inserted | Author |
|---|---|

**December 22**

| Page 26: Deleted | Author |
|---|---|

Develop a policy
1.

| Page 26: Commented | Author |
|---|---|

We agree with the specifics that are called out as needed in a policy on Medical Holds and Transfers. However if the revisions to item 38 are accepted; then 39 is not necessary as a separate item in the

implementation plan. It is a good example of work done in subtask 3 to identify the essential elements that must be covered in a particular policy. The assigned staff for this item are too generic but as is suggested in item 38, subtask 4, a subject matter expert should be identified, (in this example a Regional Coordinator would be a good subject matter expert) who would solicit input as necessary to draft the policy.

| Page 26: Commented | Author |
|---|---|

Agree

| Page 26: Deleted | Author |
|---|---|

**for medical holds that ensures any patient with a medical hold will not be transferred without a review of the patient's medical needs by the treating facility by health care staff.**

Develop a standardized procedure for Intrasystems transfer to maintain continuity of care

Provide guidelines and updated forms to document appointments and referrals

Develop procedures for sending-facilities to identify and document referrals and other tasks not yet completed, medications, and updated problem lists prior to transfer.

Develop procedures for receiving facilities to include reconciliation of medications, prostheses and durable medical equipment, verification of transfer information and timely continuation of the plan of care.

Documentation of physician to physician handoff and nurse to nurse handoff

Coordinate transfers should rest with Regional Coordinators, Agency Director of Nursing, and Deputy Chiefs of Health for complex cases.

Develop audit instrument and education to healthcare and operations staff

1.

| Page 26: Deleted | Author |
|---|---|

**Facility Medical Staff, Facility Security Staff**

| Page 26: Deleted | Author |
|---|---|

**Aug-22**

| Page 26: Inserted | Author |
|---|---|

**IV.A, II.B.2, II.B.3. , IV.A.2**

| Page 26: Deleted | Author |
|---|---|

**Sep-22**

| Page 26: Inserted | Author |
|---|---|

**January 2023**

| Page 26: Commented | Author |
|---|---|

This position has been vacant for several months and is an important position and should be filled soon.

| Page 26: Commented | Author |
|---|---|

Agree

| Page 26: Deleted | Author |
|---|---|

Develop a document that describes the detailed responsibilities of SIU with respect to the IDOC medical program including CQI.  Update this document whenever those responsibilities change.  To complete the quality improvement efforts initiated by UIC, IDOC has completed and formal agreement with Southern Illinois University School of Medicine to provide services related to the develop a comprehensive Quality Improvement Program.  Services may include the hiring of quality improvement specialists, audit team members, process engineers, data management and analytic staff, and assistance

with the implementation of system-wide quality and safety training.

| Page 26: Inserted | Author |
|---|---|

Develop a document that describes the detailed responsibilities of SIU with respect to the IDOC medical program including CQI.  Update this document whenever those responsibilities change

| Page 26: Commented | Author |
|---|---|

IDOC's initial contract with SIU does not define responsibilities of SIU's current role with respect to CQI.  Neither does the contract amendment.  The term "services may include…." Is vague and does not indicate what SIU will do.  A document describing SIU's full responsibility should be completed and made available.  Because SIU's responsibilities change over time, when those changes occur the change should require a revised document of responsibilities.  The Monitor agrees with SIU's participation but IDOC should be specific about what is being done.

| Page 26: Commented | Author |
|---|---|

IDOC has defined responsibilities in the quality manual.  However, this task is not necessary in order to comply with the Decree. The implementation plan may not create new obligations for IDOC.

 The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 26: Inserted | Author |
|---|---|

.

| Page 26: Deleted | Author |
|---|---|

Control

| Page 26: Inserted | Author |
|---|---|

Improvement

| Page 27: Commented | Author |
|---|---|

This section on quality should focus intently on requirements of the Consent Decree.  Requirements of the Consent Decree for quality improvement are development of a comprehensive and independent audit process, performance and outcome measures, adverse event reporting, and mortality review all of which identify and correct deficiencies to propel forward progress to compliance with the Consent Decree.

| Page 27: Commented | Author |
|---|---|

Agree

| Page 27: Inserted | Author |
|---|---|

 make **changes to the existing quality improvement program to one that includes a principal goal of improving care in order to attain compliance with the requirements of the Consent Decree.  The changes to the CQI program will be present in the CQI policy**

| Page 27: Deleted | Author |
|---|---|

Review all relevant quality management documentation, including but not limited to, standard operating procedures, administrative directives
   1.

| Page 27: Commented | Author |
|---|---|

This phrase is lifted from the Dec 2020 SIU draft proposal for Quality Management and is probably already done. Is it necessary in a August 2022 Implementation Plan?

| Page 27: Commented | Author |
|---|---|

Its inclusion is not improper

| Page 27: Deleted | Author |
|---|---|

| Page 27: Inserted | Author |
|---|---|

2.
   1.

| Page 27: Deleted | Author |
|---|---|

   1.

| Page 27: Inserted | Author |
|---|---|

   1.

| Page 27: Deleted | Author |
|---|---|

and with assistance from SIU and the monitor develop a new continuous quality improvement manual from IDOC
   1.

| Page 27: Inserted | Author |
|---|---|

. and develop a training plan to be used for facility staff
   1.

| Page 27: Deleted | Author |
|---|---|

.
   1.

| Page 27: Commented | Author |
|---|---|

The purpose of the manual is unclear. Because IDOC had a manual in 1992 does not mean that a booklet on CQI is the most effective method of training. Instead, staff training should replace a manual. Staff need training on how to make corrective action which is specifically called out in III.M.2 of the Consent Decree requirement (in mortality review). Training on how an organization and staff undertakes corrective action might be a better use of time. The training to be provided could be expanded as staff increase participation in quality efforts.

| Page 27: Commented | Author |
|---|---|

Agree. The updated quality manual represents the plan for the fiscal year for IDOC. The process contents of the manual are represented in policy that will change infrequently and the details about what will be audited are contained in the manual and updated every year or as needed.

| Page 27: Inserted | Author |
|---|---|

   1.

| Page 27: Deleted | Author |
|---|---|

Evaluate NCCHC Standards and the Consent Decree objectives as model and perform gap analysis

| Page 27: Commented | Author |
|---|---|

The Consent Decree already presumes a gap analysis. Clinical care and the quality improvement program have been determined to be inadequate. Two Expert reports and five Monitor reports have extensive "gap analysis". To achieve adequate care, the Consent Decree gives direction for

measurement (the audit function, performance and outcome measures, adverse event reporting, and mortality review); IDOC needs to take corrective action to correct the deficiencies found in these measurements. The IDOC does not need to repeat a gap analysis of IDOC care and draw new conclusions or rewrite the Consent Decree. It should adhere to requirements of the Consent Decree and implement them as soon as possible. Performance and outcome measures are addressed in task #37; adverse event reporting in tasks #32-34; the audit function in task #42.a., and mortality review in task #87.

| Page 27: Commented | Author |
|---|---|

This is addressed in the policies that will be put forth to the unit staff.

| Page 27: Inserted | Author |
|---|---|

Develop a written plan for the statewide CQI program, as evidenced in policy and procedure, that will utilize the audit function as the principal driver of identifying systemic and other deficiencies whose correction will result in forward progress toward compliance with the Consent Decree. The audit reports, adverse medical event reports, performance and outcome measures, and opportunities for improvement identified in mortality review also contribute to identification of deficiencies whose correction will contribute to forward progress towards compliance.

1.

| Page 27: Deleted | Author |
|---|---|

Identify best practices and standards of care recommendations for inclusion in IDOC for updates to Administrative Directives
   1.

| Page 27: Commented | Author |
|---|---|

This is vague and should be more specific. Moreover, this is better placed in the policy section.

| Page 27: Commented | Author |
|---|---|

Agree

| Page 27: Deleted | Author |
|---|---|

Create a centralized quality improvement dashboard
   1.

| Page 27: Commented | Author |
|---|---|

This is already present in task 37 above.

| Page 27: Commented | Author |
|---|---|

Agree

| Page 27: Deleted | Author |
|---|---|

Identify best practices performance improvement methodology for continued process and healthcare outcome improvement
   1.

| Page 27: Commented | Author |
|---|---|

Process improvement is addressed in tasks # 50-53 below. Moreover, this statement lacks clarity. If it means that IDOC will select the best process improvement methodology, what will that entail and how long will it take? Not sure what this task consists of.

| Page 27: Commented | Author |
|---|---|

Agree that the language is addressed elsewhere

| Page 27: Inserted | Author |
|---|---|

.
1.

| Page 27: Deleted | Author |
|---|---|

Develop ongoing quality management metrics and measurement instruments
1.

| Page 27: Commented | Author |
|---|---|

This is redundant of development of performance and outcome measures which is already in task 37 and development of an audit instrument which is the task below. This task also lacks details

| Page 27: Deleted | Author |
|---|---|

Develop intervals for policy and metrics review, update, and approval
1.

| Page 27: Inserted | Author |
|---|---|

1.

| Page 27: Commented | Author |
|---|---|

This is misplaced in this quality improvement section and should be placed in the policy section.

| Page 27: Deleted | Author |
|---|---|

Identify pilot sites and appropriate staff for quality management test phase
1.

| Page 27: Inserted | Author |
|---|---|

1.

| Page 27: Commented | Author |
|---|---|

It is unclear what this task means. The meaning of pilot sites and quality management test phase are not clear. This should be rewritten for clarity.

| Page 27: Commented | Author |
|---|---|

No objection to the deletion of these tasks as the objectives are outlined elsewhere in this section

| Page 27: Deleted | Author |
|---|---|

Develop initial Compliance Survey Instrument
1.

| Page 27: Inserted | Author |
|---|---|

See audit instrument below.
1.

| Page 27: Commented | Author |
|---|---|

The development of the audit instrument needs significantly more detail than is provided with this statement. A more detailed task is provided below in 42.a.

| Page 27: Commented | Author |
|---|---|

Disagree as IDOC's updated quality plan has been updated to include required detail

| Page 27: Deleted | Author |
|---|---|

Disseminate and train staff on updated Administrative Directives
1.

| Page 27: Inserted | Author |
|---|---|

See task 7 above
1.

| Page 27: Inserted | Author |
|---|---|

**II.B.9.,**

| Page 27: Deleted | Author |
|---|---|

**staff are properly trained.**

| Page 27: Inserted | Author |
|---|---|

**an adequate CQI program is established**

| Page 27: Inserted | Author |
|---|---|

| | | |
|---|---|---|
| 42.a. | **Develop an audit process**<br>　1) IDOC will use Consent Decree requirements, contemporary clinical nursing standards and physician clinical care standards (e.g. as in UpToDate) as a basis and, with the input and assistance of the Monitor, develop a medical and dental audit instrument.<br>　2) IDOC will conduct an annual independent , onsite, comprehensive audit of each facility.  The evaluation will cover all areas of the Consent Decree and include all aspects of clinical care.<br>　3) Procedures for these audits will be developed with assistance of the Monitor to include development of a document list, data that will be evaluated, chart selection, interviews, touring with inspection, and a written report.<br>　4) The audit team will train on audit methodology with Monitor on multiple site visits.<br>　5) IDOC will ensure facilities cooperate and make staff available during audit visits.<br>　6) Audit team will incorporate mortality reviews, performance and outcome dashboard results, adverse event reports, and any other audits into their annual evaluation.<br>　7) A report will be delivered to the facility and system-wide quality committee and that committee will decide on corrective actions, if any, that the facility quality improvement program is to address.<br>　8) The system-wide quality committee will develop a methodology to track corrective actions.<br>　9) IDOC will develop a methodology for referral to peer review for egregious practice issues.<br>　10) IDOC will aggregate audit findings into vendor oversight as represented in an annual report of findings. | II.B.9. |
| 42.b. | **Establish a systems leadership council that meets quarterly whose responsibilities include:**<br>　**1) Direct CQI activities statewide;**<br>　**2) Develop an annual quality improvement plan;**<br>　**3) Meet quarterly and maintain minutes;**<br>　**4) Review facility audits, performance and outcome measure dashboard, adverse event reports, mortality reviews, and other audits and evaluations and recommend corrective actions to individual facilities based on review of these audits.**<br>　**5) Be responsible for attending an annual facility CQI meeting (this should be after the annual audit report) to summarize CQI findings with the facility and discuss corrective actions and approve facility annual CQI plan.**<br>　**6) Standardize data for CQI reporting that facilities use.**<br>　**7) Statewide CQI team will assign quality specialists to mentor facility CQI coordinators on corrective action assignments.** | II.B.3., III.L.1., IV.A.2 |

| Page 27: Commented | Author |
|---|---|

This is an item specifically called out in the Consent Decree and requires a more detailed plan which is provided below.

| Page 27: Commented | Author |
|---|---|

Audits are specified and a quality program is specified. A complete annual inspection is not required to achieve compliance with the Decree.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 27: Commented | Author |
|---|---|

The latest proposed audit process in the 5/31/22 Implementation Plan version was developed without assistance of the Monitor and is inconsistent with requirements of the Consent Decree to be comprehensive and independent. IDOC has abandoned input and assistance of the Monitor with respect to the audit instrument though it is required in the Consent Decree (II.B.9., III.L.1 [the audit instrument is related to the quality program], IV.A.1,and V.E.).

| Page 27: Commented | Author |
|---|---|

The audit process is comprehensive and independent (SIU is independent). The audit of the contract is done by the contractor and that is ensuring that the customer is getting what they are paying for. The current process for quality improvement has been blessed by academic experts on quality. Furthermore, the Monitor has assisted in the development of the audit instrument as SIU reviews each Monitor's report and has participated in nearly half a dozen meetings with the Monitor.

| Page 27: Deleted | Author |
|---|---|

independent

1)

| Page 27: Commented | Author |
|---|---|

The Consent Decree requires that the audit process be an independent review (II.B.9.). In the latest 5/31/22 IDOC version of the Implementation Plan the audit process is not independent as the IDOC compliance unit performs compliance audits which is the same as current practice and facility providers are ultimately slated to perform facility clinical audits which is the same as current practice. The basis for the audit should be the requirements of the Consent Decree and reasonable clinical care.

| Page 27: Commented | Author |
|---|---|

This is NOT required by the Decree. The Decree indicates that audits can be conducted by OHS or disinterested auditor. II.B.9.

| Page 27: Commented | Author |
|---|---|

The latest Implementation Plan proposal by IDOC (5/31/22) does not include a comprehensive audit and the Consent Decree requires the Quality Improvement Program to be comprehensive. There audit thereby needs to be comprehensive and address all areas of the Consent Decree so that all facilities have their deficiencies identified so that corrective actions can promote forward progress toward compliance. The latest 5/31/22 IP audit was based only on an audit of "several quality indicators that apply to prison healthcare and are expressed in Disease Management Guidelines". These audits should be comprehensive and evaluate against all requirements of the Consent Decree. Otherwise, the audit process will not move the program toward compliance.

| Page 27: Commented | Author |
|---|---|

The QI program is comprehensive and includes clinical quality audits, compliance to contract, mortality

evals, peer review, incident reporting and the ability to report process concerns---all to be handled by academic experts in quality.

| Page 27: Commented | Author |
|---|---|

Procedures for audits should be written.

| Page 27: Commented | Author |
|---|---|

Agree

| Page 27: Commented | Author |
|---|---|

The Monitor and his consultants have years of monitoring experience. SIU or other potential auditors will not have this experience and the Monitor strongly recommends this training which can be accomplished in 3-4 auditing visits. This is necessary so that the new auditor can perform a comprehensive audit.

| Page 27: Commented | Author |
|---|---|

Quality audits are prescribed processes that the SIU team is perfectly suited to design. If there is something that the monitor would like monitored, they should submit that. The better trainer of the audit teams is the academic quality group. If the monitor has opinions on what documents should be used for an audit, they can make recommendations.

| Page 27: Commented | Author |
|---|---|

Monitoring does not make a person a quality expert or an expert in the design of a statistically valid audit measure.

| Page 27: Commented | Author |
|---|---|

The Consent Decree specifically calls out that the "Mortality reviews shall identify and refer deficiencies to appropriate IDOC staff. If deficiencies are identified, corrective action will be taken. Corrective action will be subject to regular Quality Assurance review". This process is most effectively managed through the audit process which is integral to the quality program.

| Page 27: Commented | Author |
|---|---|

Mortality reviews are done by a M and M committee and corrective action, both censure or through policy revision are addressed. M and M is not done with an audity. It is a case-by-case review. This is the community standard

| Page 27: Commented | Author |
|---|---|

Performance and outcome measures and adverse events contribute significant information to the audit and advances knowledge of the progress or lack of progress toward compliance.

| Page 27: Commented | Author |
|---|---|

Agree. Included in quality policy

| Page 27: Commented | Author |
|---|---|

Audits of facilities need to result in a report as it verifies progress and its findings can be compared over time. Reports must cover all aspects of the medical program at the facility in question and can provide feedback to the facility and provides information to the statewide Quality Improvement Council.

| Page 27: Commented | Author |
|---|---|

Agree.

| Page 27: Commented | Author |
|---|---|

This is an appropriate action of the system Quality Improvement Committee

| Page 27: Commented | Author |
|---|---|

M and M outcomes should be reported to the OHS medical director, not reviewed by the SLC, which is focused on improvement on a system level, not on the problem with an individual. If system problems are found through M and M, the SLC should address with a plan for process improvement or evaluation of the prevalence.

| Page 27: Commented | Author |
|---|---|

There should be follow up of assigned corrective actions.

| Page 27: Commented | Author |
|---|---|

SIU doing this.

| Page 27: Commented | Author |
|---|---|

In uncommon cases, corrective action may include referral of a physician to peer review. This is especially true for unqualified physicians. Audits, especially mortality review components of audits, can contribute to the review of physicians by the IDOC Medical Director's as required in Consent Decree provision III.A.3.

| Page 27: Commented | Author |
|---|---|

Agree

| Page 27: Deleted | Author |
|---|---|

as represented in an annual report of findings

| Page 27: Commented | Author |
|---|---|

IDOC conducts vendor oversight which is ineffective. The audit can significantly contribute to vendor oversight as required in II.B.2. of the Consent Decree if used effectively.

| Page 27: Commented | Author |
|---|---|

Agree that audits can be an effective tool for vendor oversight. Disagree with the remaining portion of the statement

| Page 27: Commented | Author |
|---|---|

This annual report is not required in order to meet obligations outlined in the Decree. The implementation plan may not create new obligations for the Department

| Page 28: Commented | Author |
|---|---|

This was in the 5/31/22 IDOC Implementation Plan, not in this version, and the Monitor agrees with this task.

| Page 28: Commented | Author |
|---|---|

Agree

| Page 28: Commented | Author |
|---|---|

An annual plan summarizes goals for the upcoming year and initially should include upcoming-year implementation goals that are stated in this plan. This was in the 5/31/22 plan and we agree with this task.

| Page 28: Commented | Author |
|---|---|

Agree

| Page 28: Deleted | Author |
|---|---|

dashboard,

| Page 28: Commented | Author |
|---|---|

This is consistent with requirements of the Consent Decree and unifies multiple requirements of the Consent Decree (II.B.6.l, m, and n., II.B.7., II.B.9., III.L.1. and III.M.2.) into the audit function with respect to corrective action that moves the program toward compliance.

