UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DON LIPPERT, et al., ) | |
| ) | |
| Plaintiffs, ) | No. 10-cv-4603 |
| v. ) | |
| ) | Judge Jorge L. Alonso |
| ROB JEFFREYS, et al., ) | Magistrate Judge Susan E. Cox |
| ) | |
| Defendants. ) | |

**PLAINTIFFS' MOTION FOR A HEARING AND RELIEF CONCERNING
DIXON CORRECTIONAL CENTER**

Plaintiffs, by their attorneys, respectfully request that the Court set a prompt date for a hearing with the Monitor concerning conditions at Dixon Correctional Center, and order relief as set forth below. Courts routinely hear directly from their monitors, and a hearing on Dixon will promote transparency in a matter of public concern. In support, Plaintiffs state as follows:

**I. Introduction.**

1. Dixon is a death trap for elderly prisoners. Nine years ago, in February 2014, the first Court-appointed Expert and his team visited Dixon, where many of the oldest, sickest, and most fragile of the State's prisoners were housed. "Dixon is a multi-mission prison that houses male offenders with special needs including seriously mentally ill, developmentally disabled and geriatric inmates with cognitive and /or mobility impairments . . .." Dkt. 339 at 129. Dixon was in bad shape. There were "breakdowns with almost every major service that inmates receive." *Id*.

2. Two months ago, in December 2022, the Court-appointed Monitor and his team visited Dixon. Nothing has changed. Some things are worse. Dixon still houses the old, the sick, the acutely mentally ill. They cannot be cared for with the existing healthcare staff. The sickest are the most neglected. A deficit of security staff adds to the problems. Patients miss urgently

1

needed outside appointments and wait months for follow-up care. A test or consultation that a specialist has said they need in two months may happen six months later, or not at all. The prison does not even have enough vehicles for transport. It is supposed to have two doctors; it has only one. There is no nursing supervisor. There is supposed to be a full-time dentist. A dentist comes once a week.

3. In the prison's three-story healthcare building—built in 1918— a diabetic with a baseball sized foot ulcer roamed the third floor. This structure is where the old and sick and disabled live. While the first Court-appointed Expert reported, in 2014, that the building was old but "reasonably clean [and] well maintained" (Dkt. 339 at 132), now it is a wreck, littered with cracked tiles that pose tripping hazards. The showers are foul. In December, it housed 109 patients, 66 of them on the third floor. The Monitoring team found that there is often *no medical staff at all* assigned to the third floor. Instead, a single guard is supposed to monitor all 66 patients and call medical staff from elsewhere if the guard believes they are needed. There is only one working elevator. When that recently broke, staff had to carry patients up and down the stairs.

4. The man with the foot ulcer should have been in the infirmary, but the Dixon infirmary is filled with permanent patients, men who need long-term nursing care not the short-term attention a prison infirmary can provide.[1] But why they are there, and what the plan for them is, is impossible to tell: the "medical" notes are useless. Even routine care—relatively simple things that should have been fixed by now if nothing else was—is lacking. Dixon does a

---

[1] At Dixon persons who are considered "housing only" or permanent housing account for 88% of the infirmary beds. Dkt. 1579 at 110.

poor job on adult immunizations and cancer screenings.[2] Patient falls go untracked and unreported.

5.  A hearing will enable the Court to understand, without delay, the gravity of the current risks to Dixon Class members from Defendants' almost-complete failure to perform their commitments under the Decree. The conditions at Dixon are inexcusable nine years after the First Court-Appointed Expert reported on the same conditions and four years into a Decree in which Defendants promised to fix those conditions. Dixon cannot wait for Defendants to make the changes in the Implementation Plan.

II. **Courts routinely hear directly from their monitors, and a hearing will serve the purposes of transparency and accountability in a matter of public concern.**

6.  Courts often include their monitors in hearings in proceedings related to compliance with complex court injunctions or consent decrees, especially when urgent and emergent issues are at issue. Just within the federal courts of Illinois, in *Monroe v. Rauner*, 18-cv-156-NJR, U.S.D.C S.D. Ill., Chief Judge Nancy J. Rosenstengel includes the two monitors appointed last year in routine status conferences concerning IDOC's progress and emergent issues as to compliance with her orders.[3] In this district, Chief Judge Rebecca R. Pallmeyer has continued Judge Robert Dow's practice of including the court-appointed monitor in status conferences and other hearings related to the Chicago Police Department consent decree, *State of Illinois v. City of Chicago*, 17-cv-6260.