| Page 28: Commented | Author |
|---|---|

Agree

| Page 28: Commented | Author |
|---|---|

Currently this is done by the Agency Medical Director but should include the IDOC Quality Improvement

Coordinator and SIU Quality Management Director. Attendance, can be by video conference.

| Page 28: Commented | Author |
|---|---|

Agree

| Page 28: Commented | Author |
|---|---|

Currently reported data is not standardized which makes it much less effective with respect to gauging progress towards compliance.

| Page 28: Commented | Author |
|---|---|

Agree.

| Page 28: Commented | Author |
|---|---|

This is consistent with training requirements of the Consent Decree as described in provisions II.B.3 and IV.A.2., and is also necessary for the quality improvement program to make forward progress toward compliance with the Consent Decree.

| Page 28: Commented | Author |
|---|---|

Agree

| Page 28: Deleted | Author |
|---|---|

**Identify quality management teams at each facility for targeted roll out (after pilot testing)**

| Page 28: Commented | Author |
|---|---|

It isn't clear what is being rolled out but we assume it is training on quality improvement. Training is discussed in task 49 below. If this is meant to be something other than training it should be stated. The Monitor's perspective is that the purpose of the quality program is to identify deficiencies and correct them and to continually move towards compliance with the Consent Decree.

| Page 28: Commented | Author |
|---|---|

Agree

| Page 28: Inserted | Author |
|---|---|

**IDOC will modify its CQI policy to change the current facility CQI programs to be more in line with Consent Decree requirements.**

1. See task #4 above with respect to CQI coordinators.

Each facility CQI program will develop an annual CQI plan which is based on corrective actions related to its annual audit findings and findings on mortality reviews, summary adverse event reports, its summary of performance and outcome measures, and additional tasks deemed appropriate by the system leadership council.

| Page 28: Commented | Author |
|---|---|

This focuses on the Consent Decree and forward movement toward compliance.

| Page 28: Commented | Author |
|---|---|

The facilities should develop corrective action plans, when needed. They are not trained in quality to prepare a CQI plan and to have the facilities each do their own plan does not lend to increased quality in the enterprise. If the facility has a problem that they want to study, that can be performed whenever they want to and this item is on the QI minutes template.

| Page 28: Commented | Author |
|---|---|

The System Leadership Council, not the individual facilities, will develop this task

| Page 28: Inserted | Author |
|---|---|

1. The annual plan will be approved by the Chief OHS and the system-wide CQI System Leadership council.

Each facility CQI coordinator will receive appropriate training Institute for Healthcare Improvement (IHI) and/or six sigma training

| Page 28: Deleted | Author |
|---|---|

system-wide CQI

| Page 28: Deleted | Author |
|---|---|

Institute for Healthcare Improvement (IHI) and/or six sigma training in addition to training provided by SIU in addition to training provided by SIU.
The Quality

| Page 28: Commented | Author |
|---|---|

These can be on-line, easily available, and, in any case, should be a requirement of the CQI coordinators.

| Page 28: Commented | Author |
|---|---|

Agree with appropriately training staff. However, six sigma training exceeds what is required in the community and not necessary to meet obligations outlined in the Decree.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 28: Inserted | Author |
|---|---|

in addition to training provided by SIU in addition to training provided by SIU.
The Quality Management Program will assign a statewide quality specialist to work with the facility CQI coordinator, HCUA, facility Medical Director and Director of Nursing in implementing corrective actions in their annual plan and for mentoring on quality efforts in general

| Page 28: Commented | Author |
|---|---|

This keeps the statewide CQI program up-to-date on progress of the facilities. Rather than waiting until the next annual meeting, ongoing communication between the facility and the statewide CQI program occurs.

| Page 28: Commented | Author |
|---|---|

Agree

| Page 28: Inserted | Author |
|---|---|

1. .
IDOC will continue the practice of maintaining monthly CQI meeting minutes which will be assigned to the CQI coordinator and will be in a standardized format statewide

| Page 28: Commented | Author |
|---|---|

Currently, terms are used in facility CQI meetings which appear to have different meaning at different facilities. Reporting data should be defined in a glossary if necessary but, in any case, should be standardized.

| Page 28: Commented | Author |
|---|---|

Agree

| Page 28: Inserted | Author |
|---|---|

.

| Page 28: Inserted | Author |
|---|---|

**II.B.3., II.B.9.,**

| Page 28: Inserted | Author |
|---|---|

**, IV.A.2**

| Page 28: Deleted | Author |
|---|---|

**Sep-22**

| Page 28: Inserted | Author |
|---|---|

**Dec 22**

| Page 28: Inserted | Author |
|---|---|

**II.B.9.**

| Page 28: Inserted | Author |
|---|---|

**II. B.9.,**

| Page 28: Inserted | Author |
|---|---|

**II.B.9., II.B.2, II.B.3, III.A.2, IV.A.2**

| Page 28: Inserted | Author |
|---|---|

| | **Audit teams will train with the Monitor and consultants in auditing three to four facilities.** | II.B.3., |
|---|---|---|

| Page 28: Commented | Author |
|---|---|

Audits are the means to provide an independent review of quality program which is meant to be comprehensive covering all aspects of medical and dental care. The Monitor's team does a comprehensive audit of facilities and can train the audit team in its approach which moves the program towards compliance.

| Page 28: Commented | Author |
|---|---|

The Decree does not mandate the Monitors train the audit teams. The audit teams are also medical professionals and have experience in this area. If the Monitor believes audits can be improved, he is entitled to offer assistance.

| Page 28: Commented | Author |
|---|---|

This date is given because an audit instrument is not yet developed. This is an aggressive date.

| Page 28: Commented | Author |
|---|---|

An audit instrument has been developed and was provided to the Monitor nearly three months ago

| Page 28: Inserted | Author |
|---|---|

**. This is also addressed in task #4.**

| Page 28: Inserted | Author |
|---|---|

**II.B.2, II.B.3, III.A.2, IV.A.2**

| Page 28: Deleted | Author |
|---|---|

**Appoint facility quality improvement coordinators**

| Page 28: Inserted | Author |
|---|---|

**This is redundant to task #4 above. See our comments in that task.**

| Page 28: Inserted | Author |
|---|---|

**3**

| Page 28: Deleted | Author |
|---|---|

**2**

| Page 28: Inserted | Author |
|---|---|

**(or when healthcare staffing is at least 70%)**

| Page 29: Inserted | Author |
|---|---|

A

| Page 29: Deleted | Author |
|---|---|

Training

| Page 29: Inserted | Author |
|---|---|

training

| Page 29: Deleted | Author |
|---|---|

will include quality improvement methodologies

| Page 29: Inserted | Author |
|---|---|

procedure with training curriculum will be developed and implemented for QI coordinators and facility leadership.

| Page 29: Deleted | Author |
|---|---|

| Page 29: Inserted | Author |
|---|---|

The initial  focus of training will include initiating and implementing corrective actions based on deficiencies identified by the audit program.  Later training features can include methodologies to identify and report process deficiencies.  Other training can follow incrementally.  See task #44 item 3 above.

Training on patient

| Page 29: Deleted | Author |
|---|---|

and

| Page 29: Inserted | Author |
|---|---|

will initially focus on how to report and remediate adverse events.   Training will focus initially on falls, medication errors, polypharmacy, etc.

| Page 29: Commented | Author |
|---|---|

Training should be incremental.  Because audits reports will result in corrective actions, how to correct problems should be an initial focus.  Patient safety initially should include encouragement to report and training on how to report adverse events and include how to remediate common adverse events such as falls and medication errors and polypharmacy.  Additional training can be provided after initial training.

| Page 29: Commented | Author |
|---|---|

Agree

| Page 29: Inserted | Author |
|---|---|

The procedure and

| Page 29: Deleted | Author |
|---|---|

using

| Page 29: Inserted | Author |
|---|---|

will be

| Page 29: Inserted | Author |
|---|---|

using

| Page 29: Deleted | Author |
|---|---|

or other

| Page 29: Inserted | Author |
|---|---|

information from

| Page 29: Inserted | Author |
|---|---|

,

| Page 29: Deleted | Author |
|---|---|

or

| Page 29: Inserted | Author |
|---|---|

, or academic centers

| Page 29: Inserted | Author |
|---|---|

**, IV.A.2**

| Page 29: Inserted | Author |
|---|---|



| Page 29: Deleted | Author |
|---|---|

**Jun-22**

| Page 29: Inserted | Author |
|---|---|

**- June 2023**

| Page 30: Inserted | Author |
|---|---|

| 50.a. | **Hire or contract for two process analysts to perform necessary process analysis as described below.** | **II.B.2, III.A.2, III.L.1,** |
|---|---|---|
| 50.b | **Develop procedure for initiating a new process improvement analysis and effort when audits, mortality reviews, adverse event reporting, or performance and outcome data show a serious systemic problem that is a barrier to compliance with the Consent Decree or is a significant patient safety risk.** | **III.L.1** |
| 50.c | **Revise policy and procedure for completed process analysis when a revised process differs from existing policy.** | **II.B.8.** |
| 50.d | **When a process analysis is completed, the process analyst and Medical Coordinator determine any staffing, equipment, or space needs are required beyond existing capacity. Additional needs are forwarded to Chief OHS who will discuss with Executive Director and Budget Director.** | **II.B.2., IV.A.1.,** |

| Page 30: Commented | Author |
|---|---|

Correcting problems is a key feature of the Quality Improvement program. The Implementation Plan (IV.A., IV.A.1-2) requires developing projects that fulfill requirements of the Consent Decree. When a systemic problem exists IDOC as identified in one of the quality efforts, IDOC will need to analyze and fix the systemic problem. IDOC does not now have the ability to perform process analysis.   The Monitor recommends hiring these staff and that one of these be a systems engineer and the other a process analyst.

| Page 30: Commented | Author |
|---|---|

Process improvement specialists are included in the SIU team.  The group is scalable depending on the need. But otherwise agree

| Page 30: Commented | Author |
|---|---|

It may be easier for SIU to hire these positions than IDOC human resources because the position description probably doesn't exist within IDOC and to get a new IDOC position description could take an extended period of time.

| Page 30: Commented | Author |
|---|---|

Agree

| Page 30: Commented | Author |
|---|---|

Audits and other measurements will identify additional systemic deficiencies.  There needs to be a way to correct systemic deficiencies.

| Page 30: Commented | Author |
|---|---|

Agree

| Page 30: Commented | Author |
|---|---|

By design, a process analysis can result in a changed process.  When this occurs an existing policy or procedure may need to be adjusted.

| Page 30: Commented | Author |
|---|---|

Agree

| Page 30: Commented | Author |
|---|---|

A changed process may result in a need for additional or less staffing, additional equipment or space.  When this occurs, the Medical Coordinator OHS should develop a plan to obtain these needed resources.

| Page 30: Commented | Author |
|---|---|

Agree, other staff many be involved in obtaining necessary resources

| Page 30: Inserted | Author |
|---|---|

s

| Page 30: Deleted | Author |
|---|---|

| Page 30: Inserted | Author |
|---|---|

  Process analysts will systematically map all steps and procedures of specified processes; analyze input, process, and output using root cause analysis; determine the desired output; make the process more efficient, with fewer errors, and in line with the movement towards compliance with the Consent Decree.

| Page 30: Commented | Author |
|---|---|

This provides more detail with respect to what process analysis consists of.  The goal of the process

analysis is to improve the process or make it more effective consistent with overall requirements of the Implementation Plan consistent with provision IV.A., IV.A. 1-2 of the Consent Decree.

| Page 30: Commented | Author |
|---|---|

Agree.  SIU has experts in this.

| Page 30: Deleted | Author |
|---|---|

| Page 30: Inserted | Author |
|---|---|

| Page 30: Inserted | Author |
|---|---|

receipt and

| Page 30: Commented | Author |
|---|---|

Many consultations do not include a consultant reports.

| Page 30: Inserted | Author |
|---|---|

 reviewed the reports

| Page 30: Deleted | Author |
|---|---|

 take appropriate
action on those reports.

| Page 30: Inserted | Author |
|---|---|

Analysis of scheduling and tracking of specialty care to ensure whether scheduling is timely

| Page 30: Commented | Author |
|---|---|

Tracking of scheduling is often inaccurate and may contribute to discontinuity of care.  This has been repeatedly identified as a problem of specialty care in record reviews.

| Page 30: Commented | Author |
|---|---|

Agree that scheduling should be watched closely

| Page 30: Commented | Author |
|---|---|

Unclear as to which charts is the monitor referring to

| Page 30: Inserted | Author |
|---|---|

.

| Page 30: Inserted | Author |
|---|---|

**, II.B.2, II.B.3., IV.A.1., IV.A.2.**

| Page 30: Deleted | Author |
|---|---|

**SIU, Agency Medical Director OHS Director of Nursing**

| Page 30: Commented | Author |
|---|---|

Unclear who SIU represents but someone qualified to perform process analysis should do this.  If SIU is hiring a qualified process analyst, that position should be named.

| Page 30: Commented | Author |
|---|---|

SIU has a process analyst.

| Page 30: Inserted | Author |
|---|---|

**Qualified process analyst**

| Page 30: Commented | Author |
|---|---|

These analyses need to be performed by a qualified process analyst.

| Page 30: Commented | Author |
|---|---|

Not clear what the Monitor believes is qualified but otherwise agree

| Page 30: Inserted | Author |
|---|---|

**3**

| Page 30: Deleted | Author |
|---|---|

**2**

| Page 30: Deleted | Author |
|---|---|

**This**

| Page 30: Inserted | Author |
|---|---|

**The**

| Page 30: Commented | Author |
|---|---|

The Monitor supports the use of process improvement to address issues with existing sick call practices. These are additions to address aspects of the Consent Decree that have been left out of the plan, as well as the methods and tools necessary to account for quality and performance in delivering sick call services (II.B.2).

| Page 30: Commented | Author |
|---|---|

Agree

| Page 30: Deleted | Author |
|---|---|

**should**

| Page 30: Inserted | Author |
|---|---|

**will**

| Page 30: Deleted | Author |
|---|---|

Timely
1.

| Page 30: Inserted | Author |
|---|---|

Timely
1.

| Page 30: Commented | Author |
|---|---|

vague

| Page 30: Deleted | Author |
|---|---|

1.

| Page 30: Inserted | Author |
|---|---|

monitoring of access and i
1.

| Page 30: Deleted | Author |
|---|---|

I

1.

| Page 30: Inserted | Author |
|---|---|

Establish standardized process to review and account for addressing access issues.

1.

| Page 30: Inserted | Author |
|---|---|

Identify i

1.

| Page 30: Deleted | Author |
|---|---|

I

1.

| Page 30: Inserted | Author |
|---|---|

and reassign work, revise procedures, or obtain staffing necessary for timely

1.

| Page 30: Deleted | Author |
|---|---|

timely

1.

| Page 30: Commented | Author |
|---|---|

vague

| Page 30: Deleted | Author |
|---|---|

and responsive

1.

| Page 30: Inserted | Author |
|---|---|

and responsive responses to sick call requests

1.

| Page 30: Inserted | Author |
|---|---|

Define and establish the resources necessary to p

1.

| Page 30: Deleted | Author |
|---|---|

P

1.

| Page 30: Inserted | Author |
|---|---|

e

1.

| Page 30: Deleted | Author |
|---|---|

ing

1.

| Page 30: Inserted | Author |
|---|---|

registered

1.

| Page 30: Inserted | Author |
|---|---|

.

1.

| Page 30: Inserted | Author |
|---|---|

Identify the m

1.

| Page 30: Deleted | Author |
|---|---|

M

1.

| Page 30: Inserted | Author |
|---|---|

including the how to document the patient's presenting complaint in their own words, including those with multiple requests.

1.

| Page 30: Deleted | Author |
|---|---|

Review and updates to

1.

| Page 30: Inserted | Author |
|---|---|

1. Revise the use of nursing protocols to include limitations on their use with patients who require close clinician monitoring, elimination of the protocol for Non-Specific Discomfort and design a process for the periodic review and revision of treatment protocols based upon CQI, performance and audit data.

| Page 30: Deleted | Author |
|---|---|

CQI

1.

| Page 30: Deleted | Author |
|---|---|

Review and updates to nursing protocols
A review of how patients' requests are documented in the health record.

| Page 30: Inserted | Author |
|---|---|

Establish a methodology to train registered nurses

1.

| Page 30: Commented | Author |
|---|---|

Should include licensed nurses

| Page 30: Inserted | Author |
|---|---|

in the use of treatment protocols and practice clinical judgement with supervision until initial competency

1.

| Page 30: Deleted | Author |
|---|---|

until initial competency

1.

| Page 30: Commented | Author |
|---|---|

This is vague

| Page 30: Deleted | Author |
|---|---|

is established and the methods to dDetermineingDetermining the continuing competency of nurses assigned to sick call

1.

| Page 30: Inserted | Author |
|---|---|

is established and the methods to d

1.

| Page 30: Inserted | Author |
|---|---|

etermine

1.

| Page 30: Inserted | Author |
|---|---|

1. .
The results of the process improvement project

1.

| Page 30: Deleted | Author |
|---|---|

process improvement project

1.

| Page 30: Commented | Author |
|---|---|

Policy will be rewritten consistent with the Decree requirements. IDOC is not mandated to conduct a process improvement project in order to rewrite policy,

| Page 30: Inserted | Author |
|---|---|

will be revised policy and procedure for sick call, clear definitions of the staffing and resource requirements needed to conduct sick call, training and supervision of nurses to ensure appropriate clinical assessment and decision making using the nursing protocols, limiting the use of protocols in patient populations requiring monitoring by clinicians, and audit methods to monitor and account for compliance with the Consent Decree, procedures and protocol .

1.

| Page 31: Commented | Author |
|---|---|

OHS is not clear on this task

| Page 30: Inserted | Author |
|---|---|

**II. B.1;**

| Page 30: Inserted | Author |
|---|---|

**; III. A. 10; III. F. 2**

| Page 30: Deleted | Author |
|---|---|

**SIU** process improvement project leader,

| Page 30: Inserted | Author |
|---|---|

process improvement project leader

| Page 30: Commented | Author |
|---|---|

SIU needs to appoint a dedicated lead for this process improvement project. Items 1- 4, 7 and 8 may require additional expertise including data collection and analysis, and information from other large correctional systems with functional sick call systems on process and monitoring metrics. The Agency Medical Director and OHS DON should serve as final authority on decisions regarding sick call policy and practices but should not be expected to develop much of this content. SIU or OHS should consider additional clinical consulting expertise to address 5 and 6.

| Page 30: Commented | Author |
|---|---|

IDOC agrees that qualified staff should conduct the process improvement projects. SIU will determine how many staff they need to accomplish this task

| Page 30: Inserted | Author |
|---|---|

. Additional data collection and analysis resources from SIU, consulting expertise in nursing sick call, nursing treatment protocols and evaluation of nursing competency.

| Page 30: Deleted | Author |
|---|---|

Additional data collection and analysis resources from SIU, consulting expertise in nursing sick call, nursing treatment protocols and evaluation of nursing competency.

| Page 30: Commented | Author |
|---|---|

This recommendation is unclear

| Page 30: Inserted | Author |
|---|---|

3

| Page 30: Deleted | Author |
|---|---|

2

| Page 31: Deleted | Author |
|---|---|

OHS will reference correctional accreditation standards and best practices such as those provided by NCCHC, ACA, and the Federal Bureau of Prisons (FBOP). Revisions to chronic clinic practice will also reference evidenced based clinical guidelines.

| Page 31: Commented | Author |
|---|---|

The following are tasks recommended by IDOC in tasks 52 and 56 below which the Monitor agrees with but combines together in this task. These have been mostly based on recommendations of the Monitor based on deficiencies identified in mortality reviews. The corrective actions required based on III.M.1. of the Consent Decree result in this task. Because of the extent of deficiencies in this process, corrective actions in the chronic illness program make a process analysis necessary.

| Page 31: Commented | Author |
|---|---|

The Monitor agrees with this IDOC task. This is currently poorly done and few individuals have an accurate problem list.

| Page 31: Commented | Author |
|---|---|

The Monitor agrees with this IDOC task. This is useful for tracking, scheduling and monitoring purposes.

| Page 31: Commented | Author |
|---|---|

The Monitor agrees with this IDOC task. Not doing this results in many chronic illnesses not being monitored which deficiency is found in many mortality reviews and needs corrective action (III.M.2)

| Page 31: Inserted | Author |
|---|---|

1.