---

[2] Dixon Correctional Center/SIU School of Medicine "Audit" dated August 22, 2022, attached as Exhibit 1.

[3] In *Monroe*, the court has entered a series of preliminary injunctions concerning healthcare for a class of prisoners with gender dysphoria in IDOC custody; the two monitors/special masters appointed last year are charged with investigating and reporting as to compliance with these orders.

3

7. The Decree here does not limit the Monitor's duties of information-sharing with the parties and the Court to the submission of written reports. The Decree explicitly contemplates that the Monitor and his team members will testify or provide opinions in court proceedings: "In any court proceeding related to this Decree . . . the Monitor and his or her consultants may testify and opine upon ultimate issues in this case." Dkt. 1557 at 27-28 (§ X.D).

8. A public hearing concerning Dixon accords with the Seventh Circuit's oft-reiterated commitment to transparency in court proceedings, especially where issues of public trust are involved. This commitment spans every kind of case and every procedural context. "What happens in the federal courts is presumptively open to public scrutiny." *Hicklin Engineering, L.C. v. R.J. Bartell*, 439 F.3d 346, 348 (7th Cir. 2006). This extends even to cases involving "state secrets." *Id*. at 349-8-49. In *B.H v. McDonald*, 49 F3d 294 (7th Cir. 1995), the Seventh Circuit held that this rule applies in the post-consent decree context just as it does in pretrial proceedings. Unlike settlements, which "are private affairs," the court noted, "consent decrees are entered as judgments and are consequently backed by the court's powers of enforcement." *Id*. at 300. Thus consent decree proceedings also implicate the public right of access. *Id*.

9. The importance of transparency is at its height when the matters at issue involve the actions of governmental officials and discussion of governmental affairs. *See American Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 597 (7th Cir. 2012) (noting "practically universal agreement that a major purpose of the First Amendment was to protect the free discussion of governmental affairs") (citation, quotation omitted). Here, matters of public trust are at issue, and significant commitments by the State. The public as well as the Court deserve to

4

hear directly about the disgraceful conditions at Dixon, and how they reflect the failure of their public officials to keep their commitments in the Decree.

### III. Defendants' complete failure to address conditions at Dixon of their own accord after the Monitor's Fifth Report is unforgiveable and warrants a hearing.

10. Defendants have had fair warning of the catastrophic conditions at Dixon over time. If they needed a reminder and further impetus to address these conditions, that should have been provided by the Monitor's Fifth Report, which the parties received six months before the Monitoring team visited Dixon in December. Some of the most disturbing case studies of care in the Monitor's Fifth Report came from Dixon.

11. These included a man (Mortality Patient 2) who had dementia documented in his record in 2016 but had "signed" two "do not resuscitate" (DNR) orders in 2016 and 2019 (the second one with an "X"). Dkt. 1579 at 191. Throughout the two years of record documents the Monitoring team reviewed, starting in the year the patient "signed" the second DNR,

> … the patient was unable to care for himself, requiring assistance to bathe, wash, transfer, or go to the toilet. . . He was not able to walk during this entire time and was bedridden or confined to a wheelchair. A normal conversation with the patient was not documented anywhere in the record that could be found.

*Id*. Records related to this patient's care were disorganized and partial, but to the extent they existed did not reflect clinical assessments of his physical disabilities, nutritional needs, or cognitive status. *Id*. at 191-96. Even after nursing notes documented decubiti, contractures, and issues with nutritional status and mental status, there was no record of any provider examination for these problems. *Id*. at 192. In his two final hospitalizations, he found to have "severe hypothermia," likely due to "severe malnutrition." *Id.* at 196. After the last hospitalization, the hospital discharged him with a certification that he needed "post-hospital care and/or rehabilitation in a skilled nursing facility" yet Dixon took him back although it could not provide

5

such care. He died. *Id.* Another patient (Mortality Patient 20), who had been transferred from Menard Correctional Center to Dixon, had no care plan developed for him on transfer; he fell in the shower four days after arrival and broke his hip. Dkt. 1579 at 265. He was so neglected that six weeks after surgery for the fall he had to ask a nurse when his sutures would be removed, and only then were they taken out. *Id.* at 266.[4] Although he could not walk, he was placed on the third floor of the healthcare building. *Id*. The Fifth Report notes:

> At the hospital the patient was noted to have a full thickness buttock wound due to maceration from incontinence which was not being monitored at the facility despite being identified at intake. It was not clear how the decubitus would be monitored on the 3rd floor. It was also not monitored or identified on a physician or nursing plan of care.