4. Ensuring that adequate history is taken and analysis of why adequate histories are not currently obtained

1.

| Page 31: Deleted | Author |
|---|---|

Ensuring that adequate history is taken and analysis of why adequate histories are not currently obtained

1.

| Page 31: Commented | Author |
|---|---|

This task is not appropriate because what is considered an adequate history is subjective. There are better measures to ensure improvements to chronic care

| Page 31: Commented | Author |
|---|---|

Less than adequate histories are typical and IDOC should evaluate why this occurs and take appropriate action.

| Page 31: Deleted | Author |
|---|---|

.

1.

| Page 31: Commented | Author |
|---|---|

Disagree with this addition. This is very subjective and the standard for evaluating the quality of care is to look at outcomes or to look at actions that are known to produce good outcomes (like a retina check for a diabetic)

| Page 31: Inserted | Author |
|---|---|

1. .

5. Ensuring that there is an assessment and therapeutic plan for each problem.

| Page 31: Commented | Author |
|---|---|

Therapeutic plans for each of the patient's chronic conditions are often difficult to determine from the medical record and this results in discontinuity of care and clinical errors.

| Page 31: Commented | Author |
|---|---|

Not clear on how the Monitor defines a therapeutic plan

| Page 31: Deleted | Author |
|---|---|

| Page 31: Inserted | Author |
|---|---|

6.

| Page 31: Inserted | Author |
|---|---|

| Page 31: Commented | Author |
|---|---|

The Monitor agrees with this IDOC task. The worse a patient's control is the more frequently the patient should be seen.

| Page 31: Deleted | Author |
|---|---|

.

| Page 31: Deleted | Author |
|---|---|

and timely

| Page 31: Inserted | Author |
|---|---|

7.7.  and that follow up appointments with specialists are scheduled  and timely.
That immunizations are routinely tracked updated with use of a reliable immunization tracking mechanism (e.g. I-CARE).

| Page 31: Deleted | Author |
|---|---|

| Page 31: Deleted | Author |
|---|---|

and timely

| Page 31: Commented | Author |
|---|---|

The Monitor agrees with this IDOC task. But, coordination of care with specialists and timely scheduling is a significant problem identified on record reviews and should be corrected.

| Page 31: Deleted | Author |
|---|---|

updated with use of a reliable immunization tracking mechanism (e.g. I-CARE).

| Page 31: Commented | Author |
|---|---|

IDOC lacks a mechanism to track immunizations and should take advantage of available tracking mechanisms. I-CARE already exists and IDOC should use it.

| Page 31: Commented | Author |
|---|---|

The use of such tracking is not required in order to meet Decree obligations

| Page 31: Inserted | Author |
|---|---|

8.8.
That a therapeutic dental plan is made at the conclusion of the intake dental examination

| Page 31: Deleted | Author |
|---|---|

That a therapeutic dental plan is made at the conclusion of the intake dental examination.

| Page 31: Commented | Author |
|---|---|

Dentists should develop a plan of care for dental patients similar to medical patients. This is not now done.

| Page 31: Commented | Author |
|---|---|

Agree

| Page 31: Inserted | Author |
|---|---|

.

| Page 31: Commented | Author |
|---|---|

This exceeds the community standard and is atypical of prison systems.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 31: Deleted | Author |
|---|---|

That dental x-rays are digitalized and organized in a picture archiving and communication system (PACS).

| Page 31: Inserted | Author |
|---|---|

That dental x-rays are digitalized and organized in a picture archiving and communication system (PACS).

| Page 31: Commented | Author |
|---|---|

With the advent of the electronic record, maintaining dental x-rays digitally would save enormous medical record time and be a safer and more effective operational practice.

| Page 31: Commented | Author |
|---|---|

Agree but digital xrays are not required to meet obligations outlined in the Decree

| Page 31: Commented | Author |
|---|---|

This task is not necessary to meet obligations outlined in the Decree.
The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 31: Deleted | Author |
|---|---|

| Page 31: Inserted | Author |
|---|---|

11. That laboratory tests are documented as reviewed and are ordered when indicated

| Page 31: Commented | Author |
|---|---|

The process of ordering, reviewing and obtaining laboratory results and how they are documented in the EMR should be included in the process evaluation of chronic care.

| Page 31: Inserted | Author |
|---|---|

by the patient's condition or as directed by Disease Management Guidelines.

| Page 31: Deleted | Author |
|---|---|

| Page 31: Commented | Author |
|---|---|

Agree

| Page 31: Deleted | Author |
|---|---|

Provide staff training

| Page 31: Inserted | Author |
|---|---|

Ensure that clinical care follows national standards.

| Page 31: Commented | Author |
|---|---|

Rather than developing IDOC-specific clinical standards, IDOC should use existing national standards of clinical care.

| Page 31: Commented | Author |
|---|---|

Agree when appropriate

| Page 31: Inserted | Author |
|---|---|

2.
13. Make access to UpToDate available in all clinic examination rooms

| Page 31: Deleted | Author |
|---|---|

Make access to UpToDate available in all clinic examination rooms.

| Page 31: Commented | Author |
|---|---|

This valuable resource should be available to all providers at the point of care.

| Page 31: Commented | Author |
|---|---|

Not every community healthcare system has access to this in every exam room. This recommendation far exceeds the community standard and is not necessary to comply with the Decree.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 31: Inserted | Author |
|---|---|

.

| Page 31: Inserted | Author |
|---|---|

14.

| Page 31: Deleted | Author |
|---|---|

Implement recommendations for enhanced

| Page 31: Inserted | Author |
|---|---|

Ensure ability of providers to evaluate

| Page 31: Inserted | Author |
|---|---|

 compliance and current medications at chronic care visits.

| Page 31: Deleted | Author |
|---|---|

| Page 31: Commented | Author |
|---|---|

Evaluation of medication administration records does not appear to occur currently which may be due to a paper record. Evaluation of current medications and ability to know whether patients are taking medications is critical to a chronic care evaluation.

| Page 31: Commented | Author |
|---|---|

Agree.

| Page 31: Deleted | Author |
|---|---|

administration

| Page 31: Inserted | Author |
|---|---|

Make chronic clinic documentation more efficient and supportive of preventive measures

| Page 31: Commented | Author |
|---|---|

The design of EMR screens, if done well, can make physicians more effective and can improve preventive screening and vaccinations.

| Page 31: Commented | Author |
|---|---|

Agree

| Page 31: Inserted | Author |
|---|---|

 (vaccinations, cancer screening, etc.) with implementation of the EHR.

| Page 31: Deleted | Author |
|---|---|

Integrate solutions and work flows with EHR

| Page 31: Inserted | Author |
|---|---|

15.

16. Intake assessment to conclude with an initial assessment and therapeutic plan for all chronic illnesses

| Page 31: Commented | Author |
|---|---|

The initial intake orders all monitoring and meds needed for a chronic clinic visit within 30 days, or sooner, if needed. It is not a great idea to try to do CCC within a week because the labs and readings are not usually available. If you want to keep your intakes at the reception center for weeks, this would work. It is nice at a diabetes CCC to see a few weeks of sugar readings.

| Page 31: Commented | Author |
|---|---|

Agree

| Page 31: Inserted | Author |
|---|---|

.

| Page 31: Commented | Author |
|---|---|

All chronic care visits should include a therapeutic plan relevant to all chronic care problems.

| Page 31: Commented | Author |
|---|---|

Agree.

| Page 31: Commented | Author |
|---|---|

Sometimes the therapeutic plan is to continue current management.  This does not require an extensive evaluation of every problem at every visit..

| Page 31: Inserted | Author |
|---|---|

**II.B.1.,**

| Page 32: Inserted | Author |
|---|---|

**improvement**

| Page 32: Deleted | Author |
|---|---|

**administration**

| Page 32: Inserted | Author |
|---|---|

**management**

| Page 32: Commented | Author |
|---|---|

The Monitor agrees with the focus and aim of this process improvement project.  The change from medication administration to medication management and the Consent Decree numbers are made because subitems 1-7 address the broader subject of improving the effectiveness and safety of treatment with prescribed medications that is called for in II.A. and II. B of the Consent Decree.

| Page 32: Deleted | Author |
|---|---|

**should**

| Page 32: Inserted | Author |
|---|---|

**will**

| Page 32: Deleted | Author |
|---|---|

Accurate and timely transcription of medication administration record.
    1.

| Page 32: Commented | Author |
|---|---|

This change and the addition of subitem 5 incorporate items from Defendants May 22 draft implementation plan that were more descriptive of changes to be made.  See the last paragraph of the narrative on the electronic record and items 7 and 97 of the May 22 draft plan.

| Page 32: Commented | Author |
|---|---|

Agree

| Page 32: Inserted | Author |
|---|---|

The use of a pharmacy generated label to be placed on the MAR after the script has been profiled by the pharmacist and elimination of hand written orders transcribed onto the MAR.
    1.

| Page 32: Commented | Author |
|---|---|

Transcription of orders onto the MAR is an enormously unsafe practice and also is wasteful use of nursing time (when there are not enough filled nurse positions). The goal here is to eliminate handwriting

on the MAR with the occasional exception of a 1st dose that can not wait until the pharmacy can fill and deliver ordered medication.  This replaces IDOCs task that transcription is accurate and timely because accurate handwritten transcription of orders is an unrealistic, outmoded and dangerous practice and needs to be eliminated.

| Page 32: Commented | Author |
|---|---|

Medication dispensing should be done by a med aide whenever possible, to allow a nurse to practice at the top of his/her license.

| Page 32: Deleted | Author |
|---|---|

Administration of medication directly from pharmacy-dispensed, patient-specific unit dose containers.

| Page 32: Commented | Author |
|---|---|

The ability to dispense stock meds is important and the existence of a stock med log.

| Page 32: Commented | Author |
|---|---|

This is not an obligation outlined in the Decree. The implementation plan may not create new obligations.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 32: Inserted | Author |
|---|---|

Development of workflows for medications which are issued to patients to self-administer (KOP) and those administered to patients by a nurse (DOT)  to be finalized in standardized statewide policy and procedure. 1.

| Page 32: Commented | Author |
|---|---|

This comes from a task in IDOCs May version of the implementation plan concerning the electronic record # 97. The Monitor agrees that the workflow for these two types of medication distribution need to be mapped out and standardized statewide. Once that is accomplished the process needs to be finalized in a standardized procedure. This change is necessary to ensure that patients have timely, safe access to prescribed treatment that is delivered in a manner consistent with patient safety practices.

| Page 32: Commented | Author |
|---|---|

Agree

| Page 32: Inserted | Author |
|---|---|

1.

| Page 32: Deleted | Author |
|---|---|

**III.M.1.a, b and c**

| Page 32: Inserted | Author |
|---|---|

**II. A, II. B. 1, II.B.6.c.**

| Page 32: Deleted | Author |
|---|---|

**OHS Quality Control Coordinator,**

| Page 32: Inserted | Author |
|---|---|

SIU Director of Pharmacy Standards & Operations,

| Page 32: Commented | Author |
|---|---|

This change is to acknowledge the recent addition of this position to the SIU Correctional Medicine Program.  This position should be the subject matter expert to lead this project, with input and concurrence from the Deputy Chiefs and Agency DON on the direction and focus of the project. SIU will also need to facilitate the process improvement project.

| Page 32: Commented | Author |
|---|---|

Agree

| Page 32: Inserted | Author |
|---|---|

&

| Page 32: Inserted | Author |
|---|---|

.

| Page 32: Deleted | Author |
|---|---|

, SIU

| Page 32: Deleted | Author |
|---|---|

22

| Page 32: Inserted | Author |
|---|---|

23

| Page 32: Commented | Author |
|---|---|

9/23 was the completion date used by Defendants in the May 22 draft plan. It is a more realistic date than the one in this draft from 12/21.

| Page 32: Commented | Author |
|---|---|

changed

| Page 32: Inserted | Author |
|---|---|

/cancer screenings and

| Page 32: Deleted | Author |
|---|---|

,

| Page 32: Deleted | Author |
|---|---|

, and cancer screenings

| Page 32: Inserted | Author |
|---|---|

 respectively

| Page 32: Inserted | Author |
|---|---|

USPSTF (A and B recommendations) and

| Page 32: Deleted | Author |
|---|---|

and USPSTF (A and B recommendations

| Page 32: Inserted | Author |
|---|---|

to

| Page 32: Deleted | Author |
|---|---|

**for**

| Page 32: Inserted | Author |
|---|---|

.
1.

| Page 32: Inserted | Author |
|---|---|

**in task 27**.
1.

| Page 32: Deleted | Author |
|---|---|

.
1.

| Page 32: Inserted | Author |
|---|---|

.

| Page 32: Deleted | Author |
|---|---|

..

| Page 32: Inserted | Author |
|---|---|

.

| Page 32: Deleted | Author |
|---|---|

..

| Page 32: Inserted | Author |
|---|---|

.

| Page 32: Inserted | Author |
|---|---|

Record
**OHS will direct all facilities to report routine health maintenance/cancer screenings and adult immunizations data to monthly facility QI meetings and system Quality Council meetings as detailed above in tasks 26 and 27**
1.

| Page 32: Commented | Author |
|---|---|

II.B.2 requires that adequate monitoring  of health care be accomplished.  IDOC needs to monitor and report results of their monitoring on a regular basis.  This should become a dashboard item when the data is found to be standardized and accurate.

| Page 32: Commented | Author |
|---|---|

Agree that we need reports but moving away from the dashboard concept.

| Page 32: Inserted | Author |
|---|---|

R
1.

| Page 32: Deleted | Author |
|---|---|

record
1.

| Page 32: Inserted | Author |
|---|---|

.
1.

| Page 32: Inserted | Author |
|---|---|

**II.B.1.; II.B.2.;**

| Page 32: Inserted | Author |
|---|---|

**, OHS DON**

| Page 32: Inserted | Author |
|---|---|

**Nov 2022**

| Page 32: Inserted | Author |
|---|---|

**Feb-2023**

| Page 32: Deleted | Author |
|---|---|

**Jun-22**

| Page 32: Inserted | Author |
|---|---|

| Page 32: Commented | Author |
|---|---|

Additions to this task are to identify the steps necessary to move from the trial to the end goal of replacing skin tests with IGRA. This was initially suggested by the Monitor as a way to free up nursing time that could be assigned other work (i.e. sick call) and to reduce the number of patient contacts from two to one. Accomplishing this item partially addresses II.B.3 (which why it has been added to the column listing Consent Decree items) of the Consent Decree which requires having enough staff to provide care consistent with the Decree. The item also addresses III.C.1 (having sufficient staff to complete reception screening within 7 days.

| Page 32: Commented | Author |
|---|---|

Agree

| Page 32: Deleted | Author |
|---|---|

A trial initiated October 2021 is currently in place at all IDOC R&C facilities using an updated IGRA test with UIC laboratory services provide through the current vendor (Wexford health services). The results of the trial will be evaluated with expansion to the remaining IDOC facilities.

| Page 32: Inserted | Author |
|---|---|

1. IDOC replaced tuberculosis skin testing with updated IGRA blood testing at R & C facilities as of October 0221.
1. Establish written guidance for initial and subsequent screening for tuberculosis infection including the frequency, methods, timeframes, responsible parties, and reporting.
1. Establish a plan and implement finalized program which replaces TST with IGRA screening for tuberculosis infection statewide.