*Id*. He had been previously hospitalized for gastrointestinal bleeding, but he was placed on ibuprofen; five months later he was hospitalized again with gastrointestinal bleeding and died. *Id*. at 266-67.

12. Yet another elderly patient (Mortality Patient No. 21) was transferred to Dixon for care with a "problem list" containing "61 entries most of which were irrelevant" (only three related to disease). Dkt. 1579 at 269. Records related to his care at Dixon were also inadequate. He had clinical signs of dehydration but this "was not identified" and "[t]here was no effort to ensure that this patient with dementia was drinking sufficient fluid." *Id*. at 269, 271. He was housed permanently in the Dixon infirmary, but despite his age (88) and multiple risk factors, even by December 2021 he had not been vaccinated for COVID.[5] *Id*. at 270. He died of COVID in the infirmary after days of gasping for breath during which a nurse urged him to "do deep

---

[4] "Sutures do not normally remain for six weeks." Dkt. 1579 at 266.

[5] "Because of his dementia the medical staff had the responsibility to obtain a guardian for the patient so that needed testing and treatment could be provided. Patients who are not cognitively oriented should be vaccinated." Dkt. 1579 at 270.

6

breathing." *Id*. Yet another older Dixon patient (Mortality Patient No. 23) suffered from falls but "[t]here was no evidence of a fall prevention program." Dkt. 1579 at 278. He had suffered "traumatic brain injury as a child resulting in seizures, difficulty following commands, and altered mental status" but *there was nothing about this in the IDOC medical record*. The Monitoring team had to piece it together from hospital records. *Id*. After his hospitalization for the fall Dixon did not obtain the neurology consultation and did not document or follow hospital recommendations for care. *Id*. On a later hospitalization,

> [d]espite being on "fall prevention" the patient arrived at the hospital with bruising on his right hip and right rib cage with the hospitalist noting that the patient had frequent falls for which there was no documentation at the prison making it appear that the prison staff were unaware of his injuries.

*Id*. at 279. He continued to fall. He remained in the infirmary deteriorating and largely unmonitored in the weeks before his death, with intermittent hospitalizations; a care directive was finally obtained by the hospital from a family member about a week before he died ("This should have been done long ago by the prison as the patient had long-standing dementia"). *Id*. at 280. In "Opportunities for Improvement," the Fifth Report observes:

> Management of this person qualifies as neglect and elderly abuse. IDOC should have an internal evaluation of this case, and others, to determine how to appropriately monitor the elderly, especially those with dementia.

*Id*. at 281.

13. A final patient (Mortality Patient No. 24) was also transferred to Dixon for care; he had "multiple disabilities include[ing] previous traumatic loss of his right eye, poor vision in his left eye, sensorineural hearing loss, and difficulty transferring from a chair to bed. He needed total assistance." Dkt. 1579 at 283. Upon transfer, he had a significant, unexplained burn injury; the *first* provider note dated from *five days after transfer* "described the patient as moaning in pain with a large open wound from the burn on his thigh, draining pus." *Id*. "There was no

7

documented plan of care for this patient while on the infirmary yet the patient . . . was not consistently arousable, was unintelligible, and was intermittently combative or uncooperative with care. A nurse documented that the patient was scheduled for a wound clinic but there is no evidence that this appointment occurred." *Id*. at 283-84. He went back and forth between the Dixon infirmary and the hospital over his last weeks of life ("The hospital was not told that the thigh wound was a burn"). *Id*. at 285. Records at Dixon were inadequate to determine his condition or care; "laboratory tests indicated dehydration yet providers never documented a concern and it appeared that the patient remained dehydrated for almost two years." *Id*. at 285-87.

**IV.   Defendants have obligations under the Decree to address these urgent problems.**

14.     The intertwined problems that these death reviews illustrate are all issues that Defendants have known about for years and had committed in the Decree to address.

15.     Dixon's decrepit and dangerous healthcare building needs immediate attention. The Monitoring team does not believe that it would pass a routine ADA inspection. Two provisions of the Consent Decree require Defendants to provide, simply, "adequate facilities." Dkt. 1557 at 5 (§§ II.B.2; II.B.3). This broad obligation is coupled with another overarching commitment to "ensure the availability of necessary services, supports and other resources to meet [the medical and dental] needs" of prisoners. *Id*. at 5 (§ II.A). Other provisions about physical space and needs in the Decree specify that there must be "[a]ppropriate [] physical conditions . . . for infirmary care" as well as "adequately equipped infirmaries." *Id*. at 6, 7 (§§ II.B.6.k; II.B.6.p).