Use reporting metrics to monitor progress with implementation and to evaluate the effectiveness of the tuberculosis screening program.

| Page 32: Inserted | Author |
|---|---|

**II.B. 3;**

| Page 32: Inserted | Author |
|---|---|

**1 &**

| Page 32: Deleted | Author |
|---|---|

UIC lab

| Page 32: Inserted | Author |
|---|---|

UIC lab, Agency Infectious Disease Coordinator, Agency Medical Director

| Page 32: Commented | Author |
|---|---|

This change simply identifies who is involved in this project more precisely.

| Page 32: Commented | Author |
|---|---|

Agree

| Page 32: Inserted | Author |
|---|---|

,

| Page 32: Deleted | Author |
|---|---|

**Deputy Chiefs,**

| Page 32: Deleted | Author |
|---|---|

**Quality Improvement Coordinator**

| Page 32: Inserted | Author |
|---|---|

**, Infectious Disease Coordinator**

| Page 32: Deleted | Author |
|---|---|

**Oct-2021**

| Page 32: Inserted | Author |
|---|---|

**Oct-2**

| Page 32: Inserted | Author |
|---|---|

**1**

| Page 32: Deleted | Author |
|---|---|

**Apr-2023Jun**

| Page 32: Inserted | Author |
|---|---|

**April23**

| Page 32: Deleted | Author |
|---|---|

**-22**

| Page 33: Deleted | Author |
|---|---|

**Develop procedures to ensure medical record contains a problem list along with clinically appropriate diagnostic and therapeutic plans** 1. Inventory of chronic and acute illnesses and dental conditions listed on a problem list shall be completed by providers. 2. Providers shall work to obtain an adequate medical history regarding chronic problems and complications including hospitalizations. 3. For each condition there should be an assessment describing the status of the patient's condition with a therapeutic plan. The dental assessment should include a therapeutic plan which is scheduled for the patient. 4. Appointments should be made for any recommended follow up and treatment. 5. Prior records should be requested when relevant to the evaluation of the patient's current condition.6. Results of lab tests must be available for the provider to review and create a treatment plan 7. An immunization history should be taken during medical reception and recommended vaccines provided. I-CARE should be utilized for this purpose to determine current status. 8. A therapeutic plan for dental care should be documented at the conclusion of the intake dental exam with appointments made to begin any recommended dental treatment. 9. Dental x-rays should be digital

and entered into a picture archiving and communication system (PACS) to ensure x-rays are available statewide when the EHR is fully implemented.

| Page 33: Inserted | Author |
|---|---|

. Combined with task # 52 above

| Page 33: Inserted | Author |
|---|---|

1.Revise the

| Page 33: Deleted | Author |
|---|---|

OHS revised

| Page 33: Commented | Author |
|---|---|

II.B.6.f. and g. state "IDOC agrees to implement changes in the following areas; f. chronic care and g. timely access to diagnostic services and specialty care " The HCV treatment guidelines were revised to improve access to treatment at UIC HCV telehealth specialty clinic for IDOC patients with active HC. The revisions were made with collaboration between UIC telehealth, OHS, and the Monitor.  From 2017 -2021 liver cancer was the 2nd leading cause of cancer death in the IDOC.  Many of these deaths could have been prevented with timely treatment of underlying active HC.

| Page 33: Commented | Author |
|---|---|

Agree with update HCV DMG and HCV screening for all at intake.

| Page 33: Inserted | Author |
|---|---|

.

| Page 33: Deleted | Author |
|---|---|

.

| Page 33: Deleted | Author |
|---|---|

**Revised policy changes  include removing the opt out option for Hep C screening, all positives are referred for fibroscan, and all Hep C patients are referred to UIC for evaluation regardless of fibroscan results. The process of referral to Wexford physician** for approval was also removed.

| Page 33: Inserted | Author |
|---|---|

**2.Disseminate, educate, and implement the revised Hepatitis C Treatment guidelines at all IDOC facilities.**

3. **Standardize Hepatitis C Clinic monthly facility reporting tables to include a.total HC patients,b. # pts on treatment, c.# pts refused tx, d. # awaiting tx, e.# ineligible for tx. and report HC clinic data to facilities' monthly QI meetings.**

| Page 33: Commented | Author |
|---|---|

II.B.2 states "IDOC shall require ...the monitoring of health care by collecting and analyzing data to determine how well the system is providing care."The existing methodology for reporting each facility's HC clinic patients lacks standardization. This is a barrier to identifying the actual volume of HC patients

who are on treatment, have been treated, have refused treatment, are ineligible for treatment. It is currently impossible to accurately identify the # of untreated patients with active HC. Some facilities do not report any HC clinic data; some do not report all key data.  It is important to know how many untreated HC patients are in the IDOC.

| Page 33: Commented | Author |
|---|---|

Agree that it is important to know these stats, but it is not for the facility QI program to look at.  More appropriate for a statewide infection control committee to follow.

| Page 33: Inserted | Author |
|---|---|

**4.Review and tabulate on a quarterly basis the UIC HCV telehealth's spread sheet of IDOC HC patients started on treatment. Based on this data identify facilities that are not expeditiously referring active HC patients for treatment.**

| Page 33: Commented | Author |
|---|---|

II.B.6.f and g. state "IDOC agrees to implement changes in….. f. "chronic care" and g. "timely access to diagnostic services and appropriate specialty care." Based on data provided by UIC there is a wide facility-to-facility variation in the # of HC patients who have received treatment.  A number of large facilities with significant volume of active HC patients have referred few if any patients to UIC telehealth for treatment. IDOC must fully educate, monitor facility rates of treatment, and take corrective action to ensure that HC pts. in all IDOC facilities are given equal access to this curable 12 week course of HCV treatment.

| Page 33: Commented | Author |
|---|---|

An audit to look at referral rates seems more straightforward and simple.

| Page 33: Commented | Author |
|---|---|

Treatment rates may not equate referral rates.  If one facility tends to have younger patients (as many minimum security places do), it may have fewer treated, either because their fibrosis is less prominent or because they are going to leave the system soon.

| Page 33: Inserted | Author |
|---|---|

**II.B.6.f. and g., III.L.2**.

**II.B.1.; II.B.6.f. and g.**

**II.B.2**

**II.B.1, II.B.2, II.B.6.f and g.**

| Page 33: Inserted | Author |
|---|---|

**Mar-2021**

**Jun-2021**

**Nov-2022**

**Jan-22**

| Page 33: Deleted | Author |
|---|---|

**Ongoing**

| Page 33: Inserted | Author |
|---|---|

**Mar-2023 for all facilities and thereafter Ongoing**

**Mar-2023**

**Mar-2023 and Ongoing**

| Page 33: Inserted | Author |
|---|---|

**100%**

**50%**

**50%**

**50%**

| Page 33: Inserted | Author |
|---|---|

**Mar-2022**

| Page 33: Commented | Author |
|---|---|

The revised March 2021 allow IDOC to refer all active HC patients with all levels of liver fibrosis (F0 to F-4) to the UIC Hepatitis Telehealth clinic.
IDOC must monitor facilities with low referral rates to ensure that HC pts with all levels of fibrosis are being referred for treatment.

| Page 33: Commented | Author |
|---|---|

Agree

| Page 33: Deleted | Author |
|---|---|

**II.B.2; II.B.3; III.B.1-2; III.F. 1; III.I.5; III.J.2-3**

| Page 33: Inserted | Author |
|---|---|

**II.B.6,g.**

| Page 33: Inserted | Author |
|---|---|

**Jun 2022**

| Page 33: Inserted | Author |
|---|---|

**Mar-23 for all facilities thereafter**

| Page 33: Deleted | Author |
|---|---|

**Update job description (CMS-104) for Environmental Services Coordinator**

| Page 33: Commented | Author |
|---|---|

These are eliminated as tasks since they are merely the steps to achieve task 61. They may be listed as subtasks if IDOC wishes. However both completion dates are past and the Monitor has received no information that indicate these subtasks have been completed. IDOC should reconsider the completion dates listed for items 59-61.

| Page 33: Commented | Author |
|---|---|

Agree

| Page 33: Deleted | Author |
|---|---|

**II.B.2; II.B.3; III.B.1-2; III.F. 1; III.I.5; III.J.2-3**

| Page 33: Deleted | Author |
|---|---|

**Agency Medical Director or Designee**

| Page 33: Deleted | Author |
|---|---|

**Feb-22**

| Page 33: Inserted | Author |
|---|---|

**Dec 22**

| Page 34: Deleted | Author |
|---|---|

**Post position for Environmental Service Coordinator**

| Page 34: Deleted | Author |
|---|---|

**II.B.2; II.B.3; III.B.1-2; III.F. 1; III.I.5; III.J.2-3**

| Page 34: Deleted | Author |
|---|---|

**OHS and Human Resources**

| Page 34: Inserted | Author |
|---|---|

**Jan 23**

| Page 34: Deleted | Author |
|---|---|

**Mar-22**

| Page 34: Inserted | Author |
|---|---|

**Hire Environmental Services Coordinator responsible for ensuring the adequacy and functionality of clinical space and sanitation to deliver adequate health care and ensure patient safety.** These responsibilities also include establishing policies, practices, and procedures to identify inmate illness or injury potentially related to environmental factors. The Environmental Services Coordinator develops oversight and reporting systems to identify deficiencies in clinical space and equipment as well as environmental conditions that need correction at the facility as well as identification of systemic issues that are directed to the patient safety and quality improvement committees for review and action.

| Page 34: Commented | Author |
|---|---|

These additions are to define the role of Environmental Services within OHS and IDOC. The Monitor has identified environmental conditions that contribute to injury and illness that are preventable and need to be addressed to prevent harm to the health of incarcerated persons. An example are the multiple falls resulting in fractures or other impairment among frail and elderly patients brought forth as a particular area of concern in the 5th Report, page 112. NCCHC B-04 has a new standard that requires a program of medical surveillance of inmate workers. Policies, procedures and practices necessary to meet this accreditation standard should be assigned to the Environmental Services Coordinator.

| Page 34: Commented | Author |
|---|---|

Agree.

| Page 34: Inserted | Author |
| --- | --- |

| Page 34: Deleted | Author |
| --- | --- |

**Hire Environmental Services Coordinator**

| Page 34: Inserted | Author |
| --- | --- |

II.B.2; II.B.3; II.B.6.k; II.B.6. p; III.B.1-2; III.C.2;  III.F.1; III.I.5; III.J.2-
III.J.3; III.K. 4-5; III.K.13

| Page 34: Commented | Author |
| --- | --- |

These are all items in the Consent Decree that relate to Environmental Safety and Sanitation. Steps
necessary to comply with these areas of the Decree would logically be the responsibility of the
Environmental Services Program which is part of OHS.

| Page 34: Commented | Author |
| --- | --- |

Agree.

| Page 34: Deleted | Author |
| --- | --- |

III.J.3

| Page 34: Inserted | Author |
| --- | --- |

Sept 23

| Page 34: Deleted | Author |
| --- | --- |

Sep-22

| Page 34: Inserted | Author |
| --- | --- |

| | **Develop a  standardized safety and sanitation policy detailing procedures for cleaning and sanitizing medical areas and identifying a responsible party at each facility.** The policy will also outline necessary training,  supplies and equipment to be used.  Policy details will address security issues such as lockdowns and safeguarding areas containing medical supplies. *See item 38 for additional steps to be taken in developing and implementing the safety and sanitation policy.* | II.A; III III.K. 4 |
| --- | --- | --- |

| Page 34: Commented | Author |
| --- | --- |

This task, to develop a policy on safety and sanitation, was originally listed in task 62 which is limited to
the development of an audit instrument. This revision simply establishes policy making as a separate step
from development of a inspection tool.  It is necessary to add since III.I.5 specifically calls for sufficient
and *properly* sanitized bedding and linens in the infirmary. III.K.4 also requires policies for routine
disinfection of dental examination areas. II.A. states that the necessary supports and resources to provide
adequate health care must be available-therefore procedures for cleaning and sanitizing are necessary.

| Page 34: Commented | Author |
| --- | --- |

Agree.

| Page 34: Deleted | Author |
| --- | --- |

audit instrument

| Page 34: Inserted | Author |
| --- | --- |

 inspection tool

| Page 34: Commented | Author |
| --- | --- |

The Defendants draft implementation plan from May had a number of discreet tasks that were not part of
the earlier December version. The Monitor reviewed the May draft to identify any items that should be

added here. These were for example hand washing facilities (82), examination table barriers (83), and provisions for safety during radiological procedures (39). None of these were considered necessary to add because they will be addressed in the develoment of policy and the audit instrument.

| Page 34: Commented | Author |
|---|---|

The Decree does not require IDOC to test its policies/tools with the Monitor. Otherwise agree with 2-4

| Page 34: Deleted | Author |
|---|---|

**includes**

| Page 34: Inserted | Author |
|---|---|

**s**

| Page 34: Deleted | Author |
|---|---|

**of**

| Page 34: Inserted | Author |
|---|---|

Test safety and sanitation inspection tool  with Monitors

| Page 34: Commented | Author |
|---|---|

This was task 63 and has simply been moved as a subtask of 62. Additional subtasks (2-4) are necessary steps to achieve a reliable safety and sanitation survey.

| Page 34: Deleted | Author |
|---|---|

with Monitors

| Page 34: Commented | Author |
|---|---|

The Decree does not require IDOC to test every tool with the Monitor

| Page 34: Inserted | Author |
|---|---|

1. at multiple sites to ensure adequacy of the  tool.
1. Establish the frequency and calendar for an facility safety and sanitation inspections of all clinical spaces, equipment supplies, etc.

Identify who is responsible for performing safety and sanitation inspections

| Page 34: Deleted | Author |
|---|---|

n

| Page 34: Commented | Author |
|---|---|

Specific staff should be identified to do the safety & sanitation inspection and then explicitly trained in how to conduct the inspection, if the results are to yield any meaningful or actionable information (II.B. 2 &3). Currently it appears that RNs are given this task. This is an inappropriate assignment especially given IDOC's to date noncompliance with the provisions in the Consent Decree that require an RN. The S & S inspection is a very important tool in maintaining health and safety and so capable persons need to be selected for this assignment and then trained to complete it correctly and to understand the implications non-compliance has on health and safety.

| Page 34: Commented | Author |
|---|---|

Agree.

| Page 34: Inserted | Author |
|---|---|

1. and train them to produce reliable results.
1. Audit the reliability of safety and sanitation inspections.

| Page 34: Deleted | Author |
|---|---|

OHS will develop  standardized safety and sanitation policy detailing procedures for cleaning and sanitizing medical areas and identifying a responsible party at each facility. The policy will also outline necessary training,  supplies and equipment to be used.  Policy details will address security issues such as lockdowns and safeguarding areas containing medical supplies

| Page 34: Inserted | Author |
|---|---|

**; III.K.13**

| Page 34: Commented | Author |
|---|---|

III.K.13 explicitly calls for an annual survey of dental equipment. It is added here because dental equipment needs to be inspected for operability more often than annually.  The results safety and sanitation inspections should be audited annually to ensure they are completed at the predetermined schedule, findings reported and acted upon, and that the results are reliable.

| Page 34: Commented | Author |
|---|---|

Agree

| Page 34: Deleted | Author |
|---|---|

**Agency Medical Director, Deputy Chiefs, Partner Organization or Agency**

| Page 34: Inserted | Author |
|---|---|

**Environmental Services Coordinator**

| Page 34: Deleted | Author |
|---|---|

**Aug-**

| Page 34: Inserted | Author |
|---|---|

**Feb 23**

| Page 34: Deleted | Author |
|---|---|

**22Dec- 22**

| Page 34: Inserted | Author |
|---|---|

**Dec- 22**

| Page 34: Inserted | Author |
|---|---|

| | |
|---|---|
| **Implement periodic safety and sanitation inspections, using the validated inspection tool, to evaluate the presence, condition, and functionality of clinical space and equipment with a standardized process for reporting results.**<br>1. Establish a method to prioritize the repair or replacement of identified deficiencies that prevent disease or injury.<br>2. Report the results of safety and sanitation inspections to the responsible party at the facility for corrective action and follow up.<br>3. Track the progress of corrective action to the OHS Audit Committee.<br>**4.** Analyze results of safety and sanitation inspections to identify systemic issues concerning patient safety or that impede the delivery of timely, adequate health care. Report these results to the SLC via the patient safety or audit functions with necessary further action identified. | II.B.6.k<br>p; III.B.<br>III.C.2;<br>III.I.5; II<br>III.J.3; I<br>III.K.13 |

| Page 34: Commented | Author |
|---|---|

This task is added to *implement* the S & S inspection that is developed in task 62.  The actionable steps come primarily from the recommendations in the Monitor's 5th report pages 66-68.

| Page 34: Commented | Author |
|---|---|

Agree.

| Page 34: Commented | Author |
|---|---|

Unclear which committee this refers to

| Page 34: Deleted | Author |
|---|---|

timely

| Page 34: Commented | Author |
|---|---|

These are all items in the Consent Decree that concern having adequate clinical space, equipment, and supplies. Periodic monitoring ensures the adequacy of these. Reporting results adds accountability for action to address identified problems or deficiencies per II.B.2.

| Page 34: Commented | Author |
|---|---|

Agree

| Page 35: Deleted | Author |
|---|---|

**Test safety and sanitation audit with Monitors at multiple sites to ensure adequacy of the audit.**

| Page 35: Deleted | Author |
|---|---|

**II.B.1.**

| Page 35: Deleted | Author |
|---|---|

**Establish needs of elderly population to ensure that necessary access to services is available**
system wide

| Page 35: Deleted | Author |
|---|---|

**Dec-22**

| Page 35: Inserted | Author |
|---|---|

qualified

| Page 35: Commented | Author |
|---|---|

Qualifications of a consultant for this task include: knowledge of the needs of the elderly/infirm/disabled and their changing abilities with regard to self care and carrying out activities of daily living as they age, knowledge of survey and assessment tools used to determine the needs and abilities of elderly/infirm/disabled persons, experience assessing and developing recommendations to serve the needs of this population.

| Page 35: Commented | Author |
|---|---|

IDOC agrees that meeting the needs of the elderly population may require a varied approach. However, the Decree creates no specific obligations with respect to the elderly population. Tasks 64-66 far exceed the PLRA and create additional obligations not agreed to into the Decree. Further, ADA (disabled population) is not covered under this class.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 35: Commented | Author |
|---|---|

IDOC's narrative to the implementation plan states that the survey is to develop action steps to provide appropriate resources, programming, and housing for those with disabilities or those needing assistance with activities of daily living. Lets be clear that the scope of assessment must provide information sufficient to identify resources, programming and housing needed by this population.

| Page 35: Commented | Author |
|---|---|

The purpose of the Decree is to ensure that IDOC meets the medical and dental needs of the class. Programming and housing (not directly related to medical care) are not within the scope of the Decree

| Page 35: Deleted | Author |
|---|---|

the

| Page 35: Inserted | Author |
|---|---|

/

| Page 35: Deleted | Author |
|---|---|

and

| Page 35: Inserted | Author |
|---|---|

/disabled persons incarcerated in the IDOC.
1. Determine the data that is appropriate to describing the needs of this population. **Nov-22**
1. Define scope of review to include 1) determining the population of persons with dementia, memory impairment, aged and in need of supportive housing, severe medical infirmities and disabilities requiring specialized medical housing; 2) describing and quantifying existing services, clinical care, and housing for this population and its appropriateness; 3) providing recommendations and options for adequately addressing needs of this population.  Nov-22
3. Determine parties responsible for participation in the project  and set dates and expectations for work product.

| Page 35: Moved to page 20 (Move #1) | Author |
|---|---|

**Nov-22**

| Page 35: Commented | Author |
|---|---|

These additional tasks (subitems 1-3) are necessary to define the scope of work expected of the consultant in completing the project. They are consistent with IV.A. 1-2 of the Consent Decree to define specific tasks, timetables, projects, strategies, timing, and supervision necessary to implement the Decree.

| Page 35: Commented | Author |
|---|---|

IDOC agrees that meeting the needs of the elderly population may require a varied approach. However, the Decree creates no specific obligations with respect to the elderly population. Tasks 64-66 far exceed the PLRA and create additional obligations not agreed to into the Decree. Further, ADA (disabled population) is not covered under this class.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 35: Inserted | Author |
|---|---|

Dec-22

| Page 35: Inserted | Author |
|---|---|

II.A; II.B.1-3

| Page 35: Inserted | Author |
|---|---|

Establish needs of elderly/infirm/disabled population to ensure that necessary access to services is available
system wide

| Page 35: Deleted | Author |
|---|---|

**Consultant with custody Deputy and selected Wardens identified by IDOC, Regional nurses**

| Page 35: Inserted | Author |
|---|---|

**Agency Medical Director or Deputy**

| Page 35: Commented | Author |
|---|---|

OHS is responsible for identifying a consultant with appropriate qualifications to conduct the survey. The consultant cannot hire themselves.

| Page 35: Commented | Author |
|---|---|

IDOC agrees that meeting the needs of the elderly population may require a varied approach. However, the Decree creates no specific obligations with respect to the elderly population. Tasks 64-66 far exceed the PLRA and create additional obligations not agreed to into the Decree. Further, ADA (disabled population) is not covered under this class.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 35: Inserted | Author |
|---|---|

.

| Page 35: Deleted | Author |
|---|---|

**JunOct-22**

| Page 35: Inserted | Author |
|---|---|

**Oct**

| Page 35: Inserted | Author |
|---|---|

**December 23**

| Page 35: Inserted | Author |
|---|---|

Identify existing IDOC levels of care with corresponding housing and programming arrangements for the aged, infirm and disabled.
This includes r

| Page 35: Deleted | Author |
|---|---|

R

| Page 35: Inserted | Author |
|---|---|

of

| Page 35: Inserted | Author |
|---|---|

/

| Page 35: Deleted | Author |
|---|---|

and

| Page 35: Inserted | Author |
|---|---|

1. /disabled.
Identify a range of elderly/infirm/disabled populations by functional status within each living arrangement. For example, general population, protected housing, infirmary, etc. The type of facility (minimum, medium, and maximum security) is to be identified.