8

16. Four years after Defendants asked the Court to approve these provisions as part of a "fair, reasonable and adequate settlement" of this case,[6] the healthcare building at Dixon houses sick and disabled people among broken tiles, a chancy elevator, and doorways that cannot fit a wheelchair. A survey—a *mere survey*—of "clinical and health care spaces to ensure there is adequate space and equipment" that Defendants committed *in June 2020* to perform has not yet been done. Dkt. 1579 at 66. Rather than confronting the problems, Defendants appear determined to ignore them.[7]

17. Fixing the healthcare building would be a start on Defendants' overdue commitments, but it would be far from enough for Dixon and its vulnerable population. Many problems have festered, untouched, for a decade. As far back as 2014, the First Court-appointed Expert also reported urgent problems in in access to outside or specialty care. Dkt. 339 at 29. Delays in obtaining offsite services, both routine and urgent, were dangerously long, and exacerbated by sending patients to UIC instead of a local provider. *Id.* The resulting lapses of many months were not found "[i]n most correctional settings." *Id.* In 2018, the Second Court-appointed Expert found the same problems, noting that "consultations to UIC average six months to complete" and "range from 100 days for a cardiology consultation to 239 days for a gastroenterology consultation." Dkt. 767 at 68. In December—*nine years after the First Expert's*

---

[6] Dkt. 803.

[7] *See*, *e.g.,* Dkt. 1588 at 1, 52-53 (Defendants' argument that sections of the Decree mandating adequate space and conditions for the delivery of healthcare "do *not require a qualified person to conduct an evaluation*") (emphasis added); *id* at 38, 168 (Defendants' assertion that a process to "[s]olicit from facility HCUAs and Medical Directors information and data on backlogs for infirmary care to include . . . admissions that are delayed due to lack of beds [and] prolonged hospitalizations due to lack of infirmary capacity" would not be "fruitful"). The Court's Order yesterday rejected Defendants' position that "qualified" consultants were not needed for various tasks under the Decree, including an assessment of the "health-care related housing needs" of the aged, infirm and disabled. Dkt. 1612 at 6, 7.

9

*report of the same problems*—the Monitoring team found that Dixon staff are *still* routing patients to UIC, and still causing dangerous delays in care as a result.[8]

18. If this were not enough, the risks to patients have been compounded, in 2014 and still today, by a simple but critically important record-keeping problem: there are *no logs* of off-site care, either urgent or routine. "[I]t is essential that an urgent care [] log be maintained," the First Expert said; "The entire process [of outside consultations and procedures] *must be tracked in a logbook*." Dkt. 339 at 25, 31 (emphasis added).[9] Many of the sites visited by the First Expert were deficient, but Dixon stood out. Without a log, it was impossible to follow the care, schedule future appointments, or know what recommendations had been made: "There is no possibility," the First Expert observed, "that there can be an organized process to determine timeliness and appropriateness of responses . . . In addition, we found cases where the follow-up was deficient but of course the institution was unable to identify this." Dkt. 339 at 128.

19. Among the simplest and most direct provisions of the Decree are those requiring creation and maintenance of logs for urgent/emergent outside care and scheduled offsite care. Dkt. 1557 at 12-13 (§§ III.G.1; III.H.1). Four years into the Decree, there are *still no such logs* at Dixon.

---

[8] This is especially *unintelligible given that the provision that penalized Wexford monetarily if it did not use UIC* for medical appointments at northern prisons including Dixon *has been eliminated from the current vendor contract*.

[9] The First Expert's recommendations for fixing this—in 2014—were simple and clear. As to urgent/emergent care, "All facilities must track urgent/emergent services through using a logbook maintained by nursing which includes patient identifiers, the time and date, the presenting complaint, the location where the patient is seen, the disposition and when the patient is sent out, the return with the appropriate paperwork, including an emergency room report and appropriate follow up by a clinician"; as to scheduled offsite care, "The [] process, beginning with the request for services, must be tracked in a logbook, the fields of which would include date ordered, date of collegial review, date of appointment, date paperwork is returned and date of follow-up visit with clinician." Dkt. 339 at 28, 31.