| Page 35: Deleted | Author |
|---|---|

Identify a range of elderly/infirm/disabled populations by functional status within each living arrangement. For example, general population, protected housing, infirmary, etc. The type of facility (minimum, medium, and maximum security) is to be identified.
Describe existing practices to prepare for early parole release of the elderly/infirm/disabled and any expansions of such under the Joe Coleman Medical Disability Act.

| Page 35: Commented | Author |
|---|---|

Subitems 1-4 are additions from the January example plan. They are necessary to understand how elderly/infirm/disabled individuals are classified and housed and to further differentiate their needs by functional status (ie. Ability to walk to meals, to hear orders, to protect themselves from harm etc.). These additions are consistent with IV.A. 1-2 of the Consent Decree to define specific tasks, timetables, projects, strategies, timing, and supervision necessary to implement the Decree.

| Page 35: Commented | Author |
|---|---|

IDOC agrees that meeting the needs of the elderly population may require a varied approach. However, the Decree creates no specific obligations with respect to the elderly population. Tasks 64-66 far exceed the PLRA and create additional obligations not agreed to into the Decree. Further, ADA (disabled population) is not covered under this class. Housing and programming are outside the scope of the Decree

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 35: Inserted | Author |
|---|---|

Describe existing practices to prepare for early parole release of the elderly/infirm/disabled and any expansions of such under the Joe Coleman Medical Disability Act.

| Page 35: Commented | Author |
|---|---|

Not within the scope of the Decree

| Page 35: Deleted | Author |
|---|---|

| Page 35: Inserted | Author |
|---|---|

1. Identify community resources available to elderly/infirm/disabled incarcerated population, identifying Medicaid available resources and nursing home options for care at the end-stage of life.

| Page 35: Inserted | Author |
|---|---|

**Elderly/Infirm/Disabled**

| Page 35: Deleted | Author |
|---|---|

**Jun**

| Page 35: Inserted | Author |
|---|---|

**Oct**

| Page 35: Deleted | Author |
|---|---|

**Sep**

| Page 35: Inserted | Author |
|---|---|

**Jan-23**

| Page 35: Deleted | Author |
|---|---|

**2-22**

| Page 35: Commented | Author |
|---|---|

To be consistent with the narrative we understand that this includes obtaining information sufficient to identify resources, programming and housing needed by this population.

| Page 35: Commented | Author |
|---|---|

IDOC agrees that meeting the needs of the elderly population may require a varied approach. However, the Decree creates no specific obligations with respect to the elderly population. Tasks 64-66 far exceed the PLRA and create additional obligations not agreed to into the Decree. Further, ADA (disabled population) is not covered under this class. Housing and programming fall outside the scope of the Decree

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 35: Inserted | Author |
|---|---|

.
1. Convene a focus group of elderly/infirm/disabled persons to identify issues with housing and programming unique to this population and their need for care.
1. Determine process to survey elderly/infirm/disabled persons. Interviews using telemedicine may be an option. This may require sample sized population depending on numbers.
1. Survey to include level of care needed, cognitive survey Montreal Cognitive Assessment (MOCA or other similar survey instrument), clinical risk assessment, intensity of nursing care needed, functional capacity, proximity of facility to specialty services, need for specialty services.

Consultation with a survey research group may be indicated.

| Page 35: Commented | Author |
|---|---|

Items 1-5 are additions from the January example plan and are consistent with IV.A. 1-2 of the Consent Decree to define specific tasks, timetables, projects, strategies, timing, and supervision necessary to implement the Decree. First-hand knowledge of this population needs to be accomplished by a survey of that group of individuals.   Interviews of aged/infirm/disabled incarcerated persons should be the principal component of the consultant's survey.  This survey needs to include a significant sized sample of the population and a variety of survey questions.  The survey needs to determine the proportions of functional status groups of the aged/infirm/disabled and to draw conclusions about the barriers to appropriate housing, accommodation, and medical care for this population consistent with II.A.

| Page 35: Commented | Author |
|---|---|

Agree to assess elderly, and infirmed patients to ensure medical and dental needs are being met. Agree that 1-5 provide good options but do not create a minimum standard of what is constitutionally necessary to understand their needs

| Page 35: Inserted | Author |
|---|---|

1.
5. Perform record reviews of people surveyed.  This may be a sample population of persons in various categories of nursing need and functional status.  Record review is to determine medical needs, number and types of medications, need for specialty care, accommodations provided or needed, and need for nursing care.

| Page 35: Commented | Author |
|---|---|

It makes more sense to hire an expert in the functionality needed for a nursing home, a SNIF, a cognitive care facility, etc.  It would be a slow road to ask the patients.

| Page 35: Commented | Author |
|---|---|

Agree to assess elderly, and infirmed patients to ensure medical and dental needs are being met. Hiring an expert  is not constitutionally necessary to understand their needs

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 35: Inserted | Author |
|---|---|

**Elderly/Infirm/Disabled**

| Page 35: Deleted | Author |
|---|---|

**Oct-22**

| Page 35: Inserted | Author |
|---|---|

**Nov- 23**

| Page 35: Deleted | Author |
|---|---|

Survey

| Page 35: Inserted | Author |
|---|---|

Convene a focus group

| Page 35: Commented | Author |
|---|---|

The IDOC used a survey to assess the medication administration system and six months later has yet to provide any meaningful results. The use of a focus group is less time consuming and cumbersome and will provide more comprehensive identification of issues faced by the IDOC system in meeting the needs of this population.

| Page 35: Commented | Author |
|---|---|

A consultant is not constitutionally required for this task. Additionally, IDOC should be able to dictate how the task is accomplished re: use of a survey

| Page 35: Inserted | Author |
|---|---|

of

| Page 35: Deleted | Author |
|---|---|

medical

| Page 35: Inserted | Author |
|---|---|

.

| Page 35: Deleted | Author |
|---|---|

OHS Leadership,
Vendor and

| Page 35: Commented | Author |
|---|---|

The purpose of hiring a consultant is precisely to conduct a survey that includes this focus group of medical staff. OHS Leadership and Vendor may participate in the selection of participants and arrangements to conduct the focus group but they do not have primary responsibility for conducting it, the consultant does.  OHS Leadership and the Vendor should consider whether their participation would have a chilling effect on participation and candidacy.

| Page 35: Commented | Author |
|---|---|

IDOC disagrees that a consultant is necessary to meet our obligations under the Decree.

| Page 35: Inserted | Author |
|---|---|

Elderly/Infirm/Disabled

| Page 35: Deleted | Author |
|---|---|

Oct

| Page 35: Inserted | Author |
|---|---|

Nov

| Page 35: Inserted | Author |
|---|---|

3

| Page 35: Deleted | Author |
|---|---|

2

| Page 35: Inserted | Author |
|---|---|

/

| Page 35: Deleted | Author |
|---|---|

and

| Page 35: Inserted | Author |
|---|---|

/disabled

| Page 35: Inserted | Author |
|---|---|

.

| Page 35: Inserted | Author |
|---|---|

**Elderly/Infirm**

| Page 35: Deleted | Author |
|---|---|

**Oct-22**

| Page 35: Inserted | Author |
|---|---|

**Jan-23**

| Page 36: Deleted | Author |
|---|---|

 and

| Page 36: Inserted | Author |
|---|---|

/

| Page 36: Inserted | Author |
|---|---|

/disabled

| Page 36: Inserted | Author |
|---|---|

 *as well as the need* for these based upon

| Page 36: Commented | Author |
|---|---|

The purpose of the study is to identify what exists for the care of this population and also *what else is needed* to provide adequate health care.  It is well known that what currently exists is inadequate so there is no purpose in limiting the description to what already exists. The change is necessary to achieve II. A, II. B.1. & II.B.3.

| Page 36: Commented | Author |
|---|---|

Given the vast differences between civilian care and incarcerated care, civilian care is not an appropriate template. Additionally this task creates obligations for the Department that were not contemplated under the Decree and not directly related to the provision of medical/dental care.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 36: Deleted | Author |
|---|---|

,

| Page 36: Inserted | Author |
|---|---|

 Patterns of civilian care are to be used as a template to describe levels of care for a similar but incarcerated population. These are routine medical care, home nurse visit care, adult day care, elderly housing without assistance, assisted living, nursing home, skilled nursing home, and hospice. Develop housing and programming options for each group.

| Page 36: Deleted | Author |
|---|---|

Patterns of civilian care are to be used as a template to describe levels of care for a similar but incarcerated population. These are routine medical care, home nurse visit care, adult day care, elderly housing without assistance, assisted living, nursing home, skilled nursing home, and hospice. Develop housing and programming options for each group.

| Page 36: Commented | Author |
|---|---|

Civilian care is not the standard used to establish prison healthcare. These recommendations exceed our obligations under the decree.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. *Doe v. Cook County*, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 36: Inserted | Author |
|---|---|

Elderly/Infirm

| Page 36: Deleted | Author |
|---|---|

Chief OHS, Custody Deputy with selected Wardens chosen by IDOC

| Page 36: Commented | Author |
|---|---|

The consultant is the person responsible for completing the report. Additions to the task are to provide more specific detail about how the findings are to be structured (patterns of civilian care applied to the correctional setting) and are consistent with IV. A. 1-2 of the Decree.

| Page 36: Commented | Author |
|---|---|

A consultant is not necessary to meet our obligations under the Decree. The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 36: Inserted | Author |
|---|---|

4

| Page 36: Deleted | Author |
|---|---|

3

| Page 36: Deleted | Author |
|---|---|

medical

| Page 36: Commented | Author |
|---|---|

In subsequent versions of the implementation plan IDOC sought to exclude housing and programmatic needs for the aged/infirm/elderly and presumes that existing arrangements (infirmaries and general population housing) are adequate. IDOC does not address housing or activity of daily living needs that impact the health of this population including hygiene, dietary, mobility issues. Falls in showers and in general population are repeatedly seen in record reviews of aged/infirm/disabled patients. These dangers need to be identified and corrected since they place inmates at significant risk of harm. The Monitor proposes language that focuses recommendations on those that impact the health and physical safety of the elderly/ infirm/disabled consistent with II. A; II. B.1.

| Page 36: Commented | Author |
|---|---|

Falls should be reported as part of the incident reporting and the chart should be labeled (this is in the policy).

| Page 36: Inserted | Author |
|---|---|

identified in the study

| Page 36: Inserted | Author |
|---|---|

health and physical safety of the

| Page 36: Deleted | Author |
|---|---|

and

| Page 36: Inserted | Author |
|---|---|

/

| Page 36: Inserted | Author |
|---|---|

/disabled  to include options for addressing deficiencies in housing these  populations and support for each level of care.
  Develop recommendations for modifications to housing and classification system for elderly/infirm/disabled population to ensure match of housing to functional need. These recommendations may include identification of new or renovated housing for this population.
  Provide housing recommendations to the Physical Plant Consultant to incorporate into the evaluation of space.
  Identify and develop additional resources to address needs for equipment, training, specialty consultation in the care of the elderly/infirm/disabled, and at the end-of-life (i.e. geriatrics, guardianship, dementia, medication management, rehabilitation, and activities of daily living),
  Work with Re-Entry Services and Parole Board to develop process to identify eligible persons and make requests for early medical release.
  Identify, develop, and implement a plan or policy and standardized procedures to address each recommendation.
Develop interim processes for housing until capital improvements occur.

| Page 36: Deleted | Author |
|---|---|

addressing deficiencies in housing these  populations and support for each level of care.
  Develop recommendations for modifications to housing and classification system for elderly/infirm/disabled population to ensure match of housing to functional need. These recommendations may include identification of new or renovated housing for this population.
  Provide housing recommendations to the Physical Plant Consultant to incorporate into the evaluation of space.
  Identify and develop additional resources to address needs for equipment, training, specialty consultation in the care of the elderly/infirm/disabled, and at the end-of-life (i.e. geriatrics, guardianship, dementia, medication management, rehabilitation, and activities of daily living),

Work with Re-Entry Services and Parole Board to develop process to identify eligible persons and make requests for early medical release.

Identify, develop, and implement a plan or policy and standardized procedures to address each recommendation.

Develop interim processes for housing until capital improvements occur.

Engage CDB in steps necessary to obtain approval and funding for necessary modifications. (IDOC Capital Projects) Initiate Aug-23, Complete July-25

| Page 36: Commented | Author |
|---|---|

Housing it outside the scope of the decree

| Page 36: Inserted | Author |
|---|---|

Engage CDB in steps necessary to obtain approval and funding for necessary modifications. (IDOC Capital Projects) Initiate Aug-23, Complete July-25

| Page 36: Commented | Author |
|---|---|

These additions are from the Monitor's example implementation plan provided in January 22, the Monitor's comments on the December 21 draft implementation plan and the November 21draft implementation plan proposed by IDOC. They are actionable steps to address the results of the needs assessment consistent with IV.A.1-2 regarding the implementation plan.

| Page 36: Commented | Author |
|---|---|

These recommendations exceed the scope of the Decree

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. *Doe v. Cook County*, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 36: Deleted | Author |
|---|---|

| Page 36: Inserted | Author |
|---|---|

| Page 36: Inserted | Author |
|---|---|

Elderly/Infirm

| Page 36: Inserted | Author |
|---|---|

, Physical Plant Consultant. Subtask 6. IDOC Capital Projects

| Page 36: Inserted | Author |
|---|---|

4

| Page 36: Deleted | Author |
|---|---|

3

| Page 36: Deleted | Author |
|---|---|

**Assess infirmary needs including number of infirmary beds per facility**

| Page 36: Commented | Author |
|---|---|

This task is already part of item 72 and does not need to be a separate and discreet item. See revisions to 72.

| Page 36: Commented | Author |
|---|---|

Agree

| Page 37: Deleted | Author |
|---|---|

. Identify physical plant repairs or renovations that are necessary for existing infirmaries. Initiate capital requests to fund and complete necessary renovations.

| Page 37: Commented | Author |
|---|---|

This task is redundant to the tasks related to the evaluation of the physical facility and space needed for provision of health care. It is not necessary here as long as it is covered elsewhere in the implementation plan.

| Page 37: Commented | Author |
|---|---|

Agree that it is redundant

| Page 37: Inserted | Author |
|---|---|

| Page 37: Inserted | Author |
|---|---|

3. Solicit from facility HCUAs and Medical Directors information and data on backlogs for infirmary care to include procedures that must be completed in-cell, use of alternative placements such as Specialized Housing Unit HU or Residential Treatment Unit RTU, admissions that are delayed due to lack of beds, prolonged hospitalizations due to lack of infirmary capacity. This information could be solicited using focus groups with a skilled facilitator.

| Page 37: Deleted | Author |
|---|---|

HU

| Page 37: Deleted | Author |
|---|---|

RTU,

| Page 37: Deleted | Author |
|---|---|

This information could be solicited using focus groups with a skilled facilitator.

| Page 37: Commented | Author |
|---|---|

Subitem 2 only evaluates those who receive infirmary services. Subitem 3 is necessary to assess the numbers and types of patient situations not placed in the infirmary because of lack of resource (primarily beds availability). For example the CQI minutes from facilities have discussed problems with cancelled off site procedures because patients were not admitted to the infirmary to complete pre-procedure care under supervision and instead were expected to do it on their own. Infirmary utilization plus those not admitted need to be considered in determining the number of beds needed for infirmary service.

| Page 37: Commented | Author |
|---|---|

Agree that an evaluation of the need for infirmary beds should include the patients who need an infirmary bed and are in GP.

| Page 37: Inserted | Author |
|---|---|

| Page 37: Deleted | Author |
|---|---|

3

| Page 37: Inserted | Author |
|---|---|

4.

| Page 37: Deleted | Author |
|---|---|

.

| Page 37: Inserted | Author |
|---|---|

 in statewide policy based upon the data collected on utilization in 2 & 3.

| Page 37: Commented | Author |
|---|---|

The reason for the addition is that NCCHC F-02 (E ) requires the scope of infirmary services *be defined in policy.*  The scope of services needs to be based upon what the need for service is and resources available. The addition is simply to describe where the rationale for the scope of services is derived.

| Page 37: Commented | Author |
|---|---|

Agree. This will be written into policy

| Page 37: Inserted | Author |
|---|---|

5 .

| Page 37: Deleted | Author |
|---|---|

. .

| Page 37: Inserted | Author |
|---|---|

6. Establish the staffing and other resources needed

| Page 37: Commented | Author |
|---|---|

This should take place as part of the system wide staffing analysis (see earlier items re: staffing). Infirmary staffing must account for the staffing required by III.I. 1-4 as well as the  Monitor's recommendations regarding infirmary services (5th report pages 117 -118). Other resources suggested for consideration by the Monitor include access to physical therapy, other aspects of rehabilitative medicine, dental care, geriatric consultation, and clinical pharmacy for complicated patients.

| Page 37: Commented | Author |
|---|---|

Agree

| Page 37: Inserted | Author |
|---|---|

to operate each infirmary according to the scope of service, number, and type of infirmary beds.