20. The failure to track basic facts about care also disables any prospect of improving that care. Continuous quality improvement (CQI) is the mechanism by which health care systems identify and correct their errors. Nine years ago, the First Court-appointed Expert declared that Dixon's "CQI program needs to be completely rebuilt." Dkt. 339 at 166. *Multiple* provisions of the Decree require a comprehensive overhaul of the CQI program, starting at the facility level. Dkt. 1557 at 5-8, 17-18 (§§ II.B.2; II.B.6.i, l, m, n, and q; II.B.7; II.B.9; III.L.1; and III.M.2).[10] In December 2022, the Monitor and his team found that the Dixon CQI program remains non-functional. CQI minutes do report on some problems—but there are no efforts to identify solutions, no "action plans" for the problems. *See* Dkt. 1557 at 5 (§ II.B.2). The simplest things are not addressed. Although the elderly and disabled population at Dixon is, unsurprisingly, susceptible to falls and report having fallen, and falls were a notable problem in the mortality reviews of the Fifth Report, falls go untracked and unreported.

**V.  A public airing of these issues cannot and should not wait for the Monitor's next report.**

21. The Monitor's Sixth Report is due soon, and will certainly report many details of Defendants' ongoing, unameliorated non-compliance with the Decree. There will be additional death reviews from Dixon. In due course, the Monitors' reports become part of the public record. History has now shown, however, that their impact is muted. The reports are long, and hard reading. The 30-day delay between issuance and filing in the public docket—often protracted longer by some objection made by Defendants—dilutes the reports' impact, and deprives them of

---

[10] For instance, Section II.B.2 requires "the monitoring of health care by collecting and analyzing data to determine how well the system is providing care. This monitoring must include meaningful performance measurement, action plans, [and] effective peer review . . .."; Section III.L.1 requires the "implementation of a comprehensive medical and dental Quality Improvement Program *for all IDOC facilities*, which program shall be implemented with input from the Monitor." Dkt. 1557 at 5, 12 (emphasis added).

11

currency and immediacy. These delays and the fact that the reports are tucked in a court docket enables Defendants to discount them and even trivialize their findings.

22. Not long after the Court had issued its finding of contempt for Defendants' delays in creating and submitting an Implementation Plan last August (Dkt. 1577), journalists questioned the Governor at the State fair about prison healthcare in Illinois. They asked about the Fifth Report and its findings that some elderly prisoners with dementia appeared "neglected" and "abused" and that "[a]iling prisoners in some cases were not adequately hydrated or provided assistance with eating by medical staff." The Governor responding by claiming that "health care within our prison system has actually improved substantially since I took office." He said that what was currently going on in this case was merely that the Monitor had failed to respond to "the health care plan for prisons submitted in late May." (Jeremy Gorner, *Federal monitor finds Illinois prisons fail to provide adequate health care to inmates*, Chi. Trib. (Aug. 10, 2022), https://www.chicagotribune.com/politics/ct-illinois-prisons-contempt-order-20220810-45nvyohhr5byrdatuvxs3dl27e-story.html, attached as Exhibit 2). The Governor blamed Illinois *Republicans* for failing to fund prison health care—an excuse Defendants have never made to this Court.

23. The shameful conditions at Dixon, thirteen years after this case was filed, speak to Defendants' larger failures. Plaintiffs therefore request that the Court hold a prompt hearing about conditions at Dixon, and thereafter that the Court order that:

(1) Within thirty (30) days, Defendants submit a plan to the Court, the Monitor, and Plaintiffs' counsel to remedy any violations found during the hearing. The plan must include:

(a) Each step required to remedy all physical problems in the Dixon HCU (HCU means the Dixon three-story healthcare building, including all floors of same);

(b) The number of net additional staff to be assigned to the Dixon HCU and the date by which those staff will be in place, including a list of and timeline for each interim step required to effect that net increase (*e.g.*, formulating a position description if required; posting the position; completing interviews; offering jobs; start date for jobs; training if necessary prior to starting work; etc.); and

(c) Detailed plans to remedy any other violations found by the Court.

(2) The plan must provide for completion of all steps within six (6) months.

(3) In the event Defendants are unable or unwilling to produce a plan in a timely manner which will remedy all violations found by the Court, or fail timely to implement the plan, then the Court should appoint a receiver to remedy all violations.

Dated: February 22, 2023

Respectfully submitted,

By: /s/ Camille E. Bennett
*One of Plaintiffs' attorneys*

Alan Mills
Nicole R. Schult
Emily Hirsch
Uptown People's Law Center
4413 North Sheridan
Chicago, IL 60640

Harold C. Hirshman
Dentons US LLP
233 S. Wacker Drive, Ste. 5900
Chicago, IL 60606

Camille E. Bennett
Roger Baldwin Foundation of ACLU, Inc.
150 N. Michigan Ave., Ste. 600
Chicago, IL 60601