7

| Page 37: Deleted | Author |
|---|---|

5

| Page 37: Inserted | Author |
|---|---|

, including correctional officers.

| Page 37: Commented | Author |
|---|---|

IDOC needs a way to account for compliance with III.I.1-4, including access to security (III.I.4). These

responsibilities could be outlined in policy and actual performance measured against the policy.

| Page 37: Commented | Author |
|---|---|

Agree

| Page 37: Inserted | Author |
|---|---|

8

| Page 37: Deleted | Author |
|---|---|

. 6.

| Page 37: Inserted | Author |
|---|---|

.).

| Page 37: Deleted | Author |
|---|---|

.)7.

| Page 37: Inserted | Author |
|---|---|

9

| Page 37: Deleted | Author |
|---|---|

7

| Page 37: Inserted | Author |
|---|---|

.

| Page 37: Deleted | Author |
|---|---|

 Assess the equipment and supplies that are needed to provide the scope of services

| Page 37: Commented | Author |
|---|---|

This duplicates other items re: evaluation and determination of necessary equipment and supplies for each clinical area already included in the implementation plan and so can be eliminated here.

| Page 37: Commented | Author |
|---|---|

Agree that a UR concept would help with managing the infirmary beds.  Not sure a huddle is practical on a daily basis.

| Page 37: Deleted | Author |
|---|---|

8

| Page 37: Inserted | Author |
|---|---|

10

| Page 37: Inserted | Author |
|---|---|

| Page 37: Inserted | Author |
|---|---|

| Page 37: Inserted | Author |
|---|---|

| Page 37: Inserted | Author |
|---|---|

| Page 37: Inserted | Author |
|---|---|

| Page 37: Inserted | Author |
|---|---|

11

| Page 37: Deleted | Author |
|---|---|

9

| Page 37: Commented | Author |
|---|---|

There should be nurse protocols for what to do to admit a patient, develop nursing POC, what documents should be used, how to screen for falls and wound risk for selected groups.

| Page 37: Commented | Author |
|---|---|

Agree

| Page 37: Inserted | Author |
|---|---|

| Page 37: Deleted | Author |
|---|---|

| Page 37: Inserted | Author |
|---|---|

2

| Page 37: Deleted | Author |
|---|---|

0

| Page 37: Inserted | Author |
|---|---|

; II.B.6.p.; III.I.1-4

| Page 37: Inserted | Author |
|---|---|

Physical Plant

| Page 37: Commented | Author |
|---|---|

This work needs to be led by the consultant on physical space and equipment. The work of the consultant on elderly/infirm/disabled needs to inform the consultant performing the evaluation of physical space. The infirmary must be available to serve others in addition to the elderly/infirm/disabled population. Typically infirmary capacity must be available for patients in need of medical isolation, those who require pre-operative procedures, convalescence after hospitalization, surgery or injury, monitoring of unstable medical or psychiatric conditions, and diagnostic testing or procedures. The numbers and types of patients needing these types of care will not be the focus of the consultant on the aged and infirm. IDOC will need to assess infirmary capacity needed for these other purposes. The Monitor suggests IDOC use the physical plant consultant to evaluate the number of infirmary beds needed at each facility, for the population other than the elderly/infirm/disabled. Then the recommendations for infirmary beds needed by the elderly/infirm/disabled people should be added to the number needed for other uses to determine the total infirmary beds needed. The Agency Medical Director needs to appoint an individual member of OHS to lead this project.

| Page 37: Commented | Author |
|---|---|

IDOC agrees that the Decree requires us to ensure appropriate infirmary care is being provided. However, the requirement that a physical plant consultant being hired is not necessary to meet the Decree objectives

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. *Doe v. Cook County*, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 37: Deleted | Author |
|---|---|

Jun

| Page 37: Inserted | Author |
|---|---|

Sep

| Page 37: Deleted | Author |
|---|---|

Survey facility examination rooms to ensure they are appropriately equipped to address **medical needs**

| Page 37: Commented | Author |
|---|---|

Item 73 is deleted because it is addressed in revised items 104 and 105a.

| Page 37: Commented | Author |
|---|---|

Agree

| Page 37: Deleted | Author |
|---|---|

III.B.2

| Page 37: Deleted | Author |
|---|---|

  To ensure that exam rooms are appropriately equipped with the necessary supplies.

| Page 37: Deleted | Author |
|---|---|

Agency Chief of Health Services or Deputy Chief of Health Services/Agency Director of Nursing/Agency Medical Coordinator/facility healthcare staff

| Page 37: Deleted | Author |
|---|---|

Sep-22

| Page 37: Commented | Author |
|---|---|

This task needs to have specific people identified as responsible for each part of the task not the listing given here.  1. Who is to establish the contents? (Agency Medical Director) By when? (Oct-22). 2. Who is assigned to work with fiscal to procure the bag and contents? (Medical Coordinator) By when? (12-22). See Task 38 for steps of policy development. (A Regional Coordinator could be the Subject Matter Expert to draft the policy). By when? (3-23). Suggest development of the process to audit the bags be the responsibility of one of the Regional Coordinators to be completed by 12-22.

| Page 37: Commented | Author |
|---|---|

Agree. To be completed by Dec 23

| Page 37: Inserted | Author |
|---|---|

a process

1.

| Page 37: Deleted | Author |
|---|---|

annual

1.

| Page 37: Commented | Author |
|---|---|

An annual audit is not sufficient to ensure emergency response bags contain the appropriate items and are secure. Revised wording allows the IDOC with the Monitor's assistance to establish a process closer to the industry norm for checking the presence and operability of emergency equipment more frequently than annually.

| Page 37: Commented | Author |
|---|---|

Agree

| Page 37: Deleted | Author |
|---|---|

audit

1.

| Page 37: Deleted | Author |
|---|---|

**Sep-232**

| Page 37: Inserted | Author |
|---|---|

**3**

| Page 37: Inserted | Author |
|---|---|

**Dec 23**

| Page 38: Deleted | Author |
|---|---|

**Develop a standardized emergency response equipment list**

1.

| Page 38: Commented | Author |
|---|---|

Item 75 is deleted because it is addressed in revised item 105a.

| Page 38: Commented | Author |
|---|---|

Agree

| Page 38: Deleted | Author |
|---|---|

.

Work with fiscal to procure emergency equipment for each facility

Develop policy that ensures each facility has identical emergency medical equipment

Educate staff on new emergency response equipment list policy

With the assistance of the monitor and the audit team, develop annual audit to ensure emergency equipment is available on site and operational.

1.

| Page 38: Deleted | Author |
|---|---|

**III.B.2**

| Page 38: Deleted | Author |
|---|---|

**To ensure that health care units are appropriately equipped with operational equipment.**

| Page 38: Deleted | Author |
|---|---|

**Sep-22**

| Page 39: Deleted | Author |
|---|---|

**Develop a standardized list of equipment**
   1.

| Page 39: Commented | Author |
|---|---|

Item 76 is deleted because it is addressed in revised item 105a.

| Page 39: Commented | Author |
|---|---|

Agree

| Page 39: Deleted | Author |
|---|---|

**to be available in every health care unit**
   Work with fiscal to procure healthcare equipment for each facility
   Develop policy that ensures each facility has the required healthcare unit medical equipment,
necessary specialized for populations (women's health, dialysis, etc.)
   Educate staff on new health care unit equipment policy
With the assistance of the Monitor and the audit team, develop annual audit to ensure health care
unit equipment is available on site and operational.
   1.

| Page 39: Deleted | Author |
|---|---|

**II.6.p; III.I; III.B.2**

| Page 39: Deleted | Author |
|---|---|

   **To ensure that facility healthcare units are properly equipped with operational
equipment.**

| Page 39: Deleted | Author |
|---|---|

**Sep-22**

| Page 39: Deleted | Author |
|---|---|

**Develop a standardized list of equipment**
   1.

| Page 39: Commented | Author |
|---|---|

Items 77 is deleted because it is addressed in revised item 105a.

| Page 39: Commented | Author |
|---|---|

Agree

| Page 39: Deleted | Author |
|---|---|

**to be available in every infirmary**
   Work with fiscal to procure infirmary equipment for each facility
   Develop policy that ensures each facility has the required infirmary equipment.
   Educate staff on new infirmary equipment policy
With the assistance of the Monitor and the audit team, develop annual audit to ensure
infirmary equipment is available on site and operational.
   1.

| Page 39: Deleted | Author |
|---|---|

**III.B.2**

| Page 39: Deleted | Author |
|---|---|

**To ensure infirmaries are properly equipped**

| Page 39: Deleted | Author |
|---|---|

**Sep-22**

| Page 39: Deleted | Author |
|---|---|

**Develop a standardized list of equipment**
  3.

| Page 39: Commented | Author |
|---|---|

Item 78 is deleted because it is addressed in revised item 105a.

| Page 39: Commented | Author |
|---|---|

Agree

| Page 39: Deleted | Author |
|---|---|

**to be available in every dental operatory.**
  1. Work with fiscal to procure dental equipment for each facility
  4. Develop policy that ensures each facility has the required dental equipment.
    Ensure all facilities should have lead radiation aprons with thyroid collars for patient protection during X-Rays.
    Educate staff on new dental equipment policy
With the assistance of the Monitor and the audit team, develop annual audit to ensure dental equipment is available on site and operational.
  3.

| Page 39: Deleted | Author |
|---|---|

**II.B.2-3; III.B.1- 2**

| Page 39: Deleted | Author |
|---|---|

**Agency Chief of Health Services or Deputy Chief of Health Services/Agency Director of Nursing/Agency Medical Coordinator/facility healthcare staff/State of Illinois Capital Development**
Board

| Page 39: Deleted | Author |
|---|---|

**Sep-22**

| Page 39: Deleted | Author |
|---|---|

**Based on the number of expected staff needed to  timely perform all requirements of the consent decree, identify how many examination rooms**

| Page 39: Commented | Author |
|---|---|

Redundant; see revised tasks #103- 110 below

| Page 39: Commented | Author |
|---|---|

Agree

| Page 39: Deleted | Author |
|---|---|

**, and other physical spaces are necessary**
**Then compare this number to number of existing examination rooms and spaces and determine by facility the additional examination rooms or spaces  that need to be developed.** For projects administered by the Capital Development Board there is an Architect/Engineering firm hired to design the construction. Firms hired for both A/E and construction are competitively procured once the specifications are published, and then overseen by both CDB, who also

employs architects and engineers, as well as the Department.

| Page 39: Inserted | Author |
|---|---|

Redundant; see task #103- 110 below

| Page 39: Deleted | Author |
|---|---|

Redundant; see task #103- 110 below

| Page 39: Deleted | Author |
|---|---|

**To ensure that the current number of spaces is appropriate based on expected health needs**

| Page 39: Deleted | Author |
|---|---|

**Defendants, monitor and plaintiffs**

| Page 39: Deleted | Author |
|---|---|

**Sep-22**

| Page 39: Deleted | Author |
|---|---|

**develop**

| Page 39: Inserted | Author |
|---|---|

**will meet to settle the meaning of**

| Page 39: Inserted | Author |
|---|---|

**. and develop a more effective methodology for transfer of information**

| Page 39: Deleted | Author |
|---|---|

**and develop a more effective methodology for transfer of information.**

| Page 39: Commented | Author |
|---|---|

The Monitor receives a fraction of data and information requested for his reports. There are differences of opinion with respect to the V.G. provision which can hopefully be settled in a meeting of parties and the Monitor. A better method of transfer of information should be agreed upon.

| Page 39: Commented | Author |
|---|---|

IDOC is limited with respect to the state's IT security rules regarding the transfer of confidential information or large data dumps.

| Page 39: Deleted | Author |
|---|---|

**Feb-22**

| Page 39: Inserted | Author |
|---|---|

**October 2022**

| Page 39: Inserted | Author |
|---|---|

**Ongoing**

| Page 39: Deleted | Author |
|---|---|

**Mar-22**

| Page 39: Commented | Author |
|---|---|

This is ostensibly accomplished but IDOC has not informed the Monitor of this mechanism.

| Page 39: Commented | Author |
|---|---|

Disagree the Monitor has been informed

| Page 40: Deleted | Author |
|---|---|

**Mar-22**

| Page 40: Inserted | Author |
|---|---|

**Jan 23**

| Page 40: Deleted | Author |
|---|---|

**, dentists, and other health care providers**

| Page 40: Commented | Author |
|---|---|

The Monitor separates physicians from other clinicians or nurses because physician removal is governed by provisions III.A.2-4 of the Consent Decree but discipline or termination of others is governed by provision II.B.6.r

| Page 40: Commented | Author |
|---|---|

The M and M process accounts for that part.

| Page 40: Commented | Author |
|---|---|

Peer review is an option based on the findings of M and M or on reports sent anonymously to SIU.

| Page 40: Deleted | Author |
|---|---|

Evaluation of physician performance

| Page 40: Inserted | Author |
|---|---|

 2.Utilize mortality reviews of care or other methodologies (#84.2) of IDOC to identify egregious clinical errors that either cause harm or are likely to result in harm to the patient and are inconsistent with adequate medical care

| Page 40: Commented | Author |
|---|---|

This is the suggestion of the Monitor and is used by the Monitor currently to identify egregious acts. IDOC has not proposed an alternative.

| Page 40: Commented | Author |
|---|---|

We account for this in M and M.  agree

| Page 40: Inserted | Author |
|---|---|

.

| Page 40: Deleted | Author |
|---|---|

 2.

| Page 40: Deleted | Author |
|---|---|

Further investigation of problematic physicians

| Page 40: Commented | Author |
|---|---|

Mortality records contain multiple episodes of physician care that can be used to further investigate care. IDOC can and should use whatever methods of evaluation they deem appropriate but they should give more detail.

| Page 40: Commented | Author |
|---|---|

Agree

| Page 40: Deleted | Author |
|---|---|

3

| Page 40: Inserted | Author |
|---|---|

2

| Page 40: Inserted | Author |
|---|---|

. 4. at regular intervals to discuss monitoring that has occurred

| Page 40: Commented | Author |
|---|---|

A regular discussion should occur particularly if there is/are problematic physicians.

| Page 40: Commented | Author |
|---|---|

Agree

| Page 40: Deleted | Author |
|---|---|

.

| Page 40: Inserted | Author |
|---|---|

3

| Page 40: Deleted | Author |
|---|---|

.

| Page 40: Deleted | Author |
|---|---|

**Dental Director**

| Page 40: Deleted | Author |
|---|---|

**Agency Director of Nursing**

| Page 40: Inserted | Author |
|---|---|

| 83.a. | **Develop a mechanism to remove dentists and other health care staff providers.**<br>1) Utilize mortality reviews of care or other methodologies of IDOC to identify egregious clinical errors that either cause harm or are likely to result in harm to the patient and are inconsistent with adequate medical care. | II.B.6.r. |
|---|---|---|

| Page 40: Deleted | Author |
|---|---|

**dentists and**

| Page 40: Deleted | Author |
|---|---|

**providers**

| Page 40: Inserted | Author |
|---|---|

**Develop**

| Page 40: Deleted | Author |
|---|---|

**Finalize**

| Page 40: Inserted | Author |
|---|---|

**no less than annual**

| Page 40: Deleted | Author |
|---|---|

**physician**

| Page 40: Inserted | Author |
|---|---|

of the clinical services provided by both credentialed and non-credentialed existing physicians and dentists

1. The plan for physician review as codified in policy and/or standard operating procedure should include the elements of care that would be annually reviewed, process for identification and referral of staff to peer review, the establishment of a fair process and the standards used to evaluate professional care and clinical decision making, the qualifications physicians individuals must have to perform peer review, as well as the documentation of the evaluation, assessment, deliberation and decisions made in the review process.

1. The elements of care reviewed should include clinical services provided in sick call, onsite urgent/emergent care, chronic care clinics, infirmary admissions and progress notes, discharge and transfer care, timely and appropriate referrals to specialty care, continuity of care after offsite emergent, hospitalization, and specialty consultation care, intake healthcare services at reception centers including intake health assessments, review of diagnostic tests, mortality and morbidity reviews, annual performance reviews, health care patient grievances, corrective action plans, peer reviews for cause, etc.

The

| Page 40: Deleted | Author |
|---|---|

The

| Page 40: Commented | Author |
|---|---|

This is not required by the Decree

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. *Doe v. Cook County*, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 40: Deleted | Author |
|---|---|

review of the physicians should be performed by independent contracted or consulting physicians such as SIU physicians with training in similar fields as the physicians being reviewed (i.e. primary care, specialty physician, dentist, etc.)

| Page 40: Inserted | Author |
|---|---|

review of the physicians should be performed by independent contracted or consulting physicians such as SIU physicians with training in similar fields as the physicians being reviewed (i.e. primary care, specialty physician, dentist, etc.)

| Page 40: Commented | Author |
|---|---|

II.B.6.q states that "IDOC agrees to implement changes ...in the annual assessment of medical, dental, and nursing staff competency and performance." The monitor has requested but never been provided with any reviews of the clinical performance of medical physicians practicing in the IDOC. (The vendor has provided some Salary Compensation evaluations that did not address clinical competency.)   IDOC has verbally communicated some of the elements of care that would be used to assess the clinical performance of medical physicians but no written procedure has been provided to date.  IDOC has provided annual assessments of the care provided by dentists which contains both administrative, adequacy of documentation, and clinical performance evaluations.  Dentists working in IDOC are assigned to evaluate fellow dentists in the system which raises concerns about the objectivity of the dentist peer reviews. Medical physicians and dentist should optimally be evaluated by independent clinicians. The Monitor encourages IDOC to use SIU physicians and dentists to perform the annual reviews of medical and dental providers in the IDOC.

| Page 40: Commented | Author |
|---|---|

IDOC agrees to establish metrics necessary assess the care being provided in the system. The Decree does not require an independent auditor.

| Page 40: Inserted | Author |
|---|---|

| Page 40: Deleted | Author |
|---|---|

 to include: review of physician peer review, sick call contacts, chronic care clinic contacts, infirmary admission contacts and lab /x-ray reviews, a list of  adverse patient events and

| Page 40: Deleted | Author |
|---|---|

associated corrective action plans and associated healthcare grievances and conclusions

| Page 40: Inserted | Author |
|---|---|

II.B.3, II.B.6.m.,n.,q., and r;.

| Page 40: Deleted | Author |
|---|---|

.

| Page 40: Inserted | Author |
|---|---|

, Dental Director, SIU consultants

| Page 40: Inserted | Author |
|---|---|

Nov-2022

| Page 40: Deleted | Author |
|---|---|

Aug-22

| Page 40: Inserted | Author |
|---|---|

 Apr-2023

| Page 40: Deleted | Author |
|---|---|

peer

| Page 40: Inserted | Author |
|---|---|

provider

| Page 40: Inserted | Author |
|---|---|

1.   . The annual peer review forms may contain administrative and process elements but should

**primarily focus on aspects of clinical care**

| Page 40: Deleted | Author |
|---|---|

**ad**

| Page 40: Deleted | Author |
|---|---|

| Page 40: Deleted | Author |
|---|---|

**independent**

| Page 40: Inserted | Author |
|---|---|

**independent**

| Page 40: Commented | Author |
|---|---|

Not required by Decree

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. *Doe v. Cook County*, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 40: Deleted | Author |
|---|---|

**contracted or consultant**

| Page 40: Inserted | Author |
|---|---|

**contracted or consultant**

| Page 40: Commented | Author |
|---|---|

III.B.6. states "IDOC agrees to implement changes in....annual assessment of staff competency and performance." The annual assessments/peer reviews must significantly evaluate pertinent aspects of the quality of the clinical care provided by providers.

| Page 40: Commented | Author |
|---|---|

Agree

| Page 40: Inserted | Author |
|---|---|

**, III.B.q., III.K.9**

| Page 41: Inserted | Author |
|---|---|

**annual assessments, peer reviews, adverse events, corrective action plans, and other**

| Page 41: Deleted | Author |
|---|---|

| Page 41: Inserted | Author |
|---|---|

**, corrective action, and even termination.**

| Page 42: Commented | Author |
|---|---|

IDOC states that this process is complete but evidence of its completion has not been provided to the Monitor.

| Page 42: Commented | Author |
|---|---|

This information was provided to the Monitor in June 2022. Despite two requests the Monitor has provided no availability to meet with SIU

| Page 42: Deleted | Author |
|---|---|

**SIU has completed a preliminary draft of the mortality review process**

| Page 42: Deleted | Author |
|---|---|

**Updates**

| Page 42: Inserted | Author |
|---|---|

**that is evidenced by an implemented policy.  The policy**

| Page 42: Commented | Author |
|---|---|

This process should be memorialized in a policy and procedure which is still incomplete.

| Page 42: Commented | Author |
|---|---|

Disagree this complete and was provide to the Monitor in June

| Page 42: Inserted | Author |
|---|---|

:

| Page 42: Inserted | Author |
|---|---|

1.

| Page 42: Inserted | Author |
|---|---|

.  to include a physician and a nurse
1.

| Page 42: Deleted | Author |
|---|---|

.
1.

| Page 42: Commented | Author |
|---|---|

It is critical that a physician and a nurse review physician and nursing care respectively.

| Page 42: Commented | Author |
|---|---|

There is a process in place for referring licensed staff to peer review as a result of M and M.  Peer review may include OHS leadership.

| Page 42: Inserted | Author |
|---|---|

List all deficiencies,
a.

| Page 42: Deleted | Author |
|---|---|

Opportunities
a.

| Page 42: Inserted | Author |
|---|---|

( opportunities
a.

| Page 42: Inserted | Author |
|---|---|

) identified in the mortality review
a.

| Page 42: Deleted | Author |
|---|---|

review  and

a.

| Page 42: Inserted | Author |
|---|---|

review  and

a.

| Page 42: Inserted | Author |
|---|---|

 of these deficiencies.

a.

| Page 42: Commented | Author |
|---|---|

This is specifically called out in provision III.M.2. of the Consent Decree.

| Page 42: Commented | Author |
|---|---|

Agree. Covered in policy

| Page 42: Inserted | Author |
|---|---|

 IDOC will develop a procedure for referral of a nurse or provider to their respective peer review entity when a mortality review identifies an egregious clinical act by a provider or nurse.  This procedure will be written

| Page 42: Commented | Author |
|---|---|

This is consistent with provision II.B.6.r.

| Page 42: Commented | Author |
|---|---|

Agree. Covered in policy

| Page 42: Inserted | Author |
|---|---|

.  The group of providers performing peer review for an alteration of privileges will be leadership physicians (Chief and Deputy Chiefs)

| Page 42: Commented | Author |
|---|---|

The group reviewing care cannot be existing provider staff who are not independent.

| Page 42: Commented | Author |
|---|---|

The Decree has no such prohibition against existing provider staff reviewing one another. The Implementation plan may not create additional obligations

| Page 42: Inserted | Author |
|---|---|

 III.L.1.,

| Page 42: Commented | Author |
|---|---|

This date is past but there is no evidence that this process has been completed.

| Page 42: Commented | Author |
|---|---|

IDOC offered to meet with the Monitoring team twice in the last 3 months to discuss the progress with SIU initiatives. The monitor has provided no availability

| Page 43: Inserted | Author |
|---|---|

| 87.a. | A morbidity and mortality committee will meet monthly to evaluate deaths reviews and other sentinel events.  Actions taken to complete this task will include:<br>1.   The Chief OHS will chair this group and designate other senior OHS leadership; members (physician, nurse, mid-level provider) of the independent audit team who reviewed the facility; others designated | III.M2.  I |
|---|---|---|

|  | as needed by the Chief OHS. |  |
|---|---|---|
|  | 2. The deficiencies or opportunities for improvement identified by reviewers will be evaluated by the mortality review committee who will also review the completed death reviews and any available morality reviews of the Monitor. The Mortality Review Committee will assign corrective actions to the facility; if systemic risk is identified the Chief OHS will decide on a course of action and decide whether a process analysis is needed (this decision should be recorded in the minutes); unsafe patient safety risks that endanger patients are immediately remediated; and egregious care of by a provider or nurse will be referred to the appropriate peer review entity. |  |
|  | 3. Corrective actions are monitored through completion by the Quality Management Program. The policy on Quality Improvement will define how corrective actions are monitored. |  |

| Page 43: Commented | Author |
|---|---|

This task is consistent with the 5/31/22 IDOC Implementation Plan. We agree with a morbidity and mortality monthly committee meeting.

| Page 43: Commented | Author |
|---|---|

The Chief OHS should provide leadership for this committee.

| Page 43: Commented | Author |
|---|---|

A peer review means peers, not senior leadership. The chief of OHS does not need to chair M and M either. This has been assigned to and is organized by SIU. Disagree with this

| Page 43: Deleted | Author |
|---|---|

of

| Page 43: Commented | Author |
|---|---|

This is consistent with III.M.2 of the Consent Decree

| Page 43: Commented | Author |
|---|---|

The opportunities or deficiencies are identified in Mortality and Morbidity and will be passed to the process evaluation and revision experts at SIU for evaluation. Agree

| Page 43: Commented | Author |
|---|---|

There should be follow up on assigned corrective actions

| Page 43: Commented | Author |
|---|---|

 Agree. This is in policy and procedure

| Page 43: Inserted | Author |
|---|---|

**100%**

| Page 43: Inserted | Author |
|---|---|

**Feb- 21**

| Page 44: Inserted | Author |
|---|---|

|  | **Review and identify any language in the vendor's dental policies that impose a potential barrier or a restriction to any aspect of dental care** | **II.B.6.h** |
|---|---|---|

| Page 44: Deleted | Author |
|---|---|

**Review and identify any language in the vendor's dental policies that impose a potential barrier or a restriction to any aspect of dental care**

| Page 44: Commented | Author |
|---|---|

Example; The current vendor's protocols state that incarcerated individuals may be charged for replacement of lost/damaged dentures, if at the discretion of the dentist it is believed that loss/damage was due to the patient's negligence or abuse. It has been communicated to the Monitor that individuals with broken dentures have gone without dentures because they could not afford the cost of replacement. IDOC must review and modify any such restrictions that puts the health of the patient at risk.

| Page 44: Commented | Author |
|---|---|

This is unnecessary. Per the contract, the vendor is required to follow IDOC's dental policies. IDOC policy will outline rules for replacement dentures

| Page 44: Inserted | Author |
|---|---|

**comprehensive**

| Page 44: Commented | Author |
|---|---|

The Consent Decree calls for comprehensive policies and procedures. IDOC has committed to drafting dental policies on 1. using the S.O.A.P documentation format for dental notes, 2. creation of a dental care orientation manual, 3. disinfection of dental exam areas, 4. proper radiation hygiene (use of protective lead shields), 5. the provision of compressive dental exams, treatment plans, dental hygiene care, dental self-care with documentation in the dental record, 6. provision of dental cleanings every 2 years or more frequently is so needed, 7. specific consents for dental extractions, completion of appropriate dental x-rays prior to non-emergent dental extractions. **There are additional dental policies that will need to drafted.**

| Page 44: Commented | Author |
|---|---|

IDOC will draft policies guided by NCCHC and the ACA. IDOC will provide policies to the Monitors for input. Changes will be considered based on Monitor's input. IDOC cannot be expected to withhold implementation of sound medical policies, consistent with nationally recognized correctional standards, while waiting for Monitor's input. In the past such input on policy has taken months to receive.

| Page 44: Inserted | Author |
|---|---|

| Page 44: Inserted | Author |
|---|---|

   1. **Provide the drafts of these and other dental policies to the Monitor for input.**

| Page 44: Deleted | Author |
|---|---|

| Page 44: Deleted | Author |
|---|---|

**the drafts of**

| Page 44: Inserted | Author |
|---|---|

**II.B.2.; II.B.8,**

| Page 44: Inserted | Author |
|---|---|

**Jul-2022**

| Page 44: Deleted | Author |
|---|---|

**Jul-22**

| Page 44: Inserted | Author |
|---|---|

**Feb-2023**

| Page 44: Inserted | Author |
|---|---|

**Procure sufficient leaded aprons with thyroid collars so that each dental suite has a dedicated thyroid collar that is stored in the dental area.**

| Page 44: Deleted | Author |
|---|---|

**Procure sufficient leaded aprons with thyroid collars so that each dental suite has a dedicated thyroid collar that is stored in the dental area.**

| Page 44: Commented | Author |
|---|---|

Leaded aprons with thyroid collar are used to protect the radiation sensitive thyroid gland. During site visits, the monitor identified facilities with only a single leaded apron thyroid collar that was kept locked in the general radiology suite and was not readily available for use in the dental suite. Each dental suite should have a dedicated thyroid collar that is stored in the dental unit.

| Page 44: Commented | Author |
|---|---|

Requiring a separate lead apron for the dental suites is not required by the Decree. The Decree simply requires that they are used

| Page 44: Inserted | Author |
|---|---|

| Page 44: Deleted | Author |
|---|---|

#

| Page 44: Inserted | Author |
|---|---|

91 Below .

| Page 44: Inserted | Author |
|---|---|

Sept-2022

| Page 44: Deleted | Author |
|---|---|

Jun-22

| Page 44: Inserted | Author |
|---|---|

Feb-2023

| Page 44: Inserted | Author |
|---|---|

**Create a standardized list of all medical equipment required in each dental operatory in the IDOC and**

| Page 44: Deleted | Author |
|---|---|

D

| Page 44: Inserted | Author |
|---|---|

develop an

| Page 44: Deleted | Author |
|---|---|

Develop

| Page 44: Deleted | Author |
|---|---|

**1.Contract with a professional evaluator (e.g. Henry Schein) of dental suite equipment to create a standardized list of dental equipment required in all dental operatories in the IDOC.**

| Page 44: Inserted | Author |
|---|---|

**1.Contract with a professional evaluator (e.g. Henry Schein) of dental suite equipment to create a standardized list of dental equipment required in all dental operatories in the IDOC.**

| Page 44: Commented | Author |
|---|---|

III.K.9 states that "IDOC shall conduct annual surveys to evaluate dental equipment to determine ...equipment that needs to be repaired or replaced." To date, the Monitor has not been provided with a dental equipment survey list/instrument or the results of annual survey of dental equipment. IDOC is encouraged to consider to hire an outside consultant to expedite  this long overdue survey. During site visits the Monitor has noted missing equipment, defective dental chairs, and non-functioning sterilization machines.

| Page 44: Commented | Author |
|---|---|

This task is not necessary to meet our obligations outlined in the Decree.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. *Doe v. Cook County*, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 44: Inserted | Author |
|---|---|

**2.Develop an instrument to perform an initial and thereafter annual survey of presence, functionality, and calibration status (if required) of dental equipment in every IDOC dental suite. A record or log of the dates and findings of annual dental equipment surveys are to be maintained**

**3.Dental operatory equipment that is missing, broken, or defective must be replaced. Work orders or fiscal requests must be tracked and regularly reported to the facility QI meeting until repairs are completed or new equipment is installed.**

**4. Each dental unit needs to track the last servicing or calibration and keep a record or log of servicing and calibrations which generally should be done at least annually.**

**5. Each facility's documentation of servicing, calibration, needed repairs and  replacements, and the turnaround time of work and purchase orders are be reported annual to the system's Quality Council**

| Page 44: Deleted | Author |
|---|---|

**. Each facility's documentation of servicing, calibration, needed repairs and replacements, and the turnaround time of work and purchase orders are be reported annual to the system's Quality Council**

| Page 44: Commented | Author |
|---|---|

II.B.2 states "IDOC shall require ….monitoring of care by collecting and analyzing data to determine how well the system is providing care."  Broken or non-functional dental equipment results in diminished access to much needed dental care in the IDOC.

| Page 44: Commented | Author |
|---|---|

Agree

| Page 44: Deleted | Author |
|---|---|

| Page 44: Inserted | Author |
|---|---|

**. The annual independent audit would determine whether this survey of dental equipment was done and whether appropriate action was taken.**

| Page 44: Deleted | Author |
|---|---|

**The annual independent audit would determine whether this survey of dental equipment was done and whether appropriate action was taken.**

| Page 44: Commented | Author |
|---|---|

The annual audit will determine if the annual survey was done and whether appropriate actiontaken.  But an annual survey of equipment should be performed by a qualified dental equipment surveyor (e.g. Henry Schein)

| Page 44: Commented | Author |
|---|---|

This is not required by the Decree which allows OHS to audit itself II.B.9

| Page 44: Inserted | Author |
|---|---|

| Page 44: Inserted | Author |
|---|---|

**III. K.13**

| Page 44: Deleted | Author |
|---|---|

**II.B.9.**

| Page 44: Inserted | Author |
|---|---|

Sept-2022

| Page 44: Deleted | Author |
|---|---|

**Sep-22**

| Page 44: Inserted | Author |
|---|---|

**Mar 2023**

| Page 44: Inserted | Author |
|---|---|

**Audits of the dental provisions in the Consent Decree should be done by independent auditors with backgrounds and training in dental care (i.e dentists and dental hygienists)**

| Page 44: Deleted | Author |
|---|---|

**Audits of the dental provisions in the Consent Decree should be done by independent auditors with backgrounds and training in dental care (i.e dentists and dental hygienists)**

| Page 44: Commented | Author |
|---|---|

II.B.9. states "The implementation of this Agreement shall also include the design, with the assistance of the Monitor, of an audit function ….which for independent review of all facilities' QA programs, either by OHS or by another disinterested auditor." SIU drafted a dental performance review data tool in March 2022 for which the Monitor provided feedback advising that a dentist should review the dental performance review section. There has been no further information about the dental care audit tool provided to he Monitor.

| Page 44: Commented | Author |
|---|---|

This requirement is inconsistent with the Decree and is above community standard.  Community dentists do not have somebody come in and decide if they are competent.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 44: Inserted | Author |
|---|---|

**II.B.9**

| Page 44: Inserted | Author |
|---|---|

**Mar 2022**

| Page 44: Deleted | Author |
|---|---|

**Sep**

| Page 44: Inserted | Author |
|---|---|

**Jun-2023**

| Page 44: Deleted | Author |
|---|---|

**-22**

| Page 44: Inserted | Author |
|---|---|

**1.The facility dental care orientation manual should include information on the dental services provided in the IDOC, directions on how to submit requests for routine and urgent dental care including dental cleanings, and**

| Page 44: Deleted | Author |
|---|---|

dental care

| Page 44: Deleted | Author |
|---|---|

and

| Page 44: Commented | Author |
|---|---|

This is not required by the Decree

| Page 44: Deleted | Author |
|---|---|

 education on dental hygiene and dental self care

| Page 44: Inserted | Author |
|---|---|

 education on dental hygiene and dental self care.

| Page 44: Commented | Author |
|---|---|

The dental condition of the new admissions to IDOC is abysmal. The majority of the inmates need a significant amount of dental work; they need orientation in how to access dental services and education on how they can improve their oral health.   IDOC has reported that they are planning to update the Dental Service Orientation Manual. To date the Monitor has not yet received the old orientation manual, let alone a draft of a new manual.

| Page 44: Commented | Author |
|---|---|

Agree to ensure that
Each facility's orientation manual shall include instructions regarding how prisoners can access dental care at that facility.

| Page 44: Inserted | Author |
|---|---|

| Page 44: Inserted | Author |
|---|---|

**III.K.2**

| Page 44: Inserted | Author |
|---|---|

Sept 2022

| Page 44: Inserted | Author |
|---|---|

**023**

| Page 44: Deleted | Author |
|---|---|

**2**

| Page 44: Inserted | Author |
|---|---|

1. **Panorex x-rays will be performed on all new admissions to the IDOC**

**Intake screening dental examinations at the reception centers shall include intra- and extra-oral tissue examination**

1.

| Page 44: Commented | Author |
|---|---|

Panorex films are currently part of the dental screening and should be continued. III.K.3 states " ...screening dental examinations at the receptions ...shall include intra- and extra-oral soft tissue examination." It is important the dental screening include both the examination of teeth but also intra- and extra-oral soft tissue to identify inflammation, infection, dysplasia, and cancer.

| Page 44: Commented | Author |
|---|---|

Agree

| Page 44: Inserted | Author |
|---|---|

1.

| Page 45: Inserted | Author |
|---|---|

initial

1.

| Page 45: Inserted | Author |
|---|---|

and timely referrals for evaluation and development of comprehensive medical and dental treatment plans based on acuity

1.

| Page 45: Commented | Author |
|---|---|

The intake evaluation is not the appropriate setting to address a comprehensive treatment plan although urgent matters must be addressed. The patient needs to be timely referred so that a comprehensive therapeutic plan can be developed. The time line of referral needs to ensure safety of the patient.

| Page 45: Commented | Author |
|---|---|

Agree

| Page 45: Inserted | Author |
|---|---|

.

1.

| Page 44: Inserted | Author |
|---|---|

, III.K.3

| Page 44: Inserted | Author |
|---|---|

Mar-2023

| Page 44: Deleted | Author |
|---|---|

Dec-22

| Page 45: Deleted | Author |
|---|---|

Develop audit to ensure a comprehensive dental treatment plan is created at the time of the first comprehensive dental visit, unless the initial visit is an emergency

| Page 45: Inserted | Author |
|---|---|

See 42.a.1) above which discusses development of an audit. This should be included in that instrument.

| Page 45: Deleted | Author |
|---|---|

| Page 45: Inserted | Author |
|---|---|

**II.B.9.;**

| Page 45: Inserted | Author |
|---|---|

**Mar 2023**

| Page 45: Deleted | Author |
|---|---|

**Jun-22**

| Page 45: Deleted | Author |
|---|---|

**Develop audit to ensure comprehensive examinations, X rays, oral cancer screening, and appropriate charting occurs prior to dental treatment.**

| Page 45: Inserted | Author |
|---|---|

**See 42.a.1) above which discusses development of an audit. This task can be included in that instrument.**

| Page 45: Deleted | Author |
|---|---|

| Page 45: Inserted | Author |
|---|---|

**II.B.9.;**

| Page 45: Inserted | Author |
|---|---|

**Mar-2023**

| Page 45: Deleted | Author |
|---|---|

**Nov-20**

| Page 45: Deleted | Author |
|---|---|

**healthcare vendor**

| Page 45: Inserted | Author |
|---|---|

**IDOC**

| Page 45: Inserted | Author |
|---|---|

**annual**

| Page 45: Deleted | Author |
|---|---|

**peer**

| Page 45: Inserted | Author |
|---|---|

**I**

| Page 45: Commented | Author |
|---|---|

It would best to label this section " annual" reviews not "peer" reviews due to "peer" reviews being used by IDOC to mean providers who being sent to the SIU Clinical Quality Group for investigation of significant concerns about performance.

| Page 45: Commented | Author |
|---|---|

Agree

| Page 45: Deleted | Author |
|---|---|

**III.K.9**

| Page 45: Inserted | Author |
|---|---|

**II.B.2.; II.B.3.; II.B.6.r.; V.G**

| Page 45: Deleted | Author |
|---|---|

peer

| Page 45: Commented | Author |
|---|---|

IDOC has done dentist annual reviews since 2020. The dentists are reviewed by other dentists in the IDOC. This creates a potential risk of pro or con bias and lack objectivity. IDOC should contract with independent consulting dentists possibly from SIU to perform the dentist reviews. It would best to label this section annual reviews not peer reviews due to "peer" reviews being used by IDOC to mean providers who being sent to the SIU Clinical Quality Group for investigation of significant concerns about performance.

| Page 45: Commented | Author |
|---|---|

This is not required by the Decree and inconsistent with community standards.

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. *Doe v. Cook County*, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 45: Inserted | Author |
|---|---|

1. Contract with independent consulting dentists to perform annual dentist reviews. See task 84

| Page 45: Deleted | Author |
|---|---|

1. Contract with independent consulting dentists to perform annual dentist reviews. See task 84

| Page 45: Inserted | Author |
|---|---|

2020

| Page 45: Inserted | Author |
|---|---|

Mar 2023

| Page 45: Deleted | Author |
|---|---|

Jun-22

| Page 45: Inserted | Author |
|---|---|

annual

| Page 45: Inserted | Author |
|---|---|

and dental hygienists

1. Develop a standardized performance review tool for IDOC and vendor/contracted dental assistants that evaluates competency of dental assistants in performing their duties including cleaning and sterilization of dental equipment and disinfection of dental operatory surfaces

2. Develop a standardized performance review tool for IDOC and vendor/contracted dental hygienists that evaluates competency of dental hygienists in performing their duties but primarily focuses on the clinical services delivered by the dental hygienist.

3. Collaborate with SIU Clinical Quality Group in the development of the performance review tools for both dental assistants and dental hygienists.

4. Performance reviews should be shared with and signed by the dental assistants and dental hygienists, reviewed by the Chief of Dentistry, deficiencies addressed with training and/or corrective actions, and results reported annually to the IDOC Quality Council.

| Page 46: Commented | Author |
|---|---|

III.K.9 states "...IDOC shall establish a peer review system for all dentists and annual performance evaluations for dental assistants." Dental hygienists must be added to the dental team that has annual clinical performance evaluations.
Currently IDOC-employed and vendor-employed dental assts and hygienists are evaluated using the State's Individual Development and Performance System which touches on some clinical aspects of their duties and is shared/signed by the reviewee . Vendor-employed assts and hygienists are evaluated by a generic Salary Compensation Calibration Worksheet which does not evaluate the performance of clinical duties and is not shared with the employee. IDOC needs to develop a single shared clinical performance evaluation tool that assesses the performance of all dental assts and hygienists working in the IDOC .

| Page 46: Commented | Author |
|---|---|

Agree

| Page 45: Inserted | Author |
|---|---|

, SIU

| Page 45: Inserted | Author |
|---|---|

Nov-2022

| Page 45: Deleted | Author |
|---|---|

Jun-22

| Page 45: Inserted | Author |
|---|---|

 Apr-2023

| Page 46: Inserted | Author |
|---|---|

annual and new hire orientation

| Page 46: Inserted | Author |
|---|---|

1.

| Page 46: Inserted | Author |
|---|---|

Dental Policies and Procedures

**Infection Control guidelines**

**2.Identify who will provide the training and how the training will be done (in-person, zoom presentation, etc), and where the documentation of training will be maintained.**

| Page 46: Commented | Author |
|---|---|

IDOC needs to list sub-steps that are needed to organize and provide training to all dental staff.

| Page 46: Commented | Author |
|---|---|

Agree

| Page 46: Inserted | Author |
|---|---|

**3.An annual report covering training of dental staff will be provided to the IDOC Quality Council.**

| Page 46: Commented | Author |
|---|---|

II.B.2 states "IDOC shall require…. the monitoring of health care by collecting and analyzing data to determine how well the system is providing care."   Well trained staff are better staff. The Quality Council needs to track and monitor that all staff are receiving no less than annual training and updates in order for the system to better provide health care services to the incarcerated population in IDOC.

| Page 46: Commented | Author |
|---|---|

IDOC disagrees that this is an appropriate use of SLC. Dental staff shall participate in all relevant trainings. That information can be maintained at a facility level or with the vendor

| Page 46: Inserted | Author |
|---|---|

| Page 46: Inserted | Author |
|---|---|

**II.B.2**

| Page 46: Inserted | Author |
|---|---|

**, Infectious Disease Coordinator**

| Page 46: Inserted | Author |
|---|---|

**3**

| Page 46: Deleted | Author |
|---|---|

**2**

| Page 46: Inserted | Author |
|---|---|

**See previous tasks on  adverse event reporting, audits, quality**

| Page 46: Inserted | Author |
|---|---|

**improvement, and outcomes**

| Page 46: Inserted | Author |
|---|---|

**and performance.  It is presumed that dental is to be included in all areas of quality improvement**

| Page 46: Inserted | Author |
|---|---|

**Mar 2022**

| Page 46: Deleted | Author |
|---|---|

**Dec-22**

| Page 46: Inserted | Author |
|---|---|

**Jun 2023**

| Page 46: Inserted | Author |
|---|---|

1. Standardize policies and procedure for provision of urgent/emergent services to include expectations for training, demonstrated competency and clinical proficiency in determining the urgent or emergent nature of the response needed, and documentation thereof.
Train staff to provide urgent/emergent services consistent with policy and procedure, validate staff competency in urgent/emergent care initially and annually thereafter. Track and report of training completion and competency evaluation through the quality improvement process.
1.

| Page 46: Commented | Author |
|---|---|

The draft implementation plan has no tasks to address III. G. 2. the obligation of medical staff to determine whether a situation is urgent or emergent and the respondent care required. The Monitor's reviews have thus far identified substantive deficiencies by IDOC in maintaining readiness, skill proficiency and documentation of urgent/emergent episodes of care. IDOC needs to set performance standards for these in policy and implement them statewide to ensure that patients are provided access to appropriate, timely and responsive urgent/emergent care consistent with II.A., II.B.1., II.B.3 and II.B.6.b.

| Page 46: Commented | Author |
|---|---|

IDOC is drafting a policy about urgent/emergent services.  However, to try to audit whether they were done correctly is vague and subjective.

| Page 46: Inserted | Author |
|---|---|

1.

| Page 46: Inserted | Author |
|---|---|

, as well as documentation of effort to obtain such documentation.
1.

| Page 46: Commented | Author |
|---|---|

This addition is necessary to achieve III.G.3 of the Consent Decree.

| Page 46: Commented | Author |
|---|---|

Agree

| Page 46: Deleted | Author |
|---|---|

.
1.

| Page 46: Deleted | Author |
|---|---|

Revise
1.

| Page 46: Commented | Author |
|---|---|

The use of a separate log is not required by the Decree. IDOC will otherwise continue to track

| Page 46: Deleted | Author |
|---|---|

 and sStandardize offsite
1.

| Page 46: Inserted | Author |
|---|---|

S
1.

| Page 46: Commented | Author |
|---|---|

The off-site services log does not track urgent/emergent services that are delivered on-site.  The Consent Decree requires that *all* these services be tracked. Not just the those delivered off-site. The redline change is to establish a method of tracking all urgent/emergent encounters called for in III.G.1.  The information that needs to be included on the urgent/emergent log is listed in recommendation 4 of the Monitor's 5th Report (page 104)  The Monitor also recommended changes to the off site services log but its continued use as the sole tracking of urgent/emergent care is not sufficient to comply with III.G.1.

| Page 46: Commented | Author |
|---|---|

Agree

| Page 46: Deleted | Author |
|---|---|

   -tracking of all onsite and offsite urgent/ emergent services in separate a log books.

| Page 46: Inserted | Author |
|---|---|

-tracking of all onsite and offsite urgent/ emergent
1.

| Page 46: Inserted | Author |
|---|---|

 in separate a
1.

| Page 46: Inserted | Author |
|---|---|

 books.
1.

| Page 46: Inserted | Author |
|---|---|

, Agency Training Coordinator

| Page 46: Inserted | Author |
|---|---|

| Page 47: Inserted | Author |
|---|---|

The Capital Development Board in consultation with the Chief OHS will hire a qualified

| Page 47: Deleted | Author |
|---|---|

the health care units and other

| Page 47: Inserted | Author |
|---|---|

all

| Page 47: Inserted | Author |
|---|---|

.  The Capital Development Board will hire a consultant qualitifiedqualified (in health facility design and operation) to evaluate structural space and equipment relative to a useful life determination.

| Page 47: Deleted | Author |
|---|---|

qualitified

| Page 47: Commented | Author |
|---|---|

This task, as written, lacks detail.  The detail added is consistent with task 79.  Task 79 can be eliminated as it is duplicative. In task #79, IDOC stated, "For projects administered by the Capital Development Board there is an Architect/Engineering firm hired to design the construction. Firms hired for both A/E and construction are competitively procured once the specifications are published, and then overseen by both CDB, who also

Employs architects and engineers, as well as the Department". We agree. The Capital Development Board should hire a consultant capable of evaluating whether space and equipment can adequately serve its purpose.  This requires someone with expertise in health facility structural evaluation and equipment adequacy.

| Page 47: Commented | Author |
|---|---|

IDOC is committed to ensuring that patients have adequate space to receive medical and dental care.

| Page 47: Inserted | Author |
|---|---|

.

| Page 47: Inserted | Author |
|---|---|

**II.B.2, II.B.3, III.B.1-2, III.K.13., IV.A.2**

| Page 47: Deleted | Author |
|---|---|

**IDOC Human Resources**

| Page 47: Inserted | Author |
|---|---|

**Capital Development Board**

| Page 47: Commented | Author |
|---|---|

IDOC Human Resources would not be capable of hiring a consultant to evaluate physical space and equipment.  This should be done by the Capital Development Board whose line of work involves  physical space and capital improvements and would typically hire such a consultant.

| Page 47: Commented | Author |
|---|---|

IDOC should be able to use any appropriate resources at its disposal to conduct an analysis of healthcare space

| Page 47: Inserted | Author |
|---|---|

| Page 47: Deleted | Author |
|---|---|

**Jun-22  1/1/2**

| Page 47: Inserted | Author |
|---|---|

**1/1/2Fed 233**

| Page 47: Deleted | Author |
|---|---|

**3**

| Page 47: Inserted | Author |
|---|---|

Develop structural space and fixed equipment

| Page 47: Commented | Author |
|---|---|

Equipment is necessary to provide adequate medical care as required in provisions II.B.2-3; III.B; and III.K.13

| Page 47: Commented | Author |
|---|---|

Agree that an equipment list should be developed for all specialized areas.

| Page 47: Inserted | Author |
|---|---|

 for **all** clinical activities necessary to provide adequate medical and dental care.

| Page 47: Deleted | Author |
|---|---|


| Page 47: Inserted | Author |
|---|---|

Clinical spaces include all health care units, dental units, intake areas, clinical examination rooms, support spaces necessary to carry out medical functions, infirmaries or other specialized housing for those with severe disabilities, are severely infirm, or have dementia or memory issues and are unable to care for themselves

| Page 47: Inserted | Author |
|---|---|

 Benchmark requirements consist of a space and equipment typically available In a contemporary health program.

| Page 47: Commented | Author |
|---|---|

This adds detail to the task 104 missing from IDOC's version.

| Page 47: Commented | Author |
|---|---|

This requirement must be evaluated by what is necessary to remedy an ongoing constitutional violation

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. *Doe v. Cook County*, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 47: Inserted | Author |
|---|---|

**II.B.2, II.B.3, III.B.1-2, III.K.13., IV.A.2**

| Page 47: Inserted | Author |
|---|---|

 **in consultation with Chief OHS and designees, Consultant for survey of aged, infirm and disabled and Monitor**

| Page 47: Commented | Author |
|---|---|

The consultant needs to understand how care is to be provided and the scope of services necessary.  For this reason, the Chief OHS and designees and the consultant determining physical space and equipment needs of the aged, infirm, and disabled are included.

| Page 47: Commented | Author |
|---|---|

Agree

| Page 47: Deleted | Author |
|---|---|

**Nov-22 Mar 2023**

| Page 47: Inserted | Author |
|---|---|

 **Mar 2023May 23**

| Page 47: Inserted | Author |
|---|---|

Using the requirements in task #104 as a benchmark, d

| Page 47: Deleted | Author |
|---|---|

D

| Page 47: Deleted | Author |
|---|---|

| Page 47: Inserted | Author |
|---|---|

useful life

| Page 47: Commented | Author |
|---|---|

Useful life is a standard methodology for determining if a physical space or piece of equipment needs replacement.  If the structural space is not consistent with typical health care space, a decision will need to be made with respect to whether rehabilitation or replacement is needed.

| Page 47: Commented | Author |
|---|---|

Not sure what user life standard means

| Page 47: Deleted | Author |
|---|---|

health care units

| Page 47: Inserted | Author |
|---|---|

medical and dental space

| Page 47: Deleted | Author |
|---|---|

| Page 47: Deleted | Author |
|---|---|

clinical

| Page 47: Inserted | Author |
|---|---|

medical, dental, support and housing (infirmaries and other housing spaces for infirm, disabled, or persons with dementia

| Page 47: Deleted | Author |
|---|---|

spaces

| Page 47: Inserted | Author |
|---|---|

 (including dental and medical support space) and living space for persons who need medically supervised housing (aged, infirm, and disabled). This analysis would include any physical space or structure that impairs the delivery of care, access to care, or the safety of staff and/or the incarcerated population.  The consultant will use the staffing analysis, to estimate current and future needs of staff who may work for IDOC.

| Page 47: Commented | Author |
|---|---|

This incorporates task 106 and 107 from below.

| Page 47: Commented | Author |
|---|---|

Agree

| Page 47: Inserted | Author |
|---|---|

Use the recommendations of the survey of the aged, infirm and disabled to estimate housing and other needs of this population,

| Page 47: Commented | Author |
|---|---|

This refers to tasks 64-70 above which is essential for the task of the physical space consultant to consider.

| Page 47: Commented | Author |
|---|---|

Agree

| Page 47: Inserted | Author |
|---|---|

The analysis will result in a report with recommendations on how to establish adequate medical and dental clinical and support space as well as adequate specialized infirmary or medical housing for the aged, infirm and disabled who need to live in a medically monitored unit. The recommendation will provide an opinion regarding deficient space whether to rehabilitate existing space or build new space to provide adequate facilities. The analysis and recommendations will be given by facility.

| Page 47: Commented | Author |
|---|---|

These comments add detail that is otherwise missing and include tasks 107-8 below.

| Page 47: Commented | Author |
|---|---|

Agree

| Page 47: Inserted | Author |
|---|---|

Determinations on improvements to physical space will be made in accordance with Defendants obligations under the Decree and do not establish a minimum standard by which to measure compliance

| Page 47: Inserted | Author |
|---|---|

**II.B.2, II.B.3, III.B.1-2, III.K.13., IV.A.2**

| Page 47: Deleted | Author |
|---|---|

**Nov-22 July**

| Page 47: Inserted | Author |
|---|---|

**July Aug 2023**

| Page 47: Inserted | Author |
|---|---|

| 105.a. | Develop an analysis of all existing fixed and mobile medical and dental equipment typically necessary to equip facilities for the types of services provided at each facility. The analysis will describe whether necessary fixed and mobile equipment is currently available and functional. The meaning of functional will include a useful-life perspective. The analysis will result in a report with recommendations on how to remedy any deficiencies identified. Equipment beyond useful life will be identified in the report. | II.B.2, II III.B.1-2 III.K.13. |
|---|---|---|

| Page 47: Commented | Author |
|---|---|

This provides detail on how equipment should be evaluated.

| Page 47: Commented | Author |
|---|---|

This recommendation is unclear

| Page 47: Deleted | Author |
|---|---|

**July 2023**

| Page 47: Deleted | Author |
|---|---|

Using the staffing analysis, survey work space availability for current and future staff

| Page 47: Inserted | Author |
|---|---|

. See items above.

| Page 47: Deleted | Author |
|---|---|

**Physical Plant**
**Consultant**

| Page 47: Deleted | Author |
|---|---|

**May-22**

| Page 47: Deleted | Author |
|---|---|

**May-23**

| Page 48: Deleted | Author |
|---|---|

Develop recommendations to ensure that current and future health care staff have sufficient work space to perform their duties

| Page 48: Inserted | Author |
|---|---|

. See items above

| Page 48: Deleted | Author |
|---|---|

**Physical Plant Consultant**

| Page 48: Deleted | Author |
|---|---|

**May-22**

| Page 48: Deleted | Author |
|---|---|

**May-23**

| Page 48: Deleted | Author |
|---|---|

Develop recommendations to ensure that health care units and clinical spaces are sufficient to meet the medical needs of the population

| Page 48: Inserted | Author |
|---|---|

See items above

| Page 48: Deleted | Author |
|---|---|

**Physical Plant Consultant**

| Page 48: Deleted | Author |
|---|---|

**May-22**

| Page 48: Deleted | Author |
|---|---|

**May-23**

| Page 48: Inserted | Author |
|---|---|

Based on recommendations in the consultant's report,

| Page 48: Deleted | Author |
|---|---|

Develop

| Page 48: Inserted | Author |
|---|---|

develop a

| Page 48: Inserted | Author |
|---|---|

and equipment

| Page 48: Commented | Author |
|---|---|

The recommendations should be informed and based on the analysis of facilities and equipment.

| Page 48: Commented | Author |
|---|---|

This requirement must be evaluated by what is necessary to remedy an ongoing constitutional violation

The plain language of the PLRA requires that a "court shall not grant or approve any prospective relief" absent PLRA narrowness-need-intrusiveness findings. Doe v. Cook County, 798 F.3d 558 (7th Cir. 2015) (emphasis in original). And while simple enforcement of a consent decree does not require a new round of findings under the PLRA, this implementation plan will be "incorporated into, and become enforceable as part of this Decree". Dkt. 1557 at 19. Therefore, this recommendation cannot be approved as there has been no finding that there is an ongoing violation of federal law, and even if there were, the Court has not found that this recommendation extends no further than necessary to correct any violation of a federal right or that this recommendation is the least intrusive means to correct said violation.

| Page 48: Inserted | Author |
|---|---|

**II.B.2, II.B.3, III.B.1-2, III.K.13., IV.A.2**

| Page 48: Inserted | Author |
|---|---|

**Can only be accomplished once deficiencies have been outlined**

| Page 48: Deleted | Author |
|---|---|

**Jul 24May 2023**

| Page 48: Inserted | Author |
|---|---|

**May 2023**

| Page 48: Commented | Author |
|---|---|

To synchronize with the budget year, a May 2023 proposal is more appropriate as the budget year is July to June.

| Page 48: Commented | Author |
|---|---|

Not clear on what monitor means by "To synchronize with the budget year"

| Page 48: Deleted | Author |
|---|---|

s

| Page 48: Inserted | Author |
|---|---|

S

| Page 48: Inserted | Author |
|---|---|

medical and dental

| Page 48: Deleted | Author |
|---|---|

work

| Page 48: Inserted | Author |
|---|---|

and equipment

| Page 48: Deleted | Author |
|---|---|

staff

| Page 48: Inserted | Author |
|---|---|

operations and care for all inmates in need of medical care or medical supervision

| Page 48: Commented | Author |
|---|---|

Adds detail that conforms to Consent Decree (provisions II.B.2-3).

| Page 48: Inserted | Author |
|---|---|

**II.B.2, II.B.3, III.B.1-2, III.K.13., IV.A.2**

| Page 48: Deleted | Author |
|---|---|

**Jul-25July 2024**

| Page 48: Inserted | Author |
|---|---|

**July 2024 will be established once scope of work is completed**

| Page 48: Inserted | Author |
|---|---|

| **110.a.** | Develop a timeline for completion of any rehabilitation or construction. | **II.B.2, II** **III.B.1-2** **III.K.13.** |
|---|---|---|

| Page 48: Commented | Author |
|---|---|

No timeline is associated with completion of the task.  A timeline should be included.

| Page 48: Commented | Author |
|---|---|

Proposed timeline included

| Page 48: Deleted | Author |
|---|---|

**December 2024**

Header and footer changes

Text box changes

Header and footer text box changes

Footnote changes

| Page 11: Inserted | Author |
|---|---|

[1] Critical positions are OHS non-clerical staff, HCUAs, Medical Directors, Directors of Nursing, Dentists, Dental Hygienists, Physical Therapists,  and Project Management staff which should be filled as soon as possible.

Endnote changes